## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Case No. _____

JOHANA PAOLA BELTRAN; and those similarly situated

      Plaintiffs,

v.

PAMELA H NOONAN;
THOMAS J NOONAN;
INTEREXCHANGE, INC.;
USAUPAIR, INC.;
GREATAUPAIR, LLC;
EXPERT GROUP INTERNATIONAL INC., DBA EXPERT AUPAIR;
EURAUPAIR INTERCULTURAL CHILD CARE PROGRAMS;
CULTURAL HOMESTAY INTERNATIONAL;
CULTURAL CARE, INC. D/B/A CULTURAL CARE AU PAIR;
AUPAIRCARE INC.;
AU PAIR INTERNATIONAL, INC.;
APF GLOBAL EXCHANGE, NFP;
AMERICAN INSTITUTE FOR FOREIGN STUDY DBA AU PAIR IN AMERICA;
AMERICAN CULTURAL EXCHANGE, LLC, DBA GOAUPAIR;
AGENT AU PAIR;
A.P.EX. AMERICAN PROFESSIONAL EXCHANGE, LLC DBA PROAUPAIR; and
20/20 CARE EXCHANGE, INC. DBA THE INTERNATIONAL AU PAIR EXCHANGE

      Defendants.

---

# COMPLAINT

---

      Comes now, Johana Paola Beltran, on behalf of herself and those similarly situated, with the following complaint:

## INTRODUCTORY STATEMENT

      Foreign *au pair*s form a unique vulnerable cohort of young adult workers in the United States. The U.S. State Department administers the J-1 Visa program for *au pair*s with the best of intentions. The visas give young adults from around the world the opportunity to live with a

family in the United States, working as child care professionals while learning English and experiencing the culture. But the program has been co-opted by an illegal cartel of approved "sponsors" that set wage rates for the industry far below the market rate for non-immigrant professionals in the same industry. The sponsors collude by setting most *au pair* wages at <u>exactly</u> the absolute minimum that the sponsors believe is allowable under the Fair Labor Standards Act (the "FLSA"). All the while, the sponsors extract premiums from families seeking affordable child care with the sales pitch that even with significant sponsor fees, *au pairs* are significantly cheaper than other child care options available in the United States. Adding insult to injury, the *au pair* wage set by the sponsors are in fact often below the legal minimums set by Federal and state law.

Many *au pair*s are lucky to join great families and have exceptional experiences, but the situation is ripe for exploitation by unscrupulous "hosts." As Professor Janie Chuang noted in her groundbreaking study in the Harvard Journal of Law and Gender, the "'cultural exchange' subterfuge has created an underclass of migrant domestic workers conceptually and structurally removed from the application of labor standards and the scrutiny of labor institutions."[1] The revenue seeking agencies fiercely compete for host families, but have tacitly or explicitly agreed to set the price for labor at fixed low rate in order to increase the competitiveness of their captured labor compared to the dynamic domestic market. Many of the Defendants explicitly advertise on the internet that their labor costs are set far lower than that of their domestic labor competitors. The result suppresses wages to the benefit of the sponsors and family employers and to the detriment of the young visiting workers and their domestic competitors.

---

[1] Janie A. Chuang, The U.S. Au Pair Program: Labor Exploitation and the Myth of Cultural Exchange , 36 Harv. J.L. & Gender 269, 269 (2013), *available at* http://harvardjlg.com/wp-content/uploads/2013/09/Chuang.pdf (last visited 11/13/2014)

Often tucked away in homes in scattered communities, and with limited language skills, *au pairs*, while technically protected by U.S. and state labor laws, are often afraid and usually lack the knowledge and ability to assert their rights. The named Plaintiff, Johana Paola Beltran, like almost every *au pair* J-1 Visa holder, suffered greatly diminished wages from the price fixing scheme. But she is also a classic example of the extreme suffering this program brings when the "sponsors" fail in their obligations to protect these vulnerable workers from exploitative host families.

Ms. Beltran was recruited in Colombia by employees or agents of defendant InterExchange. After she was accepted into their *au pair* program, InterExchange matched Ms. Beltran with the Noonan family in Colorado, but kept substantial control and responsibility over Ms. Beltran's work and pay. While legally obligated to protect her interests, InterExchange set an illegal wage term in the employment agreement. When Ms. Beltran flew to the U.S., InterExchange directed her to attend an unpaid training session in New York, and then she flew to Colorado. The wages paid Ms. Beltran on their face violated the Federal law and Colorado state law. The Noonans did not even uphold their unjust contract with Ms. Beltran, and Ms. Beltran eventually managed to call InterExchange to be extricated from the situation.

Ms. Beltran's story is typical. The sponsors, under the guise of State Department approval, trade the services of working people as if they were merely commodities without the ability to demand higher wages. But even the sellers of commodities cannot collude to form a set illegal price.

## I. <u>JURISDICTION AND VENUE</u>

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (federal question), and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiffs' related claim under Colorado law.

2.      Venue is proper pursuant to 28 U.S.C. § 1391. The Plaintiff suffered harm in Colorado as result of Defendants' actions. Several of the Defendants either reside or do business in Colorado.

## II. PARTIES

3.      The Plaintiff is a natural person who currently resides in New Jersey but who performed the service contract at issue in this Complaint in Colorado.

4.      Defendants PAMELA H NOONAN and THOMAS J NOONAN (hereinafter, the "Noonans") are natural persons residing at 101 FALCON HILLS DR, HIGHLANDS RANCH, CO 80126.

5.      Defendant InterExchange, Inc. is a business entity located at 161 Sixth Avenue, New York, NY 10013.

6.      Defendant USAuPair, Inc. is a business entity located at 252 'A' Avenue, Suite 100, Lake Oswego, Oregon 97034.

7.      Defendant GreatAuPair, LLC is a business entity located at 6836 Bee Caves Road, Suite 222, Austin, TX 78746.

8.      Defendant Expert Group International Inc., dba Expert AuPair is a business entity located at 111 Second Avenue NE, Suite 213, St Petersburg, FL 33701.

9.      Defendant EurAuPair is a business entity located at 250 N Coast Highway Laguna Beach, CA 92651.

10.     Defendant Cultural Homestay International is a business entity located at 104 Butterfield Road, San Anselmo, CA, 94960.

11.     Defendant Cultural Care, Inc. d/b/a Cultural Care Au pair is a business entity located at 8 Education St, Cambridge, MA 02141.

12.     Defendant AuPairCare Inc. is a business entity located at 600 California St., Floor 10, San Francisco, CA 94108.

13.     Defendant Au pair International, Inc. is a business entity located at 4450 Arapahoe Avenue, Suite 100, Boulder, CO 80303.

14.     Defendant APF Global Exchange is a business entity located at 205 Keller Street Suite 204, Petaluma, CA 94952.

15.     Defendant American Institute For Foreign Study dba Au pair in America is a business entity located at 1 High Ridge Park, Stamford, CT 06905.

16.     Defendant American Cultural Exchange, LLC, dba goAuPair is a business entity located at 151 East 6100 South, Suite 200, Murray, UT 84107.

17.     Defendant Agent Au pair is a business entity located at 1450 Sutter Street #526, San Francisco, CA 94109.

18.     Defendant A.P.EX. American Professional Exchange, LLC dba ProAuPair is a business entity located at 433 Calle Familia, San Clemente, CA 92672.

19.     Defendant 20/20 Care Exchange, Inc. dba The International Au pair Exchange 1250 Newell Avenue, Walnut Creek, CA 94597.

20.     All Defendants other than the Noonan Defendants shall hereinafter be referred to collectively as the "Sponsors".

### III. <u>STATEMENT OF FACTS</u>

<u>*The J1 Au Pair Program*</u>

21.     The J-1 *Au pair* Program is an official U.S. State Department cultural exchange program that allows aliens aged 18-26 to work for "host families" as child care workers for 45 hours a week in exchange for room and board and a legal wage.

22.     The U.S. State Department "has outsourced its implementation of the program to fourteen State Department-designated "sponsor" *au pair* agencies. Most of these agencies are non-profit organizations-or non-profit entities of for-profit companies-that generate significant revenue

from the program fees paid by the host families and *au pair*s. With minimal oversight from the State Department . . .these agencies handle the recruitment and placement of *au pair*s and (ostensibly) monitor the host family-*au pair* relationship to ensure compliance with the State Department regulations."[2]

23.     These companies have tens of millions of dollars in annual revenue from fee-paying families.[3]

24.     On February 5, 1990 the General Accounting Office issued a report titled `Inappropriate Uses of Educational and Cultural Exchange Visas,' which sharply criticized the then United States Information Agency ("USIA") for its implementation of the *au pair* program, specifically for exceeding its congressional authority by allowing *au pair*s to be treated as other than employees under the Fair Labor Standards Act.

25.     The USIA realized its error after consulting the United States Department of Labor ("USDOL"), and after formal rulemaking issued a final rule that recognized *au pair*s congressionally mandated status as employees under the Fair Labor Standards Act, and thereby disclaimed any authority to contravene labor protections.[4]

26.     In addition to recognizing the authority of the Department of Labor and the supremacy of the Fair Labor Standards Act, USIA comments recognized the need to create a programmatic wage floor so that it could fulfill its own separate obligation to attempt to protect the *au pair*s with limited enforcement resources. It derived this floor from USDOL rules for room and board credits at "not less than $115" per week, and created a mechanism for this to automatically adjust with changes in the FLSA minimum wage. And while this rule in practice often violated the

---

[2] Chuang, *supra* note 1, at 276 (citations omitted).
[3] *Id.*
[4] Exchange Visitor Program, Final Rule, 60 Fed. Reg. 8547-8553 (Feb. 15, 1995) (amending 22 CFR Part 514).

FLSA, *e.g.*, when three meals a day are not provided, or State law when state minimum wages are set higher than the FLSA, the uniform programmatic wage floor at least gave USIA a mechanism to easily determine if the wages were a per se violation of the federal rate when their scarce resources did not allow further inquiry. [5]

27.    The Sponsors moved together to create a wage rate exactly at this floor and expressed this rate to the "host families" as a set price instead of a regulatory floor.

28.    The USIA, and subsequently the U.S. State Department, automatically adjusted the wage floor several times with changes in FLSA minimum wage or USDOL rules, and the sponsors responded to these automatic adjustments by moving together to create a wage rate at the lowest possible wage floor each time even though this wage floor was a per se violation of the wage laws of several states and in application would necessarily violate the FLSA.

29.    The Websites of the sponsors make the following statements as of November 2014:

    i.    Defendant InterExchange' Website:[6]

| Description | 2014 Costs | Payment Due |
|---|---|---|
| Au Pair Stipend | $195.75 per week for 51 weeks | Each week, on a day that you and your au pair agree upon |

    ii.    Website for USAuPair, Inc.:[7]

| | Families | New Families Transferring[1] | Repeat Families[2] |
|---|---|---|---|
| Weekly Stipend for | $ 195.75 | $ 195.75 | $ 195.75 |

[5] *Id.*

[6] InterExchange, Au Pair USA Costs, https://www.interexchange.org/au-pair-usa/child-care/au-pair-usa-costs (last visited 11/13/2014) (excerpt from website)

[7] USAuPair, Inc., Program Fees and Services, http://www.usaupair.com/au-pair-host-family-information/program-fees-and-services-2/, https://www.interexchange.org/au-pair-usa/child-care/au-pair-usa-cost (last visited 11/13/2014)

51 weeks[3]

    iii.     Website for GreatAuPair, LLC:[8]

| Paid to Your Au Pair | | |
|---|---|---|
| Au Pair Stipend | $195.75/wk | Paid per week for 52 weeks ($10,179) |

    iv.     Website for Expert Group International Inc., dba Expert AuPair:[9]

| ITEM | COST | DUE |
|---|---|---|
| Pay | Regular: $10,179 ($195.75* X 52 weeks)<br><br>Educare: $7,634.12 ($146.81* X 52 weeks) | Due according to contrac |

    v.     Website for EurAuPair Intercultural Child Care Programs:[10]

| | Regular | Par Expérience |
|---|---|---|
| Au Pair Weekly Stipend** | $195.75 | $250 |

        **Au Pair Weekly Stipend (paid directly to the au pair) is established by regulations promulgated by the U.S. Department of State in compliance with the Fair Labor Standards Act and is subject to change.

---

[8] GreatAuPair, LLC, 12-Month Au Pair Program Costs, http://www.greataupairusa.com/aupaircosts/aupaircosts.cfm (last visited 11/13/2014) (excerpt from website)
[9] Expert Group International Inc., dba Expert AuPair, Costs, http://www.expertaupair.com/index.php?option=com_k2&view=item&layout=item&id=217&Itemid=21 (last visited 11/13/2014) (excerpt from website)
[10] EurAuPair Intercultural Child Care Programs, 2014 Host Family Fees & Cost, https://www.euraupair.com/fees-and-cost/ (last visited 11/13/2014) (excerpt from website)

vi.   Website for Cultural Homestay International:[11]

**Additional costs**: In addition to the program fee, additional costs required by

the U.S. Department of State and CHI Au Pair USA include the au pair's:

Weekly stipend of $195.75

vii.   Website for Cultural Care, Inc. d/b/a Cultural Care Au pair:[12]

## Paid to your au pair
### Weekly stipend: $195.75

The weekly stipend is paid by you directly to your au pair for 51 weeks, including two weeks of paid vacation. Please note: the weekly stipend is determined by the U.S. Department of Labor using a formula based on the federal minimum wage. Any change in the federal minimum wage will result in an increase in the stipend.

viii.   Website for AuPairCare Inc.:[13]

| Au Pair Stipend | |
| --- | --- |
| **$195.75 / week** | Paid weekly to your au pair for 51 weeks |

ix.   Website for Au pair International, Inc.:[14]

| | Standard Au | Au Pair | Pre Selected |
| --- | --- | --- | --- |

---

[11] Cultural Homestay International, Program Costs 2014, http://chinet.org/au-pair/become-a-host-family/2014-program-cost/ (last visited 11/13/2014) (excerpt from website)

[12] Cultural Care, Inc. d/b/a Cultural Care Au pair, Program Costs, http://culturalcareaupair.com/costs/program-costs/ (last visited 11/13/2014) (excerpt from website)

[13] AuPairCare Inc., Program Costs, http://www.aupaircare.com/host-families/program-costs (last visited 11/13/2014) (excerpt from website)

[14] Au pair International, Inc., Program Costs, http://www.aupairint.com/program-costs.html (last visited 11/13/2014) (excerpt from website)

| | Pair and Infant Specialized Au Pair | Professional | Au Pair |
|---|---|---|---|
| **Weekly Stipend \*\*** | $195.75 | $225 | $195.75 |
| **Average cost for 45 hours of customized care** | $324/week $7.20/hour | $369/week $8.20/hour | $310/week $6.90/hour |

*\*\*Paid directly to au pair weekly*

x.    Website for APF Global Exchange, NFP:[15]

## STANDARD AU PAIR

Description:

A Standard Au Pair provides up to 45 hours of experienced childcare per week for children over the age of 2 years. A Standard Au Pair has at least 200 hours of documented childcare experience with children over the age 2.

Educational Component:

A Standard Au Pair studies at least 6 semester units at an accredited, post-secondary institution. The Host Family contributes up to $500 toward the Au Pair's educational expenses.

**Weekly stipend: $195.75**

xi.    Website for American Institute For Foreign Study dba Au pair in America:[16]

| | **Au Pair** | **Extraordinaire** | **Educare** |
|---|---|---|---|

---

[15] APF Global Exchange, NFP, Au Pair Programs, http://www.aupairfoundation.org/become-a-host-family/au-pair-programs/ (last visited 11/13/2014) (excerpt from website)

[16] American Institute For Foreign Study dba Au pair in America, Programs Cost, http://www.aupairinamerica.com/fees/ (last visited 11/13/2014) (excerpt from website)

|  | Au Pair | Extraordinaire | Educare |
|---|---|---|---|
| Match Fee | $400 | $400 | $400 |
| Program Fee Annual | $8,245 | $9,375 | $7,065 |
| Weekly Stipend* Paid weekly/51 weeks | $195.75** | $250** | $146.81** |
| **Average weekly cost** | **$ 365** 45hrs of weekly care) | **$ 442** 45hrs of weekly care) | **$ 293** (30hrs of weekly care) |

i.      Website for American Cultural Exchange, LLC, dba goAuPair:[17]

# Fees Paid to Au Pair

**Weekly Stipend**                        **$195.75**

The weekly stipend is the term for the wages paid to the Au Pair by the Host family

**Education Contribution**                **$500**

The education contribution is the contribution amount paid to the Au Pair by the Host Family and required by Department of State regulations

**Other Fees**                            **Varies**

Learn more about other fees that may occur

ii.     Website for Agent Au pair:[18]

Program Fees

---

[17] American Cultural Exchange, LLC, Standard 1 Year Program Pricing Breakdown - Most Popular, http://www.goaupair.com/host-families/fees (last visited 11/13/2014) (excerpt from website).
[18] Agent Au pair, Program Fees and Discounts, http://www.agentaupair.com/host-family/program-fees-and-discounts/ (last visited 11/13/2014) (excerpt from website).

11

| Fee Type | Standard Au Pair | Infant Qualified Au Pair | Repeat Families |
|---|---|---|---|
| Application Fee | $300.00 *WAIVED* | $300.00 *WAIVED* | $0 |
| Program Fee | $7,400.00 | $7,400.00 | $7,050.00 |
| Weekly Stipend (paid to au pair) | $195.75 | $195.75 | $195.75 |
| Average Weekly Cost | $340.00 | $340.00 | $340.00 |
| Education Allowance | Up to $500 | Up to $500 | Up to $500 |
| Domestic Transportation ($0 for Bay Area families) | Varies by State | Varies by State | Varies by State |

iii.    Website for A.P.EX. American Professional Exchange, LLC dba ProAuPair:[19]

## Traditional Au Pair (referred to as a Au Pair) – approximately $7.70/hr. ($350/week)

- Traditional au pairs have childcare experience, but do not have a professional background or degree in a childcare related field. Less than a professional au pair, you can expect to pay an average of $7,70 an hour to hire a Traditional au pair for up to 45 hours per week. The cost is the same regardless of how many children you have. This average hourly cost includes the au pair's weekly stipend and PROaupair's fees which include the au pair's visa sponsorship, medical insurance, international airfare, personalized matching assistance and our on-going support for the duration of your program. Au pair wages are not subject to withholding of FICA taxes. To learn more about our Regular Program, please contact us.

iv.    Website for 20/20 Care Exchange, Inc. dba The International Au pair Exchange:[20]

**12 Months Program:**
- Application Fee $350 due at application (Waived during November 2015 application and match by December 15 2014)
- Placement Fee $7895 due upon matching * 350$ Discount if you found your au pair, who is not registered with us

---

[19] A.P.EX. American Professional Exchange, LLC dba ProAuPair, Au Pairs vs. PRO Au Pairs vs. Nannies, https://proaupair.com/fees (last visited 11/13/2014) (excerpt from website)
[20] 20/20 Care Exchange, Inc. dba The International Au pair Exchange, Cost, http://tiape.org/host-families/cost/ (last visited 11/13/2014) (excerpt from website)

- Weekly Stipend $195.75 paid directly to the au pair

### _Ms. Beltran's Experience in the Au Pair Program Working for the Noonans_

30.     Ms. Beltran is originally from Bogotá, Colombia.

31.     In or about early 2011, Ms. Beltran went to an office operated by Defendant InterExchange, or an agent of InterExchange, in downtown Bogotá to apply to become an _au pair_ in the United States.

32.     Ms. Beltran filled out an application and paid InterExchange or its agents approximately $2,500. No one ever told Ms. Beltran what the $2,500 covered. The "sponsors" operate with a web of subcontractors, agents, employees, and other relationships that are difficult for a young adult in a foreign country to understand.

33.     InterExchange or its agents told Ms. Beltran that in order to become an _au pair_ she would have to take classes in English, take a course to get her driver's license, get first aid training, and take a swimming class. She also was instructed to take two classes at a post-secondary school, which she believes was a J-1 visa requirement.

34.     Ms. Beltran did all of this from 2011 until early 2012.

35.     Upon information and belief, sometime during this time InterExchange created a website advertising Ms. Beltran as an _au pair_ for families in the United States.

36.     In early 2012, Ms. Beltran interviewed with 3 or 4 families via Skype and/or telephone. One of these families was the Noonans.

37.     For roughly the first half of 2012, Ms. Beltran was in touch with the Noonans about becoming their _au pair_.

38.     At some point the Noonans decided that they wanted Ms. Beltran to be their _au pair_ and indicated this to Interexchange.

39.     InterExchange then contacted Ms. Beltran and formally interviewed her. They asked her questions regarding ability to provide childcare. At the end of the interview, InterExchange told Ms. Beltran that she was qualified to go work for the Noonans and InterExchange facilitated a J-1 visa interview at the United States embassy in Bogotá.

40.     In or around May 2012, Ms. Beltran received her visa.

41.     In August 2012, InterExchange flew Ms. Beltran from Bogotá to New York, New York.

42.     In New York, InterExchange put Ms. Beltran in a hotel with roughly 50 other *au pair*s. Ms. Beltran and the other *au pair*s were then trained for a week by InterExchange in childcare skills.

43.     After that week, Ms. Beltran flew to Denver and went to the Noonan's house to be an *au pair*.

44.     Ms. Beltran was given a room in the Noonan's basement and began her work.

45.     After Ms. Beltran arrived in Denver, an Agent of Interexchange from New York called Ms. Beltran to check in on her.

46.     During her time in Denver, Ms. Beltran attended a meeting with other *au pair*s and an agent of Interexchange. There were 2 or 3 meetings like this scheduled each month by Interexchange, but Ms. Beltran only went to one because the Noonans would not take her to the others.

47.     No one from InterExchange ever came to the Noonans house to check on Ms. Beltran.

48.     During her time working for the Noonans, Ms. Beltran performed both childcare and house work.

49.     In addition to any childcare duties, she cleaned for the entire family (2 adults and 2 children), cooked dinner for the entire family every night, did laundry for the entire family, made

the family's beds, packed and unpacked luggage for the children and Ms. Noonan before and after trips, cleaned Ms. Noonan's car on a daily basis, brought the groceries in from the car when Ms. Noonan went shopping, gardened – cutting roses and picking apples –, cared for the Noonans' approximately 8 chickens – feeding, watering, and cleaning the coop.

50.      The Noonans did not furnish Ms. Beltran with three meals per day.

51.      Ms. Beltran prepared dinner for the Noonan family each night. Ms. Beltran was not allowed to eat with the Noonans. Sometimes there were leftovers for Ms. Beltran to eat after the Noonans' dinner, but sometimes there were no leftovers, and Ms. Beltran had to prepare her own dinner.

52.      One week Ms. Noonan failed to purchase food for Ms. Beltran. Ms. Noonan gave Ms. Beltran leftover pizza from one of the Noonans' parties and that is all Ms. Beltran had for dinner that whole week.

53.      Ms. Beltran worked Monday through Saturday, and sometimes on Sunday.

54.      Ms. Beltran worked close to 8 hours a day Monday-Friday, fluctuating in either direction by an hour or two.

55.      On Saturday and Sunday she worked for approximately 4 hours each day.

56.      Ms. Noonan maintained a schedule for Ms. Beltran's work, but she did not keep track of the hours. Ms. Beltran was expected to, and frequently did, work more hours than were scheduled.

57.      The Noonans always paid Ms. Beltran exactly $195.75 for each week Ms. Beltran worked, with no withholding.

58.      In the second half of November 2012, Ms. Beltran decided she wanted to leave the Noonans and told the Noonans this.

59.     Ms. Noonan then contacted InterExchange and someone came to the Noonan's house, had Ms. Beltran sign something that she did not understand, and Ms. Beltran left.

## IV. RULE 23 CLASS ALLEGATIONS

60.     Ms. Beltran incorporates by reference all previous paragraphs of this Complaint as if fully re-written herein.

61.     Ms. Beltran asserts her Count I, III, IV, and V claims as class action claims pursuant to Fed. R. Civ P. 23.

62.     Pending any modifications necessitated by discovery, Ms. Beltran defines a class for Count I (hereinafter, the "Price Fixing Class") as follows:

> ALL CURRENT AND FORMER AU PAIRS FOR WHOM ANY
> OF THE DEFENDANTS WAS A J-1 VISA SPONSOR

63.     Pending any modifications necessitated by discovery, Ms. Beltran defines a class for Counts III and IV (hereinafter, the "National Wage Class") as follows:

> ALL CURRENT AND FORMER AU PAIRS FOR WHOM
> DEFENDANT INTEREXCHANGE, INC. WAS A J-1 VISA
> SPONSOR AND WHO PERFORMED AU PAIR WORK IN A
> STATE WHERE THE STATE MINIMUM WAGE IS GREATER
> THAN THE FEDERAL MINIMUM WAGE[21]

64.     Pending any modifications necessitated by discovery, Ms. Beltran defines a class for Count V (hereinafter, the "New York Wage Class") as follows:

> ALL CURRENT AND FORMER AU PAIRS FOR WHOM
> DEFENDANT INTEREXCHANGE, INC. WAS A J-1 VISA
> SPONSOR

65.     The members of each class are so numerous that joinder of all potential class members is impracticable. Ms. Beltran does not know the exact size of the classes since that information is

---

[21] *See* United States Department of Labor, Wage & Hour Division, CHANGES IN BASIC MINIMUM WAGES IN NON-FARM EMPLOYMENT UNDER STATE LAW: SELECTED YEARS 1968 TO 2013, http://www.dol.gov/whd/state/stateMinWageHis.htm.

within the control of Defendants. However, according to the Secretary of State's J-1 visa statistics, there were 13,789 J1 *au pair*s in the United States in 2014. These persons make up the Price Fixing Class and, based on these statistics, a conservative estimate of the size of the class is at least 50,000 people. According to the Secretary of State's J-1 visa statistics only one J1 *au pair* sponsor places *au pair*s in Colorado – which by information and belief is InterExchange – and that sponsor placed 363 *au pair*s in Colorado in 2014. By information and belief, InterExchange operates in other states as well. All of InterExchange's sponsored *au pair*s make up the National Wage Class and, based on these statistics, a conservative estimate of the size of this class is at least 10,000 persons. The New York Wage class would encompass at lease these 10,000 persons. The exact sizes of the classes will be easily ascertainable from Defendants' records and government records.

66.     There are questions of law or fact common to the classes that predominate over any individual issues that might exist. Common questions of law and fact include whether or not the *au pair* sponsors and employers all engaged in a price fixing conspiracy in order to keep *au pair* wages low and whether or not *au pair*s were paid at least the applicable federal and/or state minimum wage.

67.     The class claims asserted by Ms. Beltran are typical of the claims of all of the potential Class Members because they experienced the same or similar pay as a result of Defendants' conspiracy. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because numerous identical lawsuits alleging similar or identical causes of action would not serve the interests of judicial economy.

68.     Ms. Beltran will fairly and adequately protect and represent the interests of the class. Her *au pair* wages were artificially kept at the same low level as other *au pair*s as a result of the same

conspiracy among the *au pair* visa sponsors, she was paid less than the applicable federal and state minimum wage during her time as an *au pair*, and she was not paid at all for her training in New York.

69.     Ms. Beltran is represented by counsel experienced in litigation on behalf of low-wage workers and in class actions.

70.     The prosecution of separate actions by the individual potential Class Members would create a risk of inconsistent or varying adjudications with respect to individual potential Class Members that would establish incompatible standards of conduct for Defendants.

71.     Each Class Member's claim is relatively small. Thus, the interest of potential Class Members in individually controlling the prosecution or defense of separate actions is slight. In addition, public policy supports the broad remedial purposes of class actions in general.

72.     Ms. Beltran is unaware of any members of the putative class who are interested in presenting their claims in a separate action.

73.     Ms. Beltran is unaware of any pending litigation commenced by members of the Class concerning the instant controversy.

74.     It is desirable to concentrate this litigation in this forum because the relevant employment of Ms. Beltran occurred in this jurisdiction and the Noonan Defendants reside in this jurisdiction.

75.     This class action will not be difficult to manage due to the uniformity of claims among the Class Members and the susceptibility of the claims to class litigation and the use of representative testimony and representative documentary evidence.

76.     The contours of the class will be easily defined by reference to Defendants records and government records kept for each J-1 visa issued for an *au pair*.

## V. 29 U.S.C. § 216(B) COLLECTIVE ACTION ALLEGATIONS

77.     Ms. Beltran incorporates by reference all previous paragraphs of this Complaint as if fully re-written herein.

78.     Ms. Beltran brings her FLSA claim as a collective action, pursuant to 29 U.S.C. § 216(b), on behalf of herself and on behalf of all other similarly situated current and former employees of Defendant Interexchange.

79.     Ms. Beltran's written consent to be a named Plaintiff in a FLSA collective action is attached to this Complaint as Exhibit 1.

80.     Pending any modifications necessitated by discovery, Ms. Beltran preliminarily defines the "216(b) Class" as follows:

> ALL CURRENT AND FORMER AU PAIRS FOR WHOM
> DEFENDANT INTEREXCHANGE, INC. WAS A J-1 VISA
> SPONSOR

81.     All potential FLSA Class Members are similarly situated because, among other things, they were all employees of Defendant InterExchange and, upon information and belief, all suffered from the same policies of Defendant InterExchange, including failing to pay for all hours worked, failing to pay at least federal minimum wage for hours worked by its employees, and illegally deducting amounts from the wages paid to employees.

## COUNT I: RESTRAINT OF TRADE IN VIOLATION OF 15 U.S.C. §§ 1 *ET SEQ.*
### (Ms. Beltran and the Price Fixing Class vs. the Sponsor Defendants)

82.     Ms. Beltran incorporates by reference all previous paragraphs of this Complaint as if fully re-written herein.

83.     As set forth above, Ms. Beltran asserts this count on her own behalf and on behalf of all other similarly situated employees pursuant to Fed. R. Civ P. 23.

84.     The U.S. Department of State regulations mandate that *au pairs* be "paid in conformance with the requirements of the Fair Labor Standards Act as interpreted and implemented by the United States Department of Labor." 22 C.F.R. § 62.31.

85.     As a group, the Sponsors agreed, either expressly or tacitly, agreed on the absolute minimum weekly wage for an *au pair* under the FLSA. The Sponsors then agreed to fix all *au pair* weekly wages at exactly that minimum amount. This fixed weekly rate was illegal as a matter of law in many states.

86.     This collusive agreement is evidenced by the ratcheting up of this agreed weekly wage rate each time the federal minimum wage increased. The Sponsors admitted the price ceiling by, among other things, stating on many of their websites that families would only have to pay the price fixed weekly wage rate to their *au pairs. See supra ¶* 29.

87.     This collusive activity had the effect of restraining trade in that *au pairs* were not able to negotiate their wage rates with their employers or any other potential hosts.

88.     The restraint of trade caused damages. In a properly functioning labor market, the *au pair*s, upon preliminary acceptance in the program, would be free to negotiate wages with multiple prospective employers. But for the collusion, the result would be wages at or near the prevailing wages for workers doing similar work, *e.g.* educated, trained, live-in nannies. And because the cartel likely suppresses wages for the domestic nanny industry it is likely that absent the Defendants' price fixing conspiracy all wages in the domestic childcare industry would have been higher. As further evidence of the impact of the restraint of trade, Defendants' websites admit that the prevailing nanny wage is several times higher than their illegally price fixed *au pair* wage.

89.     The families then, in effect, pay the Sponsors for the privilege of using this artificially depressed *au pair* wage, and that is how the Sponsors benefit from the increased margin created by lowering artificially lowering the wages.

90.     The restraint of trade affects interstate commerce by artificially depressing wages for the *au pair*s and other domestic workers in every state.

91.     As a result, the Ms. Beltran and those similarly situated suffered injuries and are entitled to treble damages, fees, and costs as set forth in law.

92.     Ms. Beltran and those similarly situated are entitled to injunctive relief to end the price fixing scheme, and to force the Defendants to take affirmative steps to correct the market.

## COUNT II: FAILURE TO PAY MINIMUM WAGE IN VIOLATION OF FLSA (29 U.S.C. § 201 *ET SEQ.*)
### (FLSA Collective Action against the Noonan Defendants and InterExchange)

93.     Ms. Beltran incorporates by reference all previous paragraphs of this Complaint as if fully re-written herein.

94.     As set forth above, Ms. Beltran asserts this count on her own behalf and on behalf of all other similarly situated employees pursuant to 29 U.S.C. § 216(b).

95.     Ms. Beltran and all others similarly situated were "employees" as that term is defined by the FLSA 29 U.S.C § 203 (e) because they were employees Defendant InterExchange.

96.     InterExchange suffered and permitted Ms. Beltran and all other *au pair*s to work because it controlled their recruitment and had the ability to terminate participation in the program, trained them, maintained their records, controlled where they worked and the dates of employment, and set the terms of their employment contracts.

97.     The Noonans also directly suffered and permitted Ms. Beltran to work by directly ordering and supervising her work, and are an employer under the FLSA.

98.     Defendants InterExchange and the Noonans violated the FLSA when they failed to pay at least minimum wage for all hours worked by Ms. Beltran and other similarly-situated employees.

99.     Defendants violations of FLSA were willful under 29 U.S.C. 255 (a) because they knew or should have known that Ms. Beltran and all others similarly situated were entitled to minimum wage under FLSA, and/or, upon information and belief, they failed to make adequate inquiry regarding whether Ms. Beltran and others similarly situated were covered by FLSA.

100.    The Defendants also failed to reimburse the *au pair*s for costs associated with applying and preparing for the program which were primarily for the benefit of the employer. Such failures constitutes illegal deductions under 29 C.F.R. § 531.35.

101.    The Defendants did not pay the *au pair*s at all for training time at the beginning of the employment and this time was compensable under the FLSA.

102.    Ms. Beltran and all others similarly situated are entitled to recover unpaid minimum wages, illegal deductions, the costs incurred primarily for the benefit of the employer, liquidated damages, attorneys' fees, costs, and post-judgment interest. 29 U.S.C. §§ 206, 216(b).

## COUNT III: CLAIMS FOR UNPAID WAGES UNDER THE LAWS OF SEVERAL STATES
### (Ms. Beltran and the National Wage Class vs. Defendant InterExchange)

103.    Ms. Beltran incorporates by reference all previous paragraphs of this Complaint as if fully re-written herein.

104.    Defendant InterExchange failed to pay Ms. Beltran and the National Wage Class all wages owed under the laws of the various states where the National Wage Class worked as *au pair*s.

105.    Many states, including Colorado and California, have constitutional provisions, statutes, rules, and/or other laws that require a payment in excess of the FLSA minimum.[22]

106.    For example, during Ms. Beltran's employment, the Colorado Constitutional minimum wage was $7.64 per hour for all workers covered under the Fair Labor Standards Act and the California minimum wage was $8.00 per hour for domestic workers such as *au pair*s. Both higher than FLSA's $7.25 per hour.

107.    Defendants deprived Ms. Beltran and those similarly situated of wages legally owed by, among other actions, paying Ms. Beltran and those similarly situated less than the wage amounts required by state minimum wage law.

108.    Ms. Beltran and those similarly situated are entitled to unpaid wages.

109.    Because the wage term in the employment contracts was illegal, Ms. Beltran and those similarly situated are entitled to recover their unpaid wages in *quantum meruit, i.e.,* the difference between the amount paid for *au pair* services and the reasonable value of those services.

110.    At a minimum, Ms. Beltran and those similarly situated are entitled to unpaid state minimum wage for each hour they worked.

111.    The refusal to pay the lawful wages caused damages.  These damages in most cases can be ascertained by simple arithmetic.

112.    The *au pair*s are entitled to compensation and any statutory damages and attorney's fees and interest as allowed by state law.

---

[22] *See* USDOL, *supra* note 21.

## COUNT IV: BREACH OF FIDUCIARY DUTY AGAINST
### (Ms. Beltran and the National Wage Class vs. Defendant InterExchange)

113.    Ms. Beltran incorporates by reference all previous paragraphs of this Complaint as if fully re-written herein.

114.    Defendant InterExchange voluntarily accepted Ms. Beltran and those similarly situated into a relationship that required InterExchange to act as a fiduciary in its relations with them.

115.    Some of InterExchange's fiduciary duties are outlined in the State Department's *au pair* regulation. 22 C.F.R. § 62.31.

116.    The young *au pair*s, knowing little English and traveling alone, relied on InterExchange to act with the utmost trust and confidence in their dealings with them.

117.    The sponsors were required by their agreements with the U.S. Department of State and *au pairs*, as well as U.S. Department of State regulations, to protect the interests of the *au pairs*.

118.    InterExchange violated its duty to the *au pair*s by setting a wage ceiling that suppressed *au pair* wages, violating the Fair Labor Standards Act, violating the labor laws of most if not all states, and failing to fulfill their duties under the State Department's *au pair* regulation.

119.    As a result, Ms. Beltran and those similarly situated suffered damages, including attorney's fees where permitted by state law.

## COUNT V: VIOLATIONS OF NEW YORK WAGE ACT
### (Ms. Beltran and the New York Wage Class vs. Defendant InterExchange)

120.    Ms. Beltran incorporates by reference all previous paragraphs of this Complaint as if fully re-written herein.

121.    Defendant InterExchange required Ms. Beltran and all similarly situated *au pair*s under their sponsorship to spend one week training in New York City and did not pay them for this work.

122.    This "training" is compensable as work under the New York law because the workers acted under the Defendant's direction and control, and the training primarily benefited the Defendant as the workers were entitled to a job at the conclusion, and were not free to work at a different employer than prearranged.

123.    The Plaintiff and those similarly situated have the right to recovery under New York Code Article 6 - § 190 etc., including statutory damages of 25%, interest, and attorneys' fees and costs.

## COUNT VI: CLAIM FOR UNPAID WAGES UNDER COLORADO LAWS, INCLUDING C.R.S. § 8-6-101, *ET SEQ.* AS IMPLEMENTED BY 7 CCR 1103-1, C.R.S. § 8-4-101 *ET SEQ.*, AND COMMON LAW CONTRACT AND EQUITABLE PRINCIPLES
### (Ms. Beltran against the Noonans)

124.    Ms. Beltran incorporates by reference all previous paragraphs of this Complaint as if fully re-written herein.

125.    The Noonans jointly employed Ms. Beltran as an *au pair* with Defendant InterExchange under Colorado law, as detailed *supra*.

126.    The Noonans only paid Ms. Beltran exactly $195.75 per week for her work and Ms. Beltran worked at least, and frequently more than, 45 hours per week.

127.    The wage term in the Noonans' employment contract with Ms. Beltran is therefore void as a matter of law because it violates both state and federal minimum wage laws and was the result of an illegal price fixing conspiracy.

128.    At a minimum, the Noonans are liable to Ms. Beltran for unpaid Colorado minimum wage pursuant to C.R.S. § 8-6-101, *et seq*. as implemented by 7 CCR 1103-1 as well as her costs.

129.    However, the true measure of unpaid wages should be *quantum meruit* because equity mandates that Ms. Beltran be compensated at the reasonable value of her labor.

130.   The Noonans are also liable to Ms. Beltran for and unpaid wages and attorney's fees pursuant to C.R.S. § 8-4-101 *et seq.*.

## VI. <u>DEMAND FOR JURY TRIAL</u>

131.   Plaintiffs demand a trial by jury for all issues so triable.

## VII. <u>PRAYER FOR RELIEF</u>

132.   Ms. Beltran respectfully requests an Order from this Court that:

a.   This action, and all of the classes defined above, be certified as class actions pursuant to Fed.R. Civ. P. 23;

b.   The Named Plaintiff be appointed as class representative of the Rule 23 classes as defined above;

c.   Undersigned counsel be appointed Class Counsel for the Rule 23 classes defined above;

d.   The Named Plaintiff and the Price Fixing Class be awarded treble damages and attorney's fees for Defendants' violations of 15 U.S.C. §§ 1 *et seq.*

e.   This case also be certified to proceed as a collective action under 29 U.S.C § 216(b), and that appropriate notice of this suit and the opportunity to opt into the action be provided to all potential members of the 216(b) Class;

f.   Named Plaintiff and the 216 (b) Class be awarded unpaid minimum wage;

g.   Named Plaintiff and the 216 (b) Class be awarded liquidated damages, attorney's fees, and post-judgment interest pursuant to 29 U.S.C. §216(b);

h.   The Named Plaintiff and the National Wage Class members be awarded unpaid wages, statutory penalties, and attorney's fees pursuant to the laws of the several states and damages for breach of fiduciary duty.

i.   The Named Plaintiff and the New York Wage Class be awarded unpaid wages, statutory penalties, and attorney's fees pursuant to the New York Wage Act.

j.   The Named Plaintiff be awarded her unpaid wages, statutory penalties, fees, and costs from the Noonans under Colorado state law.

k.   Named Plaintiff be awarded a service award.

l.   The Named Plaintiff, the 216 (b) Class, and all of the Rule 23 classes be awarded costs and statutory interest.

m.   The Named Plaintiff, the 216 (b) Class, and all of the Rule 23 classes be awarded such other and further relief as may be deemed necessary and appropriate by the Court.

Dated: 11/13/2014

Respectfully Submitted,

s/Alexander Hood
Alexander Hood
Towards Justice
601 16th St., Suite C #207
Golden, CO 80401
Tel.: 720-239-2606
Fax: 303-957-2289
Email: alex@towardsjustice.org

Attorneys for the Plaintiffs

# EXHIBIT 1

## FLSA CONSENT FORM

I hereby give my consent to sue for wages that may be owed to me under the Fair Labor Standards Act. I hereby authorize my attorneys to represent me before any court or agency on these claims, including filing a case where I am the party Plaintiff in a collective action pursuant to 29 U.S.C. § 216.

NAME    _JOHANA PAOLA BELTRAN_

SIGNATURE    _JOHANA PAOLA BELTRAN_

DATE    _11/5/14_

## CONSENTIMIENTO PARA ACCION FLSA

Por este medio doy mi consentimiento para que se haga una demanda por salarios que puede que me deben bajo la Ley de Normas Justas de Trabajo. Yo les autorizo a mis abogados a que me representen ante cualquier tribunal o agencia sobre estas reclamaciones, incluyendo la presentación de un caso el cual yo soy la parte Demandante en una acción colectiva de conformidad con 29 U.S.C. § 216.

NOMBRE    _____

FIRMA    _____

FECHA    _____