IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-03074-CMA-CBS

JOHANA PAOLA BELTRAN; and those similarly situated

    Plaintiffs,

v.

PAMELA H NOONAN;
THOMAS J NOONAN;
INTEREXCHANGE, INC.;
USAUPAIR, INC.;
GREATAUPAIR, LLC;
EXPERT GROUP INTERNATIONAL INC., DBA EXPERT AUPAIR;
EURAUPAIR INTERCULTURAL CHILD CARE PROGRAMS;
CULTURAL HOMESTAY INTERNATIONAL;
CULTURAL CARE, INC. D/B/A CULTURAL CARE AUPAIR;
AUPAIRCARE INC.;
AU PAIR INTERNATIONAL, INC.;
APF GLOBAL EXCHANGE, NFP;
AMERICAN INSTITUTE FOR FOREIGN STUDY DBA AU PAIR IN AMERICA;
AMERICAN CULTURAL EXCHANGE, LLC, DBA GOAUPAIR;
AGENT AU PAIR;
A.P.EX. AMERICAN PROFESSIONAL EXCHANGE, LLC DBA PROAUPAIR; and
20/20 CARE EXCHANGE, INC. DBA THE INTERNATIONAL AU PAIR EXCHANGE

    Defendants.

---

**MOTION TO DISMISS COUNTS II, III, IV, AND V OF THE COMPLAINT BY DEFENDANT INTEREXCHANGE, INC.**

---

    Defendant InterExchange, Inc. ("InterExchange"), by its attorneys, Sherman & Howard L.L.C., moves pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss Counts II-V of the

Complaint.[1]  Plaintiff Johana Paola Beltran ("Plaintiff") cannot state a claim upon which relief can be granted against InterExchange, and the claims must be dismissed.

## CERTIFICATION PURSUANT TO CIV. PRACTICE STANDARD 7.1D

Counsel for InterExchange sent an email to Alex Hood, counsel for Plaintiff, on February 17, 2015, outlining InterExchange's arguments as set forth in this Motion and inviting discussion about the arguments and any curative amendments.  As of the date of filing, Plaintiff's counsel has not responded in any way to the communication.

### I. STANDARD FOR MOTION TO DISMISS.

In reviewing a motion pursuant to Fed. R. Civ. P. 12(b)(6), the Court asks whether the complaint states a claim that is "plausible on its face."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007)).  Assuming the truth of Plaintiff's allegations, it must be plausible and not merely possible that Plaintiff is entitled to relief.  Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008).  "A formulaic recitation of the elements . . . will not do," and the Court is not bound to accept as true a legal conclusion couched as fact.  Twombly, 550 U.S. at 555.

### II. FEDERAL LAW PREEMPTS STATE LAW AS TO THE *AU PAIR* PROGRAM.

A.  The *Au Pair* Program Extends From the Federal Immigration Power.

The *au pair* program falls squarely within an area of law dominated by the federal government.  See Arizona v. United States, 132 S. Ct. 2492, 2498 (2012) (noting that the U.S. government has "broad, undoubted power over immigration and the status of aliens").  The *au pair* program is an official U.S. Department of State (DOS) J-1 Visa

---

[1] InterExchange moved jointly with other agency Defendants to dismiss Count I.

Exchange Visitor program.  See 22 C.F.R. Part 62; see also DOS *Au Pair* website, http://j1visa.state.gov/programs/au-pair (last accessed Feb. 20, 2015) (Ex. A).[2]  An "*au pair*" is a foreign national who comes to the United States to reside with an American host family and participate directly in their home life while providing limited childcare and fulfilling an educational requirement.  22 C.F.R. § 62.4(h)(5).  The program extends from the Mutual Educational and Cultural Exchange Act of 1961, intended to "increase mutual understanding between the people of the United States and the people of other countries by means of educational and cultural exchanges."  22 C.F.R. § 62.1.  Educational and cultural exchanges "assist the Department of State in furthering the foreign policy objectives of the United States."  Id.  Exchange visitor programs "provide foreign nationals with opportunities to participate in educational and cultural programs in the United States and return home to share their experiences, and to encourage Americans to participate in educational and cultural programs in other countries.  Id.

Thus, the central element of the *au pair* program is not work, but rather the cultural knowledge and experience gained by living with an American family and studying in the United States.  See Ex. A.  The program facilitates cultural exchange through a careful balance of give-and-take; host families must be willing to welcome a stranger into their homes and families, and in exchange, those strangers become *de facto* family members, providing limited childcare and continuing their education.

---

[2] In ruling on a Motion to Dismiss, the Court may consider exhibits and documents incorporated into the Complaint by reference, matters of which the Court can take judicial notice, and  facts that are a matter of public record.  Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009); Gee v. Pacheco, 627 F.3d 1178, 1186 (10th Cir. 2010); Wolfe v. Aspenbio Pharm, Inc., No. 11-cv-00165-REB-MKT, 2012 WL 4040344 (D. Colo. Sept. 13, 2012).

*Au pairs* enter the United States to participate in the program by means of a "J" visa issued by DOS  22 C.F.R. §§ 41.62, 62.1(b).  DOS regulations establish the requirements and conditions of exchange visitor programs generally and the *au pair* program specifically.  See generally 22 C.F.R. Part 62; 22 C.F.R. § 62.31.  Among other requirements, *au pair* program participants must be between the ages of 18 and 26, a graduate of secondary school or its equivalent, and proficient in spoken English.  22 C.F.R. § 62.31(d).  The *au pairs* provide limited childcare services—a maximum of 10 hours per day and 45 hours per week—to their host families and attend a U.S. post-secondary institution.  Id. § 62.31(a), (c)(3).  DOS requires that host families pay *au pairs* "at a weekly rate based upon 45 hours of child care services per week and paid in conformance with the requirements of the Fair Labor Standards Act as interpreted and implemented by the United States Department of Labor."  22 C.F.R. § 62.31(j).  DOS refers to this compensation as a "stipend."[3]  22 C.F.R. § 62.31(n)(3); see also Ex. A.  The U.S. Department of Labor ("DOL") calculates the stipend based on the federal minimum wage and the appropriate percentage credit for the room and board provided by the host family (currently 40 percent).  See Doc. #1 at ¶¶ 24-28; http://j1visa.state.gov/wp-content/uploads/2012/09/aupair_wageincrease.pdf (last accessed Feb. 20, 2015) (Ex. B); www.irs.gov/Individuals/International-Taxpayers/Au-Pairs (last accessed Feb. 20, 2015) (Ex. C).  The current weekly stipend is $195.75.  Doc. #1 at ¶¶ 26-29.  DOS regulations do not permit a host family to reduce the weekly

---

[3] A "stipend" is a "fixed sum of money typically modest in amount that is paid periodically in compensation for services."  Webster's Third New Int'l Dictionary 2245 (Unabridged 1971).

4

stipend if an *au pair* works fewer than 45 hours in a week, nor do the regulations require that *au pairs* be paid according to state and local wage and hour laws, unlike other J-1 Exchange Visitor programs.[4]  See 22 C.F.R. § 62.31.

DOS administers the cultural exchange programs by designating, in its sole discretion, "sponsors," such as InterExchange.  22 C.F.R. § 62.31(b); Doc. #1 ¶¶ 20, 22. Sponsors are required to establish a selection mechanism for program participants consistent with DOS regulations and to provide specific information to selected participants before their arrival in the United States.  22 C.F.R. § 62.10(b).  Once participants arrive in the United States, DOS regulations require that sponsors "offer and record participation in an appropriate orientation for all exchange visitors."  22 C.F.R. §§ 62.10(c); see also 62.31(f), (g).  The orientation includes extensive information on American culture, program requirements, and community resources, as well as child safety and development.   22 C.F.R. §§ 62.10; 62.31(f), (g).  The regulations do not require that participants be compensated for this orientation and training.  See 22 C.F.R. § 62.31.  Sponsors are required to adhere to all DOS regulations applicable to the program and provide accurate information about the program to the public and prospective exchange visitors.  22 C.F.R. § 62.9(a), (d).

---

[4] Sponsors for Summer Work Travel participants must inform program participants of "Federal, State, and Local Minimum Wage requirements and ensure that at a minimum, participants are compensated at the higher of (i) the applicable Federal, State, or Local Minimum Wage (including overtime); or (ii) pay and benefits commensurate with those offered to their similarly situated U.S. counterparts."  22 C.F.R. § 62.32(i).  Camp Counselors participants must be paid commensurate with what employers pay to American counterparts.  22 C.F.R. § 62.30(f).

DOS regulations establish sanctions against sponsors that violate the DOS regulations; endanger the health, safety, or welfare of an exchange visitor; or conduct their programs so as to undermine the foreign policy objectives of the United States, compromise the national security interests of the United States, or bring the Department or the Exchange Visitor Program into notoriety or disrepute.  22 C.F.R. § 62.50(a).  DOS can suspend a sponsor that endangers the visitor or jeopardizes national security.  Id. at § 62.50(c).  Specific to the *au pair* program, DOS can sanction a sponsor that fails to "enforce and monitor the host family's compliance with the stipend and hours requirements set forth in [22 C.F.R. § 62.31(j)]."  22 C.F.R. § 62.31(n)(3).  The regulations protect an *au pair* from discrimination or retaliation for making a complaint.  22 C.F.R. § 62.10(d).  DOS also created an administrative review procedure in the event that a sponsor is facing sanctions.  Id. at § 62.50(d)-(i).  Thus, the Department of State has created a comprehensive regulatory scheme governing the *au pair* program.

  B. Federal Law Occupies the Field of Exchange Visitor Programs, and Application of State Law Would Conflict With the Federal Regulatory Scheme.

  1.   *Preemption generally.*

The U.S. Government has "broad, undoubted power" over immigration.  Arizona, 132 S. Ct. at 2498.  Federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  Const. Art. VI, cl. 2.  Congress holds Constitutional power over immigration and naturalization.  Id. Art. I, § 8, cl. 2.  Centralized authority for immigration is critical to international relations and the security of Americans abroad.  "Immigration policy can affect trade, investment, tourism, and

6

diplomatic relations for the entire Nation, as well as the perceptions and expectations of aliens in this country who seek the full protection of its law" Arizona, 132 S. Ct. at 2498. "It is fundamental that foreign countries concerned about the status, safety, and security of their nationals in the United States must be able to confer and communicate on this subject with one national sovereign, not the 50 separate states." Id.

In Arizona, the Supreme Court analyzed the preemptive effect of federal immigration law and policy in a federal preemption challenge to various provisions of Arizona Senate Bill 1070 (S.B. 1070). 132 S. Ct. at 2497. The Supreme Court considered four provisions of S.B. 1070: (1) Section 3, making failure to comply with federal registration requirements a state misdemeanor; (2) Section 5(C), making it a state misdemeanor for an unauthorized alien to seek or engage in work; (3) Section 6, authorizing Arizona officers to arrest persons the officers have probable cause to believe committed offenses rendering them removable from the U.S.; and (4) Section 2(B), requiring officers who stop, detain, or arrest a person in certain circumstances to verify immigration status. Id. at 2497-98.

The Supreme Court held that three of the four challenged provisions were preempted.[5]  Section 3 was preempted because the federal government has occupied the field of alien registration.  Arizona, 132 S. Ct. at 2502, 2503.  The Supreme Court noted, "If §3 of the Arizona statute were valid, every State could give itself independent authority to prosecute federal registration violations, 'diminish[ing] the [Federal Government]'s control over enforcement' and 'detract[ing] from the "integrated scheme

---

[5] The Court upheld § 2(B).  Arizona, 132 S. Ct. at 2510.

of regulation" created by Congress.'" Id. (citing Wisc. Dep't of Indus. v. Gould Inc., 475 U.S. 282, 288-89 (1986)).  Section 5(C) was also preempted because state employment law cannot "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Id. (quoting Hines v. Davidowitz, 312 U.S. 52, 67 (1941)).  Arizona's penalty created a conflict in the method of enforcement and "would interfere with the careful balance struck by Congress with respect to unauthorized employment of aliens." Id. at 2505.  Section 6 was preempted for similar reasons; it gave Arizona state officers greater authority than federal officers to arrest aliens for possible removability and allowed Arizona to implement its own immigration policy in an area entrusted to the federal government. Id. at 2506-07.

The Supreme Court has also has addressed the preemptive effect of federal law in the relationship between a federal agency and a non-governmental, third party governed by its regulations.  See Buckman Co. v. Plaintiffs' Legal Cmtee, 531 U.S. 341 (2001).  In Buckman, plaintiffs allegedly injured by orthopedic bone screws sued for fraud the non-governmental consultant that assisted the screws' manufacturer in securing device approval from the Food and Drug Administration (FDA).  531 U.S. at 343.  The Supreme Court held that the state-law fraud claims were preempted by the Medical Devices Amendments Act of 1976 (MDA), which granted the FDA regulatory authority to approve devices. Id. at 347.  The Supreme Court noted that "the relationship between a federal agency and the entity it regulates is inherently federal in character because the relationship originates from, is governed by, and terminates according to federal law." Id. at 347-48.  The Court recognized that the FDA had used

8

its regulatory authority to "achieve a somewhat delicate balance of statutory objectives," and "complying with the FDA's detailed regulatory regime in the shadow of 50 States' tort regimes will dramatically increase the burdens facing potential applicants. Id. at 350. Allowing state-law tort claims for violation of the statutory and regulatory requirements would "exert an extraneous pull" on Congress' scheme. Id. at 353.

### 2. DOS' regulatory scheme addresses Plaintiff's state-law wage and fiduciary complaints, and state law conflicts with DOS' system.

Plaintiff's claims are preempted by federal law and regulations because the *au pair* program is firmly entrenched in the federal government's immigration power. InterExchange is much like the consultant in Buckman; its relationship with the federal government is "inherently federal" in that it derives solely from the federal *au pair* program regulations. Those regulations are comprehensive; they encompass not only the subject of Plaintiff's claims—compensation and duties—but also every other facet of the *au pair* program. The U.S. government occupies the "field" of exchange visitors generally *au pairs* specifically.

In addition, the application of state law would create unacceptable conflict with federal law. It would transform a single, unified program into 50 different programs, making it virtually impossible for the federal government and its designated sponsors to satisfy the federal government's foreign relation objectives and provide a substantially uniform experience for program participants and host families. As to the *au pair* program, federal law preempts state law on field preemption and conflict grounds.

9

### III. PLAINTIFF'S PURPORTED FLSA CLAIM IS A COMPLAINT ABOUT PROGRAM TERMS; INTEREXCHANGE IS NOT AN "EMPLOYER."

Plaintiff asserts that InterExchange was her "employer" within the meaning of the Fair Labor Standards Act and therefore is liable under the FLSA for failing to pay Plaintiff minimum wage for all hours worked, failing to reimburse Plaintiff for costs associated in applying for the *au pair* program, and failing to pay *au pairs* for training time.  Doc. #1 at ¶¶ 93-102.  Plaintiff's allegations fail to state an FLSA claim as a matter of law, and Count II must be dismissed.

DOL sets the amount of the *au pair* stipend based on federal minimum wage and the agency's calculation of room and board deductions.  Doc. #1 at ¶¶ 24-28; Ex. C; http://dosfan.lib.uic.edu/usia/GC/GC_DOCS/AuPair/stipend.htm, (last accessed Feb. 20, 2015) (Ex. D).  Neither DOS nor DOL requires payment for *au pair* training and orientation.  Thus, the FLSA, as applicable to the *au pair* program, is incorporated into the program regulations.  What Plaintiff alleges to be FLSA violations are, in fact, complaints about the DOS-established requirements and administration of the *au pair* program itself.  Plaintiff's remedy was to make a complaint to her sponsor or to DOS, which would remedy the complaint or move Plaintiff to a different *au pair* position. Permitting Plaintiff to sustain an independent claim under the FLSA for these complaints would undermine DOS' ability to effectively balance the interests and statutory objectives of the *au pair* program and allow Plaintiff to create sponsor and host family obligations outside of the scope of the federal regulations.  No authority exists for Plaintiff to sustain an independent FLSA claim under these facts.

10

Moreover, InterExchange was not Plaintiff's employer. "Employ" under the FLSA means "suffer or permit" to work. 29 U.S.C. §203(g). An "employer" includes "any person acting directly or indirectly in the interest of an employer in relation to an employee." 20 U.S.C. §203(d). DOS and DOL have already established that the host family, not the sponsor, is the "employer" in the *au pair* program. Doc. #1 at ¶¶ 24-28; Exs. C, D. Even absent this determination, InterExchange does not "employ" the *au pairs*. The Tenth Circuit uses the economic realities test to determine whether an entity or individual is an "employer" under the FLSA. Baker v. Flint Engineering & Const. Co., 137 F.3d. 1436, 1440 (10th Cir. 1998). Relevant factors include whether the alleged employer has the power to hire and fire employees, supervise and control employee work schedules or conditions of employment, determine rate and method of payment, and maintain employment records. Id.

InterExchange does not meet this test, as it administers and monitors a relationship the terms and requirements of which are dictated by federal regulation and host family-*au pair* agreement. See 22 C.F.R. §§ 62.9, 62.31. Plaintiff's factual allegations confirm this arrangement. After lengthy communication between Plaintiff and the Noonans, the Noonans selected Plaintiff to be their *au pair*. Doc. #1 at ¶¶ 37-38. The work Plaintiff did for the Noonans was given to her and directed by the Noonans. See id. at ¶¶ 48-49. The Noonans created her work schedule and directed her hours of work and receipt of other benefits, such as lodging and meals. Id. at ¶¶ 50-56. Plaintiff made the decision to leave the Noonans; InterExchange did not remove her. Id. at ¶ 59. The contract between Plaintiff and InterExchange makes clear that

11

InterExchange serves only as Plaintiff's J-1 visa sponsor, not as an employer.  See InterExchange-Beltran contract, Ex. E, at p. 6, §5d.[6]

InterExchange administers its *au pair* program as exclusively directed by DOS; it monitors whether host families comply with the employment requirements set by the federal government for the host family-*au pair* relationship.  Even if Plaintiff could sustain an FLSA claim as an *au pair*, InterExchange is not a proper defendant.

## IV. COUNTS III AND V MUST BE DISMISSED BECAUSE COLORADO AND NEW YORK WAGE AND HOUR LAWS DO NOT APPLY.

Even if federal law did not preempt state law with respect to Plaintiff's state-law wage claims, Plaintiff cannot sustain claims under Colorado or New York wage law.[7]  The New York State Department of Labor has concluded that *au pairs* are not subject to the state's domestic worker and labor laws.  See http://www.labor.ny/gov/legal/laws/pdf/domestic-workers/facts-for-employers.pdf (last accessed Feb. 20, 2015) (Ex. F) at pg. 3.  As such, Plaintiff cannot bring a wage claim under New York state law.

Nor is InterExchange an "employer" for purposes of the Colorado Wage Act or the Colorado Minimum Wage Order.  Colorado defines an "employer" as "every person, firm, partnership, association, corporation receiver, or other . . . employing any person in Colorado."  Colorado Minimum Wage Order, 7 CCR 1103-1.  Plaintiff did not work for InterExchange in Colorado; she worked for her host family, the Noonans.  Her contract with InterExchange explicitly disclaims any employment relationship between Plaintiff

---

[6] Plaintiff refers to this contract in paragraph 117 of the Complaint.  (Doc. #1 at ¶ 117.)
[7] Plaintiff attempts to plead violations of multiple states' minimum age laws, but she provides factual support for only claims under Colorado and New York law.

12

and InterExchange.  See Ex. E §§ 1(d) (defining "at-will employment" to mean that either the host family or the au pair can end the employment relationship at any time); 5(c) ("InterExchange is not an Employer or Employment Agency.  I agree that InterExchange is not my employer or an employment or staffing agency."); 5(d) "Sponsorship.  I agree that InterExchange solely functions as my J-1 Visa sponsor.").  As such, Counts III and V must be dismissed.

### V. COUNT IV MUST BE DISMISSED BECAUSE NO FIDUCIARY DUTY EXISTED BETWEEN PLAINTIFF AND INTEREXCHANGE.

To prove a breach of fiduciary duty, Plaintiff must prove (1) InterExchange was acting as a fiduciary toward her; (2) InterExchange breached its fiduciary duty; (3) Plaintiff suffered damages; and (4) InterExchange's breach was the cause of those damages.  CJI-Civil 26.1  No legal authority exists for Plaintiff's assertion that InterExchange owed her a fiduciary duty.  A fiduciary relationship exists whenever one person is entrusted to act primarily for the benefit of or in the interests of another and has the legal authority to do so.  CJI-Civil 26:2.  The existence of a fiduciary duty is a mixed question of law and fact.  Accident & Injury Med. Specialists, P.C. v. Mintz, 279 P.3d 658, 662 (Colo. 2012).  No authority establishes the relationship between Plaintiff and InterExchange as a fiduciary relationship as a matter of law.  The few courts that have analyzed the relationship between a visa applicant and visa sponsor have found that no fiduciary duty exists.  See Shibeshi v. Alice Lloyd College, No. 11-101-ART, 2011 WL 4970781, at *4 (E.D. Ky. Oct. 19, 2011) (citing cases); but see DerKevorkian v. Lionbridge Tech., Inc., 316 Fed. Appx. 272 (10th Cir. Dec. 3, 2008) (finding a fiduciary relationship between an employee seeking her green card and her employer, when the

13

employer accepted the employee to a program specifically in place to assist employees with immigration matters) (discussed below)).

In the absence of a *per se* fiduciary relationship, a fiduciary duty may arise from a confidential relationship, when one party occupies a superior position over another and has the opportunity to use that superiority for advantage over the other.  First Nat'l Bank of Meeker v. Theos, 794 P.2d 1055, 1060-61 (Colo. App. 1990).  The party claiming the existence of a confidential relationship must prove that (1) a special trust or confidence was in fact reposed, the reposition was justifiable, and the other party invited or ostensibly accepted the trust imposed.  Id.  Plaintiff has not alleged facts that plausibly support a justifiable or accepted reposition.

Plaintiff cites the DOS regulations and InterExchange's contract with Beltran as the sources of InterExchange's alleged fiduciary duty to Plaintiff.  Doc. #1 at ¶ 117.  Nothing in the regulations purports to create a fiduciary relationship between a DOS designated sponsor and a J-1 participant.  See 22 C.F.R. § 62.31.  The contract between Plaintiff and InterExchange specifically limits InterExchange's relationship with Beltran to that of her J-1 visa sponsor under the DOS regulations.  Ex. E at p. 6, Sec. 5d.  The contract states that InterExchange in no way guaranteed that Beltran would receive or maintain a J-1 visa, would be permitted to participate in the program, or would be suitable for or satisfied with the program.  Id. at p. 12, Sec. 16a, Sec. b.  The contract created no duty or obligation under the law and specifically waives any contract damages or tort liability arising out of the relationship between Beltran and her host family.  Id. Sec. 16e.  Nothing in the regulations or the contact between InterExchange

14

and Beltran establishes a *per se* fiduciary duty or creates any situation in which Plaintiff could justifiably repose special trust or confidence in InterExchange.

The facts of his case contrast with those in DerKevorkian v. Lionbridge Tech., Inc., 316 Fed. Appx. 727 (10th Cir. Dec. 3, 2008). In DerKevorkian, the Tenth Circuit, applying Colorado law, held that DerKevorkian's employer had a confidential relationship with an employee, giving rise to a fiduciary duty, after it promised to help her acquire her green card. 316 Fed. Appx. at 737-39. The employer had a formal program in place to help employees with immigration issues and hired an attorney to assist with DerKevorkian's immigration. Id. at 730. Although no fiduciary relationship typically exists between employer and employee,[8] the employer's act of accepting DerKevorkian into the program for the specific purpose of assisting with her immigration issues created a fiduciary duty with respect to that assistance.

No such promise or relationship of trust existed between Plaintiff and InterExchange. Plaintiff has not alleged facts that plausibly indicate the existence of fiduciary duty, and Count IV must be dismissed.

### VI.     CONCLUSION.

WHEREFORE, for the reasons stated above, all counts pleaded against InterExchange should be dismissed, and InterExchange requests its costs and fees in preparing and filing this Motion.

---

[8] Combs v. PriceWaterhouseCoopers, L.L.P., 382 F.3d 1196, 1200 (10th Cir. 2004).

DATED this 20th day of February, 2015.

        Respectfully submitted,

*s/ Brooke A. Colaizzi*
Brooke A. Colaizzi
Heather F. Vickles
Raymond M. Deeny
SHERMAN & HOWARD L.L.C.
633 Seventeenth Street, Suite 3000
Denver, CO 80202
Tel: (303) 297-2900
Fax: (303) 298-0940
bcolaizzi@shermanhoward.com
hvickles@shermanhoward.com
rdeeny@shermanhoward.com

ATTORNEYS FOR DEFENDANT
INTEREXCHANGE, INC.

16

## CERTIFICATE OF SERVICE (CM/ECF)

I hereby certify that on this 20th day of February, 2015, I electronically filed the foregoing **MOTION TO DISMISS COUNTS II, III, IV, AND V OF THE COMPLAINT BY DEFENDANT INTEREXCHANGE, INC.** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Alexander Hood
Towards Justice
601 16th Street, Suite C #207
Golden, CO  80401
Email:  alex@towardsjustice.org

Susan Penniman Klopman
H&K Law, LLC
3900 East Mexico Ave., Suite 330
Denver, CO  80210
Email:  sklopman@hklawllc.com

Brian T. Moore
Jester Gibson & Moore, LLP
1999 Broadway, Suite 3225
Denver, CO  80220
Email:  BMoore@jgllp.com

Lawrence D. Stone
Christian D. Hammond
Dufford & Brown, P.C.
1700 Broadway, Suite 2100
Denver, CO  80290-2101
Email: lstone@duffordbrown.com
           chammond@duffordbrown.com

William J. Kelly III
KELLY & WALKER LLC
1401 17th Street, Suite 925
Denver, CO  80202
Email:  wkelly@kellywalkerlaw.com

Kathryn A. Reilly
Wheeler Trigg O'Donnell LLP
370 17th Street, Suite 4500
Denver, CO  80202
Email:  reilly@wtotrial.com

Brian A. Birenbach
The Rietz Law Firm, L.L.C.
114 Village Place, Suite 301
Dillon, CO  80435
Email:  brian@rietzlawfirm.com

James E. Hartley
Mher Hartoonian
Holland & Hart LLP
555 Seventeenth Street, Suite 3200
Denver, CO  80202
Email:  jhartley@hollandhart.com
Email:  mhartoonian@hollandhart.com

W.V. Bernie Siebert
SHERMAN & HOWARD L.L.C.
633 Seventeenth Street, Suite 3000
Denver, CO 80202
Email:  bsiebert@shermanhoward.com

Jeffrey P. Allen
Donald J. Gentile
LAWSON & WEITZEN, LLP
88 Black Falcon Avenue, Suite 345
Boston, MA  02210
Email:  jallen@lawson-weitzen.com
           dgentile@lawson-weitzen.com

Bogdan Enica
Expert AuPair
111 Second Ave NE, Ste. 213
St. Petersburg, FL  33701
Email:  Bogdan@expertaupair.com

17

Meshach Y. Rhoades
Martin Estevao
Greenberg Traurig, LLP
1200 17th Street, Suite 2400
Denver, CO  80202
Email:  Rhoadesm@gtlaw.com
Email:  Estevaom@gtlaw.com

Martha L. Fitzgerald
Kathryn A. Barrett
Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street, Suite 2200
Denver, CO  80202-4432
Email:  mfitzgerald@bhfs.com
Email:  kbarrett@bhfs.com

Lawrence Lee
Daniel C. Perkins
Fisher & Phillips LLP
1801 California Street, Suite 2700
Denver, CO  80202
Email:  llee@laborlawyers.com
Email:  dperkins@laborlawyers.com

No appearance yet for AuPairCare, Inc.

s/Clarine R. Kuntz