# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Case No. 1:14-cv-03074-CMA-CBS

JOHANA PAOLA BELTRAN;
LUSAPHO HLATSHANENI;
BEAUDETTE DEETLEFS;
DAYANNA PAOLA CARDENAS CAICEDO;
ALEXANDRA IVETTE GONZALEZ;
and those similarly situated,

Plaintiffs,

v.

INTEREXCHANGE, INC.;
USAUPAIR, INC.;
GREATAUPAIR, LLC;
EXPERT GROUP INTERNATIONAL INC., DBA EXPERT AUPAIR;
EURAUPAIR INTERCULTURAL CHILD CARE PROGRAMS;
CULTURAL HOMESTAY INTERNATIONAL;
CULTURAL CARE, INC. D/B/A CULTURAL CARE AU PAIR;
AUPAIRCARE INC.;
AU PAIR INTERNATIONAL, INC.;
APF GLOBAL EXCHANGE, NFP;
AMERICAN INSTITUTE FOR FOREIGN STUDY DBA AU PAIR IN AMERICA;
AMERICAN CULTURAL EXCHANGE, LLC, DBA GOAUPAIR;
AGENT AU PAIR;
A.P.EX. AMERICAN PROFESSIONAL EXCHANGE, LLC DBA PROAUPAIR; and
20/20 CARE EXCHANGE, INC. DBA THE INTERNATIONAL AU PAIR EXCHANGE,

Defendants.

---

## DEFENDANT CULTURAL CARE, INC.'S MOTION TO DISMISS ALL CLAIMS IN FIRST AMENDED COMPLAINT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(B)(6)

---

# I. INTRODUCTION

This Court should dismiss all claims asserted against Cultural Care, Inc. ("Cultural Care") in the First Amended Complaint (the "Complaint") because all the claims asserted are barred as a matter of law.  Plaintiffs are five foreign nationals who voluntarily participated in the U.S. Government au pair cultural exchange program. They are now attempting to circumvent the federal legislative/regulatory process by asking a federal court to interject itself into the U.S. Department of State ("DOS") program by invalidating the controlling legislation and the regulations adopted thereunder, including the $195.75 weekly stipend that host families pay au pairs as mandated by DOS.  Plaintiffs ask this Court to order that state minimum wage and employment law be applied despite the fact that this is a cultural exchange program which is part of the United States foreign policy, an area preempted by the federal government.  The application of state minimum wage and employment law is in direct conflict with DOS regulations and mandates, nonsensical given the structure of the program, and would effectively destroy the program and thereby frustrate the foreign policy objectives of the U.S.  The au pair program is not a work program; it is a DOS-designated exchange visitor program under which foreign nationals obtain a J-1 visa (a cultural exchange visa, not a work visa) from DOS.  Au pairs are afforded the opportunity to live with an American host family, participate directly in the host's home life, complete an educational requirement while in the program, and provide limited childcare services to the host family.  The U.S. District Court for the District of Connecticut has recognized that "the purposes of the [Exchange Act] and the . . .

2

implementing regulations [are to] establish [ ] a program of cultural exchange as opposed to an employment program" and that "it would be inappropriate to look to Connecticut employment law to interpret [an exchange visitor's] contract."[1]   The U.S. District Court for the District of Columbia has also ruled that a J-1 sponsor was not an "employer" for purposes of FLSA.[2]   The au pair program assists DOS in furthering the foreign policy objectives of the United States and is overseen, facilitated, and regulated by DOS pursuant to the Mutual Educational and Cultural Exchange Act of 1961 (Fulbright-Hays Act), 22 U.S.C. § 2451, *et seq.* (the "Exchange Act").   Plaintiffs seek to change the nature and content of the program by asserting a variety of claims, including a frivolous Sherman Act claim and various state-law wage claims, against Cultural Care and the other non-government sponsors, which sponsors are designated by DOS in its sole discretion and governed in their operations by the DOS regulations.   Plaintiffs' tactic in attempting to reform the DOS exchange program by suing the sponsors in this Court is without any legal basis.

As explained in detail herein, all claims asserted by Plaintiffs against Cultural Care should be dismissed, pursuant to Fed. R. Civ. P. 12(b)(6), because, among other things: i) Cultural Care is immune from Plaintiffs' antitrust claims since at all times it was following a federal mandate and Plaintiffs have failed to validly plead conspiracy under *Twombly* [pages 9-12]; ii) the state-law wage claims fail for, among other reasons, that they are preempted by federal law [pages 12-19]; iii) Plaintiffs' FLSA claims fail because

---

[1] *Bai Haiyan v. Hamden Pub. Schs,* 875 F. Supp. 2d 109 (D. Conn. 2012) (discussed below in Section III(C)(1)).
[2] *Ivanov v. Sunset Pools Mgmt.,* 567 F. Supp. 2d 189, 195 (D.D.C. 2008) (discussed below in Section III(D)(1)).

they are in direct conflict with the DOS regulations, direct conflict with the $195.75 weekly au pair stipend determined by the U.S. Department of Labor ("DOL") and mandated by DOS, and Cultural Care is not an employer for purposes of FLSA [pages 19-22]; iv) Plaintiffs' various fraud and misrepresentation claims fail on their face because, among other things, the state claims are preempted and Cultural Care's representations were true based on the DOS regulations and directives [pages 22-24]; v) Plaintiffs' breach of fiduciary duty claims are preempted and rife with other legal defects [page 24]; and vi) the breach of contract claims are preempted and include glaring pleading defects [pages 24-25].

## CIV. PRACTICE STANDARD 7.1D CERTIFICATE

Counsel for Cultural Care, Donald J. Gentile, sent an e-mail to Plaintiffs' counsel, Alexander Hood, on April 14, 2015 outlining the arguments made herein.  Mr. Hood responded by e-mail the same day with follow-up questions.  Mr. Gentile responded via e-mail to Mr. Hood the same day answering his questions in part and suggesting that it would be most efficient to schedule a call to discuss any other questions.  Mr. Hood and Mr. Gentile, along with lead counsel for Cultural Care, Jeffrey P. Allen, had a telephone conference on April 17, 2015 after which Mr. Hood confirmed that Plaintiffs disagree with Cultural Care's arguments, will not be amending, and oppose Cultural Care's motion.

## II.  FACTUAL ALLEGATIONS[3]

### A.  The Cultural Exchange Programs and Plaintiffs Deetlefs and Cardenas.

The au pair program is one of several U.S. Government cultural exchange programs (others include the guest teacher and summer work travel programs) created

---

[3] When considering a motion to dismiss, "a Court may consider outside documents that are both central to the plaintiffs' claims and to which the plaintiffs refer in their complaint." *GFF Corp. v. Associated Wholesale Grocers,* 130 F.3d 1381, 1384 (10th Cir. 1997) (and cases cited therein).  A Court may consider outside documents subject to judicial notice, including court documents and matters of public record. *Tal v. Hogan*, 453 F.3d 1244, 1265 n.24 (10th Cir. 2006).

pursuant to the Mutual Educational and Cultural Exchange Act of 1961 (Fulbright-Hays Act), 22 U.S.C. § 2451, *et seq.* (the "Act") the stated purpose of which is:

> to enable the Government of the United States to increase mutual understanding between the people of the United States and the people of other countries by means of educational and cultural exchange; to strengthen the ties which unite us with other nations by demonstrating the educational and cultural interests, developments, and achievements of the people of the United States and other nations, and the contributions being made toward a peaceful and more fruitful life for people throughout the world; to promote international cooperation for educational and cultural advancement; and thus to assist in the development of friendly, sympathetic, and peaceful relations between the United States and the other countries of the world.

DOS oversees, facilitates, and regulates the exchange visitor programs created by the legislation. These cultural exchanges were created to assist the Department of State in furthering the foreign policy objectives of the United States. 22 C.F.R. § 62.1(a). The programs "provide foreign nationals with opportunities to participate in educational and cultural programs in the United States and return home to share their experiences, and to encourage Americans to participate in educational and cultural programs in other countries." 22 C.F.R. § 62.1(b). Exchange visitors enter the United States on J-1 cultural exchange visas issued by DOS, which are not work visas. *Id.* Plaintiffs Deetlefs and Cardenas are au pair participants who were placed by Cultural Care. They attended a week of training in New York and were then placed with families in Utah (Deetlefs) and New Jersey and Pennsylvania (Cardenas). *Compl.* ¶¶ 371-407.

## B. Au Pair Program.

DOS dictates every aspect of the au pair program through its regulations, from participation requirements to the amount of childcare an au pair can provide. "Exchange Visitor Program" is defined as "the international exchange program

administered by the Department of State to implement the [Exchange Act] by means of educational and cultural programs." 22 C.F.R. § 62.2, Cultural Care is a "designated sponsor" which is "a legal entity designated by the Secretary of State of the State Department to conduct an exchange visitor program." *Id.* An "exchange visitor" is defined as "a foreign national who has been selected by a sponsor to participate in an exchange visitor program and who is seeking to enter or has entered the United States temporarily on a J-1 visa." *Id.*

The au pair program is a "Department of State-designated exchange visitor program under which foreign nationals are afforded the opportunity to live with an American host family and participate directly in the home life of the host family." *Id.* § 62.31(a). As part of the cultural exchange program, au pairs attend a U.S. post-secondary educational institution and also provide child care services to the host family. *Id.* "Au pair participants provide up to forty-five hours of child care services per week and pursue not less than six semester hours of academic credit or its equivalent during their year of program participation." *Id.* Host families must facilitate the enrollment and attendance of au pairs at accredited U.S. post-secondary institutions and pay the cost of such academic coursework up to $500. *Id.* § 62.10(k)(2)(ii). DOS controls the requirements participants must meet in order to qualify for the program, and sponsors must have a system to screen and select prospective au pairs *Id.* §§ 62.10(a), 62.31(d).

Sponsors must provide au pairs with orientation and specific written materials, including "all operating procedures, rules, and regulations . . . which govern the au pair's participation in the exchange program . . . ." *Id.* §§ 62.10(a), 62.31(f). An au pair must

also receive training that consists of at least eight hours of child safety instruction and twenty four hours of child development instruction.  *Id.* § 62.31(g).  The regulations do not require that au pairs be paid for training.  There are also significant requirements regarding the educational component, time off, monitoring of the program, and reporting requirements.  *Id.* § 62.31(h)-(i), (j)-(m).

An exchange visitor's participation in the program is expressly subject to termination. The regulations provide that a sponsor shall terminate an exchange visitor's participation if, among other things, he/she fails to pursue the activities for which he or she was admitted to the United States, violates the DOS regulations and/or the sponsor's rules governing the program, or engages in unauthorized employment.  *Id.* § 62.40.  The DOS regulations provide a sanctions process for sponsors that violate the regulations.  *Id.* §§ 62.50(a), 62.60-62.63.  DOS can sanction a sponsor that fails to "enforce and monitor the host family's compliance with the stipend and hours requirements . . . ."  *Id.* § 62.31(n)(3).  The DOS regulations also protect au pairs from discrimination or retaliation for making a complaint.  *Id.* § 62.10(d).  DOS has also created an administrative review procedure in the event a sponsor is facing sanctions.  *Id.* § 62.10(d)-(i).

### C. Au Pair Stipend.

 "Sponsors shall require that au pair participants are compensated at a weekly rate based upon 45 hours of child care services per week and paid in conformance with the requirements of the Fair Labor Standards Act as interpreted and implemented by the United States Department of Labor."  22 C.F.R. § 62.31(j)(1).  DOS refers to this

payment as a "stipend." *Id.* § 62.31(n)(3); *Exhibit 1,* Stipend Notice.[4]  The stipend is paid by the host family to the au pair, not by the sponsor.  The au pair is entitled to the entire $195.75 weekly stipend regardless of whether he or she provides zero or 45 hours of childcare services that week.   As the Internal Revenue Service ("IRS") has acknowledged, DOL has already established that the host family, not the sponsor, is the "employer" in the au pair program.  *Exhibit 2, IRS Page; Exhibit 3, Stipend Fact Sheet.* Plaintiffs incorporate the Stipend Notice into the Complaint on page 35 where they state that "The State Department's Posted Minimum Wage of $195.75 Represents a Programmatic Wage Floor."  A copy of the Stipend Notice in which DOS adjusted the mandatory stipend amount, which notice is central to Plaintiffs' claims and a public document, is attached as *Exhibit 1.*[5]  DOS explained therein the methodology by which DOL interprets FLSA for purposes of the au pair program.  *Exhibit 1, Stipend Notice.* The Stipend Notice stated that DOL calculated the stipend based on the federal minimum wage and the appropriate percentage credit for room and board provided by the host family, which is 40%.  *Id.*  The Stipend Notice then **mandated** the $195.75 weekly stipend effective July 24, 2009 (the stipend increased over a period of two years to $195.75).  *Id.*  It did not set a "wage floor" as Plaintiffs claim.  *Compl.* ¶ 4.  "The Au Pair Stipend is based on a U.S. Department of Labor formula that includes credit for the room and board Host Families provide for their Au Pairs.  The room and board credit

---

[4] A "stipend" is a "fixed sum of money typically modest in amount that is paid periodically in compensation for services."  *Webster's Third New Int'l Dictionary* 2245 (Unabridged 1971).
[5] The Stipend Notice was available through the DOS website through at least February 20, 2015 when Cultural Care filed its initial motion to dismiss, but was recently removed from the website.

currently is 40% of an au pair's credited compensation."  DOS stated that "The following

are the increases in weekly stipend (including room and board) for the standard Au Pair

and EduCare participants as follows" and then listed the mandated stipend amount.  *Id.*

DOS's application of the $195.75 weekly stipend to the au pair program is a deliberate

regulatory implementation specific to the au pair program, especially given that DOS

mandates different payment structures for other cultural exchange programs.[6]

### III.  LEGAL ARGUMENT

#### A.  Standard of Review.

Under Fed. R. Civ. Rule 12(b)(6), a complaint must "have enough allegations of

fact, taken as true, 'to state a claim to relief that is plausible on its face.'"  *Kan. Penn*

*Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011) (quoting *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 570 (2007)).  The complaint must contain factual allegations

directed at each defendant sufficient to support a claim for relief.  *See, e.g., Ashcroft v.*

*Iqbal*, 556 U.S. 662, 676 (2009).

#### B.  Plaintiffs' Antitrust Claim in Count I Fails for Two Independent Reasons.

##### 1.  Federal Instrumentality/Implied Immunity.

This Court should dismiss Plaintiffs' Sherman Act claim in Count I because it is

clear from the face of the DOS regulations and the Stipend Notice that the federal

government expressly directed Cultural Care to ensure that host families paid au pairs

---

[6] For example, sponsors of the summer work travel and camp counselor programs are required to, among other things, inform participants that they must be paid the higher of minimum wage or the wage paid to American counterparts.  22 C.F.R.  §§ 62.30(f), 62.31.

the weekly stipend of $195.75.  Thus, Cultural Care's conduct is protected from antitrust liability under the federal instrumentality/implied immunity doctrine.

Although Section 1 of the Sherman Act generally proscribes all contracts, combinations, and conspiracies in restraint of trade, DOS, as a U.S. Government agency, is immune from suit under the antitrust laws.  *See United States Postal Service v. Flamingo Indus. (USA) Ltd.,* 540 U.S. 736 (2004).   Under the federal instrumentality/implied immunity doctrine, alleged anticompetitive conduct by private parties is immune from antitrust challenge when the federal government expressly directs the conduct at issue.[7]   Here, the federal instrumentality/implied immunity doctrine protects Cultural Care's conduct because the federal government directed the specific conduct being challenged by Plaintiffs.  Any uniformity in the stipend paid to au pairs was specifically mandated by DOS.   Through 22 C.F.R. § 62.31(j)(1), DOS directed Cultural Care and the other sponsors to "require that au pair participants are compensated at a weekly rate" based on a particular formula.  DOS later issued the Stipend Notice, which 1) notified Cultural Care and the other sponsors of how DOS applies the formula; and 2) directed Cultural Care and the other sponsors to require a stipend amount of $195.75 effective June 24, 2009.  *Exhibit 1, Stipend Notice.*  There is nothing in the Stipend Notice that could be interpreted to make the stipend amount discretionary or suggesting that it was merely a "wage floor."  Cultural Care was acting

---

[7]  *See, e.g., Name.Space, Inc. v. Network Solutions, Inc.,* 202 F.3d 573, 581-84 (2d Cir. 2000); *Flamingo Indus. (USA) Ltd. United States Postal Service,* 302 F.3d 985, 993 (9th Cir. 2002) (holding antitrust immunity can apply when an entity acts at the direction of a federal sovereign, and citing *Name.Space*).

in compliance with the clearly articulated policies of DOS with respect to the stipend, which DOS policies were in furtherance of the au pair program.

### 2. Plaintiffs Fail to Plead Sufficient Facts Demonstrating that Cultural Care Conspired with Other Program Sponsors.

This Court should dismiss Plaintiffs' Sherman Act claim in Count I because Plaintiffs have failed to allege facts showing that Cultural Care had any communications whatsoever with the other defendants regarding the stipend, much less that Cultural Care reached an agreement with other sponsors to restrain trade.  In *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), the Court observed that, "[b]ecause § 1 of the Sherman Act 'does not prohibit [all] unreasonable restraints of trade . . . but only restraints effected by a contract, combination or conspiracy', 'the crucial question is whether the challenged anti-competitive conduct 'stems from independent decision or from an agreement, tacit or express.'" *Id.* at 553 (internal citations omitted).  Thus, it is critical that the factual allegations in the complaint "suggest that an agreement was made." *Twombly*, 550 U.S. at 588.  As this Court has noted, "an allegation of parallel conduct and a bare assertion of conspiracy will not suffice.  Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Design Basics, LLC v. ProBuild Co.*, LLC, 2011 WL 3366436 (D. Colo. 2011).

Here, Plaintiffs' allegations regarding the existence of a conspiracy between Cultural Care and other sponsors are the epitome of bare conclusions and speculation. Under Plaintiffs' theory, all companies in an industry that follow the federal minimum wage would be in violation of the Sherman Act.  Plaintiffs merely repeat variations of the

same conclusion that "Sponsors have conspired and agreed to fix . . . wages" (*Compl.* ¶ 77), "Sponsors have conspired to fix standard au pair wages" (*Compl.* ¶ 81), and "Sponsors have conspired to fix standard au pair wages at [the stipend amount]" (*Compl.* ¶ 84).   Plaintiffs vaguely allege that unnamed "representatives" of unnamed defendants supposedly admitted the existence of an agreement related to the stipend during "telephone conversations" on November 20 and 21, 2014, over a week after this lawsuit was filed.   *Compl.* ¶¶ 91-94.   The supposed "statements" are suspiciously paraphrased, lack context, do not allege a "specific time, place or person involved in the alleged conspirac[y]," or whether the speaker had knowledge of any alleged conspiracy or possessed any authority to speak for the sponsor in question.   *Twombly*, 550 U.S. at 565 n.10.   Neither do the allegations state the bases for the speakers' alleged knowledge.   The allegations at their best do not involve Cultural Care, nor do they name any other sponsor.   Plaintiffs allege no facts showing that conversations occurred between Cultural Care and other sponsors on the stipend or that written correspondence were exchanged on the issue.   Plaintiffs' allegations are merely parallel conduct coupled with a bare assertion of conspiracy, which does not suffice for purposes of stating a claim.

### C. The Comprehensive DOS Regulations Preempt and Render Inapplicable the Complaint's State-Law Wage Claims in Counts IX and X.

#### 1. Plaintiffs' State-Law Wage Claims are Preempted.

Plaintiffs' state-law wage claims in Counts IX and X are preempted by the Exchange Act and the DOS regulations because the DOS regulations encompass the subject matter of Plaintiffs' claims as well as every other facet of the au pair program.

Thus the U.S. government occupies the "field" with respect to the au pair exchange visitor program.  The application of state law minimum wages to the exchange program would also directly conflict with the DOS regulations and the Stipend Notice.

In *Bai Haiyan v. Hamden Pub. Schs,* the U.S. District Court for the District of Connecticut dismissed a variety of employment-related claims brought by a J-1 cultural exchange participant on the grounds that the plaintiff "was participating in an exchange visitor program and [was] not an employee of [the defendant]."  875 F. Supp. 2d 109, 127 (D. Conn. 2012).  The plaintiff was a Chinese national teaching in a public school district as part of the "guest teacher" cultural exchange program which, like the au pair program, is governed by the Exchange Act and the DOS regulations.  *Id.* at 113; 22 C.F.R. § 62.24.  The District Court analyzed the relationship between the plaintiff and defendant school system in depth under the Exchange Act and DOS regulations.  *Bai Haiyan,* 75 F. Supp. 2d at 114-16, 125-135.  The court explained that "[i]n view of the context, purpose and nomenclature of the Cultural Exchange Act, the State Department's implementing regulations, [plaintiff's] status as a J-1 visa holder, and the language of the [memorandum of understanding with the school district], [plaintiff's] status can only be understood as a foreign teacher participating in an exchange visitor program and not as an employee of [the school district]."  *Id.* at 126-27.  The court concluded that "[s]ince [plaintiff] did not have a contract for employment with [the school district] but rather a contract to patriciate in an exchange visitor program it would be inappropriate to look to Connecticut employment law to interpret [plaintiff's] purported contract" and dismissed the plaintiff's claims on summary judgment.  *Id.* at 127.

"The Government of the United States has broad, undoubted power over the subject of immigration . . . ." *Arizona v. U.S.,* 132 S. Ct. 2492, 2498 (2012).  "The federal power to determine immigration policy is well settled [and] [i]mmigration policy can affect trade, investment, tourism, and diplomatic relations for the entire Nation, as well as the perceptions and expectations of aliens in this country who seek the full protection of its law." *Arizona,* 132 S. Ct. at 2498.  In *Arizona,* the Supreme Court analyzed whether federal law preempted Arizona's "Support our Law Enforcement and Safe Neighborhoods Act" (S.B. 1070).  132 S. Ct. at 2497.  The Supreme Court considered four provisions of S.B. 1070:  1) Section 3, making failure to comply with federal registration requirements a state misdemeanor; 2) Section 5(C), making it a state misdemeanor for an unauthorized alien to seek or engage in work; 3) Section 6, authorizing Arizona officers to arrest persons the officers had probable cause to believe committed offenses rendering them removable from the U.S.; and 4) Section 2(B), requiring officers who stop, detain, or arrest a person in certain circumstances to verify immigration status.  *Id.* at 2497-98.  The Supreme Court held that Section 3 was preempted because the federal government has occupied the field of alien registration.  *Id.* at 2502-03.  The Supreme Court stated that "If § 3 of the Arizona statute were valid, every State could give itself independent authority to prosecute federal registration violations, 'diminish[ing] the [federal government]'s control over enforcement' and 'detract[ing] from the 'integrated scheme of regulation' created by Congress."  *Id.* Section 5(C) was also preempted because state employment law cannot "stand[ ] as an obstacle to the accomplishment and execution of the full purposes and objectives of

Congress." *Id.* Arizona's penalty created a conflict in the method of enforcement and "would interfere with the careful balance struck by Congress with respect to unauthorized employment of aliens." *Id.* at 2505. Section 6 was preempted because it gave Arizona state officers greater authority than federal officers to arrest aliens for removability and allowed Arizona to implement its own immigration policy in an area entrusted to the federal government. *Id.* at 2506-07. The Court upheld Section 2(B).

In *Buckman Co. v. Plaintiffs' Legal Comm.,* the Supreme Court addressed the preemptive effect of federal law in the relationship between a federal agency and a private third-party governed by the agency's regulations. 531 U.S. 341 (2001). The plaintiffs alleged that they were injured by orthopedic bone screws, and sued the private consultant who assisted the screws' manufacturer in securing device approval from the Food and Drug Administration (the "FDA"). *Id.* at 343. The plaintiffs claimed that the consultant made fraudulent misrepresentations to the FDA. *Id.* The Supreme Court held that the state-law fraud claims were preempted by the Medical Devices Amendments Act of 1976 (the "MDA"), which granted the FDA regulatory authority to approve medical devices. *Id.* at 347. The Court explained that "the relationship between a federal agency and the entity it regulates is inherently federal in character because the relationship originates from, is governed by, and terminates according to the federal law." *Id.* at 347-48. The Court held that "the federal statutory scheme amply empower[ed] the FDA to punish and deter fraud against the Agency." *Id.* at 347. The Supreme Court recognized that the FDA had used its regulatory authority to "achieve a somewhat delicate balance of statutory objectives . . . [and] . . . complying with the

FDA's detailed regulatory regime in the shadow of the 50 States' tort regimes will dramatically increase the burdens facing potential applicants." *Id.* at 350.

Here, like the plaintiff in *Bai Haiyan*, Plaintiffs were participating in an exchange visitor program and were not employees Cultural Care, and it would be inappropriate to look to state employment law to interpret Plaintiffs' relationship with Cultural Care. *Id.* at 127. *Arizona* reinforces the undisputable legal principle that the federal government has "broad, undoubted power" over immigration and state laws regulating education and labor in the context of immigration are the subject of federal preemption. Here, DOS has occupied the field of the au pair exchange visitor program because, as explained in detail in Section II above, DOS dictates every aspect of the au pair program through its regulations. Under the Exchange Act and the DOS regulations, the au pair program is a vehicle that allows DOS to further the foreign policy objectives of the United States. If state wage laws are applied to au pairs, every state would have independent authority to essentially override DOS' regulations and dictate the terms of the au pair program including, among other things, wages, hours worked, time off, and the plethora of other issues covered by state wage law. This would directly conflict with DOS's regulatory scheme, override the statutory framework created by Congress in the Exchange Act, and diminish the federal government's control over the program. Like the statutory scheme in *Buckman*, the Exchange Act, DOS regulations, and DOS directives amply empower DOS to remedy noncompliance with the DOS regulations *sua sponte* or in response to complaints from participants. Like the FDA, DOS has used its regulatory authority to achieve a delicate balance of foreign policy objectives. Complying with

DOS' detailed regulatory regime in the shadow of the 50 States' wage laws would render the au pair program unworkable.  Like the relationship between the private consultant and the FDA in *Buckman,* the relationship between Cultural Care and DOS is inherently federal because it originates from, is governed by, and terminates according to federal law (the DOS regulations).  Allowing state wage laws to infiltrate DOS's regulatory scheme with respect to the au pair program would not only dramatically increase the burdens facing sponsors, it would transform a unified, U.S. government cultural exchange program into a work program.  The au pair program, unlike the summer work travel program, includes a fixed stipend and integrates education, cultural discovery, and childcare so that participants can have a family oriented cultural experience.  The au pair program was specifically designed to operate according to the DOS regulations, including the stipend.  The introduction of state wage laws would convert the au pair program into a work program, cause au pair participants to compete to work only in states with the highest minimum wages, and would hamper the ability of au pair participants to experience the varying cultures that permeate the fifty states. The result sought by the Plaintiffs would most likely end the au pair program, thus eliminating an important foreign relations tool of the U.S. Government.  Accordingly, Plaintiffs' state-law wage claims are preempted by federal law.

2.   <u>Plaintiffs' Lack Standing to Assert Wage Claims Under Laws of States Other than New York, Utah, New Jersey, and Pennsylvania; Count IX is Not Well Pleaded; and New York, Pennsylvania, and Utah Wage Law Does Not Apply.</u>

In the unlikely event that this Court concludes that the state-law wage claims are not preempted, Plaintiffs' claim in Count IX (Unpaid Wages Under Laws of Several

States) should still be dismissed because Plaintiffs Deetlefs and Cardenas are the only plaintiffs allegedly placed by Cultural Care and, according to their allegations, they were trained in New York and were then placed with families in Utah (Deetlefs) and New Jersey and Pennsylvania (Cardenas).   Thus, they lack standing to allege state-law wage claims against Cultural Care other than in these four states.

In addition, Count IX includes only a generalized pleading that fails to plead a cause of action under any of these state's laws.   Plaintiffs seek to state a claim for wages under the laws of all 50 states by simply pleading that "Cultural Care . . . . failed to pay the named Plaintiffs . . . all wages owed under the laws of the various states [and] [m]any states . . . have constitutional provisions, statutes, rules, regulations, and/or other laws that require payment in excess of the FLSA minimum wage." *Compl.* ¶¶ 515, 516.  Plaintiffs further claim that they are "entitled to recover their unpaid wages in quantum meriut . . . under the various applicable state, district, or local laws.*" Id.* ¶ 515.   This is a hopelessly vague pleading devoid of any legal elements whatsoever, much less the varying wage laws of all fifty states.   Plaintiffs fail to even list which states they claim have a minimum wage applicable to au pairs in excess of the federal minimum wage, much less what time worked and what other benefits (meals, board, etc.) are countable under the laws of the various states.   Further, even if well pleaded, the claims under Pennsylvania and Utah wage law fail because domestic workers are exempted under state law.   43 P.S. § 333.105; 34 Pa. Code § 231.1; Utah Code § 34-40-104.  Count X (New York Wage Act) also fails because the New York Department of

Labor has concluded that au pairs are not subject to the state's domestic worker and labor laws. *Exhibit 4, NYS Department of Labor Facts for Employers at page 3.*

### D.  Plaintiffs' FLSA Claims in Count VIII Should be Dismissed.

#### 1.  Cultural Care Is Not an "Employer" for Purposes of FLSA.

Plaintiffs' FLSA claims in Count VIII should be dismissed because Cultural Care is not an "employer" for purposes of the statute.  "Employ" under the FLSA means "suffer or permit" to work.  29 U.S.C. § 203(g).  An "employer" includes "any person acting directly or indirectly in the interest of an employer in relation to an employee."  29 U.S.C. § 203(g).  In *Ivanov v. Sunset Pools Mgmt.,* the U.S. District Court for the District of Columbia ruled that a J-1 sponsor was not an "employer" for purposes of FLSA and dismissed plaintiffs' FLSA claims on summary judgment.  567 F. Supp. 2d 189, 195 (D.D.C. 2008).  The defendant Intrax was a sponsor for the summer work travel program and performed functions similar to Cultural Care under the DOS regulations. *Id.* at 194.  The district court analyzed the DOS regulations relating to sponsors and found that Intrax was not an employer or joint employer for purposes of FLSA because Intrax did not exercise control or supervision over [the participants] [but] merely complied with State Department regulations" by, among other things, conducting orientation, assisting with placement, maintaining current addresses for participants, providing health insurance, checking in with participants, and maintaining records relating to the placement.  *Id.*  The court reasoned that "even though Intrax kept tabs on [the participants] while they were in the United States, that control was unrelated to their lifeguard positions and thus not indicative of a joint employment relationship."  *Id.* at

194-95. DOL has already established that the host family, not the sponsor, is the "employer" in the au pair program. *Exhibit 2, IRS Page; Exhibit 3, Stipend Fact Sheet.*

An au pair does not do work for a sponsor and a sponsor is not an agent of the host family that manages the au pair. A sponsor is "a legal entity designated by the Secretary of State of the State Department to conduct an exchange visitor program." 22 C.F.R. § 62.2. A sponsor monitors the exchange visitor relationship between the au pair and the host family, the terms of which are dictated by the DOS regulations. A sponsor is a unique entity that in no way fits within the FLSA definition of "employer." A sponsor also does not constitute an employer under the "economic realities" test employed by the Tenth Circuit. *Baker v. Flint Engineering & Const. Co.,* 137 F.3d 1436, 1440 (10th Cir. 1998). Relevant factors under this test include the factors the *Ivanov* court considered, including whether the alleged employer can hire and fire employees, supervise and control employees work schedules or conditions of employment, determine rate and method of payment, and maintain employment records. *Id.*

According to the allegations in the Complaint, Plaintiffs Deetlefs and Cardenas lived with their host families as members of the families. *Id.* ¶¶ 383-390, 403-407. The Complaint suggests that Plaintiffs Deetlefs and Cardenas and their respective host families complied with the terms of the program as dictated by DOS with respect to education requirements, hours worked, time off, childcare services, and stipend. *Id.* Cultural Care sponsored Plaintiffs Deetlefs and Cardenas and provided the training required by the DOS regulations prior to their placement. *Compl.* ¶¶ 373-380, 394-402. Cultural Care had no power to hire or fire Plaintiffs Deetlefs and Cardenas; instead their

20

placement was dependent on the mutual consent of them and their host families. Indeed, Plaintiffs allege in the Complaint that **Plaintiff Cardenas decided to leave her first host family because she was not allowed to use the family automobile and the child was "difficult."** *Id.* ¶ 404.  Like the sponsor in *Ivanov,* Cultural Care had no power to supervise and control the au pair work schedules or conditions of employment. DOS regulations set strict standards for hours worked and conditions of employment and, within that framework, host families and au pairs cooperated to reach agreement on specific arrangements.  Cultural Care as a sponsor had no physical presence in the home and, according to the DOS regulations and allegations in the Complaint, had no ability to control specific childcare tasks.  DOS determined rate and method of payment under the DOS regulations and Stipend Notice.  *See* Section II(C) above.  Finally, while Plaintiffs plead that Cultural Care maintained records related to its role as a sponsor, under *Ivanov*, there is no basis to suggest that this saves Plaintiffs' FLSA claim.  Thus, like the sponsor in *Ivanov*, Cultural Care did not employ Plaintiffs Deetlefs and Cardenas for purposes of FLSA nor was it a joint employer with the host families.

2.  Plaintiffs' Remedy for Nonpayment of Stipend/Wages Is Under the DOS Regulations, Not FLSA.

In the unlikely event this Court concludes that Cultural Care is an employer for purposes of FLSA, Plaintiffs' claims under FLSA should be dismissed because they are in direct conflict with the plain terms of the DOS regulations, and the DOS regulations— not FLSA—provide Plaintiffs with a remedy for nonpayment of the stipend/wages.  22 C.F.R. § 62.31(j)(1) provides that "[s]ponsors shall require that au pair participants are compensated at a weekly rate based upon 45 hours of child care services per week and

paid in conformance with the requirements of the Fair Labor Standards Act **as interpreted and implemented by the United States Department of Labor.**" (emphasis supplied).  DOS explained in the Stipend Notice the methodology by which DOL interprets FLSA for purposes of the au pair program.  *Exhibit 1, Stipend Notice.* The Stipend Notice states that DOL calculates the stipend based on the federal minimum wage and the appropriate percentage credit for room and board provided by the host family (40%) which calculates to a $195.75 weekly stipend.  *Id.*  Plaintiffs' allegation that Cultural Care violated the FLSA when it allegedly failed to pay federal minimum wage for "all hours worked" and overtime is belied by the DOS regulations and the Stipend Notice.  *Compl.* ¶¶ 509-510, 512.  Neither the DOS regulations nor the Stipend Notice provide for such a wage structure.  Instead, they provide for a weekly stipend of $195.75 based on DOL's interpretation of FLSA with respect to the au pair program.  In addition, as explained in Section II(B) above, the DOS regulations provide for a comprehensive grievance and sanction process for when host families and/or sponsors violate the regulations.  Plaintiffs' remedy is to make a complaint to DOS under the regulations.  Allowing Plaintiffs to assert FLSA claims would directly conflict with DOS's regulatory scheme, override the statutory framework created by Congress in the Exchange Act, and diminish DOS's control over the program.

### E. Plaintiffs' Fraud/Misrepresentation Claims in Counts II, IV, V and VI Should be Dismissed.

Plaintiffs' claim in Count II (Civil RICO), Count IV (Negligent Misrepresentation All States), Count VI (Consumer Protection All States), and Count V (Fraud All States) that Cultural Care made fraudulent or negligent misrepresentations when it told potential au

pairs that the stipend was a fixed amount set by DOS.   First, Count IV (Negligent Misrepresentation All States), Count VI (Consumer Protection All States), and Count V (Fraud All States) are preempted by federal law for the same reasons discussed above in Section III(C)(1) because the U.S. government occupies the "field" with respect to the au pair exchange visitor program and, like the state-law fraud claims in *Buckman,* the application of state law fraud/misrepresentation claims to the exchange program would directly conflict with the DOS regulations and DOS's directive in the Stipend Notice. Second, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake" and the pleading must "set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof.  Fed. R. Civ. P. 9(b); *see also Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1236 (10th Cir. 2000).   Here, Plaintiffs cannot succeed on the fraud or misrepresentation claims in Counts II, IV, V and VI because the alleged representations by Cultural Care regarding the stipend were accurate according to the DOS regulations and the Stipend Notice.  In addition, even assuming *arguendo* that the stipend was a wage floor, Plaintiffs have failed to plead facts sufficient to show that Cultural Care was aware of this in light of the DOS regulations and Stipend Notice and therefore acted to mislead au pairs.  Count IV (Negligent Misrepresentation All States), Count VI (Consumer Protection All States), and Count V (Fraud All States) should be dismissed to the extent that they assert claims against Cultural Care under the laws of states other than New York, Utah, New Jersey, and Pennsylvania due to Deetlefs and Cardenas lack of standing.  *See* Section III(C)(2) above.  Finally, these counts consist of

only generalized pleadings that are hopelessly vague and devoid of any legal elements whatsoever.

### F. Plaintiffs' Breach of Fiduciary Duty Claim in Count III Should be Dismissed.

Count II (Breach of Fiduciary Duty Several States) should be dismissed on the grounds that, as explained in Section III(C)(1) above, it is preempted by federal law because the DOS regulations provide for a comprehensive grievance/sanction process for when sponsors violate the regulations.  Plaintiffs' remedy is to make a complaint to DOS.  In addition, there is no legal basis under the DOS regulations to allege that a fiduciary relationship existed between Cultural Care and Plaintiffs Deetlefs and Cardenas.  Courts have considered the relationship between a visa applicant and visa sponsor and found that no fiduciary duty exists.  *See Shibeshi v. Alice Lloyd College*, No. 11-101-ART, 2011 WL 4970781, at *4 (E.D. Ky. Oct. 19, 2011) (citing cases).[8]

### G. Plaintiffs' Breach of Contract Claim in Count VII Should be Dismissed.

Count VII (Breach of Contract and Quasi Contract) should be dismissed on the grounds that, as explained in Section III(C)(1) above, it is preempted by federal law because the DOS regulations provide for a comprehensive grievance and sanction process.  In addition, even if the breach of contract claim is not preempted, Plaintiffs fail

---

[8] In *DerKevorkian v. Lionbridge, Tech., Inc.,* the Tenth Circuit ruled that the plaintiff's employer had a confidential relationship with her employer, giving rise to a fiduciary duty, but only after the employer accepted her into a formal program to assist with immigration issues and hired an attorney to assist her with immigration. *Id.* at 730. *DerKevorfian* represents a departure from the rule that no fiduciary duty typically exists between an employer and employee. *Combs v. PrinceWaterhouseCoopers, L.L.P.,* 382 F.3d 1196, 1200 (10th Cir. 2004). Nowhere in the Complaint do Plaintiffs plead facts showing that Cultural Care ever hired an attorney for Plaintiffs Deetlefs or Cardenas or that Cultural Care entered into any confidential relationship with them.

to plead facts alleging that Plaintiffs Deetlefs and Cardenas entered into contracts, written or otherwise, with Cultural Care, much less what terms of the alleged contracts were breached.  Plaintiffs collectively make the vague allegation that "au pairs entered into employment contracts [with unnamed parties]" (*Compl.* ¶ 241) and "the contracts . . . were prepared by the Sponsors and were identical" (*Id.* ¶ 290).  Plaintiffs make some allegations in paragraph 303 of the Complaint about the alleged contents of Cultural Care's "form agreement," including that it contained several provisions regarding, among other things, following the requirements of the DOS regulations.  Plaintiffs never provide specific allegations that Plaintiffs Deetlefs or Cardenas entered into such a contract with Cultural Care.  In any event, even if they did, Plaintiffs make no allegation that Cultural Care breached any of the terms mentioned in paragraph 303.  Plaintiffs then confusingly claim in Count VII that "Plaintiffs and those similarly situated entered into contracts with their respective ***hosts*** [and] [t]he respective sponsors of the Plaintiffs and those similarly situated breached the contracts."  *Id.* ¶ 496 (emphasis supplied). Thus, not only did Plaintiffs fail to allege facts establishing a contract between Deetlefs and/or Cardenas and Cultural Care and a breach of said contract, it is entirely unclear whether Plaintiffs are alleging that they entered into contracts with sponsors or host families and which contracts were allegedly breached.

## IV.  CONCLUSION

For the foregoing reasons, this Court should dismiss all claims against Cultural Care in the Complaint pursuant to Fed. R. Civ. P. 12(b)(6).

Respectfully Submitted,


    s/ Jeffrey P. Allen

Jeffrey P. Allen
E-mail: jallen@lawson-weitzen.com
Donald J. Gentile
E-mail: dgentile@lawson-weitzen.com
LAWSON & WEITZEN, LLP
88 Black Falcon Avenue
Boston, MA 02210
Telephone: (617) 439-4990
Facsimile:  (617) 439-3987

-and-

W.V. Bernie Siebert
SHERMAN & HOWARD L.L.C.
633 Seventeenth Street, Suite 3000
Denver, CO 80202
Tel: (303) 297-2900
Fax: (303) 298-0940
Email: bsiebert@shermanhoward.com

ATTORNEYS FOR DEFENDANT
CULTURAL CARE, INC.

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this 17th day of April, 2015, a true and correct copy of the foregoing motion was electronically filed with the Court using the CM/ECF system which will send notification of such filing to the following:

Alexander N. Hood
Towards Justice
1535 High Street, Suite 300
Denver, CO 80218
Telephone: (720) 239-2606
alex@towardsjustice.org

*Attorney for Plaintiff Johana Paola Beltran, Lusapho Hlatshaneni, Beaudette Deetlefs, Dayanna Paola Cardenas Caicedo, Alexandra Ivette Gonzalez, and those similarly situated*

James E. Hartley
Mher Hartoonian
Holland & Hart LLP
555 Seventeenth Street, Suite 3200
Denver, CO 80202
Telephone: (303) 295-8000
jhartley@hollandhart.com
mhartoonian@hollandhart.com

*Attorneys for Defendant Cultural Homestay International*

Meshach Y. Rhoades
Kutak Rock, LLP
1801 California Street, Suite 3000
Denver, CO 80202-2626
Telephone: (303) 297-2400
rhoadesm@gtlaw.com

Martin J. Estevao
Greenberg Traurig, LLP
1200 17th Street, Suite 2400
Denver, CO 80202
Telephone: (303) 572-6500
estevaom@gtlaw.com

Lawrence Daniel Stone
Dufford & Brown, P.C.
1700 Broadway, Suite 2100
Denver, CO 80290-2101
Telephone: (303) 861-8013
lstone@duffordbrown.com

*Attorney for Defendants A.P.E.X. American Professional Exchange, LLC d/b/a ProAuPair and 20/20 Care Exchange, Inc., d/b/a The International Au Pair Exchange*

William J. Kelly III
Chanda M. Feldkamp
Kelly & Walker LLC
1401 17th Street, Suite 925
Denver, CO 80202
Telephone: (720) 236-1800
wkelly@kellywalkerlaw.com
cfeldkamp@kellywalkerlaw.com

*Attorneys for Defendant USAuPair, Inc.*

Daniel C. Perkins
Lawrence L. Lee
Fisher & Phillips, LLP
1801 California St., Suite 2700
Denver, CO 80202-3025
Telephone: (303) 218-3650
dperkins@laborlawyers.com
llee@laborlawyers.com

*Attorneys for Defendants APF Global Exchange, NFP and American Institute for Foreign Study, d/b/a Au Pair in America*

*Attorneys for Defendant GreatAuPair, LLC*

Kathryn A. Reilly
Wheeler Trigg O'Donnell LLP
370 Seventeenth Street, Suite 4500
Denver, CO 80202
Telephone: (303) 244-1800
reilly@wtotrial.com

Brian A. Birenbach
The Rietz Law Firm, LLC
114 Village Plaza, Suite 301
Dillon, CO 80435
Telephone: (970) 468-0210
brian@rietzlawfirm.com

*Attorney for Defendants Agent Au Pair, Inc.
and American Cultural Exchange, LLC
d/b/a GoAuPair*

*Attorney for Defendants Au Pair
International, Inc. and American Cultural
Exchange, LLC*

Bogdan Enica
Bogdan Enica, Attorney at Law
111 2nd Avenue NE, Suite 213
St. Petersburg, FL 33701-3440
Telephone: (727) 225-2649
bogdane@hotmail.com

Brian T. Moore
Jester Gibson & Moore, LLP
1999 Broadway, Suite 3225
Denver, CO 80202
Telephone: (303) 377-7075
bmoore@jgllp.com

*Attorney for Defendant Expert Group
International, Inc. d/b/a Expert AuPair*

*Attorney for Defendant Au Pair
International, Inc.*

John R. Mann
Thomas B. Quinn
Gordon & Rees LLP
555 17th Street, Suite 3400
Denver, CO 80202
Telephone: (303) 534-5160
tquinn@gordonrees.com
jmann@gordonrees.com

Katherine A. Barrett
Martha L. Fitzgerald
Brownstein Hyatt Farber Schreck, LLP
410 17th Street, Suite 2200
Denver, CO 80202-4432
Telephone: (303) 223-1100
Kbarrett@bhfs.com
Mfitzgerald@bhfs.com

*Attorneys for Defendant AuPairCare, Inc.*

*Attorneys for Defendant EuRaupair
InterCultural Child Care Programs*

Brooke A. Colaizzi
Raymond M. Deeny
Heather F. Vickles
Sherman & Howard L.L.C.
633 Seventeenth Street, Suite 3000
Denver, CO 80202
Telephone: (303) 297-2900
rdeeny@shermanhoward.com

hvickles@shermanhoward.com
bcolaizzi@shermanhoward.com

*Attorneys for Defendant Interexchange, Inc.*

_____s/ Donald J. Gentile_____
Donald J. Gentile