IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO


Civil Action No. 14-cv-03074-CMA-CBS

JOHANA PAOLA BELTRAN;
LSUAPHO HLATSHANENI;
BEAUDETTE DEETLEEFS;
DAYANNA PAOLA CARDENAS CAICEDO;
ALEXANDRA IVETTE GONZALEZ;
and those similarly situated

     Plaintiffs,

v.

INTEREXCHANGE, INC.;
USAUPAIR, INC.;
GREATAUPAIR, LLC;
EXPERT GROUP INTERNATIONAL INC., DBA EXPERT AUPAIR;
EURAUPAIR INTERCULTURAL CHILD CARE PROGRAMS;
CULTURAL HOMESTAY INTERNATIONAL;
CULTURAL CARE, INC. D/B/A CULTURAL CARE AUPAIR;
AUPAIRCARE INC.;
AU PAIR INTERNATIONAL, INC.;
APF GLOBAL EXCHANGE, NFP;
AMERICAN INSTITUTE FOR FOREIGN STUDY DBA AU PAIR IN AMERICA;
AMERICAN CULTURAL EXCHANGE, LLC, DBA GOAUPAIR;
AGENT AU PAIR;
A.P.EX. AMERICAN PROFESSIONAL EXCHANGE, LLC DBA PROAUPAIR; and
20/20 CARE EXCHANGE, INC. DBA THE INTERNATIONAL AU PAIR EXCHANGE

     Defendants.

---

## MOTION TO DISMISS THE FIRST AMENDED COMPLAINT BY DEFENDANT INTEREXCHANGE, INC.

---

Defendant InterExchange, Inc. ("InterExchange"), by its attorneys, Sherman &

Howard L.L.C., moves pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss the First Amended

Complaint (Doc. #101).  Plaintiffs cannot state a claim upon which relief can be granted against InterExchange, and the claims must be dismissed.

### CERTIFICATION PURSUANT TO CIV. PRACTICE STANDARD 7.1D

On April 13, 2015, counsel for InterExchange provided Plaintiffs' counsel Alex Hood with a summary of the arguments herein and inquired whether any deficiencies could be cured by amendment.  On April 16, 2015, Mr. Hood responded that Plaintiffs disagree with the arguments herein, oppose this Motion, and do not intend to amend.

### I.   INTRODUCTION AND FACTUAL AND PROCEDURAL BACKGROUND.

Plaintiffs have not stated claims upon which relief can be granted because they portray the au pair program as something that, as a matter of law and regulation, it is not.  The au pair program is a cultural exchange program, not a work program.  Although the au pair program has a work component, it serves a specific foreign policy objective of the United States and is, and should remain, regulated by the United States Department of State ("DOS").

Plaintiffs were participants in DOS' au pair program.  Doc. #101 at ¶¶ 11-12.  The au pair program is an official J-1 Visa Exchange Visitor program.  22 C.F.R. Part 62; see also DOS Au Pair website, http://j1visa.state.gov/programs/au-pair (last accessed Apr. 17, 2015).[1]  Exchange Visitor Programs extend from the Mutual

---

[1] The Court may consider exhibits and documents incorporated into the Complaint by reference, matters of which the Court can take judicial notice, and facts that are a matter of public record.  Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009); Gee v. Pacheco, 627 F.3d 1178, 1186 (10th Cir. 2010); Wolfe v. Aspenbio Pharm., Inc., No. 11-cv-00165-REB-MKT, 2012 WL 4040344 (D. Colo. Sept. 13, 2012).  InterExchange references and/or attaches as exhibits documents referenced as follows in the First Amended Complaint:  ¶¶ 11 (InterExchange contract), 55-57 (GAO report),

Educational and Cultural Exchange Act of 1961, intended to "increase mutual understanding between the people of the United States and the people of other countries by means of educational and cultural exchanges."  22 C.F.R. § 62.1. Educational and cultural exchanges "assist the Department of State in furthering the foreign policy objectives of the United States." Id.  They "provide foreign nationals with opportunities to participate in educational and cultural programs in the United States and return home to share their experiences, and to encourage Americans to participate in educational and cultural programs in other countries.  Id.

The au pair program provides foreign nationals with the ability to live with an American family for one or two years and "participate directly in the home life of the host family."  22 C.F.R. §§ 62.4(h)(5), 62.31(a).  The au pair program is not a work program, despite Plaintiffs' efforts to portray it as such.  Rather, the program is designed to fulfill a specific foreign policy objective:  "increasing mutual understanding between Americans and others through people-to-people contact."  Exchange Visitor Program, 60 Fed. Reg. 8547 Summary (Feb. 15, 1995) (codified at 22 C.F.R. pt. 514).  In its program brochure, DOS reminds host families that, although an au pair is their employee, he or she is to be "treated like a member of the family."  The Au Pair Exchange Program Brochure, Exhibit A hereto, available at http://j1visa.state.gov/sponsors/current/regulations-compliance (last visited Apr. 17, 2015) at p. 1.

---

58-65 (1996 USIA commentary and regulations), 138 (InterExchange extension application), 155-56 (Department of State website), 163 (Fact Sheet:  Au Pair Stipend), 165 (Weekly Wage Due to Au Pair Program Participants), and 168 (DOS notices and documents generally).

Au pairs enter the United States to participate in the program by means of  "J" visa issued by DOS.  22 C.F.R. §§ 41.62, 62.1(b).[2]  J visas are exchange visitor and non-immigrant visas; holders of J visas are not permitted to work generally within the United States but rather only for the specific employer involved in the program.  22 C.F.R. § 62.16.  The au pair programs are administered by fifteen agencies designated by DOS, who serve as the "sponsors" for the J-1 visas.  Doc. #101 at ¶¶ 2, 45, 46; 22 C.F.R. § 62.31(b).  InterExchange is one of these agencies.  Doc. # 101 at ¶¶ 2, 24.

DOS has established comprehensive regulations addressing every facet of Exchange Visitor programs generally and the au pair program specifically.  22 C.F.R. §§ 62.10, 62.31.  Au pairs must be between the ages of 18 and 26, graduates of secondary school or its equivalent, and proficient in spoken English.  Id. at § 62.31(d).  They provided limited childcare services—a maximum of 10 hours per day and 45 hours per week—to their host families, and attend a U.S. post-secondary institution.  Id. at § 62.31(a), (c)(3).  As to host families' obligations, DOS states, "The rules are clear:  au pairs are provided a private bedroom, meals, remuneration tied to the minimum wage, one and one-half days off weekly plus a full weekend off each month, two weeks' paid vacation, and $500 toward the cost of required coursework . . . ."  Ex. A at p. 1; 22 C.F.R. §§ 62.31(e), (j), (k).  Host families must pay au pairs at a "weekly rate based upon 45 hours of child care services per week and paid in conformance with the

---

[2] In 1990, the Government Accounting Office investigated the United States Information Agency's oversight of Exchange Visitor Programs and the utilization of J visas. Exchange Visitor Program, 60 Fed. Reg. 8547-48 Summary (Feb. 15, 1995) (codified at 22 C.F.R. pt. 514).  The GAO emphasized the importance of maintaining the distinction between visas granted for work purposes and J visas.  Id.

4

requirements of the Fair Labor Standards Act *as interpreted and implemented by the United States Department of Labor.*" 22 C.F.R. § 62.31(j)(1) (emphasis added); Doc. #101 at ¶ 48.  This compensation is sometimes referred to as a "stipend."  Id. at § 62.31(n)(3).  The U.S. Department of Labor ("DOL") determined in 1994 that an employment relationship exists between the au pair and his or her host family.  See Fact Sheet:  Au Pair Stipend, Mar. 14, 1997, Exhibit B hereto.  DOL computes the stipend by multiplying the federal minimum wage by 45 hours and subtracting a percentage credit for room and board.  Id.  Notice Federal Minimum Wage Increase, Exhibit C hereto; U.S. Dep't of State, Bureau of Educational and Cultural Affairs, Office of Exchange Coordination and Designation, Private Sector Programs Division, Weekly Wage Due to Au Pair Program Participants, Exhibit D hereto.  In 2007, in response to an increase in the federal minimum wage, DOS advised sponsors that from 2009 forward the au pair stipend, as calculated by DOL with a 40 percent credit for room and board, was $195.75.  Ex. C.  Through its program website, which Plaintiffs refer to as the "virtual front door" to the program, Doc. #101 at  ¶ 156, DOS informs host families that their financial obligation to au pairs is "a weekly minimum stipend based on the program option selected."  Id. at  ¶ 155;  http://j1visa.state.gov/programs/au-pair#hostsemployers (last accessed April 13, 2015).  DOS refers to the weekly stipend as a "predetermined weekly wage."  Ex. A at p. 1.  The regulations do not permit host families to pay an au pair less than $195.75 per week, even if the au pair provides fewer than 45 hours of child care.  See generally 22 C.F.R. § 62.31.  DOS advises prospective host families that the average annual cost of the program is $17,000, including

sponsorship fees, the weekly payment, the education allowance, and room and board. Ex. A at p. 3.

DOS provides different compensation methods for other J-1 exchange programs. For example, sponsors of Summer Work Travel and Camp Counselor programs are required to (1) inform participants of state and local minimum wage law; and (2) inform participants that they must be paid the higher of minimum wage or the wage paid to American counterparts.  22 C.F.R. §§ 62.30(f), 62.31.  No such requirements are built in to the au pair program regulations or contained in DOS publications about the au pair program.  See 22 C.F.R. § 62.31; Ex. A.  Although Plaintiffs assert that au pairs are not "carved out" of wage laws (Doc. #101 at ¶ 6), DOS clearly selected a specific method of compensation for the au pair program.

The duties of the sponsors also are clearly enumerated in the regulations.  Id. at §§ 62.10; 62.31.  Sponsors must provide participants with an orientation after they arrive in the United States.  22 C.F.R. §§ 62.10(c), 62.31(f), (g).  The orientation must include information about American culture, the program requirements, community resources, and child safety and development.  Id.  The regulations do not require that participants be paid for the orientation.  Id § 62.31.  During the au pair's program year, his or her sponsor must monitor "all au pair exchanges."  22 C.F.R. § 62.31(l).   The sponsors also are required to adhere to program regulations and provide accurate information about the program to the public and prospective exchange visitors.  Id. at § 62.9(a), (d).  DOS has the authority to revoke an agency's designation for good cause.  Id. at § 62.31(b).  The regulations also provide for sanctions for violating the regulations,

endangering the health, safety, or welfare of exchange visitors, or conducting the

program so as to undermine U.S. foreign policy objectives or bring DOS or the

Exchange Visitor Program into disrepute.  Id. at § 62.50(a).  Specifically, DOS can

sanction a sponsor for failing to enforce and monitor host families' compliance with the

stipend and hours requirements.  Id. at § 62.31(n)(3).  Au pair participants are protected

from retaliation.  Id. at § 62.10(d).  InterExchange instructs the au pairs that it sponsors

to contact it if they have any problems or complaints, including but not limited to

problems with their hours or compensation.  InterExchange Au Pair USA Au Pair

Agreement, Exhibit E hereto, at ¶ 4(i), (k).  An administrative procedure exists for

sponsors facing sanctions under the regulations.  Id. at § 62.50(d)(i).

     Thus, the Department of State has created a comprehensive regulatory scheme

governing the au pair program, from recruitment and selection of participants and host

families and program requirements to sponsor misconduct.[3]

## II.    STANDARD FOR MOTION TO DISMISS.

     In reviewing a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the Court

asks whether the complaint states a claim that is "plausible on its face."  Ashcroft v.

Iqbal, 556 U.S. 662, 678 (2009) (citing  Bell Atlantic Corp. v. Twombly, 550 U.S. 544

(2007)). Assuming the truth of Plaintiff's allegations, it must be plausible and not merely

possible that Plaintiff is entitled to relief.  Robbins v. Oklahoma, 519 F.3d 1242, 1247

(10th Cir. 2008).  "A formulaic recitation of the elements . . . will not do," and the Court is

---

[3] In its program brochure, DOS advises prospective host families and participants that
"[i]f these requirements cause you any concern, you may wish to reconsider
participating in the Au Pair Program."  Ex. A at p. 1.

not bound to accept as true a legal conclusion couched as fact.  Twombly, 550 U.S. at

555.  Moreover, a complaint brought against multiple defendants must contain factual

allegations directed at each of them sufficient to support a claim for relief.  See Iqbal,

556 U.S. at 676 ("A plaintiff must plead that each Government-official defendant,

through the official's own individual actions, has violated the Constitution.").

### III. FEDERAL LAW PREEMPTS STATE LAW AS TO THE AU PAIR PROGRAM.

A. The Au Pair Program Extends From the Federal Immigration Power.

The au pair program falls squarely in an arena dominated by the federal

government.  Federal law is "the supreme Law of the Land . . . ."  Const. Art. VI, cl. 2.

The government has "broad, undoubted power" over immigration.  Arizona v. United

States, 132 S. Ct. 2492, 2498 (2012).

Centralized authority for immigration is critical to international relations and the

security of Americans abroad.  "Immigration policy can affect trade, investment, tourism,

and diplomatic relations for the entire Nation . . . ."  Arizona, 132 S. Ct. at 2498.  "It is

fundamental that foreign countries concerned about the status, safety, and security of

their nationals in the United States must be able to confer and communicate on this

subject with one national sovereign, not the 50 separate states."  Id.

In Arizona, the Supreme Court analyzed the preemptive effect of federal law and

policy in a challenge to various provisions of Arizona Senate Bill 1070 (S.B. 1070).  132

S. Ct. at 2497.  The Supreme Court considered four provisions of S.B. 1070:  (1)

Section 3, making failure to comply with federal registration requirements a state

misdemeanor; (2) Section 5(C), making it a state misdemeanor for an unauthorized

8

alien to seek or engage in work; (3) Section 6, authorizing Arizona officers to arrest persons the officers have probable cause to believe committed offenses rendering them removable from the U.S.; and (4) Section 2(B), requiring officers who stop, detain, or arrest a person in certain circumstances to verify immigration status.  Id. at 2497-98.

The Supreme Court held that three of the four challenged provisions were preempted.[4]  Section 3 was preempted because the federal government occupies the field of alien registration.  Arizona, 132 S. Ct. at 2502, 2503.  "If §3 of the Arizona statute were valid, every State could give itself independent authority to prosecute federal registration violations, 'diminish[ing] the [Federal Government]'s control over enforcement' and 'detract[ing] from the "integrated scheme of regulation" created by Congress.'"  Id. (citing Wisc. Dep't of Indus. v. Gould Inc., 475 U.S. 282, 288-89 (1986)).  Section 5(C) also was preempted; state employment law cannot "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  Id. (quoting Hines v. Davidowitz, 312 U.S. 52, 67 (1941)).  Arizona's penalty created a conflict in the method of enforcement and "would interfere with the careful balance struck by Congress with respect to unauthorized employment of aliens."  Id. at 2505.  Section 6 was preempted for similar reasons.  Id. at 2506-07.

The Supreme Court also has addressed the preemptive effect of federal law in the relationship between a federal agency and a non-governmental third party subject to its regulations.  See Buckman Co. v. Plaintiffs' Legal Cmtee, 531 U.S. 341 (2001).  In

---

[4] The Court upheld § 2(B).  Arizona, 132 S. Ct. at 2507-10.  The Supreme Court held that a status check during an otherwise lawful detention or after a detainee was released would not interfere with federal law and its objectives.  Id.

EMPLOY/1199720.1

Buckman, plaintiffs allegedly injured by orthopedic bone screws alleged state-law fraud

claims against the non-governmental consultant that assisted the screws' manufacturer

in securing device approval from the Food and Drug Administration ("FDA").  531 U.S.

at 343.  The Supreme Court held that the Medical Devices Amendments Act of 1976

("MDA"), 21 U.S.C. § 301 *et seq.*, which gave the FDA regulatory authority to approve

devices, preempted the fraud claims.  Id. at 347.  The Supreme Court noted, "[T]he

relationship between a federal agency and the entity it regulates is inherently federal in

character because the relationship originates from, is governed by, and terminates

according to federal law."  Id. at 347-48.  The Court recognized that the FDA had used

its regulatory authority to "achieve a somewhat delicate balance of statutory objectives,"

and "complying with the FDA's detailed regulatory regime in the shadow of 50 States'

tort regimes will dramatically increase the burdens facing potential applicants."  Id. at

350.  Allowing state-law tort claims for violation of the statutory and regulatory

requirements would "exert an extraneous pull" on Congress' scheme.  Id. at 353.

> 2.     *State law conflicts with DOS' regulation of the* au pair *program.*

Plaintiffs' state-law claims are preempted by federal law and regulations

because the au pair program is firmly entrenched in the federal government's

immigration power and fully regulated by DOS.  Despite Plaintiffs' attempts to

portray it as a "work program," the au pair program is about cultural exchange,

not work.  See Bai Haiyan v. Hamden Pub. Sch., 875 F. Supp. 2d 109, 125 (D.

Conn. 2012) (finding that the Mutual Education and Cultural Exchange Act of

1961 and DOS' implementing regulations "unambiguously describe the

framework of the Act in terms of cultural exchange as opposed to employment").
As such, InterExchange is not operating within the employment laws of the
various states, but rather within the program regulations established by DOS, the
federal agency in charge of the program.  InterExchange is much like the
consultant in <u>Buckman</u>; its relationship with the federal government is "inherently
federal" in that it derives solely from the federal au pair program regulations and
its role as a designated sponsor for the program.  The regulations are
comprehensive and encompass not only the subjects of Plaintiff's claims—
compensation and duties—but also all other facets of the au pair program.
Plaintiffs have not pleaded any facts or authority to support their assertions that
au pairs are granted visas for purposes of joining the domestic labor market.  The
program is an immigration program based on cultural exchange.  The U.S.
government occupies the "field" of exchange visitors generally and au pair
exchange visitors specifically, and Plaintiffs' state-law claims must be dismissed.

Also, the application of state law to the au pair program would create
unacceptable conflict with federal law.  As in <u>Arizona</u>, the application of state
employment laws—in this case state overtime and minimum wage requirements
and tort claims related to the au pair stipend—would transform a single unified
program into 50 different programs, making it virtually impossible for the federal
government and its designated sponsors to satisfy the federal government's
foreign relation objectives and provide a substantially uniform experience for
program participants and host families.  <u>See</u> Exchange Visitor Program

Summary, 60 Fed. Reg. 8551 (Feb. 15, 1995) (codified at 22 C.F.R. pt. 514) (in summary of regulations promulgated by the United States Information Agency ("USIA"), which merged with DOS in 1999, recognizing the "programmatic need for a uniform wage" and adopting a formula for calculating the au pair stipend based on federal minimum wage and DOL's calculation of room and board costs, eliminating host families' need to "keep individualized records" of room and board).  Thus, federal law preempts state law on conflict grounds, as well.  To the extent au pairs have complaints or sponsors fail to meet their obligations, the regulations outline DOS' means and methods of dealing with those issues.  The state-law claims against InterExchange are preempted.

## IV.   COUNTS II-VI SOUND IN FRAUD, AND PLAINTIFFS' ALLEGATIONS ARE INSUFFICIENT TO STATE A PLAUSIBLE CLAIM.

Even if Plaintiffs' state-law claims were not preempted, they fail to state a claim upon which relief can be granted as to Civil RICO, breach of fiduciary duty, negligent misrepresentation, constructive fraud/fraudulent concealment, and consumer protection. Plaintiffs acknowledge that their claims are based on the sponsors allegedly "deceiving au pairs and prospective au pairs to secure au pair employment at an illegal, fixed wage."  (Doc. #101 at ¶ 14.)  Plaintiffs' Counts II-VI as pleaded against InterExchange involve two alleged misrepresentations about au pair compensation and thus sound in fraud.  Specifically, Plaintiffs allege that InterExchange informed au pairs that stipends above $195.75 should be considered bogus (Doc. #101 at ¶¶ 187-88), and InterExchange informed au pairs that the stipend included a 40 percent credit for room and board.  (Id. at ¶¶ 189-91.)  However, these alleged "misrepresentations" are

irrefutably true, or, in the alternative, Plaintiffs have failed to allege any specific facts from which it could be concluded that they are false.  Plaintiffs' claims therefore fail to state a claim upon which relief can be granted.

Plaintiffs allege that InterExchange engaged in wire fraud and fraud in foreign labor contracting as the predicate acts for their Civil RICO claim.  (Doc. #101 at ¶ 478.) Plaintiffs allege that InterExchange breached an alleged fiduciary duty to au pairs by "misleading" them about the flexibility of the weekly stipend.  (Id. at ¶ 484.)  Plaintiffs also allege negligent misrepresentation and constructive fraud/fraudulent concealment under state law.  (Id. at ¶¶ 487, 490.)  Finally, Plaintiffs allege violation of various states' consumer protection laws, based on the sponsors' alleged "deception" and "false and misleading representations about the wage."  (Id. at ¶ 493.)  The concept of "fraud" of some sort underlies each claim.  See U.S. v. Welch, 327 F.3d 1081, 1104 (10th Cir. 2003) (federal wire fraud requires proof of a scheme or artifice to defraud or obtain property by means of false or fraudulent pretenses, representations, or promises); Colo. CJI-Civil 26.1, 26.2 (breach of fiduciary duty involves breaching an obligation born of a trust to act primarily for the benefit or interests of another party); Allen v. Steele, 252 P.3d 476, 482 (Colo. 2011) (negligent misrepresentation involves making a misrepresentation of material fact without reasonable care); Kopeikin v. Merchants Mortg. And Trust Corp., 679 P2d 599, 601 (Colo. 1984) (fraudulent concealment involves concealment of a material existing fact that in equity and good conscience should be disclosed, with the intent that the concealment be acted upon); P.T. Bank Central Asia v. ABN AMRO Bank N.V., 754 N.Y.S.2d 245, 376 (N.Y. App. Div. 2003)

(fraudulent concealment requires intentional material misrepresentation);  C.R.S. 6-1-105 (prohibiting "deceptive trade practices" as defined therein); Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A., 85 N.Y.2d 20, 26 (N.Y. 1995) (prohibited act must be "deceptive or misleading in a material way").

Plaintiffs do not allege any facts to support their insinuation that InterExchange's blog post warning participants of scams was false.  See Kaplan v. Archer, No. 11-cv-02094-PAB-CBS, 2012 U.S. Dist. LEXIS 111815, at *31 (D. Colo. July 3, 2012) (fraud is not adequately pleaded in the absence of facts demonstrating why a statement was false).  The blog post, on its face, does not state that every payment in excess of $195.75 per week is bogus or that legitimate host families never pay more than $195.75 per week.  More importantly, the blog post does not state that host families may not pay more than $195.75 per week.  Rather, the post merely identifies a higher stipend as one offer that might be made by someone pretending to be a sponsor or a host family. (Doc. #101 at ¶ 188.)  Moreover, InterExchange informs au pairs that the stipend is a minimum.  See Ex. E, at ¶1(w) ("'Stipend' is the "minimum amount that the Host Family is required to pay . . . ."); https://www.Interexchange.org/au-pair-usa/jobs/au-pair-life-usa (referenced in Doc. #101 at ¶ 248) (last accessed April 13, 2015) (au pairs can earn $10,000 or more during their program year [emphasis added]).  Plaintiffs do not allege any facts from which it could be concluded that the warning in the blog post was false, and the allegations therefore fail under Twombly.

It also is undisputed that the stipend is calculated with a 40 percent credit for room and board.  See Exchange Visitor Program, 60 Fed. Reg. 8547, 8551 (Feb. 15,

14

1995) (to be codified at 22 C.F.R. pt. 514) (the stipend will "automatically adjust using a formula based on the minimum wage and room and board costs routinely calculated by the Department of Labor;" Ex. A at p. 1, 3, 4; Exs. B-D; Doc. #101 at ¶ 15.  Contrary to Plaintiffs' assertion, the DOL February 28, 1997 opinion cited in the First Amended Complaint (Doc. #101 at ¶¶ 63, 299) did not address the credit for room and board, but rather whether or not a credit was permissible for tuition or medical insurance costs. 1997 DOLWH LEXIS 16, Exhibit F hereto.  Plaintiffs' assertions that the credit is illegal is wholly unsupported by any legal authority or communication to the sponsors. InterExchange advertised the minimum au pair compensation communicated to it by DOS.  Doc. #101 at ¶ 154 (government emphasized the stipend was a minimum).

InterExchange's statements are therefore consistent with the regulations and DOS advisements implementing the stipend.  Because Plaintiffs have not alleged facts that plausibly constitute a misrepresentation, Counts II-VI must be dismissed.

## V.   EVEN IF NOT PREEMPTED, PLAINTIFFS' FIDUCIARY DUTY CLAIM AGAINST INTEREXCHANGE FAILS FOR WANT OF A FIDUCIARY DUTY.

Even if it were not preempted, Plaintiff Beltran has not stated a claim upon which relief can be granted with respect to Count III, breach of fiduciary duty.  (Doc. #101 at ¶¶ 482-84.) To prove a breach of fiduciary duty, Plaintiff must prove (1) InterExchange was acting as a fiduciary toward the au pairs; (2) InterExchange breached its fiduciary duty; (3) Plaintiff suffered damages; and (4) InterExchange's breach was the cause of those damages.  CJI-Civil 26.1.  No legal authority exists for Plaintiff's assertion that InterExchange owed her a fiduciary duty.  Also, Plaintiffs allege breach of fiduciary duty related only to alleged misrepresentations about the au pair stipend.  Doc. #101 at ¶¶

15

221-45.  Because InterExchange communicated the stipend as set forth by DOS, Plaintiffs cannot prove breach or damages.

A fiduciary relationship exists whenever one person is entrusted to act primarily for the benefit of or in the interests of another and has the legal authority to do so.  CJI-Civil 26:2.  The existence of a fiduciary duty is a mixed question of law and fact. Accident & Injury Med. Specialists, P.C. v. Mintz, 279 P.3d 658, 662 (Colo. 2012). However, the au pair regulations and the InterExchange contract referred to in the First Amended Complaint demonstrate that no fiduciary relationship existed as a matter of law.   The few courts that have analyzed the relationship between a visa applicant and visa sponsor have found that no fiduciary duty exists.  See Shibeshi v. Alice Lloyd College, No. 11-101-ART, 2011 WL 4970781, at *4 (E.D. Ky. Oct. 19, 2011) (citing cases); but see DerKevorkian v. Lionbridge Tech., Inc., 316 Fed. Appx. 727 (10th Cir. Dec. 3, 2008) (finding a fiduciary relationship between an employee seeking her green card and her employer, when the employer accepted the employee to a program specifically in place to assist employees with immigration matters) (discussed below)).

In the absence of a per se fiduciary relationship, a fiduciary duty may arise from a confidential relationship, when one party occupies a superior position over another and has the opportunity to use that superiority for advantage over the other.  First Nat'l Bank of Meeker v. Theos, 794 P.2d 1055, 1060-61 (Colo. App. 1990).  The party claiming the existence of a confidential relationship must prove that (1) a special trust or confidence was in fact reposed, the reposition was justifiable, and the other party invited or

ostensibly accepted the trust imposed.  Id.  Plaintiff has not alleged facts that plausibly

support a justifiable or accepted reposition.

Plaintiffs' allegations regarding fiduciary duty all relate to the stipend and room

and board credit and generalized assertions that sponsors were au pairs' "protectors."

Doc. #101 at ¶¶ 221-53.  However, nothing in the regulations purports to create a

fiduciary relationship between a DOS designated sponsor and a J-1 participant.  See 22

C.F.R. § 62.31.  The contract between Plaintiff and InterExchange specifically limits

InterExchange's relationship with Beltran to that of her J-1 visa sponsor under the DOS

regulations.  Ex. E at p. 6, § 5d.  The contract states that InterExchange in no way

guaranteed that Beltran would receive or maintain a J-1 visa, would be permitted to

participate in the program, or would be suitable for or satisfied with the program.  Id. at

p. 12, Sec. 16a, Sec. b.  The contract created no duty or obligation under the law and

specifically waives any contract damages or tort liability arising out of the relationship

between Beltran and her host family.  Id. Sec. 16e.  Nothing in the regulations or the

contact between InterExchange and Beltran establishes a *per se* fiduciary duty or

creates any situation in which Plaintiff could justifiably repose special trust or confidence

in InterExchange.  Moreover, as addressed above in Section IV, InterExchange's

representations about the stipend could not be termed "false."  Plaintiffs' allegations of

damage relate only to the minimum wage issue, the amount of which is set by the

federal government and the host family, not InterExchange.

The facts of this case contrast with those in DerKevorkian v. Lionbridge Tech.,

Inc., 316 Fed. Appx. 727 (10th Cir. Dec. 3, 2008).  In DerKevorkian, the Tenth Circuit,

EMPLOY/1199720.1

applying Colorado law, held that DerKevorkian's employer had a confidential relationship with an employee, giving rise to a fiduciary duty, after it promised to help her acquire her green card.  316 Fed. Appx. at 737-39.  The employer had a formal program in place to help employees with immigration issues and hired an attorney to assist with DerKevorkian's immigration.  Id. at 730.  Although no fiduciary relationship typically exists between employer and employee,[5] the employer's act of accepting DerKevorkian into the program for the specific purpose of assisting with her immigration issues created a fiduciary duty with respect to that assistance.

No such promise or relationship of trust existed between Plaintiff and InterExchange.  Plaintiff has not alleged facts that plausibly indicate the existence of fiduciary duty, and Count III must be dismissed.

## VI.   PLAINTIFFS FAIL TO STATE A CLAIM FOR BREACH OF CONTRACT.

As noted in the First Amended Complaint, InterExchange and Plaintiff had a signed agreement.  Doc. #101 at ¶ 11; Ex. E.  Plaintiffs do not identify what contractual provisions InterExchange allegedly breached.  They allege only that the contract "contained an illegal wage term" and "incorporated state, federal, and District of Columbia wage and hour laws and also created duties to ensure the protection of the au pairs." (Doc. #101 at ¶¶ 11, 497.)  The First Amended Complaint does not allege that the contract was binding or identify specific facts that the contract was breached.  As such, the claim fails to meet the Twombly standard.  McDonald v. Miller, 945 F. Supp. 2d 1201, 1206 (D. Colo. 2013) reversed in part on different grounds, 769 F.3d 1202,

---

[5] Combs v. PriceWaterhouseCoopers, L.L.P., 382 F.3d 1196, 1200 (10th Cir. 2004).

EMPLOY/1199720.1

1221 (10th Cir. 2014) (conclusory allegations that a valid and binding contract existed and was breached are insufficient to state a claim under Iqbal/Twombly).  Moreover, InterExchange's contract with Beltran referenced only the $195.75 minimum stipend.  Ex. E, at ¶¶ 1(w), 4(k).  It makes no promises with respect to other compensation, including state and local wages, and makes no representations that $195.75 is the maximum compensation that an au pair can receive.  Nothing in the Agreement purports to incorporate any state or local wage laws or create any duties on the part of InterExchange toward the au pairs that are not mandated by DOS regulations.  The breach of contract claim must be dismissed.

## VII.   INTEREXCHANGE IS NOT AN "EMPLOYER" UNDER THE FLSA, AND PLAINTIFF WAS NOT ENTITLED TO OVERTIME IN ANY EVENT.

Plaintiffs assert that they were "domestic service workers" within the meaning of the Fair Labor Standards Act, ("FLSA"), 29 U.S.C. § 201 *et seq.*, and the sponsors were their "employers" and therefore liable for allegedly failing to pay au pairs overtime and minimum wage under federal law.  (Doc. # 94 at ¶¶ 501-512.)  Plaintiffs' allegations fail to state an FLSA claim as a matter of law, and Count VIII must be dismissed.

A.   InterExchange Was Not Beltran's "Employer."

InterExchange was not a "joint employer" of Beltran[6] and therefore is not liable for FLSA violations, if any occurred.  "Employ" under the FLSA means "suffer or permit" to work.  29 U.S.C. §203(g).  An "employer" includes "any person acting directly or indirectly in the interest of an employer in relation to an employee."  20 U.S.C. §203(d) (emphasis added).  DOL has identified the host family, not the sponsor, as an au pair's

---

[6] Beltran is the only named Plaintiff whom InterExchange sponsored.

employer.  Ex. A at p. 1; Ex. B; Ex. D; http://www.irs.gov/Individuals/International-Taxpayers/Au-Pairs (last accessed Apr. 17, 2015), Exhibit G hereto.

Even absent this determination, InterExchange does not "employ" the au pairs. The Tenth Circuit uses the economic realities test to determine whether an entity or individual is an "employer" under the FLSA.  Baker v. Flint Engineering & Const. Co., 137 F.3d. 1436, 1440 (10th Cir. 1998).  Relevant factors include whether the alleged employer has the power to hire and fire employees, supervise and control employee work schedules or conditions of employment, determine rate and method of payment, and maintain employment records.  Id.  InterExchange does not meet this test, as it administers and monitors a relationship the terms and requirements of which are dictated by federal regulation and host family-au pair agreement.  See 22 C.F.R. §§ 62.9, 62.31.  InterExchange's compliance with DOS regulations, even its ability to remove participants from the program[7], does not translate into "control" over an au pair's employment such that an employment relationship is established.  See Ivanov v. Sunset Pools Mgmt. Inc., 567 F. Supp. 2d 189, 194-95 (D.D.C. 2008).  In Ivanov, the plaintiffs entered in the United States on J-1 visas to participate in the work travel exchange visitor program.  Id. at 190.  They sued their employer, Sunset, and their DOS-designated visa sponsor, Intrax, under the FLSA, alleging they were joint employers and failed to pay the plaintiffs overtime.  Id. at 191.  The U.S. District Court for the District of Columbia rejected the plaintiff's argument that Intrax was the plaintiffs'

---

[7] Plaintiffs allege that InterExchange has the power to "fire" au pairs.  Doc. #101 at  ¶ 295.  InterExchange's authority, however, derives from federal regulations and relates to au pairs immigration status as J-1 visa holders.  22 C.F.R. § 62.40.

"employer." Intrax's obligations under DOS regulations, such as recruitment, orientation training, health insurance, and employment monitoring, did not evidence control over the plaintiffs <u>as</u> <u>employees</u>.  <u>Id.</u> at 194-95 9 (emphasis added).  Intrax did not direct the plaintiff's schedule and did not dictate the plaintiffs' pay.  <u>Id.</u> at 195.  Moreover, the fact that the plaintiffs paid to participate in the exchange visitor program and did not do work involving Intrax's equipment or facilities also weighed against the existence of an employment relationship.  <u>Id.</u> at 196.

Like the plaintiffs in <u>Ivanov</u>, Beltran paid to participate in the au pair program. (Doc. #101 at ¶ 324.)  DOS and the Noonans, not InterExchange, established the terms and conditions of her employment.  22 C.F.R. § 62.31.  Her host family, the Noonans, set her schedule and dictated her work.  <u>Id.</u> at ¶¶ 343-49; Ex. E at ¶4(c)(i) (host family shall provide au pair with duties and schedule).  The compensation Beltran received from the Noonans was not set by InterExchange; it was set by DOS in conjunction with DOL.  Plaintiff alleges that she made the decision to leave the Noonans; InterExchange did not remove her.  (<u>Id.</u> at ¶ 352.) The contract between Plaintiff and InterExchange makes clear that InterExchange served only as Plaintiff's J-1 visa sponsor, not as an employer.  <u>See</u> Ex. E at p. 6, §5d. This result is consistent with the findings of the United States Information Agency ("USIA") in 1995 after consultation with DOL, which concluded that au pairs are dependent upon their host families for subsistence, "the measure of economic reality."  Exchange Visitor Program 60 Fed. Reg. 8550 (Feb. 15, 1995) (codified at 22 C.F.R. pg. 514).  USIA  recognized that the host family determined the au pair's duties and the manner in which he or she would care for the children.  <u>Id.</u>

EMPLOY/1199720.1

at 8551.  Plaintiffs fail to allege any facts that would plausibly support the conclusion

that InterExchange was Beltran's employer within the meaning of the FLSA.

    B.    <u>Beltran's Compensation Complied with the FLSA.</u>

    *1.    Beltran was not entitled to overtime compensation under the FLSA.*

    Even if Beltran could establish that InterExchange was her employer, she has not

alleged facts plausibly stating a claim that her compensation did not comply with the

FLSA.  Exchange visitor programs are cultural exchanges, not work programs.  <u>Bai</u>

<u>Haiyan v. Hamden Pub. Sch.</u>, 875 F. Supp. 2d 109, 125 (D. Conn. 2012).  However,

even if Beltran could establish that she was a domestic service worker, a live-in

domestic service employee is not entitled to overtime compensation under the FLSA.

<u>See</u> 29 C.F.R. 552.102(a) (a domestic service employee who lives with his or her

employer permanently or for an extended period of time is exempt from the FLSA's

overtime requirements).  Plaintiff Beltran has not alleged any facts supporting she was

entitled to overtime despite this exception.

    *2.    Beltran received minimum wage for all hours worked.*

    Even if Beltran was a live-in domestic service worker, and even if InterExchange

was her employer, she has not alleged facts sufficient to state a claim that she was not

paid minimum wage.  Although Beltran alleges that she and other au pairs were paid

only $4.35 per hour (Doc. #101 at ¶ 5), that figure does not account for her room and

board, and as described below, DOL has approved a room and board credit.  Moreover,

Plaintiff has not pleaded sufficient facts to support any allegation that she worked more

than 45 hours per week.  She alleges vaguely that she worked eight hours per day

Monday-Friday, sometimes nine or ten hours, and approximately four hours on Saturday and Sunday, but only worked on Sunday "sometimes."  (Doc. #101 at ¶¶ 347-49.)  However, the stipend set by the DOS and DOL is computed based on 45 hours of work per week.  22 C.F.R. Sec. 62.31(j)(1).  Beltran has not alleged sufficient specific facts supporting her contention that in any given week she in fact worked more than 45 hours, and therefore she has not stated a claim that she was paid less than minimum wage.  To the extent Beltran complains about the 40 percent deduction for room and board, this deduction was computed and applied <u>by DOS through DOL</u>, not by InterExchange.  The au pair regulations require that au pairs be compensated in accordance with the requirements of the Fair Labor Standards Act <u>"as interpreted and implemented by the United States Department of Labor."</u>  22 C.F.R. Sec. 62.31(j)(1).  The DOL has authorized the 40 percent credit.  Beltran has not stated a claim under the FLSA that she was not paid federal minimum wage for all hours worked.

## VIII.   COUNTS IX AND X MUST BE DISMISSED BECAUSE COLORADO AND NEW YORK WAGE AND HOUR LAWS DO NOT APPLY.

Even if federal law did not preempt state law with respect to Plaintiffs' state-law wage claims, Plaintiff Beltran cannot sustain claims under New York or Colorado wage law against InterExchange.[8]  The New York State Department of Labor has concluded that au pairs are not subject to the state's domestic worker and labor laws.  <u>See</u> <u>http://www.labor.ny.gov/legal/laws/pdf/domestic-workers/facts-for-employers.pdf</u> (last

---

[8] Plaintiffs attempt to plead violations of multiple states' minimum age laws, but Plaintiff Beltran, as the only Plaintiff sponsored by InterExchange, could only have claims under Colorado or New York law.

accessed Apr. 17, 2015), Exhibit H hereto, at pg. 3.  As such, Plaintiff cannot bring a wage claim under New York state law.

Nor is InterExchange an "employer" for purposes of the Colorado Wage Act or the Colorado Minimum Wage Order.  Colorado defines an "employer" as "every person, firm, partnership, association, corporation receiver, or other . . . employing any person in Colorado."  Colorado Minimum Wage Order, 7 CCR 1103-1.  Plaintiff did not work for InterExchange in Colorado; she worked for her host family, the Noonans.  Her contract with InterExchange explicitly disclaims any employment relationship between Plaintiff and InterExchange.  See Ex. E §§ 1(d) (defining "at-will employment" to mean that either the host family or the au pair can end the employment relationship at any time); 5(c) ("InterExchange is not an Employer or Employment Agency.  I agree that InterExchange is not my employer or an employment or staffing agency."); 5(d) "Sponsorship.  I agree that InterExchange solely functions as my J-1 Visa sponsor.").  In the alternative, the Colorado Minimum Wage Order exempts "domestic employees employed by households . . . to perform duties in private residences" from all provisions of the Minimum Wage Order, including minimum wage and overtime.  7 CCR § 1103-1.  Plaintiff Beltran asserts that she was a live-in domestic service worker.  (Doc. #101 at ¶¶ 501-12.)  As such, Counts IX and X must be dismissed.

## IX.    JOINDER IN MOTION TO DISMISS COUNT I.

InterExchange hereby joins the Joint Motion by Certain Sponsor Defendants to Dismiss the First Amended Complaint and Certification of Compliance with Civil Practice Standard 7.1D, filed on April 20, 2015, as to Count I of the First Amended

Complaint, and hereby incorporates those arguments herein.  In addition to the arguments stated herein regarding the au pair stipend, Plaintiffs have not pleaded any specific facts that could plausibly state a claim that InterExchange was part of any illegal agreement regarding the stipend or au pair compensation.

## X.    CONCLUSION.

WHEREFORE, for the reasons stated above, all counts pleaded against InterExchange should be dismissed, and InterExchange requests its costs and fees in preparing and filing this Motion.

DATED this 20th day of April, 2015.

Respectfully submitted,


*s/ Brooke A. Colaizzi*
Brooke A. Colaizzi
Heather F. Vickles
Raymond M. Deeny
SHERMAN & HOWARD L.L.C.
633 Seventeenth Street, Suite 3000
Denver, CO 80202
Tel: (303) 297-2900
Fax: (303) 298-0940
bcolaizzi@shermanhoward.com
hvickles@shermanhoward.com
rdeeny@shermanhoward.com

ATTORNEYS FOR DEFENDANT
INTEREXCHANGE, INC.

**CERTIFICATE OF SERVICE (CM/ECF)**

I hereby certify that on this 20th day of April, 2015, I electronically filed the foregoing **MOTION TO DISMISS THE FIRST AMENDED COMPLAINT BY DEFENDANT INTEREXCHANGE, INC.** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Alexander Hood
Towards Justice
1535 High Street, Suite 300
Denver, CO  80218
Email:  alex@towardsjustice.org

Brian T. Moore
Jester Gibson & Moore, LLP
1999 Broadway, Suite 3225
Denver, CO  80220
Email:  BMoore@jgllp.com

Lawrence D. Stone
Christian D. Hammond
Dufford & Brown, P.C.
1700 Broadway, Suite 2100
Denver, CO  80290-2101
Email: lstone@duffordbrown.com
        chammond@duffordbrown.com

William J. Kelly III
Chanda M. Feldkamp
KELLY & WALKER LLC
1401 17th Street, Suite 925
Denver, CO  80202
Email:  wkelly@kellywalkerlaw.com
        cfeldkamp@kellywalkerlaw.com

Kathryn A. Reilly
Toren G.E. Mushovic
Wheeler Trigg O'Donnell LLP
370 17th Street, Suite 4500
Denver, CO  80202
Email:  reilly@wtotrial.com
        mushovic@wtotrial.com

Brian A. Birenbach
The Rietz Law Firm, L.L.C.
114 Village Place, Suite 301
Dillon, CO  80435
Email:  brian@rietzlawfirm.com

James E. Hartley
Mher Hartoonian
Holland & Hart LLP
555 Seventeenth Street, Suite 3200
Denver, CO  80202
Email:  jhartley@hollandhart.com
Email:  mhartoonian@hollandhart.com

W.V. Bernie Siebert
SHERMAN & HOWARD L.L.C.
633 Seventeenth Street, Suite 3000
Denver, CO 80202
Email:  bsiebert@shermanhoward.com

Jeffrey P. Allen
Donald J. Gentile
LAWSON & WEITZEN, LLP
88 Black Falcon Avenue, Suite 345
Boston, MA  02210
Email:  jallen@lawson-weitzen.com
        dgentile@lawson-weitzen.com

Bogdan Enica
Expert AuPair
111 Second Ave NE, Ste. 213
St. Petersburg, FL  33701
Email:  Bogdan@expertaupair.com

26

Meshach Y. Rhoades
Martin Estevao
Greenberg Traurig, LLP
1200 17th Street, Suite 2400
Denver, CO  80202
Email:  Rhoadesm@gtlaw.com
        Estevaom@gtlaw.com

Martha L. Fitzgerald
Kathryn A. Barrett
Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street, Suite 2200
Denver, CO  80202-4432
Email:  mfitzgerald@bhfs.com
        kbarrett@bhfs.com

Lawrence Lee
Daniel C. Perkins
Fisher & Phillips LLP
1801 California Street, Suite 2700
Denver, CO  80202
Email:  llee@laborlawyers.com
        dperkins@laborlawyers.com

John R. Mann
Thomas B. Quinn
Gordon & Rees LLP
555 Seventeenth St., Suite 3400
Denver, CO  80202
Email:  jmann@gordonrees.com
        tquinn@gordonrees.com

s/Mary Ann Meise

EMPLOY/1199720.1