**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**


Civil Case No. 14-cv-03074-CMA-KMT

JOHANA PAOLA BELTRAN, *ET AL.*

      Plaintiffs,

v.

INTEREXCHANGE, INC., *ET AL.*

      Defendants.

---

**PLAINTIFFS' CONSOLIDATED OPPOSITION
TO DEFENDANTS' MOTIONS TO DISMISS
[DOCS. 127, 130-133, 135-136]**

---

**Table of Contents**

Preliminary Statement ................................................................................... 1

Background ................................................................................................... 3

A.    The J-1 Visa Program ........................................................................... 3

B.    State Department Regulations Require *Au Pairs* To Be Paid a Legal Wage ........ 4

C.    The Defendants Have Agreed to Hold *Au Pair* Wages at $195.75 Per Week
      Regardless of Market Forces ................................................................. 4

Standard of Review ....................................................................................... 7

Argument ..................................................................................................... 8

A.    The Court Should Deny Defendants' Motions to Dismiss Plaintiffs'
      Antitrust and Civil RICO Claims (Counts I and II). ................................. 9

      1.    Plaintiffs Have Pled a Plausible Entitlement to Relief Based on
            Their Allegations of a Price-Fixing Conspiracy Among the Sponsor
            Defendants ................................................................................ 9

            a.    The First Amended Complaint Satisfies *Twombly's* Pleading
                  Requirements ................................................................... 9

            b.    The Defendants' Alternative Explanations for their
                  Conspiratorial Conduct Are Irrelevant ............................. 17

      2.    Defendants Are Not Mere Instrumentalities of the Federal
            Government, and they Are Not Immune from Liability Under
            the Sherman Act. ....................................................................... 22

B.    The Court Should Deny Defendants' Motions to Dismiss Plaintiffs' Wage
      and Hour Claims (Counts VIII (Federal) and IX, X, XI, (State)) ............ 24

      1.    Defendants are Employers for Purposes of State and Federal Wage
            and Hour Laws. ......................................................................... 24

            a.    The Issue of Whether Defendants are "Employers" is Not
                  Appropriately Decided At the Motion to Dismiss Stage ....... 24

            b.    Defendants are Plaintiffs' "Joint Employers" Under the FLSA ....... 27

i

2.      Defendants are Violating the Federal Fair Labor Standards Act .............. 33

        a.      Defendants Are Violating The Minimum Wage Laws By
                Unlawfully Deducting The Cost of Housing .................................. 33

                i.     Defendants Are Not Entitled to Deduct the Cost of Room
                       and Board Because They Are Required By Law ..................... 34

                ii.    Defendants Are Not Entitled to Deduct the Cost of Room
                       and Board Because They Primary Benefit the Employer ........ 35

                iii.   The Department of Labor Has Never Permitted Defendants
                       to Deduct the Cost of Room and Board .................................. 37

        b.      Sponsors Are Required To Pay Overtime Compensation ............. 39

1.      State Law Claims are Not Preempted by Federal Immigration Law ......... 41

        a.      Preemption of State Law Is the Exception Rather Than the
                Rule, Particularly Where the Historic Police Powers of the
                States Are Involved ........................................................ 44

        b.      Plaintiffs' Claims Are Not Impliedly Preempted Under the
                Doctrine of Field Preemption ........................................... 47

        c.      Plaintiffs' Claims Are Not Impliedly Preempted Under the
                Doctrine of Conflict Preemption ....................................... 53

4.      Plaintiffs have Standing to Assert State Wage and Hour Claims,
        and They Have Sufficiently Pleaded Those Claims ................................. 59

5.      Defendants Must Abide by Specifically Identified States' Wage
        and Hour Laws ......................................................................... 62

        a.      Colorado ..................................................................... 62

        b.      Pennsylvania and Utah ................................................... 63

        c.      New York ...................................................................... 65

        d.      California ...................................................................... 66

C.      The Court Should Deny Defendants' Motions to Dismiss Plaintiffs'
        State Common Law Claims (Counts III through VII) ........................... 67

1.      Plaintiffs' Fraud Claims are Sufficiently Plead (Counts II, IV, V, VI) ......... 67

2.      Plaintiffs' Breach of Fiduciary Duty Claims are Sufficiently
        Pleaded (Count III) .................................................................................... 71

3.      Plaintiffs' Breach of Contract Claims are Sufficiently Pleaded
        (Count VII) ............................................................................................... 72

D.      If the Court Decides to Dismiss Any of Plaintiffs' Claims, it Should
        Do So Without Prejudice to Filing an Amended Complaint.................................. 74

Conclusion ............................................................................................................. 74

## **Exhibits**

A       U.S. Department of State Informational Pamphlet Created Pursuant to the
        Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, P.L. 110–
        457 (Dec. 23, 2008)

B       Lydia DePilis, Au pairs Provide Cheap Child Care. Maybe Illegally Cheap,
        Washington Post (March 20, 2015)

C       U.S. Department of Labor, Wage and Hour Division, Fact Sheet #79E (June
        2014)

D       Brief for the Secretary of Labor as *Amicus Curiae* in *Ramos-Barrientos v. Bland*,
        No. 10-13412-C (11th Cir. filed Oct. 13, 2010)

E       U.S. Department of State Slide Deck Created Pursuant to the Wilberforce
        Trafficking Victims Protection Reauthorization Act of 2008, P.L. 110–457 (Dec.
        23, 2008)

## Preliminary Statement

Defendants argue that "[t]his lawsuit attacks the very essence of our nation's *au pair* program[.]"  Go Au Pair Mot. at 2.[1]  But nothing could be further from the truth.  In fact, precisely the opposite is the case:  this lawsuit is necessary to protect the integrity of the *au pair* program and to enforce the laws that govern it — laws that exist to protect *au pairs* from the very type of exploitation that is at issue here.

As Plaintiffs explained in their First Amended Complaint ("Complaint" or "FAC") [Doc. 101], Defendants have conspired to set the wages paid to *au pairs* at $195.75 per week — an amount that is below the rate that *au pairs* could obtain on the open market and below the amount required by federal and state wage and hour laws.  Further, the Defendants have misled *au pairs* in an attempt to convince them that the $195.75 rate has been imposed by the U.S. government, and that *au pairs* should be suspicious of any host family who might offer to pay them more.  The result:  young men and women who have come to this country, lured by the promise of earning an honest living while learning about American culture, have been subjected to sub-standard working conditions and a violation of their rights.

---

[1]      Defendants have filed seven motions to dismiss.  For avoidance of confusion, they are referred to as follows: "Cultural Care Mot." [Doc. 127]; "InterExchange Mot." [Doc. 130]; "Go Au Pair Mot." [Doc. 131]; "20/20 Mot." [Doc. 132]; "A.P. Ex. Mot." [Doc. 133]; "Joint Mot." [Doc. 135]; and "AIFS Mot." [Doc. 136].

Defendants would have this Court believe that the government has somehow granted Defendants a license to run roughshod over the antitrust laws and the wage and hour laws.  *See, e.g.*, Cultural Care Mot. at 3 (arguing that Defendant "was following a federal mandate" when it set wages); Go Au Pair Mot. at 4 (arguing that Defendants were "merely implementing" the *au pair* program).  But that position has been expressly rejected by the very State Department that Defendants invoke as cover for their illegal conduct.  First and foremost, the State Department regulations governing payments to *au pairs* expressly invoke the protections of the federal wage and hour laws, which in turn expressly preserve state minimum wage laws to the extent they are more generous.  *See* 22 C.F.R. § 62.31(j)(1) (requiring that *au pairs* be "paid in conformance with the requirements of the Fair Labor Standards Act," which includes the federal minimum wage); 29 U.S.C. § 218(a) ("No provision of [the FLSA] shall excuse noncompliance with any Federal or State law or municipal ordinance establishing a minimum wage higher than the minimum wage established under this chapter. . . .").

Further, the State Department's official, statutorily mandated documents issued to *au pairs* specify that *au pairs* are entitled to the protections of the federal and state wage and hour laws.  *See* Exhibit A (Wilberforce Pamphlet) at 5.[2]  And, when this very lawsuit became public, an official State Department spokesman took the extraordinary step of going on record with the *Washington Post* to reject Defendants' contentions, stating that Defendants "must also comply with all other applicable federal, state, and

_____

[2]      As explained below at page 45, the so-called Wilberforce Pamphlet is an informational pamphlet that the State Department is statutorily required to create and make available to all visa applicants.  *See* 8 U.S.C § 1375b.

local laws, including any state minimum wage requirements."  Exhibit B (Lydia DePilis, *Au pairs Provide Cheap Child Care. Maybe Illegally Cheap*, Washington Post (March 20, 2015)).  Defendants should not be heard to argue that the State Department sanctions their unlawful conduct when the State Department itself has said otherwise.

Defendants' motions to dismiss this case are themselves a clear indication – an admission, even – that they are operating with blatant disregard for *au pairs'* rights. One Defendant asserts that it is "immune" from the nation's antitrust laws and that it would be "nonsensical" for Defendants to comply with wage and hour laws.  Cultural Care Mot. at 1, 3.  Another Defendant goes so far as to admit that it simply is "not operating within the employment laws of the various states[.]"  InterExchange Mot. at 11.  The question presented, as Defendants apparently see it, is not whether Defendants are complying with the laws; it is whether the laws apply to them at all.

### Background

**A. The J-1 Visa Program**

The J-1 visa program, created under the Mutual Educational and Cultural Exchange Act of 1961, as amended ("Exchange Act"), was designed to foster cultural exchange between nations.  *See* 22 U.S.C. § 2451; FAC p. 10, ¶ 43.  It includes a number of separate programs, including the *au pair* program, a program for various visiting students, and a program for camp counselors.  *See* 22 C.F.R. Part 62.  The *au pair* program is open to foreign nationals between the ages of 18 and 26, who are proficient in English and who have at least a secondary school education.  FAC p. 10,

¶ 44.  *Au pairs* provide child care services to "host families" for no more than 45 hours per week, in exchange for room and board and a legal wage.  *Id.*

The State Department has authorized 15 "sponsor" organizations — the Defendants in this case — as the exclusive entities authorized to recruit and place *au pairs*; any foreign national seeking a position as an *au pair* must be sponsored by one of these 15 entities.  *Id.* ¶¶ p. 11, 45-46.  Defendants are a mix of for-profit and not-for-profit entities, which generate their revenue from fees paid by both *au pairs* (for entry into the program) and host families (for placement of an *au pair*).  *Id.* P. 11, ¶ 47.

## B.  State Department Regulations Require *Au Pairs* To Be Paid a Legal Wage

Under State Department regulations, among other things, "Sponsors shall require that *au pair* participants [a]re compensated at a weekly rate based upon 45 hours of child care services per week and paid in conformance with the requirements of the Fair Labor Standards Act as interpreted and implemented by the United States Department of Labor."  22 C.F.R. § 62.31(j)(1).  The Fair Labor Standards Act ("FLSA") requires, among other things, that employees be paid the federal minimum wage.  29 U.S.C. § 206.  Moreover, to the extent that a state may have a higher minimum wage, the FLSA expressly does not preempt that state law, requiring employers to pay the higher state minimum wage.  *See* 29 U.S.C. § 218(a).

## C.  The Defendants Have Agreed to Hold *Au Pair* Wages at $195.75 Per Week Regardless of Market Forces

Notwithstanding this clear requirement, Defendants have uniformly determined that *au pairs* shall be paid $195.75 per week, which is less than the federal minimum wage, not to mention many states' minimum wages.  FAC p. 3, ¶ 5; pp. 19-20, ¶¶ 80-89.

The $195.75 per week figure derives from a 2009 State Department bulletin, which updated the weekly minimum programmatic wage floor for *au pairs*; according to the State Department's website, this represents a "weekly minimum stipend."[3]  *Id.* p. 19, ¶ 83; p. 36, ¶ 155.  Each of the Defendants, moreover, offers *au pairs* at precisely the same rate regardless of location — so an *au pair* in Manhattan earns the same as one in Maine, without respect to cost of living, supply, or demand — and regardless of job description, such that an *au pair* responsible for four children earns exactly the same as one responsible for one.  *Id.* pp. 29-30, ¶¶ 117-120.  The fact that *au pair* wages are set, and therefore insensitive to these usually relevant characteristics, is in fact offered as a selling point.  *Id.* p. 4, ¶ 9; p. 34, ¶ 148.  For example, Defendant InterExchange advertised that "no matter how many children you have, your costs are for hosting one *au pair*, not based on each child."  *Id.* p. 51, ¶ 246.

Defendants *agreed* to hold *au pair* wages at this level.  Defendant Cultural Care, for example, advised potential *au pairs*, in writing, that the wage would be "the same regardless of which *au pair* agency you use."  *Id.* p. 42, ¶ 197.  This is not an allegation of mere parallel conduct, for only an illegal agreement in restraint of trade could ensure

---

[3]  Over the past 20 years, the government has repeatedly clarified that the programmatic wage floor (a) is a bare minimum stipend, and (b) does not trump either the FLSA or state minimum wage laws.  In 1997, for example, the predecessor agency responsible for administering the *au pair* program promulgated a rule that required *au pairs* to be paid "in conformance with the requirements of the Fair Labor Standards Act as interpreted and implemented by the United States Department of Labor."  FAC p. 15, ¶ 64.  That same year, the Labor Department clarified that the stipend constituted a "minimum" weekly payment, and not a set fee.  *Id.* p. 36, ¶ 160.  In 2002, the State Department published a notice that provided, among other things, that "the wage given an *Au Pair* must conform to minimum wage law and adjustments."  *Id.* p. 37, ¶ 165.

*au pairs* are paid identically at this unlawful rate.  More powerfully, telephone

conversations with several of the Defendants resulted in admissions that there was an

understanding between all of the Defendants to pay standard *au pairs* the same

amount.  *Id.* pp. 21-22, ¶¶ 92-94.  One Defendant explained that the government sets a

minimum amount, and that "there is no difference in prices, as far as the stipend goes,

between all of the agencies."  *Id.* p. 21, ¶ 92.  Another admitted that Defendants "all

agreed to pay that amount, no more."  *Id.* p. 21, ¶ 93.  A third reiterated that

"[e]verybody" – meaning the Defendants – "agrees" to pay the minimum amount.  *Id.* p.

22, ¶ 94.[4]

Consistent with this agreement, each of the Defendants publicly advertises that

its *au pairs* will be paid $195.75 per week.  *Id.* pp. 22-28, ¶¶ 95-114.  Seemingly

recognizing that this amount is a programmatic wage floor, and not a set wage required

by the government, several of the sponsors also offer premium categories of *au pairs*

(who have additional education and experience) at higher rates, typically $225-250 per

week.  *Id.* p. 18, ¶ 78; p. 23, ¶ 98; p. 25, ¶ 103; p. 26, ¶ 106.  One explicitly states that

"[s]ome families choose to pay more than the required $195.75 stipend."  *Id.* p. 39,

¶ 179 (referring to Defendant Cultural Care).

---

[4]     Certain of the Defendants have moved to strike these allegations, arguing that they were obtained in violation of ethical rules concerning contact with represented parties.  Plaintiffs already filed a response to that motion, which explains that the contacts were made before any of the relevant sponsors were served with the complaint or had lawyers, and certainly before Plaintiffs' attorneys knew that they had retained counsel.  As explained below, the allegations of Defendants' unlawful agreement are more than sufficient to withstand a motion to dismiss even without these admissions. When properly considered, however, the Defendants' admissions are direct proof of an antitrust conspiracy.

Defendants have also disseminated false information to both *au pairs* and host families.  For example, Defendant AuPairCare warns potential *au pairs* about suspicious activity by host families, and notes that "[l]egitimate host families will also not offer you a higher stipend than what is listed in the" State Department bulletin.  *Id.* p. 33, ¶ 143.  In a similar vein, Defendant InterExchange warns, "don't let your excitement cloud your judgment. . . .  Scams and fraud involve many techniques. . . . . They may make you offers that sound amazing, like paying you more than the program amount of $195.75 per week."  *Id.* p. 41, ¶ 188.  InterExchange similarly states unequivocally that "[a]ll *au pairs* earn a weekly stipend of $195.75 per week – this is a number determined by the U.S. State Department."  *Id.* p. 41, ¶ 190.  And one other cautions prospective *au pairs* that the weekly stipend will be "the same regardless of which *au pair* agency you use." *Id.* p. 47, ¶ 197 (referring to Defendant Cultural Care).

## Standard of Review

Defendants move to dismiss the First Amended Complaint under Federal Rule of Civil Procedure 12(b)(6).  "To survive dismissal, 'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Thomas v. Kaven*, 765 F.3d 1183, 1190 (10th Cir. 2014) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "At the motion-to-dismiss stage, [the Court] must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff."  *Id.* (citing *Cressman v. Thompson*, 719 F.3d 1139, 1152 (10th Cir. 2013)).  "Granting [a] motion to dismiss is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also

to protect the interests of justice." *Dias v. City & County of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (internal quotation marks omitted).

## Argument

Defendants' motions should be denied.  Their primary argument rests on the false premise that the antitrust and wage and hour laws have no application to *au pairs*, when in fact the precise opposite is true:  the State Department's own regulations explicitly affirm that *au pairs* are not exempt from ordinary labor laws.  Nor are Defendants correct when they argue that the State Department has mandated that *au pairs* be paid $195.75 per week, and no more.  That argument is belied by the conduct of several Defendants (which offer premium *au pairs* at somewhat higher rates), as well as by every piece of guidance published by the U.S. government.

Defendants' other arguments fare no better.  *First*, Plaintiffs have adequately pled a price-fixing antitrust conspiracy and a RICO conspiracy because Plaintiffs plead uniform prices in contravention of market forces, uniform conduct, opportunity to conspire, illegal conduct, and admissions of conspiracy.  *Second*, Plaintiffs' wage and hour claims are adequately pled because Defendants, acting as employers, are failing to comply with the requirements of state and federal wage and hour laws.  *Third*, Plaintiffs' state common law claims are adequately pled.  *Finally*, any claims that are dismissed should be dismissed without prejudice to filing an amended complaint.

**A. The Court Should Deny Defendants' Motions to Dismiss Plaintiffs' Antitrust and Civil RICO Claims (Counts I and II).**

**1. Plaintiffs Have Pled a Plausible Entitlement to Relief Based on Their Allegations of a Price-Fixing Conspiracy Among the Sponsor Defendants**

The fifteen Sponsor Defendants act as the sole gatekeepers for foreign workers interested in traveling to the United States to work as *au pairs* through the J-1 visa program. Together, the Defendants control all *au pair* employment opportunities in the United States. And while these fifteen sponsors are competitors in the business of attracting foreign nationals to be *au pairs* and placing them with host families, they do not compete on the basis of *au pair* wages. They all tell *au pair* candidates that they will receive $195.75 per week, and they all tell host families that they will pay $195.75 per week. The Sponsor Defendants' uniformity with respect to *au pair* wages is not the product of natural market forces or independent business judgment; it is the result of a coordinated, unlawful agreement among them to depress *au pair* wages to the very bottom of the programmatic wage floor. The overwhelming circumstantial evidence available to date supports that inference and by itself easily puts the Plaintiffs on the right side of the *Twombly* pleading line. The three separate admissions of agreement from representatives of three separate Defendants merely confirms Defendants' unlawful conspiracy.

**a. The First Amended Complaint Satisfies *Twombly's* Pleading Requirements**

Under *Twombly*, a plaintiff alleging a Sherman Act Section One claim must include in the complaint "enough factual matter (taken as true) to suggest that an

agreement was made." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007); *see also Iqbal*, 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."). "Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 556.

In *Twombly*, the plaintiffs alleged generally that incumbent local exchange carriers ("ILECs") violated Section One of the Sherman Act by preventing the entry of new carriers into their respective territories and by not competing with one another for attractive business opportunities. *Id.* at 550-51. All the plaintiffs could point to were descriptions of parallel conduct; there were no allegations of any actual agreement among the ILECs and nothing in the complaint suggested "that the resistance to the upstarts was anything more than the natural, unilateral reaction of each ILEC intent on keeping its regional dominance." *Id.* at 556, 564.

Plaintiffs' allegations here are markedly different from those in *Twombly*, and they easily support a plausible inference of an unlawful agreement. For example, Plaintiffs have pled the following, among other facts:

- At least one Defendant has informed prospective *au pairs* in writing that its weekly wage of $195.75 would be "the same regardless of which *au pair* agency you use." FAC. p. 20, ¶ 87.

- The Defendants control all *au pair* employment opportunities in the United States. *Id.* p. 10, ¶ 42.

- All Defendants set the wages for standard *au pair* services at the current programmatic wage floor of $195.75 per week, and each has advertised that weekly amount on its website.  *Id.* pp. 22-27, ¶¶ 96-109.

- None of the Defendants have adjusted their weekly wages for geographic differences, the number of children in a home, or changes in market conditions.  *Id.* pp. 29-30, ¶¶ 118-120.

- There is a programmatic wage ***floor***, but there is no government-imposed requirement that the Defendants set *au pair* wages at $195.75 per week. *Id.* pp. 14-15, ¶¶ 61-65.

- Each time the programmatic wage floor has increased, the Defendants have acted in unison in raising their weekly wages for standard *au pair* services accordingly.  *Id.* p. 29, ¶ 115.

- The Defendants have means, opportunity, and motive to agree to depress wages for standard *au pair* services in order to reap artificially high profits. *Id.* pp. 30-32, ¶¶ 122-136.

- The Defendants can easily monitor and police against cheating within the cartel.  *Id.* p. 32, ¶¶ 134-135.

- Absent agreement, at least some Defendants would offer *au pairs* competitive wages higher than the current $195.75 per week programmatic wage floor.  *Id.* pp. 17-18, ¶¶ 73-76.

- The $195.75 per week wage is an illegal wage under federal law, and is less than many states' minimum wages.  *Id.* p. 29, ¶¶ 116-117.

- Representatives of some Defendants have ***admitted*** that they all agreed to fix standard *au pair* wages at the $195.75 per week programmatic wage floor.  *Id.*  pp. 20-22, ¶¶ 90-94.

These allegations meet Plaintiffs' pleading burden under Section One.  *See*

*Araphoe Surgery Ctr., LLC v. Cigna Healthcare, Inc.*, No. 13-cv-3422, – F. Supp. 3d –,

2015 WL 753954, at *3-4 (D. Colo. Feb. 20, 2015) (denying motion to dismiss Sherman

Act claim based on allegations "that suggest a conscious commitment to a common

scheme designed to achieve an unlawful objective" (internal quotation marks omitted));

*Confre Cellars, Inc. v. Robinson*, No. 01-N-1060, 2002 WL 32376945, at *13 (D. Colo. Mar. 6, 2002) (report and recommendation) ("In the absence of an explicit agreement, a plaintiff claiming a Section 1 violation may establish concerted action by circumstantial evidence."); *see also Evergreen Partnering Group, Inc. v. Pactiv Corp.*, 720 F.3d 33 (1st Cir. 2013) ("While each of Evergreen's allegations of circumstantial agreement standing alone may not be sufficient to imply agreement, taken together they provide a sufficient basis to plausibly contextualize the agreement necessary for pleading a § 1 claim.").

Defendants make what amount to two arguments under *Twombly*. Neither has merit.

*First*, Defendants conflate the critical distinction between what is necessary to overcome a motion to dismiss and what is needed to get past a post-discovery motion for summary judgment. *See*, *e.g.*, Joint Mot. at 10 (citing *Quality Auto Body, Inc. v. Allstate Insurance Co.*, 660 F.2d 1195 (7th Cir. 1981) (affirming summary judgment); Joint Mot. at 17 (citing *In re Baby Food Antitrust Litig.*, 166 F.3d 112 (3d Cir. 1999) (affirming summary judgment), and *Maric v. St. Agnes Hosp. Corp.*, 75 F.3d 310 (2d Cir. 1995) (affirming summary judgment)).

Take, for instance, Defendants' reliance on *In re Text Messaging Antitrust Litigation*. *See, e.g.*, Joint Mot. at 15 & 16. In that case, the Seventh Circuit found that allegations of circumstantial evidence of collusion, including "a mixture of parallel behaviors, details of industry structure, and industry practices that facilitate collusion" were sufficient to defeat a motion to dismiss. 630 F.3d 622, 627 (7th Cir. 2010). Writing for the court, Judge Posner reasoned:

> What is missing, as the defendants point out, is the smoking gun in a price-fixing case:  direct evidence, which would usually take the form of an admission by an employee of one of the conspirators, that officials of the defendants had met and agreed explicitly on the terms of a conspiracy to raise price . . . .  Direct evidence of conspiracy is not a sine qua non, however.  *Circumstantial evidence can establish an antitrust conspiracy.*  We need not decide whether the circumstantial evidence that we have summarized is sufficient to compel an inference of conspiracy; the case is just at the complaint stage and the test for whether to dismiss a case at that stage turns on the complaint's "plausibility."

*Id.* at 628-29 (internal citations omitted, emphases supplied).  That "plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.* at 629 (quoting *Iqbal*, 129 S. Ct. at 1949).  "[T]he complaint must establish a nonnegligible probability that the claim is valid; but the probability need not be as great as such terms as 'preponderance of the evidence' connote."  *Id.*  Judge Posner concluded:

> The plaintiffs have conducted no discovery.  Discovery may reveal the smoking gun or bring to light additional circumstantial evidence that further tilts the balance in favor of liability.  All that we conclude at this early stage in the litigation is that the district judge was right to rule that the second amended complaint provides a sufficiently plausible case of price fixing to warrant allowing the plaintiffs to proceed to discovery.

*Id.*[5]

---

[5]    In a case that preceded *Twombly*, the Tenth Circuit similarly recognized that circumstantial evidence alone can support an antitrust conspiracy claim, and even allegations of consciously parallel behavior that is inconsistent with a conspirator's independent business interest will be sufficient to state a claim.  *See Cayman Exploration Corp. v. United Gas Pipe Line Co.*, 873 F.2d 1357, 1361 (10th Cir. 1989).

After discovery, the defendants in *In re Text Messaging Antitrust Litigation* moved for summary judgment, and the district court granted their motion and dismissed the claims.  The plaintiffs appealed and the same panel of the Seventh Circuit affirmed. Again writing for the court, Judge Posner explained that, while the allegations in the complaint had been sufficient to let the plaintiffs conduct full pretrial discovery, the plaintiffs failed in discovery "to find sufficient evidence of express collusion."  *In re Text Messaging Antitrust Litigation*, 782 F.3d 867, 879 (7th Cir. 2015).

Defendants cite only to this second decision, in which the Seventh Circuit affirmed summary judgment, to support their arguments.  *See, e.g.*, Joint Mot. at 15 & 16.  But they conveniently ignore the Seventh Circuit's *earlier* 2010 decision denying a motion to dismiss and allowing the text messaging case to proceed to discovery, which, of course, is the most relevant guidepost at this stage of this case.

*Second*, Defendants attempt to trivialize – or mischaracterize – Plaintiffs' allegations, which include both (1) strong circumstantial evidence of price fixing, and (2) substantial direct evidence of price fixing, in the form of Defendants' own admissions. Either of these on its own would be sufficient to survive a motion to dismiss; both combined remove any doubt that Plaintiffs are entitled to proceed to discovery.

Defendants attempt to minimize the circumstantial evidence of their unlawful conspiracy, repeatedly characterizing it as mere "parallel action."  But as catalogued above, the allegations in the First Amended Complaint go far beyond parallel action. Plaintiffs allege the Defendants' means and opportunity to fix the price of *au pair* labor: collectively, the fifteen Defendants control 100 percent of the *au pair* labor market, and

no *au pair* may enter that market without paying for the sponsorship of one of the Defendants. *See* FAC p. 17, ¶ 72; p. 32, ¶ 134. Most of the Defendants are also part of one of two trade organizations, which provide further opportunity for collusion. *See, e.g.,* FAC pp. 30-31, ¶¶ 126-130. The Defendants' incentive to keep the price of labor down is also obvious; the greater the disparity between *au pair* wages and ordinary market wages for child care, the more willing host families will be to pay expensive placement fees to the Defendants. *See, e.g.*, Au Pair in America Website, Program Cost/2015 Program Fees, available at http://bit.ly/1dbjYvc (last accessed July 10, 2015) (describing $8,245 "Program Fee Annual" plus $400 "Match Fee" to be paid by *au pair* host families). Moreover, the uniform $195.75 per week wage cannot be explained by parallel conduct with an "independent business justification," Joint Mot. at 10, because the $195.75 wage is illegal under federal and state wage and hour laws. Where multiple market participants have settled on the same *unlawful* wage, that alone is sufficient circumstantial evidence of conspiracy. *See, e.g.*, *In re Motor Fuel Temperature Sales Practices Litig.*, 534 F. Supp. 2d 1214, 1237 (D. Kan. 2008) (denying motion to dismiss Section One claim where, in addition to parallel action, plaintiffs alleged "that defendants agreed to an unlawful course of action to unlawfully deprive plaintiffs of rights and property by selling motor fuel on a non-temperature compensated basis" and "that as members of various trade associations, defendants have pressured manufacturers to not sell automatic temperature compensation equipment and retrofit kits").

Plaintiffs' allegations reflecting circumstantial evidence of agreement are themselves sufficient to state a plausible entitlement to relief under *Twombly* and *Iqbal*, but Plaintiffs have gone even further by offering additional allegations reflecting direct evidence of agreement among Defendants – what Judge Posner called "the smoking gun in a price-fixing case:  direct evidence, [in] the form of an admission by an employee of one of the conspirators, that officials of the defendants had met and agreed explicitly on the terms of a conspiracy to [set] price." *In re Text Messaging Antitrust Litig.*, 630 F.3d 628-29.[6]

In the leading Tenth Circuit case on direct evidence at summary judgment – when the standard imposed on plaintiffs is higher – the court stated that "evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted" would constitute direct evidence that relieved the plaintiff of the burden of

---

[6]     Defendants try to minimize the import of the admissions, but they rely on inapposite cases. *Contrast* FAC pp. 21-22, ¶¶ 92-94 (party representatives' admissions of agreement) *with In re Online Travel Co. (OTC) Hotel Booking Antitrust Litigation*, No. 3:12-CV-3515, 2014 WL 5460450 (N.D. Tex. Oct. 27, 2014) (magazine articles offering decidedly mixed data about industry competition); *A&E Auto Body, Inc. v. 21st Century Centennial Insurance Co.*, No. 6:14-CV-310, 2015 WL 304048 (M.D. Fla. Jan. 21, 2015) (evidence merely showing that defendants were unwilling to pay more than their competitors); *Bona Fide Conglomerate, Inc. v. SourceAmerica*, No. 14CV0751, 2015 WL 618665 (S.D. Cal. Jan. 6, 2015); *Corr Wireless Communications, LLC v. AT&T, Inc.*, 893 F. Supp. 2d 805 (N.D. Miss. 2012) (no admission of any agreement or conspiracy among the defendants).

At least one Defendant, Cultural Care, further argues that the admissions "do not involve Cultural Care, nor do they name any other sponsor."  Cultural Care Mot. at 12. That much is true, but it does nothing to undermine Plaintiff's allegations of conspiracy. The admission by three participants of the existence of a conspiracy is sufficient direct evidence, standing alone, to implicate all of the Defendants.  *See, e.g.,* FAC p. 21, ¶ 92 (admitting that "pricing becomes standard across all agencies"); *id.* ¶ 93 (Defendants "all agreed to pay [the same] amount"); *id.* p. 22, ¶ 94 ("everybody agrees").

presenting circumstantial evidence.  *See Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1083 (10th Cir. 2006) (internal quotation marks omitted).  The admissions by Defendants here explicitly refer to an agreement, and they identify precisely who made that agreement, requiring no inferences and establishing a conspiracy for the purposes of this motion.  *See, e.g.*, FAC pp. 21-22, ¶¶ 92-94.  This evidence is even stronger than that which permitted a case to proceed past summary judgment in *Champagne Metals*, where the Tenth Circuit determined that a vague statement from an employee regarding an alleged group boycott constituted direct — albeit "weak" — evidence of an agreement to take collective action.  *See id.* at 1084. The Tenth Circuit held that the direct evidence of agreement, combined with the other circumstantial evidence in the case, compelled the conclusion that the district court had wrongly granted summary judgment to the defendants.  *See id.* at 1087.  If the weaker evidence in *Champagne Metals* justified denial of summary judgment, then surely the stronger evidence here justifies denial of a motion to dismiss.

### b. The Defendants' Alternative Explanations for their Conspiratorial Conduct Are Irrelevant

Defendants mistakenly contend that *Twombly* requires dismissal if **they** offer a plausible, non-conspiratorial justification for their conduct.  Thus, for example, they assert that "it certainly is plausible that [Defendants] independently would conclude that they should inform host families that the cost of hosting an *au pair* includes a weekly stipend of $195.75."  Joint Mot. at 12.  And they try to couch their conduct as making "perfect business sense" and the result of independent business judgment.  *Id.* at 13.

17

These explanations are irrelevant at the motion to dismiss stage.  The Supreme Court has been clear that a plaintiff need only allege facts that "suggest that an agreement was made" and that "raise a reasonable expectation that discovery will reveal evidence of illegal agreement"; plaintiffs need not rule out all alternative explanations.  *Twombly*, 550 U.S. at 556; *see Araphoe Surgery Ctr.*, 2015 WL 753954, at *3 (same).  Indeed, the Supreme Court explicitly rejected a "probability" requirement: "Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage . . . ."  *Twombly*, 550 U.S. at 556; *see also Anderson News, L.L.C. v. American Media, Inc.*, 680 F.3d 162, 190 (2d Cir. 2012) ("Consequently, although an innocuous interpretation of the defendants' conduct may be plausible, that does not mean that the plaintiff's allegation that that conduct was culpable is not also plausible.").

Defendants wrongly rely on *Monsanto Co v. Spray Rite Serv. Corp.*, 465 U.S. 752 (1984), in contending that an antitrust plaintiff "must allege facts sufficient 'to exclude the possibility that the [defendants] were acting independently.'"  Joint Mot. at 13.  *Monsanto* was not a motion to dismiss case.  It dealt with "evidentiary standard[s]," 465 U.S. at 763, and held only that in order to get to a jury, "there must be evidence that *tends* to exclude the possibility of independent action," *id.* at 769 (emphasis supplied).  And even if Plaintiffs were required to come forward with allegations at the initial pleading stage that "tend[ed] to exclude the possibility" of independent action, they have done so here.  First, as discussed above, there could be no independent business justification for any sponsor to set standard *au pair* wages at an illegal level.  But that is

just what the Defendants have done by setting *au pair* wages below the minimum wage under both federal and state law (as discussed at greater length below).  Plaintiffs are aware of no case in which a group of defendants were alleged to have agreed to fix wages at a level that is illegal in its own right — let alone any case in which defendants successfully moved to dismiss such a claim based on a *Twombly* pleading argument.

In a truly competitive marketplace, sponsors would employ different strategies to increase their market share.  Some would undoubtedly try to grow their market share by offering *au pairs* a higher wage, which in turn would attract more and higher-quality *au pairs* and result in those sponsors making more placements, and being able to charge higher fees to host families and *au pairs* alike.  FAC pp. 17-18, ¶¶ 73-76.  Other sponsors might use alternative business models, such as offering *au pairs* the minimum wage, understanding that this approach would be less attractive to *au pairs* but more attractive to host families.  In a competitive labor market, *au pair* sponsors might also have to compete with agencies that place other kinds of domestic workers, such as nannies, and react to market forces that drive their pay, including factors such as location and childcare responsibilities.[7]  As a result of these natural market forces, a

---

[7]     Indeed, several of the Defendants specifically advertise that *au pair* labor is immune from market forces and therefore a cheap alternative to daycare or nannies. *See, e.g.,* FAC ¶¶ 9, 258 (Cultural Care), 264 (Go Au Pair).  Defendant Cultural Care, for example, makes this point in compelling fashion on its website:

prevailing market wage for *au pairs* would be established, with some sponsors generally paying at the higher end of the range and others at the lower end.  They would not all pay precisely the same.

Through their unlawful agreement, however, the Defendants created an artificial market in which they eliminated an arena of competition, thereby driving down the costs of *au pair* labor, which increased the number of placements (*i.e.*, increased the size of the market) and led to greater profits for the Defendants in the form of fees for each placement.[8]  Here too is another key aspect of their unlawful conspiracy:  only those firms that have been designated as "sponsors" by the State Department can operate in the *au pair* marketplace.  With this known barrier to entry, the Defendants are

---



Cultural Care Website, A Flexible, Affordable Childcare Solution, available at http://bit.ly/1LW8mkX (last visited July 10, 2015).

[8]      Defendants point out that some of them "advertise, and a significant number of their host families pay, a weekly stipend in an amount greater than $195.75."  Joint Mot. at 11.  In fact, as alleged in the FAC, those Defendants that advertise a higher weekly wage only do so for more experienced, extraordinary *au pairs*.  All of the Defendants advertise standard *au pair* services at the same $195.75 per week wage.  Thus, while the Defendants' motion papers confirm their knowledge that they are *not required* to set *au pair* wages at the $195.75 per week level – contrary to Defendant Cultural Care's argument (at page 8 of its brief) that *au pairs* are "mandated" to be paid $195.75 per week, and no more – they all still agreed to do so for the vast majority of *au pairs*, *i.e.*, the putative class of "standard *au pairs*."

comfortable that a new entrant will not frustrate their agreement by paying *au pairs* a wage above the programmatic wage floor.

This is not a situation like those at issue in the cases that the Defendants rely upon. For example, in *Mayor & Council of Baltimore v. Citigroup, Inc.*, 709 F.3d 129 (2d Cir. 2013), the defendant financial institutions were alleged to have exited the auction rate securities market through an unlawful agreement. The defendants rebutted the allegation that they acted in parallel in exiting the market at the same time by noting that it was clearly in each of their respective business interests to withdraw "from a collapsing market in which they had significant downside exposure." *Id.* at 138. Accordingly, it was not hard for the court to conclude that the plaintiffs' allegation of an unlawful conspiracy was not plausible.

Similarly, in *Cayman Exploration*, the plaintiff vaguely contended that the defendant and other gas transmission companies uniformly breached their contracts with gas producers. *See id.* at 1361. The *Cayman* plaintiff included no factual allegations identifying the alleged conspirators, how the conspiracy functioned, or the nature of the defendant's participation. *See id.* In addition, there were no allegations to support an inference that the conspiracy would be contrary to the defendant's economic interests absent agreement. *See id.* Here, in contrast, Plaintiffs' allegations support the inference that it is not in each Defendant's independent business interest to set *au pair* wages at the programmatic wage floor *unless* each knows that all of the others in the industry will do the same.

**2. Defendants Are Not Mere Instrumentalities of the Federal Government, and they Are Not Immune from Liability Under the Sherman Act.**

Defendant Cultural Care makes the additional half-hearted argument that its "conduct is protected from antitrust liability under the federal instrumentality/implied immunity doctrine" because the State Department purportedly "directed the specific conduct being challenged by the Plaintiffs."  Cultural Care Mot. at 10.  Cultural Care is wrong, for two basic reasons.

*First*, Cultural Care is not an instrumentality of the U.S. government.  In *United States Postal Service v. Flamingo Industries (USA) Ltd.*, – the only case cited in the text of Cultural Care's argument – the Supreme Court held that the United States Postal Service could not be liable under the antitrust laws because, "in form and function," it is not a separate person from the United States.  540 U.S. 736 (2004).  The Court noted the long history of the Postal Service's place in the United States, beginning with the appointment of Benjamin Franklin as the first Postmaster General and its later elevation to a Cabinet-level Department, before concluding that Congress had not intended in the 1970 Postal Reorganization Act to waive the Postal Service's sovereign immunity so broadly as to open it up to antitrust liability.[9]  There is no basis to conclude from *Flamingo Industries* that Cultural Care is immune from federal antitrust law liability.  Cultural Care is not a federal entity and bears no similarity to the United States Postal

---

[9]     After the Supreme Court's decision, Congress expressly removed some of the United States Postal Services' antitrust immunity with respect to certain services that it provides that are not part of its monopoly to provide the carriage of stamped mail. *See*, *e.g.*, *Tog, Inc. v. United States Postal Service*, No. 12-cv-01946 (JLK), 2013 WL 3353883 (D. Colo. July 3, 2013).

Service, in form or function.  *See also* 22 C.F.R. § 62.9(d)(5) (J-1 sponsors shall not represent that they are "endorsed, sponsored, or supported by the Department of State or the United States Government").

*Second*, and more to the point, Cultural Care was not "expressly directed" by the government to set *au pair* wages at $195.75 per week.  Cultural Care Mot. at 9.[10]   This immunity argument proceeds from a faulty premise:  that the $195.75 stipend is "mandated" by the State Department and sponsors are not free to offer *au pairs* at a different rate.  *Id.* at 8; *see also id.* at 9-10 ("the federal government expressly directed Cultural Care to ensure that host families paid *au pairs* the weekly stipend of $195.75. . . .  There is nothing in the Stipend Notice that could be interpreted to make the stipend amount discretionary or suggesting that it was merely a 'wage floor.'").  Not even the other Defendants agree with this argument.  *See, e.g.,* Joint Mot. at 3 ("The variation in weekly stipends is not surprising").  To the contrary, the U.S. government has repeatedly emphasized that the published *au pair* stipend is a *minimum* weekly payment, *see supra* n. 3 (collecting citations), and there is nothing in the guidance that Cultural Care relies upon to the contrary.  Even the so-called "Stipend Notice" (Exhibit 1

---

[10]      For the proposition that a private entity can be entitled to immunity "when the federal government expressly directs the conduct at issue," Cultural Care relies on *Name.Space, Inc. v. Network Solutions, Inc.*, 202 F.3d 573, 584 (2d Cir. 2000) (holding that defendant NSI was entitled to antitrust immunity both because its conduct was "expressly directed" by the government, and because immunity was "in furtherance of the government's policy" regarding domain names).  Other courts have expressly declined to wade into the thorny issue of implied antitrust immunity for private entities, *see*, *e.g.*, *Watts v. Network Solutions, Inc.*, 202 F.3d 276 (7th Cir. 1999) (unpublished) (expressly avoiding the "complex issue of whether NSI enjoys antitrust immunity"), and the Tenth Circuit has yet to embrace antitrust immunity for private entities acting in accordance with federal directives.

to the Cultural Care Motion) is in fact titled "Notice [of] Federal Minimum Wage Increase," which strongly suggests that the stipend is no more than a minimum weekly payment.  Therefore, even if a sponsor could be said to be cloaked with antitrust immunity for its actions in compliance with federal directives, there is no such federal directive dictating that *au pairs* receive only $195.75 per week.

## B.    The Court Should Deny Defendants' Motions to Dismiss Plaintiffs' Wage and Hour Claims (Counts VIII (Federal) and IX, X, XI, (State))

Defendants' efforts to dismiss the federal and state wage and hour claims should likewise be rejected.  State Department regulations expressly make it the responsibility of the Defendants to ensure that *au pairs* are paid a legal wage.  *See* 22 C.F.R. § 62.31 ("Sponsors shall require that au pair participants" are paid in accordance with the FLSA).  As the First Amended Complaint adequately alleges, they have failed in that responsibility, instead requiring *au pairs* to accept compensation below the federal and state minimum wages.

### 1.    Defendants are Employers for Purposes of State and Federal Wage and Hour Laws.

Defendants first argue that they need not abide by federal or state wage and hour laws because they are not *au pairs'* "employers."  That contention is wrong as a matter of law and fact, but the Court should not reach that question at this stage, since it is an inherently fact-bound question not appropriately resolved on a motion to dismiss.

#### a.    The Issue of Whether Defendants are "Employers" is Not Appropriately Decided At the Motion to Dismiss Stage

Under the FLSA, an "employer" is "any person acting directly *or indirectly* in the interest of an employer in relation to an employee."  29 U.S.C. § 203(d) (emphasis

24

supplied); *see also id.* § 203(g) ("'Employ' includes to suffer or permit to work").   "This definition is a necessarily broad one in accordance with the remedial purposes" of the FLSA.  *Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 66 (2d Cir. 2003).   As a result, under the wage and hours laws, multiple or "joint" employers can employ a single worker.

Here, Plaintiffs have alleged a number of facts that support the conclusion that the Defendants are joint employers of *au pairs*.   *First*, the State Department regulations expressly make it the responsibility of the Defendants to "require that au pair participants" receive certain conditions of employment, including (1) a legal wage, (2) a limit on the number of child care hours worked, (3) a certain amount of time off every week, and (4) two weeks of paid vacation.   22 C.F.R. § 62.31(j)(1)-(4).   *Second*, as described in more detail below, the Defendants have reserved the rights to hire, fire, train, and discipline *au pairs*; they also set the *au pairs*' wages, hours, and even provide them with health insurance.   *See, e.g.*, FAC ¶ 303 (alleging that Defendant Cultural Care expressly retained the authority to terminate *au pairs* who "marr[ied] or bec[ame] pregnant]").   These indicia of control demonstrate unambiguously – and certainly at the pleading stage – that the Defendants at least indirectly "suffer or permit [*au pairs*] to work."

But the law is clear that it is not appropriate at the motion to dismiss stage – before any discovery – for the Court to decide whether a defendant is a "joint employer." *See Does v. Rodriquez*, 2007 WL 684117, No. 06-cv-00805 (D. Colo. 2007) (court finding in an FLSA action that the determination of the joint employer issue is not appropriate at the motion to dismiss stage); *see also Goodrich v. Covelli Family Ltd.*

*Partnership*, 2012 WL 921493, No. 8:11-cv-1715-T-33TBM, *2 (M.D. Fla. Mar. 19, 2012) (denying motion to dismiss because "Plaintiffs assert that they will be able to prove that [defendant] was a joint employer after conducting discovery[,]" and "[r]ather than dismissing Plaintiffs' action . . . at this early juncture, the Court will give the Plaintiffs an opportunity to prove their case including the contention that [defendant] is a 'joint employer' under the FLSA."); *Enkhbayar Choimbol v. Fairfield Resorts, Inc.*, 475 F. Supp. 2d 557, 563 (E.D. Va. 2006) (granting conditional certification to FLSA opt-in class and rejecting defendants' argument that the court must determine fact intensive inquiry of whether defendant was a joint employer before issuing conditional certification, reasoning that the determination was not necessary at this preliminary stage of the collective action); *Quedraogo v. Durso Ass. Inc.,* 2005 WL 1423308, NO. 03CV 1851(RLC) (S.D.N.Y. Jun. 16, 2005) (denying motion to dismiss because, "given plaintiffs' allegations and the fact-intensive nature of the joint employment inquiry, dismissal of these claims prior to the conduct of discovery would be inappropriate").[11]

Unable to marshal any authority to support its motion to dismiss under Rule 12(b)(6), Defendants again rely on a handful of cases that were decided at the summary judgment stage, after the parties had engaged in extensive discovery.  *See, e.g.*, *Baker v. Flint Engineering & Const. Co.*, 137 F.3d 1436, 1440 (10th Cir. 1998) (analyzing facts relevant to economic realities test at the summary judgment stage); *Barlow v. C.R.*

---

[11]    Analogously, in the context of Title VII actions, Colorado courts have held that "as a general rule, determining whether an entity qualifies as an employer is a fact issue for the jury." *Camera v. Sanchev*, 2013 WL 9721026, No. 12-cv-03040-CMA-CBS (D. Colo. Sep. 23, 2013) (Arguello, *J.*) (quoting *Bristol v. Board of County Com'rs of County of Clear Creek*, 312 F.3d 1213, 1221 (10th Cir. 2002) (*en banc*)); *Dafia v. Guardsmark LLC*, 2012 WL 5187762, No. 10-cv-03119-RBJ-MJW (D. Colo. Oct. 19, 2012).

*England Inc.,* 703 F.3d 497, 506 (10th Cir. 2012) (same); *Ivanov v. Sunset Pools Management Inc.,* 567 F. Supp. 2d 189 (D.D.C. 2008) (same).  As was true of Defendants' reliance on summary judgment cases on the antitrust claims, those cases are inapplicable at this stage.

For example, in *Does v. Rodriquez*, No. 06-cv-00805, 2007 WL 684117 (D. Colo. Mar. 2, 2007), the Court explicitly rejected the defendants' reliance on summary judgment decisions on this issue:

> [T]hese cases were decided on summary judgment, with a much fuller factual record.  Grant does not point me to any cases dismissing under Rule 12 an FLSA or AWPA claim with this level of detail.  At this stage of the case I cannot say that plaintiffs can prove no set of facts that would show that Grant was an employer under the FLSA.

*Id.* at *5 (internal citations omitted).  Here, too, the Court should decline to undertake this analysis at the motion to dismiss stage.

### b.  Defendants are Plaintiffs' "Joint Employers" Under the FLSA

Even if the Court were to reach the joint employer issue now, it would have to conclude that Defendants are "employers" for purposes of the wage and hour laws.  In fact, just last year, the Labor Department reached that very conclusion in its official Fact Sheet #79E, titled "Joint Employment Services in Domestic Service Employment Under the FLSA," which provides that "[p]rivate agencies, non-profit organizations, or public entities may be third party joint employers of domestic service employees . . . under the FLSA."  U.S. Department of Labor, Wage and Hour Division, Fact Sheet #79E (June 2014) (attached as Exhibit C).

The Labor Department explained that where a private agency, like the Defendants, "sets the wage rate; authorizes a certain number of hours based upon an assessment; pays health insurance, workers' compensation and unemployment insurance premiums; and also may choose to authorize overtime," but permits the "consumer" to "hire-and fire workers" and conduct "day to day supervision" it is likely that the consumer and the agency are "joint employers" for purposes of the FLSA.  The Labor Department gave examples of joint employers in its Fact Sheet as follows:

> As a general example, workers sent by a cleaning company to a client-hotel to clean hotel rooms may be jointly employed by both the cleaning company and the hotel. Similarly, a private agency, non-profit organization, or public entity that hires a home care worker to provide services in an individual's home may be a joint employer with the individual (or family or household member of the individual).

*Id.* at #79E.

The Labor Department's analysis is compelled by the statute, which defines an "employer" as "includ[ing] any person acting directly or indirectly in the interest of an employer in relation to an employee."  29 U.S.C.  § 203(d).  The FLSA further "defines the verb 'employ' expansively to mean 'suffer or permit to work.'"  *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992) (quoting 29 U.S.C.  § 203(g)).  "[T]he striking breadth of this latter definition stretches the meaning of employee to cover some parties who might not qualify as such under a strict application of traditional agency law principles."  *Baker v. Flint Engineering & Const. Co.*, 137 F.3d 1436, 1440 (10th Cir. 1998) (internal quotation marks omitted).  As the Tenth Circuit has explained:

> [T]he economic realities of the relationship govern, and the focal point is whether the individual is economically

28

> dependent on the business to which he renders service or is, as a matter of economic fact, in business for himself.  The economic reality test includes inquiries into whether the alleged employer has the power to hire and fire employees, supervises and controls employee work schedules or conditions of employment, determines the rate and method of payment, and maintains employment records.

*Id.* (internal citations and quotation marks omitted); *see also Fernandez v. Mora-San Miguel Elec. Co-op, Inc.*, 462 F.3d 1244, 1248 (10th Cir. 2006) (noting that the "economic reality test" applies under the FLSA).[12]

A court in this district has upheld allegations that defendants were joint employers on the strength of allegations that defendant "had day to day operational control of the business"; "oversaw the foremen"; "regularly consulted" with the joint employer; whose employees "acted at the direction of or under the supervision" of the defendant; and "knew of, condoned and benefitted from the illegal" conduct.  *Does*, 2007 WL 684117, at *5; *see also Donovan v. Tavern Talent and Placements, Inc.*, No.

---

[12]    The *Baker* factors are not exclusive, and courts in this Circuit have considered a variety of indicia of economic reality.  *See Harbert v. Healthcare Services Group, Inc.*, 173 F. Supp. 2d 1101, 1106 (D. Colo. 2001) ("the Tenth Circuit adheres to no single set of factors in undertaking the [joint employer] analysis"); *Saavedra v. Lowe's Home Ctrs., Inc.*, 748 F. Supp. 2d 1273, 1286-89 (D.N.M. 2010) (collecting cases and noting the different factors used by courts around the country, including the observation that "[c]ases interpreting § 203(d) of the FLSA have held that a person who has the authority to hire and fire may be considered an employer" (internal quotation marks omitted)); *Zachary v. Rescare Okla., Inc.*, 471 F. Supp. 2d 1175, 1179 (N.D. Okla. 2006) (noting that "joint employment may be found even when an entity does not hire and fire its joint employees, directly dictate their hours, or pay them," and that "[r]egardless of the specific factors used, the concept of joint employment should be defined expansively" (internal citation and quotation marks omitted)); *Antunez v. G & C Farms, Inc.*, No. 92-cv-308, 1993 WL 451344, at *4-5 (D.N.M. Aug. 9, 1993) (considering nine factors, including "whether the service rendered is an integral part of the alleged employer's business," and "the degree of supervision, direct and indirect").

84-F-401, 1986 WL 32746 (D. Colo. Jan. 8, 1986) (finding that talent placement agency and nightclub owners were both joint employers because the talent agency recruited the dancers and the night club owners supervised their daily activities); *Bureerong v. Uvawas*, 922 F. Supp. 1450, 1468-69 (C.D. Cal. 1996) (manufacturers could be deemed joint employers of garment workers even though manufacturers were clearly removed from the actual garment manufacturing process that transpired at the facility, even though there was no traditional employment relationship between the garment workers and the manufacturers, and even though manufacturers did not have the power to hire or fire the individual workers).[13]

---

[13]     Defendants' reliance on an IRS document that characterizes a host family as an "employer" for tax purposes is misplaced. *See, e.g.,* Cultural Care Mot. at 19-20 & Ex. B.  In the first place, the IRS document does not state (as Cultural Care purports to quote it) that "the host family, not the sponsor, is the 'employer' in the au pair program." Cultural Care Mot. at 20.  Instead, the IRS stated that, according to the Labor Department, "an employer-employee relationship exists between the au pair and his host family."  Cultural Care Mot., Ex. B.  This conclusion is in no way inconsistent with the sponsor being a joint employer of the *au pair.*  And anyway, Plaintiffs' claim is that the Defendants are "joint employers" for purposes of the wage and hour laws, not the tax laws.

Equivalent allegations are present here: Defendants have statutory obligations to supervise and monitor *au pairs*, and they have the ability to hire and fire au pairs. And Defendants did not merely know of the illegal conduct, they are the proponents of it. Plaintiffs have described the extensive control that Defendants have over the *au pairs*' work. For example, Plaintiffs have alleged that:

- Defendants dictate and control a "stipend" at which the *au pairs* are paid. FAC p. 62, ¶ 297.

- The contracts entered into by the *au pairs* are drafted and controlled by the Defendants. *Id.* p. 62, ¶ 299.

---

Equally misplaced is Defendants' heavy reliance on *Ivanov v. Sunset Pools Management Inc.,* 567 F. Supp. 2d 189 (D.D.C. 2008) (cited in, *e.g.*, Cultural Care Mot. at 19; AIFS Mot. at 12), which was resolved at the summary judgment stage, and, in any event, involved substantially different facts from those at issue here, as the defendant in that case merely facilitated the employee's job search and did not exercise any control once an employment relationship was established. *Id.* at 194-95. *Ivanov* involved an international staffing company that recruits foreign citizens for work-travel opportunities; in that instance the job involved pool maintenance work. Unlike, the relationship between the *au pairs* and their sponsors in this case, in *Ivanov*, the Court held – after a full course of discovery – that Intrax did not exercise any control over the foreign employees and instead simply facilitated the initial job search process. *Id.* at 194-95. In this case, the *au pairs* have alleged that the Defendants not only controlled their initial job search, entrance to the country, and training, but they continued to control their employment in a number of ways. Moreover, the Defendants' control over *au pairs* went far beyond even that which is required by the regulations, *see, e.g.,* FAC pp. 60-67, ¶¶ 289-312, which further distinguishes this case from *Ivanov*. For example, the Defendants set *au pairs*' wages, hours, and provided them with health insurance, *see* FAC p. 61, ¶ 290, trained *au pairs* and selected the location of both training and ultimate placement, *see id.* p. 61, ¶ 292, kept extensive employment records, *see id.* p. 61, ¶ 296, and retained exclusive control of hiring and firing, *see id.* p. 61, ¶ 295. Indeed, although government regulations may have set the contours of Defendants' relationship with *au pairs*, Defendants' control extended well beyond (and sometimes in defiance of) these regulations. *See, e.g.*, FAC p. 65, ¶ 306 (contract drafted by Defendant AIFS required *au pairs* to agree to provide childcare up to 45 hours per week, when State Department regulations allow *au pairs* to negotiate for fewer hours of work); *id.* p. 63, ¶ 303 (Cultural Care agreement specifying that *au pairs* who become "married or pregnant" will be terminated, which certainly isn't required by the regulations).

- Defendants control Plaintiffs' employment by dictating precisely how much *au pairs* are compensated and by establishing the number of hours they would work each week. *Id.* p. 61, ¶¶ 293-94.

- Defendants have a permanent role in overseeing the *au pair*'s work and have authority to control that work including the power to discipline and even terminate the *au pair*. *Id.* p. 63, ¶ 303 (alleging that Defendant Cultural Care expressly retained the authority to terminate *au pairs* who "marr[ied] or bec[ame] pregnant").

- Defendants matched the Plaintiffs with host families and kept substantial control over their pay and work. *Id.* p. 13, ¶ 53.

- Defendants set the terms of Plaintiffs' employment including setting their "stipends," hours, and even providing them with health insurance. *Id.* p. 61, ¶ 290.

- Defendants sometimes exercise sole and exclusive control over Plaintiffs' work, for example, during training sessions, and they exercise control over the location of Plaintiffs' work both during training and by selecting Plaintiffs' host families. *Id.* p. 61, ¶ 292.

- Defendants keep extensive employee records. *Id.* p. 61, ¶ 296.

- And, of critical importance to the "joint employer" analysis, Defendants retain exclusive control to hire and fire *au pairs*, which they frequently exercise. *Id.* p. 61, ¶ 295.

Simply put, Plaintiffs have sufficiently pled allegations necessary to establish the joint employer status of the Defendants at the motion to dismiss stage. *See also* FAC pp. 62-63, ¶¶ 297-302 (allegations that Defendant InterExchange demonstrated control over *au pairs* sufficient to make them joint employers); *id.* pp. 63-64, ¶¶ 303-304 (same, for Cultural Care); *id.* pp. 64-66, ¶¶ 305-309 (same, for AIFS); *id.* pp. 66-67, ¶¶ 310-312 (same, for Go Au Pair).

### 2.  Defendants are Violating the Federal Fair Labor Standards Act

Defendants are violating the FLSA in at least two significant ways: (1) they fail to pay *au pairs* the federal minimum wage and (2) they fail to pay *au pairs* properly for overtime work.

### a.  Defendants Are Violating The Minimum Wage Laws By Unlawfully Deducting The Cost of Housing

The FLSA requires that employees be paid at least the prevailing federal minimum wage, currently $7.25 per hour.  *See* 29 U.S.C. §§ 201 *et. seq.*  It also provides that if a state law requires a higher minimum wage payment, an employer operating in that state is required to comply with state law and make the increased payment.  *See infra*, Section B.3.  Here, Defendants have dictated an illegal wage of $4.35 an hour for *au pairs*.  FAC p. 29, ¶ 116.  To justify this sub-standard wage, Defendants say that they are entitled to take a 40% deduction to use as a "credit" for the *au pairs'* housing.  That argument fails because the *au pairs'* housing is provided pursuant to a legal obligation and because the *au pairs'* housing is provided for the benefit of the employer.  As a result, under the express terms of the FLSA, *au pairs'* wages should not be reduced by any so-called credit.  In fact, several of the Defendants have tacitly admitted that an *au pair's* room and board is not validly considered part of his or her wage, advising that only the *au pair's* $195.75 cash wage amount is taxable as income.  *See* FAC p. 49, ¶ 231.

### i. Defendants Are Not Entitled to Deduct the Cost of Room and Board Because They Are Required By Law

An employer is not entitled to take a credit for housing when that housing is required to be provided by law.  *See* FAC p. 15, ¶ 63. The FLSA's implementing regulations expressly provide that an employer may take an "appropriate credit" for food and lodging, but only where the "employee's acceptance of them is voluntary." 22 C.F.R. 552.10(b).  The Department of Labor – whose interpretation of its own regulations is entitled to "substantial deference," *see Antelope Coal Company/Rio Tinto Energy America v. Goodin*, 743 F.3d 1331, 1341 (10th Cir. 2014) (citing, among others, *Auer v. Robbins*, 519 U.S. 452, 461 (1997)) – has repeatedly applied this provision to *au pairs*, concluding that various expenses that otherwise might be credited against an *au pair*'s wage are ineligible.  *See* DOL Opinion Letter, 1997 WL 998029 (Aug. 19, 1997) (an employer hiring an *au pair* "may not take credit for facilities which the employer is required by law or regulation to provide"); *see also* DOL Opinion Letter, 1997 WL 959980 (Feb. 28, 1997) ("If the host family is required by law, regulation or some other legal instrument to provide such insurance, a deduction from wages to recoup the cost is not permissible.  In such a situation, the provision of insurance is a normal operating expense of the employer . . . it is irrelevant that the insurance also benefits the au pair . . . if the employer derives any benefit, such deduction may not be made.").  The Labor Department has also made this point expressly clear in court.  *See* Exhibit D, Brief for the Secretary of Labor as *Amicus Curiae* in *Ramos-Barrientos v. Bland*, No. 10-13412-C (11t Cir. filed Oct. 13, 2010), at 16 ("Other Wage and Hour Division guidance interpreting section 3(m) also provides support for the principle

enunciated in the FOH that an employer may not take credit for lodging required to be provided by law." (citing Wage and Hour Opinion Letters dated August 19, 1997)); *see generally Chase Bank USA, N.A. v. McCoy*, 562 U.S. 195, 211 (2011) (under *Auer*, "deference to [an agency's] interpretation of its own regulation, as presented in the agency's *amicus* brief, is wholly appropriate.");

Here, because the law unambiguously requires housing for *au pairs* as an essential component of the au pair program, *see* 22 C.F.R. § 62.31(e)(6) (requiring that the host family provide housing for the *au pairs* as a condition of participating in the program), it necessarily follows that Defendants cannot claim a credit for that housing. In other words, Defendants cannot be compensated (in the form of a wage credit) and *au pairs* cannot be charged (in the form of a wage deduction) for something (housing) that the law requires Defendants to provide. And the State Department has said as much. *See* Exhibit A, Wilberforce Pamphlet ("[A]n employer usually may not deduct for housing (with some visa classifications, housing must be provided free of charge), most uniforms, safety equipment, or recruitment fees."); *see also* Exhibit E, U.S. Department of State Slide Deck Created Pursuant to the Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, P.L. 110–457 (Dec. 23, 2008) ("While you are employed in the United States, you have the right to be paid at least minimum wage . . . . Employers should not deny you pay for overtime work.").

### ii. Defendants Are Not Entitled to Deduct the Cost of Room and Board Because They Primary Benefit the Employer

*Second*, and relatedly, an employer is not entitled to take a wage credit for housing when that housing is provided primarily for the benefit of the employer. *See* 29

C.F.R. § 531.3(d)(1) ("[T]he cost of furnishing facilities found by the Administrator to be primarily for the benefit or convenience of the employer will not be recognized as reasonable and may not therefore be included in computing wages.").

The Labor Department has taken the position that housing is provided primarily for the benefit or convenience of the employer where, as here, the employer must provide the housing to comply with the law.  *See Ramos-Barrientos v. Bland*, 661 F.3d 587, 595 (11th Cir. 2011) (holding employer could not claim credit for housing where it was required by law, and therefore primarily for the employer's benefit).

Courts throughout the country, including in this district, have agreed with this common-sense view that an employer cannot charge an employee for the cost of housing when the employer primarily benefits from the housing or when the defendant is required to provide the housing to comply with the law.  *See, e.g.*, *id.* at 598 ("The cost of housing that Bland provided to the workers hired through the H-2A program was a mandatory business expense, and Bland cannot 'shift part of [its] business expense to employees.'"); *Schneider v. Landvest Corp.,* No. 03 Civ. 2474 (WYD)(PAC), 2006 WL 322590, at *28 (D. Colo. 2006) (holding that defendant was not entitled to have cost of lodging included in calculating wages where housing was furnished primarily for the benefit of the employer); *Jiao v. Shi Ya Chen*, No. 03 CIV. 0165 (DF), 2007 WL 4944767, at *14 (S.D.N.Y. Mar. 30, 2007) (holding that hotel employee's residence at hotel was primarily for the benefit of employer because it allowed employee to assist late-arriving guests and answer late-night telephone calls); *Marshall v. Debord,* No. 77-106-C, 1978 WL 1705 at *6 (E.D. Okl. 1978) (holding that employer was not entitled to

36

have the cost of furnishing lodging included in computing wages since at least one employee had to be available on site at all times); *Bailey v. Pilots' Ass'n for Bay & River Del.*, 406 F. Supp. 1302, 1309 (E.D. Pa. 1976) (wage deductions not allowed for pilot who served aboard pilots' association vessel while serving his pilot apprenticeship).

Here, the Plaintiffs have sufficiently alleged that the housing provided to the *au pairs* was primarily for the benefit of the employers. FAC p. 49, ¶ 231. Defendants may not take a 40% housing credit from the *au pairs*' already sub-standard wages. Even if the housing were not required to be provided by law, it was nevertheless for the "primary benefit of the employers" because *au pairs* often are required to take care of children in the middle of the night and have curfews. FAC p. 49, ¶ 231, p. 50, 238. Plaintiffs are expected to be available at varying times of the day and night to perform their job functions, rendering the housing for the benefit of the employers. Simply put, Defendants are unlawfully deducting from the *au pairs*' wages a substantial housing credit and the *au pairs*' factual allegations, if accepted as true, are sufficient to survive a motion to dismiss.[14]

### iii. The Department of Labor Has Never Permitted Defendants to Deduct the Cost of Room and Board

Notwithstanding the Department of Labor's clear regulations, which bar *au pair* employers from deducting the cost of room and board, the Defendants rely on the State

---

[14] Plaintiffs have also properly stated a claim for wrongful deductions of meal credits. More specifically, Defendants' policies allow for deductions for meal payments three times a day, seven days a week. *See* FAC p. 49, ¶ 233. The policy does not account for days when the *au pair* is not required to work or for vacation weeks. Moreover, Plaintiffs have alleged that, in some cases, the meals were not provided as promised. *See id. p. 16,* ¶ 66; p. 71, ¶ 344. Plaintiffs are therefore entitled to discovery with respect to the meal credit issue.

Department's "Notice [of] Federal Minimum Wage Increase" to justify the $195.75 per week stipend.  Indeed, the State Department Notice is the focal point of the defense; virtually all of their arguments flow from it.  *See, e.g.,* Go Au Pair Mot. at 15; Cultural Care Mot. at 8 & Exhibit 1.

In the first place, the Notice is a State Department document but the *au pair* regulations expressly defer to the Labor Department.  Where a since-withdrawn State Department Notice conflicts with decades of formal guidance from the Labor Department, the Labor Department's interpretation of the FLSA controls.  *See* 22 C.F.R. § 62.31(j)(1) ("Sponsors shall require that au pair participants . . . [are] paid in conformance with the requirements of the Fair Labor Standards Act as interpreted and implemented by the United States Department of Labor").

Contrary to the Notice – which, incidentally, the State Department has withdrawn since the filing of this litigation – a 40 percent room and board credit finds no support in the labor laws, and the Defendants cite none.  Under 29 C.F.R. § 552.100(c) and (d), some employers are permitted to take appropriate credit for the reasonable cost of lodging and meals of up to three meals a day based on percentages of the regular rate of pay. These deductions would add up to a 40 percent deduction if an employee worked 45 hours per week, 7 days a week at the federal minimum wage, and if the employer provided every meal she ate.  But the *au pair* regulations expressly forbid *au pairs* from working seven days a week.  *See* 22 C.F.R. § 62.31(j)(3) (*au pairs* shall "[r]eceive a minimum of one and one half days off per week in addition to one complete

weekend off each month").  As a result, even assuming that any deduction were

appropriate, a 40 percent deduction would not be.

Furthermore, federal law regarding lodging and meal credits is much more

complex and employee friendly than Defendants would have the Court believe or than

the purported 40 percent deduction would allow.  The Department of Labor has

explained that when calculating meal and lodging credits, there is no one-size-fits-all

federal formula.  Rather, if state wage and hour law addresses credits against minimum

wage and allows employers to credit less against minimum wage than would otherwise

be permitted by the Department of Labor, then as a matter of federal law, the "law

providing the greatest compensation to the employee" is effective.  DOL Op. Letter June

16, 1975 (where state law limits the housing credit to a maximum of $140 per month,

even though the reasonable cost or fair value is $400 per month, "the law providing the

greater compensation to the employee will prevail" and the state law will govern the

amount of credit allowed in computing the wage paid for FLSA minimum wage

purposes).[15]

The State Department's erroneous, and now withdrawn, Notice (which is also

outside the pleadings) simply cannot overcome the Department of Labor's own

regulations, and it certainly cannot be relied upon to dismiss this case.

### b.    Sponsors Are Required To Pay Overtime Compensation

Defendants have also failed to properly pay *au pairs* for overtime hours.

Defendants dictate that the *au pairs* must work 45 hours per week, and many are

---

[15]    The 1975 Opinion Letter is included in the Addendum to the Labor Department's
*amicus* brief in *Ramos-Barrientos v. Bland*, which is attached as Exhibit D.

required to work far more.  *Id.* p. 13, ¶ 54.  The law requires that an employer pay

overtime compensation for all hours that exceed 40 in a given workweek.  29 U.S.C. §§

201, *et. seq.*  At a minimum, the *au pairs* are working five hours a week over the 40

hour work week for which they are not being properly paid overtime compensation.

Defendants' only response to this argument is that they are not required to pay

overtime because *au pairs* are domestic servants who live with their employer for

extended time periods.  *See, e.g.,* AIFS Mot. at 13 (citing 29 C.F.R. § 552.102(a)).  But

this argument is simply wrong, because it ignores recent changes in Department of

Labor rules regarding joint- and third-party employment of live-in domestic servants

under 29 C.F.R. § 552.109(c).  *See* 78 Fed. Reg. 60,454-01 (October 1, 2013).  Under

the revised section 552.109(c), third party employers "may not avail themselves of the

overtime exemption."  *See also* 78 Fed. Reg. 60,454 ("[T]hird party employers, such as

home care agencies, will not be able to claim either of the exemptions.  The major effect

of this Final Rule is that more domestic service workers will be protected by the FLSA's

minimum wage, overtime, and recordkeeping provisions.").

In its Fact Sheet #79E, the Labor Department explains that effective January 1,

2015:

> [U]nder the Final Rule, third party employers of home care
> workers (that is, any employer who is not the consumer or a
> member of the consumer's family or household, such as a
> private or non-profit home care agency or a public entity
> administering home care programs) are not permitted to
> claim either the exemption from companionship services or
> the exemption for live-in domestic service employees.  Third
> party employers may not claim these exemptions even when
> they jointly employ a worker with an individual, family or
> household who may claim either exemption.  Thus, any third

> party employer of a domestic service worker is obligated to pay not less than the minimum wage for all hours worked and overtime compensation for all hours worked over 40 in a workweek, and any third party employer of a live-in domestic service worker is required to pay overtime pay for all hours worked over 40 in a workweek.

Exhibit C. The current state of the law therefore requires that Defendants pay *au pairs* overtime for all hours worked in excess of forty in a given work week.[16] Accordingly, Plaintiffs have sufficiently alleged that Defendants are required to make these overtime payments and the motions to dismiss should be denied.

### 1.   State Law Claims are Not Preempted by Federal Immigration Law

Even clearer is that the Defendants, in requiring *au pairs* to be paid $195.75 per week, are violating the minimum wage laws of the various states in which *au pairs* work. California, for example, presently has a $9.00 per hour minimum wage; New York's minimum wage is $8.75 per hour. Even accepting the Defendants' assertion – which is wrong for the reasons just given – that $195.75 is equivalent to the federal minimum wage of $7.25 per hour, it is undisputedly less than these and many other states' minimum wages.

---

[16]   One court has held that the Final Rule is invalid. *See Home Care Ass'n of Am. v. Weil*, – F. Supp. 3d. –,  2014 WL 7272406 (D.D.C. Dec. 22, 2014), *appeal docketed*, No. 15-5018 (D.C. Cir. filed Jan. 2015). The Department of Labor, however, has stated that it "strongly disagrees" with that decision, and an appeal is currently pending before the D.C. Circuit. *See* Labor Department Website, DOL Appeals Decision in Lawsuit Brought by Associations of Home Care Companies, available at http://1.usa.gov/1L517Wz (last visited July 10, 2015). The *Home Care* decision has no binding effect on this Court, and in any case no Defendant has challenged the validity of the Final Rule, so there is no reason for the Court to reach that question. *See, e.g., Johnson v. Town of Grand Lake*, No. 05–CV–01169–WDMMJW, 2006 WL 686487, at *2 n.4 (D. Colo. Mar. 17, 2006) ("This argument was not raised in the motion to dismiss, and I deem it waived"); *see also Garcia v. Lemaster*, 439 F.3d 1215, 1220 (10th Cir. 2006) (declining to consider an argument raised for the first time in a reply brief).

There is no credible argument that the Defendants are immune from state wage and hour laws – which is the only way to excuse their flagrant violations.  In the sections below, Plaintiffs rebut every possible theory of pre-emption advanced by the Defendants.  But those preemption arguments can be rejected for one very simple reason:  the *au pair* regulations explicitly incorporate the FLSA, which in turn explicitly incorporates state minimum wage laws.

The State Department's regulations are susceptible to no interpretation other than that *au pairs* enjoy the protections of the wage and hour laws of the states in which they work.  Those regulations provide that "[s]ponsors shall require that au pair participants . . . [a]re compensated at a weekly rate based upon 45 hours of child care services per week and paid in conformance with the requirements of the Fair Labor Standards Act as interpreted and implemented by the United States Department of Labor."  22 C.F.R. § 62.31j(1).  The Labor Department, Congress, and the courts have made it clear that the FLSA preserves workers' rights under more protective state laws.  As the Labor Department has explained:  "In cases where an employee is subject to both the state and federal minimum wage laws, the employee is entitled to the higher of the two minimum wages."  Labor Department Website, Topics/Wages/Minimum Wage, available at http://1.usa.gov/1h0A3si (last accessed July 10, 2015).

This conclusion is compelled by the text of the FLSA itself, which contains an express savings clause that preserves more protective state laws.  *See* 29 U.S.C. § 218 ("No provision of this chapter or of any order thereunder shall excuse noncompliance with any Federal or State law or municipal ordinance establishing a minimum wage

42

higher than the minimum wage established under this chapter or a maximum work week lower than the maximum workweek established under this chapter."). And courts have uniformly interpreted the FLSA to mean what it says: that states retain the prerogative to afford their workers greater protections. *See Pettis Moving Co., Inc. v. Roberts*, 784 F. 2d 439, 441 (2nd Cir. 1986) ("Congress did not prevent the states from regulating overtime wages paid to workers exempt from the FLSA. Section 218(a) of the FLSA explicitly permits states to set more stringent overtime provisions than the FLSA."); *Williamson v. General Dynamics Corp.*, 208 F.3d 1144, 1151 (9th Cir. 2000) ("The [FLSA] contains a 'savings clause' that allows states and municipalities to enact stricter wage and hour laws. . . . [This] is evidence that Congress did not intend to preempt the entire field.").

In short, the State Department regulations say that the FLSA applies to *au pairs*, and the FLSA says that states' wage and hour laws are not preempted. The State Department has expressly, formally, and repeatedly reached this conclusion. Under the Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, P.L. 110–457 (Dec. 23, 2008), the State Department is required to "develop an information pamphlet and video on legal rights and resources for aliens applying for employment or education based nonimmigrant visas." 8 U.S.C § 1375b. Pursuant to that statutory mandate, the State Department – in consultation with the Justice Department, the Labor Department, and the Department of Homeland Security – has produced an official document, the Wilberforce Pamphlet, in which it notifies all visa holders, including *au pairs*, that they have a right to receive the minimum wage in the state in which they work:

43

The Right to Be Paid

- You have the right to get paid for all work you do, in the same manner as U.S. workers.

- You have the right to earn at least the federal legal minimum wage, $7.25 per hour, in the same manner as U.S. workers. Also check

  − *The minimum wage for the state in which you work. If that wage is higher, you have the right to be paid the higher amount.*

Exhibit A, Wilberforce Pamphlet at 5 (emphasis supplied).

The State Department has not shied away from its official position that *au pairs* are entitled to each state's minimum wage.  To the contrary, the State Department affirmatively requires Defendants to provide all *au pairs* with a copy of the Wilberforce Pamphlet during orientation.  *See* 62 C.F.R. § 62.10(c)(8).  And the State Department recently reiterated its position in an official statement on the record when asked by a *Washington Post* reporter whether Defendants' position in this litigation had any merit:

> State Department officials disagree [with the industry's position]. In a statement to The Washington Post, the agency says that sponsors "must also comply with all other applicable federal, state, and local laws, including any state minimum wage requirements."

Exhibit B, Washington Post Article.

Defendants' convoluted preemption arguments are frivolous in light of these express statements that preserve the application of state laws.

### a.  Preemption of State Law Is the Exception Rather Than the Rule, Particularly Where the Historic Police Powers of the States Are Involved

Defendants make the sweeping assertion that Plaintiffs' state law claims must fail because they are somehow preempted by the J-1 visa *au pair* program and the

44

associated regulations.  *See, e.g.,* Cultural Care Mot. at 12-17; AIFS Mot. at 4-6; Go Au Pair Mot. at 5; InterExchange Mot. at 8-12.  Defendants do not and cannot argue that Plaintiffs' claims are expressly preempted, but their implied preemption argument is equally meritless.

Federal law preempts state law in only three situations:  (1) expressly, where Congress has done so through explicit language; (2) implicitly, where Congress has intended to foreclose state legislation in a particular field, which "can be inferred from a framework of regulation so pervasive . . . that Congress left no room for the States to supplement it or where there is a federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject," *Arizona v. United States*, 132 S. Ct. 2492, 2501 (2012) (internal citations and quotation marks omitted); or (3) implicitly, though conflict preemption, which exists where either "compliance with both state and federal law is impossible" or "the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Oneok, Inc. v. Learjet, Inc.*, 135 S. Ct. 1591, 1595 (2015) (internal quotation marks and citation omitted).

Two cornerstones of Supreme Court preemption jurisprudence apply in all cases. "First, 'the purpose of Congress is the ultimate touchstone in every pre-emption case.'" *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (internal citation omitted).  "Second, '[i]n all pre-emption cases, and particularly in those in which Congress has legislated . . . in a field which the States have traditionally occupied . . . we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act

unless that was the clear and manifest purpose of Congress."  *Id.* (internal citations and quotation marks omitted).  This presumption "applies with particular force" where, as here, Congress acts in "a field traditionally occupied by the States." *Altria Grp. v. Good,* 555 U.S. 70, 77 (2008); *see also Ramsey Winch Inc. v. Henry*, 555 F.3d 1199, 1204 (10th Cir. 2009) (the presumption against preemption applies with greater force when the alleged conflict is in an area traditionally occupied by the States").[17]

Indeed, it is "never assumed lightly that Congress has derogated state regulation, but instead [courts] have addressed claims of pre-emption with the starting presumption that Congress does not intend to supplant state law." *N.Y.S. Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654 (1995).  "[F]reewheeling judicial inquiry" into preemption is not justified because "it is Congress rather than the courts that preempts state law." *Chamber of Commerce of the U.S. v. Whiting*, 131 S. Ct. 1968, 1985 (2011) (internal citation and quotation marks omitted).  Thus, a "high threshold must be met if a state law is to be preempted for conflicting with the purposes of a federal act." *Id.* (internal citation and quotation marks omitted).  The party advocating preemption bears the burden of showing that federal and state law conflict. *See Cook v. Rockwell Int'l Corp.*, 618 F.3d 1127, 1143 (10th Cir. 2010).

---

[17]     Employment conditions are unquestionably an area traditionally occupied by the states.  *See, e.g.*, *Cal. Div. of Labor Stds. Enforcement v. Dillingham Constr., N.A., Inc.,* 519 U.S. 316, 331 (1997); *Mass. v. Morash*, 490 U.S. 107, 119 (1989) ("The States have traditionally regulated the payment of wages, including vacation pay."); *De Canas*, 424 U.S. at 354 ("States possess broad authority under their police powers to regulate the employment relationship to protect workers within the State.  Child labor laws, minimum and other wage laws, laws affecting occupational health and safety, and workmen's compensation laws are only a few examples."); *WSB Electric, Inc. v. Curry*, 88 F.3d 788, 791 (9th Cir. 1996) ("It is well settled that wages are a subject of traditional state concern . . . .'").

**b.    Plaintiffs' Claims Are Not Impliedly Preempted Under The Doctrine of Field Preemption**

Defendants fall far short of showing that Congress intended to foreclose state legislation in the field purportedly at issue here – the precise nature of which Defendants cannot even articulate, as evidenced by references to the alleged field as "exchange visitors generally and *au pair* exchange visitors specifically," "the *au pair* exchange visitor program," "cultural exchange," and sometimes "immigration" more broadly.  Cultural Care mot. at 13; AIFS Mot. at 6; InterExchange Mot. at 11.  The *au pair* regulations do not preclude the possibility of state supplementation, but rather expressly contemplate concurrent compliance with state and local law.  And there is no federal interest so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.

In 1994, Congress authorized the United States Information Agency, since merged with the State Department, to promulgate regulations specifically governing the J-1 visa *au pair* program.  *See* Foreign Relations Laws Technical Amendments, Pub. L. No. 103-415, 108 Stat. 4299, 4302 (1994); *see also* Exchange Visitor Program, 59 Fed. Reg. 64296, 64297 (proposed Dec. 14, 1994) (codified at 22 C.F.R. Part 514). Defendants contend that the pervasiveness of the resultant regulations preempts "the field" such that even laws of more general applicability, including those stemming from the states' historic police powers, cannot apply.  This argument is contrary to Supreme Court precedent and the regulations themselves.

The Supreme Court has made clear that "it is appropriate to expect an administrative regulation to declare any intention to pre-empt state law with some

specificity." *Cal. Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 583 (1987).  The

Court has reasoned that, "because agencies normally address problems in a detailed

manner and can speak through a variety of means, including regulations, preambles,

interpretive statements, and responses to comments, we can expect that they will make

their intentions clear if they intend for their regulations to be exclusive." *Hillsborough*

*Cnty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 718 (1985).  Indeed, courts are

"even more reluctant to infer pre-emption from the comprehensiveness of regulations

than from the comprehensiveness of statutes," as "[t]o infer pre-emption whenever an

agency deals with a problem comprehensively is virtually tantamount to saying that

whenever a federal agency decides to step into a field, its regulations will be exclusive."

*Id.* at 717.

In light of these principles, "if an agency does not speak to the question of pre-

emption, [the Supreme Court] will pause before saying that the mere volume and

complexity of [the agency's] regulations indicate that the agency did in fact intend to

pre-empt." *Id.* at 718.  An intention to preempt "is impossible to divine" where

regulations "appear to assume that those [subject to them] will comply with state laws,"

or "expressly contemplate coincident compliance with state law as well as federal law."

*Cal. Coastal Comm'n*, 480 U.S. at 583.

Here, the *au pair* regulations lack the express and specific statement of

preemption required of an administrative agency affecting preemption.  *See id.*; *see also*

*Hillsborough Cnty.*, 471 U.S. at 717-18.  Defendants wisely forego any argument that

such a statement exists.  (In fact, as explained above, the relevant regulations expressly

*save* the application of state law.)  Instead, Defendants rely on the alleged

comprehensiveness of the regulations to argue that the federal government has

occupied some undefined field encompassing *au pairs*.  In so doing, Defendants ignore

that the applicable regulations are replete with references to state and local law and

regulations.

> For example, the regulations provide in part as follows:

- *Au pair* sponsors must appoint and maintain officers who are "thoroughly familiar with the Exchange Visitor Program regulations, relevant immigration laws, and all federal *and state regulations and laws* pertaining to the administration of their exchange visitor program(s)," and who have "a detailed knowledge of federal, *state, and local laws pertaining to employment*, including the Fair Labor Standards Act."  22 C.F.R. § 62.11(a) (emphases supplied); *id.* § 62.9(g).

- Sponsors are required to provide *au pairs* with clear information and materials to assist them to prepare for their stay in the United States, with "employee rights and laws, including workman's compensation" – a quintessentially state law program – listed as an example of relevant information.  22 C.F.R. § 62.10(b)(9).

- Sponsors must offer *au pairs* information concerning the Wilberforce Pamphlet on the Rights and Protections for Temporary Workers.  *See* 22 C.F.R. § 62.10(c)(8); *see also* Ex. A (Wilberforce Pamphlet).  Through this publication, the State Department specifically advises J-1 visa holders like *au pairs* of their right to federal minimum wage at $7.25 per hour and to "check [t]he minimum wage for the state in which you work.  If that wage is higher, you have the right to be paid the higher amount."  *Id.* at 7; FAC ¶ 4.  The Wilberforce Pamphlet also includes more general information regarding employee rights and laws, and advises J-1 visa holders (including *au pairs*) of their "right to more protections under state law."  Wilberforce Pamphlet at 7, 9.

- Sponsors must require that *au pairs* "[a]re compensated at a weekly rate in conformance with the requirements of the Fair Labor Standards Act as interpreted and implemented by the United States Department of Labor."  22 C.F.R. § 62.31(j)(1).   The FLSA explicitly states that "n[o] provision of [the FLSA] or any order thereunder shall excuse noncompliance with any Federal or State law or municipal ordinance establishing a minimum wage

higher than the minimum wage established under [the FLSA]." 29 U.S.C. § 218(a).

- Each sponsor "must remain in compliance with all local, state, and federal laws, and professional requirements, necessary to carry out the activities for which it is designated, including accreditation and licensure, if applicable." 22 C.F.R. § 62.9(c); *see also id.* § 62.60(f) (sponsor's designation may be terminated where a sponsor "fails to remain in compliance with Federal, State, local, or professional requirements necessary to carry out the activity for which it is designated, including loss of accreditation, or licensure").

The repeated references to state and local laws in the *au pair* regulations make clear that the regulatory scheme expressly contemplates coincident compliance with state as well as federal law. Accordingly, "it is impossible to divine" an intention to preempt all state regulation that touches upon *au pairs* or their employment. *Cal. Coastal Comm'n*, 480 U.S. at 583. The State Department's recent public statement in response to this lawsuit also makes clear that it does not support Defendants' position; rather, the State Department expects that sponsors "must also comply with all other applicable federal, state, and local laws, including any state minimum wage requirements." Ex. B (Washington Post Article).

There is also no federal interest here so dominant that the federal system should be assumed to preclude enforcement of state laws. Defendants imply that the federal interest in regulating immigration preempts Plaintiffs' claims. *See, e.g.,* InterExchange Mot. at 10 ("the au pair program is firmly entrenched in the federal government's immigration power"). However, although the "power to regulate immigration is unquestionably exclusively a federal power," "the [Supreme] Court has never held that every state enactment which in any way deals with aliens is a regulation of immigration

50

and thus per se pre-empted by this constitutional power, whether latent or exercised."

*De Canas v. Bica*, 424 U.S. 351, 354 (1976). "[S]tanding alone, the fact that aliens are

the subject of a state statute does not render it a regulation of immigration, which is

essentially a determination of who should or should not be admitted into the country,

and the conditions under which a legal entrant may remain." *Id.* (internal citation

omitted).[18]

---

[18]     Defendants rely principally on two cases in support of their implied preemption argument, one of which has nothing to do with preemption. *First*, Defendants place great emphasis on *Bai Hayan v. Hamden Public Schools*, 875 F. Supp. 2d 109 (D. Conn. 2012) (cited in, *e.g.*, Cultural Care Mot. at 13), apparently citing this decision to argue that because the purpose of the J-1 visa program is cultural exchange, rather than employment, state employment law should not apply. *See id.* But *Bai Hayan* has absolutely nothing to say about preemption. It is also non-binding and wrongly-decided. The State Department's position, the relevant regulatory framework (which states that *au pair* wages are governed by the FLSA and explicitly contemplates the presence of state level employment protection), and contrary case law all point to the application of state law. *See supra* Section B.2; *see also Chaturong Jatupornchaisri v. Wyndham Vacation Ownership, Inc.*, No. 6:12-cv-59, 2012 WL 1600435 (M.D. Fl. May 7, 2012) (rejecting argument that the FLSA cannot apply to J-1 visa recipients because the purpose of the Exchange Act is education rather than labor, and noting that "the controlling issue here is the manner in which Plaintiffs were actually treated, not simply the goals of the Exchange Visitor Act").

*Second*, Defendants argue that the Supreme Court's decision in *Arizona v. United States* "reinforces the undisputable legal principle that the federal government has 'broad, undoubted power' over immigration and state laws regulating education and labor in the context of immigration are the subject of federal preemption." Cultural Care Mot. at 16. Plaintiffs do not dispute that the federal government has broad power over the subject of immigration or that the government has occupied the field of alien registration. But the *Arizona* Court did not issue a broad ruling regarding preemption as to any state law regulating education or labor that happens to touch upon immigration, much less immigrants, as Defendants imply. The Court did hold that a state law making it a misdemeanor for an unauthorized alien to knowingly apply for work or work in the state was preempted by the federal framework for combating the employment of illegal aliens, which imposed criminal and civil penalties on employers who violated the law but only civil penalties on aliens. *See id.* at 2503-05. The Court reasoned that such a law would interfere with the careful balance struck by Congress with respect to the

Even were the specific field preempted – whether it be "exchange visitors generally and *au pair* exchange visitors specifically," "the *au pair* exchange visitor program," "cultural exchange," or "immigration" more generally – this is not the field that state minimum wage laws regulate.  State minimum wage laws are laws of general application, which regulate across the economy.  This is a field squarely within the purview of the states' historic police power.  *See supra* n. 17.  And, as noted, the regulations themselves expressly contemplate that state minimum wage laws will apply.

In sum, Defendants have failed to demonstrate that Plaintiffs' state law claims are preempted by the doctrine of field preemption.  This conclusion is in keeping with the Supreme Court's admonishment that "[f]ederal regulation . . . should not be deemed pre-emptive of state regulatory power in the absence of persuasive reasons – either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained."  *De Canas*, 424 U.S. at 356 (internal citation and quotation marks omitted).

---

unauthorized employment of aliens, as although the state law pursued the same goal as federal law (the deterrence of unlawful employment of aliens), its method of enforcement was in conflict with federal law.  *Id.* at 2504-05.  Specifically, the text, structure, and history of the relevant federal law indicated that Congress decided imposing criminal penalties on aliens who seek unauthorized employment would be inappropriate.  *See id.*

Here, neither alien registration nor the unauthorized employment of aliens is at issue.  Moreover, as set forth above, the state laws at issue do not interfere with Congressional objectives or purposes related to the Exchange Act or create a conflict in a method of enforcement.  Nothing in the text, structure, or history of the Exchange Act indicates that Congress decided applying state minimum wage or tort laws would be inappropriate.  Accordingly, *Arizona* is relevant to this case only insofar as it repeats familiar principles regarding preemption generally.

### c.      Plaintiffs' Claims Are Not Impliedly Preempted Under the Doctrine of Conflict Preemption

Given the impossibility of proving field preemption, Defendants are left to argue that Plaintiffs' state law claims are preempted either because "compliance with both state and federal law is impossible" or "the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Oneok, Inc.*, 135 S.Ct. at 1595.  Defendants cannot plausibly argue impossibility, given that the *au pair* regulations expressly contemplate simultaneous compliance with state and local law, and because there is nothing in the regulations that would prevent an *au pair* from being paid a legal wage under state law.  Defendants therefore make a half-hearted argument that the "high threshold [is] met" for preempting a state law for conflicting with Congressional purposes or objectives in a material way.  *Chamber of Commerce of the U.S.*, 131 S. Ct. at 1985; *see also Mt. Olivet Cemetery Ass'n v. Salt Lake City*, 164 F.3d 480, 489 (10th Cir. 1998) (To justify preemption, "a state or local action [must] be a *material* impediment to the federal action . . . or thwart[] the federal policy in a *material* way." (emphases supplied, internal citation and quotation marks omitted)); *Mandelbaum v. Fiserv, Inc.*, 787 F. Supp. 2d 1226, 1238-39 (D. Colo. 2011) (same).  Once again, however, Defendants are unable to overcome the presumption against implied conflict preemption.  *See Wyeth*, 555 U.S. at 565.

As Defendants recognize, the J-1 visa *au pair* program is carried out under the auspices of the Exchange Act, the stated purpose of which is "to increase mutual understanding between the people of the United States and the people of other countries by means of educational and cultural exchanges."  22 C.F.R. § 62.1; *see also*

22 U.S.C. § 2451.  Protection of *au pairs* is a paramount concern in implementing the

program; indeed, a stated purpose of the regulations promulgated pursuant to the

Exchange Act is "provid[ing] safeguards for *au pair* participants and the American host

families with whom they are placed."  *See* Exchange Visitor Program, 59 Fed. Reg.

64296, 64297 (proposed Dec. 14, 1994) (codified at 22 C.F.R. Part 514).

Contrary to Defendants' arguments, application of state wage laws and tort

claims related to the *au pair* stipend does not stand as an obstacle to the

accomplishment and execution of these purposes and objectives, but furthers the goal

of ensuring that people of other countries who are in the United States for educational

and cultural exchanges receive sufficient protection while here.  *See Tarrant Reg'l*

*Water Dist. v. Herrmann*, 656 F.3d 1222, 1242 (10th Cir. 2011) (stating that "[w]hat is a

sufficient obstacle is a matter of judgment, to be informed by examining the federal

statute as a whole and identifying its purpose and intended effects" (internal citation and

quotation marks omitted)), *aff'd*, 133 S. Ct. 2120 (2013).  The challenged state laws are

also in a field squarely within the purview of the states' historic police power, making the

presumption against preemption particularly strong, and the *au pair* regulations

expressly contemplate coincident compliance with state as well as federal law, including

state laws regarding employment.  *See supra* n. 17; s*ee also Wyeth*, 555 U.S. at 565;

*Ramsey Winch Inc.*, 555 F.3d at 1204.

Defendants' argument that ensuring that *au pairs* receive protection under state

minimum wage laws would somehow "convert" the *au pair* program into a work program

defies logic.  The State Department regulations already require that *au pairs* receive a

stipend and charge sponsors with requiring that *au pairs* "[a]re compensated at a weekly rate in conformance with the requirements of the Fair Labor Standards Act as interpreted and implemented by the United States Department of Labor."  22 C.F.R. § 62.31(j)(1); *see also* 29 U.S.C. § 218(a) (explaining that the FLSA does not excuse noncompliance with state laws establishing a higher minimum wage).  And as even Defendants admit, the Department of Labor has long recognized that *au pairs* are employees.  *See* Cultural Care Mot., Ex. 2 (IRS publication, reporting that "[i]n 1994, the U.S. department of Labor determined that the au pair stipend constitutes 'wages' because an employer-employee relationship exists. . . . ").  Accordingly, even if the payment of wages or compliance with employment laws such as the FLSA could "convert" the *au pair* program into a work program, that die has already been cast by the federal government.  Denying *au pairs* applicable protection under state law can hardly change the program's nature.

Application of "state overtime and minimum wage requirements and tort claims related to the *au pair* stipend" also would not "transform a single unified program into 50 different programs" or "render the *au pair* program unworkable," as Defendants contend. InterExchange Mot. at 11; Cultural Care Mot. at 17; *see also* AIFS Mot. at 6. Application of state wage laws and tort claims related to the *au pair* stipend has little to nothing to do with many of the regulations concerning the *au pair* program, and certainly would not intrude upon those specifically addressing the *au pair* program's cultural and educational aspects.  Application of these laws would also strengthen the purpose of

the program by confirming that *au pairs* are entitled to receive additional protections while in the United States.

The possibility that having to comply with additional state laws might be more burdensome to sponsors or host families is also not a basis for preemption.  Legal compliance invariably entails some sort of burden; state laws touching upon federally-regulated subject matter would be routinely preempted if vague assertions of additional burden could establish preemption.  Passing references to a supposed "programmatic need for a uniform wage" in a summary of proposed regulations promulgated by the former United States Information Agency do not require a contrary result.  *See* Exchange Visitor Program, 60 Fed. Reg. 8547 (proposed Feb. 15, 1995) (codified at 22 C.F.R. Part 514).  Indeed, the current regulations do not set forth a "uniform wage," but contemplate the application of federal and state laws.  *See, e.g.*, 22 C.F.R. § 62.31(j)(1).

Defendants' assertion that application of state laws would "cause *au pair* participants to compete to work only in states with the highest minimum wages" and thus "hamper the ability of *au pair* participants to experience the varying cultures that permeate the fifty states" has no merit absent Defendants' illegal conspiracy to restrain wages.  Cultural Care Mot. at 17.  Somewhat ironically, Defendants' argument ignores that, in a competitive market unhampered by Defendants' antitrust conspiracy, *au pair* stipends would not be limited to the bare minimum in each state, but would fluctuate according to the laws of supply and demand.

Finally, allowing state law claims would not create a conflict in the "method of enforcement" between state and federal law.  Contrary to Defendants' assertion that the

regulatory scheme "amply empower[s] [the State Department] to remedy noncompliance with the DOS regulations," sanctions against sponsors are quite limited, with program revocation as the harshest consequence.  *See* 22 C.F.R. § 62.31(n); *id.* § 62.50 (regarding "Sanctions"); *id.* § 62.60 (regarding "Termination of designation"). The regulations do not give the State Department the ability to seek civil remedies or injunctive relief on behalf of *au pairs* or create a private right of action pursuant to which *au pairs* may enforce their rights.  *See Beul v. ASSE Int'l Inc.*, 233 F.3d 441, 445 (7th Cir. 2000) (noting in passing that "[t]here is no argument that the regulations [regarding an international student exchange program] create a private federal right of suit that would allow the plaintiffs to sue [a sponsor] under the federal-question jurisdiction of the federal courts (and we have found no case suggesting there is such a right)").  The regulations also simply mention in passing that sponsors are to provide *au pairs* with a copy of a grievance process governing the *au pair's* participation in the program, which can hardly be described as a "comprehensive grievance/sanction process for when sponsors violate the regulations."  *See* 22 C.F.R. § 62.31(f)(1); Cultural Care Mot. at 24. Accordingly, without access to state minimum wage laws and tort claims, *au pairs* lack an effective means to remedy sponsors' wrong-doing.[19]

---

[19]     Defendants rely almost exclusively on *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001), to argue that Plaintiffs' state law claims are preempted under the doctrine of conflict preemption.  But *Buckman* turned on very particular facts that make it irrelevant here.  In *Buckman*, patients who were injured by a medical device sued a company that helped get the device approved by the FDA, claiming that the defendant defrauded the FDA.  The Court held that this fraud-on-the-FDA theory was preempted by the Food, Drug, and Cosmetic Act, in part because allowing the claims to proceed would undermine the FDA's ability to pursue the acts' competing objectives. *See id.* at 350.  Specifically, the FDCA balanced the need to ensure device safety and

Defendants have failed to show that Plaintiffs' state law claims are preempted under the doctrine of conflict preemption.  Defendants appear to anticipate this failure, insofar as at least one Defendant (Cultural Care) has recently urged host families to engage in a letter-writing campaign to the Massachusetts Attorney General asking that

---

effectiveness on the one hand, with the need to bring products quickly to market, on the other.  To meet these goals, the FDA was empowered to punish and deter fraud, including by seeking injunctive relief, as well as civil and criminal penalties; the Act also explicitly barred private enforcement to ensure the FDA's sole enforcement role.  *See Id.* at 348-50, 352 & n. 4.  Ultimately, the Court concluded that state law fraud-on-the-FDA claims would conflict with the FDA's responsibility to police fraud consistently with these competing objectives.  *See id.* at 350.  The Court observed that "the fraud claims [at issue] exist solely by virtue of the FDCA disclosure requirements" – plaintiffs therefore were not "relying on traditional state tort law which had predated the federal enactments in question[]," but, "[o]n the contrary, the existence of these federal enactments is a critical element in their case."  *Id.* at 353.  The Court also emphasized its concern that "disclosures to the FDA, although deemed appropriate by the Administration, [would] later be judged insufficient in state court," thereby creating "an incentive to submit a deluge of information that the Administration neither wants nor needs, resulting in additional burdens on the FDA[]."  *Id.* at 351.

In contrast, Plaintiffs' state law claims in this case do not exist solely by virtue of any requirements in the State Department regulations.  Rather, Plaintiffs are relying on traditional state tort law, contract law, and minimum wage laws that stand independently of the federal regime.  *See id.* at 347-48.  Furthermore, there is no indication that Congress intended that the federal government have exclusive authority to enforce the Exchange Act.  *See id.* at 352.  Indeed, Defendants' assertion that, "[l]ike the statutory scheme in *Buckman*, the Exchange Act, DOS regulations, and DOS directives amply empower [the State Department] to remedy noncompliance with the DOS regulations," is simply not true.  Cultural Care Mot. at 16.  Sanctions against sponsors are in fact very limited under the regulations, with program revocation as the harshest consequence.  *See* 22 C.F.R. § 62.31(n); *id.* at § 62.50; *id.* at § 62.60.  The State Department is not given authority to seek civil penalties or relief on behalf of third parties, and *au pairs* are not given a private right of action under federal law.  That is to say, if federal and state minimum wage laws were preempted, *au pairs* would be left without any remedy, public or private, that would make them whole for their labor.  And, as noted above, Plaintiffs are not simply seeking to "remedy noncompliance" with federal regulations, but to vindicate their rights through state laws and claims not dependent on those regulations.  In sum, the limited case law cited by Defendants does not support their novel, far-reaching arguments regarding preemption.

the *au pair* program be excluded from the provisions of the recently-passed Massachusetts Domestic Workers' Rights bill.  *See* AuPairMom, Massachusetts' Domestic Workers Rights Bill.  Time to write letters?, available at http://bit.ly/1K0gtux (last visited July 10, 2015).

4.   **Plaintiffs have Standing to Assert State Wage and Hour Claims, and They Have Sufficiently Pleaded Those Claims**

Count IX of the First Amended Complaint alleges that Defendants have violated, and continue to violate, the wage and hour laws of each state in which they operate. *See* FAC p. 22, ¶ 96.  Without any citation to authority, Cultural Care simply asserts that this Count should be dismissed, stating that Plaintiffs lack standing and that the pleading is too general.  *See* Cultural Care Mot. at 17-18.  Neither assertion has merit.

Count IX incorporates by reference the extensive, detailed, and specific factual allegations contained elsewhere in the FAC, including the essential fact that Defendants have set *au pair* wages at $195.75 per week.  *See* FAC p. 22, ¶ 96 ("Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully re-written herein."); *id.* pp. 22-30, ¶¶ 95-120 (describing in detail the wages Defendants have set for *au pair* services).  As Count IX itself makes clear, these wages are unlawful because they are less than what is required by the state minimum wage laws in the states in which Defendants place *au pairs.  See id.* p. 96, ¶ 515 ("[Defendants] failed to pay the named Plaintiffs and those similarly situated all wages owed under the laws of  the

various states where the named Plaintiffs and those similarly situated worked as au pairs."). These allegations are sufficient to state Plaintiffs' claim.[20]

Plaintiffs have standing to assert this claim on behalf of themselves and the nationwide class that they seek to represent, and courts have made clear that it would be premature to conclude otherwise at the motion to dismiss stage instead of examining the standing issue in connection with class certification. *See, e.g.*, *In re Grand Theft Auto Video Game Consumer Litig.*, No. 06 MD 1739, 2006 WL 3039993, at *3 (S.D.N.Y. Oct. 25, 2006) ("[C]lass certification is logically antecedent to standing and the Court will defer consideration of standing until after the class certification issue has been resolved. . . . [T]he Court will be in a better position to analyze the various laws that are actually at issue in the instant case and to determine whether the Class has standing to assert claims arising thereunder."); *Kuhl v. Guitar Center Stores, Inc.*, No. 07 C 214, 2008 WL 656049, *3 (N.D. Ill. Mar. 5, 2008) ("It is only through a determination of typicality of claims across the various state statutes that the court will know whether standing is appropriate for all the claims asserted."); *see also Gitson v. Trader Joe's Co.*, 63 F.

---

[20]    Cultural Care's only specific objection to Count IX of the FAC is that "Plaintiffs fail to even list which states they claim have a minimum wage applicable to *au pairs* in excess of the federal minimum wage." Cultural Care Mot. at 18.  That argument misses the point and misreads the First Amended Complaint.  For one thing, Count IX specifically says that the claim is brought under "the laws of the various states where the named Plaintiffs and those similarly situated worked as *au pairs*." FAC p. 96, ¶ 515. For another, for all of the reasons set forth in the Complaint, Defendants are violating the wage and hour laws of *every* state in which they operate:  they plainly violate the minimum wage laws in those states that have a higher minimum wage than the federal rate, but they also violate – for the same reasons they are violating the FLSA – the laws of those states whose minimum wage is equal to that set by the federal government.  If Cultural Care's argument is simply that the Plaintiffs did not enumerate specifically the minimum wage laws of those states, Rule 8 does not require that much.  Even if it did, that problem could easily be cured through amendment of the Complaint.

Supp. 3d 1114, 1116 (N.D. Cal.  2014) ("the Court will not strike the nationwide class

claims at the pleading stage" because "a consumer protection class action can proceed

under the laws of multiple states").

Were the Court to conclude otherwise – that is, if the Court concluded that

Plaintiffs lack standing to assert the claims of putative class members who reside in

other states[21] – then it would necessitate the filing of fifty-one separate lawsuits

predicated on the same underlying facts and the same allegations of underpayment by

Defendants.  That is precisely the type of judicial waste and inefficiency that Rule 23 is

intended to avoid.  *See American Pipe & Const. Co. v. Utah*, 414 U.S. 538, 554 (1974)

(explaining that "efficiency and economy of litigation" is a "principle purpose of the [Rule

23] procedure"); *Joseph v. Wiles*, 223 F.3d 1155, 1167 (10th Cir. 2000) ("Rule 23

encourages judicial economy by eliminating the need for potential class members to file

individual claims.  If all class members were required to file claims . . . , the point of Rule

23 would be defeated.").

---

[21]    Although Defendants do not cite to it, Plaintiffs acknowledge the Court's decision in *Smith v. Pizza Hut, Inc.*, No. 09–cv–01632–CMA–BNB, 2011 WL 2791331 (D. Colo. July 14, 2011), in which Your Honor held that the Court may, but need not, defer the standing determination until after class certification.  In *Pizza Hut*, Your Honor found that on the unique circumstances of that case – which involved an enormously fact-bound determination of how many hours each class member drove and how many deliveries each made per hour – "class certification is not logically antecedent to the issue of standing."  *Id.* at *7.  In this case, by contract, the allegations of Defendants' unlawful treatment are common across all Plaintiffs.  The Court should therefore hold, consistent with the cases cited above, that standing is better resolved after class certification.  At that time, the Court will have a full record of the states in which *au pairs* work – a fact that the Department of State publishes in any event, see State Department Website, J-1 Visa Participant and Sponsor Totals, available at http://1.usa.gov/1Hqc4g5 (last visited July 10, 2015) – and other claimants will have an opportunity to step forward, including through the FLSA opt-in process, as additional potential class representatives.

5.     **Defendants Must Abide by Specifically Identified States' Wage and Hour Laws**

Aside from their general statement that Plaintiffs lack standing to assert state wage and hour claims, Defendants also argue that they need not abide by five specific states' wage and hour laws: those of Colorado, Pennsylvania, Utah, New York, and California.  As explained below, the laws of these states, just like all others, apply to Defendants.

a.     **Colorado**

Defendant InterExchange argues that it need not comply with Colorado's wage and hour laws, *see* InterExchange Mot. at 23-24, but it offers no good basis for that assertion, demonstrating again that Defendants simply view themselves as acting outside the law.

*First*, InterExchange claims that it is not an employer for purposes of Colorado's wage and hour law.  However, as explained in detail above, whether Defendants are employers is a fact-intensive question not suitable for resolution at the motion to dismiss stage.  And even if that issue were appropriate resolved now, the Court would have to find that Defendants are employers under the facts alleged.  See *supra* Section B.1; *see also* FAC pp. 62-63, ¶¶ 297-302 (specific allegations about InterExchange's status as employer).  In fact, one of the documents on which Defendants rely – a contract provision specifying that au pairs are at-will employees who can be fired at any time, *see* InterExchange Mot., Ex. E (InterExchange *au pair* agreement) – actually supports Plaintiffs' position by providing further evidence that *au pairs* are subject to extensive economic control.  Interexchange also cites a provision of its own contract asserting that

Interexchange is not an employer, but InterExchange plainly cannot use a contract that it wrote itself to re-define the employment relationship, and it cannot force *au pairs* to waive their rights under the wage and hour laws as a result.  *See* 7 Colo. Code Regs. § 1103-7:18.1 ("Any agreement, written or oral, by any employee purporting to waive or to modify such employee's rights in violation of article 4, title 8, C.R.S. [Wages], shall be void.")

*Second*, InterExchange says that the Colorado Minimum Wage Order exempts domestic employees from minimum wage and overtime protections.  But that argument is wrong on the face of the Wage Order.  The very first page of the Order expressly states that employees are entitled to the state's minimum wage if they are covered by *either* the Wage Order *or* if they are covered by the FLSA.  *See* 7 Colo. Code Regs. § 1101-1 ("if either of the following two situations applies to an employee, then the employee is entitled to the $8.23 state minimum wage . . .").  Thus, even assuming that *au pairs* are exempted from the Wage Order, they would still enjoy the protections of Colorado's minimum wage law because they are expressly (pursuant to the State Department's regulations) covered by the FLSA.

### b.    Pennsylvania and Utah

Defendant Cultural Care asserts in a single sentence of its motion that Plaintiffs' claims fail under Pennsylvania and Utah law "because domestic workers are exempted" under the laws of those states.  Cultural Care may not avail itself of the domestic workers' exemption under either law, which applies to householders as employers but is inapplicable to third party agencies.

Pennsylvania has expressly refused to apply the exemption for domestic service employees to third party employers.  In *Bayada Nurses, Inc. v. Commonwealth*, 8 A. 3d 866 (Pa. 2010), the Supreme Court of Pennsylvania ruled that the Pennsylvania Minimum Wage Act, 43 P.S. § 333.105, in its plain and unambiguous language, recognizes a distinction between the domestic services performed for an employer in her capacity as a *householder* and work for the employer in her capacity in pursuing a separate trade, such as third-party agency employer. *Id.* at 881-82 (concluding that PMWA required agency to pay domestic service employees overtime).  Cultural Care, like the nursing agency at issue in *Bayada*, does not employ the plaintiff *au pair* in its capacity as a householder but rather, in the pursuit of its trade and enterprise.  As such, Cultural Care may not avail itself of the exemption in the PMWA for domestic service employees.

Utah's code similarly contains an exemption for "casual and domestic employees as defined by the commission." Utah Code § 34-40-104(e).  Utah's courts have not reached the precise question answered by *Bayada*. But there is no basis to assume, as Cultural Care has, that Utah courts would apply this exemption in a manner less protective to the employee than the FLSA provides. See, *e.g.*, *Smith v. Batchelor*, 832 P.2d 467, 471 (Utah 1992) (observing that "FLSA's minimum wage and overtime requirements do not prevent states from enacting their own statutes that are *more protective* of employees.").  And as discussed above, the Department of Labor has concluded that any exemption for domestic workers does not apply to third-party employers such as the Defendants.  *See* Exhibit C (Fact Sheet #79E).  There is

therefore no support, particularly at the pleading stage, for Cultural Care's bald assertion that Utah's wage law exempts Plaintiffs from its protection.

### c. New York

Defendants say that the New York State Department of Labor ("NYSDOL") has "concluded" that *au pairs* are exempt from the State's wage and hour laws, citing a document published by the NYSDOL called "Facts for Employers," which (they argue) provides that "ALL workers" other than *au pairs* are covered by New York's labor laws. *See* Cultural Care Mot. at 19; InterExchange Mot. at 23; AIFS Mot. at 15; *see also* Cultural Care Mot. at Exh. 4.

In the first instance, it is far from clear what force (if any) this "fact sheet" has, and it certainly is not properly considered on a motion to dismiss because it is outside the four corners of the Complaint.  Defendants locate no New York statutory basis for exempting *au pairs* from the state minimum wage, and cannot rely on the NYSDOL "fact sheet," devoid of any context or understanding of its logic that might be revealed after discovery.  In any case, Defendants misinterpret its meaning.  The document states that *au pairs* are "admitted into the United States under a J-1 visa, which are subject to special federal rules" – rules that guarantee *au pairs* the protections of the states' minimum wage laws, for all the reasons given above.  *See supra* Section B.2 (discussing federal regulations and Wilberforce pamphlet).  Defendants' alternative reading of the document is logically (not to mention grammatically) untenable: it would mean that Defendants are somehow exempt from New York's wage and hour laws

because NYSDOL says that *au pairs* are governed by "special federal rules" that require Defendants to follow the state's wage and hour laws.

A more appropriate – and obvious – reading of the document is that NYSDOL simply wanted to make employers aware that the State Department has rules that are unique to *au pairs*, *see, e.g.*, 22 C.F.R. § 62.31(g) (requiring special training for *au pairs*); § 62.31(m) (requiring employers to file special reports for *au pairs*), and that employers must abide by those rules.  Here, the NYSDOL document has no impact on Defendants' legal obligations because, as explained above, the document calls for the application of federal rules, which specifically preserve the protections of the states' wage and hour laws.

### d.     California

Finally, Defendant AIFS argues that California's wage and hours laws do not apply to it, because it is not an "employer" of *au pairs*.  AIFS Mot. at 15.  This argument fails; AIFS is an employer under California law for the same reasons it is an employer under Federal law, and in any case that issue is not properly resolved at the pleading stage.  *See supra* Section B.1.  In fact, AIFS's argument is even weaker under California law, since state law is more expansive and protective than the FLSA, making clear that an employer is anyone who "directly or indirectly, or through an agent or any other person, employs or exercises control over the wages, hours, or working conditions of any person."  Cal. Code Regs. tit. 8, § 11150 §§ (2)(G).  As is the case under the FLSA, California law extends wage and hour requirements to multiple entities that exercise control over one employee (*e.g.*, a sponsor agency and a host family).  *See,*

*e.g., Martinez v. Combs*, 231 P.3d 259, 281, 286 (Cal. 2010) ("[O]ne of the reasons the IWC defined 'employer' in terms of exercising control was to reach situations in which multiple entities control different aspects of the employment relationship."). Here, AIFS hired and trained Plaintiff, required periodic meetings to discuss work conditions, made statements to both host families and *au pairs* misrepresenting what wages should be paid, held itself out as an expert on the rules regarding *au pairs*, and knowingly allowed and encouraged host families to pay less than California minimum wage. *See generally* FAC pp. 64-66, ¶¶ 305-309. These factual allegations are more than enough to establish Defendants' obligation to abide by California's wage and hour laws.

### C. The Court Should Deny Defendants' Motions to Dismiss Plaintiffs' State Common Law Claims (Counts III through VII)

Finally, the Court should reject Defendants' motions to dismiss the other state law claims properly alleged in the First Amended Complaint

### 1. Plaintiffs' Fraud Claims are Sufficiently Pleaded (Counts II, IV, V, VI)

Defendants makes essentially three arguments in support of their motion to dismiss the First Amended Complaint's fraud claims (that is, both the RICO claim in Count II and the state-law claims in Counts IV, V, and VI). *First*, they contend that that Plaintiffs' state law fraud claims are preempted, *see* Cultural Care Mot. at 23; AIFS Mot. at 5; Go Au Pair Mot. at 5; InterExchange Mot. at 8, and that Plaintiffs lack standing, *see* Cultural Care Mot. at 23. Those argument are wrong for the reasons already provided.[22]

---

[22] Defendants also argue that the RICO claim is preempted. That argument is addressed in Section A, above.

*Second*, they argue that it is factually true that *au pairs* need not be paid more than $195.75 per week – and that they therefore made no fraudulent misrepresentations.  *See* Cultural Care Mot. at 23; Go Au Pair Mot. at 8-10; InterExchange Mot. at 12-13.  This argument is also wrong:  as discussed above, $195.75 per week is not a lawful wage under either federal or state law.  The Defendants' statements to the contrary is therefore a misrepresentation, and the same evidence of their unlawful conspiracy discussed above demonstrates the Defendants' fraudulent intent.  This is also not an argument that can "be considered at the pleading stage."  *In re Accelr8 Tech. Corp. Secs. Litig.*, 147 F. Supp. 2d 1049, 1055-56 (D. Colo. 2001) (whether or not GAAP had been complied with could not be determined until summary judgment).

*Third*, Defendants argue that even if *au pairs* are entitled to a fair wage, the allegations in the Complaint are insufficient to show that they made false statements. *See United States ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d 1163, 1172 (10th Cir. 2010) (Rule 9(b)'s "purpose" is "to afford defendant fair notice of plaintiff's claims and the factual ground upon which they are based" (internal quotation marks and brackets omitted)).

As an initial matter, the First Amended Complaint alleges examples of specific false statements made by each of the Defendants against whom Plaintiffs have asserted fraud claims.  Cultural Care has represented that $195.75 was a "fixed" stipend, that "all *au pairs* made the same weekly stipend," and that "the weekly stipend is set by the Department of Labor," which statements were made in "marketing

materials" and "information sessions."  FAC p. 42, ¶¶ 193-98.  Interexchange has

posted to its website warnings that payment of more "than the program amount" can be

a sign of "Scams and frauds," and that $195.75 is "determined by the U.S. State

Department" through a "strict equation."  *Id.* p. 40-42, ¶¶ 187-92.[23]  *Au Pair* in America

has threatened *au pairs* with deportation if they accept more from host families, and its

website instructed host families to pay $195.75.  *Id.* p. 43, ¶¶ 199-201.  Go Au Pair

created a handbook that states that wages are set by the United States at $195.75 per

week.  *Id.* p. 33, ¶ 139.

Moreover, Defendants have committed fraud because they had a legal duty to

provide accurate information about employment terms and conditions but instead

provided false information or failed to provide the correct information.  *See* 22 C.F.R.

§ 62.10(b) ("[S]ponsors must provide exchange visitors information and materials on . . .

terms and conditions of employment (including . . . wages, other compensation and

---

[23]     InterExchange also claims that its website accurately reports that the $195.75 stipend is the "minimum amount that the Host Family is required to pay."  InterExchange Mot. 14.  That is not, in fact, what InterExchange's website says now, nor what it said at the time Plaintiffs filed the First Amended Complaint.  Instead, InterExchange's website currently informs prospective *au pairs* that they can "earn almost $10,000 or more" per year – "almost $10,000" being the projected annual wage for an *au pair* paid exactly $195.75 per week for 51 weeks.  *See* InterExchange Website, Au Pair Life in the USA, available at http://bit.ly/1JZEX6Z (last visited July 10, 2015).  Notably, the "or more" was added after this lawsuit was filed; at the time Plaintiffs' initial complaint was filed, InterExchange's website simply said that *au pairs* could "earn almost $10,000" per year. *See id.* (version as of Dec. 5, 2014; screen shot available upon request).

benefits[)] . . . .").[24]   The First Amended Complaint details that each and every

Defendant publicly advertises that the weekly stipend is $195.75 which, because it is

false, violates Defendants' obligations to provide accurate information.  *See* FAC pp.

22-29, ¶¶ 95-114.  Whether this is characterized as Defendants failing to speak when

they had an obligation to state what a legal wage would be, or as Defendants' materially

misrepresenting what a legal wage is, both affirmative misstatements and omissions

constitute fraud.  *See Myklatun v. Flotek Indus., Inc.*, 734 F.3d 1230, 1234 (10th Cir.

2013) (under Oklahoma law, "constructive fraud is the concealment of material facts

which one is bound under the circumstances to disclose" (internal quotation marks

omitted)); *Level 3 Commc'ns, LLC v. Liebert Corp.*, 535 F.3d 1146, 1163 (10th Cir.

2008) (same standard gives rise to liability under Colorado law); *Burton v. R.J.*

*Reynolds Tobacco Co.*, 397 F.3d 906, 910 (10th Cir. 2005) (same standard gives rise to

liability under Kansas law); Restatement (Second) of Torts § 551(1) (providing for

essentially the same theory of liability).

Lastly, some Defendants argue that because they advertised premium *au pairs*

with specific qualifications (primarily educational or experience), "[i]t is not plausible

that" those Defendants "would verbally inform *au pairs* and host families that payment of

$195.75 per week is the required practice."  AIFP Mot. at 8 (emphasis omitted); Go Au

Pair Mot. at 7.  This argument makes no sense.  There is nothing inconsistent in saying

---

[24]     This also defeats Cultural Care's argument that it did not know that $195.75 was
insufficient.  Cultural Care Mot. at 23.  It had a duty to know.  Moreover, the Complaint
includes specific allegations showing that $195.75 was the result of collusion among the
Defendants.  FAC pp. 20-22, ¶¶ 90-94.

that the required price for a standard service is $195.75, but a premium service meeting specific qualifications costs more.

### 2. Plaintiffs' Breach of Fiduciary Duty Claims are Sufficiently Pleaded (Count III)

The only argument Defendants make that is specific to Plaintiffs' fiduciary duty claims and, hence, not already addressed above, is that the Defendants were not in a fiduciary relationship with *au pairs*. Cultural Care Mot. at 24; AIFS Mot. at 9-10; InterExchange Mot. at 15-18. This argument is belied by the law of this Circuit.

Where, as here, the recipient of an H-1B visa "invariably relied upon" the sponsor "and its expertise to assist her in obtaining whatever documentation was necessary to remain a legal worker in the United States," the Tenth Circuit found that a fiduciary relationship existed. *DerKevorkian v. Lionbridge Techs., Inc.*, 316 F. App'x 727, 738 (10th Cir. 2008). Defendants' heavy reliance on *Shibeshi v. Alice Lloyd College.*, No. 11-cv-101, 2011 WL 4970781 (E.D. Ken. Oct. 9, 2011), is thus misplaced. *Id.* at *4 (finding that the university sponsor of an H-1B visa did not owe fiduciary duties to an assistant professor with whom the university had "[a]n ordinary business relationship or an agreement reached through arm's length transactions)"

This case also presents far more than an ordinary visa sponsorship relationship. The list of acts Defendants take for and on behalf of the dependent *au pairs* is extensive and established a fiduciary duty. Defendants must:

- provide "pre-arrival" information on "employment information and terms and conditions of employment," "housing," "[h]ealth care and insurance," travel information, and "information that will assist exchange visitors to prepare for their stay in the United States (*e.g.*, how and when to apply for a social security number, if applicable; how to apply for a driver's license;

how to open a bank account; employee rights and laws, including workman's compensation; and how to remain in lawful non-immigrant status," 22 C.F.R. § 62.10(b);

- "offer and record participation in an appropriate orientation for all exchange visitors" including through information concerning "healthcare" and the rules of the program, 22 C.F.R. § 62.10(c);

- monitor "retaliation or discrimination against exchange visitors who make adverse comments related to the program," 22 C.F.R. § 62.10(d),

- "secure . . . a host family placement" for the *au pair*, and ensure that there is "a written agreement between the *au pair* and the host family," 22 C.F.R. § 62.31(e);

- "adequately screen all potential host families" including interview of "all adult family members," 22 C.F.R. § 62.31(h);

- "fully monitor all *au pair* exchanges," including through "monthly personal contact by the local counselor," 22 C.F.R. § 62.31(l); and, of course,

- "require that *au pair* participants" are compensated "in conformance with the requirements of the Fair Labor Standards Act," 22 C.F.R. § 62.31(j).

These intensive and pervasive duties – to inform, to monitor, to protect, and to supervise contracts and labor standards, among other things – create more than a standard business relationship.  They create a relationship in which the sponsor "is under a duty to act for or to give advice for the benefit of" the *au pair*.  Restatement (Second) Torts § 874 cmt. a.  Indeed, it would be incoherent to find a fiduciary relationship in *DerKevorkian*, but then not to find one here where the precise same reliance on the visa sponsor is present, but the relationship is also broader and the *au pair* more dependent.

### 3.  Plaintiffs' Breach of Contract Claims are Sufficiently Pleaded (Count VII)

Finally, the Court should reject Defendants' motion to dismiss the breach of contract claims.  Defendants' primary argument – that Plaintiffs have not identified a

contract or provision thereof that was breached, *see* Cultural Care Mot. at 24-25; AIFS

Mot. at 14; InterExchange Mot. at 18-19 – misses the point. *First*, as discussed in

Section B.1 above, Defendants were joint employers and parties to employment

contracts with the *au pairs*. Indeed, the State Department regulations explicitly put the

Defendants in charge of securing *au pairs*' employment contracts, and ensuring that

those contract advise *au pairs* and host families alike of the proper terms of the *au pair*'s

participation in the J-1 program. *See, e.g.,* 22 C.F.R. § 62.31(e)(5) ("Sponsors shall not

. . . [p]lace an *au pair* with a host family unless a written agreement between the *au pair*

and the host family . . . has been signed"); *id.* § 62.31(h)(6) ("Sponsors . . . at a

minimum shall . . . [p]rovide a written detailed summary of the exchange program and

the parameters of [the host family's] and the *au pair*'s duties, participation, and

obligations.").

   *Second*, whether the Defendants are understood to be parties to the employment

agreements or merely to have contracted with the *au pairs* to place them with host

families, those contracts accepted Plaintiffs into an *au pair* placement, which

necessarily incorporates the duties and obligations provided by statute for such a

relationship. These duties include the requirement to compensate *au pairs* "in

conformance with the requirements of the Fair Labor Standards Act," 22 C.F.R.

§ 62.31(j), which obligation was breached for all the reasons given above.

   In any case, Defendants are simply wrong that the First Amended Complaint fails

to identify the contracts they breached. Plaintiffs plainly alleged that the Defendants

required *au pairs* to enter into a "written agreement detailing the *au pair*'s job

description," FAC ¶ 46, and then "set an illegal wage term in th[ose] employment agreements." *id.* ¶ 11.  Plaintiffs also alleged specific written agreements required by the four Defendants against whom the breach of contract claim is brought.  *See id.* ¶¶ 297-302 (InterExchange), 303-304 (Cultural Care), 305-309 (Au Pair in America), and 310-312 (Go Au Pair); *see generally id.* ¶¶ 494-500.  *See also* InterExchange Mot., Exhibit E (attaching copy of written agreement).

**D.  If the Court Decides to Dismiss Any of Plaintiffs' Claims, it Should Do So Without Prejudice to Filing an Amended Complaint**

In the event that the Court grants any part of the Defendants' motions to dismiss, Plaintiffs respectfully request that the Court do so without prejudice, and that Plaintiffs have an opportunity to re-plead.  *See* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend a pleading] when justice so requires.").  Amendment in this case would not be futile, and Defendants have not and could not point to any other basis on which to deny Plaintiffs the right to re-plead.  *See United States ex rel. Ritchie v. Lockheed Martin Corp.*, 558 F.3d 1161, 1166 (10th Cir. 2009) ("undue delay," "dilatory motive," and "undue prejudice to the opposing party" are among the reasons a district court "may withhold leave to amend" (internal quotation marks omitted)).

## Conclusion

For the foregoing reasons, Defendants' motions to dismiss should be denied in their entirety.  To the extent that the Court grants dismissal of one or more claims, such dismissal should be without prejudice and Plaintiffs should be given leave to re-plead.

Dated: July 10, 2015

Respectfully Submitted,

BOIES, SCHILLER & FLEXNER LLP

 /s/ Matthew L. Schwartz
Matthew L. Schwartz
Peter M. Skinner
Randall W. Jackson
575 Lexington Avenue
New York, New York  10022
Tel: (212) 446-2300
Fax: (212) 446-2350
mlschwartz@bsfllp.com
pskinner@bsfllp.com
rjackson@bsfllp.com

Sigrid S. McCawley
Lauren Fleischer Louis
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, Florida  33301
Tel.: (954) 356-0011
Fax: (954) 356-0022
smccawley@bsfllp.com
llouis@bsfllp.com

Alexander Hood
TOWARDS JUSTICE
1535 High Street, Suite 300
Denver, Colorado  80218
Tel: (720) 239-2606
Fax: (303) 957-2289
alex@towardsjustice.org
*Attorneys for Plaintiffs*

## Certificate of Service

I hereby certify that on July 10, 2015, I served a true and correct copy of the forgoing on the individuals below pursuant to Fed. R. Civ. P. 5.

Raymond Myles Deeny
rdeeny@shermanhoward.com

Martha Louise Fitzgerald
mfitzgerald@bhfs.com

James Edward Hartley
jhartley@hollandhart.com

John Roger Mann
jmann@gordonrees.com

Lawrence Daniel Stone
lstone@duffordbrown.com

Walter Vernon Bernie Siebert
bsiebert@shermanhoward.com

Thomas Baker Quinn
tquinn@gordonrees.com

Heather Fox Vickles
hvickles@sah.com

Lawrence L. Lee
llee@laborlawyers.com

Erica Herrera Gutherz
egutherz@shermanhoward.com

Meshach Yustine Rhoades
rhoadesm@gtlaw.com

Kathryn A. Reilly
reilly@wtotrial.com

William James Kelly, III
wkelly@kellywalkerlaw.com

Daniel C. Perkins
dperkins@laborlawyers.com

Brian Alan Birenbach
brian@rietzlawfirm.com

Kathryn Anne Barrett
kbarrett@bhfs.com

Chanda Marie Feldkamp
cfeldkamp@kellywalkerlaw.com

Mher Hartoonian
mhartoonian@hollandhart.com

Bogdan Enica
bogdane@hotmail.com

Jeffrey Paul Allen
jallen@lawson-weitzen.com

Brooke A. Colaizzi
BColaizzi@shermanhoward.com

Donald Joseph Gentile
dgentile@lawson-weitzen.com

 /s/  Matthew L. Schwartz
Matthew L. Schwartz