UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Case No. 1:14-cv-03074-CMA-KMT

JOHANA PAOLA BELTRAN, *ET AL.,*

Plaintiffs,

v.

INTEREXCHANGE, INC., *ET AL.*,

Defendants.

## DEFENDANT CULTURAL CARE, INC.'S REPLY TO PLAINTIFFS' CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS[1]

Plaintiffs' Opposition to the Motion to Dismiss (the "Opposition") suffers from the same fatal flaw as the Amended Complaint (the "Complaint"), a failure to recognize that the au pair program is a congressionally created exchange program and not a labor program. The Opposition does nothing to change the conclusion that, under prevailing law, this Court should dismiss Plaintiffs' claims because the Complaint and incorporated documents demonstrate that Cultural Care has conducted its au pair cultural exchange program in compliance with the DOS regulations. This is not a work program, and Plaintiffs' attempt to pursue claims based solely on the sponsoring organizations' uniform communication of and adherence to the stipend amount set by DOS as opposed to a negotiated wage and to have this Court supplant this regulatory scheme

---

[1] All capitalized terms in this Reply, unless otherwise defined, shall have the meanings ascribed to them in Cultural Care's Motion to Dismiss (Docket No. 127).

and apply instead the myriad federal and state wage act requirements must fail as a matter of law.

First, on the Sherman Act and civil RICO claims (Counts I and II), the Opposition does no more than outline parallel conduct based on the sponsors' compliance with the mandated weekly stipend issued by DOS.  The Opposition admits that DOS issued the Stipend Notice in 2007, a copy of which is attached to Cultural Care's Motion to Dismiss ("CC MTD") as *Exhibit 1,* mandating a $195.75 weekly stipend (paid by host families to au pairs).  The facts alleged in the Complaint reinforce that there is no conspiracy or avoidance of any law; just compliance with DOS mandates.  The only "agreement" identified by Plaintiffs on behalf of their antitrust claim, is the "agreement" to comply with the DOS regulations governing the program, including the DOS set stipend amount.

Second, Plaintiffs' claims under the Fair Labor Standards Act ("FLSA") (Count VIII) also fail because the Stipend Notice specifically sets out DOL's interpretation of FLSA with respect to the au pair program in accordance with 22 C.F.R. § 62.31(j)(1), which states  "[s]ponsors shall require that au pair participants are compensated at a weekly rate based upon 45 hours of child care services per week and paid in conformance with the requirements of the Fair Labor Standards Act as interpreted and implemented by the United States Department of Labor." (emphasis supplied).  DOS sets the stipend based on a DOL calculation that includes a room and board compensation credit of 40%.  Indeed, Plaintiffs' critique of that specifically authorized credit, which is a cornerstone of this cultural exchange program, underscores the absurdity of their Opposition.  In addition, the DOS regulations require that the stipend

be paid regardless of the number of hours of childcare services provided in a given week.  By contrast, the FLSA or state hourly pay structure Plaintiffs apparently prefer would not guarantee any payment unless the au pair actually provided childcare services that week (for example, the au pair would receive nothing if the family went on vacation).  An hourly structure would also require burdensome record keeping by families, sponsors, and the government, which record keeping the government avoids as a matter of policy with respect to the au pair program.  *See* quote from Federal Register Section II(A) below.  In short, Plaintiffs without any authority are attempting to change the stipend set forth in the regulations to an hourly wage.

Nothing cited in Plaintiffs' 75-page Opposition—no statute, case quotation, or creative analogy—imposes liability on Cultural Care for conducting its program in compliance with government regulations and mandates.  The Opposition ignores that au pairs enter the U.S. on cultural exchange visas, not work visas.  Yet Plaintiffs continually seek to apply labor, not exchange, mandates.  Plaintiffs' efforts to convert the au pair program from a foreign-policy driven cultural exchange to a work program are more appropriately addressed to Congress.  This Court should not alter the program's fundamental nature through the misapplication of various federal and state statutes.  The Court should dismiss Plaintiffs' claims with prejudice as stated in CC MTD and below:

### I. **ANTITRUST AND RICO**

Plaintiffs' antitrust and RICO claims fail for three reasons.  First, while Plaintiffs' Opposition repeatedly asserts that the Complaint pleads "strong circumstantial

evidence" that Cultural Care *agreed* with the other defendants on the stipend payable to au pairs, the only "evidence" Plaintiffs can muster is uniform compliance with the stipend amount set forth in the DOS Stipend Notice.[2]  Alleging a conspiracy based on uniform compliance with a government directive is nothing more than parallel conduct insufficient to state a claim under *Twombly*.

Plaintiffs' supposed "direct evidence" of a conspiracy fairs no better, as it consists of alleged "admissions" that must be stricken based on defendants' pending Joint Motion to Strike (Docket No. 134), and even if considered points only to compliance with the DOS Stipend Notice.  What is more, Plaintiffs concede that none of the alleged "admissions" were from Cultural Care representatives or name Cultural Care.  These alleged "admissions" in no way save Plaintiffs' claims.  Plaintiffs purport to quote statements of *unnamed* so-called "representatives" of *unnamed* defendants allegedly made *after this lawsuit was filed*.  These are not well-pleaded facts entitled to any presumption of truth under *Ashcroft v. Iqbal*.  In any event, Plaintiffs fail to allege a "specific time, place or person involved in the alleged conspirac[y]," or whether the speaker(s) had knowledge of any alleged conspiracy or possessed any authority to speak for the sponsor in question.  *Twombly*, 550 U.S. at 565 n.10.  Tellingly, Plaintiffs could have provided detail about these alleged "admissions" in the Opposition but did not.  A close examination of the alleged statements exposes them as an admission of

---

[2] The USIA has confirmed that the stipend is a "uniform wage." *Exhibit 1*, USIA Summary of Adopted Regulation, Exchange Visitor Program, 60 Federal Register 8547 at 7 (February 15, 1995) ("the programmatic need for a uniform wage remains.  Thus, in order to balance the preference of host families against the programmatic need for a uniform wage, the agency will rely on the Department of Labor's methodology as set forth in its proposed rule of December 30, 1993.")

nothing more than parallel conduct pursuant to a federal mandate. Only counsel's characterizations purport to make them anything more.

Second, a "conspiracy allegation will fail if there is an independent business justification which explains the alleged conspirators' conduct." *Cayman Exploration Corp. v. United Gas Pipeline Co.,* 873 F.2d 1357, 1361 (10th Cir. 1989). An antitrust complaint must allege facts that, taken as true, plausibly "tend[ ] to exclude the possibility that the [defendants] were acting independently." *Monsanto Co. v. Spray Rite Serv. Corp.,* 465 U.S. 752, 768 (1984). The Stipend Notice not only provides an independent business justification for the $195.75 stipend, but fully explains the parallel conduct that Plaintiffs so desperately want to label a conspiracy.

Finally, a third independent reason to dismiss the antitrust and RICO claims is that Cultural Care's compliance with the DOS directive in the Stipend Notice requiring the specific weekly stipend amount Plaintiffs now challenge as the product of an unlawful conspiracy renders Cultural Care immune from such liability under the doctrine of federal instrumentality/implied immunity. *CC MTD at 10 n.7.*

## II. FLSA

### A. Room and Board Deduction.

22 C.F.R. § 62.31(j)(1) provides that "[s]ponsors shall require that au pair participants are compensated at a weekly rate based upon 45 hours of child care services per week and paid in conformance with the requirements of the Fair Labor Standards Act **as interpreted and implemented by the United States Department of Labor**." (emphasis supplied). The Stipend Notice explains the methodology by which

5

DOL interprets FLSA for the au pair program: "[t]he Au Pair stipend is based on a U.S. Department of Labor formula that includes credit for room and board Host Families provide for their Au Pairs. The room and board credit currently is 40% of an au pair's credited compensation." *Exhibit 1 to CC MTD, Stipend Notice.* The Stipend Notice is therefore dispositive and unequivocally establishes that the 40% room and board credit is applicable to the au pair program. The USIA, which regulated the au pair program before DOS, discussed the room and board deduction at length in a 1995 Federal Register publication:

> [T]he programmatic need for a uniform wage remains. Thus, in order to balance the preference of host families against the programmatic need for a uniform wage, the agency will rely on the Department of Labor's methodology as set forth in its proposed rule of December 30, 1993. [ ] Upon finalization of this Department of Labor regulation, the Agency will adopt the **fixed credit** method and thereby alleviate the family's obligation to maintain records. [ ] The Agency concludes this approach will allow the weekly wage or stipend to automatically adjust, using a formula based on the minimum wage **and room and board costs routinely calculated by the Department of Labor**. [ ] Moreover, once the Department of Labor regulations are finalized, **this approach will eliminate the need for host families to keep individualized records. Additionally, it will not compel the federal government to expend scarce resources to regulate or otherwise oversee this portion of the program.**

*Exhibit 1,* USIA Summary of Adopted Regulation, Exchange Visitor Program, 60 Federal Register 8547, 8551 (February 15, 1995) (emphasis supplied).

Plaintiffs' Opposition cites four DOL opinion letters, none of which affect the validity of the Stipend Notice. All of them predate the Stipend Notice by over a decade (three in 1997 and one in 1975), and none address whether room and board may be credited against minimum wage payments to au pairs in an exchange program. Only the Stipend Notice addresses the room and board deduction specifically for the au pair

6

program; it is directly on point, and states that DOL has determined that a 40% deduction is appropriate.

Plaintiffs ignore the dispositive Stipend Notice, and instead focus on authority discussing traditional employment situations and unrelated immigration work programs, like H-1B (special occupation workers) and H-2A (seasonal agricultural work). They cite cases involving these relationships for the proposition that an au pair's room and board "primarily benefits" the host family rather than the au pair. However, as the Complaint and DOS regulations make clear, the au pair program is fundamentally different from these relationships; it is an exchange program. Cases relating to other programs are simply inapplicable.

Unlike labor programs, the au pair program is rooted in *cultural exchange*, not services for wages**.**  The program's fundamental purpose is accomplished by having host families provide au pairs with room and board in family homes. *See* 22 C.F.R. § 62.31(a) (objective of program is for an au pair to "live with an American host family and participate directly in the home life of the host family"). Unlike educational and insurance expenses (Opp. at 34), room and board in the host's home is the conduit of the cultural exchange. It cannot be said that an au pair's room and board "primarily benefits the host family" where it is the engine that drives the cultural exchange program and differentiates an au pair from a hired live-in nanny with a work visa.

### B.  Joint Employer.

The Complaint and DOS regulations make clear that Cultural Care, as a program sponsor, was not a "joint employer" of Plaintiffs Deetlefs and Cardenas under the FLSA.

Plaintiffs' Opposition blurs the lines between the role of the host family and the sponsor. Under the DOS regulations, as the Complaint concedes, the host family chooses the au pair, provides living quarters in its home, pays the stipend, sets hours, and directs how the au pair cares for the children. The au pair provides childcare services for the *host family*. The sponsor, on the other hand, *enforces and monitors the host family's compliance with the DOS regulations during the placement*. Cultural Care's performance of a sponsor's duties under the DOS regulations, to the extent Plaintiffs argue it constitutes the exercise of control of au pairs, cannot be used to find the existence of a joint employment arrangement.[3] As explained in detail in CC MTD at 20-21, even assuming the truth of every allegation in Plaintiffs' Complaint, the "economic realities" test clearly indicates that Cultural Care was not a joint employer. Plaintiffs only partially quote the DOL's Facts Sheet #79E (June 2014) on page 27 of the Opposition for the proposition that "private agencies . . . **may be** third party joint employers." The publication, however, clarifies on page 2 that "[j]oint employment *is determined by applying the 'economic realities' test*.'" (emphasis supplied). In addition, Plaintiffs push the boundaries of candor by claiming that Cultural Care "reserved the rights," Opp. at 25, to train Plaintiffs Deetlefs and Cardenas, set their wages, set the number of hours they provide childcare services, and provide health insurance. Cultural Care's obligations for training, wages, number of hours, and insurance are regulated in detail by DOS. No amount of obfuscation by Plaintiffs can change the fact that the "economic

---

[3] *Zhao v. Bebe Stores, Inc.,* 247 F. Supp. 2d 1154, 1160-61 (C.D. Cal. 2003); *Taylor v. Waddell & Reed, Inc.,* 2010 U.S. Dist. LEXIS 81920, *7-9 (S.D. Cal. Aug. 12, 2010); *Matson v. 7455, Inc.,* 2000 U.S. Dist LEXIS 23013, *12 (D. Or. Jan. 14, 2000).

realities" test deems Cultural Care's activity insufficient to establish joint employer status.

### III. PREEMPTION

As explained in detail in CC MTD at 12-17, Plaintiffs' state-law wage claims are preempted by the Exchange Act and DOS regulations under both "field" and "conflict" preemption principles because the DOS regulations encompass every facet of the program, including the amount of the stipend through the Stipend Notice. Plaintiffs' argument against preemption consists of two simple but erroneous points: 1) the DOS regulations incorporate FLSA, which in turn incorporates state minimum wage; and 2) the au pair regulations expressly contemplate compliance with state minimum wage. Plaintiffs' arguments lack any legal basis because they ignore the Stipend Notice and rely on an incomplete and misleading reading of the DOS regulations.

#### A. State-Minimum Wage Laws Are Not Incorporated into the DOS Regulations.

Plaintiffs principally contend that "[defendants'] preemption arguments can be rejected for one very simple reason: the au pair regulations explicitly incorporate the FLSA, which in turn explicitly incorporates state minimum wage laws. *Opp.* at 42. Once again, however, *see* Section II(A) above, Plaintiffs ignore the Stipend Notice and any portion of the DOS regulations that fails to support their premise. The stipend is set in the Stipend Notice pursuant to the au pair regulations, and state minimum wage laws play no role.[4] Plaintiffs argue that FLSA allows traditional employees to be paid the

---

[4] Plaintiffs cite a Washington Post Blog Article attached as Exhibit B to the Opposition, which purports to quote unnamed DOS "officials" for DOS's current policy on the

higher of the federal or state minimum wage because "states retain the prerogative to afford their workers greater protections." But Plaintiffs are not employees; they obtained a visa specifically for the purpose of voluntarily participating in a cultural exchange program. The regulations do not provide for state minimum wage and, contrary to Plaintiffs' claim for which they cite no legal support, the individual states have no prerogative to set wages for the federal program.

Plaintiffs' claim that the au pair regulations "expressly contemplate that state minimum wage laws will apply" is equally unfounded. *Opp.* at 47, 52. The au pair regulations do not mention state minimum wage; rather they defer to DOL. If state minimum wage applied to the au pair program, the regulations would state this in specific terms as they do for the summer work travel program. The summer work travel regulations state "Sponsors must . . . ensure that at a minimum, participants are compensated *at the higher of (i) The applicable Federal, State, or Local Minimum Wage (including overtime)* . . ." 22 C.F.R. § 62.32(i) (emphasis supplied). The regulations include no such provision for the au pair program.[5] Instead, the regulations expressly leave it to DOL to interpret FLSA for purposes of the au pair program. The reference in the regulations to FLSA is for the sole purpose of setting the amount of the stipend.

---

stipend. This article is obviously hearsay and should be ignored by the Court. The futility of Plaintiffs' argument is underscored by their reliance on unnamed sources in an internet news article. Regulatory policy is not issued anecdotally by unnamed sources through internet news articles.

[5] Contrary to Plaintiffs' assertion, passing references in the "program administration" section of the regulations—which applies to all cultural exchanges including summer work travel—mentioning workers' compensation, the sponsors' need to appoint officers who are familiar with state law, and sponsors' compliance with state law hardly "incorporate state minimum wage law into the au pair program." *Opp.* at 49-50.

The USIA also confirmed in a 1995 Federal Register publication that the stipend is a "uniform wage." *See* supra note 2. The au pair is entitled to the fixed $195.75 weekly stipend from the host family even if the family goes on vacation or the children are away at summer camp and childcare services are not needed that week. A uniform stipend throughout the program would be impossible if host families paid a different amount depending on the state of placement. Plaintiffs' reliance on the poorly worded Wilberforce Pamphlet is a paper tiger. As they acknowledge, this document is given to *all* visa holders and no one can argue that state minimum wage applies to the teacher, specialist, or government visitor programs.[6] Plaintiffs' position that state minimum wage is incorporated into the au pair regulations is devoid of any legal or factual basis.

### B. Plaintiffs' State-Law Wage Claims are Preempted Under Both "Field" and "Conflict" Preemption Principles.

As explained in CC MTD at 16-17, Plaintiffs' state-law wage claims are preempted by the Exchange Act and implementing DOS regulations under both "field" and "conflict" principles because 1) the federal government has occupied the field by creating the program to further U.S. foreign policy objectives and regulating every aspect of it, including the stipend; 2) application of state minimum wage law mandating a higher or lower amount would directly conflict with the federally mandated stipend of $195.75; and 3) application of state wage law stands as an obstacle to the accomplishment and execution of the program because it would override the statutory

---

[6] Stipends vary dramatically between cultural exchange programs. While the au pair weekly stipend is $195.75 and the summer work travel participants are entitled to state minimum wage, there is no mandated stipend for the teacher, specialist, and the government visitor programs. 22 C.F.R. §§ 62.24(f)(3), 62.26(f)(3), 62.29(e)(3).

11

framework created by Congress in the Exchange Act, diminish the federal government's control over the program, and give states authority to dictate the terms of this federal program including, among other things, wages, hours worked, time off, and the plethora of other issues covered by state wage law.

Nothing in Plaintiffs' Opposition refutes the preemption argument. Conflict preemption applies not only when state and federal laws conflict—as they do here—but when state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress. *See, e.g., Hines v. Davidowitz,* 312 U.S. 52, 67-68 (1941). Complying with DOS' detailed regulatory regime in the shadow of the 50 states' wage laws would render the au pair program unworkable and materially impair the federal government's ability to accomplish its foreign policy goals. The introduction of state minimum wage into the program would essentially create an auction-type placement process that would force these students to negotiate with American families like hired help. There is obviously no basis for this in the Exchange Act or DOS regulations, and such a structure would conflict with the entire objective of the program.

Plaintiffs' effort to minimize the preemptive effect of an agency regulation as opposed to a federal statute should be ignored because "[a]n agency's preemption regulations have no less preemptive effect than statutes" and "[i]f a statute gives an agency broad powers to effect the statute's purpose, we cannot limit the agency's power to preempt state law . . . ." *State ex rel. Todd v. United States,* 995 F.2d 1505, 1509 (10th Cir. 1993) (internal citations omitted). Equally unfounded is Plaintiffs' contention that this Court should apply a presumption against preemption because

Congress has acted in "a field traditionally occupied by the states." *Opp.* at 46. Immigration and foreign relations—the areas in which the Exchange Act and DOS regulations operate—are areas of law where the federal government has predominated; the states have never occupied the field. In attempting to label the au pair program an "employment" program and therefore within the state's police power, Plaintiffs continue their pattern of simply ignoring the nature of the program and the program's legislative and regulatory framework. *Opp.* at 46 n.17.

Plaintiffs principally rely on two Supreme Court cases, neither of which avoid preemption in this case. *Hillsborough County v. Automated Medical Laboratories* involved whether the FDA's regulations regarding the collection of blood plasma preempted a county ordinance on the same issue. 471 U.S. 707, 709 (1985). There, the FDA specifically explained in a statement accompanying the regulations that "[these] regulations are not intended to usurp the powers of State or local authorities to regulate plasmapheresis procedures in their localities." *Id.* at 714. The Supreme Court specifically relied on this statement in holding that the local ordinance was not preempted. *Id.* at 716.[7] The Court also applied a presumption against preemption because the local ordinances regulated health and safety, a field traditionally occupied by the states. *Id* at 715. *Hillsborough County* is thus doubly inapplicable here because neither Congress nor DOS has expressed an intention not to preempt, and no presumption against preemption attaches because immigration and foreign relations are areas of federal, not state, concern.

---

[7] "Given the clear indication of the FDA's intention *not to preempt* . . . we conclude that these ordinances are not preempted." *Id.* (emphasis in original).

*Cal. Coastal Com. v. Granite Rock Co.* is also inapposite. 480 U.S. 572 (1987). There, the Supreme Court held that state environmental laws requiring miners operating in coastal areas to obtain state permits were not preempted by federal regulations. *Id.* at 583. The federal regulations explicitly required miners to comply with the state laws. *Id.* at 582-83.[8] They were like the summer work travel regulations, which explicitly require state minimum wage. 22 C.F.R. § 62.32(i); Section III(A) above. *Cal. Coastal Com.*, however, provides no basis for avoiding preemption here where the au pair regulations do not state that host families must comply with state minimum wage laws.

Finally, Plaintiffs simply label the recent opinion by the U.S. District Court for the District of Connecticut in *Bai Haiyan v. Hamden Pub. Schs.* (CC MTD at 13) as "wrongly decided." 875 F. Supp. 2d 109 (D. Conn. 2012). While the case is not binding on this Court, it is highly persuasive, was recently decided by a highly respected district court, and analyzes at length the statutory and regulatory framework surrounding the J-1 visa programs. As explained in CC MTD, the *Bai Haiyan* court dismissed a variety of employment-related claims brought by a J-1 cultural exchange participant on the grounds that the plaintiff "was participating in an exchange visitor program and [was] not an employee of [the defendant]." *Id.* at 127.

### IV. <u>STANDING FOR STATE WAGE CLAIMS</u>

As stated in CC MTD at 17-18, even if their state-law wage claims are not preempted, Plaintiffs Deetlefs and Cardenas lack standing to allege state-law wage

---

[8] "The regulations explicitly require all operators in national forests to comply with state air quality standards, state water quality standards, and state standards for the disposal and treatment of solid wastes." *Id.* at 582-83.

claims against Cultural Care other than in the four states in which they trained or were placed (NY, UT, NJ, PA).  As Judge Arguello observed in *Smith v. Pizza Hut, Inc.*, a claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim.  09-cv-01632, U.S. Dist. LEXIS 76793 (D. Colo. 2011) and cases cited therein.

## V.  PLAINTIFFS' UTAH AND PENNSYLVANIA WAGE CLAIMS FAIL

Plaintiffs' argument that their Pennsylvania and Utah wage claims survive because Cultural Care is a third party agency employer fails because, for the reasons explained in CC MTD and in Section II(B) above, Cultural Care never employed Plaintiffs Deetlefs and Cardenas.  In *Bayada Nurses, Inc. v. Dep't of Labor & Indus.*, the case on which Plaintiffs rely, the Pennsylvania Supreme Court based its decision on the fact that the agency itself "employed" and paid the nurses who worked in the homes of the agency's clients.  8 A.3d 866, 869 (Pa. 2010).

Respectfully Submitted,

\_\_\_s/ Jeffrey P. Allen_____
Jeffrey P. Allen
E-mail: jallen@lawson-weitzen.com
Donald J. Gentile
E-mail: dgentile@lawson-weitzen.com   -and-
LAWSON & WEITZEN, LLP
88 Black Falcon Avenue
Boston, MA 02210
Telephone: (617) 439-4990
Facsimile:  (617) 439-3987

W.V. Bernie Siebert
SHERMAN & HOWARD L.L.C.
633 Seventeenth Street, Suite 3000
Denver, CO 80202
Tel: (303) 297-2900
Fax: (303) 298-0940
Email: bsiebert@shermanhoward.com

ATTORNEYS FOR DEFENDANT CULTURAL CARE, INC.

## CERTIFICATE OF SERVICE (CM/ECF)

  I hereby certify that on August 6, 2015, I electronically filed the foregoing Defendant Cultural Care, Inc.'s Reply to Plaintiffs' Consolidated Opposition to Defendants' Motions to Dismiss with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses.

**Lauren Fleischer Louis**
llouis@bsfllp.com

**Sigrid Stone McCawley**
smccawley@bsfllp.com

**Matthew Lane Schwartz**
mlschwartz@bsfllp.com

**Peter Murray Skinner**
pskinner@bsfllp.com

**Randall Wade Jackson**
rjackson@bsfllp.com

**Alexander Hood**
alex@towardsjustice.org

**Bogdan Enica**
bogdane@hotmail.com

**Brian A. Birenbach**
brian@rietzlawfirm.com

**Brooke A. Colaizzi**
bcolaizzi@shermanhoward.com

**Chandra M. Feldkamp**
cfeldkamp@kellywalkerlaw.com

**Christian D. Howard**
chammond@duffordbrown.com

**Daniel C. Perkins**
dperkins@laborlawyers.com

**Heather F. Vickles**
hvickles@shermanhoward.com

**Kathryn A. Reilly**
reilly@wtotrial.com

**Toren G. E. Mushovic**
mushovic@wtotrial.com

**James E. Hartley**
jhartley@hollandhart.com

**John R. Mann**
jmann@gordonrees.com

**Kathryn Anne Barrett**
kbarrett@bhfs.com

**Lawrence D. Stone**
lstone@duffordbrown.com

**Lawrence L. Lee**
llee@laborlawyers.com

**Martin J. Estevao**
estevaom@gtlaw.com

**Martha L. Fitzgerald**
mfitzgerald@bhfs.com

**Meshach Y. Rhoades**
rhoadesm@gtlaw.com

**Mher Hartoonian**
mhartoonian@hollandhart.com

**Raymond M. Deeny**
rdeeny@shermanhoward.com

**Thomas B. Quinn**
tquinn@gordonrees.com

**W.V. Bernie Siebert**  
bsiebert@shermanhoward.com

**William J. Kelly III**  
wkelly@kellywalkerlaw.com

s/ Jeffrey P. Allen  
Jeffrey P. Allen