# EXHIBIT 1

## 60 FR 8547

Vol. 60, No. 31, Wednesday, February 15, 1995

Rules and Regulations

Reporter
60 FR 8547

*Federal Register* > *1995* > *February* > *Wednesday, February 15, 1995* > *Rules and Regulations* > *UNITED STATES INFORMATION AGENCY (USIA)*

**Title:** Exchange Visitor Program

**Action:** Final rule.

## Agency

UNITED STATES INFORMATION AGENCY (USIA)

**Identifier:** [Rulemaking No. 110]

## Administrative Code Citation

22 CFR Part 514

## Synopsis

[*8547] **SUMMARY:** The Agency hereby adopts as final with modifications the interim rule governing its oversight and administration of au pair programs. Au pair programs permit foreign nationals to enter the United States for a period of one year for the purpose of residing with an American host family while participating directly in the home life of the family and providing limited child care services. The foreign national also attends a United States accredited post-secondary educational institution. These rules are promulgated pursuant to *Public Law 103-415* which authorizes the continued operation, until September 30, 1995, of au pair programs currently designated by the Agency.

## Text

**SUPPLEMENTARY INFORMATION:** First begun pursuant to the provisions of the United States Information and Educational Exchange Act of 1948 ("Smith-Mundt"), and subsequently incorporated into and broadened under the Fulbright-Hays Act, educational and cultural exchange activities have, over the past forty years, exposed millions of foreign nationals to the United States, its peoples, cultures, skills, business techniques, educational institutions, and way of life. The Fulbright-Hays Act mandates reciprocal exchange and Americans traveling abroad have, in similar fashion, developed an enhanced awareness of foreign people, their cultures and societies. Thus, Fulbright-Hays programs further one of the Agency's primary missions: increasing mutual understanding between Americans and others through people-to-people contact. Originally conducted by the Department of State, oversight of exchange activities, occurring under the umbrella of the Exchange Visitor Program, has been the responsibility of the Agency since 1978.

The Fulbright-Hays Act sets forth certain parameters which all exchange activities must meet. With an eye towards ensuring that these parameters were being met and acting in response to a Congressional request, the General Accounting Office ("GAO") investigated Agency oversight and administration of the Exchange Visitor Program and its attendant utilization of the J visa. In its report to Congress, dated February 5, 1990 and entitled "Inappropriate Uses [*8548] of Educational and Cultural Exchange Visas," the GAO determined that certain Exchange Visitor Program activities appeared to be inconsistent with the statutory grant of authority and its underlying legislative intent. GAO summarized its findings, stating:

DONALD GENTILE

60 FR 8547, *8548

"Most J visa activities appear to conform to the intent of the 1961 act. However, GAO believes that certain activities and programs in the trainee and international visitor categories, including the summer student/travel work, international camp counselor, and au pair (Child care) programs, are inconsistent with the legislative intent. GAO identified instances of participants working as waiters, cooks, child care providers, amusement and leisure park workers, and summer camp counselors. Authorizing J visas for participants and activities that are not clearly for educational and cultural purposes as specified in the act dilute the integrity of the J visa and obscures the distinction between the J visa and other visas granted for work purposes."

The concerns raised in the GAO report had troubled USIA for several years, especially the au pair program. Objections to the operation of au pair programs under the Exchange Visitor Program and the use of the J visa were also raised by the Department of Labor, the Immigration and Naturalization Service, and, most importantly, USIA's congressional committees of jurisdiction.

In June of 1993, USIA was approached by the au pair sponsors conducting these programs to examine whether the Agency's past objections to the continuation of these programs under the Exchange Visitor Program could be resolved. The au pair sponsors were advised that the Agency saw merit in the programs but had concluded that it lacked statutory authority to conduct the programs as then configured. The Agency's principal objection to the program was its lack of a bona fide educational component sufficient to meet the statutory requirements of the Fulbright-Hays Act. A secondary, but equally compelling, objection was the program's failure to comply with the Fair Labor Standards Act and its requirements governing the payment of minimum wage.

The Agency and the au pair sponsors began earnest discussions involving how best to regularize the au pair program in order for it to find a permanent home at USIA. During the course of these discussions, several tragic incidents involving au pair placements occurred and were widely reported in the press. Specifically, the deaths of two infants while in the care of au pairs and allegations of child molestation and child pornography allegedly involving au pairs brought about Congressional and public scrutiny of these programs. This scrutiny, in turn, resulted in Congressional action which authorized and directed the Agency to promulgate regulations governing au pair placements.

Pursuant to this clear directive, the Agency published, on December 14, 1994, interim final regulations governing the au pair program that were both consistent with the provisions of the Fulbright-Hays Act and which also provided safeguards for au pair participants and the American host families with whom they are placed. Given the wide popularity of these programs-and the criticisms of them-the Agency met with, solicited, and incorporated the views of the au pair organizations, interested members of the public and the views of those congressional offices possessing jurisdiction over educational and cultural exchange programs.

The Agency's **Federal Register** publication of this interim rule with request for public comment generated over 3,000 responses from American families during the thirty day public comment period. A considerable number of the comments received had a remarkably familiar style and theme, and focused primarily or exclusively on two issues: the rise in weekly wage or stipend paid to au pairs and the requirement that au pairs taking care of children under the age of two be at least 21 years of age. Additionally, however, the Agency received a significant number of personalized and thoughtful comments and responses, many which were highly persuasive. A majority of the commentators, including a large number who objected to certain aspects of the interim final rules, praised the Agency for efforts to improve screening, training, and/or other aspects of the au pair program. The letters also highlighted that, despite the problems which have been associated with this program, many families develop excellent relations with their au pairs and make considerable efforts to advance the cultural and educational exchange aspects of the program.

Many letters lamented that other forms of child care were unaffordable. Some complained about the quality alternative child care. While the USIA is pleased that the au pair program apparently provides considerable direct benefit to many American families on the important matter of affordable child care, the Agency cannot lose sight of the fact that it has legal authority to operate the au pair program only if it is primarily a cultural and educational exchange program which incidentally provides child care. If the program becomes primarily a child care program, no matter how valuable, it can be legally maintained as a federal program only if it is transferred to another agency.

DONALD GENTILE

Although a distinct small minority, some letters criticized the Agency for virtually any effort to regulate the program as undue interference into family activities. While the Agency has made every effort to ensure that the regulations are as unburdensome as possible, it is important to note that certain regulations are necessary before the Agency is legally permitted to operate this program. Additionally, none of the regulations will affect individuals involuntarily. The regulations apply only to families who voluntarily and deliberately choose to participate in the au pair program.

In light of the comments it has received, the Agency has determined that the interim regulations published December 14, 1994 should be amended as follows.

### Educational Component

As discussed above, the Agency's statutory authority to facilitate au pair activities has been the subject of debate for the past eight years. To achieve compliance with applicable federal law, taking into account the 1990 GAO opinion, the interim regulations required that au pair participants pursue six semester hours (or its equivalent) of academic course work at an accredited post-secondary institution. The Agency concluded that this requirement is the minimum programmatic component necessary to comply with the provisions of the Fulbright-Hays Act. Without this requirement the Agency had determined that it would not have statutory authority to conduct this activity.

Some responses criticized the Agency for focusing excessively on traditional forms of educational activities to meet the educational exchange requirement. These critics claimed the Agency failed to appreciate the degree and caliber of cultural exchange that results from daily contact between host families and au pairs. Contrary to these assertions, the Agency believes it fully appreciates the value of the experiences identified by these commentators. The Agency recognizes that the family context provides a unique opportunity for the host family and au pair to learn about each other's cultures and values. Additionally, one of the clear benefits of the au pair program is that it provides many young foreign nationals who otherwise would not have the opportunity to participate in an exchange program a chance to do so.

This recognition does not alleviate the Agency's responsibility to conduct the [*8549] program in accordance with federal law, however. The Agency does agree it should not impose unnecessary rigidity into the requirement and adhered to this principle in drafting the interim regulations. Accordingly, the Agency does not amend the regulatory provisions set forth at 22 CFR 514.31(k). Moreover, for clarification purposes, it is not necessary that the course work be taken for credit so that audit of such courses is permissible.

### Selection, Training and Screening

The au pair program has been governed for over eight years by voluntary guidelines issued in 1986. Because of Congressional enactments in 1988 and 1990, the Agency had been essentially barred from modifying or enforcing the guidelines or otherwise regulating and monitoring the au pair organizations. Unfortunately, these guidelines, promulgated for two au pair organizations under a pilot program overseeing 300 au pairs annually, was deficient for a program that had grown to eight au pair organizations and 10,000 au pairs annually. By the summer of 1994, a number of high profile incidents, buttressed by a series of investigative reports, strongly suggested that the lack of oversight may in some instances be jeopardizing the safety of host family children. Evidence also was presented that some au pairs had been mistreated by host family members. The Agency was equally disturbed by reports suggesting the program had been portrayed to host families as a child care program but to young potential au pairs as a chance to see America. Such a disparity in expectations laid a poor foundation for either a good exchange experience or for quality child care. Faced with this history, and under Congressional mandate, the Agency developed regulations which attempted to provide reasonable confidence that au pairs assigned to host families had the skills, experiences and character to meet host families' reasonable expectations.

One of the two components of the interim regulations drawing the most comments involved the age requirement for au pairs caring for infant children. The Agency had specified at 22 CFR 514.31(e)(3) that an au pair providing such care for a child under the age of two must be at least twenty-one years of age. The reason for this requirement was to attempt to ensure that au pairs entrusted with infant children had some degree of maturity and experience. In imposing this requirement the Agency recognized that any age limitation was subjective and inexact; nevertheless, the Agency had considered the requirement reasonable given all surrounding circumstances.

60 FR 8547, *8549

Many who commented provided persuasive accounts, examples, and illustrations supporting their beliefs that a 21 year old rule was unnecessary, especially in light of the Agency's six months of prior child care experience requirement. These stories helped convince the Agency that the correlation between age and maturity was marginal at best and, as a result, the Agency is dropping the twenty-one age requirement.

Another modification is set forth at 22 CFR 514.31(e) (1)-(3). Many comments were received which questioned the utility of requiring a parent to remain in the home for the first week following the au pair's arrival. Many suggested modifications but agreed that some form of transition was desirable; others suggested the transition period should be left entirely to the discretion of the host family.

The Agency's reason for imposing such a requirement was the need to ensure that the au pair received the benefit of an adequate transition period and was comfortable with his or her new duties, new home, new community, and new country. The Agency recognized that a vast majority of host families would never leave their infants and other children with an au pair without an adequate adjustment period, but concluded that requiring a reasonable transition period was essential to the welfare of both the au pair and the children, especially infants.

In response to the comments received, the Agency is amending 22 CFR 514.31(e)(1) to allow either a parent or other responsible adult to assist in this transition period and also is reducing the length of such transition from one week to three days duration. The Agency has been informed that in many instances this three day period will encompass the weekend. This increased flexibility addresses the concerns raised by most of these comments but still provides adequate assurances of a smooth transition for the au pair. The Agency rejects those comments suggesting the transition period should be left entirely to the discretion of the host family based upon the Agency's experience in these matters which indicates that a prescribed transition period is necessary, even if it is a short one.

The Agency also is amending the requirement set forth at 22 CFR 514.31(e)(3) to provide for greater flexibility. Originally, the Agency had required that au pairs placed with families having children under the age of two must have at least six months documented infant child care experience. In response to comments suggesting that "documented" was too rigid, confusing or otherwise counterproductive, the Agency is amending this provision by substituting the word "prior" for "documented."

In response to documented failures over past eight years to adequately screen potential au pair participants, the Agency set forth at 22 CFR 514.31(d) specific criteria governing au pair selection. Based upon comments received, the Agency is amending 22 CFR 514.31(d)(6) by requiring a personality profile rather than a psychological profile for potential au pair participants. This amendment is adopted based upon representations made to the Agency that psychological testing would be unduly burdensome, costly and would be ineffective. Au pair sponsors suggested the substitution of a "personality" profile which they assert would in fact provide a screening mechanisms sufficient to ensure the au pair applicant's suitability for child care services. Also set forth in this paragraph is the requirement that au pair applicants undergo a criminal record check. Au pair sponsors and the Agency's posts overseas confirm that a criminal record check as such term is commonly understood in the United States is not necessarily available in all countries. For those countries where such records are not readily available, the Agency will accept the recognized equivalent of a criminal record check for that country.

Directly related to the screening of au pair participants is experience and training. A need for some level of uniform training for au pair participants was recognized and supported by the public comments received by the Agency. However, the length of this training was subject to debate. At 22 CFR 514.31(g)(1) the Agency set forth a requirement that au pair participants receive not less than 16 hours of child safety instruction. Based upon comments received from au pair sponsors and the American Red Cross, the Agency is amending this requirement by reducing the number of hours of such instruction from 16 to 8. The regulation is also amended to permit such training to be given prior to placement with the host family. This amendment will permit au pair sponsors to provide child safety training in the au pair's home country if they choose to do so.

Finally, for the purpose of clarity, the Agency has determined that amendments to 22 CFR 514.31(h) are needed. This regulation sets forth requirements governing host family [*8550] selection for participation in the au pair program. Given

the educational and cultural exchange overlay of this program, criteria for program participation is necessary. As published, the interim rule required that all family members resident in the home be fluent in spoken English, be personally interviewed, and have successfully passed a background investigation. The Agency is amending this regulation by substituting "host parents" for "all family members" based upon comments received which convinced the Agency that the change is needed to avoid confusion and unintended senseless results.

**Placement and Orientation**

The Agency has reviewed certain requirements governing the terms and conditions of an au pair placement and has determined that greater flexibility is both possible and desirable. At 22 CFR 514.31(e)(4) the Agency amends the interim rule language in order to permit the host family and au pair the latitude of establishing flexible work hours. As amended, this regulation will require only that the au pair and host family have signed a written agreement that outlines the au pair's obligation to provide not more than 45 hours of child care services per week.

A small, but vocal, minority expressed strong disagreement with the interim regulations' nine hour ceiling on an au pair's work day. Many of these commentators apparently failed to realize that the nine hours per day limit had been in effect since 1986 and was not new. Nevertheless, upon reconsidering this provision, the Agency has concluded that the 45 hour week limit, if aggressively enforced, in conjunction with other oversight changes, makes the nine hours per day cap unnecessary. Thus, the Agency amends 22 CFR 514.31(j)(2) by deleting the requirement that au pairs provide not more than nine hours of child care services per day. The Agency adopts instead language that will permit the au pair to provide a "reasonable" number of hours per day. The Agency does not define what is reasonable, leaving this determination to the host family and au pair in the first instance, working with the sponsoring au pair organization as necessary. Given the monthly contact by organizational representatives, the Agency is of the belief that the documented abuses that prompted the limitation of hours will be prevented. As a result of striking the nine hour per day limit, the Agency believes the program will be opened to potential host families previously unable to participate.

Many comments objected to the requirement that host families and au pairs attend quarterly conferences or seminars devoted to cross cultural or child development issues. Some comments criticized the number as excessive, others disagreed with the nature of the events, and still others considered any such events as an intrusive nuisance. The gatherings suggested by the Agency have been a traditional hallmark of educational and cultural exchange programs, and the Agency does not agree with the characterization that they are an intrusive nuisance or otherwise inappropriate for a cultural and educational exchange program. However, based on the comments, the Agency agrees to amend 22 CFR 514.31(i)(3) to require attendance at one family day event sponsored by the au pair organization. Thus, not only are the number of events reduced, but the Agency is making clear it did not intend to prescribe a narrow agenda to the activity.

**Au Pair Employment Status**

Much of the criticism of the au pair program is directly related to the work component that is an integral part of the program. Because of this, domestic nanny services, and others, have long and loudly objected to these programs. Critics contend that since 45 hours of work per week exceeds the traditional 40 hour American work week, it leaves the au pair insufficient time to either meet the educational exchange requirement or truly pursue a cultural experience. They assert that the program displaces American workers and amounts to no more than the import of cheap foreign labor in the guise of an educational and cultural exchange program. While the Agency does not agree with this characterization, it may not ignore these claims. Accordingly, the Agency has been obligated to examine the question of whether au pairs are employees subject to the provisions of the Fair Labor Standards Act. The Agency has also sought the views and guidance of the Department of Labor on this matter. The Department of Labor has specifically advised the Agency that an employment relationship is established. Because the Department of Labor is the Federal agency entrusted with regulating labor laws, including the definition of employer and employee and determining when an employment relationship is established, it is appropriate for the Agency to defer to Department of Labor in this area. *Chevron, U.S.A.* versus *NRDC, 467 U.S. 837 (1984).* To assist the public in their understanding of this matter a short analysis is set forth.

To fall within the purview of the Fair Labor Standards Act, *29 U.S.C.S. 202 et seq*, an individual must meet the threshold requirement of "employee" status. The Act, at *29 U.S.C.S. 203*(e)(1) and (g), defines "employee" as an individual employed

DONALD GENTILE

by an employer and "employ" as to suffer or permit to work. Three United States Supreme Court decisions provide the controlling authority for the determination of employee status.

In seeking to answer directly the question of who is an employee, the Court in *Bartels* versus *Birmingham , 332 U.S. 126 (1947)* at page 130 pronounced that "in the application of social legislation employees are those who as a matter of economic reality are dependent upon the business to which they render service." This concept of "economic reality" was first developed in *Rutherford Food Corp.* versus *McComb , 331 U.S. 722 (1947)* which has, along with *Bartels* , been controlling authority for almost fifty years.

The decision in *Goldberg* versus *Whitaker House Corp., Inc., 366 U.S. 28 (1961)* dictates that determination of an employee relationship requires review of the circumstances of the whole activity. Pursuant to this decision, pervasive control exercised by the employer over the work performed is indicative of employee status. Application of these judicially established criteria to the au pair and to his or her host "family" clearly reveals an employment relationship.

The most obvious indication of employment is the inherent financial basis upon which the relationship is built. The au pair provides child care services and currently receives one hundred dollars per week room and board. The au pair is dependent upon her host "family" for her subsistence. This economic dependence is the measure of "economic reality" set forth in the *Rutherford* and *Bartels* decisions, *supra* . The Agency believes it to be unlikely that an au pair is going to uproot his or herself from his or her home country, travel to the United States, and provide forty-five hours of child care per week for someone's children without compensation. The au pair provides a service and expects and receives payment therefore. Designation of the wage paid as "pocket money" is immaterial given that the consideration for the receipt of the "pocket money" is the child care services of the au pair. Pursuant to *Rutherford* and *Bartels* , an au pair is an employee.

A second criterion routinely applied to determine employee status is that of [*8551] employer control over the work performed. As explained in the *Goldberg* decision, *supra* , pervasive control exercised by the employer over the work performed is indicative of an employment relationship. This concept of control stems from the English common law theories of master and servant.

As applied today, the concept of control involves the employer setting the terms and conditions of the employment, i.e., hours of work, methods of performing the work, break times, uniforms, and the designation of actual duties. The question of control generally arises in those situations in which an employer seeks to designate an employee as an independent contractor and thereby escapes the obligations of various labor statutes such as the Fair Labor Standards Act. Designation of the au pair as a "family" member would be analogous to this scenario, when made to avoid the employer/employee relationship.

An au pair's relationship to his or her "family" meets the pervasive control theory of *Goldberg* . The "family" determines what hours of the day the au pair will work. The "family" determines what additional duties may be necessary for the au pair to perform on a daily basis. The "family" dictates what the child, under the care of the au pair, will eat, when he will play, and when he will nap. Pursuant to *Goldberg* , an au pair is an employee.

**Au Pair Wages**

The weekly compensation paid to au pairs generated voluminous comment. All of the comments received objected to an increase in the weekly wage or stipend from the current $ 100 to $ 155 per week. Many agreed that a substantial increase was appropriate, given that au pairs have been receiving $ 100 per week since the inception of the program in 1986. $ 120-$ 130 per week was the range mentioned most frequently.

Some of the commentators who criticized the increase to $ 155 per week reprimanded the Agency for promoting a 55 percent increase, asserting that the decision reflected an insensitivity to the needs of American families. The Agency believes these critics misunderstood the interim regulations and the purpose for the formula proposed in those regulations.

As explained in the interim final rulemaking published December 14, 1994, the $ 155 amount was established by examining Department of Labor regulations governing the payment of minimum wage to live-in domestic employees. The $ 155

amount reflected minimum wage less a fixed credit of $ 36 permitted under current Department of Labor regulations for room and board. This regulation, set forth at 29 CFR 552.100 also provides for an alternative calculation of the credit for room and board based upon actual cost.

The Agency noted in the interim rule that the $ 36 credit was based upon a regulation published in 1979 and that the Agency was of the opinion that the credit should be substantially higher. The Department of Labor is of the same opinion as evidenced by its proposed rule published in the **Federal Register** on December 30, 1993 at page 69312. In this proposed rule the Department of Labor sought to amend 29 CFR 552.100 to reflect the increase in the cost of room and board by determining the permissible credit as a percentage of the hourly minimum wage. This proposed rule has not been finalized.

In an attempt to document costs, certain au pair organizations conducted a nationwide survey of their host families to determine the average cost of room and board provided to au pairs. While not endorsing the methodology used in this survey, the Agency is comfortable with the results presented. This survey suggests that the average cost for room and board is approximately $ 65 per week. This survey provides some measure of objective evidence that the allowance for room and board is substantially higher than the 1979 allowance of $ 36 per week.

As stated, 29 CFR 552.100 provides two methods for recognizing the cost of room and board provided live-in domestic employees. The first method, which allows a fixed $ 36 credit is outdated but still legally applicable. The second method, which allows for a deduction against the minimum wage based on the actual cost of room and board.

The public comments received have convinced the Agency that a credit for room and board based upon actual costs is preferred by the majority of host families. However, the programmatic need for a uniform wage remains. Thus, in order to balance the preference of host families against the programmatic need for a uniform wage, the Agency will rely on the Department of Labor's methodology as set forth in its proposed rule of December 30, 1993. To this end, and until this Department of Labor regulation is adopted as final, the Agency will permit a credit for room and board based upon actual cost but not to exceed $ 76 per week. Upon finalization of this Department of Labor regulation, the Agency will adopt the fixed credit method and thereby alleviate the family's obligation to maintain records.

The Agency concludes this approach will allow the weekly wage or stipend to automatically adjust, using a formula based on the minimum wage and room and board costs routinely calculated by the Department of Labor. The Agency believes this method is fair to host families and au pairs, and will ensure adherence to federal law. Moreover, once the Department of Labor regulations are finalized, this approach will eliminate the need for host families to keep individualized records. Additionally, it will not compel the federal government to expend scarce resources to regulate or otherwise oversee this portion of the program.

Based on the comments received and the above discussions, the Agency is of the opinion that a weekly stipend or wage of not less than $ 115 is consistent with Fair Labor Standards Act requirements governing payment of minimum wage and is appropriate for the present time.

### Other Statutory Considerations

Finally, a question has arisen regarding the Agency's statutory authority to impose a performance bond. The program guidelines governing au pair placements for the past eight years have required that the au pair participants place with the au pair sponsor a bond in the amount of five hundred dollars. This bond was forfeited if the au pair participant failed to successfully complete the agreed upon one year program or failed to return to their home country.

In discussions with the Department of Labor regarding payment of minimum wage, the Agency was advised by the Department that this bond requirement was a minimum wage violation. For the reasons discussed above, under the *Chevron* doctrine, deference to Department of Labor's interpretation is appropriate. Additionally the Agency's subsequent review of this matter has led it to conclude that it is without statutory authority to impose a bond. Pursuant to provisions of the Immigration and Naturalization Act set forth at 8 U.S.C. 1184(a) the Attorney General is vested with authority governing the admission of aliens into the United States and the giving of a bond to insure the aliens maintenance of status and

departure from the United States. The Director of USIA is without such authority and the regulatory provision set forth at 22 CFR 514.31(1) requiring a performance bond is therefore deleted.

# Regulations

**List of Subjects in 22 CFR Part 514**

Cultural exchange programs. [*8552]

Dated: February 8, 1995.

**Les Jin,**

*General Counsel.*

Accordingly, the interim rule amending 22 CFR part 514 which was published at 59 FR 64296 on December 14, 1994, is adopted as a final rule with the following change:

### PART 514-- EXCHANGE VISITOR PROGRAM

1. The authority citation for part 514 continues to read as follows:

**Authority:** 8 U.S.C. 1101(a)(15)(J), 1182, 1258; 22 U.S.C. 1431-1442, 2451-2460; Reorganization Plan No. 2 of 1977, 42 FR 62461, 3 CFR, 1977 Comp. p. 200; E.O. 12048 43 FR 13361, 3 CFR, 1978 Comp. p. 168; USIA Delegation Order No. 85-5 (50 FR 27393).

2. Part 514 is amended by revising § 514.31 to read as follows:

### § 514.31 -- Au pairs.

(a) *Introduction.* These regulations govern Agency-designated exchange visitor programs under which foreign nationals are afforded the opportunity to live with an American host family and participate directly in the home life of the host family while providing limited child care services and attending a U.S. post-secondary educational institution.

(b) *Program designation.* The Agency may, in its sole discretion, designate bona fide programs satisfying the objectives set forth in paragraph (a) of this section. Such designation shall be for a period of two years and may be revoked by the Agency for good cause.

(c) *Program eligibility.* Sponsors designated by the Agency to conduct au pair exchange program shall:

(1) Limit the participation of foreign nationals in such programs to not more than one year;

(2) Limit the number of hours an au pair participant is obligated to provide child care services to not more than 45 hours per week;

(3) Require that the au pair participant enrolls in a U.S. institution of higher education for not less than six semester hours of academic credit or its equivalent;

(4) Require that all officers, employees, agents, and volunteers acting on their behalf are adequately trained and supervised;

(5) Require that the au pair participant is placed with a host family within one hour's driving time of the home of the local organizational representative authorized to act on the sponsor's behalf in both routine and emergency matters arising from the au pair's participation in their exchange program;

(6) Require that each local organizational representative maintain a schedule of personal monthly contact (or more frequently as required) with each au pair and host family for which he or she is responsible;

DONALD GENTILE

60 FR 8547, *8552

(7) Require that local organizational representatives not devoting their full time and attention to their program obligations are responsible for no more than fifteen au pairs and host families; and

(8) Require that each local organizational representative is provided adequate support services by a regional organizational representative.

(d) *Au pair selection.* In addition to satisfying the requirements of § 514.10(a), sponsors shall ensure that all participants in a designated au pair exchange program:

(1) Are between the ages of 18 and 26;

(2) Are a secondary school graduate, or equivalent;

(3) Are proficient in spoken English;

(4) Are capable of fully participating in the program as evidenced by the satisfactory completion of a physical;

(5) Have been personally interviewed, in English, by an organizational representative; and

(6) Have successfully passed a background investigation that includes verification of school, three, non-family related personal and employment references, a personality profile and a criminal record check or its recognized equivalent.

(e) *Au pair placement.* Sponsors shall secure, prior to the au pair's departure from the home country, a host family placement for each participant. Sponsors shall not:

(1) Place an au pair with a family unless the family has specifically agreed that a parent or other responsible adult will remain in the home for the first three days following the au pair's arrival;

(2) Place an au pair with a family having a child aged less than three months unless a parent or other responsible adult is present in the home;

(3) Place an au pair with a host family having children under the age of two, unless the au pair has at least six months of prior infant child care experience;

(4) Place the au pair with a family unless a written agreement between the au pair and host family outlining the au pair's obligation to provide not more than 45 hours of child care services per week has been signed by both; and

(5) Place the au pair with a family who cannot provide the au pair with a suitable private bedroom.

(f) *Au pair orientation.* In addition to the orientation requirements set forth herein at § 514.10, all sponsors shall provide au pairs, prior to their departure from the home country, with the following information:

(1) A copy of all operating procedures, rules, and regulations, including a grievance process, which govern the au pair's participation in the exchange program;

(2) A detailed profile of the family and community in which the au pair will be placed;

(3) A detailed profile of the educational institutions in the community where the au pair will be placed, including the financial cost of attendance at these institutions; and

(4) A detailed summary of travel arrangements.

(g) *Au pair training.* Sponsors shall provide the au pair participant with child development and child safety instruction, as follows:

(1) Prior to placement with the host family, the au pair participant shall receive not less than eight hours of child safety instruction; and

(2) Prior to placement with the American host family, the au pair participant shall receive not less than twenty-four hours of child development instruction.

DONALD GENTILE

(h) *Host family selection.* Sponsors shall adequately screen all potential host families and at a minimum shall:

   (1)  Require that the host parents are U.S. citizens or legal permanent residents;

   (2)  Require that host parents are fluent in spoken English;

   (3)  Require that all adult family members resident in the home have been personally interviewed by an organizational representative;

   (4)  Require that host parents have successfully passed a background investigation including employment and personal references;

   (5)  Require that the host family has adequate financial resources to undertake hosting obligations; and

   (6)  Provide a written detailed summary of the exchange program and the parameters of their and the au pair's duties, participation, and obligations.

(i) *Host family orientation.* In addition to the requirements set forth at § 514.10, sponsors shall:

   (1)  Inform all host families of the philosophy, rules, and regulations governing the sponsor's exchange program;

   (2)  Provide all selected host families with a copy of Agency-promulgated Exchange Visitor Program regulations;

   (3)  Advise all selected host families of their obligation to attend at least one family day conference to be sponsored by their au pair organization during the course of the placement year. Host [*8553] family attendance at such gathering is a condition of program participation and failure to attend will be grounds for possible termination of their continued or future program participation; and

   (4)  Require that the organization's local counselor responsible for the au pair placement contacts the host family and au pair within forty-eight hours of the au pair's arrival and meets, in person, with the host family and au pair within two weeks of the au pair's arrival at the host family' home.

(j) *Stipend and hours.* Sponsors shall require that au pair participants:

   (1)  Are compensated at a rate of not less than $ 115.00 per week;

   (2)  Do not provide more than a reasonable number of hours of child care on any given day;

   (3)  Receive a minimum of one and a half days off per week in addition to one complete weekend off each month; and

   (4)  Receive two weeks of paid vacation.

(k) *Educational component.* Sponsors shall require that during the period of program participation, all au pair participants are enrolled in an accredited post-secondary institution for not less than six hours of academic credit or its equivalent. As a condition of program participation, host family participants must agree to facilitate the enrollment and attendance of the au pair and to pay the cost of such academic course work in an amount not to exceed $ 500.

(l) *Monitoring.* Sponsors shall fully monitor all au pair exchanges, and at a minimum shall:

   (1)  Require monthly personal contact by the local counselor with each au pair and host family for which the counselor is responsible. Counselors shall maintain a record of this contact;

   (2)  Require quarterly contact by the regional counselor with each au pair and host family for which the counselor is responsible. Counselors shall maintain a record of this contact;

   (3)  Require that all local and regional counselors are appraised of their obligation to report unusual or serious situations or incidents involving either the au pair or host family; and

DONALD GENTILE

 (4) Promptly report to the Agency any incidents involving or alleging a crime of moral turpitude or violence.

(m) *Reporting requirements.* Along with the annual report required by regulations set forth at § 514.17, sponsors shall file with the Agency the following information:

 (1) A summation of the results of an annual survey of all host family and au pair participants regarding satisfaction with the program, its strengths and weaknesses;

 (2) A summation of all complaints regarding host family or au pair participation in the program, specifying the nature of the complaint, its resolution, and whether any unresolved complaints are outstanding;

 (3) A summation of all situations which resulted in the placement of an au pair participant with more than one host family;

 (4) A report by a certified public accountant attesting to the sponsor's compliance with the procedures and reporting requirements set forth in this subpart;

 (5) A report detailing the name of the au pair, his or her host family placement, location, and the names of the local and regional organizational representatives; and

 (6) A complete set of all promotional materials, brochures, or pamphlets distributed to either host family or au pair participants.

(n) *Sanctions.* In addition to the sanctions provisions set forth at § 514.50, the Agency may undertake immediate program revocation procedures upon documented evidence that a sponsor has failed to:

 (1) Comply with the au pair placement requirements set forth in paragraph (e) of this section;

 (2) Satisfy the selection requirements for each individual au pair as set forth in paragraph (d) of this section; and

 (3) Enforce and monitor host family's compliance with the stipend and hours requirements set forth in paragraph (j) of this section.

[FR Doc. 95-3597 Filed 2-14-95; 8:45 am]
BILLING CODE 8230-01-M

# Dates

**DATES:** Effective date: These rules are effective February 15, 1995.

*Applicability dates:* With the exceptions of § 514.31(j) (1) and (4), and § 514.31(k), these rules apply to all au pair placements and operations as of February 15, 1995. The provisions set forth at § 514.31(j) (1) and (4) and § 514.31(k) shall apply only to au pair participants placed after date of publication.

*Compliance date:* Sponsor implementation of the provisions set forth at § 514.31(g) (1) and (2) will not be expected before March 31, 1995.

# Contacts

**FOR FURTHER INFORMATION CONTACT:**
Stanley S. Colvin, Assistant General Counsel, United States Information Agency, 301 4th Street, SW., Washington, DC 20547; Telephone, (202) 619-6829.

FEDERAL REGISTER