1              IN THE UNITED STATES DISTRICT COURT

    2                FOR THE DISTRICT OF COLORADO

    3     Case No. 14-cv-03074-CMA-KMT

    4     ----------------------------------------------------------

    5     JOHANA PAOLA BELTRAN, et al.,

    6        Plaintiffs,

    7     vs.

    8     INTEREXCHANGE, INC., et al.,

    9        Defendants.

   10     ----------------------------------------------------------

   11          Proceedings before KATHLEEN M. TAFOYA, United States

   12     Magistrate Judge, United States District Court for the

   13     District of Colorado, commencing at 9:58 a.m., July 6th,

   14     2015, in the United States Courthouse, Denver, Colorado.

   15     ----------------------------------------------------------

   16          WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

   17     ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED. . .

   18     ----------------------------------------------------------

   19                        APPEARANCES

   20          RANDALL JACKSON, PETER SKINNER, and ALEXANDER HOOD,
          Attorneys at Law, appearing for the Plaintiffs.
   21
               BROOKE COLAIZZI and ERICA GUTHERZ, Attorneys at Law,
   22     appearing for InterExchange, Inc.

   23          WILLIAM KELLY, Attorney at Law, appearing for US
          AuPair, Inc.
   24     ----------------------------------------------------------

   25                     SCHEDULING CONFERENCE


          AVERY/WOODS REPORTING SERVICE, INC. (303) 825-6119

 1        APPEARANCES, CONT.

 2        MESHACH RHOADES and MARTIN ESTEVAO, Attorneys at Law,
          appearing for GreatAuPair, LLC.
 3
          BOGDAN ENICA, Attorney at Law, appearing for Expert Group
 4        International, Inc.

 5        KATHRYN BARRETT and MARTHA FITZGERALD, Attorneys at Law,
          appearing for EuRaupair Intercultural Child Care.
 6
          JAMES HARTLEY and MHER HARTOONIAN, Attorneys at Law,
 7        appearing for Cultural Homestay International.

 8        JEFFREY ALLEN and WALTER SIEBERT, Attorneys at Law,
          appearing for Cultural Care, Inc.
 9
          JOHN MANN, Attorney at Law, appearing for AuPair Care,
10        Inc.

11        KATHRYN REILLY and TOREN MUSHOVIC, Attorneys at Law,
          appearing for Au Pair International, Inc. and American
12        Cultural Exchange.

13        LAWRENCE LEE and DANIEL PARKINS, Attorneys at Law,
          appearing for APF Global Exchange, NFP and American
14        Institute for Foreign Study.

15        LAWRENCE STONE, Attorney at Law, appearing via telephone
          for A.P.E.X. American Professional Exchange, LLC and
16        20/20 Care Exchange, Inc.
          ----------------------------------------------------------
17                      P R O C E E D I N G S

18           (Whereupon, the within electronically recorded

19        proceedings are herein transcribed, pursuant to order of

20        counsel.)

21           COURTROOM DEPUTY:  All rise.  Court is in

22        session.

23           THE COURT:  Morning, everyone.  Please be seated.

24        We are here today in Civil Action Number 14-cv-3074.

25        This is a action that comes before us today for a


          AVERY/WOODS REPORTING SERVICE, INC. (303) 825-6119

1     scheduling conference and/or consideration -- well, we

2     are going to consider Documents Number 160, 162, and 164

3     and also 166, which was a joinder in the motions for

4     protective order and stay.

5          But first I need appearances.  So the plaintiffs

6     in this matter are Johana Paola Beltran, Lusapho -- is it

7     Hlatshaneni?  Is that even close?

8          MR. JACKSON:  It's close enough, Your Honor.

9          THE COURT:  All right.  So that you know who I'm

10    talking about at least.  Right?  Okay.  Beaudette

11    Deetlefs and Dayanna Paola Cardenas -- is it Caicedo?

12          MR. JACKSON:  Yes, Your Honor.

13          THE COURT:  So may I have appearances for

14    plaintiffs?

15          MR. JACKSON:  Your Honor, Randall Jackson on

16    behalf of the plaintiffs.

17          MR. SKINNER:  Peter Skinner on behalf of the

18    plaintiffs.  I will note that Mr. Jackson and I are from

19    the firm of Boies Schiller and Flexner.  As of two weeks

20    ago, we have filed notices of appearance on behalf of two

21    of the five named plaintiffs.  And as of yesterday, we've

22    now filed notices of appearance on behalf of all five

23    named plaintiffs.

24          THE COURT:  Okay.  I have three on my list.  Am I

25    missing one?  I have four plaintiffs or five?

```
 1              MR. JACKSON:  There are five, Your Honor.

 2    Ms. Beltran, Ms. Shaneni (sic) -- you missed

 3    Ms. Gonzales, Alexandra Ivette Gonzales.  She's the fifth

 4    plaintiff on the amended complaint.

 5              THE COURT:  Is that showing up on our docket,

 6    Ms. Grimm?  Maybe we ought to --

 7              COURTROOM DEPUTY:  It is, yeah.

 8              THE COURT:  Okay.  We just missed it on --

 9              COURTROOM DEPUTY:  We'll get that added on our

10    (inaudible).

11              THE COURT:  All right.  So now you're

12    representing all five?

13              MR. JACKSON:  We are, Your Honor.

14              THE COURT:  All right.  And I have all five.  So

15    that's good.

16              MR. HOOD:  Your Honor, Alexander Hood for the

17    plaintiffs from Towards Justice.

18              THE COURT:  All right.  And then I have a number

19    of defendants here.  Now, the Noonans are no longer part

20    of this case?

21              MR. JACKSON:  That's right, Your Honor.  They've

22    been dismissed.

23              THE COURT:  All right.  So let me have -- I'll

24    try to just go down the list here -- appearances for

25    InterExchange, Inc.
```

```
 1            MS. COLAIZZI:  Brooke Colaizzi of Sherman and
 2      Howard on behalf of InterExchange, Your Honor.
 3            THE COURT:  And is it Erica Gutierrez?
 4            MS. GUTHERZ:  Erica Guthrez.
 5            THE COURT:  All right.  And for US AuPair?
 6            MR. KELLY:  William Kelly from Kelly and Walker.
 7            THE COURT:  Okay.  And GreatAuPair, LLC?
 8            MS. RHOADES:  Yes, Your Honor, Meshach Rhoades of
 9      Greenberg Traurig and (inaudible).
10            THE COURT:  Okay.  And Expert Group
11      International?  And that's -- their d/b/a Expert AuPair?
12            MR. ENICA:  Yes, Your Honor, Bogdan Enica on
13      behalf of Expert AuPair.
14            THE COURT:  EuRaupair Intercultural Childcare?
15            MS. BARRETT:  Yes, Your Honor, Kathryn Barrett
16      and Martha Fitzgerald from Brownstein Hyatt.
17            THE COURT:  Cultural Homestay International?
18            MR. HARTLEY:  Good morning, Your Honor, James
19      Hartley and Mher Hartoonian from Holland and Hart.
20            THE COURT:  Morning.  Cultural Care, Inc., d/b/a
21      Cultural Care Au Pair?
22            MR. ALLEN:  Jeffrey Allen from the law firm of
23      Lawson and Weitzen and also with me is Walter Siebert
24      from Sherman and Howard.
25            THE COURT:  Okay.  AuPairCare, Inc?
```

```
 1                MR. MANN:  John R. Mann, Gordon and Rees, LLP for

 2       AuPair, Inc.

 3                THE COURT:  And Au Pair International, Inc.?

 4                MS. REILLY:  Good morning, Your Honor.  Katie

 5       Reilly with Wheeler Trigg O'Donnell.  And I'm here with

 6       my colleague, Toren Mushovic.

 7                THE COURT:  Way in the back there can you hear

 8       us?

 9                MR. MUSHOVIC:  I sure can, ma'am.

10                THE COURT:  Okay.  APF Local Exchange NFP doing

11       business as AuPair Foundation?

12                MR. LEE:  Lawrence Lee and Daniel Perkins from

13       Fisher and Phillips on behalf of APF and also the next

14       listed defendant, Your Honor, American Institute for

15       Foreign Study.

16                THE COURT:  All right.  And their d/b/a Au Pair

17       in America.  Right?

18                MR. LEE:  Yes.

19                THE COURT:  And then I don't have anyone on my

20       list here for Associates In Cultural Exchange.  That may

21       be d/b/a GoAuPair.  No?  What's --

22                MS. REILLY:  Your Honor, we represent the next

23       defendant American Cultural Exchange, LLC d/b/a Go AuPair

24       but do not have any relationship with the prior GoAuPair.

25                THE COURT:  Oh, okay.  So there's two GoAuPairs.
```

1           MR. JACKSON:  Your Honor, that first defendant

2     you mentioned has actually been dismissed.

3           THE COURT:  Oh, okay.  We'll take that out of the

4     caption then.  All right.  I have the appearances then

5     for American Cultural Exchange, LLC d/b/a GoAuPair.  And

6     Agent AuPair, that's you two?

7           MS. REILLY:  That's me and Mr. Mushovic as well.

8           THE COURT:  All right.  And A.P.E.X. American

9     Professional Exchange?

10          MR. STONE:  Lawrence P. Stone appearing by

11    telephone with the law firm of Dufford and Brown

12    appearing on behalf of A.P.E.X. American Professional

13    Exchange.

14          THE COURT:  All right.  And then how about 20/20

15    Care Exchange d/b/a The International Au Pair Exchange?

16          MR. STONE:  Yes, Your Honor, Lawrence P. Stone

17    again appearing on behalf of 20/20 Care Exchange.

18          THE COURT:  Okay.  So I think we have everybody

19    then.  Anybody that I missed?  All right.  Well, you have

20    all been juggled around with judges, I think, when you

21    first filed this case.  I saw that I was -- I think I'm

22    third on the list.  So too bad for you, but I think

23    you'll end up here.

24          I think what we ought to do before we get into

25    the scheduling order, there are a few things I wanted to

1    talk to you about in the scheduling order regardless of

2    the outcome of the protective order.  But I'm leaning

3    towards thinking that this case really ought to be stayed

4    pending ruling on the motions to dismiss.

5         Basically, you know, under the teachings of the

6    Supreme Court cases, and also it seems to fit with the

7    String Cheese incident factors that we look for.  But

8    Twombly itself I think was an antitrust case.  And there

9    just seems to be a huge amount of discovery that's going

10   to be needed in this case, and I'm not sure that the

11   motions to dismiss will resolve everything.  I know

12   they've been referred to me.  I have not really looked at

13   them with any great depth yet, but I just can't envision

14   going forward without knowing about the ruling on some of

15   these threshold issues.

16        But I didn't want to do that in a vacuum.  So I

17   wanted to give plaintiffs a chance to argue this if you

18   want to.  I did read your brief, and I understand where

19   you're coming from.  But, you know, with this 20 years

20   worth of discovery for some of the things you're

21   requesting, it just seems to me to be a monumental task.

22   Do you have anything you want to add to that?

23        MR. JACKSON:  Your Honor, we would just

24   emphasize, first of all, that as we set out in our

25   application -- and we appreciate the Court giving us a

1     preview of its thinking.  First, we think that the

2     defendants' estimation of what the discovery burden is

3     going be in this case is why we (inaudible) stay.  There

4     are allegations -- and as we stress in our -- as we

5     stress in our submission, these allegations have almost

6     no detail attached to it in their application.  There are

7     allegations and millions of responses that would be

8     required (inaudible) pages of responses and hundreds and

9     hundreds of interrogatories.

10    What's happened so far is we've made a very

11    limited discovery request.  And the burden, as this Court

12    has repeatedly stated, is on the defendants to

13    demonstrate not with just generalities about, you know,

14    numbers of pages and the fact that there's a motion to

15    dismiss pending, but they have a real burden to

16    demonstrate that there is a serious burden that they're

17    going to face with regard to discovery.

18    And in this case, Your Honor, we respectfully

19    submit if you look at their pleadings, they have not done

20    that; that simply setting out the number of pages that

21    they have of discovery is not enough.  We have no

22    discussion of whether or not these are electronic

23    records, no discussion of how much it's already been

24    indexed, no explanation as to how they get to their

25    conclusions about the breadth of our discovery request,

10

```
1     which from our position is not that -- is not

2     extraordinarily wide.

3              And we would just stress, Your Honor, that this

4     Court has repeatedly stated that the nature of -- has

5     repeatedly made clear -- and this is really the point of

6     String Cheese -- is that we're not really at this stage

7     supposed to be getting into the question of the substance

8     of the motions to dismiss so much as we are supposed to

9     be looking at the factors that are set out in the String

10    Cheese case.

11             And the most important of those, the first one,

12    is the burden -- I'm sorry, the potential prejudice to

13    the plaintiffs here.  And we would just stress, Your

14    Honor, that this case is very different from many of the

15    other cases that are alluded to in the defendants' briefs

16    because there is an ongoing harm to a very vulnerable

17    class of plaintiffs that is going to continue to go on as

18    long as this case is pending.

19             And from the perspective of the plaintiffs -- and

20    we think it's the reasonable perspective -- it does not

21    make sense to wait whatever amount of time is going to be

22    necessary for the Court to appropriately consider the

23    complex arguments that the defendants have set out in

24    their motions to dismiss and waste that time when we

25    could be proceeding in a fair but expeditious way through
```

1        discovery.

2              And this is particularly true because in this

3        case there is no -- one of the things that the courts

4        have said in this district repeatedly is that this is

5        really only something that we should be staying when we

6        have a qualified immunity situation or we have -- where

7        we have qualified immunity or jurisdictional arguments.

8        And in their replies to our motion -- to our response not

9        one of the defendants can set out that they have some

10       sort of qualified immunity or jurisdictional response.

11             And the reason that the courts have stated that

12       these are the only two real exceptions to the presumption

13       against staying discovery in this case is because those

14       are the only situations where you can take a look at the

15       pleadings and say right off the bat that this is likely

16       to be something that's going to be dismissed.

17             And moreover, in the situation of a qualified

18       immunity defense, you have governed hackers usually who

19       are, you know, particularly susceptible to a number of

20       different suits.  And we have a number of different

21       concerns that justify the qualified immunity that Your

22       Honor is completely familiar with.  But the point is

23       neither one of those is present here.  None of the

24       defendants are saying that there is a basis for getting

25       rid of all the claims on jurisdictional or qualified

1        immunity basis.

2              So if we go back to what this Court has said

3        about why we shouldn't stay cases in this situation --

4        outside of those situations normally, we're back in the

5        situation of looking at this case and asking ourselves:

6        Is this an extraordinary burden to the defendants, or is

7        this a normal discovery burden that's going to accompany

8        a civil case?

9              There is -- the Rules of Civil Procedure expect

10       exactly that situation.  There's going to be some burden

11       to discovery where plaintiffs are able to state a claim.

12       And here we are able to state a claim, and the Court

13       should not be put in the position of being required to

14       essentially pre-adjudicate a motion to dismiss before we

15       go forward with discovery.

16             And I would just stress this point, Your Honor.

17       It's a point we made in our brief, but I think it's very

18       important.  If the Court rules that simply because of the

19       complexity of the defendants' motions to dismiss that

20       discovery should be stayed, this is going to incentivize

21       defendants to repeatedly make as complex a motion to

22       dismiss as possible knowing that this is going to create

23       a situation where they can indefinitely stay discovery.

24       And the more complexity of the motion, the longer they'll

25       be able to stay discovery, the longer they'll be able to

1     continue with the ongoing harm that is the first String

2     Cheese factor that we focus on in our brief.

3          And, Your Honor, I think the decisions of this

4     Court that we set out in our brief would say that you're

5     not supposed to be doing that go right to that concern,

6     go right to the idea that we shouldn't just let

7     defendants file extraordinarily complex motions to

8     dismiss and use that as a wedge against completing

9     discovery or even beginning discovery.  That's not what

10    was intended by the Rules of Civil Procedure.  It's not

11    what's intended by the precedence of this Court.

12         And we'd ask Your Honor to take a look at that

13    and to hold the defendants to their burden to demonstrate

14    not just that it's going to inconvenience them, but that

15    they have a real and serious burden that is

16    extraordinary.  And moreover, that there's some reasons

17    for us to step away from what this Court has repeatedly

18    said, which is that if it's not qualified immunity and

19    it's not jurisdictional, we shouldn't be staying

20    discovery.

21         THE COURT:  Well, I don't think that's exactly

22    what the Court said.  What the Court said is that for

23    qualified immunity and jurisdictional reasons the Court

24    may not have the opportunity to ever go forward with the

25    case even if the plaintiff has stated a claim.  For

14

1    instance, police officer.  Qualified immunity is such

2    that if you -- if you're found to have qualified

3    immunity, you're not going to go through the burdens of

4    discovery ever.  Right?  It's just not going to happen.

5    With jurisdictional discovery, the court might not have

6    jurisdiction over the case.  So anything that you do is

7    superfluous because you don't have any jurisdiction.  So

8    those are cases where a stay is kind of the presumed

9    factor.

10           Otherwise, all other cases, including this one,

11   then get analyzed under the String Cheese factors because

12   that's where you analyze is it in an individual case

13   appropriate?  Right?  So you set those jurisdictional and

14   qualified immunity things aside.  And then you talk

15   about, okay, is it appropriate in this case anyway, you

16   know, with the presumption that it's not.  The

17   presumption is you're going forward.

18           MR. JACKSON:  I think that's right, Your Honor.

19   And certainly we weren't trying to suggest it would be

20   impossible for the Court to ever conclude under the

21   String Cheese factors that there were cases beyond the

22   qualified immunity or jurisdictional area where a stay

23   might be appropriate.  But I think that the Court -- we

24   respectfully argue, Your Honor, that the courts

25   essentially think -- that the courts -- these decisions

1    say something just a little bit stronger.

2            What they're saying is that qualified immunity

3    and jurisdiction, like Your Honor said, clearly create

4    this extraordinarily strong presumption against staying.

5    But this all points to that make -- the fact that there

6    is the strong presumption against a stay unless you can

7    look at the case and say this is the type of case that

8    for some reason belongs outside of the exceptions that

9    are created there.

10           When you look at the String Cheese factors, it's

11    not a situation where after you determine it's not a

12    qualified immunity case, it's not a jurisdictional case,

13    that you -- you know, there's some sort of shift

14    backwards.  I think that the burden becomes even higher

15    in a sense.  And in this case there are no particulars in

16    their submissions about what the specific nature of the

17    burden is.

18           They've only set out a number of pages, which,

19    Your Honor, we would point out suggests that they've

20    already done some significant indexing.  I mean, the

21    precision with which the numbers that are utilized in

22    some of the defendants' briefs suggests that we may be

23    dealing with electronic records.  We may be dealing with

24    already indexed information.  It doesn't really matter

25    because the burden was on them to set out not just that

16

 1    there's going to be some inconvenience, but that is going

 2    to be an extraordinary situation.

 3           And in our situation we've pointed to the

 4    extraordinary burden on the plaintiffs because of the

 5    ongoing violation that is occurring with regard to wages.

 6    I mean, this is something -- when you're talking about a

 7    vulnerable class of individuals, it goes right to the

 8    heart of what I think the Court should be concerned about

 9    when we're talking about a vulnerable class of people who

10    have an ongoing harm to them.

11           And the only response in the replies is, well,

12    you know, at the end of the case there can be monetary

13    damages that will address, you know, whatever has

14    occurred.  But these are people who -- I think that any

15    delay -- and I think these are complexed motions that the

16    defendants have set out.  They're very complex motions.

17    The Court is going to be required to take some time to

18    consider them.

19           And the potential significant delay is a serious

20    prejudice to the plaintiffs.  On the other side they

21    haven't demonstrated anything other than a regular

22    burden.  The burden that they've described is exactly the

23    burden that every single defendant who files a motion to

24    dismiss would argue.

25           THE COURT:  But as for your plaintiffs, money

17

```
1    damages is what you're seeking, and money damages is what

2    fixes the problem.  You know, it's not like you've got a

3    prisoner who's being denied medical care, for instance.

4    That's an ongoing problem.  You know, he could die while

5    waiting.  That's not a monetary problem.  That's a more

6    serious problem really.

7         Your plaintiffs -- and I'm not saying that

8    they -- that it isn't serious.  I'm just saying money

9    fixes that.  Right?  That's what you want for them, and

10   that fixes it.  And if you win, that's what you get.  And

11   you don't lose it by not going forward right now.

12        MR. JACKSON:  Well, Your Honor, money will

13   address it in the end.  But in the meantime you have

14   people who are operating in a situation where they're

15   making less than what is the minimum wage.  They're

16   making less than what's necessary.

17        THE COURT:  Right.  But if you win, that gets

18   fixed with money.  Right?  And at this point their --

19   they voluntarily entered into this situation.  I don't

20   think there's any way this case will get tried within a

21   year, which you -- I think you set out in your papers

22   that a lot of the au pairs, if not all of them, are here

23   for a year.  If they started today, this case isn't going

24   to be over by the time it's time for them to go home.

25        So all of those things are -- speeding it up
```

AVERY/WOODS REPORTING SERVICE, INC. (303) 825-6119

1    unnecessarily is not going to fix your problem.  I

2    understand plaintiffs always want to go forward and get

3    some acceleration, and I understand the need for that.

4    You wouldn't have brought a lawsuit if you didn't think

5    so.  But that seems to me to be unextraordinary.  Right?

6    It's the normal thing.

7         I'm not being treated fairly.  I'm not getting

8    the money that I need.  In any employment situation,

9    these are the employment cases -- this is a big one.  But

10    this is the employment situation we see all the time.

11    Fix this.  Give me my backpay, and start paying me

12    correctly.  There's no difference from you and the single

13    guy who says, "I didn't get the promotion."

14         MR. JACKSON:  Your Honor, can I -- can I briefly

15    defer to my colleague also for one additional point that

16    we wanted to make with regard to that?

17         MR. SKINNER:  Well, one other harm that we have,

18    Your Honor, is the fact that the statute of limitations

19    on the FLSA claims is running until the plaintiffs opted.

20    So if we stay discovery, we have nothing going on in this

21    case until after the motions to dismiss are resolved.  We

22    have a whole large number of plaintiffs who potentially

23    may be excluded from pursuing those claims under the

24    statute of limitations.

25         And just to amplify something Mr. Jackson was

 1      saying, money may ultimately repair some of these

 2      damages.  But let's not forget what we're talking about.

 3      In addition to the antitrust and the labor claims are

 4      fraud claims.  We have a class of plaintiffs out there

 5      who are young, vulnerable people coming from foreign

 6      lands into the United States who are being lied to about

 7      what they're entitled to receive as far as monetary

 8      compensation goes.

 9           And we may not find a lot of them in the future,

10      and they may never be able to address their harm.  And we

11      may not be able to rectify whatever other atmospheric

12      harm there is to an individual who comes in and works

13      with a family over a course of a year and is lied to

14      virtually every month when they receive their pay with

15      respect to what they're entitled to.

16           THE COURT:  All right.  Well, I'm glad you

17      brought that up because I did remember when I was reading

18      that there is that running of the time frame.  So there

19      is some harm here.

20           MR. ALLEN:  Well, Your Honor, we have agreed --

21      Jeffrey Allen.  I think I speak for all defendants in

22      this regard -- that we have agreed to toll -- if a stay

23      is granted, to toll the statute of limitations on the

24      FLSA cases so that that would not be a harm that would

25      fall to the plaintiffs.  So we don't believe that is an

     1          issue.

     2               I am also prepared, if Your Honor wishes, to

     3          address the stay in its entirety.  But years of

     4          experience has taught me not to try to snatch victory --

     5          defeat from the jaws of victory.  So if Your Honor is so

     6          inclined to grant the stay, I will pass.  But I would

     7          just say two quick points, and then I can go through my

     8          entire presentation that I prepared.

     9               But we do have a qualified immunity defense here,

    10          and that is the federal instrumentality immunity under

    11          the -- to the antitrust action, and to the labor-type

    12          actions we have a defense that's akin to jurisdictional

    13          in the federal preemption that this Court doesn't really

    14          have the right to go into what is a congressional mandate

    15          here.  So I do believe we have those two defenses.  But

    16          even as Your Honor pointed out, we don't need those two

    17          defenses.

    18               I think we have an index to discovery.  It's very

    19          easy to figure out what we need.  Each au pair and each

    20          home family combined counsel 40 pages of documents in

    21          their applications.  And if we multiply that times a

    22          number of au pairs in any given year, we can estimate the

    23          number of documents and add in the number of e-mails and

    24          so forth.  So we haven't indexed it.  We're not prepared

    25          for discovery.  As I said, I can go through my

1       presentation to you.

2               But I do think at the outset there's one -- two

3       things I would like to add, is there's a fundamental

4       problem with this case, the plaintiffs' case that is

5       going to appear throughout in the motion to stay, in the

6       motion to dismiss, wherever this case goes.  And that is

7       a federal exchange program in which the defendant -- the

8       plaintiffs have come to this court trying to advocate

9       that it's some sort of a labor program.  It's not a labor

10      program.  It's an exchange program created under the

11      Fulbright Act for exchange to affect the foreign

12      relations of the United States.  And that fundamental

13      mischaracterization by the plaintiffs will affect every

14      step of the way.

15              For instance, you've heard at least five times

16      this morning that these au pairs are receiving an illegal

17      wage.  Nothing can be further from the truth.  The

18      federal regulation -- the federal regulation specifically

19      says the au pairs will be compensated at a weekly rate

20      based upon 45 hours of childcare service per week and

21      paid in conformance with the requirements of the Fair

22      Labor Standards Act as interpreted and implemented by the

23      United States Department of Labor.

24              The United States Department of Labor officially

25      issued an order that the au pair -- that the au pair

AVERY/WOODS REPORTING SERVICE, INC. (303) 825-6119

1    stipend is based on the U.S. Department of Labor formula

2    that includes credit for the room and board host families

3    provide for their au pair.  The room and board credit

4    currently is at 40 percent of an au pair's credited

5    compensation.  Thus starting on July 24th, 2009 the

6    stipend was set at 195.75.

7            And it's interesting to say that -- the

8    regulation doesn't say that's a minimum.  It says what

9    the stipend is.  So this allegation that affects this

10   case that there's some sort of conspiracy to deprive

11   these exchange visits, because that's what they are, with

12   some sort of illegal compensation is contrary to the

13   regulations and the orders of the Department of Labor.

14           THE COURT:  Well, I understand that, and I don't

15   want to cut you short --

16           MR. ALLEN:  No, no.

17           THE COURT:  -- because this is kind of our first

18   hearing, but you're arguing the motions to dismiss now.

19           MR. ALLEN:  Yes.  And I didn't --

20           THE COURT:  I really want to talk to you about

21   the stay.

22           MR. ALLEN:  Okay.  Because I just didn't want --

23           THE COURT:  And --

24           MR. ALLEN:  -- that aura of some illegality to

25   penetrate this case at this first hearing.


AVERY/WOODS REPORTING SERVICE, INC. (303) 825-6119

1          THE COURT:  Well, I understand the fluff, and I

2     can disregard that part of it.  I understand what the

3     plaintiffs' allegations are and what your defenses are to

4     some extent.  But what I need to know from you is what

5     you're talking about when you say you agree to toll the

6     (inaudible).  Are you agreeing to a number of days to be

7     tolled between, for instance, today and the ruling on the

8     motion to dismiss?  Are you agreeing to something else?

9          MS. COLAIZZI:  Your Honor, Brooke Colaizzi on --

10          MR. ALLEN:  Rather than have her whisper to me,

11     she's taking the lead on that issue.  So I'll defer to

12     her.

13          MS. COLAIZZI:  Brooke Colaizzi on behalf of

14     InterExchange.  We will agree to toll the statute of

15     limitations on the FLSA collective action claims from the

16     date of enter of today's order until the date of this

17     Court's order on the motions to dismiss.

18          THE COURT:  Okay.  Now, you understand, right,

19     how this works where what I do is not going to be an

20     order?  It's going to be a recommendation.  And so that

21     was the other thing that I wanted to talk to all of you

22     about, is what to do about that.  Now, once you have a

23     recommendation, I think the complexion of the case

24     changes because you have at least one judge who has sat

25     and thought about it and looked at it and decided one way

1     or the other.

2            But my ruling is not final.  So if I, for

3     instance, think that the case ought to be dismissed,

4     you're not dismissed.  Right?  You're still going forward

5     until Judge Arguello has a chance to look at it.  And

6     while Judge Arguello is very fast, all things considered,

7     all things considered.  Right?  It's still federal court.

8     And it's, you know, still going to take a while.

9            So we need to know what to do about the point

10    where I make a recommendation, should we readdress

11    discovery at that point if the recommendation -- well,

12    regardless of what the recommendation is?  And then are

13    you agreeing to toll until Judge Arguello's final ruling?

14           MS. COLAIZZI:  On behalf --

15           THE COURT:  Or should we take that up then?

16           MS. COLAIZZI:  On behalf of InterExchange I would

17    not object to tolling until we receive the final order

18    from Judge Arguello.  I would not purport to speak on

19    behalf of all my colleagues with respect to that point.

20    But on behalf of InterExchange we would agree to toll

21    until the final order.

22           MR. ALLEN:  I would agree on behalf of Cultural

23    Care also, Your Honor.

24           MS. REILLY:  Your Honor, Katie Reilly on behalf

25    of Au Pair International, Inc., American Cultural

AVERY/WOODS REPORTING SERVICE, INC. (303) 825-6119

```
1      Exchange, and Agent Au Pair.  And I would suggest that we
2      would toll until your ruling, the recommendation.  And
3      then we would revisit the issue at a status conference.
4      Because if, for example, the motion -- in the event that
5      the motions to dismiss are denied and discovery proceeds,
6      we would not want the tolling to go on.  So I would
7      suggest that in -- on behalf of my clients propose that
8      we toll only through the date of the status conference
9      following the issuance of your recommendation.
10          THE COURT:  Okay.  So are either one of you, are
11     you -- what you're really saying is the number of days.
12     Right?  So we would count the number of days from now
13     until either the recommendation or now and the order, and
14     that would be added to the time that you could go back.
15     I mean, that actually gives you -- you know, talk about
16     nonprejudicial.  That gives you extra time.  Right?
17     Because normally you don't get the date -- the cut-off
18     date is not today.  It's down the road.  Right?
19          MR. SKINNER:  Well, the cutoff date, Your Honor,
20     is when an individual opts in.
21          THE COURT:  Right.  And they're not going to opt
22     in until they get notice.
23          MR. SKINNER:  No.  That's right.  That's why
24     we're trying to figure out logistically how this would
25     work.  I think if you're adding the days -- I don't know
```

AVERY/WOODS REPORTING SERVICE, INC. (303) 825-6119

```
 1        if we're any better off than we would be otherwise.  But
 2        it would be at least addressing the prejudice on that
 3        point.  We can come back and revisit this again at the
 4        time that the motion to dismiss is resolved.  But if
 5        I'm -- if the defendants are going to seek a stay, even
 6        if they lose on the motion to dismiss during the time
 7        that they seek an appeal to the district court judge,
 8        then, of course, a tolling should continue during that
 9        period of time.  The tolling should correspond to however
10        long the stay is going on.
11            THE COURT:  Well, I guess what I'm trying to
12        decide is do we just say that no matter what, if you get
13        to the time of a class, today's the day, you know?  We go
14        back to today.  And any person who is employed as an au
15        pair as of today would be included?
16            MR. SKINNER:  Well, we should be able to
17        include -- no, but we should also be able to include
18        folks that are coming into the country and have been
19        added since the amended complaint was filed back in
20        April.  I mean, there's no reason why we shouldn't be
21        able to have those plaintiffs in the class as well.  So I
22        don't think today should serve as a cutoff.  I think the
23        statute of limitations period is what it is.  And under a
24        tolling agreement you're essentially adding the periods
25        of the toll time period to that statute of limitations.
```

1          THE COURT:  Okay.  That's what I was asking.

2          MR. SKINNER:  That's how I see it unless defense

3     counsel think we're missing something.

4          THE COURT:  That seems like the best way thinking

5     of it kind of offhand, is to take the number of days,

6     which we don't know what that will be.  But I can tell

7     you it won't be 30, for instance.  But add that number of

8     days at least to the recommendation or to the date of the

9     status conference that may have -- I'll set -- whenever I

10    do the recommendation, we'll put a status conference date

11    in there.  And then we can discuss anything further.

12         Because I think it makes a difference on what the

13    ruling is whether or not we go forward with discovery.

14    For instance, if the Court says I recommend that the

15    motions to dismiss be denied, it seems to me logical to

16    go forward.  Now, I would certainly listen to argument

17    that we shouldn't go forward, but that's what I would be

18    thinking.

19         MR. SKINNER:  And we would agree with that.  Your

20    Honor, I'll just note too this addresses one discrete

21    concrete harm to the plaintiffs of entering a toll --

22    entering into a stay of discovery pending resolution of

23    the motions to dismiss.  But if the Court were inclined

24    to stay discovery, as the Court as said it is, we think

25    that a limited stay would be preferable to a blanked stay

1       of all discovery.

2              I mean, the motions to dismiss I think are going

3       to take a fair amount of time to resolve.  I mean, maybe

4       I'm overestimating things.  But I think we can

5       realistically say that by the time we file our briefs on

6       Friday, defense attorneys have two weeks to file their

7       replies.  I would hazard a guess they're going to be

8       asking for some more time on that.  They're going to get

9       some more time because we're going to grant them the

10      professional courtesy of doing so.

11             It's not going to be fully briefed until sometime

12      in August, perhaps even the beginning of September

13      because August schedules always involve vacations.  And

14      then it's going to take the Court a fair amount of time

15      to resolve what are lengthy well-briefed motions to

16      dismiss.  I think we're looking at potentially staying

17      all discovery in this case for somewhere in the range of

18      nine months to a year by the time the district court

19      judge ultimately resolves the issues.

20             And there's really in our minds no reason why we

21      can't be using that time to our advantage to be moving

22      this case forward in some limited aspect without unduly

23      burdening the defendants and by some limited aspect so

24      that the time is not just lost and so that our

25      plaintiffs, who have been harmed in the event that we

1    survive the motion to dismiss and ultimately prevail on

2    the merits -- so that our plaintiffs don't have to wait

3    that much longer in order to get equal redress here.

4         There are issues of discovery that we can cover

5    with respect to the class certification that are very

6    straight forward just with respect to identifying names

7    and addresses of au pairs who are employed by the

8    defendants so that we can start reaching out to them and

9    notify them of the lawsuit so that they understand what's

10   going on.  And they can start considering whether or not

11   to opt in in the event we get to the point of moving for

12   class certification.

13        The defendants have outlined in their Phase 1

14   Discovery a number of discrete areas that they feel

15   are -- discovery will be needed first in order to resolve

16   substantive issues in this case.  And we can proceed on

17   those discrete areas while the motions to dismiss are

18   pending.  But while we understand the rationale of

19   limiting what they have to do while the motions are

20   pending, it seems to us that it's unfair to the

21   plaintiffs to ask them to wait a really long time until

22   they begin to try to move this case forward.  And we're

23   going to lose a substantial chunk of time if we just have

24   a blanked stay.

25        There has to be some course we can strike in the

```
 1    middle that's going to be able to address a burden to

 2    them that, as Mr. Jackson explained, we really don't feel

 3    they've satisfied but nevertheless to address whatever

 4    burden there is to them, while giving up something so

 5    that we can be making use of this time and moving this

 6    case forward.

 7         MR. ALLEN:  Your Honor, that is not limited.

 8    We're talking about 25 years of au pairs currently at

 9    7,000, 8,000 a year.  Certainly, it was less in the

10    beginning.  And certainly for a good period of that paper

11    records.  That's a significant undertaking, which the

12    plaintiffs suggested to this Court is minimal.  And if,

13    in fact, our motions to dismiss are allowed, it will be a

14    waste of significant resources, very significant

15    resources.

16         And I don't see any reason why, with all do

17    respect to the Court's schedule, that nine months for

18    Your Honor's recommended ruling would occur.  And then as

19    Your Honor mentioned, dependent on your recommendation,

20    we may have to revisit the stay.  And I think that makes

21    perfect sense.

22         But this issue on discovery realistically -- this

23    case was brought in November.  We're here in July.

24    This -- so what is that, ten months, nine months?  This

25    case -- and all of that nine-month delay really is
```

1     attributable to the plaintiffs' actions in an amended

2     complaint at the last second, three extensions to motion

3     to respond to the second motion to dismiss.

4          This -- Your Honor's recommended ruling -- and

5     depending on Your Honor's schedule -- I think we will

6     have in much probably half the time of nine months.  I

7     expect this matter to be fully briefed by the first or

8     second week in August at the latest.  There's no reason

9     why sometime in the fall, even with vacations, that we

10    will have the benefit of Your Honor's wisdom on the

11    motions to dismiss.  And based on that we can come back

12    here and revisit this issue.  So it will take that long

13    and longer to begin to assemble what the plaintiffs

14    suggest is a minimal effort.  It's a substantial effort.

15         THE COURT:  What if -- what if your Phase 1

16    Discovery was limited in time just for now?  I'm not

17    saying that I would limit you -- I don't really

18    understand why you want 25 years worth of information

19    anyway given the statute of limitations, but let's not

20    argue that today.  But what if you were doing the last

21    five years, the most recent five years, or the most

22    recent three years or something like that?

23         MR. ALLEN:  For my part we're still probably

24    talking if we did five years searching 35,000 records for

25    last-known foreign addresses.

AVERY/WOODS REPORTING SERVICE, INC. (303) 825-6119

```
 1          THE COURT:  Right.  But most of them will be
 2     electronic.
 3          MR. ALLEN:  Most of them will be, but I'm the
 4     largest sponsor.  I would like to defer a minute to my
 5     colleague, who represents -- Mr. Hartley, who represents
 6     one of the smallest sponsors.  Because I think -- one of
 7     the problems I think in this case is the discovery in and
 8     of itself may be the death now for parts of this program.
 9     And that would be a shame if parts of this program that
10     have been so beneficial over the years would be -- wreck
11     havoc on it by virtue of discovery.  But I would defer to
12     my colleague.
13          MR. HARTLEY:  Morning, Your Honor.  James Hartley
14     on behalf of Cultural Homestay International.  And I
15     think we need to keep track of one important point in
16     this case, and that is not all the defendants are
17     similarly situated.  It may not been obvious to you from
18     reading the complaint or from reading any of the papers
19     that have been provided.  But there are -- I think it's
20     nine or ten of the defendants -- 11 of the defendants who
21     I would call smaller companies, smaller sponsors, who I
22     would characterize as one-claim defendants.  They are
23     defendants only on the antitrust claim.  That will have a
24     significant bearing both on the motion to stay and on the
25     motion to dismiss because the two go together.
```

1           The other defendants, four of them, correspond to

2     the sponsoring organizations for the four named -- four

3     or five named plaintiffs -- five named plaintiffs.  And

4     they have been sued on the panoply of FLSA and other

5     employment claims.  So there's a dramatic difference in

6     the exposure, if you will, in terms of the number of

7     claims and the like for 11 of the smaller defendants

8     versus the other four who are named in the employment

9     claim.  So that's Point Number 1.

10          Point Number 2 is that think about an au pair

11    agency.  Common sense tells us that many of these are

12    home office, one- or two-employee organizations quite

13    literally.  Sure, they have some contractual arrangements

14    around the country so they can keep track of their au

15    pairs who might have been placed outside of the home

16    city.  But these are very small organizations for whom

17    quite literally there's a discovery burden in this case

18    and proved to be a death now.

19          Only segue to that burdensome issue -- because I

20    guess at some theory if you don't have the facts you

21    argue burden.  Here Twombly tells us, at least from my 11

22    clients -- my 11 codefendants who are one-claim

23    defendants, Twombly tells us that the expense of

24    discovery in an antitrust case is enormous.  That's the

25    word they use, "enormous."  It has the potential

1   according to the Supreme Court in Twombly of causing

2   companies to go out of business or entering into what

3   might be called extortionate settlements solely for the

4   purpose of being able to continue in business.  That's

5   the downside here that we're looking at.

6        Twombly itself and the recognition of the nature

7   of the burden created by (inaudible) antitrust case and

8   the burden of discovery in an antitrust case, it's

9   Twombly that tells Your Honor and tells all of us how

10  burdensome that can be.  But you don't have to rely just

11  on Twombly.  Mr. Allen has told you a little bit about

12  the burden on his clients here.  Well, obviously not --

13        THE COURT:  IPhones, BlackBerrys, they cause

14  this.  So those of you who are close to mikes that have

15  something -- it's when you get an e-mail or something

16  that makes the noise.  I'm sorry to interrupt.

17        MR. HARTLEY:  No.  That's all right.  It's not

18  just the Twombly burden that we're talking about here,

19  although that I think is enough for particularly the

20  one-claim defendants.  Let's talk about the discovery

21  that has been served.  Your Honor has already pointed out

22  that there is some 20 to 25 years worth of discovery that

23  is being sought.

24        The plaintiffs claim that the class is in the

25  neighborhood of 50,000 past, former, potential au pairs.

```
 1      When you start trying to put together for a small
 2   business even minimal information about every au pair
 3   placed, every potential au pair, every host family, every
 4   potential host family, and all those records, that's a
 5   lot.  That's a very substantial burden for companies that
 6   may just have files in the drawer.
 7           And finally I have to acknowledge what I read in
 8   the plaintiffs' brief about the burden of discovery.
 9   They said 1.5 million documents, that's no big deal.
10   Here's a case that says 70 million isn't very much.
11   Here's a case that says 180 depositions is no big deal.
12   That's what they're thinking of.
13           So the point to be made here, Your Honor, is this
14   is a case where my single-claim defendant and
15   codefendants (inaudible) for the application of Twombly.
16   This is Twombly.  Twombly could have been written for
17   this case.  And the Supreme Court says until they can
18   plea sufficient facts to make a conspiracy plausible,
19   they don't get to engage in discovery.  And I submit to
20   Your Honor in fairness that shouldn't be discovery of
21   anything.
22           MR. ALLEN:  There's one other factor that I would
23   like to bring to Your Honor's attention, if I may.  When
24   an au pair -- when a young foreign national applies to be
25   an au pair, they provide the agency pursuant to federal
```

1    regulations some very personal information, criminal

2    background, health records, school records, personality

3    profile, English proficiency, and some very personal

4    information about themselves as to why they want to come

5    to the United States, children they want to be with, the

6    type of family, their dietary restrictions, so forth.

7        And the same with host families even more so, who

8    the family is, what living in my house or someone else's

9    house is like, what we do, talks mostly about our

10   children, the most personal information, our children's

11   needs, in some cases our children's special needs, how

12   our children behave, where they go to school, what they

13   study, what they want to do in their free time, the

14   family's criminal background, the family's health

15   background, the family's habits.

16       And String Cheese understands and underscores the

17   impact discovery can have on third parties.  Discovery in

18   this case alone is going to shrink the host families

19   because the au pair companies aren't the employers.  The

20   host families are.  And as this case gains notoriety,

21   host families are -- they're going to flee.  They don't

22   want to hire lawyers.  They just wanted an exchange

23   visitor in their home.  We already had one incident that

24   the notoriety of this case ended up with a host family

25   and an au pair splitting and the au pair going home, one

```
 1        of the named plaintiffs in this case.  So already the
 2        case on a minimal level has affected this program.
 3               Discovery will affect it in any form.  It may
 4        depending on the rulings of the motion to dismiss be an
 5        unavoidable consequence.  But there is a knowledge of the
 6        effect on third parties and the public interest.  Are we
 7        really going to change a 25-year-old federal program that
 8        has been incredibly successful in educating our children
 9        about different cultures and educating children from
10        around the world about different cultures -- our culture?
11        Sorry.
12               I'm told that the J-1 Visa program, which this is
13        a part of, has already had 21 world leaders who learned
14        about America from being here under the program.  So it
15        has a -- discovery even in a limited sense will affect
16        third parties and also affect the public interest by
17        changing the nature of this program, changing the
18        validity of this program, and wrecking havoc on this
19        program.  And I would submit to Your Honor, as I said,
20        that may be inevitable.  But clearly, at this early stage
21        before we allow that to happen by judicial action, the
22        plaintiffs should have to do more than just pay a
23        docketing fee.  That's all that's happened so far, is a
24        docketing fee.
25               So I would urge this Court not to let this
```

1     program change today in this courtroom without some

2     minimal finding that the plaintiffs have a right to

3     proceed, and I think we can do that expeditiously.  And

4     the defendants, all of us, have worked expeditiously in

5     this case.  And we continue to do so, and I look forward

6     to being back here in the fall if it's necessary.  And I

7     just thank you for your attention.

8          MR. SKINNER:  Your Honor, very briefly because I

9     don't want to belabor any of this.  We -- our firm just

10    came into this case two weeks ago.  I want to be entirely

11    clear to all the defendants that are here, and this goes

12    for Mr. Hood as well because we've talked about this.  We

13    have no interest in putting anybody out of business.

14          Nobody's come to us with concrete explanation

15    about how responding to any particular discovery

16    demand -- mind you, we've only served one very limited

17    discovery demand to date -- nobody's claimed that

18    discovery demand could possibly put them out of business,

19    and we don't want to put anybody out of business because

20    that would just end up hurting the very plaintiffs that

21    we represent.

22          We do want to change action.  We want our

23    plaintiffs to receive more money, but the filing of our

24    complaint has caused no change in action to date.  So we

25    are proceeding with the lawsuit.

39

 1        We asked for a long period of time with respect

 2    to our discovery under a theory that the conspiracy dates

 3    back in time, and RICO claims in particular can relate

 4    back for some period of time.  But we have no problem

 5    with as an initial basis confining discovery to a limited

 6    time period that is closer in time to now, particularly

 7    given that we all understand that those records are going

 8    to be electronic.  Maybe perhaps some are paper.

 9    Realistically speaking, they're going to be electronic.

10    And the burden should be much less on the defendant to

11    gather and produce electronic records.

12        With respect to the sensitive information that's

13    included in a response to document request, we'll, of

14    course, consider requests to carve out some of that

15    stuff.  Nobody's made an -- nobody's asked us to so far,

16    but we will consider that if a reasonable request was

17    made.  That's also what protective orders are there for,

18    to make sure that sensitive information like that is not

19    disclosed publically and does not cause harm to

20    individuals who turn that information over.

21        Discovery in this case so far has been entirely

22    one sided.  Everything in this case so far aside for the

23    filing of our complaint has been entirely one sided.  And

24    the defendants want to keep it one-sided until they

25    possibly get themselves out.  Of course, we think their

  1        motions to dismiss do not add merit for the reasons that

  2        we'll explain in the brief that we're going to be filing

  3        this week.

  4              But putting that aside, we served our initial

  5        discovery demand in March, not that long ago, in March.

  6        We got initial discovery demand back from the defendants

  7        shortly thereafter.  And I'm recounting to be clear.

  8        This is all before we came into the case.  I'm only

  9        counting what I've learned from co-counsel.  We responded

 10        to their initial limited discovery demand.  And then on

 11        the day or the day before their responses were due they

 12        file a motion for a stay.  So they have gotten something

 13        that they wanted initially in order to make arguments

 14        that they wanted to present to this Court, and we've

 15        gotten nothing that would advance this case to the

 16        perspective of the plaintiffs.

 17              There has to be some middle ground that we can

 18        strike here, Your Honor, that will allow us to make use

 19        of the time without overwhelming them with burden so we

 20        can be doing something while the motion to dismiss is

 21        pending.

 22              THE COURT:  Well, I think -- first, let me ask is

 23        there any representative of any defendant here who

 24        opposes tolling the statute of limitations for purposes

 25        of the FLSA claim?  So I assume if your client is not

1    charged in the FLSA count, right, you really don't have a

2    voice in this?

3         But for purposes of the class or a collective

4    action, is there anybody that opposes tolling from today

5    until the recommendation is filed from this Court?  So in

6    other words, that number of days, as I see it, would be

7    added onto the normal statute of limitations for purposes

8    of notice and opting in.

9         Okay.  So hearing nothing, my discovery ruling is

10   going to be -- is informed by that decision on your part.

11   So that becomes really part of why I think a discovery

12   stay is appropriate in this case, and I'm not discounting

13   anyone's arguments.  But, you know, I did quite a bit of

14   research on this issue beforehand, and I actually --

15   although I'm going to grant Documents Number 160, 162,

16   and 164 for a stay until the time that we can have a

17   status conference after the recommendation is issued, I

18   think you should be working on protective orders.  That's

19   one thing that everybody can do, not all that hard to do.

20        I would -- I'll refer to you, for lack of a

21   better place to refer you, to Gillard versus Boulder

22   Valley School District case.  That's 196 F.3d 382.

23   That's a District of Colorado case 2000, pretty

24   simplistic.  There's an appendix that has a very simple

25   protective order, but it hits all the high points.

```
 1          And if you can be working on that, how you want
 2     to mark things, is there any reason to keep anything
 3     attorneys' eyes only?  I don't see it, frankly.  But if
 4     you do, you need to talk about that sort of
 5     confidentiality.  Should there be more than one level of
 6     confidentiality?  The local rules now deal with
 7     confidentiality pretty well, I think, when you start to
 8     have to file things in court.  So that probably isn't the
 9     issue, but at least be doing that much.  That I think we
10     can do, and you can be ready to go.
11          Because if you have a stipulated protective order
12     that basically underscores the fact that I rely on the
13     attorneys' designation of confidentiality, not on your
14     parties.  I don't care what the host families think is
15     confidential, and I don't care what your clients think
16     is.  What I care is what you think as lawyers.  Is it
17     something that should be marked confidential?  And as
18     long as I know that you've made that decision, then I'm
19     comfortable with you going forward and making it.  But
20     also the protective order has to have some kind of
21     provision for challenging confidentiality too.  It's not
22     necessarily just based on filing it in court.  Obviously,
23     you have some challenge abilities there.
24          So let me just -- we've talked about all of these
25     factors, et cetera.  But I did go through them, and I do
```

1    believe that in this case really we are talking about the

2    String Cheese incident factors, which I always think it's

3    kind of funny we're talking about I think a defunct band,

4    you know, with music I know I didn't like.  But

5    nonetheless that's the name of the case that is 2006

6    Westlaw 894955, District of Colorado, March 30, 2006.

7         So the factors we're talking about are potential

8    prejudice to the plaintiff of a delay, the burden on the

9    defendant, the convenience to the Court, and the interest

10   of persons, not parties, to this civil litigation, which

11   we've also talked about today, for instance, the third

12   party host -- well, I guess the host families which I

13   think would be considered third parties, and the public

14   interest, which for a change I think we have a case here

15   that there is a lot of public interest in.

16        And I'm not saying that everybody is paying

17   attention, but there's an interest in the public in

18   whether or not, for instance, the program goes forward,

19   whether or not people who are brought over here on visas

20   get paid a fair wage.  I mean, those are things that the

21   public cares about in general.  So I think there's more

22   than usual public interest factors to be considered in a

23   case.

24        You know, I acknowledge that plaintiffs have an

25   interest in proceedings expeditiously.  But given that

44

1    the information that you're seeking goes back so far, I

2    don't think that destruction of evidence is as immediate

3    as maybe in another case.  People's memories aren't going

4    to fade.  The records are there.  This is a

5    government-sponsored program.  So there's records kept,

6    and there's things that will be there.

7         I don't think the case is going to conclude in a

8    year no matter what.  So people who are employed today as

9    au pairs may not be here when the case gets -- I think

10    it's very likely they won't be here, at least not with

11    that host family if the program is for a year.  So I just

12    don't think that weighs very heavily in the plaintiffs'

13    favor, although I do acknowledge that it's there.

14         The burden on the defendants appears to me to be

15    pretty extreme.  Now, when I say extreme, I don't mean

16    overly extreme.  Because if there's a reason to go

17    forward, too bad for defendants.  You're going to have to

18    come up with all of these documents.  You're going to

19    have to produce these files and records if the case goes

20    forward.  But because there's so much documentation and

21    because I've been told that some of the companies could

22    actually go out of business -- and as I understand it,

23    there's some nonprofits and for-profits here too -- it

24    seems to me that we should at least make the first cut

25    first.

1          Motions to dismiss are strange creatures because

2     they're usually not granted because you can't rely on

3     anything but what's in the pleading, and the burden is

4     certainly on defendants.  And oftentimes it's summary

5     judgment where you really get the meat of the questions

6     answered.  But I think that in this case -- I don't know

7     anything about the au pair program.  I don't know

8     anything about the law that most of you are talking about

9     and are probably very familiar with, but it certainly is

10    something that's out there.

11         I don't agree that it makes a qualified immunity

12    kind of argument because I think protecting government

13    officials from being taken from their duties while they

14    litigate is one of the big things on qualified immunity,

15    and that's not the case here.  These are private

16    companies that are kind of working under the auspices of

17    the government.  But geez, how many of those are there?

18    There's a lot of private companies that work under

19    government oversight.

20         But I do think there is a particular gnarly -- I

21    guess that's a legal term, I'm sure -- question here

22    about how far does the program go, and how much can we

23    find out and resolve on a motion to dismiss with no other

24    facts that might be discovered?  So I think that the time

25    is now to look at that.

          1          And as we've talked about, Iqbal itself talks

          2     about the heavy costs in terms of efficiency and

          3     expending valuable time and resources that might

          4     otherwise be directed to the proper execution of the work

          5     of the government.  That's what I'm talking about when I

          6     say that -- usually we're caring about government

          7     officials.  It's not that I don't care about the company

          8     executives or whatever, but it's the government officials

          9     that are often the kind of subject of qualified immunity.

          10         But this is an antitrust case.  And as I

          11    understand it, everybody, every defendant is named in the

          12    antitrust action.  And it seems to me to be a pretty

          13    large one.  The Supreme Court in Twombly has expressed

          14    concern over allowing the expansive discovery associated

          15    with modern antitrust litigation prior to resolution of a

          16    motion to dismiss, and I've taken that to heart reading

          17    those decisions.

          18         I note that several courts from the various

          19    courts of appeal around the country have talked about

          20    this too echoing the same concern.  I'll direct you to

          21    Car Carriers, Inc. versus Ford Motor Company.  That's a

          22    Seventh Circuit Case, 745 F.2d 1101 at 1106 talking about

          23    the cost of modern federal antitrust litigation and

          24    balancing that with the increasing caseload of federal

          25    courts and finding that basically you should make some of

1    these threshold determinations first.  Second Circuit

2    went the same way in Mayor and City Council of Baltimore,

3    Maryland versus City Group.  That's at 709 F.3d 129, 2013

4    case, the same kind of analysis.

5         I don't want my words to be misconstrued that I

6    think a stay of discovery is appropriate in every

7    antitrust case because I don't, and some of them are

8    pretty small actually.  But I think that this one is not

9    small.  This one is pretty expansive, and it's going to

10   require a lot of discovery.  I think the discovery will

11   be plainly burdensome.  Again, I'm not saying overly

12   burdensome.  But I'm just saying it will be burdensome if

13   there's a need to go forward.

14        I think there will be a lot of court wrangling

15   back and forth about what discovery is appropriate and

16   how much should be given and how it should be given and

17   how the electronic information will be searched.  I mean,

18   I think there's just a lot that will have to be decided.

19   There's -- I think the complaint -- at least this is my

20   law clerk's count -- 112 pages, eight separate claims for

21   relief under federal law and the law of several states in

22   the District of Columbia.

23        So I think that all told -- I'm giving you just

24   some of the figures here.  Plaintiffs propose to serve

25   100 requests for production of documents, 100

1       interrogatories, and 100 requests for admissions.  And

2       I'm drawing that from the proposed scheduling order that

3       you sent me.  And then plaintiff has said that each

4       request served on all of the defendants should count as

5       one.

6              So that is really pretty exponential if you think

7       about it.  I'm not sure that that's what you meant

8       exactly.  But if each one gets a hundred and then they

9       are all counted for everybody, that could end up being

10      4,500 separate discovery requests just doing the math.

11             MR. SKINNER:  Your Honor, that's not what we

12      meant.  But you can --

13             THE COURT:  Okay.  But there will be a lot.  I

14      mean, even if that's taking it a little bit too extreme.

15      I think you've indicated you want to conduct about 45

16      depositions, and you've proposed that the discovery could

17      be concluded within nine months.  I'm not sure of that.

18      I -- more power to you if you can.  I think that would be

19      good.

20             But even if you assume that all the depositions

21      were going to be evenly distributed, which is never,

22      ever, ever the case that I've seen, that would be five

23      depositions per month that you would have to attend and

24      decide what to do about it collectively I guess so that

25      you didn't all have to attend.  In addition, the 30(b)(6)


AVERY/WOODS REPORTING SERVICE, INC. (303) 825-6119

49

1    depositions, that's going involve multiple deponents in

2    itself I'm just certain.  Maybe not for the one-claim

3    defendants, but for the others it will be (inaudible), I

4    think.

5         Defendant Culture Care I noticed estimated that

6    the documents that are already served by plaintiffs would

7    exceed 1.4 million documents.  Now I know plaintiff does

8    not think that that's true, but that's what I have in

9    front of me now.

10        So I think it will be a massive undertaking, and

11   I don't think we should undertake it until we're

12   absolutely sure that on the motions to dismiss that

13   it's -- or at least the first step for sure.  I guess it

14   won't be absolute when I do a recommendation.  But at

15   least let me look at it and let me make sure that I think

16   that you've got grounds to go forward.  And then we'll

17   see what Judge Arguello thinks about it as well.

18        And just for all of you, most of you practice

19   here in federal court so you know this.  Judge Arguello

20   is one that -- you know, the fastest of our judges as far

21   as case management.  She really is pretty quick.  So your

22   holdup is going to be me really.  That's where you're

23   going to be bottlenecked for a while until I rule on it.

24   I think she'll rule on it pretty fast.  I mean, there's

25   still that briefing time for whoever -- whichever side

 1     wants to file objections, which almost always happens,

 2     and then response to that.  But outside of that, she's

 3     pretty quick.  So I don't think it's going to be quite as

 4     long as you think.

 5          There are two different ways of looking at

 6     judging, and one of them is to put your head in the sand

 7     and hope that things will resolve and not have very many

 8     hearings and not try to do things quickly.  And neither

 9     of the judges that you have on this case are that kind of

10     person.  I mean, I generally think the worst thing is you

11     need to get on it quicker.  Right?  And get the bull by

12     the horns and try to resolve things.

13          So with that said, I don't think it will be quite

14     as long as plaintiffs fear, but it will be a while.  It

15     will be a few months, I'm sure.  But I agree with the

16     argument of defendants that this is precisely the type of

17     case that Twombly and its progeny really talk about in

18     the concern of the discovery.

19          Now, the Court's convenience, you know, we have

20     an interest, I think, in managing our docket.  And part

21     of that is trying to see the cases move expeditiously.

22     And I know that Judge Arguello really believes that.  I

23     mean, she really does try.  So stays are not something

24     that she really likes, but it's also something she

25     referred to me to decide.  So I'm going to decide it.

1    And she's probably not going to overrule me on that.  Of

2    course, you obviously could appeal the decision if you

3    want.

4          But I think judicial timing and resources would

5    plainly be wasted if I have to go through what I think I

6    will have to go through on discovery if it turns out that

7    I'm recommending that the motions to dismiss be granted.

8    That's not a hint or anything.  Like I said, I haven't

9    even really looked at them very carefully.  So I think

10   that given the magnitude of the discovery problem here

11   it's better to not do it unless we determine that we have

12   to, and then everybody will be in the same boat there.

13         Now, the interest of nonparties I think is very

14   similar, potentially the families that are hosted, other

15   au pairs, that sort of thing.  Again, I think the best

16   practice is to ensure that plaintiffs' claims are viable

17   before allowing the broad and intrusive third-party

18   discovery.  I hope that discovery in a legitimate case

19   that should go forward doesn't deter people from being

20   host families, but I accept the fact that at least some

21   of you think that it may.

22         In fact, (inaudible) not to, you know, belabor

23   this too much, but I think there is a public interest

24   here.  And I think that public interest is that all of

25   these issues be addressed carefully and with some real

AVERY/WOODS REPORTING SERVICE, INC. (303) 825-6119

1    concentration by the judiciary and by the parties on

2    what's really at issue here.  And where are we going to

3    go from here?  What's the remedy if there has been some

4    kind of problem?

5         So balancing all these factors, I am going to

6    rule that the case be stayed from all discovery pending

7    issuance of a recommendation on the defendants' motions

8    to dismiss.  And I'm going to do two things.  I am going

9    to undertake to issue a status conference and that sort

10   of thing as part of my recommendation.  So I will try to

11   remember to do that, and I'm quite certain I'll remember

12   to do it.

13        But just in case, I'm going to ask the parties

14   file a status report no later than ten days after the

15   recommendation on the motions to dismiss, and I want you

16   to do this regardless of whether I set a status

17   conference.  I want you to file a status report telling

18   me what you think should happen next.  All right?

19   Because the ruling may shed some light on your feelings

20   about whether or not you want to appeal or whether or

21   not, you know, we should go forward with some discovery.

22   If so, how much?  Would it be reasonable at that point

23   then to use a time-limited discovery?

24        I will tell all of you I'm not  -- I have come to

25   not be very excited about phased discovery because it

 1    causes so many problems.  People are always arguing

 2    about, well, this isn't right.  We -- we're supposed to

 3    do this next time.  That's Phase 2.  That's Phase 3.  We

 4    can almost always parse out damages, for instance, to a

 5    later phase.  But other than that, everything gets so

 6    intertwined.  And I hear so many arguments, and it's so

 7    costly to your clients to be arguing about whether it's

 8    Phase 1 or Phase 2 that I'm more tempted to say not

 9    phased discovery.

10         But it could be that what you really need is the

11    first however many years.  Right?  Most recent years.  So

12    I would be more inclined to grant that kind of discovery

13    going back X amount because plaintiffs then will have a

14    broad phase to see what you've got.  Do you really need

15    to go all the way back or not?  And it won't be quite so

16    burdensome on defendants.  So that's something you might

17    want to talk about, and I'm not telling any of you do it.

18    I'm just saying that might be a way to compromise on the

19    volume of discovery.  I don't -- I don't know exactly

20    what plaintiffs are looking for way back.  So it may not

21    help.  But if it does, you know, think about that.

22         Anything else that you think we need to do today?

23    I have a number of notes on your scheduling order, but I

24    don't see any real purpose in going through them at this

25    point until we meet again and see where we are in a few

1      months.

2              MR. JACKSON:  Thank you, Your Honor.  We would

3      just ask if Your Honor is going to set out in any writing

4      exactly what Your Honor's understanding of the tolling

5      agreement will be.

6              THE COURT:  Well, I wasn't going to except for

7      the minutes.  I could make the minutes a little more

8      explicit.  Would that -- do you think that would be

9      helpful, or do you want to circulate an agreement about

10     the tolling?

11             MR. JACKSON:  Well --

12             THE COURT:  Or both?

13             MR. JACKSON:  As long as Your Honor could so

14     order that the -- that the instructions that Your Honor

15     stated as provided in the minutes are the order in this

16     case, tolling -- tolling statute of limitations, that's

17     sufficient for the plaintiffs.  Thank you.

18             MR. ALLEN:  You could do a stipulation, Your

19     Honor.  That probably would be clearer.

20             THE COURT:  I think that might be clearer.  So

21     maybe defendants could take it first since you're the one

22     that's agreeing to it.  Take a stab at drafting it, and

23     get it to plaintiffs.  And if all you agree, just file

24     it.  I would just file it as a stipulation somewhere.

25             MR. SKINNER:  Your Honor, I think it would need

1       to be a stipulation and order because it actually needs

2       to be an order from the Court in order for the toll to

3       have an effect.  It can't just be an agreement between

4       the parties, but this is putting form over substance.

5       We'll look at what they send us, and we'll get it to the

6       court.

7              MR. ALLEN:  Your Honor, can I ask one question of

8       Your Honor out of ignorance?  Do you -- is it your

9       practice to have oral arguments before you issue a

10      recommended decision or not?

11             THE COURT:  No.

12             MR. ALLEN:  Okay.  So then I don't need to --

13             THE COURT:  Yeah, especially not on --

14             MR. ALLEN:  -- ask you to schedule it?

15             THE COURT:  Yeah, I do on discovery motions.  I

16      like to hear from you.  And if any of you would prefer to

17      appear by phone, I think your appearance before me is

18      somewhat diluted if you proceed by phone.  But if you

19      want to or, you know, give someone authority to argue the

20      motion, whatever --

21             MR. ALLEN:  Barring exceptional circumstances, I

22      intend to be present in person during all of your

23      hearings.  I just wanted to know your practice on the

24      motion to dismiss.

25             THE COURT:  Right.  Not on the motion to dismiss

1        because I think I'm limited to what's in the pleading.

2                    MR. ALLEN:  You are.  But I just -- thank you.

3                    THE COURT:  Okay.  Anything else that anybody

4        needs to raise, or are we all on the same page now?  I'm

5        not going to give you a date.  I'll do the

6        recommendation.  But believe me, this is on the top

7        burner.  The only thing is we are coming up on our

8        six-month list, which everybody knows how that works.  So

9        I do have to get those older motions done first for the

10       most part, and this is also law clerk changing time of

11       year.  But someone is going to be really delighted with

12       their first case.

13                   MR. ALLEN:  Thank you, Your Honor.

14                   MR. JACKSON:  Thank you, Your Honor.

15                   THE COURT:  All right.

16                   COURTROOM DEPUTY:  All rise.

17                   (Whereupon, the within hearing was then in

18       conclusion at 11:11 a.m.)

19                       I certify that the foregoing is a correct

20       transcript, to the best of my knowledge and belief

21       (pursuant to the quality of the recording) from the

22       record of proceedings in the above-entitled matter.

23

24       /s/ Deborah VanDemark              July 30th, 2015
         Signature of Transcriber           Date
25


AVERY/WOODS REPORTING SERVICE, INC. (303) 825-6119