IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14–cv–03074–CMA–KMT

JOHANA PAOLA BELTRAN,
LUSAPHO HLATSHANENI,
BEAUDETTE DEETLEFS,
DAYANNA PAOLA CARDENAS CAICEDO, and
ALEXANDRA IVETTE GONZALEZ,

       Plaintiffs,

v.

INTEREXCHANGE, INC,
USAUPAIR, INC.,
GREAT AUPAIR, LLC,
EXPERT GROUP INTERNATIONAL INC., d/b/a Expert AuPair,
EURAUPAIR INTERCULTURAL CHILD CARE PROGRAMS,
CULTURAL HOMSTAY INTERNATIONAL,
CULTURAL CARE, INC. d/b/a Cultural Care Au Pair,
AUPAIRCARE INC.,
AU PAIR INTERNATIONAL, INC.,
APF GLOBAL EXCHANGE, NFP, d/b/a AuPair Foundation,
AMERICAN INSTITUTE FOR FOREIGN STUDY d/b/a Au Pair in America,
AMERICAN CULTURAL EXCHANGE, LLC, d/b/a/ GoAuPair,
AGENT AU PAIR,
A.P.EX. AMERICAN PROFESSIONAL EXCHANGE, LLC d/b/a/ ProAuPair, and
20/20 CARE EXCHANGE, INC. d/b/a The International Au Pair Exchange,

       Defendants.

---

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

---

**Magistrate Judge Kathleen M. Tafoya**

       This case comes before the court on "Defendant Cultural Care, Inc.'s Motion to Dismiss

All Claims in First Amended Complaint Pursuant to Federal Rule of Civil Procedure 12(B)(6)"

(Doc. No. 127, filed April 17, 2015), "Motion to Dismiss the First Amended Complaint by

Defendant Interexchange, Inc." (Doc. No. 130, filed April 20, 2015), "Defendant American

Cultural Exchange, LLC, D/B/A Go Au Pair's Motion to Dismiss Counts I, III, IV, V, VI, VII,

VIII, IX and X of the First Amended Complaint" (Doc. No. 131, filed April 20, 2015), "Joint

Motion by Certain Sponsor Defendants to Dismiss the First Amended Complaint and

Certification of Compliance with Civil Practice Standard 7.1D." (Doc. No. 135, filed April 20,

2015), and "Defendant American Institute for Foreign Study's ["AIFS"] Motion to Dismiss

Amended Complaint" (Doc. No. 136, filed April 20, 2015).  Plaintiffs filed a "Consolidated

Opposition to Defendants' Motions to Dismiss" (Doc. No. 199 ["Resp."], filed July 10, 2015)

and each Defendant replied.  (Doc. Nos. 207, 211, 214, 215, 216).

Also before the court is "Defendant Cultural Care, Inc.'s Motion to Strike Material in

Plaintiffs' Consolidated Opposition to Defendants' Motions to Dismiss" (Doc. No. 206, filed

August 6, 2015), to which Plaintiffs have responded (Doc. No. 220, August 31, 2015) and

Defendant replied.  (Doc. No. 225, filed September 17, 2015).  Finally, Plaintiffs filed a "Cross-

Motion to Strike Certain Exhibits Submitted by the Defendants" (Doc. No. 221, filed August 31,

2015), to which certain Defendants responded (Doc. No. 227, filed September 24, 2015) and

Plaintiffs replied.  (Doc. No. 231, filed October 8, 2015).

## STATEMENT OF THE CASE

This case arises out of the *au pair* program, made possible by the J-1 visa program, and

currently overseen by the United States Department of State ("DOS").  (Doc. No. 101 ["Am.

Comp."] at 2).  The J-1 visa program was created to facilitate cultural exchange between nations

and the applicable visas are carried out under the authority of the Mutual Educational and

Cultural Exchange Act of 1961 ("Cultural Exchange Act").  (Am. Comp. at 2, 10; 22 U.S.C. §

2451, *et seq.*)  The J-1 *au pair* program was created in 1986 and was administered by the United

States Information Agency ("USIA").  (Am. Comp. at 12.)  Initially, the *au pair* program was

considered solely a "cultural exchange" program and was not subject to any employment or labor

law protections.  (*Id.*)  However, the *au pairs* were required to work 45 hours per week providing

child care services to their host families.  (*Id.*)  Under this program, the *au pairs* were paid

$100.00 per week for their services, plus room and board.  (Am. Comp. at 13.)  The USIA

delegated oversight to entities that it designated to act as sponsors ("Sponsors") for the J-1 visa

*au pair* program.  (Am. Comp. at 11.)

    In 1990, in response to a Congressional request, the General Accounting Office ("GAO")

issued a report to Congress entitled, "Inappropriate Uses of Educational and Cultural Exchange

Visas" (the "GAO Report"), in which the GAO determined, *inter alia*, that the *au pair* program

was in reality a work program administered under the auspices of "cultural exchange" that

required 45 hours per week of work.  60 Fed. Reg. at 8547-48 (Feb. 15, 1995) (codified at 22

C.F.R. pt. 514).[1]  "Authorizing J visas for participants and activities that are not clearly for

educational and cultural purposes as specified in the act dilute[s] the integrity of the J visa and

obscures the distinction between the J visa and other visas granted for work purposes."  *Id.* at

8548.  Similar objections to the *au pair* program were raised by the DOS, the Immigration and

Naturalization Service and the U.S. Department of Labor ("DOL"), all of whom agreed with the

GAO Report that the *au pair* program possessed all the characteristics of a full-time child care

work program.  *Id.*

---

[1] The remaining history of the *au pair* program and the background leading to the changes
codified in 1995 are set forth in the Amended Complaint at 11-15.

Following the GAO report and several subsequent tragic events involving *au pairs*, Congress authorized and directed the USIA to promulgate regulations governing *au pair* placements. *Id.* The USIA recognized that the *au pair* program lacked a bona fide educational component sufficient to meet the requirements of the Cultural Exchange Act. *Id.* Critics of the program had complained that it amounted to no more than the import of cheap foreign labor in the guise of an educational and cultural exchange program. *Id.* at 8550. The USIA consulted with the DOL regarding the employment aspect of the program and the DOL advised the USIA that the *au pair* program created an employment relationship and fell under the purview of the Fair Labor Standards Act ("FLSA"). *Id.*

In December 1994, the USIA, in direct consultation with the DOL, conducted a formal rulemaking to issue a rule recognizing that *au pair* participants are full-time employees entitled to the protections afforded all employees under domestic labor laws, including the FLSA. *Id.* at 8547-48, 8550-51. The final rule required compensation of *au pairs* "at a rate of *not less than* $115.00 per week" plus a weekly credit reflecting the actual cost incurred for room and board, not to exceed $76.00 per week. *Id.* at 8551. (emphasis in original).[2]

In June 1997, the USIA issued an interim rule in order to "ensure that there is no future confusion regarding the payment of minimum wage." 62 Fed. Reg. at 34633 (June 27, 1997) (codified at 22 C.F.R. pt. 514). Rather than stating the specific minimum amount an *au pair* had

---

[2] The new regulation also included a requirement that *au pairs* pursue six hours of college credit, although they were allowed to audit their courses. *Id.* at 8548-49. The final regulation provided, "Sponsors shall require that during the period of program participation, all *au pair* participants are enrolled in an accredited post-secondary institution for not less than six hours of academic credit or its equivalent. As a condition of program participation, host family participants must agree to facilitate the enrollment and attendance of the *au pair* and to pay the cost of such academic course work in an amount not to exceed $500." *Id.* at 8553. This requirement remains today at 29 U.S.C. § 62.31(k)(1).

to be compensated, the USIA amended the rule to provide, "Sponsors shall require that *au pair* participants: (1) Are compensated at a weekly rate based upon 45 hours per week and paid in conformance with the requirements of the [FLSA] as interpreted and implemented by the [DOL]." *Id.* at 34634.[3]  This same rule is now codified at 22 C.F.R. § 62.31(j)(1).

Today, the DOS, rather than the USIA, oversees the *au pair* program.  (Am. Comp. at 19.)  Sponsor Defendants are the exclusive entities authorized to recruit and place *au pairs* with host families in the United States.  (Am. Comp. at 11.)  DOS regulations mandate that Sponsors ensure various conditions of employment for the *au pairs*, including but not limited to that host families are capable of and do meet various requirements and that *au pairs* are compensated in compliance with labor laws and do not work beyond specified limits.  (Am. Comp. at 11-12.)  The Sponsors' extensive role throughout the *au pair* program is discussed in more detail herein.

Plaintiffs named each of the designated Sponsors as Defendants in this action (collectively referred to herein as "Sponsors" or "Defendants").  Plaintiffs allege that in spite of the fact that the applicable regulations require that *au pairs* receive **not less than** the applicable minimum wage as compensation, Sponsors have conspired and agreed to set all of the *au pairs'* weekly wages at the purported minimum amount, currently $195.75 per week plus room and board.  (Am. Comp. at 16-33.)[4]  Additionally, Plaintiffs contend the Sponsors falsely inform both

---

[3] The rule also provided for the first time that *au pairs* were not to work more than ten hours per day, amended from "a reasonable number of hours per day," in addition to the forty-five hour per week limitation.  *Id.*  The USIA noted the necessity for this change due to "the existing standard [being] subject to abuse and a source of dispute."  *Id.* at 34633.  (*See also* Am. Comp. at 16.)

[4] The Amended Complaint notes that six of the Sponsors offer a "professional" or "extraordinary" *au pair* position for higher wages if the *au pair* meets specified criteria, such as two years of child care study plus two years of full-time child care experience.  (Am. Comp. at 18.)  Plaintiffs explain that relatively few *au pairs* obtain employment in these positions and that they have little economic significance on the overall *au pair* market.  (Am. Comp. at 18-19.)

*au pairs* and host families that this minimum wage is the maximum wage *au pairs* are permitted to receive.  (Am. Comp. at 30, 33-34, 40-60, 73-74.)[5]  Sponsors universally advertise that the *au pairs* fees will be $195.75 per week plus room and board.  (Am. Comp. at 22-29.)  The required fees that each host family must pay to each Sponsor range in amount from $ 7,000.00 to $8,700.00.  (*Id.*)

By this action, Plaintiffs assert, on behalf of themselves and all those similarly situated, federal claims under the Sherman Antitrust Act, 15 U.S.C. § 1, *et seq*., the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1964, *et seq.*, and the FLSA, as well as state law claims based on Breach of Fiduciary Duty, Negligent Misrepresentation, Constructive Fraud or Fraudulent Concealment, Consumer Protection laws, Breach of Contract or Quasi Contract, Unpaid Wages, and claims pursuant to various state wage laws.

## LEGAL STANDARD

### *Failure to State a Claim Upon Which Relief Can Be Granted*

Federal Rule of Civil Procedure 12(b)(6) provides that a defendant may move to dismiss a claim for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted."  *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (citations and quotation marks omitted).

---

Regardless, Plaintiffs' claims pertain solely to standard *au pairs*, which is also how the positions are generally referenced on the Sponsors' websites and materials.  (Am. Comp. at 18-19, 22-29.)
[5] Notably, this minimum wage does not change regardless of the number of children in the home.  (*Id.*)

"A court reviewing the sufficiency of a complaint presumes all of plaintiff's factual allegations are true and construes them in the light most favorable to the plaintiff." *Hall v. Bellmon*, 935 F.2d 1106, 1198 (10th Cir. 1991). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility, in the context of a motion to dismiss, means that the plaintiff pleaded facts which allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The *Iqbal* evaluation requires two prongs of analysis. First, the court identifies "the allegations in the complaint that are not entitled to the assumption of truth," that is, those allegations which are legal conclusion, bare assertions, or merely conclusory. *Id.* at 679-81. Second, the Court considers the factual allegations "to determine if they plausibly suggest an entitlement to relief." *Id.* at 681. If the allegations state a plausible claim for relief, such claim survives the motion to dismiss. *Id.* at 679.

Notwithstanding, the court need not accept conclusory allegations without supporting factual averments. *Southern Disposal, Inc., v. Texas Waste*, 161 F.3d 1259, 1262 (10th Cir. 1998). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S at 678. Moreover, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does the complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (citation omitted). "Where a

complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (citation omitted).

In evaluating a Rule 12(b)(6) motion to dismiss, courts may consider not only the complaint itself, but also attached exhibits and documents incorporated into the complaint by reference. *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009) (citations omitted). "[T]he district court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." *Id.* (internal quotations omitted).

## ANALYSIS

### 1. Antitrust claim

Plaintiffs contend that Defendants conspired and agreed to fix the standard *au pair* wages at the purported minimum wage. They assert that Defendants' actions in this regard constitute a *per se* violation of the Sherman Antitrust Act (the "Sherman Act").

As an initial matter, Defendant Cultural Care, Inc. requests that Plaintiffs' claim under the Sherman Act be dismissed because the federal government expressly mandated that Sponsors ensure host families paid *au pairs* a weekly stipend in the amount of $195.75, and therefore, they are immune from antitrust liability under the federal instrumentality and/or implied immunity doctrine. (Doc. No. 127 at 9-10.) This argument misses the point. There is no evidence that the federal government "directs," or in any other way mandates, that an *au pair's* wages are set at $195.75. [6] Instead, since the *au pair* program became formally subject to wage and hour laws, the applicable laws and regulations have required that Sponsors ensure an *au pair's* wages

---

[6] Notably, no other Defendant joined Cultural Care's argument in this regard.

comply with FLSA requirements, including that employers pay employees the applicable *minimum* wage. *See* 60 Fed. Reg. 8547 (February 15, 1995) (codified at 22 C.F.R. pt. 514); 62 Fed. Reg. 34632 (June 27, 1997) (amending 22 C.F.R. pt. 514); 22 C.F.R. § 62.31(j)(1). Defendant Cultural Care's claim that it is entitled to immunity under a theory of federal instrumentality and/or implied immunity is wholly without merit.

The remaining Defendants, as well as Cultural Care, request the court dismiss this claim because Plaintiffs' allegations are insufficient to demonstrate a conspiracy of price-fixing between Defendants.

The Sherman Act is a federal statute prohibiting monopolies and combinations in restraint of trade. Section One of the Sherman Act provides, in relevant part, "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. "Because § 1 of the Sherman Act does not prohibit all unreasonable restraints of trade but only restraints effected by a contract, combination, or conspiracy, the crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express." *Twombly*, 550 U.S. at 553 (internal citations and brackets omitted). Accordingly, at the pleading stage, stating a § 1 claim "requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made ... [and] to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.* at 556. Such an agreement is established by evidence that the conspiring parties "had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 764 (1984).

If the complaint does not directly allege an agreement but instead makes only "allegations of parallel conduct . . . in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 557. That is, the complaint must contain "allegations plausibly suggesting (not merely consistent with) agreement." *Id.*

Defendants rely on *Twombly* and contend that Plaintiffs have alleged only parallel conduct that does not raise a suggestion of an agreement, that Defendants' alleged conduct is consistent with unilateral conduct and Defendants' alleged admissions are too vague. In *Twombly*, the plaintiffs asserted a claim under the Sherman Act alleging that regional telephone companies were engaged in "parallel behavior." *Id.* at 564-65. In other words, they were not competing but instead, maintaining their services within their respective regions in order to refrain from competing against each other and to inhibit the growth of upstart companies. *Id.* at 550-51, 564-65. However, § 1 of the Sherman Act, under which the suit had been brought, does not require sellers to compete; it just forbids their agreeing or conspiring not to compete. *Id.* at 553. Thus, as the court pointed out, a complaint that merely alleges parallel behavior alleges facts that are equally consistent with both an inference that the defendants are conspiring and an inference that the conditions of their market have enabled them to avoid competing without having to agree not to compete. *Id.* at 554. The latter does not constitute a violation of the Sherman Act.

The plaintiffs in *Twombly* offered no allegations that the defendants had *agreed* not to compete. They simply relied on the fact that the defendants did not compete to argue that there must be an agreement between them to that effect. *Id.* The court ruled that the plaintiffs'

allegations, which consisted of nothing more than parallel conduct without any allegations of actual agreement between the defendants, suggested that the lack of competition was "the natural, unilateral reaction of each [defendant] intent on keeping its regional dominance." *Id.* at 566. *See also In re Musical Instruments and Equip. Antitrust Litig.*, 798 F.3d 1186, (9th Cir. 2015) ("Recognizing that parallel conduct may arise on account of independent business decisions rather than an illegal agreement, *Twombly* requires that when allegations of parallel conduct are set out to make a § 1 claim, plaintiffs must plead enough nonconclusory facts to place that parallel conduct in a context that raises a suggestion of a preceding agreement." (internal quotations omitted)).

Plaintiffs set forth the following relevant evidence in support of their claim under the Sherman Act: (1) At least one Sponsor, Cultural Care, has informed prospective *au pairs*, in writing, that the weekly stipend arranged by Cultural Care would be "the same regardless of which *au pair* agency you use." (Am. Comp. at 20; Resp. at 14); (2) Sponsors informed *au pairs* and host families that $195.75/week plus room and board is the only permitted compensation for *au pairs* (Am. Comp. at 73-74, 76-77); (3) As the exclusive entities authorized to recruit, provide training, place and supervise *au pairs* with host families in the United States, Defendants control *au pair* opportunities within the United States (Am. Comp. at 10-11, Resp. at 14); (4) The Sponsors' industry structure facilitates collusion as they are a relatively small group, 15 agencies, with 100% market share (Am. Comp. at 32); (5) In addition to industry structure, many Sponsors are members of the Alliance for International Education and Cultural Exchange and the International Au Pair Association ("IAPA"), individuals from certain Sponsors sit on IAPA's Board, and the featured speaker at a recent IAPA conference published an article arguing for

strict maintenance of the fixed $195.75 weekly wage for standard *au pairs*, stating that "host families do each other a disservice when they start to compete with each other (or try to stand out as a 'better family') by offering more pocket money.  We don't want *au pairs* shopping for a higher stipend." (Am. Comp. at 30-31); (6) The Sponsors uniformly advertise *au pair* wages at an identical amount even though the federal government does not require that *au pairs* only receive minimum wage (Am. Comp. at 13-15, 20, 22-29; Resp. at 15, *see also supra*); (7) There are no adjustments to advertised compensation with relation to geographic differences, varying state laws and/or the number of children in the home (Am. Comp. at 29-30; Resp. at 15); (8) By depressing wages for *au pair* services, the Sponsors reap artificially high profits because if the host family's direct cost for an *au pair* does not increase, then any increase, while still costing the family less than a full-time nanny on the open market, goes to the Sponsor in the form of fees, and keeping the cost down will theoretically increase the number of potential host families (Am. Comp. at 32); (9) Representatives of certain Sponsors have specifically admitted that the Sponsors agreed to fix *au pair* wages at the minimum wage rate (Am. Comp. at 20-22; Resp. at 15.); and, (10) Defendants advertise that their labor costs are set lower than the cost of a comparable child-care worker in the free market. (Am. Comp. at 5, 54, 55; Resp. at 23-24.) Plaintiffs also contend that in a competitive marketplace, at least some Defendants would either offer higher salaries to potential *au pairs*, thereby attracting more and higher quality *au pairs* and charging higher fees to families, or the Sponsors might have to compete with agencies that place other domestic workers, such as nannies, or react to market forces, including location or higher salaries based on unique childcare responsibilities, such as the number of children.  (Resp. at 23.) None of these natural consequences have occurred.

The court finds Plaintiffs have plead sufficient factual allegations that the Sponsors entered into an agreement to set the *au pairs* stipend at the purported lowest minimum wage. The court must take these factual allegations as true when considering Defendants' Motions to Dismiss, and they are sufficiently specific to "raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 556.  Far from invoking mere antitrust "buzz words," Plaintiffs' allegations include facts that suggest "a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto*, 465 U.S. at 764.

Defendants' contention that Plaintiffs have failed to state claim under the Sherman Act seems to be based on an approach of considering each allegation individually and judging its sufficiency.  However, the court must consider Plaintiffs' allegations as a whole. *See Evergreen Partnering Group, Inc. v. Pactiv Corp*., 720 F.3d 33, 47 (1st Cir. 2013) ("While each of Evergreen's allegations of circumstantial agreement standing alone may not be sufficient to imply agreement, taken together, they provide a sufficient basis to plausibly contextualize the agreement necessary for pleading a § 1 claim.").  For example, Defendants argue that their uniform advertisement of $195.75 as an *au pair's* weekly stipend is insufficient to state an antitrust claim because it is "merely parallel conduct that could just as well be independent action."  (Doc. No. 135 at 16, 18.)  However, Plaintiffs do not rely on this conduct alone.  The Amended Complaint alleges a mixture of "parallel behaviors, details of industry structure, and industry practices, that facilitate collusion." *In re Text Messaging Litig.*, 630 F.3d 622, 627 (7th Cir. 2010).

Defendants also argue that the alleged conduct is not actually parallel because Defendants advertise differing weekly stipends based on the individual *au pair*.  (Doc. No. 84 at 3-4; Doc.

No. 135 at 17.)  However, this argument is disingenuous.  The only instance in which Defendants advertise a higher compensation rate is for non-standard positions.  (Am. Comp. at 22-29.)  Each of the Defendants advertise standard *au pair* services at the same minimum rate.  (*Id.*)  Plaintiffs, and those they seek to represent in a class action, are standard *au pairs*.  (Am. Comp. at 79-86, *see also supra*.)  The only issues raised by Plaintiffs and therefore, the only issues relevant to the current inquiry, pertain to Defendants' practices with regard to standard *au pairs*.

Defendants further contend that because their host families are required to pay their *au pairs* in conformance with the FLSA, then it "certainly is plausible that the [Defendants] would conclude that they should inform host families that the cost of hosting an *au pair* includes a weekly stipend of $195.75."  (Doc. No. 135 at 18.)  Defendants are over-simplifying Plaintiff's allegations.  Plaintiffs have alleged far more than merely that Defendants inform host families of their minimum legal requirements.  Plaintiffs clearly assert that Defendants have unlawfully 'set' *au pair* wages at the bare minimum and also acted deceptively toward *au pairs* and host families in doing so.

Defendants also assert that Plaintiff's allegations regarding admissions by certain Sponsor representatives that an agreement exists between the Sponsors to keep standard *au pair* wages at exactly $195.75 per week should be disregarded as impermissibly vague.  (Doc. No. 135 at 20-21.)  In support of this argument, Defendants rely primarily on *In re Text Messaging Antitrust Litig.*, 782 F.3d 867 (7th Cir. 2015) to insist that the alleged admissions are insufficient because they do not include a specific time, place or person involved, nor do they include whether the speakers ever communicated with representatives from the other Sponsors. However, as Plaintiffs point out, the *In re Text Messaging* case upon which Defendants rely was

not decided at the dismissal stage but instead, on summary judgment.  *See In re Text Messaging*, 782 F.3d at 869.  Earlier in the proceedings, when the case reached the Seventh Circuit *via* an interlocutory appeal by the defendants after the district court denied their motion to dismiss, the court upheld the trial court ruling, explaining:

> What is missing, as the defendants point out, is the smoking gun in a price-fixing case: direct evidence, which would usually take the form of an admission by an employee of one of the conspirators, that officials of the defendants had met and agreed explicitly on the terms of a conspiracy to raise price.  The second amended complaint does allege that the defendants "agreed to uniformly charge an unprecedented common per-unit price of ten cents for text messaging services," but does not allege direct evidence of such an agreement; the allegation is an inference from circumstantial evidence.  Direct evidence of conspiracy is not a sine qua non, however.  Circumstantial evidence can establish an antitrust conspiracy.  We need not decide whether the circumstantial evidence that we have summarized is sufficient to compel an inference of conspiracy; the case is just at the complaint stage and the test for whether to dismiss a case at that stage turns on the complaint's "plausibility."

*In re Text Messaging Litig.*, 630 F.3d 622, 628-29 (7th Cir. 2010).

Here, Plaintiffs are not required to have direct evidence of admissions in order to support their claims.  Likewise, standing alone, Plaintiffs' current admissions allegations might not be sufficient to allege an antitrust violation.  However, as noted, in looking at Plaintiffs' Amended Complaint as a whole, they have provided a sufficiently plausible claim to warrant allowing them to proceed to discovery.

The court in *In re Text Messaging* also noted that "an industry structure that facilitates collusion constitutes supporting evidence of collusion."  *Id.* at 627-28.  "[T]he complaint in this case alleges that the four defendants sold 90% of U.S. text messaging services, and it would not be difficult for such a small group to agree on prices and to be able to detect 'cheating' (underselling the agreed price by a member of the group) without having to create elaborate

mechanisms, such as an exclusive sales agency, that could not escape discovery by the antitrust authorities." *Id.* at 628.  In the present case, Defendants control 100% of the market share and they could easily detect cheating on an agreement regarding wages considering they each advertise *au pair* compensation on their websites.  Although Plaintiffs have asserted theories regarding the Sponsors' opportunities to meet and make agreements, *see* Am. Comp. at 30-31, the fact is that similar to in *In re Text Messaging*, the industry structure facilitates collusion.

Plaintiffs' allegations, taken as true and considered as a whole, present a plausible claim under the Sherman Act.  *Twombly* does not require Plaintiffs prove their case in the Amended Complaint, nor does it impose a summary judgment-like standard at the pleading stage. Plaintiffs are held to a plausibility, rather than a probability, standard at this stage and they have met it. *See Twombly*, 550 U .S. at 556.

## 2.  FLSA

Plaintiffs assert FLSA claims based upon their position that Defendants are required to compensate them for the mandatory week long training, room and board is unlawfully credited toward their compensation, including but not limited to during vacations when they are not provided room and board, and they are entitled to overtime compensation.[7] Defendants urge the court to dismiss Plaintiffs' FLSA claims because they are not Plaintiffs' employers, room and board is appropriately credited toward Plaintiffs' compensation and Plaintiffs are exempt from overtime compensation.

---

[7] The court notes that Defendants do not request dismissal of Plaintiffs' FLSA claims based upon Defendants' failure to pay them for the one-week mandatory training, nor Plaintiffs' claims that room and board is unlawfully deducted from their weekly stipends during vacations.

### a. Defendants' status as employers

Plaintiffs contend that Defendants are 'joint employers' of *au pairs* with the host families.  Defendants argue that the DOL has identified the host family as an *au pair's* employer.  (Doc. No. 130 at 19-20.)  Defendants also argue that they do not qualify as an employer under the Tenth Circuit's economic realities test and therefore, any employment based claim against them should be dismissed.  (Doc. No. 130 at 20; Doc. No. 131 at 11-14.)

The court notes that Defendants have not presented any federal regulation or guideline affirmatively indicating that they are not employers within the *au pair* program.  Merely because the DOL has identified the host family as an employer and/or recognizes that the *au pair* program creates an employment relationship is not dispositive of whether Defendants may be considered a joint employer.

Further, resolution of whether Defendants are joint employers is usually premature at this stage of the proceedings.  In light of its obligation to accept as true all well-pleaded factual allegations and view those allegations in the light most favorable to Plaintiffs, *see Hall*, 935 F.2d at 1198, this court is not persuaded dismissal is appropriate at this stage.  *See also Camara v. Matheson Trucking, Inc., et al.,* No. 12-cv-03040-CMA-CBS, 2013 WL 9721026, at *3 (D. Colo. 2013) (noting, "as 'a general rule, determining whether an entity qualifies as an employer is a fact issue for the jury.'" (quoting *Bristol v. Bd. of Cnty. Comm'rs of Clear Creek*, 312 F.3d 1213, 1221 (10th Cir. 2012)).

The FLSA defines "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee."  29 U.S.C. § 203(b).  The FLSA defines "employee" as, with enumerated exceptions not pertinent to this matter, "any individual employed by an

employer." *Id.* at § 203(e)(1).  The definition is necessarily a broad one in accordance with the

remedial purpose of the FLSA.  *See United States v. Rosenwasser*, 323 U.S. 360, 363 (1945).

The FLSA defines "to employ" as "to suffer or permit to work" but fails to define or elaborate on

"suffer or permit to work."  29 U.S.C. § 203(g); *Norton v. Worthern Van Serv., Inc*., 839 F.2d

653, 654 (10th Cir. 1988).

 To determine whether an individual is an employee under the FLSA, the Tenth Circuit

applies the "economic realities test."  *Baker v. Flint Eng'g & Constr. Co.*, 137 F.3d 1436, 1439

(10th Cir. 1998).  In *Baker*, the court held that "[t]he economic reality test includes inquiries into

whether the alleged employer has the power to hire and fire employees, supervises and controls

employee work schedules or conditions of employment, determines the rate and method of

payment, and maintains employment records."  *Id.* (citing *Watson v. Graves*, 909 F.2d 1549,

1553 (5th Cir.1990)).  In applying the economic realities test, courts consider the following

factors: "(1) the degree of control exerted by the alleged employer over the worker; (2) the

worker's opportunity for profit or loss; (3) the worker's investment in the business; (4) the

permanence of the working relationship; (5) the degree of skill required to perform the work; and

(6) the extent to which the work is an integral part of the alleged employer's business."  *Baker,*

137 F.3d at 1440.  However, the Tenth Circuit has made it clear that these factors are not

exclusive as "no single set of factors" controls the analysis of whether an entity is an employer.

*Harbert v. Healthcare Servs. Group, Inc.*, 173 F. Supp. 2d 1101, 1106 (D. Colo. 2001).

 Here, Plaintiffs have alleged facts upon which a reasonable person could conclude that

they were jointly employed by Defendants and their respective host families.  According to

Plaintiffs' allegations, Defendants dictate the wages of the *au pairs*.  (*See generally* Am. Comp.)

Further, Defendants have statutory obligations to recruit *au pairs* and place them with host families, as well as supervise and monitor *au pairs* throughout the time they are employed as the same.  (Am. Comp. at 11, 16-17; Resp. at 35.)  Defendants are required to place each *au pair* with a host family that lives within one hour's driving time from one of Defendant's local organizational representatives who is authorized to act on the respective Defendant's behalf in both routine and emergency matters arising from the *au pair*'s employment with the host family. 22 C.F.R. §62.31(c)(5).  Each *au pair's* local organizational representative is required to have personal monthly contact, as well as twice monthly for the first two months following initial placement, with the *au pair* and host family and maintain records of the same, including noting any issues or problems.  22 C.F.R. §62.31(c)(6), (7); 22 C.F.R. § 62.3 (l)(1). Defendants are also required to ensure that each local organizational representative is receiving "adequate support services by a regional organizational representative."  22 C.F.R. § 62.31(c)(9).  Additionally, Defendants' regional organizational representatives or counselors are required to make quarterly contact with each *au pair* and host family and maintain records of this contact.  22 C.F.R. § 62.31(2).

22 C.F.R. § 62.31(j)(1)-(4) makes it the responsibility of Defendants to "require that *au pair* participants" receive certain conditions of employment, including: "(1) are compensated at a weekly rate based upon 45 hours of child care services per week and paid in conformance with the requirements of the [FLSA] as interpreted and implemented by the [DOL] . . . . ; (2) Do not provide more than 10 hours of child care per day, or more than 45 hours of child care in any week. . . . . ; (3) Receive a minimum of one and one-half days off per week in addition to one complete weekend off each month; and (4) Receive two weeks of paid vacation."  (*See* Am.

Comp. at 11; Resp. at 29.)  Defendants are required to provide *au pairs* with training that *au pairs* are likewise required to receive.  (Am. Comp. at 5-6, 47, 61, 62, 63, 68, 70, 73, 75, 77, 78.)  *See also* 22 C.F.R. § 62.31(g).  Defendants are required to provide the *au pairs* with a "copy of all operating procedures, rules and regulations, including a grievance process, which govern the *au pair*'s participation in the exchange program."  22 C.F.R. § 62.31(f).

Defendants act as the arbitrators of any disputes the *au pairs* have with their host families regarding wages and hours.  (Am. Comp. at 47, 61.)  Defendants have the ability to remove *au pairs* from the program and cause their removal from this country.  (*Id.*)  Defendants draft the contracts between the *au pairs* and their host families.  (Am. Comp. at 61.)  Defendants provide health insurance to the *au pairs*.  (*Id.*)  Some *au pairs* work at the Defendants' training sessions and local coordinator sessions.  (*Id.*)  Defendants have the ability to remove an *au pair* from a particular host family.  (*Id.*)  Most significant, Defendants have the ability to terminate an *au pair's* employment, even if the host family does not want to do so.  (*Id.*)  Moreover, the host families cannot terminate an *au pair* without approval from the applicable Defendant.  (*Id.*)

Defendants rely on *Ivanov v. Sunset Pools Mgmt., Inc.*, 567 F. Supp. 2d 189 (D.D.C. 2008) to argue that they are not employers because they are merely complying with DOS regulations in administering and monitoring the *au pair* program.  This argument is unavailing.  Significantly, DOS regulations do not require Defendants to dictate the *au pair's* wages.  While Defendants dispute this assertion, Plaintiffs have sufficiently alleged the same for this stage of the proceedings.  *See supra*.  Further, while *Ivanov* holds some similarities to the present case, it is distinguishable.

In *Ivanov*, two plaintiffs traveled to the United States to work as lifeguards. *Id.* at 190. They were recruited by Defendant Intrax, an international firm that recruits foreign citizens for "work-travel" opportunities within the United States. *Id.* Intrax worked with host companies, similar to Defendant Sunset, to match participants with appropriate employment. *Id.* Intrax also contracted with organizations in other countries to assist with the administration of its services. *Id.* The plaintiffs went to Zip Travel in Bulgaria begin Intrax's recruitment process. *Id.* A Sunset representative interviewed the plaintiffs for the lifeguard positions. *Id.* Intrax assisted the plaintiffs in obtaining their J-1 visas and entered into a Conditions Agreement with them. *Id.* The plaintiffs paid Intrax for these services. *Id.* Ultimately, the plaintiffs worked for Sunset for six months but worked in excess of forty hours per week and did not receive overtime compensation. *Id.* They brought suit against Sunset and Intrax under the FLSA. *Id.* All parties moved for summary judgment. *Id.*

With regard to Intrax's status as an employer, the plaintiffs relied on the fact that Intrax required them to attend an orientation session upon their arrival in the United States, report any address changes, notify Intrax of a change in employment and obtain authorization to leave their positions. *Id.* at 195. The court found that none of these actions were related to the plaintiffs' employment as a lifeguard and were also required by DOS regulations. *Id.* The plaintiffs also pointed out that Intrax helped the plaintiffs obtain health insurance, secure and maintain their visas and other immigration forms and requested updates on their employment status. *Id.* The court found that each of these actions were also required by DOS regulations and were therefore insufficient to establish that Intrax was a joint employer of the plaintiffs. *Id.*

In the present case, Defendants rely on these facts to argue that they are also not joint employers. However, the remainder of the court's reasoning in *Ivanov* is particularly relevant to this case. The court explained, "[T]he undisputed evidence shows that Intrax did not assign or direct plaintiffs' schedule or pay. In fact, the wages of its participants are set by the host company, such as Sunset; leaving Intrax's role to communicating information received from Sunset to plaintiffs *via* the Premium Placement Confirmation Form. Indeed, nothing in the Premium Placement Confirmation Form indicates that Intrax directed Sunset what to pay plaintiffs. To the contrary, the document merely indicates that Sunset will abide by the wages it provided to Intrax for inclusion in the form." *Id.* Additionally, there is no indication Intrax had any authority to terminate the plaintiffs' employment. *Id.* at 195-96.

The court is not convinced Defendants' statutory obligations should be inherently excluded from consideration of whether they are joint employers, especially given how much more in depth the obligations are than those discussed in *Ivanov*. Regardless however, Plaintiffs have alleged that in addition to their statutory obligations, Defendants set their wages, draft their employment contracts and have the authority to remove the *au pairs* from their host families and terminate their employment, even if the host families do not agree to the same. (Am. Comp. at 61-66.)

Additionally, the Amended Complaint contains excerpts from certain Defendants' employment contracts with the *au pairs* indicating those contracts, unlike in *Ivanov*, touch upon daily employment duties for the *au pairs*. (Am. Comp. at 63, 65-67.) For example, Defendant Cultural Care's contract grants it the "exclusive right to determine [the *au pair's*] continued participation in the Program." (Am. Comp. at 63.) The *au pair* must acknowledge that Cultural

Care (not the host family) will terminate the *au pair* if it determines that her emotional or physical state makes her unsuitable for providing childcare, if she gets married or pregnant, engages in behavior Cultural Care determines to be unsuitable, or Cultural Care deems her performance unsatisfactory "for whatever reason." (*Id.*)  In another example, Defendant Go Au Pair's contract with its *au pairs* sets out an au pair's daily employment responsibilities, including "daily maintenance of the children, including meal preparation, doing the children's laundry, transporting the children to various activities, assisting with homework, playing, teaching and caring for the children. [] Minor housekeeping, including but not limited to, washing the children's dishes, tidying up the children's rooms and making their beds, vacuuming and dusting the children's rooms and cleaning their bathrooms. [] pick up after the children in any room in which they have played." (Am. Comp. at 66-67.)

The court finds that under the Tenth Circuit's economic realities test, Plaintiffs have asserted sufficient allegations at this stage of the proceedings to support their contention that Defendants are joint employers.

### b. Room and Board Credit

Plaintiffs contend that Defendants are not allowed to credit room and board against their wages because the host families are required by law to provide the same.  29 C.F.R. § 531.27(a) allows an employer to include the reasonable cost or fair value of furnishing an employee board, lodging or other facilities in the employee's wages.  However, pursuant to 29 C.F.R. § 531.30, an employer may not credit the cost of facilities toward an employee's wages if the employer is required by law to provide the same.  Additionally, "under § 531.3(d)(1), the cost of furnishing 'facilities' which are primarily for the benefit or convenience of the employer will not be

recognized as reasonable and may not therefore be included in computing wages." 29 C.F.R. § 531.32(c). Relying on this, Plaintiffs also contend that the cost of room and board cannot be credited against their compensation as it benefits the host families.

In 1997, the DOL responded to a petition seeking credit against an *au pair's* wages for the cost of educational expenses, two weeks paid vacation, and credit for the "personal" use of the family automobile. U.S. Dep't of Labor, Wage and Hour Division, Opinion Letter, 1997 WL 998029, at *1 (Aug. 19, 1997). The DOL concluded that an "*au pair* employer may <u>not</u> take credit in meeting its minimum wage obligations for any of the three items" because each falls under the definition of "facility" for purposes of the FLSA and the employer is required by law to provide each. *Id.* at *1-2 (emphasis in original). *See also Ramos-Barrientos v. Bland*, 661 F.3d 587, 597-98 (11th Cir. 2011) (holding that employer was not entitled to wage credit under FLSA for cost of housing provided to workers because employer was statutorily required to provide the same); *Jiao v. Shi Ya Chen*, No. 03 Civ. 0165(DF), 2007 WL 4944767, at *14 (S.D.N.Y. March 30, 2007) (holding that the defendant-employer was not permitted to factor cost of lodging into employee's compensation where employer required employee to reside on the premises); *Schneider v. Landvest Corp.*, No. 03 CV 02474 WYD PAC, 2006 WL 322590, at *27-28 (D. Colo. Feb. 9, 2006) (relying on 29 C.F.R. §§ 531.30, 531.31 to hold that "because Plaintiffs' housing was furnished primarily for the benefit of Landvest and because Plaintiffs were required to reside at the facility, I find that the value of their lodging should not be included in the computation of their regular rate."); *Marshall v. DeBord*, No. 77-106-C, 1978 WL 1705, at *6 (E.D.Okla. 1978) (holding that "since the employees were required to live at the premises and since at least one employee had to be available at all times" then "rooms were primarily

furnished for the benefit of the defendant employer" and it was not permitted to "have the cost of furnishing lodging included in computing wages.").

There is no question that pursuant to 22 C.F.R. § 62.31(e)(6) host families are required to provide room and board to their *au pairs*. Defendants do not cite to any FLSA provision providing an exception for the *au pair* program as to 29 C.F.R. § 531.30 that otherwise prohibits an employer from crediting the cost of room and board from an employee's wages if the employer is required by law to provide the same. Instead, Defendants rely upon the 1995 amendments to the Code of Federal Regulations, as well as a Notice released by DOS. (Doc. No. 214 at 8; Doc. No. 127 at 22; Doc. No. 127-1; Doc. No. 207 at 2-3.)

Addressing the 1995 Code of Federal Regulations amendment, Defendants are correct that in 1995, when the USIA initially acknowledged that *au pairs* were in an employment relationship, the Final Rule published in the Federal Register incorporated a credit for room and board against *au pair* compensation, as discussed *supra*. 60 Fed. Reg. at 8551-8553 (Feb. 15, 1995) (codified at 22 C.F.R. pt. 514). However, in 1997, when the regulation was amended again, the USIA issued an Interim Final Rule, which was subsequently adopted into the Federal Regulations, and specifically noted that it was "amending this regulation to ensure that there is no future confusion regarding the payment of minimum wage." 62 Fed. Reg. at 34633 (June 27, 1997) (codified at 22 C.F.R. pt. 514); 62 Fed. Reg. 46876 (Sept. 5, 1997). Thus, the regulation had previously incorporated a credit into the minimum wage but after the 1997 amendment, the applicable regulation no longer included such a credit. Instead, the provision provides, "Sponsors shall require that *au pair* participants: (1) Are compensated at a weekly rate based upon 45 hours of work and paid in conformance with the requirements of the [FLSA] as

interpreted and implemented by the United States [DOL]." *Id.* at 34634; see also 22 C.F.R. §62.31(j)(1). As established above, conformance with the requirements of the FLSA does not include a room and board credit toward an employee's wage if an employer is required by law to provide that room and board. 29 C.F.R. § 531.30.

To that end, Defendants rely upon a Notice from the DOS related to the stipend amount following any changes to the federal minimum wage. Specifically, they cite to a Notice issued in 2007 in which the DOS indicates that the federal minimum wage was increasing to $7.25 per hour within two years. (Doc. No. 127-1 at 2.) The Notice provides that the weekly stipend for the standard *au pair* is directly connected to the federal minimum wage and "is based on a U.S. Department of Labor[] formula that includes credit for the room and board Host Families provide for their Au Pairs." (*Id.*) The Notice goes on to indicate that allowing for the credit, the weekly stipend would equal $195.75 by the time the full minimum wage increase goes into effect in 2009. (*Id.*).

The problem created by the Notice is that it does not cite to any law allowing the *au pair* program to use the room and board credit in spite of the FLSA provision specifically prohibiting such a credit for facilities when they are required by law. *See* 29 C.F.R. § 531.30. Defendants have not cited to any legal provision that indicates an exception to the FLSA's general provision regarding room and board credit. Nor has this court been able to locate such authority. It may well be ultimately resolved that an exception exists for the *au pair* program that allows credit of room and board against an *au pair*'s compensation. However, Plaintiffs have asserted a legal cause of action based upon specific provisions and regulations related to the FLSA. This court cannot conclude that they have failed to state a viable claim based solely on a Notice

disseminated by the DOS that does not include the citation to or the support of any specific legal authority.

### c. Overtime

Finally, Defendants seek dismissal of Plaintiffs' claim for overtime under the FLSA based on the overtime exemption for domestic workers.  29 U.S.C. § 213(b)(21) provides an exemption to the FLSA's overtime requirements for "any employee who is employed in domestic service in a household and who resides in such household."  29 C.F.R. § 522.3 defines "domestic service employment" as including babysitters and nannies.  Thus, Plaintiffs fall under the overtime exemption applicable to employees in domestic service who reside in their employer's household.  29 U.S.C. § 213(b)(21).

Plaintiffs rely, however, on recent changes to the FLSA to argue that they are entitled to overtime compensation due to their joint employment by Defendants.  Effective January 1, 2015, the DOL implemented the following Federal Rule, "[T]hird party employers of employees engaged in live-in domestic service employment [] may not avail themselves of the overtime exemption provided by [29 U.S.C. § 213(b)(21)], even if the employee is jointly employed by the individual or member of the family or household using the services."  29 C.F.R. § 552.109(c).  Plaintiffs acknowledge that this provision was held invalid in *Home Care Ass'n of Am. v. Weil*, 76 F. Supp. 3d 138 (D.D.C. 2014). (Resp. at 45.)  However, the District of Columbia Circuit Court of Appeals subsequently reversed the lower court's decision, finding that the provision is valid.  *Home Care Ass'n of Am. v. Weil*, 799 F.3d 1084 (D.C. Cir. 2015), *petition for writ of cert. filed*, (U.S. Nov. 18, 2015) (No. 15-683).  A petition for certiorari in the case is currently pending before the United States Supreme Court.  *Id.*

Thus, at this time, an exception applies for work performed after January 1, 2015, prohibiting joint employers from claiming the overtime exemption as applied to domestic service employees, such as Plaintiffs.  This court has already found that Plaintiffs have set forth sufficient allegations to support their claim that Defendants are joint employers with the host families, at least for this stage of the proceedings.  Therefore, Plaintiffs may proceed with their claim for overtime against Defendants under the FLSA for work performed after January 1, 2015.

**3. State law wage claims**

Plaintiffs contend that their wages must conform with the state law wage claims in each of the respective states in which they work or worked as an *au pair*.  To the extent applicable state laws direct greater compensation than the FLSA, Plaintiffs are asserting state law wage violations.  Defendants request dismissal based on various grounds.

**a. Pre-emption**

Defendants argue that any state law wage claims are pre-empted by DOS regulations and therefore, do not apply to *au pairs*.  In support of this proposition, Defendants assert a fragmented argument that begins with the premise that the *au pair* program falls under immigration law and because "[c]entralized authority for immigration is critical to international relations and the security of Americans abroad," these claims are preempted by federal law and regulations.  This argument fails for many reasons, not the least of which is that federal law and regulations do not dictate that *au pairs* are not entitled to the protection of state wage laws. Instead, they dictate just the opposite.

As an initial matter, the court notes that Defendants' reliance on *Arizona v. United States*, __ U.S. __, 132 S.Ct. 2492 (2012) is misplaced.  In *Arizona*, the Supreme Court reviewed Arizona state laws that essentially allowed a state to enforce federal immigration law, declared engaging in work by an unauthorized alien a misdemeanor, allowed state law enforcement officers to check immigration status of an individual they have lawfully stopped, detained or arrested, and allowed law enforcement to arrest individuals they had probable cause to believe had committed a crime that warranted deportation under federal immigration law.  *Id.* at 2497-98.  The Supreme Court struck down these laws, with the exception of one, as unconstitutional based on the reasoning that the "subject of immigration and the status of aliens" is reserved to the federal government and the state laws at issue not only usurped that authority but conflicted with federal law.  *Id.* at 2498, 2503, 2505, 2507, 2510.

In order to avoid the application of state wage laws, Defendants attempt to couch the *au pair* program as falling squarely into the field of immigration and then claim federal preemption under *Arizona*.  The *Arizona* opinion holds little, if any, relevance to the present case.  The state laws at issue herein do not pertain to immigration.  The *au pair* program permits young people to enter this country and work lawfully as an *au pair* under the auspices of "cultural exchange."[8] More significantly, the federal laws and regulations explicitly contemplate the application of state wage laws to *au pairs*.[9]

---

[8] Tellingly, though administration of this program has passed from the USIA to the DOS, it has never fallen under the authority of Immigration and Naturalization Services.

[9] Defendants also rely upon *Bai Haiyan v. Hamden Public Schools*, 875 F. Supp. 2d 109 (D. Conn. 2012) to argue that *au pairs* do not operate within the employment context.  (Doc. No. 130 at 10.) In *Bai Haiyan*, the plaintiff was part of the Chinese Guest Teacher Program ("CGTP") that, similar to the *au pair* program, was established under the Cultural Exchange Act.  *Id.* at 114.  The plaintiff brought employment related claims against the defendants, however, the court

Defendants contend that they are "not operating within the employment laws of the various states, but rather within the program regulations established by DOS, the federal agency in charge of the program." (Doc. No. 130 at 11.) However, at no point do Defendants explain where, within this allegedly all-encompassing federal scheme or regulatory plan, DOS indicates an intent to remove the *au pair* program from state employment and labor laws.

As discussed in detail, *supra*, federal regulations are explicitly clear that the FLSA applies to the *au pair* program. Further, the FLSA mandates that state minimum wage laws control within each respective state. Specifically, 29 U.S.C. § 218(a), the FLSA's savings clause, provides, "No provision of this chapter or of any order thereunder shall excuse noncompliance with any Federal or State law or municipal ordinance establishing a minimum wage higher than the minimum wage established under this chapter." Thus, if a state sets its minimum wage higher than that mandated by the FLSA, as many have, then pursuant to the FLSA, employees within that state are entitled to receive the higher state minimum wage. (*Id.*) Defendants make broad claims that the DOS's scheme and regulations governing the *au pair* program pre-empt state laws regarding minimum wage, but they fail to cite to any federal law, regulation or guideline that provides for what would essentially be an exemption to the FLSA's savings clause.[10] 29 C.F.R. § 62.31(j)(1) specifically requires that *au pairs* are compensated "in

---

found that the regulations implementing the CGTP and the Memorandum of Understanding pertaining to her placement as a teacher under the CGTP did not create an employment relationship. *Id.* at 126-27. The *Bai Haiyan* decision is distinguishable from the present case because applicable federal law makes clear that *au pairs* are in an employment relationship.

[10] Defendants cite to 60 Fed. Reg. 8547 (1995) as indicating that the federal government "identified a programmatic need for a uniform wage." (Doc. No. 214 at 3.) However, Defendants' characterization of this statement is misleading. In the Supplementary Information section preceding the Final Rule, the USIA discussed the appropriate amount of credit a host family could use with regard to the room and board provided to an *au pair* and considered the

conformance with the requirements of the FLSA" and it does not include language indicating "except for the savings clause."[11]

Additionally, under the Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, the Secretary of State, in consultation with the Secretary of Homeland Security, the Attorney General and the Secretary of Labor, was required to develop an "information pamphlet [] on legal rights and resources for aliens applying for employment- or education-based nonimmigrant visas." 8 U.S.C. § 1375b(a)(1) (the "Wilberforce Pamphlet"). The Wilberforce Pamphlet is required to include, *inter alia*, information concerning "the legal rights of employment or education-based nonimmigrant visa holders under Federal immigration, labor and employment law." 8 U.S.C. § 1375b(b)(2). The Wilberforce Pamphlet specifically addresses the rights of a person holding, *inter alia*, a J-1 visa. (Doc. No. 199-1 at 6-7.) Pursuant to 22 C.F.R. § 62.10(c)(8), the Sponsors are required to provide the Wilberforce Pamphlet to *au pairs*. The Wilberforce Pamphlet discusses rights guaranteed to any individual holding one of the visas discussed within the Pamphlet and states explicitly, "You have the right to earn at least the federal legal minimum wage, $7.25 per hour, in the same manner as U.S. workers. Also check – [t]he minimum wage for the **state** in which you work. If that wage is higher, you have the right to be paid the higher amount." (Doc. No. 199-1 at 8) (emphasis in original).

---

options of crediting actual cost or a fixed cost. *Id.* at 8551. The USIA weighed the preference for crediting actual cost against the need for the *credit* to be uniform so that host families would not have to maintain individualized records. *Id.*

[11] In a request to cite new relevant authority, *see* Doc. No. 233, Defendants submitted *ASSE Int'l, Inc. v. Kerry*, 803 F.3d 1059 (9th Cir. 2015), in which the court discussed that DOS regulations "provide a framework" for implementing various programs under the Cultural Exchange Act. *Id.* at 1065. However, Defendants continue to ignore that the very regulations governing the *au pair* program mandates the application of and conformance with the FLSA.

Based on the above, the court finds Defendants' contention that an overall federal scheme and/or federal regulations pre-empt the state minimum wage laws in this country as applied to *au pairs* has no support under federal law.

**b. Colorado wage laws**

Plaintiff Beltran has asserted a claim under Colorado's wage laws because her compensation did not comply with Colorado's minimum wage requirements while she served as an *au pair* in Colorado.  Defendant InterExchange contends that the Colorado wage laws do not apply to Plaintiff Beltran because "domestic employees" are exempt from the Colorado Minimum Wage Act.  (Doc. No. 130 at 24.)

"Defendant bears the burden of demonstrating that a particular employee 'plainly and unmistakably' qualifies for an [] exemption" from wage and labor laws.  *Kennett v. Bayada Home Health Care, Inc.*, __ F. Supp. 3d __, 2015 WL 5608132, at *5 (D. Colo. 2015) (quoting *Chase v. Farmers Ins. Exch.*, 129 P.3d 1011, 1014-15 (Colo. App. 2004)).  In asserting this argument, InterExchange relies upon 7 Colo. Code Regs. 1103-1:5, which provides that "companions, casual babysitters, and domestic employees employed by households or family members to perform duties in private residences" are exempt from all provisions of Colorado's Minimum Wage Order.

Plaintiff correctly responds that the Minimum Wage Order specifically provides,

if either of the following two situations applies to an employee, then the employee is entitled to the $8.23 state minimum wage . . . .:

1. The employee is covered by the minimum wage provisions of Colorado Minimum Wage Order Number 31.

2.  The employee is covered by the minimum wage provisions of the Fair Labor Standards Act.

*Colo. Minimum Wage Order No. 31.*  The plain reading of the Order indicates an intent to set a uniform minimum wage so that all employees within the state who are entitled to receive minimum wage under either federal or state law will receive the same wage. *Id.*

The court has already established, *supra*, that *au pairs*  are covered by the minimum wage requirements of the FLSA.  *See* 29 U.S.C. § 206(f) (providing that an employee in domestic service in a household is entitled to minimum wage; 29 C.F.R. § 522.3 (defining "domestic service employment" as including babysitters and nannies).  Thus, Plaintiff Beltran was clearly covered under the minimum wage provisions of the FLSA and therefore, entitled to minimum wage under Colorado's Minimum Wage Order No. 31.

### d. New York wage laws

Defendants argue that *au pairs* are exempt from New York's wage laws.  Again, Defendants have the burden to show that an employee is exempt from any otherwise applicable wage and labor laws.  *Kennett,* 2015 WL 5608132, at *5.  In support of their position, Defendants cite only to a "Fact Sheet" disseminated by the New York Department of Labor indicating that it has concluded *au pairs* are not subject to the protections of the state's wage and labor laws.  (Doc. No. 127-4 at 4; Doc. No. 136 at 14-15.)  Defendants also note that New York's Department of Labor enforces state labor law.  (Doc. No. 214 at 14.)

The Fact Sheet upon which Defendants rely does not cite to any state law that exempts *au pairs* from minimum wage and/or overtime exemptions, nor do Defendants.[12]  The Fact Sheet is most analogous to a an opinion letter and therefore, may be entitled to a certain amount of

---

[12] Further, though not dispositive of the issue presented here, the portion of the Fact Sheet upon which Defendants rely is primarily focused on immigration status, though it does refer generally to the application of all state labor laws.

deference with regard to the interpretation of New York's wage and hour laws, but it does not

displace or supersede a court's own interpretation and judgment.  *See Salazar v. Butterball, LLC,*

No. 08-cv-02071-MSK-CBS, 2009 WL 6048979, at *8 (D. Colo. Dec. 3, 2009) (finding that

[DOL's] opinion letters are entitled to deference, but the level of deference accorded depends

upon the "thoroughness evident in its consideration, the validity of its reasoning, its consistency

with earlier and later pronouncements, and all those factors which give it power to persuade, if

lacking power to control.") (citing *McGraw v. Barnhart*, 450 F.3d 493, 501 (10th Cir. 2006)

("Under *Skidmore*, the degree of deference given informal agency interpretations will vary with

circumstances, and courts have looked to the degree of the agency's care, its consistency,

formality, and relative expertness, and to the persuasiveness of the agency's position.")).  While

the New York DOL's opinion with regard to whether its state labor laws applies to *au pairs* may

be persuasive depending upon the above mentioned factors, it is not determinative of whether

Plaintiffs have stated a viable claim.  As that is the only authority upon which Defendants have

relied, the court finds their request for dismissal should be denied.

### e.  California

Defendant AIFS argues that Plaintiffs were not employees of AIFS under California law

because AIFS did not control their wages, hours or working conditions.  (Doc. No. 136 at 15.)

Plaintiffs argue that Defendants, including Defendant AIFS, are joint employers of Plaintiffs

with the respective host families.  The court has already found that Plaintiffs have provided

sufficient allegations to support this argument, at least at this stage of the proceedings.  The same

reasoning applies with regard to Defendant AIFS's request to dismiss Plaintiffs' claims under the

California wage laws.

### f. Pennsylvania and Utah

Defendant Cultural Care, Inc. ("Cultural Care") contends that "domestic workers are exempted" under the wage laws of Pennsylvania and Utah.  (Doc. No. 127 at 18.) Pennsylvania's Minimum Wage Act does include an exemption for employment in "[d]omestic services in or about the private home of the employer."  43 Pa. Cons. Stat. § 331.105(a)(2). Plaintiffs correctly note, however, that the Pennsylvania courts have specifically refused to apply the domestic workers exemption to third-party employers.  *Bayada Nurses, Inc. v. Commonwealth*, 8 A.3d 866, 881-82 (Pa. 2010).  Defendants do not dispute the holding in *Bayada* but instead, assert that they are not Plaintiffs' employers.  (Doc. No. 207 at 15.)  The court has already concluded Plaintiffs have provided sufficient allegations to support their argument that Defendants are joint employers, at least at this stage of the proceedings.

Similarly, Utah's Minimum Wage Act contains an exemption for "casual and domestic employees." Utah Code Ann. § 34-40-104(e).  The court notes that Utah's Minimum Wage Act sets the minimum wage at $3.80 per hour, specifically prohibits the minimum wage from exceeding the minimum wage set by the FLSA, and exempts from its provisions any employee already entitled to a minimum wage under the FLSA.  Utah Code Ann. §§ 34-40-103, 34-40-104(1)(a).  This court has already concluded that Plaintiffs are entitled to minimum wage under the FLSA.  Therefore, Plaintiffs are exempt from Utah's Minimum Wage Act.

**4. Claims Based on Fraud**

Defendants seek dismissal of Plaintiffs' claims II-VI, arguing generally that Plaintiffs did

not plead the fraud aspect of these claims with sufficient particularity.[13]  Fed. R. Civ. P. 9(b)

requires that "[i]n alleging fraud [], a party must state with the particularity the circumstances

constituting fraud . . . ."  Typically, to satisfy Rule 9(b), Plaintiffs must "set forth the time, place

and contents of the false representation, the identity of the party making the false statements, and

the consequences thereof."  *HealthONE of Denver, Inc. v. UnitedHealth Group, Inc.*, 805 F.

Supp. 2d 1115, 1121 (D. Colo. 2011) (quoting *Koch v. Koch Industries, Inc.*, 203 F.3d 1202,

1236 (10th Cir. 2000)).

Plaintiffs have alleged Defendants falsely informed them, other *au pairs* and host

families that $195.75 was a "set" or "fixed" salary and that they could not receive more. As

specific examples, Plaintiffs asserted that Defendant InterExchange's website informed *au pairs*

that they can earn "**almost** $10,000.00" per year, which would represent the total salary if

making $195.75 per week.  (Am. Comp. at 40-41; Resp. at 72-73.) (emphasis provided).[14]

Plaintiffs further allege that through a blog entry on its website, Defendant InterExchange

informed *au pairs* that if they received offers for higher salaries, they should consider such offers

bogus and/or the product of a scam.  (Am. Comp. at 40-41.)  Finally, Defendant InterExchange

---

[13] To the extent Defendants contend these claims are pre-empted, the court has already addressed that argument, *supra*, in the context of Plaintiffs' state law wage claims and concluded Plaintiffs' state law claims are not pre-empted.

[14] Defendant InterExchange contends that its website states that *au pairs* will earn "almost $10,000.00 or more."  (Doc. No. 130 at 14.)  However, Plaintiffs allege that the "or more" was not added until after the current lawsuit was filed and have indicated they can produce the screenshot of Defendant InterExchange's website as of December 5, 2014.  (Resp. at 73.)

informed *au pairs* through another blog post that the salary of $195.75 per week was the product of a "strict equation."  (Am. Comp. at 40-41.)

Plaintiffs allege that Defendant AIFS has informed *au pairs* that if they received more than $195.75/week, they could be subject to deportation and that its website listed the weekly stipend as simply $195.75 and instructed host families that they "needed to 'pay th[at] published fee.'"  (Am. Comp. at 43)  Similarly, Plaintiffs allege that Defendant American Cultural Exchange LLC d/b/a GoAuPair created a handbook entitled, "GoAuPair Au Pair Household Handbook," that instructs GoAuPair host families that *au pair* wages are set by the federal government at $195.75.  (Am. Comp. at 33.)

Defendants argue that this claim should be dismissed because Plaintiffs admitted their websites advertised higher rates for *au pair* salaries.  (Doc. No. 131 at 7-8; Doc. No. 136 at 8.) However, Defendants' references to a higher salary was not for standard *au pairs* and are therefore not relevant to Plaintiffs' claims herein, as discussed *supra*.  (Am. Comp. at 23, 57, 67.)

Finally, Defendant Cultural Care again argues (alone) that the $195.75 is the maximum amount *au pairs* are permitted to receive.  (Doc. No. 127 at 23.)  As an alternative argument, it argues that if its position in that regard is inaccurate, "Plaintiffs have failed to plead facts sufficient to show that Cultural Care was aware of this . . . . and therefore acted to mislead *au pairs*."  (*Id.*).  The fact that $195.75/week does not represent a fixed wage is well established. *See supra*.  With regard to its alternative argument, Defendant Cultural Care has essentially conceded they informed *au pairs* that $195.75 was a fixed rate, which aligns with Plaintiffs' allegations.  (Doc. No. 127 at 23; Am. Comp. at 42.)  It is not Plaintiffs' burden to prove in their

pleading that Defendant Cultural Care knew these statements were false and misleading.  Such

an inquiry implicates a question of fact and is appropriate for a later stage of these proceedings.

Plaintiffs have set forth specific statements allegedly made by Defendants in order to

deceive and/or mislead *au pairs* that $195.75/week was a fixed or set rate.  These statements are

sufficient to satisfy Rule 9(b) regarding the fraud related elements of Counts II-VI.

## 5.  Breach of Fiduciary Duty

Colorado law recognizes that "some special relationships by their nature automatically

trigger an independent duty of care that supports a tort action even when the parties have entered

into a contractual relationship."  *Town of Alma v. Azco Constr. Co.*, 10 P.3d 1256, 1263 (Colo.

2000).  As explained in *DerKevorkian v. Lionbridge Techs., Inc.*, 316 F. App'x 727 (10th Cir.

2008), "A confidential relationship exists when one party justifiably reposes confidence in

another such that the parties drop their guard and assume that each side is acting fairly.  Colorado

does not recognize a separate tort founded upon breach of a confidential relationship.  However,

a confidential relationship may serve as an indication of fiduciary status."  *Id.* at 737 (internal

quotations and citations omitted).  Under Colorado law, in order to establish a breach of

fiduciary duty in this context

> 'there must be proof, among other things, that (1) either the reposing of trust and
> confidence in the other party was justified, or the party in whom such confidence
> was reposed either invited, ostensibly accepted, or acquiesced in such trust; (2)
> the alleged trustee assumed a primary duty to represent the other party's interest
> in the subject of the transaction; (3) the nature and scope of the duty that arose by
> reason of the confidential relationship extended to the subject mater [sic] of the
> suit; and (4) that duty was violated, resulting in damage to the party reposing such
> confidence.

*Id.* at 737-38 (quoting *Equitex, Inc. v. Ungar*, 60 P.3d 746, 752 (Colo. Ct. App. 2002)).

In *DerKevorkian*, the plaintiff relied upon a specific written agreement between the defendant-employer and the plaintiff-employee whereby the employer agreed to sponsor the plaintiff's permanent residence application under the terms of the company's Permanent Resident Program ("PRP") in exchange for, *inter alia*, the employee's remaining with the company for two years following receipt of her green card.  *Id.* at 729-30.  Ultimately, the plaintiff did not receive a green card and alleged that was due to the employer's handling of the application process.  *Id.* at 731-32.  The plaintiff brought several causes of action, including breach of contract and breach of fiduciary duty. *Id.* at 733.  The jury returned a verdict in the plaintiff's favor on each of those claims.  *Id.*

The employer appealed, arguing that the evidence did not support a finding of fiduciary duty.  *Id.* The Tenth Circuit affirmed the jury's verdict and noted the lower court's reasoning in denying the employer's motion for a new trial, that the plaintiff "trusted [the employer] to represent her interests in the handling of various filings in order for her to continue to work in the United States.  From the beginning of their employment relationship, at least prior to the time they entered into a contract related to [the plaintiff's] green card application, [the employer] had a high degree of control and [the plaintiff] placed a significant amount of trust and confidence that [the employer] would look after her best interests related to her ability to work in the United States as an employee." *Id.* at 738.  The Tenth Circuit stated, "[W]e find sufficient evidence supporting the district court's conclusion that, throughout their employment relationship, [the plaintiff] invariably relied upon [the employer] and its expertise and experience to assist her in obtaining whatever documentation was necessary to remain a legal worker in the United States. This culminated in the PRP, pursuant to which we agree with [the plaintiff] and the district court

that [the employer] assumed a fiduciary duty to assist her and support her in her green card

application." *Id.*

The contentions in the present case provide a stronger basis to find a confidential

relationship than that described in *DerKevorkian*.  Plaintiffs' allegations related to the first three

elements of a fiduciary relationship include the following: (1) The *au pairs* are required to be

young (between the ages of 18-26) and they understandably lack sophistication with regard to

United States wage and labor laws  (Am. Comp. at 10, 5); (2) The *au pairs* have a markedly

inferior ability to know the applicable law beyond what Defendants inform them (Am. Comp. at

47-48); (3) They inherently place their trust in Defendants to protect their legal interests as

Defendants are legally responsible for training the *au pairs* for their employment and protecting

their rights  (*Id.*); (4) Defendants specifically promote this aspect of the relationship to the *au*

*pairs* through recruiting materials, agreements and training  (Am. Comp. at 47); (5) Defendants

purport to be in a position to protect the *au pairs* and to have superior knowledge and specialized

information of the applicable law  (*Id.*); (6) This image is strengthened by the fact that

Defendants act as arbitrators of any disputes about wages and hours with the *au pairs* and their

host families  (*Id.*); and, (6) Defendants had a duty to know the applicable law regarding

employee rights and wages and Plaintiffs allege that in fact they did know but intentionally

mislead them.  (Am. Comp. at 48-51.)  Addressing the final fiduciary duty element, Plaintiffs

contend that they never asked for higher wages or for wages that were mandated by the FLSA

and/or state wage laws because they were led to believe they were receiving the maximum

amount to which they were eligible.  (Am. Comp. at 50.)  The assertions within Plaintiffs'

Amended Complaint suggest that the manner in which Defendants almost uniformly choose to

administer their statutory obligations creates a fiduciary relationship between Defendants and Plaintiffs.  (Am. Comp. at 10, 16-17, 30, 43, 46-51.)

Defendants assert that there is "no legal basis under DOS regulations to allege" a fiduciary relationship, *see* Doc. No. 127 at 24, and argue that Defendants did not guarantee that Plaintiffs "would receive or maintain a J-1 visa, would be permitted to participate in the program or would be suitable for or satisfied with the program."  (Doc. No. 130 at 17.)  However, these arguments wholly fail to address the substance of Plaintiffs' claims.  Plaintiffs have not asserted this claim alleging that Defendants somehow failed to assist them in acquiring a visa or guaranteed that Plaintiffs would like the program.  Rather, Plaintiffs have plainly asserted this and other claims in this action based on the fact that Defendants mislead them, to Plaintiffs' detriment, with regard to the compensation to which they were entitled.

Taking Plaintiffs' allegations as true and accurate, as is required, the court finds Plaintiffs have set forth allegations sufficient to support a claim that a fiduciary relationship existed between the parties and that Defendants breached the same.

## 6.  Breach of Contract

"[A] party attempting to recover on a claim for breach of contract must prove the following elements: (1) the existence of a contract; (2) performance by the plaintiff or some justification for nonperformance; (3) failure to perform the contract by the defendant; and (4) resulting damages to the plaintiff." *W. Distribution Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992) (citations omitted).  Plaintiffs do not allege that Defendants violated a provision within their respective contracts with the *au pairs*.  (Am. Comp. at 93; Resp. at 76-78.)  Instead, Plaintiffs contend that each contract incorporated the legal requirements of applicable wage and

labor laws and that Defendants breached those requirements.  (*Id.*)  However, Defendants'

violations of wage and labor laws are their own independent causes of action and Plaintiffs have

asserted those causes of action herein.

Therefore, the breach of contract claim cannot stand.  However, as an alternative,

Plaintiffs also assert claims for unjust enrichment and promissory estoppel.  (Am. Comp. at 93.)

Defendants have not requested dismissal of either of those claims.

**7.  Motions to Strike**

On August 6, 2015, Defendant Cultural Care, Inc. filed a Motion to Strike related to

material Plaintiffs had submitted with their consolidated Response to Defendants' Motions to

Dismiss. (Doc. No. 206.)  Defendant's Motion requested the court strike from consideration and

review an article from the Washington Post, an amicus brief filed by the Secretary of Labor in a

separate action, and a PowerPoint presentation created by the DOS regarding the Wilberforce

Trafficking Victims Protection Reauthorization Act of 2008.  (Doc. No. 206 at 1-2.)

Plaintiffs subsequently filed a Motion to Strike requesting the court strike from

consideration and review certain materials that Defendants had submitted in relation to their

Motions to Dismiss.  (Doc. No. 221.)  However, with the exception of two documents submitted

with Defendant GoAuPair's Reply, Plaintiffs' request to strike was premised solely on the court

granting Defendant's Motion to Strike.  (Doc. No. 221 at 2.)  In other words, Plaintiffs were only

requesting the court strike the objectionable materials submitted by Defendants, other than

Defendant GoAuPair, if the court granted Defendant's Motion to Strike.

As the court was able to resolve the pending Motions to Dismiss without considering the materials the parties found objectionable, the court finds that both Motions to Strike should be denied as moot.

WHEREFORE, for the foregoing reasons, this court respectfully

**RECOMMENDS** that the "Joint Motion by Certain Defendants to Dismiss the First Amended Complaint and Certification of Compliance with Civil Practice Standard 7.1D." (Doc. No. 135) should be **DENIED**;

**RECOMMENDS** that "Defendant Cultural Care, Inc.'s Motion to Dismiss All Claims in First Amended Complaint Pursuant to Federal Rule of Civil Procedure 12(B)(6)" (Doc. No. 127), "Motion to Dismiss the First Amended Complaint by Defendant InterExchange, Inc." (Doc. No. 130), "Defendant American Cultural Exchange, L.L.C., D/B/A Go Au Pair's Motion to Dismiss Counts I, III, IV, V, VI, VII, VIII, IX and X of the First Amended Complaint" (Doc. No. 131), and "Defendant American Institute for Foreign Study's Motion to Dismiss Amended Complaint" (Doc. No. 136) should be **GRANTED in part** and **DENIED in part**.  Plaintiffs' claim under the Utah Minimum Wage Act and Plaintiffs' claim for breach of contract should be dismissed. Plaintiffs' remaining claims should proceed.

Additionally, it is

**ORDERED** that "Defendant Cultural Care, Inc.'s Motion to Strike Material in Plaintiffs' Consolidated Opposition to Defendants' Motions to Dismiss" (Doc. No. 206) and "Plaintiffs' Cross-Motion to Strike Certain Exhibits Submitted by the Defendants" (Doc. No. 221) are **DENIED as moot**.

## ADVISEMENT TO THE PARTIES

Within fourteen days after service of a copy of the Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *In re Griego*, 64 F.3d 580, 583 (10th Cir. 1995). A general objection that does not put the district court on notice of the basis for the objection will not preserve the objection for *de novo* review. "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." *United States v. One Parcel of Real Prop. Known As 2121 East 30th Street, Tulsa, Okla.*, 73 F.3d 1057, 1060 (10th Cir. 1996). Failure to make timely objections may bar *de novo* review by the district judge of the magistrate judge's proposed findings and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings and recommendations of the magistrate judge. *See Vega v. Suthers*, 195 F.3d 573, 579–80 (10th Cir. 1999) (stating that a district court's decision to review a magistrate judge's recommendation *de novo* despite the lack of an objection does not preclude application of the "firm waiver rule"); *One Parcel of Real Prop.*, 73 F.3d at 1059–60 (stating that a party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for *de novo* review by the district court or for appellate review); *Int'l Surplus Lines Ins. Co. v. Wyo. Coal Ref. Sys., Inc.*, 52 F.3d 901, 904 (10th Cir. 1995) (holding that cross-claimant had waived its right to appeal those portions of the ruling by failing to object to certain portions of the magistrate judge's order); *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (holding that plaintiffs waived their

right to appeal the magistrate judge's ruling by their failure to file objections). *But see Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (stating that firm waiver rule does not apply when the interests of justice require review).

Dated this 22nd day of February, 2016.

BY THE COURT:

Kathleen M. Tafoya
United States Magistrate Judge