**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Case No. 14-cv-03074-CMA-KMT

JOHANA PAOLA BELTRAN, *ET AL.*

      Plaintiffs,

v.

INTEREXCHANGE, INC., *ET AL.*

      Defendants.

---

**PLAINTIFFS' RESPONSE TO CERTAIN DEFENDANTS' OBJECTIONS
TO THE MAGISTRATE JUDGE'S RECOMMENDATION**

---

## <u>PRELIMINARY STATEMENT</u>

In a comprehensive 45-page Recommendation, Magistrate Judge Tafoya found that Plaintiffs' core allegations – that *au pairs* are entitled to be paid at least the applicable minimum wage, without deductions for room and board, and that the defendants agreed amongst themselves to hold *au pair* wages to a uniform and illegal rate – were legally correct and well-pleaded. This Court should adopt the Recommendation in its entirety.[1]

Defendants – who are the only sponsors of visas for *au pairs* in the United States, and who therefore control one hundred percent of the *au pair* labor market – have conspired to set the wages paid to *au pairs* at $195.75 per week. That amount is both below the rate that *au pairs* could obtain on the open market and below the amount

---

[1] Plaintiffs have not objected to Judge Tafoya's recommendation that their claims under the Utah Minimum Wage Act and for breach of contract be dismissed.

required by federal and state wage and hour laws.  Defendants have further misled *au pairs* in an attempt to convince them that the $195.75 rate has been imposed by the U.S. government, and that *au pairs* should be suspicious of any host family who might offer to pay them more.  The result:  young people who have come to this country, lured by the promise of earning an honest living while learning about American culture, have been subjected to sub-standard working conditions and a violation of their rights.

In their objections, the Defendants assert that the government has somehow implicitly granted them an exemption from the laws that apply to all other employers. That position has been rejected by the State Department, the very agency Defendants invoke as cover for their illegal conduct, which has stated in multiple places — including an on-the-record comment made in response to this very lawsuit — that *au pairs* are entitled to the protection of state and federal wage and hour laws.  That position has also now been rejected by Magistrate Judge Tafoya.

After reviewing more than 200 pages of briefing, [Docs. 127, 130-133, 135-36, 199, 211, 214-216], along with four filings of supplemental authority, [Docs. 222, 228, 233, 239], Judge Tafoya issued a 45-page Recommendation that is as thoughtful as it is thorough, [Doc. 240 (the "Recommendation," and cited as "Rec.")].  Judge Tafoya correctly concluded that Defendants' central argument — that "the federal government expressly mandated that Sponsors ensure host families paid *au pairs* a weekly stipend in the amount of $195.75" — "misses the point."  *Id.* at 8.  As Judge Tafoya reasoned:

> There is no evidence that the federal government "directs," or in any other way mandates, that an *au pair*'s wages are set at $195.75.  Instead, since the *au pair* program became formally subject to wage and hour laws, the applicable laws

> and regulations have required that Sponsors ensure an *au pair*'s wages comply with [the Fair Labor Standard Act's] requirements, including that employers pay employees the applicable minimum wage.

*Id*.

Defendants' objections to Judge Tafoya's Recommendation rehash the very argument Judge Tafoya rejected:  that they are immune from federal and state wage and hour laws.  [Doc. 247].  But the text of the State Department's *au pair* regulations is crystal clear on this point:  *au pairs* must be "paid in conformance with the requirements of the Fair Labor Standards Act as interpreted and implemented by the United States Department of Labor."  22 C.F.R. § 62.31(j)(1).  Far from exempting *au pairs* from the minimum wage laws, the regulation explicitly provides that the FLSA applies to *au pairs*.

Defendants' other primary objection is that the antitrust claim is not properly pleaded because, in their view, they have only been accused of "parallel conduct where there is independent business rationale for the behavior."  [Doc. 248 at 2].  But aside from all of the other factual material in the First Amended Complaint demonstrating the existence of an agreement in restraint of trade – including the dispositive admissions by several of the Defendants' agents that there was an antitrust conspiracy – there is no lawful "independent business rationale" for setting wages at an illegal level, and Defendants proffer none.  These facts, along with all the other facts alleged in the Complaint, more than state a viable antitrust claim, as Judge Tafoya properly found.

## STANDARD OF REVIEW

Where a party has filed "specific written objections" to a Magistrate Judge's recommendations, the Court must "determine de novo any part of the magistrate

judge's disposition that has been properly objected to." Fed. R. Civ. P. 72(b)(2)-(3).

"An objection is properly made if it is both timely and specific." *Saxton v. Lucas*, No. 15-cv-00255-CMA-MJW, 2016 WL 750697, at *2 (D. Colo. Feb. 26, 2016) (internal quotation marks omitted).[2]

## ARGUMENT

### I.   WAGE & HOUR LAW CLAIMS

Defendants argue that *au pairs* are not their employees and, even if they were, that they need not ensure that *au pairs* are paid either the state or federal minimum wage. These arguments go a long way toward explaining the substandard wages *au pairs* have received over the years, but they have no basis in the law.

####     A.   *Au Pairs* are Entitled to the Protections of the Fair Labor Standards Act, Including the Federal Minimum Wage.

The crux of Defendants' objections is the argument that the FLSA simply does not apply to *au pairs'* wages, and that instead some "DOS formula[] governs calculations of the weekly stipend," *i.e.*, wage. [Doc. 247 at 2]. This argument was rightly rejected by Judge Tafoya for two exceedingly straightforward reasons. First, the State Department regulations explicitly say that *au pairs* must be paid in accordance

---

[2]     As Your Honor recently emphasized, "the objections process is not intended to allow Defendants to . . . merely reargue their positions on the Motion to Dismiss, but rather, to specifically analyze why the Magistrate Judge erred in [her] conclusions." [Doc. 244 (citing *United States v. Berryman*, No. 11-cv-2708, 2012 WL 3245415, at *5 (D. Colo. Aug. 8, 2012))]. Because the purpose of objecting to a Magistrate's recommendations is to attempt to demonstrate error, an objecting party may not raise new arguments not previously presented to the Magistrate: "this is not a de novo review permitting a 'second shot' based on new arguments." *Berryman*, 2012 WL 3245415, at *5 (internal quotation marks and citations omitted). But nor may a party "merely rehash arguments raised in the [original] briefing." *Villareal v. United States*, No. 11-cv-0100-CMA-CBS, 2012 WL 6830384, at *1 (D. Colo. Nov. 19, 2012).

with the FLSA.  And second, this so-called DOS formula – which purportedly consists of a calculation of the federal minimum wage for a 45-hour work week, less a 40% discount for room and board – literally does not exist in any current statute, regulation, or piece of administrative guidance.

The plain text of the regulations governing the *au pair* program provides that *au pairs* are to be "paid in conformance with the requirements of the Fair Labor Standards Act as interpreted and implemented by the United States Department of Labor."  22 C.F.R. § 62.31(j)(1).  This explains why the State Department's Wilberforce Pamphlet, which is a statutorily mandated notice that must be issued to *au pairs*, states that *au pairs* "have the right to earn at least the federal minimum wage . . . in the same manner as U.S. workers."  [Doc. 199-1, Wilberforce Pamphlet, at 7].  That statutorily mandated notice does not say anything about an alternative "formula" or a 40% wage cut for room and board, as surely it would if Defendants' argument had any merit.

Federal regulations implementing the FLSA further provide that an employer may not take deductions from a worker's wages to cover the cost of room and board when such room and board are provided "primarily for the benefit or convenience of the employer."  *See* 29 C.F.R. § 531.3(d)(1); *see also id.* § 531.  The Labor Department has interpreted these regulations to mean that facilities are furnished primarily for the benefit of the employer, and therefore are ineligible for a wage deduction, when the employer is legally required to provide them.  *See* DOL Opinion Letter, 1997 WL 998029 (Aug. 19, 1997) (an employer hiring an *au pair* "may not take credit for facilities which the employer is required by law or regulation to provide"); *see also* Doc. 199 at 33-39

(collecting relevant authority from Labor Department, including briefing in *Ramos-Barrientos v. Bland*, 661 F.3d 587, 597-98 (11th  Cir. 2011)); Rec. at 24 (collecting additional cases).  Nobody disputes that *au pairs*' employers are required to furnish room and board, *see* 22 C.F.R. §  2.31(e)(6), so it necessarily follows that *au pairs*' employers are prohibited from reducing *au pairs'* wages to pay for such room and board.

To summarize: (1) the regulations governing the *au pair* program state that *au pairs* are entitled to the protections of the FLSA, as interpreted and implemented by the Labor Department; (2) the Labor Department has interpreted and implemented the FLSA in a manner that prohibits wage deductions for room and board that an employer is required by law to provide; (3) *au pairs'* employers are legally required to provide room and board; therefore, (4) *au pairs'* employers are not entitled to deduct the cost of room and board from *au pairs'* wages.

That straightforward logic stands in stark contrast with Defendants' convoluted argument to the contrary.  They say that they need not comply with the FLSA because they believe that the State Department has adopted an alternative "formula" that "governs calculation of the weekly stipend" owed to *au pairs* and which allows them to take a 40% wage credit for *au pairs*' room and board.  [Doc. 247 at 3].

As noted, this formula does not appear anywhere in current law – in fact, it has *never* been the law.  Defendants' argument is rooted not in any current statute, regulation, statutorily mandated agency document, or item of binding administrative guidance, but rather in commentary to a now-obsolete regulation from 1995.  The

regulation itself merely provided, with respect to *au pair* wages, that "[s]ponsors shall require that au pair participants . . . [a]re compensated at a rate of not less than $115.00 per week." 22 C.F.R. § 514.31(j)(1) (1995). That figure had been derived by multiplying the then-prevailing federal minimum wage by 45 hours (for a total of approximately $191 per week), and deducting $76 per week as a fixed credit for room and board. *See* Rec. at 4 (citing 60 Fed. Reg. 8547, 8551 (Feb. 15, 1995)). Mathematically, $76 is approximately 40% of $191, but even the commentary to the 1995 regulation did not provide for a "formula" that includes a 40% deduction, as Defendants would have it.[3]

Further, that regulation was amended just two years later to dispel the very type of confusion about employers' legal obligations that appears to saddle Defendants to this day. As the State Department's predecessor explained at the time:

> [T]he Agency is amending 22 CFR 514.31(j) which governs an au pair's wages and hours. *The United States Department of Labor has determined that au pair participants are covered under the provisions of the Fair Labor Standards Act and therefore must receive federal minimum wage.* The Agency is amending this regulation to ensure that there is no future confusion regarding the payment of minimum wage.

62 Fed. Reg. 34632, 34633 (Jun. 27, 1997) (emphasis added). The regulation was changed to its current language, which requires Defendants to ensure that *au pairs* are

---

[3]      In their objections, Defendants cite an earlier, 1994 interim rule as the source of the 40% "formula." [*See* Doc. 247 at 3]. But the 1994 rulemaking similarly contains no reference to a 40% deduction. To the contrary, the 1994 interim rule proposed a weekly stipend of $155 per week, based on a fixed $36 room-and-board credit – and $36 is significantly less than 40% of $191. 59 Fed. Reg. 64296, 64298 (Dec. 14, 1994). The 1994 interim rule also does not purport to be "DOL-approved," as Defendants claim. Instead, the regulations merely mention that the State Department's predecessor had "sought guidance from regulations governing payment of minimum wage promulgated by the Department of Labor." *Id.*

"paid in conformance with the requirements of the Fair Labor Standards Act as interpreted and implemented by the United States Department of Labor," *id.* at 34634; *see also* 22 C.F.R. § 62.31(j)(1).  Thus, as Judge Tafoya explained, "the regulation had previously incorporated a credit into the minimum wage but after the 1997 amendment, the applicable regulation no longer included such a credit."  Rec. at 25.

Defendants act as though these changes never occurred.  Instead, they insist upon using a 40% formula that, if it existed at all, was apparently derived from a regulation that has been bad law for almost twenty years – and was scrapped shortly after it was adopted because it would have allowed employers to underpay *au pairs*. That formula does not appear in any existing statute or regulation, which is entirely unsurprising, as it conflicts with the FLSA and the regulations that apply that statute to the *au pair* program.[4]

_____

[4]      The only post-1997 authority cited by Defendants is a 1997 Labor Department Opinion Letter, which they cite for the proposition that the Labor Department "acknowledged it had 'no authority' to modify the stipend to conform with standard FLSA requirements."  [Dec. 247 at 5 (quoting DOL Opinion Letter, 1997 WL 998029 (Aug. 19, 1997)].  But that is not what the Opinion Letter says at all:  it says that the Labor Department has "no authority to lower the amount of the minimum stipend where the *au pair* works less than the maximum" 45 hours per week.  This is a statement about the Labor Department's inability to permit that *au pairs* be paid for less than 45 hours of work per week, even if they work less than that much.  It says nothing about whether the *au pair* stipend must conform with the FLSA generally, since paying an *au pair* for 45 hours of work when he or she didn't work that much results in a *higher* hourly rate. Put differently, the Opinion Letter confirmed that the *au pair* regulations mean what they say when they provide that *au pairs* must be "compensated at a weekly rate based upon 45 hours of child care services per week."  22 C.F.R. § 62.31(j)(1).  But nothing about the Opinion Letter undercuts the second half of that regulatory provision, which also requires that *au pairs* be "paid in conformance with the requirements of the Fair Labor Standards Act."  *Id.*

Unable to cite any legal authority to justify their continued use of this formula, Defendants rely on a State Department notice issued in 2007 that correctly stated that "[t]he weekly stipends for the standard Au Pair Program and EduCare Program are directly connected to the federal minimum wage," but which incorrectly stated that the minimum weekly wage was $195.75, after accounting for a 40% room and board credit. [*See* Doc. 127-1, State Department Notice (Jun. 14, 2007)].

Defendants' reliance on this notice – which was withdrawn by the State Department shortly after this lawsuit was filed – along with other notices or opinion letters that pre-date it, is misplaced.  Contrary to what the notice said, *au pairs*' employers are not permitted to charge *au pairs*, in the form of a wage deduction, for room and board.  Insofar as the notice purported to say otherwise, it was mistaken:  it was in conflict with the FLSA and the regulations expressly applying the FLSA to the *au pair* program, as well as subsequent agency guidance such as the Wilberforce pamphlet.  Where an agency interpretation cannot be reconciled with the law, the agency interpretation is due no deference. *See Kennett v. Bayada Home Health Care, Inc.*, — F. Supp. 3d —, 2015 WL 5608132, at *9 (D. Colo. 2015) ("Courts, of course, must interpret the law and are not bound by an agency decision that misapplies or misconstrues the law.").  The 2007 notice is not even that – it does not purport to interpret the law, and certainly exhibits none of the hallmarks of administrative guidance that would be due deference from the Court.  It is a one-page "notice," both unsigned and unpublished, that as Judge Tafoya correctly found "does not cite to any law allowing the *au pair* program to use the room and board credit in spite of the FLSA

provision specifically prohibiting such a credit for facilities when they are required by law."  Rec. at 26.

## B.    *Au Pairs* are Entitled to the Protections of State Wage & Hour Laws.

In what is perhaps among the most telling illustration of Defendants' indifference toward their legal responsibilities, they say that "regulations clearly express [the State Department's] desire that state minimum wage laws *not* apply to the *au pair* program." [Doc. 247 at 11 (emphasis added)].  One would think that if the State Department had so "clearly express[ed]" this "desire," Defendants would have cited the regulation, and that it would say words to the effect of:  "*Au pairs* are not covered by the states' wage and hour laws."  Defendants do not cite any such provision, however, because none exists.  *See* Rec. at 30 ("[A]t no point do Defendants explain where, within this allegedly all-encompassing federal scheme or regulatory plan, DOS indicates an intent to remove the *au pair* program from state employment and labor laws.").

Perhaps what Defendants really mean is not that the State Department has "clearly express[ed]" its "desire" to preempt the states' wage and hour laws but rather that the State Department has done so by implication.  But that argument would fail, too. First, there is no reason to believe that the *au pair* program would be unable to function if *au pairs* were paid according to the states' wage and hour laws or that Defendants cannot comply with both federal and state laws.  *See Phillips v. Lucky Gunner, LLC*, 84 F. Supp. 1216, 1227 (D. Colo. 2015) (discussing types of preemption).

Second, and more importantly, the Court need not speculate as to the federal government's view on this matter.  The regulations governing the *au pair* program

expressly provide that *au pairs* will be compensated in conformance with the FLSA, *see* 29 C.F.R. § 62.31(j)(1), and the FLSA expressly provides that employers must comply with states' wage and hour laws, *see* 29 U.S.C. § 218(a) ("No provision of this chapter or of any order thereunder shall excuse noncompliance with any Federal or State law or municipal ordinance establishing a minimum wage higher than the minimum wage established under this chapter. . . ."). This is the opposite of pre-emption; it is an express federal recognition of state law, or, as Defendants themselves acknowledge, the FLSA "disavows preemption" of state wage laws. [Doc. 247 at 13 n.4].

To summarize, Defendants argue that the State Department has "clearly express[ed]" one thing – that the states' wage and hours laws are inapplicable – when the State Department has actually clearly expressed the exact opposite. As Judge Tafoya explained, Defendants' "fragmented" preemption argument "fails for many reasons, not the least of which is that federal law and regulations do not dictate that *au pairs* are not entitled to the protection of state wage laws. Instead, they dictate just the opposite." Rec. at 28.

And as if that were not enough – as it surely is – the State Department has advised *au pairs* in the Wilberforce Pamphlet, a statutorily mandated document, that they are entitled to the protections of the states' wage and hour laws:

> You have the right to earn at least the federal legal minimum wage, $7.25 per hour, in the same manner as U.S. workers. *Also check – [t]he minimum wage for the state in which you work. If that wage is higher, you have the right to be paid the higher amount.*

[Doc. 199-1 at 7 (emphasis in original)]; *see also* 8 U.S.C. § 1375b(a)(2) (requirements for Wilberforce Pamphlet); 22 C.F.R. § 62.10(c)(8) (requiring Sponsors to distribute Wilberforce Pamphlet to *au pairs*).  It would be strange, indeed, were the State Department, pursuant to a statutory requirement, to expressly inform *au pairs* that they are protected by the states' wage and hour laws when, in fact, the State Department secretly intended for the exact opposite to be the case.  Yet that is precisely the absurd result Defendants argue for here.

But there's more.  Not only does the governing statute expressly incorporate the FLSA, which expressly preserves the application of the states' wage and hour laws, and not only has the State Department expressly told *au pairs* that they are protected by the states' wage and hour laws, but the State Department also went on the record with the *Washington Post* to reiterate – in response to this lawsuit – "that sponsors 'must also comply with all other applicable federal, state, and local laws, including any state minimum wage requirements.'"  [Doc. 199-2, Lydia DePilis, *Au pairs Provide Cheap Child Care. Maybe Illegally Cheap*, Washington Post (March 20, 2015)].  In these circumstances, Defendants' objections must be overruled.

### 1.    *Au Pairs* are Entitled to the Protections of Colorado Law.

Colorado provides a minimum wage, currently $8.31 per hour,[5] "if either of the following two situations applies to an employee": (1) "The employee is covered by the minimum wage provisions of Colorado Minimum Wage Order Number 31" or (2) "[t]he

---

[5]    The Colorado minimum wage became $8.31 per hour, up from $8.23, effective January 1, 2016, under Colorado Minimum Wage Order 32.  Because the underlying briefing, the Recommendation, and the objections all refer to Wage Order 31, we do so as well.  The relevant language is identical.

employee is covered by the minimum wage provisions of the Fair Labor Standards Act."
*See* Colorado Minimum Wage Order No. 31, available at http://1.usa.gov/1pUYNLU
(codified at 7 Colo. Code Regs. 1103-1 (2015)); *see also* Rec. at 32.  *Au pairs* are
covered by the FLSA's minimum wage provisions, *see* 22 C.F.R. § 62.31(j)(1), so
Plaintiffs fall within the second of the two categories enumerated above.  Judge Tafoya
therefore correctly concluded that *au pairs* are "clearly covered under the minimum
wage provisions of the FLSA and therefore, entitled to minimum wage under Colorado's
Minimum Wage Order No. 31."  Rec. at 33.

        Defendants nonetheless argue that *au pairs* are exempt from Colorado's wage
and hour laws, relying on an exception to the Colorado Wage Order for babysitters and
other domestic workers.  [*See* Doc. 247 at 11-12].  Even if it were true that *au pairs* fell
within this exception – and Defendants offer no reason to believe that to be the case – it
would do nothing to change the fact that *au pairs* remain "covered by the minimum
wage provisions of the Fair Labor Standards Act," and therefore remain entitled to
Colorado's minimum wage under the plain terms of the Colorado Wage Order.  7 Colo.
Code Regs. 1103-1.3 (2015).  "Or" means "or": Colorado law does not require Plaintiffs
to meet both of the above enumerated requirements, only one.  Because Plaintiffs are
covered by the FLSA, they are entitled to seek wages under Colorado's Minimum Wage
Order No. 31.  Certainly, Defendants have not met their "burden of demonstrating that"
*au pairs* "plainly and unmistakably qualif[y] for an exemption" to Colorado's laws.  Rec.
at 32 (quoting *Kennett*, 2015 WL 5608132, at *5 (internal quotation marks, citation, and
alterations omitted)).

### 2.   *Au Pairs* are Entitled to the Protections of New York Law.

Judge Tafoya also concluded that Defendants failed to meet their burden of showing that Plaintiffs are exempted from the protections of New York's Wage law.  *See* Rec. at 33.  Defendants object, [*see* Doc. 247 at 12], not on the basis of any New York State or federal law, but on a quotation taken out of context from a "Facts for Employers" document produced by the New York State Labor Department, [*see* Doc. 130-8].  That quotation says that New York's Workers' Bill of Rights and Labor Laws protect all workers, regardless of immigration status, except that "au pairs hired through the federal au pair program and admitted into the United States under a J-1 visa, [] are subject to special federal rules."  *Id.* at 3.

Nothing about this statement is specific to wages, and indeed the previous pages of the Fact Sheet discuss not only wages, but work schedules, insurance coverage (unemployment, worker's compensation, and health), anti-harassment and anti-retaliation rules, and payroll taxes, among other things.  It is certainly true, for example, that "special federal rules" apply to *au pairs*' work schedules.[6]

But the Fact Sheet does *not* say that au pairs are exempt from New York law or New York's minimum wage, as Defendants argue.  Indeed, the actual New York State

---

[6]   *Compare, e.g.,* 22 C.F.R. § 62.31(j)(2)-(4) (requiring *au pairs* to work no more than 10 hours per day, to receive a minimum of one and one half days off per week in addition to one complete weekend off each month, and to receive two weeks of paid vacation per year), *with* N.Y. Labor Law § 161(1) ("Every person employed as a domestic worker . . . shall be allowed at least twenty-four consecutive hours of rest in each and every calendar week.  No provision of this paragraph shall prohibit a domestic worker from voluntarily agreeing to work on such day of rest required by this paragraph, provided that the worker is compensated at the overtime rate for all hours worked on such day of rest").

statute provides that all "employees" are entitled to be paid the state minimum wage, N.Y. Labor Law § 652, with "employee" defined broadly as "any individual employed or permitted to work by an employer in *any occupation*," *id.* § 651(5) (emphasis added). There is a list of workers who are exempt from the state minimum wage, but that list does not include *au pairs*, nannies, or similar domestic workers.  *See id.*

Simply put, the text of the relevant New York State law makes clear that it applies to people employed in "any occupation," subject to irrelevant exceptions.  Thus, *au pairs* are entitled to the New York State minimum wage.  A "Fact Sheet" that does not even purport to clearly say that *au pairs* are exempt from the minimum wage plainly cannot override the law itself.  Thus, Judge Tafoya correctly concluded that Plaintiffs enjoy the protections of New York's minimum wage law.  Rec. 33-34.

**C.      The Allegations That Defendants are Joint Employers Are Sufficient.**

Finally, Defendants argue that regardless of whether *au pairs* are entitled to be paid the minimum wage, they are not the *au pairs*' employers.  [Doc. 247 at 7-8].  Judge Tafoya correctly disagreed, noting that "resolution of whether Defendants are joint employers is usually premature at this stage of the proceedings."  Rec. at 17.

The Tenth Circuit's "economic realities test" governs the question of whether Defendants constitute *au pairs*' employers.  That test "includes inquiries into whether the alleged employer has the power to hire and fire employees, supervises and controls employee work schedules or conditions of employment, determines the rate and method of payment, and maintains employment records."  *Baker v. Flint Eng'g & Constr. Co.*, 137 F.3d 1436, 1439 (10th Cir. 1998).  A court applying this test typically considers

factors such as "(1) the degree of control exerted by the alleged employer over the worker; (2) the worker's opportunity for profit or loss; (3) the worker's investment in the business; (4) the permanence of the working relationship; (5) the degree of skill required to perform the work; and (6) the extent to which the work is an integral part of the alleged employer's business."  *Id.* at 1440.

Applying this test, Judge Tafoya concluded that "Plaintiffs have alleged facts upon which a reasonable person could conclude that they were jointly employed by Defendants and their respective host families."  Rec. at 18.  Among the allegations the Court cited in support of her conclusion were the following:

- Defendants recruit and supervise *au pairs*.  *Id.* at 19.
- Defendants place the *au pairs* close to Defendants' offices in order to maintain close and frequent contact and supervision of the *au pairs*.  *Id.*
- Defendants have responsibility to set *au pairs'* hours and vacation allowances.  *Id.*
- Defendants have responsibility to provide *au pairs* with job training.  *Id.* at 20.
- Defendants have the exclusive right to fire *au pairs*.  *Id.* at 20; *see also Kennett*, 2015 WL 5608132, at *11 (entity's power to terminate employment is a strong indicator of employment relationship).

Defendants do not dispute that the economic realities test applies here.  [*See* Doc. 247 at 7-8].  Nor do Defendants take issue with the litany of allegations that Judge Tafoya relied upon in support of her conclusion that Plaintiffs have sufficiently alleged an employment relationship.  [*Id.*; *see also* Doc. 199 at 31-32 (setting forth examples of allegations of Defendants' control over *au pairs*)].  Instead, Defendants object to Magistrate Judge Tafoya's conclusions on two separate grounds, each of which is baseless.

First, they argue that they are merely "visa sponsor[s]" operating within an exchange program.  [Doc. 247 at 7].  But there is nothing in the law – and Defendants have not cited anything – that says that a "visa sponsor" cannot also be an employer.  In fact, the Labor Department has recently concluded that an employment relationship exists where a private agency places workers in third-parties' homes while maintaining a certain degree of control over the workers.  [*See* Doc. 199-3, Labor Department Fact Sheet #79E: Joint Employment in Domestic Service.]  Ultimately, the question of whether Defendants are employers is a fact-intensive one that defies any other labels that may apply.

Defendants rely on *Bai Haiyan v. Hamden Public Schools*, 875 F. Supp. 2d 109 (D. Conn. 2012), which is easily distinguishable: there, the cumulative evidence presented at the summary judgment stage showed that the defendant did not exercise sufficient control over the plaintiff, whereas here, the cumulative allegations presented at the motion to dismiss stage show that Defendants exercise extensive control over *au pairs'* employment.  Moreover, as Judge Tafoya noted, "[t]he *Bai Haiyan* decision is distinguishable from the present case because applicable federal law makes clear that *au pairs* are in an employment relationship," whereas the applicable law in that case did not do so.  Rec. at 30 n.9; *see also id.* at 20 (distinguishing *Ivanov v. Sunset Pools Mgmt.*, Inc., 567 F. Supp. 2d 189 (D.D.C. 2008), decided on summary judgment, where plaintiffs had adduced no evidence of recruiter's control over worker's employment).

Second, Defendants dispute that they set *au pairs'* wages, which is one of the factors that courts consider under the economic realities test.  [*See* Doc. 247 at 8].  As

explained above, and as is discussed more fully below, Judge Tafoya correctly concluded that Plaintiffs' allegations of Defendants' wage-setting conduct are sufficient to survive a motion to dismiss.  Nothing in the applicable law or regulations requires (or indeed permits) Defendants to establish a set wage of $195.75 for *au pairs*; and while Defendants dispute that they did in fact set *au pairs'* wages, the Amended Complaint sufficiently alleges that they did.

For example, Plaintiffs allege that "*au pairs* were told that they could not accept more than a stipend of $195.75 a week from their families and that if they accepted more money they might be deported," [Doc. 101, Amended Complaint ("FAC"), ¶ 362], and further allege that Defendants uniformly advertise that *au pairs* will receive $195.75 per week, *id.* pp. 22-29, ¶¶ 95-114.[7]  In any event, Defendants' wage-setting conduct is but one of many factors that Judge Tafoya took into account in her analysis of the employment relationship between Defendants and *au pairs* – an analysis that should be upheld over Defendants' objections.

## II.   ANTITRUST CLAIMS

Defendants have two core objections to the Recommendation's conclusion that Plaintiffs plausibly alleged an antitrust conspiracy:  that the Plaintiffs have not sufficiently alleged the existence of an agreement to fix *au pairs'* wages, and that the

---

[7]      In arguing that they do not set *au pair* wages, Defendants point to allegations in the Amended Complaint that certain host families may choose to pay *au pairs* more than $195.75 per week, such as $200 per week "because it's easier" to pay a round number.  [Doc. 247 at 8 (citing FAC ¶¶ 179, 374, 418)].  The fact that some host familiar might choose to pay *au pairs* an extra $4.25 per week – which amounts to 9.4 cents per hour – in no way undermines the notion that Defendants have agreed to set the price of *au pair* labor at $195.75 per week, and have taken numerous steps to ensure that that is precisely what *au pairs* are paid.

Plaintiffs have alleged facts contrary to parallel behavior.  Both arguments rest on misunderstandings of the applicable law and Plaintiffs' allegations.

As Judge Tafoya correctly recognized, an antitrust conspiracy claim "'requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made . . . [and] to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.'"  Rec. at 9 (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)) (alterations in original).  Further, if a complaint "does not directly allege an agreement but instead makes only 'allegations of parallel conduct . . . in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action."  *Id.* at 10 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).  Put differently, a complaint must contain allegations "plausibly suggesting" an agreement, but not necessarily the who, what, where, and when of the agreement itself.

Here, Plaintiffs' allegations include both (1) substantial direct evidence of price fixing, in the form of Defendants' own admissions, and (2) strong circumstantial evidence of price fixing.  [*See* Doc. 199 at 9-17].  Either of these on its own would be sufficient to survive a motion to dismiss; both combined remove any doubt that Plaintiffs are entitled to proceed to discovery.

### A.   Plaintiffs Have Pled An Agreement to Violate the Antitrust Laws.

The Complaint alleges that Defendants' agents made admissions that explicitly refer to an agreement and identify precisely who made that agreement, requiring no inferences and establishing a conspiracy for the purposes of this motion.  *See, e.g.,*

FAC pp. 21-22, ¶¶ 92-94.  For instance, one Defendant stated that the government sets a minimum amount, and that "there is no difference in prices, as far as the stipend goes, between all of the agencies."  *Id.* p. 21, ¶ 92.  Another Defendant admitted that Defendants "all agreed to pay that amount, no more."  *Id.* p. 21, ¶ 93.  A third reiterated that "[e]verybody" – meaning each of the Defendants – "agrees" to pay the minimum amount.  *Id.* p. 22, ¶ 94.  In short, the Complaint clearly alleges admissions by individual Defendants that there was an understanding between *all* of the Defendants to pay standard *au pairs* the same amount.  *Id.* pp. 21-22, ¶¶ 92-94.  This case is thus quite different than *Twombly*, where the Supreme Court affirmed the dismissal of an antitrust complaint that rested entirely on "descriptions of parallel conduct and not on any independent allegation of actual agreement" among the defendants.  550 U.S. at 564.

Defendants have virtually no response to their admissions of collusion. Selectively citing from dicta in a footnote in *Twombly*, they mistakenly argue that allegations that are not specific as to time, place, or person provide no basis for inferring agreement.  [Doc. 248 at 10].  This is simply not the law.[8]  And in any event, the Complaint is detailed as to the dates on which these admissions were made, the specific language used in the admissions, and that they were made by "directors" of

---

[8]    The Court speculated that if the complaint "had not explained that the claim of an agreement rested on the parallel conduct described, we doubt that the complaint's references to an agreement among the [defendants] would have given the notice required" because the Plaintiffs had done nothing more than identify a seven-year span in which the antitrust violations were alleged to have occurred.  550 U.S. at 565 n.10. The Court was thus describing what might not have been sufficient standing alone — that is, absent allegations of parallel conduct.  It did not alter the holding that antitrust complaints may proceed to discovery where they plead sufficient facts to suggest that an agreement was made.  550 U.S. at 557.

certain Sponsor Defendants. FAC ¶¶ 92-94. These allegations are clearly stronger than those that permitted a case to proceed past summary judgment in *Champagne Metals v. Ken-Mac Metals, Inc.*, where the Tenth Circuit determined that a vague statement from an employee regarding an alleged boycott was direct — albeit "weak" — evidence of an agreement to take collective action. 458 F.3d 1073, 1084 (10th Cir. 2006). If the vague evidence in *Champagne Metals* justified denial of summary judgment, surely the concrete evidence here justifies denial of a motion to dismiss.

Defendants further claim that these admissions are inadequate because the Complaint does not make clear that these "directors" had "authority to speak for one, much less all, of the sponsor Defendants." [Doc. 248 at 10]. So what? The point is not whether the speakers had legal authority to bind the Defendants, but whether the statements are evidence of an actual agreement between the Defendants. Clearly, admissions from individuals answering the phones at certain Sponsor Defendants that "everyone agrees" to pay the same amount are evidence of an actual agreement, regardless of the title of the specific individuals who made the statements.

The direct evidence of price fixing alleged in the Complaint is more than enough for this case to proceed to discovery.

**B. Plaintiffs Have Alleged Circumstantial Evidence of Price Fixing in the Form of Parallel Conduct by the Sponsor Defendants That Lacks Any Reasonable Business Rationale**

Further, as *Twombly* makes clear, antitrust conspiracy claims are not fatally flawed where they do not allege an actual agreement; rather, a conspiracy theory may be predicated upon allegations of parallel conduct. 550 U.S. at 557; *see also Araphoe*

*Surgery Center, LLC v. Cigna Healthcare, Inc.*, 80 F. Supp. 3d 1257, 1263 (D. Colo. 2015) (addressing circumstances where "the complaint does not directly allege an agreement"); *Heartland Surgical Specialty Hosp., LLC v. Midwest Div., Inc.*, 527 F. Supp. 2d 1257, 1297 (D. Kan. 2007) (noting – post *Twombly* – that "[c]ircumstantial evidence may support the existence of an illegal § 1 agreement" even at the summary judgment stage).  Here, as Judge Tafoya found, Rec. at 11-16, there is ample evidence of parallel conduct supporting a plausible inference of an unlawful agreement among the Defendants.  For example, Plaintiffs have pled the following, amongst other facts:

- At least one Defendant has informed prospective *au pairs* in writing that its weekly wage of $195.75 would be "the same regardless of which *au pair* agency you use." FAC. p. 20, ¶ 87.
- The Defendants control all au pair employment opportunities in the United States.  *Id.* p. 10, ¶ 42.
- All Defendants set the wages for standard *au pair* services at $195.75 per week, and each has advertised that weekly amount on its website.  *Id.* pp. 22-27, ¶¶ 96-109.
- None of the Defendants have adjusted their weekly wages for geographic differences, the number of children in a home, or changes in market conditions.  *Id.* pp. 29-30, ¶¶ 118-120.
- There is a programmatic wage *floor*, but there is no government-imposed requirement that the Defendants set *au pair* wages at $195.75 per week. *Id.* pp. 14-15, ¶¶ 61-65.
- Each time the programmatic wage floor has increased, the Defendants have acted in unison in raising their weekly wages for standard *au pair* services accordingly.  *Id.* p. 29, ¶ 115.
- The Defendants can easily monitor and police against cheating within the cartel.  *Id.* p. 32, ¶¶ 134-135.
- Absent agreement, at least some Defendants would offer *au pairs* competitive wages higher than the current $195.75 per week programmatic wage floor.  *Id.* pp. 17-18, ¶¶ 73-76.

These allegations of parallel conduct meet Plaintiffs' burden under Section One.  *See, e.g.*, *Confre Cellars, Inc. v. Robinson*, No. 01-N-1060, 2002 WL 32376945, at *13 (D.

Colo. Mar. 6, 2002) (report and recommendation) ("In the absence of an explicit agreement, a plaintiff claiming a Section 1 violation may establish concerted action by circumstantial evidence.").

Once again, Defendants offer virtually no response.  Rather, they mistakenly claim that Plaintiffs have alleged other facts in the Complaint that undermine the allegations of parallel conduct.  For instance, Defendants argue that Plaintiffs' allegations of a conspiracy to fix wages for standard *au pair* services is somehow defeated by allegations that some Defendants offer "premium *au pair*" services at a higher wage than standard *au pair* wages.  [Doc. 248 at 3].  As Judge Tafoya found, this argument is "disingenuous."  Rec. at 14.  The Complaint alleges that, of the fifteen Defendants, all of whom set uniform rates for standard *au pairs*, "six (6) Sponsors offer two or more positions, with a 'standard' *au pair* position at the rate of $195.75 per week, and one or more additional positions – termed 'professional' or 'extraordinary' or the like – at higher rates."  FAC ¶ 78.  The Complaint continues, "[t]he six Sponsors offer these higher wages for *au pairs* meeting specified criteria, such as two years of child care study plus two years of full-time child care experience; and there are relatively few *au pairs* that obtain employment in these special positions."  *Id*.  Plaintiffs, and those they seek to represent in this class action lawsuit, are standard *au pairs*, not premium *au pairs* satisfying the six Sponsors' requirements for higher wages.  *See* Rec. at 14 (citing FAC ¶¶ 22-29, 79-86).  Thus, as Judge Tafoya found, certain Sponsors' higher compensation of premium *au pairs* is irrelevant.  Rec. at 14.

23

Nor does the fact that a small number of premium *au pairs* may receive higher wages undermine Plaintiffs' argument that in a truly competitive market, some sponsors might offer higher wages to more desirable *au pairs*.  [Doc. 248 at 4].  According to Defendants, the existence of higher wages for premium *au pairs* shows that the market is functioning competitively.  *Id.*  But this fails to take into account the great variation in qualifications of standard *au pairs*, which would lead to price differentiation in a truly competitive labor market.  The statutory qualifications for standard *au pairs* are that they are aged 18-26, have secondary school educations, and English proficiency.  *See* FAC ¶ 44.  Many variations in skill and experience can fill the gap between these minimum criteria and the childcare experience required for the premium *au pair* categories.  Examples include:  experience with children of the relevant age, the desirability of the *au pair*'s native language, qualifications such as CPR certification, variations in educational background, and less tangible factors such as personality or professionalism.  *See id.* ¶¶ 325 (driving license, first aid training, and swimming are relevant skills), 343 (plaintiff cleaned, cooked, did the laundry, gardened, and cared for chickens).  That none of these factors have led to any variation in price for standard *au pairs* is highly suggestive of a conspiracy to fix prices.

Defendants also incorrectly argue that isolated comments from a website and a blog are inconsistent with a conspiracy to fix prices.  Defendants point to Expert Group International's website, which provides, "You can pay more to your au pairs, according to the terms of your contract with them."  [Doc. 248 at 4].  Next, Defendants point to a host parent's blog stating that "the required amount [of payment] is set" but "some host

families offer their *au pairs* a stipend above the required amount." *Id.* at 5. These statements do not contradict a price fixing conspiracy *on the part of the sponsor Defendants*. As the Complaint alleges, "Sponsors dictate wages to *au pair* family employers, and families agree to pay the fixed wages to *au pairs*." *See* FAC ¶ 137. The Complaint further alleges specific examples of Defendants instructing host families not to pay more or instructing *au pairs* not to accept more on pain of deportation. *Id.* at ¶¶ 362, 366, 369, 381, 386. That some host families may, on their own, elect to pay more to their *au pairs* on top of the wages they agree to in their contracts with the Sponsor defendants – yet still far below competitive or indeed lawful wages – does not undermine the charged conspiracy *between the Sponsor defendants* to fix prices in employment contracts.

### C.  Defendants' Remaining Antitrust Objections Are Meritless

Defendants' remaining objections consist of isolated attacks on specific allegations in the Complaint that Judge Tafoya relied upon in denying Defendants' motion to dismiss. These arguments ignore the law, which provides that "the court must consider Plaintiffs' allegations as a whole." Rec. at 13 (citing *Evergreen Partnering Group, Inc. v. Pactiv Corp.*, 720 F.3d 33, 47 (1st Cir. 2013)).[9] They further ignore the

---

[9]  Defendants pay lip service to this standard, before cutely arguing that "a null (empty) set does not transform to a set containing substance when additional nullities are described." [Doc. 248 at 7]. That may be true as a matter of math, but not as a matter of law. The whole point of considering Plaintiffs' allegations as a whole is that the whole may be greater than the sum of all parts, and that even where no allegation standing along would suffice, the entire complaint does. *See, e.g., Evergreen Partnering Group, Inc. v. Pactiv Corp.*, 720 F.3d 33 (1st Cir. 2013) ("While each of Evergreen's allegations of circumstantial agreement standing alone may not be sufficient to imply agreement, taken together they provide a sufficient basis to plausibly

entirety of the Recommendation, in which Judge Tafoya found that allegations of uniform prices set by fifteen entities that have complete control over the market and operate in an industry structure that facilitates collusion, combined with (1) a complete lack of price variation based on factors such as location and number of children to supervise, (2) direct evidence of agreement, and (3) lower salaries than comparable services, was sufficient to meet Plaintiff's burden to plead an antitrust conspiracy.  *See* Rec. at 11-16.  And even when considered in isolation, they have no merit.

For instance, Judge Tafoya relied on the Complaint's allegation that there are no adjustments to advertised compensation with relation to geographic differences, varying state laws and/or the number of children in the home.  Rec. at 12.  Defendants summarily respond that this allegation is "irrelevant" and refer the Court to their separate brief addressing Plaintiffs' wage claims.  [Doc. 248 at 12].  But the absence of price variation by location is strong evidence of an illicit agreement to control wages because it demonstrates immunity to normal market forces.  In a well-functioning market, *au pair* wages would fluctuate depending on some of the same factors that affect other childcare pay, including local cost of living, labor supply and demand, and job responsibilities. But the price of *au pair* labor is entirely uniform.  Defendants have not and cannot offer an alternative, free-market-based explanation for this lack of variation, which is extraordinarily suggestive of an agreement to set wages.

---

contextualize the agreement necessary for pleading a § 1 claim.").  But that is not an issue here anyway, since a number of Plaintiffs' allegations are independently sufficient to state a plausible antitrust conspiracy claim.

Defendants also misunderstand Plaintiffs' allegations that the Defendants control the *au pair* market.  [Doc. 248 at 9-10].  Contrary to Defendants' suggestion, Plaintiffs do not allege that Defendants' exclusive control of *au pair* activities in the United States is itself illegal or dispositive; rather, this level of control facilitates the Defendants' ability to set and enforce *au pair* wages in violation of the antitrust laws.  The same can be said of Defendants' challenge to Plaintiffs' allegation that there are only fifteen authorized sponsors — many, if not all, of which participate in trade groups that advocate against price competition.  Rec. at 11-12.  These allegations provide context for the conspiracy.  In *Twombly*'s terms, they make the other allegations of a conspiracy more plausible.

Defendants likewise misunderstand Plaintiffs' allegations that the "[s]ponsors uniformly advertise *au pair* wages at an identical amount even though the federal government does not require that au pairs only receive minimum wage."  *See* Rec. at 12; *see also* Doc. 248 at 11-12.  Defendants claim that the allegation is undermined by the fact that the host families ultimately determine how much to pay *au pairs*.  But evidence that *all* Sponsors advertise at the same rates is evidence of the *Sponsors'* agreement amongst themselves.  Moreover, the argument ignores Plaintiffs' allegations that Defendants exercise control over the contractual wages in *au pair* employment contracts.  FAC p. 61-62, ¶¶ 290, 293-94, 297, 299; *see also id.* ¶ 137.

Defendants also argue that they compete for host families and hence have no economic incentive to advertise that hosts must pay more than minimum wages.  [Doc. 248 at 12].  But this argument assumes the existence of the conspiracy alleged — the

elimination of competition for *au pairs*.  In a free market, Defendants would compete *both* for the most desirable *au pairs* and also for host families.  It is only by eliminating competition for *au pairs* through price fixing that the defendants can focus all of their competitive energy on host families – and charge higher fees for themselves.

Lastly, Defendants mistakenly contend that Judge Tafoya erred in considering allegations for which the Defendants can offer alternative, non-conspiratorial explanations for their conduct.  For instance, they claim that they advertise the minimum wage not to reap artificially high profits, but to comply with State Department regulations and to remain competitive with host families.  [Doc. 248 at 13].  Likewise, they claim that they advertise that their labor costs are lower than comparable childcare workers in order to attract host families.  [*Id.* at 14].  These explanations are irrelevant at the motion to dismiss stage.  The Supreme Court has been clear that a plaintiff need only allege facts that "suggest that an agreement was made" and that "raise a reasonable expectation that discovery will reveal evidence of illegal agreement"; plaintiffs need not rule out all alternative explanations.  *Twombly*, 550 U.S. at 556.  Indeed, the Supreme Court rejected a "probability" requirement:  "Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage . . . ."  *Id.*; *see also Anderson News, L.L.C. v. American Media, Inc.*, 680 F.3d 162, 190 (2d Cir. 2012) ("Consequently, although an innocuous interpretation of the defendants' conduct

may be plausible, that does not mean that the plaintiff's allegation that that conduct was culpable is not also plausible.").[10]

### III.   COMMON LAW CLAIMS

Finally, Defendants object to Magistrate Judge Tafoya's recommendation that Plaintiffs be permitted to proceed on their claims for fraud, breach of fiduciary duty, and quasi-contract.  [Doc. 247 at 13-15].  However, these objections all turn on the erroneous argument that *au pair* wages are set at $195.75 by law, when in fact Plaintiffs have plausibly alleged that it was Defendants who set it at that unlawful level.  [*E.g.,* Doc. 247 at 14].

The objections to Plaintiffs' common law claims suffer from other defects as well. With respect to Plaintiffs' fraud claims, Defendants appear to argue that certain statements made by InterExchange and Cultural Care were not false.  [*See* Doc. 247 at 13].  But Plaintiffs have sufficiently pleaded otherwise.  For example, InterExchange has falsely told *au pairs* that anyone offering a higher wage would be a "scammer" and that *au pairs'* wage are the product of a "strict equation," when, in fact, there is no such "strict equation," and people lawfully could offer higher wages.  *See* FAC at ¶¶ 40-41.

With respect to Plaintiffs' breach of fiduciary duty claims, Defendants contend that Magistrate Judge Tafoya "failed to address" issues relating to contracts between

---

[10]      Equally misleading is Defendants' reliance on *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752 (1984), in contending that Plaintiffs must allege facts "*sufficient to exclude* the possibility of independent action."  [Doc. 248 at 8 (emphasis in original)].  *Monsanto* was not a motion to dismiss case.  It dealt with "evidentiary standard[s]," 465 U.S. at 763, and held only that in order to get to a jury, "there must be evidence that tends to exclude the possibility of independent action," *id.* at 769.  And in any event Plaintiffs, have pled allegations that "tend to exclude the possibility" of independent action.  *See* Doc. 199 at 9-21.

the *au pairs* and the Defendants.  [Doc. 147 at 14].  But Judge Tafoya discussed these very issues over the course of four pages, including an in-depth analysis of *DerKevorkian v. Lionbridge Techs., Inc.*, 316 F. App'x 727 (10th Cir. 2008), which addressed breach of fiduciary duty in the context of a contract, and which supports Judge Tafoya's legal conclusions here.  *See* Rec. at 38-41.  Defendants' failure to even address *DerKevorkian* – or any other case for that matter – effectively waives any objection to this aspect of the Recommendation.

Finally, with respect to Plaintiffs' quasi-contract claims, Defendants' objections must be rejected because they never sought to move to dismiss these claims in the first place.  *See* Rec. at 42 ("Defendants have not requested dismissal of either of those claims."); *Marshall v. Chater*, 75 F.3d 1421, 1426 (10th Cir. 1996) ("[I]ssues raised for the first time in objections to the magistrate judge's recommendation are deemed waived.").  And in any case, the elements of unjust enrichment and promissory estoppel are met here because Defendants falsely led Plaintiffs to accept an illegally low wage, and Defendants were themselves enriched by it.  The assertion that Judge Tafoya "rejected the notion that Defendants made separate promises with respect to the *au pair* compensation," [Doc. 247 at 15 (citing Rec. at 41-42)], is simply false.  To the contrary, Judge Tafoya expressly found that Defendants made numerous misrepresentations to prospective *au pairs*.  *See, e.g.,* Rec. at 36-38.

## CONCLUSION

For the foregoing reasons, Defendants' objections should be rejected, and Magistrate Judge Tafoya's Recommendation should be adopted in full.

30

Dated: March 28, 2016

Respectfully Submitted,
BOIES, SCHILLER & FLEXNER LLP

  /s/ Matthew L. Schwartz
Matthew L. Schwartz
Peter M. Skinner
Randall W. Jackson
575 Lexington Avenue
New York, New York  10022
Tel: (212) 446-2300
Fax: (212) 446-2350
mlschwartz@bsfllp.com
pskinner@bsfllp.com
rjackson@bsfllp.com

Sigrid S. McCawley
Lauren Fleischer Louis
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, Florida  33301
Tel.: (954) 356-0011
Fax: (954) 356-0022
smccawley@bsfllp.com
llouis@bsfllp.com

Alexander Hood
TOWARDS JUSTICE
1535 High Street, Suite 300
Denver, Colorado  80218
Tel: (720) 239-2606
Fax: (303) 957-2289
alex@towardsjustice.org
*Attorneys for Plaintiffs*

## Certificate of Service

I hereby certify that on March 28, 2016, I served a true and correct copy of the forgoing on the individuals below pursuant to F.R.C.P. 5.

Christian Dow Hammond
chammond@duffordbrown.com

Lawrence Daniel Stone
lstone@duffordbrown.com

Lawrence L. Lee
llee@laborlawyers.com

Daniel C. Perkins
dperkins@ laborlawyers.com

Susan M. Schaecher
sschaecher@laborlawyers.com

Toren G. E. Mushovic
mushovic@wtotrial.com

Kathryn A. Reilly
reilly@wtotrial

Brian Alan Birenbach
brian@rietzlawfirm.com

John Roger Mann
jmann@gordonrees.com

Thomas Baker Quinn
tquinn@gordonrees.com

Jeffrey Paul Allen
jallen@lawson-weitzen.com

Donald Joseph Gentile
dgentile@lawson-weitzen.com

William Leitzsey Monts, III
william.monts@hoganlovells.com

Walter Vernon Siebert
bsiebert@shermanhoward.com

James Edward Hartley
jhartley@hollandhart.com

Kathryn Anne Barrett
kbarrett@bhfs.com

Martha Louise Fitzgerald
mfitzgerald@bhfs.com

Bogdan Enica
bogdane@hotmail.com

Martin Jose Estevao
mestevao@armstrongteasdale.com

Meshach Yustine Rhoades
rhoadesm@armstrongteasdale.com

Brooke A. Colaizzi
BColaizzi@shermanhoward.com

Raymond Myles Deeny
rdeeny@shermanhoward.com

Erica Lynn Herrera
eherrera@shermanhoward.com

Heather Fox Vickles
hvickles@shermanhoward.com

Chanda Marie Feldkamp                    William James Kelly, III
cfeldkamp@kellywalkerlaw.com             wkelly@kellywalkerlaw.com


                                          /s/  Matthew L. Schwartz
                                         Matthew L. Schwartz