**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Christine M. Arguello**

Civil Action No. 14-cv-03074-CMA-KMT

JOHANA PAOLA BELTRAN,
LUSAPHO HLATSHANENI,
BEAUDETTE DEETLEFS,
DAYANNA PAOLA CARDENAS CAICEDO, and
ALEXANDRA IVETTE GONZÁLEZ,
on behalf of themselves and others similarly situated,

      Plaintiffs,

v.

INTEREXCHANGE, INC.,
USAUPAIR, INC.,
GREATAUPAIR, LLC,
EXPERT GROUP INTERNATIONAL INC., d/b/a EXPERT AUPAIR,
EURAUPAIR INTERCULTURAL CHILD CARE PROGRAMS,
CULTURAL HOMESTAY INTERNATIONAL,
CULTURAL CARE, INC., d/b/a CULTURAL CARE AU PAIR,
AUPAIRCARE INC.,
AU PAIR INTERNATIONAL, INC.,
APF GLOBAL EXCHANGE, NFP, d/b/a AUPAIR FOUNDATION,
AMERICAN INSTITUTE FOR FOREIGN STUDY, d/b/a AU PAIR IN AMERICA,
AMERICAN CULTURAL EXCHANGE, LLC, d/b/a GOAUPAIR,
AGENT AU PAIR,
A.P.EX. AMERICAN PROFESSIONAL EXCHANGE, LLC, d/b/a PROAUPAIR,
20/20 CARE EXCHANGE, INC., d/b/a THE INTERNATIONAL AU PAIR EXCHANGE, and
ASSOCIATES IN CULTURAL EXCHANGE, d/b/a GOAUPAIR,

      Defendants.

---

**ORDER ADOPTING AND AFFIRMING IN PART FEBRUARY 22, 2016**
**RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**

---

This matter is before the Court on the February 22, 2016 Recommendation of United States Magistrate Judge Kathleen M. Tafoya (Doc. # 240) on a handful of motions to dismiss in the instant case.

## I.  BACKGROUND

In her Recommendation, Magistrate Judge Tafoya analyzed five separate motions to dismiss brought by some combination of the fifteen Defendants named in this matter: Defendant Cultural Care, Inc.'s Motion to Dismiss All Claims in First Amended Complaint (Doc. # 127), Motion to Dismiss the First Amended Complaint by Defendant Interexchange, Inc. (Doc # 130), Defendant American Cultural Exchange, LLC, D/B/A Go Au Pair's Motion to Dismiss Counts I, III, IV, V, VI, VII, VIII, IX and X of the First Amended Complaint (Doc. # 131), Joint Motion by Certain Sponsor Defendants to Dismiss the First Amended Complaint (Doc. # 135), and Defendant American Institute for Foreign Study's Motion to Dismiss Amended Complaint (Doc. # 136).  She recommended the Joint Motion by Certain Defendants to Dismiss the First Amended Complaint (Doc. # 135) be denied.  (Doc. # 240 at 43.)  Additionally, she recommended that the remaining motions (Doc. ## 127, 130, 131, and 136) should be granted in part and denied in part; specifically, that Plaintiffs' claim under the Utah Minimum Wage Act and Plaintiffs' claim for breach of contract should be dismissed,[1] but that Plaintiffs' remaining claims should proceed.  (*Id.*)[2]

---

[1] Plaintiffs did not object to this aspect of the Recommendation.  (*See* Doc. # 256 at 1 n.1.)

[2] Judge Tafoya also ordered that certain motions to strike relating to the motions to dismiss – specifically, Defendant Cultural Care, Inc.'s Motion to Strike Material in Plaintiffs' Consolidated Opposition to Defendants' Motions to Dismiss (Doc. # 206) and Plaintiffs' Cross-Motion to Strike

On March 14, 2016, Defendants filed two timely, consolidated objections to Judge Tafoya's Recommendation; one relates to her recommendation regarding Plaintiffs' antitrust claims (Doc. # 248), and the other relates to her recommendation regarding Plaintiffs' remaining claims (Doc. # 247).  Plaintiffs also filed a Response to Defendants' Objections.  (Doc. # 256.)

The Recommendation is incorporated herein by reference.  *See* 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).  As such, the Recommendation's thorough recitation of the factual background of this case will be reiterated only to the extent necessary to resolve Defendants' objections.

## II.  ANALYSIS

### A.   Legal Standard

When a magistrate judge issues a recommendation on a dispositive matter, Fed. R. Civ. P. 72(b)(3) requires that the district judge "determine *de novo* any part of the magistrate judge's [recommended] disposition that has been properly objected to."  In conducting its review, "[t]he district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions."  *Id.*

### B.   Application

#### 1.  Plaintiffs' Sherman Act Claims

Plaintiffs sue fifteen so-called "Sponsor" organizations (Sponsors), a mix of for-profit and non-profit organizations that are formally designated by the U.S. Department

---

Certain Exhibits Submitted by the Defendants" (Doc. # 221) – were denied as moot.  The parties did not object to this ruling.  (*See* Doc. ## 247, 248, 256.)

of State (DOS) as the exclusive entities permitted to recruit and place *au pairs*[3] with host families in the United States under the J-1 Visa program.[4]   (Doc. # 110, ¶¶ 45–47, 72.)   Judge Tafoya's Recommendation found that Plaintiffs' allegations were sufficient to state a claim for price fixing under Section 1 of the Sherman Act (Doc. # 240 at 13), which provides, in relevant part, that "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."   15 U.S.C. § 1 (Section 1).

Plaintiffs' Amended Complaint alleges that the Sponsors, who have "100% of the market power within the relevant market, including the power jointly to set *au pair* compensation below competitive and legal levels," have violated Section 1 by engaging in a conspiracy not to compete with one another with respect to *au pair* wages.   (Doc. # 110, ¶¶ 2, 72.)   In other words, Plaintiffs allege that the Sponsors have agreed among themselves to create an artificially low, anticompetitive "wage floor" for *au pairs* – that is, to "fix" the price of *au pair* wages.   Plaintiffs allege that such an agreement is to the Sponsors' economic advantage, as wages are one of several components of the overall "price" of providing an *au pair* to a host family, and the Sponsors must compete both for *au pairs* and for host families.   In particular, they allege that this so-called "wage-fixing"

---

[3] Under the DOS' *au pair* program, young, foreign nationals (between the age of 18 and 26), with some secondary school education and English proficiency, are permitted to obtain a so-called "J-1" visa and stay in United States for one or two years.   *Au pairs* live with an American host family, for whom they provide live-in child care services for 45 hours per week (as well as, in some cases, housekeeping and cooking).   In exchange for these services, they are provided with, among other things, (1) a weekly stipend (which the Plaintiffs allege violates the FLSA's minimum wage and overtime regulations); and (2) up to $500 in an "education credit" to cover tuition (per year).   (Doc. # 101, ¶¶ 44, 99, 108.)

[4] The J-1 visa *au pair* program is one of several official J-1 visa "cultural exchange" programs overseen and administered by the DOS.   (Doc. # 101, ¶ 43.)

agreement benefits the Sponsors in at least two ways: first, it allows them to effectively increase the portion of the overall costs to host families that are comprised of Sponsors' fees without increasing overall costs to host families for employing an *au pair*;[5] second, it allows the Sponsors to expand the number of potential host families they can attract (i.e., customers), by increasing the affordability of *au pair* child care child arrangements for host families vis-à-vis other kinds of child care arrangements.  (*Id.*, ¶ 132.)  "Both of these results increase Sponsors' profits, at the expense of *au pairs*."  (*Id.*)

As a preliminary matter, Defendants' objection to the legal standard employed by Judge Tafoya is without merit.  Defendants assert that Judge Tafoya erred because her Recommendation

> failed to address the fact that Plaintiffs fail to allege facts in their Amended Complaint **sufficient to exclude the possibility of independent action**, even where parallel conduct is present, **as required by *Monsanto Co. v. Spray Rite Serv. Corp.*, 484 U.S. 752 (1984)** (cited by the Court in *Twombly* for that proposition at 550 U.S. 557, 556).

(Doc. # 238 at 8) (emphasis added).  In making this argument, Defendants conflate the summary judgment standard (i.e., the standard applicable in *Monsanto*) and the motion to dismiss standard (i.e., the standard applicable here).  As Plaintiffs explained long ago in their Response brief to Defendants' Consolidated Motion to Dismiss (Doc. # 199 at 18), in *Monsanto*, the United States Supreme Court held that, in order to survive **a motion for a directed verdict** (which is analogous to the standard applied to a summary judgment motion), "there must be evidence that tends to exclude the

---

[5] Sponsors generate revenue at least in part from "placement" or "program" fees paid by host families in order to participate in the *au pair* program.  For example, Au Pair in America's website indicates that it charges a host family an annual $8,245 "Program Fee" plus a $400 "Match Fee."  (Doc. # 101, ¶ 99.)

possibility of independent action." *Id.* at 769.  Obviously, Judge Tafoya's decision to apply the correct standard for the 12(b)(5) Motions before her, rather than the directed verdict/summary judgment standard, was not erroneous.[6]

In *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), the seminal case outlining the pleading standard for Section 1 under the Sherman Act, plaintiffs brought a class action suit against several telephone companies, alleging that the companies had conspired to stay in their own markets and to keep other companies out of those markets in violation of Section 1.  The United States Supreme Court explained that because Section 1 does not prohibit all unreasonable restraints of trade, but only those restraints "effected by a contract, combination, or conspiracy, **the crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement**." *Id.* at 553 (emphasis added).  Accordingly, that Court held that, to survive a Motion to Dismiss, a complaint must present "enough factual matter (taken as true) to suggest that an agreement was made . . . [and] to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.* at 556.  An agreement, however, need not be in writing or be explicit, and may be established by either direct or circumstantial evidence.  *See id.* at 553 (stating that the agreement may be "tacit or express"); *Cayman Expl. Corp. v. United Gas Pipe Line Co.*, 873 F.2d 1357, 1361 (10th Cir. 1989) ("In the absence of an explicit agreement, conspiratorial conduct may be established by circumstantial evidence.").

---

[6] Plaintiffs' assertion that *Monsanto* simply does not apply to this stage of the dispute is easily verifiable with a simple Westlaw or LexisNexis search.  Thus, the Court is puzzled as to why this argument appeared **yet again** in Defendants' Objection to the Magistrate Judge's Recommendation.

"Direct evidence [of] a Section 1 conspiracy must be evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted." *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1083 (10th Cir. 2006) (citing *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 118 (3d Cir. 1999)).  However, because direct evidence of concerted action is "so rare," the antitrust law has "granted fact finders some latitude to find collusion or conspiracy from parallel conduct and inferences drawn from the circumstances."  *Oltz v. St. Peter's Cmty. Hosp.*, 861 F.2d 1440, 1450-51 (9th Cir. 1988).  Specifically, if a complaint does not contain direct evidence of an agreement, but instead makes only allegations of so-called "parallel conduct,"[7] e.g., allegations of similar pricing behavior, etc., such allegations "must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action."  *Twombly*, 550 U.S. at

---

[7] In *White v. R.M. Packer Co.*, the First Circuit Court of Appeals provided the following helpful explanation of the difference between a tacit agreement, which is prohibited under the Sherman Act, and parallel conduct (otherwise known as "conscious parallelism"), which is not:

> Conscious parallelism is a phenomenon of oligopolistic markets in which firms "might in effect share monopoly power, setting their prices at a profit-maximizing, supracompetitive level by recognizing their shared economic interests and their interdependence with respect to price and output decisions."  Each producer may independently decide that it can maximize its profits by matching one or more other producers' price, on the hope that the market will be able to maintain high prices if the producers do not undercut one another.
> A tacit agreement—one in which only the conspirators' actions, and not any express communications, indicate the existence of an agreement—is distinguished from mere conscious parallelism by "uniform behavior among competitors, preceded by conversations implying that later uniformity might prove desirable or accompanied by other conduct that in context suggests that each competitor failed to make an independent decision."

635 F.3d 571, 575–76 (1st Cir. 2011) (citations omitted).

557.  That is, the complaint must contain "allegations **plausibly suggesting** (not merely consistent with) agreement."  *Id.* (emphasis added); *see also Mitchael v. Intracorp, Inc.,* 179 F.3d 847, 859 (10th Cir.1999) ("While consciously parallel behavior may contribute to a finding of antitrust conspiracy, it is insufficient, standing alone, to prove conspiracy").  In considering whether a Plaintiff has alleged sufficient circumstantial evidence of conspiracy, the Court considers the allegations as a whole.  *Evergreen Partnering Group, Inc. v. Pactiv Corp.*, 720 F.3d 33, 47 (1st Cir. 2013) ("While each of [the plaintiff's] allegations of circumstantial agreement standing alone may not be sufficient to imply agreement, taken together, they provide a sufficient basis to plausibly contextualize the agreement necessary for pleading a [Section] 1 claim.")

At bottom, Defendants' Objection is rooted in the proposition that Judge Tafoya "stray[ed] from the law by **failing to recognize the impermissibility of inferring anticompetitive conspiracy from parallel conduct** where there is independent business rationale for the behavior."  (Doc. # 248 at 2) (emphasis added).  Defendants' argument, however, fails to properly consider Plaintiffs' allegations of a direct agreement, that is, the fact that Plaintiffs allege that there was **more than** mere parallel conduct indicative of an agreement among the Sponsors.

Although the Sponsors filed a Motion to Strike sections 90 through 94 of Plaintiffs' Complaint at an earlier juncture in this case – i.e., those sections of the Complaint in which Plaintiffs allege that several of the Sponsors' employees (the "Directors") **explicitly admitted** to Plaintiffs' investigator that the Sponsors had **expressly agreed among themselves** to keep *au pair* wages at the lowest possible

level – Judge Tafoya denied their Motion and Defendants did not appeal her ruling.

(Doc. # 235.)  As such, in resolving Defendants' Motions to Dismiss, Judge Tafoya

properly considered these allegations and took them to be true, and this Court must do

the same.  Although Judge Tafoya did not discuss these allegations in great detail, the

Court finds it worth doing so here, as they amount to what Judge Richard Posner has

termed the "the smoking gun in a price-fixing case" – namely, "direct evidence, . . . [in]

the form of an admission by an employee of one of the conspirators, that officials of the

defendants had met and agreed explicitly on the terms of a conspiracy to raise prices."

*See In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010) (Posner, J.);

*see also Gen. Chemicals, Inc. v. Exxon Chem. Co., USA*, 625 F.2d 1231, 1233 (5th Cir.

1980) (quotation omitted) (noting that "Rarely, if ever, can a plaintiff point to a 'smoking

gun'" of "direct evidence of a specific agreement between defendants" in a Sherman Act

case).

Specifically, in the instant case, Plaintiffs allege as follows:

- In a telephone conversation on November 20, 2014, a representative

  of one Sponsor Defendant, with the title of "Director," admitted that

  there was an understanding between all of the Sponsors to pay

  standard *au pairs* the same amount.  **The sponsor explained that the**

  **government sets a minimum amount, but that all of the Sponsors**

  **then agreed among themselves to pay exactly that minimum**

  **amount**.  This Sponsor thus characterized the "stipend paid to the *au*

  *pairs*" as a "fixed expense."  The Sponsor explained that the stipend "is

where pricing becomes standard across all agencies," and that "there is no difference in prices, as far as the stipend goes, between all of the agencies."

- In a telephone conversation on November 21, 2014, a representative of another Sponsor, also with the title of "Director," admitted that all of the Sponsors agreed to set *au pair* wages at $195.75 per week. Specifically, **the Sponsor acknowledged that each and every Sponsor got together and agreed to pay *au pairs* a stipend of no more than $195.75 a week.  As the representative added, the Sponsors "all agreed to pay that amount, no more."**

- In yet another telephone conversation on November 21, 2014, a representative of yet another Sponsor, again with a "Director" title, explained why "the stipend is identical across all companies."  The representative admitted that **the Sponsors all agreed to pay that exact same minimum rate.**  As the Sponsor noted, "[e]verybody agrees" to pay *au pairs* no more than the minimum weekly wage.

(Doc. # 101, ¶¶ 92–94) (emphasis added).

Defendants argue that the statements quoted above are not sufficiently specific to infer that there was an agreement among the Sponsors, because Plaintiffs (1) did not identify the specific individuals involved in the alleged agreement or the time or place where the agreement was made, and (2) provide "no information to suggest the individuals actually had authority to speak for one, much less all, of sponsor

Defendants." (Doc. # 248 at 14).[8]  In support of this proposition, they cite a footnote

from *Twombly,* in which the Supreme Court stated

> Apart from identifying a 7-year span in which the [Section] 1 violations
> were supposed to have occurred . . . **the pleadings mentioned no**
> **specific time, place, or person involved in the alleged conspiracies**
> . . . . [A] defendant seeking to respond to plaintiffs' **conclusory**
> **allegations** in the § 1 context would have little idea where to begin.

550 U.S. at 565 n. 10 (emphasis added).  There are a variety of reasons why *Twombly*

offers very little guidance in this case.  First, the above-quoted allegations of direct

evidence in the form of admissions by the Sponsors are well-plead, not "conclusory,"

because they supply "a factual narrative" supporting their legal conclusions, in providing

details like the specific dates of the admissions, that they were made by the Sponsor's

employees, and exact quotes about the admissions themselves.  *See Arapahoe*

*Surgery Ctr., LLC v. Cigna Healthcare, Inc.*, 80 F. Supp. 3d 1257, 1263-64 (D. Colo.

2015) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009) (explaining that "[a]llegations

are deemed 'conclusory' where they state a legal conclusion without supplying a factual

narrative for that conclusion, such that they 'amount to nothing more than a 'formulaic

recitation of the elements of a . . . claim.'  For example, a conclusory allegation [of] a

---

[8] Defendants also assert that the Directors' statements are analogous to the statements made
by the former CEO of Qwest in *Twombly*, to the effect that encroaching on another defendant's
territory "[m]ight be a good way to turn a quick dollar but that doesn't make it right."  550 U.S. at
568 n. 13.  However, *Twombly*'s pleading standard offers little guidance as to the necessary
level of specificity in the pleading of an **explicit agreement**, and in any case, this citation is in
no way supportive of Defendants' argument.  Although Defendants assert that the Supreme
Court held in *Twombly* that "a comment by the chief executive of one of the seven defendant
entities [was] insufficient to adequately plead a plausible conspiracy" (Doc. # 238 at 11), in fact,
the Supreme Court noted that the district court (correctly) did not consider the CEO's
statements because "[t]his was only part of what he reportedly said," and after it took "notice of
the full contents of the published articles referenced in the complaint, from which the truncated
quotations were drawn," the full context effectively neutralized the statements.  *See* 550 U.S. at
568 n. 13.

[Section] 1 claim would state little more than that the defendant joined a conspiracy to unreasonably restrain trade")).  Additionally, *Twombly* offers no guidance regarding the specificity required in a well-pleaded allegation of an **explicit/direct agreement**, because plaintiffs' complaint in that case was based solely on circumstantial evidence of an agreement.  *See Twombly*, 550 U.S. at 564 (noting that "the complaint leaves no doubt that plaintiffs rest their [Section] 1 claim on descriptions of parallel conduct and **not on any independent allegation of actual agreement**").  However, a Tenth Circuit case – *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1084 (10th Cir. 2006) – is particularly instructive in analyzing the instant case, which, as described above, involves well-plead allegations of a direct agreement along with allegations of circumstantial evidence of such an agreement.

In *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1084 (10th Cir. 2006), a smaller, newer entrant to the aluminum distribution business brought suit under Section 1 against seven larger, more established aluminum distributors, alleging that those established distributors had agreed among themselves to exclude new competitors. The Tenth Circuit characterized the following statement as "weak" direct evidence in support of the plaintiff's Section 1 claim:

> [Wiley, an employee of an established aluminum distributor, said that he] felt . . . that **himself and other potential customers [distributors] within the industry** would find that Commonwealth [a mill] selling to Champagne [Metals] [a distributor], they — they would find that as, again, not in the best interest of the industry, **and would cause other distributors** in that area of the country **to source their metals from other mill sources,** and that by developing a relationship with Champagne Metals, we would be putting other business with potential customers [distributors] at risk.

*Id.* at 1083.  The Tenth Circuit explained that this evidence was "direct" because it was explicit – that is, the agent of the established distributor claimed that "'himself and other potential customers [distributors] . . . would cause other service centers [distributors] to remove their business from Commonwealth [a mill] if [that mill] continued selling to Champagne Metals [a distributor]." *Id.*  The court also specifically held that "viewed in the light most favorable to [the distributor], this statement indicates an agreement . . . to take collective action." *Id.* (emphasis added).  However, it also explained that this evidence, **standing alone**, was too weak to allow the distributor to withstand summary judgment, because, **"**[f]or example, [the statement] does not indicate **which, if any, of the Established Distributors were among the 'other customers' which were part of the agreement.**" *Id.* at 1084 (emphasis added).

In the instant case, the statements of the Sponsors' Directors are, if anything, far **more** explicit about the existence of an agreement among "all" of the Sponsors than the statement involved in *Champagne Metals*.  In *Champagne Metals*, the plaintiff sued his "day-to-day competitors," but did not sue not every distributor in the market (as such, there was some justifiable doubt about which, "if any" of the "customers" were included in the alleged agreement).  *Id.* at 1077, 1084.  In contrast, Plaintiffs have sued every single Sponsor in the relevant *au pair* market, and they also specifically allege that every single Sponsor was in agreement: one Director admitted that "**every Sponsor got together and agreed** to pay *au pairs* a stipend of no more than $195.75 a week," and another admitted that "**all [Sponsors] agreed** to pay that amount, no more." (Doc. # 101, ¶¶ 92, 93) (emphasis added).  Particularly when such statements are viewed in the

13

light most favorable to Plaintiffs, they are certainly sufficient to indicate there may have been a direct agreement to take collective action among Defendant-Sponsors. *See Champagne Metals*, 458 F.3d at 1083; *see also Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 468–72 (3d Cir. 1998) (finding the plaintiff's testimony that he was told by one of his competitors that "if [he] went into business that [the competitor] and [another competitor] would do anything they could, stop supplies, cut the prices, whatever they had to do they were going to do to keep me out of business" to be direct evidence of concerted action).

At the same time, the Court **does** recognize that this evidence – at least as it is currently pled – is "weak" direct evidence, insofar as it does not provide critical details, such as the individuals with whom the investigator spoke, and whether such individuals (who allegedly identified themselves as "Directors") had the "authority to speak for one, much less all, of sponsor Defendants." (Doc. # 248 at 14). *Compare Champagne Metals*, 458 F.3d at 1084 (emphasis added) (stating that statement of employee of a distributor constituted "weak" direct evidence of agreement because, "[f]or example, [the statement] does not indicate **which, if any, of the Established Distributors** were among the 'other customers' which were part of the agreement."); *Heartland Surgical Specialty Hosp., LLC v. Midwest Div., Inc.*, 527 F. Supp. 2d 1257, 1301 (D. Kan. 2007) (emphasis added) (citing *Champagne Metals*, 458 F.3d at 1084, and characterizing testimony regarding an alleged agreement between managed care organizations as "weak" direct evidence because the testimony did not "identify **who was included** in the unwritten understanding amongst the 'managed care organizations'"). However, the

relative weakness of Plaintiffs' allegation of direct evidence is not the end of the analysis; per *Champagne Metals*, 458 F.3d at 1085, a plaintiff can survive **summary judgment** if he or she presents a combination of direct evidence and circumstantial evidence positing an economically rational theory of an agreement; by definition, then, such a plaintiff can withstand a 12(b)(6) Motion.[9] *See Champagne Metals*, 458 F.3d at 1085.[10]

In the instant case, in addition to providing evidence of a direct agreement among Sponsors, for purposes of withstanding a motion to dismiss, Plaintiffs also provide circumstantial evidence of an agreement that is at least as strong as that which was presented in *Champagne Metals*.[11] Specifically, in *Champagne Metals*, the Tenth Circuit first noted that "when a plaintiff makes out a case **based only on circumstantial evidence**," then "the more economically rational a conspiracy is in a given situation, the

---

[9] This is because a plaintiff must withstand a relatively higher burden to survive a defendant's summary judgment motion than a motion to dismiss, especially in the antitrust context, which limits the range of permissible inferences from ambiguous evidence. Specifically, "a plaintiff seeking damages for a violation of [Section] 1 must present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently. . . . [I]n other words, [a plaintiff] must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed [plaintiff]." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986); *accord Abraham v. Intermountain Health Care Inc.*, 461 F.3d 1249, 1262 (10th Cir. 2006).

[10] In *Champagne Metals*, the Tenth Circuit specifically reserved what it called the "more difficult question" of whether, on summary judgment, "when **direct** evidence has been introduced, we must still evaluate the economic rationality of the alleged conspiracy when considering the accompanying **circumstantial** evidence." 458 F.3d at 1085.

[11] In stating this conclusion, the Court emphasizes that it is **not** finding that Plaintiffs have, in fact, presented sufficient evidence to withstand summary judgment (nor could it do so at this juncture); for example, for whatever reason, Plaintiffs may ultimately fail to uncover evidence in discovery to shore up their allegations of a direct agreement, in which case the summary judgment calculus could shift significantly.

broader the range of inferences that can be drawn from the evidence" at summary judgment. *Id.* at 1084 (emphasis added). The court then found that the plaintiff's theory that established distributors "acted together to attempt to keep a new, aggressive entrant out of the market" was economically rational based on fears of new competitors eroding profit margins or fears of losing market share. *Id.* at 1084–86. Similarly, here, Judge Tafoya determined that Plaintiffs' circumstantial evidence presented sufficient circumstantial evidence of a viable economic theory of collusion,[12] citing the following allegations:

> (1) At least one Sponsor, Cultural Care, has informed prospective *au pairs*, in writing, that the weekly stipend arranged by Cultural Care would be "the same regardless of which *au pair* agency you use." (Am. Comp. at 20; Resp. at 14);
> (2) Sponsors informed *au pairs* and host families that $195.75/week plus room and board is the **only** permitted compensation for *au pairs* (Am. Comp. at 73-74, 76-77);
> (3) As the exclusive entities authorized to recruit, provide training, place and supervise *au pairs* with host families in the United States, Defendants control *au pair* opportunities within the United States (Am. Comp. at 10-11, Resp. at 14);
> (4) The Sponsors' industry structure facilitates collusion as they are a relatively small group, 15 agencies, with 100% market share (Am. Comp. at 32);
> (5) In addition to industry structure, many Sponsors are members of the Alliance for International Education and Cultural Exchange and the International *Au Pair* Association ("IAPA"), individuals from certain Sponsors sit on IAPA's Board, and the featured speaker at a recent IAPA conference published an article arguing for strict maintenance of the fixed $195.75 weekly wage for standard *au pairs*, stating that "host families do

---

[12] Specifically, Judge Tafoya found that "[t]he Amended Complaint alleges a mixture of 'parallel behaviors, details of industry structure, and industry practices, that facilitate collusion.'" (Doc. # 240 at 13) (quoting *In re Text Messaging Litig.*, 630 F.3d 622, 627 (7th Cir. 2010)).

each other a disservice when they start to compete with each other (or try to stand out as a 'better family') by offering more pocket money. We don't want *au pairs* shopping for a higher stipend." (Am. Comp. at 30-31);

(6) The Sponsors uniformly advertise *au pair* wages at an identical amount even though the federal government does not require that *au pairs* only receive minimum wage (Am. Comp. at 13-15, 20, 22-29; Resp. at 15, see also supra);[13]

(7) There are no adjustments to advertised compensation with relation to geographic differences, varying state laws and/or the number of children in the home (Am. Comp. at 29-30; Resp. at 15);

(8) By depressing wages for *au pair* services, the Sponsors reap artificially high profits because if the host family's direct cost for an *au pair* does not increase, then any increase, while still costing the family less than a full-time nanny on the open market, goes to the Sponsor in the form of fees, and keeping the cost down will theoretically increase the number of potential host families (Am. Comp. at 32);

. . . [and][14]

(10) Defendants advertise that their labor costs are set lower than the cost of a comparable child-care worker in the free market. (Am. Comp. at 5, 54, 55; Resp. at 23-24.) Plaintiffs also contend that in a competitive marketplace, at least some Defendants would either offer higher salaries to potential *au pairs*, thereby attracting more and higher quality *au pairs* and charging higher fees to families, or the Sponsors might have to compete with agencies that place other domestic workers, such as nannies, or react to market forces, including location or higher salaries

---

[13] With regard to this allegation, Defendants assert that Magistrate Judge Tafoya's Recommendation "disregard[ed] the admission that over a third of the Defendant sponsors advertised stipends above $195.75" for so-called non-standard *au pairs* (i.e., *au pairs* with additional training and education in child care), asserting that this amounts to the Court "ignor[ing] inconvenient evidence." (Doc. # 247 at 3–4.) To the contrary, Magistrate Judge Tafoya's Recommendation addressed this evidence, and she **specifically explained** that she considered this argument to be "disingenuous" because Plaintiffs, and those they seek to represent in a class action, are "standard" *au pairs,* and "[t]he only instance in which Defendants advertise a higher compensation rate is for non-standard positions. . . . [T]herefore, the only issues relevant to the current inquiry[] pertain to Defendants' practices with regard to standard *au pairs*." (Doc. # 220 at 14.)

[14] Item number nine in Judge Tafoya's list was Plaintiffs' allegation that three of the Sponsors expressly admitted that they had agreed to keep au pair wages at $195.75 per week. (Doc. # 240 at 12.)

> based on unique childcare responsibilities, such as the number of children. (Resp. at 23.) None of these natural consequences have occurred.

(Doc. # 240 at 11–12.)

Thus, although Defendants' Objection asserts that Judge Tafoya mis-applied *Twombly* and improperly disregarded the "common-sense and independent business rationale[s]" for Plaintiffs' allegations of circumstantial evidence, unlike *Twombly*, Plaintiffs' complaint does not rely exclusively on parallel conduct, but contains well-pled allegations of a direct agreement among the Sponsors as well circumstantial evidence to establish a setting that would make such an agreement plausible. *See Twombly*, 550 U.S. at 557. Because the Court must take Plaintiffs' factual allegations as true, consider them as a whole, and view them in the light most favorable to Plaintiffs in evaluating a motion to dismiss, the Court finds Defendants' arguments unpersuasive at this stage, particularly in light of Plaintiffs' well-plead allegations of direct agreement. *See Arapahoe Surgery Ctr., LLC v. Cigna Healthcare, Inc.*, 80 F. Supp. 3d 1257, 1265 (D. Colo. 2015) (citing *Twombly*, 550 U.S. at 556) (noting that a defendant's arguments about an alleged conspiracy's remote plausibility "suggest that the alleged conspiracy is less likely," but because the plaintiffs sufficiently pled an overt agreement, such arguments "do not render Plaintiffs' allegations implausible, and thus do not mandate dismissal"); *Heartland Surgical Specialty Hosp., LLC v. Midwest Div., Inc.*, 527 F. Supp. 2d 1257, 1309 (D. Kan. 2007) (citing *Champagne Metals* and finding that plaintiff's "weak" direct evidence plus circumstantial evidence outlining a plausible economic theory were sufficient to survive summary judgment).

For the foregoing reasons, the Court determines that, although Judge Tafoya did not apply the framework from *Champagne Metals*, she still correctly concluded that Plaintiffs have adequately stated a Section 1 Claim; accordingly, this claim remains.

## 2. **Defendants' Status as "Joint Employers" of Plaintiffs**

In her Recommendation, Judge Tafoya applied the Tenth Circuit's "economic realities" test[15] to Plaintiffs' allegations and determined that Plaintiffs stated a plausible claim that the Sponsors are "joint employers" of *au pairs* (along with the *au pairs*' host families).  (Doc. # 240 at 23.)  Specifically, she noted that Plaintiffs make the following allegations: (1) the Sponsors recruit, interview, and hire *au pairs* for host families; (2) the Sponsors effectively dictate *au pair* wages (as described in their antitrust allegations); (3) the Sponsors have a statutory obligation to ensure that *au pairs* are paid a stipend, do not provide more than 10 hours of child care per day or 45 hours of child care in any week, receive a minimum of one and one-half days off per week in addition to one complete weekend off each month, and receive two weeks of paid vacation; (4) the Sponsors exert control over *au pair* working conditions*,* including providing *au pairs* with training, visiting *au pairs* on a monthly basis (and twice-monthly visits in the first two months of *au pair* placement), making quarterly contact with host

---

[15] This test "includes inquiries into whether the alleged employer has the power to hire and fire employees, supervises and controls employee work schedules or conditions of employment, determines the rate and method of payment, and maintains employment records."  *Baker v. Flint Eng'g & Constr. Co.*, 137 F.3d 1436, 1439 (10th Cir. 1998) (citing *Watson v. Graves*, 909 F.2d 1549, 1553 (5th Cir.1990)). In applying the economic realities test, courts consider the following factors: "(1) the degree of control exerted by the alleged employer over the worker; (2) the worker's opportunity for profit or loss; (3) the worker's investment in the business; (4) the permanence of the working relationship; (5) the degree of skill required to perform the work; and (6) the extent to which the work is an integral part of the alleged employer's business." *Baker*, 137 F.3d at 1440.

families, and even providing specific employment tasks;[16] (4) the Sponsors act as the

final arbiters of any disputes between *au pairs* and host families regarding wages and

hours; (5) the Sponsors can terminate *au pairs* without the consent of the host family

and cause their removal from the United States,[17] and a host family cannot terminate an

*au pair* without approval from the Sponsor; (6) the Sponsors draft the contracts

governing the relationships between *au pairs* and their host families; and (7) the

Sponsors provide *au pairs* with health insurance.  (Doc. # 240 at 18–23.)  She also

noted that, "as 'a general rule, determining whether an entity qualifies as an employer is

a fact issue for the jury.'" (*Id.* at 17, 18) (citing *Bristol v. Bd. of Cnty. Comm'rs of Clear

Creek*, 312 F.3d 1213, 1221 (10th Cir. 2012)).

Defendants contend that Judge Tafoya erred because she essentially "confuse[d]

the host family's status as employer of an *au pair* with the sponsor's role as a visa

sponsor," citing to federal regulations that generally describe the *au pair* program as an

"exchange program," rather than an employment program.  (Doc. # 247 at 7.)  That the

*au pair* program has been generally described an "exchange program" is in no way

probative of the Sponsors' status as a joint employer.  Indeed, the doctrine of "joint

---

[16] Indeed, Defendant Go Au Pair's contract with its *au pairs* sets out an *au pair*'s daily employment responsibilities, including "daily maintenance of the children, including meal preparation, doing the children's laundry, transporting the children to various activities, assisting with homework, playing, teaching and caring for the children. [] Minor housekeeping, including but not limited to, washing the children's dishes, tidying up the children's rooms and making their beds, vacuuming and dusting the children's rooms and cleaning their bathrooms. [] pick up after the children in any room in which they have played."  (Doc. # 101 at 66-67.)

[17] Defendant Cultural Care's employment contract provides that the *au pair* must agree that Cultural Care (not the host family) will terminate the *au pair* if it determines that her emotional or physical state makes her unsuitable for providing childcare, **if she gets married or pregnant**, **engages in behavior Cultural Care determines to be unsuitable, or Cultural Care deems her performance unsatisfactory "for whatever reason."**  (Doc. # 101 at 63.)

employment" exists to recognize that an apparently-independent entity can still "employ" an individual for purposes of the FLSA, and Defendants point to no legal authority, either from the joint employment case law or otherwise, indicating that a "visa sponsor" cannot be considered a joint employer.  The Court also determines that Judge Tafoya properly distinguished *Ivanov v. Sunset Pools Mgmt., Inc.*, 567 F. Supp. 2d 189 (D.D.C. 2008).  As such, the Court adopts this aspect of her Recommendation.

### 3. Plaintiffs' FLSA Claims

Plaintiffs' FLSA claims are based upon four purported violations of the FLSA: (1) the Sponsors' failure to pay them minimum wage; (2) the Sponsors' failure to compensate them for their mandatory week-long training; (3) the Sponsors' unlawful deduction of room and board from their compensation (including but not limited to during vacations when they are not provided room and board), and (4) the Sponsors' failure to pay them overtime compensation when they worked in excess of 40 hours per week.[18]

### a.   Whether the FLSA Applies to Plaintiffs' Wage Claims

The Sponsors' objections to Judge Tafoya's Recommendation are that:

1. *Au pair* wages have **never** been governed by the FLSA, but rather, by a so-called separate "DOS formula" – a term of their own invention – that purportedly "governs calculations of the weekly stipend."  (Doc. # 247 at 2.)

---

[18] As Magistrate Judge Tafoya noted, "Defendants do not request dismissal of Plaintiffs' FLSA claims based upon Defendants' failure to pay them for the one-week mandatory training, nor Plaintiffs' claims that room and board is unlawfully deducted from their weekly stipends during vacations."  (Doc. # 240 at 16, n. 7.)

2.   "Nothing in the language of the 1997 regulation or the accompanying commentary reflects any intent to depart from th[e] 1995 [DOS] formula."  (*Id.* at 4).

3.   A DOS Notice issued to Sponsors in 2007, for example, is an indication that the FLSA does not apply to Plaintiffs' claims, because the DOS issued such notices after 1997 that purportedly continued to use "the stipend formula adopted in 1995 to calculate the weekly stipend."  (*Id.* at 5).

Specifically, the Sponsors point to the fact the DOS' predecessor, the United States Information Agency (USIA), promulgated an interim rule in 1995 providing that *au pairs* should receive a weekly stipend of "not less than $115 per week," which was calculated by multiplying the federal minimum wage rate at that time by 45 hours (i.e., the maximum number of hours an au pair could work under the regulations) and subtracting $36 per week for room and board.  *See* 60 Fed. Reg. 8547-02 at 8443.  In 1997, however, the USIA implemented **amended regulations**, which contain **no mention** of a "formula," much less a stipend of "not less than $115 per week."  *See* 62 Fed. Reg. 34632 (June 27, 1997).  The amended regulations, however, specifically provided that the Sponsors "shall require that *au pair* participants" are "compensated at a weekly rate based upon 45 hours per week and paid in conformance with the requirements of the Fair Labor Standards Act as interpreted and implemented by the United States Department of Labor."  *Id.* at 34634 (codified at 22 C.F.R. § 62.31(j)(1)).  Additionally, the interim final rule specifically explained that such a change was necessary because "[t]he United States Department of Labor has determined that *au*

22

*pair* participants are covered under the provisions of the Fair Labor Standards Act and therefore must receive federal minimum wage. The [USIA] is amending this regulation to ensure that there is no future confusion regarding the payment of minimum wage." 62 Fed. Reg. 34632, 34633.

Accordingly, both the plain language of the regulation (explicitly requiring *au pairs* to be "paid in conformance with" the requirements of the FLSA, **"as interpreted and implemented by the United States Department of Labor"** – **not** "as interpreted and implemented by" the DOS), as well as the DOL's explanation for the change ("to ensure that there is no future confusion regarding payment of the minimum wage), belies both of the Sponsors' assertions that (1) "[t]he 1997 stipend provision simply codifies the [prior DOS] formula on which the previous fixed-sum stipend of $115 was based, while referencing the FLSA in a way that incorporates adjustments in the [wage] rate" and (2) "Nothing in the language of the 1997 regulation or the accompanying commentary reflects any intent to depart from th[e] 1995 formula." (*See* Doc. # 247 at 4).

Although the Sponsors acknowledge the 1997 amendment to the *au pair* regulations as well as the amendment's explanatory language (that *au pairs* are "covered under the provisions of the Fair Labor Standards Act" and that the amendment was necessary to "ensure that there is no future confusion regarding the payment of minimum wage"), they conclusorily characterize this language as simply "repeat[ing] [the] conclusions that USIA reached in 1995." (Doc. # 247 at 4.) In 1995, however, the USIA did not opine broadly regarding whether *au pairs* should be "paid in conformance with the requirements of the Fair Labor Standards Act as interpreted and implemented

by the United States Department of Labor," but rather, concluded that *au pairs* were "employees" of host families.  *See* 60 Fed. Reg. at 8550-51 (noting that "the Agency has been obligated to examine the question of whether *au pairs* are employees [of host families] subject to the provisions of the Fair Labor Standards Act. . . . The Department of Labor has specifically advised the Agency that an employment relationship is established").

Moreover, with regard to the DOS' conduct in continuing to issue Notices to Sponsors, the Sponsors have cited no legal authority for the notion that the conduct of an agency like the DOS can somehow trump the plain language of a regulation. Regardless, these Notices in no way support Defendants' theory that an entirely separate, DOS regime governs *au pair* wages.  Rather, the 2007 Notice simply advises "[a]ll *Au Pair* sponsors" of an increase to the federal minimum wage, correctly notes that "[t]he weekly stipends for the standard *Au Pair* Program and EduCare Program **are directly connected to the federal minimum wage**," and indicates that *au pair* stipends, given this increase in the minimum wage, will be $195.75 per week as of July 24, 2009.  (Doc. # 127-1 at 2) (emphasis added).[19]  As such, the Court agrees with Judge Tafoya's conclusion that the FLSA applies to Plaintiffs' claims.

---

[19] Defendants' arguments that the terms of the so-called "DOS formula" are "irreconcilable" with the FLSA are also unavailing.  (Doc. # 187 at 3.)  Specifically, the Sponsors note that the FLSA has no cap on weekly hours, but that *au pairs* are only permitted to work 45 hours a week; this presents no conflict whatsoever, and simply indicates that the *au pair* regulations are more restrictive in terms of work hours than the FLSA – **not that the FLSA does not apply**.  They also cite a 1997 Opinion Letter issued by the DOL, in which it stated that it did not have the authority to **lower** the amount of the stipend if an *au pair* works fewer than 45 hours.  Again, this says nothing about whether the *au pair* stipend must conform with the FLSA generally, because paying an *au pair* for 45 hours of week when that *au pair* actually worked fewer hours would result in a higher wage.

**b. Whether Sponsors May Lawfully Deduct Room and Board**

The Sponsors first argue that the Recommendation's determination that the Sponsors may not deduct the costs for room and board against *au pairs*' wages is erroneous because it is "premised on the incorrect conclusion that the FLSA, rather than the DOS's stipend formula, governs credit of the stipend." (Doc. # 247 at 6.) This argument necessarily fails because, as discussed above, the Court believes that the FLSA does, in fact, apply to Plaintiffs' claims here.

Judge Tafoya's Recommendation also noted that pursuant to 29 C.F.R. § 531.27(a), an employer may include the reasonable cost or fair value of furnishing an employee board, lodging or other facilities in the employee's wages. However, pursuant to 29 C.F.R. § 531.30,[20] an employer may not credit the cost of facilities toward an employee's wages if the employer is required by law to provide the same. 22 C.F.R. § 62.31(e)(6) provides that "Sponsors shall secure . . . a host family placement for each participant. Sponsors shall not . . . place the *au pair* with a family who cannot provide the *au pair* with a suitable private bedroom.'" Additionally, the DOL issued a Wage and Hour Opinion Letter in 1997, cited by Judge Tafoya, stating that with regard to the hiring of an employee on an *au pair* visa, "an employer may not take credit for facilities which the employer is required by law or regulation to provide," and specifically noting that a host family could not deduct the use of the family automobile to meet the minimum

---

[20] 29 C.F.R. § 531.30 provides that "The reasonable cost of board, lodging, or other facilities may be considered as part of the wage paid an employee only where customarily 'furnished' to the employee. **Not only must the employee receive the benefits of the facility** for which he is charged, **but it is essential that his [or her] acceptance of the facility be voluntary and uncoerced**." (Emphasis added).

wage requirement.  1997 WL 998029.  Judge Tafoya concluded that the Sponsors and

host families were accordingly prohibited from deducting the cost of room and board

because

> There is no question that pursuant to 22 C.F.R. § 62.31(e)(6) host families
> are required to provide room and board to their *au pairs*.  Defendants do
> not cite to any FLSA provision providing an exception from 29 C.F.R. §
> 531.30's requirement for the *au pair* program that otherwise prohibits an
> employer from crediting the cost of room and board from an employee's
> wages if the employer is required by law to provide the same.

(Doc. # 240 at 25.)

Defendants' Objection obliquely addresses Judge Tafoya's argument about

Defendant's failure to cite an exception to 29 C.F.R. § 531.30, in citing generalized

language about the benefits to the *au pair* from the immersion of the home life of the

host family, and asserting that "provision of room and board, thus, benefits **both** the

host family and the *au pair*."  (Doc. # 247 at 7.)  The Sponsors also (unironically) cite

another regulation interpreting the FLSA, which provides that acceptance of lodging

must be "voluntary and uncoerced," but that "[i]n the case of lodging furnished to live-in

domestic service employees, the Administrator will accept a credit taken by the

employer of up to seven and one-half times the statutory minimum hourly wage for each

week lodging is furnished."  29 C.F.R. § 552.100(a), (c).  These arguments represent, at

best, red herrings, as neither the statutory provisions cited nor the Sponsors'

generalized assertions that *au pairs* also benefit from housing trump the far more

specific provision at 29 C.F.R. § 531.30, nor do they indicate, in any way, that the *au

pair* program is exempt from 29 C.F.R. § 531.30.  Accordingly, Judge Tafoya did not err

in determining that Plaintiffs have stated a plausible claim that the Sponsors' unlawfully deducted the cost of room and board from their wages.

### c. Whether Sponsors Must Pay Overtime Compensation Under the FLSA

Defendants' Objections did not challenge Judge Tafoya's analysis regarding Plaintiffs' entitlement to federal overtime provisions.  (*See* Doc. # 247.)  Nevertheless, the Court agrees with Judge Tafoya's conclusion that Plaintiffs have stated a viable claim for overtime for any work performed after January 1, 2015, due to a new DOL regulation, recently upheld by the District of Columbia Circuit Court of Appeals,[21] providing that "[T]hird party employers of employees engaged in live-in domestic service employment [] may not avail themselves of the overtime exemption provided by [29 U.S.C. § 213(b)(21)], even if the employee is jointly employed by the individual or member of the family or household using the services."  29 C.F.R. § 552.109(c).

### 4. Plaintiffs' State Wage Law Claims

### a. Preemption

Defendants assert that Plaintiffs' state wage law claims are preempted by virtue of the "regulatory framework designed by USIA, which embodies the government's policy judgments regarding *au pair* compensation.  USIA expressly recognized 'the programmatic need for a uniform wage' and adopted a compensation structure that would 'ensure that all au pair participants receive uniform wage compensation' . . . Application of state minimum wage laws presents an obstacle to the accomplishment of this objective because it eliminates any uniformity in the wage calculation," as some

---

[21] *Home Care Ass'n of Am. v. Weil*, 799 F.3d 1084 (D.C.  Cir. 2015).

states have higher minimum wages than those required by the FLSA.  (Doc. # 247 at

10) (citing 60 Fed. Reg. at 8551; 49 Fed. Reg. at 64298.)  The Sponsors also assert

that the "regulatory framework" establishing a uniform wage "reflects a careful balance

of policy objectives concerning the government's interest in furthering cultural

exchange, affording adequate protection to *au pair* participants and their American host

programs, and safeguarding the continuing viability of *au pair* program."  (*Id.* at 9–10.)

Although Defendants have slightly recast their arguments from those that appeared

before Judge Tafoya (which focused on the immigration aspects of the *au pair*

program),[22] the Court nevertheless agrees that Judge Tafoya properly decided that

state wage laws are not preempted.  First, as has already been discussed, the

regulations implemented by the USIA expressly provided that the *au pair* program **must**

conform with the FLSA, **without exception**; the FLSA, in turn, explicitly provides that, if

a state sets a higher minimum wage than that mandated by the FLSA, employees within

that state are entitled to receive that higher wage.  *See* 22 C.F.R. § 62.31(j)(1); 29

U.S.C. § 218(a).  Additionally, the Court agrees with Judge Tafoya's analysis of the

Sponsors' arguments regarding uniformity in wage calculation:

> Defendants cite to 60 Fed. Reg. 8547 (1995) as indicating that the federal
> government "identified a programmatic need for a uniform wage."
> Defendants' characterization of this statement is misleading. In the
> Supplementary Information section preceding the Final Rule, the USIA
> discussed the appropriate amount of credit a host family could use with
> regard to the room and board provided to an au pair and considered the
> options of crediting actual cost or a fixed cost. *Id.* at 8551.  The USIA
> weighed the preference for crediting actual cost against the need for the

---

[22] To the extent that the Sponsors are presenting "new" arguments before the Court in their
Objection, "issues raised for the first time in objections to the magistrate judge's
recommendation are deemed waived."  *Marshall v. Chater*, 75 F.3d 1421, 1426 (10th Cir. 1996).

> credit to be uniform so that host families would not have to maintain
> individualized records.  *Id.*

(Doc. # 240 at 30–31 n. 10.)  Accordingly, the Court agrees that Plaintiffs' claims under

state wage laws are not, in fact, preempted by some kind of amorphous "federal

framework."

### b. Plaintiffs' Claims Under Colorado Minimum Wage Law

Colorado Minimum Wage Order Number 31 provides that "domestic employees

employed by households or family members to perform duties in private residences,"

are not entitled to overtime compensation under Colorado state law ("Domestic

Employee Exemption").  7 Colo. Code Regs. § 1103-1:5.  The "preamble" to the

Minimum Wage Order, however, provides as follows:

> [I]f either of the following two situations applies to an employee, then the
> employee is entitled to the $8.31 state minimum wage . . .
>
> [1] The employee is covered by the minimum wage provisions of Colorado
> Minimum Wage Order Number 32.2.
> [2] **The employee is covered by the minimum wage provisions of the
> Fair Labor Standards Act.**
>
> **Some restrictions and exemptions may apply; contact the Colorado
> Division of Labor for additional information.**

7 Colo. Code Regs. § T.1100 (emphasis added).  Noting that *au pairs* are covered by

the FLSA's minimum wage provisions, see 22 C.F.R. § 62.31(j)(1), Judge Tafoya

concluded that Plaintiffs fall within the second of the two categories enumerated above,

and thus, that the Domestic Employees Exemption did not apply.  (Doc. # 240 at 33.)

Defendants, however, note that the last sentence of the preamble states that "[s]ome

restrictions and **exemptions <u>may</u> apply**."  (Doc. # 247 at 11) (emphasis added).  Judge

Tafoya apparently did not consider this language, and the existing briefing on this matter does not allow the Court to make a determination at this juncture as to whether *au pairs* do, in fact, qualify for the Domestic Employees Exemption.  Accordingly, the Court neither adopts nor rejects Judge Tafoya's determination on this issue, and Defendants' Motion to Dismiss is denied without prejudice with respect to Plaintiffs' wage claims under Colorado state law.

### c. Plaintiffs' Claims Under New York Minimum Wage Law

Defendants merely reiterate their arguments about how a "Fact Sheet for Employers," disseminated by the New York Department of Labor, indicated that *au pairs* are exempted from New York state labor law coverage.  Specifically, that "Fact Sheet" stated that that New York State labor laws "cover ALL workers.  Their Immigration status does not matter," but that there was one exception, namely, "*au pairs* hired through the federal *au pair* program and admitted into he United States under a J-1 visa . . . [who] are subject to special federal rules."  (Doc. # 127-4 at 4; Doc. # 247 at 12.) Judge Tafoya's analysis on this point is well-taken:

> The Fact Sheet upon which Defendants rely does not cite to any state law that exempts au pairs from minimum wage and/or overtime exemptions, nor do Defendants. The Fact Sheet is most analogous to an opinion letter and therefore, may be entitled to a certain amount of deference with regard to the interpretation of New York's wage and hour laws, but it does not displace or supersede a court's own interpretation and judgment.  *See Salazar v. Butterball, LLC*, No. 08-cv-02071-MSK-CBS, 2009 WL 6048979, at *8 (D. Colo. Dec. 3, 2009) (finding that [DOL's] opinion letters are entitled to deference, but the level of deference accorded depends upon the "thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.") (citing *McGraw v. Barnhart*, 450 F.3d 493, 501 (10th Cir. 2006) ("Under *Skidmore*, the degree of deference given informal agency interpretations

> will vary with circumstances, and courts have looked to the degree of the
> agency's care, its consistency, formality, and relative expertness, and to
> the persuasiveness of the agency's position.")). While the New York
> DOL's opinion with regard to whether its state labor laws applies to au
> pairs may be persuasive depending upon the above mentioned factors, it
> is not determinative of whether Plaintiffs have stated a viable claim. As
> that is the only authority upon which Defendants have relied, the court
> finds their request for dismissal should be denied.

(Doc. # 240 at 33–34.)  Accordingly, the Court will adopt the Recommendation

with respect to New York wage laws.[23]

### 5.  <u>Plaintiffs' Fraud Claims</u>

Defendants claim that Plaintiffs fail to plead fraud with the particularity required

by Rule 9(b) of the Colorado Rules of Civil Procedure, in alleging that the Sponsors

falsely informed them, other *au pairs*, and host families that $195.75 was a "set" or

"fixed" salary and that they could not receive higher wages.  Specifically, they assert

that Judge Tafoya "simply concluded" that Plaintiffs met their burden "without analysis."

(Doc. # 247 at 13.)  To the contrary, Judge Tafoya specifically noted that Plaintiffs

provided the following specific examples of fraudulent statements,[24] including the fact

that

> Plaintiffs . . . allege that through a blog entry on its website, Defendant
> InterExchange informed *au pairs* that if they received offers for higher
> salaries, they should consider such offers bogus and/or the product of a

---

[23] The Sponsors did not object to Judge Tafoya's recommendations regarding the applicability
of the state wage laws of Pennsylvania or California.  (*See* Doc. # 47.)

[24] The Sponsors note that Judge Tafoya improperly referenced Plaintiffs' assertion, made in
their Response to Defendants' Motion to Dismiss, that Defendant InterExchange's website
informed *au pairs* that they can make "**almost** $10,000 per year," in considering whether
Plaintiffs pled their fraud allegations with sufficient particularity, as this allegation did not appear
in Plaintiff's Complaint.  (Doc. # 247 at 14 n. 5.)  The Court reviewed the Complaint and
determined that this allegation was not, in fact, included (see Doc. # 101); as such, the Court did
not consider that particular assertion here.

scam. . . . Defendant InterExchange informed *au pairs* through another blog post that the salary of $195.75 per week was the product of a "strict equation."  Plaintiffs allege that Defendant AIFS has informed *au pairs* that if they received more than $195.75/week, they could be subject to deportation and that its website listed the weekly stipend as simply $195.75 and instructed host families that they "needed to 'pay th[at] published fee.'" Similarly, Plaintiffs allege that Defendant American Cultural Exchange LLC d/b/a GoAuPair created a handbook entitled, "GoAuPair *Au Pair* Household Handbook," that instructs GoAuPair host families that au pair wages are set by the federal government at $195.75. . . . **Finally, Defendant Cultural Care again argues (alone) that the $195.75 is the maximum amount *au pairs* are permitted to receive.** As an alternative argument, it argues that if its position in that regard is inaccurate, "Plaintiffs have failed to plead facts sufficient to show that Cultural Care was aware of this . . . . and therefore acted to mislead *au pairs*."  **The fact that $195.75/week does not represent a fixed wage is well established.  With regard to its alternative argument, Defendant Cultural Care has essentially conceded they informed *au pairs* that $195.75 was a fixed rate, which aligns with Plaintiffs' allegations.**

(Doc. # 240 at 36–37) (internal citations omitted, emphasis added).  The Court agrees with Judge Tafoya that these allegations are sufficient to satisfy Rule 9(b).  Additionally, even though Defendants' objection to Judge Tafoya's analysis of Plaintiffs' fraud claims was limited to the claims' purported lack of particularity, the Court notes that it is undisputed that the $195.75 represented, at best, a "wage floor," such that families **could** pay *au pairs* more if they wished[25] – but Plaintiffs' allegations indicate that the Sponsors led both *au pairs* and host families to believe otherwise.  As such, Plaintiffs' fraud claims will not be dismissed.

---

[25] Of course, Plaintiffs also allege that the Sponsors should have ensured the host families did, **in fact**, pay more than $195.75 per week, because they allege that the *au pairs* were entitled to additional wages under the FLSA and/or state wage law.

### 6.  Plaintiffs' Fiduciary Duty Claims

The Sponsors' arguments regarding Magistrate Judge Tafoya's conclusions about Plaintiffs' fiduciary duty claim are cursory, conclusory, and difficult to follow, but as far as the Court can surmise from an examination of the Defendants' Motions to Dismiss, the Sponsors apparently are attempting to argue that Judge Tafoya erred in finding that Plaintiffs stated a plausible claim for breach of fiduciary duty because she entirely "failed to address" issues relating to contracts between the *au pairs* and the Sponsors and how such contracts essentially preclude a fiduciary duty claim.  (Doc. # 147 at 14.)  In fact, she discussed these issues in depth, including an extensive analysis of *DerKevorkian v. Lionbridge Techs., Inc.*, 316 F. App'x 727 (10th Cir. 2008), a case which specifically addressed a breach of fiduciary duty under Colorado law in the context of an employment contract and employer-employee relationship, and noted that "[a] confidential relationship exists when one party justifiably reposes confidence in another such that the parties drop their guard and assume that each side is acting fairly. Colorado does not recognize a separate tort founded upon breach of a confidential relationship. However, a confidential relationship may serve as an indication of fiduciary status."  *Id.* at 737.

Defendants ignore Judge Tafoya's treatment of *DerKevorkian*, much less attempt to distinguish it, and the Court agrees with her conclusion that, taking Plaintiffs' allegations as true, they present "a stronger basis to find a confidential relationship than that described in *DerKevorkian*."  (Doc. # 240 at 40.)  As such, the Court agrees with

Judge Tafoya's analysis and adopts her Recommendation as to Plaintiffs' Fiduciary

Duty Claims.

### 7. **Plaintiffs' Quasi-Contract and Unjust Enrichment Claims**

Finally, Defendants note that the Recommendation properly dismissed Plaintiffs'

breach of contract claim because "Plaintiffs do not allege that Defendants violated a

provision within their respective contracts with the *au pairs*." (Doc. # 240 at 41–42.)

Nevertheless, they object that she did not also dismiss Plaintiffs' quasi-contract or

unjust enrichment claims. (Doc. # 247 at 15.) However, she correctly noted that

"Defendants have not requested dismissal" of either of those claims in any of their

Motions to Dismiss, and Defendants do not disagree with this conclusion. (*Id.* at 42.)

"Issues raised for the first time in objections to the magistrate judge's recommendation

are deemed waived." *Marshall v. Chater*, 75 F.3d 1421, 1426 (10th Cir. 1996).

Accordingly, both of these claims will stand.

### III. **CONCLUSION**

The Court has conducted a full *de novo* review of this matter, including reviewing

all relevant pleadings, the Recommendation, Defendants' Objections thereto, and the

Plaintiffs' Response to Defendants' Objections. Based on this *de novo* review, the

Court concludes that Judge Tafoya's thorough and thoughtful Recommendation

is correct and is not called into question by Defendants' Objections, except as

discussed above.

Accordingly, it is hereby ORDERED that Defendants' Objections (Doc. ## 247,

248) are OVERRULED IN PART. It is

FURTHER ORDERED that the Recommendation of United States Magistrate Judge Kathleen Tafoya (Doc. # 240) is ACCEPTED IN PART AND REJECTED IN PART; specifically, the Court adopts Judge Tafoya's conclusions regarding the dismissal of Plaintiffs' claim under the Utah Minimum Wage Act and Plaintiffs' claim for breach of contract; neither accepts nor rejects Judge Tafoya's conclusions regarding Plaintiffs' Colorado wage claim; and adopts her conclusions regarding the remainder of Plaintiffs' claims.  Accordingly, it is

FURTHER ORDERED that Defendants' Motions to Dismiss (Doc. ## 127, 130, 131, and 136) are GRANTED IN PART (with respect to Plaintiffs' claim under the Utah Minimum Wage Act and Plaintiffs' claim for breach of contract), denied without prejudice with respect to the Colorado wage claim, and denied as to the remainder.  It is

FURTHER ORDERED that the Joint Motion by Certain Defendants to Dismiss the First Amended Complaint (Doc. # 135) is DENIED in its entirety.  Finally, it is

FURTHER ORDERED that Defendants' Unopposed Motion for Oral Argument Regarding Recommendation of United States Magistrate Judge (Doc. # 257) is hereby DENIED AS MOOT.

Dated: March 31, 2016

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge