# EXHIBIT 1

1          IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF COLORADO
2
   Civil Action No. 14-cv-03074-CMA-KMT
3  _____

4  VIDEOTAPE DEPOSITION OF:  DAVID KEIL - July 21, 2016
   _____
5
   JOHANA PAOLA BELTRAN; LUSAPHO HLATSHANENI; BEAUDETTE
6  DEEELEFS; DAYANNA PAOLA CARDENA CAICEDO; ALEXANDRA
   IVETTE GONZALEZ; on behalf of themselves and others
7  similarly situated,

8  Plaintiffs,

9  v.

10 INTEREXCHANGE, INC.; USAUPAIR, INC.; GREATAUPAIR, LLC;
   EXPERT GROUP INTERNATIONAL INC., d/b/a EXPERT AUPAIR;
11 EURAUPAIR INTERCULTURAL CHILD CARE PROGRAMS; CULTURAL
   HOMESTAY INTERNATIONAL; CULTURAL CARE, INC. d/b/a
12 CULTURAL CARE AU PAIR; AUPAIRCARE INC.; AU PAIR
   INTERNATIONAL, INC.; APF GLOBAL EXCHANGE, NFP d/b/a
13 AUPAIR FOUNDATION; AMERICAN INSTITUTE FOR FOREIGN STUDY
   d/b/a AU PAIR IN AMERICA; AMERICAN CULTURAL EXCHANGE,
14 LLC, d/b/a GOAUPAIR; AGENT AU PAIR, INC.; A.P.EX.
   AMERICAN PROFESSIONAL EXCHANGE, LLC d/b/a PROAUPAIR;
15 and 20/20 CARE EXCHANGE, INC. d/b/a THE INTERNATIONAL
   AU PAIR EXCHANGE, and ASSOCIATES IN CULTURAL EXCHANGE,
16 d/b/a GOAUPAIR,

17 Defendants.
   _____
18

19

20

21

22

23  **H+G**

24
   Hunter + Geist, Inc.
25

**303.832.5966**
**800.525.8490**
1900 Grant Street, Suite 1025
Denver, CO 80203

Your Partner in Making the Record

■ www.huntergeist.com
■ scheduling@huntergeist.com

Court Reporting, Legal Videography, and Videoconferencing

**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-03074-CMA-KMT
_____

VIDEOTAPE DEPOSITION OF:  DAVID KEIL - July 21, 2016
_____

JOHANA PAOLA BELTRAN; LUSAPHO HLATSHANENI; BEAUDETTE
DEEELEFS; DAYANNA PAOLA CARDENA CAICEDO; ALEXANDRA
IVETTE GONZALEZ; on behalf of themselves and others
similarly situated,
Plaintiffs,
v.
INTEREXCHANGE, INC.; USAUPAIR, INC.; GREATAUPAIR, LLC;
EXPERT GROUP INTERNATIONAL INC., d/b/a EXPERT AUPAIR;
EURAUPAIR INTERCULTURAL CHILD CARE PROGRAMS; CULTURAL
HOMESTAY INTERNATIONAL; CULTURAL CARE, INC. d/b/a
CULTURAL CARE AU PAIR; AUPAIRCARE, INC.; AU PAIR
INTERNATIONAL, INC.; APF GLOBAL EXCHANGE, NFP d/b/a
AUPAIR FOUNDATION; AMERICAN INSTITUTE FOR FOREIGN STUDY
d/b/a AU PAIR IN AMERICA; AMERICAN CULTURAL EXCHANGE,
LLC, d/b/a GOAUPAIR; AGENT AU PAIR, INC.; A.P.EX.
AMERICAN PROFESSIONAL EXCHANGE, LLC d/b/a PROAUPAIR;
and 20/20 CARE EXCHANGE, INC. d/b/a THE INTERNATIONAL
AU PAIR EXCHANGE, and ASSOCIATES IN CULTURAL EXCHANGE,
d/b/a GOAUPAIR,
Defendants.
_____

**2**

PURSUANT TO NOTICE AND SUBPOENA, the
videotape deposition of DAVID KEIL was taken on behalf
of the Defendant Cultural Care, Inc. d/b/a Cultural
Care Au Pair at 1200 17th Street, Suite 3000, Denver,
Colorado 80202, on July 21, 2016, at 9:05 a.m., before
Carol M. Bazzanella, Registered Professional Reporter,
Certified Realtime Reporter, and Notary Public within
Colorado.

A P P E A R A N C E S

For the Plaintiffs:

LAUREN FLEISCHER LOUIS, ESQ.
Boies, Schiller & Flexner LLP
401 East Las Olas Boulevard, Suite 1200
Fort Lauderdale, Florida 33301
ALEXANDER HOOD, ESQ.
Towards Justice
1535 High Street, Suite 300
Denver, Colorado 80218

For the Defendant InterExchange, Inc.:
BROOKE A. COLAIZZI, ESQ.
Sherman & Howard L.L.C.
633 17th Street, Suite 3000
Denver, Colorado 80202

For the Defendant Expert Group International Inc. d/b/a
Expert AuPair:

BOGDAN ENICA, ESQ.
Law Office of Bogdan Enica
111 2nd Avenue NE, Suite 213
St. Petersburg, Florida 33701

For the Defendant EurAuPair Intercultural Child Care
Programs:
MARTHA L. FITZGERALD, ESQ.
DAVID B. MESCHKE, ESQ.
Brownstein Hyatt Farber Schreck, LLC
410 17th Street, Suite 2200
Denver, Colorado 80202

**3**

For the Defendant Cultural Homestay International:
JONATHAN S. BENDER, ESQ.
Holland & Hart LLP
555 17th Street, Suite 3200
Denver, Colorado 80202

For the Defendant Cultural Care, Inc. d/b/a Cultural
Care Au Pair:

JOAN A. LUKEY, ESQ.
Choate Hall & Stewart LLP
Two International Place
Boston, Massachusetts 02110
JAMES M. LYONS, ESQ.
Lewis Roca Rothgerber Christie LLP
1200 17th Street, Suite 3000
Denver, Colorado 80202

For the Defendant AuPairCare, Inc.:
PEGGY E. KOZAL, ESQ.
Gordon Rees Scully Mansukhani
555 17th Street, Suite 3400
Denver, Colorado 80202

For the Defendant APF Global Exchange, NFP:
SUSAN M. SCHAECHER, ESQ.
Fisher & Phillips LLP
1801 California Street, Suite 2700
Denver, Colorado 80202

For the Defendants Agent Au Pair, American Cultural
Exchange, LLC d/b/a GoAupair and Associates in Cultural
Exchange, d/b/a GoAupair:
KATHRYN A. REILLY, ESQ.
Wheeler Trigg O'Donnell LLP
370 17th Street, Suite 4500
Denver, Colorado 80202

**4**

For the Defendant A.P.EX. American Professional
Exchange, LLC d/b/a ProAuPair and 20/20 Care Exchange,
Inc., d/b/a The International Au Pair Exchange:

KATHLEEN CRAIGMILE, ESQ.
Nixon Shefrin Hensen Ogburn, P.C.
5619 DTC Parkway, Suite 1200
Greenwood Village, Colorado 80111

Also Present:
John Jensen, Videographer

Beltran v. Interexchange, Inc.                    DAVID KEIL                              7/21/2016

---

**5**

                    I N D E X
EXAMINATION OF DAVID KEIL:                        PAGE
July 21, 2016

By Ms. Lukey                                         8

By Ms. Kozal                                       206

By Ms. Louis                                       214

                                               INITIAL
DEPOSITION EXHIBITS:                         REFERENCE
Exhibit 1  Renewed Notice of Deposition          12
Exhibit 2  Subpoena Recipient David Keil's       13
           Privilege Log

Exhibit 3  Collection of information printed      25
           from website David Keil
           Investigations

Exhibit 4  Response to Joint Motion to Strike     65
           Amended Complaint Sections 90 to 94
           by Certain Moving Defendants

Exhibit 5  Towards Justice: CONFIDENTIAL -       144
           Attorney-Client Work Product
           three-page report of Keil

Exhibit 6  Department of Regulatory              207
           Agencies Division of Professions
           and Occupations Office of Private
           Investigator Licensing 4 CCP 750-1,
           pages 1, 11, and 12

---

**7**

09:06:26  1   class.
09:06:27  2          MR. HOOD:  Alexander Hood from Towards
09:06:27  3   Justice on behalf of the plaintiff class.
09:06:31  4          MR. ENICA:  And for Defendant Expert Group
09:06:31  5   Bogdan Enica.
09:06:31  6          MS. KOZAL  Peggy Kozal for AuPairCare.
09:06:40  7          MS. COLAIZZI:  Brooke Colaizzi of Sherman
09:06:40  8   & Howard on behalf of Defendant InterExchange.
09:06:45  9          MS. CRAIGMILE:  Kathleen Craigmile on
09:06:47 10   behalf of Defendants A.P.EX. American Professional
09:06:49 11   Exchange and 20/20 Care Exchange.
09:06:52 12          MS. FITZGERALD:  Martha Fitzgerald and
09:06:53 13   David Meschke from Brownstein Hyatt on behalf
09:06:57 14   EurAuPair.
09:06:57 15          MR. BENDER:  John Bender from Holland &
09:06:59 16   Hart for Cultural Homestay International.
09:07:02 17          MS. SCHAECHER:  Sue Schaecher, Fisher &
09:07:03 18   Phillips, on behalf of AIFS and APF Global.
09:07:08 19          MR. LYONS:  Jim Lyons on behalf of -- with
09:07:11 20   Lewis Roca Rothgerber Christie on behalf of Cultural
09:07:14 21   Care.
09:07:14 22          MS. LUKEY:  Joan Lukey, Choate Hall &
09:07:16 23   Stewart, also on behalf of Cultural Care.
09:07:26 24          DAVID KEIL,
09:07:26 25   having been first duly sworn to state the whole truth,

---

**6**

08:16:12  1          WHEREUPON, the following proceedings were
08:16:12  2   taken pursuant to the Federal Rules of Civil Procedure.
08:16:12  3          *   *   *   *   *
09:05:19  4          THE VIDEOGRAPHER:  Good morning.  We are
09:05:20  5   on the record.  The time is 9:05 a.m. on July 21, 2016.
09:05:26  6   This is the beginning of Media Unit No. 1.
09:05:30  7          We are here for the videotaped deposition
09:05:31  8   of David Keil in the matter of Johana Paola Beltran, et
09:05:37  9   al., versus InterExchange, Inc., et al., in the United
09:05:42 10   States District Court, the District of Colorado, Civil
09:05:45 11   Action No. 1:14-cv-03074-CMA-KMT.
09:05:55 12          The deposition is being held at 1200 17th
09:05:59 13   Street, Suite 3000, Denver, Colorado.  The videographer
09:06:03 14   is John Jensen and the court reporter is Carol
09:06:06 15   Bazzanella with Hunter + Geist, Inc., of Denver,
09:06:08 16   Colorado.
09:06:09 17          Please note that audio and video recording
09:06:12 18   will take place until all parties have agreed to go off
09:06:15 19   the record.  Microphones are sensitive and may pick up
09:06:18 20   whispers, private conversations, and cellular
09:06:21 21   interference.
09:06:21 22          Will counsel please state their
09:06:21 23   appearances, beginning with plaintiffs' counsel.
09:06:26 24          MS. LOUIS:  Good morning.  Lauren Louis of
09:06:26 25   Boies, Schiller & Flexner on behalf of the plaintiff

---

**8**

09:07:26  1   testified as follows:
09:07:27  2               EXAMINATION
09:07:27  3   BY MS. LUKEY:
09:07:27  4       Q.  Good morning.  Could you state your full
09:07:30  5   name for the record, please.
09:07:31  6       A.  Yes.  My name is David Eric Keil.
09:07:35  7          MS. LUKEY:  I would like to establish
09:07:36  8   whether stipulations are going to be used.  I would
09:07:38  9   propose that we use the standard stipulation of
09:07:40 10   reserving all objections except as to form and
09:07:42 11   reserving motions to strike until time of trial, that
09:07:45 12   the witness be asked to read, correct, and sign within
09:07:48 13   30 days or such further period as all parties may agree
09:07:51 14   in writing, and that if the deposition is not returned
09:07:56 15   signed and with a corrected errata sheet, it will be
09:08:00 16   deemed final.  Is that acceptable?
09:08:02 17          MS. LOUIS:  Yes.
09:08:03 18          MS. LUKEY:  Acceptable to all
09:08:05 19   co-defendants?
09:08:06 20          (Indicated in the affirmative.)
09:08:06 21          MS. LUKEY:  Thank you.
09:08:08 22       Q.  (BY MS. LUKEY)  Mr. Keil, just by way of
09:08:09 23   background so that you understand the process we'll be
09:08:12 24   following this morning, on behalf of Cultural Care,
09:08:15 25   which is the party that noticed this deposition, I will

---

**Beltran v. Interexchange, Inc.**                **DAVID KEIL**                **7/21/2016**

---

**9**

| | |
|---|---|
| 09:08:18 | 1 |
| 09:08:23 | 2 |
| 09:08:26 | 3 |
| 09:08:28 | 4 |
| 09:08:32 | 5 |
| 09:08:35 | 6 |
| 09:08:38 | 7 |
| 09:08:42 | 8 |
| 09:08:45 | 9 |
| 09:08:47 | 10 |
| 09:08:47 | 11 |
| 09:08:50 | 12 |
| 09:08:53 | 13 |
| 09:08:55 | 14 |
| 09:08:56 | 15 |
| 09:08:57 | 16 |
| 09:08:59 | 17 |
| 09:09:02 | 18 |
| 09:09:06 | 19 |
| 09:09:08 | 20 |
| 09:09:11 | 21 |
| 09:09:14 | 22 |
| 09:09:16 | 23 |
| 09:09:18 | 24 |
| 09:09:21 | 25 |

be questioning you, actually, on all of the topics. But to the extent that I leave something out -- I'm attempting, for the sake of efficiency, for us to get everything in here. I have been sure to consult with other defendants to find out if there were specific questions they wanted added to the outline, but if I leave something out, some among them may choose to ask you additional questions as well.

  Sir, could you state your residential address, please.

  A. My legal address is 191 University Boulevard, No. 250, Denver, Colorado 80206.

  Q. Now, you referred to that as your legal address. Do you live there?

  A. No, I do not.

  Q. Where do you reside?

  A. I am going to respectfully decline to answer that question. I am currently involved in a situation where there have been threats of violence made against myself and my family, and for reasons of safety and on the advice of law enforcement, I am not going to provide that information today.

  Q. I will reserve all rights --

  MR. LYONS: Mr. Kyle, I apologize for the vent. But --

---

**10**

| | |
|---|---|
| 09:09:22 | 1 |
| 09:09:22 | 2 |
| 09:09:22 | 3 |
| 09:09:23 | 4 |
| 09:09:24 | 5 |
| 09:09:25 | 6 |
| 09:09:26 | 7 |
| 09:09:26 | 8 |
| 09:09:28 | 9 |
| 09:09:31 | 10 |
| 09:09:32 | 11 |
| 09:09:34 | 12 |
| 09:09:36 | 13 |
| 09:09:38 | 14 |
| 09:09:38 | 15 |
| 09:09:42 | 16 |
| 09:09:47 | 17 |
| 09:09:50 | 18 |
| 09:09:53 | 19 |
| 09:09:56 | 20 |
| 09:09:59 | 21 |
| 09:10:00 | 22 |
| 09:10:01 | 23 |
| 09:10:02 | 24 |
| 09:10:05 | 25 |

  THE DEPONENT: Yeah.

  MR. LYONS: -- you're going to have to keep your voice up so we can all hear you.

  THE DEPONENT: I apologize. I'll do my best.

  MR. LYONS: It's all right. Thank you.

  Q. (BY MS. LUKEY) The other thing you should know is that although you and I are wearing microphones, it doesn't -- it isn't a microphone that magnifies, so the folks at the other end would have difficulty hearing.

  A. Thank you. I'll do my best.

  MS. LUKEY: I will reserve rights, since I have not consulted with everyone else about the issue of your residential address, but I would ask Ms. Louis or you, Alex, Mr. Hood, whether you would accept service of a subpoena were we in a position to wish to subpoena him for trial?

  MS. LOUIS: Why don't we talk about it off record. I imagine that the answer's yes as long as we are still in a retention agreement posture with Mr. Keil, the answer would be yes.

  MS. LUKEY: All right. That is, of course, the problem, and that's why I reserved our rights.

---

**11**

| | |
|---|---|
| 09:10:05 | 1 |
| 09:10:07 | 2 |
| 09:10:09 | 3 |
| 09:10:09 | 4 |
| 09:10:11 | 5 |
| 09:10:12 | 6 |
| 09:10:14 | 7 |
| 09:10:15 | 8 |
| 09:10:16 | 9 |
| 09:10:17 | 10 |
| 09:10:20 | 11 |
| 09:10:20 | 12 |
| 09:10:23 | 13 |
| 09:10:27 | 14 |
| 09:10:27 | 15 |
| 09:10:30 | 16 |
| 09:10:32 | 17 |
| 09:10:33 | 18 |
| 09:10:34 | 19 |
| 09:10:34 | 20 |
| 09:10:35 | 21 |
| 09:10:36 | 22 |
| 09:10:36 | 23 |
| 09:10:38 | 24 |
| 09:10:40 | 25 |

  Q. (BY MS. LUKEY) We don't mean to put you in a difficult position, sir.

  A. I understand.

  Q. And your business address, sir?

  A. 191 University Boulevard, Denver, Colorado 80206.

  Q. Is that an actual office building?

  A. It is not.

  Q. What is it?

  A. It's a -- a place where I receive business and personal mail.

  Q. Okay. I'm suspecting that since you're speaking not loud enough for me to hear you, I'll bet --

  MS. LUKEY: Well, can everybody hear?

  MS. FITZGERALD: I cannot hear you.

  THE DEPONENT: I apologize. I'm fighting a bit of a cold, so I'll --

  MS. LUKEY: Oh. Sorry.

  THE DEPONENT: I will do my best.

  A. Would you like to ask it again? I'll . . .

  Q. (BY MS. LUKEY) Yes. Apparently that was missed, so could you tell us whether that is an actual office building?

---

**12**

| | |
|---|---|
| 09:10:41 | 1 |
| 09:10:44 | 2 |
| 09:10:45 | 3 |
| 09:10:47 | 4 |
| 09:10:50 | 5 |
| 09:10:53 | 6 |
| 09:10:56 | 7 |
| 09:10:57 | 8 |
| 09:10:59 | 9 |
| 09:11:09 | 10 |
| 09:11:16 | 11 |
| 09:11:20 | 12 |
| 09:11:21 | 13 |
| 09:11:25 | 14 |
| 09:11:29 | 15 |
| 09:11:32 | 16 |
| 09:11:33 | 17 |
| 09:11:34 | 18 |
| 09:11:40 | 19 |
| 09:11:44 | 20 |
| 09:11:47 | 21 |
| 09:11:50 | 22 |
| 09:11:51 | 23 |
| 09:11:58 | 24 |
| 09:12:00 | 25 |

  A. It is not an actual physical address, no. It's where I receive my mail.

  Q. Okay. Before we proceed into any substantive questions, sir, I'm going to ask our reporter to mark as the first exhibit the notice of deposition with subpoena attached.

  MS. LUKEY: We have just a few copies in here now. More are being made. I want to be sure, however, that plaintiffs' counsel has some. I will keep one, and whoever needs one can grab one.

  (Deposition Exhibit 1 was marked.)

  Q. (BY MS. LUKEY) If you would just take a moment, sir, to take a look at that. As you can see, attached to the Renewed Notice of Deposition is the Subpoena to Testify at a Deposition in a Civil Action. Have you seen that, sir?

  A. Yes, I have.

  Q. And attached to that document is a request for production of documents by you, to the extent that you had any that fit in the categories within your possession, custody, or control. Do you have any documents to produce today?

  A. No, I do not.

  Q. Do you -- did you have in your possession documents that fit the description contained in the

---

3 (Pages 9 to 12)

**Beltran v. Interexchange, Inc.**               **DAVID KEIL**                              **7/21/2016**

---

**13**

```
09:12:03   1    subpoena which are no longer in your possession?
09:12:05   2        A.  No, I have not.
09:12:07   3        Q.  Okay.  I'm also going to mark when it gets
09:12:11   4    here a privilege log, but we don't have the copies of
09:12:14   5    it yet.  Sir, there is a log that was filed yesterday.
09:12:18   6    If it becomes necessary for us to wait because a
09:12:20   7    question requires the physical document to be present,
09:12:23   8    I'll come back to it.  But are you aware that counsel
09:12:28   9    for the plaintiffs has, in fact, provided a privilege
09:12:32  10    log to the defendants?
09:12:33  11        A.  I was made aware of that yesterday, yes.
09:12:35  12        Q.  There is one document listed in the
09:12:38  13    privilege log, and it is a memorandum.  Are you
09:12:41  14    familiar with that fact?
09:12:42  15        A.  I am familiar with that fact.
09:12:44  16        Q.  Do you know what the memorandum is that is
09:12:46  17    described in the privilege log?
09:12:47  18        A.  I do.
09:12:49  19        Q.  I have a feeling we're about to have the
09:12:52  20    privilege log in hand.  While that is being
09:12:56  21    distributed, and we will have it marked in a moment,
09:12:59  22    were you the author of the document referenced in the
09:13:03  23    privilege log?
09:13:06  24        A.  I've not seen the privilege log.
09:13:08  25        Q.  Okay.  Well, hold on.  We'll -- let me see
```

**14**

```
09:13:10   1    if we can just get that so it's clear from the very
09:13:13   2    beginning.
09:13:13   3        MS. LUKEY:  Thank you.  I hope you all
09:13:21   4    have better eyes than I do.  It's a little bit -- a
09:13:25   5    little bit small.  Could we have that marked as
09:13:27   6    Exhibit 2, please.
09:13:38   7        (Deposition Exhibit 2 was marked.)
09:13:38   8        THE DEPONENT:  Thank you.
09:13:39   9        Q.  (BY MS. LUKEY)  While that's being
09:13:42  10    circulated, sir, could you take a look at this, and in
09:13:45  11    particular at the Description column.
09:13:47  12        A.  Yes.
09:13:47  13        Q.  All right.  As you can see, this refers to
09:13:49  14    a document bearing the date December 2, 2014,
09:13:55  15    indicating that you are the source of the document and
09:13:57  16    that it was addressed to Mr. Hood, and it is described
09:14:00  17    as, "Memorandum to counsel summarizing telephonic
09:14:05  18    discussions with employees of defendants APF Global
09:14:09  19    Exchange NFP, Au Pair International, and EurAuPair
09:14:14  20    Intercultural."  It is indicated as a claimed privilege
09:14:18  21    of work product and it is being withheld.  Do you know
09:14:21  22    what document that is?
09:14:23  23        A.  I do.
09:14:23  24        Q.  Can you describe for us in your own words
09:14:25  25    what the document is?
```

**15**

```
09:14:26   1        MS. LOUIS:  Objection.  To the extent that
09:14:28   2    your answer would cause you to reveal any of the work
09:14:32   3    product nature of the document, I instruct you not to
09:14:36   4    do so.  If you disagree with the characterization
09:14:40   5    that's on the privilege log, so indicate.
09:14:44   6        A.  No, I agree with -- as it's characterized
09:14:46   7    on the log.
09:14:47   8        Q.  (BY MS. LUKEY)  Sir, I would assume, since
09:14:49   9    it's described as relating to telephonic discussions,
09:14:53  10    that the memorandum includes recitations of facts
09:14:56  11    relating to interviews or conversations that you had.
09:15:01  12    Would that be correct?
09:15:04  13        A.  Yes.
09:15:05  14        Q.  With regard to the factual portion, I am
09:15:08  15    going to be asking you questions, but I want to make it
09:15:11  16    clear on the record for the benefit of plaintiffs'
09:15:13  17    counsel that the defendants are reserving their rights
09:15:16  18    to move to compel the production of the document.  But
09:15:21  19    we don't want to hold up the deposition today, so we
09:15:24  20    will revisit that issue if no consensus can be reached
09:15:30  21    among us.
09:15:32  22        As we go through this today, I will be
09:15:33  23    asking you, sir, questions about your calls to various
09:15:37  24    individuals.  In the memorandum that was withheld, did
09:15:41  25    you recite verbatim conversations that you had with any
```

**16**

```
09:15:46   1    of the persons whom you called?
09:15:49   2        A.  I recited portions of conversations.  Not
09:15:56   3    verbatim and not entire conversations, but portions
09:15:59   4    therein.
09:16:00   5        Q.  I know you have a cold, and I'm sorry,
09:16:02   6    sir --
09:16:02   7        A.  I'm very sorry.
09:16:03   8        Q.  Just for the benefit of the folks at that
09:16:05   9    end, if you could please keep your voice up.
09:16:08  10        A.  Yes.  I memorialized portions of
09:16:11  11    conversations.  They were not taken verbatim and they
09:16:15  12    were not -- they did not include entire conversations,
09:16:17  13    but short passages from specific conversations.
09:16:19  14        Q.  When you refer to short passages, did you
09:16:23  15    place any of those passages in quotation marks?
09:16:28  16        A.  I don't recall.
09:16:30  17        Q.  In order to -- well, first, is the
09:16:33  18    memorandum dated, as indicated, on December 2, 2014?
09:16:41  19        A.  I don't recall, actually.  I'm sorry.
09:16:43  20        Q.  Okay.  Do you recall when you prepared the
09:16:46  21    memorandum in relation to the calls?
09:16:49  22        A.  Yes.  The memorandum -- which is why I
09:16:53  23    don't recall the exact date that appears on it.  The
09:16:56  24    memorandum was compiled over a period of five or six
09:17:00  25    days as the calls were made.  The memorandum was made
```

Beltran v. Interexchange, Inc.                 DAVID KEIL                              7/21/2016

---

**17**

```
09:17:05   1
09:17:10   2
09:17:12   3
09:17:16   4
09:17:17   5
09:17:19   6
09:17:20   7
09:17:23   8
09:17:25   9
09:17:26  10
09:17:29  11
09:17:33  12
09:17:35  13
09:17:35  14
09:17:37  15
09:17:39  16
09:17:44  17
09:17:48  18
09:17:50  19
09:17:55  20
09:17:58  21
09:17:59  22
09:18:01  23
09:18:05  24
09:18:09  25
```

in real time, contemporaneous with the phone calls.  So
different calls occurred on different days, therefore,
different portions of the memorandum were authored at
the time the phone calls were being made.

    Q.  Were you recording the phone calls?

    A.  No, I was not.

    Q.  Were you typing into a computer what you
were taking down from the calls?

    A.  Correct, yes.

    Q.  All right.  Am I correct in understanding
that you were preparing a running compilation of
comments from the calls?

    A.  Yes.

    Q.  And when it was completed, is that when
you sent it to Mr. Hood?

    A.  When it was completed, and it was edited
simply for grammatical and spelling issues, it was then
sent to Mr. Hood.

    Q.  Did the memorandum contain anything other
than factual recitations of information relating to
your calls?

    A.  To the best of my knowledge, no.

    Q.  Did you offer opinions or in any way
interject your thoughts into your comments recording
the calls?

---

**18**

```
09:18:10   1
09:18:11   2
09:18:14   3
09:18:19   4
09:18:22   5
09:18:25   6
09:18:28   7
09:18:32   8
09:18:35   9
09:18:40  10
09:18:46  11
09:18:49  12
09:18:50  13
09:18:52  14
09:18:54  15
09:18:59  16
09:19:02  17
09:19:05  18
09:19:09  19
09:19:14  20
09:19:15  21
09:19:16  22
09:19:18  23
09:19:19  24
09:19:20  25
```

    A.  To the best of my knowledge, no.

    Q.  As far as you know, was the memorandum
comprised completely of a recitation of the information
you were gathering from the people you spoke with?

    A.  There may have been some small statements
about the process and procedures of which the calls
were made, but other than that, that was all.

    Q.  Have you now told us the complete contents
of the call, that is, that you recorded excerpts or
pieces of the information from each of the calls and
then perhaps or before recording that, listed how you
were going about the process?

    MS. LOUIS:  Objection.  Sorry.  Again, I
would instruct you in answering that question not to
reveal anything that constitutes work product.

    A.  The -- to the best of my recollection, the
memorandum was done in real time, while I was on the
telephone, and any other information contained in there
was simply edits for clarity and -- and spelling and
grammar.

    Q.  (BY MS. LUKEY)  You did not, then, offer
any opinions or thought processes about the people with
whom you spoke?

    MS. LOUIS:  Objection.

    Q.  (BY MS. LUKEY)  Is that correct?

---

**19**

```
09:19:25   1
09:19:29   2
09:19:29   3
09:19:30   4
09:19:33   5
09:19:38   6
09:19:41   7
09:19:43   8
09:19:46   9
09:19:48  10
09:19:50  11
09:19:55  12
09:20:01  13
09:20:06  14
09:20:12  15
09:20:15  16
09:20:18  17
09:20:19  18
09:20:22  19
09:20:26  20
09:20:28  21
09:20:32  22
09:20:33  23
09:20:34  24
09:20:35  25
```

    A.  I don't believe so.  I don't recall.

    Q.  All right.

    MS. LUKEY:  Counsel, on the basis of that
testimony, I'm going to ask that you produce the
document today.  We can discuss whether you wish to
redact any portion where he says that he described the
process he followed, about which we're going to be
asking him anyway because it's factual, but factual
statements are not covered by work product.

    MS. LOUIS:  I understand and appreciate
your -- your position.  We are going to stand on the
privilege.  I don't know if Mr. Keil said it in that
exchange, but he did not review the document prior to
coming here and he is testifying from his recollection,
and having most recently reviewed the document, it is
our position that it is work product.

    MS. LUKEY:  Well, we obviously will
preserve our position.  We think his testimony is such
that the document is clearly discoverable, and we don't
want to be in a position where we could have to come
back and depose him again on the contents of the
document --

    MS. LOUIS:  Right.

    MS. LUKEY:  -- when he's had the
opportunity to refresh his memory.  Obviously, there

---

**20**

```
09:20:38   1
09:20:42   2
09:20:44   3
09:20:46   4
09:20:48   5
09:20:52   6
09:20:55   7
09:20:56   8
09:20:57   9
09:21:00  10
09:21:02  11
09:21:04  12
09:21:06  13
09:21:07  14
09:21:08  15
09:21:09  16
09:21:10  17
09:21:13  18
09:21:15  19
09:21:17  20
09:21:21  21
09:21:26  22
09:21:30  23
09:21:33  24
09:21:36  25
```

are folks in the room, myself included, that have to
travel, and we think that that is inappropriate.

    MS. LOUIS:  We understand your position.

    Q.  (BY MS. LUKEY)  Sir, did you take any
notes of the conversation apart from typing into your
computer that which ended up being one consolidated
memorandum?

    A.  No, I did not.

    Q.  Did you indicate the dates of each
conversation in your memorandum?

    MS. LOUIS:  Objection.

    A.  I don't recall.

    Q.  (BY MS. LUKEY)  Did you indicate to whom
you were speaking?

    A.  Yes.

    Q.  Did you indicate by what process you
reached that person?

    A.  I'm sorry, could you expand on that
question?  I don't understand.

    Q.  Well, for example, if you were placing a
call to an 800 number on a website and then an operator
or call center answered and you were placed on a line
for someone else, did you indicate those steps?

    A.  No.

    Q.  All right.  We will leave the issue of the

---

Beltran v. Interexchange, Inc.                 DAVID KEIL                          7/21/2016

---

21

09:21:38  1   subpoena for now with the reservation of rights that
09:21:41  2   I've already mentioned.
09:21:42  3        Going back to your personal background,
09:21:44  4   sir. What is your occupation?
09:21:45  5        A. I'm a private investigator.
09:21:47  6        Q. Okay. Do you have any other occupation?
09:21:49  7        A. I do not.
09:21:51  8        Q. Are you a mystery writer?
09:21:54  9        A. I'm an unpublished mystery writer.
09:21:58 10        Q. It would be interesting to take a count in
09:22:00 11   this room on how many people are unpublished authors of
09:22:04 12   one kind or another.
09:22:05 13        A. And I -- just to fully -- also, I do have
09:22:07 14   a very slight side occupation. I consult with mystery
09:22:12 15   writers on issues of investigative technique, and I
09:22:15 16   have been compensated for that.
09:22:17 17        Q. Okay. All right, sir. Sticking for the
09:22:22 18   moment with your occupation as a private investigator,
09:22:26 19   for how long have you been in that occupation?
09:22:29 20        A. I've been solo practitioner, David Keil
09:22:35 21   Investigations, since February 3, 1986. And prior to
09:22:40 22   that I worked in-house for a number of other agencies.
09:22:45 23        Q. Let's back up to when you finished school
09:22:47 24   and then run quickly through your employment history.
09:22:50 25        A. Sure.

---

22

09:22:50  1        Q. What's the highest level of education that
09:22:52  2   you've had?
09:22:53  3        A. Two years of -- two years of Colorado.
09:22:54  4        Q. And where was that?
09:22:56  5        A. University of Denver.
09:22:56  6        Q. And did you not stay to complete your
09:22:58  7   degree?
09:22:59  8        A. I did not.
09:22:59  9        Q. Okay. Where did you graduate from high
09:23:02 10   school?
09:23:02 11        A. That's been a while. Fox Lane High School
09:23:06 12   in Bedford, New York.
09:23:08 13        Q. Okay. And what was the year of your high
09:23:11 14   school graduation?
09:23:13 15        A. 1978.
09:23:14 16        Q. What were the years in which you were in
09:23:16 17   attendance at college?
09:23:18 18        A. 1978 through 1980.
09:23:23 19        Q. Okay. Did you have any time in the
09:23:26 20   military, sir?
09:23:26 21        A. No.
09:23:28 22        Q. Once you graduate -- or, sorry, once you
09:23:30 23   left the college piece of your education after the two
09:23:34 24   years what did you next do?
09:23:37 25        A. I did several odd jobs. I was part owner

---

23

09:23:41  1   of a horse breeding business. I worked for a
09:23:47  2   collection agency here in Denver as a skip tracer. And
09:23:51  3   ultimately I became employed as a skip tracer and
09:23:57  4   ultimately rose to the position of head of in-house
09:24:00  5   investigations for a local finance company.
09:24:02  6        Q. What company was that?
09:24:03  7        A. It's a company no longer in existence
09:24:05  8   called National Educators. They educated
09:24:07  9   financial -- excuse me, educational materials.
09:24:10 10        Q. Okay. Although it's probably apparent
09:24:14 11   from the words themselves, what is a skip tracer?
09:24:16 12        A. My job was to locate people who could not
09:24:19 13   be found. They had -- in the parlance of the business,
09:24:23 14   they had skipped out.
09:24:24 15        Q. Okay. And after your stint with the
09:24:29 16   finance company -- by the way, what years was that?
09:24:33 17        A. 1981 through January of '86.
09:24:39 18        Q. What did you do next?
09:24:41 19        A. I began working as an independent private
09:24:46 20   investigator. I worked in-house for an attorney for a
09:24:50 21   short period of time and then struck out on my own and
09:24:53 22   have been self-employed ever since.
09:24:55 23        Q. Who was the attorney for whom you worked?
09:24:57 24        A. A gentleman named Steven Hickox.
09:25:00 25        Q. Okay. And where does he practice?

---

24

09:25:03  1        A. I don't believe he practices anymore.
09:25:04  2        Q. Was he in Denver at the time?
09:25:06  3        A. He was.
09:25:06  4        Q. Okay. Over the period that you've had
09:25:08  5   your own business, I know that you refer to it now as a
09:25:11  6   solo business, but have you ever been affiliated with
09:25:14  7   any other investigators?
09:25:15  8        A. No.
09:25:17  9        Q. Okay. Has the nature of the work that
09:25:21 10   your solo practice performs stayed constant or changed
09:25:25 11   over time?
09:25:26 12        A. It's constant in the types of
09:25:31 13   investigation work I do, but the types of cases that
09:25:35 14   come my way tends to change over time.
09:25:39 15        Q. Focusing your attention on, let's say, the
09:25:41 16   last five years, what would you say the focus of your
09:25:46 17   business has been?
09:25:47 18        A. Complex civil and criminal litigation
09:25:51 19   often of a financial nature, financial fraud, financial
09:25:58 20   criminal cases. But not limited to financial cases.
09:26:02 21   The theme that runs through my business is I interview
09:26:06 22   witnesses, and for 30 years that's been the day-to-day
09:26:13 23   thread. I interview potential trial witnesses for
09:26:16 24   attorneys all over the country. The types of cases
09:26:19 25   change.

---

6 (Pages 21 to 24)

scheduling@huntergeist.com            HUNTER + GEIST, INC.            303-832-5966/800-525-8490

Beltran v. Interexchange, Inc.                DAVID KEIL                          7/21/2016

---

25

09:26:20 1    Q.  Within the field of private investigation,
09:26:23 2  is there such a thing as a forensic private
09:26:26 3  investigator, to be treated as slightly different from
09:26:29 4  more general investigators?
09:26:31 5    A.  I've heard the term.
09:26:32 6    Q.  Are you a forensic private investigator?
09:26:34 7    A.  I don't consider myself one, no.
09:26:37 8    Q.  What percentage of your work relates to
09:26:39 9  litigation?
09:26:42 10    A.  95 percent.
09:26:44 11    Q.  But you don't consider yourself forensic?
09:26:46 12    A.  I don't -- I don't like the term, per se.
09:26:50 13    Q.  Okay.  In the 95 percent or so of your
09:26:52 14  business that is related to litigation, can you give us
09:26:56 15  your best estimate of your breakdown between work
09:26:59 16  performed for plaintiffs and work performed for
09:27:02 17  defendants?
09:27:02 18    A.  About 50/50.  It varies from year to year.
09:27:05 19    Q.  Okay.  Sir, I'm going to ask our reporter
09:27:08 20  to mark what I took off the web as your website just to
09:27:12 21  confirm that it is your current website and that it is
09:27:15 22  accurate.
09:27:15 23    A.  Yes.
09:27:24 24    (Deposition Exhibit 3 was marked.)
09:27:25 25    MS. LUKEY:  I can't get it all the way

---

26

09:27:27 1  across without leaning in front of the camera.  I
09:27:30 2  apologize.
09:27:32 3    MR. HOOD:  You are fine.
09:27:41 4    Q.  (BY MS. LUKEY)  Can you take a moment and
09:27:42 5  look at it, see whether you can confirm that that is
09:27:44 6  your current website and that it appears to be
09:27:49 7  complete?
09:27:50 8    A.  I have to admit that my website at times
09:27:53 9  is changed.  I am not a technical person, so I don't
09:27:57 10  make the physical changes.  But to the best of my
09:28:00 11  knowledge, this is currently what's up on the web.
09:28:04 12    Q.  To the best of your knowledge, would this
09:28:06 13  be the website that was up in late 2014, when you were
09:28:10 14  placing the calls that we're going to be discussing?
09:28:12 15    A.  This would have been the website.  There
09:28:14 16  may have been longer or shorter sections.  I believe we
09:28:19 17  may have at some point in the last five years edited it
09:28:25 18  for -- to make it a little more succinct.
09:28:29 19    Q.  Okay.  If you could turn in -- I think
09:28:32 20  these are actually staple -- excuse me, clipped rather
09:28:35 21  than staples.  So to the section called, "About David
09:28:41 22  Keil Investigations," which is the second piece.
09:28:42 23    A.  Yes.
09:28:43 24    Q.  There's an indication in the third
09:28:44 25  paragraph up from the bottom that you have had the

---

27

09:28:48 1  unique opportunity of working closely with hundreds of
09:28:52 2  complex financial crimes.  This has allowed access and
09:28:57 3  insight into the closely guarded, and it is cut off,
09:29:01 4  but I think it's information or some such of criminal
09:29:04 5  defendants.
09:29:04 6    A.  Yes.
09:29:05 7    Q.  Is that a significant percentage of what
09:29:06 8  you do, that is, representing individuals who have been
09:29:09 9  charged with complex crimes?
09:29:12 10    MS. LOUIS:  Objection.  Excuse me.  Sorry,
09:29:14 11  give me a pause before you . . .
09:29:17 12    THE DEPONENT:  Certainly.
09:29:17 13    MS. LOUIS:  Thanks.  Object to the form.
09:29:20 14    A.  As I said, my business changes depending
09:29:22 15  on the cases that come through the door.  During much
09:29:28 16  of the financial crisis of late -- the late 2000s and
09:29:35 17  early 2010s, I was involved in a number of federal
09:29:40 18  criminal litigations, court appointed through the
09:29:43 19  federal court system.  So for a number of those years
09:29:46 20  it made up a large chunk of some of my days.  But at
09:29:51 21  all times I'm also doing civil litigation.
09:29:56 22    In civil cases I usually work for
09:29:58 23  plaintiffs.  Not always, but often.  And in criminal
09:30:01 24  cases I always work for the defense, because
09:30:04 25  prosecutors don't use people in my business.

---

28

09:30:07 1    Q.  (BY MS. LUKEY)  So let me go back with
09:30:08 2  that clarification and ask you in the context of civil
09:30:11 3  litigation, what percentage of your work is for
09:30:14 4  plaintiffs and what percentage for defendants?
09:30:16 5    A.  I would say historically 50/50 over time.
09:30:20 6    Q.  You mentioned a moment ago, I thought,
09:30:22 7  that you did more for plaintiffs.  To what were you
09:30:26 8  referring?
09:30:30 9    A.  I do quite a bit of work, financial work,
09:30:33 10  in asset recovery, asset investigations, locating and
09:30:38 11  understanding financial schemes.  And often that's done
09:30:44 12  for victims of white collar crime, to use a very broad
09:30:53 13  term, but, really, those -- those folks and their
09:30:56 14  attorneys tend to be plaintiffs in those civil cases
09:30:59 15  even though they may be characterized as victims in
09:31:02 16  other types of cases.
09:31:04 17    Q.  But what is the -- is there a breakdown
09:31:08 18  between plaintiffs and defendants that is other than
09:31:11 19  50/50?
09:31:13 20    A.  Let me see if I can explain it this way.
09:31:15 21  I work for a large, but relatively fixed pool of
09:31:19 22  lawyers.  Most of the firms I work with do plaintiffs
09:31:23 23  and defendant work.  I do the work that they hire me to
09:31:26 24  do and I don't discriminate between whether it's a
09:31:30 25  plaintiff's case or a defendant's case.  It's generally

---

scheduling@huntergeist.com          HUNTER + GEIST, INC.          303-832-5966/800-525-8490

29

09:31:33  1    coming from the same pool of lawyers.
09:31:35  2        Q.  When you refer to a pool of lawyers, can
          you tell us the size of that pool?
09:31:37  3
09:31:41  4        A.  Again, it varies from year to year, but
09:31:43  5    over time I've worked for several hundred attorneys and
09:31:47  6    probably 200 different law firms.
09:31:51  7        Q.  So the pool is comprised of 200 different
09:31:54  8    law firms?
09:31:55  9        A.  Currently, no.  But my business also tends
09:31:58 10    to be cyclical.  I will often work for an attorney this
09:32:04 11    year very intimately, not hear from that firm again for
09:32:07 12    three, four, five, six years, until they have something
09:32:10 13    that they think meets my skill set, they'll call me
09:32:14 14    again.  So it varies.
09:32:15 15        Q.  What percentage of those law firms are in
09:32:17 16    Colorado?
09:32:23 17        A.  More than half.
09:32:26 18        Q.  And where are the others located,
09:32:30 19    generally speaking?
09:32:31 20        A.  All over the country.  I've done work
09:32:32 21    for -- also for firms in Canada and Europe.  All over.
09:32:37 22        Q.  Okay.  Who retained you in this case?
09:32:42 23        A.  I was retained in this case by a firm
09:32:45 24    called Towards Justice.
09:32:48 25        Q.  Had you previously worked with Towards

30

09:32:50  1    Justice?
09:32:50  2        A.  I had not.
09:32:51  3        Q.  And whom in particular contacted you from
09:32:54  4    Towards Justice?
09:32:55  5        A.  I received a call from Alex Hood.
09:32:59  6        Q.  Okay.  Had you worked previously with
09:33:01  7    Mr. Hood?
09:33:02  8        A.  I had not.
09:33:05  9        Q.  Do you have any understanding as to how it
09:33:07 10    is that Towards Justice came to you in particular?
09:33:11 11        A.  Well, I do not advertise.  You may have
09:33:14 12    found other than my website, there is no phone number
09:33:17 13    or address listed for me anywhere.  All of my cases
09:33:20 14    come on referral.  I also take virtually no cases for
09:33:25 15    parties that are not represented by counsel.  So the
09:33:31 16    standard way someone gets my number is it's usually one
09:33:35 17    attorney receives it from a colleague, another
09:33:37 18    attorney.  And I don't recall exactly who referred
09:33:42 19    Mr. Hood, but I'm assuming it was from one of my other
09:33:45 20    clients.
09:33:45 21        Q.  When did Mr. Hood reach out to you?
09:33:49 22        A.  This would have been fall, early winter
09:33:51 23    2014.
09:33:54 24        Q.  When you say fall, early winter you mean
09:33:57 25    into December of 2014?

31

09:33:58  1        A.  Frankly, I don't recall when we first
09:34:00  2    spoke.
09:34:01  3        Q.  I'm simply trying to distinguish it from
09:34:04  4    early winter being January, February of '14.  So it's
09:34:08  5    in the last quarter 2000 --
09:34:09  6        A.  In the last quarter of '14.
09:34:12  7        Q.  Thank you.
09:34:13  8        A.  Yes.
09:34:13  9        Q.  What did he ask you to do?
09:34:15 10        MS. LOUIS:  Objection.  Sorry, remind
09:34:16 11    you --
09:34:17 12        THE DEPONENT:  Yes.
09:34:17 13        MS. LOUIS:  -- that your answer, to the
09:34:18 14    extent that it would reveal any work product
09:34:21 15    communications, any strategy revealed by counsel to
09:34:24 16    you, your answer should not include it.
09:34:27 17        THE DEPONENT:  Yes.
09:34:27 18        A.  I'm sorry.  Again, please.
09:34:30 19        Q.  (BY MS. LUKEY)  What was the task that you
09:34:31 20    were being retained to do?
09:34:35 21        A.  Conduct telephone interviews of certain
09:34:39 22    people.
09:34:44 23        MS. KOZAL:  I'm sorry, I didn't hear your
09:34:45 24    answer.
09:34:47 25        THE DEPONENT:  To conduct telephone

32

09:34:49  1    interviews of a small group of people.
09:34:51  2        Q.  (BY MS. LUKEY)  Was your task to contact
09:34:53  3    identified people or entities?
09:34:58  4        A.  To the best of my recollection, my task
09:35:01  5    was to contact or attempt to contact employees of
09:35:07  6    companies who offered services, au pair services.
09:35:13  7        Q.  Just so that we're clear before we move
09:35:17  8    later through those calls, were you tasked
09:35:19  9    with calling specific people or were you tasked with
09:35:23 10    calling particular companies?
09:35:26 11        A.  I was not provided direction regarding
09:35:31 12    speaking to specific people, no.
09:35:33 13        Q.  Okay.  How large was the group of
09:35:35 14    companies you were asked to contact?
09:35:39 15        A.  I don't recall exactly.  I -- I believe
09:35:42 16    somewhere in the neighborhood of 10 to 15.  10 to 20.
09:35:48 17        Q.  Were you provided with the names of the
09:35:50 18    entities you were being asked to contact?
09:35:54 19        A.  I don't recall.
09:35:56 20        Q.  Were you provided with instruction as to
09:35:58 21    the nature of the information that you were to seek?
09:36:02 22        MS. LOUIS:  Objection.  Same instruction.
09:36:09 23        A.  I'm sorry, could you rephrase the
09:36:11 24    question?
09:36:11 25        Q.  (BY MS. LUKEY)  Were you provided with

8 (Pages 29 to 32)

Beltran v. Interexchange, Inc.      **DAVID KEIL**      7/21/2016

---

**33**

| | |
|---|---|
| 09:36:14 | 1 |

information as to what information you were to seek from the companies you were calling?

MS. LOUIS:  And I'll remind you of my instruction not to reveal any strategy --

THE DEPONENT:  Yes.

MS. LOUIS:  -- that was given to you by counsel.

A.  I contacted employees through finding phone numbers on the Internet, and I spoke with who -- whomever I could reach by telephone.

Q.  (BY MS. LUKEY)  Were you given a script to follow?

A.  No.

Q.  You must have been given some guidance, sir, as to what the nature of your conversations was to be.  What information were you supposed to be gathering?

MS. LOUIS:  Objection.  Same instruction.

A.  I was seeking to find out as much as I could about the way individual companies provided services and what the cost to consumers for those services would be and how much the provider, the au pair, would be compensated for those services.

Q.  (BY MS. LUKEY)  Were you asked, sir, to ascertain whether an agreement had been reached among

---

**34**

any or all of the companies regarding either fees charged or payments to be made to au pairs?

MS. LOUIS:  Objection.  I will instruct you not to reveal anything you were told by counsel in this.

A.  I questioned people on the telephone, through the interview process, about payment, charges to the consumer, payment to the au pair, and throughout these interviews I began to notice some consistencies, and upon becoming aware of those consistencies, I asked follow-up questions that led to that information.

Q.  (BY MS. LUKEY)  Well, to become aware of consistencies, you must first have had a number of conversations; is that correct?

A.  I had a number of conversations.

Q.  Is it your testimony that you then went back to the early companies that you had called after you perceived the consistencies, as opposed to gathering all information in the first calls?

A.  I don't recall that that's the case.  I think it was more of an evolving process.  There were calls to some companies over time.  But a lot of that had to do with trying to reach someone who had some level of knowledge that could speak to the issue.  So often what I found was the more knowledgeable the

---

**35**

person I was able to interact with, the more I learned from the questioning.

Q.  When you said, "speak to the issue," what issue?

A.  Well, I had a number of questions.  But, again, my questions were based on how individual companies structured their fees, structured their payment to au pairs, the services they provided to families, the services they provided to the au pairs, and I found that by speaking to representatives of different companies, there was a lot of consistency.

Q.  Is it your testimony, sir, that you did not enter into this process with at least one of the purposes being to determine whether the companies had agreements among themselves as to fees or stipends paid?

MS. LOUIS:  Objection.

A.  I'm sorry, again?

Q.  (BY MS. LUKEY)  Is it your testimony that you entered into this call process without any instruction to determine whether agreements had been reached among the companies relating to fees or stipends?

MS. LOUIS:  Objection.  And instruct you not to reveal what you were told by counsel.

---

**36**

A.  I would -- I would say that I formulated my questions and obtained answers that led me to believe that there was a consistency of information from company to company.

MS. FITZGERALD:  I couldn't hear you.

THE DEPONENT:  I'm sorry.

MS. LUKEY:  Do you want it read back?

THE DEPONENT:  Yes, please.

MS. LUKEY:  Can you read it back, Carol.

THE REPORTER:  Sure.

(The last answer was read back as follows: "I would -- I would say that I formulated my questions and obtained answers that led me to believe that there was a consistency of information from company to company.")

MS. FITZGERALD:  Thank you.

THE REPORTER:  You're welcome.

Q.  (BY MS. LUKEY)  Is it your testimony that you did not formulate your questions with the purpose in mind of determining whether agreements existed about fees and stipends?

A.  I formulated my questions to gather as much information about the payment process by customers and the payment process to employees, au pairs, as I could gather.  And my questions were designed to elicit

---

Beltran v. Interexchange, Inc.                    DAVID KEIL                              7/21/2016

---

37

09:41:32  1   that information from as many companies as possible.
09:41:36  2        Q.  You're going to have to keep your voice
09:41:37  3   up.  And I'm going to ask the question --
09:41:38  4        A.  Again, I apologize.
09:41:39  5        Q.  -- again because it was very specific.
09:41:42  6   Are you telling us that you did not formulate your
09:41:45  7   questions for the purpose, at least in part, of
09:41:50  8   determining whether agreements existed among the
09:41:54  9   companies concerning stipends or fees?
09:41:57 10        MS. LOUIS:  Object.  I just want to remind
09:41:59 11   you of my instruction not to reveal what you were
09:42:02 12   instructed by counsel.
09:42:03 13        A.  Let me answer it this way.  I, as an
09:42:07 14   investigator, make a point of not going into interviews
09:42:14 15   or investigations with predetermined outcomes.  I find
09:42:19 16   that that's -- you can answer any question you're
09:42:24 17   determined to answer with enough interviews.  I think
09:42:26 18   that's poor investigative technique.  My belief is that
09:42:31 19   I try to go in with a clean slate, I try not to have
09:42:35 20   preconceived notions of the answers I'm trying to
09:42:38 21   obtain, and I see where the interviews take me.
09:42:41 22        Q.  (BY MS. LUKEY)  I appreciate understanding
09:42:42 23   your normal philosophy, sir, but the question is in
09:42:47 24   this case, did you or did you not enter into the phone
09:42:52 25   calls with the purpose at least in part of determining

---

38

09:42:58  1   whether agreements existed between or among any of the
09:43:02  2   companies about stipends or fees?
09:43:05  3        A.  I can't --
09:43:06  4        MS. LOUIS:  Same objection.
09:43:07  5        A.  I can't say whether I entered into the
09:43:10  6   process with that thought process.  Certainly as the
09:43:14  7   process continued, I did focus my questions on those
09:43:19  8   specific areas.  But I can't tell you at what point in
09:43:23  9   the process I landed on those questions specifically.
09:43:28 10        Q.  (BY MS. LUKEY)  Well, that is, again, not
09:43:30 11   quite to the point.  I'm asking about at the beginning,
09:43:34 12   when you started this process, did you or did you not
09:43:40 13   enter into the process with the purpose at least in
09:43:44 14   part of finding out whether the companies had
09:43:50 15   agreements about fees or stipends?
09:43:55 16        MS. LOUIS:  Same objection.
09:44:01 17        A.  I can't recall that being the case, no.
09:44:06 18        Q.  (BY MS. LUKEY)  Can you recall that it was
09:44:07 19   not the case?  That is, do you know one way or the
09:44:10 20   other whether you started out with at least one of the
09:44:14 21   purposes being to determine whether agreements existed
09:44:18 22   among the companies about fees or stipends?
09:44:23 23        A.  I think -- I think --
09:44:23 24        MS. LOUIS:  I'm sorry.  Before you start,
09:44:24 25   objection.

---

39

09:44:25  1        THE DEPONENT:  Yes.
09:44:26  2        MS. LOUIS:  I just want to remind you that
09:44:27  3   this line of questioning's going around and around at
09:44:30  4   this point, but to the extent that your answer would
09:44:33  5   call you to reveal the -- the work product or strategy
09:44:36  6   of the attorney, I'm instructing you not to do so.
09:44:38  7        MS. LUKEY:  Well, let me just point out,
09:44:40  8   Lauren, that if he was instructed to ask questions of a
09:44:45  9   particular nature, that is, pose those questions to
09:44:50 10   third parties, then that's not protected.  We have a
09:44:53 11   right to know that.
09:44:55 12        Q.  (BY MS. LUKEY)  So if you were told to ask
09:44:59 13   questions to ascertain whether the companies did or did
09:45:02 14   not have agreements about fees and stipends, I would
09:45:08 15   like an answer to that question.
09:45:11 16        A.  I do --
09:45:12 17        MS. LOUIS:  Wait.  Before you do, to the
09:45:14 18   extent that the conversation is intermingled with and
09:45:17 19   can't be separated from a conversation that reveals the
09:45:21 20   strategy and the thinking and the approach to
09:45:23 21   litigation from counsel, that is the portion that I'm
09:45:27 22   instructing him not to reveal.
09:45:29 23        MS. LUKEY:  I hear what you're saying, but
09:45:31 24   if he's being told to ask questions for a specific
09:45:35 25   purpose which will influence both the questions and how

---

40

09:45:38  1   the answers may come out, we're entitled to know that.
09:45:42  2   If he entered into this because his task was to find
09:45:45  3   out whether there were agreements reached, we have a
09:45:48  4   right to know that, 'cause that is going to frame his
09:45:54  5   questions.  And the framing of the questions will frame
09:45:57  6   his interpretation of the answers.
09:45:59  7        MS. LOUIS:  Except that he's already
09:46:00  8   testified that he didn't mean his questions that way.
09:46:03  9        MS. LUKEY:  He has not.  He hasn't
09:46:05 10   answered the question.
09:46:06 11        MS. LOUIS:  Right.  I -- listen, we had a
09:46:08 12   stipulation about objections, so I'm going to be quiet
09:46:11 13   now.
09:46:12 14        MS. LUKEY:  Okay.
09:46:13 15        Q.  (BY MS. LUKEY)  Again, sir, did you enter
09:46:14 16   into this process understanding that your purpose, or
09:46:17 17   at least one of the purposes, was to find out whether
09:46:21 18   the companies had agreements among themselves about
09:46:24 19   fees or stipends?
09:46:27 20        MS. LOUIS:  Same objection.
09:46:31 21        A.  I believe I've answered that question to
09:46:32 22   the best of my ability.
09:46:34 23        Q.  (BY MS. LUKEY)  I don't believe you've
09:46:35 24   answered that question, much less to the best of
09:46:40 25   anyone's ability.  I need an answer to that question.

---

Beltran v. Interexchange, Inc.                    DAVID KEIL                                    7/21/2016

---

41

```
09:46:43  1    Did you know when you started that one of your goals
09:46:47  2    was to find out if there were or were not agreements
09:46:51  3    among the companies about fees or stipends?
09:46:56  4         A.  As I --
09:46:57  5         MS. LOUIS:  Objection.
09:46:57  6         A.  As I said, I -- I don't believe -- I don't
09:47:01  7    recall that being the case.  This was an evolving
09:47:04  8    process.  Certainly at some point during the
09:47:08  9    investigation I focused on that issue.  I can't say one
09:47:12  10   way or the other whether that was my intent at the
09:47:15  11   beginning or not.
09:47:16  12        Q.  (BY MS. LUKEY)  You just don't remember?
09:47:18  13        A.  I don't remember.
09:47:19  14        Q.  So you can't tell us one way or the other
09:47:20  15   whether you had that intent at the beginning?
09:47:22  16        A.  Correct.
09:47:39  17        Q.  Did you know at the time that you began
09:47:42  18   the calls, sir, that it related to litigation?  That
09:47:53  19   is, the assignment.
09:47:54  20        A.  I don't recall whether I was aware that
09:47:56  21   there was actual litigation.  Matter of fact, I'm not
09:47:59  22   aware as to whether there was litigation at that time.
09:48:02  23   Certainly I'm aware it is now.  And the nature of my
09:48:06  24   business is such that I assume every case I work is
09:48:11  25   potentially going to wind up in litigation.
```

42

```
09:48:15  1         Q.  Well, you can't simply get on the
09:48:17  2    call -- on a phone and start calling a group of
09:48:20  3    companies without having a subject matter in mind.
09:48:24  4    What is it that you were directed to ask?
09:48:27  5         A.  I was --
09:48:29  6         MS. LOUIS:  Objection and same
09:48:29  7    instruction.
09:48:30  8         A.  I was attempting to determine how each of
09:48:33  9    these companies structured their products, what did
09:48:39  10   they charge, to the extent that I could get that
09:48:41  11   information; what did they provide, what services did
09:48:44  12   they provide to the consumer; and how much of those
09:48:49  13   fees ultimately were paid to the employee, the au pair.
09:48:54  14        Q.  (BY MS. LUKEY)  At the time that you went
09:48:56  15   into this process, were you aware of the identity or
09:48:59  16   classification of the clients Mr. Hood represented?
09:49:03  17        A.  No.
09:49:04  18        Q.  Were you aware of the nature of the claims
09:49:06  19   that he was asserting or intended to assert shortly?
09:49:10  20        A.  No.
09:49:12  21        Q.  What did you know about Towards Justice?
09:49:15  22        A.  I'd met with Mr. Hood on one occasion.  I
09:49:19  23   may have looked at -- may have looked them up on the
09:49:23  24   web.  And that's about it.
09:49:24  25        Q.  Did you have any understanding as to the
```

43

```
09:49:26  1    nature of the cases that they took on?
09:49:32  2         MS. LOUIS:  Objection.
09:49:32  3         A.  Only what I was able to glean from simple
09:49:36  4    research.
09:49:37  5         Q.  (BY MS. LUKEY)  And what were you able to
09:49:39  6    glean from simple research?
09:49:44  7         A.  That they tended to represent people in
09:49:48  8    class action suits.  Smaller, less affluent customer
09:49:53  9    base.
09:49:55  10        Q.  Okay.  When you say, "tended to
09:49:57  11   represent," did you learn that they only represented
09:50:03  12   prospective classes or individuals in less affluent
09:50:07  13   circumstances?
09:50:08  14        A.  No.
09:50:08  15        Q.  Did you enter into this process believing
09:50:11  16   that Towards Justice, for example, might be
09:50:14  17   representing the companies that occupied the space in a
09:50:18  18   particular business or entity?
09:50:20  19        A.  I'm sorry, could you rephrase that?
09:50:21  20        Q.  Certainly.  When you started making these
09:50:23  21   calls, did you have the impression that you were
09:50:25  22   calling up the people whom Mr. Hood represented?
09:50:29  23        A.  No, I did not.
09:50:29  24        Q.  Did you understand that you were calling
09:50:30  25   up the people whom Mr. Hood either was already suing or
```

44

```
09:50:35  1    intended to sue?
09:50:36  2         A.  I didn't know the status of what his
09:50:39  3    intent was.  I work -- as a general rule, I become used
09:50:47  4    to attorneys asking me to seek information in a vacuum.
09:50:52  5    It is very common for me to be tasked with some sort of
09:50:56  6    investigative task without having any greater context
09:51:00  7    at that time.  That's not unusual.
09:51:02  8         Q.  Do you have records that indicate on
09:51:03  9    the -- indicate the date on which you received this
09:51:07  10   call?
09:51:07  11        A.  I'm sorry, which call?
09:51:08  12        Q.  From Mr. Hood.
09:51:09  13        A.  I have no records.
09:51:11  14        Q.  So you have no means of confirming what
09:51:12  15   the date was; is that right?
09:51:17  16        A.  I -- no, I don't think so.  I mean . . .
09:51:20  17        Q.  And -- okay.  And you are telling us that
09:51:22  18   you were not made aware that a complaint had been filed
09:51:26  19   by that point in time, if indeed it had?
09:51:29  20        A.  I don't recall being made aware of that,
09:51:31  21   no.
09:51:32  22        Q.  Were you told that this related to
09:51:33  23   litigation?
09:51:36  24        A.  I don't know if I was told that or if it
09:51:38  25   was, again, an assumption I made.  Again, I only take
```

11 (Pages 41 to 44)

45

| 09:51:42 | 1 | cases from counsel. Very, very rarely do I take things |
| 09:51:47 | 2 | off the street. I know from the nature of that that |
| 09:51:50 | 3 | most cases are either in litigation or potentially |
| 09:51:54 | 4 | might be in litigation, and it's not my custom to ask |
| 09:51:59 | 5 | questions that aren't -- you know, if the information |
| 09:52:02 | 6 | isn't volunteered, I assume it's related to litigation, |
| 09:52:04 | 7 | or it might be, and I do my job. |
| 09:52:08 | 8 | Q.  Do you have an engagement letter? |
| 09:52:09 | 9 | A.  With some clients, yes. |
| 09:52:11 | 10 | Q.  Do you have an engagement letter with |
| 09:52:14 | 11 | Towards Justice? |
| 09:52:16 | 12 | A.  I don't believe so, although I don't |
| 09:52:18 | 13 | recall. |
| 09:52:19 | 14 | Q.  Do you have an engagement letter with |
| 09:52:20 | 15 | Towards Justice co-counsel Boies Schiller? |
| 09:52:24 | 16 | A.  Yes. With -- with regard to the |
| 09:52:27 | 17 | engagement for today's testimony. |
| 09:52:31 | 18 | Q.  So your engagement with Boies Schiller is |
| 09:52:33 | 19 | only for today? |
| 09:52:35 | 20 | A.  Is for regarding -- my understanding is |
| 09:52:37 | 21 | it's regarding my testimony in this case. |
| 09:52:41 | 22 | Q.  Your testimony today, or your entire |
| 09:52:44 | 23 | testimony in this case? |
| 09:52:46 | 24 | A.  Frankly, I don't recall. |
| 09:52:48 | 25 | Q.  Do you know whether Boies Schiller has |

46

| 09:52:50 | 1 | retained you for purposes of this case? |
| 09:52:54 | 2 | A.  Boies Schiller has -- the conversations I |
| 09:52:56 | 3 | had with counsel with Boies Schiller were regarding |
| 09:52:59 | 4 | today's deposition with the possibility that that may |
| 09:53:02 | 5 | at some point also entail trial testimony. |
| 09:53:05 | 6 | Q.  Okay. When did you sign that engagement |
| 09:53:08 | 7 | letter? |
| 09:53:08 | 8 | A.  Within the last several weeks. |
| 09:53:13 | 9 | Q.  How long ago, sir? |
| 09:53:15 | 10 | A.  Within the last two weeks would be my best |
| 09:53:17 | 11 | recollection. |
| 09:53:17 | 12 | Q.  Not within the last week? |
| 09:53:20 | 13 | A.  I don't believe so, but I don't -- I can't |
| 09:53:23 | 14 | say for sure. |
| 09:53:24 | 15 | Q.  Okay. And you don't remember whether you |
| 09:53:26 | 16 | have an engagement with Towards Justice? |
| 09:53:28 | 17 | A.  The reason I don't recall that is in |
| 09:53:31 | 18 | Colorado, under Colorado statute for investigators, I'm |
| 09:53:35 | 19 | required to have an engagement letter with any |
| 09:53:39 | 20 | nonattorney. Any layman who retains an investigator, I |
| 09:53:42 | 21 | am required to produce a letter of engagement. Because |
| 09:53:46 | 22 | the vast majority of my cases come through counsel, |
| 09:53:50 | 23 | that's not a requirement, and I only do it in cases |
| 09:53:54 | 24 | where certain firms request it. And I have a number of |
| 09:53:58 | 25 | longstanding firms who have never requested it, |

47

| 09:54:02 | 1 | don't -- don't care. So it's a bit of a hodgepodge. |
| 09:54:06 | 2 | I don't recall if we did an engagement |
| 09:54:08 | 3 | letter with Towards Justice. It would be not unusual |
| 09:54:13 | 4 | if we hadn't because Mr. Hood was an attorney and I'm |
| 09:54:16 | 5 | not required to do one with a -- with a law firm. |
| 09:54:20 | 6 | Q.  What is the requirement to which |
| 09:54:21 | 7 | you're -- or -- or nonrequirement that you're |
| 09:54:24 | 8 | referencing? |
| 09:54:24 | 9 | A.  Under Colorado -- under the statute |
| 09:54:27 | 10 | governing private investigators, we are required -- |
| 09:54:29 | 11 | when dealing with the general public, we're required to |
| 09:54:35 | 12 | produce a fee agreement that specifically states |
| 09:54:37 | 13 | certain facts in the engagement. There is an exemption |
| 09:54:40 | 14 | in that rule which is if we are retained by legal |
| 09:54:45 | 15 | counsel. I can assume the legislature's intent was |
| 09:54:50 | 16 | lawyers know -- know well enough to protect themselves, |
| 09:54:52 | 17 | where the public might not. |
| 09:54:54 | 18 | So as I said, it's a bit of a hodgepodge. |
| 09:54:56 | 19 | I have attorney clients whom I do engagement letters |
| 09:54:59 | 20 | with on a case-by-case basis. I have attorney clients |
| 09:55:02 | 21 | who we have longstanding retainer letters on file. I |
| 09:55:06 | 22 | have attorney clients who don't request retainer |
| 09:55:10 | 23 | letters. It runs the gamut. |
| 09:55:12 | 24 | Q.  I understand, sir, that Colorado only |
| 09:55:15 | 25 | implemented a mandatory licensing requirement for |

48

| 09:55:18 | 1 | private investigators in early 2015; is that correct? |
| 09:55:22 | 2 | A.  There was a nonmandatory requirement for |
| 09:55:24 | 3 | several years prior to that. So I started following |
| 09:55:27 | 4 | these rules when the -- when the legislature first |
| 09:55:33 | 5 | proposed them, I think, in the early 2000s. |
| 09:55:35 | 6 | Q.  Okay. So during the period when it was a |
| 09:55:38 | 7 | voluntary licensing, you're saying throughout that |
| 09:55:40 | 8 | period you obtained the voluntary license? |
| 09:55:43 | 9 | A.  I did not obtain the voluntary license, |
| 09:55:46 | 10 | 'cause they weren't issuing them really. But I did |
| 09:55:49 | 11 | follow the rules that were being implemented because I |
| 09:55:53 | 12 | understood that they were going to become law at some |
| 09:55:56 | 13 | point in the near future. So I started trying to |
| 09:55:59 | 14 | conform to them to the best of my ability. |
| 09:56:01 | 15 | Q.  What causes you to believe they weren't |
| 09:56:03 | 16 | issuing temporary licenses -- or, excuse me, voluntary |
| 09:56:07 | 17 | licenses? |
| 09:56:08 | 18 | A.  There were fits and starts in the process. |
| 09:56:09 | 19 | They issued some, then they didn't for a while. I |
| 09:56:13 | 20 | don't know the reasons for that, but it's pretty well |
| 09:56:16 | 21 | documented in literature in my profession that there |
| 09:56:20 | 22 | was a lot of frustration in obtaining voluntary |
| 09:56:24 | 23 | licenses. And I didn't attempt to obtain one. Of |
| 09:56:30 | 24 | course, I did once it became mandatory. |
| 09:56:32 | 25 | Q.  During the voluntary licensing period, was |

Beltran v. Interexchange, Inc.    DAVID KEIL    7/21/2016

---

49

09:56:35  1   there a code of conduct associated with being a private
09:56:39  2   investigator?
09:56:39  3       A.  To the best of my knowledge, the code of
09:56:43  4   conduct is all codified in the statute.
09:56:45  5       Q.  And did you consider yourself to be bound
09:56:47  6   by that code of conduct during the voluntary licensure
09:56:52  7   period?
09:56:53  8       A.  I believed that it was prudent to follow
09:56:54  9   the advice of the legislature, as I always have.
09:56:58 10   I -- maybe I'll use this as an opportunity to explain
09:57:02 11   my philosophy on this.
09:57:04 12       Q.  Well, actually, sir, you can't do that.
09:57:07 13       A.  Okay.
09:57:08 14       Q.  You got to wait for my question.
09:57:09 15       A.  I'll try and answer your question.
09:57:11 16       Q.  If plaintiff counsel wishes to ask you
09:57:14 17   about it later, they certainly can.
09:57:16 18       A.  Okay.
09:57:17 19       Q.  You said a moment ago that you believed it
09:57:20 20   was prudent to follow the dictates of the legislature,
09:57:22 21   but my question was did you consider yourself bound by
09:57:25 22   the code of conduct during the voluntary licensure
09:57:28 23   period?
09:57:28 24       A.  No.
09:57:29 25       Q.  Okay.  When the permanent licensure came

---

50

09:57:34  1   into effect in early 2015, did you obtain a permanent
09:57:39  2   license?
09:57:39  3       A.  I did.
09:57:40  4       Q.  When did you do that?
09:57:41  5       A.  I don't recall the date that I applied.
09:57:44  6   There was a long delay in the application being
09:57:47  7   processed.  Again, my understanding is that there was
09:57:52  8   staffing problems and other issues at DORA, which is
09:57:56  9   the state organization that does this.  In my case, I
09:58:00 10   think it took them approximately six months from
09:58:06 11   application to approval.
09:58:08 12       Q.  So your testimony is even though your
09:58:10 13   licensure didn't come through until mid-2015, you had
09:58:13 14   actually applied in early 2015?
09:58:15 15       A.  Correct.
09:58:16 16       Q.  Okay.  And do you now consider yourself
09:58:19 17   bound by the code of conduct that is incorporated into
09:58:21 18   the statute?
09:58:21 19       A.  I do.
09:58:23 20       Q.  Okay.  Now, sir, with regard to the
09:58:36 21   beginning of your assignment, did you have any
09:58:41 22   understanding or knowledge that the litigation which
09:58:44 23   you were either told or assumed was pending or coming
09:58:49 24   related to the antitrust statutes of this country?
09:58:54 25       A.  No.

---

51

09:58:54  1       Q.  Did you have any understanding whether it
09:58:57  2   related to labor laws?
09:58:59  3       A.  I think I reached that assumption, but it
09:59:04  4   was only a guess, an assumption.
09:59:07  5       Q.  When you say you reached the assumption
09:59:08  6   that this related to labor laws, did you reach the
09:59:11  7   assumption that your assignment related to labor laws
09:59:15  8   as they affected au pairs?
09:59:20  9       A.  During the assignment, as I spoke to
09:59:22 10   employees of the au pair companies, a number of the
09:59:25 11   interview subjects mentioned government agencies that
09:59:28 12   governed certain aspects of their work.  So I became
09:59:37 13   curious as to whether this case involved labor laws.
09:59:41 14       Q.  Sir, you have told us that you entered
09:59:44 15   into this with the understanding that you were to
09:59:47 16   determine the practices and procedures of these various
09:59:50 17   companies.
09:59:51 18       A.  Yes.
09:59:51 19       Q.  Is it your testimony that you received no
09:59:54 20   assignment specific to the issue of au pair stipends?
10:00:04 21       MS. LOUIS:  I'm going to object and remind
10:00:05 22   you of your instruction.
10:00:10 23       A.  Again, I'm going to ask you to rephrase
10:00:12 24   the question.
10:00:13 25       MS. LOUIS:  'Cause I don't understand

---

52

10:00:14  1   it.
10:00:14  2       Q.  (BY MS. LUKEY)  Did you or did you not as
10:00:16  3   part of your under -- of your assignment understand
10:00:21  4   that you were to ascertain what each company was
10:00:25  5   telling host families regarding stipends?
10:00:31  6       A.  I was to determine -- I believed my task
10:00:35  7   was to determine what they were charging, whom they
10:00:40  8   were charging, how those fees were arrived at, and to
10:00:47  9   attempt to compare and contrast if there were
10:00:50 10   differences.
10:00:51 11       Q.  Well, sir, the people you were calling, or
10:00:54 12   the entities, were the so-called sponsor companies.
10:00:57 13   You were asked to determine what they were charging the
10:01:00 14   host families?
10:01:01 15       A.  What they would charge -- I didn't -- at
10:01:06 16   no point during my calls did I claim to be or try to
10:01:11 17   give the impression that I was -- that I had an agenda
10:01:14 18   of any type.  I was trying to ask very plain vanilla
10:01:19 19   generic questioning.  So my questions were based more
10:01:24 20   in how do you in a typical case do business?  And I
10:01:30 21   directed the questions as to things like, to use your
10:01:35 22   example, au pair payments.  I did not, for instance,
10:01:38 23   know the word "stipend" until I'd heard it a number of
10:01:41 24   times through the interview process, so I incorporated
10:01:44 25   that in and I started asking, you know, how does your

---

13 (Pages 49 to 52)

Beltran v. Interexchange, Inc.      **DAVID KEIL**      7/21/2016

---

53

```
10:01:47   1   stipend -- how is it arrived at, how does it compare to
10:01:51   2   the competition in your field.
10:01:53   3       Q.  When you entered into this process, sir,
10:01:55   4   did you understand that the sponsor companies don't pay
10:01:59   5   anything to the au pairs?
10:02:01   6       A.  When I entered into this process I did not
10:02:03   7   have that knowledge, no.
10:02:06   8       Q.  When you entered into this process, did
10:02:08   9   you understand that host families pay a fee to sponsor
10:02:15  10   companies?
10:02:15  11       A.  I came to discover that through the
10:02:17  12   interview process.
10:02:19  13       Q.  Are you saying that when you started this
10:02:21  14   process, you had no idea that it was host families and
10:02:27  15   not the companies you were calling who paid au pairs?
10:02:32  16       A.  I understood intellectually that host
10:02:38  17   families certainly were ultimately paying a fee for au
10:02:43  18   pair services.  I had no advance information or
10:02:47  19   advanced theories on who paid what and how those fees
10:02:51  20   were divided.  That's what the purpose of the
10:02:54  21   interviews was, so that I could gather that information
10:02:58  22   and then compare it and contrast it.
10:03:00  23       Q.  Well, if the purpose of the interview was
10:03:02  24   to gather that information, you must have been told
10:03:05  25   something about how the payments were structured, that
```

54

```
10:03:09   1   is, that they came from host families, not from the
10:03:12   2   companies you were calling?
10:03:14   3       A.  I don't recall that being information I
10:03:16   4   had before I made the first phone calls, no.
10:03:19   5       Q.  You were not told to find out how much
10:03:23   6   each company told the host families to pay the au
10:03:27   7   pairs; is that what you're saying to us?
10:03:29   8       MS. LOUIS:  Objection.  Let me remind you
10:03:30   9   of your instruction not to reveal counsel's
10:03:33  10   instructions or strategy.
10:03:34  11       A.  I do not believe any of the phone calls
10:03:36  12   were entered into with a preconceived outcome.
10:03:40  13       Q.  (BY MS. LUKEY)  That's not my question,
10:03:41  14   sir.  The question is were you instructed to find out
10:03:48  15   what these companies, the sponsors, were telling host
10:03:53  16   families to pay the au pairs?
10:03:56  17       MS. LOUIS:  Objection.  Same instruction.
10:03:58  18       A.  I believe I've answered that to the best
10:04:02  19   of my ability.
10:04:03  20       Q.  (BY MS. LUKEY)  You haven't answered it.
10:04:05  21   Yes or no --
10:04:05  22       THE DEPONENT:  Oops.  I'm sorry.
10:04:07  23       Q.  (BY MS. LUKEY)  -- were you told to find
10:04:08  24   out what the sponsor companies were telling host
10:04:12  25   families about the payments to au pairs?
```

---

55

```
10:04:16   1       MS. LOUIS:  Objection.  Same instruction.
10:04:18   2       A.  During the course of my investigation, of
10:04:22   3   course I became interested in this topic because it was
10:04:26   4   raised in every interview.  Every interview that I
10:04:29   5   conducted, the person I spoke with raised these points,
10:04:34   6   so certainly it became very clear that there was --
10:04:38   7   there was something to compare and contrast, to use my
10:04:42   8   initial term.  But, no, I did not go into this with a
10:04:47   9   preconceived notion of this.  I don't recall that being
10:04:48  10   the case.
10:04:49  11       Q.  (BY MS. LUKEY)  I'm not asking you of a
10:04:51  12   preconceived notion which would relate to the results
10:04:54  13   of the question.  I am asking you, sir, whether
10:04:57  14   Mr. Hood or anyone else on behalf of Towards Justice
10:05:01  15   asked or instructed you to determine from the sponsor
10:05:06  16   companies what they were telling host families about
10:05:09  17   payments to au pairs?
10:05:12  18       A.  I do not recall having conversations
10:05:15  19   regarding that topic with Mr. Hood or anyone else.
10:05:18  20       Q.  Do you recall one way or the other whether
10:05:20  21   you were instructed to do that?
10:05:23  22       A.  I don't --
10:05:24  23       MS. LOUIS:  Objection.  Just bear in mind
10:05:26  24   your instruction.
10:05:26  25       A.  I don't -- I don't recall.
```

56

```
10:05:27   1       Q.  (BY MS. LUKEY)  So you actually don't
10:05:28   2   remember whether you were instructed to ask the
10:05:31   3   sponsors what they told host families to pay the au
10:05:34   4   pairs, is that what you're saying?
10:05:35   5       MS. LOUIS:  Objection.
10:05:36   6       A.  I'm saying I -- I had one conversation
10:05:40   7   with Mr. Hood.  I do not recall that being the topic,
10:05:45   8   no.
10:05:45   9       Q.  (BY MS. LUKEY)  It wasn't a -- you don't
10:05:47  10   recall it even being a topic?
10:05:49  11       A.  No, I do not.
10:05:51  12       Q.  So you had your conversation and entered
10:05:53  13   into this process of calling the sponsor companies
10:05:57  14   without even knowing that you were supposed to find out
10:06:02  15   what the sponsors told the host families, correct?
10:06:06  16       MS. LOUIS:  Objection.  Same instruction.
10:06:09  17       A.  I obviously can't speak to what Mr. Hood's
10:06:12  18   intent was in hiring me.  I can tell you that the way I
10:06:17  19   conduct an investigation is to gather the information
10:06:23  20   without bias and see where it leads.  That's what I
10:06:26  21   attempted to do here.
10:06:28  22       Q.  (BY MS. LUKEY)  But in order to gather
10:06:29  23   information, you have to know what information you're
10:06:33  24   supposed to be gathering, don't you?
10:06:35  25       A.  Well, I structured my questions to cover a
```

---

14 (Pages 53 to 56)

Beltran v. Interexchange, Inc.                 DAVID KEIL                              7/21/2016

---

57

10:06:39  1    number of topics, but not every topic. But my
10:06:42  2    questions were structured to discuss what services do
10:06:46  3    the companies provide for the host family, what
10:06:50  4    services do they provide for the au pair, who
10:06:55  5    customarily pays what in that arrangement. Can the
10:06:59  6    au pair -- the arrangement for the au pair stipend --
10:07:05  7    and this is a question I hit on somewhat down the road
10:07:08  8    in the interview process. Could the au pair be paid
10:07:11  9    more?
10:07:11  10           These are questions that, A, evolved
10:07:14  11   during the -- my period of questioning; and, B, were
10:07:18  12   sort of triggered by the responses that I was getting
10:07:21  13   and by the types of information that was being given to
10:07:24  14   me on the phone. And I followed their lead and took it
10:07:28  15   where it seemed logical to follow.
10:07:30  16        Q.  So you went into the process with a wide
10:07:33  17   open assignment, as you understood, to figure out how
10:07:37  18   the au pair industry functioned; is that right?
10:07:40  19        A.  No. With --
10:07:41  20           MS. LOUIS: Objection.
10:07:42  21        A.  I can't speak to what the assignment was.
10:07:44  22   I went into this with the intent to figure out how au
10:07:51  23   pairs were paid, by whom, what the policies were around
10:07:58  24   that, and how that would affect a hypothetical
10:08:02  25   consumer.

58

10:08:03  1        Q.  (BY MS. LUKEY) Okay. Now, you just said
10:08:04  2    to us you went into the process to find out how the au
10:08:10  3    pairs were paid, by whom, and what policies were in
10:08:14  4    effect in that respect that would affect the consumer,
10:08:16  5    by whom I assume you mean the au pairs?
10:08:18  6        A.  No. I'm sorry. My use of consumer in my
10:08:22  7    mind would have been the families. I guess the term is
10:08:26  8    host family. Is that correct?
10:08:28  9        Q.  Okay. Did you go into your -- well, first
10:08:32  10   of all let me back up. When you said you can't speak
10:08:35  11   to the assignment, I'm talking about the assignment you
10:08:36  12   were given, sir. You clearly know what you were asked
10:08:38  13   to do?
10:08:39  14        A.  I understand.
10:08:40  15        Q.  You were asked to go into this process to
10:08:42  16   determine how the au pairs were paid, by whom, and what
10:08:47  17   policies were in place that would affect the host families?
10:08:50  18        A.  That's how I approached this, yes.
10:08:53  19        Q.  Well, never mind how you approached it.
10:08:54  20   Is that what you were asked to find out?
10:08:57  21        A.  I don't recall what specifics I was asked.
10:09:00  22        Q.  So you can't tell us whether you were
10:09:03  23   instructed to find out how au pairs were paid, by whom,
10:09:07  24   and what the policies were affecting host families or
10:09:09  25   whether that's something that came to you all on your

59

10:09:11  1    own?
10:09:12  2        A.  Well --
10:09:12  3           MS. LOUIS: Objection. Same
10:09:14  4    instruction.
10:09:14  5        A.  I wouldn't say all on my own. I spoke
10:09:17  6    with many employees over a period of days. If I
10:09:22  7    recall, these interviews took place over a five- or
10:09:25  8    six-day period. It was very intense. It was all -- it
10:09:29  9    was all within a week. I think there was a break of a
10:09:32  10   day or two somewhere in there. It was one phone call
10:09:35  11   after another, after another. And over time, my
10:09:40  12   questioning changed and evolved to follow where I
10:09:45  13   thought the questions needed to go.
10:09:50  14           My approach is always to get as -- my
10:09:52  15   approach is always with any interview is to get a
10:09:56  16   subject talking, to prime the pump, give them an
10:10:00  17   open-ended question, and hope for a chatty person on
10:10:05  18   the other end of the interview. And in cases where
10:10:08  19   that happened, I learned a lot, and I incorporated that
10:10:10  20   in my approach with the next phone call.
10:10:13  21        Q.  (BY MS. LUKEY) I'm not suggesting you
10:10:14  22   wouldn't evolve your questions, sir. I'm suggesting
10:10:18  23   that you'd have to know what it was you were supposed
10:10:20  24   to be finding out before you could start making calls
10:10:23  25   to the sponsors in the au pair program. So you had to

60

10:10:26  1    know that what you were supposed to find out, perhaps
10:10:29  2    among other things, was how au pairs were paid, by whom
10:10:33  3    they were paid, and what policies the sponsors had in
10:10:36  4    place that affected the host families?
10:10:38  5        A.  Those are questions that I asked. Were
10:10:40  6    those questions that were given to me or speculate --
10:10:43  7    or specified by Mr. Hood? I don't honestly recall.
10:10:48  8        Q.  So you can't even remember if he gave you
10:10:50  9    those questions; is that right?
10:10:51  10           MS. LOUIS: Objection. I -- the extent of
10:10:56  11   the answers that you're pulling -- I know that you're
10:11:00  12   looking to get behind what specific instructions were
10:11:04  13   given, but to the extent that his answers have not
10:11:08  14   revealed what he did, there is nothing else here.
10:11:13  15           MS. LUKEY: I'm sorry, Lauren, but he was
10:11:15  16   given instructions as to what to ask about, and we're
10:11:19  17   entitled to find out about that. These are
10:11:21  18   instructions for his interactions with third parties
10:11:23  19   who happen to be our clients. We have the right to
10:11:26  20   know what he was instructed to do, the extent to which
10:11:29  21   he received broad instruction, the extent to which he
10:11:33  22   received narrow instruction, and I keep hearing him say
10:11:36  23   he doesn't actually recall, and I need to test that,
10:11:39  24   and I'm going to test that.
10:11:42  25        Q.  (BY MS. LUKEY) Do you recall one way or

scheduling@huntergeist.com          HUNTER + GEIST, INC.          303-832-5966/800-525-8490

Beltran v. Interexchange, Inc.          DAVID KEIL                    7/21/2016

---

61

10:11:43  1   the other whether Mr. Hood instructed or asked you to
10:11:50  2   determine how au pairs were paid, by whom, and what the
10:11:54  3   companies had in place as policies affecting host
10:11:56  4   families?
10:11:58  5         A.  Let me address it this way.
10:12:01  6         MS. LOUIS:  It calls for a yes or no
10:12:02  7   answer.
10:12:02  8         Q.  (BY MS. LUKEY)  Why don't you just answer
10:12:03  9   the question.
10:12:04  10        A.  I'm sorry.
10:12:06  11        Q.  Do you recall one way or the other whether
10:12:08  12  you were instructed or asked by Mr. Hood, who's sitting
10:12:12  13  here listening to your answers under oath, how au pairs
10:12:16  14  were paid, by whom they were paid, and what policies
10:12:21  15  the sponsors had in place affecting host families?
10:12:24  16        A.  I recall having a conversation with
10:12:26  17  Mr. Hood.  I do not recall the specifics of that
10:12:29  18  question, no.
10:12:31  19        Q.  Do you recall even generally that you were
10:12:33  20  supposed to be ascertaining how au pairs were paid, by
10:12:38  21  whom, and what policies the sponsors had in place
10:12:41  22  affecting those families?
10:12:44  23        A.  Generally I recall that we discussed I
10:12:46  24  would be contacting au pair companies trying to
10:12:48  25  ascertain how these -- the process worked and how --

---

62

10:12:51  1   how au pairs were paid, yes.  That's the extent of my
10:12:56  2   recollection.
10:12:56  3         Q.  That's as much as you can tell us about
10:13:00  4   the instructions regarding what you were to ask; is
10:13:03  5   that correct?
10:13:03  6         A.  Correct.
10:13:06  7         Q.  When you were retained by Towards Justice,
10:13:11  8   to your knowledge, was Boies Schiller also part of the
10:13:14  9   entity retaining you?
10:13:16  10        A.  The first time I became aware of Boies
10:13:19  11  Schiller in this case was recently, within the last
10:13:22  12  month.
10:13:22  13        Q.  So as far as you were concerned, your
10:13:25  14  retention was by Towards Justice; is that right?
10:13:29  15        A.  Correct, yes.
10:13:29  16        Q.  Now, sir, you have said to us that you
10:13:34  17  can't -- that you didn't know, I guess, whether
10:13:36  18  litigation had been filed already?
10:13:38  19        A.  That's correct.
10:13:41  20        Q.  When, if at all, in the last quarter of
10:13:45  21  2014 did you read any stories about the litigation
10:13:50  22  pertaining to au pairs brought by Towards Justice?
10:13:54  23        A.  I've read no stories other than a couple
10:13:59  24  of pleadings that Ms. Louis put in front of me
10:14:04  25  yesterday, attachments to pleadings.  I've read nothing

---

63

10:14:07  1   about this case.
10:14:08  2         Q.  We're going to come back to how you
10:14:09  3   prepared for today --
10:14:10  4         A.  Okay.
10:14:10  5         Q.  -- at a later point.  But right now what I
10:14:12  6   want to understand is whether it's your testimony that
10:14:15  7   you didn't see anything in the press or online via
10:14:21  8   Internet press that related to the filing of a lawsuit
10:14:25  9   pertaining to au pairs here in Denver?
10:14:28  10        A.  Correct.  I -- I -- my testimony is I've
10:14:30  11  not read or sought to read anything about this case.
10:14:33  12        Q.  Did you intentionally avoid reading any
10:14:36  13  articles?
10:14:36  14        A.  No.  I frankly didn't give any -- any
10:14:39  15  thought to this case after I was done with it.  It was
10:14:42  16  a small, small matter on my calendar, and I never
10:14:45  17  really gave it any more thought after that.
10:14:47  18        Q.  Is there any local media that you
10:14:50  19  regularly read, sir?
10:14:53  20        A.  No.  I read the sports section of The
10:14:56  21  Denver Post.  I read national media.  I read the New
10:15:00  22  York Times and a number of national media, but other
10:15:03  23  than -- if it doesn't pertain to the Denver Nuggets or
10:15:07  24  the Broncos, I probably don't read it here.
10:15:09  25        Q.  So you never saw anything in the press

---

64

10:15:10  1   about this lawsuit; is that right?
10:15:12  2         A.  No.  That's correct.
10:15:14  3         MS. LOUIS:  Objection.
10:15:15  4         Q.  (BY MS. LUKEY)  All right.  Why don't we
10:15:16  5   go to the issue of your preparation, and then I'll go
10:15:20  6   back to your specific process of making the phone
10:15:22  7   calls, sir.  How did you prepare for your deposition
10:15:24  8   today?
10:15:26  9         A.  I met for a period yesterday with
10:15:30  10  Ms. Louis and another attorney from Towards Justice
10:15:34  11  named David whose last name I don't know.
10:15:38  12        Q.  Was Mr. Hood there?
10:15:38  13        A.  No.
10:15:40  14        Q.  Did you find that surprising?  Were you
10:15:43  15  expecting him?
10:15:44  16        A.  I've worked for a number of lawyers.  I
10:15:46  17  find nothing surprising anymore.
10:15:48  18        Q.  Did you expect him to be there, sir?
10:15:50  19        A.  I did not.
10:15:50  20        Q.  Did you know he was not going to be there?
10:15:52  21        A.  I did not.
10:15:53  22        Q.  Okay.  How long was the meeting yesterday?
10:15:57  23        A.  Other than a break for coffee, two to
10:16:01  24  three hours.  Two, two-and-a-half hours, something like
10:16:04  25  that.

---

16 (Pages 61 to 64)

Beltran v. Interexchange, Inc.                 DAVID KEIL                        7/21/2016

---

65

10:16:06  1        Q.  And in the course of that preparation
10:16:09  2    session were you shown documents?
10:16:14  3        A.  I was shown exhibits to a pleading that --
10:16:22  4    I believe it was a pleading filed by or for Mr. Hood,
10:16:27  5    and there was an exhibit to that that I was given the
10:16:30  6    opportunity to read.
10:16:31  7        Q.  Are you talking about the declaration or
10:16:34  8    affidavit of Mr. Hood --
10:16:35  9        A.  Yes.
10:16:37 10        Q.  -- pertaining to your role in this case?
10:16:40 11        A.  Yes.
10:16:40 12        Q.  Okay.  At this time, sir, I'm going to
10:16:58 13    hand you my copy.  We will have copies made for
10:17:00 14    everyone.  But I want this to be marked as an exhibit.
10:17:03 15    The document that I will ask our reporter to mark is
10:17:06 16    entitled Response to Joint Motion to Strike Amended
10:17:09 17    Complaint Sections 90 to 94 by Certain Moving
10:17:13 18    Defendants.  Appended to it is the Declaration of
10:17:20 19    Alexander Hood, Esquire.  And once this is marked and
10:17:24 20    handed to you, I would ask you to review it and tell us
10:17:26 21    whether this is the pleading and the declaration to
10:17:29 22    which you just made reference.
10:17:39 23        (Deposition Exhibit 4 was marked.)
10:17:39 24        THE DEPONENT:  Thank you.
10:17:41 25        THE REPORTER:  You're welcome.

---

66

10:18:17  1        (The deponent perused the exhibit.)
10:18:20  2        A.  Well, I did not read the entire pleading
10:18:25  3    yesterday.  I did peruse it, and based on that, I
10:18:28  4    believe this is either all or part of what I saw
10:18:32  5    yesterday.
10:18:32  6        MS. LOUIS:  And, Joan, before you begin
10:18:35  7    questioning, we don't have a copy of that.
10:18:37  8        MS. LUKEY:  I'm actually not going to
10:18:39  9    question him until I can have copies made.
10:18:41 10        MS. LOUIS:  Okay.
10:18:41 11        Q.  (BY MS. LUKEY)  Just one other question,
10:18:43 12    which is had you ever previously seen either the
10:18:46 13    pleading or Mr. Hood's declaration?
10:18:47 14        A.  I had not.
10:18:49 15        MS. LUKEY:  We're not going to break quite
10:18:51 16    yet, although I imagine you'll need a break in about
10:18:54 17    15 minutes.  But I'm going to ask that this be copied,
10:18:57 18    and then we'll go back to questions about it.  Could I
10:19:04 19    have the copy, sir.
10:19:07 20        THE DEPONENT:  Certainly.
10:19:08 21        MS. LUKEY:  Thank you.
10:19:22 22        Q.  (BY MS. LUKEY)  So this may be slightly
10:19:13 23    disjointed, but in order to ensure that everybody has
10:19:15 24    Exhibit 4, we'll leave that subject.  It will come up
10:19:18 25    in the ordinary course anyway as we go forward with the

---

67

10:19:22  1    other questioning.  So let us now, for 15 or 20 minutes
10:19:27  2    before we take a break, go into the issues of the
10:19:31  3    actual work that you performed.  But let me, before I
10:19:36  4    forget myself, ask you, what are the terms of your
10:19:39  5    employment?
10:19:39  6        A.  I'm sorry?
10:19:41  7        Q.  What is your retention agreement?
10:19:42  8        A.  I don't recall my agreement with Mr. Hood
10:19:45  9    per se.  I can tell you what my standard fee agreement
10:19:48 10    is.
10:19:49 11        Q.  Do you recall what you are charging
10:19:51 12    Towards Justice or Boies Schiller as your fee?
10:19:53 13        A.  My -- my hourly fee currently is $250 an
10:19:58 14    hour.  I believe the fee that I charged Mr. Hood was a
10:20:03 15    slight reduction on that amount.  I think we were just
10:20:05 16    going through a fee change at the first of this
10:20:08 17    year -- or the first of 2015.  So I don't recall the
10:20:12 18    fee.  It might have been $200 an hour.  We were --
10:20:17 19    was at $200 an hour for many, many years.  So I don't
10:20:20 20    remember which fee we charged him.
10:20:22 21        Q.  I'm going to ask you again if you can to
10:20:23 22    keep your voice up, sir.
10:20:24 23        A.  Yes.  I'm sorry.
10:20:26 24        Q.  For the benefit of those at the end of the
10:20:28 25    table.  Sir, did you give Mr. Hood, Towards Justice, a

---

68

10:20:33  1    reduced fee because they are a not for profit, or did
10:20:38  2    you just --
10:20:39  3        A.  No.  I --
10:20:40  4        Q.  -- have a lower fee at one point?
10:20:42  5        A.  No.  I had a lower fee.  Throughout the
10:20:45  6    recession of 2008 through about 2014 I did not raise my
10:20:49  7    rates at all, so my rates remained 200 an hour
10:20:54  8    throughout that time.  I charge less when working for
10:20:56  9    the U.S. District Court 'cause they pay less.  But all
10:20:59 10    private clients paid 200 an hour until sometime in late
10:21:03 11    '14, early '15.  I don't really recall when Mr. Hood
10:21:09 12    falls in that, but since early 2015 my rate's been $250
10:21:13 13    an hour.
10:21:13 14        Q.  Is your fee arrangement with Boies
10:21:17 15    Schiller different from or the same as that you have
10:21:19 16    with Towards Justice?
10:21:20 17        A.  The different -- my agreement with Boies
10:21:23 18    Schiller is at my current hourly rate of 250 an hour.
10:21:27 19    I generally, when I'm giving testimony or a deposition,
10:21:31 20    I charge my normal hourly rate because it is taking me
10:21:36 21    away from normally billing -- normally billing to other
10:21:39 22    clients, so it replaces the income I'm losing from not
10:21:42 23    being -- working for other cases today.
10:21:44 24        Q.  Before I move on, you just referenced
10:21:46 25    doing work for the district court.

---

17 (Pages 65 to 68)

Beltran v. Interexchange, Inc.                    DAVID KEIL                              7/21/2016

---

69

10:21:48    1         A.  Yes.
10:21:48    2         Q.  What is the nature of the work you do for
10:21:50    3    the court?
10:21:51    4         A.  I have been for about almost 20 years
10:21:54    5    work -- I've done court-appointed investigation,
10:21:59    6    criminal defense investigation under the Criminal
10:22:01    7    Justice Act, and the court has a fee structure that is
10:22:05    8    radically different than my fee structure, but when I
10:22:08    9    work on those cases, I work at the court's fee
10:22:11   10    structure.
10:22:12   11         Q.  What percentage of your work is in that
10:22:15   12    category?
10:22:16   13         A.  In the last two years it's none, and the
10:22:18   14    reason for that is I couldn't economically justify the
10:22:24   15    great -- the reduction in rate anymore.  But probably
10:22:29   16    over the previous 18, 19 years, it was 10 percent,
10:22:34   17    15 percent of my -- my annual income.
10:22:36   18         Q.  Are you referring to the federal district
10:22:38   19    court in Denver, or multiple courts?
10:22:42   20         A.  Generally in Denver.  I have done cases in
10:22:43   21    other jurisdictions, but not many.  Mostly in Denver.
10:22:47   22         Q.  Okay.  Now, turning to the work that you
10:22:50   23    performed in this matter.  Do you recall the month in
10:22:55   24    which you were performing the work?
10:22:56   25         A.  I know it was the -- the tail end of 2014.

---

70

10:23:01    1    I don't know if it was November, December.  I don't
10:23:04    2    recall if it bled into January.
10:23:06    3         Q.  Were you asked to complete your assignment
10:23:09    4    within some specified period?
10:23:11    5         A.  I don't believe so, no.
10:23:13    6         Q.  Okay.  Were you given any indication of
10:23:17    7    urgency?
10:23:18    8         A.  I know we created a budget, an
10:23:21    9    investigative budget, which is generally the way I work
10:23:23   10    with all clients.  And we -- we budget a specific
10:23:29   11    amount of time corresponding to my rate, and we work
10:23:34   12    until that budget's exhausted.  I think the only -- the
10:23:41   13    only guidelines I remember from those -- from this
10:23:43   14    arrangement was that I should -- that I should not
10:23:47   15    exceed the budget, that there were no additional funds
10:23:50   16    available if I couldn't finish the task within the
10:23:54   17    original budget.
10:23:56   18         Q.  What is the process that you followed
10:23:59   19    before you began making phone calls in order to put in
10:24:04   20    place a routine to get to your end game?
10:24:10   21         A.  My process is, after 30 years, somewhat
10:24:16   22    informal.  I've been doing this a long time.  I have a
10:24:20   23    very rigid practice and belief that when I conduct
10:24:27   24    interviews, whether it's in this case or any case, that
10:24:30   25    I do that without the use of any subterfuge, without

---

71

10:24:36    1    misidentifying who I am, what my purposes are.  It's a
10:24:41    2    large characteristic of my -- of my business.  Most of
10:24:44    3    the clients who -- attorney clients who work with me
10:24:49    4    know in advance that I'm not an investigator who's
10:24:52    5    going to make pretext calls or withhold information.
10:24:59    6         So when I entered into this process, I had
10:25:01    7    to come up with a criteria by which I could ask these
10:25:06    8    questions and I could ask them in as broad and generic
10:25:11    9    a method as possible, but I had to be able to do so
10:25:14   10    without misrepresenting myself.  So I decided I would
10:25:20   11    not attempt to pass myself off as a potential customer,
10:25:25   12    I would not attempt to pass myself off as a parent.
10:25:29   13    Although I am a parent, I would not discuss that.  I
10:25:32   14    would not discuss the fact that I was interested in
10:25:37   15    hiring someone in this field.  I would not discuss the
10:25:41   16    fact that I'd been hired to investigate this field.
10:25:44   17         So for me, it was sort of a mental
10:25:47   18    exercise of having to craft questions that I could ask
10:25:52   19    that were, A, not leading; B, did not require a lot of
10:26:00   20    preamble or explanation; and I needed to devise a
10:26:05   21    method -- because I anticipated being asked about my
10:26:07   22    family, because we're talking about child care, I had
10:26:11   23    to devise a method by which I could continue forward
10:26:15   24    with questioning without materially misrepresenting
10:26:19   25    anything.

---

72

10:26:21    1         So there was a lot of -- a lot of mental
10:26:24    2    exercise, a lot of thought that went into that.  And
10:26:27    3    as -- as the interviews progressed, my questions became
10:26:30    4    a little more intelligent because I had a sense of --
10:26:34    5    finally a sense of what it is I was talking about.
10:26:39    6         Q.  Sir, in the code that's embodied in the
10:26:43    7    statute concerning private investigators, now mandatory
10:26:47    8    licensing statute, previously voluntary, are there any
10:26:50    9    provisions that relate to not misleading the subject of
10:26:59   10    an interview as to your role?
10:27:01   11         A.  To be frank, I can't recall if they're
10:27:05   12    specific to the statute.  I can tell you that in
10:27:09   13    practice -- and I was a large advocate for licensure.
10:27:12   14    There was a lot of debate.  For 20 years there was
10:27:17   15    debate over whether there should be licensure of my
10:27:20   16    profession.  I was an advocate of it.  And the reason
10:27:22   17    being, it is well-known practice that investigators,
10:27:28   18    like police officers, often tell little white lies or
10:27:34   19    mischaracterizations to get information.
10:27:37   20         I have been throughout my career adamant
10:27:40   21    with my clients that I should not do that.  It's not
10:27:43   22    because I'm the world's best guy, I'm not a white hat.
10:27:46   23    I just understand that my business is very unique.  I
10:27:52   24    only work for cases involving counsel.  The
10:27:55   25    overwhelming majority of work I do is litigation-based.

---

18 (Pages 69 to 72)

Beltran v. Interexchange, Inc.          DAVID KEIL                          7/21/2016

---

73

| | |
|---|---|
| 10:27:59 1 | And I know that every interview I conduct will be |
| 10:28:03 2 | scrutinized at some point and I'm going to have to get |
| 10:28:06 3 | on a witness stand and answer questions about it, how |
| 10:28:10 4 | information was gleaned. |
| 10:28:13 5 | I don't think most people in my profession |
| 10:28:14 6 | have that responsibility, whether they're ethical |
| 10:28:17 7 | people or not. But I understand and I make it very |
| 10:28:21 8 | aware to my attorney clients that if I can't get up in |
| 10:28:25 9 | a forum like this and honestly answer how I got the |
| 10:28:29 10 | information, then it's of no value to them. And sorry |
| 10:28:33 11 | for the preamble, but that's -- that's how I approached |
| 10:28:36 12 | this interview, that's how I approach every interview |
| 10:28:39 13 | that I've done for 30 years. |
| 10:28:41 14 | Q.  Back to my question, sir. The question |
| 10:28:44 15 | was, I think -- it's been a while, but I think the |
| 10:28:47 16 | question was are you aware of any codification of the |
| 10:28:50 17 | requirement that private investigators be honest and |
| 10:28:54 18 | not misleading? |
| 10:28:55 19 | A.  I would assume it's in the statute, yes. |
| 10:28:57 20 | Q.  And whether or not it's in the statute, |
| 10:28:59 21 | sir, you would agree with me that it's supposed to be |
| 10:29:03 22 | industry standards that private investigators will not |
| 10:29:08 23 | mislead the interviewees, correct? |
| 10:29:10 24 | A.  I -- I believe that that is the accepted |
| 10:29:15 25 | standard. |

---

74

| | |
|---|---|
| 10:29:17 1 | Q.  Now, your long exposition of your own |
| 10:29:23 2 | practices and of what you consider to be the norm among |
| 10:29:26 3 | law enforcement officials and other investigators -- |
| 10:29:30 4 | sorry, I just pulled the microphone off -- leads me to |
| 10:29:40 5 | wonder whether among the items you reviewed with |
| 10:29:45 6 | Ms. Louis and someone from Towards Justice yesterday |
| 10:29:49 7 | was the declarations of certain of the sponsors whom |
| 10:29:54 8 | you had called. |
| 10:29:57 9 | MS. LOUIS:  There's no question. |
| 10:29:59 10 | THE DEPONENT:  I'm sorry? |
| 10:30:00 11 | MS. LOUIS:  There's no question. |
| 10:30:01 12 | Q.  (BY MS. LUKEY)  The question is did you |
| 10:30:02 13 | read the declarations of the sponsors whom you had |
| 10:30:07 14 | called? |
| 10:30:08 15 | A.  I don't -- I read one document yesterday. |
| 10:30:11 16 | It was the document, I believe, that you put in front |
| 10:30:13 17 | of me. |
| 10:30:13 18 | Q.  All right.  You had indicated earlier that |
| 10:30:15 19 | you thought that was at least part of the document. |
| 10:30:18 20 | A.  I -- |
| 10:30:20 21 | Q.  Was that the only document that you |
| 10:30:20 22 | reviewed? |
| 10:30:21 23 | A.  I reviewed one document, and I did not |
| 10:30:23 24 | read it in depth.  I perused it for about five minutes, |
| 10:30:27 25 | less, and it was a single document. |

---

75

| | |
|---|---|
| 10:30:31 1 | Q.  Is it your testimony, then, that you did |
| 10:30:35 2 | not review the declarations that were filed relating to |
| 10:30:41 3 | what you said or did or didn't say or do on your calls? |
| 10:30:44 4 | A.  There were a couple of pages therein that |
| 10:30:50 5 | quoted things that apparently came from the complaint |
| 10:30:55 6 | about my calls.  Excerpts from the complaint that I |
| 10:30:58 7 | think were in the amendment. |
| 10:30:59 8 | Q.  But you did not see the declarations |
| 10:31:03 9 | submitted by the sponsors; is that correct? |
| 10:31:08 10 | A.  And maybe I'm misunderstanding the |
| 10:31:11 11 | terminology.  I apologize. |
| 10:31:11 12 | MS. LUKEY:  I'm sorry, what was he just |
| 10:31:13 13 | handed? |
| 10:31:14 14 | MS. LOUIS:  Exhibit 1. |
| 10:31:15 15 | MS. LUKEY:  The same exhibit? |
| 10:31:16 16 | MS. LOUIS:  I think -- I think you're |
| 10:31:18 17 | questioning him about Exhibit 4.  It's not clear.  And |
| 10:31:22 18 | I'm just trying to put the exhibits back in front of |
| 10:31:24 19 | him so that he's not testifying from a vacuum. |
| 10:31:27 20 | THE DEPONENT:  Thank you. |
| 10:31:28 21 | MS. LUKEY:  You put the subpoena in front |
| 10:31:29 22 | of him? |
| 10:31:29 23 | MS. LOUIS:  It's Exhibit 1, I believe, is |
| 10:31:31 24 | your revised -- |
| 10:31:33 25 | MS. LUKEY:  Yes. |

---

76

| | |
|---|---|
| 10:31:33 1 | MS. LOUIS:  -- deposition notice. |
| 10:31:34 2 | MS. LUKEY:  Yes.  So that's what he has in |
| 10:31:35 3 | front of him.  I'm not questioning him from Exhibit 4. |
| 10:31:40 4 | Q.  (BY MS. LUKEY)  I am asking you, sir, if |
| 10:31:41 5 | you saw the declarations that were filed by the |
| 10:31:45 6 | sponsor -- in connection with the same motion to |
| 10:31:48 7 | which -- |
| 10:31:48 8 | A.  And -- |
| 10:31:50 9 | Q.  -- Mr. Hood's declaration relates? |
| 10:31:51 10 | A.  And I apologize in that I may not |
| 10:31:54 11 | understand the form of your question well, but I can |
| 10:31:56 12 | state that this document I have seen in portion, and no |
| 10:32:01 13 | other documents beyond this. |
| 10:32:03 14 | Q.  Well, that's Exhibit 1.  It's the subpoena |
| 10:32:05 15 | and notice of deposition.  I think you told us a moment |
| 10:32:08 16 | ago that you had seen Exhibit 4, which just came back |
| 10:32:12 17 | into the room. |
| 10:32:13 18 | A.  Oh, is that what this is?  Okay.  Again, I |
| 10:32:16 19 | apologize if I'm not understanding the terminology. |
| 10:32:19 20 | Q.  Well, let me -- let me suggest this, sir. |
| 10:32:21 21 | If at any point you're not understanding my question, |
| 10:32:24 22 | please let me know, and I will rephrase the question. |
| 10:32:28 23 | If you don't ask me, then I'm going to assume that you |
| 10:32:30 24 | understand the question.  Is that all right? |
| 10:32:32 25 | A.  Yes. |

---

Beltran v. Interexchange, Inc.                    DAVID KEIL                           7/21/2016

---

77

```
10:32:32   1        Q.  Thank you.  So Exhibit -- are you now
10:32:35   2   looking at Exhibit 4?
10:32:36   3        A.  I am, yes.
10:32:38   4        Q.  Okay.  Now, that's the document I asked
10:32:40   5   you about a few moments ago, whether that is what you
10:32:43   6   reviewed with Ms. Louis and the gentleman from Towards
10:32:48   7   Justice.  Is that what you reviewed?
10:32:49   8        A.  I reviewed a portion of this, yes.
10:32:53   9        Q.  Did you review any other document?
10:33:00  10        A.  No.  I don't believe so.
10:33:03  11        Q.  I will represent to you there were a few
10:33:06  12   affidavits filed from the sponsor side.  Did you review
10:33:11  13   any of those affidavits or declarations?
10:33:13  14        A.  I --
10:33:14  15        MS. LOUIS:  Can you show him what you're
10:33:15  16   asking about?
10:33:16  17        THE DEPONENT:  Yes.
10:33:17  18        MS. LUKEY:  If you don't have an objection
10:33:18  19   to him seeing it.
10:33:19  20        MS. LOUIS:  I don't.
10:33:19  21        MS. LUKEY:  Okay.  Well, let me -- let me
10:33:21  22   pull that out.  But I think he can answer at least yes
10:33:25  23   or no as to whether he remembers seeing them.
10:33:29  24        MS. LOUIS:  If --
10:33:29  25        MS. LUKEY:  It will take me a minute just
```

78

```
10:33:30   1   to dig those out.
10:33:31   2        MS. LOUIS:  It's not clear that he
10:33:34   3   understands your description.
10:33:39   4        (Pause in the proceedings.)
10:34:25   5        MS. LUKEY:  I'm going to suggest we take a
10:34:27   6   brief break now.  It's about time we would anyway.  And
10:34:29   7   we'll go get a copy -- I have it here somewhere, but I
10:34:33   8   don't want to take up everybody's time watching me try
10:34:35   9   to find it in my file.  So if acceptable to everyone, I
10:34:40  10   would propose that we go off the record and take a
10:34:42  11   five-minute break.
10:34:43  12        MS. LOUIS:  Sure.
10:34:44  13        THE VIDEOGRAPHER:  Going off the record.
10:34:45  14   This is the end of Media Unit No. 1 in the videotaped
10:34:48  15   deposition of David Keil.  The time is 10:34 a.m.  We
10:34:52  16   are off the record.
10:34:54  17        (Recess taken, 10:34 a.m. to 10:53 a.m.)
10:53:26  18        THE VIDEOGRAPHER:  We are back on the
10:53:27  19   record.  This is the beginning of Media Unit No. 2 in
10:53:30  20   the videotaped deposition of David Keil.  The time is
10:53:33  21   10:53 a.m.
10:53:37  22        Q.  (BY MS. LUKEY)  Mr. Keil, while we were on
10:53:39  23   the break we started copying the documents I was
10:53:42  24   referencing before the break.  They're still not done,
10:53:45  25   but they'll be here shortly, so let me just do a couple
```

79

```
10:53:48   1   of cleanup questions while we wait to get there.
10:53:53   2        I think that in your narrative answer when
10:53:56   3   you were describing your process for getting ready, you
10:53:58   4   mentioned that you do not make it a practice to
10:54:00   5   disclose that you're an investigator investigating a
10:54:06   6   particular matter; is that right?
10:54:06   7        A.  No.  I think -- the I hope -- if that's
10:54:12   8   the impression I gave you, that was incorrect.  I do
10:54:15   9   that in some instances, I don't do it in others.  It's
10:54:19  10   dependent on what I think's appropriate at the time.
10:54:23  11        Q.  On what factors do you decide whether it's
10:54:25  12   appropriate to disclose that you're acting as an
10:54:28  13   investigator and on what circumstances do you determine
10:54:32  14   that it is not appropriate?
10:54:35  15        MS. LOUIS:  Object to the form.
10:54:44  16        A.  Sometimes it depends on the type of case.
10:54:48  17   Sometimes it's dependent on the type of witness.  And
10:54:52  18   sometimes it's dependent on whether I think it will be
10:54:55  19   detrimental to my ability to do my job.
10:54:59  20        Q.  (BY MS. LUKEY)  In what type of case do
10:55:05  21   you disclose that you are a private investigator
10:55:07  22   looking into a matter?
10:55:09  23        A.  Always in a criminal case no matter what.
10:55:13  24   Excuse me.  I'm sorry, I'm not being loud enough.
10:55:16  25   Always in criminal cases I -- because it's important to
```

80

```
10:55:20   1   delineate my -- between myself and law enforcement.  In
10:55:24   2   civil cases, where I believe it is -- the parties are
10:55:28   3   aware of litigation, where I believe the parties know
10:55:31   4   who the other parties are, who the lawyers are, I
10:55:36   5   identify myself and who my client is.  In situations
10:55:39   6   where I don't believe anyone has knowledge of the
10:55:44   7   parties, I generally don't identify myself or them.
10:55:48   8        Q.  And what type of witnesses or for what
10:55:51   9   type of witnesses do you typically disclose that you
10:55:54  10   are a private investigator and for what type do you not
10:55:57  11   disclose it?
10:55:59  12        A.  Again, in criminal cases I always disclose
10:56:03  13   because it's important to delineate that I'm not law
10:56:06  14   enforcement.  In civil cases, again, where the parties
10:56:10  15   are aware of whom is whom, I identify myself as a
10:56:17  16   private investigator so that I can then explain to them
10:56:21  17   who my client is, either whether they know the lawyer
10:56:24  18   or they know the client, so they know -- so that when I
10:56:27  19   speak to them, they are aware of my point of view.
10:56:35  20        Q.  Okay.  And in what circumstances do you
10:56:38  21   consider it detrimental to your job to disclose that
10:56:42  22   you're working for --
10:56:44  23        A.  Well, in a case --
10:56:44  24        Q.  -- that you're a private investigator
10:56:46  25   working on a matter?
```

20 (Pages 77 to 80)

Beltran v. Interexchange, Inc.                    DAVID KEIL                    7/21/2016

---

81

10:56:47  1         A.  In a case where I'm not aware there's
10:56:50  2   litigation or I haven't specifically been told that
10:56:52  3   people -- how people relate to litigation or relate to
10:56:58  4   my client.  I feel like it's potentially damaging to my
10:57:03  5   client's case, 'cause I don't have enough information.
10:57:05  6   I don't know enough about the case, I don't want to
10:57:07  7   prejudice a witness by having them find out that I'm an
10:57:10  8   investigator, followed up by, Well, what's this about?
10:57:13  9   So in cases where I don't want to damage or prejudice
10:57:16 10   my client's case about that, I try to be more generic.
10:57:24 11         Q.  Do you know whether the code of conduct
10:57:26 12   specifies that you should identify yourself as a
10:57:28 13   private investigator?
10:57:29 14         A.  I don't know that, no.
10:57:30 15         Q.  Do you know whether the accepted standards
10:57:34 16   of the profession require you to disclose that you're a
10:57:39 17   private investigator?
10:57:39 18         A.  I don't believe they do, but that's
10:57:42 19   my -- my understanding.
10:57:44 20         Q.  Okay.  With regard to this case, when you
10:57:51 21   were making your phone calls -- we will go through them
10:57:54 22   individually, but taking your analysis of the three
10:57:58 23   factors you just mentioned, what was your determination
10:58:02 24   as to whether this was the type of case or matter in
10:58:06 25   which you should or should not disclose that you're a

---

82

10:58:10  1   private investigator?
10:58:12  2         MS. LOUIS:  Object to form.
10:58:14  3         A.  I'm sorry, could you answer -- ask that
10:58:16  4   again?
10:58:16  5         Q.  (BY MS. LUKEY)  As you entered into the
10:58:17  6   process in this case, what was your analysis as to
10:58:20  7   whether you would or would not disclose that you're a
10:58:23  8   private investigator?
10:58:24  9         A.  I -- my analysis was based on the fact
10:58:27 10   that I knew nothing about the case.  I didn't know
10:58:31 11   whether there was litigation involved.  I didn't know
10:58:35 12   whom the parties were.  I didn't know if my identifying
10:58:39 13   myself as an investigator would do damage to the case.
10:58:42 14   So I erred on the side of caution and decided to do a
10:58:49 15   more generic type of questioning.
10:58:50 16         Q.  You consider it to be erring on the side
10:58:53 17   of caution not to tell the person you're interviewing
10:58:57 18   that you're a private investigator; is that right?
10:58:59 19         A.  No.  I -- what I said was I believe I err
10:59:02 20   on the side of caution when I may find myself in a
10:59:09 21   situation where I do damage or give privileged
10:59:15 22   information to a third party that I'm not authorized to
10:59:20 23   give.  So when I don't know specifically the facts of
10:59:23 24   the case, I could do more harm than good by telling
10:59:29 25   someone I'm an investigator and here's who I work for.

---

83

10:59:32  1         Q.  In the work that you were performing in
10:59:35  2   this matter, did you consider yourself to be working
10:59:37  3   for Towards Justice?
10:59:38  4         A.  I did.
10:59:39  5         Q.  And that is a public interest law firm,
10:59:42  6   correct?
10:59:42  7         A.  All I knew at the time is that they were a
10:59:45  8   law firm.
10:59:46  9         Q.  Well, it's kind of an unusual name.  Did
10:59:49 10   you have a clue from the name that perhaps they were in
10:59:51 11   the public interest sector of the profession?
10:59:54 12         A.  I --
10:59:56 13         MS. LOUIS:  Object to form.
10:59:57 14         A.  I can't speculate on that.
10:59:58 15         Q.  (BY MS. LUKEY)  Okay.  As you were making
11:00:02 16   this analysis in this case, did you make any
11:00:07 17   distinction among various witnesses -- that was one of
11:00:09 18   the factors you said you usually considered.  Did you
11:00:12 19   consider that you would disclose to some witnesses that
11:00:14 20   you were a private investigator and not to others?
11:00:17 21         A.  No.
11:00:19 22         Q.  Do you typically disclose a circumstance
11:00:22 23   when you are acting on behalf of an attorney or a law
11:00:28 24   firm?
11:00:39 25         MS. LOUIS:  Object to form of the

---

84

11:00:29  1   question.
11:00:30  2         A.  It depends on the circumstances.
11:00:32  3         Q.  (BY MS. LUKEY)  Under what circumstances
11:00:33  4   do you disclose that you are acting as an agent of a
11:00:36  5   lawyer or law firm?
11:00:43  6         A.  Again, when I believe it is appropriate
11:00:45  7   and doesn't do damage to my client's case.
11:00:48  8         Q.  So as long as you are of the belief that
11:00:50  9   it will not damage your client's case and would
11:00:53 10   otherwise be appropriate, you typically do tell the
11:00:56 11   interviewees that you're acting on behalf of a lawyer
11:00:59 12   or a law firm; is that right?
11:01:02 13         A.  I do often, but not typically.  More often
11:01:05 14   than not.
11:01:07 15         Q.  In -- well, I was about to ask you the
11:01:09 16   distinction between your criminal and civil cases, but
11:01:11 17   let me ask you first what is your typical breakdown of
11:01:17 18   criminal cases versus civil cases?
11:01:19 19         A.  Again, it varies from year to year, and
11:01:22 20   there's a lot of gray area because the civil cases I
11:01:29 21   work are often butting up against criminal matters.
11:01:32 22   But as a general theme, 50/50.
11:01:35 23         Q.  In those 50 percent of the cases,
11:01:37 24   approximately, that you are doing civil cases, in what
11:01:40 25   percentage of the cases do you disclose that you're a

---

scheduling@huntergeist.com          HUNTER + GEIST, INC.          303-832-5966/800-525-8490

Beltran v. Interexchange, Inc.                    DAVID KEIL                              7/21/2016

---

85

11:01:43  1    private investigator?
11:01:43  2         A.  I don't think I could break it down on a
11:01:48  3    case-by-case basis.  It's more on an individual basis.
11:01:51  4         Q.  Well, what is your -- your default
11:01:53  5    position?  Is it I will tell them I'm a private
11:01:56  6    investigator, but for certain circumstances, or is it
11:01:59  7    I'm not going to tell them I'm a private investigator
11:02:02  8    unless certain circumstances attach?
11:02:05  9         A.  My default position when I possess enough
11:02:08 10    information to be confident is to disclose.
11:02:12 11         Q.  I understand that you can't give us an
11:02:13 12    exact breakdown, sir, but can you tell us at least
11:02:17 13    approximately how often you disclose to witnesses whom
11:02:19 14    you call that you are a private investigator?
11:02:24 15         MS. LOUIS:  Object to form.
11:02:26 16         A.  70 percent of the time.
11:02:29 17         Q.  (BY MS. LUKEY)  Okay.  So more often than
11:02:30 18    not you do disclose; is that correct?
11:02:32 19         A.  More often than not.
11:02:33 20         Q.  And, again, with regard to civil cases,
11:02:36 21    what is your best estimate as to the percentage of the
11:02:39 22    cases in which you disclose that you are calling on
11:02:42 23    behalf of an attorney or a law firm?
11:02:48 24         A.  Again, probably more often than not.
11:02:53 25         Q.  As much as 70 percent, as in the other

---

86

11:02:54  1    case?
11:02:55  2         A.  Yes, as much as.
11:02:58  3         Q.  So approximately a little more than
11:03:00  4    two-thirds of the time it is your practice to disclose
11:03:03  5    that you're a private investigator working for an
11:03:05  6    attorney or law firm, and the remaining one-third plus
11:03:09  7    of the time you do not do so because of the factors you
11:03:14  8    enumerated, type of the case, type of the witness, or
11:03:17  9    detriment to the job; is that right?
11:03:18 10         A.  Yes.
11:03:18 11         MS. LOUIS:  Object to the form of the
11:03:19 12    question.
11:03:20 13         Q.  (BY MS. LUKEY)  Okay.  Now, when you set
11:03:22 14    out to start your calls in this instance, did you have
11:03:27 15    a written script or an online electronic script from
11:03:32 16    which you were working?
11:03:33 17         A.  No.
11:03:35 18         Q.  And I believe you said this earlier, but
11:03:37 19    as you proceeded, did you take any notes apart from
11:03:41 20    what you were typing into the computer?
11:03:43 21         A.  No.
11:03:43 22         Q.  Did you retain any of those notes in that
11:03:47 23    form even after you had created the memo?
11:03:51 24         A.  I kept no notes other than the continuing
11:03:55 25    memo that I was keeping.

---

87

11:03:58  1         MS. KOZAL:  I'm sorry, I didn't hear
11:03:59  2    you.
11:04:00  3         THE DEPONENT:  I kept absolutely no notes
11:04:02  4    other than the continuing electronic memo that I was
11:04:04  5    creating.
11:04:05  6         Q.  (BY MS. LUKEY)  Now, when Mr. Hood told
11:04:06  7    you the universe of the companies that you were to
11:04:10  8    call, and I think you said you believed it to be
11:04:13  9    somewhere between 10 and 20; is that right?
11:04:17 10         A.  Yes.
11:04:17 11         Q.  Did you write those down?
11:04:18 12         A.  I don't recall whether I wrote them
11:04:20 13    down -- obviously, I had a list.  I don't recall when I
11:04:25 14    created that list or how I created that list.  I
11:04:29 15    certainly had one, and I was aware that there was a
11:04:31 16    couple of companies that I probably -- that I knew I
11:04:34 17    could not call.  So I was working from a list, but I
11:04:39 18    don't recall.
11:04:41 19         Q.  Why were there companies that you could
11:04:42 20    not call?
11:04:43 21         A.  Mr. Hood had made me aware that there were
11:04:45 22    companies that were represented by counsel, and I know
11:04:49 23    from previous practice that as an investigator, I can't
11:04:53 24    contact anyone who's represented by counsel.  So I know
11:04:56 25    that I had a list, and I recall that there were one or

---

88

11:04:59  1    possibly two names that I had crossed out as do not
11:05:03  2    call.  But the circumstances of the list I don't
11:05:08  3    remember.
11:05:08  4         Q.  Did you understand that they had counsel
11:05:10  5    in litigation?
11:05:12  6         A.  I did not know whether they had counsel in
11:05:15  7    litigation regarding this matter, no.
11:05:20  8         Q.  But you understood that there were two
11:05:23  9    companies that were represented by counsel with regard
11:05:27 10    to the subject matter that you were inquiring about?
11:05:30 11         MS. LOUIS:  Object to form.
11:05:31 12         A.  No.
11:05:32 13         THE DEPONENT:  Excuse me.
11:05:32 14         A.  I don't know that.  I just know -- and
11:05:35 15    this is common practice in my -- in my profession.
11:05:38 16    Attorneys will often say, "This person is represented."
11:05:43 17    And that's understood to mean you don't speak to them.
11:05:46 18    And I didn't ask any additional questions.  That's
11:05:49 19    usually enough to warn me away from them.
11:05:53 20         Q.  (BY MS. LUKEY)  Do you understand, sir,
11:05:54 21    that the -- the rules that relate to avoiding contact
11:05:58 22    with those who are represented are rules about
11:06:03 23    representation in the specific matter at issue?
11:06:05 24         A.  No.  I've not -- I don't know that
11:06:09 25    specifically, no.

---

scheduling@huntergeist.com              HUNTER + GEIST, INC.              303-832-5966/800-525-8490

Beltran v. Interexchange, Inc.                          DAVID KEIL                                    7/21/2016

---

89

| 11:06:10 | 1 | Q. Did you make any effort to ascertain |
| 11:06:12 | 2 | whether any of these companies had in-house general |
| 11:06:16 | 3 | counsel? |
| 11:06:17 | 4 | A. No. |
| 11:06:17 | 5 | Q. Would you consider that to be a |
| 11:06:19 | 6 | circumstances in which a company is represented by |
| 11:06:21 | 7 | counsel? |
| 11:06:22 | 8 | MS. LOUIS: Object to form. |
| 11:06:24 | 9 | A. I was simply informed not to call two |
| 11:06:28 | 10 | companies who were represented. I think it was two. |
| 11:06:31 | 11 | Who were or may be represented by counsel. I took that |
| 11:06:34 | 12 | at face value and I didn't pursue it further. |
| 11:06:38 | 13 | Q. (BY MS. LUKEY) You did not infer from |
| 11:06:39 | 14 | that that this was a matter in litigation, sir? |
| 11:06:42 | 15 | A. I infer, as I said earlier, that |
| 11:06:44 | 16 | everything I do might potentially someday become part |
| 11:06:47 | 17 | of litigation. I know that to be the case. |
| 11:06:50 | 18 | Q. With regard, sir, to the maintaining of |
| 11:06:53 | 19 | notes regarding your work, is that required by the code |
| 11:06:56 | 20 | applicable to private investigators? |
| 11:06:58 | 21 | A. Not to my knowledge, no. |
| 11:07:00 | 22 | Q. Does accepted industry practice require |
| 11:07:02 | 23 | that an investigator maintain notes? |
| 11:07:05 | 24 | A. No. My understanding and my practice is |
| 11:07:08 | 25 | that I take direction on issues of work product and |

---

90

| 11:07:14 | 1 | privilege from counsel. And in my case, I work for a |
| 11:07:18 | 2 | lot of different lawyers, and I have learned over the |
| 11:07:21 | 3 | years that every lawyer has a different opinion on |
| 11:07:25 | 4 | investigator and work product and notes. It's as |
| 11:07:29 | 5 | different as fingerprints. So I -- I don't have a |
| 11:07:34 | 6 | general practice. |
| 11:07:36 | 7 | Q. So you have to know what the particular |
| 11:07:38 | 8 | lawyer or law firm who has retained you wishes you to |
| 11:07:41 | 9 | do? |
| 11:07:41 | 10 | A. And when I don't know that, I err on the |
| 11:07:44 | 11 | side of caution and I don't create notes that I haven't |
| 11:07:48 | 12 | been requested to create. |
| 11:07:50 | 13 | Q. In this instance, sir, did you have any |
| 11:07:53 | 14 | guidance or instruction as to maintaining notes, |
| 11:07:57 | 15 | retaining notes, or anything of that nature? |
| 11:07:59 | 16 | A. The electronic log that I was keeping was |
| 11:08:05 | 17 | consistent with my understanding of the task at hand, |
| 11:08:08 | 18 | and I did not maintain any additional notes beyond |
| 11:08:12 | 19 | that. |
| 11:08:14 | 20 | Q. And when you're -- |
| 11:08:14 | 21 | MS. KOZAL: I'm sorry, I didn't hear you. |
| 11:08:16 | 22 | THE DEPONENT: I'm sorry. |
| 11:08:18 | 23 | MS. KOZAL: It's okay. I just -- |
| 11:08:18 | 24 | MS. LUKEY: He did not maintain any notes |
| 11:08:19 | 25 | beyond that. |

---

91

| 11:08:20 | 1 | Q. (BY MS. LUKEY) You're going to have to |
| 11:08:21 | 2 | keep your voice up, sir. |
| 11:08:22 | 3 | A. I'm -- I'm very sorry. I'm hoarse today. |
| 11:08:24 | 4 | I kept a running, as I mentioned, computer log, which |
| 11:08:29 | 5 | is something that I do often. But because I had no |
| 11:08:31 | 6 | specific instructions to create other notes or maintain |
| 11:08:33 | 7 | other notes, I did not. |
| 11:08:35 | 8 | Q. That running computer log, does it still |
| 11:08:38 | 9 | exist, sir? |
| 11:08:39 | 10 | A. No. I -- well, I don't have a copy of it. |
| 11:08:48 | 11 | So I don't know if it exists beyond me, but I do not |
| 11:08:50 | 12 | have a copy of it. |
| 11:08:52 | 13 | Q. Well, who would have a copy of it, if |
| 11:08:53 | 14 | anyone? |
| 11:08:54 | 15 | A. I sent a copy to Mr. Hood as my client, |
| 11:08:56 | 16 | and as is often the case, I did not retain a copy. |
| 11:09:01 | 17 | Q. What you sent to Mr. Hood that has been |
| 11:09:04 | 18 | described as a memorandum, is that the same document |
| 11:09:07 | 19 | that you're referring to now as the electronic log? |
| 11:09:10 | 20 | A. I can't tell you how it's been referred to |
| 11:09:11 | 21 | in this case. I haven't been privy to that. But I |
| 11:09:15 | 22 | created a single document as a running -- I don't know |
| 11:09:20 | 23 | if memorandum's the right word, but a running |
| 11:09:24 | 24 | documentation of the interviews. As I stated earlier |
| 11:09:27 | 25 | when it was complete, it was checked for grammar, |

---

92

| 11:09:30 | 1 | spelling, and clarity, and it was forwarded to |
| 11:09:33 | 2 | Mr. Hood. |
| 11:09:34 | 3 | Q. All right. So you did not create a |
| 11:09:35 | 4 | separate memorandum, what you did was to clean up your |
| 11:09:39 | 5 | running log of your interviews and forward it in that |
| 11:09:43 | 6 | form to Mr. Hood? |
| 11:09:45 | 7 | A. Yes. |
| 11:09:45 | 8 | Q. Is that right? |
| 11:09:46 | 9 | A. Yes. |
| 11:09:47 | 10 | Q. And that would show, for example, the |
| 11:09:48 | 11 | dates on which the calls were made? |
| 11:09:52 | 12 | A. I don't know. It could, but I don't know |
| 11:09:54 | 13 | for a fact. |
| 11:09:55 | 14 | Q. Do you have a practice of either dating or |
| 11:09:57 | 15 | not dating your notes of calls? |
| 11:10:01 | 16 | A. As a general rule I would date. |
| 11:10:04 | 17 | Q. Okay. Did you do anything other than |
| 11:10:05 | 18 | clean up the grammar before sending your running |
| 11:10:09 | 19 | electronic log of your notes of calls to Mr. Hood? |
| 11:10:11 | 20 | A. I -- I am notoriously bad at spelling, so |
| 11:10:17 | 21 | I ran it through spell check many times. |
| 11:10:21 | 22 | Q. Anything other than that? |
| 11:10:21 | 23 | A. No. |
| 11:10:22 | 24 | MS. LUKEY: Counsel, again, I'm going to |
| 11:10:24 | 25 | call on you. This is an electronic running log of the |

---

23 (Pages 89 to 92)

Beltran v. Interexchange, Inc.                    DAVID KEIL                              7/21/2016

---

93

11:10:27  1   factual matters of his investigation.  I would prefer
11:10:29  2   not to have to reconvene this deposition.  I ask you to
11:10:33  3   reconsider your position.
11:10:33  4         MS. LOUIS:  I know.  I understand.  And I
11:10:35  5   understand that that's the characterization that he's
11:10:37  6   given now.  I'm going to repeat that having much more
11:10:41  7   proximately seen, reviewed, analyzed, and researched
11:10:43  8   the document, we're going to maintain the privilege.
11:10:47  9         MS. LUKEY:  Well, you know our position.
11:10:48  10        MS. LOUIS:  Yes.
11:10:49  11        Q.  (BY MS. LUKEY)  Sir, is there anything in
11:10:53  12  your possession now, any note, document, or other
11:10:59  13  memorialization of your work that you still have in
11:11:03  14  your possession, custody, or control?
11:11:06  15        A.  No.  Possibly a billing statement.
11:11:09  16        Q.  I was just going to ask you about that.
11:11:10  17  You do send bills, I assume?
11:11:12  18        A.  I do.
11:11:13  19        Q.  Okay.  And do the bills -- well, first,
11:11:15  20  was your arrangement by the hour, as you were
11:11:18  21  describing to us earlier?
11:11:19  22        A.  Yes.
11:11:19  23        Q.  So when you sent -- did you send one bill
11:11:23  24  or more than one bill?
11:11:25  25        A.  I don't recall.

---

94

11:11:25  1         Q.  When you sent the bill or bills to Towards
11:11:27  2   Justice for your work, did it recite the number of
11:11:30  3   hours that you had worked?
11:11:32  4         A.  Typically, yes.
11:11:33  5         Q.  All right.  So the bill would have,
11:11:37  6   presumably, a date for the service?
11:11:39  7         A.  Presumably, yes.
11:11:40  8         Q.  Did it describe the service?
11:11:42  9         A.  Typically, in a very generic sense.
11:11:44  10        Q.  And then it would have a time on that
11:11:47  11  particular task?
11:11:48  12        A.  Yes.
11:11:48  13        Q.  Do you maintain copies of your bills?
11:11:52  14        A.  I'm sorry?  Do I?
11:11:53  15        Q.  Do you maintain copies of your bills?
11:11:55  16        A.  I do keep, maintain copies of my bills.
11:11:58  17        MS. LUKEY:  Counsel, I suggest that our
11:11:59  18  subpoena extends to the bills, and we don't have them.
11:12:06  19        MS. LOUIS:  I will look at the subpoena
11:12:08  20  response and -- or if you can direct me to where you
11:12:11  21  feel that that was responsive and we can talk about it
11:12:14  22  off the -- at the next break.
11:12:15  23        MS. LUKEY:  All right.  Well, I'm --
11:12:15  24        MS. LOUIS:  I don't know the answer.
11:12:16  25        MS. LUKEY:  I'm not going to stop

---

95

11:12:17  1   questioning now.
11:12:17  2         MS. LOUIS:  No.
11:12:18  3         MS. LUKEY:  But someone will check or I
11:12:20  4   will check later on that and see if we can work that
11:12:22  5   out.
11:12:23  6         MS. LOUIS:  Yeah.
11:12:23  7         Q.  (BY MS. LUKEY)  What about the budget that
11:12:25  8   you mentioned, is that in writing?
11:12:27  9         A.  No.  Other than -- no.  As I say, other
11:12:33  10  than it's reflected in the bill at some point.
11:12:35  11        Q.  All right.  What was the amount of your
11:12:36  12  budget?
11:12:37  13        A.  I don't recall.
11:12:39  14        Q.  Can you give us even an approximation of
11:12:41  15  the amount of your budget?
11:12:46  16        A.  No.  I'm afraid at this point I can't.
11:12:50  17        Q.  Well, how will you know if you've exceeded
11:12:52  18  your budget?
11:12:53  19        A.  Well, in real time I would have known.
11:12:55  20  But I don't know now.
11:12:56  21        Q.  Was the budget simply for the assigned
11:12:58  22  tasks relating to the calls, or was it a longer term
11:13:02  23  budget?
11:13:03  24        A.  I'm sorry, can you rephrase that?
11:13:06  25        Q.  Did the budget upon which you agreed with

---

96

11:13:08  1   Mr. Hood relate to the assignment of making the calls
11:13:12  2   and reporting back the results alone, or did it relate
11:13:16  3   to more than that?
11:13:18  4         A.  Typically when I budget with clients, and
11:13:21  5   I can't recall specifically with Mr. Hood, but
11:13:23  6   typically I -- we create a budget of time, X amount of
11:13:31  7   hours, and if there are investigative costs, an
11:13:35  8   estimate of those costs.  Generally speaking, I am
11:13:39  9   trusting counsel to know how much time -- to tell me
11:13:44  10  what the tasks are and estimate how much time it is.
11:13:47  11  In this case, I don't recall that there were any other
11:13:50  12  tasks for me -- before me other than phone calls.
11:13:55  13        Q.  Did Mr. Hood estimate for you the amount
11:13:57  14  of time that he anticipated should be encompassed in
11:14:00  15  the task of making these calls?
11:14:02  16        A.  I don't recall.
11:14:05  17        Q.  Can you tell us whether we're talking in
11:14:07  18  the range of 2 hours, 10 hours, 20 hours?
11:14:10  19        A.  We're probably talking in the range of 5
11:14:12  20  to 15 hours, 5 to 10 hours.
11:14:15  21        Q.  Okay.  And you mentioned that you were
11:14:17  22  calling somewhere between 10 and 20 companies, right?
11:14:20  23        A.  Yes.
11:14:20  24        Q.  Okay.  Let's talk about those calls.  As I
11:14:23  25  understood your earlier testimony, you were not

---

24 (Pages 93 to 96)

Beltran v. Interexchange, Inc.          DAVID KEIL                    7/21/2016

97

11:14:25 1    provided with the names of individuals to contact; is
11:14:28 2    that right?
11:14:29 3         A.  That's correct.
11:14:29 4         Q.  And in your research to prepare for the
11:14:33 5    calls, did you seek to identify the names of specific
11:14:36 6    individuals or specific positions held within the
11:14:38 7    company, or did you just call into a number for the
11:14:42 8    companies?
11:14:42 9         A.  I --
11:14:43 10        MS. LOUIS:  Object to form.
11:14:44 11        A.  I called into the number publicly
11:14:48 12   available for the company.
11:14:49 13        Q.  (BY MS. LUKEY)  How did you determine
11:14:50 14   those public numbers?
11:14:51 15        A.  I believe through a search of the
11:14:54 16   Internet.
11:14:56 17        Q.  Would you typically go to a website, for
11:14:58 18   example, for a company and look for a phone number or a
11:15:01 19   "Contact Us" link?
11:15:06 20        A.  That's possible, yes.
11:15:07 21        Q.  Do you recall whether the numbers you
11:15:09 22   called included 800 numbers?
11:15:11 23        A.  I do not recall.
11:15:17 24        Q.  When checking the websites, did you use
11:15:19 25   those to try to find a person or a title, a position of

98

11:15:23 1    the person you wanted to call?
11:15:25 2         A.  No.
11:15:26 3         Q.  Okay.  Was it your goal to reach someone
11:15:31 4    other than a phone operator or a call center?
11:15:35 5         A.  Yes.
11:15:35 6         Q.  What was your objective in that regard?
11:15:37 7         A.  My objective was to find someone with a
11:15:43 8    working knowledge of what they were talking about that
11:15:46 9    impressed me as -- as being knowledgeable, and once I
11:15:51 10   determined someone was knowledgeable and the
11:15:54 11   conversation proceeded, I was hoping to find someone
11:15:57 12   with a title or job description that indicated that
11:16:01 13   they were in an executive capacity of some sort.
11:16:05 14        Q.  Why did you care whether the information
11:16:07 15   came to you from someone in an executive capacity of
11:16:11 16   some sort?
11:16:12 17        A.  Based on 30 years of experience of
11:16:16 18   interviewing people in civil litigation.
11:16:18 19        Q.  Well, what did you understand, based on
11:16:20 20   your 30 years of experience in civil litigation, to be
11:16:23 21   the import of the person having an executive capacity
11:16:29 22   position?
11:16:29 23        A.  I'm looking in the context of these calls
11:16:32 24   for someone who was knowledgeable and had specific
11:16:37 25   information that I could rely on to be true.  And so my

99

11:16:41 1    experience is that someone who has a long tenure with
11:16:44 2    the company and has risen to an executive position is
11:16:48 3    likely to not only have the best facts, but, also,
11:16:52 4    those facts will not be in dispute later.
11:16:56 5         Q.  Were you seeking to get someone in a
11:16:58 6    position who was high enough within the hierarchy that
11:17:01 7    their statements would be binding on the company?
11:17:05 8         MS. LOUIS:  Object to the form.
11:17:06 9         A.  I can't say that that was part of my
11:17:09 10   thought process.
11:17:10 11        Q.  (BY MS. LUKEY)  You were not seeking any
11:17:12 12   particular level for purposes of binding the entities
11:17:16 13   you were calling; is that correct?
11:17:18 14        A.  No.
11:17:18 15        MS. LOUIS:  Object to the form.
11:17:19 16        A.  I would say the opposite is true.  I was
11:17:21 17   seeking a minimum -- a minimal level of authority and
11:17:24 18   knowledge to know that I could rely on that information
11:17:29 19   to be true and consistent throughout the company.
11:17:32 20        Q.  (BY MS. LUKEY)  You wanted someone in an
11:17:33 21   executive capacity, but at a minimal level within that
11:17:36 22   capacity?
11:17:38 23        A.  Let me -- let me answer it this way.  If I
11:17:42 24   was speaking with someone who clearly was a low-level
11:17:48 25   employee who didn't know how to answer basic questions,

100

11:17:51 1    I would ask them, "How long have you been with the
11:17:53 2    company?  What's your experience there?  What's your
11:17:56 3    job title?"  And if I didn't feel that it was someone
11:18:02 4    who possessed enough knowledge to be a credible
11:18:06 5    witness, I ended those calls.
11:18:10 6         Q.  Did you ask each of the people you called
11:18:13 7    what their titles were?
11:18:15 8         A.  I asked everyone whom I got to the
11:18:20 9    completion of a phone call, and I believe there were
11:18:22 10   three that I took all the way to a conclusion, and,
11:18:27 11   yes, I did ask each of those people for their
11:18:30 12   job -- for their job title.
11:18:32 13        Q.  Did you do that in some fashion that
11:18:34 14   wouldn't give away why you were calling?
11:18:36 15        A.  No.  I asked it directly, and they
11:18:38 16   answered it directly.
11:18:41 17        Q.  Is it only three companies as to whom you
11:18:43 18   got to an end point?
11:18:45 19        A.  I conducted a number of interviews.  There
11:18:53 20   were, to the best of my recollection, three companies
11:18:56 21   whom -- or three phone calls.  I can't say three
11:18:59 22   companies -- three phone calls that I felt answered my
11:19:07 23   questions thoroughly.
11:19:08 24        Q.  How many other companies did you contact
11:19:12 25   other than those three?

Beltran v. Interexchange, Inc.                    DAVID KEIL                                  7/21/2016

---

101

11:19:13  1        A.   At some point I contacted virtually
11:19:17  2   everyone on my list that I, again, did not believe was
11:19:19  3   represented by counsel.  In some cases I got only small
11:19:26  4   amounts of information because I didn't believe the
11:19:29  5   person possessed any more than that.  In some cases I
11:19:34  6   ended the phone call because I didn't feel I could
11:19:40  7   adequately ask the questions without somehow
11:19:44  8   misrepresenting myself, which was my first goal, not to
11:19:46  9   do that.  So the calls in which I was able to freely
11:19:51 10   answer questions, I felt they freely answered questions
11:19:55 11   and that they were knowledgeable enough to do that I
11:19:57 12   think ended in three, maybe four phone calls.
11:20:01 13        Q.   And as to all of the others, you were
11:20:03 14   unable to get to that point?
11:20:05 15        A.   I was unable to get to that point.  Or I
11:20:08 16   was unable to reach somebody who could get me to that
11:20:11 17   point.
11:20:12 18        Q.   All right.  Where did you -- from what
11:20:14 19   source or location did you make these calls?  Where
11:20:18 20   were you physically situated?
11:20:20 21        A.   Physically situated in my typical work
11:20:22 22   space in Colorado.
11:20:23 23        Q.   Okay.  So you were making the calls from
11:20:25 24   your office?
11:20:26 25        A.   Yes.

---

102

11:20:26  1        Q.   Were you using a cell phone or a business
11:20:29  2   phone?
11:20:29  3        A.   Cell phone.
11:20:30  4        Q.   From what number were you placing the
11:20:32  5   calls?
11:20:33  6        A.   I was -- as a general practice, whenever I
11:20:38  7   make calls to nonclients, to anyone in a case who is
11:20:41  8   not a client, I block the caller ID from my phone, and
11:20:47  9   I do that, again, for safety purposes.  It's just a
11:20:50 10   habit.  So the phone number, to the -- as a general
11:20:54 11   rule -- I can't say it's 100 percent of the time.  As a
11:20:57 12   general rule, the phone number that I'm calling from
11:21:01 13   does not appear on . . .
11:21:02 14        MS. KOZAL:  Does not what?
11:21:03 15        THE DEPONENT:  Does not appear to the
11:21:04 16   caller.
11:21:05 17        Q.   (BY MS. LUKEY)  Given that those calls
11:21:06 18   will show up within phone bills or messages that are
11:21:10 19   coming in through a vendor supplier, can you tell us
11:21:13 20   what number you were using?
11:21:14 21        A.   I was using the number listed on my --
11:21:17 22   listed in my professional literature.
11:21:20 23        Q.   In your website, sir?
11:21:21 24        A.   Yes.  Correct.
11:21:22 25        Q.   Let's see if we can find it.  It would

---

103

11:21:25  1   be -- it'd probably be easier if you just tell us what
11:21:28  2   it is.  Do you know what it is?
11:21:29  3        A.   I do.  303-916-1376.
11:21:37  4        Q.   To your memory, did you use any other
11:21:41  5   phone than that one when you placed these calls?
11:21:45  6        A.   I don't believe so.
11:21:49  7        Q.   Did --
11:21:50  8        A.   It's possible, but I don't believe so.
11:21:52  9        Q.   As you can imagine, efforts have been made
11:21:54 10   to identify whether calls came in.  Is there any other
11:21:58 11   number within the state of Colorado that you can
11:22:01 12   remember placing a call from?
11:22:03 13        A.   No.
11:22:04 14        Q.   Do you remember whether you ever placed
11:22:06 15   any calls from Towards Justice or any other law firm or
11:22:11 16   not for profit in this matter?
11:22:12 17        A.   No.
11:22:14 18        Q.   You did not?
11:22:14 19        A.   I did not.
11:22:15 20        Q.   Okay.  Did you have an order in mind when
11:22:20 21   you were placing the calls to these companies?
11:22:21 22        A.   No.
11:22:23 23        Q.   So how did you determine whom you would
11:22:25 24   call in what order?
11:22:26 25        A.   It -- for lack of a better term, it was

---

104

11:22:29  1   random.  I don't know -- I don't recall how I created
11:22:32  2   the list, but I went from top to bottom.  And, again,
11:22:36  3   top to bottom or bottom to top.  It was literally a
11:22:41  4   random process.
11:22:42  5        Q.   Did you take into account time zones?
11:22:45  6        A.   No, actually.  I should have, but no, I
11:22:47  7   did not.
11:22:48  8        Q.   Okay.  Did you record any of these calls?
11:22:52  9        A.   I did not.
11:22:53 10        Q.   Did you have anyone present with you while
11:22:56 11   you made any of these calls?
11:22:57 12        A.   No.
11:22:58 13        Q.   Did you have anyone on other lines when
11:23:01 14   you were making these calls?
11:23:01 15        A.   No.
11:23:04 16        Q.   And in terms of what you did during the
11:23:06 17   calls, you were taking notes on the computer; is that
11:23:08 18   right?
11:23:09 19        A.   Yes.
11:23:10 20        Q.   But you were not taking verbatim notes?
11:23:13 21        A.   I'm not a stenographer.
11:23:15 22        Q.   Well, can you give us some sense of how
11:23:17 23   complete you attempted to make the responses in terms
11:23:21 24   of the words used by your interviewees?
11:23:24 25        A.   In places where I was attempting to quote

---

scheduling@huntergeist.com          HUNTER + GEIST, INC.          303-832-5966/800-525-8490

Beltran v. Interexchange, Inc.                    DAVID KEIL                          7/21/2016

---

105

11:23:30  1   them as best I could, I made reference to -- to that.
11:23:34  2   But it was a small number of places where I attempted
11:23:39  3   to quote them directly or more or less directly.  It
11:23:43  4   was a very small number.
11:23:44  5       Q.   You're going to have to keep your voice
11:23:46  6   up, sir.
11:23:47  7       A.   Sorry.
11:23:48  8       Q.   When you made the determination that you
11:23:49  9   were trying to quote them more or less directly, did
11:23:52 10   you put those phrases in quotation marks?
11:23:56 11       A.   I don't recall.
11:23:58 12       Q.   How, if at all, did you attempt to
11:24:00 13   designate the instances where you were trying to use
11:24:03 14   the interviewee's words?
11:24:05 15       A.   If it was a brief, on-the-point statement
11:24:11 16   and if I was able to in that moment accurately reflect
11:24:15 17   it correctly, I would likely have put quotes.  If I
11:24:19 18   didn't feel comfortable that I was able to quote them
11:24:21 19   directly while at the same time talking to them and
11:24:24 20   typing, which I'm not as good as our court reporter, I
11:24:28 21   would likely not have used quotes and I might have
11:24:31 22   somehow referred to this as a, you know, paraphrase of
11:24:36 23   their statement.
11:24:37 24       Q.   Okay.  Were you on a speakerphone so that
11:24:40 25   you could type while you were talking?

---

106

11:24:44  1       A.   Sometimes.
11:24:46  2       Q.   If you were not on a speakerphone, were
11:24:48  3   you using earphones?
11:24:50  4       A.   Hands free.  Hands free sometimes.
11:24:51  5       Q.   Yes.  Okay.  Were you concerned at all
11:25:00  6   about interviewees hearing the sound of the clicking of
11:25:04  7   keys?
11:25:04  8       A.   No.
11:25:05  9       Q.   Do you take any protective measures to
11:25:09 10   ensure that your keyboard is silent or quiet?
11:25:12 11       A.   It may just be my keyboard, but it doesn't
11:25:15 12   seem to make enough noise that it ever really occurs to
11:25:18 13   me.
11:25:19 14       Q.   So this was a desktop or laptop?
11:25:21 15       A.   It's an Apple laptop.
11:25:24 16       Q.   Before, sir, you engaged in the process of
11:25:28 17   making these calls, did you consult with counsel or
11:25:33 18   anyone else about the propriety of calls and the
11:25:37 19   methods you intended to use?
11:25:40 20       A.   Could you be more specific?
11:25:43 21       Q.   Sure.  Did you ask anybody, given that you
11:25:46 22   are operating on behalf of a law firm, what you could
11:25:50 23   say and what you could not say on these calls?
11:25:53 24       A.   No.
11:25:54 25       Q.   Did you ask anybody whether there was any

---

107

11:25:57  1   problem with you making these calls?  For example, an
11:26:00  2   ethical problem?
11:26:01  3       A.   No.  Other than I had been made aware that
11:26:04  4   there were certain entities I could not call for the
11:26:08  5   fact that they were represented by counsel, no.
11:26:09  6       Q.   Were you assuming that these calls related
11:26:14  7   to a matter in litigation?
11:26:16  8       MS. LOUIS:  Object to form.
11:26:17  9       A.   No.  I'll refer to my previous answer.  I
11:26:21 10   always assume it's a possibility in cases I've been
11:26:24 11   retained in, but I didn't know.
11:26:27 12       Q.   (BY MS. LUKEY)  Is it generally your
11:26:29 13   practice when you are retained in cases that are in
11:26:32 14   litigation to call opposite parties?
11:26:38 15       MS. LOUIS:  Object to form.  Could you
11:26:39 16   just read that back?  I'm sorry, I didn't understand.
11:26:42 17       THE DEPONENT:  Yes.
11:26:27 18       (The last question was read back as
11:26:27 19   follows:
11:26:27 20       "Is it generally your practice when you
11:26:32 21   are retained in cases that are in litigation to call
11:26:35 22   opposite parties?")
11:26:50 23       MS. LOUIS:  I'm sorry.  Withdraw the
11:26:52 24   objection.  I didn't hear it.
11:26:53 25       A.   No.

---

108

11:26:55  1       Q.   (BY MS. LUKEY)  In this matter, in which
11:26:58  2   you said you would generally assume if not otherwise
11:27:01  3   told that the matter was in litigation, did you have
11:27:04  4   any understanding as to the role of the companies you
11:27:08  5   were calling in that assumed litigation?
11:27:11  6       A.   Again, I had no direct knowledge that
11:27:13  7   there was litigation.  I -- my assumption was very
11:27:18  8   general, which is at some point, at some -- it's not
11:27:22  9   uncommon for me to interview someone and not see a
11:27:25 10   lawsuit for three or four or five years.  Sometimes
11:27:27 11   never.  So I respond to what I know at the time.  I had
11:27:33 12   no reason to believe that this case was in litigation
11:27:35 13   at that moment.  I had no reason to believe I couldn't
11:27:39 14   contact, to use your words, opposing parties, 'cause I
11:27:44 15   didn't know them to be opposing parties.
11:27:46 16       Q.   I just want to be sure I'm understanding
11:27:48 17   you, sir.  Did you or did you not assume that this was
11:27:51 18   a matter in litigation?
11:27:52 19       A.   I did not assume it was a matter in
11:27:53 20   litigation at that time, no.
11:27:55 21       Q.   Did you assume it was a matter that was
11:27:56 22   not in litigation at that time?
11:27:58 23       A.   I had no idea either way.
11:28:01 24       Q.   I believe you told us earlier that your
11:28:03 25   default belief or position is that it's in litigation

---

27 (Pages 105 to 108)

Beltran v. Interexchange, Inc.                    DAVID KEIL                                    7/21/2016

---

**109**

```
11:28:06   1   if you're retained --
11:28:08   2       A.  No.
11:28:08   3       Q.  -- and no one says anything.  Is that
11:28:09   4   wrong?
11:28:09   5       A.  I believe I said my default position is
11:28:12   6   that it may well sometime become litigation.  I work on
11:28:19   7   cases that are, for lack of a better term,
11:28:23   8   prelitigation, where firms hire me to do investigative
11:28:27   9   work that will then help them determine whether to file
11:28:32  10   suit.  That's a very common practice.  I don't have any
11:28:34  11   say in the matter, but my investigative work product
11:28:38  12   goes into that decision making.  So I couldn't say at
11:28:42  13   this moment whether this was a case destined for
11:28:44  14   litigation or not.
11:28:46  15       Q.  If, sir, you are aware that a matter is in
11:28:50  16   litigation and that an attorney is asking you to call
11:28:52  17   the opposing parties directly, will you do so?
11:28:57  18       A.  No.
11:28:59  19       Q.  So the only way you will call the opposing
11:29:02  20   parties in a matter in litigation is when you don't
11:29:04  21   know it's in litigation; is that right?
11:29:08  22       A.  Yes.
11:29:08  23       Q.  So in this case, when you made these calls
11:29:11  24   based upon your communications with your call with
11:29:14  25   Mr. Hood, you did not believe the matter to be in
```

---

**110**

```
11:29:17   1   litigation; is that right?
11:29:18   2       A.  I had no knowledge one way or the other.
11:29:21   3       Q.  As the calls were progressing, sir, and
11:29:24   4   you referred to the fact that you were detecting both a
11:29:28   5   pattern and the fact that this was labor related, did
11:29:33   6   it at some point occur to you that you were calling
11:29:38   7   opposing parties?
11:29:39   8       A.  No.  I wouldn't have characterized them in
11:29:42   9   that fashion, no.
11:29:44  10       Q.  How did you think they related to the
11:29:46  11   matter being handled by Mr. Hood and Towards Justice?
11:29:49  12       A.  Again, the term, I guess, I'm objecting to
11:29:52  13   is "opposing parties."  I had no reason to know or
11:29:56  14   believe that they were at that point opposing parties.
11:29:58  15       Q.  And if you had known, you would not have
11:30:00  16   called them; is that right?
11:30:01  17       A.  If I had been specifically told that these
11:30:05  18   parties are adverse in litigation, I would not have
11:30:09  19   called them.  And there were two parties that I had
11:30:12  20   been at least warned were represented, I didn't know in
11:30:16  21   what capacity, so I erred on the side of caution and
11:30:20  22   didn't contact them.  But I had no information one way
11:30:24  23   or the other with -- regarding the rest of that list.
11:30:28  24       Q.  Were you instructed not to call those two
11:30:30  25   parties, or did you just decide not to call them
```

---

**111**

```
11:30:32   1   because you were simply told they had representation?
11:30:34   2       A.  I was told they had representation.
11:30:36   3       Q.  You were not told that they were opposing
11:30:38   4   parties?
11:30:38   5       A.  I don't recall the conversation, but I
11:30:41   6   believe -- I believe that I went into that process
11:30:46   7   understanding that two of them were represented by
11:30:49   8   counsel, and using a shorthand layman's understanding
11:30:53   9   of that term, my understanding is you don't contact
11:30:57  10   those people.
11:30:59  11       Q.  That's what you -- that is your own
11:31:01  12   understanding, you do not contact people in litigation
11:31:03  13   who are represented by counsel, correct?
11:31:06  14       A.  Unless counsel has approved.
11:31:08  15       MS. LOUIS:  Object to form.
11:31:09  16       Q.  (BY MS. LUKEY)  Unless the counsel for the
11:31:10  17   other party has approved?
11:31:11  18       A.  Yes.
11:31:12  19       Q.  You mentioned that you would not call them
11:31:15  20   if you were specifically told that they were opposing
11:31:18  21   parties in litigation.  What if you infer from the
11:31:25  22   circumstances either at the beginning or over the
11:31:27  23   course of your assignment that it is opposing parties
11:31:32  24   in litigation, will you then stop the process?
11:31:37  25       A.  I have been told many, many times by very
```

---

**112**

```
11:31:42   1   smart attorneys that it's not my job to infer.
11:31:47   2       MS. FITZGERALD:  To what?
11:31:49   3       Q.  (BY MS. LUKEY)  It's not your job to what?
11:31:49   4       A.  To infer.  My job is to gather facts.  If
11:31:53   5   I do not know that a part -- a case is in litigation
11:31:56   6   and no one has told me a case is in litigation, I do
11:31:59   7   not infer one way or the other, I act on what I know
11:32:02   8   until I know something different.
11:32:05   9       Q.  Well, sir, don't you have certain ethical
11:32:09  10   obligations yourself in these circumstances where
11:32:13  11   you're investigating a matter in litigation?
11:32:15  12       A.  No.
11:32:16  13       Q.  So as far as you're concerned, it is
11:32:18  14   completely the responsibility of the attorney; is that
11:32:20  15   right?
11:32:21  16       A.  The -- the ethical standard is the
11:32:23  17   attorney's ethical standard.  There is no corresponding
11:32:28  18   standard, as I know it, in my professional code.  I try
11:32:33  19   to maintain the same ethical standards my attorney
11:32:37  20   clients are required to maintain, 'cause my job is to
11:32:40  21   act as their agent.  But I don't believe, to the best
11:32:44  22   of my knowledge, that there's any specific ethical
11:32:48  23   standard that applies to my profession on that topic.
11:32:51  24       Q.  Do you understand that you are the agent
11:32:52  25   of the attorney when you make these calls?
```

---

28 (Pages 109 to 112)

Beltran v. Interexchange, Inc.     **DAVID KEIL**     7/21/2016

---

### 113

11:32:56 1   A. I do.

11:32:58 2   **Q. Do you understand that if it is ethically**

11:33:00 3   **prohibited for the attorney to make such calls, you are**

11:33:04 4   **also prohibited from doing so?**

11:33:06 5   MS. LOUIS: Objection.

11:33:08 6   A. I do not know whether this was ethically

11:33:12 7   prohibited.

11:33:15 8   **Q. (BY MS. LUKEY) And you don't consider it**

11:33:17 9   **to be your responsibility to figure that out, right?**

11:33:23 10   A. I had no way of knowing whether this case

11:33:25 11   was subject to litigation. I had no way of knowing

11:33:29 12   whether these were opposing parties. The people I

11:33:35 13   spoke with, to the best of my knowledge, had no way of

11:33:37 14   knowing that this case was in litigation.

11:33:39 15   **Q. How do you know that?**

11:33:41 16   A. 'Cause I got the impression that -- well,

11:33:46 17   let me strike that. I didn't get anything from the --

11:33:48 18   from the conversation that led me to believe that this

11:33:51 19   was an issue they were familiar with. This was

11:33:55 20   just -- the folk -- the people I spoke with, there was

11:33:59 21   no indication coming from them that these conversations

11:34:02 22   should be off limits or off topic.

11:34:05 23   **Q. That what was an issue that they were**

11:34:08 24   **familiar with?**

11:34:09 25   A. Anything regarding these -- the questions

---

### 114

11:34:13 1   I was asking. So I was asking questions about how they

11:34:17 2   performed for their customer base and how those charges

11:34:23 3   were -- come about. At no point did anyone say

11:34:27 4   anything to me that set off a red flag that, oh, wait a

11:34:31 5   minute, these questions are off base. I had no reason

11:34:35 6   to believe that this was not -- that this was in some

11:34:37 7   sort of off-limits or litigation setting.

11:34:41 8   **Q. And if you had deduced or realized that,**

11:34:44 9   **you would have stopped making the calls; is that right?**

11:34:51 10   A. Yes.

11:34:52 11   **Q. Do you recall in total how many calls you**

11:34:54 12   **ended up making?**

11:34:55 13   A. No.

11:34:59 14   **Q. How many times did you make it past a call**

11:35:02 15   **center or operator?**

11:35:03 16   A. I don't know specifically that I spoke to

11:35:06 17   anyone in a call center or operator. I don't know that

11:35:08 18   for a fact.

11:35:09 19   **Q. Well, did you call 800 numbers, for**

11:35:12 20   **example, and somebody answers with the name of the**

11:35:15 21   **company?**

11:35:16 22   A. Sometimes, yes.

11:35:17 23   **Q. And when that happened, what did you do?**

11:35:19 24   A. I started asking questions.

11:35:21 25   **Q. Of the person who answered the 800 number?**

---

### 115

11:35:24 1   A. I usually said -- I usually started each

11:35:27 2   conversation with, "Hi, I'm interested in knowing more

11:35:30 3   about your services. Is there someone I can speak

11:35:33 4   with?"

11:35:35 5   **Q. Did you believe that they would assume**

11:35:36 6   **from that that you were a prospective customer, sir?**

11:35:40 7   A. No, I didn't suspect -- I didn't intend

11:35:43 8   that to sound like I was a prospective customer. I

11:35:46 9   intended it to sound like I was someone who was

11:35:48 10   interested in gathering information about their

11:35:51 11   organization.

11:35:53 12   MS. KOZAL: Speak up, please.

11:35:55 13   THE DEPONENT: Yeah. Sorry. I did not --

11:35:55 14   I do not believe that was intended to sound like a

11:35:57 15   customer. It was intended and it did sound as if I was

11:36:01 16   someone seeking information.

11:36:03 17   **Q. (BY MS. LUKEY) You don't think they would**

11:36:04 18   **infer that someone calling an 800 number from their**

11:36:07 19   **website saying, "Hi, I'm interested about your**

11:36:09 20   **services" --**

11:36:10 21   A. I didn't say that.

11:36:11 22   **Q. What did you say?**

11:36:12 23   A. I said specifically, "I'm interested in

11:36:14 24   finding out more about your services."

11:36:16 25   **Q. Okay. Let's use your phrase. When you**

---

### 116

11:36:18 1   say, "I'm interested in finding out more about your

11:36:21 2   services" to the person who answers the 800 number on

11:36:23 3   the website, you did not think that they would assume

11:36:26 4   that that meant you were a prospective customer?

11:36:29 5   A. What they assumed is -- is really not -- I

11:36:32 6   can't speak to what they assumed. That was not my

11:36:35 7   intent.

11:36:35 8   **Q. What -- what else would you expect someone**

11:36:38 9   **answering an 800 website number to believe when you**

11:36:42 10   **asked that question --**

11:36:44 11   A. I didn't --

11:36:44 12   **Q. -- than that you were a prospective**

11:36:46 13   **customer looking for customers?**

11:36:48 14   A. I --

11:36:49 15   MS. LOUIS: Object to form.

11:36:51 16   A. My belief was that they would either

11:36:53 17   answer the question or transfer me to someone with the

11:36:56 18   knowledge to answer the question.

11:36:56 19   **Q. (BY MS. LUKEY) Okay. And how many times**

11:36:57 20   **did you get transferred to someone after the initial**

11:37:03 21   **person answered the phone?**

11:37:04 22   A. It was a hodgepodge. There were some

11:37:09 23   people who appeared to be answering the phone directly.

11:37:12 24   There were some people who seemed to be answering the

11:37:14 25   phone from their homes. There was one call that stuck

---

29 (Pages 113 to 116)

Beltran v. Interexchange, Inc.                    DAVID KEIL                              7/21/2016

---

117

11:37:18  1    out where I spoke to someone who told me they were in
11:37:21  2    their home and then transferred me to a person who also
11:37:24  3    told me they were in their home. So it was a
11:37:27  4    hodgepodge. I can't characterize it as any one thing.
11:37:30  5         Q.  Did you do any research to ascertain the
11:37:33  6    size of these various companies before your calls?
11:37:35  7         A.  No.
11:37:36  8         Q.  Okay. Did you have knowledge from
11:37:39  9    information -- or information from any source of the
11:37:42  10   varying sizes of these companies?
11:37:44  11        A.  No.
11:37:46  12        Q.  Did you understand that some might, in
11:37:49  13   fact, be a mom-and-pop operation?
11:37:51  14        A.  I had no information either way.
11:37:54  15        Q.  Did it matter to you in terms of what you
11:37:57  16   would say to them and present yourself if you were
11:38:00  17   dealing with a sophisticated responder or a mom-and-pop
11:38:04  18   operation?
11:38:05  19        A.  I wouldn't -- I would take umbrage, as a
11:38:09  20   mom-and-pop organization, that we're not sophisticated.
11:38:11  21   No, it didn't enter into my thinking.
11:38:13  22        Q.  Would you expect a mom-and-pop operation
11:38:16  23   to have the same capacity for handling calls of this
11:38:20  24   nature as a large company?
11:38:23  25            MS. LOUIS:  Object to the form.

---

118

11:38:24  1         A.  I can't say that I gave that any thought
11:38:28  2    at all.
11:38:30  3         Q.  (BY MS. LUKEY)  All right. Which sponsors
11:38:32  4    did you have substantive conversations?
11:38:35  5         A.  This is strictly from memory. Europe Au
11:38:42  6    Pair. I'm sorry, these -- I may mangle these. The
11:38:44  7    names all sort of string together in my mind. API.
11:38:51  8         Q.  API. Was Europe Au Pair the first one?
11:38:55  9         A.  Europe Au Pair or EurAuPair. One was API,
11:38:59  10   and I can't remember what that stands for. And the
11:39:00  11   third was something Global.
11:39:08  12        Q.  You can't tell us from memory and you have
11:39:11  13   no notes reflecting who they were; is that right?
11:39:13  14        A.  I do not have any notes to reflect
11:39:16  15   my -- to recall my memory on that, no.
11:39:19  16        Q.  Did you make any effort before coming here
11:39:21  17   today to refresh your memory as to the identity of the
11:39:25  18   sponsors with whom you had more substantive
11:39:29  19   conversations?
11:39:30  20        A.  With -- yesterday with Ms. Louis, I did
11:39:33  21   see those names and did the best to my ability to try
11:39:38  22   to recall them correctly today, but I'm struggling with
11:39:42  23   the word salad of it, so I apologize.
11:39:46  24        Q.  I'm sorry, you're struggling with?
11:39:49  25        A.  They all have similar sounding names, and

---

119

11:39:51  1    it's causing me some confusion, so I apologize.
11:39:54  2         Q.  Okay. Are you able to tell us where in
11:39:56  3    the order or chronology of the calls it was that you
11:39:59  4    initially reached the company you refer to as Europe or
11:40:04  5    Euro Au Pair? Was it your first call, your fifth call
11:40:08  6    your eighth call?
11:40:11  7         A.  I can't recall.
11:40:11  8         Q.  To the best of your memory, are those
11:40:13  9    three, whatever their proper names may prove to be, the
11:40:17  10   only three whom you were able to reach someone and get
11:40:21  11   substantive answers to your questions?
11:40:23  12        A.  No.
11:40:23  13        Q.  Who else -- from whom else did you get
11:40:27  14   substantive answers to questions?
11:40:28  15        A.  There were a number of other organizations
11:40:30  16   who I received some substantive answers, but there
11:40:35  17   were -- those are the three companies specifically that
11:40:37  18   I felt comfortable answered my questions thoroughly,
11:40:42  19   all my questions in a manner that I felt confident I
11:40:45  20   could report to Mr. Hood on, and those are the three
11:40:49  21   companies that I ultimately reported on. The other
11:40:51  22   conversations for a myriad of reasons did not reach
11:40:55  23   their conclusion.
11:40:56  24        Q.  Can you tell us the names of each of the
11:40:59  25   other companies from whom you received some

---

120

11:41:02  1    information?
11:41:03  2         A.  I'm sorry, no, I can't.
11:41:04  3            MS. LUKEY:  Counsel, this is going to make
11:41:05  4    this a worthless deposition if we don't get to see his
11:41:08  5    running log. He has no memory, and we're trying to
11:41:11  6    find out. We each represent a different company. As
11:41:14  7    we sit here now, none of us, other than the
11:41:16  8    representatives of those three, once we get the names
11:41:20  9    clarified, can even know whether he's talking about our
11:41:24  10   clients. I mean, it makes a difference to us. You
11:41:27  11   know that.
11:41:28  12            MS. LOUIS:  I do. I under -- I understand
11:41:30  13   your position and I understand that we disagree on
11:41:33  14   this.
11:41:35  15            MS. KOZAL:  Perhaps we need to break and
11:41:38  16   talk about whether or not we need to call the judge. I
11:41:41  17   think we may be at that point.
11:41:43  18            MS. LUKEY:  Well, let's have that
11:41:44  19   discussion.
11:41:45  20        Q.  (BY MS. LUKEY)  I just want to be sure
11:41:47  21   before we break, you cannot tell us the name of any
11:41:50  22   other company from whom you obtained any substantive
11:41:53  23   information?
11:41:54  24        A.  Beyond the three I just attempted to name?
11:41:57  25        Q.  Correct.

---

scheduling@huntergeist.com              HUNTER + GEIST, INC.              303-832-5966/800-525-8490

**Beltran v. Interexchange, Inc.**     **DAVID KEIL**     **7/21/2016**

---

121

```
11:41:57   1      A.  Yes, that's correct.
11:41:58   2      Q.  If we had your electronic log that you
11:42:01   3   passed on to Mr. Hood, would the names be reflected of
11:42:05   4   each of the companies from whom you received some
11:42:08   5   substantive information?
11:42:09   6      A.  I don't believe they would, no.
11:42:11   7      Q.  Are you saying the electronic log only
11:42:14   8   includes information on the three from whom you got
11:42:18   9   answers to all your questions?
11:42:20  10      A.  I am -- I've not seen my electric
11:42:22  11   log -- electronic log in quite some time.  From my
11:42:26  12   memory, to answer your question, I do not believe it
11:42:30  13   would thoroughly answer the question you're seeking.
11:42:32  14      Q.  Whether it would thoroughly answer it or
11:42:35  15   not, did you list each of the calls where you reached
11:42:38  16   somebody?
11:42:39  17      A.  I believe the answer is no.
11:42:42  18      Q.  Where would any of us find out to whom you
11:42:46  19   spoke about any substantive information?  How are we
11:42:51  20   going to find out whether you spoke to any of our
11:42:53  21   particular clients?
11:42:56  22      A.  When I conducted this research, I
11:43:00  23   wasn't -- certainly wasn't planning on answering that
11:43:03  24   question.  And I did not, as we've discussed, keep
11:43:07  25   notes other than the notes that I turned over to
```

122

```
11:43:09   1   Mr. Hood.  That's -- that's the sum total of what I
11:43:12   2   have.
11:43:13   3      Q.  Okay.  Before we break, I'm just going to
11:43:14   4   take the liberty of asking about my client.  I
11:43:17   5   represent Cultural Care, Incorporated, doing business
11:43:20   6   as Cultural Care Au Pairs.  Did you speak to anyone at
11:43:24   7   my client?
11:43:26   8      A.  I can tell you they were on the list of
11:43:28   9   people I called.
11:43:29  10      Q.  Can you tell me whether you spoke to
11:43:32  11   anyone from my client?
11:43:33  12      A.  I cannot tell you the substance of the
11:43:35  13   conversations I may or may not have had with your
11:43:38  14   client, no.
11:43:39  15      Q.  Can you even tell me if you reached anyone
11:43:41  16   but the operator who answered the phone?
11:43:44  17      A.  I can tell you that I had conversations of
11:43:46  18   some sort with somebody from everybody on the list I
11:43:50  19   was working from.  But, no, I -- I do not have any
11:43:54  20   notes reflecting what those conversations were.
11:43:57  21      Q.  Can you from memory tell me whether you
11:44:00  22   had any conversation in which an answer was given to
11:44:03  23   you on any question by anyone at Cultural Care Au Pair?
11:44:11  24      A.  No.
11:44:13  25      MS. LUKEY:  All right.  Let's break.
```

123

```
11:44:14   1      THE VIDEOGRAPHER:  Going off the record.
11:44:15   2   The time is 11:43 a.m.
11:44:18   3      (Recess taken, 11:44 a.m. to 11:59 a.m.)
11:59:54   4      THE VIDEOGRAPHER:  We are back on the
11:59:55   5   record.  The time is 11:59 a.m.
12:00:00   6      Q.  (BY MS. LUKEY)  Mr. Keil, during the break
12:00:04   7   did you review any additional documents?
12:00:06   8      A.  I did not.
12:00:06   9      Q.  Okay.  I'm going to turn your attention to
12:00:08  10   the three entities that you identified, EurAuPair, API,
12:00:13  11   and you referred to Global, I believe you meant APF
12:00:16  12   Global.  Does that sound right?
12:00:17  13      A.  That sounds right, yes.
12:00:19  14      Q.  And I'm going to ask you about your memory
12:00:21  15   of those conversations.  Let's start with EurAuPair,
12:00:28  16   since you referenced them first.  Would you tell us,
12:00:30  17   please, how you first made contact with EurAuPair?
12:00:34  18      A.  I contacted all -- excuse me.  I made all
12:00:37  19   of the phone calls in the same manner, from the same
12:00:41  20   location, and I began each phone call the same way.  I
12:00:44  21   said, "I am calling 'cause I'd like to get some more
12:00:46  22   information about your company."
12:00:48  23      Q.  I'm sorry, I can't even hear you here.
12:00:51  24      A.  I'm very sorry.  I'm really struggling
12:00:53  25   with that today.
```

124

```
12:00:54   1      Q.  Sorry.
12:00:55   2      A.  I -- excuse me.  I made all of the phone
12:01:02   3   calls in the same manner from the same location, and I
12:01:05   4   began them all as close as possible with the same
12:01:09   5   statement, which was, "Hi, I'd like to speak with
12:01:13   6   someone.  I'd like to learn more about your
12:01:16   7   organization."  Or "more about your services."
12:01:20   8      Q.  Was it "more about your services" was the
12:01:22   9   language?
12:01:23  10      A.  Again, it evolved over time, and I can't
12:01:26  11   say that it was -- it was not scripted.  I didn't have
12:01:28  12   a script.  So it was not word for word each time.
12:01:32  13      Q.  In the case of EurAuPair, do you know with
12:01:35  14   whom you first spoke?
12:01:40  15      A.  I apologize, but I -- I don't -- if you
12:01:45  16   want to give me a name, I can tell you if I spoke to
12:01:47  17   that person, if it sounds familiar.  But I can't tell
12:01:50  18   you the name of the person I spoke to -- with from
12:01:53  19   memory.
12:01:53  20      Q.  Did you speak with more than one person at
12:01:56  21   EurAuPair?
12:01:57  22      A.  There was one entity where I spoke to
12:02:00  23   multiple people in multiple conversations.  I don't
12:02:02  24   know if that was EurAuPair.
12:02:05  25      Q.  Do you know what entity it was?
```

scheduling@huntergeist.com     **HUNTER + GEIST, INC.**     303-832-5966/800-525-8490

Beltran v. Interexchange, Inc.                     DAVID KEIL                          7/21/2016

---

125

```
12:02:06   1        A.  No.  Again, without something to refresh
12:02:10   2   my memory, no.
12:02:11   3        Q.  Do you have anything with which you can
12:02:13   4   refresh your memory?
12:02:15   5        A.  Could I -- could I refresh my memory with
12:02:18   6   the documents in front of me that I was showed
12:02:21   7   yesterday?
12:02:22   8        Q.  Well, that's Mr. Hood's declaration.  Do
12:02:25   9   you have any memory or any documents of your own?
12:02:27  10        A.  No.
12:02:29  11        Q.  So you're saying that you can't give us
12:02:32  12   any information from your memory, you would have to
12:02:35  13   refresh your memory by referencing Mr. Hood's
12:02:38  14   declaration?
12:02:38  15        A.  I -- no.  I -- I cannot --
12:02:40  16        MS. LOUIS:  Are you referring to both?
12:02:42  17        THE DEPONENT:  Yes.  Both.
12:02:44  18        A.  There are names that I recall.  There are
12:02:47  19   company names I recall.  I am having trouble recalling
12:02:51  20   which employee was with which company.
12:02:56  21        Q.  (BY MS. LUKEY)  I'm prepared to show you
12:03:01  22   the complaint, amended complaint, if that will help
12:03:04  23   you, but I have a little trouble refreshing your memory
12:03:09  24   with Mr. Hood's affidavit or declaration without
12:03:11  25   turning him into a witness.
```

---

126

```
12:03:13   1        A.  May I look at the amended complaint?  That
12:03:15   2   might help.
12:03:16   3        Q.  Yes.  Do you have another copy of it?
12:03:19   4        MR. LYONS:  Oh, yeah.
12:03:19   5        MS. REILLY:  I'm not sure --
12:03:19   6        MS. LUKEY:  What?
12:03:19   7        MS. REILLY:  Can we pause for a moment?
12:03:22   8        MS. LUKEY:  Yeah.  You don't want him to
12:03:22   9   see it?
12:03:22  10        MS. REILLY:  I don't.  No.
12:03:24  11        MS. LUKEY:  Okay.
12:03:24  12        Q.  (BY MS. LUKEY)  We'll go from memory
12:03:26  13   first.  Since I am questioning for everyone, I will do
12:03:30  14   that.  I'm sure you'll be given the opportunity, but
12:03:31  15   first we'd like to test the full extent of your memory,
12:03:35  16   sir.  Do you recall whether with regard to EurAuPair
12:03:39  17   you spoke to one person or more than one person?
12:03:42  18        A.  I can't specifically say whether with that
12:03:44  19   company I spoke with more than one person.
12:03:46  20        Q.  Did you have more than one phone call to
12:03:51  21   EurAuPair?
12:03:53  22        A.  I can't say that from memory, no.
12:03:55  23        Q.  Did you talk -- have more than one phone
12:03:57  24   call with any of the sponsors?
12:03:59  25        A.  I had multiple phone calls with some of
```

---

127

```
12:04:02   1   the companies, but not with the same individuals.  So,
12:04:05   2   in other words, I may have had one or two or three
12:04:08   3   phone calls with one company, but ultimately either did
12:04:14   4   not gain -- you know, complete a phone call or maybe
12:04:17   5   only completed a phone call with the second or third
12:04:19   6   person.  I did not take notes of the names of people
12:04:22   7   whom, for instance, didn't give me them or wouldn't
12:04:24   8   give me their title.  So of the conversations we're
12:04:29   9   discussing, three come to mind, and I can't tell you
12:04:33  10   how many other people in that organization I spoke
12:04:35  11   with.
12:04:37  12        Q.  All right.  When you made multiple phone
12:04:41  13   calls, sir, what was the purpose for calling back a
12:04:44  14   second time or a third time?
12:04:46  15        A.  There were several purposes.  Sometimes it
12:04:49  16   was just as simple as I couldn't reach anybody.  There
12:04:52  17   were a number of cases where I got voicemail.  There
12:04:55  18   were cases where I got someone who answered the phone
12:05:00  19   who couldn't find someone to speak with me.  There were
12:05:03  20   instances where I called and spoke to someone, and
12:05:06  21   shortly into the conversation I realized they couldn't
12:05:09  22   answer my questions well.  And there were -- there were
12:05:13  23   some calls where the person on the other end of the
12:05:17  24   phone was extremely persistent and wanted to ask me
12:05:20  25   questions about my own life, my own family, my own
```

---

128

```
12:05:23   1   children, and I did not feel it was possible to
12:05:27   2   continue the phone call without giving a falsehood or
12:05:31   3   some answer that I had determined wasn't going to be
12:05:35   4   part of my questioning.  So I ended those calls.
12:05:39   5        Q.  Did you hang up?
12:05:40   6        A.  No.  I said, "Thank you" or I said, "You
12:05:43   7   know, this isn't a great time, can I get back with
12:05:45   8   you?"  Or -- and I've said this many times, "I'm
12:05:48   9   speaking with a lot of companies this week, let me get
12:05:53  10   back to you later."  So it was usually a polite way of
12:05:56  11   ending the call if possible.
12:05:58  12        Q.  When you received voicemail, did you leave
12:06:02  13   messages?
12:06:02  14        A.  I did not.
12:06:03  15        Q.  Why?
12:06:04  16        A.  'Cause, again, I'm very secretive about
12:06:06  17   return -- leaving my -- for safety reasons leaving my
12:06:09  18   number.  If I called from a blocked number, I didn't
12:06:11  19   feel it was appropriate for me to then leave that
12:06:14  20   voicemail number as well.  Defeat the purpose.
12:06:17  21        Q.  Do you block your number in all calls, or
12:06:19  22   did you do it in this instance?
12:06:21  23        A.  I block my -- my number in all calls that
12:06:24  24   are not to clients or people who I have a professional
12:06:27  25   relationship with.  So if I call anyone involved in a
```

---

32 (Pages 125 to 128)

---

129

| | |
|---|---|
| 12:06:30 | 1 case of any stripe who's not my client or working for |
| 12:06:33 | 2 my client, I have a policy of blocking my calls. |
| 12:06:36 | 3 **Q.   Did you in any of the calls give your** |
| 12:06:38 | 4 **name?** |
| 12:06:38 | 5 A.   My first name. |
| 12:06:40 | 6 **Q.   Did you ever give a false name?** |
| 12:06:41 | 7 A.   No. |
| 12:06:43 | 8 **Q.   Did you always give your first name?** |
| 12:06:45 | 9 A.   I believe so, yes. |
| 12:06:46 | 10 **Q.   But never your last?** |
| 12:06:47 | 11 A.   No.   Correct. |
| 12:06:48 | 12 **Q.   Did you ever in any of the calls identify** |
| 12:06:51 | 13 **yourself as a private investigator?** |
| 12:06:53 | 14 A.   No. |
| 12:06:53 | 15 **Q.   Did you ever in any of the calls identify** |
| 12:06:56 | 16 **yourself as an agent of an attorney or law firm?** |
| 12:06:58 | 17 A.   No. |
| 12:07:00 | 18 **Q.   Okay.   Back to EurAuPair, sir.   Would you** |
| 12:07:05 | 19 **give us your first -- your best memory of any** |
| 12:07:11 | 20 **conversation that you actually had with a person that** |
| 12:07:14 | 21 **was more than passing you through to someone else?** |
| 12:07:17 | 22 A.   I'm going -- I'm afraid I'm going to |
| 12:07:19 | 23 frustrate you, but without the name of the person I |
| 12:07:21 | 24 spoke with, which is how my memory seems to be attached |
| 12:07:25 | 25 to this case.   Without the name of the person I spoke |

---

130

| | |
|---|---|
| 12:07:28 | 1 with, I'm having a very difficult time determining |
| 12:07:30 | 2 which company that was. |
| 12:07:31 | 3 **Q.   So among the three, you can't give us an** |
| 12:07:34 | 4 **answer as to which company it was without hearing a** |
| 12:07:37 | 5 **name of a person?** |
| 12:07:39 | 6 A.   I apologize, but I'm afraid that's the |
| 12:07:41 | 7 case. |
| 12:07:41 | 8 **Q.   All right.   Let's go to the second company** |
| 12:07:43 | 9 **which you gave, was API.   Did you have -- did you speak** |
| 12:07:47 | 10 **to someone other than the person who first answered the** |
| 12:07:50 | 11 **phone?** |
| 12:07:51 | 12 A.   I don't recall whether it was the first -- |
| 12:07:53 | 13 person who first answered the call. |
| 12:07:55 | 14 **Q.   Okay.   You're going to have to keep your** |
| 12:07:57 | 15 **voice, up, sir.** |
| 12:07:58 | 16 A.   Thank you.   I don't recall in that |
| 12:08:00 | 17 instance if it was the first person who answered or |
| 12:08:00 | 18 not. |
| 12:08:00 | 19 **Q.   Would you give us your best memory of what** |
| 12:08:05 | 20 **you said and what that person said in the call?** |
| 12:08:07 | 21 A.   Again I'll answer the question the same |
| 12:08:09 | 22 way.   I'm having difficulty putting the name of the |
| 12:08:12 | 23 person with the company they are employed with.   So I'm |
| 12:08:15 | 24 unwilling to speculate on what one company might have |
| 12:08:20 | 25 said.   If you could prompt me with the name of the |

---

131

| | |
|---|---|
| 12:08:22 | 1 person, then I can be more specific and I think my |
| 12:08:26 | 2 memory will be more reliable. |
| 12:08:28 | 3 **Q.   Do your -- does your electronic log** |
| 12:08:31 | 4 **include the names of the people with whom you spoke?** |
| 12:08:34 | 5 A.   The records that I kept as I saw from |
| 12:08:39 | 6 the amendment that I was shown yesterday, the names of |
| 12:08:45 | 7 the people I spoke with did make it into the complaint, |
| 12:08:47 | 8 because I saw them in yesterday's documents.   So I know |
| 12:08:52 | 9 they're there. |
| 12:08:53 | 10 **Q.   You saw the names of the individuals with** |
| 12:08:56 | 11 **whom you spoke in the amended complaint, sir?** |
| 12:08:58 | 12 A.   I believe so. |
| 12:08:59 | 13 **Q.   Okay.   And whether it was the amended** |
| 12:09:02 | 14 **complaint -- did you look at the amended complaint** |
| 12:09:04 | 15 **yesterday?** |
| 12:09:05 | 16 A.   I don't believe so.   I saw these two |
| 12:09:06 | 17 documents.   I believe I saw these two documents. |
| 12:09:10 | 18 **Q.   You believe you saw Exhibits -- I think** |
| 12:09:12 | 19 **it's -- is it 1 and 4, the subpoena and the declaration** |
| 12:09:18 | 20 **and response of Towards Justice.   As you sit here now,** |
| 12:09:23 | 21 **do you remember any other documents?** |
| 12:09:27 | 22 A.   I recall that Ms. Louis had a number of |
| 12:09:32 | 23 documents, and I recall she didn't show them to me. |
| 12:09:35 | 24 **Q.   Did she read any of them to you?** |
| 12:09:37 | 25 A.   No. |

---

132

| | |
|---|---|
| 12:09:38 | 1 **Q.   Okay.   All right.   Let's go to the third** |
| 12:09:40 | 2 **company you mentioned, APF Global.   Did you speak with** |
| 12:09:44 | 3 **someone other than the operator there?** |
| 12:09:46 | 4 A.   Again, I spoke with someone.   I had a |
| 12:09:48 | 5 substantive conversation with them, but, again, without |
| 12:09:52 | 6 having some method of recalling the name of the person |
| 12:09:56 | 7 and matching it to the company, I'm afraid I would not |
| 12:09:59 | 8 be able to be factually correct. |
| 12:10:02 | 9 **Q.   So you can't tell us from memory anything** |
| 12:10:03 | 10 **that you said or that that person said?** |
| 12:10:05 | 11 A.   Well, you have to identify that person. |
| 12:10:07 | 12 **Q.   The person with whom you spoke.   I wasn't** |
| 12:10:09 | 13 **there, sir.** |
| 12:10:14 | 14 A.   From memory, without knowing the person in |
| 12:10:16 | 15 question, I don't feel comfortable answering the |
| 12:10:20 | 16 question because my memory is not working in that |
| 12:10:25 | 17 fashion.   I need to know the name of the person I spoke |
| 12:10:27 | 18 with. |
| 12:10:28 | 19 **Q.   So --** |
| 12:10:29 | 20 MR. ENICA:   Excuse me.   Can you repeat the |
| 12:10:30 | 21 last part?   I . . . |
| 12:10:31 | 22 THE DEPONENT:   I believe I need to know |
| 12:10:32 | 23 the name of the person in question so that I can |
| 12:10:34 | 24 accurately reflect what the conversation said. |
| 12:10:37 | 25 **Q.   (BY MS. LUKEY)   So that we are clear, with** |

---

Beltran v. Interexchange, Inc.                    DAVID KEIL                    7/21/2016

---

### 133

```
12:10:39  1   regard to all three of the companies you have
12:10:41  2   identified as the companies with whom you had
12:10:44  3   substantive conversations about the subject matters at
12:10:47  4   issue here, you cannot from memory, without looking at
12:10:53  5   other materials, tell us anything that you said or that
12:10:57  6   any of the individuals at any of the three companies
12:11:00  7   said; is that right?
12:11:01  8       A.  I think that's a mischaracterization of
12:11:03  9   what I said.
12:11:04 10       Q.  Can you tell us from your memory anything
12:11:08 11   that anyone at EurAuPair said to you?
12:11:12 12       A.  If I know the -- if I have some way of
12:11:15 13   understanding what person we're discussing, then, yes,
12:11:18 14   I have specific memories of those conversations.  I am
12:11:23 15   hesitant to give information that's erroneously
12:11:26 16   attached to the wrong person, and based on the name of
12:11:29 17   the companies, I'm having -- I'm struggling to make
12:11:32 18   those connections.
12:11:33 19       Q.  All right.  Just tell us the name of the
12:11:35 20   people, then, and you can give us the answers that way
12:11:38 21   and we'll match it to the companies.  With what
12:11:41 22   individual do you recall speaking substantively?
12:11:44 23       A.  Okay.  I re -- I recall speaking with one
12:11:53 24   woman named Carrie Crompton.  I do not recall which
12:11:57 25   company she was.  I recall that she was a director.
```

### 134

```
12:12:00  1   All of the people that I ultimately had substantive
12:12:03  2   conversations with I believe gave me their title as
12:12:07  3   director of something.  So I recall a conversation with
12:12:13  4   Ms. Crompton.  I'm sorry, can you repeat the question?
12:12:17  5       Q.  The question is to take it by name of
12:12:19  6   individual rather than company, and we'll do the
12:12:22  7   matching later.
12:12:22  8       A.  Okay.
12:12:23  9       Q.  Did you have one conversation with
12:12:24 10   Ms. Crompton or more than one?
12:12:27 11       A.  I had -- actually, I may have had two with
12:12:31 12   her.  I can't recall, but I believe she -- I may have
12:12:33 13   had one that was for some reason cut short and then a
12:12:38 14   follow-up.
12:12:39 15       Q.  Would you give us your best memory of what
12:12:41 16   you said and what she said in the first conversation?
12:12:46 17       A.  Without -- I'm not going to give you
12:12:50 18   verbatim answers, 'cause I don't have that kind of
12:12:52 19   recall.  I recall speaking and, again, asking for
12:12:58 20   information about the company, about the services they
12:13:00 21   provided, about the pricing structure was.
12:13:06 22   Although I do recall in the case of Ms. Crompton, she
12:13:10 23   was unwilling or unable to give me specific numbers
12:13:15 24   other than she stated that her -- her company fell --
12:13:21 25   their pricing scale fell somewhere in the middle of the
```

### 135

```
12:13:24  1   industry norm.  They weren't the most expensive, they
12:13:29  2   weren't the least expensive.  So I recall that.
12:13:34  3       I recall that we got into the
12:13:37  4   conversation -- into a conversation about how much of
12:13:41  5   the fees that a prospective family might pay were
12:13:47  6   received by a potential person acting as an au pair.
12:13:52  7   Ms. Crompton explained to me that, in fact, the au
12:13:55  8   pairs were paid directly by the family, that there was
12:13:58  9   a fee, I can't recall what it was designated as, but
12:14:03 10   there was a fee, I believe it was $500, that the au
12:14:08 11   pair received, and then she explained that the au pair
12:14:11 12   would receive directly from the family an amount that
12:14:16 13   she referred to as a stipend, and that the stipend was
12:14:20 14   $195.75 per week.  That that would be paid directly by
12:14:26 15   the family, and that to her knowledge, all of the au
12:14:34 16   pairs received the same amount.
12:14:36 17       Q.  I'm sorry.  Could you keep your voice up.
12:14:38 18       A.  I'm trying.  To the best of her knowledge,
12:14:41 19   all of the au pairs in their employ would receive the
12:14:44 20   same amount of stipend.
12:14:46 21       Q.  And "their employ" referring to her
12:14:49 22   company, whichever one it is?
12:14:51 23       A.  Yes, ma'am.
12:14:51 24       Q.  Okay.  What else did she say or you say in
12:14:54 25   that conversation?
```

### 136

```
12:14:55  1       A.  In that conversation I asked Ms. Crompton
12:15:01  2   how was the -- that number derived.
12:15:05  3       Q.  The stipend number?
12:15:06  4       A.  The stipend number.  And she explained
12:15:08  5   that it was a number that was designated by the U.S.
12:15:13  6   Government.  I believe she said the Department -- I'm
12:15:15  7   sorry, I'm drawing a blank.  Department of Commerce?
12:15:18  8   But that there was a government agency whom set that
12:15:23  9   amount as the minimum and that all of the companies
12:15:27 10   that I might be calling that day, because I had
12:15:30 11   explained to Ms. Crompton that I was calling multiple
12:15:33 12   companies, she said, "You will find that everyone
12:15:36 13   charges the same."
12:15:39 14       Q.  The same as the amount that the government
12:15:39 15   agency sets?
12:15:40 16       A.  Everybody pays the set government agency
12:15:42 17   amount for a stipend.
12:15:45 18       Q.  Okay.
12:15:45 19       A.  I then followed up with the question, "If
12:15:51 20   a family was very happy with their au pair, if the
12:15:59 21   relationship was better than normal, would the family
12:16:03 22   have the ability to pay a larger stipend?"  And I
12:16:08 23   believe Ms. Crompton said that the family may have that
12:16:11 24   ability, but it was very unlikely.  I believe it was
12:16:16 25   Ms. Crompton that stated that there -- that she was
```

34 (Pages 133 to 136)

Beltran v. Interexchange, Inc.                    DAVID KEIL                    7/21/2016

---

137

12:16:22  1   aware of one family, one family who was their customer,
12:16:26  2   who had rounded up the stipend to $200 because they
12:16:32  3   were specifically happy with their au pair.
12:16:36  4        Q.   Okay.  Do you remember anything else from
12:16:37  5   the first conversation?
12:16:40  6        A.   I think this -- I apologize.  I think
12:16:42  7   that's substantive of information from both
12:16:45  8   conversations.
12:16:46  9        Q.   Are you able to separate those in your
12:16:48  10  mind?
12:16:49  11       A.   No.
12:16:49  12       Q.   So what you're telling us now is a
12:16:52  13  combination of the questions you asked and the answers
12:16:55  14  Ms. Crompton provided in both conversations?
12:16:57  15       A.   And I believe the -- I believe the
12:16:59  16  majority of the substance was in the second
12:17:01  17  conversation.  I think the first conversation was cut
12:17:03  18  short either -- I believe she had to cut it short or I
12:17:06  19  had to cut it short.  But we hadn't gotten very far
12:17:10  20  into the process.
12:17:11  21       Q.   Okay.  Can you tell us anything else that
12:17:13  22  you said or she said in the two conversations?
12:17:17  23       A.   There was, again, discussion about the
12:17:20  24  stipend.  And I believe this was Ms. Crompton.  I could
12:17:23  25  be confusing this with another party.  But there was a

---

138

12:17:29  1   statement that I believe was Ms. Crompton that said at
12:17:32  2   some point in her past experience she had been an au
12:17:37  3   pair, worked as an au pair for this company, and that
12:17:43  4   in her case, the number elected to round the -- the
12:17:47  5   number from 195.75 to $200 and stated that as a
12:17:57  6   possibility for a future family, if they chose to do
12:18:00  7   so.
12:18:00  8        Q.   I'm sorry, I couldn't hear you.
12:18:02  9        A.   And stated that that extra payment of
12:18:04  10  $4.25 would be certainly up to the family if they chose
12:18:11  11  to do that.
12:18:12  12       Q.   Okay.  To the best of your memory, those
12:18:15  13  are the words that she used?
12:18:17  14       A.   To the best of my memory, yes.
12:18:19  15       Q.   Okay.  Do you recall anything else that
12:18:23  16  either of you said?
12:18:30  17       A.   Again, I'm trying not to bleed between
12:18:33  18  interviews.  There was a statement made -- no, I don't
12:18:39  19  believe this was Ms. Crompton.  I believe that was the
12:18:41  20  sum total.
12:18:41  21       Q.   All right.  So to the best of your memory,
12:18:44  22  just so we can close out that piece, you have now told
12:18:47  23  us everything that you said and that Ms. Crompton said
12:18:49  24  in the combined two conversations?
12:18:51  25       A.   I don't believe I've said every single

---

139

12:18:53  1   thing that was discussed.  Those are the things that I
12:18:56  2   can recall today.
12:18:59  3        Q.   Do you expect your memory of the events to
12:19:02  4   become better over time?
12:19:05  5        A.   I'm sorry?
12:19:05  6        Q.   Well, you just said that's the best you
12:19:07  7   can recall today.  Do you expect your memory will be
12:19:11  8   better in two weeks or a month?
12:19:12  9        A.   No.  I'm responding to your question which
12:19:15  10  is, is this everything that was discussed, and I don't
12:19:17  11  believe it was verbatim everything that was discussed.
12:19:19  12       Q.   Do you remember anything else that was
12:19:20  13  discussed?
12:19:23  14       A.   I remember that the tone and tenor of the
12:19:29  15  conversation was that a family hiring an au pair
12:19:37  16  through that organization would be able to have some
12:19:42  17  cost certainty as to the price of the au pair.  There
12:19:46  18  was some comfort to be derived from the fact that the
12:19:49  19  stipend was fixed and it was a fixed cost.  So that it
12:19:53  20  would be a benefit to a family using their services to
12:19:58  21  know that this was not an open-ended number, but it was
12:20:02  22  a fixed cost that they could rely on.
12:20:11  23       Q.   Okay.  Do you recall anything else?
12:20:12  24       A.   No.
12:20:13  25       Q.   Okay.  Just a few follow-ups on a couple

---

140

12:20:17  1   of points.  You mentioned that early on in the
12:20:19  2   discussion, the conversation, that you discussed
12:20:25  3   pricing structure and that she indicated that her
12:20:31  4   company fell in the middle of the industry?
12:20:34  5        A.   May I ask a favor?  I know we just came
12:20:37  6   back from a break, but I think everyone's having a hard
12:20:40  7   time hearing me.
12:20:40  8        Q.   Yes.
12:20:41  9        A.   And I think I'm having a very hard time
12:20:44  10  speaking up.  Could I ask for a rest -- a five-minute
12:20:48  11  restroom break to try to address that?
12:20:48  12       Q.   You can always have a restroom break, sir.
12:20:51  13  We never deprive anyone of a restroom break.
12:20:51  14       A.   Thank you.  I'll try to --
12:20:53  15       THE VIDEOGRAPHER:  Going off the record.
12:20:57  16  The time is 12:20 p.m.
12:20:59  17       (Recess taken 12:20 p.m. to 1:05 p.m.)
13:05:48  18       THE VIDEOGRAPHER:  We are back on the
13:05:48  19  record.  The time is 1:05 p.m.
13:05:51  20       Q.   (BY MS. LUKEY)  Mr. Keil, while we're
13:05:55  21  waiting for a document to be copied, let me ask you a
13:05:58  22  few questions that are a little bit of a sidetrack from
13:06:02  23  where we were before.  Did you email the electronic log
13:06:05  24  to Mr. Hood?
13:06:07  25       A.   I don't recall.  I don't recall if it was

---

35 (Pages 137 to 140)

Beltran v. Interexchange, Inc.          DAVID KEIL                    7/21/2016

---

141

```
13:06:12   1    emailed or printed and hand delivered.
13:06:14   2         Q.  Do you have any regular practice in that
13:06:16   3    regard?
13:06:16   4         A.  It varies from client to client.
13:06:18   5         Q.  All right.  Can you tell us, please, if
13:06:22   6    you emailed it from your office, what your email
13:06:24   7    account was at that time?
13:06:26   8         A.  It would have either been
13:06:27   9    keilinv@gmail.com or keil@me.com.
13:06:40  10         Q.  Do you still both -- maintain both of
13:06:43  11    those accounts?
13:06:44  12         A.  I do.
13:06:46  13         Q.  Do you have any other email accounts that
13:06:48  14    you use from your office?
13:06:49  15         A.  No.
13:06:50  16         Q.  And you said it was an Apple, I believe, a
13:06:54  17    Mac?
13:06:55  18         A.  Yes.
13:06:55  19         Q.  Okay.  Do you still have that computer?
13:06:58  20         A.  Yes.
13:06:59  21         Q.  And can you tell us the model of the
13:07:00  22    computer, by any chance?
13:07:03  23         A.  It's a -- an iBook, iBook Air.
13:07:06  24         Q.  iBook Air?
13:07:07  25         A.  Yes.
```

---

142

```
13:07:08   1         Q.  And you still have the same iBook Air?
13:07:10   2         A.  I do.
13:07:11   3         Q.  Okay.  Do you know what program you used
13:07:14   4    to create the document?  Was it Word or something else?
13:07:17   5         A.  Probably used Word.  Sometimes I use a
13:07:20   6    program called, Bean, B-e-a-n.
13:07:24   7         Q.  As regards the log, do you remember which
13:07:28   8    you used?
13:07:29   9         A.  No.  I use them kind of interchangeably.
13:07:32  10         Q.  Do you remember if the log was at one
13:07:35  11    point longer than it is currently?
13:07:38  12         A.  No.
13:07:38  13         Q.  And I don't mean by a few words, but I
13:07:40  14    mean contained more information?
13:07:41  15         A.  No, I don't believe so.  I think, again,
13:07:44  16    the only changes that were made were for clarity and
13:07:47  17    grammar.
13:07:48  18         Q.  Have you maintained that document on your
13:07:49  19    computer?
13:07:50  20         A.  I don't believe so.
13:07:51  21         Q.  All right.  Have you swapped -- I don't
13:07:54  22    think you can swap out the hard drive on an iBook
13:07:57  23    Air --
13:07:59  24         A.  No.
13:07:59  25         Q.  -- but just in case you can, have you
```

---

143

```
13:08:01   1    swapped out the hard drive?
13:08:02   2         A.  No.  But I did have -- I was hacked
13:08:05   3    sometime in the last two years.  I don't know where
13:08:07   4    this falls.  So I did have some corruption problems.
13:08:12   5    So I don't know what -- no, we've not hard -- we've not
13:08:15   6    swapped out the hard drive, but we had some corruption
13:08:18   7    issues.
13:08:19   8         Q.  Okay.  Do you have any reason to believe
13:08:22   9    that any efforts were taken to change the metadata in
13:08:26  10    any way?
13:08:27  11         A.  No.
13:08:28  12         Q.  So if it isn't as originally created with
13:08:31  13    its various versions reflected as metadata reflects
13:08:36  14    them, it would be because of the corruption issue?
13:08:39  15         MS. LOUIS:  Object to the form.
13:08:39  16         A.  All I know is that the corruption issue
13:08:41  17    has worked its way into some strange places that are
13:08:44  18    surprising to me, so I put it out there as a
13:08:47  19    possibility.
13:08:47  20         Q.  (BY MS. LUKEY)  Okay.  Now, while we're
13:08:51  21    waiting for that to be copied.
13:08:53  22         MR. LYONS:  Here it is.
13:08:55  23         MS. LUKEY:  Oh.  Thank you.  May we have
13:08:55  24    that marked?  Where -- are we at 4, 5?
13:08:55  25         THE REPORTER:  We're at 5.
```

---

144

```
13:08:58   1         MS. LOUIS:  And, Joan, before there's
13:08:59   2    questioning --
13:09:00   3         MS. LUKEY:  Yes.
13:09:00   4         MS. LOUIS:  -- with respect to what's
13:09:00   5    being marked as Exhibit 5, plaintiffs maintain the
13:09:03   6    position that the document constitutes protected work
13:09:07   7    product.  We're making the election at this time to
13:09:10   8    waive the protection with respect to this document,
13:09:12   9    Exhibit 5, for the expediency of this proceeding.
13:09:23  10         THE DEPONENT:  May I also say --
13:09:23  11         (Deposition Exhibit 5 was marked.)
13:09:23  12         MS. LUKEY:  Wait a minute.  Wait a minute.
13:09:26  13         MS. LOUIS:  She's marking.
13:09:26  14         THE DEPONENT:  Thank you.
13:09:26  15         MS. LUKEY:  We just didn't want to miss a
13:09:27  16    part of your comments on the record.  So . . .
13:09:30  17         THE DEPONENT:  Okay.
13:09:30  18         MS. LUKEY:  All right.  Why don't we all
13:09:32  19    take one minute to read through it quickly, and then I
13:09:34  20    will start with the questions from it with your
13:09:37  21    position noted.  We obviously have a disagreement on
13:09:40  22    whether there's privilege and if it was privileged,
13:09:43  23    whether that's been waived, but we appreciate the
13:09:46  24    accommodation to allow this to go forward.
13:09:53  25         (Pause in the proceedings.)
```

Beltran v. Interexchange, Inc.                    DAVID KEIL                                 7/21/2016

---

**145**

13:11:11  1    Q.   (BY MS. LUKEY)  Mr. Keil, when you are
13:11:11  2    ready, I will proceed.  Others can keep reading.
13:11:17  3         (The deponent perused the exhibit.)
13:11:51  4    Q.   Are you ready, sir?
13:11:53  5    A.   I am.
13:11:53  6    Q.   You have now had the opportunity to review
13:11:56  7    the document that has been marked as Exhibit 5; is that
13:11:58  8    correct?
13:11:59  9    A.   Yes.
13:11:59  10   Q.   Is this the electronic log to which you
13:12:01  11   were making reference?
13:12:02  12   A.   Yes.
13:12:03  13   Q.   Do you recall whether it ever existed in
13:12:05  14   another version but for the correction, for example, of
13:12:10  15   typographical or grammatical errors?
13:12:12  16   A.   I believe it was generated
13:12:16  17   chronologically, so it got longer as more interviews
13:12:21  18   took place.
13:12:24  19        MS. KOZAL:  As what?
13:12:24  20        MS. LUKEY:  As his interviews took
13:12:25  21   place.
13:12:26  22   A.   As the interviews took place, the log got
13:12:28  23   longer, so it -- after one interview, it was a short
13:12:30  24   log, and it grew over the course of the three
13:12:32  25   conversations.

**146**

13:12:33  1    Q.   (BY MS. LUKEY)  Now, if you look to the
13:12:35  2    last page, where it says, "Other Calls," there is a
13:12:38  4    two-paragraph description that indicates that you were
13:12:42  4    unable to reach a live person or reached a live person,
13:12:50  5    but they had little or no knowledge, and therefore
13:12:55  6    there's no information about those calls; is that
13:12:57  7    right?
13:12:58  8    A.   Yes.
13:12:59  9    Q.   So do the two paragraphs that are on the
13:13:02  10   last page of Exhibit 5 under the caption Other Calls
13:13:07  11   correctly reflect the full nature and extent of your
13:13:11  12   phone calls to any of the sponsors other than APF
13:13:19  13   Global Exchange, Au Pair International, Inc., and
13:13:24  14   EurAuPair Intercultural Child Care Program?
13:13:30  15        MS. LOUIS:  Object to form.  Excuse me.
13:13:31  16   A.   The last two paragraphs, again, as this
13:13:34  17   was written chronologically, were a summation of all
13:13:37  18   the other calls not already indicated in the body of
13:13:41  19   the letter.  So, yes, this was my summation statement
13:13:44  20   about all of the other calls made during the process.
13:13:47  21   Q.   (BY MS. LUKEY)  At any point, sir, did you
13:13:50  22   take notes in this electronic log or otherwise relating
13:13:55  23   to those other calls?
13:13:57  24   A.   I don't believe so, no.
13:13:58  25   Q.   So this is not a matter of your having

**147**

13:14:03  1    recorded information about the other calls and then
13:14:05  2    deleted it before finalizing?
13:14:07  3    A.   No.
13:14:09  4    Q.   So is there anything else about the calls
13:14:11  5    to any sponsor apart from the three that we just
13:14:15  6    referenced that is -- that you recall that is not
13:14:20  7    reflected under, quote, Other Calls?
13:14:22  8    A.   No.
13:14:26  9    Q.   Going back in the order in which you have
13:14:28  10   set them out to Carrie Crompton of Au Pair Foundation
13:14:33  11   or APF Global Exchange.  Have you reviewed the portion
13:14:39  12   of this document which is page 1 that relates to that
13:14:46  13   interaction?
13:14:46  14   A.   Just -- just now briefly.
13:14:48  15   Q.   If you'd like to read it in more detail,
13:14:50  16   please do now, because I'm going to ask you whether it
13:14:53  17   is a full and complete recitation of everything that
13:14:56  18   you either took note of or have memory of relating to
13:15:01  19   Ms. Crompton's communications.
13:15:16  20   A.   I'm sorry, your question?
13:15:18  21   Q.   Have you had a chance to read it
13:15:20  22   completely?
13:15:20  23   A.   Yes.
13:15:21  24   Q.   And then the question is does page 1 of
13:15:24  25   Exhibit 5 correctly and completely reflect what you

**148**

13:15:31  1    recall of your communications with Carrie Crompton of
13:15:36  2    APF?
13:15:38  3    A.   It does.
13:15:38  4    Q.   Is there anything else that you recall
13:15:41  5    relating to that communication that is not present
13:15:44  6    here?
13:15:47  7    A.   No.
13:15:54  8    Q.   I note that in the third paragraph up from
13:15:57  9    the bottom you actually have a quotation about your
13:16:03  10   question where you say, "So you're saying that the
13:16:07  11   government sets a minimum amount to pay, and all the
13:16:12  12   agencies agree to pay that exact same minimum amount?"
13:16:16  13   Is that an accurate reflection of the words that you
13:16:20  14   actually used?
13:16:21  15   A.   Yes.  The fact that I've put it in -- made
13:16:24  16   the specific effort to put it in quotation marks means
13:16:29  17   that it is as close as I could do at the moment to get
13:16:32  18   it accurate to my statement -- to my question.
13:16:37  19   Q.   And with regard to your question about the
13:16:40  20   agencies agreeing to pay the minimum amount set by the
13:16:43  21   government, you have noted quotes below from
13:16:48  22   Ms. Crompton, "Correct, correct!  Everybody agrees,
13:16:51  23   correct!"  Do you see that?
13:16:53  24   A.   Yes.
13:16:54  25   Q.   And is that an accurate and complete

scheduling@huntergeist.com          HUNTER + GEIST, INC.          303-832-5966/800-525-8490

Beltran v. Interexchange, Inc.                    DAVID KEIL                              7/21/2016

---

149

13:16:57  1    recitation of her words, to the best of your memory?
13:16:59  2         A.  To the best of my memory, yes.
13:17:01  3         Q.  And then you indicated that Ms. Crompton
13:17:06  4    volunteered toward the end of the conversation or at
13:17:08  5    the end of the conversation that since the fees are
13:17:11  6    paid directly to the au pair and since the $196 is a
13:17:18  7    minimum amount, nobody has to know if a particular
13:17:21  8    family elects to pay an au pair a little bit more,
13:17:24  9    right?
13:17:26 10         A.  That -- yes.
13:17:27 11         Q.  And that's what she said to you?
13:17:28 12         A.  Yes.  I remember the context of that a
13:17:30 13    little bit, but -- a little bit more.  But, yes, that's
13:17:33 14    what she said to me.
13:17:35 15         Q.  So there was something about context that
13:17:37 16    you chose not to put in the notes?
13:17:39 17         A.  There was something that I just -- my
13:17:41 18    memory was just sparked by reading this note that
13:17:44 19    reminds me of the context of this.
13:17:46 20         Q.  The last -- the context of the last
13:17:48 21    paragraph?
13:17:49 22         A.  Correct.
13:17:50 23         Q.  And you're just remembering it now?
13:17:52 24         A.  Yes.
13:17:53 25         Q.  Would you tell us what you now remember?

---

150

13:17:56  1    Is this the first time that you've looked -- let me
13:17:59  2    back up.  Have you looked at this document at any time
13:18:02  3    since you sent it to --
13:18:03  4         A.  No.
13:18:04  5         Q.  -- Mr. Hood?
13:18:05  6         A.  I haven't looked at it in two-plus years,
13:18:08  7    since November of '14.  I may have looked at it with --
13:18:12  8    you know, within a day or two of delivering it to
13:18:13  9    Mr. Hood, but I've not looked at it since.
13:18:15 10         Q.  Have you had any communications regarding
13:18:19 11    the document, without for the moment telling us the
13:18:22 12    content, with Mr. Hood since you sent it to him?
13:18:27 13         A.  No.
13:18:29 14         Q.  Were you aware that Mr. Hood was going to
13:18:31 15    be using portions of this document in his own
13:18:34 16    declaration filed with the court?
13:18:37 17         A.  No.
13:18:39 18         Q.  Were you asked to review the portion --
13:18:41 19    all or the portion of the amended complaint in this
13:18:44 20    case that referred to your work in this case?
13:18:48 21         A.  No.
13:18:50 22         Q.  Did you approve any language relating to
13:18:53 23    your work in this case for inclusion in the complaint?
13:18:57 24         A.  I'm sorry, I don't understand the
13:19:00 25    question.

---

151

13:19:00  1         Q.  Let me rephrase it.  It was poorly stated.
13:19:03  2         Were you asked to sign off on the accuracy
13:19:06  3    of the paragraphs in the amended complaint that purport
13:19:10  4    to summarize the information that you provided from
13:19:14  5    your investigation?
13:19:15  6         A.  No.
13:19:17  7         Q.  Have you ever seen the language that was
13:19:20  8    used to summarize your work in this investigation as
13:19:26  9    included in the amended complaint?
13:19:29 10         A.  Unless I saw it in one of these two
13:19:31 11    documents that were placed before me today, the
13:19:33 12    answer's no.
13:19:34 13         Q.  The documents before you today, for the
13:19:36 14    record, do not include the amended complaint.  Is it
13:19:40 15    your testimony that you have never seen the amended
13:19:43 16    complaint?
13:19:44 17         A.  Correct.
13:19:45 18         Q.  And you never saw an excerpt of the
13:19:48 19    amended complaint that related to your work?
13:19:56 20         A.  I believe that's true.  I believe that's
13:20:02 21    correct.
13:20:02 22         Q.  So this is now the first time that you are
13:20:04 23    reviewing this document since you forwarded it to
13:20:08 24    Mr. Hood sometime in the last quarter of 2014; is that
13:20:13 25    right?

---

152

13:20:13  1         A.  Yes.  Correct.
13:20:14  2         Q.  But you don't know what date?
13:20:15  3         A.  No.
13:20:17  4         Q.  What is it that you now remember that
13:20:20  5    comes to mind after reviewing the last paragraph on
13:20:23  6    page 1?
13:20:31  7         A.  I remember this conversation with
13:20:33  8    Ms. Crompton.  I was -- again, in trying to ask plain
13:20:42  9    vanilla questions, and Ms. Crompton was -- was
13:20:47 10    answering them as if this was her or someone like her.
13:20:52 11    And she was discussing the fact that if a particular au
13:20:56 12    pair did a wonderful job, that a family like mine could
13:21:01 13    elect to pay more, no one would have to know.  Now, of
13:21:06 14    course, I didn't give her any indication that I had a
13:21:09 15    family or was going to hire an au pair, but she seemed
13:21:12 16    to believe that the ability to pay more was okay.  If
13:21:17 17    you really loved your EurAuPair, it was okay, you just
13:21:21 18    don't have to tell us.
13:21:22 19         So that -- that was sort of the context
13:21:24 20    for this statement where she said no one would have to
13:21:28 21    know if a particular family elected to pay a little bit
13:21:31 22    more.  She seemed to be trying to make me happy if I
13:21:36 23    wanted -- if I wanted to pay an au pair more, which,
13:21:39 24    again, we didn't discuss, she seemed to be trying to
13:21:42 25    explain that that was an option.

---

38 (Pages 149 to 152)

Beltran v. Interexchange, Inc.                    DAVID KEIL                          7/21/2016

---

153

13:21:44  1          Q.   Did you enter into this conversation
13:21:48  2   knowing that one of the subjects you were exploring was
13:21:52  3   whether the sponsors had an agreement with regard to
13:21:55  4   the payment amount?
13:21:57  5          A.   By the time this conversation happened,
13:21:59  6   and I don't know where it was in the chronology,
13:22:02  7   clearly I was asking questions to determine if that was
13:22:04  8   true.
13:22:08  9          Q.   From what source did you gain the
13:22:11  10   understanding before having this conversation that
13:22:13  11   caused you to know that one of the questions about
13:22:17  12   which you were inquiring was whether an agreement
13:22:20  13   existed?
13:22:21  14          MS. LOUIS:   Objection.
13:22:27  15          A.   Either from other interviews, other
13:22:32  16   conversations that I'd had with other people before
13:22:34  17   Ms. Crompton, and beyond that I can't answer on the
13:22:38  18   grounds of privilege.
13:22:46  19          Q.   (BY MS. LUKEY)   Well, you gave us your
13:22:47  20   explanation before in some detail of what your
13:22:52  21   instructions were with regard to questioning the
13:22:55  22   sponsors.   You did not in that description say anything
13:23:01  23   about an instruction to determine whether an agreement
13:23:05  24   existed among the sponsors.   So let me ask you this
13:23:08  25   question now.   Is it your testimony that you were asked

---

154

13:23:14  1   or instructed to attempt to find out whether there was
13:23:19  2   an agreement among the sponsors as to the amount of
13:23:23  3   payment to the au pairs?
13:23:25  4          MS. LOUIS:   I'm going to object.   He has
13:23:29  5   stated what instructions he has received.   He's
13:23:33  6   described them, and I'm going to instruct, again, that
13:23:38  7   he not reveal the content of the communications from
13:23:42  8   counsel, the description of counsel's strategy, or
13:23:47  9   analysis of the case, if there was any.
13:23:52  10          MS. LUKEY:   What I'm asking is what
13:23:53  11   instructions he was given as to the questions to pose
13:23:59  12   to a third party, namely the sponsors.   That's not
13:24:03  13   protected.
13:24:05  14          Q.   (BY MS. LUKEY)   So, again, sir, were you
13:24:07  15   asked or instructed to inquire of the sponsors as to
13:24:12  16   whether there was an agreement among the sponsors
13:24:15  17   concerning the payments to au pairs?
13:24:17  18          MS. LOUIS:   Objection.   And your
13:24:19  19   question -- or your explanation to me assumes that
13:24:22  20   instructions were given in the format that you're
13:24:25  21   expecting them to have been given, and if the
13:24:28  22   conversation did not go the way that you think that it
13:24:31  23   went and it cannot be separated, my objection stands
13:24:35  24   that he should not reveal the communication -- or,
13:24:39  25   rather, the description of any analysis or strategy

---

155

13:24:41  1   that he was given by counsel as it pertained to his
13:24:45  2   instructions.
13:24:46  3          He has identified what he was told to do
13:24:48  4   to the extent that it doesn't step on any privileged
13:24:52  5   communication.   And he has testified to the fullest
13:24:56  6   extent that he can of what he was told to do without
13:25:00  7   entering into a privileged communication.
13:25:03  8          MS. LUKEY:   Well, we're going to have to
13:25:04  9   disagree there.   He did not mention this morning
13:25:08  10   anything about being instructed or asked to inquire
13:25:12  11   about an agreement among the sponsors on au pair pay.
13:25:18  12   If he was given an instruction to inquire into that
13:25:22  13   express topic, he's standing in the shoes of the
13:25:26  14   attorney, he is the attorney's agent talking to the
13:25:29  15   adverse party.   I want to know if, as the attorney's
13:25:33  16   spokesperson, he was told to ask about an agreement
13:25:37  17   among the sponsors, and we are entitled to an answer to
13:25:42  18   that question.
13:25:43  19          Q.   (BY MS. LUKEY)   So the question is were
13:25:44  20   you asked or instructed to ascertain from the sponsors
13:25:51  21   whether there was an agreement concerning the amount of
13:25:54  22   pay to the sponsors -- sorry, to the au pairs?
13:25:58  23          MS. LOUIS:   We're going to maintain and
13:26:01  24   insist on the instruction that the communications
13:26:03  25   between counsel and his agent regarding his

---

156

13:26:07  1   instructions not be waived.
13:26:10  2          MS. LUKEY:   Are you instructing him not to
13:26:12  3   answer that question?
13:26:14  4          MS. LOUIS:   I'm instructing him not to
13:26:15  5   answer any more questions about what instructions he
13:26:18  6   was given by counsel.
13:26:20  7          MS. LUKEY:   You're instructing him that he
13:26:22  8   cannot answer the question of whether he was instructed
13:26:26  9   specifically to find out whether the sponsors had an
13:26:30  10   agreement among themselves on au pair pay; is that
13:26:36  11   right?
13:26:36  12          MS. LOUIS:   Your question continues to
13:26:38  13   assume that a specific question was posed in a specific
13:26:40  14   manner separate and isolated from any other analysis,
13:26:46  15   strategy, discussion, or instructions that would reveal
13:26:48  16   a privileged communication.   It is both my
13:26:54  17   understanding and our position that to the extent that
13:26:58  18   the counsel's instruction cannot be separated from
13:27:03  19   their description of the strategy, analysis, and the
13:27:07  20   case, that he cannot answer the question without
13:27:10  21   waiving privilege.
13:27:13  22          MS. LUKEY:   I'm going to make the
13:27:14  23   question -- while reserving our rights as to what you
13:27:19  24   just said, I'm going to make this question as narrow as
13:27:22  25   I can, because I want to be sure that we are teeing up

---

scheduling@huntergeist.com                HUNTER + GEIST, INC.                303-832-5966/800-525-8490

Beltran v. Interexchange, Inc.        DAVID KEIL        7/21/2016

---

157

```
13:27:26   1    in each iteration as best we can this issue for the
13:27:29   2    court.
13:27:30   3         Q. (BY MS. LUKEY)  Mr. Keil, were you asked
13:27:31   4    or instructed to pose questions to the sponsors to
13:27:38   5    determine whether they had agreed among themselves to
13:27:43   6    the amount to be paid to au pairs?
13:27:45   7         MS. LOUIS:  Same instruction.
13:27:48   8         A.  I -- I'm afraid I can't answer that
13:27:50   9    question as posed without violating privilege.
13:27:55  10         Q. (BY MS. LUKEY)  I'm not asking you to tell
13:27:56  11    us anything that may have been said to you by Mr. Hood
13:28:01  12    about his strategy, I'm just asking you with regard to
13:28:06  13    the questions he asked you to pose to the sponsors, did
13:28:12  14    he ask or instruct you to pose questions as to whether
13:28:17  15    the sponsors had an agreement among themselves
13:28:23  16    concerning the amount of pay to the au pairs?
13:28:26  17         MS. LOUIS:  Same instruction.
13:28:27  18         A.  Again, I don't believe I can answer that
13:28:30  19    question directly without violating privilege.
13:28:33  20         MS. LUKEY:  Well, we could interrupt the
13:28:36  21    deposition right now, and certainly we would be
13:28:39  22    justified in doing so, because what he is asking a
13:28:43  23    third party on the instruction of the attorney whose
13:28:47  24    agent he is is not protected.  I don't care --
13:28:50  25         MS. LOUIS:  Agreed.  What he asked.
```

158

```
13:28:52   1    Agreed.  What he asked is not --
13:28:55   2         MS. LUKEY:  No.  No.
13:28:56   3         MS. LOUIS:  -- privileged.
13:28:57   4         MS. LUKEY:  I said what the attorney,
13:28:58   5    Mr. Hood, instructed him to ask.  It doesn't matter
13:29:02   6    that the words came out of Mr. Hood's mouth.  It
13:29:05   7    mattered that as Mr. Hood's spokesperson, he was asking
13:29:10   8    questions that he was directed to ask.  That's what I'm
13:29:14   9    attempting to determine.
13:29:15  10         MS. LOUIS:  And he has already testified
13:29:16  11    that he wasn't directed to ask specific questions.
13:29:19  12         MS. LUKEY:  He's not given any such
13:29:21  13    testimony.  It's a topic, it's not a question.  I
13:29:25  14    didn't ask did he give you the words, "By the way, did
13:29:28  15    you sit down and reach agreement."  I asked him whether
13:29:32  16    he was instructed to inquire as to whether there was an
13:29:36  17    agreement among sponsors regarding the pay to au pairs.
13:29:39  18         MS. LOUIS:  Okay.  All right.  The
13:29:41  19    suggestion's being made that we go off the record and
13:29:43  20    try to help instruct him with respect to the privilege
13:29:46  21    so that he can answer in a manner that does not --
13:29:51  22         MS. LUKEY:  If you --
13:29:52  23         MS. LOUIS:  And if you're amenable to
13:29:54  24    that, then we will try that.
13:29:56  25         MS. LUKEY:  If you wish to step out with
```

159

```
13:29:57   1    your witness and attempt to determine what he will be
13:30:00   2    allowed to answer, that's fine.  But I just want to be
13:30:04   3    clear on the record that we are reserving our rights to
13:30:09   4    the questions already asked.  That is, that he should
13:30:11   5    have been answering those questions.  So if you want to
13:30:15   6    talk to him and see if we can get any information,
13:30:17   7    fine.  But I am not waiving our right to have answers
13:30:20   8    to the questions that were posed over the last several
13:30:23   9    minutes.
13:30:25  10         MS. LOUIS:  All right.
13:30:27  11         THE VIDEOGRAPHER:  Going off the record.
13:30:28  12    This is the end of Media Unit No. 2 in the videotaped
13:30:32  13    deposition of David Keil.  The time is 1:30 p.m.  We
13:30:41  14    are off the record.
13:30:42  15         (Recess taken, 1:30 p.m. to 1:37 p.m.)
13:37:06  16         THE VIDEOGRAPHER:  We are back on the
13:37:07  17    record.  This is the beginning of Media Unit No. 3 in
13:37:10  18    the videotaped deposition of David Keil.  The time is
13:37:14  19    1:36 p.m.
13:37:18  20         MS. LUKEY:  Counsel, is there any
13:37:19  21    clarification on the instruction to the witness?
13:37:21  22         MS. LOUIS:  Oh.  The clarification was to
13:37:23  23    the witness.
13:37:24  24         MS. LUKEY:  Okay.
13:37:25  25         MS. LOUIS:  So that he could understand
```

160

```
13:37:26   1    how and the extent so that he could answer your
13:37:29   2    question.
13:37:29   3         MS. LUKEY:  Thank you.  I will pose the
13:37:32   4    question again not knowing, obviously, what the
13:37:34   5    instruction was or the clarification.
13:37:36   6         Q. (BY MS. LUKEY)  Sir, were you asked or
13:37:42   7    instructed to pose questions to the sponsors as to
13:37:45   8    whether an agreement had been reached among the
13:37:48   9    sponsors regarding the amount of pay to au pairs?
13:37:53  10         A.  I was not.
13:37:54  11         Q.  Okay.  Now, as you just indicated before
13:37:58  12    the break, your questions to Ms. Crompton indicate that
13:38:05  13    you had become aware or realized in some fashion that
13:38:07  14    agreement among the sponsors was an issue; is that
13:38:10  15    right?
13:38:14  16         A.  Yes.
13:38:14  17         Q.  What is it that you became aware of or
13:38:18  18    learned that caused you to realize when you were
13:38:22  19    talking to Ms. Crompton that one of the areas of
13:38:27  20    inquiry was or should be agreement among the sponsors?
13:38:32  21         MS. LOUIS:  Object to form.
13:38:33  22         A.  And I believe I cannot answer that due to
13:38:36  23    privilege.
13:38:40  24         Q. (BY MS. LUKEY)  I'm sorry, you cannot
13:38:41  25    answer that due to privilege.  Did you have a
```

scheduling@huntergeist.com        HUNTER + GEIST, INC.        303-832-5966/800-525-8490

Beltran v. Interexchange, Inc.                DAVID KEIL                7/21/2016

---

161

13:38:44  1   conversation -- don't give me the substance of it at
13:38:46  2   the moment, we may come back to that.  Did you have a
13:38:50  3   conversation with Mr. Hood or anyone else from Towards
13:38:56  4   Justice after the conversation that you have already
13:39:00  5   described in which you were told your assignment?
13:39:02  6       A.  No.
13:39:04  7       Q.  Did you have a communication, such as
13:39:07  8   email communication, with Mr. Hood or anyone else from
13:39:11  9   Towards Justice after you had received the assignment
13:39:14  10  that you have already described and before you
13:39:18  11  completed the electronic log that is Exhibit 5?
13:39:24  12      A.  I can't recall if there were any
13:39:26  13  communications, but there were no communications
13:39:28  14  discussing this topic.
13:39:30  15      Q.  Well, you can -- well, I must confess to
13:39:34  16  being confused, then, Mr. Keil, because you said you
13:39:38  17  did not receive any instructions about inquiring into
13:39:41  18  the topic of whether an agreement was reached among the
13:39:45  19  sponsors.
13:39:46  20      A.  Yes.
13:39:46  21      Q.  But you also said that you had come to
13:39:49  22  realize that that was an issue by the time you were
13:39:53  23  having your conversation with Ms. Crompton.
13:39:55  24      A.  Yes.
13:39:56  25      Q.  When I asked you how you had come to

---

162

13:39:59  1   realize that that was an issue, you said you could not
13:40:02  2   tell me because that would violate the privilege.  So
13:40:08  3   I'm having trouble understanding what would violate the
13:40:14  4   privilege if you weren't instructed to have asked such
13:40:17  5   questions and you had no subsequent communications?
13:40:21  6       A.  It's --
13:40:21  7       MS. LOUIS:  If you understood the
13:40:23  8   question.  Her question.  Sorry.
13:40:29  9       A.  It's -- I was going to say, it's possible
13:40:30  10  I misunderstood your question.
13:40:34  11      MS. LUKEY:  I'm going to ask counsel not
13:40:36  12  to make any speaking objections, please.  Not only have
13:40:39  13  we reserved all objections except as to form and motion
13:40:41  14  to strike, and, of course, you have the right to
13:40:43  15  interject as to privilege, but the witness is picking
13:40:45  16  up every time you make a speaking objection and
13:40:48  17  responding accordingly.
13:40:49  18      Q.  (BY MS. LUKEY)  Let me try the question
13:40:53  19  again.  You recall having one conversation with
13:40:56  20  Mr. Hood, which is the conversation in which he
13:40:59  21  retained you and described what it was he wanted you to
13:41:01  22  do, correct?
13:41:02  23      A.  Correct.
13:41:02  24      Q.  In that conversation, did he or did he not
13:41:07  25  ask or instruct that in your calls to the sponsors, you

---

163

13:41:10  1   inquire as to whether an agreement had been reached
13:41:13  2   among the sponsors concerning the amount of payment to
13:41:16  3   au pairs?
13:41:16  4       A.  He did not.
13:41:18  5       Q.  By the time you had the conversation with
13:41:22  6   Ms. Crompton which is memorialized on page 1 of
13:41:25  7   Exhibit 5, had you come to know from whatever source
13:41:30  8   that one of the issues to be explored was whether an
13:41:35  9   agreement had been reached among the sponsors
13:41:37  10  concerning the amount of pay to au pairs?
13:41:39  11      A.  I do not recall if that was in my mind at
13:41:45  12  the time I interviewed Ms. Crompton, but by the end of
13:41:48  13  this process, I had begin -- begun to notice a pattern.
13:41:53  14  Whether that pattern had emerged at the time I spoke to
13:41:56  15  Ms. Crompton, I don't know.
13:41:58  16      Q.  If you look at page 1, sir, of Exhibit 5,
13:42:04  17  the first of your own questions that you quote appears
13:42:10  18  about halfway down.  It says, "I asked, 'So is there an
13:42:16  19  understanding among all the agencies about paying the
13:42:20  20  au pair's this set amount?'"
13:42:26  21      A.  Yes.
13:42:27  22      Q.  Did you pose that question because you
13:42:29  23  knew that one of the issues you were supposed to be
13:42:32  24  exploring was whether there was an agreement among the
13:42:35  25  agencies about paying the au pairs a set amount?

---

164

13:42:38  1       A.  No.
13:42:41  2       Q.  So is it your testimony that you did not
13:42:43  3   realize by the time you were having your conversation
13:42:47  4   with Ms. Crompton that one of the issues was whether
13:42:52  5   the sponsors had reached an agreement about paying the
13:42:56  6   au pairs a set amount?
13:42:57  7       A.  My statement is based on it was a response
13:43:00  8   to her previous -- in the paragraph three from the top,
13:43:03  9   where Ms. Crompton said -- discussed pricing standard
13:43:07  10  across all agencies.  And I believe, if I recall
13:43:10  11  correctly, the next statement that I made or question I
13:43:12  12  asked was simply based on a -- responding to something
13:43:16  13  that Ms. Crompton said in the preceding response.  And
13:43:20  14  I took up -- took that and took it to its next logical
13:43:25  15  step in my mind at the time and asked what I thought
13:43:27  16  was a reasonable follow-up question.
13:43:29  17      Q.  In Exhibit 5, page 1, you quote yourself
13:43:33  18  with regard to three questions.  Those questions are as
13:43:37  19  follows:  "So is there an understanding among all the
13:43:42  20  agencies about paying the au pairs this set amount?"
13:43:48  21  No. 2, the question is, "I'm still a little confused on
13:43:52  22  the stipend amount.  Can you explain it to me?"  No. 3
13:43:58  23  is, "So you're saying that the government sets a
13:44:02  24  minimum amount to pay, and all the agencies agree to
13:44:06  25  pay that exact same minimum amount?"  All three

---

scheduling@huntergeist.com          HUNTER + GEIST, INC.          303-832-5966/800-525-8490

Beltran v. Interexchange, Inc.　　　　　DAVID KEIL　　　　　7/21/2016

---

165

13:44:09  1    questions that you quote yourself as having asked are
13:44:13  2    on the subject of an agreement on paying the minimum
13:44:17  3    amount among the sponsors.
13:44:21  4          A.  I believe --
13:44:22  5          MS. LOUIS:  Objection.
13:44:23  6          A.  I believe --
13:44:24  7          Q.  (BY MS. LUKEY)  Why is that?
13:44:25  8          A.  Well, I believe each of those taken in
13:44:27  9    context with the preceding question is simply the
13:44:31  10   relevant follow-up question to something that
13:44:34  11   Ms. Crompton raised.  So the fact that she kept coming
13:44:37  12   back to that issue and I kept asking follow-up
13:44:40  13   questions turned out to be these three paragraphs.  But
13:44:45  14   I --
13:44:46  15         Q.  So were there any other questions that you
13:44:48  16   asked that you recall that are not set down here?
13:44:52  17         A.  I'm certain there were -- there were
13:44:53  18   questions on a number of topics that were not set down
13:44:56  19   here.
13:44:56  20         Q.  Just so that we're very clear, it is your
13:44:58  21   testimony that you did not enter into this conversation
13:45:00  22   with Ms. Crompton with the objective of determining
13:45:05  23   specifically whether the sponsors had an agreement
13:45:08  24   concerning the amount to pay au pairs; is that correct?
13:45:12  25         A.  That was not my explicit intent, no.

---

166

13:45:16  1          Q.  Well, whether it was an explicit intent,
13:45:18  2    was it any intent of any kind?
13:45:20  3          A.  I don't believe so, no.
13:45:22  4          Q.  Okay.  Let's go to the second one.  This
13:45:25  5    is your interview -- by the way, these don't show
13:45:28  6    dates.  Is that consistent with your practice?
13:45:30  7          A.  Again, my practice varies from case to
13:45:33  8    case, client to client, circumstance to circumstance.
13:45:36  9    And, frankly, I don't recall what the -- what the
13:45:39  10   thinking was here.  But, no, it doesn't include dates.
13:45:42  11   Although it does, actually.  This one says on -- this
13:45:45  12   one starts with, "On November 21."
13:45:47  13         Q.  Oh, I'm sorry, you're right.  That one --
13:45:48  14   okay.  So --
13:45:48  15         A.  Actually, they all do.
13:45:50  16         Q.  -- what you do is you have it in the text?
13:45:51  17         A.  Yeah, they all do.
13:45:52  18         Q.  Is that what it is?
13:45:53  19         A.  They all do.
13:45:53  20         Q.  Okay.  I apologize.  I'm looking -- is the
13:45:56  21   last one, does that indicate -- apparently it's not in
13:45:59  22   the last one.
13:46:00  23         A.  Okay.
13:46:03  24         Q.  Is it your testimony that private
13:46:05  25   investigators are not required to maintain records of

---

167

13:46:09  1    their activities?
13:46:10  2          A.  My agreement with all my clients, and it's
13:46:14  3    stated in my fee agreement, is that all notes, all
13:46:16  4    documents, and all materials are work product belonging
13:46:20  5    to the law firm who's retained me, and it's clearly
13:46:23  6    stated in my fee agreement that no copies of that
13:46:26  7    material will be maintained, and if it by some
13:46:30  8    happenstance happens to be in my possession when
13:46:31  9    someone seeks it, it is a work product -- it is subject
13:46:34  10   to the work product and privilege exceptions.
13:46:36  11         Q.  Is that your standard agreement?
13:46:39  12         A.  That's my standard agreement.
13:46:42  13         Q.  So what caused you to enter an agreement
13:46:44  14   in which you make it a point to -- to specify that your
13:46:49  15   work is attorney work product?
13:46:52  16         A.  I've had that requested to me by literally
13:46:55  17   hundreds of attorneys over the years, and in other
13:46:57  18   cases, my work product has been sought through
13:47:02  19   discovery, and after having those issues adjudicated,
13:47:07  20   this is the advice I've received from my own personal
13:47:11  21   counsel as well as a number of attorneys who -- who use
13:47:13  22   me.
13:47:14  23         Q.  So you do have a personal attorney of whom
13:47:17  24   you could have inquired as to the propriety of making
13:47:20  25   these calls, correct?

---

168

13:47:21  1          A.  No.  I don't have a personal attorney who
13:47:23  2    over -- looks over my shoulder, no.
13:47:25  3          Q.  You have someone available to you to ask
13:47:27  4    question -- legal questions?
13:47:28  5          A.  I have someone -- I was referring to cases
13:47:30  6    in which my work product in prior cases had been asked
13:47:36  7    through -- sought through discovery, and in those
13:47:38  8    cases, yes, I retained my own legal counsel.  But, no,
13:47:42  9    I don't have ongoing counsel.
13:47:43  10         Q.  Okay.  Going to the second one.  Au Pair
13:47:48  11   International.  Would you review the few paragraphs
13:47:52  12   that exist there and tell us whether this is an
13:47:56  13   accurate and complete memorialization of your
13:48:00  14   conversation with a woman named Joanna at Au Pair
13:48:04  15   International.
13:48:05  16         (The deponent perused the exhibit.)
13:48:05  17         A.  I'm sorry, could you repeat the question?
13:48:23  18         Q.  Yes.  Is it an accurate and complete
13:48:25  19   description of your conversation with the woman named
13:48:29  20   Joanna at Au Pair International?
13:48:31  21         A.  It is accurate.  I can't state whether it
13:48:33  22   was -- whether there were other things discussed that
13:48:35  23   are not reflected here, but what's reflected here is
13:48:38  24   accurate.
13:48:39  25         Q.  Do you have a memory of anything that is

---

scheduling@huntergeist.com　　　　HUNTER + GEIST, INC.　　　　303-832-5966/800-525-8490

Beltran v. Interexchange, Inc.          DAVID KEIL                    7/21/2016

---

169

13:48:41  1    not included here?
13:48:43  2         A.  I remember that these conversations
13:48:46  3    included some back and forth and some discussion of
13:48:51  4    their services, how their services were conducted,
13:48:55  5    where the au pairs came from.  All of these interviews
13:48:58  6    had preamble and sort of boilerplate portions to them,
13:49:04  7    and what I reflected was, you know, what I thought was
13:49:07  8    unique and substantive of that conversation.  So that's
13:49:10  9    what appears here.
13:49:12  10        Q.  So in your own words, would you describe
13:49:16  11   what you chose to include and what you chose to
13:49:19  12   exclude, please.
13:49:21  13        A.  Things that I would characterize as
13:49:24  14   boilerplate I chose to exclude.
13:49:28  15        Q.  And what did you choose to include?
13:49:30  16        A.  I chose to include the items that are
13:49:32  17   reflected here.
13:49:33  18        Q.  Here again, sir, everything that you chose
13:49:36  19   to include and put in quotes relates to whether there
13:49:39  20   was an agreement among the sponsors as to the amount to
13:49:42  21   pay the au pairs.  Is there a reason for that?
13:49:46  22        A.  Again, I would from my recollection say
13:49:50  23   that that's the -- the issue that caught my attention
13:49:55  24   during the interview.  During the interview we talked
13:49:57  25   about their policies, we talked about their fee

170

13:50:01  1    structures to some degree, and what I noticed was a
13:50:05  2    consistency through each interview on this one topic,
13:50:09  3    and I'd say that caught my attention and I asked
13:50:13  4    appropriate follow-up questions for that reason.
13:50:15  5         Q.  Are you stating that you, yourself came up
13:50:17  6    with the concept that what was significant in the
13:50:25  7    interviews that you conducted was the discussion of an
13:50:29  8    agreement among sponsors regarding stipends?
13:50:33  9         MS. LOUIS:  Objection.
13:50:38  10        A.  I -- I would answer it this way.  I took
13:50:41  11   the interviews where they went based on the
13:50:46  12   conversations and the representations that the
13:50:48  13   interview subject was making.  I asked the appropriate
13:50:51  14   follow-up questions, and I noted where I saw a stark
13:50:56  15   similarity.
13:50:57  16        Q.  (BY MS. LUKEY)  And that's what you wrote
13:50:58  17   down on your own?
13:51:00  18        A.  Yes.
13:51:00  19        Q.  Nobody asked you at any point to look into
13:51:03  20   the issue of agreement among the sponsors with regard
13:51:06  21   to the stipend --
13:51:07  22        A.  Correct.
13:51:08  23        Q.  -- is that right?
13:51:08  24        A.  That's right.
13:51:09  25        Q.  So you were providing Mr. Hood with

---

171

13:51:11  1    information of this interesting phenomenon that you
13:51:15  2    developed in the course of the three conversations that
13:51:17  3    you had substantively; is that right?
13:51:19  4         A.  I was simply --
13:51:20  5         MS. LOUIS:  Object to form.
13:51:21  6         A.  I was simply reporting on the
13:51:23  7    conversations and the issues that I felt were important
13:51:27  8    within.
13:51:28  9         Q.  (BY MS. LUKEY)  Now, I noticed in both of
13:51:30  10   these that you quote both Ms. Crompton and Joanna as
13:51:44  11   saying, "everybody agrees," in Ms. Crompton's case, and
13:51:48  12   then Joanna, the same thing, "everybody agrees."
13:51:54  13   That's the language that each of them used; is that
13:51:57  14   right?
13:51:58  15        A.  Well, to follow this, she -- paragraph
13:52:02  16   one, two -- four, she says, "It's a base rate.  It's a
13:52:06  17   minimum."  And I inferred the follow-up question being
13:52:12  18   is it a minimum -- this is paraphrasing.  Is it a
13:52:15  19   minimum that everybody uses, is it something that
13:52:17  20   everybody agrees to, and her answer was, "Everybody
13:52:20  21   agrees, yeah."
13:52:21  22        Q.  So everybody agrees that's the minimum
13:52:23  23   amount; is that right?
13:52:24  24        A.  That's what this person stated.
13:52:26  25        Q.  All right.  Have you ever seen the

172

13:52:28  1    Department of State notification?
13:52:31  2         A.  No.
13:52:32  3         Q.  Do you know what that says?
13:52:35  4         A.  No.
13:52:35  5         Q.  Do you know if the quotes that you have in
13:52:37  6    here accurately reflect what the Department of State
13:52:41  7    notification says?
13:52:42  8         A.  I don't think I was attempting to
13:52:43  9    accurately reflect what the Department of State says, I
13:52:46  10   was trying to accurately reflect what these witnesses
13:52:49  11   stated.
13:52:49  12        Q.  I'm suggesting to you that what the
13:52:51  13   witnesses said is consistent with what the Department
13:52:53  14   of State notification says, and I'm asking if you were
13:52:56  15   aware of that?
13:52:57  16        A.  I was not.
13:52:57  17        Q.  Okay.  And in both instances, they also,
13:53:00  18   also agreed that if somebody wanted to pay more, they
13:53:03  19   could?
13:53:04  20        A.  In -- in small -- small amounts, yes.
13:53:06  21        Q.  Did they say in small, small amounts, or
13:53:09  22   did they happen to give you examples that were small
13:53:12  23   amounts?
13:53:12  24        A.  They happened to give me examples of small
13:53:14  25   amounts.

43 (Pages 169 to 172)

Beltran v. Interexchange, Inc.                    DAVID KEIL                                    7/21/2016

---

173

| | | |
|---|---|---|
|13:53:15|1|    Q.   Okay.  Did you ask either of them a|
|13:53:17|2|follow-up question about, "What do you mean when you|
|13:53:20|3|say everybody agrees?"|
|13:53:29|4|    A.   Yes.|
|13:53:30|5|    Q.   That's not reflected here.|
|13:53:31|6|    A.   No.  And the reason was the answer, as I|
|13:53:35|7|recall, and I don't remember, I believe it was this|
|13:53:38|8|witness that we're discussing here, the answer was --|
|13:53:41|9|    Q.   I'm sorry, I can't even hear you here.|
|13:53:43|10|    A.   I'm so sorry.  I'm having -- I'm usually|
|13:53:45|11|not this -- this quiet.  I believe I asked this witness|
|13:53:48|12|a follow-up question and received, again, the exact|
|13:53:50|13|same answer, "Everybody agrees."  No, I did not notate|
|13:53:54|14|that twice.  I thought one notation was sufficient.|
|13:53:58|15|    Q.   So I'm clear, what they both told you is|
|13:54:00|16|everybody agrees that the minimum amount that can be|
|13:54:04|17|paid is that set by the Department of State?|
|13:54:05|18|    A.   Correct.|
|13:54:10|19|    Q.   And both of them told you that if a family|
|13:54:13|20|didn't want to pay the minimum amount, they could pay|
|13:54:16|21|some more?|
|13:54:18|22|    MS. LOUIS:  Object to form.|
|13:54:18|23|    A.   What they told me was they were personally|
|13:54:20|24|aware of a few examples, I think two examples, where|
|13:54:23|25|families did pay more, and the amount more that was|

---

174

| | | |
|---|---|---|
|13:54:27|1|paid was less than $5.|
|13:54:29|2|    Q.   (BY MS. LUKEY)  But they said to you that|
|13:54:31|3|families were free to pay more?|
|13:54:33|4|    MS. LOUIS:  Object to form.|
|13:54:34|5|    A.   What I -- what I understand from these|
|13:54:37|6|notes and what I recall from my conversations was that|
|13:54:41|7|there were -- they were stating there were some few|
|13:54:45|8|examples where families elected to pay more and that|
|13:54:48|9|those amounts were quite small.|
|13:54:50|10|    Q.   (BY MS. LUKEY)  I'm sorry, I couldn't hear|
|13:54:52|11|you.  And those amounts what?|
|13:54:53|12|    A.   Were quite small.|
|13:54:54|13|    Q.   Okay.  They told you the amounts?|
|13:54:56|14|    A.   Yes.|
|13:54:56|15|    Q.   They didn't say, "Those amounts were|
|13:54:58|16|small," they told you the amount, correct?|
|13:55:00|17|    A.   Correct.  I'm -- I'm stating they were|
|13:55:01|18|quite small.|
|13:55:02|19|    Q.   Okay.  Did either of these two women tell|
|13:55:10|20|you that the host families were told they could only|
|13:55:16|21|pay the State Department's stated amount?|
|13:55:21|22|    A.   No.|
|13:55:25|23|    Q.   Turning to the third, Irina Gussev,|
|13:55:29|24|Regional Director, it says, of EurAuPair, E-u (sic)|
|13:55:33|25|capital A-u capital P-a-i-r.  Would you review your|

---

175

| | | |
|---|---|---|
|13:55:39|1|notes with regard to Ms. Gussev, please, and let me|
|13:55:42|2|know when you have had a chance to do so.|
|13:55:46|3|    (The deponent perused the exhibit.)|
|13:56:29|4|    A.   Yes.|
|13:56:29|5|    Q.   Now, you indicate in your opening -- oh,|
|13:56:32|6|first let me ask you, is this a complete and accurate|
|13:56:36|7|memorialization of your conversation with EurAuPair?|
|13:56:41|8|    A.   It's an accurate representation.  Again,|
|13:56:43|9|there may have been some boilerplate conversation that|
|13:56:45|10|didn't -- that's not reflected here.|
|13:56:47|11|    Q.   Because you didn't consider that important|
|13:56:49|12|to what you were doing?|
|13:56:50|13|    A.   Because I was talking and typing and|
|13:56:51|14|trying to do multiple things at once, and I was -- this|
|13:56:56|15|is what I elected to memorialize.|
|13:56:56|16|    Q.   Did you take down the information that you|
|13:57:02|17|thought was important to your assignment?|
|13:57:04|18|    A.   I took down the information that I thought|
|13:57:07|19|was relevant to the interview.|
|13:57:13|20|    Q.   Well, how did you define what was relevant|
|13:57:15|21|to the interview?|
|13:57:16|22|    A.   I don't believe I had an assignment other|
|13:57:18|23|than to conduct fact-finding interviews.  So what I|
|13:57:23|24|memorialized here is the facts that I found in the|
|13:57:25|25|interviews.|

---

176

| | | |
|---|---|---|
|13:57:26|1|    Q.   What facts were you supposed to be|
|13:57:27|2|finding?|
|13:57:28|3|    A.   Again, I do not believe I was -- set out|
|13:57:32|4|to find any facts.  I believe, as I stated in my|
|13:57:36|5|earlier testimony, my goal was to learn about how these|
|13:57:41|6|companies compensate -- were compensated by customers,|
|13:57:44|7|how they compensated au pairs, how those policies|
|13:57:49|8|differed or were similar amongst the various companies.|
|13:57:53|9|    Q.   Now, in the information that you've taken|
|13:57:55|10|down in your only notes from your project, there's no|
|13:58:00|11|discussion of the answers to questions about how the|
|13:58:04|12|sponsors are compensated by host families.  Did you ask|
|13:58:07|13|that question?|
|13:58:08|14|    A.   I'm sorry.  Again, please?|
|13:58:11|15|    Q.   A moment ago you said that the directive|
|13:58:13|16|was to find out what you could about the industry,|
|13:58:16|17|including how host families were compensated -- I'm|
|13:58:19|18|sorry, sponsors were compensated by host families, and|
|13:58:23|19|how au pairs were compensated.  Did you ask questions|
|13:58:28|20|about how the sponsors were compensated?|
|13:58:32|21|    A.   I asked questions about their fee|
|13:58:36|22|structures.  I received no direct response as far as|
|13:58:44|23|amounts or types of fees.  I believe that had I been|
|13:58:54|24|acting as a potential customer or had I been a|
|13:58:57|25|potential customer, maybe they would have volunteered|

---

scheduling@huntergeist.com            HUNTER + GEIST, INC.            303-832-5966/800-525-8490

Beltran v. Interexchange, Inc.                    DAVID KEIL                          7/21/2016

---

177

13:58:59  1    that information, but because I was asking very generic
13:59:03  2    questions, I was receiving very generic answers back
13:59:07  3    about fees.
13:59:08  4         Q.  Did you get information -- other than
13:59:09  5    Ms. Crompton's general statement that her sponsor
13:59:15  6    agency was in the middle price wise, did you get
13:59:18  7    information from any of them regarding how and in what
13:59:22  8    amount they were compensated?
13:59:24  9         A.  Again, I don't recall anybody giving me
13:59:28  10   specific amounts about how they were compensated.  And,
13:59:32  11   frankly, if those conversations did occur, I don't
13:59:36  12   recall them.  But I don't recall anyone giving me
13:59:40  13   specific numbers.
13:59:42  14        Q.  Were you asking for specific numbers?
13:59:44  15        A.  No.  I was asking more generic questions,
13:59:47  16   as I've said.  How does this program work?  How
13:59:52  17   are -- you know, how are au pairs compensated?  How are
13:59:56  18   you guys compensated?  What type of expenses could a
13:59:59  19   family expect?  I was asking very general questions,
14:00:02  20   and I was receiving back pretty general answers on a
14:00:06  21   lot of those topics.
14:00:07  22        Q.  So you did not hear anything that you
14:00:11  23   considered important to note with regard to the
14:00:15  24   compensation of sponsors other than Ms. Crompton's
14:00:18  25   reference to being in the middle of the pack; is that

---

178

14:00:21  1    right?
14:00:21  2         A.  I didn't note anything beyond what's
14:00:24  3    currently in my statement.
14:00:25  4         Q.  Okay.  And you did not find any agreement
14:00:28  5    among sponsors as to the amount that they're paid,
14:00:31  6    correct?
14:00:32  7         A.  I didn't obtain enough information to know
14:00:34  8    that, no.
14:00:35  9         Q.  Okay.  So looking at what you did inquire
14:00:39  10   of with Irina Gussev.  Again, the questions relate to
14:00:47  11   the amount of the stipends paid to the au pairs,
14:00:51  12   correct?
14:00:52  13        A.  That appears to be the case.
14:00:53  14        Q.  Okay.  In this instance you say -- you
14:01:00  15   quote your own question, "Are you saying that each and
14:01:04  16   every one of the 15 companies have gotten together and
14:01:08  17   they made an agreement to pay all au pairs a stipend
14:01:12  18   that is no more than" 120 -- I'm sorry -- "$195.75 per
14:01:18  19   week?"  That was your question.
14:01:20  20        A.  That was my question.
14:01:21  21        Q.  Okay.  And her answer was initially, "Yes,
14:01:26  22   they all agreed to pay that amount, no more."  But then
14:01:30  23   she added, "We have" a -- "one family who pays a little
14:01:35  24   bit more, so I guess you could pay more if you wanted
14:01:37  25   to . . ."  She said that to you, right?

---

179

14:01:40  1         A.  Yes.
14:01:40  2         Q.  Okay.  Did you ask her whether there was
14:01:45  3    an agreement among the companies to pay the same
14:01:50  4    amount?
14:01:52  5         A.  I -- if you look again at paragraph 2, she
14:01:59  6    discussed -- and this is the flow of the conversation.
14:02:02  7    She discussed the $500 educational fee and that all 15
14:02:07  8    companies agreed to require that same amount.  She
14:02:11  9    answered yes.  I then asked what I thought was the
14:02:14  10   logical follow-up question, "What about the amount paid
14:02:17  11   directly to the au pair?"  She answered, "Yes, it's
14:02:21  12   called a stipend," and quoted the amount of 195.75.
14:02:25  13   And then I asked again what I thought was just a
14:02:28  14   logical follow-up question, and she answered, "Yes,
14:02:33  15   it's exactly the same amount, equal in all programs."
14:02:36  16   I didn't prompt that question.  That was her response
14:02:39  17   to a more broad question.
14:02:42  18        Q.  Except she added that you could pay more
14:02:43  19   if you wanted to?
14:02:47  20        A.  Yes.
14:02:47  21        Q.  Was it of any significance to you in
14:02:51  22   conducting your interviews what the Department of State
14:02:53  23   directive or notification says?
14:02:56  24        A.  I -- I'm sorry?  Ask --
14:02:59  25        Q.  Was it of any importance to you whether,

---

180

14:03:01  1    in fact, there is a directive or notification from the
14:03:04  2    Department of State that sets forth elements of the
14:03:10  3    compensation of au pairs?
14:03:12  4         A.  The individuals I spoke to in these
14:03:15  5    conversations plus others that are not documented here
14:03:17  6    led me to believe it was a minimum amount set by law
14:03:22  7    and that everyone in the industry followed that minimum
14:03:27  8    amount, and I didn't see a need to research that
14:03:30  9    further.  It seemed to be a consensus, and I took it at
14:03:33  10   face value.
14:03:41  11        Q.  Did you obtain information from anyone
14:03:46  12   regarding any purported agreement, that is,
14:03:50  13   communications among sponsors, to use the stipend
14:04:01  14   included in the Department of State guidance and
14:04:01  15   notification?
14:04:02  16        MS. LOUIS:  Object to form.
14:04:03  17        A.  And, I'm sorry, I'm not understanding the
14:04:05  18   question.
14:04:06  19        Q.  (BY MS. LUKEY)  Agreement, sir.  Like I
14:04:07  20   say to you, "Let's do this.  Let's pay $190 a week."
14:04:15  21        A.  I -- I think --
14:04:16  22        MS. LOUIS:  There's no question.
14:04:18  23        THE DEPONENT:  Oh.  Yes.
14:04:19  24        Q.  (BY MS. LUKEY)  I haven't gotten there
14:04:20  25   yet.

---

Beltran v. Interexchange, Inc.                DAVID KEIL                        7/21/2016

---

181

14:04:21  1    A.  Thank you.
14:04:21  2    Q.  Did you ask any of them whether they
14:04:24  3  communicated with each other regarding the amount, as
14:04:29  4  opposed to all following the State Department directive
14:04:33  5  that is by law sent to all of them?
14:04:36  6    MS. LOUIS:  Object to form.
14:04:38  7    A.  My understanding when I asked the question
14:04:40  8  was -- and my understanding of what these individuals
14:04:45  9  was saying to me was our -- our -- their understanding
14:04:48  10  was that their employers had all agreed to set the same
14:04:51  11  amount, and that that was an amount set by law.
14:04:56  12    Q.  (BY MS. LUKEY)  Now you've interjected the
14:04:58  13  element of their employers having all agreed, and we
14:05:02  14  haven't actually heard that reference.  Did -- going
14:05:08  15  back to the first one.  Did Ms. Crompton of APF tell
14:05:13  16  you that she understood that her employer and all the
14:05:17  17  other sponsors had reached an agreement?
14:05:20  18    MS. LOUIS:  Before you answer, object to
14:05:23  19  the characterization.
14:05:28  20    A.  Ms. Crompton -- I can only reflect what's
14:05:30  21  stated in my report.  Ms. Crompton stated that there
14:05:35  22  were pricing -- excuse me.  So there -- I asked, "Is
14:05:38  23  there an understanding amongst all the agencies about
14:05:40  24  paying the au pairs this set amount?"  And her answer
14:05:45  25  was, "Well, yeah, it's that."

182

14:05:48  1    Q.  (BY MS. LUKEY)  Okay.
14:05:49  2    A.  Then she added, "Plus, we are all subject
14:05:51  3  to the same federal guidelines, so we stay within
14:05:55  4  that."  So . . .
14:05:56  5    Q.  Do you find it surprising that they were
14:05:58  6  all staying within the federal guidelines?
14:06:00  7    MS. LOUIS:  Object to form.
14:06:01  8    A.  I don't have an opinion on that.
14:06:03  9    Q.  (BY MS. LUKEY)  Okay.  Did you find out
14:06:05  10  from her what, if any, information she had directly of
14:06:11  11  any agreement being reached?
14:06:13  12    A.  I thought it was implied in her statement
14:06:15  13  that there -- "We all agree" is -- I didn't believe
14:06:21  14  Ms. Crompton and her coworkers were agreeing, I
14:06:24  15  believed when she said, "We," she meant we, her
14:06:28  16  organization.
14:06:29  17    Q.  Did you attempt to ascertain since she, as
14:06:31  18  an individual working for an organization, what
14:06:34  19  information she had that her organization had agreed
14:06:38  20  with other organizations to pay a set amount?
14:06:41  21    A.  I did not ask that question.
14:06:45  22    Q.  With regard to Joanna of Au Pair
14:06:52  23  International, did you ask her what -- now, it was
14:06:56  24  clear to you, she is an employee, she is not the owner
14:07:00  25  of the company, correct?

---

183

14:07:02  1    A.  Based on the notes here in my report, she
14:07:06  2  described herself as an area director.
14:07:08  3    Q.  Okay.  Did you ask her what information
14:07:12  4  she had that her employer had agreed with other
14:07:18  5  agencies to a set amount?
14:07:20  6    A.  Other than her statement that everybody
14:07:24  7  agrees, no.
14:07:25  8    Q.  You didn't follow up?
14:07:26  9    A.  I did not follow up.
14:07:27  10    Q.  By the way, you didn't have the sense that
14:07:30  11  either of these women, Carrie Crompton or Joanna, was
14:07:34  12  herself the person who was in a position of sufficient
14:07:37  13  authority to reach an agreement with other agencies,
14:07:39  14  did you?
14:07:40  15    A.  I don't have any basis to know the answer
14:07:42  16  to that.
14:07:43  17    Q.  Do you have any basis to suggest that
14:07:45  18  these people had the authority to enter into agreements
14:07:48  19  with other companies?
14:07:49  20    A.  They all told me their titles were
14:07:52  21  director.  They all used the word "we."  That's the
14:07:57  22  maximum I can glean from that -- those statements.
14:07:59  23    Q.  Okay.  Were you looking for the top person
14:08:02  24  when you were reaching into these sponsors?
14:08:05  25    A.  No.

184

14:08:09  1    Q.  And with regard to Irina, did you inquire
14:08:13  2  of Irina whether -- what the basis was for her
14:08:21  3  understanding that the sponsors paid the same amount,
14:08:28  4  although a family could pay more if it wanted to?
14:08:32  5    A.  Other -- no, other than her statement that
14:08:34  6  she states, "Yes, it's exactly the same amount, equal
14:08:38  7  in all programs."  So I assumed that she had knowledge
14:08:42  8  to make that statement.
14:08:46  9    Q.  Well, if you assumed that her knowledge is
14:08:49  10  to state that all of the programs were informing the
14:08:52  11  host family of the stipend specified by the Department
14:08:56  12  of State in the notification, does that constitute some
14:09:02  13  form of an agreement among the sponsors?
14:09:05  14    A.  I don't --
14:09:06  15    MS. LOUIS:  Objection.
14:09:07  16    A.  I don't think I have enough information to
14:09:08  17  answer that question.
14:09:09  18    Q.  (BY MS. LUKEY)  Do you know, as to any of
14:09:10  19  these three women, whether they were confirming for you
14:09:14  20  that the sponsor agencies all follow the federal
14:09:19  21  directive?
14:09:21  22    A.  I'm sorry, could you rephrase that?
14:09:23  23    Q.  Do you know whether in the case of the
14:09:26  24  only three agencies from which you received substantive
14:09:29  25  information, that they were confirming for you that

---

46 (Pages 181 to 184)

Beltran v. Interexchange, Inc.                    DAVID KEIL                              7/21/2016

---

185

| | |
|---|---|
| 14:09:32 | 1 |
| 14:09:36 | 2 |

all the sponsor agencies follow the same federal
directive?

A. I believed, based on my recollection of my
notes, that they were speaking to me honestly about
their understanding of how their company and their
industry operated. That's the sum total of what I
asked, and I believe they seemed to have the knowledge
to answer that question directly.

Q. That everybody was following the same
federal directive of $195.75 as their information to
the families about what they are to pay?

A. Yes.

MS. LOUIS: Object to form.

Q. (BY MS. LUKEY) And in each instance, all
three of them also said you could pay more if you
wanted to; is that right?

A. Two of them stated that they -- they had
seen instances where slight amounts -- larger amounts
were paid, again, amounts under $5. And Ms. Crompton
stated 196 is a minimum and that no one would know if a
particular family were to elect to pay more.

Q. Okay. So she said this is the minimum,
and if somebody pays more, they can pay more?

MS. LOUIS: Object to form.

Q. (BY MS. LUKEY) Is that correct?

---

186

A. I stand by the statement that's in
my -- in my report.

Q. That she told you that the $196 is -- is a
minimum amount, so that nobody would have to know if a
particular family elected to pay more?

A. A little bit more is exactly the
statement.

Q. Okay. So that's the statement from Au
Pair -- sorry. That's the statement from APF Global.
The statement from Au Pair International is that "You
can pay a little more, it's fine, it's up to you." And
the statement from EurAuPair is, ". . . I guess you
could pay more if you wanted to."

MS. LOUIS: Object to the form of the
question.

Q. (BY MS. LUKEY) Right?

A. No. If I understand what -- if I
understood this right, Irina Gussey -- Gussev stated,
" . . . they all agreed to pay the amount, no more."
She added that one family -- she was aware of one
family who paid a little bit more.

Q. And keep reading the rest of her quote,
please.

A. And, "I guess you could pay more if you
wanted to, yes. But it's exactly the same in all

---

187

programs."

Q. So what you found out from each of these
women is that their organizations informed their host
families of the amount set forth in the Department of
State stipend, correct?

MS. LOUIS: Object to --

Q. (BY MS. LUKEY) I'm sorry, notification.

MS. LOUIS: Object to form.

A. That is what I was told.

Q. (BY MS. LUKEY) I want you to tell us,
sir, each and every piece of evidence that you learned
of a communication between any two or more sponsors in
which they reached an agreement on the amount.

A. The statement that I've made here -- the
statements that are here are my complete statements.
I -- as I stated earlier on several occasion, they used
the term "we." I assumed or believed that to be, when
they said, "we," they were talking about their
organizations, not themselves personally, and that's
the sum total of what I have.

Q. You have no evidence, then, of any
communications occurring between two or more sponsors
in which they agreed to set the amount of the stipends;
is that correct?

A. Correct.

---

188

Q. You mentioned there were other interviews,
sir, that weren't recorded here, that you gained some
information, but not the full amount of information; is
that right?

A. Yes.

Q. Do you have any notes or memorialization
relating to any of those communications?

A. I do not.

Q. Do you have any memory relating to those
communications?

A. Specific memories of specific
conversations, no. General memories of how the
interviews were conducted, yes.

Q. Did you in any of these information --
excuse me, in these calls that you cannot recall
specifically, did you gain any substantive information
relating to pay or stipends of au pairs?

A. No. Had I obtained anything
substantive -- that I deemed substantive at the time,
it would have appeared in my running memo.

Q. Is there any -- I'm sorry. Is there any
information that you intentionally omitted?

A. No.

Q. Did you gain any information from any of
these entities as to whom we have no notes and you have

---

47 (Pages 185 to 188)

Beltran v. Interexchange, Inc.                    DAVID KEIL                          7/21/2016

---

### 189

14:14:51  1   no specific memory that suggested there was not
14:14:55  2   agreement among the sponsors?
14:14:57  3        Q.  Did any sponsor suggest to you -- sorry.
14:15:00  4   Did any of the employees of these sponsors suggest to
14:15:03  5   you in any way that there was an agreement on an amount
14:15:06  6   that was different from the State Department directive?
14:15:12  7        A.  No.
14:15:18  8        Q.  In all instances you were told the amount
14:15:21  9   that is the standing State Department directive; is
14:15:27 10   that correct?
14:15:29 11        A.  I was told a combination.  It was stated a
14:15:30 12   combination of ways over the calls.  Some individuals
14:15:34 13   stated that it was the standard State Department
14:15:38 14   minimum.  Some stated the amount and did not mention
14:15:41 15   that it was related to the State Department minimum.
14:15:45 16   Some borrowed a little bit from -- from either of
14:15:50 17   those.  But, no, I was not told anything other than
14:15:54 18   those two things.
14:15:58 19        Q.  And the amount in all three instances that
14:16:05 20   you were told was $195.75?
14:16:08 21        A.  I believe from my notes, Ms. Crompton
14:16:11 22   stated 196.  I believe that was her -- the amount that
14:16:14 23   she stated.
14:16:19 24        Q.  Okay.  And I can see that you actually
14:16:21 25

### 190

14:16:26  1   note for Ms. Gussev $195.75.
14:16:29  2        A.  Yes.
14:16:29  3        Q.  Do you know, sir, that that is the amount
14:16:31  4   in the State Department directive?
14:16:32  5        A.  I do not.
14:16:34  6        Q.  You don't know one way or the other?
14:16:36  7        A.  I know -- I don't know one way or the
14:16:38  8   other.
14:16:38  9        Q.  Okay.  Was there ever a time when you had
14:16:40 10   on your electronic running log or elsewhere any
14:16:44 11   information about your other calls?
14:16:45 12        A.  No.
14:16:49 13        Q.  Did you provide any information in your
14:16:52 14   bills or otherwise to Mr. Hood or Towards Justice or
14:17:00 15   Boies Schiller as to the identity of the other persons
14:17:04 16   or entities whom you called?
14:17:06 17        A.  No.
14:17:12 18        Q.  Did you come away with the understanding
14:17:14 19   that any of the three women whom you interviewed was in
14:17:22 20   the executive suite, if you will, at the top of the
14:17:24 21   organizations?
14:17:25 22        A.  I didn't have any advance knowledge or any
14:17:28 23   knowledge, really, at all about the size of these
14:17:31 24   organizations or whether they had an executive suite.
14:17:33 25   All I knew was these women explained to me that they

### 191

14:17:38  1   were directors in an executive position with their
14:17:41  2   organization, but that's all I knew.
14:17:44  3        Q.  Well, you weren't looking for the top
14:17:46  4   decision makers, were you?
14:17:47  5        A.  No.
14:17:49  6        Q.  And did any of them suggest to you or did
14:17:52  7   you otherwise understand that they owned the agencies?
14:17:55  8        A.  I don't think -- I asked, and I don't
14:17:57  9   think anyone suggested it.
14:18:02 10        Q.  Is what appears in Exhibit 5 as slightly
14:18:08 11   expanded today the sum total of all of the information
14:18:13 12   that you have gathered in this case?
14:18:14 13        A.  Yes.
14:18:15 14        MS. LOUIS:  Object to form.
14:18:32 15        Q.  (BY MS. LUKEY)  Do you have any
14:18:35 16   information as to how the stipend in the federal
14:18:37 17   directive of $195.75 was computed?
14:18:41 18        A.  No.
14:18:44 19        Q.  Do you have any knowledge or information
14:18:46 20   of the application by the Department of Labor and the
14:18:49 21   Department of State of room and board or lodging
14:18:52 22   credits as an offset to minimum wage compensation?
14:18:57 23        A.  No.
14:18:59 24        Q.  Do you have any information to suggest
14:19:01 25   that there was anything improper in the setting of the

### 192

14:19:07  1   stipend of $195.75 by the State Department?
14:19:11  2        A.  I don't know how to answer the word
14:19:13  3   "improper."  I don't have enough factual basis to know
14:19:17  4   what is and isn't proper here.
14:19:20  5        Q.  Do you have any reason to believe that it
14:19:21  6   would be improper for the sponsor families to
14:19:23  7   inform -- I'm sorry, the sponsor agencies to inform the
14:19:27  8   host families of the amount of the stipend specified by
14:19:31  9   the State Department?
14:19:33 10        MS. LOUIS:  Object to form.
14:19:35 11        A.  Could you please restate?
14:19:35 12        Q.  (BY MS. LUKEY)  Sure.  Do you have any
14:19:36 13   reason to think there would be anything inappropriate
14:19:38 14   or improper for the sponsor agencies to inform each
14:19:43 15   host family of the amount of the stipend set by the
14:19:46 16   State Department?
14:19:47 17        A.  Since I'm not familiar with the rules
14:19:49 18   governing this or how they're implemented, I don't
14:19:52 19   think I have the basis to answer that.  I don't know.
14:20:02 20        Q.  Have you talked to any au pairs?
14:20:05 21        A.  No.
14:20:05 22        Q.  Have you talked to any host families?
14:20:08 23        A.  No.
14:20:13 24        Q.  Have you talked to anyone other than the
14:20:20 25   sponsor agencies whose names were provided by Mr. Hood?

Beltran v. Interexchange, Inc.                    DAVID KEIL                              7/21/2016

---

193

14:20:24  1    A.  I'm sorry?
14:20:25  2    Q.  In connection with your work on this
14:20:27  3    assignment, have you talked to anyone other than
14:20:29  4    employees of the sponsor agencies that were identified
14:20:34  5    for you by Mr. Hood?
14:20:36  6    A.  Again, I don't recall that -- whether or
14:20:39  7    not Mr. Hood identified these agencies directly for me.
14:20:42  8    I -- I don't recall whether that was something I did
14:20:46  9    independently of Mr. Hood or at his -- you know, with
14:20:51  10   his suggestion. I honestly don't remember.
14:20:54  11   Q.  Did you have an understanding as to the
14:20:55  12   definition of the entities that you were to be
14:20:57  13   contacting?
14:20:58  14   A.  Yes.
14:20:58  15   Q.  What did you understand it to be?
14:21:00  16   A.  Companies that provided au pair services
14:21:04  17   in the United States and could be found, you know,
14:21:09  18   through advertisements on the Internet.
14:21:13  19   MS. FITZGERALD:  I couldn't hear you.
14:21:16  20   THE DEPONENT:  I'm sorry.
14:21:16  21   MS. LUKEY:  Could be -- could be found
14:21:16  22   through advertising on the Internet was the last part.
14:21:19  23   A.  And then, again, that was my -- I don't
14:21:22  24   recall whether that's exactly the method I used to
14:21:25  25   create the list or not.

---

194

14:21:27  1    Q.  (BY MS. LUKEY)  Do you have any memory at
14:21:28  2    all of how you defined the list of entities that you
14:21:34  3    were contacting other than the fact that you were told
14:21:37  4    not to contact two agencies?
14:21:40  5    A.  No.
14:21:41  6    Q.  So you don't remember whether Towards
14:21:45  7    Justice gave you a list or whether you made up your own
14:21:47  8    list?
14:21:47  9    A.  I don't recall.
14:21:48  10   Q.  Did you do any research on the State
14:21:51  11   Department site to find out who the approved sponsors
14:21:54  12   under the program are?
14:21:55  13   A.  No.
14:21:56  14   Q.  How did you define the program?
14:21:58  15   A.  Again, probably after a general
14:22:02  16   conversation I did some research online. But, again, I
14:22:08  17   don't really recall the circumstances of how that list
14:22:10  18   was compiled. I don't.
14:22:15  19   Q.  Do you know what the J-1 program is?
14:22:18  20   A.  I don't know that term.
14:22:20  21   Q.  If you were researching online, how would
14:22:22  22   you identify all of the sponsors in the country?
14:22:29  23   A.  Again, I don't have a lot of familiarity
14:22:32  24   with the program. I do research for a living. I don't
14:22:37  25   recall whether some of the names or all of the names or

---

195

14:22:41  1    none of the names were provided by Mr. Hood. I don't
14:22:44  2    recall the answer to that.
14:22:46  3    Q.  Where did you come up with the number 10
14:22:48  4    to 20 companies at the beginning?
14:22:50  5    A.  Because I recall it all fit on one page of
14:22:54  6    an 11-inch legal pad.
14:22:56  7    Q.  So you recall having the names listed in
14:22:58  8    writing; is that right?
14:22:59  9    A.  I recall the names in my handwriting
14:23:02  10   listed in writing, yes.
14:23:04  11   MS. KOZAL:  I'm sorry, I didn't hear you.
14:23:05  12   I apologize.
14:23:07  13   THE DEPONENT:  Yes, I recall at one point
14:23:08  14   I was working off a handwritten list on a yellow 11 X
14:23:12  15   14 legal pad.
14:23:15  16   Q.  (BY MS. LUKEY)  Do you still have that
14:23:16  17   list?
14:23:17  18   A.  I do not.
14:23:18  19   Q.  And you can't even tell us whether someone
14:23:20  20   told you the names or you tried to find them online?
14:23:23  21   A.  I don't recall, other than I recall a
14:23:26  22   specific conversation where I was told that two
14:23:29  23   specific companies might be represented by counsel and
14:23:32  24   I should avoid contact -- contacting them. But I don't
14:23:35  25   recall if they were on the list or not at that point.

---

196

14:23:38  1    Q.  What search terms would you have used if
14:23:40  2    that's how you came up with these names?
14:23:45  3    A.  Probably -- well, again, I don't want to
14:23:47  4    speculate. Probably au pair. But that's -- you know,
14:23:49  5    again, I don't want to speculate. I don't recall.
14:23:52  6    Q.  Do you know whether the companies you
14:23:54  7    contacted were the 15 State Department approved J-1
14:24:01  8    au pair program sponsors?
14:24:04  9    A.  I do not.
14:24:05  10   Q.  Do you know whether you were calling
14:24:07  11   companies that were not among the 15 State Department
14:24:10  12   approved J-1 sponsor agencies?
14:24:15  13   A.  I do not.
14:24:19  14   Q.  It happens that the three names that you
14:24:22  15   gave us are State Department approved agencies. Do you
14:24:29  16   even know whether you called, for example,
14:24:33  17   InterExchange?
14:24:36  18   A.  I'm sorry? Your question?
14:24:38  19   Q.  Did you call InterExchange?
14:24:40  20   A.  I called -- in regard to these three
14:24:42  21   statements here, I think it's very clear that I called
14:24:46  22   the company listed in my report, I listed the phone
14:24:50  23   number of whom I contacted and where they were located,
14:24:53  24   and in the case of at least one of them, the email
14:24:58  25   address that they provided me to return. So I believed

---

49 (Pages 193 to 196)

Beltran v. Interexchange, Inc.                    DAVID KEIL                              7/21/2016

---

197

| | |
|---|---|
| 14:25:01 | 1 | I was -- I believe whatever information is here is as |
| 14:25:05 | 2 | accurate as it's reflected in this report. |
| 14:25:07 | 3 | Q.  But I'm asking you about what you refer to |
| 14:25:10 | 4 | as the other calls, where you said that you've recorded |
| 14:25:13 | 5 | what you remember of significance in reaching out to |
| 14:25:17 | 6 | others -- |
| 14:25:18 | 7 | A.  Yes. |
| 14:25:18 | 8 | Q.  -- in those two paragraphs.  Do you know |
| 14:25:21 | 9 | whether you called an au pair agency named |
| 14:25:25 | 10 | InterExchange, Incorporated? |
| 14:25:26 | 11 | A.  At this moment I do not. |
| 14:25:27 | 12 | Q.  Do you have any means of finding out |
| 14:25:29 | 13 | whether you did? |
| 14:25:30 | 14 | A.  No. |
| 14:25:31 | 15 | Q.  Do you know whether you called an agency |
| 14:25:34 | 16 | called known as USAuPair, Incorporated? |
| 14:25:37 | 17 | A.  No. |
| 14:25:37 | 18 | Q.  Do you know whether you called an agency |
| 14:25:39 | 19 | known as GreatAuPair, LLC? |
| 14:25:42 | 20 | A.  No. |
| 14:25:42 | 21 | Q.  Do you know whether you called an agency |
| 14:25:46 | 22 | called Expert Group International, Inc., doing business |
| 14:25:49 | 23 | as Expert AuPair? |
| 14:25:51 | 24 | A.  No. |
| 14:25:52 | 25 | Q.  Do you know whether you called Cultural |

198

| | |
|---|---|
| 14:25:57 | 1 | Homestay International? |
| 14:25:57 | 2 | A.  That one actually rings a bell, so |
| 14:25:59 | 3 | possibly. |
| 14:26:00 | 4 | Q.  Do you have any memory of that call? |
| 14:26:01 | 5 | A.  I have a memory of that name. |
| 14:26:03 | 6 | Q.  Do you have any memory -- |
| 14:26:06 | 7 | MR. BENDER:  I can't hear. |
| 14:26:07 | 8 | THE DEPONENT:  Yes, I have a memory of |
| 14:26:09 | 9 | that name. |
| 14:26:09 | 10 | Q.  (BY MS. LUKEY)  Do you have any memory of |
| 14:26:10 | 11 | the call? |
| 14:26:11 | 12 | A.  I -- I remember making a call to that |
| 14:26:13 | 13 | company. |
| 14:26:13 | 14 | Q.  And what happened? |
| 14:26:14 | 15 | A.  Again, I don't have any specific notes to |
| 14:26:16 | 16 | that effect.  I can't speak to that. |
| 14:26:18 | 17 | Q.  Do you know whether you received any |
| 14:26:20 | 18 | substantive information? |
| 14:26:21 | 19 | A.  The information that I've provided in this |
| 14:26:25 | 20 | report is the information that I have to provide. |
| 14:26:28 | 21 | Q.  And there's nothing in there about |
| 14:26:30 | 22 | Cultural Homestay, so you have no information; is that |
| 14:26:34 | 23 | right? |
| 14:26:34 | 24 | A.  I stand by the written report. |
| 14:26:36 | 25 | Q.  Well, the written report names three |

199

| | |
|---|---|
| 14:26:38 | 1 | agencies, sir.  I need to know for the benefit of the |
| 14:26:41 | 2 | other sponsors who have been sued here who are |
| 14:26:43 | 3 | defendants whether any information you gathered has any |
| 14:26:47 | 4 | bearing on the other 12, including my client, and I |
| 14:26:51 | 5 | asked you this morning.  Do you know whether you called |
| 14:26:54 | 6 | Cultural Care, doing business as Cultural Care Au Pair? |
| 14:26:58 | 7 | A.  And, again, to the best of my memory, I |
| 14:27:01 | 8 | believe I did.  I do not recall the substance of the |
| 14:27:04 | 9 | conversation. |
| 14:27:06 | 10 | Q.  Do you recall anything about the |
| 14:27:07 | 11 | conversation? |
| 14:27:09 | 12 | A.  I remember, again, as I said, the |
| 14:27:13 | 13 | boilerplate questions that I asked all of the parties I |
| 14:27:16 | 14 | called, and we talked about that.  And I do recall |
| 14:27:19 | 15 | that.  Do I recall specifically their answers?  No. |
| 14:27:23 | 16 | Q.  Sir, did you get past the call center at |
| 14:27:26 | 17 | Cultural Care? |
| 14:27:27 | 18 | A.  I have no idea if they have a call center |
| 14:27:29 | 19 | or not. |
| 14:27:29 | 20 | Q.  I'll represent to you they have a call |
| 14:27:31 | 21 | center.  Did you get beyond the operator who picked up |
| 14:27:33 | 22 | the 800 number? |
| 14:27:35 | 23 | A.  I -- I did not speak to anyone I believed |
| 14:27:40 | 24 | to be an operator or a receptionist.  The calls that I |
| 14:27:47 | 25 | made were attempting to reach someone who could answer |

200

| | |
|---|---|
| 14:27:50 | 1 | substantive questions. |
| 14:27:51 | 2 | Q.  And in the case of Cultural Care Au Pair, |
| 14:27:55 | 3 | did you get beyond the operator who answered the phone? |
| 14:28:00 | 4 | A.  I don't recall. |
| 14:28:01 | 5 | Q.  Do you have any reason to believe that you |
| 14:28:03 | 6 | did? |
| 14:28:04 | 7 | A.  I believe that I spoke with someone of |
| 14:28:09 | 8 | some knowledge at each of the companies I called. |
| 14:28:12 | 9 | Q.  Sir, do you recall whether the operator |
| 14:28:16 | 10 | said she would put you in touch with someone in Denver |
| 14:28:21 | 11 | and that you hung up after you had been in the queue |
| 14:28:24 | 12 | for a brief period? |
| 14:28:25 | 13 | A.  That -- |
| 14:28:26 | 14 | MS. LOUIS:  Object to form. |
| 14:28:27 | 15 | A.  That doesn't ring a bell.  It's possible, |
| 14:28:29 | 16 | but I don't recall it. |
| 14:28:31 | 17 | Q.  (BY MS. LUKEY)  Let me be clear on this. |
| 14:28:32 | 18 | Are you saying you posed any questions to anyone at |
| 14:28:36 | 19 | Au Pair (sic) other than asking to speak with someone |
| 14:28:39 | 20 | who had knowledge of the program and not getting beyond |
| 14:28:44 | 21 | there? |
| 14:28:44 | 22 | A.  As I stated, I don't believe that I had |
| 14:28:48 | 23 | conversations with anyone I believed to be a |
| 14:28:51 | 24 | receptionist or a call center, but I don't recall |
| 14:28:53 | 25 | specifically a conversation I had with that company. |

scheduling@huntergeist.com                  HUNTER + GEIST, INC.                  303-832-5966/800-525-8490

Beltran v. Interexchange, Inc.                   DAVID KEIL                         7/21/2016

---

**201**

14:28:57  1      Q.   Well, you must remember that in some
14:28:58  2   instances an operator answered the phone?
14:29:00  3      A.   In some instances, yes.
14:29:03  4      Q.   Cultural Care was one such instance,
14:29:05  5   wasn't it?
14:29:05  6      A.   I have no idea.
14:29:06  7      Q.   Did you speak to anyone other than the
14:29:08  8   operator at Cultural Care?
14:29:09  9      A.   I do not recall.
14:29:12  10     Q.   How about AuPairCare, incorporated?
14:29:16  11     A.   I do not --
14:29:17  12     Q.   Did you have any -- do you have any memory
14:29:19  13  of a communication with them?
14:29:20  14     A.   Again, I do not recall.
14:29:22  15     Q.   How about American Institute for Foreign
14:29:26  16  Studies, doing business as Au Pair in America?  Did you
14:29:30  17  have any conversation with them?
14:29:31  18     A.   The name rings a bell.  I can't tell you
14:29:34  19  anything beyond that the name rings a bell.
14:29:36  20     Q.   Do you have any memory of any conversation
14:29:38  21  with anyone at the company doing business as Au Pair in
14:29:43  22  America?
14:29:43  23     A.   Again, I believe I had conversations with
14:29:46  24  people at many, if not all of these companies, but I do
14:29:50  25  not recall the specifics.

**202**

14:29:52  1      Q.   How about Associates in Cultural Exchange,
14:29:55  2   doing business as GoAuPair?  Do you remember any
14:29:58  3   conversation with them?
14:29:58  4      A.   Same answer.
14:29:59  5      Q.   So you have no memory?
14:30:01  6      A.   I have no memory.
14:30:02  7      Q.   How about American Cultural Exchange,
14:30:04  8   doing business as GoAuPair?  Do you have any memory of
14:30:08  9   a conversation with them?
14:30:10  10     A.   Again, same answer.  I have no -- no
14:30:12  11  recollection.
14:30:12  12     Q.   No memory?
14:30:14  13     A.   No.
14:30:14  14     Q.   How about Agent Au Pair?  Do you remember
14:30:16  15  a conversation with them?
14:30:17  16     A.   Again, the name is -- the name is familiar
14:30:20  17  to me, but I have no memory of the substance.
14:30:30  18     Q.   This is a long one.  How about A.P.EX,
14:30:33  19  American Professional Exchange, doing business as
14:30:37  20  ProAuPair, and 20/20 Care Exchange, doing business as
14:30:41  21  the International Au Pair Exchange?
14:30:44  22     A.   Again, it's a long name, and, again, I do
14:30:46  23  recall the name, but I can't speak about the substance
14:30:50  24  of the call.
14:30:52  25     Q.   Other than as -- do you remember any

**203**

14:30:53  1   conversation with them?
14:30:55  2      A.   Specifically, no.
14:30:56  3      Q.   Other than as set forth in Exhibit 5, do
14:31:02  4   you have any memory of any conversations with any other
14:31:07  5   sponsor?
14:31:09  6      A.   The Exhibit 4 is the total --
14:31:14  7      Q.   5.
14:31:14  8      A.   5, excuse me.
14:31:16  9      Q.   Yeah.
14:31:16  10     A.   -- the total of the notes that I generated
14:31:19  11  in this case, and my memory is largely what was reduced
14:31:23  12  to writing.
14:31:24  13     Q.   Again, you have to keep your voice up,
14:31:26  14  but, of course, by using the word "largely," you know
14:31:29  15  what the next question was going to be.
14:31:31  16     A.   Yes.
14:31:31  17     Q.   Do you have any memory of any
14:31:34  18  conversations other than set -- as set forth in
14:31:36  19  Exhibit 5 or as it may have been expanded in your
14:31:40  20  comments today?
14:31:42  21     A.   I can -- as I stated earlier this morning
14:31:45  22  before the lunch break, sometimes when prompted with
14:31:49  23  specific questions, I seem to be able to remember
14:31:52  24  specific things.  As you asked the question now, I
14:31:55  25  don't recall anything else.  If I am asked a specific

**204**

14:31:59  1   question about a specific conversation, that may spark
14:32:02  2   my memory.
14:32:03  3      Q.   Well, I'm going to ask you to press your
14:32:05  4   memory now, and the question is did you have any
14:32:10  5   substantive conversations with any of the 12 agencies
14:32:16  6   that are not referred to in pages 1 through 4 1/2 of
14:32:22  7   Exhibit 5?
14:32:24  8      A.   No.
14:32:26  9      Q.   Are you able to prove or document that you
14:32:29  10  made calls to the remaining 12?
14:32:35  11     A.   Am I able to document it at this point,
14:32:37  12  no.
14:32:38  13     Q.   Who was your phone provider at the time?
14:32:44  14     A.   That's a good question.  It's changed a
14:32:46  15  few times.  Might have been Verizon.  It might have
14:32:51  16  been T-Mobile.  Might have been Sprint.
14:33:00  17     Q.   Do you have bills within your possession
14:33:01  18  that allow you to determine which provider you had when
14:33:05  19  you made these calls in the last quarter of 2014?
14:33:09  20     A.   I do not.
14:33:32  21          (Discussion off the record between
14:33:32  22  Ms. Lukey and Mr. Lyons.)
14:33:32  23     Q.   All right.  I'm about to wrap up my part,
14:33:33  24  although others --
14:33:34  25     A.   I apologize.  It also might have been

---

51 (Pages 201 to 204)

Beltran v. Interexchange, Inc.                     **DAVID KEIL**                               7/21/2016

---

205

14:33:36    1    AT&T.  Sorry.
14:33:37    2         Q.  Well, I think you hit the entire universe
14:33:39    3    of major providers, and I'm -- I'm sure they'll all
14:33:43    4    appreciate their subpoenas.  Just so we can wrap this
14:33:48    5    up, sir, you -- you do not have any information as to
14:33:54    6    communications between or among sponsors, that is, you
14:33:58    7    cannot tell us about any communications between or
14:34:00    8    among sponsors in which they purportedly agreed to set
14:34:06    9    au pair compensation; is that fair?
14:34:08   10         A.  That is fair.
14:34:12   11         Q.  And I gather you do not have any basis to
14:34:14   12    suggest that the $195.75 amount specified in the State
14:34:21   13    Department directive and notification is proper -- is
14:34:26   14    improper under any law?
14:34:27   15         A.  I have no information at all on that
14:34:32   16    topic.  I can't answer that.
14:34:34   17         Q.  Okay.  You have no information to suggest
14:34:38   18    that any au pairs who have come to this country under
14:34:42   19    the J-1 cultural exchange program have been abused or
14:34:46   20    mistreated; is that correct?
14:34:47   21         A.  That's correct.
14:34:49   22         Q.  Okay.  And in actuality, you actually
14:34:53   23    don't know the identity of the 15 sponsors who are
14:34:56   24    approved by the State Department; is that correct?
14:34:58   25         A.  That's correct at this moment.

---

206

14:35:02    1         MS. LUKEY:  That is it for my questioning,
14:35:04    2    sir.  If you want to take a five-minute break, I
14:35:07    3    suspect that others may want to convene among
14:35:11    4    themselves to decide in what order they would speak.
14:35:14    5         MS. LOUIS:  Okay.
14:35:14    6         MS. LUKEY:  Thank you.
14:35:15    7         THE VIDEOGRAPHER:  Going off the record.
14:35:16    8    The time is 2:34 p.m.
14:35:20    9         (Recess taken, 2:34 p.m. to 2:56 p.m.)
14:55:48   10         (Deposition Exhibit 6 was marked.)
14:56:33   11         THE VIDEOGRAPHER:  We are back on the
14:56:34   12    record.  The time is 2:56 p.m.
14:56:39   13              EXAMINATION
14:56:39   14    BY MS. KOZAL:
14:56:39   15         Q.  Mr. Keil, my name is Peggy Kozal.  I
14:56:42   16    represent AuPairCare in this litigation.  I just have a
14:56:45   17    few very short questions for you.
14:56:47   18         A.  Certainly.
14:56:48   19         Q.  Are -- you are licensed in Colorado as a
14:56:50   20    private investigator; is that correct?
14:56:52   21         A.  That's correct.
14:56:52   22         Q.  And since when have you been licensed?
14:56:56   23         A.  Licensure started in 2015.  I applied at
14:57:01   24    the very beginning, but I don't think I was approved
14:57:04   25    until mid-2015 because of clerical issues.

---

207

14:57:08    1         Q.  Have you ever had any actions against your
14:57:10    2    license?
14:57:10    3         A.  No.
14:57:11    4         Q.  Are you licensed in any other states
14:57:13    5    besides Colorado?
14:57:14    6         A.  No.  I have a pending license in New
14:57:16    7    Mexico, but it's not -- I'm not currently licensed
14:57:20    8    there.
14:57:21    9         Q.  What has prompted you to get licensed in
14:57:23   10    New Mexico?
14:57:24   11         A.  I have family that lives in New Mexico.
14:57:27   12         Q.  And did you make all of the calls as it
14:57:29   13    relates to the investigation that you did in this case,
14:57:31   14    did you make all of those calls from Colorado?
14:57:33   15         A.  I believe so.
14:57:34   16         Q.  Okay.  And I'm going to hand you what we
14:57:42   17    have marked as Deposition -- oh, excuse me --
14:57:44   18    Deposition Exhibit 6.  Do you have an understanding of
14:57:53   19    what this document is?
14:57:56   20         A.  Yes.
14:57:56   21         Q.  And can you identify it for me?
14:57:58   22         A.  I've not seen it in this form, but it
14:58:00   23    appears to be excerpts from the Private Investigator
14:58:05   24    Licensure Rules and Regulations.
14:58:07   25         Q.  And do you comply with those rules and

---

208

14:58:09    1    regulations?
14:58:11    2         A.  Yes.
14:58:11    3         Q.  And specifically I'd like to turn your
14:58:15    4    attention to Rule 8D, which is found on page 11.
14:58:23    5         A.  I'm sorry?
14:58:25    6         Q.  8D.  There's a subheading called,
14:58:27    7    "Recordkeeping."
14:58:28    8         A.  Okay.
14:58:28    9         Q.  And can you take a look at subsection D?
14:58:33   10         A.  Yes.
14:58:34   11         Q.  And let me know when you're finished
14:58:36   12    reading it.
14:58:38   13         MS. LOUIS:  Counsel, where's the 8?
14:58:41   14         MS. CROUCH:  I apologize, it's just the
14:58:43   15    excerpt from it, from the -- the rules and regulations.
14:58:47   16    But it's -- I can get all -- all of the pages if you'd
14:58:51   17    like.  It would just take some time.  This is taken off
14:58:55   18    of the Department of Regulatory Agency's website.  I do
14:58:59   19    not have the full document.
14:59:00   20         A.  Yes, I'm familiar with this.
14:59:02   21         Q.  (BY MS. KOZAL)  Okay.  And do you follow
14:59:05   22    the recordkeeping requirements?
14:59:07   23         A.  Yes.  But the recordkeeping requirements
14:59:10   24    here does not -- do not mention the specific exemption
14:59:16   25    that exists in the statute, and my understanding is

---

scheduling@huntergeist.com                **HUNTER + GEIST, INC.**              303-832-5966/800-525-8490

Beltran v. Interexchange, Inc.                    DAVID KEIL                            7/21/2016

---

209

| | |
|---|---|
| 14:59:18 | 1 |
| 14:59:21 | 2 |
| 14:59:24 | 3 |
| 14:59:29 | 4 |
| 14:59:31 | 5 |
| 14:59:33 | 6 |
| 14:59:37 | 7 |
| 14:59:40 | 8 |
| 14:59:43 | 9 |
| 14:59:46 | 10 |
| 14:59:48 | 11 |
| 14:59:50 | 12 |
| 14:59:53 | 13 |
| 14:59:56 | 14 |
| 15:00:01 | 15 |
| 15:00:05 | 16 |
| 15:00:06 | 17 |
| 15:00:08 | 18 |
| 15:00:11 | 19 |
| 15:00:13 | 20 |
| 15:00:15 | 21 |
| 15:00:15 | 22 |
| 15:00:17 | 23 |
| 15:00:20 | 24 |
| 15:00:20 | 25 |

that in the statute, if you are work -- working directly for legal counsel, for an attorney, record keeping requirements are not necessarily the same as if you're working for the general public.

So, for instance, my understanding of the statute is if you are retained by a nonattorney, you are required to write a written report, you are required to have a fee requirement, you are required to retain records for a certain period of time. My understanding is there's an exemption in the law that states that if you are working for an attorney, you are not required to write written reports, you are not required to have a fee agreement, and recordkeeping is subject to the attorney's issues of work product and privilege, where that's not stated in -- regarding laymen.

Q.   You're under the impression that the recordkeeping requirement is -- earlier you testified that the contractual requirement --

A.   My contractual requirement is with the attorney, yes.

Q.   With the attorney. And you are not required to keep a copy of a contract with the attorney?

A.   I -- I'm sorry. I apologize.

---

210

| | |
|---|---|
| 15:00:23 | 1 |
| 15:00:25 | 2 |
| 15:00:28 | 3 |
| 15:00:28 | 4 |
| 15:00:32 | 5 |
| 15:00:37 | 6 |
| 15:00:44 | 7 |
| 15:00:48 | 8 |
| 15:00:51 | 9 |
| 15:00:55 | 10 |
| 15:00:59 | 11 |
| 15:01:02 | 12 |
| 15:01:04 | 13 |
| 15:01:06 | 14 |
| 15:01:09 | 15 |
| 15:01:11 | 16 |
| 15:01:14 | 17 |
| 15:01:18 | 18 |
| 15:01:23 | 19 |
| 15:01:28 | 20 |
| 15:01:31 | 21 |
| 15:01:36 | 22 |
| 15:01:39 | 23 |
| 15:01:41 | 24 |
| 15:01:43 | 25 |

Q.   No. But with respect to the recordkeeping rules, you believe that there is an exemption with respect to that?

A.   I had a lengthy meeting with the executive director of my department at DORA during the licensure process, and the reason we had that meeting was there was a tremendous amount of misunderstanding about what investigators do and don't do when the legislature wrote the new law. And it was assumed, this is -- I was told it was assumed by DORA that the overwhelming majority of investigators would be working for the general public.

It was actually a surprise to the director that there were investigators that were working primarily for law -- for attorneys and law firms. That was a shock to them. So when the rules were published, I had a formal meeting with the director of the -- of my department at DORA and raised the question, which is, as stated, my understanding of the rules as they were coming into effect would be at odds with the attorney work product rules that I was accustomed to working under and that all of the attorneys I work under require.

And my understanding is that they had meetings to this effect, and I was told that I should

---

211

| | |
|---|---|
| 15:01:47 | 1 |
| 15:01:51 | 2 |
| 15:01:55 | 3 |
| 15:01:58 | 4 |
| 15:02:00 | 5 |
| 15:02:05 | 6 |
| 15:02:08 | 7 |
| 15:02:12 | 8 |
| 15:02:15 | 9 |
| 15:02:19 | 10 |
| 15:02:21 | 11 |
| 15:02:24 | 12 |
| 15:02:27 | 13 |
| 15:02:30 | 14 |
| 15:02:31 | 15 |
| 15:02:34 | 16 |
| 15:02:36 | 17 |
| 15:02:38 | 18 |
| 15:02:39 | 19 |
| 15:02:41 | 20 |
| 15:02:43 | 21 |
| 15:02:44 | 22 |
| 15:02:46 | 23 |
| 15:02:50 | 24 |
| 15:02:52 | 25 |

err on the side when working with an attorney, because there were exemptions regarding written notes, there were exemptions regarding written reports, and there were exemptions regarding fee agreements, that I should also assume that there were -- that those exemptions followed on work product and materials, and that if the work product materials belonged to the attorney, per attorney regulations and per state law, I should follow the rules as set forth by my client attorneys.

Q.   So you believe that if you're working with an attorney, all that you have to do is create the record, send it on, and then you can destroy the document?

A.   Yes.

Q.   And as a private investigator conducting a private investigation in the state of Colorado, you have to be licensed in Colorado; is that correct?

A.   Yes.

Q.   Where do you understand your client to be -- to reside?

A.   In this case I have no idea.

Q.   Who is your client in this case?

A.   I -- formally my client when I was retained was Towards Justice. They are -- they are the firm that paid my retainer. But who their underlying

---

212

| | |
|---|---|
| 15:02:56 | 1 |
| 15:02:57 | 2 |
| 15:03:00 | 3 |
| 15:03:00 | 4 |
| 15:03:04 | 5 |
| 15:03:07 | 6 |
| 15:03:10 | 7 |
| 15:03:12 | 8 |
| 15:03:17 | 9 |
| 15:03:20 | 10 |
| 15:03:23 | 11 |
| 15:03:27 | 12 |
| 15:03:30 | 13 |
| 15:03:35 | 14 |
| 15:03:37 | 15 |
| 15:03:40 | 16 |
| 15:03:44 | 17 |
| 15:03:46 | 18 |
| 15:03:49 | 19 |
| 15:03:53 | 20 |
| 15:03:56 | 21 |
| 15:04:00 | 22 |
| 15:04:04 | 23 |
| 15:04:15 | 24 |
| 15:04:17 | 25 |

client is, I have no idea.

Q.   Do you know what state your client is located in?

A.   I do not.

Q.   If you -- when you are making calls out of state in furtherance of the investigation that you are doing, do you believe that you need to be licensed in the state in which you're conducting the investigation?

A.   My understanding of the rules, again, as interpreted by DORA, and please understand, it's a moving target because it is a very new statute and they don't even have enforcement personnel in place yet, they've not hired investigators or enforcement officials yet, to my understanding.

The rule as I've always understood it is if you -- if the investigation originates in the state where you're licensed and the majority of the work that you do is within the state where you are licensed and certain elements of that investigation take you into other states, whether it's physically or by telephone, as long as that is not the main thrust of the investigation, you can follow that without any licensure in those states. That's my understanding.

I also -- may I add that at the time I did this work there was no licensure. The statute hadn't

---

Beltran v. Interexchange, Inc.                    DAVID KEIL                    7/21/2016

---

213

15:04:21   1   even been published yet. And to my understanding,
15:04:24   2   there was no staffing at DORA to even discuss these
15:04:28   3   rules with. That all came about.
15:04:31   4       Q. As you testified earlier, though,
15:04:32   5   you -- it was your intent to comply with all of the
15:04:37   6   regulations that had been drafted?
15:04:39   7       A. Had been drafted. There was a period, and
15:04:42   8   I apologize, I don't know the -- exact time frames,
15:04:46   9   but there was a period where DORA operated this as a
15:04:50  10   volunteer program. There was a period where that
15:04:53  11   ceased to exist, and I believe for a year, year and a
15:04:57  12   half there was not only no voluntary program, there was
15:04:59  13   no staffing at DORA to even discuss it with. So we
15:05:03  14   were sort of in a transitional period at the time I did
15:05:08  15   this investigation.
15:05:16  16       MS. KOZAL: I don't have any further
15:05:17  17   questions for you. Thank you.
15:05:30  18       MS. LOUIS: Microphone, Peggy.
15:05:32  19       MS. KOZAL: Thank you.
15:05:36  20       MS. LUKEY: Anyone else?
15:05:44  21       MS. LOUIS: I will -- I'm sorry, I have
15:05:45  22   one.
15:05:45  23       MS. LUKEY: Okay.
15:05:46  24       MS. LOUIS: I do need to take a short
15:05:47  25   break before we decide whether we're going to conduct

---

214

15:05:49   1   any examination. Five minutes off the record.
15:05:54   2       THE VIDEOGRAPHER: Going off the record.
15:05:55   3   The time is 3:05 p.m.
15:05:58   4       (Recess taken, 3:05 p.m. to 3:22 p.m.)
15:22:28   5       THE VIDEOGRAPHER: We are back on the
15:22:29   6   record. The time is 3:22 p.m.
15:22:34   7       EXAMINATION
15:22:34   8   BY MS. LOUIS:
15:22:34   9       Q. Mr. Keil, I'm going to ask you to recall
15:22:36  10   testimony that you gave today that you were not able to
15:22:41  11   recall the manner by which you came to identify the
15:22:46  12   entities to conduct your interviews. Do you remember
15:22:48  13   that testimony?
15:22:49  14       A. I do.
15:22:49  15       Q. Okay. You do, though, have a specific
15:22:52  16   recollection of at least one entity that was identified
15:22:55  17   by name which you were told not to contact; is that
15:22:59  18   accurate?
15:23:00  19       A. I recall being told that there was at
15:23:02  20   least one entity that I could not contact and that it
15:23:06  21   was identified by name.
15:23:07  22       Q. I'm sorry, I don't understand your answer.
15:23:09  23   I just want to clarify that you recall that there was
15:23:10  24   at least one entity that was identified by name by
15:23:14  25   counsel because you were told not to contact that

---

215

15:23:17   1   entity; is that accurate?
15:23:18   2       A. Yes.
15:23:19   3       Q. Okay. Does that refresh your recollection
15:23:21   4   as to whether or not the identity of the other entities
15:23:25   5   that you were to interview were identified by name by
15:23:28   6   counsel?
15:23:32   7       A. Yes, I think so. Yes.
15:23:34   8       Q. Now that your memory's been refreshed,
15:23:36   9   what is your recollection about how you identified the
15:23:39  10   names of the entities that you interviewed?
15:23:45  11       A. I recall working from, as I said, a
15:23:47  12   handwritten list. It was in my handwriting, is my
15:23:50  13   recollection. So I recall -- I believe I recall that
15:23:57  14   Mr. Hood must have given me those names and I must have
15:24:01  15   written them down. That's my best guess.
15:24:03  16       Q. Okay. Irrespective of the manner by which
15:24:05  17   you came to either write or come into possession of the
15:24:08  18   names, is it your recollection that counsel identified
15:24:12  19   the entities by name that you were to interview?
15:24:15  20       A. Yes.
15:24:16  21       MS. LOUIS: Okay. I have no other
15:24:17  22   questions.
15:24:21  23       MS. LUKEY: No questions.
15:24:24  24       THE VIDEOGRAPHER: Going off the record.
15:24:27  25   This concludes the videotaped deposition of David Keil.

---

216

15:24:29   1   The total number of media units used is three. The
15:24:35   2   time is 3:24 p.m. We are off the record.
15:24:42   3       WHEREUPON, the within proceedings were
15:24:42   4   concluded at the approximate hour of 3:24 p.m. on the
15:24:42   5   21st day of July, 2016.
15:24:42   6       *    *    *    *    *
           7
           8
           9
          10
          11
          12
          13
          14
          15
          16
          17
          18
          19
          20
          21
          22
          23
          24
          25

---

217

I, DAVID KEIL, do hereby certify that I have read the above and foregoing deposition and that the same is a true and accurate transcription of my testimony, except for attached amendments, if any.

Amendments attached   (  ) Yes   (  ) No

_____

DAVID KEIL

The signature above of DAVID KEIL was subscribed and sworn to before me in the county of _____, state of Colorado, this _____ day of _____, 2016.

_____

Notary Public

My commission expires

Johana Paola Beltran, et al. 7/21/16 (cb)

218

REPORTER'S CERTIFICATE

STATE OF COLORADO         )
                          ) ss.
CITY AND COUNTY OF DENVER )

I, CAROL M. BAZZANELLA, Registered Professional Reporter, Certified Realtime Reporter, and Notary Public ID 19964000498, State of Colorado, do hereby certify that previous to the commencement of the examination, the said DAVID KEIL was duly sworn by me to testify to the truth in relation to the matters in controversy between the parties hereto; that the said deposition was taken in machine shorthand by me at the time and place aforesaid and was thereafter reduced to typewritten form; that the foregoing is a true transcript of the questions asked, testimony given, and proceedings had.

I further certify that I am not employed by, related to, nor of counsel for any of the parties herein, nor otherwise interested in the outcome of this litigation.

IN WITNESS WHEREOF, I have affixed my signature this 2nd day of July, 2016.

My commission expires February 10, 2020.

__X__ Reading and Signing was requested.

_____ Reading and Signing was waived.

_____ Reading and Signing is not required.

REPORTER'S CERTIFICATE

STATE OF COLORADO        )
                         )  ss.
CITY AND COUNTY OF DENVER )

          I, CAROL M. BAZZANELLA, Registered
Professional Reporter, Certified Realtime Reporter, and
Notary Public ID 19964000498, State of Colorado, do
hereby certify that previous to the commencement of the
examination, the said DAVID KEIL was duly sworn by me
to testify to the truth in relation to the matters in
controversy between the parties hereto; that the said
deposition was taken in machine shorthand by me at the
time and place aforesaid and was thereafter reduced to
typewritten form; that the foregoing is a true
transcript of the questions asked, testimony given, and
proceedings had.

          I further certify that I am not employed
by, related to, nor of counsel for any of the parties
herein, nor otherwise interested in the outcome of this
litigation.

          IN WITNESS WHEREOF, I have affixed my
signature this 2nd day of July, 2016.


          My commission expires February 10, 2020.


__X__ Reading and Signing was requested.

_____ Reading and Signing was waived.

_____ Reading and Signing is not required.




                    _____
                    Carol M. Bazzanella
                    Certified Realtime Reporter
                    Registered Professional Reporter

Beltran v. Interexchange, Inc.   DAVID KEIL

7/21/2016

Page 219

**A**

**A-u** 174:25
**a.m** 2:3 6:5 78:15
78:17,17,21 123:2
123:3,3,5
**A.P.EX** 1:14 4:1
7:10 202:18
**ability** 40:22,25
48:14 54:19 79:19
118:21 136:22,24
152:16
**able** 35:1 43:3,5
71:9 101:9 105:16
105:18 119:2,10
132:8 137:9
139:16 203:23
204:9,11 214:10
**absolutely** 87:3
**abused** 205:19
**accept** 10:16
**acceptable** 8:16,18
78:9
**accepted** 73:24
81:15 89:22
**access** 27:2
**accommodation**
144:24
**account** 104:5
141:7
**accounts** 141:11,13
**accuracy** 151:2
**accurate** 25:22
148:13,18,25
168:13,18,21,24
175:6,8 197:2
214:18 215:1
217:3
**accurately** 105:16
132:24 172:6,9,10
**accustomed** 210:21
**act** 69:7 112:7,21
**acting** 79:12 83:23
84:4,11 135:6
176:24
**action** 1:2 6:11
12:15 43:8
**actions** 207:1

**activities** 167:1
**actual** 11:7,24 12:1
41:21 67:3
**actuality** 205:22
**adamant** 72:20
**add** 212:24
**added** 9:6 178:23
179:18 182:2
186:20
**additional** 9:8
70:15 88:18 90:18
123:7
**address** 9:10,11,14
10:15 11:4 12:1
30:13 61:5 140:11
196:25
**addressed** 14:16
**adequately** 101:7
**adjudicated** 167:19
**admit** 26:8
**advance** 53:18 71:4
190:22
**advanced** 53:19
**adverse** 110:18
155:15
**advertise** 30:11
**advertisements**
193:18
**advertising** 193:22
**advice** 9:21 49:9
167:20
**advocate** 72:13,16
**affect** 57:24 58:4
**affidavit** 65:8
125:24
**affidavits** 77:12,13
**affiliated** 24:6
**affirmative** 8:20
**affixed** 218:13
**affluent** 43:8,12
**aforesaid** 218:8
**afraid** 95:16
129:22 130:6
132:7 157:8
**agencies** 5:17 21:22
51:11 148:12,20
163:19,25 164:10

164:20,24 181:23
183:5,13 184:20
184:24 185:1
191:7 192:7,14,25
193:4,7 194:4
196:12,15 199:1
204:5
**agency** 23:2 136:8
136:15,16 177:6
197:9,15,18,21
**Agency's** 208:18
**agenda** 52:17
**agent** 1:14 3:20
84:4 112:21,24
129:16 155:14,25
157:24 202:14
**ago** 28:6 46:9 49:19
76:16 77:5 176:15
**agree** 8:13 15:6
73:21 148:12
164:24 182:13
**agreed** 6:18 95:25
157:5,25 158:1
172:18 178:22
179:8 181:10,13
182:19 183:4
186:19 187:23
205:8
**agreeing** 148:20
182:14
**agreement** 10:21
33:25 47:12 67:7
67:8,9 68:17
153:3,12,23 154:2
154:16 155:11,16
155:21 156:10
157:15 158:15,17
160:8,14,20
161:18 163:1,9,24
164:5 165:2,23
167:2,3,6,11,12
167:13 169:20
170:8,20 178:4,17
179:3 180:12,19
181:17 182:11
183:13 184:13
187:13 189:2,6

209:13
**agreements** 35:15
35:21 36:20 37:8
38:1,15,21 39:14
40:3,18 41:2
183:18 211:4
**agrees** 148:22
171:11,12,20,21
171:22 173:3,13
173:16 183:7
**AIFS** 7:18
**Air** 141:23,24
142:1,23
**al** 6:9,9 217:25
**Alex** 10:16 30:5
**Alexander** 2:10 7:2
65:19
**ALEXANDRA** 1:6
**allow** 144:24
204:18
**allowed** 27:2 159:2
**amenable** 158:23
**amended** 5:13
65:16 125:22
126:1 131:11,13
131:14 150:19
151:3,9,14,15,19
**amendment** 75:7
131:6
**amendments** 217:4
217:5
**America** 1:13
201:16,22
**American** 1:13,13
1:14 3:20 4:1
7:10 201:15 202:7
202:19
**amount** 67:15
70:11 95:11,15
96:6,13 135:12,16
135:20 136:9,14
136:17 148:11,12
148:20 149:7
153:4 154:2
155:21 157:6,16
160:9 163:2,10,25
164:6,20,22,24,25

165:3,24 169:20
171:23 173:16,20
173:25 174:16,21
177:8 178:5,11,22
179:4,8,10,12,15
180:6,8 181:3,11
181:11,24 182:20
183:5 184:3,6
186:4,19 187:4,13
187:23 188:3
189:6,9,15,20,23
190:3 192:8,15
205:12 210:7
**amount?'** 163:20
**amounts** 101:4
172:20,21,23,25
174:9,11,13,15
176:23 177:10
185:18,18,19
**analysis** 81:22 82:6
82:9 83:16 154:9
154:25 156:14,19
**analyzed** 93:7
**annual** 69:17
**answer** 9:18 10:22
15:2 31:13,16,24
36:11 37:13,16,17
39:4,15 40:25
49:15 61:7,8 73:3
73:9 77:22 79:2
82:3 94:24 99:23
99:25 101:10
107:9 116:17,18
121:12,13,14,17
122:22 127:22
128:3 130:4,21
153:17 155:17
156:3,5,8,20
157:8,18 158:21
159:2 160:1,22,25
170:10 171:20
173:6,8,13 178:21
181:18,24 183:15
184:17 185:8
192:2,19 195:2
199:25 202:4,10
205:16 214:22

Beltran v. Interexchange, Inc.   DAVID KEIL                                      7/21/2016

Page 220

answer's 10:20
  151:12
answered 20:22
  40:10,21,24 54:18
  54:20 100:16,22
  101:10 114:25
  116:21 119:18
  122:16 127:18
  130:10,13,17
  179:9,11,14 200:3
  201:2
answering 18:14
  116:9,23,24
  121:23 132:15
  152:10 159:5
answers 36:2,13
  37:20 40:1,6
  60:11,13 61:13
  114:20 116:2
  119:11,14,16
  121:9 133:20
  134:18 137:13
  159:7 176:11
  177:2,20 199:15
anticipated 71:21
  96:14
antitrust 50:24
anybody 106:21,25
  127:16 177:9
anymore 24:1
  64:17 69:15
anyone's 40:25
anyway 19:8 66:25
  78:6
apart 20:5 86:19
  147:5
APF 1:12 3:16 7:18
  14:18 123:11
  132:2 146:12
  147:11 148:2
  181:15 186:9
API 118:7,8,9
  123:10 130:9
apologize 9:24 10:4
  11:17 26:2 37:4
  75:11 76:10,19
  118:23 119:1

124:15 130:6
  137:6 166:20
  195:12 204:25
  208:14 209:25
  213:8
apparent 23:10
apparently 11:23
  75:5 166:21
appear 102:13,15
appearances 6:23
appeared 116:23
  188:20
appears 16:23 26:6
  163:17 169:9
  178:13 191:10
  207:23
Appended 65:18
Apple 106:15
  141:16
applicable 89:20
application 50:6,11
  191:20
applied 50:5,14
  206:23
applies 112:23
appointed 27:18
appreciate 19:10
  37:22 144:23
  205:4
approach 39:20
  59:14,15,20 73:12
approached 58:18
  58:19 73:11
appropriate 79:10
  79:12,14 84:6,10
  128:19 170:4,13
approval 50:11
approve 150:22
approved 111:14
  111:17 194:11
  196:7,12,15
  205:24 206:24
approximate 216:4
approximately
  50:10 84:24 85:13
  86:3
approximation

95:14
area 84:20 183:2
areas 38:8 160:19
arrangement 57:5
  57:6 68:14 70:14
  93:20
arrived 52:8 53:1
articles 63:13
ascertain 33:25
  39:13 52:4 61:25
  89:1 117:5 155:20
  182:17
ascertaining 61:20
asked 8:12 32:14
  32:18 33:24 34:10
  52:13 55:15 58:12
  58:15,20,21 60:5
  61:1,12 70:3
  71:21 77:4 100:8
  100:15 116:10
  136:1 137:13
  150:18 151:2
  153:25 154:15
  155:10,20 157:3
  157:13,25 158:1
  158:15 159:4
  160:6 161:25
  162:4 163:18
  164:12,15 165:1
  165:16 168:6
  170:3,13,19
  173:11 176:21
  179:9,13 181:7,22
  185:7 191:8 199:5
  199:13 203:24,25
  218:9
asking 15:15,23
  19:8 38:11 44:4
  52:25 55:11,13
  76:4 77:16 109:16
  114:1,1,24 122:4
  134:19 153:7
  154:10 157:10,12
  157:22 158:7
  165:12 172:14
  177:1,14,15,19
  197:3 200:19

aspects 51:12
assert 42:19
asserting 42:19
asset 28:10,10
assigned 95:21
assignment 41:19
  50:21 51:7,9,20
  52:3 57:17,21
  58:11,11 70:3
  96:1 111:23 161:5
  161:9 175:17,22
  193:3
associated 49:1
Associates 1:15
  3:20 202:1
assume 15:8 41:24
  45:6 47:15 58:5
  73:19 76:23 93:17
  107:10 108:2,17
  108:19,21 115:5
  116:3 156:13
  211:5
assumed 50:23
  108:5 116:5,6
  184:7,9 187:17
  210:9,10
assumes 154:19
assuming 30:19
  107:6
assumption 44:25
  51:3,4,5,7 108:7
AT&T 205:1
attach 85:8
attached 12:6,14
  12:18 129:24
  133:16 217:4,5
attachments 62:25
attempt 32:5 48:23
  52:9 71:11,12
  105:12 154:1
  159:1 182:17
attempted 56:21
  104:23 105:2
  120:24
attempting 9:3
  42:8 104:25 158:9
  172:8 199:25

attendance 22:17
attention 24:15
  123:9 169:23
  170:3 208:4
attorney 23:20,23
  29:10 30:17,18
  39:6 47:4,19,20
  47:22 64:10 71:3
  73:8 83:23 85:23
  86:6 109:16
  112:14,19,25
  113:3 129:16
  155:14 157:23
  158:4 167:15,23
  168:1 209:2,11,21
  209:22,24 210:21
  211:1,7,8,11
attorney's 112:17
  155:14,15 209:14
Attorney-Client
  5:15
attorneys 24:24
  28:14 29:5 44:4
  88:16 112:1
  167:17,21 210:15
  210:22 211:9
au 1:12,12,13,14,15
  2:2 3:5,20 4:2
  14:19 32:6 33:22
  34:2,8 35:8,9
  36:24 42:13 51:8
  51:10,20 52:22
  53:5,15,17 54:6
  54:16,25 55:17
  56:3 57:4,6,6,8,18
  57:22 58:2,5,16
  58:23 59:25 60:2
  61:2,13,20,24
  62:1,22 63:9
  118:5,8,9 119:5
  122:6,23 135:6,7
  135:10,11,15,19
  136:20 137:3
  138:2,3 139:15,17
  146:13 147:10
  149:6,8 152:11,15
  152:23 154:3,17

Beltran v. Interexchange, Inc.   DAVID KEIL

7/21/2016

Page 221

| | | | | |
|---|---|---|---|---|
| 155:11,22 156:10 | **B-e-a-n** 142:6 | 195:4 206:24 | 207:15 210:2 | **billing** 68:21,21 |
| 157:6,16 158:17 | **back** 13:8 19:21 | **begun** 163:13 | 211:10 212:7 | 93:15 |
| 160:9 163:3,10,20 | 21:3,23 28:1 | **behalf** 1:6 2:1 6:25 | 213:11 215:13 | **bills** 93:17,19 94:1 |
| 163:25 164:6,20 | 34:17 36:7,9,11 | 7:3,8,10,13,18,19 | **believed** 49:8,19 | 94:13,15,16,18 |
| 165:24 168:10,14 | 58:10 63:2 64:6 | 7:20,23 8:24 | 52:6 87:8 182:15 | 102:18 190:14 |
| 168:20 169:5,21 | 66:18 73:14 75:18 | 55:14 83:23 84:11 | 185:3 187:17 | 204:17 |
| 176:7,19 177:17 | 76:16 78:18 96:2 | 85:23 106:22 | 196:25 199:23 | **binding** 99:7,12 |
| 178:11,17 179:11 | 107:16,18 123:4 | **belief** 37:18 70:23 | 200:23 | **bit** 11:18 14:4,5 |
| 180:3 181:24 | 127:13 128:7,10 | 84:8 108:25 | **believing** 43:15 | 28:9 47:1,18 |
| 182:22 186:8,10 | 129:18 140:6,18 | 116:16 | **bell** 198:2 200:15 | 140:22 149:8,13 |
| 188:17 192:20 | 147:9 150:2 | **believe** 19:1 24:1 | 201:18,19 | 149:13 152:21 |
| 193:16 196:4,8 | 159:16 161:2 | 26:16 32:15 36:3 | **belonged** 211:7 | 178:24 186:6,21 |
| 197:9 199:6 200:2 | 165:12 169:3 | 36:13 40:21,23 | **belonging** 167:4 | 189:17 |
| 200:19 201:16,21 | 177:2,20 181:15 | 41:6 45:12 46:13 | **Beltran** 1:5 6:8 | **blank** 136:7 |
| 202:14,21 205:9 | 206:11 214:5 | 48:15 54:11,18 | 217:25 | **bled** 70:2 |
| 205:18 | **background** 8:23 | 65:4 66:4 67:14 | **Bender** 3:2 7:15,15 | **bleed** 138:17 |
| **audio** 6:17 | 21:3 | 70:5 73:24 74:16 | 198:7 | **block** 102:8 128:21 |
| **AuPair** 1:10,13 | **bad** 92:20 | 75:23 77:10 80:2 | **benefit** 15:16 16:8 | 128:23 |
| 2:17 197:23 | **base** 43:9 114:2,5 | 80:3,6 81:18 | 67:24 139:20 | **blocked** 128:18 |
| **AuPairCare** 1:12 | 171:16 | 82:19 84:6 86:18 | 199:1 | **blocking** 129:2 |
| 3:12 7:6 201:10 | **based** 35:6 52:19 | 97:15 100:9 101:2 | **best** 10:5,12 11:20 | **board** 191:21 |
| 206:16 | 66:3 82:9 98:17 | 101:4 103:6,8 | 17:22 18:1,16 | **body** 146:18 |
| **author** 13:22 | 98:19 109:24 | 108:12,13,24 | 25:15 26:10,12 | **Bogdan** 2:18,19 7:5 |
| **authored** 17:3 | 133:16 164:7,12 | 109:5,25 110:14 | 32:4 40:22,24 | **Boies** 2:8 6:25 |
| **authority** 99:17 | 170:11 183:1 | 111:6,6 112:21 | 46:10 48:14 49:3 | 45:15,18,25 46:2 |
| 183:13,18 | 185:3 | 113:18 114:6 | 54:18 72:22 85:21 | 46:3 62:8,10 |
| **authorized** 82:22 | **basic** 99:25 | 115:5,14 116:9 | 99:3 100:20 105:1 | 67:12 68:14,17 |
| **authors** 21:11 | **basis** 19:3 47:20 | 121:6,12,17 | 112:21 113:13 | 190:15 |
| **available** 70:16 | 85:3,3 183:15,17 | 123:11 129:9 | 118:21 119:8 | **boilerplate** 169:6 |
| 97:12 168:3 | 184:2 192:3,19 | 131:12,16,17,18 | 129:19 130:19 | 169:14 175:9 |
| **Avenue** 2:19 | 205:11 | 132:22 134:2,12 | 134:15 135:18 | 199:13 |
| **avoid** 63:12 195:24 | **Bazzanella** 2:3 6:15 | 135:10 136:6,23 | 138:12,14,21 | **borrowed** 189:17 |
| **avoiding** 88:21 | 218:4 | 136:24 137:15,15 | 139:6 149:1,2 | **Boston** 3:8 |
| **aware** 13:8,11 | **Bean** 142:6 | 137:18,24 138:1 | 157:1 199:7 | **bottom** 26:25 104:2 |
| 34:10,12 41:20,22 | **bear** 55:23 | 138:19,19,25 | 215:15 | 104:3,3 148:9 |
| 41:23 42:15,18 | **bearing** 14:14 | 139:11 141:16 | **bet** 11:14 | **Boulevard** 2:8 9:12 |
| 44:18,20 62:10 | 199:4 | 142:15,20 143:8 | **better** 14:4 103:25 | 11:5 |
| 73:8,16 80:3,15 | **BEAUDETTE** 1:5 | 145:16 146:24 | 109:7 136:21 | **bound** 49:5,21 |
| 80:19 81:1 87:15 | **becoming** 34:10 | 151:20,20 152:16 | 139:4,8 | 50:17 |
| 87:21 107:3 | **Bedford** 22:12 | 157:18 160:22 | **beyond** 76:13 | **break** 59:9 64:23 |
| 109:15 137:1 | **began** 23:19 34:9 | 164:10 165:4,6,8 | 90:18,25 91:11 | 66:15,16 67:2 |
| 150:14 160:13,17 | 41:17 70:19 | 166:3 173:7,11 | 120:24 153:17 | 78:6,11,23,24 |
| 172:15 173:24 | 123:20 124:4 | 175:22 176:3,4,23 | 178:2 199:21 | 85:2 94:22 120:15 |
| 186:20 | **beginning** 6:6,23 | 180:6 182:13 | 200:3,20 201:19 | 120:21 122:3,25 |
| | 14:2 38:11 41:11 | 185:7 189:22,23 | **bias** 56:20 | 123:6 140:6,11,12 |
| **B** | 41:15 50:21 78:19 | 192:5 197:1 199:8 | **bill** 93:23,24 94:1,5 | 140:13 160:12 |
| **B** 2:23 57:11 71:19 | 111:22 159:17 | 200:5,7,22 201:23 | 95:10 | 203:22 206:2 |

Beltran v. Interexchange, Inc.   DAVID KEIL

7/21/2016

Page 222

213:25
**breakdown** 25:15
  28:17 84:17 85:12
**breeding** 23:1
**brief** 78:6 105:15
  200:12
**briefly** 147:14
**broad** 28:12 60:21
  71:8 179:17
**Broncos** 63:24
**Brooke** 2:14 7:7
**brought** 62:22
**Brownstein** 2:24
  7:13
**budget** 70:8,9,10
  70:15,17 95:7,12
  95:15,18,21,23,25
  96:4,6
**budget's** 70:12
**building** 11:7,25
**business** 11:4,10
  23:1,13 24:5,6,17
  24:21 25:14 27:14
  27:25 29:9 41:24
  43:18 52:20 71:2
  72:23 102:1 122:5
  197:22 199:6
  201:16,21 202:2,8
  202:19,20
**butting** 84:21

────────
        **C**
────────

**C** 2:5
**CAICEDO** 1:6
**calendar** 63:16
**California** 3:18
**call** 18:9 20:21,22
  29:13 30:5 35:20
  39:5 42:2 44:10
  44:11 59:10,20
  85:14 87:8,17,20
  88:2 89:9 92:25
  97:7 98:1,4 100:9
  101:6 103:12,24
  107:4,14,21
  109:16,19,24
  110:24,25 111:19

114:14,17,19
116:25 119:5,5,6
120:16 123:20
126:20,24 127:4,5
128:2,11,25
130:13,20 196:19
198:4,11,12
199:16,18,20
200:24 202:24
**called** 16:1 23:8
  26:21 29:24 34:17
  74:8,14 97:11,22
  100:6 110:16,19
  122:9 127:20
  128:18 142:6
  179:12 190:16
  196:16,20,21
  197:9,15,16,18,21
  197:22,25 199:5
  199:14 200:8
  208:6
**caller** 102:8,16
**calling** 32:9,10 33:2
  42:2 43:22,24
  52:11 53:15 54:2
  56:13 85:22 96:22
  99:13 100:14
  102:12 108:5
  110:6 115:18
  123:21 127:13
  136:10,11 196:10
**calls** 15:23 16:21
  16:25 17:1,2,4,5,8
  17:12,21,25 18:6
  18:10 26:14 32:8
  34:19,22 37:25
  41:18 43:21 52:16
  54:4,11 59:24
  61:6 64:7 70:19
  71:5 75:3,6 81:21
  86:14 92:11,15,19
  95:22 96:1,12,15
  96:24 97:5 98:23
  100:5,21,22 101:9
  101:12,19,23
  102:5,7,17 103:5
  103:10,15,21

104:8,11,14,17
106:17,18,23
107:1,6 109:23
110:3 112:25
113:3 114:9,11
117:6,23 119:3
121:15 123:19
124:3 126:25
127:3,13,23 128:4
128:21,23 129:2,3
129:12,15 146:2,6
146:10,12,18,20
146:23 147:1,4,7
162:25 167:25
188:15 189:13
190:11 197:4
199:24 204:10,19
207:12,14 212:5
**camera** 26:1
**Canada** 29:21
**capacity** 98:13,15
  98:21 99:21,22
  110:21 117:23
**capital** 174:25,25
**caption** 146:10
**CARDENA** 1:6
**care** 1:11,11,12,15
  2:2,2,21 3:5,5 4:1
  7:11,21,23 8:24
  47:1 71:22 98:14
  122:5,6,23 146:14
  157:24 199:6,6,17
  200:2 201:4,8
  202:20
**career** 72:20
**Carol** 2:3 6:14 36:9
  218:4
**Carrie** 133:24
  147:10 148:1
  183:11
**case** 28:25,25 29:22
  29:23 34:20 37:24
  38:17,19 41:7,24
  45:21,23 46:1
  50:9 51:13 52:20
  55:10 62:11 63:1
  63:11,15 65:10

70:24,24 79:16,20
79:23 80:23 81:1
81:5,6,10,20,24
82:6,10,13,24
83:16 84:7,9 86:1
86:8 89:17 90:1
91:16,21 96:11
102:7 108:12
109:13,23 112:5,6
113:10,14 124:13
129:1,25 130:7
134:22 138:4
142:25 150:20,20
150:23 154:9
156:20 166:7,8
171:11 178:13
184:23 191:12
196:24 200:2
203:11 207:13
211:21,22
**case-by-case** 47:20
  85:3
**cases** 24:13,20,20
  24:24 27:15,22,24
  28:14,16 30:13,14
  43:1 45:1,3 46:22
  46:23 59:18 68:23
  69:9,20 72:24
  79:25 80:2,12,14
  81:9 84:16,18,18
  84:20,23,24,25
  85:20,22 101:3,5
  107:10,13,21
  109:7 127:17,18
  167:18 168:5,6,8
**categories** 12:20
**category** 69:12
**caught** 169:23
  170:3
**cause** 15:2 40:4
  48:10 51:25 68:9
  81:5 108:14
  112:20 113:16
  123:21 128:16
  134:18
**caused** 153:11
  160:18 167:13

**causes** 48:15
**causing** 119:1
**caution** 82:14,17
  82:20 90:11
  110:21
**cb** 217:25
**CCF** 5:18
**ceased** 213:11
**cell** 102:1,3
**cellular** 6:20
**center** 20:22 98:4
  114:15,17 199:16
  199:18,21 200:24
**certain** 5:13 31:21
  46:24 47:13 51:12
  65:17 74:7 85:6,8
  107:4 112:9
  165:17 209:9
  212:19
**certainly** 27:12
  38:6 41:8,23
  43:20 49:17 53:17
  55:6 66:20 87:15
  121:23 138:10
  157:21 206:18
**certainty** 139:17
**CERTIFICATE**
  218:1
**Certified** 2:4 218:4
**certify** 217:1 218:5
  218:10
**chance** 141:22
  147:21 175:2
**change** 24:14,25
  67:16 143:9
**changed** 24:10 26:9
  59:12 204:14
**changes** 26:10
  27:14 142:16
**characteristic** 71:2
**characterization**
  15:4 93:5 181:19
**characterize** 117:4
  169:13
**characterized** 15:6
  28:15 110:8
**charge** 42:10 52:15

Beltran v. Interexchange, Inc.   DAVID KEIL                           7/21/2016

Page 223

68:8,20
**charged** 27:9 34:2
   67:14,20
**charges** 34:7 114:2
   136:13
**charging** 52:7,8,13
   67:11
**chatty** 59:17
**check** 92:21 95:3,4
**checked** 91:25
**checking** 97:24
**child** 1:11 2:21
   71:22 146:14
**children** 128:1
**Choate** 3:7 7:22
**choose** 9:7 169:15
**chose** 138:6,10
   149:16 169:11,11
   169:14,16,18
**Christie** 3:9 7:20
**chronologically**
   145:17 146:17
**chronology** 119:3
   153:6
**chunk** 27:20
**circulated** 14:10
**circumstance**
   83:22 166:8,8
**circumstances**
   43:13 79:13 80:20
   84:2,3 85:6,8 88:2
   89:6 111:22
   112:10 194:17
**CITY** 218:3
**civil** 1:2 6:2,10
   12:15 24:18 27:21
   27:22 28:2,14
   80:2,14 84:16,18
   84:20,24 85:20
   98:18,20
**claim** 52:16
**claimed** 14:20
**claims** 42:18
**clarification** 28:2
   159:21,22 160:5
**clarified** 120:9
**clarify** 214:23

**clarity** 18:19 92:1
   142:16
**class** 7:1,3 43:8
**classes** 43:12
**classification** 42:16
**clean** 37:19 92:4,18
**cleanup** 79:1
**clear** 14:1 15:16
   32:7 55:6 75:17
   78:2 132:25 159:3
   165:20 173:15
   182:24 196:21
   200:17
**clearly** 19:19 58:12
   99:24 153:7 167:5
**clerical** 206:25
**clicking** 106:6
**client** 80:5,17,18
   81:4 91:15 102:8
   122:4,7,11,14
   129:1,2 141:4,4
   166:8,8 199:4
   211:9,19,22,23
   212:1,2
**client's** 81:5,10
   84:7,9
**clients** 30:20 42:16
   45:9 47:19,20,22
   60:19 68:10,22
   70:10 71:3,3
   72:21 73:8 96:4
   112:20 120:10
   121:21 128:24
   167:2
**clipped** 26:20
**close** 124:4 138:22
   148:17
**closely** 27:1,3
**clue** 83:10
**co-counsel** 45:15
**co-defendants** 8:19
**code** 49:1,3,6,22
   50:17 72:6 81:11
   89:19 112:18
**codification** 73:16
**codified** 49:4
**coffee** 64:23

**Colaizzi** 2:14 7:7,7
**cold** 11:18 16:5
**collar** 28:12
**colleague** 30:17
**collection** 5:10 23:2
**college** 22:17,23
**Colorado** 1:1 2:3,4
   2:11,15,25 3:3,10
   3:14,18,23 4:4
   6:10,13,16 9:12
   11:5 22:3 29:16
   46:18,18 47:9,24
   101:22 103:11
   206:19 207:5,14
   211:16,17 217:15
   218:2,5
**column** 14:11
**combination**
   137:13 189:12,13
**combined** 138:24
**come** 13:8 19:20
   24:14 27:15 30:14
   40:1 46:22 50:13
   63:2 66:24 71:7
   114:3 127:9 161:2
   161:21,25 163:7
   190:18 195:3
   205:18 215:17
**comes** 152:5
**comfort** 139:18
**comfortable**
   105:18 119:18
   132:15
**coming** 19:14 29:1
   50:23 102:19
   113:21 118:16
   165:11 210:20
**commencement**
   218:5
**comments** 17:12,24
   144:16 203:20
**Commerce** 136:7
**commission** 217:21
   218:15
**common** 44:5
   88:15 109:10
**communicated**

181:3
**communication**
   148:5 154:24
   155:5,7 156:16
   161:7,8 187:12
   201:13
**communications**
   31:15 109:24
   147:19 148:1
   150:10 154:7
   155:24 161:13,13
   162:5 180:13
   187:22 188:7,10
   205:6,7
**companies** 32:6,10
   32:14 33:2,20
   34:1,17,22 35:7
   35:11,14,22 37:1
   37:9 38:2,14,22
   39:13 40:18 41:3
   42:3,9 43:17
   51:10,17 52:12
   53:4,10,15 54:2
   54:15,24 55:16
   56:13 57:3 61:3
   61:24 87:7,16,19
   87:22 88:9 89:2
   89:10 96:22 97:8
   100:17,20,22,24
   103:21 108:4
   117:6,10 119:17
   119:21,25 121:4
   127:1 128:9 133:1
   133:2,6,17,21
   136:9,12 176:6,8
   178:16 179:3,8
   183:19 193:16
   195:4,23 196:6,11
   200:8 201:24
**company** 23:5,6,7
   23:16 36:4,4,14
   36:15 52:4 54:6
   89:6 97:7,12,18
   99:2,7,19 100:2
   114:21 117:24
   119:4 120:6,22
   123:22 125:19,20

126:19 127:3
   130:2,4,8,23,24
   132:2,7 133:25
   134:6,20,24
   135:22 138:3
   140:4 182:25
   185:5 196:22
   198:13 200:25
   201:21
**compare** 52:9 53:1
   53:22 55:7
**compel** 15:18
**compensate** 176:6
**compensated** 21:16
   33:23 176:6,7,12
   176:17,18,19,20
   177:8,10,17,18
**compensation**
   177:24 180:3
   191:22 205:9
**competition** 53:2
**compilation** 17:11
**compiled** 16:24
   194:18
**complaint** 5:13
   44:18 65:17 75:5
   75:6 125:22,22
   126:1 131:7,11,14
   131:14 150:19,23
   151:3,9,14,16,19
**complete** 18:8 22:6
   26:7 70:3 91:25
   104:23 127:4
   147:17 148:25
   168:13,18 175:6
   187:15
**completed** 17:14
   17:16 127:5
   161:11
**completely** 18:3
   112:14 147:22,25
**completion** 100:9
**complex** 24:18 27:2
   27:9
**comply** 207:25
   213:5
**comprised** 18:3

Beltran v. Interexchange, Inc.   DAVID KEIL                          7/21/2016

29:7
computer 191:17
computer 17:7
 20:6 86:20 91:4,8
 104:17 141:19,22
 142:19
concept 170:6
concerned 62:13
 106:5 112:13
concerning 37:9
 72:7 154:17
 155:21 157:16
 163:2,10 165:24
concluded 216:4
concludes 215:25
conclusion 100:10
 119:23
conduct 31:21,25
 49:1,4,6,22 50:17
 56:19 70:23 73:1
 81:11 175:23
 213:25 214:12
conducted 55:5
 100:19 121:22
 169:4 170:7
 188:13
conducting 179:22
 211:15 212:8
confess 161:15
confident 85:10
 119:19
CONFIDENTIAL
 5:14
confirm 25:21 26:5
confirming 44:14
 184:19,25
conform 48:14
confused 161:16
 164:21
confusing 137:25
confusion 119:1
connection 76:6
 193:2
connections 133:18
consensus 15:20
 180:9
consider 25:7,11

49:5,21 50:16
 74:2 80:21 82:16
 83:2,19 89:5
 113:8 175:11
considered 83:18
 177:23
consistencies 34:9
 34:10,13,18
consistency 35:11
 36:3,14 170:2
consistent 90:17
 99:19 166:6
 172:13
consolidated 20:6
constant 24:10,12
constitute 184:12
constitutes 18:15
 144:6
consult 9:4 21:14
 106:17
consulted 10:14
consumer 34:8
 42:12 57:25 58:4
 58:6
consumers 33:21
contact 32:2,5,5,14
 32:18 87:24 88:21
 97:1,19 100:24
 108:14 110:22
 111:9,12 123:17
 194:4 195:24
 214:17,20,25
contacted 30:3
 33:8 101:1 123:18
 196:7,23
contacting 61:24
 193:13 194:3
 195:24
contain 17:19
contained 12:25
 18:18 142:14
contemporaneous
 17:1
content 150:12
 154:7
contents 18:8 19:21
context 28:2 44:6

98:23 149:12,15
 149:19,20 152:19
 165:9
continue 71:23
 128:2
continued 38:7
continues 156:12
continuing 86:24
 87:4
contract 209:23
contractual 209:19
 209:20
contrast 52:9 53:22
 55:7
control 12:21 93:14
controversy 218:7
convene 206:3
conversation 20:5
 20:10 39:18,19
 56:6,12 61:16
 98:11 111:5
 113:18 115:2
 122:22 127:21
 129:20 132:5,24
 134:3,9,16 135:4
 135:4,25 136:1
 137:5,17,17
 139:15 140:2
 149:4,5 152:7
 153:1,5,10 154:22
 161:1,3,4,23
 162:19,20,24
 163:5 164:3
 165:21 168:14,19
 169:8 175:7,9
 179:6 194:16
 195:22 199:9,11
 200:25 201:17,20
 202:3,9,15 203:1
 204:1
conversations 6:20
 15:11,25 16:2,3
 16:11,12,13 33:15
 34:14,15 46:2
 55:18 113:21
 118:4,19 119:22
 122:13,17,20

123:15 124:23
 127:8 133:3,14
 134:2 137:8,14,22
 138:24 145:25
 153:16 169:2
 170:12 171:2,7
 174:6 177:11
 180:5 188:12
 200:23 201:23
 203:4,18 204:5
copied 66:17
 140:21 143:21
copies 12:7 13:4
 65:13 66:9 94:13
 94:15,16 167:6
copy 65:13 66:7,19
 78:7 91:10,12,13
 91:15,16 126:3
 209:23
copying 78:23
correct 8:12 15:12
 17:9,10 18:25
 34:14 41:16 48:1
 50:15 56:15 58:8
 62:5,6,15,19
 63:10 64:2 73:23
 75:9 83:6 85:18
 97:3 99:13 102:24
 111:13 120:25
 121:1 129:11
 132:8 145:8
 148:22,22,23
 149:22 151:17,21
 152:1 162:22,23
 165:24 167:25
 170:22 173:18
 174:16,17 178:6
 178:12 182:25
 185:25 187:5,24
 187:25 189:11
 205:20,21,24,25
 206:20,21 211:17
corrected 8:15
correction 145:14
correctly 105:17
 118:22 146:11
 147:25 164:11

corresponding
 70:11 112:17
corruption 143:4,6
 143:14,16
cost 33:21 139:17
 139:19,22
costs 96:7,8
counsel 6:22,23
 12:9 13:8 14:17
 15:17 19:3 30:15
 31:15 33:7 34:4
 35:25 37:12 39:21
 45:1 46:3,22
 47:15 49:16 72:24
 87:22,24 88:4,6,9
 89:3,7,11 90:1
 92:24 94:17 96:9
 101:3 106:17
 107:5 111:8,13,14
 111:16 120:3
 154:8 155:1,25
 156:6 159:20
 162:11 167:21
 168:8,9 195:23
 208:13 209:2
 214:25 215:6,18
 218:11
counsel's 54:9
 154:8 156:18
count 21:10
country 24:24
 29:20 50:24
 194:22 205:18
county 217:14
 218:3
couple 62:23 75:4
 78:25 87:16
 139:25
course 10:24 48:24
 55:2,3 65:1 66:25
 111:23 145:24
 152:14 162:14
 171:2 203:14
court 1:1 6:10,14
 27:18,19 68:9,25
 69:3,7,19 105:20
 150:16 157:2

Beltran v. Interexchange, Inc.   DAVID KEIL

7/21/2016

Page 225

court's 69:9
court-appointed 69:5
courts 69:19
cover 56:25
covered 19:9
coworkers 182:14
craft 71:18
Craigmile 4:3 7:9,9
create 90:11,12 91:6 92:3 96:6 142:4 193:25 211:11
created 70:8 86:23 87:14,14 91:22 104:1 143:12
creating 87:5
credible 100:4
credits 191:22
crime 28:12
crimes 27:2,9
criminal 24:18,20 27:4,18,23 69:6,6 79:23,25 80:12 84:16,18,21
crisis 27:16
criteria 71:7
Crompton 133:24 134:4,10,22 135:7 136:1,11,23,25 137:14,24 138:1 138:19,23 147:10 148:1,22 149:3 152:8,9 153:17 160:12,19 161:23 163:6,12,15 164:4 164:9,13 165:11 165:22 171:10 181:15,20,21 182:14 183:11 185:19 189:22
Crompton's 147:19 171:11 177:5,24
crossed 88:1
CROUCH 208:14
cultural 1:11,11,12 1:13,15 2:2,2 3:1

3:5,5,20,20 7:16 7:20,23 8:24 122:5,6,23 197:25 198:22 199:6,6,17 200:2 201:4,8 202:1,7 205:19
curious 51:13
current 25:21 26:6 68:18
currently 9:18 26:11 29:9 67:13 142:11 178:3 207:7
custody 12:21 93:14
custom 45:4
customarily 57:5
customer 43:8 71:11 114:2 115:6 115:8,15 116:4,13 137:1 176:24,25
customers 36:23 116:13 176:6
cut 27:3 134:13 137:17,18,19
cyclical 29:10

**D**

D 5:1 208:9
d/b/a 1:10,11,12,13 1:14,14,15,16 2:2 2:17 3:5,20,21 4:1 4:2
damage 81:9 82:13 82:21 84:7,9
damaging 81:4
date 14:14 16:23 44:9,15 50:5 92:16 94:6 152:2
dated 16:18
dates 20:9 92:11 166:6,10
dating 92:14,15
David 1:4 2:1,23 5:2,9,11 6:8 7:13 7:24 8:6 21:20 26:21 64:11 78:15

78:20 159:13,18 215:25 217:1,10 217:13 218:6
day 59:10 136:10 150:8 216:5 217:15 218:13
day-to-day 24:22
DAYANNA 1:6
days 8:13 16:25 17:2 27:20 59:6
dealing 47:11 117:17
debate 72:14,15
December 14:14 16:18 30:25 70:1
decide 79:11 110:25 206:4 213:25
decided 71:10 82:14
decision 109:12 191:4
declaration 65:7,18 65:21 66:13 76:9 125:8,14,24 131:19 150:16
declarations 74:7 74:13 75:2,8 76:5 77:13
decline 9:17
deduced 114:8
DEEELEFS 1:6
deemed 8:16 188:19
default 85:4,9 108:25 109:5
Defeat 128:20
defendant 2:2,13 2:17,21 3:1,5,12 3:16 4:1 7:4,8 28:23
defendant's 28:25
defendants 1:17 3:20 5:13 7:10 9:5 13:10 14:18 15:17 25:17 27:5 28:4,18 65:18

199:3
defense 27:24 69:6
define 175:20 194:14
defined 194:2
definition 193:12
degree 22:7 170:1
delay 50:6
deleted 147:2
delineate 80:1,13
delivered 141:1
delivering 150:8
Denver 2:2,11,15 2:25 3:3,10,14,18 3:23 6:13,15 9:12 11:5 22:5 23:2 24:2 63:9,21,23 69:19,20,21 200:10 218:3
department 5:16 136:6,7 172:1,6,9 172:13 173:17 179:22 180:2,14 181:4 184:11 187:4 189:7,10,14 189:16 190:4 191:20,21 192:1,9 192:16 194:11 196:7,11,15 205:13,24 208:18 210:5,18
Department's 174:21
dependent 79:10 79:17,18
depending 27:14
depends 79:16 84:2
deponent 10:1,4 11:17,20 14:8 27:12 31:12,17,25 33:5 36:6,8 39:1 54:22 65:24 66:1 66:20 74:10 75:20 77:17 87:3 88:13 90:22 102:15 107:17 115:13 125:17 132:22

144:10,14,17 145:3 168:16 175:3 180:23 193:20 195:13 198:8
depose 19:21
deposition 1:4 2:1 5:7,8 6:7,12 8:14 8:25 12:6,11,14 12:15 14:7 15:19 25:24 46:4 64:7 65:23 68:19 76:1 76:15 78:15,20 93:2 120:4 144:11 157:21 159:13,18 206:10 207:17,18 215:25 217:2 218:7
deprive 140:13
depth 74:24
derived 136:2 139:18
describe 14:24 94:8 169:10
described 13:17 14:16 15:9 19:6 91:18 154:6 161:5 161:10 162:21 183:2
describing 79:3 93:21
description 12:25 14:11 78:3 98:12 146:3 153:22 154:8,25 156:19 168:19
designate 105:13
designated 135:9 136:5
designed 36:25
desktop 106:14
destined 109:13
destroy 211:12
detail 147:15 153:20
detecting 110:4
determination

Beltran v. Interexchange, Inc.   DAVID KEIL

7/21/2016

Page 226

81:23 105:8
**determine** 35:14,21 38:21 42:8 51:16 52:6,7,13 55:15 58:16 61:2 79:13 97:13 103:23 109:9 153:7,23 157:5 158:9 159:1 204:18
**determined** 37:17 98:10 128:3
**determining** 36:20 37:8,25 130:1 165:22
**detriment** 86:9
**detrimental** 79:19 80:21
**developed** 171:2
**devise** 71:20,23
**dictates** 49:20
**differed** 176:8
**difference** 120:10
**differences** 52:10
**different** 17:2,2,3 25:3 29:6,7 35:11 68:15,17 69:8 90:2,3,5 112:8 120:6 189:7
**difficult** 11:2 130:1
**difficulty** 10:11 130:22
**dig** 78:1
**direct** 94:20 108:6 176:22
**directed** 42:4 52:21 158:8,11
**direction** 32:11 89:25
**directive** 176:15 179:23 180:1 181:4 184:21 185:2,10 189:7,10 190:4 191:17 205:13
**directly** 100:15,16 105:3,3,9,19 109:17 116:23

135:8,12,14 149:6 157:19 179:11 182:10 185:8 193:7 209:2
**director** 133:25 134:3 174:24 183:2,21 210:5,13 210:17
**directors** 191:1
**disagree** 15:4 120:13 155:9
**disagreement** 144:21
**disclose** 79:5,12,21 80:9,11,12,21 81:16,25 82:7 83:19,22 84:4,25 85:10,13,18,22 86:4
**discover** 53:11
**discoverable** 19:19
**discovery** 167:19 168:7
**discriminate** 28:24
**discuss** 19:5 57:2 71:13,14,15 152:24 213:2,13
**discussed** 61:23 121:24 139:1,10 139:11,13 140:2 164:9 168:22 179:6,7
**discussing** 26:14 127:9 133:13 152:11 161:14 173:8
**discussion** 120:19 137:23 140:2 156:15 169:3 170:7 176:11 204:21
**discussions** 14:18 15:9
**disjointed** 66:23
**dispute** 99:4
**distinction** 83:17 84:16

**distinguish** 31:3
**distributed** 13:21
**district** 1:1,1 6:10 6:10 68:9,25 69:18
**divided** 53:20
**Division** 5:17
**document** 12:18 13:7,12,22 14:14 14:15,22,25 15:3 15:18 19:5,13,15 19:19,22 65:15 74:15,16,19,21,23 74:25 76:12 77:4 77:9 91:18,22 93:8,12 140:21 142:4,18 144:6,8 145:7 147:12 150:2,11,15 151:23 204:9,11 207:19 208:19 211:13
**documentation** 91:24
**documented** 48:21 180:5
**documents** 12:19 12:22,25 65:2 76:13 78:23 123:7 125:6,9 131:8,17 131:17,21,23 151:11,13 167:4
**doing** 27:21 68:25 70:22 84:24 113:4 122:5 157:22 175:12 197:22 199:6 201:16,21 202:2,8,19,20 212:7
**door** 27:15
**DORA** 50:8 210:5 210:10,18 212:10 213:2,9,13
**drafted** 213:6,7
**drawing** 136:7
**drive** 142:22 143:1 143:6

**DTC** 4:4
**due** 160:22,25
**duly** 7:25 218:6

**E**

**E** 2:5,5 3:13 5:1
**E-u** 174:24
**earlier** 74:18 86:18 89:15 91:24 93:21 96:25 108:24 176:5 187:16 203:21 209:18 213:4
**early** 27:17 30:22 30:24 31:4 34:17 48:1,5 50:1,14 68:11,12 140:1
**earphones** 106:3
**easier** 103:1
**East** 2:8
**economically** 69:14
**edited** 17:16 26:17
**edits** 18:19
**educated** 23:8
**education** 22:1,23
**educational** 23:9 179:7
**Educators** 23:8
**effect** 50:1 58:4 198:16 210:20,25
**efficiency** 9:3
**effort** 89:1 118:16 148:16
**efforts** 103:9 143:9
**eighth** 119:6
**either** 34:1 43:25 45:3 50:23 66:4 66:12 80:17 92:14 108:23 111:22 116:16 117:14 127:3 137:18 138:16 141:8 147:18 153:15 173:1 174:19 183:11 189:17 215:17
**elect** 152:13 185:21

**elected** 138:4 152:21 174:8 175:15 186:5
**election** 144:7
**electric** 121:10
**electronic** 86:15 87:4 90:16 91:19 92:19,25 121:2,7 121:11 131:3 140:23 145:10 146:22 161:11 190:10
**elects** 149:8
**element** 181:13
**elements** 180:2 212:19
**elicit** 36:25
**email** 140:23 141:6 141:13 161:8 196:24
**emailed** 141:1,6
**embodied** 72:6
**emerged** 163:14
**employ** 135:19,21
**employed** 23:3 130:23 218:10
**employee** 42:13 99:25 125:20 182:24
**employees** 14:18 32:5 33:8 36:24 51:10 59:6 189:5 193:4
**employer** 181:16 183:4
**employers** 181:10 181:13
**employment** 21:24 67:5
**encompassed** 96:14
**ended** 20:6 100:5 101:6,12 114:12 128:4
**enforcement** 9:21 74:3 80:1,14 212:12,13
**engaged** 106:16

Beltran v. Interexchange, Inc.   DAVID KEIL                           7/21/2016

engagement 45:8
    45:10,14,17,18
    46:6,16,19,21
    47:2,13,19
Enica 2:18,19 7:4,5
    132:20
ensure 66:23
    106:10
entail 46:5
enter 35:13 37:24
    38:13 40:15 43:15
    117:21 153:1
    165:21 167:13
    183:18
entered 35:20 38:5
    40:2 51:14 53:3,6
    53:8 54:12 56:12
    71:6 82:5
entering 155:7
entire 16:3,12
    45:22 66:2 205:2
entities 32:3,18
    52:12 99:12 107:4
    123:10 128:25
    190:16 193:12
    194:2 214:12
    215:4,10,19
entitled 40:1 60:17
    65:16 155:17
entity 43:18 62:9
    124:22,25 214:16
    214:20,24 215:1
enumerated 86:8
equal 179:15 184:6
Eric 8:6
err 82:19 90:10
    211:1
errata 8:15
erred 82:14 110:21
erring 82:16
erroneously 133:15
errors 145:15
ESQ 2:7,10,14,18
    2:23,23 3:2,6,9,13
    3:17,22 4:3
Esquire 65:19
establish 8:7

estimate 25:15
    85:21 96:8,10,13
et 6:8,9 217:25
ethical 73:6 107:2
    112:9,16,17,19,22
ethically 113:2,6
EurAuPair 1:11
    2:21 7:14 14:19
    118:9 123:10,15
    123:17 124:13,21
    124:24 126:16,21
    129:18 133:11
    146:14 152:17
    174:24 175:7
    186:12
Euro 119:5
Europe 29:21
    118:5,8,9 119:4
events 139:3
everybody 11:15
    66:23 122:18
    136:16 148:22
    171:11,12,19,20
    171:20,22 173:3
    173:13,16 183:6
    185:9
everybody's 78:8
everyone's 140:6
evidence 187:11,21
evolve 59:22
evolved 57:10
    59:12 124:10
evolving 34:21 41:7
exact 16:23 85:12
    148:12 164:25
    173:12 213:8
exactly 30:18 32:15
    179:15 184:6
    186:6,25 193:24
examination 5:2
    8:2 206:13 214:1
    214:7 218:6
example 20:20
    43:16 52:22 92:10
    97:18 107:1
    114:20 145:14
    196:16

examples 172:22
    172:24 173:24,24
    174:8
exceed 70:15
exceeded 95:17
exceptions 167:10
excerpt 151:18
    208:15
excerpts 18:9 75:6
    207:23
exchange 1:12,13
    1:14,15,15,15
    3:16,20,21 4:1,1,2
    7:11,11 14:19
    19:13 146:13
    147:11 202:1,7,19
    202:20,21 205:19
exclude 169:12,14
excuse 23:9 26:20
    27:10 48:16 79:24
    88:13 123:18
    124:2 132:20
    146:15 181:22
    188:15 203:8
    207:17
executive 98:13,15
    98:21 99:2,21
    190:20,24 191:1
    210:4
exemption 47:13
    208:24 209:10
    210:2
exemptions 211:2,3
    211:4,5
exercise 71:18 72:2
exhausted 70:12
exhibit 5:8,9,10,12
    5:14,16 12:5,11
    14:6,7 25:24 65:5
    65:14,23 66:1,24
    75:14,15,17,23
    76:3,14,16 77:1,2
    144:5,9,11 145:3
    145:7 146:10
    147:25 161:11
    163:7,16 164:17
    168:16 175:3

191:10 203:3,6,19
    204:7 206:10
    207:18
exhibits 5:7 65:3
    75:18 131:18
exist 91:9 168:12
    213:11
existed 36:20 37:8
    38:1,21 145:13
    153:13,24
existence 23:7
exists 91:11 208:25
expand 20:18
expanded 191:11
    203:19
expect 64:18 116:8
    117:22 139:3,7
    177:19
expecting 64:15
    154:21
expediency 144:9
expenses 177:18
expensive 135:1,2
experience 98:17
    98:20 99:1 100:2
    138:2
Expert 1:10,10
    2:17,17 7:4
    197:22,23
expires 217:21
    218:15
explain 28:20
    49:10 80:16
    152:25 164:22
explained 135:7,11
    136:4,11 190:25
explanation 71:20
    153:20 154:19
explicit 165:25
    166:1
explored 163:8
exploring 153:2
    163:24
exposition 74:1
express 155:13
extends 94:18
extent 9:2 12:19

15:1 31:14 39:4
    39:18 42:10 60:10
    60:13,20,21 62:1
    126:15 146:11
    155:4,6 156:17
    160:1
extra 138:9
extremely 127:24
eyes 14:4

                F

face 89:12 180:10
fact 13:9,14,15
    41:21 71:14,16
    82:9 92:13 107:5
    110:4,5 114:18
    117:13 135:7
    139:18 148:15
    152:11 165:11
    180:1 194:3
fact-finding 175:23
factors 79:11 81:23
    83:18 86:7
facts 15:10 47:13
    82:23 99:3,4
    112:4 175:24
    176:1,4
factual 15:14 17:20
    19:8,8 93:1 192:3
factually 132:8
fair 205:9,10
fall 30:22,24
falls 68:12 143:4
false 129:6
falsehood 128:2
familiar 13:14,15
    113:19,24 124:17
    192:17 202:16
    208:20
familiarity 194:23
families 35:9 52:5
    52:14 53:9,14,17
    54:1,6,16,25
    55:16 56:3,15
    58:7,17,24 60:4
    61:4,15,22 173:25
    174:3,8,20 176:12

Beltran v. Interexchange, Inc.   DAVID KEIL                    7/21/2016

Page 228

176:17,18 185:11
187:4 192:6,8,22
**family** 9:20 57:3
58:8 71:22 127:25
135:5,8,12,15
136:20,21,23
137:1,1 138:4,6
138:10 139:15,20
149:8 152:12,15
152:21 173:19
177:19 178:23
184:4,11 185:21
186:5,20,21
192:15 207:11
**far** 18:2 62:13
112:13 137:19
176:22
**Farber** 2:24
**fashion** 100:13
110:9 132:17
160:13
**favor** 140:5
**February** 21:21
31:4 218:15
**federal** 6:2 27:17
27:19 69:18 182:3
182:6 184:20
185:1,10 191:16
**fee** 47:12 53:9,17
67:9,12,13,14,16
67:18,20 68:1,4,5
68:14 69:7,8,9
135:9,10 167:3,6
169:25 176:21
179:7 209:8,13
211:4
**feel** 81:4 94:21
100:3 101:6
105:18 128:1,19
132:15
**feeling** 13:19
**fees** 34:1 35:7,15
35:22 36:21 37:9
38:2,15,22 39:14
40:19 41:3 42:13
52:8 53:19 135:5
149:5 176:23

177:3
**fell** 134:24,25 140:4
**felt** 100:22 101:10
119:18,19 171:7
**field** 25:1 53:2
71:15,16
**fifth** 119:5
**fighting** 11:17
**figure** 57:17,22
113:9
**file** 47:21 78:9
109:9
**filed** 13:5 44:18
62:18 65:4 75:2
76:5 77:12 150:16
**filing** 63:8
**final** 8:16
**finalizing** 147:2
**finally** 72:5
**finance** 23:5,16
**financial** 23:9
24:19,19,19,20
27:2,16 28:9,11
**find** 9:5 33:19
37:15 40:2,17
41:2 54:5,14,23
56:14 58:2,20,23
60:1,17 64:14,17
78:9 81:7 82:20
97:25 98:7,11
102:25 120:6
121:18,20 127:19
136:12 154:1
156:9 176:4,16
178:4 182:5,9
194:11 195:20
**finding** 33:8 38:14
59:24 115:24
116:1 176:2
197:12
**fine** 26:3 159:2,7
186:11
**fingerprints** 90:5
**finish** 70:16
**finished** 21:23
208:11
**firm** 29:11,23 47:5

83:5,8,24 84:5,12
85:23 86:6 90:8
103:15 106:22
129:16 167:5
211:25
**firms** 28:22 29:6,8
29:15,21 46:24,25
109:8 210:15
**first** 7:25 12:5
16:17 31:1 34:13
34:19 48:4 54:4
58:9 62:10 67:16
67:17 84:17 93:19
101:8 118:8 119:5
123:16,17 124:14
126:13,15 129:5,8
129:19 130:10,12
130:13,17 134:16
137:5,17 150:1
151:22 163:17
175:6 181:15
**Fisher** 3:17 7:17
**fit** 12:20,25 195:5
**fits** 48:18
**Fitzgerald** 2:23
7:12,12 11:16
36:5,16 112:2
193:19
**five** 16:24 24:16
26:17 29:12 74:24
108:10 214:1
**five-** 59:7
**five-minute** 78:11
140:10 206:2
**fixed** 28:21 139:19
139:19,22
**flag** 114:4
**FLEISCHER** 2:7
**Flexner** 2:8 6:25
**Florida** 2:9,20
**flow** 179:6
**focus** 24:16 38:7
**focused** 41:9
**Focusing** 24:15
**folk** 113:20
**folks** 10:10 16:8
20:1 28:13

**follow** 33:12 48:11
49:8,20 57:15
59:12 171:15
183:8,9 184:20
185:1 208:21
211:8 212:22
**follow-up** 34:11
134:14 164:16
165:10,12 170:4
170:14 171:17
173:2,12 179:10
179:14
**follow-ups** 139:25
**followed** 19:7
57:14 70:18 81:8
136:19 180:7
211:6
**following** 6:1 8:24
48:3 181:4 185:9
**follows** 8:1 36:11
107:19 164:19
**foregoing** 217:2
218:8
**Foreign** 1:13
201:15
**forensic** 25:2,6,11
**forget** 67:4
**form** 8:10 27:13
76:11 79:15 82:2
83:13,25 85:15
86:11,23 88:11
89:8 92:6 97:10
99:8,15 107:8,15
111:15 116:15
117:25 143:15
146:15 160:21
162:13 171:5
173:22 174:4
180:16 181:6
182:7 184:13
185:13,24 186:14
187:8 191:14
192:10 200:14
207:22 218:8
**formal** 210:17
**formally** 211:23
**format** 154:20

**formulate** 36:19
37:6
**formulated** 36:1,12
36:22
**Fort** 2:9
**forth** 169:3 180:2
187:4 203:3,18
211:9
**forum** 73:9
**forward** 66:25
71:23 92:5 144:24
**forwarded** 92:1
151:23
**found** 23:13 30:12
34:25 35:10
175:24 187:2
193:17,21 208:4
**Foundation** 1:13
147:10
**four** 29:12 101:12
108:10 171:16
**Fox** 22:11
**frame** 40:4,5,8
**frames** 213:8
**framing** 40:5
**frank** 72:11
**frankly** 31:1 45:24
63:14 166:9
177:11
**fraud** 24:19
**free** 106:4,4 174:3
**freely** 101:9,10
**front** 26:1 62:24
74:16 75:18,21
76:3 125:6
**frustrate** 129:23
**frustration** 48:22
**full** 8:4 126:15
146:11 147:17
188:3 208:19
**fullest** 155:5
**fully** 21:13
**functioned** 57:18
**funds** 70:15
**further** 8:13 89:12
180:9 213:16
218:10

Beltran v. Interexchange, Inc.   DAVID KEIL

7/21/2016

Page 229

furtherance 212:6
future 48:13 138:6

**G**

gain 127:4 153:9
188:16,24
gained 188:2
game 70:20
gamut 47:23
gather 36:22,25
53:21,24 56:19,22
112:4 205:11
gathered 191:12
199:3
gathering 18:4
33:17 34:19 56:24
115:10
Geist 6:15
general 25:4 44:3
47:11 84:22 89:2
90:6 92:16 102:6
102:10,12 108:8
177:5,19,20
188:12 194:15
209:4 210:12
generally 28:25
29:19 61:19,23
68:19 69:20 70:9
80:7 96:8 107:12
107:20 108:2
generated 145:16
203:10
generic 52:19 71:8
81:10 82:15 94:9
177:1,2,15
gentleman 23:24
77:6
getting 57:12 79:3
200:20
give 25:14 27:11
52:17 59:16 63:14
67:25 82:21,23
85:11 95:14
100:14 104:22
124:16 125:11
127:7,8 129:3,6,8
129:19 130:3,19

133:15,20 134:15
134:17,23 152:14
158:14 161:1
172:22,24
given 33:6,11,14
57:13 58:12 60:6
60:13,16 65:5
70:6 93:6 102:17
106:21 122:22
126:14 154:11,20
154:21 155:1,12
156:6 158:12
215:14 218:9
giving 68:19 128:2
177:9,12
glean 43:3,6 183:22
gleaned 73:4
Global 1:12 3:16
7:18 14:18 118:11
123:11,12 132:2
146:13 147:11
186:9
go 6:18 15:22 28:1
37:19 55:8 58:9
58:15 59:13 64:5
64:5 66:18,25
67:2 78:7,10
81:21 97:17
126:12 130:8
132:1 144:24
154:22 158:19
166:4
goal 98:3 101:8
176:5
goals 41:1
GoAupair 1:14,16
3:20,21 202:2,8
goes 109:12
going 8:8 9:17,22
10:2 12:4 13:3
15:15 18:12 19:4
19:7,11 21:3
25:19 26:14 37:2
37:3,14 39:3 40:4
40:12 41:25 48:12
51:21,23 60:24
63:2 64:20 65:12

66:8,15,17 67:16
67:21 71:5 73:2
76:23 78:5,13
85:7 91:1 92:24
93:6,8,16 94:25
105:5 120:3
121:20 122:3
123:1,9,14 128:3
129:22,22 130:14
134:17 140:15
147:9,16 150:14
152:15 154:4,6
155:8,23 156:22
156:24 159:11
162:9,11 168:10
181:14 203:15
204:3 206:7
207:16 213:25
214:2,9 215:24
GONZALEZ 1:6
good 6:4,24 8:4
82:24 105:20
204:14
Gordon 3:13
gotten 137:19
178:16 180:24
governed 51:12
governing 47:10
192:18
government 51:11
136:6,8,14,16
148:11,21 164:23
grab 12:10
graduate 22:9,22
graduation 22:14
grammar 18:20
91:25 92:18
142:17
grammatical 17:17
145:15
gray 84:20
great 69:15 128:7
GreatAuPair 1:10
197:19
greater 44:6
Greenwood 4:4
grew 145:24

grounds 153:18
group 1:10 2:17 7:4
32:1,13 42:2
197:22
guarded 27:3
guess 51:4 58:7
62:17 110:12
178:24 186:12,24
215:15
guidance 33:14
90:14 180:14
guidelines 70:13
182:3,6
Gussev 174:23
175:1 178:10
186:18 190:1
Gussey 186:18
guy 72:22
guys 177:18

**H**

habit 102:10
hacked 143:2
half 29:17 213:12
halfway 163:18
Hall 3:7 7:22
hand 13:20 65:13
90:17 141:1
207:16
handed 65:20
75:13
handled 110:11
handling 117:23
Hands 106:4,4
handwriting 195:9
215:12
handwritten
195:14 215:12
hang 128:5
happen 60:19
172:22
happened 59:19
114:23 153:5
172:24 198:14
happens 167:8
196:14
happenstance

167:8
happy 136:20
137:3 152:22
hard 140:6,9
142:22 143:1,5,6
harm 82:24
Hart 3:2 7:16
hat 72:22
head 23:4
hear 10:3 11:13,15
11:16 29:11 31:23
36:5 39:23 87:1
90:21 107:24
123:23 138:8
173:9 174:10
177:22 193:19
195:11 198:7
heard 25:5 52:23
181:14
hearing 10:11
60:22 106:6 130:4
140:7
held 6:12 97:6
help 109:9 125:22
126:2 158:20
Hensen 4:3
hereto 218:7
hesitant 133:15
Hi 115:2,19 124:5
Hickox 23:24
hierarchy 99:6
high 2:11 22:9,11
22:13 99:6
highest 22:1
hire 28:23 109:8
152:15
hired 71:16 212:13
hiring 56:18 71:15
139:15
historically 28:5
history 21:24
hit 57:7 205:2
HLATSHANENI
1:5
hoarse 91:3
hodgepodge 47:1
47:18 116:22

Beltran v. Interexchange, Inc.    DAVID KEIL                                    7/21/2016

117:4
**hold** 13:25 15:19
**Holland** 3:2 7:15
**home** 117:2,3
**homes** 116:25
**Homestay** 1:11 3:1
  7:16 198:1,22
**honest** 73:17
**honestly** 60:7 73:9
  185:4 193:10
**Hood** 2:10 7:2,2
  10:16 14:16 17:15
  17:18 26:3 30:5,7
  30:19,21 42:16,22
  43:22,25 44:12
  47:4 55:14,19
  56:7 60:7 61:1,12
  61:17 64:12 65:4
  65:8,19 67:8,14
  67:25 68:11 87:6
  87:21 91:15,17
  92:2,6,19 96:1,5
  96:13 109:25
  110:11 119:20
  121:3 122:1
  140:24 150:5,9,12
  150:14 151:24
  157:11 158:5
  161:3,8 162:20
  170:25 190:14
  192:25 193:5,7,9
  195:1 215:14
**Hood's** 56:17 66:13
  76:9 125:8,13,24
  158:6,7
**hope** 14:3 59:17
  79:7
**hoping** 98:11
**horse** 23:1
**host** 52:5,14 53:9
  53:14,16 54:1,6
  54:15,24 55:16
  56:3,15 57:3 58:8
  58:17,24 60:4
  61:3,15 174:20
  176:12,17,18
  184:11 187:3

192:8,15,22
**hour** 67:14,18,19
  68:7,10,13,18
  93:20 216:4
**hourly** 67:13 68:18
  68:20
**hours** 64:24,24
  94:3 96:7,18,18
  96:18,20,20
**Howard** 2:14 7:8
**hundred** 29:5
**hundreds** 27:1
  167:17
**hung** 200:11
**Hunter** 6:15
**Hyatt** 2:24 7:13
**hypothetical** 57:24

**I**
**iBook** 141:23,23,24
  142:1,22
**ID** 102:8 218:5
**idea** 53:14 108:23
  199:18 201:6
  211:21 212:1
**identified** 32:3
  123:10 133:2
  155:3 193:4,7
  214:16,21,24
  215:5,9,18
**identify** 80:5,7,15
  81:12 97:5 103:10
  129:12,15 132:11
  194:22 207:21
  214:11
**identifying** 82:12
**identity** 42:15
  118:17 190:15
  205:23 215:4
**imagine** 10:20
  66:16 103:9
**implemented** 47:25
  48:11 192:18
**implied** 182:12
**import** 98:21
**importance** 179:25
**important** 79:25

80:13 171:7
  175:11,17 177:23
**impressed** 98:9
**impression** 43:21
  52:17 79:8 113:16
  209:17
**improper** 191:25
  192:3,6,14 205:14
**in-house** 21:22
  23:4,20 89:2
**inappropriate** 20:2
  192:13
**include** 16:12
  31:16 131:4
  151:14 166:10
  169:11,15,16,19
**included** 20:1
  97:22 151:9 169:1
  169:3 180:14
**includes** 15:10
  121:8
**including** 176:17
  199:4
**inclusion** 150:23
**income** 68:22 69:17
**incorporated** 50:17
  52:24 59:19 122:5
  197:10,16 201:10
**incorrect** 79:8
**independent** 23:19
**independently**
  193:9
**indicate** 15:5 20:9
  20:13,16,23 44:8
  44:9 160:12
  166:21 175:5
**indicated** 8:20
  14:20 16:18 74:18
  98:12 140:3
  146:18 149:3
  160:11
**indicates** 146:3
**indicating** 14:15
**indication** 26:24
  70:6 113:21
  152:14
**individual** 33:20

35:6 85:3 133:22
  134:6 182:18
**individually** 81:22
**individuals** 15:24
  27:8 43:12 97:1,6
  127:1 131:10
  133:6 180:4 181:8
  189:13
**industry** 57:18
  73:22 89:22 135:1
  140:4 176:16
  180:7 185:6
**infer** 89:13,15
  111:21 112:1,4,7
  115:18
**inferred** 171:17
**influence** 39:25
**inform** 192:7,7,14
**informal** 70:22
**information** 5:10
  9:22 17:20 18:3
  18:10,18 27:4
  32:21 33:1,1,16
  34:11,19 36:3,14
  36:23 37:1 42:11
  44:4 45:5 53:18
  53:21,24 54:3
  56:19,23,23 57:13
  71:5 72:19 73:4
  73:10 81:5 82:22
  85:10 98:14,25
  99:18 101:4
  110:22 115:10,16
  117:9,9,14 120:1
  120:23 121:5,8,19
  123:22 125:12
  133:15 134:20
  137:7 142:14
  146:6 147:1 151:4
  159:6 171:1
  175:16,18 176:9
  177:1,4,7 178:7
  180:11 182:10,19
  183:3 184:16,25
  185:10 188:3,3,14
  188:16,22,24
  190:11,13 191:11

191:16,19,24
  197:1 198:18,19
  198:20,22 199:3
  205:5,15,17
**informed** 89:9
  187:3
**informing** 184:10
**initial** 5:6 55:8
  116:20
**initially** 119:4
  178:21
**inquire** 154:15
  155:10,12 158:16
  163:1 178:9 184:1
**inquired** 167:24
**inquiring** 88:10
  153:12 161:17
**inquiry** 160:20
**insight** 27:3
**insist** 155:24
**instance** 52:22
  86:14 90:13 127:7
  128:22 130:17
  178:14 185:14
  201:4 209:5
**instances** 79:9
  105:13 127:20
  172:17 185:18
  189:9,20 201:2,3
**Institute** 1:13
  201:15
**instruct** 15:3 18:14
  34:3 35:24 154:6
  157:14 158:20
  162:25
**instructed** 37:12
  39:8 54:14 55:15
  55:21 56:2 58:23
  60:20 61:1,12
  110:24 154:1,15
  155:10,20 156:8
  157:4 158:5,16
  160:7 162:4
**instructing** 39:6,22
  156:2,4,7
**instruction** 32:20
  32:22 33:4,18

Beltran v. Interexchange, Inc.  DAVID KEIL                    7/21/2016

Page 231

35:21 37:11 42:7
51:22 54:9,17
55:1,24 56:16
59:4 60:21,22
90:14 153:23
155:12,24 156:18
157:7,17,23
159:21 160:5
**instructions** 54:10
60:12,16,18 62:4
91:6 153:21 154:5
154:11,20 155:2
156:1,5,15 161:17
**intellectually** 53:16
**intelligent** 72:4
**intend** 115:7
**intended** 42:19
44:1 106:19 115:9
115:14,15
**intense** 59:8
**intent** 41:10,15
44:3 47:15 56:18
57:22 116:7
165:25 166:1,2
213:5
**intentionally** 63:12
188:22
**interact** 35:1
**interaction** 147:13
**interactions** 60:18
**interchangeably**
142:9
**Intercultural** 1:11
2:21 14:20 146:14
**interest** 83:5,11
**interested** 55:3
71:14 115:2,10,19
115:23 116:1
218:11
**interesting** 21:10
171:1
**InterExchange**
1:10 2:13 6:9 7:8
196:17,19 197:10
**interference** 6:21
**interject** 17:24
162:15

**interjected** 181:12
**intermingled** 39:18
**International** 1:10
1:11,12,15 2:17
3:1,7 4:2 7:16
14:19 146:13
168:11,15,20
182:23 186:10
197:22 198:1
202:21
**Internet** 33:9 63:8
97:16 193:18,22
**interpretation** 40:6
**interpreted** 212:10
**interrupt** 157:20
**interview** 24:21,23
34:7 51:11 52:24
53:12,23 55:4,4
57:8 59:15,18
72:10 73:1,12,12
108:9 145:23
166:5 169:24,24
170:2,13 175:19
175:21 215:5,19
**interviewed** 163:12
190:19 215:10
**interviewee's**
105:14
**interviewees** 73:23
84:11 104:24
106:6
**interviewing** 82:17
98:18
**interviews** 15:11
31:21 32:1 34:9
37:14,17,21 53:21
59:7 70:24 72:3
91:24 92:5 100:19
138:18 145:17,20
145:22 153:15
169:5 170:7,11
175:23,25 179:22
188:1,13 214:12
**intimately** 29:11
**investigate** 71:16
**investigating** 79:5
112:11

**investigation** 24:13
25:1 41:9 55:2
56:19 69:5,6 93:1
151:5,8 207:13
211:16 212:6,8,16
212:19,22 213:15
**investigations** 5:11
21:21 23:5 26:22
28:10 37:15
**investigative** 21:15
37:18 44:6 70:9
96:7 109:8,11
**investigator** 5:18
21:5,18 23:20
25:3,6 37:14
46:20 49:2 71:4
79:5,13,21 80:10
80:16,24 81:8,13
81:17 82:1,8,13
82:18,25 83:20
85:1,6,7,14 86:5
87:23 89:23 90:4
129:13 206:20
207:23 211:15
**investigators** 24:7
25:4 46:18 47:10
48:1 72:7,17
73:17,22 74:3
89:20 166:25
210:8,11,14
212:13
**involved** 9:18
27:17 51:13 82:11
128:25
**involving** 72:24
**Irina** 174:23
178:10 184:1,2
186:18
**Irrespective** 215:16
**isolated** 156:14
**issue** 10:14 15:20
20:25 34:24 35:3
35:4 41:9 51:20
64:5 88:23 113:19
113:23 133:4
143:14,16 157:1
160:14 161:22

162:1 165:12
169:23 170:20
**issued** 48:19
**issues** 17:17 21:15
50:8 67:2 89:25
143:7 163:8,23
164:4 167:19
171:7 206:25
209:14
**issuing** 48:10,16
**it'd** 103:1
**items** 74:5 169:16
**iteration** 157:1
**IVETTE** 1:6

_____

**J**

**J-1** 194:19 196:7,12
205:19
**JAMES** 3:9
**January** 23:17 31:4
70:2
**Jensen** 4:7 6:14
**Jim** 7:19
**Joan** 3:6 7:22 66:6
144:1
**Joanna** 168:14,20
171:10,12 182:22
183:11
**job** 23:12 45:7
79:19 80:21 86:9
98:12 100:3,12,12
112:1,3,4,20
152:12
**jobs** 22:25
**Johana** 1:5 6:8
217:25
**John** 4:7 6:14 7:15
**Joint** 5:12 65:16
**JONATHAN** 3:2
**judge** 120:16
**July** 1:4 2:3 5:2 6:5
216:5 218:13
**jurisdictions** 69:21
**Justice** 2:10 5:14
7:3 29:24 30:1,4
30:10 42:21 43:16
45:11,15 46:16

47:3 55:14 62:7
62:14,22 64:10
67:12,25 68:16
69:7 74:6 77:7
83:3 94:2 103:15
110:11 131:20
161:4,9 190:14
194:7 211:24
**justified** 157:22
**justify** 69:14

_____

**K**

**Kathleen** 4:3 7:9
**KATHRYN** 3:22
**keep** 10:3 12:10
16:9 37:2 60:22
67:22 91:2 94:16
105:5 121:24
130:14 135:17
145:2 186:22
203:13 209:23
**keeping** 86:25
90:16 209:3
**Keil** 1:4 2:1 5:2,11
5:15 6:8 7:24 8:6
8:22 10:22 19:12
21:20 26:22 78:15
78:20,22 123:6
140:20 145:1
157:3 159:13,18
161:16 206:15
214:9 215:25
217:1,10,13 218:6
**Keil's** 5:9
**keil@me.com**
141:9
**keilinv@gmail.c...**
141:9
**kept** 86:24 87:3
91:4 131:5 165:11
165:12
**keyboard** 106:10
106:11
**keys** 106:7
**kind** 21:12 83:9
134:18 142:9
166:2

Beltran v. Interexchange, Inc.   DAVID KEIL                          7/21/2016

Page 232

**knew** 82:10 83:7
  87:16 163:23
  190:25 191:2
**know** 10:8 13:16
  14:21 16:5 18:2
  19:12 24:5 38:19
  39:11 40:1,4 41:1
  41:17 42:21 44:2
  44:24 45:2,5,25
  47:16,16 48:20
  52:23,25 56:23
  58:12 59:23 60:1
  60:11,20 62:17
  64:11,20 69:25
  70:1,8 71:4 73:1
  76:22 80:3,17,18
  80:18 81:6,11,14
  81:15 82:10,11,12
  82:23 87:22,24
  88:6,14,14,24
  89:17 90:7,10
  91:11,22 92:12,12
  93:4,9 94:24
  95:17,20 96:9
  99:18,25 103:2
  104:1 105:22
  107:11 108:11,15
  109:21 110:13,20
  112:5,7,8,18
  113:6,15 114:16
  114:17 120:9,11
  124:13,24,25
  127:4 128:7 131:8
  132:17,22 133:12
  139:21 140:5
  142:3 143:3,5,16
  149:7 150:8 152:2
  152:13,21 153:6
  153:11 155:15
  163:7,15 169:7
  172:3,5 175:2
  177:17 178:7
  183:15 184:18,23
  185:20 186:4
  190:3,6,7,7 192:2
  192:3,19 193:9,17
  194:19,20 196:4,6
196:10,16 197:8
  197:15,18,21,25
  198:17 199:1,5
  203:14 205:23
  208:11 212:2
  213:8
**knowing** 56:14
  113:10,11,14
  115:2 132:14
  153:2 160:4
**knowledge** 17:22
  18:1 26:11,12
  34:24 49:3 50:22
  53:7 62:8 80:6
  89:21 98:8 99:18
  100:4 108:6 110:2
  112:22 113:13
  116:18 117:8
  135:15,18 146:5
  184:7,9 185:7
  190:22,23 191:19
  200:8,20
**knowledgeable**
  34:25 98:9,10,24
  101:11
**known** 95:19
  110:15 197:16,19
**Kozal** 3:13 5:4 7:6
  7:6 31:23 87:1
  90:21,23 102:14
  115:12 120:15
  145:19 195:11
  206:14,15 208:21
  213:16,19
**Kyle** 9:24

**L**

**L** 2:23
**L.L.C** 2:14
**labor** 51:2,6,7,13
  110:5 191:20
**lack** 103:25 109:7
**landed** 38:9
**Lane** 22:11
**language** 124:9
  150:22 151:7
  171:13
**laptop** 106:14,15
**large** 27:20 28:21
  32:13 71:2 72:13
  117:24
**largely** 203:11,14
**larger** 136:22
  185:18
**Las** 2:8
**late** 26:13 27:16,16
  68:10
**Lauderdale** 2:9
**Lauren** 2:7 6:24
  39:8 60:15
**law** 2:19 9:21 29:6
  29:8,15 47:5
  48:12 74:3 80:1
  80:13 83:5,8,23
  84:5,12 85:23
  86:6 90:8 103:15
  106:22 129:16
  167:5 180:6 181:5
  181:11 205:14
  209:10 210:9,15
  210:15 211:8
**laws** 51:2,6,7,13
**lawsuit** 63:8 64:1
  108:10
**lawyer** 80:17 84:5
  84:11 90:3,8
**lawyers** 28:22 29:1
  29:2 47:16 64:16
  80:4 90:2
**layman** 46:20
**layman's** 111:8
**laymen** 209:16
**lead** 57:14
**leading** 71:19
**leads** 56:20 74:4
**leaning** 26:1
**learn** 43:11 124:6
  176:5
**learned** 35:1 59:19
  90:2 160:18
  187:11
**leave** 9:2,7 20:25
  66:24 128:12,19
**leaving** 128:17,17
**led** 34:11 36:2,13
  113:18 180:6
**left** 22:23
**legal** 9:11,13 47:14
  168:4,8 195:6,15
  209:2
**legislature** 48:4
  49:9,20 210:8
**legislature's** 47:15
**lengthy** 210:4
**let's** 21:23 24:15
  96:24 102:25
  115:25 120:18
  122:25 123:15
  130:8 132:1 166:4
  180:20,20
**letter** 45:8,10,14
  46:7,19,21 47:3
  146:19
**letters** 47:19,21,23
**level** 22:1 34:24
  99:12,17,21
**Lewis** 3:9 7:20
**liberty** 122:4
**license** 48:8,9 50:2
  207:2,6
**licensed** 206:19,22
  207:4,7,9 211:17
  212:7,17,18
**licenses** 48:16,17
  48:23
**licensing** 5:18
  47:25 48:7,25
  72:8
**licensure** 49:6,22
  49:25 50:13 72:13
  72:15 206:23
  207:24 210:5
  212:23,25
**lies** 72:18
**life** 127:25
**limited** 24:20
**limits** 113:22
**line** 20:22 39:3
**lines** 104:13
**link** 97:19
**list** 87:13,14,14,17
**led** 87:25 88:2 101:2
  104:2 110:23
  121:15 122:8,18
  193:25 194:2,7,8
  194:17 195:14,17
  195:25 215:12
**listed** 13:12 18:11
  30:13 102:21,22
  195:7,10 196:22
  196:22
**listen** 40:11
**listening** 61:13
**literally** 104:3
  167:16
**literature** 48:21
  102:22
**litigation** 24:18
  25:9,14 27:21
  28:3 39:21 41:18
  41:21,22,25 44:23
  45:3,4,6 50:22
  62:18,21 80:3
  81:2,3 82:11 88:5
  88:7 89:14,17
  98:18,20 107:7,14
  107:21 108:3,5,7
  108:12,18,20,22
  108:25 109:6,14
  109:16,20,21
  110:1,18 111:12
  111:21,24 112:5,6
  112:11 113:11,14
  114:7 206:16
  218:12
**litigation-based**
  72:25
**litigations** 27:18
**little** 14:4,5 26:18
  72:4,18 86:3
  125:23 140:22
  146:5 149:8,13,13
  152:21 164:21
  178:23 186:6,11
  186:21 189:17
**live** 9:14 146:4,4
**lives** 207:11
**living** 194:24

Beltran v. Interexchange, Inc.   DAVID KEIL

7/21/2016

Page 233

**LLC** 1:10,14,14
  2:24 3:20 4:1
  197:19
**LLP** 2:8 3:2,7,9,17
  3:22
**local** 23:5 63:18
**locate** 23:12
**located** 29:18
  196:23 212:3
**locating** 28:10
**location** 101:19
  123:20 124:3
**lodging** 191:21
**log** 5:9 13:4,5,10,13
  13:17,20,23,24
  15:5,7 90:16 91:4
  91:8,19 92:5,19
  92:25 120:5 121:2
  121:7,11,11 131:3
  140:23 142:7,10
  145:10,22,24
  146:22 161:11
  190:10
**logical** 57:15
  164:14 179:10,14
**long** 10:20 21:19
  46:9 50:6 64:22
  70:22 74:1 84:8
  99:1 100:1 202:18
  202:22 212:21
**longer** 13:1 23:7
  26:16 95:22
  142:11 145:17,23
**longstanding** 46:25
  47:21
**look** 12:13 14:10
  26:5 94:19 97:18
  126:1 131:14
  146:1 163:16
  170:19 179:5
  208:9
**looked** 42:23,23
  150:1,2,6,7,9
**looking** 60:12 77:2
  79:22 98:23
  116:13 133:4
  166:20 178:9

183:23 191:3
**looks** 168:2
**losing** 68:22
**lot** 34:22 35:11
  48:22 59:19 71:19
  72:1,1,2,14 84:20
  90:2 128:9 177:21
  194:23
**loud** 11:13 79:24
**Louis** 2:7 5:5 6:24
  6:24 8:17 10:15
  10:19 15:1 18:13
  18:24 19:10,23
  20:3,11 27:10,13
  31:10,13 32:22
  33:3,6,18 34:3
  35:17,24 37:10
  38:4,16,24 39:2
  39:17 40:7,11,20
  41:5 42:6 43:2
  51:21,25 54:8,17
  55:1,23 56:5,16
  57:20 59:3 60:10
  61:6 62:24 64:3
  64:10 66:6,10
  74:6,9,11 75:14
  75:16,23 76:1
  77:6,15,20,24
  78:2,12 79:15
  82:2 83:13,25
  85:15 86:11 88:11
  89:8 93:4,10
  94:19,24 95:2,6
  97:10 99:8,15
  107:8,15,23
  111:15 113:5
  116:15 117:25
  118:20 120:12
  125:16 131:22
  143:15 144:1,4,13
  146:15 153:14
  154:4,18 155:23
  156:4,12 157:7,17
  157:25 158:3,10
  158:18,23 159:10
  159:22,25 160:21
  162:7 165:5 170:9

171:5 173:22
  174:4 180:16,22
  181:6,18 182:7
  184:15 185:13,24
  186:14 187:6,8
  191:14 192:10
  200:14 206:5
  208:13 213:18,21
  213:24 214:8
  215:21
**loved** 152:17
**low-level** 99:24
**lower** 68:4,5
**Lukey** 3:6 5:3 7:22
  7:22 8:3,7,18,21
  8:22 10:7,13,23
  11:1,15,19,23
  12:7,12 14:3,9
  15:8 18:21,25
  19:3,17,24 20:4
  20:13 25:25 26:4
  28:1 31:19 32:2
  32:25 33:11,24
  34:12 35:19 36:7
  36:9,18 37:22
  38:10,18 39:7,12
  39:23 40:9,14,15
  40:23 41:12 42:14
  43:5 52:2 54:13
  54:20,23 55:11
  56:1,9,22 58:1
  59:21 60:15,25
  61:8 64:4 66:8,11
  66:15,21,22 74:12
  75:12,15,21,25
  76:2,4 77:18,21
  77:25 78:5,22
  79:20 82:5 83:15
  84:3 85:17 86:13
  87:6 88:20 89:13
  90:24 91:1 92:24
  93:9,11 94:17,23
  94:25 95:3,7
  97:13 99:11,20
  102:17 107:12
  108:1 111:16
  112:3 113:8

115:17 116:19
  118:3 120:3,18,20
  122:25 123:6
  125:21 126:6,8,11
  126:12 132:25
  140:20 143:20,23
  144:3,12,15,18
  145:1,20 146:1,21
  153:19 154:10,14
  155:8,19 156:2,7
  156:22 157:3,10
  157:20 158:2,4,12
  158:22,25 159:20
  159:24 160:3,6,24
  162:11,18 165:7
  170:16 171:9
  174:2,10 180:19
  180:24 181:12
  182:1,9 184:18
  185:14,25 186:16
  187:7,10 191:15
  192:12 193:21
  194:1 195:16
  198:10 200:17
  204:22 206:1,6
  213:20,23 215:23
**lunch** 203:22
**LUSAPHO** 1:5
**Lyons** 3:9 7:19,19
  9:24 10:2,6 126:4
  143:22 204:22

___

**M**

**M** 2:3 3:9,17 218:4
**ma'am** 135:23
**Mac** 141:17
**machine** 218:7
**magnifies** 10:10
**mail** 11:11 12:2
**main** 212:21
**maintain** 89:23
  90:18,24 91:6
  93:8 94:13,15,16
  112:19,20 141:10
  144:5 155:23
  166:25
**maintained** 142:18

167:7
**maintaining** 89:18
  90:14
**major** 205:3
**majority** 46:22
  72:25 137:16
  210:11 212:17
**makers** 191:4
**making** 43:20
  59:24 64:6 70:19
  81:21 83:15 96:1
  96:15 101:23
  104:14 106:17
  107:1 109:12
  114:9,12 144:7
  145:11 167:24
  170:13 198:12
  212:5
**mandatory** 47:25
  48:24 72:7
**mangle** 118:6
**manner** 119:19
  123:19 124:3
  156:14 158:21
  214:11 215:16
**Mansukhani** 3:13
**mark** 12:5 13:3
  25:20 65:15
**marked** 12:11
  13:21 14:5,7
  25:24 65:14,19,23
  143:24 144:5,11
  145:7 206:10
  207:17
**marking** 144:13
**marks** 16:15
  105:10 148:16
**Martha** 2:23 7:12
**Massachusetts** 3:8
**match** 133:21
**matching** 132:7
  134:7
**material** 167:7
**materially** 71:24
**materials** 23:9
  133:5 167:4 211:6
  211:7

Beltran v. Interexchange, Inc.   DAVID KEIL                    7/21/2016

Page 234

| | | | | |
|---|---|---|---|---|
| **matter** 6:8 41:21 | **memorialized** | **mid-2015** 50:13 | 105:16 108:13 | 120:8 121:3 |
| 42:3 63:16 69:23 | 16:10 163:6 | 206:25 | 109:13 126:7 | 125:18,19 127:6 |
| 79:6,22,23 80:25 | 175:24 | **middle** 134:25 | 148:17 150:11 | 131:4,6,10 192:25 |
| 81:24 83:2 88:7 | **memories** 133:14 | 140:4 177:6,25 | 161:2 176:15 | 194:25,25 195:1,7 |
| 88:10,23 89:14 | 188:11,12 | **military** 22:20 | 197:11 205:25 | 195:9,20 196:2,14 |
| 103:16 107:7 | **memory** 19:25 | **mind** 36:20 42:3 | **moments** 77:5 | 198:25 215:10,14 |
| 108:1,3,18,19,21 | 103:4 118:5,12,15 | 55:23 58:7,19 | **month** 62:12 69:23 | 215:18 |
| 109:11,15,20,25 | 118:17 119:8 | 103:20 118:7 | 139:8 | **narrative** 79:2 |
| 110:11 112:11 | 120:5 121:12 | 127:9 137:10 | **months** 50:10 | **narrow** 60:22 |
| 117:15 146:25 | 122:21 123:14 | 152:5 163:11 | **morning** 6:4,24 8:4 | 156:24 |
| 158:5 | 124:19 125:2,4,5 | 164:15 | 8:24 155:9 199:5 | **national** 23:8 63:21 |
| **mattered** 158:7 | 125:9,12,13,23 | **mine** 152:12 | 203:21 | 63:22 |
| **matters** 84:21 93:1 | 126:12,15,22 | **minimal** 99:17,21 | **motion** 5:12 65:16 | **nature** 15:3 24:9,19 |
| 133:3 218:6 | 129:19,24 130:19 | **minimum** 99:17 | 76:6 162:13 | 32:21 33:15 39:9 |
| **maximum** 183:22 | 131:2 132:9,14,16 | 136:9 148:11,12 | **motions** 8:11 | 41:23 42:18 43:1 |
| **mean** 11:1 30:24 | 133:4,10 134:15 | 148:20 149:7 | **mouth** 158:6 | 45:2 69:2 90:15 |
| 44:16 58:5 88:17 | 138:12,14,21 | 164:24,25 165:2 | **move** 15:18 32:7 | 117:24 146:11 |
| 120:10 142:13,14 | 139:3,7 147:18 | 171:17,18,19,22 | 68:24 | **NE** 2:19 |
| 173:2 | 149:1,2,18 168:25 | 173:16,20 180:6,7 | **moving** 5:13 32:8 | **near** 48:13 |
| **means** 44:14 | 188:9 189:1 194:1 | 185:20,22 186:4 | 65:17 212:11 | **necessarily** 209:3 |
| 148:16 197:12 | 198:4,5,6,8,10 | 189:15,16 191:22 | **multiple** 69:19 | **necessary** 13:6 |
| **meant** 116:4 | 199:7 201:12,20 | **minute** 77:25 114:5 | 124:23,23 126:25 | **need** 40:25 60:23 |
| 123:11 182:15 | 202:5,6,8,12,17 | 144:12,12,19 | 127:12 136:11 | 66:16 120:15,16 |
| **measures** 106:9 | 203:4,11,17 204:2 | **minutes** 66:17 67:1 | 175:14 | 132:17,22 180:8 |
| **media** 6:6 63:18,21 | 204:4 | 74:24 159:9 214:1 | **myriad** 119:22 | 199:1 212:7 |
| 63:22 78:14,19 | **memory's** 215:8 | **mischaracterizat...** | **mystery** 21:8,9,14 | 213:24 |
| 159:12,17 216:1 | **mental** 71:17 72:1 | 133:8 | | **needed** 59:13 71:20 |
| **meeting** 64:22 | **mention** 71:22 | **mischaracterizat...** | **N** | **needs** 12:10 |
| 210:4,6,17 | 189:15 208:24 | 72:19 | **N** 2:5 5:1 | **neighborhood** |
| **meetings** 210:25 | **mentioned** 21:2 | **misidentifying** 71:1 | **name** 8:5,6 64:11 | 32:16 |
| **meets** 29:13 | 28:6 51:11 79:4 | **mislead** 73:23 | 83:9,10 114:20 | **never** 46:25 58:19 |
| **memo** 86:23,25 | 81:23 91:4 95:8 | **misleading** 72:9 | 120:21,24 124:16 | 63:16,25 108:11 |
| 87:4 188:20 | 96:21 111:19 | 73:18 | 124:18 129:4,5,6 | 129:10 140:13 |
| **memorandum** | 132:2 140:1 188:1 | **misrepresenting** | 129:8,23,25 130:5 | 151:15,18 |
| 13:13,16 14:17 | **Meschke** 2:23 7:13 | 71:10,24 101:8 | 130:22,25 132:6 | **new** 22:12 63:21 |
| 15:10,24 16:18,21 | **messages** 102:18 | **missed** 11:24 | 132:17,23 133:16 | 207:6,10,11 210:9 |
| 16:22,24,25 17:3 | 128:13 | **mistreated** 205:20 | 133:19 134:5 | 212:11 |
| 17:19 18:2,17 | **met** 42:22 64:9 | **misunderstanding** | 198:5,9 201:18,19 | **NFP** 1:12 3:16 |
| 20:7,10 91:18 | **metadata** 143:9,13 | 75:10 210:7 | 202:16,16,22,23 | 14:19 |
| 92:4 | **method** 71:9,21,23 | **misunderstood** | 206:15 214:17,21 | **Nixon** 4:3 |
| **memorandum's** | 132:6 193:24 | 162:10 | 214:24 215:5,19 | **noise** 106:12 |
| 91:23 | **methods** 106:19 | **model** 141:21 | **named** 23:24 64:11 | **nonattorney** 46:20 |
| **memorialization** | **Mexico** 207:7,10,11 | **mom-and-pop** | 133:24 168:14,19 | 209:6 |
| 93:13 168:13 | **microphone** 10:9 | 117:13,17,20,22 | 197:9 | **nonclients** 102:7 |
| 175:7 188:6 | 74:4 213:18 | **moment** 12:13 | **names** 32:17 88:1 | **nonmandatory** |
| **memorialize** | **microphones** 6:19 | 13:21 21:18 26:4 | 97:1,5 118:7,21 | 48:2 |
| 175:15 | 10:9 | 28:6 49:19 76:15 | 118:25 119:9,24 | **nonrequirement** |

Beltran v. Interexchange, Inc.   DAVID KEIL                    7/21/2016

47:7
**norm** 74:2 135:1
**normal** 37:23
68:20,21 136:21
**normally** 68:21
**Notary** 2:4 217:20
218:5
**notate** 173:13
**notation** 173:14
**note** 6:17 93:12
147:18 148:8
149:18 177:23
178:2 190:1
**noted** 144:21
148:21 170:14
**notes** 20:5 86:19,22
86:24 87:3 89:19
89:23 90:4,11,14
90:15,18,24 91:6
91:7 92:15,19
104:17,20 118:13
118:14 121:25,25
122:20 127:6
146:22 149:16
167:3 174:6 175:1
176:10 183:1
185:4 188:6,25
189:22 198:15
203:10 211:2
**notice** 2:1 5:8 12:5
12:14 34:9 76:1
76:15 163:13
**noticed** 8:25 170:1
171:9
**notification** 172:1
172:7,14 179:23
180:1,15 184:12
187:7 205:13
**notion** 55:9,12
**notions** 37:20
**notoriously** 92:20
**November** 70:1
150:7 166:12
**Nuggets** 63:23
**number** 20:21
21:22 27:17,19
30:12,16 34:13,15

35:5 46:24 51:10
52:23 57:1 63:22
64:16 94:2 97:7
97:11,18 100:19
102:4,10,12,20,21
103:11 105:2,4
114:25 115:18
116:2,9 119:15
127:17 128:18,18
128:20,21,23
131:22 136:2,3,4
136:5 138:5
139:21 165:18
167:21 195:3
196:23 199:22
216:1
**numbers** 33:9
97:14,21,22
114:19 134:23
177:13,14

---

**O**

**O'Donnell** 3:22
**oath** 61:13
**object** 27:13 37:10
51:21 79:15 82:2
83:13,25 85:15
86:11 88:11 89:8
97:10 99:8,15
107:8,15 111:15
116:15 117:25
143:15 146:15
154:4 160:21
171:5 173:22
174:4 180:16
181:6,18 182:7
185:13,24 186:14
187:6,8 191:14
192:10 200:14
**objecting** 110:12
**objection** 15:1
18:13,24 20:11
27:10 31:10 32:22
33:18 34:3 35:17
35:24 38:4,16,25
40:20 41:5 42:6
43:2 54:8,17 55:1

55:23 56:5,16
57:20 59:3 60:10
64:3 77:18 107:24
113:5 153:14
154:18,23 162:16
165:5 170:9
184:15
**objections** 8:10
40:12 162:12,13
**objective** 98:6,7
165:22
**obligations** 112:10
**obtain** 37:21 48:9
48:23 50:1 178:7
180:11
**obtained** 36:2,13
48:8 120:22
188:18
**obtaining** 48:22
**obviously** 19:17,25
56:17 87:13
144:21 160:4
**occasion** 42:22
187:16
**occupation** 21:4,6
21:14,18,19
**Occupations** 5:17
**occupied** 43:17
**occur** 110:6 177:11
**occurred** 17:2
**occurring** 187:22
**occurs** 106:12
**odd** 22:25
**odds** 210:20
**off-limits** 114:7
**offer** 17:23 18:21
**offered** 32:6
**office** 2:19 5:17
11:7,25 101:24
141:6,14
**officers** 72:18
**officials** 74:3
212:14
**offset** 191:22
**Ogburn** 4:3
**oh** 11:19 76:18
114:4 126:4

143:23 159:22
166:13 175:5
180:23 207:17
**okay** 11:12 12:3
13:3,25 16:20
21:6,17 22:9,13
22:19 23:10,15,25
24:4,9 25:13,19
26:19 29:22 30:6
32:13 40:14 43:10
44:17 46:6,15
48:6 49:13,18,25
50:16,20 58:1,9
63:4 64:22 65:12
66:10 69:22 70:6
76:18 77:4,21
80:20 81:20 83:15
85:17 86:13 90:23
92:17 93:19 96:21
96:24 98:3 101:23
103:20 104:8
105:24 106:5
115:25 116:19
117:8 119:2 122:3
123:9 126:11
129:18 130:14
131:13 132:1
133:23 134:8
135:24 136:18
137:4,21 138:12
138:15 139:23,25
141:19 142:3
143:8,20 144:17
152:16,17 158:18
159:24 160:11
166:4,14,20,23
168:10 172:17
173:1 174:13,19
178:4,9,14,21
179:2 182:1,9
183:3,23 185:22
186:8 189:25
190:9 205:17,22
206:5 207:16
208:8,21 213:23
214:15 215:3,16
215:21

**Olas** 2:8
**omitted** 188:22
**on-the-point**
105:15
**once** 22:22,22
48:24 65:19 98:9
120:8 175:14
**one-third** 86:6
**ongoing** 168:9
**online** 63:7 86:15
194:16,21 195:20
**Oops** 54:22
**open** 57:17
**open-ended** 59:17
139:21
**opening** 175:5
**operated** 185:6
213:9
**operating** 106:22
**operation** 117:13
117:18,22
**operator** 20:21
98:4 114:15,17
122:16 132:3
199:21,24 200:3,9
201:2,8
**opinion** 90:3 182:8
**opinions** 17:23
18:22
**opportunity** 19:25
27:1 49:10 65:6
126:14 145:6
**opposed** 34:18
181:4
**opposing** 108:14,15
109:17,19 110:7
110:13,14 111:3
111:20,23 113:12
**opposite** 99:16
107:14,22
**option** 152:25
**order** 16:17 56:22
66:23 70:19
103:20,24 119:3
147:9 206:4
**ordinary** 66:25
**organization** 50:9

Beltran v. Interexchange, Inc.   DAVID KEIL

7/21/2016

Page 236

115:11 117:20
124:7 127:10
139:16 182:16,18
182:19 191:2
**organizations**
119:15 182:20
187:3,19 190:21
190:24
**original** 70:17
**originally** 143:12
**originates** 212:16
**outcome** 54:12
218:11
**outcomes** 37:15
**outline** 9:6
**overwhelming**
72:25 210:10
**owned** 191:7
**owner** 22:25
182:24

**P**

**P** 2:5,5
**P-a-i-r** 174:25
**P.C** 4:3
**p.m** 140:16,17,17
140:19 159:13,15
159:15,19 206:8,9
206:9,12 214:3,4
214:4,6 216:2,4
**pack** 177:25
**pad** 195:6,15
**page** 5:2 146:2,10
147:12,24 152:6
163:6,16 164:17
195:5 208:4
**pages** 5:18 75:4
204:6 208:16
**paid** 35:16 42:13
53:15,19 57:8,23
58:3,16,23 60:2,3
61:2,14,14,20
62:1 68:10 135:8
135:14 149:6
157:6 173:17
174:1 178:5,11
179:10 184:3

185:19 186:21
211:25
**pair** 1:12,12,13,14
1:15 2:2 3:5,20
4:2 14:19 32:6
33:23 34:8 42:13
51:10,20 52:22
53:18 57:4,6,6,8
57:18 59:25 61:24
118:6,8,9 119:5
122:23 135:6,11
135:11 136:20
137:3 138:3,3
139:15,17 146:13
147:10 149:6,8
152:12,15,23
155:11 156:10
168:10,14,20
179:11 182:22
186:9,10 193:16
196:4,8 197:9
199:6 200:2,19
201:16,21 202:14
202:21 205:9
**pair's** 163:20
**pairs** 34:2 35:8,9
36:24 51:8 53:5
53:15 54:7,16,25
55:17 56:4 57:23
58:3,5,16,23 60:2
61:2,13,20 62:1
62:22 63:9 122:6
135:8,16,19 154:3
154:17 155:22
157:6,16 158:17
160:9 163:3,10,25
164:6,20 165:24
169:5,21 176:7,19
177:17 178:11,17
180:3 181:24
188:17 192:20
205:18
**Paola** 1:5,6 6:8
217:25
**paragraph** 26:25
148:8 149:21
152:5 164:8

171:15 179:5
**paragraphs** 146:9
146:16 151:3
165:13 168:11
197:8
**paraphrase** 105:22
**paraphrasing**
171:18
**itt** 11:22
**parent** 71:12,13
**Parkway** 4:4
**parlance** 23:13
**part** 22:25 37:7,25
38:14 52:3 62:8
66:4 74:19 89:16
99:9 112:5 128:4
132:21 144:16
193:22 204:23
**particular** 14:11
30:3,10 32:10
39:9 43:18 79:6
90:7 94:11 99:12
121:21 149:7
152:11,21 185:21
186:5
**parties** 6:18 8:13
30:15 39:10 60:18
80:2,3,4,7,14
82:12 107:14,22
108:14,15 109:17
109:20 110:7,13
110:14,18,19,25
111:4,21,23
113:12 199:13
218:7,11
**party** 8:25 82:22
111:17 137:25
154:12 155:15
157:23
**pass** 71:11,12
**passages** 16:13,14
16:15
**passed** 121:3
**passing** 129:21
**pattern** 110:5
163:13,14
**pause** 27:11 78:4
126:7 144:25

**pay** 53:4,9 54:6,16
56:3 68:9 135:5
136:22 148:11,12
148:20 149:8
152:13,16,21,23
155:11,22 156:10
157:16 158:17
160:9 163:10
164:24,25 165:24
169:21 172:18
173:20,20,25
174:3,8,21 178:17
178:22,24 179:3
179:18 180:20
182:20 184:4
185:11,15,21,23
186:5,11,13,19,24
188:17
**paying** 53:17
163:19,25 164:5
164:20 165:2
181:24
**payment** 34:7,8
35:8 36:23,24
138:9 153:4 154:3
163:2
**payments** 34:2
52:22 53:25 54:25
55:17 154:17
**pays** 57:5 136:16
178:23 185:23
**Peggy** 3:13 7:6
206:15 213:18
**pending** 50:23
207:6
**people** 18:4,22
21:11 23:12 27:25
31:22 32:1,3,9,12
34:6 43:7,22,25
52:11 73:5,7 81:3
81:3 98:18 100:6
100:11 111:10,12
113:12,20 116:23
116:24 122:9
124:23 127:6,10
128:24 131:4,7
133:20 134:1

153:16 183:18
201:24
**perceived** 34:18
**percent** 25:10,13
69:16,17 84:23
85:16,25 102:11
**percentage** 25:8
27:7 28:3,4 29:15
69:11 84:25 85:21
**performed** 25:16
25:16 67:3 69:23
114:2
**performing** 69:24
83:1
**performs** 24:10
**period** 8:13 16:24
23:21 24:4 48:6,8
48:25 49:7,23
57:11 59:6,8 64:9
70:4 200:12 209:9
213:7,9,10,14
**permanent** 49:25
50:1
**persistent** 127:24
**person** 20:17 26:9
35:1 55:5 59:17
82:17 88:16 97:25
98:1,21 101:5
114:25 116:2,21
117:2 124:17,18
124:20 126:17,17
126:19 127:6,23
129:20,23,25
130:5,10,13,17,20
130:23 131:1
132:6,10,11,12,14
132:17,23 133:13
133:16 135:6
146:4,4 171:24
183:12,23
**personal** 11:11
21:3 167:20,23
168:1
**personally** 173:23
187:19
**personnel** 212:12
**persons** 16:1

190:15
**pertain** 63:23
**pertained** 155:1
**pertaining** 62:22
  63:9 65:10
**peruse** 66:3
**perused** 66:1 74:24
  145:3 168:16
  175:3
**Petersburg** 2:20
**phenomenon** 171:1
**Phillips** 3:17 7:18
**philosophy** 37:23
  49:11
**phone** 17:1,4,5
  30:12 33:9 37:24
  42:2 54:4,11
  57:14 59:10,20
  64:6 70:19 81:21
  96:12 97:18 98:4
  100:9,21,22 101:6
  101:12 102:1,2,3
  102:8,10,12,18
  103:5 116:21,23
  116:25 122:16
  123:19,20 124:2
  126:20,23,25
  127:3,4,5,12,18
  127:24 128:2
  130:11 146:12
  196:22 200:3
  201:2 204:13
**phrase** 115:25
**phrases** 105:10
**physical** 12:1 13:7
  26:10
**physically** 101:20
  101:21 212:20
**pick** 6:19
**picked** 199:21
**picking** 162:15
**piece** 22:23 26:22
  138:22 187:11
**pieces** 18:10
**place** 3:7 6:18
  11:10 16:15 58:17
  59:7 60:4 61:3,15

61:21 70:20
  145:18,21,22
  212:12 218:8
**placed** 20:22 103:5
  103:14 151:11
**places** 104:25
  105:2 143:17
**placing** 20:20
  26:14 102:4
  103:12,21
**plain** 52:18 152:8
**plaintiff** 6:25 7:3
  49:16
**plaintiff's** 28:25
**plaintiffs** 1:8 2:6
  13:9 25:16 27:23
  28:4,7,14,18,22
  144:5
**plaintiffs'** 6:23
  12:9 15:16
**planning** 121:23
**pleading** 65:3,4,21
  66:2,13
**pleadings** 62:24,25
**please** 6:17,22 8:5
  9:10 14:6 16:9
  31:18 36:8 76:22
  115:12 123:17
  141:5 147:16
  162:12 169:12
  175:1 176:14
  186:23 192:11
  212:10
**plus** 86:6 180:5
  182:2
**point** 26:17 37:14
  38:8,11 39:4,7
  41:8 44:19 46:5
  48:13 52:16 63:5
  68:4 73:2 76:21
  80:19 95:10,16
  100:18 101:1,14
  101:15,17 108:8
  110:6,14 114:3
  120:17 138:2
  142:11 146:21
  167:14 170:19

195:13,25 204:11
**points** 55:5 140:1
**police** 72:18
**policies** 57:23 58:3
  58:17,24 60:3
  61:3,14,21 169:25
  176:7
**policy** 129:2
**polite** 128:10
**pool** 28:21 29:1,2,3
  29:7
**poor** 37:18
**poorly** 151:1
**portion** 15:14 19:6
  39:21 76:12 77:8
  147:11 150:18,19
**portions** 16:2,3,10
  17:3 150:15 169:6
**pose** 39:9 154:11
  157:4,13,14 160:3
  160:7 163:22
**posed** 156:13 157:9
  159:8 200:18
**position** 10:17 11:2
  19:11,16,18,20
  20:3 23:4 85:5,9
  93:3,9 97:25
  98:22 99:2,6
  108:25 109:5
  120:13 144:6,21
  156:17 183:12
  191:1
**positions** 97:6
**possess** 85:9
**possessed** 100:4
  101:5
**possession** 12:21
  12:24 13:1 93:12
  93:14 167:8
  204:17 215:17
**possibility** 46:4
  107:10 138:6
  143:19
**possible** 37:1 71:9
  97:20 103:8 124:4
  128:1,11 162:9
  200:15

**possibly** 88:1 93:15
  198:3
**Post** 63:21
**posture** 10:21
**potential** 24:23
  71:11 135:6
  176:24,25
**potentially** 41:25
  45:3 81:4 89:16
**practice** 23:25
  24:10 70:23 72:13
  72:17 79:4 86:4
  87:23 88:15 89:22
  89:24 90:6 92:14
  102:6 107:13,20
  109:10 141:2
  166:6,7
**practices** 24:1
  51:16 74:2
**practitioner** 21:20
**preamble** 71:20
  73:11 169:6
**preceding** 164:13
  165:9
**preconceived** 37:20
  54:12 55:9,12
**predetermined**
  37:15
**prefer** 93:1
**prejudice** 81:7,9
**prelitigation** 109:8
**preparation** 64:5
  65:1
**prepare** 64:7 97:4
**prepared** 16:20
  63:3 125:21
**preparing** 17:11
**present** 4:6 13:7
  104:10 117:16
  148:5
**preserve** 19:18
**press** 63:7,8,25
  204:3
**presumably** 94:6,7
**pretext** 71:5
**pretty** 48:20
  177:20

**previous** 69:16
  87:23 107:9 164:8
  218:5
**previously** 29:25
  30:6 66:12 72:8
**price** 139:17 177:6
**pricing** 134:21,25
  140:3 164:9
  181:22
**primarily** 210:15
**prime** 59:16
**printed** 5:10 141:1
**prior** 19:13 21:21
  48:3 168:6
**private** 5:17 6:20
  21:5,18 23:19
  25:1,2,6 47:10
  48:1 49:1 68:10
  72:7 73:17,22
  79:21 80:10,16,24
  81:13,17 82:1,8
  82:18 83:20 85:1
  85:5,7,14 86:5
  89:20 129:13
  166:24 206:20
  207:23 211:15,16
**privilege** 5:9 13:4,9
  13:13,17,20,23,24
  14:20 15:5 19:12
  90:1 93:8 144:22
  153:18 156:21
  157:9,19 158:20
  160:23,25 162:2,4
  162:15 167:10
  209:15
**privileged** 82:21
  144:22 155:4,7
  156:16 158:3
**privy** 91:21
**ProAuPair** 1:14
  4:1 202:20
**probably** 23:10
  29:6 63:24 69:15
  85:24 87:16 96:19
  103:1 142:5
  194:15 196:3,4
**problem** 10:24

Beltran v. Interexchange, Inc.   DAVID KEIL                                7/21/2016

107:1,2
**problems** 50:8
143:4
**Procedure** 6:2
**procedures** 18:6
51:16
**proceed** 12:3 145:2
**proceeded** 86:19
98:11
**proceeding** 144:9
**proceedings** 6:1
78:4 144:25 216:3
218:9
**process** 8:23 18:6
18:12 19:7 20:16
34:7,21 35:13,20
36:23,24 38:6,6,7
38:9,12,13 40:16
41:8 42:15 43:15
48:18 52:24 53:3
53:6,8,12,14
56:13 57:8,16
58:2,15 61:25
64:6 70:18,21
71:6 79:3 82:6
99:10 104:4
106:16 111:6,24
137:20 146:20
163:13 210:6
**processed** 50:7
**processes** 18:22
**produce** 12:22 19:4
46:21 47:12
**product** 5:15 14:21
15:3 18:15 19:9
19:16 31:14 39:5
89:25 90:4 109:11
144:7 167:4,9,10
167:15,18 168:6
209:14 210:21
211:6,7
**production** 12:19
15:18
**products** 42:9
**profession** 48:21
72:16 73:5 81:16
83:11 88:15

112:23
**professional** 1:14
2:3 4:1 7:10
102:22 112:18
128:24 202:19
218:4
**Professions** 5:17
**profit** 68:1 103:16
**program** 59:25
142:3,6 146:14
177:16 194:12,14
194:19,24 196:8
200:20 205:19
213:10,12
**programs** 1:11
2:22 179:15 184:7
184:10 187:1
**progressed** 72:3
**progressing** 110:3
**prohibited** 113:3,4
113:7
**project** 176:10
**prompt** 130:25
179:16
**prompted** 203:22
207:9
**proper** 119:9 192:4
205:13
**propose** 8:9 78:10
**proposed** 48:5
**propriety** 106:18
167:24
**prosecutors** 27:25
**prospective** 43:12
115:6,8 116:4,12
135:5
**protect** 47:16
**protected** 39:10
144:6 154:13
157:24
**protection** 144:8
**protective** 106:9
**prove** 119:9 204:9
**provide** 9:22 42:11
42:12 57:3,4
190:13 198:20
**provided** 13:9

32:11,17,20,25
33:20 35:8,9 97:1
134:21 137:14
151:4 192:25
193:16 195:1
196:25 198:19
**provider** 33:22
204:13,18
**providers** 205:3
**providing** 170:25
**provisions** 72:9
**proximately** 93:7
**prudent** 49:8,20
**public** 2:4 47:11,17
83:5,11 97:14
209:4 210:12
217:20 218:5
**publicly** 97:11
**published** 210:16
213:1
**pull** 77:22
**pulled** 74:4
**pulling** 60:11
**pump** 59:16
**purport** 151:3
**purported** 180:12
**purportedly** 205:8
**purpose** 36:19 37:7
37:25 38:13 39:25
40:16 53:20,23
127:13 128:20
**purposes** 35:14
38:21 40:17 46:1
71:1 99:12 102:9
127:15
**pursuant** 2:1 6:2
**pursue** 89:12
**put** 11:1 62:24
70:19 74:16 75:18
75:21 105:10,17
143:18 148:15,16
149:16 169:19
200:10
**putting** 130:22

---
**Q**
---
**quarter** 31:5,6

62:20 151:24
204:19
**question** 9:18 13:7
18:14 20:19 32:24
37:3,16,23 39:15
40:10,21,24,25
49:14,15,21 51:24
54:13,14 55:13
57:7 59:17 61:9
61:18 66:9,11
73:14,14,16 74:9
74:11,12 76:11,21
76:22,24 84:1
86:12 107:18
116:10,17,18
121:12,13,24
122:23 130:21
132:15,16,23
134:4,5 136:19
139:9 147:20,24
148:10,18,19
150:25 153:25
154:19 155:18,19
156:3,8,12,13,20
156:23,24 157:9
157:19 158:13
160:2,4 162:8,8
162:10,18 163:22
164:11,16,21
165:9,10 168:4,17
171:17 173:2,12
176:13 178:15,19
178:20 179:10,14
179:16,17 180:18
180:22 181:7
182:21 184:17
185:8 186:15
196:18 203:15,24
204:1,4,14 210:18
**questioned** 34:6
**questioning** 9:1
35:2 52:19 57:11
59:12 66:7 67:1
71:24 75:17 76:3
82:15 95:1 126:13
128:4 144:2
153:21 206:1

**questioning's** 39:3
**questions** 9:6,8
12:4 15:15,23
34:11 35:5,6 36:2
36:12,19,22,25
37:7 38:7,9 39:8,9
39:13,24,25 40:5
40:5,8 45:5 52:19
52:21 56:25 57:2
57:10 59:13,22
60:5,6,9 66:18
71:8,18 72:3 73:3
79:1 88:18 99:25
100:23 101:7,10
101:10 113:25
114:1,5,24 119:11
119:14,18,19
121:9 127:22,25
137:13 140:22
144:20 152:9
153:7,11 154:11
156:5 157:4,13,14
158:8,11 159:4,5
159:8 160:7,12
162:5 163:17
164:18,18 165:1
165:13,15,18
168:4 170:4,14
176:11,19,21
177:2,15,19
178:10 199:13
200:1,18 203:23
206:17 213:17
215:22,23 218:9
**queue** 200:11
**quickly** 21:24
144:19
**quiet** 40:12 106:10
173:11
**quite** 28:9 38:11
66:15 121:11
174:9,12,18
**quotation** 16:15
105:10 148:9,16
**quote** 104:25 105:3
105:9,18 147:7
163:17 164:17

Beltran v. Interexchange, Inc.   DAVID KEIL                    7/21/2016

quoted 75:5 179:12
quotes 105:17,21
  148:21 169:19
  172:5

**R**

R 2:5
radically 69:8
raise 68:6
raised 55:4,5
  165:11 210:18
ran 92:21
random 104:1,4
range 96:18,19
rarely 45:1
rate 68:18,20 69:15
  70:11 171:16
rate's 68:12
rates 68:7,7
reach 30:21 33:10
  34:23 51:6 98:3
  101:16 119:10,22
  127:16 146:4
  158:15 183:13
  199:25
reached 15:20
  20:17 33:25 35:22
  40:3 51:3,5 119:4
  121:15 122:15
  146:4 160:8
  161:18 163:1,9
  164:5 181:17
  182:11 187:13
reaching 183:24
  197:5
read 8:12 36:7,9,11
  62:21,23,25 63:11
  63:11,19,20,21,21
  63:24 65:6 66:2
  74:13,15,24
  107:16,18 131:24
  144:19 147:15,21
  217:2
reading 63:12
  145:2 149:18

165:1 171:10
178:15 186:22

186:22 208:12
  218:16,17,18
ready 79:3 145:2,4
real 17:1 18:17
  95:19
realize 160:18
  161:22 162:1
  164:3
realized 114:8
  127:21 160:13
really 28:13 48:10
  63:17 68:11
  106:12 116:5
  123:24 152:17
  190:23 194:17
Realtime 2:4 218:4
reason 46:17 69:14
  72:16 108:12,13
  110:13 114:5
  134:13 143:8
  169:21 170:4
  173:6 192:5,13
  200:5 210:6
reasonable 164:16
reasons 9:20 48:20
  119:22 128:17
recall 16:16,19,20
  16:23 19:1 20:12
  30:18 31:1 32:15
  32:19 34:20 38:17
  38:18 41:7,20
  44:20 45:13,24
  46:17 47:2 50:5
  54:3 55:9,18,20
  55:25 56:7,10
  58:21 59:7 60:7
  60:23,25 61:11,16
  61:17,19,23 67:8
  67:11,17 68:11
  69:23 70:2 72:11
  87:12,13,18,25
  93:25 95:13 96:5
  96:11,16 97:21,23
  104:1 105:11
  111:5 114:11
  118:15,22 119:7
  125:18,19 126:16

130:12,16 131:22
131:23 133:22,23
133:24,25 134:3
134:12,19,19,22
135:2,3,9 138:15
139:2,7,23 140:25
140:25 145:13
147:6 148:1,4
161:12 162:19
163:11 164:10
165:16 166:9
173:7 174:6 177:9
177:12,12 188:15
193:6,8,24 194:9
194:17,25 195:2,5
195:7,9,13,21,21
195:25 196:5
199:8,10,14,15
200:4,9,16,24
201:9,14,25
202:23 203:25
214:9,11,19,23
215:11,13,13
recalling 125:19
  132:6
receive 11:10 12:2
  135:12,19 161:17
received 30:5 44:9
  51:19 60:21,22
  119:16,25 121:4
  128:12 135:6,11
  135:16 154:5
  161:9 167:20
  173:12 176:22
  184:24 198:17
receives 30:17
receiving 177:2,20
receptionist 199:24
  200:24
Recess 78:17 123:3
  140:17 159:15
  206:9 214:4
recession 68:6
Recipient 5:9
recitation 18:3
  147:17 149:1
recitations 15:10

17:20
recite 15:25 94:2
recited 16:2
recollection 18:16
  19:14 32:4 46:11
  62:2 100:20
  169:22 185:3
  202:11 214:16
  215:3,9,13,18
reconsider 93:3
reconvene 93:2
record 6:5,19 8:5
  10:20 15:16 78:10
  78:13,16,19 104:8
  123:1,5 140:15,19
  144:16 151:14
  158:19 159:3,11
  159:14,17 204:21
  206:7,12 209:2
  211:12 214:1,2,6
  215:24 216:2
recorded 18:9
  147:1 188:2 197:4
recording 6:17
  17:5,24 18:11
recordkeeping
  208:7,22,23
  209:13,18 210:1
records 44:8,13
  131:5 166:25
  209:9
recovery 28:10
red 114:4
redact 19:6
reduced 68:1
  203:11 218:8
reduction 67:15
  69:15
Rees 3:13
refer 16:14 24:5
  29:2 107:9 119:4
  197:3
reference 5:7 65:22
  105:1 145:11
  177:25 181:14
referenced 13:22
  68:24 123:16

147:6
referencing 47:8
  78:24 125:13
referral 30:14
referred 9:13 30:18
  91:20 105:22
  110:4 123:11
  135:13 150:20
  204:6
referring 28:8
  69:18 91:19
  125:16 135:21
  168:5
refers 14:13
reflect 105:16
  118:14 132:24
  146:11 147:25
  172:6,9,10 181:20
reflected 95:10
  121:3 143:13
  147:7 168:23,23
  169:7,17 173:5
  175:10 197:2
reflecting 118:13
  122:20
reflection 148:13
reflects 143:13
refresh 19:25
  118:17 125:1,4,5
  125:13 215:3
refreshed 215:8
refreshing 125:23
regard 15:14 45:16
  50:20 81:20 85:20
  88:9 89:18 98:6
  126:16 133:1
  141:3 148:19
  153:3,21 157:12
  164:18 170:20
  175:1 177:23
  182:22 184:1
  196:20
regarding 32:11
  34:1 45:20,21
  46:3 52:5 55:19
  62:4 88:7 89:19
  110:23 113:25

Beltran v. Interexchange, Inc.   DAVID KEIL                          7/21/2016

150:10 155:25
158:17 160:9
170:8 177:7
180:12 181:3
209:15 211:2,3,4
**regards** 142:7
**Regional** 174:24
**Registered** 2:3
218:4
**regular** 141:2
**regularly** 63:19
**regulations** 207:24
208:1,15 211:8
213:6
**Regulatory** 5:16
208:18
**REILLY** 3:22
126:5,7,10
**relate** 55:12 72:9
81:3,3 88:21 96:1
96:2 178:10
**related** 25:14 41:18
44:22 45:6 50:24
51:2,6,7 63:8
107:6 110:5,10
151:19 189:16
218:11
**relates** 25:8 76:9
147:12 169:19
207:13
**relating** 15:9,11
17:20 35:22 75:2
95:22 146:22
147:18 148:5
150:22 188:7,9,17
**relation** 16:21
218:6
**relationship** 128:25
136:21
**relatively** 28:21
**relevant** 165:10
175:19,20
**reliable** 131:2
**rely** 98:25 99:18
139:22
**remained** 68:7
**remaining** 86:6

204:10
**remember** 41:12
41:13 46:15 56:2
60:8 67:20 70:13
88:3 103:12,14
118:10 131:21
137:4 139:12,14
142:7,10 149:12
149:25 152:4,7
169:2 173:7
193:10 194:6
197:5 198:12
199:12 201:1
202:2,14,25
203:23 214:12
**remembering**
149:23
**remembers** 77:23
**remind** 31:10 33:3
37:10 39:2 51:21
54:8
**reminds** 149:19
**Renewed** 5:8 12:14
**repeat** 93:6 132:20
134:4 168:17
**rephrase** 32:23
43:19 51:23 76:22
95:24 151:1
184:22
**replaces** 68:22
**report** 5:15 119:20
181:21 183:1
186:2 196:22
197:2 198:20,24
198:25 209:7
**reported** 119:21
**reporter** 2:3,4 6:14
12:5 25:19 36:10
36:17 65:15,25
105:20 143:25
218:4,4
**REPORTER'S**
218:1
**reporting** 96:2
171:6
**reports** 209:12
211:3

**represent** 43:7,11
77:11 120:6 122:5
199:20 206:16
**representation**
88:23 111:1,2
175:8
**representations**
170:12
**representatives**
35:10 120:8
**represented** 30:15
42:16 43:11,22
87:22,24 88:9,16
88:22 89:6,10,11
101:3 107:5
110:20 111:7,13
195:23
**representing** 27:8
43:17
**request** 12:18
46:24 47:22
**requested** 46:25
90:12 167:16
218:16
**require** 71:19
81:16 89:22 179:8
210:23
**required** 46:19,21
47:5,10,11 89:19
112:20 166:25
209:7,8,8,12,13
209:23 218:18
**requirement** 46:23
47:6,25 48:2
73:17 209:8,18,19
209:20
**requirements**
208:22,23 209:3
**requires** 13:7
**research** 43:4,6
97:4 117:5 121:22
180:8 194:10,16
194:24
**researched** 93:7
**researching** 194:21
**reservation** 21:1
**reserve** 9:23 10:13

**reserved** 10:24
162:13
**reserving** 8:10,11
15:17 156:23
159:3
**reside** 9:16 211:20
**residential** 9:9
10:15
**respect** 58:4 144:4
144:8 158:20
210:1,3
**respectfully** 9:17
**respond** 108:11
**responder** 117:17
**responding** 139:9
162:17 164:12
**response** 5:12
65:16 94:20
131:20 164:7,13
176:22 179:16
**responses** 57:12
104:23
**responsibility** 73:6
112:14 113:9
**responsive** 94:21
**rest** 110:23 140:10
186:22
**restate** 192:11
**restroom** 140:11
140:12,13
**results** 55:12 96:2
**retain** 86:22 91:16
209:9
**retained** 29:22,23
31:20 46:1 47:14
62:7 90:8 107:11
107:13,21 109:1
162:21 167:5
168:8 209:6
211:24
**retainer** 47:21,22
211:25
**retaining** 62:9
90:15
**retains** 46:20
**retention** 10:21
62:14 67:7

**return** 128:17
196:25
**returned** 8:14
**reveal** 15:2 18:15
31:14 33:4 34:4
35:25 37:11 39:5
39:22 54:9 154:7
154:24 156:15
**revealed** 31:15
60:14
**reveals** 39:19
**review** 19:13 65:20
75:2 77:9,12
123:7 145:6
150:18 168:11
174:25
**reviewed** 19:15
74:5,22,23 77:6,7
77:8 93:7 147:11
**reviewing** 151:23
152:5
**revised** 75:24
**revisit** 15:20
**right** 10:6,23 14:13
17:10 19:2,23
20:25 21:17 39:11
40:4,11 44:15
57:18 60:9,19
62:14 63:5 64:1,4
74:18 76:24 79:6
82:18 84:12 86:9
87:9 91:23 92:3,8
94:5,23 95:11
96:22 97:2 101:18
104:18 109:21
110:1,16 112:15
113:9 114:9 118:3
118:13 122:25
123:12,13 127:12
130:8 132:1 133:7
133:19 138:21
141:5 142:21
144:18 146:7
149:9 151:25
156:11 157:21
158:18 159:7,10
160:15 162:14

Beltran v. Interexchange, Inc.   DAVID KEIL

7/21/2016

Page 241

166:13 170:23,24
171:3,14,23,25
178:1,25 185:16
186:16,18 188:4
195:8 198:23
204:23
**rights** 9:23 10:13
10:25 15:17 21:1
156:23 159:3
**rigid** 70:23
**ring** 200:15
**rings** 198:2 201:18
201:19
**risen** 99:2
**road** 57:7
**Roca** 3:9 7:20
**role** 65:10 72:10
108:4
**room** 20:1 21:11
76:17 191:21
**rose** 23:4
**Rothgerber** 3:9
7:20
**round** 138:4
**rounded** 137:2
**routine** 70:20
**rule** 44:3 47:14
92:16 102:11,12
208:4 212:15
**rules** 6:2 48:4,11
88:21,22 192:17
207:24,25 208:15
210:2,16,19,21
211:9 212:9 213:3
**run** 21:24
**running** 17:11 91:4
91:8,22,23 92:5
92:18,25 120:5
188:20 190:10
**runs** 24:21 47:23

**S**

**S** 2:5 3:2
**safety** 9:21 102:9
128:17
**sake** 9:3
**salad** 118:23

**saw** 63:25 66:4
76:5 131:5,8,10
131:16,17,18
151:10,18 170:14
**saying** 39:23 48:7
53:13 54:7 56:4,6
115:19 121:7
125:11 148:10
164:23 171:11
178:15 181:9
200:18
**says** 19:6 109:3
146:2 163:18
166:11 171:16
172:3,7,9,14
174:24 179:23
**scale** 134:25
**Schaecher** 3:17
7:17,17
**schemes** 28:11
**Schiller** 2:8 6:25
45:15,18,25 46:2
46:3 62:8,11
67:12 68:15,18
190:15
**school** 21:23 22:10
22:11,14
**Schreck** 2:24
**script** 33:11 86:15
86:15 124:12
**scripted** 124:11
**scrutinized** 73:2
**Scully** 3:13
**se** 25:12 67:9
**search** 97:15 196:1
**second** 26:22 127:5
127:14 130:8
137:16 166:4
168:10
**secretive** 128:16
**section** 26:21 63:20
**sections** 5:13 26:16
65:17
**sector** 83:11
**see** 12:13 13:25
14:13 26:5 28:20
37:21 56:20 63:7

75:8 95:4 102:25
108:9 118:21
120:4 126:9
148:23 159:6
180:8 189:25
**seeing** 77:19,23
**seek** 32:21 33:1
44:4 97:5
**seeking** 33:19 99:5
99:11,17 115:16
121:13
**seeks** 167:9
**seen** 12:16 13:24
66:12 76:12,16
93:7 121:10 151:7
151:15 171:25
185:18 207:22
**self-employed**
23:22
**send** 93:17,23
211:12
**sending** 92:18
**sense** 72:4,5 94:9
104:22 183:10
**sensitive** 6:19
**sent** 17:15,18 91:15
91:17 93:23 94:1
150:3,12 181:5
**separate** 92:4
137:9 156:14
**separated** 39:19
154:23 156:18
**service** 10:17 94:6
94:8
**services** 32:6,6
33:21,22,23 35:8
35:9 42:11 53:18
57:2,4 115:3,20
115:24 116:2
124:7,8 134:20
139:20 169:4,4
193:16
**session** 65:2
**set** 29:13 86:13
114:4 136:8,16
147:10 148:20
163:20,25 164:6

164:20 165:16,18
173:17 176:3
180:6 181:10,11
181:24 182:20
183:5 187:4,23
192:15 203:3,18
203:18 205:8
211:9
**sets** 136:15 148:11
164:23 180:2
**setting** 114:7
191:25
**sheet** 8:15
**Shefrin** 4:3
**Sherman** 2:14 7:7
**shock** 210:16
**shoes** 155:13
**short** 16:13,14
23:21 134:13
137:18,18,19
145:23 206:17
213:24
**shorter** 26:16
**shorthand** 111:8
218:7
**shortly** 42:19 78:25
127:21
**shoulder** 168:2
**show** 77:15 92:10
102:18 125:21
131:23 166:5
**showed** 125:6
**shown** 65:2,3 131:6
**sic** 174:24 200:19
**side** 21:14 77:12
82:14,16,20 90:11
110:21 211:1
**sidetrack** 140:22
**sign** 8:12 46:6
151:2
**signature** 217:13
218:13
**signed** 8:15
**significance** 179:21
197:5
**significant** 27:7
170:6

**Signing** 218:16,17
218:18
**silent** 106:10
**similar** 118:25
176:8
**similarity** 170:15
**similarly** 1:7
**simple** 43:3,6
127:16
**simply** 17:17 18:19
31:3 42:1 89:9
95:21 111:1
164:12 165:9
171:4,6
**single** 74:25 91:22
138:25
**sir** 9:9 11:2,4 12:4
12:13,16 13:5
14:10 15:8,23
16:6 20:4 21:4,17
22:20 25:19 33:15
33:24 35:12 37:23
40:15 41:18 46:9
47:24 49:12 50:20
51:14 52:11 53:3
54:14 55:13 58:12
59:22 62:16 63:19
64:7,18 65:12
66:19 67:22,25
72:6 73:14,21
76:4,20 85:12
88:20 89:14,18
90:13 91:2,9
93:11 102:23
105:6 106:16
108:17 109:15
110:3 112:9 115:6
126:16 127:13
129:18 130:15
131:11 132:13
140:12 145:4
146:21 154:14
160:6 163:16
169:18 180:19
187:11 188:2
190:3 199:1,16
200:9 205:5 206:2

Beltran v. Interexchange, Inc.   DAVID KEIL                          7/21/2016

Page 242

**sit** 120:7 131:20
   158:15
**site** 194:11
**sitting** 61:12
**situated** 1:7 101:20
   101:21
**situation** 9:19
   82:21
**situations** 80:5
**six** 16:24 29:12
   50:10
**six-day** 59:8
**size** 29:3 117:6
   190:23
**sizes** 117:10
**skill** 29:13
**skip** 23:2,3,11
**skipped** 23:14
**slate** 37:19
**slight** 21:14 67:15
   185:18
**slightly** 25:3 66:22
   191:10
**small** 14:5 18:5
   32:1 63:16,16
   101:3 105:2,4
   172:20,20,21,21
   172:22,24 174:9
   174:12,16,18
**Smaller** 43:8
**smart** 112:1
**so-called** 52:12
**solo** 21:20 24:6,10
**somebody** 101:16
   114:20 121:16
   122:18 172:18
   185:23
**someday** 89:16
**somewhat** 57:7
   70:21
**sophisticated**
   117:17,20
**sorry** 11:19 16:5,7
   16:19 18:13 20:18
   22:22 27:10 31:10
   31:18,23 32:23
   35:18 36:6 38:24

43:19 44:11 54:22
58:6 60:15 61:10
67:6,23 73:10
74:4,10 75:12
79:24 82:3 87:1
90:21,22 91:3
94:14 95:24 105:7
107:16,23 115:13
118:6,24 120:2
123:23,24 124:1
134:4 135:17
136:7 138:8 139:5
147:20 150:24
155:22 160:24
162:8 166:13
168:17 173:9,10
174:10 176:14,18
178:18 179:24
180:17 184:22
186:9 187:7
188:21 189:4
192:7 193:1,20
195:11 196:18
205:1 208:5
209:25 213:21
214:22
**sort** 44:5 57:12
   71:17 98:13,16
   114:7 118:7
   122:18 152:19
   169:6 213:14
**sought** 63:11
   167:18 168:7
**sound** 106:6 115:8
   115:9,14,15
   123:12
**sounding** 118:25
**sounds** 123:13
   124:17
**source** 14:15
   101:19 117:9
   153:9 163:7
**space** 43:17 101:22
**spark** 204:1
**sparked** 149:18
**speak** 34:24 35:3
   56:17 57:21 58:10

80:19 88:17 115:3
115:12 116:6
122:6 124:5,20
127:19 130:9
132:2 198:16
199:23 200:19
201:7 202:23
206:4
**speakerphone**
   105:24 106:2
**speaking** 11:13
   20:14 29:19 32:12
   35:10 96:8 99:24
   128:9 133:22,23
   134:19 140:10
   162:12,16 185:4
**specific** 9:5 16:13
   32:9,12 37:5 38:8
   39:24 51:20 60:12
   64:6 70:10 72:12
   88:23 91:6 97:5,6
   98:24 106:20
   112:22 131:1
   133:14 134:23
   148:16 156:13,13
   158:11 177:10,13
   177:14 188:11,11
   189:1 195:22,23
   198:15 203:23,24
   203:25 204:1
   208:24 214:15
**specifically** 38:9
   47:12 81:2 82:23
   88:25 96:5 110:17
   111:20 114:16
   115:23 119:17
   126:18 137:3
   156:9 165:23
   188:16 199:15
   200:25 203:2
   208:3
**specifics** 58:21
   61:17 201:25
**specified** 60:7 70:4
   184:11 192:8
   205:12
**specifies** 81:12

**specify** 167:14
**speculate** 60:6
   83:14 130:24
   196:4,5
**spell** 92:21
**spelling** 17:17
   18:19 92:1,20
**spoke** 18:4,23 31:2
   33:9 51:9 55:5
   59:5 113:13,20
   114:16 117:1
   121:19,20 122:10
   124:14,16,18,22
   126:17,19 127:10
   127:20 129:24,25
   131:4,7,11 132:4
   132:12,17 163:14
   180:4 200:7
**spokesperson**
   155:16 158:7
**sponsor** 52:12 53:4
   53:9 54:24 55:15
   56:13 76:6 77:12
   147:5 177:5
   184:20 185:1
   189:4 192:6,7,14
   192:25 193:4
   196:12 203:5
**sponsors** 54:15
   56:3,15 59:25
   60:3 61:15,21
   74:7,13 75:9
   118:3,18 126:24
   146:12 153:3,22
   153:24 154:2,12
   154:15,16 155:11
   155:17,20,22
   156:9 157:4,13,15
   158:17 160:7,9,14
   160:20 161:19
   162:25 163:2,9
   164:5 165:3,23
   169:20 170:8,20
   176:12,18,20
   177:24 178:5
   180:13 181:17
   183:24 184:3,13

187:12,22 189:2,5
   194:11,22 196:8
   199:2 205:6,8,23
**sports** 63:20
**Sprint** 204:16
**ss** 218:2
**St** 2:20
**staffing** 50:8 213:2
   213:13
**stand** 19:11 73:3
   186:1 198:24
**standard** 8:9 30:16
   67:9 73:25 112:16
   112:17,18,23
   164:9 167:11,12
   189:14
**standards** 73:22
   81:15 112:19
**standing** 155:13
   189:10
**stands** 118:10
   154:23
**staple** 26:20
**staples** 26:21
**stark** 170:14
**start** 38:24 42:2
   59:24 86:14
   123:15 144:20
**started** 38:12,20
   41:1 43:20 48:3
   48:13 52:25 53:13
   78:23 114:24
   115:1 206:23
**starts** 48:18 166:12
**state** 6:22 7:25 8:4
   9:9 50:9 76:12
   103:11 168:21
   172:1,6,9,14
   173:17 174:21
   179:22 180:2,14
   181:4 184:10,12
   187:5 189:7,10,14
   189:16 190:4
   191:21 192:1,9,16
   194:10 196:7,11
   196:15 205:12,24
   211:8,16 212:2,6

Beltran v. Interexchange, Inc.   DAVID KEIL                    7/21/2016

212:8,16,18
217:15 218:2,5
**stated** 91:24 134:24
136:25 138:5,9
151:1 154:5 167:3
167:6 171:24
172:11 174:21
176:4 181:21,21
185:17,20 186:18
187:16 189:12,14
189:15,23,24
200:22 203:21
209:15 210:19
**statement** 93:15
105:15,23 124:5
138:1,18 146:19
148:18 152:20
164:7,11 177:5
178:3 182:12
183:6 184:5,8
186:1,7,8,9,10,12
187:14
**statements** 18:5
19:9 99:7 183:22
187:15,15 196:21
**states** 1:1 6:10
47:12 184:6
193:17 207:4
209:11 212:20,23
**stating** 170:5 174:7
174:17
**status** 44:2
**statute** 46:18 47:9
49:4 50:18 72:7,8
72:12 73:19,20
208:25 209:1,6
212:11,25
**statutes** 50:24
**stay** 22:6 182:3
**stayed** 24:10
**staying** 182:6
**stenographer**
104:21
**step** 155:4 158:25
164:15
**steps** 20:23
**Steven** 23:24

**Stewart** 3:7 7:23
**Sticking** 21:17
**stint** 23:15
**stipend** 52:23 53:1
57:6 135:13,13,20
136:3,4,17,22
137:2,24 139:19
164:22 170:21
178:17 179:12
180:13 184:11
187:5 191:16
192:1,8,15
**stipends** 35:15,23
36:21 37:9 38:2
38:15,22 39:14
40:19 41:3 51:20
52:5 170:8 178:11
187:23 188:17
**stipulation** 8:9
40:12
**stipulations** 8:8
**stop** 94:25 111:24
**stopped** 114:9
**stories** 62:21,23
**strange** 143:17
**strategy** 31:15 33:4
39:5,20 54:10
154:8,25 156:15
156:19 157:12
**street** 2:2,11,15,24
3:3,10,14,18,23
6:13 45:2
**strictly** 118:5
**strike** 5:12 8:11
65:16 113:17
162:14
**string** 118:7
**stripe** 129:1
**struck** 23:21
**structure** 69:7,8,10
134:21 140:3
**structured** 35:7,7
42:9 53:25 56:25
57:2
**structures** 170:1
176:22
**struggling** 118:22

118:24 123:24
133:17
**stuck** 116:25
**Studies** 201:16
**STUDY** 1:13
**subheading** 208:6
**subject** 42:3 59:16
66:24 72:9 88:10
113:11 133:3
165:2 167:9
170:13 182:2
209:14
**subjects** 51:11
153:2
**submitted** 75:9
**subpoena** 2:1 5:9
10:17,18 12:6,15
13:1 21:1 75:21
76:14 94:18,19
131:19
**subpoenas** 205:4
**subscribed** 217:14
**subsection** 208:9
**subsequent** 162:5
**substance** 122:12
137:16 161:1
199:8 202:17,23
**substantive** 12:4
118:4,18 119:11
119:14,16 120:22
121:5,19 132:5
133:3 134:1 137:7
169:8 184:24
188:16,19,19
198:18 200:1
204:5
**substantively**
133:22 171:3
**subterfuge** 70:25
**succinct** 26:18
**sue** 7:17 44:1
**sued** 199:2
**sufficient** 173:14
183:12
**suggest** 76:20 78:5
94:17 183:17
189:4,5 191:6,24

205:12,17
**suggested** 189:1
191:9
**suggesting** 59:21
59:22 172:12
**suggestion** 193:10
**suggestion's** 158:19
**suing** 43:25
**suit** 109:10
**suite** 2:2,8,11,15,19
2:24 3:3,10,14,18
3:23 4:4 6:13
190:20,24
**suits** 43:8
**sum** 122:1 138:20
185:6 187:20
191:11
**summarize** 151:4,8
**summarizing** 14:17
**summation** 146:17
146:19
**supplier** 102:19
**supposed** 33:16
56:14,24 59:23
60:1 61:20 73:21
163:23 176:1
**sure** 9:4 12:8 21:25
36:10 46:14 78:12
106:21 108:16
120:20 126:5,14
156:25 192:12
205:3
**surprise** 210:13
**surprising** 64:14
64:17 143:18
182:5
**SUSAN** 3:17
**suspect** 115:7
206:3
**suspecting** 11:12
**swap** 142:22
**swapped** 142:21
143:1,6
**sworn** 7:25 217:14
218:6
**system** 27:19

**T**

**T-Mobile** 204:16
**table** 67:25
**tail** 69:25
**take** 6:18 12:12,13
14:10 20:4 21:10
26:4 30:14 37:21
44:25 45:1 67:2
77:25 78:5,8,10
86:19 89:25 104:5
106:9 117:19
122:4 127:6 134:5
144:19 146:22
175:16 206:2
208:9,17 212:19
213:24
**taken** 2:1 6:2 16:11
78:17 123:3
140:17 143:9
159:15 165:8
176:9 206:9
208:17 214:4
218:7
**talk** 10:19 94:21
96:24 120:16
126:23 159:6
**talked** 169:24,25
192:20,22,24
193:3 199:14
**talking** 58:11 59:16
65:7 71:22 72:5
96:17,19 98:8
105:19,25 120:9
155:14 160:19
175:13 187:18
**target** 212:11
**task** 31:19 32:2,4
40:2 44:6 52:6
70:16 90:17 94:11
96:15
**tasked** 32:8,9 44:5
**tasks** 95:22 96:10
96:12
**technical** 26:9
**technique** 21:15
37:18
**teeing** 156:25

Beltran v. Interexchange, Inc.   DAVID KEIL                          7/21/2016

telephone 18:18
  31:21,25 33:10
  34:6 212:21
telephonic 14:17
  15:9
tell 11:24 29:3 38:8
  41:14 56:18 58:22
  62:3 65:20 67:9
  72:12,18 82:17
  84:10 85:5,7,12
  91:20 96:9,17
  102:19 103:1
  118:12 119:2,24
  120:21 122:8,10
  122:12,15,17,21
  123:16 124:16,17
  127:9 132:9 133:5
  133:10,19 137:21
  141:5,21 149:25
  152:18 157:10
  162:2 168:12
  174:19 181:15
  187:10 195:19
  201:18 205:7
telling 37:6 44:17
  52:5 54:15,24
  55:16 82:24
  137:12 150:11
temporary 48:16
tend 28:14
tended 43:7,10
tends 24:14 29:9
tenor 139:14
tenure 99:1
term 25:5,12 28:13
  55:8 58:7 95:22
  103:25 109:7
  110:12 111:9
  187:17 194:20
terminology 75:11
  76:19
terms 67:4 104:16
  104:23 117:15
  196:1
test 60:23,24
  126:15
testified 8:1 40:8

155:5 158:10
  209:18 213:4
testify 12:15 218:6
testifying 19:14
  75:19
testimony 19:4,18
  34:16 35:12,19
  36:18 45:17,21,22
  45:23 46:5 50:12
  51:19 63:6,10
  68:19 75:1 96:25
  151:15 153:25
  158:13 164:2
  165:21 166:24
  176:5 214:10,13
  217:4 218:9
text 166:16
Thank 8:21 10:6,12
  14:3,8 31:7 36:16
  65:24 66:21 75:20
  77:1 128:6 130:16
  140:14 143:23
  144:14 160:3
  181:1 206:6
  213:17,19
Thanks 27:13
theme 24:21 84:22
theories 93:19
thing 10:7 25:2
  117:4 139:1
  171:12
things 45:1 52:21
  60:2 75:5 139:1
  168:22 169:13
  175:14 189:19
  203:24
think 19:18 20:2
  26:19 27:4 29:13
  34:21 37:17 38:23
  38:23 44:16 48:5
  50:10 51:3 59:9
  67:15 70:12 73:5
  73:15,15 75:7,16
  75:16 76:15 77:22
  79:2,7,18 85:2
  87:8 89:10 101:12
  110:10 115:17

116:3 120:17
  131:1,18 133:8
  137:6,6,17 140:6
  140:9 142:15,22
  154:22 172:8
  173:24 180:21
  184:16 191:8,9
  192:13,19 196:21
  205:2 206:24
  215:7
think's 79:10
thinking 39:20
  117:21 166:10
third 26:24 39:10
  60:18 82:22
  118:11 127:5,14
  132:1 148:8
  154:12 157:23
  174:23
thoroughly 100:23
  119:18 121:13,14
thought 18:22 28:6
  38:6 59:13 63:15
  63:17 72:2 74:19
  99:10 118:1
  164:15 169:7
  173:14 175:17,18
  179:9,13 182:12
thoughts 17:24
thread 24:23
threats 9:19
three 29:12 64:24
  81:22 100:10,17
  100:20,21,21,22
  100:25 101:12
  108:10 119:9,10
  119:17,20 120:8
  120:24 121:8
  123:10 127:2,9
  130:3 133:1,6
  145:24 147:5
  164:8,18,25
  165:13 171:2
  184:19,24 185:15
  189:20 190:19
  196:14,20 198:25
  216:1

three-page 5:15
thrust 212:21
time 6:5 8:11 17:1
  17:4 18:17 22:19
  23:21 24:2,11,14
  28:5 29:5 34:22
  41:17,22 42:14
  44:7,19 59:11
  62:10 65:12 68:8
  70:11,22 78:6,8
  78:15,20 79:10
  83:7 85:16 86:4,7
  94:10 95:19 96:6
  96:9,10,14 102:11
  104:5 105:19
  108:11,20,22
  121:11 123:2,5
  124:10,12 127:14
  127:14 128:7
  130:1 139:4 140:7
  140:9,16,19 141:7
  144:7 150:1,2
  151:22 153:5
  159:13,18 161:22
  162:16 163:5,12
  163:14 164:3,15
  188:19 190:9
  204:13 206:8,12
  208:17 209:9
  212:24 213:8,14
  214:3,6 216:2
  218:8
times 26:8 27:21
  52:24 63:22 92:21
  111:25 114:14
  116:19 128:8
  204:15
title 97:25 98:12
  100:3,12 127:8
  134:2
titles 100:7 183:20
today 9:22 12:22
  15:19,22 19:5
  45:19,22 63:3
  64:8 68:23 91:3
  118:17,22 123:25
  139:2,7 151:11,13

191:11 203:20
  214:10
today's 45:17 46:4
told 18:8 34:4
  35:25 39:12,24
  44:22,24 50:23
  51:14 53:24 54:5
  54:6,23 56:3,15
  76:15 81:2 87:6
  108:3,24 110:17
  111:1,2,3,20,25
  112:6 117:1,3
  138:22 155:3,6,16
  161:5 173:15,19
  173:23 174:13,16
  174:20 183:20
  186:3 187:9 189:9
  189:12,18,21
  194:3 195:20,22
  210:10,25 214:17
  214:19,25
tone 139:14
top 104:2,3,3 164:8
  183:23 190:20
  191:3
topic 55:3,19 56:7
  56:10 57:1 112:23
  113:22 155:13
  158:13 161:14,18
  170:2 205:16
topics 9:1 57:1
  165:18 177:21
total 114:11 122:1
  138:20 185:6
  187:20 191:11
  203:6,10 216:1
touch 200:10
tracer 23:2,3,11
transcript 218:9
transcription 217:3
transfer 116:17
transferred 116:20
  117:2
transitional 213:14
travel 20:2
treated 25:3
tremendous 210:7

Beltran v. Interexchange, Inc.   DAVID KEIL

7/21/2016

Page 245

**trial** 8:11 10:18
24:23 46:5
**tried** 195:20
**Trigg** 3:22
**triggered** 57:12
**trouble** 125:19,23
162:3
**true** 98:25 99:16,19
151:20 153:8
217:3 218:8
**trusting** 96:9
**truth** 7:25 218:6
**try** 37:19,19 49:15
52:16 78:8 81:10
97:25 112:18
118:21 140:11,24
158:20,24 162:18
**trying** 31:3 34:23
37:20 48:13 52:18
61:24 75:18 105:9
105:13 120:5
135:18 138:17
152:8,22,24
172:10 175:14
**turn** 26:19 123:9
208:3
**turned** 121:25
165:13
**turning** 69:22
125:25 174:23
**twice** 173:14
**two** 3:7 22:3,3,23
46:10 59:10 64:23
64:24 69:13 88:1
88:8 89:9,10
110:19,24 111:7
127:2 131:16,17
134:11 137:22
138:24 139:8
143:3 146:9,16
150:8 151:10
171:16 173:24
174:19 185:17
187:12,22 189:19
194:4 195:22
197:8
**two-and-a-half**

64:24
**two-paragraph**
146:3
**two-plus** 150:6
**two-thirds** 86:4
**type** 52:18 79:16,17
79:20 80:8,9,10
81:24 82:15 86:8
86:8 105:25
177:18
**types** 24:12,13,24
28:16 57:13
176:23
**typewritten** 218:8
**typical** 52:20 84:17
101:21
**typically** 80:9
83:22 84:10,13
94:4,9 96:4,6
97:17
**typing** 17:7 20:5
86:20 105:20
175:13
**typographical**
145:15

**U**
**U.S** 68:9 136:5
**ultimately** 23:3,4
42:13 53:17
119:21 127:3
134:1
**umbrage** 117:19
**unable** 101:14,15
101:16 134:23
146:4
**uncommon** 108:9
**underlying** 211:25
**understand** 8:23
11:3 19:10 20:3
20:19 43:24 47:24
51:25 52:3 53:4,9
58:14 63:6 72:23
73:7 76:11,24
85:11 88:4,20
93:4,5 98:19
107:16 112:24

113:2 117:12
120:12,13 150:24
159:25 174:5
186:17 191:7
193:15 211:19
212:10 214:22
**understanding**
17:10 28:11 30:9
37:22 40:16 42:25
45:20 50:7,22
51:1,15 76:19,21
81:19 89:24 90:17
108:4,16 111:7,8
111:9,12 133:13
153:10 156:17
162:3 163:19
164:19 180:17
181:7,8,9,23
184:3 185:5
190:18 193:11
207:18 208:25
209:5,10 210:19
210:24 212:9,14
212:23 213:1
**understands** 78:3
**understood** 48:12
53:16 57:17 88:8
88:17 96:25 162:7
181:16 186:18
212:15
**unique** 27:1 72:23
169:8
**Unit** 6:6 78:14,19
159:12,17
**United** 1:1 6:9
193:17
**units** 216:1
**universe** 87:7
205:2
**University** 9:11
11:5 22:5
**unpublished** 21:9
21:11
**unusual** 44:7 47:3
83:9
**unwilling** 130:24
134:23

**urgency** 70:7
**USAuPair** 1:10
197:16
**use** 8:9 27:25 28:12
49:10 52:21 55:7
58:6 70:25 97:24
103:4 105:13
106:19 108:14
115:25 141:14
142:5,9 167:21
180:13
**uses** 171:19
**usually** 27:22 30:16
83:18 88:19 115:1
115:1 128:10
173:10

**V**
**v** 1:9
**vacuum** 44:4 75:19
**value** 73:10 89:12
180:10
**vanilla** 52:18 152:9
**varies** 25:18 29:4
29:14 84:19 141:4
166:7
**various** 15:23
51:16 83:17 117:6
143:13 176:8
**varying** 117:10
**vast** 46:22
**vendor** 102:19
**vent** 9:25
**verbatim** 15:25
16:3,11 104:20
134:18 139:11
**Verizon** 204:15
**version** 145:14
**versions** 143:13
**versus** 6:9 84:18
**victims** 28:12,15
**video** 6:17
**videographer** 4:7
6:4,13 78:13,18
123:1,4 140:15,18
159:11,16 206:7
206:11 214:2,5

215:24
**videotape** 1:4 2:1
**videotaped** 6:7
78:14,20 159:12
159:18 215:25
**view** 80:19
**Village** 4:4
**violate** 162:2,3
**violating** 157:9,19
**violence** 9:19
**virtually** 30:14
101:1
**voice** 10:3 16:9
37:2 67:22 91:2
105:5 130:15
135:17 203:13
**voicemail** 127:17
128:12,20
**voluntary** 48:7,8,9
48:16,22,25 49:6
49:22 72:8 213:12
**volunteer** 213:10
**volunteered** 45:6
149:4 176:25

**W**
**wage** 191:22
**wait** 13:6 39:17
49:14 79:1 114:4
144:12,12
**waiting** 140:21
143:21
**waive** 144:8
**waived** 144:23
156:1 218:17
**waiving** 156:21
159:7
**want** 12:8 15:15,19
19:20 36:7 37:10
39:2 63:6 65:14
78:8 81:6,9
108:16 120:20
124:16 126:8
144:15 155:15
156:25 159:2,5
173:20 187:10
196:3,5 206:2,3

Beltran v. Interexchange, Inc.   DAVID KEIL

7/21/2016

Page 246

| | | | | |
|---|---|---|---|---|
| 214:23 | 143:5 | 100:5 125:25 | **worked** 21:22 23:1 | 23:16 24:16,22 |
| **wanted** 9:6 98:1 | **wearing** 10:8 | 159:1,21,23 | 23:20,23 29:5,25 | 26:17 27:19 29:12 |
| 99:20 127:24 | **web** 25:20 26:11 | 162:15 173:8,11 | 30:6 61:25 64:16 | 48:3 67:19 69:4 |
| 152:23,23 162:21 | 42:24 | 218:13 | 94:3 138:3 143:17 | 69:13,16 70:21 |
| 172:18 178:24 | **website** 5:11 20:21 | **witnesses** 24:22,23 | **working** 23:19 27:1 | 72:14 73:13 90:3 |
| 179:19 184:4 | 25:20,21 26:6,8 | 80:8,9 83:17,19 | 68:8,23 80:22,25 | 98:17,20 108:10 |
| 185:16 186:13,25 | 26:13,15 30:12 | 85:13 172:10,13 | 83:2 86:5,16 | 143:3 150:6 |
| **warn** 88:19 | 97:17 102:23 | **woman** 133:24 | 87:17 98:8 122:19 | 167:17 |
| **warned** 110:20 | 115:19 116:3,9 | 168:14,19 | 129:1 132:16 | **yellow** 195:14 |
| **wasn't** 56:9 121:23 | 208:18 | **women** 174:19 | 182:18 195:14 | **yesterday** 13:5,11 |
| 121:23 128:3 | **websites** 97:24 | 183:11 184:19 | 209:1,4,11 210:11 | 62:25 64:9,22 |
| 132:12 158:11 | **week** 46:12 59:9 | 187:3 190:19,25 | 210:14,22 211:1 | 66:3,5 74:6,15 |
| 201:5 | 128:9 135:14 | **wonder** 74:5 | 211:10 215:11 | 118:20 125:7 |
| **watching** 78:8 | 178:19 180:20 | **wonderful** 152:12 | **world's** 72:22 | 131:6,15 |
| **way** 8:22 17:23 | **weeks** 46:8,10 | **word** 52:23 91:23 | **worthless** 120:4 | **yesterday's** 131:8 |
| 23:16 24:14 25:25 | 139:8 | 118:23 124:12,12 | **wouldn't** 59:5,22 | **York** 22:12 63:22 |
| 28:20 30:16 33:20 | **welcome** 36:17 | 142:4,5 183:21 | 100:14 110:8 | |
| 37:13 38:19 40:8 | 65:25 | 192:2 203:14 | 117:19 127:7 | **Z** |
| 41:10,14 55:20 | **well-known** 72:17 | **words** 14:24 23:11 | **wrap** 204:23 205:4 | **zones** 104:5 |
| 56:18 60:25 61:5 | **went** 34:16 42:14 | 104:24 105:14 | **write** 87:11 209:7 | |
| 61:11 70:9 99:23 | 57:16,22 58:2 | 108:14 127:2 | 209:12 215:17 | **0** |
| 100:10 108:23 | 72:2 104:2 111:6 | 138:13 142:13 | **writer** 21:8,9 | **02110** 3:8 |
| 109:19 110:2,22 | 154:23 170:11 | 148:13 149:1 | **writers** 21:15 | |
| 112:7 113:10,11 | **weren't** 48:10,15 | 158:6,14 169:10 | **writing** 8:14 95:8 | **1** |
| 113:13 117:14 | 135:1,2 162:4 | **work** 5:15 14:21 | 195:8,10 203:12 | **1** 5:8,18 6:6 12:11 |
| 123:20 128:10 | 188:2 191:3 | 15:2 18:15 19:9 | **written** 86:15 | 75:14,23 76:14 |
| 130:22 133:12,20 | **Wheeler** 3:22 | 19:16 24:9,13 | 146:17 198:24,25 | 78:14 131:19 |
| 143:10,17 154:22 | **WHEREOF** | 25:8,15,16 27:22 | 209:7,12 211:2,3 | 147:12,24 152:6 |
| 158:14 166:5 | 218:13 | 27:24 28:3,9,9,21 | 215:15 | 163:6,16 164:17 |
| 170:10 183:10 | **whichever** 135:22 | 28:22,23,23 29:10 | **wrong** 109:4 | 204:6 |
| 189:6 190:6,7 | **whispers** 6:20 | 29:20 31:14 39:5 | 133:16 | **1/2** 204:6 |
| **ways** 189:13 | **white** 28:12 72:18 | 41:24 44:3 51:12 | **wrote** 87:12 170:16 | **1:05** 140:17,19 |
| **we'll** 8:23 13:25 | 72:22 | 67:3 68:25 69:2,5 | 210:9 | **1:14-cv-03074-C...** |
| 66:18,24 78:7 | **wide** 57:16 | 69:9,9,11,22,24 | | 6:11 |
| 126:12 133:21 | **wind** 41:25 | 70:9,11 71:3 | **X** | **1:30** 159:13,15 |
| 134:6 | **winter** 30:22,24 | 72:24,25 82:25 | **X** 5:1 96:6 195:14 | **1:36** 159:19 |
| **we're** 13:19 19:7 | 31:4 | 83:1 84:21 89:19 | 218:16 | **1:37** 159:15 |
| 26:14 32:7 40:1 | **wise** 177:6 | 89:25 90:1,4 | | **10** 32:16,16 69:16 |
| 47:11 60:16 63:2 | **wish** 10:17 19:5 | 93:13 94:2 95:4 | **Y** | 87:9 96:18,20,22 |
| 66:15 71:22 93:8 | 158:25 | 101:21 109:6,9,11 | **yeah** 10:1 95:6 | 195:3 218:15 |
| 96:17,19 117:20 | **wishes** 49:16 90:8 | 144:6 150:20,23 | 115:13 126:4,8 | **10:34** 78:15,17 |
| 120:5 127:8 | **Withdraw** 107:23 | 151:8,19 167:4,9 | 166:17 171:21 | **10:53** 78:17,21 |
| 133:13 140:20 | **withheld** 14:21 | 167:10,15,15,18 | 181:25 203:9 | **100** 102:11 |
| 143:20,25 144:7 | 15:24 | 168:6 177:16 | **year** 22:13 25:18 | **11** 5:18 195:14 |
| 155:8,23 165:20 | **withhold** 71:5 | 193:2 209:1,14 | 25:18 29:4,4,11 | 208:4 |
| 173:8 213:25 | **witness** 8:12 73:3 | 210:21,22 211:6,7 | 67:17 84:19,19 | **11-inch** 195:6 |
| **we've** 121:24 143:5 | 79:17 81:7 86:8 | 212:17,25 | 213:11,11 | **11:43** 123:2 |
| | | | **years** 22:3,3,16,24 | **11:44** 123:3 |

Beltran v. Interexchange, Inc.   DAVID KEIL

7/21/2016

Page 247

**11:59** 123:3,5
**111** 2:19
**12** 5:8,18 199:4
  204:5,10
**12:20** 140:16,17
**120** 178:18
**1200** 2:2,8 3:10 4:4
  6:12
**13** 5:9
**14** 31:4,6 68:11
  150:7 195:15
**14-cv-03074-CM...**
  1:2
**144** 5:14
**15** 32:16 66:17 67:1
  68:11 69:17 96:20
  178:16 179:7
  196:7,11 205:23
**1535** 2:11
**17th** 2:2,15,24 3:3
  3:10,14,23 6:12
**18** 69:16
**1801** 3:18
**19** 69:16
**190** 180:20
**191** 9:11 11:5
**195.75** 135:14
  138:5 178:18
  179:12 185:10
  189:21 190:1
  191:17 192:1
  205:12
**196** 149:6 185:20
  186:3 189:23
**1978** 22:15,18
**1980** 22:18
**1981** 23:17
**1986** 21:21
**19964000498** 218:5

---
**2**
**2** 5:9 14:6,7,14
  16:18 78:19 96:18
  159:12 164:21
  179:5
**2:34** 206:8,9
**2:56** 206:9,12

**20** 32:16 67:1 69:4
  72:14 87:9 96:18
  96:22 195:4
**20/20** 1:15 4:1 7:11
  202:20
**200** 29:6,7 67:18,19
  68:7,10 137:2
  138:5
**2000** 31:5
**2000s** 27:16 48:5
**2008** 68:6
**2010s** 27:17
**2014** 14:14 16:18
  26:13 30:23,25
  62:21 68:6 69:25
  151:24 204:19
**2015** 48:1 50:1,14
  67:17 68:12
  206:23
**2016** 1:4 2:3 5:2 6:5
  216:5 217:16
  218:13
**2020** 218:15
**206** 5:4
**207** 5:16
**21** 1:4 2:3 5:2 6:5
  166:12
**213** 2:19
**214** 5:5
**21st** 216:5
**2200** 2:24
**25** 5:10
**250** 9:12 67:13
  68:12,18
**2700** 3:18
**2nd** 2:19 218:13

---
**3**
**3** 5:10 21:21 25:24
  159:17 164:22
**3:05** 214:3,4
**3:22** 214:4,6
**3:24** 216:2,4
**30** 8:13 24:22 70:21
  73:13 98:17,20
**300** 2:11
**3000** 2:2,15 3:10

6:13
**303-916-1376**
  103:3
**3200** 3:3
**33301** 2:9
**33701** 2:20
**3400** 3:14
**370** 3:23

---
**4**
**4** 5:12,18 65:23
  66:24 75:17 76:3
  76:16 77:2 131:19
  143:24 203:6
  204:6
**4.25** 138:10
**401** 2:8
**410** 2:24
**4500** 3:23

---
**5**
**5** 5:14 96:19,20
  143:24,25 144:5,9
  144:11 145:7
  146:10 147:25
  161:11 163:7,16
  164:17 174:1
  185:19 191:10
  203:3,7,8,19
  204:7
**50** 84:23
**50/50** 25:18 28:5,19
  84:22
**500** 135:10 179:7
**555** 3:3,14
**5619** 4:4

---
**6**
**6** 5:16 206:10
  207:18
**633** 2:15
**65** 5:12

---
**7**
**7/21/16** 217:25
**70** 85:16,25
**750-1** 5:18

---
**8**
**8** 5:3 208:13
**800** 20:21 97:22
  114:19,25 115:18
  116:2,9 199:22
**80111** 4:4
**80202** 2:3,15,25 3:3
  3:10,14,18,23
**80206** 9:12 11:6
**80218** 2:11
**86** 23:17
**8D** 208:4,6

---
**9**
**9:05** 2:3 6:5
**90** 5:13 65:17
**94** 5:13 65:17
**95** 25:10,13

---