# **<u>Exhibit 1</u>**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Case No. 14-cv-03074-CMA-CBS

JOHANA PAOLA BELTRAN;
LUSAPHO HLATSHANENI;
BEAUDETTE DEETLEFS;
DAYANNA PAOLA CARDENAS CAICEDO;
ALEXANDRA IVETTE GONZÁLEZ;
SARAH CAROLINA AZUELA RASCON;
LAURA MEJIA JIMENEZ;
JULIANE HARNING;
NICOLE MAPLEDORAM;
and those similarly situated

       Plaintiffs,

v.

INTEREXCHANGE, INC.;
USAUPAIR, INC.;
GREATAUPAIR, LLC;
EXPERT GROUP INTERNATIONAL INC., DBA EXPERT AUPAIR;
EURAUPAIR INTERCULTURAL CHILD CARE PROGRAMS;
CULTURAL HOMESTAY INTERNATIONAL;
CULTURAL CARE, INC. D/B/A CULTURAL CARE AU PAIR;
AUPAIRCARE INC.;
AU PAIR INTERNATIONAL, INC.;
APF GLOBAL EXCHANGE, NFP, DBA AUPAIR FOUNDATION;
AMERICAN INSTITUTE FOR FOREIGN STUDY DBA AU PAIR IN AMERICA;
ASSOCIATES IN CULTURAL EXCHANGE DBA GOAUPAIR;
AMERICAN CULTURAL EXCHANGE, LLC, DBA GOAUPAIR;
GOAUPAIR OPERATIONS, LLC, DBA GOAUPAIR;
AGENT AU PAIR;
A.P.EX. AMERICAN PROFESSIONAL EXCHANGE, LLC DBA PROAUPAIR; and
20/20 CARE EXCHANGE, INC. DBA THE INTERNATIONAL AU PAIR EXCHANGE

       Defendants.

---

**SECOND AMENDED COMPLAINT**

---

1

Comes now, the above-named Plaintiffs, on behalf of themselves and those similarly situated, with the following First Amended Complaint alleging as follows:

This amendment is by right pursuant to F.R.C.P. 15(a)(1)(B).

## INTRODUCTORY STATEMENT

1.      Congress initially created the J-1 visa program to facilitate cultural exchange between nations, but, over time, the *au* pair program devolved into a source of cheap, migrant labor. Today, the *au pair* program recruits young, foreign workers, often with limited English skills, to provide 45 hours of child care per week to American families at a below-market rate.  That rate of $4.35 per hour has been illegally set through a price fixing conspiracy, and is so low that it also violates Federal and State minimum wage laws.  The lies told to attract labor at these illegal rates violate racketeering, tort, and consumer protection laws.

2.      The *au pair* program, initially administered by the United States Information Agency ("USIA"), which merged with the State Department in 1999, is managed through fifteen sponsor organizations.  The State Department designates these sponsors and charges them with recruiting and placing *au pairs* with American families.  Given full control of the *au pair* labor market, designated sponsors have illegally conspired not to compete on wage terms in *au pair* recruitment by colluding to set *au pair* compensation far below the market rate for other workers in the same industry.

3.      The history of the *au pair* program is a history of sponsor abuse.  At its outset, the sponsors manipulated the program by fixing *au pair* wages at prices below federal and state minimum wage.  The head of the USIA thus appropriately bemoaned that,

"unfortunately," the sponsors "have a cartel."  And an early report on the program by the congressional watchdog agency included harsh criticism and demanded that *au pairs* receive their full rights as employees for their "full-time child care work."  The U.S. Department of Labor agreed that *au pairs* were entitled to the full rights of employees.

4.       The government agencies overseeing sponsors' participation in the J-1 visa program have taken extra steps to protect *au pairs* from some of the most egregious abuses by sponsors.  While reminding sponsors that *au pairs*, like other employees, are fully protected by labor laws, including federal minimum wage laws, the government added yet another safeguard – an absolute programmatic wage floor that the sponsors were required to verify with the host families.  This additional layer of protection would at least cause sponsors to recognize that what they euphemistically called "pocket money" was actually a wage, subject to the Fair Labor Standards Act and state labor laws.  The State Department website specifically advises J-1 visa holders like *au pairs*, of their right to federal minimum wage at $7.25 per hour and to "check [t]he minimum wage for the state in which you work.  If that wage is higher, you have the right to be paid the higher amount."

5.       The sponsors quickly turned the government's effort to protect *au pairs* on its head.  They agreed amongst themselves that, with few exceptions, each sponsor would place *au pairs* with host families at a wage pegged to the programmatic wage floor, and no greater.  The *au pair* program has thus developed into a cartel setting uniform wages at $195.75 a week, *i.e.*, just $4.35 per hour.  Perversely, the sponsors are using the

government's additional protection for *au pairs* as an excuse to fix the market for *au pair* labor to artificially depress *au pair* wages.

6.       To make matters worse, the sponsors cite the government's programmatic wage floor as a reason to ignore federal and state minimum wage laws.  But compliance with the programmatic wage floor is no guarantee of compliance with minimum wage laws.  Indeed, the federal regulations and guidance governing sponsors explicitly recognize the supremacy of federal and state minimum wage laws over the programmatic minimum.  *Au pairs* are not carved out of minimum wage laws.  Thus, the programmatic wage floor does not mean *au pairs* can be paid less than the federal and state minimum wage guaranteed to other employees providing the same services in similar circumstances.  Yet, the sponsors have cheated *au pairs* out of even minimum wage by treating the programmatic wage floor as if it were the only protection for *au pairs*, rather than an additional protection.

7.       At the same time, the sponsors extract premiums from families seeking affordable childcare with the sales pitch that even with significant sponsor fees, *au pairs* are significantly cheaper than other childcare options available in the United States.

8.       Many of the sponsors go to great lengths to deceive the young workers into believing that the wage floor is not just a minimum, but also a maximum above which *au pairs* may not negotiate.  These lies not only deprive *au pairs* of market wages, but also intentionally confuse them about their rights.

9.       Many *au pairs* are lucky to join great families and have exceptional experiences, but the situation is ripe for exploitation by unscrupulous employers.  As

Professor Janie Chuang noted in her groundbreaking study in the *Harvard Journal of Law and Gender*, the "'cultural exchange' subterfuge has created an underclass of migrant domestic workers conceptually and structurally removed from the application of labor standards and the scrutiny of labor institutions."  In an extreme case, four young women recruited by Au Pair in America became sex trafficking victims, and U.S. District Judge Robert Gentlemen excoriated the sponsor because it "basically cut them loose." The revenue-seeking sponsor agencies fiercely compete for host families and *au pairs*, and have agreed to set the price for labor at a fixed low rate in order to increase the competitiveness of their captured labor compared to the dynamic domestic market. Many of the Defendants explicitly advertise on the internet that their labor costs are set far lower than those of their domestic labor competitors.  The result suppresses *au pair* wages to the benefit of the sponsors and host family employers and to the detriment of the young visiting workers.

10.     Often tucked away in homes in scattered communities, and with limited language skills, *au pairs*, while technically protected by U.S. and state labor laws, can be afraid and usually lack the knowledge and ability to assert their rights.  The named Plaintiffs, like other *au pair* J-1 visa holders, suffered greatly diminished wages from the price fixing scheme.  They are also classic examples of the extreme suffering this program brings when the "sponsors" fail in their obligations to protect these vulnerable workers from exploitative host families.

11.     The named Plaintiffs were recruited in their home countries – Colombia, Australia, Mexico, Germany, and South Africa – by agents of sponsors.  After being

5

accepted into *au pair* programs, the sponsors matched the plaintiffs with families, but kept substantial control and responsibility over their work and pay.  While legally obligated to protect their interests, the sponsors set an illegal wage term in the employment agreements.  When the named Plaintiffs flew to the United States, all but one of their sponsors directed them to attend unpaid training sessions in New York, New Jersey, and Florida before they could begin work.  The wages paid the named Plaintiffs on their face violate Federal law and state law.

12.     The named Plaintiffs' relationships with their sponsors are typical of the experience of all *au pairs*.  The sponsors, under the guise of State Department approval, trade the services of working people as if they were merely commodities without the ability to demand higher wages.  But even the sellers of commodities cannot collude to fix an illegal price.

## NATURE OF THE ACTION

13.     In this action, the named Plaintiffs and those similarly situated seek treble damages, injunctive relief, and other relief from all of the program sponsors for violating state and federal antitrust laws, including Section 1 of the Sherman Act, by fixing *au pair* wages.

14.     The named Plaintiffs, on behalf of themselves and those similarly situated, bring additional claims against sponsors (1) InterExchange, Inc. ("InterExchange"), (2) Cultural Care, Inc. d/b/a Cultural Care Au pair ("Cultural Care"), (3) American Institute For Foreign Study dba Au Pair in America ("Au Pair in America"), (4) GoAuPair Operations LLC dba GoAuPair aka Associates in Cultural Exchange dba GoAuPair fka

American Cultural Exchange, LLC, dba goAuPair (together, "GoAuPair"), (5) AuPairCare Inc., ("AuPairCare") and (6) Expert Group International Inc. dba Expert Aupair ("Expert Au Pair") for violations of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), breach of fiduciary duty, negligent misrepresentation, constructive fraud, and the violation of state consumer protection laws, based on these Defendants' conduct in deceiving *au pairs* and prospective *au pairs* to secure *au pair* employment at an illegal, fixed wage.

15.      In addition, the named Plaintiffs and those similarly situated bring claims under the Fair Labor Standards Act ("FLSA") and state wage laws against InterExchange, Cultural Care, Au Pair in America, GoAuPair, AuPairCare and Expert Au Pair for failing to pay wages and compensation in accordance with applicable state and federal laws.

## JURISDICTION AND VENUE

16.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiffs' related state law claims.

17.      Venue is proper pursuant to 28 U.S.C. § 1391.  All of the sponsors are alleged to have entered into a conspiracy that affected Mmes. Beltran and Mapledoram and similarly situated *au pairs* in the District of Colorado.  Further, the four sponsors named in claims other than the anti-trust claim reside in, do business in, and can sue or be sued in the District of Colorado.  Upon information and belief, other sponsors defendants sponsor *au pairs* in Colorado as well.

## **PARTIES**

18.     Named Plaintiff Johana Paola Beltran is a natural person who currently resides in New Jersey but who performed most of the service contract at issue in this Complaint in Colorado.

19.     Named Plaintiff Lusapho Hlatshaneni is a natural person who currently resides in Cape Town, South Africa but who performed most of the service contract at issue in this Complaint in California.

20.     Named Plaintiff Beaudette Deetlefs is a natural person who currently resides in Cape Town, South Africa but who performed most of the service contract at issue in this Complaint in Utah.

21.     Named Plaintiff Dayanna Paola Cardenas Caicedo is a natural person who currently resides in Pennsylvania.

22.     Named Plaintiff Alexandra Ivette Gonzalez is a natural person who currently resides in Colombia.

23.     Named Plaintiff Sarah Carolina Azuela Rascon is a natural person who currently resides in Wisconsin but who performed most of the service contract at issue in this Complaint in Massachusetts, Maryland, and Virginia.

24.     Named Plaintiff Laura Mejia Jimenez is a natural person who currently resides in New Zealand but who performed most of the service contract at issue in this Complaint in Pennsylvania.

25.       Named Plaintiff Juliane Harning is a natural person who currently resides in Germany but who performed most of the service contract at issue in this Complaint in Virginia.

26.       Named Plaintiff Nicole Mapledoram is a natural person who currently resides in Australia but who performed most of the service contract at issue in this Complaint in Colorado.

27.       Defendant InterExchange, Inc. is a business entity at 161 Sixth Avenue, New York, New York 10013.

28.       Defendant USAuPair, Inc. is a business entity at 252 'A' Avenue, Suite 100, Lake Oswego, Oregon 97034.

29.       Defendant GreatAuPair, LLC is a business entity at 6836 Bee Caves Road, Suite 222, Austin, Texas 78746.

30.       Defendant Expert Group International Inc., dba Expert AuPair is a business entity at 111 Second Avenue NE, Suite 213, St. Petersburg, Florida 33701.

31.       Defendant EurAuPair is a business entity at 250 North Coast Highway, Laguna Beach, California 92651.

32.       Defendant Cultural Homestay International is a business entity at 104 Butterfield Road, San Anselmo, California, 94960.

33.       Defendant Cultural Care, Inc. d/b/a Cultural Care Au pair is a business entity at 8 Education Street, Cambridge, Massachusetts 02141.

34.       Defendant AuPairCare Inc. is a business entity at 600 California Street, Floor 10, San Francisco, California 94108.

35.      Defendant Au pair International, Inc. is a business entity at 4450 Arapahoe Avenue, Suite 100, Boulder, Colorado 80303.

36.      Defendant APF Global Exchange dba AuPair Foundation is a business entity at 205 Keller Street, Suite 204, Petaluma, California 94952.

37.      Defendant American Institute For Foreign Study dba Au Pair in America (hereinafter, "Au Pair in America") is a business entity at 1 High Ridge Park, Stamford, Connecticut 06905.

38.      Defendant Associates in Cultural Exchange dba GoAuPair is a business entity at 200 West Mercer Street, Seattle, Washington 98119.  It is a successor of Defendant American Cultural Exchange, LLC.

39.      Defendant American Cultural Exchange, LLC, dba GoAuPair is a business entity at 151 East 6100 South, Suite 200, Murray, Utah 84107.  It is a predecessor of Associates in Cultural Exchange.

40.      Defendant GoAuPair Operations LLC dba GoAuPair is an affiliate or successor of Associates in Cultural Exchange, dba GoAuPair, which is a successor of American Cultural Exchange, LLC, dba GoAuPair, and they shall hereinafter collectively be referred to as "GoAuPair."

41.      Defendant Agent Au Pair is a business entity at 1450 Sutter Street #526, San Francisco, California 94109.

42.      Defendant A.P.EX. American Professional Exchange, LLC dba ProAuPair is a business entity at 433 Calle Familia, San Clemente, California 92672.

43.     Defendant 20/20 Care Exchange, Inc. dba The International Au pair Exchange is a business entity at 1250 Newell Avenue, Walnut Creek, California 94597.

44.     All Defendants shall hereinafter be referred to collectively as the "Sponsors" or the "Sponsor Defendants."

## STATEMENT OF FACTS

I.     **Background**

   A.     **The J-1 Visa *Au Pair* Program**

45.     The Sponsor Defendants control all *au pair* employment opportunities throughout the United States for foreign nationals seeking *au pair* employment.

46.     *Au pair* employment for foreign nationals is made possible through the J-1 visa *au pair* program.  The J-1 visa *au pair* program is one of several official J-1 visa "cultural exchange" programs overseen and administered by the U.S. Department of State ("State Department").  J-1 visa programs, including the J-1 visa *au pair* program, are carried out under the purported authority of the Mutual Educational and Cultural Exchange Act of 1961, as amended.

47.     The J-1 visa *au pair* program allows foreign nationals between the ages of 18 and 26, with secondary school educations and English proficiency, to work for "host families" as child care workers for no more than 45 hours a week in exchange for room and board and a legal wage.

48.     The State Department facilitates J-1 visa programs by designating entities to act as sponsors.  The Sponsor Defendants comprise all of the currently designated State Department sponsors for the J-1 visa *au pair* program.

49.      The Sponsors are the exclusive entities authorized to recruit and place *au pairs* with host families in the United States.  Under State Department regulations, the Sponsors may not place an *au pair* with a host family unless the host family and the *au pair* have executed a written agreement detailing the *au pair*'s job description, consistent with the rules of the *au pair* program and labor laws.  Any foreign national seeking a position as an *au pair* in the United States must be sponsored by one of the State Department-designated sponsors.

50.      The Sponsors are a mix of for-profit and non-profit entities that generate significant revenue from the program fees paid by host families and *au pairs*.  These companies have tens of millions of dollars in annual revenue from fee-paying families. In 2013, a single sponsor reported holding assets in excess of $30 million.

51.      State Department regulations mandate that Sponsors ensure that *au pairs* are compensated in compliance with labor laws and do not work beyond specified limits. Under these rules, Sponsors must limit the number of hours an *au pair* works to not more than 10 hours per day and not more than 45 hours per week.  They must also ensure that *au pairs* receive a minimum of one and a half days off per week, plus one complete weekend off every month, as well as an additional two weeks of paid vacation. In addition, the Sponsors must ensure that *au pairs* are compensated at a weekly rate in conformance with the requirements of the FLSA as interpreted by the Department of Labor.

### B.      Historical Labor Abuses in the *Au Pair* Program

52.      Sponsors, and those organizations that previously served as sponsors, have long abused their control of the market for foreign *au pair* labor.  They have used their market power, as the sole entities authorized to bring such labor into this country, to fix artificially and illegally low wages for *au pairs*.

### 1.      The Program Began with a Price-Fixing Cartel that Paid Illegal Wages in Contravention of Federal and State Labor Laws.

53.      The J-1 visa *au pair* program began in the United States with two pilot programs administered by the United States Information Agency ("USIA") in January and April of 1986.

54.      The initial program sponsors adopted an *au pair* labor concept that had evolved outside the United States, in a context where federal and state labor laws were inapplicable.  In particular, the initial program sponsors looked to European *au pair* relationships, where a young woman would participate in the family life of a host family while serving as a "mother's helper."  This European model was based on an *au pair* providing 30 hours of service per week, with the payment of a token weekly stipend or pocket money.

55.      The early *au pair* sponsors in the United States adapted the European *au pair* concept, without regard for U.S. domestic labor and antitrust laws.  Their program required *au pairs to* work 45 hours a week, rather than 30 hours, and to provide child care services to host families.

56.      The initial sponsors fixed illegal wages at the very outset of the program. Specifically, the *au pair* program developed by the early sponsors dictated a set payment of one hundred dollars ($100) per week for 45 hours of child care service.

57.      Even with this paltry compensation, sponsors and host families ignored the 45-hour limitation.

**2.      The Program Came Under Nearly Immediate Scrutiny for Early Sponsors' Abuses.**

58.      On February 5, 1990, the General Accounting Office ("GAO") issued a report titled "Inappropriate Uses of Educational and Cultural Exchange Visas" (the "GAO Report"), which sharply criticized the *au pair* program.

59.      The GAO Report stated that the USIA (which at that point still oversaw and administered the *au pair* program), along with the State Department, the Immigration and Naturalization Service ("INS"), and the U.S. Department of Labor ("USDOL" or "Department of Labor"), all concurred that the *au pair* program was, in fact, a "full-time child care work" program.

60.      As noted in the GAO Report, the Department of Labor informed the GAO that *au pairs* working 40 or more hours a week were full-time employees and needed to be treated as such.

**3.      The Government Issued Rules to Require Sponsors to Protect *Au Pairs*' Rights As Employees.**

61.      In December 1994, the USIA conducted a formal rulemaking to issue a rule recognizing *au pairs*' status as employees under the FLSA.  The USIA issued the rulemaking in the wake of the GAO Report and in direct consultation with the Department of Labor, which reiterated its longstanding conclusion that J-1 visa *au pair* participants were full-time employees, entitled to the protections afforded all employees under domestic labor laws, including the FLSA.

14

62.      The USIA issued a final rule in February 1995.  In the preamble to the final rule, the USIA restated its conclusion that *au pairs* are employees:  "The Agency has . . . sought the views and guidance of the Department of Labor on this matter.  The Department of Labor has specifically advised the Agency that an employment relationship is established."

63.      The USIA also recognized the authority of the Department of Labor on this point:  "Because the Department of Labor is the Federal agency entrusted with regulating labor laws, including the definition of employer and employee and determining when an employment relationship is established, it is appropriate to defer to the Department of Labor in this area."

### 4.      The Government Created a Programmatic Wage Floor.

64.      The USIA's final rulemaking at that time required compensation of *au pairs* "at a rate of *not less than* $115.00 per week."  The rule thus set a programmatic wage floor, *i.e.*, a minimum amount for the compensation of *au pairs*.

65.      The USIA derived this floor from its interpretation of USDOL rules, at that time, for room and board credits.  In the preamble to the rulemaking, the USIA reiterated its "opinion that a weekly stipend or wage of *not less than* $115 is consistent with Fair Labor Standards Act requirements governing payment of minimum wage and is appropriate for the present time."

66.      As described further below, the assumptions underlying USIA's calculations as published in 1995 quickly became obsolete.  Federal labor laws allow employers to credit board, lodging, and other facilities costs in calculating a wage, but only where

15

employees voluntarily accept those services.  By February 1997, the Department of Labor had clarified that host families may not deduct the costs of services against minimum wage if *au pair* program regulations required the host families to provide those services.  The *au pair* program regulations require host families to provide *au pairs* with lodging, including a private bedroom.  The February 1997 USDOL opinion -- which was sent to sponsors -- thus prevented host families from continuing to deduct lodging expenses from federal minimum wage.

67.      Soon thereafter, in June 1997, to "ensure that there is no future confusion regarding the payment of minimum wage," the USIA amended the rule to replace a specified programmatic wage floor with a reference to FLSA standards (*i.e.*, "in conformance with the requirements of the Fair Labor Standards Act as interpreted and implemented by the United States Department of Labor.").  That rule remains in force today, codified at 22 C.F.R. § 63.31(j)(1).

68.      Unfortunately, these rules setting a programmatic wage floor for *au pairs* and charging sponsors with FLSA compliance did not end abusive labor practices within the *au pair* program.

> **5.      Abuse of *Au Pairs*' Rights as Employees Continued Under a "Cartel" of Sponsors, Which Fixed Wages at the Programmatic Wage Floor, Irrespective of Federal and State Minimum Wage Laws.**

69.      Notwithstanding the rules, *au pairs*' rights under the FLSA and state wage laws were regularly violated where, for instance, *au pairs* did not receive three meals a day, or where state minimum wages were set higher than the FLSA and were not paid. The USIA noted abuses in its rulemaking of June 27, 1997, which imposed specific

provisions to limit the number of hours *au pairs* were required to work each day, "based upon the Agency's experience that indicates the existing standard is subject to abuse."

70.      Moreover, sponsors, including the Sponsor Defendants, continued to fix wages for *au pairs*.

71.      On March 1, 1995, Joseph Duffey, the Director of USIA, testified before Congress regarding the *au pair* program.  He expressed his view that, "unfortunately," the Sponsors "have a cartel."

72.      That cartel of Sponsors fixed standard *au pair* wages to the programmatic wage floor, despite state and federal labor laws dictating higher wages, changing market conditions, and the Sponsors' open competition for foreign nationals to serve as *au pairs* on terms other than wage amounts.

## II.      THE SPONSOR DEFENDANTS HAVE ILLEGALLY FIXED STANDARD *AU PAIR* WAGES

73.      The Sponsors continue to set *au pair* wages as an illegal cartel, to the detriment of *au pairs* and the relevant labor markets.

### A.      <u>The Sponsors Collectively Control the Market for J-1 Visa Au Pair Employment.</u>

74.      There are substantial barriers to sponsoring and providing *au pairs* to families in the United States.  As of November 2014, the Sponsors were the only entities lawfully permitted to do so because they are the only entities formally designated by the State Department to serve in that function.  Thus, to participate in the J-1 visa *au pair* program, a foreign national must be sponsored by one of the Sponsor Defendants.

75.      The Sponsors comprised 100% of the State Department-designated sponsors of J-1 visa *au pairs* for the United States market in November 2014.  Collectively, the Sponsors had 100% of the market power within the relevant market, including the power jointly to set *au pair* compensation below competitive and legal levels.

76.      The Sponsors compete with one another in attracting *au pairs* to work with them.  The Sponsors generate revenue based, primarily, on the number of *au pairs* they sponsor and place with family employers.  Generally, a greater number of *au pairs* sponsored by a Sponsor Defendant yields greater revenues for that Sponsor Defendant. Accordingly, the Sponsors compete to sponsor and place as many *au pairs* as possible.

77.      Among other things, the Sponsors compete with one another in attracting *au pairs* through marketing efforts, including splashy websites and outreach within foreign nations, and by providing competitive health insurance packages, offering completion bonuses, claiming superior host family experiences, promising personal attention and support, inviting *au pairs* on free weekend trips, and providing sponsored *au pairs* with the ability to win contests such as "Au Pair of the Year" awards.

78.      In a properly functioning and lawfully competitive labor market, Sponsors would also compete for *au pairs* by offering, or facilitating, higher wages to *au pairs* than other Sponsor competitors.

79.      In addition, in a properly functioning and lawfully competitive labor market, *au pair*s would be free to negotiate wages with multiple prospective sponsors and, upon preliminary acceptance in the program, would likewise be free to negotiate wages with multiple prospective family employers.

**B.     The Sponsor Defendants Have Conspired to Fix Standard *Au Pair* Wages.**

80.         As a group, the Sponsors have conspired and agreed to fix all of their sponsored standard *au pairs*' weekly wages at exactly the programmatic wage floor. This fixed weekly rate was and continues to be an artificially depressed wage for standard *au pair* services.  The Sponsors' agreement to fix the standard *au pair* wage constitutes a *per se* violation of antitrust laws.

81.         Of the fifteen (15) current Sponsors, nine (9) offer a single *au pair* position and rate; that rate is set at the programmatic wage floor of $195.75 per week for 45 hours of work.  That comes out to $4.35 per hour.  The remaining six (6) Sponsors offer two or more positions, with a "standard" *au pair* position at the rate of $195.75 per week, and one or more additional positions – termed "professional" or "extraordinary" or the like – at higher rates.  The six Sponsors offer these higher wages for *au pairs* meeting specified criteria, such as two years of child care study plus two years of full-time child care experience; and there are relatively few *au pairs* that obtain employment in these special positions.  Throughout this Complaint, the term "standard *au pair*" refers to those *au pair* positions offered by the nine (9) Sponsors offering a single position at a uniform wage, and those *au pair* positions offered by the remaining six (6) Sponsors for standard *au pair* services.

82.         The vast majority of *au pair* employment opportunities for foreign nationals are for standard *au pair* positions, and the non-standard *au pair* positions have little economic significance on the overall *au pair* market.

1.     **The Sponsors Have Conspired to Set Standard** *Au Pair* **Wages at the Programmatic Wage Floor, Which is Currently $195.75 Per Week.**

83.     Currently, the State Department oversees and administers the J-1 visa *au pair* program.

84.     The Sponsors have conspired to fix standard *au pair* wages at the programmatic wage floor announced by the State Department in its publications.

85.     The most current State Department regulations mandate that Sponsors ensure *au pairs* are "compensated at a weekly rate based upon 45 hours of child care services per week and paid in conformance with the requirements of the Fair Labor Standards Act as interpreted and implemented by the United States Department of Labor."

86.     As of July 24, 2009, a State Department bulletin updated the weekly minimum programmatic wage floor to $195.75 for 45 hours of weekly work.

87.     The Sponsors have conspired to fix standard *au pair* wages at this precise rate.

88.     As a result, Sponsors do not compete for standard *au pairs* through competitive wages.

89.     Indeed, Sponsors recognize that they do not compete for *au pair* labor on wage amounts.

90.     One Sponsor, Cultural Care, has informed prospective *au pairs*, in writing, that the weekly stipend arranged by Cultural Care would be "the same regardless of which au pair agency you use."

91.      Another Sponsor, Cultural Homestay International, has used a slide deck in a marketing presentation to differentiate itself from other Sponsors.  The slide differentiates Sponsors on various points, but never differentiates any Sponsor on the basis of the weekly wage.

92.      It is not possible to differentiate between the Sponsors on the weekly wage amount because, by agreement, they all offer standard *au pairs* positions with host families at the same amount, currently $195.75.

> **2.    Several Sponsors Have Admitted that the Sponsors Collectively Colluded to Set Standard *Au Pair* Wages at that Amount.**

93.      Several Sponsors have admitted to an agreement among all of the Sponsors to keep standard *au pair* wages at exactly $195.75 per week.

94.      They have admitted that:

  i.     Each and every Sponsor conspired to reach an agreement on standard *au pair* wages;

  ii.    In that agreement, all of the Sponsors pegged the weekly wage for their sponsored standard *au pairs* at the published minimum allowable amount of $195.75 per week;

  iii.   The Sponsors agreed to ensure that host families "pay that amount, no more";

  iv.    Maintaining this minimum weekly wage keeps *au pair* labor as a "fixed expense";

  v.     As a result of the Sponsors' collective agreement on fixed wages, "pricing becomes standard across all agencies," "the

stipend is identical across all companies," and "there is no

difference in prices, as far as the stipend goes, between all of

the agencies."

95.       For instance, in a telephone conversation on November 20, 2014, a

representative of one Sponsor Defendant, with the title of "director," admitted that there

was an understanding between all of the Sponsors to pay standard *au pairs* the same

amount.  The Sponsor explained that the government sets a minimum amount, but that

all of the Sponsors then agreed among themselves to pay exactly that minimum

amount.  This Sponsor thus characterized the "stipend paid to the *au pairs*" as a "fixed

expense."  The Sponsor explained that the stipend "is where pricing becomes standard

across all agencies," and that "there is no difference in prices, as far as the stipend

goes, between all of the agencies."

96.       In a separate telephone conversation on November 21, 2014, a

representative of another Sponsor, also with the title of "director," admitted that all of the

Sponsors agreed to set *au pair* wages at $195.75.  Specifically, the Sponsor

acknowledged that each and every Sponsor got together and agreed to pay *au pairs* a

stipend of no more than $195.75 a week.  As the representative added, the Sponsors

"all agreed to pay that amount, no more."

97.       In yet another telephone conversation on November 21, 2014, a

representative of yet another Sponsor, again with a "director" title, explained why "the

stipend is identical across all companies."  The representative admitted that the

Sponsors all agreed to pay that exact same minimum rate.  As the Sponsor noted, "[e]verybody agrees" to pay *au pairs* no more than the minimum weekly wage.

### 3. The Sponsors Uniformly Advertise Standard *Au Pair* Wages at the Identical Amount.

98.     Consistent with their agreement to set standard *au pair* wages at $195.75 per week, all of the Sponsors have advertised standard *au pair* wages at $195.75 per week, as set in the following paragraphs.

#### a.     InterExchange

99.     As of November 2014, InterExchange's website included the following table, advertising standard *au pair* employment for $195.75 per week:

| Description | 2014 Costs | Payment Due |
|---|---|---|
| Au Pair Stipend | $195.75 per week for 51 weeks | Each week, on a day that you and your au pair agree upon |

#### b.     Cultural Care

100.     As of November 2014, Cultural Care's website included the following text, advertising standard *au pair* employment for $195.75 per week: "Paid to your au pair – **Weekly stipend: $195.75**."

#### c.     Au Pair in America

101.     As of November 2014, Au Pair in America's website included the following table, advertising standard *au pair* employment for $195.75 per week:

| | Au Pair | Extraordinaire | Educare |
|---|---|---|---|
| Match Fee | $400 | $400 | $400 |

|  | Au Pair | Extraordinaire | Educare |
|---|---|---|---|
| Program Fee Annual | $8,245 | $9,375 | $7,065 |
| Weekly Stipend* Paid weekly/51 weeks | $195.75** | $250** | $146.81** |
| **Average weekly cost** | **$ 365 (45hrs of weekly care)** | **$ 442 (45hrs of weekly care)** | **$ 293 (30hrs of weekly care)** |

### d.    GoAuPair

102.    As of November 2014, GoAuPair's website included the following table, advertising standard *au pair* employment for $195.75 per week:

| **Fees Paid to Au Pair** | |
|---|---|
| **Weekly Stipend** | **$195.75** |
| The <u>weekly stipend</u> is the term for the wages paid to the Au Pair by the Host family | |
| **Education Contribution** | **$500** |
| The <u>education contribution</u> is the contribution amount paid to the Au Pair by the Host Family and required by Department of State regulations | |
| **Other Fees** | **Varies** |
| <u>Learn more</u> about other fees that may occur | |

### e.    USAuPair

103.    As of November 2014, USAuPair, Inc.'s website included the following table, advertising standard *au pair* employment for $195.75 per week.:

|  | Families | New Families Transferring[1] | Repeat Families[2] |
|---|---|---|---|
| Weekly Stipend for 51 weeks[3] | $ 195.75 | $ 195.75 | $ 195.75 |

### f.    GreatAuPair

104.    As of November 2014, GreatAuPair, LLC's website included the following table, advertising standard *au pair* employment for $195.75 per week:

**Paid to Your Au Pair**

| Au Pair Stipend | $195.75/wk | Paid per week for 52 weeks ($10,179) |
|---|---|---|

### g.    Expert AuPair

105.    As of November 2014, Expert Group International Inc., dba Expert AuPair's website included the following table, advertising standard *au pair* employment for $195.75 per week:

| ITEM | COST | DUE |
|---|---|---|
| Pay | Regular: $10,179 ($195.75* X 52 weeks)<br><br>Educare: $7,634.12 ($146.81* X 52 weeks) | Due according to contract |

25

### h.   EurAuPair

106.    As of November 2014, EurAuPair Intercultural Child Care Programs' website included the following table, advertising standard *au pair* employment for $195.75 per week:

|  | Regular | Par Expérience |
|---|---|---|
| **Au Pair Weekly Stipend\*\*** | $195.75 | $250 |

### i.   Cultural Homestay

107.    As of November 2014, Cultural Homestay International's website included the following text, advertising standard *au pair* employment for $195.75 per week:

> **Additional costs**: In addition to the program fee, additional costs required by the U.S. Department of State and CHI Au Pair USA include the *au pair's*: Weekly stipend of $195.75

### j.   AuPairCare

108.    As of November 2014, AuPairCare Inc.'s website included the following table, advertising standard *au pair* employment for $195.75 per week:

| **Au Pair Stipend** |
|---|

| $195.75 / week | Paid weekly to your au pair for 51 weeks |
|---|---|

### k.      Au Pair International

109.      As of November 2014, Au pair International, Inc.'s website included the following table, advertising standard *au pair* employment for $195.75 per week:

|  | Standard Au Pair andInfant Specialized Au Pair | Au Pair Professional | Pre Selected Au Pair |
|---|---|---|---|
| **Weekly Stipend **** | $195.75 | $225 | $195.75 |
| **Average cost for 45 hours of customized care** | $324/week $7.20/hour | $369/week $8.20/hour | $310/week $6.90/hour |

*\*\*Paid directly to au pair weekly*

### l.      APF Global Exchange

110.      As of November 2014, APF Global Exchange, NFP's website included the following text, advertising standard *au pair* employment for $195.75 per week:

STANDARD AU PAIR

Description:

A Standard Au Pair provides up to 45 hours of experienced childcare per week for children over the age of 2 years. A Standard Au Pair has

27

at least 200 hours of documented childcare experience with children over the age 2.

Educational Component:

A Standard Au Pair studies at least 6 semester units at an accredited, post-secondary institution. The Host Family contributes up to $500 toward the *Au pair's* educational expenses.

**Weekly stipend: $195.75**

**m.    Agent Au Pair**

111.    As of November 2014, Agent *Au pair's* website included the following table, advertising standard *au pair* employment for $195.75 per week:

| Program Fees | | | |
|---|---|---|---|
| **Fee Type** | **Standard**<br>**Au Pair** | **Infant Qualified**<br>**Au Pair** | **Repeat Families** |
| Application Fee | ~~$300.00~~  *WAIVED* | ~~$300.00~~ *WAIVED* | $0 |
| Program Fee | $7,400.00 | $7,400.00 | $7,050.00 |
| Weekly Stipend (paid to au pair) | $195.75 | $195.75 | $195.75 |
| Average Weekly Cost | $340.00 | $340.00 | $340.00 |
| Education Allowance | Up to $500 | Up to $500 | Up to $500 |
| Domestic Transportation<br><br>($0 for Bay Area families) | Varies by State | Varies by State | Varies by State |

**n.    ProAuPair**

112.    As of November 2014, A.P.EX. American Professional Exchange, LLC dba ProAuPair's website included the following text, advertising standard *au pair* employment for $195.75 per week:  "You receive:  Pocket Money: . . . Regular Au Pair - $195.75 per week."

o.      **The International Au Pair Exchange**

113.      As of November 2014, 20/20 Care Exchange, Inc. dba The International Au pair Exchange's website included the following text, advertising standard *au pair* employment for $195.75 per week:  "Weekly Stipend $195.75 paid directly to the au pair."

114.      In addition to the rates posted prominently on the Sponsors' websites, the Sponsors have also advertised the $195.75 rate to *au pairs* in other publications and promotional materials.

115.      For example, InterExchange advertises the wage of $195.75 to *au pairs* and prospective *au pairs* on its blog entitled "blog.foraupairs.org."  On that blog, InterExchange informs prospective *au pairs* that "[a]ll *au pairs* earn a weekly stipend of $195.75 per week," and that "[i]t seems like a strange number, but there is a strict equation used to arrive at that amount."

116.      Likewise, Au Pair in America advertises, on a website entitled "Benefits of Being an Au Pair," that "an Au Pair in America [will] earn a weekly stipend of $195.75." Au Pair in America also advertises, on foreign sites: "You get: US$195.75 / approx. US$9990 per year."

117.      Similarly, Expert *Au pair's* services advertised on the website "Under 31," state that its program "offer[s] *au pairs* a weekly salary of US$195.75 . . . in exchange for 45 hours of child care per week for their host family."  Expert Au Pair also advertises the $195.75 rate to host families.  On its website, it holds out the cost of the "au pair option" as "around $320 per week."  And through Craigslist posts, it advertises

"approximately 330$/week for 52 weeks and . . . 45 hours of childcare weekly."  After deducting the set fees advertised by Expert Au Pair, the advertised costs of $320-330 per week correspond with Expert *Au pair's* set weekly wage of $195.75 for *au pairs*.

> **4.    The Sponsors Have Maintained the Fixed Standard *Au Pair* Wage, Despite Illegality and Differences in Market Conditions.**

118.    The Sponsors' collusive agreement is further evidenced by, among other things, the uniform ratcheting up of this agreed weekly wage rate each time the announced programmatic wage floor increased.

119.    The Sponsors' collusive agreement is also evidenced by the fact that their fixed wage of $4.35 per hour is an illegal wage under the FLSA in most circumstances, as further described below.

120.    The Sponsors' collusive agreement is also evidenced by the Sponsors' insistence on a standard *au pair* wage of $195.75 per week throughout various states and localities, even where that wage violates applicable state and local minimum wage laws.

121.    The Sponsors' collusive agreement is evidenced as well by the Sponsors' maintenance of a fixed standard *au pair* wage of $195.75 per week across the United States, where the costs of alternative childcare arrangements differ significantly.  For instance, the Sponsors' collusion causes an *au pair* in Maine to receive the same weekly pay as an *au pair* in Manhattan.

122.    The Sponsors' collusive agreement is further evidenced by their maintenance of a fixed standard *au pair* wage of $195.75 per week across host families, regardless of the number of children within the family requiring care from the *au pair*.  Thus, the

Sponsors' collusion causes an *au pair* responsible for one child to receive the same weekly pay as an *au pair* responsible for five children.

123.    Moreover, this collusion is apparent in the failure of the Sponsors to adjust their standard *au pair* wages in changing market conditions.

### 5.    The Sponsors Have Had the Means, Opportunity, and Motive to Conspire to Fix Standard *Au Pair* Wages.

124.    The Sponsors have had the means, opportunity, and motive to conspire to fix standard *au pair* wages.

125.    Sponsors recognize that *au pairs* seek out their positions not only to earn a wage, but also to experience life in the United States on a J-1 visa.

126.    The *au pairs*' dual interest in compensation and entry into the United States means that *au pairs* do not view other opportunities for employment (*e.g.*, in their home country) as interchangeable with employment as J-1 visa *au pairs* in the United States.

127.    Sponsors accordingly understand that *au pairs* would not readily abandon an opportunity to be employed as J-1 visa *au pairs* in the United States.  Consequently, in a cartel among Sponsors fixing *au pair* wages, Sponsors are relatively unconstrained in setting those wages.

128.    The Sponsors have numerous opportunities to conspire and fix wages.

129.    For instance, Sponsor Defendants InterExchange, GreatAuPair, LLC, Expert AuPair, EurAuPair, Cultural Homestay International, Cultural Care, AuPairCare Inc., APF Global Exchange, Au Pair in America, American Cultural Exchange, Agent Au Pair, and GoAuPair are members of an association called the Alliance for International Education and Cultural Exchange (the "Alliance").

31

130.    Likewise, Sponsor Defendants InterExchange, EurAuPair, Cultural Homestay International, Cultural Care, AuPair International, AuPairCare Inc., APF Global Exchange, GoAuPair, and ProAuPair are members of an association called the International Au Pair Association ("IAPA").

131.    According to IAPA's website, individuals within InterExchange and Cultural Care have held two of the four IAPA board seats.

132.    Both the Alliance and the IAPA hold events where Sponsor members have the opportunity to meet, conspire, and agree to fix wages.  The Sponsors' membership in the Alliance and the IAPA – both legal organizations – provides the Sponsors with an opportunity to fix illegal *au pair* wages in a setting that would be difficult for authorities to detect.

133.    In 2014, the featured speaker at the IAPA annual conference has published an article arguing for strict maintenance of a fixed $195.75 weekly wage for standard *au pairs*.  Her publication states that "host families do each other a disservice when they start to compete with each other (or try to stand out as a 'better family') by offering more pocket money.  We don't want *au pairs* to be 'shopping' for a higher stipend."

134.    In addition to their various opportunities to fix wages, the Sponsors have a clear motive to do so.

135.    By fixing wages, the Sponsors collectively ensure that employer families are presented with *au pairs* at the lowest price claimed as permitted by federal law.  This benefits Sponsors in at least two ways: (1) by allowing the Sponsors to increase the portion of the overall costs to host families that are comprised of Sponsors' fees without

increasing overall costs to host families, and (2) by increasing the affordability of *au pair* arrangements for host families, and thus expanding the number of potential host families.  Both of these results increase Sponsors' profits, at the expense of *au pairs*.

136.     Beyond their opportunities and incentives to fix wages, the Sponsors are well situated to coordinate wage fixing and monitor each other to determine if any Sponsor is undercutting the cartel's fixed standard *au pair* wage.

137.     The Sponsors' industry structure inherently facilitates collusion.  The Sponsors comprise 100% of the relevant labor market.  As a relatively small group, with 100% market share, the Sponsors are able to easily and simply agree on prices and police against cheating, without the need to create elaborate mechanisms.

138.     Moreover, Sponsors advertise their standard *au pair* wages online, which allows other Sponsors to easily monitor maintenance of the fixed wage.

139.     Sponsors also treat standard *au pairs* as fungible, which further facilitates the Sponsors' ability to set, maintain, and monitor the fixed wage.

140.     Sponsors, in addition, control wages paid by host families to *au pairs*.  The Sponsors dictate wages to *au pair* family employers, and families agree to pay the fixed wages to *au pairs*.  By exercising this control over host families, Sponsors can ensure uniformity in the wage set by the Sponsors' cartel.

141.     As an example, InterExchange sets the $195.75 weekly wage in contractual arrangements between itself, host families, and *au pairs*.  For instance, the InterExchange Au Pair USA Extension Program Application requires signatures from *au*

pairs and host families.  Page 5 of the application requires the host family to agree to "the rate of $195.75 per week."

142.     As another example, GoAuPair has created a handbook, entitled "GoAuPair Au Pair Household Handbook," for GoAuPair host families to use in instructing *au pairs* on rules and expectations.  The handbook states that *au pair* wages are set by the "US Government," currently at $195.75 per week.

### 6. The Sponsors Have Used Deception as One Means of Maintaining Fixed Standard *Au Pair* Wages.

143.     The Sponsors have used deception to maintain their price-fixing scheme.

144.     Among other things, Sponsors have falsely informed *au pairs* that the $195.75 programmatic wage floor is a maximum wage or a wage fixed by the government.

145.     This Complaint details below false statements made by InterExchange, Cultural Care, and Au Pair in America to deceive *au pairs* and prospective *au pairs* into believing that the programmatic wage floor is a maximum or mandated wage.

146.     In addition, AuPairCare tells *au pairs* that any wage beyond $195.75 a week is illegal.  In a discussion about suspicious and potentially illegal acts, such as host families asking *au pairs* to open bank accounts for them, AuPairCare informs *au pairs*: "Legitimate host families will also not offer you a higher stipend than what is listed in the regulations published by the U.S. Department of State for the Au Pair Program."  The message continues:  "There's no need to be overly alarmed regarding this message. Just be aware and cautious."

147.     AuPairCare knows that its statements are false.  AuPairCare previously offered non-standard *au pair* rates above the programmatic wage floor.  It could not have offered those rates if the State Department published programmatic wage floor was, in fact, a maximum or mandated wage.

**C.     The Sponsor Defendants' Conspiracy Has Damaged and/or Continues to Damage Plaintiffs and All Those Similarly Situated.**

148.     By acting as a cartel and illegally fixing *au pair* wages, the Sponsors eliminated competition for *au pair* labor.

149.     The Sponsors' collusive activity had and has the effect of restraining trade in that *au pairs* are not able to negotiate their wage rates above the weekly stipend set by their Sponsors.  The artificially depressed wages set by the Sponsors damaged the Named Plaintiffs and those similarly situated.

150.     In a properly functioning and lawfully competitive labor market, Sponsors would compete for *au pairs* by offering, or facilitating, higher wages to *au pairs* than other Sponsor competitors.  In addition, *au pair*s would be free to negotiate wages with multiple prospective sponsors and, upon preliminary acceptance in the program, would likewise be free to negotiate wages with multiple prospective family employers.

151.     But for the collusion among Sponsors, *au pair* wages in a functioning and lawfully competitive labor market would be at or near the prevailing wages for workers doing similar work, *e.g.* educated, trained, live-in nannies.  As further evidence of the impact of the restraint of trade, Defendants' websites tout that the prevailing nanny wage is several times higher than their illegally price fixed *au pair* wage.

152.     As further evidence of the impact of the restraint of trade, Defendants' websites boast that, unlike other childcare arrangements, *au pairs* do not get paid more than the illegally fixed wage regardless of how many children are being cared for.  Many Sponsors' websites tout that the costs are fixed, regardless of the number of children in a host family.

153.     The price-fixing agreement has had the effect of suppressing competition for the compensation of J-1 visa *au pairs*.

154.     The restraint of trade affects interstate commerce by artificially depressing wages for the *au pairs* and other domestic workers across the United States.

III.     **INTEREXCHANGE, CULTURAL CARE, AND AU PAIR IN AMERICA HAVE DECEIVED STANDARD *AU PAIRS* TO INDUCE THEM TO ACCEPT ILLEGAL WAGES.**

   A.     **InterExchange, Cultural Care, Au Pair in America, and AuPairCare Have Falsely Informed *Au Pairs* That They Are Not Entitled, by Law, to Any Amount Beyond $195.75 Per Week.**

      1.     **The State Department's Posted Minimum Wage of $195.75 Represents a Programmatic Wage Floor, Not a Maximum or Government-Fixed Amount.**

155.     The advertised weekly wage of $195.75, as promoted by each Sponsor for standard *au pairs*, is not compelled by law.

156.     Rather, the current $195.75 weekly minimum wage amount is simply a programmatic wage floor.

157.     The Government has made clear that, consistent with the FLSA, the current $195.75 weekly stipend amount is a programmatic wage floor, *i.e.*, a minimum.

158.     The State Department's J-1 website states that host families are required to "[p]ay a weekly *minimum* stipend."

159.     The State Department's website is a virtual front door to the J-1 visa *au pair* program.  The fact that the $195.75 represents a minimum weekly stipend is posted on that virtual front door.

160.     The USIA, which oversaw the J-1 visa *au pair* program before the State Department took over, was just as clear.  The USIA's original rule mandated wages "at a rate of *not less than* $115.00 per week."

161.     Following increases in federal minimum wage effective October 1996 and September 1997, the USIA informed sponsors of increases in the minimum weekly compensation of *au pairs*.

162.     The USIA amended its original rulemaking in June 1997 to create the current rule.  That rule mandates that sponsors ensure *au pairs* are paid "in conformance with the requirements of the Fair Labor Standards Act as interpreted and implemented by the United States Department of Labor."

163.     In February 1997, USDOL had issued an opinion letter labeling the stipend a "minimum wage" and referring to host families' "minimum wage obligations" in paying *au pairs*.

164.     In August 1997, USDOL issued another opinion letter reiterating that the *au pair* minimum wage referenced within the *au* pair program regulations constituted a programmatic wage floor.

165.     The USIA and the State Department consolidated in 1999, and the State Department assumed the administration and oversight responsibilities for the J-1 visa *au pair* program.

166.     Before the consolidation, from approximately March 1997 through September 1999, the USIA website posted a document entitled "Fact Sheet: Au Pair Stipend." The document informed sponsors and host families that the minimum FLSA stipend calculation, then $128.25 per week, was a "*minimum* weekly stipend."

167.     Subsequent State Department rulemakings have never departed from the original rule.

168.     In 2002, the State Department's Educational and Cultural Affairs Bureau issued a notice entitled "Weekly Wage Due to Au Pair Program Participants." The notice stated that USDOL has "sole jurisdiction regarding matters of minimum wage." The notice reiterated that "the wage given an Au Pair must conform to minimum wage law and adjustments."

169.     These rules, statements, and notices are consistent with the State Department's current J-1 visa website, which states that the published minimum rate is simply a "weekly minimum stipend."

### 2. The Sponsors All Know that the Published Federal Minimum Weekly Wage of $195.75 Is Simply a Programmatic Wage Floor.

170.     The Sponsors all know that the published programmatic wage floor is simply a floor.

171.     The Sponsors all have access to the government materials referenced above, which make clear that the published programmatic wage floor is a floor.

172.     The Sponsors all have access to their competitors' websites and public marketing materials.

173.     On their websites and in their marketing materials, certain Sponsors have acknowledged that $195.75 per week is merely a programmatic wage floor.  For instance, Expert AuPair notes on its website that $195.75 per week is "the minimum required."

174.     Au Pair in America and five other Sponsors have also openly advertised on their websites extraordinary wages for certain *au pair* positions.  In offering these relatively rare higher rates, these Sponsors necessarily recognized that the State Department's published weekly wage requirement reflects merely a programmatic wage floor.

175.     In addition to the six Sponsors that currently advertise extraordinary wages for certain *au pair* positions, at least two other Sponsors previously offered rates above the fixed standard *au pair* rate for certain positions.

176.     In particular, InterExchange previously offered non-standard *au pair* positions at higher wage rates.

177.     Those Sponsors that have not offered any non-standard rates are, nevertheless, aware that their competitors offer these special positions at rates above $195.75.  They thus also recognize that, by law and in practice, $195.75 is merely a programmatic wage floor.

178.     An *au pair* sponsor association, to which Cultural Care belongs, has republished material on its website advising that State Department rules require "a weekly salary of *at least* $195.75."

179.     In addition, each of these Sponsors has acknowledged that the State Department published wage is merely a programmatic wage floor, including as detailed below.

a.     InterExchange

180.     In the past, InterExchange has advertised and offered *au pair* positions at wages higher than the amount published by the State Department.

181.     In so doing, InterExchange has acknowledged that the State Department published amount represents merely a programmatic wage floor, not a set or maximum wage.

182.     In addition, InterExchange admits on its website, as of April 19, 2016, that the weekly stipend is "a minimum of $195.75."

183.     In doing the above, InterExchange has acknowledged that the State Department published amount represents merely a programmatic wage floor, not a set or maximum wage.

184.     Notably, prior to the commencement of this suit, InterExchange's website did not characterize the stipend as a minimum on its website.

b.     Cultural Care

185.     Cultural Care admits in its tax advice to host families that "[s]ome families choose to pay more than the required $195.75 stipend" and that "many families choose to increase the stipend during an extension year."

186.     At a regional meeting conducted in 2012, a speaker addressed the *au pair* program's "biggest myths and urban legends," and the second myth covered in her presentation was whether it is "acceptable for a host family to pay their au pair more than $195.75/week: True."

187.     In so doing, Cultural Care has acknowledged that the State Department published amount represents merely a programmatic wage floor, not a set or maximum wage.

### c.     Au Pair in America

188.     Au Pair in America currently offers non-standard *au pair* positions at rates higher than $195.75 a week.

189.     In addition, Au Pair in America admits on its website, as of March 1, 2015, that "$195.75" is the "minimum weekly stipend."

190.     In doing the above, Au Pair in America has acknowledged that the State Department published amount represents merely a programmatic wage floor, not a set or maximum wage.

191.     Notably, prior to the commencement of this suit, Au Pair in America's website did not characterize the stipend as a minimum on its website.

### d.     AuPairCare

41

192.   In its form contract with its *au pairs*, AuPairCare acknowledges that in 1994 the USDOL determined that "the au pair stipend constitutes 'wages' because an employer-employee relationship exists between the au pair and the Host Family."

193.   Moreover, AuPairCare has acknowledged in the course of this litigation that *au pairs* can be paid more than the stipend, admitting that "[t]he Department of Labor has determined there is an employer/employee relationship between the host families (not the sponsors) and the *au pairs*, and thus the stipend paid to an au pair must conform to the 'requirements of the Fair Labor Standards Act as interpreted and implemented by the United States Department of Labor;'" "that host families are free to pay more than the designated amount;" and has citied with approval decisions by host families to minimally depart from the  $195.75 amount.  ECF Docs. ## 84, 135.

**3.     Yet, These Sponsors Have Falsely Informed *Au Pairs* and Host Families that the State Department Published Amount is a Fixed or Maximum Amount.**

194.   Despite understanding that $195.75 is a programmatic wage floor, InterExchange, Cultural Care, Au Pair in America, and AuPairCare have instructed host families to pay that amount, and no more, and have falsely informed foreign nationals seeking *au pair* employment and host families seeking to employ *au pairs* that the programmatic wage floor is a fixed or maximum wage.

195.     InterExchange, Cultural Care, Au Pair in America, and AuPairCare have made these false and misleading statements to ensure that host families employ *au pairs* at reduced and illegal wages, ultimately to increase their own profits.

**a.     InterExchange**

196.     InterExchange has deceptively advised *au pairs* and prospective *au pairs* that any offer for a weekly wage above $195.75 should be considered bogus.

197.     For instance, in a blog entry posted on May 21, 2014, InterExchange warned prospective *au pairs*:  "don't let your excitement cloud your good judgment. . . . .Scams and frauds involve many techniques.  For an example, a scammer may pretend to be an au pair agency like InterExchange, or a host family that saw your profile online.  . . . They may make you offers that sound amazing, like paying you more than the program amount of $195.75 per week."

198.     InterExchange has since modified its warning to *au pair* that scammers "may make you offers that sound amazing, like paying you **much more** than the **minimum** program amount of $195.75 per week." (emphasis added to show revision).

199.     InterExchange further deceived *au pairs* and prospective *au pairs* by manufacturing an explanation for the $195.75 weekly wage paid to InterExchange *au pairs*.

200.     For example, in a blog entry posted on January 22, 2014, InterExchange falsely informed *au pairs* and prospective *au pairs* that the $195.75 number was the result of a "strict equation" based on "subtracting 40% room and board":

43

All *au pairs* earn a weekly stipend of $195.75 per week – this is a number determined by the U.S. State Department.  You may be wondering, "Why 195.75 per week?"  It seems like a strange number, but there is a strict equation used to arrive at this amount.  The stipend is calculated by multiplying the Federal Minimum Wage by the maximum number of hours worked per week, then subtracting 40% for room and board.

Here's how the stipend is calculated:

Federal Minimum Wage: **$7.25** x Maximum hours worked per week: **45** = $326.25 minus Room and board credit of **40%** ($130.50) = $195.75

201.    Contrary to InterExchange's misrepresentation, the calculation of federal minimum wages due to *au pairs* nowhere incorporates a credit based on 40% of room and board.

202.    InterExchange made these misrepresentations to deceive *au pairs* and prospective *au pairs* into believing that the $195.75 wage was legal, appropriate, and mandated by law, when the opposite was true.

**b.    Cultural Care**

203.    Cultural Care has informed prospective and current *au pairs* that the weekly stipend is fixed.

204.    For instance, in its marketing materials, it tells prospective host families "all *au pairs* make the same weekly stipend of $195.75."

205.    Cultural Care has informed prospective and current *au pairs* that the weekly stipend is set by the Department of Labor, when in fact the Department of Labor has

never ruled that the State Department programmatic floor could be legal under the FLSA.

206.       For example, in information sessions, Cultural Care informed prospective *au pairs* that their wage would be $195.75 per week.

207.       In addition, Cultural Care has informed prospective and current *au pairs* the weekly stipend of $195.75 per week, as provided by Cultural Care host families, would be "the same regardless of which au pair agency you use."

208.       Likewise, in its public filings in this case, Cultural Care has maintained that $195.75 is the maximum amount permitted to be paid to any J-1 *au pair*.

### c.       Au Pair in America

209.       Similarly, Au Pair in America has informed *au pairs* that they may not accept more than a stipend of $195.75 a week from their families.

210.       Au Pair in America has threated *au pairs* that, if they accept more money from host families, the *au pairs* could be subject to deportation.

211.       Moreover, prior to the commencement of this lawsuit, Au Pair in America's website listed the "weekly stipend" as simply $195.75 and instructed host families that they needed to "pay th[at] published fee."

### d.       AuPairCare

212.       Despite knowing that paying *au pairs* more than $195.75 is lawful, AuPairCare warns *au pairs* on its website "[l]egitimate host families will also not offer you a higher stipend than what is listed in the regulations published by the U.S. Department of State for the Au Pair Program."

213.   In its contract with its *au pairs*, AuPairCare fixes au pair wages at precisely the $195.75 amount with this contract term: "Au Pair will receive a weekly stipend in accordance with the U.S. Department of State Regulations in the amount of $195.75."

214.   Moreover, on its website (at least as of the filing of the First Amended Complaint in this action), AuPairCare advertised to families and *au pairs* that the "Au Pair Stipend" is exactly $195.75 per week.

**B.    In Deceiving *Au Pairs*, InterExchange, Cultural Care, Au Pair in America, and AuPairCare Have Operated Through Patterns of Racketeering Activity That Have Injured Plaintiffs and Those Similarly Situated.**

**1.    The Enterprises**

215.   InterExchange, Cultural Care, Au Pair in America, and AuPairCare have each formed an association-in-fact between itself, its agents, and its customer host families.

216.   Each of these Sponsors has entered into contractual relationships with the host families, in which the host families compensate the Sponsor for sponsoring *au pairs* to work for the host families.  The host families for each Sponsor have no contractual relationships among themselves.

217.   Under State Department regulations, each Sponsor has an obligation to monitor the relationship between each sponsored *au pair* and each host family.

218.   The contractual and regulatory relationships between InterExchange, Cultural Care, Au Pair in America, and AuPairCare their agents, and their scores of host families form, for each such defendant, an association-in-fact (the "Enterprise").

219.     The purpose of each Enterprise is the sponsorship and employment of *au pairs*.  Without the Sponsors' sponsorship of *au pairs*, the host families would be unable to employ foreign national *au pairs*.  Without the host families' employment of *au pairs*, the Sponsors would be unable to sponsor foreign national *au pairs*.  The Enterprise is thus necessary for both the sponsorship and employment of *au pairs*.

220.     These Enterprises have existed since the State Department first designated each Sponsor as an *au pair* program sponsor.  The Enterprises have existed, and continue to exist, to permit the enterprises to achieve their purposes of sponsoring and employing *au pairs*.

221.     These Enterprises, by sponsoring foreign national *au pairs* to enter the United States, and by employing *au pairs* through the United States, have an effect on interstate and foreign commerce.

### 2.     Association

222.     InterExchange, Cultural Care, Au Pair in America, and AuPairCare are each associated with a respective Enterprise consisting of itself, its agents, and its host families.  Each of these Sponsor Defendants is the lynchpin of its respective Enterprise; while each Enterprise could continue without any particular host family, each Enterprise requires the sponsorship of each such Defendant.

223.     As explained below, InterExchange, Cultural Care, Au Pair in America, and AuPairCare each engaged in their respective Enterprise's racketeering activities.

### 3.     Participation

224.     InterExchange, Cultural Care, Au Pair in America, and AuPairCare participated directly in the conduct of the affairs of their own Enterprises.  Among other acts of participation, each such Sponsor recruited, engaged, and sponsored *au pairs* to be employed with host families within its respective Enterprise.

225.     As explained below, each such Sponsor further participated directly in the conduct of the affairs of its respective Enterprise through a pattern of racketeering activity.

### 4.     Pattern of Racketeering Activity

226.     InterExchange, Cultural Care, Au Pair in America, and AuPairCare engaged in a pattern of racketeering activity by committing multiple, continuing, and related acts of fraud for the benefit of their respective Enterprises over a period of years.

227.     Among other things, each such Sponsor Defendant has engaged in schemes and artifices to defraud *au pairs* and prospective *au pairs*, through multiple fraudulent acts intended to deprive *au pairs* and prospective *au pairs* of wages, including by using electronic communications, such as internet publications, and by recruiting *au pairs* abroad by using materially false statements.

228.     As described above and in further detail in sections that follow, each such Sponsor Defendant has lied to *au pairs* and prospective *au pairs* about the weekly stipend the Sponsor Defendants arranged for standard *au pairs* to be paid.

229.     In particular, the Sponsors have repeatedly and intentionally deceived *au pairs* and prospective *au pairs* by wrongfully informing them that standard *au pair* wages were non-negotiable and fixed at $195.75 per week.  Each such Sponsor knew that *au*

*pair* wages are negotiable and that the figure of $195.75 per week represents a programmatic wage floor.

230.     These Sponsors also lied to *au pairs* by pretending that state and local minimum wage laws were inapplicable.  As described in greater detail in this Complaint, the minimum wage laws of various states and localities required these Sponsors to pay well beyond $195.75 per week, which is just $4.35 per hour.  Despite these requirements, the Sponsors falsely claimed that *au pairs* were entitled to $195.75 per week, and no more.

231.     The Sponsors lied to *au pairs* and prospective *au pairs* in order to sponsor them, and for their host families to employ them, as *au pairs* earning just $195.75 per week, without any negotiation by the *au pairs*.

## 5.     These Actions Have Injured *Au Pairs*

232.     By conducting their respective Enterprises through patterns of racketeering, InterExchange, Cultural Care, Au Pair in America, and AuPairCare have injured the *au pairs* they have sponsored who were or are employed by the host families comprising each Sponsor's Enterprise.

233.     Among other things, each of these Sponsors' actions have caused the *au pairs* employed by each Sponsor to suffer loss of past, current, and prospective wages.

## C.     In Deceiving and/or Misleading *Au Pairs*, InterExchange, Cultural Care, GoAuPair, Au Pair in America, AuPairCare and Expert Au Pair Breached Fiduciary Duties to, Made Negligent Misrepresentations to, and/or Engaged in Constructive Fraud Against *Au Pairs*.

234.     The Sponsors engaged *au pairs* in a special relationship where they essentially, for a fee, held themselves out as the *au pairs'* protectors.  The Sponsors

sought out the Plaintiffs and those similarly situated for employment as *au pairs*, claimed to have special knowledge regarding U.S. labor laws and took on a paternalistic role by claiming to look out for the plaintiffs.

> **1.      The Sponsors Have Known That $4.35 per Hour is Not a Legal Wage.**

235.      The Sponsors were legally responsible for training the *au pairs* for their employment and protecting their rights under State Department rules in 22 C.F.R. § 62.31 and as otherwise promised to the *au pairs* in the recruiting materials, agreements, and training.

236.      In the course of their business the Sponsors told the *au pairs* that a law existed that set the wage at $195.75 and by implication that this wage was legal.  They did this because they wanted the *au pairs* to sign up with the understanding that they could not find a better deal, and that they did not have the ability to ask for more money from the sponsors or the families.  The Sponsors knew this to be false, or negligently failed to examine whether it was true or false.

237.      The Sponsors purported to be in a position to protect the legal rights of the *au pairs*, and in fact acted as the arbitrators of any disputes about wages and hours with the ability to remove *au pairs* from the program and cause their removal from the country.

238.      In doing this, the Sponsors purported to have superior knowledge and in fact specialized information of the law of *au pair* wages than the young foreign *au pairs*.  The *au pairs* had a markedly inferior ability to know the laws because they were foreigners

with no concept of the U.S. federal system and no reason to think that the Sponsors would all say the same misstatement of the law.

239.     Because the Sponsors knew that the $195.75 was a just programmatic floor, they must have known that, just like with all employees, Federal and State minimum wage laws could require higher minimum wages for 45 hours of work.

240.     The Sponsors had a duty to know that all recruitment costs, security deposits, and any other expenses the *au pairs* incurred for the benefit of the employer had to be paid back to prevent the first week's wage from falling below the minimum wage.

241.     Since the contractual wage was only $4.35, the only way it could ever satisfy State and Federal minimum wages is if it were accompanied by legal wage credits for furnished facilities.  The Sponsors never explain this to *au pairs*.

242.     The Sponsors or their predecessors in interest that existed in 1997 received a copy of the February 28, 1997 ruling by the U.S. Department of Labor that specifically explained that credits for facilities toward minimum wage could not include expenses that the sponsors were required by law to provide.

243.     The State Department echoed this ruling in the guidance the State Department issued pursuant to a congressional mandate in the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008.  The State Department's guidance issued to J-1 visa holders and entitled "Your Rights Regardless of Visa Status," reiterates that "an employer usually may not deduct for housing," such as where, as in the J-1 *au pair* program, "housing must be provided free of charge."

244.     The Sponsors had actual or constructive notice that the lodging was provided for the benefit of the employer and could not give rise to a credit.  In fact the sponsors tell the *au pairs* that only the $195.75 is taxable income, and not lodging, presumably because they know it is for the benefit of the employer.  This was always true, but was especially the case when the *au pairs* had curfews so they would be rested for work, the *au pairs* were with the family away from their home, and when the *au pairs* were expected to wake during the night to work.

245.     Cultural Care even instructed families that they could set a curfew so the *au pairs* would be rested for work, without telling the *au pairs* that this would be compensable time and the lodging would automatically be for the benefit of the employer.

246.     The Sponsors knew or should have known that any wage credit for meals requires actually furnishing the meal and keeping records of those credits.

247.     The Sponsors knew or should have known that the law for wage deductions and credits varies widely state to state, and that the State Department's formula fails to satisfy many of them.

248.     The Sponsors knew or should have known that the United States Department of Labor interprets the FLSA to not allow credits for facilities that are greater than those allowed by state law, and therefore a room and board credit would in many states automatically violate the FLSA.

249.     The Sponsors knew or had a duty to know that the paid vacation could not include credits for facilities that were not provided during the vacation.

250.     The Sponsors had a duty to know that setting a curfew time for the *au pair* to be properly rested for child care constituted work under minimum wage laws because it was for the employer's benefit.

251.     The sponsors had a duty to know that to schedule the *au pair* to take care of children in the middle of the night would defeat any ability to take a facilities credit for the room.

252.     The Sponsors had a duty to know that training time and time meeting with local coordinators was compensable time under the FLSA and many state and local laws.

253.     The *au pairs*, with limited English understanding or sophistication, put their utmost trust into the Sponsors to protect their legal interests while in the United States. They were ignorant of the reality and reasonably assumed that the $195.75 weekly rate was fixed in law and could not be altered, and thus justly relied on the Sponsors' statements as government designees.  This reliance prevented the *au pairs* from being able to exercise their rights to bargain for a higher wage or to assert their right to be paid the legal minimum wage for all hours worked.

254.     The *au pairs* entered into employment contracts at $195.75 per week.  The *au pairs* did not ask initially or during their employment for higher wages approaching the wages for nannies in the private market or for wages that were legal under the FLSA or the state and local minimum wages because they were led to believe that this was not possible.

255.     The purpose of making these material misstatements about wages was to induce *au pairs* to sign up at suppressed illegal wages without realizing that they could seek higher stipends from either the Sponsors or the families.

256.     The Sponsors failed to exercise reasonable care when they informed the *au pairs* that the stipend could not be adjusted, and the *au pairs* suffered by not being able to negotiate to a wage at or approaching the normal nanny market and by not being paid in conformity with the FLSA and state and local wage and overtime laws.

257.     They further breached their fiduciary duty by misleading *au pairs* and creating a wage ceiling.

258.     *Au pairs* reasonably relied on these misstatements of facts and suffered damages when they paid fees to the sponsors and the sponsors' agents in their home countries, when they were paid illegal wages, and when they were effectively denied the ability to argue for a free market wage.

         **2.**    **Specifically, InterExchange, Cultural Care, GoAuPair, Au Pair in America, AuPairCare and Expert Au Pair Have Known That $4.35 per Hour is Not a Legal     Wage**

              **a.**      **InterExchange**

259.     InterExchange's website for families emphasizes the fixed cost and flexibility of *au pair* schedules:  "Plus, no matter how many children you have, your costs are for hosting one *au pair*, not based on each child."

260.     The part of the website for *au pairs* does uniquely mention the serious work, but it still stresses the family-life instead of employment:  "You will be welcomed as a

new international member of the family and your relationship with your host family will develop over the program year."

261.     InterExchange tells *au pairs* that the salary is just under $10,000 for the year, which represents $195.75 per week for 51 weeks, including the paid vacation when no room and board is provided.

262.     InterExchange's website has a section for "InterExchange Participant Rights, Protections, Understanding" that sets out its special responsibility to watch out for the *au pairs*' welfare, stating, among other things:

> i.      "The following information describes a baseline for conduct that our participants can expect from InterExchange and their hosts . . ."
>
> ii.     "InterExchange makes it a priority to ensure that all our participants enjoy a safe, healthy and well monitored cultural exchange experience in the U.S."
>
> iii.    "Protection of their legal rights under United States immigrant, labor, and employment laws.
>
> iv.     "Fair treatment and payment practices."

263.     In its pro forma extension agreement, *au pairs* agree that InterExchange and its "Agents or any local coordinator may, without liability, or expense to themselves, take whatever action they deem appropriate with regard to my health and safety and may place me in a hospital or health-related facility for medical services and treatment or, if

no hospital or health-related facility is readily available, may place me in the hands of a local medical doctor or health provider for treatment or service."

264.     InterExchange plays up its position as a U.S. State Department Designated Sponsor so that the *au pairs* will trust them.  They warn *au pairs* that non-Designated parties might be scammers that "may make you offers that sound amazing, like paying you more than the program amount of $195.75 per week . . . ."

265.     InterExchange knew that the programmatic wage floor was not the highest legal wage host families could pay *au pairs*.  Indeed, InterExchange previously had programs with stipends higher than the State Department programmatic floor and, as part of those programs, arranged for *au pair* wages above the programmatic wage floor.

266.     InterExchange's tax advice for *au pairs* indicates that only the cash wage amount and not the lodging is taxable income.  Upon information and belief, InterExchange knows this is only possible because the lodging exists for the convenience of the employer, which means it is not eligible as a wage credit.

## b.     Cultural Care

267.     Cultural Care maintains separate websites for the countries from which it wants to attract *au pairs*.

268.     On these websites, Cultural Care advertises itself to potential *au pairs* by emphasizing the purported benefits of "cultural exchange", stating "[y]our host family wants you to become a member of their family so they will provide an opportunity for you to learn about American culture and also share your culture with them on a daily basis."

269.     Each of these country-specific websites contains a section advertising the

"benefits and salaries" for its *au pairs*.  All of the sections are substantially the same.

For example, the version for South Africa states as follows:

> Here are the benefits:
>
> - Flight tickets and travel arrangements to and from your host family are covered, and the programme begins with a four-day training school in Long Island, New York
> - Your room and board will be provided by your host family. This includes all meals.
> - You will receive a weekly stipend of USD$195.75 per week (approximately R8,000 a month). As your living costs will be covered; this stipend will be your pocket money!
> - As part of your visa you will enroll in classes at a local college or university. Your host family will contribute USD$500 toward your studies (approximately R5,500).
> - You are entitled to 2 weeks paid holiday during your au pair stay as well as an additional month to travel the USA once you have completed your au pair experience.

270.     The version directed to *au pairs* in Mexico similarly advertises the benefits of

being an au pair including "a weekly payment of $195.75 USD".

271.     Simultaneously, Cultural Care attempts to attract families through a U.S.

based website that highlights *au pairs* as a cheap childcare option.

272.     The top of the homepage describes the *au pair* program as "[a] flexible,

affordable childcare solution!" and goes on to describe its *au pair* program as a cheap

alternative to daycare centers and nannies.

273.     On its website, Cultural Care instructs families that "[a]n au pair should not be

considered an employee…." and describes the "stipend" as follows: "Paid to your au

pair Weekly stipend: $195.75" "The weekly stipend is paid by you directly to your au pair for 51 weeks, including two weeks of paid vacation. Please note: the weekly stipend is determined by the U.S. Department of Labor using a formula based on the federal minimum wage. Any change in the federal minimum wage will result in an increase in the stipend."

274.     Cultural Care's Website offers year-long support and states that the local childcare coordinator will, among other duties, "[g]ive support and advice as needed" and "[c]onduct a mediation in the case of a dispute."

275.     Cultural Care knew that $195.75 was not the highest amount host families could pay *au pairs.*  Cultural Care's own tax advice to host families advised that: "Many families choose to increase the stipend during an extension year."

276.     Furthermore, a Cultural Care agent and member of their Golden Heart League for the best and brightest local childcare coordinators blogged: "BTW, I do encourage host families of second year *au pairs* to pay a bit more than the usual as they are more experienced and everyone likes a yearly raise, even if it's a small one."

277.     Cultural Care's tax advice indicates that only the cash wage amount and not the lodging is taxable income.  Upon information and belief, Cultural Care knows this is only possible because the lodging exists for the convenience of the employer, which means it is not eligible as a wage credit.

### c.     GoAuPair

278.     GoAuPair advertises on their website for families: "Au Pair live-in Child Care is affordable at only $7.63/hour [a number that includes both the "stipend" and the

58

sponsor fees] and offers more flexibility and benefits to your family than any other form of child care."  This number is derived from the $195.75.

279.   The GoAuPair website compares the budget for paying an au pair to nanny and day care services, stating that for an au pair the budget is "$7.85/hr regardless of the number of kids," as compared to the approximate cost for a nanny ("$10 to $15/hr") or day care ("$8/hr per child").

280.   The portion of the GoAuPair website aimed at potential *au pairs* has a completely different emphasis on the cultural component:  "Living in the U.S. as an Au Pair offers many unique benefits not found in other cultural exchange programs. Making new friends, improving your English, furthering your education and great pay are just a few of the many benefits of the Au Pair program."

281.   GoAuPair holds itself out as an authoritative source of information for the *au pairs* on its website:  "Your Local Area Representative and GoAuPair are available to answer any questions and assist in all your needs . . . Our friendly staff at our corporate office is always ready to help. Whether you have questions about education, rules and regulations or anything else, we find the answer for you."

282.   The website section for frequently asked *au pair* questions also states:  "You and your Host Family have a Local Area Representative within a one-hour drive of your home to help resolve any problems that arise during the year. If you do have a problem, you can contact your Local Area Representative and schedule a meeting with her to try to resolve the problem.

283.     GoAuPair plays up its designation by the State Department on its website to protect *au pairs* from scams: "Au Pair scams are very serious and have stolen money from prospective Host Families and *Au pairs* all across the world. The safest way to avoid this type of problem in the United States is to find *Au pairs* and Host Families through one of the U.S. Department of State Sponsor Agencies."

284.     GoAuPair states on its website: "The Department of Labor has sole jurisdiction regarding matters of minimum wage and the credit for room and board which is applied against the weekly stipend."

285.     This statement shows that GoAuPair acknowledges that the State Department does not have jurisdiction over interpreting the FLSA. Yet the statement also wrongly denies that state and local minimum wages could supersede the FLSA wage, and incorrectly implies that the Department of Labor has approved taking credits for the room which is required by law.

286.     GoAuPair sets and advertises a standard *au pair* wage of $195.75 per week for 52 weeks, including the two weeks of vacation without room.

287.     GoAuPair's website states: "The stipend amount is based on federal minimum wage. Currently the stipend is $195.75 per week. The stipend you receive depends on the Au Pair program in which you participate."

288.     GoAuPair is unique in that its *au pairs* are offered 32 hours of DVDs to watch in their home country instead of the normal multi-day live training sessions in the United States that the other Sponsors do to satisfy the State Department training requirement.

289.     GoAuPair knows the $195.75 stipend is not a wage ceiling because it has a tiered system with higher wages for a small number of more skilled *au pairs*.

290.     A GoAuPair Agent in Boston published tax advice for *au pairs* indicating that only the cash wage amount and not the lodging is taxable income.  Upon information and belief, GoAuPair knows this is only possible because the lodging exists for the convenience of the employer, which means it is not eligible as a wage credit.

### d.     AuPairCare

291.   On its homepage, AuPairCare promises potential *au pairs* the "experience of a lifetime." A linked page states "[g]et ready for the best year of your life!"

292.   AuPairCare further advertises its 25 years of experience of supporting *au pairs*, a boast it ties to the representation that "when you become an AuPairCare au pair, you'll receive a stipend, room and board, spend time with children and have plenty of vacation time to explore America with your new friends."

293.   AuPairCare volunteers unsolicited warnings to *au pairs* so that the *au pairs* will trust them.  They warn *au pairs* that non-Designated parties might be scammers and offer tips on how to identify a potentially fraudulent communication: "Legitimate host families will also not offer you a higher stipend than what is listed in the regulations published by the U.S. Department of State for the Au Pair Program."

294.   On its website directed to *au pairs*, AuPairCare touts "Constant Support: When you become an au pair through AuPairCare, you'll gain a large support network to ensure your success before, during and after your year abroad."

295.   AuPairCare lists among the benefits with AuPairCare a stipend over the year of "about $10,000 USD," a number derived from the $195.75 minimum.

296.   On the webpages directed to host families, AuPairCare advertises that the total program costs, including fees and the stipend, amount to "less than $8 an hour," a cost that remains constant even if the size of the family, and attendant duties assumed by the au pair, increase.

297.   AuPairCare disclaims from the set costs the existence of "variable and optional costs," including travel provided for the au pair to the host home and the $500 educational credit. AuPairCare does not include the stipend as a potential variable cost, or inform host families that the stipend is a mere minimum; rather, the stipend is listed in a chart of fix expenses and timetable for their payment:

| Au Pair Stipend | **Amount** $195.75/week | **When It's Due** Paid weekly to your au pair for 51 weeks |

e.   **Expert Au Pair**

298.   On its website, Expert Au Pair answers the question "Why us?" with reference to its "Framework of Support," which promises to help the au pair "with any problems."

299.   In its agreement with its *au pairs*, Expert Au Pair demonstrates its right and intention to take action Expert Au Pair deems necessary to protect the *au pair*'s health and safety. "Employees and agents of Expert AuPair may take whatever action they consider necessary to ensure my health and safety."

300.   Expert Au Pair knew that $195.75 was not the highest amount host families could pay *au pairs.* In its contract with host families, Expert Au Pair requires the family to provide the *au pair* "with his/her pocket money. The required minimum is $195.75 for the regular au pair program."

301.   Yet on its website, Expert Au Pair shows a static number for the au pair stipend:

| STANDARD | 45 | $195.75 | $500 per year | Any age |
|----------|-----|---------|---------------|---------|

302.   Expert Au Pair solidifies the misconception that the $195.75 stipend is uniform by telling prospective *au pair* that its program offers "More Money in Your Pocket" not by virtue of a flexible weekly wage but rather by charging fees that are "significantly lower" than other programs.

303.

   **f.    Au Pair in America**

304.     Au Pair in America has a United Kingdom based website aimed at potential *au pairs* from around the world.  It strongly emphasizes travel and cultural component of the program:  "'Au pair' means 'on par' or equal, which is exactly what you will be – an equal member of your host family."

305.     Its U.S. based website strongly emphasizes the fact that this is cheap labor without bargaining power over scheduling:  "No two weeks are the same with most households.  Hosting an au pair provides the flexibility and convenience you need to simplify your life.  With an au pair, you will be able to create your own child care schedule of up to 10 hours per day and up to 45 hours per week . . . You will receive 45 hours of child care for just $361 per week, regardless of how many children you have."

306.     Both websites show that the stipend is set for the standard program at $195.75 including for vacation weeks when no room is provided.

307.     Au Pair in America knew that this stipend was not the highest amount host families could pay *au pairs.*  In fact, Au Pair in America advertised different stipends for a small number of *au pairs* with greater skills at rates above the programmatic wage floor.

308.     Au Pair in America's website for potential *au pairs* calls the programs:  "Safe and Legal" and "One of the most important reasons for choosing Au Pair in America is the complete support package we provide you with - which takes the worry out of travelling to America, enjoying life there and returning home . . . We support you every step of the way!"  It promises their agents will "inform, advise and support you and your family throughout your stay."  Another part of the website states:  "Whether it's your

local interviewer, our head offices or your community counselor, we're all on hand to support you throughout your stay in the US."

309.     Au Pair in America's tax advice for *au pairs* indicates that only the cash wage amount and not the lodging is taxable income.  Upon information and belief, Au Pair in America knows this is only possible because the lodging exists for the convenience of the employer, which means it is not eligible as a wage credit.

310.     Au Pair in America on its website plays up its affiliation with the U.S. government to gain the *au pairs*' trust with the following self-made seal:



D.     **In Deceiving and/or Misleading *Au* Pairs, InterExchange, Cultural Care, GoAuPair, Au Pair in America, AuPairCare and Expert Au Pair Violated the *Au Pairs* Rights As Consumers.**

311.     *Au pairs* act as Sponsors' consumers when they apply or reapply for the programs and pay significant fees to the Sponsors and/or the Sponsors' foreign agents.

312.     Acting from within the Several States, the Sponsors have tricked *au pairs* into thinking that the $195.75 was a wage legally set in stone when it was in fact a State Department programmatic wage floor.  The Sponsors knew that this wage was in fact

illegal under the laws of many states or acted recklessly in disregarding this truth.  They did this in order to induce *au pairs* to sign up with the Sponsors' programs which would increase their market share and profits.

313.    *Au pairs*, young adults often with limited English understanding or sophistication, put their utmost trust into the Sponsors to tell them the truth and justifiably relied on the Sponsors statements when purchasing their services, and by traveling to the United States.

314.    This conduct was unfair and deceptive because *au pairs* had placed their full trust in the Sponsors' representations that the Sponsors would watch out for the *au pairs*' interests.

315.    Because of the differences in sophistication and bargaining power, and the seriousness of the commitment, the misrepresentations were unconscionable.

316.    Because of these unfair and deceptive actions, *au pairs* have suffered damages including the money the *au pairs* paid the Sponsors and the decreased wages attributable to the *au pairs*' lack of bargaining power.

**IV.     INTEREXCHANGE, CULTURAL CARE, AU PAIR IN AMERICA, GOAUPAIR, <u>AUPAIRCARE AND EXPERT AU PAIR</u> EMPLOYED THE *AU PAIRS* THEY SPONSORED AND FAILED TO PAY THEM AT LEAST MINIMUM WAGE FOR THE HOURS THEY WORKED**

        **A.     <u>The Sponsors Employed the *Au Pairs*</u>**

317.    The Sponsors acted as joint employers with the families and the *au pairs* performed the essential function of the Sponsors.

318.     The contracts under which the workers worked were prepared by the Sponsors and were identical.  These contracts gave the sponsors tremendous power over the *au pairs*.  The sponsors bought health insurance for the *au pairs*.

319.     They had the power to recruit and hire the *au pairs*.  They trained the *au pairs*.

320.     The *au pairs* mostly worked at homes approved by the Sponsors, but also worked at the Sponsors' training sessions and local coordinator sessions directly for the sponsors.

321.     The Sponsors set and promulgated work rules including regarding compensation, benefits, and hours.  The Sponsors controlled the work schedules by implementing the State Department rules, but also by making additional rules and adjudicating disputes about schedules, vacations, and stipends.

322.     The Sponsors in fact set the wage for the *au pairs* and determined the method of payment in terms of money, food, and (illegally under the FLSA) board.

323.     The Sponsors had the power to fire and remove the *au pairs*, and in fact exercised this power often.  Because they set the rules and had the ability to adjudicate disputes, and to fire the *au pairs*, even if the family did not want to.  Upon information and belief, the families did not have the ability to fire the *au pairs* without permission from the Sponsors, and therefore the Sponsors effectively controlled the relationship.

324.     The Sponsors kept extensive employee records.

      **B.**     **<u>Each Sponsor Individually Demonstrated Their Control</u>**

          **1.**     **Interexchange**

325.     InterExchange explains in its au pair blog that "[a]ll *au pairs* earn a weekly stipend of $195.75 per week."

326.     In a video about its training program, it emphasizes that it will provide training throughout the year.

327.     In InterExchange's pro forma extension contract, *au pairs* promise "I will carry out my au pair and childcare duties and other responsibilities to InterExchange, Inc., and the host family to the highest standards and with due respect."

328.     In that agreement, the *au pairs* also agree "I will cooperate fully with those supervising the program on behalf of and in cooperation with InterExchange, Inc. and I agree to abide by any reasonable instructions they may give me."

329.     As set forth below, the InterExchange au pair handbook shows that they have ultimate control over the *au pairs* because they have authority over disputes dealing with schedules and duties, they can fire the *au pairs* for missing mandatory trainings, and they can fire *au pairs* for breaking their rules and that au pair must pay for the return ticket:

- "Your Local Coordinator is a year-round source of support and should be your first point of contact for all your questions."
- "Your Local Coordinator will visit you two weeks after your arrival to your host family's home and talk to you and your host family about child care and any communication issues. It is also a time to review your duties, responsibilities and the weekly schedule."
- "Cluster meetings are a mandatory part of your au pair year, . . . If you do not attend every month, you may be cancelled from the program."
- "If you are in transition because of inappropriate behavior, poor English language skills or poor driving ability, it may be difficult to find a new family. If no family can be found within the two week transition period, you will have to return home at your own expense. While most qualified *au pairs* are re-matched, we cannot guarantee that all *au pairs* will be able to find a new host family."

- "*Au pairs* who violate program rules will be cancelled from the program and will have to return home immediately at their own expense"

330.    Upon information and belief, InterExchange further controls the *au pairs* work by forcing them to pay a completion security deposit which they only receive back if they keep working for the full year according to InterExchange's rules.

## 2.    Cultural Care

331.    Cultural Care's form agreement with its *au pairs* requires that *au pairs* agree to the following, including, shockingly a provision requiring termination if an au pair becomes pregnant or gets married:  "I understand that CC has the exclusive right to determine my suitability for acceptance and for my continued participation in the Program. I understand that if CC determines that my emotional or physical state does not make me suitable for providing quality childcare, I will be removed from the Program. I also understand that should I marry or become pregnant while on the Program I will also be removed from the Program. If my performance as an au pair and/ or participation in the program is deemed unsatisfactory by CC for whatever reason, CC will reassess my suitability for future placement. I understand that I may be terminated from the Program if I do not successfully complete the Program requirements and uphold Program expectations for reasons including, but not limited to, the following: leaving the host family without prior consent from CC; engaging in behavior that CC deems inappropriate during the Program duration, performance reasons including but not limited to breaking host family rules, neglectful or inappropriate behavior towards the children, etc.; non-participation in training, not fulfilling educational credit, non-attendance at monthly meetings, or if I in any way violate this Agreement. I further

understand that should it be discovered that I have falsified or withheld critical information from my application materials including, but not limited to, health conditions, criminal history, educational documentation, childcare experience, etc. I may be terminated from the Program. Should I be terminated from the Program because of my actions including, but not limited to, those outlined above, I forfeit my return flight to my home country and must pay for this flight on my own."

332.     Upon information and belief, Cultural Care further controls the au pair work by forcing them to pay a completion security deposit which they only receive back if they keep working for the full year according to Cultural Care's rules.  Cultural Care also does not arrange a flight home for its *au pairs* unless they complete the full year of the au pair program.

333.     Au Pair in America

334.     Among other ways, Au Pair in America states its ability to terminate its sponsored *au pairs*' employment in its "2015 Program Support & Policies", where it states:  "The program reserves the right to terminate a relationship with a host family in the event of a violation of government regulations and/or pro- gram policies, or if the program determines that it is inappropriate for the relationship to continue. Violations not tolerated include: not paying or reducing the au pair/companion's minimum weekly stipend; not paying or reducing the au pair/companion's educational funds; not allowing or reducing the au pair/companion's free time; increasing responsibilities beyond the time and scope stipulated by the U.S. government regulations; or not treating the au pair/companion appropriately. The program may also terminate a relationship with a

host family when the host family's pro- gram fees are more than 60 days in arrears, or in the program's determination, the host family is not in keeping with the cultural exchange spirit of the program. In such cases, the host family will not be granted a replacement or refund of program fees."

335.     The regulations provide a cap of 45 hours of au pair work a week, which allows *au pairs* the flexibility to negotiate to work less.  Au Pair in America's au pair terms and conditions require *au pairs* to agree to work the entire 45 hours to be part of the program.  An au pair must agree that she "will provide childcare up to 45 hours per week."

336.     Au Pair in America gave a completion bonus to those *au pairs* that worked according to the program rules for the entire year.  Since this was basically a kick back of the *au pair's* application fees, it was functionally a security deposit, and further allowed Au Pair in America to control au pair employment.

337.     The Au Pair in America au pair terms and conditions also require *au pairs* to agree to the following terms, one of which, incredibly, allows Au Pair in America to terminate an au pair for becoming pregnant:

> b) I agree that I will perform my duties as an au pair to the best of my ability and indemnify AIFS, its staff, agents and all affiliated organizations from any damages, losses or claims resulting from my participation in the program.
> c) I will carry out my childcare and other responsibilities to the host family to the best of my ability and with due respect and will take full advantage of the cultural opportunities and will fulfill the educational requirements in accordance with the rules set out in the brochure, website and online resources.

> e) I will co-operate fully with those supervising the program on my behalf for AIFS and I agree to abide by any reasonable instructions they may give me.
> f) I understand that should a problem arise with my host family, depending on the circumstances Au Pair in America would consider re-matching me with another family but does not guarantee a second placement.
> g) I understand that should my medical condition limit my ability to perform my duties as an au pair or if I become pregnant prior to departing for the USA or during my participation on the Au Pair in America, Au Pair Extraordinaire or eduCare in America programs, that I will no longer be eligible to participate on any of the Au Pair in America programs.

338.     Upon information and belief, Au Pair in America provides a form contract called a "Host Family and Au Pair/companion Agreement" that it requires its sponsored *au pairs* and hosts to enter into with each other.

### 3.     GoAuPair

339.     In its agreement with the *au pairs* it sponsors, GoAuPair requires *au pairs* to "agree to abide by all appropriate regulations and laws of GoAuPair Operations, LLC, and the U.S. government" and to "also agree to cooperate with all those supervising the program and to abide by any reasonable instruction."

340.     It then sets outs specific duties for *au pairs*, including: "[d]aily maintenance of the children, including meal preparation, doing the children's laundry, transporting the children to various activities, assisting with homework, playing, teaching and caring for the children. 2. Minor housekeeping, including but not limited to, washing the children's dishes, tidying up the children's rooms and making their beds, vacuuming and dusting

the children's rooms and cleaning their bathrooms. In addition, I agree to pick up after the children in any room in which they have played."

341.     Upon information and belief, GoAuPair further controls the *au pairs* work by forcing them to pay a completion security deposit which they only receive back if they keep working for the full year according to GoAuPair's rules.  GoAuPair also does not arrange a flight home for its *au pairs* unless they complete the full year of the au pair program.

### 4.     AuPairCare

342.     In its agreement with the *au pairs* it sponsors, AuPairCare retains the exclusive right to determine the *au pair's* suitability to participate in the program, not only before but continuing throughout the *au pair's* participation. AuPairCare restricts eligibility to *au pairs* who are not married, engaged to be married, or who have children of their own.

343.     In 2016, AuPairCare exercised its exclusive control over an au pair in the Washington D.C. area by ordering her to return to Colombia when she was diagnosed with cancer, despite the fact that her host family wanted her to stay on as their au pair.

344.     Despite there being no regulatory requirement mandating that the au pair be sent home, the Washington Post report that, "[i]n a May 13 email to [the au pair], AuPairCare regional manager Carol Eaton wrote: 'As your health has changed due to the diagnosis of lymphoma, it is our policy that participants focus on their own recovery and not continue as caregivers. Unfortunately, we have to end your participation in the au pair program. This is not an easy decision or one we take lightly, but policy that has

been made through years of experience dealing with the health, safety and welfare of au pair participants and host children.'"

345.     Ultimately, after the intervention of a U.S. Congressman and a Change.org petition, AuPairCare allowed the au pair to stay in the United States pending a change in her visa status.

346.     In response to AuPairCare's treatment of the au pair, the Washington Post quoted the host family as saying that, in reference to AuPairCare, "[t]he J-1 employer has all the power."

347.     In the event disputes arise between the au pair and the host family over hours or job duties, AuPairCare reserves the right to resolve such disputes.

348.     AuPairCare's contract with its *au pairs* forbid the au pair from operating a cell phone while driving (without a handheld device and permission from the host family); sending or receiving inappropriate content, including text messages, while in the host family home; and smoking or consuming alcohol, at all if under the age of 21 or otherwise in excess. The penalty for violating AuPairCare's prohibition on any of these activities may be termination from the program and immediate repatriation.

349.     AuPairCare's contract further requires the au pair to waive any claim of privacy with respect to the use of recording devices, such as a nanny cam.

350.     Finally, AuPairCare sets the wages for its au pair, as AuPairCare's contract states that the au pair will receive a stipend in accordance with the U.S. Department of State Regulations in the amount of $195.75. The lack of ambiguity of this statement leaves an au pair with no doubt that the stipend is uniform.

### 5.   Expert Au Pair

351.     In its agreement with the *au pairs* it sponsors, Expert Au Care establishes

minimum requirements for its applicants, among them, the commitment "to complete 32

hours of child care courses provided by Expert AuPair." In its description of "working

conditions," Expert Au Pair reserves the right to review complaints regarding the *au*

*pair's* performance of job responsibilities and expressly retains the right to "take action

against" the au pair, including rematch or termination from the program.

352.     Expert Au Pair not only requires its *au pairs* to agree to meet regularly with

their local and regional representatives, it includes a penalty provision in the agreement

under which its au pair agree that if they "fail to communicate with the Local

Representative and/or the Regional Representative [from Expert Au Pair] each month

and in a timely fashion, [they] may forfeit [their] paid airfare home and have to pay for

[their] own transportation back to [their] home country."

353.     Expert Au Pair further exerts control over the regular activities of its *au pairs*

under the threat of forfeiting their return flight if the au pair smokes in the host family's

house, presents for work under the influence of alcohol, or fails to complete the

educational requirement.  And even though it is Expert Au Pair, not the host family, that

controls the decision to forfeit the return airfare, the contract between Expert Au Pair

and the host family gives Expert Au Pair the right to keep the funds that the family paid

for the airfare.

354.     In its form contracts between au pair and the host family, Expert Au Pair

determines the manner in which the family may discipline the au pair, and requires

notification of such discipline to the local Expert Au Pair representative. Similarly Expert Au Pair requires that two weeks notice be provided in the event of termination, by either parties, but permits the family to offset fees or charges owed by the au pair from the final paycheck.

### C.   The Sponsors Failed to Pay the *Au Pairs* Minimum Wage or Overtime

355.    Defendants Interexchange, Cultural Care, Au Pair in America, AuPairCare and Expert Au Pair all have a single tier au pair program where the sponsors instruct the hosts to pay $195.75 per week for 45 hours of work.  This is $4.35 per hour.

356.    Defendant GoAuPair has a tiered system where a small amount of higher skilled *au pairs* are paid more than $195.75 per week.  For the lowest tier, GoAuPair instructs hosts to pay $195.75 per week.

357.    The federal minimum wage has been $7.25 per hour since 2009.

358.    The majority of states and the District of Columbia have a state/district-specific minimum wage that is higher than the federal minimum wage.

359.    $195.75 per week fails to compensate *au pairs* at federal minimum wage, and does not compensate sufficiently for the higher state and District of Columbia minimum wages.

360.    Since January 1, 2015, third party employers of *au pairs* are required to pay federal overtime for hours worked in excess of 40 in a week.  The $195.75 per week fails to provide any overtime for the 45 hours per week for which *au pairs* must be paid. Sponsors, as third party employers, must pay that overtime and fail to do so.

361.     Defendants Interexchange, Cultural Care, Au Pair in America, GoAuPair, AuPairCare and Expert Au Pair also require *au pairs* to participate in roughly a week of training before joining their host familes.  This week of training is entirely for the benefit of the employer and illegally goes entirely uncompensated.  All sponsors require additional unpaid training throughout the year.

362.     These Defendants also required their *au pairs* to attend meetings with the sponsors' local agents and did not compensate the *au pairs* for these meetings.

363.     The Sponsors are liable for all minimum wage and overtime deficiencies.

V.      **THE NAMED PLAINTIFFS' SUFFERED AS A RESULT OF DEFENDANTS' WRONGFUL ACTIONS**

        A.      **Ms. Beltran's Experience in the _Au Pair_ Program**

364.     Ms. Beltran is originally from Bogotá, Colombia.

365.     In or about early 2011, Ms. Beltran went to an office operated by Defendant InterExchange, or an agent of InterExchange, in downtown Bogotá to apply to become an au pair in the United States.

366.     Ms. Beltran filled out an application and paid InterExchange or its agents approximately $2,500.  No one ever told Ms. Beltran what the $2,500 covered.  Ms. Beltran found the web of subcontractors, agents, employees, and other entities affiliated with InterExchange difficult to understand.

367.     InterExchange or its agents told Ms. Beltran that in order to become an au pair she would have to take classes in English, take a course to get her driver's license, get first aid training, and take a swimming class.  She also was instructed to take two

77

semesters at a post-secondary school, where she took one class per semester, and which she believes was a J-1 visa requirement.

368.     Ms. Beltran did all of this from 2011 until early 2012.

369.     Upon information and belief, sometime during this time InterExchange created a website advertising Ms. Beltran as an au pair for families in the United States.

370.     In early 2012, Ms. Beltran interviewed with three or four families via Skype and/or telephone.  One of these families was the Noonans.

371.     For roughly the first half of 2012, Ms. Beltran was in touch with the Noonans about becoming their au pair.

372.     Ms. Beltran understands that at some point the Noonans decided that they wanted Ms. Beltran to be their au pair and indicated this to InterExchange.

373.     InterExchange then contacted Ms. Beltran and formally interviewed her.  They asked her questions regarding her ability to provide childcare.  At the end of the interview, InterExchange told Ms. Beltran that she was qualified to work for the Noonans and InterExchange facilitated a J-1 visa interview for Ms. Beltran at the United States embassy in Bogotá.

374.     In or around May 2012, Ms. Beltran received her J-1 visa.

375.     In August 2012, InterExchange flew Ms. Beltran from Bogotá to New York, New York.

376.     In New York, InterExchange put Ms. Beltran in a hotel with roughly 50 other *au pairs*.  Ms. Beltran and the other *au pairs* participated in a week-long by InterExchange in childcare skills.

377.     Ms. Beltran and the other *au pairs* were not paid anything for the week of childcare training in New York.

378.     The week of childcare training was mandatory and directly related to au pair childcare duties.

379.     After that week, Ms. Beltran flew to Denver and went to the Noonan's house to be an au pair.

380.     Ms. Beltran was given a room in the Noonan's basement and began her work.

381.     After Ms. Beltran arrived in Denver, an Agent of Interexchange from New York called Ms. Beltran to check in on her.

382.     During her time in Denver, Ms. Beltran attended a meeting with other *au pairs* and an agent of InterExchange.  There was one meeting like this scheduled each month by InterExchange, but Ms. Beltran only went to one because the Noonans would not take her to the others.

383.     No one from InterExchange ever came to the Noonan's house to check on Ms. Beltran.

384.     During her time working for the Noonans, Ms. Beltran performed both childcare and house work.

385.     In addition to her childcare duties, Ms. Beltran cleaned for the entire family (2 adults and 2 children), cooked dinner for the entire family nearly every night, did laundry for the entire family, made the family's beds, packed and unpacked luggage for the children and Ms. Noonan before and after trips, cleaned Ms. Noonan's car on a daily basis, brought the groceries in from the car when Ms. Noonan went shopping, gardened

(i.e., by cutting roses and picking apples), and cared for the Noonans' approximately 8 chickens (i.e., by feeding, watering, and cleaning the coop).

386.    The Noonans did not furnish Ms. Beltran with three meals per day.

387.    Ms. Beltran prepared dinner for the Noonan family nearly every night.  Ms. Beltran was not allowed to eat with the Noonans.  Sometimes there were leftovers for Ms. Beltran to eat after the Noonans' dinner, but sometimes there were no leftovers, and Ms. Beltran had to prepare her own dinner.

388.    One week Ms. Noonan failed to purchase food for Ms. Beltran.  Ms. Noonan gave Ms. Beltran leftover pizza from one of the Noonans' parties and that is all Ms. Beltran had for dinner that whole week.

389.    Ms. Beltran worked Monday through Saturday, and sometimes on Sunday.

390.    Ms. Beltran worked at least 8 hours a day Monday-Friday, and sometimes 9 or ten hours.

391.    On Saturday and Sunday she worked for approximately 4 hours each day.

392.    Ms. Noonan maintained a schedule for Ms. Beltran's work, but Ms. Noonan did not keep track of the hours.  Ms. Beltran was expected to, and frequently did, work more hours than were scheduled.

393.    The Noonans always paid Ms. Beltran exactly $195.75 for each week Ms. Beltran worked, with no withholding.

394.    In the second half of November 2012, Ms. Beltran decided she wanted to leave the Noonans and told the Noonans this.

395.     Ms. Beltran understands that Ms. Noonan then contacted InterExchange and someone came to the Noonan's house, had Ms. Beltran sign something that she did not understand, and Ms. Beltran left.

## B.     Ms. Hlatshaneni's Experience in the *Au Pair* Program

396.     Ms. Hlatshaneni is originally from Cape Town, South Africa.

397.     In In 2012, during her third year of college, Ms. Hlatshaneni decided she wanted to spend the next year abroad in the United States.

398.     She went to African Ambassadors' office in Cape Town and applied to be an au pair.  On information and belief, African Ambassadors is an agent of Defendant Au Pair in America that recruits *au pairs* for Au Pair in America.

399.     Ms. Hlatshaneni went through African Ambassador's screening process, matched with a family in the United States, and interviewed with United States officials in Cape Town for a J-1 Visa.

400.     African Ambassadors told Ms. Hlatshaneni that her stipend would be exactly $195.75.

401.     Ms. Hlatshaneni paid African Ambassadors roughly $800, which she understood to include payment for part of her flight to the United States, payment towards health insurance in the United States, and a $100 to $200 "administration fee" to African Ambassadors.

402.     Ms. Hlatshaneni's visa application was approved and in or about late February 2013, she flew from South Africa to New York.

403.     Ms. Hlatshaneni and many other new *au pairs* sponsored by Au Pair in America spent a week together at a hotel in Tarrytown, New York where agents of Au Pair in America trained the new *au pairs* in childcare skills.

404.     At the training, Ms. Hlatshaneni and the other *au pairs* were told that they could not accept more than a stipend of $195.75 a week from their families and that if they accepted more money they might be deported.

405.     Ms. Hlatshaneni and the other *au pairs* were not paid anything for their training in Tarrytown.

406.     The week of childcare skills training was mandatory and directly related to au pair childcare duties.

407.     After the week of training, Ms. Hlatshaneni traveled to Virginia where she met her family and began working as an au pair.

408.     Ms. Hlatshaneni's Virginia family paid her exactly $195.75 per week and they told Ms. Hlatshaneni that Au Pair in America warned them that paying Ms. Hlatshaneni more than $195.75 was not permitted.

409.     Because their children started school, Ms. Hlatshaneni's Virginia family no longer needed an au pair after one year and Ms. Hlatshaneni was matched with a new family in California.

410.     In or about February of 2014, Ms. Hlatshaneni traveled to California and began working as an au pair for her new family.

411.     Ms. Hlatshaneni's California family also told her that Au Pair in America warned them that they could only pay the $195.75 stipend amount, although they

routinely rounded up and paid Ms. Hlatshaneni $200 in cash, for convenience, and on the assumption that Au Pair in America would not find out about the cash payments.

412.     Ms. Hlatshaneni will be with her California family until approximately late February 2015.

### C.     Ms. Deetlefs' Experience in the *Au Pair* Program

413.     Ms. Deetlefs is originally from just outside of Cape Town, South Africa.

414.     In or about June 2014, Ms. Deetlefs decided she wanted to be an au pair.

415.     Ms. Deetlefs saw an advertisement in the paper from Cultural Care or one of its agents, responded to the ad, and went to Cultural Care's office in Cape Town for an information session.

416.     At the information session, they told Ms. Deetlefs that the $195.75 stipend was a minimum, that some families might pay $200 because it's easier, and that the $500 for a education was sufficient to pay for almost any class she wanted.

417.     At the end of the information session, she had a formal interview and was accepted by Cultural Care.

418.     Ms. Deetlef created an online profile, interviewed with families, and when she matched, paid Cultural Care roughly $900.  Ms. Deetlef understood this payment to cover services to help find a family and for basic health insurance.

419.     Ms. Deetlef went to the United States embassy, got her visa, and received flight information from Cultural Care.

420.     In or about 8/18/2014, Ms. Deetlef flew from Cape Town to New York.

421.     Ms. Deetlef spent roughly one week in New York being trained by Cultural Care.  Ms. Deetlef was not paid for the training.

422.     This week of training was mandatory and directly related to Ms. Deetlef's au pair childcare duties.

423.     At training, agents of Cultural Care told Ms. Deetlef and the other *au pairs* in training that the au pair stipend is exactly $195.75 per week and no more.

424.     After the training, Ms. Deetlef went to Utah to live with her host family.

425.     At the host family's home, Ms. Deetlef lives in the basement.

426.     Ms. Deetlef has received exactly $195.75 per week by direct deposit each week since she's been with her family.

427.     There was never a discussion with her family about how much Ms. Deetlef should be paid.

428.     Ms. Deetlef's family told her that they paid $195.75 per week because that's what Cultural Care told them to pay her.

429.     At least 3 times, Ms. Deetlef's family has gone on vacation, left Ms. Deetlef at the families' home alone, and not provided food for Ms. Deetlef while they were gone.

430.     Ms. Deetlef has taken one week of paid vacation and plans to take another. The family asked her to take that particular week off because the family had family from out of town available to take care of the children

431.     During that week off, Ms Deetlef was paid only $195.75 and she stayed at her host family's home during the vacation because she could not afford to go anywhere else.

432.     When Ms. Deetlef first began work with her host family, she had a midnight curfew.  The family subsequently removed the curfew.

433.     Ms. Deetlef's visa will expire in or about August 2015.

### D.     Ms. Cardenas Caicedo's Experience in the *Au Pair* Program

434.     Ms. Cardenas is originally from Bucaramanga, Colombia.

435.     She became interested in the au pair program because she wanted to travel abroad and improve her English.

436.     Ms. Cardenas attended an information session with an agent of Cultural Care in Bucaramanga.

437.     At the information session they told her the stipend would be exactly $195.75 per week.

438.     After the information session, Ms. Cardenas agreed to become an au pair with Cultural Care and Cultural Care matched her with a family in Chicago

439.     A few weeks prior to her leaving Colombia for the United States, Cultural Care told Ms. Cardenas that the Chicago family would not work because they were moving to an area of the United States that Cultural Care did not cover.

440.      Cultural Care then matched Ms. Cardenas with a different family, this one located in New Jersey.

441.     In or about late June 2014 Ms. Cardenas flew from Bogota to New York.

442.     Ms. Cardenas spent roughly one week being trained in New York by Cultural Care.

443.     Ms. Cardenas was paid nothing for the training.

444.     This training was mandatory and directly related to Ms. Cardenas' au pair childcare duties.

445.     After the training, Ms. Cardenas took a bus to New Jersey where she met the first family for whom she provided au pair services.

446.     Ms. Cardenas was unhappy with this first family because they did not allow her to use a car, which they had previously promised, and the child she was caring for was difficult.

447.     After approximately 1.5 weeks, Ms. Cardenas told the family and Cultural Care that she would prefer to be with a different family.

448.     Cultural Care matched her with another family in Pennsylvania and in or about July 2014, Ms. Cardenas traveled to Pennsylvania and is currently working as an au pair for the Pennsylvania family.

449.     Ms. Cardenas is currently paid exactly $195.75 per week.

### E.     Ms. Ivette Gonzalez's Experience in the *Au Pair* Program

450.     Ms. Ivette is originally from Bogota, Colombia.

451.     In or about October 2013 Ms. Ivette went to an agency in Bogotá called Intercambio E tourismo LTDA ("Intercambio"), or something with a similar name.

452.     A person there explained everything about the J-1 au pair program, including that she would be paid exactly $195.75 per week for 45 hours of work.

453.     Ms. Ivette paid roughly $1,600 to Intercambio, $1,000 of which was an administrative fee and $600 of which was a completion deposit that would be returned to her when she finished being an au pair and returned from the United States

454.     Intercambio offered to help Ms. Ivette find an au pair position through either Defendant GoAuPair or Defendant EurAuPair.

455.     Ms. Ivette applied to both and both accepted her.  She was indifferent between the two because they both offered the exact same weekly payment of $195.75.

456.     Ms. Ivette eventually chose GoAuPair because it was more responsive to her questions, and GoAuPair matched her with a family in Maryland.

457.     Before coming to the United States, Go Au Pair required Ms. Ivette to complete roughly one week of training.  Ms. Ivette was paid nothing for this training.

458.     This training was mandatory and directly related to au pair childcare duties.

459.     In or about July 2014, Ms. Ivette flew to Baltimore, Maryland and began working for her family as an au pair.

460.     The family paid $200 per week.

461.     The family set a curfew for Ms. Ivette that required her to be home 7 hours before her childcare duties started.

462.     Ms. Ivette was unhappy with her the working conditions.

463.     The parents left early each morning, requiring Ms. Ivette to start caring for the infant child at 4 a.m. each weekday.

464.     Moreover, the family lived in the suburbs and did not allow Ms. Ivette to use a car.

465.     Ms. Ivette felt isolated and alone.

466.     In or about January 2015, Ms. Ivette got into a heated argument with the mother of the family about her curfew.

467.     The next morning, the mother told Ms. Ivette to get out of the house, called someone to pick her up, and to not return.  She remains completely unpaid for two weeks of work.

468.     GoAuPair agreed to help Ms. Ivette find a new family, but would not provide food or a place to stay.

469.     Ms. Ivette had to stay with friends for a few weeks, GoAuPair was unsuccessful in finding Ms. Ivette a new family and she eventually had to borrow money from a friend to fly back to Colombia.

       **F.**    **Ms. Rascon's Experience in the Au Pair Program**

470.     Ms. Rascon is originally from Mexico.

471.     Ms. Rascon applied to Cultural Care's au pair program in late 2013.

472.     Ms. Rascon selected Cultural Care because of the advertising she saw in Mexico by Cultural Care, which promised her the "best year" of her life.

473.     A representative of Cultural Care told Ms. Rascon that she would work up to 45 hours per week and be paid $195.75 USD. She told Ms. Rascon it would not make a difference how many hours she actually worked or which family she paired with; the amount was always the same.

474.     Ms. Rascon paid Cultural Care approximately $1500 USD in fees to participate in the program. She also separately had to pay for her airfare (approximately $381USD) and to apply for her visa ($180USD).

475.     Ms. Rascon matched with a family in Boston, Massachusetts.

476.    In January 2014, Ms. Rascon traveled to New York City, where she participated in Cultural Care's mandatory three-day training. She attended the training, which instructed all *au pairs* on the performance of their duties as an au pair.

477.    Ms. Rascon was not paid to attend Cultural Care's mandatory training.

478.    Ms. Rascon then took a bus to Boston and began working as an au pair.

479.    Her host family paid her $195.75 every week. Ms. Rascon worked up to 45 hours every week. She was not compensated extra for hours she worked in excess of forty per week.

480.    In May 2014, Ms. Rascon rematched with a family in Maryland. Her second family similarly paid her $195.75 per week.

481.    Ms. Rascon was verbally attacked and threatened by her host mother. Ms. Rascon contacted her representative with Cultural Care but received no help or support.

482.    She was told by one Cultural Care representative to accept the abusive treatment.  Another representative of Cultural Care acknowledged that such circumstances do exist, and recommended that Ms. Rascon deal with the threats by locking herself in her bedroom.

483.    Ms. Rascon rematched again with a family in Virginia. Her third host mother paid her $200 per week, and expressed to Ms. Rascon that she believed her labor was worth more than that.

G.    **Ms. Jimenez's Experience in the *Au Pair* Program**

484.    Ms. Jimenez is originally from Colombia.

485.     In or about early 2014, Ms. Jimenez applied to and was hired by AuPairCare through its agent in Colombia.

486.     Ms. Jimenez considered several different agencies, including Cultural Care, Au Pair in America, and AuPairCare.

487.     Because publicly available information from those sponsors all informed her that she would be paid the same amount no matter which one accepted her application, Ms. Jimenez did not base her selection of AuPairCare based on her potential to earn a particular wage.

488.     AuPairCare's Colombian agent told Ms. Jimenez that the "stipend" for working in the United States as an au pair would be $195 and that, because the amount was set by the United States Government, she would be paid that amount.

489.     That agent assured her that this would equal a lot of money in Colombia.

490.     In or about July 2014, Ms. Jimenez flew to New York, New York before traveling to New Jersey for approximately 4 days of training by AuPairCare. She was not paid to attend this training, which provided instruction on her duties as an au pair.

491.     At the training, an AuPairCare representative told her that the stipend was $195.75, and that that all *au pairs* were paid the same, no matter where they work and no matter how many children they care for.

492.     After training, she was picked up by her host family and traveled to or near Philadelphia, Pennsylvania, where her host family lived.

493.     Ms. Jimenez's host family paid her $200 each week. She worked 45 hours each week. She was not paid extra for time over forty hours each week.

494.     Occasionally her host family left her with the children, in excess of 45 hours per week. When they did so, the family paid her $10 per hour for hours worked in excess of 45 in a week.

**H.     Ms. Harning's Experience in the *Au Pair* Program**

495.     Ms. Harning is originally from Germany.

496.     Ms. Harning first applied to the au pair program in 2007. She selected AuPairCare because it advertised the lowest application fees, and at the time, featured a rebate that would refund half of those fees upon successful completion of the program.

497.     Ms. Harning did not base her decision to apply to AuPairCare on how much she could earn as an au pair, because publicly available information told her that she would be paid the same amount in all of the programs.

498.     Ms. Harning paid approximately 400 Euros to AuPairCare to apply to the program. She additionally paid $100 USD to apply for her visa to the United States.

499.     She traveled from Germany to New Jersey in July 2008. Upon arrival she participated in the mandatory three-day training presented by AuPairCare. She was not paid to attend the training, which provided instruction on the duties she would be expected to perform. At the training, an AuPairCare representative explained that all *au pairs* would be paid the same, an amount set by the Department of State.

500.     Ms. Harning then traveled to Michigan to begin working as an au pair. Her host family had six children, including two sets of twins: infants and two-year olds.

501.     Several months into her experience, Ms. Harning became responsible for the host family children around the clock, seven days a week, as her host father was hospitalized and host mother remained with him at the hospital.

502.     Ms. Harning worked well in excess of 40 and even 45 hours every week, and more than 10 hours a day. She was not compensated for her time worked in excess of 40 hours.

503.     The entire time Ms. Harning worked as an au pair in 2008, she was always paid the minimum stipend, which amount changed while she was in the program.

504.     Ms. Harning returned to the United States in 2014, again as an au pair with AuPairCare. Ms. Harning paid approximately 350 Euros to AuPairCare in October 2013 to apply to its program.

505.     Though Ms. Harning had previously attended the AuPairCare training, she again attended the training mandated by AuPairCare in New Jersey. She attended not only the basic three-day training but a fourth day focused on infant care, requested by her new host family.

506.     At the training, AuPairCare representatives told Ms. Harning and the other *au pairs* that they would be paid $195.75 per week.

507.     Ms. Harning then traveled to Virginia where she worked with her new host family and their infant daughter. Ms. Harning was paid $200 per week in cash. Her host mother acknowledged that she was only supposed to pay her $195.75, but asked Ms. Harning not to give them back the few dollars in change.

508.     Ms. Harning consistently worked more than 40 hours per week. She was not paid extra for her time in excess of 40 hours per week, though upon occasion, if her host mother ran late to relieve her, her host mother gave her extra money for that time.

**I.     Ms. Mapledoram's Experience in the *Au Pair* Program**

509.     Ms. Mapledoram is originally from Australia.

510.     Ms. Mapledoram applied to Expert Au Pair in January 2014. Before applying, Ms. Mapledoram investigated other au pair agencies, and saw that all three agencies advertised that her wages would be $195.75 per week.

511.     Thus she based her selection of which agency to apply to not on the basis of what she could potentially earn as an au pair.

512.     Ms. Mapledoram paid approximately $500 USD to Expert Au Pair to apply to the program. She had to additionally contribute $500 USD for her own airfare, and paid $265 USD to apply for her visa.

513.     Ms. Mapledoram attended training mandated by Expert Au Pair in Florida in April 2014. At the training, which provided instruction on her performance of her duties as an au pair, she and the other *au pairs* were told that they would all be paid the same weekly stipend, and that the amount was set by the Department of State. They were told by representatives of Expert Au Pair that the amount they were paid would not depend on the number of children they cared for or number of hours they worked.

514.     Upon completion of her training, Ms. Mapledoram flew to Colorado and began working as an au pair. She worked up to 10 hours a day and a minimum of 45 hours per

week. She was not compensated extra for the time she worked in excess of 40 hours per week. She was paid $195.75 every week no matter how many hours she worked.

515.    In February 2015, Ms. Mapledoram rematched with a family that was also located in Colorado.

516.    Her second host family paid her $200 per week. Her host family told her that they were only supposed to pay her $195.75, but they elected to round it to $200.

517.    As with her first host family, Ms. Mapledoram worked a minimum of 45 hours per week with her second host family. She was not compensated for the hours she worked in excess of 40 per week.

518.    Ms. Mapledoram became acquainted with other *au pairs* while she was working in the United States. To her knowledge, none were paid more than $200 per week, based on the minimum stipend of $195.75.

## **RULE 23 CLASS ALLEGATIONS**

519.    The Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully re-written herein.

520.    The Plaintiffs assert Counts I-VII and IX-X as class action claims pursuant to Fed. R. Civ P. 23.

521.    Pending any modifications necessitated by discovery, the named Plaintiffs define the "Price Fixed Class" as follows:

> ALL PERSONS SPONSORED BY ANY SPONSOR DEFENDANT TO WORK AS A STANDARD AU PAIR IN THE UNITED STATES PURSUANT TO A J-1 VISA.

522.     Pending any modifications necessitated by discovery, Ms. Beltran defines the

"Interexchange National Wage Class" as follows:

> ALL CURRENT AND FORMER *AU PAIRS* FOR WHOM
> DEFENDANT INTEREXCHANGE, INC. WAS A J-1 VISA
> SPONSOR AND WHO PERFORMED AU PAIR WORK IN A
> STATE WHERE THE STATE MINIMUM WAGE IS
> GREATER THAN THE FEDERAL MINIMUM WAGE.

523.     Pending any modifications necessitated by discovery, Mmes. Deetlefs,

Cardenas and Rascon define the "Cultural Care National Wage Class" as follows:

> ALL CURRENT AND FORMER *AU PAIRS* FOR WHOM
> DEFENDANT CULTURAL CARE, INC. D/B/A CULTURAL
> CARE AU PAIR WAS A J-1 VISA SPONSOR AND WHO
> PERFORMED AU PAIR WORK IN A STATE WHERE THE
> STATE MINIMUM WAGE IS GREATER THAN THE
> FEDERAL MINIMUM WAGE.

524.     Pending any modifications necessitated by discovery, Ms. Hlatshaneni

defines the "Au Pair in America National Wage Class" as follows:

> ALL CURRENT AND FORMER *AU PAIRS* FOR WHOM
> DEFENDANT AMERICAN INSTITUTE FOR FOREIGN
> STUDY DBA AU PAIR IN AMERICA WAS A J-1 VISA
> SPONSOR AND WHO PERFORMED AU PAIR WORK IN A
> STATE WHERE THE STATE MINIMUM WAGE IS
> GREATER THAN THE FEDERAL MINIMUM WAGE.

525.     Pending any modifications necessitated by discovery, Ms. Ivette defines the

"GoAuPair National Wage Class" as follows:

> ALL CURRENT AND FORMER *AU PAIRS* FOR WHOM
> DEFENDANT GOAUPAIR WAS A J-1 VISA SPONSOR
> AND WHO PERFORMED AU PAIR WORK IN A STATE
> WHERE THE STATE MINIMUM WAGE IS GREATER THAN
> THE FEDERAL MINIMUM WAGE.

526.      Pending any modifications necessitated by discovery, Mmes. Jimenez and

Harning define the "AuPairCare National Wage Class" as follows:

> ALL CURRENT AND FORMER *AU PAIRS* FOR WHOM
> DEFENDANT AUPAIRCARE, INC. WAS A J-1 VISA
> SPONSOR AND WHO PERFORMED AU PAIR WORK IN A
> STATE WHERE THE STATE MINIMUM WAGE IS
> GREATER THAN THE FEDERAL MINIMUM WAGE.

527.      Pending any modifications necessitated by discovery, Ms. Mapledoram

defines the "Expert Au Pair National Wage Class" as follows:

> ALL CURRENT AND FORMER *AU PAIRS* FOR WHOM
> DEFENDANT EXPERT GROUP INTERNATIONAL, INC.
> D/B/A EXPERT AU PAIR WAS A J-1 VISA SPONSOR AND
> WHO PERFORMED AU PAIR WORK IN A STATE WHERE
> THE STATE MINIMUM WAGE IS GREATER THAN THE
> FEDERAL MINIMUM WAGE.

528.      Pending any modifications necessitated by discovery, Ms. Beltran defines the

"Interexchange New York Wage Class" as follows:

> ALL CURRENT AND FORMER *AU PAIRS* FOR WHOM
> DEFENDANT INTEREXCHANGE, INC. WAS A J-1 VISA
> SPONSOR.

529.      Pending any modifications necessitated by discovery, Ms. Hlatshaneni

defines the "Au Pair in America New York Wage Class" as follows:

> ALL CURRENT AND FORMER *AU PAIRS* FOR WHOM
> DEFENDANT AMERICAN INSTITUTE FOR FOREIGN
> STUDY DBA AU PAIR IN AMERICA WAS A J-1 VISA
> SPONSOR.

530.      Pending any modifications necessitated by discovery, Mmes. Deetlefs,

Cardenas, and Rascon define the "Cultural Care New York Wage Class" as follows:

> ALL CURRENT AND FORMER *AU PAIRS* FOR WHOM DEFENDANT CULTURAL CARE, INC. D/B/A CULTURAL CARE AU PAIR WAS A J-1 VISA SPONSOR.

531.     Pending any modifications necessitated by discovery, Ms. Ivette defines the

"GoAuPair New York Wage Class" as follows:

> ALL CURRENT AND FORMER *AU PAIRS* FOR WHOM DEFENDANT GOAUPAIR WAS A J-1 VISA SPONSOR.

532.     Pending any modifications necessitated by discovery, Mmes. Jimenez and

Harning define the "AuPairCare New Jersey Wage Class" as follows:

> ALL CURRENT AND FORMER *AU PAIRS* FOR WHOM DEFENDANT AUPAIRCARE WAS A J-1 VISA SPONSOR.

533.     Pending any modifications necessitated by discovery, Ms. Beltran defines the

"InterExchange Fraud Class" as follows:

> ALL CURRENT AND FORMER *AU PAIRS* FOR WHOM DEFENDANT INTEREXCHANGE, INC.WAS A J-1 VISA SPONSOR.

534.     Pending any modifications necessitated by discovery, Ms. Hlatshaneni

defines the "Au Pair in America Fraud Class" as follows:

> ALL CURRENT AND FORMER *AU PAIRS* FOR WHOM DEFENDANT AMERICAN INSTITUTE FOR FOREIGN STUDY DBA AU PAIR IN AMERICA WAS A J-1 VISA SPONSOR.

535.     Pending any modifications necessitated by discovery, Mmes. Deetlefs,

Cardenas, and Rascon define the "Cultural Care Fraud Class" as follows:

> ALL CURRENT AND FORMER *AU PAIRS* FOR WHOM DEFENDANT CULTURAL CARE, INC. D/B/A CULTURAL CARE AU PAIR WAS A J-1 VISA SPONSOR.

536.     Pending any modifications necessitated by discovery, Ms. Ivette defines the

"GoAuPair Fraud Class" as follows:

> ALL CURRENT AND FORMER *AU PAIRS* FOR WHOM
> DEFENDANT GOAUPAIR WAS A J-1 VISA SPONSOR.

537.     Pending any modifications necessitated by discovery, Mmes. Jimenez and

Harning define the "AuPairCare Fraud Class" as follows:

> ALL CURRENT AND FORMER *AU PAIRS* FOR WHOM DEFENDANT
> AUPAIRCARE WAS A J-1 VISA SPONSOR.

538.     Pending any modifications necessitated by discovery, Ms. Mapledoram

defines the "Expert Au Pair Fraud Class" as follows:

> ALL CURRENT AND FORMER *AU PAIRS* FOR WHOM DEFENDANT
> EXPERT AU PAIR WAS A J-1 VISA SPONSOR.

539.     The members of each classes are so numerous that joinder of all potential

class members is impracticable.  The Plaintiffs do not know the exact size of the classes

since that information is within the control of the Sponsor Defendants.  However,

according to the Secretary of State's J-1 visa statistics, there were 13,789 J1 *au pairs* in

the United States in 2013.  These persons make up a portion of the Price Fixing Class

and, based on these statistics, a conservative estimate of the size of the class is at least

50,000 current and former *au pairs*.  According to the same statistics, over 13,000 *au

pairs* come to the United States each year and there are 15 au pair visa sponsors.

Based on these numbers, Plaintiffs estimate that there are at least 1,000 members in

each of the New York wage classes and national wage classes defined above.  The

exact sizes of the classes will be easily ascertainable from the Sponsor Defendants'

records and government records.

98

540.     There are questions of law or fact common to the classes that predominate over any individual issues that might exist.  Common questions of law and fact include whether or not the au pair sponsors all engaged in a price fixing conspiracy in order to keep au pair wages low and whether or not *au pairs* were paid at least the applicable federal and/or state minimum wage.

541.     The class claims asserted by Plaintiffs are typical of the claims of all of the potential Class Members because all potential Class Members experienced the same or similar pay as a result of Defendants' conspiracy.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy because numerous identical lawsuits alleging similar or identical causes of action would not serve the interests of judicial economy.

542.     Plaintiffs will fairly and adequately protect and represent the interests of the class.  Plaintiffs' wages were artificially kept at the same low level as other *au pairs* as a result of the same conspiracy among the Sponsors, Plaintiffs were paid less than the applicable federal and state minimum wage during their time as an *au pairs*, and Plaintiffs were not paid at all for their training.

543.     Plaintiffs are represented by counsel experienced in litigation on behalf of low-wage workers and in class actions.

544.     The prosecution of separate actions by the individual potential Class Members would create a risk of inconsistent or varying adjudications with respect to individual potential Class Members that would establish incompatible standards of conduct for Defendants.

545.     Each Class Member's claim is relatively small.  Thus, the interest of potential Class Members in individually controlling the prosecution or defense of separate actions is slight.  In addition, public policy supports the broad remedial purposes of class actions in general.

546.     Plaintiffs are unaware of any members of the putative class who are interested in presenting their claims in a separate action.

547.     Plaintiffs are unaware of any pending litigation commenced by members of the Class concerning the instant controversies.

548.     It is desirable to concentrate this litigation in this forum because the relevant employment of Ms. Beltran and Ms. Mapledoram occurred in this jurisdiction, and proceedings have been pending in this jurisdiction since in or about 2014. At the time this lawsuit was filed, certain of the defendants resided in this jurisdiction, as well.

549.     This class action will not be difficult to manage due to the uniformity of claims among the Class Members and the susceptibility of the claims to class litigation and the use of representative testimony and representative documentary evidence.

550.     The contours of the class will be easily defined by reference to Defendants records and government records kept for each J-1 visa issued for an au pair.

## 29 U.S.C. § 216(B) COLLECTIVE ACTION ALLEGATIONS

551.     Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully re-written herein.

552.     Plaintiffs bring their FLSA claims as a collective actions, pursuant to 29 U.S.C. § 216(b), on behalf of themselves and on behalf of all other similarly situated current and former employees.

553.     Written consents to be named Plaintiffs in a FLSA collective action by Mmes. Rascon, Jimenez, Harning and Mapledoram are attached to this Second Amended Complaint as Exhibit 1.

554.     Pending any modifications necessitated by discovery, Ms. Beltran preliminarily defines the "InterExchange 216(b) Class" as follows:

> ALL CURRENT AND FORMER *AU PAIRS* FOR WHOM DEFENDANT INTEREXCHANGE, INC. WAS A J-1 VISA SPONSOR.

555.     Pending any modifications necessitated by discovery, Ms. Hlatshaneni preliminarily defines the "Au Pair in America 216(b) Class" as follows:

> ALL CURRENT AND FORMER *AU PAIRS* FOR WHOM DEFENDANT AMERICAN INSTITUTE FOR FOREIGN STUDY DBA AU PAIR IN AMERICA WAS A J-1 VISA SPONSOR.

556.     Pending any modifications necessitated by discovery, Ms. Hlatshaneni preliminarily defines the "Au Pair in America Sub-216(b) Class" as follows:

> ALL CURRENT AND FORMER *AU PAIRS* FOR WHOM DEFENDANT AMERICAN INSTITUTE FOR FOREIGN STUDY DBA AU PAIR IN AMERICA WAS A J-1 VISA SPONSOR AND WHO WERE NOT PAID OVERTIME FOR HOURS WORKED IN EXCESS OF 40 IN A WEEK FOR WORK PERFORMED AFTER 1/1/2015.

557.     Pending any modifications necessitated by discovery, Mmes. Deetlefs, Cardenas and Rascon preliminarily define the "Cultural Care 216(b) Class" as follows:

> ALL CURRENT AND FORMER *AU PAIRS* FOR WHOM
> DEFENDANT CULTURAL CARE, INC. D/B/A CULTURAL
> CARE AU PAIR WAS A J-1 VISA SPONSOR.

558.     Pending any modifications necessitated by discovery, Mmes. Deetlefs,

Cardenas, and Rascon preliminarily define the "Cultural Care 216(b) Sub-Class" as

follows:

> ALL CURRENT AND FORMER *AU PAIRS* FOR WHOM
> DEFENDANT CULTURAL CARE, INC. D/B/A CULTURAL
> CARE AU PAIR WAS A J-1 VISA SPONSOR AND WHO
> WERE NOT PAID OVERTIME FOR HOURS WORKED IN
> EXCESS OF 40 IN A WEEK FOR WORK PERFORMED
> AFTER 1/1/2015.

559.     Pending any modifications necessitated by discovery, Ms. Ivette preliminarily

defines the "GoAuPair 216(b) Class" as follows:

> ALL CURRENT AND FORMER *AU PAIRS* FOR WHOM
> DEFENDANT GOAUPAIR WAS A J-1 VISA SPONSOR.

560.     Pending any modifications necessitated by discovery, Ms. Ivette preliminarily

defines the "GoAuPair 216(b) Sub-Class" as follows:

> ALL CURRENT AND FORMER *AU PAIRS* FOR WHOM
> DEFENDANT GOAUPAIR AND WHO WERE NOT PAID
> OVERTIME FOR HOURS WORKED IN EXCESS OF 40 IN
> A WEEK FOR WORK PERFORMED AFTER 1/1/2015.

561.     Pending any modifications necessitated by discovery, Mmes. Jimenez and

Harning preliminarily define the "AuPairCare 216(b) Class" as follows:

> ALL CURRENT AND FORMER *AU PAIRS* FOR WHOM
> DEFENDANT AUPAIRCARE WAS A J-1 VISA SPONSOR.

562.     Pending any modifications necessitated by discovery, Mmes. Jimenez and

Harning preliminarily define the "AuPairCare 216(b) Sub-Class" as follows:

>   ALL CURRENT AND FORMER *AU PAIRS* FOR WHOM
>   DEFENDANT AUPAIRCARE AND WHO WERE NOT PAID
>   OVERTIME FOR HOURS WORKED IN EXCESS OF 40 IN
>   A WEEK FOR WORK PERFORMED AFTER 1/1/2015.

563.    Pending any modifications necessitated by discovery, Ms. Mapledoram

preliminarily defines the "Expert Au Pair 216(b) Class" as follows:

>   ALL CURRENT AND FORMER *AU PAIRS* FOR WHOM
>   DEFENDANT EXPERT AU PAIR WAS A J-1 VISA
>   SPONSOR.

564.    Pending any modifications necessitated by discovery, Ms. Mapledoram

preliminarily defines the "Expert Au Pair 216(b) Sub-Class" as follows:

>   ALL CURRENT AND FORMER *AU PAIRS* FOR WHOM
>   DEFENDANT EXPERT AU PAIR AND WHO WERE NOT
>   PAID OVERTIME FOR HOURS WORKED IN EXCESS OF
>   40 IN A WEEK FOR WORK PERFORMED AFTER
>   1/1/2015.

565.    All potential FLSA Class Members are similarly situated to their respective

named Plaintiffs because, among other things, they were all employees of the

respective Defendant sponsors and, upon information and belief, all suffered from the

same policies of the Defendant Sponsors, including:

>   i.    Failing to pay at least federal minimum wage for all hours
>
>         worked;
>
>   ii.   Failing to pay overtime for hours worked in excess of 40 in a
>
>         week; and
>
>   iii.  Illegal taking deduction and/or credits.

## COUNT I: RESTRAINT OF TRADE IN VIOLATION OF 15 U.S.C. §§ 1 *ET SEQ.*

**Brought by:**
**Plaintiffs and the Price Fixed Class against the Sponsor Defendants**

566.  Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully re-written herein.  As set forth above, Plaintiffs assert this count on their own behalf and on behalf of all other similarly situated employees pursuant to Fed. R. Civ P. 23.

567.  At all relevant times, the Sponsor Defendants employed Price Fixed Class members throughout the United States.

568.  The conduct of the Sponsor Defendants, as described herein, substantially affected interstate and international commerce and caused antitrust injury.

569.  The Sponsors directly compete with one another in attracting *au pairs* to work with them.

570.  As a group, the Sponsors conspired and agreed to fix all of their sponsored standard *au pairs*' weekly wages at exactly the minimum amount viewed as allowable under the FLSA.  This fixed weekly rate was and continues to be an artificially depressed wage for standard au pair services.  The Sponsors' agreement to fix the standard au pair wage constitutes a per se violation of Section 1 of the Sherman Act.

571.  Nevertheless, in the alternative, Plaintiffs allege that the Sponsor Defendants' price-fixing agreement is anticompetitive and illegal under the Rule of Reason.  For purposes of the Rule of Reason, the relevant geographic market for the claim alleged in this Count is the United States, and the relevant service market consists of the services provided by J-1 Visa standard *au pairs*.

572.     The Sponsors' collusive activity had and has the effect of (a) fixing the compensation of Plaintiffs and the Price Fixed Class at an artificially low level; (b) eliminating, to a substantial degree, competition for au pair labor; and (c) restraining trade in that *au pairs* are not able to negotiate their wage rates above the weekly stipend set by their Sponsors.

573.     The Sponsors' combinations and contracts to restrain trade and eliminate competition for au pair labor have damaged the Named Plaintiffs and the members of the Price Fixed Class.

574.     As a result, Plaintiffs and those similarly situated suffered injuries and are entitled to treble damages, fees, and costs as set forth by law.  Plaintiffs and those similarly situated are also entitled to injunctive relief to end the price fixing scheme, and to force the Defendants to take affirmative steps to correct the market.

## COUNT II: CIVIL RICO, 18 U.S.C. 1964(C)

**Brought by:**
- **Ms. Beltran and the InterExchange Fraud Class against InterExchange**
- **Mmes. Deetlefs, Cardenas and Rascon and the Cultural Care Fraud Class against Cultural Care**
- **Ms. Hlatshaneni and the Au Pair in America Fraud Class against Au Pair in America**
- **Mmes. Jimenez and Harning and the AuPairCare Fraud Class against AuPairCare**

575.     Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully re-written herein.

576.     As set forth above, Plaintiffs assert this count on their own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

577.     Defendants InterExchange, Cultural Care, Au Pair in America, and AuPaireCare violated RICO by violating 18 U.S.C. §§ 1962(c) and 1964(c).

578.     InterExchange, Cultural Care, Au Pair in America, and AuPairCare engaged in the fraudulent schemes, acts, and misrepresentations described above, which violate 18 U.S.C. § 1343 and 18 U.S.C. § 1351, and which constitute patterns of racketeering.

579.     By conducting their respective Enterprises through patterns of racketeering, each of these Defendants has injured the *au pairs* sponsored by each such Defendant and employed by the host families comprising each such Defendant's Enterprise.

580.     Among other things, each of these RICO violations have caused the *au pairs* employed by the Sponsors to suffer loss of past, current, and prospective wages.

581.     As a result, Plaintiffs and those similarly situated suffered injuries and are entitled to treble damages, fees, and costs as set forth by law.

## COUNT III: BREACH OF FIDUCIARY DUTY UNDER THE LAWS OF THE SEVERAL STATES AND THE DISTRICT OF COLUMBIA

**Brought by:**
- **Ms. Beltran and the InterExchange Fraud Class against Interexchange**
- **Mmes. Deetlefs, Cardenas, and Rascon and the Cultural Care Fraud Class against Cultural Care**
- **Ms. Hlatshaneni and the Au Pair in America Fraud Class against Au Pair in America**
- **Ms Ivette and the GoAuPair Fraud Class against GoAuPair**
- **Ms. Jimenez and Harning and the AuPairCare Fraud Class against AuPairCare**
- **Ms. Mapledoram and the Expert Au Pair Fraud Class against Expert Au Pair**

582.     The Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully re-written herein.

106

583.     As set forth above, Plaintiffs assert this count on their own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

584.     The Defendant Sponsors solicited and accepted a duty to act as *au pairs*' protectors, in a special relationship where the *au pairs*' vulnerability to the Sponsors resulted in the Sponsors' empowerment.  This special relationship of trust prevented the *au pairs* from effectively protecting themselves.  The Sponsors breached their duties to the *au pairs* for the reasons set out in the preceding paragraphs including setting an illegal wage and by misleading the *au pairs* to believe that the weekly wage was fixed by law and could not be altered.  The *au pairs* suffered damages when they were paid below minimum wage, when they paid to join their respective programs, and when they received wages lower than they otherwise would have.

## COUNT IV: NEGLIGENT MISREPRESENTATION THE LAWS OF THE SEVERAL STATES AND THE DISTRICT OF COLUMBIA

**Brought by:**
- **Ms. Beltran and the InterExchange Fraud Class against Interexchange**
- **Mmes. Deetlefs, Cardenas and Rascon and the Cultural Care Fraud Class against Cultural Care**
- **Ms. Hlatshaneni and the Au Pair in America Fraud Class against Au Pair in America**
- **Ms Ivette and the GoAuPair Fraud Class against GoAuPair**
- **Ms. Jimenez and Harning and the AuPairCare Fraud Class against AuPairCare**
- **Ms. Mapledoram and the Expert Au Pair Fraud Class against Expert Au Pair**

585.     The Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully re-written herein.

586.     As set forth above, Plaintiffs assert this count on their own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

587.     In the course of their business, the Sponsors entered into special relationships with the vulnerable *au pairs*.  The Sponsors made misstatements of material facts for the *au pairs*' guidance as set forth in preceding paragraphs, including but not limited to the legality and set nature of the wages.  The Sponsors made these statements in order to induce the *au pairs* to retain their services and agree to this low pay.  The Sponsors failed to act with due care or competence when obtaining and relaying this information and had a duty to know that the information could not be true. The *au pairs*, as vulnerable foreigner workers, reasonably and justifiably relied on the deceptive, incorrect, and false statements, when they reasonably believed that the wages were fixed by law and could not be altered.  They suffered damages when they were paid below minimum wage, when they paid to join their respective programs, and when they received wages lower than they otherwise would have.

## COUNT V: CONSTRUCTIVE FRAUD OR FRAUDULENT CONCEALMENT UNDER THE LAWS OF THE SEVERAL STATES AND THE DISTRICT OF COLUMBIA

**Brought by:**
- **Ms. Beltran and the InterExchange Fraud Class against Interexchange**
- **Mmes. Deetlefs, Cardenas and Rascon and the Cultural Care Fraud Class against Cultural Care**
- **Ms. Hlatshaneni and the Au Pair in America Fraud Class against Au Pair in America**
- **Ms Ivette and the GoAuPair Fraud Class against GoAuPair**
- **Ms. Jimenez and Harning and the AuPairCare Fraud Class against AuPairCare**
- **Ms. Mapledoram and the Expert Au Pair Fraud Class against Expert Au Pair**

588.     Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully re-written herein.

589.     As set forth above, Plaintiffs assert this count on their own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

590.     The Sponsors were in a superior position of knowledge to know facts related to the au pair wage and held themselves out to have special knowledge of wage rules for *au pairs*.  The sponsors had a duty to know that the $195.75 weekly wage could be illegal.  The Sponsors, with the intent to get the *au pairs* to sign up at an exact wage of $195.75, failed to disclose this fact, knowing that the *au pairs* were ignorant of U.S. labor laws.  The *au pairs* were in a markedly inferior position to know labor laws, and justly relied upon the statements of fact to reasonably believe that the wage was fixed in law and could not be altered.  They suffered damages when they were paid below minimum wage, when they paid to join their respective programs, and when they received wages lower than they otherwise would have.

## COUNT VI: CONSUMER PROTECTION UNDER THE LAWS OF THE SEVERAL STATES AND THE DISTRICT OF COLUMBIA

### Brought by:

- **Ms. Beltran and the InterExchange Fraud Class against Interexchange**
- **Mmes. Deetlefs, Cardenas and Rascon and the Cultural Care Fraud Class against Cultural Care**
- **Ms. Hlatshaneni and the Au Pair in America Fraud Class against Au Pair in America**
- **Ms Ivette and the GoAuPair Fraud Class against GoAuPair**
  - **Ms. Jimenez and Harning and the AuPairCare Fraud Class against AuPairCare**
  - **Ms. Mapledoram and the Expert Au Pair Fraud Class against Expert Au Pair**

591.     Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully re-written herein.

592.     As set forth above, Plaintiffs assert this count on their own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

593.     The Sponsors' deception as described above constitutes an unfair trade practice in violation of the consumer protection acts of the several states and the District of Columbia.  The *au pairs* were consumers of the Sponsors' services.  The Sponsors, acting from within the several States, tricked the *au pairs* to sign up for their programs based on false and misleading representations about the wage.  The Sponsors knew or recklessly disregarded the falsity of their statements in order to induce the *au pairs* to trust them pay for their services in return for suppressed wages, and because of the differences in sophistication the misrepresentations were unconscionable.  The *au pairs* justifiably relied on the Sponsors' statements.  The *au pairs* suffered damages when they paid for the programs and received suppressed wages.

### COUNT VIII: FAILURE TO PAY MINIMUM WAGE AND OVERTIME IN VIOLATION OF THE FAIR LABOR STANDARDS ACT, 29 U.S.C. §§ 201 *ET SEQ.*

**Brought by:**
- **Ms. Beltran and the InterExchange 216(b) Class against InterExchange and the Noonans**
- **Mmes. Deetlefs,  Cardenas, and Rascon, the Cultural Care 216(b) Class and the Cultural Care 216(b) Sub-Class against Cultural Care.**
- **Ms. Hlatshaneni, the Au Pair in America 216(b) Class, and the Au Pair in America 216(b) Sub-Class against Au Pair in America.**
- **Ms Ivette, the GoAuPair 216(b) Class, and GoAuPair 216(b) Sub-Class against Au Pair in America.**
- **Mmes. Jimenez and Harning, the AuPairCare 216(b) Class and the AuPairCare 216(b) Sub-Class against AuPairCare**
- **Ms. Mapledoram, the Expert Au Pair 216(b) Class, and the Expert Au Pair 216(b) Sub-Class against Expert Au Pair.**

594.     Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully re-written herein.

595.     As set forth above, Plaintiffs assert this count on their own behalf and on behalf their respective 216(b) classes and 216(b) sub-classes.

596.     The named Plaintiffs and those similarly situated are covered by the FLSA as domestic service workers.

597.     On information and belief, each of the Sponsors named in this count had annual revenues in excess of $500,000 or were members of enterprises with revenues in excess of $500,000.

598.     Based on the nature of the operations of Defendants InterExchange, Cultural Care, Au Pair in America, GoAuPair, AuPairCare and Expert Au Pair, which included recruiting workers from foreign countries, transporting them to the United States, training them, employing them, and monitoring them, at all relevant times, Defendant Interexchange had two or more employees that handled goods or materials that had been moved in or produced for interstate commerce, including computers and telephones.

599.     The named Plaintiffs and all others similarly situated were "employees" as that term is defined by the FLSA 29 U.S.C § 203 (e) because they were employed by their respective Sponsors.

600.     InterExchange, Cultural Care, Au Pair in America, GoAuPair, AuPairCare and Expert Au Pair suffered and permitted the named Plaintiffs and all other similarly situated *au pairs* to work because it controlled their recruitment, had the ability to terminate participation in the program, trained them, maintained their records, controlled

Case No. 1:14-cv-03074-CMA-KMT   Document 329-1   filed 08/15/16   USDC Colorado   pg 113 of 124


where they worked, the dates of employment, set the terms of their employment contracts, and set their wage rates.

601.   InterExchange, Cultural Care, Au Pair in America, GoAuPair, AuPairCare and Expert Au Pair violated the FLSA when they failed to pay at least minimum wage for all hours worked by the named Plaintiffs and all others similarly-situated employees.

602.   InterExchange, Cultural Care, Au Pair in America, GoAuPair, AuPairCare and Expert Au Pair also violated the FLSA by failing to pay overtime to the named Plaintiffs and all others similarly-situated employees.

603.   Defendants' violations of the FLSA were willful under 29 U.S.C. 255 (a) because they knew or should have known that the named Plaintiffs and all others similarly situated were entitled to minimum wage and overtime under FLSA, and/or, upon information and belief, they failed to make adequate inquiry regarding whether the named Plaintiffs and others similarly situated were covered by the FLSA.

604.   The named Plaintiffs and all others similarly situated are entitled to recover unpaid minimum wage, overtime, illegal deductions and/or credits, the costs incurred primarily for the benefit of the employer, liquidated damages, attorneys' fees, costs, and post-judgment interest. 29 U.S.C. §§ 201 *et seq.*

112

## COUNT IX: CLAIMS FOR UNPAID WAGES UNDER THE LAWS OF SEVERAL STATES AND THE DISTRICT OF COLUMBIA

**Brought by:**
- **Ms. Beltran and the InterExchange National Wage Class against InterExchange.**
- **Mmes. Deetlefs, Cardenas, and Rascon, and the Cultural Care National Wage Class against Cultural Care.**
- **Ms. Hlatshaneni and the Au Pair in America National Wage Class against Au Pair in America.**
- **Ms Ivette and the GoAuPair National Wage Class against GoAuPair.**
- **Mmes. Jimenez and Harning and the AuPairCare National Wage Class against AuPairCare.**
- **Ms. Mapledoram and the Expert Au Pair National Wage Class against Expert Au Pair.**

605.     Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully re-written herein.

606.     As set forth above, Plaintiffs assert this count on their own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

607.     Defendants InterExchange, Cultural Care, Au Pair in America, GoAuPair, AuPairCare and Expert Au Pair failed to pay the named Plaintiffs and those similarly situated all wages owed under the laws of the various states where the named Plaintiffs and those similarly situated worked as *au pairs*, including statutorily required minimum wage and overtime.

608.     Many states, including Colorado, California, and Massachusetts have constitutional provisions, statutes, rules, regulations, and/or other laws that require a payment in excess of the FLSA minimum wage.

609.     Plaintiffs and those similarly situated are entitled to unpaid wages under these various laws.

610.     Because the wage term in the employment contracts was illegal, Plaintiffs and those similarly situated are entitled to recover their unpaid wages in *quantum meruit*, i.e., the difference between the amount paid for au pair services and the reasonable value of those services.

611.     At a minimum, Plaintiffs and those similarly situated are entitled to unpaid minimum wage for each hour they worked under the various applicable state, district, or local laws.

612.     The refusal to pay the lawful wages caused damages.  These damages in most cases can be ascertained by simple arithmetic.

613.     Plaintiffs and those similarly situated are entitled to compensation and any statutory damages and attorney's fees and interest as allowed under the various laws.

## COUNT X: VIOLATIONS OF NEW YORK WAGE ACT

**Brought by:**
- **Ms. Beltran and the InterExchange New York Wage Class against InterExchange.**
- **Mmes. Deetlefs, Cardenas, and Rascon and the Cultural Care New York Wage Class against Cultural Care.**
- **Ms. Hlatshaneni and the Au Pair in America New York Wage Class against Au Pair in America.**
- **Ms Ivette and the GoAuPair New York Wage Class against GoAuPair.**

614.     Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully re-written herein.

615.     As set forth above, Plaintiffs assert this count on their own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

616.     Defendants InterExchange, Cultural Care, and Au Pair in America failed to pay the Plaintiffs and those similarly situated consistent with New York law, including failing to pay them at least New York minimum wage for all hours worked.

617.     The unpaid work includes unpaid training time. Plaintiffs and those similarly situated to spend approximately one week training in New York and did not pay anything for this week of work.

618.     This "training" is compensable as work under the New York law because the training was mandatory, the *au pairs* acted under the Defendants' direction and control, and the training primarily benefited the Defendants as the workers were guaranteed a job with their respective sponsors at the end of the training, and were not free to work at a different employer than prearranged.

619.     Plaintiffs and those similarly situated have the right to recovery under New York Code Article 6 - § 190 *et seq.*., including statutory damages of 25%, interest, and attorneys' fees and costs.

## COUNT XI: VIOLATIONS OF NEW JERSEY WAGE ACT

### Brought by:

- **Mmes. Jimenez and Harning, and the AuPairCare National Wage Class against Defendant AuPairCare**

620.     Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully re-written herein.

621.     As set forth above, Plaintiffs assert this count on their own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

622.    Defendant AuPairCare failed to pay the Plaintiffs and those similarly situated consistent with New Jersey law, including failing to pay them at least New Jersey minimum wage for all hours worked.

623.    The unpaid work includes unpaid training time. Defendant required Plaintiffs and those similarly situated to spend approximately one week training in New Jersey and did not pay anything for this week of work.

624.    This "training" is compensable as work under the New Jersey law because the training was mandatory, the *au pairs* acted under the Defendant's direction and control, and the training primarily benefited the Defendant as the workers were guaranteed a job with their respective sponsors at the end of the training, and were not free to work at a different employer than prearranged.

625.    Plaintiffs and those similarly situated have the right to recovery under New Jersey wage and hour law, including N.J.S.A. 34:11-57 to -67 and associated regulations, including any applicable penalties, interest, attorneys' fees and costs.

## DEMAND FOR JURY TRIAL

626.    Plaintiffs and those similarly situated demand a trial by jury for all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that judgment be entered in their favor and in favor of those similarly situated as follows:

a. Certifying and maintaining this action as a class action, with Plaintiffs as designated class representatives and with their counsel appointed as class counsel;

b. Certifying and maintaining this action as a collective action under 29 U.S.C § 216(b), and providing appropriate notice of this suit and the opportunity to opt into the action be provided to all potential members of the 216(b) classes;

c. Declaring Defendants in violation of each of the counts set forth above;

d. Awarding treble damages for antitrust injuries to Plaintiffs and those similarly situated;

e. Awarding treble damages for RICO injuries to Plaintiffs and those similarly situated;

f. Awarding Plaintiffs and those similarly situated compensatory and punitive damages on Counts III, IV, V, VI, and VII;

g. Awarding Plaintiffs and those similarly situated unpaid minimum wage and overtime as permitted by law;

h. Awarding Plaintiffs and those similarly situated liquidated damages, attorney's fees, and post-judgment interest pursuant to 29 U.S.C. §216(b);

i. Awarding Plaintiffs and those similarly situated unpaid wages, statutory penalties, and attorney's fees pursuant to the laws of the several states;

j. Awarding Plaintiffs and the New York wage class unpaid wages, statutory penalties, and attorney's fees pursuant to the New York Wage Act;

k.  Awarding the Named Plaintiffs a service award;

l.  Awarding Plaintiffs and those similarly situated reimbursement for costs incurred in applying for and traveling to au pair jobs;

m.  Awarding pre-judgment, post-judgment, and statutory interest;

n.  Awarding attorneys' fees;

o.  Awarding costs;

p.  Ordering equitable relief, including a judicial determination of the rights and responsibilities of the parties;

q.  Awarding such other and further relief as the Court may deem just and proper.

Dated:  August 15, 2016

Respectfully Submitted,


s/Alexander Hood
Alexander Hood
Towards Justice
601 16th St., Suite C #207
Golden, CO 80401
Tel.: 720-239-2606
Fax: 303-957-2289
Email: alex@towardsjustice.org

Attorney for the Plaintiffs

## Exhibit 1

## CONSENTIMIENTO PARA ACCIÓN FLSA

Por este medio doy mi consentimiento para que se haga una demanda por salarios que puede que me deben bajo la Ley de Normas Justas de Trabajo. Yo les autorizo a mis abogados a que me representen ante cualquier tribunal o agencia sobre estas reclamaciones, incluyendo la presentación de un caso el cual yo soy la parte Demandante en una acción colectiva de conformidad con 29 U.S.C. § 216.

NOMBRE   _____

FIRMA   _____

FECHA   _____


## FLSA CONSENT FORM

I hereby give my consent to sue for wages that may be owed to me under the Fair Labor Standards Act. I hereby authorize my attorneys to represent me before any court or agency on these claims, including filing a case where I am the party Plaintiff in a collective action pursuant to 29 U.S.C. § 216.

NAME   _Juliane Harning_

SIGNATURE   _J H_

DATE   _08/01/2016_

1

## <u>CONSENTIMIENTO PARA ACCIÓN FLSA</u>

Por este medio doy mi consentimiento para que se haga una demanda por salarios que puede que me deben bajo la Ley de Normas Justas de Trabajo. Yo les autorizo a mis abogados a que me representen ante cualquier tribunal o agencia sobre estas reclamaciones, incluyendo la presentación de un caso el cual yo soy la parte Demandante en una acción colectiva de conformidad con 29 U.S.C. § 216.

NOMBRE      _____

FIRMA      _____

FECHA      _____

## <u>FLSA CONSENT FORM</u>

I hereby give my consent to sue for wages that may be owed to me under the Fair Labor Standards Act. I hereby authorize my attorneys to represent me before any court or agency on these claims, including filing a case where I am the party Plaintiff in a collective action pursuant to 29 U.S.C. § 216.

NAME      *Nicole Mapledoram*

SIGNATURE      _____

DATE      *15-AUG-2016*

1

## CONSENTIMIENTO PARA ACCIÓN FLSA

Por este medio doy mi consentimiento para que se haga una demanda por salarios que puede que me deben bajo la Ley de Normas Justas de Trabajo. Yo les autorizo a mis abogados a que me representen ante cualquier tribunal o agencia sobre estas reclamaciones, incluyendo la presentación de un caso el cual yo soy la parte Demandante en una acción colectiva de conformidad con 29 U.S.C. § 216.

NOMBRE   Laura Mejia Jimenez

FIRMA   Laura Mejia J

FECHA   16/04/2015

## FLSA CONSENT FORM

I hereby give my consent to sue for wages that may be owed to me under the Fair Labor Standards Act. I hereby authorize my attorneys to represent me before any court or agency on these claims, including filing a case where I am the party Plaintiff in a collective action pursuant to 29 U.S.C. § 216.

NAME   Laura Mejia Jimenez

SIGNATURE   Laura Mejia J

DATE   16/04/2015

8

## CONSENTIMIENTO PARA ACCIÓN FLSA

Por este medio doy mi consentimiento para que se haga una demanda por salarios que puede que me deben bajo la Ley de Normas Justas de Trabajo. Yo les autorizo a mis abogados a que me representen ante cualquier tribunal o agencia sobre estas reclamaciones, incluyendo la presentación de un caso el cual yo soy la parte Demandante en una acción colectiva de conformidad con 29 U.S.C. § 216.

NOMBRE _Sarah Carolina Arzola-Ramón_

FIRMA _____

FECHA _08/11/2016_

## FLSA CONSENT FORM

I hereby give my consent to sue for wages that may be owed to me under the Fair Labor Standards Act. I hereby authorize my attorneys to represent me before any court or agency on these claims, including filing a case where I am the party Plaintiff in a collective action pursuant to 29 U.S.C. § 216.

NAME _Sarah Carolina Arzola-Ramón_

SIGNATURE _____

DATE _08/11/2016_

1