IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Case No. 14-cv-03074-CMA-KMT

JOHANA PAOLA BELTRAN *et al.*,

      Plaintiffs,

v.

INTEREXCHANGE, INC. *et al.*,

      Defendants.

---

**PLAINTIFFS' OPPOSITION TO JOINT MOTION TO STRIKE [ECF NO. 327]**

---

This is the second time that the defendants have moved to strike paragraphs 90-94 of the First Amended Complaint, which recount various statements by their agents acknowledging that the defendants agreed to set a uniform price for *au pair* labor. In denying the previous attempt, the Court observed that motions to strike allegations in a complaint are disfavored, not in small part because they lead to "excessive quibbling, tactical maneuvering and possible frustration of justice."  [ECF No. 235 at 3]. Now, after a single deposition, defendants have renewed their motion, engaging in precisely the sort of tactical maneuvering that this Court frowned upon. That is perhaps understandable, as Judge Arguello described the relevant allegations as amounting to a "smoking gun."  [ECF No. 258 at 9].  But the result must be the same.

Striking plaintiffs' allegations is simply not the appropriate remedy for whatever wrong the defendants perceive. If defendants can really demonstrate that the smoking gun allegations have been "repudiated," then they will have little trouble dealing with the

1

evidence at trial, which, as the Court previously noted, is the proper way to deal with allegations that cannot be proved. [*See* ECF No. 235 at 4].  But the truth is that plaintiffs' allegations were entirely borne out by the relevant deposition.

To be perfectly clear, the defendants do not argue that the smoking gun admissions quoted in the First Amended Complaint were never made. To the contrary, the deposition of plaintiffs' investigator confirmed that their agents said precisely what the Complaint alleges they said. Instead, they argue that the allegations were somehow "misleading by omission" because plaintiffs did not set forth in the complaint every word uttered by their agents. In other words, defendants' agents somehow did not mean what they said, and as a result, their admissions should be stricken.

The defendants are wrong on both the facts and the law. The investigator's report and deposition are not inconsistent with any of plaintiffs' allegations. And even if they were somehow inconsistent with any of the statements that plaintiffs allege in the Complaint—statements that defendants never deny making—there would still be no legal basis to strike the allegations.

**RELEVANT FACTS**

Plaintiffs alleged that certain of the defendants "admitted to an agreement among all of the [defendants] to keep standard *au pair* wages at exactly $195.75 per week." [ECF No. 101, at ¶ 90]. The Complaint recounted telephone conversations in November 2014 in which representatives of certain of the defendants characterized the wage paid to *au pairs* as a "fixed expense," and stated that the wage "is where pricing becomes standard across all agencies," because "there is no difference in prices, as far as the

2

stipend goes, between all of the agencies." [*Id.*, at ¶ 92]. Another defendant's agent admitted that the defendants "all agreed to pay that amount, no more." [*Id.*, at ¶ 93]. And a third defendant's agent stated that "the stipend is identical across all companies" and that "[e]verybody agrees" to set *au pair* wages at $195.75. [*Id.*, at ¶ 94].

On July 21, 2016, the defendants took the deposition of the investigator who elicited these admissions, David Keil. The investigator repeatedly confirmed that the defendants' agents had made the remarks attributed to them in the Complaint. [*See, e.g.*, ECF No. 327, Exhibit 1 at 139 ("fixed cost"); 164 ("price standard across all agencies"); 178-78 and 186 ("they all agreed to pay that amount, no more"); 181 ("all agreed"); 148-49 ("everybody agrees")]. A report containing the investigator's notes of those conversations likewise confirmed that defendants' agents said precisely the words ascribed to them.[1]  [ECF No. 327, Ex. 5].

## THE MOTION SHOULD BE DENIED

Defendants' motion to strike should be denied for at least two simple and independent reasons. *First*, contrary to defendants' claims, the investigator's testimony

---

[1]    Defendants complain that the report was inappropriately withheld as work product. [*E.g.,* ECF No. 327 at 7]. But defendants fail to note that plaintiffs offered to produce a redacted version disclosing the relevant facts but omitting mental impressions and analysis. In any event, plaintiffs' counsel produced the entire report unredacted, and defendants elicited testimony from the investigator using the report.

Defendants further claim the production of the report was "belated." [*E.g.,* ECF No. 327 at 3 n. 5]. But they fail to note that they never made a Rule 34 demand for the report. Instead, they made a series of Rule 26(b)(3)(C) requests that entitled them to quoted admissions, which plaintiffs provided. Even after plaintiffs invited defendants to make a proper Rule 34 request, they declined to do so. In short, defendants demanded the report be produced at the deposition, and the report was produced at the deposition. Complaints of obstruction and prejudice are therefore entirely unfounded.

and written report are fully consistent with the allegations in the Complaint. *Second*, even if that were not the case, striking the allegations would not be appropriate. There are any number of ways for a defendant to deal with allegations that they believe cannot be proved; asking the court to strike them is not one of them. Rather, as this Court held the first time defendants attempted to expunge their admissions, Rule 12(f) should be used only to strike "redundant, immaterial, impertinent, or scandalous matter."

## A.    The Evidence Is Consistent With Plaintiffs' Allegations

As an initial matter, the entire premise of defendants' motion to strike is misguided. The investigator's testimony and his notes are consistent with the allegations in the Complaint and the plaintiffs' theory of the case. Indeed, the defendants do not attempt to argue that their agents were misquoted. And when those accurate quotations are placed in context, they still support the plaintiffs' theory.

At base, this case primarily involves three distinct but inter-related types of illegal conduct. First, defendants colluded with each other to fix *au pair* wages at $195.75 per week—that is the Sherman Act violation. Second, to sustain the suppressed wages, defendants falsely told both prospective *au pairs* and host families that the government sets *au pair* wages at $195.75 per week—that is the fraud. And third, defendants ignored federal and state wage-and-hour laws and misled *au pairs* and families about their applicability—that is the violation of federal and state employment law.

In a series of phone calls between an investigator and representatives of certain of the defendants, those representatives effectively admitted the Sherman Act violation. As set forth above, the representatives admitted that *au pair* wages are "identical across

all companies," that the $195.75 stipend amounted to a "fixed expense" because "there is no difference in prices, as far as the stipend goes [*i.e.*, as opposed to the fees to the defendants], between all of the agencies," and that "[e]verybody agrees," *i.e.,* the defendants "all agreed to pay that amount, no more." [ECF No. 101, ¶¶ 90-94]. These were the "smoking gun" admissions that Judge Arguello noted in adopting the Recommendation substantially denying defendants' motions to dismiss.

Now, however, defendants claim that their admissions were not as bad as they sound, and should be interpreted as consistent with the "parallel conduct" argument that the Court already rejected at the pleading stage. [*See, e.g.,* ECF No. 258 at 18]. Specifically, defendants identify two alleged "omissions" from the Complaint that, they claim, defeat the well-pleaded allegations of antitrust conspiracy:  (a) certain sponsors' agents indicated that some host families paid *au pairs* slightly more than $195.75 per week, and (b) certain sponsors' agents indicated that the $195.75 weekly wage was established by the government.

Neither of these alleged omissions renders the Complaint misleading, or is at odds with plaintiffs' allegations. Indeed, the Complaint states that some host families pay *au pairs* – including several of the named plaintiffs – slightly more than $195.75 per week. And there is no doubt that the $195.75 figure derives from a (misguided) government publication. But the fact that this figure may have been erroneously put

5

forward as a minimum by the government in no way justifies each and every one of the

defendants setting *au pair* wages at precisely that figure. *That* is the antitrust violation.[2]

With respect to the first alleged "omission," the fact that some host families pay

slightly more than $195.75 is entirely consistent with the alleged illegal conduct. In the

first place, the Complaint alleges an unlawful agreement amongst the sponsor

defendants, not among the host families. The undisputed fact that some host families

may pay slightly more than the agreed-upon wage does not eliminate the

anticompetitive effect of the agreement, and it certainly does not mitigate defendants'

fraudulent claim that the stipend is fixed. And as the investigator's report makes clear,

even as some defendants' agents acknowledged that *au pairs* could technically be paid

more than the stipend, they also strongly suggested that that was the exception rather

than the rule. [*See, e.g.*, ECF No. 327, Ex. 5 at 1 "nobody would have to know if a

particular family elected to pay an au pair little bit more"); *id.* at 3 (defendant had "one

family" who paid more than $195.75)]. This is certainly not inconsistent with the

plaintiffs' allegations. The Complaint makes plain that several of the named plaintiffs

were paid slightly more than $195.75. [*See* ECF No. 101, ¶¶ 369 ("although they

---

2        Although not a purported "omission" from the Complaint, defendants also
highlight the investigator's testimony that he had no evidence of communications
between the sponsors regarding their unlawful agreement. [*E.g.,* ECF No. 327 at 2, 9].
Defendants' argument seems to be that the "smoking gun" admission that they agreed
amongst themselves to fix *au pair* wages is insufficient; there needs to be evidence of
precisely how that agreement was reached. That is wrong. An admission by one party
to the existence of an agreement is direct evidence. Communications between the
parties would also be direct evidence. But the lack of the latter does not affect the
former. *Beltran v. InterExchange, Inc.,* No. 14-CV-03074-CMA-KMT, 2016 WL 1253622,
at *6 (D. Colo. Mar. 31, 2016).

routinely rounded up and paid Ms. Hlatshaneni $200 in cash, for convenience"), 418 ("The family paid $200 per week.")].

Nor is the fact that some families were told they could pay slightly more than $195.75 remotely inconsistent with an anticompetitive agreement. To the contrary, this sort of behavior – members of a cartel encouraging marginal cheating by its customers in order to capture more of the benefit of collusion – is a common feature of antitrust conspiracies.  *See, e.g., In re High Fructose Corn Syrup Antitrust Litig.,* 295 F.3d 651, 656 (7th Cir. 2002). Certain defendants' encouragement of marginal cheating supports, rather than refutes, the existence of the conspiracy.

And "marginal" is certainly the right word. The defendants would have the Court believe that their agents instructed the investigator that host families are free to pay any amount. But that is simply not the case; the investigator testified that the defendants' agents told him that some families opted – notwithstanding the set wage – to pay their *au pairs* trivially more. [*See, e.g.,* ECF No. 327, Ex. 1 at 174:5 to 174:9].  And this is what the defendants' agents actually said, taken verbatim from the investigator's report:

> At the end of the conversation, [the representative], who seemed to need to explain further, volunteered, that since these fees are paid directly to the au pair, and since the $196 is a minimum amount, that nobody would have to know if a particular family elected to pay an au pair little bit more.

*          *          *

> She then explained that while she was working for this company, as an Au Pair in Florida, her host family rounded her weekly stipend up, to $200 a week. She added, if your Au Pair did something extra nice for you child one week, like cleaning out a dresser, you could maybe pay a little more that one-week. It's fine, it's up to you."

*          *          *

7

> I then asked, "Are you saying that each and every one of the fifteen companies have gotten together and they made an agreement to pay all au pairs a stipend that is no more than $195.75 per week?"
>
> She first answered, "Yes, they all agreed to pay that amount, no more." Then she added, "we have one family who pays a little bit more, so I guess you could pay more if you wanted to, but yes, it's exactly the same, equal in all programs."

[ECF No. 327, Ex. 5 at 1-3].  To be clear, rounding from $195.75 to $200 per week amounts to a difference of less than 10¢ an hour.  These statements speak for themselves, and plainly do not undermine – let alone "repudiate" – plaintiffs' allegations of price-fixing. That is especially true where, as described above, the Complaint expressly acknowledges that many *au pairs* are paid slightly more than $195.75.

The second alleged "omission" from the Complaint – that certain sponsors' agents indicated that the $195.75 weekly wage was established by the government – similarly does not undermine any of plaintiffs' allegations. First, the defendants' statement to the investigator that the $195.75 per week wage is *required* by the government [*e.g.*, ECF No. 327, Ex. 5 at 1 ("the government sets an amount, and we all pay that amount")] – which this Court has already found is untrue [*see* ECF No. 240 at 8] – supports the allegation that defendants colluded to set wages at that rate. Indeed, plaintiffs have always characterized the defendants' admissions to the investigator as confirming the existence of a conspiracy to fix *au pair* wages at the minimum amount allegedly set by the government. [*See, e.g.*, ECF No. 199 at 10].  And the fact that some defendants apparently stated to the investigator that the $195.75 amount is a minimum

8

does not change plaintiffs' core allegation: that the sponsors colluded to direct host families to pay, and *au pairs* to accept, that minimum.

In addition to being entirely consistent with plaintiffs' antitrust claims, the admissions to the investigator are also fully consistent with plaintiffs' fraud claims. The Complaint alleges that several defendants knew the stipend was nothing more than a minimum and yet falsely insisted to host families and *au pairs* that the stipend was fixed by the government at $195.75.  Amazingly, multiple defendants continue to falsely claim that *au pair* wages are set by the government – even though this Court has already held that the rate is not mandated, is a minimum, and violates federal and state minimum wage laws. For example, Cultural Care, AuPairCare, and APF Global Exchange each advertise on their website a "weekly stipend" of exactly $195.75.[3]  EurAuPair's website (reproduced here) goes farther, explicitly claiming that the $195.75 figure is set by the State Department and is consistent with the FLSA:[4]

| Au Pair Weekly Stipend** | $195.75 | $250 |
| --- | --- | --- |

**Au Pair Weekly Stipend (paid directly to the au pair) is established by regulations promulgated by the U.S. Department of State in compliance with the Fair Labor Standards Act and is subject to change.

---

[3] Cultural Care, Our Pricing, http://bit.ly/2cluusZ (last visited September 6, 2016); AuPairCare, Au Pair Agency Costs for Host Families, http://bit.ly/2c4aI30 (last visited September 6, 2016); APF Global Exchange, Host Family Program Fees, http://bit.ly/2cluTM6 (last visited September 6, 2016).

[4] EurAuPair, 2016 Host Family Fees and Costs, http://bit.ly/2c8bvlR (last visited September 6, 2016).

Likewise, Cultural Care still claims that the $195.75 weekly wage is "determined by the U.S. Department of Labor using a formula based on the federal minimum wage."[5]

Notwithstanding these continuing false statements, in a belated effort to avoid plaintiffs' antitrust claims, defendants embrace the argument that the "stipend" is nothing more than a wage floor.  They even try to twist some of their agents' statements to the investigator to support that argument. But as explained above, the fact that the stipend is a *minimum* is entirely consistent with the allegation that the defendants set the wage that *au pairs* are offered and that the vast majority of *au pairs* receive.

A simple analogy proves the point. The federal minimum wage is $7.25 per hour. One of the jobs with the most employees making the minimum wage is food preparation and service.[6]  But imagine if all of the fast food restaurants in America agreed with one another to hold wages at $7.25 per hour. That would be both an antitrust violation and, to the extent that the restaurants told prospective employees or franchisees that the government set the rate at exactly $7.25, fraudulent. That some restaurant chains might tell their franchisees that they could pay trivially more, or could pay modest bonuses for exceptional work, would do nothing to cure their unlawful conduct.

---

[5]     Cultural Care, Fact or Fiction? Au Pairs Are Expensive, http://bit.ly/2bVBwFb (last visited September 6, 2016). In a lawsuit filed just last week seeking a declaratory judgment (and associated injunctive relief) that Massachusetts state labor laws don't apply to it – an apparent end-run around this Court's jurisdiction – Cultural Care again claimed that *au pairs* must be paid "a weekly stipend . . . in an amount set by the DOS." *See* Complaint, ¶ 2, *Cultural Care, Inc. v. Office of the Attorney General of the Commonwealth of Massachusetts*, No. 16-cv-11777-JCB (D. Mass. filed Aug. 31, 2016).

[6]     *See* BLS Reports, Characteristics of Minimum Wage Workers, 2015, http://bit.ly/2cxVTKk (last visited September 6, 2016).

The allegations in this case are no different, notwithstanding the defendants' repeated attempts to hide behind the State Department's now-repudiated and withdrawn stipend notice.[7]  The defendants' statements that host families can pay small amounts more when an *au pair* is particularly helpful, or can round to $200 out of convenience – an increase of less than 10¢ an hour – hardly dull fraudulent admonitions that the stipend is fixed by the government. Instead, they provide even more proof that defendants continue to perpetuate a fraud against the public.  Because the defendants' statements to the investigator were fully consistent with both the specific allegations in the Complaint and the plaintiffs' theory of the case, the defendants' motion to strike must be denied, since it rests on a fundamentally mistaken premise.

### B.     The Relief Requested is Not Legally Available

For the reasons just given, the defendants are wrong that the investigator's report or testimony undermined, let alone repudiated, the allegations in the Complaint. But even entertaining that fiction, defendants have asked for the wrong relief.

### 1.     Defendants' Arguments Are Irrelevant at this Stage

Defendants argue that their admissions should be interpreted to reflect parallel conduct, not a wage-fixing conspiracy. This interpretation is not plausible based on the face of the admissions. But even if it were, that does not matter at the pleading stage. In

---

[7]     The $195.75 weekly wage has been removed from the State Department website since this lawsuit was initiated, and sponsors are left with the instruction, consistent with the J-1 regulations, that they "must ensure . . . [a]u pairs are compensated for their work according to the Fair Labor Standards Act as interpreted and implemented by the U.S. Department of Labor."  *See* Department of State, J-1 Visa Exchange Visitor Program, Au Pair Program, http://bit.ly/2cluKIz (last visited September 6, 2016); *See also* 29 C.F.R § 62.31(j)(1) (requiring the same).

considering exactly the allegations at issue in this motion, the Court previously stated that "[p]articularly when such statements are viewed in the light most favorable to Plaintiffs, they are certainly sufficient to indicate there may have been a direct agreement to take collective action among Defendant Sponsors." *Beltran*, 2016 WL 1253622, at *6. Thus, even if the allegations *could* be interpreted in a different way, they rightly were not. Alternative interpretations should be left for the factfinder. *See Evergreen Partnering Group, Inc. v. Pactiv Corp.*, 720 F. 3d 33, 45 (1st Cir. 2013).

The availability of countervailing evidence, should defendants find any, is similarly irrelevant. Even if there were evidence contradictory to the admissions quoted in the Complaint, plaintiffs had no duty to include it in their Complaint. That is the purpose of discovery and trial. And there is no basis to strike allegations from a complaint simply because defendants later discover contrary evidence. That is particularly so where, as here, defendants could not introduce into evidence the statements they rely upon, because they are nothing more than self-serving hearsay.[8]

### 2.     The Motion Should be Analyzed and Denied Under Rule 12(f)

In denying defendants' previous motion to strike, the Court rejected defendant's suggestion that it could rely on its "inherent authority," grounding its analysis instead in Rule 12(f), which is the sole basis for striking allegations from pleadings. *Beltran v.*

---

[8]     *See generally Williamson v. United States*, 512 U.S. 594, 600 (1994) (while party admissions are not hearsay, non-self-inculpatory statements are generally inadmissible hearsay even when made at the same time as inculpatory admissions, unless the rule of completeness requires their admission; "Self-exculpatory statements are exactly the ones which people are most likely to make even when they are false; and mere proximity to other, self-inculpatory, statements does not increase the plausibility of the self-exculpatory statements.").

*InterExchange, Inc.*, No. 14-CV-03074-CMA-KMT, 2015 WL 7253286, at *1 (D. Colo. Nov. 16, 2015).  Ignoring this reasoning, defendants again call on the Court to exercise its "inherent authority."  [*Compare* ECF No. 327 at 1, *with* ECF No. 134 at 1]. They are wrong now for the same reasons they were wrong before.

Rule 12(f) allows a court to strike "redundant, immaterial, impertinent, or scandalous matter."  Defendants bear a heavy burden of proof in this regard. *See Sierra Club v. Young Life Campaign, Inc.*, 176 F. Supp. 2d 1070, 1086 (D. Colo. 2001). Generally, allegations fall within Rule 12(f)'s prohibitions only if they "have no possible bearing on the controversy," and if "they degrade defendants' moral character, contain repulsive language, or detract from the dignity of the court;" if the allegations are relevant to the dispute, they must satisfy the foregoing requirements and also "go into unnecessary detail."  *Sierra Club v. Tri-State Generation & Transmission Ass'n*, 173 F.R.D. 275, 285 (D. Colo. 1997). And even if the allegations are "redundant, immaterial, impertinent, or scandalous," defendants must also demonstrate prejudice.  *Id.*

Defendants "have failed to meet their heavy burden of demonstrating that these four paragraphs of the First Amended Complaint should be stricken pursuant to Fed. R. Civ. P. 12(f)." *Beltran*, 2015 WL 7253286, at *3. Once again, defendants have failed to identify any "redundant, immaterial, impertinent, or scandalous matter" in the contested allegations. Indeed, the allegations are plainly relevant to plaintiffs' claims and consist of direct quotations from the defendants' agents.

Defendants also do not, and cannot, claim the prejudice necessary to strike the allegations. The only asserted prejudice defendants identify is their continued litigation

of this case.  [ECF No. 327 at 12]. This is entirely wrong. *First*, defendants' theory of prejudice is misguided. Allegations that tend to support a plaintiff's claims – and thus defeat a motion to dismiss – are not "prejudicial" in the sense required on a motion to strike. *Second*, even if defendants' theory were valid, they cannot demonstrate "prejudice" because they would be forced to defend against the antitrust claims in any event. The Complaint asserts numerous allegations demonstrating, both circumstantially and directly, the defendants' unlawful wage-fixing conspiracy. In recommending denial of the various motions to dismiss, Judge Tafoya relied exclusively on plaintiffs' allegations of circumstantial evidence of an antitrust agreement and did not mention the contested allegations *at all*. *See Beltran*, 2016 WL 695967, at *6.  In adopting the Recommendation, Judge Arguello relied in part on the direct evidence, recognizing it as the "smoking gun" it is, but did not need to. *See Beltran* 2016 WL 1253622, at *3 ("In considering whether a Plaintiff has alleged sufficient circumstantial evidence of conspiracy, the Court considers the allegations as a whole."); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553 (2007) (agreement may be "tacit or express").

At bottom, including accurate and relevant quotations from the defendants in a complaint is not the "redundant, immaterial, impertinent, or scandalous matter" necessary to strike allegations under Rule 12(f) and, regardless, there is no prejudice.

C.     **The Remaining Relief Defendants Demand Should also be Denied**

Defendants also ask the Court to strike paragraphs 4-24 of the Declaration of Alexander Hood and portions of the first motion for conditional FLSA certification, and

14

for leave to renew their motions to dismiss. [ECF No. 327 at 2, 15].  For the reasons stated above, these requests should also be denied.

Moreover, the contested paragraphs of the Hood declaration merely quote the Complaint, state when and by whom the quoted statements were made, and summarize some of the history of the case. [*See* ECF Doc. 141-1].  All of this remains true and uncontested.  Further, because there is no basis to strike the allegations in the Complaint, any portions of the FLSA certification motion relying on this Courts' denial of the motions to dismiss are proper. And finally, because the Complaint should stand, there is no reason to permit the defendants to relitigate the denial of their motions to dismiss – especially because the result would be the same.

## CONCLUSION

At base, defendants' entire motion is misplaced.  They apparently feel that they conducted a successful deposition of the investigator, and want to challenge any allegations based on his work.  Fair enough.  But the way to deal with allegations that can be disproven is to disprove them – at trial or, if defendants believe the evidence is incontrovertible, at summary judgment.  Instead, defendants resort, yet again, to levelling accusations of misconduct against plaintiffs' counsel and moving to strike the well-pleaded allegations of the Complaint.  *Compare Sierra Club*, 173 F.R.D. at 285 (purpose of Rule 12(f) is "to conserve time and resources by avoiding litigation of issues which will not affect the outcome of a case").  Defendants' motion should be denied.

Dated: New York, New York
September 6, 2016

Respectfully Submitted,

BOIES, SCHILLER & FLEXNER LLP

/s/ Matthew L. Schwartz
Matthew L. Schwartz
Peter M. Skinner
Randall W. Jackson
575 Lexington Avenue
New York, New York  10022
Tel: (212) 446-2300
Fax: (212) 446-2350
mlschwartz@bsfllp.com
pskinner@bsfllp.com
rjackson@bsfllp.com

Sigrid S. McCawley
Lauren Fleischer Louis
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, Florida  33301
Tel.: (954) 356-0011
Fax: (954) 356-0022
smccawley@bsfllp.com
llouis@bsfllp.com

Alexander Hood
TOWARDS JUSTICE
1535 High Street, Suite 300
Denver, Colorado  80218
Tel: (720) 239-2606
Fax: (303) 957-2289
alex@towardsjustice.org

*Attorneys for Plaintiffs*

## Certificate of Service

I hereby certify that on September 6, 2016, I served a true and correct copy of

the forgoing on the individuals below pursuant to Federal Rule of Civil Procedure 5.


 /s/ Matthew L. Schwartz
Matthew L. Schwartz
cfeldkamp@kellywalkerlaw.com

Kathryn A. Reilly
Wheeler Trigg O'Donnell LLP
370 Seventeenth Street, Suite 4500
Denver, CO 80202-5647
Email: reilly@wtotrial.com

James E. Hartley
Jonathan S. Bender
Holland & Hart LLP
555 Seventeenth Street, Suite 3200
Denver, CO 80202
Email: jhartley@hollandhart.com
jsbender@hollandhart.com

Brian Alan Birenbach Rietz Law Firm,
LLC P.O. Box 5268
114 Village Place #301
Dillon, CO 80435
brian@rietzlawfirm.com

Adam A. Hubbard
Holland & Hart LLP
1800 Broadway Suite 300
Boulder, CO 80302
Email: aahubbard@hollandhart.com

Christian D. Hammond
Dufford & Brown, P.C.
1700 Broadway, Suite 2100
Denver, CO 80290-2101
Email:chammond@duffordbrown.com

Robert M. Buchanan, Jr.
Joan A. Lukey
Lyndsey M. Kruzer
Michael T. Gass
Justin J. Wolosz
Choate Hall & Stewart LLP
Two International Place
Boston, MA 02110
rbuchanan@choate.com
joan.lukey@choate.com
lkruzer@choate.com
mgass@choate.com
jwolosz@choate.com

Lawrence D. Stone
Kathleen E. Craigmile
Nixon Shefrin Hensen Ogburn, P.C.
5619 DTC Parkway, Suite 1200
Greenwood Village, CO 80111
lstone@nixonshefrin.com
kcraigmile@nixonshefrin.com

William J. Kelly III
Chandra Marie Feldkamp
KELLY & WALKER LLC
1512 Larimer Street, Suite 200
Denver, CO 80202
Email: wkelly@kellywalkerlaw.com

17

Jessica L. Fuller
Diane Hazel
James M. Lyons
Lewis Roca Rothgerber Christie LLP
One Tabor Center, Suite 3000
1200 Seventeenth Street
Denver, CO 80202
jfuller@lrrc.com
dhazel@lrrc.com
jlyons@lrrc.com

Bogdan Enica
Expert AuPair
111 Second Ave NE, Ste. 213
St. Petersburg, FL 33701
Email: Bogdan@expertaupair.com

Meshach Y. Rhoades
Martin Estevao
Greenberg Traurig, LLP
1200 17th Street, Suite 2400
Denver, CO 80202
Email: Rhoadesm@gtlaw.com
Email: Estevaom@gtlaw.com

Martha L. Fitzgerald
David B. Meschke
Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street, Suite 2200
Denver, CO 80202-4432
Email: mfitzgerald@bhfs.com
Email: dmeschke@bhfs.com

Brooke A. Colaizzi
Heather F. Vickles
Raymond M. Deeny
Erica Lynn Herrera
SHERMAN & HOWARD L.L.C.
633 Seventeenth Street, Suite 3000
Denver, CO 80202
Email: bcolaizzi@shermanhoward.com
Email: hvickles@shermanhoward.com
Email: rdeeny@shermanhoward.com
Email: eherrera@shermanhoward.com

Brian P. Maschler
Gordon & Rees, LLP-San Francisco
275 Battery Street, Suite 2000 San
Francisco, CA 94579
bmaschler@gordonrees.com

John R. Mann
Peggy E. Kozal
Thomas Baker Quinn
Gordon & Reese LLP
555 17th Street, Suite 3400
Denver, CO 80202
Email: jmann@gordonrees.com
Email: pkozal@gordonrees.com
Email: tquinn@gordonrees.com

Lawrence L. Lee, Esq.
Susan M. Schaecher, Esq.
FISHER & PHILLIPS, LLP
1801 California Street, Suite 2700
Denver, CO 80202
Tel: 303-218-3650
Fax: 303-218-3651
llee@laborlawyers.com
sschaecher@laborlawyers.com