Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Juliane Harning
September 08, 2016

1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO
2
      Civil Action No. 1:14-cv-03074-CMA-KMT
3    _____

4    JOHANA PAOLA BELTRAN; AND THOSE SIMILARLY SITUATED,

5         Plaintiffs,

6    vs.

7    INTEREXCHANGE, INC.; USAUPAIR, INC.; GREATAUPAIR, LLC;
     EXPERT GROUP INTERNATIONAL, INC., D/B/A EXPERT AUPAIR;
8    EURAUPAIR INTERCULTURAL CHILD CARE PROGRAMS; CULTURAL
     HOMESTAY INTERNATIONAL; CULTURAL CARE, INC., D/B/A
9    CULTURAL CARE AU PAIR; AUPAIRCARE, INC.; AU PAIR
     INTERNATIONAL, INC.; APF GLOBAL EXCHANGE, NFP; AMERICAN
10   INSTITUTE FOR FOREIGN STUDY D/B/A AU PAIR IN AMERICA;
     AMERICAN CULTURAL EXCHANGE, LLC, D/B/A GOAUPAIR; AGENT AU
11   PAIR; A.P.EX. AMERICAN PROFESSIONAL EXCHANGE, LLC, D/B/A
     PROAUPAIR; AND 20/20 CARE EXCHANGE, INC., D/B/A THE
12   INTERNATIONAL AU PAIR EXCHANGE,

13        Defendants.

14   _____

                CONFIDENTIAL VIDEO DEPOSITION OF JULIANE HARNING
15                      September 8, 2016

16   _____

17

18

19

20

21

22

23

24

25

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Juliane Harning
September 08, 2016

Page 14

1   **Q.   You signed a contract with AuPairCare**

2   **twice in the past, haven't you?**

3          A.   Yes.

4          **Q.   Did you understand it before you signed**

5   **it?**

6          A.   Yes, because we got it in German.

7          **Q.    Okay.   All right.**

8                UNIDENTIFIED SPEAKER:   Joining the

9   meeting.

10                MR. QUINN:   Whoever joined, could you

11   please enter your appearance for today?

12                MS. FITZGERALD:   Hi.   It's Martha

13   Fitzgerald.   I got cut off.   I apologize.

14                MR. QUINN:   Oh, no problem.

15          **Q.   (By Mr. Quinn)  I'm going to hand you**

16   **what's been marked as Exhibit 41.   If you'll take a**

17   **moment and review it.**

18                MR. HOOD:   Thank you, Tom.

19                MR. QUINN:   I've got more for folks that

20   want it.

21                MR. HOOD:   Tom, could we get two, one for

22   Nina and --

23                MR. QUINN:   Sure.   They're in --

24                MR. HOOD:   Oh, perfect.

25                (Exhibit 41 was marked.)

Johana Paola Beltran, et al. vs.                              Confidential Video Deposition of Juliane Harning
Interexchange, Inc., et al.                                                                     September 08, 2016

 1               Q.   (By Mr. Quinn)  Oops.  Hang on.  Wait a

 2     minute.  I gave you -- he's got the marked ones.  I

 3     apologize.  I marked the wrong one.  My apologies.

 4               A.   I have the marked one too.

 5                    MR. HOOD:  Did you say I have --

 6                    MR. QUINN:  No.  My mistake.  It was my

 7     mistake.

 8               A.   You want me to look at it, not read it

 9     all, right?

10               Q.   (By Mr. Quinn)  Right.  What I'm going to

11     ask you to do is take a look and confirm that's your

12     signature on the last page of Exhibit 41.

13               A.   It's really hard to tell, but it looks

14     like my signature.

15               Q.   Okay.  Do you have a recollection of

16     signing -- excuse me, of reviewing the Au Pair Agreement

17     with AuPairCare before you started your engagement --

18     your au pair engagements here in the United States?

19               A.   Yes, I had the paperwork.

20                    MR. HOOD:  Tom, I apologize.  But my copy

21     of this has work product on it.

22                    MR. QUINN:  You know, they copied it in

23     color.

24                    MR. HOOD:  Okay.

25                    MR. QUINN:  It's just highlights.  We're

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Juliane Harning
September 08, 2016

Page 16

1    going to talk about those, but thanks.  I just realized

2    that just now.

3         Q.  (By Mr. Quinn)  Were there any portions of

4    this Au Pair Agreement that you had any confusion about

5    or misunderstandings or needed any counseling on?

6         A.  I don't remember exactly, but I don't

7    think so.

8         Q.  Okay.  So when you signed it, you agreed

9    to abide by the terms of the Au Pair Agreement, right?

10        A.  Yes.  I -- yeah.

11        Q.  Okay.  All right.  You talked a moment

12    about your declaration.  I'll have you take a look at

13    what's been marked as Exhibit 42.

14             (Exhibit 42 was marked.)

15             MR. HOOD:  Thank you.

16             MR. QUINN:  Can you give me one of those

17    back, please?

18             MS. CRAIGMILE:  Sure.

19             MR. QUINN:  Thank you.

20        Q.  (By Mr. Quinn)  Have you had a chance to

21    look at that?

22        A.  Yes.

23        Q.  Okay.  Why don't you tell me how this

24    document came into being.

25        A.  What do you mean by "this"?

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Juliane Harning
September 08, 2016

Page 41

1     Q.    And during that discussion Ms. Russell

2  denied that you always worked 45 hours per week minimum,

3  didn't she?

4         A.    I don't know exactly what she said.

5         Q.    Well, this just happened within the last

6  ten days, didn't it?

7         A.    Yes.

8         Q.    Okay.  So you don't recall what she said

9  about your statement in Paragraph 22, quote, "I always

10  worked 45 hours per week minimum"?

11        A.    No, I don't remember exactly her words

12  because I don't -- I don't know if you would remember,

13  but I do -- would like to clarify something that I might

14  have overread.  English is not my first language.  I was

15  always expected to work 45 hours, yeah.

16        Q.    Okay.  So you'd like to -- there are some

17  changes to this affidavit you'd like to make.  Is that

18  what you're telling me?

19        A.    I would like to clarify this part of it.

20        Q.    Okay.  Let's mark this as Exhibit 45.

21  This is another copy of your declaration, and I'll give

22  you a red pen.  Why don't you tell us the parts of this

23  affidavit that you would like to clarify.

24        (Exhibit 45 was marked.)

25        A.    Well, the 22, like I just told you.

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Juliane Harning
September 08, 2016

Page 42

1        Q.   What do you want to say in 22?

2        A.   I was always expected to work 45 hours.

3        Q.   Okay.  So you would -- you would delete

4    the sentence that says, "I always worked 45 hours per

5    week minimum," and replace it with, "I was always

6    expected to work 45 hours per week"?

7        A.   Yes.

8        Q.   Okay.  Why don't you strike that line,

9    that first sentence, and write in what you really mean.

10   Okay.  Let's go on to the next sentence.  "Occasionally,

11   my host mom would run late returning to the house to

12   relieve me."  Okay.  Anything accurate or inaccurate

13   about that statement or anything you'd like to clarify

14   with that?

15       A.   No.  That's accurate.

16       Q.   Let's go on to the next one:  "She

17   acknowledged that doing so violated the program rules,

18   and she gave me extra money on these occasions."  So on

19   that first sentence are you saying that Whitney Russell

20   told you that she violated the program rules?  She used

21   that word?

22            MR. HOOD:  I'd like to mark this portion

23   of the deposition as confidential under the protective

24   order, the response to this question.  I apologize.

25       A.   I don't remember exactly her words.

Johana Paola Beltran, et al. vs.        Confidential Video Deposition of Juliane Harning
Interexchange, Inc., et al.                                 September 08, 2016

Page 46

```
 1   foundation.

 2            A.   I didn't say that either.

 3            Q.   (By Mr. Quinn)  Okay.  Where are we not

 4   meeting on this?  Because I'm trying to find out if she

 5   ever told you that she violated the rules, and you said

 6   you don't have a recollection of that.

 7            A.   No, that's not what I said.  I said I

 8   don't recollect if she used the word "violate."

 9            Q.   Okay.  So then this is not -- then what

10   you've written here, this sentence, "She acknowledged

11   that doing so violated the program rules," is not a

12   concise or exact summary of her statements to you,

13   correct?

14            MR. HOOD:  Objection as to form and

15   foundation.

16            A.   No, it is a summary -- it is a summary of

17   what she said or wrote to me.

18            Q.   (By Mr. Quinn)  Let's go on to the next

19   phrase in this sentence, "and gave me extra money on

20   these occasions"; is that right?

21            A.   That's correct.

22            Q.   Did I read that correctly?

23            A.   And gave me -- if you read exactly what's

24   standing there, then you read it correctly.

25            Q.   Okay.  Did -- what amount of money did she
```

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Juliane Harning
September 08, 2016

Page 47

 1    give you on the occasion -- on these occasions?

 2              A.   $20 per hour.

 3              Q.   Did she give you extra money on every

 4    occasion that you felt you were entitled to extra money?

 5              A.   I don't know what you mean by that.

 6              Q.   Sure.  You believed you were entitled to

 7    extra money when she ran late, correct?

 8              A.   I'm not sure what I believed or felt at

 9    that time.

10              Q.   Well, how did you know that -- were you

11    able to track whether Whitney Russell was running late or

12    not?

13              A.   Yes, because I had a schedule.

14              Q.   You had to schedule what?

15              A.   For my hours.

16              Q.   And then if Whitney Russell came in late,

17    you believed you were entitled to extra money, correct?

18              A.   I don't know if that's what I believed.  I

19    just told you.

20              Q.   Did you -- whether you believed you were

21    entitled to extra money or not, did Whitney Russell give

22    you money every time she ran late?

23              A.   I didn't get extra money if she ran late

24    two minutes.

25              Q.   Was there a range of when she -- that she

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Juliane Harning
September 08, 2016

Page 48

1    would give you extra money if she was running late?

2          A.   When she was over 10 hours or over 45

3    hours.

4          Q.   So 10 and a half hours you would get $20,

5    10 hours and 15 minutes, you would get 20 hours (sic), 40

6    hours and a half you would get $20.  Is that how it

7    worked?

8               MR. HOOD:  Objection as to form.

9          A.   I don't recall exactly how it worked.

10         Q.   (By Mr. Quinn)  Well, part of your claims

11   in this lawsuit is you're entitled to extra wages for

12   overtime work but not paid, right?

13         A.   Say it again, please.

14         Q.   Sure.  Part of your claims here is that

15   you're entitled to overtime wages that you've earned but

16   were not paid, correct?

17               MR. HOOD:  Objection as to form.

18         A.   Every hour -- well, if I understand it

19   right, every hour you work more than 40 hours a week is

20   overtime, which we did not get paid.  That is correct.

21         Q.   (By Mr. Quinn)  Okay.  But then you also

22    believe -- but you were paid for time over 45 hours,

23   correct?

24         A.   Yes.

25         Q.   Is there any time over 45 hours or 10

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Juliane Harning
September 08, 2016

Page 49

1  hours a day while you were living with the Russell family

2  that you did not believe you were fairly compensated?

3         A.   I'm not sure -- can you rephrase it,

4  please?

5         Q.   Sure.  Was there any time while you worked

6  for the Russell family and you worked 45 hours a week --

7  excuse me, more than 45 hours a week that you believe you

8  were not fairly compensated for that time?

9         A.   I'm still not sure if I get this right.

10         Q.   Tell me what you -- tell me what you're

11  confused about.

12         A.   Well, every hour over 45 hours they would

13  pay me what they would pay a babysitter.

14         Q.   Okay.  So is there any time you ever

15  worked more than 45 hours in a week that you do not feel

16  you were fairly compensated for that timeframe, 45 hours

17   plus per week?

18              MR. HOOD:  Objection as to form.

19         A.   The 40 -- every hour over 45 hours was

20  compensated with $20, which I think was way better than

21  $4 and something that I would get for 45 hours.

22         Q.   (By Mr. Quinn)  Okay.  Is there any unpaid

23  time for over 45 hours that the Russells still owe you?

24         A.   No.

25         Q.   I'm going to talk to you about

Johana Paola Beltran, et al. vs.                    Confidential Video Deposition of Juliane Harning
Interexchange, Inc., et al.                                     September 08, 2016

Page 52

```
 1                A.   I don't really know what you mean.  Maybe
 2      you can like ask it a different way.
 3                Q.   (By Mr. Quinn)  Sure.  So how many weeks
 4      during your time that you worked with the Russells do you
 5      believe you worked 45 hours per week?
 6                A.   I don't know.
 7                Q.   Half the time?
 8                A.   I don't know.
 9                Q.   Less than half the time?
10                A.   I don't know.
11                Q.   Okay.  When you didn't work 45 hours a
12      week, how many hours a week did you work on those weeks?
13                A.   41, 42 and up, except if I had a vacation
14      day that week.
15                Q.   Were you with the Russell child all of the
16      time every day, Monday through Friday?
17                A.   No.  Sometimes -- at some point during my
18      years she started to go to preschool.  So she was gone
19      from about 9:00 until noon.
20                Q.   How far into the -- to your time with the
21      Russell family was it when the child started to go to
22      preschool?
23                A.   I don't recall.  It probably was with the
24      school years, September, October, maybe November because
25      it was like not a real school but like more another stay
```

Johana Paola Beltran, et al. vs.                    Confidential Video Deposition of Juliane Harning
Interexchange, Inc., et al.                                               September 08, 2016

Page 63

```
 1              A.   No.
 2              Q.   If you worked less than 45 hours per week,
 3    did you ever offer to take less money?
 4              A.   No.
 5              Q.   Were you ever asked to take less money by
 6    the Russells if you worked less than 45 hours per week?
 7              A.   No.
 8              Q.   Were you ever asked by AuPairCare to
 9    return any money to the Russells for weeks you worked
10    less than 45 hours?
11              A.   No.  AuPairCare told us that it doesn't
12    matter if we work 40, 42, 43, 45 hours per week.  We will
13    always only get 195.75.  And it's a fixed amount we will
14    get no matter if we worked 20 hours or 45.
15              Q.   We talked about this a moment ago.  You're
16    making a claim for underpayment of regular and overtime
17    wages, correct?
18              A.   Correct.
19              Q.   What is the claim you're making -- what is
20    the amount that you're making for unpaid regular-time
21    wages?
22              A.   I'm not sure I understand what you mean.
23              Q.   Sure.  How much money are you looking for
24    for unpaid regular-time wages?
25                   MR. HOOD:  Objection.
```

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Juliane Harning
September 08, 2016

Page 66

1    Q.  (By Mr. Quinn)  Okay.  In fact, you did get
2  more, correct?
3        A.  I did get more, yes.
4        Q.  And you got more every week -- every week
5  that you worked for the Russell family, correct?
6            MR. HOOD:  Objection.
7        A.  I got $200 every week, yes.
8        Q.  (By Mr. Quinn)  Plus overtime?
9        A.  I had overtime, yes.
10       Q.  $20 an hour?
11           MR. HOOD:  Objection.
12       Q.  (By Mr. Quinn)  Then in Paragraph 36 you
13  agreed to receive two calendar weeks of paid vacation; is
14  that right?
15       A.  Yes.
16       Q.  And you received at least two weeks of
17  calendar paid vacation while living with the Russell
18  family, correct?
19       A.  I received those ten days, yes.
20       Q.  And sometimes you received more, correct?
21           MR. HOOD:  Objection, foundation.
22       A.  I don't know.
23       Q.  (By Mr. Quinn)  Well, you were there.  I
24  mean, you received additional days off beyond the
25  original -- the ten allotted holiday times, correct?

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Juliane Harning
September 08, 2016

Page 206

```
 1                 CERTIFICATE OF DEPOSITION OFFICER

 2     STATE OF COLORADO                )

 3     CITY AND COUNTY OF DENVER        )

 4              I, Deborah A. VanDemark, a Registered

 5     Professional Reporter and Notary Public within and for

 6     the State of Colorado, commissioned to administer oaths,

 7     do hereby certify that previous to the commencement of

 8     the examination, the witness was duly sworn by me to

 9     testify to the truth in relation to matters in

10     controversy between the said parties; that the said

11     deposition was taken in stenotype by me at the time and

12     place aforesaid and was thereafter reduced to typewritten

13     form by me; and that the foregoing is a true and correct

14     transcript of my stenotype notes thereof.

15              That I am not an attorney nor counsel nor in any

16     way connected with any attorney or counsel for any of the

17     parties to said action nor otherwise interested in the

18     outcome of this action.

19              My commission expires:  March 4, 2017.

20

21              _____
                 DEBORAH A. VANDEMARK
22               Registered Professional Reporter
                 Colorado Realtime Certified Reporter
23               Notary Public, State of Colorado

24

25
```

# Exhibit 7

Johana Paola Beltran, et al.,

vs.

Interexhange, Inc., et al.,

Deposition of

Laura Mejia-Jiminez

September 14, 2016

Volume I

Job # 18766

LAURA MEJIA-JIMINEZ on 09/14/2016

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2               FOR THE DISTRICT OF COLORADO

 3   JOHANA PAOLA BELTRAN; and     )
     those similarly situated,     )
 4                                 )
                    Plaintiffs,    )
 5                                 ) Case No.
       vs.                         ) 1:14-cv-03074-CMA-KMT
 6                                 )
     INTEREXCHANGE, INC.;          )
 7   USAUPAIR, INC.; GREAT AUPAIR,)
     LLC; EXPERT GROUP             )
 8   INTERNATIONAL, INC., DBA      )
     EXPERT AUPAIR; EURAUPAIR      )
 9   INTERCULTURAL CHILD CARE      )
     PROGRAMS; CULTURAL HOMESTAY   )
10   INTERNATIONAL; CULTURAL CARE,)
     INC.; D/B/A CULTURAL CARE     )
11   AUPAIR; AUPAIRCARE, INC.;     )
     AUPAIR INTERNATIONAL, INC.;   )
12   APF GLOBAL EXCHANGE, NFP;     )
     AMERICAN INSTITUTE FOR        )
13   FOREIGN STUDY DBA AU PAIR IN )
     AMERICA; AMERICAN CULTURAL    )
14   EXCHANGE, LLC, DBA GOAUPAIR; )
     AGENT AU PAIR; A.P.E.X.       )
15   AMERICAN PROFESSIONAL         )
     EXCHANGE, LLC DBA PROAUPAIR; )
16   and 20/20 CARE EXCHANGE,      )
     INC., DBA THE INTERNATIONAL   )
17   AU PAIR EXCHANGE,             )
                                   )
18                  Defendants.    )
     _____)
19

20        VOLUME ONE TELECONFERENCED VIDEO DEPOSITION OF

21                  LAURA MEJIA-JIMINEZ

22               San Francisco, California

23            Wednesday, September 14, 2016

24   Reported By:  KIMBERLY E. D'URSO, RPR, CSR No. 11372

25   Job No. 18766
```



 1   repeated.  I didn't hear something clearly.

 2              MR. MASCHLER:  Yeah, I'll repeat it.

 3   BY MR. MASCHLER:

 4        Q.   **Do you know whether the other au pairs that**

 5   **worked for the Mele family were sponsored by AuPairCare?**          11:15:27

 6        A.   I don't know if they had other au pairs.  I

 7   know they had Leah, and that's it.

 8        Q.   **Leah finished out her full year term with the**

 9   **Mele family; correct?**

10        A.   Yes.                                                        11:15:52

11        Q.   **All right.  And did you have any -- withdrawn.**

12             **How long did she work for the Mele family while**

13   **you were working as an au pair for the Mele family?**

14        A.   One month.

15        Q.   **And what did she tell you about being an**             11:16:15

16   **au pair for the Mele family when she was working at the**

17   **same time you worked for the Mele family?**

18        A.   It was very good, because we would work extra

19   hours, and so they would be giving us extra money.

20        Q.   **She told you that you would be getting extra**          11:16:43

21   **money?**

22        A.   Yes.

23        Q.   **Extra in addition to what?  Extra from what?**

24        A.   Beyond the 45 official hours.

25        Q.   **I'm not talking about hours.  I'm talking about**       11:17:04



LAURA MEJIA-JIMINEZ on 09/14/2016

Page 68

```
 1    extra compensation.

 2            In addition to what?  When you say "extra,"

 3    extra from what?

 4    A.   Extra money.  10 an hour, $10 an hour.

 5    Q.   Are you familiar with the term "stipend"?        11:17:30

 6            THE INTERPRETER:  The interpreter needs to

 7    inquire about that term.

 8            MR. MASCHLER:  The record should reflect that

 9    the interpreter is looking up "stipend" in Spanish.

10            THE INTERPRETER:  So -- but what was the        11:18:04

11    question?

12    BY MR. MASCHLER:

13    Q.   Are you familiar with the term "stipend"?

14    A.   Salary?

15    Q.   No.  Stipend.  Do you know the term "stipend"?   11:18:10

16    A.   No.

17    Q.   You've never in your life heard the term

18    "stipend"?

19            MS. LOUIS:  Object to form.

20            THE WITNESS:  I -- yes, I have heard it, but I  11:18:24

21    was wondering about the correct meaning, and I don't know

22    what it is.

23    BY MR. MASCHLER:

24    Q.   Have you ever seen the term "stipend" written

25    down anywhere?                                          11:18:37
```



 1   signed that you didn't know the dictionary definition

 2   of?

 3          MS. LOUIS:  Object to form.

 4          THE WITNESS:  No, there weren't any others.

 5   BY MR. MASCHLER:                                      11:20:29

 6     Q.   Okay.  We'll get back to your declaration in a

 7   second.

 8          We were referring to what Leah told you about

 9   working as an au pair for that host family while she was

10   still there while you were still working there.        11:20:43

11     A.   Yes.

12     Q.   Right.  And you said that one of the things she

13   said was that it was good because you could get extra

14   money.

15          Do you recall that?                            11:21:03

16     A.   Yes.

17     Q.   And did she say anything else about her

18   experience as an au pair with the Mele family?

19     A.   No.

20     Q.   Have you spoken to Leah since she left her      11:21:23

21   engagement as an au pair for the Mele family?

22     A.   Ever since I stopped working with that Mele

23   family --

24     Q.   No.  Ever -- ever since --

25     A.   -- or her?                                      11:21:43



EXCEEDING YOUR EXPECTATIONS

COMBS REPORTING, INC.

DEPOSITION REPORTERS • LEGAL VIDEO

```
 1      Q.    That's not my question.

 2            Do you recall signing a document, a contract,

 3   in which you acknowledged that you were not an employee

 4   of AuPairCare?

 5      A.    This is a confusing question.  Why are you        11:30:56

 6   saying not to be?

 7      Q.    Well, I've got a lot of reasons for saying

 8   that, but I'll just ask you the question again.

 9            Do you recall signing a contract with

10   AuPairCare?  We'll start with that.                        11:31:26

11      A.    Yes.

12      Q.    And when you signed that contract, did you

13   agree to abide by its terms and conditions?

14      A.    Yes.

15      Q.    And do you recall that in signing that           11:31:48

16   contract, you acknowledged that by serving as an au pair

17   for the host family, you were not an employee of

18   AuPairCare?

19            MS. LOUIS:  Object to form.

20            THE WITNESS:  Well, I don't remember, but I       11:32:12

21   worked for AuPairCare, because if you have to do a

22   rematch, it's the agency that does it, not the family.

23   If you have a problem, you have to talk to your agency,

24   not the family.  If you need something, you speak to the

25   agency, not the family.                                    11:32:40
```



LAURA MEJIA-JIMINEZ on 09/14/2016

Page 77

```
 1          Because -- so in reality, you do work for

 2   AuPairCare, because if you have to do anything in

 3   particular, you have to check in with the agency.

 4          And my visa said AuPairCare.  In other words,

 5   my sponsor was AuPairCare, not the family.  Therefore, I       11:33:03

 6   worked for the agency.

 7   BY MR. MASCHLER:

 8      Q.   Who paid you?

 9      A.   The family.

10      Q.   Did AuPairCare ever pay you while you were an            11:33:20

11   au pair for the Mele family?

12          THE INTERPRETER:  The interpreter needs a

13   repetition of the answer.

14          THE WITNESS:  The entity that pays me is the

15   family, but the amount that I'm being paid is decided by        11:33:44

16   the agency.  So it's the agency that is contracting me.

17          MR. MASCHLER:  Okay.  Move to strike as

18   nonresponsive.

19   BY MR. MASCHLER:

20      Q.   My question to you is, did AuPairCare ever pay           11:34:03

21   you any compensation for your work as an au pair?

22      A.   No.

23      Q.   Okay.  And is it correct that the Mele family

24   told you what they wanted you to do on a daily basis in

25   taking care of their children?                                  11:34:31
```



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

Page 79

```
 1    care of children was a prerequisite to your being

 2    qualified to work as an au pair in the U.S.; isn't that

 3    right?

 4        A.   Yes.

 5        Q.   So when the host family, Mele, told you what          11:36:13

 6    they wanted you to do to take care of their children,

 7    did you ever ask them questions about how to do those

 8    things?

 9        A.   Yes.

10        Q.   Okay.                                                  11:36:44

11        A.   I would ask questions because my English wasn't

12    that good at that time.

13        Q.   So you interacted with them so you would have a

14    clear understanding about what they wanted you to do in

15    taking care of their children; is that right?              11:36:55

16        A.   Yes.  Yes, I would ask several times to make

17    sure that I had understood clearly.

18        Q.   And the Mele family, your host family,

19    expressed to you what they expected from you in

20    connection with your taking care of their children as an     11:37:22

21    au pair?

22        A.   Yes.

23        Q.   Okay.  You mentioned that you thought that

24    AuPairCare set the compensation, in words or substance.

25            Do you recall that testimony?                       11:37:49
```



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

LAURA MEJIA-JIMINEZ on 09/14/2016

Page 116

```
 1    become an au pair in the U.S., the highest paying job

 2    you had in Colombia was working in a clothing store in

 3    2012; is that right?

 4         A.   Yes.

 5         Q.   Now, you testified that in making the decision        01:50:58

 6    whether to apply for an au pair job, you received

 7    information from former au pair and from travel agents

 8    and that you relied on that information in making that

 9    decision; is that correct?

10         A.   Yes.                                                   01:51:27

11         Q.   Did you also do research about the au pair

12    program online as part of that decision-making process?

13         A.   Yes.

14         Q.   What Internet sites did you research or do

15    research on?                                                    01:51:54

16         A.   At the Cultural Care website, AuPair in

17    America, and AuPairCare.  And I looked on some

18    blocks [sic], but I don't remember the numbers exactly.

19         Q.   Blogs, b-l-o-g-s?

20         A.   Blogs.                                                01:52:17

21         Q.   Okay.  You don't remember the name of the

22    blogs?

23         A.   No, because I would go to Google and put -- do

24    a search, and then some of them would show up, and I

25    would look at them, and then I would go on to other           01:52:42
```



1  BY MR. MASCHLER:

2      Q.   Ms. Mejia, would you please refer to your

3  declaration, which we've marked as Exhibit 50?

4         If you look at paragraph 3 of your declaration,

5  it says that you "looked into different au pair agencies    02:06:17

6  before becoming an au pair, in an attempt to select the

7  best one."

8         Do you see that?

9      A.   Yes.

10     Q.   What did you do to look into different au pair    02:06:42

11  agencies?  If you would, describe the process by which

12  you selected an au pair agency.

13     A.   Well, aside from the information that I had

14  already gathered, I sent an e-mail to Cultural Care

15  asking about the program.                                   02:07:19

16         I asked my friends which companies they had

17  worked with and Laura, who's the friend of a friend, and

18  the travel agency and my girlfriends when they -- they

19  told me that -- the agency that they had worked for is

20  one that I took.                                            02:07:48

21     Q.   All right.  So you looked at Cultural Care,

22  AuPair in America, and AuPairCare; is that right?

23     A.   Yes.

24     Q.   Did you look into any other au pair agencies in

25  the U.S.?                                                   02:08:06



LAURA MEJIA-JIMINEZ on 09/14/2016

Page 122

```
 1      A.   No.
 2      Q.   Okay.  So you did some research on Cultural
 3  Care, AuPair in America, and AuPairCare before a
 4  applying for an au pair position; correct?
 5      A.   Yes.                                          02:12:23
 6      Q.   And when you sent a letter to Cultural Care
 7  asking for information, did you receive anything back?
 8      A.   Yes.
 9      Q.   What did you get back from Cultural Care?
10      A.   I don't remember exactly.                     02:12:39
11      Q.   Okay.  In paragraph -- well, withdrawn.
12           What information about Cultural Care did you
13  consider in making this decision where to apply?
14      A.   I don't remember.
15      Q.   Well, was it publically available information?  02:13:28
16      A.   Yes.  It was on the Internet on their page.
17      Q.   Okay.  And do you recall what Cultural Care
18  said about its program on its website?
19      A.   I don't remember exactly, but I remember the
20  pages of the three agencies gave the same information.  02:14:02
21      Q.   Okay.  Did the agencies all indicate that
22  the -- withdrawn.
23           Did the web pages of the three agencies --
24  Cultural Care, AuPair in America, and AuPairCare --
25  indicate that the au pair program in the United States  02:14:23
```



```
 1   was administered by the United States Department of

 2   State?

 3            MS. LOUIS:  Object to form.

 4            THE WITNESS:  I don't remember.

 5   BY MR. MASCHLER:                                      02:14:46

 6       Q.  Did those three websites indicate that the

 7   Department of State set the stipend that was to be paid

 8   as a minimum to au pairs in the U.S. program?

 9            MS. LOUIS:  Object to form.

10            THE WITNESS:  I don't remember.            02:15:01

11   BY MR. MASCHLER:

12       Q.  Did those three websites for Cultural Care,

13   AuPair in America, and AuPairCare, respectively,

14   indicate that as an au pair in the U.S., you would be

15   entitled to room and board?                         02:15:27

16            MS. LOUIS:  Object to form.

17            THE WITNESS:  I don't remember.

18   BY MR. MASCHLER:

19       Q.  Did any of those websites discuss an

20   educational payment or subsidy that might be available  02:15:46

21   to you as an au pair in the U.S.?

22       A.  I don't remember.

23       Q.  Okay.  Did any of those three websites mention

24   the maximum hours expectation that would apply to an

25   au pair engagement in the U.S.?                     02:16:14
```



EXCEEDING YOUR EXPECTATIONS

COMBS REPORTING, INC.

DEPOSITION REPORTERS • LEGAL VIDEO

LAURA MEJIA-JIMINEZ on 09/14/2016

Page 124

```
 1        A.   I don't remember.  I remember that the websites

 2   were general, but I don't remember the exact

 3   information.

 4        Q.   Okay.  How did you decide on AuPairCare over

 5   Cultural Care or AuPair in America?                    02:16:41

 6        A.   Because I talked to a travel agency that had a

 7   connection with an agency here, and I thought that they

 8   would be able to help me with the process, and that was

 9   my agency, the one that I worked for.

10        Q.   You worked for a travel agency?            02:17:14

11        A.   No.

12        Q.   I think we have a disconnect in the testimony.

13             Okay.  When you say that you worked for an

14   agency, what do you mean?

15        A.   For AuPairCare.                            02:17:33

16        Q.   Okay.  I'm now talking about information that

17   you received or reviewed before making the decision to

18   become -- to apply for an au pair position.  Okay?

19        A.   Yes, I understand.

20        Q.   All right.  And so did you speak to anyone who  02:18:04

21   worked for Cultural Care about possibly applying for an

22   au pair position sponsored by Cultural Care?

23        A.   No.  I just sent an e-mail requesting

24   information.  They wrote me back an e-mail.  But at that

25   time, I had already decided to go work with that travel  02:18:43
```



```
 1              MS. LOUIS:  Object to form.

 2              THE WITNESS:  But what would I have concluded

 3    back then isn't the same as what I would conclude now.

 4    BY MR. MASCHLER:

 5        Q.  Well, that's what we're focusing on, like, what    02:33:48

 6    your state of mind was when you applied for a job or

 7    position as an au pair in the U.S.

 8              So at the time you applied to become an

 9    au pair, you knew that there was a minimum stipend of

10    $195.75, correct, per week?                                02:34:18

11        A.  Yes.

12        Q.  And you knew that you would be provided with

13    room and board by the host family; correct?

14        A.  Yes.

15        Q.  And you knew that the host family would provide    02:34:39

16    you with a $500 contribution to your education; correct?

17        A.  Yes.

18        Q.  And you knew that your primary responsibilities

19    would entail caring for the children of the host family;

20    correct?                                                   02:35:12

21        A.  Yes.

22        Q.  And you knew that as part of that program, you

23    would be entitled to a vacation; correct?

24        A.  Yes.

25        Q.  And you knew that the maximum hours prescribed     02:35:24
```



```
 1    in the program were 45 hours per week; right?

 2        A.   Yes.

 3        Q.   And you knew that you would have one weekend

 4    off per month as part of this program?

 5        A.   No.  One day a week --                        02:35:56

 6        Q.   One day a week.

 7        A.   -- not a weekend.

 8        Q.   All right.  And all of those features factored

 9    into your decision to become an au pair in the U.S.;

10    correct?                                               02:36:25

11        A.   Yes.

12             MR. MASCHLER:  Can we mark this as next in

13    order, please.

14             (Exhibit Number 52 was marked for

15              identification.)                             02:38:39

16    BY MR. MASCHLER:

17        Q.   Do you recognize, Ms. Mejia, the document that

18    we've marked as Exhibit 52?

19        A.   Yes.

20        Q.   What is it?                                   02:38:49

21        A.   It's my application paper, my profile, the

22    documents they requested in order to apply.

23        Q.   This is your application to become an au pair

24    sponsored by AuPairCare; is that correct?

25        A.   Yes.                                          02:39:21
```



EXCEEDING YOUR EXPECTATIONS

COMBS REPORTING, INC.

DEPOSITION REPORTERS • LEGAL VIDEO

```
 1   say that the "training covered all aspects of the duties

 2   I would be expected to perform as an au pair."

 3            Do you see that?

 4       A.   Yes.

 5       Q.   And what aspects of the duties you would be      03:04:48

 6   expected to perform are you referring to here?

 7       A.   Well, they gave us information.  Depending on

 8   the age of the kids we were supposed to be taking care

 9   of, they gave us information about first aid, general

10   things about children, motor development in children.  I  03:05:30

11   don't remember any more.

12       Q.   Did you find that information to be useful?

13       A.   Of course.

14       Q.   And were you able to use some of that

15   information you received during the training in your      03:05:52

16   au pair engagement for the Mele family?

17            MS. LOUIS:  Object to form.

18            THE WITNESS:  Yes.

19   BY MR. MASCHLER:

20       Q.   Okay.  Was there anything that you were told or  03:06:07

21   information you were provided during this training

22   program that was inconsistent with what you were told

23   about the au pair -- what you had been told about the

24   au pair program by AuPairCare before you went to the

25   United States?                                            03:06:26
```



LAURA MEJIA-JIMINEZ on 09/14/2016

Page 148

```
 1              MS. LOUIS:  Object to form.

 2              THE WITNESS:  No.

 3  BY MR. MASCHLER:

 4       Q.   Okay.  And did you receive information about

 5  the weekly stipend during the training program?          03:06:48

 6       A.   It was quick information.  They just said that

 7  they pay the au pair $195 dollars a week.  And then they

 8  went on with other rights and obligations of an au pair.

 9       Q.   When you say "they," you're referring to the

10  host family?                                             03:07:25

11       A.   When I say "they," I mean the family.

12       Q.   Okay.  And what do you recall their saying

13  about your rights as an au pair, if I captured your

14  testimony correctly?

15       A.   But I don't remember.                          03:07:45

16       Q.   Okay.  You say in paragraph 11 of your

17  declaration that "We were also told that all au pair was

18  paid the same no matter where they work and no matter

19  how many children they care for."

20            Do you see that?                               03:08:08

21       A.   Yes.

22       Q.   Who told you that?

23       A.   I don't remember.

24       Q.   Was it an individual who told you that?

25       A.   No.  It was some ladies from the agency who    03:08:32
```



```
 1      Q.   Okay.  And at the time, they still had the
 2  services of au pair Leah; is that correct?
 3      A.   Yes.
 4      Q.   Okay.  All right.
 5           MR. MASCHLER:  Let's mark this as next in        03:34:29
 6  order, please.
 7           (Exhibit Number 53 was marked for
 8           identification.)
 9  BY MR. MASCHLER:
10      Q.   Exhibit 53 is a copy of the 2014 au pair         03:34:54
11  agreement between AuPairCare and Ms. Mejia.
12           MR. MASCHLER:  I'm sorry.  Can you read the
13  last answer back?
14           THE REPORTER:  Actually, there was no answer.
15  You had said, "Exhibit 53 is a copy of the 2014 au pair   03:34:54
16  agreement between AuPairCare and Ms. Mejia."
17  BY MR. MASCHLER:
18      Q.   And it bears Bates Numbers APC591 to 596.  Do
19  you recognize this document, Ms. Mejia?
20      A.   Yes.                                             03:36:05
21      Q.   Is that your signature that appears on the last
22  page of this document?
23      A.   Yes.
24      Q.   Did you sign this document willingly and
25  voluntarily?                                              03:36:24
```



```
 1              MS. LOUIS:  Object to form.

 2              THE WITNESS:  Yes.

 3   BY MR. MASCHLER:

 4       Q.   Can you make out the date that you signed this

 5   document on the last page?  Is that a 7, or is that a 4?   03:36:34

 6       A.   I don't know.

 7       Q.   Do you think you signed this document before

 8   you traveled to the U.S. in July of 2014?

 9       A.   Yes.

10       Q.   Okay.  So it's some point before July 21 of     03:37:09

11   2014 that you signed this document; right?

12       A.   Yes.

13       Q.   Okay.  And did you review this document before

14   you signed it?

15       A.   Yes.                                             03:37:28

16       Q.   Did you ever see a Spanish version of this

17   au pair agreement before you signed it?

18       A.   Yes.

19       Q.   Okay.  And did you satisfy yourself that the

20   statements in this document were true before you signed   03:37:46

21   it?

22       A.   Yes.

23       Q.   Did you satisfy yourself that the statements

24   and provisions in this document were acceptable to you

25   before you signed it?                                     03:38:01
```



```
 1              THE INTERPRETER:  I'm sorry.  Could that be
 2   repeated?
 3              MR. MASCHLER:  Read it back, please.
 4              (Record read.)
 5              (Question interpreted again.)                10:18:38
 6              THE WITNESS:  At that time, yes.
 7   BY MR. MASCHLER:
 8       Q.   Okay.  If you turn to the first page of this
 9   exhibit, paragraph number 2, it says "au pair," and that
10   "au pair" refers to you.  Do you understand that?         03:39:05
11       A.   Yes.
12       Q.   Okay.  "Au pair is hereby advised and
13   acknowledges that all au pairs are participants in a
14   cultural exchange program."
15              Do you see that?                              03:39:21
16              THE INTERPRETER:  Which paragraph is that,
17   Counsel?
18              MR. MASCHLER:  2.
19              (Question interpreted again.)
20              THE WITNESS:  Yes.                            03:39:54
21   BY MR. MASCHLER:
22       Q.   Did you understand, as of the date you signed
23   this agreement, that you were a participant in a
24   cultural exchange program?
25              MS. LOUIS:  Object to form.                   03:40:02
```



Page 155

```
 1              THE WITNESS:  Yes.

 2   BY MR. MASCHLER:

 3       Q.   This same paragraph, number 2, says that the

 4   "au pair," you, "agree to comply with all of the

 5   regulations published by the U.S. Department of State in      03:40:19

 6   22 CFR, part 514."

 7            And it refers you to a link where those

 8   regulations may be found.  Do you see that?

 9       A.   Yes.

10       Q.   Before signing this 2014 au pair agreement, did      03:41:00

11   you review those regulations published by the U.S.

12   Department of State?

13       A.   No.

14       Q.   Have you ever gone to this link or otherwise

15   reviewed the U.S. Department of State regulations            03:41:22

16   referred to in this paragraph?

17       A.   No.

18       Q.   Okay.  Please turn to paragraph 9 of the first

19   page of the 2014 au pair agreement.  It says that

20   "Au pair," you, "is not an employee, agent, or               03:41:54

21   independent contractor of AuPairCare."

22            Do you see that?

23       A.   Yes.

24       Q.   Okay.  Did you understand that that statement

25   was true as of the time you signed this agreement?          03:42:20
```



EXCEEDING YOUR EXPECTATIONS

COMBS REPORTING, INC.

DEPOSITION REPORTERS • LEGAL VIDEO

```
 1    that you're not an independent contractor of AuPairCare.

 2    Do you see that?

 3        A.   Yes, I see it.

 4        Q.   Okay.  And did you ever understand that you

 5    were an independent contractor of AuPairCare?          03:44:52

 6        A.   No.

 7        Q.   In your previous answer, did you list all the

 8    reasons that you surmised that you might be an employee

 9    of AuPairCare?

10            MS. LOUIS:  Objection.                          03:45:13

11            THE WITNESS:  Yes.

12    BY MR. MASCHLER:

13        Q.   But in signing this agreement, you were advised

14    and acknowledged that you agreed that you were not an

15    employee of au pair.  Do you see that?                 03:45:33

16        A.   Yes.

17        Q.   Did you ever tell anyone at AuPairCare or

18    anyone else that you could not sign this agreement

19    because you disagreed with any of its provisions?

20        A.   I told the travel agency that it didn't seem  03:46:12

21    right to me, but they told me -- and so they told me

22    that if I didn't like that, then I couldn't be in the

23    program.  But I decided to be in the program because I

24    wanted to.

25        Q.   Well, the Mele family paid you your weekly     03:46:33
```



1   stipend; correct?

2       A.   Yes.

3       Q.   And they paid that weekly stipend to you every

4   week that you worked for them it was an au pair;

5   correct?                                                          03:46:54

6       A.   Yes.

7       Q.   And they were the ones who specified the

8   childcare that they wanted you to perform for their

9   children; right?

10          MS. LOUIS:   Object to form.                             03:47:09

11          THE WITNESS:   Yes.

12  BY MR. MASCHLER:

13      Q.   And they were the ones who worked out the

14  schedule for each week with you; right?

15      A.   Yes.                                                     03:47:26

16      Q.   Was there ever a week in which the Mele family

17  did not pay you the weekly stipend?

18      A.   No.

19      Q.   And on occasions in which you worked more than

20  45 hours in a particular week, they paid you more than a        03:47:45

21  stipend; is that correct?

22      A.   Yes.

23      Q.   And did they pay you for all of the hours more

24  than 45 hours that you claimed you had worked each time?

25      A.   Yes.                                                     03:48:11



LAURA MEJIA-JIMINEZ on 09/14/2016

Page 160

```
 1        Q.   And that $200 was, in fact, a little more than

 2   $4 more than the minimum weekly stipend that you had

 3   heard you would be paid as an au pair; correct?

 4        A.   Yes.

 5        Q.   Okay.  And there were weeks, were there not, in      03:51:03

 6   which you worked less than 45 hours when you were

 7   working for the Mele family as an au pair?

 8        A.   The first month, when I was with Leah.

 9        Q.   And despite the fact that in those weeks you

10   worked less than 45 hours, you still were paid the $200     03:51:37

11   stipend; correct?

12        A.   I don't remember.

13        Q.   Okay.  If you turn to page 2 of Exhibit 53,

14   paragraph 17, it says that, in the second sentence,

15   "You," as the au pair, "will have one full weekend off     03:52:12

16   per month."

17             Did you, in fact, receive that one full weekend

18   off per month off when you worked for the Mele family?

19        A.   Yes.

20        Q.   And were you provided with your own private     03:52:38

21   bedroom when you worked for the Mele family as an

22   au pair?

23        A.   Yes.

24        Q.   Was it a nice room?

25        A.   Yes.                                             03:52:54
```



EXCEEDING YOUR EXPECTATIONS

COMBS REPORTING, INC.

DEPOSITION REPORTERS • LEGAL VIDEO

```
 1   answer.

 2   BY MR. MASCHLER:

 3       Q.   Okay.  I asked you before if, prior to becoming

 4   an au pair with the Mele family, you had been told in

 5   any documents or seen any documents that said it was the    03:55:36

 6   Department of State that set the minimum stipend.

 7       A.   Yes, the agency told me --

 8       Q.   Okay.

 9       A.   -- in Colombia.

10       Q.   All right.  So, in fact, before you started       03:56:04

11   working as an au pair for the Mele family, you had been

12   told orally and in writing -- in this contract, for

13   example -- that the United States Department of State

14   had set that minimum stipend; correct?

15       A.   The agency told me.                                03:56:22

16       Q.   And it's also written in your contract;

17   correct?

18       A.   Yes.

19       Q.   Okay.  If you turn to paragraph 41, the last

20   line in the bold print, it says that the au pair, you,     03:56:58

21   are "required to file U.S. Individual Tax Returns even

22   if no taxes are due."

23           Have you filed a U.S. tax return?

24           MS. LOUIS:  Subject to the objections that

25   plaintiffs' counsel has previously made, including up to   03:57:34
```



 1  the hearing that was conducted last week, you can answer.

 2        THE WITNESS:  Yes.

 3  BY MR. MASCHLER:

 4     Q.   **For what years did you file U.S. tax returns?**

 5     A.   When I was au pair, when I opened the bank                    03:57:55

 6  account.

 7     Q.   Okay.  So you worked an au pair in 2014 for

 8  about five months; correct?

 9     A.   July, August, September, October, November,

10  December.  Six months.                                               03:58:19

11     Q.   **Well, you started working at the end of July;**

12  **right?**

13     A.   Yes.  Let's say five months and one week.

14     Q.   **Okay.  All right.  And when did you file a tax**

15  **return in the U.S.?**                                              03:58:38

16     A.   When I got that paper that you need in order to

17  work here.

18     Q.   **When you got the paper you need --**

19     A.   It has a number, security number.

20        MS. LOUIS:  Social Security number?                            03:59:02

21        THE WITNESS:  Yes.

22  BY MR. MASCHLER:

23     Q.   **Okay.  Did you file that tax return sometime in**

24  **2015?**

25     A.   I don't remember.                                            03:59:18



EXCEEDING YOUR EXPECTATIONS

COMBS REPORTING, INC.

DEPOSITION REPORTERS • LEGAL VIDEO

**LAURA MEJIA-JIMINEZ on 09/14/2016**

Page 170

1      A.    They already knew.  Carmen would send me an

2  e-mail through Gmail each week that had my schedule on

3  it, and you could see that there were more than 45 hours

4  on it.  He would simply pay me the extra hours.  I

5  didn't have to ask for the money.  They would give it to        04:11:22

6  me.

7      Q.    **So you would enter on Carmen's computer the**

8  **hours that you were claiming that you worked?**

9      A.    No.  The Gmail -- the Gmail e-mails are

10 connected.  And so what we would do is, they would send        04:11:57

11 me my schedule, and I would open my Gmail, and there it

12 would be.

13     Q.    **Okay.  But sometimes the -- the hours that you**

14 **actually worked differed from the schedule; right?**

15     A.    No.                                                  04:12:28

16     Q.    **There was never a time in the five-month period**

17 **you worked for the Mele family that the actual hours**

18 **that you worked differed from the schedule that the Mele**

19 **family provided you for a coming week?**

20     A.    Well, they knew I was working more time, so          04:12:57

21 that's why they would put it on the schedule.

22     Q.    **That's not my question.**

23           **My question is, they provided you a schedule**

24 **each week; is that right?**

25     A.    Yes.                                                 04:13:16



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

```
 1        Q.    When during the week would they provide you
 2   that schedule?
 3        A.    Every Sunday evening.
 4        Q.    Okay.  And was that schedule meant to cover the
 5   week to follow, the following week?                          04:13:31
 6        A.    Yes.
 7        Q.    All right.  And did you make any entries on
 8   that schedule to document the hours you actually worked?
 9        A.    I couldn't modify the Gmail schedule.
10              THE INTERPRETER:  Interpreter correction.        04:14:01
11              I couldn't make modifications on the Gmail
12   schedule.  That's why I started doing it manually.
13   BY MR. MASCHLER:
14        Q.    Okay.  So when you did it manually, how did you
15   present your manual entries to the host family?             04:14:15
16        A.    So I just put down on my schedule the extra
17   hours that they were supposed to pay me, but I didn't
18   have to show them to it manually.  As I said, he already
19   knew what he had to pay me.
20              But I wanted to have it manually because I       04:15:01
21   could take a look at the week that was about to come.
22   But I wasn't able to add anything or change anything on
23   the week that just happened, and so it seemed important
24   to me to be able to keep track of the hours.
25        Q.    All right.  Well, were there instances in which  04:15:19
```



LAURA MEJIA-JIMINEZ on 09/14/2016

Page 173

```
 1                (Question interpreted again.)

 2                THE WITNESS:  No.

 3  BY MR. MASCHLER:

 4      Q.    Okay.  So you indicated in your manual schedule

 5  the total number of hours that you felt that you had       04:18:00

 6  worked and were entitled to be paid for; yes?

 7      A.    Yes.

 8      Q.    And Mele family paid you for all of those hours

 9  that you documented; is that right?

10      A.    Yes.                                             04:18:25

11      Q.    Who was the area director with whom you

12  interacted while you were an au pair for the Mele

13  family?

14      A.    Beth Lawrence.

15      Q.    And while you were an au pair for the Mele      04:18:49

16  family, you had a number of instances in which you

17  either met with Beth Lawrence or spoke to her on the

18  phone; is that right?

19      A.    I spoke to her on the phone or via e-mail.

20      Q.    Okay.  And the first month that you began your  04:19:18

21  au pair engagement with the Mele family, you met with

22  besides Lawrence face-to-face.  Do you remember that?

23      A.    Yes.  She came to my house the second day.

24      Q.    Okay.  And did she ask how it was going so far

25  with the Mele family?                                      04:19:45
```



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

```
 1      Q.   Did they ever pay you $20 extra in any given

 2  week?

 3      A.   I don't remember.

 4      Q.   Did they ever pay you a hundred dollars in

 5  extra money in any given week?                             04:46:44

 6      A.   I don't remember.

 7      Q.   And when they did pay you the extra money, they

 8  paid in cash every time; is that right?

 9      A.   Yes.

10      Q.   Did you ever deposit those monies in your bank    04:47:01

11  account?

12           MS. LOUIS:  Objection.

13           THE WITNESS:  I already said that I didn't.

14  BY MR. MASCHLER:

15      Q.   Okay.  So there was not one time that you         04:47:13

16  deposited the extra money for a particular week in your

17  bank account; is that right?

18      A.   I don't think so.

19      Q.   Okay.  And some of it you sent back to your

20  family; is that right?                                     04:47:41

21           MS. LOUIS:  Objection.

22           THE WITNESS:  Yes.

23  BY MR. MASCHLER:

24      Q.   And what did you -- how did you spend the -- if

25  you did spend, the rest of the extra money that you        04:47:47
```



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

1      Q.   A monthly statement that tells you the amounts

2    deposited, the amounts withdrawn, and the current

3    balance.

4      A.   Yes.  I would put in my password, and they

5    would tell me how much had been deposited and how much I        04:49:51

6    had used.

7      Q.   Okay.  And that was an electronic bank

8    statement that you were able to access online; is that

9    correct?

10     A.   Yes.                                                     04:50:04

11     Q.   Did you ever receive your bank statements with

12   that information in paper form, document form, from the

13   bank?

14     A.   I don't remember.

15     Q.   Do you have any records of your bank account       04:50:24

16   amounts that cover the five months plus a week that you

17   worked as an au pair for the Mele family?

18     A.   No.

19     Q.   Do you have any idea of the total amount you

20   were paid by the Mele family while you were an au pair      04:50:57

21   for them?

22     A.   No.

23     Q.   Okay.  You've not ever added that up?

24     A.   No.

25     Q.   As you sit here today, do you know the total      04:51:20



LAURA MEJIA-JIMINEZ on 09/14/2016

Page 182

```
 1    amount that you were paid in extra payments by the Mele

 2    family?

 3       A.   No.  I'm very tired to be calculating.

 4       Q.   Well, I'm just asking you if, as you sit here

 5    today, you have a sense of the total amount of extra      04:51:43

 6    payments you received as an au pair from the Mele

 7    family.

 8       A.   I don't remember.

 9       Q.   Okay.  Can you think of any way that -- or any

10    source of information that we might go to to determine    04:52:05

11    the amount of extra payments you received in total while

12    you were an au pair for the Mele family?

13       A.   Through the schedule that I made.

14       Q.   And would that information be reflected on your

15    tax returns?                                              04:52:37

16            MS. LOUIS:  Again, objection.  This is within

17    the scope of what the magistrate said couldn't be asked

18    and is an intrusion into your privacy, and you don't have

19    to answer that.

20            THE WITNESS:  Perfect.                            04:52:52

21            MR. MASCHLER:  Can you mark that, please.

22    BY MR. MASCHLER:

23       Q.   Do you know how the Meles came up with the

24    $10-an-hour figure for the extra -- using the term

25    "extra," your term -- time you worked for them?          04:53:08
```



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

LAURA MEJIA-JIMINEZ on 09/14/2016

Page 186

1    of this document, it's got a schedule for August of

2    2014.  Do you see that?

3        A.   Yes.

4        Q.   It's got a calendar, I should say, for August

5    2014.                                                    04:59:10

6        A.   Yes.

7        Q.   And there are a series of handwritten entries.

8    Do you see that?

9        A.   Yes.

10       Q.   Whose writing is that?                          04:59:26

11       A.   Mine.

12       Q.   Okay.  You wrote all of those handwritten

13   entries on the calendar for August 2014 that's part of

14   this exhibit?

15       A.   Yes.                                            04:59:39

16       Q.   Okay.  And I note that for the week ending

17   August 16, 2014, you wrote down that you had worked 43

18   hours for that week.  Do you see that?

19       A.   Yes.

20       Q.   Okay.  If you turn to the next page, for       05:00:14

21   September 2014, is that your handwriting on this page of

22   this exhibit?

23       A.   Yes.

24       Q.   Okay.  And I note for the week ending

25   September 27 of 2014, you indicate that you worked 33    05:00:33



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

```
 1    number of au pair with whom you've had regular contact

 2    since the time that you were an au pair with the Mele

 3    family.  Do you recall --

 4        A.   That I knew -- that I met when -- yes.

 5        Q.   Okay.  When you say, "many other au pair," how      05:15:54

 6    many other au pair are you acquainted with?

 7        A.   Before being an au pair or after?

 8        Q.   I'm referring to your statement in your

 9    declaration in paragraph 16.  It says, "I'm acquainted

10    with many other au pair who are recently working in the    05:16:22

11    United States."

12            Do you see that?  Do you see that?

13        A.   Yes.

14        Q.   Did you write that sentence?

15        A.   Yes.                                                05:16:34

16        Q.   Is that a true statement?

17        A.   Yes.

18        Q.   How many other au pair are you acquainted with

19    who recently worked in the United States?

20        A.   About two or three.                                05:16:44

21        Q.   Okay.  So when you say "many," you meant two or

22    three; is that right?

23        A.   Two or three that are friends of mine.  And

24    then friends of friends that I also know are au pairs.

25    So that makes quite a few.                                  05:17:21
```



EXCEEDING YOUR EXPECTATIONS

COMBS REPORTING, INC.

DEPOSITION REPORTERS • LEGAL VIDEO

LAURA MEJIA-JIMINEZ on 09/14/2016

Page 196

```
 1        Q.   So friends of yours, you've compared notes

 2   about how much you were paid as au pairs in the U.S.; is

 3   that right?

 4        A.   Yes.

 5        Q.   And as compared to your two or three friends,      05:17:48

 6   did you make the most per week while you were an au pair

 7   for the Mele family?

 8             MS. LOUIS:  Object to foundation.

 9             THE WITNESS:  No.  We all earned the same

10   amount.                                                      05:18:11

11   BY MR. MASCHLER:

12        Q.   Well, did they all get paid $10 an hour for the

13   extra work beyond 45 hours in a week?

14        A.   No.  No, I had friends who didn't receive

15   payment for extra time.                                      05:18:35

16        Q.   Okay.  So in that case, you didn't make the

17   same as they did; you made more money, because you were

18   paid extra, to use your term, by the Mele family.  Is

19   that right?

20        A.   Correct.                                           05:18:52

21        Q.   Okay.  So as compared to you with your two or

22   three other friends that you've testified about that are

23   referred to in paragraph 16, who was paid the most per

24   week as an au pair in the United States?

25             MS. LOUIS:  Object to foundation.                  05:19:11
```



EXCEEDING YOUR EXPECTATIONS

COMBS REPORTING, INC.

DEPOSITION REPORTERS • LEGAL VIDEO