IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:14-cv-03074-CMA-KMT

JOHANA PAOLA BELTRAN; et al.

       Plaintiffs,

v.

INTEREXCHANGE, INC.; et al.

      Defendants.

_____

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A PROTECTIVE ORDER

### INTRODUCTION

On September 8, 2016, this Court conducted an informal teleconference in this matter.  A dispute had arisen during a deposition regarding whether defense counsel was permitted to ask the witness, one of the proposed plaintiffs, if she filed a tax return when she was in the United States.  Counsel for AuPairCare, Inc., who was taking the deposition, requested the conference so that the Court could resolve the issue promptly.  Just before the Court joined, however, Plaintiffs' counsel advised that they planned to take the conference in a different direction, and complain more generally about the scope of questions at depositions of Plaintiffs in this case.  Plaintiffs proceeded to do just that.  Citing an FLSA case as precedent (that did not involve antitrust or the host of other claims at issue here), Plaintiffs essentially questioned defense counsel's integrity, claiming that counsel have been intentionally asking a host of questions that have "no bearing" on the case and that "are doing nothing other than intimidating and harassing these plaintiffs."  Sept 8, 2016 Transcript ("Trans.") at 7:17-23 (ECF No. 357).

Although Plaintiffs asked the Court to reserve ruling on the issues they raised (*id.* at 6:15-24), their attorneys have seized upon comments that the Court made during the conference and turned them into a broad, global objection that they have asserted dozens of times.  They have injected the objection liberally with respect to any topic they call "personal," without even attempting to determine whether the particular question might bear on one of the claims or defenses, including Defendants' threshold defense that *au pairs* are not subject to blanket wage and hour rules because they are cultural exchange visitors, not simply employees.  Based on the objection, Plaintiffs' counsel has invited Plaintiffs not to answer questions that range from whether a plaintiff traveled in her free time to how she felt about living with her Host Family.  Many times, the objections are accompanied by a statement that the Court has already ruled that all of these topics are off limits, which it has not.[1]

Plaintiffs are now using the fact that one Plaintiff, Dayanna Paola Cardenas Caicedo, refused to show up at her deposition as a hook to ask for an unprecedented written order that would implement their broad objection and turn the theory of civil discovery on its head, dictating – *before the discovery proceeds* – that Defendants may not ask any question of a Plaintiff that arguably involves Plaintiffs' "personal lives."  The order would cut off legitimate lines of inquiry that are directly relevant to the myriad

---

[1] For example, when counsel asked Beaudette Deetlefs questions regarding her geographic limitations on her re-match and her cultural exchange experiences in the United States, Plaintiffs' counsel objected, saying "I'm confident that we would be backed up by the magistrate giving [sic] the rulings."  Deetlefs Dep., 148:14-15; 123:5-10, attached as Ex. A.  Likewise, when counsel asked Gonzalez, "did you do fun things on the weekends," Plaintiffs' counsel objected and stated, "…the magistrate's preliminary ruling was that questions about their personal time are off limits, they don't have to answer."  Gonzalez Dep., 129:14-130:7, attached as Ex. B.

claims Plaintiffs have injected into this case.  Plaintiffs must not be able to foreclose important discovery in this manner.  Their claim that these topics are irrelevant is wrong, and their suggestion that experienced, respected officers of the Court have crafted their questions solely to harass or intimidate the plaintiffs is disingenuous and offensive.  Plaintiffs' Motion for Protective Order (ECF No. 365) (the "Motion") should be denied.

## BACKGROUND

Plaintiffs' First Amended Complaint (ECF No. 101) ("FAC") alleges ten counts, including violation of antitrust laws, breach of contract, negligent misrepresentation, fraud under consumer protection laws, civil RICO, breach of fiduciary duty, and wage and hour claims.  The 102-page complaint includes numerous factual allegations that range from claims regarding Plaintiffs' experience as *au pairs* to experiences before joining the *au pair* program.  Many of these allegations are unrelated to the childcare performed or the stipend, and instead seek to portray Host Families, Defendants, and the *au pair* program in a negative—indeed an exploitative—light.

For example, Plaintiffs complain about the quality of their bedrooms and the selection of food.  *See, e.g.,* FAC, ¶338 (Beltran claims she lived in a basement); ¶383 (Deetlefs claims she lived in a basement); ¶346 (Beltran claims she was forced to eat leftover pizza).  Plaintiffs also complain about their experiences during the free timein which they were not providing childcare.  Beltran alleges that she was not permitted to eat with her family, and Deetlefs complains that her Host Family did not take her on vacations. *Id.* at ¶¶387.  Gonzalez and Cardenas both complain that they were not able to use cars during their free time. *Id.* at ¶¶404, 422.  Deetlefs claims that she stayed in

the Host Family home during her vacation because she could not afford to go anywhere.  *Id.* at ¶389.  Gonzalez alleges that she felt isolated and alone.  *Id.* at ¶423.

Plaintiffs' statements to the media about this lawsuit have gone even further.  For instance, regarding her misrepresentation claims, Beltran stated, "When I was in Colombia, InterExchange told me that being an *au pair* would be wonderful and that I would explore another life, language, family, culture and that if anything bad happened to me they would be there to help…Instead, my Host Family treated me like a maid." Deetlefs Dep., Ex. 73, attached as Ex. C.  In claiming she was deceived, Deetlefs said: "What the company told us before we came here, and what actually happened when we got to America, was two different things… The way [the agency] presented it is you can save money…It's not possible with a family that wants you to pay for everything … The pay we get is not enough to save and do stuff with."  Deetlefs Dep., Ex. 72, attached as Ex. D.  She also reported "her Host Family wasn't comfortable [with] her living in the house, which made things tense, and wouldn't take her on vacation. Sometimes she would be left behind with no food, and the pay was meager."  *Id.*

Despite the breadth of their allegations, Plaintiffs' counsel have taken an aggressive position that any question related to what they call "personal" issues is off limits.  The issue was first brought to the Court's attention during the September 8 conference discussed above.  In the end, the Court ruled only on the "very narrow issue" of tax returns, finding that Defendants could ask if a Plaintiff filed tax returns, but could not ask further questions on that topic.  Trans. 33:14-19, 34:4-5.  Emboldened by what they believed were helpful comments from the Court, however, Plaintiffs have

parlayed that conference into a speaking objection that they have used to attempt to shut down dozens of legitimate questions.  If this were merely an FLSA case, Plaintiffs might arguably have a point, as a clinical analysis of hours worked and amounts paid might not require discovery regarding other issues.  In this litigation, however, which involves a threshold issue of whether the *au pair* program is a cultural exchange program (as Defendants contend) or a labor program (as Plaintiffs contend), and which asserts putative class claims ranging from antitrust conspiracy to claims sounding in fraud and breach of fiduciary duty that bring into issue the Plaintiffs' knowledge and experiences, their request for a blanket protective order is improper.

## ARGUMENT

Building off the incredible premise that defense counsel are engaged in an unethical scheme to bully Plaintiffs into dropping their claims, Plaintiffs ask this Court to prohibit Defendants from asking any question that touches on Plaintiffs' "personal lives," "immigration status," or "personal finances."[2]  Proposed Order (ECF No. 365-1).  Their position cannot be squared with their complaint or the rules of civil discovery.

**I.      Parties are Broadly Permitted Discovery of Any Matter that Is Relevant to Any Claim or Defense.**

Rule 26(b)(1) of the Federal Rules of Civil Procedure permits discovery on "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the

---

[2] According to the proposed order, Defendants should be limited to questions regarding Plaintiffs' "work . . .  while employed by one of Defendants' companies."  *Id.*  As Plaintiffs well know, Defendants dispute the characterization that they are "employers."

parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."  *See also Lester v. City of Lafayette*, 639 Fed. Appx. 538, 542-43 (10th Cir. 2016).  In order to avoid discovery, "[t]he party objecting to discovery must establish that the requested discovery does not fall under the scope of relevance as defined in Rule 26(b)(1)." *Hynes v. Petkoff*, Civil Action No. 15-cv-00758, 2016 WL 1391616, at *2 (D. Colo. Apr. 8, 2016), *citing Simpson v. Univ. of Colo.*, 220 F.R.D. 354, 359 (D. Colo. 2004). Ordinarily, courts err in favor of allowing discovery, and a party seeking to challenge this norm must show that "the potential harm occasioned by discovery would outweigh the ordinary presumption in favor of broad disclosure."  *Caves v. Beechcraft Corp.*, No. 15-CV-125, 2016 WL 355491, at *1 (N.D. Okla. Jan. 29, 2016).

Accordingly, "[t]he standard for issuance of a protective order is high."  *Nix v. Holbrook*, Civil Action No. 5:13-02173, 2015 WL 631155, at *2 (D.S.C. Feb. 13, 2015), *citing Minter v. Wells Fargo Bank, N.A.*, 258 F.R.D. 118, 125 (D. Md. 2009).  The party seeking a protective order bears the burden of showing "good cause" and "must show that disclosure will result in a clearly defined and serious injury to that moving party." *Klesch & Co. v. Liberty Media Corp.*, 217 F.R.D. 517, 524 (D. Colo. 2003).  This "standard is not satisfied by conclusory statements."  *Klesch*, 217 F.R.D. at 524. Moreover, even when a court finds good cause, it must determine whether the privacy interests outweigh the opposing party's right to the information.  *Simpson*, 220 F.R.D. at 361 ("While [the court] can appreciate [Plaintiff's] desire to maintain her privacy … Defendant is certainly entitled to discovery of any relevant, non-privileged matters

bearing on the claims and defenses asserted in the pleadings.") (allowing discovery of diary excerpts).  *See also Exum v. U.S. Olympic Comm.*, 209 F.R.D. 201, 206 (D. Colo. 2002) (determination generally "requires the court to balance the party's need for the information against the injury which might result from unrestricted disclosure").

Plaintiffs cannot argue that their privacy is being violated in a serious, public way because there is a protective order pursuant to which they could designate testimony as confidential.  Nevertheless, Plaintiffs and their counsel have stated in depositions that (for example) they do not want to answer questions about finances or personal time, because they are "personal" or answering them makes them feel "uncomfortable."  *See, e.g.,* Deetlefs Dep., Ex. A at 123:5-10; Gonzalez Dep., Ex. B at 129:17-18.   The perfunctory motion they have now filed seeks to solidify and broaden this objection, even though they do not even attempt to meet the exacting standard for issuance of a protective order.  To the contrary, their two-page legal argument is devoid of actual law and primarily consists of a pronouncement that "Magistrate Judge Tafoya has already indicated" that Defendants have no need for this information.  Motion at 7.  Respectfully, the Magistrate Judge has not ruled on this issue, and Plaintiffs cannot satisfy their high burden with conclusory allegations that they find the questions too "personal."

## II.     Defendants Have Inquired into Proper Subjects.

Not only is Plaintiffs' motion deficient, its premise is also wrong.  Plaintiffs cannot show that the questions asked are irrelevant or designed to harass or intimidate.

### A.     Plaintiffs' So-Called "Personal" Questions Are Relevant to the Claims and Defenses in This Case.

One of the Defendants' threshold defenses is that *au pairs* are not subject to

blanket wage and hour rules because they are cultural exchange visitors, not simply employees, as their lawyers now claim.  These young foreign nationals came to the United States for a period of one to two years for the purpose of cultural exchange, i.e., to reside with an American Host Family and participate in their home life, while providing limited childcare services, and fulfilling an educational requirement.  *See* 22 CFR § 62.4(h)(5).  Cultural exchange does not end when childcare services end.  Accordingly, evidence of the *au pairs'* experiences, e.g., visiting museums, attending concerts, learning to windsurf, making American friends, which extends well beyond the time they were actually providing childcare services, is relevant to Defendants' position.

In order to explore this defense, Defendants must be permitted to collect evidence about the *au pairs*' experiences in the United States, to demonstrate that they received benefits beyond the payment of a stipend, as the program was and is intended to provide.  Defendants are thus entitled to seek discovery regarding the benefits – both monetary and non-monetary – that *au pairs* received as participants in this program.  This necessarily requires questions about what the *au pairs* did in their free time when they were not caring for children, but were experiencing American culture.

Questions regarding Plaintiffs' background, financial information and activities during their non-childcare time are relevant to the operative claims and defenses.  For example, Plaintiffs assert there was a conspiracy to fix the stipend that Host Families pay to *au pairs*.  Each *au pair* must demonstrate that he or she was injured by the supposed conspiracy – in other words, that the Host Family would have paid more to the *au pair* if there had not been a conspiracy.  *JetAway Aviation, LLC v. Bd. of Cty.*

*Comm'rs*, 754 F.3d 824, 833 (10th Cir. 2014) ("Whether a plaintiff has suffered an antitrust injury is a threshold inquiry") (internal quotations omitted).  To defend against this element and assess whether Plaintiffs are similarly situated for Rule 23 certification, Defendants are entitled to discover all value – both monetary and non-monetary – that Plaintiffs derived from the *au pair* program, and they must be permitted to explore whether all *au pairs* received the same value or differing value from their experiences in the United States.  Two lines of inquiry (at least) are relevant to this analysis.  First, how much did the *au pair* get paid?[3]  Second, what stipend would have resulted if the parties had negotiated?[4]  Defendants will have an incomplete record on this issue if their inquiry is restricted to the time when Plaintiffs were providing child care assistance.

In order for Plaintiffs to prevail on their misrepresentation claim, Plaintiffs would have to show, among other things, that Defendants "in the course of [their] business… supplie[d] false information for the guidance of others in their business transactions, [and are] subject to liability for pecuniary loss caused to [plaintiffs] by their justifiable reliance upon the information."  Restatement (Second) of Torts § 552 (1977); *Burlington Ins. Co. v. Okie Dokie, Inc.*, 329 F. Supp. 2d 45, 48-49 (D.D.C. 2004).  Moreover, "[t]he questions relevant to [Plaintiffs'] negligent misrepresentation claim are . . . 1) whether the misrepresentations were a substantial factor in causing [Plaintiffs'] entrance into [the *au pair* program] with [Defendants], and 2) whether the entrance into [the *au pair*

---

[3] In dollars?  In the use of a car?  In travel with the family on vacation?  And so on.

[4] Would the Host Family have opted to pay more – or did the Host Family have other alternatives that would have been more attractive than paying more to the *au pair*?  Likewise, would the *au pair* have demanded more – or did the existing program provide at least as much value as the alternatives that were available to the *au pair*?

program] was a substantial factor in [Plaintiff's] subsequent losses." *First Sealord Sur. v. Durkin & Devries Ins. Agency*, 918 F. Supp. 2d 362, 376 (E.D. Pa. 2013).

Plaintiffs have made various allegations of misrepresentation, largely centered upon whether the stipend was enough money for them to save, travel, or engage in other activities outside the Host Family's home.  In order for Defendants to test the truth or falsity of this claim and (for example) to determine whether the Plaintiffs "justifiably relied" on statements they claim were made, Defendants must be permitted to ask about Plaintiffs' finances and their experience in matters of finance, and also about their time and activities outside providing childcare.  The ability of Plaintiffs to satisfy this element and serve as a class representative can only be assessed if this discovery proceeds, notwithstanding their blanket claim that it would be too "personal."[5]

Plaintiffs are responsible for the breadth of issues raised.  Among other things, they have complained about car accessibility during their free time, how they felt their Host Families treated them in their free time, the alleged difficulty in traveling or engaging in other activities, the alleged insufficiency of the stipend to cover their costs, and other topics that open the door to inquiry about finances and personal time.  *See, e.g.,* FAC, ¶¶ 338, 345, 346, 389, 423; Deetlefs Dep., Ex. A at 137: 4-5; Gonzalez Dep., Ex. B at 7:25-8:17.  "When a party opens the door to a topic, the admission of rebuttal evidence on that topic becomes permissible."  *Lounds v. Torres*, 217 F. App'x 755, 758

---

[5] Defendants do not intend to question particular deponents about whether they are in the United States legally.  However, immigration-related issues will invariably arise in this litigation given that the *au pair* program is part of the Department of State's J-1 Visa Program.  Accordingly, a protective order precluding discovery on "immigration status" is inappropriate, and will create confusion about the permissible scope of discovery.

(10th Cir. 2007) (questions regarding history of domestic violence permitted because "[plaintiff] put the nature and quality of her relationship … at issue by claiming damages for grief and loss of companionship") (internal citation and quotation omitted); *see also Carbajal v. Warner,* Civil Action No. 10-cv-02862, 2013 WL 1129429, at *3-4 (D. Colo. Mar. 18, 2013) (requiring plaintiff to disclose mental health records when he claimed reputational damage, humiliation, mental anguish, and loss of enjoyment of life). Proposed Plaintiffs Juliane Harning and Laura Mejia Jimenez stated in declarations that they were paid "extra sums" above their weekly stipends.  Defendants are entitled to explore that extra compensation, and if and how those proposed Plaintiffs accounted for it in their finances.  Defendants are entitled to seek information on these topics raised by Plaintiffs, even if Plaintiffs argue that those issues are not otherwise relevant. *Klesch*, 217 F.R.D. at 524 ("[D]iscoverable information may include . . . 'information that could be used to impeach a likely witness, although not otherwise relevant to the claims or defenses.'") (quoting Advisory Committee Notes to Fed. R. Civ. P. 26); *see also Moore v. Miller*, Civil Action No. 10-cv-651, 2013 WL 2456114, at *2 (D. Colo. June 6, 2013) (finding plaintiffs' entire Facebook history discoverable because plaintiff chose "to share his version of events online often and in many different forums, including detailed and specific descriptions of [the subject matter of the action] as well as the injuries he allegedly suffers").

### B.      Viewed in the Proper Context, All of the Challenged Questions Were Proper.

In their Motion, Plaintiffs identify the questions that they say were improper, irrelevant, and designed to harass or intimidate.  Consistent with the examples above,

each challenged question is relevant to the claims or defenses in this case.

### 1.   Questions Asked of Johana Paola Beltran Were Proper.

Plaintiffs' counsel impugns the integrity and professionalism of InterExchange's counsel regarding the deposition of Plaintiff Johana Paola Beltran, asserting that counsel asked Beltran "offensive, personal and degrading" questions in a "transparent effort to punish" her, and accusing counsel—in blatant disregard of the actual questions asked—of suggesting that Beltran overstayed her visa and committed bribery.  Motion at  2-3.  As clarified below, Plaintiffs' complaints are unfounded in both law and fact and without any good faith basis whatsoever.

During Beltran's deposition, Plaintiffs' counsel who were present in person— Messrs. Hood and Seligman—did not object to a *single question* on the grounds of form or foundation, much less on the grounds of harassment or intimidation.[6]  In support of the Motion for Protective Order, Plaintiffs submitted the affidavit of Plaintiffs' counsel Lauren Louis ("Louis Decl.") (ECF No. 367).  Ms. Louis did not attend the deposition in person.  Declaration of Brooke A. Colaizzi, attached as Ex. Q, at ¶ 34.  It is not possible to determine whether she called into the deposition or not; all of the phone numbers in Defendants' records associated with the deposition are confirmed as numbers belonging to various Defendants' counsel.  *Id.* at ¶¶ 27-33.  If Ms. Louis did attend the deposition by phone with a blocked number, she did not object to any questions nor engage InterExchange's counsel in any discussions involving the allegedly intimidating, punishing, harassing, and accusatory questioning during the deposition.

---

[6] Plaintiffs' counsel Mr. Hood objected a handful of times to caution against revealing attorney-client communications but did not otherwise object to a single question.

Aside from the fact that Plaintiffs' counsel did not object to any of the now-challenged questions, the questions to Beltran were wholly appropriate and neither threatening nor harassing.  The questions sought relevant testimony about a previously undisclosed and unidentified witness in this case, Orlando Salazar ("Salazar").  The night before her deposition, Beltran produced emails from Salazar to her former Host Family that demanded money on her behalf for the time she lived with the family.[7]  *Id.* at ¶6, Ex. 1.   Salazar stated in the emails that he "represented" Beltran.  *Id.* at Ex. 1.  However, Beltran stated in her deposition that Salazar was not a lawyer.  *Id.* at ¶¶ 13-14, Ex. 3.  She confirmed that Salazar was the unnamed "partner" to whom she referred in her discovery responses as someone she had communicated with regarding the lawsuit.  *Id.* at ¶ 17.  Beltran also confirmed that Salazar helped her calculate her alleged hours worked and wages allegedly owed her.  *Id.* at ¶ 18.  Beltran also revealed that Salazar sponsored her student visa, that she lived in his home with him and his adult son, and that he was her sole source of financial support.  *Id.* at ¶¶ 11-20.  Given the revelation that Salazar was not a legal representative but is in fact a witness in this case, InterExchange was entitled to explore the nature of Beltran's relationship with him.  Plaintiff did not express any discomfort as a result of the questions and as noted above, Plaintiffs' counsel did not object to them.[8]

Nor did Plaintiffs' counsel object to Defendant's counsel's questions regarding

---

[7] Despite the fact that a protective order has been entered in this case, none of these emails were marked confidential.

[8] Notwithstanding that Beltran did not express discomfort, the propriety of a question does not turn solely on whether the deponent felt uncomfortable, or even harassed.

whether Beltran paid Salazar to sponsor her student visa, which Plaintiff now claims was tantamount to accusing Beltran of committing a crime. Colaizzi Decl., Ex. Q, Ex. 3 at 178:11-21. The questions made no reference to bribery specifically or any crime generally. InterExchange is entitled to explore the relationship between Beltran and Salazar, a witness in this case who made legal demands on her behalf, especially in light of Beltran's testimony that Salazar supports her financially. Contrary to Louis' bald assertion to the contrary, Defendant's counsel had no "stated purpose" of trying to determine if Beltran overstayed her visa. Louis Decl. at ¶ 6. The questions related to email communications between InterExchange and Beltran regarding the end of her participation in the *au pair* program, which by Department of State regulation required InterExchange to cancel Beltran's J-1 visa. Beltran Dep. Ex. 24, attached as Ex. E. The questions also were relevant to the development of Beltran's relationship with Salazar, a witness to her alleged hours worked and wages due, which according to Plaintiffs are key issues. Motion at 2. Moreover, Mr. Hood took a recess during the deposition to discuss with Beltran whether she had any concerns testifying about the cancellation of her J-1 visa. Colaizzi Decl., Ex. Q at ¶ 24. He returned and stated not only that Beltran had no issue with answering such questions, but he was withdrawing his prior assertion that the topic be marked confidential under the protective order. *Id.*

Following the conclusion of Defendant InterExchange's counsel's questioning of Plaintiff Beltran, counsel for Go Au Pair, Au Pair International, and Agent Au Pair asked Beltran a total of two questions—neither of which drew an objection. As with the previous questions addressed above, Defendants' counsel's two questions concerned

the nature of the "partnership" between Beltran and Salazar. Contrary to Beltran's deposition testimony (but consistent with her written discovery responses), photographs posted on Beltran's public Facebook page suggested that her relationship with Salazar was in fact romantic. Defendants' counsel was entitled to cross-examine Beltran on the apparent inconsistency between her deposition testimony, on the one hand, and her written discovery responses and Facebook page, on the other hand, to explore Salazar's true role and interest in this case. *See* Declaration of Kathryn A. Reilly, Attached as Exhibit S. Thus she asked two questions:

> Q:     On your Facebook page, who was it who sent you the beautiful flowers for Valentine's Day?
> A:     Somebody from the school.
> Q:     Not Orlando?
> A:     No.

Again, counsel encourages the Court to review the video,[9] which demonstrates the respectful manner in which these questions were asked. Moreover, the absence of any objection either by the two counsel for Plaintiffs sitting in the room or by Lauren Louis, whose sworn declaration asserts the groundless claims of harassment, speaks volumes. Plaintiffs' counsel's failure to object confirms the propriety of these two questions (and the preceding line of inquiry by InterExchange's counsel), and precludes Plaintiffs' disingenuous, *post hoc* allegations of abuse.

## 2.     Questions Asked of Lusapho Hlatshaneni Were Proper.

AIFS sponsored *au pair* Plaintiff Lusapho Hlatshaneni. AIFS counsel Lawrence Lee asked Hlatshaneni about her duties with one of her Host Families and her response

---

[9] All videos referenced herein are being filed with this Opposition on a hard drive. A directory of the videos is attached hereto as Ex. F.

acknowledged that she took the two children to various places.  Hlatshaneni Dep. 114:8-15, attached as Ex. G.  A document produced by Plaintiffs in discovery revealed that she had an accident while driving that Host Family's vehicle, and had shared in the cost of the damages.  Hlatshaneni Dep., Ex. G at 125:18–126:3.  These are relevant subjects of discovery related to Hlatshaneni's duties and the pay that she received.

Plaintiffs claim that Mr. Lee harassed Hlatshaneni by asking repeated questions about traffic violations.  As the record demonstrates, he did not.  Ex. F (Hlatshaneni_03 _1.wav at 1:17:40–1:22:48).  First, Plaintiffs' counsel did not object to the testimony excerpted in the motion.  *See* Motion at 3, citing Hlatshaneni Dep., Ex. G at 117-18, 119:5-21, 115:16-117:16.  Second, Plaintiffs' counsel repeatedly made speaking objections, accusing Mr. Lee of harassing and intimidating Hlatshaneni, attempting to coach her to say she felt harassed, and telling her she did not need to answer. Hlatshaneni Dep., Ex. G at 117:17–119:2; Declaration of Lawrence Lee, attached as Ex. H.  After Hlatshaneni testified she had received two tickets, Mr. Lee asked if she had been cited for any other violation and Plaintiffs' counsel started objecting.  Mr. Lee explained that his questions concerned how seriously she took safety and how it affected the children in her care, but counsel's arguments continued.  Several times Plaintiffs' counsel asked the leading question  "Lusapho, do you feel comfortable answering the question?"  At first, she replied "At this point, its okay, And if I don't, I'll let you know."  Hlatshaneni Dep., Ex. G at 118:24 – 119:2; Ex. F (Hlatshaneni_03_1.wav at 1:22:39 - 1:22:48).  "I'll let you know" is not the response of an intimidated witness.

Plaintiffs complain that a short time later in the deposition, Hlatshaneni testified that she was uncomfortable with the tone of a question.  *See* Motion at 4, citing 131:15-19.  Mr. Lee had shown the document that mentioned the accident to Hlatshaneni and Plaintiffs' counsel immediately repeated his earlier speaking objections.  When asked if the children were in the car when the accident occurred, Hlatshaneni said she did not feel comfortable with the tone of that question.  Mr. Lee re-asked the question.  This was followed by more argument and coaching by Plaintiffs' counsel, but Hlatshaneni admitted the children were in the car at the time of the accident.  Mr. Lee asked how the repairs were paid for and, to this question, Plaintiffs' counsel did not object.  Mr. Lee went on to other topics. Hlatshaneni Dep., Ex. G at 125:18 – 132:10;  Ex. F (Hlatshaneni_03_1.wav and Hlatshaneni_03_2.wav at 1:31:40 – 1:41:25).

Finally, Plaintiffs object that Mr. Lee asked Hlatshaneni "numerous questions about her finances."  The "numerous" questions consist of whether she filed taxes with the U.S. Government in 2013, 2014 or 2015.  Hlatshaneni Dep., Ex. G at 153:25 – 156:11.  Again prodded by Plaintiffs' counsel's speaking objections to say that she felt harassed, she testified that the question of whether she filed taxes was "Intimidating, yes.  Harassment, it's borderline"  because "I don't understand why it's being asked."  *Id.* at 154:17-25.  As Plaintiffs now know, the next day, Judge Tafoya stated that such questions are relevant and permissible.  Mr. Lee asked if Hlatshaneni felt comfortable answering the question and she responded unequivocally:  "I can answer."  *Id.* at 155:6-9.  Although Hlatshaneni's counsel instructed her again that she did not need to answer, she did answer the yes/no questions, and the deposition moved on to other matters.  *Id.*

at 156:7-25; *see also* Ex. F (Hlatshaneni_03_3.wav and Hlatshaneni_04_1.wav at

2:11:50 – 2:39:37); Lee Decl., Ex. H.

### 3. Questions Asked of Juliane Harning and Laura Mejia Jimenez Were Proper.

Juliane Harning ("Harning") and Laura Mejia Jimenez ("Mejia"), proposed plaintiffs

whom Plaintiffs have sought to add in their motion to amend the complaint, are the only

persons who have sought to bring an FLSA claim against AuPairCare. The FAC does

not list any party-plaintiff who maintains any FLSA claim against AuPairCare.

At the same time Plaintiffs filed their motion for leave to file a second amended

complaint, they filed a second motion for conditional collective certification. Harning and

Jimenez have been offered by Plaintiffs as proposed collective class representatives,

and both filed declarations in support of that motion. Those declarations were their first

"appearance" in this case. As the Court is aware, the briefing schedule on the motions

for conditional certification was modified to allow Defendants to depose proposed class

representatives. Because of difficulties in scheduling the depositions of these former *au

pairs*, who live far outside this jurisdiction, the depositions of Harning and Jimenez were

likely the one "shot" AuPairCare would have to take their testimony before trial, if any.

These depositions thus were particularly critical, and it was imperative that

AuPairCare's counsel explore thoroughly all matters germane to this case.

As detailed in counsel's declarations, the depositions of Harning and Jimenez

focused exclusively on such matters.  *See* Declaration of Thomas Quinn, attached as

Ex. I; Declaration of Brian Maschler, attached as Ex. J. They addressed, *inter alia*,

statements the deponents had made in declarations, the bases for those statements,

their experiences as *au pairs*, and the compensation they received as *au pairs*. The last issue obviously goes to the heart of what is in dispute in this lawsuit. Both Harning and Jimenez are different from putative class members they purport to represent in that, among other things, they received "extra" pay from their Host Families in addition to weekly stipends. To determine whether either suffered cognizable damage in this case, and if so, in what amounts, it was important to explore in depth what they were paid. Neither Harning nor Jimenez kept track of those amounts. Therefore, it was necessary and appropriate in their depositions to explore alternative ways that the payments they received could be ascertained—be it through bank records, diaries, weekly or monthly payments to relatives, or other secondary evidence. Defendants' inquiry into these matters was essential, and cannot properly be abridged through a protective order that seeks to shield vague areas like "personal finances" or "personal lives."

Plaintiffs' accusations that Harning and Jimenez were subjected to "harassment" in their depositions go beyond zealous advocacy, and land squarely in the realm of mendacity. AuPairCare invites the Court to listen to the audiotape of these depositions, as well as review the written transcripts.  The Court will find that AuPairCare's counsel were respectful, congenial, and measured in tone—even where the witnesses were contradicting their own prior testimony or were obviously dissembling.  The distorted picture presented by Plaintiffs is not worthy of this Court.

### 4.    Questions Asked of Beaudette Deetlefs were Proper.

Beaudette Deetlefs served as an *au pair* near Salt Lake City from August, 2014 until she was asked by her Host Family to leave in June 2015.  A few months earlier,

Deetlefs had been interviewed by the Washington Post about this litigation.  Ex. C.  She was quoted complaining that she did not have "a very pleasant feeling in" her Host Family's home, and she felt in the way.  *Id.*  She complained that "[t]raveling around was difficult on the $195.75 stipend; she spent much of it on public transportation and toiletries" and "hasn't been able to afford to leave her Host Family's house."  *Id.*

Deetlefs has claimed that "she was terminated in retaliation for her participation in this lawsuit."  Plaintiffs' Opposition to Defendant Cultural Care's Motion for Sanctions (ECF No. 368) ("Sanctions Opposition").  According to documents, however, the Host Family may have been primarily upset by the negative statements Deetlefs made to the press.  Ex. K.  Evidence also shows that the Host Family had complained about other issues, including that Deetlefs is "a raceist [sic]" and had made improper racially-biased comments in their home.  Ex. K.  Indeed, the Host Family reportedly limited Deetlefs' time with their children as a result of her comments.  *Id.*  It is reasonable to infer that these issues impacted whether she felt "at home" with her Host Family.

Deetlefs had been planning to find a second Host Family and stay in the *au pair* program after her first year, but she wanted to limit prospective families to Utah because, as she told her Local Childcare Consultant, she had found a boyfriend.  Ex. L.  When she was asked to leave her Host Family's home, Deetlefs submitted a statement to Cultural Care, drafted by her counsel, claiming in terse terms that "Cultural Care is on notice of the discharge" and must find a new Host Family "pursuant to their obligations to me as a Cultural Care Au Pair."   Ex. M; Deetlefs Dep., Ex. A at 183:7-184:23.

In their motion, Plaintiffs complain that Deetlefs was asked, "What did you do in

your free time" and asked if she traveled while an *au pair*.  Ex. A at 123:4.   After her counsel injected inappropriate objections, Deetlefs responded that she volunteered for the Red Cross, met with other *au pairs*, went to parks, and went "for dinner."  Ex. A at 125:16-20.  She also traveled to Arches National Park in Moab, Utah.  This information directly supports Defendants' claim that State Department sanctioned sponsors of the *au pair* program are not mere staffing agencies and the program is no mere labor program.   Rather, the program allows *au pairs* the opportunity to gain new experiences, and it fosters cultural exchange.  These questions also bear directly on Deetlefs' public allegations about the program.  Having complained to a national newspaper that she brought this case because the stipend does not give her enough money to travel, Deetlefs cannot seriously contend that the question "did you travel" is off limits.

Plaintiffs go on to complain that Deetlefs was asked whether she had a boyfriend while in the United States.  As explained above, documents say that Plaintiff geographically limited her re-match search – materially reducing the number of possible Host Families – because of a boyfriend in Utah.  Ex. N.  Since Deetlefs also suggests that it was Cultural Care's responsibility to find a new Host Family, it is reasonable for Cultural Care to probe this issue.  Cultural Care is also entitled to explore whether some external factor – like a boyfriend, other outside activities, or her racist views – may have contributed to her feeling that she was not part of the family.   Ex. O at 6.

Plaintiffs next complain that Deetlefs was asked about money, including how much she brought to the United States, her expenses before she joined the program, and what she planned to do with the stipend.  Motion at 5.  Deetlefs was told the stipend

amount before she joined the program, and recruiting materials are required to tell prospective exchange visitors that their stipend might not cover their expenses, so they should bring additional personal funds.  *See* 22 CFR § 62.9(d)(3).  Yet, Plaintiffs claim that Defendants defrauded them with statements regarding compensation they would receive.  Defendants must be permitted to explore whether Deetlefs was, in fact, "defrauded" and whether her allegations that the money she was paid was "low" (Deetlefs Dep., Ex. A at 139:1), made it "difficult to buy everything you needed to buy" (Deetlefs Dep., Ex. A at 142:19-22), and that she could not afford to buy what she needed or travel (Ex. D) are credible, particularly given what she earned before and after the program.   These same kinds of individual perspectives and understandings as to the program may also bear on whether Deetlefs can represent a putative class.

Significantly, Plaintiffs' Motion does not identify every instance in which they asserted their "privacy" objection.  For example, Plaintiffs objected when counsel inquired as to reports that Deetlefs is a racist, and regarding her highly offensive racist Facebook posts.  Deetlefs' racial bias is relevant because it is discussed in documents in this case and may explain why she feels that she was never accepted by her Host Family.  Deetlefs Dep., Ex. A 153:19-155:14, Ex. 67, attached as Ex. P.  The topic is also relevant because hostility toward people who are black may render her inappropriate as a class representative.  Plaintiffs also objected when counsel asked about Plaintiffs' long terms plans, despite the fact that the question led Deetlefs to give a compelling recitation of how her participation in the program has benefitted her in her studies.  Deetlefs Dep., Ex. A at 188:17-189:25 (agreeing that she is in a unique

position to contribute to college classes because, for example, her time in the *au pair* program allowed her to observe how different cultures approach things like "teaching a baby to walk, or the first words they say."). In both of these instances, Plaintiffs' counsel asserted privacy objections. Although Deetlefs did not accept counsel's invitation and chose to provide relevant information in response, it is highly likely that, armed with the blanket protective order requested, she would have stood on the objection.

Finally, as to any remaining suggestion that the tone or manner of the questioning demonstrates harassment or intimidation, (1) Defendants note that counsel has affirmed that his intention was proper, Second Declaration of Justin J. Wolosz, ¶8, attached as Ex. R; and (2) Defendants request that the Court review the deposition video and see for itself. Ex. F. Counsel was respectful in asking the questions, and Deetlefs was far from intimidated. Ex. A, F.

### C.   Plaintiffs Have Not Been Harassed or Intimidated by Defendants.

Plaintiffs have no claim that they have been harassed or intimidated. Plaintiffs decided early on – before discovery even began – that they would claim harassment or intimidation tactically to avoid discovery that was unfavorable to their theory of the case. During the Scheduling Conference on April 25, 2016, Plaintiffs' counsel expressed a general resistance to Defendants deposing Plaintiffs, particularly opt-in Plaintiffs, with no basis whatsoever, on the theory that Defendants would try to "pick them off." April 25, 2016 Hearing Transcript 79:11-16; 79:18-81:17 (ECF No. 307). Plaintiffs now use as a launching point for their Motion for a Protective Order Cardenas' failure to appear at her deposition, which was the *first deposition of a Plaintiff scheduled in this case*, and

which cost all Defendants in time and fees.  It is incredulous to connect Cardenas' non-appearance and Plaintiffs' baseless complaints of deposition misconduct, as no defense counsel had asked any Plaintiff a single question at the time she failed to appear.

If Plaintiffs thought that Defendants' conduct at depositions was harassing or intimidating, they could have availed themselves of the proper process by stopping the deposition and seeking a protective order.  Their unwillingness to do so strongly suggests that Plaintiffs' claims of "harassment and intimidation" are merely tactics to avoid questions for which the answers are unfavorable to their claims, and are being asserted now as a red herring to avoid paying costs associated with the inexcusable failure of Dayanna Paola Cardenas Caicedo to appear for her deposition.

Indeed, as all deposing counsel have attested, no attorney has intended to harass or intimidate any Plaintiff.  See Declarations of counsel, attached as Exs. H, I, J, Q, R and S.  To the extent that the Court has any question as to whether Defendants have, in fact, been harassing or intimidating, Defendants again invite the Court to review the deposition videos submitted with this Opposition.  *See* Ex. F.

**III. Plaintiffs Would Use the Requested Novel, Blanket Protective Order for the Improper Purposes of Cutting Off Legitimate Inquiry and Hampering Defendants' Ability to Discover Evidence Necessary to Their Defense.**

Finally, the Court should deny the requested protective order because it would lead to disputes and abuse by Plaintiffs.  Plaintiffs have already attempted to rely on this Court's preliminary comments to curtail relevant discovery.  In many instances, Plaintiffs' counsel have given a confusing instruction that Plaintiff is free to decline answering if she is "uncomfortable."  *See, e.g.,* Deetlefs Dep., Ex. A at 123:5-10

("Objection. . . I'm going to say that to the extent that these questions make Bella uncomfortable I don't believe she should have to answer them"); Deetlefs Dep., Ex. A at 124:12-21 (Defendant's counsel: "…so you're not instructing her… not to answer but you are telling her she doesn't have to?"  Plaintiffs' counsel: "I'm not instructing Bella what to say I'm saying that if she feels uncomfortable discussing her free time she does not have to discuss her free time."); Gonzalez Dep., Ex. B at 129:14-131:2 (Defendants' counsel: "did you do fun things on the weekends?"  Plaintiffs' counsel: "I'm instructing her that she does not have to answer questions about her personal time if she was not working during that time and how she spent her personal time. She can choose to answer if she wants to.  Do you want to answer this question?").  Plaintiffs' counsel have also engaged in inappropriate coaching by asking their clients questions like, "do you feel comfortable answering the question?"  Hlatshaneni Dep., Ex. G at 118:24-25. This instruction awkwardly leaves it to Plaintiffs (who in many instances seem confused by the instruction) whether or not they want to answer.  That is not the legal standard.

If the Court enters the requested protective order, Plaintiffs will be emboldened to stop any lines of questions they do not like.  Plaintiffs should not be permitted to offer self-serving pleadings, testimony, and media statements that paint Defendants and Host Families in a negative light, yet avoid any testimony that calls their claims into question.

## **CONCLUSION**

Plaintiffs may prefer not to be deposed; but having filed suit that is not an option. The Court should not curtail Defendants' right to discovery that is so clearly relevant to their defenses and Plaintiffs' claims.  The Motion for Protective Order should be denied.

Dated:  October 13, 2016.                    Respectfully submitted,


s/ Diane Hazel
Joan A. Lukey (joan.lukey@choate.com)
Robert M. Buchanan, Jr.
(rbuchanan@choate.com)
Michael T. Gass (mgass@choate.com)
Justin J. Wolosz (jwolosz@choate.com
Lyndsey M. Kruzer (lkruzer@choate.com)
CHOATE HALL & STEWART LLP
Two International Place
Boston, Massachusetts  02110
Telephone:  (617) 248-4790

James M. Lyons (jlyons@lrrc.com)
Jessica L. Fuller (jfuller@lrrc.com)
Diane Hazel (dhazel@lrrc.com)
LEWIS ROCA ROTHGERBER CHRISTIE
LLP
One Tabor Center, Suite 3000
1200 Seventeenth Street
Denver, CO 80202
Tel: (303) 623-9000
Fax: (303) 623-9222

**Attorneys for Defendant Cultural Care,
Inc. d/b/a Cultural Care Au Pair**

s/ Kathryn A. Reilly
Kathryn A. Reilly (reilly@wtotrial.com)
Wheeler Trigg O'Donnell LLP
370 Seventeenth Street, Suite 4500
Denver, CO 80202-5647

**Attorneys for Defendants Agent Au Pair
and American Cultural Exchange, LLC
d/b/a Go Aupair**

_s/ Brian Alan Birenbach_
Brian Alan Birenbach
(brian@rietzlawfirm.com)
Rietz Law Firm
LLC P.O. Box 5268
114 Village Place #301
Dillon, CO 80435

**Attorneys for Defendants American Cultural Exchange, LLC d/b/a Go Aupair and Au Pair International, Inc.**

_s/ Kathleen E. Craigmile_
Kathleen E. Craigmile
(kcraigmile@nixonshefrin.com)
Nixon Shefrin Hensen Ogburn, P.C.
5619 DTC Parkway, Suite 1200
Greenwood Village, CO 80111
lstone@nixonshefrin.com

**Attorneys for Defendants A.P.E.X. American Professional Exchange, LLC d/b/a ProAuPair and 20/20 Care Exchange, Inc. d/b/a The International Au Pair Exchange**

_s/ James E. Hartley_
James E. Hartley (jhartley@hollandhart.com)
Jonathan S. Bender
(jsbender@hollandhart.com)
Holland & Hart LLP
555 Seventeenth Street, Suite 3200
Denver, CO 80202

Adam A. Hubbard
(aahubbard@hollandhart.com)
Holland & Hart LLP
1800 Broadway Suite 300
Boulder, CO 80302

**Attorneys for Defendant Cultural Homestay International**

s/ Susan M. Schaecher
Lawrence L. Lee, Esq.
(llee@laborlawyers.com)
Susan M. Schaecher, Esq.
(sschaecher@laborlawyers.com)
FISHER & PHILLIPS, LLP
1801 California Street, Suite 2700
Denver, CO 80202
Tel: 303-218-3650
Fax: 303-218-3651

**Attorneys for Defendants APF Global Exchange, NFP and American Institute for Foreign Study d/b/a Au Pair in America**

s/ Bogdan Enica
Bogdan Enica (Bogdan@expertaupair.com)
Expert AuPair
111 Second Ave NE, Ste. 213
St. Petersburg, FL 33701

**Attorney for Defendant Expert Group International, Inc. d/b/a Expert Au Pair**

s/ Brian P. Maschler
Brian P. Maschler
(bmaschler@gordonrees.com)
Gordon & Rees, LLP-San Francisco
275 Battery Street, Suite 2000 San
Francisco, CA 94579

John R. Mann (jmann@gordonrees.com)
Peggy E. Kozal (pkozal@gordonrees.com)
Thomas Baker Quinn
(tquinn@gordonrees.com)
Gordon & Reese LLP
555 17th Street, Suite 3400
Denver, CO 80202

**Attorneys for Defendant AuPairCare, Inc.**

_s/ Martha L. Fitzgerald_
Martha L. Fitzgerald (mfitzgerald@bhfs.com)
David B. Meschke (dmeschke@bhfs.com)
Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street, Suite 2200
Denver, CO 80202-4432

**Attorneys for Defendant EurAuPair**
**Intercultural Child Care Programs**

_s/ Brooke A. Colaizzi_
Brooke A. Colaizzi
(bcolaizzi@shermanhoward.com)
Heather F. Vickles
(hvickles@shermanhoward.com)
Raymond M. Deeny
(rdeeny@shermanhoward.com)
Erica Lynn Herrera
(eherrera@shermanhoward.com)
SHERMAN & HOWARD L.L.C.
633 Seventeenth Street, Suite 3000
Denver, CO 80202

**Attorneys for Defendant InterExchange,**
**Inc.**

_s/ William J. Kelly III_
William J. Kelly III
(wkelly@kellywalkerlaw.com)
Chandra Marie Feldkamp
(cfeldkamp@kellywalkerlaw.com)
KELLY & WALKER LLC
1512 Larimer Street, Suite 200
Denver, CO 80202

**Attorneys for Defendant USAuPair, Inc.**

## <u>CERTIFICATE OF SERVICE (CM/ECF)</u>

I hereby certify that on October 13, 2016, I have caused to be electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following counsel of record:

Randall W. Jackson (rjackson@bsfllp.com)
Lauren F. Louis (llouis@bsfllp.com)
Sigrid S. McCawley (smccawley@bsfllp.com)
Matthew L. Schwartz (mlschwartz@bsfllp.com)
Peter M. Skinner (pskinner@bsfllp.com)
Boies Schiller & Flexner, LLP
401 East Las Olas Boulevard, Suite 1200
Ft. Lauderdale, FL 33301

Alexander N. Hood (alex@towardsjustice.org)
Towards Justice-Denver
1535 High Street, Suite 300
Denver, CO 80218


*s/ Diane Hazel*
Diane Hazel