# EXHIBIT J

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:14-cv-03074-CMA-KMT
JOHANA PAOLA BELTRAN; and those similarly situated,

Plaintiffs,

v.

INTEREXCHANGE, INC.;
USAUPAIR, INC.;
GREATAUPAIR, LLC;
EXPERT GROUP INTERNATIONAL INC., DBA EXPERT AUPAIR;
EURAUPAIR INTERCULTURAL CHILD CARE PROGRAMS;
CULTURAL HOMESTAY INTERNATIONAL;
CULTURAL CARE, INC. D/B/A CULTURAL CARE AU PAIR;
AUPAIRCARE, INC.;
AU PAIR INTERNATIONAL, INC.;
APF GLOBAL EXCHANGE, NFP;
AMERICAN INSTITUTE FOR FOREIGN STUDY DBA AU PAIR IN AMERICA;
AMERICAN CULTURAL EXCHANGE, LLC, DBA GOAUPAIR;
AGENT AU PAIR;
A.P.E.X. AMERICAN PROFESSIONAL EXCHANGE, LLC DBA PROAUPAIR; and
20/20 CARE EXCHANGE, INC. DBA THE INTERNATIONAL AU PAIR EXCHANGE

Defendants.

_____

**DECLARATION OF BRIAN P. MASCHLER IN SUPPORT OF DEFENDANTS'
RESPONSE TO PLAINTIFFS' MOTION FOR A PROTECTIVE ORDER**

_____

I, Brian P. Maschler, hereby declare as follows:

1.    I am attorney at the law firm of Gordon & Rees, LLP, counsel of record for

Defendant AuPairCare, Inc. ("AuPairCare" or "APC"). I have been admitted to this Court

*pro hac vice* on this case. I have personal knowledge of the matters set forth in this

Declaration, except as to those stated on information and belief, and as to those

1

matters, I am informed and believe they are true.  If called as a witness, I could and would testify competently to the matters set forth in this declaration.

2.      I have reviewed Plaintiffs' Motion for a Protective Order [DE 365] and the Declaration of Lauren Lewis (DE 367) filed with that motion.

3.      I submit this Declaration in support of the Defendants' Response to Plaintiffs' Motion for a Protective Order.

4.      The statements made by Plaintiffs regarding the deposition of proposed plaintiff Laura Mejia Jimenez (Mtn. at 5) and in Ms. Louis' Declaration are completely erroneous.  I took the deposition of Ms. Mejia, and was in the same conference room with her and her counsel, as well as two language interpreters immediately before her deposition, during breaks in the deposition and immediately after the deposition.  I treated her and her counsel with the upmost respect and professionalism.  Plaintiffs' and Ms. Louis' contention that I "harassed" this witness is preposterous and irresponsible.

5.      As reflected in the transcript of this deposition (Exhibit A hereto), the lines of inquiry I pursued with Ms. Mejia were directly relevant to core issues in the case, including her compensation as an au pair, the unique circumstances surrounding her early termination of her au pair engagement, statements made in the declaration she had submitted in support of Plaintiffs' second motion for conditional collective certification (ED 330-1), and statements made by her in emails and other documents she produced in this case.  The videotape of her deposition confirms that not only was I respectful and gracious to Ms. Mejia and Plaintiffs' counsel throughout this deposition, I

was gentle in how I asked questions and followed up on the witness' inconsistencies. Plaintiffs' pejorative characterization bears no resemblance to reality.

6.     The Mejia deposition transcript also confirms that at no time during the deposition did Ms. Louis or Ms. Mejia claim that Ms. Mejia had been "harassed" or mistreated in any way. No objection or comment was made on that basis by Plaintiffs' counsel. Indeed, a review of the Glossary of Terms appended to the deposition transcript confirms that the word "harass" or any other variant thereof was not uttered even once during this deposition, which lasted longer than seven (7) hours (primarily because the interpreter translated each question, answer and attorney comment) and took up 235 pages of transcript.  The few instances of allegedly "harassing" lines of inquiry cited by Plaintiffs in their motion themselves belie such a characterization, particularly with the benefit of context - - i.e., with the benefit of the questions and answers that immediately preceded and came after those few snippets cherry-picked by Plaintiffs.  I address those lines of inquiry below.

7.     With regard to the first area of inquiry cited by Plaintiffs (Mejia Deposition transcript at 179:15-180:05) that question was but part of a multi-question inquiry into the amounts of compensation that Ms. Mejia earned from her host family (the Mele family) during her stint as a au pair.  In Ms. Mejia's declaration submitted in support of Plaintiffs' Second Motion for Conditional Certification, and during her deposition, she admitted that unlike members of the putative class, she had received "extra" payments from the host family above and beyond the weekly, Department of State–mandated stipend.   (See Declaration of Laura Mejia Jiminez [ED 330-1] ¶15.)   My inquiry concerning the frequency and amounts of these payments went directly to the issues of

(a) what her compensation actually was, (b) whether this proposed plaintiff was similarly situated with members of a putative class of individuals who, as defined, received only the government-sanctioned, minimum stipend, and (c) what damages, if any, she could claim in this case.  As the testimony quoted below demonstrates, this line of questioning was calculated to elicit information on those issues, and in no way "harassed" this witness:

> Q.     And I believe we've established that you worked for the Mele family as an au pair approximately five months and one week. Is that right?
>
> A.     Yes.
>
> Q.     So by my primitive math, that comes out to about 21 weeks. Does that sound about right?
>
> A.     4, 8, 32 weeks, five months. It would be 32 weeks or 33 weeks --
>
> Q.     Well, five months --
>
> A.     -- and one week.
>
> Q.     Four weeks in a month; right?
>
> A.     Yes.
>
> Q.     Okay. So that's 20. That's 20 weeks. Plus 1.
>
> A.     Of course.
>
> Q.     Okay.
>
> A.     I'm sorry.
>
> Q.     Of those 21 weeks, can you recall how many of those you made more than the $200 stipend when you worked as an au pair for the Mele family?
>
> A.     None.
>
> Q.     I'm sorry?
>
> A.     No.
>
> Mr. Maschler: Okay. I think she said "No, not "none."
>
> The Interrupter: She said "none." Sorry, Counsel.

4

Mr. Maschler:

Q.     Okay. So of those 21 weeks, is it your testimony that you did not earn extra money for any of those weeks?

A.     Yes, I did earn extra money.

Q..    So, then, that way, the answer didn't make since to me, at least as I meant the question, so I'll ask you it again.  Of those 21 weeks, in how many of those weeks did you -- were you paid by the Mele family more than the $200 stipend?

A.     I don't remember exactly.

Q.     Best estimate?

A.     I don't remember exactly.

Q.     Okay. Can you recall what was the highest amount of the extra compensation, to use your term, that the Mele family paid you for any particular week while you worked for them as an au pair?

MS. LOUIS: Object to form.

THE WITNESS: I don't remember.

BY MR. MASCHLER

Q.     Did they ever pay you $50 extra in any given week?

A.     I don't remember.

Q.     Did they ever pay you $20 extra in any given week?

A.     I don't remember.

Q.     Did they ever pay you a hundred dollars in extra money in any given week?

A.     I don't remember.

Q.     And when they did pay you the extra money, they paid in cash every time; is that right?

A.     Yes.

Q.     Did you ever deposit those monies in your bank account?

MS. LOUIS: Objection.

THE WITNESS: I already said that I didn't.

5

BY MR. MASCHLER:

Q.      Okay. So there was not one time that you deposited the extra money for a particular week in your bank account; is that right?

A.      I don't think so.

Q.      Okay. And some of it you sent back to your family; is that right?

MS. LOUIS: Objection.

THE WITNESS: Yes.

BY MR. MASCHLER:

Q.      And what did you -- how did you spend the - - if you did spend, the rest of the extra money that you received as an au pair for the Mele family?

A.      It's part of my privacy, isn't it?

Q.      I'm asking how you spent the money that you received -- the extra money that you received as an au pair for the Mele family.

MS. LOUIS: And I'm going to object and instruct you that you have a you don't have to answer the question. The magistrate has already ruled that you would not have to testify or give testimony about what you did in your non-working time here in the understanding, including if you feel it covers how you spent your money.

THE WITNESS: Perfect.

MR. MASCHLER: I certainly disagree with that characterization of the Magistrate's ruling, so let's mark that. And we may have to be back.

BY MR. MASCHLER:

Q.   What bank were your stipend payments deposited in?

A.   BNC [*sic*].

Q.   P.

A.   PNC.

Q.   Okay. And did you receive bank statements from PNC while you were an au pair for the Mele family?

A.      What do you mean, "bank statements"?

6

Q.      A monthly statement that tells you the amounts deposited, the amounts withdrawn, and the current balance.

A.      Yes. I would put in my password, and they would tell me how much had been deposited and how much I had used.

Q.      Okay. And that was an electronic bank statement that you were able to access online; is that correct?

A.      Yes.

Q. Did you ever receive your bank statements with that information in paper form, document form, from the bank?

A.      I don't remember.

Q       Do you have any records of your bank account amounts that cover the five months plus a week that you worked as an au pair for the Mele family?

A.      No.

Q.      Do you have any idea of the total amount you were paid by the Mele family while you were an au pair for them?

A.      No.

Q.      Okay. You've not ever added that up?

A.      No.

Q.      As you sit here today, do you know the total amount that you were paid in extra payments by the Mele family?

A.       No. I'm very tired to be calculating.

Q.      Well, I'm just asking you if, as you sit here today, you have a sense of the total amount of extra payments you received as an au pair from the Mele family.

A.      I don't remember.

Q.      Okay. Can you think of any way that -- or any source of information that we might go to determine the amount of extra payments you received in total while you were an au pair for the Mele family?

A.      Through the schedule that I made.

Q.      And would that information be reflected on your tax returns?

7

MS. LOUIS: Again, objection. This is within the scope of what the Magistrate said couldn't be asked and is an intrusion into your privacy, and you don't have to answer that.

THE WITNESS: Perfect.

MR. MASCHLER: Can you mark that, please.

BY MR. MASCHLER:

Q. Do you know how the Meles came up with the $10-an-hour figure for the extra -- using the term "extra," your term – time you worked for them?

A.    No. They just told me it was that it was.

Q.    Did you ever try to renegotiate that amount with them?

A.    No.

Q.    Did you ever tell them, in words or substance, that you felt that the $10 an hour for the extra time was too low?

A.    No.

(Exhibit A, p. 177, l. 1. – p. 183, l. 8.)

8.    The issue of the total compensation paid to this proposed FLSA plaintiff, including the "extra" payments she received from the host family, go to the heart of what is at issue in this case, and to the threshold question or whether this particular individual may properly represent a proposed collective class.  AuPairCare is entitled to full discovery on these issues.  Because Ms. Mejia's recollection of key details with regard to her compensation was lacking, it is incumbent upon counsel for AuPairCare to inquire into possible alternative ways of ascertaining or isolating the elements of compensation this proposed plaintiff actually received. [1]

9.    The second line of inquiry cited by Plaintiffs in their motion pertained to Ms. Mejia's complaints about having to work at her host family residence during the day

---

[1] The witness' faulty recollection was a constant during this deposition; she claimed "she could not recall" over 180 times in the course of her deposition.

rather than pursue her own educational opportunities.  This goes to the basic nature of her au pair engagement, which of course is the predicate for her seeking to serve as a putative class representative.  One of the ways in which Ms. Mejia is different from putative class members she seeks to represent, is that she unilaterally terminated her au pair engagement after only five months and one week into the year-long program.  She admitted in deposition that she terminated her au pair engagement because she was having to take care of the host family's children during the day, when she would have preferred to be free to take classes in the U.S.  She did not like the classes she took at night.

      10.    Attached as Exhibit 56 to Ms. Mejia's deposition was an email she sent to her host family approximately a year to the date after which she had terminated her prior au pair engagement.  In that email (a true and correct copy of which is attached as Exhibit B), Ms. Mejia apologized for the "damage" she had caused her host family. The multi-question line of examination, from which Plaintiffs have taken but one question, examined Ms. Mejia on the content and reasons behind her note of apology, which she had produced in this case.  I also asked Ms. Mejia why she did not disclose in her note that she had signed a consent form to participate in this lawsuit:

> Q.    Ms. Mejia, I've handed you what we've marked as Exhibit 56.  For the record, it's an e-mail from you to Michele Mele, dated December 31, 2015.  Do you recall sending this e-mail to Ms. Mele?
>
> A.    Yes.
>
> Q.    In the second paragraph, you wrote: "for this reason, I want to apologize myself for the damage that I could occasioned to your family."
>
> A.    Well, because of the problem that I had with Carmen that day.
>
> Q.    Well, what damage did you cause the family?
>
> A.    I don't know exactly.

Q.     Well, this is your language.  So when you say, "the damage that I could occasioned to your family," what damage were you referring to?

A.     Because of the - - what happened with Carmen the day that I left, and, also, when I went back to Colombia, I was very depressed because of my  experience, my au pair experience.

Q.     Well, when you say that you were forgiving the Meles for the damage referred to in this exhibit; didn't you think it was important to advise them that you had signed a consent to participate in a lawsuit against AuPairCare and others?

MS. LOUIS:  Objection to foundation.

THE WITNESS:  No. That's part of my privacy.

Q.     You think signing a consent from that is filed in court is part of your privacy?

A.     Yes, of course, I would only tell - - I would only tell people about it who I want to tell about it.

Q.     Okay.

MR. MASCHLER:    Let's mark this next in order, please.

(Exhibit Number 57 was marked for identification.)

BY MR. MASCHLER:

Q.     Exhibit 57 is a consent form.  Do you see that?

A.     Yes.

Q.     Okay.  Is that your signature that appears on this form?

A.     Yes

Q.     And did you sign this form on April 16, 2015?

A.     Yes.

Q.     And who sent you this form?

A.     Justin Grant.

Q.     Okay. At the time you signed this form, do you know whether the plaintiffs in this lawsuit had brought any FLSA claims against AuPairCare?

THE INTERPRETER:  I'm sorry.  Could that question be repeated

10

for the interpreter?

MR. MASCHLER:    Read it back, please.

THE WITNESS: I don't remember.

BY MR. MASCHLER:

Q.      Do you know the term "Fair Labor Standards Act"?  Have you ever heard of that act?

A.      No, I don't remember.

Q.       Have you ever heard of "FLSA"?

A.      I don't remember.

Q.      Well, when you signed the FLSA consent form that we've marked as Exhibit 57, did you have an understanding what FLSA was?

A.      I don't remember.

Q.      Before you signed the consent form that we've marked as Exhibit 57, did you review any version of a Complaint filed in this case?

A.      I don't remember.

Q.      So you signed this FLSA consent form on April 16, 2015, and then about eight and half months later, you sent this letter of apology to the Mele family.  Why did you send this e-mail, dated December 31, 2015, that we've marked as Exhibit 56 - -

Excuse me.

Ms. LOUIS:   Objection.

THE WITNESS:      Because I've always thought that what happened in my case is the fault of the agency, not the family, the agency knows that the family needs somebody with a lot of time to be with them, and in spite of that, they give them an au pair who isn't able to be there the number or hours that they need.

BY MR. MASCHLER:

Q.      What else did you have going on between July of 2015 and the end of December of 2014?

A.      What - - was I doing what?

Q.      Well, you were living in their house; right? You got room and board paid for by the host family; right?

11

MS. LOUIS:  Object to foundation.

BY MR. MASCHLER:

Q.      Right?

A.      Yes.

Q.      Okay.  You didn't have any other jobs during that time; right?

A.      The time that I was au pair?

Q.      Right.

A.      Correct.

Q.      Okay.  You went to school at night sometimes; right?

A.      Yes.

Q.      So you, in fact, had the time to work for them during the days that you were a au pair for them; isn't that right?

A.      Yes.

Q.      Right.  You just didn't like working for that family during the days; is that right?

A.      No.

Q.      No?

        You wanted to take more education classes to better your English during the day; isn't that right?

A.      Yes.

Q.      All right.  And because the Mele family needed someone to take care of their infant children, they couldn't accommodate that request that you not take care of their kids during the days; isn't that right?

A       But what is the question?

Q.      The question is that they needed you to take care of their children during the day when they were at work, but you wanted to go to class during the day; isn't that right?

Ms. LOUIS:  Object to form.

THE WITNESS:      They wanted me to take care of the kids during the day and the night, to do more than 45 hours.  As I said before, if I only had 45 hours to work, I would have had some free time to be

able to attend classes.  But since I didn't have that free time, because I worked more than the 45 hours, that's why I didn't like working there.

BY MR. MASCHLER:

Q.      Identify a single class or educational opportunity offered at night that you were not able to participate in because of the hours you worked for the Mele family.

A.      I don't remember.

Q.      You can't identify a single educational opportunity that you had to forego or pass up because of the hours that the Mele family requested that you work for them as an au pair; isn't that right?

MS. LOUIS:  Objection.

THE WITNESS:      I never said that I couldn't identify them.  I just said that I don't remember.

BY MR. MASCHLER:

Q.      Well, this is the time to do it. So if something pops into your mind, please let us know.

A.      Okay.

Q.      Now, you indicated that - - in your December 31, 2015 email that you knew that they never understood a lot of your attitudes.  Do you see that?  What attitudes, were you referring to there?

A.      I don't remember.

Q.      Okay.  You say that "The agency promised a lot of things t that most of the families ignore."

What were you referring to there?

A.      Because the agency in Columbia tells us that it's an exchange program - - that where a person can work and study at the same time, but the family said to me - - declared - - stated to me many times that it's a family for - - interpreter clarification - - that it's a program for taking care of children, that's all.

Q.      Did you read the contract that you signed before you signed it?  I've probably asked you that question.  Let me ask you again.  Did you read it?

MS. LOUIS:  Objection.

THE WITNESS: Yes.

13

By MR. MASCHLER:

Q.      And didn't the contract also provide that you would be entitled to a particular number of educational hours?

MS. LOUIS:  Objection.

THE WITNESS:  They said that the family would give you a certain amount of money to take classes and that you have to take six credits during the year.

Q.      And you met that requirement in the first five months of your au pair engagement with the Mele family; right?

MS. LOUIS:  Objection.

THE WITNESS:      Yes.

BY MR. MASCHLER:

Q.      Okay. All right.  Is there anywhere in any documents or literature or advertisements that you attribute to AuPairCare in which you are promised more educational opportunity than what you just referred to?

MS. LOUIS: Object to form.

THE WITNESS.  No.

(Exhibit A,  p. 216, l. 19 – p. 224, l. 14)

11.      As the foregoing indicates, there was nothing "harassing" about this line of inquiry.  Asking about the content of and circumstances surrounding a document that this proposed plaintiff produced in this case, and which Plaintiffs may attempt to introduce into evidence, is entirely appropriate.  Ms. Mejia's selective recall of details also is apparent with respect to this document, which she herself authored.

12.      Plaintiffs' contention that I "accused Ms. Mejia of lying," again misstates the record.  As noted above, by Ms. Mejia's own admission, she unilaterally terminated her au pair engagement with her host family approximately seven months before it was scheduled to end.  She left without notice, depriving the host family of child care.  Ms. Mejia acknowledged that under her au pair contact, she was obliged to give at least two weeks' notice of termination to the host family, among other things to allow AuPairCare

14

an opportunity to re-place her with another host family.  By abruptly leaving, without notice, and never returning, Ms. Mejia violated those obligations.  It was important to ask her about these events.

13.     She also gave varying reasons why she had terminated her au pair engagement. One of those reasons was that she had been asked to work more than 45 hours in a particular week.  The contemporaneous records maintained by the assigned Area Director (Beth Lawrence), which were produced to Plaintiffs in advance of this deposition, state that Ms. Mejia provided her own time-written entries to support her contention that she had been asked to work more than 45 hours, that upon review by the Area Director, the total number actually worked were less than 45 hours of those week:

> Q.     So for the week ended November 29, 2014, you put down 41 hours; is that right?
>
> A.     Yes.
>
> Q.     Okay.  Now, if you look again at the first page of this exhibit, it indicates that you emailed this calendar schedule to Beth Lawrence and you cc'd Sherry Guent. (*sic*) Do you see that?
>
> A.     Yes.
>
> Q.     Okay.  And is it also correct that you had complained to Beth Lawrence that you were asked to work more than 45 hours a week in the month of December 2014?
>
> A.     Yes.
>
> Q.     And is it also correct that you sent her this compendium of calendars that we've marked as Exhibit 42 in order to substantiate your claim you had worked more than 45 hours a week in December of 2014?
>
> A.     Yes.
>
> Q.     Okay.  And is it also correct, Ms. Mejia, that when Ms. Lawrence reviewed your documentation and added up your hours, she determined that your claim that you had been working more than 45 hours for particular weeks in December of 2014 was not true?

15

Ms. LOUIS: Objection to foundation.

THE WITNESS;      You mean she - - Ms. Lawrence counted?

Q.      I mean, you provided her with this documentation to support your claim that you had been working more than 45 hours in particular weeks in December, and after that, Ms. Lawrence responded that you, in fact, had not worked more than 45 hours based - - in particular weeks based on the schedule or calendar that you provided.  Do you recall that?

A.      It's not true.  She never responded to me in that way.

Q.      You're testifying under oath that she never took issue with your claim that you had worked more than 45 hours a week in December"

Ms. Louis:      Objection to foundation.

THE WITNESS:  No. I'm just saying that she never send me an email back saying that she didn't agree.

Q.      Did she talk to you on the phone and tell you that she didn't agree with your calculations?

A.      No.

Q.      Did she ever - - she never, to your recollection, communicated to you her belief that you were not entitled to, quote/unquote, additional pay because you had not, in fact, that you had worked more than 45 hours for weeks in  December 2015 (sic).

MS. LOUIS:  Object to foundation.

MR. MASCHLER:   2014.  Excuse me.

THE WITNESS:      I don't remember.

(Exhibit A. p. 192, l. 2- p. 194, l.6))

14.      As indicated in the above, Ms. Mejia's testimony fluctuated from "she never responded to me in that way,"  to "I am just saying that she never sent me an email back saying that she didn't agree," to "I don't remember." Hours worked are a central issue in this case.  The cross-examination of the witness on those issues is necessary and appropriate.

15.      The next line of inquiry cited by Plaintiffs in their motion, taken in proper

16

context, explored the reasons why Plaintiff unilaterally terminated her au pair

engagement months before its scheduled end date and the discrepancy between her

account of her abrupt leaving and that that had been memorialized in the Area

Director's cotemporaneous log, which again, was produced to Plaintiffs in advance of

this deposition:

> Q.    And you terminated the au pair engagement with the Mele family on December 30, 2014. Does that right?
>
> A.    Yes.
>
> Q.    And you did so because you were having difficulties with caring for the children?
>
> MS. LOUIS: Objection.
>
> THE WITNESS: No.
>
> BY MR. MASCHLER:
> Q.    Well, wasn't that the reason you gave AuPairCare for your terminating the au pair engagement early?
>
> A.    No.
>
> Q.    What was the reason you gave AurPairCare, if any, for terminating the au pair engagement seven months early?
>
> MS. LOUIS:        Objection.
>
> THE WITNESS:     Because I worked extra hours and I had spoken to the family about the activities of the children, and I suggested that we take them out because I felt like the children needed to get out. And so in a certain way, I had already suggested a lot of different activities to the family for the children, but they didn't respect them.
>
> Q.    Okay.  And did you communicate those reasons to the host family?
>
> A.    Yes.
>
> Q.    And, in fact, Carmen had taken the day off from work to assist you with the kids on December 30, 2014.  Do you recall?

17

MS. LOUIS:   Object to foundation.

THE WITNESS:       I don't remember.

BY MR. MASCHLER:

Q.     Do you recall telling Carmen that you were – you wanted to stop the au pair engagement on December 30, 2014?

A.     No. I called Beth.

Q.     Okay, But I'm asking, did you tell the host family that you were not going to work there anymore?

A.     No.

Q.     You never told them?  You just left?  Is that your testimony?

MS. LOUIS:   Objection.

THE WITNESS:       No, that's not what happened.  What happened was, I called Beth, and Beth called Carmen.  Carmen came back home. And he already knew the new because Beth had told him on the phone.  And I left the house, because he came home very angry. He started attacking me verbally.  He started yelling.  He started hitting the walls.  So I said, "That's enough for me. I'm leaving the house."  I called a girlfriend of time, Helen. I asked if she could come and pick me up.  I grabbed my things, and I left.

BY MR. MASCHLER: In fact, you raised your voice at Carmen, didn't you on that occasion, and you used foul language in front of the children; isn't that correct?

A.     No.

Q.     And, in fact, you falsely represented to Carmen that Beth Lawrence had told you that it was okay for you to leave immediately, when, in fact, she'd made no such assurances to you?

A.     That's not true.

Q.     After December 30, 2014, did you ever work for the Mele family as an au pair?

A.     No.

18

Q.      So you left the same day that you told Beth that you were leaving; that right?

Ms. LOUIS:   Object to foundation.

THE WITNESS:      Of course.

BY MR. MASCHLER:

Q.      And do you know whether there were procedures that you were bound to follow with regard to an early termination of your au pair agreement?

A.      Yes. So when I talked to Beth about the rematch, she explained to me what process I had to follow.  She told me I had to speak to the family. There were two days for her to come over to our house to do mediation, and then after than if nothing could be agreed upon, there were 14 days for me to find a new family and for the family to find a new au pair.

Q.      And you were supposed to stay with the host family during that two-week period, weren't you?

A.      Yes, I was supposed to stay there during that period, but I'm a person first and an au pair second.  And Carmen was disrespectful towards me, and I wasn't going to put up with that.

Q.      In fact, you lied to Carmen and told him that Beth (Area Director) had told you it was okay to leave before that two-week period; isn't that right?

MS. LOUIS:   Objection.

THE WITNESS:      I never told that to Carmen. I told him I was leaving house because of the disrespectful way he was behaving with me.

BY MR. MASCHER:

Q.      In fact, you had prepared to leave even before December 30, 2014; isn't that right?

A.      Yes.  I had started calling Beth on December 28th.

(Exhibit A, p. 202, l. 4 – p. 206, l. 4)

19

16.     The last line of inquiry cited in Plaintiffs' motion addressed Ms. Mejia's behavior on the date that she left her host family.  Records produced to Plaintiffs in this case prior to this deposition indicate that shortly before she left her host family's home in her communications with the host father, she raised her voice and used inappropriate language in front of the host family's infant children.  Such behavior on the part of a putative class representative also is an appropriate line of questioning.  It was in no way "harassing."

Q.     Did the Meles [host family] mistreat you?

A.     Mistreated me physically or psychologically?

Q.     You use the term "mistreat." Did the Meles mistreat you?

A.     I use the word "mistreat" to refer to other people, but they didn't mistreat me.

Q.     Okay.  Well, I was referring to you claims in this case, about you.

And the Meles provided you with a nice room; right?

A.     Yes.

Q.     Alright.

Ms. LOUIS: I'm sorry, but we have been over seven hours now. So  before we go through the exact same testimony that she has done   three times, I did forward you the documents and if you want to ask about it, then I will indulge a little over seven, but otherwise we are off.

MR. MASCHLER:    I am going to finish this line of questioning and –

MS. LOUIS:  Then we will end the deposition.

Mr. MASCHLER:     No. I am going to follow up on the answer she gave. And I am entitled to do that, and that will be that, reserving both of our rights.

Q.     So the Meles did not mistreat you, and you sent them a letter apologizing for the damage you caused them. You recall that?

MS. LOUIS:  Object to foundation.

THE WITNESS:     Yes, they mistreated me psychologically, the

20

day Carmen verbally mistreated me, and he was hitting the walls. I was afraid that day.

Q.     Well you used foul language in front of her children, didn't you?

MS. LOUIS:  Object to foundation.

THE WITNESS:      No, sir.

MR. MASCHLER:  You screamed at Carlos, didn't you? Carmen, excuse me.

MS. LOUIS:  Object to form.

THE WITNESS: I didn't yell at Carmen. I said to Carmen to stop yelling at me.  He was the one who was yelling at me and attacking me.

Q.     Did you pledge to be honest when you applied for a position as an au pair with the Mele family?

MS. LOUIS:  Object to foundation.

THE WITNESS: Yes.

Q.     Okay. And did you think honesty was an important attribute of an au pair?

A.     No for a - - any person in general.

Q.     I am not asking for any person in general.  I am asking about au pairs.

Do you think honesty is an important attribute that must be adhered to.

A.     Yes. Of course.

(*Id.* at p. 227, l. 25 – p. 230, l. 7)

17.     Thus, in the span of a few questions and answers, Ms. Mejia's testimony fluctuated from "no the Mele's did not mistreat me" to "the host family mistreated me psychologically."  I had a good faith basis for pursuing these questions and following up on the witness' inconsistent statements.

18.     At the very end of the deposition, after counsel appearing by telephone stated their positions with respect to keeping the record open, I thanked Ms. Mejia for her time. (*See id.* at p. 233, ll. 9-10).  She smiled and nodded.  At that point Ms. Mejia,

21

the Spanish interrupter her counsel had retained for her, and counsel engaged in light banter about possibly having dinner at a good Columbian restaurant in San Francisco. I volunteered I was not knowledgeable about Colombian restaurants but would not be surprised if San Francisco had a number of great ones.  As Ms. Mejia and her counsel Ms. Louis were leaving our office, I shook both of their hands and wished them both safe travels.  Both of them smiled; the exchange was very cordial.  Ms. Mejia gave no indication whatsoever that she was distressed - - quite the opposite.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed this _13th __ day of October, 2016, in San Francisco, California.

*s/Brian P. Maschler*

_____

Brian P. Maschler

1104001/30045363v.1

# EXHIBIT A

LAURA MEJIA-JIMINEZ on 09/14/2016

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF COLORADO

 3  JOHANA PAOLA BELTRAN; and    )
    those similarly situated,    )
 4                               )
                   Plaintiffs,   )
 5                               ) Case No.
        vs.                      ) 1:14-cv-03074-CMA-KMT
 6                               )
    INTEREXCHANGE, INC.;         )
 7  USAUPAIR, INC.; GREAT AUPAIR,)
    LLC; EXPERT GROUP            )
 8  INTERNATIONAL, INC., DBA     )
    EXPERT AUPAIR; EURAUPAIR     )
 9  INTERCULTURAL CHILD CARE     )
    PROGRAMS; CULTURAL HOMESTAY  )
10  INTERNATIONAL; CULTURAL CARE,)
    INC.; D/B/A CULTURAL CARE    )
11  AUPAIR; AUPAIRCARE, INC.;    )
    AUPAIR INTERNATIONAL, INC.;  )
12  APF GLOBAL EXCHANGE, NFP;    )
    AMERICAN INSTITUTE FOR       )
13  FOREIGN STUDY DBA AU PAIR IN )
    AMERICA; AMERICAN CULTURAL   )
14  EXCHANGE, LLC, DBA GOAUPAIR; )
    AGENT AU PAIR; A.P.E.X.      )
15  AMERICAN PROFESSIONAL        )
    EXCHANGE, LLC DBA PROAUPAIR; )
16  and 20/20 CARE EXCHANGE,     )
    INC., DBA THE INTERNATIONAL  )
17  AU PAIR EXCHANGE,            )
                                 )
18                   Defendants. )
    _____)
19

20      VOLUME ONE TELECONFERENCED VIDEO DEPOSITION OF

21              LAURA MEJIA-JIMINEZ

22              San Francisco, California

23          Wednesday, September 14, 2016

24  Reported By:  KIMBERLY E. D'URSO, RPR, CSR No. 11372

25  Job No. 18766
```



LAURA MEJIA-JIMINEZ on 09/14/2016

Pages 174..177

Page 174

1    A.   No.  She just explained some things to me about
2  au pair, being an au pair, like, the school and when you
3  tried to get credits for school, what the process was
4  that you had to use when you finished your year, what
5  the format -- or form was that you had to turn in for
6  that, information about -- her contact information,
7  e-mail, telephone number.
8    Q.   Okay.  Do you recall that about a couple weeks
9  later, on August 6, 2014, you had a telephone contact
10 with Beth Lawrence?
11   A.   I don't remember.
12   Q.   Do you recall in the second month, in August of
13 2014, that you advised Beth Lawrence that you were
14 taking English classes at DCCC?
15   A.   I don't remember.
16   Q.   Okay.  As of August 2014, Leah was still at the
17 Mele household; correct?
18   A.   Yes.
19   Q.   Do you remember telling Beth Lawrence that the
20 host family was very kind to you?
21   A.   I don't remember.
22   Q.   Do you recall, in August 2014, telling Beth
23 Lawrence that things were going well?
24   A.   I don't remember.
25   Q.   Do you recall advising Beth Lawrence in August

Page 175

1  of 2014 that you did not have any concerns with the
2  45-hour workweek schedule?
3    A.   I don't remember.
4    Q.   Do you recall a phone call that you had with
5  Beth Lawrence in September of 2014?
6    A.   I don't remember.
7    Q.   Do you recall advising her at or about that
8  time that things were going great with the Mele family
9  girls?
10   A.   I don't remember.
11   Q.   Okay.  Did you advise Ms. Lawrence in or about
12 September of 2014 that you were taking courses at DCCC?
13   A.   I don't remember.
14   Q.   Did you request of the Mele host family that
15 you be able to take a vacation after Christmas of 2014
16 in Florida?
17        THE INTERPRETER:  I'm sorry.  Could the
18 question be repeated for the date?
19        MR. MASCHLER:  Yeah.
20        (Record read.)
21        THE WITNESS:  Yes.
22 BY MR. MASCHLER:
23   Q.   And they agreed to that even though you had not
24 accrued enough time to be eligible for a week-long
25 vacation?

Page 176

1        MS. LOUIS:  Object to foundation.
2        THE WITNESS:  Yes.  And they also told me that
3  it was better for me to take them at that period because
4  Carmen wasn't traveling.
5        MR. MASCHLER:  Okay.  We're at the end of the
6  tape.  Why don't we break.
7        THE VIDEOGRAPHER:  Thank you.
8        This marks the end Video Number 3 in the
9  deposition Laura Mejia-Jimenez.  Going off the record.
10 The time is 4:24.
11        (Break taken.)
12        THE VIDEOGRAPHER:  Here begins Video Number 4
13 in the deposition Laura Mejia-Jimenez.  Coming back on
14 the record.  The time is 4:42.
15 BY MR. MASCHLER:
16   Q.   Ms. Mejia, do you understand you're still
17 testifying under oath this afternoon?
18   A.   Yes.
19   Q.   Your au pair engagement with the Mele family
20 was originally scheduled to be one year; correct?
21   A.   Yes.
22   Q.   So it would have expired or run its course if
23 it had gone the full year in July of 2015; is that
24 right?
25   A.   Yes.

Page 177

1    Q.   And I believe we've established that you worked
2  for the Mele family as an au pair approximately five
3  months and one week.  Is that right?
4    A.   Yes.
5    Q.   So by my primitive math, that comes out to
6  about 21 weeks.  Does that sound about right?
7    A.   4, 8, 32 weeks, five months.  It would be 32
8  weeks or 33 weeks --
9    Q.   Well, five months --
10   A.   -- and one week.
11   Q.   Four weeks a month; right?
12   A.   Yes.
13   Q.   Okay.  So that's 20.  That's 20 weeks.  Plus 1.
14   A.   Of course.
15   Q.   Okay.
16   A.   I'm sorry.
17   Q.   Of those 21 weeks, can you recall how many of
18 those you made more than the $200 stipend when you
19 worked as an au pair for the Mele family?
20   A.   None.
21   Q.   I'm sorry?
22   A.   No.
23        MR. MASCHLER:  Okay.  I think she said "No,"
24 not "none."
25        THE INTERPRETER:  She said "None."  Sorry,



LAURA MEJIA-JIMINEZ on 09/14/2016

Pages 178..181

Page 178

1  Counsel.
2  BY MR. MASCHLER:
3      Q.  Okay.  So of those 21 weeks, is it your
4  testimony that you did not earn extra money for any of
5  those weeks?
6      A.  Yes, I did earn extra money.
7      Q.  So, then, that way, the answer didn't make
8  since to me, at least as I meant the question, so I'll
9  ask you it again.
10         Of those 21 weeks, in how many of those weeks
11  did you -- were you paid by the Mele family more than
12  the $200 stipend?
13     A.  I don't remember exactly.
14     Q.  Best estimate?
15     A.  I don't remember exactly.
16     Q.  Okay.  Can you recall what was the highest
17  amount of the extra compensation, to use your term, that
18  the Mele family paid you for any particular week while
19  you worked for them as an au pair?
20         MS. LOUIS:  Object to form.
21         THE WITNESS:  I don't remember.
22  BY MR. MASCHLER:
23     Q.  Did they ever pay you $50 extra in any given
24  week?
25     A.  I don't remember.

Page 179

1      Q.  Did they ever pay you $20 extra in any given
2  week?
3      A.  I don't remember.
4      Q.  Did they ever pay you a hundred dollars in
5  extra money in any given week?
6      A.  I don't remember.
7      Q.  And when they did pay you the extra money, they
8  paid in cash every time; is that right?
9      A.  Yes.
10     Q.  Did you ever deposit those monies in your bank
11  account?
12         MS. LOUIS:  Objection.
13         THE WITNESS:  I already said that I didn't.
14  BY MR. MASCHLER:
15     Q.  Okay.  So there was not one time that you
16  deposited the extra money for a particular week in your
17  bank account; is that right?
18     A.  I don't think so.
19     Q.  Okay.  And some of it you sent back to your
20  family; is that right?
21         MS. LOUIS:  Objection.
22         THE WITNESS:  Yes.
23  BY MR. MASCHLER:
24     Q.  And what did you -- how did you spend the -- if
25  you did spend, the rest of the extra money that you

Page 180

1  received as an au pair for the Mele family?
2      A.  It's part of my privacy, isn't it?
3      Q.  I'm asking how you spent the money that you
4  received -- the extra money that you received as an
5  au pair for the Mele family.
6         MS. LOUIS:  And I'm going to object and
7  instruct you that you have a right -- you don't have to
8  answer the question.  The magistrate has already ruled
9  that you would not have to testify or give testimony
10  about what you did in your non-working time here in the
11  understanding, including if you feel it covers how you
12  spent your money.
13         THE WITNESS:  Perfect.
14         MR. MASCHLER:  I certainly disagree with that
15  characterization of the magistrate's ruling, so let's
16  mark that.  And we may have to be back.
17  BY MR. MASCHLER:
18     Q.  What bank were your stipend payments deposited
19  in?
20     A.  BNC [sic].
21     Q.  P.
22     A.  PNC.
23     Q.  Okay.  And did you receive bank statements from
24  PNC while you were an au pair for the Mele family?
25     A.  What do you mean, "bank statements"?

Page 181

1      Q.  A monthly statement that tells you the amounts
2  deposited, the amounts withdrawn, and the current
3  balance.
4      A.  Yes.  I would put in my password, and they
5  would tell me how much had been deposited and how much I
6  had used.
7      Q.  Okay.  And that was an electronic bank
8  statement that you were able to access online; is that
9  correct?
10     A.  Yes.
11     Q.  Did you ever receive your bank statements with
12  that information in paper form, document form, from the
13  bank?
14     A.  I don't remember.
15     Q.  Do you have any records of your bank account
16  amounts that cover the five months plus a week that you
17  worked as an au pair for the Mele family?
18     A.  No.
19     Q.  Do you have any idea of the total amount you
20  were paid by the Mele family while you were an au pair
21  for them?
22     A.  No.
23     Q.  Okay.  You've not ever added that up?
24     A.  No.
25     Q.  As you sit here today, do you know the total

LAURA MEJIA-JIMINEZ on 09/14/2016

Pages 182..185

Page 182

1   amount that you were paid in extra payments by the Mele
2   family?
3       A.   No.  I'm very tired to be calculating.
4       Q.   Well, I'm just asking you if, as you sit here
5   today, you have a sense of the total amount of extra
6   payments you received as an au pair from the Mele
7   family.
8       A.   I don't remember.
9       Q.   Okay.  Can you think of any way that -- or any
10  source of information that we might go to to determine
11  the amount of extra payments you received in total while
12  you were an au pair for the Mele family?
13      A.   Through the schedule that I made.
14      Q.   And would that information be reflected on your
15  tax returns?
16          MS. LOUIS: Again, objection.  This is within
17  the scope of what the magistrate said couldn't be asked
18  and is an intrusion into your privacy, and you don't have
19  to answer that.
20          THE WITNESS:  Perfect.
21          MR. MASCHLER:  Can you mark that, please.
22  BY MR. MASCHLER:
23      Q.   Do you know how the Meles came up with the
24  $10-an-hour figure for the extra -- using the term
25  "extra," your term -- time you worked for them?

Page 183

1       A.   No.  They just told me it was that.
2       Q.   Did you ever try to renegotiate that amount
3   with them?
4       A.   No.
5       Q.   Did you ever tell them, in words or substance,
6   that you felt that the $10 an hour for the extra time
7   was too low?
8       A.   No.
9       Q.   Okay.  Do you recall having monthly, if not
10  more frequent, communications with Beth Lawrence, your
11  area director, while you were an au pair for the Mele
12  family?
13      A.   I remember that they would call us, but I don't
14  remember what kind of conversations we had.
15      Q.   Okay.  Do you recall Beth Lawrence asking you
16  about whether you had been paid your weekly stipend?
17      A.   I don't remember.
18      Q.   Do you recall complaining to Beth Lawrence
19  about the quality of ESL classes you were taking at
20  DCCC?
21      A.   I don't remember.
22      Q.   Do you recall that Beth Lawrence e-mailed you a
23  list of possible other schools at which you could take
24  ESL courses?
25      A.   Yes, but she gave me a list on the second day,

Page 184

1   when she came to the house.  It was a physical list.  It
2   wasn't e-mail.  And there were several schools on it.
3       Q.   I'm talking about October 2014 now.  Do you
4   recall, after your initial face-to-face meeting, that
5   Beth Lawrence e-mailed you a list of other schools that
6   you may attend?
7       A.   I don't remember.
8       Q.   Do you recall telling Beth Lawrence, in words
9   or substance, that things were great with the home
10  family and the girls, the Mele girls?
11          MS. LOUIS:  Objection.
12          THE WITNESS:  I don't remember.
13  BY MR. MASCHLER:
14      Q.   Do you recall that you told Beth Lawrence that
15  you liked taking the girls to the park?
16      A.   I don't remember.
17      Q.   Did you ever take the Mele girls to the park?
18      A.   Yes.
19      Q.   How many times?
20      A.   I don't remember.
21      Q.   More than ten?
22      A.   I don't remember.
23      Q.   You have no recollection whatsoever how many
24  times you took the Mele girls to the park?
25          MS. LOUIS:  Objection.

Page 185

1          THE WITNESS:  I don't remember.
2   BY MR. MASCHLER:
3       Q.   Okay.  In late October, the Meles took you on a
4   vacation to the Woodloch Spa.  Do you recall that?
5       A.   Yes.
6       Q.   How many days did you spend at the Woodloch
7   Spa?
8       A.   Five days.
9       Q.   And did the Mele family pay you the full amount
10  of the stipend for that week?
11      A.   Yes.
12          MR. MASCHLER:  Why don't we mark this as next
13  in order.
14          (Exhibit Number 54 was marked for
15          identification.)
16  BY MR. MASCHLER:
17      Q.   I'm handing you, Ms. Mejia, an exhibit marked
18  54.  For the record, this was one of the documents
19  produced by your counsel.
20          The cover sheet is an e-mail exchange between
21  you and your counsel, and beneath that is an e-mail
22  exchange between you and blawrence@aupaircare.com.  Do
23  you see that?
24      A.   Yes.
25      Q.   Okay.  If you look at the second physical page



LAURA MEJIA-JIMINEZ on 09/14/2016

---

Page 190

1  Mele family?

2      A.   I was embarrassed to.  I didn't ask for it, and
3  they didn't pay me for it.

4      Q.   Okay.  You didn't ask for it for that week; is
5  that correct?

6          MS. LOUIS:  Objection.

7          THE WITNESS:  I just said that I was
8  embarrassed about it.

9  BY MR. MASCHLER:

10     Q.   Okay.  I just want to make sure.  Did you ask
11 them for extra money for that week?

12         MS. LOUIS:  Objection.

13         THE WITNESS:  No.

14 BY MR. MASCHLER:

15     Q.   Okay.  And did they pay for your room and board
16 in the Poconos while you were on vacation?

17     A.   Yes.

18     Q.   And did they buy you anything from the gift
19 shop or otherwise while you were on vacation with them
20 in the Poconos?

21     A.   No.

22     Q.   Okay.  Let's turn to the next page of this
23 exhibit, which is November 2014.  Is this your
24 handwriting on this page of the exhibit as well?

25     A.   Yes.

---

Page 191

1      Q.   Is it correct that, by your entry for the week
2  ending November 15, you worked less than 45 hours that
3  week?

4      A.   42.

5          MR. MASCHLER:  No.  You didn't get my question
6  right.

7          Read it back, please.

8          THE INTERPRETER:  Please repeat it.

9          MR. MASCHLER:  Listen to the question.

10         (Record read.)

11         (Question interpreted again.)

12         THE WITNESS:  That's not true.

13 BY MR. MASCHLER:

14     Q.   Well, I'm looking at the week ended
15 November 15.  I see an entry of "42 hours."

16         Did you write that?

17     A.   Yes.

18     Q.   Okay.  Were you trying to be accurate when you
19 wrote "42 hours" for that week?

20     A.   Sometimes I would miss hours.  Sometimes I
21 wouldn't put them down exactly as I told him.  Sometimes
22 I would forget to write down some hours.

23     Q.   Were there times that you overstated your hours
24 on these rough estimates?

25     A.   I never exaggerated.  I never put extra hours

---

Page 192

1  down, but sometimes I put less.

2      Q.   So for the week ended November 29, 2014, you
3  put down "41 hours"; is that right?

4      A.   Yes.

5      Q.   Okay.  Now, if you look again at the first page
6  of this exhibit, it indicates that you e-mailed this
7  calendar schedule to Beth Lawrence and you cc'd Sherry
8  Guent.  Do you see that?

9      A.   Yes.

10     Q.   Okay.  And is it also correct that you had
11 complained to Beth Lawrence that you were asked to work
12 more than 45 hours a week in the month of December 2014?

13     A.   Yes.

14     Q.   And is it also correct that you sent her this
15 compendium of calendars that we've marked as Exhibit 53
16 in order to substantiate your claim that you worked more
17 than 45 hours a week in December of 2014?

18     A.   Yes.

19     Q.   Okay.  And is it also correct, Ms. Mejia, that
20 when Ms. Lawrence reviewed your documentation and added
21 up your hours, she determined that your claim that you
22 had been working more than 45 hours for particular weeks
23 in December of 2014 was not true?

24         MS. LOUIS:  Object to foundation.

25         THE WITNESS:  You mean she -- Ms. Lawrence

---

Page 193

1  counted?

2  BY MR. MASCHLER:

3      Q.   I mean, you provided her with this
4  documentation to support your claim that you had been
5  working more than 45 hours in particular weeks in
6  December, and after that, Ms. Lawrence responded that
7  you, in fact, had not worked more than 45 hours based --
8  in particular weeks based on the schedule or calendar
9  that you provided.  Do you recall that?

10     A.   It's not true.  She never responded to me in
11 that way.

12     Q.   You're testifying under oath that she never
13 took issue with your claim that you had worked more than
14 45 hours a week in December?

15         MS. LOUIS:  Object.  Foundation.

16         THE WITNESS:  No.  I'm just saying that she
17 never sent me an e-mail back saying that she didn't
18 agree.

19 BY MR. MASCHLER:

20     Q.   Did she talk to you on the phone and tell you
21 that she didn't agree with your calculations?

22     A.   No.

23     Q.   Did she never -- she never, to your
24 recollection, communicated to you her belief that you
25 were not entitled to, quote/unquote, additional pay

---

LAURA MEJIA-JIMINEZ on 09/14/2016

Page 194

1 because you had not, in fact, provided documentation
2 that you had worked more than 45 hours for weeks in
3 December 2015 [sic]?
4          MS. LOUIS: Object to foundation.
5          MR. MASCHLER: 2014. Excuse me.
6          THE WITNESS: I don't remember.
7 BY MR. MASCHLER:
8     Q.   Okay. Did your home family ever offer to give
9 you more money to take classes after you had completed
10 the requisite 60 hour number of units?
11    A.   No.
12    Q.   They never offered to make a contribution for
13 additional education after you had already satisfied the
14 educational minimum of the program?
15    A.   Well, they did offer that, but since I didn't
16 take it, they didn't give me the money.
17    Q.   Well, that was my question. Did they offer it?
18    A.   Yes, they did offer it to me.
19    Q.   All right. And when did they offer it?
20    A.   I don't remember.
21    Q.   Okay. All right. Now, you've indicated in
22 your declaration that you're "acquainted with many other
23 au pair." And this is paragraph 16 of your declaration.
24         Okay. Earlier -- correct me if I'm not
25 capturing your testimony correctly, but you identified a

Page 195

1 number of au pair with whom you've had regular contact
2 since the time that you were an au pair with the Mele
3 family. Do you recall --
4     A.   That I knew -- that I met when -- yes.
5     Q.   Okay. When you say, "many other au pair," how
6 many other au pair are you acquainted with?
7     A.   Before being an au pair or after?
8     Q.   I'm referring to your statement in your
9 declaration in paragraph 16. It says, "I'm acquainted
10 with many other au pair who are recently working in the
11 United States."
12         Do you see that? Do you see that?
13    A.   Yes.
14    Q.   Did you write that sentence?
15    A.   Yes.
16    Q.   Is that a true statement?
17    A.   Yes.
18    Q.   How many other au pair are you acquainted with
19 who recently worked in the United States?
20    A.   About two or three.
21    Q.   Okay. So when you say "many," you meant two or
22 three; is that right?
23    A.   Two or three that are friends of mine. And
24 then friends of friends that I also know are au pairs.
25 So that makes quite a few.

Page 196

1     Q.   So friends of yours, you've compared notes
2 about how much you were paid as au pairs in the U.S.; is
3 that right?
4     A.   Yes.
5     Q.   And as compared to your two or three friends,
6 did you make the most per week while you were an au pair
7 for the Mele family?
8          MS. LOUIS: Object to foundation.
9          THE WITNESS: No. We all earned the same
10 amount.
11 BY MR. MASCHLER:
12    Q.   Well, did they all get paid $10 an hour for the
13 extra work beyond 45 hours in a week?
14    A.   No. No, I had friends who didn't receive
15 payment for extra time.
16    Q.   Okay. So in that case, you didn't make the
17 same as they did; you made more money, because you were
18 paid extra, to use your term, by the Mele family. Is
19 that right?
20    A.   Correct.
21    Q.   Okay. So as compared to you with your two or
22 three other friends that you've testified about that are
23 referred to in paragraph 16, who was paid the most per
24 week as an au pair in the United States?
25         MS. LOUIS: Object to foundation.

Page 197

1          THE WITNESS: I don't remember.
2 BY MR. MASCHLER:
3     Q.   Well, do you know if any of the two or three
4 friends were paid more than you on an average basis per
5 week?
6     A.   I don't remember, because one of them also
7 worked extra hours.
8     Q.   Okay. So you don't really know how much they
9 made a week, do you?
10    A.   No.
11    Q.   So we're talking about your friends, and you
12 know even less about how much the friends of friends of
13 friends made per week; isn't that right?
14         MS. LOUIS: Object to foundation.
15         THE WITNESS: Correct.
16 BY MR. MASCHLER:
17    Q.   Okay. So when you say, "Our wages have all
18 been based on the stipend of $195.75 advertised by all
19 of the sponsor defendants," that's speculation on your
20 part, isn't it?
21         MS. LOUIS: Object to foundation.
22         (Interpreter interprets question.)
23         MR. MASCHLER: I'm not sure that's a good one.
24 Listen to my question again, please.
25         (Record read.)



LAURA MEJIA-JIMINEZ on 09/14/2016

Pages 202..205

Page 202

1  with the Mele family before its scheduled one-year
2  duration; correct?
3      A.  Yes.
4      Q.  And you terminated the au pair engagement with
5  the Mele family on December 30, 2014.  Does that sound
6  right?
7      A.  Yes.
8      Q.  And you did so because you were having
9  difficulties with caring for the children?
10         MS. LOUIS:  Objection.
11         THE WITNESS:  No.
12 BY MR. MASCHLER:
13     Q.  Well, wasn't that the reason you gave
14 AuPairCare for your terminating the au pair engagement
15 early?
16     A.  No.
17     Q.  What was the reason you gave AuPairCare, if
18 any, for terminating the au pair engagement seven months
19 early?
20         MS. LOUIS:  Objection.
21         THE WITNESS:  Because I worked extra hours and
22 I had already spoken to the family about the activities
23 of the children, and I suggested that we take them out,
24 because I felt like the children needed to get out.
25         And so in a certain way, I had already

Page 203

1  suggested a lot of different activities to the family for
2  the children, but they didn't respect them.
3  BY MR. MASCHLER:
4      Q.  Okay.  And did you communicate those reasons to
5  the host family?
6      A.  Yes.
7      Q.  And, in fact, Carmen had taken the day off from
8  work to assist you with the kids on December 30, 2014.
9  Do you recall that?
10         MS. LOUIS:  Object to foundation.
11         THE WITNESS:  I don't remember.
12 BY MR. MASCHLER:
13     Q.  Do you recall telling Carmen that you were --
14 you wanted to stop the au pair engagement on
15 December 30, 2014?
16     A.  No.  I called Beth.
17     Q.  Okay.  But I'm asking, did you tell the host
18 family that you were not going to work there anymore?
19     A.  No.
20     Q.  You never told them?  You just left?  Is that
21 your testimony?
22         MS. LOUIS:  Objection.
23         THE WITNESS:  No, that's not what happened.
24 What happened was, I called Beth, and Beth called Carmen.
25 Carmen came back home.  And he already knew the news,

Page 204

1  because Beth had told him on the phone.
2          And I left the house, because he came home very
3  angry.  He started attacking me verbally.  He started
4  yelling.  He started hitting the walls.  So I said,
5  "That's enough for me.  I'm leaving the house."
6          I called a girlfriend of mine, Helen.  I asked
7  if she could come and pick me up.  I grabbed my things,
8  and I left.
9  BY MR. MASCHLER:
10     Q.  In fact, you raised your voice at Carmen,
11 didn't, you on that occasion, and you used foul language
12 in front of the children; isn't that correct?
13     A.  No.
14     Q.  And, in fact, you falsely represented to Carmen
15 that Beth Lawrence had told you that it was okay for you
16 to leave immediately, when, in fact, she'd made no such
17 assurance to you?
18     A.  That's not true.
19     Q.  After December 30, 2014, did you ever work for
20 the Mele family as an au pair?
21     A.  No.
22     Q.  So you left the same day that you told Beth
23 that you were leaving; is that right?
24         MS. LOUIS:  Object to foundation.
25         THE WITNESS:  Of course.

Page 205

1  BY MR. MASCHLER:
2      Q.  And do you know whether there were procedures
3  that you were bound to follow with regard to an early
4  termination of your au pair engagement?
5      A.  Yes.  So when I talked to Beth about the
6  rematch, she explained to me what process I had to
7  follow.  She told me I had to speak to the family.
8  There were two days for her to come over to our house to
9  do a mediation, and then after that, if nothing could be
10 agreed upon, there were 14 days for me to find a new
11 family and for the family to find a new au pair.
12     Q.  And you were supposed to stay with the host
13 family during that two-week period, weren't you?
14     A.  Yes, I was supposed to stay there during that
15 period, but I'm a person first and an au pair second.
16 And Carmen was disrespectful towards me, and I wasn't
17 going to put up with that.
18     Q.  In fact, you lied to Carmen and told him that
19 Beth had told you it was okay to leave before that
20 two-week period; isn't that right?
21         MS. LOUIS:  Objection.
22         THE WITNESS:  I never told that to Carmen.  I
23 told him I was leaving the house because of the
24 disrespectful way he was behaving with me.
25 BY MR. MASCHLER:

LAURA MEJIA-JIMINEZ on 09/14/2016

Pages 206..209

Page 206

1    Q.   In fact, you had prepared to leave even before
2  December 30, 2014; isn't that right?
3    A.   Yes.  I had started calling Beth on
4  December 28th.
5    Q.   You had started moving your belongings to your
6  friend's house before you left on December 30, 2014;
7  isn't that correct?
8    A.   That's not true.
9    Q.   Well, did you move all of your belongings,
10  then, on December 30, 2014?
11    A.   No.  There's some things that stayed at the
12  house.
13    Q.   You had moved some of the belongings before you
14  had advised the host family on December 30, 2014 that
15  you were not going stay there anymore; isn't that right?
16    MS. LOUIS:  Objection.
17    THE WITNESS:  No, that's not true.
18  BY MR. MASCHLER:
19    Q.   Okay.  And did you request that AuPairCare
20  attempt to rematch you?
21    A.   Yes.
22    Q.   Why?
23    A.   You want to know why I asked or why they --
24    Q.   Why you asked.
25    A.   Because Beth no.  Sherry sent me an e-mail

Page 207

1  telling me that I wasn't going to get an opportunity to
2  do a rematch.
3    Q.   I guess you didn't understand my question.
4         You requested a rematch of AuPairCare; is that
5  right?
6    A.   No.
7    Q.   You never requested a rematch?
8    A.   It wasn't my right.  I didn't have to request
9  it.
10    Q.   Ms. Mejia, you've already testified that you
11  spoke to potential new host families while you were in
12  Florida on vacation with your mother.  Do you recall
13  that testimony?
14    A.   Yes.
15    Q.   So you did, in fact, elect to the pursue the
16  alternative of seeking a new host family; is that right?
17    A.   Yes, I did.
18    THE INTERPRETER:  I'd like to answer [sic] a
19  question.  Can I go to the restroom?
20    MR. MASCHLER:  Sure.
21    THE INTERPRETER:  Thank you.
22    THE VIDEOGRAPHER:  Going off the record, the
23  time is 5:41.
24    (Break taken.)
25    THE VIDEOGRAPHER:  Coming back on the record,

Page 208

1  the time is 5:50.
2    MR. MASCHLER:  Back on the record.
3  BY MR. MASCHLER:
4    Q.   Ms. Mejia, after you left the au pair
5  engagement with the Mele family, you went through a
6  rematch process with AuPairCare; is that right?
7    A.   Yes.
8    Q.   And a number of families indicated, at least
9  initially, they were potentially interested in engaging
10  you as an au pair?
11    A.   Yes.
12    Q.   And you spoke to, I believe, two of them during
13  that process?
14    A.   Yes.
15    Q.   But, ultimately, none of the families who had
16  expressed initial interest in engaging you as an au pair
17  selected you as an au pair; is that right?
18    A.   No.  I was the one who rejected the offer.
19    Q.   Okay.  Well, how many offers did you reject?
20    A.   One.
21    Q.   And how many other families indicated potential
22  interest in retaining you as an au pair?
23    A.   I don't remember if it was two or three.
24    Q.   All right.  So other than the one that you
25  rejected, the other families, be it one or two, did not

Page 209

1  accept you as an au pair; is that right?
2    A.   Yes.
3    Q.   Why did you reject the one host family that
4  wanted to retain you as an au pair?
5    A.   Because they told me that they needed me for at
6  least one year, and I only had six months more to stay
7  in the United States because my university only gave me
8  one year off.
9    Q.   I understand.
10    A.   And I already had six months in.
11    Q.   When you terminated your au pair engagement
12  with Mele family, where did you go?
13    A.   I went to Helen's house for two days, and then
14  I went to Miami, the trip that I had scheduled with my
15  family.  I spent eight days with them.
16         I went back to Philadelphia.  I was at Sajoa's
17  house two days and Helen's house one day, and then I
18  went to my cousin's house in Connecticut.
19    Q.   And how long were you at your cousin's house in
20  Connecticut?
21    A.   I think it was two or three days.
22    Q.   Has Helen consented to be a participant in this
23  lawsuit?
24    MS. LOUIS:  Object to foundation.
25    THE WITNESS:  I don't know.

LAURA MEJIA-JIMINEZ on 09/14/2016

Pages 214..217

Page 214

1  Mele family?
2      A.   Yes.
3      Q.   When?
4      A.   The day I left the house.
5      Q.   Did you return the keys to their house back to
6  the Mele family?
7      A.   Yes.
8      Q.   And did you pay for at least part of the ticket
9  to Miami, Florida that Carmen had paid for?
10     A.   Yes.  I paid what he told me I owed him.
11     Q.   When did he tell you that?
12     A.   When I was returning the cell phone and the
13 keys, he told me I had to pay for that ticket also.
14     Q.   Was that December 30 of 2014?
15     A.   Yes, the day I left the house.
16     Q.   Okay.  And when did you pay that?
17     A.   When I did pay it?  That day.
18     Q.   Okay.  So you had $250 in cash on hand that
19 day?
20     A.   Yes.
21     Q.   When you worked as an au pair for the Mele
22 family, did you have a checking account at the bank that
23 they set up for you?
24     A.   I don't remember.
25     Q.   Did you have an ATM card for the account that

Page 215

1  the Meles set up for you while you were an au pair for
2  them?
3      A.   I had my card for my account.
4      Q.   Okay.  Was that an ATM card so that you could
5  use it on an ATM machine and withdraw money?
6      A.   Yes.
7      Q.   Okay.  Now in the fourth paragraph of this
8  second page that we've marked as Exhibit 55, the e-mail
9  dated January 13, 2015, you say:  "But the family never
10 pay me the money they owe me for my work."
11          Do you see that?
12     A.   Yes.
13     Q.   What were you referring to there?
14     A.   That week, they hadn't paid me, because they
15 paid me on Sundays.  So they owed me for those days of
16 work.  Mrs. Mele, she put -- she deposited in my account
17 $104, but it was $143.  So money was missing.
18     Q.   And did you count the time you spent in the
19 Mele house on December 30, when you announced that you
20 weren't going to be working there any more?
21          MS. LOUIS:  Object to foundation.
22          THE WITNESS:  My work hours, yes.
23 BY MR. MASCHLER:
24     Q.   Okay.  All right.  And did you count the time
25 that you were having discussions with Beth Lawrence

Page 216

1  about leaving the Mele household?
2      A.   No.
3      Q.   Okay.  So when you say, "The family never pay
4  me the money that they own me for my work," you're
5  referring to the difference between $143 and $104 that
6  Ms. Mele transferred to your account; is that right?
7      A.   Yes.
8      Q.   Okay.
9          MR. MASCHLER:  Off the record.
10          THE VIDEOGRAPHER:  Going off the record, the
11 time is 6:06 p.m.
12          (Pause.)
13          THE VIDEOGRAPHER:  Coming back on the record,
14 the time is 6:07.
15          MR. MASCHLER:  Mark this as 56, please.
16          (Exhibit Number 56 was marked for
17          identification.)
18 BY MR. MASCHLER:
19     Q.   Ms. Mejia, I've handed you what we've marked as
20 Exhibit 56.  For the record, it's an e-mail from you to
21 Michele Mele, dated December 31, 2015.
22          Do you recall sending this e-mail to Ms. Mele?
23     A.   Yes.
24     Q.   In the second paragraph, you wrote:  "For this
25 reason, I want to apologize myself for the damage that I

Page 217

1  could occasioned to your family."
2          What damage did you cause the Mele family?
3      A.   Well, because of the problem that I had with
4  Carmen that day.
5      Q.   Well, what damage did you cause the family?
6      A.   I don't know exactly.
7      Q.   Well, this is your language.  So when you say,
8  "the damage that I could occasioned to your family,"
9  what damage were you referring to?
10     A.   I don't remember.
11     Q.   Okay.  And when you say that you forgive them
12 for the damage that they occasioned to you as well, what
13 damage were you referring to?
14     A.   Because of the -- what happened with Carmen the
15 day that I left, and, also, when I went back to
16 Colombia, I was very depressed because of my experience,
17 my au pair experience.
18     Q.   Well, when you say that you were forgiving the
19 Meles for the damage referred to in this exhibit, didn't
20 you think it was important to advise them that you had
21 signed a consent to participate in a lawsuit against
22 AuPairCare and others?
23          MS. LOUIS:  Object to foundation.
24          THE WITNESS:  No.  That's part of my privacy.
25 BY MR. MASCHLER:

LAURA MEJIA-JIMINEZ on 09/14/2016

Pages 218..221

Page 218

1    Q.   You think signing a consent form that is filed
2 in court is part of your privacy?
3    A.   Yes, of course.  I would only tell -- I would
4 only tell people about it who I want to tell about it.
5    Q.   Okay.
6       MR. MASCHLER:  Let's mark this next in order,
7 please.
8       (Exhibit Number 57 was marked for
9       identification.)
10 BY MR. MASCHLER:
11    Q.   Exhibit 57 is a consent form.  Do you see that?
12    A.   Yes.
13    Q.   Okay.  Is that your signature that appears on
14 this form?
15    A.   Yes.
16    Q.   And did you sign this form on April 16, 2015?
17    A.   Yes.
18    Q.   And who sent you this form?
19    A.   Justin Grant.
20    Q.   Okay.  At the time you signed this form, do you
21 know whether the plaintiffs in this lawsuit had brought
22 any FLSA claims against AuPairCare?
23       THE INTERPRETER:  I'm sorry.  Could that
24 question be repeated for the interpreter?
25       MR. MASCHLER:  Read it back, please.

Page 219

1       (Record read.)
2       (Question interpreted again.)
3       THE WITNESS:  I don't remember.
4 BY MR. MASCHLER:
5    Q.   Do you know the term "Fair Labor Standards
6 Act"?  Have you ever heard of that act?
7    A.   No, I don't remember.
8    Q.   Have you ever heard the term "FLSA"?
9    A.   I don't remember.
10    Q.   Well, when you signed the FLSA consent form
11 that we've marked as Exhibit 57, did you have an
12 understanding what FLSA was?
13    A.   I don't remember.
14    Q.   Before you signed the consent form that we've
15 marked as Exhibit 57, did you review any version of a
16 Complaint filed in this case?
17    A.   I don't remember.
18    Q.   So you signed this FLSA consent form on
19 April 16, 2015, and then about eight and a half months
20 later, you sent this letter of apology to the Mele
21 family.
22       Why did you send this e-mail, dated
23 December 31, 2015, that we've marked as Exhibit 57 --
24 56.  Excuse me.
25       MS. LOUIS:  Objection.

Page 220

1       THE WITNESS:  Because I've always thought that
2 what happened in my case is the fault of the agency, not
3 the family, because the agency knows that the family
4 needs somebody with a lot of time to be with them, and in
5 spite of that, they give them an au pair who isn't able
6 to be there the number of hours that they need.
7 BY MR. MASCHLER:
8    Q.   What else did you have going on between July of
9 2014 and the end of December of 2014?
10    A.   What -- was I doing what?
11    Q.   Well, you were living in their house; right?
12 You got room and board paid for by the host family;
13 right?
14       MS. LOUIS:  Object to foundation.
15 BY MR. MASCHLER:
16    Q.   Right?
17    A.   Yes.
18    Q.   Okay.  You didn't have any other jobs during
19 that time; right?
20    A.   The time that I was au pair?
21    Q.   Right.
22    A.   Correct.
23    Q.   Okay.  You went to school at night sometimes;
24 right?
25    A.   Yes.

Page 221

1    Q.   So you, in fact, had the time to work for them
2 during the days that you were an au pair for them; isn't
3 that right?
4    A.   Yes.
5    Q.   Right.  You just didn't like working for that
6 family during the days; is that right?
7    A.   No.
8    Q.   No?
9       You wanted to take more education classes to
10 better your English during the day; isn't that right?
11    A.   Yes.
12    Q.   All right.  And because the Mele family needed
13 someone to take care of their infant children, they
14 couldn't accommodate that request that you not take care
15 of their kids during the days; isn't that right?
16    A.   But what is the question?
17    Q.   The question is that they needed you to take
18 care of their children during the day when they were at
19 work, but you wanted to go to class during the day;
20 isn't that right?
21       MS. LOUIS:  Object to form.
22       THE WITNESS:  They wanted me to take care of
23 the kids during the day and the night, to do more than 45
24 hours.  As I said before, if I only had 45 hours to work,
25 I would have had some free time to be able to attend

LAURA MEJIA-JIMINEZ on 09/14/2016

Pages 222..225

---

**Page 222**

1  classes.  But since I didn't have that free time, because
2  I worked more than the 45 hours, that's why I didn't like
3  working there.
4  BY MR. MASCHLER:
5      Q.   Identify a single class or educational
6  opportunity offered at night that you were not able to
7  participate in because of the hours you worked for the
8  Mele family.
9      A.   I don't remember.
10     Q.   You can't identify a single educational
11  opportunity that you had to forego or pass up because of
12  the hours that the Mele family requested that you work
13  for them as an au pair; isn't that right?
14          MS. LOUIS:  Objection.
15          THE WITNESS:  I never said that I couldn't
16  identify them.  I just said that I don't remember.
17  BY MR. MASCHLER:
18     Q.   Well, this is the time to do it.  So if
19  something pops into your mind, please let us know.
20     A.   Okay.
21     Q.   Now, you indicated that -- in your December 31,
22  2015 e-mail that you knew that they never understood a
23  lot of your attitudes.  Do you see that?  What
24  attitudes, were you referring to there?
25     A.   I don't remember.

---

**Page 223**

1      Q.   Okay.  You say that "The agency promised a lot
2  of things that most of the families ignore."
3          What were you referring to there?
4      A.   Because the agency in Colombia tells us that
5  it's an exchange program that -- where a person can work
6  and study at the same time, but the family said to me --
7  declared -- stated to me many times that it's a family
8  for -- interpreter clarification -- that it's a program
9  for taking care of children, that's all.
10     Q.   Did you read the contract that you signed
11  before you signed it?  I've probably asked you that
12  question.  Let me ask you again.  Did you read it?
13          MS. LOUIS:  Objection.
14          THE WITNESS:  Yes.
15  BY MR. MASCHLER:
16     Q.   And didn't that contract say that your primary
17  obligation as an au pair would be to take care of the
18  children of the host family?
19     A.   Yes.
20     Q.   And didn't the contract also provide that you
21  would be entitled to a particular number of educational
22  hours?
23          MS. LOUIS:  Objection.
24          THE WITNESS:  They said that the family would
25  give you a certain amount of money to take classes and

---

**Page 224**

1  that you have to take six credits during the year.
2  BY MR. MASCHLER:
3      Q.   And you met that requirement in the first five
4  months of your au pair engagement with the Mele family;
5  right?
6          MS. LOUIS:  Objection.
7          THE WITNESS:  Yes.
8  BY MR. MASCHLER:
9      Q.   Okay.  All right.  Is there anywhere in any
10  documents or literature or advertisements that you
11  attribute to AuPairCare in which you are promised more
12  educational opportunity than what you just referred to?
13          MS. LOUIS:  Object to form.
14          THE WITNESS:  No.
15  BY MR. MASCHLER:
16     Q.   Okay.  Have you ever read the Second Amended
17  Complaint filed in this lawsuit?
18     A.   I don't remember.
19     Q.   Well, it was just filed -- the proposed Second
20  Amended Complaint was just filed on August 15, 2016, the
21  same day you signed your declaration.
22          Does that refresh your recollection as to
23  whether you -- does that refresh your recollection as to
24  whether you might have read a Complaint filed in this
25  case?

---

**Page 225**

1      A.   I don't remember.
2      Q.   Are you aware that in the proposed Second
3  Amended Complaint there are allegations that pertain to
4  you?
5      A.   I don't remember.
6      Q.   Well, did you ever review any pleading filed in
7  this case, any document, that had claims about you?
8      A.   Yes.
9      Q.   When did that happen?
10     A.   In 2015.  That's why I don't remember right
11  now.
12     Q.   Well, do you know whether that document in 2015
13  said anything about the -- Laura Mejia-Jimenez?
14     A.   Yes, it spoke about my case.
15     Q.   Did it speak about you?  Did it say anything
16  about you in that document that you reviewed in 2015?
17     A.   I don't remember.
18     Q.   What's your understanding, if any you have, of
19  the claims that are brought in your name in this case?
20     A.   Well, according to me, because I'm suing.
21     Q.   Yes.  And so what are you claiming in this
22  case?
23     A.   I'm claiming that the agencies don't protect
24  the au pairs the way they say they're going to protect
25  them.

---

LAURA MEJIA-JIMINEZ on 09/14/2016

Pages 226..229

Page 226

1    I'm complaining because if I'm an employee of
2  AuPairCare, when there's a problem, why do they defend
3  the family and not the au pair?
4    I'm complaining that I don't think it's fair
5  what they pay au pairs.  If a nanny makes a hundred
6  dollars in one day -- because an au pair who does the
7  same work or even more intense work only makes $200 in a
8  week.
9    I'm complaining -- excuse me -- I'm complaining
10 that it's a cultural exchange program.  So why -- if
11 it's an exchange program, why, in my case, did I do
12 nothing but work?
13   You're saying that I attended classes.  Yes, I
14 did attend classes, and I spoke to the family and to
15 Beth about how bad the classes were.
16   And the schedule was horrible.  I would finish
17 work, and I would have to run to class.  I would come
18 back to the house around or 11:00 or 12:00 at night,
19 maybe, and then have to start working very early in the
20 morning.
21   And so -- and I did that every day, and if you
22 think -- if you think that somebody could study well in
23 those conditions, I wasn't -- I just wasn't able to.
24   Q.  So you didn't do well in your classes that you
25 took while an au pair for the Mele family?  Is that what

Page 227

1  you're testifying?
2    A.  I'm not saying that, no.  I'm saying that I had
3  a very difficult schedule in order to be able to take
4  classes at night.
5    And the classes were bad, because it wasn't
6  English.  It was American culture.  And I paid for an
7  ESL class, not an American culture class.
8    But coming back to what you asked me, I'm suing
9  because I feel that the agency doesn't support the
10 au pairs.
11   They bring some girls over from other countries
12 to another country, where they're alone, and they leave
13 them alone with a family who can do whatever they feel
14 like doing with them.  And the girls are alone.  So you
15 do everything that the family tells you to do because
16 you -- there's no other -- there's no other alternative.
17   Many of those girls are girls with great need
18 in their country.  So if they come from one of those
19 countries to a place where they give them things that
20 they don't have there, it doesn't matter to them if they
21 have to work extra hours or if they mistreat them.
22 They're happy because they have something that they
23 never had back home.  So the agencies have no right to
24 take advantage of that situation.
25   Q.  Did the Meles mistreat you?

Page 228

1    A.  Mistreated me physically or psychologically?
2    Q.  You used the term "mistreat."  Did the Meles
3  mistreat you?
4    A.  I use the word "mistreat" to refer to other
5  people, but they didn't mistreat me.
6    Q.  Okay.  Well, I was referring to your claims in
7  this case, about you.
8    And so the Meles provided you with a nice room;
9  right?
10   A.  Yes.
11   Q.  All right.
12     MS. LOUIS:  I'm sorry, but we've been over
13 seven hours now.  So before we go through the exact same
14 testimony that she's done three times, I did forward you
15 the documents.  And if you want to ask her about it, then
16 I'll indulge a little over seven.  But otherwise, we're
17 cutting it off.
18     MR. MASCHLER:  I'm gonna finish this line of
19 questioning and --
20     MS. LOUIS:  Then we'll end the depo.
21     MR. MASCHLER:  No.  I'm going to follow up on
22 the answer she just gave.  And I'm entitled to do that,
23 and that will be that, reserving both of our rights.
24 BY MR. MASCHLER:
25   Q.  So the Meles did not mistreat them [sic], and

Page 229

1  you sent them a letter apologizing for the damage you
2  had caused them.  Do you recall that?
3      MS. LOUIS:  Object to foundation.
4      THE WITNESS:  Yes, they mistreated me
5  psychologically.  The last day Carmen verbally mistreated
6  me, and he was hitting the walls.  I was afraid that day.
7  BY MR. MASCHLER:
8    Q.  Well, you used foul language in front of the
9  children, didn't you?
10     MS. LOUIS:  Object to foundation.
11     THE WITNESS:  No, sir.
12 BY MR. MASCHLER:
13   Q.  You screamed at Carlos, didn't you?  Carmen.
14 Excuse me.
15     MS. LOUIS:  Object to form.
16     THE WITNESS:  I didn't yell at Carmen.  I said
17 to Carmen to stop yelling at me.  He was the one who was
18 yelling at me and attacking me.
19 BY MR. MASCHLER:
20   Q.  Did you pledge to be honest when you applied
21 for a position as an au pair with the Mele family?
22     MS. LOUIS:  Object to foundation.
23     THE WITNESS:  Yes.
24 BY MR. MASCHLER:
25   Q.  Okay.  And did you think honesty was an



LAURA MEJIA-JIMINEZ on 09/14/2016

Page 230

1  important attribute of an au pair?
2      A.   No, for a -- any person in general.
3      Q.   I'm not asking for any person in general.  I'm
4  talking about au pairs.
5           Do you think honesty is an important attribute
6  that must be adhered to?
7      A.   Yes, of course.
8      Q.   And have you ever heard of the term "class
9  representative"?
10     A.   Yes.
11     Q.   What's your understanding of class
12  representative?
13     A.   Are you sure you're translating it correctly?
14     Q.   It's a term of art in the law in the United
15  States.  It's called class representative.
16          MS. LOUIS:  John, what's the time?
17          THE VIDEOGRAPHER:  You mean the total running
18  time?
19          MS. LOUIS:  Uh-huh.
20          THE VIDEOGRAPHER:  It is 7:08.
21          MR. MASCHLER:  There's a question pending.
22  BY MR. MASCHLER:
23     Q.   Do you understand the term "class
24  representative"?
25          MR. MASCHLER:  You can use the English term.

Page 231

1          THE WITNESS:  Yes.
2  BY MR. MASCHLER:
3      Q.   What's your understanding of that term?
4      A.   Can you help me with the translation?
5      Q.   No.  It's an English term.  I want to know if
6  you understand the English term "class representative."
7      A.   I want to know what it is in Spanish.
8      Q.   My first questions is, do you have an
9  understanding of what it means in English?
10     A.   No.
11     Q.   Do you know -- have you ever heard the term
12  "collective class representative"?
13          (Interpreter begins interpretation of
14          question.)
15          THE INTERPRETER:  Do you want me to say it in
16  English?
17          MR. MASCHLER:  Say it in English, "collective
18  class representative."
19          THE INTERPRETER:  "Collective class
20  representative."
21          THE WITNESS:  Yes.
22  BY MR. MASCHLER:
23     Q.   What's your understanding --
24          MS. LOUIS:  I'm sorry.  I'm sorry, but I'm
25  trying to give you the leeway to finish a line of

Page 232

1  questioning, but there seems to be no end in sight.
2          MR. MASCHLER:  Well, I'll just -- let me --
3          So we're not talking over each other.
4          Because we have a translator here, the judge
5  has already said we'll get leeway on the seven-hour
6  requirement because, obviously, about half the time has
7  been devoted to translation.
8          MS. LOUIS:  Actually, you spent the first hour
9  asking about a nonparty.  We spent a ton of time doing
10  questions over and over and over again.  So I appreciate
11  that you want to some leeway, and I'm trying to give
12  it --
13          MR. MASCHLER:  Yeah.
14          MS. LOUIS:  -- but we've all asked you, "How
15  much longer," and your answer was "When I'm done" --
16          MR. MASCHLER:  No.  I told you --
17          MS. LOUIS:  -- which is way in excess of seven
18  hours.
19          The interpreter asked --
20          MR. MASCHLER:  I mean --
21          MS. LOUIS:  The interpreter is exhausted.  The
22  interpreter --
23          MR. MASCHLER:  The interpreter has not said
24  that she's exhausted.
25          THE WITNESS:  But I am.  Can I -- do I have the

Page 233

1  right to say I'm exhausted and I don't want to do this
2  anymore?
3          MR. MASCHLER:  Okay.  Fine.  Just give me and
4  answer to the last question, please, and we'll make
5  whatever statements we need to on the record.
6          THE WITNESS:  Could you repeat it, please?
7          MR. MASCHLER:  Repeat the last question before
8  we had the extended colloquy.
9          (Record read.)
10          (Question interpreted again.)
11          THE WITNESS:  I don't remember.
12          MR. MASCHLER:  All right.  The
13  interpreter [sic] has indicated she's exhausted.
14          We're leaving the record open for a number of
15  reasons.  One, we believe the judge has given us latitude
16  where we have a translation and, therefore, it doubles
17  the time to take a deposition.  Second, we have some
18  instructions not to answer with which we take issue.
19          So we are leaving the record open.  Thank you.
20          MR. WOLOSZ:  Excuse me.  This is Justin Wolosz.
21  Could I also just add that, on behalf of Cultural Care,
22  we also object, and we'd like to leave the record open
23  because I had a small number of questions -- but I did,
24  in fact, have questions -- that I have not been able to
25  ask.

# EXHIBIT B

# REDACTED

Begin forwarded message:

**From:** "laura mejia jimenez" 
**Date:** December 31, 2015 at 6:32:58 PM EST
**To:** michelle mele <mmmeie321 a gmail.com>
**Subject: Hello...**

Hello Carmen and Michel, it´s been a long time without know about you. Due a life circunstances our relationship does not end in a good way, there was a lot of misunderstandings between us.

For this reason I want to apologize myself for the damage that i could occasioned to your family, and I want to tell you that I forgive you for the damage that you occasioned to me as well. I know that you never understand a lot of my attitudes; i want to let you know that i felt and still feeling disappointed with the Au Pair program, the agency promised us a lot of things that most of the families ignore, so after a few time I just realized that I did not achieved my goals and targets with the program.

**HIGHLY CONFIDENTIAL ATTORNEY EYES ONLY**    1    APC 000682



I always loved your family and  wanted  and obviously I still do it  and I still  think about you, i really wish you the best. I always remember all of you and for this reason i want to wish you a happy new year, hope someday you understand that we are not perfect, and  understand that  you and I had mistakes, wrong attitudes and hurting words between us. Finally i want to greet Pat, Ava, Lucia, Olivia and Samy. I just wanted to let you know that your always are in my prayers.

HIGHLY CONFIDENTIAL ATTORNEY EYES ONLY [2]    APC 000683