# EXHIBIT Q

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-03074-CMA-KMT

JOHANA PAOLA BELTRAN, et al.,

    Plaintiffs,

v.

INTEREXCHANGE, INC., et al.,

    Defendants.

---

## DECLARATION OF BROOKE A. COLAIZZI

---

1.  My name is Brooke A. Colaizzi.  I am a member of the law firm of Sherman & Howard L.L.C. and a member in good standing of the bar of the State of Colorado and the United States District Court for the District of Colorado.

2.  I am one of the attorneys representing Defendant InterExchange, Inc. in the above-captioned case.

3.  I took the deposition of Plaintiff Johana Paola Beltran ("Ms. Beltran") on August 30, 2016.

4.  At the request of Ms. Beltran's attorney Lauren Louis, the deposition proceeded with a Spanish-language interpreter for Ms. Beltran.  All of my questions to Ms. Beltran were translated into Spanish, and Ms. Beltran responded to all of my questions in Spanish.  Her responses were then translated into English for the record.

5. Counsel for Ms. Beltran is now impugning my ethics and professionalism during Ms. Beltran's deposition, without cause or factual support.

6. The night before Ms. Beltran's deposition, at 7:16 p.m. MDT on August 29, 2016, Plaintiffs' counsel produced for the first time approximately 100 pages of documents.

7. Included in this production were emails between and among an individual named Orlando Salazar ("Mr. Salazar") and Pam Noonan, a member of Ms. Beltran's host family, and Noonans' attorney. (Exhibit 1 hereto.) The documents were not marked confidential or otherwise subject to the terms of the protective order entered in this case.

8. The emails demonstrated that Mr. Salazar repeatedly demand money from the Noonans on Ms. Beltran's behalf under threat of legal action. (Exhibit 1.)

9. The emails also included details regarding the total amount of hours Ms. Beltran allegedly worked and the hourly and overtime wages she alleges she was owed. (Exhibit 1 at BELTRAN 555-556).

10. Ms. Beltran's response to Interrogatory No. 7 propounded to her by InterExchange states that she has communicated with her "partner" about this case. (Exhibit 2, Interrogatory No. 7.) The "partner" is not identified by name in the discovery responses, despite the instructions requesting such information.

11. During her deposition, Ms. Beltran testified as to her current address in New Jersey and that she lives there with "[t]he people that support me." (Exhibit 3 Beltran Dep. at 14:10-13.)

2

12. She identified "the people who support" her as Mr. Salazar and his adult son.  (Exhibit 3 at 14:14-16.)

13. Ms. Beltran testified that Mr. Salazar was not, and never had been, her attorney.  (Exhibit 3 at 14:21-15:9; 25:7-13.)

14. She also testified that Mr. Salazar was not an attorney at all.  (Exhibit 3 at 15:7-9.)

15. I asked Ms. Beltran what she meant by her statement that Mr. Salazar and his son "supported" her, and she testified, "He's my sponsor."  (Exhibit 3 at 15:13-15.)

16. I then asked Ms. Beltran, "Sponsor of what?"  She replied, "Of my student visa."  (Exhibit 3 at 15:13-17.)

17. During her deposition, Ms. Beltran identified Mr. Salazar as the "partner" to whom she referred in response to Interrogatory No. 7.  (Exhibit 3 at 20:8-11.)

18. Ms. Beltran further testified in her deposition that she discussed this case with Mr. Salazar and had asked him to communicate with the Noonans to demand payment, which is the subject of the aforementioned production of documents, and that Mr. Salazar had helped Ms. Beltran calculate how much she was allegedly owed as a result of her time with the Noonans.  (Exhibit 3 at 182:7-9; 187:22-188:2.

19. Ms. Beltran also testified that Mr. Salazar provides her with complete financial support.  (Exhibit 3 at 24:1-23.)

20. My questions to Ms. Beltran about her arrangement with Mr. Salazar were not meant to suggest that she engaged in any inappropriate conduct, including but

3

not limited to bribery, but merely to understand the nature of their relationship, as Ms. Beltran's testimony revealed Mr. Salazar to be a potential witness in this case as to her hours worked and the money she alleges she is owed, and she had referred to him as her "partner."

21. Indeed, during the deposition, a discussion ensured regarding the word "partner" because of its various potential meanings in Spanish.  (Exhibit 3 at 19:19-20:18.)

22. Ms. Beltran's counsel even advised the interpreter to use both the word for business partner and word for social partner in his translation to Ms. Beltran. (Exhibit 3 at 19:20-20:3.)

23. My single question to Ms. Beltran about whether or not she had a boyfriend was not intended to pry into her love life; identifying potential witnesses is one purpose of a deposition.

24. Plaintiffs' counsel's current complaint about questions related to Ms. Beltran's visa status are tantamount to bad faith.  Not only did Plaintiffs' counsel (be it Mr. Hood, Mr. Seligman, or Ms. Louis) fail to object to any such questions, Mr. Hood requested a recess during the deposition to discuss with Ms. Beltran whether she had any concerns answering questions about her visa status.  After the recess, Mr. Hood reported that Ms. Beltran had no concerns and would be answering such questions.  He furthermore withdrew his previous designation of the testimony as confidential.

4

25. For context, once an au pair's participation in the au pair program ends, InterExchange is obligated by State Department regulations to cancel his or her J-1 visa.  My questions to Ms. Beltran about her visas were related to and to email communications between InterExchange and Ms. Beltran about the cancellation of her J-1 visa and the student visa that she voluntarily disclosed during her deposition testimony.  (Exhibit 4 hereto.)

26. At no point did I ask Ms. Beltran any question that could be interpreted to suggest that I was accusing her of conduct tantamount to a crime, nor were my questions intended to suggest any such thing.

27. Attached hereto as Exhibit 5 is a copy of the dial-in meeting log for the conference call number used during Ms. Beltran's deposition for counsel to appear telephonically.

28. The first number, 303-299-8355, is the Sherman & Howard number from which I dialed in as host of the teleconference.

29. The next three numbers, beginning 303-807 and further redacted for privacy, were used by counsel for A.p.ex. American Professional Exchange, LLC and 20/20 Care Exchange.

30. The next five entries, beginning 305-901 and also further redacted for confidentiality reasons, were numbers used by counsel for Expert Au Pair.

31. The two entries with a 415 area code were used by counsel for AuPairCare, Inc.

5

32. The final two entries with a 617 area code were used by counsel for Defendant Cultural Care.

33. I personally confirmed the use of these telephone numbers with respective Defendants' counsel.

34. Ms. Louis did not attend the deposition in person.

35. If Ms. Louis listened to any of Ms. Beltran's deposition over the phone, it appears that her phone number was blocked, as all of the numbers on this list are accounted for as described above.  As her number does not appear, it is impossible to determine how much of the deposition, if any, that she listened to. To the extent Ms. Louis did attend telephonically, she did not raise any objections or initiate any discussions about the allegedly abusive questions during the deposition.

I declare under penalty of perjury that the foregoing is true and correct. Executed on October 12, 2016.

Brooke A. Colaizzi, Esq.

Active/43862880.1

# DECLARATION OF BROOKE A. COLAIZZI

# EXHIBIT 1

# Miss Johana Paola Beltran's wages

ORLSALA@aol.com

mar 26/08/2014 01:44 p.m.

Para:pamnoonan@comcast.com <pamnoonan@comcast.com>;

Cc:pao.18,02@hotmail.com <pao.18,02@hotmail.com>;

◊ 1 archivo adjunto (70 KB)

paola's wages letter Colorado.tif;

Mrs. Noonan,

Pasted below and attached please find letter in reference to Paola Beltran.  It was also airmailed.



**SALAZAR & ASSOCIATES, INC.**

825 Rahway Avenue, Suite 1A · Union, New Jersey 07083
Phone: 908-206-1278 · Fax: 908-206-1594 · Email: mail@salazar-associates.com/

August 26, 2014

Mrs. Pam Noonan
101 Falcon Hills Drive
Highlands Ranch, Co 80126

Re: Miss Johana Paola Beltran's wages
     Via email and airmail

Mrs. Noonan,

My name is Orlando Salazar, and I represent Miss Johana Paola Beltran.
This email is to collect $12,564.50 owed to Miss Beltran for live-in housekeeping/cooking services rendered from August 17, 2012 to November 17, 2012.

Miss Beltran came to the USA as an Au Pair (an intercultural live-in child care program) to your house.  During the time that she was in your house, instead of being an Au Pair, she was used as a live-in housekeeper/cook. It seems like the federal and Colorado state labor laws were broken with such an act.  That was the reason why Miss Beltran left you; she did not come to the USA to be a housekeeper/cook. A detail explanation as to how we arrived at the amount of $12,264.50 follows:

1) Au Pair duties included in the program: a) Waking the children, b) taking/collecting children from and to school, c) helping with school homework, d) playing with children, e) taking children to parks, playgroups, and other activities, f) preparing light meals for children and clean up after the meals, g) doing the children's laundry and ironing their clothes, h) making the children beds, i) tidying up the children's toys, j) cleaning the children's bathroom.  Miss Beltran did only some of these chores, since your children were already self sufficient (ages of about 10 and 12 at the time).

2) Instead, Miss Beltran: a) prepared meals for the whole family, b) made everyone's beds, c) tidied up and minor cleaning of all the bathrooms, d) cleaned the floors, e) cleaned the windows, f) took care of the chickens in the back yard, g) collected the eggs from the chicken coop, h) cleaned thoroughly the coop two times per week, i) did minor gardening, j) did all the laundry,

EXHIBIT
1

BELTRAN000555

folded it and put it away (except Mr. Noonan's), k) Dusted the house, l) cleaned HVAC filters, m) picked up and cleaned inside of your car on a daily basis, n) Whenever you returned from a trip, unpacked your suitcases and put things away, o) arranged yard/house for social gatherings/parties held at your house, and p) before she quit the job, the house was being renovated, so she had to pack in boxes most of the house's contents as if you were moving.

3) Miss Beltran came to the USA on the assumption that she was on duty 45 hours per week, where she was to have 1/2 day Saturday and a full day Sunday off. Instead, you gave her a day off during the week and 1/2 day Saturday. Her daily work day would start at 7:30 AM and would end around 8:30 PM, making it a 12 hour work-day (we will assume that one hour was for lunch).

4) You tried to fit the 8 hour work day by breaking the 7:30 AM to 8:30 PM shift into sections throughout the day that would add up to 8 hours, which is an illegal employment practice. Meaning that legally she was on duty from 7:30 AM to 8:30 PM.

5) The average salary of a living housekeeper/cook in the state of Colorado is $600/week based on a 40 hour week, or $15/hour. Miss Beltran worked 12 hours per day 5 days per week plus 5 hours on Saturday. Total amount of hours worked were 65 per week during 13 weeks (3 months). Colorado's labor law states that after 40 hours per week, the employee must be paid at 1 1/2 times the hourly salary. Miss Beltran received a compensation of $196/week during the 13 weeks. Therefore:

| | |
|---|---|
| $600/week x 13 weeks = | $ 7,800 |
| 25 hours OT/ week x $22.50/hour x 13 weeks = | $ 7,312.50 |
| | |
| Total wages earned during the 13 weeks = | $15,112.50 |
| $196/week x 13 weeks received          = | 2,548.00 |
| | |
| Total owed Miss Beltran | $12,564.5 |

6) This amount does not include any interest that Miss Beltran should be entitled to receive.

Mrs. Noonan, you took advantage of Miss Beltran's lack of knowledge of the USA labor laws, and she feels she was a victim of modern slavery. Therefore, I am allowing you 7 calendar days to respond with payment for these wages owed Miss Beltran. Otherwise we will file a claim with the federal government and Colorado's labor departments to recover back wages owed. Should we file a claim with the labor departments, not only you will be liable for payment of wages owed, but also all federal and state income taxes owed (Miss Beltran's part and the employer part, in this case you are the employer), fines, penalties, plus interest. That is besides being audited for any other "Au Pairs" that you have hired in the past and present.

You may mail the check to my office in Miss Beltran's name: Paola Beltran, Salazar & Associates, 625 Rahway Avenue 1A, Union, NJ 07083.

Should you have any questions, please contact me via email at orlsala@aol.com

Thank you,

Orlando Salazar

BELTRAN000556

# Re: Miss Johana Paola Beltran's wages

Orlando Salazar

vie 05/09/2014 07:27 a.m,

Para:Pamnoonan@comcast.net <Pamnoonan@comcast.net>;

Cc:pao.18.02@hotmail.com <pao.18.02@hotmail.com>;

Mrs. Noonan,

September 23rd is acceptable to Miss Beltran.

Thanks,

Orlando Salazar

——Original Message——
From: Pamnoonan <Pamnoonan@comcast.net>
To: Orlando Salazar <orlsala@aol.com>
Sent: Fri, Sep 5, 2014 1:49 am
Subject: RE: Fwd: Miss Johana Paola Beltran's wages

Mr Salazar,

I have been out of town and only recently received your letter, with such a short response time.
I need additional time to analyze it and would appreciate 2 more weeks until September 23rd.
Please Confirm.

Thank you
Pam

—— Original message ——
From: Orlando Salazar
Date:09/04/2014 3:09 PM (GMT-07:00)
To: pamnoonan@comcast.net
Cc: pao.18.02@hotmail.com
Subject: Fwd: Miss Johana Paola Beltran's wages

Mrs. Noonan,

It has been already 7 calendar days since I wrote to you in reference to Miss Johana Paola Beltran's
wages, and I have not heard from you or Mr. Noonan. Miss Beltran was hoping to resolve this issue on
an amicable manner.  Apparently the Noonans have chosen to face the labor department and any other
legal means allowed by the law to Miss Beltran to recover wages owed her for the time spent working
for the Noonan family; a housekeeper/cook camouflaged as an Au Pair, as stated in my previous

BELTRAN000558

correspondence.

If I have not heard from you by Tuesday September, 9th, 2014, our next step will be to start legal proceedings.

Thank you,

Orlando Salazar


——Original Message——
From: ORLSALA <ORLSALA@aol.com>
To: pamnoonan <pamnoonan@comcast.net>
Cc: pao.18.02 <pao.18.02@hotmail.com>
Sent: Tue, Aug 26, 2014 2:53 pm
Subject: Fwd: Miss Johana Paola Beltran's wages



Mrs. Noonan,

Pasted below and attached please find letter in reference to Paola Beltran.  It was also airmailed.



August 26, 2014

Mrs. Pam Noonan
101 Falcon Hills Drive
Highlands Ranch, Co 80126

Re: Miss Johana Paola Beltran's wages
        Via email and airmail

Mrs. Noonan,

My name is Orlando Salazar, and I represent Miss Johana Paola Beltran.
This email is to collect $12,564.50 owed to Miss Beltran for live-in housekeeping/cooking services rendered from August 17, 2012 to November 17, 2012.

Miss Beltran came to the USA as an Au Pair (an intercultural live-in child care program) to your house.  During the time that she was in your house, instead of being an Au Pair, she was used as a live-in housekeeper/cook. It seems like the federal and Colorado state labor laws were broken with such an act.  That was the reason why Miss Beltran left you; she did not come to the USA to be a housekeeper/cook. A detail explanation as to how we arrived at the amount of $12,264.50 follows:

1) Au Pair duties included in the program: a) Waking the children, b) taking/collecting children from and to school, c) helping with school homework, d) playing with children, e) taking children to parks, playgroups, and other activities, f) preparing light meals for children and clean up after the meals, g) doing the children's laundry and ironing their clothes, h) making the children beds, i) tidying up the children's toys, j) cleaning the children's bathroom.  Miss Beltran did only some of these chores, since your children were already self sufficient (ages of about 10 and 12 at the time).

2) Instead, Miss Beltran: a) prepared meals for the whole family, b) made everyone's beds, c) tidied up and minor cleaning of all the bathrooms, d) cleaned the floors, e) cleaned the windows, f) took care of the chickens in the back yard, g) collected the eggs from the chicken coop, h) cleaned thoroughly the coop two times per week, i) did minor gardening, j) did all the laundry, folded it and put it away (except Mr. Noonan's), k) Dusted the house, l) cleaned HVAC filters, m) picked up and cleaned inside of your car on a daily basis, n) Whenever you returned from a trip, unpacked your suitcases and put things away, o) arranged yard/house for social gatherings/parties held at your house, and p)

BELTRAN000559

before she quit the job, the house was being renovated, so she had to pack in boxes most of the house's contents as if you were moving.

3) Miss Beltran came to the USA on the assumption that she was on duty 45 hours per week, where she was to have 1/2 day Saturday and a full day Sunday off. Instead, you gave her a day off during the week and 1/2 day Saturday. Her daily work day would start at 7:30 AM and would end around 8:30 PM, making it a 12 hour work-day (we will assume that one hour was for lunch).

4) You tried to fit the 8 hour work day by breaking the 7:30 AM to 8:30 PM shift into sections throughout the day that would add up to 8 hours, which is an illegal employment practice. Meaning that legally she was on duty from 7:30 AM to 8:30 PM.

5) The average salary of a living housekeeper/cook in the state of Colorado is $600/week based on a 40 hour week, or $15/hour. Miss Beltran worked 12 hours per day 5 days per week plus 5 hours on Saturday. Total amount of hours worked were 65 per week during 13 weeks (3 months). Colorado's labor law states that after 40 hours per week, the employee must be paid at 1 1/2 times the hourly salary. Miss Beltran received a compensation of $196/week during the 13 weeks. Therefore:

$600/week x 13 weeks =                               $ 7,800
25 hours OT/ week x $22.50/hour x 13 weeks = $ 7,312.50

Total wages earned during the 13 weeks =        $15,112.50
$196/week x 13 weeks received           =            2,548.00

Total owed Miss Beltran                                $12,564.5

6) This amount does not include any interest that Miss Beltran should be entitled to receive.

Mrs. Noonan, you took advantage of Miss Beltran's lack of knowledge of the USA labor laws, and she feels she was a victim of modern slavery. Therefore, I am allowing you 7 calendar days to respond with payment for these wages owed Miss Beltran. Otherwise we will file a claim with the federal government and Colorado's labor departments to recover back wages owed. Should we file a claim with the labor departments, not only you will be liable for payment of wages owed, but also all federal and state income taxes owed (Miss Beltran's part and the employer part, in this case you are the employer), fines, penalties, plus interest. That is besides being audited for any other "Au Pairs" that you have hired in the past and present.

You may mail the check to my office in Miss Beltran's name: Paola Beltran, Salazar & Associates, 625 Rahway Avenue 1A, Union, NJ 07083.

Should you have any questions, please contact me via email at orlsala@aol.com

Thank you,

Orlando Salazar

BELTRAN000560

# Fwd: Miss Johana Paola Beltran's wages

ORLSALA@aol.com

mar 23/09/2014 10:22 a.m.

Para:pao.18.02@hotmail.com <pao.18.02@hotmail.com>;

From: ORLSALA@aol.com
To: Pamnoonan@comcast.net
Sent: 9/23/2014 9:46:09 A.M. Eastern Daylight Time
Subj: Re: Miss Johana Paola Beltran's wages

Mrs. Noonan,

Today is the deadline of the time extension that you and Dr. Noonan had asked for to analyze and respond to Miss Beltran's wages owed for her services as a housekeeper/cook in your house during the year 2012.

Thank you,

Orlando Salazar

In a message dated 9/5/2014 1:49:26 A.M. Eastern Daylight Time, Pamnoonan@comcast.net writes:

Mr Salazar,

I have been out of town and only recently received your letter, with such a short response time. I need additional time to analyze it and would appreciate 2 more weeks until September 23rd. Please Confirm.

Thank you
Pam

———— Original message ————
From: Orlando Salazar <orlsala@aol.com>
Date:09/04/2014 3:09 PM (GMT-07:00)
To: pamnoonan@comcast.net
Cc: pao.18.02@hotmail.com
Subject: Fwd: Miss Johana Paola Beltran's wages

Mrs. Noonan,

It has been already 7 calendar days since I wrote to you in reference to Miss Johana Paola Beltran's wages, and I have not heard from you or Mr. Noonan. Miss Beltran was hoping to resolve this issue on an amicable manner. Apparently the Noonans have chosen to face the labor department and any other legal means allowed by the law to Miss Beltran to recover wages owed her for the time spent working for the Noonan family;

BELTRAN000549

a housekeeper/cook camouflaged as an Au Pair, as stated in my previous correspondence.

If I have not heard from you by Tuesday September, 9th, 2014, our next step will be to start legal proceedings.

Thank you,

Orlando Salazar

——Original Message——
From: ORLSALA <ORLSALA@aol.com>
To: pamnoonan <pamnoonan@comcast.net>
Cc: pao.18.02 <pao.18.02@hotmail.com>
Sent: Tue, Aug 26, 2014 2:53 pm
Subject: Fwd: Miss Johana Paola Beltran's wages

Mrs. Noonan,

Pasted below and attached please find letter in reference to Paola Beltran. It was also airmailed.

August 26, 2014

Mrs. Pam Noonan
101 Falcon Hills Drive
Highlands Ranch, Co 80126

Re: Miss Johana Paola Beltran's wages
    Via email and airmail

Mrs. Noonan,

My name is Orlando Salazar, and I represent Miss Johana Paola Beltran.
This email is to collect $12,564.50 owed to Miss Beltran for live-in housekeeping/cooking services rendered from August 17, 2012 to November 17, 2012.

Miss Beltran came to the USA as an Au Pair (an intercultural live-in child care program) to your house. During the time that she was in your house, instead of being an Au Pair, she was used as a live-in housekeeper/cook. It seems like the federal and Colorado state labor laws were broken with such an act. That was the reason why Miss Beltran left you; she did not come to the USA to be a housekeeper/cook. A detail explanation as to how we arrived at the amount of $12,264.50 follows:

1) Au Pair duties included in the program: a) Waking the children, b) taking/collecting children from and to school, c) helping with school homework, d) playing with children, e) taking children to parks, playgroups, and other activities, f) preparing light meals for children and clean up after the meals, g) doing the children's laundry and ironing their clothes, h) making the children beds, i) tidying up the

BELTRAN000550

children's toys, j) cleaning the children's bathroom.  Miss Beltran did only some of these chores, since your children were already self sufficient (ages of about 10 and 12 at the time).

2) Instead, Miss Beltran: a) prepared meals for the whole family, b) made everyone's beds, c) tidied up and minor cleaning of all the bathrooms, d) cleaned the floors, e) cleaned the windows, f) took care of the chickens in the back yard, g) collected the eggs from the chicken coop, h) cleaned thoroughly the coop two times per week, i) did minor gardening, j) did all the laundry, folded it and put it away (except Mr. Noonan's), k) Dusted the house, l) cleaned HVAC filters, m) picked up and cleaned inside of your car on a daily basis, n) Whenever you returned from a trip, unpacked your suitcases and put things away, o) arranged yard/house for social gatherings/parties held at your house, and p)  before she quit the job, the house was being renovated, so she had to pack in boxes most of the house's contents as if you were moving.

3) Miss Beltran came to the USA on the assumption that she was on duty 45 hours per week, where she was to have 1/2 day Saturday and a full day Sunday off.  Instead, you gave her a day off during the week and 1/2 day Saturday. Her daily work day would start at 7:30 AM and would end around 8:30 PM, making it a 12 hour work-day (we will assume that one hour was for lunch).

4) You tried to fit the 8 hour work day by breaking the 7:30 AM to 8:30 PM shift into sections throughout the day that would add up to 8 hours, which is an illegal employment practice.  Meaning that legally she was on duty from 7:30 AM to 8:30 PM.

5) The average salary of a living housekeeper/cook in the state of Colorado is $600/week based on a 40 hour week, or $15/hour.  Miss Beltran worked 12 hours per day 5 days per week plus 5 hours on Saturday.   Total amount of hours worked were 65 per week during 13 weeks (3 months). Colorado's labor law states that after 40 hours per week, the employee must be paid at 1 1/2 times the hourly salary. Miss Beltran received a compensation of $196/week during the 13 weeks. Therefore:

$600/week x 13 weeks =                       $ 7,800
25 hours OT/ week x $22.50/hour x 13 weeks = $ 7,312.50

Total wages earned during the 13 weeks =    $15,112.50
$196/week x 13 weeks received        =          2,548.00

Total owed Miss Beltran                     $12,564.5

6) This amount does not include any interest that Miss Beltran should be entitled to receive.

Mrs. Noonan, you took advantage of Miss Beltran's lack of knowledge of the USA labor laws, and she feels she was a victim of modern slavery. Therefore, I am allowing you 7 calendar days to respond with payment for these wages owed Miss Beltran.  Otherwise we will file a claim with the federal government and Colorado's labor departments to recover back wages owed.  Should we file a claim with the labor departments, not only you will be liable for payment of wages owed, but also all federal and state income taxes owed (Miss Beltran's part and the employer part, in this case you are the employer), fines,  penalties, plus interest. That is  besides being audited for any other "Au Pairs" that you have hired in the past and present.

You may mail the check to my office in Miss Beltran's name: Paola Beltran, Salazar & Associates, 625 Rahway Avenue 1A, Union, NJ 07083.

Should you have any questions, please contact me via email at orlsala@aol.com

Thank you,

Orlando Salazar

BELTRAN000551

# Re: Noonan family

ORLSALA@aol.com

mié 24/09/2014 03:15 p.m.

Para:sklopman@hklawllc.com <sklopman@hklawllc.com>;

Cc:pao.18.02@hotmail.com <pao.18.02@hotmail.com>;

Ms. Klopman,

Thank you for your response.

Miss Betran stands by her statements in our letter to Mrs. Noonan on August 26, 2014, and states that your letter is the one rife with factual inaccuracies. She also has witnesses that have knowledge as to her obligations during her time with the Noonan family. There are also a series of e-mails that Miss Beltran has dating back to when Mrs. Noonan was trying to bring her to the USA as an Au Pair, where Mrs. Noonan describes her duties that she was to perform as an Au Pair, and those duties differ completely to what she actually did.

Please be informed that by writing to Mrs. Noonan on August 26, 2014, that was just a courtesy to Dr. Noonan, who Miss Beltran found to be a fair person. Just a rumor of being involved in a case like this could be very harmful professionally, and she wishes to cause no harm to his reputation as a sports medicine Doctor, Colorado Rockies team Physician, and the Denver Broncos Associate team Physician. At the time that I wrote the letter Miss Beltran thought that they could resolve this matter on a friendly basis.

However, if this is how Dr. Noonan and Mrs. Noonan would like to proceed and not pay what they owe, then Miss Beltran will have no other alternative than go after everything that is lawfully hers.

Thank you,

Orlando Salazar

In a message dated 9/23/2014 8:01:44 P.M. Eastern Daylight Time, sklopman@hklawllc.com writes:

> Attached please find a letter to your attention of even date.
>
> Thank you
>
> Susan P. Klopman
>
> Attorney at Law
>
> H&K Law, LLC
>
> 3900 E. Mexico Avenue, Suite 330 | Denver, CO 80210
>
> sklopman@hklawllc.com | O: (303) 749-0659 | F: (303) 927-0809

BELTRAN000561



Unless specifically indicated otherwise, any tax advice contained in this communication (including attachments) (the "Email") is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax-related penalties under any federal tax law, or (ii) promoting, marketing or recommending to another party any transaction or tax-related matter addressed in this Email.

This Email is intended solely for the person or persons to whom it is addressed and may contain confidential and attorney/client privileged information. If you receive this Email in error, (i) do not disseminate or copy this Email, (ii) notify the sender that you received this Email in error and (iii) delete this Email from your system. Thank you.

BELTRAN000562

# (no subject)

ORLSALA@aol.com

lun 29/09/2014 03:40 p.m.

Para:sklopman@hklawllc.com <sklopman@hklawllc.com>;

Cc:pamnoonan@comcast.net <pamnoonan@comcast.net>; pao.18.02@hotmail.com <pao.18.02@hotmail.com>;

Ms. Klopman,

We are in the process of hiring a Colorado law firm to handle Miss Beltran's case. However, before we give them the green light to start the process, Miss Beltran wanted to give the Noonan's one last chance to make good on what she earned and is owed her while at the Noonan's, as described in the letter of August 26th, 2014. She is doing this out of respect for Dr. Noonan. Once the Colorado law firm is hired to represent her rights in the State of Colorado, she has no control as to any harm that the case will cause Dr. Noonan's reputation.

Hence, you have until tomorrow, September 30, 2014, at 12 PM Colorado time or 2 PM New Jersey time, to decide. If we have not heard from you by then, we will contact the Colorado law firm to give them the green light.


Thank you,


Orlando Salazar

BELTRAN000517

# DECLARATION OF BROOKE A. COLAIZZI

# EXHIBIT 2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-03074-CMA-KMT

JOHANA PAOLA BELTRAN, et al.,

        Plaintiff,

v.

INTEREXCHANGE, INC., et al.,

        Defendants.

_____/

## PLAINTIFF'S, JOHANA PAOLA BELTRAN, ANSWERS TO DEFENDANT'S FIRST SET OF INTERROGATORIES

Plaintiff, Johana Paola Beltran, by and through her undersigned counsel, files Plaintiff's Answers to Interrogatories propounded by Defendant, Interexchange, Inc.

### PRELIMINARY STATEMENT

The answers below reflect the current state of Beltran's knowledge, understanding and belief based upon the investigation and discovery to date. Beltran reserves the right to make subsequent revisions and to supplement her responses as additional information is discovered, if any.

Beltran further reserves the right to object on any ground and at any time to a demand for further answers to these Interrogatories. In responding to the Interrogatories, Beltran does not waive, or intend to waive, any privilege or objection, including but not limited to, any objection to the competency, relevance, materiality, or admissibility of any of the Interrogatories.

<div style="border:1px solid black; width:150px; text-align:center;">

**EXHIBIT**

**2**

</div>

RESPONSE: Beltran states that, around November 2012, she informed an InterExchange employee or representative by telephone that she was being abused by the Noonans and that she was being forced to provide housekeeping services outside the scope of her duties as an au pair. She does not recall the exact date of the call. The complaint was never addressed by InterExchange.

INTERROGATORY 7:     Identify any communication you have had with any person, other than counsel, regarding this lawsuit and/or the allegations in the Complaint.

RESPONSE:  Beltran objects to this interrogatory on the grounds that it is overbroad, unduly burdensome, and vague with respect to the phrase "any communication you have had with any person...regarding this lawsuit and/or the allegations in the Complaint." As phrased, this interrogatory requires Beltran to recall each and every communication with every individual during an undefined period of time. In addition, Beltran objects to this interrogatory on the grounds that it calls for information pertaining to individuals not a party to this action, and potentially encompasses communications not relevant to the facts at issue in this action. Beltran states that she has communicated with her partner regarding this lawsuit. She does not recall communicating with anyone other than counsel regarding this lawsuit and/or the allegations in the Complaint since the Complaint was filed.

INTERROGATORY 8:     Have you, your attorneys, their investigators, or anyone acting on your behalf interviewed or taken any statement from any Sponsor or its past or present agents, employees, or representatives? If so, state: (a) the name, address, and telephone number of the person interviewed; (b) the name, address, and the telephone number of the person conducting the interview; (c) the person or person present when the interview was taken; (d) the persons having knowledge of the substance of the interview; (e) whether the interview was recorded or otherwise how obtained; (f) the substance of the statement made; (g) if notes exist purporting to be a

<div align="center">

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

</div>

Civil Action No. 14-cv-03074-CMA-KMT

JOHANA PAOLA BELTRAN, et al.,

       Plaintiff,

v.

INTEREXCHANGE, INC., et al.,

       Defendants.

_____/

<div align="center">

**DECLARATION OF JOHANA PAOLA BELTRAN**

</div>

    I, JOHANA PAOLA BELTRAN, respectfully submit this Declaration in support of Plaintiff's, Johana Paola Beltran, Answers to Defendant's First Set of Interrogatories. I affirm and attest that the foregoing Answers to the Interrogatories are true and correct to the best of my knowledge, information and belief.

    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on this _11_ day of August, 2016.

<div align="right">

*Johana Paola Beltran*
Johana Paola Beltran

</div>

<div align="center">8</div>

# DECLARATION OF BROOKE A. COLAIZZI

# EXHIBIT 3

JOHANA PAOLA BELTRAN - 8/30/2016
Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-03074-CMA-KMT

---

VIDEOTAPE DEPOSITION OF:  JOHANA PAOLA BELTRAN
                          August 30, 2016

---

JOHANA PAOLA BELTRAN; LUSAPHO HLATSHANENI; BEAUDETTE
DEEELEFS; DAYANNA PAOLA CARDENA CAICEDO; ALEXANDRA
IVETTE GONZALEZ; on behalf of themselves and others
similarly situated,

Plaintiffs,

v.

INTEREXCHANGE, INC.; USAUPAIR, INC.; GREATAUPAIR, LLC;
EXPERT GROUP INTERNATIONAL INC., d/b/a EXPERT AUPAIR;
EURAUPAIR INTERCULTURAL CHILD CARE PROGRAMS; CULTURAL
HOMESTAY INTERNATIONAL; CULTURAL CARE, INC. d/b/a
CULTURAL CARE AU PAIR; AUPAIRCARE INC.; AU PAIR
INTERNATIONAL, INC.; APF GLOBAL EXCHANGE, NFP d/b/a
AUPAIR FOUNDATION; AMERICAN INSTITUTE FOR FOREIGN STUDY
d/b/a AU PAIR IN AMERICA; AMERICAN CULTURAL EXCHANGE,
LLC, d/b/a GOAUPAIR; AGENT AU PAIR, INC.; A.P.EX.
AMERICAN PROFESSIONAL EXCHANGE, LLC d/b/a PROAUPAIR;
and 20/20 CARE EXCHANGE, INC. d/b/a THE INTERNATIONAL
AU PAIR EXCHANGE, and ASSOCIATES IN CULTURAL EXCHANGE,
d/b/a GOAUPAIR,

Defendants.

---

EXHIBIT
3

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490
72a36b2c-f212-4c28-bc87-91475225150f

JOHANA PAOLA BELTRAN - 8/30/2016
Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.

**Page 2**

1    PURSUANT TO NOTICE, the videotape
deposition of JOHANA PAOLA BELTRAN was taken on behalf
2  of the Defendant InterExchange, Inc., at 633 17th
Street, Suite 3000, Denver, Colorado 80202, on
3  August 30, 2016, at 9:13 a.m., before Carol M.
Bazzanella, Registered Professional Reporter, Certified
4  Realtime Reporter, and Notary Public within Colorado.
5    A P P E A R A N C E S
6
  For the Plaintiffs:
7
    ALEXANDER HOOD, ESQ.
8    DAVID SELIGMAN, ESQ.
    Towards Justice
9    1535 High Street, Suite 300
    Denver, Colorado 80218
10
11  For the Defendant InterExchange, Inc.:
12    BROOKE A. COLAIZZI, ESQ.
    ERICA L. HERRERA, ESQ.
13    Sherman & Howard L.L.C.
    633 17th Street, Suite 3000
14    Denver, Colorado 80202
15
  For the Defendant Expert Group International Inc. d/b/a
16  Expert AuPair:
17    BOGDAN ENICA, ESQ.
    Law Office of Bogdan Enica
18    111 2nd Avenue NE, Suite 213
    St. Petersburg, Florida 33701
19    (Appearing Telephonically)
20
  For the Defendant EurAuPair Intercultural Child Care
21  Programs:
22    MARTHA L. FITZGERALD, ESQ.
    Brownstein Hyatt Farber Schreck, LLC
23    410 17th Street, Suite 2200
    Denver, Colorado 80202
24
25

**Page 3**

1  For the Defendant Cultural Homestay International:
2    ADAM A. HUBBARD, ESQ.
    Holland & Hart LLP
3    555 17th Street, Suite 3200
    Denver, Colorado 80202
4
5  For the Defendant Cultural Care, Inc. d/b/a Cultural
  Care Au Pair:
6
7    JUSTIN WOLOSZ, ESQ.
    Choate Hall & Stewart LLP
8    Two International Place
    Boston, Massachusetts 02110
9    (Appearing Telephonically)
    DIANE HAZEL, ESQ.
10    Lewis Roca Rothgerber Christie LLP
    1200 17th Street, Suite 3000
11    Denver, Colorado 80202
12
  For the Defendant AuPairCare, Inc.:
13
    BRIAN P. MASCHLER, ESQ.
14    Gordon Rees Scully Mansukhani LLP
    555 17th Street, Suite 3400
15    Denver, Colorado 80202
    (Appearing Telephonically)
16
17  For the Defendant APF Global Exchange, NFP:
18    LAWRENCE LEE, ESQ.
    Fisher & Phillips LLP
19    1801 California Street, Suite 2700
    Denver, Colorado 80202
20
21  For the Defendants Agent Au Pair, American Cultural
  Exchange, LLC d/b/a GoAupair and Associates in Cultural
22  Exchange, d/b/a GoAupair:
23    KATHRYN A. REILLY, ESQ.
    Wheeler Trigg O'Donnell LLP
24    370 17th Street, Suite 4500
    Denver, Colorado 80202
25

**Page 4**

1  For the Defendant A.P.EX. American Professional
  Exchange, LLC d/b/a ProAuPair and 20/20 Care Exchange,
2  Inc., d/b/a The International Au Pair Exchange:
3    KATHLEEN CRAIGMILE, ESQ.
    Nixon Shefrin Hensen Ogburn, P.C.
4    5619 DTC Parkway, Suite 1200
    Greenwood Village, Colorado 80111
5    (Appearing Telephonically)
6
  Also Present:
7
    Justin Grant
8    John Jensen, Videographer
    Christine LaMonica-Lunn
9    Michael McHugh
    Jack Mudry, Interpreter
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 5**

1        I N D E X
2  EXAMINATION OF JOHANA PAOLA BELTRAN:    PAGE
  August 30, 2016
3
  By Ms. Colaizzi        9, 209
4
  By Ms. Reilly        200
5
  By Mr. Hood        201
6
               INITIAL
7  DEPOSITION EXHIBITS:      REFERENCE
8  Exhibit 15  Plaintiff's, Johana Paola Beltran,  17
        Answers to Defendant's First Set
9        of Interrogatories
10  Exhibit 16  First Amended Complaint    75
11  Exhibit 17  The Au Pair Exchange Program Brochure  109
12  Exhibit 18  InterExchange Au Pair USA Au Pair  109
        Agreement
13
  Exhibit 19  Blank InterExchange Au Pair USA  129
14        Record of Hours Worked and Payment
        Received
15
  Exhibit 20  22 C.F.R. 62.31 Au pairs  143
16        Effective: July 21, 2008
17  Exhibit 21  Brochure, Know Your Rights  146
18  Exhibit 22  Email to Hughes from Ung,  162
        11/21/12, Subject: FW: Re-matching,
19        with email attached
20  Exhibit 23  Email to Ung from Beltran,  169
        12/5/12, no subject, with two
21        emails attached
22  Exhibit 24  Email to Beltran from Ung, 1/2/13,  171
        Subject: Re: Important: Immediate
23        Response Needed, with two emails
        attached
24
25

2   (Pages 2 to 5)

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490
72a36b2c-f212-4c28-bc87-91475225150f

JOHANA PAOLA BELTRAN - 8/30/2016
Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.

---

**Page 6**

| | |
|---|---|
| 1 | Exhibit 25  United States General Accounting   191 |
| | Office Report to Congressional |
| 2 | Committees, U.S. Information Agency |
| | Inappropriate Uses of Educational |
| 3 | and Cultural Exchange Visas, |
| | February 1990 |
| 4 | |
| | Invoking of Protective Order: |
| 5 | |
| | Page, Line |
| 6 | |
| | 33    16 |
| 7 | 34    5 |
| | 35    22 |
| 8 | 45    10 |
| | 47    4 |
| 9 | 47    16 |
| | 105   17 |
| 10 | 119   15 |
| | 127   13 |
| 11 | 172   16 |
| | 181   19 |

---

**Page 7**

08:15:26 1    WHEREUPON, the following proceedings were
08:15:26 2  taken pursuant to the Federal Rules of Civil Procedure.
08:15:26 3       *    *    *    *    *
08:15:26 4    (At this time Mr. Maschler was not
08:15:26 5  present.)
09:13:47 6    THE VIDEOGRAPHER:  Good morning.  We are
09:13:48 7  on the record.  The time is 9:13 a.m. on August 30,
09:13:53 8  2016.  This is the beginning of Media Unit No. 1.  We
09:13:57 9  are here for the videotaped deposition of Johana Paola
09:14:01 10 Beltran in the matter of Johana Paola Beltran, et al.,
09:14:07 11 versus InterExchange, Inc., et al., in the United
09:14:11 12 States District Court for the District of Colorado,
09:14:13 13 Civil Action No. 14-cv-30 -- excuse me --
09:14:19 14 03074-CMA-KMT.
09:14:23 15    The deposition is being held at 633 17th
09:14:26 16 Street, Suite 3000, Denver, Colorado.  The videographer
09:14:31 17 is John Jensen and the court reporter is Carol
09:14:34 18 Bazzanella with Hunter + Geist, Inc., of Denver,
09:14:37 19 Colorado.
09:14:38 20    Please note that audio and video recording
09:14:40 21 will take place until all parties have agreed to go off
09:14:42 22 the record.  Microphones are sensitive and may pick up
09:14:46 23 whispers, private conversations, and cellular
09:14:48 24 interference.
09:14:49 25    Will counsel please state their

---

**Page 8**

09:14:51 1  appearances, beginning with the plaintiffs' counsel.
09:14:53 2    MR. HOOD:  Alexander Hood and David
09:14:55 3  Seligman for the plaintiffs.
09:14:58 4    MS. COLAIZZI:  Brooke Colaizzi and Erica
09:14:59 5  Herrera of Sherman & Howard on behalf of Defendant
09:14:59 6  InterExchange.  Also present are Michael McHugh and
09:15:05 7  Christine LaMonica-Lunn, representatives of
09:15:08 8  InterExchange.
09:15:08 9    MR. HUBBARD:  Adam Hubbard on behalf of
09:15:12 10 Cultural Homestay International.
09:15:14 11    MR. LEE:  Lawrence Lee on behalf of AIFS
09:15:17 12 and APF.
09:15:19 13    MS. HAZEL:  Diane Hazel on behalf of
09:15:20 14 Cultural Care.
09:15:21 15    MS. REILLY:  Katie Reilly on behalf of
09:15:21 16 GoAupair, Agent Aupair, and Au Pair International.
09:15:26 17    MS. FITZGERALD:  Martha Fitzgerald on
09:15:28 18 behalf of EurAuPair.
09:15:30 19    MS. COLAIZZI:  If we could have
09:15:32 20 appearances on the phone, please.
09:15:35 21    MS. CRAIGMILE:  Kathleen Craigmile on
09:15:37 22 behalf of A.P.EX, American Professional Exchange, and
09:15:39 23 20/20 Care Exchange.
09:15:44 24    MR. ENICA:  And Bogden Enica on behalf of
09:15:47 25 Expert Au Pair.

---

**Page 9**

09:15:49 1    MR. WOLOSZ:  And also Justin Wolosz on
09:15:50 2  behalf of Cultural Care.
09:16:09 3    THE REPORTER:  I'm going to swear in
09:16:09 4  the depo -- or the interpreter first.
09:16:09 5    JACK MUDRY,
09:16:09 6  having been duly sworn to interpret verbatim Spanish
09:16:09 7  into English and English into Spanish.
09:16:10 8    THE INTERPRETER:  Jack Mudry, M-u-d-r-y.
09:16:10 9  I will state for the record I'm an interpreter for the
09:16:15 10 State of Colorado and a federally certified interpreter
09:16:17 11 since 2003.  I do not know the parties in this matter,
09:16:22 12 either organizations or individually, and I have no
09:16:26 13 interest in the outcome of the matter.
09:16:51 14    THE REPORTER:  I'm going to swear in the
09:16:51 15 deponent.
09:16:51 16    JOHANA PAOLA BELTRAN,
09:16:51 17 having been first duly sworn to state the whole truth,
09:16:51 18 testified as follows:
09:16:51 19    EXAMINATION
09:16:51 20 BY MS. COLAIZZI:
09:16:51 21    Q.  Good morning, Ms. Beltran.
09:16:55 22    A.  Good morning.
09:16:56 23    Q.  We have an interpreter here at the request
09:16:59 24 of your counsel.  My understanding is you wish to
09:17:09 25 proceed in Spanish; is that correct?

3 (Pages 6 to 9)

JOHANA PAOLA BELTRAN - 8/30/2016
Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.

Page 10

09:17:14 1    A.  Yes.
09:17:15 2    Q.  If that's the case, I'll ask that all
09:17:17 3  questions be translated into Spanish before you give an
09:17:21 4  answer.  Is that acceptable?
09:17:31 5    A.  That's fine.
09:17:33 6    Q.  Please state and spell your name for the
09:17:35 7  record.
09:17:41 8    A.  My name is Johana Paola Beltran.
09:17:47 9    Q.  Can you spell your name, please.
09:17:50 10   A.  J-o-h-a-n-a.  P-a-o-l-a.  My last name is
09:18:14 11  B-e-l-t-r-a-n.
09:18:17 12   Q.  Ms. Beltran, a moment ago you were placed
09:18:20 13  under oath.  Did you understand that oath?
09:18:33 14   A.  Yes.
09:18:33 15   Q.  And do you have a general understanding of
09:18:35 16  what will happen here today?
09:18:44 17   A.  Yes.
09:18:44 18   Q.  Have you ever given a deposition before?
09:18:53 19   A.  No.
09:18:59 20   Q.  I would like to go over a few rules just
09:19:02 21  to make today go as smoothly as possible for everyone.
09:19:14 22  As I said before, I'm going to ask that all questions
09:19:16 23  be translated before you respond so that we have a
09:19:19 24  clear record.  Is that acceptable?
09:19:30 25   A.  Yes.

Page 11

09:19:31 1    Q.  It's very important that only one person
09:19:33 2  talk at a time whenever possible, so please allow the
09:19:43 3  interpreter to finish the translation before you begin
09:19:45 4  your answer.
09:19:53 5    A.  That's fine.
09:19:53 6    Q.  Okay.  We also need audible answers from
09:19:56 7  you so that the court reporter can accurately record
09:19:59 8  your response.  So if I ask you to verbalize your
09:20:09 9  answer, that's why I'm asking.  I'm not trying to be
09:20:12 10  rude, I just want to make sure we have a clear record.
09:20:27 11    THE DEPONENT:  (In English) Uh-huh.
09:20:27 12   Q.  (BY MS. COLAIZZI)  Can you give me a
09:20:28 13  verbal answer?
09:20:30 14   A.  Yes.
09:20:31 15   Q.  Gracias.
09:20:33 16    THE DEPONENT:  Gracias.
09:20:33 17   Q.  (BY MS. COLAIZZI)  If you do not
09:20:35 18  understand a question, please tell me so that I can ask
09:20:39 19  it again or rephrase it.
09:20:45 20   A.  Thank you.
09:20:46 21   Q.  If you don't ask me to rephrase, I'm going
09:20:49 22  to assume that you understand.  Is that fair?
09:21:00 23   A.  Yes.
09:21:03 24   Q.  We have people listening in on the
09:21:06 25  telephone this morning.

Page 12

09:21:08 1    THE DEPONENT:  (In English)  Uh-huh.
09:21:12 2    Q.  (BY MS. COLAIZZI)  So although I know it
09:21:14 3  can be difficult, please try to keep your voice up
09:21:17 4  today so that everybody can hear.
09:21:24 5    A.  That's fine.
09:21:26 6    Q.  We'll take breaks periodically, but if you
09:21:29 7  need one before we take a formal break, please let me
09:21:33 8  know.
09:21:43 9    A.  Thank you.
09:21:45 10   Q.  My next question is designed only to make
09:21:49 11  sure that we can proceed today.  Are you under the
09:21:58 12  influence of drugs, alcohol, or any medication or other
09:22:04 13  substances that might affect your ability to understand
09:22:09 14  or answer my questions today?
09:22:11 15   A.  No.
09:22:22 16   Q.  Are there any other circumstances you're
09:22:24 17  aware of that might affect your ability to understand
09:22:29 18  or answer my questions today?
09:22:35 19   A.  No.
09:22:40 20   Q.  Did you review any documents in
09:22:42 21  preparation for your deposition?
09:22:50 22   A.  No.
09:22:53 23   Q.  Did you speak with anyone other than your
09:22:55 24  attorneys in preparation for your deposition?
09:23:03 25   A.  No.

Page 13

09:23:06 1    Q.  Did you watch any videos or listen to any
09:23:11 2  audio recordings of any kind in preparation for your
09:23:14 3  deposition?
09:23:20 4    A.  No.
09:23:24 5    Q.  At any other time have you reviewed
09:23:27 6  documents that have been exchanged back and forth
09:23:30 7  between the parties in this case?
09:23:40 8    A.  No.
09:23:44 9    Q.  To your knowledge, have any documents in
09:23:46 10  this case been translated into Spanish for your
09:23:50 11  benefit?
09:23:59 12   A.  No.
09:24:03 13   Q.  Ms. Beltran, what is your date of birth?
09:24:11 14   A.  February 18 of 1986.
09:24:15 15   Q.  And what is your current address?
09:24:23 16   A.  What does that mean?
09:24:25 17   Q.  Where do you live currently?
09:24:29 18   A.  New Jersey.
09:24:29 19   Q.  What is your address in New Jersey?
09:24:35 20   A.  1087 Azalea, with a Z, Road, Union.
09:24:54 21   Q.  Do you know the zip code?
09:25:02 22   A.  07083.
09:25:04 23   Q.  How long have you been at that address?
09:25:12 24   A.  Approximately four years.  I'm sorry, less
09:25:17 25  than that.  Approximately three years, I think.

4  (Pages 10 to 13)

## JOHANA PAOLA BELTRAN - 8/30/2016
Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.

### Page 14

09:25:24 1    Q. So you moved there, to that address,
09:25:27 2  sometime in 2013?
09:25:36 3    A. I think so.
09:25:37 4    Q. Do you remember what month in 2013?
09:25:43 5    A. Not really.
09:25:44 6    Q. Do you remember if it was at the beginning
09:25:45 7  of the year, middle of the year, end of the year?
09:25:56 8    A. I think it was at the beginning of the
09:25:57 9  year.
09:25:58 10    Q. Does anyone live at that address with you?
09:26:03 11    A. Yes.
09:26:03 12    Q. Who lives there with you?
09:26:10 13    A. The people that support me.
09:26:12 14    Q. And who are those people?  What are their
09:26:16 15  names?
09:26:21 16    A. Orlando Salazar.  And his son.
09:26:28 17    Q. What is the son's name?
09:26:33 18    A. Andres Salazar.
09:26:35 19    Q. Do you know how old Andres is?
09:26:41 20    A. No.
09:26:42 21    Q. And is Orlando Salazar your former
09:26:44 22  attorney?
09:26:49 23    A. No.
09:26:51 24    Q. Did you have a previous attorney named
09:26:53 25  Orlando Salazar?

### Page 15

09:26:58 1    A. No.
09:27:01 2    Q. Did anyone named Orlando Salazar ever send
09:27:05 3  a demand letter to the Noonan family on your behalf?
09:27:16 4    A. Yes.
09:27:17 5    Q. Is that the same Orlando Salazar?
09:27:21 6    A. It is.
09:27:24 7    Q. To your knowledge, is Orlando Salazar an
09:27:26 8  attorney?
09:27:31 9    A. He's not.
09:27:45 10    Q. Does anyone live with you other than
09:27:47 11  Orlando and Andres Salazar?
09:27:53 12    A. No.
09:27:56 13    Q. You said a moment ago that they support
09:27:57 14  you.  What did you mean by that?
09:28:09 15    A. He's my sponsor.
09:28:13 16    Q. Sponsor of what?
09:28:19 17    A. Of my student visa.
09:28:24 18    Q. When did you first obtain that visa?
09:28:33 19    A. After I finished the au pair program.
09:28:38 20    Q. How long after?
09:28:42 21    A. After what?
09:28:44 22    Q. How long after you finished the au pair
09:28:46 23  program or ended the au pair program did you obtain
09:28:50 24  your student visa?
09:29:04 25    A. You could say approximately seven to eight

### Page 16

09:29:07 1  months.
09:29:07 2    Q. How did you meet Mr. Orlando Salazar?
09:29:17 3    A. We met in Los Angeles.
09:29:24 5  in Los Angeles?
09:29:18 4    Q. Under what circumstances did you meet him
09:29:26 6    A. What does that mean?
09:29:29 7    Q. Did someone introduce you to him, did you
09:29:32 8  just meet him randomly, or by accident?
09:29:41 9    A. Somebody introduced us.
09:29:42 10    Q. Who introduced you to Mr. Salazar?
09:29:50 11    A. A friend.
09:29:50 12    Q. What's the friend's name?
09:29:55 13    A. Loraina.
09:29:56 14    Q. Is that her first name?
09:29:59 15    A. Yes.
09:30:00 16    Q. What's Loraina's last name?
09:30:05 17    A. I don't know it.
09:30:09 18    Q. Are you still friends with Loraina today?
09:30:17 19    A. Yes, but we don't speak very frequently.
09:30:23 20    Q. Is there any particular reason why you
09:30:26 21  don't speak with her frequently?
09:30:32 22    A. Yes.
09:30:32 23    Q. And what's that reason?
09:30:38 24    A. Well, she's busy with school and with her
09:30:41 25  home, too, and she has work to contend with.

### Page 17

09:30:45 1    Q. Do you know where Loraina lives currently?
09:30:53 2    A. No.
09:30:55 3    Q. Do you even know what state?
09:31:00 4    A. Not really.
09:31:02 5    Q. Is she in the United States, as far as you
09:31:08 6  know?
09:31:09 7    A. Yes.
09:31:09 8    Q. When's the last time you spoke with her?
09:31:21 9    A. I don't remember, but we always would
09:31:23 10  speak when we would have birthdays.
09:31:29 11    Q. At any time have you spoken with Loraina
09:31:32 12  about any aspect of this lawsuit?
09:31:42 13    A. No.
09:32:13 14     (Deposition Exhibit 15 was marked.)
09:32:15 15     MS. COLAIZZI:  We have one copy for your
09:32:15 16  side.  If you need more, let me know, we'll see what we
09:32:18 17  can do.
09:32:18 18     THE DEPONENT:  Thank you.
09:32:18 19     Q. (BY MS. COLAIZZI) Ms. Beltran, you've
09:32:19 20  been handed what's been marked as Exhibit 1 -- oh, I'm
09:32:24 21  sorry.  15.  My apologies.
09:32:36 22     THE DEPONENT:  (In English) Uh-huh.
09:32:36 23     Q. (BY MS. COLAIZZI) The title of the
09:32:37 24  document is Plaintiff's, Johana Paola Beltran, Answers
09:32:45 25  to Defendant's (sic) First Set of Interrogatories.  Do

5 (Pages 14 to 17)

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490
72a36b2c-f212-4c28-bc87-91475225150f

JOHANA PAOLA BELTRAN - 8/30/2016
Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.

| Page 18 |
| --- |

```
09:32:56  1  you recognize this document?
09:33:02  2        A.  One moment for me to look at it, please.
09:33:04  3        Q.  Of course.
09:33:06  4        (The deponent perused the exhibit.)
09:33:30  5        A.  Yes.
09:33:30  6        Q.  You have seen this document before.  Have
09:33:32  7  you read this document before today?
09:33:42  8        A.  Can you repeat the question?
09:33:45  9        Q.  I believe you said a moment ago you've
09:33:47 10  seen this document before.  Have you read this document
09:33:48 11  before today?
09:34:01 12        A.  Not very long ago.
09:34:02 13        Q.  Okay.  Do you remember how long ago?
09:34:06 14        A.  No.
09:34:08 15        Q.  Can you please turn to page 8 of
09:34:09 16  Exhibit 15.
09:34:37 17        A.  Yeah.
09:34:38 18        Q.  Is that your signature at the bottom of
09:34:39 19  page 8?
09:34:45 20        A.  It is.
09:34:47 21        Q.  And would you agree with me that the date
09:34:49 22  on page 8 is August 11, 2016?
09:35:05 23        A.  I'm reading it.  Yes.
09:35:19 24        THE INTERPRETER:  The interpreter
09:35:20 25  corrects.  The interpreter said page 15.  It should be
```

| Page 19 |
| --- |

```
09:35:24  1  page 8.
09:35:25  2        Q.  (BY MS. COLAIZZI)  Did you read Exhibit 15
09:35:27  3  prior to signing Exhibit 15?
09:35:39  4        A.  Yes.
09:35:40  5        Q.  Could you please turn to page 5 of
09:35:41  6  Exhibit 15.  Do you see Interrogatory 7 in the middle
09:35:59  7  of the page on page 5 of Exhibit 15?
09:36:16  8        A.  You mean to say this part here or the one
09:36:19  9  below?
09:36:20 10        Q.  The part that's labeled Interrogatory 7.
09:36:27 11        A.  I'm looking at it.
09:36:30 12        Q.  Okay.  The third line from the bottom of
09:36:35 13  your response refers to a partner.  The sentence
09:36:49 14  states, "Beltran states that she has communicated with
09:36:51 15  her partner regarding this lawsuit."  Do you see that?
09:37:14 16        A.  The third line?
09:37:17 17        Q.  From the bottom of your answer, yes.
09:37:23 18        A.  Right here?
09:37:25 19        Q.  Where it references partner.
09:37:29 20        THE INTERPRETER:  The interpreter would
09:37:29 21  like to clarify.  The interpreter is using one word for
09:37:33 22  the word "partner," but partner in Spanish can also be
09:37:36 23  a business partner, which would be a different word.
09:37:43 24        MS. COLAIZZI:  The only word we have is
09:37:44 25  partner.
```

| Page 20 |
| --- |

```
09:37:47  1        MR. HOOD:  Perhaps we could use both
09:37:48  2  words, since there are two words that could mean the
09:37:50  3  same thing.
09:38:01  4        THE DEPONENT:  (In English)  Okay.
09:38:02  5        A.  Okay.  Well, so what -- what those mean,
09:38:13  6  partner, socio, or a companion, which is the other one
09:38:18  7  for partner in English.
09:38:20  8        Q.  (BY MS. COLAIZZI)  You state here that you
09:38:21  9  have communicated with your partner regarding this
09:38:23 10  lawsuit.  Who is your partner?
09:38:39 11        A.  Orlando Salazar.
09:38:42 12        Q.  So when you refer to him as your partner,
09:38:44 13  is he your business partner or a social partner of some
09:38:48 14  sort?
09:39:02 15        A.  A sponsor.
09:39:04 16        Q.  Are you romantically involved with him in
09:39:09 17  any way?
09:39:12 18        A.  No.
09:39:18 19        Q.  What do -- what did you speak with
09:39:20 20  Mr. Salazar about regarding this lawsuit?
09:39:33 21        A.  I asked him for help to be able to
09:39:38 22  translate into English.
09:39:39 23        Q.  In what circumstances have you asked him
09:39:41 24  for help?
09:39:48 25        A.  What does that mean?
```

| Page 21 |
| --- |

```
09:39:49  1        Q.  Were you looking at documents?  Were you
09:39:51  2  communicating with someone else when he was helping
09:39:54  3  you?  Under what circumstances was he helping you
09:39:56  4  understand?
09:40:00  5        A.  He was helping me to communicate with the
09:40:14  6  attorneys.
09:40:21  7        Q.  Has Mr. Salazar been present for all of
09:40:24  8  your communications with your attorneys?
09:40:32  9        A.  No.
09:40:37 10        Q.  Are you able to communicate with your
09:40:39 11  attorneys without Mr. Salazar's presence?
09:40:48 12        A.  Yes.
09:40:48 13        Q.  Are you able to communicate with your
09:40:51 14  attorneys without an interpreter of some sort?
09:41:03 15        A.  No.
09:41:23 16        Q.  Have you discussed anything about the
09:41:24 17  lawsuit with Mr. Salazar outside the presence of your
09:41:28 18  attorneys?
09:41:29 19        MR. HOOD:  I'm going to object.  To the
09:41:31 20  extent any communication with Mr. Salazar was merely
09:41:35 21  for him to translate for the purposes of communicating
09:41:38 22  with your attorney, I instruct the witness not to
09:41:40 23  answer.  To the extent any communications with
09:41:43 24  Mr. Salazar were for anything else, the witness may
09:41:46 25  answer.
```

6 (Pages 18 to 21)

JOHANA PAOLA BELTRAN - 8/30/2016
Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.

| Page 22 | Page 24 |
|---|---|

**Page 22**

09:42:11 1 A. It was for the translation to English.

09:42:15 2 Q. (BY MS. COLAIZZI) What? Translation of

09:42:15 3 what to English?

09:42:17 4 MR. HOOD: I'm going to object again and

09:42:19 5 instruct the witness that to the extent any

09:42:22 6 communication with Mr. Salazar was for the purposes of

09:42:25 7 translation to communicate with her attorney, that she

09:42:27 8 should not answer the question on attorney-client

09:42:30 9 privilege grounds. To the extent -- I'm sorry. Why

09:42:33 10 don't we do it in pieces.

09:42:53 11 To the extent any communications with

09:42:55 12 Mr. Salazar were for the purposes of doing anything

09:42:59 13 other than communicating with her attorney, I instruct

09:43:05 14 the witness that she may answer.

09:43:17 15 Q. (BY MS. COLAIZZI) Let me ask it this way.

09:43:18 16 I understand you to say that Mr. Salazar has served as

09:43:21 17 an interpreter for you when you are communicating with

09:43:24 18 your attorneys; is that correct?

09:43:42 19 A. Can you repeat that question, please.

09:43:45 20 Q. I understand that Mr. Salazar has served

09:43:48 21 as an interpreter for you when you are communicating

09:43:51 22 with your attorneys. Is that correct?

09:44:05 23 A. I don't understand the question.

09:44:06 24 MR. HOOD: I'm going to ask for a break so

09:44:08 25 that I may instruct my witness as to how she may invoke

**Page 23**

09:44:12 1 privilege and to which questions she should answer.

09:44:15 2 MS. COLAIZZI: I'm fine. That's fine.

09:44:16 3 MR. HOOD: All right. Five minutes.

09:44:30 4 THE DEPONENT: Thank you.

09:44:31 5 THE VIDEOGRAPHER: Going off the record.

09:44:33 6 The time is 9:44 a.m.

09:44:41 7 (Recess taken, 9:44 a.m. to 9:59 a.m.)

09:59:34 8 THE VIDEOGRAPHER: We are back on the

09:59:35 9 record. The time is 9:59 a.m.

09:59:40 10 Q. (BY MS. COLAIZZI) Ms. Beltran, has

09:59:42 11 Mr. Salazar served as an interpreter for you during

09:59:47 12 communications with your attorneys?

09:59:51 13 A. Can you repeat the question?

10:00:06 14 Q. Has Mr. Salazar served as an interpreter

10:00:10 15 for you while you've been communicating with your

10:00:12 16 attorneys?

10:00:17 17 A. No.

10:00:18 18 Q. Has Mr. Salazar ever translated any

10:00:25 19 documents related to this lawsuit for you from English

10:00:29 20 into Spanish?

10:00:40 21 A. No.

10:00:43 22 Q. Before you stated that you are not

10:00:46 23 currently romantically involved with Mr. Salazar. Have

10:00:50 24 you ever been romantically involved with Mr. Salazar?

10:01:04 25 A. No.

**Page 24**

10:01:08 1 Q. You indicated that Mr. Salazar was your

10:01:11 2 student visa sponsor.

10:01:22 3 A. Yes.

10:01:22 4 Q. Does he support you financially in any

10:01:24 5 way?

10:01:32 6 A. What does that mean?

10:01:34 7 Q. Does he give you money?

10:01:39 8 A. He's my form of support.

10:01:42 9 Q. Meaning your form of financial support?

10:01:50 10 A. Yes.

10:01:50 11 Q. Does he pay for your school?

10:01:55 12 A. Yes.

10:01:57 13 Q. Does he provide you with food and meals

10:02:00 14 financially?

10:02:08 15 A. Yes.

10:02:09 16 Q. Do you pay rent to live in his home?

10:02:15 17 A. No.

10:02:16 18 Q. Do you do any work for him of any kind in

10:02:19 19 exchange for his support? Of any kind.

10:02:29 20 A. How's that?

10:02:30 21 Q. Do you do any kind of work for

10:02:32 22 Mr. Salazar?

10:02:37 23 A. No.

10:02:41 24 Q. His son Andres. Is Andres a child?

10:02:51 25 A. He's not a child, but he's young.

**Page 25**

10:02:54 1 Q. Is he a teenager?

10:03:01 2 A. I believe he's probably more than 20 years

10:03:04 3 old, but I'm not sure.

10:03:13 4 Q. Do you have any romantic relationship with

10:03:16 5 Andres Salazar?

10:03:20 6 A. No.

10:03:27 7 Q. What does Mr. Orlando Salazar do for a

10:03:30 8 living? What's his job?

10:03:40 9 A. He has businesses.

10:03:41 10 Q. What kind of businesses?

10:03:45 11 A. Construction.

10:03:49 12 Q. Anything other than construction?

10:03:55 13 A. Not that I know of.

10:03:58 14 Q. In the time that you've known Mr. Orlando

10:04:01 15 Salazar, has he had any kind of business other than

10:04:04 16 construction?

10:04:14 17 A. I don't know. I don't think so.

10:04:23 18 Q. Do you have a phone number or email or

10:04:26 19 other form of contact for Loraina?

10:04:40 20 A. I have her Facebook.

10:04:51 21 Q. I want you to take another look, please,

10:04:53 22 at Exhibit 15.

10:05:02 23 A. This one?

10:05:05 24 Q. Sí. Page 5.

10:05:08 25 MR. HOOD: Brooke, do you have another

7 (Pages 22 to 25)

JOHANA PAOLA BELTRAN - 8/30/2016
Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.

## Page 26

```
10:05:11  1   copy of the exhibit?
10:05:17  2        MS. COLAIZZI:  We'll see.
10:05:18  3        MR. HOOD:  If we could just have two
10:05:20  4   copies of the exhibits just so that David could have a
10:05:23  5   copy too.
10:05:25  6        MR. SELIGMAN:  Thank you.
10:05:26  7        THE INTERPRETER:  And the interpreter
10:05:28  8   would request, if we're going to go over large segments
10:05:32  9   of that document, it would be helpful for the
10:05:35 10   interpreter to have a copy as well to be able to look
10:05:36 11   at it to make sure the rendition is correct of what's
10:05:37 12   being asked.
10:05:38 13        MS. COLAIZZI:  Erica, let's just do
10:05:40 14   document by document, please.
10:05:41 15        MS. HERRERA:  Okay.
10:05:41 16        MR. HOOD:  The priority can obviously be
10:05:44 17   the interpreter.
10:05:45 18        MS. COLAIZZI:  Sure.  Hang on.  We've just
10:05:47 19   got to figure it out.
10:05:53 20        MS. HERRERA:  It's the answers to the
10:05:54 21   first set of interrogatories?
10:05:58 22        MS. COLAIZZI:  Yes.
10:06:00 23        MS. HERRERA:  Here.
10:06:01 24        MS. COLAIZZI:  That's all right.  He can
10:06:01 25   give it to --
```

## Page 27

```
10:06:03  1        MR. LEE:  It's right here.
10:06:05  2        MS. COLAIZZI:  That's fine.  Good.
10:06:06  3        MR. HOOD:  You could give a copy to David.
10:06:08  4   Thank you.  Oh, I have one.  Thank you.
10:06:19  5        MS. COLAIZZI:  Okay.  Are we good?
10:06:20  6        MR. HOOD:  We're good.
10:06:21  7        MS. COLAIZZI:  Okay.
10:06:23  8        Q.  (BY MS. COLAIZZI)  Ms. Beltran, you state
10:06:24  9   in response to Interrogatory 7 that you communicated
10:06:27 10   with your partner, whom you've identified as
10:06:30 11   Mr. Orlando Salazar, regarding the lawsuit.  What have
10:06:50 12   you discussed with Mr. Salazar about the lawsuit?
10:06:54 13        MR. HOOD:  I'm going to instruct --
10:06:54 14   objection; attorney-client privilege.  I understand she
10:06:57 15   said previously that she had not -- that he had not
10:07:00 16   acted as a translator, but I know that he has.  And to
10:07:04 17   the extent that Mr. Salazar has acted as a translator
10:07:07 18   for Ms. Beltran to her attorneys, I instruct her not to
10:07:11 19   answer the question.  To the extent -- sorry.  We'll go
10:07:14 20   in two parts.
10:07:36 21        To the extent that the question calls for
10:07:39 22   conversations with Mr. Salazar where he was not acting
10:07:40 23   as an interpreter with -- for your attorneys, between
10:07:44 24   you and your attorneys, I instruct the witness to
10:07:46 25   answer the questions.
```

## Page 28

```
10:08:11  1        Q.  (BY MS. COLAIZZI)  Let's go back.  Has --
10:08:16  2   has Mr. Salazar interpreted for you during
10:08:19  3   communications with your attorneys?
10:08:33  4        A.  I don't want to talk about that because of
10:08:36  5   my privilege.
10:08:38  6        Q.  You have to answer that question.  There
10:08:39  7   was no communication involved in that question.
10:08:41  8        MR. HOOD:  I instruct the witness to
10:08:42  9   answer yes or no to that question.
10:08:49 10        A.  Can you repeat the question, please.
10:08:52 11        Q.  (BY MS. COLAIZZI)  Has Mr. Salazar
10:08:53 12   interpreted for you during communications with your
10:08:55 13   attorneys?
10:09:03 14        A.  Yes.
10:09:03 15        Q.  How many times?
10:09:06 16        A.  I don't remember.
10:09:07 17        Q.  Does he interpret for you every time you
10:09:11 18   communicate with your attorneys?
10:09:17 19        A.  No.
10:09:20 20        Q.  Does somebody else interpret -- interpret
10:09:22 21   for you when you communicate with your attorneys if
10:09:25 22   Mr. Salazar is not present?
10:09:33 23        MR. HOOD:  Objection.  I instruct the
10:09:34 24   witness that she may identify the names of people who
10:09:37 25   translated for her, but that she may not reveal the
```

## Page 29

```
10:09:42  1   contents of the communications.
10:10:00  2        THE DEPONENT:  That's fine.
10:10:03  3        Q.  (BY MS. COLAIZZI)  Who interprets for you
10:10:04  4   when you speak with your attorneys if Mr. Salazar is
10:10:06  5   not present?
10:10:17  6        A.  Justin.
10:10:20  7        Q.  Does Justin have a last name?
10:10:24  8        A.  Yes, but I don't remember it.  I don't
10:10:28  9   know how to pronounce it.
10:10:29 10        Q.  And who is Justin?
10:10:35 11        A.  He works with Alex.  The interpreter.
10:10:38 12        Q.  Okay.  Other than Mr. Orlando Salazar and
10:10:42 13   Justin, who works with Mr. Hood, has anyone served as
10:10:46 14   an interpreter for you during communications with your
10:10:49 15   attorneys?
10:11:00 16        A.  No.
10:11:02 17        Q.  Other than times when Mr. Salazar has been
10:11:05 18   interpreting for you during communications with your
10:11:07 19   attorneys, have you had communications with Mr. Orlando
10:11:21 20   Salazar about this lawsuit?
10:11:30 21        A.  Can you repeat the question, please.
10:11:33 22        Q.  Other than situations in which Mr. Salazar
10:11:35 23   is interpreting for you for purposes of communicating
10:11:48 24   with your attorneys, have you talked to Mr. Salazar
10:11:51 25   about this lawsuit in any way?
```

8 (Pages 26 to 29)

JOHANA PAOLA BELTRAN - 8/30/2016
Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.

| Page 30 | |
|---|---|
| 10:12:00 1 | A. No. |
| 10:12:00 2 | Q. So why did you identify him in response to |
| 10:12:04 3 | Interrogatory No. 7? |
| 10:12:15 4 | A. Because he helped me to translate into |
| 10:12:17 5 | English. |
| 10:12:18 6 | Q. Any other reason? |
| 10:12:21 7 | A. No. |
| 10:12:26 8 | Q. Are there any other individuals other than |
| 10:12:29 9 | your lawyers that you've talked to about this lawsuit |
| 10:12:32 10 | in any way? |
| 10:12:39 11 | A. No. |
| 10:12:41 12 | Q. Prior to signing Exhibit 15 you read it, |
| 10:12:44 13 | correct? |
| 10:12:52 14 | A. Yes. |
| 10:12:53 15 | Q. Did you read it in English? |
| 10:12:57 16 | A. Yes. |
| 10:12:57 17 | Q. Were you able to understand it? |
| 10:13:02 18 | A. Yes. |
| 10:13:02 19 | Q. Was there any part of Exhibit 15 you did |
| 10:13:05 20 | not understand when you read it? |
| 10:13:14 21 | A. No. I don't think so. |
| 10:13:20 22 | Q. Are you currently taking education classes |
| 10:13:23 23 | of some sort? |
| 10:13:33 24 | A. Yes. |
| 10:13:33 25 | Q. Through what school? |

| Page 31 | |
|---|---|
| 10:13:39 1 | A. Union County College. |
| 10:13:43 2 | Q. How many classes are you taking currently? |
| 10:13:56 3 | A. A full-time student. |
| 10:13:58 4 | Q. So how many classes? |
| 10:14:06 5 | A. Three. |
| 10:14:09 6 | Q. Are you pursuing a degree of some sort? |
| 10:14:17 7 | A. Yes. |
| 10:14:18 8 | Q. What is the degree that you're seeking? |
| 10:14:22 9 | A. Biology. |
| 10:14:27 10 | Q. And how long have you been attending Union |
| 10:14:32 11 | County College? |
| 10:14:38 12 | A. Around two-and-a-half years. |
| 10:14:42 13 | Q. And how much -- how many more classes do |
| 10:14:45 14 | you need to complete your degree in Biology? |
| 10:15:00 15 | A. I don't know how many classes, but it's |
| 10:15:02 16 | two-and-a-half years more. |
| 10:15:06 17 | Q. Since November of 2012, when you ended |
| 10:15:11 18 | your participation in the au pair program, have you |
| 10:15:24 19 | attended any schools other than Union County College? |
| 10:15:33 20 | A. Yes. |
| 10:15:34 21 | Q. What other schools have you attended? |
| 10:15:40 22 | A. UCA. |
| 10:15:42 23 | Q. What is UCA? Can you ... |
| 10:15:48 24 | A. English classes. |
| 10:15:49 25 | Q. And where were you taking the English |

| Page 32 | |
|---|---|
| 10:15:52 1 | classes? |
| 10:15:56 2 | A. In New Jersey. |
| 10:15:59 3 | Q. How many English classes did you take? |
| 10:16:04 4 | A. I don't remember. |
| 10:16:05 5 | Q. When did you take them? |
| 10:16:09 6 | A. I don't remember. |
| 10:16:11 7 | Q. Do you remember the year? |
| 10:16:14 8 | A. No. |
| 10:16:15 9 | Q. Was it 2012? |
| 10:16:21 10 | A. I don't know. |
| 10:16:22 11 | Q. Was it before or after you got your |
| 10:16:25 12 | student visa? |
| 10:16:33 13 | A. It was there that I got my student visa. |
| 10:16:36 14 | Q. What do you mean, it was there that you |
| 10:16:38 15 | got your student visa? |
| 10:16:43 16 | A. I presented my documents to be able to |
| 10:16:45 17 | study. |
| 10:16:46 18 | Q. Okay. So you took the English classes |
| 10:16:48 19 | after getting your student visa; is that correct? |
| 10:16:56 20 | A. Yes. |
| 10:16:56 21 | Q. Okay. Other than your biology degree at |
| 10:17:02 22 | Union County College and your English classes, have you |
| 10:17:05 23 | attended any other schools since November of 2012? |
| 10:17:22 24 | A. No. |
| 10:17:29 25 | Q. Have you been back to Colombia at all |

| Page 33 | |
|---|---|
| 10:17:32 1 | since November of 2012? |
| 10:17:38 2 | A. Yes. |
| 10:17:38 3 | Q. When? |
| 10:17:45 4 | A. I went a year and a half ago. |
| 10:17:49 5 | Q. So 2014? |
| 10:17:53 6 | A. Around there. |
| 10:17:53 7 | Q. Okay. Have you been back more than once? |
| 10:18:01 8 | A. Yes. |
| 10:18:02 9 | Q. So you went in 2014. When else have you |
| 10:18:05 10 | returned to Colombia? |
| 10:18:21 11 | A. I don't remember, but after I got my |
| 10:18:23 12 | student visa I went to Colombia. |
| 10:18:28 13 | Q. Were you in the United States continuously |
| 10:18:31 14 | between November 2012 and when you got your student |
| 10:18:34 15 | visa? |
| 10:18:43 16 | MR. HOOD: I'm going to mark the answer to |
| 10:18:45 17 | this question as confidential under the protective |
| 10:18:49 18 | order. But I instruct the witness to answer. |
| 10:18:57 19 | Can you repeat the question, please, |
| 10:18:59 20 | Q. (BY MS. COLAIZZI) Were you in the United |
| 10:19:01 21 | States continuously between November 2012 and when you |
| 10:19:04 22 | got your student visa? |
| 10:19:17 23 | A. Yes. |
| 10:19:17 24 | Q. After completing your biology degree, do |
| 10:19:20 25 | you intend to remain in the United States or return to |

9 (Pages 30 to 33)

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490
72a36b2c-f212-4c28-bc87-91475225150f

JOHANA PAOLA BELTRAN - 8/30/2016
Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.

| Page 34 | Page 36 |
|---|---|
| 10:19:23 1 Colombia? | 10:23:54 1 Q. (BY MS. COLAIZZI) Other than the |
| 10:19:33 2 A. To return to Colombia. | 10:23:55 2 financial aid office at Union County College, have you |
| 10:19:36 3 Q. Since November of 2012 have you worked in | 10:23:57 3 worked at all since November 2012? |
| 10:19:40 4 any capacity? | 10:23:59 4 A. No. |
| 10:19:47 5 MR. HOOD: I'm going to mark the answer to | 10:24:13 5 Q. Why did you end your employment at the |
| 10:19:48 6 this question as confidential under the protective | 10:24:17 6 financial aid office? |
| 10:19:51 7 order, but instruct the witness to answer. | 10:24:29 7 A. I was taking a heavy class load that |
| 10:20:06 8 A. After getting my student visa and going to | 10:24:33 8 required me to remain at -- |
| 10:20:09 9 classes at the school, I did work at the school. | 10:24:37 9 THE INTERPRETER: Allow the interpreter to |
| 10:20:12 10 Q. (BY MS. COLAIZZI) What did you do at the | 10:24:38 10 clarify. |
| 10:20:14 11 school? | 10:24:46 11 A. So I was having to go -- because of my |
| 10:20:23 12 A. In the offices of financial aid. | 10:24:48 12 heavy class load, going to the tutoring office there |
| 10:20:27 13 Q. And just to clarify, when you say, | 10:24:51 13 where they help you get prepared for subjects that you |
| 10:20:29 14 "school," that's Union County College? | 10:24:55 14 are having trouble understanding. |
| 10:20:34 15 A. Yes, it is. | 10:25:05 15 Q. (BY MS. COLAIZZI) Other than financial |
| 10:20:38 16 Q. When did you work in the financial aid | 10:25:06 16 support from Mr. Orlando Salazar, are you currently |
| 10:20:40 17 office at Union County College, what time frame? | 10:25:11 17 receiving financial support from any other source? |
| 10:20:55 18 A. I -- I don't recall very well because I'm | 10:25:23 18 A. Yes. |
| 10:20:58 19 bad with dates. | 10:25:23 19 Q. From where? |
| 10:21:00 20 Q. Do you recall how long you worked in the | 10:25:26 20 A. From the school. |
| 10:21:02 21 financial aid office? | 10:25:30 21 Q. What kind of support are you receiving |
| 10:21:10 22 A. Let me think about it. Around six months. | 10:25:32 22 from the school? |
| 10:21:24 23 Q. Do you recall what you made, what your | 10:25:38 23 A. Scholarships. |
| 10:21:27 24 wage or earnings were for that job? | 10:25:39 24 Q. How much are your scholarships? |
| 10:21:36 25 A. The minimum. | 10:25:45 25 A. It depends. |

| Page 35 | Page 37 |
|---|---|
| 10:21:38 1 Q. What do you mean by, "the minimum"? | 10:25:47 1 Q. How much -- how much of your educational |
| 10:21:47 2 A. We were paid hourly around $8. | 10:25:51 2 expenses do your scholarships cover? |
| 10:21:53 3 Q. Did you ever work overtime in the | 10:26:02 3 A. Half. |
| 10:21:56 4 financial aid office at Union County College? | 10:26:03 4 Q. And Mr. Orlando Salazar pays for the |
| 10:22:09 5 A. I didn't have permission to work more than | 10:26:07 5 remainder; is that correct? |
| 10:22:12 6 20 hours. | 10:26:11 6 A. It is. |
| 10:22:17 7 Q. Was there ever a week during your time at | 10:26:12 7 Q. Other than the school and Mr. Orlando |
| 10:22:19 8 the financial aid office when you worked more than | 10:26:15 8 Salazar, are you currently receiving financial support |
| 10:22:21 9 20 hours? | 10:26:17 9 from any other source? |
| 10:22:30 10 A. Can you repeat the question, please. | 10:26:27 10 A. No. |
| 10:22:32 11 Q. During the time you worked in the | 10:26:29 11 Q. Since November of 2012, other than |
| 10:22:33 12 financial aid office, was there ever a week where you | 10:26:35 12 Mr. Orlando Salazar and your scholarships, have you |
| 10:22:36 13 worked more than 20 hours? | 10:26:38 13 received financial support from any other source? |
| 10:22:48 14 A. No. | 10:26:54 14 A. No. |
| 10:22:55 15 Q. During your time in the financial aid | 10:27:05 15 Q. How did you first learn about the au pair |
| 10:22:57 16 office at Union County College, did you ever ask to | 10:27:09 16 program? |
| 10:23:00 17 make more than $8 an hour? | 10:27:17 17 A. A friend. |
| 10:23:13 18 A. No. | 10:27:18 18 Q. What's the friend's name? |
| 10:23:17 19 Q. Other than the financial aid office at | 10:27:23 19 A. Karina. |
| 10:23:19 20 Union County College, have you worked at all since | 10:27:24 20 Q. And what's Karina's last name? |
| 10:23:22 21 November 2012? | 10:27:29 21 A. I think it's Camargo. |
| 10:23:36 22 MR. HOOD: I'm going to mark the answer to | 10:27:35 22 Q. In what country does Ms. Camargo live in |
| 10:23:37 23 this question as confidential under the protective | 10:27:38 23 currently? |
| 10:23:39 24 order, but instruct the witness to answer. | 10:27:42 24 A. Currently in Colombia. |
| 10:23:48 25 A. Can you repeat the question, please. | 10:27:43 25 Q. Are you still in contact with her? |

10 (Pages 34 to 37)

72a36b2c-f212-4c28-bc87-91475225150f

# JOHANA PAOLA BELTRAN - 8/30/2016
## Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.

### Page 38

10:27:47 1    A. At times, but not very often.

10:27:52 2    Q. And what did Ms. Camargo tell you about

10:27:55 3  the au pair program?

10:28:04 4    A. That she was applying for the program and

10:28:07 5  that she'd already gotten a family.

10:28:11 6    Q. So Ms. Camargo participated in the au pair

10:28:15 7  program; is that correct?

10:28:20 8    A. Yes.

10:28:21 9    Q. Do you know which sponsor sponsored her

10:28:28 10  visa?

10:28:30 11    A. I'm not sure.

10:28:33 12    Q. Do you know how many time -- was it more

10:28:36 13  than just -- strike that.

10:28:39 14        Do you know the year in which Ms. Camargo

10:28:42 15  served as an au pair?

10:28:50 16    A. I don't know, but she traveled before I

10:28:53 17  did.

10:29:01 18    Q. What else did Ms. Camargo tell you about

10:29:04 19  the au pair program, if anything?

10:29:13 20    A. No, not much.

10:29:14 21    Q. Did she tell you anything about the hours

10:29:16 22  you would work?

10:29:23 23    A. No.

10:29:23 24    Q. Did she tell you anything about the

10:29:25 25  stipend?

### Page 39

10:29:31 1    A. What's the stipend?

10:29:33 2    Q. The stipend is the amount you made per

10:29:36 3  week as an au pair.

10:29:42 4    A. No.

10:29:45 5    Q. Did Ms. Camargo tell you anything about

10:29:47 6  the job -- or about the duties you would perform for

10:29:50 7  the host family as an au pair?

10:30:06 8    A. What family? My family?

10:30:09 9    Q. Any host family. Did she generally

10:30:11 10  describe the job duties she expected to perform for the

10:30:16 11  host family?

10:30:17 12    A. Yes.

10:30:24 13    Q. And what did she tell you?

10:30:30 14    A. Play with the kids, take them to school,

10:30:36 15  and helping them to organize their rooms.

10:30:42 16    Q. Anything else that she told you?

10:30:47 17    A. Helping them to do their homework.

10:30:51 18    Q. Anything else?

10:30:53 19    A. No.

10:30:57 20    Q. Do you recall Ms. Camargo telling you

10:30:59 21  anything else about the au pair program other than what

10:31:01 22  we've just discussed?

10:31:10 23    A. No.

10:31:14 24    Q. Prior to you, yourself applying for the

10:31:17 25  program, other than Ms. Camargo, did you speak with

### Page 40

10:31:22 1  anyone about the au pair program?

10:31:34 2    A. No.

10:31:36 3    Q. Did you do any research about the program

10:31:38 4  on your own before applying?

10:31:48 5    A. Not really.

10:31:51 6    Q. "Not really" suggests that maybe you did.

10:31:53 7  Did you or did you not do any research on your own

10:31:56 8  prior to applying?

10:32:10 9    A. I just looked at their link.

10:32:12 10    Q. What do you mean by "their link"?

10:32:18 11    A. Their web page.

10:32:20 12    Q. Whose web page?

10:32:23 13    A. InterExchange.

10:32:26 14    Q. Why did you look at InterExchange's

10:32:30 15  website as opposed to any other sponsor?

10:32:32 16    A. 'Cause my friend recommended it to me.

10:32:40 17    Q. Was that friend Ms. Camargo?

10:32:44 18    A. It is.

10:32:45 19    Q. Was she being sponsored by InterExchange?

10:32:52 20    A. I think so.

10:32:54 21    Q. Other than InterExchange, did Ms. Camargo

10:32:58 22  recommend any other sponsors to you?

10:33:06 23    A. No.

10:33:09 24    Q. You said you looked at InterExchange's

10:33:12 25  website. What specific information did you look at on

### Page 41

10:33:16 1  their website?

10:33:36 2    A. Well, it was going to offer an opportunity

10:33:39 3  to go abroad to study and also to have a family with

10:33:44 4  which to share things.

10:33:50 5    Q. What else did you look at or read on

10:33:53 6  InterExchange's website prior to applying for the

10:33:56 7  au pair program?

10:34:13 8    A. In exchange for the work doing -- with the

10:34:15 9  kids and helping them, that they would give us a tip to

10:34:23 10  be able to study.

10:34:24 11    Q. Did you read on InterExchange's website

10:34:27 12  how much you would receive for your education as part

10:34:30 13  of the au pair program?

10:34:31 14    A. Nowhere.

10:34:47 15    Q. When you were looking at the InterExchange

10:34:50 16  website, did you read anything about job duties that

10:34:53 17  you might be expected to perform for the host family?

10:35:15 18    A. No. It just said that we would help --

10:35:19 19  specifically we'd help the children, help them with the

10:35:23 20  children.

10:35:23 21    Q. When you were looking at the InterExchange

10:35:26 22  website, did you read anything about the hours you

10:35:29 23  might be asked to work as part of the au pair program?

10:35:39 24    A. No.

10:35:40 25    Q. When you were looking at the InterExchange

11 (Pages 38 to 41)

JOHANA PAOLA BELTRAN - 8/30/2016
Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.

| Page 42 | |
|---|---|
| 10:35:42 1 | website, did you read anything about how much money you |
| 10:35:46 2 | might make from the host families as part of the |
| 10:35:50 3 | au pair program? |
| 10:36:00 4 | A. No. |
| 10:36:03 5 | Q. Is there anything else that you recall |
| 10:36:06 6 | reading or looking at on the InterExchange website |
| 10:36:08 7 | before you applied for the au pair program? |
| 10:36:20 8 | A. No. |
| 10:36:27 9 | Q. Other than InterExchange, did you look |
| 10:36:30 10 | into applying to any of the other sponsors of the |
| 10:36:34 11 | au pair program? |
| 10:36:45 12 | A. No. |
| 10:36:47 13 | Q. Other than what you were told by your |
| 10:36:50 14 | friend Ms. Camargo and the research you did on the |
| 10:36:55 15 | InterExchange website, did you look at anything or read |
| 10:36:57 16 | anything about the au pair program before you applied? |
| 10:37:14 17 | A. No. |
| 10:37:18 18 | Q. At any time prior to applying for the au |
| 10:37:21 19 | pair program, did you look at the -- at the U.S. |
| 10:37:24 20 | Department of State's website? |
| 10:37:25 21 | A. No. |
| 10:37:39 22 | Q. At any -- have you ever been on the |
| 10:37:41 23 | Department of State's website? |
| 10:37:48 24 | A. What is that? |
| 10:37:50 25 | Q. Do you know what the U.S. Department of |

| Page 43 | |
|---|---|
| 10:37:52 1 | State is? |
| 10:38:03 2 | A. I don't understand. |
| 10:38:05 3 | Q. Do you know what the -- I'm just asking if |
| 10:38:07 4 | you know what the Department of State is? The |
| 10:38:09 5 | U.S. -- United States Department of State. |
| 10:38:17 6 | A. No. |
| 10:38:20 7 | Q. Do you understand that the au pair program |
| 10:38:22 8 | is run by the U.S. Government? |
| 10:38:35 9 | A. Yes. |
| 10:38:35 10 | Q. What is your understanding of the U.S. |
| 10:38:37 11 | Government's involvement in the au pair program? |
| 10:38:52 12 | A. They are the ones that approve the visas. |
| 10:38:56 13 | Q. Other than approving visas, do you have |
| 10:38:58 14 | any belief as to the U.S. Government's involvement in |
| 10:39:02 15 | the au pair program? |
| 10:39:05 16 | A. No. |
| 10:39:22 17 | Q. Before you decided to apply to become an |
| 10:39:24 18 | au pair, did you discuss your decision with anyone, |
| 10:39:28 19 | your family, friends, anybody like that? |
| 10:39:41 20 | A. Family. |
| 10:39:42 21 | Q. Who in your family did you talk to? |
| 10:39:47 22 | A. With my mom. |
| 10:39:49 23 | Q. Anyone else? |
| 10:39:51 24 | A. Sisters. |
| 10:39:55 25 | Q. Anyone else? |

| Page 44 | |
|---|---|
| 10:39:57 1 | A. No. |
| 10:40:00 2 | Q. Did they support your decision to apply to |
| 10:40:02 3 | become an au pair? |
| 10:40:13 4 | A. Yes. |
| 10:40:13 5 | Q. So you spoke with your family. Any |
| 10:40:15 6 | friends that you spoke to other than Ms. Camargo prior |
| 10:40:18 7 | to applying? |
| 10:40:28 8 | A. No. |
| 10:40:30 9 | Q. Other than Ms. Camargo, who I understand |
| 10:40:34 10 | was applying for the program, did you speak with |
| 10:40:41 11 | any -- anybody who had been an au pair before?  Prior |
| 10:40:45 12 | to applying. |
| 10:41:03 13 | A. No. |
| 10:41:08 14 | Q. Prior to actually arriving in Colorado to |
| 10:41:13 15 | live with the Noonans, did you talk to any au pairs or |
| 10:41:18 16 | previous au pairs about their experience? |
| 10:41:33 17 | A. No. |
| 10:41:48 18 | Q. What did you hope to get from the au pair |
| 10:41:51 19 | program?  What experiences or benefit did you hope to |
| 10:41:56 20 | get? |
| 10:42:05 21 | A.  To learn a new language. |
| 10:42:09 22 | Q. Anything else? |
| 10:42:12 23 | A. And a new culture. |
| 10:42:17 24 | Q. Anything else? |
| 10:42:20 25 | A. New friends. |

| Page 45 | |
|---|---|
| 10:42:24 1 | Q. Anything else? |
| 10:42:26 2 | A. No. |
| 10:42:28 3 | Q. Had you ever been to the United States |
| 10:42:29 4 | before you arrived to work and live with the Noonans? |
| 10:42:40 5 | A. No. |
| 10:42:44 6 | Q. How much English -- strike that. |
| 10:42:48 7 | How would you describe your ability to |
| 10:42:50 8 | speak English at the time you applied to become an au |
| 10:43:01 9 | pair? |
| 10:43:02 10 | MR. HOOD:  I'm going to mark the answer to |
| 10:43:03 11 | this question as confidential, but instruct the witness |
| 10:43:05 12 | to answer. |
| 10:43:07 13 | MS. COLAIZZI:  Just -- |
| 10:43:08 14 | MR. HOOD:  Under the protective order.  I |
| 10:43:09 15 | apologize. |
| 10:43:17 16 | MS. COLAIZZI:  Just -- just so I'm clear, |
| 10:43:20 17 | what's the grounds for the confidentiality reservation? |
| 10:43:24 18 | MR. HOOD:  I don't think we have to |
| 10:43:26 19 | present our grounds now. |
| 10:43:27 20 | MS. COLAIZZI:  Well, it's for purposes of |
| 10:43:28 21 | protecting confidential information.  I'm just trying |
| 10:43:30 22 | to understand why you think it's confidential. |
| 10:43:33 23 | MR. HOOD:  Well, you have the grounds to |
| 10:43:35 24 | challenge any markings under the protective order. |
| 10:43:38 25 | MS. COLAIZZI:  Right.  But I have to have |

12  (Pages 42 to 45)

# JOHANA PAOLA BELTRAN - 8/30/2016
Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.

| Page 46 |
|---|

```
10:43:39  1   a reason. So...
10:43:41  2        MR. HOOD: Well, we can -- that's for
10:43:42  3   motion practice. Right now I'd just like to mark
10:43:44  4   things as confidential, and if you disagree, we can
10:43:47  5   have that disagreement later.
10:43:48  6        MS. COLAIZZI: So you're not willing to
10:43:50  7   provide a reason for confidentiality designations?
10:43:51  8        MR. HOOD: I'm not going to provide a
10:43:53  9   reason each time I mark something as confidential, nor
10:43:54 10   do people provide a reason each time they mark a
10:43:56 11   document as confidential. I'd be happy to talk about a
10:44:00 12   way to do this more efficiently so it doesn't interrupt
10:44:03 13   your questions.
10:44:04 14        MS. COLAIZZI: No, I just -- I understand
10:44:04 15   before your issues. I'm just wondering now why this is
10:44:09 16   confidential.
10:44:09 17        MR. HOOD: I -- I think -- we have the
10:44:09 18   right to mark things as confidential, and you have the
10:44:10 19   ability to challenge it under the protective order.
10:44:12 20   But I would be happy to discuss ways to do this more
10:44:15 21   efficiently if you feel like it's interrupting your
10:44:17 22   questions.
10:44:18 23        MS. COLAIZZI: It's not interrupting.
10:44:19 24   I -- I just don't get it, frankly.
10:44:21 25        MR. HOOD: Okay.
```

| Page 47 |
|---|

```
10:44:24  1        Q.  (BY MS. COLAIZZI) How would you describe
10:44:24  2   your ability to speak English at the time you applied
10:44:27  3   to become an au pair?
10:44:38  4        MR. HOOD: And I mark the answer to this
10:44:41  5   question as confidential, but -- under the protective
10:44:45  6   order, but instruct the witness to answer the question.
10:44:53  7        A.  The basic.
10:44:54  8        Q.  (BY MS. COLAIZZI) What does "the basic"
10:44:55  9   mean to you?
10:45:01 10        A.  Ask questions and greet people, like
10:45:04 11   asking, "Where's the bathroom?" Answering basic
10:45:15 12   questions, your name, where are you from, why are you
10:45:18 13   here, what you are doing.
10:45:24 14        Q.  Prior to applying to become an au pair,
10:45:26 15   had you taken English classes of any kind?
10:45:38 16        MR. HOOD: I'm going to mark the -- this
10:45:41 17   line of questions regarding Ms. Beltran's English
10:45:44 18   proficiency as confidential under the protective order.
10:45:54 19        A.  Yes.
10:45:56 20        Q.  (BY MS. COLAIZZI) How many English
10:45:56 21   classes had you taken prior to applying to become an
10:46:00 22   au pair?
10:46:06 23        A.  Around eight months.
10:46:09 24        Q.  And did you take them while you were in
10:46:11 25   school or on your own, in some other way?
```

| Page 48 |
|---|

```
10:46:23  1        A.  Another way.
10:46:23  2        Q.  And tell me about those classes, where you
10:46:26  3   took them.
10:46:33  4        A.  It was at a school that was called Berlitz
10:46:38  5   that was in Bogota, Colombia.
10:46:42  6        Q.  And why did you start taking classes with
10:46:44  7   Berlitz?
10:46:50  8        A.  Because the agency told me it's one of the
10:46:53  9   requirements.
10:46:53 10        Q.  Okay. Had you already applied for the
10:46:55 11   au pair program at the time you took the English
10:46:58 12   classes?
10:47:08 13        A.  Yes.
10:47:08 14        Q.  Before you applied to become an au pair,
10:47:11 15   had you taken any English classes?
10:47:21 16        A.  No.
10:47:25 17        Q.  So at the time that you applied to become
10:47:27 18   an au pair, how had you learned the English that you
10:47:30 19   knew at that point?
10:47:44 20        A.  I didn't know English.
10:47:46 21        Q.  Well, you told me a minute ago that you
10:47:48 22   knew the basics at the time that you applied. Is that
10:47:53 23   correct?
10:48:01 24        A.  I wanted to say when they interviewed me.
10:48:06 25        Q.  Okay. I want to make sure I understand.
```

| Page 49 |
|---|

```
10:48:08  1   Before you applied to become an au pair, had you taken
10:48:12  2   any English classes?
10:48:23  3        A.  No.
10:48:24  4        Q.  Did you know any English from another
10:48:27  5   source prior to applying to become an au pair?
10:48:38  6        A.  No.
10:48:45  7        Q.  Before you applied to become an au pair,
10:48:48  8   had you worked at any jobs in Colombia?
10:49:00  9        A.  Yes.
10:49:00 10        Q.  What jobs had you had prior to becoming an
10:49:02 11   au pair?
10:49:12 12        A.  I worked in a store at the airport. I was
10:49:19 13   a filer. At the laboratory.
10:49:27 14        Q.  I'm sorry, you were a filer in a
10:49:29 15   laboratory, or the laboratory was in addition to being
10:49:32 16   a filer?
10:49:41 17        A.  It was outside of the lab.
10:49:44 18        Q.  Okay. Any other jobs that you had other
10:49:48 19   than the airport, the filer, and the laboratory prior
10:49:52 20   to applying to become an au pair?
10:50:11 21        A.  No.
10:50:12 22        Q.  How much did you make when you worked at
10:50:15 23   the airport?
10:50:21 24        A.  I was being paid 700,000 pesos monthly.
10:50:29 25        Q.  And how long did you work at the airport?
```

13  (Pages 46 to 49)

JOHANA PAOLA BELTRAN - 8/30/2016
Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.

Page 50

10:50:31 1       A.  Approximately between eight months and a
10:50:39 2 year.
10:50:40 3       Q.  And why did you leave that job?
10:50:46 4       A.  It was -- the ownership changed.
10:50:52 5       Q.  And why did you have to leave when the
10:50:54 6 ownership changed?
10:51:07 7       A.  Well, because I had contracted directly
10:51:11 8 with the person that ran it before, and when it went to
10:51:14 9 new ownership, that new owner had already hired
10:51:18 10 somebody to work that position.
10:51:20 11       Q.  And was working as a filer the next job
10:51:23 12 you had after leaving the airport?
10:51:32 13       A.  I don't remember the order.
10:51:34 14       Q.  What type of business did you work for
10:51:36 15 when you worked as a filer?
10:51:47 16       A.  I think it was a state company.
10:51:50 17       Q.  State, meaning government company?
10:51:55 18       A.  Yes.
10:51:55 19       Q.  And what did you make as a filer?
10:52:05 20       A.  I don't remember.
10:52:06 21       Q.  Do you remember if it was more or less
10:52:08 22 than you made at the airport?
10:52:15 23       A.  It could have been around the same.
10:52:19 24       Q.  How long did you work as a filer?
10:52:26 25       A.  I think it was a year and a half.

Page 51

10:52:28 1       Q.  And why did you leave that job?
10:52:33 2       A.  It was a temporary contract.
10:52:40 3       Q.  And you also said you worked for a
10:52:42 4 laboratory; is that correct?
10:52:49 5       A.  Yes.
10:52:49 6       Q.  How long did you work in the laboratory?
10:52:55 7       A.  I don't remember, because that was my
10:52:57 8 first job.
10:52:59 9       Q.  Do you remember how much you made working
10:52:59 10 in the laboratory?
10:53:09 11       THE INTERPRETER:  I'm sorry, the
10:53:11 12 interpreter would want to clarify.  Are we talking
10:53:13 13 about the laboratory or are we talking about the
10:53:15 14 airport?
10:53:17 15       MS. COLAIZZI:  I'm sorry.  Laboratory.  I
10:53:18 16 apologize if I misspoke.
10:53:21 17       A.  I don't remember, but in addition to the
10:53:31 18 salary that we made, we were also given an incentive
10:53:35 19 tip depending on the work that we did.
10:53:38 20       Q.  (BY MS. COLAIZZI)  Do you know if the pay
10:53:41 21 you received from the laboratory was more or less than
10:53:44 22 the 700,000 pesos a month you made at the airport?
10:53:51 23       A.  I think it was more.
10:53:57 24       Q.  Were you working at the time you applied
10:54:00 25 to become an au pair?

Page 52

10:54:12 1       A.  When I was an au pair?
10:54:13 2       Q.  No.  At the time you applied to become an
10:54:15 3 au pair, were you working?
10:54:27 4       A.  I don't remember, but I think I was.
10:54:29 5       Q.  Which job was it that you were working at
10:54:32 6 the time you became -- or you applied to become an
10:54:34 7 au pair?
10:54:41 8       A.  I don't remember.
10:54:46 9       Q.  Prior to applying to become an au pair,
10:54:47 10 had you ever done any kind of child care work before?
10:55:02 11       A.  I was watching my nephews.
10:55:06 12       Q.  Did they live with you?
10:55:08 13       A.  No.
10:55:11 14       Q.  How often did you watch your nephews?
10:55:18 15       A.  Every time that my sisters would need me
10:55:21 16 to.
10:55:23 17       Q.  Was it every day, every week?  Can you
10:55:25 18 give me some idea of the frequency?
10:55:37 19       A.  There were times when it would just be the
10:55:39 20 weekends, other times when it would be the entire week.
10:55:44 21       Q.  Other than watching your nephews, did you
10:55:47 22 do any kind of child care work before you applied to
10:55:50 23 become an au pair?
10:56:03 24       A.  No.
10:56:05 25       Q.  Did your sister pay you to watch your

Page 53

10:56:06 1 nephews?
10:56:14 2       A.  Not really.
10:56:20 3       Q.  Have you ever heard the term "cultural
10:56:24 4 exchange" in connection with the au pair program?
10:56:36 5       MR. HOOD:  Objection as to the
10:56:38 6 translation.  I don't understand.
10:56:45 7       MR. GRANT:  He translated the name of
10:56:47 8 Cultural Exchange.
10:56:48 9       MR. HOOD:  What's wrong with that?
10:56:51 10       MR. GRANT:  Okay.  Excuse me.
10:56:53 11       MR. HOOD:  Okay.  Oh.  I withdraw the
10:56:58 12 objection.  I apologize.
10:56:58 13       THE DEPONENT:  I want to take a break.
10:56:59 14 Yeah?  Now?  Can I?
10:57:00 15       MS. COLAIZZI:  Let's finish -- let's
10:57:00 16 answer this question, and then we can take a break.
10:57:03 17       THE DEPONENT:  (In English)  Okay.
10:57:03 18       MS. COLAIZZI:  Can you read the question
10:57:04 19 back, please.
10:56:20 20       (The last question was read back as
10:56:20 21 follows: "Have you ever heard the term 'cultural
10:56:24 22 exchange' in connection with the au pair program?")
10:57:22 23       A.  In Colombia or in the United States?
10:57:27 24       Q.  (BY MS. COLAIZZI)  At any time.
10:57:38 25       A.  Well, what I understand is that there --

14  (Pages 50 to 53)

JOHANA PAOLA BELTRAN - 8/30/2016
Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.

| Page 54 | Page 56 |
|---|---|
| 10:57:39 1 when au pairs come here as an exchange to work and to | 11:17:09 1 MS. COLAIZZI: Sorry. That's what I |
| 10:57:44 2 work as nannies, that that's a cultural exchange. | 11:17:10 2 meant. |
| 10:57:49 3 Q. Does the term "culture exchange" have any | 11:17:13 3 MR. HOOD: Depositions in the digital era. |
| 10:57:51 4 other meaning for you other than what you just | 11:17:16 4 MS. COLAIZZI: I'm going to take it to him |
| 10:57:54 5 described? | 11:17:17 5 so he can get a picture. Is that okay? |
| 10:57:57 6 A. No. | 11:17:27 6 MR. HOOD: Okay. Yeah. And, Brooke, |
| 10:58:01 7 MS. COLAIZZI: Okay. We can take a | 11:17:36 7 maybe it would make sense to read the URL into the |
| 10:58:03 8 ten-minute break. | 11:17:40 8 record. |
| 10:58:08 9 THE VIDEOGRAPHER: Going off the record. | 11:17:40 9 MS. COLAIZZI: I will. |
| 10:58:09 10 This is the end of Media Unit No. 1 in the videotaped | 11:18:03 10 THE DEPONENT: You want me to go over |
| 10:58:12 11 deposition of Johana Paola Beltran. The time is | 11:18:06 11 there and -- |
| 10:58:17 12 10:58 a.m. We are off the record. | 11:18:06 12 MS. COLAIZZI: Is it fine if she comes |
| 10:58:22 13 (Recess taken, 10:58 a.m. to 11:14 a.m.) | 11:18:06 13 down? |
| 11:14:54 14 THE VIDEOGRAPHER: We are back on the | 11:18:09 14 MR. HOOD: Absolutely. Yeah. Yeah. You |
| 11:14:55 15 record. This is the beginning of Media Unit No. 2 in | 11:18:11 15 could just -- yeah. I could also take a picture of it |
| 11:14:59 16 the videotaped deposition of Johana Paola Beltran. The | 11:18:20 16 and email it to you, Brooke, if you'd like to just have |
| 11:15:03 17 time is 11:14 a.m. | 11:18:23 17 a paper ... |
| 11:15:06 18 Q. (BY MS. COLAIZZI) Ms. Beltran, a moment | 11:18:27 18 MS. COLAIZZI: We might do that. I'd like |
| 11:15:08 19 ago off the record your counsel indicated that you | 11:18:29 19 to -- if we could get a video of it, that makes more |
| 11:15:11 20 believe you were confused with respect to the questions | 11:18:33 20 sense. |
| 11:15:13 21 about the website that you looked at, so I'm going to | 11:18:35 21 MR. HOOD: Okay. |
| 11:15:29 22 ask you some of the questions that we discussed before | 11:19:06 22 THE VIDEOGRAPHER: I think that's as good |
| 11:15:34 23 so that we can have a clear record. | 11:19:08 23 as I'm going to get it. |
| 11:15:43 24 Prior to applying to become an au pair, | 11:19:10 24 MS. COLAIZZI: I'm going to read it into |
| 11:15:45 25 did you look at any websites as research for your | 11:19:11 25 the record, if I may. For the record, we have taken a |

| Page 55 | Page 57 |
|---|---|
| 11:15:50 1 decision to apply to become an au pair? | 11:19:23 1 video of Ms. Beltran's cell phone that has the website |
| 11:16:04 2 A. Yes. | 11:19:26 2 pulled up. At the top it says, "Au Pair Exchange," |
| 11:16:04 3 Q. How many? | 11:19:30 3 www.aupaircol, c-o-l, .com. In the upper left-hand |
| 11:16:08 4 A. Once. | 11:19:37 4 corner there is a logo, Global Exchange. |
| 11:16:09 5 Q. Okay. What was the entity or the agency | 11:19:41 5 Q. (BY MS. COLAIZZI) Ms. Beltran, thank you |
| 11:16:11 6 that hosted that website? | 11:19:54 6 for pulling the website up on your phone. |
| 11:16:22 7 A. I don't know. | 11:20:03 7 A. My pleasure. |
| 11:16:23 8 Q. Do you know the name of the company whose | 11:20:05 8 Q. When you were looking at that website |
| 11:16:25 9 website it was? | 11:20:06 9 prior to applying to become an au pair, what prompted |
| 11:16:37 10 A. I can show it to you. It's on my | 11:20:10 10 you to go to that specific website? |
| 11:16:39 11 telephone, the one that I saw. | 11:20:32 11 A. Karina gave it to me to be able to look |
| 11:16:41 12 Q. Okay. | 11:20:34 12 for the address of their offices. |
| 11:16:54 13 MS. COLAIZZI: Counsel, with your | 11:20:36 13 Q. When you say, "their offices," who are you |
| 11:16:55 14 permission, I would like to move it close to the video | 11:20:38 14 referring to? |
| 11:16:58 15 camera so that we can have a record of it. | 11:20:42 15 A. Where you would go to apply for the |
| 11:17:00 16 MR. HOOD: Yeah, that would be fine. | 11:20:44 16 program. |
| 11:17:04 17 THE VIDEOGRAPHER: I -- I can't reach that | 11:20:47 17 Q. And were you specifically looking for the |
| 11:17:05 18 far. | 11:20:49 18 office where you could apply to be sponsored by |
| 11:17:06 19 MS. COLAIZZI: Can you do that? Can | 11:20:54 19 InterExchange? |
| 11:17:06 20 anyone do it? I mean, can you do it anyway? | 11:21:05 20 A. Yes. |
| 11:17:07 21 THE VIDEOGRAPHER: If you can bring the | 11:21:05 21 Q. Have you ever at any point in time visited |
| 11:17:07 22 phone closer to me. | 11:21:11 22 InterExchange's website? |
| 11:17:07 23 MS. COLAIZZI: Right. Right. That's what | 11:21:20 23 A. No. |
| 11:17:08 24 I'm going to do. | 11:21:22 24 Q. Other than Global Exchange, have you ever |
| 11:17:09 25 MR. HOOD: Oh. | 11:21:26 25 visited any other website related to the au pair |

15 (Pages 54 to 57)

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490
72a36b2c-f212-4c28-bc87-91475225150f

JOHANA PAOLA BELTRAN - 8/30/2016
Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.

| Page 58 | Page 60 |
|---|---|

**Page 58**

11:21:29 1 program in any way?

11:21:40 2     A. No.

11:21:43 3     Q. Other than looking at the Global Exchange

11:21:45 4 website, did you do any other research or investigation

11:21:49 5 on your own prior to applying to become an au pair?

11:22:11 6     A. No.

11:22:14 7     Q. Thank you for allowing us to clarify.

11:22:20 8     A. No need to thank me.

11:22:26 9     Q. Where did you go to apply to become an

11:22:28 10 au pair?

11:22:36 11     A. Bogota.

11:22:39 12     Q. What specific location in Bogota?

11:22:48 13     A. Downtown Bogota.

11:22:50 14     Q. And how did you -- how did you learn that

11:22:54 15 that was the place you needed to go in order to apply?

11:23:05 16     A. Karina told me, and then I saw that it was

11:23:09 17 on the page.

11:23:09 18     Q. And by "page," are you referring to the

11:23:12 19 Global Exchange website that we just discussed a moment

11:23:14 20 ago?

11:23:22 21     A. Yes.

11:23:22 22     Q. Was anyone with you when you went to

11:23:24 23 apply?

11:23:31 24     A. No one.

11:23:33 25     Q. Did you fill out an application when you

**Page 59**

11:23:36 1 visited the office in downtown Bogota?

11:23:45 2     A. The first day.

11:23:51 3     THE DEPONENT: (In English) No.

11:23:53 4     A. Not the first day.

11:23:53 5     Q. (BY MS. COLAIZZI) Okay. What happened

11:23:54 6 the first day you visited the office in downtown

11:23:57 7 Bogota?

11:24:06 8     A. They told me the price, the cost, and what

11:24:08 9 I'd have to do in terms of requirements.

11:24:13 10     Q. Do you recall what name was on the

11:24:15 11 building or the office that you visited in downtown

11:24:18 12 Bogota?

11:24:27 13     A. I don't remember.

11:24:29 14     Q. How many people did you speak with at the

11:24:31 15 office that first time you visited?

11:24:41 16     A. I think it was two.

11:24:43 17     Q. Do you remember their names?

11:24:45 18     A. No.

11:24:46 19     Q. Were they men or women?

11:24:50 20     A. One man and one woman.

11:24:57 21     Q. And what did they tell you about the

11:24:59 22 price?

11:25:07 23     A. That it did -- it didn't have to be paid

11:25:11 24 all the same day, that it could be done by payments.

11:25:14 25     Q. And what was the total amount that they

**Page 60**

11:25:15 1 gave you that day?

11:25:26 2     A. I don't remember exactly, but I think that

11:25:30 3 they said it was about 5 million pesos.

11:25:35 4     Q. Do you know how much that was in U.S.

11:25:37 5 dollars?

11:25:42 6     A. No.

11:25:53 7     Q. And you also indicated that they talked to

11:25:57 8 you about what you would have to do, or the

11:25:57 9 requirements; is that correct?

11:26:06 10     A. Yes.

11:26:06 11     Q. What did they tell you about the

11:26:08 12 requirements?

11:26:13 13     A. I would have to take English classes.

11:26:19 14     Q. What else?

11:26:22 15     A. Swimming.

11:26:27 16     Q. What else?

11:26:29 17     A. First aid.

11:26:34 18     Q. And what else?

11:26:38 19     A. Driving classes.

11:26:43 20     Q. What else?

11:26:55 21     A. I would have to be enrolled in a school

11:27:01 22 like -- well, not a secondary school, but some sort of

11:27:01 23 university course.

11:27:03 24     Q. Was that university course something you

11:27:05 25 would take in Colombia?

**Page 61**

11:27:13 1     A. What do you mean by that?

11:27:14 2     Q. When they talked about the university

11:27:18 3 course, were they talking about courses in Colombia or

11:27:23 4 courses in the United States?

11:27:29 5     A. In Colombia.

11:27:32 6     Q. And what was your understanding of why you

11:27:35 7 needed to take university classes in Colombia?

11:27:46 8     A. Can you repeat the question?

11:27:48 9     Q. What was your understanding of why you

11:27:50 10 needed to take university classes in Colombia before

11:27:54 11 becoming an au pair?

11:28:16 12     A. That I had to be enrolled in an

11:28:18 13 institution there so that the American Embassy would

11:28:22 14 know that I was tied to there and that when I left, I

11:28:26 15 was going to come back and I wasn't going to remain

11:28:29 16 here.

11:28:30 17     Q. You mentioned English classes, swimming,

11:28:33 18 first aid, driving, and university classes,

11:28:51 19     A. Yes.

11:28:51 20     Q. Did the two individuals that you spoke

11:28:54 21 with that first day give you any other requirements for

11:28:55 22 the au pair program?

11:29:06 23     A. I don't remember.

11:29:08 24     Q. When you visited the office that first

11:29:10 25 time did you know how to swim?

16 (Pages 58 to 61)

72a36b2c-f212-4c28-bc87-91475225150f