**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Case No. 14-cv-03074-CMA-KMT

JOHANA PAOLA BELTRAN, ET AL.

     Plaintiffs,

v.

INTEREXCHANGE, INC., ET AL.

     Defendants.

---

**PLAINTIFFS' REPLY MEMORANDUM IN FURTHER SUPPORT OF
THEIR MOTION FOR A PROTECTIVE ORDER (DKT. 365)**

---

**PRELIMINARY STATEMENT**

Plaintiffs seek a limited protective order to memorialize the Court's existing instructions about the acceptable scope of discovery in this case. In response, Defendants strain to articulate a theory of relevance for questions—about the Plaintiffs' personal lives, their immigration status, their personal finances, and other undisputedly private matters—that are intrusive, embarrassing, and intimidating. Their arguments should be rejected, because these topics have no place in this lawsuit.

First, Plaintiffs' experiences of American culture are not relevant because, as the Court has already held, *au pairs* are not in a cultural program that preempts state wage laws; rather, *au pairs* are in an employment relationship. Second, discovery of any non-monetary value Plaintiffs theoretically received from the *au pair* program is not relevant to their antitrust claims, which allege monetary injuries. And third, Plaintiffs do not

allege—as Defendants incorrectly claim—that Defendants misrepresented whether their stipend would be enough for them to engage in activities outside their hosts' homes, but rather that Defendants' misrepresented that *au pairs'* wages are fixed by law.

In short, discovery should be focused on Plaintiffs' work as *au pairs*, not their personal lives. Because Defendants continue to claim incorrectly that Plaintiffs' personal lives are relevant to this case, the requested protective order is necessary.

<u>**Argument**</u>

**A.     Defendants' Relevance Arguments Fail**

Plaintiffs' personal lives are simply not relevant to this case. Defendants' belabored arguments to the contrary are meritless.

First, Defendants contend that questions about the *au pairs'* personal lives are relevant because "[o]ne of Defendants' threshold defenses is that *au pairs* are not subject to blanket wage and hour rules because they are cultural exchange visitors, not simply employees, as their lawyers now claim." (Dkt. 386 at 7-8). Defendants do not identify the "one" Defendant making this purported defense. Nor do they explain to which claim(s) the "cultural experience" defense may apply. Their opacity is not surprising, as they already made and lost this very argument.

In its motion to dismiss, Cultural Care argued that "state minimum wage and employment laws" do not apply to *au pairs* because "this is a cultural exchange program which is part of United States foreign policy, an area preempted by the federal government." (Dkt. 127 at 2; *id.* at 12-17 (arguing preemption of state law wage claims)). In arguing that Plaintiffs' state law wage claims were preempted by federal law,

InterExchange likewise asserted that "the au pair program is about cultural exchange," despite "Plaintiffs' attempts to portray it as a work program." (Dkt. 130 at 10; *see also* Dkt. 131 (GoAuPair's motion to dismiss) at 5 (joining in preemption arguments raised by Cultural Care and InterExchange)). Judge Arguello rejected those arguments, holding that "Plaintiffs' claims under state wage laws are not, in fact, preempted by some kind of amorphous 'federal framework,'" *Beltran v. InterExchange*, Inc., — F. Supp. 3d —, 2016 WL 1253622, at *14 (D. Colo. March 31, 2016), and that Defendants' characterization of the "au pair program" as "an 'exchange program'" is in no way probative of the Sponsors' status as a joint employer," *id.* at *10. Moreover, even putting aside the Court's previous ruling, Defendants' argument is in no way fact-bound: regardless of any cultural aspects of an *au pair*'s experience, they must be paid in conformity with federal and state minimum wage laws. Those laws require that *au pairs* be paid in money, not cultural enrichment. Plaintiffs' experience of American culture in their free time is therefore utterly irrelevant to the claims and defenses in this case.[1]

Defendants' second argument—that discovery of Plaintiffs' personal lives, immigration status and personal finances—is relevant to their antitrust injury is likewise meritless. Plaintiffs' injury is straightforward: they were paid less than they would have been paid absent Defendants' illegal wage fixing conspiracy. (Dkt 101 at ¶¶ 145-51).

---

[1]     Even were the notion of "cultural exchange" a relevant defense, Defendants' argument would explode the possible lines of inquiry, as any experience—a meal, a show, a date, a religious observance—could conceivably be defined as part of a "cultural experience." Such latitude would mean that no question would ever be off limits. Put differently, even assuming that Defendants' arguments were entirely correct, the Court would still need to define the limits of appropriate questioning. Defendants' questions about intimate personal matters plainly fall on the foul side of that line.

This case thus presents a question of monetary damages, and Plaintiffs intend to prove those damages on a class-wide basis through evidence from expert economists, among other things.[2] Defendants nevertheless contend that they are "entitled to discover all value—both monetary and non-monetary—that Plaintiffs derived from the *au pair* program" and whether they received the "same value or differing value from their experiences in the United States." (Dkt. 386 at 9). Defendants do not explain their suggestion that non-monetary value—whatever that may be—is relevant to Plaintiffs' antitrust injury. Nor could they, because whatever non-monetary value (if any) Plaintiffs derived from being *au pairs*, it would not change the fact that they were paid artificially low wages: the janitor who mops the Denver Art Museum is no less entitled to a fair wage than one that does the same job at the airport.

Nor is discovery about Plaintiffs' personal lives necessary to determine the monetary value of Plaintiffs' antitrust injury. (*See* Dkt. 386 at 8-9). In a competitive market free of Defendants' collusion, *au pairs* could demand wages akin to non-*au pair* childcare providers with similar qualifications—primarily, childcare experience, educational background, and other applicable training. Defendants are entitled to that information, which they already possess in the *au pair* applications and which they have addressed in any event at Plaintiffs' depositions. Questions regarding an *au pair's*

---

[2]     Use of expert analysis and opinion to establish class-wide injury in price fixing cases, such as this one, is standard. *See, e.g.*, *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1254 (10th Cir. 2014) (affirming use of expert opinion to determine that price-fixing conspiracy would affect all buyers and holding that "[u]nder the prevailing view, price-fixing affects all market participants, creating an inference of class-wide impact even when prices are individually negotiated.").

personal life, however, have no impact on the wages a rational, wealth-maximizing *au pair* could command and are therefore irrelevant to Plaintiffs' antitrust injury.

Indeed, even as Defendants frame the issue, the question is "what would have resulted if the parties negotiated?" (Dkt. 386 at 9).[3]  Negotiations as to wages take place *before* work begins. The proper focus of discovery for purposes of the antitrust injury is thus the qualifications the Plaintiffs brought to the table, not their experiences once they began working. To hold otherwise would be to find that any time a plaintiff alleges a wage-related injury, every aspect of that person's life is suddenly relevant, as the sum of her experiences may alter her purported negotiating posture. This is of course ridiculous, and Defendants have cited no case supporting such a novel view of relevance in a wage fixing case.

Third, Defendants argue that questions about Plaintiffs' personal lives and "experience in matters of finance" are necessary to test Plaintiffs' "allegations of misrepresentation," which Defendants incorrectly contend are "largely centered upon whether the stipend was enough money for them to save, travel, or engage in other activities outside the Host Family's home." (Dkt 386 at 10). To the contrary, Plaintiffs' misrepresentation claims are centered on Defendants' false and misleading statements that *au pair* wages are fixed by law. (Dkt. 101 ¶ 487 ("The *au pairs*, as vulnerable foreigner workers, reasonably and justifiably relied on the deceptive, incorrect, and false

---

[3]     Plaintiffs do not concede that individualized proof will be necessary for damages. The fact that individual proof may be necessary, however, would not preclude class certification, as Defendants seem to suggest. *See, e.g.*, *In re Aluminum Phosphide Antitrust Litig.*, 160 F.R.D. 609, 615 (D. Kan. 1995) ("The fact that individual proof as to the amount of damages may be necessary" would not "preclude class certification").

statements, when they reasonably believed that the wages were fixed by law and could not be altered."); *see also id.* ¶ 490. As Judge Tafoya explained, "Plaintiffs have set forth specific statements allegedly made by Defendants in order to deceive and/or mislead *au pairs* that $195.75/week was a fixed or set rate." *Beltran v. InterExchange, Inc.*, 14 Civ. 3074 (CMA)(KMT), 2016 WL 695967, at *16 (D. Colo. Feb. 22, 2016). Defendants' argument that the misrepresentation claims are premised on whether the stipend was enough for *au pairs* to engage in "activities outside the Host Family's home" is thus simply wrong.

\* \* \*

For all of these reasons, Defendants have failed to counter the obvious—that Plaintiffs' personal lives are not relevant to the claims and defenses in this case. Even if there were some marginal relevance to these lines of inquiry, which there is not, Plaintiffs' personal lives still should be off limits. Although discovery may arguably be permissible, the Court can still issue a protective order "to protect a party or a person from annoyance, embarrassment, oppression or undue burden or expense." *Boden v. Hmshost Corp.*, No. 15-CV-00606-CMA-KMT, 2015 WL 3826725, at *1 (D. Colo. June 19, 2015). There can be no credible dispute that Defendants' personal questions are intrusive—and to Plaintiffs, Defendants' persistent inquiries into their personal affairs are much worse. And any legitimate need Defendants may have for the information is limited at best. Therefore, the Court should protect Plaintiffs from having to undergo the indignity of laying bare their personal lives to their former employers in the course of pursuing a legal wage.

## B.    Defendants' Remaining Arguments are Meritless

Defendants' remaining attempts to justify their behavior are no more persuasive.

### 1.    Plaintiffs Have Not "Opened the Door" to Defendants' Otherwise Impermissible Questions

Defendants' argument that Plaintiffs have "opened the door" to personal lines of questioning is mistaken for at least two reasons. First, the allegations from the Complaint cited by Defendants (Dkt. 386 at 10) concern Plaintiffs' treatment by their host families, not their experiences outside their hosts' homes:

¶ 338: Ms. Beltran was given a room in the Noonans' basement and began her work.

¶ 345: Ms. Beltran prepared dinner for the Noonan family nearly every night. Ms. Beltran was not allowed to eat with the Noonans. Sometimes there were leftovers for Ms. Beltran to eat after the Noonans' dinner, but sometimes there were no leftovers, and Ms. Beltran had to prepare her own dinner.

¶ 346: One week Ms. Noonan failed to purchase food for Ms. Beltran . . . .

¶ 389: During that week off, Ms. Deetlefs was paid only $195.75 and she stayed at her host family's home during the vacation because she could not afford to go anywhere else.

¶ 423: Ms. Ivette felt isolated and alone.[4]

(*See* Dkt. 101 ¶¶ 338, 345-36, 389 and 423). The complaint therefore does not provide a basis for Defendants' repeated frolics into Plaintiffs' personal lives.

Second, to the extent a Plaintiff "opens the door" to the subjects covered by the proposed protective order, that may justify asking additional questions of that particular Plaintiff, but it would not make otherwise irrelevant questions relevant or somehow

---

[4]    Had Defendants asked Ms. Gonzalez about this allegation, Plaintiffs would not have objected. At her deposition, the closest Defendants got was to ask "did you do fun things on the weekends?" Plaintiffs objected, and Defendants insisted incorrectly that the line of questioning was necessary to "explore the cultural exchange component of the experience." Gonzalez Tr. 129: 23-24.

waive every other Plaintiffs' objections to improper questions in the future. The inquiry

for determining whether the proverbial "door" has been opened is witness-specific:

> The doctrine of opening the door allows a party to explore otherwise inadmissible evidence on cross-examination when the opposing party has made unfair prejudicial use of related evidence on direct examination. . . . Introduction of otherwise inadmissible evidence under shield of this doctrine is permitted only to the extent necessary to remove any unfair prejudice which might otherwise have ensued from the original evidence.

*See Quintano v. Hartley*, No. 11-CV-02191-RM, 2013 WL 2153275, at *11 (D. Colo.

May 17, 2013). The possibility the door may be opened in the future is therefore not

grounds to deny the requested protective order.

### 2.    Judge Tafoya Gave Clear Instructions to the Parties

Defendants brush aside the Court's previous instructions—perhaps recognizing

the audacity of their continued intrusions into Plaintiffs' personal lives even after the

September 8, 2016 telephone conference—as mere "comments" by the Court. (Dkt. 386

at 2). Whether "comments" or something else, the Court's statement on the scope of

discovery in this case speaks for itself:

> Now, to the extent that anybody wants to strike questions or strike testimony on irrelevant documents, I think you should probably go ahead and brief that because I don't want to sit on the phone with all of you addressing one question at a time whether or not that question was appropriate. In general, I don't think someone's love life is appropriate, and so I kind of agree with the – in general the statement that I don't think any of you would actually legitimately disagree with.
>
> I think immigration status is out. That's not relevant to anything because most of these people don't even work, I think, for the sponsors anymore. And questions about their love lives or what they did in their off time and all that sort of thing, that's just not relevant to the issues before the Court. And I don't know why you would even want to know.

*See* Harning Tr. 161:20-162:11.[5] Defendants' belated attempt to distance themselves from the Court's clear articulation of its intent only further demonstrates the need for a written protective order. If the Defendants had their way, they would be free to continue to ask all manner of harassing and intimidating questions, subject only to time-consuming, after-the-fact motions to strike particular questions. But at that point, the damage will have been done, as the Plaintiffs will have been forced to answer entirely irrelevant and inappropriate questions, allowing the Defendants to punish them for their participation in this lawsuit. The Defendants have conclusively demonstrated that they will not reign themselves in. An order from the Court is necessary to protect the Plaintiffs.

### 3.     The Previous Depositions Were Not Proper

Defendants' after-the-fact justifications for their improper questions at previous depositions (*see* Dkt. 386 at 11-25) offer nothing in addition to their global relevance arguments (which, as explained above, are meritless) and are irrelevant to this motion in any event. Plaintiffs seek a protective order going forward.[6] The motion turns on whether Plaintiffs have demonstrated good cause for the requested order. Because Plaintiffs' personal lives are not relevant to the claims before the Court, they have met the standard regardless of how Defendants' questions were handled previously in this

---

[5]     Earlier in the conference Judge Tafoya stated that she hoped to "hear the question about who sent you flowers on Valentine's Day was a joke because something like that is not relevant." Harning Tr. 137:18-20.

[6]     Plaintiffs reserve their right to move to strike questions and answers from the prior depositions, in the event the Defendants designate such testimony for trial. The remoteness of that possibility, however, underscores the irrelevance of the questions.

9

case.[7] Accordingly, Plaintiffs will not respond to every justification Defendants now raise for their previous questions. Some, however, cannot go unanswered.

### a.      Johanna Beltran

Defendants attempt to justify their questions about Ms. Beltran's personal life by focusing on her relationship with a man named Orlando Salazar, who appears to have helped Ms. Beltran *after* her time as an *au pair*. Some questioning about Mr. Salazar may have been proper because, as Defendants note, his name appeared on certain documents produced in discovery. But Ms. Beltran's relationship with Mr. Salazar does not explain Defendants' broader inquiries into Ms. Beltran's current love life. (*See* Beltran Tr. at 199:17-18 ("Q: Do you currently have a boyfriend or someone that you date?")). Nor does it explain why defense counsel accused Ms. Beltran of paying Mr. Salazar a bribe.[8] In short, Defendants' conduct at Ms. Beltran's deposition demonstrates the need for a protective order.

### b.      Lusapho Hlatshaneni

Defendants grilled Plaintiff Lusapho Hlatshaneni about speeding tickets and traffic violations that occurred during her free time. *See* Hlatshaneni Tr. at 115:16-

---

[7]      Similarly, Defendants fault the Plaintiffs in one breath for objecting too readily to their intrusive and harassing questioning, while in the next defending their actions in prior depositions by claiming Plaintiffs did not object to certain questions. Putting aside Defendants' "heads I win, tails you lose" approach, it is beside the point for purposes of this motion whether Plaintiffs objected previously or not.

[8]      Whether defense counsel's questions referred specifically to bribery or not (*see* Dkt, 386 at 14), there can be no doubt that he was asking whether Ms. Beltran had committed a crime. (*See* Beltran Tr. at 178:11-13 ("And did you give him any money or anything in exchange for his agreement to sponsor your student visa?"). It is telling that Defendants even now do not claim a basis for this question.

119:21. Defendants argue that those intimidating questions went to "how seriously she took safety and how it affected the children in her care." (Dkt. 386 at 16). This remarkable view of relevance—indeed, Ms. Hlatshaneni's driving record during her free time says nothing about the care she gave the children in her charge, and even if it did, it would not be relevant to whether she received a legal wage—further demonstrates the need for a protective order: if Defendants are seriously contending that that they can question *au pairs* about their personal time to determine how they would act when they were working, there is essentially nothing that is off the table at future depositions.

### c.    Juliane Harning and Laura Mejia Jimenez

Defendants argue that their questioning about the personal lives of Ms. Harning and Ms. Mejia was justified because they needed to determine the "extra" pay both received from their host families. (Dkt. 386 at 19). Of course, this does not explain their questioning about road trips or what Ms. Mejia might have to do with her time other than work. (*See* Dkt. 365 at 4-5). And in any event, the explanation only further demonstrates the need for a protective order. Defendants apparently view Plaintiffs' unsurprising inability to recall sporadic cash payments they may have received from their host families as an invitation to ask open-ended questions about their personal spending. Putting aside the dubious relevance of such questions—indeed, the notion that Defendants could reverse-engineer any extra payments Plaintiffs may have received by interrogating them about their personal spending nearly defies credulity—these types of intrusive questions are inappropriate and should be precluded because the burden of responding outweighs any limited benefit the answers may have.

11

### d.      Beudette Deetlefs

Defendants' asked Ms. Deetlefs whether she had a boyfriend while in the United States. Defendants now claim this question went to whether "Plaintiff geographically limited her re-match search." (Dkt 386 at 21). At the deposition, however, Defendants did not question Ms. Deetlefs about these purported geographic limitations. And in any event, Ms. Deetlefs' re-match is irrelevant because she does not claim that Cultural Care's conduct with respect to the re-match was improper.

### CONCLUSION

For the foregoing reasons, the Court should grant the motion and enter the requested a protective order prohibiting Defendants from their continued abusive, harassing and irrelevant inquires.

Dated: New York, New York
October 24, 2016

Respectfully Submitted,

BOIES, SCHILLER & FLEXNER LLP

S/ Peter M. Skinner
Matthew L. Schwartz
Peter M. Skinner
575 Lexington Avenue
New York, New York  10022
Tel: (212) 446-2300
Fax: (212) 446-2350
mlschwartz@bsfllp.com
pskinner@bsfllp.com

Sigrid S. McCawley
Lauren Fleischer Louis
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, Florida  33301
Tel.: (954) 356-0011
Fax: (954) 356-0022
smccawley@bsfllp.com
llouis@bsfllp.com

Alexander Hood
TOWARDS JUSTICE
1535 High Street, Suite 300
Denver, Colorado  80218
Tel: (720) 239-2606
Fax: (303) 957-2289
alex@towardsjustice.org

*Attorneys for Plaintiffs*

13

## Certificate of Service

I hereby certify that on October 24, 2016, I served a true and correct copy of the forgoing on all counsel of record by ECF pursuant to Fed. R. Civ. P. 5.

S/     Peter M. Skinner

Peter M. Skinner