IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Case No. 14-cv-03074-CMA-KMT

---

JOHANA PAOLA BELTRAN, et al.,

Plaintiffs,

vs.

INTEREXCHANGE, INC., et al.

Defendants.

---

Proceedings before KATHLEEN M. TAFOYA, United States Magistrate Judge, United States District Court for the District of Colorado, commencing at 11:36 p.m., October 25, 2016, in the United States Courthouse, Denver, Colorado.

---

WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED. . .

---

APPEARANCES

LAUREN F. LOUIS, PETER SKINNER and NINA DiSALVO, Attorneys at Law, appearing for the plaintiffs

BROOKE COLAIZZI, HEATHER VICKLES and JOSEPH HUNT Attorneys at Law, appearing for defendant InterExchange, Inc.

---

MOTION HEARING

APPEARANCES (Cont'd)

BOGDAN ENICA, Attorney at Law, appearing via telephone for defendant Expert Group International Inc.

DAVID MESCHKE and MARTHA FITZGERALD, Attorneys at Law, appearing for EuRaupair Intercultural Child Care Programs.

JAMES HARTLEY, ADAM HUBBARD and JONATHAN BENDER, Attorneys at Law, appearing for Cultural Homestay International.

JAMES LYONS, JOAN LUKEY, JUSTIN WOLOSZ (via telephone) and LYNDSEY KRUZER (via telephone), Attorneys at Law, appearing for Cultural Care, Inc., d/b/a Cultural Care Au Pair.

PEGGY KOZAL, THOMAS QUINN and BRIAN MASCHLER (via telephone), Attorneys at Law, appearing for AuPairCare.

KATHRYN REILLY, Attorney at Law, appearing for Au Pair International, Inc., American Cultural Exchange, LLC, d/b/a GoAuPair, Agent Au Pair.

SUSAN SCHAECHER, Attorney at Law, appearing for American Institute for Foreign Study d/b/a Au Pair in America.

APPEARANCES (Cont'd)

LAWRENCE STONE (via telephone), appearing for A.P.E.X. American Professional Exchange, LLC d/b/a ProAuPair, and 20/20 Care Exchange, Inc. d/b/a The International Au Pair Exchange.

P R O C E E D I N G S

(Whereupon, the within electroncially recorded proceedings are herein transcribed, pursuant to order of counsel.)

THE CLERK: All rise. Court is in session.

THE COURT: Good morning, everyone. Please be seated.

All right. We are here today in Case No. 14-cv-3074. This is Johana Paola Beltran, et al., plaintiffs, versus InterExchange, Inc., and a number of other defendants. We'll take the first hour taking appearances.

First, may I have plaintiff.

MR. SKINNER: Yes, Your Honor. Good afternoon.

Peter Skinner and Lauren Louis from Boies Schiller & Flexner, for plaintiffs.

MS. DiSALVO: Good afternoon. Nina DiSalvo of Towards Justice, for the plaintiff.

THE COURT: All right. Thank you.

And, defendants, do you know what order you are

in, or you want me just to call? Is it easier if I just call it out? Okay.

Interexchange, Inc.

MS. COLAIZZI: Good afternoon, Your Honor. Brooke Colaizzi and Joseph Hunt, of Sherman & Howard, on behalf of Interexchange.

THE COURT: Is Ms. Vickles here, too?

UNIDENTIFIED SPEAKER: (Inaudible) she is not.

THE COURT: She's not here? All right.

For USA -- excuse me. USAuPair, Inc. No appearance for that person. Does anybody know, have you talked to anybody on that? I mean, do they not care about these two motions or --

MR. HARTLEY: Your Honor, they are not directly implicated in these motions. I know USAuPair is a very small company, so I suspect that is driving.

THE COURT: All right. Well, we will go forward without them then. How about Great AuPair? I don't think anyone is appearing for them either.

MR. HARTLEY: I should have identified myself. It's Jim Hartley, counsel for Cultural Homestay, and I think the same would apply to Great AuPair.

THE COURT: All right. So we'll just assume, then, because they are smaller companies, we are going to save money and not appear today.

How about Expert Group International, Inc.?

MR. ENICA: Good afternoon, Your Honor. Bogdan Enica here, on the phone, for Expert AuPair.

THE COURT: All right. And thank you. And EurAuPair Intercultural Child Care Programs.

MR. MESCHKE: Your Honor, David Meschke, on behalf of EurAuPair. Martha Fitzgerald did not make it today.

THE COURT: All right. For those of you who have a good, loud voice, you can kind of shout it out, if you don't want to run up to the podium.

MR. MESCHKE: Your Honor, one correction. Martha Fitzgerald is right behind me.

THE COURT: Oh, she is here?

MR. MESCHKE: Yes.

MS. FITZGERALD: I just walked in, Your Honor. Thank you.

THE COURT: Cultural Homestay International, Mr. Hartley, you are here?

MR. HARTLEY: Yes, Your Honor. Jim Hartley from Holland & Hart. John Bender and Adam Hubbard are also here representing Cultural Homestay.

THE COURT: And Cultural Care, Inc., d/b/a Cultural Care AuPair.

MR. LYONS: Good afternoon, Your Honor. Jim

Lyons of Lewis Rocca Rothgerber Christie and I would like to introduce my cocounsel, Joan Lukey of Choate, Hall & Stewart.

MS. LUKEY: Good afternoon, Your Honor.

THE COURT: Good afternoon. Did I have appearances by (inaudible) by Cultural Care, Inc., also?

MS. LUKEY: That's the same entity, Your Honor. The d/b/a is Cultural Care AuPair.

THE COURT: And Mr. Wolosz, are you on the phone.

MS. LUKEY: Wolosz. He's supposed to be -- Justin, are you on? Must've had a problem with the dial-in, I guess, Your Honor.

THE COURT: Okay. And --

MR. WOLOSZ: There was a problem with the phone.

MS. LUKEY: There he is.

THE COURT: There you are.

MR. WOLOSZ: Sorry, Your Honor. There was a problem with the phone. Yes, this is Justin Wolosz. I am here on behalf of Cultural Care, as is my colleague Lyndsey Kruzer.

THE COURT: All right. Thank you. And let's see, AuPairCare, Inc.

UNIDENTIFIED SPEAKER: (Inaudible), Your Honor, Gordon & Rees.

THE COURT: And on the phone?

MR. MASCHLER: Brian Maschler, Your Honor, Gordon & Rees.

THE COURT: There we go. Okay. All right.

AuPair International, Inc. and I think the same counsel probably represent American Cultural Exchange, LLC; GoAuPair Operations, LLC, d/b/a GoAuPair; and I think a separate entity, Agent AuPair.

MS. REILLY: That's correct, Your Honor. Katy Reilly on behalf of all three, actually all four of those defendants, Wheeler, Trigg, O'Donnell.

THE COURT: All right. Thank you. How about APF Global Exchange, NFP, and American Institue for Foreign Study?

MS. SCHAECHER: Susan Schaecher with Stettner Miller Your Honor.

THE COURT: And then finally, A.P.EX. American Professional Exchange, LLC and 20/220 Care Exchange, Inc.?

MR. STONE: Yes, Your Honor. Larry Stone, appearing on behalf of both defendants by telephone.

THE COURT: All right. Does that take care of everyone? Did I miss anyone that thought they should be standing up and saying, Hello? All right. Good.

THE COURT: Okay, we're here today for consideration of two motions. The first is 337, this is a motion for sanctions that was filed by Cultural Care, Inc.

Who's going to be arguing on behalf?

MS. LUKEY: I will, Your Honor.

THE COURT: All right. And then the other motion that we're here on is the Motion for Protective Order No. 365 that was filed by the plaintiffs. So I'm going to set aside, first, the Motion for Protective Order -- oh, I know that's the one all of you care about the most, but I think that talking about the sanctions and this very first au pair deposition might be the practical way to proceed.

So I want to proceed on that first. Are you ready to go forward?

MS. LUKEY: I am, Your Honor. Thank you, Your Honor. Joan Lukey for Cultural Care.

This motion relates to the fact that on August 16th of this year, the first scheduled deposition of a plaintiff in this case was to have occurred. The location was Philadelphia. It was selected by the deponent, Ms. Cardenas Caicedo, who now lives in Philadelphia. The date, as I mentioned, was August 16th. That, too, was selected by Ms. Cardenas Caicedo. At the time of that deposition, there had been no earlier depositions of any plaintiff, merely the deposition of a private investigator, which is the subject of a different motion.

MS. KRUZER: When was the meeting?

MS. LUKEY: On August 15th, because the scheduled start time for the deposition the next morning was 9 a.m. My partner, Justin Wolosz and my colleague, Lyndsey Kruzer, flew down to Philadelphia to be prepared and ready to begin at 9 a.m. At about 7 o'clock that night, they receive from plaintiff's counsel an additional 400-plus pages of documents which they reviewed and had copied and ready for the deposition the next morning. When no one, counsel or witness, had appeared by 9:30, whereas Mr. Wolosz and Ms. Kruzer had been present in person and several of the co-defendants present by telephone and the videographer and stenographer standing by, Mr. Wolosz e-mailed plaintiff's counsel and inquired as to where they were. Received an answer about 10 minutes later that she, counsel, was in the building and would be up shortly. At 9:45, Ms. Louis arrived as counsel for plaintiff, but she was alone. She indicated that the deposition would not be going forward that day. She indicated that she was not in a position to explain or express a reason. I won't attempt to paraphrase what she said, but stated that she would not be explaining on that day why Ms. Cardenas Caicedo had decided not to appear.

The parties went on the record, briefly, so that it could be established on the record that this chronology had occurred and that no reason was being

given. And shortly thereafter, the deposition was suspended without having occurred. For the next several weeks, efforts were made to ascertain what had happened and why Ms. Cardenas Caicedo had not appeared. No reason was given. The answer was always that they were not in a position to explain at that point. The first -- as far as we are aware, the first that any of defendants, but certainly that Cultural Care, was aware of any reason was about six weeks later on September 26 in the evening, when plaintiffs filed the motion for protective order that you'll be dealing with next.

In that motion, they alluded to supposed fear or intimidation on the part of Ms. Cardenas Caicedo, who was supposedly afraid of her former sponsor, Cultural Care. Obviously, there was no one from the former sponsor there, just attorneys. The next day, the opposition was filed to the motion that we're now arguing before you, Your Honor. And the same reason was stated, along with an affidavit or declaration from Ms. Cardenas Caicedo stating that she did not appear, she got to the door of the building, was supposedly frightened and afraid to come in because of her fear of Cultural Care. She states in fairly inflammatory terms the reasons that she felt afraid; that she was supposedly treated as a commodity and the like during her tenure, none of which

had ever appeared in any of three complaints that, by that point, were on file, although the third had not yet been allowed by the Court, nor had it appeared in her original declaration, nor had it been heard at any time, nor was it ever given to us as an explanation. And I could tell the Court, as you have probably seen from the email exchange, if there had been a reason -- an illness, a family problem, something -- perhaps even some explanation that she needed a little more time to gather herself and needed a later start, we would certainly have been sympathetic to that. But there was nothing and the frustration grew because we weren't being given any reason at a time when all parties were moving forward with trying to do their briefing on the motions for the conditional class approval, the certification, and. Therefore, when we filed the motion, it was after communications -- several between me and plaintiffs' counsel, all of which are appended -- I believe to their opposition, actually -- in which we stated that we could not wait any longer, having waited some weeks and we were moving, therefore, to strike Ms. Cardenas Caicedo as a named representative of the punitive class. We also ask that she be dismissed from the lawsuit with prejudice, meaning also with regard to being a member of the class. We ask that allegations pertaining to her be stricken

from the Amended Complaint. Now it would be the Second Amended complaint and finally, we asked that reasonable fees -- costs and fees be awarded as actually required by Rule 37(d)(3) for a no-show party at a deposition unless there is justification -- substantial justification, or basically other extenuating circumstances.

We submitted to the Court, my partner, Mr. Wolosz's, declaration as to the amounts. We indicated that we did not request the amounts on the basis of the Boston fees, even as already discounted by us for this client, but that rather, in consultation with our co-counsel, Mr. Lyons, used a Denver fee schedule, feeling that would be more appropriate under the circumstances and made the submission.

In the opposition, Ms. Cardenas Caicedo acknowledges that she is not going to be -- she is out as a named representative of the punitive class and we do appreciate that fact. We believe, nonetheless, it would be, under the circumstances, to proceed at all -- even as a member of the class, since it is apparent that, under no circumstances apparently, will she be deposed and that we inquired over the several weeks following the deposition as scheduled, whether she would appear for a new date.

So at this point, we believe that she should

be out of the case. That leaves us then, with the only issue being that of the fees. I don't, as a lawyer, enjoy asking for fees or sanctions of this type. I don't think any experienced lawyer does, but this is a circumstance where we were given no advance warning. It was a circumstance where the lives of a couple of partners were disrupted and there were childcare issues and whatnot to do the deposition on the date that had been requested by this individual. And, frankly, most compellingly, we just weren't given any reason until a court filing setting forth what we consider to be inflammatory and inappropriate contentions that have never appeared over the course of this case, that somehow Cultural Care, a State Department sponsor of the J1 program had intimidated her during the course of her time, even though she was sufficiently fond of both her host family and her experience, to extend six months after her original year. We find the declaration unfortunate, inflammatory and highly incredible under those circumstances.

We ask, at this time, as 37(d)(3) anticipates, that the fees and costs be awarded both for the aborted deposition and an amount to be determined for what it has taken to bring this motion before the Court.

We recognize that in the opposition, there is

a contention that Ms. Cardenas Caicedo can't afford to pay the funds. We understand that. The rule states that either the party or the party's attorney. This case is an extremely expensive case in which the plaintiffs are claiming $400 million a year in damages for seven years before traveling, it is being -- apparently the costs are being borne by (inaudible).

Respectfully, Your Honor, under these circumstances, it ought not to be Cultural Care that has to bear this burden of these costs. This is a drop in the bucket, I'm sure, compared with the costs that are being incurred otherwise and fronted by (inaudible) and we ask that the fee award be made against (inaudible)

Thank you, Your Honor.

THE COURT: Thank you. And who will be responding for plaintiff?

MR. SKINNER: Peter Skinner for plaintiffs, Your Honor.

THE COURT: Okay.

MR. SKINNER: And if you'd -- so first of all, Your Honor, I don't think we have much issue with the factual recitation that was offered by Ms. Lukey. She obviously doesn't have the perspective of having heard our client's side of this and those conversations are privileged in any event, so I'm not going to get into them

today. But I think most of what she laid out is right and, really, with respect to why she didn't appear, it's simple. As we said in our paper, she was overwhelmed by fear and emotion at the threshold of appearing for this deposition.

THE COURT: You haven't told me any reason why she would be fearful.

MR. SKINNER: Well, she --

THE COURT: Your papers have nothing in them. Only that she was mistreated and she thought she was a commodity. And that's all we've heard and I think all deponents are a little bit fearful. I think I would be, if I was going to be a deponent. You're nervous and fearful, you don't want to say the right -- the wrong thing. You're prepped. I understand that, but I don't think you can argue fear and intimidation. From what?

MR. SKINNER: Well, Your Honor, I agree with you. I think anybody undergoing a deposition is put in a stressful situation. I think the plaintiffs in this case are in a uniquely stressful situation. They're all foreigners, they're all young, they have no experience with the US legal system and they're taking on their former employers, alleging that they weren't paid enough by their former employers. They are taking on what they view as an entrenched institution of power that, as was explained in Ms. Cardenas' declaration, she had viewed as somebody who

would really exercise a lot of control over her. Now she appeared for the deposition; she said she simply couldn't go forward.

THE COURT: Well, she didn't really appear. She didn't come in --

MR. SKINNER: She made it to the building, Your Honor.

THE COURT: And say, I can't go forward.

MR. SKINNER: The point here, for sanctions, is -- you know, if she had decided two weeks ahead of time I'm not doing it and we had sat on that information and we had forced everybody to show up at great expense -- and mind you, this was at expense to us as well.

THE COURT: Mhm.

MR. SKINNER: Ms. Louis flew up from Florida. We spent hours the day before preparing this woman. We reviewed hundreds of pages of documents to produce to them. She's a named plaintiff for a class that we're seeking to certify. By no means were we taking this lightly or that we had any intention that this plaintiff was not going to appear for her deposition. And we did everything we could, Your Honor, to try to get her to appear. But on the morning of, she said she couldn't do it. It's mid-August; she said I just can't do it. What are we supposed to do? Put her on behind our back? Walk her into the deposition,

force her to undergo what she says she can't do?

THE COURT: Well, walking her into the deposition is probably a good idea. You're the only people, if you had -- and I don't want to know, because I don't want you to tell me anything that's privileged, that you talked to her the day before and that is the time to ascertain whether or not you've got a really skittish witness or a person who may not appear. And if that's the case I think, as an attorney, you have an obligation to go pick her up and drive her to the thing.

Now, can you twist her arm and make her testify? Could she have dissolved there on the -- at the witness table? And, you know, everything could have blown up right then and there, which it probably would have, that you can't do anything about --

MR. SKINNER: And that's what happened, Your Honor.

THE COURT: But you're the only people that could have known how she was feeling.

MR. SKINNER: But that's exactly what happened. I mean, the only thing in the recitation Your Honor just gave that we did not do was go and pick her up, you know. And I don't want to testify incorrectly here. I'm not a witness and I wasn't even there, but my colleague was staying at a hotel near where the deposition was and had

ascertained that the deponent was going to get herself there. And if we had reason to believe on the evening of August 15th, that what happened on the 16th was not going to happen -- was -- that she was going to refuse to go into the room, she was going to make it to the building, drive herself a half hour from the suburbs of Philadelphia into downtown Philadelphia for the deposition, park her car, walk to the lobby of the building, meet the attorney who had prepared her to go in and then say, I'm sorry, I just can't do it -- if we could have read a crystal ball and foreseen that, then we would have told these folks. But we thought, in good faith, that although she was a skittish witness -- a very skittish witness -- you know, like I said, I'm not going to get into the privileged conversations we had with her. But we thought, in good faith, that she would appear and she got awfully close, Your Honor, and she was right there. And like I said, we made a decision that we were not going to force her to go into the room, because this was a young woman who was really beside herself and there wasn't really any point to it. And she made it clear that she was not going to be able to go forward at that time --

THE COURT: Well, do you feel like -- without asking you what you said to her, don't you feel like that you had some responsibility on advising her that this could

happen, that she could get stuck with the fees and costs of the other side?

MR. SKINNER: I'm not going to get into what we said. And I hope that nobody argues that what I'm doing right now is a waiver of the attorney-client privilege, but I can say that we took every effort to impress upon our client the seriousness of this proceeding, the seriousness of what she had signed up for as a named plaintiff in this lawsuit, the commitment that she had made, both to the attorneys who were prosecuting this suit, as well as to all of the other au pairs she was seeking to represent and that she had to go forward with the deposition. It was not presented as like, Okay, you can show up and see how you feel and she decided -- she couldn't do it. She was overcome, she was overwhelmed. That happens.

I don't think it happens often, I'm not saying that this is a routine occurrence, but it does happen. And I think in the circumstances in which this young woman found herself, it's not completely difficult to comprehend how she might have been overwhelmed. Now, this was mid-August. A lot of people were on vacation. Some of the lawyers working on this case were on vacation. Ms. Lukey said that if she had gotten an explanation as to why this had happened, maybe that would of changed things. I don't know, maybe we can all look

back, right now, and say that's true. I have no idea. I don't know if we had told her, She's really afraid of your client and she just can't face you in a deposition room, I don't know if that would have changed things or not. She would have said probably what we were thinking, which is she made an obligation, she has to go through with it. But we had hoped that she might come around and that we might be able to salvage this situation where she could proceed with her claims and the rest of the depositions started and we continued to be in touch with this young woman in an effort to try to first, see how she was doing and, second, see if there was any way to try again. And she asked us what was happening in the other depositions and, again, without getting into the conversations that we had with our client, I can say that we couldn't tell her, in good faith, that the depositions were going to be limited to her professional work as an au pair. Not given what had been happening in the depositions. We couldn't give her that assurance and we sent her transcripts so she could read how these depositions were going. We asked her to reconsider, to do everything -- you know, to take a deep breath, to reset, to try to see if she could do it again. And ultimately, even after the motion for sanctions had been filed, which I think was at the very end of August, she

ultimately made the decision, prior to the time that we filed our opposition to the sanctions motion, that she unfortunately just could not go forward. And that's why when we did respond to the sanctions motion, we said, We agree, she's going. Complaints against her should be dismissed and we believe they should be dismissed without prejudice, but we'll get to that in a moment.

But really, the ultimate sanction for any plaintiff who is trying to pursue a claim against the defendant is the loss of their claim. That sanction is here. It's done. We all agreed to it and we fully expect the Court to dismiss Ms. Cardenas' claims against Cultural Care. So all we're talking about is the money and who should bear the expense for the unfortunate situation that Ms. Cardenas found herself in where she was unable to overcome a flood of emotion that prevented her from going into the room for her deposition. Now a couple of things that I want to add to what we've had in our briefing and respond to what Ms. Lukey said, because I think they're relevant to the consideration of who should bear the expense.

First, as I noted before, this is not a situation where we have somehow not expended any money on this deposition and they have and as a result of our client's actions, they're out money and we're not. We've

expended time and effort on this. As we can get to in a moment, I don't think quite as much time as they did, because they seem to have expended an awful lot of time preparing for this one deposition, but we'll put that aside for a moment.

THE COURT: But you picked her, right? I mean, you're the one who picked her as the plaintiff representative. You -- I don't know who you had a choice of or if there -- you know, I don't know how you make those choices, but you're the one that put her in as a plaintiff, as a named plaintiff. Not Cultural Care. Cultural Care has nothing to do with it, except that they've got to defend against it, right?

MR. SKINNER: That's right, Your Honor, and I think that's a different point. The one I'm making, which I don't think is a particularly overall important point of the overall calculus, but it's just one to simply note that this is not a situation where there's been money expended by one side but not another. We're talking about money.

With respect to picking a plaintiff, first of all, these plaintiffs tend to pick themselves. You know, I mean, you can't just go out on the street and grab somebody and say, Hey, we think you'd make a nice plaintiff. And we can't go out on the internet and find people that we think are going to be strong enough to go

through with this and hunt them down and hope that they have -- that they were au pairs and that they had an au pair experience and everything else. And I mean, to a certain extent, these people select themselves. And certainly, when you're talking to a plaintiff, a potential plaintiff, you analyze them like you would any other client, because you're signing on to represent these individuals. And particularly in a case like this, where -- you know, where we're proceeding as a class action and there's some risk being taken on the other side with respect to investment in a case that you might lose down the road, you do everything you can to make sure that you identify folks who are going to be able to be adequate and effective class representatives, add something to the prosecution of their case and see the case forward. And we certainly thought, when we had agreed to represent Ms. Cardenas, that she fit into that category. Now, it ultimately proved that when push came to shove and she had to appear for a deposition, she wasn't able to go through with it, but I don't think that there was anything in the introductory stages of our relationship with this particular client that that's where we were headed down the road. If there were, we wouldn't have put her forward. It wouldn't have made any sense, from our perspective, to get as far as we got and

then lose one of our named class representatives. Two years into the litigation, Your Honor. And this is not something that we, by any means, you know -- agreeing to dismiss her out of this case is not something that we've done lightly and we would prefer, very much, to have her as an additional class representative, but we can't force this young woman to do what she needs to do, which is sit for her deposition. And we haven't come forward and made any kind of argument that she should be able to proceed without being deposed. We agree, if she's going to go forward, she needs to sit for her deposition and she hasn't been able to do that, but with respect to who should bear the cost for this, you know the law is clear -- well, first of all, I disagree with the suggestion that it's mandatory. That these costs need to be borne by either the either plaintiff or the defense counsel or both. I actually think this rule is written in an inconsistent way in that the rule says that sanctions are permissive as an overall matter and that "shall" that is contained within the subclause, with respect to the cost borne when somebody doesn't appear for the deposition is inconsistent with that overall precept that sanctions should be permissive.

THE COURT: But somebody's got to bear the cost. I mean, if it's not plaintiff's counsel and it's not

plaintiff herself, then it's going to be Cultural Care.

MR. SKINNER: That's right. And you know what, Your Honor, for the investment in the cost for what they've got, they've actually gotten a great result. They've got a plaintiff that is no longer a part of the case. They've dismissed a named plaintiff out of the case. It would have cost them more money, going forward, if she had appeared for the deposition. It would have cost them more money to go through with the deposition itself. It would have cost them more money to continue litigating against this young woman.

So, look, yeah, they would have -- if you're not going to put it on the plaintiff and you're not going to put it on the plaintiff's law firm, the only other person bearing this cost is the defense counsel. And yes, they have to bear that. But at the end of the day, it's actually a lot less than they might be spending otherwise and they have been spending money to defend this case. That's part of being involved in a lawsuit. That's part of losing your motion to dismiss. We have presented sufficient claims to go forward with discovery. And as a result, there is going to be some cost borne by the defendants and with respect to this particular plaintiff, the overall cost has not been exceedingly high, given the outcome that they've managed to get for

their client, which is a dismissal of the plaintiff, although this case has been pending for awhile at a relatively early stage in the overall proceeding. The law from the 10th Circuit, and we cite it in our brief at page 10, is clear that just because the plaintiff's lawyers may have the means to pay a sanction in a situation where the plaintiff herself might not otherwise be able to do it doesn't mean that you just look to them to make this whole. You look to try and ascribe fault in an unfortunate situation like this. And, frankly, Your Honor, there was nothing else that we could have done to avoid this particular situation. Like I said before, we had no notice well in advance. We couldn't have nipped this in the bud weeks in advance and just said, You know what, Ms. Lukey, stand down on Ms. Cardenas, because it doesn't appear she's going to go through with it. We didn't have that. The day before, the night before, we had every indication that she was going to appear for this deposition and we were hopeful that it was going to go forward and at that point, even if we had been able to pull the plug, most of the damage would have been done. I mean, everybody's there. People have flown from Boston to Philadelphia, they've done their 58.7 hours of prep work, or whatever it might have been. You know, the only thing that we could have saved, I guess, was the 1.3

hours of billable time for both the videographer and the court reporter the next day.

So, yes, obviously it would have been preferable if we could have saved that and perhaps sent people home that evening, but we didn't have any reason to. And if we did, we would have told folks and we would have tried to nip this in the bud and we would have gone about our lives as well. Because, like I noted, we were in the same situation where we had traveled in from out of town in order to prepare this woman for her deposition and to appear for it.

So I really don't think that under any fair reading of the applicable 10th Circuit law here, you can just say, Not really fair for them, she's your client, you guys should pay for it. That's not the way this works. And I think, as I noted before, an overall calculation of fairness, whatever that might be, you should take into consideration, the result that they got as a result of the money they spent to prepare for this deposition.

Also, I guess just with respect to the scope of the award that they're asking for, I don't -- similar to Ms. Lukey, I really don't relish arguing about another lawyer's hours or fees. I really don't want to fly-spec this. I do think that the amount of time that they spent

on this was high. I think if you ask most people, Did you spend nearly 60 hours preparing for a deposition of a plaintiff, that's probably toward the high range. High end of the range. Now they're thorough lawyers, I'm sure they wanted to make sure they were ready to go and they were going to ably represent their client, but it's a bit high.

I also think that the way this broke was unfortunate in that it's actually just ratcheted the costs up. And we were talking to them. Apparently, they didn't like the fact that we weren't telling them the reason she wasn't appearing. The reason we weren't giving them that reason was because we were still hopeful that our client might be able to appear for a deposition in the near future and, you know, we hadn't ruled that possibility out. We were also in the second half of August -- we were really talking about two weeks, here, Your Honor, August 16th until they filed their motion, which was, I think, August 30th. August 31st. So we're talking about two weeks here. People are on vacation, we were trying to talk to them. We'd asked them what they thought a reasonable amount of fees might be so that we could try and ascertain whether it was just worth our while to write a check and be done with this. But in the middle of all that -- well, I shouldn't even say the

middle of all that, because it's really the beginning of all this.

I mean, Your Honor, the first day that there was a discussion about what their fees might be was a Friday afternoon and they said, Well, we're going to move. We have our motion ready. We're going to move today. And that is not indicative of somebody who is trying to work things out. That's indicative of somebody who's decided of going to Court to get relief, has already written a brief, even before we've had any back and forth.

Matthew Schwartz, who's the lawyer from my firm, that had been talking to Ms. Lukey -- I was even further out of town than Matthew at that point in time. He was on vacation, but he interrupted his vacation to talk to her. And we got all this pressure, trying to resolve this right away. And it's kind of, I think, really false sense of urgency to try and put this to bed right away. And it doesn't make -- it didn't a lot of sense then and it still doesn't make sense to me now. They didn't file their opposition to our motion for conditional class certification until weeks after that.

So the idea that they had to have an immediate answer with respect to what her situation was and how the attorney's fees were going to play out in all of that, it

didn't make a lot of sense to us then and it still doesn't now. And because they then elected to go forward and move for sanctions and all of that, they put into place a procedure, you know, that perhaps has been more expensive than it needed to be.

So big picture, Your Honor, I think this situation is regrettable and I certainly know, from the perspective of the plaintiffs, we would prefer to have Ms. Cardenas going forward. You know, having sat for her deposition and being considered as a potential class representative, I also regret the time and effort and money that was spent on the defense side of this in order to prepare for this deposition, but I do not think that the right result here is to impose a financial burden on our client, because she simply can't pay. And I really don't think that bankrupting her at this point with a judgment is the just result. And I also don't think that, given the way these facts played out and given the timing of this situation and everything else, that you can look to us to write a check in this situation. This is a situation that, unfortunately, must be borne by the defense and they've gotten, as I've noted, a pretty good return for their investment.

THE COURT: All right. Thank you. Ms. Lukey?

MS. LUKEY: I will be brief, Your Honor. As I

mentioned earlier, a key factor for us was the continuing unwillingness of the plaintiff's counsel to tell us either why Ms. Cardenas would not appear or whether she would be available at a different date. A certain amount of frustration builds up in that process as you're in the midst of attempting to respond to the conditional class certification motions, particularly in a circumstance where there were and remain -- there were only two and now only one Cultural Care plaintiffs in the mix.

THE COURT: What size is Cultural Care, are you one of the bigger sponsors?

MS. LUKEY: We are, Your Honor. We're the largest.

THE COURT: You're the largest?

MS. LUKEY: Yes.

THE COURT: Okay.

MS. LUKEY: However, not getting an answer was very concerning for us. We already knew there were issues relating to the appropriateness of the other plaintiff that's a subject of other motions. And with this plaintiff, we then needed to know whether someone who might otherwise have been appropriate if a conditional class were to be certified, was in or out and we could not get a response. It is not adequate to finally respond six weeks later in the form of filing a motion for protective order

the evening before you file your opposition. That's not how it works between counsel. If they're about to reveal, on October -- sorry, September 26 and 7 that she was supposedly in fear of a sponsor who wasn't physically present, there were only two young attorneys present with a videographer and stenographer, then that should have been made known to us before we read it in a motion for protective order that seemed to imply that part of Ms. Cardenas' problem was the conduct at other depositions, which you'll hear about shortly from others, which hadn't occurred when she didn't show up. Hers was the first.

I will close simply by reading the language of Federal Rules Civil Procedure 37(d)(3), which is the one applicable to no shows, failure to answer and the like. Quote: The Court must require the party failing to act, the attorney advising that party or both, to pay the reasonable expenses, including attorney's fees caused by the failure unless the failure was substantially justified or other circumstances make an award of expenses unjust. Three -- quote/close quote, three quick points. There's been no challenge in the papers and no counter-declaration to Mr. Wolosz's declaration on the reasonableness of the fees.

We are hearing this contention about the -- perhaps, unreasonableness of the preparation time, which

I am surprised to hear because it is not, certainly, out of line in my experience for the first named plaintiff in an action to require 57 hours of preparation. But that has not been challenged, there is no counter-declaration on the issue of reasonableness.

Point two, the only way that mandatory -- that phrase is "mandatory," that particular phrase. The 37(d)(3) relief is mandatory, only two circumstances excuse it. That the failure was substantially justified.

Respectfully, Your Honor, we have these very first time contentions of conduct that apparently somehow frightened this young woman, with no explanation as to what that conduct was, who did it or why it was she found it frightening and why it would frighten her now, all this time later, to be deposed by two attorneys who are not that sponsor, certainly has not been made clear to this Court or to Cultural Care.

And, three other circumstances making an award of expenses unjust. Someone has to bear these expenses. I've already indicated to you we understand Ms. Cardenas' declaration that she does not have the wherewithal to do it. And I have already said to you, Your Honor, and I will close by saying again: If that is the case, the plaintiff's law firm, which is bearing substantial cost in this case, is the preferable bearer of this burden to

the innocent defendant at issue here.

Thank you.

THE COURT: All right. Well --

MR. SKINNER: Your Honor, may I say one thing -- not in response to anything Ms. Lukey said, because I don't want to get into a back and forth. I failed to address one point before I sat down.

THE COURT: Go ahead.

MR. SKINNER: And it's with respect to dismissal with prejudice. We can respond on that. If Your Honor isn't contemplating that, then I won't belabor anybody.

THE COURT: I don't think you need to belabor that with me. I think you're going to need to belabor it with Judge Arguello, right? That you have?

MR. SKINNER: That's right, Your Honor.

THE COURT: Yeah, I think that's who you're going to have to --

MR. SKINNER: But let me just quickly respond then. I'm sorry, Your Honor, I was thinking all about the dollar signs and what matters most for our client is this dismissal with prejudice or without. The law is clear that dismissal without prejudice is the ultimate sanction, a last resort. The factors that are outlined in the case laws as being in favor of it don't weigh in favor of it.

THE COURT: Well, maybe I didn't make myself

clear. I'm not going to dismiss with prejudice.

MR. SKINNER: Okay. But you're saying -- I thought you were saying you might want to preserve your record in some way--

THE COURT: Number one, I can't dismiss.

MR. SKINNER: We'll just rely on what we have in the brief.

THE COURT: All right.

MR. SKINNER: Thank you, Your Honor.

THE COURT: Maybe I'll put the cart before the horse. I have, as the last part of what I think should be considered in connection with these sanctions, that I am going to recommend to the district court that Ms. -- and I'll just say her full name for the record -- I think it's pronounced, Dayanna Paola Cardenas Caicedo, be dismissed from the case. I am not going to make a recommendation of prejudice or not prejudice because I seldom ever do that with the district court. I think that's up to the district court, how they do a dismissal. So the minutes from today will say that there's a recommendation of the magistrate court. My understanding is that no one objects to dismissal, but you may want to make an argument in your -- and I'll call them objections, just because that's the way the rule's written. So there'll be a recommendation effective today. You may want to address as part of any

objections or other thoughts to Judge Arguello your request that she be dismissed without prejudice and obviously defendants that should be dismissed with prejudice. That's going to be Judge Arguello's call, okay?

So -- and this is just a reminder, just so the record is clear that since this is a dispositive motion, recommendation, you have 14 days to file your objections or additions or whatever -- however you want to call them -- with respect to the recommendation of dismissal.

Now the attorney's fees, however -- the motion for sanctions has been referred to me and that includes the consideration of attorney fees, so that I'm not doing by recommendation, I'm doing by order and just -- there's no real set 14 days that goes with an order from a magistrate court. But obviously you do have a right to object to that too. It's just that the burden is different on that -- so it's clearly erroneous or contrary to law, okay?

So I think it's not contested, and I didn't hear anything different today that Ms. Cardenas -- her deposition was duly scheduled, properly noticed and in spite of this, Ms. Cardenas did not appear at the deposition. Now there has been testimony she appeared at the door, but I don't consider that appearing for the the deposition. And in fact, the -- what I've heard in

argument is that the attorney for plaintiffs may have met her at the door and talked to her that morning. That is a little bit unclear to me but, for sure, the other attorneys for Cultural Care were sitting in the room just waiting and not knowing what was going on.

MR. SKINNER: And, Your Honor, apologies for interrupting, but to make it clear: That's precisely what happened. The plaintiff, Ms. Cardenas, met Ms. Louis at the building where the deposition was to go forward and said she was unable to go upstairs and go forward with the deposition.

THE COURT: Okay. So I'm glad I heard that right, then. The deposition date and location in Philadelphia was picked by the deponent, apparently, Ms. Cardenas. Both counsel had to travel and incur cost, airplane cost and probably hotel cost, et cetera, although I don't know for sure what plaintiff's cost were. They've been represented that she did travel and was staying in a hotel. Her deposition, Ms. Cardenas' deposition, was the first one scheduled of the named au pairs seeking to represent one or more of the classes in this case and, therefore, the Court thinks, and will find, that preparation time for this particular deposition would probably be longer than for subsequent depositions. That may or may not be true. Everyone has their own way of

preparing, but given that it's the first one and the first time to really test the allegations of any of the complaints, I think it's reasonable that there would be a considerable amount of effort put forth, especially by -- I won't call them the lead defendant, necessarily, but the largest of the defendant sponsors. So the amount of time that was submitted in the time cards, although I will get to that later, is not particularly surprising to me.

Ms. Cardenas' allegations that Cultural Care was intimidating and demeaning to her while she was an au pair are not supported by any evidence whatsoever. Not even anecdotal evidence from Ms. Cardenas herself. There is no evidence before the Court at all of any intimidation or anything. Now I can't say there's evidence before the Court that there wasn't any either. There's just not any evidence. So her excuse for not appearing has, at least to this Court, and what's been presented to me, has absolutely no excuse at all. None. I mean, she just didn't show up. Well, she showed up at the door, apparently, but then refused to participate. So I've heard nothing to suggest that Ms. Cardenas was in any way treated improperly by Cultural Care while she was an au pair.

The evidence that was, and I put that in quotes, submitted by plaintiff's counsel with respect to

other depositions of au pairs which occurred subsequent to Ms. Cardenas' willful failure to appear, really has no relevance to Ms. Cardenas' so-called reasons for her failure to appear for her deposition or any supposed intimidation. And as I said to you earlier, I recognize that being deposed, although I've never been deposed, I can't imagine it's a pleasant experience and I don't think people would look forward to it. I think they'd be nervous, but what we're talking about is an utter failure on her part to do what she said she would do and what she was prepped by her counsel to do, et cetera.

I mean, this was a -- this particular deposition was a big deal, being that it was first. Counsel for Ms. Cardenas, I believe, is under duty to ensure that Ms. Cardenas was fully prepared to be a class representative in this case. I am not suggesting any type or order of preparation for a deposition, that's not what I'm talking about. I'm talking about -- I'm talking about the preparation that must have been -- or should have been made by plaintiff's counsel to make this person, who is from a foreign country and has been represented as being, I think, 25 years old now, so pretty young -- although, this only happened a few months ago -- prepared for what she's getting into, before they take on the whole class with her as a class

representative. I also think that counsel for Ms. Cardenas -- and I'll find this, too -- is obligated to ensure that their first class representative would appear for a deposition as scheduled. And as I had mentioned earlier, if that meant picking her up and driving her there, then that should have been done. Counsel spent the day before the scheduled depositions with Ms. Cardenas and had ample opportunity to ascertain whether or not Ms. Cardenas was fearful or so fearful that her appearance was going to be a problem. And they were the only ones that could have really predicted that in the scheme of things.

Counsel is the one that was there with her. Again, as I noted, no credible explanation for her fear was presented to the Court, just some random reason why she apparently felt fearful. I don't know why. The Court, as will be expressed later during the hearing on the motion of protective order, has not seen any evidence of intimidation tactics having been employed by defendants while deposing the punitive class representative, other than a few questions concerning immigration status, which the Court specifically forbade, once I was contacted about it. Other than that, I really haven't seen intimidation.

Now, it begs the question of improper

questions, et cetera, that we're here to talk about later, but intimidation, no. Additionally, the evidence now known to the parties concerning the treatment of other class representatives while they were au pairs is really irrelevant to the Court's finding of substantial justification concerning Ms. Cardenas' failure to appear and sit for her pre-arranged depositions.

In other words, what may have happened to Ms. Jimenez, for instance, in her au pair duties, you know, her relationship with the host family, et cetera, just doesn't make any difference here, because there's no evidence that Ms. Cardenas went through the same thing. From what everyone is telling me, there's -- I may have the number wrong, but there's at least 30,000 au pairs that may have been involved and the fact that a few of them get a problem host families, if that's what happened, is not too surprising. People being people, they're not all going to get along and not everybody's going to be as good as others, including the au pairs and the host families.

So I don't think that that bears on any substantial justification for Ms. Cardenas' failure to appear. So I am going to find that there was no justification at all for Ms. Cardenas' failure to sit for and appear at her deposition scheduled at her convenience

in both place and time.

So when determining proper sanctions, though, for this kind of behavior, the Court just has to consider a number of factors, including the degree of actual prejudice to the opposing party, in this case the defendants; the amount of interference with the judicial process; the culpability of the deponent, whether the Court warned the defaulting party in advance that dismissal of the action would be a likely sanction for non-compliance and the efficacy of lesser sanctions -- and obviously, I'm paraphrasing from (inaudible) v. Reynolds 965 2nd 916 and page 912. That's a 10th Circuit case, 1992.

So I looked at, first of all, the sanctions that are provided for in Rule 37(d)(2), since those are permissive in this case. And they include directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action as the prevailing party claims and/or prohibiting the disobedient party from supporting or opposing designated claims or defenses or from introducing designated matters in evidence and/or striking pleadings, in whole or in part, and/or staying further proceedings until the order is obeyed and/or dismissing the action or proceeding, in whole or in part, and/or rendering a default judgment

against the disobedient party and/or treating as contempt of court, the failure to obey a court order, which actually is not part of this case, because this just comes under a different section than disobeying a court order. I think that imposition of those sanctions appears to be permissive under Rule 37(d)(i), a small i. Because they say -- the word "may" is used and I agree with plaintiff counsel that the rule itself seems to be a little bit jumbled, if you will. It's kind of -- it's a little bit hard to figure out exactly what is permissive and what is mandatory. However, the rule clearly states that assessment of cost for failure to appear at your own deposition, in addition to, or in lieu of these permissive sanctions is mandatory. And that's how I read it. So I think costs are mandatory when someone does not show up for their own deposition, unless there are circumstances -- in this case, it would be unless there's other circumstances which makes an award of expenses unjust. So either it's got to be substantially justified, which I already found it was not, or there's got to be some showing that an award of expenses is unjust and unjust is kind of the key word here. Simply because someone is unable to pay, because they don't have a very good job or whatever doesn't make an award unjust. It may make it uncollectable, it may make it hollow

judgment; but it doesn't make it unjust. And there's nothing unjust in assessing damages or an award of cost -- not damages, but an award of cost and expenses against a person that doesn't show up when they're the plaintiff in a case and it's their case and they're supposed to be there for a deposition and they've got a myriad of attorneys there -- there were a number of attorneys on the phone. And while they didn't incur airplane costs, their time and effort was expended sitting there, waiting for this -- an important deposition. The first one. So I think that an award of attorney fees and costs are mandated here. So we're down to the issue, which I know all of you know in who should bear the expense, who is it that should do it? And I don't think it's ever been the law that the person with the most money should do it. Just because a defendant -- for instance, in this case, is the largest of the sponsors and may presumably have more money than Ms. Cardenas, doesn't mean that they should bear the cost of something that they didn't do. I mean, all they did is show up and do what they were supposed to do. And plaintiff's argument is, essentially, that, So did we. You know, we attorneys for the plaintiff class, which includes other named plaintiffs, just showed up and we did what we could and so therefor you can't award costs against us, but that's

not really what the rule says. So first, let me put as a matter of law, of what I've looked at here: Where a Court deems proper, an award of attorney fees, the movant must demonstrate the amount it seeks is reasonable and I'm not going to give you all the case cites on this because they're pretty standard law, but I'll give you a few of them. Generally, the starting point for the calculation of reasonable attorneys fees is -- and this is not withstanding the fact that it said who's got to pay them, but the attorney fee is a load star, so the number of hours reasonably expended multiplied by a reasonable hourly rate. The 10th Circuit case on that is (inaudible) v. Monaham 703 F3rd 1012. That's at 1017 through 18, it's a 1996 case. To determine whether a reasonable number of hours was expended, the Court reviews counsel's billing entries to ensure that counsel exercised proper billing judgment. Counsel must make a good faith effort to exclude hours or costs that are excessive, redundant, or otherwise necessary. Once a Court determines the load star, if any, it can adjust the load star upward or downward to account for the particularities of the work performed. This Court is not required to reach a load star determination necessarily. However, I will tell you that that's exactly what I did in this case and that is -- I don't think I've had very

many cases where I've done anything differently, because it seems like the fair thing to do.

As for the hourly rate, the 10th Circuit has indicated that the Court must look to what the evidence shows the market commands for analogous litigation. The burden is on the party seeking if the -- to provide evidence of the prevailing market rate for similar services by lawyers of a reasonably comparable skill, experience and reputation in the relevant community.

Now I will note that I do not have the resumes of any of the lawyers that were submitted billing in this case. However, there was some information provided to me that Mr. Wolosz was -- I'm trying to find my last page here -- a partner with the firm and Ms. Kruzer was an associate with the firm. Those were the two primary people who were billing on the account or submitting billings on the account in connection, at least with this deposition and I think that the reduced rate which, I don't know what the rate is that these attorneys charge their client, but I do know that they submitted a reduced rate here, according to the declaration of Mr. Wolosz. And so the $500 for a partner in a law firm and the $375 that submitted by Ms. Kruzer are both, seem to me to be, fairly reasonable rates in the community here in Colorado, based on my own experience of dealing with

attorney fee cases all the time. The attorneys working for Cultural Care are a Boston-based law firm and I think that that -- from what I've seen, and again this is kind of anecdotal, but Boston, New York, certain places on the East Coast have a significantly higher billing rate than do attorneys here in Colorado. Again, dependent on who they are and what kind of practice they have. But it's this Court's experience that these two billing rates, the $500 for Mr. Wolosz and the $375 for Ms. Kruzer are in line with those in the Denver attorney community, especially in a case which involves a nationwide class allegations for damages maybe in the millions of dollars. And there's some suggestion it's something like 400 million a year and where both RICO and Anti-Trust price fixing allegations are involved. Those are complicated cases that take some experience to handle and. So I'm assuming that these attorneys have that or they would not be taking the number one deposition of the first named plaintiff in the case.

So I find that the resumes of the two -- those two attorneys are not particularly germane to the Court's finding on reasonableness and so I'll find that the billing rates are reasonable. In determining the reasonableness of the hours expended, the Court must consider several factors. I've considered them and

outlined them in the case of General Steel Domestic Sales vs. Chumley, which is 2014 West Law 3057496, that was in 2014. First, the Court considers whether the fees pertain to the task that would ordinarily be billed to a client, which these did seem to be. Plaintiff must demonstrate that his counsel used billing judgment, as I've already talked about, in winnowing down the hours actually spent to those reasonably expended. If not, a Court must take extra care to ensure that an attorney has not included unjustified charges in the billing statement. A Court should also consider whether the amount of time spent on a particular task appears reasonable in light of the complexity of the case, which I've already said is complex here, the strategies pursued and the response is necessitated by an opponent's maneuvering and that is not -- that's language out of the case and I'm not suggesting that plaintiffs were maneuvering here, although the delay in letting counsel for Cultural Care know what was going on, while I believe is -- was probably prudent, given that they thought they might be able to convince her to come forward at a later date, that is still somewhat maneuvering. You don't want to tell the other side that your client is too scared of them to go have a deposition unless you absolutely have to, because you can't do it. So I understand the delay,

but it is somewhat of a maneuver.

But ultimately, my goal is to fix a fee that would be equivalent to what an attorney would reasonably bill for the same services in an open market. In reviewing the itemized summary that was submitted to me -- and this is found at document number 337-5, I find that the inclusion of attorneys fees associated with Ms. Lukey were redundant. And I'm sorry, Ms. Lukey, but I know you were the supervising attorney but I don't like supervising attorney's fees included when I'm going to assess them against someone else, although I have no doubt that you actually bill them and did them. But I think they're redundant of the work that was performed by the two primary attorneys in charge of the Cardenas deposition and, therefore, I'm not going to allow fees associated with those three individuals work and further, I find that while Cultural Care, of course, is free to pay for the attendance of more than one attorney at a deposition, if they want to, when considering an award of fees, I think it's fair and just only to include the expenses for the attendance of one attorney and usually I pick the one who was going to actually conduct the deposition and in that case, that was Mr. Wolosz. So, therefore, I have concluded that all expenses will be allowed in connection with the appearance of Mr. Wolosz,

however, those that are in connection with the appearance of Ms. Kruzer at the deposition will be disallowed.

So that's -- by that, what I mean is the air fare, the hotel, any taxi and the claim for her time associated with attending the deposition. So that will not be awarded for Mr. Kruzer's billing. And then I find that it's reasonable, however, to include portions of Ms. Kruzer's time associated with preparing for the deposition because it's cost-effective and efficient for an attorney with a lower billing rate to help in the preparation of the partner who's taking the deposition and I note that some of the extra cost came from this document dump, if you will, at the 7:00 the night before the deposition. However, to the extent that the work done by Mr. Wolosz and Ms. Kruzer was what appeared to me to be duplicative. I have cut the entries for Ms. Kruzer and allowed those of Mr. Wolosz. So after thoroughly analyzing each and every billing and I'm not going to go through each and every one of them at this point, but I did do that -- the Court finds that the reasonable billing time for Mr. Wolosz for preparing for and attending the scheduled deposition of Ms. Cardenas was 25.4 hours and the reasonable billing time for Ms. Kruzer's preparation efforts was 14.20 efforts. Therefore, I'm going to allow attorneys fees in the

amount of $12,850 for Mr. Wolosz's time and attorney fees of $5,325 for Ms. Kruzer's time. Additionally, I will allow $589.22 for Mr. Wolosz's airline travel expenses, $249.40 for Mr. Wolosz's hotel and I'm going to allow taxi and other conveyances, because there were a number of those in there, but I'm going to limit that to a total of $150. And then I will certainly allow the fees that were assessed by the court reporter and the videographer, which were $243.57 and $400 respectively. So the total fees in costs awarded by the Court that's going to be allowed is $19,807.19. As provided by Rule 37, the Court's award of fees and costs is going to be levied against the deponent party Dayanna Paola Cardenas Caicedo jointly and severally with the attorneys advising her under the rules the law firm of Bois and Flexner LLP. The reason being that I believe that the attorneys of that law firm had the last chance to make good on this and that since they didn't or couldn't and the defendants had no notice whatsoever and were not at fault, I think that's where the cause should be borne is by plaintiff's attorneys now. I think that primarily and first place is Ms. Cardenas herself, but the rule says it can be individually or jointly and I'm saying it's jointly.

All right. So that said, motion 337 for sanctions is granted in part and the in part is only

because I didn't award the amount of money that was requested, but it's granted in all other respects.

So let's talk about the motion for protective order. That's No. 365 and let me just explain to all of you who want to talk to me about this, what I did in preparation for today -- for today's hearing. I reread the transcript of the scheduling conference, I reread the transcript of our informal conference and I think a lot of what I heard and saw on the video clips and the full video deposition videos of those people -- there was one that I only got audio on, but of the others that I had video on, in general, what I think happened was on page 34 of our informal conference, I made the comment, In general, I don't think someone's love life is appropriate. And so I kind of agree with the -- in general, the statements that I don't think any of you would actually legitimately disagree with, which of course is not a sentence, but that's what I said anyways. I think that immigration status is out. That's not relevant to anything, because these -- most of these people don't even work, I don't think, for the sponsors anymore and here comes the last sentence which is And questions about their love life or what they did in their off time or all that sort of thing, that's just not relevant to the issues before the Court and I don't know

why you even want to know. I think that's a correct statement, although -- you know, wish I talked in full sentences. I don't like reading my own transcripts, but I think that is still the way the Court feels. It's an accurate statement of that. However, I will say that the objection that is to be made under a statement like that, which was not an order, it was merely the Court's opining because I didn't -- the only order I issued was then on the tax return issue -- is: Objection, relevance. That is the objection. Not, I think the witness should be instructed that if the Court thinks that if she's uncomfortable, she doesn't have to answer. That's not an objection. So wrong objection. And I think that they have to go ahead and answer it unless you see that the witness is becoming harassed and intimidated. That's when you stop the deposition and you say I instruct you not to answer, we're calling the Court. This is in violation of the Court's order. That said, I'm really giving you that as a go by for the future, because these other depositions, what's been done is done. So -- but I was a little surprised because I don't think that what I said was that every single time an attorney opens their mouth to say -- well, let's take a good example was Ms. Beltran about the flowers that she got for Valentine's Day. I made several comments that I didn't see how that

could possibly be relevant. In the context of looking at her deposition, though, I understood why it was relevant and it was relevant, although I could see an objection for relevance on there. To me, the defendant taking that deposition was trying to find out who this Orlando guy was. Is he really just a sponsor or is he really a boyfriend, husband, spouse? You know, what is he, really? And that seemed to be the thrust of the question. When the answer was given, which didn't seem to cause the deponent any problem at all, It was somebody from school, the attorney said, And not Orlando? And she said, No. That was the end of it. I mean, it really didn't matter who gave her the flowers. It might have mattered, however, if it had been Orlando, because Orlando is apparently a potential witness in the case because of that letter that he wrote saying they didn't pay the au pair, Ms. Beltran in this case, enough. So I think taking someone's comment without considering the context is always dangerous and that's always a danger that we judges run into when we make gratuitous comments. So -- but I do think that in the future you kind of need to have some guidance on this because what I went and did was went back and looked at the second amended complaint, which believe me, between all of this, has taken me quite a bit of time. But I reread the complaint and so I now

know what all of the claims are. And I will say that the way I read it, they are all based on -- even the constructive fraud and misrepresentation, are all based on the fact that the sponsors are alleged to have told both the au pairs, host families, whoever, that the $195 and some odd cents was a mandatory fixed stipend and there was no ability to make it higher or lower. They all seem to revolved around that premise, no matter what the actual charges or what the facts supporting it are. It's all that. So that means that it doesn't -- it's really irrelevant to these charges what someone did in their off time unless what you're trying to get to is how much money were they paid and on at least one of these depositions, that's exactly what I saw and I believe -- I can look at my notes, but I believe it was Ms. Jimenez who said that she made lots of money -- well, she didn't say lots. She said she made money above $200 a week, but she couldn't remember how much money and she couldn't even say whether it was $50, $100, $200, $1000, I mean she had no idea. Every question was met with, I don't know. And what was then said after that was, I had a bank, I didn't put it in the bank. I don't know, I didn't put it in the bank. So no one knows whether or not, for instance, Ms. Jimenez made a lot more than these other au pairs and if she did, does that take her out of

being an appropriate class representative? Does that go to commonality, typicality, all that stuff? Because if she made a lot more money, than her minimum wage would be more. Right? Per hour. Unless she worked a whole lot more hours too. So -- but those are questions where I think it was fully appropriate to say Okay, what did you in your off time. If what she says is, I traveled frequently to Europe, it might be a lot more money. If what she says is, I went out and ran around the block or jogged or what one of them said which was, I worked for the Red Cross, something like that, then it becomes kind of like it's probably not good evidence, but it's not improper. It's not an improper question. However, I think that questions are What did you do with your boyfriend? Or Did you have a boyfriend, are generally improper. But I didn't see any of those. So I think you really have to focus on does this question, this line of questioning, have anything to do with determining the wage that was paid, the hours that were worked or something relevant to that topic, because that's really what the case is all about. So I just -- I wanted to impress on you, before you make your arguments, that for the most part, I think you can quote to me from these depositions and I will know what you're talking about, because I watched them and I saw them and the only one

that was even a bit combative was Ms. Jimenez and I don't know her, of course, I only know what I saw, but she seemed perfectly capable of defending herself and she didn't seem a bit intimidated by the questioner. She had absolutely no problems saying, Nope, that's not right, that's not what happened. She said it in Spanish, I would think it was Spanish, but that's what she said. So I don't think she was intimidated by the questioner, although I think the questioning was more heated than some of the others, but Ms. Beltran, that was very calm and passive and I thought Ms. (inaudible) was as well. I don't see the intimidation. Although a couple of the questions, like I said, I think the question was okay, but further questioning probably wouldn't have been because of the answer that was given. For instance, on the flowers. You know -- well, who's this guy at the school that gave you flowers? Now that would probably be going too far and it's irrelevant and that's the question. I also noted and I just will say this in passing because I think it's important in this case from a real distant point of view looking at this for all of you who, I believe, were coaching the au pairs in your objections, it didn't work. It didn't work because all of them answered the question anyway, even after being told, If you're not comfortable, makes you uncomfortable

you won't have to answer, the Judge said you don't have to. We're not going to go in this, so if you're uncomfortable don't answer. And then they answered the question. So it's not working, it's taking out too much time.

Let's get something decided and I think -- I really think that unless the person is crying or there was real harassment, really truly is harassment, at that point the obligation, I think, of plaintiffs' attorneys, although you have to make that decision on your own, is to say I instruct you not to answer until we talk to the Judge, this is ridiculous. Right? But it's not because they ask Well, what did you do on Saturday? You know, kind of wait for the answer and see and if they -- if defendants can't back that up with some kind of relevance to their wages, then it is going to be out, but it didn't seem to me to be bothering anyone particularly.

MR. SKINNER: Sorry, Your Honor, your rulings -- do you want to hear from us?

THE COURT: Nope. I'm not ruling yet, I want to talk to you all about this so that we're all on the same page.

MR. SKINNER: Very well.

THE COURT: So it's your motion --

MR. SKINNER: Well, it's our motion, can I go

first?

THE COURT: Yes, you can go first.

MR. SKINNER: I don't have much to say. I think Your Honor's doing exactly what we wanted, which is if -- if Your Honor agrees with us, which is our fundamental position that what they do on their off time is not relevant, unless the defendants can find some other reason to pull it in: How it goes, how much they were earning while they were working, then we're all in agreement. First and foremost, under Rule 26, Rule 26 was redrafted. We're not in the regime of could possibly lead to discovery of relevant evidence; it has to be relevant. And we don't believe -- and it's very difficult to get down in the weeds on this things ahead of time because you're not there. But we don't believe, as a general matter, that what the au pair did on their off time is relevant. We have said as much and we have said, Why is it relevant? And the answers that we got in the motion don't add up. And I'm not going to go through it again because I think Your Honor read it and understood it. And it sounds like you generally agree with us, that their off time is not relevant.

THE COURT: I think that's true, but like I said, there were examples that I saw --

MR. SKINNER: There may be.

THE COURT: -- where I think it was, it was

relevant.

MR. SKINNER: There may be but this is -- this is the only issue I have then with how Your Honor has set it up. And I didn't -- I haven't taken any of these depositions yet. I may in the future. But, you know, I went through and reviewed the transcripts. I respectfully disagree with the assessment that not all of these plaintiffs were harassed. I think some of it, it's just not visible when they're answering. I don't see how you could watch the video testimony of Ms. Hlatshaneni at certain points and not think that this is somebody who has --

THE COURT: I only had it on vocal. I didn't see --

MR. SKINNER: That may have been the issue then and maybe we need to get you the video because we didn't put that in. The defendants put that in. But, you know, there was one scene, in particular, where there was a long pregnant pause because she was clearly upset. I mean, she paused for quite bit before she proceeded.

THE COURT: I noted that --

MR. SKINNER: And some of the questioning, I think, you know, in Harning and the Jimenez depositions was heated, but putting all of that aside --

THE COURT: I do think that that on the -- how do

you say her last name? Hlatshaneni?

MR. SKINNER: I took my best guess, Hlatshaneni.

THE COURT: Part of it, part of that long, if we will, pregnant pause was (inaudible) and calling it an (inaudible) after her final explanation about it is probably a little overboard. But her scratching up the car a little bit or doing some damage to the car when she was pulling the garage. But the kids were in the car with her, right? And so --

MR. SKINNER: And our objection, Your Honor, was not to that. Our objection has been to the questions about speeding tickets and other motor vehicle infractions that occurred on her personal time. So, look, and hopefully to short-circuit this, I know people are in from out town. Maybe some, like me, are hoping to get on a plan later on today. We will do everything we can to curtail the speaking objections. I hear Your Honor on that front. But to put this -- to agree with us that questions about irrelevant, a presumptively irrelevant subject matter, which is their off time, that we object relevance and then have to answer, I don't think that's the way this should be set up. There's been a presumption in this case that their off time is inbounds, for a variety of reasons they given, none of which actually hold water. This case should be focused on the time they worked as au pairs and the money

they earn.

Now, there may be limited exceptions to that, certainly. There may be instances where the door was opened to some other line of inquiry. There also remains, Your Honor, notes of situations where facts that have to do with their off time might bear on discovering how much they were receiving in wages. But the presumption should be that their off time is off limits and the plaintiff shouldn't have to answer an irrelevant question unless the defendants have articulated a reason for why this particular examination into what happened on personal is relevant, for one of the reasons that Your Honor gave.

And if we agree, it goes forward. If we disagree, we call the Court, we get a ruling; but I don't think that the mechanism that should be set up is objection, relevance, plaintiffs answer anyway. Because in that situation, the damage is done. The answer is given --

THE COURT: What damage?

MR. SKINNER: Well, that's --

THE COURT: If it's irrelevant, it doesn't matter what damage.

MR. SKINNER: Well, first of all, it's our -- our clients are having to answer questions about their personal lives that don't have anything to do with this case. We

shouldn't have to wait and see what they designate later. We shouldn't be put to the burden of moving to strike questions and answers after the fact if the Court agrees with us that the presumption is that their off time is out of bound.

The burden should be back on them to establish why something that is presumptively irrelevant in this unique case is okay, is permissible. And we will listen and if we can't agree amongst ourselves, we'll involve the Court. And now, Your Honor, probably somewhat to your chagrin, is well-versed in all of these things and you've got a context to make those rulings. But I would ask you to adjust the way you envision going forward on this to that.

All we want is for the presumption to be that their personal time is off limits. And if the defendants want to get into their personal time, they need to explain why it fits into one of these exemptions to the presumption that it's off limits. If that's the clear rule that we have going forward, I think things will be much easier. And we all, I think all of us collectively want to know what's inbounds and what's out of bounds so that we know how to handle ourselves in these depositions going forward.

Now, most of them will already happen, so

there will be -- presumably, there will be some additional plaintiffs that this will apply to. And that's why I think these rulings will be helpful. But I'd ask you to consider setting it up in that way, because I don't think that these young women should have to answer questions that are presumptively irrelevant without any further explanation from the defendants to these young women's lawyers as to why this particular line of inquiry is inbounds. And if they want to do that outside the presence of the witness to avoid some kind of coaching, I'm sure we can figure out a way to address that.

But it should not be: Objection, relevance. Answer. Because like I just said --

THE COURT: Why would it be different in this case from every other case that is in this court?

MR. SKINNER: Because we've --

THE COURT: In every other case, that's the way it works.

MR. SKINNER: Because we have moved for protective order, arguing that a certain category of information is irrelevant. And Your Honor has agreed with us --

THE COURT: No, no. What you've moved for is a protected order because you said that these people were

being harassed and intimated.

MR. SKINNER: But, Your Honor --

THE COURT: That's the ground for protected order.

MR. SKINNER: -- respectfully, we've moved on two grounds. The first is that under Rule 26, you are only permitted to gain discovery of relevant evidence. That is what almost all of our brief is about. And I think in -- I completed in the sections where we argued that even if it was relevant, then the Court should still be drawing a line. It was -- there was one wrap-up session after we talked about their general arguments of relevance on page 6. And we also argued with respect to certain of the plaintiffs' -- individual arguments with respect to certain of the plaintiffs, those would have been unduly harassing.

We are not saying -- the grounds for our motion is not the defendants [sic] are being harassed; therefore, they can't be asked about their personal lives. I want to be exclusively clear about that.

We are moving on the basis that the questions have nothing to do with the claims or defenses in this case. They, therefore, are impermissible discovery under Rule 26.

The secondary argument was, even to the extent there was some limited relevance, they should be

forbidden because the burden is unduly high on these plaintiffs to have to answer questions about their personal lives.

The plaintiffs are proposing that the way we address this going forward is that we all have an agreement that personal lives are presumptively not relevant, unless that presumption is rebutted by a particular line of questioning that the defendant wants to go into because it relates back to discovery about wages or because the plaintiffs somehow otherwise opened the door.

And if we are confronted with that situation, as plaintiffs' counsels, we have two choices. We listen to what they have to say, and we either say, Okay, I get, I understand where you're coming from. I'm going to instruct my client to answer. Or we say, We're going to call the Court and get a ruling as to whether this is relevant or not because we disagree.

And if the Court says it's relevant and we feel it is limitedness since it might add particular harassing, we'll let you know at that point. But harassment is really not what is driving this, as much as they shouldn't have to get into, in the first place. It feeds upon itself, to a certain extent, because our clients -- our clients want to know when they sit down

with us ahead of time: Am I going to have to talk about my boyfriend? Am I going to have to talk about this? Can they ask me about them? Can they ask me where I went on a Friday night? Can they ask me about -- how I spent my weekends, where I went on vacation? And we should be able to tell them: Most likely, not. The Court has already ruled that questions about your personal time really have nothing to do with this case, but there may be specific exceptions that apply and we'll have to deal with those on a case-by-case basis.

But there's no reason we should be having to tell our clients ahead of time: Yes, they can ask you that and you're going to have to answer, even though we all know it's not relevant to anything.

THE COURT: Well, I think -- I think you're asking me to do something that the Rules don't provide for. Under 26(c), it says: The Court, for good cause, issue an order to protect the party or a person from annoyance, embarrassment, oppression or undue burden or expense. Okay.

So that's -- that's what you issue a protective order for. If I took a poll from every attorney in every deposition where the objection was relevance, I would never be able to do anything else.

MR. SKINNER: I get it, Your Honor.

THE COURT: It happens all the time. Should it happen? No. And that's why we have time limits on depositions. So if they use all their time talking about somebody's personal life, then they are out of time. Right? Don't let them go forward --

MR. SKINNER: But, Your Honor, in most depositions, you don't already have the argument of relevance having been presented to the Court and the Court having had the opportunity to rule on it. You don't have the Judge say: I think questions about their off time are off limits.

I agree with you, that I'm proposing would not work in most cases, nor would it be appropriate. And I'd be happy to submit a supplemental letter to explain why what I'm asking for is completely permissible Rule 26. But discovery is only permissible if it's relevant. Rule 26 makes that very clear. And if we already know that something is not relevant, based on how we all view the claims of defenses, it's of no help to these plaintiffs in going through with these depositions -- or, frankly, of counsel is how to make effective use of their time to permit these questions anyway and force them to answer, even though we all know it's not relevant.

THE COURT: But that -- we don't all know. That's the point. We don't all know. You don't know. I

-- I decided that most of these things that you objected to -- not personally, but the plaintiffs objected to -- were relevant; the question was relevant. Now, the answer may have made the question irrelevant as far as having it being presented at trial but they were mostly relevant because you don't have just -- I mean, these are all the wage claims, and I wanted to make clear that I understood that. But you also have witnesses that are going to be testifying, so you need to test the veracity of your witnesses. You --

MR. SKINNER: Of course.

THE COURT: You need to test what their bias or self-interest is. I mean, there's lots and lots of things that you do when, either prosecuting or defending a deposition. And I can't sit here ahead of time and say that their time off is going to be presumptively irrelevant because in each and every case, I think maybe, one, I thought the question was relevant and should be answered, under the circumstances.

MR. SKINNER: But, Your Honor, they --

THE COURT: If they're going to -- if they're going to testify that -- that the host family (inaudible), which is (inaudible), I don't know what in the world it has to do with this case. That adds nothing. But if they're going to testify that they were abused by this program and

the sponsor and everything, I think the defendants have a right to quiz on that, although I think all of you are going to be disappointed that none of that is going to come in at trial. I can't imagine Judge Arguella letting that in. But who knows, you know? Stranger things have happened.

So -- but that stuff, I agree with you it's irrelevant. But if they've already testified to it, that's testing their credibility as a witness. It may be testing a boyfriend's credibility as a witness, or something like that. And I don't think we can make these calls in a vacuum and I think the best advice that I gave all of you, although probably not as articulate as it could be, is that, in general, questions about someone's love life, or what they do in their time off are probably not relevant to the claims in this case.

But you're the lawyers. I'm not trying the case for you and I'm not going to sit here every single time that say: Objection, that happened on Saturday and she wasn't working Saturday. No. Absolutely not. They've got a right to get an answer and if you think they're going down the path of going overboard, there are two options. You've got a time -- a time limit, so they're using up their time on irrelevant garbage. Or if you think that your client is being oppressed or

embarrassed or that sort of thing, then you can direct them not to answer and you can call me. Because that's what's in the Rule.

And, you know, I'm not going to put up with that. I understand what you're saying about these young women. And some of them, Ms. Beltran comes to mind, seem pretty fragile and like she might have, you know, be teary and that sort of thing. So quizzing her about her boyfriend, outside of that issue on who this witness is, would likely be inappropriate and I would expect that the defense attorneys would not do that. And that's I did say, No question -- there is a presumption that there's no questions about immigration status. I think the law's clear on that. Because that is intimidating. The mere fact that they are here, whether legally or not, they're about citizens of this country, that's intimidating. That's trying to chill their -- their ability to prosecute a case like this. So that's off limits.

And certainly, any -- I can't imagine anyone asking them about what kind of things they do with the boyfriend, but that would clearly be irrelevant. The things about where you are going and what you are doing and how much money you spending when they tell you they've got extra money, but they don't -- they don't know, they don't remember, they don't have any idea -- it

wasn't that long ago --

MR. SKINNER: That was one -- that was one plaintiff, Your Honor.

THE COURT: Right.

MR. SKINNER: And I think -- and I would -- and I would agree that, in that circumstance, some inquiry in that area was proper.

THE COURT: Well, but there were a million objections. Objection. Objection. Objection. Continuing objection. Right?

MR. SKINNER: Yes. And that's my point. So we -- we didn't -- we know because we've argued this out, we've said ahead of time -- let's take her out. Let's take that example out. Let's say the two defendants -- the two plaintiffs who have said, We have -- we received extra pay and the defendants were saying we were trying to test how they received extra pay --

THE COURT: And how did --

MR. SKINNER: -- I, frankly, think that the reverse engineering is questionable, at best. Some limited inquiry in that circumstance may have been appropriate. But the people -- you know, why were you -- why were you traveling here? Where did you go? How did you spend your off time? How did you spend time after the AuPair Program? Where were you living? Do you have a boyfriend now? No.

What's your boyfriend's name? Well, I don't want to give it. That makes me uncomfortable. He knows you're here. But there's no foundation that he knows anything about the case. I mean, the number of -- I think that -- it's a little frustrating because I feel like the Court is in agreement that what this case is about is what happened while they were working and their wages and in some limited circumstances, there may be some other stuff that is permissible.

That's our position; that this case is about what happened while they were working, their qualifications, their wages. And there may be some other circumstances where other lines of inquiry are permissible. But we're being told, you know, with that time work, with an acknowledgment that they're -- you know, there's nothing that we can see at this point that would be irrelevant outside of that, even if they choose to waste their time on irrelevant, completely out-there questions that have nothing to do with their work as au pairs, that our only remedy is to sit and object and have our clients answer, until they are reduced to tears or otherwise intimidated, and then we can call. That's not the way this should work. They should confine themselves to discovery on relevant topics.

THE COURT: Well, I agree. They are professional

attorneys. I mean, they're qualified; they're officers of the court, I'm assuming that that's what they're going to do. If someone were to break that mold and show that the way they were going to try to defend the case is to badger and belittle the witnesses, that's a different matter. And that's pretty self-evidence and pretty quickly. So all you need to do is get to me on that and I --

MR. SKINNER: Well, I guess --

THE COURT: -- am not going to put up with that. But I also don't think that any of the officers of this court, no matter where they are located in the country, are going to do that.

MR. SKINNER: Well, Your Honor, that's the only place card that I think is going to be a little bit difficult to police. Because, given the class of plaintiffs that we're dealing with and the vulnerability of these plaintiffs, given their relationship, viz-a-viz their former employers, their foreign status in this country, their unfamiliarity with the US legal system and all of that, I think to say to them: You know, we're going to have to wait and see, you know, how you react to these things, is just not -- it's not the right way to go about this. They should -- we should be able to tell them, and we will, because Your Honor has said it, that -- that your off time, the Court has already ruled is not relevant to

this case.

THE COURT: I didn't rule that. I said, in general --

MR. SKINNER: Well, you said: In general --

THE COURT: -- what they do on their off time is probably not relevant to the -- the charges --

MR. SKINNER: And that's -- so we will use that --

THE COURT: -- in general.

MR. SKINNER: We will use that exact language: In general, your off time is generally not relevant. I don't think that we should then have to say: But they can still ask you about it and you're going to have to answer until it reaches the point where it's clear that you're being intimidated and harassed.

It's very difficult when you're sitting in these depositions, and -- you know, I've said that these -- these women are vulnerable, but they also very brave and very strong, very motivated to go forward with these claims because they were wronged and they want the opportunity to talk about these things. So I think it's very difficult to say: Oh, I've looked at it and they've actually done pretty well. So, therefore, it's okay. They shouldn't have to answer questions about their personal lives that don't have anything to do with this.

And we should be able to shut down lines of inquiry, based on relevance; not based on, Well, clearly -- clearly, she becoming upset.

THE COURT: Well, but that's not your right in any kind of civil case. That's not your right, to shut down lines of inquiry just because you think they're not relevant.

MR. SKINNER: That's -- that's -- that's where we get to, Your Honor. It's not me. It's you. You said: This is not relevant.

THE COURT: I said: In general --

MR. SKINNER: In general, it's not relevant.

THE COURT: -- it's not relevant to the charges in this case. But every specific instance that I've been given, I saw relevance in the questions that were being asked, except, I think, one. Something about a trip on the northeast seaboard, which I kind of thought was kind of like before she even started as an au pair. But that aside, that's one question. Wasn't real personal, wasn't designed, I didn't think, to make anybody feel uncomfortable. It almost sounded like it was a question to make -- to kind of build a rapport with the person that you're just talking to them about, Oh, really? Where'd you go? You know, that kind of thing. I agree it's probably not relevant, but it's also not harmful.

And when a Court has to step in and say, This isn't going to allowed, is when the question is harmful. It's so off course, that it's harmful. Otherwise, the defendants, in any civil case, have somewhat free license to go forward and ask about things. It's when they into really, really personal things and they start asking about that, yes, it's relevant; it's also embarrassing. All right? So "embarrassing" is a word that's in Rule 26. So that's the fine line that everyone has to walk in this case. And you have to walk it in every case. It's harder in some cases than others.

But if it's embarrassing to them, or if it's, you know, makes them cry or makes them unhappy and it's irrelevant, then I think you can instruct them not to answer it until they talk to the Court. And I'm more than willing to do that --

MR. SKINNER: Okay.

THE COURT: -- we may have to have a few that we test that way. But, you know, the great majority of defense counsel are here, sitting in court. And I can't imagine anybody, in theory, disagrees. The theory in practice are two different things, though. And I'm not going to say that presumptively, their off time is off limits or out of bounds because I don't know if it is or not. But I will stick by the advisement that I gave to

everyone that, in general, you need to make sure that the questions have to do with the issues in the case, which include more than just wages, because it includes testing witnesses, testing memory, finding out who other witnesses are, all of those kind of things.

MR. SKINNER: Your Honor, I appreciate it. I actually think this will be helpful. I think actually having the Court reiterate what you said during that telephone conference, that, as a general matter, the personal lives of our clients are not relevant to this case, should put a stop-gap into unnecessary frolics, if we will. And I guess we will just have to see what -- see what happens.

THE COURT: Right, because I haven't seen any real egregious, unnecessary frolics. That's -- I guess that's a point I want to make is I, by agreeing with you, I'm not saying that I've seen it from the defendants. Because what you've pointed me to and what defendants then showed me on a video-taped deposition -- and I know that you know they gave me the full deposition, too. And I didn't listen to every minute of every of full deposition, but I spot-checked it all along. And I just didn't see any of that. So I'm not -- I'm not saying that presumptively they're going to do it. I know that there's going to be some questions that are asked that, because of the answer,

turn out to be completely irrelevant. Or a question that might be asked that probably went one step too far. But if it doesn't embarrass or oppress or intimidate or quell your clients from pursuing their case, I'm not going to be too concerned about it if it's an isolated event. I think you should make your objections so that you have preserved it for trial and move on.

And I'm assuming that defense counsel are all getting that same message.

MR. SKINNER: Thank you, Your Honor.

THE COURT: Mr. Lyons, are you going to address this one?

MR. LYONS: I've been --

THE COURT: I see you taking notes.

MR. LYONS: Well, I was listening carefully, Your Honor. I -- I think it might be useful, just briefly, to take a step back here.

If this were just a case about employment, separate and apart from anything else, then questions about issues outside of the employment probably are not relevant and probably aren't going to be allowed at trial. But it's not.

This is a case about a cultural exchange program, of which employment is a feature, but not the only feature. This program has been in place for over 60

years. It is designed to bring young women from around the world to the United States to be exposed to our cultural by living with a family and by also understanding, appreciating and having the opportunity to see our culture, as compared to theirs.

That's why they come. They don't come for $195 every two weeks and free room and board. They come for the cultural experience.

THE COURT: But that's not the point of this case.

MR. LYONS: It is the point of this --

THE COURT: I mean, this isn't an attack directly on the program. Like, State Department, you should stop administering it, the Department of Labor ought to do it and, in fact, we ought to abolish it. That's not this case.

This case is you have to pay minimum wage.

MR. LYONS: It's more than -- I think it's more than that, Your Honor.

THE COURT: That's what this case.

MR. LYONS: This case includes clearly the monetary feature that you just described, but it also includes the nonmonetary feature. These women have testified, by and large, that's why they came. Some of them have said: And we were lied to. And that's why

they've accused us of fraud. And we're entitled to explore that. And that means: So, while you were here, what did you do outside of the family and your work hours? What advantages did you have that was nonmonetary consideration that is entitled to be considered in this employment case, even if that's all this is -- one.

Two, they've made antitrust allegations and have said there's a price-fixing conspiracy here, which represses wages and compensation. Well, they're going to have to show antitrust injury, which is more than just what they were paid. It includes the nonmonetary considerations.

So we agree with you. Questions about someone's love life are off limits. We agree with you. Questions about immigration are off limits. Visa status, however, is another matter. These people get J-1 visas that we're responsible -- the sponsors -- are responsible for procuring, policing and reporting to the state department when they are terminated. So to that extent, I'm drawing a distinction between immigration status and visa status.

THE COURT: It all depends on when the visa status you are talking about.

MR. LYONS: Exactly.

THE COURT: If it was during their au pair

program, sure. Were you here on a J-1 visa?

MR. LYONS: Right. But J-1 visa, by the way, extends for another 30 days after they complete their au pair assignment. After that, they either have to leave the country or make other arrangements for either another J-1 or some other kind of visa.

THE COURT: Right.

MR. LYONS: So questions about the cultural experience, leaving personal lives aside, it seems to me, are not only implicated in what they've claimed against us -- I mean, of the nine claims in their Second Amended Complaint, five of them are fraud-based. And they are fraud-based about the compensation; but you to look at all of the compensation, because that's what they signed up for. That's why they came. They didn't come just to work for a year being paid some amount by a family. They came to be part of this cultural exchange. So it's a fair question. There are limits to it, though, and we would concede that. And love life is clearly one of those limits.

Let me point to two -- the Second Amended Complaint. And I appreciate you took the time read it, as well as look at those deposition excerpts. Because as you say, I think the deposition videos and excerpts clearly show there was no harassment going here. There

was no intimidation. These lawyers who took these depositions were professionals, they were officers of the court and they've been maligned for having misbehaved when, in fact, they didn't. If you listen -- you won't see them, of course, in the video excerpts but hear their tone of voice. You hear how they are respectful and polite. They are doing exactly what a professional attorney ought to do. So we take comfort in the fact that the Court finds that that was their behavior, or certainly finds that they didn't misbehave because they didn't.

Let me point you to a new plaintiff in the case, yet to be deposed. And I'm at page 87 of the Second Amended Complaint. This is of Ms. Roscon (phonetic) from Mexico. Paragraph 472 of the Complaint -- and I quote -- says: Ms. Roscon selected Cultural Care because of the advertising she saw in Mexico by Cultural Care, which promised her, quote, the best year of her life, unquote.

We're entitled to probe that allegation. What did you expect while you were here in the United States? And, Oh, by the way, she was here for, not one, not two, but three successive matches with families. One in Boston. One in New York, I believe. It wasn't New York.

UNIDENTIFIED SPEAKER: Maryland.

MR. LYONS: Maryland. Yes, Boston, Maryland and Virginia. So she was here for, roughly, three years and came expecting -- as she's alleged in this Complaint -- the best year of her life. We're entitled to ask her about that.

THE COURT: I agree with you, that you're entitled --

MR. LYONS: All right.

THE COURT: -- to ask her because it's in the Complaint. But, frankly, it's not really relevant. It's not relevant to the actual Counts that are alleged against you or any of the other people. It's just not relevant to whether or not they were told 195 was minimum or the maximum, or the mandatory, or however you want to put it, it's not relevant to that. It may be relevant to an attack on the cultural program itself, but that's not this case. It may have that effect --

MR. LYONS: Well --

THE COURT: -- but it's not this case. That's not charged.

MR. LYONS: Respectfully, Your Honor --

THE COURT: They put it in, so I think you get to ask about it. Did you have the best year of your life? Why? Why not? Probably those are okay --

MR. LYONS: Okay, fair enough.

THE COURT: -- to a certain extent.

MR. LYONS: Well, we're not interested in their love life, but we are interested in where she went, what she did, what apparently made this not the best year or three years of her life.

THE COURT: Something happened.

MR. LYONS: And I think that's fair game.

THE COURT: I think it's okay because it's in the Complaint.

MR. LYONS: Okay.

THE COURT: So if you can point to that, something like that, I think that's okay. However, I will tell you -- and I will tell all of you -- that that is really barking up the wrong tree here. That's not this tree. You know, you're in the forest and I'm not -- I'm not going to say you can't ask, unless it becomes oppressive or burdensome, or whatever. But I don't know why you would care because I doubt that Judge Arguello is even going to let that in, unless they drag out from her: Is it the best year of your life? In fact, putting it in the Complaint, they say that they're going to do that. So --

MR. LYONS: Well --

THE COURT: -- that's fine. You can attack that.

MR. LYONS: You and I are probably not going to

see this the same way. But the nonmonetary compensation that these au pairs receive is clearly part of the Federal Fair Labor Standards Act test for determining what's fair compensation and what's not. So it is relevant - one.

Two, it clearly relates to my client, who is one of the few accused of antitrust violations, because they can't show antitrust injury -- they have to show antitrust injury. And that's not just measured by dollars and cents. It's a much broader standard under t he Sherman Act. And that's why it will be relevant at trial.

But we don't have to argue that today --

THE COURT: Right.

MR. LYONS: -- because we're not at trial.

THE COURT: Right. And that's exactly what I'm saying. I think -- I think those questions will probably draw an objection if you go very much beyond the best year of your life. But since they put it in there, I think you can explore it and I know that there's other things that I haven't even touched on that all of you may be thinking in terms of defense of your client. That's why I'm not -- I'm unwilling to say a blanket prohibition on things have to do with you -- their lives outside of work. I'm not going to do that. You're going to have to make those calls as you go along.

MR. LYONS: Look, let me just try it this way, at the risk of arguing with you.

The program that they signed up for is not just how much they get paid. It is a question, in addition of the cultural experience to which they are exposed. And those make up the package that they agreed to, sought after and took when they came to the United States for these various programs. It is relevant. It is a cultural exchange program. And for purposes of what they got paid, you can't ignore it. It is relevant and that'll be our position our trial and that's a position we're entitled to develop in discovery.

THE COURT: Well, I agree with you, that's your --

MR. LYONS: All right.

Mr. Quinn has a few comments, too. Thank you.

MR. QUINN: Your Honor, thank you for your long afternoon of argument already. Appreciate it.

I don't want to leave the courtroom today with plaintiffs having framed discovery in too narrow a fashion. And what we heard from Mr. Skinner is it's defendants' duty to show that there must -- that the question must have some relevance to lost wages. I don't see the case that narrow as it's currently plead.

THE COURT: I don't either, and I didn't order

that. I disagreed with that.

MR. QUINN: I think we should leave it at this: That there's -- that the defendants are entitled to ask questions and conduct with respect to the elements of every Claim for Relief that has been pled. That will frame discovery. And I think that's what good lawyers do, and what I expects will do when they depose our clients. And that's what I've been seeing the lawyers do when they depose theirs. And I think that's what you saw in the transcripts. And the Claims for Relief that go beyond lost wages, alone, are stated in plaintiffs' Complaint. And they are -- the ones that I want to bring to the Court's attention are: Breach of fiduciary duty, negligent misrepresentation, constructive fraud and violation of state consumer protection laws. Those are beyond just wage claims. Those include noneconomic damages, if, indeed, the plaintiffs pursue them. We're pretty early in the case. Those are claims that are outside of class claims. Those are claims that are unique to the individual plaintiffs in this case. They trigger a different set of discussions. They trigger an analysis of what was -- if you think that -- and there has certainly been representations today in the pleadings and at the depositions where there have been emotional responses to the conduct of the -- of the defendants. And if there are other elements in an au

pair's life, or a plaintiff's life, that is triggering emotional response at or about the time of their -- of their time with the agency, then that's certain discoverable. Whether it's uncomfortable or not, we get a chance to talk about it.

You've seen my deposition, presumably. You go. You test. If there's nothing there, you move on.

THE COURT: Who did you depose?

MR. QUINN: Ms. Harning.

THE COURT: Okay. I didn't get very much of Ms. Harning.

MR. QUINN: Okay. Well, I'll tell --

THE COURT: So obviously plaintiffs don't --

MR. QUINN: I'll tell you, it was perfect. There was no problem. I stayed to the script.

THE COURT: But I don't want to leave this with you thinking that I agree with that, in whole --

MR. QUINN: Okay.

THE COURT: -- though, because I actually don't. The breach of fiduciary duty, the negligent misrepresentation, the constructive fraud, et cetera, all involve allegations that the sponsors didn't tell the au pairs that they could bargain for wages.

MR. QUINN: Right.

THE COURT: So it all has to do with that kernel

of evidence. It doesn't have to do with fraud, in general, for any and everything. And, obviously, that would violate the rules of pleading.

MR. QUINN: Sure.

THE COURT: So they have to be specific. They were specific and I think that you are limited to that. Now, that has little branches that come off --

MR. QUINN: Yes.

THE COURT: -- and you do with that what you want, but I don't think it opens the whole door to, Oh, we have emotional distress and all that kind of stuff.

MR. QUINN: I don't think you've seen that being pursued here but I think that there's certainly an element to probe and to move on and get out. I'm sure it will draw the appropriate objection and if it goes too far, you will probably hear from us again.

What I'm trying to do is put it in my perspective as I represent my client.

The other issue that I think is, you talked about, Well, what are they doing in their off time and there's a limit to this. I left it over here. I think this will do.

One of the claims that is alleged in here is the Consumer Protection Act, a state law. And Element 4 is: Evidence that the challenged trade -- excuse me.

Element 3 under 29.4 of the Pattern Jury Instructions says: The bargaining power of the consumers affected by the challenged trade practice.

So in this case, the consumer would be, let's take Ms. Harning, for example. Ms. Harning was someone that came over here and is complaining that she was treated unfairly and, therefore, she's entitled to recovery of attorney's fees, entitled to treble damages, and actual damages, which include, not only her lost wages, but anything else that she can prove up along with it.

Well, a little bit of background, I think what we discovered about Ms. Harning -- and I have already heard some light complaints about her deposition questions is: She was an au pair one time in the United States, outside of the statute of limitations that would apply to this case. Then she went on and she was an au pair in Sweden, Norway. Then she went on and she was an au pair in England. And then she went on and was a college graduate. And then she tried to extend beyond the average age. So she -- and then she signs up for her fourth au pair experience back here in the United States.

I think that that type of knowledge, What you've done before; what you do on the weekend; what you know about the employment place for child care in the

United States is all relevant to bargain power with respect to deceptive trade practice. Did you go into this program wanting to take this wage?

THE COURT: I agree with you, only because the argument would be made, for damages purposes, I'm assuming --

MR. QUINN: Right.

THE COURT: -- that had she known she had the ability to bargain, had she know that she could bargain that she could bargain for a higher wage, she would have. And probably could have gotten it because of her vast experience.

MR. QUINN: Right.

THE COURT: So I think that's relevant, I agree with you.

MR. QUINN: All right. Let's go on then. I'll move on then. I think get what our -- what my frame on the questioning is. I may be the only lawyer here who respectfully wants to probe the issue of immigration status. This is a little different in this case because on immigration status, what this program offers is a package. And think Mr. Lyons has described it. It's a J-1 visa for a limited period of time. It's room and board, it's a stipend and it's a relationship with the sponsor.

And so you understand that package when you go

into it. And when you either come back off the J-1 visa program, but agree to become and au pair and work towards this -- and work under au pair, sort of off label au pair type program, that I think we are entitled to know whether or not you did under appropriate immigration status or not.

THE COURT: I don't. I don't agree with that. And I believe that that kind of probing is a way to intimidate her that if she carries on, you are going to make a big deal out of this, and she's going to get deported. And that's what -- I mean, I'm paraphrasing wildly. But that's what that that line of cases say and I grant that they all have to do with FLSA-type cases, rather than an antitrust. But you have an FLSA claim in this case and I agree with those cases; that while interesting, depending on how you feel about immigration and deporting people who are here illegally, might be interesting and it might be -- you might think that's a real good thing to get people out who are here illegally, that's not -- the case law says absolutely not. Because what it does is chill their ability to be plaintiffs.

And that's what we don't want to do. The whole FLSA thing is to take people who don't have any power, who don't -- can't bargain for themselves -- never would have even thought of asking for ten cents more an

hour and say, Look, you know, Employer, this is on you. You have to do this. You have to do it right. I don't care whether they ask for it or not; you got to do it. And that's what you don't want to chill, are those little guys, the little people, that don't have access to an attorney just one on one, because the claim's too small.

MR. QUINN: Yes. Well, just to close up my record, there's two points that I want to make on that and the first is I do think that there are opportunities for women who are within the program range, 18 to 26, I believe it is, that choose to work off program when they can go back in program would be relevant. And that's -- I understand your ruling, and I just wanted to make a record on that particular point.

And I think Your Honor has already covered the issue of other income.

So thank you for your time here today, I appreciate it.

THE COURT: Can I ask one -- one question while you're standing there, since you represent a sponsor you probably know.

MR. QUINN: Sure.

THE COURT: Everybody talked about the women in the case. Is this program, for some reason --

UNIDENTIFIED SPEAKER: Men, too, Your Honor.

THE COURT: -- limited to women?

UNIDENTIFIED SPEAKER: Men, too.

UNIDENTIFIED SPEAKER: Men and women 18 to 26, Your Honor.

THE COURT: All right.

UNIDENTIFIED SPEAKER: Thank you.

THE COURT: I was just curious.

UNIDENTIFIED SPEAKER: To be truly accurate, it depends on what country you're coming from, but there certainly are some men in the program.

THE COURT: Okay.

UNIDENTIFIED SPEAKER: And we have a male (inaudible).

THE COURT: Oh, you do? Good. Well, that's not necessarily good or bad. I was just curious because you kept say "women," and I thought, You know, I wonder if there is some kind of requirement because they are going in someone's home that it be only women.

UNIDENTIFIED SPEAKER: I just want to point out it was two men who kept saying "women," Your Honor.

THE COURT: Duly noted.

Okay. So the Motion for Protective Order is granted, in part, and denied, in part. It's more denied than it's granted; but I'm say -- I'm giving the benefit of the doubt and going kind of both ways because I do

agree with the statement that I made in the other hearing we had that were, more or less, I guess you could call them dicta because they certainly weren't an order and I'm not making them an order now, either. But I am reiterating to you that questions about their love life or what they do in their off time or that sort of thing, is just not relevant to the issues before the Court and I don't know you would even want to know.

Frankly, I think that last little bump there is -- is how you should take the Court's rulings that are likely to come in the future. Why would you want to know? I mean, if you really have a reason why you want to know that's relevant to this case that has to do with the allegations against your clients in this case, okay. That's good. Right? But if you really don't have a reason to know and you're just fishing around seeing if you can find something that makes them squirmy or uncomfortable, there's the line. And I know all of you know that, and I don't suspect you'll do it. I haven't actually seen that. So that's why -- I mean, I'm giving you the benefit of the doubt anyway, frankly, because you are officers of the court and I think you will try to do what's right. All of you, plaintiffs' and defense counsel.

UNIDENTIFIED SPEAKER: Your Honor, if I may.

This is really important because the Motion for Protective Order really did impugn the professionalism and ethics of many of us. So to the extent -- it sounds to me, from what I've been hearing, that the Motion for Protective Order is denied. You've looked at their examples, you've concluded that all but one of the questions was relevant. You've also concluded that there was no harassment or intimidation, which was the basis on which they sought the Protective Order. So appreciating the lines and the guidance that you've provided and understanding our obligations, we would ask for a full denial of the Motion for Protective Order, in part, to really protect the professionalism of the attorneys whose conduct was very unfairly maligned.

Thank you.

UNIDENTIFIED SPEAKER: Your Honor, you've ruled that immigration status is off limit. They've asked you to reconsider that ruling and given you a legal basis that you disagreed with. I think that clearly our Motion for Protective Order which sought a ruling that immigration status was off limits should be granted.

There's no reason to deny our motion on that --

THE COURT: But I've ruled on that already.

UNIDENTIFIED SPEAKER: Yeah. So, I mean, I don't

understand why we're --

THE COURT: That was done informal conference.

UNIDENTIFIED SPEAKER: That was already granted earlier.

THE COURT: Yeah, that Motion for Protective Order on immigration was already granted, as was -- it was denied on the basis of the tax returns. So I issued what I thought were two rulings during the deposition. Tax returns was one and immigration was the other. I clearly said, No, on the immigration.

UNIDENTIFIED SPEAKER: Actually, didn't view the immigration as being that clean and that's why we moved for the protective order on it now. The only clean ruling we had out of the previous telephonic conference was, I think it asked: Did you file tax returns? And they could get an answer yes or not. It was not a definitive ruling with respect to the immigration status, which is why we moved for a protective order on those grounds and why we have continued to maintain our application for protective order on those grounds.

And, Your Honor, I know the defendants don't like the fact that we've accused them of trying to harass and intimidate our clients, but that's how it appears to our clients. And it's our job to represent them. And we made a valid motion, on valid grounds, based on good law

and good facts. And in some, they won. And some, they lost. And we've got clear instructions on how this case is going to go forward.

THE COURT: What did they lose? I guess I'm not --

MR. SKINNER: The immigration part of, Your Honor. And also, frankly --

THE COURT: That was already -- that was already lost and that was reraised at oral argument by one of the attorneys who prefaced by saying, I think I'm the only here that really wants to address this, but I would like to reconsider. And I said, No. That wasn't in the papers that I read.

MR. SKINNER: Your Honor, we moved for a Protective Order for the immigration. And that's what we got. We moved --

THE COURT: I agree -- I agree with defense counsel, I was trying to be nice about it and not be too belligerent because I think we all are on kind of the same page. But you're right. The Motion for Protective Order is denied because I saw no evidence, as I've said over and over again, of anybody being harassed or oppressed. I'm not saying that that couldn't happen and that I acknowledged that it could happen. But I didn't see it happen, and I looked. I looked very carefully at all of

the information all of you gave me. I think -- I hope that's clear because I've spent days doing it.

But I didn't see it. As far as I'm concerned, it didn't happen.

MR. SKINNER: Well, Your Honor, I think it's a little unfair to confine the record to what happened at these depositions. We haven't -- we haven't put forward any additional evidence from our clients as to how they felt or any of that. And perhaps, we'll have to do that going forward, knowing now that this is how the Court is going to view it. We have to look at the questions and answers and limit it to how they answered. I'm actually proud of them for how they did.

THE COURT: I think they did well, too. They didn't seem intimidated, they didn't seem -- they gave straightforward answers. I think they did fine. I'm not saying they did anything wrong either. The deposition seemed to go along, to me. I mean everything -- I told you what --

MR. SKINNER: Well, Your Honor, you're not dealing --

THE COURT: -- everyplace I saw --

MR. SKINNER: -- you're not dealing with the aftermath of it. I mean, you're not dealing with the plaintiff who conked out afterwards and collapsed in tears

on the street. You're not dealing with the plaintiffs who, ahead of time, are in tears, saying: Really? I'm going to be subjected to this, simply because I want to try and get what was rightfully mine as far as -- as far as an unfair wage. So we know now, I guess, what we will have to do in the future in order to make the record that needs to be made. But to suggest that, you know, these plaintiffs because they performed well at their deposition, therefor have not been intimidated or harassed, I think is too narrow a view on all of this.

THE COURT: Well, and I'm not trying to give you the narrow view. What I'm trying to say to you is that I can only rule on what I see. And I actually was provided with the video of the deposition. And I did not see a look of somebody crying and being very upset and saying, you know, Oh, my god, I didn't want to answer. You know, things that you would expect to see if someone is very stressed out and it's very stressful to them.

I'm not saying they don't feel it inside, that I can't see it. But I didn't see anything that I felt was out of line by any defense attorney that would have caused undue stress other than what we have already about, that it's obviously stressful to these people. And I agreed that they have some vulnerability. But on the other hand, you have clients who have the guts and

courage to go out and go to another country and experience in another country where they can't even speak the language very well and try it.

So, you know, I don't see your clients necessarily as quaking lambs, either.

MR. SKINNER: They're not.

THE COURT: Because they're pretty strong to do that.

MR. SKINNER: They're not.

THE COURT: I don't know that I could have done that.

MR. SKINNER: They shouldn't have to answer questions about their love life, but I think we all agree on that.

THE COURT: Yes, we all agree on that.

MR. SKINNER: Your Honor, one last thing that has to do with any of this.

The defendants have -- defendant Cultural Care filed an application to put in a sur-reply with respect to the Motion for Conditional Class Certification. We intend to put something in in writing with respect to that. We would ask for leave to put that in tomorrow.

THE COURT: That's not pending in front of me.

MR. SKINNER: It was actually referred earlier this afternoon, I believe.

THE COURT: Oh, it was?

MR. SKINNER: Yes.

THE COURT: The whole motion is?

MR. SKINNER: I believe the application for leave to file a sur-reply was referred. Am I wrong about that?

UNIDENTIFIED SPEAKER: (inaudible) .

MR. SKINNER: That's how we read what happened.

UNIDENTIFIED SPEAKER: It was just a couple of hours ago.

UNIDENTIFIED SPEAKER: Probably while we were sitting here.

UNIDENTIFIED SPEAKER: And GoAuPair also filed leave to file a sur-reply, as well, based on new evidence introduced in the reply. So there's two. I don't believe that one has been referred yet.

THE COURT: Okay. But what has been referred to me is the request for more time to do something that Judge Arguello is going to rule on?

MR. SKINNER: No, Your Honor. What --

UNIDENTIFIED SPEAKER: No. We filed an application, Your Honor, on behalf of Cultural Care, to file a sur-reply because new argument was added in the reply to which we wanted to respond. It's that that was referred to you, our request for the ability to file a sur-reply on their Conditional Cert motion.

THE COURT: And is that Motion 325, the motion to certify class?

MR. SKINNER: Yes, that's right, Your Honor.

UNIDENTIFIED SPEAKER: That's the underlying motion and this is just a motion to file a sur-reply because of new argument.

THE COURT: Well, I have to tell you, the reason I'm acting like an idiot here is that's pretty unusual for Judge Arguello to refer something to me that has to do with briefing she has to read. Do you see what I mean? She has to decide on this. And so whether or not she wants to read a sur-reply is really up to her. I have never seen her do that before. That may be a mistake.

But that aside, it's done. So I get to rule on that. Do you have any objection to their motion?

MR. SKINNER: Your Honor, we learned about this -- the first request was made to us on Friday. We just got their proposed sur-reply yesterday. We've been a little occupied with getting ready for all of this. I'm asking until tomorrow. We may object to the entire thing. We may, now that we've seen what they're putting in a sur-reply, the proposed brief, we may actually agree that part of it should properly come in. We're not going to agree all of it should properly because there's some merits discussion in that brief that is not yet properly before

the Court.

But what we're asking from you is a little time to (inaudible) and we will put something in tomorrow.

THE COURT: Okay. I understand. You don't want me to rule tonight?

MR. SKINNER: I want you to rule tonight.

THE COURT: And you know what? I won't --

MR. SKINNER: Thank you, Your Honor.

THE COURT: -- so you have until, at least tomorrow night, but probably much longer than that before I actually rule on it.

Was it expedited? Was there any need to have expedited --

UNIDENTIFIED SPEAKER: There was not, Your Honor. It was simply to get it before the Court before a ruling entered, since there isn't usually a --

THE COURT: I promise you I will not rule it or even read it until sometime after tomorrow at 5:00. How's that.

MR. SKINNER: Thank you, Your Honor.

THE COURT: So the oral motion is granted.

And then the Motion for Protective Order denied.

Okay. Anything else we need to do today?

Johana Paola Beltran, et al. vs. InterExchange, Inc., et al.

Motion Hearing
October 25, 2016

Page 106

UNIDENTIFIED SPEAKER: Thank you, Your Honor.

UNIDENTIFIED SPEAKER: Thank you.

THE COURT: All right, we'll be in recess.

(Whereupon, the within hearing was then in conclusion at 3:53 p.m.)

I certify that the foregoing is a correct transcript, to the best of my knowledge and belief (pursuant to the quality of the recording) from the record of proceedings in the above-entitled matter.

/s/Dyann Patterson — October 28, 2016

Signature of Transcriber — Date

Stevens-Koenig Reporting
303-988-8470 www.SKReporting.com

Page 106