## ATTORNEY EYES ONLY

# AuPairCare

### 2015 AU PAIR AGREEMENT

This AuPairCare Au Pair Agreement (the "Agreement") is entered into between AuPairCare, a California Corporation and "Au Pair" (first and last name of Au Pair) _____ of (City) _____, (Country) _____." Au Pair has fully read this Agreement and agrees to the terms and conditions contained herein. "Host Family" is the family in the United States with whom Au Pair has agreed to match, and with whom Au Pair will live and work.

#### A. General Provisions

Au Pair is hereby advised and acknowledges that the parties agree as follows:

1. Au Pair will abide by the terms and conditions of this Agreement for the duration of Au Pair's participation in the AuPairCare program, unless and until this Agreement is replaced or modified by a subsequent written agreement executed by AuPairCare and Au Pair.

2. Au Pair is hereby advised and acknowledges that all Au Pairs are participants in a cultural exchange program, and agrees to comply with all of the regulations published by U.S. Department of State in 22 CFR Part 514, as the same may be amended from time to time in the future ("the Regulations"). Said regulations can be found by visiting: http://j1visa.state.gov/programs/au-pair

3. Au Pair understands their rights as visa participant under the Wilberforce Trafficking Victims Act. Said rights and resources for can be found by visiting: http://travel.state.gov/content/visas/english/general/rights-protections-temporary-workers.html

4. Au Pair represents that all information provided throughout the application process is true and that no relevant information has been excluded or misrepresented in the application process and documents, including representation of the level of English proficiency, health and/ or childcare experience. Au Pair agrees that all such disclosures will be full and accurate, up to and through the date of departure from Au Pair's country of origin.

5. Au Pair agrees to complete all visa screening requirements in accordance with the instructions given and will be responsible for obtaining a valid passport and complying with all vaccinations and immunization requirements.

6. Au Pair agrees to immediately amend any disclosures should new information become available to Au Pair in any regard or at any time of participation in the program. Au Pair represents that s/he will personally conduct all written and phone correspondence with Host Family during the interviewing process. Au Pair understands that exaggeration or falsification of any application information by Au Pair, references or Originating Exchange Organization may result in immediate dismissal from the program and return to Au Pair's home country at Au Pair's expense.

7. AuPairCare has the exclusive right to determine suitability of Au Pair to participate in the program both before and during participation in the program. Au Pair agrees that in determining suitability, AuPairCare may make inquiries to third parties about Au Pair, including but not limited to medical personnel and insurance agencies otherwise covered by federal HIPAA regulations.

8. Au Pair understands that they cannot be married, engaged to be married or have children of their own, and participate in AuPairCare's au pair program.

9. Au Pair is not an employee, agent, or independent contractor of AuPairCare, and AuPairCare does not exercise dominion or control over the actions of the Host Family.

#### B. Fees and Program Costs

10. Participation in the AuPairCare program requires Au Pair to pay a non-refundable program fee to Originating Exchange Organization.

11. Originating Exchange Organization may charge Au Pair additional fees to cover their administrative costs in promoting the AuPairCare program and processing au pair applications. The fees may include, but are not limited to, an application fee, processing fee, handling fee, and interview fee. These fees may vary across Originating Exchange Organizations. AuPairCare assumes no duties or responsibilities for any acts or omissions of the Originating Exchange Organization regarding additional fees.

12. Au Pair will be responsible for additional costs, including but not limited to, baggage check fees for arrival and return flights, personal expenses while at the Au Pair arrival orientation, medical expenses not covered by insurance and all incidentals and personal expenses while on the program. Au Pairs should be prepared to cover these costs.

13. Au pair will pay all applicable fees to Originating Exchange Organization before beginning travel to the United States. Au Pair may not under any circumstances solicit funds from Host Family to cover personal costs of program, including but not limited to fees due to the Originating Exchange Organization, costs associated with securing a visa, or incidental travel costs.

14. Au Pair agrees that s/he has adequate financial resources to satisfy all obligations as an AuPairCare Au Pair, including payment for a return flight if Au Pair does not successfully complete the program.

#### C. Au Pair Cancellations/Flight Change Requests

15. Au pair agrees to pay a $300.00 USD cancellation fee, plus the actual cost of international and/or domestic airfare (if travel has been arranged), in the event he/she cancel from the program after matching with a family but prior to arrival at the host family home.

16. Au pair agrees to pay a $300.00 USD change fee and any applicable airfare penalties, in the event he/she requests to change their arrival date.

#### D. Responsibilities

17. Au Pair understands that during the first three (3) days of an au pair's stay in the home, a parent or another responsible adult shall remain in the home to facilitate the adjustment of the au pair into the family, household, and community.

rev 11/07/2014

CONFIDENTIAL

APC 000287

**ATTORNEY EYES ONLY**

# AuPairCare

18. Au Pair agrees to perform childcare services and light housekeeping related to childcare that shall not exceed forty-five (45) hours per week, five and one half (5 1/2) days per week, with a maximum of ten (10) hours per day. Au Pair will have one full weekend off per month (Friday evening to Monday morning). If a dispute arises as to any of these limits or requirements, AuPairCare shall resolve said dispute, and its decision shall be final.

19. Au Pair's responsibilities will be limited to childcare and child-related tasks for the Host Family. This may include duties such as general supervision, preparing and cleaning up after children's meals, straightening children's rooms, doing children's laundry, preparing the children for school, assisting with homework, and being present when children are sleeping. The Au Pair's responsibilities will not include heavy housework, yard work or other non-child related labor for the household. If a dispute arises concerning the scope of the Au Pair's responsibilities, AuPairCare shall resolve said dispute, and its decision shall be final.

20. Au Pair understands that U.S. Department of State regulations prohibit Au Pair employment beyond the au pair arrangement with the Host Family. Au Pair may not undertake any other paid work while in the U.S., including babysitting for Host Family for extra pay beyond the 45-hour weekly limit, babysitting for other families, or tutoring language students.

21. Au Pair is hereby advised and understands that if there is an **infant under the age of two years** old in the household, the **au pair must have 200 hours of documented experience working with children under the age of two.**

22. Au Pair understands that in the event there is an **infant under the age of three months** in the household, a parent or other responsible adult shall be present in the home at all times, and Au Pair shall not be the sole caregiver for that child at any time.

23. Au Pair agrees to perform the childcare responsibilities to the best of his/ her ability, and make every effort to act as a caring, responsible Host Family member.

### E. Behavior and Comportment

24. Au Pair agrees to abide by Host Family rules as they are determined by the Host Family, and will behave as a responsible member of the Host Family at all times. If a dispute arises concerning the Host Family rules, AuPairCare shall resolve said dispute, and its decision shall be final. Au Pair understands that Host Family is not required to provide access to a car, personal phone line, personal television, computer, or other benefits.

25. If Au Pair is expected or permitted to drive the family car(s), **Au Pair will obtain a valid international driver's license prior to arrival in the United States, and if required by law, obtain a U.S. driver's license at his/her own expense.** Failure to do so may result in termination from the program.

26. Au Pair understands that if s/he is expected or permitted to drive the family car(s), the Host Family must provide sufficient automobile insurance to comply with all applicable laws, and which insurance shall in no event cover less than $10,000 in medical coverage. Au pair understands that it is their responsibility to ensure said policy is active throughout their program participation, if they will be expected or permitted to drive. Au Pair will not be responsible for payment of any automobile insurance deductibles that exceed $250 per accident. Au Pair agrees never to use the car(s) without the express permission of Host Family or to use the car for purposes not approved by the Host Family.

27. Au Pair agrees to follow all local and state laws concerning cell phone use and driving, and at a minimum agrees to not use a cell phone while driving a motor vehicle unless it has been connected to a hands-free device AND he/she has received permission from his/her Host Family to use said equipment. Failure to adhere to this agreement may result in immediate termination from the program.

28. Au Pair agrees not to web surf, send, or read text-based communication on electronic wireless communications devices, such as cell phones, while driving a motor vehicle. Failure to adhere to this agreement may result in immediate termination from the program.

29. Au Pair agrees not to hitchhike at any time, due to the dangerous nature of hitchhiking in the United States.

30. Au Pair agrees to exercise sound judgment and caution while participating in Internet-based communities, dating and social networking websites such as Facebook, Orkut, Myspace, or other sites. Au Pair understands that Host Family information, including but not limited to phone numbers, addresses, family names, information about Host Family children, or photos of Host Family home and household members may not be posted online by Au Pair, without the Host Family's prior consent.

31. Au Pair agrees not to send, receive or view inappropriate content (sexual or violent) in the host family home, or outside of the home using the host family's equipment (i.e. computer, cell phone, handheld device, tablet, DVD player, television, etc.) by means of, but not limited to: live video, photos, pre-recorded videos, instant messages, sexting/texting, social media posts/updates. Failure to adhere to this agreement may result in immediate termination from the program.

32. Au Pair agrees not to buy, possess, or consume any controlled or illegal substances, except those prescribed by a physician. **Au Pair understands that the legal drinking age in the United States is age 21 and that the legal ramifications of underage drinking in the United States are serious and can result in immediate termination from the AuPairCare program.** Au Pair agrees not to consume alcoholic beverages at any time if Au Pair is under the legal drinking age of 21. If Au Pair is of legal drinking age, Au Pair agrees not to excessively consume alcoholic beverages at any time. Au Pair agrees never to drive an automobile after consuming alcoholic beverages. **Au Pair agrees never to consume alcoholic beverages while on duty caring for Host Family children.** As with all other terms of this Agreement, if Au Pair violates this term of the Agreement, AuPairCare may in its sole discretion terminate Au Pair's participation in the program and immediately repatriate Au Pair to his/her home country at Au Pair's expense.

33. Au Pair agrees to abide by all local, state, and federal laws. If Au Pair is arrested and/or is in police custody under suspicion of committing a crime, AuPairCare will not arrange or pay for legal assistance or representation for Au Pair. Au Pair will be responsible for resolving any legal matters independently and without the assistance of AuPairCare and its staff. As with all other terms of this Agreement, if Au Pair violates this term of the Agreement, AuPairCare may in its sole discretion terminate Au Pair's participation in the program and immediately repatriate Au Pair to his/her home country at Au Pair's expense.

rev 11/07/2014
CONFIDENTIAL                                    APC 000288

# ATTORNEY EYES ONLY

**AuPairCare**

34. Au Pair understands that the AuPairCare program is a smoke free program and agrees not to smoke while participating in the AuPairCare program. This includes, but is expressly not limited to, smoking in or around the Host Family home. As with all other terms of this Agreement, if Au Pair violates this term of the Agreement, AuPairCare may in its sole discretion terminate Au Pair's participation in the program and immediately repatriate Au Pair to his/her home country at Au Pair's expense.

35. Au Pair understands and agrees that monitoring and recording devices, including but not limited to nanny cams may be present in common areas of the Host Family home in order to monitor Au Pair's performance and interaction with the child (ren) whom Au Pair is caring for, and consents thereto and waives any and all claim of privacy rights with respect thereto.

### F. Compensation and Financial Responsibility

36. Au Pair will receive **room and board** in the form of meals and a suitable private bedroom in Host Family's home, which has been approved by a local AuPairCare representative.

37. Au Pair will receive a **weekly stipend** in accordance with the U.S. Department of State Regulations in the amount of $195.75. Said stipend shall be paid by the Host Family on the same mutually agreed upon day each week in the payment method chosen by the Host Family, and cannot be withheld for any reason.

38. Au Pair will receive two calendar weeks **paid vacation (10-days)**, to be taken at mutually agreed upon times. Vacation days shall accrue on the basis of one day per month from the beginning of Au Pair's third month in the U.S. During Au Pair's extension program, Host Family will provide 9-month and 12-month extension Au Pair with two calendar weeks (10-days) of paid vacation, to be taken at mutually agreed upon times. A 6-month extension Au Pair will receive one calendar week (5-days) of paid vacation. Vacation days shall accrue on the basis of one day per month from the beginning of the Au Pair's thirteenth month in the U.S. If any disputes arise concerning vacation issues, AuPairCare shall resolve said dispute, and its decision shall be final.

39. Au Pair **understands** that he/she is not entitled to paid or unpaid time-off on U.S. holidays.

40. Au Pair will receive **subsidy of educational costs** from the Host Family as outlined in the "Training and Education Requirements" section of this document.

41. Upon successful completion of the program, Au Pair will receive a return flight airline ticket from AuPairCare to Au Pair's home country. Au Pair will be responsible for planning and paying for travel from the international destination airport to Au Pair's final destination in home country. Au Pair understands that in the event Au Pair does not elect to use the return air ticket provided by AuPairCare for any reason, no refund, credit, or travel voucher will be provided.

42. Au Pair understands that in 1994, the U.S. Department of Labor determined that the au pair stipend constitutes "wages" because an employer-employee relationship exists between the au pair and the Host Family. Au Pair's wages are essentially in the nature of household employment, and therefore **Au Pair is required to file U.S. individual tax returns, even if no taxes are due.**

43. Au Pair is responsible for complying with any **Federal or state labor and/or income tax laws** that may apply to Au Pair. AuPairCare does not provide legal advice regarding any such laws and is not responsible for informing Au Pair of, or overseeing compliance with, any such labor laws, including but not limited to Worker's Compensation laws and/or income or other tax laws, which may vary from state to state, and are subject to change from time to time.

44. Au Pair is wholly responsible for **personal expenses and management of personal finances.** AuPairCare shall not be responsible for any personal bills incurred by the Au Pair or Host Family, such as (without limitation) telephone bills, automobile expenses, travel expenses, and/or health expenses **not covered by insurance.** Accordingly, Au Pair agrees not to seek payment or assistance in recovering any such expenses or costs from AuPairCare.

### G. Travel and Accident Insurance

45. Au Pair will receive travel and accident insurance provided by AuPairCare through a third-party insurance carrier, and such coverage contains limitations and exclusions. Au Pair agrees to review the scope of said coverage and the limitations and exclusions contained therein prior to arrival in the United States. Said information can be accessed on AuPairCare's website: http://www.aupaircare.com/current-au-pair/insurance. Au Pair is advised and agrees that any disputes pertaining to coverage issues are strictly between Au Pair and the third-party insurance company, and agrees that AuPairCare is not responsible for any coverage issues and/or disputes.

46. Au Pair understands that **pre-existing medical conditions will not be covered by the third-party travel and accident insurance.**

47. Au Pair understands that the **dental insurance** provided to them only covers injuries that are the result of an accident, and does not cover the cost of standard dental treatment. It is therefore important for Au Pair to receive a thorough dental examination prior to arrival in the U.S. so that no unexpected complications arise during the period of residence abroad.

48. Au Pair represents that the medical history provided to AuPairCare is true, and gives full consent to release all medical and psychiatric history information to potential host families.

49. If Au Pair's **medical condition changes (including pregnancy),** between the time of signing this document and Au Pair's departure to the U.S., Au Pair understands that s/he is required to notify AuPairCare and resubmit another Physician Verified Medical History document prior to arrival. As with all other terms of this Agreement, if Au Pair violates this term of the Agreement, AuPairCare may in its sole discretion terminate Au Pair's participation in the program and immediately repatriate Au Pair to his/her home country at Au Pair's expense.

50. Au Pair agrees that AuPairCare and/or its affiliates or agents may, without liability or expense to themselves, take whatever action they deem appropriate with regard to Au Pair's health and safety, including, but not limited to having Au Pair hospitalized for medical services and treatment. Au Pair further agrees that if hospitalization is not feasible for any reason, AuPairCare and/or its affiliates or agents may rely upon the advice and medical judgment of local medical staff in order to make a decision as to what is in Au Pair's best

rev 11/07/2014
CONFIDENTIAL                    APC 000289

**ATTORNEY EYES ONLY**

# AuPairCare

interests. Au Pair hereby gives full consent to be medically treated pursuant to the terms set forth herein, and/or to undergo any treatment, including but not limited to surgery, which is determined to be necessary to Au Pair's health and well-being during Au Pair's stay abroad.

51. Insurance provided by AuPairCare is valid for duration of their program participation. Au Pair accepts responsibility for payment to extend insurance during their 30-day grace period.

52. Au Pair accepts full responsibility for any medical expenses that are not covered by the insurance policy provided by AuPairCare through a third party.

53. In the event Au Pair displays a serious medical condition that in the judgment of AuPairCare prevents the Au Pair from continuing in the program (including but not limited to mental illness, substance abuse, eating disorders and/or pregnancy), whether said condition is pre-existing or new, Au Pair will be terminated from the au pair program at AuPairCare's sole discretion.

## H. Training and Education Requirements

54. Au Pair agrees to complete 32 hours of training prior to arrival at Host Family home, as required by the United States Department of State. To meet this requirement, **Au Pair will attend in full the Au Pair Academy training program upon arrival in the United States and complete a required Pre-Departure Project** as defined by AuPairCare.

55. **Au Pair understands that all 12-month program Au Pairs are required to attend courses of study at an accredited U.S. post-secondary institution for a minimum of six (6) credit hours or its equivalent in credit hours.** Host Family will provide Au Pair with time off and provide adequate transportation to and from the place of instruction, and will pay tuition up to a maximum of $500 per au pair per year. Local AuPairCare Area Directors are available to provide information about this requirement and acceptable schools; however, it is Au Pair's responsibility to plan appropriately so that s/he is able to fulfill the requirement.

56. Au Pair understands that all courses shall be taken at mutually agreed upon times with the Host Family. Au Pair shall be responsible for costs associated with such educational study that exceed the amount paid by Host Family. Au Pair agrees to provide documentation of coursework completion towards the end of the program year. In the event Au Pair does not complete the educational requirement, Au Pair will be ineligible to apply for an extension of the au pair program.

## I. Extension of Au Pair Program

57. Au Pair is hereby advised and understands that au pairs wishing to participate on the Extension Program must submit their application on or before AuPairCare's published deadline date and AuPairCare does not guarantee that AuPairCare or the Department of State will approve any extension request or that au pairs who choose to self-extend will match with a new Host Family.

58. Au Pair is hereby advised and understands that au pairs participating on the extension program will receive an updated DS-2019 form that reflects the 6, 9, or 12-month program extension. Although au pairs will have a valid DS-2019 form, the J-1 visa in his/her passport may have expired during the first 12-months of stay in the U.S. Any travel outside the U.S. is at the au pair's own risk, and AuPairCare cannot assist Au Pair or Host Family in resolving any visa concerns they may encounter.

59. Au Pair understands that **Extension Au Pairs are required to repeat the educational component** of the program during the extension time as follows: The educational component for a 6-month extension is not less than three (3) semester hours of academic credit or its equivalent. Host Family will contribute up to $250 toward the educational component. The educational component for a 9 and 12-month extension is not less than six (6) semester hours of academic credit or its equivalent. Host Family will contribute up to $500 toward the educational component.

60. Au Pair is hereby advised that by extending their program they must complete the new program terms in order to be eligible for a return flight home arranged by AuPairCare. In the event that the au pair chooses to leave the program early, he/she will be responsible for booking and paying for his or her own return flight home.

## J. Problem Resolution and Placement Changes

61. Au Pair is living as a member of a Host Family and is not under continual oversight or control of AuPairCare staff. Therefore, it is Au Pair's responsibility to promptly advise AuPairCare of any significant problems or events that occur during the program, including but not limited to Au Pair's health, safety, welfare, or adjustment to family, culture, or languages. For purposes of this Agreement, a "significant event or problem" is any change in Au Pair's circumstance that may affect an au pair's well-being and/or living situation.

62. Au Pair is hereby advised and understands that **AuPairCare requires an initial adjustment period of 60 days following Au Pair's arrival before any placement change is considered;** however, any decision regarding Au Pair removal is at AuPairCare's sole discretion and can be made at any time.

63. Au Pair should notify the local AuPairCare representative of any misunderstandings or problems with the Host Family if they persist after Au Pair has tried to address them with Host Family. AuPairCare will work with both Au Pair and Host Family to attempt to resolve the problem before authorizing a placement change. **Au Pair must show a sustained good faith effort to resolve the issues with Host Family before AuPairCare will approve an Au Pair's request for a placement change.** If Au Pair does not make a good faith and substantial effort to resolve the problems or misunderstandings with Host Family, or if Au Pair violates any terms of this Agreement, AuPairCare may in its sole discretion terminate the Au Pair's participation in the program and immediately repatriate Au Pair to his/her home country at Au Pair's expense.

64. Au Pair understands that the nature of the au pair program is one of flexibility and cultural exchange, and that placement changes may not be requested in order to achieve a preferred work schedule, location, or benefits provided by Host Family. Once Au Pair agrees to match with a Host Family, Au Pair has in effect agreed to that Host Family's required schedule, location, and benefits provided by the Host Family to Au Pair. Au Pair agrees to remain flexible in order to continually meet Host Family needs as they evolve over the course of the program year. **Changes in Host Family needs do not constitute grounds for Au Pair to request a placement change.** In the

rev 11/07/2014

CONFIDENTIAL

APC 000290

**ATTORNEY EYES ONLY**

# AuPairCare

event Au Pair's first placement is not successful, and AuPairCare determines in its sole judgment that Au Pair shall be placed in a new family, **Au Pair agrees to cooperate with AuPairCare during the entire re-matching** process, including but not limited to ensuring that potential new Host Families can easily reach Au Pair by e-mail and phone in a timely manner to arrange interviews. Au Pair is hereby advised and agrees that a replacement Host Family will be provided at the sole discretion of AuPairCare and may be dependent upon current Host Family availability. A replacement Host Family may not be available. In the event that AuPairCare is unable to provide a replacement Host Family within 14 days from the end of the first placement, Au Pair's participation in the program will end and Au Pair will have to return home at his/her personal expense.

65.  If the Host Family is willing to house Au Pair until she or he is re-matched, and AuPairCare, at its sole discretion, determines that under the circumstances it would be reasonable for Au Pair to remain in the home, but the Au Pair refuses to stay with the family, Au Pair will be required to pay a $35.00 per day housing stipend to the party who houses him/her, typically an AuPairCare field staff member.

66.  If Au Pair leaves the host family home without notice to AuPairCare and/ or Host Family and does not contact AuPairCare within 24 hours from departure, Au Pair may be subject to dismissal from the program, and Au Pair may be immediately repatriated to his/her home country at Au Pair's expense.

67.  In the event Au Pair does not successfully complete their first year program, and/or extension program, if applicable, Au Pair is responsible for his/her return travel expenses.

68.  AuPairCare is not responsible for any economic damage or loss alleged to arise from loss of or unavailability of a replacement Host Family.

69.  Au Pair agrees that any decision regarding an au pair's program status, dismissal, or re-placement will be made at the sole discretion of AuPairCare, and said decisions shall be considered final.

### K. Other Terms and Conditions

70.  Au Pair agrees to leave the United States within 30 days of the conclusion of his/her program. Au Pair understands that any stay beyond the 30-day grace period is a direct breach of the Regulations of the Department of State, and that Au Pair's future ability to travel, work or live in the United States may be compromised.

71.  Au Pair understands that if he/she is terminated or voluntarily leaves the program for any reason, they are not eligible for the 30-day grace period benefit and must depart the United States immediately.

72.  Au Pair agrees not to enter into any kind of contractual agreement during the program year in the United States, including but not limited to business, employment, marital or religious contracts.

73.  Au Pair consents and authorizes AuPairCare to use Au Pair's name, photographs, file, application content, video resume (video CV), or video likeness of Au Pair or any comments or statements from host in materials or publications to promote the AuPairCare program.

74.  Au Pair understands that AuPairCare is not a party to any agreement between Au Pair and the Originating Exchange Organization located in Au Pair's home country ("Originating Exchange Organization"). Au Pair acknowledges and agrees that the Originating Exchange Organization is solely responsible to Au Pair for injury or damage from a violation of any such agreement. AuPairCare assumes no duties or responsibilities for any acts or omissions of the Originating Exchange Organization.

75.  Au Pair agrees not to post any Host Family personal information, images, or video online or in publicly accessible areas at any time, including before, during or after duration of official program year, without the Host Family's prior consent.

76.  Au Pair understands that AuPairCare will make its best, reasonable, and diligent efforts at locating and screening all Host Families. Au Pair agrees to assume the risks involved in the matching with a Host Family, and hereby irrevocably, unconditionally, and fully waives, releases and forever discharges AuPairCare, its subsidiaries, officers, employees, and/or agents from any and all claims related to personal and/or property damage, injury, loss, delay or expense incurred by Au Pair or any guest, employee or agent, due to:

(i) events beyond AuPairCare's reasonable control, including without limitation acts of God, acts of war or government actions or restrictions.

(ii) any events and/or acts directly or indirectly caused by any intentional or negligent acts or omissions at any time, in whole or in part, by any Au Pair and/or Host Family or by any third party, including but not limited to any member, guest, employee or agent of the Host Family or other persons in the host country, even if AuPairCare's negligence is alleged to have contributed to the event,

(iii) risks associated with foreign travel and living abroad, including but not limited to risks associated with health care services, living conditions, sanitation conditions, road and transportation systems, criminal justice systems, civil liberty laws, customs and values,

(iv) any differences in the living conditions and standards between Au Pair's home and home country and the host home and host country, and,

(v) any act or omission of the Originating Exchange Organization.

In this respect, Au Pair acknowledges that neither Host Family nor Au Pair are an employee or agent of AuPairCare and actions or omissions of Au Pair or Host Family are not to be attributed in any way to AuPairCare. Au Pair fully agrees to assume all such risks and agrees to indemnify and hold harmless AuPairCare, its subsidiaries, officers, employees, and/or agents for any liability or expense, including court costs and legal fees incurred, that Au Pair has in any way caused or contributed to, whether directly or indirectly, and whether intentionally or unintentionally.

rev 11/07/2014
CONFIDENTIAL
APC 000291

**ATTORNEY EYES ONLY**

# AuPairCare

77. This Agreement shall be deemed to have been made in the State of California, U.S., and its validity, construction, breach, performance and interpretation shall be governed by the laws of the State of California, U.S. The parties to the Agreement acknowledge and agree that any dispute or claim arising out of this Agreement, including but not limited to any resulting or related transaction or the relationship of the parties, shall be decided by neutral, exclusive and binding arbitration in San Francisco, California, U.S. before an arbitration provider selected by AuPairCare, upon the petition of either party. In such proceeding, the parties may utilize subpoenas and have discovery as provided in California Code of Civil Procedure Sections 1282.6, 1283 and 1283.05. The decision of the arbitrator shall be final and binding and may be enforced in any court of competent jurisdiction. Au Pair agrees that California is a fair and reasonable venue for resolution of any such dispute and it submits to jurisdiction of the Courts of the State of California because, among other reasons, this agreement was negotiated in large part in California, and AuPairCare is domiciled in California. In the event that the arbitration clause is deemed void or inapplicable, each party expressly consents to and submits to the personal jurisdiction of the federal or state court(s) of San Francisco County, California, U.S. In any action, including arbitration, brought for breach of this Agreement, the prevailing party shall be entitled to recover reasonable attorney's fees and costs, including but not limited to the costs of arbitration

78. If there are any differences between this Agreement and any other program materials, this Agreement shall control. AuPairCare cannot be legally bound or committed by any person other than a duly authorized representative. Parties are required to follow this Agreement and cannot vary from its terms.

79. A DocuSign signature on this Agreement shall be considered the same as an original.

**ENTIRE AGREEMENT**
Please read the following statements carefully. Your signature below indicates you have read and understood these statements and that you agree to them:

- I am capable of reading and understanding this Agreement in English
- I have had the opportunity to ask questions and obtain advice, to ensure I understand this Agreement in its entirety
- I accept the terms of this entire Agreement and understand that it is legally binding
- I do not rely on any promises, statements or representations that are not expressly stated in this Agreement
- No alteration of the terms of this Agreement will be valid unless approved by AuPairCare in writing
- I have retained a copy of this Agreement for my own records

Au Pair Full Name (Signature): _____

Au Pair Full Name (Print): _____   Date : _____

Month/Day/Year

rev 11/07/2014

**CONFIDENTIAL**                    **APC 000292**

**ATTORNEY EYES ONLY**

# AuPairCare

**AU PAIR AGREEMENT**

This AuPairCare Au Pair Agreement (the "Agreement") is entered into between AuPairCare, a California Corporation and "Au Pair" (first and last name of Au Pair) _____ of (City) _____, (Country) _____." Au Pair has fully read this Agreement and agrees to the terms and conditions contained herein. "Host Family" is the family in the United States with whom Au Pair has agreed to match, and with whom Au Pair will live and work.

## A. General Provisions

Au Pair is hereby advised and acknowledges that the parties agree as follows:

1.  Au Pair will abide by the terms and conditions of this Agreement for the duration of Au Pair's participation in the AuPairCare program, unless and until this Agreement is replaced or modified by a subsequent written agreement executed by AuPairCare and Au Pair.

2.  Au Pair is hereby advised and acknowledges that all Au Pairs are participants in a cultural exchange program, and agrees to comply with all of the regulations published by U.S. Department of State in 22 CFR Part 514, as the same may be amended from time to time in the future ("the Regulations"). Said regulations can be found by visiting: http://j1visa.state.gov/programs/au-pair

3.  Au Pair understands their rights as visa participant under the Wilberforce Trafficking Victims Act. Said rights and resources for can be found by visiting: http://travel.state.gov/content/visas/english/general/rights-protections-temporary-workers.html

4.  Au Pair represents that all information provided throughout the application process is true and that no relevant information has been excluded or misrepresented in the application process and documents, including representation of the level of English proficiency, health and/ or childcare experience. Au Pair agrees that all such disclosures will be full and accurate, up to and through the date of departure from Au Pair's country of origin.

5.  Au Pair agrees to complete all visa screening requirements in accordance with the instructions given and will be responsible for obtaining a valid passport and complying with all vaccinations and immunization requirements.

6.  Au Pair agrees to immediately amend any disclosures should new information become available to Au Pair in any regard or at any time of participation in the program. Au Pair represents that s/he will personally conduct all written and phone correspondence with Host Family during the interviewing process. Au Pair understands that exaggeration or falsification of any application information by Au Pair, references or Originating Exchange Organization may result in immediate dismissal from the program and return to Au Pair's home country at Au Pair's expense.

7.  AuPairCare has the exclusive right to determine suitability of Au Pair to participate in the program both before and during participation in the program. Au Pair agrees that in determining suitability, AuPairCare may make inquiries to third parties about Au Pair, including but not limited to medical personnel and insurance agencies otherwise covered by federal HIPAA regulations.

8.  Au Pair understands that they cannot be married, engaged to be married or have children of their own, and participate in AuPairCare's au pair program.

9.  Au Pair is not an employee, agent, or independent contractor of AuPairCare, and AuPairCare does not exercise dominion or control over the actions of the Host Family.

## B. Fees and Program Costs

10.  Participation in the AuPairCare program requires Au Pair to pay a non-refundable program fee to Originating Exchange Organization.

11.  Originating Exchange Organization may charge Au Pair additional fees to cover their administrative costs in promoting the AuPairCare program and processing au pair applications. The fees may include, but are not limited to, an application fee, processing fee, handling fee, and interview fee. These fees may vary across Originating Exchange Organizations. AuPairCare assumes no duties or responsibilities for any acts or omissions of the Originating Exchange Organization regarding additional fees.

12.  Au Pair will be responsible for additional costs, including but not limited to, baggage check fees for arrival and return flights, personal expenses while at the Au Pair arrival orientation, medical expenses not covered by insurance and all incidentals and personal expenses while on the program. Au Pairs should be prepared to cover these costs.

13.  Au pair will pay all applicable fees to Originating Exchange Organization before beginning travel to the United States. Au Pair may not under any circumstances solicit funds from Host Family to cover personal costs of program, including but not limited to fees due to the Originating Exchange Organization, costs associated with securing a visa, or incidental travel costs.

14.  Au Pair agrees that s/he has adequate financial resources to satisfy all obligations as an AuPairCare Au Pair, including payment for a return flight if Au Pair does not successfully complete the program.

## C. Au Pair Cancellations/Flight Change Requests

15.  Au pair agrees to pay a $300.00 USD cancellation fee, **plus the actual cost of international and/or domestic airfare** (if travel has been arranged), in the event he/she cancel from the program after matching with a family but prior to arrival at the host family home.

16.  Au pair agrees to pay a $300.00 USD change fee and any applicable airfare penalties, in the event he/she requests to change their arrival date.

## D. Responsibilities

17.  Au Pair understands that during the first three (3) days of an au pair's stay in the home, a parent or another responsible adult shall remain in the home to facilitate the adjustment of the au pair into the family, household, and community.

Rev 9FEB2016

CONFIDENTIAL

APC 000293

**ATTORNEY EYES ONLY**

# AuPairCare

18. Au Pair agrees to perform childcare services and light housekeeping related to childcare that shall not exceed forty-five (45) hours per week, five and one half (5 1/2) days per week, with a maximum of ten (10) hours per day. Au Pair will have one full weekend off per month (Friday evening to Monday morning). If a dispute arises as to any of these limits or requirements, AuPairCare shall resolve said dispute, and its decision shall be final.

19. Au Pair's responsibilities will be limited to childcare and child-related tasks for the Host Family. This may include duties such as general supervision, preparing and cleaning up after children's meals, straightening children's rooms, doing children's laundry, preparing the children for school, assisting with homework, and being present when children are sleeping. The Au Pair's responsibilities will not include heavy housework, yard work or other non-child related labor for the household. If a dispute arises concerning the scope of the Au Pair's responsibilities, AuPairCare shall resolve said dispute, and its decision shall be final.

20. Au Pair understands that U.S. Department of State regulations prohibit Au Pair employment beyond the au pair arrangement with the Host Family. Au Pair may not undertake any other paid work while in the U.S., including babysitting for Host Family for extra pay beyond the 45-hour weekly limit, babysitting for other families, or tutoring language students.

21. Au Pair is hereby advised and understands that if there is an infant under the age of two years old in the household, **the au pair must have 200 hours of documented experience working with children under the age of two.**

22. Au Pair understands that in the event there is an infant under the age of three months in the household, a parent or other responsible adult shall be present in the home at all times, and Au Pair shall not be the sole caregiver for that child at any time.

23. Au Pair agrees to perform the childcare responsibilities to the best of his/ her ability, and make every effort to act as a caring, responsible Host Family member.

**E. Behavior and Comportment**

24. Au Pair agrees to abide by Host Family rules as they are determined by the Host Family, and will behave as a responsible member of the Host Family at all times. If a dispute arises concerning the Host Family rules, AuPairCare shall resolve said dispute, and its decision shall be final. Au Pair understands that Host Family is not required to provide access to a car, personal phone line, personal television, computer, or other benefits.

25. If Au Pair is expected or permitted to drive the family car(s), Au Pair will obtain a valid international driver's license prior to arrival in the United States, and if required by law, obtain a U.S. driver's license at his/her own expense. Failure to do so may result in termination from the program.

26. Au Pair understands that if s/he is expected or permitted to drive the family car(s), the Host Family must provide sufficient automobile insurance to comply with all applicable laws, and which insurance shall in no event cover less than $10,000 in medical coverage. Au pair understands that it is their responsibility to ensure said policy is active throughout their program participation, if they will be expected or permitted to drive. Au Pair will not be responsible for payment of any automobile insurance deductibles that exceed $250 per accident. Au Pair agrees never to use the car(s) without the express permission of Host Family or to use the car for purposes not approved by the Host Family.

27. Au Pair agrees to follow all local and state laws concerning cell phone use and driving, and at a minimum agrees to not use a cell phone while driving a motor vehicle unless it has been connected to a hands-free device AND he/she has received permission from his/her Host Family to use said equipment. Failure to adhere to this agreement may result in immediate termination from the program.

28. Au Pair agrees not to web surf, send, or read text-based communication on electronic wireless communications devices, such as cell phones, while driving a motor vehicle. Failure to adhere to this agreement may result in immediate termination from the program.

29. Au Pair agrees not to hitchhike at any time, due to the dangerous nature of hitchhiking in the United States.

30. Au Pair agrees to exercise sound judgment and caution while participating in Internet-based communities, dating and social networking websites such as Facebook, Orkut, Myspace, or other sites. Au Pair understands that Host Family information, including but not limited to phone numbers, addresses, family names, information about Host Family children, or photos of Host Family home and household members may not be posted online by Au Pair, without the Host Family's prior consent.

31. Au Pair agrees not to send, receive or view inappropriate content (sexual or violent) in the host family home, or outside of the home using the host family's equipment (i.e. computer, cell phone, handheld device, tablet, DVD player, television, etc.) by means of, but not limited to: live video, photos, pre-recorded videos, instant messages, sexting/texting, social media posts/updates. Failure to adhere to this agreement may result in immediate termination from the program.

32. Au Pair agrees not to buy, possess, or consume any controlled or illegal substances, except those prescribed by a physician. **Au Pair understands that the legal drinking age in the United States is age 21 and that the legal ramifications of underage drinking in the United States are serious and can result in immediate termination from the AuPairCare program.** Au Pair agrees not to consume alcoholic beverages at any time if Au Pair is under the legal beverage age of 21. If Au Pair is of legal drinking age, Au Pair agrees not to excessively consume alcoholic beverages at any time. Au Pair agrees never to drive an automobile after consuming alcoholic beverages. **Au Pair agrees never to consume alcoholic beverages while on duty caring for Host Family children.** As with all other terms of this Agreement, if Au Pair violates this term of the Agreement, AuPairCare may in its sole discretion terminate Au Pair's participation in the program and immediately repatriate Au Pair to his/her home country at Au Pair's expense.

33. Au Pair agrees to abide by all local, state, and federal laws. If Au Pair is arrested and/or is in police custody under suspicion of committing a crime, AuPairCare will not arrange or pay for legal assistance or representation for Au Pair. Au Pair will be responsible for resolving any legal matters independently and without the assistance of AuPairCare and its staff. As with all other terms of this Agreement, if Au Pair violates this term of the Agreement, AuPairCare may in its sole discretion terminate Au Pair's participation in the program and immediately repatriate Au Pair to his/her home country at Au Pair's expense.

Rev 9FEB2016

**CONFIDENTIAL**                    **APC 000294**

**ATTORNEY EYES ONLY**

# AuPairCare

34. Au Pair understands that the AuPairCare program is a smoke free program and agrees not to smoke while participating in the AuPairCare program. This includes, but is expressly not limited to, smoking in or around the Host Family home. As with all other terms of this Agreement, if Au Pair violates this term of the Agreement, AuPairCare may in its sole discretion terminate Au Pair's participation in the program and immediately repatriate Au Pair to his/her home country at Au Pair's expense.

35. Au Pair understands and agrees that monitoring and recording devices, including but not limited to nanny cams may be present in common areas of the Host Family home in order to monitor Au Pair's performance and interaction with the child (ren) whom Au Pair is caring for, and consents thereto and waives any and all claim of privacy rights with respect thereto.

## F. Compensation and Financial Responsibility

36. Au Pair will receive room and board in the form of meals and a suitable private bedroom in Host Family's home, which has been approved by a local AuPairCare representative.

37. Au Pair will receive a weekly stipend in accordance with the U.S. Department of State Regulations in the amount of $195.75. Said stipend shall be paid by the Host Family on the same mutually agreed upon day each week in the payment method chosen by the Host Family, and cannot be withheld for any reason.

38. Au Pair will receive two calendar weeks paid vacation (10-days), to be taken at mutually agreed upon times. Vacation days shall accrue on the basis of one day per month from the beginning of Au Pair's third month in the U.S. During Au Pair's extension program, Host Family will provide 9-month and 12-month extension Au Pair with two calendar weeks (10-days) of paid vacation, to be taken at mutually agreed upon times. A 6-month extension Au Pair will receive one calendar week (5-days) of paid vacation. Vacation days shall accrue on the basis of one day per month from the beginning of the Au Pair's thirteenth month in the U.S. If any disputes arise concerning vacation issues, AuPairCare shall resolve said dispute, and its decision shall be final.

39. Au Pair understands that he/she is not entitled to paid or unpaid time-off on U.S. holidays.

40. Au Pair will receive subsidy of educational costs from the Host Family as outlined in the "Training and Education Requirements" section of this document.

41. Upon successful completion of the program, Au Pair will receive a return flight airline ticket from AuPairCare to Au Pair's home country. Au Pair will be responsible for planning and paying for travel from the international destination airport to Au Pair's final destination in home country. Au Pair understands that in the event Au Pair does not elect to use the return air ticket provided by AuPairCare for any reason, no refund, credit, or travel voucher will be provided.

42. Au Pair understands that in 1994, the U.S. Department of Labor determined that the au pair stipend constitutes "wages" because an employer-employee relationship exists between the au pair and the Host Family. Au Pair's wages are essentially in the nature of household employment, and therefore Au Pair is required to file U.S. individual tax returns, even if no taxes are due.

43. Au Pair is responsible for complying with any Federal or state labor and/or income tax laws that may apply to Au Pair. AuPairCare does not provide legal advice regarding any such laws and is not responsible for informing Au Pair of, or overseeing compliance with, any such labor laws, including but not limited to Worker's Compensation laws and/or income or other tax laws, which may vary from state to state, and are subject to change from time to time.

44. Au Pair is wholly responsible for personal expenses and management of personal finances. AuPairCare shall not be responsible for any personal bills incurred by the Au Pair or Host Family, such as (without limitation) telephone bills, automobile expenses, travel expenses, and/or health expenses **not covered by insurance**. Accordingly, Au Pair agrees not to seek payment or assistance in recovering any such expenses or costs from AuPairCare.

## G. Travel and Accident Insurance

45. Au Pair will receive travel and accident insurance provided by AuPairCare through a third-party insurance carrier, and such coverage contains limitations and exclusions. Au Pair agrees to review the scope of said coverage and the limitations and exclusions contained therein prior to arrival in the United States. Said information can be accessed on AuPairCare's website: http://www.aupaircare.com/current-au-pair/insurance. Au Pair is advised and agrees that any disputes pertaining to coverage issues are strictly between Au Pair and the third-party insurance company, and agrees that AuPairCare is not responsible for any coverage issues and/or disputes.

46. Au Pair understands that pre-existing medical conditions will not be covered by the third-party travel and accident insurance.

47. Au Pair understands that the dental insurance provided to them only covers injuries that are the result of an accident, and does not cover the cost of standard dental treatment. It is therefore important for Au Pair to receive a thorough dental examination prior to arrival in the U.S. so that no unexpected complications arise during the period of residence abroad.

48. Au Pair represents that the medical history provided to AuPairCare is true, and gives full consent to release all medical and psychiatric history information to potential host families.

49. If Au Pair's medical condition changes (including pregnancy), between the time of signing this document and Au Pair's departure to the U.S., Au Pair understands that s/he is required to notify AuPairCare and resubmit another Physician Verified Medical History document prior to arrival. As with all other terms of this Agreement, if Au Pair violates this term of the Agreement, AuPairCare may in its sole discretion terminate Au Pair's participation in the program and immediately repatriate Au Pair to his/her home country at Au Pair's expense.

50. Au Pair agrees that AuPairCare and/or its affiliates or agents may, without liability or expense to themselves, take whatever action they deem appropriate with regard to Au Pair's health and safety, including, but not limited to having Au Pair hospitalized for medical services and treatment. Au Pair further agrees that if hospitalization is not feasible for any reason, AuPairCare and/or its affiliates or agents may rely upon the advice and medical judgment of local medical staff in order to make a decision as to what is in Au Pair's best

**ATTORNEY EYES ONLY**

# AuPairCare

interests. Au Pair hereby gives full consent to be medically treated pursuant to the terms set forth herein, and/or to undergo any treatment, including but not limited to surgery, which is determined to be necessary to Au Pair's health and well-being during Au Pair's stay abroad.

51. Insurance provided by AuPairCare is valid for duration of their program participation. Au Pair accepts responsibility for payment to extend insurance during their 30-day grace period.

52. Au Pair accepts full responsibility for any medical expenses that are not covered by the insurance policy provided by AuPairCare through a third party.

53. In the event Au Pair displays a serious medical condition that in the judgment of AuPairCare prevents the Au Pair from continuing in the program (including but not limited to mental illness, substance abuse, eating disorders and/or pregnancy), whether said condition is pre-existing or new, Au Pair will be terminated from the au pair program at AuPairCare's sole discretion.

## H. Training and Education Requirements

54. Au Pair agrees to complete 32 hours of training prior to arrival at Host Family home, as required by the United States Department of State. To meet this requirement, **Au Pair will attend in full the Au Pair Academy training program upon arrival in the United States and complete a required Pre-Departure Project** as defined by AuPairCare.

55. **Au Pair understands that all 12-month program Au Pairs are required to attend courses of study** at an accredited U.S. post-secondary institution for a minimum of six (6) credit hours or its equivalent in credit hours. Host Family will provide Au Pair with time off and provide adequate transportation to and from the place of instruction, and will pay tuition up to a maximum of $500 per au pair per year. Local AuPairCare Area Directors are available to provide information about this requirement and acceptable schools; however, it is Au Pair's responsibility to plan appropriately so that s/he is able to fulfill the requirement.

56. Au Pair understands that all courses shall be taken at mutually agreed upon times with the Host Family. Au Pair shall be responsible for costs associated with such educational study that exceed the amount paid by Host Family. Au Pair agrees to provide documentation of coursework completion towards the end of the program year. In the event Au Pair does not complete the educational requirement, Au Pair will be ineligible to apply for an extension of the au pair program.

## I. Extension of Au Pair Program

57. Au Pair is hereby advised and understands that au pairs wishing to participate on the Extension Program must submit their application on or before AuPairCare's published deadline date and AuPairCare does not guarantee that AuPairCare or the Department of State will approve any extension request or that au pairs who choose to self-extend will match with a new Host Family.

58. Au Pair is hereby advised and understands that au pairs participating on the extension program will receive an updated DS-2019 form that reflects the 6, 9, or 12-month program extension. Although au pairs will have a valid DS-2019 form, the J-1 visa in his/her passport may have expired during the first 12-months of stay in the U.S. Any travel outside the U.S. is at the au pair's own risk, and AuPairCare cannot assist Au Pair or Host Family in resolving any visa concerns they may encounter.

59. Au Pair understands that **Extension Au Pairs are required to repeat the educational component** of the program during the extension time as follows: The educational component for a 6-month extension is not less than three (3) semester hours of academic credit or its equivalent. Host Family will contribute up to $250 toward the educational component. The educational component for a 9 and 12-month extension is not less than six (6) semester hours of academic credit or its equivalent. Host Family will contribute up to $500 toward the educational component.

60. Au Pair is hereby advised that by extending their program they must complete the new program terms in order to be eligible for a return flight home arranged by AuPairCare. In the event that the au pair chooses to leave the program early, he/she will be responsible for booking and paying for his or her own return flight home.

## J. Problem Resolution and Placement Changes

61. Au Pair is living as a member of a Host Family and is not under continual oversight or control of AuPairCare staff. Therefore, it is Au Pair's responsibility to promptly advise AuPairCare of any significant problems or events that occur during the program, including but not limited to Au Pair's health, safety, welfare, or adjustment to family, culture, or languages. For purposes of this Agreement, a "significant event or problem" is any change in Au Pair's circumstance that may affect an au pair's well-being and/or living situation.

62. Au Pair is hereby advised and understands that AuPairCare requires an **initial adjustment period of 60 days following Au Pair's arrival before any placement change is considered**; however, any decision regarding Au Pair removal is at AuPairCare's sole discretion and can be made at any time.

63. Au Pair should notify the local AuPairCare representative of any misunderstandings or problems with the Host Family if they persist after Au Pair has tried to address them with Host Family. AuPairCare will work with both Au Pair and Host Family to attempt to resolve the problem before authorizing a placement change. **Au Pair must show a sustained good faith effort to resolve the issues with Host Family before AuPairCare will approve an Au Pair's request for a placement change.** If Au Pair does not make a good faith and substantial effort to resolve the problems or misunderstandings with Host Family, or if Au Pair violates any terms of this Agreement, AuPairCare may in its sole discretion terminate Au Pair's participation in the program and immediately repatriate Au Pair to his/her home country at Au Pair's expense.

64. Au Pair understands that the nature of the au pair program is one of flexibility and cultural exchange, and that placement changes may not be requested in order to achieve a preferred work schedule, location, or benefits provided by Host Family. Once Au Pair agrees to match with a Host Family, Au Pair has in effect agreed to that Host Family's required schedule, location, and benefits provided by the Host Family to Au Pair. Au Pair agrees to remain flexible in order to continually meet Host Family needs as they evolve over the course of the program year. **Changes in Host Family needs do not constitute grounds for Au Pair to request a placement change.** In the

**Rev 9FEB2016**

CONFIDENTIAL                    APC 000296

**ATTORNEY EYES ONLY**

# AuPairCare

event Au Pair's first placement is not successful, and AuPairCare determines in its sole judgment that Au Pair shall be placed in a new family, **Au Pair agrees to cooperate with AuPairCare during the entire re-matching process,** including but not limited to ensuring that potential new Host Families can easily reach Au Pair by e-mail and phone in a timely manner to arrange interviews. Au Pair is hereby advised and agrees that a replacement Host Family will be provided at the sole discretion of AuPairCare and may be dependent upon current Host Family availability. A replacement Host Family may not be available. In the event that AuPairCare is unable to provide a replacement Host Family within 14 days from the end of the first placement, Au Pair's participation in the program will end and Au Pair will have to return home at his/her personal expense.

65. If the Host Family is willing to house Au Pair until she or he is re-matched, and AuPairCare, at its sole discretion, determines that under the circumstances it would be reasonable for Au Pair to remain in the home, but the Au Pair refuses to stay with the family, Au Pair will be required to pay a $35.00 per day housing stipend to the party who houses him/her, typically an AuPairCare field staff member.

66. If Au Pair leaves the host family home without notice to AuPairCare and/ or Host Family and does not contact AuPairCare within 24 hours from departure, Au Pair may be subject to dismissal from the program, and Au Pair may be immediately repatriated to his/her home country at Au Pair's expense.

67. In the event Au Pair does not successfully complete their first year program, and/or extension program, if applicable, Au Pair is responsible for his/her return travel expenses.

68. AuPairCare is not responsible for any economic damage or loss alleged to arise from loss of or unavailability of a replacement Host Family.

69. Au Pair agrees that any decision regarding an au pair's program status, dismissal, or re-placement will be made at the sole discretion of AuPairCare, and said decisions shall be considered final.

## K. Other Terms and Conditions

70. Au Pair agrees to leave the United States within 30 days of the conclusion of his/her program. Au Pair understands that any stay beyond the 30-day grace period is a direct breach of the Regulations of the Department of State, and that Au Pair's future ability to travel, work or live in the United States may be compromised.

71. Au Pair understands that if he/she is terminated or voluntarily leaves the program for any reason, they are not eligible for the 30-day grace period benefit and must depart the United States immediately.

72. Au Pair agrees not to enter into any kind of contractual agreement during the program year in the United States, including but not limited to business, employment, marital or religious contracts.

73. Au Pair consents and authorizes AuPairCare to use Au Pair's name, photographs, file, application content, video resume (video CV), or video likeness of Au Pair or any comments or statements from host in materials or publications to promote the AuPairCare program.

74. Au Pair understands that AuPairCare is not a party to any agreement between Au Pair and the Originating Exchange Organization located in Au Pair's home country ("Originating Exchange Organization"). Au Pair acknowledges and agrees that the Originating Exchange Organization is solely responsible to Au Pair for injury or damage from a violation of any such agreement. AuPairCare assumes no duties or responsibilities for any acts or omissions of the Originating Exchange Organization.

75. Au Pair agrees not to post any Host Family personal information, images, or video online or in publicly accessible areas at any time, including before, during or after duration of official program year, without the Host Family's prior consent.

76. Au Pair understands that AuPairCare will make its best, reasonable, and diligent efforts at locating and screening all Host Families. Au Pair agrees to assume the risks involved in the matching with a Host Family, and hereby irrevocably, unconditionally, and fully waives, releases and forever discharges AuPairCare, its subsidiaries, officers, employees, and/or agents from any and all claims related to personal and/or property damage, injury, loss, delay or expense incurred by Au Pair or any guest, employee or agent, due to:

(i) events beyond AuPairCare's reasonable control, including without limitation acts of God, acts of war or government actions or restrictions.

(ii) any events and/or acts directly or indirectly caused by any intentional or negligent acts or omissions at any time, in whole or in part, by any Au Pair and/or Host Family or by any third party, including but not limited to any member, guest, employee or agent of the Host Family or other persons in the host country, even if AuPairCare's negligence is alleged to have contributed to the event,

(iii) risks associated with foreign travel and living abroad, including but not limited to risks associated with health care services, living conditions, sanitation conditions, road and transportation systems, criminal justice systems, civil liberty laws, customs and values,

(iv) any differences in the living conditions and standards between Au Pair's home and home country and the host home and host country, and,

(v) any act or omission of the Originating Exchange Organization.

In this respect, Au Pair acknowledges that neither Host Family nor Au Pair are an employee or agent of AuPairCare and actions or omissions of Au Pair or Host Family are not to be attributed in any way to AuPairCare. Au Pair fully agrees to assume all such risks and agrees to indemnify and hold harmless AuPairCare, its subsidiaries, officers, employees, and/or agents for any liability or expense, including court costs and legal fees incurred, that Au Pair has in any way caused or contributed to, whether directly or indirectly, and whether intentionally or unintentionally.

Rev 9FEB2016

**CONFIDENTIAL**                          **APC 000297**

**ATTORNEY EYES ONLY**

# AuPairCare

77. This Agreement shall be deemed to have been made in the State of California, U.S., and its validity, construction, breach, performance and interpretation shall be governed by the laws of the State of California, U.S. The parties to the Agreement acknowledge and agree that any dispute or claim arising out of this Agreement, including but not limited to any resulting or related transaction or the relationship of the parties, shall be decided by neutral, exclusive and binding arbitration in San Francisco, California, U.S. before an arbitration provider selected by AuPairCare, upon the petition of either party. In such proceeding, the parties may utilize subpoenas and have discovery as provided in California Code of Civil Procedure Sections 1282.6, 1283 and 1283.05. The decision of the arbitrator shall be final and binding and may be enforced in any court of competent jurisdiction. Au Pair agrees that California is a fair and reasonable venue for resolution of any such dispute and it submits to jurisdiction of the Courts of the State of California because, among other reasons, this agreement was negotiated in large part in California, and AuPairCare is domiciled in California. In the event that the arbitration clause is deemed void or inapplicable, each party expressly consents to and submits to the personal jurisdiction of the federal or state court(s) of San Francisco County, California, U.S. In any action, including arbitration, brought for breach of this Agreement, the prevailing party shall be entitled to recover reasonable attorney's fees and costs, including but not limited to the costs of arbitration

78. If there are any differences between this Agreement and any other program materials, this Agreement shall control. AuPairCare cannot be legally bound or committed by any person other than a duly authorized representative. Parties are required to follow this Agreement and cannot vary from its terms.

79. A DocuSign signature on this Agreement shall be considered the same as an original.

**ENTIRE AGREEMENT**
Please read the following statements carefully. Your signature below indicates you have read and understood these statements and that you agree to them:

- I am capable of reading and understanding this Agreement in English
- I have had the opportunity to ask questions and obtain advice, to ensure I understand this Agreement in its entirety
- I accept the terms of this entire Agreement and understand that it is legally binding
- I do not rely on any promises, statements or representations that are not expressly stated in this Agreement
- No alteration of the terms of this Agreement will be valid unless approved by AuPairCare in writing
- I have retained a copy of this Agreement for my own records

Au Pair Full Name (Signature): _____

Au Pair Full Name (Print): _____        Date : _____

                                                                                                        Month/Day/Year

Rev 9FEB2016

CONFIDENTIAL                    APC 000298

# Exhibit 5

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1: 14-cv-03074-CMA-KMT

JOHANA PAOLA BELTRAN; and those similarly situated,

     Plaintiffs,

v.

INTEREXCHANGE, INC.;
USAUPAIR, INC.;
GREATAUPAIR, LLC;
EXPERT GROUP INTERNATIONAL INC., DBA EXPERT AUPAIR;
EURAUPAIR INTERCULTURAL CHILD CARE PROGRAMS;
CULTURAL HOMESTAY INTERNATIONAL;
CULTURAL CARE, INC. D/B/A CULTURAL CARE AU PAIR;
AUPAIRCARE, INC.;
AU PAIR INTERNATIONAL, INC.;
APF GLOBAL EXCHANGE, NFP;
AMERICAN INSTITUTE FOR FOREIGN STUDY DBA AU PAIR IN AMERICA;
AMERICAN CULTURAL EXCHANGE, LLC, DBA GOAUPAIR;
AGENT AU PAIR;
A.P.E.X. AMERICAN PROFESSIONAL EXCHANGE, LLC DBA PROAUPAIR; and
20/20 CARE EXCHANGE, INC. DBA THE INTERNATIONAL AU PAIR EXCHANGE

     Defendants.

---

## DEFENDANT AUPAIRCARE, INC.'S ANSWER
## TO PLAINTIFFS' SECOND REQUEST FOR PRODUCTION

---

Defendant AuPairCare, Inc. ("Defendant," "AuPairCare" or "Responding Party"), by counsel, Gordon & Rees LLP, submits the following response to Plaintiffs' Second Requests for Production of Documents pursuant to Fed.R.Civ.P. 34:

## GENERAL OBJECTIONS

Defendant makes the following general objections, to which each of the responses set forth below is subject:

A.      Defendant objects to these requests on the grounds that any alleged disputes between it and the au pairs it has sponsored are subject to mandatory arbitration provisions.   Therefore, as to AuPairCare, discovery propounded under the auspices of this court proceeding is improper.   AuPairCare expressly reserves the right to move to dismiss this action and/or compel arbitration.   Nothing in these responses or objections may be deemed a waiver of that right.

B.      Defendant objects to Plaintiffs' instructions to the extent they require acts inconsistent with the Federal Rules of Civil Procedure or the Local Rules of this Court.

C.      Defendant objects to Plaintiffs' requests for production to the extent they improperly seek class-wide merits or damages discovery before any class or collective action has been certified or any motion for certification filed.   At present, the only plaintiffs in this case are the named Plaintiffs.   In particular but without limitation, Defendant objects to requests seeking the identity of and private and confidential information concerning putative class members prior to class certification.

D.      Defendant generally objects to Plaintiffs' requests for production of documents to the extent that Plaintiff seeks financial information and documents. Evidence of a defendant's financial status is not discoverable.   Absent relevancy

and a compelling need, a party may not obtain a defendant's financial records through discovery. See *Bonanno v. Quizno's Franchise Co. LLC,* 255 F.R.D. 550, 555-56 (D. Colo. 2009) (*citing Stone v. State Farm Mut. Auto. Ins. Co.,* 185 P.3d 150, 159 (Colo. 2008)); *In re Dist. Ct., City & Cnty. of Denver,* 256 P.3d 687, 691 (2011); *Corbetta v. Albertson's, Inc.,* 975 P.2d 718, 721 n.4, 723 (Colo. 1999); *see also Leidholt v. Dist. Ct.,* 619 P.2d 768, 770 (Colo. 1980); *Packard v. Moore,* 71 P.2d 922 (Cal. 1937); *Baggett v. Davis,* 169 So. 372 (Fla. 1936); *Laidlaw v. Sage,* 52 N.E. 679 (N.Y. 1899); and 1 Jones on Evidence, §§ 4.48, 49 (6th ed. 1972)).

E.     Defendant objects to Plaintiffs' requests for production to the extent they seek information pertaining to claims in the First Amended Complaint that are not brought against Defendant.

F.     Defendant objects to Plaintiffs' requests for production to the extent they require production of attorney-client or work product privileged information. Defendant's production of such privileged materials is unintentional and inadvertent. Defendant requests that Plaintiff immediately return to Defendant all documents that appear to be subject to the attorney-client privilege or work product doctrine.

G.     Defendant objects to Plaintiffs' requests for production to the extent they would require production of Defendant's proprietary business information or trade secrets.

H.     Defendant objects to Plaintiffs' requests for production to the extent they would require production of documents and things that are not in Defendant's possession, custody, or control.

I.      Defendant objects to Plaintiffs' requests for production to the extent they seek information that violates the privacy rights of non-parties.

J.      A response that Defendant "will produce" responsive documents means that if such documents exist, are within Defendant's possession, custody and control, and are not privileged, they will be produced subject to the Court's protective order.

K.      Defendant objects to Plaintiffs' requests for production to the extent they are irrelevant and reserves all rights and objections with respect to relevance, materiality and admissibility.

L.      Defendant objects to Plaintiffs' requests for production pursuant to Fed.R.Civ.P. 26(b)(1) to the extent they are not proportional to the needs of the case or seek information that is not proportional to the needs of the case.

M.      Defendant's production of documents shall be subject to the Protective Order entered by the Court on May 6, 2016.

N.      Defendant reserves the right to supplement its responses as additional information and things are discovered, if any.

## RESPONSE TO REQUEST FOR PRODUCTION

**REQUEST FOR PRODUCTION NO. 21:** All arbitration agreements that you contend apply to these claims.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 21:**

Defendant objects to this request on the grounds that any alleged disputes between it and the au pairs it has sponsored are subject to mandatory arbitration

- 4 -

provisions. Therefore, as to AuPairCare, discovery propounded under the auspices of this court proceeding is improper. AuPairCare expressly reserves the right to dismiss this action and/or move to compel arbitration. Nothing in these responses or objections may be deemed a waiver of that right.

Defendant further objects to this request on the grounds it improperly seeks class-wide discovery before any class or collective action has been certified, conditionally or otherwise, and before any motion for certification has been filed. At present, the only parties to whom documents are properly discoverable are the named Plaintiffs.

Defendant objects to this request for production on the grounds that it seeks documents that are subject to AuPairCare's privacy policy. Defendant further objects to this request on the grounds that it seeks information that is proprietary and confidential to AuPairCare.

Subject to and without waiving these objections, Defendant previously produced sample form contracts between it and au pair sponsor candidates. See APC 000254 – APC 000298 (Attorney Eyes Only and Confidential documents). Examples of applicable arbitration agreements are within these contracts.

DATED this 6th day of June, 2016.

>*s/Peggy Kozal*
>Thomas B. Quinn
>Peggy Kozal
>GORDON & REES LLP
>555 17th Street, Suite 3400
>Denver, Colorado 80202
>Tel: 303-534-5160
>tquinn@gordonrees.com
>pkozal@gordonrees.com
>
>-and-
>
>Brian P. Maschler
>GORDON & REES LLP
>275 Battery Street, Suite 2000
>San Francisco, CA 94579
>Tel: 415-875-3127
>bmaschler@gordonrees.com
>
>*Attorneys for Defendant*
>*AuPairCare, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on June 6, 2016, I served the foregoing Defendant AuPairCare, Inc.'s Answers to Plaintiffs' First Requests For Production via email on all counsel of record as follows:

| | |
|---|---|
| *Attorneys for Plaintiffs:*<br><br>*Alexandra Ivette Gonzalez*<br>*Beaudette Deetlefs*<br>*Dayanna Paola Cardenas Caicedo*<br>*Johana Paola Beltran*<br>*Lusapho Hlatshaneni* | Alexander N. Hood<br>Towards Justice-Denver<br>Suite 300<br>1535 High Street<br>Denver, CO 80218<br>alex@towardsjustice.org<br><br>-and-<br><br>Randall W. Jackson<br>Matthew L. Schwartz<br>Peter M. Skinner<br>Boies Schiller & Flexner, LLP-New York<br>7th Floor<br>575 Lexington Avenue<br>New York, NY 10022<br>rjackson@bsfllp.com<br>mlschwartz@bsfllp.com<br>pskinner@bsfllp.com<br><br>-and-<br><br>Sigrid S. McCawley<br>Lauren F. Louis<br>Boies Schiller & Flexner, LLP-Ft. Lauderdale<br>Suite 1200<br>401 E. Las Olas Boulevard<br>Ft. Lauderdale, FL 33301<br>smccawley@bsfllp.com<br>llouis@bsfllp.com |
| *Attorneys for Defendants:*<br><br>*20/20 Care Exchange, Inc. d/b/a The*<br>*International Au Pair Exchange* | Lawrence D. Stone<br>Christian D. Hammond<br>Dufford & Brown, P.C.<br>Suite 2100 |

| | |
|---|---|
| -and-<br>*A.P.E.X. American Professional Exchange, LLC d/b/a ProAuPair* | 1700 Broadway<br>Denver, CO 80290-2101<br>lstone@duffordbrown.com<br>chammond@duffordbrown.com |
| *Attorneys for Defendants:*<br><br>*Agent Au Pair, Inc.*<br>-and-<br>*American Cultural Exchange, LLC d/b/a GoAuPair*<br>-and-<br>*Au Pair International, Inc.* | Kathryn A. Reilly<br>Wheeler Trigg O'Donnell, LLP<br>Suite 4500<br>370 17th Street<br>Denver, CO 80202-5647<br>reilly@wtotrial.com |
| *Attorneys for Defendants:*<br><br>*APF Global Exchange, NFP d/b/a Aupair Foundation*<br>-and-<br>*American Institute for Foreign Study d/b/a Au Pair in America* | Lawrence L. Lee<br>Susan M. Schaecher<br>Fisher & Phillips LLP<br>Suite 2700<br>1801 California Street<br>Denver, CO 80202<br>llee@laborlawyers.com<br>sschaecher@laborlawyers.com |
| *Attorneys for Defendants:*<br><br>*Au Pair International, Inc.*<br>-and-<br>*American Cultural Exchange, LLC d/b/a GoAuPair* | Brian Alan Birenbach<br>Rietz Law Firm, LLC<br>Suite 301<br>114 Village Place<br>Dillon, CO 80435<br><br>brian@rietzlawfirm.com |
| *Attorneys for Defendant:*<br><br>*Cultural Care, Inc.* | Jeffrey Paul Allen<br>Donald J. Gentile<br>Lawson & Weitzen, LLP<br>Suite 345<br>88 Black Falcon Avenue<br>Boston, MA 02210<br>jallen@lawson-weitzen.com<br>dgentile@lawson-weitzen.com<br><br>-and-<br><br>Walter V. Siebert<br>Sherman & Howard L.L.C.<br>Suite 3000<br>633 17th Street<br>Denver, CO 80202<br>bsiebert@shermanhoward.com |

| | |
|---|---|
| | -and-<br><br>William L. Monts III<br>Hogan Lovells US LLP<br>Suite 1300<br>555 Thirteenth St., N.W.<br>Washington, CO 20004-1109<br>William.monts@hoganlovells.com |
| Attorneys for Defendant:<br><br>Cultural Homestay International | Adam A. Hubbard<br>Holland & Hart LLP<br>Suite 300<br>1800 Broadway<br>Boulder, CO 80302<br>aahubbard@hollandhart.com<br><br>James E. Hartley<br>Holland & Hart, LLP<br>Suite 3200<br>555 17th Street<br>Denver, CO 80202<br>jhartley@hollandhart.com |
| Attorneys for Defendant:<br><br>EurAupair Intercultural Child Care Programs | David B. Meschke<br>Martha L. Fitzgerald<br>Brownstein Hyatt Farber Schreck, LLP<br>Suite 2200<br>410 17th Street<br>Denver, CO 80202<br>dmeschke@bhfs.com<br>mfitzgerald@bhfs.com<br><br>-and-<br><br>Margo J. Arnold<br>Brownstein Hyatt Farber Schreck, LLP<br>Suite 3550<br>2049 Century Park East<br>Los Angeles, CA 90067<br>marnold@bhfs.com |
| Attorney for Defendant:<br>Expert Group International, Inc. | Bogdan Enica<br>Bogdan Enica, Attorney at Law<br>Suite 213<br>111 2nd Avenue NE<br>St. Petersburg, FL 33701-3440<br>bogdane@hotmail.com |

| Attorneys for Defendant: Great AuPair, LLC | Meshach Y. Rhoades<br>Martin J. Estevao<br>Armstrong Teasdale LLP<br>Suite 800<br>4643 S. Ulster Street<br>Denver, CO 80237<br>mrhoades@armstrongteasdale.com<br>mestevao@armstrongteasdale.com |
| --- | --- |
| Attorneys for Defendant: InterExchange, Inc. | Heather Fox Vickles<br>Brooke A. Colaizzi<br>Raymond M. Deeny<br>Sherman & Howard, LLC<br>Suite 3000<br>633 17th Street<br>Denver, CO 80202<br>hvickles@shermanhoward.com<br>bcolaizzi@shermanhoward.com<br>rdeeny@shermanhoward.com |
| Attorneys for Defendant: USAuPair, Inc. | William J. Kelly, III<br>Chandra M. Feldkamp<br>Kelly & Walker LLC<br>Suite 200<br>1512 Larimer Street<br>Denver, CO 80202<br>wkelly@kellywalkerlaw.com<br>cfeldkamp@kellywalkerlaw.com |

*/s/ Lacey Fachan*

# Exhibit 6

BRIAN P. MASCHLER
BMASCHLER@GORDONREES.COM

# GORDON&REES
## SCULLY MANSUKHANI
ATTORNEYS AT LAW
275 BATTERY STREET, SUITE 2000
SAN FRANCISCO, CA 94111
PHONE: (415) 986-5900
FAX: (415) 986-8054
WWW.GORDONREES.COM

September 14, 2015

***Via E-Mail and First Class Mail***
Lauren F. Louis, Esq.
Boies, Schiller & Flexner, LLP
401 E. Las Olas Boulevard
Suite 1200
Fort Lauderdale, Florida 33301

Re:  *Beltran v. InterExchange, et al.*
U.S. District Court for the District Court of Colorado,
Case No. 1:14-cv-03074-CMA-KMT
Mandatory Arbitration for Proposed Plaintiffs Laura Mejia Jimenez
and Juilane Harning

Dear Ms. Louis:

As you know, the contracts between AuPairCare, Inc. ("APC" or "AuPairCare") and proposed plaintiffs, Juilane Harning and Laura Mejia Jimenez, as well as APC's with other au pairs, contain mandatory arbitration and forum selection clauses, which provide as follows:

**The parties to the Agreement acknowledge and agree that any dispute or claim arising out of this Agreement, including but not limited to any resulting or related transaction or the relationship of the parties, shall be decided by neutral, exclusive and binding arbitration in San Francisco, California, U.S. before an arbitration provider selected by AuPairCare, upon the petition of either party.**

**In such proceeding, the parties may utilize subpoenas and have discovery as provided in California Code of Civil Procedure Sections 1282.6, 1283 and enforced in any court of competent jurisdiction. Au Pair agrees that California is a fair and reasonable venue for resolution of any such dispute and it submits to jurisdiction of the Courts of the State of California because among other reasons, this agreement was negotiated in large part in California, and AuPairCare is domiciled in California**

**In the event that the arbitration clause is deemed void or inapplicable, each party expressly consents to and submits to the personal jurisdiction of the federal or state court(s) of San Francisco County, California, U.S.  In any action, including arbitration, brought for breach of this Agreement, the**

ALABAMA • ARIZONA • CALIFORNIA • COLORADO • CONNECTICUT • FLORIDA • GEORGIA • ILLINOIS • MARYLAND
MASSACHUSETTS • MISSOURI • NEVADA • NEW JERSEY • NEW YORK • NORTH CAROLINA • OHIO • OREGON • PENNSYLVANIA
SOUTH CAROLINA • SOUTH DAKOTA • TEXAS • VIRGINIA • WASHINGTON • WASHINGTON, D.C. • WEST VIRGINIA

September 14, 2015
Page 2

> **prevailing party shall be entitled to recover reasonable attorney's fees and costs, including but not limited to the costs of arbitration.**

(*See* Attachments A, B hereto)

AuPairCare previously produced a sample contract between it and Au Pair candidates in response to Plaintiff's First Request for Production (*See* APC000-254-APC000298). In addition, in response to Plaintiffs' Second Request for Production, which specifically requested "all arbitration agreements that you contend apply to these claims," AuPairCare again referred Plaintiffs to that previously produced contract form. (*See* Attachment C)

On August 15, 2016, the last day allowed by the Court for potential amendments to the pleadings, your office filed a motion to amend complaint that requested that Ms. Jimenez and Ms. Harning be added as named plaintiffs in this lawsuit. That motion currently is pending before the Court.

We believe that adding Ms. Jimenez and Ms. Harning as plaintiffs in this lawsuit without the consent of AuPairCare is improper in that it violates the mandatory arbitration and forum selection provisions identified above. Please advise at your earliest opportunity whether you are willing to stipulate to submitting the claims of Ms. Jiminez and Ms. Harning to arbitration in accordance with the APC contract, and to dismiss them from the Colorado lawsuit, or in the alternative, stay the Colorado lawsuit as to them pending the outcome of arbitration.

Thank you in advance for your consideration and prompt response.

Very truly yours,

GORDON & REES, LLP

Brian P. Maschler

BPM/jv
cc: Beltran Defense Counsel

# Exhibit 7

*Johana Paola Beltran, et al. vs.*

*Interexchange, Inc., et al.*

*Confidential Video Deposition of Juliane Harning*

*September 08, 2016*



700 17th Street, Suite 1750
Denver, CO 80202
303-988-8470 (Office)  303-988-8478 (Fax)
SKReporting.com

Stevens-Koenig
Reporting

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Juliane Harning
September 08, 2016

1              IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLORADO
2
   Civil Action No. 1:14-cv-03074-CMA-KMT
3  _____

4  JOHANA PAOLA BELTRAN; AND THOSE SIMILARLY SITUATED,

5       Plaintiffs,

6  vs.

7  INTEREXCHANGE, INC.; USAUPAIR, INC.; GREATAUPAIR, LLC;
   EXPERT GROUP INTERNATIONAL, INC., D/B/A EXPERT AUPAIR;
8  EURAUPAIR INTERCULTURAL CHILD CARE PROGRAMS; CULTURAL
   HOMESTAY INTERNATIONAL; CULTURAL CARE, INC., D/B/A
9  CULTURAL CARE AU PAIR; AUPAIRCARE, INC.; AU PAIR
   INTERNATIONAL, INC.; APF GLOBAL EXCHANGE, NFP; AMERICAN
10 INSTITUTE FOR FOREIGN STUDY D/B/A AU PAIR IN AMERICA;
   AMERICAN CULTURAL EXCHANGE, LLC, D/B/A GOAUPAIR; AGENT AU
11 PAIR; A.P.EX. AMERICAN PROFESSIONAL EXCHANGE, LLC, D/B/A
   PROAUPAIR; AND 20/20 CARE EXCHANGE, INC., D/B/A THE
12 INTERNATIONAL AU PAIR EXCHANGE,

13      Defendants.
   _____

14
        CONFIDENTIAL VIDEO DEPOSITION OF JULIANE HARNING
15                   September 8, 2016
   _____

16

17

18

19

20

21

22

23

24

25

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Juliane Harning
September 08, 2016

Page 13

1    ten years; is that a fair estimate?

2              A.    What do you understand by fluent?

3              Q.    Sure.  You can -- you can read English?

4              A.    Yes.

5              Q.    And comprehend English?

6              A.    To most parts.

7              Q.    Okay.  And what are -- when you say for

8    the most part, are there certain things that you do not

9    comprehend in English?

10             A.    Well, they're like idioms, for example,

11   that are hard to understand if English is not your first

12   language.

13             Q.    But otherwise if you take a written

14   document, you can read it and understand it for the most

15   part; is that correct?

16             A.    I don't understand like medical terms or

17   legal terms, like terms like that.

18             Q.    You were able to sign an affidavit in this

19   case; is that correct?

20             A.    Yes.

21             Q.    Did you read it before you signed it?

22             A.    Yes.

23             Q.    Did you understand it before you signed

24   it?

25             A.    Yes.

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Juliane Harning
September 08, 2016

Page 14

 1          Q.   You signed a contract with AuPairCare

 2    twice in the past, haven't you?

 3          A.   Yes.

 4          Q.   Did you understand it before you signed

 5    it?

 6          A.   Yes, because we got it in German.

 7          Q.   Okay.  All right.

 8               UNIDENTIFIED SPEAKER:  Joining the

 9    meeting.

10               MR. QUINN:  Whoever joined, could you

11    please enter your appearance for today?

12               MS. FITZGERALD:  Hi.  It's Martha

13    Fitzgerald.  I got cut off.  I apologize.

14               MR. QUINN:  Oh, no problem.

15          Q.   (By Mr. Quinn)  I'm going to hand you

16    what's been marked as Exhibit 41.  If you'll take a

17    moment and review it.

18               MR. HOOD:  Thank you, Tom.

19               MR. QUINN:  I've got more for folks that

20    want it.

21               MR. HOOD:  Tom, could we get two, one for

22    Nina and --

23               MR. QUINN:  Sure.  They're in --

24               MR. HOOD:  Oh, perfect.

25               (Exhibit 41 was marked.)

Johana Paola Beltran, et al. vs.                    Confidential Video Deposition of Juliane Harning
Interexchange, Inc., et al.                                            September 08, 2016

Page 15

1          Q.  (By Mr. Quinn)  Oops.  Hang on.  Wait a

2    minute.  I gave you -- he's got the marked ones.  I

3    apologize.  I marked the wrong one.  My apologies.

4          A.   I have the marked one too.

5              MR. HOOD:  Did you say I have --

6              MR. QUINN:  No.  My mistake.  It was my

7    mistake.

8          A.   You want me to look at it, not read it

9    all, right?

10         Q.  (By Mr. Quinn)  Right.  What I'm going to

11   ask you to do is take a look and confirm that's your

12   signature on the last page of Exhibit 41.

13         A.   It's really hard to tell, but it looks

14   like my signature.

15         Q.   Okay.  Do you have a recollection of

16   signing -- excuse me, of reviewing the Au Pair Agreement

17   with AuPairCare before you started your engagement --

18   your au pair engagements here in the United States?

19         A.   Yes, I had the paperwork.

20              MR. HOOD:  Tom, I apologize.  But my copy

21   of this has work product on it.

22              MR. QUINN:  You know, they copied it in

23   color.

24              MR. HOOD:  Okay.

25              MR. QUINN:  It's just highlights.  We're

Johana Paola Beltran, et al. vs.                    Confidential Video Deposition of Juliane Harning
Interexchange, Inc., et al.                                                     September 08, 2016

Page 16

 1   going to talk about those, but thanks.  I just realized

 2   that just now.

 3           Q.  (By Mr. Quinn)  Were there any portions of

 4   this Au Pair Agreement that you had any confusion about

 5   or misunderstandings or needed any counseling on?

 6           A.   I don't remember exactly, but I don't

 7   think so.

 8           Q.   Okay.  So when you signed it, you agreed

 9   to abide by the terms of the Au Pair Agreement, right?

10           A.   Yes.  I -- yeah.

11           Q.   Okay.  All right.  You talked a moment

12   about your declaration.  I'll have you take a look at

13   what's been marked as Exhibit 42.

14           (Exhibit 42 was marked.)

15           MR. HOOD:  Thank you.

16           MR. QUINN:  Can you give me one of those

17   back, please?

18           MS. CRAIGMILE:  Sure.

19           MR. QUINN:  Thank you.

20           Q.  (By Mr. Quinn)  Have you had a chance to

21   look at that?

22           A.   Yes.

23           Q.   Okay.  Why don't you tell me how this

24   document came into being.

25           A.   What do you mean by "this"?

Johana Paola Beltran, et al. vs.                    Confidential Video Deposition of Juliane Harning
Interexchange, Inc., et al.                                              September 08, 2016

Page 88

```
 1    know everything about it.
 2              Q.   Okay.  Did you -- you seem like a smart,
 3    careful person.  Did you do any internet research to see
 4    if there were other ways for you to earn a living in the
 5    United States other than being an au pair?
 6              MR. HOOD:  Objection as to form.
 7              A.   I don't recall.
 8              Q.  (By Mr. Quinn)  Do you think you did?
 9              A.   I don't recall.
10              Q.   Well, you had just been in -- before you
11    came back, you had three au pair job -- experiences,
12    right?
13              A.   That's correct.
14              Q.   And in two of them you worked less hours
15    and made more money than you did in the United States,
16    correct?
17              A.   That's correct.
18              Q.   And you wanted to come back to the United
19    States and still be involved in the childcare industry,
20    correct?
21              A.   Yes.
22              Q.   Did you look into whether you could be a
23    nanny and be in the United States?
24              A.   No, because I knew you can only come here
25    legally as an au pair and only be paid 195.75.
```

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Juliane Harning
September 08, 2016

Page 90

 1    nannies get paid more than au pairs?

 2            A.   I think everybody gets paid more than

 3    au pairs.

 4            Q.   When you came back to the United States to

 5    work for the Russell family, you knew that you had

 6    opportunities to be an au pair in other countries where

 7    you could work less hours and make more money, correct?

 8            A.   Yes.

 9            Q.   But you chose not to engage in those

10    au pair opportunities because you wanted to come to the

11    United States, correct?

12            A.   Can you rephrase that?

13            Q.   What about that do you not understand?

14            A.   I don't -- I don't get the point.

15            Q.   Okay.  You could have worked elsewhere for

16    more money, right, elsewhere other than the United

17    States?

18            A.   Yeah.

19            Q.   But you didn't want to go work elsewhere.

20    You wanted to work in the United States, right?

21            A.   I wouldn't say it like that.

22            Q.   How would you say it?

23            A.   That was my only option to come here.

24            Q.   Your only option to come here was to work

25    as an au pair; is that right?

Johana Paola Beltran, et al. vs.                    Confidential Video Deposition of Juliane Harning
Interexchange, Inc., et al.                                                      September 08, 2016

Page 91

1              A.   Or travel, like -- and finance it myself.

2              Q.   Let me just -- I appreciate that, and

3     you've helped me understand what your -- what your

4     desires were, but I just want to go back to my point.

5     You could -- if you wanted to be an au pair, you could

6     have done so in a different country, worked less hours,

7     and made more money in 2014; is that right?

8                   MR. HOOD:  Objection to form.

9              A.   I think so.

10             Q.   (By Mr. Quinn)  Okay.  But you wanted to

11    either work or travel in the United States, so that's why

12    you chose to come here, right?

13             A.   I chose to come here because I wanted to

14    see if I could have a better experience than I had the

15    first time, and I think that was the main reason why I

16    decided to do it again.

17             Q.   And you knew that by coming here you would

18    make less money and work more hours than you would

19    working in a different country.  That was part of the

20    compromise in coming here, right?

21                  MR. HOOD:  Objection.

22             A.   I don't know if I would say it like that.

23             Q.   (By Mr. Quinn)  How would you say it?

24             A.   I was led to believe that the only way I

25    could come here, maybe travel here while living here

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Juliane Harning
September 08, 2016

Page 106

1         Q.  (By Mr. Quinn)  Sure.  You might have

2   complained to someone and said, I don't like that wage,

3   it stinks?

4         A.   I don't recall, maybe.

5         Q.   Okay.  And can I have more?  Can I get --

6   earn more?  You asked for that, didn't you?

7              MR. HOOD:  Objection.

8         A.   No, I didn't.

9         Q.  (By Mr. Quinn)  At any rate, you decided to

10  come to -- knowing that you didn't like the wage, you

11  decided to come to the United States anyway and work for

12  the Russell family as an au pair in 2014, correct?

13        A.   Yes.

14        Q.   Okay.

15             THE VIDEOGRAPHER:  Ms. Harning, can I ask

16  you to adjust your microphone, please.

17             THE DEPONENT:  Sure.  Is that better?

18             THE VIDEOGRAPHER:  Yes.

19        Q.  (By Mr. Quinn)  Did you ever make any

20  complaints to the Russell family about your au pair

21  engagement with them?

22        A.   What do you mean by that?

23        Q.   Did you ever complain about the hours?

24        A.   Maybe.

25        Q.   When you say "maybe," what do you mean by

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Juliane Harning
September 08, 2016

Page 122

```
 1    first -- the first time you had worked for AuPairCare; is
 2    that a fair statement?
 3              A.   Say again.
 4              Q.   Let me rephrase it.  When you filled this
 5    Exhibit 49 out, you previously had been an au pair in the
 6    United States; is that right?
 7              A.   That's correct.
 8              Q.   And you worked with the Catton family?
 9              A.   Catton.
10              Q.   Thank you for correcting me.  C-a-t-t-o-n.
11    And you had previously filled out an application that was
12    similar to this, correct?
13              A.   Yes.
14              Q.   Can I get you to take a look at the --
15    appears to be the fifth page of this application?  Do you
16    see that?  Are you there?
17              A.   I don't know.  What page are you on?
18              Q.   You're in the right area.  You're exactly
19    in the right area.  It says -- we're going to talk about
20    the very first section that says, Employer: Walter
21    Catton.  Do you see that?
22              A.   Uh-huh, yes.
23              Q.   It says here, "How many hours per week (on
24    average) did you work at this location?"
25              A.   Uh-huh.
```

Johana Paola Beltran, et al. vs.                    Confidential Video Deposition of Juliane Harning
Interexchange, Inc., et al.                                              September 08, 2016

Page 123

1           Q.   Do you see where I just read that?

2           A.   Yes.

3           Q.   What was your answer?

4           A.   I said 45.

5           Q.   That was a true and accurate answer when

6   you filled this out, correct?

7           A.   Well, that was the allowed number of hours

8   I was supposed to be working.

9           Q.   That wasn't my question.  My question was

10  you filled this out --

11          A.   Uh-huh.

12          Q.   You already told me you filled this out

13  honestly and accurately, correct?

14          A.   I said I believed I did.

15          Q.   Well, okay.

16          A.   It's not the same --

17          Q.   And here you wrote you worked an average

18  of 45 hours for the Catton family; is that correct?

19          A.   That's what I wrote, yes.

20          Q.   Let's go -- let's go all the way back to

21  near the back of the application where it says, "Number

22  8, Personality."  Are you there?

23          A.   Uh-huh.

24          Q.   Is that a yes?

25          A.   That's a yes.

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Juliane Harning
September 08, 2016

Page 125

1    next page on Section 9 you gave -- you answered some

2    questions where you typed out answers; is that right?

3          A.   Yes.

4          Q.   Okay.  And then in the first -- the first

5    answer that you provided to the first question was, I am

6    currently at university studying -- excuse me, studying

7    teaching --

8               UNIDENTIFIED SPEAKER:  Joining the

9    meeting.

10              MR. HUBBARD:  Adam Hubbard.

11         Q.  (By Mr. Quinn)  -- parentheses, English,

12   philosophy, end parentheses, which I intend to finish

13   after my final year as an Au Pair.  I have been an

14   au pair in the USA and The Netherlands and the UK, and

15   therefore I know what to expect; is that right?  You

16   wrote that?

17         A.   That's what it says, yes.

18         Q.   So you knew what to expect in terms of

19   receiving room and board, right?

20         A.   I don't know if that's what I meant with

21   "I know what to expect."

22         Q.   Okay.  Well, you knew you should expect

23   room and board, correct?

24              MR. HOOD:  Object to form and foundation.

25         A.   I didn't know that from being an au pair

Johana Paola Beltran, et al. vs.                    Confidential Video Deposition of Juliane Harning
Interexchange, Inc., et al.                                                    September 08, 2016

Page 171

1              A.    What do you mean?

2              Q.    Sure.  Have you ever applied to be an

3    au pair with anyone else other than AuPairCare in the

4    United States?

5              A.    Do you mean signing a contract?

6              Q.    I mean submitting an application.

7              A.    I can't recall if I have submitted several

8    applications.  I might have.

9              Q.    Okay.  Do you recall which agencies you

10   might have submitted an application to with here in the

11   United States?

12             A.    Probably -- maybe Cultural Care.  That's

13   like one of the bigger ones.  AuPairCare, Cultural Care,

14   and it's probably Expert AuPair, yeah.  Those are like

15   the biggest ones in Germany, so that would be the most

16   likely.

17             Q.    When was the last time you submitted an

18   application to be an au pair?

19             A.    When I applied to be an au pair in 2013.

20             Q.    To be with the Russell family?

21             A.    Well, I didn't apply to be with them,

22   but --

23             Q.    But for that placement?

24             A.    For that placement, yeah.

25             Q.    Have you ever applied for any other

Johana Paola Beltran, et al. vs.                          Confidential Video Deposition of Juliane Harning
Interexchange, Inc., et al.                                                        September 08, 2016

Page 206

```
 1              CERTIFICATE OF DEPOSITION OFFICER

 2    STATE OF COLORADO              )

 3    CITY AND COUNTY OF DENVER      )

 4            I, Deborah A. VanDemark, a Registered

 5    Professional Reporter and Notary Public within and for

 6    the State of Colorado, commissioned to administer oaths,

 7    do hereby certify that previous to the commencement of

 8    the examination, the witness was duly sworn by me to

 9    testify to the truth in relation to matters in

10    controversy between the said parties; that the said

11    deposition was taken in stenotype by me at the time and

12    place aforesaid and was thereafter reduced to typewritten

13    form by me; and that the foregoing is a true and correct

14    transcript of my stenotype notes thereof.

15            That I am not an attorney nor counsel nor in any

16    way connected with any attorney or counsel for any of the

17    parties to said action nor otherwise interested in the

18    outcome of this action.

19            My commission expires:  March 4, 2017.

20

21            _____
              DEBORAH A. VANDEMARK
22            Registered Professional Reporter
              Colorado Realtime Certified Reporter
23            Notary Public, State of Colorado

24

25
```

# Exhibit 8

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF COLORADO

 3  JOHANA PAOLA BELTRAN; and    )
    those similarly situated,    )
 4                               )
                   Plaintiffs,   )
 5                               ) Case No.
       vs.                       ) 1:14-cv-03074-CMA-KMT
 6                               )
    INTEREXCHANGE, INC.;         )
 7  USAUPAIR, INC.; GREAT AUPAIR,)
    LLC; EXPERT GROUP            )
 8  INTERNATIONAL, INC., DBA     )
    EXPERT AUPAIR; EURAUPAIR     )
 9  INTERCULTURAL CHILD CARE     )
    PROGRAMS; CULTURAL HOMESTAY  )
10  INTERNATIONAL; CULTURAL CARE,)
    INC.; D/B/A CULTURAL CARE    )
11  AUPAIR; AUPAIRCARE, INC.;    )
    AUPAIR INTERNATIONAL, INC.;  )
12  APF GLOBAL EXCHANGE, NFP;    )
    AMERICAN INSTITUTE FOR       )
13  FOREIGN STUDY DBA AU PAIR IN )
    AMERICA; AMERICAN CULTURAL   )
14  EXCHANGE, LLC, DBA GOAUPAIR; )
    AGENT AU PAIR; A.P.E.X.      )
15  AMERICAN PROFESSIONAL        )
    EXCHANGE, LLC DBA PROAUPAIR; )
16  and 20/20 CARE EXCHANGE,     )
    INC., DBA THE INTERNATIONAL  )
17  AU PAIR EXCHANGE,            )
                                 )
18                 Defendants.   )
    _____)
19

20        VOLUME ONE TELECONFERENCED VIDEO DEPOSITION OF

21                   LAURA MEJIA-JIMINEZ

22                 San Francisco, California

23               Wednesday, September 14, 2016

24  Reported By:  KIMBERLY E. D'URSO, RPR, CSR No. 11372

25  Job No. 18766
```



EXCEEDING YOUR EXPECTATIONS

COMBS Reporting, Inc.

DEPOSITION REPORTERS • LEGAL VIDEO

LAURA MEJIA-JIMINEZ on 09/14/2016

Page 76

```
 1        Q.   That's not my question.
 2             Do you recall signing a document, a contract,
 3   in which you acknowledged that you were not an employee
 4   of AuPairCare?
 5        A.   This is a confusing question.  Why are you       11:30:56
 6   saying not to be?
 7        Q.   Well, I've got a lot of reasons for saying
 8   that, but I'll just ask you the question again.
 9             Do you recall signing a contract with
10   AuPairCare?  We'll start with that.                        11:31:26
11        A.   Yes.
12        Q.   And when you signed that contract, did you
13   agree to abide by its terms and conditions?
14        A.   Yes.
15        Q.   And do you recall that in signing that          11:31:48
16   contract, you acknowledged that by serving as an au pair
17   for the host family, you were not an employee of
18   AuPairCare?
19             MS. LOUIS:  Object to form.
20             THE WITNESS:  Well, I don't remember, but I      11:32:12
21   worked for AuPairCare, because if you have to do a
22   rematch, it's the agency that does it, not the family.
23   If you have a problem, you have to talk to your agency,
24   not the family.  If you need something, you speak to the
25   agency, not the family.                                    11:32:40
```



LAURA MEJIA-JIMINEZ on 09/14/2016

Page 87

```
 1    it in quotations.  Why did you put it in quotations?
 2        A.    Because the agency told me -- in Colombia told
 3    me.
 4        Q.    Okay.  All right.  And did you ever see the
 5    word "stipend" in any other -- in any document that was      11:49:55
 6    provided you in connection with your au pair engagement
 7    for the Mele family?
 8        A.    I don't remember.
 9        Q.    Okay.  So the Colombian agent told you that the
10    United States government had set the stipend; is that        11:50:23
11    right?
12        A.    Yes.
13        Q.    And when were you told that?
14        A.    When I was looking at the possibility of going
15    as an au pair.                                               11:50:45
16        Q.    And that was sometime prior to July of 2014?
17        A.    Yes.  I think it was more or less in April.
18        Q.    Who was that Colombian agent?
19        A.    The agency is called InterExchange.
20        Q.    Do you remember the name of the agent?            11:51:11
21        A.    No.
22        Q.    Okay.  Did you undertake to determine whether,
23    in fact, the stipend had been set by the United States
24    government when you were told that in or about April of
25    2015 [sic]?                                                  11:51:41
```



LAURA MEJIA-JIMINEZ on 09/14/2016

```
 1       A.   No.  He's an architect.  But he speaks English

 2  very well because he lived in London and England for a

 3  long time.

 4       Q.   Okay.  Did you receive any response to that

 5  letter from AuPairCare?                                    12:09:39

 6       A.   No, they never did, and I waited for a long

 7  time.

 8       Q.   And you sent that letter, you believe, in

 9  January of 2015?

10       A.   Yes.                                             12:09:57

11       Q.   Okay.  Now, go back to your --

12            THE INTERPRETER:  Counsel, is there -- I need a

13  break --

14            MR. MASCHLER:  Well, just -- in a minute.

15            THE INTERPRETER:  -- soon.  I just wanted to     12:10:06

16  let you know.

17            MR. MASCHLER:  Okay.  We're going to break for

18  lunch in minute.

19  BY MR. MASCHLER:

20       Q.   Going back to your declaration again -- we've   12:10:12

21  marked it as Exhibit 50 -- paragraph 6 refers to a

22  statement the agent in Colombia made to you about the

23  stipend.  Do you see that?

24       A.   Yes.

25       Q.   And it says that it was an amount set by the     12:10:34
```



LAURA MEJIA-JIMINEZ on 09/14/2016

Page 98

```
 1    United States government.  Do you see that?

 2        A.   Yes.

 3        Q.   Do you have any reason to believe that that

 4    statement is not true?

 5        A.   No.                                          12:10:47

 6        Q.   Okay.

 7             MR. MASCHLER:  Let's break for lunch.

 8             THE VIDEOGRAPHER:  Going off the record, the

 9    time is 12:11.

10             (Lunch break taken.)                         12:11:09

11             THE VIDEOGRAPHER:  Coming back on the record,

12    the time is 1:15.

13    BY MR. MASCHLER:

14        Q.   Ms. Mejia, do you understand you're still

15    testifying under oath this afternoon?                 01:15:36

16        A.   Yes.

17        Q.   How did you first learn about the possibility

18    of becoming an au pair?

19        A.   Are you asking me about the date?

20        Q.   How did you first learn?  How did that come   01:15:58

21    into your range of consideration?

22        A.   I was looking into how to study -- well, I was

23    looking for a way to study English in a foreign country.

24        Q.   Yes, okay.  And how were you looking into that?

25        A.   I was talking to travel agencies.  I was      01:16:39
```



LAURA MEJIA-JIMINEZ on 09/14/2016

Page 99

```
 1    talking to friends of mine who had already traveled
 2    outside the country and some friends who had already
 3    been au pairs.
 4        Q.    Okay.  Who first told you about the United
 5    States au pair program?                              01:17:03
 6        A.    One of my very best friends who was thinking of
 7    becoming an au pair at that time.
 8        Q.    Who was that?
 9        A.    Ana Isabel Tomiyo.
10        Q.    Did they ever become an au pair in the U.S.?  01:17:28
11        A.    Yes.
12        Q.    When?
13        A.    I don't remember the exact date.
14        Q.    Before or after you were an au pair or during
15    the same time?                                       01:17:42
16        A.    Before.
17        Q.    Where did you she live as an au pair in the
18    U.S.?
19        A.    New York.
20        Q.    Had Ana Isabel completed her au pair engagement  01:17:55
21    when you first applied to be an au pair?
22        A.    No.  She was an au pair at that time.
23        Q.    So she was an au pair at the time you first
24    applied to become an au pair; is that right?
25        A.    Yes.                                        01:18:26
```



LAURA MEJIA-JIMINEZ on 09/14/2016

```
 1        Q.   Do you know what agency -- what au pair agency
 2   she signed up with?
 3        A.   Cultural Care.
 4        Q.   And while she was an au pair, before you
 5   applied to become an au pair, did you have discussions        01:18:47
 6   with her about her experience as an au pair in New York?
 7        A.   Yes.
 8        Q.   What did she tell you about that experience?
 9        A.   She told me about the program, how it worked,
10   what I could do in order to become an au pair.               01:19:18
11        Q.   What did she tell you about the program?
12        A.   She told me it was a program where you would
13   work in the United States taking care of kids, that --
14   where you had some minimum work hours, and you would
15   work during those hours, and rest of the time, you could     01:19:54
16   do whatever you want, so -- but I could use those hours
17   to go to school, and the family would give you $500.
18   And she told me which agencies I could go to to see
19   about this.
20        Q.   When she referred to $500, was that for an         01:20:13
21   educational subsidy?
22        A.   No.  It was some money that the family would
23   give us so -- that we could use to pay for what we
24   wanted to study.
25        Q.   That's what I meant as an educational subsidy.     01:20:40
```



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

LAURA MEJIA-JIMINEZ on 09/14/2016

```
 1      Q.    What did she say about that?

 2      A.    The same, that it was 195 a week.

 3      Q.    Okay.  And did any of them indicate that $195 a

 4   week was in the form of a stipend?

 5      A.    Yes --                                          01:25:34

 6      Q.    Okay.

 7      A.    -- for the work that was done.

 8      Q.    Did you speak to Ms. Isabel other times, after

 9   you had applied to become a U.S. au pair, about her

10   experience as an au pair?                               01:25:50

11          THE INTERPRETER:  I'm sorry.  Could the

12   question be repeated?

13          MR. MASCHLER:  Read it back, please.  There's a

14   dangling participle in there.  I apologize.

15          (Record read.)                                   01:26:12

16          (Question interpreted again.)

17          THE WITNESS:  Yes.

18   BY MR. MASCHLER:

19      Q.    What did she tell you about her experience on

20   those other occasions?                                  01:26:44

21      A.    She was very happy with the program.  She had

22   three kids to take care of.  She would take them to

23   school in the morning and then pick them up in the

24   afternoon.  So in the morning, she had some free time,

25   and she wanted to study English, so she was studying    01:27:13
```



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

```
 1   was correct, what the interpreter said.

 2   BY MR. MASCHLER:

 3       Q.   Okay.  So you spoke to Ana Isabel, Ana Maria

 4   Gomez, and Laura, last name you don't know.  Were there

 5   any other current or former au pair or au pair              01:31:40

 6   applicants with whom you spoke before you signed up to

 7   be an au pair in the U.S.?

 8       A.   Well, I didn't speak to any more au pairs, but

 9   I went to some agencies, travel agencies in my country.

10       Q.   Travel agencies?                                   01:32:11

11       A.   Yes.

12       Q.   What travel agencies?

13       A.   I went to one called Viajes & Viajes, and I

14   went to InterExchange.  And they also had an au pair

15   program, and they told me about the options available.     01:32:38

16            They told me about the option of going to study

17   in an English-speaking country, and they told me how

18   much it would cost.  And they told me that if I wanted

19   to get into the au pair program, how much it would cost

20   me to get into that program and the advantages of doing    01:33:04

21   that.

22       Q.   What did they say were the advantages of doing

23   that?

24       A.   That it's much cheaper than paying for a school

25   to study English, that you can work and you can study at   01:33:23
```



LAURA MEJIA-JIMINEZ on 09/14/2016

```
 1   the same time.
 2       Q.   Was your main reason for becoming an au pair in
 3   the U.S. to learn English?
 4           MS. LOUIS:  Object to form.
 5           THE WITNESS:  What is the question?              01:33:49
 6   BY MR. MASCHLER:
 7       Q.   Was the main reason you decided to become an
 8   au pair in the U.S. to learn English?
 9       A.   Yes, and because I could have the experience.
10       Q.   Did you ask Laura, the former au pair who        01:34:08
11   terminated her au pair engagement six months in -- did
12   you ask her about the types of work she did as an
13   au pair?
14       A.   Yes.
15       Q.   What did she tell you?                           01:34:33
16       A.   That she had to take care of the kids; she had
17   to feed them, take them to school, stay with them in the
18   evening until the mom got back.
19           And since the house was so dirty, she had to
20   clean the house.  Sometimes they told her to do it.       01:35:00
21   Sometimes she just did it on her own because it was so
22   dirty.
23       Q.   Did she tell you about the compensation she
24   earned as an au pair?
25       A.   She told me they gave her 195, like everybody,   01:35:26
```



LAURA MEJIA-JIMINEZ on 09/14/2016

```
 1  per week.
 2       Q.   And that was in the form of a stipend?
 3            MS. LOUIS:  Object to form.
 4            MR. MASCHLER:  Did you get her answer?
 5            THE REPORTER:  "Object to form."  And I have
 6  not gotten an answer yet.
 7            MR. MASCHLER:  She said "Si."
 8            THE REPORTER:  That's not in English.
 9            MR. MASCHLER:  I know.  I know.
10            But I'm wondering, did you get her answer?    01:35:57
11            THE INTERPRETER:  I was in the middle of
12  listening to her response when your question came up, so
13  I need to have her answer repeated to me.
14            (Pause.)
15            THE WITNESS:  That they paid her $195 a week   01:36:07
16  for her work.
17  BY MR. MASCHLER:
18       Q.   Okay.  And did she indicate that that was in
19    the form of a stipend?
20            MS. LOUIS:  Object to form.                    01:36:21
21            THE WITNESS:  Yes.
22  BY MR. MASCHLER:
23       Q.   Okay.  So other than Ana Isabel and Ana Maria
24    Gomez and Laura, whose name we don't recall, and the
25    travel agents, did you speak to anyone else, other than 01:36:35
```



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

LAURA MEJIA-JIMINEZ on 09/14/2016

```
 1    representatives of the agencies, about the au pair

 2    program in the U.S.?

 3        A.   Yes.  I sent an e-mail to Cultural Care

 4    requesting information about the program.

 5        Q.   Yeah.  My earlier question excluded au pair      01:37:07

 6    agencies, such as Cultural Care.  Okay?  So I'll ask the

 7    question again, leaving to one side the information you

 8    received from the agencies you consulted or did research

 9    about.

10            Other than Ana Isabel and Ana Maria Gomez and     01:37:34

11    Laura, the travel agency, and InterExchange, was there

12    anyone else that you talked to about the U.S. au pair

13    program or the possibility of you joining it before you

14    signed up for that program?

15            MS. LOUIS:  Object to form.                       01:37:55

16            THE WITNESS:  No.

17  BY MR. MASCHLER:

18        Q.   Okay.  Did any -- withdrawn.

19            Did you rely on the information provided to you

20    by the former au pair and by the travel agencies in      01:38:21

21    deciding to sign up for the U.S. au pair program?

22        A.   Yes, of course.  I figured that I had already

23    found the information I needed in order to make a

24    decision.

25        Q.   Okay.  Did any of the information that you were  01:38:59
```



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

LAURA MEJIA-JIMINEZ on 09/14/2016

```
 1   become an au pair in the U.S., the highest paying job

 2   you had in Colombia was working in a clothing store in

 3   2012; is that right?

 4        A.   Yes.

 5        Q.   Now, you testified that in making the decision      01:50:58

 6   whether to apply for an au pair job, you received

 7   information from former au pair and from travel agents

 8   and that you relied on that information in making that

 9   decision; is that correct?

10        A.   Yes.                                                 01:51:27

11        Q.   Did you also do research about the au pair

12   program online as part of that decision-making process?

13        A.   Yes.

14        Q.   What Internet sites did you research or do

15   research on?                                                   01:51:54

16        A.   At the Cultural Care website, AuPair in

17   America, and AuPairCare.  And I looked on some

18   blocks [sic], but I don't remember the numbers exactly.

19        Q.   Blogs, b-l-o-g-s?

20        A.   Blogs.                                               01:52:17

21        Q.   Okay.  You don't remember the name of the

22   blogs?

23        A.   No, because I would go to Google and put -- do

24   a search, and then some of them would show up, and I

25   would look at them, and then I would go on to other           01:52:42
```



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

LAURA MEJIA-JIMINEZ on 09/14/2016

```
 1   ones.  So I didn't really pay attention to what each one

 2   was named.

 3       Q.   Okay.  Did the blogs that you did go onto, did

 4   they say anything about the U.S. au pair program that

 5   was different than what the other au pairs you talked to     01:52:58

 6   said about it?

 7       A.   No.  It was all the same.

 8       Q.   Okay.  So they talked about the compensation

 9   that you could expect to earn as an au pair; is that

10   right?                                                       01:53:31

11           MS. LOUIS:  Object to form.

12           THE WITNESS:  Yes.

13   BY MR. MASCHLER:

14       Q.   And those blogs also talked about the types of

15   duties and responsibilities you would be expected to        01:53:39

16   perform as an au pair; is that right?

17       A.   Yes.

18       Q.   And did they talk about the maximum hours that

19   you could expect to work as an au pair in the U.S.?

20       A.   Yes.                                                01:54:04

21       Q.   Okay.  Did any of them tell you that --

22   withdrawn.

23           Did any of them indicate, in words or

24   substance, that as an au pair you could expect to earn

25   more than the $195-and-change stipend?                       01:54:17
```



LAURA MEJIA-JIMINEZ on 09/14/2016

Page 118

```
 1      A.   No.
 2      Q.   Okay.  Did the au pairs that you spoke to
 3   before applying to become an au pair -- did they tell
 4   you that you would receive room and board as an au pair?
 5      A.   Yes.                                              01:54:54
 6      Q.   And did the blogs also mention that as an
 7   au pair in the U.S., you could expect to receive room
 8   and board?
 9      A.   Yes.
10      Q.   And did you rely on the information you saw in  01:55:14
11   the blogs on the Internet in making your decision to
12   become an au pair?
13      A.   Not just in the blogs.
14      Q.   I wasn't saying just the blogs, but that
15   would -- did they factor into your decision-making       01:55:37
16   process?
17      A.   Yes.
18      Q.   Okay.  He has to change the tape.
19           THE VIDEOGRAPHER:  This marks the end of Video
20   Number 2 in the deposition of Laura Mejia.  Going off the 01:55:46
21   record, the time is 1:55.
22           (Break taken.)
23           THE VIDEOGRAPHER:  Here begins Video Number 3
24   in the deposition of Laura Mejia-Jimenez.  Coming back on
25   the record, the time is 2:06.                             02:06:00
```



EXCEEDING YOUR EXPECTATIONS

COMBS REPORTING, INC.

DEPOSITION REPORTERS • LEGAL VIDEO

LAURA MEJIA-JIMINEZ on 09/14/2016

 1  BY MR. MASCHLER:

 2      Q.   Ms. Mejia, would you please refer to your

 3  declaration, which we've marked as Exhibit 50?

 4          If you look at paragraph 3 of your declaration,

 5  it says that you "looked into different au pair agencies      02:06:17

 6  before becoming an au pair, in an attempt to select the

 7  best one."

 8          Do you see that?

 9      A.   Yes.

10      Q.   What did you do to look into different au pair      02:06:42

11  agencies?  If you would, describe the process by which

12  you selected an au pair agency.

13      A.   Well, aside from the information that I had

14  already gathered, I sent an e-mail to Cultural Care

15  asking about the program.                                     02:07:19

16          I asked my friends which companies they had

17  worked with and Laura, who's the friend of a friend, and

18  the travel agency and my girlfriends when they -- they

19  told me that -- the agency that they had worked for is

20  one that I took.                                              02:07:48

21      Q.   All right.  So you looked at Cultural Care,

22  AuPair in America, and AuPairCare; is that right?

23      A.   Yes.

24      Q.   Did you look into any other au pair agencies in

25  the U.S.?                                                     02:08:06


EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

LAURA MEJIA-JIMINEZ on 09/14/2016

Page 122

```
 1      A.   No.
 2      Q.   Okay.  So you did some research on Cultural
 3  Care, AuPair in America, and AuPairCare before a
 4  applying for an au pair position; correct?
 5      A.   Yes.                                              02:12:23
 6      Q.   And when you sent a letter to Cultural Care
 7  asking for information, did you receive anything back?
 8      A.   Yes.
 9      Q.   What did you get back from Cultural Care?
10      A.   I don't remember exactly.                        02:12:39
11      Q.   Okay.  In paragraph -- well, withdrawn.
12           What information about Cultural Care did you
13  consider in making this decision where to apply?
14      A.   I don't remember.
15      Q.   Well, was it publically available information?  02:13:28
16      A.   Yes.  It was on the Internet on their page.
17      Q.   Okay.  And do you recall what Cultural Care
18  said about its program on its website?
19      A.   I don't remember exactly, but I remember the
20  pages of the three agencies gave the same information.  02:14:02
21      Q.   Okay.  Did the agencies all indicate that
22  the -- withdrawn.
23           Did the web pages of the three agencies --
24  Cultural Care, AuPair in America, and AuPairCare --
25  indicate that the au pair program in the United States  02:14:23
```



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

LAURA MEJIA-JIMINEZ on 09/14/2016

Page 123

```
 1    was administered by the United States Department of

 2    State?

 3              MS. LOUIS:  Object to form.

 4              THE WITNESS:  I don't remember.

 5    BY MR. MASCHLER:                                        02:14:46

 6         Q.   Did those three websites indicate that the

 7    Department of State set the stipend that was to be paid

 8    as a minimum to au pairs in the U.S. program?

 9              MS. LOUIS:  Object to form.

10              THE WITNESS:  I don't remember.             02:15:01

11    BY MR. MASCHLER:

12         Q.   Did those three websites for Cultural Care,

13    AuPair in America, and AuPairCare, respectively,

14    indicate that as an au pair in the U.S., you would be

15    entitled to room and board?                           02:15:27

16              MS. LOUIS:  Object to form.

17              THE WITNESS:  I don't remember.

18    BY MR. MASCHLER:

19         Q.   Did any of those websites discuss an

20    educational payment or subsidy that might be available 02:15:46

21    to you as an au pair in the U.S.?

22         A.   I don't remember.

23         Q.   Okay.  Did any of those three websites mention

24    the maximum hours expectation that would apply to an

25    au pair engagement in the U.S.?                       02:16:14
```



LAURA MEJIA-JIMINEZ on 09/14/2016

Page 124

```
 1      A.   I don't remember.  I remember that the websites
 2  were general, but I don't remember the exact
 3  information.
 4      Q.   Okay.  How did you decide on AuPairCare over
 5  Cultural Care or AuPair in America?                      02:16:41
 6      A.   Because I talked to a travel agency that had a
 7  connection with an agency here, and I thought that they
 8  would be able to help me with the process, and that was
 9  my agency, the one that I worked for.
10      Q.   You worked for a travel agency?                 02:17:14
11      A.   No.
12      Q.   I think we have a disconnect in the testimony.
13           Okay.  When you say that you worked for an
14  agency, what do you mean?
15      A.   For AuPairCare.                                 02:17:33
16      Q.   Okay.  I'm now talking about information that
17  you received or reviewed before making the decision to
18  become -- to apply for an au pair position.  Okay?
19      A.   Yes, I understand.
20      Q.   All right.  And so did you speak to anyone who   02:18:04
21  worked for Cultural Care about possibly applying for an
22  au pair position sponsored by Cultural Care?
23      A.   No.  I just sent an e-mail requesting
24  information.  They wrote me back an e-mail.  But at that
25  time, I had already decided to go work with that travel  02:18:43
```



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

LAURA MEJIA-JIMINEZ on 09/14/2016

Page 125

```
 1   agency who could help me out with the process.
 2        Q.   What travel agency was this?
 3        A.   InterExchange.
 4        Q.   Okay.  And who from InterExchange did you
 5   interact with?                                          02:19:01
 6        A.   You already asked me the question, and I said I
 7   didn't remember.
 8        Q.   Okay.  You don't remember any of the people at
 9   InterExchange with whom you spoke in connection with
10   applying for an au pair position in the U.S.?           02:19:22
11        A.   No.
12        Q.   Okay.  Did the agent with whom you communicated
13   in 2014 make any statements to you or promises about the
14   AuPairCare program that were different than what
15   AuPairCare said in its website?                         02:19:51
16        A.   No.
17        Q.   Okay.  So after you decided on AuPairCare, what
18   was the next step in the process?
19        A.   I had to pay.
20        Q.   Okay.  Did you ever consult the Department of    02:20:29
21   State website in connection with your decision to apply
22   for an au pair position in the U.S.?
23        A.   When you're talking about Department of State,
24   are you talking about the United States government
25   website?                                               02:21:00
```



EXCEEDING YOUR EXPECTATIONS
Combs REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

LAURA MEJIA-JIMINEZ on 09/14/2016

Page 126

```
 1        Q.   I'm talking about the United States government
 2   Department of State website.
 3        A.   You're asking if I looked at it?
 4        Q.   Yes.  I'm asking if you looked at it --
 5        A.   No.                                              02:21:16
 6        Q.   -- before you applied to become an au pair in
 7   the U.S.
 8        A.   No.
 9        Q.   Have you ever gone onto or reviewed the United
10   States Department of State's website that addresses the    02:21:35
11   au pair program in the United States?
12        A.   Yes.
13        Q.   When did you do that?
14        A.   I don't remember exactly.
15        Q.   Was it in 2016?                                  02:21:57
16        A.   Well, it was in 2014 when I had applied for the
17   program, because I had to get a visa, because I had to
18   find out what type of visa I had to get.
19        Q.   Okay.
20        A.   I wanted to get information.                     02:22:24
21        Q.   Okay.  And was that before or after you applied
22   for an au pair position at the AuPairCare agency?
23        A.   After.
24        Q.   Was your going online onto the Department of
25   State website before or after you traveled to the United   02:22:47
```



EXCEEDING YOUR EXPECTATIONS

COMBS REPORTING, INC.

DEPOSITION REPORTERS • LEGAL VIDEO

LAURA MEJIA-JIMINEZ on 09/14/2016

Page 154

```
 1              THE INTERPRETER:  I'm sorry.  Could that be
 2   repeated?
 3              MR. MASCHLER:  Read it back, please.
 4              (Record read.)
 5              (Question interpreted again.)                10:18:38
 6              THE WITNESS:  At that time, yes.
 7   BY MR. MASCHLER:
 8       Q.   Okay.  If you turn to the first page of this
 9   exhibit, paragraph number 2, it says "au pair," and that
10   "au pair" refers to you.  Do you understand that?        03:39:05
11       A.   Yes.
12       Q.   Okay.  "Au pair is hereby advised and
13   acknowledges that all au pairs are participants in a
14   cultural exchange program."
15              Do you see that?                              03:39:21
16              THE INTERPRETER:  Which paragraph is that,
17   Counsel?
18              MR. MASCHLER:  2.
19              (Question interpreted again.)
20              THE WITNESS:  Yes.                            03:39:54
21   BY MR. MASCHLER:
22       Q.   Did you understand, as of the date you signed
23   this agreement, that you were a participant in a
24   cultural exchange program?
25              MS. LOUIS:  Object to form.                   03:40:02
```



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

LAURA MEJIA-JIMINEZ on 09/14/2016

Page 155

```
 1                THE WITNESS:  Yes.

 2   BY MR. MASCHLER:

 3        Q.   This same paragraph, number 2, says that the

 4   "au pair," you, "agree to comply with all of the

 5   regulations published by the U.S. Department of State in    03:40:19

 6   22 CFR, part 514."

 7             And it refers you to a link where those

 8   regulations may be found.  Do you see that?

 9        A.   Yes.

10        Q.   Before signing this 2014 au pair agreement, did   03:41:00

11   you review those regulations published by the U.S.

12   Department of State?

13        A.   No.

14        Q.   Have you ever gone to this link or otherwise

15   reviewed the U.S. Department of State regulations          03:41:22

16   referred to in this paragraph?

17        A.   No.

18        Q.   Okay.  Please turn to paragraph 9 of the first

19   page of the 2014 au pair agreement.  It says that

20   "Au pair," you, "is not an employee, agent, or            03:41:54

21   independent contractor of AuPairCare."

22             Do you see that?

23        A.   Yes.

24        Q.   Okay.  Did you understand that that statement

25   was true as of the time you signed this agreement?        03:42:20
```



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

LAURA MEJIA-JIMINEZ on 09/14/2016

Page 156

```
 1              MS. LOUIS:  Object to form.

 2              THE REPORTER:  Can I ask them to --

 3              Can you scoot back just a little bit so I can

 4    see you?  Thank you.  Appreciate it.

 5              THE WITNESS:  I always thought I was an        03:42:26

 6    employee of AuPairCare.  Until I signed that contract, I

 7    thought I was an employee of AuPairCare, in spite of the

 8    fact that I read that section, but -- because of the fact

 9    that my Visa is backed up by AuPairCare and because of

10    the fact that the agency takes -- is what's backing us up  03:43:17

11    in the United States.

12              I always thought that AuPairCare is the company

13    that contracted me, because if I were an independent

14    contractor at the time when I did a rematch, my area

15    manager wouldn't be so concerned about where I was going  03:43:53

16    or what I'm going to do -- what's going to happen with my

17    visa, because if I was independent contractor, she would

18    have nothing to do with me.

19              But that wasn't the case, and that's the way I

20    thought, and I still think that AuPairCare contracted me.  03:44:17

21    BY MR. MASCHLER:

22         Q.  Well, you entered into a contract with the

23    AuPairCare in 2014; is that right?

24         A.  Yes.  That's this one.

25         Q.  And this line in number 9 -- paragraph 9 says    03:44:34
```



EXCEEDING YOUR EXPECTATIONS

COMBS REPORTING, INC.

DEPOSITION REPORTERS • LEGAL VIDEO

 1    that you're not an independent contractor of AuPairCare.

 2    Do you see that?

 3        A.   Yes, I see it.

 4        Q.   Okay.  And did you ever understand that you

 5    were an independent contractor of AuPairCare?          03:44:52

 6        A.   No.

 7        Q.   In your previous answer, did you list all the

 8    reasons that you surmised that you might be an employee

 9    of AuPairCare?

10        MS. LOUIS:  Objection.                             03:45:13

11        THE WITNESS:  Yes.

12    BY MR. MASCHLER:

13        Q.   But in signing this agreement, you were advised

14    and acknowledged that you agreed that you were not an

15    employee of au pair.  Do you see that?                 03:45:33

16        A.   Yes.

17        Q.   Did you ever tell anyone at AuPairCare or

18    anyone else that you could not sign this agreement

19    because you disagreed with any of its provisions?

20        A.   I told the travel agency that it didn't seem  03:46:12

21    right to me, but they told me -- and so they told me

22    that if I didn't like that, then I couldn't be in the

23    program.  But I decided to be in the program because I

24    wanted to.

25        Q.   Well, the Mele family paid you your weekly     03:46:33



```
 1  STATE OF CALIFORNIA       )
                              ) ss:
 2  COUNTY OF NEVADA          )

 3

 4            I, KIMBERLY E. D'URSO, do hereby certify:

 5        That the witness named in the foregoing

 6  deposition was present and duly sworn to testify to the

 7  truth in the within-entitled action on the day and date

 8  and at the time and place therein specified;

 9        That the testimony of said witness was reported

10  by me in shorthand and was thereafter transcribed through

11  computer-aided transcription;

12        That the foregoing constitutes a full, true and

13  correct transcript of said deposition and of the

14  proceedings which took place;

15        Further, that if the foregoing pertains to the

16  original transcript of a deposition in a federal case,

17  before completion of the proceedings, review of the

18  transcript [ ] was [ ] was not requested.

19        That I am a disinterested person to the said

20  action;

21        IN WITNESS WHEREOF, I have hereunder subscribed

22  my hand this 19th day of September, 2016.

23

24  _____
    KIMBERLY D'URSO
25  CSR NO. 11372, STATE OF CALIFORNIA
```



## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Case No. 14-cv-03074-CMA-KMT

JOHANA PAOLA BELTRAN, *ET AL.*

      Plaintiffs,

v.

INTEREXCHANGE, INC., *ET AL.*

      Defendants.

---

## DECLARATION OF LAURA MEJIA JIMENEZ

I, Laura Mejia Jimenez, declare as follows:

1.     My name is Laura Mejia Jimenez and I am over the age of 18.

2.     Sometime in or about early 2014 I was hired to be an au pair by AuPairCare, Inc. ("AuPairCare") through its agent in Colombia.

3.     I looked into different au pair agencies before becoming an au pair in an attempt to select the best one. I looked at Cultural Care, Au Pair in America, and AuPairCare.

4.     I did not base my selection on how much I could earn because the information that was publicly available from the sponsors told me that I would be paid the same amount no matter which one accepted my application.

5.     Among other things, AuPairCare's Colombian agent told me that the "stipend" for working in the United States as an au pair was $195 and some amount of cents per week. I do not remember the amount of cents, but am certain about the number of dollars.

6.     That agent also told me the "stipend" was an amount set by the United States Government and so that is what I would be paid.

7.     That agent also told me that this would equal a lot of money in Colombia.

8.     In or about April 2014, I paid the agent of AuPairCare in Colombia approximately 3,800,000 COP. In or about June 2014, I paid approximately $150 USD to the United States embassy for my visa.

9.     In or about July 21, 2014, I flew to New York, New York and was driven to somewhere in New Jersey for approximately 4 days of training by AuPairCare. My



understanding is that all AuPairCare au pairs are trained in New Jersey and that none of them are paid for training.

10.     The training covered all aspects of the duties I would be expected to perform as an au pair.

11.     At the training, AuPairCare told me that the stipend was $195 and some amount of cents per week. I do not remember the amount of cents, but am certain about the number of dollars. We were also told that all au pairs were paid the same, no matter where they work and no matter how many children they care for.

12.     After training I was picked up by my host family and traveled to or near Philadelphia, Pennsylvania, where my host family lived, by car.

13.     My host family had two young girls that I cared for as an au pair.

14.     During the entirety of my time as an au pair, my host family paid me $200 for each 45 hour week of work.

15.     However, after the first month, my host family left me with the children in excess of 45 hours per week. When they did so, they gave me $10 per hour for hours worked in excess of 45 in a week.

16.     I am acquainted with many other au pair who were recently working in the United States. I am not aware of one au pair earning more than $200 per week (other than amounts paid for hours worked in excess of 45 in a week); our wages have all been based on the stipend of $195.75 advertised by all of the sponsor defendants.

I solemnly affirm under the penalties of perjury that the contents of this

Declaration are true and correct to the best of my knowledge.

Dated: August 15, 2016

_Laura Mejia_
LAURA MEJIA JIMENEZ