## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Case No. 14-cv-03074-CMA-KMT

JOHANA PAOLA BELTRAN, *ET AL.*

     Plaintiffs,

v.

INTEREXCHANGE, INC., *ET AL.*

     Defendants.

---

## DECLARATION OF ALEXANDER HOOD, ESQ., IN SUPPORT OF PLAINTIFFS' OPPOSITION TO MOTION TO COMPEL ARBITRATION AND DISMISS OR, ALTERNATIVELY, STAY LAWSUIT

---

I, Alexander Hood, Esq., declare as follows:

1.     I am an attorney duly licensed to practice law in the State of Colorado with the law firm Towards Justice, Co-Counsel for the Plaintiffs and for the Class. I am over the age of 18. The matters stated herein are based on my personal knowledge and, if called upon to testify, I could and would testify competently thereto. I make this declaration in support of Plaintiffs' opposition to Defendant AuPairCare's Motion to Compel Arbitration and Dismiss or, Alternatively, Stay Lawsuit.

2.     On August 19, 2016, the parties met for an informal discovery conference. A true and correct copy of the transcript from that conference is attached herein as Ex. A.

3.     On July 21, 2016, AuPairCare ("APC") participated in the deposition of Plaintiffs' investigator, David Keil, including participating in the examination of Mr. Keil at

the transcript location 206:14-212:17.  A true correct copy of a portion of that deposition transcript is attached herein as Ex. B.

4.     On August 25, 2016, APC attended the deposition of Joanna Gorry.

5.     On August 30, 2016, APC attended the deposition of Joanna Beltran.

6.     On September 7, 2016, APC attended the deposition of Lusapho Hlatshaneni.

7.     On September 8, 2016, APC took the deposition of Juliane Harning, who traveled to the United States from New Zealand. While the deposition covered a variety of topics, arbitration was not discussed.

8.     On September 14, 2016, APC took the deposition of Laura Mejia-Jimenez, who lives in Germany and interrupted a visit to the United States to be deposed.  While the deposition covered a variety of topics, arbitration was not discussed.

9.     As demonstrated by the transcript of the deposition, the deposition began at 9:05 a.m., P.S.T.  A true and correct copy of the first page of the transcript is attached herein as Exhibit C.

10.     On September 14, APC requested by letter, sent to Plaintiffs' counsel via electronic mail at 3:28 PM EST, that Plaintiffs refer the case to arbitration.  The electronic mail attaching that letter is attached herein as Exhibit D.  The letter requesting that Plaintiffs refer the case to arbitration is attached herein as Exhibit E.

11.     On September 22, 2016, APC participated in the deposition of Carrie Crompton, at which APC's counsel lodged numerous objections, including at the following locations in the deposition transcript: 69:14, 71:18, 102:17, 104:10, 105: 6-13,

106:2, 108:9, 109:10,22, 120:1, 125:2, 126:12.  A true and correct copy of portions of that deposition is attached herein as Exhibit F.

12.     On September 28, 2016, APC participated in the deposition of Alexandra Gonzalez, at which APC's counsel engaged in argument with Plaintiffs' counsel (Gonzalez Tr. 93:9-19) and suggested that deposing counsel ask a particular question (94:6-7).  A true and correct copy of a portion of the Gonzalez Deposition is attached herein as Exhibit G.

13.     On August 15, 2016, Plaintiffs produced to APC 466 pages of documents from custodian Johana Paola Beltran.

14.     On August 29, 2016, Plaintiffs produced to APC 100 pages of documents from custodian Johana Paola Beltran.

15.     On August 15, 2016, Plaintiffs produced to APC 476 pages of documents from Plaintiff Diana Caicedo.

16.     On August 15, 2016, Plaintiffs produced to APC 481 pages of documents from Plaintiff Beudette Deetlefs.

17.     On August 15, 2016, Plaintiffs produced to APC 517 pages of documents from Plaintiff Alexandra Ivette Gonzalez.

18.     On August 15, 2016, Plaintiffs produced to APC 478 pages of documents from Plaintiff Lusapho Hlatshaneni.

19.     On August 26, 2016, AuPairCare served a subpoena to Juliane Harning demanding her testimony at a deposition and her production of documents relating to the action.

20.     On September 6, 2016, Plaintiffs produced to APC 24 pages of documents from Plaintiff Lusapho Hlatshaneni.

21.     On September 7, 2016, Plaintiffs produced to APC 563 pages of documents from Plaintiff Lusapho Hlatshaneni.

22.     On September 7, 2016, Plaintiffs produced to APC 3,694 pages of documents from Plaintiff Juliane Harning.

23.     On September 7, AuPairCare served a subpoena to Laura Mejia Jimenez demanding her testimony at a deposition and her production of documents relating to the action.

24.     On September 27, 2016, Plaintiffs produced to APC 20 pages of documents from Plaintiff Alexandra Ivette Gonzalez.

25.     On September 30, 2016 Plaintiffs produced to APC 442 pages of documents from Plaintiff Nicole Mapledoram.

26.     On October 3, 2016 Plaintiffs produced to APC 1,673 pages of documents from Plaintiff Nicole Mapledoram.

27.     On October 12, 2016, Plaintiffs produced 421 pages of documents from Plaintiff Laura Mejia-Jimenez.

28.     In total, between August 15, 2016, the date Plaintiffs filed their second motion to amend the Complaint (DE 329), and November 10, 2016, the date the instant motion was filed, Plaintiffs produced 9,990 pages of documents.

FURTHER DECLARANT SAYETH NOT.

I declare under penalty of perjury under the laws of the United States that the

foregoing is true and correct and that I executed this declaration on December 5, 2016

in Denver, Colorado.

Alexander Hood
TOWARDS JUSTICE
1535 High Street, Suite 300
Denver, Colorado 80218
Tel: (720) 239-2606
Fax: (303) 957-2289
alex@towardsjustice.org
*Attorneys for Plaintiffs*

# Exhibit A

*Johana Paola Beltran, et al. vs.*

*InterExchange, Inc., et al.*

---

*Telephonic Informal Discovery Conference*

*August 19, 2016*

---



700 17th Street, Suite 1750
Denver, CO  80202
303-988-8470 (Office)   303-988-8478 (Fax)
SKReporting.com

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
August 19, 2016

Page 1

```
 1           IN THE UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF COLORADO
 3    Case No. 14-cv-03074-CMA-KMT
 4    _____
 5    JOHANA PAOLA BELTRAN, et al.,
 6         Plaintiffs,
 7    vs.
 8    INTEREXCHANGE, INC., et al.,
 9         Defendants.
10    _____
11         Proceedings before KATHLEEN M. TAFOYA, United
12    States Magistrate Judge, United States District Court for the
13    District of Colorado, commencing at 3:13 p.m., August 19,
14    2016, in the United States Courthouse, Denver, Colorado.
15    _____
16         WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS
17    ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED...
18    _____
19                      APPEARANCES
20         LAUREN F. LOUIS, Attorney at Law, appearing for
21    the plaintiffs.
22         BROOKE A. COLAIZZI, Attorney at Law, appearing for
23    the defendant InterExchange, Inc.
24    _____
25         TELEPHONIC INFORMAL DISCOVERY CONFERENCE
```

Page 2

1    APPEARANCES (Cont'd)
2         BOGDAN ENICA, Attorney at Law, appearing for the
3    defendant Expert Group International, Inc.
4         ADAM A. HUBBARD, Attorney at Law, appearing for
5    the defendant Cultural Homestay International.
6         JOAN A. LUKEY, Attorney at Law, appearing for the
7    defendant Cultural Care, Inc.
8         THOMAS B. QUINN and BRIAN P. MASCHLER, Attorneys
9    at Law, appearing for the defendant AuPairCare, Inc.
10        KATHRYN A. REILLY, Attorney at Law, appearing for
11    the defendants Au Pair International, Inc., and American
12    Cultural Exchange, LLC.
13        SUSAN M. SCHAECHER, Attorney at Law, appearing
14    for the defendants APF Global Exchange, NFP, and American
15    Institute for Foreign Study.
16           P R O C E E D I N G S
17        (Whereupon, the within electronically recorded
18    proceedings are herein transcribed, pursuant to order of
19    counsel.)
20        THE COURTROOM DEPUTY:  Court is in session.
21        THE COURT:  Good afternoon, everyone.  This is
22    Judge Tafoya.  I'm sitting in the courtroom so that we will
23    have a record of this hearing if we happen to need one.
24        We are here today in case number 14-cv-3074, which
25    is Beltran, et al., versus InterExchange, Inc., et al.  This

Page 3

1    is an informal discovery conference.  I understand that the
2    parties want to talk to the Court about some scheduling
3    issues.  So we're all here today.  And I will ask each of you
4    to enter an appearance here.  I know that you've already told
5    my clerk who's here, but I think the record should be
6    complete so that it sets forth who all is here.  So if you'll
7    begin -- well, however you want.  Plaintiff first, I guess.
8        MS. LOUIS:  Good afternoon, Your Honor.  This is
9    Lauren Louis of Boies Schiller & Flexner on behalf of the
10    plaintiffs.
11        THE COURT:  All right.
12        MR. QUINN:  Good morning -- or good afternoon,
13    Your Honor.  This is Tom Quinn and Brian Maschler on behalf
14    of the defendant, AuPairCare.
15        THE COURT:  All right.
16        MS. LUKEY:  Good afternoon, Your Honor.  This is
17    Joan Lukey at Choate, Hall on behalf of Cultural Care,
18    Incorporated.
19        THE COURT:  Okay.  Maybe -- maybe it would be
20    easier if I called you -- called out since there's so many of
21    you on the phone.  So let me just make sure I don't forget
22    anyone.  So for InterExchange, Inc.
23        MS. COLAIZZI:  Good afternoon, Your Honor, Brooke
24    Colaizzi of Sherman & Howard.
25        THE COURT:  All right.  And for Expert Group

Page 4

1    International, Inc.
2        MR. ENICA:  Good afternoon, Your Honor.  Bogdan
3    Enica for Expert AuPair.
4        THE COURT:  And for Cultural Homestay
5    International.
6        MR. HUBBARD:  Good afternoon, Your Honor.  This is
7    Adam Hubbard from Holland & Hart on behalf of Cultural
8    Homestay.
9        THE COURT:  Okay.  And for Au Pair International,
10    Inc.
11        MS. REILLY:  Hi, Your Honor.  This is Katie Reilly
12    for Au Pair International as well as American Cultural
13    Exchange and Agent Au Pair, who I believe come next.
14        THE COURT:  All right.  And how about for APF
15    Global Exchange.
16        MS. SCHAECHER:  Good afternoon, Your Honor.  Susan
17    Schaecher with Fisher and Phillips.
18        THE COURT:  All right.  Did I get everybody?
19        MS. SCHAECHER:  Also representing American
20    Institute for Foreign Study.
21        THE COURT:  Foreign Study.  Okay.  And did I leave
22    anyone out?  Okay.  Sounds good.  All right.  Who would like
23    to tell me what the issue is?  And speak for -- tell me
24    whoever you're speaking for.  All right?
25        MR. QUINN:  Your Honor, this is Tom Quinn.  And we

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
August 19, 2016

Page 5

1  are the ones that -- that requested the informal assistance
2  this afternoon.  I -- I represent AuPairCare, Inc.,
3  defendant.
4      THE COURT:  All right.
5      MR. QUINN:  And let me briefly set the stage for
6  Your Honor.  The -- Your Honor, there are -- these are
7  primarily the FLSA defendants in the lawsuit that are -- as
8  well as the plaintiff that are attending the call today.  As
9  you may be aware, on July 25th, the first motion for
10  conditional class certification was filed.  On August 15th a
11  second motion for conditional class certification was filed,
12  along with a motion to amend the complaint to add two
13  defendants to the FLSA class, as well as a handful of new
14  named plaintiffs.  So what we had -- in the -- in the last
15  day or so the plaintiffs on the one hand, the defendants on
16  the other, have addressed whether we could reach a common
17  briefing schedule for the conditional class certification
18  briefing.  In other words, because of the staggered filings,
19  we now have staggered briefing schedules.  And while the
20  defendants think it's a good idea to have a common briefing
21  schedule, the plaintiffs are opposed.  Let me try and explain
22  succinctly what I think the issues are between the two
23  parties, and then, of course, I'll let Ms. Louis chime in and
24  clarify anything I haven't -- either I've left out or I
25  have -- I haven't stated clearly.

Page 6

1      On the one hand the defendants think a common
2  briefing schedule will be beneficial because there will be
3  one stack of pleadings that the Court will rule on in terms
4  of the question of conditional class certification.  In other
5  words, we're going to cut the workload not only for the Court
6  but for the parties in half.
7      Next, there will be a uniform opt-in period that
8  will apply throughout the FLSA class.  And then, finally,
9  there is -- if we end up with two different sets of pleadings
10  there's a chance we will end up with inconsistent rulings on
11  some or all of the same or similar facts or circumstances.
12  So I think in general we thought that a common briefing date
13  would be beneficial under those circumstances.  In terms of
14  what the plaintiffs have indicated their opposition is, I
15  think generally they -- they hearken -- they go back to the
16  August -- or to the April 25th hearing in which it was
17  identified by the plaintiffs that there will be -- there
18  would -- there was a possibility of two distinct petitions
19  for conditional class certification filed and a different
20  deadline.  And that the parties at that point did -- nor the
21  Court expressed any reservation for dealing with it if there
22  were indeed two different petitions for class certification.
23  Also at that time plaintiffs' counsel indicated that the --
24  that there would be identification of new named plaintiffs
25  coming in short order, if I have that correctly, using the

Page 7

1  term, but then there weren't any new plaintiffs coming for
2  just about -- something short of four months (inaudible), the
3  very date of the last date for amendment of the pleadings and
4  adding new parties.  So if there's a substantial gap in time
5  perhaps that -- those arguments might make more sense to the
6  defendants, but in general because there's only a 21-day gap
7  in time, it seems that getting us on to a common briefing
8  schedule would be important.
9      Now, the only other issue that's really
10  outstanding between the defendants that were -- that were
11  added to the FLSA class on August 15th and the original FLSA
12  defendants from late July is that we believe that because
13  there was a motion to amend to add new parties to that claim
14  filed at the exact same time that the condition -- or
15  petition for conditional class certification was filed
16  against those same new defendants, that the timing of the
17  responsive pleadings of the petition for class
18  certification -- conditional class certification should begin
19  to tick once -- you know, that clock should be set once the
20  motion to amend is granted, not from the date of the filing.
21  So those are -- that's a separate and distinct issue with
22  respect to the two new defendants.  And I think instead of
23  going into any dates, I think that the dates that we've
24  proposed to plaintiffs' counsel are relative -- are
25  consistent with what the Court has previously ordered, all --

Page 8

1  with the only change now being trying to true everything up
2  to where we are today.  So instead of getting any new dates,
3  why don't we just see how you feel about these issues?  And
4  if you think that some of these proposals have some merit,
5  then maybe we can put some dates together.  Can I answer any
6  other questions for you, Your Honor?
7      THE COURT:  No.  I think I understand what you're
8  saying.  But you -- you want everything to run on one track,
9  but you don't want that track to actually start until after
10  the motion to -- to amend is ruled on?
11      MR. QUINN:  That's exactly right.
12      THE COURT:  Okay.  So, plaintiff?
13      MS. LOUIS:  Thank you, Your Honor.  So the last
14  point that Mr. Quinn made I think is probably the most
15  important, which is that there is this distinction between
16  the first FLSA motion, which is not interdependent at all on
17  the second one.  The response, the opposition, is due on
18  Tuesday.  And it's in a different posture.  In fact, defense
19  counsel has sent us a proposal.  We're speaking about the
20  form and proposed order.  It's in a totally separate posture.
21  And there's just no reason to tie it to the second motion.
22  And so (inaudible) the resolution of the motion that was
23  filed on July 25th to the motion that was for conditional
24  certification that were filed this week.  So the -- in Court,
25  when it imposed this deadline, we -- we were all present.  We

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
August 19, 2016

Page 9

1  all spoke about the likelihood that the plaintiffs would file
2  a motion to amend two conditional certification motions.
3  And (inaudible) for that circumstance, the Court set the date
4  for both of those events, the final motion for conditional
5  certification and the final date to amend the joint parties
6  for August 15th. We adhered by both (inaudible), starting
7  the deadlines, taking for the opposition, both for the motion
8  to amend and for the opposition for conditional certification
9  which has a longer timeframe for the defendants to oppose it.
10  So with respect -- if we -- if we -- we (inaudible) the two
11  motions differently. I disagree with the characterization
12  that tying them together will cut everyone's work in half.
13  Mr. Quinn said that there would be one set of pleadings.
14  That does not mean one pleading. It just means that they'll
15  be coming in at the same time. It doesn't cut the work in
16  half.
17      With respect to Mr. Quinn's concern that having
18  two sets of pleadings coming into the Court at two different
19  times will lead to two different results, I think that that
20  highlights the potential for -- I'm sorry. The fact that
21  (inaudible) the motion as a defendant will be assessed
22  independent of each other with respect to however the
23  plaintiffs presented it in their motion. And so I -- I truly
24  don't see -- and, you know, we invited the discussion, but I
25  don't see any value in tying these two together. Ultimately,

Page 10

1  if we were to agree to the schedule that is proposed, which
2  is an indefinite briefing schedule, instead of having
3  opposition due on Tuesday, it becomes not due at all. It
4  will delay all of the other deadlines in the case.
5  (Inaudible) the defendants' motion to move for
6  decertification of the FLSA conditional certification is six
7  months away, and, you know, contemplating a three- to
8  six-month notice period. So if we continue to just
9  (inaudible) the deadlines for it, it will impact the rest of
10  the case. We (inaudible) that we don't see good cause to do
11  so. And there is already a briefing schedule that is
12  established in the Court's scheduling order. So it's our
13  position that with respect to the motion to amend (inaudible)
14  recommended a briefing schedule for that, defendant can
15  stipulate to that, but we do not stipulate either to the --
16  the delay or (inaudible) of deadlines with respect to the
17  first FLSA motion, which is due on -- the opposition is due
18  on Tuesday. And it would not be our agreement to change the
19  Court's deadline. The Court has imposed a deadline of
20  30 days from the time of filing.
21      THE COURT: Okay. Let me -- let me ask you -- I
22  do have a couple of questions of you. Besides the date of
23  filing of these two motions, which I -- I do want to note are
24  pending in front of Judge Arguello, not me, what -- you say
25  they're in a different posture. How are they different?

Page 11

1      MS. LOUIS: Well, are the two FLSA motions
2  (inaudible)?
3      THE COURT: Yes.
4      MS. LOUIS: Well, the -- the (inaudible) one was
5  only filed on Monday. And I have not conferred further with
6  either defendant for AuPairCare or Expert AuPair, which are
7  the two new FLSA defendants under the second amended
8  complaint versus the first motion that was filed back in
9  July. (Inaudible) its opposition is due on Tuesday. It is
10  utterly unaffected by the second amended complaint with a
11  potential exception for Cultural Care because we did add a
12  named plaintiff with respect to Cultural Care. But --
13  actually, now I think that's wrong. I'm still not sure. But
14  it wouldn't impact Cultural Care's position on the FLSA
15  motion. And the counsel for InterExchange, which is one of
16  those four FLSA defendants that we (inaudible) in the first
17  motion, I contacted plaintiffs' counsel with proposed changes
18  to the -- the notice and the proposed order, and we may be in
19  a posture of agreeing on both of those things. Again,
20  (inaudible) the extent to which that would involve the entire
21  motion. They don't otherwise indicate. But that dialog has
22  already progressed.
23      THE COURT: Okay. So -- so, really, the only
24  difference is -- I mean, outside of -- obviously it's
25  different defendants, but -- is that you filed one early.

Page 12

1  And then the motion to amend doesn't impact very much of
2  those. But that seems to be somewhat of an artificial
3  distinction when you say that they're not in the same posture
4  because, really, they are in the same posture. You just
5  decided to get on a fast track with one set of defendants and
6  not with the others. So I don't see really that that makes
7  any sense. I will tell you as a practical matter, I can't
8  imagine, although I don't control her docket, and I don't
9  know what she -- how she actually rules on the motions, but I
10  will tell you that if the motions were pending in front of
11  me, I'd wait until all of them are briefed and rule on the
12  whole thing together. I mean, I wouldn't undertake anything
13  apart like that. You know, it just doesn't seem to make
14  sense because the issues are the same. I think there's very
15  little chance of getting inconsistent rulings because you've
16  got the same judge, right? So that's not really an issue, I
17  don't think. So the issue is the practicality of it. And
18  I -- I'm not really sure why you filed one early. Maybe
19  because you knew about the, you know, upcoming -- I think we
20  all were alerted to the upcoming possibility of an amended
21  complaint. So I'm not suggesting that's underhanded. I --
22  you know, I'm sure we talked about it in April. But it -- it
23  seems to me more practical to put it all on the same track,
24  however, it's not practical to me to wait until after the
25  motion to amend is ruled on. I think, for me, the motion to

**Johana Paola Beltran, et al. vs.**
**InterExchange, Inc., et al.**

**Telephonic Informal Discovery Conference**
**August 19, 2016**

Page 13

1  amend was filed on time. So that means that the only
2  criteria is that it comply with Rule 15. And Rule 15, as you
3  all know, says the Court should freely give leave to amend
4  when justice so requires. And, really, only excepts that
5  when you can show that the party engaged in undue delay, bad
6  faith, dilatory motive, failure to cure deficiencies by
7  amendments previously allowed, which doesn't apply, and undue
8  prejudice. And while I understand that any change is
9  prejudicial, any addition of charges or claims against a
10  company is prejudicial, it's not unduly prejudicial when you
11  add the plaintiffs. So I'm not saying that because it's not
12  pending in front of me that -- that Judge Arguello will say
13  yes to the amendment, but I think the law is pretty clear
14  that the presumption is yes, unless you can show one of those
15  kind of bad faith things. So I don't see why we should wait
16  on the class certification either. So -- so I don't -- I
17  don't really get it. I mean, I -- I think the practical
18  thing to do would be to run the briefing -- run these
19  briefing schedules together. And then -- you know, but not
20  wait on the motion to amend. I'd just put them all together
21  with the second one. Now, that said, I -- you know, if
22  there's strong opposition to that, which it sounds like there
23  is some, then brief it twice. It doesn't matter to me. I'm
24  telling you, the Court probably isn't going to look at it
25  twice, but, you know, if you want to brief it twice, that's

Page 14

1  fine. So, you know, I -- I guess, am I missing a point here
2  or something?
3      MR. QUINN: No, Your Honor. This is Tom Quinn.
4  May I -- may I speak?
5      THE COURT: Yes.
6      MR. QUINN: So what -- the issue for us is just
7  there's a -- there should be a good amount of time or a
8  reasonable amount of time allowed to investigate the
9  plaintiffs preceding the petition for class certification.
10  On April 25th, 2016, on page 27 of the hearing that date
11  plaintiff's counsel said, We intend to move to leave to amend
12  the complaint in short order, Your Honor, and adding
13  additional plaintiffs, to add additional FLSA defendants, end
14  quote. And what happened is instead of short order, it
15  waited four months, and then filed on the same day -- on the
16  same deadline. So we ended up having -- instead of having
17  short order and some time to investigate and be prepared and
18  have reasonable time to object, prepare evidence to object to
19  the condition of class certification, we got them filed
20  15 minutes apart at a quarter to 12:00 -- a quarter to
21  midnight on the date they were due. That's not a whole bunch
22  of time. And that's our point about trying to at least get
23  some reasonable time on the motion to amend, whether that's a
24  few days or a few weeks, whatever it may be, to get geared
25  up. That's my point in this process. So was it done

Page 15

1  pursuant to the -- to the strict order? Yes, it was. Is it
2  done in spirit of what sort of underlied (sic) the -- the
3  discussions that day? Well, you know, that's a little
4  different.
5      THE COURT: Well, as far as the motion to amend
6  goes, I mean, you're -- you have 21 days from the date it was
7  filed. And are you asking for more time than that?
8      MR. QUINN: No, none, none.
9      THE COURT: Okay.
10      MR. QUINN: We'll -- we'll live with all the
11  deadlines. We'll live right within the deadlines. We just
12  think that we should get -- we think that the meter should
13  run for a uniform petition -- response to the petition for
14  class certification from the -- from the date that the Court
15  granted the motion to amend the complaint to add these two
16  defendants. And then we're off to the races. All parties
17  are off to the races. I disagree that it's going to change
18  the -- we're trying to abrogate the deadlines. We didn't ask
19  for that at all. And I don't think it's going to delay any
20  other deadlines. I mean, this is triggered by plaintiffs'
21  own conduct. They could have filed it earlier. They chose
22  to file that date. That's the day that the loss -- these
23  issues are being triggered from. So I think we've said it --
24  I -- I've had my piece. Thank you for taking the call. And
25  we look forward to your -- any instruction -- how would you

Page 16

1  like for us to handle it from here, Your Honor?
2      MS. LUKEY: Excuse me. If I could, this is Joan
3  Lukey from Cultural Care. The three of us who were affected
4  by the first motion haven't spoken yet.
5      THE COURT: All right.
6      MS. LUKEY: And I did want to draw a matter or two
7  if I may to your attention, Your Honor. There were five
8  plaintiffs initially, and three of us have those -- two of
9  them are au pairs who formally worked with my client's
10  organization. There was, as you know, a limited period in
11  which we could do some preliminary discovery in order to
12  determine whether we would take the unusual step of approving
13  even the conditional cert at the beginning. In this instance
14  Cultural Care made an effort to depose both of these two
15  plaintiffs because we think there are serious issues about
16  their ability to represent a putative class. The first of
17  those plaintiffs, Dayanna -- I didn't get the name of
18  their -- I don't have the papers with me. I'm not in my
19  office. Caicedo I believe it is, did not appear last week
20  for her deposition which was scheduled in the city in which
21  she resides, Philadelphia, at her request, and on a date that
22  she had suggested was convenient to her. And when Ms. Louis
23  did appear that morning she said she was unable to tell us
24  why her client did not appear. And we traveled from Boston,
25  not I, but my partner and my associates, for the purposes of

**Johana Paola Beltran, et al. vs.**
**InterExchange, Inc., et al.**

**Telephonic Informal Discovery Conference**
**August 19, 2016**

Page 17

1  that deposition.  And one of the things we had hoped that
2  we'd be able to say today is we don't think we should be
3  compelled to be filing our opposition in a circumstance where
4  we will likely be filing a motion to strike Ms. Caicedo from
5  this action.
6        The second plaintiff, we offered and they agreed
7  that we would pay her expenses to come -- all of her expenses
8  to come from South Africa to be deposed in a city of her
9  choice.  I think we went to the city, which is New York.
10  Now, she has attempted to cooperate, as have we, but she has
11  not been able, despite efforts on both parties' sides, to get
12  a visa in time to come.  These are not meaningless
13  depositions, Your Honor.  I can only say to you that we have
14  a good faith basis for believing that there's a serious
15  question about these two being able to represent the class,
16  particularly as to Ms. Deetlefs, the second one from South
17  Africa.  So we are now in a position -- we are confronting a
18  deadline, which we understand to be Wednesday, not Tuesday,
19  for whatever that's worth.  That's the 30th day from the
20  filing.  And we still haven't had the opportunity to confirm
21  the information that we believe is relevant to this.  And we
22  would be asking in the ordinary course, and thought we could
23  do so at this time this proceeding, knowing that the Court
24  would expect us to request the business days in advance, that
25  we be given additional time to either move to strike or get

Page 18

1  this lady's deposition, although, frankly, we have no
2  interest in paying again to go to another city to do it when
3  she just refused to show up.  And we'd like to be able to do
4  Ms. Deetlefs' deposition as well.  So we are in a posture,
5  despite very good faith efforts to get that discovery done
6  quickly where we cannot.
7        Further, the amended complaint does add an au
8  pair, another au pair who's employed by Cultural Care.  That
9  au pair has not been named in either of the two conditional
10  motions, so we don't know whether she's not an FLSA plaintiff
11  or what the story is.  We just know that we're suddenly
12  looking at a motion to amend to add a third named plaintiff
13  against one au pair agency which would put us potentially on
14  two schedules, Your Honor.  And that is exactly what I think
15  Mr. Quinn was suggesting he'd like to avoid.  I can assure
16  you we would like to avoid that as well since it would
17  directly impact us.
18        THE COURT:  Well, let me -- let me ask all of you
19  this:  And if someone else wants to speak, I'll give you a
20  chance in a minute.  But let me just throw out something.
21  What if we put the date for the response to the motion to
22  amend and the responses to the certification of the
23  collectives -- the collectives at 9/15.  That's 30 days from
24  the date the second one was filed.  And the -- and 30 days
25  from the date the motion to amend was filed.  Do you think

Page 19

1  that would put us on a track where those of you who need to
2  get more discovery and, you know, take some depositions or
3  whatever, you'd have enough time?  We don't want to -- I
4  don't want to go too far out, but that date kind of makes
5  sense because that's really the response date for motion
6  number two anyway.  So does that sound like something that
7  would work for everyone?  I know plaintiff probably disagrees
8  with this.  So, plaintiff, I'll certainly let you speak to
9  it.  But for defendants, did -- would that work?
10        MS. LOUIS:  (Inaudible.)
11        MR. QUINN:  (Inaudible.)
12        MS. LOUIS:  Your Honor, for what it's worth,
13  plaintiffs' counsel -- I wouldn't oppose that.
14        THE COURT:  Okay.
15        MR. QUINN:  Your Honor, this is Tom Quinn again.
16  I -- I would be -- it would be fine with us if we can be
17  assured that we will have our opportunities to depose
18  Ms. Harning and Ms. Jimenez within -- you know, within
19  adequate time to add their information to -- to any sort of
20  opposition.  We too have serious doubts about whether these
21  are adequate plaintiffs to represent a class.  And so I'm
22  sure that plaintiffs' counsel will do their best to cooperate
23  to get their clients here.  If they can assure us that they
24  can -- we can get it done within the next two or three weeks,
25  I think we're -- we can work with that.

Page 20

1        THE COURT:  Well, have you -- I'm sure you must
2  have considered taking video depositions, etcetera.  I don't
3  see why you would go through getting a visa and everything to
4  get people here when you could ask them the questions you
5  need to ask them on video.
6        MS. LOUIS:  Your Honor, that was exactly the
7  position that I took with respect to especially my plaintiffs
8  that are in South Africa.  It will acquire 24 hours of plane
9  travel to get here.  Cultural Care offered to pay to bring
10  them here.  They agreed.  As Ms. Lukey explained, the -- the
11  second one was scheduled to fly just in a few hours.  Her
12  visa didn't issue.  But I completely agree that
13  videoconferencing is the appropriate response to the distance
14  that these plaintiffs have to travel in order to attend and
15  try to get here with the difficulties of (inaudible) here.
16        MS. LUKEY:  Well, Your Honor, we obviously chose
17  to bear, this is -- this is Joan Lukey again, the substantial
18  cost of bringing Ms. Deetlefs in from South Africa because I,
19  as trial counsel, happen to believe that it is much more
20  effective to take a deposition in person.  You're there to
21  hand the documents that you want to refer someone to them.
22  They have the documents at the same time you do.  It is very
23  difficult to do a truly efficient and effective deposition by
24  video that involves exhibits.  And that's what we would have
25  been compelled to do, which is why we went so far as to incur

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
August 19, 2016

Page 21

1  the cost of offering to bring her here.  The other one, the
2  one that didn't show up, she lives in Philadelphia.  And
3  we've agreed to go there to do it in person.
4       THE COURT:  Yeah.  The other one, I'm -- that's a
5  different issue.  You know, when people agree to come and set
6  a date and set a time and then don't come, that's a bit of a
7  different issue.  And that's an issue that might result in
8  costs being assessed.  So I don't know what the deal was
9  there.  But that -- that I'm leaving out of this discussion.
10  But the South Africa one couldn't get there.  Now, if you
11  want them there, and you're willing to pay, and they want to
12  come, that -- I'm -- I'm not saying you shouldn't do that.  I
13  just -- it is time-consuming, you know.  So -- so that's
14  another thing to think about.
15       How about, Ms. Lukey, do you think if we -- if we
16  had all these responses due on 9/15, would -- do you think
17  that's adequate time to at least try to get things done?  And
18  then everything would be on the same track.  You would
19  file -- you'd have to file a response to the motion to amend
20  and to the FLSA action, whichever motion you're in.  I guess
21  you're in -- probably in the second one, by 9/15.  And that's
22  only about, what, a little over three weeks away now.  Well,
23  almost a month.  But -- but that would get us all on track.
24  And I think that might be the way -- the best way to handle
25  it, and -- and go from there.  Do I hear any --

Page 22

1       MS. LUKEY:  Well, I think --
2       THE COURT:  -- vociferous objection to that?
3       MS. LUKEY:  -- we could work -- I'm sorry.  I
4  think we could work with that, Your Honor, if we can get the
5  depositions done.  Frankly, we will be moving to strike
6  Ms. Caicedo's participation.  And we will do that promptly.
7  But as to Ms. Deetlefs, I am told that a certain day a visa
8  should be issuing.  And if we can get her agreement to come
9  on another date that's convenient to her, to, again, New York
10  or whatever city she wants, we'll still pay the costs.  But
11  as Mr. Quinn was mentioning, if we run into a circumstance
12  where in the short time allowed that can't be effected, it
13  could be a problem.  And I say that in very good faith
14  because we have a serious issue on Ms. Deetlefs, on one of
15  the class -- one of the key class characteristics.  I'm just
16  (inaudible) to that statement in advance of her deposition.
17  But we really need the deposition.
18       THE COURT:  Okay.  Well --
19       MS. LUKEY:  So if we can get that done, if she can
20  come, and we can get that visa, then, yes, we really
21  appreciate the coordinated dates, and we would work with
22  that.
23       THE COURT:  All right.  And, Ms. Louis, did you --
24  I -- you kind of broke -- ended, and I didn't hear you quite
25  fully.  Did you say that's all right with plaintiff?

Page 23

1       MS. LOUIS:  Did I say what was all right with
2  plaintiff?  The September 15th (inaudible) opposition date,
3  Your Honor?
4       THE COURT:  Yes.
5       MS. LOUIS:  That's what I said, that the plaintiff
6  would not oppose.  It would be fine with both FLSA opposition
7  motions to opposition being due on September 15th.
8       THE COURT:  Okay.  So let's -- let's do that.  Why
9  don't -- why don't we put the response dates to both of the
10  FLSA motions?  And I should call them by number.  So hold on.
11  Just let me look up so that the minutes are correct.  I know
12  my courtroom deputy can get it, but it's easier if I say it.
13       So the first motion is document 327.  No.  Excuse
14  me.  That's not right.  325, motion to certify class filed on
15  July 25th.  And the second one is the second motion to
16  certify class, which is 330.  So the responses to both of
17  those will be due on September 15.  The responses from
18  defendants to the motion to amend the complaint, which is
19  329, will also be due on 9/15.
20       Now, I'm going to -- what I'm going to say is that
21  replies, if any, you know, because that's kind of up to you,
22  though most people do want to reply.  So replies would be due
23  two weeks after that.  So that -- well, we'll just go with
24  the 14 -- the normal 14 days.  And then everything will be
25  coordinated.  It will all be in front of Judge Arguello

Page 24

1  because she hasn't referred any of those motions.  And it
2  could be she just hasn't looked at them yet.  But -- but
3  they're not referred.  And she doesn't usually refer class
4  certification motions to me, so I don't think I'll get those.
5  I think you'll be in front of her.  And that -- that tees
6  everything up by October 1st or so.  All right?
7       MS. LOUIS:  Yes, Your Honor.  Thank you.
8       MR. QUINN:  Your Honor, Tom Quinn again, if I can
9  chime back in.  So -- but I just -- I just want to make sure.
10  For the two new FLSA defendants, by participating in
11  discovery there's going to be no claim that we waived our
12  objection on the motion to amend.
13       THE COURT:  Yes.
14       MR. QUINN:  I know we're trying to be efficient
15  here, but I don't want any sort of a, Well, look it, you went
16  and took a deposition, therefore, you waived your right to
17  object to the motion to amend.  We're not going to hear that,
18  are we, counsel, plaintiffs' counsel?
19       MS. LOUIS:  Mr. Quinn, I'm not clear what it is
20  that you are asking.  I'm sorry.
21       MR. QUINN:  I don't -- want to make sure that we
22  get a waiver argument.  Just by participating in discovery,
23  if that's what happens regarding conditional class
24  certification, that later on if we -- if we intend to object
25  to the motion to amend that there's some sort of waiver

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
August 19, 2016

Page 25

1  argument that's raised -- raised because we did participate
2  in discovery.
3      MS. LOUIS:  Not from me, no.  No.  You're not.
4      MR. QUINN:  Okay.
5      MS. LOUIS:  I don't view --
6      MR. QUINN:  All right.
7      MS. LOUIS:  -- that as a waiver.  Your Honor, may
8  I clarify (inaudible) on the timing?  Under the original
9  scheduling order plaintiffs had 21 days to reply to the
10  motions for -- I'm sorry, the oppositions to FLSA, especially
11  considering that it may be six separate motions.  Would the
12  Court still give us the 21 days from an opposition to file
13  our replies?
14      THE COURT:  Yes, if you want.  I thought maybe if
15  we consolidated it you might not need it, but since you've
16  brought it up, I did read the transcript, so I do know that I
17  did give you that before.  So that would be --
18      MS. LOUIS:  (Inaudible.)
19      THE COURT:  -- let's say the 6th.  So we'll just
20  make the replies due on everything.  All right.  On all --
21  all three of these motions we've talked about will be due on
22  October 6th.  And then that way they're teed up for Judge
23  Arguello on October 7th, and she can decide what to do.
24      MS. LOUIS:  Thank you, Your Honor.
25      THE COURT:  All right?

Page 26

1      MS. LOUIS:  Your Honor, since -- since discovery
2  issues have been raised, can I seek clarification on -- on
3  the scope of the Court's ruling on two things?
4      THE COURT:  Yes.
5      MS. LOUIS:  The first thing is, you know, with
6  respect to the plaintiff -- I'm sorry, the defendants have
7  represented a couple of times that they are okay with
8  (inaudible) so long as they get the depositions of the
9  plaintiffs within the 30 days.  Is that part of the Court's
10  order?
11      THE COURT:  Well, it's not part of my order, but
12  I -- I will tell you that I understand why they want those
13  and why it's important to these two motions.  So I -- I
14  think -- I would be inclined to give them more time, which I
15  don't think you want if they didn't get those, but I'm not
16  going to make a ruling on a supposition, you know.  And it's
17  not really part of my order.  I'm just extending your dates
18  based on the argument that you've given me.  I understand
19  why -- why they want them.  And I think that every effort
20  should be made to do that.
21      MS. LOUIS:  And every effort will be, Your Honor.
22  We've done literally nothing but cooperate in an attempt to
23  get these depositions scheduled.  But just by a point of
24  clarification, the only one that will have occurred is the
25  one that was scheduled last week with Ms. Harning.  Her

Page 27

1  deposition that will have occurred next week would have been
2  the day before the second (inaudible) opposition was due.
3  And the others are scheduled way out front of the original
4  briefing period.  And while we will -- I mean to make no
5  representation that we don't think it's important or that
6  we're going to try to hold them outside of the 30 days or not
7  diligently schedule them, but just I wanted to clarify
8  whether or not it's part of the Court's order that we have to
9  produce them within the next 30 days, particularly here in
10  the United States.
11      THE COURT:  Well, no, because, frankly, I don't
12  think anybody ought to be producing them.  Okay.  I'm not
13  telling -- like, for instance, Ms. Lukey, I'm absolutely not
14  saying that she can't bring them here if her client wants to
15  pay.  But I'm not going to give you a bunch of extra time
16  because of visa problems and everything because I think you
17  can take them by video deposition.  Now, I understand it's
18  not as good.  Excuse me.  But I still think you can.  So I'm
19  not -- I'm not making that part of my order.
20      MS. LOUIS:  Okay.  I'm sorry, Your Honor.  Thank
21  you.
22      THE COURT:  All right.  Anything else?  All right.
23  Hear --
24      MS. LOUIS:  Not from the plaintiff, Your Honor.
25      THE COURT:  All right.

Page 28

1      MR. QUINN:  Nothing, Your Honor.
2      THE COURT:  Is there anybody that wanted to say
3  anything that I didn't call on?  Okay.  I'll consider that
4  everything is good.  And we'll be in recess.
5      MS. LOUIS:  Thank you, Your Honor.  Have a good
6  weekend.
7      THE COURT:  You too.
8      UNIDENTIFIED SPEAKER:  Thank you, Your Honor.
9      UNIDENTIFIED SPEAKER:  Thank you.
10      (Whereupon, the within hearing was then in
11  conclusion at 3:50 p.m.)
12
13
14      I certify that the foregoing is a correct
15  transcript, to the best of my knowledge and belief (pursuant
16  to the quality of the recording) from the record of
17  proceedings in the above-entitled matter.
18
19
20
21  /s/ Laurel S. Tubbs                November 22, 2016
22  Signature of Transcriber              Date
23
24
25

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
August 19, 2016

**1**

**12:00** 14:20

**14** 23:24

**14-cv-3074** 2:24

**15** 13:2 14:20 23:17

**15th** 5:10 7:11 9:6 23:2,7

**1st** 24:6

**2**

**2016** 14:10 28:21

**21** 15:6 25:9,12

**21-day** 7:6

**22** 28:21

**24** 20:8

**25th** 5:9 6:16 8:23 14:10 23:15

**27** 14:10

**3**

**30** 10:20 18:23,24 26:9 27:6,9

**30th** 17:19

**325** 23:14

**327** 23:13

**329** 23:19

**330** 23:16

**3:50** 28:11

**6**

**6th** 25:19,22

**7**

**7th** 25:23

**9**

**9/15** 18:23 21:16,21 23:19

**A**

**ability** 16:16

**above-entitled** 28:17

**abrogate** 15:18

**absolutely** 27:13

**acquire** 20:8

**action** 17:5 21:20

**Adam** 2:4 4:7

**add** 5:12 7:13 11:11 13:11 14:13 15:15 18:7,12 19:19

**added** 7:11

**adding** 7:4 14:12

**addition** 13:9

**additional** 14:13 17:25

**addressed** 5:16

**adequate** 19:19,21 21:17

**adhered** 9:6

**advance** 17:24 22:16

**affected** 16:3

**Africa** 17:8,17 20:8, 18 21:10

**afternoon** 2:21 3:8, 12,16,23 4:2,6,16 5:2

**agency** 18:13

**Agent** 4:13

**agree** 10:1 20:12 21:5

**agreed** 17:6 20:10 21:3

**agreeing** 11:19

**agreement** 10:18 22:8

**alerted** 12:20

**allowed** 13:7 14:8 22:12

**amend** 5:12 7:13,20 8:10 9:2,5,8 10:13 12:1,25 13:1,3,20

**14:11,23** 15:5,15 18:12,22,25 21:19 23:18 24:12,17,25

**amended** 11:7,10 12:20 18:7

**amendment** 7:3 13:13

**amendments** 13:7

**American** 2:11,14 4:12,19

**amount** 14:7,8

**APF** 2:14 4:14

**appearance** 3:4

**APPEARANCES** 2:1

**appearing** 2:2,4,6,9, 10,13

**apply** 6:8 13:7

**approving** 16:12

**April** 6:16 12:22 14:10

**Arguello** 10:24 13:12 23:25 25:23

**argument** 24:22 25:1 26:18

**arguments** 7:5

**artificial** 12:2

**assessed** 9:21 21:8

**assistance** 5:1

**associates** 16:25

**assure** 18:15 19:23

**assured** 19:17

**attempt** 26:22

**attempted** 17:10

**attend** 20:14

**attending** 5:8

**attention** 16:7

**Attorney** 2:2,4,6,10, 13

**Attorneys** 2:8

**au** 2:11 4:9,12,13 16:9 18:7,8,9,13

**August** 5:10 6:16 7:11 9:6

**Aupair** 4:3 11:6

**Aupaircare** 2:9 3:14 5:2 11:6

**avoid** 18:15,16

**aware** 5:9

**B**

**back** 6:15 11:8 24:9

**bad** 13:5,15

**based** 26:18

**basis** 17:14

**bear** 20:17

**begin** 3:7 7:18

**beginning** 16:13

**behalf** 3:9,13,17 4:7

**belief** 28:15

**believing** 17:14

**Beltran** 2:25

**beneficial** 6:2,13

**bit** 21:6

**Bogdan** 2:2 4:2

**Boies** 3:9

**Boston** 16:24

**Brian** 2:8 3:13

**briefed** 12:11

**briefing** 5:17,18,19, 20 6:2,12 7:7 10:2, 11,14 13:18,19 27:4

**briefly** 5:5

**bring** 20:9 21:1 27:14

**bringing** 20:18

**broke** 22:24

**Brooke** 3:23

**brought** 25:16

**bunch** 14:21 27:15

**business** 17:24

**C**

**Caicedo** 16:19 17:4

**Caicedo's** 22:6

**call** 5:8 15:24 23:10 28:3

**called** 3:20

**Care** 2:7 3:17 11:11, 12 16:3,14 18:8 20:9

**Care's** 11:14

**case** 2:24 10:4,10

**cert** 16:13

**certification** 5:10, 11,17 6:4,19,22 7:15, 18 8:24 9:2,5,8 10:6 13:16 14:9,19 15:14 18:22 24:4,24

**certify** 23:14,16 28:14

**chance** 6:10 12:15 18:20

**change** 8:1 10:18 13:8 15:17

**characteristics** 22:15

**characterization** 9:11

**charges** 13:9

**chime** 5:23 24:9

**Choate** 3:17

**choice** 17:9

**chose** 15:21 20:16

**circumstance** 9:3 17:3 22:11

**circumstances** 6:11,13

**city** 16:20 17:8,9 18:2 22:10

**claim** 7:13 24:11

**claims** 13:9

**clarification** 26:2,24

**clarify** 5:24 25:8 27:7

**class** 5:10,11,13,17

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
August 19, 2016

6:4,8,19,22 7:11,15,
17,18 13:16 14:9,19
15:14 16:16 17:15
19:21 22:15 23:14,16
24:3,23

clear 13:13 24:19

clerk 3:5

client 16:24 27:14

client's 16:9

clients 19:23

clock 7:19

Colaizzi 3:23,24

collectives 18:23

common 5:16,20
6:1,12 7:7

company 13:10

compelled 17:3
20:25

complaint 5:12 11:8,
10 12:21 14:12 15:15
18:7 23:18

complete 3:6

completely 20:12

comply 13:2

concern 9:17

conclusion 28:11

condition 7:14 14:19

conditional 5:10,11,
17 6:4,19 7:15,18
8:23 9:2,4,8 10:6
16:13 18:9 24:23

conduct 15:21

conference 3:1

conferred 11:5

confirm 17:20

confronting 17:17

considered 20:2

consistent 7:25

consolidated 25:15

Cont'd 2:1

contacted 11:17

contemplating 10:7

continue 10:8

control 12:8

convenient 16:22
22:9

cooperate 17:10
19:22 26:22

coordinated 22:21
23:25

correct 23:11 28:14

correctly 6:25

cost 20:18 21:1

costs 21:8 22:10

counsel 2:19 6:23
7:24 8:19 11:15,17
14:11 19:13,22 20:19
24:18

couple 10:22 26:7

Court 2:20,21 3:2,11,
15,19,25 4:4,9,14,18,
21 5:4 6:3,5,21 7:25
8:7,12,24 9:3,18
10:19,21 11:3,23
13:3,24 14:5 15:5,9,
14 16:5 17:23 18:18
19:14 20:1 21:4 22:2,
18,23 23:4,8 24:13
25:12,14,19,25 26:4,
11 27:11,22,25 28:2,
7

Court's 10:12,19
26:3,9 27:8

courtroom 2:20,22
23:12

criteria 13:2

Cultural 2:5,7,12
3:17 4:4,7,12 11:11,
12,14 16:3,14 18:8
20:9

cure 13:6

cut 6:5 9:12,15

## D

date 6:12 7:3,20 9:3,5
10:22 14:10,21 15:6,
14,22 16:21 18:21,
24,25 19:4,5 21:6
22:9 23:2 28:22

dates 7:23 8:2,5
22:21 23:9 26:17

day 5:15 14:15 15:3,
22 17:19 22:7 27:2

Dayanna 16:17

days 10:20 14:24
15:6 17:24 18:23,24
23:24 25:9,12 26:9
27:6,9

deadline 6:20 8:25
10:19 14:16 17:18

deadlines 9:7 10:4,
9,16 15:11,18,20

deal 21:8

dealing 6:21

decertification 10:6

decide 25:23

decided 12:5

Deetlefs 17:16 20:18
22:7,14

Deetlefs' 18:4

defendant 2:3,5,7,9
3:14 5:3 9:21 10:14
11:6

defendants 2:11,14
5:7,13,15,20 6:1 7:6,
10,12,16,22 9:9 11:7,
16,25 12:5 14:13
15:16 19:9 23:18
24:10 26:6

defendants' 10:5

defense 8:18

deficiencies 13:6

delay 10:4,16 13:5
15:19

depose 16:14 19:17

deposed 17:8

deposition 16:20
17:1 18:1,4 20:20,23
22:16,17 24:16 27:1,
17

depositions 17:13
19:2 20:2 22:5 26:8,
23

deputy 2:20 23:12

determine 16:12

dialog 11:21

difference 11:24

differently 9:11

difficult 20:23

difficulties 20:15

dilatory 13:6

diligently 27:7

directly 18:17

disagree 9:11 15:17

disagrees 19:7

discovery 3:1 16:11
18:5 19:2 24:11,22
25:2 26:1

discussion 9:24
21:9

discussions 15:3

distance 20:13

distinct 6:18 7:21

distinction 8:15 12:3

docket 12:8

document 23:13

documents 20:21,
22

doubts 19:20

draw 16:6

due 8:17 10:3,17 11:9
14:21 21:16 23:7,17,
19,22 25:20,21 27:2

## E

earlier 15:21

early 11:25 12:18

easier 3:20 23:12

effected 22:12

effective 20:20,23

efficient 20:23 24:14

effort 16:14 26:19,21

efforts 17:11 18:5

electronically 2:17

employed 18:8

end 6:9,10 14:13

ended 14:16 22:24

engaged 13:5

Enica 2:2 4:2,3

enter 3:4

entire 11:20

established 10:12

et al 2:25

etcetera 20:2

events 9:4

everyone's 9:12

evidence 14:18

exact 7:14

exception 11:11

excepts 13:4

Exchange 2:12,14
4:13,15

Excuse 16:2 23:13
27:18

exhibits 20:24

expect 17:24

expenses 17:7

Expert 2:3 3:25 4:3
11:6

explain 5:21

explained 20:10

expressed 6:21

extending 26:17

extent 11:20

extra 27:15

## F

fact 8:18 9:20

facts 6:11

failure 6:3

faith 13:6,15 17:14
18:5 22:13

fast 12:5

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
August 19, 2016

feel 8:3

file 9:1 15:22 21:19 25:12

filed 5:10,11 6:19 7:14,15 8:23,24 11:5, 8,25 12:18 13:1 14:15,19 15:7,21 18:24,25 23:14

filing 7:20 10:20,23 17:3,4,20

filings 5:18

final 9:4,5

finally 6:8

fine 14:1 19:16 23:6

Fisher 4:17

Flexner 3:9

FLSA 5:7,13 6:8 7:11 8:16 10:6,17 11:1,7, 14,16 14:13 18:10 21:20 23:6,10 24:10 25:10

fly 20:11

foregoing 28:14

Foreign 2:15 4:20,21

forget 3:21

form 8:20

formally 16:9

forward 15:25

frankly 18:1 22:5 27:11

freely 13:3

front 10:24 12:10 13:12 23:25 24:5 27:3

fully 22:25

**G**

gap 7:4,6

geared 14:24

general 6:12 7:6

generally 6:15

give 13:3 18:19 25:12,17 26:14 27:15

Global 2:14 4:15

good 2:21 3:8,12,16, 23 4:2,6,16,22 5:20 10:10 14:7 17:14 18:5 22:13 27:18 28:4,5

granted 7:20 15:15

Group 2:3 3:25

guess 3:7 14:1 21:20

**H**

half 6:6 9:12,16

Hall 3:17

hand 5:15 6:1 20:21

handful 5:13

handle 16:1 21:24

happen 2:23 20:19

happened 14:14

Harning 19:18 26:25

Hart 4:7

hear 21:25 22:24 24:17 27:23

hearing 2:23 6:16 14:10 28:10

hearken 6:15

highlights 9:20

hold 23:10 27:6

Holland 4:7

Homestay 2:5 4:4,8

Honor 3:8,13,16,23 4:2,6,11,16,25 5:6 8:6,13 14:3,12 16:1,7 17:13 18:14 19:12,15 20:6,16 22:4 23:3 24:7,8 25:7,24 26:1, 21 27:20,24 28:1,5,8

hoped 17:1

hours 20:8,11

Howard 3:24

Hubbard 2:4 4:6,7

**I**

idea 5:20

identification 6:24

identified 6:17

imagine 12:8

impact 10:9 11:14 12:1 18:17

important 7:8 8:15 26:13 27:5

imposed 8:25 10:19

inaudible 7:2 8:22 9:3,6,10,21 10:5,9, 10,13,16 11:2,4,9,16, 20 19:10,11 20:15 22:16 23:2 25:8,18 26:8 27:2

inclined 26:14

inconsistent 6:10 12:15

Incorporated 3:18

incur 20:25

indefinite 10:2

independent 9:22

informal 3:1 5:1

information 17:21 19:19

initially 16:8

instance 16:13 27:13

Institute 2:15 4:20

instruction 15:25

intend 14:11 24:24

interdependent 8:16

interest 18:2

Interexchange 2:25 3:22 11:15

International 2:3,5, 11 4:1,5,9,12

investigate 14:8,17

invited 9:24

involve 11:20

involves 20:24

issue 4:23 7:9,21 12:16,17 14:6 20:12 21:5,7 22:14

issues 3:3 5:22 8:3 12:14 15:23 16:15 26:2

issuing 22:8

**J**

Jimenez 19:18

Joan 2:6 3:17 16:2 20:17

joint 9:5

judge 2:22 10:24 12:16 13:12 23:25 25:22

July 5:9 7:12 8:23 11:9 23:15

justice 13:4

**K**

KATHRYN 2:10

Katie 4:11

key 22:15

kind 13:15 19:4 22:24 23:21

knew 12:19

knowing 17:23

knowledge 28:15

**L**

lady's 18:1

late 7:12

Laurel 28:21

Lauren 3:9

law 2:2,4,6,9,10,13 13:13

lawsuit 5:7

lead 9:19

leave 4:21 13:3 14:11

leaving 21:9

left 5:24

likelihood 9:1

limited 16:10

literally 26:22

live 15:10,11

lives 21:2

LLC 2:12

long 26:8

longer 9:9

looked 24:2

loss 15:22

Louis 3:8,9 5:23 8:13 11:1,4 16:22 19:10, 12 20:6 22:23 23:1,5 24:7,19 25:3,5,7,18, 24 26:1,5,21 27:20, 24 28:5

Lukey 2:6 3:16,17 16:2,3,6 20:10,16,17 21:15 22:1,3,19 27:13

**M**

made 8:14 16:14 26:20

make 3:21 7:5 12:13 24:9,21 25:20 26:16 27:4

makes 12:6 19:4

making 27:19

Maschler 2:8 3:13

matter 12:7 13:23 16:6 28:17

meaningless 17:12

means 9:14 13:1

mentioning 22:11

merit 8:4

meter 15:12

midnight 14:21

minute 18:20

minutes 14:20 23:11

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
August 19, 2016

missing 14:1

Monday 11:5

month 21:23

months 7:2 10:7 14:15

morning 3:12 16:23

motion 5:9,11,12 7:13,20 8:10,16,21, 22,23 9:2,4,7,21,23 10:5,13,17 11:8,15, 17,21 12:1,25 13:20 14:23 15:5,15 16:4 17:4 18:12,21,25 19:5 21:19,20 23:13, 14,15,18 24:12,17,25

motions 9:2,11 10:23 11:1 12:9,10 18:10 23:7,10 24:1,4 25:10,11,21 26:13

motive 13:6

move 10:5 14:11 17:25

moving 22:5

### N

named 5:14 6:24 11:12 18:9,12

NFP 2:14

normal 23:24

note 10:23

notice 10:8 11:18

November 28:21

number 2:24 19:6 23:10

### O

object 14:18 24:17, 24

objection 22:2 24:12

occurred 26:24 27:1

October 24:6 25:22, 23

offered 17:6 20:9

offering 21:1

office 16:19

opportunities 19:17

opportunity 17:20

oppose 9:9 19:13 23:6

opposed 5:21

opposition 6:14 8:17 9:7,8 10:3,17 11:9 13:22 17:3 19:20 23:2,6,7 25:12 27:2

oppositions 25:10

opt-in 6:7

order 2:18 6:25 8:20 10:12 11:18 14:12, 14,17 15:1 16:11 20:14 25:9 26:10,11, 17 27:8,19

ordered 7:25

ordinary 17:22

organization 16:10

original 7:11 25:8 27:3

outstanding 7:10

### P

p.m. 28:11

pair 2:11 4:9,12,13 18:8,9,13

pairs 16:9

papers 16:18

part 26:9,11,17 27:8, 19

participate 25:1

participating 24:10, 22

participation 22:6

parties 3:2 5:23 6:6, 20 7:4,13 9:5 15:16

parties' 17:11

partner 16:25

party 13:5

pay 17:7 20:9 21:11 22:10 27:15

paying 18:2

pending 10:24 12:10 13:12

people 20:4 21:5 23:22

period 6:7 10:8 16:10 27:4

person 20:20 21:3

petition 7:15,17 14:9 15:13

petitions 6:18,22

Philadelphia 16:21 21:2

Phillips 4:17

phone 3:21

piece 15:24

plaintiff 3:7 5:8 8:12 11:12 17:6 18:10,12 19:7,8 22:25 23:2,5 26:6 27:24

plaintiff's 14:11

plaintiffs 3:10 5:14, 15,21 6:14,17,24 7:1 9:1,23 13:11 14:9,13 16:8,15,17 19:21 20:7,14 25:9 26:9

plaintiffs' 6:23 7:24 11:17 15:20 19:13,22 24:18

plane 20:8

pleading 9:14

pleadings 6:3,9 7:3, 17 9:13,18

point 6:20 8:14 14:1, 22,25 26:23

position 10:13 11:14 17:17 20:7

possibility 6:18 12:20

posture 8:18,20 10:25 11:19 12:3,4 18:4

potential 9:20 11:11

potentially 18:13

practical 12:7,23,24 13:17

practicality 12:17

preceding 14:9

prejudice 13:8

prejudicial 13:9,10

preliminary 16:11

prepare 14:18

prepared 14:17

present 8:25

presented 9:23

presumption 13:14

pretty 13:13

previously 7:25 13:7

primarily 5:7

problem 22:13

problems 27:16

proceeding 17:23

proceedings 2:18 28:17

process 14:25

produce 27:9

producing 27:12

progressed 11:22

promptly 22:6

proposal 8:19

proposals 8:4

proposed 7:24 8:20 10:1 11:17,18

purposes 16:25

pursuant 2:18 15:1 28:15

put 8:5 12:23 13:20 18:13,21 19:1 23:9

putative 16:16

### Q

quality 28:16

quarter 14:20

question 6:4 17:15

questions 8:6 10:22 20:4

quickly 18:6

Quinn 2:8 3:12,13 4:25 5:5 8:11,14 9:13 14:3,6 15:8,10 18:15 19:11,15 22:11 24:8, 14,19,21 25:4,6 28:1

Quinn's 9:17

quote 14:14

### R

races 15:16,17

raised 25:1 26:2

reach 5:16

read 25:16

reason 8:21

reasonable 14:8,18, 23

recess 28:4

recommended 10:14

record 2:23 3:5 28:16

recorded 2:17

recording 28:16

refer 20:21 24:3

referred 24:1,3

refused 18:3

Reilly 2:10 4:11

relative 7:24

relevant 17:21

replies 23:21,22 25:13,20

reply 23:22 25:9

represent 5:2 16:16 17:15 19:21

representation 27:5

represented 26:7

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
August 19, 2016

representing 4:19

request 16:21 17:24

requested 5:1

requires 13:4

reservation 6:21

resides 16:21

resolution 8:22

respect 7:22 9:10,17, 22 10:13,16 11:12 20:7 26:6

response 8:17 15:13 18:21 19:5 20:13 21:19 23:9

responses 18:22 21:16 23:16,17

responsive 7:17

rest 10:9

result 21:7

results 9:19

rule 6:3 12:11 13:2

ruled 8:10 12:25

rules 12:9

ruling 26:3,16

rulings 6:10 12:15

run 8:8 13:18 15:13 22:11

**S**

Schaecher 2:13 4:16,17,19

schedule 5:17,21 6:2 7:8 10:1,2,11,14 27:7

scheduled 16:20 20:11 26:23,25 27:3

schedules 5:19 13:19 18:14

scheduling 3:2 10:12 25:9

Schiller 3:9

scope 26:3

seek 26:2

sense 7:5 12:7,14 19:5

separate 7:21 8:20 25:11

September 23:2,7, 17

session 2:20

set 5:5 7:19 9:3,13 12:5 21:5,6

sets 3:6 6:9 9:18

Sherman 3:24

short 6:25 7:2 14:12, 14,17 22:12

show 13:5,14 18:3 21:2

sic 15:2

sides 17:11

Signature 28:22

similar 6:11

sitting 2:22

six-month 10:8

sort 15:2 19:19 24:15,25

sound 19:6

sounds 4:22 13:22

South 17:8,16 20:8, 18 21:10

speak 4:23 14:4 18:19 19:8

SPEAKER 28:8,9

speaking 4:24 8:19

spirit 15:2

spoke 9:1

spoken 16:4

stack 6:3

stage 5:5

staggered 5:18,19

start 8:9

starting 9:6

stated 5:25

statement 22:16

States 27:10

step 16:12

stipulate 10:15

story 18:11

strict 15:1

strike 17:4,25 22:5

strong 13:22

Study 2:15 4:20,21

substantial 7:4 20:17

succinctly 5:22

suddenly 18:11

suggested 16:22

suggesting 12:21 18:15

supposition 26:16

Susan 2:13 4:16

**T**

Tafoya 2:22

taking 9:7 15:24 20:2

talk 3:2

talked 12:22 25:21

teed 25:22

tees 24:5

telling 13:24 27:13

term 7:1

terms 6:3,13

thing 12:12 13:18 21:14 26:5

things 11:19 13:15 17:1 21:17 26:3

THOMAS 2:8

thought 6:12 17:22 25:14

three- 10:7

throw 18:20

tick 7:19

tie 8:21

time 6:23 7:4,7,14 9:15 10:20 13:1 14:7, 8,17,18,22,23 15:7 17:12,23,25 19:3,19 20:22 21:6,17 22:12 26:14 27:15

time-consuming 21:13

timeframe 9:9

times 9:19 26:7

timing 7:16 25:8

today 2:24 3:3 5:8 8:2 17:2

told 3:4 22:7

Tom 3:13 4:25 14:3 19:15 24:8

totally 8:20

track 8:8,9 12:5,23 19:1 21:18,23

transcribed 2:18

Transcriber 28:22

transcript 25:16 28:15

travel 20:9,14

traveled 16:24

trial 20:19

triggered 15:20,23

true 8:1

Tubbs 28:21

Tuesday 8:18 10:3, 18 11:9 17:18

tying 9:12,25

**U**

Ultimately 9:25

unable 16:23

unaffected 11:10

underhanded 12:21

underlied 15:2

understand 3:1 8:7 13:8 17:18 26:12,18 27:17

undertake 12:12

undue 13:5,7

unduly 13:10

UNIDENTIFIED 28:8,9

uniform 6:7 15:13

United 27:10

unusual 16:12

upcoming 12:19,20

utterly 11:10

**V**

versus 2:25 11:8

video 20:2,5,24 27:17

videoconferencing 20:13

view 25:5

visa 17:12 20:3,12 22:7,20 27:16

vociferous 22:2

**W**

wait 12:11,24 13:15, 20

waited 14:15

waived 24:11,16

waiver 24:22,25 25:7

wanted 27:7 28:2

Wednesday 17:18

week 8:24 16:19 26:25 27:1

weekend 28:6

weeks 14:24 19:24 21:22 23:23

whichever 21:20

words 5:18 6:5

work 9:12,15 19:7,9, 25 22:3,4,21

worked 16:9

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
August 19, 2016

**workload**  6:5

**worth**  17:19 19:12

**wrong**  11:13

---

### Y

**York**  17:9 22:9

# **Exhibit B**

Beltran v. Interexchange, Inc.          DAVID KEIL                                    7/21/2016

---

205

14:33:36   1    AT&T.  Sorry.

14:33:37   2        Q.   Well, I think you hit the entire universe

14:33:39   3    of major providers, and I'm -- I'm sure they'll all

14:33:43   4    appreciate their subpoenas.  Just so we can wrap this

14:33:48   5    up, sir, you -- you do not have any information as to

14:33:54   6    communications between or among sponsors, that is, you

14:33:58   7    cannot tell us about any communications between or

14:34:00   8    among sponsors in which they purportedly agreed to set

14:34:06   9    au pair compensation; is that fair?

14:34:08   10       A.   That is fair.

14:34:12   11       Q.   And I gather you do not have any basis to

14:34:14   12   suggest that the $195.75 amount specified in the State

14:34:21   13   Department directive and notification is proper -- is

14:34:26   14   improper under any law?

14:34:27   15       A.   I have no information at all on that

14:34:32   16   topic.  I can't answer that.

14:34:34   17       Q.   Okay.  You have no information to suggest

14:34:38   18   that any au pairs who have come to this country under

14:34:42   19   the J-1 cultural exchange program have been abused or

14:34:46   20   mistreated; is that correct?

14:34:47   21       A.   That's correct.

14:34:49   22       Q.   Okay.  And in actuality, you actually

14:34:53   23   don't know the identity of the 15 sponsors who are

14:34:56   24   approved by the State Department; is that correct?

14:34:58   25       A.   That's correct at this moment.

---

206

14:35:02   1        MS. LUKEY:  That is it for my questioning,

14:35:04   2    sir.  If you want to take a five-minute break, I

14:35:07   3    suspect that others may want to convene among

14:35:11   4    themselves to decide in what order they would speak.

14:35:14   5        MS. LOUIS:  Okay.

14:35:14   6        MS. LUKEY:  Thank you.

14:35:15   7        THE VIDEOGRAPHER:  Going off the record.

14:35:16   8    The time is 2:34 p.m.

14:35:20   9            (Recess taken, 2:34 p.m. to 2:56 p.m.)

14:55:48   10           (Deposition Exhibit 6 was marked.)

14:56:33   11       THE VIDEOGRAPHER:  We are back on the

14:56:34   12   record.  The time is 2:56 p.m.

14:56:39   13               EXAMINATION

14:56:39   14   BY MS. KOZAL:

14:56:39   15       Q.   Mr. Keil, my name is Peggy Kozal.  I

14:56:42   16   represent AuPairCare in this litigation.  I just have a

14:56:45   17   few very short questions for you.

14:56:47   18       A.   Certainly.

14:56:48   19       Q.   Are -- you are licensed in Colorado as a

14:56:50   20   private investigator; is that correct?

14:56:52   21       A.   That's correct.

14:56:52   22       Q.   And since when have you been licensed?

14:56:56   23       A.   Licensure started in 2015.  I applied at

14:57:01   24   the very beginning, but I don't think I was approved

14:57:04   25   until mid-2015 because of clerical issues.

---

207

14:57:08   1        Q.   Have you ever had any actions against your

license?

14:57:10   2        A.   No.

14:57:10   3        Q.   Are you licensed in any other states

besides Colorado?

14:57:11   4        A.   No.  I have a pending license in New

14:57:13   5    Mexico, but it's not -- I'm not currently licensed

there.

14:57:14   6        Q.   What has prompted you to get licensed in

New Mexico?

14:57:16   7        A.   I have family that lives in New Mexico.

14:57:20   8        Q.   And did you make all of the calls as it

relates to the investigation that you did in this case,

did you make all of those calls from Colorado?

14:57:21   9        A.   I believe so.

14:57:23   10       Q.   Okay.  And I'm going to hand you what we

have marked as Deposition -- oh, excuse me --

Deposition Exhibit 6.  Do you have an understanding of

what this document is?

14:57:24   11       A.   Yes.

14:57:27   12       Q.   And can you identify it for me?

14:57:29   13       A.   I've not seen it in this form, but it

appears to be excerpts from the Private Investigator

Licensure Rules and Regulations.

14:57:31   14       Q.   And do you comply with those rules and

---

208

14:58:09   1    regulations?

14:58:11   2        A.   Yes.

14:58:11   3        Q.   And specifically I'd like to turn your

attention to Rule 8D, which is found on page 11.

14:58:15   4        A.   I'm sorry?

14:58:23   5        Q.   8D.  There's a subheading called,

"Recordkeeping."

14:58:27   6        A.   Okay.

14:58:28   7        Q.   And can you take a look at subsection D?

14:58:28   8        A.   Yes.

14:58:33   9        Q.   And let me know when you're finished

reading it.

14:58:34   10       MS. LOUIS:  Counsel, where's the 8?

14:58:36   11       MS. CROUCH:  I apologize, it's just the

14:58:38   12   excerpt from it, from the -- the rules and regulations.

14:58:41   13   But it's -- I can get all -- all of the pages if you'd

14:58:43   14   like.  It would just take some time.  This is taken off

14:58:47   15   of the Department of Regulatory Agency's website.  I do

14:58:51   16   not have the full document.

14:58:55   17       A.   Yes, I'm familiar with this.

14:58:59   18       Q.   (BY MS. KOZAL)  Okay.  And do you follow

14:59:00   19   the recordkeeping requirements?

14:59:02   20       A.   Yes.  But the recordkeeping requirements

14:59:05   21   here does not -- do not mention the specific exemption

14:59:07   22   that exists in the statute, and my understanding is

---

scheduling@huntergeist.com          HUNTER + GEIST, INC.          303-832-5966/800-525-8490

Beltran v. Interexchange, Inc.                    DAVID KEIL                                   7/21/2016

---

209

that in the statute, if you are work -- working
directly for legal counsel, for an attorney, record
keeping requirements are not necessarily the same as if
you're working for the general public.

So, for instance, my understanding of the
statute is if you are retained by a nonattorney, you
are required to write a written report, you are
required to have a fee requirement, you are required to
retain records for a certain period of time.  My
understanding is there's an exemption in the law that
states that if you are working for an attorney, you are
not required to write written reports, you are not
required to have a fee agreement, and recordkeeping is
subject to the attorney's issues of work product and
privilege, where that's not stated in -- regarding
laymen.

     Q.  You're under the impression that the
recordkeeping requirement is -- earlier you testified
that the contractual requirement --

     A.  My contractual requirement is with the
attorney, yes.

     Q.  With the attorney.  And you are not
required to keep a copy of a contract with the
attorney?

     A.  I -- I'm sorry.  I apologize.

---

210

     Q.  No.  But with respect to the recordkeeping
rules, you believe that there is an exemption with
respect to that?

     A.  I had a lengthy meeting with the executive
director of my department at DORA during the licensure
process, and the reason we had that meeting was there
was a tremendous amount of misunderstanding about what
investigators do and don't do when the legislature
wrote the new law.  And it was assumed, this is -- I
was told it was assumed by DORA that the overwhelming
majority of investigators would be working for the
general public.

          It was actually a surprise to the director
that there were investigators that were working
primarily for law -- for attorneys and law firms.  That
was a shock to them.  So when the rules were published,
I had a formal meeting with the director of the -- of
my department at DORA and raised the question, which
is, as stated, my understanding of the rules as they
were coming into effect would be at odds with the
attorney work product rules that I was accustomed to
working under and that all of the attorneys I work
under require.

          And my understanding is that they had
meetings to this effect, and I was told that I should

---

211

err on the side when working with an attorney, because
there were exemptions regarding written notes, there
were exemptions regarding written reports, and there
were exemptions regarding fee agreements, that I should
also assume that there were -- that those exemptions
followed on work product and materials, and that if the
work product materials belonged to the attorney, per
attorney regulations and per state law, I should follow
the rules as set forth by my client attorneys.

     Q.  So you believe that if you're working with
an attorney, all that you have to do is create the
record, send it on, and then you can destroy the
document?

     A.  Yes.

     Q.  And as a private investigator conducting a
private investigation in the state of Colorado, you
have to be licensed in Colorado; is that correct?

     A.  Yes.

     Q.  Where do you understand your client to
be -- to reside?

     A.  In this case I have no idea.

     Q.  Who is your client in this case?

     A.  I -- formally my client when I was
retained was Towards Justice.  They are -- they are the
firm that paid my retainer.  But who their underlying

---

212

client is, I have no idea.

     Q.  Do you know what state your client is
located in?

     A.  I do not.

     Q.  If you -- when you are making calls out of
state in furtherance of the investigation that you are
doing, do you believe that you need to be licensed in
the state in which you're conducting the investigation?

     A.  My understanding of the rules, again, as
interpreted by DORA, and please understand, it's a
moving target because it is a very new statute and they
don't even have enforcement personnel in place yet,
they've not hired investigators or enforcement
officials yet, to my understanding.

          The rule as I've always understood it is
if you -- if the investigation originates in the state
where you are licensed and the majority of the work
that you do is within the state where you are licensed
and certain elements of that investigation take you
into other states, whether it's physically or by
telephone, as long as that is not the main thrust of
the investigation, you can follow that without any
licensure in those states.  That's my understanding.

          I also -- may I add that at the time I did
this work there was no licensure.  The statute hadn't

---

scheduling@huntergeist.com                HUNTER + GEIST, INC.                303-832-5966/800-525-8490

# **Exhibit C**

LAURA MEJIA-JIMINEZ on 09/14/2016

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2               FOR THE DISTRICT OF COLORADO

 3  JOHANA PAOLA BELTRAN; and    )
    those similarly situated,    )
 4                               )
                  Plaintiffs,    )
 5                               ) Case No.
      vs.                        ) 1:14-cv-03074-CMA-KMT
 6                               )
    INTEREXCHANGE, INC.;         )
 7  USAUPAIR, INC.; GREAT AUPAIR,)
    LLC; EXPERT GROUP            )
 8  INTERNATIONAL, INC., DBA     )
    EXPERT AUPAIR; EURAUPAIR     )
 9  INTERCULTURAL CHILD CARE     )
    PROGRAMS; CULTURAL HOMESTAY  )
10  INTERNATIONAL; CULTURAL CARE,)
    INC.; D/B/A CULTURAL CARE    )
11  AUPAIR; AUPAIRCARE, INC.;    )
    AUPAIR INTERNATIONAL, INC.;  )
12  APF GLOBAL EXCHANGE, NFP;    )
    AMERICAN INSTITUTE FOR       )
13  FOREIGN STUDY DBA AU PAIR IN )
    AMERICA; AMERICAN CULTURAL   )
14  EXCHANGE, LLC, DBA GOAUPAIR; )
    AGENT AU PAIR; A.P.E.X.      )
15  AMERICAN PROFESSIONAL        )
    EXCHANGE, LLC DBA PROAUPAIR; )
16  and 20/20 CARE EXCHANGE,     )
    INC., DBA THE INTERNATIONAL  )
17  AU PAIR EXCHANGE,            )
                                 )
18                 Defendants.   )
    _____)
19

20       VOLUME ONE TELECONFERENCED VIDEO DEPOSITION OF

21                   LAURA MEJIA-JIMINEZ

22               San Francisco, California

23             Wednesday, September 14, 2016

24  Reported By:  KIMBERLY E. D'URSO, RPR, CSR No. 11372

25  Job No. 18766
```



EXCEEDING YOUR EXPECTATIONS

COMBS Reporting, Inc.

DEPOSITION REPORTERS • LEGAL VIDEO

LAURA MEJIA-JIMINEZ on 09/14/2016

Page 2

```
 1  JOHANA PAOLA BELTRAN; and     )
    those similarly situated,     )
 2                                )
                      Plaintiffs, )
 3                                ) Case No.
       vs.                        ) 1:14-cv-03074-CMA-KMT
 4                                )
    INTEREXCHANGE, INC.;          )
 5  USAUPAIR, INC.; GREAT AUPAIR,)
    LLC; EXPERT GROUP             )
 6  INTERNATIONAL, INC., DBA      )
    EXPERT AUPAIR; EURAUPAIR      )
 7  INTERCULTURAL CHILD CARE      )
    PROGRAMS; CULTURAL HOMESTAY   )
 8  INTERNATIONAL; CULTURAL CARE,)
    INC.; D/B/A CULTURAL CARE     )
 9  AUPAIR; AUPAIRCARE, INC.;     )
    AUPAIR INTERNATIONAL, INC.;   )
10  APF GLOBAL EXCHANGE, NFP;     )
    AMERICAN INSTITUTE FOR        )
11  FOREIGN STUDY DBA AU PAIR IN )
    AMERICA; AMERICAN CULTURAL    )
12  EXCHANGE, LLC, DBA GOAUPAIR; )
    AGENT AU PAIR; A.P.E.X.       )
13  AMERICAN PROFESSIONAL         )
    EXCHANGE, LLC DBA PROAUPAIR; )
14  and 20/20 CARE EXCHANGE,      )
    INC., DBA THE INTERNATIONAL   )
15  AU PAIR EXCHANGE,             )
                                  )
16                   Defendants.  )
    _____)
17

18          VOLUME ONE TELECONFERENCED VIDEO DEPOSITION OF

19  LAURA MEJIA-JIMINEZ, taken on behalf of Defendants, at

20  the law offices of Gordon & Rees, LLP, 275 Battery

21  Street, Suite 2000, San Francisco, California, beginning

22  at 9:05 a.m., and ending at 6:39 p.m., on Wednesday,

23  September 14, 2016, before Kimberly E. D'Urso, RPR,

24  Certified Shorthand Reporter Number 11372.

25
```



EXCEEDING YOUR EXPECTATIONS
Combs Reporting, Inc.
DEPOSITION REPORTERS • LEGAL VIDEO

# **Exhibit D**

| | |
|---|---|
| **From:** | Julie Vernon <JVernon@gordonrees.com> |
| **Sent:** | Wednesday, September 14, 2016 3:28 PM |
| **To:** | Lauren Louis |
| **Cc:** | Brian Maschler |
| **Subject:** | Betran v. InterExchange, et al. |
| **Attachments:** | Beltran_ Letter to Lauren F. Louis.PDF |

Dear Ms. Louis:

Attached please find a letter of today's date.

Best Regards,

---

**JULIE L. VERNON**   | Legal Secretary to Brian P. Maschler
**GORDON & REES**
**SCULLY MANSUKHANI**

275 Battery Street, Suite 2000
San Francisco, CA 94111
D: 415-875-3338  |  P: 415-986-5900  |  F: 415-986-8054
**jvernon@gordonrees.com**

Alabama • Arizona • California • Colorado • Connecticut • Florida • Georgia
Illinois • Maryland • Massachusetts • Missouri • Nevada • New Jersey • New York
North Carolina  • Oregon • Pennsylvania • South Carolina • South Dakota • Texas
Virginia • Washington • Washington, D.C.
www.gordonrees.com

---

Alabama * Arizona * California * Colorado * Connecticut * Florida * Georgia * Illinois * Maryland * Massachusetts * Missouri * Nevada * New Jersey * New York * North Carolina * Ohio * Oregon * Pennsylvania * South Carolina * South Dakota * Texas * Virginia * Washington * Washington, DC * West Virginia

This email communication may contain CONFIDENTIAL INFORMATION WHICH ALSO MAY BE LEG/ALLY PRIVILEGED and is intended only for the use of the intended recipients identified above. If you are not the intended recipient of this communication, you are hereby notified that any unauthorized review, use, dissemination, distribution, downloading, or copying of this communication is strictly prohibited. If you are not the intended recipient and have received this communication in error, please immediately notify us by reply email, delete the communication and destroy all copies.

**GORDON & REES LLP**
http://www.gordonrees.com

# **Exhibit E**

BRIAN P. MASCHLER
BMASCHLER@GORDONREES.COM



GORDON&REES
SCULLY MANSUKHANI
ATTORNEYS AT LAW
275 BATTERY STREET, SUITE 2000
SAN FRANCISCO, CA 94111
PHONE: (415) 986-5900
FAX: (415) 986-8054
WWW.GORDONREES.COM

September 14, 2015

**_Via E-Mail and First Class Mail_**
Lauren F. Louis, Esq.
Boies, Schiller & Flexner, LLP
401 E. Las Olas Boulevard
Suite 1200
Fort Lauderdale, Florida 33301

> Re:   *Beltran v. InterExchange, et al.*
> U.S. District Court for the District Court of Colorado,
> Case No. 1:14-cv-03074-CMA-KMT
> Mandatory Arbitration for Proposed Plaintiffs Laura Mejia Jimenez
> and Juilane Harning

Dear Ms. Louis:

As you know, the contracts between AuPairCare, Inc. ("APC" or "AuPairCare") and proposed plaintiffs, Juilane Harning and Laura Mejia Jimenez, as well as APC's with other au pairs, contain mandatory arbitration and forum selection clauses, which provide as follows:

> **The parties to the Agreement acknowledge and agree that any dispute or claim arising out of this Agreement, including but not limited to any resulting or related transaction or the relationship of the parties, shall be decided by neutral, exclusive and binding arbitration in San Francisco, California, U.S. before an arbitration provider selected by AuPairCare, upon the petition of either party.**

> **In such proceeding, the parties may utilize subpoenas and have discovery as provided in California Code of Civil Procedure Sections 1282.6, 1283 and enforced in any court of competent jurisdiction. Au Pair agrees that California is a fair and reasonable venue for resolution of any such dispute and it submits to jurisdiction of the Courts of the State of California because among other reasons, this agreement was negotiated in large part in California, and AuPairCare is domiciled in California**

> **In the event that the arbitration clause is deemed void or inapplicable, each party expressly consents to and submits to the personal jurisdiction of the federal or state court(s) of San Francisco County, California, U.S. In any action, including arbitration, brought for breach of this Agreement, the**

September 14, 2015
Page 2

>**prevailing party shall be entitled to recover reasonable attorney's fees and costs, including but not limited to the costs of arbitration.**

(*See* Attachments A, B hereto)

AuPairCare previously produced a sample contract between it and Au Pair candidates in response to Plaintiff's First Request for Production (*See* APC000-254-APC000298).  In addition, in response to Plaintiffs' Second Request for Production, which specifically requested "all arbitration agreements that you contend apply to these claims," AuPairCare again referred Plaintiffs to that previously produced contract form. (*See* Attachment C)

On August 15, 2016, the last day allowed by the Court for potential amendments to the pleadings, your office filed a motion to amend complaint that requested that Ms. Jimenez and Ms. Harning be added as named plaintiffs in this lawsuit.  That motion currently is pending before the Court.

We believe that adding Ms. Jimenez and Ms. Harning as plaintiffs in this lawsuit without the consent of AuPairCare is improper in that it violates the mandatory arbitration and forum selection provisions identified above.  Please advise at your earliest opportunity whether you are willing to stipulate to submitting the claims of Ms. Jiminez and Ms. Harning to arbitration in accordance with the APC contract, and to dismiss them from the Colorado lawsuit, or in the alternative, stay the Colorado lawsuit as to them pending the outcome of arbitration.

Thank you in advance for your consideration and prompt response.

Very truly yours,

GORDON & REES, LLP

Brian P. Maschler

BPM/jv
cc:  Beltran Defense Counsel

# ATTACHMENT A

Image                                                                                     Page 2 of 2

AuPairCare                                                    2014 AU PAIR AGREEMENT

This AuPairCare Au Pair Agreement (the "Agreement") is entered into between AuPairCare, a California Corporation and "Au Pair" (first and last name of Au Pair) _____ of (City) _____, (Country) _____. Au Pair has fully read this Agreement and agrees to the terms and conditions contained herein. "Host Family" is the family in the United States with whom Au Pair has agreed to match, and with whom Au Pair will live and work.

A. General Provisions

Au Pair is hereby advised and acknowledges that the parties agree as follows:

1. Au Pair will abide by the terms and conditions of this Agreement for the duration of Au Pair's participation in the AuPairCare program, unless and until this Agreement is replaced or modified by a subsequent written agreement executed by AuPairCare and Au Pair.

2. Au Pair is hereby advised and acknowledges that all Au Pairs are participants in a cultural exchange program, and agrees to comply with all of the regulations published by U.S. Department of State in 22 CFR Part 514, as the same may be amended from time to time in the future ("the Regulations"). Said regulations can be found by visiting: http://j1visa.state.gov/programs/au-pair

3. Au Pair understands their rights as visa participant under the Wilberforce Trafficking Victims Act. Said rights and resources for can be found by visiting: http://travel.state.gov/pdf/Pamphlet-Order.pdf

4. Au Pair represents that all information provided throughout the application process is true and that no relevant information has been excluded or misrepresented in the application process and documents, including representation of the level of English proficiency, health and/or childcare experience. Au Pair agrees that all such disclosures will be full and accurate, up to and through the date of departure from Au Pair's country of origin.

5. Au Pair agrees to complete all visa screening requirements in accordance with the instructions given and will be responsible for obtaining a valid passport and complying with all vaccinations and immunization requirements.

6. Au Pair agrees to immediately amend any disclosures should new information become available to Au Pair in any regard or at any time of participation in the program. Au Pair represents that s/he will personally conduct all written and phone correspondence with Host Family during the interviewing process. Au Pair understands that exaggeration or falsification of any application information by Au Pair, references or Originating Exchange Organization may result in immediate dismissal from the program and return to Au Pair's home country at Au Pair's expense.

7. AuPairCare has the exclusive right to determine suitability of Au Pair to participate in the program both before and during participation in the program. Au Pair agrees that in determining suitability, AuPairCare may make inquiries to third parties about Au Pair, including but not limited to medical personnel and insurance agencies otherwise covered by federal HIPAA regulations.

8. Au Pair understands that they cannot be married, engaged to be married or have children of their own and participate in AuPairCare's au pair program.

9. Au Pair is not an employee, agent or independent contractor of AuPairCare, and AuPairCare does not exercise dominion or control over the actions of the Host Family.

B. Fees and Program Costs

10. Participation in the AuPairCare program requires Au Pair to pay a non-refundable program fee to Originating Exchange Organization.

11. Originating Exchange Organization may charge Au Pair additional fees to cover their administrative costs in promoting the AuPairCare program and processing au pair applications. The fees may include, but are not limited to, an application fee, processing fee, handling fee, and interview fee. These fees may vary across Originating Exchange Organizations. AuPairCare assumes no duties or responsibilities for any acts or omissions of the Originating Exchange Organization regarding additional fees.

12. Au Pair will be responsible for additional costs, including but not limited to, baggage check fees for arrival and return flights, personal expenses while at the Au Pair arrival orientation, medical expenses not covered by insurance and all incidentals and personal expenses while on the program. Au Pairs should be prepared to cover these costs.

13. Au pair will pay all applicable fees to Originating Exchange Organization before beginning travel to this United States. Au Pair may not under any circumstances solicit funds from Host Family to cover personal costs of program, including but not limited to fees due to the Originating Exchange Organization, costs associated with securing a visa, or incidental travel costs.

14. Au Pair agrees that s/he has adequate financial resources to satisfy all obligations as an AuPairCare Au Pair, including payment for a return flight if Au Pair does not successfully complete the program.

C. Au Pair Cancellations/Flight Change Requests

14. Au pair agrees to pay a $300.00 USD cancellation fee, plus the actual cost of international and/or domestic airfare (if travel has been arranged), in the event he/she cancel from the program after matching with a family but prior to arrival at the host family home.

15. Au pair agrees to pay a $100.00 USD change fee and any applicable airfare penalties, in the event he/she requests to change their arrival date.

D. Responsibilities

16. Au Pair understands that during the first three (3) days of an au pair's stay in the home, a parent or another responsible adult shall remain in the home to facilitate the adjustment of the au pair into the family, household and community.

rev 12/18/2013                             Page 1 of 6                          Au Pair's Initials _____

HIGHLY CONFIDENTIAL ATTORNEY EYES ONLY          APC 000591
http://casper.aupaircare.com/apc/imageFrame.cfm?id=968720                        9/9/2016

# AuPairCare

17. Au Pair agrees to perform childcare services and light housekeeping related to childcare that shall not exceed forty-five (45) hours per week, five and one half (5 1/2) days per week, with a maximum of ten (10) hours per day. Au Pair will have one full weekend off per month (Friday evening to Monday morning). If a dispute arises as to any of these limits or requirements, AuPairCare shall resolve said dispute, and its decision shall be final.

18. Au Pair's responsibilities will be limited to childcare and child-related tasks for the Host Family. This may include duties such as general supervision, preparing and cleaning up after children's meals, straightening children's rooms, doing children's laundry, preparing the children for school, assisting with homework, and being present when children are sleeping. The Au Pair's responsibilities will not include heavy housework, yard work or other non-child related labor for the household. If a dispute arises concerning the scope of the Au Pair's responsibilities, AuPairCare shall resolve said dispute, and its decision shall be final.

19. Au Pair understands that U.S. Department of State regulations prohibit Au Pair employment beyond the au pair arrangement with the Host Family. Au Pair may not undertake any other paid work while in the U.S., including babysitting for Host Family for extra pay beyond the 45 hour weekly limit, babysitting for other families, or tutoring language students.

20. Au Pair is hereby advised and understands that if there is an infant under the age of two years old in the household, the au pair must have 200 hours of documented experience working with children under the age of two. Such documented experience shall be verified by AuPairCare prior to au pair placement.

21. Au Pair understands that in the event there is an infant under the age of three months in the household, a parent or other responsible adult shall be present in the home at all times, and Au Pair shall not be the sole caregiver for that child at any time.

22. Au Pair agrees to perform the childcare responsibilities to the best of his/ her ability, and make every effort to act as a caring, responsible Host Family member.

### E. Behavior and Comportment

23. Au Pair agrees to abide by Host Family rules as they are determined by the Host Family, and will behave as a responsible member of the Host Family at all times. If a dispute arises concerning the Host Family rules, AuPairCare shall resolve said dispute, and its decision shall be final. Au Pair understands that Host Family is not required to provide access to a car, personal phone line, personal television, computer or other perks.

24. If Au Pair is expected or permitted to drive the family car(s), Au Pair will obtain a valid international driver's license prior to arrival in the United States, and if required by law, obtain a U.S. driver's license at his/her own expense. Failure to do so may result in termination from the program.

25. Au Pair understands that if s/he is expected or permitted to drive the family car(s), the Host Family must provide sufficient automobile insurance to comply with all applicable laws, and which insurance shall in no event cover less than $10,000 in medical coverage. Au pair understands that it is their responsibility to ensure said policy is active throughout their program participation, if they will be expected or permitted to drive. Au Pair will not be responsible for payment of any automobile insurance deductibles that exceed $250 per accident. Au Pair agrees never to use the car(s) without the express permission of Host Family or to use the car for purposes not approved by the Host Family.

26. Au Pair agrees to follow all local and state laws concerning cell phone use and driving, and at a minimum agrees to not use a cell phone while driving a motor vehicle unless it has been connected to a hands-free device AND he/she has received permission from his/her Host Family to use said equipment. Failure to adhere to this agreement may result in immediate termination from the program.

27. Au Pair agrees not to web surf, send, or read text-based communication on electronic wireless communications devices, such as cell phones, while driving a motor vehicle. Failure to adhere to this agreement may result in immediate termination from the program.

28. Au Pair agrees not to hitchhike at any time, due to the dangerous nature of hitchhiking in the United States.

29. Au Pair agrees to exercise sound judgment and caution while participating in Internet-based communities, dating and social networking websites such as Facebook, Orkut, MySpace or other sites. Au Pair understands that Host Family information, including but not limited to phone numbers, addresses, family names, information about Host Family children, or photos of Host Family home and household members may not be posted online by Au Pair, without the Host Family's prior consent.

30. Au Pair agrees not to send, receive or view inappropriate content (sexual or violent) in the host family home, or outside of the home using the host family's equipment (i.e. computer, cell phone, handheld device, tablet, DVD player, television, etc.) by means of, but not limited to: live video, photos, pre-recorded videos, instant messages, sexting/texting, social media posts/updates. Failure to adhere to this agreement may result in immediate termination from the program.

31. Au Pair agrees not to buy, possess or consume any controlled or illegal substances, except those prescribed by a physician. Au Pair understands that the legal drinking age in the United States is age 21, and that the legal ramifications of underage drinking in the United States are serious and can result in immediate termination from the AuPairCare program. Au Pair agrees not to consume alcoholic beverages at any time if Au Pair is under the legal drinking age of 21. If Au Pair is of legal drinking age, Au Pair agrees not to excessively consume alcoholic beverages at any time. Au Pair agrees never to drive an automobile after consuming alcoholic beverages. Au Pair agrees never to consume alcoholic beverages while on duty caring for Host Family children. As with all other terms of this Agreement, if Au Pair violates this term of the Agreement, AuPairCare may in its sole discretion terminate Au Pair's participation in the program and immediately repatriate Au Pair to his/her home country at Au Pair's expense.

32. Au Pair agrees to abide by all local, state and federal laws. If Au Pair is arrested and/or is in police custody under suspicion of committing a crime, AuPairCare will not arrange or pay for legal assistance or representation for Au Pair. Au Pair will be responsible for resolving any legal matters independently and without the assistance of AuPairCare and its staff. As with all other terms of this Agreement, if Au Pair violates this term of the Agreement, AuPairCare may in its sole discretion terminate Au Pair's participation in the program and immediately repatriate Au Pair to his/her home country at Au Pair's expense.

33. Au Pair understands that the AuPairCare program is a smoke free program and agrees not to smoke while participating in the AuPairCare program. This includes, but is expressly not limited to, smoking in or around the Host Family home. As with all other terms of this

rev 12/18/2013

Au Pair's initials_____

HIGHLY CONFIDENTIAL ATTORNEY EYES ONLY

APC 000592

# AuPairCare

Agreement, if Au Pair violates this term of the Agreement, AuPairCare may in its sole discretion terminate Au Pair's participation in the program and immediately repatriate Au Pair to his/her home country at Au Pair's expense.

34. Au Pair understands and agrees that monitoring and recording devices, including but not limited to nanny cams may be implemented in common areas of the Host Family home in order to monitor Au Pair's performance and interaction with the child(ren) whom Au Pair is caring for, and consents thereto and waives any and all claim of privacy rights with respect thereto.

## F. Compensation and Financial Responsibility

35. Au Pair will receive room and board in the form of meals and a suitable private bedroom in Host Family's home, which has been approved by a local AuPairCare representative.

36. Au Pair will receive a weekly stipend in accordance with the U.S. Department of State Regulations in the amount of $195.75.  Said stipend shall be paid by the Host Family on the same mutually agreed upon day each week in the payment method chosen by the Host Family, and cannot be withheld for any reason.

37. Au Pair will receive two calendar weeks paid vacation (10-days), to be taken at mutually agreed upon times.  Vacation days shall accrue on the basis of one day per month from the beginning of Au Pair's third month in the U.S.  During Au Pair's extension program, Host Family will provide 9-month and 12-month extension Au Pair with two calendar weeks (10-days) of paid vacation, to be taken at mutually agreed upon times.  A 6-month extension Au Pair will receive one calendar week (5-days) of paid vacation. Vacation days shall accrue on the basis of one day per month from the beginning of the Au Pair's thirteenth month in the U.S. If any disputes arise concerning vacation issues, AuPairCare shall resolve said dispute, and its decision shall be final.

38. Au Pair understands that he/she is not entitled to paid or unpaid holiday time-off.

39. Au Pair will receive subsidy of educational costs from the Host Family as outlined in the "Training and Education Requirements" section of this document.

40. Upon successful completion of the program, Au Pair will receive a return flight airline ticket from AuPairCare to Au Pair's home country. Au Pair will be responsible for planning and paying for travel from the international destination airport to Au Pair's final destination in home country.  Au Pair understands that in the event Au Pair does not elect to use the return air ticket provided by AuPairCare for any reason, no refund, credit, or travel voucher will be provided.

41. Au Pair understands that in 1994, the U.S. Department of Labor determined that the au pair stipend constitutes "wages" because an employer-employee relationship exists between the au pair and the Host Family.  Au Pair's wages are essentially in the nature of household employment, and therefore Au Pair is required to file U.S. individual tax returns, even if no taxes are due.

42. Au Pair is responsible for complying with any Federal or state labor and/or income tax laws that may apply to Au Pair. AuPairCare does not provide legal advice regarding any such laws and is not responsible for informing Au Pair of, or overseeing compliance with, any such labor laws, including but not limited to Worker's Compensation laws and/or income or other tax laws which may vary from state to state, and are subject to change from time to time.

43. Au Pair is wholly responsible for personal expenses and management of personal finances. AuPairCare shall not be responsible for any personal bills incurred by the Au Pair or Host Family, such as (without limitation) telephone bills, automobile expenses, travel expenses, and/or health expenses not covered by insurance.  Accordingly, Au Pair agrees not to seek payment or assistance in recovering any such expenses or costs from AuPairCare.

## G. Travel and Accident Insurance

44. Au Pair will receive travel and accident insurance provided by AuPairCare through a third-party insurance carrier, and such coverage contains limitations and exclusions. Au Pair agrees to review the scope of said coverage and the limitations and exclusions contained therein prior to arrival in the United States. Said information can be accessed on AuPairCare's website: http://www.aupaircare.com/current-au-pair/insurance. Au Pair is advised and agrees that any disputes pertaining to coverage issues are strictly between Au Pair and the third-party insurance company, and agrees that AuPairCare is not responsible for any coverage issues and/or disputes. *Note: This section [43] does not apply to au pairs recruited by Originated Exchange Organization; STS Student Travel Schools AB. STS Travel School AB au pairs should refer to section [44].*

45. If recruited by Originating Organization, STS Student Travel Schools AB, Au Pair will receive travel and accident insurance provided by STS Student Travel Schools AB through a third-party insurance carrier, and such coverage contains limitations and exclusions. Au Pair agrees to review the scope of said coverage and the limitations and exclusions contained therein prior to arrival in the United States. Said information can be accessed by visiting www.falck.com/travelcare.  Au Pair is advised and agrees that any disputes pertaining to coverage issues are strictly between Au Pair and the third-party insurance company, and agrees that AuPairCare is not responsible for any coverage issues and/or disputes.

46. Au Pair understands that pre-existing medical conditions will not be covered by the third-party travel and accident insurance.

47. Au Pair understands that the dental insurance provided to them only covers injuries that are the result of an accident, and does not cover the cost of standard dental treatment.  It is therefore important for Au Pair to receive a thorough dental examination so that no unexpected complications arise during the period of residence abroad.

48. Au Pair represents that the medical history provided to AuPairCare is true, and gives full consent to release all medical and psychiatric history information to potential host families.

rev 12/18/2013

Au Pair's Initials_____

HIGHLY CONFIDENTIAL ATTORNEY EYES ONLY          APC 000593

# AuPairCare

49. If Au Pair's medical condition changes (including pregnancy), between the time of signing this document and Au Pair's departure to the U.S., Au Pair understands that s/he is required to notify AuPairCare and resubmit another Physician Verified Medical History document prior to arrival. As with all other terms of this Agreement, if Au Pair violates this term of the Agreement, AuPairCare may in its sole discretion terminate Au Pair's participation in the program and immediately repatriate Au Pair to his/her home country at Au Pair's expense.

50. Au Pair agrees that AuPairCare and/or its affiliates or agents may, without liability or expense to themselves, take whatever action they deem appropriate with regard to Au Pair's health and safety, including, but not limited to having Au Pair hospitalized for medical services and treatment. Au Pair further agrees that if hospitalization is not feasible for any reason, AuPairCare and/or its affiliates or agents may rely upon the advice and medical judgment of local medical staff in order to make a decision as to what is in Au Pair's best interests. Au Pair hereby gives full consent to be medically treated pursuant to the terms of set forth herein, and/or to undergo any treatment, including but not limited to surgery, which is determined to be necessary to Au Pair's health and well-being during Au Pair's stay abroad.

51. Insurance provided by AuPairCare is valid for 365 days from Au Pair's arrival in the US and Au Pair accepts responsibility for payment of an extension fee to receive any coverage after the 365 days.

52. Au Pair accepts full responsibility for any medical expenses which are not covered by the insurance policy provided by AuPairCare through a third party.

53. In the event Au Pair displays a serious medical condition that in the judgment of AuPairCare prevents the Au Pair from continuing in the program (including but not limited to mental illness, substance abuse, eating disorders and/or pregnancy), whether said condition is pre-existing or new, Au Pair will be terminated from the au pair program at AuPairCare's sole discretion.

### H. Training and Education Requirements

54. Au Pair agrees to complete 32 hours of training prior to arrival at Host Family home, as required by the United States Department of State. To meet this requirement, **Au Pair will attend in full the Au Pair Academy training program upon arrival in the United States and complete a required Pre-Departure Project** as defined by AuPairCare.

55. **Au Pair understands that all 12-month program Au Pairs are required to attend courses of study at an accredited U.S. post-secondary institution for a minimum of six (6) credit hours or its equivalent in credit hours.** Host Family will provide Au Pair with time off and provide adequate transportation to and from the place of instruction, and will pay tuition up to a maximum of $500 per au pair per year. Local AuPairCare Area Directors are available to provide information about this requirement and acceptable schools; however, it is Au Pair's responsibility to plan appropriately so that s/he is able to fulfill the requirement.

56. Au Pair understands that all courses shall be taken at mutually agreed upon times with the Host Family. Au Pair shall be responsible for costs associated with such educational study that exceed the amount paid by Host Family. Au Pair agrees to submit an Education Plan at the start of the program year to outline coursework plans. Au Pair agrees to provide documentation of coursework completion towards the end of the program year. In the event Au Pair does not complete the educational requirement, Au Pair will be ineligible to apply for an extension of the au pair program.

### I. Extension of Au Pair Program

57. Au Pair is hereby advised and understands that au pairs wishing to participate on the Extension Program must submit their application on or before AuPairCare's published deadline date and AuPairCare does not guarantee that AuPairCare or the Department of State will approve any extension request or that au pairs who choose to self-extend will match with a new Host Family.

58. Au Pair is hereby advised and understands that au pairs participating on the extension program will receive an updated DS-2019 form that reflects the 6, 9, or 12-month program extension. Although au pairs will have a valid DS-2019 form, the J-1 visa in his/her passport may have expired during the first 12-months of stay in the U.S. Any travel outside the U.S. is at the au pair's own risk, and AuPairCare cannot assist Au Pair or Host Family in resolving any visa concerns they may encounter.

59. Au Pair understands that **Extension Au Pairs are required to repeat the educational component** of the program during the extension time as follows: The educational component for a 6-month extension is not less than three (3) semester hours of academic credit or its equivalent. Host Family will contribute up to $250 toward the educational component. The educational component for a 9 and 12-month extension is not less than six (6) semester hours of academic credit or its equivalent. Host Family will contribute up to $500 toward the educational component.

60. Au Pair is hereby advised that by extending their program they must complete the new program terms in order to be eligible for a return flight home arranged by AuPairCare. In the event that the au pair chooses to leave the program early, he/she will be responsible for booking and paying for their own return flight home.

### J. Problem Resolution and Placement Changes

61. Au Pair is living as a member of a Host Family and is not under continual oversight or control of AuPairCare staff. Therefore, it is Au Pair's responsibility to promptly advise AuPairCare of any significant problems or events that occur during the program, including but not limited to Au Pair's health, safety, welfare, or adjustment to family, culture, or languages. For purposes of this Agreement, a "significant event or problem" is any change in Au Pair's circumstance that may affect an au pair's well-being and/or living situation.

62. Au Pair is hereby advised and understands that **AuPairCare requires an initial adjustment period of 60 days following Au Pair's arrival before any placement change is considered**; however, any decision regarding Au Pair removal is at AuPairCare's sole discretion and can be made at any time.

rev 12/18/2013

Au Pair's Initials_____

HIGHLY CONFIDENTIAL ATTORNEY EYES ONLY     APC 000594

# AuPairCare

63. Au Pair should notify the local AuPairCare representative of any misunderstandings or problems with the Host Family if they persist after Au Pair has tried to address them with Host Family.  AuPairCare will work with both Au Pair and Host Family to attempt to resolve the problem before authorizing a placement change.  **Au Pair must show a sustained good faith effort to resolve the issues with Host Family before AuPairCare will approve an Au Pair's request for a placement change.** If Au Pair does not make a good faith and substantial effort to resolve the problems or misunderstandings with Host Family, or if Au Pair violates any terms of this Agreement, AuPairCare may in its sole discretion terminate the Au Pair's participation in the program and immediately repatriate Au Pair to his/her home country at Au Pair's expense.

64. Au Pair understands that the nature of the au pair program is one of flexibility and cultural exchange, and that placement changes may not be requested in order to achieve a preferred work schedule, location, or perks provided by Host Family. Once Au Pair agrees to match with a Host Family, Au Pair has in effect agreed to that Host Family's required schedule, location and benefits provided by the Host Family to Au Pair.  Au Pair agrees to remain flexible in order to continually meet Host Family needs as they evolve over the course of the program year. **Changes in Host Family needs do not constitute grounds for Au Pair to request a placement change.**

65. In the event Au Pair's first placement is not successful, and AuPairCare determines in its sole judgment that Au Pair shall be placed in a new family, **Au Pair agrees to cooperate with AuPairCare during the entire re-matching process,** including but not limited to ensuring that potential new Host Families can easily reach Au Pair by e-mail and phone in a timely manner to arrange interviews.  Au Pair is hereby advised and agrees that a replacement Host Family will be provided at the sole discretion of AuPairCare and may be dependent upon current Host Family availability.  A replacement Host Family may not be available. In the event that AuPairCare is unable to provide a replacement Host Family within 14 days from the end of the first placement, Au Pair's participation in the program will end and Au Pair will have to return home at his/her personal expense.

66. If the Host Family is willing to house Au Pair until she or he is re-matched, and AuPairCare, in its sole discretion, determines that under the circumstances it would be reasonable for Au Pair to remain in the home, but the Au Pair refuses to stay with the family, Au Pair will be required to pay a $25.00 per day housing stipend to the party who houses him/her, typically an AuPairCare field staff member.

67. If Au Pair leaves the host family home without notice to AuPairCare and/ or Host Family and does not contact AuPairCare within 24 hours from departure, Au Pair may be subject to dismissal from the program, and Au Pair may be immediately repatriated to his/her home country at Au Pair's expense.

68. In the event Au Pair does not successfully complete their first year program, and extension program, if applicable, Au Pair is responsible for his/her return travel expenses.

69. AuPairCare is not responsible for any economic damage or loss alleged to arise from loss of or unavailability of a replacement Host Family.

70. Au Pair agrees that any decision regarding an au pair's program status, dismissal, or re-placement will be made at the sole discretion of AuPairCare, and said decisions shall be considered final.

71. In the event of accident or serious illness or medical condition that, in the judgment of AuPairCare, prevents Au Pair from continuing her/his duties, she/he will end the program early and return home.

### K. Other Terms and Conditions

72. Au Pair agrees to leave the United States within 30 days of the conclusion of his/her program.  Au Pair understands that any stay beyond the 30-day grace period is a direct breach of the Regulations of the Department of State, and that Au Pair's future ability to travel, work or live in the United States may be compromised.

73. Au Pair agrees not to enter into any kind of contractual agreement during the program year in the United States, including but not limited to business, employment, marital or religious contracts.

74. Au Pair understands that if he/she is terminated or voluntarily leaves the program for any reason, they are not eligible for the 30-day grace period benefit and must depart the United States immediately.

75. Au Pair consents and authorizes AuPairCare to use Au Pair's name, photographs, file, application content, video resume (video CV), or video likeness of Au Pair or any comments or statements from host in materials or publications to promote the AuPairCare program.

76. Au Pair understands that AuPairCare is not a party to any agreement between Au Pair and the Originating Exchange Organization located in Au Pair's home country ("Originating Exchange Organization").  Au Pair acknowledges and agrees that the Originating Exchange Organization is solely responsible to Au Pair for injury or damage from a violation of any such agreement. AuPairCare assumes no duties or responsibilities for any acts or omissions of the Originating Exchange Organization.

77. Au Pair agrees not to post any Host Family personal information, images or video online or in publicly accessible areas at any time, including before, during or after duration of official program year, without the Host Family's prior consent.

78. Au Pair understands that AuPairCare will make its best, reasonable and diligent efforts at locating and screening all Host Families. Au Pair agrees to assume the risks involved in the matching with a Host Family, and hereby irrevocably, unconditionally, and fully waives, releases and forever discharges AuPairCare, its subsidiaries, officers, employees, and/or agents from any and all claims related to personal and/or property damage, injury, loss, delay or expense incurred by Au Pair or any guest, employee or agent, due to:

(i) events beyond AuPairCare's reasonable control, including without limitation acts of God, acts of war or government actions or restrictions.

(ii) any events and/or acts directly or indirectly caused by any intentional or negligent acts or omissions at any time, in whole or in part, by any Au Pair and/or Host Family or by any third party, including but not limited to any member, guest, employee or agent of the Host Family or other persons in the host country, even if AuPairCare's negligence is alleged to have contributed to the event,

rev 12/18/2013

Au Pair's Initials_____

HIGHLY CONFIDENTIAL ATTORNEY EYES ONLY     APC 000595

Image                                                                                    Page 2 of 2

# AuPairCare

(iii) risks associated with foreign travel and living abroad, including but not limited to risks associated with health care services, living conditions, sanitation conditions, road and transportation systems, criminal justice systems, civil liberty laws, customs and values,

(iv) any differences in the living conditions and standards between Au Pair's home and home country and the host home and host country, and,

(v) any act or omission of the Originating Exchange Organization.

In this respect, Au Pair acknowledges that neither Host Family nor Au Pair are an employee or agent of AuPairCare and actions or omissions of Au Pair or Host Family are not to be attributed in any way to AuPairCare. Au Pair fully agrees to assume all such risks and agrees to indemnify and hold harmless AuPairCare, its subsidiaries, officers, employees and/or agents for any liability or expense, including court costs and legal fees incurred, that Au Pair has in any way caused or contributed to, whether directly or indirectly, and whether intentionally or unintentionally.

79.   This Agreement shall be deemed to have been made in the State of California, U.S., and its validity, construction, breach, performance and interpretation shall be governed by the laws of the State of California, U.S.

80.   The parties to the Agreement acknowledge and agree that any dispute or claim arising out of this Agreement, including but not limited to any resulting or related transaction or the relationship of the parties, shall be decided by neutral, exclusive and binding arbitration in San Francisco, California, U.S before an arbitration provider selected by AuPairCare, upon the petition of either party.

In such proceeding, the parties may utilize subpoenas and have discovery as provided in California Code of Civil Procedure Sections 1282.6, 1283 and 1283.05. The decision of the arbitrator shall be final and binding and may be enforced in any court of competent jurisdiction. Au Pair agrees that California is a fair and reasonable venue for resolution of any such dispute and it submits to jurisdiction of the Courts of the State of California because, among other reasons, this agreement was negotiated in large part in California, and AuPairCare is domiciled in California.

In the event that the arbitration clause is deemed void or inapplicable, each party expressly consents to and submits to the personal jurisdiction of the federal or state court(s) of San Francisco County, California, U.S. In any action, including arbitration, brought for breach of this Agreement, the prevailing party shall be entitled to recover reasonable attorney's fees and costs, including but not limited to the costs of arbitration

81.   If there are any differences between this Agreement and any other program materials, this Agreement shall control. AuPairCare cannot be legally bound or committed by any person other than a duly authorized representative. Parties are required to follow this Agreement and cannot vary from its terms.

82.   An electronic or facsimile signature on this Agreement shall be considered the same as an original.

**ENTIRE AGREEMENT**
Please read the following statements carefully. Your signature below indicates you have read and understood these statements and that you agree to them:

 •   I am capable of reading and understanding this Agreement in English
 •   I have had the opportunity to ask questions and obtain advice, to ensure I understand this Agreement in its entirety
 •   I accept the terms of this entire Agreement and understand that it is legally binding
 •   I do not rely on any promises, statements or representations that are not expressly stated in this Agreement
 •   No alteration of the terms of this Agreement will be valid unless approved by AuPairCare in writing
 •   I have retained a copy of this Agreement for my own records

Au Pair Full Name (Signature): _____

Au Pair Full Name (Print): _____          Date : _____
                                                                         Month /Day/Year

rev 12/18/2013                              Page 6 of 6                    Au Pair's Initials _____

HIGHLY CONFIDENTIAL ATTORNEY EYES ONLY

# ATTACHMENT B



# AU PAIR AGREEMENT

This AuPairCare Au Pair Agreement (the "Agreement") is entered into between AuPairCare, a California Corporation and "Au Pair" (first and last name of Au Pair) _____ _____ of (City) _____, (Country) _____". Au Pair has fully read this Agreement and agrees to the terms and conditions contained herein. "Host Family" is the family in the United States with whom Au Pair has agreed to match, and with whom Au Pair will live and work.

## A. General Provisions

Au Pair is hereby advised and acknowledges that the parties agree as follows:

1. Au Pair will abide by the terms and conditions of this Agreement for the duration of Au Pair's participation in the AuPairCare program, unless and until this Agreement is replaced or modified by a subsequent written agreement executed by AuPairCare and Au Pair.

2. Au Pair is hereby advised and acknowledges that all Au Pairs are participants in a cultural exchange program, and agrees to comply with all of the regulations published by U.S. Department of State in 22 CFR Part 514, as the same may be amended from time to time in the future ("the Regulations"). Said regulations can be found by visiting: http://exchanges.state.gov/jexchanges/index.html.

3. Au Pair represents that all information provided throughout the application process is true and that no relevant information has been excluded or misrepresented in the application process and documents, including representation of the level of English proficiency, health and / or childcare experience. Au Pair agrees that all such disclosures will be full and accurate, up to and through the date of departure from Au Pair's country of origin.

4. Au Pair agrees to complete all visa screening requirements in accordance with the instructions given and will be responsible for obtaining a valid passport and complying with all vaccinations and immunization requirements.

5. Au Pair agrees to immediately amend any disclosures should new information become available to Au Pair in any regard or at any time of participation in the program. Au Pair represents that s/he will personally conduct all written and phone correspondence with Host Family during the interviewing process. Au Pair understands that exaggeration or falsification of any application information by Au Pair, references or Originating Exchange Organization may result in immediate dismissal from the program and return to Au Pair's home country at Au Pair's expense.

6. AuPairCare has the exclusive right to determine suitability of Au Pair to participate in the program both before and during participation in the program. Au Pair agrees that in determining suitability, AuPairCare may make inquiries to third parties about Au Pair, including but not limited to medical personnel and insurance agencies otherwise covered by federal HIPAA regulations.

7. Au Pair understands that they cannot be married, engaged to be married or have children of their own and participate in AuPairCare's au pair program.

8. Au Pair is not an employee, agent or independent contractor of AuPairCare, and AuPairCare does not exercise dominion or control over the actions of the Host Family.

## B. Fees and Program Costs

9. Participation in the AuPairCare program requires Au Pair to pay a non-refundable program fee to Originating Exchange Organization.

10. Originating Exchange Organization may charge Au Pair additional fees to cover their administrative costs in promoting the AuPairCare program and processing au pair applications. The fees may include, but are not limited to, an application fee, processing fee, handling fee, and interview fee. These fees may vary across Originating Exchange Organizations. AuPairCare assumes no duties or responsibilities for any acts or omissions of the Originating Exchange Organization regarding additional fees.

11. Au Pair will be responsible for additional costs, including but not limited to, baggage check fees for arrival and return flights, personal expenses while at the Au Pair arrival orientation, medical expenses not covered by insurance and all incidentals and personal expenses while on the program. Au Pairs should be prepared to cover these costs.

12. Au pair will pay all applicable fees to Originating Exchange Organization before beginning travel to this United States. Au Pair may not under any circumstances solicit funds from Host Family for to cover personal costs of program, including but not limited to fees due to the Originating Exchange Organization, costs associated with securing a visa, or incidental travel costs.

13. Au Pair agrees that s/he has adequate financial resources to satisfy all obligations as an AuPairCare Au Pair, including payment for a return flight if Au Pair does not successfully complete the program.

## C. Au Pair Cancellations/Flight Change Requests

14. Au pair agrees to pay a $300.00 USD cancellation fee, plus the actual cost of International and/or domestic airfare (if travel has been arranged), in the event he/she cancel from the program after matching with a family but prior to arrival at the host family home.

15. Au pair agrees to pay a $300.00 USD change fee and any applicable airfare penalties, in the event he/she requests to change their arrival date.

## D. Responsibilities

16. Au Pair understands that during the first three (3) days of an au pair's stay in the home, a parent or another responsible adult shall remain in the home to facilitate the adjustment of the au pair into the family, household and community.

17. Au Pair agrees to perform childcare services and light housekeeping related to childcare that shall not exceed forty-five (45) hours per week, five and one half (5 1/2) days per week, with a maximum of ten (10) hours per day. Au Pair will have one full weekend off per

rev 02/11/2013

Page 1 of 6

Au Pair's Initials_____

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY   APC 000490



month (Friday evening to Monday morning). If a dispute arises as to any of these limits or requirements, AuPairCare shall resolve said dispute, and its decision shall be final.

18.  Au Pair's responsibilities will be limited to childcare and child-related tasks for the Host Family. This may include duties such as general supervision, preparing and cleaning up after children's meals, straightening children's rooms, doing children's laundry, preparing the children for school, assisting with homework, and being present when children are sleeping. The Au Pair's responsibilities will not include heavy housework, yard work or other non-child related labor for the household. If a dispute arises concerning the scope of the Au Pair's responsibilities, AuPairCare shall resolve said dispute, and its decision shall be final.

19.  Au Pair understands that U.S. Department of State regulations prohibit Au Pair employment beyond the au pair arrangement with the Host Family. Au Pair may not undertake any other paid work while in the U.S., including babysitting for Host Family for extra pay beyond the 45 hour weekly limit, babysitting for other families, or tutoring language students.

20.  Au Pair is hereby advised and understands that if there is an infant under the age of two years old in the household, the au pair must have 200 hours of documented experience working with children under the age of two. Such documented experience shall be verified by AuPairCare prior to au pair placement.

21.  Au Pair understands that in the event there is an infant under the age of three months in the household, a parent or other responsible adult shall be present in the home at all times, and Au Pair shall not be the sole caregiver for that child at any time.

22.  Au Pair agrees to perform the childcare responsibilities to the best of his/ her ability, and make every effort to act as a caring, responsible Host Family member.

### E. Behavior and Comportment

23.  Au Pair agrees to abide by Host Family rules as they are determined by the Host Family, and will behave as a responsible member of the Host Family at all times. If a dispute arises concerning the Host Family rules, AuPairCare shall resolve said dispute, and its decision shall be final. Au Pair understands that Host Family is not required to provide access to a car, personal phone line, personal television, computer or other perks.

24.  If Au Pair is expected or permitted to drive the family car(s), Au Pair will obtain a valid international driver's license prior to arrival in the United States, and if required by law, obtain a U.S. driver's license at his/her own expense. Failure to do so may result in termination from the program.

25.  Au Pair understands that if s/he is expected or permitted to drive the family car(s), the Host Family must provide sufficient automobile insurance to comply with all applicable laws, and which insurance shall in no event cover less than $10,000 in medical coverage. Au pair understands that it is their responsibility to ensure said policy is active throughout their program participation, if they will be expected or permitted to drive. Au Pair will not be responsible for payment of any automobile insurance deductibles that exceed $250 per accident. Au Pair agrees never to use the car(s) without the express permission of Host Family or to use the car for purposes not approved by the Host Family.

26.  Au Pair agrees to follow all local and state laws concerning cell phone use and driving, and at a minimum agrees to not use a cell phone while driving a motor vehicle unless it has been connected to a hands-free device AND he/she has received permission from his/her Host Family to use said equipment. Failure to adhere to this agreement may result in immediate termination from the program.

27.  Au Pair agrees not to web surf, send, or read text-based communication on electronic wireless communications devices, such as cell phones, while driving a motor vehicle. Failure to adhere to this agreement may result in immediate termination from the program.

28.  Au Pair agrees not to hitchhike at any time, due to the dangerous nature of hitchhiking in the United States.

29.  Au Pair agrees to exercise sound judgment and caution while participating in internet-based communities, dating and social networking websites such as Facebook, Orkut, MySpace or other sites. Au Pair understands that Host Family information, including but not limited to phone numbers, addresses, family names, information about Host Family children, or photos of Host Family home and household members may not be posted online by Au Pair, without the Host Family's prior consent.

30.  Au Pair agrees not to buy, possess or consume any controlled or illegal substances, except those prescribed by a physician. Au Pair understands that the legal drinking age in the United States is age 21, and that the legal ramifications of underage drinking in the United States are serious and can result in immediate termination from the AuPairCare program. Au Pair agrees not to consume alcoholic beverages at any time if Au Pair is under the legal drinking age of 21. If Au Pair is of legal drinking age, Au Pair agrees not to excessively consume alcoholic beverages at any time. Au Pair agrees never to drive an automobile after consuming alcoholic beverages. Au Pair agrees never to consume alcoholic beverages while on duty caring for Host Family children. As with all other terms of this Agreement, if Au Pair violates this term of the Agreement, AuPairCare may in its sole discretion terminate Au Pair's participation in the program and immediately repatriate Au Pair to his/her home country at Au Pair's expense.

31.  Au Pair agrees to abide by all local, state and federal laws. If Au Pair is arrested and/or is in police custody under suspicion of committing a crime, AuPairCare will not arrange or pay for legal assistance or representation for Au Pair. Au Pair will be responsible for resolving any legal matters independently and without the assistance of AuPairCare and its staff. As with all other terms of this Agreement, if Au Pair violates this term of the Agreement, AuPairCare may in its sole discretion terminate Au Pair's participation in the program and immediately repatriate Au Pair to his/her home country at Au Pair's expense.

32.  Au Pair understands that the AuPairCare program is a smoke free program and agrees not to smoke while participating in the AuPairCare program. This includes, but is expressly not limited to, smoking in or around the Host Family home. As with all other terms of this Agreement, if Au Pair violates this term of the Agreement, AuPairCare may in its sole discretion terminate Au Pair's participation in the program and immediately repatriate Au Pair to his/her home country at Au Pair's expense.

rev 2/11/2013

Au Pair's Initials_____

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY   APC 000491

AuPairCare

33.  Au Pair understands and agrees that monitoring and recording devices, including but not limited to nanny cams may be implemented in common areas of the Host Family home in order to monitor Au Pair's performance and interaction with the child(ren) whom Au Pair is caring for, and consents thereto and waives any and all claim of privacy rights with respect thereto.

## F. Compensation and Financial Responsibility

34.  Au Pair will receive room and board in the form of meals and a suitable private bedroom in Host Family's home, which has been approved by a local AuPairCare representative.

35.  Au Pair will receive a weekly stipend in accordance with the U.S. Department of State Regulations in the amount of $195.75. Said stipend shall be paid by the Host Family on the same mutually agreed upon day each week in the payment method chosen by the Host Family, and cannot be withheld for any reason.

36.  Au Pair will receive two calendar weeks paid vacation (10-days), to be taken at mutually agreed upon times. Vacation days shall accrue on the basis of one day per month from the beginning of Au Pair's third month in the U.S. During Au Pair's extension program, Host Family will provide 9-month and 12-month extension Au Pair with two calendar weeks (10-days) of paid vacation, to be taken at mutually agreed upon times. A 6-month extension Au Pair will receive one calendar week (5-days) of paid vacation. Vacation days shall accrue on the basis of one day per month from the beginning of the Au Pair's thirteenth month in the U.S. If any disputes arise concerning vacation issues, AuPairCare shall resolve said dispute, and its decision shall be final.

37.  Au Pair understands that he/she is not entitled to paid or unpaid holiday time-off.

38.  Au Pair will receive subsidy of educational costs from the Host Family as outlined in the "Training and Education Requirements" section of this document.

39.  Upon successful completion of the program, Au Pair will receive a return flight airline ticket from AuPairCare to Au Pair's home country. Au Pair will be responsible for planning and paying for travel from the international destination airport to Au Pair's final destination in home country. Au Pair understands that in the event Au Pair does not elect to use the return air ticket provided by AuPairCare for any reason, no refund, credit, or travel voucher will be provided.

40.  Au Pair understands that in 1994, the U.S. Department of Labor determined that the au pair stipend constitutes "wages" because an employer-employee relationship exists between the au pair and the Host Family. Au Pair's wages are essentially in the nature of household employment, and therefore Au Pair is required to file U.S. individual tax returns, even if no taxes are due.

41.  Au Pair is responsible for complying with any Federal or state labor and/or income tax laws that may apply to Au Pair. AuPairCare does not provide legal advice regarding any such laws and is not responsible for informing Au Pair of, or overseeing compliance with, any such labor laws, including but not limited to Worker's Compensation laws and/or income or other tax laws which may vary from state to state, and are subject to change from time to time.

42.  Au Pair is wholly responsible for personal expenses and management of personal finances. AuPairCare shall not be responsible for any personal bills incurred by the Au Pair or Host Family, such as (without limitation) telephone bills, automobile expenses, travel expenses, and/or health expenses not covered by insurance. Accordingly, Au Pair agrees not to seek payment or assistance in recovering any such expenses or costs from AuPairCare.

## G. Travel and Accident Insurance

43.  Au Pair will receive travel and accident insurance provided by AuPairCare through a third-party insurance carrier, and such coverage contains limitations and exclusions. Au Pair agrees to review the scope of said

coverage and the limitations and exclusions contained therein prior to arrival in the United States. Said information can be accessed on AuPairCare's website, www.aupaircare.com. Au Pair is advised and agrees that any disputes pertaining to coverage issues are strictly between Au Pair and the third-party insurance company, and agrees that AuPairCare is not responsible for any coverage issues and/or disputes.

44.  Au Pair understands that pre-existing medical conditions will not be covered by the third-party travel and accident insurance.

45.  Au Pair understands that the dental insurance provided to them only covers injuries that are the result of an accident, and does not cover the cost of standard dental treatment. It is therefore important for Au Pair to receive a thorough dental examination so that no unexpected complications arise during the period of residence abroad.

46.  Au Pair represents that the medical history provided to AuPairCare is true, and gives full consent to release all medical and psychiatric history information to potential host families.

47.  If Au Pair's medical condition changes (including pregnancy), between the time of signing this document and Au Pair's departure to the U.S., Au Pair understands that s/he is required to notify AuPairCare and resubmit another Physician Verified Medical History document prior to arrival. As with all other terms of this Agreement, if Au Pair violates this term of the Agreement, AuPairCare may in its sole discretion terminate Au Pair's participation in the program and immediately repatriate Au Pair to his/her home country at Au Pair's expense.

48.  Au Pair agrees that AuPairCare and/or its affiliates or agents may, without liability or expense to themselves, take whatever action they deem appropriate with regard to Au Pair's health and safety, including, but not limited to having Au Pair hospitalized for medical services and treatment. Au Pair further agrees that if hospitalization is not feasible for any reason, AuPairCare and/or its affiliates or agents may rely upon the advice and medical judgment of local medical staff in order to make a decision as to what is in Au Pair's best interests. Au Pair hereby gives full consent to be medically treated pursuant to the terms of set forth herein, and/or to undergo any treatment, including but not limited to surgery, which is determined to be necessary to Au Pair's health and well-being during Au Pair's stay abroad.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY  APC 000492



49. Insurance provided by AuPairCare is valid for 365 days from Au Pair's arrival in the US and Au Pair accepts responsibility for payment of an extension fee to receive any coverage after the 365 days.

50. Au Pair accepts full responsibility for any medical expenses which are not covered by the insurance policy provided by AuPairCare through a third party.

51. In the event Au Pair displays a serious medical condition that in the judgment of AuPairCare prevents the Au Pair from continuing in the program (including but not limited to mental illness, substance abuse, eating disorders and/or pregnancy), whether said condition is pre-existing or new, Au Pair will be terminated from the au pair program at AuPairCare's sole discretion.

## H. Training and Education Requirements

52. Au Pair agrees to complete 32 hours of training prior to arrival at Host Family home, as required by the United States Department of State. To meet this requirement, Au Pair will attend in full the Au Pair Academy training program upon arrival in the United States and complete a required Pre-Departure Project as defined by AuPairCare.

53. Au Pair understands that all 12-month program Au Pairs are required to attend courses of study at an accredited U.S. post-secondary institution for a minimum of six (6) credit hours or its equivalent in credit hours. Host Family will provide Au Pair with time off and provide adequate transportation to and from the place of instruction, and will pay tuition up to a maximum of $500 per au pair per year. Local AuPairCare Area Directors are available to provide information about this requirement and acceptable schools; however, it is Au Pair's responsibility to plan appropriately so that s/he is able to fulfill the requirement.

54. Au Pair understands that all courses shall be taken at mutually agreed upon times with the Host Family. Au Pair shall be responsible for costs associated with such educational study that exceed the amount paid by Host Family. Au Pair agrees to submit an Education Plan at the start of the program year to outline coursework plans. Au Pair agrees to provide documentation of coursework completion towards the end of the program year. In the event Au Pair does not complete the educational requirement, Au Pair will be ineligible to apply for an extension of the au pair program.

## I. Extension of Au Pair Program

55. Au Pair is hereby advised and understands that au pairs wishing to participate on the Extension Program must submit their application on or before AuPairCare's published deadline date and AuPairCare does not guarantee that AuPairCare or the Department of State will approve any extension request or that au pairs who choose to self-extend will match with a new Host Family.

56. Au Pair is hereby advised and understands that au pairs participating on the extension program will receive an updated DS-2019 form that reflects the 6, 9, or 12-month program extension. Although au pairs will have a valid DS-2019 form, the J-1 visa in his/her passport may have expired during the first 12-months of stay in the U.S. Any travel outside the U.S. is at the au pair's own risk, and AuPairCare cannot assist Au Pair or Host Family in resolving any visa concerns they may encounter.

57. Au Pair understands that Extension Au Pairs are required to repeat the educational component of the program during the extension time as follows: The educational component for a 6-month extension is not less than three (3) semester hours of academic credit or its equivalent. Host Family will contribute up to $250 toward the educational component. The educational component for a 9 and 12-month extension is not less than six (6) semester hours of academic credit or its equivalent. Host Family will contribute up to $500 toward the educational component.

## J. Problem Resolution and Placement Changes

58. Au Pair is living as a member of a Host Family and is not under continual oversight or control of AuPairCare staff. Therefore, it is Au Pair's responsibility to promptly advise AuPairCare of any significant problems or events that occur during the program, including but not limited to Au Pair's health, safety, welfare, or adjustment to family, culture, or languages. For purposes of this Agreement, a "significant event or problem" is any change in Au Pair's circumstance that may affect an au pair's well-being and/or living situation.

59. Au Pair is hereby advised and understands that AuPairCare requires an initial adjustment period of 60 days following Au Pair's arrival before any placement change is considered; however, any decision regarding Au Pair removal is at AuPairCare's sole discretion and can be made at any time.

60. Au Pair should notify the local AuPairCare representative of any misunderstandings or problems with the Host Family if they persist after Au Pair has tried to address them with Host Family. AuPairCare will work with both Au Pair and Host Family to attempt to resolve the problem before authorizing a placement change. Au Pair must show a sustained good faith effort to resolve the issues with Host Family before AuPairCare will approve an Au Pair's request for a placement change. If Au Pair does not make a good faith and substantial effort to resolve the problems or misunderstandings with Host Family, or if Au Pair violates any terms of this Agreement, AuPairCare may in its sole discretion terminate the Au Pair's participation in the program and immediately repatriate Au Pair to his/her home country at Au Pair's expense.

61. Au Pair understands that the nature of the au pair program is one of flexibility and cultural exchange, and that placement changes may not be requested in order to achieve a preferred work schedule, location, or perks provided by Host Family. Once Au Pair agrees to match with a Host Family, Au Pair has in effect agreed to that Host Family's required schedule, location and benefits provided by the Host Family to Au Pair. Au Pair agrees to remain flexible in order to continually meet Host Family needs as they evolve over the course of the program year. Changes in Host Family needs do not constitute grounds for Au Pair to request a placement change.

62. In the event Au Pair's first placement is not successful, and AuPairCare determines in its sole judgment that Au Pair shall be placed in a new family, Au Pair agrees to cooperate with AuPairCare during the entire re-matching process, including but not limited to ensuring

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY   APC 000493



that potential new Host Families can easily reach Au Pair by e-mail and phone in a timely manner to arrange interviews.  Au Pair is hereby advised and agrees that a replacement Host Family will be provided at the sole discretion of AuPairCare and may be dependent upon current Host Family availability.  A replacement Host Family may not be available. In the event that AuPairCare is unable to provide a replacement Host Family within 14 days from the end of the first placement, Au Pair's participation in the program will end and Au Pair will have to return home at his/her personal expense.

63.   If the Host Family is willing to house Au Pair until she or he is re-matched, and AuPairCare, in its sole discretion, determines that under the circumstances it would be reasonable for Au Pair to remain in the home, but the Au Pair refuses to stay with the family, Au Pair will be required to pay a \$25.00 per day housing stipend to the party who houses him/her, typically an AuPairCare field staff member.

64.   If Au Pair leaves the host family home without notice to AuPairCare and/ or Host Family and does not contact AuPairCare within 24 hours from departure, Au Pair may be subject to dismissal from the program, and Au Pair may be immediately repatriated to his/her home country at Au Pair's expense.

65.   In the event Au Pair does not successfully complete the program year, Au Pair is responsible for his/her return travel expenses.

66.   AuPairCare is not responsible for any economic damage or loss alleged to arise from loss of or unavailability of a replacement Host Family.

67.   Au Pair agrees that any decision regarding an au pair's program status, dismissal, or re-placement will be made at the sole discretion of AuPairCare, and said decisions shall be considered final.

68.   In the event of accident or serious illness or medical condition that, in the judgment of AuPairCare, prevents Au Pair from continuing her/his duties, she/he will end the program early and return home.

### K. Other Terms and Conditions

69.   Au Pair agrees to leave the United States within 30 days of the conclusion of his/her program.  Au Pair understands that any stay beyond the 30-day grace period is a direct breach of the Regulations of the Department of State, and that Au Pair's future ability to travel, work or live in the United States may be compromised.

70.   Au Pair agrees not to enter into any kind of contractual agreement during the program year in the United States, including but not limited to business, employment, marital or religious contracts.

71.   Au Pair understands that if he/she is terminated or voluntarily leaves the program for any reason, they are not eligible for the 30-day grace period benefit and must depart the United States immediately.

72.   Au Pair consents and authorizes AuPairCare to use Au Pair's name, photographs, file, application content, video resume (video CV), or video likeness of Au Pair or any comments or statements from host in materials or publications to promote the AuPairCare program.

73.   Au Pair understands that AuPairCare is not a party to any agreement between Au Pair and the Originating Exchange Organization located in Au Pair's home country ("Originating Exchange Organization").  Au Pair acknowledges and agrees that the Originating Exchange Organization is solely responsible to Au Pair for injury or damage from a violation of any such agreement.  AuPairCare assumes no duties or responsibilities for any acts or omissions of the Originating Exchange Organization.

74.   Au Pair agrees not to post any Host Family personal information, images or video online or in publicly accessible areas at any time, including before, during or after duration of official program year, without the Host Family's prior consent.

75.   Au Pair understands that AuPairCare will make its best, reasonable and diligent efforts at locating and screening all Host Families. Au Pair agrees to assume the risks involved in the matching with a Host Family, and hereby irrevocably, unconditionally, and fully waives, releases and forever discharges AuPairCare, its subsidiaries, officers, employees, and/or agents from any and all claims related to personal and/or property damage, injury, loss, delay or expense incurred by Au Pair or any guest, employee or agent, due to:

(i) events beyond AuPairCare's reasonable control, including without limitation acts of God, acts of war or government actions or restrictions.

(ii) any events and/or acts directly or indirectly caused by any intentional or negligent acts or omissions at any time, in whole or in part, by any Au Pair and/or Host Family or by any third party, including but not limited to any member, guest, employee or agent of the Host Family or other persons in the host country, even if AuPairCare's negligence is alleged to have contributed to the event,

(iii) risks associated with foreign travel and living abroad, including but not limited to risks associated with health care services, living conditions, sanitation conditions, road and transportation systems, criminal justice systems, civil liberty laws, customs and values,

(iv) any differences in the living conditions and standards between Au Pair's home and home country and the host home and host country, and,

(v) any act or omission of the Originating Exchange Organization.

In this respect, Au Pair acknowledges that neither Host Family nor Au Pair are an employee or agent of AuPairCare and actions or omissions of Au Pair or Host Family are not to be attributed in any way to AuPairCare.  Au Pair fully agrees to assume all such risks and agrees to indemnify and hold harmless AuPairCare, its subsidiaries, officers, employees and/or agents for any liability or expense, including court costs and legal fees incurred, that Au Pair has in any way caused or contributed to, whether directly or indirectly, and whether intentionally or unintentionally.

rev 2/11/2013                                                                                                    Au Pair's Initials_____

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY  APC 000494



76. This Agreement shall be deemed to have been made in the State of California, U.S., and its validity, construction, breach, performance and interpretation shall be governed by the laws of the State of California, U.S.

77. The parties to the Agreement acknowledge and agree that any dispute or claim arising out of this Agreement, including but not limited to any resulting or related transaction or the relationship of the parties, shall be decided by neutral, exclusive and binding arbitration in San Francisco, California, U.S before an arbitration provider selected by AuPairCare, upon the petition of either party.

In such proceeding, the parties may utilize subpoenas and have discovery as provided in California Code of Civil Procedure Sections 1282.6, 1283 and 1283.05. The decision of the arbitrator shall be final and binding and may be enforced in any court of competent jurisdiction. Au Pair agrees that California is a fair and reasonable venue for resolution of any such dispute and it submits to jurisdiction

of the Courts of the State of California because, among other reasons, this agreement was negotiated in large part in California, and AuPairCare is domiciled in California.

In the event that the arbitration clause is deemed void or inapplicable, each party expressly consents to and submits to the personal jurisdiction of the federal or state court(s) of San Francisco County, California, U.S. in any action, including arbitration, brought for breach of this Agreement, the prevailing party shall be entitled to recover reasonable attorney's fees and costs, including but not limited to the costs of arbitration

78. If there are any differences between this Agreement and any other program materials, this Agreement shall control. AuPairCare cannot be legally bound or committed by any person other than a duly authorized representative. Parties are required to follow this Agreement and cannot vary from its terms.

79. An electronic or facsimile signature on this Agreement shall be considered the same as an original.

ENTIRE AGREEMENT
Please read the following statements carefully. Your signature below indicates you have read and understood these statements and that you agree to them:

* I am capable of reading and understanding this Agreement in English
* I have had the opportunity to ask questions and obtain advice, to ensure I understand this Agreement in its entirety
* I accept the terms of this entire Agreement and understand that it is legally binding
* I do not rely on any promises, statements or representations that are not expressly stated in this Agreement
* No alteration of the terms of this Agreement will be valid unless approved by AuPairCare in writing
* I have retained a copy of this Agreement for my own records

Au Pair Full Name (Signature): _____

Au Pair Full Name (Print): _____        Date : _____

                                                                  Month/Day/Year

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY   APC 000495

# ATTACHMENT C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1: 14-cv-03074-CMA-KMT

JOHANA PAOLA BELTRAN; and those similarly situated,

      Plaintiffs,

v.

INTEREXCHANGE, INC.;
USAUPAIR, INC.;
GREATAUPAIR, LLC;
EXPERT GROUP INTERNATIONAL INC., DBA EXPERT AUPAIR;
EURAUPAIR INTERCULTURAL CHILD CARE PROGRAMS;
CULTURAL HOMESTAY INTERNATIONAL;
CULTURAL CARE, INC. D/B/A CULTURAL CARE AU PAIR;
AUPAIRCARE, INC.;
AU PAIR INTERNATIONAL, INC.;
APF GLOBAL EXCHANGE, NFP;
AMERICAN INSTITUTE FOR FOREIGN STUDY DBA AU PAIR IN AMERICA;
AMERICAN CULTURAL EXCHANGE, LLC, DBA GOAUPAIR;
AGENT AU PAIR;
A.P.E.X. AMERICAN PROFESSIONAL EXCHANGE, LLC DBA PROAUPAIR; and
20/20 CARE EXCHANGE, INC. DBA THE INTERNATIONAL AU PAIR EXCHANGE

      Defendants.

---

## DEFENDANT AUPAIRCARE, INC.'S ANSWER
## TO PLAINTIFFS' SECOND REQUEST FOR PRODUCTION

---

Defendant AuPairCare, Inc. ("Defendant," "AuPairCare" or "Responding Party"), by counsel, Gordon & Rees LLP, submits the following response to Plaintiffs' Second Requests for Production of Documents pursuant to Fed.R.Civ.P. 34:

## GENERAL OBJECTIONS

Defendant makes the following general objections, to which each of the responses set forth below is subject:

A.    Defendant objects to these requests on the grounds that any alleged disputes between it and the au pairs it has sponsored are subject to mandatory arbitration provisions.  Therefore, as to AuPairCare, discovery propounded under the auspices of this court proceeding is improper.  AuPairCare expressly reserves the right to move to dismiss this action and/or compel arbitration.  Nothing in these responses or objections may be deemed a waiver of that right.

B.    Defendant objects to Plaintiffs' instructions to the extent they require acts inconsistent with the Federal Rules of Civil Procedure or the Local Rules of this Court.

C.    Defendant objects to Plaintiffs' requests for production to the extent they improperly seek class-wide merits or damages discovery before any class or collective action has been certified or any motion for certification filed.  At present, the only plaintiffs in this case are the named Plaintiffs.  In particular but without limitation, Defendant objects to requests seeking the identity of and private and confidential information concerning putative class members prior to class certification.

D.    Defendant generally objects to Plaintiffs' requests for production of documents to the extent that Plaintiff seeks financial information and documents. Evidence of a defendant's financial status is not discoverable.  Absent relevancy

- 2 -

and a compelling need, a party may not obtain a defendant's financial records through discovery.  See *Bonanno v. Quizno's Franchise Co. LLC,* 255 F.R.D. 550, 555-56 (D. Colo. 2009) (*citing Stone v. State Farm Mut. Auto. Ins. Co.,* 185 P.3d 150, 159 (Colo. 2008)); *In re Dist. Ct., City & Cnty. of Denver,* 256 P.3d 687, 691 (2011); *Corbetta v. Albertson's, Inc.,* 975 P.2d 718, 721 n.4, 723 (Colo. 1999); *see also Leidholt v. Dist. Ct.,* 619 P.2d 768, 770 (Colo. 1980); *Packard v. Moore,* 71 P.2d 922 (Cal. 1937); *Baggett v. Davis,* 169 So. 372 (Fla. 1936); *Laidlaw v. Sage,* 52 N.E. 679 (N.Y. 1899); and 1 Jones on Evidence, §§ 4.48, 49 (6th ed. 1972)).

E.    Defendant objects to Plaintiffs' requests for production to the extent they seek information pertaining to claims in the First Amended Complaint that are not brought against Defendant.

F.    Defendant objects to Plaintiffs' requests for production to the extent they require production of attorney-client or work product privileged information. Defendant's production of such privileged materials is unintentional and inadvertent. Defendant requests that Plaintiff immediately return to Defendant all documents that appear to be subject to the attorney-client privilege or work product doctrine.

G.    Defendant objects to Plaintiffs' requests for production to the extent they would require production of Defendant's proprietary business information or trade secrets.

H.    Defendant objects to Plaintiffs' requests for production to the extent they would require production of documents and things that are not in Defendant's possession, custody, or control.

- 3 -

I.      Defendant objects to Plaintiffs' requests for production to the extent they seek information that violates the privacy rights of non-parties.

J.      A response that Defendant "will produce" responsive documents means that if such documents exist, are within Defendant's possession, custody and control, and are not privileged, they will be produced subject to the Court's protective order.

K.      Defendant objects to Plaintiffs' requests for production to the extent they are irrelevant and reserves all rights and objections with respect to relevance, materiality and admissibility.

L.      Defendant objects to Plaintiffs' requests for production pursuant to Fed.R.Civ.P. 26(b)(1) to the extent they are not proportional to the needs of the case or seek information that is not proportional to the needs of the case.

M.      Defendant's production of documents shall be subject to the Protective Order entered by the Court on May 6, 2016.

N.      Defendant reserves the right to supplement its responses as additional information and things are discovered, if any.

## RESPONSE TO REQUEST FOR PRODUCTION

**REQUEST FOR PRODUCTION NO. 21:** All arbitration agreements that you contend apply to these claims.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 21:**

Defendant objects to this request on the grounds that any alleged disputes between it and the au pairs it has sponsored are subject to mandatory arbitration

- 4 -

provisions.   Therefore, as to AuPairCare, discovery propounded under the auspices of this court proceeding is improper.   AuPairCare expressly reserves the right to dismiss this action and/or move to compel arbitration.   Nothing in these responses or objections may be deemed a waiver of that right.

Defendant further objects to this request on the grounds it improperly seeks class-wide discovery before any class or collective action has been certified, conditionally or otherwise, and before any motion for certification has been filed.   At present, the only parties to whom documents are properly discoverable are the named Plaintiffs.

Defendant objects to this request for production on the grounds that it seeks documents that are subject to AuPairCare's privacy policy.   Defendant further objects to this request on the grounds that it seeks information that is proprietary and confidential to AuPairCare.

Subject to and without waiving these objections, Defendant previously produced sample form contracts between it and au pair sponsor candidates.   See APC 000254 – APC 000298 (Attorney Eyes Only and Confidential documents).   Examples of applicable arbitration agreements are within these contracts.

DATED this 6th day of June, 2016.

s/Peggy Kozal
Thomas B. Quinn
Peggy Kozal
GORDON & REES LLP
555 17th Street, Suite 3400
Denver, Colorado 80202
Tel: 303-534-5160
tquinn@gordonrees.com
pkozal@gordonrees.com

-and-

Brian P. Maschler
GORDON & REES LLP
275 Battery Street, Suite 2000
San Francisco, CA 94579
Tel: 415-875-3127
bmaschler@gordonrees.com

Attorneys for Defendant
AuPairCare, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on June 6, 2016, I served the foregoing Defendant AuPairCare, Inc.'s Answers to Plaintiffs' First Requests For Production via email on all counsel of record as follows:

| | |
|---|---|
| *Attorneys for Plaintiffs:*<br><br>*Alexandra Ivette Gonzalez*<br>*Beaudette Deetlefs*<br>*Dayanna Paola Cardenas Caicedo*<br>*Johana Paola Beltran*<br>*Lusapho Hlatshaneni* | Alexander N. Hood<br>Towards Justice-Denver<br>Suite 300<br>1535 High Street<br>Denver, CO 80218<br>alex@towardsjustice.org<br><br>-and-<br><br>Randall W. Jackson<br>Matthew L. Schwartz<br>Peter M. Skinner<br>Boies Schiller & Flexner, LLP-New York<br>7th Floor<br>575 Lexington Avenue<br>New York, NY 10022<br>rjackson@bsfllp.com<br>mlschwartz@bsfllp.com<br>pskinner@bsfllp.com<br><br>-and-<br><br>Sigrid S. McCawley<br>Lauren F. Louis<br>Boies Schiller & Flexner, LLP-Ft. Lauderdale<br>Suite 1200<br>401 E. Las Olas Boulevard<br>Ft. Lauderdale, FL 33301<br>smccawley@bsfllp.com<br>llouis@bsfllp.com |
| *Attorneys for Defendants:*<br><br>*20/20 Care Exchange, Inc. d/b/a The*<br>*International Au Pair Exchange* | Lawrence D. Stone<br>Christian D. Hammond<br>Dufford & Brown, P.C.<br>Suite 2100 |

| | |
|---|---|
| *-and-*<br>*A.P.E.X. American Professional*<br>*Exchange, LLC d/b/a ProAuPair* | 1700 Broadway<br>Denver, CO 80290-2101<br>lstone@duffordbrown.com<br>chammond@duffordbrown.com |
| *Attorneys for Defendants:*<br><br>*Agent Au Pair, Inc.*<br>*-and-*<br>*American Cultural Exchange, LLC*<br>*d/b/a GoAuPair*<br>*-and-*<br>*Au Pair International, Inc.* | Kathryn A. Reilly<br>Wheeler Trigg O'Donnell, LLP<br>Suite 4500<br>370 17th Street<br>Denver, CO 80202-5647<br>reilly@wtotrial.com |
| *Attorneys for Defendants:*<br><br>*APF Global Exchange, NFP d/b/a*<br>*Aupair Foundation*<br>*-and-*<br>*American Institute for Foreign Study*<br>*d/b/a Au Pair in America* | Lawrence L. Lee<br>Susan M. Schaecher<br>Fisher & Phillips LLP<br>Suite 2700<br>1801 California Street<br>Denver, CO 80202<br>llee@laborlawyers.com<br>sschaecher@laborlawyers.com |
| *Attorneys for Defendants:*<br><br>*Au Pair International, Inc.*<br>*-and-*<br>*American Cultural Exchange,*<br>*LLC d/b/a GoAuPair* | Brian Alan Birenbach<br>Rietz Law Firm, LLC<br>Suite 301<br>114 Village Place<br>Dillon, CO 80435<br><br>brian@rietzlawfirm.com |
| *Attorneys for Defendant:*<br><br>*Cultural Care, Inc.* | Jeffrey Paul Allen<br>Donald J. Gentile<br>Lawson & Weitzen, LLP<br>Suite 345<br>88 Black Falcon Avenue<br>Boston, MA 02210<br>jallen@lawson-weitzen.com<br>dgentile@lawson-weitzen.com<br><br>-and-<br><br>Walter V. Siebert<br>Sherman & Howard L.L.C.<br>Suite 3000<br>633 17th Street<br>Denver, CO 80202<br>bsiebert@shermanhoward.com |

| | -and-<br><br>William L. Monts III<br>Hogan Lovells US LLP<br>Suite 1300<br>555 Thirteenth St., N.W.<br>Washington, CO 20004-1109<br>William.monts@hoganlovells.com |
|---|---|
| *Attorneys for Defendant:*<br><br>*Cultural Homestay International* | Adam A. Hubbard<br>Holland & Hart LLP<br>Suite 300<br>1800 Broadway<br>Boulder, CO 80302<br>aahubbard@hollandhart.com<br><br>James E. Hartley<br>Holland & Hart, LLP<br>Suite 3200<br>555 17th Street<br>Denver, CO 80202<br>jhartley@hollandhart.com |
| *Attorneys for Defendant:*<br><br>*EurAupair Intercultural Child Care Programs* | David B. Meschke<br>Martha L. Fitzgerald<br>Brownstein Hyatt Farber Schreck, LLP<br>Suite 2200<br>410 17th Street<br>Denver, CO 80202<br>dmeschke@bhfs.com<br>mfitzgerald@bhfs.com<br><br>-and-<br><br>Margo J. Arnold<br>Brownstein Hyatt Farber Schreck, LLP<br>Suite 3550<br>2049 Century Park East<br>Los Angeles, CA 90067<br>marnold@bhfs.com |
| *Attorney for Defendant:*<br>*Expert Group International, Inc.* | Bogdan Enica<br>Bogdan Enica, Attorney at Law<br>Suite 213<br>111 2nd Avenue NE<br>St. Petersburg, FL 33701-3440<br>bogdane@hotmail.com |

- 9 -

| Attorneys for Defendant:<br>Great AuPair, LLC | Meshach Y. Rhoades<br>Martin J. Estevao<br>Armstrong Teasdale LLP<br>Suite 800<br>4643 S. Ulster Street<br>Denver, CO 80237<br>mrhoades@armstrongteasdale.com<br>mestevao@armstrongteasdale.com |
|---|---|
| Attorneys for Defendant:<br>InterExchange, Inc. | Heather Fox Vickles<br>Brooke A. Colaizzi<br>Raymond M. Deeny<br>Sherman & Howard, LLC<br>Suite 3000<br>633 17th Street<br>Denver, CO 80202<br>hvickles@shermanhoward.com<br>bcolaizzi@shermanhoward.com<br>rdeeny@shermanhoward.com |
| Attorneys for Defendant:<br>USAuPair, Inc. | William J. Kelly, III<br>Chandra M. Feldkamp<br>Kelly & Walker LLC<br>Suite 200<br>1512 Larimer Street<br>Denver, CO 80202<br>wkelly@kellywalkerlaw.com<br>cfeldkamp@kellywalkerlaw.com |

/s/ Lacey Fachan

**<u>Exhibit F</u>**

Page 69

1    of any region today in the United States in which

2    the cost of an au pair is adjusted to account for

3    the cost of living?

4        A    Could you repeat the question?

5        Q    Yes.  Are you aware of any region in the

6    United States in which the stipend paid to an

7    au pair is adjusted to account for the cost of

8    living?

9        A    No, I'm not aware.

10       Q    So there's no difference in the au pair's

11   stipend for an au pair that works in Manhattan

12   versus an au pair that works in Kansas?

13            MS. SCHAECHER:  Objection.  Foundation.

14            MS. KOZAL:  Objection to foundation.

15       A    No, there's no difference.

16       Q    (By Ms. McElroy) The first reason in this

17   article states that, "Au pairs are flexible.  Modern

18   work schedules vary as do our kids' activities.

19   With an au pair you set the schedule weekly or

20   monthly to allow for coverage where you need it

21   most.  No more running from work early to get the

22   kids to soccer practice or having to choose between

23   being in two places at once."

24            Sitting here today, do you agree that

25   flexibility is a benefit of the au pair program?



Page 71

1    hours and times you have to drop off and pick up or

2    a come-and-go nanny, you know, who gets stuck in

3    traffic, sick, late, any number of -- you know, dog

4    died.

5         Q   Do you know approximately how many au pairs

6    you have interacted with either by phone, e-mail or

7    in person in a professional capacity?

8         A   I have no idea.

9         Q   Would you say it's more than a hundred?

10        A   Probably, yes.

11        Q   Have you ever communicated to an au pair

12   that she could earn more than the $195.75 -- I'm

13   sorry.  Let me restate that.

14            I want to ask you about each time you've

15   communicated to an au pair that she could earn more

16   than $195.75 per week.  Have you ever communicated

17   that to an au pair?

18            MS. KOZAL:  Objection to form.

19        A   Could you repeat the question?

20        Q   (By Ms. McElroy) Sure.  Have you ever

21   communicated to an au pair that she could earn more

22   than $195.75 per week as an au pair?

23        A   I have never directly communicated that to

24   an au pair.

25        Q   Have you ever known an au pair that received



Page 102

1      Q    (By Ms. McElroy) So unlike the program, the

2   host family program fees which vary across the

3   agencies you've worked for, the stipend is the same

4   across the agencies that you've worked for?

5           MS. KRUZER:  Objection.

6      A    Because it is what the Department of State

7   mandates as the weekly stipend, that is what host

8   families are required to pay.

9      Q    (By Ms. McElroy) So would you agree that

10  unlike the program fees which vary across the

11  sponsors, the weekly stipend is the same across the

12  sponsors?

13          MS. SCHAECHER:  Objection; foundation.

14          MR. BENDER:  I join.

15          MR. STONE:  Objection.  Form and foundation.

16          MS. KRUZER:  I join in the objection.

17          MS. KOZAL:  As do I.

18     A    I'm sorry.  You're going to have to repeat

19  the question.  I'm so sorry.  I'm sorry.

20     Q    (By Ms. McElroy) Do you agree that unlike

21  the program fees charged to host families which you

22  testified vary across the sponsors, the weekly

23  stipend paid to au pairs is the same across the

24  sponsors?

25          MS. SCHAECHER:  Objection.  Form and



Page 104

1    as a fixed expense?

2          MR. BENDER:  Object to the form.

3      A    I don't know one way or another if I've ever

4    said fixed expense.  It doesn't sound like something

5    I would say, but I don't know.

6      Q    (By Ms. McElroy) Do you agree with the

7    statement that there is no difference in prices as

8    far as the stipend goes between all of the agencies?

9          MS. SCHAECHER:  Objection.

10          MS. KOZAL:  Objection to form.

11          MS. KRUZER:  Join in the objection.

12          MR. STONE:  Objection; foundation.

13          MR. BENDER:  Same objection.

14     Q    (By Ms. McElroy) Do you need me to repeat

15    the question?

16     A    Please.  I'm sorry.

17     Q    Do you agree with the statement:  There is

18    no difference in prices as far as stipend goes

19    between all of the agencies?

20          MR. STONE:  Same objection.

21          MS. KRUZER:  Form and foundation.

22     A    There's no difference in the minimum weekly

23    stipend of $195.75 that is mandated by the

24    Department of State.  All agencies require the

25    minimum stipend of $195.75.



Page 105

1       Q    (By Ms. McElroy) Do you agree with the

2   statement that I'm saying:  There is no difference

3   in prices as far as the stipend goes between all of

4   the agencies?

5            MR. BENDER:  Object to the form.

6            MS. KOZAL:  Counsel, are you -- this is

7   Peggy.  Counsel, are you reading from something, or

8   are you just asking her a question?

9            MS. McELROY:  I'm just asking her a

10  question.

11           MR. STONE:  Objection; foundation.

12           MS. KRUZER:  Join in the objection.

13           MS. KOZAL:  As do I.

14      A    Could you repeat the question?  I'm very

15  sorry.

16      Q    (By Ms. McElroy) Do you agree with the

17  statement that there is no difference in prices as

18  far as the stipend goes between all of the agencies?

19           MS. SCHAECHER:  Same objection.

20           MR. STONE:  Same objection.

21           MS. KRUZER:  Same objection.

22      A    I don't necessarily agree because that's the

23  minimum threshold, and the family could pay more.

24      Q    (By Ms. McElroy) Have you ever made that

25  statement to a caller while acting in your capacity



Page 106

1    as an employee of a sponsor agency?

2            MS. KOZAL:  Objection to form.

3        A    Have I ever said what?

4            MS. KRUZER:  Join in the objection.

5        Q    (By Ms. McElroy) Have you ever stated to a

6    caller when you were answering the phones in your

7    capacity as an employee of a sponsor agency that

8    there is no difference in prices as far as the

9    stipend goes between all of the agencies?

10       A    I mean I have -- to distinguish between the

11   weekly stipend and the program fee -- which the

12   program fee we've already established is variable --

13   that minimum threshold is standard across all of the

14   sponsors.

15           So yes, I would characterize it as that when

16   differentiating, when going through all the pricing

17   with a potential host family to differentiate that

18   between the stipend and the program fee that a

19   particular agency might charge.

20       Q    And within that context, do you agree with

21   the statement:  There is no difference in prices as

22   far as the stipend goes between all of the agencies?

23           MR. STONE:  Objection; foundation.

24           MS. KRUZER:  Join.

25           MS. KOZAL:  Join.



Page 108

```
 1        Q    I'm asking you if you agree with the
 2   specific statement that there is no difference in
 3   prices as far as the stipend goes between all of the
 4   agencies?
 5              MS. SCHAECHER:  Wait for a question.
 6              MS. KRUZER:  Objection.  Asked and answered.
 7              MR. STONE:  Objection.  Form and foundation.
 8              MR. BENDER:  Object to the form.
 9              MS. KOZAL:  I join in both.
10              MS. SCHAECHER:  Was there a question?
11              MS. McELROY:  Yes.
12        Q    (By Ms. McElroy) I'm asking you -- I can
13   rephrase it.  Do you agree with the statement:  Is
14   there a difference -- Do you agree with the
15   statement:  There is no difference in prices as far
16   as the stipend goes between all of the agencies?
17              MS. SCHAECHER:  Objection.  Form;
18   foundation.
19              MS. KRUZER:  Same objection.
20              MR. STONE:  Objection.  Form and foundation.
21              MR. BENDER:  Same.
22        A    I'm sorry.  I'm just not --
23              THE WITNESS:  Can I have a moment?
24              MS. SCHAECHER:  Sure.
25              MS. McELROY:  Sure, yeah.  I'll step out.
```



```
 1                    (Recess)
 2       Q    (By Ms. McElroy) Sitting here today, do you
 3  know whether you have ever told a caller in your
 4  capacity as an employee of a sponsor agency that
 5  there is no difference in prices as far as the
 6  stipend goes between all of the agencies?
 7            MR. BENDER:  Object to the form.
 8  Foundation.
 9            MR. STONE:  Objection.  Form and foundation.
10            MS. KOZAL:  Objection to form and
11  foundation.
12       A    No, I don't agree.
13       Q    (By Ms. McElroy) I'm asking you not whether
14  you agree with that statement now.  Sitting here
15  today, do you know whether you've ever told a
16  prospective -- or a caller in your capacity as an
17  employee at APF that there is no difference in
18  prices as far as the stipend goes between all of the
19  agencies?
20            MS. SCHAECHER:  Objection to form.
21            MS. KRUZER:  Join in the objection.
22            MS. KOZAL:  Join in the objection.
23       A    Yes, probably in the context of explaining
24  all of the fees, again, distinguishing from variable
25  program fees that the agencies charge and the
```



Page 120

 1           MS. KOZAL:  Nothing for AuPairCare.  Thank
 2   you.
 3           MS. KRUZER:  Nothing for Cultural Care.
 4   Thank you.
 5           MR. STONE:  I do have one more series of
 6   questions.
 7                   EXAMINATION CONTINUED
 8   QUESTIONS BY MR. STONE:
 9      Q   Mrs. Crompton, when you were being asked
10   questions by one of the defense attorneys, you
11   testified that you would only be in a position to
12   know if an au pair is being paid the minimum of
13   $195.75 or if they were being paid less than that.
14   Do you remember that testimony?
15      A   Yes, or if they were not being paid at all.
16      Q   You also testified you wouldn't know whether
17   they were being paid more than that.  You wouldn't
18   have reason to know that; is that correct?
19      A   That is correct.
20      Q   And why is it that you wouldn't have reason
21   to know that?
22      A   Because --
23           MS. McELROY:  Objection; form.
24      A   Because the minimum threshold that we --
25   that the sponsor agencies I worked for were



Page 125

1          MS. KRUZER:  Join in the objection.

2          MS. KOZAL:  Join in the objection.

3     A    I don't know whether I have ever been in a

4    position to know or not know.  I don't know.

5     Q    (By Ms. McElroy) Is it fair to say you don't

6    know whether or not you're in a position -- never

7    mind.  Strike that.

8          So you don't know whether or not there's an

9    agreement among the sponsors to set the stipend at

10   $195.75?

11    A    I'm not aware that there's any agreement.

12    Q    If there were such an agreement, can you say

13   with certainty that you would know about it?

14         MS. KOZAL:  Objection to form and

15   foundation.

16         MR. STONE:  Objection to form.

17         MS. KRUZER:  Join.

18    A    I think that in some of my roles if there

19   had been an agreement, I think I would have known.

20    Q    (By Ms. McElroy) And on what basis would you

21   know about that agreement?

22    A    I would have been told by my superiors or --

23   if there was an agreement, yeah, I think I would

24   have known.  I would have been told.

25    Q    Are you certain or you think that you would



Page 126

1    have known?

2        A    I can't be certain of anything.

3             MR. STONE:   Objection; form.

4             MR. BENDER:   Object to the form.

5        Q    (By Ms. McElroy) And when you say -- strike

6    that.

7             Would you be aware of an agreement among

8    some of the sponsors to set the stipend at $195.75?

9             MR. BENDER:   Object to the form.

10            MS. KRUZER:   Objection.

11            MR. STONE:   Objection.

12            MS. KOZAL:   Same objection.

13       A    I don't know.

14       Q    (By Ms. McElroy) While you worked at

15   Cultural Care, do you think you would have been

16   aware of whether or not Cultural Care was part of an

17   agreement with other sponsors to set the stipend at

18   $195.75?

19       A    Given my role and my position there,

20   probably not.

21       Q    Are you aware of any sponsor that advertises

22   a higher weekly stipend for -- let me rephrase.

23            Are you aware of any sponsor that advertises

24   a weekly stipend for au pairs that's higher than

25   $195.75?



# Exhibit G

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 93

1   as to why there was a two-week delay for 75 pages that

2   were produced electronically 15 days ago, not one day

3   ago, as was represented?

4           MS. McELROY:  Yes.  I said we produced

5   them when we could.  We produced them when we were able

6   to produce that file of documents.

7           MS. REILLY:  Would anyone else like to

8   make a record on this?  This has been an ongoing issue.

9           MS. KOZAL:  Yeah.  Counsel, to be clear,

10  we were outside in the hall 10 minutes ago and asked you

11  the question about when the documents were given to you.

12  You indicated to us that the documents were given to you

13  by hand by the plaintiff yesterday.

14          MS. McELROY:  She provided me hard copies

15  of the documents yesterday.  The file we were able to

16  view yesterday.  We produced them when we could.  I'm not

17  saying that she's incorrect in her testimony about

18  sending the documents several weeks ago.

19          MS. KOZAL:  Very different stories.

20          MS. McELROY:  If you want to discuss --

21  that is not a very different story.  I said I received

22  the hard copy documents from her yesterday, and we

23  produced the file of documents when we could.

24          MS. REILLY:  Larry, are you all set?

25          MR. LEE:  This has been a pattern

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 94

1    throughout all these depositions, and the spirit of

2    corporation by the plaintiffs' side through their counsel

3    has been consistently inconsistent with providing

4    documents in a timely manner even within a reasonable

5    time period for these well-noticed depositions.

6              MS. KOZAL:  Katie, you may want to ask her

7    if she gave a copy of those documents by hand.

8              MS. REILLY:  I'm about to.

9         Q.  (By Ms. Reilly)  Ms. Gonzalez, did you

10   provide a hard copy version of this stack of documents to

11   your lawyers yesterday?

12             A.   Will you repeat that question again?

13        Q.   Sure.  Did you provide a paper copy of

14   this stack of documents to your lawyer yesterday?

15             A.   I did send her the email again yesterday.

16        Q.   You just sent the same email, the same

17   email you had sent about 15 days ago?

18             A.   Yes, ma'am.

19        Q.   Thank you.  Okay.  So we'll keep going,

20   and we'll revisit a lot of issues around 5:00.  So let's

21   move to when you first arrived in Maryland.

22             A.   Yes, ma'am.

23        Q.   What was it like when you first met the

24   family?

25             MS. McELROY:  Objection.