**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Case No. 14-cv-03074-CMA-KMT

JOHANA PAOLA BELTRAN, *ET AL.*

      Plaintiffs,

v.

INTEREXCHANGE, INC., *ET AL.*

      Defendants.

---

**MOTION FOR PROTECTIVE ORDER OR, IN THE ALTERNATIVE, AMENDMENT OF
THE SCHEDULING ORDER**

---

## <u>CERTIFICATE OF CONFERAL</u>

Plaintiffs' counsel has been discussing the issues raised in this motion with the defendants for several months. Finally, after defendants failed to respond to plaintiffs' latest requests by their January 6, 2017 due date, plaintiffs' counsel informed defendants by e-mail dated January 7, 2017 that plaintiffs would be making this motion, and invited defendants to respond by January 9 at 11:00 a.m. On January 8, one defendant, Interexchange, responded that it objects to the relief requested. At 4:56 p.m. on January 9, Cultural Care stated that it was unable to respond primarily because its lead counsel was scheduled to begin a trial on January 9. At 5:29 p.m. that same day, Go Au Pair, Au Pair International, Agent Au Pair, APEX, 20/20 and Cultural Homestay stated that they had not had adequate time to respond and that they would need several additional days to do so. Expert AuPair stated the same position at 9:05 p.m. The remaining defendants have not responded in any manner. Plaintiffs cannot wait several days for defendants to confer, as the relief requested may be moot by that point.

## <u>PRELIMINARY STATEMENT</u>

As the Court is well aware, this case concerns the unlawful wages being paid to

*au pairs* in the United States.  Shortly after this case was filed—twenty months ago—

plaintiffs served defendants with requests to discover, as relevant here, (a) what wages

*au pairs* were actually paid, and (b) the identities of *au pairs* or their host families, so

that plaintiffs could investigate and verify wage information for themselves.

The defendants have uniformly refused to produce wage information, claiming that they do not physically pay *au pairs*' wages.  Even if true, that hardly means that the defendants do not *know* what their *au pairs* were paid.  Indeed, State Department regulations provide that "[s]ponsors shall require that au pair participants" are "paid in conformance with the requirements of the Fair Labor Standards Act,"  22 C.F.R. § 62.31(j)(1), and the discovery produced to date gives every reason to believe that the defendants have this data in one form or another.  At the same time, however, the defendants have effectively barred plaintiffs from gathering this information directly by unilaterally refusing to produce identifying information for their *au pairs* and host families, on the grounds that such data is somehow not discoverable until after class certification. This puts the cart before the horse, because *au pair* wage information is useful to the question of whether a class should be certified at all.

And that is precisely why plaintiffs raise this issue now.  This Friday, the parties are set to exchange expert reports in support of class certification.  In preparation for exchanging those reports, plaintiffs have plumbed defendants' meager productions, as well as other sources, and have identified wage data sufficient for their experts to offer opinions supporting class certification.  Nevertheless, knowing that the January 13, 2017 deadline for class expert opinions was approaching and that significant additional relevant data exists, plaintiffs also renewed their efforts to secure wage information from defendants.  Plaintiffs have asked for this data repeatedly, in different ways, but have received virtually nothing new.

That is fine.  Plaintiffs fully intend to move to compel this information under Rule 37.  But for present purposes, plaintiffs only seek a protective order to prevent

defendants from using their failure to produce relevant discovery as a sword in opposing class certification.  In support of class certification, plaintiffs intend to produce at least one expert report that is based on a market analysis of the effects of defendants' wage-fixing.  Every bit of evidence exchanged in discovery so far in this case—testimony, contracts, advertisements, admissions, and other documents—has supported the plaintiffs' contention that standard *au pair* wages are set at $195.75 per week across the industry, and that actual wages vary from that figure by, at most, a few dollars (*i.e.*, by rounding up to $200 per week).  Plaintiffs presume that defendants have resisted discovery of wage data because it would only cement that conclusion. But what the defendants must not be permitted to do is point to any holes in plaintiffs' data as a basis on which to object to certification, or to rely on undisclosed data.  Accordingly, plaintiffs are entitled to a protective order pursuant to Rule 37(c) preventing defendants from arguing that plaintiffs' experts' opinions are based on incomplete wage data.

Alternatively, if the defendants insist that they are entitled to make such an argument, they should have to produce the relevant data, and plaintiffs should be given an appropriate period of time in which to analyze it.  But defendants cannot have it both ways—they cannot force plaintiffs' experts to render an opinion based on the data that defendants selectively chose to produce, and then attack those opinions with the evidence they withheld.

## **BACKGROUND**

### A.    **Plaintiffs' Efforts to Obtain Wage Data Through Discovery**

Nearly two years ago, on March 19, 2015, plaintiffs served each defendant with their First Request for the Production of Documents and First Set of Interrogatories.

3

(Smalls Decl., Ex. A). The interrogatories requested that defendants "identify all *au pairs* that you have sponsored."  And the document requests sought "all Records relating to *au pair* compensation," including "Records exchanged with or reflecting communication with . . . host families [or] potential host families."  Plaintiffs received no substantive answers or documents in response.[1]

After defendants' motions to dismiss were denied in February 2016, [DE 240], plaintiffs immediately resumed attempts to obtain this information.  On March 3, 2016, plaintiffs again served document requests and interrogatories to all defendants requesting that defendants produce documents "sufficient to identify all *au pair* you have sponsored, including the period of sponsorship, the state in which each *au pair* worked, and the family for whom each *au pair* worked" (Request No. 1), "documents concerning *au pair* compensation" (Request No. 2), and "time records sufficient to show the actual number of hours worked by the putative class members" (Request No. 10). (Smalls Decl., Ex. C). The interrogatories asked defendants to "identify all *au pairs* that you have sponsored" since 2009, and for the "last known contact information for each host family identified." (Smalls Decl., Ex. B). Plaintiffs also asked defendants to "[i]dentify all putative Class members who have been paid more than $195.75 per week."  (*Id.*).

Defendants have utterly failed to provide *au pair* wage information, and have refused to identify host families or *au pairs*.[2]  No defendant has produced a remotely

---

[1] Nearly three months after these discovery requests were served on the defendants, they moved for a stay of discovery pending their motions to dismiss, which was granted. Even after the defendants' motions to dismiss were denied virtually in total, they have never responded to these initial requests.

[2] To be clear, *some* defendants have provided *limited* wage information, but none have produced anything close to comprehensive wage data.  For instance, APEX 20/20 produced *au pair* contracts and stipend information for non-standard *au pairs* — that is,

complete response to plaintiffs' Interrogatories, and the majority of the documents that plaintiffs have requested remain outstanding.

First, no defendant has provided the identities of the *au pairs* they sponsored or their host families; indeed, they have categorically refused to do so, uniformly stating that such a request "improperly seeks class-wide discovery before any class or collective action has been certified," (*see, e.g.*, Smalls Decl. Ex. D, APC's First Set of Responses and Objections, Response to Request for Production No. 1), and proffering concerns that such information was "proprietary and confidential" (*see, e.g.*, *id.*; Smalls Decl. Ex. E., Cultural Care's Second Supplemental Responses to Plaintiffs' Request for Production No. 1), or otherwise implicates privacy concerns for the *au pairs* (*see* Smalls Decl., Ex. I, Sept. 26, 2016 Letter from S. Schaecher to L. Louis).

These purported concerns are obviously misplaced: the Court had previously refused to bifurcate discovery into phases relating to class and merits discovery (*see* Scheduling Order, DE 295); there is a protective order in place protecting confidential and proprietary information; and any purported concerns regarding privacy in wage data could have been mitigated by providing survey data. The defendants have been transparent in their actual reason for refusing to provide contact information—they do not want plaintiffs to identify *au pairs* who have been victimized by their illegal wage fixing scheme. As Cultural Care put it: "you want this list so that you can contact additional individuals and attempt to recruit them as plaintiffs as an end run around the Court's conditional certification/notice process." (Smalls Decl. Ex. M, Letter from J.

---

those that are paid at a higher rate because of their greater experience and skills. But those *au pairs* are outside plaintiffs' class, which is limited to standard *au pairs*. Likewise, Cultural Care has produced a handful of logs showing how much certain *au pairs* were paid at certain times, but they are far from comprehensive.

Wolosz to L. Louis, October 24, 2016).  But even assuming that such a response had any merit (it does not), this purported justification does not explain why they have failed to identify host families, who just as easily could provide needed wage data.

Defendants have likewise either refused to provide documents regarding actual *au pair* compensation, or (incredibly) claimed that they do not have it (*see*, *e.g.*, Smalls Decl. Ex. T, Jan. 6, 2017 Letter from S. Schaecher to D. Smalls).  Plaintiffs' request for documents concerning *au pair* compensation encompasses, among other things, correspondence with host families regarding *au pair* compensation, executed contracts between *au pairs* and host families, and survey data of *au pair* wages.[3]

Defendants' failure to provide wage survey data is particularly inexplicable, since they are mandated to create this information by regulation, and to use it to generate and submit annual audits to the State Department.  (Smalls Decl. Ex. H, Deposition of Carrie Crompton, 13:18-16:1).[4]  This summary information is already in the defendants' possession and goes to the very heart of the issues in this case, but they have withheld it from plaintiffs without explanation.  (Smalls Decl., ¶ 34).  Indeed, the one real piece of specific wage data that defendants have produced thus far relates to the named plaintiffs.  But, of course, the fact that they were able to produce it at all proves that defendants' maintain wage information about the *au pairs* in their employ.

_____

[3] To the extent that defendants objected to identifying class members prior to class certification, survey data, in addition to all information showing records of wages paid to *au pairs*, could nonetheless be produced with identifying information redacted.

[4] One of the defendants, Expert AuPair, may have belatedly produced these very audit reports on January 9, 2017, the date of this motion, though plaintiffs did not have the opportunity to review or analyze those records in depth before making this application. Nor would one defendant's production of this information alter the relief sought here.

Plaintiffs have repeatedly engaged with the defendants in an attempt to avoid bringing discovery issues to the Court, and have been engaged with certain defendants in disputes over ESI protocols since May 2016.  As an example of the lengths that plaintiffs have gone to while trying to resolve this issue, we describe below certain aspects of the voluminous course of communications with three sponsors (AIFS, APC, and Cultural Care) that together appear to control the majority of the *au pair* market. Similar descriptions of plaintiffs' efforts to reach agreement with the other twelve sponsors is set out in the accompanying declaration of Dawn Smalls.

      a.    <u>AIFS</u>

- On September 15, 2016, plaintiffs wrote to AIFS that AIFS had improperly limited its Responses to Plaintiffs' request for documents identifying *au pairs* AIFS had sponsored, on the grounds that class-wide discovery was inappropriate before a class action had been certified. Plaintiffs explained that if AIFS persisted in its refusal, that plaintiffs would seek sanctions pursuant to Rule 37. (Smalls Decl. Ex F).

- On September 26, 2016, AIFS responded to plaintiffs' September 15, 2016 letter and reiterated that it was not withdrawing its objection to "pre-certification discovery." It also asserted that the names of AIFS's *au pairs* were "proprietary and confidential," and refused to produce "documents containing specific, personal information about non-parties to this suit." (Smalls Decl. Ex. I).

- On December 30, 2016, plaintiffs wrote again regarding the deficiencies in AIFS's production, and explained that AIFS had persisted in its failure to identify host families and *au pairs* AIFS had sponsored, and otherwise to have provided documents in AIFS's possession that identify wages actually paid by host families to *au pairs*. (Smalls Decl. Ex. Q). On January 5, counsel for AIFS responded to this letter stating AIFS's representative responsible for this matter has been ill the last few days and that he would discuss plaintiff's request when she returned to the office and that he would provide a response by January 13, 2017 (Smalls Decl. Ex. S).  A response made by January 13, 2017 will likely be too late to analyze as part of any expert opinion offered on January 13, 2017.

      b.    <u>APC</u>

- On October 11, 2016, plaintiffs objected to APC's refusal to produce documents regarding putative class members pursuant to numerous of its Requests for Production, and objected that APC had persisted in its failure to identify their *au*

*pairs* or provide adequate information in APC's possession to identify wages actually paid by host families to *au pairs*. [5] APC did not reply.  (Smalls Decl. Ex. K).

- On December 30, 2016, plaintiffs again notified APC of APC's failure to produce responsive documents, including documents identifying APC's *au pairs*, documents identifying host families, and documents containing adequate wage data. Again, APC did not reply.  (Smalls Decl. Ex. P).

- On January 5, 2017, plaintiffs asked for an indication of whether, as requested, APC would produce responsive documents including wage data for the *au pairs* or audits submitted to the State Department by January 6th. (Smalls Decl. Ex. R).  APC replied that they have not been able to confer with their client and that they would respond to plaintiffs' inquiry "hopefully on Monday or Tuesday of next week," *i.e.*, the week of January 9. (Smalls Decl. Ex. U)  As of the date of this motion, plaintiffs have not received a supplementary response to their December 30, 2016 letter. (Smalls Decl. ¶ 24).

      c.   Cultural Care

- On September 22, 2016, plaintiffs wrote to Cultural Care identifying numerous deficiencies in Cultural Care's discovery responses, including Cultural Care's refusal to identify its *au pairs* or host families due to objections to class-wide discovery. (Smalls Decl. Ex. H).

- On a September 29, 2016 phone call, Cultural Care again refused to supply information identifying its *au pairs* and host families. (Smalls Decl. ¶ 12).

- By letter on October 19, 2016, plaintiffs again sought appropriate discovery from Cultural Care, explaining that Cultural Care had failed in its obligations to "identify relevant custodians, issue litigation holds, [and] collect pertinent data," and that the documents produced must not be limited only to those relating to the named plaintiffs. (Smalls Decl. Ex. L).

- In a letter on October 24, 2016, Cultural Care reiterated its refusal to provide *au pair* identification information, stating that "we must assume that you want this list so that you can contact additional individuals and attempt to recruit them as plaintiffs as an end run around the Court's conditional certification/notice process." (Smalls Decl. Ex. M).

- On December 16, 2016, plaintiffs spoke with Cultural Care, and Cultural Care indicated that it would begin producing documents. However, Cultural Care persisted in its refusal to produce *au pair* contact information before class certification. By letter on December 19, 2016, plaintiffs described the phone call, and reiterated their

---

[5] Plaintiffs drafted and signed this letter with instructions to a legal assistant to send it. However, there is no copy of the final, signed letter in counsel's files.

request for discovery of host family contact information, in addition to audit documents that Cultural Care provides to the Department of State on an annual basis. (Smalls Decl. Ex. N).

- On December 23, 2016, Cultural Care finally made a production to plaintiffs. The production did not contain identification information for Cultural Care's *au pairs* (except the first and last name, with no addresses, of certain of its *au pairs*, which was disclosed incidentally in other documents it produced), it did not contain identification information for Cultural Care host families, and it did not contain the Department of State audit information or wage survey data. (Smalls Decl. ¶ 18).

As the back and forth with Cultural Care, APC, and AIFS demonstrates, plaintiffs have expended significant effort trying to dislodge basic information, only to be met with consistent and categorical stonewalling.  Their conduct is demonstrative of the positions taken by the defendants as a whole.  Indeed, no defendant has provided comprehensive wage data; no defendant has provided identifying information for its *au pairs*; and no defendant has provided identifying information for its host families.

Despite defendants' incomplete disclosures, plaintiffs are absolutely prepared to exchange expert reports on class certification issues on Friday.[6]  By looking to what has been produced, along with public records and other data, it is obvious that plaintiffs' core contention is correct:  *au pair* wages have effectively been set by the defendants at $195.75 per week, with only minor variation.  Every bit of evidence thus far is consistent with that allegation:  the defendants' advertisements, promotional materials, and public statements, their form *au pair* contracts, internal training materials, representations made to government agencies—all of it demonstrates that *au pair* wages are not set as

---

[6]  Pursuant to the original Scheduling Order (DE 295), the disclosure of affirmative experts on class action issues was due on December 16, 2016.  On December 13, 2016, plaintiffs moved with defendants' consent for an amendment of the scheduling order, explaining that due to unexpected delays, all parties required additional time to complete their disclosures (DE 450).  The Court granted the motion in part, and moved the deadline for affirmative expert disclosures to January 13, 2017 (DE 452).

the result of a free market, but rather because the defendants have unlawfully fixed them.  Materials gathered from the named plaintiffs, from other *au pairs*, and from public sources likewise confirms it. (Smalls Decl., ¶ 34).

All of this is a more than sufficient data set for the experts to do their work. Nonetheless, defendants are in possession of a *complete* data set, which would obviously be useful in the expert analysis—not to mention as proof on the merits.

## ARGUMENT

**A.    The Court Should Preclude Defendants from Attacking Plaintiffs' Expert Opinions for Relying on Insufficient Wage Data**

Defendants' failure to agree to either form of relief requested in this motion is telling. They should have no objection to either providing plaintiffs with wage data and identifying information, on the one hand, or to agreeing not to use the absence of comprehensive wage data against plaintiffs at this stage of the litigation, on the other. That defendants consent to neither form of relief strongly suggests a strategy to attack plaintiffs' expert analysis for lack of comprehensive data or put forward an alternative analysis based on that data, which they unilaterally withheld.  But such gamesmanship is prohibited by the Federal Rules.

Rule 26 makes clear that "[a] party . . . must supplement or correct its disclosure or response [to any discovery request] . . . in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect. . . . " Fed. R. Civ. P. 26(e)(1)(A). "The plain language of Rule 26 describes an ongoing duty to

supplement discovery responses." *Lexington Ins. Co. v. Newbern Fabricating, Inc.*, No. 14-CV-610-CVE-TLW, 2016 WL 6652792, at *2 (N.D. Okla. June 16, 2016).[7]

As described above, defendants have failed to supplement their responses. Despite having each received—almost two years ago—requests directed at determining *au pair* wage data and to identify *au pairs* and host families, defendants have persisted in their refusal to supply plaintiffs with documents and information they plainly possess. Such documents include, but are not limited to:

- Documents sufficient to identify defendants' *au pairs* and host families;

- Contracts with individual *au pairs* containing wage information;

- Communications with individual *au pairs* and host families; and

- Survey data regarding *au pair* wages, including but not limited to data that defendants supplied to the Department of State pursuant to 22 CFR 62.31(m), which requires Sponsor agencies to file with the government, among other things, a report by a certified public accountant, a summation of complaints regarding host family or au pair participation in the program, and a report detailing the name of the au pair, his or her host family placement, and the names of the local and regional organizational representatives.

Accordingly, by failing to produce this information, defendants are not in compliance with Rule 26(e).  And when "a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).

---

[7]   A party must comply with Rule 26(e) even in the absence of further requests by the party demanding discovery. *See, e.g., AVX Corp. v. Cabot Corp.*, 251 F.R.D. 70 (D. Mass. 2008) ("[u]nder Rule 26(e), a party may not free itself of the burden fully to comply with its duty to supplement by placing a heretofore unrecognized duty of repeated requests for information on its adversary.").  In this case, however, plaintiffs affirmatively put defendants on notice of the deficiencies in their discovery responses.

This Rule "may be employed to remedy a failure to supplement incomplete or incorrect responses to formal discovery requests," *Alvariza v. Home Depot*, 241 F.R.D. 663, 666 (D. Colo. 2007), affords broad discretion to the trial court in fashioning a remedy,[8] and prevents a party from gaming the discovery process to take advantage of asymmetric information.  For example, in *Orbit Irrigation Products v. Sunhills Int'l*, 1:10-CV-113-TS-EJF, 2014 WL 12586387 (D. Utah Feb. 11, 2014), defendants moved under Rule 37 to force plaintiffs to produce documents relating to the computation of damages. Plaintiffs argued that it need not make full disclosure as expert discovery was not yet due. The Court rejected that argument, finding that "if [plaintiff's] experts will rely on materials in [plaintiff's] possession, custody, or control, [plaintiff] should have produced those documents already—the Court will not allow [plaintiff's] experts to rely on documents [plaintiff] has not yet produced." *Id.* at 3. Further, the Court reiterated that the plaintiff "may not utilize any documents in support of its damages claims which [defendant] here seeks that [plaintiff] improperly withheld from [defendant] at this stage of discovery." *Id.* at *5.  *See also Brudwick v. Minor*, CIVA 05CV00601 WYDMJ, 2006 WL 1991755, at *22 n.15 (D. Colo. July 13, 2006) (plaintiff barred from supporting its defamation claim with statements in an article that it did not disclose, as "a party who fails to disclose or supplement a disclosure may not use the evidence withheld at trial or in motions"); *Harrison v. Principi, C.A.* 3:03-1398-MBS, 2006 WL 1581807, at *3 (D.S.C. June 6, 2006) ("Pursuant to Federal Rule of Civil Procedure 26(e)(2), a party is under a duty seasonably to amend a prior response to a…request for production…if Defendant

---

[8] *See Carroll v. Allstate Fire & Cas. Ins. Co.*, No. 12-CV-00007-WJM-KLM, 2014 WL 859238, at *4 (D. Colo. Mar. 4, 2014) (Under "Rule 37(c)…the determination of an appropriate sanction is left to the sound discretion of the court, limited only by the requirements that the sanction be "just," and "related to the particular claim" at issue.

failed to turn over discoverable documentation requested by Plaintiff, Defendant cannot use the absence of such documentation from the record to support its position").

Courts have prohibited the use of evidence at trial due to a failure to supplement an interrogatory response, *see, e.g., Lara v. Unified Sch. Dist. 501*, No. 06-4145-RDR, 2008 WL 920596, at *3 (D. Kan. Apr. 3, 2008), and have generally "been vigorous in enforcing the supplementation requirement by precluding use of evidence that was not provided by supplementation," as "exclusion of material not provided in a proper manner is relatively automatic." 8A Charles Alan Wright and Arthur Miller, Federal Practice and Procedure § 2049.1 (3d ed.) (April 2016 Update) (collecting cases).

The defendants' failure to produce responsive wage data is neither "harmless" nor "substantially justified" within the meaning of Rule 37.  "The burden to establish harmlessness is on the party who failed to make the required disclosure." *Burton v. R.J. Reynolds Tobacco Co.*, 203 F.R.D. 636, 639 (D. Kan. 2001). In evaluating a party's excuse under Rule 37, courts in this Circuit employ a four-part test, and evaluate "(1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness." *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 953 (10th Cir. 2002).

Each of these factors underscores precisely why defendants' conduct is neither justified nor harmless. First, if defendants are allowed to use the absence of *au pair* wage data that they have not disclosed to their advantage, the prejudice is clear: defendants would have unique ammunition with which to attempt to attack plaintiffs' experts. Second, absent a change to the current scheduling Order, defendants are

unable to cure the harm of their non-disclosure, as even if defendants were immediately to produce wage data or *au pair*/host-family contact information, it is too late for plaintiffs' experts to incorporate such material into the report due January 13, 2017. Third, later introduction of testimony regarding wage information—which has a direct bearing on class certification issues—would significantly disrupt trial, as it would function to sandbag plaintiffs' expert witness. Finally, defendants' refusals have not been in good faith: defendants cannot in good faith argue that *au pair* wage data is irrelevant, and neither may they credibly claim that they are under no obligation to provide plaintiffs' counsel with needed information prior to class certification: defendants know that plaintiffs would benefit from class-wide wage data, and they are doing their best to prevent plaintiffs from getting it.

In short, the defendants have withheld wage data or identifying information— which would have permitted plaintiffs to gather that data themselves—without good reason for almost two years.  When plaintiffs produce their expert reports on Friday, defendants should not be permitted for the first time to wield that data, which they uniquely possess, in an attempt to undercut plaintiffs' experts.  The Court should enter a protective order, barring the defendants from relying on undisclosed wage data or attacking plaintiffs' experts' methodologies for lack of comprehensive wage data.

**B.    Alternatively, the Court Should Amend the Scheduling Order**

Plaintiffs are absolutely prepared to disclose their expert reports on Friday, and have no interest in further delaying this case.  Indeed, once the Court certifies (or conditionally certifies) a class, many of defendants' justifications for failing to engage

fully in discovery will simply fall away, and the parties will hopefully be able to complete fact discovery without controversy.

However, as defendants have failed to produce the data described above, or to give plaintiffs the information necessary for plaintiffs to develop the data themselves, plaintiffs now expect to move forward with motions to compel defendants to produce documents relating to wage information, contact information for host families, and contact information for *au pairs*. Plaintiffs intend to gather this information to support their merits arguments, and should also be permitted to use it in support of their class certification motion if the motion for a protective order is denied.

Under the current schedule, the parties must disclose affirmative experts on the class certification issue by January 13, 2017 (D.E. 452). Absent the protective order requested above, plaintiffs request that the Court extend the time for the parties to disclose affirmative experts on class certification issues until March 13, 2017. The additional time will afford defendants an opportunity to produce the missing documentation or, if necessary, for plaintiffs to bring a motion to compel.

<u>**CONCLUSION**</u>

The Court should preclude defendants from relying upon undisclosed evidence in opposing class certification, or challenging class certification on the basis that plaintiffs' experts' analysis is predicated on less-than-comprehensive wage data.  Alternatively, the Court should extend the deadline for disclosure of affirmative experts on class action issues from January 13, 2017 until March 13, 2017, and adjust the other dates consistent with the proposed revised scheduling order attached as Exhibit 2.

Dated: January 9, 2017

Respectfully Submitted,

BOIES, SCHILLER & FLEXNER LLP

/s/      Peter M. Skinner
Matthew L. Schwartz
Peter M. Skinner
Randall W. Jackson
Dawn L. Smalls
575 Lexington Avenue
New York, New York 10022
Tel: (212) 446-2300
Fax: (212) 446-2350
mlschwartz@bsfllp.com
pskinner@bsfllp.com
rjackson@bsfllp.com
dsmalls@bsfllp.com

Sigrid S. McCawley
Lauren Fleischer Louis
Sabria McElroy
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, Florida 33301
Tel.: (954) 356-0011
Fax: (954) 356-0022
smccawley@bsfllp.com
llouis@bsfllp.com
smcelroy@bsfllp.com

Alexander Hood
TOWARDS JUSTICE
1535 High Street, Suite 300
Denver, Colorado 80218
Tel: (720) 239-2606
Fax: (303) 957-2289
alex@towardsjustice.org
*Attorneys for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 9, 2017, I electronically served the foregoing Motion for Extension of Time to Disclose Affirmative Experts on all counsel of record.

/s/ Peter M. Skinner
   Peter M. Skinner