```
 1                IN THE UNITED STATES DISTRICT COURT

 2                    FOR THE DISTRICT OF COLORADO

 3    14-cv-03074-CMA-KMT
      _____

 4

 5    JOHANA PAOLA BELTRAN, et al.,

 6         Plaintiffs,

 7    vs.

 8    INTEREXCHANGE, INC., et al.,

 9         Defendants.

10    _____

11         Proceedings before MAGISTRATE JUDGE KATHLEEN M.

12    TAFOYA, United States District Court for the District of

13    Colorado, commencing at 10:08 a.m., January 24, 2017, in the

14    United States Courthouse, Denver, Colorado.

15    _____

16         WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

17    ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED. . .

18    _____

19                           APPEARANCES

20         PETER SKINNER, DAWN SMALLS, and ALEXANDER HOOD,

21    Attorneys at Law, appearing for plaintiffs.

22         BROOKE COLAIZZI, Attorney at Law, appearing for

23    defendant InterExchange, Inc.

24    _____

25         TELEPHONIC INFORMAL DISCOVERY CONFERENCE
```

Johana Paola Beltran, et al. vs.                    Telephonic Informal Discovery Conference
InterExchange, Inc., et al.                                                January 24, 2017

```
 1                    APPEARANCES (Cont'd)

 2            WILLIAM KELLY, Attorney at Law, appearing for

 3   defendant USAuPair, Inc.

 4            BOGDAN ENICA, Attorney at Law, appearing for

 5   defendant Expert Group International, Inc. d/b/a Expert

 6   AuPair.

 7            MARTHA FITZGERALD and DAVID MESCHKE, Attorneys at

 8   Law, appearing for defendant EuRaupair InterCultural Child

 9   Care Program.

10            JONATHAN BENDER, Attorney at Law, appearing for

11   defendant Cultural Homestay International.

12            JOAN LUKEY, JUSTIN WOLOSZ, LYNDSEY KRUZER, JAMES

13   LYONS and DIANE HAZEL, Attorneys at Law, appearing for

14   defendant Cultural Care, Inc.

15            BRIAN MASCHLER and PEGGY KOZAL, Attorneys at Law,

16   appearing for defendant AuPairCare, Inc.

17            KATHRYN REILLY, Attorney at Law, appearing for

18   defendants Au Pair International, Inc., Agent Au Pair and

19   GoAuPair.

20            SUSAN SCHAECHER, Attorney at Law, appearing for

21   defendant APF Global Exchange, NFP.

22            JOHN FULFREE and STEPHEN MACRI, Attorneys at Law,

23   appearing for defendant American Institute for Foreign

24   Exchange, d/b/a Au Pair in America.

25
```

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
January 24, 2017

Page 3

```
 1              APPEARANCES (Cont'd)
 2              MESHACH RHOADES, Attorney at Law, appearing for
 3   defendant GreatAuPair, LLC.
 4                    P R O C E E D I N G S
 5              (Whereupon, the within electronically recorded
 6   proceedings are herein transcribed, pursuant to order of
 7   counsel.)
 8              THE COURT:  Good morning, everyone.  This is Judge
 9   Tafoya.  We're here in Case No. 14-cv-3074.  This is Johana
10   Beltran, and other named plaintiffs, versus a number of
11   agencies, and I won't go through them all because I want you
12   to enter your appearances.  So we'll do it that way, I think.
13              So, first of all, as to the -- I think there are,
14   let's see, nine named plaintiffs.
15              May I have appearances of counsel.
16              MR. SKINNER:  Your Honor, good morning.  Peter
17   Skinner and Dawn Smalls from Boies Schiller, and Alex Hood
18   from Towards Justice.
19              THE COURT:  All right.  Good morning to you.
20              And let's just go down the list and I'll ask you to
21   speak up if you're on the phone.
22              So we'll start with InterExchange, Inc.
23              MS. COLAIZZI:  Good morning, Your Honor.  Brooke
24   Colaizzi from Sherman & Howard on behalf of InterExchange.
25              THE COURT:  And USAuPair.
```

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
January 24, 2017

Page 4

```
 1           MR. KELLY:  William Kelly representing USAuPair.
 2           THE COURT:  Let's see, do we have anyone appearing
 3   from GreatAuPair, LLC?  Okay, hearing nothing -- my notes say
 4   no appearances, I just wanted to make sure.
 5           Expert Group International, Inc., doing business as
 6   Expert AuPair.
 7           MR. ENICA:  Good morning, Your Honor.  Bogdan
 8   Enica, counsel for Expert AuPair.
 9           THE COURT:   And EuRa -- I guess it's EuRaupair
10   InterCultural Child Care Programs.
11           MS. FITZGERALD:  Good morning, Your Honor.  Martha
12   Fitzgerald and David Meschke from EuRaupair from Brownstein
13   Hyatt.
14           THE COURT:  And Cultural Homestay International.
15           MR. BENDER:  Good morning, Your Honor.  It's
16   Jonathan Bender from Holland & Hart for Cultural Homestay
17   International.
18           THE COURT:  Cultural Care, Inc.
19           UNIDENTIFIED SPEAKER:  Good morning, Your Honor.
20   In Boston at Choate Hall, Joan Lukey, Justin Wolosz and
21   Lyndsey Kruzer.  From Denver, and Jim.
22           MR. LYONS:  In Denver, Your Honor, it's Jim Lyons
23   and Diane Hazel of Lewis Roca Rothgerber.
24           THE COURT:  All right, good morning to all of you.
25           Let's see, AuPairCare, Inc.
```

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
January 24, 2017

Page 5

```
 1              MR. MASCHLER:  Good morning, Your Honor.  Brian

 2   Maschler from Arent Fox and Peggy Kozal from Gordon & Rees

 3   for AuPairCare.

 4              THE COURT:  All right.  And Au Pair International,

 5   Inc.

 6              MS. REILLY:  Good morning, Your Honor.  This is

 7   Katie Reilly with Wheeler Trigg on behalf of Au Pair

 8   International, and then two additional defendants, GoAuPair

 9   and Agent Au Pair.

10              THE COURT:  Okay.  And for APF Global Exchange.

11              MS. SCHAECHER:  Susan Schaecher with Fisher &

12   Phillips for APF Global Exchange.

13              THE COURT:  And, let's see, American Institute for

14   Foreign Study.

15              MR. MACRI:  Good morning, Your Honor.  Steven Macri

16   and John Fulfree on behalf of AIFS, Au Pair in America

17   program.

18              THE COURT:  All right.  And let's see, that doesn't

19   include -- does that include A.P.E.X American Professional

20   Exchange?

21              MR. MACRI:  No, Your Honor.

22              THE COURT:  Okay.  Is anyone appearing for that

23   group?  About 20/20 Care -- I'm sorry, go ahead.

24              MR. SKINNER:  Your Honor, it's Peter Skinner.

25   A.P.E.X. -- A.P.E.X. American and 20/20 Au Pair are
```

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
January 24, 2017

Page 6

1   represented by the same folks, and they are not a part of the

2   relief that we're seeking here today.  We've agreed to keep

3   conferring with them, and that if we need to seek relief with

4   them, to call back to court separately.

5              THE COURT:  Okay, that sounds fine.  All right.

6              MR. SKINNER:  They were unable to participate in

7   the phone call today.

8              THE COURT:  All right, thank you.  Let's see.

9              So as I understand it, what's going on today is a

10  question about whether or not all of the names of the

11  potential class members -- so, in other words, the au pairs

12  that were, I think, employed by these agencies during the

13  period of time specified -- the plaintiff wants that now, and

14  I'm wondering why you want it now, as opposed to later.

15             I looked through the file, which is, of course, no

16  easy task, in and of itself, but it looked to me like Judge

17  Arguello has not yet even ruled on the Motion for Collective

18  Class Certification at this point and you're not going to be

19  briefing class action under Rule 23 for another month, so it

20  seems a bit premature.  I mean, if you get a class, of

21  course, you're going to get those names, but -- so do I have

22  the topic wrong or right?

23             I'll ask plaintiffs first.

24             MR. SKINNER:  Your Honor, it's Peter Skinner for

25  the plaintiffs.

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
January 24, 2017

Page 7

 1              You have it mostly right.  What we're looking for

 2      is contact information right now, at this time, for the

 3      au pairs that were sponsored by defendants.  We're also

 4      looking for contact information for the host families that

 5      were sponsored by the defendants.

 6              No defendant to date has produced this information.

 7      So we teed this up because we've been talking to them for

 8      some time about our need for the information and having been

 9      unable to resolve it amongst ourselves, but we now intend to

10      move to compel, so that's the purpose of this conference.

11              With respect to why we need it now, the short

12      answer is that we need it, not to identify who the members of

13      the class might be, if the class is certified, but rather to

14      identify other information that will be relevant to proving

15      our claims in this case.

16              And most specifically, the reason this has come to

17      a head at this moment is that we've been trying for some time

18      to gather data with respect to what the au pairs were paid as

19      far as wages go.  And we have asked the defendants for this

20      data and we had gotten some information back from the

21      defendants; but generally speaking, they've taken the

22      position that they didn't pay the au pairs so they don't know

23      specifically what the au pairs were paid.

24              So we're faced with the situation now where, having

25      been unable to gather the information from the defendants, we

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
January 24, 2017

Page 8

1   need to go out and gather it for ourselves, and the means of

2   gathering the information will be to contact host families

3   and au pairs to ask them what au pairs were paid during the

4   relevant time periods.

5           That -- that very big picture, very big picture --

6           (Recorded voice disruption.)

7           MR. SKINNER:  So I could -- you know, I can talk to

8   Your Honor about the background of what's happened here.  I

9   can talk to you in greater detail about why we need the

10  information.  I can talk to Your Honor about how -- what we

11  intend to do with the information once we get it; but again,

12  big picture, it's needed so that we can get the wage data

13  now.

14          The reason we need to go do it now is that we have

15  a fact discovery cutoff date in mid-April or, really, three

16  months from now.  If we're going to have any prayer of

17  reaching out to folks and getting information back before the

18  end of fact discovery, we need to (inaudible).

19          And with respect to the wage information itself,

20  it's relevant to the merits of our claim.  We're going to

21  need to prove damages, you know.  Quite simply, it's going to

22  be necessary to show that folks were paid at the level we

23  believe they were paid at in order to -- in order to prove

24  that part of the merits of our case.

25          And because we have to deal with this merits issue

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
January 24, 2017

Page 9

1  in a discovery cutoff that we have, we can't stop -- we can't

2  wait until after a class certification is resolved in order

3  to try and go forward and get this.

4          We also think, you know, as an aside, that this

5  information would be useful for the class certification

6  question.  And that is the subject of the motion for a

7  protective order, or alternatively, to amend the schedule

8  that we filed, I guess it was the week before last, and then

9  now briefing is due from defendants soon and we'll have that

10  before Your Honor as well.

11          So we -- we -- we have expert opinion with respect

12  to class certification.  They have offered opinion that there

13  is (inaudible) commonality and typicality across the class to

14  satisfy the class certification requirement; but we expect

15  that one of the criticisms that we are going to be receiving

16  from the defendant is the lack of underlying wage data

17  demonstrating what folks were actually paid.  In fact, they

18  did make that criticism in their opening report.  I'm sure it

19  will be addressed in their rebuttal report as well.  And our

20  experts have said as well that it would certainly be

21  additional helpful information in establishing class

22  certification.

23          So again, getting the wage data will be helpful,

24  not just -- will be necessary, not just for the merits, but

25  helpful for class certification.  And any data that we can

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
January 24, 2017

Page 10

1   get in before we file our Motion for Class Certification will

2   help us.

3          So the defendants, in general -- and I'll, of

4   course, let them speak for themselves.  But the defendants,

5   in general, have said that the discovery of this information

6   at this time is not proper; that we should wait until after a

7   class is certified.  And, you know, that is problematic to us

8   for a few reasons.

9          First, as I noted, in order to conduct merits

10  discovery, we need to be able to move forward with this.  And

11  the Court found very clearly -- we discussed it at length

12  with the Court at different stages of this litigation -- the

13  Court has decided not to bifurcate class and merits

14  discovery.  So we shouldn't have to wait until after class

15  certification to get information that would be useful to us

16  in proving the merits of our claim.

17         We also -- there is ample law, which we would

18  intend to cite for the Court if you allow us to go forward

19  with our motion, that there is ample -- there is ample law

20  out there saying that the parties should not have to wait

21  for -- so even with discovery -- of the names, the members of

22  the class until -- until after class certification.  It can

23  be -- it can and often is produced prior to that.

24         And in this case, we're not looking for the

25  information for purposes of sending out class notices or

Page 11

 1   something.  We're looking for it for a different purpose in

 2   order to establish an element of our claims that we need to

 3   establish to prove the merits of the case.

 4           So, you know, under the law, as well as just under

 5   the logistics of the way the Case Management Order has been

 6   structured, we need to address this now, rather than waiting

 7   until after -- until after the Court has resolved the class

 8   certification motions, which, as Your Honor noted, will not

 9   even be filed under the present schedule for another month.

10           THE COURT:  All right.  So let me direct just a bit

11   because I don't know how many of you representing the

12   defendants wish to speak, but my -- my interest is in as to

13   your client.

14           If your client is one of those that has not been

15   able to give wage data because they say they don't know it

16   because they didn't pay it, I understood there might be some

17   reporting requirements that the agencies had and so they

18   might have collected the wage data in to some of that

19   reporting, but I don't quite remember exactly why I think

20   that.  So you might want to address that.

21           And I -- you know, I want to hear why this isn't

22   kind of trying to hamstring plaintiffs.  I mean, if you -- if

23   you can't give them the wage data -- the wage data is kind of

24   the heart of the case because the claim is, right, that

25   they're paid this substandard rate and all of them are paid

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
January 24, 2017

Page 12

1    the same.  So clearly the information is extremely relevant

2    and the plaintiffs need to get it.

3              And if you can't give it to them, then I don't

4    understand why you shouldn't give them the people that paid.

5    You know, Here's the name of the sponsors, they're the ones

6    that paid, so that they can do a canvas and ask them how much

7    they paid.

8              They've got to get it one way or the other.  So

9    that seems like a pretty -- if the sponsors -- if you're

10   saying, and your agency is saying, that the sponsors are the

11   ones that keep those records that they know are at the home,

12   you know, where they're living, they know what they paid,

13   then that's -- you've got to give them up because they have

14   to be able to go get it.

15             So I would like to know what you would propose as

16   an alternative because I do think this is information that's

17   relevant.

18             Who wants to go first?

19             MS. LUKEY:  Your Honor, the defendants agreed last

20   week that we would have one spokesperson, if that's

21   acceptable to you, on the merits issues that were just

22   addressed.

23             This is Joan Lukey for Cultural Care.  And the

24   agreement was that I would address that briefly, including

25   your specific questions; and then Katie Reilly will talk

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
January 24, 2017

Page 13

1    about the alternative that was proposed by several, not all,

2    but several of us that the plaintiffs last weekend rejected.

3              THE COURT:  All right.

4              MS. LUKEY:  Is that acceptable to you if we proceed

5    in that fashion?

6              THE COURT:  Yes, that's fine.

7              MS. LUKEY:  All right, thank you.

8              First, just a couple of really quick preliminary

9    points, Your Honor.

10             This is, as to all of the defendants, as you know,

11   a price-fixing antitrust case.  There is a small number of us

12   as to whom it's also an FLSA case, and my client, Cultural

13   Care, which is the largest of the sponsors, is one of those.

14             We want to point out that, as to all of us, there

15   was an allegation made in this action at paragraph 80 of the

16   Second Amended Complaint, that, as a group, the sponsors

17   conspired and agreed to fix all of their sponsored standard

18   au pairs' weekly wages at exactly the programmatic wage

19   for -- close quote -- the wage for being a stipend

20   (inaudible) that's set by the Department of State, as you

21   know.

22             So we are in a context now where for two years this

23   case has been pending, a little over two years, with the

24   claim that all of us had conspired to pay the same price.

25   And only very recently, not a long time ago as implied by

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
January 24, 2017

Page 14

```
 1   Mr. Skinner, did the plaintiffs come to us and say, not only
 2   do they not know whether we have a conspiracy, they don't
 3   even know what the stipends were that were paid.  We do not,
 4   as the Court notes, consider them wages, because this was a
 5   cultural exchange program, according to the federal
 6   government, not a labor program.
 7           That being said, we're now looking at a case where
 8   we're accused of conspiring to fix prices and we have the
 9   plaintiffs telling us they don't even know what was, in fact,
10   paid.
11           Let me turn to the issue -- well, let me say this
12   first.
13           There is a huge difference for us between contact
14   information for the au pairs, as to which the vast majority
15   of us have already acknowledged we would be producing that
16   when -- if we are FLSA defendants.  When we get the
17   conditional selective action certification, which is what the
18   case law indicates is the proper sequence for the
19   antitrust-only defendants, it would be an issue of the Rule
20   23 certification; but this urgency was created by the
21   plaintiffs.  They're now contending this great urgency, even
22   though the opening reports are already in from the experts.
23           In circumstances where, at the beginning of the
24   case when they asked for au pair contact information,
25   everybody objected to producing it before there was
```

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
January 24, 2017

Page 15

 1   conditional collective action certification, and that sat

 2   for -- I'm not sure of the exact length of time -- maybe 18

 3   months.

 4            This fall, plaintiffs' counsel contacted Cultural

 5   Care, the largest of the group, in September and October to

 6   talk to us about this issue, and we continued to say that we

 7   would not produce until we had the ruling on conditional

 8   collective action certification.

 9            I want to be clear to the Court, maybe one other or

10   two other defendants were contacted in October.  All of the

11   other sponsors for whom I'm now speaking, at their request,

12   were contacted between Christmas week and the first week in

13   January for the first time since they had asserted their

14   objections to producing at this time, before there had been

15   conditional certification.

16            The only urgency here is of the plaintiffs own

17   making.  And we are in a circumstance where, frankly, we

18   believe the case law, which would obviously be briefed and

19   should be briefed in this matter if the Motion to Compel goes

20   forward, should be argued and we would hope that it would be

21   argued in person because it's a significant issue from the

22   defendants' perspective.

23            The case law indicates that this should be

24   happening, this relief of au pair contact information, should

25   be happening after the, either conditional collective action

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
January 24, 2017

Page 16

```
 1    certification or for the antitrust-only defendants, the Rule
 2    23 class certification, not before.
 3            The key reasons given in the case law are, of
 4    course, this would avoid an end run of a judicially
 5    controlled notice process.  And, in fact, the parties in this
 6    case negotiated long and hard and came up with the parameters
 7    of the notice, except on a handful of points we're now before
 8    the Court for resolution.  That would all be meaningless,
 9    were the plaintiffs to get the information and proceed now.
10            And I must respectfully again contradict something
11    that Mr. Skinner just said.  In the plaintiffs' conversations
12    with counsel, specifically with Cultural Care counsel, us,
13    when we asked why they wanted the information when they first
14    approached us in September and October, the response was,
15    They didn't have to tell us.
16            Later, much later, when they raised the issue of
17    their reading it for their expert reports -- and we're now
18    moving into closer to the time period where all the other
19    defendants were contacted, late December and early January --
20    we specifically asked if the information would also be used
21    for the purpose of soliciting class participation.  And
22    Mr. Skinner's response was that he would not be hamstrung; if
23    he called up to ask the information about the stipend payment
24    from an au pair, and they asked questions about the case and
25    expressed the interest in perhaps becoming involved, he
```

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
January 24, 2017

Page 17

```
 1   intended to discuss that with them and to permit them to join
 2   the class.
 3              Now, in the ordinary course after the conditional
 4   certification, that would probably be fine; but now it's not
 5   fine because we spent all of this effort, and the Court will
 6   be spending significant effort, to ensure that the approach
 7   is appropriate to the prospective class members.  But, to
 8   reason number one.
 9              For Cultural Care, reason number two is that we are
10   in a position where there may not be any class rep because
11   one of the two putative class reps against Cultural Care on
12   the pending issue, the FLSA issue, was Ms. Cardenas Caicedo,
13   who is out of the case, dismissed.
14              The second is Ms. Deetlefs, who is the subject of a
15   pending motion regarding her impropriety or inappropriateness
16   because she has expressed publicly racist views, and the case
17   law suggests in a multiracial class, the racist cannot serve
18   in the role of class rep.
19              So from the perspective of Cultural Care, again the
20   largest of the sponsors, we're in a position where there may
21   be no conditional class certification for FLSA purposes, and
22   it would be inappropriate for defendants to be getting
23   information from us to use for the purpose of attempting to
24   solicit other class members.  That's not how the process
25   works.
```

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
January 24, 2017

Page 18

1      So we have been specifically told that they would

2  use the information to provide information about the

3  litigation and potentially to sign on additional plaintiffs.

4      And we specifically are asking this Court to ensure

5  that the normal case law is followed in that the information

6  is provided only when and if a conditional collective action

7  certification actually occurs, bearing in mind that each of

8  us is basically being assessed separately for class purposes.

9      Here, they are now claiming, at what we would like

10  to say that their claim is both untimely and illogical to be

11  pressing it now, claiming that this somehow bears on the

12  certification issue.  If they thought it bore on the issue,

13  even though they made allegations that they already knew we

14  had colluded with each other to set the same price for

15  everybody, something they apparently concede they don't know,

16  they should have raised it before now.

17      The first round of reports -- expert reports are

18  already in, and they've known for about a year and a half,

19  perhaps a little more, that nobody intended to produce the

20  information, until and unless there was a conditional

21  collective action certification or Rule 23 for those -- to

22  whom that applies, class action certification.

23      So we say this is really illogical, because if

24  they're contacting au pairs, or attempting to contact which

25  families (inaudible) matter, that, frankly, indicates a lack

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
January 24, 2017

Page 19

1   of common proof and also indicates that allegations made that

2   couldn't be supported.

3           So we simply ask -- this is a matter of timing --

4   for the vast majority of us -- or one or two defendants who

5   actually had indicated other issues because they had, for

6   example, mandatory arbitration clauses; but for the vast

7   majority of us, we're saying the timing is not now.  We have

8   told them that from the outset of the case.

9           If they are successful in getting conditional

10  collective action certification, the notice that was

11  negotiated with great care and is now before the Court can be

12  sent out without the risk of anybody making an improper

13  outreach.

14          Now, these defendants, all of us who have had the

15  contact information, obviously, for our respective au pairs,

16  to the best of my knowledge, there has been no attempt on the

17  part of the defendants to make an outreach to any of these

18  prospective class members and that forbearance should be

19  worth something in determining whether the plaintiff can now

20  sidestep the agreed-upon notice and address the matter

21  directly with the various au pairs, even for those of us who

22  may end up not having a collective action -- conditional

23  collective action certification entered.

24          Turning quickly to the host family issue, Your

25  Honor, that's a situation where nobody has ever agreed to

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
January 24, 2017

Page 20

 1    turn over the information, although my client, and mine

 2    alone, to predecessor counsel raised the possibility of

 3    providing it for opted-in plaintiffs later.

 4              The reason that's so is that the host families are

 5    the defendants' clients, they're the lifeblood of their

 6    business.  Their names are highly sensitive and confidential.

 7    Many of them have confidentiality agreements with the

 8    sponsors, and to pull them in creates a major, major business

 9    sensitivity for these various entities.

10              And you can understand why host families feel this

11    way.  By definition, they have children, many of them have

12    small children, many of them have children with various

13    impairments.  They expect their information to be maintained

14    in confidence and they often require it as part of the

15    business arrangement.

16              Further, in the first instance, if anybody were to

17    provide the information as to what was paid, we would suggest

18    it would more appropriately be the au pairs.

19              To address your specific question, you refer to

20    wage data.  Again, respectfully, Your Honor, this is a

21    cultural exchange program, these are stipends.  But with

22    regard to the stipends, there is no requirement that the

23    sponsors report the stipend amount to the Department of

24    State.  Rather, what they must report is confirmation that

25    they have informed the sponsors and taken an effort to ensure

Johana Paola Beltran, et al. vs.                    Telephonic Informal Discovery Conference
InterExchange, Inc., et al.                                          January 24, 2017

Page 21

 1    that every sponsor is telling the host families that they

 2    must pay at least the stipend amount set by the Department of

 3    State.

 4              And that is the only reporting requirement to go

 5    out there, gather the information that is asked, Did you pay

 6    at least currently $496.71? the answers are supposed to all

 7    come back, Yes.  And they're supposed to come back saying

 8    that there was no requirement that the person work more than

 9    45 hours in a week or ten hours in a day.  But any amount of

10    work between zero hours and 45 hours, they must be paid at

11    least the stipend, even if they worked two hours in a week.

12    And that's the inquiry that the sponsors must make, and

13    that's the only inquiry they must make.

14              And by simply -- simply one could infer that

15    because the state department asked them to confirm that that

16    is the case so that at least the stipend is paid and it be

17    reported, but there is no requirement that the sponsors

18    attempt to ascertain what in excess of that amount some host

19    families may be paying.

20              There is also no requirement in the regulations,

21    the state department regulations, for the sponsors to

22    maintain the records, although an argument is asserted by the

23    plaintiffs that this should be governed by the portion of the

24    FLSA, which would require the host families to keep that

25    information.  That's a separate issue.

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
January 24, 2017

Page 22

1      But in the first instance, the party who knows what

2   they were paid, since many of them were paid by cash, would

3   be the au pairs.  And as indicated a moment ago, as soon as

4   there is, when and if there is, a conditional collective

5   action certification for the FLSA defendants, there are only

6   four or five of us, or a class certification for Rule 23 for

7   everybody, there is no reason to turn over the au pair

8   contact information; but at that point they will then have

9   the ability to go to the au pairs if classes are certified as

10  to each of the sponsors.

11      But to some sponsors there will be, we suggest, in

12  fact, no certification in (inaudible), in antitrust, there

13  may be no certification for anybody.

14      So it is premature to ask at this point that we

15  turn over all of that information when one would assume from

16  the schedule in place that that will occur in the very near

17  future and we are standing by.

18      We assume that the decision on the conditional

19  collective action certification is at this point imminent;

20  and it is then that they will get this information for the

21  appropriate sponsors and not for others, and it is then that

22  they can contact the au pairs; who are the people with the

23  most information.

24      But, again, I want to reiterate, since the

25  price-fixing case is alleged against everyone, it is

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
January 24, 2017

Page 23

 1   troubling that an allegation that we all colluded and all

 2   paid the same amount is now being countered with the

 3   statement that they don't know what the au pairs were being

 4   paid.  Period.  That's a different issue.

 5            Unless the Court has specific questions on those

 6   points, which I would be very glad to address, to follow up

 7   on your other question about whether alternatives are

 8   possible, I would defer at this point to Katie Reilly, if

 9   that's acceptable to you, Judge.

10            THE COURT:  All right.  I didn't have any specific

11   questions.  For -- for all of you, I'm sure that there is

12   someone among your group that follows things like the court's

13   six-month list requirements, et cetera.  But just in case you

14   don't know, I will tell you that the Motion for Collective

15   Class Certification under the FLSA has been pending, as I

16   look at it, since July of 2016.

17            It's going to be on the list, which tells me only

18   one real thing; and that is, that you will have a decision

19   very likely -- I mean, it's not 100 percent, but, you know,

20   99 percent, you will have a decision by the end of March, but

21   that's really all it says.

22            Now, I agree with you that it probably is -- the

23   ruling probably is pretty imminent because of the length of

24   time it has been pending, but I think that you should know

25   that it's possible you won't get one until the end of March.

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
January 24, 2017

Page 24

1    I think you will get it by then, but you may not.  So if that

2    tempers your thinking about that at all, it's just a piece of

3    information that might be good to have.

4          So let's go forward then and let me hear from Ms.

5    Reilly then.

6          MR. SKINNER:  Your Honor, it's Peter Skinner.

7          Just in the interest of efficiency, can I respond

8    to a few of Ms. Lukey's points while they're still fresh in

9    your mind before we turn to what the defendants' alternative

10   proposal has been?

11         THE COURT:  Okay.

12         MS. REILLY:  This is Katie.  The alternative

13   proposal takes probably only two to three minutes to

14   describe.

15         THE COURT:  Okay.  Let me hear the alternative, and

16   then, Mr. Skinner, you can tell me -- you can respond and you

17   can also tell me why that alternative wasn't good for you.

18   Okay.

19         MR. SKINNER:  Thank you, Your Honor.

20         MS. REILLY:  So, Your Honor, based on plaintiffs'

21   counsel's representations that they need the stipend data and

22   based on their stated purpose and intended use for that data,

23   which Mr. Skinner described last week was that plaintiffs

24   intend to provide all of the contact information to their

25   experts so the experts can design a survey and then

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
January 24, 2017

Page 25

1   administer the survey to collect stipend data, with those --

2   with those representations in mind, the sponsors spent a lot

3   of time last week working out a joint proposal, and this

4   proposal was made -- was presented on behalf of 13 of the 15

5   sponsors.  So only two sponsors, AuPairCare and Au Pair in

6   America, did not join the proposal at this time.  The other

7   13 did.

8           And here is what the proposal entails.

9           In exchange for the plaintiffs backing off the

10  request for au pair contact information, unless or until the

11  conditional certification is granted, and in exchange for the

12  plaintiff withdrawing the request for host family

13  information, unless or until Rule 23 class certification is

14  granted, the sponsors -- and when I say, "the sponsors," I

15  mean all but AuPairCare and Au Pair in America, so the other

16  13 -- are willing to transmit a survey prepared by plaintiffs

17  and their experts to the au pairs.

18          Now, this would be a survey that would be designed

19  by the plaintiffs' experts working with the plaintiff, they

20  would design the content and the methodology.  However, to

21  ensure that the survey wasn't being used improperly -- for

22  example, for recruitment purposes, to recruit class

23  members -- the sponsors would have the right to review and

24  veto on any inappropriate survey language, but otherwise, it

25  would be plaintiff's show.

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
January 24, 2017

Page 26

 1             So that proposal was submitted to plaintiff, mostly

 2     in response to the Monday night filing of the Motion for

 3     Protective Order and then the -- you know, the court

 4     conference that was teed up on Tuesday of last week.  We

 5     conveyed that proposal on Wednesday and it was rejected out

 6     of hand by plaintiffs with no further conferral the following

 7     morning, or last Thursday.

 8             THE COURT:  Okay.

 9             So Mr. Skinner --

10             MR. SKINNER:  Thank you, Your Honor.

11             THE COURT:  -- I think it's your turn now.

12             MR. SKINNER:  Peter Skinner (inaudible), but thank

13     you, I appreciate it.  I'll try and keep this brief just to

14     respond with respect to a few of the points that Ms. Lukey

15     made.

16             Of course, this request at this point in time is

17     not a concession that there was no conspiracy, nor that is

18     some kind of admission that we don't know what the plaintiffs

19     were paid.  To the contrary, there is a lot of evidence out

20     there that the plaintiffs were paid entirely consistent with

21     the arguments that we've -- with the claims that we've made

22     in our Complaint.

23             We have the defendants' own statements; we have

24     survey information, which does indicate what some of these

25     defendants -- excuse me, what some of these plaintiffs were

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
January 24, 2017

Page 27

 1   paid, the correspondence with plaintiffs and host families

 2   that give some window into this.  There is, of course, all

 3   the information that we've gotten from our own clients and

 4   have gathered through our own investigation.

 5            There is a lot of information out there

 6   supporting -- supporting our contention that the plaintiffs

 7   were paid at an artificially low level and that they were all

 8   paid at or very close to the same amount.  So this, by no

 9   means, is some kind of a concession at a late stage of the

10   case that we can't prove our case.

11            To the contrary, it's what happens in any case

12   where you make the allegations you can make in good faith

13   based upon the complaints.  You seek to gather further

14   evidence to prove those allegations.  And in this instance

15   where we sought to gather evidence that nobody disputes is

16   relevant to our claims, we've been told that the parties of

17   the case don't have the best source of evidence so we have to

18   go elsewhere in order to get it.  And it's really as simple

19   as that.

20            With respect to the timing of all this, the

21   suggestion that there is no logic to the timing of our

22   request defies logic, in and of itself.

23            We told you at the very beginning of our

24   presentation that this has been motivated by our need to

25   prove the merits of our case.  There is no bifurcation of

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
January 24, 2017

Page 28

 1    class and merits discovery.  Fact discovery ends in three

 2    months.

 3              We have been trying, with varying degrees of

 4    success, and not much success, frankly, to get documents from

 5    the defendants for a long time.

 6              Our discovery requests were originally propounded

 7    in March of 2015.  After the denial of the Motion to Dismiss,

 8    they were propounded again in March of 2016.  We have had

 9    discussions with the plaintiffs -- excuse me, with the

10    defendants in various levels for months now with respect to

11    our efforts to get basic documents from them.  And they've

12    finally, really at the end of the year and, amazingly, since

13    we filed our expert report on the 13th, we've gotten a

14    tremendous amount of information from some defendants, but

15    it's finally starting to come in.

16              And we've been analyzing the information as it

17    comes in, and we've reached the conclusion, together with our

18    experts, that in order to prove the merits of our case, we're

19    going to have to go out and do some additional investigation;

20    but there is nothing (inaudible) about the timing of the

21    request, nor is it fair to say that we have created the

22    urgency here.

23              To the contrary, we have tried responsibly to find

24    any other means of gathering this information and we haven't

25    been able to do it.  So we're now faced with the situation

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
January 24, 2017

Page 29

1    where we are going to have to take on the burden and extent

2    of trying to gather this information ourselves, and the

3    urgency is created by the discovery schedule, not by the

4    timing of our request.

5              With respect to -- this is just a minor aside.

6              But with respect to the idea that Cultural Care,

7    in particular -- first of all, we dispute the notion that we

8    don't have an adequate plaintiff as part -- as part of our

9    conditional class certification motion.  We have an

10   additional plaintiff in our Second Amended Plaintiff,

11   Ms. Rascon, for the part of our conditional class

12   certification.  So the notion that we're going to somehow

13   find somebody that we don't already have and benefit from the

14   discovery with respect to Cultural Care simply is unfounded.

15             With respect to what we want to do with this

16   information and how we're going to go about gathering it, let

17   me talk a little bit about that because we have spent quite a

18   bit of time with our experts trying to figure out the most

19   economic and efficient way of getting this wage data that

20   we've been unable to get in a comprehensive form from

21   defendants themselves.

22             So the plan is to do a survey with a particularly

23   meaningful randomized sample.  We do not plan to call

24   everyone.  We plan to call or email, or whatever the means of

25   communication is, as few people as possible, but it needs to

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
January 24, 2017

Page 30

```
 1   be a statistically meaningful sample.  Otherwise, the
 2   defendants are going to turn around and say that it's
 3   inadequate for us to meet our burden of proof.
 4            And we don't know yet precisely what we're going to
 5   get from the defendants with respect to how many au pairs and
 6   host families there are precisely in getting years and
 7   getting locations and the like; but once we have that
 8   information, we will randomize a sample that goes across, to
 9   adequately disperse across years, locations of host families,
10   as well as to make sure that we've got an adequate sampling
11   from the sponsor defendants themselves.
12            The data is data with respect to how much folks
13   were actually paid.  That resides in two places, as I
14   mentioned at the beginning: With the host families and with
15   the au pairs.
16            There was a suggestion that we're going to get the
17   au pair anyway at some point in time so we should just wait
18   for it.  And contacting au pairs alone is not -- is not going
19   to solve all of our issues with trying to address this,
20   unless the defendants are willing to make some stipulations,
21   which, thus far, they haven't been able to do.  But
22   contacting the au pairs alone is going to be an imperfect
23   source for the data.
24            The primary reason being that, first of all, our
25   likelihood of finding them, particularly for their earlier
```

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
January 24, 2017

Page 31

1   years, will go down.  I mean, you know, we don't know that

2   for sure yet, but we think that's a reasonable assumption,

3   that the response rate for au pairs will go down because

4   relative to the host families, at least, they are a more

5   transient population.

6          But we also, you know, with respect to the au pairs

7   (inaudible) do something the defendants may be able to make

8   some agreements on, but we would be worried about arguments

9   from the defendants that the sampling with respect to the au

10  pairs may be subject to bias, because the au pairs themselves

11  may have a motivation to underreport their income.  So there

12  is a couple of reasons why we want to talk to host families,

13  in addition to au pairs.

14         And the notion that contacting host families is

15  that we're going to be having -- that we're going to be

16  having access to some kind of a highly sensitive information

17  that may prejudice them, we have a protective order in place,

18  the defendants today have shown themselves more than able to

19  designate things "Confidential and Attorneys' Eyes Only."

20         The information with respect to who the host

21  families are will be coming to the plaintiffs and we don't

22  intend to disperse it out to everybody else.  So the idea

23  that this is proprietary information where their competitors

24  may be able to use it to undermine them is unfounded,

25  provided we don't provide it to anybody else, and we don't

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
January 24, 2017

Page 32

 1    have any intention of doing that.

 2           And whatever information we gather back from the

 3    host families with respect to the amounts they actually paid

 4    the defendants -- excuse me, the plaintiffs, we could

 5    certainly sanitize so that we're not enabling the defendants

 6    to undermine each other with respect to the identity of the

 7    host families.  So, also, that argument obviously does comply

 8    with respect to the au pair population.

 9           With respect to the host family population, it

10    (inaudible) apply; the host family is going back in time.

11    They are no longer -- they are no longer working with the

12    sponsors to have au pairs.

13           A big picture level of the idea that this is going

14    to somehow endanger their business, well, Your Honor, it is

15    protected by the protective order.  I'm sure we can have

16    additional discussions with the defendants and the Court, if

17    need be, to put in place an adequate regime to protect this

18    contact information; but, unfortunately, given what they --

19    the positions they have taken in this case so far, that we --

20    we have no choice but to go out and try and gather the

21    information at this point in time.

22           And I think that's one thing that is worth noting,

23    Your Honor.  I mean, at one point, what the defendants are

24    really saying is they don't trust us with the information.

25    They think that producing the information to us may damage

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
January 24, 2017

Page 33

1   them in some way, although they, frankly, haven't really

2   articulated what that damage would be or how that damage

3   couldn't be accounted for by protective order.

4           But at this point in time, we've filed a valid

5   Complaint.  That Complaint has survived rigorous review on a

6   Motion to Dismiss.  We have claims.  We are entitled to

7   investigate and to prosecute our case, and our time to do

8   that is running short.  So at this point in time, we have to

9   start taking steps to go out and gather this information.

10          And we offered to the defendants, we tried -- we

11  tried to say to the defendants, Look, you know, you guys have

12  ample, what I'll call, secondary or circumstantial

13  information in your own records as to what folks were being

14  paid.  A lot of these sponsors were talking to the au pairs

15  on a regular basis and were asking them how much they were

16  being paid.  There are contracts that indicate what the

17  agreement was as to what au pairs were going to be paid.

18  Like I said, in some instances, there's -- and some of this

19  is just correspondence -- what the amount of payment was

20  made, they would offer to pay them.  If you will stipulate

21  that the plaintiffs were paid consistent with the information

22  that you have and the secondary information that you have as

23  to what they were being paid, you know, that they were

24  actually paid that, that's fine, then we don't have an issue,

25  but they've refused to do that.

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
January 24, 2017

Page 34

```
 1              They're putting us through our burden of proof,
 2    which is their right, and that we have the right to go out
 3    and gather the evidence we need in order to satisfy our
 4    burden.
 5              THE COURT:  All right.  Well --
 6              MR. SKINNER:  Let me turn briefly to -- I was just
 7    going to turn last to the proposal, Your Honor -- to the
 8    proposal, but I can hold if you have questions.
 9              THE COURT:  No.  Go ahead and address the proposal
10    because that's kind of my focus now, too.
11              MR. SKINNER:  Okay.  Well, they proposed that, as I
12    believe Ms. Reilly explained, that we do an email survey that
13    will be administered by the defendants with the parties
14    agreeing to the content of what goes into the email.
15              There are -- there are a couple of problems with
16    this, from our perspective.
17              First, the idea that the plaintiffs are going to
18    drive the process and be able to have the flexibility to
19    prove their case in the manner in which they want to prove
20    their case is inaccurate, because they retain a veto power as
21    to what is said to the folks who would get the email blast.
22              And, you know, we shouldn't have to depend upon the
23    defendants a voice in our -- in our request to these folks to
24    try and gather the information that we have to gather.  We
25    should have the freedom to do it in the way that we think is
```

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
January 24, 2017

Page 35

1    best.

2              More importantly than that, however, is that, you

3    know, in talking to our experts who have done this kind of

4    work before, this is not as clean a process as the defendants

5    might suggest.  It's not as simple as agree to an email and

6    hitting "Send."  It's really an interim process.

7              Initial -- an initial contact will go out.  We then

8    have to determine what kind of response do we get.  And the

9    response will likely be with respect to certain factors that

10   we have to account for in order to have a real meaningful

11   randomized survey.

12             We might know from the contact list that there is a

13   certain population of au pairs and host families in a certain

14   region.  We might not get adequate responses back from that

15   region in the first go, so we may then have to follow with

16   additional responses going out to additional places.

17             We could have the same issues across years.  We

18   could have the same issues across sponsor defendants.  We're

19   going to have to -- we expect there to be some follow-up.

20             So we also very well may be getting questions back

21   from au pairs, as well as host families, as to what we're

22   looking for, why we're looking for it, what's going to be

23   done with the information, et cetera, et cetera, and that

24   will be a process in responding to them.

25             And it's simply going to be untenable, as a

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
January 24, 2017

Page 36

1 logistical matter, to constantly be working through the

2 defendants in order to do this.  The logistics of getting the

3 defendants on a telephone just for today were, frankly, high.

4 The idea that we're going to be able to conduct and

5 administer this survey in a sufficient and rapid manner if

6 every communication, if every follow-up communication that we

7 have has to go back through one of the sponsor defendants.

8 It's just simply unrealistic.

9          And lastly, we shouldn't have to defend -- we

10 shouldn't have to depend upon the defendant to gather this

11 information.  We don't have any expectation that the

12 defendants would do it in a dishonest way or, you know, in a

13 way calculated to undermine what we're trying to achieve.  I

14 will assume that they will operate in good faith, even if

15 they may have -- may have an interest in not doing so.  We'll

16 see if they will.  But the real problem is the nature of who

17 the request is coming from.

18          The request out to the au pairs, and the sponsors

19 alike, coming from the sponsors are weighted.  The au pairs,

20 particularly the folks who are currently being sponsored by

21 the defendants, are -- may not -- I think it's a reasonable

22 assumption that they may not be going to respond to queries

23 that are coming from the sponsors.

24          And host families, we have similar concerns.  While

25 the host families have a separate type of relationship with

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
January 24, 2017

Page 37

1    the sponsors, it's still a relationship that, to some degree,

2    is somewhat of dependence in that they depend on the sponsors

3    to identify and provide the folks who are living in their

4    homes, they depend on the sponsors to help them if things

5    don't work out.  And again, there is -- we have concerns

6    about the quality of the information that we might be getting

7    back if it is administered by the defendants.

8              So for all of these reasons, the idea that the

9    defendants would administer this survey simply doesn't work

10   for us.  This is something that we did not want to have to

11   do.  We still believe -- and we're getting the information

12   now, Your Honor.  We've gotten tens of thousands of pages in

13   the last ten days alone and we're working through that stuff.

14             We still believe there very well may be a lot of

15   information of the actual wages paid in what we are receiving

16   from the defendants; but nevertheless, they have told us

17   quite clearly, quite unequivocally and quite uniformly, that

18   they don't have wage data because they didn't pay the

19   sponsors.  And we know that's going to be a basis of attack

20   against us in our burden to prove the merits of our case.

21             And we should be allowed to go out and do what we

22   have to do, reluctantly, because we would prefer not to take

23   the time or expense to do it, but we should be permitted to

24   do what we have to do now, now that we're three months away

25   from the fact discovery deadline, to find out, through the

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
January 24, 2017

Page 38

 1    best means possible, how much folks were paid.

 2            THE COURT:  Okay.  Well, let me -- let me tell you

 3    that -- here is how I am looking at it.  And, you know, I

 4    don't rule in these informal conferences so we may just need

 5    to brief all this out.

 6            But the way I'm looking at it is that there is a

 7    difference between information going to the au pairs, and the

 8    difference that I'm drawing between them and the host

 9    families is that the au pairs are likely to be class members.

10            So if you get a class certified, either a

11    collective or a class under Rule 23, the people that are

12    au pairs are likely class members, and so that problem arises

13    with the notice provisions that go out to class members.

14            Now, that same problem does not exist with respect

15    to the host families because they're not class members, as

16    far as I can tell.  So -- and what I've heard from the

17    defendants is that the host families are -- you know, they

18    consider that highly confidential information.  I'm not sure

19    why, because it seems to me that the host family information,

20    you would care more about your fellow defendants getting

21    ahold of than the plaintiffs.

22            But all these things, especially the host family

23    thing, I think could be solved by agreeing to use a

24    third-party vendor.  You know, hire someone that will send

25    out the survey, agree on the survey to begin with, and I

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
January 24, 2017

Page 39

 1   would think the only information that would be reasonable for

 2   defendants to say they're not going to -- well, I'm not sure

 3   I think if it's the host families.  Let me break this out

 4   into two parts.

 5             If it's a survey to the host families, I don't see

 6   why the defendants would have any particular input into

 7   what's in the survey, but the defendants could protect their

 8   rights by giving each host family a number.  For instance, a

 9   person could be CC Number 1, you know, for Cultural Care

10   Number 1 -- and I understand this is bulky, there is a lot

11   of -- the numbers are large for some of you.  But still, they

12   could be identified by number, you have the key code, and

13   then you give the true information to the third-party vendor,

14   but not to plaintiffs, and then the  third-party vendor sends

15   those out.

16             Then the plaintiff gets the surveys with only the

17   number on it, you know, CC1, and decides then what it needs

18   to do with the rest because what they're talking about is

19   sampling or something like that.  I don't suppose you know

20   exactly what you want to do until you see what the answers to

21   the survey are.

22             So I think that is a way to handle the host family

23   information as a preliminary matter.

24             Now, it doesn't solve the problem in the end

25   because, clearly, plaintiffs are probably going to want to

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
January 24, 2017

Page 40

1   talk to some of these people; but as we roll along with

2   discovery, you're going to have rulings on your class so, you

3   know, you'll be better versed in how to handle things.

4           With the au pairs, it seems to me that there is --

5   there is a problem with anyone really contacting them at this

6   point without getting crosswise with the Court's notice

7   provisions.  So I tend to think that should wait, okay.

8   That's kind of my leaning towards that, is that that

9   information should wait.

10          That's something the plaintiff is going to get if

11  you have -- get your classes certified -- your class in

12  collective, I should say more appropriately.  You're going to

13  get that, but that hasn't been done yet.  And if it's not

14  done, then you're not going to get that.

15          So that's information that probably ought to wait,

16  but I think you could -- I really think that the information

17  from the host families could be gathered in a way, right now,

18  that starts the process, gets the thing going.

19          What I haven't had a chance to even think about, so

20  I can't give you much suggestion, is what to do with the

21  questions that come in.  You know, host family number one has

22  some questions:  Why do you want this?  What's it for?  Who

23  do they contact?  Right?  So that's something that might need

24  to be worked out.

25          Perhaps sending some, you know, like a fact sheet,

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
January 24, 2017

Page 41

```
 1   you know, here is -- here's some frequently asked questions,
 2   right, you know.  And you could -- maybe you could head those
 3   questions off by sending out a FAQ, F-A-Q.  So I think that's
 4   one thing that you might want to talk about and see if that
 5   could happen.
 6           I'm not certainly going to order anything like that
 7   at this point because I'm not going to order anything, but I
 8   do think that's something to think about because I -- I see
 9   the merit in both sides here.
10           You know, I think that the host families are in the
11   best position to say what they paid the people.  They're the
12   ones that are writing checks or handing over cash.  They have
13   no real reason to lie about it either.  There is no incentive
14   for them.  They're not going to be class members.  They're
15   probably not going to get anything out of the case.  They got
16   services, they paid for them, whatever it was, whether -- and
17   I don't mean by calling it "wages" or a "stipend," that I'm
18   taking sides here; but they paid something in terms of dollar
19   bills, let's put it that way, and they know how much it was,
20   probably.
21           They could say whether or not there were tips
22   involved or whether they paid extra.  I mean, all those --
23   all those questions are for the host families.  That's the
24   perfect place for them.
25           So it seems to me you could solve the problems by
```

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
January 24, 2017

Page 42

 1   using a third-party vendor who does not, you know -- it will

 2   be under Court order that that vendor does not give out the

 3   names and addresses that they're sending these things to, and

 4   that vendor would get anything that is returned undeliverable

 5   so that, you know, all that information would be protected

 6   for the moment and then see, you know, see what you get from

 7   there and what you want to do next, you know, once you get

 8   that part out because all this takes time.

 9           I don't know.  Does anybody want to weigh in on any

10   of that or see the pitfalls with that?

11           MS. LUKEY:  I do, Your Honor.  This is -- this is

12   Joan Lukey again.

13           As I tried to make clear before, the sponsors are a

14   whole lot more concerned about host families than they are

15   about au pairs, and it's not because of the concerns about

16   each other.  It's concerns that the host families, many of

17   whom have confidentiality agreements, have a right to expect

18   privacy.

19           We would like to have briefing and argument if the

20   Court is going in that direction.  I am not suggesting that

21   the third-party vendor idea is not one that we would not be

22   amenable to at some point if it comes to that, but I would

23   like to point out to the Court what is, I think, the elephant

24   in the room.

25           The host families are the employers of the

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
January 24, 2017

Page 43

1    au pairs.  They are prospective defendants.  I have not heard

2    any suggestion from the plaintiffs that they are willing to

3    stipulate that they would never sue host families, even if we

4    take as a given that doesn't get reversed on summary judgment

5    the initial ruling on Motion to Dismiss, that sponsors are,

6    quote, co-employers or joint employers, a position with which

7    we respectfully disagree.

8          No one is suggesting that sponsors are the actual

9    employers.  That would be the host families.  And the concern

10   for the sponsors is that the host families be protected

11   because that does destroy the business and it destroys the

12   cultural exchange program if families are in fear that they

13   could themselves be sued.

14         If the plaintiffs wish to discuss with us that they

15   would give a permanent waiver of some kind, we can see

16   whether we can work with that; but there is no way the

17   sponsors are prepared to voluntarily serve up the host

18   families, who are the employers in this instance.  And all of

19   the allegations in this case are related to the employment,

20   or alleged employment relationship, both in terms of the

21   price-fixing and in terms of the FLSA.

22         So respectfully, Your Honor, when you say that the

23   host families have no dog in this hunt or issue in this

24   matter in the way the prospective class members do, I would

25   suggest to you that they have an even bigger concern; and

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
January 24, 2017

Page 44

1    that is, that they themselves would be named as defendants as

2    the first-level employers.

3            So that is the reason, not because we fear each

4    other.  That is the reason that the sponsors are so

5    protective of the privacy and confidentiality and,

6    ultimately, in protecting from the claims of liability the

7    actual families that host the exchange visitors under the

8    state department program.

9            None of us intend to serve them up willingly, Your

10   Honor, although we'll, of course, abide by any order of the

11   Court.

12           THE COURT:  Okay, I'm following that.

13           Mr. Skinner, do you want to talk about that at all?

14           MR. SKINNER:  Yes, Your Honor.

15           I mean, we can -- we can talk to the defendants,

16   see if we can work something out.  (Inaudible) I really doubt

17   we're going to be able to.

18           I also, frankly, don't think that it's really the

19   defendants place to protect the identity of individuals who

20   are violating the law as either joint employers and they're

21   not the sole employers.  We can argue that until we're blue

22   in the face, but we certainly don't concede that they're the

23   sole employers.

24           And even if they were, you know, if we filed an AHS

25   claim against -- against the individuals that we know about

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
January 24, 2017

Page 45

1  and then sought third-party discovery from the defendants to

2  identify the rest of them, they wouldn't have an argument to

3  say that, you know, they're just protecting these people from

4  becoming defendants in the case.  That's not how -- that's

5  not how our judicial system works.  In any event, you know,

6  we can talk to them about that.

7          With respect to the Court's idea of the third-party

8  vendor, we can certainly consider that.  I mean, part of our

9  concern -- our real concern is what the Court alluded to,

10 which is this is not going to be solved with one round of

11 emails, and it's not going to be as easy as having somebody

12 simply send emails around, we get perfect information back

13 and we're good to go.

14         There is going to be follow-up.  And I expect there

15 will probably be follow-up, not only with additional emails,

16 answering questions, but also additional emails to new folks

17 if we're unable to get sufficient responses from the first

18 sample that we send out, but I think that we are also going

19 to be making phone calls.  And we may learn, after sending

20 the emails, depending upon the results we get back, that

21 phone calls are really the way to go.

22         I think in the interest of cost -- I mean, without

23 binding ourselves to really see what we're going to get yet

24 and we haven't finalized our approach, but I think we

25 certainly anticipate at least initial contact be

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
January 24, 2017

Page 46

 1    correspondence and then following up.  We don't know.

 2            I mean, I don't know -- at the end of the day, I

 3    kind of doubt that -- I doubt that the third-party vendor is

 4    going to be adequately positioned to address the big order

 5    follow-up nature of the survey that we're anticipating.

 6            We also face the prospect that we may need to use,

 7    you know, the discovery mechanism to gather some of this

 8    information.  We just don't know yet.  And obviously, you

 9    know, the plaintiffs would have that authority, but a

10    third-party vendor would not.

11            I also worry about cost.  I mean, the -- it's

12    putting an additional cost burden on the plaintiffs to gather

13    information that -- that we feel we could probably gather

14    more economically ourselves, although I don't want to

15    prejudge it because we haven't really dug into this.  But it

16    does -- you know, it does put a cost burden on us to address

17    issues from the defendants' side that we intend to be

18    addressed with respect to protective orders and

19    confidentiality, and the like, on how the information is

20    used.

21            So with all of that said, we still think that

22    really, at the end of the day, what we're really going to

23    come down to is an order giving us this information so that

24    we can go out and try and gather it, and then the defendants

25    are going to sit back and see whether we're able to gather it

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
January 24, 2017

Page 47

1   adequately or not.  I think that's where we're going to be at

2   some point in the future.

3           We don't think we should have to wait until after

4   class certification to get there; but at the end of the day

5   we have to try now, given the schedule that we have, to get

6   things moving.

7           So we would like leave to file our briefs; we would

8   like to get these things, (inaudible) briefs in short order

9   so that we can get an answer as to how the Court wants us to

10  go about it.  And in the meantime, we'll continue to talk to

11  defendants to see if there is something we can agree to that

12  is satisfactory to the group of us.

13          THE COURT:  All right.  That would at least maybe

14  give you some partial information.

15          You know, there is no sense sending out something

16  to all host families that is not complete.  That's not what

17  I'm suggesting.  But it could be that there are some things

18  that could be done now that, you know, you don't have to wait

19  for if you could agree on a process.  But that's just my

20  suggestion.

21          I think that you're right, this does need to be

22  briefed.  As you've seen in this case, Judge Arguello does

23  keep some motions and she refers some, so we don't really

24  know who exactly who would decide this.  My guess is they

25  will come to me, but I'm not 100 percent on that, just

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
January 24, 2017

Page 48

```
 1    because it's discovery-related, but I think that you should

 2    start the briefing process on this.

 3            I did want to give you some feel for what I think

 4    is important for all of you to address because my feeling is

 5    that this is information, in one form or another, that the

 6    plaintiff is entitled to.

 7            So if you disagree with me, you need to be sure

 8    you're telling me why.  Because just as a matter of fairness,

 9    I think that they have a right to ask the people who know:

10    How much did you pay, stipend, wage, whatever you want to

11    call it?  But:  How much did you give the person who was

12    looking after your children in the home under this program?

13    And that's information that is pretty basic.

14            So my inclination is going to be that they need to

15    get this information one way or the other.  So if there is

16    real concerns -- I think my -- my position would be that it's

17    more important that we think about confidentiality of the

18    host families as far as just the fact that they are engaging

19    in a process that they thought was going to be confidential,

20    and there may be some things signed by them.

21            I agree with plaintiff, in kind of a general way,

22    that the sponsors should not be trying to protect host

23    families if they're breaking the law.  Right?  Because that's

24    not the way things work and that had, frankly, not occurred

25    to me, just sitting here on the bench for the last hour or
```

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
January 24, 2017

Page 49

 1    so.  So I'm taking that to heart.

 2           I understand what the argument is, and I understand

 3    what everybody is saying.  You know, we don't want to be

 4    pointing the fingers at our own host families.  That's not

 5    really very good for business, but those are kind of the

 6    considerations.

 7           And so what I'm going to be looking for is

 8    practical ways to satisfy both sides, to some extent, that

 9    the information can be protected; that it can be held

10    confidential for purposes of this case, but that the

11    plaintiffs can still get this very basic information that

12    they certainly need to go forward on their case.

13           The second topic then is when.  You know, that's

14    the other question.  When do they get it?  And so those are

15    things that I would expect you to brief.

16           Are you asking for accelerated briefing on this

17    issue?

18           MR. SKINNER:  Yes, Your Honor, we would like

19    accelerated briefing on this.

20           THE COURT:  Okay.  How soon can you get your motion

21    filed then?

22           MR. SKINNER:  I think there are some additional

23    things that we should address, given what Your Honor has

24    raised today.  We have a draft brief right now.  I would like

25    a day or two to get it -- to get it updated to reflect, then

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
January 24, 2017

Page 50

1   have the benefit of the argument that we just had.

2        So what I propose is that we file as soon as we can

3   and that the defendants have seven days to respond.

4        MS. LUKEY:  Your Honor, respectfully, that's

5   nowhere near (inaudible) of this importance to the

6   defendants.

7        THE COURT:  How much time do you think you do need?

8        MS. LUKEY:  Can we get 14?

9        THE COURT:  Does everybody agree that, on an

10  accelerated schedule, 14 would be enough?

11       MR. SKINNER:  Well, Your Honor, for the plaintiffs,

12  I think 14 is kind of a default schedule.  I mean, that's

13  typically what you get under the federal rules to apply to a

14  motion, so that's not accelerated in any way.

15       THE COURT:  But you get 21.  Mr. Skinner, you get

16  21 days.

17       MS. LUKEY:  21 (inaudible).

18       MR. SKINNER:  Okay.  So I guess, maybe, perhaps

19  it's accelerated in some ways.  Maybe I'm just making a lot

20  of the (inaudible) I practice in front of and their

21  individual practices.

22        In any event, if we filed tomorrow and the

23  plaintiffs had -- the defendants had two weeks to respond,

24  we're not getting a response brief in until February 8.  If

25  we had any sort of accelerated reply, even if it's just a few

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
January 24, 2017

Page 51

1   days after that, realistically, the Court is not considering

2   this motion until the week of the 13th.

3           You know, I mean, I think at the end of the day,

4   we're waiting almost a month in order to get an answer on

5   this from the Court, if we can't work it out ourselves, and

6   we don't have that much time left in discovery.

7           I mean, maybe -- maybe the defendants are operating

8   under the assumption that we're going to be adjusting the

9   discovery schedule at some point, but we're operating under

10  the assumption that we have to work with what we've got.  And

11  I think that -- I think that we need to get this issue

12  resolved sooner than a month from now.

13          THE COURT:  Well, I just don't see how --

14          MS. COLAIZZI:  Your Honor, if I may, Brooke

15  Colaizzi on behalf of InterExchange.

16          I just want to pipe in here with respect to the

17  timing issue, remind the Court we already have a January 31

18  deadline that we are working under with respect to the Motion

19  for Protective Order.  So I would (inaudible) your request

20  that we have a more than week so that we are not attempting

21  to respond to both simultaneously, given the importance of

22  these issues.

23          THE COURT:  I mean, I think the issues are

24  important, and I don't want to cut you off too short, and I

25  understand the issue for plaintiffs.  I mean, I get it.  It's

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
January 24, 2017

Page 52

1  just that everything takes time.  I mean, you've just brought

2  this to me.  I didn't understand quite how complicated it

3  was.  I've given you some feedback, but certainly not enough

4  to resolve the issue, I understand that.

5         So both sides want to get this briefed and to the

6  Court, but I think -- I think two weeks is not unreasonable.

7  Ten days would be okay, too, with me.  What if -- what if the

8  plaintiff filed -- let me just get some dates here so that

9  we're all on the same page.

10         If the defendant could file this by, say, noon on

11  Friday, that's the 27th, and could you -- do you think you

12  could respond with -- let's see, ten days from that would

13  be -- the 3rd is seven.  Like, do you think you could respond

14  maybe by the 7th or the 8th?  Or do you think you really need

15  the 10th?

16         MS. LUKEY:  Your Honor, the problem, as

17  Ms. Colaizzi just pointed out, we're also responding on the

18  Motion for Protective Order for the next several days.  We're

19  trying to get those responses done.

20         THE COURT:  Right.

21         MS. LUKEY:  But we're also in a circumstance where

22  plaintiffs have presumably been working on their motion for a

23  while, or so they're now telling us, and we haven't seen it

24  so we haven't been.  And the issue then that we may need

25  affidavits on this, we need time.  We particularly need time

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
January 24, 2017

Page 53

1  with regard to the host family, frankly, especially given the

2  Court's indication (inaudible).

3            So respectfully, two weeks is not very long to

4  handle something like this while simultaneously handling, for

5  the first part of it, the Motion for Protective Order

6  response.

7            THE COURT:  Well, I have to agree with you.

8            MS. LUKEY:  And two weeks is probably cutting it

9  short.  I'm guessing some of my defendants -- some of the

10 defendants didn't much like that suggestion, so . . .

11           MS. REILLY:  This is Katie Reilly, Your Honor.

12           Yes, I'm very concerned about even the 14 days,

13 although I will agree to that if that's what everyone else

14 agrees to.

15           Just another issue.  We always do our best, as a

16 group, to consolidate the briefing and we'll do that here as

17 well; it may not be possible.  But that adds another -- a

18 whole other layer of complication to our filing on the

19 defense that the plaintiffs don't have.  And I would

20 respectfully suggest that if we're looking at a 14-day

21 timeline, looking at whittling that down (inaudible), if they

22 get that filed tomorrow instead of Friday, that gets you on

23 the same schedule as giving us ten days.

24           MR. SKINNER:  I appreciate you guys taking your

25 time on our end.  You know, we do not have this thing fully

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
January 24, 2017

Page 54

```
 1   briefed.  Obviously, we're thinking about it, but we weren't
 2   going to extend our resources putting a brief comprehensively
 3   together until -- until the Court told us we had leave to
 4   file it.
 5            We'll file as soon as we can.  And if we can file
 6   tomorrow, we will.  And I would ask that if we file it
 7   tomorrow, whatever the deadline is slides up, but I would
 8   like until Friday as our ultimate deadline, which is -- you
 9   know, which is only three business days from now.
10            THE COURT:  Okay.  Here is the schedule I think
11   makes sense and is fair.  I want you to file your motion on
12   or before the end of the day on the 26th.  Okay, that's two
13   days.
14            And what I'm telling is that you can file it at
15   midnight, if you want, all right, at 11:59, as long as it's
16   the 26th, dated the 26th.  That gives you two full days.  So
17   you're only shorted by a couple of hours in the morning.
18            Then the responses will be due on the 9th, February
19   9th, which is 14 days.  Same deal:  If you have to take until
20   11 p.m., okay.  I hope you don't, because I hope you get some
21   sleep.  But if you're like me and you don't sleep, then maybe
22   you'll like that extra time.  So the 9th for responses and
23   then a reply on the 16th.
24            And do you think that -- do all of you have
25   calendars?  Could we set a date for hearing on this?  Because
```

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
January 24, 2017

Page 55

1  if we set a date for hearing, that is something that pushes

2  you to the front in front of me.  Right?  Because I have to

3  get ready for the hearing, so that means I'll read your

4  stuff.  I won't put it on the back burner.  So I would

5  suggest that might be a good idea.

6           MR. SKINNER:  Your Honor -- Your Honor, this is

7  Peter Skinner.

8           I'm -- I'm, obviously, fine with the Court's order

9  and I appreciate your efforts to accelerate this.  I just

10  want to throw out, the other thing that is concerning me in

11  all of this is that we have to file (inaudible) briefs on the

12  24th for class certification, that some of which may actually

13  be (recording static, inaudible) may be related to the

14  quality of the wage data.  But putting that aside, but not

15  only are -- the defendants are talking about the fact that

16  they have to respond to a protective order and then also

17  respond to this, what I think is a discrete Motion to Compel,

18  we will be dealing with a reply, prepping for the hearing,

19  deposing their expert and moving for class certification all

20  in this period of time.  And, you know, we'll -- we'll try to

21  do it, but I think the schedule that we have right now is

22  starting to get a little bit unmanageable.

23           THE COURT:  So what's your suggestion?

24           MR. SKINNER:  I mean, I think we need to keep our

25  foot on the gas and keep moving on this.  But I guess I'm

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
January 24, 2017

Page 56

1  suggesting that if -- if it's just simply impossible for us,

2  two law firms versus them, (inaudible) now, all 15 defendants

3  and all their law firms, to get done what we need to get

4  done, we may very well may be seeking relief from the

5  discovery schedule.  Because even if we get -- if we set a

6  hearing -- if we set a hearing the week of the 20th and we

7  get a ruling, you know, at that point, we're going to have

8  two months, less than two months, to actually get the study

9  done.

10        I doubt that's actually going to be enough time,

11  but -- you know, because we're going to have to get the

12  information from the defendants and then do the study.  But I

13  guess, let's see how it plays out, Your Honor, and we'll make

14  an application if we need to make an application; but there

15  are -- there are a lot of balls in the air and only so many

16  hours in the day at this point.

17        THE COURT:  Right.  And I actually was not

18  suggesting that we would do it the week of the 20th, because,

19  frankly, that's not enough time for me to read everything,

20  you know, and get -- and get prepared to have a hearing.  So

21  I was thinking more in terms of, either the week of the 27th,

22  those first maybe three days there, or the week of the -- of

23  March 3 -- wait a minute, that's not March, hold on --

24  March --

25        MR. SKINNER:  March 6.

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
January 24, 2017

Page 57

```
 1              THE COURT:  Yes.  Now, I --
 2              MS. LUKEY:  Your Honor, this is Joan Lukey.
 3          I can't do the week of the 27th.  I have a
 4  prescheduled trip to Florida for a board meeting and a
 5  vacation.  And that's only a week, but that's the only week I
 6  can't do.  I can do before and I can do after.
 7              THE COURT:  Okay.  And here comes another problem.
 8          I'm on criminal duty the week of, let's see, the
 9  6th and the week of the 13th, so -- now, I can fit you in.
10  You know, I can put you in early, early in the morning or
11  maybe late in the afternoon.  And I don't know how long you
12  think you would take for oral argument, but, you know, when
13  you're on criminal, the midday is just completely gone.  You
14  know, I've got from 10 o'clock until about 3:30 where I don't
15  even get to have lunch or anything.  So I don't know what --
16  what do you think about that?
17              MS. LUKEY:  It would be fine with us, Your Honor,
18  whatever time of day you want.  We would be coming in the day
19  before anyway.  Or maybe a day after.  Whatever.
20              THE COURT:  All right.
21              MR. SKINNER:  Yes, same for plaintiffs, Your Honor,
22  we're happy to come in early in the morning or late at night.
23              THE COURT:  Okay.  Well, let's see -- well, I think
24  any day of the week of March 6.  We could do early morning --
25  and by that I mean, like maybe 8:30 or so.  I can get here a
```

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
January 24, 2017

Page 58

 1   little earlier if you want, but 8:30 is about typical, but we

 2   could start at 8:00.  Can you get here at 8:00?  Yes, my

 3   courtroom deputies can get here at 8:00.  So we could start

 4   at 8:00.  Or we could set, you know, like I said, in the

 5   afternoon.  Or we could set, and if we have to have more

 6   time, you could come back in the afternoon, but that is going

 7   to mess with people's flights if you're flying in from out of

 8   town.

 9            So March 10?  Okay, I'm told on March 10, I don't

10   have -- we don't actually have criminal duty, so maybe that's

11   the day to set it.  Could everybody make it?  That's a

12   Friday.

13            MS. LUKEY:  We can do it, Your Honor.

14            UNIDENTIFIED SPEAKER:  (Inaudible) Your Honor --

15            THE COURT:  Anybody that can't do it?

16            MR. KELLY:  Your Honor, this is Bill Kelly with

17   USAuPair.  I'll be out of state, but I will not object to the

18   hearing going forward with my proxy to one of the counsel in

19   the group.

20            THE COURT:  Okay.  Well, let's set it on the 10th

21   then.  Why don't we set it -- why don't we go ahead and start

22   early if all of you are fine with that.  Let's start at 8:30

23   a.m.  And then I'm not going to set anything else that day,

24   so I will just give you the time that you need.  I'm figuring

25   a couple hours, but with as many of you as there are, it does

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
January 24, 2017

Page 59

```
 1   kind of take some time.
 2           Any of you who don't particularly want to have to
 3   stand up and say anything, if you just let my CRD know, you
 4   can appear by phone.  So if you want to appear by phone, you
 5   know, we'll do that for you, also.
 6           So I think -- probably the easiest way --
 7           MR. KELLY:  This is Bill Kelly.  I'll appear by
 8   phone.  And thank you for that.
 9           THE COURT:  Okay.  I think probably the easiest
10   thing to do is to file a little motion asking to appear by
11   telephone at that hearing, and then that way we'll have a
12   record.  It doesn't have to be very long, just -- I mean,
13   like a one sentence thing, you know:  I would like to appear
14   by phone.  And then you'll see who else needs to appear by
15   phone, and I'll have to get all of you who want to appear by
16   phone to call in, just like you did today on a conference
17   call, because that's the only way we can set it up here.  But
18   I'll grant all of those requests for any of you that want
19   that.
20           Now, I understand that having the hearing on March
21   10, plaintiffs, I know that this is putting you in a bind as
22   far as timing, but I just don't see how we can do it any
23   earlier.  So if you think that this is going to affect your
24   discovery schedule, which I suspect it might, you're going to
25   need to address that, and I would really like to have a joint
```

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
January 24, 2017

Page 60

 1   addressing of it.  I mean, if you need some time, if you can

 2   all agree on the amount of time, that's much easier for me.

 3           This case is getting older.  Judge Arguello just

 4   does not like these things to be on the three-year list, but

 5   it's going to be anyway.  So I think we're going to have to

 6   just do what's best for all of you and for the case and not

 7   worry about the time.  There was some time lost in the

 8   beginning, so -- and I'll talk to her about it.

 9           MR. SKINNER:  Thank you, Judge.  Peter Skinner for

10   the plaintiffs.

11           We'll talk to the defendants.  I mean, I can say

12   that, you know, with the hearing on the 10th, and I

13   understand it's going to take the time that it takes and so

14   be it -- but with the hearing on the 10th, there is no way

15   we're going to be able to -- assuming that we prevail, there

16   is no way that we would be able to complete that discovery on

17   April 17 as currently scheduled.  So we'll talk to defense

18   counsel and see if we can work out a revised schedule that

19   keeps this case moving, but accounts for, you know, the

20   issues that we've been discussing today.

21           THE COURT:  Okay, sounds good.  All right.

22           Anything else that you think we need to take up

23   today?

24           MS. SMALLS:  Your Honor --

25           THE COURT:  Yes.

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
January 24, 2017

Page 61

1        MR. SKINNER:  Your Honor, it's Peter Skinner again.

2        We had discussed with your clerk teeing up a

3   discrete issue that we had with one of the defendants,

4   USAuPair, at the end of this conference.  I know it has gone

5   on for quite a while; but if you're able to entertain that,

6   we would like to raise it quickly to see if we can also get a

7   briefing schedule set on this issue.

8        THE COURT:  Okay.  Does everybody want to stay -- I

9   forgot about that.  My law clerk did tell me about it.

10       Does everyone want to stay on the phone for this,

11  or do you want to get just the parties that are involved to

12  call back in?

13       MS. LUKEY:  I don't feel the need to stay on the

14  phone for Cultural Care, Your Honor.

15       THE COURT:  Okay.  How about USAuPair?  Let's see,

16  is that Ms. Kozal?

17       MR. KELLY:  It's Bill Kelly, Your Honor.

18       THE COURT:  Oh, okay.  And how do you feel about

19  it?

20       MR. KELLY:  I think it will be very brief.  And if

21  parties want to drop off, we can maybe just give everybody a

22  minute to drop off.  I don't think it will take more than a

23  couple of minutes.

24       I owe documents to the plaintiffs and acknowledge

25  that.  We're trying to work out an acceptable timeframe for

1   that and avoid motion practice on it.

2          THE COURT:  Okay.  Well, let's -- hearing nothing

3   else, then, let's let everybody drop off that wants to drop

4   off.  Those of you that want to stay, that's fine, you can

5   stay and listen to this.  We'll give you about 30 seconds or

6   so, okay.

7          (Recorded voice of attorneys who have left the

8   conference.)

9          MS. RHOADES:  Your Honor, this is Meshach Rhoades

10  for GreatAuPair.  Do we need (inaudible) we were -- we had a

11  little bit of technical difficulties, and I don't believe

12  that we formally entered our appearance, or if we did, I'm

13  not sure if Your Honor heard, but I wanted to make that known

14  for the record.

15         Thank you very much.

16         THE COURT:  Okay.  I'm sorry, tell me your name

17  again.

18         MS. RHOADES:  Meshach Rhoades for GreatAuPair.

19         THE COURT:  Okay.  All right, we'll get that down

20  that you were participating and we'll put your appearance on.

21         MS. RHOADES:  Thank you very much, Your Honor.

22         THE COURT:  You're welcome.

23         UNIDENTIFIED SPEAKER:  And Your Honor, I apologize,

24  I'm the defendant that has the line open.  Am I supposed to

25  keep this line open or are the parties involved going to

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
January 24, 2017

Page 63

```
 1   call?

 2           THE COURT:  Well, I -- what do you want to do,

 3   parties, that are left?  Do you want to call back in or can

 4   you just keep the line open?

 5           UNIDENTIFIED SPEAKER:  Your Honor, why don't we --

 6   why don't we -- if -- I don't want to keep the defendant who

 7   has the line open.  If she hangs up, and we all lose the

 8   line, then why don't we -- we'll call back, you know,

 9   immediately and we'll get defense counsel on the phone and

10   conference in and call the Court right back.

11           THE COURT:  All right.

12           Is there anyone on the line --

13           (Recorded voice interruption.)

14           THE COURT:  Okay.  Is there anyone on the line who

15   is not directly involved in this latter dispute that would

16   like to be called back?

17           I don't hear anybody.  So why don't you -- why

18   don't you go ahead and close the line, and if that cuts

19   everybody off, then the two of you go ahead and call back.

20           UNIDENTIFIED SPEAKER:  Okay.

21           UNIDENTIFIED SPEAKER:  All right, thank you, Your

22   Honor.  I'm closing now.

23           THE COURT:  Okay.  Who is left?

24           MR. SKINNER:  Your Honor, I think we stayed on.

25           THE COURT:  Oh, yay.  That's good, okay.  Okay, so
```

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
January 24, 2017

Page 64

1    tell me what the --

2              MS. SMALLS:  Your Honor, this is --

3              MR. SKINNER:  Your Honor, I'm going to let my

4    colleague Dawn Smalls take the lead on this one.

5              THE COURT:  Okay.

6              MR. SKINNER:  I'll just sit on the sidelines.

7    Thank you very much.

8              THE COURT:  All right.  Ms. Smalls, go ahead.

9              MS. SMALLS:  Your Honor, Dawn Smalls from Boies

10   Schiller for the plaintiffs.

11             As Peter mentioned, this is a discrete issue with

12   respect to USAuPair.

13             The document requests that we made to all

14   defendants were also made to USAuPair and the timing of both

15   the request in March of 2015 and then a subsequent request in

16   March of 2016, as well as several pieces of correspondence,

17   both this fall and this winter, inquiring about when and if

18   USAuPair would be providing any documents responsive to

19   plaintiffs' request.

20             And to date, USAuPair has not produced one single

21   document responsive to any of plaintiffs' requests, both

22   about contact information, but wage data, as well as a number

23   of other items that are necessary to establishing plaintiffs'

24   claims.

25             And so we wanted to tee this item up just after the

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
January 24, 2017

Page 65

1   broader discussion, specifically with respect to USAuPair.

2          THE COURT:  All right.  Mr. Kelly.

3          MR. KELLY:  We -- we apologize, USAuPair apologizes

4   for not having produced the documents that we stated that we

5   would produce, subject to the objections.

6          My issue, Your Honor, is that I'm representing a

7   sole practitioner in Lake Oswego, Oregon, and she is not a

8   particularly savvy person.  Her record retention, as far as I

9   can understand it, is a computer set up in her kitchen.

10          So I have -- first, I told Attorney Smalls that I

11   would have something to her in mid -- I believe it was middle

12   of last week, and I missed that deadline.

13          And so I apologize to her and to the Court for

14   that.

15          My issue relates to simply being able to certify

16   the completeness of the return.  My client does not really

17   understand the process.  And when I talk about searching and

18   retrieving, by way of example, PST files or emails, it's --

19   it's a difficult process to talk through.  I liken it to

20   talking to my mother about using her iPad.

21          And so the issue that I have right now is I either

22   need to go up to Oregon or I need to retain someone locally

23   to work with her to retrieve the documents that we have

24   stated that we would retrieve.

25          And in very broad brush, what we have are the form

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
January 24, 2017

Page 66

 1    contracts and brochures.  We've never done any advertising of

 2    any kind, other than the website.

 3           And while I'm using the Wayback Machine to verify

 4    that the website hasn't really changed material in any way,

 5    except perhaps with the listing of some of the au pairs

 6    available in the hopper, I'm able to produce the form

 7    contracts, the brochures, the DOS communications and the web

 8    URLs.

 9           Where I have not been able to pull the information

10    relates to the communications about the wages and the

11    training documents.  I don't know why I'm having trouble

12    getting financial statements, but I don't have them.

13           So I have pitched yesterday in front of the clerk

14    20 days.  I was told that that was not timely enough, given

15    the amount of time that has passed, which I do understand,

16    and also with regard to the upcoming Rule 23 motion that they

17    need to be filing.  And so we agreed to go ahead and go

18    forward with this call.

19           I spoke with the client last night by telephone.

20    And while she's not physically in the Oregon facility where

21    she can access her computer, she will be soon.  And I asked

22    her if she thought we could do this within the next ten days,

23    and she said that she would make sure that that did happen.

24           So my request is that we be given ten days.  And if

25    we don't, then I'll have to explain to you and to plaintiffs

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
January 24, 2017

Page 67

1   why I failed that.

2           THE COURT:  Well, here is the problem as I see it.

3           You're running up on getting a default judgment

4   against you, because if you don't -- you know, under Rule

5   37 -- now, of course, I can't enter it, but I would recommend

6   it to Judge Arguello -- and perhaps that's the hammer you

7   need to be talking to your client about, because I understand

8   where --

9           MR. KELLY:  I understood.

10          THE COURT:  -- she's coming from.  And, you know, I

11  think that would upset my grandmother, right, on her iPad if

12  I told her she was going to lose the case because she wasn't

13  cooperating in discovery, but that is what's going to happen.

14  So she's got to do this.

15          And if she needs help, she needs to hire someone to

16  come help her get it done.

17          How large is her production?

18          I mean, does she have very many clients?

19          MR. KELLY:  No, Your Honor.  She -- she does about

20  anywhere from 10 to 17 or 18 placements a year.  She operates

21  on her own out of her house.  She's a sole practitioner.  And

22  so I don't -- I don't want to leave anyone on this phone -- I

23  accept the responsibility for the lack of production and the

24  delays are attributable to me, not to her.  This is not

25  really an issue of willingness so much as it is ability and

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
January 24, 2017

Page 68

```
 1   it's my job to help with that.
 2           So I don't -- I don't want to leave the impression
 3   that I'm throwing someone under the bus here.  This is my
 4   responsibility, and I am solely to blame for this delay.  But
 5   I'm asking for ten days to produce the documents that we
 6   stated we would.
 7           I can produce some documents on a rolling
 8   production, if that's acceptable.  I hate doing that, but for
 9   reasons that are obvious; but if that's the way it is, then
10   that's the way it is.
11           So that's where I am.  I'm kind of at the mercy of
12   the Court here.
13           THE COURT:  All right.
14           Ms. Smalls, what do you think?
15           MS. SMALLS:  Well, Your Honor, we're happy and, for
16   other defendants, have been -- been receiving documents on a
17   rolling basis, and so that would be acceptable to plaintiffs.
18           I do know -- and these are arguments and things
19   that I've said to Mr. Kelly in our conferrals -- that
20   understanding the desire for completeness, not one single
21   document has been produced since the original document
22   request was issued in March of 2015.
23           We've also just gotten detail on this call with
24   teeing this up for an informal discovery conference and,
25   ultimately, a Motion to Compel, more detail about what would
```

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
January 24, 2017

Page 69

 1    be produced and what we could potentially expect to see.

 2              I do think that we -- at this point what the

 3    form -- you know, I defer to you, are looking for Court

 4    intervention because, despite best intentions and, you know,

 5    Mr. Kelly's efforts, you know, we talked in December, he

 6    committed -- I think at that point it was three weeks' time,

 7    and we still have not received any documents.

 8              He committed to getting us something by January 18.

 9    And then that deadline both came and went.  And as you noted

10    in the previous conference, deadlines are approaching.

11              And, frankly, this back and forth with USAuPair is

12    indicative of many our conversations with the other

13    defendants; that we don't get anything from them, unless we

14    have three or four back and forths in terms of written

15    correspondence, a meet and confer, and then, you know,

16    potentially teeing it up to the Court.

17              And so, you know, we're here in January asking for

18    an initial production of just basic documents for a form

19    agreement.

20              And one of the things that I have said to

21    Mr. Kelly, understanding the challenges with his client, that

22    even my mom can go to a copy store and copy, you know, a form

23    agreement.

24              So understanding that there are some challenges

25    with, you know, ESI and, you know, getting meta data, the

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
January 24, 2017

Page 70

 1   fact that there has been no production of paper files or

 2   electronic data is hard to ascribe, you know, to the lack of

 3   technical sophistication of a small operation.

 4        THE COURT:  Well, and I agree with you, it has gone

 5   on much too long; however, we're here now.  I think that

 6   there is no harm in giving Mr. Kelly ten days to get this

 7   completed.  So, Mr. Kelly, I am going to order that you get

 8   this discovery completed.

 9        Now, that doesn't mean you can't object and do all

10   the normal things, but that the normal production needs to be

11   done by no later than February 3, 2017.  That's ten days from

12   today.  And you need to do whatever you need to do to help

13   her get this information off of her computer and onto a piece

14   of paper or something, you know, a stick drive or something.

15        MR. KELLY:  Understood.

16        THE COURT:  It doesn't seem like it's that

17   burdensome.  It should -- with only 10 to -- even taking the

18   high side and say 17 placements a year, that just doesn't

19   seem like it would take all that long, that she should be

20   able to do that.

21        And I really am going to consider Rule 37 sanctions

22   that could include dismissal if this isn't done by the

23   February 3, because it's just -- this is way too long.

24        Okay?

25        MR. KELLY:  I understand.

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Telephonic Informal Discovery Conference
January 24, 2017

Page 71

1          THE COURT:  All right.

2          MR. KELLY:  I understand.

3          THE COURT:  Anything else we need to do?

4          MS. SMALLS:  No.  Thank you, Your Honor.

5          THE COURT:  All right, we'll be in recess.

6          (Whereupon, the within hearing was then in

7     conclusion at 11:45 a.m.)

8

9

10

11          I certify that the foregoing is a correct

12    transcript, to the best of my knowledge and belief (pursuant

13    to the quality of the recording) from the sound recording of

14    the proceedings in the above-entitled matter.

15

16    /s/ Dyann Patterson                    February 6, 2017

17    Signature of Transcriber              Date

18

19

20

21

22

23

24

25