1              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLORADO
2
   Civil Action No. 14-cv-03074-CMA-KMT
3  _____

4  VIDEOTAPE DEPOSITION OF:  DAVID KEIL - July 21, 2016

5  _____

   JOHANA PAOLA BELTRAN; LUSAPHO HLATSHANENI; BEAUDETTE
6  DEEELEFS; DAYANNA PAOLA CARDENA CAICEDO; ALEXANDRA
   IVETTE GONZALEZ; on behalf of themselves and others
7  similarly situated,

8  Plaintiffs,

9  v.

10 INTEREXCHANGE, INC.; USAUPAIR, INC.; GREATAUPAIR, LLC;
   EXPERT GROUP INTERNATIONAL INC., d/b/a EXPERT AUPAIR;
11 EURAUPAIR INTERCULTURAL CHILD CARE PROGRAMS; CULTURAL
   HOMESTAY INTERNATIONAL; CULTURAL CARE, INC. d/b/a
12 CULTURAL CARE AU PAIR; AUPAIRCARE INC.; AU PAIR
   INTERNATIONAL, INC.; APF GLOBAL EXCHANGE, NFP d/b/a
13 AUPAIR FOUNDATION; AMERICAN INSTITUTE FOR FOREIGN STUDY
   d/b/a AU PAIR IN AMERICA; AMERICAN CULTURAL EXCHANGE,
14 LLC, d/b/a GOAUPAIR; AGENT AU PAIR, INC.; A.P.EX.
   AMERICAN PROFESSIONAL EXCHANGE, LLC d/b/a PROAUPAIR;
15 and 20/20 CARE EXCHANGE, INC. d/b/a THE INTERNATIONAL
   AU PAIR EXCHANGE, and ASSOCIATES IN CULTURAL EXCHANGE,
16 d/b/a GOAUPAIR,

17 Defendants.

18 _____

19

20

21

22

23  **H+G**

24

25  Hunter + Geist, Inc.

303.832.5966     1900 Grant Street, Suite 1025     ▪ www.huntergeist.com
800.525.8490     Denver, CO 80203                   ▪ scheduling@huntergeist.com

Your Partner in Making the Record

**EXHIBIT B**

Beltran v. Interexchange, Inc.                    DAVID KEIL                                    7/21/2016

---

**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-03074-CMA-KMT

_____

VIDEOTAPE DEPOSITION OF: DAVID KEIL - July 21, 2016

_____

JOHANA PAOLA BELTRAN; LUSAPHO HLATSHANENI; BEAUDETTE
DEEELEFS; DAYANNA PAOLA CARDENA CAICEDO; ALEXANDRA
IVETTE GONZALEZ; on behalf of themselves and others
similarly situated,
Plaintiffs,
v.
INTEREXCHANGE, INC.; USAUPAIR, INC.; GREATAUPAIR, LLC;
EXPERT GROUP INTERNATIONAL INC., d/b/a EXPERT AUPAIR;
EURAUPAIR INTERCULTURAL CHILD CARE PROGRAMS; CULTURAL
HOMESTAY INTERNATIONAL; CULTURAL CARE, INC. d/b/a
CULTURAL CARE AU PAIR; AUPAIRCARE INC.; AU PAIR
INTERNATIONAL, INC.; APF GLOBAL EXCHANGE, NFP d/b/a
AUPAIR FOUNDATION; AMERICAN INSTITUTE FOR FOREIGN STUDY
d/b/a AU PAIR IN AMERICA; AMERICAN CULTURAL EXCHANGE,
LLC, d/b/a GOAUPAIR; AGENT AU PAIR, INC.; A.P.EX.
AMERICAN PROFESSIONAL EXCHANGE, LLC d/b/a PROAUPAIR;
and 20/20 CARE EXCHANGE, INC. d/b/a THE INTERNATIONAL
AU PAIR EXCHANGE, and ASSOCIATES IN CULTURAL EXCHANGE,
d/b/a GOAUPAIR,
Defendants.

_____

---

**2**

        PURSUANT TO NOTICE AND SUBPOENA, the
videotape deposition of DAVID KEIL was taken on behalf
of the Defendant Cultural Care, Inc. d/b/a Cultural
Care Au Pair at 1200 17th Street, Suite 3000, Denver,
Colorado 80202, on July 21, 2016, at 9:05 a.m., before
Carol M. Bazzanella, Registered Professional Reporter,
Certified Realtime Reporter, and Notary Public within
Colorado.

            A P P E A R A N C E S

For the Plaintiffs:

        LAUREN FLEISCHER LOUIS, ESQ.
        Boies, Schiller & Flexner LLP
        401 East Las Olas Boulevard, Suite 1200
        Fort Lauderdale, Florida 33301
        ALEXANDER HOOD, ESQ.
        Towards Justice
        1535 High Street, Suite 300
        Denver, Colorado 80218

For the Defendant InterExchange, Inc.:
        BROOKE A. COLAIZZI, ESQ.
        Sherman & Howard L.L.C.
        633 17th Street, Suite 3000
        Denver, Colorado 80202

For the Defendant Expert Group International Inc. d/b/a
Expert AuPair:

        BOGDAN ENICA, ESQ.
        Law Office of Bogdan Enica
        111 2nd Avenue NE, Suite 213
        St. Petersburg, Florida 33701

For the Defendant EurAuPair Intercultural Child Care
Programs:
        MARTHA L. FITZGERALD, ESQ.
        DAVID B. MESCHKE, ESQ.
        Brownstein Hyatt Farber Schreck, LLC
        410 17th Street, Suite 2200
        Denver, Colorado 80202

---

**3**

For the Defendant Cultural Homestay International:
        JONATHAN S. BENDER, ESQ.
        Holland & Hart LLP
        555 17th Street, Suite 3200
        Denver, Colorado 80202

For the Defendant Cultural Care, Inc. d/b/a Cultural
Care Au Pair:

        JOAN A. LUKEY, ESQ.
        Choate Hall & Stewart LLP
        Two International Place
        Boston, Massachusetts 02110
        JAMES M. LYONS, ESQ.
        Lewis Roca Rothgerber Christie LLP
        1200 17th Street, Suite 3000
        Denver, Colorado 80202

For the Defendant AuPairCare, Inc.:
        PEGGY E. KOZAL, ESQ.
        Gordon Rees Scully Mansukhani
        555 17th Street, Suite 3400
        Denver, Colorado 80202

For the Defendant APF Global Exchange, NFP:
        SUSAN M. SCHAECHER, ESQ.
        Fisher & Phillips LLP
        1801 California Street, Suite 2700
        Denver, Colorado 80202

For the Defendants Agent Au Pair, American Cultural
Exchange, LLC d/b/a GoAupair and Associates in Cultural
Exchange, d/b/a GoAupair:
        KATHRYN A. REILLY, ESQ.
        Wheeler Trigg O'Donnell LLP
        370 17th Street, Suite 4500
        Denver, Colorado 80202

---

**4**

For the Defendant A.P.EX. American Professional
Exchange, LLC d/b/a ProAuPair and 20/20 Care Exchange,
Inc., d/b/a The International Au Pair Exchange:

        KATHLEEN CRAIGMILE, ESQ.
        Nixon Shefrin Hensen Ogburn, P.C.
        5619 DTC Parkway, Suite 1200
        Greenwood Village, Colorado 80111

Also Present:
        John Jensen, Videographer

---

**Beltran v. Interexchange, Inc.**          **DAVID KEIL**                    **7/21/2016**

---

**5**

                    I N D E X
EXAMINATION OF DAVID KEIL:                        PAGE
July 21, 2016

By Ms. Lukey                                          8

By Ms. Kozal                                        206

By Ms. Louis                                        214

                                                INITIAL
DEPOSITION EXHIBITS:                          REFERENCE
Exhibit 1   Renewed Notice of Deposition           12
Exhibit 2   Subpoena Recipient David Keil's        13
            Privilege Log

Exhibit 3   Collection of information printed      25
            from website David Keil
            Investigations

Exhibit 4   Response to Joint Motion to Strike     65
            Amended Complaint Sections 90 to 94
            by Certain Moving Defendants

Exhibit 5   Towards Justice: CONFIDENTIAL –       144
            Attorney-Client Work Product
            three-page report of Keil

Exhibit 6   Department of Regulatory              207
            Agencies Division of Professions
            and Occupations Office of Private
            Investigator Licensing 4 CCR 750-1,
            pages 1, 11, and 12

---

**6**

08:16:12   1          WHEREUPON, the following proceedings were
08:16:12   2   taken pursuant to the Federal Rules of Civil Procedure.
08:16:12   3          *   *   *   *   *
09:05:19   4          THE VIDEOGRAPHER:  Good morning.  We are
09:05:20   5   on the record.  The time is 9:05 a.m. on July 21, 2016.
09:05:26   6   This is the beginning of Media Unit No. 1.
09:05:30   7          We are here for the videotaped deposition
09:05:31   8   of David Keil in the matter of Johana Paola Beltran, et
09:05:37   9   al., versus InterExchange, Inc., et al., in the United
09:05:42  10   States District Court, the District of Colorado, Civil
09:05:45  11   Action No. 1:14-cv-03074-CMA-KMT.
09:05:55  12          The deposition is being held at 1200 17th
09:05:59  13   Street, Suite 3000, Denver, Colorado.  The videographer
09:06:03  14   is John Jensen, and the court reporter is Carol
09:06:06  15   Bazzanella with Hunter + Geist, Inc., of Denver,
09:06:08  16   Colorado.
09:06:09  17          Please note that audio and video recording
09:06:12  18   will take place until all parties have agreed to go off
09:06:15  19   the record.  Microphones are sensitive and may pick up
09:06:18  20   whispers, private conversations, and cellular
09:06:21  21   interference.
09:06:21  22          Will counsel please state their
09:06:21  23   appearances, beginning with plaintiffs' counsel.
09:06:26  24          MS. LOUIS:  Good morning.  Lauren Louis of
09:06:26  25   Boies, Schiller & Flexner on behalf of the plaintiff

---

**7**

09:06:26   1   class.
09:06:27   2          MR. HOOD:  Alexander Hood from Towards
09:06:27   3   Justice on behalf of the plaintiff class.
09:06:31   4          MR. ENICA:  And for Defendant Expert Group
09:06:31   5   Bogdan Enica.
09:06:31   6          MS. KOZAL  Peggy Kozal for AuPairCare.
09:06:40   7          MS. COLAIZZI:  Brooke Colaizzi of Sherman
09:06:40   8   & Howard on behalf of Defendant InterExchange.
09:06:45   9          MS. CRAIGMILE:  Kathleen Craigmile on
09:06:47  10   behalf of Defendants A.P.EX. American Professional
09:06:49  11   Exchange and 20/20 Care Exchange.
09:06:52  12          MS. FITZGERALD:  Martha Fitzgerald and
09:06:53  13   David Meschke from Brownstein Hyatt on behalf
09:06:57  14   EurAuPair.
09:06:57  15          MR. BENDER:  John Bender from Holland &
09:06:59  16   Hart for Cultural Homestay International.
09:07:02  17          MS. SCHAECHER:  Sue Schaecher, Fisher &
09:07:03  18   Phillips, on behalf of AIFS and APF Global.
09:07:08  19          MR. LYONS:  Jim Lyons on behalf of -- with
09:07:11  20   Lewis Roca Rothgerber Christie on behalf of Cultural
09:07:14  21   Care.
09:07:14  22          MS. LUKEY:  Joan Lukey, Choate Hall &
09:07:16  23   Stewart, also on behalf of Cultural Care.
09:07:26  24                 DAVID KEIL,
09:07:26  25   having been first duly sworn to state the whole truth,

---

**8**

09:07:26   1   testified as follows:
09:07:27   2                 EXAMINATION
09:07:27   3   BY MS. LUKEY:
09:07:27   4          Q.  Good morning.  Could you state your full
09:07:30   5   name for the record, please.
09:07:31   6          A.  Yes.  My name is David Eric Keil.
09:07:35   7          MS. LUKEY:  I would like to establish
09:07:36   8   whether stipulations are going to be used.  I would
09:07:38   9   propose that we use the standard stipulation of
09:07:40  10   reserving all objections except as to form and
09:07:42  11   reserving motions to strike until time of trial, that
09:07:45  12   the witness be asked to read, correct, and sign within
09:07:48  13   30 days or such further period as all parties may agree
09:07:51  14   in writing, and that if the deposition is returned
09:07:56  15   signed and with a corrected errata sheet, it will be
09:08:00  16   deemed final.  Is that acceptable?
09:08:02  17          MS. LOUIS:  Yes.
09:08:02  18          MS. LUKEY:  Acceptable to all
09:08:05  19   co-defendants?
09:08:06  20          (Indicated in the affirmative.)
09:08:06  21          MS. LUKEY:  Thank you.
09:08:08  22          Q.  (BY MS. LUKEY)  Mr. Keil, just by way of
09:08:09  23   background so that you understand the process we'll be
09:08:12  24   following this morning, on behalf of Cultural Care,
09:08:15  25   which is the party that noticed this deposition, I will

---

Beltran v. Interexchange, Inc.                DAVID KEIL                              7/21/2016

---

13

09:12:03 1  subpoena which are no longer in your possession?

09:12:05 2      A. No, I have not.

09:12:07 3      Q. Okay. I'm also going to mark when it gets

09:12:11 4  here a privilege log, but we don't have the copies of

09:12:14 5  it yet. Sir, there is a log that was filed yesterday.

09:12:18 6  If it becomes necessary for us to wait because a

09:12:20 7  question requires the physical document to be present,

09:12:23 8  I'll come back to it. But are you aware that counsel

09:12:28 9  for the plaintiffs has, in fact, provided a privilege

09:12:32 10 log to the defendants?

09:12:33 11     A. I was made aware of that yesterday, yes.

09:12:35 12     Q. There is one document listed in the

09:12:38 13 privilege log, and it is a memorandum. Are you

09:12:41 14 familiar with that fact?

09:12:42 15     A. I am familiar with that fact.

09:12:44 16     Q. Do you know what the memorandum is that is

09:12:46 17 described in the privilege log?

09:12:47 18     A. I do.

09:12:49 19     Q. I have a feeling we're about to have the

09:12:52 20 privilege log in hand. While that is being

09:12:56 21 distributed, and we will have it marked in a moment,

09:12:59 22 were you the author of the document referenced in the

09:13:03 23 privilege log?

09:13:06 24     A. I've not seen the privilege log.

09:13:08 25     Q. Okay. Well, hold on. We'll -- let me see

---

14

09:13:10 1  if we can just get that so it's clear from the very

09:13:13 2  beginning.

09:13:13 3          MS. LUKEY: Thank you. I hope you all

09:13:21 4  have better eyes than I do. It's a little bit -- a

09:13:25 5  little bit small. Could we have that marked as

09:13:27 6  Exhibit 2, please.

09:13:38 7          (Deposition Exhibit 2 was marked.)

09:13:38 8          THE DEPONENT: Thank you.

09:13:39 9      Q. (BY MS. LUKEY) While that's being

09:13:42 10 circulated, sir, could you take a look at this, and in

09:13:45 11 particular at the Description column.

09:13:47 12     A. Yes.

09:13:47 13     Q. All right. As you can see, this refers to

09:13:49 14 a document bearing the date December 2, 2014,

09:13:55 15 indicating that you are the source of the document and

09:13:57 16 that it was addressed to Mr. Hood, and it is described

09:14:00 17 as, "Memorandum to counsel summarizing telephonic

09:14:05 18 discussions with employees of defendants APF Global

09:14:09 19 Exchange NFP, Au Pair International, and EurAuPair

09:14:14 20 Intercultural." It is indicated as a claimed privilege

09:14:18 21 of work product and it is being withheld. Do you know

09:14:21 22 what document that is?

09:14:23 23     A. I do.

09:14:23 24     Q. Can you describe for us in your own words

09:14:25 25 what the document is?

---

15

09:14:26 1          MS. LOUIS: Objection. To the extent that

09:14:28 2  your answer would cause you to reveal any of the work

09:14:32 3  product nature of the document, I instruct you not to

09:14:36 4  do so. If you disagree with the characterization

09:14:40 5  that's on the privilege log, so indicate.

09:14:44 6      A. No, I agree with -- as it's characterized

09:14:46 7  on the log.

09:14:47 8      Q. (BY MS. LUKEY) Sir, I would assume, since

09:14:49 9  it's described as relating to telephonic discussions,

09:14:53 10 that the memorandum includes recitations of facts

09:14:56 11 relating to interviews or conversations that you had.

09:15:01 12 Would that be correct?

09:15:04 13     A. Yes.

09:15:05 14     Q. With regard to the factual portion, I am

09:15:08 15 going to be asking you questions, but I want to make it

09:15:11 16 clear on the record for the benefit of plaintiffs'

09:15:13 17 counsel that the defendants are reserving their rights

09:15:16 18 to move to compel the production of the document. But

09:15:21 19 we don't want to hold up the deposition today, so we

09:15:24 20 will revisit that issue if no consensus can be reached

09:15:30 21 among us.

09:15:32 22          As we go through today, I will be

09:15:33 23 asking you, sir, questions about your calls to various

09:15:37 24 individuals. In the memorandum that was withheld, did

09:15:41 25 you recite verbatim conversations that you had with any

---

16

09:15:46 1  of the persons whom you called?

09:15:49 2      A. I recited portions of conversations. Not

09:15:56 3  verbatim and not entire conversations, but portions

09:15:59 4  therein.

09:16:00 5      Q. I know you have a cold, and I'm sorry,

09:16:02 6  sir --

09:16:02 7      A. I'm very sorry.

09:16:03 8      Q. Just for the benefit of the folks at that

09:16:05 9  end, if you could please keep your voice up.

09:16:08 10     A. Yes. I memorialized portions of

09:16:11 11 conversations. They were not taken verbatim and they

09:16:15 12 were not -- they did not include entire conversations,

09:16:17 13 but short passages from specific conversations.

09:16:21 14     Q. When you refer to short passages, did you

09:16:23 15 place any of those passages in quotation marks?

09:16:28 16     A. I don't recall.

09:16:30 17     Q. In order to -- well, first, is the

09:16:33 18 memorandum dated, as indicated, on December 2, 2014?

09:16:41 19     A. I don't recall, actually. I'm sorry.

09:16:43 20     Q. Okay. Do you recall when you prepared the

09:16:46 21 memorandum in relation to when you made the calls?

09:16:49 22     A. Yes. The memorandum -- which is why I

09:16:53 23 don't recall the exact date that appears on it. The

09:16:56 24 memorandum was compiled over a period of five or six

09:17:00 25 days as the calls were made. The memorandum was made

---

scheduling@huntergeist.com          HUNTER + GEIST, INC.          303-832-5966/800-525-8490

Beltran v. Interexchange, Inc.                   DAVID KEIL                              7/21/2016

---

**17**

```
09:17:05  1   in real time, contemporaneous with the phone calls.  So
09:17:10  2   different calls occurred on different days, therefore,
09:17:12  3   different portions of the memorandum were authored at
09:17:16  4   the time the phone calls were being made.
09:17:17  5        Q.  Were you recording the phone calls?
09:17:19  6        A.  No, I was not.
09:17:20  7        Q.  Were you typing into a computer what you
09:17:23  8   were taking down from the calls?
09:17:25  9        A.  Correct, yes.
09:17:26 10        Q.  All right.  Am I correct in understanding
09:17:29 11   that you were preparing a running compilation of
09:17:33 12   comments from the calls?
09:17:35 13        A.  Yes.
09:17:35 14        Q.  And when it was completed, is that when
09:17:37 15   you sent it to Mr. Hood?
09:17:39 16        A.  When it was completed, and it was edited
09:17:44 17   simply for grammatical and spelling issues, it was then
09:17:48 18   sent to Mr. Hood.
09:17:50 19        Q.  Did the memorandum contain anything other
09:17:55 20   than factual recitations of information relating to
09:17:58 21   your calls?
09:17:59 22        A.  To the best of my knowledge, no.
09:18:01 23        Q.  Did you offer opinions or in any way
09:18:05 24   interject your thoughts into your comments recording
09:18:09 25   the calls?
```

**18**

```
09:18:10  1        A.  To the best of my knowledge, no.
09:18:11  2        Q.  As far as you know, was the memorandum
09:18:14  3   comprised completely of a recitation of the information
09:18:19  4   you were gathering from the people you spoke with?
09:18:22  5        A.  There may have been some small statements
09:18:25  6   about the process and procedures of which the calls
09:18:28  7   were made, but other than that, that was all.
09:18:32  8        Q.  Have you now told us the complete contents
09:18:35  9   of the call, that is, that you recorded excerpts or
09:18:40 10   pieces of the information from each of the calls and
09:18:46 11   then perhaps or before recording that, listed how you
09:18:49 12   were going about the process?
09:18:50 13        MS. LOUIS:  Objection.  Sorry.  Again, I
09:18:52 14   would instruct you in answering that question not to
09:18:54 15   reveal anything that constitutes work product.
09:18:59 16        A.  The -- to the best of my recollection, the
09:19:02 17   memorandum was done in real time, while I was on the
09:19:05 18   telephone, and any other information contained in there
09:19:09 19   was simply edits for clarity and -- and spelling and
09:19:14 20   grammar.
09:19:15 21        Q.  (BY MS. LUKEY)  You did not, then, offer
09:19:16 22   any opinions or thought processes about the people with
09:19:18 23   whom you spoke?
09:19:19 24        MS. LOUIS:  Objection.
09:19:20 25        Q.  (BY MS. LUKEY)  Is that correct?
```

**19**

```
09:19:25  1        A.  I don't believe so.  I don't recall.
09:19:29  2        Q.  All right.
09:19:29  3        MS. LUKEY:  Counsel, on the basis of that
09:19:30  4   testimony, I'm going to ask that you produce the
09:19:33  5   document today.  We can discuss whether you wish to
09:19:38  6   redact any portion where he says that he described the
09:19:41  7   process he followed, about which we're going to be
09:19:43  8   asking him anyway because it's factual, but factual
09:19:46  9   statements are not covered by work product.
09:19:48 10        MS. LOUIS:  I understand and appreciate
09:19:50 11   your -- your position.  We are going to stand on the
09:19:55 12   privilege.  I don't know if Mr. Keil said it in that
09:20:01 13   exchange, but he did not review the document prior to
09:20:06 14   coming here and is testifying from his recollection,
09:20:12 15   and having most recently reviewed the document, it is
09:20:15 16   our position that it is work product.
09:20:18 17        MS. LUKEY:  Well, we obviously will
09:20:19 18   preserve our position.  We think his testimony is such
09:20:22 19   that the document is clearly discoverable, and we don't
09:20:26 20   want to be in a position where we could have to come
09:20:28 21   back and depose him again on the contents of the
09:20:32 22   document --
09:20:33 23        MS. LOUIS:  Right.
09:20:34 24        MS. LUKEY:  -- when he's had the
09:20:35 25   opportunity to refresh his memory.  Obviously, there
```

**20**

```
09:20:38  1   are folks in the room, myself included, that have to
09:20:42  2   travel, and we think that that is inappropriate.
09:20:44  3        MS. LOUIS:  We understand your position.
09:20:46  4        Q.  (BY MS. LUKEY)  Did you take any
09:20:48  5   notes of the conversation apart from typing into your
09:20:52  6   computer that which ended up being one consolidated
09:20:55  7   memorandum?
09:20:56  8        A.  No, I did not.
09:20:57  9        Q.  Did you indicate the dates of each
09:21:00 10   conversation in your memorandum?
09:21:02 11        MS. LOUIS:  Objection.
09:21:04 12        A.  I don't recall.
09:21:06 13        Q.  (BY MS. LUKEY)  Did you indicate to whom
09:21:07 14   you were speaking?
09:21:08 15        A.  Yes.
09:21:09 16        Q.  Did you indicate by what process you
09:21:10 17   reached that person?
09:21:13 18        A.  I'm sorry, could you expand on that
09:21:15 19   question?  I don't understand.
09:21:17 20        Q.  Well, for example, if you were placing a
09:21:20 21   call to an 800 number on a website and then an operator
09:21:26 22   or call center answered and you were placed on a line
09:21:30 23   for someone else, did you indicate those steps?
09:21:33 24        A.  No.
09:21:36 25        Q.  All right.  We will leave the issue of the
```

scheduling@huntergeist.com              HUNTER + GEIST, INC.              303-832-5966/800-525-8490

**Beltran v. Interexchange, Inc.**      DAVID KEIL      7/21/2016

---

**29**

| | |
|---|---|
| 09:31:33 | 1 |

coming from the same pool of lawyers.

Q. When you refer to a pool of lawyers, can you tell us the size of that pool?

A. Again, it varies from year to year, but over time I've worked for several hundred attorneys and probably 200 different law firms.

Q. So the pool is comprised of 200 different law firms?

A. Currently, no. But my business also tends to be cyclical. I will often work for an attorney this year very intimately, not hear from that firm again for three, four, five, six years, until they have something that they think meets my skill set, they'll call me again. So it varies.

Q. What percentage of those law firms are in Colorado?

A. More than half.

Q. And where are the others located, generally speaking?

A. All over the country. I've done work for -- also for firms in Canada and Europe. All over.

Q. Okay. Who retained you in this case?

A. I was retained in this case by a firm called Towards Justice.

Q. Had you previously worked with Towards

---

**30**

Justice?

A. I had not.

Q. And whom in particular contacted you from Towards Justice?

A. I received a call from Alex Hood.

Q. Okay. Had you worked previously with Mr. Hood?

A. I had not.

Q. Do you have any understanding as to how it is that Towards Justice came to you in particular?

A. Well, I do not advertise. You may have found other than my website, there is no phone number or address listed for me anywhere. All of my cases come on referral. I also take virtually no cases for parties that are not represented by counsel. So the standard way someone gets my number is it's usually one attorney receives it from a colleague, another attorney. And I don't recall exactly who referred Mr. Hood, but I'm assuming it was from one of my other clients.

Q. When did Mr. Hood reach out to you?

A. This would have been fall, early winter 2014.

Q. When you say fall, early winter you mean into December of 2014?

---

**31**

A. Frankly, I don't recall when we first spoke.

Q. I'm simply trying to distinguish it from early winter being January, February of '14. So it's in the last quarter 2000 --

A. In the last quarter of '14.

Q. Thank you.

A. Yes.

Q. What did he ask you to do?

MS. LOUIS: Objection. Sorry, remind you --

THE DEPONENT: Yes.

MS. LOUIS: -- that your answer, to the extent that it would reveal any work product communications, any strategy revealed by counsel to you, your answer should not include it.

THE DEPONENT: Yes.

A. I'm sorry. Again, please.

Q. (BY MS. LUKEY) What was the task that you were being retained to do?

A. Conduct telephone interviews of certain people.

MS. KOZAL: I'm sorry, I didn't hear your answer.

THE DEPONENT: To conduct telephone

---

**32**

interviews of a small group of people.

Q. (BY MS. LUKEY) Was your task to contact identified people or entities?

A. To the best of my recollection, my task was to contact or attempt to contact employees of companies who offered services, au pair services.

Q. Just so that we're clear before we move later into moving through those calls, were you tasked with calling specific people or were you tasked with calling particular companies?

A. I was not provided direction regarding speaking to specific people, no.

Q. Okay. How large was the group of companies you were asked to contact?

A. I don't recall exactly. I -- I believe somewhere in the neighborhood of 10 to 15. 10 to 20.

Q. Were you provided with the names of the entities you were being asked to contact?

A. I don't recall.

Q. Were you provided with instruction as to the nature of the information that you were to seek?

MS. LOUIS: Objection. Same instruction.

A. I'm sorry, could you rephrase the question?

Q. (BY MS. LUKEY) Were you provided with

---

8 (Pages 29 to 32)

**Beltran v. Interexchange, Inc.**                    **DAVID KEIL**                    **7/21/2016**

---

33

| | |
|---|---|
| 09:36:14 | 1 |

1  information as to what information you were to seek
2  from the companies you were calling?
3      MS. LOUIS:  And I'll remind you of my
4  instruction not to reveal any strategy --
5      THE DEPONENT:  Yes.
6      MS. LOUIS:  -- that was given to you by
7  counsel.
8      A.  I contacted employees through finding
9  phone numbers on the Internet, and I spoke with who --
10  whomever I could reach by telephone.
11      Q.  (BY MS. LUKEY)  Were you given a script to
12  follow?
13      A.  No.
14      Q.  You must have been given some guidance,
15  sir, as to what the nature of your conversations was to
16  be.  What information were you supposed to be
17  gathering?
18      MS. LOUIS:  Objection.  Same instruction.
19      A.  I was seeking to find out as much as I
20  could about the way individual companies provided
21  services and what the cost to consumers for those
22  services would be and how much the provider, the au
23  pair, would be compensated for those services.
24      Q.  (BY MS. LUKEY)  Were you asked, sir, to
25  ascertain whether an agreement had been reached among

---

34

1  any or all of the companies regarding either fees
2  charged or payments to be made to au pairs?
3      MS. LOUIS:  Objection.  I will instruct
4  you not to reveal anything you were told by counsel in
5  this.
6      A.  I questioned people on the telephone,
7  through the interview process, about payment, charges
8  to the consumer, payment to the au pair, and throughout
9  these interviews I began to notice some consistencies,
10  and upon becoming aware of those consistencies, I asked
11  follow-up questions that led to that information.
12      Q.  (BY MS. LUKEY)  Well, to become aware of
13  consistencies, you must first have had a number of
14  conversations; is that correct?
15      A.  I had a number of conversations.
16      Q.  Is it your testimony that you then went
17  back to the early companies that you had called after
18  you perceived the consistencies, as opposed to
19  gathering all information in the first calls?
20      A.  I don't recall that that's the case.  I
21  think it was more of an evolving process.  There were
22  calls to some companies over time.  But a lot of that
23  had to do with trying to reach someone who had some
24  level of knowledge that could speak to the issue.  So
25  often what I found was the more knowledgeable the

---

35

1  person I was able to interact with, the more I learned
2  from the questioning.
3      Q.  When you said, "speak to the issue," what
4  issue?
5      A.  Well, I had a number of questions.  But,
6  again, my questions were based on how individual
7  companies structured their fees, structured their
8  payment to au pairs, the services they provided to
9  families, the services they provided to the au pairs,
10  and I found that by speaking to representatives of
11  different companies, there was a lot of consistency.
12      Q.  Is it your testimony, sir, that you did
13  not enter into this process with at least one of the
14  purposes being to determine whether the companies had
15  agreements among themselves as to fees or stipends
16  paid?
17      MS. LOUIS:  Objection.
18      A.  I'm sorry, again?
19      Q.  (BY MS. LUKEY)  Is it your testimony that
20  you entered into this call process without any
21  instruction to determine whether agreements had been
22  reached among the companies relating to fees or
23  stipends?
24      MS. LOUIS:  Objection.  And instruct you
25  not to reveal what you were told by counsel.

---

36

1      A.  I would -- I would say that I formulated
2  my questions and obtained answers that led me to
3  believe that there was a consistency of information
4  from company to company.
5      MS. FITZGERALD:  I couldn't hear you.
6      THE DEPONENT:  I'm sorry.
7      MS. LUKEY:  Do you want it read back?
8      THE DEPONENT:  Yes, please.
9      MS. LUKEY:  Can you read it back, Carol.
10      THE REPORTER:  Sure.
11      (The last answer was read back as follows:
12  "I would -- I would say that I formulated my questions
13  and obtained answers that led me to believe that there
14  was a consistency of information from company to
15  company.")
16      MS. FITZGERALD:  Thank you.
17      THE REPORTER:  You're welcome.
18      Q.  (BY MS. LUKEY)  Is it your testimony that
19  you did not formulate your questions with the purpose
20  in mind of determining whether agreements existed about
21  fees and stipends?
22      A.  I formulated my questions to gather as
23  much information about the payment process by customers
24  and the payment process to employees, au pairs, as I
25  could gather.  And my questions were designed to elicit

---

scheduling@huntergeist.com              **HUNTER + GEIST, INC.**              303-832-5966/800-525-8490

**Beltran v. Interexchange, Inc.**          DAVID KEIL                    7/21/2016

---

69

10:21:48  1    A.  Yes.
10:21:48  2    Q.  **What is the nature of the work you do for**
10:21:50  3  **the court?**
10:21:51  4    A.  I have been for about almost 20 years
10:21:54  5  work -- I've done court-appointed investigation,
10:21:59  6  criminal defense investigation under the Criminal
10:22:01  7  Justice Act, and the court has a fee structure that is
10:22:05  8  radically different than my fee structure, but when I
10:22:08  9  work on those cases, I work at the court's fee
10:22:11 10  structure.
10:22:12 11    Q.  **What percentage of your work is in that**
10:22:15 12  **category?**
10:22:16 13    A.  In the last two years it's none, and the
10:22:18 14  reason for that is I couldn't economically justify the
10:22:24 15  great -- the reduction in rate anymore.  But probably
10:22:29 16  over the previous 18, 19 years, it was 10 percent,
10:22:34 17  15 percent of my -- my annual income.
10:22:36 18    Q.  **Are you referring to the federal district**
10:22:38 19  **court in Denver, or multiple courts?**
10:22:42 20    A.  Generally in Denver.  I have done cases in
10:22:43 21  other jurisdictions, but not many.  Mostly in Denver.
10:22:47 22    Q.  **Okay.  Now, turning to the work that you**
10:22:50 23  **performed in this matter.  Do you recall the month in**
10:22:55 24  **which you were performing the work?**
10:22:56 25    A.  I know it was the -- the tail end of 2014.

---

70

10:23:01  1  I don't know if it was November, December.  I don't
10:23:04  2  recall if it bled into January.
10:23:06  3    Q.  **Were you asked to complete your assignment**
10:23:09  4  **within some specified period?**
10:23:11  5    A.  I don't believe so, no.
10:23:13  6    Q.  **Okay.  Were you given any indication of**
10:23:17  7  **urgency?**
10:23:18  8    A.  I know we created a budget, an
10:23:21  9  investigative budget, which is generally the way I work
10:23:23 10  with all clients.  And we -- we budget a specific
10:23:29 11  amount of time corresponding to my rate, and we work
10:23:34 12  until that budget's exhausted.  I think the only -- the
10:23:41 13  only guidelines I remember from those -- from this
10:23:43 14  arrangement was that I should -- that I should not
10:23:47 15  exceed the budget, that there were no additional funds
10:23:50 16  available if I couldn't finish the task within the
10:23:54 17  original budget.
10:23:56 18    Q.  **What is the process that you followed**
10:23:59 19  **before you began making phone calls in order to put in**
10:24:04 20  **place a routine to get to your end game?**
10:24:10 21    A.  My process is, after 30 years, somewhat
10:24:16 22  informal.  I've been doing this a long time.  I have a
10:24:20 23  very rigid practice and belief that when I conduct
10:24:27 24  interviews, whether it's in this case or any case, that
10:24:30 25  I do that without the use of any subterfuge, without

---

71

10:24:36  1  misidentifying who I am, what my purposes are.  It's a
10:24:41  2  large characteristic of my -- of my business.  Most of
10:24:44  3  the clients who -- attorney clients who work with me
10:24:49  4  know in advance that I'm not an investigator who's
10:24:52  5  going to make pretext calls or withhold information.
10:24:59  6    So when I entered into this process, I had
10:25:01  7  to come up with a criteria by which I could ask these
10:25:06  8  questions and I could ask them in as broad and generic
10:25:11  9  a method as possible, but I had to be able to do so
10:25:14 10  without misrepresenting myself.  So I decided I would
10:25:20 11  not attempt to pass myself off as a potential customer,
10:25:25 12  I would not attempt to pass myself off as a parent.
10:25:29 13  Although I am a parent, I would not discuss that.  I
10:25:32 14  would not discuss the fact that I was interested in
10:25:37 15  hiring someone in this field.  I would not discuss the
10:25:41 16  fact that I'd been hired to investigate this field.
10:25:44 17    So for me, it was sort of a mental
10:25:47 18  exercise of having to craft questions that I could ask
10:25:52 19  that were, A, not leading; B, did not require a lot of
10:26:00 20  preamble or explanation; and I needed to devise a
10:26:05 21  method -- because I anticipated being asked about my
10:26:07 22  family, because we're talking about child care, I had
10:26:11 23  to devise a method by which I could continue forward
10:26:15 24  with questioning without materially misrepresenting
10:26:19 25  anything.

---

72

10:26:21  1    So there was a lot of -- a lot of mental
10:26:24  2  exercise, a lot of thought that went into that.  And
10:26:27  3  as -- as the interviews progressed, my questions became
10:26:30  4  a little more intelligent because I had a sense of --
10:26:34  5  finally a sense of what it is I was talking about.
10:26:39  6    Q.  **Sir, in the code that's embodied in the**
10:26:43  7  **statute concerning private investigators, now mandatory**
10:26:47  8  **licensing statute, previously voluntary, are there any**
10:26:50  9  **provisions that relate to not misleading the subject of**
10:26:59 10  **an interview as to your role?**
10:27:01 11    A.  To be frank, I can't recall if they're
10:27:05 12  specific to the statute.  I can tell you that in
10:27:09 13  practice -- and I was a large advocate for licensure.
10:27:12 14  There was a lot of debate.  For 20 years there was
10:27:17 15  debate over whether there should be licensure of my
10:27:20 16  profession.  I was an advocate of it.  And the reason
10:27:22 17  being, it is well-known practice that investigators,
10:27:28 18  like police officers, often tell little white lies or
10:27:34 19  mischaracterizations to get information.
10:27:37 20    I have been throughout my career adamant
10:27:40 21  with my clients that I should -- not do that.  It's not
10:27:43 22  because I'm the world's best guy, I'm not a white hat.
10:27:46 23  I just understand that my business is very unique.  I
10:27:52 24  only work for cases involving counsel.  The
10:27:55 25  overwhelming majority of work I do is litigation-based.

---

18 (Pages 69 to 72)

**77**

10:32:32  1      Q.  Thank you.  So Exhibit -- are you now
10:32:35  2  looking at Exhibit 4?
10:32:36  3      A.  I am, yes.
10:32:38  4      Q.  Okay.  Now, that's the document I asked
10:32:40  5  you about a few moments ago, whether that is what you
10:32:43  6  reviewed with Ms. Louis and the gentleman from Towards
10:32:48  7  Justice.  Is that what you reviewed?
10:32:49  8      A.  I reviewed a portion of this, yes.
10:32:53  9      Q.  Did you review any other document?
10:33:00 10      A.  No.  I don't believe so.
10:33:03 11      Q.  I will represent to you there were a few
10:33:06 12  affidavits filed from the sponsor side.  Did you review
10:33:11 13  any of those affidavits or declarations?
10:33:13 14      A.  I --
10:33:14 15      MS. LOUIS:  Can you show him what you're
10:33:15 16  asking about?
10:33:16 17      THE DEPONENT:  Yes.
10:33:17 18      MS. LUKEY:  If you don't have an objection
10:33:18 19  to him seeing it.
10:33:19 20      MS. LOUIS:  I don't.
10:33:19 21      MS. LUKEY:  Okay.  Well, let me -- let me
10:33:21 22  pull that out.  But I think he can answer at least yes
10:33:25 23  or no as to whether he remembers seeing them.
10:33:29 24      MS. LOUIS:  If --
10:33:29 25      MS. LUKEY:  It will take me a minute just

**78**

10:33:30  1  to dig those out.
10:33:31  2      MS. LOUIS:  It's not clear that he
10:33:34  3  understands your description.
10:33:39  4      (Pause in the proceedings.)
10:34:25  5      MS. LUKEY:  I'm going to suggest we take a
10:34:27  6  brief break now.  It's about time we would anyway.  And
10:34:29  7  we'll go get a copy -- I have it here somewhere, but I
10:34:33  8  don't want to take up everybody's time watching me try
10:34:35  9  to find it in my file.  So if acceptable to everyone, I
10:34:40 10  would propose that we go off the record and take a
10:34:42 11  five-minute break.
10:34:43 12      MS. LOUIS:  Sure.
10:34:44 13      THE VIDEOGRAPHER:  Going off the record.
10:34:45 14  This is the end of Media Unit No. 1 in the videotaped
10:34:48 15  deposition of David Keil.  The time is 10:34 a.m.  We
10:34:52 16  are off the record.
10:34:54 17      (Recess taken, 10:34 a.m. to 10:53 a.m.)
10:53:26 18      THE VIDEOGRAPHER:  We are back on the
10:53:27 19  record.  This is the beginning of Media Unit No. 2 in
10:53:30 20  the videotaped deposition of David Keil.  The time is
10:53:33 21  10:53 a.m.
10:53:37 22      Q.  (BY MS. LUKEY)  Mr. Keil, while we were on
10:53:39 23  the break we started copying the documents I was
10:53:42 24  referencing before the break.  They're still not done,
10:53:45 25  but they'll be here shortly, so let me just do a couple

**79**

10:53:48  1  of cleanup questions while we wait to get there.
10:53:53  2      I think that in your narrative answer when
10:53:56  3  you were describing your process for getting ready, you
10:53:58  4  mentioned that you do not make it a practice to
10:54:00  5  disclose that you're an investigator investigating a
10:54:06  6  particular matter; is that right?
10:54:06  7      A.  No.  I think -- the -- I hope -- if that's
10:54:12  8  the impression I gave you, that was incorrect.  I do
10:54:15  9  that in some instances, I don't do it in others.  It's
10:54:19 10  dependent on what I think's appropriate at the time.
10:54:23 11      Q.  On what factors do you decide whether it's
10:54:25 12  appropriate to disclose that you're acting as an
10:54:28 13  investigator and on what circumstances do you determine
10:54:32 14  that it is not appropriate?
10:54:35 15      MS. LOUIS:  Object to the form.
10:54:44 16      A.  Sometimes it depends on the type of case.
10:54:48 17  Sometimes it's dependent on the type of witness.  And
10:54:52 18  sometimes it's dependent on whether I think it will be
10:54:55 19  detrimental to my ability to do my job.
10:54:59 20      Q.  (BY MS. LUKEY)  In what type of case do
10:55:05 21  you disclose that you are a private investigator
10:55:07 22  looking into a matter?
10:55:09 23      A.  Always in a criminal case no matter what.
10:55:13 24  Excuse me.  I'm sorry, I'm not being loud enough.
10:55:16 25  Always in criminal cases I -- because it's important to

**80**

10:55:20  1  delineate my -- between myself and law enforcement.  In
10:55:24  2  civil cases, where I believe it is -- the parties are
10:55:28  3  aware of litigation, where I believe the parties know
10:55:31  4  who the other parties are, who the lawyers are, I
10:55:36  5  identify myself and who my client is.  In situations
10:55:39  6  where I don't believe anyone has knowledge of the
10:55:44  7  parties, I generally don't identify myself or them.
10:55:48  8      Q.  And what type of witnesses or for what
10:55:51  9  type of witnesses do you typically disclose that you
10:55:54 10  are a private investigator and for what type do you not
10:55:57 11  disclose it?
10:55:59 12      A.  Again, in criminal cases I always disclose
10:56:03 13  because it's important to delineate that I'm not law
10:56:06 14  enforcement.  In civil cases, again, where the parties
10:56:10 15  are aware of whom is whom, I identify myself as a
10:56:17 16  private investigator so that I can then explain to them
10:56:21 17  who my client is, either whether they know the lawyer
10:56:24 18  or they know the client, so they know -- so that when I
10:56:27 19  speak to them, they are aware of my point of view.
10:56:35 20      Q.  Okay.  And in what circumstances do you
10:56:38 21  consider it detrimental to your job to disclose that
10:56:42 22  you're working for --
10:56:44 23      A.  Well, in a case --
10:56:44 24      Q.  -- that you're a private investigator
10:56:46 25  working on a matter?

20 (Pages 77 to 80)

85

```
11:01:43   1   private investigator?
11:01:43   2       A.  I don't think I could break it down on a
11:01:48   3   case-by-case basis.  It's more on an individual basis.
11:01:51   4       Q.  Well, what is your -- your default
11:01:53   5   position?  Is it I will tell them I'm a private
11:01:56   6   investigator, but for certain circumstances, or is it
11:01:59   7   I'm not going to tell them I'm a private investigator
11:02:02   8   unless certain circumstances attach?
11:02:05   9       A.  My default position when I possess enough
11:02:08  10   information to be confident is to disclose.
11:02:12  11       Q.  I understand that you can't give us an
11:02:13  12   exact breakdown, sir, but can you tell us at least
11:02:17  13   approximately how often you disclose to witnesses whom
11:02:19  14   you call that you are a private investigator?
11:02:24  15       MS. LOUIS:  Object to form.
11:02:26  16       A.  70 percent of the time.
11:02:29  17       Q.  (BY MS. LUKEY)  Okay.  So more often than
11:02:30  18   not you do disclose; is that correct?
11:02:32  19       A.  More often than not.
11:02:33  20       Q.  And, again, with regard to civil cases,
11:02:36  21   what is your best estimate as to the percentage of the
11:02:39  22   cases in which you disclose that you are calling on
11:02:42  23   behalf of an attorney or a law firm?
11:02:48  24       A.  Again, probably more often than not.
11:02:53  25       Q.  As much as 70 percent, as in the other
```

86

```
11:02:54   1   case?
11:02:55   2       A.  Yes, as much as.
11:02:58   3       Q.  So approximately a little more than
11:03:00   4   two-thirds of the time it is your practice to disclose
11:03:03   5   that you're a private investigator working for an
11:03:05   6   attorney or law firm, and the remaining one-third plus
11:03:09   7   of the time you do not do so because of the factors you
11:03:14   8   enumerated, type of the case, type of the witness, or
11:03:17   9   detriment to the job; is that right?
11:03:18  10       A.  Yes.
11:03:18  11       MS. LOUIS:  Object to the form of the
11:03:19  12   question.
11:03:20  13       Q.  (BY MS. LUKEY)  Okay.  Now, when you set
11:03:22  14   out to start your calls in this instance, did you have
11:03:27  15   a written script or an online electronic script from
11:03:32  16   which you were working?
11:03:33  17       A.  No.
11:03:35  18       Q.  And I believe you said this earlier, but
11:03:37  19   as you proceeded, did you take any notes apart from
11:03:41  20   what you were typing into the computer?
11:03:43  21       A.  No.
11:03:43  22       Q.  Did you retain any of those notes in that
11:03:47  23   form even after you had created the memo?
11:03:51  24       A.  I kept no notes other than the continuing
11:03:55  25   memo that I was keeping.
```

87

```
11:03:58   1       MS. KOZAL:  I'm sorry, I didn't hear
11:03:59   2   you.
11:04:00   3       THE DEPONENT:  I kept absolutely no notes
11:04:02   4   other than the continuing electronic memo that I was
11:04:04   5   creating.
11:04:05   6       Q.  (BY MS. LUKEY)  Now, when Mr. Hood told
11:04:06   7   you the universe of the companies that you were to
11:04:10   8   call, and I think you said you believed it to be
11:04:13   9   somewhere between 10 and 20; is that right?
11:04:17  10       A.  Yes.
11:04:17  11       Q.  Did you write those down?
11:04:18  12       A.  I don't recall whether I wrote them
11:04:20  13   down -- obviously, I had a list.  I don't recall when I
11:04:25  14   created that list or how I created that list.  I
11:04:29  15   certainly had one, and I was aware that there was a
11:04:31  16   couple of companies that I probably -- that I knew I
11:04:34  17   could not call.  So I was working from a list, but I
11:04:39  18   don't recall.
11:04:41  19       Q.  Why were there companies that you could
11:04:42  20   not call?
11:04:43  21       A.  Mr. Hood had made me aware that there were
11:04:45  22   companies that were represented by counsel, and I know
11:04:49  23   from previous practice that as an investigator, I can't
11:04:53  24   contact anyone who's represented by counsel.  So I know
11:04:56  25   that I had a list, and I recall that there were one or
```

88

```
11:04:59   1   possibly two names that I had crossed out as do not
11:05:03   2   call.  But the circumstances of the list I don't
11:05:08   3   remember.
11:05:08   4       Q.  Did you understand that they had counsel
11:05:10   5   in litigation?
11:05:12   6       A.  I did not know whether they had counsel in
11:05:15   7   litigation regarding this matter, no.
11:05:20   8       Q.  But you understood that there were two
11:05:23   9   companies that were represented by counsel with regard
11:05:27  10   to the subject matter that you were inquiring about?
11:05:30  11       MS. LOUIS:  Object to form.
11:05:31  12       A.  No.
11:05:32  13       THE DEPONENT:  Excuse me.
11:05:32  14       A.  I don't know that.  I just know -- and
11:05:35  15   this is common practice in my -- in my profession.
11:05:38  16   Attorneys will often say, "This person is represented."
11:05:43  17   And that's understood to mean you don't speak to them.
11:05:46  18   And I didn't ask any additional questions.  That's
11:05:49  19   usually enough to warn me away from them.
11:05:53  20       Q.  (BY MS. LUKEY)  Do you understand, sir,
11:05:54  21   that the -- the rules that relate to avoiding contact
11:05:58  22   with those who are represented are rules about
11:06:03  23   representation in the specific matter at issue?
11:06:05  24       A.  No.  I've not -- I don't know that
11:06:09  25   specifically, no.
```

22 (Pages 85 to 88)

Beltran v. Interexchange, Inc.                    DAVID KEIL                              7/21/2016

---

97

11:14:25  1    provided with the names of individuals to contact; is
11:14:28  2    that right?
11:14:29  3         A.  That's correct.
11:14:29  4         Q.  And in your research to prepare for the
11:14:33  5    calls, did you seek to identify the names of specific
11:14:36  6    individuals or specific positions held within the
11:14:38  7    company, or did you just call into a number for the
11:14:42  8    companies?
11:14:42  9         A.  I --
11:14:43  10        MS. LOUIS:  Object to form.
11:14:44  11        A.  I called into the number publicly
11:14:48  12   available for the company.
11:14:49  13        Q.  (BY MS. LUKEY)  How did you determine
11:14:50  14   those public numbers?
11:14:51  15        A.  I believe through a search of the
11:14:54  16   Internet.
11:14:56  17        Q.  Would you typically go to a website, for
11:14:58  18   example, for a company and look for a phone number or a
11:15:01  19   "Contact Us" link?
11:15:06  20        A.  That's possible, yes.
11:15:07  21        Q.  Do you recall whether the numbers you
11:15:09  22   called included 800 numbers?
11:15:11  23        A.  I do not recall.
11:15:17  24        Q.  When checking the websites, did you use
11:15:19  25   those to try to find a person or a title, a position of

---

98

11:15:23  1    the person you wanted to call?
11:15:25  2         A.  No.
11:15:26  3         Q.  Okay.  Was it your goal to reach someone
11:15:31  4    other than a phone operator or a call center?
11:15:35  5         A.  Yes.
11:15:35  6         Q.  What was your objective in that regard?
11:15:37  7         A.  My objective was to find someone with a
11:15:43  8    working knowledge of what they were talking about that
11:15:46  9    impressed me as -- as being knowledgeable, and once I
11:15:51  10   determined someone was knowledgeable and the
11:15:54  11   conversation proceeded, I was hoping to find someone
11:15:57  12   with a title or job description that indicated that
11:16:01  13   they were in an executive capacity of some sort.
11:16:05  14        Q.  Why did you care whether the information
11:16:07  15   came to you from someone in an executive capacity of
11:16:11  16   some sort?
11:16:12  17        A.  Based on 30 years of experience of
11:16:16  18   interviewing people in civil litigation.
11:16:18  19        Q.  Well, what did you understand, based on
11:16:20  20   your 30 years of experience in civil litigation, to be
11:16:23  21   the import of the person having an executive capacity
11:16:29  22   position?
11:16:29  23        A.  I'm looking in the context of these calls
11:16:32  24   for someone who was knowledgeable and had specific
11:16:37  25   information that I could rely on to be true.  And so my

---

99

11:16:41  1    experience is that someone who has a long tenure with
11:16:44  2    the company and has risen to an executive position is
11:16:48  3    likely to not only have the best facts, but, also,
11:16:52  4    those facts will not be in dispute later.
11:16:56  5         Q.  Were you seeking to get someone in a
11:16:58  6    position who was high enough within the hierarchy that
11:17:01  7    their statements would be binding on the company?
11:17:05  8         MS. LOUIS:  Object to the form.
11:17:06  9         A.  I can't say that that was part of my
11:17:09  10   thought process.
11:17:10  11        Q.  (BY MS. LUKEY)  You were not seeking any
11:17:12  12   particular level for purposes of binding the entities
11:17:16  13   you were calling; is that correct?
11:17:18  14        A.  No.
11:17:18  15        MS. LOUIS:  Object to the form.
11:17:19  16        A.  I would say the opposite is true.  I was
11:17:21  17   seeking a minimum -- a minimal level of authority and
11:17:24  18   knowledge to know that I could rely on that information
11:17:29  19   to be true and consistent throughout the company.
11:17:32  20        Q.  (BY MS. LUKEY)  You wanted someone in an
11:17:33  21   executive capacity, but at a minimal level within that
11:17:36  22   capacity?
11:17:38  23        A.  Let me -- let me answer it this way.  If I
11:17:42  24   was speaking with someone who clearly was a low-level
11:17:48  25   employee who didn't know how to answer basic questions,

---

100

11:17:51  1    I would ask them, "How long have you been with the
11:17:53  2    company?  What's your experience there?  What's your
11:17:56  3    job title?"  And if I didn't feel that it was someone
11:18:02  4    who possessed enough knowledge to be a credible
11:18:06  5    witness, I ended those calls.
11:18:10  6         Q.  Did you ask each of the people you called
11:18:13  7    what their titles were?
11:18:15  8         A.  I asked everyone whom I got to the
11:18:20  9    completion of a phone call, and I believe there were
11:18:22  10   three that I took all the way to a conclusion, and,
11:18:27  11   yes, I did ask each of those people for their job
11:18:30  12   job -- for their job title.
11:18:32  13        Q.  Did you do that in some fashion that
11:18:34  14   wouldn't give away why you were calling?
11:18:36  15        A.  No.  I asked it directly, and they
11:18:38  16   answered it directly.
11:18:41  17        Q.  Is it only three companies as to whom you
11:18:43  18   got to an end point?
11:18:45  19        A.  I conducted a number of interviews.  There
11:18:53  20   were, to the best of my recollection, three companies
11:18:56  21   whom -- or three phone calls.  I can't say three
11:18:59  22   companies -- three phone calls that I felt answered my
11:19:07  23   questions thoroughly.
11:19:08  24        Q.  How many other companies did you contact
11:19:12  25   other than those three?

---

25 (Pages 97 to 100)

Beltran v. Interexchange, Inc.  DAVID KEIL  7/21/2016

---

101

| | |
|---|---|
| 11:19:13 1 | A. At some point I contacted virtually |
| 11:19:17 2 | everyone on my list that I, again, did not believe was |
| 11:19:19 3 | represented by counsel. In some cases I got only small |
| 11:19:26 4 | amounts of information because I didn't believe the |
| 11:19:29 5 | person possessed any more than that. In some cases I |
| 11:19:34 6 | ended the phone call because I didn't feel I could |
| 11:19:40 7 | adequately ask the questions without somehow |
| 11:19:44 8 | misrepresenting myself, which was my first goal, not to |
| 11:19:46 9 | do that. So the calls in which I was able to freely |
| 11:19:51 10 | answer questions, I felt they freely answered questions |
| 11:19:55 11 | and that they were knowledgeable enough to do that I |
| 11:19:57 12 | think ended in three, maybe four phone calls. |
| 11:20:01 13 | Q. And as to all of the others, you were |
| 11:20:03 14 | unable to get to that point? |
| 11:20:05 15 | A. I was unable to get to that point. Or I |
| 11:20:08 16 | was unable to reach somebody who could get me to that |
| 11:20:11 17 | point. |
| 11:20:12 18 | Q. All right. Where did you -- from what |
| 11:20:14 19 | source or location did you make these calls? Where |
| 11:20:18 20 | were you physically situated? |
| 11:20:20 21 | A. Physically situated in my typical work |
| 11:20:22 22 | space in Colorado. |
| 11:20:23 23 | Q. Okay. So you were making the calls from |
| 11:20:25 24 | your office? |
| 11:20:26 25 | A. Yes. |

---

102

| | |
|---|---|
| 11:20:26 1 | Q. Were you using a cell phone or a business |
| 11:20:29 2 | phone? |
| 11:20:29 3 | A. Cell phone. |
| 11:20:30 4 | Q. From what number were you placing the |
| 11:20:32 5 | calls? |
| 11:20:33 6 | A. I was -- as a general practice, whenever I |
| 11:20:38 7 | make calls to nonclients, to anyone in a case who is |
| 11:20:41 8 | not a client, I block the caller ID from my phone, and |
| 11:20:47 9 | I do that, again, for safety purposes. It's just a |
| 11:20:50 10 | habit. So the phone number, to the -- as a general |
| 11:20:54 11 | rule -- I can't say it's 100 percent of the time. As a |
| 11:20:57 12 | general rule, the phone number that I'm calling from |
| 11:21:01 13 | does not appear on . . . |
| 11:21:02 14 | MS. KOZAL: Does not what? |
| 11:21:03 15 | THE DEPONENT: Does not appear to the |
| 11:21:04 16 | caller. |
| 11:21:05 17 | Q. (BY MS. LUKEY) Given that those calls |
| 11:21:06 18 | will show up within phone bills or messages that are |
| 11:21:10 19 | coming in through a vendor supplier, can you tell us |
| 11:21:13 20 | what number you were using? |
| 11:21:14 21 | A. I was using the number listed on my -- |
| 11:21:17 22 | listed in my professional literature. |
| 11:21:20 23 | Q. In your website, sir? |
| 11:21:21 24 | A. Yes. Correct. |
| 11:21:22 25 | Q. Let's see if we can find it. It would |

---

103

| | |
|---|---|
| 11:21:25 1 | be -- it'd probably be easier if you just tell us what |
| 11:21:28 2 | it is. Do you know what it is? |
| 11:21:29 3 | A. I do. 303-916-1376. |
| 11:21:37 4 | Q. To your memory, did you use any other |
| 11:21:41 5 | phone than that one when you placed these calls? |
| 11:21:45 6 | A. I don't believe so. |
| 11:21:49 7 | Q. Did -- |
| 11:21:50 8 | A. It's possible, but I don't believe so. |
| 11:21:52 9 | Q. As you can imagine, efforts have been made |
| 11:21:54 10 | to identify whether calls came in. Is there any other |
| 11:21:58 11 | number within the state of Colorado that you can |
| 11:22:01 12 | remember placing a call from? |
| 11:22:03 13 | A. No. |
| 11:22:04 14 | Q. Do you remember whether you ever placed |
| 11:22:06 15 | any calls from Towards Justice or any other law firm or |
| 11:22:11 16 | not for profit in this matter? |
| 11:22:12 17 | A. No. |
| 11:22:14 18 | Q. You did not? |
| 11:22:14 19 | A. I did not. |
| 11:22:15 20 | Q. Okay. Did you have an order in mind when |
| 11:22:20 21 | you were placing the calls to these companies? |
| 11:22:21 22 | A. No. |
| 11:22:23 23 | Q. So how did you determine whom you would |
| 11:22:25 24 | call in what order? |
| 11:22:26 25 | A. It -- for lack of a better term, it was |

---

104

| | |
|---|---|
| 11:22:29 1 | random. I don't know -- I don't recall how I created |
| 11:22:32 2 | the list, but I went from top to bottom. And, again, |
| 11:22:36 3 | top to bottom or bottom to top. It was literally a |
| 11:22:41 4 | random process. |
| 11:22:42 5 | Q. Did you take into account time zones? |
| 11:22:45 6 | A. No, actually. I should have, but no, I |
| 11:22:47 7 | did not. |
| 11:22:48 8 | Q. Okay. Did you record any of these calls? |
| 11:22:52 9 | A. I did not. |
| 11:22:53 10 | Q. Did you have anyone present with you while |
| 11:22:56 11 | you made any of these calls? |
| 11:22:57 12 | A. No. |
| 11:22:58 13 | Q. Did you have anyone on other lines when |
| 11:23:01 14 | you were making these calls? |
| 11:23:03 15 | A. No. |
| 11:23:04 16 | Q. And in terms of what you did during the |
| 11:23:07 17 | calls, you were taking notes on the computer; is that |
| 11:23:08 18 | right? |
| 11:23:09 19 | A. Yes. |
| 11:23:10 20 | Q. But you were not taking verbatim notes? |
| 11:23:13 21 | A. I'm not a stenographer. |
| 11:23:15 22 | Q. Well, can you give us some sense of how |
| 11:23:17 23 | complete you attempted to make the responses in terms |
| 11:23:21 24 | of the words used by your interviewees? |
| 11:23:24 25 | A. In places where I was attempting to quote |

---

26 (Pages 101 to 104)

---

117

11:37:18 1    out where I spoke to someone who told me they were in
11:37:21 2    their home and then transferred me to a person who also
11:37:24 3    told me they were in their home. So it was a
11:37:27 4    hodgepodge. I can't characterize it as any one thing.
11:37:30 5        Q.  Did you do any research to ascertain the
11:37:33 6    size of these various companies before your calls?
11:37:35 7        A.  No.
11:37:36 8        Q.  Okay.  Did you have knowledge from
11:37:39 9    information -- or information from any source of the
11:37:42 10   varying sizes of these companies?
11:37:44 11       A.  No.
11:37:46 12       Q.  Did you understand that some might, in
11:37:49 13   fact, be a mom-and-pop operation?
11:37:51 14       A.  I had no information either way.
11:37:54 15       Q.  Did it matter to you in terms of what you
11:37:57 16   would say to them and present yourself if you were
11:38:00 17   dealing with a sophisticated responder or a mom-and-pop
11:38:04 18   operation?
11:38:05 19       A.  I wouldn't -- I would take umbrage, as a
11:38:09 20   mom-and-pop organization, that we're not sophisticated.
11:38:11 21   No, it didn't enter into my thinking.
11:38:13 22       Q.  Would you expect a mom-and-pop operation
11:38:16 23   to have the same capacity for handling calls of this
11:38:20 24   nature as a large company?
11:38:23 25           MS. LOUIS:  Object to the form.

---

118

11:38:24 1        A.  I can't say that I gave that any thought
11:38:28 2    at all.
11:38:30 3        Q.  (BY MS. LUKEY)  All right.  Which sponsors
11:38:32 4    did you have substantive conversations?
11:38:35 5        A.  This is strictly from memory.  Europe Au
11:38:42 6    Pair.  I'm sorry, these -- I may mangle these.  The
11:38:44 7    names all sort of string together in my mind.  API.
11:38:51 8        Q.  API.  Was Europe Au Pair the first one?
11:38:55 9        A.  Europe Au Pair or EurAuPair.  One was API,
11:38:59 10   and I can't remember what that stands for.  And the
11:39:00 11   third was something Global.
11:39:08 12       Q.  You can't tell us from memory and you have
11:39:11 13   no notes reflecting who they were; is that right?
11:39:13 14       A.  I do not have any notes to reflect
11:39:16 15   my -- to recall my memory on that, no.
11:39:19 16       Q.  Did you make any effort before coming here
11:39:21 17   today to refresh your memory as to the identity of the
11:39:25 18   sponsors with whom you had more substantive
11:39:29 19   conversations?
11:39:30 20       A.  With -- yesterday with Ms. Louis, I did
11:39:33 21   see those names and did the best to my ability to try
11:39:38 22   to recall them correctly today, but I'm struggling with
11:39:42 23   the word salad of it, so I apologize.
11:39:46 24       Q.  I'm sorry, you're struggling with?
11:39:49 25       A.  They all have similar sounding names, and

---

119

11:39:51 1    it's causing me some confusion, so I apologize.
11:39:54 2        Q.  Okay.  Are you able to tell us where in
11:39:56 3    the order or chronology of the calls it was that you
11:39:59 4    initially reached the company you refer to as Europe or
11:40:04 5    Euro Au Pair?  Was it your first call, your fifth call
11:40:08 6    your eighth call?
11:40:11 7        A.  I can't recall.
11:40:11 8        Q.  To the best of your memory, are those
11:40:13 9    three, whatever their proper names may prove to be, the
11:40:17 10   only three where you were able to reach someone and get
11:40:21 11   substantive answers to your questions?
11:40:23 12       A.  No.
11:40:23 13       Q.  Who else -- from whom else did you get
11:40:27 14   substantive answers to questions?
11:40:28 15       A.  There were a number of other organizations
11:40:30 16   who I received some substantive answers, but there
11:40:35 17   were -- those are the three companies specifically that
11:40:37 18   I felt comfortable answered my questions thoroughly,
11:40:42 19   all my questions in a manner that I felt confident I
11:40:45 20   could report to Mr. Hood on, and those are the three
11:40:49 21   companies that I ultimately reported on.  The other
11:40:51 22   conversations for a myriad of reasons did not reach
11:40:55 23   their conclusion.
11:40:56 24       Q.  Can you tell us the names of each of the
11:40:59 25   other companies from whom you received some

---

120

11:41:02 1    information?
11:41:03 2        A.  I'm sorry, no, I can't.
11:41:04 3            MS. LUKEY:  Counsel, this is going to make
11:41:05 4    this a worthless deposition if we don't get to see his
11:41:08 5    running log.  He has no memory, and we're trying to
11:41:11 6    find out.  We each represent a different company.  As
11:41:14 7    we sit here now, none of us, other than the
11:41:16 8    representatives of those three, once we get the names
11:41:20 9    clarified, can even know whether he's talking about our
11:41:24 10   clients.  I mean, it makes a difference to us.  You
11:41:27 11   know that.
11:41:28 12           MS. LOUIS:  I do.  I under -- I understand
11:41:30 13   your position and I understand that we disagree on
11:41:33 14   this.
11:41:35 15           MS. KOZAL:  Perhaps we need to break and
11:41:38 16   talk about whether or not we need to call the judge.  I
11:41:41 17   think we may be at that point.
11:41:43 18           MS. LUKEY:  Well, let's have that
11:41:44 19   discussion.
11:41:45 20       Q.  (BY MS. LUKEY)  I just want to be sure
11:41:47 21   before we break, you cannot tell us the name of any
11:41:50 22   other company from whom you obtained any substantive
11:41:53 23   information?
11:41:54 24       A.  Beyond the three I just attempted to name?
11:41:57 25       Q.  Correct.

---

### 125

12:02:06  1    A.  No.  Again, without something to refresh
12:02:10  2  my memory, no.
12:02:11  3    Q.  Do you have anything with which you can
12:02:13  4  refresh your memory?
12:02:15  5    A.  Could I -- could I refresh my memory with
12:02:18  6  the documents in front of me that I was showed
12:02:21  7  yesterday?
12:02:22  8    Q.  Well, that's Mr. Hood's declaration.  Do
12:02:25  9  you have any memory or any documents of your own?
12:02:27  10    A.  No.
12:02:29  11    Q.  So you're saying that you can't give us
12:02:32  12  any information from your memory, you would have to
12:02:35  13  refresh your memory by referencing Mr. Hood's
12:02:38  14  declaration?
12:02:38  15    A.  I -- no.  I -- I cannot --
12:02:40  16    MS. LOUIS:  Are you referring to both?
12:02:42  17    THE DEPONENT:  Yes.  Both.
12:02:44  18    A.  There are names that I recall.  There are
12:02:47  19  company names I recall.  I am having trouble recalling
12:02:51  20  which employee was with which company.
12:02:56  21    Q.  (BY MS. LUKEY)  I'm prepared to show you
12:03:01  22  the complaint, amended complaint, if that will help
12:03:04  23  you, but I have a little trouble refreshing your memory
12:03:09  24  with Mr. Hood's affidavit or declaration without
12:03:11  25  turning him into a witness.

### 126

12:03:13  1    A.  May I look at the amended complaint?  That
12:03:15  2  might help.
12:03:16  3    Q.  Yes.  Do you have another copy of it?
12:03:19  4    MR. LYONS:  Oh, yeah.
12:03:19  5    MS. REILLY:  I'm not sure --
12:03:19  6    MS. LUKEY:  What?
12:03:19  7    MS. REILLY:  Can we pause for a moment?
12:03:22  8    MS. LUKEY:  Yeah.  You don't want him to
12:03:22  9  see it?
12:03:22  10    MS. REILLY:  I don't.  No.
12:03:24  11    MS. LUKEY:  Okay.
12:03:24  12    Q.  (BY MS. LUKEY)  We'll go from memory
12:03:26  13  first.  Since I am questioning for everyone, I will do
12:03:30  14  that.  I'm sure you'll be given the opportunity, but
12:03:31  15  first we'd like to test the full extent of your memory,
12:03:35  16  sir.  Do you recall whether with regard to EurAuPair
12:03:39  17  you spoke to one person or more than one person?
12:03:42  18    A.  I can't specifically say whether with that
12:03:44  19  company I spoke with more than one person.
12:03:46  20    Q.  Did you have more than one phone call to
12:03:51  21  EurAuPair?
12:03:53  22    A.  I can't say that from memory, no.
12:03:55  23    Q.  Did you talk -- have more than one phone
12:03:57  24  call with any of the sponsors?
12:03:59  25    A.  I had multiple phone calls with some of

### 127

12:04:02  1  the companies, but not with the same individuals.  So,
12:04:05  2  in other words, I may have had one or two or three
12:04:08  3  phone calls with one company, but ultimately either did
12:04:14  4  not gain -- you know, complete a phone call or maybe
12:04:17  5  only completed a phone call with the second or third
12:04:19  6  person.  I did not take notes of the names of people
12:04:22  7  whom, for instance, didn't give me them or wouldn't
12:04:24  8  give me their title.  So of the conversations we're
12:04:29  9  discussing, three come to mind, and I can't tell you
12:04:33  10  how many other people in that organization I spoke
12:04:35  11  with.
12:04:37  12    Q.  All right.  When you made multiple phone
12:04:41  13  calls, sir, what was the purpose for calling back a
12:04:44  14  second time or a third time?
12:04:46  15    A.  There were several purposes.  Sometimes it
12:04:49  16  was just as simple as I couldn't reach anybody.  There
12:04:52  17  were a number of cases where I got voicemail.  There
12:04:55  18  were cases where I got someone who answered the phone
12:05:00  19  who couldn't find someone to speak with me.  There were
12:05:03  20  instances where I called and spoke to someone, and
12:05:06  21  shortly into the conversation I realized they couldn't
12:05:09  22  answer my questions well.  And there were -- there were
12:05:13  23  some calls where the person on the other end of the
12:05:17  24  phone was extremely persistent and wanted to ask me
12:05:20  25  questions about my own life, my own family, my own

### 128

12:05:23  1  children, and I did not feel it was possible to
12:05:27  2  continue the phone call without giving a falsehood or
12:05:31  3  some answer that I had determined wasn't going to be
12:05:35  4  part of my questioning.  So I ended those calls.
12:05:39  5    Q.  Did you hang up?
12:05:40  6    A.  No.  I said, "Thank you" or I said, "You
12:05:42  7  know, this isn't a great time, can I get back with
12:05:45  8  you?"  Or -- and I've said this many times, "I'm
12:05:48  9  speaking with a lot of companies this week, let me get
12:05:53  10  back to you later."  So it was usually a polite way of
12:05:56  11  ending the call if possible.
12:05:58  12    Q.  When you received voicemail, did you leave
12:06:02  13  messages?
12:06:02  14    A.  I did not.
12:06:03  15    Q.  Why?
12:06:04  16    A.  'Cause, again, I'm very secretive about
12:06:06  17  return -- leaving my -- for safety reasons leaving my
12:06:09  18  number.  If I called from a blocked number, I didn't
12:06:11  19  feel it was appropriate for me to then leave that
12:06:14  20  voicemail number as well.  Defeat the purpose.
12:06:17  21    Q.  Do you block your number in all calls, or
12:06:19  22  did you do it in this instance?
12:06:21  23    A.  I block my -- my number in all calls that
12:06:24  24  are not to clients or people who I have a professional
12:06:27  25  relationship with.  So if I call anyone involved in a

Beltran v. Interexchange, Inc.                    DAVID KEIL                                    7/21/2016

---

141

```
13:06:12  1    emailed or printed and hand delivered.
13:06:14  2        Q.  Do you have any regular practice in that
13:06:16  3    regard?
13:06:16  4        A.  It varies from client to client.
13:06:18  5        Q.  All right.  Can you tell us, please, if
13:06:22  6    you emailed it from your office, what your email
13:06:24  7    account was at that time?
13:06:26  8        A.  It would have either been
13:06:27  9    keilinv@gmail.com or keil@me.com.
13:06:40 10        Q.  Do you still both -- maintain both of
13:06:43 11    those accounts?
13:06:44 12        A.  I do.
13:06:46 13        Q.  Do you have any other email accounts that
13:06:48 14    you use from your office?
13:06:49 15        A.  No.
13:06:50 16        Q.  And you said it was an Apple, I believe, a
13:06:54 17    Mac?
13:06:55 18        A.  Yes.
13:06:55 19        Q.  Okay.  Do you still have that computer?
13:06:58 20        A.  Yes.
13:06:59 21        Q.  And can you tell us the model of the
13:07:00 22    computer, by any chance?
13:07:03 23        A.  It's a -- an iBook, iBook Air.
13:07:06 24        Q.  iBook Air?
13:07:07 25        A.  Yes.
```

142

```
13:07:08  1        Q.  And you still have the same iBook Air?
13:07:10  2        A.  I do.
13:07:11  3        Q.  Okay.  Do you know what program you used
13:07:14  4    to create the document?  Was it Word or something else?
13:07:17  5        A.  Probably in Word.  Sometimes I use a
13:07:20  6    program called, Bean, B-e-a-n.
13:07:24  7        Q.  As regards the log, do you remember which
13:07:28  8    you used?
13:07:28  9        A.  No.  I use them kind of interchangeably.
13:07:32 10        Q.  Do you remember if the log was at one
13:07:35 11    point longer than it is currently?
13:07:38 12        A.  No.
13:07:38 13        Q.  And I don't mean by a few words, but I
13:07:40 14    mean contained more information?
13:07:41 15        A.  No, I don't believe so.  I think, again,
13:07:44 16    the only changes that were made were for clarity and
13:07:47 17    grammar.
13:07:48 18        Q.  Have you maintained that document on your
13:07:49 19    computer?
13:07:50 20        A.  I don't believe so.
13:07:51 21        Q.  All right.  Have you swapped -- I don't
13:07:54 22    think you can swap out the hard drive on an iBook
13:07:57 23    Air --
13:07:59 24        A.  No.
13:07:59 25        Q.  -- but just in case you can, have you
```

143

```
13:08:01  1    swapped out the hard drive?
13:08:02  2        A.  No.  But I did have -- I was hacked
13:08:05  3    sometime in the last two years.  I don't know where
13:08:07  4    this falls.  So I did have some corruption problems.
13:08:12  5    So I don't know what -- no, we've not hard -- we've not
13:08:15  6    swapped out the hard drive, but we had some corruption
13:08:18  7    issues.
13:08:19  8        Q.  Okay.  Do you have any reason to believe
13:08:22  9    that any efforts were taken to change the metadata in
13:08:26 10    any way?
13:08:27 11        A.  No.
13:08:28 12        Q.  So if it isn't as originally created with
13:08:31 13    its various versions reflected as metadata reflects
13:08:36 14    them, it would be because of the corruption issue?
13:08:39 15        MS. LOUIS:  Object to the form.
13:08:39 16        A.  All I know is that the corruption issue
13:08:41 17    has worked its way into some strange places that are
13:08:44 18    surprising to me, so I put it out there as a
13:08:47 19    possibility.
13:08:47 20        Q.  (BY MS. LUKEY)  Okay.  Now, while we're
13:08:51 21    waiting for that to be copied.
13:08:53 22        MR. LYONS:  Here it is.
13:08:55 23        MS. LUKEY:  Oh.  Thank you.  May we have
13:08:55 24    that marked?  Where -- are we at 4, 5?
13:08:55 25        THE REPORTER:  We're at 5.
```

144

```
13:08:58  1        MS. LOUIS:  And, Joan, before there's
13:08:59  2    questioning --
13:09:00  3        MS. LUKEY:  Yes.
13:09:00  4        MS. LOUIS:  -- with respect to what's
13:09:00  5    being marked as Exhibit 5, plaintiffs maintain the
13:09:03  6    position that the document constitutes protected work
13:09:07  7    product.  We're making the election at this time to
13:09:10  8    waive the protection with respect to this document,
13:09:12  9    Exhibit 5, for the expediency of this proceeding.
13:09:23 10        THE DEPONENT:  May I also say --
13:09:23 11        (Deposition Exhibit 5 was marked.)
13:09:23 12        MS. LUKEY:  Wait a minute.  Wait a minute.
13:09:26 13        MS. LOUIS:  She's marking.
13:09:26 14        THE DEPONENT:  Thank you.
13:09:26 15        MS. LUKEY:  We just didn't want to miss a
13:09:27 16    part of your comments on the record.  So . . .
13:09:30 17        THE DEPONENT:  Okay.
13:09:30 18        MS. LUKEY:  All right.  Why don't we all
13:09:32 19    take one minute to read through it quickly, and then I
13:09:34 20    will start with the questions from it with your
13:09:37 21    position noted.  We obviously have a disagreement on
13:09:40 22    whether there's privilege and if it was privileged,
13:09:43 23    whether that's been waived, but we appreciate the
13:09:46 24    accommodation to allow this to go forward.
13:09:53 25        (Pause in the proceedings.)
```

scheduling@huntergeist.com              HUNTER + GEIST, INC.              303-832-5966/800-525-8490

**Beltran v. Interexchange, Inc.**          DAVID KEIL          7/21/2016

---

169

13:48:41 1 not included here?
13:48:43 2      A. I remember that these conversations
13:48:46 3 included some back and forth and some discussion of
13:48:51 4 their services, how their services were conducted,
13:48:55 5 where the au pairs came from. All of these interviews
13:48:58 6 had preamble and sort of boilerplate portions to them,
13:49:04 7 and what I reflected was, you know, what I thought was
13:49:07 8 unique and substantive of that conversation. So that's
13:49:10 9 what appears here.
13:49:12 10      Q. So in your own words, would you describe
13:49:16 11 what you chose to include and what you chose to
13:49:19 12 exclude, please.
13:49:21 13      A. Things that I would characterize as
13:49:24 14 boilerplate I chose to exclude.
13:49:28 15      Q. And what did you choose to include?
13:49:30 16      A. I chose to include the items that are
13:49:32 17 reflected here.
13:49:33 18      Q. Here again, sir, everything that you chose
13:49:36 19 to include and put in quotes relates to whether there
13:49:39 20 was an agreement among the sponsors as to the amount to
13:49:42 21 pay the au pairs. Is there a reason for that?
13:49:46 22      A. Again, I would from my recollection say
13:49:50 23 that that's the -- the issue that caught my attention
13:49:55 24 during the interview. During the interview we talked
13:49:57 25 about their policies, we talked about their fee

170

13:50:01 1 structures to some degree, and what I noticed was a
13:50:05 2 consistency through each interview on this one topic,
13:50:09 3 and I'd say that caught my attention and I asked
13:50:13 4 appropriate follow-up questions for that reason.
13:50:15 5      Q. Are you stating that you, yourself came up
13:50:17 6 with the concept that what was significant in the
13:50:25 7 interviews that you conducted was the discussion of an
13:50:29 8 agreement among sponsors regarding stipends?
13:50:33 9      MS. LOUIS: Objection.
13:50:38 10      A. I -- I would answer it this way. I took
13:50:41 11 the interviews where they went based on the
13:50:46 12 conversations and the representations that the
13:50:48 13 interview subject was making. I asked the appropriate
13:50:51 14 follow-up questions, and I noted where I saw a stark
13:50:56 15 similarity.
13:50:57 16      Q. (BY MS. LUKEY) And that's what you wrote
13:50:58 17 down on your own?
13:51:00 18      A. Yes.
13:51:00 19      Q. Nobody asked you at any point to look into
13:51:03 20 the issue of agreement among the sponsors with regard
13:51:06 21 to the stipend --
13:51:07 22      A. Correct.
13:51:08 23      Q. -- is that right?
13:51:08 24      A. That's right.
13:51:09 25      Q. So you were providing Mr. Hood with

171

13:51:11 1 information of this interesting phenomenon that you
13:51:15 2 developed in the course of the three conversations that
13:51:17 3 you had substantively; is that right?
13:51:19 4      A. I was simply --
13:51:20 5      MS. LOUIS: Object to form.
13:51:21 6      A. I was simply reporting on the
13:51:23 7 conversations and the issues that I felt were important
13:51:27 8 within.
13:51:28 9      Q. (BY MS. LUKEY) Now, I noticed in both of
13:51:30 10 these that you quote both Ms. Crompton and Joanna as
13:51:44 11 saying, "everybody agrees," in Ms. Crompton's case, and
13:51:48 12 then Joanna, the same thing, "everybody agrees."
13:51:54 13 That's the language that each of them used; is that
13:51:57 14 right?
13:51:58 15      A. Well, to follow this, she -- paragraph
13:52:02 16 one, two -- four, she says, "It's a base rate. It's a
13:52:06 17 minimum." And I inferred the follow-up question being
13:52:12 18 is it a minimum -- this is paraphrasing. Is it a
13:52:15 19 minimum that everybody uses, is it something that
13:52:17 20 everybody agrees to, and her answer was, "Everybody
13:52:20 21 agrees, yeah."
13:52:21 22      Q. So everybody agrees that's the minimum
13:52:23 23 amount; is that right?
13:52:24 24      A. That's what this person stated.
13:52:26 25      Q. All right. Have you ever seen the

172

13:52:28 1 Department of State notification?
13:52:31 2      A. No.
13:52:32 3      Q. Do you know what that says?
13:52:35 4      A. No.
13:52:35 5      Q. Do you know if the quotes that you have in
13:52:37 6 here accurately reflect what the Department of State
13:52:41 7 notification says?
13:52:42 8      A. I don't think I was attempting to
13:52:43 9 accurately reflect what the Department of State says, I
13:52:46 10 was trying to accurately reflect what these witnesses
13:52:49 11 stated.
13:52:49 12      Q. I'm suggesting to you that what the
13:52:51 13 witnesses said is consistent with what the Department
13:52:53 14 of State notification says, and I'm asking if you were
13:52:56 15 aware of that?
13:52:57 16      A. I was not.
13:52:57 17      Q. Okay. And in both instances, they also,
13:53:00 18 also agreed that if somebody wanted to pay more, they
13:53:03 19 could?
13:53:04 20      A. In -- in small -- small amounts, yes.
13:53:06 21      Q. Did they say in small, small amounts, or
13:53:09 22 did they happen to give you examples that were small
13:53:12 23 amounts?
13:53:12 24      A. They happened to give me examples of small
13:53:14 25 amounts.

scheduling@huntergeist.com          HUNTER + GEIST, INC.          303-832-5966/800-525-8490

Beltran v. Interexchange, Inc.          DAVID KEIL                    7/21/2016

---

173

13:53:15   1     Q.   Okay.  Did you ask either of them a
13:53:17   2   follow-up question about, "What do you mean when you
13:53:20   3   say everybody agrees?"
13:53:29   4     A.   Yes.
13:53:30   5     Q.   That's not reflected here.
13:53:31   6     A.   No.  And the reason was the answer, as I
13:53:35   7   recall, and I don't remember, I believe it was this
13:53:38   8   witness that we're discussing here, the answer was --
13:53:41   9     Q.   I'm sorry, I can't even hear you here.
13:53:43  10     A.   I'm so sorry.  I'm having -- I'm usually
13:53:45  11   not this -- this quiet.  I believe I asked this witness
13:53:48  12   a follow-up question and received, again, the exact
13:53:50  13   same answer, "Everybody agrees."  No, I did not notate
13:53:54  14   that twice.  I thought one notation was sufficient.
13:53:58  15     Q.   So I'm clear, what they both told you is
13:54:00  16   everybody agrees that the minimum amount that can be
13:54:04  17   paid is that set by the Department of State?
13:54:05  18     A.   Correct.
13:54:10  19     Q.   And both of them told you that if a family
13:54:13  20   didn't want to pay the minimum amount, they could pay
13:54:16  21   some more?
13:54:18  22     MS. LOUIS:  Object to form.
13:54:18  23     A.   What they told me was they were personally
13:54:20  24   aware of a few examples, I think two examples, where
13:54:23  25   families did pay more, and the amount more that was

---

174

13:54:27   1   paid was less than $5.
13:54:29   2     Q.   (BY MS. LUKEY)  But they said to you that
13:54:31   3   families were free to pay more?
13:54:33   4     MS. LOUIS:  Object to form.
13:54:34   5     A.   What I -- what I understand from these
13:54:37   6   notes and what I recall from my conversations was that
13:54:41   7   there were -- they were stating there were some few
13:54:45   8   examples where families elected to pay more and that
13:54:48   9   those amounts were quite small.
13:54:50  10     Q.   (BY MS. LUKEY)  I'm sorry, I couldn't hear
13:54:52  11   you.  And those amounts what?
13:54:53  12     A.   Were quite small.
13:54:54  13     Q.   Okay.  They told you the amounts?
13:54:56  14     A.   Yes.
13:54:56  15     Q.   They didn't say, "Those amounts were
13:54:58  16   small," they told you the amount, correct?
13:55:00  17     A.   Correct.  I'm -- I'm stating they were
13:55:01  18   quite small.
13:55:02  19     Q.   Okay.  Did either of these two women tell
13:55:10  20   you that the host families were told they could only
13:55:16  21   pay the State Department's stated amount?
13:55:21  22     A.   No.
13:55:25  23     Q.   Turning to the third, Irina Gussev,
13:55:29  24   Regional Director, it says, of EurAuPair, E-u (sic)
13:55:33  25   capital A-u capital P-a-i-r.  Would you review your

---

175

13:55:39   1   notes with regard to Ms. Gussev, please, and let me
13:55:42   2   know when you have had a chance to do so.
13:55:46   3     (The deponent perused the exhibit.)
13:56:29   4     A.   Yes.
13:56:29   5     Q.   Now, you indicate in your opening -- oh,
13:56:32   6   first let me ask you, is this a complete and accurate
13:56:36   7   memorialization of your conversation with EurAuPair?
13:56:41   8     A.   It's an accurate representation.  Again,
13:56:43   9   there may have been some boilerplate conversation that
13:56:45  10   didn't -- that's not reflected here.
13:56:47  11     Q.   Because you didn't consider that important
13:56:49  12   to what you were doing?
13:56:50  13     A.   Because I was talking and typing and
13:56:51  14   trying to do multiple things at once, and I was -- this
13:56:56  15   is what I elected to memorialize.
13:56:56  16     Q.   Did you take down the information that you
13:57:02  17   thought was important to your assignment?
13:57:04  18     A.   I took down the information that I thought
13:57:07  19   was relevant to the interview.
13:57:13  20     Q.   Well, how did you define what was relevant
13:57:15  21   to the interview?
13:57:16  22     A.   I don't believe I had an assignment other
13:57:18  23   than to conduct fact-finding interviews.  So what I
13:57:23  24   memorialized here is the facts that I found in the
13:57:25  25   interviews.

---

176

13:57:26   1     Q.   What facts were you supposed to be
13:57:27   2   finding?
13:57:28   3     A.   Again, I do not believe I was -- set out
13:57:32   4   to find any facts.  I believe, as I stated in my
13:57:36   5   earlier testimony, my goal was to learn about how these
13:57:41   6   companies compensate -- were compensated by customers,
13:57:44   7   how they compensated au pairs, how those policies
13:57:49   8   differed or were similar amongst the various companies.
13:57:53   9     Q.   Now, in the information that you've taken
13:57:55  10   down in your only notes from your project, there's no
13:58:00  11   discussion of the answers to questions about how the
13:58:04  12   sponsors are compensated by host families.  Did you ask
13:58:07  13   that question?
13:58:08  14     A.   I'm sorry.  Again, please?
13:58:11  15     Q.   A moment ago you said that the directive
13:58:13  16   was to find out what you could about the industry,
13:58:16  17   including how host families were compensated -- I'm
13:58:19  18   sorry, sponsors were compensated by host families and
13:58:23  19   how au pairs were compensated.  Did you ask questions
13:58:28  20   about how the sponsors were compensated?
13:58:32  21     A.   I asked questions about their fee
13:58:36  22   structures.  I received no direct response as far as
13:58:44  23   amounts or types of fees.  I believe that had I been
13:58:54  24   acting as a potential customer or had I been a
13:58:57  25   potential customer, maybe they would have volunteered

---

scheduling@huntergeist.com          HUNTER + GEIST, INC.          303-832-5966/800-525-8490

Beltran v. Interexchange, Inc.                   DAVID KEIL                                    7/21/2016

---

177

13:58:59  1    that information, but because I was asking very generic
13:59:03  2    questions, I was receiving very generic answers back
13:59:07  3    about fees.
13:59:08  4          Q.  Did you get information -- other than
13:59:09  5    Ms. Crompton's general statement that her sponsor
13:59:15  6    agency was in the middle price wise, did you get
13:59:18  7    information from any of them regarding how and in what
13:59:22  8    amount they were compensated?
13:59:24  9          A.  Again, I don't recall anybody giving me
13:59:28  10   specific amounts about how they were compensated.  And,
13:59:32  11   frankly, if those conversations did occur, I don't
13:59:36  12   recall them.  But I don't recall anyone giving me
13:59:40  13   specific numbers.
13:59:42  14         Q.  Were you asking for specific numbers?
13:59:44  15         A.  No.  I was asking more generic questions,
13:59:47  16   as I've said.  How does this program work?  How
13:59:52  17   are -- you know, how are au pairs compensated?  How are
13:59:56  18   you guys compensated?  What type of expenses could a
13:59:59  19   family expect?  I was asking very general questions,
14:00:02  20   and I was receiving back pretty general answers on a
14:00:06  21   lot of those topics.
14:00:07  22         Q.  So you did not hear anything that you
14:00:11  23   considered important to note with regard to the
14:00:15  24   compensation of sponsors other than Ms. Crompton's
14:00:18  25   reference to being in the middle of the pack; is that

---

178

14:00:21  1    right?
14:00:21  2          A.  I didn't note anything beyond what's
14:00:24  3    currently in my statement.
14:00:25  4          Q.  Okay.  And you did not find any agreement
14:00:28  5    among sponsors as to the amount that they're paid,
14:00:31  6    correct?
14:00:32  7          A.  I didn't obtain enough information to know
14:00:34  8    that, no.
14:00:35  9          Q.  Okay.  So looking at what you did inquire
14:00:39  10   of with Irina Gussev.  Again, the questions relate to
14:00:47  11   the amount of the stipends paid to the au pairs,
14:00:51  12   correct?
14:00:52  13         A.  That appears to be the case.
14:00:53  14         Q.  Okay.  In this instance you say -- you
14:01:00  15   quote your own question, "Are you saying that each and
14:01:04  16   every one of the 15 companies have gotten together and
14:01:08  17   they made an agreement to pay all au pairs a stipend
14:01:12  18   that is no more than" 120 -- I'm sorry -- "$195.75 per
14:01:18  19   week?"  That was your question?
14:01:20  20         A.  That was my question.
14:01:21  21         Q.  Okay.  And her answer was initially, "Yes,
14:01:26  22   they all agreed to pay that amount, no more."  But then
14:01:30  23   she added, "We have" a -- "one family who pays a little
14:01:35  24   bit more, so I guess you could pay more if you wanted
14:01:37  25   to . . ."  She said that to you, right?

---

179

14:01:40  1          A.  Yes.
14:01:40  2          Q.  Okay.  Did you ask her whether there was
14:01:45  3    an agreement among the companies to pay the same
14:01:50  4    amount?
14:01:52  5          A.  I -- if you look again at paragraph 2, she
14:01:59  6    discussed -- and this is the flow of the conversation.
14:02:02  7    She discussed the $500 educational fee and that all 15
14:02:07  8    companies agreed to require that same amount.  She
14:02:11  9    answered yes.  I then asked what I thought was the
14:02:14  10   logical follow-up question, "What about the amount paid
14:02:17  11   directly to the au pair?"  She answered, "Yes, it's
14:02:21  12   called a stipend," and quoted the amount of 195.75.
14:02:25  13   And then I asked again what I thought was just a
14:02:28  14   logical follow-up question, and she answered, "Yes,
14:02:33  15   it's exactly the same amount, equal in all programs."
14:02:36  16   I didn't prompt that question.  That was her response
14:02:39  17   to a more broad question.
14:02:42  18         Q.  Except she added that you could pay more
14:02:43  19   if you wanted to?
14:02:47  20         A.  Yes.
14:02:47  21         Q.  Was it of any significance to you in
14:02:51  22   conducting your interviews what the Department of State
14:02:53  23   directive or notification says?
14:02:56  24         A.  I -- I'm sorry?  Ask --
14:02:59  25         Q.  Was it of any importance to you whether,

---

180

14:03:01  1    in fact, there is a directive or notification from the
14:03:04  2    Department of State that sets forth elements of the
14:03:10  3    compensation of au pairs?
14:03:12  4          A.  The individuals I spoke to in these
14:03:15  5    conversations plus others that are not documented here
14:03:17  6    led me to believe it was a minimum amount set by law
14:03:22  7    and that everyone in the industry followed that minimum
14:03:27  8    amount, and I didn't see a need to research that
14:03:30  9    further.  It seemed to be a consensus, and I took it at
14:03:33  10   face value.
14:03:41  11         Q.  Did you obtain information from anyone
14:03:46  12   regarding any purported agreement, that is,
14:03:50  13   communications among sponsors, to use the stipend
14:03:55  14   included in the Department of State guidance and
14:04:01  15   notification?
14:04:02  16         MS. LOUIS:  Object to form.
14:04:03  17         A.  And, I'm sorry, I'm not understanding the
14:04:05  18   question.
14:04:06  19         Q.  (BY MS. LUKEY)  Agreement, sir.  Like I
14:04:10  20   say to you, "Let's do this.  Let's pay $190 a week."
14:04:15  21         A.  I -- I think --
14:04:16  22         MS. LOUIS:  There's no question.
14:04:18  23         THE DEPONENT:  Oh.  Yes.
14:04:19  24         Q.  (BY MS. LUKEY)  I haven't gotten there
14:04:20  25   yet.

---

Beltran v. Interexchange, Inc.          DAVID KEIL                    7/21/2016

---

185

14:09:32  1   all the sponsor agencies follow the same federal
14:09:36  2   directive?
14:09:36  3       A.  I believed, based on my recollection of my
14:09:40  4   notes, that they were speaking to me honestly about
14:09:43  5   their understanding of how their company and their
14:09:47  6   industry operated.  That's the sum total of what I
14:09:50  7   asked, and I believe they seemed to have the knowledge
14:09:55  8   to answer that question directly.
14:09:57  9       Q.  That everybody was following the same
14:09:59  10  federal directive of $195.75 as their information to
14:10:06  11  the families about what they are to pay?
14:10:09  12      A.  Yes.
14:10:09  13          MS. LOUIS:  Object to form.
14:10:11  14      Q.  (BY MS. LUKEY)  And in each instance, all
14:10:12  15  three of them also said you could pay more if you
14:10:16  16  wanted to; is that right?
14:10:34  17      A.  Two of them stated that they -- they had
14:10:37  18  seen instances where slight amounts -- larger amounts
14:10:40  19  were paid, again, amounts under $5.  And Ms. Crompton
14:10:45  20  stated 196 is a minimum and that no one would know if a
14:10:50  21  particular family were to elect to pay more.
14:10:52  22      Q.  Okay.  So she said this is the minimum,
14:10:55  23  and if somebody pays more, they can pay more?
14:10:58  24          MS. LOUIS:  Object to form.
14:11:00  25      Q.  (BY MS. LUKEY)  Is that correct?

---

186

14:11:02  1       A.  I stand by the statement that's in
14:11:03  2   my -- in my report.
14:11:05  3       Q.  That she told you that the $196 is -- is a
14:11:11  4   minimum amount, so that nobody would have to know if a
14:11:15  5   particular family elected to pay more?
14:11:17  6       A.  A little bit more is exactly the
14:11:19  7   statement.
14:11:19  8       Q.  Okay.  So that's the statement from Au
14:11:23  9   Pair -- sorry.  That's the statement from APF Global.
14:11:28  10  The statement from Au Pair International is that "You
14:11:35  11  can pay a little more, it's fine, it's up to you."  And
14:11:39  12  the statement from EurAuPair is, ". . . I guess you
14:11:48  13  could pay more if you wanted to."
14:11:50  14          MS. LOUIS:  Object to the form of the
14:11:51  15  question.
14:11:51  16      Q.  (BY MS. LUKEY)  Right?
14:11:59  17      A.  No.  If I understand what -- if I
14:12:03  18  understood this right, Irina Gussey -- Gussev stated,
14:12:06  19  " . . . they all agreed to pay the amount, no more."
14:12:11  20  She added that one family -- she was aware of one
14:12:15  21  family who paid a little bit more.
14:12:18  22      Q.  And keep reading the rest of her quote,
14:12:21  23  please.
14:12:22  24      A.  And, "I guess you could pay more if you
14:12:24  25  wanted to, yes.  But it's exactly the same in all

---

187

14:12:27  1   programs."
14:12:28  2       Q.  So what you found out from each of these
14:12:30  3   women is that their organizations informed their host
14:12:34  4   families of the amount set forth in the Department of
14:12:38  5   State stipend, correct?
14:12:41  6           MS. LOUIS:  Object to --
14:12:42  7       Q.  (BY MS. LUKEY)  I'm sorry, notification.
14:12:43  8           MS. LOUIS:  Object to form.
14:12:44  9       A.  That is what I was told.
14:12:45  10      Q.  (BY MS. LUKEY)  I want you to tell us,
14:12:47  11  sir, each and every piece of evidence that you learned
14:12:51  12  of a communication between any two or more sponsors in
14:13:05  13  which they reached an agreement on the amount.
14:13:05  14      A.  The statement that I've made here -- the
14:13:07  15  statements that are here are my complete statements.
14:13:10  16  I -- as I stated earlier on several occasion, they used
14:13:15  17  the term "we."  I assumed or believed that to be, when
14:13:19  18  they said, "we," they were talking about their
14:13:21  19  organizations, not themselves personally, and that's
14:13:23  20  the sum total of what I have.
14:13:25  21      Q.  You have no evidence, then, of any
14:13:28  22  communications occurring between two or more sponsors
14:13:31  23  in which they agreed to set the amount of the stipends;
14:13:37  24  is that correct?
14:13:38  25      A.  Correct.

---

188

14:13:40  1       Q.  You mentioned there were other interviews,
14:13:42  2   sir, that weren't recorded here, that you gained some
14:13:47  3   information, but not the full amount of information; is
14:13:50  4   that right?
14:13:52  5       A.  Yes.
14:13:52  6       Q.  Do you have any notes or memorialization
14:13:56  7   relating to any of those communications?
14:13:59  8       A.  I do not.
14:13:59  9       Q.  Do you have any memory relating to those
14:14:02  10  communications?
14:14:03  11      A.  Specific memories of specific
14:14:04  12  conversations, no.  General memories of how the
14:14:08  13  interviews were conducted, yes.
14:14:11  14      Q.  Did you in any of these information --
14:14:13  15  excuse me, in these calls that you cannot recall
14:14:17  16  specifically, did you gain any substantive information
14:14:22  17  relating to pay or stipends of au pairs?
14:14:29  18      A.  Had I obtained anything
14:14:32  19  substantive -- that I deemed substantive at the time,
14:14:34  20  it would have appeared in my running memo.
14:14:37  21      Q.  Is there any -- I'm sorry.  Is there any
14:14:40  22  information that you intentionally omitted?
14:14:42  23      A.  No.
14:14:44  24      Q.  Did you gain any information from any of
14:14:47  25  these entities as to whom we have no notes and you have

---

47 (Pages 185 to 188)

**Beltran v. Interexchange, Inc.**   **DAVID KEIL**   **7/21/2016**

---

189

14:14:51  1    no specific memory that suggested there was not
14:14:55  2    agreement among the sponsors?
14:14:57  3       Q.  Did any sponsor suggest to you -- sorry.
14:15:00  4    Did any of the employees of these sponsors suggest to
14:15:03  5    you in any way that there was an agreement on an amount
14:15:06  6    that was different from the State Department directive?
14:15:12  7       A.  No.
14:15:18  8       Q.  In all instances you were told the amount
14:15:21  9    that is the standing State Department directive; is
14:15:27  10   that correct?
14:15:29  11      A.  I was told a combination.  It was stated a
14:15:30  12   combination of ways over the calls.  Some individuals
14:15:34  13   stated that it was the standard State Department
14:15:38  14   minimum.  Some stated the amount and did not mention
14:15:41  15   that it was related to the State Department minimum.
14:15:45  16   Some borrowed a little bit from -- from either of
14:15:50  17   those.  But, no, I was not told anything other than
14:15:54  18   those two things.
14:15:58  19      Q.  And the amount in all three instances that
14:16:05  20   you were told was $195.75?
14:16:08  21      A.  I believe from my notes, Ms. Crompton
14:16:11  22   stated 196.  I believe that was her -- the amount that
14:16:14  23   she stated.
14:16:19  24      Q.  Okay.  And I can see that you actually
14:16:21  25

190

14:16:26  1    note for Ms. Gussev $195.75.
14:16:29  2       A.  Yes.
14:16:29  3       Q.  Do you know, sir, that that is the amount
14:16:31  4    in the State Department directive?
14:16:32  5       A.  I do not.
14:16:34  6       Q.  You don't know one way or the other?
14:16:36  7       A.  I know -- I don't know one way or the
14:16:38  8    other.
14:16:38  9       Q.  Okay.  Was there ever a time when you had
14:16:40  10   on your electronic running log or elsewhere any
14:16:44  11   information about your other calls?
14:16:45  12      A.  No.
14:16:49  13      Q.  Did you provide any information in your
14:16:52  14   bills or otherwise to Mr. Hood or Towards Justice or
14:17:00  15   Boies Schiller as to the identity of the other persons
14:17:04  16   or entities whom you called?
14:17:06  17      A.  No.
14:17:12  18      Q.  Did you come away with the understanding
14:17:14  19   that any of the three women whom you interviewed was in
14:17:22  20   the executive suite, if you will, at the top of the
14:17:24  21   organizations?
14:17:25  22      A.  I didn't have any advance knowledge or any
14:17:28  23   knowledge, really, at all about the size of these
14:17:31  24   organizations or whether they had an executive suite.
14:17:33  25   All I knew was these women explained to me that they

191

14:17:38  1    were directors in an executive position with their
14:17:41  2    organization, but that's all I knew.
14:17:44  3       Q.  Well, you weren't looking for the top
14:17:46  4    decision makers, were you?
14:17:47  5       A.  No.
14:17:49  6       Q.  And did any of them suggest to you or did
14:17:52  7    you otherwise understand that they owned the agencies?
14:17:55  8       A.  I don't think -- I asked, and I don't
14:17:57  9    think anyone suggested it.
14:18:02  10      Q.  Is what appears in Exhibit 5 as slightly
14:18:08  11   expanded today the sum total of all of the information
14:18:13  12   that you have gathered in this case?
14:18:14  13      A.  Yes.
14:18:15  14         MS. LOUIS:  Object to form.
14:18:32  15      Q.  (BY MS. LUKEY)  Do you have any
14:18:35  16   information as to how the stipend in the federal
14:18:37  17   directive of $195.75 was computed?
14:18:41  18      A.  No.
14:18:44  19      Q.  Do you have any knowledge or information
14:18:46  20   of the application by the Department of Labor and the
14:18:49  21   Department of State of room and board or lodging
14:18:52  22   credits as an offset to minimum wage compensation?
14:18:57  23      A.  No.
14:18:59  24      Q.  Do you have any information to suggest
14:19:01  25   that there was anything improper in the setting of the

192

14:19:07  1    stipend of $195.75 by the State Department?
14:19:11  2       A.  I don't know how to answer the word
14:19:13  3    "improper."  I don't have enough factual basis to know
14:19:17  4    what is and isn't proper here.
14:19:20  5       Q.  Do you have any reason to believe that it
14:19:21  6    would be improper for the sponsor families to
14:19:23  7    inform -- I'm sorry, the sponsor agencies to inform the
14:19:27  8    host families of the amount of the stipend specified by
14:19:31  9    the State Department?
14:19:33  10         MS. LOUIS:  Object to form.
14:19:35  11      A.  Could you please restate?
14:19:35  12      Q.  (BY MS. LUKEY)  Sure.  Do you have any
14:19:36  13   reason to think there would be anything inappropriate
14:19:38  14   or improper for the sponsor agencies to inform each
14:19:43  15   host family of the amount of the stipend set by the
14:19:46  16   State Department?
14:19:47  17      A.  Since I'm not familiar with the rules
14:19:49  18   governing this or how they're implemented, I don't
14:19:52  19   think I have the basis to answer that.  I don't know.
14:20:02  20      Q.  Have you talked to any au pairs?
14:20:05  21      A.  No.
14:20:05  22      Q.  Have you talked to any host families?
14:20:08  23      A.  No.
14:20:13  24      Q.  Have you talked to anyone other than the
14:20:20  25   sponsor agencies whose names were provided by Mr. Hood?

---

48 (Pages 189 to 192)

**Beltran v. Interexchange, Inc.**          DAVID KEIL                    7/21/2016

---

205

AT&T. Sorry.

Q.   Well, I think you hit the entire universe of major providers, and I'm -- I'm sure they'll all appreciate their subpoenas.  Just so we can wrap this up, sir, you -- you do not have any information as to communications between or among sponsors, that is, you cannot tell us about any communications between or among sponsors in which they purportedly agreed to set au pair compensation; is that fair?

A.   That is fair.

Q.   And I gather you do not have any basis to suggest that the $195.75 amount specified in the State Department directive and notification is proper -- is improper under any law?

A.   I have no information at all on that topic. I can't answer that.

Q.   Okay.  You have no information to suggest that any au pairs who have come to this country under the J-1 cultural exchange program have been abused or mistreated; is that correct?

A.   That's correct.

Q.   Okay.  And in actuality, you actually don't know the identity of the 15 sponsors who are approved by the State Department; is that correct?

A.   That's correct at this moment.

---

206

MS. LUKEY:  That is it for my questioning, sir.  If you want to take a five-minute break, I suspect that others may want to convene among themselves to decide in what order they would speak.

MS. LOUIS:  Okay.

MS. LUKEY:  Thank you.

THE VIDEOGRAPHER:  Going off the record. The time is 2:34 p.m.

(Recess taken, 2:34 p.m. to 2:56 p.m.)

(Deposition Exhibit 6 was marked.)

THE VIDEOGRAPHER:  We are back on the record. The time is 2:56 p.m.

EXAMINATION

BY MS. KOZAL:

Q.   Mr. Keil, my name is Peggy Kozal.  I represent AuPairCare in this litigation.  I just have a few very short questions for you.

A.   Certainly.

Q.   Are -- you are licensed in Colorado as a private investigator; is that correct?

A.   That's correct.

Q.   And since when have you been licensed?

A.   Licensure started in 2015. I applied at the very beginning, but I don't think I was approved until mid-2015 because of clerical issues.

---

207

Q.   Have you ever had any actions against your license?

A.   No.

Q.   Are you licensed in any other states besides Colorado?

A.   No.  I have a pending license in New Mexico, but it's not -- I'm not currently licensed there.

Q.   What has prompted you to get licensed in New Mexico?

A.   I have family that lives in New Mexico.

Q.   And did you make all of the calls as it relates to the investigation that you did in this case, did you make all of those calls from Colorado?

A.   I believe so.

Q.   Okay.  And I'm going to hand you what we have marked as Deposition -- oh, excuse me -- Deposition Exhibit 6.  Do you have an understanding of what this document is?

A.   Yes.

Q.   And can you identify it for me?

A.   I've not seen it in this form, but it appears to be excerpts from the Private Investigator Licensure Rules and Regulations.

Q.   And do you comply with those rules and

---

208

regulations?

A.   Yes.

Q.   And specifically I'd like to turn your attention to Rule 8D, which is found on page 11.

A.   I'm sorry?

Q.   8D.  There's a subheading called, "Recordkeeping."

A.   Okay.

Q.   And can you take a look at subsection D?

A.   Yes.

Q.   And let me know when you're finished reading it.

MS. LOUIS:  Counsel, where's the 8?

MS. CROUCH:  I apologize, it's just the excerpt from it, from the -- the rules and regulations. But it's -- I can get all -- all of the pages if you'd like.  It would just take some time.  This is taken off of the Department of Regulatory Agency's website.  I do not have the full document.

A.   Yes, I'm familiar with this.

Q.   (BY MS. KOZAL)  Okay.  And do you follow the recordkeeping requirements?

A.   Yes.  But the recordkeeping requirements here does not -- do not mention the specific exemption that exists in the statute, and my understanding is

---

52 (Pages 205 to 208)