THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Case No. 14-cv-03074-CMA-KMT

JOHANA PAOLA BELTRAN, *ET AL.*

    Plaintiffs,

v.

INTEREXCHANGE, INC., *ET AL.*

    Defendants.

---

**PLAINTIFFS' MOTION TO COMPEL RESPONSE TO DOCUMENT REQUEST NO. 16 FROM DEFENDANTS APEX, 20/20, AGENT AU PAIR, AIFS, AU PAIR CARE, AU PAIR INTERNATIONAL, CULTURAL CARE, EXPERT AU PAIR, AND GO AU PAIR[1]**

**CERTIFICATE OF CONFERRAL**

    Since March 3, 2016, Plaintiffs have been requesting Defendants' audited or unaudited financial statements. Defendants have uniformly refused. The parties met and conferred on February 21, 2017 and were unable to reach an agreement. On March 9, 2017, the parties held an informal conference before Judge Tafoya, at which time the Court invited this motion and set a briefing schedule.

**PRELIMINARY STATEMENT**

    Plaintiffs bring this motion to compel Defendants' audited or unaudited financial statements from January 1, 2009 to March 3, 2016.

    As the Court observed during the parties' informal conference on March 9, 2017, Defendants' financial statements are part of this case. Indeed, financial statements are

---

[1] Plaintiffs have been able to reach a separate agreement for the production of financial information with Defendant Great Au Pair, and have been able to obtain relevant financial information from publicly available sources from Defendants Interexchange, Cultural Homestay International, US Au Pair, EurAupair, and APF Global Exchange. Those Defendants are therefore not part of this motion.

1

plainly relevant to at least two of Plaintiffs' core claims.  First, that Defendants are part of an illegal cartel fixing *au pair* wages at a programmatic wage floor in violation of federal and state minimum wage laws.  And second, that certain of the Defendants — Cultural Care, Au Pair in America, Go Au Pair, Au Pair Care, and Expert Au Pair — are liable for punitive damages from Defendants Interexchange.[2]

As Judge Arguello reasoned in denying Defendants' motion to dismiss Plaintiffs' antitrust claims, circumstantial economic evidence of Defendants' antitrust conspiracy supports Plaintiffs' claims, including Plaintiffs' claim that Defendants are able to reap artificially high profits by suppressing *au pair* wages.  (*See* DE 258 at 17).  With demanded financial information, Plaintiffs will be able to establish the profits Defendants garnered from administering the *au pair* program, detail the difference between those profits and the profits which would be expected in an economically competitive marketplace, and isolate patterns among Defendants' financial statements indicating the existence of anticompetitive behavior.

Defendants' financial condition is also relevant to the issue of punitive damages.  Punitive damages exist to punish and deter, and the wealth and size of a defendant are relevant considerations to formulating punitive damages.  Under Colorado law, punitive damages are available for Plaintiffs' claims sounding in fraud, a fact which Defendants did not dispute in their unsuccessful motion to dismiss Plaintiffs' First Amended Complaint.  Any evaluation of a just damage award will therefore require Defendants' financial records to determine the proper scope of punitive damages, if any.

---

[2] The "fraud claims" include claims for Breach of Fiduciary Duty (Count III), Negligent Misrepresentation (Count IV), Constructive Fraud or Fraudulent Concealment (Count V); and Violations of Consumer Protection Laws (Count VI).

## BACKGROUND

On March 13, 2015, Plaintiffs filed their First Amended Complaint ("FAC") on behalf of a putative class of *au pairs*, bringing eleven causes of action against Defendants. The FAC described how Defendants, Sponsor agencies responsible for the placement of *au pairs* with host families, engaged in a conspiracy to set the wages paid to *au pairs* at $195.75 per week, fraudulently misled *au pairs* regarding the sub-minimum-wage nature of that wage, and otherwise engaged in wage violations as the *au pairs'* employers. With respect to the claims sounding in fraud, Plaintiffs sought punitive damages. Defendants moved to dismiss, and, in their motions, did not object to the applicability of a punitive award.

On February 22, 2016, Judge Tafoya issued a Report and Recommendation denying Defendants' motions to dismiss (DE 240). On March 31, 2016 Judge Arguello largely adopted and affirmed Judge Tafoya's Report and Recommendation, upholding Plaintiffs' antitrust claims, federal wage claims, and fraud claims (*see* DE 258).

On March 3, 2016 Plaintiffs served Defendants with their First Request For the Production of Documents (DE 467, Smalls Decl., Ex. C). Document Request No. 16 requested from Defendants their "audited or unaudited financial statements, including documents sufficient to show your annual revenue and income derived from participating in the au pair program during each year in which you have participated in the program."

On May 6, 2016, the parties entered into a stipulated protective order which allows parties to designate documents "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY." (*See* DE 305). After the entrance of the Protective

Order, Defendants began to produce documents, although from March 2016 until December 2016, they were produced at a trickle. It was only in January 2017, after Plaintiffs began to press Defendants on discovery issues and threaten motion practice, that Defendants began to pick up their production.  And it was not until January 13, 2017, the very day class certification expert discovery was due, that Defendants began to produce documents in earnest.  Since then, Defendants have made at least forty separate productions totaling over 110,000 pages of documents, representing the vast majority of documents so-far disclosed in this case.  In light of these late document productions, Plaintiffs were forced to seek more time to complete discovery and move for class certification—a motion the Court largely granted.

In addition to delaying their production of relevant documents, Defendants refused to produce identification information for host families, forcing Plaintiffs to move to compel the information.  (*See* DE 465).  Plaintiffs' motion to compel the host family identification information was ultimately successful, but the motion practice and Defendants' refusals to produce relevant information led to further delays, leading to yet another extension of the case management schedule.  (*See* DE 506).

As they did with host family contact information, Defendants persist in their refusal to produce the financial information.  While Plaintiffs have been able to reach a separate agreement for the production of financial statements or have been able to discover financial statements from publicly available information from some Defendants, the Defendants subject to this motion – APEX, 20/20, Agent Au Pair, AIFS, Au Pair Care, Au Pair International, Cultural Care, Expert Au Pair, and Go Au Pair – have uniformly refused to produce their financial statements.   Plaintiffs therefore find

themselves, yet again, moving to compel the production of basic records that they have been seeking for over a year.

# ARGUMENT

## I. Legal Standard

"The scope of evidence that is subject to discovery under the federal rules is broad." *Tinley v. Poly-Triplex Techs., Inc.*, No. CIVA07CV01136-WYDKMT, 2008 WL 732590, at *1 (D. Colo. Mar. 18, 2008) (Tafoya, J.). Rule 26 provides that a party "may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense." *See Deuty v. HP (Hewlett-Packard)*, No. 10-CV-00562-WYD-KMT, 2011 WL 834197, at *1 (D. Colo. Mar. 4, 2011) (Tafoya, J.). "Relevancy is broadly construed at the discovery stage and a request for discovery should be considered relevant if there is any possibility that the information sought may be relevant to the claim or defense of any party." *Griffin v. Home Depot USA, Inc.*, No. 11-2366-RDR, 2013 WL 1304378, at *4 (D. Kan. Mar. 28, 2013) (internal citations omitted). As a general matter, "[d]iscovery in an antitrust case is necessarily broad because allegations involve improper business conduct....Such conduct is generally covert and must be gleaned from records, conduct, and business relationships." *Callahan v. A.E.V. Inc.,* 947 F. Supp. 175, 179 (W.D. Pa.1996) (citations omitted).

A motion to compel a discovery response may be made under Rule 37 if a party fails to answer an interrogatory or respond to a document request. "Once the low burden of relevance is established, the legal burden regarding the defense of a motion to compel resides with the party opposing the discovery request." *Fox v. Morreale Hotels, LLC*, No. 10-CV-03135-RPM-MJW, 2011 WL 2894066, at *2 (D. Colo. July 20,

2011). "When a party files a motion to compel and asks the Court to overrule certain objections, the objecting party must specifically show in its response to the motion to compel, despite the broad and liberal construction afforded by the federal discovery rules, how each request for production or interrogatory is objectionable." *S.E.C. v. Fuhlendorf*, No. 10-CV-h01691-MSK-KLM, 2010 WL 3547951, at *2 (D. Colo. Sept. 7, 2010).

Finally, if the motion to compel "is granted—or if the disclosure or requested discovery is provided after the motion was filed—the court must, after giving an opportunity to be heard, require the party or deponent whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees." Fed. R. Civ. P. 37(a)(5)(A).

## II. Plaintiffs' Antitrust Claims Require An Assessment of Defendants' Financial Records

Despite Plaintiffs' well-pled allegation that Defendants conspired to keep *au pair* wages low in order to maximize their profits, Defendants persist in their refusal to produce financial statements – the very documents relevant to establishing those profits.

In their First and Second Amended Complaints, Plaintiffs detailed Defendants' antitrust conspiracy. Plaintiffs explained that the "au pair program has…developed into a cartel setting uniform wages at $195.75, i.e. just $4.35 per hour," (DE 101, First Amended Complaint ¶ 5), described direct evidence of conspiracy in the form of statements by Sponsors themselves indicating that the Sponsors affirmatively agreed to keep *au pair* wages at $195.75 (*see, e.g.*, DE 101 at ¶¶ 90-94), and described a wide

6

range of circumstantial evidence further demonstrating the existence of a conspiracy, including but not limited to Defendants' communications with *au pairs* (*see, e.g.,* DE 101 at ¶ 87), Defendants' statements indicating that $195.75 is the only permissible compensation (DE 101 at ¶¶ 362, 381), an industry structure that facilitates collusion (DE 101 at ¶ 134), and an allegation that, by depressing *au pair* wages, the Sponsors are able to attract more host families and charge those families higher fees, generating artificially high profits (DE 101 at ¶ 132). Specifically, Plaintiffs explained the argument as follows:

> By fixing wages, the Sponsors collectively ensure that employer families are presented with *au pairs* at the lowest price claimed as permitted by federal law. This benefits Sponsors in at least two ways: (1) by allowing the Sponsors to increase the portion of the overall costs to host families that are comprised of Sponsors' fees without increasing overall costs to host families, and (2) by increasing the affordability of *au pair* arrangements for host families, and thus expanding the number of potential host families. Both of these results increase Sponsors' profits, at the expense of *au pairs*.

*See* DE 101 at ¶ 132.

Defendants' ability to generate outsized profits is a straightforward economic motive for their collaborating on *au pair* wages, which Judge Arguello explicitly recognized. In her decision, Judge Arguello ruled that a Plaintiff alleging an antitrust conspiracy can survive summary judgment if "he or she presents a combination of direct evidence and circumstantial evidence positing an economically rational theory of an agreement." (DE 258 at 15, *citing Champagne Metals v. Ken-Mac Metals*, 458 F.3d 1073, 1085 (10th Cir. 2006)). Further, she explained that as a result, "the more economically rational a conspiracy is in a given situation, the broader the range of inferences that can be drawn from the evidence." (DE 258 at 15-16, *citing Champagne Metals*, 458 F.3d at 1084). Judge Arguello then listed a number of findings Judge

7

Tafoya made demonstrating "sufficient circumstantial evidence of a viable economic theory of collusion," (DE 258 at 16), including the allegation that "[b]y depressing wages for *au pair* services, the Sponsors reap artificially high profits because if the host family's direct cost for an *au pair* does not increase, then any increase, while still costing the family less than a full-time nanny on the open market, goes to the Sponsor in the form of fees…" (DE 258 at 17). Given that the Court has already held that evidence of profits is circumstantial evidence of Defendants' collusion, there can be no credible dispute that financial statements, which show profits and losses, are relevant to Plaintiffs' claims in this litigation. *See, e.g.*, *In re Folding Carton Antitrust Litig.*, 76 F.R.D. 420, 427 (N.D. Ill. 1977) (granting antitrust plaintiff's motion to compel financial statements from Defendant as "[t]he financial information here requested may help plaintiffs determine whether or not defendants enjoyed unreasonably high or excessive profits, facts which are relevant to the issues here involved.")[3]

Patterns in Defendants' profits over time—as demonstrated by their financial statements—can also be powerful evidence of collusion. As Judge Posner has explained, "changes in the level of profits of the firms in the market and of particular subsets of those firms may be useful evidence of collusion—and it is easier to prove such changes than it is to show whether the level of profits in the market at any time is above or below the competitive level." See Richard Posner, *Antitrust Law* 90-91 (2d Ed.

---

[3] Defendants have previously suggested that Plaintiffs do not need financial statements because they can use evidence of the size of fees and the total number of au pairs to "back into" Defendants' profits. This argument is mistaken for at least two reasons. First, Plaintiffs should not have to extrapolate Defendants' profits; they should be given Defendants' financial statements, which contain Defendants' actual calculations of their profits. Second, Plaintiffs cannot calculate Defendants' profits on their own, as they do not know how the revenue Defendants generate through fees is offset by the costs of administering the *au pair* program.

2009). Plaintiffs' request for financial statements over a number of years is thus proportional to the needs of this case. Moreover, as Judge Posner implicitly recognized, evidence of profits is also relevant to collusion claims because it permits comparisons between Defendants' actual profits and those expected to be found in competitive markets. *See id.*

For all of these reasons, the financial records Plaintiffs request are relevant to Plaintiffs' antitrust claim.[4]

### III. Plaintiffs' Claims for Punitive Damages Further Necessitate the Production of Financial Records

The law in the Tenth Circuit is settled that a Plaintiff's claim for punitive damages puts a Defendant's financial condition at issue. *See, Scavetta v. King Soopers, Inc.*, No. 10-CV-02986-WJM-KLM, 2012 WL 3545278, at *2 (D. Colo. Aug. 16, 2012) ("[A]ccording to binding Tenth Circuit case law, the financial condition of a defendant is relevant to the issue of the proper amount, if any, of punitive damages to be awarded."); *Meeker v. Life Care Centers of America, Inc.*, 2015 WL 7882695, at *6 (D. Colo., 2015) ("the financial condition of [defendants] is generally discoverable as relevant to the issue of punitive damages."); *Deters v. Equifax Credit Info. Servs., Inc.*, 202 F.3d 1262, 1273 (10th Cir. 2000) ("In assessing the reasonableness of the punitive damages award in the instant case, we must consider the purposes of such a remedy, namely to punish

---

[4] Indeed, courts in this Circuit readily order the production of financial statements when relevant to claims or defenses. *See, e.g., Audiotext Commc'ns Network, Inc. v. US Telecom, Inc.*, No. CIV.A.94-2395-GTV, 1995 WL 625962, at *4 (D. Kan. Oct. 5, 1995) (granting production of financial records including profit and loss statements, balance sheets, cash flow statements, market forecasts, business agreements, annual reports, and tax returns because they "appear relevant to calculation of damages and determining lost profits."); *Aero Tech Aviation Design, LLC v. Otto Aviation Grp., LLC*, No. 15-CV-1373-EFM-TJJ, 2016 WL 6595031, at *1 (D. Kan. Nov. 8, 2016) (granting motion to compel financial records relevant to counterclaim).

and deter. In this respect, the wealth and size of the defendant are relevant considerations."). Indeed, courts in the Tenth Circuit regularly compel the production of financial statements, as the "requesting parties generally must simply show the claim for punitive damages is not spurious." *Audiotext Commc'ns Network, Inc. v. US Telecom, Inc.*, No. CIV.A.94-2395-GTV, 1995 WL 625962, at *3 (D. Kan. Oct. 5, 1995).

Plaintiffs have asserted fraud claims against Defendants Cultural Care, Go Au Pair, Au Pair Care, AIFS d/b/a Au Pair in America and Expert Au Pair ("Fraud Defendants") for which Plaintiffs seek punitive damages.[5] Plaintiffs' Complaint describes a variety of evidence—including websites, brochures and affidavits—demonstrating that the Fraud Defendants fraudulently misrepresented *au pair* wages in recruiting au pairs. (*See*, *e.g.*, DE 395 ¶¶ 234-316). From the outset of this case Plaintiffs have sought punitive damages for this odious behavior. And Defendants have not disputed that punitive damages apply to Plaintiffs' fraud claims. Under the law of this Circuit—and, indeed, under federal law generally, Defendants' financial statements are therefore discoverable. *See Gust v. Wireless Vision, L.L.C.*, No. 15-2646-KHV, 2015 WL 9462078, at *5 (D. Kan. Dec. 24, 2015) ("When a punitive damages claim has been asserted by the plaintiff, a majority of federal courts permit pretrial discovery of financial information of the defendant without requiring plaintiff to establish a *prima facie* case on the issue of punitive damages"); *Mid Continent Cabinetry, Inc. v. George Koch*

---

[5] These Causes of Action include Count III: Breach of Fiduciary Duty; Count IV: Negligent Misrepresentation; Count V: Constructive Fraud or Fraudulent Concealment; and Count VI: Consumer Protection. Plaintiffs also brought fraud-based claims against Defendant Interexchange. As noted above, however, Interexchange is not part of this motion.

*Sons, Inc.*, 130 F.R.D. 149, 151 (D. Kan. 1990) (the same, collecting cases);[6] *Patient A v. Vermont Agency of Human Servs.*, No. 5:14-CV-000206, 2016 WL 880036, at *2 (D. Vt. Mar. 1, 2016) ("the vast majority of federal district courts which have addressed the discoverability of financial information before a claim for punitive damages has been clearly established have held that such information is discoverable"); *Searcy v. Esurance Ins. Co.,* Case No. 2:15-cv-00047-APG-NJK, 2015 WL 9216573, at *1 (D. Nev. Dec. 16, 2015) ("The majority approach is that a plaintiff is not required to make a *prima facie* showing of merit on its punitive damages claim before permitting discovery of a defendant's net worth.") (citation omitted).[7]

  Accordingly, the Fraud Defendants should be compelled to produce their financial statements.

---

[6] The court in *Mid Continent Cabinetry* further described the common-sense nature of the rule allowing discoverability of financial records prior to the establishment of a *prima facie* case: "the requirement that claimant establish a *prima facie* case applies to the admissibility of evidence about financial status, not its discoverability…The discoverability of information is governed by whether it would be relevant, not by whether the information discovered would be admissible at trial…To require a *prima facie* showing of entitlement to punitive damages at this time, before the completion of discovery, could also be quite difficult for the plaintiff and would not be logical since the very purpose of discovery is to locate evidence to support a punitive damages claim." *See* Mid Continent Cabinetry 130 F.R.D. at 152 (D. Kan. 1990)

[7] The same is true under Colorado law, which provides that "[i]n all civil actions in which damages are assessed by a jury for a wrong done to the person or to personal or real property, and the injury complained of is attended by circumstances of fraud, malice, or willful and wanton conduct, the jury, in addition to the actual damages sustained by such party, may award . . . reasonable exemplary damages." Colo. Rev. Stat. Ann. § 13-21-102 (West). State and federal courts sitting in Colorado therefore find that punitive damages are available when a party brings claims sounding in fraud. *See, e.g., Wood v. Houghton Mifflin Harcourt Pub. Co.*, 569 F. Supp. 2d 1135, 1142 (D. Colo. 2008) (holding where complaint combined federal copyright claim with claims of fraud and fraudulent concealment that, "[p]ursuant to relevant Colorado statute, punitive damages are permissible for fraud and fraudulent concealment.")

### IV.     Financial Statements Are Always Sensitive and Regularly Produced

Lastly the Court should swiftly reject Defendants' argument that their financial statements are too sensitive to be produced.  "[I]formation is not shielded from discovery on the sole basis that such information is confidential." *Moss v. Blue Cross & Blue Shield of Kansas, Inc.*, 241 F.R.D. 683, 698 (D. Kan. 2007).  In any event, the protective order in this case is more than adequate to address any confidentiality concerns associated with the production of financial statements.  *See Audiotext Commc'ns Network, Inc. v. US Telecom, Inc.,* No. CIV.A.94-2395-GTV, 1995 WL 625962, at *3 (D. Kan. Oct. 5, 1995).  ("A respondent's interest in the nondisclosure and confidentiality of its financial records can usually be adequately protected by a protective order.").  In fact, the confidentiality of financial records is treated no differently "than any other confidential information currently being protected from disclosure by the protective order." *Heartland Surgical Specialty Hosp., LLC v. Midwest Div., Inc.*, No. 05-2164 MLBDWB, 2007 WL 950282, at *12 (D. Kan. Mar. 26, 2007).  And Defendants have already produced tens of thousands of pages of documents that they have marked CONFIDENTIAL or HIGHLY CONFIDENTIAL/ATTORNEYS' EYES ONLY.  Defendants can therefore use the protective order to address whatever confidentiality concerns they may have with the production of their financial information.

### Conclusion

For the reasons stated above, Plaintiffs' Motion to Compel Defendants' response to Request No. 16 from Plaintiffs' First Request for the Production of Documents should be granted, and Plaintiffs should be awarded their reasonable expenses incurred in bringing this motion, including attorneys' fees.

Dated: New York, New York
March 13, 2017

Respectfully Submitted,

BOIES, SCHILLER & FLEXNER LLP

<u>/s/ Peter M. Skinner</u>
Matthew L. Schwartz
Peter M. Skinner
Randall W. Jackson
Dawn L. Smalls
575 Lexington Avenue
New York, New York  10022
Tel:  (212) 446-2300
Fax: (212) 446-2350
mlschwartz@bsfllp.com
pskinner@bsfllp.com
rjackson@bsfllp.com
dsmalls@bsfllp.com

Alexander Hood
TOWARDS JUSTICE
1535 High Street, Suite 300
Denver, Colorado  80218
Tel: (720) 239-2606
Fax: (303) 957-2289
alex@towardsjustice.org

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

      I hereby certify that on March 13, 2017, I electronically served the foregoing motion on all counsel of record.

/s/ Peter M. Skinner
Peter M. Skinner
