1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF COLORADO

3    Case No. 14-cv-03074-CMA-KMT

4    _____

5    JOHANA PAOLA BELTRAN, et al.,

6         Plaintiffs,

7    vs.

8    INTEREXCHANGE, INC., et al.,

9         Defendants.

10   _____

11           Proceedings before KATHLEEN M. TAFOYA, United

12   States Magistrate Judge, United States District Court for the

13   District of Colorado, commencing at 8:38 a.m., March 10,

14   2017, in the United States Courthouse, Denver, Colorado.

15   _____

16           WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

17   ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED...

18   _____

19                      APPEARANCES

20           ALEXANDER N. HOOD and JOSHUA J. LIBLING, Attorneys

21   at Law, appearing for the plaintiffs.

22           WILLIAM J. KELLY, III, Attorney at Law, appearing

23   telephonically for the defendant USAuPair, Inc.

24   _____

25                    MOTION HEARING

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Motion Hearing
March 10, 2017

Page 2

```
 1                    APPEARANCES (Cont'd)

 2            BROOKE A. COLAIZZI, Attorney at Law, appearing for

 3     the defendant InterExchange, Inc.

 4              MARTIN J. ESTEVAO, Attorney at Law, appearing for

 5     the defendant GreatAuPair, LLC.

 6            BOGDAN ENICA, Attorney at Law, appearing

 7     telephonically for the defendant Expert Group International,

 8     Inc.

 9            DAVID MESCHKE, Attorney at Law, appearing for the

10     defendant EuRaupair InterCultural Child Care Programs.

11             JAMES E. HARTLEY and JONATHAN S. BENDER,

12     Attorneys at Law, appearing for the defendant Cultural

13     Homestay International.

14             JOAN A. LUKEY, JAMES M. LYONS and JESSICA L.

15     FULLER, Attorneys at Law, appearing for the defendant

16     Cultural Care, Inc.

17            PEGGY E. KOZAL and BRIAN P. MASCHLER, Attorneys at

18     Law, appearing for the defendant AuPairCare, Inc.

19            KATHRYN A. REILLY, Attorney at Law, appearing for

20     the defendants Au Pair International, Inc., and American

21     Cultural Exchange, LLC.

22             SUSAN M. SCHAECHER, Attorney at Law, appearing

23     for the defendants APF Global Exchange, NFP, and American

24     Institute for Foreign Study.

25             LAWRENCE D. STONE, Attorney at Law, appearing
```

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Motion Hearing
March 10, 2017

Page 3

 1  telephonically for the defendant A.P.E.X. American

 2  Professional Exchange, LLC.

 3          STEPHEN J. MACRI, Attorney at Law, appearing for

 4  the defendant American Institute for Foreign Study.

 5                  P R O C E E D I N G S

 6          (Whereupon, the within electronically recorded

 7  proceedings are herein transcribed, pursuant to order of

 8  counsel.)

 9          THE COURTROOM DEPUTY:  All rise.  Court is in

10  session.

11          THE COURT:  Good morning, everyone.  Please be

12  seated.

13          ALL COUNSEL IN UNISON:  Good morning, Your Honor.

14          THE COURT:  All right.  We are here today in case

15  number 14-cv-3074, Johana Beltran, et al., plaintiffs, versus

16  InterExchange, Inc., et al., defendants.  So the first order

17  of business is to take appearances.  So let's go down the

18  list as we normally do and have appearances first for

19  plaintiff.

20          MR. LIBLING:  Good morning, Your Honor.  Joshua

21  Libling, Boies Schiller & Flexner for the plaintiffs.

22          THE COURT:  All right.  Good morning.

23          MR. HOOD:  Your Honor, Alexander Hood from Towards

24  Justice for the plaintiffs.

25          THE COURT:  Good morning.  And let's just start

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Motion Hearing
March 10, 2017

Page 4

 1  down the line.  InterExchange?

 2          MS. COLAIZZI:  Good morning, Your Honor.  Brooke

 3  Colaizzi of Sherman & Howard.

 4          THE COURT:  And USAuPair.

 5          MR. KELLY:  Good morning, Your Honor.  William

 6  Kelly on the phone from Kelly & Walker.

 7          THE COURT:  Okay.  And is -- let's see.  For

 8  GreatAuPair.

 9          MR. ESTEVAO:  Good morning, Martin Estevao,

10  Armstrong Teasdale.

11          THE COURT:  Okay.  And then Expert AuPair I think

12  by phone.

13          UNIDENTIFIED SPEAKER:  We're waiting for him to

14  join us, Your Honor.  He has not yet joined the phone call.

15          THE COURT:  Okay.  So -- so Mr. -- is it Enica?

16          UNIDENTIFIED SPEAKER:  Yes.  That's correct.

17          THE COURT:  Okay.  So he's not on the phone yet.

18  All right.

19          UNIDENTIFIED SPEAKER:  Correct.

20          THE COURT:  We're -- we're about 10 minutes past

21  our start time, which was 8:30.  So it's about 8:40.  So I

22  think we'll go forward.  How about EuRaupair?

23          MR. MESCHKE:  Your Honor, David Meschke,

24  Brownstein Hyatt Farber Schreck.

25          THE COURT:  And Cultural Homestay.

Johana Paola Beltran, et al. vs.                                      **Motion Hearing**
InterExchange, Inc., et al.                                          **March 10, 2017**

Page 5

 1              MR. HARTLEY:  Good morning, Your Honor.  Jim

 2     Hartley and Jon Bender.

 3              THE COURT:  Okay.  Let's see.  Cultural Care.

 4              MS. LUKEY:  Good morning, Your Honor.  Joan Lukey.

 5     And with me, James Lyons and Jessica Fuller.

 6              THE COURT:  All right.  Good morning.

 7              MR. LYONS:  Good morning, Your Honor.

 8              THE COURT:  AuPairCare.

 9              MR. MASCHLER:  Good morning, Your Honor.  Brian

10     Maschler and Peggy Kozal.

11              THE COURT:  Okay.  Good morning to you.  And Au

12     Pair International is Go Au Pair.

13              MS. REILLY:  Good morning, Your Honor.  Katie

14     Reilly on behalf of Go Au Pair, Au Pair International, and

15     Agent Au Pair.

16              THE COURT:  And Agent Au Pair.  Okay.  Thank you.

17     Let's -- is anyone here for APF Global Exchange?

18              MS. SCHAECHER:  Yes, Your Honor.  Susan Schaecher

19     with Fisher Phillips.

20              THE COURT:  All right.  And is it Mr. Macri?  Is

21     he on the phone or --

22              MR. MACRI:  No.  I'm here, Your Honor.

23              THE COURT:  You're here.  All right.

24              MR. MACRI:  Good morning.

25              THE COURT:  And you're for A.P.E.X/20/20, right?

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Motion Hearing
March 10, 2017

Page 6

 1    No.

 2              MR. MACRI:  No, Your Honor.  I'm here for American

 3    Institute for Foreign Study, via Au Pair in America program.

 4              THE COURT:  Okay.  All right.  Thank you.  And

 5    then for A.P.E.X and 20/20 Care Exchange.

 6              MR. STONE:  Yes, Your Honor.  Larry Stone

 7    appearing on behalf of those defendants for -- our clients

 8    are not part of this motion.  We're just listening in.  And

 9    additionally, I think Mr. Enica has joined us perhaps because

10    someone else joined our call.

11              THE COURT:  All right.  Mr. Enica, are you on the

12    phone now?

13              MR. ENICA:  Yes.  Good morning, Your Honor.  I'm

14    on the phone for Expert Group International doing business as

15    Expert AuPair.

16              THE COURT:  All right.  Thank you very much.  And

17    did I get everybody?  Okay.  Looking good.  That's -- that's

18    always the first challenge, right, in this case.

19              So we're here today to consider two motions.  The

20    first is 454, which is the motion for protective order, or in

21    the alternative, amendment of the scheduling order.  And the

22    second is 465.  And it's also numbered 469 because of the

23    restrictions.  So 465/469 are one.  One is the public entry.

24              So as I looked at these motions, they're pretty

25    well intertwined I think with the 465/469, which is the

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Motion Hearing
March 10, 2017

Page 7

```
 1    motion to compel by plaintiff.  So if you want to address
 2    them separately, you can, but I -- to me it seems just as
 3    easy to do them together.  The issue I think before the Court
 4    is whether or not the defendants have to reveal either the
 5    names and contact information for the au pairs and/or the
 6    host families, which I see as two completely different
 7    entities.  I mean, not -- well, of course they are different
 8    entities.  They're different people.  But I think the issues
 9    are completely different between the two as well.  So
10    that's -- that's how I'm viewing it.  And it's plaintiffs'
11    motion, so I'll let you go first.
12              MR. LIBLING:  Thank you, Your Honor.  And good
13    morning.  May it please the Court.  Plaintiffs' position on
14    the motion to compel, which is where I'll start, is
15    relatively straightforward, which is that defendants are not
16    permitted to have three separate positions all at the same
17    time.  First, defendants maintain their own form contracts,
18    their own market surveys, their own advertising, all of which
19    demonstrating a universal stipend of 195.75 do not
20    demonstrate what au pairs were actually paid.  That's the
21    position defendants have taken in this litigation.  Second,
22    defendants maintain that they do not have the information
23    about what au pairs are actually paid.  And, third,
24    defendants maintain that plaintiffs are not entitled to
25    receive the contact information for the people who do know
```

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Motion Hearing
March 10, 2017
Page 8

```
 1    what au pairs were actually paid.  Those three positions
 2    cannot all exist simultaneously.  One of them has to give.
 3    And plaintiffs have offered and remain open to a stipulation
 4    from defendants that au pairs were paid in accordance with
 5    defendants' form contracts or the results of defendants' own
 6    market surveys.  But, of course, defendants are not required
 7    to provide such a stipulation.  They can put us to our burden
 8    of proof.  If they do that though, absent such a stipulation,
 9    plaintiffs are entitled to pursue the best evidence or,
10    indeed, any area where we have a reasonable expectation of
11    finding relevant evidence for -- of what au pairs were, in
12    defendants' parlance, actually paid.  And that's what
13    defendant -- that's what plaintiffs are here to do today.
14              So at this point it is worth noting that relevance
15    is not really an issue in this motion.  Indeed, as recently
16    as defendants' expert reports, defendants criticized
17    plaintiffs for not having the very data the plaintiffs are
18    here to seek.  Even more relevance not conceded, however,
19    issues of what au pairs were actually paid and whether those
20    payments are subject to class wide proof are unquestionably
21    relevant to both the merits and certification issues.
22    Because relevance has been established, the legal burden
23    shifts.  So in a motion to compel the initial burden, of
24    course, is on the movant to demonstrate relevance.  But once
25    that burden has been established, the legal burden then
```

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Motion Hearing
March 10, 2017

Page 9

 1   shifts to the person opposing production in order to

 2   demonstrate some legal basis for refusal.  Normally that

 3   legal basis is that it would be too burdensome in some way to

 4   produce the information.  Now, that argument is not really

 5   available to defendants for a couple of reasons.  First and

 6   most obviously, defendants are required by statute to keep

 7   this information and, indeed, are required to file

 8   significant portions of this information with the Department

 9   of State.  Indeed, some defendants have, in fact, produced

10   the audit files that have all of this information.  They've

11   just redacted hundreds and hundreds of pages of the contact

12   information.  So it's readily available.  And there's no

13   question that it could be extremely easily produced.

14   Moreover, because plaintiffs' need for the information is

15   driven by defendants' own positions, the burden arguments

16   should -- should not carry the day.  So although we believe

17   that really should be the end of the matter because the

18   relevance established there being no significant burden in

19   production, it sort of automatically should follow that

20   plaintiffs are entitled to the information.

21           Defendants do make some additional arguments that

22   I'd like to address.  Most of those additional arguments come

23   down to some kind of speculation that plaintiffs will do

24   nothing improper such as undermining the class notice process

25   or violating ethical rules.  But these accusations are

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Motion Hearing
March 10, 2017

Page 10

 1   entirely unwarranted.  Defendants have not demonstrated any
 2   likelihood that plaintiffs' counsel is somehow unable to
 3   comply with the requirements that all lawyers adhere to
 4   practicing before this Court.  Similarly speculative is
 5   defendants' arguments.  And I want to talk specifically for a
 6   moment about host families.
 7           Similarly speculative is defendants' arguments
 8   that host families information would cause them harm.
 9   (Inaudible) initial note, to the extent that defendants are
10   advancing burden arguments on behalf of host families, they
11   lack standing.  Moreover, if plaintiffs use a voluntary
12   survey, then the burden on host families is light.  And if
13   plaintiffs use formal discovery methods, then host families
14   will be entitled to the same protections against overly
15   burdensome discovery that all nonparties are entitled to
16   before this Court.  To the extent defendants are advancing a
17   harm to themselves, such harm is both speculative.  It's
18   entirely unsubstantiated and irrelevant.  As the District of
19   Delaware has stated, Nothing is sacred in civil litigation.
20   Even the legendary barriers erected by the Coca-Cola Company
21   to keep its formula from the world must fall if the formula
22   is needed to allow plaintiffs and the Court to determine the
23   truth in these disputes.  That quote is from 107 FRD 288 at
24   290.  But more prosaically, having put actual au pair
25   compensation at issue, defendants cannot now say it would be

Johana Paola Beltran, et al. vs.                    Motion Hearing
InterExchange, Inc., et al.                         March 10, 2017

 1  too burdensome to allow plaintiffs to prove actual au pair

 2  compensation.

 3          So I now want to talk about why it's important

 4  that plaintiffs receive both au pair and host family

 5  information.  As an initial matter, to the extent that it is

 6  difficult to get information from one group, plaintiffs would

 7  like to seek it from the other.  Inevitably, the

 8  practicalities of seeking discovery mean that some parties or

 9  nonparties have better or more information than others do.

10  And so it is reasonable and customary for a plaintiff or a

11  defendant to seek information from multiple sources in order

12  to be able to present the best evidence to the Court.  But in

13  addition to that, the two groups have different strengths in

14  terms of the evidence that they can provide.  Speaking about

15  host families specifically, they are less transient.  You

16  know, they are established families in the United States,

17  meaning, one, they're in the United States which makes them

18  easier to find.  Two, their contact information is more

19  likely to be up to date and reliable.  And, three, they're

20  likely to have better financial records all simply as a

21  result of being established, and unlike the au pairs, who by

22  their nature, are coming into America for a certain period of

23  time and will then leave.  Au pairs, on the other hand, are

24  likely to have better recollections of the hours and

25  conditions under which they worked which are other areas of

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Motion Hearing
March 10, 2017

Page 12

 1   relevant factual investigation.  And this is for the simple

 2   reason that any law firm associate could tell you.  The

 3   person who does the work generally has a better understanding

 4   of what was involved than the person who assigned it.

 5         The last point on this is that the host families

 6   and the au pairs have had different interactions with the

 7   sponsors, with the defendants.  And as a result, they have

 8   different information that goes to crucial issues in this

 9   case, including the joint employer issue, which is, of

10   course, a central issue in this case as to whether sponsors

11   and host families together were joint employers of the -- of

12   the au pairs.

13         So on the motion for -- on the motion to compel, I

14   sort of end where I started which is the defendants cannot

15   maintain that actual payment information is necessary, that

16   they don't have it, and that plaintiffs can't get it.  These

17   are simply -- that's simply not the way our civil litigation

18   system works.  The information is necessary.  If we can't get

19   it from a party, we're entitled to get it from nonparties.

20   And that's what we would like to do.

21         I'm happy to address the motion for protective

22   order now if that's the Court's preference.  I think we agree

23   that it is extremely intertwined, as you said, with the

24   motion to compel.  And if the motion to compel is granted,

25   then some of the relief that's sought in the protective order

Johana Paola Beltran, et al. vs.                                    Motion Hearing
InterExchange, Inc., et al.                                       March 10, 2017

Page 13

 1   has -- becomes moot or unnecessary, whereas if the motion to

 2   compel is not granted, then the need for the protective order

 3   is especially great because at that point the defendants will

 4   have essentially prevented plaintiffs from receiving the

 5   information they need to demonstrate actual au pair

 6   compensation separate, of course, from things like the form

 7   contracts and the market surveys that defendants have

 8   conducted but claim does not establish actual au pair

 9   compensation.  And so defendants should not be permitted to

10   take the position that we can't have the information, but

11   also we should be criticized for not having it.  And that's

12   really the aim of the protective order.

13          So unless the Court has any questions, which I'm

14   happy to address, I think it's easier to save any other

15   points until after defendants have put their position.

16          THE COURT:  All right.  So who wants to go first

17   in the defendants?

18          MS. LUKEY:  Good morning, Your Honor.  Again, it

19   is Joan Lukey.  My particular client is Cultural Care,

20   however, by agreement among the defendants, I will be

21   addressing these comments on behalf of all defendants except

22   A.P.E.X and 20/20.  And as to AuPairCare, they join in this

23   opposition but preserve their arbitration demand.  It may be

24   that I will miss something and that one among my colleagues

25   will wish to stand up when I'm done.

Johana Paola Beltran, et al. vs.                                    Motion Hearing
InterExchange, Inc., et al.                                         March 10, 2017

 1          THE COURT:  All right.

 2          MS. LUKEY:  Your Honor, we do consider the motions

 3   to be intertwined.  Indeed, we thought the motion for

 4   protective order was procedurally deficient, and what they

 5   were actually trying to accomplish was that which would come

 6   with the motion to compel.  I will, therefore, begin with the

 7   motion to compel.  And I think the issues largely address

 8   those in the protective order.  If counsel -- plaintiff's

 9   counsel says something specifically in response to my

10   comments about the protective order, I'm glad to get up and

11   address that as well.

12          I'd like to begin by talking about the issue of

13   timing because much of what plaintiffs say in their written

14   papers, although it wasn't emphasized this morning, is that

15   there is a sense of urgency.  And that's part of what the

16   motion for protective order does relate to.

17          Your Honor has in the records of this case the

18   declaration of my partner, Justin Wallace, at

19   document 476-13, which sets forth the dates that I'm about to

20   mention to you.  The objections of the defendants to

21   interrogatory number 1 and RFP number 1, which are the

22   subjects of the motion to compel, were filed in May of 2016

23   in a timely fashion after the stay of discovery ended when

24   the motion to dismiss was acted upon.  About four and-a-half

25   to five months later -- and nothing happened in-between.

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Motion Hearing
March 10, 2017

Page 15

```
 1    Plaintiffs' counsel contacted at the end of September
 2    Cultural Care.  And it appears in each instance Cultural Care
 3    was the sponsor contacted first.  So the dates I'm giving you
 4    would be the earliest on which any contacts occurred.  In
 5    that late September contact by telephone there was a request
 6    for au pair contact information to which -- nothing about
 7    host families, to which the objection had been made back on
 8    May 16th largely relating to timing.  That is, the objection
 9    was, This information should not be provided before we have a
10    ruling, which was expected, frankly, sometime soon, we still
11    don't have it, on the conditional collective action
12    certification.  It is a little bit more than a timing issue
13    in this -- well, let me stop there a moment and say the
14    reason that the case law indicates that that conditional
15    collective action certification should occur first is in
16    significant part to ensure that the notice which goes out as
17    the first contact to prospective class members is one that
18    has been approved by the Court so that there is not something
19    that could in essence taint the pool of prospective class
20    members.  And that had not yet occurred.  The other reason,
21    of course, is that it is possible, since each collective
22    action -- since each sponsor must be separately conditionally
23    certified in the collective action arena, that one or two of
24    the six FLSA defendants will not have a collective action
25    certification.  It's important to note too that nine of the
```

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Motion Hearing
March 10, 2017

Page 16

```
 1   15 defendants aren't in this case at all on the FLSA,

 2   presumably because the plaintiffs couldn't find putative

 3   class reps for those nine sponsors since all of the sponsors

 4   basically are engaged in the same activities.  So the

 5   position taken by the FLSA defendants was, We need to see

 6   whether each of us survives the conditional class action --

 7   collective action certification.  And if you prevail at that

 8   level, we will give you the au pair information.

 9           With regard to my specific client, that is more

10   than an academic issue, and it may be for others as well.

11   But to use mine as an example, Your Honor dismissed one of

12   the two putative class reps because she failed to appear for

13   her deposition.  The second woman named as Deetlefs from

14   South Africa was deposed in South Africa.  She has some very

15   unfortunate social media postings that are extraordinarily

16   racist.  Say things like, Whites, take your country back.

17   And there are some that are less pleasant than that.  Those

18   are the subject of an opposition to allowing her to proceed

19   as the representative of a class against Cultural Care.  And

20   case law has been provided that says if you have a class

21   comprised of multiple races, you may not have a

22   representative who is himself or herself a racist.  That

23   would leave the plaintiffs with no class rep for FLSA

24   purposes against Cultural Care.  So that is to demonstrate

25   for this context that it is not an academic question whether
```

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Motion Hearing
March 10, 2017

Page 17

```
 1    the plaintiffs succeed in getting conditional class --
 2    collective action certification against every sponsor.
 3              THE COURT:  Could I -- could I stop you for just a
 4    second?
 5              MS. LUKEY:  Certainly.
 6              THE COURT:  Because I -- are you trying to tell me
 7    that if you're a racist you can't be a witness or you can't
 8    have an FLSA claim --
 9              MS. LUKEY:  No, no, Your Honor.
10              THE COURT:  -- against you?  Like you don't have
11    to pay racists the same as you pay everybody else?
12              MS. LUKEY:  No, Your Honor.  It's not the question
13    of whether she can be a member of the class.  It's whether
14    she can be the class representative.  And the case law that
15    we provided to the Court on that issue, which is still
16    pending before Judge Arguello, is that if you have a
17    multiracial class, and this is very much a multiracial class,
18    you cannot have as the class representative a person who,
19    himself or herself, is a racist.  It is, of course, a
20    question of degree.  We believe that degree threshold is
21    easily met in this case.  I pointed out to Your Honor, the
22    issue is pending obviously before Judge Arguello.  But I
23    pointed out to Your Honor because it is to indicate that
24    there is substantively a basis for a sponsor to say, I may
25    not be in the FLSA case after the conditional collective
```

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Motion Hearing
March 10, 2017

Page 18

```
 1   action certification.  If I am not, then I would not be
 2   required at that point to provide the contact information for
 3   au pairs.  On behalf of the antitrust only defendants,
 4   typically the provision of the complete list would relate to
 5   the Rule 23 process.  And it is entirely possible that for
 6   some among them, and -- as well for the FLSA defendants who
 7   are also antitrust defendants, not to remain in the case at
 8   the end of the certification process.  For that reason there
 9   is a separate body of law that deals with the question of
10   when the provision of contact information should be made.
11   And we have respectfully indicated and told them from the
12   outset back in May that that information would not be
13   provided until they had clor- -- cleared the basic hurdles
14   because they are not entitled to have the contact information
15   for everyone in a class if they don't clear those hurdles.
16   So that is a timing issue that could end up substantive
17   depending on what happens in the certification process, both
18   for the FLSA and for the Rule 23 causes of action.  So if
19   there is any suggestion in their papers, which there is, that
20   there is urgency here, we suggest -- on the au pair
21   information, we suggest that that is very much of their own
22   making.
23           That is even more so as to the host family
24   information.  That objection was included in May as well
25   because the request was for information allowing them to find
```

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Motion Hearing
March 10, 2017

Page 19

1    au pairs.  And it included within it a request for the host

2    family contact information.  On that issue, the first contact

3    was received in December of 2016, late in the month by

4    Cultural Care.  That is approximately seven months after the

5    objection.  And all other defendants were contacted, as we

6    understand it, for the first time in January, shortly before

7    the motion to compel was filed.  So we have a circumstance

8    here where in the papers there is a significant complaint by

9    plaintiffs that they are bumping up against deadlines.  And,

10   indeed, they are.  But they are because they did nothing at

11   all for four and-a-half to five months, five to six months

12   for most of the defendants on the au pairs, and nothing at

13   all for seven and a half to eight months with regard to the

14   host family information.  Now, turning though to the

15   substance -- so that is the background to address their

16   urgency contentions.

17           Turning to the substance, we very much agree with

18   Your Honor that there are two completely separate analyses

19   that have to be done here relating to the au pairs and

20   relating to the host families.  As I've already indicated, a

21   good part of the objection on the au pair contact information

22   simply relates to timing.  Even in an instance where

23   discovery is going forward throughout the process, there is

24   substantial case law, as I said, that suggests that on

25   the turning over of the class contact information there has

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Motion Hearing
March 10, 2017

Page 20

1    to be an initial hurdle crossed first.  Someone just can't

2    come in and demand all of the class information in any class

3    action without being able to class -- to -- I'm sorry, to

4    meet an initial threshold burden.

5            Now, in this instance of the six who are in for

6    the FLSA, the largest is Cultural Care.  And they have

7    approximately in the period between 2009 and 2014, without

8    waiving the position that the plaintiffs are seeking to look

9    back farther than they're supposed to, but for this purpose

10   excepting that, the number of au pairs for this one sponsor

11   has been between approximately 7,000 and 11,000 per year.  So

12   we're talking numbers.  There is no claim here of

13   burdensomeness.  But the Court should understand that we're

14   talking about turning over contact information for several --

15   well, when you put all of us together, many thousands of

16   young people.  There should be at least an initial burden we

17   suggest met in that regard.  And, again, with regard to the

18   antitrust only defendants, the same would be true, but that

19   burden could only be met a little bit farther down the road

20   when the initial threshold is met for them.

21           So we expect, Your Honor, in terms of

22   practicalities, we just assume the conditional collective

23   action certification ruling surely must be coming soon.  And

24   the motion has been pending for many months.  We don't mean

25   to suggest that we control or should have the ability to

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Motion Hearing
March 10, 2017

Page 21

 1   control what Judge Arguello does.  We understand that there

 2   is a reporting deadline at the end of March.  Sometimes that

 3   will trigger decisions being made.  But we do believe that

 4   there will be something coming soon which will, in all

 5   likelihood, clarify whether all of the six FLSA defendants

 6   must turn over information now or only some who survive who

 7   actually are not still in that claim at the end of the

 8   rulings.  And for the other sponsors, again, respectfully

 9   suggest the ones who aren't subject to the FLSA

10   certification, that process has to be delayed further.  There

11   must be a threshold showing before they can be required to

12   turn over this information.  And that is, as I said,

13   particularly important because of the importance that the

14   first contact of au pairs be pursuant to an order that is

15   approved by the Court.  There should not be a prior contact.

16   As the Court knows, the sponsors agreed not to engage in

17   reaching out to their current or former au pairs.  And we

18   believe that the plaintiffs should not be doing so until the

19   Court determines what the language of that outreach should

20   be.

21            Now, I turn to the issue that is much more

22   substantive, and that is the host families.  This is a truly

23   critical issue from the perspective of the sponsors.  As the

24   Court has seen, you have several declarations on this.  The

25   sponsors agree to protect this information, the contact

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Motion Hearing
March 10, 2017

Page 22

 1   information.  And, frankly, that's perfectly understandable

 2   because by definition these are all people with children in

 3   their homes.  This is not information that they would give

 4   out.  They --

 5           THE COURT:  You know, I'm -- I'm sorry.  But I'm

 6   not -- I'm kind of not buying that argument.  I -- the --

 7   what is so confidential about hiring a nanny or having a

 8   nanny?  That may be -- not -- "hiring" is probably the wrong

 9   word since that's at issue in the case.

10           MS. LUKEY:  It is in issue.

11           THE COURT:  But having -- having a nanny in your

12   home, what -- why is that so confidential?  I don't get it at

13   all.

14           MS. LUKEY:  It's -- it's -- it's not that there's

15   a matter of embarrassment or concern about the fact that one

16   has an au pair, which does respectfully differ from a nanny,

17   Your Honor.

18           THE COURT:  Right.

19           MS. LUKEY:  It's the fact that you're giving out

20   their -- their addresses.  Typically, folks with children

21   expect that other than the people -- well, with whom they

22   choose to share the information in their own community,

23   aren't going to be able to go into a database and find them.

24   That is the reason for confidentiality.  I'm not suggesting

25   that there are wrongdoers among the plaintiffs per say.  I'm

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Motion Hearing
March 10, 2017

Page 23

```
 1   suggesting that because this Court has to weigh the rights of
 2   multiple parties, one of the considerations here is, from the
 3   sponsor's perspective, they have agreed to protect that
 4   information and not to give it out except to the Department
 5   of State.  So -- and, of course, Your Honor I'm sure will
 6   look at the issue of the host family rights too, whether or
 7   not they're actually being propounded by these sponsors.
 8           There are three different groups here.  For the
 9   purposes of this analysis, there are the plaintiffs who have
10   their interest in getting discovery.  There are the sponsors
11   who have their concerns, both about the proprietary nature of
12   their -- basically their client list and the promises that
13   they've made about confidentiality.  And there are the host
14   families who certainly have some interest in knowing whether
15   their addresses are being handed out to someone about whom
16   they know nothing, because they will not have been told in
17   advance, presumably, that the information is being provided.
18   So when the Court is weighing these interests, you've got on
19   the one hand the interests in discovery and on the other hand
20   the interests both of the host families in thinking that
21   their addresses aren't being handed out and of the sponsors
22   in trying to live up to the contractual promises and to
23   protect their proprietary information.  The same timing
24   issues we already talked about obviously apply here too.  A
25   sponsor who's not in the FLSA case now or not still in after
```

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Motion Hearing
March 10, 2017

Page 24

1   the conditional action -- cert- -- collective action

2   certification shouldn't be compelled at this stage to breach

3   its confidentiality agreements with its clients.  There has

4   to be that same issue of some threshold showing before that

5   happens.  So for the defendants who remain in after

6   conditional collective action certification, it -- the

7   Cultural Care at least -- and I am not sure of the positions

8   of other defendants.  But Cultural Care in writing had said

9   after that we would actually produce host family contact

10  information for opt-in plaintiffs, but absent a court order

11  wouldn't do it for others.  In that more limited circumstance

12  presumably there would be the opportunity for the sponsor to

13  reach out and at least give the host family advance notice

14  that they're going to be sharing the information.

15          THE COURT:  Well, but I -- what about the -- you

16  know, we're looking really at the antitrust claim rather than

17  just the FLSA claim because I -- I think those should be

18  probably treated a bit differently.  But -- but for the

19  antitrust claim, the host families by virtue of the fact that

20  the sponsors have uniformly said, We don't have the

21  information.  They pay.  They do -- these are the key

22  witnesses in the case now.  They -- they weren't to start

23  with.  But they are the key witnesses now because only they

24  can say what the sponsors told them.

25          MS. LUKEY:  Well, the --

Johana Paola Beltran, et al. vs.                                    Motion Hearing
InterExchange, Inc., et al.                                        March 10, 2017

Page 25

 1            THE COURT:  And -- and how much they paid, right?

 2            MS. LUKEY:  Well, and the issue --

 3            THE COURT:  And so -- and I'm not presuming that

 4    they'll say anything one way or the other just on the basis

 5    of what these named plaintiffs have said.  The host families

 6    may come back, 7,000 of them or however many there are per

 7    year, and say --

 8            MS. LUKEY:  Oh, it's a lot more.

 9            THE COURT:  -- something different.  Yeah.

10    There's more probably.  So they may say something completely

11    different that -- that exonerates the sponsors from any kind

12    of issues with antitrust.  But they're the witnesses.

13            MS. LUKEY:  Well, Your Honor, if I may address

14    that.  In terms -- the sponsors don't have direct

15    conversations with the host families.  Their LLCs do.

16    Occasionally there will be questions.  But in terms of the

17    issue that we're talking about here is -- and presumably what

18    we're talking about is, What did you say about the stipend or

19    how much is to be paid?  That's -- that's done via

20    documentation.  And it is largely dictated by the state

21    department.  That is what must go into it.  And to my

22    knowledge at least, all sponsors have turned over the

23    documentation.  This is what goes out to the prospective, and

24    then the actual -- another set of information for the actual

25    host families.  So it's not that somebody is picking up the

Johana Paola Beltran, et al. vs.                                    Motion Hearing
InterExchange, Inc., et al.                                         March 10, 2017

Page 26

```
 1    phone and calling them.  I'm not saying that there couldn't
 2    be times when the host family calls up with questions or
 3    whatnot.  And that will be an issue that could be explored at
 4    an appropriate point in time.  But in terms of what the
 5    sponsors are saying to the host families about pay and hours,
 6    for example, that's in writing.  That goes out.  And I can
 7    tell you Cultural Care's writing goes out and says, Here's
 8    the stipend.  If you wish to pay a higher amount than that by
 9    X percent, please consult your tax advisor because there will
10    be a necessity of withholding.  Others have similar
11    statements saying, Here is the lawfully imposed minimum.  If
12    you're going higher, you must do X or Y.  So that's in
13    writing.  And that, I think, would be very rare for host
14    families to be having regular conversations.  I can tell you
15    over this period of time, and it is in the papers that were
16    submitted to you, I believe even in Natalie Jordan, the vice
17    president of Cultural Care's declaration, but it may be
18    elsewhere, the combined total of host family and au pairs for
19    this one sponsor, admittedly the largest, but this one
20    sponsor for the 2009 through '14 period is in excess of
21    100,000.  So it's 100,000 contacts of -- one family would be
22    one contact or one au pair.  So we're talking about a lot of
23    people.  And they're not having conversations on a regular
24    basis with the sponsors.  To the extent there's interactions,
25    it will often be with what we call the local childcare
```

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Motion Hearing
March 10, 2017

Page 27

 1   coordinators who are independent contractors in communities

 2   all over the country who are required by Department of State

 3   regulations to live within a certain distance of all the au

 4   pairs.  So I don't think that's an issue what was said to

 5   them.

 6          Let's turn to the issue then of what was paid.

 7   Well, there are two parties to that.  There are the au pairs

 8   who actually receive the money, and there are the host

 9   families.  There has been a suggestion made by the plaintiffs

10   that the host families would be better record-keepers.  Well,

11   the Department of State regulations have requirements of

12   certain records to be kept.  They do not happen to include

13   the amount paid.  There is a requirement that the sponsor

14   ensure that every host family is paying at least the minimum,

15   the stipend.  But there is no other recordkeeping

16   requirement.  And no recordkeeping regarding payments on the

17   host families themselves, the people making --

18          THE COURT:  Well, except for US taxes, right?  So

19   if you want to deduct those -- those pays -- payments that

20   you made for childcare, whether it be au pair or nanny, you

21   need to keep records because you need to file your tax

22   returns, as do the au pairs.  I'm assuming that they have to

23   pay taxes.

24          MS. LUKEY:  Yes.  The au pairs have to keep --

25   that's -- that's actually the better source, Your Honor, I

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Motion Hearing
March 10, 2017

Page 28

```
 1    would suggest.  Not all host families are deducting since
 2    there are limitations.  And if your income is at a certain
 3    level, you don't get the deduction, and so forth.  But for
 4    the au pairs, they are required to file tax returns.  If they
 5    are a certain level, as I mentioned a moment ago, above the
 6    stipend, then the host family is required to withhold.  If
 7    they're at the stipend or a certain percentage above it, they
 8    don't have to withhold.  But they -- but the au pair must
 9    file tax returns.
10           So the notion that they don't have records doesn't
11    make any sense.  It's far less likely that a host family will
12    have the records because it isn't all host families who are
13    taking a deduction or who qualify to take the deduction.
14    That's not an automatic.  So if you want to look to what is
15    an automatic, it's the au pairs, and what they filed for
16    their tax returns.  So -- and they also, of course, are the
17    ones receiving the money.  And what we --
18           THE COURT:  And -- I'm sorry to interrupt you, but
19    I -- I know I'm going to forget to ask you.  The -- the
20    intermediaries, the -- the -- the people that must live
21    within a certain distance.
22           MS. LUKEY:  The local care coordinators.  Yes.
23           THE COURT:  Who -- who pays them?
24           MS. LUKEY:  They're independent contract- -- in
25    the case of Cultural Care -- and this varies by sponsor.  In
```

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Motion Hearing
March 10, 2017

Page 29

```
 1    the case of Cultural Care, they pay the -- as independent
 2    contractors pursuant to contracts.
 3              THE COURT:  Okay.
 4              MS. LUKEY:  So they are -- they are --
 5              THE COURT:  So they're paid by the sponsors?
 6              MS. LUKEY:  They're paid by the sponsors on -- not
 7    on a W-2, on a 1099.
 8              THE COURT:  Okay.
 9              MS. LUKEY:  And that may vary with other sponsors.
10    That happens to be the model for Cultural Care.  They do not
11    employ their local care coordinators.  Often the local care
12    coordinators are current or former host families as well.  So
13    they're people who've had involvement.  Some of them are
14    former au pairs.  They're people who've had involvement in
15    the cultural exchange program, but they're not employed by
16    the sponsor.  Again, that is not necessarily uniform.
17    That -- that --
18              THE COURT:  Well, they're -- they're paid by the
19    sponsor but not employed by them necessarily?
20              MS. LUKEY:  That's correct.
21              THE COURT:  Okay.
22              MS. LUKEY:  The local care coordinators are
23    independent contractors of the sponsor, or in some instances,
24    I believe, employees of the sponsor.  So -- but in any event,
25    in terms of where you can get the information, all au pairs
```

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Motion Hearing
March 10, 2017

Page 30

1    are required to file tax returns.  So presumably they all

2    have that information.  The host families, they're not

3    required to record it unless they're going to be taking a

4    deduction, which is certainly not going to be all host

5    families.  In fact, I suspect it will be less than half of

6    the host families, but that's simply an educated guess.

7            So in the first instance when one is looking at

8    the various rights to be weighed, we are in a circumstance

9    where the au pairs should be consulted first.  Interestingly,

10   as the depositions have gone forward of the currently named

11   plaintiffs, it is the case, including for a plaintiff who

12   worked -- who -- excuse me, not worked, was a cultural

13   exchange visitor and now works in the US, Ms. Rascon.  I

14   believe she's married.  And I don't recall her married name.

15   But she was deposed recently.  And she testified to a variety

16   of different payments.  She was with three different host

17   families over a period of two years because she extended.

18   And each host family paid a different amount.  And sometimes

19   they paid different amounts from week to week.  She reported

20   one week at 300, one week at 600, other weeks at 220 or 250,

21   others were at the stipend amount or at 200.  And it depended

22   on whether she was doing extra services basically, whether

23   she was putting in extra efforts.  And I believe that she

24   identified at least some of those payments as being cash

25   payments.  The host families think, Okay, you did -- you went

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Motion Hearing
March 10, 2017

Page 31

 1   an extra mile here.  They -- one of them -- in one instance

 2   she helped them with packing everything up for the move

 3   because they were changing households and received

 4   substantially more money.  That information is -- to the

 5   extent that a host family is paying cash as a supplement or a

 6   bonus or a thank-you, that information is more likely to be

 7   in the possession of the au pairs than it is of the host

 8   family.

 9           So we would respectfully suggest, particularly at

10   a time when we don't even have a conditional collective

11   action certification, we have nothing, that if there is to be

12   an order that issues before we have any indication of

13   where -- where the parties stand in the first instance, the

14   au pairs are the appropriate people to ask.  And, indeed, for

15   those sponsors for whom the conditional collective action

16   certification occurs, there will then be the sharing of the

17   au pair information.  And at that point the -- the plaintiffs

18   will have a substantially expanded field of au pairs with

19   whom to consult.  And honestly we don't even know how many au

20   pairs they already have who are working with them and will be

21   named at some point as members of the class, but we do

22   believe they have substantial access to many, many au pairs.

23   And we believe they know that those au pairs have given

24   testimony that varies with regard to the amounts they are

25   paid.

Johana Paola Beltran, et al. vs.                                          Motion Hearing
InterExchange, Inc., et al.                                               March 10, 2017

Page 32

 1               So our position is there should be at least a

 2    preliminary showing for the FLSA defendants, and then later

 3    for the antitrust defendants before this kind of information

 4    should be turned over since it's both confidential

 5    information and proprietary to the various sponsors.  And in

 6    the first instance the au pairs should be asked before the

 7    rights of the host family are potentially infringed and

 8    before the sponsors are required to break their

 9    confidentiality agreements with the host families.

10               But final point.  If the host families are to be

11    contacted via subpoena -- sorry, survey, there is an ethics

12    issue.  And we think it is a very strong ethics issue.  It is

13    ironic that in the plaintiffs' reply brief in this matter two

14    statements end up on the same page.  It's just by chance.

15    But at page 8 of document 492, the reply, filed last month

16    the following quote appears.  Even in -- even pre-suit

17    discovery of defendants would be permissible to determine the

18    contact details for host families in order to permit the host

19    families to be named as defendants, close quote.  I emphasize

20    that last phrase.  The contact details in order to permit the

21    host families to be named as defendants.  They segue into

22    their next argument right below it which is their attempt to

23    rebut the application of Rule 4.3 of the Colorado Rules of

24    Professional Conduct.  Now, the particular section -- and I'm

25    going to read the sentence without any editing that the

Johana Paola Beltran, et al. vs.                                        Motion Hearing
InterExchange, Inc., et al.                                            March 10, 2017

Page 33

1   defendants mostly rely upon is this:  Quote, When the lawyer

2   knows or reasonably should know that the unrepresented person

3   misunderstands the lawyer's role in the matter, the lawyer

4   shall make reasonable efforts to correct the

5   misunderstanding, end quote.  The lawyer's role in the matter

6   in this instance, if plaintiffs reach out to host families

7   who are unrepresented, is to gather information for a lawsuit

8   in which plaintiffs are insisting on reserving their rights

9   to add the host families.  There is no ethical way that you

10  can ask a host family, an unrepresented party, to answer even

11  a voluntary survey without telling them that the information

12  they give is going to be used in a lawsuit in which their

13  interests would be more closely aligned with the sponsors

14  because they too are prospective defendants.

15         THE COURT:  Well, but I don't understand.  So -- I

16  mean, so what?

17         MS. LUKEY:  You have to tell them.

18         THE COURT:  If they're -- if they're -- if they

19  are breaking the law, so what?  I mean, I'm not saying they

20  are.  I'm just saying if what they're doing is against the

21  law, they are not paying enough, they're not paying minimum

22  wage, whatever the claim may be, if that's the case, why

23  should you or anyone else protect them?  I don't get that.  I

24  don't get what that argument is.  Now --

25         MS. LUKEY:  The ethical rules protect them, Your

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Motion Hearing
March 10, 2017

Page 34

```
 1   Honor.  We're not protecting them.  Rule 4.3 requires, if the
 2   plaintiffs are contacting these defend- -- these, excuse me,
 3   host families and asking them for information that they may
 4   turn around and use to add the host families as defendants,
 5   they have to tell the host families why they're contacting
 6   them.  They have to provide them with that information
 7   ethically.  They can't say, Hi.  Would you answer a voluntary
 8   survey for me?  This is a class action for au pairs.  And
 9   we'd really appreciate it.  And not say to them, And we are
10   required ethically to tell you that our role is to represent
11   the au pairs, and potentially against you too, because we are
12   refusing to give up the right to sue you.  It's not that they
13   can't go ahead and sue them.  It's that they can't ask for
14   the disclosure of information from someone who may end up
15   being a defendant, someone who has received material that
16   says to them, The minimum of payment is the Department of
17   State's stipend of X.  Now, if the sponsors are wrong that
18   will be something that comes out in this lawsuit if they --
19           THE COURT:  Well, that's their defense, right?
20   If -- if -- if there was a lawsuit, and if that's what they
21   were going to say, that's their defense, is, I --
22           MS. LUKEY:  But --
23           THE COURT:  -- I went through a sponsor who is
24   approved by the United States government who submits
25   everything to the Department of State.  And this is what they
```

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Motion Hearing
March 10, 2017

Page 35

 1   told me to pay, and that is what I paid.  And, you know,

 2   that's -- that's their defense, right?  I don't know if it's

 3   a good defense or not.  But I know that doesn't do you and

 4   your clients any good.  But, I mean, that -- that is -- if

 5   that is what it is, why is -- why would that be somehow

 6   prohibited from the plaintiffs finding out?  I mean --

 7             MS. LUKEY:  It isn't prohibited --

 8             THE COURT:  -- I just don't get it.

 9             MS. LUKEY:  -- from them finding out.  What is

10   prohibited is for them to speak to an unrepresented party

11   whom they're considering adding as a defendant to elicit

12   information that they will then use to bring that party in as

13   a defendant.  I'm not making up the rule, Your Honor.  Rule

14   4.3 is the Colorado rule of professional responsibility.

15   It's the same in virtually every state.  And it's there for a

16   reason.  We lawyers are in an unusual position.  We have a

17   certain amount of learning.  And we serve a certain role.

18   When we take our education and we decide that we're going to

19   see if we can make a suit against somebody, we are legally

20   obligated -- first, if we can find out they have a lawyer, we

21   can't talk to them anymore.  But if they are unrepresented,

22   as would be the expectation for the host families, even a

23   reason to be represented at this point, we must say to them,

24   I'm gathering information.  And I'll tell you what, and I

25   want to be up-front with you because the ethical rules

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Motion Hearing
March 10, 2017

Page 36

```
 1   require me to be up-front with you.  I'm asking you for this
 2   information because I may add you as a defendant to this
 3   lawsuit.  I'm not saying they don't have the right to add
 4   somebody as a defendant.  I'm saying they do not have the
 5   right to breach the Code of Professional Responsibility by
 6   eliciting that information without telling the person whom
 7   they've interviewed.  And they told us last time they wanted
 8   to do some of this by telephone calls.  They cannot do that
 9   without telling the person that the information they
10   voluntarily provide may be used to contend that they have
11   violated the law.  That's not allowed.  Maybe the Court is
12   suggesting they aren't entitled to be protected in that way.
13   I would respectfully disagree.  But that's not the point.
14   The professional rules require that to happen.  And if there
15   is going to be an outreach to these families who had the
16   expectation that the sponsors would maintain their contact
17   information in confidence, then that outreach has to disclose
18   to them that they could end up being defendants.  That issue
19   could be removed if plaintiffs would agree not to sue the
20   host families.  They have refused to agree.  That refusal
21   suggests that they hold as an open possibility that they will
22   elicit information from innocent and unsuspecting lay people
23   and use it to make them defendants in the lawsuit.
24   Respectfully, Your Honor, that's not okay.  And, again, it is
25   not I who wrote the rules.  None of us here did.  But the
```

Johana Paola Beltran, et al. vs.                                    Motion Hearing
InterExchange, Inc., et al.                                         March 10, 2017

                                                                    Page 37

1   rule exists for a purpose.  And it does exist.  So if there

2   is to be a survey, and we respectfully request that it not

3   occur until in the -- in the case of FLSA defendants or at

4   least be a conditional collective action certification.  In

5   the case of the non-FLSA defendants, that there at least have

6   been an initial determination in the Rule 23 process.  After

7   that there should be a determination of whether the

8   information is already available through the au pairs.  And

9   if at that point it is no longer available, then certain host

10  family outreach would be appropriate if -- if that outreach

11  includes the notification that whatever they say could be

12  used against them and they may be sued.  Lawsuits aren't

13  cheap, Your Honor.  And the families who employ au pairs --

14  I'm sorry.  Not employ, but who have them in their homes

15  don't expect to have to pay lawyers to protect them.  So we

16  respectfully suggest in this instance that you can't simply

17  say, Well, if they did something wrong, they get sued, and

18  then they have a defense, because defenses don't come cheap.

19  What the issue here is, is there a right on the part of the

20  plaintiffs to gather the information with which to sue them

21  without telling them?

22          THE COURT:  By a -- by a survey, right?

23          MS. LUKEY:  Well, they said they wanted to do

24  phone calls too, follow-up phone calls.  And that's where the

25  real risk I suspect could lie.  But, yes, if there's to be a

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Motion Hearing
March 10, 2017

Page 38

1   survey, there has to be -- much like the approved notice that

2   the Court has responsibility for approving for notice to the

3   class, there must be similar approval by the Court of

4   language that would satisfy the requirements of Rule 4.3.

5            THE COURT:  And what about a Rule 45 subpoena?  Do

6   you think that applies there too?

7            MS. LUKEY:  Well, if it's a Rule 45 subpoena, the

8   parties -- the individual receiving the subpoena is probably

9   going to figure out pretty fast that there's a legal

10   proceeding.  And they're going to wonder whether they are at

11   risk.  Typically, one would expect at that point either they

12   ask a lawyer who's a friend or they will call up, because

13   there's a contact at the bottom of every subpoena, and say,

14   What's this about?  And then that triggers the next sentence

15   in Rule 4.3, and requires them to explain what it's about and

16   to urge them to consult console (sic) -- counsel.  So it's a

17   Rule 45 subpoena because that's in the context of an

18   adversarial proceeding.  And because when you receive a

19   subpoena as opposed to receiving a phone call, a casual phone

20   call, you're on notice.  You know there's something unusual

21   happening here.  It is more likely that they will either ask

22   someone who has knowledge of the law or at the very least

23   call up the person who sent the subpoena and say, What's this

24   about?  And then trigger the next sentence of the rule.

25            That's -- our respectful suggestion to the Court

Johana Paola Beltran, et al. vs.                                    Motion Hearing
InterExchange, Inc., et al.                                         March 10, 2017

Page 39

```
 1    is while we don't think this is the time to be requiring that
 2    host families be contacted, we do think if that is to occur,
 3    those host families have to know that anything they say could
 4    be used against them.  It's not a criminal proceeding.  I'm
 5    not talking about Fifth Amendment rights.  But nonetheless,
 6    it could be used against them for an allegation in a lawsuit
 7    that they've engaged in wrongdoing.  And once they are in
 8    that position, they're going to have to expend money to
 9    defend themselves.  And a lot of those families aren't going
10    to have that money.  Many of them have cultural exchange
11    visitors with them both because of the cultural exchange
12    nature of the program and because it's -- it's a way to
13    integrate someone in the family to help at a lesser cost.
14    That's what this whole program was all about when
15    Fulbright-Hays was passed and the program was set up.  Now,
16    it may be that there's going to be some determination
17    somewhere that it can no longer be done, that there can no
18    longer be a cultural exchange program at a lower price.  But
19    at the moment that program continues to exist.  That law
20    continues to exist.  And those families have made an election
21    to integrate someone into their family as a visitor, and to
22    do it at a price that they can afford.  If you then turn
23    around and say to them, Hire a lawyer, we all know what the
24    cost of that would be, Your Honor.  So respectfully, they
25    need to know that if they answer questions, they may be
```

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Motion Hearing
March 10, 2017

Page 40

 1  putting themselves in an at-risk position.  It isn't fair

 2  otherwise.

 3           THE COURT:  I mean, don't -- don't you think that

 4  extending the rule that way, the way you're talking about,

 5  could apply then to every single person that a lawyer ever

 6  contacts in connection with any case because at any given

 7  moment a witness could say something that would cause the

 8  lawyer to go, Whoops, I think you should be a defendant in

 9  this case rather than just a witness.  Right?  You can always

10  say that.  That's -- that's --

11           MS. LUKEY:  No, Your --

12           THE COURT:  -- that's kind of an absurd result to

13  get from that one rule.

14           MS. LUKEY:  Respectfully, Your Honor, that is not

15  the case.  That's the whole reason for Upjohn warnings.  It

16  is not the case that you can simply start interviewing

17  someone in a situation where you have reason to believe that

18  there may be exposure for that person.  You have to warn

19  them.  If you have no reason to believe at the minute a word

20  comes out of their mouth that you realize may put them at

21  risk, the minute they say anything, at least the way I was

22  brought up in the law, your ethical obligation is to say, I'm

23  sorry.  I have to stop this interview.  I would suggest that

24  you may want to consult counsel.  So I don't think that it is

25  the case that any time a lawyer interviews someone this would

Johana Paola Beltran, et al. vs.                                        Motion Hearing
InterExchange, Inc., et al.                                            March 10, 2017

Page 41

1    be an impediment.  If the lawyer has no reason to believe

2    that a witness has any involvement that would put the witness

3    at risk, fine.  That's not the circumstance here.  I mean,

4    this is very much like an Upjohn situation, even if it isn't

5    criminal.  If you're going to talk to someone where you

6    know -- you know that you're currently thinking about suing

7    them, you're refusing to waive the right to sue them, you

8    can't elicit the information that gives you what you think as

9    a basis to sue and then sue them.  You have to tell them.

10   It's an ethical requirement.  And it's an equitable

11   requirement as well.

12            THE COURT:  Okay.

13            MS. LUKEY:  Thank you.

14            THE COURT:  Before you respond to all this, who --

15   is any -- does anyone else want to weigh in on this?  I

16   rather you not repeat what Ms. Lukey already said.  I've

17   taken notes.  I've asked her questions.  So obviously I'm

18   paying attention.  But if you have something different or --

19   or that you feel is left out, I want to make sure no other

20   defendant wants to talk, or defense counsel, excuse me.  No?

21   Okay.

22            MR. LIBLING:  Thank you, Your Honor.  I thought it

23   was telling that defendants started with a long discussion

24   that had nothing to do with the legal requirements for a

25   motion to compel.  And that's because when we actually get to

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Motion Hearing
March 10, 2017

Page 42

 1  talking about the legal requirements for the motion to compel
 2  they have almost no defense.  And I will get to that at the
 3  end, but unfortunately I have to address some of the things
 4  that they said.
 5          First -- and this is a refrain we've heard before.
 6  Defendants like to say that the time crunch we're under --
 7  and we do believe there is a time crunch.  If we get this
 8  information that we're seeking now, then we will likely need
 9  to extend the -- the deadline for certification to give us
10  enough time to get the information and analyze it.  So we
11  agree there is a time crunch, but we disagree as to the cause
12  of the time crunch, as you might imagine.
13          So just a very quick overview.  Plaintiffs
14  originally sought this information on March 19, 2015.
15  Defendants never responded.  They ultimately moved for a stay
16  which was granted.  After the stay was lifted, plaintiffs
17  re-sought this information in March 2016.  Meet and confers
18  continued until January 2017.  But what is really crucial
19  here is that defendants didn't produce any documents.  I
20  shouldn't say "any."  They produced almost no documents.  Let
21  me be accurate.  They've produced approximately 180,000 of
22  pages in documents all defendants throughout the life of this
23  case.  Now, that doesn't actually include the documents that
24  were produced yesterday, but...  Anyway, of those, 136,000
25  pages, more than 136,000 pages, which is more than 75 percent

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Motion Hearing
March 10, 2017

Page 43

 1   of the total production, was produced after plaintiffs'

 2   expert report, including on the day plaintiff's expert

 3   reports were due, on January 13th of this year.  So we're

 4   talking about production -- 75 percent of the total

 5   production has happened since mid January of this year.  So

 6   when you're talking about why didn't plaintiffs know that we

 7   could get all of the information that we needed from

 8   defendants?  It's because we didn't get any information or

 9   only 25 percent of what we've received so far until a couple

10   of months ago.  That's what's causing the time crunch, and

11   that's what's causing the delay.  And, you know, in fact, the

12   fact that the documents were produced, you know, after they

13   were too late for the expert reports show that defendants'

14   strategy here is to slow play production, deny plaintiffs

15   documents in time for court-mandated deadlines, which is I

16   think, again, what they're trying to do by suggesting that

17   production should only occur after it cannot be used for

18   certification.

19               I also want to correct a couple of statements that

20   were made about -- or specifically about Cultural Care.

21   There was a statement that there isn't -- that there's a

22   possibility that there wouldn't be a named plaintiff.  That's

23   not true.  In fact, counsel mentioned Ms. Rascon who is a

24   Cultural Care defendant, I'm sorry, a Cultural Care

25   plaintiff, and could be a class representative.  So that was

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Motion Hearing
March 10, 2017

Page 44

1   just inaccurate.

2          But regardless, the focus on the FLSA is

3   misleading.  As Your Honor pointed out, there is an antitrust

4   claim in this case.  And we need this information both for

5   the merits of the antitrust claim and also for certification

6   on the antitrust claim because defendants have taken the

7   position that their surveys and form contracts, etcetera,

8   etcetera, do not establish what plaintiffs were actually

9   paid.  Plaintiffs have the right to rebut that argument in

10  making their antitrust arguments, in moving for certification

11  and showing that it can be proven on a class basis what

12  plaintiffs were actually paid.  And then that information is

13  necessary for that.

14         And the last thing I need to correct on this point

15  is that I believe there was a suggestion that if

16  certification is not granted, some of the defendants might be

17  out of the lawsuit.  And that's, of course, not true either

18  because the named plaintiffs could always continue and the

19  antitrust claim could continue even with just the named

20  plaintiffs.  I just wanted to correct those things.

21         And then I want to talk about the things -- I want

22  to talk specifically about au pairs and host families because

23  Your Honor suggested you're analyzing them separately.  And

24  they discussed them separately as well.  So let's talk about

25  au pairs first.

Johana Paola Beltran, et al. vs.                          Motion Hearing
InterExchange, Inc., et al.                                March 10, 2017

Page 45

1          There they essentially conceded that we have the
2    right to get it.  And they just said, But wait, wait, wait
3    until after FLSA.  Again, there's the antitrust issue, but I
4    also want to talk about the legal authority.  The legal
5    authority that they cite says that they're correct.  We're
6    not entitled to get the information for the purpose of having
7    class notification information.  Right.  Some courts actually
8    have allowed it even for that purpose before certification.
9    Some courts have not.  So I shouldn't have said "they're
10   correct."  They have an argument.  What they don't have an
11   argument for is that we're not permitted to get the
12   information for merits and for certification, which is the
13   purpose that it's being sought for.  When the information is
14   relevant to those issues, courts have permitted discovery.
15   And, of course, I should point out that in this case
16   discovery is not bifurcated.  And the merits -- the deadline
17   for merits discovery is, in fact -- in fact, quite soon,
18   after the certification briefing is meant to be done.  I
19   believe it's in mid July that the deadline comes up for all
20   discovery.  So the time crunch is real even on the merits.
21   And there's no bifurcation.  And we should be permitted the
22   discovery now.  And that was their only argument on au pairs.
23   We're entitled to it, but let's wait, let's wait.  We don't
24   have time to wait.  And there's no requirement under the
25   rules or authority to wait.

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Motion Hearing
March 10, 2017

Page 46

 1            Let's talk about host families.  I thought it was
 2    remarkable how weak their core argument was on host families.
 3    Your Honor asked them, Well, surely the fact that you had an
 4    au pair is not highly confidential information.  And counsel
 5    agreed and said, Oh, but the addresses, the addresses are
 6    highly confidential.  Your Honor, addresses are not highly
 7    confidential information.  Addresses are information that you
 8    can often look up.  If you know who -- if you have somebody's
 9    name, you can look up their address frequently.  More to the
10    point, addresses are in initial disclosures.  Addresses are
11    simply never -- have never been held to be highly
12    confidential information.  Normally people talk about trade
13    secrets, you know, some kind of deeply important piece of
14    information or, you know, medical information.  That could be
15    highly confidential.  Where you live?  Where you live is not
16    highly confidential information.  And that was what counsel
17    retracted to.  When Your Honor made the point about not being
18    secret that you have an au pair, counsel retracted to, But
19    your address is secret.  That's just wrong.  And at that
20    point they should just lose the argument on host families and
21    have to produce it.
22            We agree with Your Honor that defendants have made
23    the host families essential witnesses in this case by
24    taking -- by the positions that they've taken.  I don't think
25    I need to talk further about that.

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Motion Hearing
March 10, 2017

Page 47

```
 1              I do want to make the point that the LCCs (sic) --
 2    and I think Your Honor's questions pushed towards this
 3    anyway.  The LCCs (sic) are sponsors' agents.  Indeed,
 4    they're -- LCCs (sic) are required under the regulations.
 5    Even if they weren't factually agents, they would be required
 6    to be under the law.  But they are agents.  They're paid by
 7    the sponsors.  They're employees of the sponsors.  But even
 8    if they're independent contractors of the sponsors, they are
 9    agents of the sponsors.  And they have interactions with the
10    host families.  They have conversations with the host
11    families.  They have mediations with the host families.
12    We've already seen that there are call logs between LCCs
13    (sic) and host families.  Host families make complaints.
14    There are interactions.  That's why the regulations require
15    that there be an LCC (sic).  So the au pairs have somebody to
16    talk to?  Yes.  But also so that the host families have
17    somebody to contact.
18              But even putting that aside, they have put actual
19    compensation at issue.  And they've said, We don't know what
20    it is.  The host families do.  And they tried to make an
21    argument.  Counsel tried to make an argument that, Oh, the
22    host families don't have great records.  The au pairs
23    probably have the better records.  The first point on that,
24    the very fact that we're having this debate shows that
25    plaintiffs are entitled to both au pairs and host family
```

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Motion Hearing
March 10, 2017

Page 48

```
 1   information because to the extent one has better than the
 2   other, then we need to ask both so that we can get the best
 3   information and put that before the Court.
 4            The second point on this, host families have bank
 5   accounts, Your Honor.  They live in a community.  They have
 6   financial ties to that community.  They're writing a check
 7   week after week after week which, as far as we know, the vast
 8   majority of host families pay by check.  It was, you know,
 9   that -- there will be records of that with banks.  Yes.  Au
10   pairs sometimes create bank accounts for themselves in the US
11   in order to -- in order to bank those checks.  But those are
12   transient bank accounts.  They create them.  They use them
13   while they're an au pair.  And then they close them when they
14   go home.  Host families have consistent financial records.
15   So even if they don't have the tax records that you discussed
16   with counsel, they do have their own financial records as to
17   what they paid.  And they have banking records.  And they're
18   simply -- it is simply a logical fact that the person who
19   stays in one place with roots to that community is more
20   likely to have consistent records of what they did during
21   that period than the person who is moving around, especially
22   when you're talking about financial records.  So I think they
23   do have better access.  And they are better record-keepers.
24            At this point counsel brought up plaintiff Rascon
25   and made some arguments about what her testimony was.  I
```

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Motion Hearing
March 10, 2017

Page 49

```
 1   disagree with the characterization of her testimony.  I don't
 2   think I really should get into it because that's getting
 3   quite far afield.  So the only thing I'll say is that we
 4   think plaintiff Rascon's testimony was consistent with the
 5   idea that she was paid the 95.75 for -- or sometimes 196.  It
 6   was rounded up by one family, I believe, for her work as an
 7   au pair.
 8            And then I also -- I will quickly address the
 9   ethics issues that counsel brought up.  First of all, this is
10   simply not relevant to whether we're entitled to receive host
11   family information.  There is no ethical bar on us receiving
12   host family contact information.  They argue that there are
13   ethical bars with what we can do with that information.  So
14   let's start with what we can obviously do.  And Your Honor
15   brought this up.  We could seek formal discovery.  If that's
16   what we want to do, we can do that.  And we can attempt to do
17   the equivalent of a statistical survey or whatever we want to
18   do through the formal discovery procedures that exist for
19   every third-party or nonparty deponent or subpoena recipient,
20   or what have you, you know, in a litigation such as this.  We
21   could do that.  In terms of the -- in terms of the surveys,
22   nobody is disputing that Rule 4.3 applies.  But, you know, we
23   can create a survey that is consistent with Rule 4.3.  And if
24   we feel that that's too difficult, maybe we won't, and maybe
25   we'll go the formal route.  It's really our issue to decide
```

Johana Paola Beltran, et al. vs.                                    Motion Hearing
InterExchange, Inc., et al.                                          March 10, 2017

Page 50

 1    and our issue to work out.  We are bound by the ethical

 2    requirements.  There's no reason to believe that we -- that

 3    we're incapable of sticking to our ethical requirements.  And

 4    there's nothing in this rule that says informal surveys are

 5    impermissible.  So with respect -- I think that issue is a

 6    red herring.  It's unusual that the defendant gets up and is

 7    worried about how effective the discovery the plaintiff wants

 8    to take is going to be.  But in this case plaintiff has many

 9    options.  And the core point is that we're entitled to the

10    information.  We are entitled to pursue information about the

11    actual compensation that au pairs received because defendants

12    have said that their documents which -- and at the risk of

13    really repeating myself at this point, the surveys, the form

14    contracts, the training materials, the advertisements,

15    everything, all of that doesn't show what au pairs were

16    actually paid.  That's their position.  We're entitled to

17    rebut it.  We need this information to do so.  Thank you,

18    Your Honor.

19              MS. LUKEY:  May I briefly respond, Your Honor?

20              THE COURT:  Yes.

21              MS. LUKEY:  Thank you.  First, Your Honor, with

22    regard to the plaintiffs' argument that they're entitled to

23    the au pair contact information not for purposes of reaching

24    out to the au pairs in advance of notice but for merits and

25    certification, if they cannot reach out to the au pairs

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Motion Hearing
March 10, 2017

Page 51

```
 1   because notice has not been given, there's no way having the
 2   contact information helps them with regard to the merits of
 3   the case or to certification.  It's only by attempting to
 4   gain information from the au pairs that they might
 5   conceivably, they claim, find assistance with merits and
 6   certification.  And, again, Your Honor, we believe that
 7   should not be happening before an appropriate notice.  And
 8   with regard to notice to the au pairs, we would also point
 9   out that at least it is my recollection that before this
10   Court in a hearing or an informal conference maybe six weeks
11   ago the plaintiffs were talking about an au pair survey as a
12   means of gaining information that they would be able to use
13   for both their antitrust and other class claims.  Today what
14   we're hearing is much more focused on host families, which we
15   believe should be a second line and only after preliminary --
16   preliminary matters have been decided.
17           On the issue of the host families, I'm going to
18   close just by saying this:  And it may be more -- perhaps I'm
19   imposing personal observations on this, and if so I
20   apologize.  If you are a parent to the child you do not want
21   your address in the hands of strangers along with the
22   information that you have a child or children.  It is that
23   simple.  Thank you.
24           MR. LIBLING:  Your Honor, I won't argue.  I just
25   want to correct a misimpression.  We are seeking both au pair
```

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Motion Hearing
March 10, 2017

Page 52

1   and host family.  We do anticipate surveys to both.  That's
2   certainly things we're considering.  And I didn't mean to
3   imply that we couldn't reach out to the au pairs before
4   notice is sent.  I was drawing a distinction in the case law
5   between cases that say -- where the plaintiff says, I want
6   the information for notice purposes, and when a plaintiff
7   says, I want the information for merits or certification
8   purposes.  That's the distinction I meant to draw.  I
9   apologize if it was confusing.
10          THE COURT:  All right.  Thank you.  Well, let me
11  start by saying -- and I am going to flip through my notes a
12  bit here.  I don't have anything written out, prepared
13  because I did want to hear from all of you because I felt
14  like I was perhaps missing something.  I -- I don't think I
15  am anymore.  So -- but let me -- let me tell you that I'm
16  viewing host families and au pairs separately for the primary
17  reason that au pairs are the class members if you have a
18  class.  They're the class members.  And that is different
19  from the host families.  The host families are not class
20  members.  The host families are witnesses in the case
21  perhaps.  And they're not in any way going to be class
22  members.  That's -- that's not their role.  So I think for
23  that reason only that puts them in a different category
24  depending on how you want to look at it.  I've done many
25  collective action certifications.  And the -- the rules for

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Motion Hearing
March 10, 2017

Page 53

1    a -- you know, certifying a collective initially are very

2    low.  And those -- those decisions are usually made pretty

3    quickly because the -- the bar is so low.  It concerns me

4    that the decision has not been made yet on that by Judge

5    Arguello.  And it is her case.  I have not talked to her

6    about the case.  I don't have any insight information at all.

7    But just as an observer who is, you know, looking at the

8    discovery in the case, that fact makes me think that there's

9    some reason why she has not ruled on it yet.

10          Now, I agree with the comments of Ms. Lukey.  And

11   I -- I believe I've probably made them to all of you before.

12   I think it's very likely that you will get a ruling on that

13   before March 31st because if you don't it's something she's

14   got to report.  And she doesn't ever report anything from

15   what I can see.  Right.  She always -- she's very

16   conscientious which makes me think there's a reason why she

17   hasn't ruled.  And so since I don't know what that reason is,

18   I feel that I need to respect it.  There's -- there's

19   something that's going on and, therefore, that puts the au

20   pairs category to me in a different position at this time.

21          There is a lot of case law that you don't give out

22   the class member's contact information until after you have a

23   collective -- or class in a case of a Rule 23 class.  I think

24   that there could -- could be an exception made in this case,

25   however, I really do think you're going to have a ruling on

Johana Paola Beltran, et al. vs.                                    Motion Hearing
InterExchange, Inc., et al.                                         March 10, 2017

Page 54

1   something by the end of the month.  I don't see any reason to

2   step on what is Judge Arguello's right to decide in this

3   case.  She did not refer that motion to me.  And so it's --

4   she's going to decide it.  If she certifies a collective

5   action, you better be prepared to give out the au pair list.

6   I mean, that's the next step because they are your putative

7   class.  So you have to do it then.  And I'm not going to

8   through a discovery order take that away from her prematurely

9   because it's just not my right to do that.  It's her right to

10  do it.  So for that reason I'm not going to grant the motion

11  with respect to the au pairs, the -- the names and addresses

12  and other contact information of the au pairs at this time.

13  I do want to state that I probably would if it -- we weren't

14  in March.  But we're here.  So let's see what Judge Arguello

15  says first.  Because if she says no, then the issue is

16  different.  If she says no collective, the -- the reason to

17  have 100,000 people produced to you is different.  And should

18  that go forward?  Should -- I mean, that -- it just changes

19  the whole landscape if she does not certify the collective, I

20  think, as far as producing the entirety of the au pair list.

21  I think there's still a very good argument to be made that --

22  in the antitrust claim that you are entitled to that

23  information, but I think that's an argument for another day.

24          So what that leaves me with is whether or not you

25  should get the information about the host families.  And as I

Page 55

1    said, I take them completely out of it because I don't think

2    it makes any difference whether or not there's been a class

3    action certified.  And, in fact, I find it very troubling --

4    and I -- I'm reading to you from document 489 which was the

5    defendants' opposition to the motion to compel.  Right on the

6    first page the defendants state -- and this, of course, isn't

7    filed on behalf of all defendants, but on -- on the majority

8    of them.  This is like the last full sentence on the page.

9    But as plaintiffs' motion to compel makes clear, plaintiffs

10   do not know whether all au pairs were paid the same amount or

11   whether they provided the same number of hours of childcare

12   per week.  Now they want to conduct an individualized inquiry

13   of au pairs and host families to attempt to determine whether

14   their allegations are accurate.  So you're using against the

15   plaintiffs the fact that they don't know what the au pairs

16   were paid, and yet the reason that they don't know what all

17   the au pairs were paid is because the sponsors didn't pay

18   them and will not give up the information about who did pay

19   them.  So you really cannot have it both ways.  I think this

20   is a situation where the host families -- absolutely the

21   contact information must be provided and should have been

22   provided long ago because the -- the sponsors are -- I -- I'm

23   assuming, absolutely truthfully saying, We don't know.  You

24   know, we don't pay them.  We let the host families know what

25   they have to pay them, what the stipend is.  And, you know,

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Motion Hearing
March 10, 2017

Page 56

 1   I'm not saying that it's necessarily wages.  But we -- we

 2   just tell them what -- you have to give them the stipend.

 3   And you have to do certain other things.  But if you give

 4   them more, that's kind of up to you.  That's what the

 5   defendants are saying that most of them will say.  So that

 6   means the host families are the people who pay.  And that's

 7   the only way that plaintiffs can find this information out.

 8   And it's not fair to withhold the information from them and

 9   then criticize them because they can't make their class

10   allegations stick because they don't know if everybody is in

11   the same position.  It's just not -- that's just not right.

12   This is a -- that is a wrong way to look at it.  And the host

13   families are not protected by the fact of being class members

14   because they're not class members.  So there's no problem

15   there with notice.

16           Now, I -- I grant you, I had my law clerk bring me

17   4.3 just to reread it.  I don't think it quite says what

18   the -- everybody -- or Ms. Lukey says it's -- I mean, I'm not

19   saying you said it wrong.  But the way you paraphrased it is

20   the way that I think lawyers look at things when they say,

21   You don't want to even touch it.  If it smells like a fish,

22   you know, just don't touch it.  And so -- but that's not

23   exactly what 4.3 says.  And I think that the plaintiffs could

24   contact all the host families.  They probably do need to have

25   some kind of advisory language in there about what they're

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Motion Hearing
March 10, 2017

Page 57

1    doing.  They're representing a group of au pairs, you know,

2    in a -- in a proposed class action case at this point who

3    believe they were underpaid, or however you want to put it.

4    But -- but I think certainly that much of an advisement has

5    to go out and maybe more.  But that -- again, that's an issue

6    for another day too because the -- the -- what we're talking

7    about today is are they entitled to the information?  And I

8    think that in -- you know, absolutely, 100 percent, they are.

9    And I think they're -- like I said, I think they're entitled

10   to it now.

11            One of the arguments that the defendants brought

12   today was that the au pairs are the best source of wages.

13   But we're not going to give you the au pairs because it's not

14   time to give you the au pairs yet.  So -- so, yeah, that's

15   your best source, but you can't have that source.  So what's

16   the second best source?  Well, the second best source is the

17   host families.  Frankly, I think you're wrong about that.  I

18   think the host families are the better source, but I -- I'm

19   not sure that my opinion or your opinion or anyone else's

20   opinion really matters who's best or not.  But -- but where

21   can the plaintiffs get the information that they need?  And

22   they clearly need it.  If the sponsors had been able to

23   truthfully say, Hey, we -- we control this.  All the money

24   goes through us.  I was thinking like a staffing company, for

25   instance.  A staffing company that puts together employers

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Motion Hearing
March 10, 2017

Page 58

```
 1   and employees.  Some staffing companies don't have anything
 2   to do with the money.  Some staffing companies actually pay
 3   the employee, and they get their money by billing the
 4   employer.  And so that the -- the difference between those
 5   two things is their profits.  I'm not sure how it works in
 6   the au pair industry.  No one has really told me how that
 7   works.  But what I know is that from what the defendants have
 8   said, they don't really control any other thing other than
 9   making sure that the au pairs receive the stipend that
10   they're supposed to get.  And so they -- they can't act in
11   that role.  I think the logical place to get that
12   information, the most logical is the primarily United
13   States-based host families who have to, I'm going to say,
14   write a check.  But they may or may not write a check.  They
15   may give cash.  But who -- who actually are paying the money.
16   I think they're the best source of knowing what they paid.
17   They should know what they paid even if they don't file it on
18   tax returns.  And obviously Ms. Lukey is correct that
19   probably a lot of them -- well, maybe a lot of them don't.
20   It depends on whether you itemize, I suppose, and any number
21   of things.  But nonetheless, you know, if you don't itemize,
22   you might have a checking account that says, you know, To
23   Ms. So-and-so every week, so you know.
24          And so I think even if it's not perfect, it's the
25   best place to get it because the sponsors can't give it to
```

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Motion Hearing
March 10, 2017

Page 59

1    them.  And they're entitled to it.

2              So I'm going to grant the motion to compel insofar

3    as the names and contact information for the host families.

4    Now, if you -- if the sponsors believe they should, it can

5    certainly go under a protective order.  Not an attorney's

6    eyes only protective order, but a regular protective order to

7    withhold addresses so that you're doing what you can to make

8    sure that the information is not in the public forum.  That's

9    not to say that plaintiffs can't use that information to

10   contact the host families.  But I don't see any reason why

11   the addresses of the host families should be in the local

12   newspaper or filed as anything in the court.  And that's

13   really what a protective order is for.  So I think there's

14   some value there.  I also think as a practical real matter, I

15   have children.  I was a federal prosecutor before I took the

16   bench.  And I couldn't withhold my address.  I tried.  But it

17   was all over the internet.  You know, so anybody could have

18   come and taken my child out of school too.  So I understand

19   the situation.  But in this day and age withholding

20   addresses, I don't think it does any good.  And -- and,

21   frankly, I don't think that's why the sponsors don't want to

22   give that up.  I don't believe that argument.  I think they

23   don't particularly want their clients to be contacted.  And I

24   understand.  But that's part of what we're doing here.

25             So, anyway, for those reasons I am going to grant

Johana Paola Beltran, et al. vs.                                      Motion Hearing
InterExchange, Inc., et al.                                         March 10, 2017

Page 60

1  the defendants' (sic) motion to compel in part on the host

2  families, but I'm going to deny it with respect to the names

3  and contact information of the au pairs.

4           Now, I am going to require that as to host

5  families, the names of the au pairs be provided.  So when you

6  give up a host family you say who the au pair is.  You don't

7  have to give up any contact information on the au pair,

8  however, at this point unless you want to because at the end

9  of this month if -- if Judge Arguello certifies the class, or

10  the collective, not really the class, then at least for those

11  defendants who are FLSA defendants that -- that information

12  is going to be given up anyway.  So you can decide if it's

13  easier or cheaper to do it all at once or not.

14           MS. LUKEY:  May I ask a clarifying question on

15  behalf of the sponsors?  Given that in each instance the

16  sponsors are going to be acting contrary to a contractual

17  provision, may they inform the host families that they are

18  giving out their contact information in advance?

19           THE COURT:  I don't see anything that would keep

20  you from --

21           MS. LUKEY:  Pursuant to court order --

22           THE COURT:  Yeah.

23           MS. LUKEY:  -- we'd have to tell them.

24           THE COURT:  Well, I don't see any reason why you

25  shouldn't tell them.  Do you have an argument against that?

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Motion Hearing
March 10, 2017

Page 61

 1   I mean, it's your client.  You've been ordered now.  You

 2   don't really have a choice.  It's an order.  It's a court

 3   order.

 4            MR. LIBLING:  I mean, I don't know what -- whether

 5   these contracts require notice or -- or not.  Obviously, in

 6   the event of a court order that the information gets

 7   produced, I mean, we do have an agreement about what

 8   information -- you know, what contacts defendants will have

 9   with their clients.  I wouldn't want to change that agreement

10   which I think has been, you know, in place throughout this

11   case.

12            MS. LUKEY:  No.  We have it -- we have it for

13   au --

14            MR. LIBLING:  And that is my primary concern.

15            MS. LUKEY:  Sorry.  That's for au pairs.  We

16   haven't had any kind of discussion about host families that

17   I'm aware of, at least we haven't.

18            THE COURT:  All right.  Well, let me --

19            MS. LUKEY:  No.  There's nothing on host families.

20            THE COURT:  Let me limit it then.  I think you

21   should be able to tell your clients that you have had to,

22   under a court order in this case, given up their contact

23   information, their name, address, whatever it is that you're

24   giving up.  Is it just name and address?  Is that what you've

25   asked for?

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Motion Hearing
March 10, 2017

Page 62

1           MS. LUKEY:  I think they've asked for email too.

2           MR. LIBLING:  Yeah.  We've asked for additional

3    contact information as well.

4           THE COURT:  Name, address, and email, whatever it

5    is --

6           MR. LIBLING:  Yeah.  Phone numbers.

7           THE COURT:  -- that you've given up.  You can tell

8    them that.  You can't tell them anything else.  Right.  I

9    don't -- I mean, I -- what I -- what I'm guarding against for

10   all the sponsors, so that all of you know, is a long letter

11   that says, We believe we've been wrongly accused and --

12          UNIDENTIFIED SPEAKER:  We do have.

13          UNIDENTIFIED SPEAKER:  Join.

14          THE COURT:  -- this is this, this is that.  Okay.

15   So that -- I don't want that kind of information.  But if you

16   want to just tell them that there is this ongoing case.  And

17   in this -- in the course of the litigation you have been

18   required to give up this information about them, that's fine.

19   If you want to say, You may be contacted by the plaintiffs in

20   the case, I think you can say that as well.

21          MS. LUKEY:  Just so --

22          THE COURT:  If you put "may."

23          MS. LUKEY:  Just so the Court is aware, we had,

24   because we thought we should do so, we had given simply a

25   notice that there was litigation pending of which host

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Motion Hearing
March 10, 2017

Page 63

 1  families who are currently potentially at risk.  We gave them

 2  a notice that there was a case pending.  And offered them no

 3  advice on what to do, but just told them because we thought

 4  we had to when -- back when it got started.  So some of them

 5  are going to be able to make the connection, I'm sure.  And

 6  that won't be on the basis of anything we say now.  We

 7  already sent them saying something case name and number.

 8          MR. LIBLING:  So it sounds like Your Honor has

 9  ordered a purely factual communication.

10          THE COURT:  Right.

11          MR. LIBLING:  I don't think we would have a

12  problem with that.

13          MR. KELLY:  Your Honor, this is Bill Kelly with

14  USAuPair.  You keep on using the term "clients."  And I want

15  to clarify that I think the request is to notify host

16  families --

17          MS. LUKEY:  But she's talking --

18          MR. KELLY:  -- who are not our clients.

19          MS. LUKEY:  -- talking about our sponsors.

20          MR. KELLY:  So I just want to make sure I'm clear

21  on what we're talking about.

22          MS. LUKEY:  Right.  She's talking -- she's talking

23  about our sponsors.  That we can notify our --

24          MR. KELLY:  No contact with the host families.

25          MS. LUKEY:  -- our sponsors that they can tell the

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Motion Hearing
March 10, 2017

Page 64

1  host families that by court order they are turning over

2  contact information and they may be contacted.

3            THE COURT:  Right.  Obviously the attorneys here

4  are -- your clients are the sponsors.

5            MS. LUKEY:  Are the sponsors.  Yes.

6            THE COURT:  I'm talking about the sponsors'

7  clients.

8            MS. LUKEY:  Right.

9            THE COURT:  All right.  So S apostrophe on

10  sponsors' clients.

11            MS. LUKEY:  Yes.

12            MR. HARTLEY:  Your Honor, Jim Hartley.

13            MR. KELLY:  Thank you.  I understand -- I

14  understand.  Thank you.

15            MR. HARTLEY:  Jim Hartley on behalf of Cultural

16  Homestay.  Some of the sponsors may not have yet provided the

17  general notice that -- that Ms. Lukey just referred to.  In

18  order for this all to make sense, we will have to build that

19  into our short statement of the information that is being

20  provided.  So I hope that would be acceptable to Your Honor

21  as well.

22            THE COURT:  Have plaintiffs seen the notice that

23  went out?

24            MR. LIBLING:  No.

25            MS. LUKEY:  It's actually appended to one of

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Motion Hearing
March 10, 2017

Page 65

 1   your --

 2              MR. LIBLING:  Oh, sorry.

 3              MS. LUKEY:  -- documents produced.

 4              MR. LIBLING:  If that's the only thing --

 5              MS. LUKEY:  Yes.

 6              MR. LIBLING:  -- you're talking about --

 7              MS. LUKEY:  That's what I'm talking about.

 8              MR. LIBLING:  -- then -- okay.  Then, yes, we've

 9   seen that one.

10              THE COURT:  All right.  So -- and that one is

11   acceptable, right?  No one said anything.

12              MR. LIBLING:  We haven't objected to that.

13              THE COURT:  All right.

14              UNIDENTIFIED SPEAKER:  We didn't --

15              THE COURT:  So you can use that form.

16              UNIDENTIFIED SPEAKER:  Use that as a model, Your

17   Honor.  Thank you.

18              THE COURT:  Yeah.

19              MS. REILLY:  Your Honor, I have another question.

20   Katie Reilly on behalf of Go Au Pair, Au Pair International,

21   and Agent Au Pair.  Back to the confidentiality designation

22   on the lists.  So just to be really clear, what's driving the

23   attorney's eyes only designations that have been made, it's

24   not really a fear about plaintiffs.  It's --

25              MS. LUKEY:  Each other.

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Motion Hearing
March 10, 2017

Page 66

```
 1          MS. REILLY:  -- competitively sensitive
 2   information.  This is the entire industry.  Because these are
 3   regulated entities, there's only 15 of them -- well, now
 4   there's 16.  That one hasn't been added to the lawsuit.  The
 5   amount of difference in terms of business operations and
 6   business information is about an inch.  And protecting that
 7   inch of unique, competitively sensitive information is
 8   absolutely critical.  And so that is the reason.  The host
 9   family information, that's our client lists.  So for us to be
10   able -- if we don't have attorney's eyes only, that means
11   that each one of the 15 sponsors can see the entire client
12   list for every other sponsor which would be -- that is the
13   core of their -- their most valuable business information.
14   So we would ask for permission to be able to designate that
15   as attorney's eyes only so that the other sponsors can't see
16   each other's client lists.
17          THE COURT:  All right.  What does that do to
18   plaintiffs?  Do you feel that that affects you one way or the
19   other?  I mean, you --
20          MR. LIBLING:  Well --
21          THE COURT:  -- you still are able to use the
22   information to do whatever you need to do, to survey or
23   whatever.
24          MR. LIBLING:  Well, we -- it means that we can't
25   use the information or show the information to anybody except
```

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Motion Hearing
March 10, 2017

Page 67

 1   attorneys and some specific agents of attorneys.  I mean, to

 2   be clear, I don't have an objection -- we don't have an

 3   objection to a rule prohibiting defendants from seeing each

 4   other's, you know, proprietary information.  That -- that

 5   part of it, what's being asked for, doesn't affect what we

 6   want to use it.  I mean, if it's -- if it's clear that we are

 7   permitted to use this information to seek discovery from the

 8   host families -- and I should point out that in doing that if

 9   we, for example, seek -- just as an example.  If we were to

10   send out a subpoena to a host family, we have to disclose

11   under the rules that subpoena to every party to this

12   litigation.  That will inevitably disclose that host family

13   and their contact information and -- to everybody.  So there

14   are -- there are limits on what is -- on us if -- you know,

15   if there are certain requirements.  And we need to be able to

16   do whatever we need to do in order to get this information.

17   And, you know, but in terms of, like, when the documents are

18   produced, they don't go to beyond counsel amongst defendants'

19   group, we don't object to that.

20          MS. REILLY:  If I could respond, Your Honor.  I'm

21   not sure we have a disagreement here.  So the -- the complete

22   list is really the important thing.  I'm guessing/hoping that

23   they're -- they don't plan to issue subpoenas to, you know,

24   hundreds of thousands of host families.  So the subpoena

25   issue I think we can take on a case-by-case basis.  And

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Motion Hearing
March 10, 2017

Page 68

1  that -- you know, certainly we can agree that that particular

2  host family name would not be subject to the attorney's eyes

3  only designation.  I'm talking about the complete list

4  though.  I think you guys can accomplish what you need to if

5  we designate those lists as attorney's eyes only and just

6  have it operate under the protective order.  And then we can

7  work with you when you need to do -- you know, subpoenas to

8  individual host families would not be subject to the

9  attorney's eyes only protection.

10          MR. LIBLING:  Your Honor, I think there's a basis

11  here for the parties to work this out without needing a court

12  order at this point.  I mean, maybe defendants can negotiate

13  a separate protective order amongst themselves.  Maybe that

14  would work.  Maybe we have to be involved.  But I think the

15  principles, that plaintiffs are permitted to seek the

16  discovery, but the complete lists should not be shared to --

17  you know, Cultural Care shouldn't be getting Go Au Pair's

18  complete list beyond counsel.  I don't think there's any real

19  dispute about those principles.  So I would suggest we just

20  discuss it.

21          MS. REILLY:  And that's fine with my clients, Your

22  Honor.  And I'll let the rest of the group speak.

23          THE COURT:  Anyone else want to weigh in on that?

24  Because I'm inclined to let you do that on your own and

25  take -- I'll withdraw my order that you can't designate them

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Motion Hearing
March 10, 2017

Page 69

```
 1   attorney's eyes only.  You can designate them attorney's eyes
 2   only if that's what all of you want to do, if that's how you
 3   want to decide it, or you can have a different protective
 4   order.  You should file a form of that jointly so that I know
 5   that there's nothing for me to really decide.  I'll just look
 6   at it and sign it and make it an order of the Court if that's
 7   what you want to do, something separate to protect this --
 8   this information which I consider to be the clients of your
 9   clients.  So I think that's something you can work out.  What
10   I -- what I don't want to happen is to restrict the
11   plaintiffs' use of this other than, plaintiff, you will be
12   restricted from, for instance, giving it over to the
13   newspaper, something like that.  Right.  You're not going to
14   be able to file the list in any form in court without an
15   order restricting access, that sort of thing.  I don't think
16   that's even really an issue in the case, but --
17            MR. LIBLING:  Yeah.  I don't think that's an
18   issue, Your Honor.
19            THE COURT:  -- I -- I can see it could be.
20            MS. LUKEY:  I -- I assume they wouldn't sell or
21   use them in any other fashion outside the litigation.
22            THE COURT:  Well, that's -- that goes without
23   saying because that's part of being in a case.  And I take
24   that pretty seriously.  I think discovery that's exchanged in
25   a case belongs only in the case.  So that -- that does not
```

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Motion Hearing
March 10, 2017

Page 70

 1    make me happy when I see things going outside.

 2            MR. LIBLING:  I don't think it's necessary to make

 3    suggestions that a party would violate the rules like that

 4    with no reason for those kinds of aspersions.

 5            THE COURT:  Right.  I don't -- and I don't think

 6    there's any reason to believe that would happen.  But I'm

 7    telling you all anyway that -- that -- that does not trigger

 8    any warm, fuzzy feelings in me.  I don't think it does in

 9    Judge Arguello either, frankly, but I shouldn't speak for

10    her.

11            Okay.  So let -- if we're through with this topic,

12    let's talk about the other motion that's pending.

13            MR. LIBLING:  Your Honor, may I just ask a

14    clarifying question about your -- your order?  I understood

15    your order and the reasoning with respect to the FLSA

16    plaintiffs.  The antitrust only plaintiffs, are they going to

17    be required to produce au pair information, or does your

18    order, based on the FLSA certification motion, also apply to

19    the antitrust only plaintiffs -- defendants?  I'm sorry.

20            THE COURT:  Yes.  It -- it applies to everybody.

21    I am not authorizing any release of au pair contact

22    information at this time.

23            MR. LIBLING:  Understood.  Two quick points before

24    we move on just to put them on the record.  One is that

25    plaintiffs will in all likelihood be seeking the costs for

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Motion Hearing
March 10, 2017

Page 71

 1    this motion under 37(a)(5).  We can work that out now or we

 2    can discuss it and file a motion if we have to.  And,

 3    secondly, as I mentioned during the argument, once we get

 4    this information, I'm not clear how much delay there's going

 5    to be as a result of protective orders and those

 6    negotiations.  But once we get this information, we'll have

 7    to use it and analyze it.  And so we will need extra time

 8    before the certification motion to do that.  And, again, I'm

 9    happy to work that out now, or if we're required to file

10    another motion, then we will do that.

11            THE COURT:  You're going to have to fill me in on

12    where -- where you stand on all the dates because my computer

13    will only --

14            MR. LIBLING:  Yes.

15            THE COURT:  -- give me like a discovery cutoff

16    date.  It's not going to give me all the certification dates.

17    So tell me what you --

18            MR. LIBLING:  So --

19            THE COURT:  -- what you have coming up.

20            MR. LIBLING:  -- the deadline for class

21    certification, at the moment we currently have to file our

22    brief on April 25th.  And the close of fact discovery is

23    July 17th at the moment.  I would -- I would expect that once

24    we get the information it will take at least 60 days to do

25    the survey or whatever we do and -- at least 60 days,

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Motion Hearing
March 10, 2017

Page 72

```
 1   maybe -- you know, to -- and then analyze that information.
 2   It could take longer, but --
 3            MS. LUKEY:  Your Honor, I think I should draw to
 4   the Court's attention that there is a very real likelihood
 5   that there may be an objection filed on the host family.  So
 6   I stand here saying that because I recognize it could affect
 7   the deadlines.  I do think that at least some among the
 8   sponsors feel the issue is sufficiently important to -- to do
 9   that.  And we recognize that's going to require changes in
10   some of these deadlines, so --
11            MR. LIBLING:  Well, obviously if we --
12            THE COURT:  Right.  Because that will extend
13   things out further.
14            MR. LIBLING:  Obviously if we're not going to get
15   the information, that will extend things further.
16            THE COURT:  Well, pay close attention to the local
17   rules.  I think it's 72.  Until you get a stay of this order,
18   this order is in effect.  It doesn't matter if you appeal or
19   not.  So the fact that your appeal is finite, that's not
20   unexpected.  But this order is going to be valid no matter
21   what unless you get --
22            MS. LUKEY:  Until we get a stay.
23            THE COURT:  -- either me to stay it.  And you have
24   to ask me first, then you have to go to Judge Arguello and
25   ask her.  And while those stay motions -- you can't ask Judge
```

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Motion Hearing
March 10, 2017

Page 73

 1    Arguello until I rule whether or not you get a stay.  And

 2    then you -- you can't -- you don't have a stay just because

 3    it's pending in front of her.  So, you know, I'm going to

 4    give you some timeframes to get this done.  And those are

 5    going to be the order unless you have a stay from one of us.

 6              MS. LUKEY:  I would -- I would alert you orally

 7    right now if I knew with certainty that there will be an

 8    objection that required a motion for a stay.  I don't have

 9    that information so I can't stand here before you and ask you

10    orally for a stay and follow it up with a written motion.  I

11    will need to consult both with my client and with other

12    defense counsel on --

13              THE COURT:  Right.

14              MS. LUKEY:  -- whether that's going to happen.

15              THE COURT:  Because it's a non-dispositive motion.

16              MS. LUKEY:  Right.

17              THE COURT:  So your argument has to be clearly

18    erroneous or contrary to law --

19              MS. LUKEY:  Right.

20              THE COURT:  -- which is pretty tough in a

21    discovery matter.  It's not so tough in other issues, but it

22    is kind of in discovery.  So we all just might as well talk

23    about the elephant, you know, in the room.  And so the

24    inclination to -- to give someone a stay in discovery is not

25    very great, although I will tell you in this -- in this case

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Motion Hearing
March 10, 2017

Page 74

```
 1    I understand that for some of you this is a huge amount of
 2    discovery.  I don't -- I don't -- I haven't really heard any
 3    burdensome arguments.  But I know it's -- there's a lot of
 4    names around.  So I'm not saying that I wouldn't grant it or
 5    that Judge Arguello wouldn't grant it.  I'm just saying I
 6    think the standard is pretty high.  So -- so you have to
 7    decide, all of you individually representing your clients
 8    decide what you want to do.  But in the meantime I want to
 9    get all of our dates out and set about when you're going to
10    do it, and what's going to happen, and whether or not we're
11    going to extend the class certification which is the one
12    that's most imminent.  And understanding that if you get a
13    stay from somebody, that may change everything.  And, you
14    know, the -- the case may change considerably when you get an
15    order from Judge Arguello on any of the motions that are
16    pending in front of her.  But that's up to you to decide.
17    Okay?
18              MR. LIBLING:  Yes.  We would appreciate a date
19    certain by which discovery has to be produced --
20              THE COURT:  Okay.
21              MR. LIBLING:  -- absent a stay.
22              THE COURT:  So given the fact that you need to
23    collaborate a bit on how you want to protect the information,
24    because I'm assuming that all of you defendants -- counsel of
25    the sponsors are going to want some kind of protection for
```

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Motion Hearing
March 10, 2017

Page 75

1  the information.  Do you think two weeks is enough time to

2  get that all worked out?  There's a lot of you.  But I think

3  your interests are similar.  So it should really be kind of

4  two positions that you've got to negotiate.

5          MS. LUKEY:  That would be two weeks in which we

6  determine what we think the terms should be?

7          THE COURT:  Right.  Or -- or even 10 days I think

8  might be more appropriate because it's really between you

9  defendants.  The plaintiff isn't going to object if you work

10  out something among yourselves that you think is protective

11  enough.

12          MS. LUKEY:  We can -- I believe we can easily do

13  that within 10 days, Your Honor.  We'll certainly commit to

14  that.

15          MR. LIBLING:  And --

16          THE COURT:  Okay.  So --

17          MS. LUKEY:  I'm not feeling any daggers behind me

18  yet, so I guess everybody is okay.

19          THE COURT:  All right.  Now, in the meantime, I

20  would be expecting you to be collating all this information

21  and getting ready to produce it because it sounds to me like

22  for some of the sponsors at least the information has already

23  been collated.  You've -- you've taken the time to redact it.

24  So that means you've already got it.  So that shouldn't take

25  more than about a week after you decide how to protect it,

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Motion Hearing
March 10, 2017

Page 76

1   right?

2           MS. LUKEY:  Yeah.  I don't actually know the

3   answer because I think we're the one that was talking about

4   50,000 host families.  So --

5           THE COURT:  Right.

6           MS. LUKEY:  -- I assume, without knowing, that

7   there's some computerized way for at least the more recent

8   years.  I just have to check.

9           MS. REILLY:  Your Honor, speaking on behalf of the

10  smaller -- some of the smaller sponsors, I think it's

11  actually going to be a little more time-consuming.  It can be

12  done, but I think a week is unrealistic.  So I think two or

13  three weeks I think would -- does that work for everybody?  I

14  think two or three weeks would be necessary to --

15          THE COURT:  Well, how about --

16          MS. REILLY:  -- collect it all.

17          MR. LIBLING:  Your Honor, I -- sorry.

18          THE COURT:  The -- the 10 day would be March 20.

19  Okay.  So if we -- if we leave March 20, how about March 31

20  for actual production?  And in the interim that gives you

21  plenty of time to file your objections if you want to with

22  Judge Arguello --

23          MS. LUKEY:  The move to stay.  Right.  Thank you,

24  Your Honor.

25          THE COURT:  -- before you actually produce

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Motion Hearing
March 10, 2017

Page 77

```
 1   anything.

 2              MS. LUKEY:  Yes.

 3              THE COURT:  Okay.

 4              MS. LUKEY:  Thank you.

 5              MS. REILLY:  Your Honor, just one follow-up

 6   question.  In thinking more about the logistics of the -- the

 7   order that you've issued regarding the sponsors'

 8   communications with host families, I'm just a little worried

 9   about practically how that's going to play out.  So the Court

10   is ordering the production of the host family information.

11   And the plaintiffs are going to be free to communicate with

12   the host families subject to their ethical responsibilities.

13   We would ask for the same -- just the same guidelines.  So

14   not having specific -- or a specific order from the Court as

15   to what we can and can't say to our clients because I think

16   that would just be very difficult to administer.  You know,

17   the communication might go out, and then there could be a

18   phone call from the host family to the sponsor.  And I think

19   having all of the parties subject to just complying with our

20   professional responsibilities is sufficient.  And so I would

21   ask for no specific order as to how we can communicate with

22   our own clients.

23              THE COURT:  Well, they -- they aren't class

24   members.  I mean, I was kind of treating it as though they --

25   they were in limiting you to what you said because that -- I
```

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Motion Hearing
March 10, 2017

Page 78

 1  -- I would as far as the au pairs because they're going to be

 2  potential class members.  But these are just witnesses.

 3           MR. LIBLING:  I mean, Your Honor, I thought we

 4  reached an agreement on this issue that solved the problem.

 5  And I think we should stick with the agreement that we had.

 6  It's -- I acknowledge some complications.  I mean, the host

 7  families and the sponsors are potentially adverse parties as

 8  well because of the reason that you gave during the argument

 9  where in theory the au pairs could look to the sponsors for

10  any liability or --

11           THE COURT:  The host families?

12           MR. LIBLING:  Sorry.  The -- I'm sorry.  Let me

13  start that again.

14           THE COURT:  Yeah.

15           MR. LIBLING:  The host families could look to the

16  sponsors and either say that you told us the -- the wrong

17  information about what we should pay or for whatever reason,

18  any of our liabilities, your liability.  So there is -- there

19  is a potential adverse relationship there which I do think

20  complicates the issue and -- but --

21           THE COURT:  Well, but that's more of a -- that's

22  more of an attorney ethical thing --

23           MR. LIBLING:  But that is --

24           THE COURT:  -- that you should handle on your --

25  you -- you wanted to handle your own on your own, and I think

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Motion Hearing
March 10, 2017

Page 79

 1    they should too.  And --

 2                MR. LIBLING:  That's true.

 3                THE COURT:  -- actually I haven't limited you as

 4    to what you could say to the host families, so I don't see

 5    any reason to limit the sponsors either.

 6                MR. LIBLING:  Understood.

 7                MS. REILLY:  Thank you, Your Honor.

 8                THE COURT:  So I think that's a good point and --

 9                MS. REILLY:  Thank you.

10                THE COURT:  -- and that will be amended.  But I'm

11    not going to limit you to what you -- what your sponsors can

12    say to their host families.  Now, that's different from au

13    pairs who are the class members.  But, you know, I think you

14    could say what you want because I'm not limiting plaintiffs

15    to say what they want.

16                MR. LIBLING:  All right.  We --

17                THE COURT:  I understand they have a jump on you.

18    But they've had a jump on you for, you know, several years --

19                MR. LIBLING:  Yes.  Yes.

20                THE COURT:  -- as far as contacting the host

21    families, so --

22                MR. LIBLING:  We were discussing deadlines, Your

23    Honor, and --

24                THE COURT:  Okay.  So we've got the deadline

25    for -- if you need to submit something to the Court, that's

Johana Paola Beltran, et al. vs.                    **Motion Hearing**
InterExchange, Inc., et al.                          **March 10, 2017**

Page 80

1   fine.  But if you don't need to submit anything to the Court,
2   the deadline for working out how -- whatever kind of
3   protection for your host family information you want to do
4   among yourselves is 3/20, so March 20.  And then the deadline
5   to produce the documents, which I assume will be in the form
6   of probably, for most of you, computerized lists, March 31st,
7   2017.  So you're going to get them the end -- let's say the
8   end of -- and I'm just assuming that there's no -- nothing
9   that stops this.  So the end of March you get all the
10  information, just when you'll probably have your rulings too,
11  I suspect.  But anyway, so you -- do you want -- do you think
12  you need 60 days after that?
13          MR. LIBLING:  At least, Your Honor.  Yes.
14          THE COURT:  So that puts you about May, at the end
15  of May.  So your -- your case is going to be three years old
16  in November of 2017, which makes me think that, you know,
17  Judge Arguello is going to want to get the case tried this
18  year.  Maybe not.  But that's what I think.  I'm putting this
19  out very far.  Gosh, you don't -- if you don't even file your
20  class certification briefs until the end of May, there's at
21  least -- what have you decided on?  Is it 30/30 to respond
22  and reply, or are you the normal 21 and 14?
23          MS. REILLY:  30/30.
24          MS. LUKEY:  30/30 is what we've been doing.
25          THE COURT:  Okay.  So that's another 60 days from

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Motion Hearing
March 10, 2017

Page 81

1  there.  So that's the end of July before it's even briefed.

2  So that's not working out very well.  I don't like how that's

3  coming together for getting a case tried this year.

4           MS. LUKEY:  And, Your Honor, there will be

5  dispositive motions which are currently built into the

6  deadline.  That's going to take some time presumably on a

7  decision.

8           THE COURT:  Right.  What's your dispositive motion

9  deadline?

10          UNIDENTIFIED SPEAKER:  October 16.

11          MS. LUKEY:  October 16.

12          MR. LIBLING:  October 16.  So I -- I mean,

13  defendants may disagree, but I don't think -- even under the

14  current schedule, I don't think a trial this year is likely.

15          THE COURT:  Well, that may be.

16          MS. LUKEY:  It appears it would be difficult, but

17  it will be up to the judge obviously.

18          MR. LIBLING:  Of course.  But with a motion being

19  filed in October, there could be dispositive.

20          THE COURT:  Well, the discovery was just -- was

21  stayed for about a year, right?

22          MR. LIBLING:  That's correct.

23          THE COURT:  Well, yeah, it may not.  How about I

24  give you until mid May?  And then I want to put everybody

25  back on a regular schedule so that you get 21 days to respond

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Motion Hearing
March 10, 2017

Page 82

 1  and 14 to reply.  I mean, you've got your experts out there.

 2  They'll have all the information out there.

 3            MS. LUKEY:  Your Honor, that would be

 4  extraordinarily difficult to respond to a class cert motion.

 5  There are like seven counts covered by this.  It's not just

 6  antitrust.  It's RICO, and then a whole slew of Clemon

 7  (phonetic) law counts.  To try to do that -- we don't know

 8  exactly what their motion is going to say.  But to try to do

 9  that in 21 days --

10            THE COURT:  Well, that's only one week less.

11            MS. LUKEY:  A week makes a big difference, Your

12  Honor.

13            MR. LIBLING:  I was thinking, Your Honor, it's

14  going to be very difficult to do the survey because the

15  survey could very much be an iterative process.  Well, the

16  dis- -- the discovery could very much be iterative.

17            THE COURT:  You guys are just too difficult.

18  You're trying to convince me you have other clients and other

19  cases, right?  Okay.  All right.  So let's -- let's move this

20  to -- I want to -- I want you to file your class motion by

21  3/19.  Okay.  That's only a week up.  Well, wait.

22            MR. LIBLING:  Do you --

23            THE COURT:  We -- I said 3/20.  And I'm sorry.

24  I'm in May.

25            MR. LIBLING:  I was -- I was (inaudible) very

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Motion Hearing
March 10, 2017

Page 83

1   concerned.

2          THE COURT:  Yeah.  No.  That's not going to work.

3   You don't even have the stuff yet, right?  I'm sorry.  I'm

4   getting confused.  I'm confusing myself is what's happening,

5   and that's never a good thing.  So I think I said May 20,

6   but, of course, that's a Saturday.  So we'll just leave it

7   at -- how about May 19?  That's 60 days basically.  Right?

8          MR. LIBLING:  If that's what you order, that's

9   what you order, Your Honor.  We would ask for a little extra

10  time.

11         THE COURT:  Okay.  You don't -- you don't get your

12  discovery until March 31st.

13         MR. LIBLING:  That's right.

14         THE COURT:  But if you do it -- if you -- if you

15  get your filing done, your class -- so the class cert -- the

16  date for class certification motions would be 5/19/17.  And

17  then the date for responses would be June 19.  And then do

18  you really need a month for a reply?

19         MR. LIBLING:  Your Honor, we have to respond to up

20  to 15 different briefs.

21         THE COURT:  Well, they've never filed them that

22  way before.

23         MR. LIBLING:  But we --

24         THE COURT:  I don't see any reason why they would.

25         MR. LIBLING:  Well, they --

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Motion Hearing
March 10, 2017

Page 84

 1              MS. LUKEY:  I suspect there may be -- we may end

 2     up allocating the different counts among different

 3     defendants.

 4              MR. LIBLING:  We --

 5              MS. LUKEY:  But he does have to respond obviously

 6     to all the counts.

 7              MR. LIBLING:  Right.  We don't know how many

 8     briefs are going to be filed.  But, I mean, just like they

 9     still need a lot of time, I think we need the same.  And this

10     was -- the amount of time between briefs was something I

11     think we didn't have a dispute about.  So we'd like to keep

12     it as it is.

13              THE COURT:  Well, I like to cause disputes.  It's

14     fun, you know.  No.  It really isn't fun.

15              All right.  7/19 then for the reply.  And then

16     I've got to give you a -- a close of fact discovery date.

17     But I -- I suspect that we're going to have to move a lot of

18     these things.  And probably this is going -- it -- it depends

19     on how the rulings go.  But I -- I suspect Judge Arguello and

20     I are going to have to sit down and talk about this.  But

21     shall we put fact discovery -- the close of fact discovery

22     out to September 22nd then?

23              MR. LIBLING:  Okay.

24              THE COURT:  And then let's not move our

25     dispositive motion deadline now.  We'll -- we may have to,

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Motion Hearing
March 10, 2017

Page 85

1   but we'll talk about it and see how things go.  It kind of
2   depends on all these class issues, and how much notice has to
3   go out, and what you get, and what kind of an opt-in class
4   you have or an opt-out class you have.  So I think it's
5   probably too early.  I think you're right.  I doubt the case
6   can be tried in this year.
7           MR. LIBLING:  Thank you, Your Honor.
8           THE COURT:  It doesn't look good.
9           MR. LIBLING:  Obviously if they do move for a
10  stay, and if the stay is granted -- if the stay is not
11  granted it may not affect these deadlines.  But if the stay
12  is granted, then I think we will be back asking for more
13  time.
14          THE COURT:  Well, it may or may not.  I mean, you
15  know, it depends.  It depends on who grants the stay,
16  frankly.  You know, whether or not they -- I mean, there
17  could be some -- well, I'm not even going to speculate.  But
18  I can see that it could mean various things.  And we don't
19  know.  None of us know.  I don't know.  I can't tell you.  I
20  could tell you if it was me.  If -- if you were all dependent
21  upon everything I did, then I could tell you kind of what to
22  expect.  But I can't tell you what to expect of Judge
23  Arguello.  It's just like in my ruling telling you I don't
24  know why that motion has not been ruled on.  It seems to me
25  odd.  And that's why I'm hesitant to act because it's her

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Motion Hearing
March 10, 2017

Page 86

 1   case --

 2            MR. LIBLING:  Understand, Your Honor.

 3            THE COURT:  -- not mine.  Okay.  I'm just your --

 4   I'm your -- I'm your lower level.  Right.  So -- which is why

 5   you get an opportunity to appeal if you want.

 6            Okay.  Let's talk about the -- the other motion so

 7   that we get a ruling because the ruling on the -- the first

 8   motion -- so -- or actually the second motion, the 465/469

 9   is -- you'll find on the minutes is granted in part and

10   denied in part.  So what about the 454?  This is -- this is

11   the one I talked about right at the beginning.

12            MR. LIBLING:  That's -- yes, Your Honor.

13            MS. LUKEY:  Is there anything left?

14            MR. LIBLING:  Well, I mean, I suppose it depends.

15   We have the -- sorry.  I suppose it depends, Your Honor.  We

16   have the host family -- we should get the host family

17   information at the end of March.  So to the extent we were

18   seeking a protective order on that, if we have the

19   information, we have the information.  If we -- we don't have

20   the au pair information, and the protective order was

21   addressing both issues, perhaps it makes sense to hold the

22   motion in abeyance until all of the appeals and this whole

23   process has been worked out.

24            THE COURT:  I'm thinking actually about denying it

25   as moot at this point and letting you re- -- without

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Motion Hearing
March 10, 2017

Page 87

 1    prejudice to reraise any of the issues at a time where the

 2    case is framed differently.  Right at the moment I'm assuming

 3    that you're going to get host family information by no later

 4    than the end of March.  And if you get that, I think most of

 5    what you're concerned about is not a concern anymore.

 6                MR. LIBLING:  I think that's reasonable, Your

 7    Honor.

 8                THE COURT:  Anybody disagree with that?

 9                MS. LUKEY:  No, Your Honor.

10                THE COURT:  All right.

11                MS. LUKEY:  We do have one request.  There's

12    currently a status conference scheduled for April 23.  And it

13    seems to us that we probably dealt with those issues.

14                THE COURT:  That was to make sure we were on track

15    for things like class certification.

16                MS. LUKEY:  Yeah.  All right.

17                THE COURT:  All right.  Just to --

18                MS. LUKEY:  Well, we'll just -- we'll leave it

19    then if you --

20                THE COURT:  No.  I'm -- I'm not saying that.  When

21    was it set?

22                UNIDENTIFIED SPEAKER:  April 13th.

23                MS. LUKEY:  April 13th.

24                THE COURT:  Okay.  So does everyone feel like we

25    should just go ahead and vacate that?  We've been together

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Motion Hearing
March 10, 2017

Page 88

 1   quite a bit.  I don't want to have you appearing for no

 2   reason.

 3            MR. LIBLING:  At this time, Your Honor, I can't

 4   think of a reason why we have to have that.  We have

 5   deadlines right now.  So it's not like the parties don't have

 6   things to do.

 7            THE COURT:  Right.

 8            MS. LUKEY:  May I have a moment to consult because

 9   I'm hearing things from both sides.  And my head is --

10            THE COURT:  Yes.

11            MS. LUKEY:  -- assimilating nothing.  All right.

12   It apparently was a different issue that I was being asked to

13   address the Court on, which is that reference was made by

14   plaintiffs' counsel that they want to seek fees on the motion

15   to compel.  In which case we would reserve our right to seek

16   fees on the motion for protective order which we think was

17   procedurally deficient.  And the motion to compel followed.

18   So we'd complain that it was procedurally deficient.

19            THE COURT:  Okay.  Do both of you --

20            MS. LUKEY:  I'd like to think that's all going to

21   be a wash.

22            THE COURT:  Do both of you have any particular

23   desire to brief this out and have a full briefing on the

24   record?  Because I can give you a ruling on both of those

25   now.

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Motion Hearing
March 10, 2017

Page 89

1           MR. LIBLING:  That's an interesting question, Your

2    Honor.  I mean --

3           UNIDENTIFIED SPEAKER:  It's yes -- it's yes or no.

4           MS. LUKEY:  Given that I -- if your answer is

5    right now, then we probably are fine with getting the answer

6    right now without briefing.

7           MR. LIBLING:  I suppose the only thing I would

8    say, Your Honor, is that the -- the rule -- I have it written

9    down.  That's not the right piece of paper.

10          THE COURT:  Let me just tell you --

11          MR. LIBLING:  The rule is --

12          THE COURT:  -- that because -- because the motion

13   is granted in part and denied in part, by the ruling itself

14   it -- there's a -- there's a reasonable basis for the parties

15   to have objected to your motion.  And there was certainly a

16   reasonable basis for you to bring it.  So I'm not going to

17   award fees.  Right.  Why would I do that?

18          MR. LIBLING:  Understood, Your Honor.

19          THE COURT:  All right.  So both of the requests

20   for fees are denied.  I think all parties here are acting in

21   good faith.  I haven't seen any bad faith from anybody.  And

22   everybody's got a position, and they're arguing it

23   strenuously which is what you should do as lawyers.  So I

24   don't see a reason to award fees at this time.

25          MS. LUKEY:  Thank you, Your Honor.

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Motion Hearing
March 10, 2017

Page 90

```
 1            THE COURT:  Okay.  So just -- just so the record
 2    is clear for my clerk, 454 is denied without prejudice as
 3    moot based on the ruling on the other motion.  So you can
 4    re-bring it or bring it in another form if you think it's
 5    appropriate.
 6            Okay.  Anything else?
 7            MS. LUKEY:  So is April 13 off?  I think we got --
 8    and I don't really --
 9            THE COURT:  Oh, yes.  We'll vacate -- is that okay
10    with everybody?  Does anybody have a burning desire that they
11    want to keep that on the calendar?  You know, you don't have
12    much trouble getting on my calendar anyway because I don't
13    schedule trials until a final pretrial conference.  And so I
14    don't have a bunch of trials cluttering up that are all going
15    away anyway.  I found that too difficult to work with.
16            So -- so we'll vacate the hearing that's set for
17    9:30 on April 13, 2017.  And in lieu of setting another
18    status conference, just -- I'll just ask you to let me know
19    if you think that we should have a status conference if
20    things seem to be getting out of hand.  But I think we've
21    got -- everybody is well on track.  So I don't see any
22    problem there.
23            MR. LIBLING:  Thank you, Your Honor.
24            MS. LUKEY:  Thank you, Your Honor.
25            THE COURT:  All right.  We'll be in recess.
```

Johana Paola Beltran, et al. vs.
InterExchange, Inc., et al.

Motion Hearing
March 10, 2017

Page 91

```
 1            THE COURTROOM DEPUTY:  All rise.

 2            (Whereupon, the within hearing was then in

 3    conclusion at 10:35 a.m.)

 4

 5

 6            I certify that the foregoing is a correct

 7    transcript, to the best of my knowledge and belief (pursuant

 8    to the quality of the recording) from the record of

 9    proceedings in the above-entitled matter.

10

11

12

13    /s/ Laurel S. Tubbs                  March 13, 2017

14    Signature of Transcriber             Date

15

16

17

18

19

20

21

22

23

24

25
```