# Exhibit A

Case No. 1:14-cv-03074-CMA-KMT   Document 576-1   filed 06/15/17   USDC Colorado   pg 2 of 43

# Exhibit 84

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Case No. 14-cv-03074-CMA-KMT

_____

JOHANA PAOLA BELTRAN, ET AL.,

        Plaintiffs,

vs.

INTEREXCHANGE, INC., ET AL.,

        Defendants.

_____

VIDEOTAPED DEPOSITION OF

A. WILLIAM KAPLER, III

30(b)(6) REPRESENTATIVE FOR GOAUPAIR

MAY 11, 2017

DENVER, COLORADO

10:11 A.M.

Magna Legal Services

866-624-6221

www.magnals.com



Page 2

1          The videotaped deposition of

2   A. WILLIAM KAPLER, III, taken before Leeann Keenan, a

3   Registered Merit Reporter, Certified Realtime Reporter,

4   and a Notary Public in and for the County of Summit and

5   the State of Colorado, at 370 17th Street, Suite 4500,

6   Denver, Colorado, on Thursday, May 11, 2017, at the

7   hour of 10:11 a.m., pursuant to Notice.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Case No. 1:14-cv-03074-CMA-KMT   Document 558-37   filed 06/15/17   USDC Colorado   pg 5
of 43

```
 1   APPEARANCES:
 2
             BOISE, SCHILLER, FLEXNER, L.L.P.
 3           BY: JUAN P. VALDIVIESO, ESQ.
                 1999 Harrison Street
 4               Suite 900
                 Oakland, California  94612
 5               (510) 874-1010
                 appeared on behalf of the Plaintiffs
 6
             WHEELER, TRIGG, O'DONNELL
 7           BY: KATHRYN REILLY, ESQ.
                 370 17th Street
 8               Suite 4500
                 Denver, Colorado  80202
 9               (303) 244-1983
                 reilly@wtotrial.com
10               appeared on behalf of USAuPair, Inc.,
                 GoAuPair, and Au Pair International
11
             SHERMAN & HOWARD, L.L.C.
12           BY: JOSEPH HUNT, ESQ.
                 633 17th Street
13               Suite 3000
                 Denver, Colorado  80202
14               (303) 299-8194
                 jhunt@shermanhoward.com
15               appeared by telephone on behalf of
                 InterExchange, Inc.
16
             HOLLAND & HART
17           BY: JONATHAN BENDER, ESQ.
                 555 17th Street
18               Suite 3200
                 Denver, Colorado  80202
19               (303) 295-8456
                 jsbender@hollandhart.com
20               appeared on behalf of Cultural
                 Homestay International
21
             LEWIS, ROCA, ROTHGERBER, CHRISTIE
22           BY: JESSICA FULLER, ESQ.
                 1200 17th Street
23               Suite 3000
                 Denver, Colorado  80202
24               (303) 628-9527
                 appeared on behalf of Cultural Care
25
```



```
 1    APPEARANCES CONTINUED:
 2
              GORDON & REES
 3            BY: JENNIFER W. VEDRA, ESQ.
                  555 17th Street
 4                Suite 3400
                  Denver, Colorado  80202
 5                (303) 200-6888
                  jverda@gordonrees.com
 6                appeared by telephone on behalf of
                  AuPairCare, Inc.
 7
              BROWNSTEIN, HYATT, FARBER, SCHRECK
 8            BY: MARTHA FITZGERALD, ESQ.
                  410 17th Street
 9                Suite 2200
                  Denver, Colorado  80202
10                (303) 223-1100
                  mfitzgerald@bhfs.com
11                appeared by telephone on behalf of
                  EuRaupair InterCultural Child Care
12                Programs
13            NIXON, SHEFRIN, HENSEN, OGBURN
              BY: MICHAEL DREW, ESQ.
14                5619 DTC Parkway
                  Suite 1200
15                Greenwood Village, Colorado  80111
                  (303) 773-3500
16                mdrew@nixonshefrin.com
                  appeared by telephone on behalf of
17                ProAuPair and International Au Pair
                  Exchange
18
19
      ALSO PRESENT: Davis Baumunk, Videographer
20
21
22
23
24
25
```



Page 5

1                      I   N   D   E   X
2
   DEPOSITION WITNESS:                                    PAGE
3  A. WILLIAM KAPLER, III
4  Examination by Mr. Schwartz                               7
5
   PLAINTIFFS' DEPOSITION EXHIBITS MARKED:
6  NO.            DESCRIPTION                             PAGE
7  Exhibit 1    Notice of 30(b)(6) Deposition of           10
                GoAuPair Operations, LLC d/b/a
8               GoAuPair
9  Exhibit 2    July 23 through 24, 2009 e-mail chain      41
                between Cara Stewart, Devon Kapler,
10              and others
                GAP_00009924 - 9925
11
   Exhibit 3    "About Us" section of GoAuPair             51
12              website
13 Exhibit 4    June 3 through August 4, 2009 e-mail       75
                chain between Tyillere Hansen and
14              Edina Stone and Devon Kapler
                GAP_00009902 - 9904
15
   Exhibit 5    "Apply Now" 2012 section of GoAuPair       79
16              website
                GAP_00046733 - 46734
17
   Exhibit 6    "What is AuPair Child Care?"               83
18
   Exhibit 7    "Steps to Become and AuPair"              101
19
   Exhibit 8    September 3 through September 5,          107
20              2014 e-mail string between Tessa Dean
                and Dena Loveless
21              GAP_00009109 - 9119
22 Exhibit 9    Local Area Representative Manual          126
                GAP_00015599 - 15644
23
   Exhibit 10   2012 International Representative         128
24              Manual
                GAP_00006982 - 7017
25



```
                                                         Page 6
 1    PLAINTIFFS' DEPOSITION EXHIBITS MARKED:
      NO.              DESCRIPTION                       PAGE
 2
      Exhibit 11   2013 Annual Department of State Audit 132
 3                 GAP_00010764 - 11040
 4    Exhibit 12   CONFIDENTIAL
                   October 25 through 30, 2012 e-mail    145
 5                 chain between Mark Overmann and
                   Stacey Frank
 6                 AAP_0000938 - 941
 7    Exhibit 13   April 14, 2011 e-mail from Michael    169
                   McCarry to multiple recipients with
 8                 attached April 19, 2011 Alliance
                   Meeting Agenda Items
 9                 EPA0001552 - 1554
10    Exhibit 14   January 25, 2012 e-mail from Michael  173
                   McCarry to Michael McCarry with
11                 attached April 19, 2011 Aur Pair
                   Sponsor Meeting with ECA notes
12                 InterExchange0005364 - 5368
13    Exhibit 15   March 4, 2013 WETM-IAC Rome Attendees 198
                   IAPA_00079 - 83
14
      Exhibit 16   August 2, 2011 e-mail from Heidi      203
15                 Woehl to multiple recipients with
                   attached June 27, 2011 e-mail
16                 EAP0001557 - 1559
17    Exhibit 17   December 23 - 24, 2014 e-mail chain   208
                   between Tanna Wilson and Michael
18                 McHugh
                   GAP_00003903 - 3905
19
      Exhibit 18   December 23, 2014 e-mail from Tanna   215
20                 Wilson to Michael McHugh
                   GAP_00003305
21
      Exhibit 19   December 24 through 25, 2014 e-mail   220
22                 chain between Susan Hayes and Tanna
                   Wilson
23                 GAP_00003308 - 3309
24    Exhibit 20   February 19, 2016 e-mail from Ilir    224
                   Zherka to multiple recipients
25                 ExpertAuPair028121 - 281226
```



MAGNA
LEGAL SERVICES

Case 1:14-cv-03074-CMA-KMT   Document 558-87   Filed 06/02/17   USDC Colorado   Page 8 of 42

Page 7

```
 1                      P R O C E E D I N G S
 2                 THE VIDEOGRAPHER:  We are now on the
 3      record.  This begins videotape No. 1 in the
 4      deposition of A. William Kapler, III, 30(b)(6)
 5      representative for GoAuPair in the matter of Johana
 6      Paola Beltran, et al. versus InterExchange, et al.
 7      in the United States District Court for the District
 8      of Colorado, Case No. 14-cv-03074-CMA-KMT.
 9                      Today is May 11th, 2017 and the
10      time is 10:11.  This deposition is being taken at
11      370 17th Street, Denver, Colorado at request of
12      counsel for plaintiff.
13                      The videographer is Davis Baumunk.
14      The court reporter is Leeann Keenan of Magna Legal
15      Services.  All counsel will be noted on the
16      stenographic record.  Will the court reporter please
17      swear in the witness.
18                      (Witness duly sworn.)
19                      A. WILLIAM KAPLER, III,
20      having been first duly sworn, was examined and
21      testified as follows:
22                      EXAMINATION
23      BY MR. VALDIVIESO:
24          Q.    Good morning, Mr. Kapler.
25          A.    How are you?
```



Page 29

```
 1        A.      International Nanny Association.

 2        Q.      When did you get rid of your association

 3   with INA?

 4        A.      I don't know exactly when, but it was

 5   early on.  It provided no value for us.

 6        Q.      Was GoAuPair ever in the nanny business?

 7        A.      Yes.

 8        Q.      Let's back up.

 9                What is the nanny business?

10        A.      I'm not that familiar with it, but it's

11   the business where an agency basically does vetting

12   of -- of nannies and then potential families,

13   basically use the -- what do you want to call it --

14   the vetting process to the agency, and then they

15   have the nanny paid directly with the -- between the

16   family and the nannies.

17        Q.      And that was a business that GoAuPair was

18   in when you purchased it, and you continued doing

19   that business for a period of time; is that right?

20        A.      Yes.  When I -- when I -- when I bought

21   the company, there were maybe two or three nannies

22   that we were using.  And we basically wound up not

23   involving that at all, so it was a very quick --

24   there weren't many to start when I bought the

25   company, and we basically got out of that business.
```



1    Q.    Why did you get out of the business?

2    A.    Too hard to work with.

3    Q.    What was --

4    A.    Too --

5    Q.    -- hard about it?

6    A.    Too -- too competitive.

7    Q.    Other than the nanny business and the

8    au pair program, has GoAuPair participated in any

9    other aspect of childcare?

10    A.    I would call -- I would not -- I would

11    not say so.

12    Q.    During your time that you've owned the

13    company?

14    A.    Correct.  That's correct.

15    Q.    Does GoAuPair belong to any organizations

16    or groups having to do with the work travel

17    industry?

18    A.    What was it?

19    Q.    Work travel.

20    A.    What about it?

21    Q.    Are you familiar with the term --

22    A.    Yes, I am.

23    Q.    -- work travel?

24    A.    Yes, I am.

25    Q.    Does GoAuPair belong to any organizations



Page 31

1   or groups related to work travel?

2          A.     No, we do not.

3          Q.     Does GoAuPair belong to any organizations

4   or groups related to cultural exchange?

5          A.     Yes, we do.

6          Q.     Which groups?

7          A.     IAPA.

8          Q.     Any others?

9          A.     I guess you would call -- what -- what --

10  I guess you'd call it the Alliance.  I mean, I don't

11  know the answer you wanted me to get, so -- as well

12  as with cultural exchange, we involve the Alliance

13  and IAPA.

14         Q.     What is your understanding of IAPA,

15  IAPA's mission, if any?

16         A.     IAPA is this intergalactic international

17  association that has a lot of members from all over

18  the world.  And their mission, I guess -- I'd have

19  to read the website, so just -- but if you ask me

20  personally, I would say it's their goal to make sure

21  that there's high standards.  And using au pairs

22  going across borders, to make sure that they're

23  safe.

24         Q.     And do you have any understanding of what

25  the Alliance's mission is?



```
1                    They then perform the function of

2    doing the initial collection of documentation and

3    vetting, and then they will do some support in

4    trying to get the au pair ready to get their visas.

5         Q.    When you work with international --

6    strike that.

7                    What -- what is -- what kind of

8    relationship does GoAuPair have with its

9    international representatives?

10        A.    What do you mean by "relationship"?

11        Q.    Does it have a contractual relationship

12   with those?

13        A.    Yes, we do.  We have a -- a contract

14   every year for every single one of the international

15   reps.

16        Q.    Is that contract a standard contract?

17        A.    Most of it's standard.  There are

18   sections that allow us to put in specifics related

19   to fees and things like that.

20        Q.    Does GoAuPair have an ownership interest

21   in any of the international representatives with

22   whom it works?

23        A.    No, it does not.

24        Q.    Has it ever, to your knowledge?

25        A.    No, it has not.  Not -- not under me,
```



Page 60

1    anyway.

11        Q.      So to obtain the marginal profit --

12        A.      Okay.

13        Q.      -- you would subtract some costs; is that

14   right?

15        A.      Yes, that's correct.

16        Q.      What are some of the major categories of

17   those costs?

18        A.      Okay.  On a general basis there are

19   associations with the au pairs.  So a big chunk

20   would be flights, how we classify it.  Another chunk

21   would be medical insurance.

22        Q.      Are salaries a cost?

23        A.      Well, I have to finish the list.

24        Q.      Oh, I'm sorry.  Please go ahead.  I --

25        A.      So --



Page 61

1    Q.    -- apologize for interrupting.

2    A.    -- another -- another major chunk would

3    be cost to the international reps.  So we pay them a

4    commission when an au pair arrives here to the

5    United States.

6              We have a significant amount of

7    cost to our local area reps.  Those people are all

8    independent contractors, and they get paid on a

9    basically a piecemeal basis.

10             We have employees at GoAuPair.  So

11   that's answering your questions about salaries.

12   There's roughly 15 people or so.  We have a couple

13   of part-time consultants for IT and for accounting

14   and stuff.  Then we have a bunch of your typical

15   administrative-type things like postage and T&E and

16   stuff like that.

17             We also have a fair amount of

18   costs on IT.  So it would be things related to data

19   center stuff we have and licenses and things like

20   that.  So those would be, off the top of my head,

21   the major costs.

22   Q.    Is advertising or marketing a component

23   of your cost?

24   A.    Yes, it is.

25   Q.    You've listed several categories.  Of the



Page 95

1    uses video?

2        A.    Yes, we do.

3        Q.    Why do you use video?

4        A.    It's a good way to communicate to people.

5    Also we use it -- well, you said on the -- on the

6    website.

7              Yeah.  It's a good way to kind of

8    sum -- summarize information easily to people on the

9    site.

10       Q.    And when you say "people on the site,"

11   what type of people generally visit your website?

12       A.    Most of them are families, some au pairs.

13       Q.    Who approves the videos that go on

14   GoAuPair's website?

15       A.    Probably the person in charge of

16   marketing.  And maybe Devon's reviewed some of them,

17   but it would probably be by either Brian Alexander,

18   is probably who -- I don't know what -- what year

19   this is because...

20       Q.    So I'm going to show you a video that --

21             MR. VALDIVIESO:  For the people on

22   the phone, this video is from the current website at

23   www.GoAuPair.com/hostfamilies/program costs, and

24   it's currently available.  We're actually accessing

25   it via WiFi live right now.



Page 96

1              (Whereupon, a video played.)

2        Q.    I'm going to pause for a second right

3   there.

4              The video just described the

5   stipend.  Is that fair to say?

6        A.    Yes.  As an --

7        Q.    Did it --

8        A.    As an example, yes.

9        Q.    Did it mention anything about the stipend

10  being a minimum?

11       A.    No, it did not.

12       Q.    I'm going to continue playing the video.

13             (Whereupon, a video played.)

14       Q.    I'm going to pause it for a second there.

15             The last slide showed the stipend,

16  did it not?

17       A.    Yes, it did.

18       Q.    Did it describe the stipend as a minimum?

19       A.    No, it did not.

20       Q.    Did it suggest that it was anything other

21  than 195.75?

22       A.    Did it -- it didn't suggest anything.

23  It's an example.

24       Q.    But the example that it gave was 195.75;

25  is that right?



Page 97

```
 1        A.     That is correct.

 2               (Whereupon, a video played.)

 3        Q.     In the last slide we just saw, is the

 4  affordability of the au pair program something that

 5  this video promotes?

 6        A.     Correct.  Yes.

 7        Q.     And is the 195.75 stipend a component

 8  that goes into making the program affordable?

 9        A.     Say -- say it again.

10        Q.     Is the 195.75 stipend described in this

11  video a component that goes towards making the

12  program affordable?

13        A.     It includes part of what the total cost

14  is.  The individual can determine whether it's

15  affordable or not.

16        Q.     Does GoAuPair present the total cost as

17  affordable?

18        A.     We believe it is affordable.

19               (Whereupon, a video played.)

20               MS. REILLY:  Are we watching it

21  again?

22               MR. VALDIVIESO:  I think -- I

23  think -- I apologize.

24               THE WITNESS:  I think we went to

25  the --
```



Page 121

1    reps, families, or au pairs, along with GoAuPair

2    Operations, L.L.C.

3          Q.    What leads you to believe that?

4          A.    Huh?

5          Q.    What leads you to believe that?

6          A.    Why would I believe that?  Because I

7    be -- that's what our contracts say.  If you look at

8    the contracts, it shows who the entity is that we're

9    signing with.

10         Q.    What are the types of contracts that make

11   up the operation of the GoAuPair program?

12         A.    The types of contracts in what level?  I

13   mean, do you want me to have contracts with IT

14   providers, or are you looking for -- just for

15   families, or which?

16         Q.    Let's start with families.

17         A.    Okay.  With families we have a -- an

18   agreement between us and the host families.  It's

19   called the Host Family Agreement.

20         Q.    Are there any other contracts involving

21   families?

22         A.    There are attachments to that, which I

23   consider them to be pieces of that agreement, but --

24   okay.  Yes, sir.  Good.  Thank you.  Good to ask.

25   Good question.



1           So there's an overall agreement

2    that's done once, that basically is kind of an

3    overall agreement between GoAuPair and -- and the

4    host family.

5           And then for every single

6    placement there's something called an Appendix A,

7    that is basically the agreement for that particular

8    au pair.  So if they have four au pairs, they'll

9    have four Appendix As.  So that's how that

10   agreement -- how that agreements were.

11       Q.    And is there an agreement between

12   GoAuPair and just the au pair?

13       A.    Yes.  We have an agreement between the

14   GoAuPair and the au pair.

15       Q.    And is there an agreement between the

16   host family and the au pair?

17       A.    Between the host family and the au pair,

18   yes, there is.  There is an agreement.  We call it

19   the CCS -- CCSA, Childcare Services Agreement, and

20   that is a standard contract.

21           In addition to that, we attach to

22   that the orientation as a piece -- a piece of that.

23       Q.    And does GoAuPair publish resource guides

24   or training manuals for various players in the

25   GoAuPair program?



```
 1        A.    We do have -- when you say "players,"
 2   could you be a little more specific which --
 3        Q.    I think you've mentioned a few characters
 4   in the GoAuPair process.  I think you've mentioned
 5   LARs --
 6        A.    Okay.
 7        Q.    -- as one?
 8        A.    Okay.
 9        Q.    I think you mentioned au pairs?
10        A.    Okay.
11        Q.    You mentioned host families?
12        A.    Okay.
13        Q.    Do you think there are any other major
14   players in the GoAuPair --
15        A.    As far as training?
16        Q.    -- au pair program.
17        A.    Training program?  Yeah, I would include
18   the LARs with that.
19        Q.    And do you -- is there a -- a resource
20   guide or a manual used in -- as a reference for any
21   of those?
22        A.    Yes, we do.
23        Q.    Which -- which publications do you
24   produce?
25        A.    We have a general -- I'll just call it a
```



 1       A.    We do have -- when you say "players,"

 2   could you be a little more specific which --

 3       Q.    I think you've mentioned a few characters

 4   in the GoAuPair process.  I think you've mentioned

 5   LARs --

 6       A.    Okay.

 7       Q.    -- as one?

 8       A.    Okay.

 9       Q.    I think you mentioned au pairs?

10       A.    Okay.

11       Q.    You mentioned host families?

12       A.    Okay.

13       Q.    Do you think there are any other major

14   players in the GoAuPair --

15       A.    As far as training?

16       Q.    -- au pair program.

17       A.    Training program?  Yeah, I would include

18   the LARs with that.

19       Q.    And do you -- is there a -- a resource

20   guide or a manual used in -- as a reference for any

21   of those?

22       A.    Yes, we do.

23       Q.    Which -- which publications do you

24   produce?

25       A.    We have a general -- I'll just call it a



Page 124

1    general manual that is -- I -- I can't -- I can't

2    guarantee exactly which people have it right now

3    because we're still in the process of rolling it

4    out.

5                      But that would be sort of a

6    summary bit of information that talks about what's

7    the general program, how do you go through and be

8    vetted, how do you do matching, and stuff like that.

9    So that eventually that will given to everybody.

10                      Specifically let's go back to your

11   list.  For the international reps we would have a

12   training, where we bring in a new international rep.

13   They would be given a PowerPoint and be going

14   through with probably -- or Megan, and basically go

15   through what the experience is of what you have to

16   go through to basically complete all the appl -- all

17   the components of the au pair's application.

18                      And then we would then monitor it

19   very closely for the first X number of months or

20   applications to make sure that it's done right and

21   thoroughly and stuff like that.  So that would be

22   the training with the IRs.

23                      With the families, there really is

24   a limited amount of stuff that they would get that

25   they call training.  Although if you look at the



1    site visit, that is really kind of our opportunity

2    to sort of run the overall -- understand the

3    basic -- once again, still at the high level of

4    understanding what are all the components of the

5    au pair program.

6                      The au pairs, from us they get the

7    training, which is the 32 hours.

8                      In the case of our LARs, the LARs

9    have initial training.  When we hire new ones of

10   those, they are then shadowed by some of our

11   experienced people for the first year.  And then

12   periodically we will have sort of updates on new

13   releases, new things we've done, things like that.

14                     So when we -- that -- that's

15   pretty much the -- the training that we have for all

16   the major stakeholders.

17       Q.    The general manual that you're

18   describing -- that you described at the beginning of

19   your list.

20       A.    Uh-huh.

21       Q.    Is the intended -- who is the intended --

22   intended audience of that manual?

23       A.    Eventually it will be everybody, so

24   everybody will see the same thing.  In the past

25   we've had things like that, and you have three or



1    four versions of them, and then somebody changes one

2    and they don't change the other.

3                    So we -- we -- we basically

4    decided we're going to have a single one that

5    everybody could use at the highest level.  So

6    there's only one version, updated once.  Those

7    sections have been provided to you guys.

8         Q.    You've provided us a lot of materials.

9         A.    You asked for a lot.  I'm very thorough.

10   I will tell you that this business is a lot more

11   complicated than I ever thought it was going to be.

12        Q.    I'm going to mark --

13              MR. VALDIVIESO:  For those of you on

14   the phone, I'm marking GAP 6982.

15                    (Exhibit No. 9 was marked.)

16        Q.    This is Exhibit 9.

17        A.    That's a thick one.

18              MR. VALDIVIESO:  I only have one of

19   these for you guys.  I'm sorry.

20        Q.    I'm not going to go into a lot of

21   detail --

22        A.    Uh-huh.

23        Q.    -- on this document.  So you're free to

24   read the whole thing.

25        A.    At my leisure?



1          Q.     Well, my -- my --

2                 MS. REILLY:  Take the rest of your

3     time up here.

4          Q.     My -- my -- my question is do you

5     recognize this document?

6          A.     Yes, I do.  This -- this looks like this

7     is a -- an amalgamation of the -- the general

8     information that we talked about.  And -- and the

9     way we've set this up is that if somebody -- one of

10    the stakeholders in this case, the local area rep,

11    there should be a very more detailed section that

12    talks about what's relevant to them.

13                Now, I would have to look through

14    and see if it's totally complete yet, but that's the

15    intent.  Most of the things I have, looking here,

16    look like they're -- they're general stuff.  It

17    looks like they don't have a -- let me just look at

18    one.

19                Let's see.  No. 7.  Where's No. 7.

20    Yeah.  Okay.  So for here, if you look at No. 7.

21         Q.     Uh-huh.  Yes.

22         A.     You'll see Chapter 7 has orientation

23    requirements.  Those are the basic of what it is,

24    and this is something that kind of everybody needs

25    to know.  There will be an additional -- if it's not



Page 141

```
 1        Q.    Do you have a general sense on whether
 2   it's working in the way that you intended it to
 3   work?
 4        A.    We don't monitor the wage logs thing
 5   meticulously because it's really between the au pair
 6   and the family, so that could be a potential loop.
 7   But -- but as far as overall, the logic makes sense.
 8   It's all there for people to do, to happen.  And
 9   they're all told how to do this as part of the
10   orientation.  So in some cases you can get the horse
11   to -- get the horse to water, but you can't have
12   them drink, so...
13        Q.    And is it right that -- are -- are the
14   au pairs provided some sort of log to keep their
15   hours?
16        A.    Yes.
17        Q.    And does GoAuPair collect that log at
18   some point?
19        A.    No, we do not.
20        Q.    Why not?
21        A.    It's not our responsibility.  We're not
22   the employer for the au pair.  We ask them to
23   provide it if there's -- if there's a dispute, we
24   say, "Well, show me the -- then show us the
25   results."  Because it's hard in month 10 for
```



Page 142

1    somebody to say, "Well, I've been working for these

2    hours," whatever, "and I didn't get" -- you know,

3    let's -- let's show it on a contemporaneous basis

4    because people have a habit of historical -- what's

5    the right term?  Changing the stories over time.

6                    We did provide you a log of this

7    thing, if you want to actually look at it.  I don't

8    know what the Bates number is, but it is there,

9    somewhere between before -- I don't know if it's

10    before or under the 11,000, but -- but it is in

11    there.  It's a two-page thing.  It's on both -- you

12    know, same thing on both sides.

13        Q.    Are you familiar with the term

14    "responsible officer"?

15        A.    Yes, I am.

16        Q.    What is the responsible officer?

17        A.    That is the person who's the primary

18    person at the Department of State that is

19    responsible for the relationship and stuff, and

20    basically improving whether there's going to be a --

21    what is it, AROs, which is the alternate --

22        Q.    Who --

23        A.    -- responsible officer.

24        Q.    Who is the responsible officer at

25    GoAuPair?



Page 143

```
 1        A.     That is me.

 2        Q.     Does GoAuPair have any AROs?

 3        A.     Yes, we do.

 4        Q.     Who -- who is an ARO?

 5        A.     Right now I think I'm missing one.  I

 6   know two that definitely are.  I know that Tanna

 7   Wilson is.  I know that Megan Ramirez is.  And there

 8   may be a third, but I don't know for sure.  I'd have

 9   to look on the website.

10        Q.     What is your duty as the responsible

11   officer?

12        A.     I don't do much because I have all those

13   other people do all the details, which is basically

14   recording information into the SEVIS.  My role, what

15   I do, is I authorize them once a year, and that's --

16   you know, I have them do most of the work.

17        Q.     Do you attend any meetings with the

18   Department of State on behalf of GoAuPair?

19        A.     Yes, I have.

20        Q.     How many meetings have you attended with

21   the Department of State?

22        A.     Oh, wow.  I'm going to say that almost

23   once a year with the Alliance annual meeting.  The

24   Alliance has a -- what's the right term?  A -- they

25   have a bunch of side conferences and stuff.
```



Page 162

1   after, you're saying, or before we talked about

2   we --

3        Q.    I'm sorry, that was confusing.

4        A.    Okay.

5        Q.    I'll break it down for you.

6        A.    I want to make sure it's right.

7        Q.    Prior to 2014, before this lawsuit was

8   filed, do you recall discussing the issue of wages

9   and hours with any of the people listed on this

10  list?

11       A.    I probably either listened, or as part of

12  the standard meeting that the Department of State

13  had and the Alliance, Michael McHugh probably made

14  comments about what they were doing on -- on hours

15  logs type of stuff.

16       Q.    What do you recall Mr. McHugh saying

17  about the logs?

18       A.    The Department of State basically -- this

19  is in -- this was in a -- an Alliance meeting where

20  all the sponsors were there, and the Department of

21  State was describing stuff people are doing.

22              InterExchange was highlighted

23  as -- you know, a handful of things they were doing.

24  They talked about their bracelet they used for their

25  800 -- 40 -- or 24-hour thing.  It had a phone



Page 163

1    number on it.  And then they did talk about what

2    they were doing in the way of their hours log thing

3    they were doing.  But that was just in the context

4    of recording hours.  That's why I wanted to know

5    whether you were asking -- specifically what you

6    were asking for.

7         Q.    I'm being -- I'm being somewhat general

8    about the term.  I'm not limiting it to --

9         A.    Yeah.

10        Q.    -- to logs.

11        A.    Yeah, that was -- okay.  Well, that

12   was -- it was logs, I mean.

13        Q.    And if you -- if you recall any

14   conversations beyond the topic of logs that's still

15   relevant to the issue of wages and hours, that would

16   be relevant --

17        A.    Yeah.

18        Q.    -- to the question I asked.

19        A.    Yeah.  No.  I'm trying to understand.  I

20   -- I -- yeah, I can't think of any.

21        Q.    Okay.

22        A.    I mean.

23        Q.    Do you recall when that conversation with

24   Mr. McHugh occurred?

25        A.    On logs, no, I don't.



Page 164

```
 1        Q.     Do you recall whether it was before or

 2   after the audit report that we looked at, when

 3   you -- you told the Department of State that you

 4   were considering implementing --

 5        A.     I -- I -- I don't know.

 6        Q.     -- changes?

 7        A.     I mean, I really can't -- I -- I -- I

 8   don't know.  I mean, it wasn't that big of a deal,

 9   so...

10        Q.     Do you recall --

11        A.     I didn't like what they were doing, so --

12   so...

13        Q.     Why didn't you like what they were doing?

14        A.     I just thought it was way too detailed,

15   onerous.

16        Q.     Was that your only concern?

17        A.     Yeah.

18        Q.     Do you recall anyone ever voicing a

19   concern that being too involved in logging hours

20   would result in the sponsor being determined to be

21   an employer?

22        A.     No, that was never discussed.

23        Q.     Do you recall sharing with Mr. McHugh

24   what GoAuPair did with respect to logging hours?

25        A.     No, we did not.
```



1       Q.     So your testimony -- is it fair to say

2     that your testimony is in that conversation you were

3     just a listener?

4       A.     That is correct.

5       Q.     Even though you didn't like what he was

6     doing, is it fair to say that eventually you did

7     something similar?

8       A.     Conceptually, yes, but very different

9     than what they actually did.

10      Q.     What do you understand the differences to

11    be?

12      A.     Sure.

13             They had a -- a whole little

14    binder where they were recording, you know, starts

15    and times every day, what somebody was doing, and

16    then calculating what the hours were for each --

17    each day.  And it just seemed to be overkill,

18    especially given the objectives we had anyway.

19      Q.     Did you consider what InterExchange was

20    doing when crafting the changes to policies that you

21    made?

22      A.     I -- I mean, obviously it's in the

23    general area, so you look at input and then you

24    decide what you want to do.  So in a general basis,

25    yeah, their input was -- something was input of, but



Page 166

1    it wasn't output.  It wasn't -- it didn't create the

2    output.

3        Q.    Are you aware of any other sponsors that

4    took steps to log hours?

5        A.    No, I am not.  I have no idea.  We never

6    talked about other people.  The only thing we talked

7    about was in the context of we're in a meeting with

8    the Department of State and, you know, 10 people.

9    And the comment came up, "Well, hey, here's

10   companies that are doing great things."  The

11   Department of State sort of shows these things.  So

12   I'm just saying what the context was.  This was not

13   that -- not a --

14       Q.    It's not unusual at a Department of State

15   meetings for sponsors to share what they're doing?

16             MS. REILLY:  Objection.  That

17   mischaracterizes what he just said.  He said

18   Department of State shared that.

19       Q.    Is your testimony that you're --

20   you're -- in the context of you're in a meeting with

21   the Department of State with 10 people, and the

22   comment came up, "Here's companies that are doing

23   great things"?

24       A.    Correct.

25       Q.    Who was the comment coming from in the --



Page 167

1    the description that you gave?

2        A.    Oh, who was having good things, was the

3    Department of State people were saying, "Here's" --

4    "here's" -- they're big on continual improvement,

5    and they have a better term.  But anyway, I'll just

6    call it my term, continual improvement.

7                So oftentimes they will go through

8    and say, okay, here's some things we're finding

9    other sponsors doing that are best practices, and

10   they'll talk about it in an anonymous basis.  In

11   this case they didn't.

12       Q.    In this case they didn't what?

13       A.    They -- they -- they didn't do it on an

14   anonymous basis.  They actually notified -- they

15   said that, you know, "InterExchange is doing this

16   and this and this."

17       Q.    I'm -- I'm confused.

18       A.    Okay.

19       Q.    I -- I thought -- I thought you told us

20   that Mr. McHugh told you what InterExchange was

21   doing with respect to its logs?

22       A.    Oh, okay.  Okay.  I'm sorry.

23                So the context is is that we're at

24   a meeting.  Department of State is at the top, and

25   one of the topics they had was here's some best



1   practices we're doing over the course of the year.

2              They talked specifically about

3   InterExchange was doing, in one case was the -- the

4   wristband in order to get the 800 number, their 8 --

5   24-hour number.  And they also said about whatever

6   they're doing in this area of recording logs and

7   hours and stuff like that, and they showed the stuff

8   like this (indicating).  So that's what was said.

9              And then Michael was there, and I

10  said, "Well, what -- what -- what was that?"

11             And he said, "Oh, it's this."  And

12  he -- he showed exactly what she had shown, but

13  obviously she was going like this (indicating) and

14  I -- I wasn't right in front of it.  So that's --

15  that's what the context was.

16      Q.    So you learned that information both from

17  the Department of State and from Mr. McHugh?

18      A.    Correct.  Yes.

19      Q.    Thank you for clarifying that.

20      A.    No, no problem.  My wife tells me I'm not

21  too clear on some of these things too, so you're not

22  the first person to say that.

23      Q.    I'm going to apologize to the court

24  reporter for handing a stapled document to the

25  witness, but I don't have one with a paperclip,



Page 169

1    unfortunately.

2                    (Exhibit No. 13 was marked.)

3        Q.    I'm marking what's Bates stamped EAP1552.

4    This document does not bear any confidentiality

5    designation.  And that includes a -- an attachment.

6                    MR. VALDIVIESO:  I apologize to

7    counsel, but it is stapled in the wrong order, so

8    I've folded it into the appropriate order.

9                    MS. FULLER:  Got it.

10                   MR. VALDIVIESO:  Oh, and I need one

11   of those.  I'm sorry.

12                   (Witness peruses document.)

13       A.    The 19th.  Okay.  This looks like it's

14   the same thing.  Is that -- am I looking at this

15   right, or -- okay.  These looks like these are the

16   same, just in a different sequence.  Okay.

17       Q.    Yeah, I think I might have included two

18   copies of the --

19       A.    Yes.  Yes.

20       Q.    -- attachment?

21       A.    Do you want one back?  There you go.

22       Q.    Sure.

23       A.    Okay.

24       Q.    Do you recognize Exhibit 13, Mr. Kapler?

25       A.    Specifically, no, I do not.  But



Page 189

1    A.    Not specifically.  In the case of this

2    example -- I'll give you an example potential -- I

3    don't know specifically.  But weekend education is

4    not allowed, according to my interpretation of what

5    the Department of State's regulations are.  Yet we

6    receive e-mails from two or three different

7    institutions that say, hey, we have this au pair

8    program over a weekend.  Why don't you guys be part

9    of it.

10                So obviously somebody must be

11   doing it, and we have a just different, totally

12   different interpretation as to what the department

13   said versus what somebody else apparently is doing.

14   So that would be an example of how I would have very

15   specific information about something with education.

16   Q.    What I'm trying to understand, and I'm

17   not trying to beat a dead horse.

18   A.    That's okay.

19   Q.    I'm trying to understand whether the

20   examples that you're giving are hypothetical or

21   whether they are things that actually occurred?

22   A.    In the case of education I just said, it

23   would be specific.  I can't remember the exact

24   college, but it would be, like, CW Post or something

25   in the Bay Area, that where they do stuff like that.



Page 190

1    Q.    Scrolling a few lines down.

2    A.    Uh-huh.

3    Q.    It says, "To remind re the Feb 9 details:

4    10:00 a.m. - Alliance sponsors convene at Alliance

5    for prep meeting."

6            Do you see that?

7    A.    Yes.

8    Q.    Do you have an understanding as to why a

9    prep meeting is convened prior to meeting with ECA?

10   A.    To consolidate and synthesize people's

11   point of view so we don't have everybody going off

12   the place.  Make it more efficient.

13   Q.    Can you explain how the various sponsors

14   go about consolidating and synthesizing a point of

15   view?

16            MS. FULLER:  Objection.  Form.

17   Foundation.

18   A.    Say the question again, just so I

19   understand.

20   Q.    You testified -- I asked you if you had

21   an understanding as to why a prep meeting is

22   convened prior to meeting with ECA.

23   A.    Right.

24   Q.    And you stated it was to consolidate and

25   synthesize people's point of view so we don't have



Page 191

1    everybody going off the place.

2         A.    Okay.

3         Q.    What is your basis for that

4    understanding?

5         A.    Basic man -- business management, meeting

6    management.

7         Q.    In this particular 10:00 a.m. prep

8    meeting, do you recall if Ms. Ferry was the chair of

9    the meeting?

10        A.    I would not -- I -- I don't -- I don't

11   know.  That's very specific.

12        Q.    I think you referred to her at some point

13   as a chair --

14        A.    Right.

15        Q.    -- of something?

16        A.    Yes.

17        Q.    What -- what was Ms. Ferry a chair of?

18        A.    The au pair task force, I'll call it,

19   that group of -- of au pair sponsors.

20        Q.    Is that a -- is that an -- an official

21   title?

22        A.    I don't know why the -- the Alliance says

23   that.  That's what they -- I have no idea, other

24   than that's what you saw on the e-mail I saw.

25        Q.    Do you believe that Ms. Ferry was the



Page 205

1      A.      Okay.

2      Q.      Who is Heidi Woehl, do you know?

3      A.      At that time she was one of the higher

4   executive people at AuPairCare.

5      Q.      Do you know her?

6      A.      I've met her, yes.

7      Q.      What do you understand from reading this

8   document now what this situation was?

9      A.      Well, from here, my -- my understanding

10   is that apparently there is this woman called Marie

11   Vaugh who set up a website called

12   AuPairSelectionAdvice.Net, and it looks like she has

13   some sort of list of au pairs that she's putting in

14   as being available.

15                      And in this case, it looks like

16   they actually used one of the one, a specific

17   au pair that was being -- that was a participant in

18   the au pair program for AuPairCare.

19                      And then later on it says that she

20   is basically going through and trying to have fees,

21   services to pay -- to -- to incur -- I'm sorry, to

22   have host families pay a fee for finding out this

23   au pair, who actually is an AuPairCare participant.

24      Q.      So in that last -- last paragraph it

25   says, "AuPairCare will be following up with Marie



1    Vaugh about our concerns and request that au pair

2    information that she's taken from our site be

3    removed immediately from hers."

4         A.   Uh-huh.

5         Q.   "It's highly likely au pairs from other

6    sponsors are featured there too.  It might be good

7    if we are all sending a similar message."

8         A.   Uh-huh.

9         Q.   "Please let me know if you have any

10   questions."

11                  Did I read that correctly?

12        A.   Yes, you did.

13        Q.   Do you have any recollection of this

14   situation?

15        A.   No, I do not.  This is the first time I

16   recall -- I mean, yeah, I don't recall this at all.

17        Q.   Is AuPairCare a competitor of GoAuPair?

18        A.   Yes.

19        Q.   And do you think it's fair to say that

20   this e-mail appears to be alerting other sponsors

21   that Ms. Vaugh is putting information about their

22   au pairs on her website?

23        A.   Yes.

24        Q.   Do you think it's unusual for a

25   competitor to alert its other competitors that its

Page 207

1    information is being posted on a website?

2                    MS. REILLY:  Objection to form.

3                    Go ahead and answer.

4         A.    I think this is -- the concern here is,

5    A, stealing au pair information, which is serious,

6    to a third party.  And also the risks that whatever

7    this person is doing is basically trying to

8    potentially, you know, do abusive stuff with -- with

9    the family -- with the -- with the au pair.  So,

10   yes, I think that would be an industrywide issue.

11        Q.    Is your testimony that it is not unusual?

12        A.    It is usual.  But if I had those

13   things -- good -- good question.

14                    This is usual -- unusual as to --

15                    MS. REILLY:  Object to that question,

16   by the way.  Just let me get that in there.

17        A.    But in this situation it sounds like it

18   would warrant this.

19        Q.    Put Exhibit 16 to the side.

20                    Actually, one more follow-up

21   question.

22        A.    Sure.

23        Q.    Do you know if Go -- GoAuPair actually

24   contacted AuPairSelectionAdvice.Net?

25        A.    I do not know.

