# <u>EXHIBIT A</u>

# Exhibit 44

Page 1

THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

------------------------------x

JOHANA PAOLA BELTRAN, ET AL,

     Plaintiffs,

  v.     Civil Case No.

       14-cv-03074-CMA-KMT


INTEREXCHANGE, INC., ET AL.,

    Defendants.


------------------------------x



   CONFIDENTIAL VIDEOTAPED DEPOSITION

     OF RUTH FERRY

    NEW YORK, NEW YORK

   Thursday, May 11, 2017





Reported by:

JEREMY RICHMAN

JOB NO:  314334


   MAGNA LEGAL SERVICES

  320 West 37th Street, 12th Floor

   New York, New York 10018

    (866) 624-6221



Page 2

 1

 2

 3

 4                    May 11, 2017

 5                    9:11 a.m.

 6

 7          CONFIDENTIAL VIDEOTAPED DEPOSITION

 8   of RUTH FERRY, held at the offices of Boies

 9   Schiller & Flexner, 575 Lexington Avenue, New

10   York, New York, before JEREMY RICHMAN, a

11   Shorthand Reporter and Notary Public of the

12   State of New York

13

14

15

16

17

18

19

20

21

22

23

24

25



Page 3

1

2    A P P E A R A N C E S :

3

4    BOIES SCHILLER & FLEXNER

5    Attorneys for plaintiffs

6         575 Lexington Avenue

7         New York, NY 10022

8    BY:   RANDALL JACKSON, ESQ.

9         BYRON D.M. PACHECO, ESQ.

10        (rjackson@bsfllp.com)

11        (bpacheco@bsfllp.com)

12

13   PUTNEY, TWOMBLY, HALL & HIRSON, LLP

14   Attorneys for American Institute For Foreign

15   Study, Inc., d/b/a  Au Pair in America

16        521 Fifth Avenue

17        New York, NY 10175

18   BY:   STEPHEN J. MACRI, ESQ.

19        (smacri@putneylaw.com)

20

21

22

23

24

25



Case 1:14-cv-03074-CMA-KMT   Document 558-127   Filed 06/02/17   USDC Colorado   Page 5 of 44

```
                                                        Page 4

 1

 2    APPEARANCES (Continued):

 3

 4    GIBSON DUNN

 5    Attorneys for American Institute For Foreign

 6    Study, Inc., d/b/a  Au Pair in America

 7          200 Park Avenue

 8          New York, NY 10166-0193

 9    BY:   ERIC J. STOCK, ESQ.

10          (estock@gibsondunn.com)

11

12    SHERMAN & HOWARD

13    Attorneys for defendant InterExchange

14          633 Seventeenth Street, Suite 3000

15          Denver, CO 80202

16    BY:   JOSEPH H. HUNT, ESQ., via teleconference

17          ALYSSA LEVY, ESQ., via teleconference

18          (jhunt@shermanhoward.com)

19          (alevy@shermanhoward.com)

20

21

22

23

24

25
```



Case 1:14-cv-03074-CMA-KMT Document 557-1 filed 08/02/17 USDC Colorado pg 7 of 45

```
                                                                   Page 5

 1

 2    APPEARANCES (Continued):

 3

 4    NIXON SHEFRIN HENSEN OGBURN, P.C.

 5    Attorneys for 20/20, A.P.E.X.

 6         5619 DTC Parkway, Suite 1200

 7         Greenwood Village, CO 80111

 8    BY:   KATHLEEN E. CRAIGMILE, via teleconference

 9         (kcraigmile@nixonshefrin.com)

10

11    BOGDAN ENICA, ESQ.

12    Attorneys for defendant Expert Group

13    International dba Expert AuPair

14         111 Second Avenue NE, Suite 204

15         St Petersburg, FL 33701

16    BY:   BOGDAN ENICA, ESQ.

17         (bogdane@hotmail.com)

18

19

20

21

22

23

24

25
```



```
                                                              Page 6

 1

 2   APPEARANCES (Continued):

 3

 4

 5   GORDON & REES, LLP

 6   Attorneys for Au Pair Care

 7        555 Seventeenth Street, Suite 3400

 8        Denver, CO 80202

 9   BY:    PEGGY E. KOZAL, ESQ., via teleconference

10        (pkozal@gordonrees.com)

11

12

13   CHOATE HALL & STUART

14   Attorneys for Cultural Care

15        2 International Place

16        Boston, MA 02110

17   BY:    JUSTIN J. WOLOSZ, ESQ., via

18   teleconference

19        (jwolosz@choate.com)

20

21

22

23

24

25
```



```
                                                          Page 7
 1

 2    APPEARANCES (Continued):

 3

 4

 5    WHEELER TRIGG O'DONNELL, LLP

 6    Attorneys for defendant Go Au Pair, Au Pair

 7    International, and Agent Au Pair

 8          370 17th Street, Suite 4500

 9          Denver, CO 80202

10    BY:    NATALIE WEST, ESQ.

11          (West@wtotrial.com)

12

13    PRESENT:

14    ROBERT STEINKOPF, Videographer

15

16

17

18

19

20

21

22

23

24

25
```



Page 8

```
 1
 2                 IT IS HEREBY STIPULATED AND AGREED
 3     by and between the attorneys for the respective
 4     parties herein, that filing and sealing be and
 5     the same are hereby waived.
 6                 IT IS FURTHER STIPULATED AND AGREED
 7     that all objections, except as to form of the
 8     question, shall be reserved to the time of the
 9     trial.
10                 IT IS FURTHER STIPULATED AND AGREED
11     that the within deposition may be sworn to and
12     signed before any officer authorized to
13     administer an oath, with the same force and
14     effect as if signed and sworn to before the
15     Court.
16
17
18
19
20                 -  oOo  -
21
22
23
24
25
```



```
 1
 2          THE VIDEOGRAPHER:  We are
 3     now on the record.  This begins
 4     DVD number one in the deposition
 5     of Ruth Ferry in the matter of
 6     Johana Beltran, et al. V.
 7     InterExchange, Inc., et al.
 8          Today is Thursday, May 11,
 9     2017, and the time is 9:11 a.m.
10     This deposition is being taken at
11     575 Lexington Avenue, New York,
12     New York, at the request of Boies
13     Schiller & Flexner, LLP.
14          The videographer is Robert
15     Steinkopf of Magna Legal
16     Services, and the court reporter
17     is Jeremy Richman of Magna Legal
18     Services.
19          Will counsel and all parties
20     present state their appearances
21     and whom they represent.
22          MR. JACKSON:  Good morning.
23     Randall Jackson of Boies Schiller
24     & Flexner on behalf of the
25     plaintiffs.
```



```
 1
 2          MR. PACHECO:  Byron Pacheco
 3     of Boies Schiller & Flexner also
 4     on behalf of the plaintiffs.
 5          MR. MACRI:  Stephen Macri of
 6     Putney Twombly Hall & Hirson on
 7     behalf of American Institute for
 8     Foreign Study.
 9          MR. STOCK:  Eric Stock from
10     Gibson Dunn & Crutcher,
11     representing AIFS as well.
12          THE VIDEOGRAPHER:  Will the
13     court reporter please swear in
14     the witness.
15          RUTH FERRY, having been
16     called as a witness, having first
17     been duly sworn by a Notary
18     Public (Jeremy Richman) of the
19     State of New York, was examined
20     and testified as follows:
21          EXAMINATION BY
22          MR. JACKSON:
23     Q.    Thank you.  Good morning.
24     A.    Good morning.
25     Q.    Could you please, for the
```



 1

 2    speaking to, who would have the

 3    information.  Yes, to that extent.

 4        Q.      That's great.  Thank you.

 5                All right.  Let's talk just

 6    a little bit through each one of these

 7    topics.  The first one on page 5 is

 8    corporate structure, your corporate

 9    structure, including your legal and/or

10    beneficial ownership.

11                Can you just describe to me

12    a little bit about what sort of --

13    what is the basis for your knowledge

14    on that topic?

15        A.      The American Institute for

16    Foreign Study is owned by the Sir

17    Cyril Taylor, who is chairman and

18    founder of AIFS.  He founded AIFS in

19    1964.

20                It's a privately held

21    company, a Delaware corporation, and

22    its headquarters is in Stamford,

23    Connecticut.

24        Q.      And can you -- can you

25    describe to me how it is that you know



```
 1
 2   that?
 3       A.      I think I've known that
 4   since 1972.
 5       Q.      The second topic listed here
 6   are finances, including financial
 7   records, revenue and expense streams,
 8   major sources of revenue or funding,
 9   profits and losses, and overall
10   financial position.
11              What I'm -- what I'm asking
12   here is, can you just describe
13   generally what kinds of things you did
14   to prepare to be able to talk about
15   that topic?
16       A.      I reviewed with the -- my
17   legal counsel and with the chief
18   information officer, the documents
19   that were provided to Boies Schiller
20   on the revenue and expenses that were
21   requested and submitted to make sure
22   that I understood what was presented.
23       Q.      What about topic three,
24   which includes recruitment, training,
25   placement, and supervision of au pairs
```



1

2    in a number of areas that are

3    described here?

4         A.    I did have -- I'm quite

5    familiar with the process, very

6    involved in the structure of setting

7    up recruitment, training, placement,

8    and supervision of au pairs.

9              Specifically, the placement

10   and supervision of au pairs falls

11   directly under my watch as the

12   director here in the U.S.

13             MR. MACRI:  Some of the

14             folks on the phone are asking for

15             the dial-in number to be sent by

16             email, please.

17             (An off-the-record

18             discussion was held.)

19        Q.    And topic four is your

20   relationship and communications with

21   the State Department and the

22   Department of Labor, including a

23   number of subcategories there.

24             Can you describe for us what

25   you did to prepare for your testimony



1

2  on that topic?

3      A.     Well, as responsible

4  officer, I have a pretty thorough

5  relationship and communications with

6  the Department of State.  I'm their

7  primary point of contact, that, along

8  with any alternate responsible

9  officers within our division, I relate

10  to the Department of State directly,

11  not the Department of Labor.

12      Q.     Is it fair to say that

13  you're the most competent person at

14  your organization to talk about this

15  topic?

16      A.     Oh, absolutely.

17      Q.     All right.  What about topic

18  five, which is your relationship and

19  communications with other sponsors,

20  including your membership and

21  associations with other sponsors,

22  including, but not limited to, the

23  Alliance for International Education

24  and the International Au Pair

25  Association?



1
2   schedule and say, Well, there's more
3   staff here than there are down the
4   street.
5       Q.    Right.
6       A.    It's very complex.  There's
7   a lot of complex wheels.
8       Q.    No.  I understand.  I
9   totally understand.
10          Would you say that APIA is
11   the biggest program of AIFS?
12      A.    Well, it depends on how you
13   want to measure it.  If you're
14   measuring it in terms of, you know,
15   staff and staff support, it's probably
16   the biggest.
17      Q.    What about -- what are the
18   other ways that you might measure it?
19      A.    I suppose you could measure
20   it in revenues.  Then it's about -- I
21   don't know -- 20 percent.
22      Q.    And how big is the staff of
23   APIA?
24      A.    I have 33 full-time staff in
25   the Stamford office.  I have 192



1

2    employees in the field, and I have

3    another eight employees involved in

4    the orientation program, six, eight.

5    That's right.

6        Q.    As a general matter, what

7    are those employees in the field

8    doing?

9        A.    They're -- well, they're the

10   ones that are fulfilling the

11   requirements of the Department of

12   State, in terms of interviewing the

13   hosting families, vetting the room for

14   the au pair -- prospective au pair,

15   contacting the au pair and the host

16   family at 48 hours, going out and

17   conducting an assessment of the

18   placement at two weeks, staying in

19   monthly contact with the host family

20   and the au pair, stepping back into

21   the placement if they are asked to

22   mediate a problem.

23              They are to fulfill the

24   cultural component of the program,

25   ensure that the cultural emersion for



```
 1
 2    the au pair is going well, that she is
 3    being exposed to activities within her
 4    community.
 5              She's learning about her
 6    community, that she's registering for
 7    classes, that she's participating in
 8    those classes, that she's experiencing
 9    America as a whole.
10              Go to a baseball game, you
11    know.  We're all going to a hockey
12    game on Friday night.  Let's do it.
13    So it's those activities.
14         Q.    At any given time,
15    approximately how many au pairs are
16    those 192 people in the field
17    responsible for?
18         A.    Well, it can range from two
19    or three, or it can be -- but on
20    average, it's about 24, 25.
21         Q.    So how many au pairs does
22    your organization typically have
23    placed with a host family at any given
24    time?
25         A.    Repeat that.
```



1

2      A.     Correct.

3      Q.     What do those orientation

4    trainers do?

5      A.     Well, it should be

6    orientation team, because the

7    orientation team are the lead

8    orientation, those that provide the

9    program, deliver the program, the

10   orientation program to the au pairs,

11   plus the logistic staff that's present

12   at the orientation to handle any

13   logistics and sort out any details,

14   take care of sick au pairs, whatever.

15     Q.     What about the program

16   services manager?  What does the

17   program services manager do?

18     A.     So the program services

19   manager would oversee the regional

20   program managers.  The community

21   counselors report up to the regional

22   program managers.

23            And she also -- so she would

24   provide training and support,

25   communication with community



1

2    counselors.

3            She also has the education

4    administrator, who fulfills -- makes

5    sure that we are fulfilling the

6    education component for the program

7    and tracking the education details of

8    au pairs for the completion of their

9    education component.

10            And then there's a program

11    administrative assistant.

12        Q.    What does the insurance

13    division do?

14        A.    Where's insurance?  Oh, at

15    the bottom, support divisions.

16            The insurance division -- it

17    would be Cultural Services Insurance

18    International that handles both the

19    medical and liability insurance for au

20    pairs.

21        Q.    Who is in charge of the

22    accounting team right now?

23        A.    The accounting team would be

24    James Mahoney.

25        Q.    Where is Mr. Mahoney's



Page 65

1

2    office?

3         A.     In the Stamford,

4    Connecticut, office.

5         Q.     How often do you talk to

6    Mr. Mahoney?

7         A.     Every day at lunch, some

8    frequency.

9         Q.     Is he a person who's under

10   your supervision?

11        A.     No, he's not.

12        Q.     And then there's a community

13   relations manager.  Can you tell us

14   what that person does?

15        A.     RedactedRedactedRedactedRedactedRedactedRedacted
                 RedactedRedactedRedactedRedactedRedactedRedacted

16   RedactedRedactedRedactedRedactedRedactedRedactedRedactedRedacted
     RedactedRedactedRedactedRedactedRedactedRedactedRedactedRedacted

17   RedactedRedactedRedactedRedactedRedactedRedactedRedactedRedacted
     RedactedRedactedRedactedRedactedRedactedRedactedRedactedRedacted

18   RedactedRedactedRedactedRedactedRedactedRedactedRedactedRedacted
     RedactedRedactedRedactedRedactedRedactedRedactedRedactedRedacted

19                RedactedRedactedRedactedRedactedRedacted
                  RedactedRedactedRedactedRedactedRedacted

20   RedactedRedactedRedactedRedactedRedactedRedactedRedacted
     RedactedRedactedRedactedRedactedRedactedRedactedRedacted

21   RedactedRedactedRedactedRedactedRedactedRedactedRedactedRedacted
     RedactedRedactedRedactedRedactedRedactedRedactedRedactedRedacted

22   RedactedRedactedRedactedRedactedRedactedRedactedRedactedRedacted
     RedactedRedactedRedactedRedactedRedactedRedactedRedactedRedacted

23   Redacted
     Redacted

24                RedactedRedactedRedactedRedactedRedacted
                  RedactedRedactedRedactedRedactedRedacted

25   RedactedRedactedRedactedRedactedRedactedRedacted
     RedactedRedactedRedactedRedactedRedactedRedacted



1

2    How does that work?  What does the

3    program fee include?  And I pay the

4    stipend.  Yes, you would pay the

5    weekly stipend.  And what is the

6    stipend amount?

7              Well, the minimum is.  And

8    depending on -- we offer three program

9    types.  So we have an educator

10   program, and then we have the 195.75.

11   And then we have the -- an

12   extraordinaire program.  So they have

13   to be able to meet those levels.

14       Q.    Now, are host families

15   instructed by the community counselors

16   as to what the average payment is to

17   au pairs?

18             MR. MACRI:  Objection as to

19       form and foundation.

20       A.    The average payment, no.

21       Q.    No.  I guess one of the

22   things that you mentioned a moment ago

23   is that host families are instructed

24   as to what the minimum is when they

25   ask the question, What is the stipend



Case 1:14-cv-03074-CMA-KMT Document 588-247 Filed 06/02/17 USDC Colorado Page 24 of 45

Page 100

```
 1
 2    amount?
 3             Is there any other
 4    information that's provided about what
 5    they should expect to pay, other than
 6    the minimum?
 7        A.    No.
 8        Q.    Have you ever encountered
 9    the issue, within the organization, of
10    host families understanding that this
11    is -- that the minimum that you've
12    described is something other than the
13    minimum?
14             MR. MACRI:  Objection, form.
15        A.    I'm not sure I understand
16    the question.
17        Q.    Sure.  I guess have you ever
18    confronted, within your organization,
19    the question of confusion amongst host
20    families about what they are actually
21    expected to pay?
22        A.    I'm not sure I understand
23    there to be confusion about what
24    they're expected to pay.
25        Q.    Okay.  So the answer is no,
```



1

2    you have not, within the organization,

3    confronted the question of whether or

4    not there's any confusion with the

5    host family --

6              MR. MACRI:  I'm going to

7         object.  The witness's answer is

8         the witness's answer.  It's in

9         the record.  If you have a

10        question, you can ask her another

11        question.

12             MR. JACKSON:  I'm going to

13        repeat my question.

14        Q.    The answer is no, you have

15   not, within the organization,

16   confronted the question of whether or

17   not there's any confusion with the

18   host families about the amount that

19   they're supposed to pay?

20             MR. MACRI:  Same objection.

21        The witness answered the

22        question.

23             MR. JACKSON:  Are you

24        instructing the witness not to

25        answer the question?



1

2          MR. MACRI:  No.  But the

3     same objection stands.

4          MR. JACKSON:  Your objection

5     is noted.

6     Q.    You should answer the

7  question.

8     A.    I am not aware that families

9  are confused by the amount that they

10  are to pay.

11     Q.    Right.  And that's -- I

12  understand that.  The question I'm

13  asking you is, has your organization,

14  within the organization, ever

15  confronted the question of whether or

16  not there was confusion amongst host

17  families?

18     A.    Since there -- the

19  organization is not aware that there

20  is confusion, we have not raised the

21  question of confusion.

22     Q.    Okay.  So at no point are

23  you aware of host families contacting

24  the organization, seeking clarity as

25  to what the appropriate amount of



Case No. 1:14-cv-03074-CMA-KMT   Document 588-247   Filed 06/16/17   USDC Colorado   pg 27 of 45

Page 109

1
2    say you wouldn't be adhering to

3    Department of State regulations,

4    you've already raised the minimum of

5    one of your programs, right?

6         A.    That's correct.

7         Q.    And we're clear that you

8    were not running afoul of any

9    Department of State regulations by

10   raising the minimum from 195 to 250,

11   correct?

12        A.    Mm-hmm.

13        Q.    Is that right?

14        A.    Mm-hmm.

15        Q.    I'm sorry.  I have to have a

16   verbal answer on that.

17        A.    Yes.

18        Q.    And if that didn't run

19   afoul, why would raising the minimum

20   for all of your   au pairs potentially

21   run afoul of Department of State

22   regulations?

23             MR. MACRI:  Objection to

24        form.

25        A.    There's no -- here's another



Page 110

```
 1
 2   way to put it.  There's no value in
 3   raising the -- raising the weekly
 4   stipend for an au pair if I have more
 5   au pairs anytime than are possibly
 6   going to be placed.
 7        Q.    What do you mean --
 8        A.    We're only able to place
 9   somewhere between 72 and 80 percent of
10   the au pair applicants that we receive
11   that are cleared to be accepted into
12   the program.
13             So you lose many in the
14   process, but at the end of the day, I
15   want a relatively high placement rate.
16        Q.    What do you mean when you
17   say there's no value?
18        A.    If the -- if you suggest
19   that we're going to pay the au pair
20   more, then I'm going to have more of a
21   challenge -- more than the state
22   minimum, then I will have more of a
23   challenge to compete against
24   competitors who are -- why would a
25   hosting family go with    Au Pair in
```



1

2    America when I tell them that the

3    minimum stipend for the au pairs in

4    our program are going to be greater?

5            The -- there's no -- when I

6    also want to have -- ensure that the

7    high volume of applicants that are

8    coming into the program will be pretty

9    secure to have a placement.

10           Otherwise, I'm going to be

11   the known entity on the block.  Don't

12   apply to them.  Don't apply to this

13   organization, because they're not able

14   to secure a placement for you.

15       Q.    Isn't it the case, though,

16   that there are -- if you were able to

17   recruit a higher percentage of the

18   available au pairs, that you would

19   have the potential to edge out some of

20   your competitors, in terms of the

21   ability to actually place au pairs

22   with host families?

23           MR. MACRI:  Objection, form

24       and foundation.

25       A.    I think that is very



1

2    unknown, you know.  I think the

3    limitation is on the volume of

4    families that are willing and wanting

5    and able to participate in this

6    program in the U.S.  That is the

7    limitation.

8       Q.    What is the average amount

9    of money that host families associated

10   with your organization are paying the

11   au pairs?

12           MR. MACRI:  Objection, form

13      and foundation.

14      A.    I can't tell you that,

15   because that's between the au pair and

16   the hosting family.

17      Q.    At no point --

18      A.    I don't know what their

19   compensation package makes up.

20      Q.    Is that something that you

21   could survey the au pairs about?

22           MR. MACRI:  Objection to

23      form.

24      A.    I believe you already do

25   that.



Page 144

1

2       Q.      If we look at the page that

3   ends in 7123.  It's a few pages ahead.

4       A.      Yes.  That's me.

5       Q.      Okay.  Where did this

6   description come from?

7       A.      It's my bio.

8       Q.      I know.  I guess did you

9   write this?

10      A.      Yeah.  Well, I sort of

11  crafted the start of it.  The

12  marketing department probably polished

13  it up, took out the typos.

14      Q.      Okay.  Now, on the

15  subsequent pages, on 7125 and 7126,

16  there are a number of family quotes

17  from different host families?

18      A.      That's correct.

19      Q.      Can you tell us how you

20  accumulated these family quotes?

21      A.      Most of these family quotes

22  would come from yearend surveys, or

23  they could be unsolicited.  I receive,

24  you know, emails all the time -- our

25  staff do -- about that.



1

2      Q.     In those yearend surveys,

3    was there ever any surveying of

4    amounts of money that were paid to au

5    pairs?

6      A.     No.

7      Q.     Why is that?

8      A.     We've just never done that.

9    We've never needed to do that.

10     Q.     And how far back have you

11   been doing yearend surveys like this

12   with the host families?

13     A.     Probably since almost the

14   beginning of time.

15     Q.     One of the phrases -- one of

16   the terms you used a little bit

17   earlier when you were describing the

18   structure of payment to the    au

19   pairs was the term pocket money?

20     A.     Yes.

21     Q.     Can you explain a little bit

22   more about what you mean when you

23   refer to pocket money?

24     A.     I think of the weekly

25   stipend or the pocket money.  I use



Page 146

```
 1
 2   those terms sort of interchangeably.
 3   They were intended to be part of the
 4   compensation package that an      au
 5   pair would receive while she is in the
 6   United States.
 7            So her medical insurance is
 8   provided.  Her transportation will be
 9   provided.  Her room and board will be
10   provided.  Her, you know, support
11   services will be provided.  She is not
12   paying excess fees for those things --
13   for those things.
14            So this is intended as money
15   that she can put towards her own
16   social activity for the week, set
17   aside for a trip that she might plan
18   to do, you know, halfway through the
19   year or a few times during the year.
20            So I use that somewhat
21   interchangeably.  I think it's very
22   possible the Department of State used
23   it in preambles in various regulatory
24   documents as well.
25       Q.    Now, you mentioned -- you
```



1
2    mentioned, for example, the health
3    insurance that's paid for for the au
4    pairs?
5         A.    That's correct.
6         Q.    Who pays for their health
7    insurance?
8         A.    It's included in the host
9    family fees, the basic health
10   insurance required.  The    au pair
11   does have the option to purchase an
12   upgrade policy and/or additional, like
13   a sports policy or a travel policy.
14            If the au pair is -- chooses
15   to -- the au pair has the right, if
16   she completes her first 12 months in
17   the program, to take an additional
18   four weeks to travel within the U.S.
19   prior to exiting the country, at which
20   point her Visa then becomes invalid.
21            In that 30-day period, she
22   would be required to have insurance
23   coverage.  That is not covered by the
24   basic insurance that the family has
25   paid for for the first 12 months.



1

2      Q.    What is the host family fee

3  for an    au pair?

4      A.    It depends on the program

5  type, but it ranges from -- what is

6  it -- about 78, $7900 to -- the kind

7  of basic program is -- what are we up

8  to -- about 8500, $8600.

9      Q.    How did you come up with

10  those numbers?

11      A.    I look at the -- I look at

12  program expenses for the program.  So

13  cost of insurance, estimated cost of

14  airlines, estimated cost of our

15  general liability insurance, our

16  staffing structure for our community

17  counselors, their training cost.

18          That's all indirect costs.

19  So I look at all the direct costs.

20  And we sort of measure it off of then

21  prior year.

22          Typically, your costs,

23  particularly, in the airline sector

24  and insurance sector -- well,

25  insurance has just been out of sight,



 1

 2   document, Ms. Ferry?

 3          MR. JACKSON:  And just for

 4       the record, this is a document

 5       that was produced in native

 6       format.  The Bates number that

 7       corresponds with this document is

 8       AIFS0058479.

 9       Q.    Ms. Ferry, what is this

10   document?

11       A.    I believe this document is a

12   PowerPoint presentation that can be

13   used by a community counselor to use

14   in doing a presentation in front of, I

15   would presume, a group of interested

16   families to give an overview of the

17   program and as a way to educate them

18   about the possibility of joining the

19   Au Pair in America program.

20       Q.    Right.  Can we go to the

21   fourth page of this document, the one

22   that starts with, "Added benefits of

23   live-in childcare with   Au Pair in

24   America"?

25       A.    Mm-hmm.



Case 1:14-cv-03074-CMA-KMT   Document 588-247   Filed 06/02/17   USDC Colorado   Page 37
of 44

Page 158

```
 1
 2       Q.     The second bullet point on
 3   that page is, "Only $347 per week.
 4   That's per family, not per child,"
 5   with an exclamation point, correct?
 6       A.     That's correct.
 7       Q.     How was that $347
 8   calculated?
 9       A.     I would presume that would
10   have been calculated based on the --
11   what year this is -- the program fee
12   prorated, plus the weekly pocket money
13   prorated, to establish a per week
14   average rate.
15       Q.     Right.  And the
16   reasonable -- what your organization
17   is attempting to communicate in this
18   particular bullet point is that the
19   host family can expect to only pay
20   $347 per week when you add the stipend
21   that they'd be expected to pay and the
22   prorated amount?
23           MR. MACRI:  Objection as to
24       form.
25       A.     Well, that's the hook.
```



```
 1
 2        Q.     What do you mean when you
 3   say that's the hook?
 4        A.     Well, you're trying to get
 5   the lead in the door.  You're trying
 6   to get the customer interested.
 7        Q.     Okay.
 8        A.     Once you have the lead in
 9   the door, then you have to start
10   educating them about the program, you
11   know, the room and board, the private
12   room, the transportation, the
13   educational benefit, the limitation on
14   hours, the -- whatever it is, the
15   support services.  There's a whole
16   litany of stuff.
17        Q.     But you would agree --
18        A.     And then you would -- then
19   you would give them the program fee.
20   We would -- we would hand out
21   brochures.
22               Every brochure would have a
23   program fee insert that would describe
24   the program fees, the minimum stipend
25   amounts, how they're described and
```



Page 160

```
 1
 2   established by the Department of
 3   State.
 4              This is not giving them all
 5   those details.  These are a few
 6   highlights.
 7       Q.    Okay.  But you would agree
 8   that that's a -- that's a pretty
 9   important detail, the amount of money
10   that they can expect to pay?
11              MR. MACRI:  Objection as to
12       form.
13       A.    Repeat the question.
14       Q.    You would agree with me that
15   one of the most important details to
16   be communicated to the host families
17   is the amount of money that they can
18   expect to pay, right?
19       A.    I think there are many other
20   details that need to be communicated
21   as well, but I would agree with you
22   that before a family -- and this is
23   not -- this is an introductory piece.
24              Before a family is even
25   thinking about applying to the
```



1
2  was flexible.
3          What I'm asking is what you
4  looked at.
5      A.    Well, this -- the fee being
6  flexible is -- this doesn't even
7  include all of the fees.  This doesn't
8  include the educational monies.  This
9  doesn't include the room and board.
10  This doesn't include the private room.
11  This doesn't include the
12  transportation costs.  This doesn't
13  include -- there are many things that
14  this doesn't include.
15     Q.    I understand that, ma'am.
16  I'm only asking, what are the other
17  types of advertising that you looked
18  at?
19     A.    It would be likely that we
20  would look at other au pair programs.
21  It would be likely that we would look
22  at nanny programs, maybe not so much
23  programs, but nanny advertising.
24          Those would be the two
25  bigger components.  So it's sort of



Page 205

```
 1
 2    the one-on-one childcare.  Possibly,
 3    childcare centers or in-home
 4    childcare.  It's being awareness of
 5    your broad spectrum of childcare.
 6         Q.    All right.  And to the
 7    extent this is just a hook, you're
 8    aware that the person who is going to
 9    be hooked by this is going to have a
10    misimpression about whether or not
11    this is a fixed fee at this point,
12    right?
13         A.    At this point.  Absolutely.
14         Q.    Now, can I ask you to take a
15    look at Exhibit 13, which we already
16    marked?
17              Now, this is a document
18    ending in Bates stamp number 2079.
19    Are you familiar with this document,
20    ma'am?
21         A.    I don't know that I'm
22    familiar with this specific document.
23    I'm certainly familiar with the
24    content of the document.
25         Q.    This is a fact sheet that
```



1
2    talks about the Au Pair in America
3    program, correct?
4        A.    Correct.
5        Q.    Who is this fact sheet
6    targeted towards?
7        A.    I don't know.  I don't know
8    whether it's an internal, you know,
9    fact sheet prepared just to inform the
10   staff about -- to give them some
11   background and kind of general broad
12   understanding of the program, because
13   there's outcomes, assessment data
14   here.
15            There's -- it could have
16   been part of a review document
17   extracted from a bigger review
18   document.  I don't know.
19       Q.    About halfway down on the
20   page, there's a section that says
21   Screening and Placement.
22            Do you see that?
23       A.    Yes, I do.
24       Q.    The first sentence reads,
25   "Au Pair in America uses a thorough



1

2      Q.      Right.  But that's not part

3   of the expectation?

4      A.      Correct.

5      Q.      And in the second column, it

6   identifies the weekly stipend,

7   correct?

8      A.      Correct.

9      Q.      Now, it identifies 195.75 as

10   the weekly stipend for the standard

11   program, right?

12      A.      Mm-hmm.

13      Q.      Is that -- I'm sorry.

14   That's a yes?

15      A.      Yes.  Sorry.

16      Q.      That's fine.

17              $250 for the extraordinaire

18   program, correct?

19      A.      Yes.

20      Q.      And 146.81 for the EduCare,

21   correct?

22      A.      Yes.

23      Q.      Now, those -- those are

24   reflected in this document as fixed

25   prices, right?



 1
 2            MR. MACRI:  Objection as to
 3      form and foundation.
 4      A.    Well, what's -- it's like
 5  stripped out.  Nobody has explained
 6  here, other than to say that the
 7  weekly stipend established by the U.S.
 8  government and paid directly to the
 9  au pair -- you know, there is not a
10  continuance of that.  I neither say
11  more.  I neither say less.
12      Q.    Right.
13      A.    The audience here is not the
14  hosting family.
15      Q.    My question, though, is, it
16  is reflected in this document as a
17  fixed price, correct?
18      A.    It appears to be a fixed
19  price here.
20      Q.    Right.  And there's nothing
21  here that indicates that these are
22  just minimums for the weekly stipend,
23  correct?
24      A.    That's correct.
25      Q.    Now, one of the things that



Page 214

1

2    it says in -- one of the things that's

3    reflected here is, next to weekly

4    stipend, there's an asterisk, correct?

5        A.    Yes.

6        Q.    And the text beneath this in

7    italics, next to the asterisk, says,

8    "Weekly stipend established by the

9    U.S. government and paid directly to

10   au pair.  All programs also include a

11   400 match fee," correct?

12       A.    Correct.

13       Q.    The indication is that the

14   weekly stipend is set by the U.S.

15   government, correct?

16       A.    Correct.

17       Q.    Now, in fact, the host

18   families have discretion to pay more

19   than this amount, correct?

20       A.    Correct.

21       Q.    And just to be clear,

22   there's not a specific U.S. government

23   document of which you are aware that

24   says 195.75 is the weekly stipend for

25   the standard program?

