**Exhibit A
to Cultural Care, Inc.'s Unopposed Motion
to Restrict Public Access (Level 1) to Plaintiffs'
Motion for Rule 23 Class Certification and
Appointment of Counsel**

Case No. 1:14-cv-03074-CMA-KMT Document 570-2 filed 06/16/17 USDC Colorado pg 1 of 2
Case 1:14-cv-03074-CMA-KMT Document 559 Filed 06/03/17 USDC Colorado Page 1 of 57
of 58

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Case No. 14-cv-03074-CMA-KMT

JOHANA PAOLA BELTRAN, *ET AL.*

    Plaintiffs,

v.

INTEREXCHANGE, INC., *ET AL.*

    Defendants.

---

**PLAINTIFFS' MOTION FOR**
**RULE 23 CLASS CERTIFICATION**
**AND APPOINTMENT OF CLASS COUNSEL**

---

EXHIBIT A

## TABLE OF CONTENTS

Page

RELEVANT FACTS .................................................................................... 4

LEGAL STANDARD .................................................................................. 10

ARGUMENT ............................................................................................. 12

I.    THIS CASE SATISFIES RULE 23(A)'S PREREQUISITES ...................................... 12

      A.   The Classes Are So Numerous That Joinder All Members Is
           Impracticable ................................................................................ 12

      B.   There Are Questions Of Law Or Fact Common Within The Classes............ 14

      C.   The Claims Of The Plaintiffs Are Typical Of The Classes, And The
           Plaintiffs Will Fairly And Adequately Protect The Interests Of The
           Classes ........................................................................................ 19

           1.   Plaintiffs Are Typical Of The Class ...................................... 20

           2.   Plaintiffs Have Retained Experienced Counsel And There Are No
                Conflicts Of Interest........................................................... 25

II.   CERTIFICATION IS APPROPRIATE UNDER RULE 23(B)(3) BECAUSE COMMON
      ISSUES OF LAW OR FACT PREDOMINATE ....................................................... 27

      A.   The National Antitrust And RICO Classes Were Harmed By A Conspiracy
           And Common Course Of Conduct ............................................... 28

           1.   The Conspiracy-Based Claims Satisfy Rule 23(b)(3) ........................ 28

           2.   Defendants Cannot Undermine The Predominance Of Common
                Questions By Quarreling About A Few Particular Class Members
                Or Inventing Damages-Related Issues ........................................ 30

      B.   Common Issues Predominate In The Two Training Classes........................ 35

           1.   The Training Classes' Wage And Hour Claims Are Suited For Class
                Procedure Because The Relevant Defendants Subject *Au Pairs* To
                Standardized Unpaid Training In A Single State............................ 35

           2.   The Training Class's Fraud- Or Misrepresentation-Based Claims Are
                Also Properly Handled Classwide ................................................ 38

C.  THE STATE LAW CLASS AND SUBCLASSES SHOULD BE CERTIFIED
    UNDER RULE 23(B)(3). ......................................................................... 38

    1.  The State Wage-And-Hour Claims Meet The Predominance
        Requirement ................................................................................... 39

    2.  The State Misrepresentation and Fraud-Based Claims Also Meet The
        Predominance Requirement .......................................................... 41

D.  The State Consumer Protection Claims Satisfy Rule 23(b)(3). ................... 44

E.  A Class Action Will Be Manageable And Superior To Any Other Available
    Form Of Adjudication ................................................................................ 46

III.  CERTIFICATION IS ALSO APPROPRIATE UNDER RULE 23(B)(2) TO ENSURE
      THE CONTROVERSY IS RESOLVED UNIFORMLY .......................................... 48

IV.  THE COURT SHOULD APPOINT PLAINTIFFS' COUNSEL AS CLASS COUNSEL
     AND ORDER A JOINT PROPOSED NOTICE AND NOTICE PLAN ................... 49

CONCLUSION ............................................................................................................. 50

## CERTIFICATE OF CONFERRAL PURSUANT TO D.C. COLO.LCivR. 7.1(A)

Pursuant to D.C. Colo.LCivR. 7.1(a), plaintiffs conferred about this Motion with counsel for all defendants via email on May 15, 2017 and certain defendants in the days following.  The responses fell into three categories:  the defendant opposed any class; the defendant would not be able to state their position on the Motion before they were able to review it; or no response.

## PRELIMINARY STATEMENT

This is a model case for class certification.  There are tens of thousands of plaintiffs residing all over the world, who were each injured by the defendants' common scheme to suppress their wages when the plaintiffs came to the United States to work as *au pairs*.  Each of the defendants falsely represented that *au pair* wages were set at $195.75 per week, in violation of state (and federal) labor laws and as part of an illegal agreement to suppress wages and accordingly inflate their own fees.

Common issues abound.  The existence of the defendants' common agreement is of course a factual question common to every plaintiff's claim, as is the truth or falsity of the defendants' representations that wages were fixed at $195.75.  Indeed, the core *defense* advanced by the defendants in this case illustrates that class action treatment is appropriate:  To a one, each of the defendants has asserted that they believed that the United States Department of State required payment of the $195.75 weekly wage, and that the government therefore somehow authorized their fraudulent representations.[1]  Therefore, on the defendants' own theory, all of the controlling

---

[1]     *See* Rodr. Decl. Exs. 135-141 (D.E. 127 at 8-9 (Cultural Care); D.E. 130 at 5

questions and answers in this case are common ones.

The rejoinder to this defense also raises common questions. The State Department's *au pair* regulations provide that *au pairs* must be paid in accordance with the Fair Labor Standards Act, as interpreted by the Department of Labor.[2] And although a now-withdrawn document published by the State Department did erroneously include the $195.75 figure – raising the common question of whether that single document could override an Act of Congress – even that document referred to $195.75 as a *minimum* wage, rather than an inflexible one.

The named plaintiffs' experiences as *au pairs* were typical of the other class members. They were treated consistently with the allegations and facts of this case, and will continue to vigorously defend their rights and the rights of the numerous persons similarly situated as they continue to pursue this case through well-qualified counsel.

Accordingly, plaintiffs Johana Paola Beltran, Beaudette Deetlefs, Lusapho Hlatshaneni, Ivette Alexandra Gonzalez Cortes, Nicole Mapledoram, Sara Azuela Rascon, Laura Meija Jimenez, Julie Harning, Camila Perez Reyes, Cathy Caramelo and Linda Elizabeth move to certify classes and subclasses that will ensure this case remains manageable and efficient while vindicating the rights of tens of thousands of

---

(InterExchange); D.E. 131 at 2 (GoAuPair); D.E. 135 at 8 (Cultural Homestay International, USAuPair, GreatAuPair, Expert AuPair, EurAupair, AuPairCare, Au Pair International, Au Pair Foundation, and Agent Au Pair Motion to Dismiss the First Amended Complaint) at 8 ("the State Department set the weekly au pair stipend at $195.75"); D.E. 132 (20/20 Care Exchange joining D.E. 135 at 8); D.E. 133 (APEX joining D.E. 135 at 8); D.E. 136 at 8-9 (Au Pair in America)).

[2] MTD Order at 22 (citing 22 C.F.R. § 62.31(j)(1)) (Rodr. Decl. Ex.142).

2

domestic workers.[3]  Plaintiffs also move to have Boies Schiller Flexner LLP and Toward Justice appointed as class counsel.

## **CLASS DEFINITIONS**

Appendix A defines and explains each proposed class and subclass.  They break down into the following categories:

*First*, two national classes under federal law:  (a) a national Antitrust Class against all defendants; and (b) a national RICO Class against defendants InterExchange, Cultural Care, Au Pair in America, and AuPairCare (the "RICO Class").

*Second*, national classes against the defendants who subject *au pairs* to mandatory unpaid training in a specific state, regardless of where the *au pair* is ultimately placed.  These are (c) a national class of all *au pairs* who were subjected to mandatory unpaid training in New Jersey ("NJ Training Class") by AuPairCare; (d) a national class of all *au pairs* subject to unpaid training in New York ("NY Training Class") by InterExchange, Au Pair in America, Cultural Care, and GoAuPair; and (e) a national class of all *au pairs* subject to unpaid training in Florida ("FL Training Class") by Expert Au Pair.

*Third*, national and state-specific classes arising under state law.  Specifically, these include (a) a nationwide Class asserting state law claims against certain defendants, with (b) subclasses specific to the defendant and state where the current named plaintiffs worked (*i.e.*, defendant-and-state-specific Subclasses).[4]

---

[3]      Certain of these plaintiffs have not yet been joined but are the subject of a pending motion for leave to amend.

[4]      The defendant-and-state-specific Subclass approach respects this Court's past

## RELEVANT FACTS

This case arises out of the defendants' uniform policy – and their collective agreement – to artificially suppress *au pair* wages at an unlawfully low level. Each and every one of the defendants systematically tells *au pairs* that they have no choice but to be paid less than the minimum wage. Each and every defendant has a category for the "standard" *au pairs* it employs, and each and every defendant has agreed that all standard *au pairs* should be paid $195.75 per week, or about $10,000 per year. Recognizing that this sum is totally inadequate to provide a living wage, defendants refer to *au pairs'* earned wages "pocket money."[5] That characterization is accurate— but only because defendants fix *au pairs'* wages at an illegally low level. Indeed, the government agency responsible for overseeing most aspects of the *au pair* program has expressly rejected the characterization of *au pair* wages as "pocket money," recognizing them for what they are: Wages paid for domestic work, which must comply with federal

---

holdings on state wage-and-hour standing. *E.g., Avendano v. Averus, Inc.*, 14-cv-01614-CMA, Doc. No. 92 at 10-11 (D. Colo. Sept. 29, 2016) ("Avendano Class Order"); *Smith v. Pizza Hut, Inc.*, No. 09-CV-01632-CMA-BNB, 2011 WL 2791331 (D. Colo. July 14, 2011). Notwithstanding that authority, plaintiffs believe that an overarching national Class asserting state law claims is appropriate in this case, and plaintiffs seek certification of such a class, particularly in the event of after-arising law or appeal.

[5]     *E.g.*, APC 30(b)(6) [McNamara] Dep. Ex. 20 (stipend is "pocket money"; urging *au pairs* to shop at dollar stores) (Rodr. Decl. Ex. 15); APIA 30(b)(6) Dep. Tr. 145:24-146:2 ("I think of the weekly stipend or the pocket money. I use those terms sort of interchangeably.") (Rodr. Decl. Ex. 44); EurAuPair 30(b)(6) Dep. Tr. at 119:20-25 ("…families must provide the au pair with 195.75 pocket money per week…") (Rodr. Decl. Ex. 72); USAuPair 30(b)(6) Dep. Tr. at 188: 5-7 ("I could have used [the term pocket money] or it could have been used…with another agency.") (Rodr. Decl. Ex. 105); *see also* Lydia DePillis, "Au Pairs Provide Cheap Childcare. Maybe Illegally Cheap", The Washington Post (March 20, 2015) ("some call it 'pocket money,' as if it were a bonus to receive $10,000 a year") (Rodr. Decl. Ex. 156).

and state labor laws.[6]

      Prior to this litigation, every defendant consistently told *au pairs* and host families that each "standard" *au pair* must be paid precisely $195.75 per week.[7]  For example, the biggest employer of *au pairs*, Cultural Care, distributed marketing materials saying "all au pairs make the same weekly stipend of $195.75."  Cultural Care 30(b)(6) Dep. Ex. 9 (Rodr. Decl. Ex. 60).  AuPairCare once sent a blast email warning *au pairs* that "[l]egitimate host families" would "not offer you a higher stipend than" $195.75 per week.  APC 30(b)(6) Dep. Ex. 8 (Rodr. Decl. Ex. 8).  InterExchange told its *au pairs* that it was a "scam" if an *au pair* received "offers that sound amazing, like paying you more than the program amount of $195.75 per week."  (Rodr. Decl. Ex. 144).

      Other defendants likewise told *au pairs* that their wages were fixed.  For example, one defendant stated that "the amount we pay is the government regulated amount and not open to negotiation!"  *E.g.*, CHI 30(b)(6) [Reilly] Dep. Ex. 28 (Rodr.

---

[6]    Final Rule, Supp. Info., Exchange Visitor Program, 60 F.R. 8547-02, 1995 WL 59291 (agency then responsible for the *au pair* program explaining that *au pairs* earn wages for domestic service work; indicating that "pocket money" does not accurately describe earned wages).

[7]    *See* SAC ¶ 81 (defining "standard *au pair*" position as one in which the wage is set at $195.75 per week for 45 hours of work – a position that all Sponsors offer, despite the fact that some Sponsors offer other, non-standard au pair positions) (Rodr. Decl. Ex.146); *see also* APIA 30(b)(6) Dep. Ex. 31, "Competitive analysis for au pair programs (October 2009)" (listing standard au pairs paid $195.75 weekly for numerous Sponsors) (Rodr. Decl. Ex.51); ██████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

Sullivan Decl. ¶ 5 ("When I initially inquired about the au pair program four years ago, and at every point thereafter, I was told that the weekly stipend for au pairs was a set amount of $195.75 a week for up to 45 hours of work. I was also told that the amount was set by the federal government.") (*see* Rodr. Decl. Ex. 155).

Decl. Ex. 70).[8]  Several defendants memorialized their scheme (and each *au pair*'s

reliance on it) in form contracts that every *au pair* was required to sign.  For instance,

AuPairCare *au pairs* for years were required to sign form contracts representing and

confirming that the *au pair* "will receive a weekly stipend in accordance with US

Department of State Regulations in the amount off $195.75" – no more, and no less.

APC 30(b)(6) [McNamara] Dep. Ex. 9 at ¶ 29 (standard form) & Exs. 10-14 (same

language retained as forms revised over the years) (Rodr. Decl. Exs. 9 & 10-14).[9]

Indeed, it was a selling point for the defendants that all *au pairs* would be paid the exact

---

[8]     *See also, e.g.*, Agent Au Pair 30(b)(6) Dep. Ex. 18 (". . . weekly stipend
determined by the Department of State, currently 195.75 . . . .") (Rodr. Decl. Ex. 3);
APEX-2020 30(b)(6) Dep. Ex. 5 ("Weekly Stipend $195.75 paid directly to the au pair")
(Rodr. Decl. Ex. 27); APF 30(b)(6) Dep. Ex. 13 (au pair "will receive a weekly stipend of
$195.75") (Rodr. Decl. Ex. 31); API 30(b)(6) Dep. Ex. 3, at 3 ( "au pair receives weekly
stipend of $195.75") (Rodr. Decl. Ex. 39); APIA 30(b)(6) Dep. Ex. 31 (describing stipend
as "fixed cost" weekly and annually) (Rodr. Decl. Ex. 51); Cultural Care 30(b)(6) Dep.
Ex. 8 ("Salary negotiations are a hassle.  All au pairs earn a weekly stipend of $195.75")
(Rodr. Decl. Ex. 59); CHI 30(b)(6) [Reilly] Dep. Ex. 28 ("…let the Au Pairs know that
with CHI they would just be making the $195.75.") (Rodr. Decl. Ex.70); EurAuPair
30(b)(6) Dep. Ex. 16 ("provide the Au Pair with $195.75 weekly pocket money") (Rodr.
Decl. Ex. 74); InterExchange 30(b)(6) Dep. Ex. 14 ("Au Pair Stipend $195.75 per week")
(Rodr. Decl. Ex. 99).

[9]     *E.g.*, APF 30(b)(6) Dep. Ex. 15 ("Host Family will pay the Au Pair a weekly
stipend of $195.75 ($146.81) in accordance with U.S. State Department and Fair Labor
Standards Act guidelines.") (Rodr. Decl. Ex. 32).  Some defendants' form contracts
incorporate other program materials, which specify $195.75 as a set weekly stipend.
*See, e.g.*, Rodr. Decl. Ex. 52, (AIFS 0000061"Host Family and Au Pair/Companion
Agreement" stating that au pairs are to receive "the weekly stipend as stipulated by
regulations governing au pair programs and set forth in Au Pair in America's program
materials."); Rodr. Decl. Ex. 51, (APIA 30(b)(6) Dep. Ex. 31, program material stating
that because of an "increase in the federal minimum wage paid to all workers…your
weekly stipend will increase from $176.85 to $195.75"); Rodr. Decl. Ex. 74, (EurAuPair
30(b)(6) Dep. Ex. 16 Au Pair Handbook: "provide the Au Pair with $195.75 weekly
pocket money").

same wages, regardless of which defendant employed them.[10]

This uniform, artificially low, and illegal wage was the product of defendants' *per se* illegal price fixing and fraud. Plaintiffs will show that defendants made their unlawful agreement in the course of regular communications—including through regular email contact,[11] by hosting meetings with one another at their offices,[12] and by using a trade association as cover for collusive in-person meetings.[13] In the course of their

---

[10] *See, e.g.,* APC 30(b)(6) [McNamara] Dep. Tr. 36:15-19 ("Q. In your experience in the industry, have you ever found it to be the case that au pair sponsors compete for au pairs by offering au pairs a higher stipend? A. No.") (Rodr. Decl. Ex. 6); APEX-2020 30(b)(6) Dep. Tr. 226:6, 23-24 ("195.75 for regular au pairs"…"That's my view, based on my history…managing au pair programs.") (Rodr. Decl. Ex. 26); APF 30(b)(6) Dep. Ex. 12 ( "weekly stipend is 195.75, as with all agencies.") (Rodr. Decl. Ex. 30); API Email to Host Family ("Your fees next year will be as follows: Weekly Stipend: $195.75/wk") (Rodr. Decl. Ex. 43); APIA 30(b)(6) Dep. Ex.  31 (describing the $195.75 stipend as part of a "fixed cost" for all Sponsors listed) (Rodr. Decl. Ex. 51); Cultural Care 30(b)(6) Dep. Ex. 8 ("Salary negotiations are a hassle.  All au pairs earn a weekly stipend of $195.75") (Rodr. Decl. Ex. 59); EurAuPair 30(b)(6) Dep. Tr. 236:1-4 ("stipend" or "pocket money" will be "the same regardless which au pair program sponsor a family chooses to host with") (Rodr. Decl. Ex. 72); Expert Au Pair 30(b)(6) Dep. Ex. 12 ("Sponsor Organizations Comparison" showing identical annualized stipend) (Rodr. Decl. Ex. 82).

[11] *E.g.* Agent Au Pair 30(b)(6) Dep. Ex. 4 (email exchange between Agent Au Pair and USAuPair, discussing other defendants) (Rodr. Decl. Ex. 2); APC 30(b)(6) Dep. Ex. 23 (email exchange between APC and USAuPair) (Rodr. Decl. Ex. 18); ██████████ GoAuPair 30(b)(6) Dep. Ex. 19 (email exchange between GoAuPair and EurAuPair) (Rodr. Decl. Ex. 91).

[12] *E.g.* Agent Au Pair 30(b)(6) Dep. Tr. 76: 7-17 (discussing workshops hosted by APC and meeting where defendants gave one another "tips") (Rodr. Decl. Ex.1); APEX-2020 30(b)(6) Dep. Tr. 194-196 (discussing meeting with APIA) (Rodr. Decl. Ex. 26); Cultural Care 30(b)(6) Dep. Ex. 26 (email with InterExchange discussing meeting) (Rodr. Decl. Ex. 64); Expert Au Pair 30(b)(6) Dep. Tr. 145:7–23 (describing contacts with USAuPair) (Rodr. Decl. Ex. 80); USAuPair 30(b)(6) Dep. Tr. 157:17–22 (discussing contact with other defendants generally) (Rodr. Decl. Ex. 105).

[13] *E.g.*, Agent Au Pair 30(b)(6) Tr. 48:19-49:10 (trade association helps Defendants have a "collective approach" on industry issues) (Rodr. Decl. Ex. 1); APEX-2020 30(b)(6) Dep. Ex. 25, APEX-20/20 494 (email exchange between trade association

conspiracy, the defendants – while purporting to be obeying Department of State

("DOS") and Department of Labor ("DOL") guidance – chose and agreed instead to

ignore those agencies' explanations of the law.[14]  They even coordinated a walk-out

when DOL attempted to speak to them about wage and hour law.[15]

Defendants' purported lack of interest in competing with one another (at least,

with respect to *au pair* wages) also reflects their collusion.[16]  Rather than compete,

---

members discussing meeting and a "briefing on the stipend question") (Rodr. Decl. Ex. 28); APF 30(b)(6) Dep. Ex. 26 (email exchange between trade association members discussing Department of State meeting ) (Rodr. Decl. Ex. 36); Cultural Care 30(b)(6) Dep. Tr. 216:16–19 ("How often would you say you speak with other sponsors? A. I speak with other sponsors at the annual Alliance meeting.") (Rodr. Decl. Ex. 55); Expert AuPair 30(b)(6) Dep. Tr. 128:12-130:20 (discussing meeting with trade association members and Department of State) (Rodr. Decl. Ex. 80); GoAuPair 30(b)(6) Tr. 186:21-23 (defendants hold group meetings prior to meeting with the Department of State to "consolidate and synthesize people's point of view") (Rodr. Decl. Ex. 84).

[14]  *E.g.* APC 30(b)(6) [McNamara] Dep. Tr. 89:22-91:14, 96:3-97:5 (discussing agreement regarding approach to stipend discussion with DOS) (Rodr. Decl. Ex. 6); APEX-2020 30(b)(6) Dep. Tr. 186 (discussing defendants refusal to attend Department of Labor presentation) (Rodr. Decl. Ex. 26); APF 30(b)(6) Dep. Ex. 26 (email between defendants discussing "collective interest" in meeting with DOS regarding stipend) (Rodr. Decl. Ex. 36); Expert Au Pair 30(b)(6) Dep. Tr. 128:12-130:20 (discussing refusal to attend DOS meeting regarding stipend) (Rodr. Decl. Ex. 80); USAuPair 30(b)(6) Dep. Tr.  131: 7-133: 12 (defendants demanded DOS remove the stipend from meeting agenda); (Rodr. Decl. Ex. 105); *see also* APC 30(b)(6) [McNamara] Dep. Ex. 8 (warning au pairs that "Legitimate host families will not offer you a higher stipend than what is listed in the regulations published by the" DOS) (Rodr. Decl. Ex. 8).

[15]  APC 30(b)(6) [McNamara] Dep. Tr. at 139:21-144:6 (discussing walk-out) (Rodr. Decl. Ex. 6); APEX-2020 30(b)(6) Dep. Tr. 186:10-15 ("It was very weird at that meeting because the Department of Labor showed up, and a bunch of sponsors walked out") (Rodr. Decl. Ex. 26); EurAuPair Document, EAP0000612, at 616 (meeting minutes for July 17, 2015 meeting with DOL, discussing walk-out) (Rodr. Decl. Ex. 77); Expert AuPair 30(b)(6) Dep. Tr., 128:16-21 (discussing walk-out) (Rodr. Decl. Ex. 80).

[16]  Agent Au Pair 30(b)(6) Dep. Tr. 82:24-83:21 ("I mean, competing to me means that you're sort of fighting . . . to get someone else's customers or something . . . I don't think I ever did that.") (Rodr. Decl. Ex. 1); APC 30(b)(6) [Schneider] Dep. Tr. at 36: 15-24 (defendants compete for host families on price but not *au pairs*) (Rodr. Decl. Ex. 7);

defendants promote homogeny and stability by sharing business methods and

otherwise helping one another.[17]  Four defendants—InterExchange, Cultural Care, Au

Pair in America, and AuPairCare—have worked so closely together that they formed a

fraudulent enterprise.  *See* SAC ¶¶ 215-231.  They are the "RICO defendants."

In short, all the defendants worked systematically to ensure that *au pairs* are

underpaid and defrauded in connection with their right to fair and lawful wages and

working conditions.  That common and collusive course of conduct violates the nation's

---

APEX-2020 30(b)(6) Dep. Tr. 105: 16-21 ("we don't view ourselves as competitors with other au pair agencies") (Rodr. Decl. Ex. 26); APF 30(b)(6) Dep. Tr. 264:1-20 (APF's discounts to host families are not intended to compete with other sponsors) (Rodr. Decl. Ex. 29); APIA 30(b)(6) Dep. Tr. 110:18-111:4 ("if you suggest that we're going to pay the au pair more, then I'm going to have more of a challenge [ . . . ] why would a hosting family go with Au Pair in America when I tell them that the minimum stipend for the au pairs in our program are going to be greater?") (Rodr. Decl. Ex. 44); Cultural Care 30(b)(6) Dep. Tr. 141:21–142:4: ("Q. Does stipend distinguish you from other sponsors? A. Not to my knowledge. Q. Is stipend a distinguishing characteristic for Cultural Care from other sponsors? . . . A. No.") (Rodr. Decl. Ex." 55); EurAuPair 30(b)(6) Dep. Tr. 235:9-236:4 (discussing how EurAuPair does not compete with other defendants because the stipend is "the same regardless which au pair program sponsor" a host family choose) (Rodr. Decl. Ex. 72); GoAuPair 30(b)(6) Dep. Tr. 30:1-9 (discussing how defendant left nanny business because "too competitive" but stayed in au pair program) (Rodr. Decl. Ex. 84); USAuPair 30(b)(6) Dep. Tr. 180:4-8 ("[Q.] So how do you – how do you compete with other sponsors?  A. I don't really.") (Rodr. Decl. Ex. 105).

[17]      *E.g.*, Agent Au Pair 30(b)(6) Dep. Tr. 57:7-9 (cooperation between Agent Au Pair and  USAuPair) (Rodr. Decl. Ex. 1); APC 30(b)(6) Dep. Ex. 23 (cooperation between APC and USAuPair regarding placement of *au pair*) (Rodr. Decl. Ex. 18); APEX-2020 30(b)(6) Dep. Tr. 196: 14-22 (describing discussions to "glean…best practices" from other Sponsors) (Rodr. Decl. Ex. 26); APF 30(b)(6) Dep. Ex. 28 (email between APF and CHI regarding candidate reference) (Rodr. Decl. Ex. 37); ███████████████████
███████████████████████████████████████████████
███████████████; Expert Au Pair 30(b)(6) Dep. Ex. 10 (agreement between Expert Au Pair and "ProAuPair LLC" (defendant APEX)) (Rodr. Decl. Ex. 81); GoAuPair 30(b)(6) Dep. Tr. at 162-169 (cooperation between GoAuPair and InterExchange); Tr. 205:24-206:23  (cooperation between GoAuPair and APC) (Rodr. Decl. Ex. 84).

"fundamental" commitment to competition, as embodied in the antitrust laws. *N.C. State Board of Dental Examiners v. F.T.C.*, 135 S. Ct. 1101, 1110 (2015) ("fundamental" commitment does not waiver even if government actors may be somehow involved in the market). Defendants' wrongful conduct adversely affected every class member by keeping their wages illegally low, and by lying to them about their ability to seek higher wages. *See Arizona v. Maricopca Cnty. Med. Soc.*, 457 U.S. 332, 345-49 (1982); Kerr Dep. Tr. 76:18-77:6 ("if there is collusion the collusion put downward pressure on price and in the absence of collusion there would have been a higher price" for *au pair* labor) (Rodr. Decl. Ex. 150). Defendants' conduct also violates state wage-and-hour laws, constitutes fraud, and gives rise to other state-law violations. As a result of the defendants' conduct, *au pairs* earned wages lower than they were legally required to receive, and lower than they would have been able to receive in the absence of the defendants' fraud and collusion. Kerr Rep. ¶¶ 8-10 (Rodr. Decl. Ex. 148). The specific damages for each class member can be formulaically calculated. *Id.*

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 23, "[o]ne or more members of a class may sue or be sued as representative parties on behalf of all members." In deciding whether to certify a class under Rule 23, a court must undertake a two-step inquiry. *First*, the court must be satisfied that Rule 23(a)'s prerequisites are met: that the proposed class is sufficiently numerous, raises common issues of law or fact, and is represented by named plaintiffs that are typical of the class and adequate to protect absent classmembers' interests. *Shook v. El Paso Cnty.*, 386 F.3d 963, 971 (10th Cir.

10

2004).  *Second*, each class must meet the requirements of at least one Rule 23(b) subsections.  *Id.*  Here, plaintiffs seek to certify classes under Rules 23(b)(2) and (3).

Under Rule 23(b)(2), class certification is appropriate if the class seeks declaratory and injunctive relief because defendants "acted or refused to act on grounds that apply generally to the class as a whole."

A Rule 23(b)(3) damages class, meanwhile, requires that "common questions of law or fact predominate" over individualized issues, and that the class procedure be superior to alternatives for resolving the controversy.  "When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.'"  *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (quoting 7AA C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1778, pp. 123–124 (3d ed. 2005)); *see also Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1196 (2013) ("Rule 23(b)(3), however, does not require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof." (internal quotations and citations omitted)).

At the certification stage, a "Court must accept a plaintiff's substantive allegations as true," though it "need not blindly rely on conclusory allegations which parrot Rule 23," and "may consider the legal and factual issues presented by plaintiff's complaints."  *In re Thornburg Mortg., Inc. Sec. Litig.*, 912 F. Supp. 2d 1178, 1220 (D.N.M. 2012) (internal quotations and citations omitted).  This analysis may implicate some limited merits

inquiry, but only so far as it informs the Rule 23 analysis. *Amgen*, 133 S. Ct. at 1195.

The question always "is not whether the plaintiff or plaintiffs have stated a cause of

action or will prevail on the merits, but rather whether the requirements of Rule 23 are

met." *Anderson v. City of Albuquerque*, 690 F.2d 796, 799 (10th Cir. 1982).

## ARGUMENT

## I.      THIS CASE SATISFIES RULE 23(A)'S PREREQUISITES

The proposed classes in this action satisfy each of the four prerequisites of Rule

23(a)—numerosity, commonality, typicality, and adequacy.

### A.      The Classes Are So Numerous That Joinder All Members Is Impracticable

Class members must be sufficiently numerous that joinder is "impracticable."

Fed. R. Civ. P. 23(a)(1).  "The Tenth Circuit has stated that there is 'no set formula' to

determine whether the numerosity requirement is met; instead, it is a fact-specific

inquiry best left to the district court's discretion."  *Gonzales v. City of Albuquerque*, No.

CIV 09–0520 JB/RLP, 2010 WL 4053947, at *7 (D.N.M. Aug. 21, 2010) (quoting *Rex v.

Owens*, 585 F.2d 432, 436 (10th Cir. 1978)).  Neither extensive evidence nor absolute

precision is needed.  *Colo. Cross–Disability Coal. v. Abercrombie & Fitch Co.*, 765 F.3d

1205, 1214–15 (10th Cir. 2014) (proposed representatives need only offer "some

evidence of established, ascertainable numbers constituting the class" (citing *Rex*, 585

F.2d at 436)).

Courts within the Tenth Circuit commonly certify classes that number in the

thousands, hundreds, or even tens. *E.g.*, *Menocal v. GEO Grp., Inc.*, No. 14-CV-02887-

JLK, 2017 WL 880882, at n.10 (D. Colo. Feb. 27, 2017); *Zuniga v. Bernalillo Cty.*, 11-

12

CV-0877 JB/LAM, 2016 WL 7210148, at *18 (D.N.M. Oct. 25, 2016); *Bennett v. Sprint Nextel Corp.*, 298 F.R.D. 498, 504–05 (D. Kan. 2014) ("good faith estimate" of more than 50 class members satisfied numerosity); *see also* Newberg on Class Actions § 3:12 (5th ed. 2011) (classes of around 40 members are often sufficiently numerous).

As a quantitative matter, the proposed classes here are unquestionably numerous. Although the defendants still have not finished producing *au pair* information, the discovery to date establishes that the proposed nationwide classes have more than 91,201 members. Rodr. Decl. ¶ 162. An additional nearly 20,000 class members are added every year. *See* "J-1 Visa Participant and Sponsor Totals," U.S. Department of State, available at http://bit.ly/2qFLkYZ (last visited June 1, 2017). And one subclass (the NY Training class) has over 61,297 members. *Id.* Under any quantitative measure, these figures satisfy Rule 23(a)(1).[18]

Numerosity has a qualitative aspect too, and the proposed classes are qualitatively numerous. Rule 23(a)(1) asks whether it would be "impracticable" for each member to personally join and participate in the action. "Impracticable does not mean impossible, and a plaintiff only need establish the difficulty or inconvenience of joining all members of the class." *Pliego v. Los Arcos Mexican Restaurants, Inc.*, 313 F.R.D. 117, 125–26 (D. Colo. 2016) (Tafoya, M.J.).

Here, it would be impracticable for each class member to pursue an individual action. Most of the proposed class members reside internationally, as they are required

---

[18] Some of the defendant-and-state specific Subclasses have fewer members, but because all those class members and defendants are also subject to adjudication of the nationwide issues, they are properly viewed in the aggregate. Rodr. Decl. ¶ 162.

to leave the United States within thirty days of their completion of the program.[19]  Most

of the proposed class members are also generally young people for whom English is a

second language.  *See* Janie A. Chuang, *The U.S. Au Pair Program: Labor Exploitation*

*and the Myth of Cultural Exchange*, 36 Harv. J. L. & Gender 270, 275-77, 292 (2013).

And even if it were possible for each class member to pursue their own claim, it

would not be economically reasonable for them to do so, given the costs of litigating a

complicated antitrust conspiracy case against multiple defendants and for damages

that, by regulation, could generally arise from at most two years of service as an *au pair.*

*See* 22 C.F.R. § 62.31(o) (allowing for up to 12-month extension after initial 12-month

program); *id.* § 62.31(p) (allowing repeat participation after residing two years outside of

the U.S. following successful completion of initial program).  In these circumstances, it

would be extremely difficult to join all class members and personally involve them in this

action.  *Cf. Torres–Vallejo v. Creativexteriors, Inc.*, No. 15-CV-2832-WJM-CBS, 2016

WL 7155840, at *8 (D. Colo. Nov. 23, 2016) ("The class members are Mexican

nationals with limited access to U.S. courts, and the value of any individual's claims is

likely too small to make individual litigation cost effective." [superiority analysis]).

## B.  There Are Questions Of Law Or Fact Common Within The Classes

Rule 23(a)(2) asks if "there are questions of law or fact that are common to the

class."  To satisfy this prerequisite, "even a single common question will do," so long as

it is capable of generating a class-wide answer.  *Wal-Mart Stores, Inc. v. Dukes*, 564

---

[19]     *See* Department of State J-1 Visa Program, *Common Questions for Participants*,
*available at* https://j1visa.state.gov/participants/common-questions/ (accessed May 16,
2017) (Rodr. Decl. Ex. 157).

U.S. 338, 350, 359 (2011). That common question need not, however, be dispositive. *CGC Holding Co., LLC v. Broad & Cassel*, 773 F.3d 1076, 1087 (10th Cir. 2014).

As plaintiffs have already demonstrated at the motion to dismiss and FLSA certification stages and is discussed at further length below (in the discussion of predominance), numerous common issues of law and fact are present in this case, the resolution of which is common to all the *au pairs* and defendants. For example, the Court has already observed that the defendants' "antitrust conspiracy" "represents precisely the 'single decision, policy, or plan' that would make plaintiffs and other *au pairs* sponsored by the FLSA defendants similarly situated." FLSA Order at 8-9. The same holds for the national Antitrust and RICO Classes, which arise in part from the defendants' same common policy. So too for the state-law claims, because the state wage-and-hour claims and common law claims arise from the same course of conduct that furthered the overall conspiracy. SAC ¶¶ 582-93; 605-25.

The Court's MTD Order (Rodr. Decl. Ex. 142) points to many other common facts and legal issues that can be resolved uniformly among the classes, including:

1) the defendants secure, vet, and train *au pairs* for host families;[20]

---

[20]     Agent Au Pair Document, AAP_0001135 (partnership agreement with international agents to recruit and interview au pairs) (Rodr. Decl. Ex. 4); APC 30(b)(6) [McNamara] Dep. Tr. 68:12-69:6 (discussing APC's *au pair* training program) (Rodr. Decl. Ex. 6); APEX-2020, 30(b)(6) Dep. Tr. 147:6-149:7 (discussing APEX-2020's *au pair* training) (Rodr. Decl. Ex. 26); APF 30(b)(6) Dep. Tr. 119:13-21 (discussing APF's transport of *au pairs* to the U.S. and training) (Rodr. Decl. Ex.29); API Document, API_36, at ¶¶ 5, 7 ("Au Pair Agreement" requiring completion of API training course, and API's provision of travel to the U.S.) (Rodr. Decl. Ex. 41); APIA 30(b)(6) Dep. Tr. 21:23-22:12 (APIA responsible for "recruitment, training, placement, and supervision of au pairs") (Rodr. Decl. Ex. 44); Cultural Care 30(b)(6) Dep. Tr. 81:2-9 ("The training school is the required first stop for all au pairs coming to the U.S. to make sure that they have the mandatory orientation programming before they travel to their host family")

2) the defendants effectively dictate *au pair* wages (as described in the antitrust allegations);

3) the defendants have a statutory obligation to ensure that *au pairs* are paid in compliance with state and federal minimum wage laws, do not provide more than 10 hours of child care per day or 45 hours of child care in any week, receive a minimum of one and one-half days off per week in addition to one complete weekend off each month, and receive two weeks of paid vacation, 22 C.F.R. § 62.31(j);

4) the defendants exert control over *au pair* working conditions, including providing *au pairs* with training, visiting *au pairs* on a monthly basis (and twice-monthly visits in the first two months of *au pair* placement), monitoring host families by quarterly contact, providing specific employment tasks, and even asking personal, invasive, and illegal questions to control *au pairs*' placement;[21]

---

(Rodr. Decl. Ex. 55); CHI 30(b)(6) Dep. Ex. 14, ("Welcome to CHI Au Pair USA! training presentation given to au pairs) (Rodr. Decl. Ex. 67); EurAuPair 30(b)(6) Dep. Tr. 211:8-11 (EurAuPair approves content for au pair training) (Rodr. Decl. Ex. 72); Expert AuPair 30(b)(6) Dep. Tr. 81: 9-10 (discussing *au pair* training site in St. Petersburg Florida) (Rodr. Decl. Ex. 80); GoAuPair 30(b)(6) Dep. Tr. 124:23-126:11 (discussing GoAuPair training program) (Rodr. Decl. Ex. 84); GreatAuPair Document, GAP00005913 (program brochure advertising training, travel, insurance, and other assistance GreatAuPair provides to *au pairs* participating in its program) (Rodr. Decl. Ex. 96); InterExchange 30(b)(6) Dep. Tr. 180:14–188:6 (discussing InterExchange's online and in person training program for *au pairs*) (Rodr. Decl. Ex. 97); USAuPair 30(b)(6) Dep. Tr. 22:17-20 (describing USAuPair's training program) (Rodr. Decl. Ex. 105).

[21]     *E.g.*, Agent Au Pair Document, AAP_0002597 at 2623 (employee manual describing required monthly meetings with au pair and calls with host families) (Rodr. Decl. Ex. 5); APC 30(b)(6) [McNamara] Dep. Tr. Dep. Ex. 22 (pre-employment questionare demanding HIV status, a doctor's statement whether the prospective *au pair* has been the "victim of abuse," and disclosure of any "genitourinary" issues) (Rodr. Decl. Ex. 17); APEX-2020 30(b)(6) Dep. Tr. 136:1-137:12 (discussing area director's oversight responsibilities with respect to *au pairs* and host families) (Rodr. Decl. Ex. 26); API Document, API00002248 at 2255-56, (describing training and other program responsibilities) (Rodr. Decl. Ex. 42); APIA 30(b)(6) Dep. Ex. 4 (discussing APIA Community Counselor's oversight responsibilities regarding *au pairs*) (Rodr. Decl. Ex. 45); Cultural Care 30(b)(6) Dep. Tr. 24:24–25:4 ("continued monitoring" of host families and *au pairs* throughout their participation in its program) (Rodr. Decl. Ex. 55); CHI 30(b)(6) Dep. Ex. 19 (au pair agreement detailing prohibited conduct, activities, and responsibilities of au pairs) (Rodr. Decl. Ex. 68); EurAuPair 30(b)(6) Dep. Tr. 244:3-10 (describing monitoring of *au pairs* through quarterly questionnaires) (Rodr. Decl. Ex. 72); Expert Au Pair 30(b)(6) Dep. Tr. 201:1–202:15 (describing training and oversight of

5) the defendants act as the final arbiters of any disputes between *au pairs* and host families regarding wages and hours;[22]

6) the defendants can terminate *au pairs* without the consent of the host family and cause their removal from the United States, whereas a host family cannot terminate an *au pair* without approval from the relevant defendant;[23]

7) the defendants draft the contracts governing the relationships between *au pairs* and their host families;[24] and

---

*au pairs* and host families) (Rodr. Decl. Ex. 80); InterExchange 30(b)(6) Dep. Ex. 39 (male au pairs disfavored and smokers not accepted) (Rodr. Decl. Ex. 103; USAuPair 30(b)(6) Dep. Exs. 4, 5 (discussing program rules, including not permitting *au pairs* to invite members of their own family as guests to no "couch surfing") (Rodr. Decl. Exs. 106, 107).

[22]    *E.g.*, AuPairCare 30(b)(6) [McNamara] Dep. Ex. 9 at ¶ 21; EurAupair 30(b)(6) Dep. Ex. 19 at 3655 ¶ E (Host Family Agreement) ("EurAupair may, in its sole judgment, withdraw the Au Pair from my/our household"); Au Pair Foundation 30(b)(6) Dep Tr. (Rough) 179:5-14; Agent Au Pair 30(b)(6) Dep. Ex. 18 ¶ 2 ("If a dispute arises as to any of these limits or requirements, Agent Au Pair shall resolve said dispute, and its decision shall be final."); APEX and 20-20, 30(b)(6) Dep. Tr. 86: 13-16 ("So if there are any things that come up between a family and the professional au pair, we're there to help either mediate them or help them problem solve."); Interexchange 30(b)(6) Dep. Ex. 5, p. 14 ("Host agrees that any decision regarding an au pair's program status, dismissal, or replacement will be made at the sole discretion of Interexchange…"); USAuPair 30(b)(6) Dep. Tr. 46: 13-15 (Rodriguez Decl. Ex. 105).

[23]    *E.g.* APC 30(b)(6) [McNamara] Dep. Tr. at 48:23-49:25 & 50:24-51:24 (AuPairCare has the right to terminate au pair's employment in its sole discretion) (Rodr. Decl. Ex. 6); ████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
███ CHI 30(b)(6) Dep. Ex. 22 (describing CHI policy to terminate J-1 if an au pair gets married) (Rodr. Decl. Ex. 69); Expert Au Pair 30(b)(6) Dep. Ex. 14 ("Au pairs found to be in violation of program regulations and/or sponsor's rules may be terminated from the program.") (Rodr. Decl. Ex. 83); GreatAuPair 30(b)(6) Dep. Ex. 18,  at 027 (*au pair* must agree "any decision regarding my program status will be made at the sole discretion of GreatAuPair") (Rodr. Decl. Ex. 95); InterExchange 30(b)(6) Dep. Ex. 5, at 14 ("Host agrees that any decision regarding an au pair's program status, dismissal, or replacement will be made at the sole discretion of Interexchange") (Rodr. Decl. Ex. 98).

[24]    *E.g.* APC 30(b)(6) [McNamara] Dep. Ex. 9 (form contract) (Rodr. Decl. Ex. 9); APEX-2020 30(b)(6) Dep. Tr. 69-71 ("Q.  And do you provide the contracts to the host families and au pairs?  A. Yes.") (Rodr. Decl. Ex. 26); APF 30(b)(6) Dep. Ex. 19

8) the defendants provide *au pairs* with health insurance.[25]

*See* MTD Order at 19-20; 29-31 (state law wage and hour claims). All the materials

previously considered by the Court demonstrate that common evidence—such as

standard contracts, handbooks, webpages and other avenues for mass, standardized

messages (*id.* at 31-32)—can (and will) be used to prove these common fact issues.

There are also numerous common legal issues, including:

1) whether the defendants may properly deduct room and board from *au pairs*'

---

(standard form Host Family – Au Pair Agreement) (Rodr. Decl. Ex. 34); APIA Document, AIFS0000061 (standard form Host Family and Au Pair/Companion Agreement) (Rodr. Decl. Ex. 52); Cultural Care 30(b)(6) Dep. Ex. 15 (standard form Au Pair Agreement) (Rodr. Decl. Ex. 62); EurAuPair 30(b)(6) Dep.Tr. Dep. Ex. 25 (EuAuPair's standard form Host Family Au Pair Agreement) (Rodr. Decl. Ex. 76); GoAuPair 30(b)(6) Dep. Tr. 122:13-20 (discussing "standard contract") (Rodr. Decl. Ex. 84); InterExchange 30(b)(6) Dep. Ex. 5 (standard *au pair* application forms) (Rodr. Decl. Ex. 98); USAuPair 30(b)(6) Dep. Ex. 7 (standard form Host Family Agreement) (Rodr. Decl. Ex. 108).

[25] *E.g.*, APC 30(b)(6) Dep. Ex. 21 (Au Pair Handbook, at APC000569, discussing health insurance) (Rodr. Decl. Ex. 16); APEX-2020 30(b)(6) Dep. Tr. 83:8-24 ("We provide the insurance . . . we have a third party that provides the insurance.") (Rodr. Decl. Ex. 26); APF 30(b)(6) Dep. Ex. 20 (Au Pair Handbook, at APF 000178, discussing health insurance) (Rodr. Decl. Ex. 35); API 30(b)(6) Dep. Ex. 3 (International Sending Agent Handbook, at API00002083, discussing health insurance) (Rodr. Decl. Ex. 39); APIA 30(b)(6) Dep. Tr. 146:7-8 ("So her medical insurance is provided.") (Rodr. Decl. Ex. 44); Cultural Care 30(b)(6) Dep. Tr. 86: 1-3 (discussing provision of health insurance) (Rodr. Decl. Ex. 55); CHI 30(b)(6) [Reilly] Dep. Tr. 70: 5-19 (describing medical insurance, and how an au pair with insulin dependency would not be recruited, as insurance does not cover insulin) (Rodr. Decl. Ex. 66); EurAuPair 30(b)(6) Dep. Ex. 19 (EurAuPair Community Counselor Manual, at EAP0003781, discussing healthy insurance) (Rodr. Decl. Ex. 75); Expert AuPair 30(b)(6) Dep. Tr. 38: 3-5 (discussing provision of health insurance to all its *au pairs* through third party) (Rodr. Decl. Ex. 80); GoAuPair 30(b)(6) Dep. Ex. 9 (Local Area Representative Manual at GAP_0001568, discussing insurance) (Rodr. Decl. Ex. 88); GreatAuPair Document, GAP00005913 (discussing insurance) (Rodr. Decl. Ex. 96); InterExchange 30(b)(6) Dep. Tr. 75:16–76:2 (confirming that InterExchange provides health insurance to its *au pairs*) (Rodr. Decl. Ex. 97); USAuPair 30(b)(6) Dep. Tr. 26:3-11 (discussing provision of health insurance to *au pairs*) (Rodr. Decl. Ex. 105).

wages when they are required by law to provide room and board, and it is therefore to the employer's benefit;

2) whether, as defendants contend, a single, since-withdrawn State Department notice could preempt federal law and the State Department's properly promulgated *au pair* regulations;

3) whether, as a matter of law, defendants' asserted misinterpretation of and reliance on a single, since-withdrawn State Department notice (rather than the unambiguous language in the actual regulations), was reasonable or could have any legal bearing on their liability for various claims;

4) whether, as defendants contend, state minimum wage laws do not apply to *au pairs*, notwithstanding the fact that the State Department's regulations expressly incorporates the FLSA, which requires payment in accordance with applicable state minimum wage laws;

5) whether, as defendants contend, they are somehow excused from paying *au pairs* for time spent in mandatory training, notwithstanding the requirements of the FLSA and state law.

Therefore, this case raises numerous class-wide questions of law and fact, which are susceptible to common answers through common proof.

### C. The Claims Of The Plaintiffs Are Typical Of The Classes, And The Plaintiffs Will Fairly And Adequately Protect The Interests Of The Classes

Each plaintiff is typical of her proposed classes, and will fairly and adequately protect the interests of all class members. F.R.C.P. 23(a)(3)-(4). These "typicality" and "adequacy" prerequisites have overlapping considerations, and therefore "tend to merge." *Amchem*, 521 U.S. at 626. Typicality requires all class members to be "at risk of being subjected to the same harmful practices, regardless of any class member's individual circumstances." *DG ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1199 (10th Cir. 2010); *see also Bass v. PJCOMN Acquisition Corp.*, No. 09-CV-01614-REB-MEH, 2011 WL 2149602, at *3 (D. Colo. June 1, 2011) ("A plaintiff's claim is typical of class

19

claims if it challenges the same conduct that would be challenged by the class."). It follows that "typicality does not demand exactly identical interests and claims." *Roberts v. C.R. England, Inc.*, 318 F.R.D. 457, 511 (D. Utah 2017) (internal quotations and footnotes omitted).

Rule 23(a)(4) requires a representative and her counsel "fairly and adequately protect" the class, which requires (1) that neither the plaintiff nor her counsel have a conflict of interest with the class and (2) that both will "prosecute the action vigorously on behalf of the class." *Rutter & Wilbanks*, 314 F.3d at 1188. Where plaintiffs are typical of the class their incentives are aligned with the class and there is unlikely to be any conflict of interest. *See Amchem*, 512 U.S. at 20.

### 1. Plaintiffs Are Typical Of The Class

"In the antitrust context, typicality will be established by plaintiffs and all class members alleging the same antitrust violations by defendants." *In re Rubber Chemicals Antitrust Litig.*, 232 F.R.D. 346, 351 (N.D. Cal. 2005). That is exactly the situation here. *See* FLSA Order at 8-9 ("The conspiracy alleged in the underlying complaint represents precisely 'the single decision, policy, or plan' that would make plaintiffs and other *au pairs* sponsored by the FLSA defendants similarly situated.").

Typicality is similarly easy to demonstrate for the state wage-and-hour claims. The defendant-and-state specific Subclasses ensure that each defendant on those claims is aligned with a plaintiff who worked for that defendant in a particular state. Since plaintiffs are challenging the policies and procedures of the defendants that applied to every *au pair* they placed, the named plaintiffs are typical of the state wage-

and-hour Subclasses.  *See* SAC ¶¶ 317-363; *see also* Section II.C.1, below.

Similarly, because uniform and illegal wages across numerous employers "cannot be explained any other way" besides by defendants' fraudulent course of conduct, and because defendants' false representations were made in advertisements, web pages, and other common communications to class members, plaintiffs' other claims—RICO, fraud, misrepresentation, breach of fiduciary duty, and state statutory violations—are typical of the class.  *CGC Holding Co.,* 773 F.3d at 1089–90 ("In the RICO context," approving a "commonsense inference" that the "behavior of the plaintiffs and class members" was common [predominance analysis]); *Roberts*, 318 F.R.D. at 514 ("where, as here, a party seeks to recover for fraud, the proposed class representative's claims are generally held to be typical of the class members' claims if the allegations can be traced to the same overall fraud, even if class members' specific claims are factually distinct." (internal quotations omitted; quoting William B. Rubenstein, Newberg on Class Actions § 3:36 (5th ed. 2012)); *see also* Section II.C.2, below (predominance analysis for these claims).

Each named plaintiff was indeed a victim of the same fraudulent scheme, tricked into accepting an illegally low wage of approximately $195.75 for up to (or even above) forty-five hours of domestic work per week.[26]  Each received fundamentally the similar

---

[26]    Jimenez Decl. ¶¶ 14-16 (Rodr. Decl. Ex. 118) (recounting her experience working 45 hours per week for approximately $200 as a standard au pair with AuPairCare); Deetlefs Decl. ¶¶ 10-11 (Rodr. Decl. Ex. 111) (recounting her experience of being paid $195.75 per week as a standard au pair with Cultural Care); Harning Decl. ¶¶ 21-22 (Rodr. Decl. Ex. 112) (recounting her experience of being paid approximately $200 per work for at least 45 hours of work as a standard au pair with AuPairCare); Gonzalez Decl. ¶¶ 7-8  (Rodr. Decl. Ex. 116) (recounting her experience of being paid

fraudulent misrepresentations about wages and the *au pair* program.[27]  Each named

plaintiff has provided testimony describing her rate of pay, and that the relevant

defendant established that rate of pay.[28]  Each plaintiff was subjected to the defendants'

---

approximately $200 per week for 45 hours of work as a standard au pair with Go Au Pair); Hlatshaneni Decl. ¶¶ 9-10, 13-15 (Rodr. Decl. Ex. 114) (recounting her experience of being paid approximately $195.75 per week for 40-45 hours, or more, per week, as a standard au pair with Au Pair in America); Beltran Decl. ¶¶ 12-15 (Rodr. Decl. Ex. 109) (recounting her experience working approximately 40 hours per week for $195.75 as a standard au pair with InterExchange); Mapledoram Decl. ¶¶ 9-10 (Rodr. Decl. Ex. 120) (recounting her experience of being paid $195.75 for 45 hours of work as a standard au pair with Expert Au Pair; Azuela Rascon [March 3, 2017] Dep. Ex. 154 at 6-7, 13; 155 (Rodr. Decl. Ex. 123, 124) (detailing her pay and work experience as a standard au pair with Cultural Care); Caramelo Decl. ¶ 3 (Rodr. Decl. Ex. 125) (recalling her experience learning of the $195.75 stipend for 45 hours of work); Reyes Decl. ¶ 6 (Rodr. Decl. Ex. 127) (describing the representation that she would earn $195.75 per week); Elizabeth Decl. ¶¶ 8, 13 (Rodr. Decl. Ex. 126) (describing her experiences working 45 hours per week for $195.75).

27      Rodr. Decl. Ex. 118 (plaintiff Jimenez testifying that Au Pair Care agents told the au pair at her training in New Jersey they would be paid $195.75 per week); Rodr. Decl. Ex. 111 (plaintiff Deetlefs describing how she and other au pair were told in training that au pair are uniformly paid $195.75 *by law*); Rodr. Decl. Ex. 112 (plaintiff Julie Harning testifying that the agency, AuPairCare, informed au pair they would be paid $195.75 per week and could not ask for more money); Rodr. Decl. Ex. 131 (plaintiff Gonzalez testifying that GoAuPair told her what the stipend would be, no more no less); Rodr. Decl. Ex. 114 (plaintiff Hlatshaneni was told by agents of Au Pair in America that if she accepted more than $195.75 per week from the family, she would be discharged from the program and sent back to Africa); Rodr. Decl. Ex. 109 (plaintiff Beltran was told by the agency in Colombia she would be paid $195.75); Rodr. Decl. Ex. 120 (plaintiff Mapledoram was told at training by Expert Au Pair the amount was the same no matter which agency the au pair worked for); Rodr. Decl. Ex. 122, Azuela Rascon Dep. Tr. 29:18-30:7 (plaintiff Azuela Rascon testifying that she was told she would be paid $196 per week); Caramelo Decl. ¶ 3 (Rodr. Decl. Ex. 125) (recalling her experience learning of the $195.75 stipend for 45 hours of work while in Brazil); Reyes Decl. ¶ 6 (Rodr. Decl. Ex. 127) (describing the representation that she would earn $195.75 per week); Elizabeth Decl. ¶ 3 (Rodr. Decl. Ex. 126) (describing posters she saw in Germany advertising the stipend).

28      *E.g.* Jimenez Decl. ¶¶ 5, 11, 14-16 (Rodr. Decl. Ex. 118); Jimenez Dep. Tr. 88:2-11; 148:4-8 (Rodr. Decl. Ex. 119); Azuela Rascon Dep. Exs. 154 at 5-7, 13, 155, 156; Azuela Rascon Dep. Tr. 182:3-19 (Rodr. Decl. Exs. 122); Beltran Decl. ¶¶ 12-15 (Rodr.

unlawful policy of deducting "room and board" from her wages.[29]  And each was

subjected to mandatory unpaid training by a defendant.[30]

---

[29] Decl. Ex. 109); Beltran Dep. Tr. 87:13-16, 106: 4-7, 117:5-24, 158:6-9 (Rodr. Decl. Ex. 110); Hlatshaneni Decl. ¶¶ 9-10, 13-15 (Rodr. Decl. Ex. 114); Deetlefs Decl. ¶¶ 7, 11 (Rodr. Decl. Ex. 111); Gonzalez Decl. ¶¶ 10-11 (Rodr. Decl. Ex. 116); Harning Decl. ¶¶ 21-22 (Rodr. Decl. Ex. 112); Mapledoram Decl. ¶¶ 9-10 (Rodr. Decl. Ex. 120); Caramelo Decl. ¶ 9 (Rodr. Decl. Ex. 125); Reyes Decl. ¶ 6 (Rodr. Decl. Ex. 127) (describing the representation that she would earn $195.75 per week); Elizabeth Decl. ¶¶ 3, 8, 13 (Rodr. Decl. Ex. 126).

[29]     *See, e.g.*, Gonzalez Decl. ¶ 5 (Rodr. Decl. Ex. 116); Gonzalez Dep. Tr. 96: 6-16 (Rodr. Decl. Ex. 131) (testifying about room provided); Beltran Decl. ¶ 5 (Rodr. Decl. Ex. 109); Beltran Dep. Tr. 117:5-24 (Rodr. Decl. Ex. 110) (testifying that her host family paid her $195.75 per week because InterExchange "told them that that was the amount to pay me"); Deetlefs Decl. ¶ 6 (Rodr. Decl. Ex. 111); Deetlefs Dep. Tr. 77:9-15 (Rodr. Decl. Ex. 129) (testifying about room and board generally); Hlatshaneni Decl. ¶ 6 (Rodr. Decl. Ex. 114); Hlatshaneni Dep. Tr. 78: 4-18, 148:12-23 (Rodr. Decl. Ex. 115) (testifying that APIA told her she would be provided with room and board); Harning Decl. ¶ 6 (Rodr. Decl. Ex. 112); Harning Dep. Tr. 64:15-65:4 (Rodr. Decl. Ex. 113) (discussing room and board credit); Jimenez Decl. ¶ 9 (Rodr. Decl. Ex. 118); Jimenez Dep. Tr. Dep. Tr. 133:8-14; 220: 11-17(Rodr. Decl. Ex. 119); Azuela Rascon Dep. Ex. 154 at 6-7, 13; 155 (Rodr. Decl. Exs. 123)  (stating that she was paid approximately $200 per work for 45 hours of work); Caramelo Decl. ¶ 9 (Rodr. Decl. Ex. 125) (recalling Cultural Care telling her that she could not earn more than the $195.75 stipend); Reyes Decl. ¶ 7 (Rodr. Decl. Ex. 127) (describing her pay of approximately $195.75 per week); Elizabeth Decl. ¶¶ 8, 13 (Rodr. Decl. Ex. 126) (describing her experiences working 45 hours per week for $195.75); *see also* Mapledoram Decl. ¶ 5 (Rodr. Decl. Ex. 120).

[30]     *E.g.* Jimenez Decl. ¶ 9 (Rodr. Decl. Ex. 118); Jimenez Dep. Tr. 150:22-25 (Rodr. Decl. Ex. 119) (unpaid AuPairCare training in New Jersey); Azuela Rascon Dep. Tr. 48:23-51:3 (Rodr. Decl. Ex. 122) (discussing Cultural Care training in New York); Beltran Decl. ¶ 8 (Rodr. Decl. Ex. 109) (unpaid InterExchange training in New York); Hlatshaneni Decl. ¶ 6 (Rodr. Decl. Ex. 114) (unpaid Au Pair in America training in New York); Deetlefs Decl. ¶ 6 (Rodr. Decl. Ex. 111) (unpaid Cultural Care training in New York); Gonzalez Decl. ¶ 5 (Rodr. Decl. Ex. 116) (unpaid Go Au Pair training); Harning Decl. ¶¶ 6, 18 (Rodr. Decl. Ex. 112) (unpaid AuPairCare training in New Jersey); Mapledoram Decl. ¶ 5 (Rodr. Decl. Ex. 120) (unpaid Expert Au Pair training in Florida); Elizabeth Decl. ¶ 5 (Rodr. Decl. Ex. 126) (unpaid Cultural Care training in New York); describing her experiences working 45 hours per week for $195.75); Caramelo Decl. ¶ 4 (Rodr. Decl. Ex. 125) (unpaid Cultural Care training in New York); Reyes Decl. ¶ 7 (Rodr. Decl. Ex. 127) (describing her pay of approximately $195.75 per week); *see also* Reyes Decl. ¶¶ 2, 3 (Rodr. Decl. Ex. 127) (APIA au pair from Chile).

Indeed, the named plaintiffs have consistently testified that they appreciated their typicality even before bringing this suit.  Most importantly, they knew that "all au pairs . . . from other agencies were getting paid the same amount."  Hlatshaneni Dep. Tr. 168:3-11 (Rodr. Decl. Ex. 115); *see also* Ex. J to D.E. 383 (excerpts of Gonzalez Dep. Tr.) (Rodr. Decl. Ex. 131) (describing plaintiff Gonzalez's interaction with many *au pairs*, all of whom were paid $195 and change per week).

Plaintiff Azuela's story is illustrative.  She answered a Cultural Care advertisement promising the "best years" of her life.  Azuela Dep. Tr. at 26:24-27:4 (Rodr. Decl. Ex. 122).  Ms. Azuela met with an individual she understood to be a Cultural Care representative, who told her that she was going to earn $196 dollars per week.  *Id.* at 29:20-21.  Ms. Azuela attended a training program in New York City for which she was not paid, and during which time she was informed that she would earn $195.75 per week for her work as an *au pair*.  *Id*. at 182:3-10.  During her time in the United States, Ms. Azuela worked for three host families.  The first two host families paid her $195.75, *id.* at 124:11-16; the third host family rounded up for her childcare duties,[31] paying her $200 weekly, *id.* at 143:15.  During her time as an *au pair*, Ms. Azuela met a number of other *au pairs* who worked for other defendants, including InterExchange.  Ms. Azuela described their common experience:

**Q.  What did they share with you?**

A. It was a big full table of au pairs that we were complaining about what we were doing for the amount that we were paid.  We

---

[31]     Ms. Azuela testified that she was paid additional sums, but that money was expressly for tasks that were unrelated to childcare duties.  *See* Azuela Dep. Tr. 139:6-140:3 (Rodr. Decl. 122).

Case 1:14-cv-03074-CMA-KMT · Document 559 · Filed 06/03/17 · USDC Colorado · Page 29 of 37

thought that it was really low.  We – no one knew how expensive things were in the U.S., how expensive it is to go places in the metro, that how this amount that you were paid trying to go places, it's really hard to even do stuff. . . . So we were discussing about how we didn't have much for what we came here for.

**Q.  Anything else that you recall about your discussion of wages with the au pairs?**

A.  No.  We were discussing only that we thought that we were paying really low and that – I do recall that we even laughed at how illegal people get more payment than us. . . . Yeah, well, girls said that besides her cleaning out the house, there was another person that was coming to her house to clean deeply the house and . . . she asked her how much you earn, and so the other person that just came up once and cleaned the whole house in two hours was paid 25, $50 in those two hours.  So we were laughing at the fact that we do way more for totally minimal amount and we tried to think the right way legally.

*Id.* at 173:22-175:2.  That is, Ms. Azuela—like the other named plaintiffs—suffered injuries typical of other *au pairs*, because their damages all arose from the defendants' common course of conduct.  *Darwin v. Taylor*, No. 12-CV-01038-CMA-CBS, 2012 WL 5250400, at *3 (D. Colo. Oct. 23, 2012) (Arguello, J.) ("Typicality exists where the claims of the representative plaintiffs arise out of the same course of conduct and are based on the same theories as those of the absent classmembers." (internal quotation omitted)).

### 2.  Plaintiffs Have Retained Experienced Counsel And There Are No Conflicts Of Interest

In addition to having claims typical of other class members, class representatives must also retain counsel competent to prosecute the case in order to adequately protect the interests of the class.  *Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180,

1188 (10th Cir. 2002). Counsel are adequate where they are experienced, have

knowledge of the case's subject matter, and have no conflict of interest with the class.

*See Decoteau v. Raemisch*, 304 F.R.D. 683, 689 (D. Colo. 2014).

The named plaintiffs' attorneys are more than adequate. Towards Justice has

extensive experience representing wage-and-hour classes in this District,[32] and this

Court has previously appointed them class counsel in another wage-and-hour case.

*Avendano* Class Order at 18 (Rodr. Decl. Ex. XX). Boies Schiller Flexner LLP ("BSF"),

meanwhile, is an international law firm that has assembled a team for this case that is

composed of litigators with immense trial and appellate experience, who have

represented both plaintiffs and defendants in numerous class actions.[33] For example,

three BSF partners are former federal prosecutors who have tried dozens of cases and

---

[32]     *E.g.*, *Solis v. Circle Group, LLC*, 16-cv-01329-RBJ; *Rojas v. Westco Framers, LLC*, 15-cv-0168-WJM; *Menocal v. GEO Group, Inc.*, 14-CV-02887-JLK; *Gentry v. National Multi List Svc. Inc.*, 14-cv-00858-PAB.

[33]     Schwartz, M. Bio., *available at* https://www.bsfllp.com/lawyers/matthew-l-schwartz.html (last accessed May 18, 2017); Skinner, P. Bio., *available at* https://www.bsfllp.com/lawyers/peter-m-skinner.html (last accessed May 18, 2017); Jackson, R. Bio., *available at* https://www.bsfllp.com/lawyers/randall-w-jackson.html (last accessed May 18, 2017); Smalls, D. Bio., *available at* https://www.bsfllp.com/lawyers/dawn-l-smalls.html (last accessed May 18, 2017); Rodriguez, S. Bio., *available at* https://www.bsfllp.com/lawyers/sean-phillips-rodriguez.html (last accessed May 18, 2017); Louis, L. Bio., *available at* https://www.bsfllp.com/lawyers/lauren-e-louis.html (last accessed May 18, 2017); Libling, J. Bio., *available at* https://www.bsfllp.com/lawyers/joshua-james-libling.html (last accessed May 18, 2017); Valdivieso, J. Bio., *available at* https://www.bsfllp.com/lawyers/juan-p-valdivieso.html (last accessed May 18, 2017); Pacheco, B. Bio., *available at* https://www.bsfllp.com/lawyers/byron-d-m-pacheco.html (last accessed May 18, 2017); Schwartz, D. Bio., *available at* https://www.bsfllp.com/lawyers/daniel-schwartz.html (last accessed May 18, 2017).

overseen complex fraud and RICO investigations, among other things.[34]  One BSF

lawyer has personally tried more than 30 cases, and has previously helped secure a

favorable judgment for a certified class of children on Medicaid in a *pro bono* matter.[35]

BSF has a world-wide reputation as a preeminent antitrust litigation firm (both on behalf

of defendants as well as plaintiffs, including in class actions), and two BSF partners and

one counsel involved in this case are experienced antitrust litigators.[36]  One Partner is

currently involved in another significant wage-and-hour matter.[37]  And every single BSF

team member has litigated complex class actions involving tort claims.[38]  In short,

plaintiffs' attorneys are more than adequate.

Finally, in order to be adequate class representatives, neither the proposed

representatives nor their counsel may have a conflict of interest with other class

members.  *Rutter & Wilbanks*, 314 F.3d at 1188.  There are no such conflicts here.

For these reasons, the proposed class representatives have claims typical of

other class members; they will adequately and fairly prosecute the classes' claims; they

have selected well-qualified counsel; and there are no conflicts of interest.

## II.    CERTIFICATION IS APPROPRIATE UNDER RULE 23(B)(3) BECAUSE COMMON ISSUES OF LAW OR FACT PREDOMINATE

As discussed above, virtually all of the significant questions in this case, both

---

[34]    Schwartz, M.; Skinner, P.; Jackson, R. at footnote 33, above.

[35]    Louis, L. at footnote 33, above.

[36]    Jackson, R.; Rodriguez, S.; Libling, J. at footnote 33, above.

[37]    Public proceedings related to the matter at *Zoumer v. WeWork Companies Inc.*, 4:16-cv-00340-JSW (N.D. Cal.).

[38]    Footnote 33, above.

legal and factual, are inherently class-wide questions, with class-wide answers,
susceptible to common proof.  That is enough to satisfy Rule 23(b)(3)'s predominance
requirement, and the court need go no further.  *Tyson Foods*, 136 S. Ct. at 1045
(certifying wage-and-hour class, holding: "When one or more of the central issues in the
action are common to the class and can be said to predominate, the action may be
considered proper under Rule 23(b)(3)").  The sections that follow, however, elaborate
on why a class action is particularly suitable to resolve those common issues, and
explain why more peripheral issues are properly adjudicated on a class basis, as well.

### A.    The National Antitrust And RICO Classes Were Harmed By A Conspiracy And Common Course Of Conduct

#### 1.  The Conspiracy-Based Claims Satisfy Rule 23(b)(3)

"Under the prevailing view, price-fixing affects all market participants, creating an
inference of class-wide impact," leading courts to regard the "existence of a conspiracy
as the overriding issue even when the market involves diversity in products, marketing,
and prices."  *In re Urethane*, 768 F.3d 1245, 1254-55 (10th Cir. 2014).  The defendants'
common agreement to fix wages is the foundational liability issue in the antitrust claims.
MTD Order at 6 (noting that "**the crucial question is whether the challenged
anticompetitive conduct stems from independent decision or from an agreement.**"
(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553 (2007)) (emphasis in Order)).
Indeed, recognizing that the existence of an anticompetitive agreement is the
predominant issue, each and every one of the defendants challenged the plaintiffs'

28

complaint by attacking the sufficiency of the allegations of conspiracy. [39]  Trial of the

antitrust claims will likewise revolve around the single, and therefore predominating,

question of whether the defendants agreed to hold *au pair* wages at an illegal level (as

plaintiffs will demonstrate), or if, as the defendants contend, they each independently

decided to violate the labor laws in precisely the same way.

The conspiracy also has a common purpose.  Defendants suppress *au pairs'*

wages—the biggest component of an *au pair*'s total "cost" to a host family—so they can

take artificially high fees for themselves in comparison to other forms of child care, such

as nannies or daycare, in which a larger proportion of the total "cost" to the family is

childcare labor.  *See* MTD Order at 5 (explaining the economic logic that "wage-fixing"

benefits defendants in both these ways); *see also Telecor Commc'ns, Inc. v. Sw. Bell

Tel. Co.*, 305 F.3d 1124, 1134–36 (10th Cir. 2002) (discussing some economic effects

of fixing wages); Kerr Dep. Tr. 164:12-165:11 (Rodr. Decl. Ex. 150).

The economic benefit to the defendants from their wage-fixing conspiracy has

been borne out in discovery.  ████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

*see also* API 30(b)(6) Dep. Tr. at 95:10-96:23, 98:7-99:6 & Ex. 20 (Rodr. Decl. Ex. 38 &

---

[39]      D.E. 127 at 11-12; D.E. 135 at 9-20; D.E. 130 at 24-25 (joining DE 135), D.E. 131
at  1 (joining D.E. 135); D.E. 132 at 2 (joining D.E .135); D.E. 133 at 2 (joining D.E.
135); D.E. 136 at 3-4.  Apart from the inference of conspiracy, Plaintiffs pursued no
other discernable antitrust argument except for Cultural Care's theory that the DOS
somehow ratified defendants' wrongdoing and immunized them from legal challenge.
D.E. 127, Cultural Care Mot. to Dismiss at 9-11.  All the purported evidence Cultural
Care cited for that theory was common to all defendants.  *Id.* at 10 (citing a regulation
and communications to Cultural Care and "the other sponsors").

40) (host family demanded discount for a "non-standard" *au pair* that API offered for higher pay; defendants refuse to sacrifice any of its own fees; *au pair* paid $195.75).

Substantially the same analysis applies to the RICO Class. RICO claims premised on wire and mail fraud (as here) rest on a common "scheme or artifice to defraud" carried out by defendants through a single "enterprise." *Bridge v. Phoenix Bond & Indemn. Co.*, 553 U.S. 639, 647 (2008); SAC ¶ 578. Moreover, there is no "reliance" element under the mail and wire fraud statutes, *Bridge*, 553 U.S. at 639, so exposure to "generally uniform" misrepresentations transmitted via the mail or wires is enough. *Roberts*, 318 F.R.D. at 514. That is precisely what plaintiffs alleged, and what they will prove – through evidence of advertisements, marketing materials, web sites, and other "generally uniform" misrepresentations about *au pair* wages. *E.g.*, SAC ¶¶ 98-123. In sum, because the defendants function together as one enterprise engaged in racketeering activity and executed a common fraudulent scheme, which will be proved principally through common evidence, the RICO Class satisfies Rule 23(b)(3).

### 2. Defendants Cannot Undermine The Predominance Of Common Questions By Quarreling About A Few Particular Class Members Or Inventing Damages-Related Issues

As they did at the FLSA conditional certification stage, defendants will likely attempt to find outliers, and speculate about differences among class members. Minor differences among class members, however, cannot defeat the clear common questions of law and fact that predominate in this case. *E.g., Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2412 (2014) ("That the defendant might attempt to pick off the occasional class member here or there through individualized rebuttal does not

cause individual questions to predominate."); *Kohen v. Pacific Inv. Mgmt. Co.,* 571 F.3d 672, 677 (7th Cir. 2009) ("a class will often include persons who have not been injured by the defendant's conduct; indeed this is almost inevitable because at the outset of the case many of the members of the class may be unknown, or if they are known still the facts bearing on their claims may be unknown."); *Torres v. S.G.E. Mgmt., LLC*, 838 F.3d 629, 643-46 (5th Cir. 2016) (rejecting "conjecture" and "speculation" that various classmembers might not have been defrauded; affirming certification [RICO case]).

Nor can defendants point to hypothetical individualized damages issues to defeat class certification. As an initial matter, courts routinely certify Rule 23(b)(3) classes even when *damages* differ among the classmembers, so long as the common questions predominate over individual ones or a model can calculate damages classwide. *Sibley v. Sprint Nextel Corp.*, 315 F.R.D. 642, 660-64 (D. Kan. 2016) (certifying class because there were "common questions of fact and law that can be decided in one stroke, and these common questions are not overwhelmed by the individualized fact question of damages" (internal quotation omitted)). Where, as here, there is a common *approach* to analyzing damages, there is absolutely no impediment to class certification. Indeed, courts have not hesitated to hold that common questions predominate even in cases with significant material differences among class members.

For example, *In re High-Tech Employee Antitrust Litigation* involved an antitrust conspiracy not to "poach" workers (*i.e.*, compete for their labor). 985 F. Supp. 2d 1167 (N.D. Cal. 2013). The *High-Tech* Court certified a class comprising workers "in the technical, creative, and/or research and development fields" with fourteen different job

31

titles. *Id.* at 1171, 1177. The class was proper even though it consisted of members with diverse skills who were paid dramatically different wages, because "all class members, regardless of their individual employers, allege[d] the same injuries arising from common conduct: suppression of compensation due to defendants' anti-solicitation agreements." *Id.* at 1181. The court found that the plaintiffs could overcome differences among the class members via an expert using, among other tools, a regression model showing that but-for the conspiracy the class members would have been paid more, on average. *See id.* at 1210 (noting that expert "used the model to estimate the average or net under-compensation at each firm during the conspiracy period"). Other cases have likewise approved of the use of expert analysis to overcome differences among class members. *E.g.*, *Merenda v. VHS of Mich., Inc.,* 296 F.R.D. 528, 541 (E.D. Mich. Sept. 13, 2013), *reinstated at* 2014 WL 905828 (E.D. Mich. Mar. 7, 2014) (certifying class of registered nurses in wage-fixing case where plaintiffs' expert derived a "'conservative estimate' of the 'but-for' hourly pay rate that each member of the proposed RN class would have received, at a minimum, in the absence of Defendants' alleged agreement to regularly share RN compensation data.").

This case is far easier than any of those. All "standard" *au pairs* have the same job title;[40] are able to be employed for standardized durations;[41] have similar

---

[40]     *See* SAC, at ¶ 81 (defining "standard *au pair*" position as one in which the wage is set at $195.75 per week for 45 hours of work – a position that all Sponsors offer, despite the fact that some Sponsors offer other, non-standard au pair positions) (Rodr. Decl. Ex. 146).

[41]     *See* 22 C.F.R. § 62.31(c)(1) and (p) (allowing au pairs to participate in the program for one or two years).

qualifications;[42] have the same or substantially the same base pay;[43] and are subject to nearly identical regulations and guidelines enforced by every defendant.[44]  The defendants in fact treat *au pairs* as fungible commodities, not unique persons.[45]

Therefore, no complicated economic modeling is necessary to see that damages individualized issues will not predominate in this case.  *Kaiser v. At The Beach, Inc.*, No. 08-CV-586-TCK-FHM, 2010 WL 5114729, at *22 (N.D. Okla. Dec. 9, 2010) (no damages expert needed in wage and hour case; certifying class).  Even though no

---

[42]     *See* 22 C.F.R. § 62.31(d)(1)-(6) (all au pairs are between the ages of 18 and 26; secondary school graduates or the equivalent; proficient in English; physically capable of participating in the program; have been interviewed in English; and have passed a background investigation and criminal background check).

[43]     By agreement of the defendants, standard au pairs are paid approximately $195.75 per week for up to 45 hours of childcare.  *See, e.g.* GoAuPair Document, GAP_00012089 (noting that the "stipend is the same for most programs") (Rodr. Decl. Ex. 93); APC 30(b)(6) [McNamara] Dep. Tr. 36:15-19 ("Q. In your experience in the industry, have you ever found it to be the case that au pair sponsors compete for au pairs by offering au pairs a higher stipend? A. No.") (Rodr. Decl. Ex. 6); APIA 30(b)(6) Dep. Ex. 31 ("Competitive analysis for au pair programs (October 2009)", showing all Sponsors listed charging $195.75 for standard au pairs) (Rodr. Decl. Ex. 51); APEX-2020 30(b)(6) Dep. Tr. 226:23-24 ("A.  That's my view, based on my history in the – managing au pair programs", that all "regular" au pairs get $195.75 weekly minimum) (Rodr. Decl. Ex. 26); *see also* Kerr Affidavit ¶ 9 (survey results show that the great majority (almost 90%) of *au pairs* were paid a sub-minimum wage within +/-2.5% of $195.75).

[44]     As described above, all defendants subjected all *au pairs* to identical policies, including (a) imposing an unlawful wage of $195.75 per week for up to 45 hours of work, in contravention of the federal minimum wage and higher state wages where applicable; (b) failing to pay *au pairs* overtime for hours worked in excess of 40 per week; (c) improperly crediting against *au pairs'* wages items such as room and board; and (d) failing to pay *au pairs* for hours worked, such as during mandatory training periods.

[45]     *See* API 30(b)(6) Dep. Tr. 50:8-20 (Rodr. Decl. Ex. 38) (no attempt to differentiate standard *au pairs* on quality or training); APIA 30(b)(6) Dep. Tr. 100:24-101:3 (Rodr. Decl. Ex. 44) (questioning why a host family would choose to host through APIA if it were to pay higher than $195.75); Ex. A to D.E. 383 at AAP_46 at 98 (Rodr. Decl. Ex. 162) (listing *au pair* concerns; "Sponsor doesn't care about the au pair; they only care about the host family and the money").

expert is needed, plaintiffs have nonetheless proffered the testimony of Dr. Kerr. His

analysis demonstrates that the harm to class members is common, and arises from the

defendants' unitary course of conduct. Kerr Report ¶¶ 8-10 (Rodr. Decl. Ex. 148) ("the

members of the proposed class suffered common harm from the alleged actions of

Defendants in that virtually all were paid a wage below the legal minimum and that

wage was depressed by the complained-of actions . . ."); Kerr Dep. Tr. at 209:23-

210:10; 293:23-294:20 (Rodr. Decl. Ex. 150). Among other things, Dr. Kerr devised a

survey of host families and analyzed the results, which confirm that the defendants'

conspiracy had a common impact:  Nearly 90% of *au pairs* were paid from $195.75 +/-

2.5% per week. Kerr Affidavit ¶ 9 (Rodr. Decl. Ex. 151); *cf. Verdin v. R&B Falcon

Drilling*, No. G-00-488, 2006 U.S. Dist. LEXIS 43273 (S.D. Tex. Apr. 24, 2006)

(certifying class of approximately 60,000 offshore oil workers who alleged that 15

companies and their corporate affiliates conspired to set artificially low wages for

dozens of classes of workers; relying on surveys to show predominance); *see also

Tyson Foods,* 136 S. Ct. at 1048 (2016) (in wage-and-hour case, holding that

representative proof from a sample can show predominance of common questions);

Newlon Dep. Tr. at 215:11-216:16 (Rodr. Decl. Ex. 153) (proffered *defense* expert

admitting that sampling and surveys can establish predominance).

Moreover, Dr. Kerr's analysis illustrates how a straightforward "yardstick"

approach can measure harm to the class by comparing *au pair* wages as unlawfully set

by the defendants, on the one hand, and in accordance with state and federal minimum

wages laws, on the other hand. Kerr Rep. ¶ 10 (Rodr. Decl. Ex. 148) ("the damages of

the proposed class members can be computed for the class in common using a standard model . . . . "); Kerr. Aff. ¶ 10 (Rodr. Decl. Ex. 151); *see also* Kerr Rebuttal ¶ 29 (Rodr. Decl. Ex. 149) (stating that the yardstick method provides for "conservative measure of class-wide damages.").[46]

Thus, even the calculation of damages raises common questions.  Certainly, minor differences among the class members does not defeat the predominance of the many common issues among the class.  *See, e.g., In re Universal Service Fund*, 219 F.R.D 661, 676 (D. Kan. 2004) (accepting "yardstick" approach as reasonable method to prove damages).

### B.    Common Issues Predominate In The Two Training Classes

The FL, NY, and NJ Training Classes also easily meet the predominance requirement.  The Training Classes assert both state wage-and-hour law claims (Counts IX-XI) and the state law claims founded on fraud, misrepresentations, omissions, or deception (Counts III-VI).

### 1.    The Training Classes' Wage And Hour Claims Are Suited For Class Procedure Because The Relevant Defendants Subject *Au Pairs* To Standardized Unpaid Training In A Single State

Common issues predominate in the wage-and-hour claims because the Training Classes were subjected to unpaid training pursuant to a standard policy and standard protocol at specific facilities in a specific state.  The Supreme Court recently confirmed

---

[46]    If the yardstick method for determining damages were found inapplicable to some portion of the class, certification would still be proper:  There are other well-accepted economic methods of proving damages on a classwide basis, *see* Kerr Affidavit ¶10, and the issue of damages may be appropriately bifurcated or deferred after trial because the threshold issue—liability—predominates.  *See In re Urethane*, 768 F.3d at 1251, 1257-59 (affirming class certification after trial).

this type of wage-and-hour class is well suited to Rule 23(b)(3) certification. *Tyson Foods*, 136 S. Ct. at 1048 ("in this case each employee worked in the same facility, did similar work, and was paid under the same policy"; certification of stage wage-and-hour class proper); *see also* Newlon Dep. Tr. 198:7-13 (Rodr. Decl. Ex. 153) (proffered defense expert admitting that with the appropriate information and the ability to "identify the specific training" a class for uncompensated training time "is possible").

Each of the Training Classes involves standardized training that is common across the class. The FL Training Class includes Expert Au Pair *au pairs* whom Expert Au Pair sent to Florida for standardized training. The NJ Training Class consists of all AuPairCare *au pairs*, each of whom was required to attend mandatory, unpaid training in New Jersey. And the NY Training Class similarly consists of all Cultural Care, InterExchange, and Au Pair in America *au pairs*, as well as certain Go Au Pair *au pairs* who were required to attend unpaid training in New York.[47]

In each case, the defendants employ a standard training protocol, and none of them pays *au pairs* for the training time, in violation of the FLSA and state law:

- Expert Au Pair requires its au pairs to attend an unpaid Florida-based training program. Expert Au Pair's 30(b)(6) designee explained that the training takes place in St. Petersburg, Florida. Normally au pairs arrive on a Monday, and will leave to their host families on a Saturday. The training is mandatory, and au pairs are not compensated for it. *See* Expert Au Pair 30(b)(6) [Gaulter] Dep. Tr., May 31, 2017 (Rodr. Decl. Ex. 80 at 18:24–23:3

- AuPairCare has had an unpaid New Jersey-based training program for as long as its 30(b)(6) witness could remember. The program is of a finite duration, and

---

[47] There is no named Go Au Pair plaintiff who received training at this time. Plaintiffs recognize that this Court's holdings concerning class standing prevent Go Au Pair's being added as an NY Training defendant at this time, but request certification nevertheless for the reasons stated at footnotes 4 & 51.

all AuPairCare *au pairs* are required to attend it (absent "an act of God").  APC 30(b)(6) [McNamara] Dep. Tr. at 69:23-71:11 (Rodr. Decl. Ex. 6).

- Au Pair in America requires every *au pair* to undergo a weeklong unpaid training, approximately 32 hours total, in New York.  *See* Hlatshaneni Decl. ¶ 6 (Rodr. Decl. Ex. 114).  The training covers topics such as appropriate childcare techniques, health insurance, living and traveling in the United States, CPR, first aid, and policies, procedures and best practices for au pairs to assimilate with their host families.  *See generally* Rodr. Decl. Ex. 54 (AIFS0062207-62295) (Au Pair in America Orientation Guide for trainers).  At the training, *au pairs* are told that "Au Pair In America sets the stipend that we're supposed to get paid, and the families must adhere to what they're told that they should pay us. And the amount is $195.75, so nothing less and nothing more than that."  Hlatshaneni Dep. Tr. 81: 6-10 (Rodr. Decl. Ex. XX 115 or 132).

- Cultural Care requires every *au pair* to undergo a standardized training in New York City.  "The training school is the required first stop for all au pairs coming to the U.S. to make sure that they have the mandatory orientation programing before they travel to their hosting family.  And so that school located in New York has a manager and, of course, on-site residential staff that support its operations."  Cultural Care 30(b)(6) Dep. Tr. at 81:2-9 (Rodr. Decl. Ex. 55).

- InterExchange requires each prospective *au pair* to come to New York City and attend an identical training.  "Once they've secured their Visa, so they would have a scheduled arrival date that they've agreed on with their family, and then they would arrive to New York for that training"  InterExchange 30(b)(6) Dep. Tr. 187:17–21 (Rodr. Decl. Ex. 97).  The trainings take place approximately twice a month, "but sometimes they're back to back in busier seasons, but, yeah, 24 to 26 per year."  *Id*. at 187: 25-188:3 (Rodr. Decl. Ex. 97).  Interexchange's representative explained that all *au pairs* go through the New York City training, as "it's a State Department requirement that the Au Pairs go through a certain number of hours before reaching the host family home, so everyone has to go through it."  *Id* at 190:11-16 (Rodr. Decl. Ex. 97).

The relevant issues for each of these classes are straightforward and uniform across

the class, and include (1) whether state wage-and-hour law requires employees to be

paid for training time; (2) whether the defendants are somehow exempt from that state

law; and (3) the amount of plaintiffs' damages, which can be calculated formulaically.[48]

> ## 2. The Training Class's Fraud- Or Misrepresentation-Based Claims Are Also Properly Handled Classwide

The *au pairs* in the proposed Training Classes also assert claims for fraudulent

misrepresentations and omissions, breaches of fiduciary duty that induced them to

accept illegally low wages (Counts III-V), as well as state statutory violations founded on

consumer deception (Count VI; Appendix B). As explained in Section III.C.2-3, each

defendant defrauded or deceived *au pairs* by means of standardized misrepresentations

through advertisements, website, marketing materials, form contracts, and other

common communications. Those falsehoods caused the Training Class members to

accept less pay than they were entitled to—beginning with their first week of training in

the specific state where the specific defendant conducts training, and continuing

throughout their employment.[49]

> ## C. THE STATE LAW CLASS AND SUBCLASSES SHOULD BE CERTIFIED UNDER RULE 23(B)(3).

---

[48]      Especially because there is no factual dispute that members of the NY Training Class are required by the defendants to attend unpaid training, there is no conceivable reason to further break them into defendant-specific subclasses. At most, there would be minor differences in the damages methodology to account for each of the defendants' training policies.

[49]      *See* Decl. of Beaudette Deetlefs ¶ 6 (Rodr. Decl. Ex.111) (attended mandatory unpaid training in New York as prerequisite to becoming Cultural Care au pair); Decl. of Julianne Harning ¶¶ 18-19 (Rodr. Decl. Ex. 112) (attended mandatory, unpaid, training in New Jersey as prerequisite to being an Au Pair Care au pair); Decl. of Johanna Paola Beltran ¶¶ 8-9 (Rodr. Decl. Ex. 109) (attended mandatory unpaid training in New York as prerequisite to becoming Interexchange au pair); Decl. of Lusapho Hlatshaneni ¶¶ 6-7 (Rodr. Decl. Ex. 114) (attended mandatory unpaid training in New York as prerequisite for being an Au Pair in America au pair); Decl. of Laura Mejia Jimenez ¶ 9 (Rodr. Decl. Ex. 118) (attended mandatory unpaid training in New Jersey as a prerequisite for being an au pair with AuPairCare).

Plaintiffs also seek to certify Subclasses that are particular to both a particular

defendant and a particular state's law.[50]  These defendant-and-state-specific

Subclasses are shown on Appendix A.  Each Subclass asserts breach of fiduciary duty,

negligent misrepresentation, fraud, statutory consumer protection or unfair practices

law, and wage-and-hour claims.  (Counts II-VI; IX).

### 1. The State Wage-And-Hour Claims Meet The Predominance Requirement

The state wage-and-hour claims turn entirely on defendants' policies and

practices.  That makes class certification appropriate.  *See Pliego v. Los Arcos Mexican*

*Restaurants, Inc.*, 313 F.R.D. 117, 126 (D. Colo. 2016) (Tafoya, M.J.) (certifying class

"subject to the same alleged company-wide policies of non-payment of overtime

premiums"); *Kerner v. City and Cnty. Of Denver*, 2012 WL 7802744, at *10-11 (D. Colo.

Nov. 30, 2012) (Tafoya, M.J.) (recommending certification of class affected by "a single

---

[50]     Plaintiffs seek to represent a national class and state subclasses on behalf of *au pairs* who suffered the same harm as part of defendants' same conduct.  *See* Appendix A.  Given this Court's opinions rejecting this view on standing grounds (*see* n.4, above), plaintiffs will not press those claims at length here.  For purposes of preserving the issues for appeal, however, plaintiffs contend that multistate (even nationwide) state-law claims may also proceed even though there is not a named plaintiff for every state. *Spencer v. Hartford Fin. Servs. Grp., Inc.*, 256 F.R.D. 284 (D. Conn. 2009) (permitting three named plaintiffs to represent claims under multiple states' laws); *see Morangelli v. Chemed Corp.*, 275 F.R.D. 99, 118 (E.D.N.Y. 2011) ("Distinctions between state laws matter only when they create meaningful differences among the members of the nationwide class."); *Cruz v. Hook-Superx, LLC*, 2010 WL 3069558, at *3 (S.D.N.Y. Aug. 5, 2010) (collecting wage-and-hour cases supporting the proposition that predominance is satisfied "where the 'fundamental elements' of claims are 'substantially similar from state to state").  Notwithstanding some differences in applicable laws, such actions can proceed as a single class if the plaintiffs' claims under various state laws are "susceptible to proof using common evidence."  *In re Terazosin Hydrochloride*, 220 F.R.D. 672, 695 (S.D. Fla. 2004).

policy or practice"), *adopted*, 2013 WL 1222394 (D. Colo Mar. 25, 2013); *see also Fast*

*v. Applebee's Int'l, Inc.*, 243 F.R.D. 360, 364 (W.D. Mo. 2007) (noting in the context of a

wage-and-hour claim, "though each restaurant is different, all bartenders and all servers

are subject to Applebee's corporate policies and training, and all perform essentially the

same duties, which are described in the Core Manual").

Every one of the defendants for whom plaintiffs propose a relevant Subclass has

a consistent practice of unlawfully setting *au pair* wages at $195.75 per week:

- Au Pair in America consistently describes a weekly "stipend" of $195.75 for standard *au pairs*, to both host families and *au pairs*. *See, e.g.,* APIA 30(b)(6) Dep. Ex. 13 (Au Pair in America Fact Sheet; "Weekly Stipend: $195.75  * Weekly stipend established by the U.S. government paid directly to the au pair.") (Rodr. Decl. Ex. 46); APIA 30(b)(6) Dep. Ex. 16 (Rodr. Decl. Ex. 48) (Memo to Community Counselors, June 17, 2009, "All au pairs in their first year and second year on the standard program must receive the increased weekly stipend of $195.75 beginning July 24, 2009."); APIA 30(b)(6) Dep. Ex. 15 (Rodr. Decl. Ex. 47) (FAQ, Au Pair in America Extension Program, "The weekly stipend amounts for the extension year are $195.75 for Au Pairs…").

- Au Pair Care has likewise described a uniform "weekly stipend" of precisely $195.75.  *See, e.g.,* APC 30(b)(6) [McNamara] Dep. Ex. 21 & Tr. 104:13-105:3 (Rodr. Decl. Exs. 16, 6); *id.* Ex. 9 ¶ 29 (Rodr. Decl. Ex. 9) ("Au pair will receive a weekly stipend in accordance with the US Department of State Regulations in the amount of $195.75.").

- Cultural Care describes in its advertisements that all of its *au pairs* earn the same weekly stipend.  *See*, *e.g.*, Cultural Care 30(b)(6) Dep. Tr. 145:21–23 & Ex. 8 (Rodr. Decl. Exs. 55 & 59) ("Salary negotiations are a hassle.  All au pairs earn a weekly stipend of $195.75").

- Expert Au Pair advertises the weekly stipend as precisely $195.75.  *See* Expert Au Pair 30(b)(6) Dep. Tr. 170:16-173:17 (Rodr. Decl. Ex. 80).  Moreover, the defendants' own expert admits that 92% of the Expert Au Pair contracts she analyzed provided for between $195.75 and $200 per week.  Newlon Rebuttal at 5 n.15 (Rodr. Decl. Ex. 152); Newlon Dep. Tr. 222:24-223:2 (Rodr. Decl. Ex. 153).  She thereby demonstrated that Expert Au Pair's *au pair* wages are both ascertainable and below the minimum wage.

- GoAuPair implements "measures to more effectively monitor the au pair's schedule and payment of wages by the host family to ensure regulations are met." GoAuPair 30(b)(6) Dep. Ex. 11 (Rodr. Decl. Ex. 90); Rodr. Decl. Ex. 131 (plaintiff Gonzalez testifying that GoAuPair told her what the stipend would be, no more no less).

- InterExchange described its obligation to monitor its host families and *au pairs* to make sure that regulations related to how much the Au Pair is paid are being adhered to. InterExchange 30(b)(6) Dep. Tr. 58: 7 – 14 (Rodr. Decl. Ex. 97); InterExchange 30(b)(6) Dep. Ex. 14 ("Au Pair Stipend $195.75 per week") (Rodr. Decl. Ex. 99).

Although the predominance of the defendants' common wage policy is more than sufficient to justify class treatment for the state law wage-and-hour claims, it is particularly efficient and appropriate to certify state wage-and-hour claims under Rule 23 while parallel federal Fair Labor Standards Act claims proceed as collective actions under FLSA Section 216(b). *Avendano* Class Order at 5-9 (Rodr. Decl. Ex. XX); *see also Pliego v. Los Arcos Mexican Restaurants, Inc.*, 313 F.R.D. 117, 123–25 (D. Colo. 2016) (Tafoya, M.J.) (same). Such "hybrid" actions are commonplace because there is no inherent incompatibility between federal and state wage-and-hour law, *see Avendano* Class Order at 6 (Rodr. Decl. Ex. XX), and including state claims resolves more claims more efficiently. *See id.* at 20; *Pliego*, 313 F.R.D. at 123-25.[51]

### 2. The State Misrepresentation and Fraud-Based Claims Also Meet The Predominance Requirement

Each defendant makes misrepresentations (including misleading omissions) that are either completely uniform or have no material differences. Plaintiffs' common law misrepresentation or fraud-based theories (Counts III-V) all rely on those

---

[51] Hybrid actions do require a carefully drafted notice to ensure the class understands the difference between the federal and state claims. *Avendano*, Class Order at 6. This Court and proposed class counsel are experienced in giving those notice issues the attention they deserve. *See id.*

misrepresentations, and the elements required to make out the claims are the same no matter the state.[52]  Just as with plaintiffs' RICO claims, because the state law claims arise from the same general misrepresentations that defendants communicated to the entire class, common issues predominate.  *Roberts*, 318 .F.R.D. at 520-21; *see also* Rule 23 Adv. Comm. Notes ("a fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action, and it may remain so despite the need, if liability is found, for separate determination of the damages suffered by individuals within the class"); *Daye v. Cmty. Fin. Serv. Centers, LLC*, 313 F.R.D. 147, 169, n.12 (D.N.M. 2016); *Bustillos v. Bd. of Cty. Comm'rs of Hidalgo Cty.*, 310 F.R.D. 631, 659 (D.N.M. 2015); *Connett v. Justus Enterprises of Kansas, Inc.*, No. CIV. A. 87-1739-T, 1991 WL 13076, at *10 (D. Kan. Jan. 24, 1991) (certifying common law fraud class where "plaintiff's complaint alleges a course of conduct by defendants to misrepresent or omit material information in the relevant documents").

Each of the relevant defendants engaged in an essentially uniform course of misrepresentations that reached members of each Subclass.  For example:

---

[52]    The claims of negligent misrepresentation (Count IV) and fraudulent concealment or constructive fraud (Count V) are straightforwardly premised on the same misrepresentations.  Breach of fiduciary duty (Count III) is not always founded on misrepresentations or fraud—but in this case it is.  A fiduciary duty may arise when there is a special duty of trust or unbiased counsel.  *E.g.*, *Moses v. Diocese of Colorado*, 863 P.2d 310, 321 (Colo. 1993) (quoting the Restatement (Second) of Torts § 74 cmt. a (1979)).  Here, defendants all owed fiduciary duties to the putative classmembers because young foreign nationals were entrusted to their care, and the defendants took advantage of their superior knowledge and power over the putative classmembers through the same course of fraud and misrepresentations that Counts IV and V attempt to remedy.  SAC ¶ 584 & Tafoya Rep. & Rec. re MTD, D.E., 240 at 40 (S. Rodr. Decl. Exs. 146, 161).

- Au Pair in America's Rule 30(b)(6) representative, Senior Vice President Ruth Ferry, described APIA's statements about the $195.75 weekly stipend as a "hook" designed to attract host families and *au pairs* to their program, which was therefore communicated to all host families and *au pairs*. APIA 30(b)(6) Dep. Tr. at 158:15-159:6; 205:6-13 (Rodr. Decl. Ex. 44). APIA repeats that same false "hook" throughout the *au pair* relationship.[53]

- Before this litigation was filed, every AuPairCare host family was forced to sign an agreement containing the same (false) statement: "The Department of State has set the current weekly stipend amount at $195.75 as of July 23, 2009." APC 30(b)(6) [McNamara] Dep. Exs. 26 (¶ 16), 27 (¶ 16), 28 (¶ 16), 29 (¶ 16), 30 (¶ 16), 31 (¶16) (Rodr. Decl. Exs. 19, 20, 21, 22, 23 & 24).[54] Similarly, each *au pair* was required to sign an agreement containing the following (false) statement: "Au Pair will receive a weekly stipend in accordance with the U.S. Department of State Regulations in the amount of $195.75." APC 30(b)(6) [McNamara] Dep. Exs. 9 (¶ 29), 10 (¶ 30), 11 (¶ 35), 12 (¶ 35), 13 (¶ 37), 14 (¶ 37) (Rodr. Decl. Exs. 9, 10, 11, 12, 13, & 14). AuPairCare even sent an email blast to all of its more than 800 *au pairs* falsely proclaiming that "Legitimate host families will also not offer you a higher stipend than what is listed in the regulations published by the US Department of state for the au pair program." APC 30(b)(6) [McNamara] Dep. Ex. 8 (Rodr. Decl. Ex. 8).

- Cultural Care admits that its handbooks and other standardized guidance to host families is not "accurate" in explaining *au pairs'* legally required weekly pay. *E.g.*, Cultural Care 30(b)(6) Dep. Tr. 108:25-109:8 (Rodr. Decl. Ex. 55). Numerous Cultural Care documents contain identical or substantially identical "inaccurate" language. *Id.* at Tr. 124:4-24, Tr. 173:12-22 & Ex. 16 (Rodr. Decl. Exs. 55 & 63). Its marketing materials are even more blunt. For example, Cultural Care told prospective host families, "Salary negotiations are a hassle. All au pairs earn [a] weekly stipend of $195.75." Cultural Care 30(b)(6) Dep. Tr. 145:15-146:20 &

---

[53]     *E.g.* APIA 30(b)(6) Dep. Ex. 13 (Au Pair in America Fact Sheet; "Weekly Stipend: $195.75 * Weekly stipend established by the U.S. government paid directly to the au pair."); APIA 30(b)(6) Dep. Ex. 16 (Memo to Community Counselors, June 17, 2009; "All au pairs in their first year and second year on the standard program must receive the increased weekly stipend of $195.75 beginning July 24, 2009."); APIA 30(b)(6) Dep. Ex. 15, (FAQ, Au Pair in America Extension Program; "The weekly stipend amounts for the extension year are $195.75 for Au Pairs, $250 for Au Pair Extraordinaire and $146.81 for EduCare companions.") (*see* Rodr. Decl. Exs. 46-48).

[54]     In 2016, AuPairCare altered its Host Family Agreement to add the word "minimum" before "weekly stipend amount." *See* APC Document, APC 000349 (Host Family Agreement) (Rodr. Decl. Ex. 25). Prior to that, $195.75 was presented as an inflexible "weekly stipend amount."

Dep. Ex. 8 (Rodriguez Exs. 55 & 59); *see also* Cultural Care 30(b)(6) Tr. at 166:5-14 & Dep. Ex. 13 (Rodr. Decl. Exs. 55 & 61) (examples of misrepresentations on Cultural Care's websites).

- Expert Au Pair advertises that $195.75 is a set weekly rate of pay.  Expert Au Pair 30(b)(6) Dep. Tr. 170:16-173:17 (Rodr. Decl. Ex. 80). Advertisements indicated a weekly cost to host families based upon a stipend of $195.75. *See, e.g.*, Expert Au Pair 30(b)(6) Dep. Tr. 164:20–21 (admitting that weekly estimated cost is "quite likely to be based on the minimum stipend") (Rodr. Decl. Ex. 80).  Expert Au Pair also routinely told host families that the stipend was $195.75.  *See, e.g.*, Expert Au Pair 30(b)(6) Dep. Ex. 17 (Founder and head of Expert Au Pair described instructing host family to pay au pair based on stipend of $195.75);  Expert Au Pair 30(b)(6) Dep. Ex. 23 (email from Expert Au Pair to prospective host family stating that the au pair can "provide 45 hours of childcare per week for a weekly salary of $195.75" with no indication that the stipend was a minimum); Expert Au Pair 30(b)(6) Dep. Ex. 24 (e-mail from Expert Au Pair to prospective host family stating that "There is also a weekly stipend that the au pair must receive each week of $195.75") (*see* Rodr. Decl. Exs. 158, 159, 160).

- GoAuPair's website informs both host families and *au pairs* that the weekly stipend is $195.75.  Go Au Pair 30(b)(6) Dep. Exs. 5, 6, 7 (Rodr. Decl. Exs. 85, 86 & 87; *see also* Go Au Pair 30(b)(6) Dep. Tr. 95:20-96:11 (showing video available at http://www.goaupair.com/host-families/program-costs, last visited May 18, 2017) (Rodr. Decl. Ex. 84).

- InterExchange tells potential *au pairs* that they can earn "nearly $10,000.00" per year, a figure that only makes sense if *au pairs* are being paid *even less* than $195.75 per week for 52 weeks per year ($195.75 x 52 = $10,071).  *See* Louis Decl. at Ex. G.  InterExchange also warned potential *au pairs* that offers to pay higher wages are likely a scam:  "a scammer may pretend to be an *au pair* agency like InterExchange, or a host family that saw your profile online.  . . . They may make you offers that sound amazing, like paying you more than the program amount of $195.75 per week."  *See* Louis Decl. Ex. H-1 (Rodr. Decl. Ex. 144); SAC ¶ 264 (Rodr. Decl. Ex. 146).

Because each defendant made common statements falsely claiming that *au pair* wages were set at $195.75 and otherwise made generalized misrepresentations, class treatment of the state law fraud and misrepresentation claims is appropriate.

**D.  The State Consumer Protection Claims Satisfy Rule 23(b)(3).**

Finally, the defendant-and-state-specific Subclasses assert statutory consumer

protection claims that are appropriately treated as class actions. *See, e.g. Saltzman v. Pella Corp.*, 257 F.R.D. 471, 477 (N.D. Ill. 2009), *aff'd*, 606 F.3d 391 (7th Cir. 2010) (certifying six state consumer fraud subclasses). State-specific subclasses are often appropriate. *See, e.g., Klay v. Humana, Inc.,* 382 F.3d 1241, 1262 (11th Cir. 2004) (noting advantages for grouping state laws and certifying subclasses accordingly); *Fournigault v. Indep. One Mortg. Corp.*, 234 F.R.D. 641, 643 (N.D. Ill. 2006) (certifying seven state subclasses); *Calkins v. Fidelity Bond & Mortg. Co.,* No. 94C5971, 1998 WL 719569, at *3 (N.D. Ill. Oct.8, 1998) (creating state subclasses to avoid conflicts of law); Manual for Complex Litigation (Fourth) § 22.634, p. 412 (2004) (noting the option of creating subclasses if the law of only a few jurisdictions applies).

*Saltzman* is instructive because there the court rejected defendants' argument that individual issues would predominate where each state consumer fraud statute had different requirements. *Id.* at 484 (plaintiffs' "proposal to certify subclasses by each state, to which each state's respective consumer fraud act would apply, makes [defendants' variation argument] irrelevant"). The court reasoned that despite whatever variation may exist, common issues would predominate within each state-specific subclass. *Id.* at 485. In affirming the district court, the Seventh Circuit observed that "[u]nder Rule 23, district courts are permitted to devise imaginative solutions to problems created by the presence in a class action litigation of individual damages issues." *Pella Corp. v. Saltzman*, 606 F.3d 391, 394-96 (7th Cir. 2010). The class proposal of state-specific subclasses provided here by plaintiffs are not "imaginative" and plainly addresses any concerns the Court may have about the variation that could

45

arise in considering the consumer protection laws of nine states.

Nor do these statutory claims add significant complexity to the case. As the chart at Appendix B illustrates, each state's consumer protection law creates liability for unfair, fraudulent, or deceptive practices. Thus, the consumer protection claims turn on the same (common) issues relevant to plaintiffs' state law fraud- and misrepresentation based claims, as well as their federal RICO claim. Any issues the consumer protections claims raise will therefore be classwide and intertwined with other common issues.

### E.   A Class Action Will Be Manageable And Superior To Any Other Available Form Of Adjudication

A Rule 23(b)(3) class must be "superior to other available methods for the fair and efficient adjudication of the controversy." In deciding whether superiority is satisfied, courts in the Tenth Circuit consider factors such as whether it "would be grossly inefficient, costly, and time consuming [for the plaintiffs to pursue individual claims] because the parties, witnesses, and courts would be forced to endure unnecessarily duplicative litigation." *In re Universal Serv. Fund Tel. Billing Practices Litig.*, 219 F.R.D. 661, 679 (D. Kan. 2004).

That standard is easily met here. As discussed above in the context of numerosity, requiring plaintiffs to pursue their claims individually would neither be administrable nor realistic. Tens of thousands of plaintiffs would have to pursue fundamentally identical claims, litigating the same issues over and over again – at great cost to the parties, and at significant expense to the court's resources.

Although not a standalone requirement for certification, in analyzing whether a class action is superior to other forms of adjudication, Rule 23 instructs courts to

46

consider "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(D).[55] In doing so, courts sometimes consider specific ways in which the case can be managed after certification, to assist in the Rule 23(a) analysis. *See* Fed. Jud. Ctr., Manual for Complex Litig. (4th ed.) § 21.141.

Litigating this case as a class action poses no particular manageability concerns. All the Classes and Subclasses turn on a unified course of conduct. Factual and legal issues surrounding that common course of conduct can be resolved jointly. This is most obvious for the classes premised upon an agreement or conspiracy among the defendant (the Antitrust and RICO classes), where proof of the agreement will be identical for all class members. But it applies to the three Training Subclasses and the defendant-specific Subclasses too, because at base this case is concerned with the defendants' uniform wage policies. SAC ¶¶ 8, 89-91, 95-117, 144-47, 180-214.

And the experienced Court and counsel (plaintiffs and defense alike) in this case are more than capable of managing complex litigation and finding "flexible and creative" plans for trying—"in an orderly fashion"—what remains of the case after pre-trial motions. Fed. Jud. Ctr., Manual for Complex Litig. (4th ed.) § 12.11. For instance, trial might be phased so that certain claims proceed first because resolving them could

---

[55] *See, e.g.*, *Foster v. Merit Energy Co.*, 282 F.R.D. 541, 562 (W.D. Okla. 2012) (analyzing manageability as the "principal concern" of the superiority requirement); *In re Telectronics Pacing Sys., Inc.*, 172 F.R.D. 271, 287 (S.D. Ohio 1997) (variations in state law "immaterial" where plaintiffs' proposed subclass showed that the case was manageable and therefore superior to individual actions); *In re Welding Fume Prod. Liab. Litig.*, 245 F.R.D. 279, 293 (N.D. Ohio 2007) (the court could "manage" state-wide subclasses because "plaintiffs do not seek to apply the law of a single state to all of the proposed class members. . . .  Rather, the plaintiffs propose single-state subclasses; if necessary, each subclass could try its claims separately").

47

conceivably exhaust the Classes' damages on other claims, estop defendants from contesting liability, encourage settlement, or otherwise narrow the litigation. Following that trial and further narrowing of the issues, the Court may agree that the remaining claims and classes can fairly be tried together. *See id.* at § 21.141 ("Bifurcation and severance under Rule 42 are available as tools that might make a case more manageable by separating out discrete issues for a phased or sequenced decision by the judge or at trial" in class actions).[56] No matter the procedures used, a class action will be a better use of resources and provide more certainty to all stakeholders than individual actions in the federal or state courts.

## III. CERTIFICATION IS ALSO APPROPRIATE UNDER RULE 23(B)(2) TO ENSURE THE CONTROVERSY IS RESOLVED UNIFORMLY

Separate and apart from the question of whether common issues predominate under Rule 23(b)(3), class action treatment is appropriate in this case under Rule 23(b)(2) because plaintiffs seek class-wide injunctive relief. "Class certification is appropriate under Rule 23(b)(2) where specific, detailed relief can be fashioned in a single injunction without differentiating among class members." *Lozoya v. AllPhase Landscape Constr., Inc.*, No. 12-CV-1048-JLK, 2015 WL 1524639, at *2 (D. Colo. Mar. 31, 2015). In a case brought by workers, Rule 23(b)(2) certification is appropriate when "an injunction or declaratory relief can be fashioned that enjoins defendants from

---

[56] In raising this possibility, plaintiffs certainly do not concede that it is appropriate or necessary to phase the trial of this action. Indeed, the most manageable solution, given the relatively few factual issues in play, may well be to try all claims and issues at once. The point here is simply that the court and counsel can devise procedure to ensure the orderly management of this case as a class action, and that in any event, a class action will be superior to tens of thousands of individual claims.

continuing the main practices challenged in the complaint." *Id.*

Here, the Court can fashion injunctive relief that will (a) enjoin defendants from fixing *au pair* wages; (b) enjoin defendants from making contractual, marketing, or other commercial statements that fail to disclose clearly and accurately that *au pairs* must be paid in accordance with federal and state law, including minimum wage laws, and that *au pairs* are free to negotiate their wages; and (c) enjoin defendants from otherwise violating wage-and-hour laws, such as by requiring *au pairs* to participate in unpaid training, or unlawfully deducting from *au pairs*' wages an arbitrary figure for room and board. The Court can fashion other class-wide injunctive relief and remedial measures to ensure compliance with the law, including the appointment of an independent monitor. As a result, certification under Rule 23(b)(2) is plainly appropriate.

## IV. THE COURT SHOULD APPOINT PLAINTIFFS' COUNSEL AS CLASS COUNSEL AND ORDER A JOINT PROPOSED NOTICE AND NOTICE PLAN

Whenever a class action is certified under Rule 23, the court must appoint class counsel under Rule 23(g) at the same time. Fed. R. Civ. P. 23(c)(1)(B). In doing so, the court should consider, among other things, proposed counsel's experience in class action and complex litigation; the work done "in identifying or investigating potential claims in the action"; "counsel's knowledge of the applicable law"; and "the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv).

Applying these standards, the Court should appoint Boies Schiller Flexner and Towards Justice as co-class counsel. As explained above, the two firms are extraordinarily well qualified and experienced in class actions and complex litigation, especially matters involving antitrust violations, wage-and-hour claims, RICO, and fraud.

49

Towards Justice originally investigated and filed this case, and they were quickly joined by BSF.  Over the intervening two years, BSF and Towards Justice have demonstrated both their commitment to this case, and their subject matter expertise.  The firms have invested thousands of hours, and hundreds of thousands of dollars.  Rodr. Decl. ¶ 161.  In short, proposed class counsel have and will continue to vigorously advocate *au pairs*' rights, and will "fairly and adequately represent the interests of the class[es]."  Fed. R. Civ. P. 23(g)(4); *see also* Fed. R. Civ. P. 23(g)(2).

Finally, plaintiffs respectfully request that the parties be ordered to confer regarding the class notice procedures in light of the Court's decision on this motion, and further be ordered to submit a plan and proposed notice form(s) within 10 days of this Court's order on certification.  The parties should reach agreement on as many issues as possible, and set forth their joint proposal and any disputes in a single, concise filing.  This procedure will ensure the litigation continues to move efficiently.  Of course, plaintiffs would have no objection should the Court order the parties to meet and confer regarding class notice, and to propose a plan and form of notice, while this motion is under consideration.

## CONCLUSION

The Court should certify the classes set forth in Appendix A, appoint BSF and Towards Justice as co-class counsel, and order a joint class notice filing.

Dated: June 2, 2017

Respectfully Submitted,

BOIES SCHILLER FLEXNER LLP

   *s/Matthew L. Schwartz*

Matthew L. Schwartz
Peter M. Skinner
Randall W. Jackson
575 Lexington Avenue
New York, New York 10022
Tel: (212) 446-2300
Fax: (212) 446-2350
mlschwartz@bsfllp.com
pskinner@bsfllp.com
rjackson@bsfllp.com

Sean P. Rodriguez
1999 Harrison Street, Suite 900
Oakland, CA 94612
Tel. (510) 874-1000
Fax: (510) 874-1460

Sigrid S. McCawley
Lauren Fleischer Louis
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, Florida  33301
Tel.: (954) 356-0011
Fax: (954) 356-0022
smccawley@bsfllp.com
llouis@bsfllp.com

TOWARDS JUSTICE
Alexander Hood
1535 High Street, Suite 300
Denver, Colorado  80218
Tel: (720) 239-2606
Fax: (303) 957-2289
alex@towardsjustice.org

*Attorneys for Plaintiffs*

## Certificate of Service

I hereby certify that on June 2, 2017, I electronically filed the foregoing with the

Clerk of Court using the CM/ECF system which will send notification of such filing to all

counsel of record.

Heather Fox Vickles, Esq.
Brooke A. Colaizzi, Esq.
Raymond M. Deeny, Esq.
SHERMAN & HOWARD LLC
633 Seventeenth Street, Suite 3000
Denver, CO 80202
Tel: 303-297-2900
Fax: 303-298-0940
hvickles@shermanhoward.com
bcolaizzi@shermanhoward.com
redeeny@shermanhoward.com

William J. Kelly, III, Esq.
Chandra Marie Feldkamp, Esq
KELLY & WALKER LLC
1512 Larimer Street, Suite 200
Denver, CO 80202
Tel: 720-236-1800
Fax: 720-236-1799
wkelly@kellywalkerlaw.com
cfeldkamp@kellywalkerlaw.com

Meshach Y. Rhoades, Esq.
Martin J. Estevao, Esq.
ARMSTRONG TEASDALE, LLP
1700 Broadway, Suite 2100
Denver, CO 80290-2101
Tel: 720-722-7195
mrhoades@armstrongteasdale.com
mestevao@armstrongteasdale.com

Bogdan Enica, Esq.
111 Second Avenue NE, Suite 204
St. Petersburg, FL 33701
Tel: 727-388-3472
bogdane@hotmail.com

Martha L. Fitzgerald, Esq.
David Meschke, Esq.
BROWNSTEIN HYATT FARBER
SCHRECK, LLP
410 Seventeenth Street, Suite 2200
Denver, CO 80202-4432
Tel: 303-223-1219
Fax: 303-223-1111
dmeschke@bhfs.com
mfitzgerald@bhfs.com

James Hartley, Esq.
Jonathan S. Bender, Esq
HOLLAND & HART
555 Seventeenth Street, Suite 3200
Denver, CO 80202-3979
Tel: 303-295-8000
jhartley@hollandhart.com
jsbender@hollandhart.com

Adam A. Hubbard, Esq.
HOLLAND & HART
1800 Broadway, Suite 300
Boulder, CO 80302-5234
Tel: 303-473-2700
aahubbard@hollandhart.com

Brian Alan Birenbach
RIETZ LAW FIRM, LLC
P.O. Box 5268
114 Village Place, #301
Dillon, CO 80435
Tel: 970-468-0210
Fax: 970-468-0371
brian@rietzlawfirm.com

Robert M. Buchanan, Jr.
Joan A. Lukey
Lyndsey M. Kruzer
Michael T. Gass
Justin J. Wolosz
CHOATE HALL & STEWART LLP
Two International Place
Boston, MA 02110
rbuchanan@choate.com
joan.lukey@choate.com
lkruzer@choate.com
mgass@choate.com

Lawrence, D. Stone
Kathleen E. Craigmile
NIXON SHEFRIN HENSEN
OBURN, P.C.
5619 DTC Parkway, Suite 1200
Greenwood, Vilage, CO 80111
303-773-3500
lstone@nixonshefrin.com
kcraigmile@nixonshefrin.com

Jessica L. Fuller
Diane Hazel
James M. Lyons
LEWIS ROCA ROTHGERBER
CHRISTIE LLP
One Tabor Center, Suite 3000
1200 Seventeenth Street
Denver, CO 80202
jfuller@lrrc.com
dhazel@lrrc.com
jlyons@lrrc.com

Christian Hammond, Esq.
DUFFORD & BROWN, P.C.
1700 Broadway, Suite 2100
Denver, CO 80290-2101
chammond@duffordbrown.com
Thomas B. Quinn, Esq.
Peggy E. Kozal, esq.

John R. Mann, Esq.
GORDON & REES, LLP
555 Seventeenth Street, Suite 3400
Denver, CO 80202
Tel: 303-534-5160
Fax: 303-534-5161
tquinn@gordonrees.com
pkozal@gordonrees.com
jmann@gordonrees.com

Brian P. Maschler, Esq.
GORDON & REES, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111
Tel: 415-986-5900
Fax: 415-986-8054
bmaschler@gordonrees.com

Kathryn A. Reilly, Esq.
WHEELER TRIGG O'DONNELL LLP
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202
Tel: 303.244.1983
Fax: 303.244.1879
reilly@wtotrial.com

Lawrence L. Lee, Esq.
Susan M. Schaecher, Esq.
FISHER & PHILLIPS, LLP
1801 California Street, Suite 2700
Denver, CO 80202
Tel: 303-218-3650
Fax: 303-218-3651
llee@laborlawyers.com
sschaecher@laborlawyers.com

Eric J. Stock
GIBSON DUNN & CRUTCHER, LLP
200 Park Avenue, 48th Floor
New York, NY 10166-0193
estock@gibsondunn.com

_s/Mathew L. Schwartz_
Matthew L. Schwartz