**Exhibit B
to Cultural Care, Inc.'s Unopposed Motion
to Restrict Public Access (Level 1) to Plaintiffs'
Motion for Rule 23 Class Certification and
Appointment of Counsel**

# Exhibit 55

EXHIBIT B

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

-------------------------------x

JOHANA PAOLA BELTRAN, et al.,

      Plaintiffs,     Civil Action No.

vs.           14-cv-03074-CMA-KMT

INTEREXCHANGE, INC., et al.,

      Defendants.

-------------------------------x


  VIDEOTAPED DEPOSITION of CULTURAL CARE,

INC., pursuant to Rule 30(b)(6), designee

NATALIE JORDAN

      April 14, 2017

      Boston, Massachusetts


Magna Legal Services Reported By:

(866) 624-6221    MaryJo O'Connor, RMR/CSR

www.MagnaLS.com    Job No: 308025



Page 2

```
 1

 2

 3

 4

 5

 6                    April 14, 2017

 7                     9:11 a.m.

 8

 9

10         VIDEOTAPED DEPOSITION of CULTURAL

11   CARE, INC., pursuant to Rule 30(b)(6),

12   designee NATALIE JORDAN, held at Choate, Hall

13   & Stewart, LLP, Two International Place,

14   Boston, Massachusetts, pursuant to notice,

15   before MaryJo O'Connor, Registered Merit

16   Reporter, Certified Court Reporter, and

17   Notary Public in and for the Commonwealth of

18   Massachusetts.

19

20

21

22

23

24

25
```



Page 3

```
 1    A P P E A R A N C E S:

 2

 3    COUNSEL FOR THE PLAINTIFFS:

 4        BOIES, SCHILLER & FLEXNER LLP

 5        575 Lexington Avenue, 7th Floor

 6        New York, New York 10022

 7        (212) 446-2300

 8        BY:  DAWN L. SMALLS, ESQ.

 9             dsmall@bsfllp.com

10             DANIEL R. SCHWARTZ, ESQ.

11             dschwartz@bsfllp.com

12

13   (Via telephone)

14   COUNSEL FOR APF GLOBAL FOUNDATION:

15        FISHER & PHILLIPS LLP

16        1801 California Street, Suite 2700

17        Denver, Colorado 80202

18        (303) 218-3650

19        BY:  SUSAN M. SCHAECHER, ESQ.

20             sschaecher@fisherphillips.com

21

22

23

24

25
```



Case No. 1:14-cv-03074-CMA-KMT Document 559-3 filed 06/15/17 USDC Colorado pg 6 of 62

```
 1    A P P E A R A N C E S, Continued:

 2

 3    COUNSEL FOR THE CULTURAL CARE:

 4       CHOATE, HALL & STEWART LLP

 5       Two International Place

 6       Boston, Massachusetts 02110

 7       (617) 248-5000

 8       BY:  JOAN LUKEY, ESQ.

 9            jlukey@choate.com

10            KEVIN O'KEEFE, ESQ.

11            kokeefe@choate.com

12

13    (Via telephone)

14    COUNSEL FOR AUPAIRCARE:

15       GORDON & REES

16       555 17th Street, Suite 3400

17       Denver, Colorado 80202

18       (303) 534-5160

19       BY:  PEGGY E. KOZAL, ESQ.

20            pkozal@gordonrees.com

21

22

23

24

25
```



Page 5

1    A P P E A R A N C E S, Continued:

2

3    (Via telephone)

4    COUNSEL FOR PROAUPAIR, APEX PROFESSIONAL

5    EXCHANGE and 20/20 CARE EXCHANGE D/B/A

6    INTERNATIONAL AUPAIR EXCHANGE:

7        NIXON SHEFRIN HENSEN OGBURN P.C.

8        5619 DTC Parkway, Suite 1200

9        Greenwood Village, Colorado 80111

10       (303) 773-3500

11       BY:  LAWRENCE D. STONE, ESQ.

12            lstone@nixonshefrin.com

13

14

15   (Via telephone)

16   COUNSEL FOR EXPERT AUPAIR:

17       EXPERT AUPAIR

18       100 2nd Avenue S., Suite 3025

19       St. Petersburg, Florida 33701

20       (727) 225-2649

21       BY:  BOGDAN ENICA, ESQ.

22            bogdan@expertaupair.com

23

24

25



```
 1   A P P E A R A N C E S, Continued:

 2

 3    (Via telephone)

 4   COUNSEL FOR AU PAIR INTERNATIONAL, INC.,

 5   AMERICAN CULTURAL EXCHANGE LLC, D/B/A

 6   GOAUPAIR AND AGENT AU PAIR:

 7       WHEELER TRIGG O'DONNELL LLP

 8       370 Seventh Street, Suite 4500

 9       Denver, Colorado 80202

10       (303) 244-1983

11       BY:  KATHRYN A. REILLY, ESQ.

12            reilly@wtotrial.com

13

14    (Via telephone)

15   COUNSEL FOR INTEREXCHANGE:

16       SHERMAN HOWARD LLC

17       633 Seventeenth Street, Suite 3000,

18       Denver, Colorado 80202

19       (303) 299-8302

20       BY:  JOE H. HUNT, ESQ.

21            jhunt@shermanhoward.com |

22

23

24

25
```



1    A P P E A R A N C E S, Continued:

2

3    (Via telephone)

4    COUNSEL FOR CULTURAL CARE:

5       LEWIS ROCA ROTHGERBER CHRISTIE LLP

6       1200 17th Street, Suite 3000

7       Denver, Colorado 80202

8       (303) 628.9527

9       BY:   JESSICA L. FULLER, ESQ.

10           jfuller@lrrc.com

11

12

13    COUNSEL FOR EXPERT GROUP INTERNATIONAL INC.

14    D/B/A EXPERT AUPAIR:

15       BOGDAN ENICA, ESQ.

16       111 Second Avenue NE, Suite 204

17       St Petersburg, Florida 33701

18       (727)388-3472

19       BY:   BOGDAN ENICA, ESQ.

20           bogdane@hotmail.com

21

22

23

24

25



Page 8

1    A P P E A R A N C E S, Continued:

2

3    (Via telephone)

4    COUNSEL FOR AMERICAN INSTITUTE FOR FOREIGN

5    STUDY D/B/A AU PAIR IN AMERICA:

6        PUTNEY, TWOMBLY, HALL & HIRSON LLP

7        521 Fifth Avenue

8        New York, NY 10175

9        (212) 682-0020

10       BY:   JOHN B. FULFREE,  ESQ.

11             Jfulfree@putneylaw.com

12

13

14   ALSO PRESENT:

15       William Dunn, Cultural Care, Inc.

16       Luc-Bernard Val, video technician

17

18

19

20

21

22

23

24

25



```
 1              P R O C E E D I N G S

 2

 3              VIDEO TECHNICIAN:  We are now on

 4         the record.  This begins DVD number one

 5         in the deposition of Cultural Care, Inc,

 6         with designee Natalie Jordan

 7         representative in the matter of Johana

 8         Paola Beltran versus InterExchange

 9         Incorporated, et al in the U.S. District

10         Court for the District of Colorado Civil

11         number 14-cv-03074-CMA-KMT.

12              Today is Friday, April 14, 2017,

13         and the time is 9:11 a.m.

14              This deposition is being taken at

15         the law offices of Choate Hall and

16         Stewart LLP, located in Boston,

17         Massachusetts.  It is being done at the

18         request of the law offices of Boies

19         Schiller & Flexner LLP.

20              The videographer is Luc-Bernard Val

21         of Magna Legal Services, and the court

22         reporter is MaryJo O'Connor of Magna

23         Legal Services.

24              Will counsel and parties all

25         present please state their appearances
```



Page 10

```
 1          and whom they represent.
 2              MS. SMALLS:  Dawn Smalls from
 3          Boies, Schiller & Flexner for the
 4          Plaintiffs.
 5              MR. SCHWARTZ:  Daniel Schwartz from
 6          Boies, Schiller & Flexner for the
 7          Plaintiffs.
 8              MS. LUKEY:  For the Defendants,
 9          this is Joan Lukey, with me is Kevin
10          O'Keefe and in-house counsel Bill Dunn
11          for Cultural Care, Incorporated.
12              In order to keep this organized, as
13          we discussed before we went online, I'm
14          now going to read the names of each
15          sponsor Defendant in the order in which
16          they appear in the Amended Complaint.
17          And ask as I read your name, if you can
18          identify yourself to make your
19          appearance.
20              InterExchange, Inc.
21              MR. HUNT:  This is Joe Hunt from
22          Sherman and Howard on behalf of
23          InterExchange.
24              MS. LUKEY:  USAuPair, Inc.  No one
25          identifies himself other herself.
```



```
 1          GreatAuPair, LLC.  No counsel.

 2          Expert Group International, Inc

 3     d/b/a Expert Au Pair.

 4          MR. ENICA:  Bogdan Enica on behalf

 5     of Expert International doing business

 6     as Expert Au Pair.

 7          MS. LUKEY:  EurAuPair InterCulteral

 8     Childcare Programs.  No response.

 9          Cultural Homestay International.

10          AuPairCare, Inc.  No answer.

11          MS. KOZAL:  Good morning.  This is

12     Peggy Kozal on behalf of AuPairCare,

13     Inc.  Thank you.

14          MS. LUKEY:  Thank you.  Au Pair

15     International, Inc.

16          MS. REILLY:  Good morning.  This is

17     Katie Reilly on behalf of Au Pair

18     International, Inc., and also the

19     GoAuPair Defendants and Agent Au Pair.

20          MS. LUKEY:  Okay.  I may read you

21     again Peggy, because I'm not sure I can

22     remember.

23          Au Pair -- oh, that's one I just

24     did I think.

25          APF Global Exchange NFP.
```



Page 12

<pre>
 1          MS. SCHAECHER:  Susan Schaecher

 2     Fisher & Phillips on behalf of APF

 3     Global.

 4          MS. LUKEY:  American Institute For

 5     Foreign Study d/b/a Au Pair in America.

 6          MR. FULLFREE:  John Fullfree from

 7     Putney, Twombly, Hall & Hirson on behalf

 8     of Au Pair in America.

 9          MS. LUKEY:  The next one I think

10     may be one that Katie indicated she was

11     doing, but I'll read them anyway.

12     American Cultural Exchange LLC doing

13     business as GoAuPair and Agent Au Pair.

14     Katie Reilly, are those two yours?

15          MS. REILLY:  Yes, and Katie Reilly

16     from Wheeler Trigg O'Donnell on both of

17     those.

18          MS. LUKEY:  Thank you.

19          Apex American Professional Exchange

20     d/b/a PROaupair.

21          MR. STONE:  Larry Stone with the

22     firm of Nixon Shefrin Hensen Ogburn

23     appearing on behalf of that entity.

24          MS. LUKEY:  And I believe you also

25     have 20/20 Care Exchange, Inc, d/b/a,
</pre>


MAGNA
LEGAL SERVICES

Page 13

```
 1          the International Au Pair Exchange; is
 2          that right?
 3               MR. STONE:  That's correct.  Thank
 4          you.
 5               MS. LUKEY:  Thank you all.  That's
 6          the complete list of Defendant sponsors.
 7               VIDEO TECHNICIAN:  Thank you very
 8          much.
 9               MS. FULLER:  And excuse me, Joan.
10          Just for the record, this is Jessica
11          Fuller from Lewis Roca Rothgerber
12          Christie also for Cultural Care.
13               MS. LUKEY:  Sorry, Jessica.  Yes,
14          our co-counsel in Colorado.
15               Have we got everybody?  Okay, thank
16          you.
17               VIDEO TECHNICIAN:  Thank you very
18          much.  Will the court reporter now
19          please swear in the witness.
20
21
22
23
24
25
```



```
 1                 NATALIE JORDAN,

 2    having been satisfactorily identified by a

 3    Massachusetts drivers license and duly sworn

 4    by the Notary Public, was examined and

 5    testified as follows:

 6    EXAMINATION

 7    BY MS. SMALLS:

 8         Q.   Good morning.

 9         A.   Good morning.

10         Q.   You understand today -- well, let

11    me -- please state your name for the record?

12         A.   Natalie Jordan.

13         Q.   And who are you testifying for

14    today?

15         A.   Cultural Care, Inc.

16         Q.   Okay.  You understand that your

17    testimony today is under oath and you are

18    offering testimony in this lawsuit?

19         A.   Yes.

20         Q.   Just a few ground rules.  I'm going

21    to ask you a series of questions.  I'm going

22    to -- please wait until my question is

23    finished, and then I'll allow you an

24    opportunity to answer.

25              I won't interrupt you; and if you
```



Page 23

```
 1    communications with other Sponsors, including

 2    Your member in association with other

 3    Sponsors, including but not limited to the

 4    Alliance for International Education and the

 5    International Au Pair Association."

 6         Q.  Do you feel qualified to testify to

 7    topic number 5?

 8         A.  Yes.

 9         Q.  Can you state what your competence

10    is to testify to topic number 5?

11         A.  My experience with the organization

12    and the role that I have allows me to feel

13    that I'm competent to do so.

14         Q.  If you can read topic number 6?

15         A.  "Your analysis and identification

16    of the market(s) in which you operate,

17    including any analysis of the compensation

18    paid to childcare professionals other than

19    au pairs."

20         Q.  Do you feel qualified to testify to

21    topic number 6?

22         A.  Yes.

23         Q.  And what's the basis of your

24    competence to testify to topic number 6?

25         A.  My experience with the organization
```



Page 24

1    and years of service allow me to feel

2    comfortable, more competent, to do so.

3            Q.  Topic number 7 relates to your

4    document retention and your document -- the

5    maintenance of your documents.

6            Do you feel comfortable testifying

7    to topic number 7?

8            A.  I feel comfortable and competent to

9    testify to part of it, though I'm certainly

10   not a technology expert.  And so my ability

11   specifically in Item 7(b) would be limited.

12           Q.  Okay, thank you.

13           Can you tell me what is Cultural

14   Care?

15           A.  Well, Cultural Care Au Pair, for

16   whom I represent, is a U.S.-based designated

17   sponsor of the au pair program.

18           Q.  And do you represent Cultural

19   Care -- you represent Cultural Care Au Pair?

20           A.  Cultural Care, Inc.

21           Q.  Okay.  And it is a designated

22   sponsor for au pairs.  And in your role as

23   sponsor, what functions do you conduct?

24           A.  We are responsible for ensuring

25   compliance with State Department regulations



Page 25

 1   as a sponsor, but also for the monitoring of

 2   placements of au pairs with hosting families

 3   and the support, continued monitoring, during

 4   their term together in the United States.

 5          Q.   So ensuring compliance is the

 6   stated functions -- again, I'm just starting

 7   very generally -- for Cultural Care is

 8   ensuring compliance with State Department

 9   regulations and the monitoring and placement

10   of au pairs?

11          A.   Correct.

12          Q.   Does it have any other functions?

13          A.   Well, within that, the ongoing

14   support of au pairs and hosting families, the

15   recruiting of hosting families, the

16   operations of the training school program.

17          Q.   What is EF?

18          A.   EF is a -- there are a number of

19   legal entities that make up the EF Education

20   First group.

21          Q.   Well, when Cultural Care refers to

22   "EF," what is it referring to?

23          A.   It is referring to -- so Cultural

24   Care, Inc., is a separate legal entity, and

25   EF is comprised of a group of other legal



Page 26

```
 1   entities and we are affiliated with some of

 2   those.

 3          Q.  So is Cultural Care a division of

 4   EF?

 5          A.  No.  Cultural Care is a separate

 6   legal entity.

 7          Q.  Is Cultural Care affiliated with

 8   EF?

 9          A.  Cultural Care is affiliated with

10   the legal entities that, as a group, make up,

11   or are part of the EF Educational --

12   Education First.

13          Q.  Okay.  Do you have a position at

14   EF?

15          A.  No.

16          Q.  Do you have an e-mail, an EF e-mail

17   address?

18          A.  That's not my primary e-mail

19   address.

20          Q.  Okay.

21          A.  I believe that there is an EF

22   e-mail address that exists, but it's not the

23   one that I use.

24          Q.  Why would you have an e-mail

25   address at a separate legal entity?
```



Page 80





Page 81



```
2              The training school is the required

3    first stop for all au pairs coming to the

4    U.S. to make sure that they have the

5    mandatory orientation programing before they

6    travel to their hosting family.  And so that

7    school located in New York has a manager and,

8    of course, on-site residential staff that

9    support its operations.
```



Page 82

14          MS. SMALLS:  Exhibit 5.

15               (Document marked for

16       identification as Jordan Exhibit 5)

17          Q.  Are you familiar with this

18   document?

19          A.  Yes.

20          Q.  If you can turn your attention to

21   Page 3, Bates numbers 34508.

22          MS. LUKEY:  For those on the phone,

23       this is the one that begins at

24       CC00034504.



Case 1:14-cv-03074-CMA-KMT   Document 588-55   Filed 06/02/17   USDC Colorado   Page 23 of 61

Page 85





Case No. 1:14-cv-03074-CMA-KMT   Document 559-3   filed 06/16/17   USDC Colorado   pg 24 of 61

Page 86





Case 1:14-cv-03074-CMA-KMT   Document 588-55   Filed 06/02/17   USDC Colorado   Page 25 of 61

Page 87





1          Q.  That's fine.

2          A.  Okay.

3          Q.  And what entity are we referring to

4     here?

5          A.  International Care Limited, or ICL.

6          Q.  Okay, this is ICL.  Is it fair to

7     say that ICL is also referred to as Cultural

8     Care Limited?

9          A.  Do you mean -- in this context,

10    it's referring to ICL.

11         Q.  In any context.  The language says

12    "Cultural Care Au Pair -- "Au Pair's

13    affiliate, Cultural Care Limited," and then

14    it explains a staff in various countries.  It

15    doesn't say ICL.  It says Cultural Care

16    Limited.

17              So I asked you what entity are you

18    referring to here.  You told me ICL.  So what

19    I'm asking is:  Is Cultural Care Limited the

20    same as ICL?

21         A.  It is referring to -- it is

22    intended to refer to ICL.  I don't know of

23    Cultural Care as ICL being known as a

24    different legal name such as Cultural Care

25    Limited.  But what is intended in this



1    statement is a reference to ICL.  That's what

2    it's intended to refer to.

3         Q.  Let's go to Page 11.  Second

4    paragraph, can you just read that first

5    sentence?

6         A.  "As participants in the program,

7    Cultural Care Au Pair, our local

8    representatives, au pairs and host families

9    are all required to comply with these

10   regulations."

11        Q.  What entity are we referring to

12   here?

13        A.  Cultural Care, Inc.

14        Q.  And then if you can just note the

15   asterisk, what does that say?

16        A.  Note the?

17        Q.  The asterisked little note on the

18   bottom.

19        A.  Oh, on the bottom of the page here?

20   This one?

21        Q.  Yes.

22        A.  I'm sorry, are you asking me to

23   read it?

24        Q.  Yes.

25        A.  "The weekly stipend is determined



Page 109

1    by the U.S. Department of Labor using a

2    formula based on the federal minimum page."

3          Q.  Is that accurate?

4          A.  I don't believe so, no.

5          Q.  But this was included in your Host

6    Family Handbook that was distributed to host

7    families in 2010?

8          A.  That's correct.

9          Q.  Okay, thank you.  If we can go to

10   Page 14.  If you can read the section

11   "Cultural Care Au Pair Overseas," that first

12   paragraph?

13         A.  Out loud?

14         Q.  Yes, out loud.  Thank you.  Sorry.

15         A.  "In 2010 Cultural Care Au Pair

16   became the only au pair agency designated by

17   the U.S. State Department to recruit all of

18   our au pairs through our own offices

19   worldwide.  Unlike other au pair agencies who

20   use independent agents, our au pairs are

21   recruited and screened by Cultural Care staff

22   in one of our 20 offices around the world.

23   This unique recruitment structure reflects

24   our belief that investing in a quality

25   recruitment organization is the best way to



1  ensure that our au pairs are rigorously

2  screened and well prepared for their year as

3  an au pair with an American host family."

4       Q.  Can you tell me what entity you

5  were referring to here?

6       A.  There is two different references

7  here.

8       Q.  Okay.  Let's start with the first

9  reference, "Cultural Care Au Pair became the

10 only au pair agency designated by the U.S.

11 State Department to recruit all of our

12 au pairs through our own offices worldwide."

13          What does that refer to?

14      A.  So when we talk about being a

15 designated au pair agency, that's Cultural

16 Care, Inc.

17      Q.  Okay.  And when you refer to

18 "recruit all of our au pairs through our own

19 offices worldwide," what are you referring

20 to?

21      A.  Again, as I stated earlier, the

22 Cultural Care Au Pair name is a name that's

23 licensed to Cultural Care, Inc. that's owned

24 by International Care, or ICL.

25          So the experience for a customer is



```
 1          A.  (Complies.)
 2          Q.  Under "General Au Pair
 3    Responsibilities," it references a weekly
 4    schedule towards the end of the second
 5    paragraph.
 6          A.  (Document review.)
 7          Q.  Sorry, strike that.
 8              Okay, let's go to Page 32.
 9          A.  (Complies.)
10          Q.  Can you read the first three
11    sentences of the paragraph under "Weekly
12    Stipend"?
13          A.  Out loud?
14          Q.  Yes, out loud.  Thank you.
15          A.  Can I just request when you ask me
16    a question, it's really helpful if you look
17    at me, because I read your lips as you're
18    talking.
19          Q.  Okay.  Thank you.
20          A.  "The weekly stipend you give your
21    au pair is a living stipend of $195.75.  The
22    stipend is based on a formula that includes
23    the federal minimum wage and a housing
24    credit."
25              Did you say to read the whole
```



1    paragraph?

2         Q.   No.

3         A.   Okay.

4         Q.   Is that guidance consistent with

5    the guidance that you give to host families

6    regarding the stipend?

7         A.   Yes.

8         Q.   And that guidance is, that the

9    stipend is $195.75 on a weekly basis?

10        A.   We would take the position it's a

11   minimum stipend, but we do provide that

12   number as it's been issued by the Department

13   of State.

14        Q.   Can you read that first sentence

15   again?

16        A.   Sure.  "The weekly stipend you give

17   your au pair is a living stipend of $195.75."

18        Q.   Is there anything about that

19   guidance -- and you can read and reference

20   the entire paragraph -- but is there anything

21   in that paragraph that suggests that the

22   $195.75 is a minimum?

23        A.   There is no reference to either a

24   minimum nor a maximum.

25        Q.   So the guidance to host families is



 1    that the weekly stipend is $195.75?

 2              MS. LUKEY:  Objection.

 3         A.   The sentence here says "The weekly

 4    stipend you give your au pair is a living

 5    stipend of $195.75."

 6         Q.   Is the guidance that you provide

 7    host families in this document that the

 8    weekly stipend is $195.75?

 9              MS. LUKEY:  Objection.

10         A.   This sentence says that.  I can't

11    speak to every reference throughout the

12    entire --

13         Q.   Okay, but this particular section

14    says "Weekly Stipend."  In this section where

15    you are -- this section entitled "Weekly

16    Stipend," is the guidance that you are giving

17    host families that the weekly stipend is

18    $195.75?

19              MS. LUKEY:  Objection.

20         A.   The sentence that is written in

21    this document is that "The weekly stipend you

22    give your au pair is a living stipend of

23    $195.75."

24         Q.   Can you go down to the asterisk and

25    read that as well?



Case 1:14-cv-03074-CMA-KMT Document 588-55 Filed 06/02/17 USDC Colorado pg 34 of 62

Page 135



16          MR. STONE:  Counsel, this is Larry

17     Stone.  What document are you referring

18     to?

19          MS. SMALLS:  It is CC3114.

23          MR. STONE:  Is this a document

24     prepared by Cultural Care?

25          MR. SCHWARTZ:  Yes.



Page 136

1          MS. SMALLS:  It is.

2          MR. STONE:  Okay.  All right, thank

3     you for clarifying.  I appreciate it.

4  BY MS. SMALLS:



Case 1:14-cv-03074-CMA-KMT Document 588-55 Filed 06/16/17 USDC Colorado Page 35 of 61

Page 137





Page 140













Page 143

Q. Is the stipend something within the
sponsor's control?  The amount of the
stipend, is that something you understand to
be within the sponsor's control?

A. No.

(Document marked for
identification as Jordan Exhibit 8)

Q. Are you familiar with this
document?

A. I've seen it before, yes.

Q. Can you just go to the first page
and tell me what the logo says on the top
page?

A. It says, "Celebrating over 25
years, Cultural Care Au Pair is proud to have
placed over 100,000 au pairs in American
homes for over 25 years."

Q. Sorry, I meant on the cover page.

A. Oh.

Q. That's my mistake.  On the cover



Page 144

1    page if you can tell me what the logo is.

2         A.  Are you referring to this in

3    particular?

4         Q.  I am.

5         A.  "Cultural Care Au Pair."

6         Q.  And do you know what entity or

7    entities we're referring to when we refer to

8    a Cultural Care Au Pair document?

9         A.  This document in particular is in

10   relation to Cultural Care, Inc.

11        Q.  Okay, thank you.  And what year is

12   this document?

13        A.  In the top right corner it says

14   "2015."

15        Q.  And then on the bottom of the cover

16   page on the bottom right, can you read what

17   that says?

18        A.  There are two things here.  Which

19   in particular?

20        Q.  On the bottom right in the blue.

21        A.  In the blue.  "Part of the EF

22   Education First family."

23        Q.  Can you tell me what you mean by

24   "Part of the EF Education First family"?

25        A.  Well, as I indicated earlier today,



Page 145

1    we have an affiliation with some of the legal

2    entities that make up the EF Education First

3    group.

4           Q.  But you don't know what those legal

5    entities are?

6           A.  No.

7           Q.  If you could go to the Bates number

8    is 968.  I don't see this document otherwise

9    numbered, but in the blue -- well, tell me

10   what is this page?

11              It says -- well, read the title of

12   this page.

13          A.  "Why families choose au pair

14   childcare over..."

15          Q.  And there is a column here for

16   "Daycare" and there is a column here for

17   "Nannies"; is that correct?

18          A.  Yes.

19          Q.  Can you read the last entry under

20   "Nannies" out loud?

21          A.  Sure.  "'Salary negotiations are a

22   hassle.'  All au pairs earn with weekly

23   stipend of $195.75."

24          Q.  Does that communicate a minimum of

25   $195.75?



Case 1:14-cv-03074-CMA-KMT   Document 588-59-8   filed 06/16/17   USDC Colorado   pg 42 of 61

Page 146

1          A.   We understand the stipend to be a

2     minimum.

3          Q.   Where does it say that?  I'm sorry.

4          A.   Well, I'm stating that's our

5     position, that's our understanding.  The

6     sentence itself says "All au pairs can

7     earn" -- sorry.  "All au pairs earn a weekly

8     stipend of $195.75."

9          Q.   And let me just back up for a

10    minute.

11              Who is this document intended for?

12         A.   This is a document intended for

13    prospective host families.

14         Q.   And if you could read that sentence

15    again?

16         A.   The one I just read?

17         Q.   Under "'Salary negotiations are a

18    hassle.'"

19         A.   "All au pairs earn a weekly stipend

20    of $195.75."

21         Q.   Okay, thank you.

22              (Document marked for

23         identification as Jordan Exhibit 9)

24         Q.   What is this document?  Well, are

25    you familiar with this document?



Page 147

```
 1           A.  I may have seen it before, but I'm
 2    not extensively familiar with it.
 3           Q.  Do you know what it is?
 4           A.  Yes.
 5           Q.  What is it?
 6           A.  Well, it's entitled "Choosing the
 7    Right Childcare."  I believe it's a document
 8    that was created in order to -- intended for
 9    host families, prospective host families, to
10    discuss the program and how it might be a fit
11    for them.
12           Q.  Okay, thank you.  Can you go to
13    Page 3 of this document.  And under
14    "Au pair," if you can read the first two
15    sentences.
16           A.  Out loud?
17           Q.  Out loud.  Thanks you.
18           A.  "The cost of an au pair is the
19    easiest to calculate because it is largely a
20    fixed amount."
21              Sorry, did you say to read the
22    first two sentences?
23           Q.  Mm-hmm.
24           A.  "The au pair program is regulated
25    by the U.S. Department of State, so all
```



Page 165

1    to note that this is a section trying to

2    share the average cost of the program.  And

3    so using the minimum here as a baseline for

4    that helps to come up with a number that a

5    family can then use to determine whether this

6    is something to consider from that

7    perspective.

8              (Document marked for

9         identification as Jordan Exhibit 13)

10        Q.  Are you familiar with this

11   document?

12        A.  I don't believe that this is a

13   document.

14        Q.  What is it?

15        A.  I believe this is information

16   pulled from an online site.

17        Q.  Do you know what site?

18        A.  I believe this is from the

19   CulturalCare.com website.

20        Q.  There is a date stamp on the bottom

21   right of this document that shows when this

22   document was printed from your website.

23             Can you read what that date was?

24        A.  Bottom right on the front?

25        Q.  Yes, right on the front.  Thank



Page 166

1    you.

2           A.   4/12/2017.

3           Q.   And then if we can turn to Page 3.

4           A.   (Complies.)

5           Q.   Can you read what it says with

6    respect to the "Au Pair Weekly Stipend"?

7           A.   It reads, "The weekly stipend is

8    paid by you directly to your au pair for 51

9    weeks, including two weeks of paid vacation."

10          Q.   And what does it say under that?

11          A.   "Weekly $195.75."

12          Q.   Is there any indication about the

13   $195.75 being a minimum or a maximum?

14          A.   No.

15          Q.   Okay, thank you.

16               (Document marked for

17          identification as Jordan Exhibit 14)

18          Q.   Do you recognize this document?

19          A.   Yes.

20          Q.   And what is it?

21          A.   Well, it's not a document, but

22   rather it is taken from the website.

23   Specifically, it looks like it's taken from a

24   recruitment website overseas.

25          Q.   Well, is the website overseas?



Page 167

```
 1          A.  It's my understanding that this

 2   website would be an overseas website.  It's a

 3   recruitment page.

 4          Q.  So this website was printed from

 5   the Cultural Care Au Pair website?

 6          A.  You can access, if you're

 7   interested -- if you find yourself on the

 8   CulturalCare.com website, you could navigate

 9   on the bottom it would say "Interested in

10   becoming an au pair," and it would take you,

11   then, to the recruitment website in that

12   native country -- or in the native language

13   of that country.

14          Q.  Is it your site?

15          A.  No.

16              MS. LUKEY:  I'm sorry, is which?

17          Q.  As I understand it, you're saying

18   if you go to CulturalCare.com and there is a

19   link that says "Interested in becoming an

20   au pair."  If you click the link on

21   "Interested in becoming an au pair," it leads

22   to this page; is that correct?

23          A.  It leads to this website.

24          Q.  It leads to this website?

25          A.  Yes.
```



Page 172

1    paragraph?

2         A.  Cultural Care, Inc.

3         Q.  Can you go back up to the top of

4    the agreement and read the definition for

5    "CC"?  Prior to the quotation marks.

6              How does the agreement define "CC"?

7         A.  It comes after the term

8    "assignees."  It comes after the term

9    "successors and assignees."



14              (Document marked for

15         identification as Jordan Exhibit 16)

16              MS. LUKEY:  Dawn, at a convenient

17         moment for you, perhaps we can take a

18         break.  It's been about an hour and ten

19         minutes.  I'm guessing that folks might

20         want to take a break.  In fact, our

21         reporter could use me turning down the

22         air condition -- the temperature.

23              MS. SMALLS:  I'll be quick with

24         this and then we can take a break.

25              MS. LUKEY:  Thanks.



Page 173

```
1    BY MS. SMALLS:

2           Q.  Are you familiar with this

3    document?

4           A.  I'm not sure what this is.

5           Q.  You've never seen it before?

6           A.  It doesn't look familiar to me.
```

```
24               MS. SMALLS:  We can take a break.

25               MS. LUKEY:  Thank you.  We can keep
```



Page 174

```
1          it short.  I just thought we'd try to

2          adjust the temperature.

3               VIDEO TECHNICIAN:  Off the record

4          at 2:16.

5               (Proceedings recessed at 2:16 p.m.,

6          and reconvened at 2:28 p.m.)

7               VIDEO TECHNICIAN:  We're back on

8          the record at 2:28 p.m.

9    BY MS. SMALLS:

10         Q.  I'm going to refer you to

11   Exhibit 6.  And ask you to turn to Page 13.

12              MS. SMALLS:  For those on the

13         phone, this is Cultural Care 341.

14         A.  I'm sorry, what page again?

15         Q.  13.

16              Can you tell me what this document

17   is, this page, what it represents?

18         A.  This is an overview of the

19   screening and matching process.

20         Q.  Okay.  I'm going to use this

21   document as just a map to kind of walk

22   through the process.

23         A.  Okay.

24         Q.  So -- well, let me ask you first,

25   is this representative of the process for
```



 1              The question is that if we were to

 2     apply this as a nonrefundable charge on their

 3     account, that it would not be using any

 4     credit cards in question in order to provide

 5     closure potentially to this situation, which

 6     is not confirmed by the end that that's in

 7     fact what happened here.

 8          Q.  So in this case, there was a

 9     situation where the au pair was not paid her

10     weekly stipend by the host family?

11          A.  There is an allegation that the

12     au pair makes that there is outstanding

13     stipend.

14          Q.  Okay.  And what was your proposed

15     solution to the allegation that she was not

16     paid her weekly stipend?

17          A.  I'm not sure that I'm introducing a

18     solution in so much as an answer to a

19     question that if we were to provide closure

20     to the situation by way of making the au pair

21     whole for the outstanding amount, how we

22     could do that so as to avoid a concern with

23     respect to the credit card that was used for

24     the host family payments.

25          Q.  Okay.  Let me ask a more general



Page 214

1    question.

2            If the host family does not pay the

3    stipend amount, will Cultural Care pay the

4    stipend to the au pair?

5        A.  Not necessarily.  I mean, you have

6    to look at every case individually, and there

7    are cases where there may be an allegation

8    that a stipend has not been paid, but then

9    the family can provide proof that it had in

10   fact been paid and there was a

11   misunderstanding.

12           It can be that after the fact even

13   though the family may dispute it, they'll

14   still make payment regardless.

15           So it's not a situation that just

16   because an au pair says that she hasn't been

17   paid that as an organization we step in and

18   make any sort of financial offer.

19       Q.  But if you find that the au pair

20   has not actually been paid in fact, will you

21   pay the stipend?

22       A.  There have been very rare occasions

23   where we have provided disclosure to a

24   situation by making the au pair whole for the

25   alleged outstanding stipend, if everything



1   else has been exhausted and the situation

2   warrants that.

3              (Document marked for

4        identification as Jordan Exhibit 25)

5        A.  (Document review.)  Okay.

6        Q.  Is this another example of Cultural

7   Care paying the stipend where the host family

8   did not?

9        A.  I think it's an example of a

10  discussion about that as a possible solution.

11  But based on the most recent part of the

12  e-mail thread, it doesn't seem that that is a

13  conclusion that's confirmed in this document.

14       Q.  Okay.  But you confirmed that that

15  is -- that that does happen on occasion --

16       A.  Very, very rare occasions.

17       Q.  -- that Cultural Care will pay the

18  stipend if the host family does not pay the

19  stipend according to State Department

20  regulations and their host family agreement?

21       A.  We're not paying the stipend, but

22  we're making the au pair whole for the

23  allegation of being out financially, or not

24  having been -- not having received what she

25  feel was due.



 1         Q.  In a case of making the au pair

 2    whole for a missing stipend payment, would

 3    that payment be for $195.75, or some other

 4    amount?

 5         A.  It depends on the situation or the

 6    scenario.  You could have an au pair who

 7    alleged a missing stipend and there may be a

 8    dispute about something else, and perhaps

 9    closure is inclusive of a financial payment

10    in order to address that as well.

11         Q.  I'd like to ask you about your

12    communication with other sponsors.  Is that

13    something you regularly do as part of your

14    role as senior vice president?

15         A.  No.

16         Q.  How often would you say you speak

17    with other sponsors?

18         A.  I speak with other sponsors at the

19    annual Alliance member meeting.

20         Q.  At any other times?

21         A.  If at the invitation of the State

22    Department I was to attend a meeting, I would

23    have social conversation with them, but we

24    would be at the presence of a meeting

25    together.



Page 217

```
1            Q.  And are you -- and when you say
2    "the Alliance meeting," are you referring to
3    the Alliance for International Education?
4            A.  Yes.  I think they updated their
5    name at some point over the course of the
6    past two years, but I believe we're talking
7    about the same organization.  So, yes.
8            Q.  And are you also a member of the
9    International Au Pair Association?
10           A.  Yes.
11           Q.  Do you have opportunity to speak
12   and meet with other sponsors in the course of
13   your participation in the International
14   Au Pair Association?
15           A.  Socially, yes.
16           Q.  Is there any other membership or
17   other associations in which you are a member
18   with another sponsor?
19           A.  Not that I'm aware of.
20           Q.  I didn't state my question as
21   clearly as I could.
22               Are you a member of any association
23   in which the staff or leadership of another
24   sponsor is also a member?
25           A.  Outside of what we've just talked
```



Page 228





Page 229









Case 1:14-cv-03074-CMA-KMT   Document 588-55   Filed 06/16/17   USDC Colorado   Page 58 of 61

Page 231















