# Exhibit A

Case 1:14-cv-03074-CMA-KMT   Document 558-83   Filed 06/02/17   USDC Colorado   Page 1 of
55

# Exhibit 80

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

_____

JOHANA PAOLA BELTRAN, ET AL.,      )

        Plaintiffs,,            ) Case No.

v.                                 ) 14-cv-03074-CMA-CBS

                                 )

INTEREXCHANGE, INC., ET AL.,       )

        Defendants.              )

_____     )


    HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY


    Videotaped oral deposition of MARK JAMES

GAULTER, called by the Plaintiffs herein, held

before a stenographic court reporter at the offices

of Hilman Law Chambers, 197 Spadina Avenue, Suite

402, Toronto, Ontario, on Tuesday, the 9th day of

May, 2017, at 9:00 a.m.



Highly Confidential - Attorney's Eyes Only

Page 2

```
 1    A P P E A R A N C E S:
 2    For Plaintiffs:
 3    BOIES SCHILLER FLEXNER LLP
      BY:  Dawn L. Smalls, Esq.
 4         Daniel R. Schwartz, Esq.
              575 Lexington Avenue
 5            New York, NY 10022
              (212) 446-2300
 6            dsmall@bsfllp.com
              dschwartz@bsfllp.com
 7
 8    For Defendant Expert International Group d/b/a
 9    Expert AuPair and witness:
      BY:  BOGDAN ENICA, ESQ.
10            100 2nd Avenue S.
              Suite 302-S
11            St. Petersburg, FL 33701
              (727) 225-2649
12            bogdan@expertaupair.com
13
      For Defendant American Institute For Foreign
14    Study d/b/a Au Pair In America:
15    PUTNEY, TWOMBLY, HALL & HIRSON LLP
      BY: JOHN B. FULFREE, ESQ.      (telephone)
16        521 Fifth Avenue
          New York, NY 10175
17        (212) 682-0020
          jfulfree@putneylaw.com
18
19    For Defendant InterExchange, Inc.:
20    SHERMAN & HOWARD, L.L.C.
      BY: ALYSSA LEVY, ESQ.          (telephone)
21        633 17th Street
          Suite 3000
22        Denver, Colorado 80202
          (303) 299-8194
23        alevy@shermanhoward.com
24
      For Defendant Au Pair Care:
25
```



Case 1:14-cv-03074-CMA-KMT   Document 558-1   Filed 08/02/17   USDC Colorado   Page 4 of
55

Highly Confidential – Attorney's Eyes Only

Page 3

```
 1    BY: NATHAN HUEY, ESQ.          (telephone)
          555 17th Street, Suite 3400
 2        Denver, CO 80202
          (303) 600-6842
 3        nhuey@gordonrees.com
 4
      For Defendants USAuPair, Inc., GoAuPair,
 5    and Au Pair International:
 6    WHEELER, TRIGG, O'DONNELL
      BY: NATALIE WEST, ESQ.          (telephone)
 7        370 17th Street
          Suite 4500
 8        Denver, Colorado 80202
          (303) 244-1918
 9        west@wtotrial.com
10
      For Defendant Cultural Care
11
      CHOATE, HALL & STEWART
12    BY:  LYNDSEY KRUZER, ESQ.      (telephone)
          Two International Place
13        Boston, Massachusetts 02110
          (617) 248-5221
14        lkruze@choate.com
15
16
17    ALSO PRESENT:
18    Ronald Eckstein, CIM, CCVS (Certified Legal
19    Videographer and Commissioner for Taking Affidavits)
20
21
22
23
24
25
```



Highly Confidential – Attorney's Eyes Only

Page 4

1                    INDEX OF PROCEEDINGS

2

3    WITNESS:  MARK JAMES GAULTER:  SWORN

4    EXAMINATION                                    PAGE

5         By Ms. Smalls                          10

6         By Mr. Enica                          206

7

8

9    QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER: N/a

10   INFORMATION TO BE SUPPLIED: 42, 205

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Highly Confidential - Attorney's Eyes Only

Page 5

 1                    INDEX OF EXHIBITS

 2    NO./ DESCRIPTION                              PAGE

 3    EXHIBIT 1 marked for identification:          14

 4            Revised notice of 30(b)(6)

 5            deposition of Defendant Expert

 6            Group International d/b/a Expert

 7            AuPair.

 8    EXHIBIT 2 marked for identification:          26

 9            Organization chart, Bates

10            ExpertAuPair000203

11    EXHIBIT 3 marked for identification:          39

12            Organization chart,  Bates

13            ExpertAuPair000202

14    EXHIBIT 4 marked for identification:          49

15            Host Family Application, Bates

16            ExpertAuPair000055-59

17    EXHIBIT 5 marked for identification:          67

18            International Representation and

19            Interviewer Agreement, Bates

20            ExpertAuPair000050-54

21    EXHIBIT 6 marked for identification:          78

22            Expert AuPair flyer, Bates

23            ExpertAuPair000151

24    EXHIBIT 7 marked for identification:          101

25            Depreciation and Amortization,



Highly Confidential - Attorney's Eyes Only

                                                    Page 6

 1              IRS Form 4562, Bates

 2              ExpertAuPair038114-118

 3    EXHIBIT 8 marked for identification:        110

 4              U.S. Corporation Income Tax

 5              Return, IRS Form 1120, Bates

 6              ExpertAuPair038119-126

 7    EXHIBIT 9 marked for identification:        111

 8              Defendant Expert AuPair's Answers

 9              to Plaintiffs' Second Set of

10              Interrogatories with attachments

11              (8 pp.)

12    EXHIBIT 10 marked for identification:       124

13              Agreement, Bates

14              ExpertAuPair026398-400

15    EXHIBIT 11 marked for identification:       137

16              Family Costs, Bates

17              ExpertAuPair021692

18    EXHIBIT 13 marked for identification:       164

19              "About the Expert AuPair Program"

20              flyer, Bates ExpertAuPair025157

21    EXHIBIT 12 marked for identification:       174

22              Sponsor Organizations Comparison

23              chart (produced in native

24              format), Bates

25              ExpertAuPair0022941 (2 pp.)



Highly Confidential - Attorney's Eyes Only

Page 7

1    EXHIBIT 14 marked for identification:        185

2              AuPair Agreement, Bates

3              ExpertAuPair000001-8

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Highly Confidential - Attorney's Eyes Only

Page 8

1    --- Upon commencing at 9:15 a.m.

2            THE VIDEOGRAPHER:  We are now on the

3            record.  This is the video-recorded

4            deposition of Dr. Mark Gaulter in the

5            matter of Johana Paola Beltran et al.

6            versus InterExchange, Inc. et al., being

7            heard before the United States District

8            Court for the District of Colorado, Case

9            No. 14-cv-03074-CMA-KMT.

10           This deposition is being held at the

11           Hilman Law Chambers, 197 Spadina Avenue,

12           Suite 402, Toronto, Ontario, Canada, and

13           today's date is Tuesday, May the 9th,

14           2017, at the approximate time of 9:16 a.m.

15           My name is Ronald Eckstein, CIM,

16           CCVS, and I am the Certified Legal

17           Videographer and Commissioner for Taking

18           Affidavits.  The court reporter is Karin

19           Jenkner, CSR, RPR, CRR.

20           Counsel, please introduce yourselves,

21           state whom you represent, after which the

22           witness will be sworn.

23   MS. SMALLS:  Dawn Smalls from Boise,

24           Schiller & Flexner for the Plaintiffs.

25   MR. SCHWARTZ:  Daniel Schwartz from Boise,



Highly Confidential - Attorney's Eyes Only

Page 9

1          Schiller, Flexner for the Plaintiffs.

2          MR. ENICA:  Bogdan Enica on behalf of

3          Expert Group International, doing business

4          as Expert AuPair, representing the

5          witness -- representing the witness here

6          today.

7              And we do have counsel on the phone.

8          I would read the names of the people on

9          the phone.  I would like the attorneys on

10         the phone to identify themselves or to

11         acknowledge their presence.

12             So I have John Fulfree, representing

13         American Institute Foreign Study, Au Pair

14         in America.

15         MR. FULFREE:  Present.

16         MR. ENICA:  I have Nathan Huey,

17         representing AuPair Care.

18         MR. HUEY:  Present.

19         MR. ENICA:  I have Alyssa Levy,

20         representing InterExchange.

21         MS. LEVY:  Present.

22         MR. ENICA:  I have Natalie West,

23         representing GoAuPair and two other

24         sponsors.  Maybe she can identify the

25         sponsors for us.



Page 10

```
 1            MS. WEST:  Yes, Agent Au Pair and Au Pair
 2            International.
 3            MR. ENICA:  Thank you, Natalie.
 4                And I have Lyndsey Kruzer,
 5            representing Cultural Care.
 6            MS. KRUZER:  Present.
 7            MR. ENICA:  As far as I know, there are no
 8            other attorneys on the phone.  If any
 9            other attorney's on the phone, now is the
10            time to make an appearance.
11            THE VIDEOGRAPHER:  And now for the
12            swearing.
13                MARK JAMES GAULTER,
14                having been duly sworn,
15        was examined and testified as follows:
16            THE VIDEOGRAPHER:  The witness has been
17            sworn.  Counsel, you may begin.
18   EXAMINATION BY MS. SMALLS:
19            BY MS. SMALLS:
20            Q.   Good morning, Dr. Gaulter.
21            A.   Good morning.
22            Q.   Thank you for being here today.
23                I just want to go over a couple of ground
24   rules.  I'm going to -- you have now just taken an
25   oath, so all of your answers will be truthful to the
```


MAGNA
LEGAL SERVICES

Highly Confidential - Attorney's Eyes Only

Page 37

1    anything around the world.  I think that's -- I

2    think that's a forthright answer.

3              Q.    Okay.

4              A.    Right.

5              Q.    Does Expert Group International, Inc.

6    have any affiliates?

7              A.    Can you define "affiliate"?  Is

8    that -- it's just if you could -- again, I want to

9    be really careful.

10             Q.    Well, for purposes --

11             A.    Sorry, go ahead.

12             Q.    Yeah.  No, I was looking to see if --

13   we have in other documents but I was looking to see

14   if we had provided a definition that we could use

15   for purposes of this definition -- this deposition.

16             A.    Mm-hm.

17             Q.    But for purposes of my question --

18             A.    Mm-hm.

19             Q.    -- I would define "affiliates" of --

20   as other companies or entities in which you have a

21   relationship with or contract in your administration

22   of the au pair program.

23             A.    Then I would say yes.  We contract

24   with the hotel in which the au pairs stay in

25   training.



Highly Confidential – Attorney's Eyes Only

Page 38

1    St.~Pete.  It's quite nice, actually.

2              We contract with [REDACTED]

3    [REDACTED] I believe their full name is.  They

4    provide health insurance for au pairs once they've

5    arrived.

6              We contract with [REDACTED], who help us

7    to buy flights for them coming in.  We have loose

8    relationships with other travel providers.

9              We have [REDACTED]

10   overseas, and I know this because I checked it

11   yesterday.  However, I would qualify that with

12   saying that some of them aren't active.  So some of

13   the contracts expired in January 2017 because we

14   have a three-year term on, I believe, all of them.

15   And they haven't been worth renewing.

16             So I can give as much information as I can

17   about [REDACTED] without having notes, and -- if you

18   would like me to.

19             Q.   Okay.  Is there any other entity or

20   organization other than the vendors that you

21   outlined in terms of hotels, health insurance, and

22   then the [REDACTED] organizations that you just

23   mentioned?  Is there any other company or entity

24   that would qualify as an affiliate of Expert Group

25   International, Inc.?



Highly Confidential - Attorney's Eyes Only

Page 39

1          A.    I don't believe there is.

2          Q.    Okay.

3          A.    No, I can't, I can't -- I'm just

4    trying to think but I can't think of anything.

5          Q.    Okay.

6          (Counsel conferring)

7    EXHIBIT 3 marked for identification: Organization

8               chart,  Bates ExpertAuPair000202

9          BY MS. SMALLS:

10         Q.    You've given us org charts... sorry.

11         The prior org chart that we looked at was

12   for 2015.

13         A.    Mm-hm.

14         Q.    This is for 2014.  In the interest of

15   thoroughness, I just want to review year by year.

16         A.    Yes, absolutely.

17         Q.    And ensure that the org chart is

18   either reflective of how you described the

19   organization as it functioned in 2015 or note any

20   differences in personnel or differences in function.

21         MR. ENICA:  Just for the people on the

22              phone, I want to mention this was marked

23              as Exhibit 3.  And we are talking about

24              document Expert AuPair ending in 202.

25              That's the Bate number.



Highly Confidential - Attorney's Eyes Only

Page 80

1  talk about is what we give, which I think is

2  essential.

.

5          Beyond that I would not like to -- there's

6  going to be a cultural difference between what

7  information is given to people according to their --

8  according to the recruiting agency because they're

9  based in different places.

10          Q.    But the information provided is about

11  a U.S. program; is that correct?

12          A.    That's correct.

13          Q.    So why would there be differences in

14  the information provided about a U.S. program,

15  depending on location?

16          A.    I think it's fair to say that some

17  countries are more similar to the U.S. and some are

18  very different.

19          Q.    Do you know what information the

20  recruiting agencies provide to au pair candidates

21  before they are connected with Expert AuPair?

22          A.    I do not know all the details.

23          Q.    Do you provide the recruiting

24  agencies with information about the au pair program

25  that they should use in their materials?



Highly Confidential - Attorney's Eyes Only

Page 81

1              A.    The recruiting agencies have a copy

2       of our contract with the au pair and with the host

3       family.  Sorry.  Sorry, with -- a copy of the

4       contract that the au pairs are required to sign.

5       They have a copy of the contract which is between

6       the au pair and the host family, which is fillable

7       so they can amend what is, you know, what can be

8       changed.

9              And they know that au pairs come to St.

10      Petersburg for training; they know that then they go

11      off to, you know, their family.  So they are aware,

12      and all of these contracts have been negotiated in

13      English, so there should be no confusion about the

14      meaning.

18             Q.    Do you have any knowledge about what

19      is being represented to potential au pair candidates

20      by recruiting agencies about the program?

21             A.    I do not have full knowledge.

22      However, the -- I am confident that nothing is

23      being -- well, I'm confident that to the extent that

24      anything is being advertised incorrectly, we have

25      every ability to take care of that.  And once we



Highly Confidential – Attorney's Eyes Only

Page 82

1    talk to au pairs when they arrive, we do discuss

2    what they expect.  And if there's a discrepancy, of

3    course we will address that with the recruiting

4    agency.

5            But again, we meet all the au pairs.

6            Q.    But that's after they arrive,

7    correct?

8            A.    That's after they arrive.  But it is

9    an opportunity to make sure that, if something was

10   incorrect, that it is dealt with for people in the

11   future.  Not perfect, but actually quite effective.

12           Q.    How often does an au pair arrive with

13   a misunderstanding or a discrepancy between what the

14   program guidelines actually are and what they were

15   told in their home country?

16           MR. ENICA:  Objection to form.

17           A.    I would argue that it almost never

18   happens.  I will give you the only example I can

19   think of, which was that an au pair was told they

20   needed to have an international driver's licence

21   before they came.  That's the only example I can

22   think of in which it was reported in training.

23           BY MS. SMALLS:

24           Q.    Okay.  Do you review the

25   advertisements that are used by the in-country



Highly Confidential – Attorney's Eyes Only

Page 105

1   States?

2          A.   Yes.

3          Q.   Even though it's called a "departure"

4   handbook?

5          A.   It's called the departure handbook

6   because it's the departure from training.

7          Q.   Okay.  Do you have a host family

8   handbook?

9          A.   Yes.  Although, again, whether it's

10  called "handbook" or "guidelines," I wouldn't like

11  to say.

12         Q.   Okay.  Do you know if that's been

13  produced?

14         A.   I do not.

15         MS. SMALLS:  Okay.  I'm going to ask that

16              we take a short break.

17         THE VIDEOGRAPHER:  This is the

18              videographer on May the 9th, 2017, at

19              approximately 12:12 p.m.  We are now going

20              off the record.

21  --- Upon recessing at 12:12 p.m.

22  --- Upon resuming at 12:25 p.m.

23         THE VIDEOGRAPHER:  This is the

24              videographer on May the 9th, 2017, at

25              approximately 12:26 p.m.  We are now back



Highly Confidential - Attorney's Eyes Only

Page 106

1            on the record.

2            BY MS. SMALLS:

3            Q.   Okay.  Dr. Gaulter, you indicated

4    before we went back on the record that you wanted to

5    supplement one of your prior responses, please.

6            A.   Yes.  That's right.  We -- I can

7    confirm that we did, we did disclose, or submit,

8    whatever the word is, a family handbook.  I'm not

9    sure precisely what name it was.  However, I do know

10   that it was submitted in discovery.

11           Q.   Okay.  Did you realize that on your

12   own or after discussion with counsel?

13           A.   I'll -- counsel did remind me.

14           Q.   Okay.  Thank you.

15           A.   Yeah.

16           Q.   So we were discussing your -- the

17   2015

20           MR. ENICA:  Objection to form.

21           A.   I -- you're reading it, so let me --

22   yeah.

23           BY MS. SMALLS:

24           Q.   Let's strike that.

25           A.   Yeah.



Highly Confidential – Attorney's Eyes Only

Page 107



1          Q.    Let's turn to the last page of the

2

7          Q.    Can you tell me how you determined

8    what your compensation is year by year?

9          A.

13         Q.    Okay.  My question was:  How do you

14   determine what you are compensated year by year?

15         A.

18         Q.    Is it based on how many au pairs you

19   place?

20         A.

25         Q.    So the compensation, your



Highly Confidential – Attorney's Eyes Only

Page 108



1    compensation, is determined by the size of the

2    company in any given year; is that correct?

3              A.

10             Q.    Do you determine your own

11   compensation?

12             A.

15             Q.    Okay.  Who serves on your board of

16   directors?

17             A.

18             Q.    Do you have any other members of the

19   board of directors?

20             A.

22             Q.    But for the American entity, are

23   there any other members of the board of directors?

24             A.

25             Q.    Okay.  Is there anyone else that has



Highly Confidential - Attorney's Eyes Only

Page 124

1   believe, with special-needs children.  Actually, I

2   think it was one, one of their major niche markets.

3            Q.    You mentioned that you came into

4   contact with Susan Asay because you placed an au

5   pair in California.  How did that come about?

6            A.    It's hard for me to respond

7   accurately because it was so long ago.  I believe

8   that she contacted us because her au pair wanted --

9   she wanted to hire an au pair.  And I think that is

10  what happened, and then she spoke to me, and that

11  was how it started.

12           Q.    When you say that she wanted to hire

13  an au pair --

14           A.    Right.

15           Q.    -- you mean for herself?

16           A.    For her own family, yes.

17           Q.    Okay.  And at that point, based on

18  your understanding, ProAuPair was not engaged in

19  sponsoring au pairs?

20           A.    ProAuPair was not a designated

21  sponsor organization and may not have existed, even.

22  I cannot tell you when it was founded.

23           THE REPORTER:  Exhibit 10.

24  EXHIBIT 10 marked for identification:  Agreement,

25            Bates ExpertAuPair026398-400



Highly Confidential - Attorney's Eyes Only

Page 125

```
 1              BY MS. SMALLS:
 2              Q.   Can you take a moment to review this
 3   document?
 4              (witness perusing document)
 5              Okay.  Can you tell me what this is?
 6              A.   It is my recollection that this was a
 7   proposed agreement between ourselves and ProAuPair.
 8   I do not believe it was ever signed.
 9              Q.   Okay.  Do you know who drafted it?
10              A.   I would imagine it was -- it looks
11   like I did.
12              Q.   Okay.  Can you read item number 13
13   out loud?
14              A.   (as read):
15                   "There are situations in which
16                   PA" -- so that's ProAuPair -- "and
17                   EAP may compete.  PA and EAP
18                   recognize they are competitors."
19              Q.   Okay.  Can you explain how -- strike
20   that.
21              You previously mentioned that you are a
22   member of the Alliance?
23              A.   Yes.
24              Q.   When did you become a member of the
25   Alliance?
```



Highly Confidential - Attorney's Eyes Only

1          A.   I believe 2011 or 2012.

2          Q.   And why did you join?

3          A.   I think, I think we were invited to

4     join.  And I saw some benefits to joining.

5          Q.   What sort of benefits?

6          A.   I think... knowing -- I think there's

7     some advantage to having some liaison with people,

8     with au pairs to -- you know, that the natural

9     reaction is to join an industry group.  I mean, just

10    that's, that's a normal thing that business do.

11         Q.   And you mentioned specific benefits

12    that you foresaw by joining the Alliance.  What

13    would be some of those benefits?

14         A.   Conferences.  Things like that.

15         Q.   When you joined the Alliance in

16    2011 --

17         A.   Or '12, yeah.

18         Q.   -- or 2012, did you begin attending

19    Alliance meetings on a regular basis?

20         A.   I wouldn't necessarily use the word

21    "regular basis" but to give you an indication, I

22    believe I've been to less than ten total meetings,

23    and probably only about five or six.

24         Q.   At less than ten but more accurately,

25    you think?



Highly Confidential - Attorney's Eyes Only

Page 127

1          A.    Probably five or six.

2          Q.    Probably five or six.

3          A.    Right.

4          Q.    Okay.  And how often are the meetings

5      held?

6          A.    There is an annual meeting which I

7      believe is always in October.  I have not been to

8      them all.  There are -- there have in the past been

9      occasional meetings when people are in D.C. to meet

10     the State Department.  So it's a convenient way, you

11     know, for people to gather because they're all in

12     the same city.

13         Q.    And at the Alliance meetings, do you

14     convene with other sponsors?

15         MR. ENICA:  Object to form.  Please

16              answer.

17         A.    Other sponsors not just of the au

18     pair program but other J-1 exchange programs.

19         BY MS. SMALLS:

20         Q.    And you mentioned that there are

21     often State Department meetings that are close in

22     time to the Alliance meetings.

23         Have you attended those State Department

24     meetings as well?

25         A.    Yes.  And I would object slightly to



Highly Confidential - Attorney's Eyes Only

Page 128

1   the word "often."  I don't believe that there have

2   been that many meetings in the State Department.  I

3   would again characterize it as maybe five, that I've

4   been to.

5           Q.   And at those five or six meetings

6   hosted or in which the State Department gave a

7   presentation, what were the topics?

8           A.   A common topic was the, the

9   educational component.  And I believe the Department

10  was looking at making changes there.

11          Q.   Was the stipend ever discussed?

12          A.   There was, in the State Department,

13  there was a presentation which I left the room for

14  because I thought it was inappropriate.

15          Q.   What was that meeting?

16          A.   That was -- I couldn't tell you the

17  date of that meeting.  But there was a meeting when

18  the -- there was a presentation that was about the

19  stipend as part of that meeting.  And that was not

20  something, out of due respect for the judicial

21  process, that I was willing to stay for.

22          Q.   Who was giving the presentation?

23          A.   I couldn't tell you a name.

24          Q.   Okay.  Do you have a general time

25  frame in terms of year that that --



Highly Confidential - Attorney's Eyes Only

Page 129

```
 1             A.   I put it as 2015, maybe.
 2             Q.   Okay.  Was it before or after the
 3   lawsuit was filed?
 4             A.   That would have been after.
 5             Q.   Okay.
 6             A.   And again, that was my reason for
 7   leaving.
 8             Q.   And so, at the presentation the
 9   stipend was discussed, and that was your reason for
10   leaving?
11             MR. ENICA:  Object to form.
12             MS. SMALLS:  Well, strike that.
13             Q.   You said that the stipend was
14   discussed at this meeting.  What was specifically
15   being discussed with respect to the stipend?
16             A.   I was not there.  So I can't tell
17   you.  What I can tell you is that I thought that
18   the -- that the conversation was inappropriate.
19             Q.   Okay.  Well, what did you hear that
20   lead you to believe that the discussion of the
21   stipend was inappropriate?
22             A.   This was based on my, my reading of
23   the Complaint.
24             Q.   Did you attend the meeting and then
25   walk out?
```



Highly Confidential - Attorney's Eyes Only

Page 130

1          A.    Yes, I did.  But -- oh, sorry.
2     Sorry.
3          Q.    Go ahead.  Go ahead.
4          A.    But that's not to say I attended
5     the -- the meeting had different topics.
6          Q.    Okay.  You attended a meeting, and
7     then someone said something that lead you to walk
8     out; is that correct?
9          A.    Yes.  And I, I left for the duration
10    of the conversation about the stipend.
11         Q.    Right.  So what I am asking you is,
12    what was said that lead you to believe that the
13    topic or the presentation was inappropriate and that
14    lead you to walk out?
15         A.    I don't.  I know that was -- that
16    that section of the meeting said, I know it said
17    something like stipend or Department of --
18    something.  Something.  There was something on the
19    agenda.  And I just think that the presence of all
20    the sponsors wasn't appropriate.
21         Q.    Has the stipend ever been discussed
22    before at an Alliance meeting?
23         A.    I want to clarify that this is not
24    the Alliance meeting, this is a Department of State
25    meeting which was open to sponsors whether they were



1   members of the Alliance or not.

2            Q.   Okay.  Thank you for that

3   clarification.

4            A.   I will say that I have never seen the

5   stipend discussed at an Alliance meeting.

6            Q.   Has the stipend ever been discussed

7   at a State Department meeting that you have

8   attended?

9            A.   Again, I -- well, as described, it

10  was clear that this was about, about the minimum

11  stipend.  And so I was not there.

12           I don't believe I have attended any

13  meeting, either at the Alliance or at the Department

14  of State, and remained there while the stipend was,

15  the minimum stipend was, under any discussion.

16           Q.   So I just want to make sure I

17  understand your answer.

18           A.   Mm.  Yes.

19           Q.   I'm just going to ask, rather than me

20  trying to rephrase what I understand your answer to

21  be.

22           Prior to 2015, or the filing of this

23  Complaint, have there been any State Department

24  briefings or conversations in which the minimum

25  stipend has been discussed?



Highly Confidential - Attorney's Eyes Only

Page 144

1              MR. ENICA:  Objection --

2              BY MS. SMALLS:

3              Q.    During that, during that meeting?

4              A.    I was under the impression that this

5       was going to be, like many of the conversations we

6       will have in the State Department, a communication

7       between people, not only a presentation by somebody.

8              Q.    Did you ever receive the information

9       that was communicated in that meeting by any other

10      means?

11             A.    I don't recall.

12             Q.    Do you know the substance of what was

13      communicated in the meeting that you walked out of?

14             A.    I can surmise it was about the

15      stipend, the minimum stipend.

16             Q.    Other than Alliance meetings, how do

17      you normally communicate with other sponsors?

18             A.    It's rare that we need to communicate

19      with other sponsors, but I will give you some

20      examples.

21             We -- in order for an au pair to transfer

22      programs from one sponsor to another, there's a

23      technique in SEVIS which is, the sponsor releases

24      and lets the other sponsor take that au pair.

25             It's extremely rare for that to happen.



Highly Confidential - Attorney's Eyes Only

Page 145

1   But we had a case in which the au pair was moving

2   with her host family to a location where the sponsor

3   could not place, and so she wanted to change

4   program.  She wanted to change to our program; the

5   family wanted to; the sponsor was happy for her to

6   change program.

7               We also -- let me think.  I have -- as you

8   know, I've previously been in touch with ProAuPair

9   and with Great Au Pair before designation.  I've

10  also sometimes been in touch with Helene (ph.) at

11  USAuPair about, I think there was something about

12  like payment plans is what I think it was about.

13                   (Query by reporter)

14              Like payment plans, yeah.  The exact --

15  this sort of thing can happen by e-mail, but it

16  would have been presented in ESI.

17          Q.   Other than, you talked about your

18  relationship with the Great Au Pair and then

19  ProAuPair.  Who are the sponsors that you most

20  regularly interact with other than Great Au Pair or

21  ProAuPair?

22          MR. ENICA:  Object to form.

23          A.   I would say USAuPair.

24          BY MS. SMALLS:

25          Q.   Are there any other sponsors you deal



Highly Confidential – Attorney's Eyes Only

Page 146

1    with on a regular basis?

2           MR. ENICA:  Object to form.

3           A.   I'm concerned about the word

4    "regular."  I would expect, other than Alliance

5    meetings, that it would be rare that I would

6    communicate with a different sponsor more than once

7    or twice a year.

8           BY MS. SMALLS:

9           Q.   Okay.  Let me...

10          Are there any sponsors that you

11   communicate with multiple times a year?

12          A.   I think I can say USAuPair.  And I'm

13   taking Alliance meetings and State Department

14   meetings out of the equation because they're not

15   relevant for what I understand you to be asking.

16          I don't believe I do.  Sometimes there

17   might be a situation where somebody tries to call an

18   organization on our behalf, and the natural things,

19   the natural reason for that, would be, you know, if

20   a family came from a different agency, would you

21   place with that family again?

22          And that may have happened, I don't know.

23   But again, it's rare that we are in touch with

24   sponsors.  It's much more common that we're in touch

25   directly with the Department about whatever has --



Highly Confidential - Attorney's Eyes Only

Page 152

1  substantive issues.  So let me find an example of

2  that.  If an au pair has not been paid by their host

3  family, we will inform the Department of State.

4        If an au pair -- I think the Estonian

5  example I gave before lunch would also be something

6  that we would have communicated, and any crime,

7  serious crime, committed by an au pair such as for

8  example let's say DUI, that needs to be reported by

9  new directives from the Department.

10        Q.   You gave an example of an au pair not

11  being paid the weekly stipend.

12        A.   Mm-hm.

13        Q.   If that occurs, would you pay the au

14  pair?

15        A.   If that occurs, the family would pay

16  the au pair, because the family is -- if the au pair

17  was withdrawn,

21        Q.   I'm sorry.  I don't understand the

22  refund part of it.

23        A.   Right.



Highly Confidential - Attorney's Eyes Only

Page 153

 1

 2

 

  So the

 5   assumption is the au pair is going to be paid by the

 6   family.

 7           Q.  Okay.  But --

 8           A.  From (indiscernible) --

 9           Q.  They're not paid by the family

10   directly.  In that example they're not being paid by

11   the family directly, they're being paid by Expert

12   AuPair funded by the family's fees; is that correct?

13           A.  I would, I would characterize it

14   differently.  I think this is an interpretation.  I

15   would characterize it as the family is paying the au

16   pair.

17           Q.  Well, how does the situation arise

18   where the au pair is not paid the weekly stipend?

19           A.  How does it happen.

20           Q.  Yeah.

21           A.  Well, it could be several things.  It

22   could be a case of the family not -- the family not

23   wanting to pay, or it could be a case of the family

24   not being able to pay.

25           Q.  Okay.  So let's say the family does



Page 154

1    not want to pay.

2              A.   Mm-hm.

3              Q.   It gets escalated to you if the

4    family as an entity is -- refuses to pay or is

5    unable to pay the au pair; is that correct?

6              A.   It would normally, it would normally

7    be something that I was aware of, yes.

8              Q.   Okay.  And in terms of the

9    disbursement of funds to pay the au pair --

10             A.   Mm-hm.

11             Q.   -- where the au pair has not been

12   paid, where are those funds disbursed from?

13             MR. ENICA:  Object to form.

14             A.   The funds would be normally paid by

15   cheque, and the money would come from the family's

16   ▩▩▩▩▩.

17             BY MS. SMALLS:

18             Q.   Who would issue the cheque?

19             A.   Well, in an ideal world, the family.

20   But, again, most families understand that they must

21   pay.

22             Q.   Right.  But in this scenario, we're

23   talking about the few, you said it's rare, but an

24   instance where the family either refuses to pay the

25   au pair or is unable to pay the au pair.



Page 155

1          So family X that the au pair is working

2    for is not writing a cheque; has not acted in

3    compliance with their obligations under, under the

4    agreement.  But the au pair must be paid.

5          Who pays the au pair when the family

6    cannot or will not pay the au pair?

7          A.   The amount is reimbursed from the

8    family as a reduced        , and, if it's absolutely

9    necessary, and it's very rare, we will make sure

10   that the au pair is treated appropriately so they go

11   back home having a positive view of the United

12   States.

13         Q.   Whose name is on the cheque to the au

14   pair in the situation where the host family cannot

15   or will not pay and the au pair needs to be made

16   whole?

17         MR. ENICA:  Object to the form of the

18         question.

19         A.   I'm not sure that I understand "to be

20   made whole" as it's --

21         BY MS. SMALLS:

22         Q.   Okay.  Strike that.

23         Does Expert AuPair issue cheques to au

24   pairs that have not received payment from host

25   families?



Highly Confidential - Attorney's Eyes Only

Page 156

1          A.    We have issued a cheque using the

2     host family's money probably on three occasions.

3          Q.    Okay.  So Expert AuPair, on occasion,

4     has issued cheques directly to au pairs for payment

5     of the weekly stipend; is that correct?

6          MR. ENICA:  Object to form.

7          A.    I would not characterize it as

8     payment by us.

9          BY MS. SMALLS:

10         Q.    I understand that you would not

11    characterize it that way.  I'm just -- what I'm

12    trying to get to is the actual facts of what occurs.

13         A.    Mm-hm.

14         Q.    Rather than get into any

15    characterization.

16         If an au pair is not paid by a host family

17    and is due a stipend payment, you testified that you

18    will step in and make a payment to that au pair.  Is

19    that correct?

20         A.    There would be a cheque with our name

21    on, and it would, however, not be -- we consider to

22    be our money.

23         Q.    Okay.  But that cheque would be from

24    Great Au Pair -- I'm sorry, Expert AuPair to the au

25    pair for the weekly stipend?



Highly Confidential - Attorney's Eyes Only

Page 157

1          A.   That's --

2          MR. ENICA:  Object to form.

3          BY MS. SMALLS:

4          Q.   Is that correct?

5          MR. ENICA:  I renew my objection.  You may

6          answer.

7          THE WITNESS:  Can you ask -- can I hear

8          that question again?

9               (Reporter read back as requested)

10         A.   It would be from Expert AuPair using

11   the host family's money, and therefore it is the

12   host family's money for the minimum stipend, not our

13   payment.

14         BY MS. SMALLS:

15         Q.   For the three occasions that this has

16   occurred...

17         A.   Mm-hm.

18         Q.   Whose name is on the cheque as where

19   the funds are being -- are being disbursed from?

20         A.   The cheque would be --

21         Q.   Which cheque is it?

22         A.   It would be a corporate cheque that

23   we issue using the host family's money.

24         Q.   Okay.  So it's a Great Au Pair (sic)

25   cheque; is that correct?



Highly Confidential – Attorney's Eyes Only

                                                    Page 158

 1              MR. ENICA:  Objection.  We are not at a

 2              Great Au Pair deposition.

 3         BY MS. SMALLS:

 4              Q.   I'm sorry.  I screwed that up.

 5    Sorry.

 6              So it's an Expert AuPair cheque?

 7              A.   Yes.

 8              Q.   Okay.  And on that cheque, on the

 9    three occasions that you recall, it has an au pair,

10    an au pair's name on it.  Is that correct?

11              A.   The cheque would be issued to the au

12    pair using the host family's money.

13              Q.   From Expert AuPair; is that correct?

14              MR. ENICA:  Objection.

15              A.   The money is not from Expert AuPair.

16         BY MS. SMALLS:

17              Q.   Okay.  But the cheque is from Expert

18    AuPair?

19              A.   The cheque appears to be from Expert

20    AuPair; however, it is using the host family's

21    money.

22              Q.   Okay.  Thank you.

23              THE VIDEOGRAPHER:  This is the

24              videographer on May the 9th, 2017, at

25              approximately 2:35 p.m.  We are now going



Highly Confidential - Attorney's Eyes Only

Page 169

```
 1   18,000 -- and just a quick bit of math would have

 2   you thinking, well, there's going to be -- it's

 3   going to be a small part of the market, because

 4   19,000 compared with the number of American children

 5   is small.

 6            BY MS. SMALLS:

 7            Q.   Are au pairs employees?

 8            A.   Au pairs work for their host

 9   families.

10            Q.   Are they employees?

11            MR. ENICA:  I will object to the question.

12            It requires some legal conclusion but I'm

13            moving just to state the objection and...

14            A.   I'm not qualified to state that

15   because it does seem to be a question of law.

16            BY MS. SMALLS:

17            Q.   Do they sign an employment contract?

18            A.   They do sign a document that we

19   entitle "Employment Contract."

20            Q.   Thank you.  I want to refer you back

21   to I guess this is document number 13.  And the

22   first sentence on the right side says:  (as read)

23                 "When you become a host family,

24                 your program fees cover everything,

25                 including the following: health
```



Highly Confidential - Attorney's Eyes Only

Page 170

```
 1                     insurance for the au pair, detailed
 2                     pre-screening of the au pair, Skype
 3                     interview with the au pair prior to
 4                     their arrival, embassy scheduling
 5                     and visa [terms]" -- I think.
 6                 I think the sentence stops there.
 7             Can you tell me what the "detailed
 8     pre-screening of the au pair" is?
 9             MR. ENICA:  I would have to object to the
10             fact that you mentioned the sentence stops
11             there, but the sentence continues on the
12             next line.
13                 And I also want for the record to
14             make clear we are talking about Exhibit
15             13.  The Bate number of the document is
16             different.
17             MS. SMALLS:  Okay.  Exhibit 13, I think I
18             already said the Bates number.
19             MR. ENICA:  Correct.
20             MS. SMALLS:  Which is zero --
21             MR. ENICA:  You mentioned document number
22             13, so I just want to make sure for the
23             record that it's Exhibit 13.
24             MS. SMALLS:  Okay, but let me just read
25             the whole sentence because I --
```



Highly Confidential – Attorney's Eyes Only

Page 171

1              (Query by reporter)

2         MR. ENICA:  You referred to Exhibit 13.

3         BY MS. SMALLS:

4         Q.    Exhibit 13:

5              "When you become a host family

6              your program fees cover everything

7              including the following:  Health

8              insurance for the au pair, detailed

9              pre-screening of the au pair, Skype

10             interview with the au pair prior to

11             their arrival, embassy scheduling

12             and visa terms [sic], support

13             network through the local and

14             regional representatives,

15             orientation, airfare, child

16             development training, and CPR and

17             First Aid training."

18        That sentence refers to "detailed

19   pre-screening of the au pair."

20        Can you tell me what is referred to there

21   or what constitutes the "detailed pre-screening of

22   the au pair" referred to in that sentence?

23        A.    I can certainly try.  I would like to

24   correct, I believe it says visa forms, not visa

25   terms.  That's what I'm reading.  But again, the



Highly Confidential - Attorney's Eyes Only

Page 172

1   copy is -- this isn't --

2              Q.   We can change that to "visa forms."

3              A.   Yeah, it's --

4              Q.   I was reading it the best I could.

5              A.   Yes, I'm not sure that must was done

6   with this advertisement.  I don't think it was -- as

7   I say, I don't really like the way it's written, so

8   I -- you know, I'm -- and I would like again to

9   emphasize it's historic.

10             The pre-screening would involve collecting

11  references, the medical check that we're required to

12  do by law, a personality profile, a criminal record

13  check in home country and in any country they've

14  spent more than a year in, because some people will

15  move, become au pairs in the UK and come over, for

16  example.  And it's what's required by law.  A test

17  of English proficiency as well.

18             I may be missing something, but those are

19  the things that I can think of.

20             Q.   But that screening, the elements that

21  you've just or the components that you just outlined

22  are conducted by the in-- the recruiting companies,

23  as we've been referring to them; is that correct?

24             A.   ████████████████████████████

    ████████████████████████████████████.  Now, sometimes



Highly Confidential - Attorney's Eyes Only

Page 173

 1    the -- sometimes people will collect documents and

 2    send them.  But we have all of those documents in

 3    head office and review them all.

 7              And so, to the extent the -- you know, to

 8    all extents, I think, we can say we do that.

 9              Q.   Okay.  The sentence also refers to

10    health insurance for the au pair.

11              Who -- how does health insurance for the

12    au pair work?  And how did the fees, the program

13    fees by the host family, pay for them?

14              MR. ENICA:  Object to form.

15              A.   The medical cover we buy from a

16    company I've mentioned before, Global Secutive.  We

17    pay the amount, and we will enroll them before their

18    arrival.  And clearly, I mean, we are -- the family

19    pays us a fee.  So that would be where the money

20    comes from.

21              BY MS. SMALLS:

22              Q.   Okay.  And so the health insurance

23    that the au pair has while they are in United

24    States, is arranged and done by Expert AuPair?

25              MR. ENICA:  Object to form.



Highly Confidential - Attorney's Eyes Only

Page 174

1                A.    The health in-- the insurance policy
2       that we enroll them in, again, it's paid for by the
3       host family's fees.  We sign them up because we --
4       obviously, I mean, if you are enrolling, let's say,
5       200 au pairs, the rates are going to be cheaper.
6                Q.    Thank you.
7                THE REPORTER:  Exhibit 12.
8       EXHIBIT 12 marked for identification:  Sponsor
9                     Organizations Comparison chart
10                    (produced in native format), Bates
11                    ExpertAuPair0022941 (2 pp.)
12               THE WITNESS:  Haven't we had Exhibit 13?
13               THE REPORTER:  Yes.  We just skipped.
14               THE WITNESS:  Okay.  We skipped.  Okay,
15               sorry.
16               MS. SMALLS:  Okay.  For those on the
17               phone, we're now looking at Expert AuPair
18               22941.
19               Q.    Are you familiar with this document?
20               A.    I have seen it, yes.
21               Q.    Okay.  What is it?
22               A.    It's -- appears to be a comparison
23      aimed at seeing what other sponsors are charging.
24               Q.    Okay.  And let me just ask you
25      generally.  How do you -- how does Expert AuPair



Highly Confidential - Attorney's Eyes Only

Page 178

1   standard deviation of those contracts, as we're

2   calling them, as $77, which is very high in -- if

3   it's -- I would imagine it's very high compared with

4   other agencies, although I do not have knowledge.  I

5   would imagine you'll find that's a reasonably high

6   standard deviation, which implies a large difference

7   in contracts.

8           And should I talk about being qualified to

9   calculate standard deviation?  I --

10          Q.   No.

11          A.   Yeah.

12          Q.   My question, again, is, and I'll

13  rephrase it in a different way...

14          A.   Mm-hm.

15          Q.   You're in a market where you compete

16  for host families seeking au pairs; is that correct?

17          A.   We are in a market where we compete,

18  yes.

19          Q.   Compete for what?

20          A.   We compete for, primarily for, host

21  families because there are more au pairs than

22  families.

23          Q.   Okay.  So in the competition for host

24  families, is the weekly stipend a point of

25  differentiation between you and other sponsors?



Highly Confidential - Attorney's Eyes Only

Page 179

1          MR. ENICA:  Object to form.

2          A.   I believe if a family wants to pay

3    their au pair more, it is more practical for them to

4    do it with our agency fee.  And we also emphasize

5    and have done since before the lawsuit, since well

6    before the lawsuit was filed, that this is a

7    minimum.

8          I would argue that some families do come

9    to us because they appreciate that.  I'm not saying

10   that all families do.  However, any business wants

11   to compete in various ways to, to provide a product,

12   if you like, that people want.

13         So certainly the fees are useful.  The

14   fact that there is the ability to pay more than the

15   minimum stipend is good.  The size is good.  There

16   are, there are many things that we compete on, to

17   use your language.

18         Q.   Okay.  If we can go back to Exhibit,

19   I think it's 6?

20         A.   Yeah.

21         Q.   Which is the advertisement?

22         A.   Mm-hm.

23         Q.   I've lost my copy but why don't you

24   just walk through.  That's a advertisement.

25         A.   Mm-hm.



Highly Confidential - Attorney's Eyes Only

Page 180

1        Q.    And we've already established that

2    that's a advertisement to a host family.

3        A.    Right.

4        Q.    Is that correct?

5        A.    Yes.

6        Q.    And you are advertising to try to

7    obtain new host families to participate in the

8    program?

9        A.    Yes.

10       Q.    And by doing that, you also testified

11   that in advertising, you generally try to put your

12   best foot forward; is that correct?

13       A.    Yes.  I believe that comment was

14   actually about Exhibit 13, but I say that... I say

15   that advertisements are designed to make -- designed

16   to try to attract people.

17       Q.    Okay.  Can you tell me what, in this

18   advertisement, what are the points that you

19   highlight that you are trying -- you are using to

20   attract host families to your program?

21       A.    I believe that this is aimed at

22   people who had never heard of an au pair rather than

23   people who already house an au pair, because it

24   seems to talk about the au pair program in general

25   more than it talks about us, other than it has the



Highly Confidential – Attorney's Eyes Only

Page 181

1    name on it.  And of course there's that reference at

2    the bottom, the MW from Jacksonville.

3              Q.    Okay.  But can you, can you read the

4    three bullets on the, on the advertisement?

5              A.    Yes.

6              Q.    That are the substance of this

7    advertisement?

8              A.    (as read):

9                    "Hosting an au pair offers

10                   families the chance to experience a

11                   new culture and receive affordable

12                   childcare services.

13                   The program averages out to

14                   approximately $330 per week for 52

15                   weeks and provides you with 45 hours

16                   of childcare weekly.

17                   Regional and local

18                   representatives ensure monthly

19                   contact with your family and your au

20                   pair."

21             Q.    Okay.  Now let's go back to Exhibit

22    No. 13.

23             A.    Mm-hm.

24             Q.    And I think this was the document,

25    you testified that this was also an advertisement;



Highly Confidential - Attorney's Eyes Only

Page 182

```
 1    is that correct?
 2            A.   Yes, that's my, that's my reading of
 3    it, yes.
 4            Q.   Okay.  And under "Fees and costs,"
 5    can you read -- well, can you read that whole
 6    section under "Fees and costs"?
 7            A.   Yes.  (As read)
 8                  "At Expert AuPair, we have a
 9                  strict no-hidden-fee policy.
10                  Here's what you can expect to pay:
11                      Program fee:  6,400.
12                      Domestic transfer:  0-350.
13                      Tuition allowance" --
14            And my copy is not clear but I believe
15    that would say "500."
16                  "Weekly stipend:  195.75."
17            Total is approximately $330 a week for one
18    year.
19            Q.   So understanding that these are,
20    Exhibit 6 and Exhibit 13 are, just two
21    advertisements, based on these two advertisements,
22    can you tell me anything that would attract families
23    that are interested in paying their au pair more
24    than the minimum stipend of 195.75?
25                  MR. ENICA:  I object to form.  And may I
```



Page 183

1          request a clarification or you want him to

2          answer?

3          BY MS. SMALLS:

4          Q.   I want him to answer.

5          A.   I believe it is accurate to say that

6    both of these advertisements -- and again, I find

7    this one sloppy and I've mentioned that -- I believe

8    that both of these advertisements were aimed at

9    people who had not heard of the au pair program more

10   than more than for people who were currently housing

11   an au pair or had heard of the au pair program.

12          Q.   What percentage of the families that

13   participate in your program have never heard of the

14   au pair program, versus families that already house

15   an au pair or are already versed in the program?

16          A.   It's very hard for me to say that

17   because I don't -- I haven't collected all that

18   data, at least not -- it's not something we've done.

19          The probable answer to your question is,

20   about 50 percent, probably, and again, this is

21   conjecture, about 50 percent have not heard of an au

22   pair or at least thought it was not something that

23   they -- that would be something that they would --

24   an avenue they would pursue.

25          Q.   I only ask that question because you


MAGNA ▶
LEGAL SERVICES

Highly Confidential – Attorney's Eyes Only

Page 200

1    host family?

2              A.    I believe so, but I can't... I am

3    talking from vague recollection, not from...

4              Q.    Okay.  And then can you read number

5    36?

6              A.    (as read):



13             Q.

15             MR. ENICA:  I object to the form of the

16             question.

17             BY MS. SMALLS:

18             Q.    Pursuant to this agreement?

19             A.

24             Q.    And once the au pair is in the United

25    States and placed with a host family, what kind of



Highly Confidential - Attorney's Eyes Only

Page 201

1    monitoring occurs?

2              A.    So, once they've left training, they

3    will fly, normally on Friday, I believe now, to

4    their host family's local airport.  The host family

5    will pick them up.  Obviously it's different if it's

6    in Tampa or St. Pete.

7              The host family will pick them up.  There

8    is a check-in from the local representative within

9    two days, so within 48 hours.

10             The local rep then performs an

11   orientation, and that goes over the document we're

12   calling the employment contract.  And they interpret

13   various things like what dangers the child may --

14   may face in the home.  You know, things like

15   swimming pools and so on come up.  What the

16   understanding is on phone lines, although that's

17   less important now in the days of Skype.  What

18   opportunities the au pairs has -- the au pair has to

19   go out and sort of meet people?

20             And so that's all performed in two --

21   within two weeks of the date of the, date of

22   arrival, so two weeks after the Friday they've left

23   training.

24             Then there is monthly monitoring from the

25   local rep.  And so the typical questions are, you



Highly Confidential - Attorney's Eyes Only

Page 202

1    know:  How are you doing?  We'll ask, you know,

2    we'll ask how they're going about their education to

3    make sure that we want them to get out early to meet

4    Americans, because that's the point of the program,

5    the cultural exchange.

6              We will -- we'll ask to make sure that the

7    family is obeying the program rules.  We'll make

8    sure they're happy.  And we'll also talk to the host

9    family once a month.  And then the regional rep

10   calls once every quarter.  So typically there will

11   be -- you know, there would normally be four

12   contacts from the regional rep.  The regional reps

13   know the au pairs from training, which is a nice,

14   you know, it's a nice sort friendly voice.

15              Q.   And are all of those contacts

16   required by the State Department regulations?

17              A.   Yes, I believe so.  The only other

18   contact is -- the only other necessary contact, let

19   me say, is the two contacts that are needed in the

20   case of a rematch.  So when an au pair leaves one

21   family and moves to another, we need two contacts

22   per month.

23              (Query by reporter)

24              Rematch, yeah.

25              And then there are various events



Highly Confidential - Attorney's Eyes Only

Page 203

1    depending on where they are.

                         And she occasionally does

4    something else as well.  We have -- we've started

5    doing events in sort of big, quote, "interesting"

6    cities, so we did an event in D.C. a couple of weeks

7    ago which was attended by, I think, 40, some of whom

8    came down from New York.

9               So there is interaction afterwards with

10   the au pairs.

11              MS. SMALLS:  I'd ask that we take a short

12              break, and we'll just review what we have

13              left.  Thank you.

14              MR. ENICA:  So we'll take ten minutes for

15              the people on the phone?

16              MS. SMALLS:  Yes.

17              THE VIDEOGRAPHER:  This is the

18              videographer on May the 9th, 2017, at

19              approximately 4:07 p.m.  We are now going

20              off the record.

21   --- Upon recessing at 4:07 p.m.

22   --- Upon resuming at 4:15 p.m.

23              THE VIDEOGRAPHER:  This is the

24              videographer on May the 9th, 2017, at

25              approximately 4:16 p.m.  We are now back

