IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-03074-CMA-KMT

JOHANA PAOLA BELTRAN; *et al.,*

     Plaintiffs,

v.

INTEREXCHANGE, INC.; *et al.,*

     Defendants.

---

**DEFENDANT INTEREXCHANGE, INC.'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR RULE 23 CLASS CERTIFICATION (DOC. #559)**

---

     Defendant InterExchange, Inc. ("InterExchange") opposes class certification in this case.  InterExchange joins in all respects the master brief filed on behalf of all Defendants.  This Opposition provides additional facts and argument specific to InterExchange as permitted by the Court's Order of May 19, 2017.  (Doc. #555.)

     The named Plaintiffs asserted that they "suffered injuries typical of other au pairs, because their damages all arose from the defendants' common course of conduct." (Doc. #559 at pp. 19, 25.)  As to the Colorado Subclass, Beltran cannot rely on general allegations of all Defendants' "common course of conduct."  She must demonstrate that the Rule 23 factors are satisfied *as to each claim* and *as to InterExchange* specifically. Plaintiffs devote little of their Motion to this endeavor.  Because Plaintiffs made little

effort to distinguish one Defendant from the others, many of their allegations are incorrect on their face as to InterExchange and do not support class certification.

## I.    THE INQUIRIES RELEVANT TO RULE 23 ARE HIGHLY INDIVIDUALIZED.

Although Rule 23 class certification does not depend on the merits of the case, the Court must make "findings" that class certification is appropriate, even if they overlap with the merits.  Vallario v. Vandehey, 554 F.3d 1259, 1266-67 (10th Cir. 2009). The facts specific to InterExchange demonstrate the highly individualized nature of the inquiries necessary to resolve the claims for which Beltran seeks class certification.

### A.    Au Pairs' Pay and Work Conditions Are Unique and Individual.

None of Plaintiffs' claims can be resolved without knowing certain fundamental facts about each au pair's individual experience with her host family:  where she was living; how many hours per week she worked; how much she was paid; the reasonable cost or fair market value of the lodging and meals she received,[1] and the information about the au pair program and resources to which the au pair was exposed and on which she relied.  No class-wide source of this information exists as to InterExchange au pairs.  Au pairs enter into individual agreements with their host families, the terms of which are decided between them, including but not limited to work schedule, work tasks, hours per week, and stipend, subject to any restrictions imposed by Department of State.  (Declaration of Michael McHugh, Ex. A hereto, at ¶ 8, Ex. 1 at InterExchange0000052, Ex. 2 at InterExchange0000019.)  The available information

---

[1] See 7 CCR 1103-1:3.  The reasonable cost or fair market share of lodging of up to $25.00 per week and reasonable cost or fair market value of meals may be credited toward minimum wage under Colorado law.

2

demonstrates that the hours and conditions vary widely.  For example, the Department of State's stipend calculation is based on 45 hours of work per week.  22 C.F.R. 62.31(j).  Beltran worked 40 hours per week.  (Doc. #559 at p. 21-22 n.26.)  Other InterExchange host families need far fewer hours each week.  (See, e.g., Ex. A at Ex. 3 [host family needing only 20 hours per week].)

Duties differ, as well.  Beltran asserts she performed the work of a housekeeper, not an au pair.  (Deposition of Johana Paola Beltran, Ex. B hereto, at 131:15-17; 132:4-11; 133:4-19; 134:12-135:2; 137:17-19; 138:22-139:18; DOC. #325-1 at p. 19; Doc. #395 at ¶ 385.)  She is even seeking damages for work as a housekeeper rather than a live-in au pair.  (Id. at 182:19-20; 183:2, 10-25; 187:5-21.)  Her experience sheds no light on those of the other putative class members.

No basis exists upon which Beltran can demonstrate that common evidence will establish the necessary facts to resolve her claims.

### B.    What an Au Pair Read or Heard is Unique to Each Au Pair.

Plaintiffs generalize that "every defendant consistently told *au pairs* and host families that each "standard" *au pair* must be paid precisely $195.75 per week."  (Doc. #559 at p. 5.)  Plaintiffs have not identified a single instance of InterExchange stating that au pairs must be paid "precisely" $195.75 per week, much less *consistent* representations to that effect.  Plaintiffs point to a single blog post from 2014, quoted in its entirety in the Second Amended complaint but recklessly paraphrased in the Motion, that a scammer "*may* make you offers that sound amazing, like paying you more than the program amount of $195.75 per week."  (Doc. #559 at p. 5 [citing to Doc. #395 at ¶

Active/45957102.1

197] [emphasis added].)  As Beltran was an au pair in 2012, she obviously never read this blog post.  Beltran had a single conversation with the international cooperator in Colombia.  (Ex. B at 86:18-89:5.)  She cannot satisfy commonality, typicality, or predominance as to alleged misrepresentations by InterExchange when no class-wide method is available to determine what class members read or heard.

Plaintiffs assert that the sponsors' host family and au pair agreements support "consistent" misrepresentations made regarding the stipend.  (Doc. #559 at p. 6.)  The contract that Beltran signed, and the contract that her host family, the Noonans, signed, specifically define "stipend" as "the *minimum* amount that the Host Family must pay to the Au Pair . . . .  The current *minimum* required weekly amount is one hundred ninety-five dollars and seventy-five cents ($195.75)."  (Ex. A at Ex. 1 InterExchange0000051; Ex. 2 at InterExchange 0000017 [emphasis added].)  The Host Family agreement states that the Host Family's obligation is to give the Au Pair "at least the minimum appropriate U.S. State Department mandated Stipend."  (Ex. A at Ex. 2, InterExchange 0000019.)  This language is consistent in InterExchange's agreements through the years.  (Ex. A. at ¶¶ 6-7.)  InterExchange's agreements do not represent a standardized misrepresentation that would support commonality, typicality, or predominance.

**C.**     **Au Pairs Become Au Pairs For Different Reasons.**

Beltran became an au pair to learn a new language, experience a new culture, and make new friends.  (Ex. B at 44:20-25.)  However, audit information that InterExchange provides annually to the Department of State have identified *many* factors that motivate individuals to become au pairs, and the stipend is nowhere close to

4

the most frequently identified factor.  Also, prospective au pairs obtain information about the program from many sources, several of which are not under the control of InterExchange.  For example:

- In 2012, "earning money" received only 37 responses as being a "very important" consideration for au pairs participating in the program, compared to 150 "very important" responses for living in the United States, 130 "very important" responses for cultural opportunities, and 136 responses for learning English. (Ex. A at Ex. 4, InterExchange 0007139.)  Twenty-seven responses stated that earning money was not a factor at all, compared to zero such responses for living in the United States and cultural opportunities.  (Id.)  The 2013 audit results were similar.  (Ex. A at Ex. 5, InterExchange0005974.)

- In 2012, when respondees were given the opportunity to write in the most important factors for a successful au pair experience, only one au pair identified anything to do with money.  (Ex. A at Ex. 4, InterExchange 0007134-35.)  The most common write-in was "travel."  (Id.)

- In 2012, regarding the most influential sources of information about the au pair program, four different sources received more than 35 responses.  (Ex. A at Ex. 4, InterExchange0007137.)  "International cooperator" received the most responses, followed by family or friends.  (Id.)  The InterExchange website was third and only barely above a general online search for au pair sites.  (Id.)  In 2013, 71% of the responses identified the home country agency as the most influential factor. (Ex. A at Ex. 5, InterExchange0005973.)  That same year, 77%

of responding au pairs learned about InterExchange's program through a home country agency, a family member or friend, or a past or current au pair.  (Id. at InterExchange0005996.)

- In 2012, 93% were satisfied or very satisfied with InterExchange's communications and program materials, and 97% thought the website information and program materials were good, very good, or excellent.  (Ex. A at Ex. 4, InterExchange0007132, 7150.)  In 2013, 97% rated the program materials good, very good, or excellent.  (Ex. A at Ex. 5, InterExchange0005967.)

- In 2013, when asked to identify what InterExchange could do to better prepare au pairs for their work and improve their experience, 123 responses indicated that nothing needed to be done.  (Ex. A at Ex. 5, InterExchange0005972.)  The next closest response, a better orientation to the U.S., had 32 responses.  (Id.)

- In 2012, 86% were satisfied or very satisfied with the orientation and training in New York.  (Ex. A at Ex. 4, InterExchange0007131.)  In 2013, 96% rated it good, very good, or excellent.  (Ex. A at Ex. 5, InterExchange 0005966.)

- In 2012, 83% were satisfied or very satisfied with their home country agencies.  (Ex. A at Ex. 4, InterExchange0007130).  In 2013, 93% rated their home country agencies good, very good, or excellent.  (Ex. A at Ex. 5, InterExchange 5965.)

In addition to demonstrating that various factors and sources of information played a role in au pairs' decisionmaking, the audit results show that many au pairs were perfectly satisfied with the various communications and materials Plaintiffs allege

were fraudulent and a program that Plaintiffs allege was injurious.  Individualized

inquiries are at the core of Beltran's claims.

## II.   <u>INDIVIDUALIZED INQUIRIES MAKE CLASS CERTIFICATION IMPROPER.</u>

A dearth of class-wide evidence and an abundance of individualized issues

render the proposed Colorado Subclass overbroad and defeat commonality, typicality,

and predominance.  <u>See</u> <u>Friedman v. Dollar Thrifty Auto. Group, Inc.</u>, 304 F.R.D. 601,

606 (D. Colo. 2015) (denying class certification on grounds of overbreadth, lack of

commonality, lack of typicality, and lack of predominance because of individualized

issues).  In <u>Friedman</u>, the plaintiffs alleged that the defendants tricked consumers into

buying so-called "Add-On Products" as a result of a "systematic pattern of conduct

across the country."  <u>Id.</u> at 604.  The plaintiffs sought certification of a class composed

of "all persons who rented cars from Dollar in Colorado and Florida . . . and were

charged for [the Add-On Products] by Dollar other than as part of a prepaid tour

reservation."  <u>Id.</u> at 604-05.  The plaintiffs argued that the uniform practices Dollar used

could establish liability on a class-wide basis, and that the named plaintiffs' experiences

were typical.  <u>Id.</u> at 605.

The Court found that the proposed class was overbroad, and individual issues

defeated commonality, typicality, and predominance.  <u>Friedman</u>, 304 F.R.D. at 606,

608, 612.  The proposed class definition included persons who chose to purchase the

products; were not deceived in connection with purchase of the products; received a

benefit from the products; or otherwise were not injured.  <u>Id.</u> at 607.  While

acknowledging the existence of several common issues, the Court concluded that the

Active/45957102.1

claims did not depend on a common contention that is "of such a nature that it is capable of classwide resolution . . . ." Friedman, 304 F.R.D. at 608 (quoting Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2551 (2011)).  Plaintiffs' contention that Dollar made misleading statements and omissions of material fact to *all* purchasers of Add-On Products failed because the purchases often turned on the consumers' individual transactions.  Id. at 609-10.  "In this situation, where the circumstances would likely differ as to what was told or understood by the consumer about the purchase of Add-On Products, a plaintiff may not rely on class-wide inferences of causation and injury . . . ." Id. at 610.  The individualized circumstances rendered the named plaintiffs inadequate class representatives, as well.  Id. at 613-14.

As in Friedman, the highly individualized inquiries necessary to resolve Beltran's claims defeat Rule 23 class certification.

## A.  Plaintiffs' allegations of an enterprise are too vague, and causation cannot be determined or presumed on a class-wide basis.

Plaintiffs' allegation of a RICO enterprise among InterExchange, Cultural Care, Au Pair in America, and AuPairCare is new allegation, as the Second Amended Complaint (as well as the proposed Third Amended Complaint) alleged RICO enterprises comprised of each sponsor and its respective agents and host families. (See Doc. #559 at p. 9; Doc. #395 at ¶¶ 215-231; Doc. 3561-2 at ¶ 219.)  A RICO plaintiff must prove that the alleged racketeering activity was both the "but-for" and the proximate cause of his or her injury.  CGC Holding Co. v. Broad and Cassel, 773 F.3d 1076, 1088 (10th Cir. 2014).

8

Plaintiffs' new allegations of a RICO enterprise are insufficient for the Court to conclude that the Rule 23 factors are met as to InterExchange.  Plaintiffs cite to an email between InterExchange and Cultural Care discussing the types of educational opportunities that are permitted under the regulations, an issue that is irrelevant to the stipend and any of the claims in this case.  (Doc. #558-64; Doc. #559 at n. 17.)  Plaintiffs do not explain or suggest how this email supports the existence of an enterprise or racketeering activity.  Plaintiffs also cite to testimony from GoAuPair's 30(b)(6) deposition, characterizing it as "cooperation between GoAuPair and InterExchange."  (Doc. # 559 at p. 9 n.17.)  However, GoAuPair is not a member of the newly-alleged RICO enterprise.  (Id. at p. 9.)  Also, the deponent, William Kapler, was testifying about an Alliance meeting at which the *State Department* complimented certain InterExchange practices, specifically a log of au pairs to record hours worked.  (Doc. # 558-87 at pp. 162-69.)   A far cry from "cooperation," Mr. Kapler testified that he did not like InterExchange's log.  (Id.)  Plaintiffs also assert that the sponsors "coordinated a walk-out when DOL attempted to speak to them about wage and hour law."  (Doc. #559 at p. 8.)  InterExchange representatives were present at the DOL presentation referenced by Plaintiffs *but did not walk out.*  (Doc. #559 at p. 8; Ex. A at ¶ 11.)  As made clear by the evidence to which Plaintiffs themselves cite, only the representatives of Cultural Care and Expert Au Pair walked out.  (Ex. A at ¶ 11; Doc. #558-80 [declaration of Plaintiff's counsel Mr. Rodriguez attached exhibit from EurAuPair that only Cultural Care and Expert Au Pair left]).  Expert Au Pair is not part of the alleged RICO enterprise, either.  Plaintiffs' enterprise allegations as to the four

9

sponsors identified in their Motion are so off-point that the Court cannot determine that InterExchange au pairs were affected as a class.

Moreover, whether an au pair was injured, and whether alleged racketeering activity was the cause of that injury, can only be determined on an individual basis. Only the details of each au pair's experience, including the information she received about the program, where she lived, the hours she worked and the amounts earned, as well as the extent to which various factors contributed to her decision to become an au pair, can answer the questions necessary to determine liability.  The audit results suggest that many factors contribute to au pairs' decisions to participate in the program. Beltran is a perfect example:  she received only limited information about the program from limited sources, and the value of the stipend had no meaning for her in making her decision because she had no concept of the value of it in terms of her native currency. (Ex. B at 86:18-89:5.)  Other au pairs are going to have very different experiences and communications.  Beltran's RICO allegations do not satisfy the Rule 23 factors.

**B.     The Colorado Subclass is Overbroad as to the Wage Claim.**

Without asking each au pair individually about her state of residence, her hours worked, and the stipend received, the Court cannot ascertain whether she falls within the class of potentially injured au pairs under Colorado wage law, and the class therefore is overbroad.  Friedman, 304 F.R.D. at 607.  Moreover, any additional compensation in the form of gifts, bonuses, or other items of value that may be relevant to an au pair's compensation—and therefore the fact and degree of injury—could only

be determined by asking each host family and/or au pair.  These individualized inquiries defeat class certification.

### C.      The Fraud Claims Equally Depend on Individualized Circumstances.

The fraud-based claims require significant individualized inquiries into each au pair's experiences applying for and participating in the au pair program to determine whether any particular au pair conceivably suffered any harm.  InterExchange does not provide stock responses or scripts to its employees for resolving common problems, (Deposition of Michael McHugh, Ex. C hereto, at 226:24-227:9), so no class-wide information can establish what representations were made to any particular au pair.  As Beltran's personal experience and InterExchange's audit results illustrate, au pairs had vastly different experiences in terms of source, content, and impact of information.  See City & County of Denver v. Am. Oil Co., 53 F.R.D. 620, 624 (D. Colo. 1971) (material variation in representations or kinds or degrees of reliance makes class treatment improper); Brickey v. Dolgencorp., Inc., 272 F.R.D. 344, 349 (W.D.N.Y. 2011) (class treatment was inappropriate when the claims really involved not the policy itself but the indirect *effect* of the policies, which depended upon the store at issue, how the managers reacted to the policies, etc.)  No class-wide assumptions can be made about what sources of information au pairs consulted and what role, if any, those sources played in the decisionmaking process.

The Colorado Consumer Protection Act requires proof of damages as an element of a claim in class actions.  See C.R.S. 6-1-113.  Courts have denied class certification of these claims because actual damages are an element of the claim, establishing

11

dissimilarity and individual questions.  <u>Robinson v. Lynmar Racquet Club, Inc.</u>, 851 P.2d 274, 278-79 (Colo. App. 1993).  Class certification must be denied in this case, as well.

As in <u>Friedman,</u> individualized inquiries make the proposed classes overbroad and also defeat commonality, typicality, and predominance.  Only detailed individual inquiry will yield the evidence that will resolve the state law claims.

## III.   <u>CONCLUSION.</u>

For the reasons stated above, Rule 23 class certification is proper as to Beltran's claims against InterExchange. Plaintiffs' Motion should be denied.


Respectfully submitted this 17th day of July, 2017.


Brooke A. Colaizzi
Heather F. Vickles
Raymond M. Deeny
Joseph H. Hunt
Alyssa L. Levy
SHERMAN & HOWARD L.L.C.
633 Seventeenth Street, Suite 3000
Denver, CO 80202
Tel: (303) 297-2900
Fax: (303) 298-0940
Email:  bcolaizzi@shermanhoward.com
Email:  hvickles@shermanhoward.com
Email:  rdeeny@shermanhoward.com
Email:  jhunt@shermanhoward.com
Email:  alevy@shermanhoward.com

ATTORNEYS FOR DEFENDANT
INTEREXCHANGE, INC.

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of July, 2017, I electronically filed a true and correct copy of the foregoing **DEFENDANT INTEREXCHANGE, INC.'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR RULE 23 CLASS CERTIFICATION (DOC. #559)** with the Clerk of the Court via ECF/CM e-filing system, which will send notification of such filing via email to the following:

Alexander Hood
TOWARDS JUSTICE
1535 High Street, Suite 300
Denver, CO  80218
Email: alex@towardsjustice.org

Lawrence D. Stone
Kathleen E. Craigmile
NIXON SHEFRIN HENSEN OGBURN,
    P.C.
5619 DTC Parkway, Suite 1200
Greenwood Village, CO 80111
E-mail: LStone@Nixonshefrin.com
E-mail:
    kcraigmile@nixonshefrin.com

William J. Kelly III
Chanda M. Feldkamp
KELLY & WALKER LLC
1512 Larimer Street, Suite 200
Denver, CO  80202
Email: wkelly@kellywalkerlaw.com
Email: cfeldkamp@kellywalkerlaw.com

Brian A. Birenbach
THE RIETZ LAW FIRM, L.L.C.
114 Village Place, Suite 301
Dillon, CO  80435
Email: brian@rietzlawfirm.com

Kathryn A. Reilly
Grace A. Fox
Natalie E. West
WHEELER TRIGG O'DONNELL LLP
370 Seventeenth Street, Suite 4500
Denver CO  80202-5647
Email: reilly@wtotrial.com
Email: fox@wtotrial.com
Email: West@wtotrial.com

James E. Hartley
Adam A. Hubbard
Jonathan S. Bender
HOLLAND & HART LLP
555 Seventeenth Street, Suite 3200
Denver, CO  80202
Email: jhartley@hollandhart.com
Email: aahubbard@hollandhart.com
Email: jsbender@hollandhart.com

13

John B. Fulfree
Joseph B. Cartafalsa
Robert M. Tucker
Stephen J. Macri
PUTNEY, TWOMBLY, HALL & HIRSON
    LLP
521 Fifth Avenue
New York, NW 10175
Email: jfulfree@putneylaw.com
Email: jcartafalsa@putneylaw.com
Email: rtucker@putneylaw.com
Email: smacri@putneylaw.com

Martha L. Fitzgerald
David B. Meschke
Margo J. Arnold
BROWNSTEIN HYATT FARBER
    SCHRECK, LLP
410 Seventeenth Street, Suite 2200
Denver, CO  80202-4432
Email: mfitzgerald@bhfs.com
Email: dmeschke@bhfs.com
Email: marnold@bhfs.com

Joan A. Lukey
Robert M. Buchanan, Jr.
Michael T. Gass
Justin J. Wolosz
Lyndsey M. Kruzer
Kevin P. O'Keefe
CHOATE HALL & STEWART LLP
Two International Place
Boston, MA 82110
Email: joan.lukey@choate.com
Email: rbuchanan@choate.com
Email: mgass@choate.com
Email: jwolosz@choate.com
Email: lkruzer@choate.com
Email: kokeefe@choate.com

Thomas B. Quinn
Peggy E. Kozal
Heather K. Kelly
Jennifer W. Vedra
Nathan A. Huey
GORDON & REES, LLP
555 17th Street, Suite 3400
Denver, CO 80202
Email: tquinn@gordonrees.com
Email: pkozal@gordonrees.com
Email: hkelly@gordonrees.com
Email: jvedra@gordonrees.com
Email: nhuey@gordonrees.com

James M. Lyons
Jessica L. Fuller
Diane R. Hazel
LEWIS ROCA ROTHGERBER CHRISTIE
    LLP
One Tabor Center, Suite 3000
1200 Seventeenth Street
Denver, CO 80202
Email: jlyons@lrrc.com
Email: jfuller@lrrc.com
Email: dhazel@lrrc.com

Meshach Y. Rhoades
Martin Estevao
Vance O. Knapp
ARMSTRONG TEASDALE LLP
4643 S. Ulster St., Suite 800
Denver, CO  80237
Email: mrhoades@armstrongteasdale.com
Email: mestevao@armstrongteasdale.com
Email: vknapp@armstrongteasdale.com

14

Bogdan Enica
Bogdan Enica, Attorney at Law
111 Second Avenue, NE, Suite 213
St. Petersburg, FL  33701
Email: Bogdane@hotmail.com

Susan Penniman Klopman
H & K Law, LLC
3900 East Mexico Ave, Suite 330
Denver, CO 80210
Email: sklopman@hklawllc.com

Lauren F. Louis
Sigrid S. McCawley
Sabria McElroy
BOIES, SCHILLER & FLEXNER, LLP
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, FL  33301
575 Lexington Ave., 7th Floor
New York, NY  10022
Email: llouis@bsfllp.com
Email: smccawley@bsfllp.com
Email: smcelroy@bsfllp.com

Sean P. Rodriguez
Juan P. Valdivieso
Boies Schiller Flexner LLP
1999 Harrison Street, Suite 900
Oakland, CA 94612
Email:  srodriguez@bsfllp.com
Email:  jvaldivieso@bsfllp.com

Lawrence Lee
Susan M. Schaecher
FISHER & PHILLIPS LLP
1801 California Street, Suite 2700
Denver, CO  80202
Email: llee@laborlawyers.com
Email: sschaecher@laborlawyers.com

Eric J. Stock
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY  10166-0193
Email: estock@gibsondunn.com

Matthew L. Schwartz
Peter M. Skinner
Dawn L. Smalls
Randall W. Jackson
Joshua J. Libling
Boies, Schiller & Flexner, LLP
575 Lexington Ave., 7th Floor
New York, NY  10022
Email:  mlschwartz@bsfllp.com
Email:  pskinner@bsfllp.com
Email: dsmalls@bsfllp.com
Email:  rjackson@bsfllp.com
Email: jlibling@bsfllp.com

s/Laura Lewis

15