Case No. 1:14-cv-03074-CMA-KMT Document 602-1 filed 07/17/17 USDC Colorado pg 1 of 19

# EXHIBIT A

*Johana Paola Beltran, et al. vs.*

*Interexchange, Inc., et al.*

*Confidential Video Deposition of Juliane Harning*

*September 08, 2016*



Stevens-Koenig Reporting

700 17th Street, Suite 1750
Denver, CO 80202
303-988-8470 (Office)   303-988-8478 (Fax)
SKReporting.com

Johana Paola Beltran, et al. vs. Interexchange, Inc., et al.

**EXHIBIT A**

Confidential Video Deposition of Juliane Harning
September 08, 2016

### Page 1

```
          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLORADO

Civil Action No. 1:14-cv-03074-CMA-KMT
_____

JOHANA PAOLA BELTRAN; AND THOSE SIMILARLY SITUATED,
     Plaintiffs,
vs.
INTEREXCHANGE, INC.; USAUPAIR, INC.; GREATAUPAIR, LLC;
EXPERT GROUP INTERNATIONAL, INC., D/B/A EXPERT AUPAIR;
EURAUPAIR INTERCULTURAL CHILD CARE PROGRAMS; CULTURAL
HOMESTAY INTERNATIONAL; CULTURAL CARE, INC., D/B/A
CULTURAL CARE AU PAIR; AUPAIRCARE, INC.; AU PAIR
INTERNATIONAL, INC.; APF GLOBAL EXCHANGE, NFP; AMERICAN
INSTITUTE FOR FOREIGN STUDY D/B/A AU PAIR IN AMERICA;
AMERICAN CULTURAL EXCHANGE, LLC, D/B/A GOAUPAIR; AGENT AU
PAIR; A.P.EX. AMERICAN PROFESSIONAL EXCHANGE, LLC, D/B/A
PROAUPAIR; AND 20/20 CARE EXCHANGE, INC., D/B/A THE
INTERNATIONAL AU PAIR EXCHANGE,
     Defendants.
_____

          CONFIDENTIAL VIDEO DEPOSITION OF JULIANE HARNING
                        September 8, 2016
```

### Page 2

```
APPEARANCES:
ON BEHALF OF THE PLAINTIFFS:
     ALEXANDER N. HOOD, ESQ.
     NINA E. DiSALVO, ESQ.
     Towards Justice
     1535 High Street, Suite 300
     Denver, Colorado 80218
     Phone: 720-239-2606
     Emails: alex@towardsjustice.org
             nina@towardsjustice.org
     and
     LAUREN E. LOUIS, ESQ. (appearing by phone)
     Boies Schiller & Flexner, LLP
     401 East Las Olas Boulevard, Suite 1200
     Fort Lauderdale, Florida 33301
     Phone: 954-356-0011
     Email: llouis@bsfllp.com
ON BEHALF OF AUPAIRCARE, INC.:
     THOMAS B. QUINN, ESQ.
     PEGGY E. KOZAL, ESQ.
     BRIAN P. MASCHLER, ESQ. (appearing by phone)
     Gordon Rees Scully Mansukhani, LLP
     555 17th Street, Suite 3400
     Denver, Colorado 80202
     Phone: 303-534-5160
     Emails: tquinn@gordonrees.com
             pkozal@gordonrees.com
             bmaschler@gordonrees.com
ON BEHALF OF INTEREXCHANGE, INC.:
     BROOKE A. COLAIZZI, ESQ.
     Sherman & Howard, LLC
     633 17th Street, Suite 3000
     Denver, Colorado 80202
     Phone: 303-297-2900
     Email: bcolaizzi@shermanhoward.com
ON BEHALF OF A.P.EX. AMERICAN PROFESSIONAL
EXCHANGE AND 20/20 CARE EXCHANGE, INC.:
     KATHLEEN E. CRAIGMILE, ESQ.
     Nixon Shefrin Hensen Ogburn, P.C.
     5619 DTC Parkway, Suite 1200
     Greenwood Village, Colorado 80111
     Phone: 303-773-3500
     Email: kcraigmile@nixonshefrin.com
```

### Page 3

```
APPEARANCES (CONTINUED):
ON BEHALF OF EXPERT GROUP INTERNATIONAL:
     BOGDAN ENICA, ESQ. (appearing by phone)
     Bogdan Enica, Attorney at Law
     111 2nd Avenue NE, Suite 900
     St. Petersburg, Florida 33701
     Phone: 727-225-2649
     Email: bogdane@hotmail.com
ON BEHALF OF EURAUPAIR INTERCULTURAL CHILD CARE:
     MARTHA L. FITZGERALD, ESQ.
     Brownstein Hyatt Farber Schreck
     410 17th Street, 22nd Floor
     Denver, Colorado 80202
     Phone: 303-223-1100
     Email: mfitzgerald@bhfs.com
ON BEHALF OF CULTURAL HOMESTAY INTERNATIONAL:
     ADAM A. HUBBARD, ESQ. (appearing by phone)
     Holland & Hart LLP
     555 17th Street, Suite 3200
     Denver, Colorado 80202
     Phone: 303-295-8000
     Email: aahubbard@hollandhart.com
ON BEHALF OF AU PAIR INTERNATIONAL, INC., AMERICAN
CULTURAL EXCHANGE, AND AGENT AU PAIR:
     KATHRYN A. REILLY, ESQ. (appearing by phone)
     Wheeler Trigg O'Donnell, LLP
     1801 California Street, Suite 3600
     Denver, Colorado 80202
     Phone: 303-244-1800
     Email: reilly@wtotrial.com
ON BEHALF OF APF GLOBAL EXCHANGE, NFP
AND AMERICAN INSTITUTE FOR FOREIGN STUDY:
     LAWRENCE L. LEE, ESQ. (appearing by phone)
     Fisher & Phillips, LLP
     1801 California Street, Suite 2700
     Denver, Colorado 80202
     Phone: 303-218-3663
     Email: llee@laborlawyers.com
```

### Page 4

```
APPEARANCES (CONTINUED):
ON BEHALF OF CULTURAL CARE, INC.:
     JOAN A. LUKEY, ESQ.       (appearing by phone)
     LYNDSEY M. KRUZER, ESQ. (appearing by phone)
     JUSTIN J. WOLOSZ, ESQ.   (appearing by phone)
     Choate Hall & Stewart, LLP
     Two International Place
     Boston, Massachusetts 02110
     Phone: 617-248-5000
     Emails: joan.lukey@choate.com
             lkruzer@choate.com
             jwolosz@choate.com
     and
     DIANE R. HAZEL, ESQ.
     Lewis Roca Rothgerber Christie, LLP
     1200 17th Street, Suite 3000
     Denver, Colorado 80202
     Phone: 303-628-9545
     Email: dhazel@lrrc.com

     Also Present: Jerry DeBoer, Videographer
```

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

EXHIBIT A

Confidential Video Deposition of Juliane Harning
September 08, 2016

Page 5

```
 1           PURSUANT TO WRITTEN NOTICE and the appropriate
 2   rules of Civil Procedure, the confidential video
 3   deposition of JULIANE HARNING, called for examination by
 4   Defendant AuPairCare, was taken at the offices of Gordon
 5   Rees Scully Mansukhani, LLP, 555 17th Street, Suite 3400,
 6   Denver, Colorado, commencing at 9:18 a.m. on Thursday,
 7   September 8, 2016, before Deborah A. VanDemark, RPR,
 8   CRCR, and Notary Public in and for the State of Colorado.
 9                         I N D E X
10   EXAMINATION:                                       PAGE
11       By Mr. Quinn                                11, 199
12       By Ms. Kruzer                                   196
13       By Mr. Enica                                    197
14       By Ms. DiSalvo                                  201
15   Testimony Requested to be marked:
16       Page                    Line
17        42                      25
18        44                       1
19       110                      10
20       166                       2
21       176                       3
22       187                      10
23
24
25
```

Page 6

```
 1                                            INITIAL
     EXHIBITS:                               REFERENCE
 2
       41   AuPairCare Agreement signed by       14
 3          Ms. Harning
 4     42   Declaration of Juliane Harning       16
 5     43   Handwritten contact information      25
 6     44   1040NR-EZ Tax Form                   35
 7     45   Ms. Harning's Declaration with       41
            handwritten corrections
 8
       46   4506-T Request for Transcript of Tax 70
 9          Return
10     47   Email from AuPairCare to Ms. Harning 71
11     48   AuPairCare Handbook                  94
12     49   Ms. Harning's Application with      121
            AuPairCare
13
```

Page 7

```
 1            P R O C E E D I N G S
 2       MR. QUINN:  So prior to today's -- prior
 3   to this moment today and for a short period last night,
 4   plaintiffs' counsel and I discussed objections today and
 5   how to -- I guess a more serviceable way to move through
 6   objections during the course of the deposition, and we
 7   have agreed that form and foundation are appropriate
 8   objections; and that if a -- if there is a concern about
 9   the content of some of the questions, whether it be
10   privileged, then that would be an appropriate objection.
11       And if there is a deeper concern about the
12   area of questioning and counsel would like to make an
13   extensive record, we will -- we will jointly ask the
14   witness to leave the room.  We'll make a record.  And if
15   we need to engage Magistrate Judge Tafoya at that point,
16   then we can do so.  But I think that's an agreement we've
17   worked on and is certainly amenable to the defense and
18   hopefully it is to the plaintiffs as well.
19       MR. HOOD:  Just a few, I think,
20   amendments, which are clarifying more than adding.  One
21   is that we've agreed that certain subject areas are off
22   limits for today's deposition.
23       MR. QUINN:  Yes.
24       MR. HOOD:  Is that correct?
25       MR. QUINN:  Right.
```

Page 8

```
 1       MR. HOOD:  Do you want to state for the
 2   record what --
 3       MR. QUINN:  First would be the romantic
 4   relationships of the witness and then current visa status
 5   of this witness.
 6       MR. HOOD:  So I would characterize that as
 7   her immigration status past or present.
 8       MR. QUINN:  That's --
 9       MR. HOOD:  And we have a minor
10   disagreement about another issue, and we're tabling that
11   for now.  And the only other thing I'd say is that my
12   understanding is that by saying objection, form or
13   foundation that I am preserving any objection within the
14   scope of those objections.
15       MR. QUINN:  Yes.
16       MR. HOOD:  For example, asked and
17   answered.
18       MR. QUINN:  Right.
19       MR. HOOD:  Without any further
20   explanation.
21       MR. QUINN:  You are preserving all
22   objections on all topics available under the Federal
23   Rules of Evidence.  Can't be any broader than that.  How
24   is that?
25       MR. HOOD:  Sounds good.
```

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.
EXHIBIT A
Confidential Video Deposition of Juliane Harning
September 08, 2016

**Page 9**

1  MR. QUINN: And the one -- the one issue
2  that remains to be resolved is the tax questions, and
3  we'll deal with those after the first break as I
4  understand it; is that right?
5      MR. HOOD: Right. Well, I will signal to
6  you and perhaps ask you to go off the record at a
7  breaking point --
8      MR. QUINN: Sure.
9      MR. HOOD: -- when I know -- and if not,
10 we can discuss it at the first break.
11     MR. QUINN: Sure.
12     MR. HOOD: The only other thing -- and I
13 forgot to do this, and I apologize -- ask my client to
14 mute her cell phone, which I normally ask before I --
15     THE DEPONENT: I did.
16     MR. HOOD: So I just wanted to make sure.
17 So I apologize about that.
18     MR. QUINN: Okay. We're ready to begin.
19     THE VIDEOGRAPHER: All right. Please
20 stand by. We are on the record at 9:20 on September 8,
21 2016 at 555 17th Street, Suite 3400, Denver, Colorado.
22 We are here for the video deposition of Juliane Harning
23 in the matter of Johana Paola Beltran and those similarly
24 situated versus InterExchange, Inc., et al., in the
25 United States District Court for the District of

**Page 10**

1  Colorado, Case Number 1:14-cv-03074-CMA-KMT. The
2  videographer is Jerry DeBoer, and the court reporter is
3  Debbie VanDemark from Stevens-Koenig. Will counsel
4  present in the room please state their appearances
5  followed by counsel on the phone.
6      MR. HOOD: Alexander Hood and Nina DiSalvo
7  from Towards Justice for the plaintiffs.
8      MR. QUINN: Tom Quinn on behalf of
9  Defendant AuPairCare.
10     MS. CRAIGMILE: Kathleen Craigmile on
11 behalf of A.P.EX. American Professional Exchange and
12 20/20 Care Exchange, Inc.
13     MS. COLAIZZI: Brooke Colaizzi on behalf
14 of InterExchange, Inc.
15     MS. HAZEL: Diane Hazel on behalf of
16 Cultural Care.
17     MR. QUINN: Okay. Phone folks.
18     MS. LOUIS: Lauren Louis with Boies
19 Schiller & Flexner also on behalf of the plaintiff.
20     MS. KRUZER: Lyndsey Kruzer on behalf of
21 Cultural Care Au Pair.
22     MS. FITZGERALD: Martha Fitzgerald on
23 behalf of EurAupair.
24     MR. ENICA: Bogdan Enica on behalf of
25 Expert AuPair.

**Page 11**

1      MR. QUINN: Is that it for folks on the
2  phone? All right. Let's go ahead and begin.
3      THE VIDEOGRAPHER: Will the reporter
4  please swear in the witness.
5          JULIANE HARNING,
6  having been first duly sworn, was examined and testified
7  as follows:
8              EXAMINATION
9  BY MR. QUINN:
10     Q.  Please state your name and your current
11 address.
12     A.  Juliane Harning, Hunnenstrasse 22A 17489,
13 Greifswald, Germany.
14     Q.  Okay. Can you please spell the name of
15 the street for the court reporter?
16     A.  Yes. H-u-n-n-e-n-s-t-r-a-s-s-e.
17     Q.  And are you currently living in the United
18 States?
19     A.  No.
20     Q.  When did you arrive in the United States
21 before this deposition?
22     A.  August 16.
23     Q.  Where have you been staying from
24 August 16th to the present?
25     A.  I stayed first with my former host family

**Page 12**

1  and then with a friend and now at a hotel here.
2      Q.  Okay. And that was the Russell family?
3      A.  Yes.
4      Q.  And that was in Virginia?
5      A.  Yes.
6      Q.  From August 16th until what day?
7      A.  I'm not sure exactly what day,
8  August 31st, I think.
9      Q.  And then what friend are you staying with
10 now? Excuse me, what friend did you stay with?
11     A.  Carrie, friend.
12     Q.  Carrie. Does Carrie have a last name?
13     A.  Myatt, M-y-a-t-t.
14     Q.  And where does Carrie Myatt live?
15     A.  In Silver Spring.
16     Q.  Maryland?
17     A.  Maryland.
18     Q.  So you've been able to understand my
19 questions and provide answers in English --
20     A.  Yes.
21     Q.  -- thus far for the last three to five
22 minutes or so, all right?
23     A.  Yes.
24     Q.  Okay. Good. And you've been fluent in
25 English, when I looked through your records, for at least

Johana Paola Beltran, et al. vs. Interexchange, Inc., et al.

EXHIBIT A

Confidential Video Deposition of Juliane Harning
September 08, 2016

**Page 17**

1  Q. Did you type this up?
2  A. No.
3  Q. It was typed for you?
4  A. Yes.
5  Q. Do you know when it was typed?
6  A. No.
7  Q. Do you know why it was typed?
8  A. What do you mean by that?
9  Q. Do you know why this was typed -- why this
10 was prepared?
11 A. No.
12 Q. Did you read it carefully before you
13 signed it?
14 A. I think I did.
15 Q. Do you know when you signed this
16 particular document?
17 A. I don't remember exactly when I signed it.
18 Q. Okay. Take a look at the back. Does that
19 look like August 12th to you?
20 A. It does.
21 Q. Were you in the United States when you
22 signed this?
23 A. No.
24 Q. Where were you?
25 A. In Berlin, I think.

**Page 18**

1  Q. When was the first -- how did you learn
2  about the lawsuit that you were involved in?
3  A. I don't exactly remember, but I read
4  either on a website about it or a report about it on the
5  internet.
6  Q. Let's start about the report. What type
7  of report do you think you read about this lawsuit?
8  A. I think it was like a news report by the
9  New York Times maybe. I don't remember.
10 Q. Do you remember when you read that report?
11 A. No.
12 Q. Have you at any time read any other
13 reports, newspaper articles, anything like that on the
14 internet about this lawsuit that you're in --
15 A. Yes.
16 Q. -- that you're involved in? What other
17 reports have you read?
18 A. Like more newspaper articles.
19 Q. Have you ever talked to any investigators?
20 A. What are investigators?
21 Q. Investigator would be someone who might
22 reach out to you to ask you about your experiences as an
23 au pair in the United States and then ask you if you want
24 to join this lawsuit.
25 A. I don't remember.

**Page 19**

1  Q. When did you join this lawsuit?
2  A. I think in April I started talking to
3  lawyers.
4  Q. That's the first time you talked to a
5  lawyer, would be in April of 2016; is that correct?
6  A. I think so.
7  Q. Could it have been even earlier?
8  A. Maybe.
9  Q. Could it have been in March?
10 A. I don't remember.
11 Q. Could it have been in 2015?
12 A. I don't remember.
13 Q. So the earliest recollection you have here
14 today is April 2016 of thinking about joining the
15 lawsuit; is that correct?
16 A. Yes.
17 Q. When did you sign an agreement to hire
18 lawyers to join this lawsuit?
19 A. I don't remember.
20 Q. Was it in April of 2016?
21 A. I don't remember.
22 Q. When did you provide documents to your
23 lawyers about your experiences as an au pair?
24 A. I don't remember.
25 Q. We received a bunch of documents last

**Page 20**

1  night, about 3,600 documents from your lawyers. Had you
2  provided documents to your lawyers recently?
3  A. Yes.
4  Q. About how many?
5  A. I don't know.
6  Q. Did you provide everything to your lawyers
7  within the last couple of weeks, or has it been a process
8  over a period of time?
9  A. I think everything they have they got last
10 week.
11 Q. So you hadn't provided them any documents
12 before last week; is that correct?
13 A. I don't remember.
14 Q. Let's go back to when you first read a
15 report or a newspaper article about this lawsuit, all
16 right?
17 A. Uh-huh.
18 Q. And I apologize if I've forgotten this.
19 But when do you think you might have first seen the
20 report about this lawsuit?
21 A. I don't remember.
22 Q. When you read the report, what did you do?
23 A. Nothing.
24 Q. Did you call lawyers to see if you could
25 join the lawsuit?

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

**EXHIBIT A**

Confidential Video Deposition of Juliane Harning
September 08, 2016

Page 21

1  A.  No.
2  Q.  Well, tell me the process of how you got
3  from reading a report or a newspaper article to getting
4  signed up to be a plaintiff in this case.
5      MR. HOOD:  I'm going to object as to
6  privilege, and I'm going to ask to -- for a break to
7  discuss with my client how to -- how to answer these
8  questions without delving into privilege.
9      MR. QUINN:  Okay.  I'll withdraw the
10 question.  So I'll withdraw it in case you were
11 concerned.
12  Q.  (By Mr. Quinn)  So once you read the
13 article about the -- the newspaper article that we're
14 talking about, did you then go to a website?
15  A.  I don't remember.
16  Q.  Have you ever been to a website that talks
17 about this lawsuit?
18  A.  What do you mean by "a website that talks
19 about"?
20  Q.  Sure.  Did you go to any blogs, websites,
21 Facebook pages where this lawsuit is discussed between
22 au pairs?
23  A.  I don't remember, maybe.
24  Q.  Okay.  Well, you told me maybe five minute
25 ago that you think you read about this on the internet

Page 22

1  through some sort of communication other than a lawsuit.
2  What were you talking -- excuse me.  Other than a
3  newspaper article, what were you talking about when you
4  said that?
5  A.  Can you rephrase the question, please?
6  Q.  Sure.  Aside from reading newspaper
7  articles about this lawsuit on the internet, what else
8  have you read about this lawsuit on the internet?
9  A.  More newspaper articles.  I Googled the
10 lawsuit.  Like I Googled au pair lawsuit, and a bunch of
11 sites pop up.  I know that there are blogs about it.  I
12 don't remember -- I don't recall accessing those blogs
13 and like reading about them.
14  Q.  Do you think you might have accessed them
15 and read about them?
16  A.  I don't remember.  I can't recall.
17      MR. HOOD:  Tom, I just got word from
18 people who are trying to listen on the phone.  They're
19 having a very difficult time hearing, so I don't know if
20 there's anything -- could we move the star closer maybe?
21      THE VIDEOGRAPHER:  Counsel, that is my
22 microphone.  That's not for the sound system.
23      MS. LOUIS:  We're having difficulty just
24 with the witness, not with Tom.
25      MR. HOOD:  Tom is closer.

Page 23

1  Q.  (By Mr. Quinn)  So talk a little louder.
2  We'll take a break, and then we'll -- I think what we're
3  going to have to do is move it.  It looks like it's
4  plugged in in that jack down here.  So we'll move it at
5  the next break.  That sound good?  But we'll both try to
6  keep our voice up.
7  A.  Okay.
8  Q.  And we'll take a break shortly.  Let's
9  finish this topic up and take a break and reconvene.
10 A.  Yep.
11 Q.  So we were talking about blogs and you
12 don't recall going -- you know there are blogs, but you
13 don't recall reading information about the lawsuit on the
14 blogs; is that a fair statement?
15 A.  That's what I just said.
16 Q.  Okay.  So where -- where did you learn
17 about the blogs?
18 A.  I just told you when you Google the
19 lawsuit, the blogs pop up.
20 Q.  Okay.  Have you exchanged any text
21 messages with anyone about this lawsuit?
22 A.  Probably.
23 Q.  Who?
24 A.  Other au pairs.
25 Q.  When have you exchanged those text

Page 24

1  messages with other au pairs about this lawsuit?
2  A.  I don't remember.
3  Q.  Would that have been as early as March or
4  April of this year to the present?
5  A.  Maybe.
6  Q.  Could it have been before that?
7  A.  I don't remember.
8  Q.  Okay.  So it could have been even all the
9  way back into late 2015 to the present; is that a fair
10 statement?
11 A.  I don't remember.
12 Q.  But it could be, right?
13 A.  I don't remember.
14 Q.  How about emails?  Have you shared emails
15 with other au pairs about this lawsuit?
16 A.  I don't remember.
17 Q.  But you could have?
18 A.  I don't remember.
19 Q.  You can't say you did, and you can't say
20 you didn't, correct?
21 A.  I don't remember.
22 Q.  All right.  So let's do this:  Why don't
23 you tell me all the email addresses that you have.
24 A.  JulianeHarning@Gmail.com, Juliane1 --
25 JulianeHarning1@Gmail.com.  And then I have university

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

EXHIBIT A

Confidential Video Deposition of Juliane Harning
September 08, 2016

**Page 41**

1  Q. And during that discussion Ms. Russell
2  denied that you always worked 45 hours per week minimum,
3  didn't she?
4  A. I don't know exactly what she said.
5  Q. Well, this just happened within the last
6  ten days, didn't it?
7  A. Yes.
8  Q. Okay. So you don't recall what she said
9  about your statement in Paragraph 22, quote, "I always
10 worked 45 hours per week minimum"?
11  A. No, I don't remember exactly her words
12 because I don't -- I don't know if you would remember,
13 but I do -- would like to clarify something that I might
14 have overread. English is not my first language. I was
15 always expected to work 45 hours, yeah.
16  Q. Okay. So you'd like to -- there are some
17 changes to this affidavit you'd like to make. Is that
18 what you're telling me?
19  A. I would like to clarify this part of it.
20  Q. Okay. Let's mark this as Exhibit 45.
21 This is another copy of your declaration, and I'll give
22 you a red pen. Why don't you tell us the parts of this
23 affidavit that you would like to clarify.
24  (Exhibit 45 was marked.)
25  A. Well, the 22, like I just told you.

**Page 42**

1  Q. What do you want to say in 22?
2  A. I was always expected to work 45 hours.
3  Q. Okay. So you would -- you would delete
4  the sentence that says, "I always worked 45 hours per
5  week minimum," and replace it with, "I was always
6  expected to work 45 hours per week"?
7  A. Yes.
8  Q. Okay. Why don't you strike that line,
9  that first sentence, and write in what you really mean.
10 Okay. Let's go on to the next sentence. "Occasionally,
11 my host mom would run late returning to the house to
12 relieve me." Okay. Anything accurate or inaccurate
13 about that statement or anything you'd like to clarify
14 with that?
15  A. No. That's accurate.
16  Q. Let's go on to the next one: "She
17 acknowledged that doing so violated the program rules,
18 and she gave me extra money on these occasions." So on
19 that first sentence are you saying that Whitney Russell
20 told you that she violated the program rules? She used
21 that word?
22  MR. HOOD: I'd like to mark this portion
23 of the deposition as confidential under the protective
24 order, the response to this question. I apologize.
25  A. I don't remember exactly her words.

**Page 43**

1  Q. (By Mr. Quinn) So that might be an
2  overstatement there?
3  A. What do you mean by that?
4  Q. Sure. If you don't exactly remember her
5  words, then where she says, "She acknowledged that doing
6  so violated the program," might be an inaccurate
7  statement; is that a fair statement?
8  MR. HOOD: Objection as to form.
9  A. I'm still not sure I understand.
10  Q. (By Mr. Quinn) Okay. But you're
11 saying that she -- when you sign a document like this
12 that you understand that you're telling the Court and the
13 parties to this lawsuit that these are accurate and
14 concise statements?
15  A. Uh-huh.
16  Q. Do you understand that?
17  A. Yes.
18  Q. Okay. When you write down here that she,
19 meaning Whitney Russell, acknowledged that doing so
20 violated the program rules, are you telling the Court
21 that that's a concise statement? Or is that just the
22 summary that you kind of recall?
23  MR. HOOD: Objection as to form, and I'll
24 mark the response to this question as confidential under
25 the protective order.

**Page 44**

1  A. I'm sorry. I'm still not exactly sure
2  what you want from me, like what you're asking.
3  Q. (By Mr. Quinn) Sure. Let me ask it again
4  a different way. You've said here this is a concise
5  statement: She acknowledged that in doing so -- she
6  acknowledged, quote -- let me start all over. Quote,
7  "She acknowledged doing so violated the program rules,"
8  end quote. Did I say that right?
9  A. That's what it says, yes.
10  Q. Okay. You're not telling us this is a
11 concise statement of what she said, correct?
12  A. I don't know what the word "concise"
13 means.
14  Q. Exact.
15  A. Okay. Can you -- can you use that word
16 "exact," and then ask the question again, please?
17  Q. Sure. You're not telling us that Whitney
18 Russell said exactly that running late, quote, violated
19 the program rules, end quote, are you?
20  A. This doesn't say that running late
21 violates the rules.
22  Q. Did she ever use the word "violating" the
23 rules with you?
24  A. I don't know if she used exactly that
25 word.

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

EXHIBIT A

Confidential Video Deposition of Juliane Harning
September 08, 2016

Page 45

1    Q.  Okay.  So that would be an overstatement
2  there, wouldn't it?
3       MR. HOOD:  Objection as to form.
4    A.  I don't know what you mean.
5    Q.  (By Mr. Quinn)  Did you write this
6  paragraph, or did someone else write this paragraph?
7    A.  I didn't write this.
8    Q.  You did not write Paragraph 22?
9    A.  Well, I didn't phrase the sentence, no.
10   Q.  Who wrote Paragraph 22?
11   A.  I don't know.
12   Q.  It was just given to you; is that right?
13   A.  Well, I talked about this and then was
14 summarized.
15   Q.  So it would be -- it is -- it is
16 inaccurate to say that Whitney Russell acknowledged that
17 she violated the program rules, correct?
18   A.  I didn't say that.
19   Q.  Okay.  So why don't you strike that part
20 out there too.
21      MR. HOOD:  Objection.
22   A.  I mean, I didn't say that it's wrong.
23   Q.  (By Mr. Quinn)  She never told you that she
24 violated the rules, did she?
25      MR. HOOD:  Objection as to form and

Page 46

1  foundation.
2    A.  I didn't say that either.
3    Q.  (By Mr. Quinn)  Okay.  Where are we not
4  meeting on this?  Because I'm trying to find out if she
5  ever told you that she violated the rules, and you said
6  you don't have a recollection of that.
7    A.  No, that's not what I said.  I said I
8  don't recollect if she used the word "violate."
9    Q.  Okay.  So then this is not -- then what
10 you've written here, this sentence, "She acknowledged
11 that doing so violated the program rules," is not a
12 concise or exact summary of her statements to you,
13 correct?
14      MR. HOOD:  Objection as to form and
15 foundation.
16   A.  No, it is a summary -- it is a summary of
17 what she said or wrote to me.
18   Q.  (By Mr. Quinn)  Let's go on to the next
19 phrase in this sentence, "and gave me extra money on
20 these occasions"; is that right?
21   A.  That's correct.
22   Q.  Did I read that correctly?
23   A.  And gave me -- if you read exactly what's
24 standing there, then you read it correctly.
25   Q.  Okay.  Did -- what amount of money did she

Page 47

1  give you on the occasion -- on these occasions?
2    A.  $20 per hour.
3    Q.  Did she give you extra money on every
4  occasion that you felt you were entitled to extra money?
5    A.  I don't know what you mean by that.
6    Q.  Sure.  You believed you were entitled to
7  extra money when she ran late, correct?
8    A.  I'm not sure what I believed or felt at
9  that time.
10   Q.  Well, how did you know that -- were you
11 able to track whether Whitney Russell was running late or
12 not?
13   A.  Yes, because I had a schedule.
14   Q.  You had to schedule what?
15   A.  For my hours.
16   Q.  And then if Whitney Russell came in late,
17 you believed you were entitled to extra money, correct?
18   A.  I don't know if that's what I believed.  I
19 just told you.
20   Q.  Did you -- whether you believed you were
21 entitled to extra money or not, did Whitney Russell give
22 you money every time she ran late?
23   A.  I didn't get extra money if she ran late
24 two minutes.
25   Q.  Was there a range of when she -- that she

Page 48

1  would give you extra money if she was running late?
2    A.  When she was over 10 hours or over 45
3  hours.
4    Q.  So 10 and a half hours you would get $20,
5  10 hours and 15 minutes, you would get 20 hours (sic), 40
6  hours and a half you would get $20.  Is that how it
7  worked?
8       MR. HOOD:  Objection as to form.
9    A.  I don't recall exactly how it worked.
10   Q.  (By Mr. Quinn)  Well, part of your claims
11 in this lawsuit is you're entitled to extra wages for
12 overtime work but not paid, right?
13   A.  Say it again, please.
14   Q.  Sure.  Part of your claims here is that
15 you're entitled to overtime wages that you've earned but
16 were not paid, correct?
17      MR. HOOD:  Objection as to form.
18   A.  Every hour -- well, if I understand it
19 right, every hour you work more than 40 hours a week is
20 overtime, which we did not get paid.  That is correct.
21   Q.  (By Mr. Quinn)  Okay.  But then you also
22 believe -- but you were paid for time over 45 hours,
23 correct?
24   A.  Yes.
25   Q.  Is there any time over 45 hours or 10

**Page 49**

1 hours a day while you were living with the Russell family
2 that you did not believe you were fairly compensated?
3     A. I'm not sure -- can you rephrase it,
4 please?
5     Q. Sure. Was there any time while you worked
6 for the Russell family and you worked 45 hours a week --
7 excuse me, more than 45 hours a week that you believe you
8 were not fairly compensated for that time?
9     A. I'm still not sure if I get this right.
10     Q. Tell me what you -- tell me what you're
11 confused about.
12     A. Well, every hour over 45 hours they would
13 pay me what they would pay a babysitter.
14     Q. Okay. So is there any time you ever
15 worked more than 45 hours in a week that you do not feel
16 you were fairly compensated for that timeframe, 45 hours
17 plus per week?
18     MR. HOOD: Objection as to form.
19     A. The 40 -- every hour over 45 hours was
20 compensated with $20, which I think was way better than
21 $4 and something that I would get for 45 hours.
22     Q. (By Mr. Quinn) Okay. Is there any unpaid
23 time for over 45 hours that the Russells still owe you?
24     A. No.
25     Q. I'm going to talk to you about

**Page 50**

1 Paragraph 20. Why don't you take a moment and read it
2 and tell me when you're done.
3     A. Okay.
4     Q. You've had a chance to read it? Did you
5 write this sentence?
6     A. No.
7     Q. Did you write sentence -- did you write
8 the terms in Paragraph 21 -- excuse me, the contents of
9 Paragraph 21?
10     A. I said the contents.
11     Q. But you didn't write them?
12     A. I didn't phrase this, no.
13     Q. Okay. Let's go back to Paragraph 20. How
14 old was the Russell child when you moved into their home
15 in February 2014?
16     A. About six months.
17     Q. At that time was there also a nanny in the
18 home?
19     A. Yes.
20     Q. Why don't you tell us the working hours of
21 the nanny, if you can, if you recall.
22     A. It was 10 hours a week, so probably not
23 full-time.
24     Q. What days of the week did the nanny work?
25     A. I don't remember.

**Page 51**

1     Q. Did the nanny work when you worked?
2     A. Maybe in the first week to adjust. The
3 family had overlap, but generally, no.
4     Q. So let's talk about this. What were your
5 general hours with the Russell family when you worked for
6 them?
7     A. In the beginning, 8:00 to 6:00 Monday
8 through Friday, and then one -- two of the days the nanny
9 would come in for 5 hours, thus relieving me -- releasing
10 me at 1:00. So I had 40 hours, and then I would work up
11 to 5 hours on a Saturday or on a Sunday.
12     Q. Did you work 45 hours every week that you
13 were with the Russell family?
14     A. I was expected to work up to 45 hours.
15     Q. I'm sorry. I asked a little bit different
16 question. Did you work 45 hours every week that you were
17 with the Russell family?
18     A. No.
19     Q. Was there a pattern to the weeks where you
20 did not work 45 hours per week? In other words --
21     MR. HOOD: Objection.
22     Q. (By Mr. Quinn) -- certain -- certain days
23 of the week when you didn't work, certain times of the
24 day you didn't work?
25     MR. HOOD: Objection as to form.

**Page 52**

1     A. I don't really know what you mean. Maybe
2 you can like ask it a different way.
3     Q. (By Mr. Quinn) Sure. So how many weeks
4 during your time that you worked with the Russells do you
5 believe you worked 45 hours per week?
6     A. I don't know.
7     Q. Half the time?
8     A. I don't know.
9     Q. Less than half the time?
10     A. I don't know.
11     Q. Okay. When you didn't work 45 hours a
12 week, how many hours a week did you work on those weeks?
13     A. 41, 42 and up, except if I had a vacation
14 day that week.
15     Q. Were you with the Russell child all of the
16 time every day, Monday through Friday?
17     A. No. Sometimes -- at some point during my
18 years she started to go to preschool. So she was gone
19 from about 9:00 until noon.
20     Q. How far into the -- to your time with the
21 Russell family was it when the child started to go to
22 preschool?
23     A. I don't recall. It probably was with the
24 school years, September, October, maybe November because
25 it was like not a real school but like more another stay

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

**EXHIBIT A**

Confidential Video Deposition of Juliane Harning
September 08, 2016

Page 61

1  leave.
2  Q. Okay. At any point did you -- between the
3  time that it was on Whitney Russell's phone and the time
4  you moved out of the house, did you have -- develop an
5  understanding that she thought your declaration was false
6  and that's why you were asked to leave?
7  A. No. Oh, no, never mind.
8  Q. So I was going to have you write -- during
9  the break you were going to write down the phone numbers
10 that you might have sent text messages from. Could you
11 please put those on Exhibit 43?
12 A. I still don't know the number from the top
13 of my head.
14 Q. Okay.
15 A. It's my German number.
16 Q. So the German number starts with 016; is
17 that correct?
18 A. That is correct.
19 Q. You have your United States -- your
20 current United States phone with you right now?
21 A. I do.
22 Q. Why don't you get it out and let's see if
23 we could figure out what the phone number is for that.
24 A. (Indicating.)
25 Q. That's a 703 phone number; is that right?

Page 62

1  A. That's what it says, yes.
2  Q. Are there any -- do you recall any other
3  United States-based phone numbers today?
4  A. I don't recall any number, no.
5  Q. All right. Do you recall how much in
6  total you were paid by the Russell family?
7  A. What do you mean?
8  Q. You were -- let me break it down. Do you
9  remember how much regular time, money for regular time,
10 the 45 hours you were paid by the Russell family while
11 you were working for them?
12 MR. HOOD: Objection as to form.
13 A. Do you mean like per week, or do you want
14 me to count it together --
15 Q. (By Mr. Quinn) All --
16 A. -- for the entire time?
17 Q. All together for the entire time.
18 A. No, I cannot.
19 Q. Do you remember how much time you were
20 paid in overtime wages?
21 A. I don't know.
22 Q. Do you recall when you were paid in
23 overtime wages?
24 A. When?
25 Q. Yeah, by date.

Page 63

1  A. No.
2  Q. If you worked less than 45 hours per week,
3  did you ever offer to take less money?
4  A. No.
5  Q. Were you ever asked to take less money by
6  the Russells if you worked less than 45 hours per week?
7  A. No.
8  Q. Were you ever asked by AuPairCare to
9  return any money to the Russells for weeks you worked
10 less than 45 hours?
11 A. No. AuPairCare told us that it doesn't
12 matter if we work 40, 42, 43, 45 hours per week. We will
13 always only get 195.75. And it's a fixed amount we will
14 get no matter if we worked 20 hours or 45.
15 Q. We talked about this a moment ago. You're
16 making a claim for underpayment of regular and overtime
17 wages, correct?
18 A. Correct.
19 Q. What is the claim you're making -- what is
20 the amount that you're making for unpaid regular-time
21 wages?
22 A. I'm not sure I understand what you mean.
23 Q. Sure. How much money are you looking for
24 for unpaid regular-time wages?
25 MR. HOOD: Objection.

Page 64

1  A. I don't know.
2  Q. (By Mr. Quinn) How much money are you
3  looking for for unpaid overtime wages?
4  MR. HOOD: Objection.
5  A. I don't know.
6  Q. (By Mr. Quinn) Are you seeking
7  compensation for unpaid overtime wages?
8  A. Yes.
9  Q. Going back to the first exhibit we marked
10 in this case is Exhibit 41.
11 A. Uh-huh.
12 Q. Is that right?
13 A. If that was the first one you gave me,
14 then yes.
15 Q. Okay. In Paragraph 34, page 3 of
16 Exhibit 41, you understood that you would be receiving
17 room and board at the Russell home; is that correct?
18 A. It says that we would get room and board
19 at the house with the family, yep.
20 Q. And you understood you were getting that
21 as part of your compensation for working as an au pair
22 for the Russell family, correct?
23 A. That's what AuPairCare told us, yes.
24 Q. And, in fact, the Russell family provided
25 you room and board; is that correct?

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

EXHIBIT A

Confidential Video Deposition of Juliane Harning
September 08, 2016

Page 65

1    A.  That's correct.
2    Q.  And they provided you room and board the
3  entire time you worked for the Russell family, correct?
4    A.  That's correct.
5    Q.  And you never complained to anyone,
6  including the Russells or AuPairCare, about the room
7  where you lived or the home where you lived, correct?
8    A.  Correct.
9    Q.  And you never complained about the board
10  that you received from the Russell family to anyone,
11  correct?
12    A.  Yeah, I don't think I did.
13    Q.  All right.  And you agreed as part of the
14  compensation that you would receive wages in the amount
15  of 195.75 per week in exchange for 45 hours or less of
16  light -- of childcare and light childcare-related duty,
17  correct?
18    A.  Can you rephrase the question, please?
19    Q.  Sure.  You agreed to the compensation rate
20  of 195.75 to take care of the Russell child and do light
21  child-related duties or no more than 75 hours per week --
22  excuse me, 45 hours per week, correct?
23        MR. HOOD:  Objection as to form.
24    A.  That's the amount that AuPairCare told us
25  was the amount we were entitled to get, no more, no less.

Page 66

1    Q.  (By Mr. Quinn)  Okay.  In fact, you did get
2  more, correct?
3    A.  I did get more, yes.
4    Q.  And you got more every week -- every week
5  that you worked for the Russell family, correct?
6        MR. HOOD:  Objection.
7    A.  I got $200 every week, yes.
8    Q.  (By Mr. Quinn)  Plus overtime?
9    A.  I had overtime, yes.
10    Q.  $20 an hour?
11        MR. HOOD:  Objection.
12    Q.  (By Mr. Quinn)  Then in Paragraph 36 you
13  agreed to receive two calendar weeks of paid vacation; is
14  that right?
15    A.  Yes.
16    Q.  And you received at least two weeks of
17  calendar paid vacation while living with the Russell
18  family, correct?
19    A.  I received those ten days, yes.
20    Q.  And sometimes you received more, correct?
21        MR. HOOD:  Objection, foundation.
22    A.  I don't know.
23    Q.  (By Mr. Quinn)  Well, you were there.  I
24  mean, you received additional days off beyond the
25  original -- the ten allotted holiday times, correct?

Page 67

1    A.  I don't remember.
2    Q.  Okay.  Did you go on the Russell family
3  vacation with the Russell family?
4    A.  I did go on vacation with them, yes.
5    Q.  And then you had your own vacation as
6  well, correct?
7    A.  I had my own vacation, yes.  But when I
8  was on vacation with them, I was not on vacation.
9    Q.  And then there were additional days when
10  you were able to -- when the Russell -- Mr. and
11  Mrs. Russell stayed at home, whether it was a government
12  holiday or an American holiday, when you got time off as
13  well, correct?
14        MR. HOOD:  Objection to form.
15    A.  I usually had to work when they were off
16  work.
17    Q.  (By Mr. Quinn)  I'm not saying usually.
18  I'm not saying every time.  I'm saying there are days
19  when you received additional days off other than the paid
20  holiday vacation while you worked for the Russell family,
21  correct?
22    A.  There might have been, yes.
23    Q.  Okay.  And you received educational
24  subsidy from the Russell family, correct?
25    A.  Yes.

Page 68

1    Q.  And you had the opportunity to pursue
2  educational desire -- educational benefits as you desired
3  while working for the Russell family, correct?
4        MR. HOOD:  Objection to form.
5    A.  What do you mean by that?
6    Q.  (By Mr. Quinn)  Well, you were able to
7  pursue educational goals that you might have wanted to
8  while you worked for the Russell family, correct?
9    A.  I wouldn't call anything I had to do for
10  AuPairCare, the schoolwork they made us do, I wouldn't
11  call that like a desire or a goal of mine.
12    Q.  So did you -- you got $500 for educational
13  endeavors from the Russell family, correct?
14    A.  I did.
15    Q.  What did you do with it?
16    A.  I took an au pair class in Baltimore and
17  New Orleans.
18    Q.  And you worked in New Orleans?
19    A.  Huh?
20    Q.  You said Baltimore and New Orleans?
21    A.  Baltimore and New Orleans for a weekend
22  class, and then I had a class at a local community
23  college.
24    Q.  What type of class was that?
25    A.  Screenwriting.

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

**EXHIBIT A**

Confidential Video Deposition of Juliane Harning
September 08, 2016

Page 73

1    Q.  Sure.  Did -- from time to time did you
2    receive any -- whether it be from AuPairCare or anyone
3    else, any sort of fraud warnings on how to be careful
4    about dealing with third parties, internet scams,
5    anything like that?
6         MR. HOOD:  Objection.
7    A.  I don't recall.
8    Q.  (By Mr. Quinn)  Okay.  You recall receiving
9    this -- I think you've already said, but you recall
10   receiving this fraud warning or internet scam warning?
11   A.  I said that I received this email from
12   AuPairCare, yes.
13   Q.  Okay.  Did you understand it to be a
14   financial safety-type email warning from AuPairCare for
15   your best interest?
16        MR. HOOD:  Objection.
17   A.  Can you rephrase the question, please?
18   Q.  (By Mr. Quinn)  Sure.  Did you
19   understand -- when you received this message --
20   A.  Uh-huh.
21   Q.  -- did you understand it to be in your
22   best interest for your financial protection?
23   A.  No.
24   Q.  You didn't -- you didn't understand it was
25   a way to better -- best operate for your personal

Page 74

1    finances while you were in the United States or manage
2    your personal finances while you were in the United
3    States?
4         MR. HOOD:  Objection.
5    A.  I'm not sure I know what you mean.
6    Q.  (By Mr. Quinn)  Okay.  Well, when you read
7    this, do you understand this to be a money
8    management-type email?
9         MR. HOOD:  Objection.
10   A.  I'm not sure I know what a money
11   management-type email is.
12   Q.  (By Mr. Quinn)  Okay.  Do you manage your
13   own personal finances?
14   A.  I really don't have finances, but the
15   little money I have I manage myself, yes.
16   Q.  Okay.  And do you -- when you were an
17   au pair, did you open up a bank account in order to
18   receive money from the au pair family?
19   A.  I did with Ms. Russell, yes.
20   Q.  Did you have a checking account while
21   you --
22   A.  I'm not sure what that is.
23   Q.  Do you know what -- you write out a check.
24   You write, Pay to the Order of U.S. Post Office or to the
25   grocery store, and then you write the amount in there and

Page 75

1    give it to someone.
2         MR. HOOD:  Object to form.
3    A.  I don't think I've ever written a check.
4    Q.  (By Mr. Quinn)  Okay.  Did you ever send
5    cash or Western Union?  Did you wire money at all?
6         MR. HOOD:  Objection.
7    A.  I don't know what you mean by that.
8    Q.  (By Mr. Quinn)  Okay.  Did you ever send --
9    did you ever send any money to a lawyer or travel agent
10   or anything while you were here?
11   A.  I don't recall.
12   Q.  Okay.  And did you not do those things
13   because -- did you not send wire transfers and that sort
14   of thing because you had received this email not to do
15   this because it would be the victim of a scam?
16        MR. HOOD:  Objection to foundation and
17   form.
18   A.  I'm sorry.  I'm not sure I understand.
19   Q.  (By Mr. Quinn)  Okay.  All right.  But you
20   have -- you do recall seeing this email?
21   A.  I do recall seeing this email, yes.
22   Q.  I want to talk to you a little bit about
23   your personal background, okay?  How old are you today?
24   A.  28.
25   Q.  When was the first time you became

Page 76

1    employed as an au pair?
2    A.  I signed the contract with AuPairCare the
3    first time I think end of -- end of 2007.
4    Q.  So you would have been basically 19 years
5    old, something like that, the first time you became an
6    au pair, right?
7    A.  Probably, yes.
8    Q.  What got you interested in being an
9    au pair?
10   A.  I wanted to see the United States, and
11   that was a pretty cheap option.
12   Q.  Had you -- where were you in your
13   educational process at that time?  Had you graduated from
14   our equivalent of high school by then?
15   A.  When I started to research this all, I
16   think I was in the process of graduating.  I graduated in
17   July 2008, so I wasn't -- I hadn't graduated yet.  But it
18   was high school, like 13 years of school.
19   Q.  Okay.  At that point were you intending on
20   going on to university?
21   A.  Yes.
22   Q.  What did you want to study when you went
23   on to university?
24   A.  I wasn't sure yet.
25   Q.  Okay.  So the opportunity in 2007 was to

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

**EXHIBIT A**

Confidential Video Deposition of Juliane Harning
September 08, 2016

Page 77

1  travel, see the United States, and have a job?
2          MR. QUINN: Objection.
3       Q. (By Mr. Quinn) Is that right?
4       A. Can you rephrase?
5       Q. Sure. In 2007 when you signed up to be an
6  au pair, you had in mind travel, right?
7       A. I wanted to see the United States, yeah.
8       Q. And still have an income while you were
9  traveling, correct?
10      A. I wouldn't call being an au pair
11 traveling.
12      Q. Okay. You would have an income while you
13 were working and living in the United States; is that
14 right?
15      A. Yes.
16      Q. And you would have your room and board
17 taken care of; is that right?
18      A. Yes.
19      Q. Okay.
20      A. I wouldn't call it income, though. I was
21 told it was more stipend or pocket money.
22      Q. Okay. You -- where are you today in your
23 educational process? Have you been to university?
24      A. I'm like in the process of graduating.
25      Q. And you'll have a degree in what?

Page 78

1       A. Teaching.
2       Q. When did you have your first teaching job?
3       A. I'm not a teacher yet.
4       Q. I know, but you did work in daycare
5  centers, that sort of thing, haven't you?
6       A. Yes, but all volunteered, not worked. But
7  that's not teaching in Germany.
8       Q. Okay. Have you worked in a preschool?
9       A. I haven't worked. I volunteered.
10      Q. And when you say you volunteered, is that
11 only in the United States or have you volunteered
12 elsewhere at a preschool as well?
13      A. I haven't volunteered in the United States
14 at a preschool or something.
15      Q. Did you volunteer where?
16      A. We had to do 200 hours. In order to sign
17 up as an au pair, we had to do 200 hours. I don't know
18 the exact equivalent, but I took care of kids between a
19 year, nine months, and until they go to school, so about
20 like 5, 6, focused on the younger ones.
21      Q. And you did that in Germany?
22      A. I did that in Germany.
23      Q. And what age did you do that?
24      A. When I was in high school.
25      Q. So 16, 17, 18 years old, in that

Page 79

1  timeframe?
2       A. Probably like the last year of high
3  school, between 18, 19, last two years.
4       Q. Have you volunteered at any schools or
5  daycare centers, anything like that since that time --
6  that high school time to the present?
7       A. Yes.
8       Q. Tell me about that.
9       A. For university you have to do like
10 four-week volunteering in like preschool or equivalent of
11 preschool, I think, and then in a high school, middle
12 school, another four weeks and then another four. So we
13 have to do three volunteering jobs or whatever. I don't
14 know how you would say it.
15      Q. I think I get the --
16      A. I do volunteer three times for four weeks
17 at different types of our education system in Germany.
18      Q. Do you do that while school is in session
19 or while school is out of session?
20      A. Part while school was in session and part
21 while school was off session.
22      Q. I expect that volunteer means the same
23 thing in German as it does in English, that is when you
24 did these three 4-week teaching sessions you did not get
25 paid; is that right?

Page 80

1       A. That's correct.
2       Q. And you did all of those -- all of those
3  volunteer sessions in Germany, correct?
4       A. One of them I did in The Netherlands.
5       Q. Oh. So following high school your first
6  au pair experience was in the United States; is that
7  right?
8       A. That's correct.
9       Q. And then did you have another au pair
10 experience somewhere after that?
11      A. Yes.
12      Q. Tell me where that is.
13      A. In Amsterdam.
14      Q. And how long was that au pair experience
15 for?
16      A. About nine months, I think.
17      Q. Was that the scheduled length, or was it
18 shorter than the scheduled length?
19      A. That was the scheduled length I agreed
20 upon with the family. You don't need an agency for that
21 in Europe.
22      Q. So you went -- you did not have to work
23 through the equivalent of AuPairCare for that au pair
24 experience in Amsterdam; is that right?
25      A. That's right.

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

EXHIBIT A

Confidential Video Deposition of Juliane Harning
September 08, 2016

Page 81

1  Q. And did you live in that family home?
2  A. I lived in a home adjacent to their home.
3  Q. But it was -- did that -- did you pay for
4  it, or did someone else pay for it?
5  A. They paid for it.
6  Q. And did they provide your daily food as
7  well?
8  A. Yes.
9  Q. So the experience is similar to that of
10 the United States?
11 A. Similar but not the same.
12 Q. What's the differences?
13 A. A lot less hours, a lot more money --well,
14 not a lot more, but more money.
15 Q. Why don't you tell me why it's less hours.
16 Tell me how many less hours and how much more money.
17 A. So I worked about two hours in the
18 mornings and then two hours in the evenings, so about
19 four hours a day and -- yeah. So 20, 25 hours a week.
20 So it's about 20 hours less. And I got 300 euros per
21 week, I think. I can't exactly recall or 3 -- 200 euros
22 a week, something like that.
23 Q. And that would have been in what
24 timeframe? When were you -- when were you working in
25 Amsterdam?

Page 82

1  A. About August 2010 -- '9, August 2009 when
2  I got back from U.S., August 2009 until nine months
3  later. School started in April, so I left them before
4  that.
5  Q. So less hours and more money. Is that
6  what the Europe -- or at least the Amsterdam au pair
7  experience was like for you?
8  A. Yes.
9  Q. What was your next au pair experience?
10 A. I worked for about three months in like --
11 for a family in England while teaching at a school in
12 that same city as well in preparation for the au pair
13 stay now or the last au pair stay in the U.S. because the
14 hours I had previously done weren't -- I don't know.
15 They didn't count for anything.
16 Q. The teaching hours?
17 A. Like none of the hours -- like the au pair
18 hours I had done in Michigan or high school teaching, if
19 you want to call it teaching --
20 Q. Right.
21 A. We don't say teaching to that type of
22 work. Yeah, so none of that counted towards the 200
23 hours I had to again show -- show to AuPairCare that I
24 had done 200 hours.
25 Q. So you went to England, and you became an

Page 83

1  au pair and a teacher at the same time; is that right?
2  A. Yeah.
3  Q. All right. How many hours a week were you
4  an au pair?
5  A. About the same, 20, 25 hours.
6  Q. And what was your compensation?
7  A. I don't recall.
8  Q. Equivalent to Amsterdam?
9  A. No, a little less.
10 Q. Was it more than the U.S.?
11 A. I would have to like take pounds into
12 euros and then euros into dollars and given the exchange
13 rate back at that time. So I can't tell if it was more.
14 I think it was more.
15 Q. I mean, it's one of those things. Your
16 gut sense is you were probably making more in England
17 than you were in the United States a few years earlier,
18 right?
19 A. Definitely.
20    MR. HOOD: Objection.
21 Q. (By Mr. Quinn) Okay. So another job where
22 less hours and more pay but this time in England, right?
23 A. Yes.
24 Q. All right. And then you also did teaching
25 while you were in England, correct?

Page 84

1  A. I was like an assistant -- language
2  assistant at a school.
3  Q. What level? What level students?
4  A. All levels.
5  Q. In our -- kindergarten through high
6  school?
7  A. No, probably middle school and high
8  school.
9  Q. Okay. And how much were you paid at that
10 job?
11 A. That was not a job. That was like mostly
12 me watching the teachers teach German. So that I didn't
13 get paid. That was volunteering work to --
14 Q. How many -- sorry. Go ahead.
15 A. It was volunteering.
16 Q. How many hours a week did you volunteer at
17 the school in England?
18 A. Three hours maybe.
19 Q. A week?
20 A. Yeah, or six -- like -- like two days for
21 like three hours or something.
22 Q. So what was your next au pair job?
23 A. Russell family.
24 Q. And so the Russell family occurred --
25 there was a period of time then, maybe two or three

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

**EXHIBIT A**

Confidential Video Deposition of Juliane Harning
September 08, 2016

Page 85

1  years, when you were back in -- leaving England and went
2  back to Germany. And you must have been a full-time
3  student during that timeframe; is that right?
4       A.  I don't know if it was three -- I don't
5  exactly remember when I was in England. But yeah, I was
6  a full-time student.
7       Q.  How long do you think you were a full-time
8  student for?
9       A.  I started school in 2010, and then in 2014
10 I left. So about that time. I don't know what --
11      Q.  Sure.
12      A.  You mean with full-time student? I think
13 it might be -- there might be a difference between the
14 U.S. and German.
15      Q.  Basically, the principal thing you were
16 doing during that timeframe you just identified was you
17 were trying to get your de- -- to graduate from the
18 university in Germany. Is that a fair way to summarize
19 it?
20      A.  Yes.
21      Q.  All right. So then it came time -- and
22 then you became interested in becoming -- going back to
23 the United States; is that right?
24      A.  Yes.
25      Q.  And what you wanted to do was come back

Page 86

1  and live in the United States; is that right?
2           MR. HOOD:  Objection.
3       A.  I wanted to see a little more of the
4  United States because I didn't see basically anything the
5  first time I was here.
6       Q.  (By Mr. Quinn) When you were here the
7  first time, did you learn there was such things as
8  babysitters or nannies when you were here?
9       A.  What do you mean?
10      Q.  Sure. I mean, you were here living in the
11 United States with the family in Michigan the first time;
12 is that right?
13      A.  That's correct.
14      Q.  Did you learn while you were here that
15 there's people that come into the home and they're called
16 babysitters, they might come in the daytime, they might
17 come at nighttime?
18      A.  Yes.
19      Q.  Okay.
20      A.  I didn't learn that here.
21      Q.  You knew that before?
22      A.  Yes, because we have that too.
23      Q.  Okay. And you also learned that there
24 were things like nannies; is that right?
25      A.  I'm not fully sure I know what the

Page 87

1  difference between nanny and babysitting is.
2       Q.  Okay. You knew that there was childcare
3  opportunities where you could get paid better than being
4  an au pair; is that right?
5       A.  I don't know. I couldn't -- I didn't know
6  I could be paid more -- or I don't know if I could be
7  paid more. I don't know what you mean.
8       Q.  Did you -- before you came back to be with
9  the Russell family --
10      A.  Yes.
11      Q.  -- did you understand that there were --
12 in the United States there were opportunities for you to
13 earn more money taking care of children other than being
14 an au pair?
15      A.  For me?
16      Q.  For you.
17      A.  For me personally?
18      Q.  For you personally.
19      A.  No.
20      Q.  Did you ever look into getting a green
21 card?
22      A.  I don't think so.
23      Q.  Do you know what a green card is?
24      A.  I'm not -- I mean, I -- I know about the
25 word and I guess what it means, but I don't know if I

Page 88

1  know everything about it.
2       Q.  Okay. Did you -- you seem like a smart,
3  careful person. Did you do any internet research to see
4  if there were other ways for you to earn a living in the
5  United States other than being an au pair?
6           MR. HOOD:  Objection as to form.
7       A.  I don't recall.
8       Q.  (By Mr. Quinn) Do you think you did?
9       A.  I don't recall.
10      Q.  Well, you had just been in -- before you
11 came back, you had three au pair job -- experiences,
12 right?
13      A.  That's correct.
14      Q.  And in two of them you worked less hours
15 and made more money than you did in the United States,
16 correct?
17      A.  That's correct.
18      Q.  And you wanted to come back to the United
19 States and still be involved in the childcare industry,
20 correct?
21      A.  Yes.
22      Q.  Did you look into whether you could be a
23 nanny and be in the United States?
24      A.  No, because I knew you can only come here
25 legally as an au pair and only be paid 195.75.

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

EXHIBIT A

Confidential Video Deposition of Juliane Harning
September 08, 2016

Page 97

1   A.   Because that's what I understood what the
2   paper said, and AuPairCare said like the amount we work
3   is set by some department.  They said the amount of money
4   we get is a set amount by the department or by some
5   government program and that you can only be an au pair if
6   you're with one of the agencies that are allowed by the
7   government.
8       Q.   And where did you get that information
9   that you just told to me about the au pair program?
10      A.   On the website.
11      Q.   Which website?
12      A.   Of AuPairCare.
13      Q.   Did you go to any other sponsor websites
14  at any time and look at the information on those
15  websites?
16      A.   I looked at other -- before 2008.
17      Q.   And then before 2014, maybe in the 2013
18  timeframe, 2012, did you go to any other websites other
19  AuPairCare?
20      A.   I don't recall.
21      Q.   And I know I've asked you again, but now
22  we've talked about websites; perhaps it's jogged your
23  memory a little bit.  Do you recall going to the
24  Department of State website to look at the au pair
25  program information?

Page 98

1       A.   I still don't recall.
2       Q.   Okay.  Going back to looking at the
3   AuPairCare handbook, do you recall looking at the
4   document that is page 6 in front of you or something
5   similar to it?
6       A.   I don't recall.
7       Q.   Okay.  Let's describe this document.  It's
8   got a stamp on -- in the upper left-hand corner from the
9   Department of State, United States of America.  Do you
10  see that?
11      A.   Yes.
12      Q.   And it's from the United States Department
13  of State over in the upper right-hand corner.  Do you see
14  that?
15      A.   Yes.
16      Q.   And it's addressed to, "Dear Au Pair
17  Program Participant."  Do you see that?
18          MR. HOOD:  Could I ask if the other
19  attorneys aren't using the other copy of the handbook --
20  I think there's one just sitting down there.
21          MS. DiSALVO:  You don't mind?
22          MR. HOOD:  We'll use this one.  I'm
23  assuming -- do you guys care?  It didn't seem like they
24  were using it, so -- what page are you on?  I'm sorry.
25          MR. QUINN:  6.

Page 99

1           THE DEPONENT:  6.
2           MR. HOOD:  Thank you.
3       Q.   (By Mr. Quinn)  Did you understand this to
4   be a cultural exchange program, meaning the au pair
5   program?
6       A.   I'm not sure.
7       Q.   What does cultural exchange mean to you?
8       A.   That we learn something about the culture
9   of wherever we go or wherever you are and that the other
10  party learns something about my culture.
11      Q.   In fact, that's one reason why you wanted
12  to sign up for the au pair program, was for the cultural
13  program, right?
14          MR. HOOD:  Objection.
15      A.   I don't know why I decided.
16      Q.   (By Mr. Quinn)  Well, certainly you wanted
17  to see the United States; is that right?
18      A.   I wanted to see the United States, yes.
19      Q.   You wanted to learn about the United
20  States; is that right?
21          MR. HOOD:  Objection.
22      A.   What do you mean by "learn"?
23      Q.   (By Mr. Quinn)  What does "learn" mean to
24  you?
25      A.   Learn means to me like in school learning

Page 100

1   about it.
2       Q.   You wanted to observe the customs and
3   habits of the people in the United States when you --
4   when you signed up to come back and live with the Russell
5   family, right?
6           MR. HOOD:  Objection.
7       A.   I don't know if I would use the word
8   "observe."
9       Q.   (By Mr. Quinn)  Well, you were certainly
10  aware that the -- from what you've told me right now or
11  just a moment ago that the -- that you weren't exactly
12  happy with the amount of money you would be paid while
13  living as an au pair in the United States; is that right?
14      A.   I'm not sure if I said that before.
15      Q.   You said almost everyone else makes more
16  money than au pair.
17      A.   Well, I did say that.  I'm sure you make
18  more in an hour than I get in a month or in a week.
19      Q.   Okay.  And then do you -- so there were
20  other reasons why you came to live as an au pair other
21  than the stipend, right?
22      A.   I did not come here for the stipend.
23      Q.   Okay.  What did you come here for?
24      A.   To live in the United States.
25      Q.   For what purpose?

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

**EXHIBIT A**

Confidential Video Deposition of Juliane Harning
September 08, 2016

**Page 117**

1  Q. (By Mr. Quinn) Ms. Harning, did you have a
2  chance to have some lunch and stretch your legs, that
3  sort of stuff?
4  A. Yes, I have.
5  Q. Ready to go?
6  A. Sure.
7  Q. Have you had a chance to think about this
8  morning's testimony?
9  A. No, I haven't.
10 Q. Is there anything you'd like to change,
11 amend, or revise about this morning's testimony after
12 about an hour -- basically hour break?
13 A. I don't know right now.
14 Q. How did you first learn of AuPairCare?
15 A. Probably -- I'm not entirely sure. I read
16 it online or read something online on the website, yeah.
17 It's been a long time ago.
18 Q. Okay. When you went to the AuPairCare
19 website, was there a section there that related to
20 compensation and terms of employment and in terms of the
21 program, I guess is a better way to put it, for
22 AuPairCare?
23 A. As I said, it's been a long time. So I
24 don't remember exactly what was on that page. But I do
25 remember -- or I do think that they have like you work

**Page 118**

1  ten days (sic) maximum a day, 45 hours a week, get one
2  and a half days off, ten days of paid vacation, and then
3  it says the stipend as well.
4  Q. Before your deposition today, let's -- but
5  after you signed up as part of this lawsuit, did you have
6  a chance to go look at the AuPairCare website?
7  A. I can't recall that I accessed it after I
8  signed up.
9  Q. Okay. Did you access the AuPairCare
10 website in let's just say the three or four months before
11 you signed up?
12 A. I can't recall.
13 Q. Did you access the AuPairCare website
14 between the time that you retained a lawyer in this
15 lawsuit and the time -- and today?
16 A. I can't recall.
17 Q. Okay. Do you recall from what you do
18 remember about the AuPairCare website anything that might
19 have been false or misleading about the contents of that
20 website?
21 A. What exactly do you mean by that?
22 Q. What do you think I mean?
23 A. I don't know what you mean.
24 Q. What does "false" mean to you?
25 A. Wrong.

**Page 119**

1  Q. What does "misleading" mean to you?
2  A. Like I guess not lying, but omitting
3  maybe.
4  Q. Tricking you?
5  A. Tricking.
6  Q. Stuff like that?
7  A. Yeah.
8  Q. Was there anything about the AuPairCare
9  website that you recall was false or misleading?
10 A. I don't exactly remember as I haven't
11 accessed it in a while, but it says that the Department
12 of State has set the fixed amount of 195.75. And if I do
13 understand this correctly, that's false. So that would
14 be the false information that's definitely on the site.
15 Q. Do you remember anything else that might
16 be false or misleading about the website that you read?
17 A. I don't recall.
18 Q. As you sit here today, you don't recall
19 any other aspect of the AuPairCare website, other than
20 the 195.75 or presentation, that might be false or
21 misleading; is that a correct statement?
22 A. There might be other information that are
23 false or misleading. I just don't remember them right
24 now, so I can't say that there wasn't anything else.
25 Q. Okay. Have you reviewed any other

**Page 120**

1  promotional material from AuPairCare that you believe
2  might be false or misleading?
3  A. What exactly do you mean by "other
4  material"?
5  Q. What does "promotional material" mean to
6  you?
7  A. I assume flyers or something.
8  Q. Right. Have you reviewed any other
9  promotional material from AuPairCare that you believe is
10 false or misleading?
11 A. Since when?
12 Q. Since the time that you first looked at
13 the website to today -- excuse me, from the first time
14 you looked at any of that material that we're speaking
15 of, promotional material, to today.
16 A. I don't know if I actually got sent
17 promotional material after checking out the websites, but
18 I might have seen flyers or hand -- not handbooks but
19 like -- I don't know, flyers, posters, if they sent
20 anything.
21 Q. Okay. So if you did see that type of
22 material, you just can't recall it; is that right?
23 A. I can't -- I can't say -- I can't swear
24 that I have had a flyer of theirs in my hands.
25 Q. Okay. Once you became involved in the

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

**EXHIBIT A**

Confidential Video Deposition of Juliane Harning
September 08, 2016

Page 169

1  Q. Okay. Some of the reasons you wrote to
2  the -- to the potential host family was you wanted
3  another year of challenges; is that right?
4      A. If it's in there, then that's what I
5  wrote.
6      Q. Let's just --
7      A. I assume.
8      Q. It says, "I want to experience another
9  year of challenges." Did you write that? Want me to
10 point it out for you?
11     A. Yes.
12     Q. That makes it go faster. I'm going to
13 stay right in this area.
14     A. It appears to be what I have written, yes.
15     Q. And you wanted to come for fun. Is that
16 another reason why you wanted to come back to the au pair
17 program?
18     A. Sure.
19     Q. And that you wanted to be part of the life
20 of another family. Is that one of the reasons?
21     A. Yes.
22     Q. And you wanted to be part of their
23 traditions; is that right?
24     A. It's not written down in there, I think.
25 Ah, there.

Page 170

1   Q. Okay? You see that?
2       A. Yeah.
3       Q. And you also wanted to participate in the
4   culture; is that right?
5       A. That's what it says, yes.
6       Q. Okay. We're done with that.
7       A. Okay.
8       Q. During our lunch break or during some of
9   the breaks we've had this afternoon, have you had a
10  chance to locate the phone numbers for any of the
11  au pairs that we are -- that you told me you have talked
12  to about your au pair experiences?
13      A. I have not looked for any numbers during
14  the break, no.
15      Q. All right. We'll take one more break, and
16  I'm going to ask that you do that, okay?
17          MS. DiSALVO: Counsel, it might make more
18  sense to do that through interrogatory, just given how
19  short our time -- the time we have left today is.
20          MR. QUINN: I'll give her enough time to
21  try to get some done, okay?
22      Q. (By Mr. Quinn) I'll let you supplement
23  what you find today through interrogatories.
24          Have you ever applied with any other
25  au pair sponsoring agencies other than AuPairCare?

Page 171

1       A. What do you mean?
2       Q. Sure. Have you ever applied to be an
3  au pair with anyone else other than AuPairCare in the
4  United States?
5       A. Do you mean signing a contract?
6       Q. I mean submitting an application.
7       A. I can't recall if I have submitted several
8  applications. I might have.
9       Q. Okay. Do you recall which agencies you
10 might have submitted an application to with here in the
11 United States?
12      A. Probably -- maybe Cultural Care. That's
13 like one of the bigger ones. AuPairCare, Cultural Care,
14 and it's probably Expert AuPair, yeah. Those are like
15 the biggest ones in Germany, so that would be the most
16 likely.
17      Q. When was the last time you submitted an
18 application to be an au pair?
19      A. When I applied to be an au pair in 2013.
20      Q. To be with the Russell family?
21      A. Well, I didn't apply to be with them,
22 but --
23      Q. But for that placement?
24      A. For that placement, yeah.
25      Q. Have you ever applied for any other

Page 172

1  positions with an au pair sponsor?
2      A. What do you mean?
3      Q. Area director, regional director, any sort
4  of type of position to work with an au pair agency other
5  than being an au pair?
6      A. I don't remember.
7      Q. Well, do you think you have?
8      A. I'm not sure. Like I can't be an area
9  director if I live in Germany.
10     Q. Okay. Really, it wasn't my question. My
11 question was, Have you applied for any of those
12 positions?
13     A. I don't think I have.
14     Q. Have you ever applied for any other --
15 subsequent to working with the Russells, have you ever
16 applied for a green card or any sort of ability to come
17 work in the United States?
18     A. No.
19     Q. Have you applied to work with any
20 au pair -- European au pair agencies other than in a --
21 in a position other than as an au pair?
22     A. I don't think there are European -- I'm
23 not sure what you mean.
24     Q. Okay. Are there au pairs in Europe?
25     A. Yeah, but we don't need an agency to be an

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

EXHIBIT A  Confidential Video Deposition of Juliane Harning
September 08, 2016

**Page 205**

```
 1        I, JULIANE HARNING, the deponent in the above
 2   deposition, do hereby acknowledge that I have read the
 3   foregoing transcript of my testimony, and state under
 4   oath that it, together with any attached Amendment to
 5   Deposition pages, constitutes my sworn testimony.
 6
 7   _____ I have made changes to my deposition
 8
 9   _____ I have NOT made any changes to my deposition
10                          _____
                                       JULIANE HARNING
11
12        Subscribed and sworn to before me this _____
13   day of _____, 20____.
14        My commission expires: _____.
15
16                          _____
                                       NOTARY PUBLIC
17
18
19
20
21
22
23
24
25
```

**Page 206**

```
 1              CERTIFICATE OF DEPOSITION OFFICER
 2   STATE OF COLORADO         )
 3   CITY AND COUNTY OF DENVER )
 4        I, Deborah A. VanDemark, a Registered
 5   Professional Reporter and Notary Public within and for
 6   the State of Colorado, commissioned to administer oaths,
 7   do hereby certify that previous to the commencement of
 8   the examination, the witness was duly sworn by me to
 9   testify to the truth in relation to matters in
10   controversy between the said parties; that the said
11   deposition was taken in stenotype by me at the time and
12   place aforesaid and was thereafter reduced to typewritten
13   form by me; and that the foregoing is a true and correct
14   transcript of my stenotype notes thereof.
15        That I am not an attorney nor counsel nor in any
16   way connected with any attorney or counsel for any of the
17   parties to said action nor otherwise interested in the
18   outcome of this action.
19        My commission expires: March 4, 2017.
20
21                   _____
                         DEBORAH A. VANDEMARK
22                       Registered Professional Reporter
                         Colorado Realtime Certified Reporter
23                       Notary Public, State of Colorado
24
25
```