EXHIBIT B

**Johana Paola Beltran, et al.,**

**vs.**

**Interexhange, Inc., et al.,**

**Deposition of**

**Laura Mejia-Jiminez**

**September 14, 2016**

**Volume I**

**Job # 18766**

EXHIBIT B

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

JOHANA PAOLA BELTRAN; and those similarly situated,

Plaintiffs,

vs.

Case No. 1:14-cv-03074-CMA-KMT

INTEREXCHANGE, INC.; USAUPAIR, INC.; GREAT AUPAIR, LLC; EXPERT GROUP INTERNATIONAL, INC., DBA EXPERT AUPAIR; EURAUPAIR INTERCULTURAL CHILD CARE PROGRAMS; CULTURAL HOMESTAY INTERNATIONAL; CULTURAL CARE, INC.; D/B/A CULTURAL CARE AUPAIR; AUPAIRCARE, INC.; AUPAIR INTERNATIONAL, INC.; APF GLOBAL EXCHANGE, NFP; AMERICAN INSTITUTE FOR FOREIGN STUDY DBA AU PAIR IN AMERICA; AMERICAN CULTURAL EXCHANGE, LLC, DBA GOAUPAIR; AGENT AU PAIR; A.P.E.X. AMERICAN PROFESSIONAL EXCHANGE, LLC DBA PROAUPAIR; and 20/20 CARE EXCHANGE, INC., DBA THE INTERNATIONAL AU PAIR EXCHANGE,

Defendants.

VOLUME ONE TELECONFERENCED VIDEO DEPOSITION OF

LAURA MEJIA-JIMINEZ

San Francisco, California

Wednesday, September 14, 2016

Reported By: KIMBERLY E. D'URSO, RPR, CSR No. 11372

Job No. 18766

EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT B

JOHANA PAOLA BELTRAN; and those similarly situated,

Plaintiffs,

vs.

INTEREXCHANGE, INC.; USAUPAIR, INC.; GREAT AUPAIR, LLC; EXPERT GROUP INTERNATIONAL, INC., DBA EXPERT AUPAIR; EURAUPAIR INTERCULTURAL CHILD CARE PROGRAMS; CULTURAL HOMESTAY INTERNATIONAL; CULTURAL CARE, INC.; D/B/A CULTURAL CARE AUPAIR; AUPAIRCARE, INC.; AUPAIR INTERNATIONAL, INC.; APF GLOBAL EXCHANGE, NFP; AMERICAN INSTITUTE FOR FOREIGN STUDY DBA AU PAIR IN AMERICA; AMERICAN CULTURAL EXCHANGE, LLC, DBA GOAUPAIR; AGENT AU PAIR; A.P.E.X. AMERICAN PROFESSIONAL EXCHANGE, LLC DBA PROAUPAIR; and 20/20 CARE EXCHANGE, INC., DBA THE INTERNATIONAL AU PAIR EXCHANGE,

Defendants.

Case No. 1:14-cv-03074-CMA-KMT

VOLUME ONE TELECONFERENCED VIDEO DEPOSITION OF LAURA MEJIA-JIMINEZ, taken on behalf of Defendants, at the law offices of Gordon & Rees, LLP, 275 Battery Street, Suite 2000, San Francisco, California, beginning at 9:05 a.m., and ending at 6:39 p.m., on Wednesday, September 14, 2016, before Kimberly E. D'Urso, RPR, Certified Shorthand Reporter Number 11372.

APPEARANCES:

For the Plaintiffs:

BOIES, SCHILLER & FLEXNER, LLP
BY: LAUREN FLEISCHER LOUIS, Esq.
401 East Las Olas Boulevard
Suite 1200
Fort Lauderdale, FL 3301-2211
(954) 356-0011
llouis@bsfllp.com

For the Defendant, AuPairCare, Inc.:

GORDON & REES, LLP
BY: BRIAN P. MASCHLER, Esq.
275 Battery Street, Suite 2000
San Francisco, CA 94111
(415) 986-5900
bmaschler@gordonrees.com

For the Defendant, Expert Group International, Inc., d/b/a Expert AuPair: (Telephonic)

BOGDAN ENICA, Esq.
111 Second Avenue NE, Suite 204
St. Petersburg, FL 33701
(727) 388-3472
bogdane@hotmail.com

For the Defendant, A.P.E.X. & 20/20: (Telephonic)

NIXON SHEFRIN HENSEN OGBURN
BY: MICHAEL S. DREW, Esq.
5619 DTC Parkway, Suite 1200
Greenwood Village, CO 80111
(303) 773-3500
mdrew@nixonshefrin.com

For the Defendant, Au Pair International, Inc., American Cultural Exchange, LLC d/b/a GoAuPair: (Telephonic)

WHEELER TRIGG O'DONNELL, LLP
BY: KATHRYN A. Reilly, Esq.
370 17th Street, Suite 4500
Denver, CO 80202
(303) 292-2525
reilly@wtotrial.com

APPEARANCES: (CONT'D)

For the Defendant, Cultural Care, Inc. d/b/a Cultural Care Au Pair: (Telephonic)

CHOATE, HALL & STEWART
BY: JUSTIN J. WOLOSZ, Esq.
Two International Place
Boston, MA 02110
(617) 248-5221
jwolosz@choate.com

For the Defendants, American Institute of Foreign Study & APF Global Exchange, NFP: (Telephonic)

FISHER & PHILLIPS, LLP
BY: SUSAN SCHAECHER, Esq.
1801 California Street, Suite 2700
Denver, CO 80202
(303) 218-3676
sschaecher@fisherphillips.com

For the Defendant, Eur AuPair InterCultural Childcare Programs: (Telephonic)

BROWNSTEIN HYATT FARBER SCHRECK, LLP
BY: MARTHA L. FITZGERALD, Esq.
410 Seventeenth Street, Suite 2200
Denver, CO 80202
(303) 223-1472
mfitzgerald@bhfs.com

Also Present:
Jonathan Flinker, Videographer
Ellen Rosanthal, Spanish Interpreter (Deposition Interpreter)

Ruth MacKay, Spanish Interpreter (Guest Interpreter appearing for Ms. Louis)

I N D E X

| WITNESS | EXAMINATION |
|---|---|
| LAURA MEJIA-JIMENEZ | |
| BY MR. MASCHLER | 8 |

QUESTIONS MARKED/WITNESS INSTRUCTED NOT TO ANSWER

| PAGE | LINE |
|---|---|
| 84 | 3 |
| 164 | 1 |
| 168 | 10 |
| 179 | 24 |
| 180 | 3 |
| 182 | 14 |

--oOo--

EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 50 | - Declaration of Laura Mejia-Jimenez; 2 pages. | 82 |
| 51 | - Notice of Deposition; 14 pages. | 90 |
| 52 | - AuPairCare Room Application; APC 000618-681. | 134 |
| 53 | - AuPairCare 2014 Agreement; APC 000591-596. | 152 |
| 54 | - Email dated September 13, 2016; 6 pages. | 185 |
| 55 | - Email dated September 3, 2016; 2 pages. | 210 |
| 56 | - Redacted Email dated December 31, 2015; 2 pages. | 216 |
| 57 | - Consent; 1 page. | 218 |

EXHIBIT B

A. M-e-l-e, Michele Mele.
Q. And Carmen's last name?
A. M-a-g-r-o, Magro.
Q. Okay. Were Michele and Carmen husband and wife?
A. Yes.
Q. Okay. So, initially, after you and Ms. Rodriguez had completed your training, you were assigned to the Mele family, and she was assigned to a family a few blocks away from the Mele family; is that correct?
A. Yes.
Q. How often did you communicate with Ms. Rodriguez when you were living a few blocks from one another in Pennsylvania?
A. We would talk every day. We were very good friends.
Q. Would you talk during the day?
A. Yes.
Q. Would you talk during work hours?
A. No. We were working.
Q. Well, you said you talked during the day. What were your normal work hours when you were an au pair for the Mele family?
A. Well, my work hours would vary, but usually,

they would start at 6:00 a.m.; and then the ending time would vary, depending on if Mr. Magro had a trip or not.
Q. All right. So 6:00 a.m. to at some point in the early evening, was that your typical work period during weekdays?
A. Well, it would be 6:00 a.m. to 7:00 p.m.; and if Mr. Magro was on a trip, then it would be until 11:00 in the evening.
Q. All right. During those hours in which you worked, did you talk to Ms. Rodriguez on the phone?
A. When the girls were taking their nap, we would talk.
Q. So your answer is yes, you did speak to Ms. Rodriguez during work hours; correct?
A. Yes, but I would make sure that the girls were fine.
MR. MASCHLER: Move to strike after the word "Yes" as nonresponsive.
BY MR. MASCHLER:
Q. And, typically, how many times a day did you have telephone conversations with Ms. Rodriguez when she lived only a few blocks away from you in Pennsylvania?
A. Often.
Q. All right. Can you give a rough estimate of how much time in a typical day you would spend on the

phone with Ms. Rodriguez while you were working for the Meles?
A. I don't remember.
Q. More than an hour?
A. I don't think so.
Q. How many phone calls a day, typically, if there was a typical number, did you have with Ms. Rodriguez when she lived just a few blocks away from you in Pennsylvania?
A. Well, we didn't really talk on the phone that much. It was more like sending messages through WhatsApp, which is also a communication.
Q. Yes. What is WhatsApp, for the record, for old codgers like me?
A. It's like a text message, but it's through an application.
Q. Did the Mele family provide you with a cell phone when you worked for them as an au pair?
A. Yes, they gave me one.
Q. Did they pay for your use of that cell phone?
A. Yes.
Q. Did you ever have to pay any of the cell phone costs when you worked for them as an au pair?
A. No.
Q. Did you ever come to know what the cost of your

cell phone usage was when you worked as an au pair for the Mele family?
A. No.
Q. They didn't show you any of those bills?
A. No.
Q. Did they ever ask you to pay any of the cell phone charges?
A. No.
Q. Did you have access to a home computer when you worked for the Mele family as an au pair?
A. I had my computer.
Q. And did you -- withdrawn.
Were you hooked up to the Mele's Wi-Fi?
A. Yes.
Q. Did the Meles ever ask you to pay for any computer usage costs while you were an au pair for them?
A. No.
Q. When you were working for them during work hours, did you ever go online on your computer?
A. Yes.
Q. How often did you do that?
A. Use the computer?
Q. Yes.
A. When the girls were taking their nap, and in the evening when I finished working.

EXHIBIT B

THE WITNESS: No, that's not true.
BY MR. MASCHLER:
**Q. You didn't suggest that to them?**
A. No. What I was suggesting to them was to hire a nanny to allow me to work the appropriate 45 hours so that then I would have time to also go to classes.
**Q. When you first started working for the Mele family, you were working less than 45 hours a week; is that correct?**
A. The first month, yes, because there were two au pairs in the house.
**Q. Right. And what was the name of the other au pair?**
A. Leah Nadia Casper.
**Q. And in addition to Leah, were you aware that the Mele family had used other au pairs before you worked for them?**
A. Just Leah.
**Q. Are you sure about that?**
A. Yes. Well, if they had other au pairs, I didn't know.
**Q. All right. And do you know that their other au pairs were provided or sponsored by AuPairCare?**
MS. LOUIS: Object to foundation.
THE INTERPRETER: I need to have that question repeated. I didn't hear something clearly.

MR. MASCHLER: Yeah, I'll repeat it.
BY MR. MASCHLER:
**Q. Do you know whether the other au pairs that worked for the Mele family were sponsored by AuPairCare?**
A. I don't know if they had other au pairs. I know they had Leah, and that's it.
**Q. Leah finished out her full year term with the Mele family; correct?**
A. Yes.
**Q. All right. And did you have any -- withdrawn.**
**How long did she work for the Mele family while you were working as an au pair for the Mele family?**
A. One month.
**Q. And what did she tell you about being an au pair for the Mele family when she was working at the same time you worked for the Mele family?**
A. It was very good, because we would work extra hours, and so they would be giving us extra money.
**Q. She told you that you would be getting extra money?**
A. Yes.
**Q. Extra in addition to what? Extra from what?**
A. Beyond the 45 official hours.
**Q. I'm not talking about hours. I'm talking about extra compensation.**

**In addition to what? When you say "extra," extra from what?**
A. Extra money. 10 an hour, $10 an hour.
**Q. Are you familiar with the term "stipend"?**
THE INTERPRETER: The interpreter needs to inquire about that term.
MR. MASCHLER: The record should reflect that the interpreter is looking up "stipend" in Spanish.
THE INTERPRETER: So -- but what was the question?
BY MR. MASCHLER:
**Q. Are you familiar with the term "stipend"?**
A. Salary?
**Q. No. Stipend. Do you know the term "stipend"?**
A. No.
**Q. You've never in your life heard the term "stipend"?**
MS. LOUIS: Object to form.
THE WITNESS: I -- yes, I have heard it, but I was wondering about the correct meaning, and I don't know what it is.
BY MR. MASCHLER:
**Q. Have you ever seen the term "stipend" written down anywhere?**

A. Yes, I've seen it written, but I don't know what the real meaning is.
**Q. Do you know whether the term "stipend" was written in the declaration that you signed in this case?**
A. Yes, it was written.
**Q. And when you signed that declaration that "The foregoing testimony is true and correct to the best of my knowledge," did you understand what the term "stipend" meant?**
A. Well, if you read it in a paragraph, you understand the paragraph. But if you ask me this word in the dictionary, what does it mean, I don't know what to say.
**Q. Were there other words in your declaration that you didn't understand the meaning of when you signed your declaration, in addition to the word "stipend"?**
MS. LOUIS: Object to the form.
THE WITNESS: I never said I didn't understand.
MR. MASCHLER: I believe you did.
BY MR. MASCHLER:
**Q. Do you know what the term "stipend" means?**
A. Based on what the correct definition of the dictionary is, no.
**Q. Okay. Well, other than "stipend," were there other words that ended up in your declaration that you**



EXHIBIT B

United States government. Do you see that?
A. Yes.
Q. Do you have any reason to believe that that statement is not true?
A. No.
Q. Okay.
MR. MASCHLER: Let's break for lunch.
THE VIDEOGRAPHER: Going off the record, the time is 12:11.
(Lunch break taken.)
THE VIDEOGRAPHER: Coming back on the record, the time is 1:15.
BY MR. MASCHLER:
Q. Ms. Mejia, do you understand you're still testifying under oath this afternoon?
A. Yes.
Q. How did you first learn about the possibility of becoming an au pair?
A. Are you asking me about the date?
Q. How did you first learn? How did that come into your range of consideration?
A. I was looking into how to study -- well, I was looking for a way to study English in a foreign country.
Q. Yes, okay. And how were you looking into that?
A. I was talking to travel agencies. I was

talking to friends of mine who had already traveled outside the country and some friends who had already been au pairs.
Q. Okay. Who first told you about the United States au pair program?
A. One of my very best friends who was thinking of becoming an au pair at that time.
Q. Who was that?
A. Ana Isabel Tomiyo.
Q. Did they ever become an au pair in the U.S.?
A. Yes.
Q. When?
A. I don't remember the exact date.
Q. Before or after you were an au pair or during the same time?
A. Before.
Q. Where did you she live as an au pair in the U.S.?
A. New York.
Q. Had Ana Isabel completed her au pair engagement when you first applied to be an au pair?
A. No. She was an au pair at that time.
Q. So she was an au pair at the time you first applied to become an au pair; is that right?
A. Yes.

Q. Do you know what agency -- what au pair agency she signed up with?
A. Cultural Care.
Q. And while she was an au pair, before you applied to become an au pair, did you have discussions with her about her experience as an au pair in New York?
A. Yes.
Q. What did she tell you about that experience?
A. She told me about the program, how it worked, what I could do in order to become an au pair.
Q. What did she tell you about the program?
A. She told me it was a program where you would work in the United States taking care of kids, that -- where you had some minimum work hours, and you would work during those hours, and rest of the time, you could do whatever you want, so -- but I could use those hours to go to school, and the family would give you $500. And she told me which agencies I could go to to see about this.
Q. When she referred to $500, was that for an educational subsidy?
A. No. It was some money that the family would give us so -- that we could use to pay for what we wanted to study.
Q. That's what I meant as an educational subsidy.

It was for education, right, that $500?
A. Yes.
Q. And you referred to -- I'm using your term, I believe, "minimum work hours." What --
Go ahead.
No, I've not asked a question yet.
A. 45 minimum hours a week.
Q. Okay. I just said --
Let's go one at a time, okay?
So you indicated that your friend Isabel -- Ana Isabel referred to "minimum work hours." What was your understanding at the time as to what she meant by that?
A. The number of work hours that were allowed.
Q. Is that a minimum or a maximum? Because minimum in our language means the lowest.
Is that what you understood her to mean by "minimum work hours" when she was describing her au pair experience?
A. No. Excuse me. Maximum.
Q. Okay. And did she tell you anything about the compensation she was receiving as an au pair?
A. Yeah, that they paid her, like, 195 a week, something like that.
Q. Okay. Did you speak to any other current or

EXHIBIT B

was correct, what the interpreter said.

BY MR. MASCHLER:

Q. Okay. So you spoke to Ana Isabel, Ana Maria Gomez, and Laura, last name you don't know. Were there any other current or former au pair or au pair applicants with whom you spoke before you signed up to be an au pair in the U.S.?

A. Well, I didn't speak to any more au pairs, but I went to some agencies, travel agencies in my country.

Q. Travel agencies?

A. Yes.

Q. What travel agencies?

A. I went to one called Viajes & Viajes, and I went to InterExchange. And they also had an au pair program, and they told me about the options available.

They told me about the option of going to study in an English-speaking country, and they told me how much it would cost. And they told me that if I wanted to get into the au pair program, how much it would cost me to get into that program and the advantages of doing that.

Q. What did they say were the advantages of doing that?

A. That it's much cheaper than paying for a school to study English, that you can work and you can study at

the same time.

Q. Was your main reason for becoming an au pair in the U.S. to learn English?

MS. LOUIS: Object to form.

THE WITNESS: What is the question?

BY MR. MASCHLER:

Q. Was the main reason you decided to become an au pair in the U.S. to learn English?

A. Yes, and because I could have the experience.

Q. Did you ask Laura, the former au pair who terminated her au pair engagement six months in -- did you ask her about the types of work she did as an au pair?

A. Yes.

Q. What did she tell you?

A. That she had to take care of the kids; she had to feed them, take them to school, stay with them in the evening until the mom got back.

And since the house was so dirty, she had to clean the house. Sometimes they told her to do it. Sometimes she just did it on her own because it was so dirty.

Q. Did she tell you about the compensation she earned as an au pair?

A. She told me they gave her 195, like everybody,

per week.

Q. And that was in the form of a stipend?

MS. LOUIS: Object to form.

MR. MASCHLER: Did you get her answer?

THE REPORTER: "Object to form." And I have not gotten an answer yet.

MR. MASCHLER: She said "Si."

THE REPORTER: That's not in English.

MR. MASCHLER: I know. I know.

But I'm wondering, did you get her answer?

THE INTERPRETER: I was in the middle of listening to her response when your question came up, so I need to have her answer repeated to me.

(Pause.)

THE WITNESS: That they paid her $195 a week for her work.

BY MR. MASCHLER:

Q. Okay. And did she indicate that that was in the form of a stipend?

MS. LOUIS: Object to form.

THE WITNESS: Yes.

BY MR. MASCHLER:

Q. Okay. So other than Ana Isabel and Ana Maria Gomez and Laura, whose name we don't recall, and the travel agents, did you speak to anyone else, other than

representatives of the agencies, about the au pair program in the U.S.?

A. Yes. I sent an e-mail to Cultural Care requesting information about the program.

Q. Yeah. My earlier question excluded au pair agencies, such as Cultural Care. Okay? So I'll ask the question again, leaving to one side the information you received from the agencies you consulted or did research about.

Other than Ana Isabel and Ana Maria Gomez and Laura, the travel agency, and InterExchange, was there anyone else that you talked to about the U.S. au pair program or the possibility of you joining it before you signed up for that program?

MS. LOUIS: Object to form.

THE WITNESS: No.

BY MR. MASCHLER:

Q. Okay. Did any -- withdrawn.

Did you rely on the information provided to you by the former au pair and by the travel agencies in deciding to sign up for the U.S. au pair program?

A. Yes, of course. I figured that I had already found the information I needed in order to make a decision.

Q. Okay. Did any of the information that you were

EXHIBIT B

United States au pair program.
MS. LOUIS: Object to foundation.
THE WITNESS: Yes.
BY MR. MASCHLER:
Q. Okay. In paragraph 4 of your declaration, you indicate that you did not base your selection on how much you could earn. Do you see that?
A. Yes.
Q. And I want to make sure I understand your testimony. Your selection was based on the fact that there was a travel agent that assisted you in applying for AuPairCare?
THE INTERPRETER: I'm sorry. Could that question be repeated?
MR. MASCHLER: Yeah. I'll ask it again.
BY MR. MASCHLER:
Q. I believe you testified that your decision to select AuPairCare among the other agencies under consideration was based on the fact there was a travel agent that helped you in connection with the application process with AuPairCare.
A. Yes.
Q. Okay. And that travel agent, you don't remember the name of that person, but it was InterExchange?

A. Yes.
Q. And were the statements about the au pair program made to you by InterExchange consistent with what you had been told by your au pair friends and acquaintances about the U.S. au pair program?
MS. LOUIS: Object to form.
THE WITNESS: Yes.
BY MR. MASCHLER:
Q. And were the statements made to you by the InterExchange agent about the U.S. au pair program consistent with what you reviewed on the AuPairCare website?
MS. LOUIS: Object to form.
THE INTERPRETER: I'm sorry. Could that question be repeated?
MR. MASCHLER: Read it back, please.
(Record read.)
(Question interpreted again.)
THE WITNESS: Yes.
BY MR. MASCHLER:
Q. Do you think you would have gone to the U.S. to become an au pair if the weekly stipend were only $175?
MS. LOUIS: Object to form.
THE WITNESS: Yes.
BY MR. MASCHLER:

Q. Do you think you would have gone to the U.S. to become an au pair if the weekly stipend were only $150?
MS. LOUIS: Object to form.
THE WITNESS: No.
BY MR. MASCHLER:
Q. So you draw the line somewhere between $150 a week and $175 a week as a stipend?
MS. LOUIS: Object to form.
THE WITNESS: No.
BY MR. MASCHLER:
Q. Well, I asked you if you would still have participated in the program if the stipend were $175, and you said "Yes."
A. Oh, I thought that you had made a mistake with the number. But no.
Q. Let me ask the question again.
If the stipend -- the minimum stipend available under the Department of State program were $175, as opposed to $195 and change, when you applied to become an au pair, would you still have gone to the U.S. and become an au pair?
MS. LOUIS: Object to the form.
THE WITNESS: I would have thought about it.
BY MR. MASCHLER:
Q. And how do you think would you have come out?

MS. LOUIS: Object to form.
THE WITNESS: But what would I have concluded back then isn't the same as what I would conclude now.
BY MR. MASCHLER:
Q. Well, that's what we're focusing on, like, what your state of mind was when you applied for a job or position as an au pair in the U.S.
So at the time you applied to become an au pair, you knew that there was a minimum stipend of $195.75, correct, per week?
A. Yes.
Q. And you knew that you would be provided with room and board by the host family; correct?
A. Yes.
Q. And you knew that the host family would provide you with a $500 contribution to your education; correct?
A. Yes.
Q. And you knew that your primary responsibilities would entail caring for the children of the host family; correct?
A. Yes.
Q. And you knew that as part of that program, you would be entitled to a vacation; correct?
A. Yes.
Q. And you knew that the maximum hours prescribed

EXHIBIT B

application?
A. I don't remember.
Q. Okay. Could you please turn to page 630 of Exhibit 52? That's the Bates number at the bottom.
In this section you were asked to explain why you want to be an au pair.
A. Uh-huh.
Q. "Yes"?
A. Yes. Sorry.
Q. Okay. Did you receive aversion of this au pair application in Spanish?
A. No.
Q. Did someone help you translate the various sections of this agreement when you filled it out?
A. Yes, the guy who was my boyfriend at that time.
Q. Okay. If you will go down to the bottom of this paragraph, again, it's talking about the reasons you want to become an au pair. Do you see that?
You wrote: "Also, I want to improve my English."
A. Just a second. Let me see where you are.
Q. It's at the bottom.
Is that a true statement?
A. Yes.
Q. You also wrote that you want to be an au pair

in the United States because you love the American lifestyle. Do you see that?
A. Yes.
Q. Was that a true statement when you wrote it?
A. When I wrote it.
Q. What did you mean by "the American lifestyle" at that time?
A. I was talking about the way -- well, let me see -- the way the people in the United States live, because the culture is different. There are a lot of things that are different, like the food, the way people live, things like that.
Q. Did you think the quality of life in the United States would be better than what you had experienced in Colombia when you had applied for an au pair position in the U.S.?
A. Yes.
Q. You also wrote in this paragraph that you would be able to travel around the country. Do you see that at the bottom of this page?
A. Yes.
Q. Was it your understanding that as an au pair assigned to a host family that you would be able to travel around the country?
A. During my vacation, yes.

Q. Okay. Let's talk about the process by which you were matched with your host family.
A. May I close this?
Q. Yes.
A. Okay.
Q. How did you come to be matched with the Mele family?
A. When a family is selecting somebody, your profile gets activated. So then they send you a notification by mail. So you talk with the family by mail in order to get an interview on Skype. You do the interview, and then the family and you decide if you want to have another interview. And then after that, you decide if you want to do a match. That's the process that I went through with the Mele family.
Q. Okay. Did you go through that process with any other potential host families before you took an au pair position in the U.S.?
A. Yes.
Q. How many other families?
A. I remember I spoke to one mom in New York, another in California, and another one in -- Charlotte, is it called? Is that the name?
Q. There are places called Charlotte.
A. I don't know. It was Charlotte.

Q. Okay.
A. And the Mele family.
Q. Okay. Which of those families did you like the best?
A. The one in California.
Q. And why did you like them the best? Because they lived in California?
A. No -- well, I did like California, yes, but I liked the family because the kids were -- there were four kids, who were 5, 6, 7, 8 years old, and you would take them to school in the morning, and then you would pick them up in the afternoon, take care of them in the afternoon.
And the mom, she seemed very affectionate. Well -- so the family -- I liked the family.
Q. Okay. And one of the reasons you liked the California family is because it seemed you would have at least part of your days free to yourself, not taking care of the kids?
A. A part of the day free, yes.
Q. Because the kids were in school; right?
A. Yes.
Q. And the Mele children were not of school age yet; right?
A. Yes.

EXHIBIT B

answer.
BY MR. MASCHLER:
**Q. Okay. I asked you before if, prior to becoming an au pair with the Mele family, you had been told in any documents or seen any documents that said it was the Department of State that set the minimum stipend.**
A. Yes, the agency told me --
**Q. Okay.**
A. -- in Colombia.
**Q. All right. So, in fact, before you started working as an au pair for the Mele family, you had been told orally and in writing -- in this contract, for example -- that the United States Department of State had set that minimum stipend; correct?**
A. The agency told me.
**Q. And it's also written in your contract; correct?**
A. Yes.
**Q. Okay. If you turn to paragraph 41, the last line in the bold print, it says that the au pair, you, are "required to file U.S. Individual Tax Returns even if no taxes are due."**
**Have you filed a U.S. tax return?**
MS. LOUIS: Subject to the objections that plaintiffs' counsel has previously made, including up to

the hearing that was conducted last week, you can answer.
THE WITNESS: Yes.
BY MR. MASCHLER:
**Q. For what years did you file U.S. tax returns?**
A. When I was au pair, when I opened the bank account.
**Q. Okay. So you worked an au pair in 2014 for about five months; correct?**
A. July, August, September, October, November, December. Six months.
**Q. Well, you started working at the end of July; right?**
A. Yes. Let's say five months and one week.
**Q. Okay. All right. And when did you file a tax return in the U.S.?**
A. When I got that paper that you need in order to work here.
**Q. When you got the paper you need --**
A. It has a number, security number.
MS. LOUIS: Social Security number?
THE WITNESS: Yes.
BY MR. MASCHLER:
**Q. Okay. Did you file that tax return sometime in 2015?**
A. I don't remember.

**Q. Do you know whether the amount that you stated on that tax return included both the weekly stipend and the extra money that you paid -- were paid by the host family?**
MS. LOUIS: Objection. Beyond the scope of what the magistrate said that you could ask, whether or not she filed for the years that she was here as an au pair.
THE INTERPRETER: Okay. The interpreter did not interpret the question because I was interpreting the objection.
Could the question be repeated, please?
MR. MASCHLER: Listen to the question.
(Record read.)
(Question interpreted again.)
MS. LOUIS: And, again, this goes beyond the scope of what the magistrate said that you could ask. The magistrate exclusively said that you could ask them whether or not they filed a tax return for the year that they were an au pair here. This question is improper. The magistrate has already ruled that you couldn't go beyond asking whether or not they filed a tax return.
MR. MASCHLER: Are you instructing her not to answer?
MS. LOUIS: Yes.

BY MR. MASCHLER:
**Q. Did you keep track of the amounts that you were paid by the Meles while you were an au pair for them?**
A. I kept track of the hours. That's all. Just -- I would just calculate -- it's just simple math.
**Q. Okay. I don't understand that answer, so I'll ask you again.**
A. My answer was that I kept track of the hours.
**Q. That wasn't my question.**
A. And that way, I could figure out how much money it should be. That 45 hours was $200. The extra hours were paid $10 an hour.
**Q. You received the $200 stipend regardless of how many hours you actually worked in any given week while an au pair for the Mele family; correct?**
A. They paid me $200 for 45 hours. If I worked more, they would pay me in cash for that.
**Q. Please listen to my question.**
**You received the $200 a week stipend from the Mele family regardless of how many hours you actually worked; correct?**
MS. LOUIS: Objection.
THE WITNESS: They paid me $200 for 45 hours.
MR. MASCHLER: Move to strike as nonresponsive. I'm going to ask you again.

EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT B

**with the Mele family before its scheduled one-year duration; correct?**

A. Yes.

**Q. And you terminated the au pair engagement with the Mele family on December 30, 2014. Does that sound right?**

A. Yes.

**Q. And you did so because you were having difficulties with caring for the children?**

MS. LOUIS: Objection.

THE WITNESS: No.

BY MR. MASCHLER:

**Q. Well, wasn't that the reason you gave AuPairCare for your terminating the au pair engagement early?**

A. No.

**Q. What was the reason you gave AuPairCare, if any, for terminating the au pair engagement seven months early?**

MS. LOUIS: Objection.

THE WITNESS: Because I worked extra hours and I had already spoken to the family about the activities of the children, and I suggested that we take them out, because I felt like the children needed to get out.

And so in a certain way, I had already

suggested a lot of different activities to the family for the children, but they didn't respect them.

BY MR. MASCHLER:

**Q. Okay. And did you communicate those reasons to the host family?**

A. Yes.

**Q. And, in fact, Carmen had taken the day off from work to assist you with the kids on December 30, 2014. Do you recall that?**

MS. LOUIS: Object to foundation.

THE WITNESS: I don't remember.

BY MR. MASCHLER:

**Q. Do you recall telling Carmen that you were -- you wanted to stop the au pair engagement on December 30, 2014?**

A. No. I called Beth.

**Q. Okay. But I'm asking, did you tell the host family that you were not going to work there anymore?**

A. No.

**Q. You never told them? You just left? Is that your testimony?**

MS. LOUIS: Objection.

THE WITNESS: No, that's not what happened. What happened was, I called Beth, and Beth called Carmen. Carmen came back home. And he already knew the news,

because Beth had told him on the phone.

And I left the house, because he came home very angry. He started attacking me verbally. He started yelling. He started hitting the walls. So I said, "That's enough for me. I'm leaving the house."

I called a girlfriend of mine, Helen. I asked if she could come and pick me up. I grabbed my things, and I left.

BY MR. MASCHLER:

**Q. In fact, you raised your voice at Carmen, didn't, you on that occasion, and you used foul language in front of the children; isn't that correct?**

A. No.

**Q. And, in fact, you falsely represented to Carmen that Beth Lawrence had told you that it was okay for you to leave immediately, when, in fact, she'd made no such assurance to you?**

A. That's not true.

**Q. After December 30, 2014, did you ever work for the Mele family as an au pair?**

A. No.

**Q. So you left the same day that you told Beth that you were leaving; is that right?**

MS. LOUIS: Object to foundation.

THE WITNESS: Of course.

BY MR. MASCHLER:

**Q. And do you know whether there were procedures that you were bound to follow with regard to an early termination of your au pair engagement?**

A. Yes. So when I talked to Beth about the rematch, she explained to me what process I had to follow. She told me I had to speak to the family. There were two days for her to come over to our house to do a mediation, and then after that, if nothing could be agreed upon, there were 14 days for me to find a new family and for the family to find a new au pair.

**Q. And you were supposed to stay with the host family during that two-week period, weren't you?**

A. Yes, I was supposed to stay there during that period, but I'm a person first and an au pair second. And Carmen was disrespectful towards me, and I wasn't going to put up with that.

**Q. In fact, you lied to Carmen and told him that Beth had told you it was okay to leave before that two-week period; isn't that right?**

MS. LOUIS: Objection.

THE WITNESS: I never told that to Carmen. I told him I was leaving the house because of the disrespectful way he was behaving with me.

BY MR. MASCHLER:

EXHIBIT B

Q. **You think signing a consent form that is filed in court is part of your privacy?**
A. Yes, of course. I would only tell -- I would only tell people about it who I want to tell about it.
Q. **Okay.**
MR. MASCHLER: Let's mark this next in order, please.
(Exhibit Number 57 was marked for identification.)
BY MR. MASCHLER:
Q. **Exhibit 57 is a consent form. Do you see that?**
A. Yes.
Q. **Okay. Is that your signature that appears on this form?**
A. Yes.
Q. **And did you sign this form on April 16, 2015?**
A. Yes.
Q. **And who sent you this form?**
A. Justin Grant.
Q. **Okay. At the time you signed this form, do you know whether the plaintiffs in this lawsuit had brought any FLSA claims against AuPairCare?**
THE INTERPRETER: I'm sorry. Could that question be repeated for the interpreter?
MR. MASCHLER: Read it back, please.

(Record read.)
(Question interpreted again.)
THE WITNESS: I don't remember.
BY MR. MASCHLER:
Q. **Do you know the term "Fair Labor Standards Act"? Have you ever heard of that act?**
A. No, I don't remember.
Q. **Have you ever heard the term "FLSA"?**
A. I don't remember.
Q. **Well, when you signed the FLSA consent form that we've marked as Exhibit 57, did you have an understanding what FLSA was?**
A. I don't remember.
Q. **Before you signed the consent form that we've marked as Exhibit 57, did you review any version of a Complaint filed in this case?**
A. I don't remember.
Q. **So you signed this FLSA consent form on April 16, 2015, and then about eight and a half months later, you sent this letter of apology to the Mele family.**
**Why did you send this e-mail, dated December 31, 2015, that we've marked as Exhibit 57 -- 56. Excuse me.**
MS. LOUIS: Objection.

THE WITNESS: Because I've always thought that what happened in my case is the fault of the agency, not the family, because the agency knows that the family needs somebody with a lot of time to be with them, and in spite of that, they give them an au pair who isn't able to be there the number of hours that they need.
BY MR. MASCHLER:
Q. **What else did you have going on between July of 2014 and the end of December of 2014?**
A. What -- was I doing what?
Q. **Well, you were living in their house; right? You got room and board paid for by the host family; right?**
MS. LOUIS: Object to foundation.
BY MR. MASCHLER:
Q. **Right?**
A. Yes.
Q. **Okay. You didn't have any other jobs during that time; right?**
A. The time that I was au pair?
Q. **Right.**
A. Correct.
Q. **Okay. You went to school at night sometimes; right?**
A. Yes.

Q. **So you, in fact, had the time to work for them during the days that you were an au pair for them; isn't that right?**
A. Yes.
Q. **Right. You just didn't like working for that family during the days; is that right?**
A. No.
Q. **No?**
**You wanted to take more education classes to better your English during the day; isn't that right?**
A. Yes.
Q. **All right. And because the Mele family needed someone to take care of their infant children, they couldn't accommodate that request that you not take care of their kids during the days; isn't that right?**
A. But what is the question?
Q. **The question is that they needed you to take care of their children during the day when they were at work, but you wanted to go to class during the day; isn't that right?**
MS. LOUIS: Object to form.
THE WITNESS: They wanted me to take care of the kids during the day and the night, to do more than 45 hours. As I said before, if I only had 45 hours to work, I would have had some free time to be able to attend



EXHIBIT B

classes. But since I didn't have that free time, because I worked more than the 45 hours, that's why I didn't like working there.

BY MR. MASCHLER:

Q. Identify a single class or educational opportunity offered at night that you were not able to participate in because of the hours you worked for the Mele family.

A. I don't remember.

Q. You can't identify a single educational opportunity that you had to forego or pass up because of the hours that the Mele family requested that you work for them as an au pair; isn't that right?

MS. LOUIS: Objection.

THE WITNESS: I never said that I couldn't identify them. I just said that I don't remember.

BY MR. MASCHLER:

Q. Well, this is the time to do it. So if something pops into your mind, please let us know.

A. Okay.

Q. Now, you indicated that -- in your December 31, 2015 e-mail that you knew that they never understood a lot of your attitudes. Do you see that? What attitudes, were you referring to there?

A. I don't remember.

Q. Okay. You say that "The agency promised a lot of things that most of the families ignore."

What were you referring to there?

A. Because the agency in Colombia tells us that it's an exchange program that -- where a person can work and study at the same time, but the family said to me -- declared -- stated to me many times that it's a family for -- interpreter clarification -- that it's a program for taking care of children, that's all.

Q. Did you read the contract that you signed before you signed it? I've probably asked you that question. Let me ask you again. Did you read it?

MS. LOUIS: Objection.

THE WITNESS: Yes.

BY MR. MASCHLER:

Q. And didn't that contract say that your primary obligation as an au pair would be to take care of the children of the host family?

A. Yes.

Q. And didn't the contract also provide that you would be entitled to a particular number of educational hours?

MS. LOUIS: Objection.

THE WITNESS: They said that the family would give you a certain amount of money to take classes and

that you have to take six credits during the year.

BY MR. MASCHLER:

Q. And you met that requirement in the first five months of your au pair engagement with the Mele family; right?

MS. LOUIS: Objection.

THE WITNESS: Yes.

BY MR. MASCHLER:

Q. Okay. All right. Is there anywhere in any documents or literature or advertisements that you attribute to AuPairCare in which you are promised more educational opportunity than what you just referred to?

MS. LOUIS: Object to form.

THE WITNESS: No.

BY MR. MASCHLER:

Q. Okay. Have you ever read the Second Amended Complaint filed in this lawsuit?

A. I don't remember.

Q. Well, it was just filed -- the proposed Second Amended Complaint was just filed on August 15, 2016, the same day you signed your declaration.

Does that refresh your recollection as to whether you -- does that refresh your recollection as to whether you might have read a Complaint filed in this case?

A. I don't remember.

Q. Are you aware that in the proposed Second Amended Complaint there are allegations that pertain to you?

A. I don't remember.

Q. Well, did you ever review any pleading filed in this case, any document, that had claims about you?

A. Yes.

Q. When did that happen?

A. In 2015. That's why I don't remember right now.

Q. Well, do you know whether that document in 2015 said anything about the -- Laura Mejia-Jimenez?

A. Yes, it spoke about my case.

Q. Did it speak about you? Did it say anything about you in that document that you reviewed in 2015?

A. I don't remember.

Q. What's your understanding, if any you have, of the claims that are brought in your name in this case?

A. Well, according to me, because I'm suing.

Q. Yes. And so what are you claiming in this case?

A. I'm claiming that the agencies don't protect the au pairs the way they say they're going to protect them.

EXHIBIT B

important attribute of an au pair?

A. No, for a -- any person in general.

Q. I'm not asking for any person in general. I'm talking about au pairs.

Do you think honesty is an important attribute that must be adhered to?

A. Yes, of course.

Q. And have you ever heard of the term "class representative"?

A. Yes.

Q. What's your understanding of class representative?

A. Are you sure you're translating it correctly?

Q. It's a term of art in the law in the United States. It's called class representative.

MS. LOUIS: John, what's the time?

THE VIDEOGRAPHER: You mean the total running time?

MS. LOUIS: Uh-huh.

THE VIDEOGRAPHER: It is 7:08.

MR. MASCHLER: There's a question pending.

BY MR. MASCHLER:

Q. Do you understand the term "class representative"?

MR. MASCHLER: You can use the English term.

THE WITNESS: Yes.

BY MR. MASCHLER:

Q. What's your understanding of that term?

A. Can you help me with the translation?

Q. No. It's an English term. I want to know if you understand the English term "class representative."

A. I want to know what it is in Spanish.

Q. My first questions is, do you have an understanding of what it means in English?

A. No.

Q. Do you know -- have you ever heard the term "collective class representative"?

(Interpreter begins interpretation of question.)

THE INTERPRETER: Do you want me to say it in English?

MR. MASCHLER: Say it in English, "collective class representative."

THE INTERPRETER: "Collective class representative."

THE WITNESS: Yes.

BY MR. MASCHLER:

Q. What's your understanding --

MS. LOUIS: I'm sorry. I'm sorry, but I'm trying to give you the leeway to finish a line of

questioning, but there seems to be no end in sight.

MR. MASCHLER: Well, I'll just -- let me --

So we're not talking over each other.

Because we have a translator here, the judge has already said we'll get leeway on the seven-hour requirement because, obviously, about half the time has been devoted to translation.

MS. LOUIS: Actually, you spent the first hour asking about a nonparty. We spent a ton of time doing questions over and over and over again. So I appreciate that you want to some leeway, and I'm trying to give it --

MR. MASCHLER: Yeah.

MS. LOUIS: -- but we've all asked you, "How much longer," and your answer was "When I'm done" --

MR. MASCHLER: No. I told you --

MS. LOUIS: -- which is way in excess of seven hours.

The interpreter asked --

MR. MASCHLER: I mean --

MS. LOUIS: The interpreter is exhausted. The interpreter --

MR. MASCHLER: The interpreter has not said that she's exhausted.

THE WITNESS: But I am. Can I -- do I have the

right to say I'm exhausted and I don't want to do this anymore?

MR. MASCHLER: Okay. Fine. Just give me and answer to the last question, please, and we'll make whatever statements we need to on the record.

THE WITNESS: Could you repeat it, please?

MR. MASCHLER: Repeat the last question before we had the extended colloquy.

(Record read.)

(Question interpreted again.)

THE WITNESS: I don't remember.

MR. MASCHLER: All right. The interpreter [sic] has indicated she's exhausted.

We're leaving the record open for a number of reasons. One, we believe the judge has given us latitude where we have a translation and, therefore, it doubles the time to take a deposition. Second, we have some instructions not to answer with which we take issue.

So we are leaving the record open. Thank you.

MR. WOLOSZ: Excuse me. This is Justin Wolosz. Could I also just add that, on behalf of Cultural Care, we also object, and we'd like to leave the record open because I had a small number of questions -- but I did, in fact, have questions -- that I have not been able to ask.

EXHIBIT B

Page 234

MS. SCHAECHER: This is Susan Schaecher. I have the same objections for the same reasons.

MR. DREW: This is Mike Drew. Same objection.

MS. FITZGERALD: Martha Fitzgerald. Same objection.

MR. MASCHLER: All right.

MR. ENICA: Bogdan Enica on behalf Expert AuPair. And I do have the same objection.

MR. MASCHLER: Thank you for your time, Ms. Mejia.

THE VIDEOGRAPHER: This marks the end of Video Number 4 in the deposition of Laura Jimenez. The original videos will be retained by Stevens-Koenig Reporting; and the time is 6:39.

(6:39 p.m., deposition adjourned.)

--oOo--

Page 235

PENALTY OF PERJURY CERTIFICATE

I hereby declare I am the witness in the within matter, that I have read the foregoing transcript and know the contents thereof; that I declare that the same is true to my knowledge, except as to the matters which are therein stated upon my information or belief, and as to those matters, I believe them to be true.

I declare being aware of the penalties of perjury, that the foregoing answers are true and correct.

Executed on the_____day of____________________, 2016, at __________________________.

__________________________
LAURA MEJIA-JIMENEZ

Page 236

STATE OF CALIFORNIA )
) ss:
COUNTY OF NEVADA )

I, KIMBERLY E. D'URSO, do hereby certify:

That the witness named in the foregoing deposition was present and duly sworn to testify to the truth in the within-entitled action on the day and date and at the time and place therein specified;

That the testimony of said witness was reported by me in shorthand and was thereafter transcribed through computer-aided transcription;

That the foregoing constitutes a full, true and correct transcript of said deposition and of the proceedings which took place;

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [ ] was [ ] was not requested.

That I am a disinterested person to the said action;

IN WITNESS WHEREOF, I have hereunder subscribed my hand this 19th day of September, 2016.

[signature]
__________________________
KIMBERLY D'URSO
CSR NO. 11372, STATE OF CALIFORNIA

Page 237

ERRATA SHEET

If any corrections to your deposition are necessary, indicate them on this sheet, giving the change, page number, line number and reason for change.

Page ____ Line _____ Reason ____________________
From________________ to____________________
Page ____ Line _____ Reason ____________________
From________________ to____________________
Page ____ Line _____ Reason ____________________
From________________ to____________________
Page ____ Line _____ Reason ____________________
From________________ to____________________
Page ____ Line _____ Reason ____________________
From________________ to____________________
Page ____ Line _____ Reason ____________________
From________________ to____________________
Page ____ Line _____ Reason ____________________
From________________ to____________________
Page ____ Line _____ Reason ____________________
From________________ to____________________
Page ____ Line _____ Reason ____________________
From________________ to____________________
Page ____ Line _____ Reason ____________________
From________________ to____________________

__________________________
LAURA MEJIA-JIMENEZ

EXHIBIT B

Job#187606
Received on 11/13/2016

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-03074-CMA-KMT

JOHANA PAOLA BELTRAN, et al.,

Plaintiff,

INTEREXCHANGE, INC., et al.,

Defendants.

DECLARATION OF LAURA MEJIA JIMINEZ

I, JULIANE HARNING, respectfully submit this Declaration regarding my Deposition Transcript dated September 14, 2016. I hereby certify that I have read my transcript dated September 14, 2016 and that the accompanying correction sheets, if any, constitute a true and complete copy of my testimony.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 2 day of November, 2016.

Laura Mejia J.
Laura Mejia Jiminez

EXHIBIT B

# ERRATA SHEET

## DEPOSITION OF LAURA MEJIA JIMINEZ

## SEPTEMBER 14, 2016

| Page | Line | Original | Correction | Reason |
|---|---|---|---|---|
| 113 | 23 | quality of life | cost of living | The translation is wrong. Corrected to reflect original testimony |
| 170 | 15 | no | Yes | Misunderstood question |
| 170 | 20 | they put it on the schedule | yes there are some weeks that differed from the schedule that the Mele family provided me | Misunderstood question |
| 171 | 11 | I couldn't make modifications | No I didn't. Only Mrs. Magro can do it | Correcting testimony |
| 185 | 11 | yes | Yes, they paid me the stipend but they never paid the extra hours beyond 45 that I worked that week | Correcting testimony |
| 214 | 24 | I don't remember | No I did not | Misspoke |
| 215 | 3 | I had my card for my account | No I did not | Misspoke |
| 215 | 14 | that week they hadn't paid me | The agency claimed the aupair return all the things to family but they don't do the same thing with the family | Better explanation |
| 216 | 7 | yes | I was referring to the unfairness of the agency | Correcting testimony |

EXHIBIT B

PENALTY OF PERJURY [illegible]

I, [illegible] declare I am the [illegible] in the above matter, that I have read the foregoing [illegible] and know the contents thereof; that the same is true of my knowledge, except as to the matters which are therein stated upon my information or belief, and as to those matters, I believe them to be true.

I declare under penalty of perjury that the foregoing answers are true and correct.

Executed on the 31 day of October, 2016, at Hendon 31 october 2016

[signature]

[illegible]

COMBS REPORTING, INC.

opinions. Were they similar or different? [illegible] work in pairs. Take turns explaining your