EXHIBIT C

IN THE UNITED STATES DISTRICT COURT

FOR THE STATE OF COLORADO

JOHANA PAOLA BELTRAN, et )
al.,                     )
          Plaintiffs,    )
vs.                      ) Case No.:  14-cv-03074
                         )               CMA-KMT
                         )
INTEREXCHANGE, INC., et  )
al.,                     )
          Defendants.    )
_____)

VIDEOTAPED DEPOSITION of AUPAIRCARE, INC.,

pursuant to Rule 30(b)(6), designee

SARAH MCNAMARA

Thursday, May 4, 2017

MAGNA LEGAL SERVICES

866-624-6221

www.MagnaLS.com

Taken before:
HEIDI BELTON, CSR, RPR, CRR, CCRR, CLR
CSR No. 12885



EXHIBIT C

---

Page 2

1    Thursday, May 4, 2017
2
3
4    Videotaped deposition of SARAH MCNAMARA,
5    held at the offices of GORDON & REES,
6    275 Battery Street, Suite 2000, San
7    Francisco, California, before Heidi
8    Belton, a Certified Shorthand Reporter,
9    Registered Professional Reporter,
10   Certified Realtime Reporter, California
11   Certified Realtime Reporter, Certified
12   LiveNote Reporter, and NCRA Realtime
13   Systems Administrator.
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 3

1    APPEARANCES:
2    For the Plaintiffs:
       BOISE, SCHILLER, FLEXNER, LLP
3       BY: SEAN PHILLIPS RODRIGUEZ, ESQ.
          JUAN P. VALDIVIESO, ESQ.
4       1999 Harrison Street, Suite 900
        Oakland, California 94612
5       (510) 874-1010
        srodriguez@bsfllp.com
6       jvaldivieso@bsfllp.com
7
     For Cultural Care:
8       CHOATE, HALL & STEWART
        BY: LYNDSEY KRUZER, ESQ. (via phone)
9       Two International Place
        Boston, Massachusetts 02110
10      (617) 248-5221
        lkruzer@choate.com
11   and
        LEWIS, ROCA, ROTHGERBER, CHRISTIE
12      BY: JESSICA FULLER, ESQ. (via phone)
        1200 17th Street, Suite 3000
13      Denver, Colorado 80202
        (303) 628-9527
14
15   For AuPairCare, Inc.:
        GORDON & REES
16      BY: THOMAS B. QUINN, ESQ.
        555 17th Street, Suite 3400
17      Denver, Colorado 80202
        (303) 200-6888
18      tquinn@gordonrees.com
19
     For InterExchange, Inc.:
20      SHERMAN & HOWARD, LLC
        BY: JOSEPH H. HUNT, ESQ. (via phone)
21      633 17th Street, Suite 3000
        Denver, Colorado 80202
22      (303) 299-8302
        jhunt@shermanhoward.com
23
24
25

---

Page 4

1    APPEARANCES (Continued):
2
     For APF Global Foundation:
3       FISHER & PHILLIPS LLP
        BY: SUSAN M. SCHAECHER, ESQ. (via phone)
4       1801 California Street, Suite 2700
        Denver, Colorado 80202
5       (303) 218-3650
        sschaecher@fisherphillips.com
6
7    For ProAuPair, APEX Professional Exchange and 20/20
     Care Exchange d/b/a International Aupair Exchange:
8       NIXON SHEFRIN HENSEN OGBURN P.C.
        BY: MICHAEL S. DREW, ESQ. (via phone)
9       5619 DTC Parkway, Suite 1200
        Greenwood Village, Colorado 80111
10      (303) 773-3500
        mdrew@nixonshefrin.com
11
12   Also Present: Marcie Schneider; Daniel Stroud,
     videographer
13
14           ---oOo---
15
16
17
18
19
20
21
22
23
24
25

---

Page 5

1    THURSDAY, MAY 4, 2017                 11:47 A.M.
2           P R O C E E D I N G S
3         THE VIDEOGRAPHER:  Good morning, ladies
4    and gentlemen.  We're on video record.
5         The time is 11:47 a.m.  Today's date is
6    May 4, 2017.  This begins video 1, Volume I in the
7    30(b)(6) deposition of Sarah McNamara.  In the case
8    JP Beltran versus InterExchange, Incorporated,
9    et al., appearing before the United States District
10   Court, District of Colorado.  Case number
11   14-CV-03074.
12        We're located today at 275 Battery Street,
13   San Francisco, California.  My name is Daniel
14   Stroud; I'm your video specialist.  Our court
15   reporter is Ms. Heidi Belton.  We're with Magna
16   Legal Services.
17        Would all counsel please identify
18   themselves for the record.
19        MR. RODRIGUEZ:  Sean Rodriguez; Boise,
20   Schiller, Flexner, for the plaintiffs.
21        MR. VALDIVIESO:  Juan Valdivieso; Boise,
22   Schiller, Flexner, for the plaintiffs.
23        MR. QUINN:  Tom Quinn, on behalf of the
24   defendant AuPairCare and Ms. McNamara.
25        MR. RODRIGUEZ:  And if no one on the phone

---



EXHIBIT C

Page 14

1    A.  At the time, yes.
2    Q.  At what time did it change?
3    A.  I believe probably four years ago it
4 changed over that AuPairCare had its own marketing
5 department.
6    Q.  And when did you become -- well,
7 following -- my mistake.
8        Following your position as senior
9 development director, what position did you hold at
10 AuPairCare?
11    A.  I believe my next title was vice
12 president.  And then my current role.
13    Q.  Approximately when did you receive the
14 title of vice president?
15    A.  Three years ago, approximately.
16    Q.  Can you tell me how your responsibilities
17 as vice president changed from your responsibilities
18 as senior development director?
19    A.  Sure.  I became the responsible officer
20 for AuPairCare.  So that is the main change.  And I
21 was responsible for all -- all revenue.
22    Q.  And same question with respect to the
23 transition between vice president and your title
24 today.  How did your responsibilities change after
25 you transitioned from vice president to today's

Page 15

1 role?
2    A.  They didn't.  Maybe the addition of the
3 senior leadership team.
4    Q.  Since 2006, have you had some
5 responsibility for AuPairCare marketing materials,
6 despite your various titles?
7    A.  Yes.
8    Q.  Can you say anything about the general
9 nature of those responsibilities as they have
10 continued over time?
11    A.  (No response.)
12    Q.  That was a bad question.
13        Is it fair to say that you have always --
14 well, is there a common denominator with respect to
15 your marketing role since you joined Intrax?
16    A.  Yes.  AuPairCare.
17    Q.  So fair to say that since 2006 you have
18 had a hand in AuPairCare's marketing materials?
19    A.  Yes.
20    Q.  Can you explain to me what the title
21 "responsible officer" means.
22    A.  It's a term from the Department of State
23 in that you are the designated responsible officer
24 for the sponsor agency who ultimately is responsible
25 for the management of the program.

Page 16

1    Q.  Does the responsible officer have any
2 particular duties that are prescribed by the
3 Department of State?
4    A.  To understand the -- the regulations and
5 to implement them as -- as they are -- as they see
6 fit.
7    Q.  So am I correct that you became
8 responsible officer about four years ago?
9    A.  About three years ago --
10    Q.  Three years ago?
11    A.  -- yes, when I moved to the VP role.
12    Q.  In that time has AuPairCare's
13 understanding of the Department of State's
14 requirements with respect to au pair stipends
15 changed?
16    A.  No.
17    Q.  What is AuPairCare's understanding with
18 respect to the Department of State's requirements
19 concerning the stipend?
20    A.  AuPairCare's understanding is that the
21 stipend is based on federal minimum wage to be paid
22 to the au pair by the host family on a weekly basis.
23    Q.  You said, "based on the federal minimum
24 wage."  Does that mean equal to the federal minimum
25 wage?

Page 17

1    A.  It's a calculation based on the -- that's
2 our understanding is a calculation based on the
3 federal minimum wage.
4    Q.  Okay.  And how is that calculation made?
5    A.  My understanding is it's the federal
6 minimum wage with a 40 percent deduction for room
7 and board.  And that's what the host family is to
8 pay the au pair.
9    Q.  Now, I note the passive voice in the
10 phrase you just used "is to pay."  Do you have an
11 understanding as to whether the host family is
12 required to pay $195.75 and no more?
13    A.  The guidance that we understand from the
14 Department of State is the host family is to pay
15 $195.75.
16    Q.  And no more?
17    A.  Families do pay more but the guidance we
18 have is $195.75.
19    Q.  Those families that do pay more, is it
20 AuPairCare's understanding that they are in
21 violation of the DoS' position?
22    A.  No.
23    Q.  Okay.  Why not?
24    A.  Because our role as designated au pair
25 sponsor is to ensure that the au pair is paid



EXHIBIT C

---

Page 18

1   $195.75 per week.  So our role is to make sure that
2   she's paid that amount.  And if host families feel
3   that they want to pay more, they can, but we need to
4   ensure that at least they were paid the $195.75.
5       Q.   So the phrase "at least" modified your
6   last sentence.  And now I'm very confused.
7           Is it in fact AuPairCare's position that
8   au pairs must be paid at least $195.75?
9       A.   They need to be paid $195.75.
10      Q.   Okay.  So if a host family chooses to pay
11  more than $195.75, is it AuPairCare's position that
12  the host family is violating the Department of
13  State's requirements?
14      A.   No.
15      Q.   Why?
16      A.   Because they're -- they're paying $195.75,
17  and that's what we need to ensure that they're paid.
18      Q.   Is it fair to characterize what you just
19  said as treating $195.75 as a minimum stipend?
20          MR. QUINN:  Object to form.
21  BY MR. RODRIGUEZ:
22      Q.   Is there anything unclear about my
23  question?
24      A.   Can you repeat it?
25      Q.   Yeah.  I believe you testified that

---

Page 19

1   AuPairCare does not believe a host family is
2   violating the Department of State's requirements if
3   they choose to pay more than $195.75; is that fair?
4       A.   Yes.
5       Q.   Okay.  Now I asked is it fair to
6   characterize that position as treating $195.75 as a
7   minimum stipend?
8           MR. QUINN:  Object to form.  Go ahead.
9           (Telephonic interruption.)
10          THE WITNESS:  Repeat it again?  Sorry.
11  BY MR. RODRIGUEZ:
12      Q.   I'll ask it a different way.
13          MR. QUINN:  Hang on.
14          Whoever just joined, would you please put
15  your mute on?
16          Sorry.
17          MR. RODRIGUEZ:  That's okay.
18          MR. QUINN:  Let's get this cleared up.
19          MR. RODRIGUEZ:  Thank you.
20      Q.   May I call AuPairCare APC?
21      A.   Sure.
22      Q.   True or false:  APC is responsible for
23  ensuring that host families follow Department of
24  State directives?
25      A.   True.

---

Page 20

1       Q.   True or false:  APC understands DoS has
2   issued a directive stating that the stipend must
3   equal $195.75?
4       A.   APC's understanding of the Department of
5   State guidelines is, yes, the au pair should receive
6   $195.75 weekly stipend.
7       Q.   My question was about a directive stating
8   that the stipend must equal.  And I believe you
9   answered in terms of "should receive."  So I'm going
10  to ask again.
11          Is it APC's understanding that DoS has
12  issued a directive stating that the stipend must
13  equal $195.75?
14      A.   No.
15      Q.   Can you articulate what APC understands
16  DoS to require concerning the stipend?
17      A.   Sure.  I'll repeat what I just said.
18          Our understanding is that per the
19  Department of State, that host families should pay
20  the au pair $195.75 per week.
21      Q.   "Should pay."  That means that DoS does
22  not have a requirement of $195.75 a week; is that
23  right?
24          MR. QUINN:  Object to form.
25          THE WITNESS:  The guidance that we

---

Page 21

1   received is that the au pair needs to be paid $195.
2   So it needs, should, yeah.
3   BY MR. RODRIGUEZ:
4       Q.   So your testimony is that needs to be paid
5   and should pay are synonymous?
6       A.   If they want to participate in the
7   program, yes.
8       Q.   So -- so your testimony is "should pay"
9   and "needs to be paid" are synonymous; correct?
10      A.   Yes.
11      Q.   However, it is also your testimony that
12  "must be paid" has a different meaning than "needs
13  to be paid"; is that accurate?
14      A.   Sure.
15      Q.   What's the difference?
16      A.   I -- I think we're going back to semantics
17  here.  My -- my -- our main goal as an agency is
18  that the au pair -- 195 is what the host family
19  needs to pay the au pair per week, $195.75.
20      Q.   How would you describe a situation where a
21  host family chooses to pay an au pair more than
22  $195.75?
23      A.   So our role per the Department of State is
24  to monitor placements.  So we monitor placements in
25  that we're talking to both the au pair and the host

---



# EXHIBIT C

Page 22

1  family to -- per regulations to see how their
2  placement is going and we would be alerted if an
3  au pair was not receiving the $195.75, but he would
4  not be informed an au pair was receiving more than
5  that. So that's -- that's how we would be --
6      Q.  But -- okay. So if I'm understanding your
7  testimony correctly, "needs to be paid $195.75" is
8  the same as "needs to be paid a minimum of $195.75";
9  is that accurate?
10     A.  Yes.
11     Q.  So it would be contrary to AuPairCare's
12 understanding of the Department of State's position
13 if AuPairCare had ever represented that the stipend
14 must be $195.75, no more, no less; is that right?
15         MR. QUINN: Object to form.
16         THE WITNESS: No.
17 BY MR. RODRIGUEZ:
18     Q.  Why?
19     A.  Because our understanding -- that's a --
20 we have to put a -- a number out there for host
21 families to -- to -- to base this decision on, to
22 participate in the au pair program. So that's the
23 weekly stipend that the --
24         (Telephonic interruption.)
25         -- department of State gave to us and

Page 23

1  that's what we informed the host family to the best
2  of our -- to the best of our knowledge.
3      Q.  Okay. So if AuPairCare required host
4  families to pay $195.75 to au pairs, no more, no
5  less, would that accurately reflect AuPairCare's
6  understanding of the Department of State's position?
7      A.  No, because we -- our role is to ensure
8  that the au pair is paid $195.75.
9      Q.  No more, no less; right?
10     A.  Our role as a designated sponsor is to
11 ensure that she's paid $195.75. And we're not -- if
12 au pairs are paid more than that, there's -- we're
13 not monitoring that. But we need to ensure that
14 she's paid $195.75 a week per -- per the Department
15 of State.
16     Q.  Now ensuring someone is paid $195 a week,
17 does that mean that the au pair must be paid at
18 least $195.75 a week but could be paid more?
19     A.  Yes.
20     Q.  So when you say that APC ensures that
21 au pairs are paid $195.75 a week what you actually
22 mean is we ensure that au pairs are paid at least
23 $195.75 a week --
24         MR. QUINN: Object --
25 BY MR. RODRIGUEZ:

Page 24

1      Q.  -- fair?
2          MR. QUINN: Object to form.
3          MR. RODRIGUEZ: I take that objection.
4  Let me try it again.
5      Q.  Is it accurate to say that ensuring
6  au pairs are paid $195.75 a week is the very same as
7  ensuring au pairs are paid at least $195.75 a week?
8      A.  Yes.
9          MR. RODRIGUEZ: I am marking what's going
10 to be Exhibit 8. Bears the Bates number APC 000489.
11             (Exhibit 8 marked.)
12 BY MR. RODRIGUEZ:
13     Q.  Ms. McNamara, do you recognize the
14 document marked as Exhibit 8?
15     A.  Yes.
16     Q.  What is the document marked as Exhibit 8?
17     A.  It's an e-mail communication to au pairs.
18     Q.  Where have you seen Exhibit 8 before?
19     A.  Where have I seen it? Um -- can you -- in
20 what context.
21     Q.  Have you seen Exhibit 8 before in any
22 context?
23     A.  Yes.
24     Q.  Okay. What was the context?
25     A.  In my capacity working for AuPairCare.

Page 25

1      Q.  And did you have any role in the drafting
2  of Exhibit 8?
3      A.  I don't believe I had a role in drafting
4  it, but -- I don't believe I -- I maybe gave
5  feedback on the content.
6      Q.  Did you approve the content of Exhibit 8?
7      A.  I don't recall.
8      Q.  Fair to say that Exhibit 8 reflects APC's
9  position as of the date of Exhibit 8; no?
10         MR. QUINN: Object to form.
11         THE WITNESS: Can you repeat the question,
12 please?
13 BY MR. RODRIGUEZ:
14     Q.  I'll phrase it a little differently.
15         Is it fair to say that Exhibit 8 reflects
16 APC's position as of the date of Exhibit 8?
17         MR. QUINN: Object to form.
18         THE WITNESS: Our position of ensuring the
19 health, safety, and welfare of au pairs? Yes.
20 BY MR. RODRIGUEZ:
21     Q.  Okay. Now I'd like you to read the
22 sentence following the bullets on Exhibit 8.
23     A.  "Legitimate host families will also not
24 offer you a higher stipend than what is listed in
25 the regulations published by the US Department of



# EXHIBIT C

1  state for the au pair program."
2      Q.  As of the date of Exhibit 8, what was the
3  stipend that was published in the regulations by the
4  US Department of state for the au pair program?
5      A.  I believe at the time it was $195.75.
6      Q.  Is it a true statement that at the time of
7  Exhibit 8, legitimate host families would not offer
8  au pairs a higher stipend than $195.75?
9      A.  Repeat the question?
10     Q.  Is it a true statement that as of the time
11 of Exhibit 8, legitimate host families would not
12 offer au pairs a stipend higher than $195.75?
13     A.  No.
14     Q.  So I believe you testified that Exhibit 8
15 was sent to -- sent by e-mail to au pairs; correct?
16     A.  Yeah.
17     Q.  So in light of your testimony, is it
18 accurate to say that AuPairCare sent a false
19 statement by e-mail to au pairs?
20         MR. QUINN:  Objection.
21         THE WITNESS:  I think the statement of
22 this e-mail was sent in the spirit of protecting
23 au pairs from being taken advantage of and losing
24 money by going with scam artists who were not
25 US-designated au pair agencies.

1  BY MR. RODRIGUEZ:
2      Q.  I have a few questions about that.
3      A.  Sure.
4      Q.  Number 1, does the spirit of Exhibit 8
5  have anything to do with whether the sentence
6  following the bullets is true or false?
7      A.  Yes.  In that we wanted to paint the
8  picture for au pairs that families typically would
9  be paying $195.75.  And someone that's offering you
10 $300 per week or $400 per week, that that's not part
11 of this program.  So that was the spirit of the
12 communication, to provide au pairs context around
13 what was happening in the industry at the time.
14 That these phishing scams came out.
15     Q.  So you just said that -- I believe you
16 said in sum and substance that paying more than
17 $195.75 per week was not part of the program; is
18 that right?
19     A.  What I was conveying is that there were at
20 the time probably 2013 legitimate host families that
21 were paying more than $195.75.  But we were painting
22 the context for these au pairs regarding a scam that
23 was taking advantage of them.
24     Q.  So what about the sentence following the
25 bullets on Exhibit 8 says that there are legitimate

1  host families paying more than $195.75 at the time
2  of Exhibit 8?
3      A.  Repeat the question, please?
4      Q.  What about the sentence following the
5  bullets on Exhibit 8 --
6      A.  The sentence, yes.
7      Q.  -- conveys that there were in fact
8  legitimate host families offering more than $195.75
9  per week at the time of Exhibit 8?
10     A.  Is that a question?
11     Q.  It is.  What about it?  Where from the
12 text following the bullets on Exhibit 8 do you
13 infer -- let me start again.
14         From reading Exhibit 8, how would an
15 au pair come to the conclusion that there were in
16 fact legitimate host families paying more than
17 $195.75 at the time of Exhibit 8?
18     A.  She wouldn't.
19     Q.  She wouldn't.  So fair to say, then, that
20 Exhibit 8 contains a falsehood?
21         MR. QUINN:  Object to form.
22 Argumentative.
23         THE WITNESS:  No.
24 BY MR. RODRIGUEZ:
25     Q.  Okay.  But the statement legitimate host

1  families will also not offer you a higher stipend
2  than what is listed in the regulations --
3      A.  Right.
4      Q.  -- that is false?
5      A.  So -- majority.  So maybe it was a -- we
6  could have put in "majority."  But for the majority
7  legitimate host families wouldn't be offering the
8  au pair $300 or $400 stipend a week.
9      Q.  Now you said a moment ago that the spirit
10 of Exhibit 8 was to protect au pairs from losing
11 money; is that right?
12     A.  Protect au pairs from people that were
13 taking -- trying to take advantage of them, yes.
14     Q.  Do you believe that an au pair is taken
15 advantage from if host families compete for her by
16 paying her more than $195.75?
17     A.  No.
18     Q.  In fact, an au pair would gain money if
19 host families competed for her by offering higher
20 stipends?
21     A.  Well, it's a cultural exchange program.
22 So what goes into the experience is more than just
23 the weekly stipend.  It's living with a host family,
24 it's being part of that host family.  "On par" means
25 equal to that host family.  So there's a lot more



EXHIBIT C

Page 30

1  elements that go into this cultural exchange
2  experience than just the stipend.
3      Q.  Okay.  Do you have an understanding of
4  what full-time employment is considered to be in the
5  United States?
6      A.  I do.
7      Q.  Okay.  What is full-time employment?
8      A.  For federal, I believe it is 40 hours a
9  week.
10      Q.  And au pairs can work up to how many hours
11  a week?
12      A.  45.
13      Q.  Okay.  Fair to say, then, that au pairs
14  are full-time employees?
15      A.  No.
16      Q.  Why?
17      A.  Au pairs are part of a cultural exchange
18  program.  So they're coming in on a J-1 visa.
19      Q.  But if au pair -- if au pairs are working
20  full-time as domestic workers up to 45 hours a
21  week -- let me ask that again.
22          Am I correct that au pairs generally work
23  at least 40 hours a week?
24      A.  The maximum that au pairs can work is 45
25  hours a week.

Page 31

1      Q.  That was not my question.
2          Am I correct that au pairs generally work
3  at least 40 hours a week?
4      A.  No.
5      Q.  Why am I incorrect?
6      A.  It depends on the family situation.
7      Q.  For the purposes of federal wage and hour
8  law, are au pairs considered full-time employees?
9      MR. QUINN:  Objection to form.
10  Foundation.
11      THE WITNESS:  I don't know.  They're
12  considered, and what they come in on is a J-1 visa.
13  So they're a cultural exchange participant and
14  that's what they're considered in our understanding.
15  BY MR. RODRIGUEZ:
16      Q.  So assume for me that an au pair is in
17  fact working 40 hours a week as a domestic worker.
18  Do you believe it's accurate not to characterize
19  that au pair as a full-time employee?
20      MR. QUINN:  Object to form.
21      THE WITNESS:  Repeat the question, please?
22  BY MR. RODRIGUEZ:
23      Q.  Yeah.  So if an au pair is in fact working
24  over 40 hours a week in a household, do you think
25  it's accurate to characterize that au pair as a

Page 32

1  full-time employee?
2      MR. QUINN:  Object to form.
3      THE WITNESS:  No.  An au pair is a
4  cultural exchange visitor, participant.  So she
5  is -- she or she -- the participant is in a
6  completely different category for the time that they
7  are in the US under the J-1 visa for the au pair
8  program.
9  BY MR. RODRIGUEZ:
10      Q.  So it simply does not matter that au pairs
11  are working up to 45 hours a week?  That does not
12  change the nature of their relationship?
13      A.  With who?
14      Q.  With anyone.
15      MR. QUINN:  Object to form.
16  BY MR. RODRIGUEZ:
17      Q.  Let me ask it a different way.
18      A.  Sure, please.
19      Q.  What is the significance of au pairs
20  working over 40 hours a week, if any?
21      A.  Per the Department of State regulations
22  for the J-1 au pair program, au pairs are able to
23  work up to 45 hours per week.  Maximum 10 hours per
24  day.
25      Q.  Now, is it your testimony that by dint of

Page 33

1  the type of visa that they're coming in on, that the
2  45 hours a week does not make them full-time
3  employees?
4      MR. QUINN:  Object to form.
5      THE WITNESS:  Based on -- sorry.
6      MR. QUINN:  Go ahead.
7      THE WITNESS:  Our understanding is that
8  they are cultural exchange participants.  And part
9  of the program, some of the components of the
10  program are childcare up to 45 hours a week.  But
11  there's other components of the cultural exchange
12  program also.
13  BY MR. RODRIGUEZ:
14      Q.  But 45 hours a week is the equivalent of
15  full-time employment; correct?
16      A.  Correct.
17          (Exhibit 9 marked.)
18  BY MR. RODRIGUEZ:
19      Q.  I'm marking Exhibit 9, which is a document
20  beginning at Bates APC 000254.
21          Ms. McNamara, do you recognize Exhibit 9?
22      A.  Yes.
23      Q.  What is Exhibit 9?
24      A.  It is AuPairCare's au pair agreement.
25      Q.  Is it the agreement as of a certain date?



EXHIBIT C

Page 146

1      Q.  Where have you seen Exhibit 5 before?
2      A.  I believe this was -- I believe it was
3  sent to sponsors in the March -- a link to it -- in
4  the March '15 -- 2015 communication.
5      Q.  Do you have any understanding as to
6  whether Exhibit 5 was provided by DoL at the --
7  we'll call it the walk-out meeting?
8      A.  Yes.
9      Q.  Was it?
10     A.  I -- I -- I believe it was.  I didn't
11  receive it personally.
12        MR. RODRIGUEZ:  Okay.  Subject to any
13  questions from your counsel, I have nothing further
14  today.
15        MR. QUINN:  I have no questions.
16        THE VIDEOGRAPHER:  We're off the record.
17  The time is 4:43 p.m.
18        (Discussion held off the record.)
19        MR. RODRIGUEZ:  Does anyone on the phone
20  think they have standing to ask questions and want
21  to ask questions?
22        (No response.)
23        MS. KRUZER:  Not at this time, thanks
24  Sean.
25        THE REPORTER:  Anyone on the phone need a

Page 147

1  copy of this transcript?
2        MS. KRUZER:  Cultural Care will take a
3  copy.  This is Lyndsey.
4        MR. QUINN:  We'll take a mini.  And I'd
5  like to have the video synched.  And I've got the
6  exhibits.
7        THE REPORTER:  So you don't need more
8  exhibits attached?
9        MR. QUINN:  (Counsel shakes heads.)
10        (The proceeding adjourned at 4:43 p.m.)
11
12        _____
13        SARAH MCNAMARA
14
15
16
17
18
19
20
21
22
23
24
25

Page 148

1  STATE OF CALIFORNIA   )  ss.
2
3        I hereby certify that the deponent in the
4  foregoing deposition was by me duly sworn to testify
5  to tell the truth, the whole truth and nothing but
6  the truth in the within-entitled cause; that said
7  deposition was taken at the time and place therein
8  stated; that the deposition is a true record of the
9  deponent's testimony as reported to the best of the
10  ability by me, a duly certified shorthand reporter
11  and a disinterested person, and was thereafter
12  transcribed under my direction into typewriting by
13  computer.
14        I further certify that I am not interested
15  in the outcome of the said action, nor connected
16  with, nor related to any of the parties in said
17  action, nor to their respective counsel.
18        IN WITNESS WHEREOF, I have hereunto set my
19  hand this 9th day of May, 2017.
20
21
22        _____
23        HEIDI BELTON, CSR, RPR, CRR, CCRR, CLR
24        CSR No. 12885
25

MAGNA
LEGAL SERVICES

EXHIBIT C



1    ACKNOWLEDGMENT OF DEPONENT

2    I, _Sarah McNamara_ do

3    hereby certify that I have read the
     foregoing pages, 1 - PGS, and that the

4    same is a correct transcription of the
     answers given by me to the questions

5    therein propounded, except for the
     corrections or changes in form or

6    substance, if any, noted in the attached
     Errata Sheet.

7

8    _Sarah McNamara_  5/23/17
     WITNESS NAME        DATE

9

10

     Subscribed and sworn
11   to before me this
     _23rd_ day of _May_, 20_17_.

12
     My commission expires: _11·13·17_

13

14   _____
     Notary Public

15

16   APRIL M. JOHNSON
     COMM. #2045614
     NOTARY PUBLIC-CALIFORNIA
     SAN FRANCISCO COUNTY
17   My Comm. Expires Nov. 13, 2017

18

19

20

21

22

EXHIBIT C

 *Signature* 6/2/17

1    - - - - - -
       E R R A T A
2    - - - - - -

3

| 4 PAGE | LINE | CHANGE FROM | CHANGE TO | REASON |
|---|---|---|---|---|
| 5 132 | 19-22 | | | To clarify I |
| 6 | | have not had any oral communication w/ Department | | |
| 7 | | of State | | |
| 8 | | | | |
| 9 | | | | |
| 10 | | | | |
| 11 | | | | |
| 12 | | | | |
| 13 | | | | |
| 14 | | | | |
| 15 | | | | |
| 16 | | | | |
| 17 | | | | |
| 18 | | | | |
| 19 | | | | |
| 20 | | | | |
| 21 | | | | |
| 22 | | | | |
| 23 | | | | |
| 24 | | | | |