IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-03074-CMA-KMT

JOHANA PAOLA BELTRAN, *et al.*,

        Plaintiffs,

v.

INTEREXCHANGE, INC., *et al.*,

        Defendants.

---

### DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY OF WILLIAM KERR PURSUANT TO F.R.E. 702

---

Defendants, through their counsel and pursuant to Federal Rule of Evidence 702, hereby move to exclude the testimony of William Kerr and state as follows:[1]

## I.        INTRODUCTION

The opinions of Dr. William Kerr ("Kerr"), upon which Plaintiffs rely to support class certification, are not based upon reliable principles and methods and therefore should be excluded.  First, Kerr cannot show common impact by merely observing that some host families paid the Department of State ("DOS") minimum stipend of $195.75 to au pairs.  Although Kerr compares the amounts earned by other types of childcare workers to stipends he believes are earned by au pairs, he makes no attempt to show that these other types of childcare workers are a reliable benchmark for predicting what au pair stipends might have been in a but-for world.  Accordingly, those comparisons

---

[1] Pursuant to D.C.COLO.LCivR 7.1 and CMA Civ. Practice Standard 7.1C(a), counsel for Defendants conferred in good faith with counsel for Plaintiffs by e-mail and telephone regarding this dispute, but the parties were unable to reach agreement.

are worthless.  Second, Kerr does not have any workable methodology for calculating damages on a classwide basis.  His "Wage and Hour Law Compliance Model" is a mere restatement of Plaintiffs' legal position concerning the labor laws, and his "Price Competition Model" lacks any reliable basis for calculating damages—as Kerr himself admits.  Finally, Kerr is not qualified to design the survey of host families that he conducted.  As a result, the survey does not comply with the professional standards that govern survey research and is unreliable.  Moreover, the survey simply ignores key questions, such as how many hours the au pairs actually provided childcare each week.  For all of these reasons, Kerr's testimony should be excluded.

## II.  LEGAL STANDARDS

Plaintiffs bear the burden of establishing that Kerr's testimony satisfies the requirements of Rule 702 and *Daubert v. Merrell Dow Pharms.*, *Inc.*, 509 U.S. 579 (1993).  Kerr's testimony is admissible only if (1) he is "qualified as an expert by knowledge, skill, experience, training, or education," and (2) Plaintiffs demonstrate all of the following:  Kerr's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; the testimony is based on sufficient facts or data; the testimony is the product of reliable principles and methods; and Kerr has reliably applied the principles and methods to the facts of the case.  Fed. R. Evid. 702.

Courts employ a two-step analysis to ensure expert testimony is relevant and reliable: first, the Court determines whether the expert is qualified; and, second, the Court examines whether the opinion is reliable.  *103 Inv'rs I, L.P. v. Square D Co.*, 470

F.3d 985, 990 (10th Cir. 2006).  As part of the second step, the Court vets the process by which the expert derives his or her opinion under the *Daubert* principles, as expanded in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).

## III.   <u>ARGUMENT</u>

### A.   <u>Kerr does not offer reliable means of demonstrating classwide impact because he relies on anecdotal evidence instead of rigorous analysis.</u>

Kerr's opinions on classwide impact are unreliable.  To determine if expert testimony has a reliable basis, the Court should consider:

> (1) whether the opinion at issue is susceptible to testing and has been subjected to such testing; (2) whether the opinion has been subjected to peer review; (3) whether there is a known or potential rate of error associated with the methodology used . . . ; (4) whether the theory has been accepted in the scientific community.

*Dodge v. Cotter Corp.*, 328 F.3d 1212, 1221-22 (10th Cir. 2003); *Hollander v. Sandoz Pharms. Corp.*, 289 F.3d 1193, 1205 (10th Cir. 2002).

Expert conclusions based on unsupported or incorrect assumptions undermine an expert's reliability and do not support a finding of classwide impact.  *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1078-80 & n.4 (10th Cir. 2006) (affirming exclusion of expert who based opinions on self-serving information from interested party).  Expert opinions "must be based on facts which enable [the expert] to express a reasonably accurate conclusion as opposed to conjecture or speculation[.]" *Dodge*, 328 F.3d at 1222 (quotation omitted); *Pioneer Centres Holding Co. Empl. Stock Ownership Plan & Tr. v. Alerus Fin. N.A.*, 858 F.3d 1324, 1342 (10th Cir. 2017).

Kerr's opinions do not satisfy these standards.  Kerr claims the common impact to the class is "a reduction in income . . . to an amount well below the amount that would

have been paid had Defendants behaved legally and competitively."  Rebuttal Report of William O. Kerr ¶ 18, ECF No. 560-66; Ex. V-1, Excerpts of Dep. of William Kerr 297:14-18.[2]  This opinion, however, does not derive from any reliable methodology.  Ex. Z, Rebuttal Report of Lauren J. Stiroh ¶ 4; Ex. AA, Excerpts of Dep. of Lauren Stiroh 70:15-17, 74:16-19, 75:11-17.[3]

To determine whether a particular class member was harmed, Kerr must present a methodology that considers hours and other compensation.  Ex. AA, 165:2-8, 201:16-22, 214:4-9, 220:11-13, 221:9-13, 294:3-11.  In contrast, Kerr points only to anecdotal evidence that some host families paid a stipend of $195.75.  Ex. V-1, 143:23-144:4.  Observations of some weekly stipends of $195.75 are insufficient to show classwide impact.  The record shows that the stipends host families paid varied.[4]  *See, e.g.*, Ex. O, Decl. of Bill Kapler, ¶¶ 12-13.  Kerr also wrongly assumes that all au pairs "worked" 45 hours per week, but the available evidence directly refutes that assumption.[5]  *See, e.g.*, *id.*  Finally, Kerr does not even try to determine what the stipend would be in a but-for

---

[2] Citations in the form of "Ex. __" refer to the exhibits to Defendants' Response in Opposition to Plaintiffs' Motion for Rule 23 Class Certification, ECF No. 603.

[3] Kerr effectively concedes that he lacked any methodology for demonstrating a common impact, but incorrectly claims that such an analysis is premature at this stage. Ex. V-1, 72:7-12, 73:16-20, 222:10-14.  In fact, such an analysis is required if the expert is purporting to identify common proof of impact at class certification.  *See, e.g.*, *Sample v. Monsanto Co.*, 218 F.R.D. 644, 650 (E.D. Mo. 2003) ("To establish antitrust impact, an expert is required to construct a hypothetical market, a but-for market, free of the restraints and conduct alleged to be anticompetitive.") (quotation omitted).

[4] Kerr does not explain how he would address this variation, dismissing the variation as the result of rounding.  Ex. V-1, 143:23-144:4.

[5] Kerr incorrectly defines "worked" as au pairs agreeing to provide childcare and being available to work up to 45 hours per week.  Ex. V-1, 57:21-58:1.

world without the alleged collusion.  Ex. V-1, 288:6-11, 297:10-13.  Even if Kerr did have

information on stipends and hours, such information would require individual analysis

and proof.  *Id.* 231:6-16.  Because Kerr's opinions are not based on facts or a

methodology capable of testing or peer review, his opinions are not reliable.

> **1. Kerr uses inappropriate benchmarks to purportedly determine impact and damages.**

Kerr improperly suggests that au pairs' stipends were depressed by comparing

the stipends au pairs received to the wages of nannies and other "childcare workers" as

defined by the U.S. Bureau of Labor Statistics ("BLS").  Report of William Kerr ¶ 71,

ECF No. 560-65 ("Kerr Rpt.").  But Kerr conducted no analysis to ensure that these

benchmarks will "permit a legitimate comparison by the trier of fact."  *Home Placement*

*Serv., Inc. v. Providence Journal Co.*, 819 F.2d 1199, 1206 (1st Cir. 1987).[6]  An expert

may not simply compare two purportedly similar markets, observe a difference, and

attribute that difference to an antitrust violation; rather, the expert must conduct a

disciplined analysis that excludes "lawful explanations" for the differential.  *See In re*

*Pharm. Benefit Managers Antitrust Litig.*, Nos. 06-1782, 03-4730, 06-4305, 06-4114, 06-

4115, 2017 WL 275398, at *18 (E.D. Pa. Jan. 18, 2017); *Blue Cross and Blue Shield*

*United of Wisc. v. Marshfield Clinic*, 152 F.3d 588, 593 (7th Cir. 1998).  Kerr did nothing

of the kind.

---

[6] *See also Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 812 (N.D. Ill. 2005) ("[C]are must be taken to be sure that the comparison is one between 'apples and apples' rather than one between 'apples and oranges.'"); *cf. Eleven Line, Inc. v. N. Tex. State Soccer Ass'n*, 213 F.3d 198, 208 (5th Cir. 2000) ("An antitrust plaintiff who uses a yardstick method of determining lost profit bears the burden to demonstrate the reasonable similarity of the business . . . .").

Both of Kerr's proposed bases of comparison—childcare workers and nannies—are unreliable and cannot be used as benchmarks to calculate what au pair stipends would have been in a "but-for" world. First, the BLS's definition of "childcare workers" includes workers who watch children at schools, businesses, and childcare institutions as well as preschool special education teachers and teacher's assistants. Ex. V-1, 183:10-185:1. Although the definition encompasses *some* workers in private households, Kerr does not account for what proportion of the workers underlying the index work in private households—or whether childcare workers in the other settings earned more or less than those in private households. *Id.* 187:9-16, 185:6-186:1. Kerr even concedes that "[t]hey're not a perfect benchmark by far, by any stretch of the imagination . . . ." *Id.* 181:25-182:2. Even that is an understatement, as Kerr did no work at all to validate the BLS as a useful benchmark.

Second, for nannies, Kerr obtains his data on nanny wages from an unscientific and unreliable International Nanny Association ("INA") survey. Kerr Rpt. ¶ 74. In addition to the inclusion of data for nannies from other countries, Kerr failed to undertake any economic analysis of whether wages earned by nannies are even an appropriate benchmark for au pair stipends. Ex. V-1, 196:4-9, 197:23-198:1, 201:17-202:3; Kerr Rpt. ¶ 74 n.82; *see* Ex. AH, Excerpts of Dep. of Tammy Gold 204:12-15 ("[T]he same exact job could be $500 apart. It's a very strange industry."). He did not account for the specialty types of nannies included in the survey, such as household managers, newborn care specialists, or specialty nurses (Ex. V-1, 196:4-11), did not analyze the differences in education levels and college degrees (*id.* 196:23-197:7), and

did not analyze whether living with the family affects compensation (*id.* 201:17-202:8). Nor did Kerr undertake any analysis to determine whether nanny wages and au pair stipends had a predictable economic relationship during periods in which Plaintiffs do not allege a conspiracy.

Although Kerr vaguely claimed that nannies are "interchangeable at some level" with au pairs (*id.* 172:17-23), Plaintiffs' other expert, Tammy Gold, contradicted Kerr, detailing the many differences between nannies and au pairs.  Ex. AH, 56:4-7 (au pairs "tend to be younger" and "may have less experience than nannies"), 42:7-9 (nannies are "paid at a higher fee based on the fact that it's looked at as more of a professional role"), 151:23-152:1 (au pairs, unlike nannies, are limited to 45 hours per week), 139:9-17 (au pairs, unlike nannies, can work for the family for a maximum of two years), 205:16-21 (agreeing that it would be "hard to directly compare" live-in nannies who are older, experienced, and able to drive with live-in au pairs who are also able to drive but are younger and lack experience); *see also* Ex. O, ¶¶ 40-41 (demonstrating the many ways in which nannies differ from au pairs).  In addition, as explained below, Kerr conceded that his analysis of nanny wages from the INA survey could not be used to predict what au pair stipends would have been in the but-for world.

This is not the first time that Kerr has failed to account for crucial variables.  In excluding Kerr's royalty-rate testimony for failure to "perfor[m] a more nuanced analysis," another federal court reasoned that "Kerr's one-size-fits-all multiplier would treat all litigation settlements in the same way, regardless of the underlying facts.  The Federal Circuit has found that such shortcuts are 'arbitrary, unreliable, and irrelevant'

and their use 'fails to pass muster under *Daubert* . . . .'"  *Avocent Redmond Corp. v. Rose Elecs.*, No. C06-1711RSL, 2013 WL 8844098, at *3-5 (W.D. Wash. Mar. 11, 2013) (quotation omitted).  Here, Kerr similarly fails to identify appropriate benchmarks and control for material differences, rendering his opinions unreliable.

**B.**  **Kerr's damages models are not reliable.**

**1.  Kerr does not have data to support his proposed damages models.**

Kerr does not—and cannot—identify any classwide method of proving damages, because he does not have the requisite data to calculate damages on a classwide basis.  *See United States v. Crabbe*, 556 F. Supp. 2d 1217, 1223 (D. Colo. 2008) ("[I]nquiry examines only whether the witness obtained the amount of data that the methodology itself demands.").  Plaintiffs must show that Kerr gathered "sufficient facts and data to formulate his opinions."  Fed. R. Evid. 702, advisory committee note to 2000 amendment; *see United States v. Lauder*, 409 F.3d 1254, 1264 n.5 (10th Cir. 2005).

Although Kerr now purports to rely on stipend information from a survey disseminated to host families, the survey did not include any questions related to hours or other benefits received, which would be necessary to calculate an hourly stipend.  Ex. V-2, 355:6-356:11, 370:20-371:4.  Data on the hours of childcare or benefits received does not exist in a common aggregate form but instead must be gathered on an individual basis.  Ex. Y, Report of Lauren Stiroh ¶ 48; Ex. Z ¶ 4; Ex. AA, 201:4-22, 202:17-22 ("there is not a common wage, there is not a common set of hours that the au pairs provide child care, there is not a common set of additional benefits that the au pairs received, and their experiences varied."), 205:24-206:4, 207:4-8.  Courts regularly

exclude expert opinions such as Kerr's when "there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

### 2. Kerr's "Wage and Hour Compliance Model" is a mere legal conclusion.

Kerr's Wage and Hour Compliance Model—which he claims supports both the labor/wage claims and the antitrust claims—is nothing more than an unsupported legal conclusion. *See* Ex. V-1, 275:16-21. An expert may not opine on legal conclusions. *Alerus Fin.*, 858 F.3d at 1342-43; *Specht v. Jensen*, 853 F.2d 805, 808 (10th Cir. 1988). Yet, here, Kerr makes numerous legal conclusions about matters the Court has yet to consider, including whether federal, state, and local minimum wage laws would apply; the room and board credit was improper; the DOS notices in 2007 and 2009 were incorrect; and au pairs are employees. *See* Kerr Rpt. ¶¶ 40, 64, 85, 91, 93; Ex. V-1, 19:22-25, 24:2-6, 24:22-25, 26:15-18, 27:9-16, 30:19-24, 61:14-17.

Not only does Kerr concede that these legal determinations are not within his expertise, he acknowledges that he made these assumptions at Plaintiffs' counsel's request. Ex. V-1, 19:17-19, 244:24-245:5, 246:12-17, 247:13-18, 24:11-16.[7] Kerr performed no independent investigation to determine if the assumptions Plaintiffs' counsel fed him were correct. *See id.* 37:24-39:21. Regardless, Kerr did not attempt to determine what the but-for stipend would be, instead again claiming any such analysis

---

[7] Kerr also improperly attempts to apply the law to the facts, concluding that there is "sufficient commonality among individuals in question [sic] that they should be considered to be a class." Kerr Rpt. ¶ 8. He may not do so. *A.E. v. Ind. Sch. Dist. No. 25*, 936 F.2d 472, 476 (10th Cir. 1991) ("[A]n expert may not state legal conclusions drawn by applying the law to the facts.").

would be premature at this juncture.  *Id.* 72:7-13, 288:6-11, 297:10-13.  Because Kerr has not performed any independent analysis and tries to stray into the purview of the Court on legal determinations, Kerr's opinions regarding the Wage and Hour Compliance Model are unreliable.

### 3. Kerr's "Price Competition Model" is not a damages model and cannot demonstrate impact.

Similarly, Kerr's Price Competition Model is not a "working, testable methodology to calculate damages on a classwide basis."  Ex. Z, ¶¶ 4, 53.  After observing that the ratio of standard au pair earnings to premium au pair earnings was lower than the ratio for nannies, Kerr, based on nothing more than conjecture, suggests that "[a]ctive price competition among the sponsors could lead to even higher competitive wages."  Kerr Rpt. ¶¶ 100, 102.  Kerr's conclusion is based on mere speculation—it is not a scientific or reliable analysis, and provides no reliable basis for calculating but-for stipends.

Kerr acknowledges that such "data and the analysis based upon this data are preliminary at this time."  Kerr Rpt. ¶ 103.  When pressed, he also admitted that he had done no work to determine whether the so-called "experience premium" he observed for nannies was transferable to au pairs—and that his observations on the experience premium could *not* be used to calculate damages or demonstrate common impact.[8]  Ex. V-1, 193:17-194:1 ("I'm not using the nanny data as a way of calculating damages."); 204:1-4 (acknowledging that he has no opinion regarding whether the "experience

---

[8] As with his Wage and Hour Law Compliance Model, Kerr incorrectly claims that he does not need to calculate a but-for stipend until the merits phase.  Ex. V-1, 253:17-25, 71:4-11.  Kerr conceded that identifying the but-for stipend would require individualized analyses.  *Id.* 160:14-161:5, 234:16-23.

premium concept" is "transferable to au pairs"); 296:1-9 ("Q: But the [experience premium ratio] doesn't on its own demonstrate common impact, correct?  A: No, no, not at all."); 302:11-303:18 (Kerr not using nanny data "to say what the but-for world would be like"); *see also id.* 296:1-9.  Kerr similarly admitted that he had not developed any reliable damages model using the BLS information for wages for childcare workers.  *Id.* 190:5-24 ("I can't imagine it ever being done.  This is not something that could be used to do damages . . . .").  As a result, Kerr's Price Competition Model provides no information that could be used to assess whether any individual class member was impacted by the alleged conspiracy—or by how much.

Because Kerr failed to develop or present any sort of common model for evaluating impact or the amount of purported damages—as he himself admits—his opinions should be excluded and cannot serve as a basis for Plaintiffs' motion for class certification.

**C.   Kerr's host family survey is fatally flawed.**

**1.   Kerr is not qualified to design a survey.**

Kerr is not qualified to design the survey that Plaintiffs disseminated to host families.  To determine whether an expert is qualified, courts examine if the witness has specialized knowledge in the "particular field" about which he or she is testifying. *Conroy v. Vilsack*, 707 F.3d 1163, 1169 (10th Cir. 2013) (quotation omitted).  Where a party retains an expert to design a survey, as Plaintiffs have here, the expert must be qualified in the field of survey design.  *See New York v. United Parcel Serv., Inc.*, No. 15-CV-1136 (KBF), 2016 WL 4735368, at *7-8 (S.D.N.Y. Sept. 10, 2016).  When

assessing whether a purported expert possesses sufficient specialized knowledge, courts examine whether the witness has "researched, written about, or opined" on the topic before. *Conroy*, 707 F.3d at 1169. If not, then the expert is not qualified. *Id.*[9]

Kerr has no expertise in survey design. Kerr is an economist; not a survey-design expert. Affidavit of William Kerr ¶ 3, ECF No. 560-68 ("Kerr Aff."). Kerr has never published on the topic of survey design. Ex. V-2, 343:25-344:2. He is not a member of any professional organizations that focus on survey design. *Id.* 344:3-5. He has never taken or taught a class focused specifically on survey design. *Id.* 343:13-22. And no court has ever qualified Kerr to testify as an expert regarding survey design. Ex. V-1, 213:14-17. In short, Kerr has no expertise in the "particular field" of survey design and he has not "researched, written about, or opined" on the subject before. *Conroy*, 707 F.3d at 1169. If an economist with no expertise in survey design nevertheless designs and relies upon a survey in his capacity as an expert witness, his testimony should be excluded. *United Parcel Serv.*, 2016 WL 4735368, at *7-8.

**2. Kerr's survey is not reliable.**

Given Kerr's lack of qualifications, it should come as no surprise that his survey falls well short of the accepted professional standards that govern the field of survey design. Ex. W, Report of Paul Lavrakas 16. Defendants' survey-design expert, Dr. Paul Lavrakas—who is widely regarded as a leader in the field—confirmed that Kerr committed a variety of serious errors. *Id.* 4-9. From the perspective of a survey methodologist, these errors render Kerr's survey wholly unreliable. *Id.* 12-13. In other

---

[9] *See also Milne v. USA Cycling, Inc.*, 575 F.3d 1120, 1133-34 (10th Cir. 2009) (excluding testimony where expert "[h]ad never published any articles" on the subject).

words, Kerr failed to employ "the same level of intellectual rigor that characterizes the practice of an expert in the field." *Kumho Tire*, 526 U.S. at 152. Three types of serious errors in particular—whether considered alone or in combination—preclude the admission of Kerr's opinions.[10]

*First*, Kerr did not properly account for nonresponse bias. Nonresponse bias refers to the possibility that those who fail to respond to a survey differ in meaningful ways from those who do respond, biasing the survey's results. Ex. W, 9-10. Nonresponse bias is a serious problem, and courts have repeatedly held that experts proffering the results of a survey must take steps to control for it.[11]

Nonresponse bias should have been of particular concern to Kerr, because the response rate for his survey was unusually low. "The U.S. Office of Statistical Standards suggests that because nonresponse is often not random, a survey should maintain a response rate of 75% or above." *Chavez v. IBP, Inc.*, No. CV-01-5093-RHW, 2004 WL 5520002, at *10 (E.D. Wash. Dec. 8, 2004); *Hostetler*, 2016 WL 3662263, at *13 ("Non-response bias typically becomes a concern when the response rate falls below eighty percent."). Kerr received responses from just 18% of the surveyed families. Kerr Aff. ¶ 8. Where a survey suffers from significant nonresponse,

---

[10] The Lavrakas Report, Ex. W, identifies several other errors that Kerr committed and explains why they too render his report unreliable.

[11] *See, e.g.*, *Wallace v. Countrywide Home Loans, Inc.*, No. SACV 08-1463-JST, 2012 WL 11896333, at *3 (C.D. Cal. Aug. 31, 2012) (excluding survey that was "infect[ed]" with nonresponse bias); *Hostetler v. Johnson Controls, Inc.*, No. 3:15-cv-226 JD, 2016 WL 3662263, at *12-13, *13 n.11 (N.D. Ind. July 11, 2016) (excluding survey and finding, among other errors which Kerr has also committed, that the lack of testing for nonresponse bias rendered the survey results unreliable).

"it is the survey proponent's burden to assure that the nonresponses are random."
*Wallace*, 2012 WL 11896333, at *4.  At a minimum, that requires the expert to "provide
analysis of the reasons of nonresponse."  *Marlo v. United Parcel Serv., Inc.*, 251 F.R.D.
476, 485 (C.D. Cal. 2008).

Despite the survey's 82% nonresponse rate, Kerr's affidavit contained no
analysis of nonresponse bias whatsoever.  *See generally* Kerr Aff. (making no mention
of nonresponse bias).  Kerr claimed to have examined the results of the survey for
possible nonresponse bias.  Ex. V-2, 377:18-19.  But Kerr did not employ any of the four
main approaches that survey methodologists use to assess nonresponse error, and the
after-the-fact tests he ran were meaningless.  Ex. W, 10-11 (concluding that Kerr
reported "nothing that is valid and reliable about the nature and size of the nonresponse
bias in his study").  In any event, Kerr's analyses of nonresponse error were so cursory
that they were not committed to writing.  Ex. V-2, 379:6.  This failure alone requires the
exclusion of the survey.

*Second*, Kerr failed to conduct any pre-survey testing of the questions that he
planned to ask.  Where an expert fails to adequately test his survey, his testimony
should be excluded.  *York v. Starbucks*, No. CV 08-07919 GAF PJWX, 2011 WL
8199987, at *12-13 (C.D. Cal. Nov. 23, 2011), *partial class decertified*, No. CV 08-
07919 GAF PJWX, 2012 WL 12507388, at *6 (C.D. Cal. Nov. 1, 2012) (excluding
survey that included "numerous departures from established survey procedures," which
included failing to "pre-test" the questions); *In re Autozone, Inc.*, No. 3:10-MD-02159-
CRB, 2016 WL 4208200, at *18 n.28 (N.D. Cal. Aug. 10, 2016) (same).  Kerr apparently

did not pilot-test his survey at all, and dealt with the company who administered the survey only once, on a single call. Ex. V-2, 341:17-22. That level of pre-survey testing—and Kerr's general lack of attention to the conduct of the survey—falls short of professional standards and renders Kerr's results unreliable. Ex. W, 8-9.

Finally, Kerr's efforts to address other data quality problems such as primacy effects were insufficient and ineffective. *Id.* 7-8. The primacy effect causes respondents, particularly in self-administered written surveys, to prefer responses encountered early in a list of choices. *Id.* To guard against such a primacy effect in his survey, Kerr picked a single "random" order of responses and presented every survey taker with that single ordering of options. Ex. V-2, 381:8-12. This resulted in survey respondents seeing only one ordering out of 720 randomized possibilities. Ex. W, 7-8. Kerr should have separately randomized the responses for each respondent, which would have distributed the primacy effect evenly throughout the possible responses, and across all respondents. *Id.* 12-13. His failure to do so again departed from established professional standards governing survey research. *Id.*

## IV.    CONCLUSION

For the reasons set forth herein, the Court should exclude the testimony of William Kerr. Pursuant to CMA Civ. Practice Standard 7.1C(b)(3), Defendants request a two-hour evidentiary hearing based upon the complexity of the issues in this Motion.

WHEREFORE, Defendants respectfully request the Court grant this Motion, exclude the expert testimony of William Kerr as detailed herein, and award Defendants such other relief as the Court deems just and proper.

Respectfully submitted this 17th day of July, 2017.

s/ Jessica L. Fuller
Joan A. Lukey (joan.lukey@choate.com)
Robert M. Buchanan, Jr.
(rbuchanan@choate.com)
Michael T. Gass (mgass@choate.com)
Justin J. Wolosz (jwolosz@choate.com
Lyndsey M. Kruzer (lkruzer@choate.com)
CHOATE HALL & STEWART LLP
Two International Place
Boston, Massachusetts  02110
Telephone:  (617) 248-4790

James M. Lyons (jlyons@lrrc.com)
Jessica L. Fuller (jfuller@lrrc.com)
Diane Hazel (dhazel@lrrc.com)
LEWIS ROCA ROTHGERBER CHRISTIE
LLP
One Tabor Center, Suite 3000
1200 Seventeenth Street
Denver, CO 80202
Tel: (303) 623-9000
Fax: (303) 623-9222

**Attorneys for Defendant Cultural Care,
Inc. d/b/a Cultural Care Au Pair**

s/ Kathryn A. Reilly
Kathryn A. Reilly (reilly@wtotrial.com)
Grace A. Fox (fox@wtotrial.com)
Natalie E. West (west@wtotrial.com)
Wheeler Trigg O'Donnell LLP
370 Seventeenth Street, Suite 4500
Denver, CO 80202-5647

**Attorneys for Defendants Agent Au Pair,
Au Pair International, Go Au Pair
Operations, and American Cultural
Exchange, LLC d/b/a Go Au Pair**

s/ Lawrence D. Stone
Lawrence D. Stone

(lstone@nixonshefrin.com)
Katheleen E. Craigmile
(kcraigmile@nixonshefrin.com)
Nixon Shefrin Hensen Ogburn, P.C.
5619 DTC Parkway, Suite 1200
Greenwood Village, CO 80111

***Attorneys for Defendants A.P.E.X.
American Professional Exchange, LLC
d/b/a ProAuPair and 20/20 Care Exchange,
Inc. d/b/a The International Au Pair
Exchange***

*s/ James E. Hartley*
James E. Hartley
(jhartley@hollandhart.com)
Jonathan S. Bender
(jsbender@hollandhart.com)
Holland & Hart LLP
555 Seventeenth Street, Suite 3200
Denver, CO 80202

Adam A. Hubbard
(aahubbard@hollandhart.com)
Holland & Hart LLP
1800 Broadway, Suite 300
Boulder, CO 80302

***Attorneys for Defendant Cultural
Homestay International***

*s/ Lawrence L. Lee*
Lawrence L. Lee, Esq.
(llee@laborlawyers.com)
Susan M. Schaecher, Esq.
(sschaecher@laborlawyers.com)
FISHER & PHILLIPS, LLP
1801 California Street, Suite 2700
Denver, CO 80202
Tel: 303-218-3650
Fax: 303-218-3651

***Attorneys for Defendants APF Global
Exchange, NFP***

*s/ Stephen J. Macri*
Stephen J. Macri
(smacri@putneylaw.com)
Joseph B. Cartafalsa
(jcartafalsa@putneylaw.com)
Robert M. Tucker
(rtucker@putneylaw.com)
John B. Fulfree
(jfulfree@putneylaw.com)
Putney, Twombly, Hall & Hirson LLP
521 Fifth Avenue
New York, NY 10175
(212) 682-0020 ext. 221

*s/ Eric J. Stock*
Eric J. Stock
(estock@gibsondunn.com)
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166
(212) 351-2301

**Attorneys for Defendant American
Institute for Foreign Study d/b/a Au Pair in
America**

*s/ Bogdan Enica*
Bogdan Enica
(Bogdan@expertaupair.com)
Expert AuPair
111 Second Ave NE, Ste. 213
St. Petersburg, FL 33701

**Attorney for Defendant Expert Group
International, Inc. d/b/a Expert Au Pair**

*s/ Peggy Kozal*
Peggy E. Kozal
(pkozal@gordonrees.com)
Thomas Baker Quinn
(tquinn@gordonrees.com)
Nathan A. Huey (nhuey@gordonrees.com)
Heather K. Kelly (hkelly@gordonrees.com)

Gordon & Rees LLP
555 17th Street, Suite 3400
Denver, CO 80202

**Attorneys for Defendant AuPairCare, Inc.**

*s/ Martha L. Fitzgerald*
Martha L. Fitzgerald
(mfitzgerald@bhfs.com)
David B. Meschke
(dmeschke@bhfs.com)
Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street, Suite 2200
Denver, CO 80202-4432

**Attorneys for Defendant EurAuPair Intercultural Child Care Programs**

*s/ Brooke A. Colaizzi*
Brooke A. Colaizzi
(bcolaizzi@shermanhoward.com)
Heather F. Vickles
(hvickles@shermanhoward.com)
Raymond M. Deeny
(rdeeny@shermanhoward.com)
Joseph Hunt
(jhunt@shermanhoward.com)
Alyssa L. Levy
(alevy@shermanhoward.com)
SHERMAN & HOWARD L.L.C.
633 Seventeenth Street, Suite 3000
Denver, CO 80202

**Attorneys for Defendant InterExchange, Inc.**

*s/ William J. Kelly III*
William J. Kelly III
(wkelly@kellywalkerlaw.com)
Chandra Marie Feldkamp
(cfeldkamp@kellywalkerlaw.com)
KELLY & WALKER LLC
1512 Larimer Street, Suite 200

Denver, CO 80202

***Attorneys for Defendant USAuPair, Inc.***

s/ Meshach Y. Rhoades
Meshach Y. Rhoades
Martin J. Estevao
1700 Broadway, Suite 2100
Denver, CO 80290-2101
(720) 722-7195
mrhoades@armstrongteasdale.com
mestevao@armstrongteasdale.com

***Attorneys for Defendant GreatAuPair, LLC***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 17, 2017, I caused to be electronically filed the foregoing **DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY OF WILLIAM KERR PURSUANT TO F.R.E. 702** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record, including:

Matthew L. Schwartz (mlschwartz@bsfllp.com)
Peter M. Skinner (pskinner@bsfllp.com)
Randall W. Jackson (rjackson@bsfllp.com)
Dawn L. Smalls (dsmalls@bsfllp.com)
Joshua J. Libling (jlibling@bsfllp.com)
Lauren F. Louis (llouis@bsfllp.com)
Sigrid S. McCawley (smccawley@bsfllp.com)
Sabria A. McElroy (smcelroy@bsfllp.com)
Sean P. Rodriguez (srodriguez@bsfllp.com)
Juan P. Valdivieso (jvaldivieso@bsfllp.com)
Boies Schiller & Flexner, LLP

Alexander N. Hood (alex@towardsjustice.org)
Towards Justice-Denver

*Counsel for Plaintiffs*

*s/ Jessica L. Fuller*
Jessica L. Fuller

8224089