**THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Case No. 14-cv-03074-CMA-KMT

JOHANA PAOLA BELTRAN, *ET AL.*

     Plaintiffs,

v.

INTEREXCHANGE, INC., *ET AL.*

     Defendants.

---

**PLAINTIFFS' OPPOSITION TO DEFENDANTS'
*DAUBERT* MOTION AS TO CLASS CERTIFICATION OPINIONS**

---

The Court should deny Defendants' motion to exclude the class certification-related opinions of Plaintiffs' expert, Dr. William Kerr, an experienced economist who regularly serves an antitrust and damages expert.  Dr. Kerr offered opinions based on models constructed from the available data.  In addition, with the help of survey consultants, Dr. Kerr surveyed host families about the stipends paid to *au pairs*.  The results of the survey corroborate Dr. Kerr's opinions and models.  Defendants' misguided attacks on Dr. Kerr, which virtually ignore *Daubert's* reliability and relevance requirements, should be denied for at least three reasons.

*First*, Defendants mistakenly attack Dr. Kerr's antitrust predominance analysis, criticizing Dr. Kerr for "merely observing that some host families paid" the rate Defendants fixed.  Defendants' Motion to Exclude Expert Testimony of William Kerr Pursuant to F.R.E. 702 (D.E. 606), at 1 ("Mot.") at 1.  In fact, Defendants' own admissions and conduct—including their own ordinary-course surveys and time logs—

support Dr. Kerr's finding that the vast majority of host families paid the fixed rate.  The survey of the host families further supports the same finding.

*Second*, Defendants mischaracterize one of two models that Dr. Kerr offers, the "Wage and Hour Law Compliance Model" (hereafter the "Wage Compliance Model"). Defendants assert that the Model is a legal position and insufficiently grounded in fact. Mot. at 21.[1]  It is nothing of the sort.  To the contrary, the Model is a proper method of calculating class-wide damages if and when Plaintiffs' factual contentions are proven.[2] Defendants' bizarre claim that the model fails *Daubert*'s requirements because it assumes Plaintiffs' success on the merits should be swiftly rejected.  Indeed, that is precisely what damages models do—they model the world assuming one party or the other is right.

*Finally*, Defendants make a premature and meritless attack on Dr. Kerr's host family survey.  Defendants' ill-conceived attack is borne of desperation in the face of the survey's results:  Across the country, over about 10 years, and across J-1 visa sponsors, there was only +/- 2.5% variation from a weekly stipend of $195.75.  Thus, according to the host families themselves, they virtually all paid their *au pairs* approximately the same amount, precisely as Plaintiffs have claimed since first initiating this case.  To illustrate visually, the graph below shows the results of rounding the survey responses to the nearest whole dollar, then counting up how many results fall into $5 ranges or "buckets" (*e.g.*, $191-195 vs. $196-200).[3]

---

[1]    References to "Rodr. Decl." are to the Declaration of Sean P. Rodriguez in Support of Plaintiffs' Opposition to Defendants' *Daubert* Motion as to Class Certification, and the exhibits thereto, filed herewith.

[2]    In their joint class certification opposition, Defendants argue the opposite.  They said Dr. Kerr did not offer a model that was consistent with the legal theory.  Jt. Opp. at 16, 24-25 (D.E. 603, Rodr. Decl. Ex. 31).

[3]    FRE 1006; Rodriguez Decl. ¶ 39 ("the survey result spreadsheets, as produced to Defendants.  Stipend responses were rounded to the nearest whole number (dollar). Responses within each range were summed up and the resulting count was charted using simple Excel functions.")

2



This uniformity is all but impossible in a competitive market.  So Defendants hired a "survey design expert," Dr. Lavrakas, to rebut the survey.  But Dr. Lavrakas did not even read Dr. Kerr's affidavit before writing his report.  Nor did he review or consider the full dataset Dr. Kerr's team relied on.  Some of Dr. Lavrakas's opinions even turn on false assumptions about basic facts concerning the survey.

Defendants further criticize Dr. Kerr for not being a "survey design expert"—a very particular type of non-quantitative, non-objective, non-verifiable "expertise" that remains controversial today.  Dr. Lavrakas is a psychologist who disdains statistics and serious quantitative work, preferring instead to assert untestable theories.  His report is little more than generalized statements about conceivable survey biases.  Under questioning, he admitted that his proposed survey biases either (1) would generate a bias in Defendants' favor (*i.e.*, that Dr. Kerr's survey results are conservative) or (2) are completely irrelevant to the survey conducted in this case.

The Motion should be denied for all these reasons and those that follow.

## THE FACTS

### I.   Background

Dr. Kerr has over thirty years' experience as an antitrust and damages expert. Kerr Rep., App'x A at 3 (Rodr. Decl. Ex. 1).  He is the author of a damages treatise now in its 10th edition.  *Id.*  And he has testified and been qualified as an expert in numerous court cases (where his work was about evenly split between plaintiffs and defendants). *Id.,* App'x A at 5-6; Kerr Dep. (May 4, 2017) 14:18-23 (Rodr. Decl. Ex. 4).

Class certification discovery in this case took place in two phases.  First, the sides exchanged principal and rebuttal reports in January and February, then deposed one another's experts in April and May.  As the Court knows, Defendants during this time resisted providing information about host families that Plaintiffs had demanded for purpose of conducting a survey about the stipend amount.  After the Court granted Plaintiffs' motion to compel the production of host family contact information, *see* D.E. 506 (Court order compelling Defendants to turn over host family information) (Rodr. Decl. Ex. 28), Plaintiffs were able to conduct the host family survey, with Dr. Kerr's assistance.  Preliminary survey results became available in late May, and Dr. Kerr offered a 2-page affidavit on the class certification due date (June 2) that analyzed those preliminary results.  Kerr. Aff. at ¶¶ 6-8 (Rodr. Decl. Ex. 3).

### II.   Dr. Kerr's Class Certification Opinions

Dr. Kerr opines that (1) Plaintiffs and the putative classes share numerous indicia that make them a similarly situated and cohesive group with common interests (Kerr. Rep. at ¶ 8, Rodr. Decl. Ex. 1; Reb. at ¶¶ 4 & 10-13, Rodr. Decl. Ex. 2); (2) Plaintiffs and the putative classes all suffered harm in the form of suppressed wages because of Defendants' misconduct (Rep. at ¶ 9, Rodr. Decl. Ex. 1; Reb. at ¶ 4, Rodr. Decl. Ex. 2); and (3) damages can be calculated on a class-wide basis under well-established economic models (*id.* at ¶ 10, Rodr. Decl. Ex. 1; Reb. at ¶¶ 4, 19, Rodr. Decl. Ex. 2).

### a.    The Class Is Cohesive

Dr. Kerr reviewed the extensive evidence of Defendants' business practices, which show that every one of Defendants consistently misrepresent the stipend as "fixed," "set," or that it simply "is" $195.75.  Kerr Rep. at 16 (Rodr. Decl. Ex. 1).  The evidence relied upon by Dr. Kerr included: contemporaneous business records of the actual stipend amount, including statements Defendants made about the stipend in their marketing materials, policies and guidelines, Kerr. Reb. at ¶ 14 (Rodr. Decl. Ex. 2); Defendants' standard form contracts, which attempt to legally bind the *au pairs* to these false representations, id. at 17-18, 20; <u>Defendants' own ordinary-course</u> surveys, which show that host families uniformly adhere to Defendants' fixed wages, *id.* at 22; the parties' depositions, which also support the proposition that *au pairs* were paid a fixed wage, *id.* at 17, 19-22.  *See also* Kerr Rep. ¶¶ 39-55 & Exs. 7-10; Rule 23 Mot. at 5-7 & nn. 7-10 (D.E. 565-2, Rodr. Decl. Ex. 30); Class Cert. Reply at 24-26 (D.E. 642, Rodr. Decl. Ex. 32) (citing additional evidence regarding same).

All those sources—direct and indirect, contemporaneous and retrospective—show the same thing.  *Au pairs*' wages were consistently fixed at approximately $195.75 per week.  *Id.*; *see also* Rule 23 Mot. at 33 n.43 (Rodr. Decl. Ex. 30); Kerr Rep. ¶ 51.

### b.    The Market Features Indicia Of Price Fixing

To better understand the market, Dr. Kerr reviewed Defendants' business strategies and internal documents in addition to the evidence discussed above.  Kerr Rep. at ¶¶ 55-58 (citing evidence of competition among sponsors for *au pairs*); 59-61 (citing evidence of competition among sponsors for host families); Kerr Reb. at ¶¶ 13-14 & nn. 9-25 (citing evidence that indicates commonality as to amount of stipend offered and actually paid); *see also* Kerr Rep. App'x B (listing documents considered).  The record shows that Defendants compete against one another on the fees they charge host families—but not as to compensation for what the Defendants call "standard *au pairs*."  *Id.* at 24-25; *see also* Mot. at 8-9 n.16.  None of these features are consistent

with competition.  *See, e.g.*, Kerr Tr. 77:24-78:2 (Rodr. Decl. Ex. 4) (describing evidence in the record showing that Sponsors "don't want price competition.  [Defendants] don't want *au pairs* shopping for different, higher rates from families.  [Defendants] want to keep a rate down."); *id.* at 78:7-25 (Defendants compete with each other over fees because it is a "zero-sum game, if the *au pairs* get more than the stipend, the sponsors get less in fees."); *id.*at 164:11-165:20 (because stipend is fixed, Sponsors compete only on fees).  They are, however, the indicia of a price-fixed market.  *Id.*; *see also id.* at 166:11-168: 19 (variations in Sponsors' fees coupled with no variation in stipend is consistent with price fixing).

### c.    All Standard *Au pairs* Suffered Common Harm ("Impact")

In addition to economic knowledge about price fixing's effects (¶ 85), and the facts discussed above that are inconsistent with a competitive market, Dr. Kerr reviewed the available information about the market and created models to demonstrate common impact and show how he will calculate damages at the merits.  Kerr Rep. at ¶¶ 38 (common impact) & 87 *et seq.* (common proof for damages); Kerr. Reb. at ¶¶ 29-31 (elaborating and summarizing in response Defendants' expert reports).

### i.    The Wage Compliance Model

The first is the Wage Compliance Model, which assumes compliance with federal, state and local wage and hour laws and does not require collusion (Kerr Rep. ¶¶ 37-38; Reb. ¶¶ 21-22).  As elaborated in the class certification papers, this model is consistent with a but-for world where *au pair* wages rise to the minimum wage.  This is a floor beneath which wages cannot fall.  MTD Order, D.E. 258, at 32 (Rodr. Decl. Ex. 26) ("the Court notes that it is undisputed that the $195.75 represented, at best, a 'wage floor,' such that families could pay *au pairs* more if they wished – but Plaintiffs' allegations indicate that the Sponsors led both *au pairs* and host families to believe otherwise.").  It is consistent with the but-for world that Defendants advocate: Defendants allege that *au pair* wages would fall absent price fixing or minimum wage

6

law because they believe that standard *au pairs* are worth less than $195.75 per week. Jt. Class Opp. at 16-17 (Rodr. Decl. Ex. 31).[4]

In truth, this model will represent the minimal recovery to which every class member is entitled absent proof under the Competitive Wage Model.  This result follows because, but-for Defendants' conduct, *au pairs* would have been paid at least the minimum wage required by the local, state, or federal minimum wage law (depending on where the *au pair* worked).  Class Cert. Reply at 5, 13-18 (Rodr. Decl. Ex. 32).

Dr. Kerr's Wage Compliance Model takes as inputs an *au pair*'s year(s) of service and the relevant minimum wage law for that year, and outputs the difference between the price-fixed stipend and the minimum wage.  Kerr. Rep. ¶¶ 89-99.  That arithmetic calculation is the very definition of "formulaic damages."

### ii.    The Price Competition Model

The second model—the Price Competition Model—examines whether an *au pair* would be paid more than minimum wage under competitive conditions. Kerr Rep. at ¶ 88.  This requires more inputs than the Wage Compliance Model because two primary drivers of wages are the local cost of living (over time) and competition or labor supply and demand across geographies.  Kerr. Rep. at ¶¶ 73, 97, 103.  The other key axis for labor markets is the qualification and quality of workers.  *Id.* at ¶¶ 70, 101.

The model therefore needs to predict the direction and degree of variation over time and across geographies.  It also needs to estimate the amount of a premium buyers of labor put on experience and qualifications.  The process is known as "calibrating" the model, and the first step is finding market-priced benchmarks.  *See* Kerr Dep. (May 4, 2017) at Tr. 181:20-183 (Rodr. Decl. Ex. 4).

---

[4] As explained in the class certification reply, Defendants' other but-for world "substitutes out" the class of *au pairs* who were actually harmed for unknown and unknowable people Defendants say would take their place.  Class Cert. Reply at 9-12 (Rodr. Decl. Ex. 32); Kerr Reb. Rep. at ¶¶ 24-28.  That but-for world fails as a matter of law.  *Id.*

Critically, a benchmark is not an "exact match."  One would not be possible here because the entire industry is price-fixed across the United States, so there are no competitive market prices for standard *au pairs*.  And Plaintiffs have sought but have not yet received data prior to 2009, so there is no "before conspiracy" and "after conspiracy" data to compare.  Calibration just requires knowing the <u>relative variation</u> across relevant axes (*i.e.*, over time and across geographies).  Thus, as is often the case the best possible data was simply unavailable.  *See Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1046 ("the only practicable means to collect and present relevant data establishing a defendant's liability" may be statistical models and estimates).

So Dr. Kerr turned to economic modeling for the second-best solution that was available at the time his class certification report was due: two data sources that can estimate the direction and degree of variation.  One is data from the Federal Bureau of Labor Statistics.  The Bureau measures and tracks variations over time and across geographies; the Bureau creates and publishes the data it collects as part of its "mission to collect, analyze, and disseminate essential economic information to support public and private decision-making."[5]  The Bureau systematically categorizes similar occupations for this purpose.[6]  The definition goes on: "Illustrative examples: Nanny, <u>Au pair</u>, Daycare Provider." *Id*.  (emphasis added).  The latest data reports that the average hourly wage for Childcare Workers varies significantly by state—such as $13.06 in California versus $9.95 in Texas.[7]  Kerr Rep. at ¶ 73.  Historical data is available to track changes over time (*e.g.*, because of inflation).[8]

---

[5] Bureau of Labor Statistics, BLS Information:  About BLS, *available at* https://www.bls.gov/bls/infohome.htm.
[6]  The Bureau explains that "Childcare Workers" (Standard Occupational Classification 39-9011) tend "children at schools, businesses, private households, and childcare institutions and perform "a variety of tasks, such as dressing, feeding, bathing, and overseeing play."  Bureau of Labor Statistics, Standard Occupational Classification 39-9011, *available at* https://www.bls.gov/soc/2010/soc399011.htm.
[7]  Bureau of Labor Statistics, Occupational Employment Statistics, Occupational Wages and Employment, May 2016:  39-9011 Childcare Workers, *available at*

The next data source comes from the International Nanny Association ("INA"). The INA conducts surveys to estimate prevailing wages in various locales. Dr. Kerr obtained survey results for 2009, 2011, 2012, 2013, and 2014. Kerr Rep. ¶ 75. The data available as of the date of the class certification report already demonstrated that variables such as experience levels could be estimated using the INA data. *Id.* at ¶¶ 78-84.

### d. The Host Family Survey Corroborates Dr. Kerr's Opinions And The Evidence Supporting Them

In addition to the surveys that Defendants themselves completed in the ordinary course (*see* Kerr Reb. Rep. at Appx. p.2; *see also* Stiroh Rep. at 5 n.15 (Rodr. Decl. Ex. 14) (noting that 92% of Expert *Au pair* agreements for standard *au pairs* from 2010 to 2015 provided for stipend of $200 or less), Dr. Kerr explained that additional surveys could be performed <u>to corroborate and confirm</u> the voluminous other evidence. And after Defendants finally produced the host family contact information, more than <u>two years</u> after Plaintiffs originally requested it (D.E. 465 at 1, Rodr. Decl. Ex. 27, and D.E. 467), Dr. Kerr and his team were finally able to execute that survey. *See* Kerr Aff. at ¶ 6 (Rodr. Decl. Ex. 3); Kerr Dep. (July 5, 2017) at 349:16-350:8 (Rodr. Decl. Ex. 5). Dr. Kerr has ample survey experience, especially with regard to empirically analyzing survey results and other quantitative work. Kerr Dep. (July 5, 2017) at 343:3-18. He relied in part on his consulting experts—such as Stefan Boedeker, who has extensive survey experience, as well as other BRG staff with professional survey experience. Rodr. Decl. Ex. 8; Kerr. Dep. Tr. at 352:25-353:14 (July 5, 2017). Together, Dr. Kerr and his team created a straightforward survey. Kerr Dep. Ex. 12 (Rodr. Decl. Ex. 6).

---

https://www.bls.gov/oes/current/oes399011.htm; *see also* Kerr Rep. at ¶ 72 (noting that the lowest tranche of childcare wages reported in the Bureau of Labor Statistics made $8.32 per hour, approximately $4 more than the hourly compensation received by standard *au pairs*.")

[8] *Id.*, "Tables," *available at* https://www.bls.gov/oes/tables.htm.

The first step determined the year and type of *au pair*.  *Id.* at p.3.  The second asked the following open-ended question:

> What was the typical weekly stipend amount paid to the au pair?
>
> Please enter a value greater than or equal to **0**.
>
> ☐ I don't recall my weekly stipend amount

Every host family for which Defendants provided an email got a survey; there was "no sampling involved at all."  Kerr Dep. Tr. at 346:3-10.  The resulting data can be broken down by year, by state where the *au pair* worked, and by Defendant.  *See* Rodr. Decl. Ex. 7 (survey results).

8,806 families responded, of which 4,583 both (1) concerned an *au pair* within one of the alleged classes and (2) contained a specific response to the stipend question.  Kerr. Aff. ¶ 8 (Rodr. Decl. Ex. 3).  The responses covered every Defendant and almost every state.  Kerr Survey Table 1-A (Rodr. Decl. Ex. 7).  They spanned 10 years.  *Id.* at 1-B.

For every Defendant, for every year, and in every state the overwhelming majority of families reported they paid the fixed price—approximately $4.40 per hour (between $195.75 and $200 divided by *au pairs*' 45-hour weeks).  Rodr. Decl. Ex. 7.

But at the time Plaintiffs moved for class certification, a few survey responses were still trickling in, and Dr. Kerr's team had only a few days to analyze the results.  In light of the little time and the fact that class certification asks whether and how common questions can be answered class-wide without individualized issues predominating, Dr. Kerr offered a 2-page affidavit that opined:

> "9.  These results indicate that the vast majority of responding host families paid a weekly stipend at or near $195.75.  Approximately 90% of weekly stipends were reported to be in a range of plus or minus 2.5% of $195.75.  My initial analysis indicates that the results are accurate and robust from a statistical

perspective and will show that: 1) the members of the proposed classes received weekly stipends demonstrating significant commonality, and 2) the stipends were consistently below the amounts Plaintiffs allege are required under the law.

10.  The survey results can be used to show both economic harm and damages on a classwide basis.  The results demonstrate the feasibility of determining the amount actually paid to members of the class.  Using standard economic models, commonly employed in antitrust and labor market studies, data on actual payments can be compared with legally required amounts for the stipend, as well as with the but-for amount that likely would have prevailed absent the alleged anticompetitive activities."

Kerr. Aff. ¶¶ 8-10 (Rodr. Decl. Ex. 3).

### i.  Defendants' Proffered Survey Expert

Dr. Kerr's survey simply confirms what Defendants' own surveys, form contracts, business records, and other admissions show.  Perhaps recognizing the damage the survey causes their case, however, Defendants' hired their own putative expert, Dr. Lavrakas, to attack it in every way imaginable.  Most of the attacks were simply without basis, as Dr. Lavrakas did not review Dr. Kerr's actual affidavit before submitting his report.  Lavrakas Dep. 12:11-14:24 (Rodr. Decl. Ex. 10) ("A.  I had not seen Dr. Kerr's affidavit at the time that I submitted my expert report.") & 135:21-136:16 (confirming same in response to leading questions from Defendants' attorney designed to push Dr. Lavrakas toward equivocal position).  Nor did he consider or review many volumes of data underlying the survey.  *Compare* Lavrakas Rep. Ex. B. (Rodr. Decl. Ex. 9) (only one of Plaintiffs' relevant production files reviewed), *with* Rodr. Decl. Ex. 37 (email producing RFP0000732-750 to Defendants); *see also* Lavrakas Dep. Tr. at 123:14-124:11 (Rodr. Decl. Ex. 10).

Moreover, virtually anyone can find some way to fault virtually any survey, as Dr. Lavrakas confirmed.  Lavrakas Tr. at 67:13-68:21 ("There are a great many things that could be criticized in any survey").  While Dr. Lavrakas and Defendants' Motion have a number of criticisms about the survey, Dr. Lavrakas's admitted in his deposition, that every critique either (1) could not apply to the open-ended stipend question; (2)

exposed a bias that would favor Defendants if it existed; or (3) requires speculation or

raises a question that could not be answered:

| Dr. Lavrakas's claim | The truth |
|---|---|
| "Although Dr. Kerr may have the appropriate statistical knowledge about the Sampling stage of survey research, there is no indication that he has expert knowledge about the Recruitment or Data Collection stages of survey research."<br><br>Lavrakas Rep. at 4. | Dr. Kerr and his consulting team have survey expertise and experience.<br><br><br><br>Rodr. Decl. Ex. 8; Kerr. Dep. Tr. at 352:25-353:14 (July 5, 2017) |
| "Expert survey methodologists know to guard against response biases such as **Primacy Effects** and Recency Effects."<br><br>Lavrakas Rep. at 7 (emphasis added). | The primacy effect applies to lists of questions, not open-ended questions such as the question about how the stipend amount.<br><br>Lavrakas Tr. at 73:2-74:15 & 108:7-109:6. |
| "Expert survey methodologists know to guard against response biases such as Primacy Effects and **Recency Effects**."<br><br>Lavrakas Rep. at 7 (emphasis added) | The recency effect cannot have occurred with respect to the stipend amount because the recency effect does not occur with open-ended questions.<br><br>Lavrakas Tr. at 77:3-78:1. |
| "Failure of memory" or "memory bias."<br><br><br>Lavrakas Rep. at 6; Lavrakas Tr. at 117:14-120:4. | Nothing in the wording of the stipend question would cause or contribute to these problems.<br><br>Lavrakas Tr. at 117:14-120:4. |
| "Recall bias" because the stipend question used terms be believes are ambiguous—"typical" and "weekly stipend."<br><br><br><br>Lavrakas Rep. at 6-7; Lavrakas Dep. Tr. at 114:9-117:9. | Recall bias would tend to increase variation among the respondents—i.e., the results would be biased in Defendants' favor.<br><br><br>Lavrakas Dep. Tr. at 114:9-117:9. |

| | |
|---|---|
| "Questionnaire-related measurement error because" the stipend question asked about the "typical" weekly stipend instead of a range of alternatives.<br><br><br>Lavrakas Dep. Tr. at 109:10-16. | Dr. Lavrakas does not know how much the use of "typical" might bias the survey. He has "no idea" which direction any bias would go.<br><br>Dep. Tr. at 112:15-113:1. |
| "Expert survey methodologists know to guard against response biases . . . ."<br><br><br><br><br><br><br><br><br><br>Lavrakas Rep. at 7. | The "social desirability" effect leads people to view themselves and respond to questions in a socially desirable way. Generosity is socially desirable, and there would bias respondents toward over-estimating the amount they paid.<br><br>Lavrakas Tr. at 74:16-77:2 ("Q. So if someone is asked how much money they paid someone, do you think it would more likely than not that any bias would inflate the figures?  A.  I believe it would be more likely than not." |
| "When research is conducted by gathering data from only a portion of the target population of interest, then generalizability . . . is a major concern for anyone trying to evaluate whether the findings from the study's data accurately apply to the target population as a whole."<br><br>Lavrakas Rep. at 13. | Dr. Lavrakas's published works extrapolate to the entire population based on opinion surveys given to undergraduate college students at a Catholic institution. Though he admits those were not representative samples, his published works make no such qualifications.<br><br>Lavrakas Ex. 3. |
| "I've criticized Dr. Kerr [for] apparently not pursuing, to my knowledge, any investigation on whether there was meaningful noncoverage."<br><br>Dep. Tr. at 63:20-64:1 | Lavrakas does not know how one would test for noncoverage under the facts of this case.<br><br>Dep. Tr. at 62:18-76:12.[9] |

---

[9]     As explained in Argument Section III, below, Defendants argue far fewer points than this chart conveys in their opening Motion.  Plaintiffs include them because the Motion is vague about "other biases" it does not mention, and because Dr. Lavrakas's concessions demonstrate the vacuousness of Defendants' survey arguments.

## LEGAL STANDARD

I.   **The *Daubert* Standard**

"Under *Daubert*, the trial court acts as a 'gatekeeper' of proffered expert testimony by reviewing that testimony for relevance pursuant to F.R.E. 401 and reliability pursuant to F.R.E. 702."  *Camara v. Matheson Trucking, Inc.*, No. 12-CV-03040-CMA-CBS, 2015 WL 161271, at *2 (D. Colo. Jan. 13, 2015) (Arguello, J.) (citation omitted).  Rule 702 permits testimony if it will "help the trier of fact to understand the evidence or to determine a fact in issue," as long as the "testimony is based on sufficient facts or data" and is the "product of reliable principles and methods" that are reliably applied to the facts of the case.  As long as an expert's scientific testimony rests upon "'good grounds,' based on what is known," *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 590 (1993), it should be tested by the adversary process. *Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998) ("In short, *Daubert* neither requires nor empowers trial courts to determine which of several competing scientific theories has the best provenance.  It demands only that the proponent of the evidence show that the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion.").

II.   ***Daubert* At Class Certification**

Last year the Supreme Court addressed expert evidence at the class certification stage, explaining that "reasonable minds may differ as to whether the average" output by a model "is probative as to" the actual figure for each class member.  *Tyson Foods,* 136 S. Ct. at 1049.  "Resolving that question, however, is the near-exclusive province of the jury," and so a District Court can deny class certification for failure to offer a workable model "only if it conclude[s] that no reasonable juror could have believed" the model and its output.  *Id.*

The Tenth Circuit has never ruled on how to apply the *Daubert* test at the class certification stage.  *See Seabron v. Am. Family Mut. Ins. Co.*, No. 11-CV-01096-WJM-

KMT, 2013 WL 2423061, at *1 & n.2 (D. Colo. June 4, 2013) (noting the issue but declining to resolve it because the *Daubert* motion failed under the full *Daubert* standard); *Ammons v. La-Z-Boy, Inc.*, No. 1:04-CV-67 TC, 2008 WL 5142186, at *13 (D. Utah Dec. 5, 2008) (concluding that the precise role of *Daubert* is left to the trial court's discretion in light of the facts). *Daubert* must be carefully applied and "tailored" to the importance of the expert opinion to the class certification decision. *In re Zurn Pex Plumbing Prod. Liab. Litig.*, 644 F.3d 604, 612 (8th Cir. 2011). As the Eighth Circuit explained, this is because:

(1)   a complete *Daubert* analysis may be prejudicial or impractical where (as in this case), the class certification and expert phases take place before the close of discovery and therefore before the parties have the chance to fully develop the facts (*Zurn*, 644 F.3d at 612);

(2)   *Daubert*'s "main purpose" is to prevent juries from being misled by inadequate experts, while a District Court is well situated to objectively measure the probative value of an opinion (*id.* at 613);

(3)   class certification does not make final judgments or determinations, but looks forward to how the case is likely to unfold and whether it will be practical, superior, and manageable to litigate on a class basis (*id.*).

Given the Supreme Court's "no reasonable juror" admonition in *Tyson Foods*, the Eighth Circuit clearly got it right.

Indeed, expert opinions at class certification go to Rule 23 issues, which are for the judge to decide. The opinions are necessarily forward-looking to the rest of fact discovery, expert discovery on the merits, and how Plaintiffs will prove the case on a class-wide basis at trial. *See also In re Urethane Antitrust Litig.*, 251 F.R.D. 629, 637 (D. Kan. 2008) (refusing to "disregard" plaintiffs' expert's opinion "[a]t this procedural juncture" because the court was "satisfied that [plaintiffs' expert's] opinions are grounded in a sufficiently accurate understanding" of the relevant industry), aff'd, 768

15

F.3d 1245, 1256 (10th Cir. 2014) (observing that the district court certified the class despite the fact that "the court did not even have [plaintiffs' expert's] models or any other sort of extrapolation evidence"); *Johnson v. Arizona Hosp. & Healthcare Ass'n*, No. CV07-1292-PHX-SRB, 2009 WL 5031334, at *10 (D. Ariz. July 14, 2009) ("While the benchmark model is not fully fleshed out in [expert's] report, the Court is satisfied that it could be used to provide an estimate," which "the Court can revisit . . . if it becomes clear at a later point in the litigation that the benchmark method is flawed.").

On the other hand, if an expert can offer at the class certification stage no methodology or opinion that could ever be presented to the jury <u>and</u> that opinion is necessary for the certification decision, then the opinion may be stricken and class certification denied because no class wide model for the jury could be constructed by the close of discovery. *See Tyson Foods*, 136 S. Ct. at 1049 ("Once a district court finds evidence to be admissible, its persuasiveness is, in general, a matter for the jury."). Any other approach would violate *Tyson Foods*' caution against invading the province of the jury by forcing a premature ruling.[10]

Therefore, to strike the <u>entire methodology</u> proposed for merits issues such as damages, the Court must assure itself that there could be "no workable model" for trial, and that "no reasonable juror" could believe such a model provides case-wide proof.

Defendants seek nothing short of having the entire methodology stricken, which would allow them to avoid a *Daubert* test on the <u>actual</u> damages model that Plaintiffs will present to the jury. Without conceding that a full *Daubert* inquiry is necessary, Plaintiffs address the full standard in this opposition.

---

[10]     Prior to *Tyson Foods*, the Eighth and Ninth Circuit "tailored" *Daubert* to the case's circumstances, while the Seventh and Third Circuits took a binary approach:  If an opinion is "critical" to class certification, then full *Daubert* applies. *In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 187–88 (3d Cir. 2015) (Seventh and Third); *Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 494–95 (C.D. Cal. 2012) (Eighth and Ninth). *Tyson Foods* undermines that sort of rigidity by emphasizing that merits issues must not be taken away from the jury prematurely.

## ARGUMENT

I.   **Dr. Kerr's Classwide Impact Analysis Is Not "Anecdotal"**

Defendants falsely contend that Dr. Kerr relied on "anecdotes" or performed no expert analysis to opine that common impact can be shown classwide.  Mot. at 3-5.

*First*, Dr. Kerr relied on Defendants' own business records, and contracts, including contemporaneous logs and surveys the Defendants did in the ordinary course. For example, Defendants' expert, Dr. Stiroh, was shown an example of data produced by Go AuPair, showing *au pairs* who were paid precisely $195.75.  In the face of that evidence, she backed down from the very speculative and overbroad criticisms that the Motion now quotes.  Stiroh Dep. Tr.  Tr. 224: 25 – 225: 9 (Rodr. Decl. Ex. 15) ("Q. So everyone in this class of people who was earning 195.75 a week was getting paid 195.75 a week, no matter how many hours they worked, correct? A. Everyone, from what you can tell in the chart, it looks like everybody in that column that got 195.75 a week, and that's why they appear in that column.").

*Second*, Dr. Kerr reviewed documents that showed how Defendants and other market participants characterized the relevant market.  These included emails and strategy documents.[11]

Such documents are not "anecdotes."  They are the correct starting point. Market participants' contemporaneous materials are the place economists begin when understanding a market.  It is in fact what the law requires:  When analyzing a market

---

[11]   *See, e.g.*, Kerr. Rep. ¶ 14 n.8 (citing AIFS's website) (Rodr. Decl. Ex. 18); *id.* ¶ 72-73 & nn.80-81 (citing Bureau of Labor Statistics) (Rodr. Decl. Ex. 36); *id.* ¶ 15 & nn.10-11 (citing Department of State website) (Rodr. Decl. Ex. 35); *id.* Ex. B (citing APC 000128) (APC website) (Rodr. Decl. Ex. 17); *id.* (citing CC00000570) (CC marketing materials) (Rodr. Decl. Ex. 19); *id.* (citing CC00000858) (CC guide to families on selecting childcare) Rodr. Decl. Ex. 20); *id.* (citing CC00002890) (CC guide to local representatives) (Rodr. Decl. Ex. 22); *id.* at ¶ 30 n.33 & ¶ 60 n.68) (citing InterExchange0007562) (presentation on Competitive Market Environment) (Rodr. Decl. Ex. 25); *id.* ¶¶ 44, 49 & Ex. B (citing Crompton Dep. and Exhibits).

courts consider "practical indicia" and "commercial realities," not any type of "formal" requirement.  *Cf. Brown Shoe Co. v. United States*, 370 U.S. 294, 325, 335-37 (1962). Thus, when analyzing the market "courts often pay close attention to the defendants' ordinary course of business documents."  *United States v. H & R Block*, Inc., 833 F. Supp. 2d 36, 52 (D.D.C. 2011).

Ordinary-course documents are also where common impact analysis begins, including when determining common impact in labor price fixing.  *See In re High-Tech Employee Antitrust Litig.*, 289 F.R.D. 555 (N.D. Cal. 2013).  The *High-Tech Employee* plaintiffs' expert relied on a mix of "economic studies and theory, documentary evidence, and statistical analyses" which he asserted would be "capable of showing that this suppression of compensation affected all or virtually all Class members."  *Id.* at 569. The documentary evidence in *High-Tech* was much like the documents Kerr relies on here:   "internal, contemporaneous documents created by Defendants [ . . . ] such as CEO-to-CEO emails, powerpoint presentations regarding compensation and recruitment from the heads of Defendants' human resources departments, and inter-office communications about . . . compensation decisions."  *Id.* at 576; *see also Johnson*, 2009 WL 5031334, at *8 (in a wage suppression antitrust class action, plaintiffs expert "cite[d] deposition testimony from" a defendant to show how the conspiracy had a classwide impact).  In short, nothing about Dr. Kerr's reliance on contemporaneous documentary evidence to ground his economic analysis is unusual.

*Second*, Defendants say that Dr. Kerr "must present a methodology that considers hours and other compensation."  Mot. at 4.  This rehashes arguments already addressed in the main class certification briefs.  Class Cert. Reply at 28-31.  As Dr. Kerr explained, everyone agrees that *au pairs* are compensated based on a 45-hour work week, so the actual hours worked are not necessary.  The *au pair* program regulations effectively foreclose Defendants' argument.  They require that *au pairs* be paid a weekly rate based on 45 hours of work.  *See* 22 C.F.R. § 62.31(j)(1) (*au pairs* "[a]re

compensated at a weekly rate based upon 45 hours of child care services per week")
(Rodr. Decl. Ex. 16).  Defendants' own documents confirm as much; consistently
advising *au pairs* that the stipend is to be paid on a weekly basis, regardless of how
many of the 45 hours the *au pair* worked.  *E.g.*, EAP0002824 (employee manual: "This
money cannot be withheld if the *au pair* is ill, or if the *au pair* works lees than 45 hours
per week.") (Rodr. Decl. Ex. 23); GAP_00016743 (employee manual: "Can an *Au pair*
work less than 45 hours? Yes, *Au pair*s can work less than 45 hours. However, the Host
Family is still required to pay the full weekly stipend.") (Rodr. Decl. Ex. 24).  Moreover,
some Defendants survey their *au pairs* to determine the hours worked as part of a DOS-
imposed monitoring requirement.  Kerr Rep. ¶ 38 (citing CC00002868, Rodr. Decl. Ex.
21; Crompton Dep. at 13-15, Rodr. Decl. Ex. 33)  Those data could be used if it became
necessary.  Finally, any doubt must be resolved against the Defendants because they
intentionally refused to keep records.  Kerr Rep. ¶ 30-31.

As for "other compensation," Defendants still have not offered any authority that
gifts and incidentals are compensation that can make up for a below-minimum wage.
For good reason:  They do not.  *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 53-
54 (S.D.N.Y. 2016) (rejecting defense argument that plaintiffs' expert's testimony should
be excluded for not considering bonuses); Class Cert. Reply at 29 n.10 (citing 27 Am.
Jur. 2d Emp't Rel. § 55 (2017) & 1 Emp't L. Deskbook Hum. Res. Prof. § 6:28 (2016)
(same)).

*Third*, Defendants claim that "Kerr failed to undertake any economic analysis of
whether wages earned by nannies are even an appropriate benchmark for *au pair*
stipends."  Mot. at 6.  This argument goes to probative value, not *Daubert's* standards,
because Dr. Kerr engaged in economic analysis and explained these commonly used
models.  Defendants object not to Dr. Kerr's models, but to the <u>sources</u> he referenced.

Defendants argue that Dr. Kerr should not have considered the information that
the Bureau of Labor Statistics produces expressly for the purpose of assisting "public

and private decision-making."[12]  Defendants object that Bureau of Labor Statistics Classification 39-9011 data, which expressly includes *au pairs* as an example of the type of employee the data covers, also includes data for other "childcare workers" such as daycare workers and nannies.  Similarly, Defendants fault Dr. Kerr for considering surveys by the International Nannies Association.

Defendants mischaracterize what Dr. Kerr does with these data sources.  They say, "An expert may not simply compare two purportedly similar markets, observe a price difference, and attribute that price difference to an antitrust violation."  Mot. at 5. That is true.  And in the first case Defendants cite for this point, the expert did a simple regression analysis that <u>failed to account for confounding variables</u>.  *In re Pharm. Benefit Managers Antitrust Litig.*, Nos. 06-1782, 03-4730, 06-4305, 06-4114, 06- 4115, 2017 WL 275398, at *18 (E.D. Pa. Jan. 18, 2017).  The other case explains that Dr. Kerr's "yardstick approach" is appropriate, but the experts there did not follow it because <u>they failed to correct "for any" relevant factors or variables</u>.  *Blue Cross and Blue Shield United of Wisc. v. Marshfield Clinic*, 152 F.3d 588, 592-93 (7th Cir. 1998).  But model calibration that Defendants criticize Dr. Kerr for were done <u>in order to account</u> for the relevant variables such as geography, qualifications, and time.  That is, Dr. Kerr did what *Pharmacy Benefit* and *Blue Cross* confirm is appropriate.  *Id.*; *see also In re Linerboard Antitrust Litig.*, 203 F.R.D. 197, 218 (E.D. Pa. 2001), *aff'd*, 305 F.3d 145 (3d Cir. 2002) ("The yardstick or benchmark model involves a comparison of the characteristics of the linerboard and corrugated products industry with the characteristics of a comparable, or "yardstick" industry that is not affected by the price-fixing conspiracy."); *In re Live Concert Antitrust Litig.*, 247 F.R.D. 98, 139 n.36 (C.D. Cal. 2007).[13]

---

[12]    *See* Footnote 5, above.

[13]    Defendants also incorrectly suggest that Dr. Kerr did something similar to what the Court in *Avocent* rejected.  In *Avocent*, Dr. Kerr offered a damages opinion regarding patent damages that the Court in large part approved admitted.  The issue

Defendants next note the ways that nannies and daycares are differentiated from the *au pairs*.  There are differences, but there is also no closer benchmark.  Indeed, Defendants have not and cannot suggest a better one.  In fact, Defendants themselves consider nannies to be comparable to *au pairs*.  *See, e.g.* Rodr. Decl. Ex. 20 ("Paying for Childcare", citing INA salary and benefits data comparing nannies and *au pairs*, CC00000858 at 860, 864-865).  And that is all that *Daubert* asks, that plaintiffs' expert choose a benchmark that is "sufficiently comparable."  *Cason-Merenda v. Detroit Med. Ctr.*, No. 06-15601, 2013 WL 1721651, at *6 (E.D. Mich. Apr. 22, 2013) (denying *Daubert* challenge where plaintiffs' expert compared plaintiffs' (registered nurses) wages to fees paid for temp. agency nurses).  The court stressed that the "[m]arkets need not be wholly identical to serve useful and reliable purposes ... in determining what a market would do in the absence of an antitrust violation," and that "Plaintiffs and their expert need only produce sufficient evidence of comparability."  *Id.* at *6.  Defendants will be free to "test[] [the benchmark] on cross-examination and subject[] [it] to further scrutiny and criticism" during the merits phase.  *Id.* at *8.

## II.   The Damages Models Are Appropriate And Reliable

Defendants next argue that Dr. Kerr's models are "not reliable", based again, on

---

there was patent damages.  After Dr. Kerr calculated a reasonable royalty that the Court agreed satisfied *Daubert*, he applied a "litigation risk" factor.  The Court rejected found that only the incorporation of that risk factor as inadmissible.  *Avocent Redmond Corp. v. Rose Elecs.*, No. C06-1711RSL, 2013 WL 8844098, at *5 (W.D. Wash. Mar. 11, 2013).  But the same approach has been upheld by other courts, has been compared favorably with Judge Posner's views concerning how damages should be calculated.  *See* Masur, Jonathan S., The Use and Misuse of Patent Licenses,110 Nw. U. L. Rev. 115, 149 & nn.132-34 (2015).  The *Avocent* multiplier bears no resemblance to the benchmarks that Dr. Kerr used to calibrate the Competition Model in this case.  Here, Dr. Kerr uses the benchmarks in order to control for the very factors that Defendants say he should be controlling for.  And to the extent Defendants merely intend to sling mud by pointing out that Dr. Kerr had a portion of his testimony excluded in the course of his long career as an economist, it bears emphasis that Defendants' Dr. Stiroh was *Daubert*ed earlier this year.  *Insight Equity v. Transitions Optical, Inc.*, No. 10-CV-635 (RGA), 2017 WL 1900738, at *6 (D. Del. May 9, 2017).

two demonstrably false premises.  First, they contend that for any model to be reliable, it must include data on specific "hours or other benefits received" and that in order to calibrate Dr. Kerr's Wage Competition Model he needed such information.  Mot. at 8-9. For starters, this is a class certification argument dressed up as a *Daubert* argument: Defendants' real contention is that there is too much variation in the number of hours each *au pair* worked to certify a class.  In any event, federal regulations for the *au pair* and Defendants' own records confirm that data on specific hours worked are unnecessary: regardless of whether *au pairs* are paid the price-fixed price, or some other price, they will be paid a <u>weekly</u> amount.  And as a case cited by Defendants' confirms, for *Daubert* purposes, an expert need only gather "facts and data <u>as required by the methodology</u>."  *United States v. Crabbe*, 556 F. Supp. 2d 1217, 1221 (D. Colo. 2008) (emphasis added).  Hours worked are not required here.

Moreover, to the extent that the Wage Competition Model <u>may</u> extrapolate hourly *au pair* rates in order to do an "apples to apples comparison" with any hourly Bureau and INA benchmark data, it is quite common (and simple) exercise for experts. *See Scott*, 315 F.R.D. at 53 (approving expert's extrapolation of hourly rates from salaried wages to compare salaried plaintiffs to an hourly benchmark employee group).  Indeed, if necessary, it does not require rocket science to figure out what $195.75 translates into on an hourly basis – where the weekly salary presumes a 45-hour work week.

Defendants' second false premise is that because precision is impossible, no damages model is acceptable.  Mot. at 8-11.  This is unsupported by law, which does not insist on such an impossible degree of certainty or specificity.  "The ways compensatory damages may be proven are many.  The injured party is not to be barred

from a fair recovery by impossible requirements.  The wrongdoer should not be mulcted, neither should he be permitted to escape under a cover of a demand for nonexistent certainty."  *Palmer v. Conn. Railway & Lighting Co*., 311 U.S. 544, 560-61 (1941); *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 124 (1969). ("just and reasonable estimate" based on "probable and inferential as well as direct and positive proof" is appropriate in antitrust damages because "[a]ny other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim.") (internal quotation marks and citation omitted).

Defendants go on to assert that the Wage Compliance Model "is nothing more than an unsupported legal conclusion.  Mot. at 9.  This is yet another class certification argument disguised as a *Daubert* argument: Defendants' real aim is to advance their nonsensical claim that the "but-for" world should not take the existing regulatory environment (*i.e.*, the existence of minimum wage laws) as a given because wage law is different than antitrust law.  *See* Jt. Opp. at 22-23.  Plaintiffs' responded to this argument with a wealth of case law showing that antitrust law accepts regulatory and legal overlays as part of the extrinsic but-for world.  *See* Class Cert. Reply at 14-18.  To mirror the existing world 'but-for' the anticompetitive conduct, the but-for world must take into account whatever federal, state and local regulations, taxes, minimum wage laws, or other policies impact the relevant market and its prices.  *Id.*  Here, it is a fact – not a legal conclusion – that minimum wages laws exist, and they impact *au pair* pay.

None of that matters for *Daubert* purposes.  Dr. Kerr does not need to defend the line between fact and law, nor can he be expected to "perform[] [an] independent investigation to determine if the assumptions" in Plaintiffs' legal theories are correct.

Mot. at 9.  All the law requires is for Dr. Kerr to show that his assumptions are consistent with Plaintiffs' legal theory.  For example, in *Behrens v. Comcast*, the plaintiffs' case had been reduced from four distinct alleged types of antitrust misconduct to just one.  133 S. Ct. 1426, 1434 (2013).  At class certification Plaintiffs' expert offered damages that assumed the other three theories—which were no longer in the case at all—contributed to Plaintiffs' damages.  *Id.*  The result was that the model did "not even attempt" to reflect the permissible legal theory that plaintiffs were litigating.  *Id.* at 1433. Here, by contrast, Dr. Kerr's Wage Compliance Model reflects ("assumes") Plaintiffs' legal theory.  Just as *Behrens* teaches, Dr. Kerr assumed a set of merits results and then created a model that calculates formulaic damages <u>if</u> those results are obtained.

Defendants' final "reliability argument" again forgets the procedural posture. Defendants contend that the "Price Competition Model" offered at class certification is not a complete damages model.  Mot. at 10-11.  Of course it is not.  Discovery has not closed, and at class certification the question is not damages, but whether damages can be tried classwide.  *See, e.g., In re Urethane Antitrust Litig.*, 251 F.R.D. 629, 637 (D. Kan. 2008), *aff'd* 768 F.3d 1245 (10th Cir. 2014) (observing that  the district court certified the class despite the fact that "the court did not even have [plaintiffs' expert's] models or any other sort of extrapolation evidence"); *Johnson*, 2009 WL 5031334, at *10 ("While the benchmark model is not fully fleshed out in [expert's] report, the Court is satisfied that it could be used to provide an estimate", which "the Court can revisit…if it becomes clear at a later point in the litigation that the benchmark method is flawed.").

## III.   The Host Family Survey Was Properly Performed

Turning to the survey, Defendants first argue that Dr. Kerr is not an expert on "survey design." Mot. at 11-12. They assert that he lacks experience and that the survey must therefore be insufficient.  They can only do so by willfully ignoring the record.

Defendants suggest that Dr. Kerr is "an economist with no expertise in survey design." *Id.* at 12.   In fact, Dr. Kerr has testified about surveys and done other survey work extensively.  Kerr Dep. (July 5, 2017) at 343:3-18 (Rodr. Decl. Ex. 5).   Defendants chose not to probe those facts in their deposition of Dr. Kerr.  Defendants also failed to look at the survey experience on Dr. Kerr's CV, the first page of which discloses that Dr. Kerr was on an industry task force for the 1982-84 President's Private Sector Survey on Cost Control.  *Id.*; Rodr. Decl. Ex. 34, at 5-6 & 392.  And Defendants knew Dr. Kerr relied heavily on consultants to design and implement the survey.  Rodr. Decl. Ex. 8; Kerr. Dep. Tr. at 352:25-353:14 (July 5, 2017).  They buried their heads in the sand rather than examining whether those consultants had survey experience.  And they do; for example, Stefan Boedeker's publicly available CV.  Rodr. Decl. Ex. 8.  Dr. Kerr brought the quantitative expertise and experience, and his consultants brought the design and implementation expertise.  That is entirely appropriate.

Further to the "expertise" argument, Defendants and their expert point to an esoteric and vague notion of what is a "survey design expert."  Mot. at 10-11; Lavrakas Dep. Tr. at 19:6-9 (Rodr. Decl. Ex. 10).  Defendants and their expert have in mind a very particular kind of "expertise."  Dr. Lavrakas is a psychologist, who disdains "survey statisticians" and prefers a type of analysis that lacks objective criteria.  Lavrakas Dep. Tr. at 10:18-23; 33:21-36:3; 39:24-41:4; 97:22-100:4.  Dr. Lavrakas's approach is controversial and, he admits, still is not fully accepted today.  *Id.* at 102:3-104:9.  Asked how to determine whether someone is a "survey design methodologist," Dr. Lavrakas offered everything from attending conferences and "study a lot of books," *id.* at 10:24-11:18; 20:7-14, to looking at job descriptions and asking "personnel departments in companies."  *Id.* at 19:10-23:19.  By contrast, Dr. Kerr is an economist trained in quantitative methods that lead to objective and verifiable results.

Defendants argue that the survey must be insufficient because it obtained approximately a 20% response rate.  They propose an 80% response rate minimum as

25

a bright-line test.  The Federal Judicial Center's Reference Manual on Scientific Evidence disagrees.  It explains, that "high response rates (i.e., 80% or higher) are desirable . . . such high response rates are increasingly difficult to achieve."  Fed. Jud. Ctr., Reference Manual on Scientific Evidence (3d ed.), at 384.  The almost 20% response rate for the internet survey is high for an email survey—which can generate response rates as low as 2-5%.[14]  The approximately 20% rate is about the same as mail and telephone surveys about politics.[15]  These results from the literature are consistent with Dr. Kerr's experience with survey response rates.  Kerr Aff. ¶ 8 (Rodr. Decl. Ex. 3).

Defendants also complaint that Dr. Kerr did not "conduct any pre-survey testing" in the manner their expert prefers.  Mot. at 14.  Pre-testing means performing a survey on a small sample to see if a question's wording confuses or alters responses.  Fed. Jud. Ctr., Reference Manual on Scientific Evidence (3d ed.), Reference Guide on Survey Research, at 387.  Since Dr. Lavrakas could not identify any wording deficiency except for one that would have a bias, if any, in Defendants' favor, this criticism is beside the point.  Additional pretesting would have delayed the survey further without providing significant value (as Dr. Lavrakas admits), and time was of the essence because Defendants' delayed production of host family information pushed the survey to the very end of the class certification period.  Moreover, while "some courts have recognized the value of pretests" (Reference Guide on Survey Research, at 388), they

---

[14] Sinclair, M. et al., BioMed Central, Comparison of Response Rates and Cost-Effectiveness For A Community-Based Survey:  Postal, Internet, And Telephone Modes With Generic Or Personalized Recruitment Approaches, *available at* https://bmcmedresmethodol.biomedcentral.com/articles/10.1186/1471-2288-12-132.
[15] S. Ansolabehere, et al., "Does Survey Mode Still Matter?  Findings from a 2010 Multi-Mode Comparison," published in 22:3 Political Analysis 285 (2014), *available at http://people.umass.edu/schaffne/ansolabehere_schaffner_mode2.pdf,* at 6-7 & table 1.  This paper reports an "internet" survey with a response of 42.9%, but that was a panel survey:  The panel members had already opted-in to respond to surveys.  Even that survey-inclined group came nowhere near 80%.

are not required—and, in any event, the issue of pretesting goes to the weight of the evidence, not admissibility.  *See Barry v. Medtronic, Inc.*, No. 1:14-CV-104, 2016 WL 7665773, at *3 (E.D. Tex. July 19, 2016).

Finally, Defendants refer to "other data quality problems such as primacy effects."  Mot. at 15.  But their proffered expert undermined that argument.  He explained that primacy effect applies to lists of questions, not open-ended questions such as the question about how the stipend amount.  Lavrakas Tr. at 73:2-74:15 & 108:7-109:6.  As for any other "data quality problems", Defendants did not discuss in their original Motion but may attempt to invent on reply, the chart in section II.d.i. shows that they have no expert testimony to support any such argument.  The bottom line is that if anything the survey favors Defendants by making conservative choices.  *Cf. Merenda v. VHS of Mich., Inc.,* 296 F.R.D. 528 (E.D. Mich. Sept. 13, 2013) (damages model that errs on the "conservative" side "will suffice to establish that Defendants' alleged antitrust violations had a common impact on the members of the plaintiff class, even if this benchmark might not accurately measure the precise harm suffered by each individual class member.").  *Id.* at 543. [16]

## Conclusion

For the foregoing reasons, the Court should deny Defendants' *Daubert* motion.

---

[16] Alternatively, if a class member and the Court believe it to be appropriate, short individualized damages proceedings could assess the market rate that a particular *au pair* (or sub-class of *au pairs*) would have commanded in the but-for world.  *See, e.g.*, *In re Visa Check/MasterMoney Antitrust Litigation,* 280 F.3d 124, 141 (2d Cir. 2001) (tools for addressing individualized damages that arise in a class action include: "(1) bifurcating liability and damage trials with the same or different juries; (2) appointing a magistrate judge or special master to preside over individual damages proceedings; (3) decertifying the class after the liability trial and providing notice to class members concerning how they may proceed to prove damages; (4) creating subclasses; or (5) altering or amending the class.").

Dated: New York, New York
      August 7, 2017

Respectfully Submitted,

BOIES, SCHILLER & FLEXNER LLP

*/s/ Peter M. Skinner*
Matthew L. Schwartz
Peter M. Skinner
Randall W. Jackson
Dawn L. Smalls
Joshua J. Libling
575 Lexington Avenue
New York, New York  10022
Tel:  (212) 446-2300
Fax: (212) 446-2350
mlschwartz@bsfllp.com
pskinner@bsfllp.com
rjackson@bsfllp.com
dsmalls@bsfllp.com
jlibling@bsfllp.com

Sean P. Rodriguez
Juan Valdivieso
1999 Harrison Street, Suite 900
Oakland, California 94612
Tel: (510) 874-1000
Fax: (510) 874-1460
rodriguez@bsfllp.com
jvaldivieso@bsfllp.com

Alexander Hood
TOWARDS JUSTICE
1535 High Street, Suite 300
Denver, Colorado  80218
Tel: (720) 239-2606
Fax: (303) 957-2289
alex@towardsjustice.org

*Attorneys for Plaintiffs*