## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-03074-CMA-CBS


**JOHANA PAOLA BELTRAN; et al.,**

**Plaintiffs,**

**v.**

**INTEREXCHANGE, INC.; et al.,**

**Defendants.**

_____

### REPORTER'S TRANSCRIPT
### (Motions Hearing)

_____

        Proceedings before the HONORABLE CHRISTINE M.
ARGUELLO, Judge, United States District Court, for the
District of Colorado, commencing at 9:03 a.m. on the 25th
day of August, 2017, Alfred A. Arraj United States
Courthouse, Denver, Colorado.

### A P P E A R A N C E S

**FOR THE PLAINTIFFS:**
DAWN SMALLS and JOSHUA J. LIBLING, Boies Schiller &
Flexner, LLP, 575 Lexington Ave., 7th Floor, New York, NY
10022
ALEX N. HOOD and DAVID SELIGMAN, Towards Justice, 1535
High St., Suite 300, Denver, CO 80218

**FOR THE DEFENDANT AUPAIRCARE INC.,**
THOMAS B. QUINN and PEGGY E. KOZAL, Gordon & Rees, LLP,
555 17th St., Suite 3400, Denver, CO 80202

**FOR DEFENDANT AMERICAN INSTITUTE FOR FOREIGN STUDY:**
ROBERT M. TUCKER, Putney, Twombly, Hall & Hirson LLP, 521
Fifth Ave., 10th Floor, New York, NY 10175

**FOR DEFENDANTS AU PAIR INTERNATIONAL, ET AL:**
KATHRYN A. REILLY, Wheeler Trigg O'Donnell, LLP, 370 17th
St., Suite 4500, Denver, CO 80202-5647

**FOR DEFENDANT CULTURAL CARE, INC.:**
JAMES M. LYONS and DIANE B. HAZEL, Lewis Roca Rothgerber Christie LLP, 1200 17th St., One Tabor Center Suite 3000 Denver, CO 80202-5855
JUSTIN J. WOLOSZ, Choate, Hall & Stewart, LLP, Two International Place Boston, MA 02110

**FOR DEFENDANT EURAUPAIR INTERCULTURAL CHILD CARE:**
MARTHA L. FITZGERALD and DAVID MESCHKE, Brownstein Hyatt Farber Schreck, LLP, 410 17th St., Suite 2200, Denver, CO 80202-4432

**FOR DEFENDANT CULTURAL HOMESTAY INTERNATIONAL:**
JONATHAN S. BENDER, Holland & Hart, LLP, 555 17th St., Suite 3200, Denver, CO 80202
ADAM A. HUBBARD, Holland & Hart, LLP, 1800 Broadway, One Boulder Plaza, Suite 300, Boulder, CO 80302

**FOR DEFENDANT INTEREXCHANGE:**
BROOKE A. COLAIZZI and ALYSSA L. LEVY, Sherman & Howard, LLC, 633 17th St., Suite 3000, Denver, CO 80202-3622

**FOR DEFENDANT USAUPAIR, INC:**
WILLIAM JAMES KELLY, III, Kelly & Walker, LLC, 1512 Larimer St., Suite 200, Denver, CO 80202

**FOR DEFENDANT APF GLOBAL EXCHANGE, NFP:**
LAWRENCE L. LEE, Fisher & Phillips, LLP, 1801 California St., Suite 2700, Denver, CO 80202-3025

**FOR DEFENDANTS APEX AND 20/20 CAR EXCHANGE:**
LAWRENCE D. STONE, Nixon Shefrin Hensen Ogburn, P.C., 5619 DTC Parkway, Suite 1200, Greenwood Village, CO 80111-3061

**FOR DEFENDANT GREATAUPAIR, LLC:**
MESHACH Y. RHOADES and MARTIN J. ESTEVAO, Armstrong Teasdale, LLP, 4643 S. Ulster St., Suite 800 Denver, CO 80237

**FOR DEFENDANT EXPERT GROUP INTERNATIONAL, INC.**
BOGDAN ENICA, Attorney at Law, 111 2nd Avenue NE, Suite 213, St Petersburg, FL 33701-3440 (Appearing Telephonically)

1                          **AUGUST 25, 2017**

2              (Proceedings commence at 9:03 a.m.)

3              THE COURT:  You may be seated.

4              Court calls Civil Action No. 14-cv- 03074-CMA,

5    encaptioned Johana Beltran, et al versus InterExchange,

6    Inc. et al.

7              Counsel, would you please enter your appearances.

8              MS. SMALLS:  Your Honor, Dawn Smalls from Boies

9    Schiller & Flexner, on behalf of the plaintiffs.

10             MR. LIBLING:  Your Honor, Joshua Libling on behalf

11   of the plaintiffs.

12             MR. HOOD:  Good morning, Your Honor, Alex Hood from

13   Towards Justice, on behalf of the plaintiffs.

14             MR. SELIGMAN:  Your Honor, David Seligman for the

15   plaintiffs.

16             THE COURT:  Good morning.

17             MR. QUINN:  Tom Quinn on behalf of AuPairCare.

18             MS. KOZAL:  Peggy Kozal on behalf of AuPairCare.

19             MR. TUCKER:  Robert Tucker on behalf of American

20   Institute for Foreign Studies.

21             MS. REILLY:  Good Morning, Your Honor, Katie Reilly

22   for GoAuPair, Au Pair International, and Agent Au Pair.

23             MR. WOLOSZ:  Good morning, Your Honor, Justin

24   Wolosz on behalf of Cultural Care.

25             MR. LYONS:  Good morning, Your Honor, Jim Lyons on

1    behalf of Cultural Care, as well.

2          MR. BENDER:  Your Honor, Jonathan Bender for

3    defendant Cultural Homestay International.

4          MS. FITZGERALD:  Good morning, Your Honor, Martha

5    Fitzgerald on behalf of EuRaupair.

6          MS. COLAIZZI:  Good morning, Your Honor, Brooke

7    Colaizzi on behalf of defendant InterExchange.

8          MR. MESCHKE:  Good morning, Your Honor, David

9    Meschke, on behalf of EuRaupair.

10          MR. HUBBARD:  Good morning, Your Honor, Adam

11   Hubbard on behalf of Cultural Homestay International.

12          MS. HAZEL:  Good morning, Your Honor, Diane Hazel

13   on behalf of Cultural Care.

14          MR. KELLY:  Good morning, William Kelly for

15   USAuPair.

16          MS. LEVY:  Alyssa Levy on behalf of InterExchange.

17          MR. LEE:  Good morning, Your Honor, Larry Lee on

18   behalf of Au Pair Foundation.

19          MR. STONE:  Good morning, Your Honor, Larry Stone

20   on behalf of APEX and 20/20.

21          MS. RHOADES:  Good morning, Your Honor, Meshach

22   Rhoades on behalf of GreatAuPair.

23          MR. ESTEVAO:  Good morning, Your Honor, Martin

24   Estevao on behalf of GreatAuPair, as well.

25          THE COURT:  There are a lot of billable hours going

1    up at this hearing, so I will try to make it short.

2         So we are convened for a motions hearing on

3    Defendants' Motion for Order to Show Cause, Document No.

4    596; Plaintiffs' Motion to Amend the FLSA, Document No.

5    618; and Plaintiffs' Motion to Amend the Scheduling Order,

6    Document No. 620.

7         Now, before we get to the matters that we are here

8    to discuss, I want to address what I consider to be

9    extremely unprofessional conduct by the attorneys and

10   members of the staff at one or more of your firms.

11        First, it is clear to me that you all do not get

12   along, and that despite your reputations as being among

13   the highest caliber of trial attorneys in the community,

14   you are not behaving as I would expect legal professionals

15   who come before me should behave.

16        There is a difference between zealous advocacy and

17   being needlessly difficult or nasty to one another.  This

18   case, I am afraid, has spun out of control because of what

19   appears to me to be a deep antipathy among counsel in this

20   suit.

21        It is not an exaggeration to say that out of my

22   more than 200 civil matters, you are my most dysfunctional

23   case.  Frankly, there is not another case that comes even

24   close to the dysfunctionality that I am facing in this

25   case.

 1          And that is actually the main reason I called you

 2     all here today.  Many of the issues that you want me to

 3     adjudicate could be resolved if you all decided to sit

 4     down and act like professionals with one another.  You

 5     long ago crossed the line in this case.  And I am giving

 6     you fair warning, I am not going to tolerate anything

 7     other than professionalism moving forward.

 8          And if I get a sense that any of you are filing

 9     frivolous motions or being needlessly obstructive, I will

10     not hesitate to impose sanctions.  Are we clear?

11          MS. SMALLS:  Yes, Your Honor.

12          MR. QUINN:  Yes.

13          THE COURT:  On a related note, last week, a

14     paralegal employed by defense counsel, called my chambers

15     to inquire about moving the date of this hearing because

16     of a scheduling conflict.  I carry a case load of more

17     than 200 civil cases and approximately 60 criminal cases.

18     I also believe that justice delayed is justice denied.

19     And my chambers works very hard, and prides itself on

20     running one of the most efficient dockets in this

21     courthouse.

22          And I say "my chambers," because it is my judicial

23     assistant, my law clerks, my courtroom deputy, and myself,

24     all working together as a team, that makes my docket move

25     smoothly and efficiently.  My chambers also goes to great

1    length to attempt to accommodate the litigants, which is

2    why we actually answer our phone calls to chambers, unless

3    we are on another line.

4         So, it truly irks me when attorneys or paralegals

5    for the litigants presume that their case trumps every

6    other matter on my docket, and you are rude to my judicial

7    assistant or my law clerks.

8         After being told that the date she proposed would

9    not work on my calendar because of an existing trial or

10   hearing settings, this paralegal proceeded to lecture my

11   staff, remarking on the inefficiency with which we conduct

12   our business.  And then she had the audacity to ask my

13   staff to provide her with the case numbers and the matters

14   being heard on the dates that she proposed were available

15   to you all, implying a belief that my staff was lying

16   about the limitations on my ability to fit this hearing

17   into the dates she proposed.

18        Now, I know how law firms work.  I was a partner in

19   two of the most prestigious law firms in this state.

20   These staff members are taking their cues from you all.

21   You are their bosses, and they are mimicking what they

22   hear you say.

23        So, I want to make something absolutely clear to

24   you all.  You may think your case is the most important

25   case in the world.  And, to you and your client, it may

1    be.  But I assure you that whether I am dealing with

2    claims in a multi-million dollar class lawsuit, or claims

3    of an incarcerated pro se prisoner, every case before me

4    gets equal billing.

5          You would do well to remember that you are one of

6    over 200 civil cases on my docket.  I will do what I can

7    do to move this litigation forward.  But do not presume to

8    tell me how I run my calendar.  So, do not ever call my

9    chambers and act rudely to my staff.

10          And I direct you to go back to your law firms and

11    tell your staff that are assisting you with this case that

12    they are never to call my chambers and act rudely to my

13    staff.

14          And, I mean this.  After this hearing, when you

15    return to your offices, I am directing you to gather up

16    all of the staff that are assisting you with this case,

17    and I want you to have a serious conversation with each

18    and every one of them about what is the appropriate

19    professional way to communicate with opposing counsel --

20    because if you are doing this to me, I can just imagine

21    what you are doing to each other -- and with this Court.

22    Are we clear?

23          MS. SMALLS:  Yes, Your Honor.

24          MR. QUINN:  Yes, Your Honor.

25          THE COURT:  Finally, I want to talk about motions

1    to restrict, which have been a chronic source of

2    dysfunction in this case.  My staff and employees in the

3    clerk's office have spent hours trying to walk your staff

4    through how to complete what is a pretty basic task.

5         District Court of Colorado Local Rule 7.2 sets

6    forth the exact procedure for filing documents under

7    restriction.  It is clear to me that some of you have not

8    read it.  And it is clear to me that your staff has not

9    read it.

10        The local rule lays out a very clear procedure for

11   filing documents under restriction.  Never file restricted

12   documents as exhibits to the motion to restrict.  The

13   motion to restrict should be filed like any other motion,

14   and it is a public document.

15        The motion to restrict should identify the

16   documents you wish to restrict, describe their contents,

17   and set forth the legal basis for that restriction.  The

18   actual documents are filed under restriction as a separate

19   docket entry.

20        I know the local rules give you 14 days to file the

21   motion to restrict, but ideally you would file a motion to

22   restrict right before you file the restricted documents.

23   Doing so makes reading the docket much easier for me and

24   my staff, and I can actually find the documents I am

25   looking for when I am trying to review your motions.

1    Now, there have been a number of occasions in this

2    case where one side files a batch of documents under

3    restriction, and then never files a motion to restrict.

4    As best I can tell, that is a product of you all trying to

5    fulfill your obligation under the stipulated protective

6    order.  You are filing documents under restriction because

7    you feel you have to, not necessarily because you are

8    independently motivated to do so.

9    In effect, you are putting the ball in opposing

10   counsel's court, and it is up to them to file the motion.

11   But just so you all are clear, if a batch of documents is

12   filed under restriction, and a motion to restrict does not

13   come in within 14 days from someone, all of those

14   documents will lose the restriction.  Does everybody

15   understand that?

16   MS. SMALLS:  Yes, Your Honor.

17   MR. QUINN:  Yes.

18   THE COURT:  So the dynamic I just described has led

19   to many situations where a batch of documents is filed

20   under restriction by one side, and some combination of

21   parties on the other side files numerous motions to

22   restrict, with each motion seeking restriction of some

23   number of documents from the larger batch.  This has

24   created an administrative nightmare for my chambers and

25   for the clerk's office, and it is taking up an inordinate

1    amount of time for me.

2          So, from here out I am ordering the following:  If

3    a batch of documents is filed under restriction by

4    opposing counsel, and the other side wants to file a

5    motion to restrict directed towards some or all of those

6    documents, you are ordered to confer with your co-counsel

7    and submit a consolidated motion to restrict.

8          For example, if plaintiffs' counsel files a batch

9    of 20 documents under restriction, and counsel for

10   defendant one wants documents 3, 6, and 14 restricted, and

11   counsel for defendant two wants 3, 8, and 12 restricted,

12   and counsel for defendant three wants 6, 14, and 19

13   restricted, instead of submitting three separate motions

14   to restrict, you are all to submit a single consolidated

15   motion.

16         You are not required to attach as exhibits to your

17   motion the redacted versions of the documents you seek to

18   restrict.  But, if you choose to do so, make sure you and

19   co-counsel are on the same page about what needs to be

20   redacted.

21         If you choose not to attach redacted versions to

22   your motion, be sure to clearly identify the exact docket

23   number of the exhibit or exhibits you wish redacted or

24   restricted.

25         Now, it would make it easier for me when I am

1   reviewing your motions if you all could cooperate with one

2   another, and before plaintiffs filed that motion, she

3   talks to opposing counsel and finds out which ones they

4   object to and which portions, and file one document that

5   is public, with the exhibits redacted, so I only have to

6   look at one document.  And then when you file your motion

7   to restrict, and you file the unredacted document, I know

8   where to go to find the unredacted version.  That would

9   make my life a whole lot easier, and I could actually find

10  what I am looking for.

11          Now, looking through what you all submitted

12  yesterday, or two days ago, there were documents being

13  sought to restrict that were already redacted.  What is

14  the purpose of that?  It just wastes my time.

15          Now, because all of the motions to restrict have

16  been unopposed -- and I will admit I dropped my guard.  I

17  did not review the motions to restrict as closely as I

18  should have.  And in preparing for this hearing, I have to

19  agree with plaintiffs that there is no real basis for some

20  of the documents that were restricted to have been

21  restricted.

22          So, moving forward -- I am not going to do anything

23  going back, because it is too time consuming to do that.

24  But, moving forward, I will be scrutinizing motions more

25  are carefully to ensure compliance with the standard set

1    forth in the local rule, and to ensure that there is truly

2    a legitimate reason to restrict the document.

3           So your motion to restrict better specifically

4    identify a sufficient legal basis for each and every

5    document you wish to restrict.

6           I would also remind you, per the local rule, the

7    fact that a document would fall under the umbrella of a

8    stipulated protective order is, by itself, not a

9    sufficient basis for me to grant restriction.  Any motions

10   to restrict which do not comply with the local rule and

11   the order I just made, will be summarily stricken.

12          So, I gave you a lot there, so I will sum it up.

13   From this moment on, if you file a motion to restrict that

14   does not comply with the local rule, it will be summarily

15   denied.

16          If you file multiple motions to restrict, in

17   defiance of this order regarding the duty to confer and

18   make joint motions, those motions will be summarily

19   denied.

20          If any motion to restrict fails to provide a

21   sufficient legal basis for each and every document you

22   wish to restrict, that motion will be summarily denied.

23          Any questions?

24          MS. SMALLS:  No, Your Honor.

25          MR. QUINN:  No, Your Honor.

1      THE COURT:  So, I now am directing you, in that

2   same meeting in which you discuss with your staff how true

3   professionals behave themselves, I want you to read the

4   local Rule 7.2 together.  And I want to you go over the

5   directions I have given you here today.

6      All right.  Now let's move on to what the real meat

7   of this hearing is all about.  Unfortunately, I think

8   these hearings sadly exemplify some of the frustrations I

9   have just described to you now.  There are three motions

10   that I indicated that we plan to adjudicate today.  The

11   first two, Dockets 596 and 618 relate to the FLSA notice

12   that went out in the wake of my order conditionally

13   certifying the FLSA class.  And I will address each in

14   turn.

15      First, defendants' motion for order to show cause,

16   Document No. 596.  I am not going to recite all of the

17   relevant procedural history, which is laid out in great

18   detail in the motion and the response thereto.

19      In short, the defendants are very unhappy with

20   opposing counsel's execution of the notice procedure set

21   forth in my conditional certification order.  Boiled down,

22   they have two objections:  First, plaintiffs' counsel

23   erroneously sent the notice to a number of au pairs

24   sponsored by non-FLSA or antitrust-only defendants.

25      Second, defense counsel objects to the language

1    used in the transmittal e-mail and notice website, arguing

2    that the language is non-neutral.  Defense counsel also

3    objects to the way in which the official notice document

4    was presented in the transmittal e-mail and on the

5    website, arguing that it was deliberately buried.

6         I want to begin with the first issue, the erroneous

7    transmittal of the notice to au pairs sponsored by

8    antitrust-only defendants.

9         I want to start, Ms. Smalls, though this may not

10   have any bearing on the decision I make today, just by way

11   of background.  I am trying to understand why there are

12   antitrust-only defendants in this case.  Was it a matter

13   of plaintiffs' inability to identify named plaintiffs for

14   each and every of the defendants?  Why do we have two

15   different tracks here?

16        MS. SMALLS:  Your Honor, we -- the answer to your

17   question is yes.  So, we proceeded with the notice that

18   came to us and the sponsor agencies with which they were

19   associated.  We did not survey au pairs to try to get an

20   au pair for each agency.  And so we proceeded with the au

21   pairs that we met with and presented their claims to us,

22   and those were the au pairs that we proceeded with on the

23   FLSA claims.

24        THE COURT:  All right.  And over the course of

25   this -- this case has been pending since 2014.  So, over

1   the course of discovery, you didn't discover any other

2   plaintiffs to amend before the deadline expired?

3       MS. SMALLS:  We weren't specifically seeking au

4   pairs for each antitrust-only defendant.

5       THE COURT:  All right.  So, obviously defense

6   counsel, understandably, is concerned that your erroneous

7   distribution of the FLSA notice to antitrust-only au pairs

8   might give rise to a new wave of plaintiffs seeking to sue

9   their respective sponsor agencies for FLSA violations.

10      So, to date, have any of the antitrust-only au

11  pairs who were erroneously contacted requested that you

12  represent them in an FLSA action against one of the

13  antitrust-only defendants?

14      MS. SMALLS:  We have received several

15  consent-to-join forms from au pairs from antitrust-only

16  defendants, which we have not reviewed or processed in any

17  way.

18      THE COURT:  And what representations or what have

19  you told them?

20      MS. SMALLS:  We haven't told them -- given the

21  pendency of the motions that have been put before the

22  Court, we haven't done anything.

23      THE COURT:  So you have not responded?

24      MS. SMALLS:  We have not responded in any way to

25  any au pairs from the antitrust defendants, either for

 1   requests for information or with respect to their

 2   consent-to-join forms.

 3         I want to amend, there was one response to an

 4   antitrust-only au pair that responded to the corrective

 5   notice saying, I think I want to know why we cannot be

 6   included.  And we drafted a very short e-mail saying the

 7   e-mail was sent to you in error, it only applies to these

 8   FLSA defendants, we apologize for the confusion and any

 9   inconvenience, without any other -- without any other

10   substantive content to that e-mail.

11         Other counsel reminded me that the other content

12   that was sent to antitrust-only au pairs was the e-mail

13   requested by defendants with their exact language, which

14   was sent within 24 to 48 hours of the erroneous e-mail.

15         Other than that, we have not viewed any of the

16   inquiries from non-FLSA au pairs.  We have not reviewed or

17   processed any consent-to-join forms from any

18   antitrust-only defendants, except when they have requested

19   that information.

20         There was one defendant that requested to know how

21   many of their au pairs had completed a consent-to-join

22   form.  That was the first time that any of the plaintiffs

23   even looked at that information, but did so at the request

24   of defendants.

25         Other than that, and the one clarifying e-mail just

 1    repeating the information that had already been given, and

 2    saying it was sent to you in error, we apologize for the

 3    confusion and any inconvenience, that is the only

 4    communication that plaintiffs' counsel has had with any

 5    antitrust-only au pairs that received the erroneous

 6    e-mail.

 7         THE COURT:  All right.  So, according to the

 8    scheduling order in this case, the deadline to join

 9    parties and to amend pleadings was August 15, 2016.  If an

10    au pair sponsored by an antitrust-only defendant comes

11    forward and asks you to bring a new FLSA claim, how are

12    you going to proceed?  Will you seek leave of this Court

13    to amend the Complaint in order to add that FLSA

14    plaintiff, and then move to certify a new subclass?  In

15    other words, are you going to try to convert an existing

16    antitrust-only defendant into a full-fledged FLSA

17    defendant?

18         MS. SMALLS:  We have no plans to further amend the

19    Complaint at this time.  And we affirmatively made

20    representations, affirmatively stated to the defendants

21    that, one, that we would not use any au pairs or try to

22    capitalize on the mistake by using any of the au pairs

23    that received the e-mail as a named plaintiff.

24         We have been in contact with antitrust-only au

25    pairs prior to the sending of the e-mail, and have had

```
 1    conversations, we have draft declarations from au pairs

 2    from antitrust-only defendants that preceded the sending

 3    of the e-mail.

 4          The only issue -- we have already conceded to

 5    defendants that we will not use the e-mail to derive or

 6    obtain any additional-named plaintiffs.

 7          The only point of dispute is whether -- for

 8    example, one of the au pairs that we have talked to

 9    extensively about joining the suit, had a declaration, and

10    that person then decides to join the suit, that we be

11    proactively barred from then having a suit, a class for

12    that antitrust-only defendant, that thereafter the

13    recipient of the e-mail could then join, if that ever came

14    to pass.

15          THE COURT:  How would that happen without amending

16    the Complaint?

17          MS. SMALLS:  It would -- the Complaint would have

18    to be amended.  We have no intention of further amending

19    the Complaint.  But I also am somewhat hesitant to say

20    that we are absolutely saying that we will never do it.

21    But we wanted to --

22          THE COURT:  Well, I will make it easy for you,

23    because I will tell you -- although I am not ruling on a

24    motion that is not before me -- if any such motion to

25    amend comes to me at this extremely late date, I would be
```

1    disinclined to grant leave to amend.

2         This case, as I mentioned, was filed in 2014.  We

3    will soon be ringing in 2018, and a trial date has not

4    been set.  We are not even close to trial in this case.

5    It has been almost a year since the deadline for amending

6    has expired.

7         My view -- and I never did handle in my practice a

8    huge class-action case like this, but it seems to me that

9    plaintiffs could have and should have uncovered the

10   identities of any au pairs that you needed to make

11   separate FLSA class allegations for as a result of

12   discovery.

13        So I am not preemptively ruling, but I am giving

14   you a good indication that a motion to amend would not be

15   well received by me.  What you do in terms of a separate

16   lawsuit or somebody else, that is up to you all, but it is

17   not going to slow this case down.

18        MS. SMALLS:  Understood, Your Honor.

19        THE COURT:  All right.  Finally, I have reviewed

20   the declaration you submitted in response to my order of

21   August 21, 2017, and all of the attachments thereto.  But,

22   given the gravity of the situation, I think it is

23   important to make a record about how this mistake

24   occurred.

25        I will give you the opportunity to put anything

1   more on the record that you wish to put on in terms of

2   when you realized the mistake, what you did, what steps

3   you took to minimize the havoc, et cetera, et cetera.  So

4   I will give you that opportunity if you want to supplement

5   your filing in any way.

6       MS. SMALLS:  I think the filing, my declaration --

7   just in terms of the record, my declaration and then

8   subsequent filings, subject to the Court's order, is a --

9   the Court will make its own judgment, but is a fairly

10  extensive record of what occurred and what occurred when,

11  and the very clear instruction that was given to the

12  vendor about who was to receive the FLSA notice.

13      It was iterated in an e-mail, multiple e-mails,

14  where we talked about the subset of defendants that were

15  to receive the FLSA notice.  It was specifically outlined

16  with the six FLSA defendants, outlined in the e-mail

17  specifically, as well as their files.  The analysis that

18  came back to plaintiffs of the data, specifically

19  outlining only the six FLSA defendants and no other

20  defendants.

21      And, as I outlined in my declaration, there was no

22  reason to believe that there was any change in practice

23  from the analysis that was given to plaintiffs about that

24  data of the six FLSA defendants and that any other dataset

25  would be used for the transmittal of the FLSA notice when

1    we sent it on July 5th.

2         THE COURT:  And can you put on the record the

3    corrective measures that you took.

4         MS. SMALLS:  Yes.  So, we received late Friday

5    evening, I think that is July 7 or July 8, an e-mail from

6    Mr. Bender alerting us to the fact that at least some

7    subset of non-FLSA au pairs were contacted.

8         Before I continue, Your Honor, I just want to make

9    a note that we -- as I explain this, there may be things

10   that I say that are protected by work product.  And so

11   plaintiffs are maintaining that privilege, and so anything

12   that I say --

13        THE COURT:  I am ordering you to tell me, so you

14   are okay.  You are protected.

15        MS. SMALLS:  Okay.  Thank you.  So, Mr. Bender

16   e-mailed me late on a Friday night and said that there had

17   been some indication that at least one of the subsets of

18   au pairs of antitrust-only au pairs had received the

19   notice.  That was my first notice that that could even be

20   a possibility.

21        I immediately contacted the vendor and asked, was

22   that possible, and asked for immediate confirmation of

23   what datasets that had been sent to.  I received a

24   response that it had been sent to the full dataset, and

25   that they had mistakenly -- the person who had actually

1    pulled the trigger had mistakenly misunderstood they were

2    to send that to the full dataset, despite verbal and

3    written instruction that the e-mail should only be sent to

4    the six FLSA au pairs.

5         So, I don't know if there is anything else that

6    Your Honor wants me to put on the record.

7         THE COURT:  So Mr. Bender got in touch with you,

8    and that was the first cue you had that something had gone

9    terribly wrong?

10        MS. SMALLS:  That's correct.

11        THE COURT:  What did you do?  How did you know what

12   to send out to the folks?  By that time you all finally

13   started talking to each other.  You started cooperating

14   with each other.  And it seems to me that --

15        MS. SMALLS:  Well, I think -- I'm only hesitating

16   because I am trying to figure out exactly what piece of

17   this Your Honor wants me to focus on.  But, the first

18   reaction after Mr. Bender's e-mail was to assess whether

19   it had occurred.  And that's outlined in the e-mail

20   correspondence that was provided to chambers.

21        THE COURT:  And once you determined that it had

22   occurred, what did you do?

23        MS. SMALLS:  We acknowledged the error to

24   defendants and said that we were trying to understand the

25   scope, in terms of which au pairs had received the e-mail.

1    And, as you can see from the e-mail correspondence with

2    the vendor, there was an extended back and forth trying to

3    determine the scope, the scope of the error.

4         And I think the cooperation that you see over the

5    course of that weekend was less cooperation and more

6    plaintiffs taking -- one, taking an affirmative proactive

7    role in acknowledging the error -- it was our vendor that

8    did it -- and doing everything that we could, even when we

9    disagreed with the remedy, to make sure that we did

10   everything in our power to correct it and correct it as

11   soon as possible.

12        So, you know, the first notice that we had was a

13   Friday evening.  I believe the corrective notice went out

14   Sunday evening to all au pairs that received the erroneous

15   e-mail in English.  You know, counsel for plaintiffs, as

16   well as the staff for the vendor, worked throughout the

17   weekend to make sure that we were responsive to

18   defendants' concerns, to the corrective measures that they

19   requested.

20        As you can see from the e-mail correspondence,

21   plaintiffs were concerned that an additional e-mail would

22   actually cause more confusion with au pairs.  And we

23   thought that the prejudice would be minimal, given the

24   fact that the notice clearly outlines which six FLSA

25   defendants it applied to.

1          Defendants strenuously disagreed.  Rather than make

2    this an issue that we bring before the Court, in fact, it

3    was our error, we immediately conceded to sending the

4    corrective notice, and sending it out within 48 hours of

5    receiving notice.

6          THE COURT:  And the text of that e-mail was that --

7          MS. SMALLS:  It was drafted by defendants.

8          THE COURT:  And no changes?

9          MS. SMALLS:  And no changes.

10         THE COURT:  All right.  And I understand you

11   stopped any further distributions of the original notices,

12   because I think only a third had gone out.

13         MS. SMALLS:  That's correct.  So, I mean, there are

14   two issues before the Court.  One is the fact that a

15   vendor pressed a button and included a dataset to the

16   wrong subset of defendants.  And then the second issue is

17   the method and manner in which plaintiffs distributed the

18   notice to FLSA au pairs.

19         THE COURT:  We will talk about that later.  I want

20   to focus on this first.

21         MS. SMALLS:  Yes.  Yes.

22         THE COURT:  All right.  Anything further you wish

23   to say?

24         MS. SMALLS:  So the only additional -- we, also, in

25   the vein of trying to make corrective measures, we also

1    translated the corrective notice, the language drafted by

2    defendants, in the original language.  As you can see, the

3    way that the e-mails were transmitted, the au pairs that

4    had been designated as primarily Spanish speaking and

5    primarily Portuguese speaking had gone first.  So the

6    transmittal e-mail was in Portuguese and in Spanish, so

7    the vast majority of au pairs that received the erroneous

8    e-mail.

9            So we translated the language of defendants into

10   Portuguese and Spanish, and then also had that sent out, I

11   believe on Monday, the following Monday, from the Friday

12   from when we first received notice, in the original

13   language that we sent the original notice.

14           We also voluntarily, though it wasn't specifically

15   requested by defendants, made modifications to the website

16   so that there was a banner that very clearly said for only

17   au pairs, and listing the six sponsor agencies.  To the

18   extent somebody clicked on the website, that would be the

19   first -- or one of the first things they saw.

20           So, if they were an au pair for one of the

21   antitrust-only defendants, they would see that on this

22   website, and the consent-to-join form only applied to the

23   FLSA defendants.

24           THE COURT:  All right.  I want to give defense

25   counsel an opportunity to be heard on this issue.  I can

1   understand why your clients are concerned, upset,

2   frustrated.  I imagine that there has been a lot of

3   confusion that has been created, a lot of concern.  But

4   the motion you filed was a bit vague on what damage has

5   occurred to you all.

6        So, can you tell me in more detail how your clients

7   were prejudiced by this erroneous transmittal of the

8   notice.

9        MS. REILLY:  This is Katie Reilly.  I represent

10  Agent Au Pair and Au Pair International, who are two of

11  the seven antitrust-only defendants whose au pairs

12  improperly received the FLSA notice.  I also represent

13  GoAuPair, who is an FLSA defendant.  But I am arguing for

14  the non-FLSA defendants now.

15       So, there has been a serious break of trust here,

16  and it starts with the protective order and the production

17  of the au pair contact information, which the clients

18  really view to be incredibly sensitive, valuable

19  information.

20       So I think it is important to set the stage that

21  the size of the 15 sponsors, you've got the largest six,

22  who are the FLSA defendants, and then the smallest nine

23  are the antitrust-only, and that is not a mistake or an

24  accident, it is structured that way.  But, what you are

25  dealing with, with the antitrust-only defendants, are

1    very, very small businesses, many only have one employee,

2    just the owner, and no support staff, and certainly no

3    sophistication when it comes to litigation.

4         So handing over that type of information is a very

5    difficult thing, and it was hard to explain to them why

6    they needed to do it, but with the assurance of the

7    protective order that this information would be guarded

8    scrupulously.

9         And so what happened -- and I will have to disagree

10   with the characterization of how plaintiffs responded once

11   the mistake was identified by Mr. Bender a few days after

12   the e-mail transmission went out.  What happened is there

13   was a flood of e-mails and calls to the antitrust-only

14   sponsors.

15        THE COURT:  And when you say "a flood," how many

16   are we talking about?

17        MS. REILLY:  So, out of my two clients, my client,

18   Au Pair International, which is slightly larger than Agent

19   Au Pair, received at least five e-mails -- there are

20   probably more, I've seen five.  We took actions right away

21   after seeing those initial ones, and more than five phone

22   calls.

23        THE COURT:  That is not a flood.

24        MS. REILLY:  Okay.  Well, there were more than I

25   can quantify that I can supplement for Your Honor.  I

1    don't have a precise number.  But there were many more,

2    those are just the ones that I personally saw or had all

3    of the details of.  This is all happening in realtime.

4         I then reached out to Boies Schiller.  There was no

5    proactive effort on their part to propose a solution to

6    this problem.  It was immediately a defensive mode; no

7    harm, no full, there is no problem here.  There is a

8    lawsuit, they are antitrust defendants.

9         THE COURT:  I read the e-mails going back and

10   forth.

11        MS. REILLY:  Okay.  I also would like to clarify,

12   you asked a question about cooperation.  There was good

13   cooperation that weekend that occurred between me and

14   Ms. Smalls.

15        THE COURT:  And why that couldn't translate to the

16   rest of this case, I don't know.

17        MS. REILLY:  I don't either.

18        THE COURT:  If you all would cooperate that way in

19   this case, you wouldn't be churning this case.  The amount

20   of time that you all spend filing vitriolic motions and

21   responses on issues that I shouldn't even be involved in,

22   could be resolved very easily if you would just cooperate

23   the way you cooperated over that.

24        MS. REILLY:  I agree, Your Honor.  I agree.  I do

25   want the Court to understand that there was incredible

 1    responsiveness and cooperation on both sides.  And I

 2    represent a client that doesn't have resources to pay me

 3    to spend my any entire weekend cleaning this mess up.  And

 4    that is what we did.  We worked together.

 5        There was resistance from Boies Schiller to the

 6    corrective e-mail.  They did edit it.  There was

 7    negotiation back and forth.  They did it.  But

 8    characterizing it as a proactive or heroic effort by them

 9    to fix it is just --

10        THE COURT:  That is kind of the thing -- I don't

11    care how you perceive them.  I want you all to get

12    together and act professionally to one another.  You all

13    work together.  You are advocates for your clients.

14        Was there anything beyond being an advocate for her

15    side and an advocate for your side that they violated in

16    some way?

17        MS. REILLY:  During those conversations, no.  I'm

18    the first to say, in answer to your question about

19    cooperation, that we cooperated.  Now, what happened, the

20    reason that the motion is filed, we were this close to

21    not --

22        THE COURT:  I read that.  I read that.  They agreed

23    to everything except that they were not going to

24    preemptively say that they would never represent anyone.

25    That is why I am spending 3 hours today, and I don't know

1    how many hours beforehand, dealing with this issue.

2         MS. REILLY:  And I understand that and appreciate

3    the time you are spending on it, Your Honor.  From our

4    clients' perspectives, we represent their interests, and

5    we needed that assurance that they weren't going to use --

6    they weren't going to benefit from the improper

7    solicitation e-mail to assert those claims in this suit.

8         And without having Your Honor's guidance about not

9    being likely to grant the motion to amend, that was the

10   logjam that caused us to have to file.  Our preference was

11   to resolve this.  We had multiple good-faith conferrals,

12   and we essentially had an agreement, and then there was a

13   change of position the next day that was very --

14        THE COURT:  I have read the e-mails, and I

15   understand your position.  I understand their position.

16   So stop trying to put a spin on it.  Just tell me the

17   facts, okay.  Stop trying to put a spin on what was agreed

18   to and what wasn't.  There was a conversation.  You

19   thought she said this.  She thought she said that.  And,

20   in the end, you didn't agree on number three.

21        MS. REILLY:  That's correct, Your Honor.

22        THE COURT:  But don't put a spin on it.  I don't

23   like the spin you are putting on it, trying to claim they

24   are doing something.  That is why we have this problem,

25   because you all think negatively of one another.  You

1   don't give anybody the benefit of the doubt.  So just tell

2   me the facts.

3          MS. REILLY:  Your Honor, I am responding to your

4   question as to why we are even pursuing this, and that is

5   the story.  If we had been able to reach an agreement on

6   that, we wouldn't have even brought this to the Court's

7   attention.  To be honest with you, it would have been our

8   preference to just resolve this in the spirit of the

9   cooperation that we dealt with it over the weekend, and

10  not even bring this to the Court's attention.  We just

11  couldn't get all of the way there, and that is why the

12  motion was filed.  And we are protecting our clients'

13  interests.

14         And I feel like Your Honor's comments about the

15  motion to amend, you have given us that peace of mind

16  assurance that we need.  I hope Your Honor can understand.

17         THE COURT:  I can understand exactly how your

18  clients feel.  I do understand why you were so upset.

19  But, you know, you all come in here and it is all spin,

20  spin, spin; the motions, the responses.  It is like you

21  are not really trying to get to a resolution.  You want me

22  to be mom and tell you which of you are right and which of

23  you are wrong.  And that is not my job.

24         I think you all need to start acting more like

25  professionals.  So, tell me, what is the damage that your

1    client faced, other than this "flood" of five e-mails and

2    phone calls that came in.

3           MS. REILLY:  So, are you asking about the remedy we

4    are seeking, because that is different than the actual

5    prejudice.  The prejudice goes far beyond anything that we

6    can quantify, in terms of --

7           THE COURT:  How?  Tell me what the prejudice is.

8           M. REILLY:  The prejudice is the harm to the

9    reputation, the business disruption.  We are seeking

10   limited attorney fees in connection with dealing with this

11   mistake and preparing for this hearing, the very limited

12   fees; money our clients don't have.

13          We are not spending a lot of time trying to get

14   experts required for business disruption or reputational

15   harm damages that our clients sincerely believe they

16   suffered.  But we're not -- it is not a good use of the

17   Court's resources or any of the parties' resources to go

18   down that road, Your Honor.

19          THE COURT:  All right.  Anybody else?  Any other

20   counsel?  Or are on you lead counsel for the antitrust

21   defendants?

22          MS. REILLY:  I am appearing today on behalf of the

23   antitrust-only defendants on this issue, Your Honor.

24          THE COURT:  All right.  In light of what I have

25   heard today, and in light of what I have read in the

1    documents, I believe that erroneous transmittal, although

2    extremely unfortunate, was indeed a mistake, and not the

3    product of any bad faith on the part of plaintiffs.

4         I've reviewed the correspondence between

5    plaintiffs' counsel and their e-mail vendor.  It is clear

6    to me from those communications that the vendor was

7    correctly instructed, and that the erroneous transmittal

8    was nothing more than exceptionally unfortunate mistake.

9         Plaintiffs' counsel quickly recognized the error

10   when they were contacted.  They took steps to mitigate the

11   damage, including by sending a corrective notice to the

12   antitrust-only au pairs and halting distribution of the

13   notices.

14        Defense counsel wants me to impose sanctions.  I am

15   not going to do that.  Ordering plaintiffs' counsel to pay

16   fees and costs for a regrettable mistake, and one they

17   took swift action to correct, is not, in my opinion, the

18   right remedy.

19        Nor am I prepared to bar plaintiffs' counsel from

20   representing any au pairs who erroneously received the

21   FLSA notice.  That would be, I believe, needlessly

22   punitive to the au pairs, who I hope we can all agree are

23   not at fault for this debacle.

24        I have already telegraphed how I would receive a

25   motion to amend the Complaint to add FLSA plaintiffs

1   against antitrust defendants.  The transmittal blunder

2   might result in some follow-on suit, I don't know.  But I

3   am not going to issue a per se bar on representation.  I

4   just don't think that is appropriate, either.

5       So, to the extent that defendants' motion requests

6   that I impose sanctions for the onerous transmittal; that

7   request is denied.

8       That brings us to second issue of the content and

9   form of the transmittal e-mail and the website.  We will

10  dispose of that issue fairly quickly.

11      For reasons I do not understand, because I thought

12  I was clear on the issue in my Order granting conditional

13  certification, there is still a dispute regarding whether

14  the notice should have been disseminated to au pairs

15  sponsored between 2009 and 2016, or 2013 and 2016.

16      As I said in my Order, notice is appropriately

17  distributed to au pairs who were sponsored between 2009

18  and 2016.  I am reserving ruling on the statute of

19  limitations until such time as we can get global

20  resolution of the issue.

21      Now, as part of my conditional certification order,

22  I directed plaintiffs' counsel to prepare a new notice

23  form.  My order read in part:  "Plaintiffs shall provide a

24  new notice form, revised in accordance with this Order, to

25  defendants for review.  Defendant shall have two business

1    days from the receipt of such a revised notice form to

2    assert any objection that the form does not comply with

3    this Order."

4         The notice form should have been reviewed at that

5    time to reflect the correct notice window.  It was not.  I

6    am directing plaintiffs' counsel to modify the notice form

7    so that the window properly reflects the 2009 to 2016

8    period contemplated in my Order.

9         At this point, I am bringing in now the Plaintiffs'

10   Motion to Amend the FLSA Notice, Document No. 618, to the

11   discussion, because the issues contemplated therein,

12   namely questions regarding the substance of the notice

13   documents, are similar to the remaining questions in

14   defendants motion.

15        And, I will tell you, reading both of these motions

16   and the responses and replies thereto has taxed my

17   patience, not because there aren't important issues

18   implicated, but because professionals operating in good

19   faith and with mutual respect and professionalism, should

20   have been able to resolve these issues before they spun

21   out of control.

22        Defense counsel has a number of objections to the

23   language of the transmittal e-mail and the website and the

24   way in which links to the official notice documents were

25   presented.

1          Here is my question to defense counsel.  There are

2     a ton of you here.  Among all of you, how many FLSA

3     collective action suits or class actions have you

4     litigated?

5          Mr. Quinn, what would you estimate?

6          MR. QUINN:  Me personally?

7          THE COURT:  You personally, or everybody here.

8          MR. QUINN:  Five to 10.  Speaking for the group, I

9     am not sure.

10         THE COURT:  Would each of you say you have each

11    done at least one?  Anybody that this is their first?  All

12    right.  So, with your collective decades of experience

13    doing this kind of work, it did not ever occur to you that

14    you might want to review the content of the transmittal

15    e-mail or website before notice went out?

16         Were you under the impression that elves were going

17    to deliver the court notice documents directly to the au

18    pairs?  How did you think that was going to happen?

19         I ask the same question of plaintiffs' counsel.

20    Between all of you, how many FLSA collective action

21    lawsuits or class actions have you litigated?

22         MS. SMALLS:  Approximately five, Your Honor.

23         THE COURT:  All right.  With your collective

24    experience doing this kind of work, it never occurred to

25    you that it might be best to share the content of your

1    transmittal e-mail and website prior to commencing the

2    notice procedure?  Isn't that what considerate

3    professionals would have done?  At the very minimum,

4    wouldn't that have been the prudent thing to do, an action

5    which would have completely solved the crisis before it

6    even began?

7          If either side had acted like competent

8    professionals, we wouldn't be where we are today.  And

9    that's what is most frustrating to me about this entire

10   dispute.

11         So, here is the bottom line.  I am not here to do

12   your work for you.  I am denying the remainder of

13   defendants' motion and plaintiffs' motion, Document Nos.

14   596 and 618, without prejudice.  I am not going to tie

15   your shoestrings.  You are all going to do what you should

16   have done from the beginning, which is work together to

17   move this litigation forward by acting like reasonable

18   professionals.

19         To that end, get out a pad of paper and take some

20   notes, because I am ordering you to do the following:

21         The original transmittal e-mail went out to 30,741

22   au pairs before transmission was halted.  The 60-day

23   reminder should be sent to those au pairs, minus the

24   antitrust-only, on September 3, 2017, which is fast

25   approaching.

1          You are ordered to confer on or before Wednesday,

2     August 30, 2017, and hash out the language for the

3     reminder e-mail that is agreeable to all parties and in

4     accordance with my Order.

5          If, and only if, you are unable to come to an

6     agreement with respect to that language, you are directed

7     to file briefing by close of business on Thursday, August

8     31, detailing the language on which you cannot agree.  And

9     I am warning you right now, if you can't come to an

10    agreement on the language, you better have a damn good

11    reason.

12         When you reach an agreement, you are directed to

13    file a short notice with this Court indicating as much.

14    Plaintiffs' counsel should then transmit the reminder

15    e-mail as scheduled.

16         Now, there are 60,463 FLSA au pairs, I believe, who

17    have not yet received any notice.  You are ordered to

18    confer on or before Wednesday, September 6, 2017, and hash

19    out language for the transmittal e-mail and the website

20    that suits all parties.

21         Again, if, and only if, you are unable to reach an

22    agreement with respect to that language, you are directed

23    to file briefing by close of business on Thursday,

24    September 7, 2017, detailing the language on which you

25    cannot agree.  And, again, you had better have a very good

 1    reason for failing to come to an agreement.

 2         When you reach an agreement, plaintiffs' counsel is

 3    ordered to file a short notice with this Court, and then

 4    transmit the e-mail to the remaining au pairs on Monday,

 5    September 11, 2017.

 6         Now, I will tell you, starting September 5th, the

 7    day after Labor Day, I am in back-to-back civil and

 8    criminal trials until Thanksgiving.  So, if we have to

 9    come back to court, you are going to have to be here after

10    hours.  That is the only time I will be able to fit

11    anything in.

12         All right.  Because these instructions effectively

13    have two notice tracks, I am ordering that the scheduling

14    of deadlines for reminder e-mails and closure of the

15    notice window be transposed onto the new notice track that

16    begins on September 11; In other words, the reminder

17    e-mail.  So the second track should be transmitted 60 days

18    later, on November 10, 2017, and the opt-in window will

19    close 60 days after that, on January 9, 2018.

20         In terms of the substance, I am going to leave it

21    to you all to work out the language of these e-mails and

22    the website.  I weigh in by ordering the following:

23         Any transmittal e-mail, including the 60-day

24    reminder, and the website, should make clear:  1, that the

25    communication is Court authorized.  2, that joining the

1    lawsuit includes certain responsibilities, as set forth in

2    Section 4 of the notice document.  And, 3, that sponsor

3    families are not defendants in this lawsuit.

4         Any questions about what I just ordered?

5         MS. SMALLS:  No, Your Honor.

6         MR. QUINN:  No, Your Honor.

7         THE COURT:  All right.  The last motion, then, is

8    the Plaintiffs' Motion to Amend the Scheduling Order,

9    Document No. 620.  Plaintiffs' counsel represents that

10   they had difficulty meeting the expert disclosure deadline

11   because of issue with production and the ongoing addition

12   of plaintiffs to this suit, any of whom might have

13   information that bears on the content of the expert

14   reports.

15        I have reviewed the motion, and I believe there is

16   good cause to extend the deadlines, as set forth in the

17   motion.  I will issue a brief written order at the

18   conclusion of this hearing that lays out the new

19   deadlines.

20        All right.  Now that we have disposed of all of the

21   business I was here to discuss, I want to ask, what is the

22   future of this lawsuit?  This case is 3 years old, going

23   on 4 and, unfortunately, it appears to me to still be in

24   its infancy.  I would like to hear from both sides with

25   respect to where we think we are going to go from here.

 1    How you all are going to work together to make sure we

 2    work expeditiously.

 3         Let's just, for purposes of this discussion, assume

 4    for the sake of argument that I grant the certification of

 5    the FLSA classes.  What are the next steps if that

 6    happens?

 7         MR. LIBLING:  Your Honor, Joshua Libling for the

 8    plaintiffs.

 9         I think the next steps formally, we have to build

10    up to a Motion for Summary Judgment, which is expected, as

11    the major next step before trial.  To do that, there are

12    expert issues, in terms of deadlines, which I think will

13    be mostly resolved by the forthcoming order that Your

14    Honor plans to issue.

15         Defendants have raised, in consultation with us,

16    not before the Court, but just to us, they have raised a

17    desire to do opt-out discovery.  In fact, they have raised

18    the desire to do literally hundreds of opt-in -- sorry,

19    opt-in discovery.  In fact, they have told us they want to

20    do literally hundreds of depositions of opt-in plaintiffs.

21         The status of that discussion is that we have taken

22    the position -- we have taken two positions.  One, we have

23    said that any kind of discovery of that kind not be done

24    twice.  Any class that may be certified for the antitrust,

25    needs to be all -- any kind of opt-in or class member

1    discovery needs to be done just once for everyone, that is

2    the first position we took.

3        The second position we took is before evaluating

4    their request to do literally hundreds of depositions and

5    sending document request to literally every opt-in -- that

6    is what they asked for -- we have to know what they were

7    hoping to achieve.

8        THE COURT:  Well, don't you think they will want to

9    know what the damages are for each of those plaintiffs?

10    What their claims are.  That is what happens when you

11    contact -- I wasn't a lead counsel on one, but I helped

12    take hundreds of depositions in one of the big drug class

13    actions.  That is what they need to do.

14        MR. LIBLING:  I think that in this case, it is very

15    easy to know what the damages that are being sought by any

16    particular au pair is, you only need to look at --

17        THE COURT:  That is your perspective.  But they are

18    defendants.  They have an obligation to their clients.  So

19    I don't think it is at all unreasonable that if they want

20    to spend the money to take that, and to fly to all of the

21    different countries they have to go, to get interpreters

22    to do that, I think that is within the realm of what they

23    are entitled to do.

24        MR. LIBLING:  Your Honor, we think that -- we

25    haven't taken the position that they can't do any of that,

1    but we think that some kind of smaller sampling would make

2    sense; that they could do fewer than they have requested,

3    and maybe that would be illustrative.

4        THE COURT:  That is not my decision to make, that

5    is essentially their decision to make, isn't it?

6        MR. LIBLING:  I don't think they are -- I don't

7    think under the law that they are automatically entitled

8    to hundreds of depositions.  They may be entitled to some.

9        THE COURT:  All right.  Well, let's not get into

10   it.  I am just trying to figure out, where is this case

11   going?  Assuming that I do grant some final certification

12   here for certain classes, then they know what their

13   dealing with in terms of the class members.  There is

14   going to be additional discovery.  There will be discovery

15   as to -- your expert reports are due in, and there will be

16   discovery as to that.

17       So, what are we looking at?  Are we looking at 2020

18   before we even get to trial, if we go to trial?  How many

19   years are we looking down the road?  Because this case is

20   going to be 4 years old.

21       MR. LIBLING:  Well, from our perspective, Your

22   Honor, we ask that summary judgment briefs be due November

23   30th.  And the only reason I think that there is a

24   question mark there is because if there are going to be,

25   what we view as an absurd number of depositions, that will

```
 1   extend the case.  Otherwise, we think we could get through

 2   this.  You know, we get summary judgment briefing done by

 3   early -- I would hope by early 2018, and then it would

 4   just be whenever Your Honor decides that, and trial if

 5   necessary.

 6        THE COURT:  All right.  And with respect to the

 7   antitrust claims, do I need to bifurcate?  How long is the

 8   trial, if we go to trial, how long will that take?  We

 9   have two sets of defendants here.  Some are involved in

10   both the antitrust and FLSA case, some are only antitrust.

11   What are we looking at in terms of how we handle that?

12        MR. LIBLING:  I will say, Your Honor, we haven't

13   discussed this issue with the defendants, to my knowledge.

14   Standing here today, I don't think there would be a need

15   to bifurcate the trial.

16        THE COURT:  Have you moved forward on the antitrust

17   claims, at all?

18        MR. LIBLING:  We have briefed a motion for class

19   certification.

20        THE COURT:  Right, for class certification, but

21   that is it?

22        MR. LIBLING:  I am sorry, Your Honor?

23        THE COURT:  That is fine.  That is fine.

24        Let me hear from defendants.

25        MR. QUINN:  Let's start at the end and work our way
```

1    forward.  We think we can have trial next year.  I think

2    the November 30th summary judgment deadline, I think, is

3    extremely optimistic of where we currently are in terms of

4    plaintiffs' expert disclosures and beginning individual

5    opt-in plaintiff discovery.

6         I think one way to keep the case moving quickly

7    would be to begin to have disclosure of opt-in plaintiffs

8    and to begin opt-in plaintiff discovery right now, as soon

9    as we can, that way we can get that going.

10        In terms of hundreds of depositions, I suppose that

11   can be taken as a potential, but really what we had talked

12   about is an up-to-10-percent-of-the-class type proposal.

13   We don't know the final class numbers.  Obviously, we are

14   not going to know until sometime in early January.  So we

15   really won't know what those final numbers look like.

16   Could it be hundreds?  It could be.

17        I think there is some realistic travel concerns,

18   and that sort of thing.  So we are looking as fast as we

19   can.  We are coming up at the very end of summer.  We are

20   coming into fall, then November, December, and that is

21   sort of a hard time to get discovery done.  But we will do

22   our best to get it done.

23        So, I think we have to tinker with the summary

24   judgment deadline.  I think we have to set a trial, and

25   once we have a trial date, we have to move forward with

1    it.

2              In terms of bifurcation, in terms of how we posture

3    the trial structure, I haven't given that much thought

4    yet.  I think maybe the thing to do is keep it all as one

5    for the time being as we move through the summary judgment

6    process, and see what makes sense after you determine what

7    remaining issues are to be resolved between the parties.

8              THE COURT:  All right.  And so when you say "tinker

9    with the summary judgment deadline," what do you think

10   would be a reasonable time, considering the hiccups we

11   have gone through.

12             MR. QUINN:  Can you give me just a moment, please?

13             THE COURT:  We don't have to decide it now.  I am

14   getting ready to issue an order setting deadlines on other

15   matters.  I do think that it is very optimistic to think

16   you could be in a position to be able to do summary

17   judgment motions by November.  So, I think we probably

18   ought to bump that deadline.

19             I would like you all to confer with each other and

20   with all the co-counsel to see what you think would be a

21   reasonable time frame.  And if there are any other dates

22   that need to be changed, as well, send something to

23   chambers, via e-mail, indicating that this is what you

24   have agreed upon, and then I will issue the order that I

25   was going to issue.

1          But I think that you are absolutely right, that

2     there is just no way.  And I just want to move this case,

3     and I want to move it forward expeditiously.  But I want

4     to make sure that you have the opportunity to represent

5     your clients fully.

6          So I think that is something you all probably need

7     to discuss and come to agreement upon.

8          MR. LIBLING:  Your Honor, Joshua Libling.

9          Plaintiffs are requesting clarification.  Were you

10    saying that we should confer on all of the deadlines,

11    including those that were subject to the motion, to see if

12    we can agree, or we should await your order?

13         THE COURT:  No, I have bumped all of the deadlines

14    that are impacted by the Order.

15         LAW CLERK:  Your Honor, may I offer a point of

16    clarification?

17         Counsel, I think the Judge's position is that if

18    you look at the proposed order that was attached to

19    plaintiff counsels' motion, if you take every deadline for

20    the Rule 56 motions, that is how the Court would want to

21    proceed with those deadlines.

22         The Judge would like you to confer on the deadlines

23    for the Rule 56 motion, oppositions, and reply in support

24    thereto, and to get back to us so we can issue a complete

25    order in the next 48 hours that addresses all of those.

1          My understanding is that it is the Judge's position

2     that she would like to move forward with the deadlines as

3     set forth in your proposed order with respect to a reply

4     in support of Rule 23; affirmative expert disclosures,

5     rebuttal expert disclosures, and any fact discovery.

6          MR. QUINN:  I understand.  Thank you.  So

7     affirmative expert disclosures will be October 2.

8     Rebuttal, October 30.  Fact discovery ends November 3rd.

9     We will confer in the next 48 hours on everything else.

10         LAW CLERK:  That is what my boss has told me.  But,

11    still, I think she wants your -- she just ordered you to

12    confer with respect to the remaining deadlines that were

13    on that proposed order and to get those to us, please, as

14    quickly as possible, so we can get this order issued,

15    because we don't want to issue two orders on the

16    deadlines.

17         MS. REILLY:  One question.  Something that would

18    help our conferral about the remaining deadlines would be

19    if Your Honor agrees that we can start with the opt-in

20    discovery now, as opposed to what plaintiffs have

21    proposed, that we have to wait until the Court has ruled

22    on the Rule 23 motion before any of that discovery can

23    start, that would put this trial out to 2020.

24         THE COURT:  So why is plaintiff digging its feet in

25    with respect to at least starting the discovery with the

1    opt-in plaintiffs?

2          MS. SMALLS:  Your Honor, we have two concerns.

3    One -- and you have already noted that the FLSA defendants

4    are the six largest defendants; they make up 95 percent of

5    the entire au pair class.  What we have put forward to

6    defendants is that we are fine proceeding, but we don't

7    want to agree on a process for the FLSA defendants and

8    then redo the discovery for the same class.

9          THE COURT:  Well, if they are going to take a

10   deposition, they will take a deposition, and that is what

11   you want.  Any objection to that?

12         MS. SMALLS:  No.

13         THE COURT:  So that's done.

14         MS. SMALLS:  Okay.  And then the second concern was

15   the fact that because we halted the process, we have a

16   body of opt-ins that opted in early.  And, so, given their

17   proposed limitations, they originally proposed 20 percent,

18   20 depositions.

19         THE COURT:  I don't want to get into that.

20         MS. SMALLS:  Okay.  But the limitation, whatever it

21   is --

22         THE COURT:  Is there any reason you can't start

23   giving them discovery as to the opt-ins?

24         MS. SMALLS:  My only concern, Your Honor, is that

25   it would pose a disproportionate burden on the early

1    opt-ins versus the later opt-ins for discovery purposes.

2         THE COURT:  In what regard?

3         MS. SMALLS:  Well, if they are limited to 20 --

4         THE COURT:  I don't think they will take all 20 of

5    them, from what they said.  But they want to start getting

6    it moving so they can study who is coming in and who they

7    might want to depose.  And when they do this, the 10 or

8    20, whatever it is, I assume they look to see who would be

9    the best for their defense.

10        MS. SMALLS:  Your Honor, our only concern is that

11   it would provide -- it would be a disproportionate burden

12   on the early opt-ins.  The other thing I would note is

13   that in terms of information about the opt-ins, the

14   defendants actually have more information than plaintiffs

15   because they have all of their personnel files.

16        THE COURT:  So let's just -- they are entitled to

17   get this information through discovery anyway; right?

18        MS. SMALLS:  That's correct, Your Honor.

19        THE COURT:  Let's start the process.

20        MS. SMALLS:  Okay.

21        THE COURT:  You all confer, figure out what it is

22   you can do, but let's start getting that information

23   moving, because I don't want to have this on my report 5

24   years from now as still being a pending case.  I want to

25   get this case moving forward.

1          MS. SMALLS:  Understood, Your Honor.

2          THE COURT:  So you all confer, figure out what you

3     can do with respect to that, and send that in within the

4     next 48 hours.

5          And, remember, please keep in mind my admonition to

6     please be professional with one another.

7          MS. SMALLS:  Yes, Your Honor.

8          THE COURT:  You are zealous advocates, I understand

9     that, but you can be very professional and very

10    reasonable, as well.

11         Anything further?

12         MS. SMALLS:  No, Your Honor.

13         MR. QUINN:  No, Your Honor.

14         THE COURT:  All right.  Court will be in recess.

15         (Proceedings conclude at 10:10 a.m.)

16         **R E P O R T E R ' S   C E R T I F I C A T E**

17         I, Darlene M. Martinez, Official Certified

18    Shorthand Reporter for the United States District Court,

19    District of Colorado, do hereby certify that the foregoing

20    is a true and accurate transcript of the proceedings had

21    as taken stenographically by me at the time and place

22    aforementioned.

23         Dated this 28th day of August, 2017.

24         _____

25         s/Darlene M. Martinez, RMR, CRR