1

1                  IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLORADO
2
        Case No. 14-cv-03074-CMA-KMT
3       _____

4       JOHANA PAOLA BELTRAN, et al.,

5            Plaintiffs,

6       vs.

7       INTEREXCHANGE, INC., et al.,

8            Defendants.
        _____
9

10              Proceedings before KATHLEEN M. TAFOYA, United

11      States Magistrate Judge, United States District Court for the

12      District of Colorado, commencing at 9:42 a.m., November 17,

13      2017, in the United States Courthouse, Denver, Colorado.

14      _____

15              WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

16      ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED. . .

17      _____

18                             APPEARANCES

19              SEAN RODRIGUEZ, NINA DISALVO, and JUAN VALDIVIESO,

20      Attorneys at Law, appearing for plaintiffs.

21              JOSEPH HUNT, Attorney at Law, appearing for

22      defendant InterExchange, Inc.

23      _____

24                           MOTION HEARING

25

**PATTERSON TRANSCRIPTION COMPANY**
scheduling@pattersontranscription.com

2

```
 1                    APPEARANCES (Cont'd)

 2             BOGDAN ENICA, ttorney at Law, appearing for

 3    defendant Expert Group International, Inc. d/b/a Expert

 4    AuPair.

 5             MARTHA FITZGERALD and DAVID MESCHKE, Attorneys at

 6    Law, appearing for defendant EuRaupair InterCultural Child

 7    Care Program.

 8             JONATHAN BENDER, Attorney at Law, appearing for

 9    defendant Cultural Homestay International.

10             JOAN LUKEY and DIANE HAZEL, Attorneys at Law,

11    appearing for defendant Cultural Care, Inc.

12             KATHRYN REILLY, Attorney at Law, appearing for

13    defendants Au Pair International, Inc., Agent Au Pair and

14    GoAuPair.

15             SUSAN SCHAECHER, Attorney at Law, appearing for

16    defendant APF Global Exchange, NFP.

17             ROBERT TUCKER, Attorney at Law, appearing for

18    defendant American Institute for Foreign Exchange, d/b/a Au

19    Pair in America.

20             MARTIN ESTEVAO, Attorney at Law, appearing for

21    defendant GreatAuPair, LLC.

22             LARRY STONE, Attorney at Law, appearing for

23    defendant A.P.E.X. American Professional Exchange, LLC.

24    _____

25
```

3

```
 1                  P R O C E E D I N G S

 2              (Whereupon, the within electronically recorded

 3    proceedings are herein transcribed, pursuant to order of

 4    counsel.)

 5              THE COURT:  Good morning, everyone.  Please be

 6    seated.

 7              MS. LUKEY:  Good morning, Your Honor.

 8              MR. RODRIGUEZ:  Good morning.

 9              THE COURT:  We're here today in case number

10    14-cv-3074, Johana Beltran, et al., versus a number of

11    defendants that I'll read out as we go along for appearances.

12    Let me advise you we have a couple of situations today, just

13    so all you know what's going on.

14              There are two -- at least two people that were

15    going to appear by phone and our phone system doesn't seem to

16    be working.  They've called in, then we tried to transfer

17    them, and they aren't on.  So if you hear a ring starting, it

18    means that we finally got that fixed.  We've got IT looking

19    at it.  So we'll stop if you hear this loud ringing.  The

20    phone will automatically answer and then we'll connect them

21    in.

22              The other thing is, I have a terrible cold and I

23    can't hear very well, so please talk into the microphone for

24    me because otherwise I won't be able to hear you.  And does

25    anybody -- do I sound like I'm shouting to any of you?  Okay.
```

4

1   So if I appear to be too loud it's because I can't hear.

2   It's not because I'm yelling at you.  So I just thought I

3   would alert you to that.  Yesterday I did have to take a

4   quick break and go cough my heart out for a little while and

5   then come back.  So if that happens, I'll ask you briefly to

6   just have some patience with me.

7            If any of you need a recess, you know, feel free to

8   ask.

9            So let's take appearances first.  For plaintiffs.

10           MS. DISALVO:  Nina Disalvo.

11           MR. RODRIGUEZ:  Sean Rodriguez from Boies Schiller

12   & Flexner for the plaintiffs.

13           MR. VALDIVIESO:  Juan Valdivieso from Boies

14   Schiller & Flexner for the plaintiffs.

15           THE COURT:  Okay, thank you.  And let me just read

16   the names because I'm not sure exactly who is on the phone.

17           For InterExchange, Inc.

18           MR. HUNT:  Joseph Hunt.

19           THE COURT:  All right.  For USAuPair.

20           UNIDENTIFIED SPEAKER:  Your Honor, they are not

21   appearing today.

22           THE COURT:  They're not appearing, okay.

23   GreatAuPair, LLC.

24           MR. ESTEVAO:  Good morning, Your Honor, Martin

25   Estevao.

1          THE COURT:  Expert Group International, Inc., d/b/a

2    Expert AuPair.

3          UNIDENTIFIED SPEAKER:  They're trying to call?

4          THE COURT:  They're one of the ones trying to call.

5    So that's --

6          UNIDENTIFIED SPEAKER:  Bogdan Enica.

7          THE COURT:  All right.  Did they have, to your

8    knowledge as a group, were they going to be speaking, have a

9    speaking part or anything?

10          MS. LUKEY:  No, Your Honor.

11          UNIDENTIFIED SPEAKER:  No, Your Honor.

12          THE COURT:  Do you think we can go forward without

13    them?  I hate to do that --

14          MS. LUKEY:  They had all agreed that I would speak

15    on behalf of the defendants, Joan Lukey for Cultural Care.

16          THE COURT:  All right.  Okay, so we'll keep trying,

17    but that's situation there.  So EuRaupair InterCultural Child

18    Care Programs.

19          MS. FITZGERALD:  Good morning, Your Honor.  Martha

20    Fitzgerald and David Meschke from Brownstein Hyatt for

21    EuRaupair.

22          THE COURT:  Okay, good morning.  And let's see, for

23    Cultural Homestay International.

24          MR. BENDER:  Good morning, Your Honor.  Jonathan

25    Bender from Holland & Hart.

6

1          THE COURT:  And Cultural Care, Ms. Lukey, we have

2     you and Diane Hazel?

3          MS. LUKEY:  Correct, Your Honor.

4          THE COURT:  All right.  And AuPairCare, Inc.?  No?

5     Does anybody know about them?

6          MS. LUKEY:  They are not planning to put in an

7     appearance this morning, Your Honor.

8          THE COURT:  Okay.  Au Pair International, Inc.

9          MS. REILLY:  Good morning, Your Honor, Katie Reilly

10    with Wheeler Trigg O'Donnell appearing on behalf of AuPair

11    International, Agent Au Pair, and GoAuPair.

12         THE COURT:  Okay, thank you.  American Institute

13    for Foreign Study.

14         MS. LUKEY:  They're trying to call in, Your Honor.

15         THE COURT:  These are call-ins.  Okay.  And so

16    would that be Mr. Macri?

17         MS. LUKEY:  It's going to be Mr. Tucker.

18         THE COURT:  Okay.  And I think my law clerk is

19    calling their offices to -- they may be on perpetual hold.

20    We're just not sure what happened.

21         Okay, and let's see GoAuPair we have already.  How

22    about American Professional Exchange, d/b/a ProAuPair?

23    They're not -- okay, hearing nothing, we'll go on.

24         And then 20/20 Care Exchange.  No one is appearing

25    for them, okay.  I don't think they were on the phone.  I

7

1   think there were only two, so we accounted for them.  All

2   right, so I think we can go forward today.

3           Before the Court is, let's see, the motion -- let

4   me get to the motion.  I think it's 711.  Excuse me, 710,

5   motion to compel before the Court involving basically the --

6   as I -- I'm just going to summarize briefly what I read, but

7   basically talking about whether or not any kind of

8   privileges, number one, existed; or, number two, if they did

9   exist, were they waived by sharing privileged information

10  with members of the Alliance, which is the trade group.

11          So I've read the primary cases that most of you

12  cited on both sides.  I didn't read in detail every case, but

13  I did read the ones that all of you seem to be relying on

14  most for the Common Interest Doctrine, which is what I

15  foresee as being the big issue here.

16          I think it's -- it's helpful to talk about work

17  product and attorney/client; but, frankly, we're all pretty

18  versed in the law and those, you know, subjects and we know

19  what is and what isn't, and I'm well aware that work product

20  can exist in people other than lawyers, so no one needs to

21  really convince me about that.

22          But what I'm really caring about here is whether or

23  not the Common Interest Doctrine applies, because I think

24  that really resolves the motion.  So if you disagree with me,

25  feel free to tell me so, but that's where I'm going with it.

8

1          So let's see, this is plaintiffs' motion?  And I'm

2   sorry, I don't know what's making that noise.  We had this

3   problem yesterday.  I wonder if this is the same problem

4   that's going on with the phone.  I think we have we need to

5   have somebody come in and look at the courtroom.  So I

6   apologize for the background noise.  I don't know what's

7   doing that.

8          MR. RODRIGUEZ:  Thank you, Your Honor.

9          Your Honor, I do think that there is a fundamental

10  issue here with attorney work product.  We do not dispute

11  that in some circumstances --

12          THE COURT:  I can't hear you.

13          MR. RODRIGUEZ:  My apologies.

14          THE COURT:  Maybe you get the microphone a little

15  closer to you; it moves.

16          MR. RODRIGUEZ:  Is this better?

17          THE COURT:  Yes, thank you.

18          MR. RODRIGUEZ:  Great.  In some circumstances we

19  certainly agree that non-lawyers can create work product;

20  however, so far as we can tell the defendant's notion of work

21  product includes any non-lawyer at a business after that

22  business has been sued.  I haven't seen them articulate any

23  sort of limiting principle.  They've said concerning the

24  subject matter.  They've said concerning the --

25          THE COURT:  Hold on a second.

1          UNIDENTIFIED SPEAKER:  Hello.

2          MR. FULFREE:  Hi, how are you?  This is John

3  Fulfree, Larry Stone and Bogdan Enica.  We're calling in for

4  the hearing today.

5          UNIDENTIFIED SPEAKER:  Okay, thank you.  The judge

6  is on the bench.

7          THE COURT:  All right.  This is Judge Tafoya and I

8  will mark all of you present now.  We had a discussion,

9  everyone has entered their appearances already, and we just

10  got started on the hearing.  Plaintiff is just beginning to

11  articulate its standing on the motion.

12          Can you hear me all right?

13          UNIDENTIFIED SPEAKER:  Yes.

14          THE COURT:  Okay, we can hear you fine.  Well, I'm

15  assuming most of the people in the courtroom can hear them

16  fine, right.  I'm having some difficulty.

17          MR. RODRIGUEZ:  So far as we can tell under

18  defendants' reasoning, any defendant can truthfully say on a

19  privilege log after litigation has begun that any exchange

20  between business people concerns the litigation and was made

21  with an intent to further the business's interest as agents

22  usually intend to do.

23          Under this theory there is no such thing as a party

24  admission after litigation begins.  I do not know how we

25  could challenge a privilege log because as long as the

10

1    defendants can say that the subject matter concerned subject

2    matter of the litigation, they would have a, at least prima

3    facie, work product argument, I believe, under their theory.

4            To take a very extreme example, the tobacco

5    companies very famously relied on inside and outside

6    consultants to create studies concerning the safety of

7    tobacco to discourage studies from being created, and they

8    did so by including attorneys nominally on all

9    communications.  They did so to claim attorney work product.

10   That, of course, is not the law and it never has been the

11   law.

12           I think the Ecuador (ph) case from the Tenth

13   Circuit makes this very clear.  It says we can't read Rule

14   26(b)(3) literally.  We have to look at the context.  That

15   context was codifying Hickman, (ph) which was a common law

16   doctrine that had just begun to be developed.  Hickman is

17   about attorneys' mental impressions and protecting the

18   questions of facts by attorneys because they reflect

19   attorneys' mental impressions and theories of the case.

20           The Tenth Circuit made very clear that it's the

21   traditional understanding that the work product doctrine is

22   intended only to guard against divulging the attorney

23   strategies or legal impressions.  The work product doctrine

24   solely protects the interworkings of an attorney's mind.  And

25   we agree that non-lawyers can assist attorneys.  We agree

**PATTERSON TRANSCRIPTION COMPANY**
scheduling@pattersontranscription.com

1    that legal representatives, in some circumstances, can claim

2    the doctrine.  For example, perhaps a pro se litigant, a

3    trustee, a conservator.  And there may be some special cases,

4    like claims adjustment, where the nature of the job works so

5    closely with attorneys that when it becomes clear that

6    litigation will occur, a business person is effectively

7    acting as almost a paralegal, as an agent of the attorney.

8           So I think that what defendants have done is taken

9    a very literal reading of the rule, in violation of what the

10   Tenth Circuit has explained the rule means, to try to

11   disconnect work product from the attorney's mind.

12          Now, turning to Common Interest Doctrine, I think

13   that there are two critical facts.  The first is that the

14   Alliance does not solely represent au pairs or the au pair

15   sponsor industry as defendants' opposition puts it.  They

16   represent a variety of businesses and other interests that

17   involve international travel and exchange.

18          Number two, the Alliance needs to have an identical

19   legal interest.  An identical legal interest is not an

20   interest that its members prevail.  Every trade association

21   has an interest, because of the nature of it -- the nature of

22   its existence and its purpose is to further its members'

23   business interests.  It would effectively be a per se rule

24   that protects trade associations and puts any discussion

25   among members potentially under the umbrella of privilege.

1          Finally, I want to note that we have 12 defendants

2    participating in this motion.  We have declarants from two of

3    those defendants.  Those declarants identify single attorney,

4    an attorney Allen, who is, I believe, claimed only to

5    directly represent Cultural Care.  The other defendant that

6    submitted declaration is AIFS.  AIFS's declarant has not

7    named any attorney.  In fact, he says one of his employees,

8    Ms. Ruth Farry (ph) attends almost all the meetings, but

9    Ms. Ruth Farry has not submitted a declaration.  None of the

10   ten other defendants has submitted a declaration explaining

11   the context or the nature of the discussions or anything

12   else.  So far as we can tell, the only specific note-taker

13   that has been identified is Ms. Heinz (ph).  She has not

14   submitted a declaration.

15          Finally, every entry on the privilege log has an

16   entry for unnamed Alliance staff; that is, defendants have

17   not even identified all of the non-lawyers who were present.

18   One of the entries still says that the attendees were

19   unknown.

20          I believe that defendants have not established

21   prima facie privilege because of their limited and narrow

22   declarations; that they fundamentally misunderstand the

23   attorney work product doctrine, and that there can be no

24   common interest.

25          If Your Honor has no further questions, I will

13

1    yield.

2              THE COURT:  All right.

3              MR. RODRIGUEZ:  Thank you.

4              THE COURT:  Thank you.

5              MS. LUKEY:  Were you planning a second part of the

6    argument, Sean?

7              MR. RODRIGUEZ:  No.

8              MS. LUKEY:  No?

9              MR. RODRIGUEZ:  Well, after, in rebuttal, yes.

10             MS. LUKEY:  Okay.  Good morning, Your Honor.

11             As previously indicated, I'm Joan Lukey here for

12   Cultural Care.  I'm speaking on behalf of the defendants and

13   would like to reserve the right of other defendants in case I

14   miss something to bring it to your attention.  I think it's

15   important for the Court to know that not all defendants were

16   involved in redactions; hence, there are some who are not

17   present as a result.

18             Briefly, I would like to talk to you about the

19   context in which this all arose, particularly in light of

20   something that was just said by my brother.  These were not

21   Alliance meetings, as should be apparent from the papers,

22   from the logs, and from the notes -- that have the materials

23   that have been turned into you as Exhibit 4 to defendants'

24   opposition; that is, we gave you the complete set of

25   materials with the very limited redactions that are in them.

1          These were circumstances where generally phone

2     calls, I think there may have been one meeting, were convened

3     for the sponsors only to discuss the litigation.  Every one

4     of these communications occurred well after the litigation

5     was filed.  Every one of the conversations occurred to

6     discuss how to go forward handling the litigation.

7          As I prepared my outline for the argument today,

8     one thing occurred to me.  I was going to say to the Court

9     that the matters that were redacted were not business

10    discussions; they are clearly specific discussions of legal

11    strategy which, in four instances on their face, reveal that

12    is a recitation of advice from counsel.  And with regard to

13    the declarations on file of Ms. Jordan and Mr. Ranforce (ph)

14    from Cultural Care and Mr. Goertz (ph) from AFIS, they were

15    reciting advice from their counsel, passing it along to the

16    group in a circumstance where, as Boies Schiller well knows,

17    there was an in-place written joint defense agreement, in

18    part, a function of this Court's understandable order to

19    control the discovery process in an efficient way of

20    requiring the defendants to act cooperatively with each

21    other.  Hence, a joint defense group was required to decide,

22    for example, with the limited number of depositions

23    available, whom they would be calling as witnesses.  There

24    had to be a cooperation.  The experts had to be selected as a

25    group.  There was no way for a defendant to avoid being part

15

1    of the joint defense group.  Plaintiffs know about the

2    existence of the agreement, they are aware of the existence

3    of the group.  They even have our joint defense e-mail

4    distribution which says "Beltran Defendants" on it and have

5    it available to them to use when they wish to do so to

6    communicate with all of us at once.

7         But I was thinking of saying to you what was in and

8    not in the redactions, it became apparent to me that this

9    Court needs to see the full version of this document.  This

10   Court needs to have the portions that are redacted.  And just

11   this morning I consulted with all of the other members of the

12   group and asked their permission to provide that to the

13   Court.  I am going to suggest that I hand it to the clerk

14   before I am finished and that we then go through, so that you

15   have it available quickly, and then that we then go through a

16   formal filing using the sealed process to get it into the

17   record so you don't have to worry about doing that piece if

18   you don't want to.

19        When you get it, you are going to see this.  There

20   are entries in which non-lawyer sponsors are talking about

21   principles, which clearly are principles of law that wouldn't

22   be known to a non-lawyer.  Those can be matched to the

23   declarations, whoever was taking the notes from the Alliance

24   usually it was Ms. Heinz.  And by the way, the only people

25   from the Alliance present as indicated are a scribner,

1   usually Ms. Heinz; and the executive director of the

2   Alliance, who was the facilitator on behalf of the sponsors,

3   the au pair sponsors.  These were not open meetings involving

4   others.

5           THE COURT:  Who -- what's the name of the

6   facilitator, the director?

7           MS. LUKEY:  Ellier (ph) -- what's Ellier's last

8   name?

9           UNIDENTIFIED SPEAKER:  Zyrka (ph).

10          MS. LUKEY:  Ellier Zyrka (ph).  He happens to be a

11  lawyer, by the way, but that is not referenced in the paper

12  as he's not acting as counsel.  But he's not a non-lawyer; he

13  is just not a lawyer to the parties.  He's a facilitator.

14          The Alliance exists for the purpose of furthering

15  the interests of its members and they come in subsets and

16  this subset is -- they're all exchange programs.  This subset

17  is of the au pair program and 13 of the 16 defendants are

18  members of the Alliance.  He, therefore, facilitated these

19  calls for them to discuss what to do.

20          THE COURT:  And was the -- was the Alliance's

21  attorney there other than Zyrka?

22          MS. LUKEY:  The Alliance doesn't have a regular

23  attorney, Your Honor.  And the answer is, no, the Alliance

24  did not have an attorney present.  It was only the Alliance

25  acting as facilitator and a member of his staff, Ms. Heinz,

1    acting as the scribner to keep notes that, by the way, the

2    participants who were on the phone didn't know were being

3    kept.  So the context in which this arose, the way these

4    notes came to the attention of the sponsors for the first

5    time was when one of the Boies Schiller lawyers pulled them

6    out at a deposition and started questioning the principal of

7    one of the sponsors.  The attorneys who were physically

8    present quickly recognized there were no Bates numbers on the

9    documents and asked where they were, where they had come

10   from.  And that was the first that the sponsors learned that

11   there had been a production of documents that included notes

12   containing what the defendants, the sponsors, thought were

13   privileged communications with each other and with the

14   Alliance, which shares a common interest with them.  And I

15   will obviously come back to that point very shortly.

16            But again, going back to what you're going to see

17   in the redactions which are extremely limited, they are

18   statements of legal principle made by laypersons who have now

19   given you declarations saying, I was reciting what our

20   attorneys told us.  And that was apparently made clear, but

21   the scribner didn't happen to note that.  In four other

22   instances, the notes actually say, Our counsel tells us X,

23   and then there is a response, Well, our counsel says Y.

24            Now, BSF -- Boies Schiller has already seen this.

25   They agreed to the clawback, as we would suggest under the

18

1    rules they had to, when the issue was raised, and they've

2    agreed to sequester those documents pending this ruling.

3           There is no way that any attorney could ever look

4    at these documents and not feel as if she or he are had just

5    inadvertently been joined on a conference call that was a

6    strategy session of the adverse parties.

7           This might as well have been a situation where the

8    Alliance's facilitator, through its staff member, made a

9    mistake and sent the invite, not simply to the sponsors, but

10   somehow to the plaintiffs' attorney.

11          An attorney in that circumstance would, of course,

12   to abide by ethical principles hang up the phone and/or,

13   hopefully, alert the other parties first and then hang up the

14   phone.

15          Here the documents were produced, apparently only

16   one day earlier, according to the papers of Boies Schiller;

17   but, nonetheless, no disclosure was made by Boies Schiller

18   that they had the documents.  The Alliance attorney hadn't

19   told the sponsors he was turning over the documents, and the

20   Alliance attorney was subsequently replaced on this case with

21   somebody who was retained for handling this matter.

22          Now, the Alliance obviously can't waive the

23   privilege of the parties to whom it belongs.  So the

24   facilitator's counsel, and the facilitator had to hire

25   counsel because they were subpoenaed, did something he wasn't

19

1    authorized to do, and Boies Schiller did not tell the

2    sponsors that this had occurred.  Rather, it was sprung on

3    them at a deposition.

4              THE COURT:  Since you are at a pause --

5              MS. LUKEY:  Yes.

6              THE COURT:  -- can I ask you, were there any of the

7    lawyers who are representing defendants in on any of these

8    conversations?

9              MS. LUKEY:  No, there were no lawyers on the call,

10   Your Honor.

11             THE COURT:  So it was all just the parties

12   themselves?

13             MS. LUKEY:  This is the parties.  And as we've

14   argued rather extensively in our brief, it isn't necessary

15   for the attorneys to be present when the parties are engaging

16   in a discussion within a joint defense group of what the

17   attorneys have advised.  That is not necessary.  One of the

18   cases we cited to actually involved another trade association

19   situation.

20             THE COURT:  Yeah, that's not really why I asked.  I

21   agree with you on that.  I mean, clearly the problem is,

22   there is an attorney/client privilege over here between the

23   client and the attorney, and the client then comes over here

24   and shares it with others without the attorney.  That's what

25   happened here, right?

1          MS. LUKEY:  Well, as long as -- that is what

2     happened here, Your Honor.  But as long as the party, the

3     client, is sharing it with others who, as a matter by

4     operation of law, are also treated as clients of the attorney

5     for purposes of the joint defense, that is not a waiver.

6          THE COURT:  Right.

7          MS. LUKEY:  The only issue whether by having their

8     facilitator present, that would be a waiver.  We'll come back

9     to that.  That's the common interest.

10          THE COURT:  And Heinz.

11          MS. LUKEY:  Excuse me?

12          THE COURT:  And Heinz.  So the facilitator and

13     Heinz.  They didn't just --

14          MS. LUKEY:  Well, she's the scribner.

15          THE COURT:  They didn't just put it together for

16     you and get off the phone, right?  They -- like my law clerk

17     just transferred the counsel that are by phone in here.

18     She's not on the line and can't get back on the line, right,

19     so she can't really hear.  So they didn't do that.  They

20     stayed on; the facilitator stayed on and the scribner?

21          MS. LUKEY:  Scribner.

22          THE COURT:  The scribner.

23          MS. LUKEY:  Well, the scribner had to stay on.

24          THE COURT:  The person who took the notes?

25          MS. LUKEY:  Right.  She is an administrative

21

1    employee, as I understand it, of the Alliance -- those are

2    the two Alliance employees who are known to be present.  The

3    executive director and the person who is taking notes on his

4    behalf, although, again, the sponsors were unaware that the

5    notes were being taken.

6            So if we have a common interest with the Alliance,

7    and again -- I would like to come back to that in just a

8    moment, but I had a couple of other points I wanted to make

9    first -- then none of that would be a problem because this is

10   a discussion among the parties who were sharing information

11   that their lawyers are also sharing.

12           So what was occurring during the time period --

13   this is so extraordinary, actually, I've never had a

14   circumstance where discovery was made of documents when

15   litigation was pending that relate to discussion of the

16   strategy by a joint defense group be the subject of a motion

17   to compel.  That is a highly unusual circumstance.  Nor have

18   I ever had a circumstance where notes that clearly relate --

19   remember, they saw the notes that talk about the advice of

20   counsel -- ended up in the hands of the adverse party and not

21   have those lawyers reveal that fact and disgorge the

22   documents as they're ethically required do, unless they get a

23   court order which they're now seeking.

24           But instead of doing that, they were using them at

25   the deposition, springing them on the sponsors which, of

22

1   course, is not the way the system is designed to work.

2          So we are in a circumstance in the middle of

3   litigation where a joint defense group is trying to talk to

4   each other; principals are trying to understand what's

5   happening, as well as their attorneys having their separate

6   meetings.

7          So what you have are regular discussions among

8   counsel as a group and periodic discussions, as reflected in

9   these notes, that are among the principals themselves trying

10  to understand what is happening.

11          To the extent that there are redactions, you have

12  from two of -- I believe there are three parties involved in

13  the redactions.  You have the declarations in which they

14  expressly say to you, I thought I was having a privileged

15  conversation among the defense group facilitated by a

16  nonparty that clearly has the identical interest to us, the

17  Alliance, our trade association, to assist us in getting

18  together and trying to understand.

19          When you read these, you will see that four of

20  them, as I started to say earlier, actually referred to the

21  fact that they are describing what their attorneys told them.

22          I do not, for the life of me, understand how it

23  could be that at that moment Boies Schiller didn't stop

24  reading and call one of us or alert us by e-mail.  I cannot

25  imagine how it is that we learned of this in the deposition

1    when the documents were placed in front of a totally

2    blind-sided director of one of the sponsors.

3            THE COURT:  Well, they got it from a third party,

4    that's why.

5            MS. LUKEY:  Well, Your Honor, that's not the way

6    the rules work.  If you get -- if you subpoena materials from

7    a third party, you are obligated to provide them to the

8    adverse side.  That's always been the case.  You don't just

9    get to just keep them.  They got it from a third party.  The

10   third party's lawyer didn't have the sense to send it out to

11   the sponsors, the other parties or their lawyers; but Boies

12   Schiller certainly knew they were obligated to turn over what

13   they got on subpoena from third parties.  We've been

14   obligated to do the same.  You don't hold onto them until

15   after you spring them on the other side.  Were we to have

16   done this to one of the plaintiffs, we would have heard about

17   it, I'm quite sure.

18           THE COURT:  I do want to hear from the other side

19   later that because this is the second time -- this is none of

20   your faults, but just to let you know, yesterday I had

21   exactly the same thing happen, where somebody subpoenaed a

22   third party, got the documents and just kept them, never gave

23   them up.  And as I was of the understanding, and I wasn't the

24   civil lawyer that all of you, I was the criminal lawyer, so,

25   of course, we gave everything up.  But for civil, I was under

24

1    the understanding that that was understood, that that's what

2    you had to do.  When you get documents from a third party,

3    you copy them, Bates-stamp and give them to the other side.

4            MR. RODRIGUEZ:  Your Honor, if you would like me to

5    address those facts now, I would be happy too.

6            THE COURT:  No, I will let you hold them, because I

7    don't want to interrupt Ms. Lukey.  But I do -- that is

8    concerning to me, as a judge because this is the second time

9    this has happened and I am not used to seeing that either.

10           MS. LUKEY:  I -- I have never seen it in 43 years,

11   and it caught us off guard.  Literally, every sponsors'

12   attorney who was not present was receiving frantic phone

13   calls and e-mails, as you can imagine, about this event.  It

14   was not a happy occurrence.  It should not have happened.

15           When you see these, which you will shortly, I think

16   you are going to be very surprised that a lawyer could read

17   them and not recognize, at least as to the four -- which, for

18   the Court's reference, appear on pages Bates-numbered 21, 22,

19   40 and 74 -- and not realize that they were literally reading

20   the strategic advice of counsel within the joint defense

21   group.

22           They now know, and they're not supposed to, where

23   the joint defense group feels their strongest points are and

24   their weakest points.  They now know of disagreements about

25   the weight to be accorded to certain events in the past.

1    They know the strategic thinking of our group which should

2    not be in their possession, and it is deeply troubling that

3    they do.

4              Let me turn to the common interest issue -- well,

5    should, I guess briefly, I'll just say with regard to

6    attorney/client privilege, you have the log.  All but four of

7    the entries in the log include attorney/client privilege,

8    most in conjunction with work product.  The attorney/client

9    privilege references every one of them, is either expressly

10   stating on its face in the redaction, My attorney says, or it

11   is the subject of the three declarations from Ms. Jordan,

12   Ms. Ranforce and Mr. Goertz saying, I got -- I regularly

13   got -- in Ms. Jordan's case, I regularly got the advice from

14   there then counsel, my predecessor Jeffrey Allen, before each

15   of these scheduled calls, and I shared it with the rest of

16   the sponsors, the joint defense group, on the principal side

17   as opposed to the lawyer's side.  And Mr. Ranforce saying, I

18   wasn't usually there, but on the one time you'll see a

19   reference to my comments, I got the advice from our counsel

20   that day and I shared it.  And Mr. Goertz says he believes he

21   did the same.  His is a little less clear than the other two.

22             So as to all the attorney/client privilege

23   references you now have, either the words or the redaction

24   itself will show you that it's talking about the attorneys'

25   advice or the individuals speaking whose notes were being

26

1    taken were describing the advice from their counsel and

2    asking what other thoughts.

3             There was not always agreement, as you would

4    expect, Your Honor, and it's awkward for us, frankly, to have

5    it known that there was not always agreement and where there

6    was disagreement and who thought what about whose advice, but

7    it is what it is.

8             Turning to the work product doctrine, we think,

9    very clearly, this is a circumstance where acting as

10   facilitator, Mr. Zryka's staff member took notes for him to

11   create a record of the positions of the parties within the

12   joint defense group because he believed they had a common

13   interest and he wanted to help them and we will come back to

14   it.

15            The portions that are redacted, I don't -- you

16   know, it occurs to me, I'm embarrassed that we didn't give

17   them to you sooner, because to look at in camera, I don't

18   really want to give it back to them unsequestered.  It's not

19   talking about the underlying issues in the case.  It's

20   talking about how the litigation is progressing.  There are

21   even comments, to be frank, Your Honor, on your opinion

22   recommending that the motion to dismiss be denied.  There is

23   nothing inappropriate said, but there are strategic comments,

24   should it be appealed, should it not be appealed, what is its

25   import.  Probably also part of the reason that the defendants

1    were a little embarrassed about turning them over, but there

2    is no reason for you not to see again.  Again, there is

3    nothing inappropriate, just consternation reflected.

4         So when you see these, you will see that everyone

5    of them has to do with strategy:  What do we do?  What is our

6    position?  Or it has do with:  Is this a strong point?  Or

7    is this a weak point.

8         I, for one, really don't like at all that we're now

9    in a circumstance where Boies Schiller has seen, read,

10   analyzed enough to start questioning a witness where we think

11   our strengths and our weaknesses are.  That is not a place I

12   like to be.

13        Turning now to the question that you first raised,

14   which is that of the common interest privilege, our

15   discussion of the law -- and the law is pretty extensive,

16   actually, in the Tenth Circuit -- appears on page 12 of our

17   opposition brief.

18        The description of the common interest is both the

19   Alliance and the sponsors obviously wished -- had a need to

20   prevail in this litigation.  The plaintiffs contend that that

21   common interest in assuring that this matter proceeded

22   successfully could not constitute a common interest.  That's

23   not true.  As you read through a common interest is the same

24   interest in a legal matter in a litigation.

25        In the notes that you already have unredacted

1    Ms. Jordan, who is from my client, states why there is a need

2    to prevail.  And she puts it in her own words thinking she's

3    in the midst of a privileged conversation.  She said, If we

4    lose this case, the AuPair program is gone, it dies.  That

5    was the common interest.

6           The sponsors, as the Court has heard in various

7    financials -- we've done the filings about the financial

8    issues -- do not operate at high margin, many of them are not

9    for profits.  This is not a high profit industry or

10   profession.  This is a circumstance where entities have

11   decided to proceed with a cultural exchange program.

12          So they don't have a lot of money, excess money

13   around.  And if it is determined that this is predominantly a

14   work program, thereby bringing into play domestic workers

15   bills and the like, and the need to have 50 different states

16   minimum wages reviewed, as well as all the municipalities,

17   then the program doesn't survive.  It's that simple.  So

18   there is the common interest.

19          The interest in ensuring that this cultural

20   exchange program survives, the Alliance is very interested in

21   that because this is a substantial subgroup of the Alliance

22   which represents, I believe it is four, it may be five,

23   cultural exchanges programs, of which this is one of the more

24   prominent ones.

25          Obviously, the sponsors who have devoted what they

1    do to this cultural exchange program have an interest in

2    making sure that the program survives.  That is the same

3    interest.  If their trade association doesn't share their

4    interest in the survival of this program, I don't know what a

5    common interest is.

6          The words that have been used in this circuit to

7    describe a common interest or response follows:  Where,

8    quote, different persons or entities have an identical legal

9    interest with respect to the subject matter of a

10    communication, close quote, that is otherwise protected, the

11    Common Interest Doctrine protects the communication or the

12    document.  And that is actually from a district court case

13    here in July of this year called Cejka, C-E-J-K-A, versus

14    Vectrus -- versus Vectrus.  And it cites to a couple of Tenth

15    Circuit cases.

16          This is not a circuit that has been shy about

17    common interest.  Common interest is an important doctrine.

18    It only exists where privilege or a protection otherwise

19    exists, such as the work product doctrine or the

20    attorney/client privilege.  And that is what we seek to

21    invoke here.

22          Contrary to the suggestions made by my brother, we

23    have not made any contention that any non-lawyer at a

24    business after it is sued can create work product and any

25    exchange concerning litigation with regard to furthering the

1     business interests of that entity is protected.  That is not

2     the case and that is abundantly apparent when you look at

3     these redacted extracts, which they've already seen, even if

4     they are now sequestered.

5            They are saying we cannot read Rule 26(b)(3)

6     literally.  Well, I think we can read it for what it fairly

7     says as interpreted in this circuit.  And what it fairly says

8     is that if different persons have the same -- have legal

9     interests, identical legal interests with respect to the

10    subject matter of the communication that is protected, the

11    Common Interest Doctrine protects that communication.

12           I would like to -- if the Court -- when the Court

13    is done with any questions it may have, to give a copy of the

14    pages which have redactions.  What we have done is to

15    highlight them in red.  We will then file them under the

16    provision that actually doesn't allow Boies Schiller to look

17    at them either until the Court rules.  They've already seen

18    them, they possess them, they've sequestered them.  And this

19    Court will then see what it is the defendants were trying to

20    protect.  And perhaps the Court will understand the level of

21    my distress because I've done a lot of work in the legal

22    ethics field, with the notion that these materials were

23    received, reviewed, used and undisclosed until the time that

24    they were used.  And even greater distress with the concept

25    of moving forward in a circumstance where the plaintiffs' law

31

1     firm, frankly, knows exactly where we think our weaknesses

2     are and knows exactly what our strategies are with regard to

3     trying to get the state department involved and so forth.

4     You will see all of that and they have already seen it.

5             Does Your Honor have any questions?

6             THE COURT:  I think I've already asked you the ones

7     that I have.

8             MS. LUKEY:  May I, Your Honor, hand a copy of this

9     to the clerk for your use?

10            THE COURT:  You can.  The way I'm going to have to

11    handle this is to take the whole thing under review and I

12    will look at the documents.  I do want to hear from

13    plaintiff, whether they have any objection to that.  So

14    that's a caveat, but to the extent that they don't, I'll look

15    at them and I'll have to issue a written order.  I think

16    that's the fair way to do it.  There is a few things that

17    have come out today that I was not aware of.

18            MS. LUKEY:  Subject to your taking the objection

19    from plaintiffs' lawyer, if there is one, is the procedure

20    that I proposed acceptable, Your Honor, that we would do this

21    and then use the level of protection that would be limited to

22    the Court's eyes only?

23            THE COURT:  We can do that without you filing it.

24            MS. LUKEY:  You can do it, okay.

25            THE COURT:  Just accept them and hold them under

1   restriction.  What is that, little two?

2          UNIDENTIFIED SPEAKER:  Two.  I think it's

3   one-sided, like they just want.

4          MS. LUKEY:  Just the site --

5          THE COURT:  All right.  The defendants and Court

6   only, but I think that's (inaudible) but we'll check.

7          MS. LUKEY:  I will hold it until you ascertain the

8   position of the plaintiffs' counsel, Your Honor.

9          THE COURT:  All right.  Let me ask first, for

10  you -- because I need to ask the other defendants if they

11  want to say anything.  So, first, do you object to me looking

12  at the unredacted complete document?

13         MR. RODRIGUEZ:  No, not at all.

14         THE COURT:  All right.  So I will ask that you give

15  the unredacted set to the clerk, who will accept them as part

16  of the minutes of this proceeding under the restriction level

17  appropriate or viewing by defendants' counsel and the Court

18  and Court staff only, which I think is Level II; but if I'm

19  wrong, we'll fix the number.

20         MS. LUKEY:  Thank you, Your Honor.

21         THE COURT:  Let me -- before you respond,

22  plaintiff, do any of the other defendants wish to make any

23  comments or statements today in court?  And then how about

24  you on the phone?  No.

25         UNIDENTIFIED SPEAKER:  No, Your Honor.

33

```
1              THE COURT:  All right.  So plaintiff.

2              MR. RODRIGUEZ:  Thank you, Your Honor.

3              Concerning the production that Ms. Lucky contends

4    that we reviewed and withheld, that production was made to us

5    the day before the deposition.  And it was made to us by an

6    entity the defendants claim has an identical legal interest

7    in this subject matter.

8              THE COURT:  Okay.  So, first, talk a little louder.

9    I really -- my ears are gone.

10             MR. RODRIGUEZ:  My mistake.  The production was

11   played to us by the Alliance the day before the deposition.

12             THE COURT:  And whose deposition was this, remind

13   me?  Goertz?

14             MR. RODRIGUEZ:  Susan Hayes (ph).

15             THE COURT:  Hayes.

16             MR. RODRIGUEZ:  Of EuRaupair?  You're pair.

17             THE COURT:  Okay.  So one day before you get it,

18   and then you use it in the deposition.

19             MR. RODRIGUEZ:  My colleague, Mr. Valdivieso did,

20   and he will be happy to speak to some of the factual details

21   surrounding the deposition, including the deponent's own

22   counsel's position on the papers while at a break in the

23   deposition.

24             However, it's not a situation where we had reviewed

25   the documents extensively before.  We had also assumed that
```

1     this organization that has an identical legal interest with

2     the plaintiffs would have produced it to them.  We certainly

3     did produce it immediately.  And we proceeded with a

4     deposition under an agreement that use of the deposition

5     alone would not waive any privilege.

6            The defendants waited over three weeks to say a

7     word about privilege, and they then raised it the night

8     before another Alliance deposition was scheduled to occur.

9            Now, concerning the joint defense privilege, the

10    defendants never raised that in their reply.  We mention it

11    in our opening brief.  Here are the facts.

12           The Alliance is not a signatory to any joint

13    defense agreement.  Mr. Zryka may have a law degree, but

14    according to his -- I believe it is the New York bar,

15    although it could be the D.C. bar, I'll be happy to file

16    immediately after this hearing.  He has been unlicensed and

17    listed as inactive for many years.  If he was acting as an

18    attorney, he was not legally allowed to.

19           Now, defense counsel has tried to recharacterize

20    the Alliance meetings or phone calls as convened for the

21    purpose of the joint defense group.  I've never heard of a

22    joint defense group call where no lawyers were present.

23           Further, I don't see how you can reconcile the idea

24    that the phone calls were convened for the purpose of legal

25    discussion when, by defendants' own admission, there were

35

1    portions that concern legal matters.

2             Finally, and before I leave the subject, I would

3    like to note that the last time we were before Judge Tafoya,

4    Judge Tafoya made very clear -- my mistake, Judge Arguello.

5    Judge Arguello made very clear that she would no longer

6    tolerate defendants constant accusations of misconduct by my

7    firm.

8             Concerning the Common Interest Doctrine, as

9    Ms. Lukey correctly said, the legal interests must be

10   identical; it must be a legal interest.  She did not identify

11   a legal interest.  She identified an interest in the business

12   continuing as it has.  That is a business interest.  That is

13   not a legal interest.  And it is not identical because the

14   Alliance is not a participant in the business itself.

15            I'm not going to engage with Ms. Lukey on the

16   merits of the case or the equities, except to note that, as

17   in the tobacco example I used earlier, any defendant who is

18   charged with misconduct that goes to the core of its present

19   business model or its preferred business model can say that

20   the matter is so important that there should be an exception

21   to the law.  There is no such thing as an exception to the

22   law because it's important to a defendants' business.

23            Now, I would like with Your Honor's permission,

24   Mr. Valdiviceso to give some more facts concerning the

25   deposition where the documents were used.

1            THE COURT:  All right.

2            MR. VALDIVIESO:  Good morning, Your Honor.

3            THE COURT:  None of them are tall enough for you,

4    right.  talk louder.

5            MR. VALDIVIESO:  I'm happy to answer any questions

6    that you may have about the timing of the production of

7    documents and the use of the deposition.  I was there, I took

8    the deposition.

9            I had been in contact with the Alliance for several

10   months trying to obtain these documents.  They had agreed to

11   produce them months -- weeks before, and they eventually

12   produced it the day before when I was already traveling to

13   Orange County to take this deposition.

14           I was reviewing other documents in preparation for

15   this deposition.  And we got these documents, and I didn't

16   even have time to review the whole production before the

17   deposition took place.  I identified pages where the deponent

18   appeared.  And I actually -- I spoke with my opposing

19   counsel, counsel for EuRaupair, fairly extensively during the

20   deposition in an effort to not do anything unfair.  I spoke

21   with her and told her that I intended to use these documents.

22   I told her that, from my understanding that because it had

23   been produced by a third party, that I didn't believe that

24   any privilege applied, and she did not -- she did not contest

25   that.  And so when I -- this was during a break.

1          After the break, I was going to use the documents

2   and some of the defense counsel objected.  And I -- excuse

3   me, I actually spoke with my opposing counsel at the

4   deposition to ask her if she had received the documents from

5   the Alliance, and she told me that she wasn't sure.  And

6   neither of us was really sure whether any of it had been

7   produced, but then I confirmed that it had been produced the

8   day before.

9          And so when I realized that the other defense

10  counsel had not received the documents, I immediately

11  e-mailed it to them, and I confirmed that they had received

12  them before I proceeded with the deposition.

13         So I just want to clear up any confusion that use

14  of these documents was an attempt to spring a fast one on my

15  opponents, an attempt to use documents that were, on their

16  face, privileged and that I was aware of that because I did

17  not have an opportunity to review these documents extensively

18  for any privilege until after that deposition had concluded.

19         And at that point, Your Honor, the defendants had

20  said at the deposition, We would like to designate the

21  portion of this transcript attorneys eyes only and we would

22  like an opportunity to review these documents for privilege

23  and call up docket if necessary.  And I said, Understood.

24  And I gave the opportunity -- I gave the defendants the

25  opportunity to so.  And then they took three weeks before

1    reaching back to me with a letter finally asserting privilege

2    over these documents when they knew the contents of the

3    documents and they knew that these were important documents

4    that we were trying to use in a deposition and they asserted

5    privilege the night before we were going to be deposing

6    someone else that was involved in with the Alliance.

7           So I just wanted to clear up the facts regarding

8    the timing.  I was, frankly, disappointed that there were any

9    allegations of unethical behavior with respect to our

10   handling of the documents.

11          As soon as my opposing counsel sent us the letter,

12   I had the documents sequestered, and I worked with them in

13   good faith to go through the process with the Court, the

14   processes required by Rule 45 to sequester the documents and

15   to bring them before the Court for the Court to make a

16   determination as to whether the documents were subject to any

17   privilege or work product claim.

18          Thank you, Your Honor.

19          THE COURT:  All right, thank you.

20          MS. LUKEY:  May I very briefly respond, Your Honor?

21          THE COURT:  Yes.

22          MS. LUKEY:  Your Honor will now have the

23   opportunity to review the documents yourself.  You are going

24   to find actual references to "our counsel confirms X" and

25   then someone else responding "that may not be so clear on one

1    of the key issues in this case."  You are going to find a

2    description of what Cultural Care's lawyers had done in terms

3    of the filing of a motion, and what their assessment was

4    regarding the conduct of a private investigator involved in

5    this case in a matter that previously came before the Court.

6             You are going to find discussions -- by the way,

7    the entire document is a discussion of:  How to do with he

8    handle this litigation?  Can we go to the Department of

9    State?  This part is unredacted.  Can we ask them to do X, Y,

10   and Z, and then you get to redactions when advice of ever

11   counsel as to whether that was or wasn't a good idea in the

12   current environment at that time.

13            I hear what my brother says, but these are entries

14   about the legal strategy of the counsel in the joint defense

15   group.

16            THE COURT:  You know, I'm -- I hear your concern, I

17   understand it.  But the other thing that occurs to me is that

18   the Alliance did have an attorney at the time.  I'm not

19   suggesting that that attorney binds the defendants in this

20   case, although if you're going to call them joint people with

21   identical interests, I don't know, but I think that lurks out

22   there.

23            But for the plaintiffs, they got the documents from

24   a lawyer who, apparently, made a determination that, on the

25   face of those documents that are -- if they say what you say

1    they do -- and I believe that they do -- that they weren't

2    privileged, and he turned them over.

3         So it's kind of hard for me to look at the

4    defendants with anything but somewhat, Well, what do you do,

5    you know?  You subpoenaed them.  Their lawyer looked at them

6    and said, They're not the privileged, here you go.

7         MS. LUKEY:  That actually, Your Honor, you'll see

8    in the papers that there is a discussion of the communication

9    that came from this lawyer who was very shortly thereafter

10   off the case, as you can imagine, replaced by somebody else.

11   The lawyer was not a regular for the Alliance.

12        There is a letter from him in which he says --

13   Okay, here are the first 77 pages and we've got a ton more

14   documents, but it's going to take a long time to review them

15   for privilege and I don't have time to it that so why don't I

16   just do that all to you, subject to a clawback agreement,

17   which, of course, the sponsors and the Alliance immediately

18   nixed.

19        There is no indication that he made a privilege

20   review on these documents, nor could he have, frankly,

21   although if he bothered to read them, he would surely have

22   recognized the legal strategy was contained within the notes.

23   But if he was concerned about privilege attaching to the

24   80,000, or whatever it is, pages of records of the Alliance,

25   that he wasn't going to go through, he was just going to

41

1   throw them all at plaintiffs because he wasn't going to look

2   for privilege, that would have to be on the same basis, the

3   privilege either existed or didn't exist, and he was

4   concerned about there being a privilege, but he wasn't going

5   to go to the trouble of figuring it out.  Again, unthinkable,

6   but that's what his communication says.

7          So I do not believe this Court can infer, nor do I

8   believe that the plaintiffs could infer, that he had actually

9   made a privilege review, even if he could have.

10         Now, just to go back to a point that you just made,

11   the Common Interest Doctrine only comes into play with a

12   separate entity, a nonparty.  The Alliance is not an agent or

13   representative here as we make clear in our papers.  They are

14   a nonparty separate entity that has a common interest with

15   the sponsors; namely -- and this is what the notes in their

16   entirety are about -- Can we save this program?  What can we

17   do?  Can we get the State Department to stop hiding, sitting

18   back and refusing to say anything and to come forward?

19   That's all in there.  And I don't know how you look at that

20   and don't recognize that you just have a road map to the

21   views of various counsel.

22         What they will now know that they may not have

23   quickly realized before is where comments are made that

24   clearly involve legal principles and knowledge being stated

25   by non-lawyers where it is not expressly noted, My counsel

42

1    said X, maybe they thought these sponsors were very

2    sophisticated about the law, even though they weren't

3    lawyers, although I think that's unlikely.  But where the

4    comments are made, Here is what the lawyers said, there is no

5    question in my mind.  It is what it is.  I did not hear any

6    statement from my brother that he had not read them, just

7    that he hadn't studied them in detail.

8           They were starting to be used at the deposition,

9    and I don't know about the conversation he is alluding to.  I

10   don't know who was there for the deponent.

11          I do know there was often confusion because

12   multiple attorneys at multiple law firms actually have to

13   cover because there is so much going on in the case.  And

14   whoever this attorney is, I don't know if she was one who

15   should or would have been aware of what the Alliance did, but

16   the truth is -- and there is no disputing this -- that

17   attorney, who was quickly removed from the case, didn't

18   provide it to anybody, except the plaintiff's counsel.  And

19   the plaintiff's counsel had an obligation before using it to

20   provide it to defendants.

21          We think that was recognized because as soon as

22   other defendants present objected, we all then received

23   scanned copies in the midst of the deposition after the

24   objections were put on the record.  In the confusion that

25   ensued, plaintiff's counsel wanted to proceed with the

1    deposition; defendants who couldn't reach the full defense

2    group to reach a coordinated decision said, Okay, but this is

3    all without prejudice, it's all basically protected under our

4    protective order, and we reserve our rights until we can sort

5    out what happened here.

6           But the only attorneys in this case who knew what

7    the Alliance had done were the plaintiff's attorney -- and

8    what the Alliance attorney had done, I should say, and not

9    the defendants.

10          So that's why we're now in a posture where you two

11   get to know what some of the strategy decisions have been and

12   where we think the strengths and weaknesses are, and what we

13   think about the FLSA claims and the like.  So be it.

14          It is not as I would prefer it, it is not as it

15   should be.  But it is what, it is.  Thank you.

16          THE COURT:  Let me ask you one question that I'm a

17   little bit -- I think I know the answer to this by the fact

18   that it has not been said, but I want to make sure of it.

19          The meeting -- and I don't know if there was more

20   than one, but the meeting that we've been talking about that

21   were facilitated, using your word, by the Alliance, was any

22   attorney directing that those meetings be held or facilitated

23   by the Alliance, the defense attorneys?

24          MS. LUKEY:  It's more than one meeting.  I know the

25   answer because it has it to do with my predecessor; but it is

```
1    not in the record and I don't know whether the Court would

2    like to us do a supplement or would rather let the record

3    stand.  I'm not sure that I should be making a representation

4    about what my predecessor may or may not have instructed, but

5    if it's of import to the Court, we will.

6              I can I think say this much, which can be inferred

7    from the record, clearly my predecessor anticipated and

8    expected that his advice was doing to be shared.

9              THE COURT:  All right.

10             MS. LUKEY:  Without getting an affidavit from him,

11   I don't think I can say to you:  Did he direct it to happen?

12   It was more than one meeting, as you will see.

13             And when you go through it, you're going to find

14   that all of it relates to the litigation.  I just want to

15   point out that on page 1 on the right-hand side -- and this

16   probably should have been taken out -- is a completely

17   unrelated discussion of an American Friends Service Committee

18   meeting, which has nothing to do with this.  And I don't

19   think there is anything in there of consequence, but I

20   apologize to the American Friends Service Committee for

21   including notes of that --

22             THE COURT:  All right.

23             MS. LUKEY:  -- with the others.  Everything else

24   you will see is a discussion of the strategy about what do in

25   had litigation.  All that was redacted was when lawyers
```

1    advice had been discussed or lawyers comments before the

2    developments in the litigation, such as Your Honor's earlier

3    ruling on the motion or recommendation on the motion to

4    dismiss.

5            THE COURT:  All right.

6            MR. RODRIGUEZ:  Your Honor, may I very briefly be

7    heard?

8            THE COURT:  Yes.

9            MR. RODRIGUEZ:  Your Honor, the cover e-mail from

10   the Alliance attorney that produced the documents is at

11   Valdiviceso Exhibit 7.  And he writes, Enclosed please find

12   documents responsive to your subpoena.  We also have a large

13   volume of potentially responsive documents, but which we have

14   not taken more time to -- but which have taken more time to

15   get through than expected.  He is distinguishing these

16   documents from another set.

17           Next paragraph.  He says, I propose that we enter

18   into a clawback agreement, such that we can produce

19   additional documents now while preserving our rights to

20   clawback any documents which are determined to be privileged.

21   Again, he is distinguishing what he is producing, these 77

22   pages, from different documents that he wants more time do a

23   privilege review on.

24           And finally, though my colleague says that the

25   limiting principle is now comments made about the law to

1   other business people are privileged, the papers that they

2   submitted say that communications concerning litigation by

3   non-attorneys are the essence of work product.  And if that

4   contention is allowed to stand, Your Honor, I think there

5   will be many, many more privilege disputes in this case.

6           Thank you.

7           THE COURT:  All right.  Great.  Anybody else have

8   anything else to add before the Court closes the hearing and

9   I'll take this under advisement, issue a written order, which

10  I'm sorry, that always does take awhile to get to.  It's

11  holidays.  So I'll do my best to get to this quickly, but I

12  just can't promise.  I wish I could.  It would be nice, if I

13  could just, Hey, here's something new, I think I'll work on

14  that, right.  But that's not how it works, unfortunately.

15          So anything for plaintiffs?

16          MR. RODRIGUEZ:  No, thank you.

17          THE COURT:  Defendants.

18          MS. LUKEY:  No, thank you, Your Honor.

19          THE COURT:  All right, Court will be in recess.

20          (Whereupon, the within hearing was then in

21  conclusion at 10:46 a.m.)

22

23

24

25

47

```
1

2    I certify that the foregoing is a correct transcript to the

3    best of my ability to hear and understand the audio recording

4    and based on the quality of the audio recording from the

5    above-entitled matter.

6

7    /s/ Dyann Patterson                    November 27, 2017

8    Signature of Transcriber              Date

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**PATTERSON TRANSCRIPTION COMPANY**
scheduling@pattersontranscription.com