IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Magistrate Judge Kathleen M. Tafoya**

Civil Action No. 14–cv–03074–CMA–KMT

JOHANA PAOLA BELTRAN,
LUSAPHO HLATSHANENI,
BEAUDETTE DEETLEFS,
DAYANNA PAOLA CARDENAS CAICEDO,
ALEXANDRA IVETTE GONZALEZ,
SARAH CAROLINA AZUELA RASCON,
LAURA MEJIA JIMENEZ,
JULIANE HARNING,
NICOLE MAPLEDORAM, and those similarly situated,

    Plaintiffs,

v.

INTEREXCHANGE, INC,
USAUPAIR, INC.,
GREAT AUPAIR, LLC,
EXPERT GROUP INTERNATIONAL INC., d/b/a Expert AuPair,
EURAUPAIR INTERCULTURAL CHILD CARE PROGRAMS,
CULTURAL HOMSTAY INTERNATIONAL,
CULTURAL CARE, INC. d/b/a Cultural Care Au Pair,
AUPAIRCARE INC.,
AU PAIR INTERNATIONAL, INC.,
APF GLOBAL EXCHANGE, NFP, d/b/a AuPair Foundation,
AMERICAN INSTITUTE FOR FOREIGN STUDY d/b/a Au Pair in America,
AMERICAN CULTURAL EXCHANGE, LLC, d/b/a GoAuPair,
GOAUPAIR OPERATIONS, LLC, d/b/a GoAuPair,
AGENT AU PAIR,
A.P.EX. AMERICAN PROFESSIONAL EXCHANGE, LLC d/b/a/ ProAuPair, and
20/20 CARE EXCHANGE, INC. d/b/a The International Au Pair Exchange,

    Defendants.

**ORDER**

This matter is before the court on "Plaintiffs' Motion to Compel and for Relief Under Federal Rules of Civil Procedure 26, 37, and 45" filed September 27, 2017 [Doc. No. 711]. "Defendants' Opposition to Plaintiffs' Motion to Compel" was filed October 6, 2017 [Doc. No. 715] and the Reply [Doc. No. 719] was filed by Plaintiffs on October 11, 2017.  The court heard argument on November 17, 2017.  (See Minutes [Doc. No. 757].)  At the hearing, Defendants presented the court with the unredacted documents which are at the heart of this dispute.  [Doc. No. 758, filed under restriction, Level 2.]  Plaintiffs did not object to the court's *in camera* review of the documents, which the court has now completed.

Also addressed in this Order is the parties' "*Stipulated* Motion to Amend Scheduling Order" filed November 3, 2017 [Doc. No. 747].

### BACKGROUND

Defendants are entities designated by the U.S. Department of State ("DOS") as sponsors for DOS' J-1 Visa Exchange Visitor *au pair* program.  Defendants maintain that the *au pair* program is a cultural exchange program which gives foreign nationals an opportunity to live with an American family for one year.  *Au pairs* participating in the program are paid a stipend and provided with room and board by host families.  Plaintiffs assert that the *au pair* program is a labor program which is covered by the Fair Labor Standards Act and various state labor laws, thus entitling *au pairs* to receive applicable federal or state hourly minimum wages, among other things.

The Alliance for International Exchange (the "Alliance") is a trade organization that existed before this litigation was commenced and has continued its business through the litigation. The Alliance is "an association of 90 nongovernmental organizations comprising the

international educational and cultural exchange community in the United States." (Resp. at 7, citing to the alliance-exchange website at http://www.alliance-exchange.org/about-alliance.) *Au pair* sponsor organizations, including Defendants, form a 13-member sub-group. *Id.* Officers of three Defendants (W. Gertz of American Institute for Foreign Study, E. Hoggard of Au Pair Foundation, and M. Schneider of AuPairCare) currently serve on the Alliance's Board of Directors. *Id*. The Alliance is not a party to this case.

Plaintiffs served an initial subpoena on the Alliance on or about January 30, 2017, followed by an amended subpoena on the Alliance on May 25, 2017. (Declaration of Juan P. Valdivieso [Doc. No. 709] ("Vald. Decl.") at Ex. 1, 2.) Plaintiffs and defense counsel, John Hathway, conferred on several occasions about matters of potential privilege and on August 23, 2017, Alliance made its initial production. Vald. Decl. 7 [Doc. No. 709-8] and Ex 8 [Doc. Nos. 709-9 – 709-16].

This motion primarily concerns the production of notes and a draft letter composed by a staff member of the Alliance during several discussions hosted by the Alliance and its *au pair* program members, including discussions about this litigation and potential responses to it. [See Doc. No. 758.] Defendants allege that "[b]ecause all of the Alliance *au pair* member organizations are named Defendants in this lawsuit, and the Alliance is Defendants' trade association, Defendants understood that they were discussing the litigation under the auspices of a common interest agreement." (Resp. at 7-8.)

Upon review of the notes *in camera*, the court finds that the notes are all dated after the filing of this litigation and that the redacted portions of the notes do reflect communications about the issues underlying the claims in this lawsuit between Defendants who are all signatories

3

to a Joint Defense Agreement[1] and two staff members of the Alliance who are neither defendants in this suit nor signatories to the Joint Defense Agreement. Therefore, the issues before the court are: 1) whether the redacted parts of the Alliance's production are privileged under the attorney-client privilege or the work product privilege; 2) whether the common interest doctrine applies to communications between the Alliance staff members and Defendants, and, if it does not, 3) whether the work product and/or attorney client privileges have been waived by disclosure to non-party Alliance staff.

## *LEGAL STANDARDS*

### A.   *Common Interest Doctrine*

In Colorado, the common interest doctrine, also known as the joint defense doctrine, is an exception to the general rule that the attorney-client or work product privilege is waived when privileged information is disclosed to third parties. *Marianist Province of U.S., Inc. v. Century Indem. Co.*, No. 08-CV-01760-WYD-MEH, 2010 WL 3938355, at *2 (D. Colo. Oct. 5, 2010); *Black v. Southwestern Water Conservation Dist.,* 74 P.3d 462, 469 (Colo. App. 2003) (citing *Wesp v. Everson*, 33 P.3d 191, 197 (Colo. 2001). "Communications shared with third persons who have a common legal interest with respect to the subject matter thereof will be deemed neither a breach nor a waiver of the confidentiality surrounding the attorney-client relationship." *Marianist Province of U.S., Inc., id.* "[T]he common interest doctrine extends the work product doctrine to those situations where parties share a "'common interest' in current or potential litigation, either as actual or potential plaintiffs or defendants." *BASF Aktiengesellschaft v.*

---

[1] At the hearing, all parties conceded that Defendants are parties to a Joint Defense Agreement which would allow them to share otherwise privileged information with one another and which allows their attorneys to do the same.

*Reilly Indus., Inc.*, 224 F.R.D. 438, 442 (S.D. Ind. 2004); *see also Beneficial Franchise Co. v. Bank One, N.A.*, 205 F.R.D. 212, 216 (N.D. Ill. 2001).

To maintain the privilege, the common interest must be a legal interest, not merely a business or financial interest. *BASF*, 224 F.R.D. at 442. The "common" interest must "be identical, not similar, and be legal, not solely commercial." *In re Urethane Antitrust Litig.*, No. 04-MD-1616-JWL, 2013 WL 4781035, at *2 (D. Kan. Sept. 5, 2013). The common interest doctrine includes pre-existing confidential communications and documents that are shared during a common enterprise. *Id.; see also Ritter v. Jones,* 207 P.3d 954, 960 (Colo. App. 2009). The common interest simply to prevail in the litigation, however, is insufficient. *United States v. Hudson,* No. CRIM.A. 13-20063-01, 2013 WL 4768084, at *2 (D. Kan. Sept. 5, 2013) ("[S]hared desire to see same outcome in legal matter is insufficient to establish 'common interest' or 'joint defense privilege.'"); *Hedquist v.Patterson*, 215 F. Supp. 3d 1237, 1246 (D. Wyo. 2016) (same), r*econsideration denied*, No. 14-CV-45-ABJ, 2016 WL 8453415 (D. Wyo. July 1, 2016).

Since the common interest doctrine merely widens the circle of those encompassed within a claim of attorney-client or work product protection, it is self-evident that communications to which the doctrine is applied must first independently be privileged were it not for the sharing of protected information with a non-party.

### B. *Attorney Client Communications Privilege*

The attorney-client privilege "is the oldest of the privileges for confidential communications known to the common law." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). "Its purpose is to encourage full and frank communication between attorneys and their

clients and thereby promote broader public interests in the observance of law and administration of justice." In Colorado, the attorney client privilege is "established by the act of a client seeking professional advice from a lawyer and extends only to confidential matters communicated by or to the client in the course of gaining counsel, advice, or direction with respect to the client's rights or obligations." *People v. Tucker,* 232 P.3d 194, 198 (Colo. App. 2009) (citing *Losavio v. Dist. Court in and for Tenth Judicial Dist.,* 533 P.2d 32, 35 (Colo. 1975)); *see also People v. Trujillo,* 144 P.3d 539, 542 (Colo. 2006) ("[T]he attorney-client privilege applies to confidential matters communicated by or to the client in the course of obtaining counsel, advice, or direction with respect to the client's rights or obligations"). The privilege applies only to communications under circumstances giving rise to a reasonable expectation that the communications will be treated as confidential. *Tucker,* 232 P.3d at 198 (citing *Wesp,* 33 P.3d at 197). Mere statements of fact are not protected by the attorney-client privilege. *Trujillo,* 144 P.3d at 545 (citing *Gordon v. Boyles,* 9 P.3d 1106, 1123 (Colo. 2000) (noting that "the privilege protects only the communications to the attorney; it does not protect any underlying and otherwise unprivileged facts that are incorporated into a client's communication to his attorney. . . . ")). *See also Marianist Province of U.S., Inc.,* at *1.

Under federal common law, the attorney-client privilege arises (1) where legal advice of any kind is sought; (2) from a professional legal advisor in his capacity as such; (3) the communications relating to that purpose; (4) made in confidence; (5) by the client; (6) are at his instance permanently protected; (7) from disclosure by himself or by the legal advisor; (8) unless the protection is waived. *See Williams v. Sprint/United Mgmt. Co.,* No. 03–2200–JWL–DJW, 2006 WL 266599, at *2 (D. Kan. Feb. 1, 2006).

"[F]ederal courts narrowly construe all privileges, whether of constitutional, common-law, or statutory origin." *Everitt v. Brezzel,* 750 F. Supp. 1063, 1066 (D. Colo.1990). "Whatever their origins, these exceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth." *United States v. Nixon,* 418 U.S. 683, 710 (1974) (unanimous decision); *Roe v. Catholic Health Initiatives Colo.*, 281 F.R.D. 632, 636 (D. Colo. 2012)

Where a client's discussion or writing is <u>based on</u> attorney advice, the privilege is extended to that communication, because "such statements involve counsel's advice and/or mental impressions." *Reginald Martin Agency, Inc. v. Conseco Med. Ins. Co.*, 460 F. Supp. 2d 915, 919-20 (S.D. Ind. 2006). *See also Catholic Health Initiatives Colo.*, 281 F.R.D. at 637 ("The attorney-client privilege can extend to communications between representatives of the client or between the client and a representative of the client, if the communication was made in confidence for the primary purpose of obtaining legal advice."); *United States v. Dish Network, LLC,* 283 F.R.D. 420, 423 (C.D. Ill. 2012) ("The privilege also extends to communications about the privileged material between non-attorneys . . . ."). Further, material concerning legislative efforts is protected by the attorney client privilege where the documents "resemble legal advice and analysis." *Barfield v. Sho-Me Power Elec. Coop.*, 2:11-cv-04321, 2014 WL 2575220, at *3 (W.D. Mo. June 9, 2014). *See also Black*, 74 P.3d at 469. "The presence of a third-party will not destroy the attorney-client privilege if the third-party is the attorney's or client's agent or possesses commonality of interest with the client. *Catholic Health Initiatives Colo.*, 281 F.R.D. at 637.

### C.     *Work Product Privilege.*

Work product immunity derives from the provisions of Fed. R. Civ. P. 26(b)(3), which provides in relevant part:

> **(3)** *Trial Preparation: Materials*.
> **(A)** *Documents and Tangible Things*. Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent). But, subject to Rule 26(b)(4), those materials may be discovered if:
> **(i)** they are otherwise discoverable under Rule 26(b)(1); and
> **(ii)** the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means.
> **(B)** *Protection Against Disclosure*. If the court orders discovery of those materials, it must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation.

*Id.*; *See Am. Banker's Ins. Co. of Fla. v. Colo. Flying Academy, Inc.,* 97 F.R.D. 515, 516 n.1 (D. Colo. 1983) (noting that Rule 26(b)(3) codifies the work product doctrine recognized in *Hickman v. Taylor,* 329 U.S. 495 (1947)). *See also McCall v. Skyland Grain, LLC,* Case No. 08–cv–01128–PAB–BNB, 2009 WL 1203304, at *6–8 (D. Colo. April 29, 2009). The work product privilege is governed by a uniform federal standard. *Frontier Refining Inc. v. Gorman–Rupp Co., Inc.,* 136 F.3d 695, 702 n.10 (10th Cir. 1998). As the court noted in *Martin v. Monfort, Inc.,* 150 F.R.D. 172 (D. Colo. 1993) when describing the process to be employed in deciding a claim of work product immunity:

> Rule 26(b)(3) [ ] contemplates a sequential step approach to resolving work product issues. First, the party seeking discovery must show that the subject documents or tangible things are relevant to the subject matter involved in the pending litigation and are not privileged. Fed. R. Civ. P. 26(b)(1). Once such a showing has been made, the burden shifts to the party seeking protection to show that the requested materials were prepared in anticipation of litigation or for trial by or for the party or the party's attorney, consultant, surety, indemnitor, insurer

> or agent. Fed. R. Civ. P. 26(b)(3). Such a showing may be made by affidavit, deposition testimony, answers to interrogatories, and the like. If the Court concludes that the items were prepared in anticipation of litigation, the burden shifts back to the requesting party to show: (a) a substantial need for the materials in the preparation of the party's case; and (b) the inability without undue hardship of obtaining the substantial equivalent of the materials by other means. Fed. R. Civ. P. 26(b)(3).

*Id.* at 172–73 (emphasis added). *See Catholic Health Initiatives Colo*, 281 F.R.D. at 639–40.

### *ANALYSIS*

Of the 77 page production from the Alliance, the court reviewed *in camera* pages 1, 10, 11, 18, 21, 22, 40, 52, 54, and 74.[2] A careful review of the redactions reveals that Defendants and the Alliance were communicating about the current litigation together with the legal effect of the litigation on themselves and on the Department of State's ("DOS") position on the central issue in the case – whether *au pairs* brought to this country on a J-1 Visa as exchange visitors are subject to wage and hour laws pursuant to the FLSA and the various wage laws applicable in each of the fifty states, including the retroactivity of any findings in this case or rules and regulations promulgated by the DOS with respect to the *au pair* program. Much of the information exchanged was quite obviously "based on attorney advice" even though many of the communications did not quote or paraphrase the actual advice rendered by an attorney. *See Reginald Martin Agency, Inc.*, 460 F. Supp. 2d at 919-20; *Catholic Health Initiatives Colo.*, 281 F.R.D. at 637. The redacted information uniformly involved the mental impressions, conclusions, opinions, or legal theories of the speaking Defendant representative, often directly

---

[2] A side by side comparison of the in camera materials and the entirety of the production as redacted and contained in Doc. Nos. 709-9 through 709-16 revealed more redactions in the 709 series than were represented in Doc. No. 758, the in camera materials. The court has not been advised why the two are different. However, the court has considered in this Order only the redactions for which it was able to view the unredacted contents in Doc. No. 758.

attributable to the party's received legal advice.  All of the redacted material appears to have been prepared in anticipation of litigation by or for a party.  As a threshold matter, then, the court finds that the material sought is both relevant and that it is either attorney-client privileged or work product privileged, and sometimes both.  Therefore, since the information was shared with members of the Alliance who are non-parties, the court must move to consideration of the common interest doctrine.

The Alliance clearly considered itself to be working in concert with its members on the legal of issue of applicability of federal and state wage laws to *au pairs* brought into this country through the J-1 Visa Exchange program.  The letter from the Alliance, in several places, referred to itself and its members as "we" in discussing various litigation and lobbying efforts "we" should pursue.  In fact, in that same letter [Doc. No. 758 at 8] in the non-redacted section, the Alliance claimed, "Alliance staff has met with AIFS and EF lobbyists, and have identified the following objectives: . ." indicating that the Alliance was actively and independently advancing the interests of its members, the defendants in this litigation.  Included in those objectives was a push in favor of a flat stipend to be paid to *au pairs* under the J-1 Visa program rather than compliance with both federal labor laws and the differing laws of the fifty states where *au pairs* might be placed.  Tactics for dealing with the federal authorities through lobbying efforts were laid out side-by-side with tactics to pursue in the litigation,[3] as well as the effect certain DOS positions might have on the current litigation.

In the Second Amended Complaint ("SAC") [Doc. No. 395], Plaintiffs claim that by paying a fixed stipend Defendants have "cheated *au pairs* out of even minimum wage by treating

---

[3] One such litigation tactic noted in the letter was redacted as privileged.

the programmatic wage floor as if it were the only protection for *au pairs*, rather than an additional protection."[4] *Id*. at ¶ 6. Plaintiffs state further that "[m]any of the [Defendants and members of the Alliance] go to great lengths to deceive the young workers into believing that the wage floor is not just a minimum, but also a maximum above which *au pairs* may not negotiate. These lies not only deprive *au pairs* of market wages, but also intentionally confuse them about their rights." *Id*. at ¶ 8. These are allegations which could be made against the Alliance as well considering the Alliance's own lobbying efforts to exempt *au pairs* under the J-1 Visa from the FLSA and other state wage laws.

The sponsor Defendants and members of the Alliance are the "exclusive entities authorized to recruit and place *au pairs* with host families in the United States." (*Id.* at ¶ 49.) As previously noted, all the defendants are members of the Alliance and participants in the *au pair* subgroup. The SAC alleges, "Sponsors, and those organizations that previously served as sponsors, have long abused their control of the market for foreign *au pair* labor. They have used their market power, as the sole entities authorized to bring such labor into this country, to fix artificially and illegally low wages for *au pairs*." (*Id*. at ¶ 52.) In its independent efforts to retain the current method of paying stipends, the Alliance is acting in complete conformance with the position taken by the sponsor Defendants and therefore their interests are identical.

Further, the SAC alleges that the "cartel of Sponsors fixed standard au pair wages to the programmatic wage floor, despite state and federal labor laws dictating higher wages, changing market conditions, and the Sponsors' open competition for foreign nationals to serve as au pairs

---

[4] Plaintiffs currently have pending a motion to further amend their Complaint to add certain named plaintiffs and to add as a defendant an affiliate of Cultural Care named International Care, Ltd. [Doc. No. 561.] A ruling on this motion will not change the analysis with respect to the identity of interests between the Alliance and the sponsor Defendants.

on terms other than wage amounts" (*id*. at ¶ 72) and that "[a]s a group, the Sponsors have conspired and agreed to fix all of their sponsored standard au pairs' weekly wages at exactly the programmatic wage floor. This fixed weekly rate was and continues to be an artificially depressed wage for standard au pair services. The Sponsors' agreement to fix the standard au pair wage constitutes a per se violation of antitrust laws." (*Id*. at ¶ 80.) Again, the Alliance could be named, at the very least, an active aider and abettor of this so-called cartel or, indeed, as a co-conspirator.

In fact, the Alliance is specifically named in the SAC, although it is not charged as a co-conspirator defendant at this time. (*Id.* at ¶ 129.) The SAC alleges that

> Both the Alliance and the IAPA[5] hold events where Sponsor members have the opportunity to meet, conspire, and agree to fix wages. The Sponsors' membership in the Alliance and the IAPA – both legal organizations – provides the Sponsors with an opportunity to fix illegal au pair wages in a setting that would be difficult for authorities to detect.

(*Id*. at ¶ 132.)

In light of the information reviewed *in camera* by the court which dealt with exactly this subject matter and the allegations contained in the SAC, the court finds that with respect to whether *au pairs* brought in through the J-1 Visa program should be subject to state and federal labor laws rather than a fixed stipend, the Alliance and its members' interests are identical and that the Alliance may be considered as a 'potential defendant.'

Accordingly, this court finds that the communications memorialized in the notes written by the staff member of the Alliance are communications given in confidence and intended and reasonably believed to be part of an on-going and joint effort to set up a common legal strategy

---

[5] Another trade group to which some Defendants belong.

concerning entities with identical interests.  Therefore, the common interest doctrine will protect those privileged portions of the communications from disclosure.

Having found that the common interest doctrine applies between the Alliance and Defendants with respect to the communications at issue, there is no necessity to address the subject of waiver of privilege by disclosure to third parties.

Therefore, it is **ORDERED**

"Plaintiffs' Motion to Compel and for Relief Under Federal Rules of Civil Procedure 26, 37, and 45" [Doc. No. 711] is **DENIED.**  Documents placed under restriction regarding this motion shall remain restricted until further order of the court.

It is further **ORDERED**

The "*Stipulated* Motion to Amend Scheduling Order" [Doc. No. 747] is **GRANTED**. The close of fact discovery shall be **January 5, 2018**.

Dated December 4, 2017.

BY THE COURT:

Kathleen M. Tafoya
United States Magistrate Judge

13