```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLORADO
 2
        Case No. 14-cv-03074-CMA-KMT
 3      _____

 4      JOHANA PAOLA BELTRAN, et al.,

 5           Plaintiffs,

 6      vs.

 7      INTEREXCHANGE, INC., et al,

 8           Defendants.

 9      _____

10              Proceedings before KATHLEEN M. TAFOYA, United

11      States Magistrate Judge, United States District Court for the

12      District of Colorado, commencing at 1:56 p.m., January 9,

13      2018, in the United States Courthouse, Denver, Colorado.

14      _____

15              WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

16      ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED. . .

17      _____

18                          APPEARANCES

19              SHAWN RODRIGUEZ, Attorney at Law, appearing for

20      the Plaintiffs.

21              MARTIN ESTEVAO, Attorney at Law, appearing

22      for the Defendant GreatAuPair.

23      _____

24

25                          MOTION HEARING
```

```
 1
 2                    APPEARANCES (Continued)
 3           MARTHA FITZGERALD, Attorney at Law, appearing for
 4   the Defendant EuRaupair InterCultural.
 5           JONATHAN BENDER, Attorney at Law, appearing for
 6   Defendant Cultural Homestay International.
 7           DIANA HAZEL, JOAN LUKEY and SAMUEL RUDMAN,
 8   Attorneys at Law, appearing for Defendant Cultural Care.
 9           BROOKE COLAIZZI, Attorney at Law, appearing for
10   Defendant Interexchange.
11           KATHRYN REILLY, Attorney at Law, appearing for
12   Defendants GoAuPair, Agent Au Pair, and Au Pair
13   International.
14           LAWRENCE STONE, Attorney at Law, appearing for
15   Defendant A.P.E.X and 20/20.
16           BOGDAN ENICA, Attorney at Law, appearing for
17   Defendant Expert Group International, d/b/a Expert AuPair.
18           ERIC STOCK, Attorney at Law, appearing for
19   Defendant AIFS.
20   _____
21                    P R O C E E D I N G S
22           (Whereupon, the within electronically recorded
23   proceedings are herein transcribed, pursuant to order of
24   counsel.)
25           THE COURT:  Good afternoon, everybody.  Please be
```

1    seated.

2              UNIDENTIFIED SPEAKER:  Good afternoon.

3              THE COURT:  All right.  We are here in Case Number

4    14-cv-3074, Johana Beltran, et al. vs. Interexchange, Inc.,

5    et al.  We are here to talk about Motion Number 606, which is

6    the motion to exclude expert testimony.

7              I am going to get appearances of counsel.  I have a

8    list here, so -- and I'm assuming that some people perhaps

9    don't have an interest in this, but I'm not sure.

10             So let's start with plaintiff.

11             MR. RODRIGUEZ:  Shawn Rodriguez, Boies Schiller &

12   Flexner, for the plaintiffs.

13             THE COURT:  All right.  And let me just ask in the

14   courtroom who is here, if you can just watch each other,

15   stand up one at a time.  And I know most of you, but I need

16   you to tell me again.

17             MS. LUKEY:  Do you want to start at the back or the

18   front, Your Honor?

19             THE COURT:  The back is fine.

20             MR. ESTEVAO:  Martin Estevao for GreatAuPair, Your

21   Honor.

22             THE COURT:  All right.

23             MS. FITZGERALD:  Good afternoon, Your Honor.

24   Martha Fitzgerald for EuRaupair International.

25             THE COURT:  Okay.

1          MR. BENDER:  Your Honor, Jonathan Bender for

2     Cultural Homestay International.

3          THE COURT:  Thank you.

4          MS. HAZEL:  Good afternoon, Your Honor.  Diana

5     Hazel for Cultural Care.

6          THE COURT:  All right, thank you.

7          MS. COLAIZZI:  Good afternoon, Your Honor.  Brooke

8     Colaizzi of Sherman & Howard on behalf of Interexchange.

9          MS. REILLY:  Good afternoon, Your Honor.  Katie

10    Reilly on behalf of GoAuPair, Agent Au Pair, and Au Pair

11    International.  I just want to point out to Your Honor that

12    every party does have an interest in this one.  It concerns

13    the antitrust claim to which every defendant is a -- or every

14    party is a defendant.

15         THE COURT:  Okay.  Well, I would have thought so,

16    but I thought I saw that there were some people that weren't

17    here, but I think probably you're all here, right.  Either

18    here or on the phone.

19         MS. LUKEY:  This is Joan Lukey, with me my

20    colleague Sam Rudman, for Cultural Care.

21         THE COURT:  Okay.  All right.  Let's go on the

22    phone.  I don't know how many of you are on the phone; but if

23    you could just tell me who you are, we'll see if we have any

24    problem, if I have some problem hearing you.

25         MR. STONE:  Judge, this is Larry Stone.  We have

1    three attorneys on the phone.  I represent A.P.E.X and 20/20.

2              THE COURT:  All right.

3              MR. ENICA:  Good afternoon, Your Honor.  This is

4    Bogdan Enica representing Expert Group International, doing

5    business as Expert AuPair.

6              THE COURT:  Thank you.

7              MR. STOCK:  Good afternoon, Your Honor.  This is

8    Eric Stock from Gibson Dunn & Crutcher, and we are co-counsel

9    for AIFS.

10             THE COURT:  All right.  Do I have one more?

11             MR. STOCK:  That's it.

12             THE COURT:  Okay.  All right.  So I've gotten

13   everybody, I think.  I don't think I have you in the proper

14   places on my list here, but we have everybody entered so

15   that's good.

16             Okay.  Let's take up the motion here, and I don't

17   know if you designated -- Ms. Lukey, are you it again?

18             MS. LUKEY:  I'm it again.

19             THE COURT:  So I will call you "Ms. Lukey" instead

20   of "it," but you know.

21             MS. LUKEY:  Thank you.

22             THE COURT:  All right.  So let's get started on

23   this.

24             I have recently read the motion, response, and

25   reply, so I think I understand what all the issues are.  But

1    I've at least read it in the last few days so you don't have

2    to argue necessarily case law to me, but direct me to

3    anything you think I should see.

4              MS. LUKEY:  Excellent, that should make it much

5    more expeditious, Your Honor.

6              The pending motion is actually fairly narrow.  It's

7    to exclude the plaintiff's economic expert's testimony,

8    that's Dr. William Kerr, with regard to his class

9    certification opinions relating to the antitrust claims.  So

10   it has no impact on his merits' opinions, but only on the

11   class certification opinions.

12             Obviously, a very important issue because this will

13   be a key part, one would presume, of Judge Arguello's review

14   of the class certification motions which are pending still.

15             The key issue here as you would expect in any

16   Daubert-type motion is whether Dr. Kerr's opinions are based

17   on the scientifically sound and methodologically reliable

18   methods for determining, and here is the key, whether the

19   defendants' alleged wrongdoing had a common impact on the

20   putative class.  That phrase "common impact" is going to keep

21   coming up because that's the focus of what this motion is all

22   about.

23             What Dr. Kerr has done is to propose two damages'

24   models, which he uses to attempt to prove common impact.

25   Common impact is critical because that is the basis on which

1   most antitrust class action decisions are based, and it is

2   the focus of many, many Tenth Circuit decisions as well.  So

3   at this stage what we're looking for is whether Dr. Kerr has

4   provided scientifically acceptable evidence of common impact.

5            You here?

6            THE COURT:  I'm here.

7            MS. LUKEY:  You're here.  Okay, I wasn't sure --

8            THE COURT:  I realized I had some notes so I am

9   going to get my law clerk.

10            MS. LUKEY:  Okay.  I was afraid that I had lost you

11   somewhere along the way, Your Honor.  Thank you.

12            THE COURT:  I'm looking.

13            MS. LUKEY:  So the first two of the two models is

14   actually the focus of what I'm here to talk about today,

15   although I will be addressing both of them.

16            That's what Dr. Kerr has called the wage law

17   compliance model, which he has testified.  It's not a phrase

18   of art, but a title that he has attached.  Basically what it

19   is, is to determine the difference between the stipend, which

20   we've all been talking about for a long time, the $195.75 a

21   week; and the higher of state or municipal minimum wage

22   applicable to any given au pair.

23            So that's the wage law compliance model, the

24   difference between the stipend, which is under federal

25   minimum wage, with the 40 percent room and board credit

1    included by the Department of State in its calculation, and

2    either state law, minimum law, or municipal, depending on

3    which is higher for a given au pair.

4              Now, this model fails, and this is really what I'm

5    here primarily to talk to you about.  This model has got to

6    be out of the case under the Supreme Court's decision in

7    Comcast vs. Behrend, which you read in our papers.  It's 2013

8    decision.

9              The gist of it is that plaintiffs in a putative

10   class action cannot use a damages' theory from one claim --

11   here that would be their labor claim, the FLSA claim -- to

12   obtain certification of a claim -- a class, excuse me, for

13   another claim.  Here that would be antitrust.  The damages'

14   model to support an antitrust class certification has to be

15   an antitrust claim.  And what that is, it has to trace the

16   harm to a reduction of competition, and that comes from the

17   Tenth Circuit Sharp's decision in 1992.

18             Now, that -- that is Kerr's price competition

19   model, which I'll turn to in a moment, and that is based on

20   the concept that you will take the stipend and attempt to

21   scientifically and methodologically soundly determine what

22   the market price would have been, as compared to the stipend.

23             That's what antitrust harm is supposed to be, but

24   the wage law compliance model doesn't do that.  What it does

25   is to take and compare two different minimum wages.  Minimum

9

1     wages, by definition, aren't part of the free market.  They

2     are not competitive prices.  They're set by legislative or

3     regulatory bodies generally intended to protect workers by

4     providing a floor, which Dr. Kerr acknowledges and has

5     testified to in his deposition.

6          So what the plaintiffs are doing is seeking to

7     present a labor minimum wage dispute as an antitrust problem.

8     This is an issue you've heard us reference before and the

9     papers have been replete with this argument, but in essence,

10    the plaintiffs' claim here is a labor claim.  They're

11    claiming that the sponsor should not have told the host

12    families that the stipend was the minimum wage as set by the

13    Department of State, which was based on federal law; but

14    rather, that the sponsor should have told the host families

15    that that was a minimum and that they should be looking to

16    the highest applicable minimum wage, be it state or

17    municipal.

18         So in using this model where they're taking two

19    regulatory or legislative set numbers, they have defined

20    themself out from under what the Tenth Circuit has talked

21    about repeatedly about what constitutes antitrust harm in a

22    class setting.

23         They cite no case for the proposition that you can

24    do what they did here, which is to take their damages that

25    are applicable to the labor piece of the case, which

1    defendants have said right along is actually what this case

2    is about, not about collusion, because everybody was just

3    following the Department of State stipend.  They've taken

4    that and they've tried to use that to create an antitrust

5    harm, and they can't because one of those two pieces has to

6    be from the competitive market.

7         The experts are supposed to use a scientific and

8    methodologically sound approach to figuring out which piece

9    of the bracket, typically the higher ones being alleged by

10   the plaintiffs, is the free market price.

11        By definition, neither of these is, because both of

12   them is a minimum wage set by a body to ensure that workers'

13   compensation will go up.  Nobody sets a minimum wage with the

14   goal of making workers' compensation go down.  So we have no

15   free market here and they can't use that method.

16        The minimum wages are, in fact, the opposite of

17   competition.  It's -- by definition, Kerr has acknowledged

18   minimums wages are intended to cause wages to go up over what

19   the market was providing to the worker.  They can't use it.

20        So that particular model they can use in their

21   labor case, although there were other issues pertaining to

22   that in the class certification papers, but for purposes of

23   what's before the Court now they can't use that model for

24   antitrust.  They cannot use that model to show that there was

25   a common impact because no piece of that model has the free

1    market price in it.

2              So let's turn briefly, then, to the price

3    competition model.  If that model could be properly and had

4    been properly populated with scientifically sound

5    methodologically proper data, it could, in fact, support

6    antitrust damages.  That's kind of the prototypical model

7    that would be used in a situation like this.

8              The problem here is that plaintiffs have taken the

9    position that they were not obligated as of this point in

10   time when the Court has under advisement the -- the class

11   certification decision the evidence to populate the model.

12   In fact, although some of this is -- all of it, I think, is

13   covered probably in the papers, what Dr. Kerr has said in his

14   report, in his supplemental report, and in his deposition is,

15   Oh, that's premature.

16             Now, I'm not just talking about the dollar amount

17   of the damages here.  We're not arguing that Dr. Kerr had to

18   know precisely what the dollar amount was, but he had to have

19   presented a scientifically sound, methodologically

20   appropriate approach to prove that there is a higher bracket,

21   there is another end of the number after you look at the

22   stipend, that there is a free market number that is higher

23   than the stipend number.  And he hasn't done it, and they

24   cannot delay it until a later date.

25             The proof of the so-called but for competitive

1    compensation has to be in the case now.  They have to have

2    proven by now that but for the alleged anticompetitive

3    conduct of the defendants, the amount paid to the au pairs

4    would have been higher than the stipend.

5         Now, Kerr acknowledges in his first report, which

6    was in January of 2017, that his analysis was only

7    preliminary -- that's his word -- that, quote, the potential,

8    close quote, existed for earnings that would be higher in a

9    competitive situation, but that he didn't yet have that

10   analysis done.

11        In his rebuttal report a month later, he stated --

12   and I would refer the Court in particular to footnote 50.  I

13   know the report has been filed at various points -- quote, it

14   is possible that in the but for world competition would lead

15   to stipends in excess of the minimum legal amount, close

16   quote.  Again, he hadn't yet in February of 2017 made the

17   determination that there was a higher figure; that the

18   bracket went up and not down from the stipend number.

19        By the time of his class-certification deposition,

20   with I was in May of 2017, he acknowledged that he was,

21   quote, assuming, close quote, that the alleged collusive

22   activity, which he was asked to assume had occurred, resulted

23   in downward pressure on the stipend.  But again, he had not

24   yet done the analysis to confirm that that was the case.

25   That is a big dispute here.

13

1        They have the burden of proof on this, by the way,

2    in this setting.  And the defendants' expert says, No, the

3    stipend was not a downward pressure, it was an upward

4    pressure in this program; and that in the absence of the

5    stipend, the average amount paid to the au pairs in this

6    program would have been less than the stipend amount.

7        Dr. Kerr says that he assumes it would have been

8    higher, but he hasn't yet done an analysis, saying that will

9    come later.  It can't come later, and that isn't the law.

10       The Court has to know now that he can demonstrate

11   that there is a higher number; that the free market would

12   produce a higher number, and he does not have any indication

13   that that's the case.  He has no evidence.

14       That means that neither of his models, although for

15   very different reasons, can support a finding of common

16   impact injury.

17       The first one is, as I said, is just inappropriate.

18   That's a labor model and he can't use it.

19       The second one he hasn't prepared yet.  He can

20   delay on coming up with precise numbers, but he can't delay

21   on giving the Court the proof that but for alleged

22   anticompetitive activity because the sponsors supposedly

23   colluded to tell the host families about the stipend amount

24   set by the Department of State, there would have been a

25   higher amount.  He assumes there would have been.

1            THE COURT:  Isn't that what his benchmark is,

2    though, is the higher amount?

3            MS. LUKEY:  But his benchmarks aren't -- that's

4    where the Daubert standard kicks in because his benchmarks

5    are not scientifically sound or methodologically appropriate.

6            He acknowledges -- and this is cited in our papers,

7    the references to his deposition testimony on this point.  He

8    acknowledges that at this stage, he can't use those

9    benchmarks by themselves because the benchmarks are to two

10    things, two categories.  One is called childcare workers

11    under the Bureau of Labor statistics general categorization

12    of employees.  That includes teachers' assistants.  It

13    includes people who work in schools, generally with children,

14    particularly with the younger children.  It includes a broad

15    swath of people who provide childcare work, and he

16    acknowledges he would have to do a serious analysis to figure

17    out what pieces of that apply and what doesn't.  He doesn't

18    have that information.

19            And the second category is nannies.  And he uses

20    the International Nanny's Association numbers for this

21    purpose, but again he acknowledges those numbers relate to a

22    different kind of work or generally more experienced,

23    generally older, all professional childcare providers.  And

24    the numbers aren't broken down geographically, which he

25    admits one would have to do to do a true market comparison.

1    So he has taken what he had available, but he has admitted

2    that those benchmarks aren't enough to do the scientific

3    analysis.

4           The problem that they're confronting here is that

5    they've got the timing wrong.  He didn't get to defer doing

6    the analysis until the time of trial.  He had to have done

7    enough of an analysis, a scientifically sound analysis,

8    before the Court rules on class cert to allow the Court to

9    determine that there is a scientifically sound basis for

10   concluding that in the absence of the stipend, which is

11   allegedly the result of collusion, there would have been a

12   higher number paid to these au pairs.

13          It's their burden to show that would have been the

14   case.  They don't have to show now what that dollar amount

15   is; that can come later.  But they do have to show it's free

16   market and higher, and they have to show it with

17   scientifically sound basis.

18          As I indicated, he acknowledges that those

19   benchmarks are not enough, by themselves, because he hasn't

20   done and doesn't have -- didn't have the data, presumably

21   still doesn't have the data -- to do the analysis that he

22   said would be required to be able to use those benchmarks in

23   lieu of other scientific evidence of the higher end of a

24   bracket.

25          So we are just left here with his testimony and

16

1    statements in his reports about assumptions.  I'm assuming

2    it's higher.  I think it's higher.  I look at the benchmarks

3    and I think, Well, I think that will be higher because the

4    nannies get paid more than what they refer to as premier au

5    pairs.  There is no such category, by the way.

6              The Department of State sets only two categories,

7    au pairs and educare au pairs, who have a higher level of

8    education, smaller number of childcare hours.  They're not in

9    this case.

10             All the other au pairs are just au pairs, and what

11   they try do is carve out everybody who makes more than the

12   $200 a week by claiming that they're premier au pairs, but

13   they can't do that, obviously.  The analysis has to take into

14   account everyone and that makes their numbers and Mr. -- and

15   Dr. Kerr's numbers about the au pairs being 90 percent paid

16   within 2 1/2 percent of $200 inaccurate because he's leaving

17   out -- by definition, he is defining out of the group

18   everybody who is paid over 215 as being premier.

19             But in any event, he doesn't even claim that those

20   benchmarks are enough.  He knows they're not enough.  He's

21   making an assumption.  He had to give the Court more by this

22   time and he hasn't.

23             This doesn't mean Dr. Kerr would be out of the

24   case.  He could still come in at the time of trial if another

25   Daubert motion at that point were not successful.  It does

1    mean that the Court should not be considering his reports or

2    opinions for purposes of class certification.  The first

3    model because it's just legally an inappropriate model, it's

4    a labor model and it doesn't have any free market dollars in

5    it, and the second because he hasn't populated it yet with

6    scientifically and methodologically sound data.

7            Very quickly, let me reference his survey which he

8    attempted to use to buttress his opinion and that was done

9    late in the game, but is referenced in his rebuttal report, I

10   believe, and in his deposition testimony.

11           I'm not going to get into the argument over whether

12   he was qualified to put together a survey.  Obviously, the

13   defendants have an actual survey professional expert who says

14   he was not and that his methods were improper.  I'm just

15   going to give you one of the three that we argued in the

16   written papers.  I'm not waiving the other two, but I think

17   this one is the most compelling.

18           The courts have typically required that for a

19   response to a survey to be considered in evidence, the

20   response rate must be at least 75 percent, and that is

21   because nonresponse is typically indication of factors that

22   may include bias against responding.

23           So, for example, if you send out a survey asking

24   the open-ended question, Did you pay the stipend as to host

25   families?  Did you pay the stipend as the sponsor told you or

1    you heard about or whatever?  And only 18 percent respond, at

2    least under existing case law, the Court has to infer, in the

3    absence of an explanation to the contrary -- and there isn't

4    one here -- that there may be a reason that the rest of the

5    folks didn't respond.  And one of those reasons may be, Well,

6    gee, I paid a lot more than the stipend and I don't know

7    whether I was supposed to do that or not, because that was a

8    state -- Department of State calculation.  So his isn't even

9    close.  It actually flips on its head what's required for

10   survey to be considered by a court.

11          Now, they cite in their papers -- you will note

12   there are no cases cited for the concept that you can drop

13   down to an 18 percent response rate, still use that survey in

14   court and not even explain why you only got an 18 percent

15   response rate.  There are no cases cited, nor have we found

16   any.

17          All they cite to is a couple of articles that deal

18   with the fact that online surveys and political surveys

19   typically get a return rate -- I forget the numbers, but in

20   the 10 to 20 percent range.  Fine, that may be true, but it

21   doesn't make them admissible in court or appropriately

22   satisfactory for Daubert review.

23          So we respectfully suggest that, in addition to the

24   fact that his models, one is inapplicable, one isn't

25   populated with scientifically appropriate data, he can't fill

1    in the blanks with the survey with an 18 percent response

2    rate.  There are other factors as well, but that's the one I

3    would leave with the Court.

4              THE COURT:  The one problem that I have on that one

5    is that it seems to me that we have discussed on several

6    occasions with everybody here the fact that host families

7    might have some liability for not complying with wage and

8    hour laws.  And to me, that's a pretty big reason not to

9    answer, no matter what you paid.  You know, it's like, Eehhh,

10   I'm just -- I'm going to just ignore this, because it's

11   either not complying with state and local laws or, you know,

12   it might be, Oh, my God, State Farm is going to get me

13   because I paid more, right, so they're afraid to answer.

14             MS. LUKEY:  And that may well be the explanation,

15   but that doesn't solve their problem, Your Honor.  He was

16   trying to come up with something to make -- to pass a Daubert

17   review of his damages model.  He was trying to come up with

18   something where his benchmarks, he himself admitted, weren't

19   enough to meet the scientific and methodological requirements

20   so he came up with the survey concept.  It didn't work

21   because the Court is not -- the courts historically will not

22   consider a survey with a response rate that low.  Not even

23   close.  It would have to be like four times higher to be

24   considered.

25             And whatever the reason, the response rate is still

1    the problem.  If the response rate is very low, whatever the

2    factor was that influenced the host families who didn't

3    respond, the survey remains not scientifically sound under

4    Daubert.

5              THE COURT:  But the only thing it really says is

6    for these many people, they got paid the stipend amount.

7    That's really all it says.  It doesn't really extrapolate any

8    information from that, other than that's what they got paid.

9              MS. LUKEY:  Not all of them.  That's what -- but,

10   remember, they also self-selected because they developed the

11   self-created premier category.  Anybody higher than, I think,

12   it was $215 they were carving out, and I assume they carved

13   out the host families, too, because they carved out the au

14   pairs, so wouldn't (inaudible) of the host family that

15   hosted the au pair that had been carved out of the case by

16   them.

17             So we would say, Your Honor, to that, that the

18   survey starts from a difficult premise.  It starts from the

19   self-defined premise that everybody they asked is going to be

20   pretty close to the stipend amount, somewhere between the

21   195.75 and whatever their cutoff was, 215, 220, I'm not sure

22   what it was.  They can't do that.  They can't self-define,

23   send out the survey that way and then go, Aha, when 18

24   percent of the people who respond say they paid in that range

25   because if they were outside that range, they didn't get the

1    survey.

2              Any other questions, Your Honor?

3              THE COURT:  No.

4              MS. LUKEY:  Thank you very much.

5              MR. RODRIGUEZ:  Good afternoon, Your Honor.

6              THE COURT:  Good afternoon.

7              MR. RODRIGUEZ:  I'll start with the survey.

8              The survey corroborates the defendants' own

9    ordinary course surveys that reach the same conclusion, their

10   form contracts that reach the same conclusion that au pairs

11   must be paid 195.75.

12             Your Honor mentioned that the host families are

13   potential defendants.  I want to be very clear, but in our

14   theory, the host families are victims of the defendants'

15   conspiracy and misrepresentations, as well.  The conspiracy

16   operates by telling, both the host family and the au pairs,

17   that they must be paid 195.75, and that will become important

18   in a moment when we get to the antitrust merits.

19             Now, when Ms. Lukey is referencing the 75 percent

20   threshold, those cases she's talking about deal with samples.

21   Dr. Kerr did not sample the population.  We sent the survey

22   to every single host family that hosted an au pair within our

23   alleged class and for which we had an e-mail account.  We

24   then followed up multiple times to get as much response as we

25   could.  There is nothing further that we could have done to

1    increase the response rate or to decrease any response by us.

2    Their expert has nothing to say about what we would have done

3    or what we could have done.

4         There is no magic number at 80 percent.  In fact,

5    one of the cases that defendants cite is the Hostetler case,

6    and the 80 percent doesn't appear anywhere in the case.  In

7    fact, it's talking about a sample of 200 subjects in a test

8    group and 200 in a control group.  And the reasoning there is

9    that the sample size due to low response was insufficient.

10   That is not a response rate issue; that is a sample size

11   issue.  Again, this all comes back to those cases being about

12   sampling surveys.

13        I agree with Ms. Lukey that the issue here that

14   class certification is common impact.  The trouble is that

15   almost none of her argument is about common impact.

16        Let's start with the wage argument.  She's talking

17   about antitrust harm.  This is the subject of approximately

18   the first one-third of our class certification reply.  This

19   is a class certification legal issue pending before Judge

20   Arguello that they put into their reply on this motion as a

21   sort of sur-reply after we had filed our class reply.

22        Now, there is no such thing as a legal dichotomy

23   between antitrust and wage or some other area of law.  What

24   the antitrust model has to do is compare a world but for the

25   specific conduct that's challenged with the actual world

1    where the conduct occurred.  Now, the but-for world has to be

2    a real world, and that means that it has to have every

3    constraint that is present in the real world.

4         As Judge Arguello held in the motion to dismiss

5    order, the minimum wage represents a floor below which wages

6    could not fall.  That is an alternative theory that Dr. Kerr

7    provides a damages model for, and he has done so, not because

8    he is either assuming improperly or because he has not done

9    an analysis or because that's what he's supposed to do.

10        Dr. Kerr's place is not to opine on liability or

11   the ultimate fact issue.  He says if the facts are proven

12   that au pair wages, that there was not defendants so-called

13   oversupply and wages would increase, this is the model.  If

14   defendants happen to be right about the idea that market

15   wages would be below the minimum wage, in the but-for world,

16   the conspiracy caused those wages to fall below the minimum

17   wage.

18        Now, defendants have no case that supports this

19   dichotomy between one area of law and another.

20        THE COURT:  Now, is it -- I'm losing you a little

21   bit on this.  The -- explain to me what you're talking about

22   when you say -- I understand the theory that the real world

23   has a minimum wage in it and it's different for different

24   states.

25        And so how -- what in the theory, how does the

1   anticompetitive behavior of the defendants influence the fact

2   that their wages are below minimum wage?  Limiting that to

3   anticompetitive behavior versus a conspiracy to, you know,

4   cause labor wage damages, right, but did not have the -- have

5   the minimum wage?  Because anticompetitive behavior is

6   different from, you know, a conspiracy to just make sure that

7   they don't qualify under the minimum wage.  That's a labor.

8   That's a labor thing.  They're saying they're not labor.

9           Now that's why I keep -- I try to be careful about

10  not saying "employment," et cetera, and meaning it in any --

11  in any way that would undercut the defendants' analysis.

12  This isn't labor.  This is -- this is a cultural program.

13  It's different.

14          MR. RODRIGUEZ:  So, Your Honor, that is a merit's

15  contention about the nature of the employment relationship

16  and the joint employment relationship.

17          THE COURT:  Right.

18          MR. RODRIGUEZ:  That's not properly considered

19  here.

20          THE COURT:  Why not?

21          MR. RODRIGUEZ:  Because that's a merit's issue that

22  does not relate to the methodology.

23          THE COURT:  You're saying whether or not they were

24  employees versus --

25          MR. RODRIGUEZ:  That's right.

1          THE COURT:  -- culture?  Yeah, you're right, that

2    doesn't -- I'm not considering that.

3          What I'm trying to -- what I'm trying to get at is

4    the fact that they said, if they said, pay them 197.75 a

5    week, how is the -- how is the anticompetitive nature of

6    that, what causes them to come in under minimum wage, versus

7    just the fact that that number that you told them to pay is

8    under, it's under?

9          MR. RODRIGUEZ:  I want to push back for a moment on

10    a distinction between anticompetitive behavior and a

11    conspiracy.  There is no distinction.  A conspiracy is, per

12    se, anticompetitive.  So if the conspiracy causes the wages

13    to be suppressed, that is a complete antitrust injury.

14          Does that address at least the first part of your

15    question?

16          THE COURT:  Well, antitrust means anticompetitive.

17    Okay.  It doesn't just mean you're not doing what you should

18    do under the Fair Labor Standards Act.  Okay, it's a

19    different -- it's a different analysis.

20          MR. RODRIGUEZ:  That's right.  And the nature of

21    the conspiracy is not -- we're not going to do what you're

22    supposed to do under federal or state minimum wage.  The

23    nature of the conspiracy, as I opened up by saying, is lying

24    to both the host families and the au pairs about what can be

25    paid.

1          The defendants conspired so that each of them would

2     offer a consistent set of lies and standardized contracts

3     that imposed this particular wage.  It is beside the point

4     for the antitrust issue whether the wage is above or below

5     the minimum -- the minimum, right.  So that's on the

6     liability side.

7          Once we've established liability, setting aside

8     minimum wage law, because I agree with you, that's not

9     relevant to liability, now we get to damages.  And in damages

10    we're constructing a but-for world.  And that but-for world

11    has to be the same as the world would be without the

12    anticompetitive conduct.

13         Now, one of defendant's contentions is that without

14    the anticompetitive conduct, wages for au pairs would have

15    fallen even lower.  This is the argument that minimum wage

16    law steps in when markets would otherwise result in employees

17    being paid less than minimum wage.

18         And what Dr. Kerr is saying is, if that is true,

19    once we've established liability without regard to minimum

20    wage law, you're now in the but-for world where minimum wage

21    law sets a constraint on the outcome.  This is the so-called

22    floor from the motion to dismiss order that I talked about.

23    I think some analogies from other areas of antitrust law may

24    help.  These are all cited in our opposition.

25         In Zenith v. Hazeltine patent law was misused to

1    create antitrust violation.  Your Honor may be familiar with

2    the so-called Walker Process theory, which is where

3    misrepresentations to the Patent Office resulting in a patent

4    being issued that should not have been issued and then being

5    enforced against a defendant cannot be, not only a patent

6    issue, but also an antitrust issue.

7              And so in that context, just as in Hazeltine,

8    patent law happens to be part of the antitrust analysis, but

9    that doesn't mean that they are completely separate.  In

10   fact, patent law and a reasonable royalty can establish the

11   measure of antitrust damages before trebling.

12             Similarly, we cite a variety of treatises and cases

13   on page 16 of our opposition that explains that a proper

14   damages' model must take account of tax and regulatory

15   implications.  This is the same principle.

16             Tax and regulatory law is part of the but-for world

17   in antitrust damages, just like minimum wage law.  And the

18   damages have to reflect what that world would be like.  We

19   don't get to make up a new world where, not only was there no

20   conspiracy, but also minimum wage law doesn't exist.

21             THE COURT:  So what if the results are that -- and

22   I'm not talking about methodology at the moment.  Just asking

23   this question.

24             The results of the experts doing all these numbers,

25   manipulation, find that, instead of 4.40 an hour, what the

1    market would have borne for au pairs with less education, et

2    cetera, than the nannies was $6.50, but that's below the

3    minimum wage for any state.  So the minimum wage only comes

4    into account in the FLSA part of the case because that's your

5    floor.

6            So, yeah, that's the damages that comes from that,

7    but the methodology to get to the 6.50 is what we're talking

8    about here, I think.  So even if it's less than the minimum

9    wage, it -- you don't really care about that.  That's the

10   damages part of it.

11           So compartmentalized that's different, the damages

12   are going to come up to the minimum wage then maybe.  But the

13   argument, I think, is the collusion on that anticompetitive

14   part of this whole thing has to be figured a different way

15   because if the -- if the damages -- if the result is 6.50,

16   that's what they would have made an hour, then, you know,

17   minimum wages really matter there, but it is more than what

18   they would have gotten with this edict, as the plaintiffs

19   would put it, to pay 195.75.

20           So the damage -- the antitrust situation is

21   different than the minimum wage and minimum wage has nothing

22   to do with that.  So I think the argument is that, yeah, the

23   minimum wage does come in to the damages' calculation in the

24   end, but that's not a reason to say that there is an

25   antitrust class.

1          MR. RODRIGUEZ:  I agree with that final summary,

2    that the minimum wage law doesn't come in until damages

3    because it's part of the but-for world.  And everything

4    before that, all the liability questions in this case, not in

5    every case, Zenith v. Hazeltine is an example, but in this

6    case the conspiracy doesn't turn on the fact that there was a

7    minimum wage.

8          The conspiracy turns on the fact that all the

9    defendants got together and said, We are going to fix wages

10   at 195.75, and we are, in concert, going to tell au pairs and

11   host families that that is what the wage must be.

12         That's not a -- that's not a waiver law issue.

13   That's not a -- that's not a FLSA issue.  It's simply the

14   nature of the agreement.

15         THE COURT:  Okay.  But then, I guess, what the

16   question that we're not answering, or that you want me to

17   answer and so I'm trying to get there is, Why does Dr. Kerr's

18   wage law compliance model have anything to do with this

19   anticompetitive behavior?  It has to do with damages because,

20   for instance, it could be that you got to bring them up to

21   the minimum wage, you know, if that's -- if they went on that

22   part of the case, which is a different part of the case than

23   the antitrust.  So why would his wage law compliance model

24   have anything to do with this antitrust part of the case?

25         MR. RODRIGUEZ:  So I think that may be a

1   terminology issue.  The -- so when you are in a situation --

2   if, in fact, the fact-finder concludes that wages would not

3   rise over minimum wage, then it happens that because minimum

4   wage is a floor in the antitrust but-for world, the damages

5   are identical, though trebled in the antitrust context.  It

6   happens to be the same model because that's the nature of --

7   of defendants' contention and that liability scenario.

8            THE COURT:  Right.  But it's not whether -- it has

9   nothing to do with whether or not there is an antitrust

10  class, right?  Because you've got to prove that differently;

11  that's a different analysis.

12           MR. RODRIGUEZ:  That's correct.  And I think this

13  may be the disconnect about common impact.

14           Common impact is what we're here to talk about.

15  That is the class certification issue.  Common impact is

16  antitrust jargon for predominance.  The question is, Was the

17  class, by and large, all harmed by the challenge conduct?

18  Were some class members, in fact, helped by it?  That's the

19  issue.

20           The only reason we're talking about damages is

21  because we need to show a damages' model that can be used to

22  prove damages classwide.  And so that is the only issue we're

23  talking about.

24           And so if I'm understanding Your Honor's question

25  correctly, the answer is that, no, the wage model has nothing

1    to do with liability.  It has only to do with damages, which

2    is only relevant here to the extent it goes to common impact.

3              THE COURT:  Right.  But I don't see that the wages

4    necessarily go to -- the minimum wage part of this doesn't

5    really go -- well, it doesn't really go to common impact.

6              MR. RODRIGUEZ:  Oh, it does because -- because if,

7    in fact, wages would fall in a competitive market, they could

8    all fall by however much they want to; but the minimum wage,

9    this external constraint in the but-for world is going to

10   raise everyone's wage to the same level -- that is, the

11   minimum -- and that is inherently classwide.  That is the

12   common impact.  It is --

13             THE COURT:  But see, under what you're saying, I

14   think that would mean that it doesn't really have any impact.

15   If the -- if these are all minimum wage-type employees so

16   that the free market would come in lower than the minimum

17   wage, then their behavior doesn't -- even assuming it would

18   be true, doesn't -- doesn't impact what they would get

19   because what they would get is minimum wage, right.  So

20   antitrust has no value in the case.  It's not supportive of

21   antitrust.

22             It's only if -- only if they would get more than

23   the minimum wage that antitrust behavior would come into

24   call, right?

25             MR. RODRIGUEZ:  I don't think so, Your Honor,

1    because antitrust triggers treble damages.  And the fact is

2    that their conspiracy caused wages to go below the correct

3    minimum wage.  In the but-for world, they would have risen to

4    the correct minimum wage.

5           Maybe to take the tax and regulatory case analogy,

6    I think the analogy there would be we should assess the

7    damages without considering whether, for example, tax or

8    regulatory implications would have actually resulted in the

9    defendant paying, you know, more or having some sort of tax

10   benefit.

11          Antitrust does not -- let me put it this way.  The

12   defendants have not cited a single case that splits antitrust

13   law from any other area of law in the way they're asking, and

14   this is the question about the but-for world.  And in the

15   but-for world, it just happens that minimum wage would set

16   the -- would set the wages.

17          THE COURT:  Well, if they lose on FLSA.  I mean,

18   there is another question in the case, right?  It doesn't

19   have anything do with this class certification, but it is, We

20   don't think we are subject to the FLSA.  We believe we're a

21   cultural program, not an employment program.

22          So their anticompetitive behavior may have impacted

23   in the 6.50 example that I gave, right.  That would be, you

24   know, say -- I know there is argument around this, but let's

25   say relatively $2 an hour that the people were harmed, even

1    if they are a cultural program, rather than a wage program

2    because the anticompetitive behavior kept them at 4.40, when

3    the experts all agree that the competitive market would have

4    been 6.50.  Okay, so -- so there is a damage there.

5          Now, you can't -- you're not going to collect it

6    twice because if the wages were above minimum wage, that's

7    obviously inclusive of all of it, but it might kind of wipe

8    out even the minimum wage portion of the case more or less.

9    Because if the anticompetitive behavior would have been $15,

10   you know, it would have been $15 instead of 4.40, that's

11   what -- you get a different case because then the

12   anticompetitive behavior is driving the machine, right.

13         If you have -- really have a wage case, then it's

14   going to be the minimum wage, if these are minimum wage

15   workers, which they seem to be.  So I'm making a few little

16   assumptions here, but I'm just trying to draw, in practical

17   reality, how the Kerr model of wage loss -- let's assume that

18   there is no prohibition for him to use it.  I mean, we have

19   minimum wages.  But how does that further an

20   anticompetitive-type claim, as opposed the wage claim?  I

21   don't think it really does so I don't think his model is

22   really appropriate on that, even though it's -- it's a model,

23   but I just don't see how to works there.

24         MR. RODRIGUEZ:  So am I understanding correctly

25   that one of the predicates for your question is that minimum

1   wage law does not apply?

2           THE COURT:  No.

3           MR. RODRIGUEZ:  No?  Okay.

4           THE COURT:  It applies.

5           MR. RODRIGUEZ:  You're saying whether it applies?

6           THE COURT:  Yeah.  But what does it have do with

7   the defendants' alleged anticompetitive behavior, as opposed

8   to just the fact that they shouldn't have done it because it

9   was below minimum wage?  That's a conspiracy to violate labor

10   laws, maybe, but it's not necessarily anticompetitive

11   behavior.

12           MR. RODRIGUEZ:  A conspiracy to violate labor laws

13   is absolutely anticompetitive.

14           THE COURT:  Well, it could be, but it isn't always,

15   right?

16           MR. RODRIGUEZ:  Our theory of this case is that

17   this is a, per se, horizontal conspiracy among competitors.

18   And when competitors conspire horizontally to fix prices,

19   regardless whether it's at a minimum wage level or not, that

20   is, per se, illegal.  Antitrust to penalize and to

21   disincentive corporations from doing that create treble

22   damages.  This is, again, an issue that is in our class

23   certification briefing that has -- has gotten imported here.

24           THE COURT:  Okay.  And I will -- I have to admit to

25   all of you I have not read the class certification briefing

1    because it wasn't before me so I didn't look at it.  I should

2    have.  Obviously, it would be helpful today.

3              MR. RODRIGUEZ:  Have I answered your questions as

4    much as I can?

5              THE COURT:  I think we're going in circles.

6              MR. RODRIGUEZ:  Okay.

7              THE COURT:  So I think you should just continue.

8    And, really, I'm only talking about the wage laws compliance

9    model anyway, which I think the least important to what

10   Dr. Kerr is trying to say.

11             I think his other model is -- now, that is

12   antitrust, no matter whether it's coming from you or me,

13   right.  We all agree that that's a model that is directed at

14   antitrust behavior.

15             MR. RODRIGUEZ:  Before I leave this, I just want to

16   touch on one more issue, which is, I think Your Honor's

17   hypothetical may be breaking causation between antitrust and

18   another claim as soon as they intersect.  Is it a causation

19   issue that --

20             THE COURT:  Well, it depends on what the answer to

21   the question is.  But what's before us is, Can Dr. Kerr's

22   expert opinion be used by Judge Arguello to make a class

23   determination, right?  Isn't that the bottom line?

24             MR. RODRIGUEZ:  Absolutely, that's the bottom line.

25   And our view is that if liability, antitrust liability is

1    established on the merits, then it comes into play for common

2    impact because it provides a formulaic classified damages

3    model.

4              THE COURT:  Okay, because the -- what you're saying

5    is that it affected the class, so it doesn't really matter

6    how?  It could have been under minimum wage, over minimum

7    wage, it could have been anything, but it affected them -- it

8    has to affect them, right?

9              MR. RODRIGUEZ:  No, Your Honor, my position is not

10   that it doesn't matter.

11             Dr. Kerr's wage model, such as it goes to

12   antitrust, assumes, as it must, that we have proven an

13   antitrust claim on the merits, which means we have proven

14   that everyone's wages would have risen to the minimum wage

15   but for the conspiracy.  So we're not -- we're not saying

16   that it doesn't matter how.  We're saying that if we're

17   right, if we, in fact, prove our case on the merits, this is

18   how we prove damages.

19             Now, if, in fact, we don't prove our case on the

20   merits and it turns out that somehow the conspiracy could

21   have helped some and hurt others, then I agree, we have no

22   damages' model for antitrust.

23             THE COURT:  Okay.

24             MR. RODRIGUEZ:  Now, the Tenth Circuit in the In

25   re: Urethane case that we cite several times has explained

1    that in the antitrust context as soon as, quote, the

2    defendants conspired to interfere with the free market

3    pricing structure, common impact is satisfied.

4         Now, I believe defendants are contending that

5    Dr. Kerr admitted that he could not calculate damages.  That

6    is not the case.

7         In every single one of those deposition excerpts

8    that defendants discuss, the question posed to Dr. Kerr is

9    some variation of:  Could this issue, by itself, calculate

10   damages?  Of course, the answer is no, because what Dr. Kerr

11   is talking about is calibrating a multivariable model.  And

12   so when you ask about each one in isolation, of course that's

13   not sufficient on its own.  And the rest of the responses I

14   believe are quite clear that that's what Dr. Kerr is talking

15   about.

16        Similarly, I believe defendants are inaccurately

17   portraying the testimony when they say that Dr. Kerr is

18   saying he couldn't calculate damages with his proposed model.

19   In fact, what he's saying is that when, in fact, discovery is

20   complete, this model will permit me to assess damages on a

21   classwide basis.  And that is exactly what the Supreme Court

22   in Tyson Foods said we need to do.

23        The Tyson Foods standard is that in order for a --

24   the opinion to be stricken, a class certification, there must

25   be, quote, no workable model for trial, end quote, no

1    reasonable juror could believe what the model described could

2    provide classwide proof.

3           Now, that makes sense because Daubert, a class

4    certification, occurs before discovery is complete, goes to

5    the judge and not the jury, so there is no gatekeeping issue

6    here, and class certification is not a final determination.

7           Also, on the so-called competition model, I believe

8    defendants also raised an issue of geography.  And to be very

9    clear, that geographic issue was limited to one specific data

10   set, the Bureau of Labor statistics dataset.  Dr. Kerr

11   discusses two other datasets that, in fact, do have

12   geographic variation.

13          At one point in their brief they actually say that

14   we don't -- that Dr. Kerr doesn't discuss time, geography, or

15   qualifications.  And the answer is that at pages 7 to 9, we

16   have a detailed explanation of why time, because cost of

17   living changes, inflation changes, is important, and we have

18   that.  We have from defendants data the years when the au

19   pairs were employed.

20          Geography matters because cost of living is

21   different in the different states, and we have that.  We have

22   that from defendants' data and we have that from the survey

23   and we have that from the nurses' data and the other datasets

24   discussed in the papers.

25          If Your Honor has no more questions at this time,

1    I'm happy to yield.

2            THE COURT:  No.

3            MR. RODRIGUEZ:  Thank you.

4            MS. LUKEY:  May I respond very briefly, Your Honor.

5            THE COURT:  Yes, be very quick.

6            MS. LUKEY:  First, whether the au pairs should have

7    been paid under state or municipal a minimum wage, as opposed

8    to federal minimum wage, has nothing to do with the free

9    market pricing structure, and it does not show whether the

10   plaintiffs would have been better off or worse off in a

11   freely competitive market.  That is why this wage law

12   compliance model is a labor-injury model and not an antitrust

13   model.  This is not antitrust injury.  It has nothing to do

14   with the free market and we don't know whether the au pairs

15   would have been better or worse off in the free market.

16           The only other point --

17           THE COURT:  Let me ask you this, though.

18           When you're doing a free market analysis, using

19   any -- I mean, even -- I know you don't like the comparison

20   groups necessarily.

21           But using any comparison groups that get paid

22   wages, the minimum wage is always going to be a factor, so

23   it's -- because it's there.  I mean, if you're an employee,

24   you live with that.  So any benchmark that you take of

25   employees of some kind in the United States is going to have

1    as a factor in the benchmark the minimum wage.  So doesn't

2    that, by itself, bring that minimum wage in to something

3    Dr. Kerr has to consider?  Because if these are all people

4    that are -- you know, the ones that the minimum wage wants to

5    protect -- in other words, they're people that are going to

6    make less if we don't set a minimum wage -- then the minimum

7    wage becomes the benchmark basically, it has to.

8           MS. LUKEY:  No, Your Honor.  You only look to

9    benchmark groups when there is a differential.  If everybody

10   is being paid at minimum wage, you're not talking about the

11   differential.  What he is doing in his price competition

12   model, which is where he uses the benchmarks, not under the

13   one that we're saying is wrong --

14          THE COURT:  Right.

15          MS. LUKEY:  -- (inaudible) compliance model.  If

16   he's using that model, he's looking for the higher rates.  It

17   has nothing to do with minimum wages.  Everybody would be

18   balanced at a minimum wage.  He's looking to find another --

19   an occupation -- we say au pairs are exchange visitors with a

20   childcare service component, as contrasted with professional

21   childcare providers.  But he's looking for another group that

22   is paid at a higher level in the free market.  If it's not

23   free market --

24          THE COURT:  Well, higher than stipend, right?  So

25   higher than stipend.  But all of those people are going to be

1    pay at least minimum wage in this country.  So that is going

2    to influence them, right?

3         If the minimum wage is -- say it's $10, and these

4    people, some of them are getting 11 and some of them are

5    getting 12, and there is a category up here that is getting

6    25 because they're, you know, college-educated teachers,

7    nonetheless, they're all getting at least minimum wage.  So

8    he's not getting any of those people that in a free market

9    economy would be paid less but for the minimum wage.  So it

10   influences your benchmark, no matter what it is, because it's

11   there in the real world, right.

12        MS. LUKEY:  Respectfully, Your Honor, benchmarks

13   have to be tied to the free market.  Minimum wage is, by

14   definition, not free market.

15        THE COURT:  It is, though, because it's the floor,

16   right.  So you and I can go out and hire people, but we have

17   to at least pay them that much, right?  So we may want to pay

18   them more and that may be why some are making $12.  Maybe

19   they wouldn't be making 12.  Maybe they would be making 8 if

20   it wasn't for that darn minimum wage, but it sits there and

21   at least establishes that for your comparative groups.

22        MS. LUKEY:  Respectfully, Your Honor, I think

23   you're now inappropriately conflating the labor law issue and

24   the antitrust issue.  The whole concept of the antitrust

25   issue is we are dealing with the free market.  Otherwise,

1    we're not dealing with competition.  So the minimum wage has

2    nothing to do with free market because I understand what

3    you're saying, you can't pay less, but by definition, minimum

4    wages are the antithesis of the free market because they are

5    set by law.  Do they have some impact?  They might have some

6    impact, but that's not what a benchmark is.  A benchmark

7    looks to the free market because that's the price model that

8    the --

9                THE COURT:  Right, but the free market has within

10   it minimum wage, right?  No matter who you're talking --

11   well, okay, if we're talking about a bunch of engineers, they

12   probably don't care about the minimum wage.  They're all

13   making a bunch more than minimum wage, but we're not.  We're

14   talking a bunch people, who some are skilled and many are

15   unskilled.  And so the -- the benchmark group, no matter who

16   they are, they -- in reality, they do have that minimum wage.

17   That's part of our free market, right.  You can't just ignore

18   it.

19               And I'm not really saying we should use -- I'm not

20   talking really about the model.  I'm just saying that that is

21   a factor in a price competitive free market.  You can't

22   ignore the fact that the minimum wage is there.  And there

23   may be some people that would have been paid less in that

24   group, had it not been there, but it is.  So, therefore,

25   their prices are going to be higher.  So if you don't take

1    that into consideration, your model is really messed up.

2    It's really not going to be right because it is there.

3              MS. LUKEY:  Well, that may be true, you may have a

4    messed-up model, but it's not an antitrust model.

5              Antitrust injury has to be competitive injury.

6    What we're talking about is if you decide, as alleged here,

7    that au pairs were receiving a federal minimum wage with room

8    and board credit set by the Department of State and they

9    should have been receiving, according to plaintiffs, the

10   state minimum wage with a different credit in each state,

11   that has nothing to do with the free market.  That can't be

12   an antitrust injury --

13             THE COURT:  So how do you --

14             MS. LUKEY:  -- because it's not competitive.

15             THE COURT:  How do you ever have an antitrust -- if

16   you've got a group of people who would otherwise might be

17   making less than the minimum wage, how do you ever have a

18   free market comparative?  How do you ever have an antitrust

19   violation?  Because you will never be able to have a

20   benchmark group because all the other people do have minimum

21   wage.  They do have a floor which you can't go under.  And

22   that is not a -- that is not a free, you know, market, I

23   agree with you, but it's the real world.  It's the real world

24   when you're looking to compare what did the defendants or any

25   defendants' anticompetitive behavior did, right.  So I think

1    you have to take those -- that into account because it's part

2    of any comparative group.

3            MS. LUKEY:  Well, I think -- I think we're

4    conflating the two models here, to be honest.  We've got this

5    wage law compliance model, which is completely based on

6    nothing but the difference between the stipend, which is

7    based on the federal minimum wage of the credit and whatever

8    the state or municipal minimum wage is.  That's what it is.

9            That has nothing to do on either end with the free

10   market and we have no idea whether there is a competitive

11   injury.  We know there is a labor injury if it was the case

12   that the exchange visitors were supposed to be paid at the

13   state minimum wage or municipal minimum wage.  That's a labor

14   code violation, but it has nothing to do with competition.

15           They're in a program where they were being paid

16   under a specific federal stipend, when it turns out by the

17   plaintiffs' accounting, which we dispute, that they should

18   have been paid under state minimum wage.  That's not an

19   antitrust collusion resulting in anticompetitive behavior.

20           It's an injury, yes, if they're right, it's a labor

21   injury, but there is a reason that antitrust injuries are

22   defined separately and looked at so carefully in this

23   circuit, more so than in many other circuits, actually.

24           What is the antitrust injury?  What is the free

25   market injury?  What is the anticompetitive injury, as

1    opposed to the labor injury of picking a wrong -- picking and

2    agreeing among yourselves that you're going to use the

3    federal stipend set by the Department of State -- talk about

4    parallel conduct.  But what is the antitrust aspect of that?

5    What does that have to do with competition as an injury?

6         There is -- the only competition that the sponsors

7    engage is with each other.  So if they're all agreeing that

8    they think what the federal stipend means is that's what

9    we're supposed to tell the host families to pay, that's not

10    affecting their competition with each other, and they aren't

11    competing with nannies or childcare providers in a school

12    system.  That's the au pairs.

13         So the fact that, at least as the plaintiffs

14    allege, the sponsors may have been mistaken when they all

15    paid at the same time.  There is no evidence, by the way,

16    they reached agreement with each other, but that they all --

17    I'm sorry, they didn't pay anything; but they all told their

18    host families the federal amount, usually with some

19    variations of reference to minimum or other such things, but

20    they used that number with their host families.  What does

21    that have to do with competition?  Whose competition are they

22    affecting?  If they're all -- if they're all doing the same

23    thing --

24         THE COURT:  That's a merit argument, though.  You

25    know, I understand what you're saying, but that's -- that's

1    not what I'm saying.

2              I'm trying to focus on Dr. Kerr's analysis here.

3    And it seems to me that even using the model that you say,

4    under some circumstances, would be the appropriate one, if

5    you ignore the fact that there is a minimum wage out there

6    for all other comparative groups, then you would not be doing

7    your job, right.  It would be like ignoring the other things

8    that you've talked about.  Privacy, which I don't think

9    really is an issue.  But the fact that you only have 18

10   percent return and not accounting for why that is, you know,

11   not explaining it.  All those factors go into a really good

12   model.  And if you ignore the fact that but for the

13   defendants telling everyone -- now, let's -- we're assuming

14   an antitrust injury, right, or conspiracy to tell them.

15             If you ignore the fact that the comparative groups

16   have a minimum wage, you could never arrive at correct

17   damages because you're talking, then, about the $6.50, right,

18   and there is no way to know that.  There is no way to ever

19   know that because in our country, the free market includes in

20   it a minimum wage.  That's part of free market competition,

21   is that it's there, and all employers have to take that into

22   account.

23             And so in a -- in this case I think it makes a big

24   difference.  In some cases it wouldn't make any difference at

25   all.  Airline pilots, right, but who cares, right, what the

1    minimum wage is?  That's not ever going to affect them.

2              But it does for people who are au pairs versus

3    nannies versus other child care workers, because they

4    might -- they might not actually be paid what the statistics

5    shows they are being paid.  And so it is part of the

6    anticompetitive behavior, I think, although not -- maybe not

7    in the way that I believe this model was set up.

8              This model appears to me to be kind of a damages'

9    model.  Like no matter what happens, they would get -- the

10   damages would be minimum wage, but, so that's a little bit

11   different.  But you've got to take it into account in your

12   other model because it is part of the free market.

13             MS. LUKEY:  Well, so -- but we're talking about --

14   that's why I said I thought we were conflating the two

15   models.  We had been primarily talking about the wage law

16   compliance model.  There I don't believe there is anything

17   that can even remotely be considered an anticompetitive

18   injury, an antitrust injury.  There is a labor injury, if it

19   were true, that the wrong minimum wage was being used.

20             Switching over to what would be an antitrust model,

21   the price comparison model, if it were properly populated,

22   then you take into account all factors.

23             Respectfully, if you look at his numbers, nobody is

24   even close to minimum wage, but it could be the case of the

25   benchmark groups, but it could be the case, certainly.  There

1    is a minimum wage out there and it could be the case on that

2    side.

3              So let's just be clear, the wage law compliance

4    model does not include an antitrust injury; it is not an

5    anticompetitive injury.  It's a labor injury if it were true.

6              If you want to take into account as one of many

7    factors on the price comparison model that there is a minimum

8    wage and that in determining what the appropriate benchmarks

9    are, you would look at minimum wage, along with all the other

10   factors, that's absolutely correct.

11             Our argument on that model is that he hasn't

12   populated it yet with Daubert sufficient data.  He has not

13   provided an analysis, a scientifically sound or

14   methodologically appropriate analysis, to support that model

15   because he says, I can do that later.  And the truth is, he

16   can do the precise dollar amount later, but he has to have

17   already given the basis for saying, I know that those

18   benchmarks in a free market society would be higher.  He

19   hasn't done that.  We don't know that they would be higher.

20             THE COURT:  Well, but what if they would be higher

21   because there is, at least, the floor of a minimum wage,

22   right?

23             MS. LUKEY:  Well, there is a minimum wage for the

24   au pairs, too.  The question then -- we got to be careful not

25   to lose track of that.  The state department actually

1   published how it calculated the stipend.  And although its

2   guidelines are no longer posted, since this lawsuit was

3   filed.  About four months after the filing, they took it off

4   the web site; they did not withdraw it, however.  It's a

5   formal guidance.  Still there.  It's just not posted.

6        When you look at the calculation, they're starting

7   the federal minimum wage.  So that's -- it is what it is,

8   it's $7.25 an hour.  And they selected, as the implementing

9   agency, the room and board credit, which was one initially

10   proposed by the Department of Labor in a proposed rule when

11   the Department of Labor switched and used a different model

12   for determining room and board credit.

13        The Department of State chose to continue with

14   that -- which it had already adopted that room and board

15   credit for its ease of use, its national continuity, and so

16   forth.  All of that, by the way, is recited in the

17   declaration of Stanley Colvin (ph), who was the Department of

18   State employee in charge of all this regulations, the

19   guidelines, and the calculation, which is in the Rule 23

20   papers, if the Court wishes to look at them.  So that history

21   is set out.  But there is federal minimum wage this.  It's a

22   question of which room and board credit should apply.  And

23   then on the state side, there are state and municipal minimum

24   wages in some places that will be higher and other places it

25   won't.

1          So --

2          THE COURT:  It wouldn't be lower, though?

3          MS. LUKEY:  It can't be lower.  It cannot be lower.

4    The federal minimum wage is there.  It won't be lower, it

5    can't be.  But there are certain -- there are still states

6    that don't have a higher minimum wage and there are states

7    that have -- that tie their own minimum wage to federal

8    minimum wage.

9          So, yes, there are states that are higher, and yes,

10   there are states that aren't.  And you can certainly look at

11   that on the price comparison model to the extent you think

12   it's relevant.  But when you're benchmarking, that's

13   actually -- it's not a scientifically acceptable method to

14   simply say, Well, I'm going to look at these individuals who

15   are also in the childcare world and I'm going to assume they

16   are going to be higher because of an anticompetitive decision

17   of the defendants.

18         But in any event, that's over on the other side.

19   That's under the price -- that's under a model that we have

20   not attacked substantively, but rather by its status -- that

21   is, that the plaintiffs had the obligation of already having

22   been populated the model with the scientific analysis done in

23   a Daubert acceptable manner, and they haven't done it.  So

24   whatever might be the case on that model, we don't challenge.

25   That's the model that can be used in an antitrust situation.

51

1     We challenge that at the class certification process at this

2     stage, the Court has to know what the analysis is.  They

3     don't have to know the dollar amount of the damages, but they

4     have to know what the method is.

5           You can read, and I'm sure you either have or will

6     read the reports, Dr. Kerr's --

7           THE COURT:  I did look at the reports, yeah.  I

8     just didn't -- I didn't look at the class certification

9     argument.

10          MS. LUKEY:  Right.  But even the reports for

11    purposes of this motion, you can't derive an analysis because

12    he says he hasn't done it.  He hasn't done it yet.

13          THE COURT:  But I think -- I thought I heard what

14    you were arguing is that he started off by not even knowing

15    if the anticompetitive behavior would cause the wages to go

16    up.  And I think what the -- what he is saying basically is

17    that the wages would go up because in the free market, they

18    would get minimum wage.  So it would definitely go up.

19          So if they have engaged in anticompetitive behavior

20    that caused them to not get minimum wage, we know that would

21    go up because we know what minimum wage is, and it's more

22    than 4.40 an hour.

23          So if he's starting with that, that doesn't seem

24    faulty to me to use that as, at least, his knowledge that it

25    would be higher, and then he's -- then he's trying to use all

1    these other benchmarks.

2           MS. LUKEY:  Well, Your Honor, it isn't -- he does

3    not say that he knows -- he says it's possible that it will

4    be higher.  And I think I know the reason he says it.  The

5    reason he says is that he's got to attack, both the use of

6    the federal minimum wage, which is what the Department of

7    State stipend is, and the use of the room and board credit.

8    That room and board credit is a shortcut that is determined

9    by methods that are very similar to the way room and board

10   credits are determined otherwise.  That is basically the same

11   number that you would come up with, with the different

12   language that the Department of Labor used.

13          What plaintiffs are arguing is a different legal

14   argument.  They're saying that these individuals should be

15   treated as if they were compelled to live in the home and

16   given no choice, and, therefore, there can be no room and

17   board credit.  But they well know the Department of Labor has

18   issued guidances saying if you elect to take a position, such

19   as the au pair position where you're voluntarily coming into

20   a situation where the whole idea is to live with the family,

21   then the room and board credit still applies.  Whether you

22   use the language that the Department of Labor uses for actual

23   paid employees where the language Department of State chooses

24   for cultural exchange visitors, it comes out in the same

25   place.

1        So it is not correct that they're paid 4-something

2    an hour.  They are paid 7.25, minus the value of the room and

3    board that they receive.  So that is the 7.25 because that

4    number is a proxy for the value of the room and board.

5        If he was dealing with a benchmark of somebody who

6    comes into a state, or an au pair is coming into this

7    country, he or she is not necessarily -- would not

8    necessarily be paid more if the state or municipal codes were

9    applied.  In some states, it will be -- they will be paid the

10   same because there is either is no minimum wage or it's tied

11   to the federal minimum wage and the credits work out the same

12   way.

13       So it depends on where the au pair is, which is why

14   geographic issues are so critical.  Sometimes it will be

15   true; sometimes it won't be true.

16       It is not true that the au pair would automatically

17   be paid more if there were no recommendation to the -- from

18   the sponsors to host families about the federal stipend

19   because it could come out to being exactly the same

20   computation.  It could theoretically come out to being a

21   higher computation if there are states that give a more -- a

22   more generous room and board credit -- that is, the stipend

23   could be higher.  Isn't likely to be by much, but it is

24   certainly possible.

25           If the state has a higher room and board credit and

1    is tied to the federal minimum wage, the au pair will

2    actually take home less.  So you can't make that assumption,

3    and that's the problem here.  You can't tell what he did.

4          He didn't do -- you're suggesting he can

5    automatically assume it would be higher.  He doesn't that.

6    He doesn't it, I suppose, either he didn't think of it or he

7    recognizes that, in fact, depends on where the au pair ends

8    up, but he doesn't give us what he did do.

9          He has to, at least, tell the Court a

10   scientifically sound methodologically correct method of

11   getting to his belief that the free market would be higher.

12         And that is -- here is a place where minimum wage

13   does become an interesting question.  If you're dealing in a

14   situation that's bracketed, as the wage law compliance model

15   is, by two minimum wages, then you're dealing with a

16   situation where the free market might well be lower.  You

17   don't know.

18         So at this stage, we do not attack the --

19         THE COURT:  Well, the free market might be lower,

20   but they the employer couldn't pay that.  He would have to

21   pay the minimum wage, right?

22         MS. LUKEY:  Unless the au pair went to another

23   state.  You know, it depends on where the au pair is located.

24         THE COURT:  In that state.

25         MS. LUKEY:  Right.

1          THE COURT:  It might -- and that was my whole

2     impression.  You could calculate it where it's less, you

3     know, it comes out less; but the employer could pay less,

4     right, because that's the floor and that's what -- what Judge

5     Arguello has already said.

6          MS. LUKEY:  Well, again, if you're in a state with

7     a higher minimum wage or a lower credit, then it's going to

8     be more and you're going to have to pay more.  It's not a

9     free market situation, but that would be the true statement.

10          But our point is, you don't have to get there

11     because we're not talking at this point about the validity or

12     the applicability of a price comparison model in an antitrust

13     case.  Those models are used to determine what the antitrust

14     injury is.  You can see if there is a common impact.  Common

15     impact becomes very interesting when you're looking at a

16     national program and all of this is state by state.

17          But in any event, we're not attacking its

18     application or its substance.  We're attacking the fact that

19     he has deferred doing the analysis, and he can't.  He's got

20     to do the analysis, at least, sufficient to present to the

21     Court that damages are occurring that have a common impact.

22          And he references in his report some issues about

23     geographic issues, or his deposition, I'm not sure which at

24     the moment because I just read them both.  It makes a huge

25     difference.

1          But he hasn't -- we can't tell.  If he had laid out

2     an analysis, I might well have been in a here before the

3     Court saying that doesn't meet the Daubert requirements; it's

4     not scientifically sufficient.  But he doesn't tell us what

5     he plans to do or what he did, if anything, other than

6     looking at benchmarks which he acknowledges he couldn't

7     adjust for controls that have to be built in.  Said he didn't

8     have the data.  It's not the sponsor's fault.  It's not data

9     that the sponsors control.  He's looking at benchmarks for

10    two other -- two industries, as compared with this program,

11    and he says he doesn't have enough data to do the analysis.

12          So had he done it, which he hasn't, we might well

13    have been saying, You've got to do a true Daubert review here

14    because we don't think he meets the standard, but he doesn't

15    even do that.

16          He just says, Well, okay, what I'm doing is I'm --

17    I'm going to look at these benchmarks, but I recognize that I

18    don't yet have enough data.  These are preliminary.  These

19    are potential.  That's not good enough, Your Honor, so it's

20    two different arguments completely.

21          One is that the wage law compliance model doesn't

22    belong here at all because it has nothing do with the free

23    market or antitrust injuries, anticompetitive injuries.

24          The other model appropriately belongs in an

25    antitrust analysis, but he didn't give us anything from which

1    to see whether there would be common impact because we don't

2    know what he's going to do.  We don't know what his analysis

3    is going to be.  And he can't delay that until time of trial,

4    and that's what he says he plans to do.

5             THE COURT:  Okay.

6             MS. LUKEY:  Two different arguments.

7             THE COURT:  All right.  I guess I just can't get

8    over the fact that the common impact is that they would all

9    be making at least minimum wage.

10            MS. LUKEY:  Depending on where they are, that may

11   or may not be more than what they did make.

12            THE COURT:  Okay.  Now, that's the first time I've

13   really heard that.  I heard -- I listened to you because I've

14   always wondered really about the housing allowance and why

15   that isn't taken into account, et cetera.  So, you know, I

16   hear that argument, that maybe then some places it would be

17   the same.

18            MS. LUKEY:  Yes.

19            THE COURT:  But -- but I think that the common

20   impact is that it would never be less, right?

21            MS. LUKEY:  That has nothing to do with

22   anticompetitive conduct.

23            THE COURT:  Well, it could, if your anticompetitive

24   conduct was the cause of them not getting paid, whatever the

25   minimum wage is, right?  I mean, I'm not saying it does.  I'm

1    just saying that the proof of that is totally separate.

2    That's on merits.

3           MS. LUKEY:  Well, yes, I hear you.  But for

4    purposes of today what you're being tasked with doing is

5    determining whether his opinions, whether Dr. Kerr's

6    opinions, show a common impact.

7           The method that he -- the approach that he chooses

8    to use is to set forth the damages' models which he says will

9    show you the common impact.  And that's an acceptable

10   approach.  You can -- you can show common impact by your use

11   of the appropriate damages' model.  The problem -- and that's

12   all he does is the damages' models.

13          The problem is the first damages' model is not

14   applicable in an antitrust setting.  It's a labor model and

15   contrary to what my brother said, Comcast and I forget --

16   Spark (ph), I believe is the name of the Tenth Circuit case,

17   do say you can't use a model from another liability claim to

18   prove antitrust injury.

19          In fact, Dr. Kerr actually says he's using that

20   model, the wage law compliance model; he's using that model

21   for both the FLSA class and the antitrust class.  (Inaudible)

22   that occurred to him actually, but that's what he says he's

23   doing.  So he can't do that.

24          And the other damages' model he uses, as we

25   discussed, would be appropriate if he gave you the scientific

1    approach.  He doesn't -- I mean, he doesn't tell you what the
2    approach is.  This is a Daubert review.
3         It's not that -- so, yes, so suppose -- let's
4    accept what the Court is saying.  Let's ignore the fact that
5    there are states that don't have a minimum wage or have the
6    same wage and credit.
7         Even if they were all the same, the fact that the
8    number might be -- would be higher, if you were looking at --
9    if you assumed all states had a higher minimum wage and that
10   the number would be higher, you still need to know what his
11   analysis is to get you to the free market injury, the
12   antitrust injury, the anticompetitive injury.
13        What -- who is competing with whom here?  What is
14   the anticompetitive injury, as opposed to the labor injury?
15   It's a labor injury when what's happening is that the
16   individuals are getting paid at a federal wage when they
17   should be paid at the state minimum wage.  It's an antitrust
18   injury when somebody is attempting to compete with somebody
19   else that causes harm along the way.
20        THE COURT:  Price fixing, right, the typical?
21        MS. LUKEY:  Yes.  Exactly, Your Honor.  And to do
22   that, he needed to provide the approach, not simply to say --
23   even if he had said, which he didn't say in his report, he
24   said it was potentially higher.  And I think, again, that's
25   because some places it isn't.  But even if he had said, it's

1    higher, he's got to give you what his analysis is so you can

2    do the Daubert review and he didn't.

3            THE COURT:  But this is not -- really, I mean, we

4    all talk about Daubert, but there is not really a Daubert

5    analysis 100 percent because this is not trial testimony.

6    This is supporting, you know, the end -- the common interest,

7    right?  It's not -- it's not the same exactly.  It's a far

8    less rigorous standard.

9            MS. LUKEY:  It -- clearly, Your Honor is correct,

10   Daubert is normally used for determining whether trial

11   testimony comes in.

12           It is also true, however, that in the cases that

13   deal with the analysis at this stage, the challenge to an

14   expert at the class-certification stage, Daubert is the

15   standard that's routinely cited in the court cases.  That's

16   why we didn't title the motion as a Daubert motion; it's a

17   motion to exclude.  But the first case we cite to give the

18   Court the standard is Daubert.

19           THE COURT:  Okay.

20           MS. LUKEY:  Thank you, Your Honor.

21           MR. RODRIGUEZ:  May I very briefly?

22           THE COURT:  Yes.  Since we weren't too brief here,

23   you can certainly respond.

24           MR. RODRIGUEZ:  Thank you, Your Honor.

25           Well, first, I'm puzzled by the discussion of state

1    labor law.  So just to be very clear, what the model does is

2    it calculates the federal minimum wage and if the au pair was

3    in a state where the state or local minimum wage was higher,

4    the state or local minimum wage controls, the higher of the

5    two controls, and that's what the model does.  I don't

6    understand how there could be a situation where minimum wage,

7    if it controlled, could be lower than the federal minimum

8    wage.

9              THE COURT:  Is it true under plaintiffs' argument

10   that you disagree that any of these au pairs that were paid

11   195.75 a week ever made minimum wage?

12             MR. RODRIGUEZ:  Absolutely, that's correct.

13             THE COURT:  Based on your -- the way that you're

14   calculating the -- the credit for where they live?

15             MR. RODRIGUEZ:  Yes, Your Honor, that's correct.

16             And if we're wrong on that, then there is -- if

17   we're wrong on that as to an au pair who was controlled only

18   by the federal minimum wage, and if defendants are right that

19   in the but-for world prices wouldn't have gone above minimum

20   wage, then we have zero damages as to that au pair.  That is

21   common impact.  The model tells you whether or not you have

22   zero damages.  That demonstrates common impact.

23             You know, I think -- I think we have -- on the

24   wage-and-hour issue, I think we've clarified it and I think

25   that it's now pretty clear that the question is a pure

1    question of law as to whether this is an injury in the nature

2    of an antitrust injury or if it is an injury in the nature of

3    labor law.  And I submit, Your Honor, that that is not a

4    proper Daubert question and is, in fact, before Judge

5    Arguello.

6            Now, there is a lot of discussion of free market.

7    I think that term is not illuminating here.

8            The issue is not free market in the sense of, you

9    know, ideal libertarian competition.  The question is, What

10   would the market outcome have been but for the challenged

11   conduct?

12           So, for example, in Zenith, the defendant didn't

13   get to say, Well, you misused patent law and patent is an

14   exclusive right to exclude me from your invention and so

15   that's a patent injury and can't be considered an antitrust.

16   That is not the law.  It has never been the law.

17           I was also remiss, Your Honor, for not earlier

18   mentioning another example, again in the class-certification

19   briefing on page 18, which is about labor law.  In fact,

20   union activities can violate antitrust law and there are

21   special carve-outs that prevent them from violating antitrust

22   law.  That alone, I believe, demonstrates that there is no

23   such thing as a separation between antitrust and labor law.

24           Finally on Comcast.  So what Comcast -- what

25   happened in Comcast is there were four theories.  All but one

1   was kicked out at dispositive motions, and what the

2   plaintiffs had offered was a single damages' model that

3   conflated all four of the theories.  And so when they went to

4   trial, the only available opinion was one that assumed that

5   they won on all four theories and packed them altogether.

6         We've done just the opposite.  What we have done is

7   said if this set of outcomes happens -- that is, we're right

8   about the room and board credit, we're right about state

9   labor law, and it happens the defendants are right about

10  competition and price pressure in the but-for world, then we

11  come to the wage-and-hour law model.

12        If we are right that, in fact, damages would be

13  greater than wage and hour because in the free market, au

14  pairs would have competed with one another and driven prices

15  up, then we come to the competition model.

16        So when I hear that -- when I hear us being

17  criticized for saying it is possible or I haven't reached the

18  conclusion, what I hear is a criticism of doing exactly what

19  Comcast teaches.

20        Your Honor, I have nothing further.

21        THE COURT:  All right.  The Court is going to take

22  this under advisement.  I'm sure you kind of got that.  I

23  would like to do a little more reading on the topics and read

24  with a little more care the primary cases that you have

25  cited.  I -- I actually printed excerpts of the Urethane

1    antitrust litigation, so I looked at that pretty carefully,

2    but I have to admit that Comcast is not the one that I paid

3    much attention to.  So I do want to go back and look at those

4    things and try to sort this through.

5          You know, it's a complicated case.  And is the

6    briefing completely done in class cert motions?

7          MS. LUKEY:  It is, Your Honor.

8          THE COURT:  How long has it been pending?

9          MS. LUKEY:  Five months.

10         MR. RODRIGUEZ:  The briefing on class certification

11   was completed, I believe it was August 2 and I believe

12   briefing on this motion was concluded on August 21.

13         THE COURT:  Is it 562?  That's the -- is that the

14   class one we're talking about?

15         MS. LUKEY:  We'll check it right now, Your Honor.

16         THE COURT:  That looks like the right one to me,

17   filed in --

18         MS. LUKEY:  The corrected one is 565-1.  Okay.  So

19   I guess the original one was probably 565.

20         THE COURT:  So filed in June?

21         MS. LUKEY:  Filed on June 5, Your Honor.

22         THE COURT:  Okay.  Well, you know, you're going to

23   get a ruling on that by the end of March absolutely because

24   it's on that list.  So I'll try not to wait too long.

25         I think my feeling is since Judge Arguello referred

1    this one to me, that I better get some contact with her on

2    where she is on the scheme.  So I will try to do that and

3    push this one out.  Because that's where you're talking about

4    considering it, right, is in that June motion?

5            MS. LUKEY:  It wasn't clear to us, Your Honor, when

6    the -- when the referral was made whether she focused on the

7    fact that this was an exclusion motion on class certification

8    or whether she assumed, which she could have from the title,

9    but not from the paragraph below it.  If you just looked at

10   the title, you wouldn't know this was the class-cert

11   exclusion motion.

12           THE COURT:  You know, it's not always -- I'm sure

13   this is a big surprise to you, but it's not always the judge

14   who makes those calls, you know.

15           So I better get ahold of her because my guess is

16   they're working on this motion, you know, just because of the

17   age of it.  So -- so I won't hold up too long.  I do want to

18   contact her and look, but I'm not prepared to make a ruling

19   today because there is obviously some things I would like to

20   think over that we've talked about.

21           Thank you all for being patient and, you know,

22   really explaining it to me.  I appreciate the effort you've

23   put in.

24           MS. LUKEY:  Thank you, Your Honor.

25           MR. RODRIGUEZ:  Thank you, Your Honor.

1              THE COURT:  All right, we'll be in recess.

2              (Whereupon, the within hearing was then in

3    conclusion at 3:34 p.m.)

4

5

6    I certify that the foregoing is a correct transcript to the

7    best of my ability to hear and understand the audio recording

8    and based on the quality of the audio recording from the

9    above-entitled matter.

10

11   /s/ Dyann Labo                    January 15, 2018

12   Signature of Transcriber                Date

13

14

15

16

17

18

19

20

21

22

23

24

25