EXHIBIT C

Case No. 1:14-cv-03074-CMA-KMT   Document 808-3   filed 01/19/18   USDC Colorado   pg 2 of 67

# Exhibit 8

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

- - - - - - - - - - - - - - - - - - - - x

JOHANA PAOLA BELTRAN, et al.,

                Plaintiffs,

                        Civil Case No.
   -against-         14-cv-03074-CMA-CBS

INTEREXCHANGE INC., et al.,

                Defendants.
- - - - - - - - - - - - - - - - - - - - x


       Videotaped oral deposition of
WILLIAM L. GERTZ, taken pursuant to
Notice, was held at the law offices of
BOIES SCHILLER & FLEXNER LLP, 575
Lexington Avenue, New York, New York,
commencing September 14, 2017, 10:10
a.m., on the above date, before Leslie
Fagin, a Registered Professional
Reporter and Notary Public in the State
of New York.




           MAGNA LEGAL SERVICES
   320 West 37th Street, 12th Floor
     New York, New York 10018
       (866) 624-6221



## Page 2

APPEARANCES:

BOIES SCHILLER FLEXNER LLP
Attorneys for Plaintiffs
    575 Lexington Avenue
    New York, New York 10022
BY:    BYRON D.M. PACHECO, ESQUIRE
    DAWN SMALLS, ESQUIRE

CHOATE HALL & STEWART LLP
Attorneys for the Witness
    Two International Place
    Boston, Massachusetts 02110
BY:    KEVIN O'KEEFE, ESQUIRE

GIBSON DUNN & CRUTCHER LLP
Attorneys for AIFS
    200 Park Avenue
    New York, New York 10166-0193
BY:    ERIC STOCK, ESQ.

WHEELER TRIGG O'DONNELL
Attorneys for USAuPair, Inc. and GoAuPair and
Au Pair International
    370 17th Street, Suite 4500
    Denver, Colorado 80202
BY:    KATHRYN REILLY, ESQUIRE
    (Appearing via telephone.)

NIXON SHEFRIN HENSEN OGBURN
Attorneys for ProAuPair and International Au
Pair Exchange
    5619 DTC Parkway #1200
    Greenwood Village, Colorado 80111
BY:    KATHLEEN CRAIGMILE, ESQUIRE
    (Appearing via telephone.)

## Page 3

APPEARANCES:

SHERMAN & HOWARD LLC
Attorneys for InterExchange, Inc.
    633 17th Street, Suite 3000
    Denver, Colorado 80202
BY:    ALYSSA LEVY, ESQUIRE
    (Appearing via telephone.)

GORDON & REES
Attorneys for AuPairCare, Inc.
    555 17th Street #3400
    Denver, Colorado 80202
BY:    PEGGY KOZAL, ESQUIRE
    (Appearing via telephone.)

PUTNEY, TWOMBLY, HALL & HIRON LLP
Attorneys for AIFS
    521 Fifth Avenue
    New York, New York 10175
BY:    STEPHEN J. MACRI, ESQUIRE
    ROBERT TUCKER, ESQUIRE

ALSO PRESENT:

    ROBERT STEINKOPF, Videographer

## Page 4

1
2          THE VIDEOGRAPHER:  We are now on
3    the record.
4          This begins media No. 1 in the
5    deposition of William Gertz in the
6    matter of Joan Paola Beltran, et al.,
7    via InterExchange, Inc., et al., in the
8    United States District Court for the
9    District of Columbia.
10          Today is Thursday, September 14,
11    2017.  Time is 10:10 a.m.
12          This deposition is being taken at
13    575 Lexington Avenue, New York, New York
14    at the request of Boies Schiller &
15    Flexner LLP.
16          The videographer is Robert
17    Steinkopf of Magna Legal Services and
18    the court reporter is Leslie Fagin of
19    Magna Legal Services.
20          Will counsel and all parties
21    present state their appearance and who
22    they represent.
23          MS. SMALLS:  Dawn Smalls from Boies
24    Schiller & Flexner on behalf of the
25    plaintiffs.

## Page 5

1          W. Gertz
2          MR. PACHECO:  Byron Pacheco from
3    Boies Schiller & Flexner, also on behalf
4    of the plaintiffs.
5          MR. MACRI:  Steven Macri and Robert
6    Tucker from Putney, Twombly, Hall &
7    Hiron on behalf of American Institute
8    For Foreign Study, Inc.
9          MR. O'KEEFE:  Kevin O'Keefe of
10    Choate Hall & Stewart on behalf of
11    Cultural Care, Inc.
12    W I L L I A M  L.  G E R T Z, called as a
13    witness, having been duly sworn by a
14    Notary Public, was examined and testified
15    as follows:
16    EXAMINATION BY
17    MS. SMALLS:
18          Q.   Good morning.  Could you please
19    state your full name, your employer and your
20    title for the record?
21          A.   William L. Gertz, president and CEO
22    of AIFS.
23          Q.   Have you ever been deposed before?
24          A.   I have not.
25          Q.   A few ground rules for the



Page 6

```
1              W. Gertz
2    deposition.  The court reporter, as well as
3    the videographer is recording everything that
4    is being said.  I'm going to ask you
5    questions.  I ask that you answer them rather
6    than nodding or gesturing, so it can be
7    correctly reflected on the record.
8        If there is anything that I ask you
9    that you don't understand or that is not
10   clear, please let me know that and I'm happy
11   to rephrase the question.
12       And another rule is that you and I
13   should be careful not to talk over each other
14   so that, again, the court reporter and the
15   videographer can correctly reflect the
16   record.  I will make sure to wait until you
17   have finished until I believe that you have
18   finished a question before I ask you another
19   question.
20       In the same vein, if you can wait
21   until I finish my question, even if you think
22   you know what I'm going to ask, so we are
23   both clear on both the question and the
24   answer.
25       If, at any point, you need to take
```

Page 7

```
1              W. Gertz
2    a break, I would only ask you to answer the
3    question I have just asked and then I'm happy
4    to take a break or whatever reason, if you
5    need to use the restroom or just want a few
6    minutes.
7        In response to some of my questions
8    today, your counsel may make objections.
9    That's fine, but you are still required to
10   answer the question, unless what I'm asking
11   you is privileged.
12    A.  Okay.
13    Q.  So he will make objections,
14   whatever those objections are, we will allow
15   an opportunity for your counsel to make those
16   objections and then you should proceed with
17   answering the question and then those
18   objections are noted for the record.
19       Let me make sure I'm not forgetting
20   anything.
21       I would just remind you that you've
22   been sworn in by the court reporter and that
23   you've been -- you are sworn to tell the
24   truth and I would just ask, is there any
25   reason that you cannot testify truthfully and
```

Page 8

```
1              W. Gertz
2    fully to the questions being asked today?
3    A.  No.
4    Q.  Have you taken any medication or
5    drugs or anything else that would impede your
6    ability to answer questions today?
7    A.  No.
8        (Gertz Exhibit 1, document, marked
9    for identification.)
10   Q.  I've just handed you a document.
11       Do you recognize this document.
12       MS. SMALLS:  Who just joined?
13       MR. STOCK:  Eric Stock from Gibson
14   Dunn.
15       MS. SMALLS:  You are representing?
16       MR. MACRI:  AIFS.  We will
17   stipulate to the notice of the
18   deposition.
19   Q.  You testified, Mr. Gertz, you have
20   never testified at a deposition before, is
21   that correct?
22   A.  Correct.
23   Q.  What did you do to -- did you do
24   anything to prepare for today's deposition?
25   A.  Spoke with counsel.
```

Page 9

```
1              W. Gertz
2    Q.  Did you review any documents?
3    A.  We looked at some documents.
4    Q.  What documents did you review?
5    A.  A whole bunch.
6    Q.  Like what?
7        MR. MACRI:  He didn't review
8    anything outside of the presence of
9    counsel when he met with me.
10       MS. SMALLS:  That's a pretty
11   standard question of what documents were
12   reviewed.  I understand it was in your
13   presence, but that's not privileged in
14   terms of what documents you --
15   Q.  What documents do you recall you
16   reviewed in preparation for today's
17   deposition?
18   A.  There was a business plan, there
19   was some org chart, there was some pieces of
20   paper, records from phone calls.
21   Q.  Some notes from phone calls?
22   A.  Uh-huh, correct.
23   Q.  Were there any other documents?
24   A.  There were other documents, but I
25   don't remember every document I looked at.
```



Page 10

```
 1              W. Gertz
 2      Q.  How long did you meet with counsel?
 3      A.  A couple of hours.
 4      Q.  Did you meet with counsel once or
 5  did you meet with counsel more than once, in
 6  preparation for this deposition?
 7      A.  We met twice.
 8      Q.  When did you meet?
 9      A.  We met yesterday.
10      Q.  You met twice in one day?
11      A.  No, a week before.
12      Q.  So you met a week ago to prepare
13  for this deposition and then you met
14  yesterday?
15      A.  Correct.
16      Q.  And how long did you meet when you
17  met a week ago?
18      A.  Three, four hours, something like
19  that.
20         MS. KOZAL:  I am having trouble
21      hearing.
22         MS. SMALLS:  We just requested,
23      which the witness gladly complied, to
24      move the microphone up, so we will see
25      if that helps.
```

Page 11

```
 1              W. Gertz
 2      Q.  When you met a week ago, you met
 3  for three or four hours, is that correct?
 4      A.  Uh-huh.
 5      Q.  How long did you meet with counsel
 6  yesterday?
 7      A.  Same amount.
 8      Q.  Three or four hours?
 9      A.  Yeah.
10      Q.  So, total, you met with counsel for
11  six to eight hours in preparation for today's
12  deposition?
13      A.  Sounds about right.
14      Q.  When you say that you reviewed
15  handwritten notes, were they your handwritten
16  notes or were they somebody else's
17  handwritten notes?
18      A.  Not mine, no.
19      Q.  Not yours.
20         Were they the notes of an Alliance
21  employee?
22      A.  They could have been, I don't know.
23      Q.  Were the notes an account of an
24  Alliance meeting?
25      A.  They were Alliance, yes.
```

Page 12

```
 1              W. Gertz
 2      Q.  Were those the only handwritten
 3  notes that you reviewed in preparation for
 4  today's deposition or were there other
 5  handwritten notes that you reviewed?
 6      A.  That's all I recall.
 7      Q.  So the only handwritten notes that
 8  you remember reviewing in preparation for
 9  today's deposition were the handwritten notes
10  that were taken concurrently with an Alliance
11  meeting?
12         MR. MACRI:  I object as to
13      foundation on that.
14      A.  What do I do?
15      Q.  My question was, so the only
16  handwritten notes that you remember reviewing
17  in preparation for today's deposition were
18  the handwritten notes that were taken
19  concurrently with the Alliance meeting, is
20  that correct?
21      A.  Yes.
22      Q.  Mr. Gertz, you said that you were
23  president and CEO of AIFS, is that correct?
24      A.  That's correct.
25      Q.  Do you hold any other roles?
```

Page 13

```
 1              W. Gertz
 2      A.  In what respect?
 3      Q.  Do you hold any other roles or
 4  titles with any other organizations?
 5      A.  I am -- yes.
 6      Q.  What are those?
 7      A.  I'm on the board of trustees at the
 8  Westport School of Music; I am the chair of
 9  the Alliance, I am a trustee of the AIFS
10  Foundation and a trustee of the National
11  Society For Gifted and Talented.
12      Q.  Anything else?
13      A.  That's all I know now.
14      Q.  What are your responsibilities as
15  president and CEO of AIFS?
16      A.  I'm the chief morale officer, for
17  lack of a better term, in charge of making
18  sure the place runs well and I'm responsible
19  for managing seven divisions at AIFS, as well
20  as working with divisions, various divisions,
21  so that we have managing the au pair and a
22  bunch of other things.
23      Q.  When you say managing various
24  divisions, are those various divisions in
25  addition to the seven divisions that you
```



4 (Pages 10 to 13)

Page 14

1  W. Gertz
2  mentioned?
3  A. No, those are some of the
4  divisions, I was just giving you a brief
5  outline of what I do.
6  Q. What are the seven divisions?
7  A. There is Au Pair America, as I
8  mentioned, there is the college study abroad,
9  which is a big part of what we do, there is
10  an insurance division, there is the liaison
11  with the Foundation, which is a part of the
12  group, I am -- Summer Institute For The
13  Gifted, I am a trustee there, so I work with
14  the people there. The Camp America is
15  another one of our exchange programs, so I
16  work with a director there. I am also
17  responsible for going to meetings and
18  conferences and generally dealing with
19  cultural exchange issues and making sure the
20  companies run, that our programs are high
21  quality programs.
22  (Gertz Exhibit 2, AIFS, Inc.
23  company brochure, marked for
24  identification.)
25  (Gertz Exhibit 3, document, marked

Page 15

1  W. Gertz
2  for identification.)
3  Q. Let me ask you, the Exhibit 2, the
4  first, that document right there, do you
5  recognize this document?
6  A. Yes.
7  Q. What is it?
8  A. It is the company brochure.
9  Q. Can I refer you to page 7 of the
10  company brochure?
11  A. Sure.
12  Q. Actually, before I get to my
13  question, when you say, the company brochure,
14  who is it prepared for?
15  A. AIFS, Inc. By AIFS, Inc., it's the
16  overall company brochure.
17  Q. Who is the targeted audience for
18  the company brochure?
19  A. It's a good question because now
20  it's all online. I would say anyone from
21  participants to staff, anyone who wants to
22  find out what AIFS is all about, cultural
23  exchange programs, a parent, a university
24  wants to know what AIFS does, this is what
25  AIFS does.

Page 16

1  W. Gertz
2  Q. So this was your -- before
3  everything was moved online, as I understand
4  it, or maybe you still have a brochure?
5  A. Yes.
6  Q. But for this particular brochure,
7  it's your standard brochure that's meant for
8  the public and people that may be interested
9  in AIFS programs?
10  A. Correct.
11  Q. That would include potential host
12  families or au pairs?
13  A. Not so much, I would say. If they
14  would ask for it, yes.
15  Q. Again, if it's not so much meant
16  for host families and au pairs, who was the
17  brochure meant for?
18  A. It would be anyone, it could be a
19  journalist, it's a brochure about what the
20  company does, so we don't mail them out, but
21  if someone says, what do you people do, this
22  is what we do.
23  Q. Got it.
24  So if we can, I'm going to go to
25  page 7 and, again, just ask about the seven

Page 17

1  W. Gertz
2  divisions.
3  A. Sure.
4  Q. In your last answer to the question
5  about the seven divisions, you gave some of
6  your duties, but not necessarily a specific
7  answer to each of the seven divisions, so I
8  wanted to give you this document so you could
9  reference something.
10  If you can, again, walk me through
11  what are the seven divisions of AIFS.
12  A. AIFS College Division.
13  Q. What is the AIFS College Division?
14  A. Study abroad programs for
15  Americans.
16  Q. And as a percentage, how big is
17  that in the overall -- how big is it in
18  respect to the other six divisions that make
19  up AIFS?
20  MR. MACRI: Objection as to form.
21  A. I don't I understand the question.
22  Q. Actually, let's go through all the
23  divisions and then we will go back.
24  A. Okay.
25  Q. So study abroad programs for



Page 18

1            W. Gertz
2   Americans.
3         What's the next division?
4      A.  Camp America.
5      Q.  Okay.  What does Camp America do?
6      A.  Camp America sends international
7   counselors to the United States, students,
8   these are all student programs, these are
9   students that come from around the world to
10  participate in the cultural exchange for a
11  summer.
12     Q.  When you say participate in a
13  cultural exchange, how do they do that?
14     A.  It's a broad term, they're at a
15  camp, as a counselor, so they deal with the
16  children, events, they teach the children how
17  to play soccer.  It's a wonderful program,
18  there is many thousands of kids every year
19  coming in from around the world to live at
20  the camps.
21     Q.  What would be the next division?
22     A.  Au pair in America.
23     Q.  What does that division do?
24     A.  It brings young people from around
25  the world for a one-year cultural exchange in

Page 19

1            W. Gertz
2   the United States living with host families,
3   watching the children, participating in a
4   wonderful series of events, meeting each
5   other, so they have an international
6   component, the young women from all over the
7   world meet together, they also get involved
8   in the community, they go to school, college
9   for credits, they volunteer in the local
10  community and they stay for a year or they
11  can extend for a second year and that's
12  pretty much it.
13     Q.  What is the next division?
14     A.  Cultural insurance services
15  international.
16     Q.  What does cultural insurance
17  services do?
18     A.  Provides medical, travel insurance
19  for international participants and American
20  students going overseas.
21     Q.  Is the insurance that's provided
22  under this division only for AIFS programs or
23  do you provide it to other sponsors or other
24  entities that may be providing cultural
25  exchange programs?

Page 20

1            W. Gertz
2     A.  Other organizations in addition to
3  AIFS.
4     Q.  What percentage of services are
5  provided to AIFS programs versus non-AIFS
6  programs?
7       MR. MACRI:  Objection as to form.
8     A.  I have no idea, I don't know the
9  percentage basis of their clients.
10     Q.  Roughly, do you think it's a
11  majority?
12     A.  I don't think it's a majority.
13     Q.  Let me ask you, you're responsible
14  for oversight and management of all seven --
15     A.  Roughly seven.
16     Q.  -- of all seven divisions, correct?
17     A.  Yes.
18     Q.  So for this particular division,
19  the cultural insurance services international
20  division, how much of that division is based
21  on servicing AIFS programs?
22     A.  I wouldn't know that information.
23  I don't run the division.  There is a manager
24  there who has all those details.
25     Q.  Are you familiar with the general

Page 21

1            W. Gertz
2   business plan for cultural insurance
3  services?
4     A.  Yes.
5     Q.  Does the business plan rely on --
6  rely at all or heavily on providing services
7  to AIFS programs, program participants?
8       MR. MACRI:  Objection as to form.
9     A.  No.
10     What was the question?
11     Q.  Was the business plan for cultural
12  insurance services rely -- rely at all or
13  heavily on providing services to AIFS program
14  participants?
15       MR. MACRI:  I have an objection as
16  to form on that question, please.
17     A.  Not heavily.
18     Q.  Is it part of the business plan for
19  cultural insurance services to provide
20  medical and travel insurance for AIFS program
21  participants?
22     A.  One more time, I'm trying to get
23  this.
24     Q.  Is it part of the business plan for
25  cultural insurance services to provide



6  (Pages 18 to 21)

Page 22

W. Gertz

1  
2 medical and travel insurance for AIFS program  
3 participants?  
4     A.  Yes.  
5     Q.   Does cultural insurance services  
6 provide medical and travel insurance for Au  
7 Pair in America participants?  
8     A.  Yes.  
9     Q.   Are there other providers of  
10 medical and travel insurance for Au Pair in  
11 America participants?  
12     A.  I don't know.  
13     Q.   Is Cultural Insurance Services  
14 International the exclusive provider for Au  
15 Pair in America participants of medical and  
16 travel insurance?  
17     A.  Yes.  
18     Q.   Can we move on to the next  
19 division?  
20     A.  Uh-huh.  
21     Q.   What is the next division after  
22 Cultural Insurance Services International?  
23     A.   Those are all.  
24     Q.   I'm trying to get to seven.  So you  
25 said that you were responsible for seven  

Page 23

W. Gertz

1  
2 divisions, so I'm trying to understand what  
3 the seven divisions are.  
4         So this page lists our programs and  
5 affiliated organizations, so we've gone  
6 through four and when you say, seven  
7 divisions, I'm trying to understand.  
8     A.  I mean, there are AIFS college  
9 partnership programs, Camp Power.  Is that  
10 seven?  
11     Q.  No.  That's six.  
12     A.  I would say there are six divisions  
13 I am responsible for.  
14     Q.  I don't know, is National Society  
15 For the Gifted and Talented, is that a  
16 division you are responsible for?  
17     A.  No, that's not a division.  
18     Q.  Is the Summer Institute For The  
19 Gifted American Institute a division that you  
20 are responsible for?  
21     A.   Summer Institute For The Gifted,  
22 I'm not responsible for.  
23     Q.  Is the Foreign Study Foundation a  
24 division you are responsible for?  
25     A.  No.  

Page 24

W. Gertz

1  
2     Q.   Is Academic Year in America a  
3 division that you are responsible for?  
4     A.  No.  
5     Q.   Is the American International  
6 University in London a division that you are  
7 responsible for?  
8     A.  No.  
9     Q.   And then is the American Council  
10 For International Studies a division that you  
11 are responsible for?  
12     A.  No.  
13     Q.   So as I understand it, the  
14 divisions for which you are responsible for  
15 in terms of oversight and management are the  
16 AIFS college division, the AIFS college  
17 partnership programs, Camp America, Camp  
18 Power, Au Pair in America and the Cultural  
19 Insurance Services International, is that  
20 correct?  
21     A.   That is correct.  
22     Q.   Are there any other divisions for  
23 which you are responsible?  
24     A.  No.  
25     Q.   How many -- does each division have  

Page 25

W. Gertz

1  
2 its own employees?  
3     A.  I don't understand the question.  
4     Q.   How many employees does AIFS have?  
5     A.  170-ish.  
6     Q.   Is that staff all assigned to a  
7 specific program or --  
8     A.  No.  
9     Q.   -- or is some of the staff service  
10 AIFS in general?  
11     A.  Yes.  AIFS, in general, some of the  
12 staff.  
13     Q.   Can you give me generally a break  
14 down of how the staff is broken down in terms  
15 of AIFS generally and program specific staff?  
16     A.  Yes.  
17     Q.   Okay.  Please give me a breakdown  
18 of how many staff are assigned to AIFS  
19 generally?  
20     A.  I will give you a guess because I  
21 don't have -- it changes every day and I  
22 don't know exactly how many in each division,  
23 but I can tell you -- which division are you  
24 interested in?  What is your question?  
25     Q.  I will rephrase my question.  



7 (Pages 22 to 25)

| Page 26 | Page 28 |
|---|---|

**Page 26**

W. Gertz

1
2   A.   Thank you.
3   Q.   How is the staff of AIFS organized?
4   A.   By divisions, operating divisions
5   and then support divisions.
6   Q.   What are the operating divisions
7   and what are the -- let's start with what are
8   the operating divisions?
9   A.   The ones I gave you.
10  Q.   Can you repeat them?
11  A.   College partnership, Au Pair in
12  America, Cultural Insurance Services
13  International, ACIS, Camp America, Camp
14  Power.
15  Q.   Is ACIS a division you are
16  responsible for?
17  A.   No.
18  Q.   I just -- you just said ACIS?
19  A.   I did, I meant not ACIS, I am not
20  responsible for ACIS.
21  Q.   But when you referred to operating
22  divisions and support divisions, you are
23  referring to the six divisions that you said
24  you maintain general oversight and management
25  of, is that correct?

**Page 27**

W. Gertz

1
2   A.   Correct.
3   Q.   When you refer to support
4   divisions, what are you referring to there?
5   A.   The marketing division, the human
6   resources division, IT.  That's all I can
7   remember.
8   Q.   You testified that you have about
9   170 employees total, is that correct?
10  A.   Yes.
11  Q.   Approximately?
12  A.   Yes, in Stamford.
13  Q.   In Stamford?
14  A.   Correct.
15  Q.   Do you supervise employees -- do
16  you supervise and are responsible for
17  employees outside of Stamford?
18      MR. MACRI:  Objection as to
19  foundation.
20  A.   No.
21  Q.   So of the 170 employees, how many
22  are assigned to the operating division -- to
23  working for the operating divisions and how
24  many work for the support divisions?
25  A.   I never added them up.

**Page 28**

W. Gertz

1
2   Q.   Half and half?
3   A.   Finance also, just to go back.
4   Half and half sounds right, maybe more on the
5   operating side.
6   Q.   You don't really know?
7   A.   No.
8   Q.   I don't want to offer you an
9   answer, I don't know.
10  A.   You said half and half I said that
11  sounds pretty good, but I have no clue.
12  Q.   I don't want to give you an answer
13  because I certainly don't know.
14  A.   I never really looked at it that
15  way.
16  Q.   So for the staff that are assigned
17  to operating divisions, roughly how many are
18  assigned to AIFS college division?
19  A.   █████
20  Q.   How many staff are assigned to AIFS
21  college partnership programs?
22  A.   ███████
23  Q.   How many staff are assigned to Camp
24  America and -- Camp America?
25  A.   █████.

**Page 29**

W. Gertz

1
2   Q.   How many staff are assigned to Camp
3   Power?
4   A.   █████.
5   Q.   How many staff are assigned to
6   Cultural Insurance Services International?
7   A.   ████ you would really have to
8   ask the managers, they would know.████.
9   Q.   How many staff are assigned to Au
10  Pair in America?
11  A.   █████.
12  Q.   Is Au Pair in America your largest
13  division?
14  A.   Some years.  In what respect,
15  staff, yes, I think so.
16  Q.   Go ahead, finish.
17  A.   College and au pair are comparable
18  in terms of staff, I think.
19  Q.   In terms of the amount of time you
20  spend supervising management, is Au Pair in
21  America your most significant or largest
22  division?
23  A.   No.
24  Q.   What is your largest and most
25  significant division?





Page 30

```
1              W. Gertz
2      A.  College.
3      Q.  And is that the AIFS college
4  division or the AIFS college partnership
5  program?
6      A.  College division.
7      Q.  Would it be fair to use the number
8  of staff as a rough allocator of their size
9  and significance for each?
10        MR. MACRI:  Objection as to form.
11     A.  No.
12     Q.  What would you consider your
13 primary division within AIFS?
14     A.  I spent time on everything,
15 frankly, all the divisions.  And a lot of
16 internal time on employee morale.  I don't do
17 day to day, I'm not a day to day guy.  I do
18 mostly -- I'm the face of AIFS, conferences
19 and that's why I have my good side, that's a
20 big part of my job, coming up with ideas and
21 food trucks.
22     Q.  Coming up with.
23     A.  Food trucks, employee satisfaction,
24 I do a lot of that now, that's a lot of what
25 I do.
```

Page 32

```
1              W. Gertz
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17     Q.  On the same page, this brochure
18 refers to international offices.
19        What are the international offices
20 referred to here?
21     A.  Those would be our international
22 offices.  I'm looking for addresses.
23        MR. MACRI:  It's a two-sided
24     document.
25     A.  Overseas offices would be this
```

Page 31

```
1              W. Gertz
2      Q.  When you say that you are not a day
3  to day guy, what does that mean?
4      A.  Each division has a manager
5  responsible for their division, so I'm
6  managing the managers, I guess.
7      Q.  Which divisions have the largest
8  revenues?
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 33

```
1              W. Gertz
2  German office, that's overseas.  Australia is
3  overseas, London is overseas.  Those are the
4  overseas offices.
5      Q.  These are AIFS offices, just as the
6  Stamford office is an AIFS office, is that
7  correct?
8      A.  Correct.
9      Q.  Are they affiliated or are they
10 offices of AIFS?
11     A.  Offices of AIFS.
12     Q.  Are you responsible, as president
13 and CEO of AIFS, for the management and
14 oversight of those offices, as well?
15     A.  I am not.
16     Q.  Who is responsible for the
17 management and oversight of the overseas
18 offices?
19     A.  The chairman of AIFS.
20     Q.  What is the chairman of AIFS?
21     A.  Sir Cyril Taylor.
22     Q.  Who are the officers of AIFS?
23     A.  Their board of directors would be
24 the officers, as far as I know.
25     Q.  It says under international offices
```


LEGAL SERVICES

Case 1:14-cv-03074-CMA-KMT   Document 780-2   Filed 02/09/18   USDC Colorado   Page 11 of 66

Page 34

```
1              W. Gertz
2    and the next line says, Principal offices and
3    officers?
4          MR. MACRI:  Page 7.
5       A.  It just looks like what's coming
6    up, international, principal offices and
7    officers and then the board of directors.
8    This looks out of order to me.
9       Q.  Board of directors is listed
10   separately from principal offices and
11   officers, so I'm asking you, from your
12   understanding or your best knowledge, what
13   constitutes the principal officers of AIFS?
14      A.  The principal officers, really, the
15   board of directors.
16      Q.  Who is on the AIFS board of
17   directors?
18      A.  There is a list here, all the
19   people on the list in this brochure at that
20   year, so it would be Sir Cyril Taylor,
21   myself, J.  Michael Berry, Jack Burg, Michael
22   DiMauro, Ruth Frizell Ferry, Peter Jones,
23   Thomas Kiechle, Linda Langin, Philippe
24   Setton, Rebecca Tabaczynski, Peter
25   Tcherepnine, Paul Watson, Gene Maillet,
```

Page 35

```
1              W. Gertz
2    that's it.
3       Q.  What page are you looking at?
4       A.  Thirty-four and 33 -- 33 and 34.
5       Q.  What is AIFS, Inc.?
6       A.  Parent company or holding company,
7    a parent company, I guess is -- it's the
8    whole organization, would be AIFS, Inc.
9       Q.  What is AIFS Stamford?
10      A.  It's just the people that work in
11   Stamford.
12      Q.  And --
13      A.  We just call it AIFS Stamford, they
14   work for... yeah.
15      Q.  Here, it says you are the
16   vice-president and chairman of AIFS, Inc., is
17   that correct?
18      A.  That's correct.
19      Q.  And AIFS, Inc. is the holding
20   company for all the AIFS entities, is that
21   correct?
22      A.  For lack of a better word.  Again,
23   this is not my area of expertise, the legal
24   setup of AIFS.  You are going to have to --
25   these are more just what I think, but they're
```

Page 36

```
1              W. Gertz
2    not -- I'm not that person who does that, so
3    I would fumble with the legal entities.
4       Q.  I'm just trying to understand how
5    it works.
6       A.  Basically, AIFS is the board and
7    then there is divisions, locations, just
8    everything that we went through.
9          THE WITNESS:  Can I get another
10   water?
11         THE VIDEOGRAPHER:  We are now off
12   the record.  The time is 10:58 a.m.
13         (Recess.)
14         THE VIDEOGRAPHER:  We are now on
15   the record.  The time is 11:05 a.m.
16      Q.  So before the break, we were asking
17   about AIFS, Inc. versus AIFS Stamford and so
18   I want to direct you to the top of this page
19   where it says, AIFS board of directors.  It's
20   the last page we were looking at on page 33
21   of this document.
22         Do you see that at the top of the
23   page where it says, AIFS board of directors?
24      A.  I do.
25      Q.  Then it lists the individuals that
```

Page 37

```
1              W. Gertz
2    you named before?
3       A.  Yes.
4       Q.  When it says, AIFS board of
5    directors, is that the board of directors for
6    AIFS, Inc. or AIFS Stamford?
7       A.  AIFS, Inc.
8       Q.  Does AIFS Stamford have a board of
9    directors?
10      A.  No.
11      Q.  Here on this list, it says you are
12   the vice-chairman of AIFS, Inc., is that
13   correct?
14      A.  Yes.
15      Q.  Is that still true today?  This
16   document is dated in 2011.
17      A.  Yes.
18      Q.  As vice-chairman of AIFS, Inc., do
19   you have any responsibilities with respect to
20   the other AIFS entities that make up AIFS,
21   Inc.?
22      A.  Repeat the question, please.
23      Q.  Are your only responsibilities as
24   president and vice-chairman limited to the
25   Stamford office or as president and
```

MAGNA ▶
LEGAL SERVICES

| Page 38 | Page 40 |
|---|---|

Page 38

1        W. Gertz
2 vice-chairman of AIFS, Inc., do you also have
3 responsibilities for other offices?
4     A.   No, I do not.
5     Q.   What is the relationship between
6 AIFS Stamford and AIFS, Inc.?
7     A.   We use it interchangeably.  I would
8 say, as we said before AIFS, Inc. is the name
9 of operating -- the whole operation, but,
10 again, I don't know all these details with
11 which -- I just know what I'm responsible
12 for, as I told you.
13     Q.   Can I refer you to Exhibit 3.
14        What is Exhibit 3?
15     A.   It says, AIFS, Inc. Organization
16 Chart.
17     Q.   Have you seen this document before?
18     A.   No.
19     Q.   Is it consistent with your
20 understanding of how AIFS, Inc. is
21 structured?
22     A.   More or less.
23     Q.   What is inaccurate about or
24 unclear?
25     A.   This looks like the two Delaware

Page 39

1        W. Gertz
2 corporations, which I don't know if that's
3 the case or not, so I couldn't comment on
4 whether there are one or two entities.
5     Q.   There is also no corresponding
6 lines to show what goes up, what reports into
7 what on this chart, so I'm going to ask you a
8 few questions about that.
9        So it says that American Institute
10 For Foreign Study, Inc. is a Delaware
11 corporation.
12        Is that consistent with your
13 understanding of AIFS, Inc.?
14     A.   Again, these are two -- I don't
15 know if these are two or one in terms of how
16 you are phrasing it, so I don't really have
17 an answer.
18     Q.   So you and I can agree that AIFS,
19 Inc. and American Institute Foreign Study,
20 Inc. both says Delaware corporation, it's
21 duplicative, so let's cross the top one off.
22     MR. MACRI:  I'm going to object as
23 to foundation and as to form on this
24 question.
25     Q.   Okay.

Page 40

1        W. Gertz
2     MR. MACRI:  If they were
3 duplicative, they wouldn't be two
4 different entries.  They are two
5 different corporations and have
6 different names.
7     MS. SMALLS:  Okay.  I think he said
8 that it was -- they seemed the same.
9     MR. MACRI:  He didn't understand
10 the relationship.
11     Q.   As best you understand it, what
12 does the first box represent?
13     A.   Which box?
14     Q.   The top box, AIFS, Inc., Delaware
15 corp.
16     A.   That is AIFS, including, you know,
17 London and -- all these things.
18     Q.   As best you understand it, what is
19 the second box?
20     A.   I don't know, I don't know if this
21 is Stamford or this is a separate entity.
22     Q.   And understanding that you cannot
23 testify on things that you don't know, who
24 would know the structure of these two
25 entities as they're listed on this page or

Page 41

1        W. Gertz
2 how AIFS is legally structured?
3     A.   Probably somebody in finance, chief
4 finance officer would make sense.
5     Q.   From either the current leadership
6 or the board of directors and if you need to
7 refer back to that list of who is on that
8 list, who would have knowledge of the
9 structure of AIFS, Inc.?
10     A.   Well, it could be -- I'm surmising
11 this now because I never had a conversation
12 about the structure and form that I can
13 remember, but I would say that looking at the
14 chart here, it would be the -- the chairman
15 would know, I would assume, but I don't know
16 that for a fact.
17        The two finance people, Michael
18 Berry and Jack Burg, they would be the people
19 that would, as far as I know, would know
20 logically the -- and lawyers, probably.
21     Q.   And understanding that generally,
22 there is a holding company, AIFS, Inc., how
23 do each of the boxes -- the boxes on the
24 bottom relate to AIFS, Inc.?
25     A.   I think, from looking at this, it



---

Page 42

```
1                W. Gertz
2    would all be put to the Inc.  Looking it up,
3    this is an org chart, it looks to me, so
4    there is no lines here, but I would say they
5    all -- again, I don't know the finances of
6    whose reporting where and how these companies
7    are structured or if they're -- I just don't
8    have that information.
9         Q.  Do you know why AIFS Stamford, as
10   you refer to it, is not reflected on this
11   chart?
12        A.  No, that's just what we call it,
13   AIFS Stamford, I don't know if it's a legal
14   entity or not.
15        Q.  Let me ask you a different way.
16        Is AIFS Stamford reflected on this
17   chart?
18        A.  It would have to be, yes.
19        Q.  So where would AIFS Stamford, as
20   you refer to it...
21        A.  It's either -- I don't know, but
22   it's one -- it has to be one of these two
23   places, right, Inc. or American Institute For
24   Foreign Study, Inc.
25        Q.  Let's go back to Exhibit 2.  I will
```

---

Page 43

```
1                W. Gertz
2    refer you to page 15.
3         A.  Uh-huh.
4         Q.  On page 15, the second checkmark.
5         A.  Uh-huh.
6         Q.  Can you read that out loud?
7         A.  Sure.  Cost effective on an average
8    all-in cost of 347 per week, including the au
9    pair's pocket money of $200 a week,
10   irrespective of number of children in the
11   family.  Au pairs are a more cost effective
12   solution than most nannies, babysitters and
13   daycare.  Families with full-time school age
14   children, the edu care program will provide
15   30 hours weekly care for $274 a week may be
16   the option of choice.
17        Just that line?
18        Q.  Yes.  Do you know how that number
19   of $347 a week was arrived at?
20        A.  I'm not sure.
21        Q.  If you can go to page 16.
22        A.  Uh-huh.
23        Q.  On the bottom of that page, there
24   is a reference to a program fee of $500, is
25   that correct?
```

---

Page 44

```
1                W. Gertz
2         A.  That's what it says here, yes.
3         Q.  And then can you read out loud what
4    it says the program fee of $500, what that
5    covers?
6         A.  A London to New York return flight,
7    12 to 24-month J-1 Visa, basic medical
8    insurance, two weeks paid vacation, $200
9    study allowance payable by host family,
10   additional travel month support network
11   throughout their stay, 24 toll-free emergency
12   phone access.
13        Q.  And does $500 pay for all those
14   things?
15        A.  I don't know, I don't know how this
16   is calculated.  No, I don't know.
17        Q.  How long have you served as
18   president and CEO of AIFS?
19        MR. MACRI:  Objection as to form.
20        Q.  What is the basis of the objection?
21        MR. MACRI:  He is president and CEO
22   of American Foreign Institute.
23        MS. SMALLS:  That's not what he
24   testified.
25        MR. MACRI:  That's why I'm
```

---

Page 45

```
1                W. Gertz
2    objecting as to form.
3         MS. SMALLS:  His testimony today,
4    which I'm going based on, is that he is
5    president and CEO of AIFS.  I'm reading
6    the transcript, that's what it says.
7         MR. MACRI:  He also didn't
8    understand the distinction or legal
9    distinctions between the two --
10        MS. SMALLS:  That's separate.  I
11   asked him to state his name and title
12   for the record.  That's the very first
13   question I asked him.  There was no
14   other discussion.  He said, I am
15   president and CEO of AIFS.  If I ask a
16   question as president and CEO of AIFS, I
17   don't understand the basis of an
18   objection.  That's absurd.
19        MR. MACRI:  It's shorthand.
20        Q.  At the beginning of this
21   deposition, you testified that you were
22   president and CEO of AIFS, is that correct?
23        A.  Yes, but -- and I'm going to say
24   this.  We use AIFS and American Institute
25   Foreign Study, the same, it's the same, it
```

---

**MAGNA** ▶
LEGAL SERVICES

Page 46

```
 1              W. Gertz
 2   says American Institute Foreign Study, which
 3   is the full name of what I am president and
 4   CEO of and, in parenthesis, it says AIFS.
 5   I'm the vice-chair of AIFS, Inc.
 6        Q.  So let's go back to Exhibit No. 3.
 7        A.  Right.
 8        Q.  Because when I asked you before
 9   where was AIFS Stamford represented, you said
10   you didn't know and when your counsel
11   interjected and then told you which entity on
12   this page represented AIFS Stamford, you now
13   have a different answer, is that correct?
14        A.  I don't know if I have a different
15   answer.  It's the same.  I don't understand
16   the exact corporate structure, AIFS, American
17   Institute Foreign Study is called AIFS, so if
18   you are looking for legal entities, there are
19   a bunch of legal entities of which I am not
20   great at and I am the president and CEO of
21   AIFS, American Institute Foreign Study.
22        Q.  How long were you president and CEO
23   -- I will start where we started before this
24   whole aside.
25           How long have you been president
```

Page 47

```
 1              W. Gertz
 2   and CEO of AIFS?
 3        A.  2005.
 4        Q.  What did you do before that?
 5        A.  I worked at AIFS.
 6        Q.  In what capacity?
 7        A.  I was the chief operating officer.
 8   I was the marketing officer, marketing
 9   vice-president.
10        Q.  So --
11        A.  I was the associate director of
12   marketing when I came in.  I have been there
13   a long time.
14        Q.  So 2005 to present, you were
15   elevated, you had the role of president and
16   CEO of AIFS, is that correct?
17        A.  Uh-huh.
18        Q.  Before that role, what was your
19   role at AIFS?
20        A.  The chief operating officer.
21        Q.  How long did you have the role of
22   chief operating officer?
23        A.  Not a long time, a couple of years
24   maybe, but I don't know the dates or
25   anything, a couple of years.
```

Page 48

```
 1              W. Gertz
 2           (Gertz Exhibit 4, William L. Gertz'
 3   LinkedIn page, marked for
 4   identification.)
 5        Q.  Do you recognize this document?
 6        A.  Yes.
 7        Q.  What is it?
 8        A.  It's a LinkedIn page.
 9        Q.  Whose LinkedIn page is it?
10        A.  It's my LinkedIn page.
11        Q.  Is it accurate?
12        A.  Not correct, no.  It's got all
13   kinds of things in it, Richmond, which I am
14   not responsible for.
15        Q.  Are you responsible for your
16   LinkedIn page or does someone else maintain
17   your LinkedIn page?
18        A.  I am responsible, I maintain it.
19        Q.  But this is the LinkedIn page that
20   you have up as of September 8, 2017, is that
21   correct?
22        A.  Yes.
23        Q.  If you go to page 2 of the exhibit,
24   it lists your employment history?
25        A.  Yes.
```

Page 49

```
 1              W. Gertz
 2        Q.  So you testified that prior to
 3   taking on the role of president and CEO of
 4   AIFS, that you had served as COO of AIFS?
 5        A.  Uh-huh.
 6        Q.  How long did you serve in that
 7   role?
 8        A.  It says here five years.  I don't
 9   remember how many years actually.  It might
10   not be five years.  It sounds like a lot to
11   me, but I don't know exactly.  These are not
12   necessarily accurate, even though they are
13   self-reported.  Marketing director looks
14   right.
15        Q.  Let me ask, whatever period of time
16   you said, a couple of years to the five years
17   that is on your LinkedIn page, when you
18   served as COO, what were your
19   responsibilities?
20        A.  Same as they were when I was --
21   just kind of waiting for my CEO to kind of
22   retire because he retired and then I became
23   CEO.
24        Q.  I'm going to ask my question again.
25           What were your responsibilities
```



Page 50

```
 1                 W. Gertz
 2   when you were COO of AIFS?
 3       A.  Mostly the overseeing marketing,
 4   overseeing some of the programs, although I
 5   don't remember which ones in particular, not
 6   much dissimilar to my role now.
 7       Q.  Did you have responsibility for the
 8   au pair program during your time as the COO
 9   of AIFS?
10       A.  I would say if it's -- I don't
11   remember what year I took responsibility, but
12   certainly during 2004, yes would be the
13   answer.
14       Q.  So you don't recall whether during
15   the timeframe prior to assuming the role as
16   CEO and president of AIFS, whether you had
17   responsibility for the au pair program?
18       A.  I don't recall which years I did,
19   again, and then there was a president above
20   me who was responsible, just like I'm
21   responsible now for the au pair program.
22       Q.  So among your responsibilities as
23   COO, you said marketing was one of your
24   responsibilities?
25       A.  Would report, yes, but I wasn't the
```

Page 51

```
 1                 W. Gertz
 2   marketing director.  There was a marketing
 3   executive.
 4       Q.  When you said, report, what does
 5   that mean in terms of --
 6       A.  Just they run their own show, but
 7   if they have a question or, you know,
 8   whatever.
 9       Q.  During time you were COO, there was
10   a separate marketing manager?
11       A.  Correct.
12       Q.  That reported to you, is that
13   correct?
14       A.  Correct.
15       Q.  But you were ultimately responsible
16   for --
17       A.  Not ultimately, the president of
18   the company would be ultimately, so not
19   ultimately, no.
20       Q.  But you were responsible and had --
21   you had oversight of the marketing activities
22   and marketing materials of the company during
23   time that you were COO, is that correct?
24       A.  I would have some oversight, but,
25   again, they run independently, so I'm not
```

Page 52

```
 1                 W. Gertz
 2   sure everything would have -- you know, but I
 3   had responsibility, it was one of the things
 4   at the time that reported in to me.
 5       Q.  Then prior to your role as COO, you
 6   said you served as the marketing director at
 7   AIFS, is that correct?
 8       A.  Yes.
 9       Q.  How long did you serve in that
10   role?
11       A.  Seven years maybe, six years.  I
12   don't know exactly.
13       Q.  The LinkedIn profile says you
14   served as the marketing director for 14
15   years, is that incorrect?
16       A.  That's incorrect.
17       Q.  You did not serve --
18       A.  I did not.
19       Q.  As the marketing director for 14
20   years?
21       A.  No, I did not.
22       Q.  Your estimate of how many years you
23   served as marketing director is --
24       A.  Eight, six, seven.
25       Q.  -- six to eight years?
```

Page 53

```
 1                 W. Gertz
 2       A.  Something like that.
 3       Q.  Was the marketing director role
 4   your first role at AIFS?
 5       A.  No.
 6       Q.  What did you do before you were
 7   marketing director?
 8       A.  I was hired as the associate
 9   director of marketing, but I really didn't --
10   I wrote a lot.
11       Q.  What did you write?
12       A.  I wrote press releases, brochures.
13       Q.  When did you first come to AIFS?
14       A.  '85, in the summer.
15       Q.  And what was the role that you
16   first came to AIFS as?
17       A.  My title was associate director of
18   marketing.
19       Q.  How long were you associate
20   director of marketing?
21       A.  Five, six years, I don't know the
22   details.
23       Q.  You testified during that time that
24   you wrote press releases, brochures and other
25   marketing materials, is that correct?
```



14 (Pages 50 to 53)

Page 54

1           W. Gertz
2      A.  Yes.
3      Q.  Were there other things that you
4  did during that time?
5      A.  It's all I remember.
6      Q.  How did your role change when you
7  went from the associate director of marketing
8  to being the marketing manager?
9      A.  It didn't really change much.
10     Q.  Did you still do writing of --
11     A.  I wrote things and sent them to the
12 divisions who made brochures, you know.
13     Q.  So you were creating, during the
14 time that you were the associate director of
15 marketing and the director of marketing, you
16 were creating content for use by the
17 divisions, is that correct?
18     A.  Correct.
19     Q.  And when you took on the role as
20 COO, did you continue to create content?
21     A.  Less, I don't remember, I don't
22 remember when I created something.
23     Q.  Did you ever create content while
24 you served as COO in your recollection?
25     A.  I can't recall.  I might have, I

Page 55

1           W. Gertz
2  don't know.
3      Q.  But that was not your primary role
4  when you were COO, was not to create content
5  in that position?
6      A.  Correct.
7      Q.  What do you report to?
8      A.  The chairman of AIFS.
9      Q.  Do you report to anybody else?
10     A.  I do not.
11     Q.  Who has the power to fire you?
12     A.  The chairman.
13     Q.  Anybody else?
14     A.  No.
15     Q.  Does the chairman report to anyone?
16     A.  No.
17     Q.  Does the chairman report to the
18 board of directors?
19     A.  I don't know technically if he does
20 or not, but he is the founder of the company.
21     Q.  Who directly reports to you?
22     A.  The division heads that we went
23 over and the support division heads, except
24 for finance -- finance does report into me,
25 IT reports to me, HR reports to the CFO.

Page 56

1           W. Gertz
2  That's it.
3      Q.  Do you have any other direct
4  reports?
5      A.  I have an assistant, two
6  assistants.
7      Q.  In preparation for this deposition,
8  did you discuss the deposition with anyone,
9  other than your counsel?
10     A.  No, not really.
11     Q.  Did you discuss it with Ruth Ferry?
12     A.  No.
13     Q.  Did you discuss it with any other
14 sponsor?
15     A.  No.  I might have said I'm nervous,
16 there is a deposition coming, but the details
17 were not discussed.
18     Q.  What entity pays you?
19     A.  American Institute For Foreign
20 Study probably.  I don't look on my check.  I
21 wouldn't -- it's American Institute For
22 Foreign Study, that would be the entity.
23     Q.  Do you know which entity pays the
24 salaries or the checks for the Stamford
25 staff?

Page 57

1           W. Gertz
2      A.  I don't know, I don't know, again
3  the entities.  I don't know how the payroll
4  is structured.
5      Q.  Is Au Pair in America a part of
6  AIFS or a separate legal entity?
7      A.  Part of AIFS?
8      Q.  Does APIA engage in any other
9  business, other than administrating the au
10 pair program?
11     A.  No, not to my knowledge.
12     Q.  Did you ever meet with host
13 families?
14     A.  No.
15     Q.  Did you ever meet with au pairs?
16     A.  No.  I probably have gone to a
17 place where there were host families and au
18 pairs, but not on a regular basis.
19     Q.  Do you interact with any of the
20 AIFS offices outside the United States?
21     A.  From time to time.
22     Q.  How do you interact with the AIFS
23 offices outside of the United States?
24     A.  Meetings.
25     Q.  What kind of meetings?



| Page 58 | Page 60 |
|---|---|
| 1          W. Gertz | 1          W. Gertz |
| 2    A.  Just general conferences or program | 2    Q.  Let's go office by office. |
| 3  meetings. | 3    A.  Uh-huh. |
| 4    Q.  What kind of conferences? | 4    Q.  Is the au pair -- is the AIFS |
| 5    A.  I see people from other offices | 5  office in Germany, is the primary purpose of |
| 6  around at, like, I don't know what, | 6  that office to recruit au pairs for the au |
| 7  conferences, I'm trying to think.  We have | 7  pair program in the United States? |
| 8  program meetings, so we would have AIFS | 8    A.  One of purposes. |
| 9  meetings, three times a year. | 9    Q.  What are the other purposes? |
| 10    Q.  What's the purpose of those program | 10    A.  Recruits German students to go to |
| 11  meetings? | 11  Australia, German students to go to Canada, |
| 12    A.  Discuss the business. | 12  things like that. |
| 13    Q.  What's a typical agenda for a | 13    Q.  Is the primary purpose of the AIFS |
| 14  program meeting? | 14  office in Germany to recruit au pairs for the |
| 15    A.  How we're doing, new ventures, | 15  au pair program in the United States? |
| 16  state of things.  Ruth would know more, she | 16    A.  I would say primary would probably |
| 17  would set the agenda. | 17  be that. |
| 18    Q.  Does Ruth set the agenda for those | 18    Q.  Is the primary purpose of the AIFS |
| 19  meetings? | 19  office in Australia to recruit au pairs for |
| 20    A.  She would. | 20  the au pair program in the United States? |
| 21    Q.  With the AIFS offices abroad? | 21    A.  No. |
| 22    A.  I mean, sometimes, London and AIFS | 22    Q.  What are the other purposes for the |
| 23  Stamford work more closely together, so that | 23  AIFS office in Australia? |
| 24  would be the main meeting. | 24    A.  To recruit students for camp |
| 25    Q.  Is the main purposes of those | 25  counselor programs. |

| Page 59 | Page 61 |
|---|---|
| 1          W. Gertz | 1          W. Gertz |
| 2  meetings to discuss the au pair program in | 2    Q.  Is the primary purpose of the AIFS |
| 3  the United States or is the agenda broader | 3  office in Australia to recruit program |
| 4  than that? | 4  participants for the camp counseling program |
| 5    A.  Mostly au pair program in the | 5  and the au pair program in the United States? |
| 6  United States. | 6    A.  And additional things, as well, so |
| 7    Q.  So when you talk about having a | 7  it's hard to say primary.  It wouldn't be au |
| 8  program meeting three or four times a year. | 8  pair, I can say that. |
| 9    A.  Right. | 9    Q.  What are the additional things that |
| 10    Q.  It's a meeting of Stamford and the | 10  office does? |
| 11  other international offices to discuss the au | 11    A.  Recruits -- receives German |
| 12  pair program in the United States, is that | 12  students and works on an inbound program from |
| 13  correct? | 13  Germany to Australia.  We send students from |
| 14    A.  Correct. | 14  Germany to Australia, the German office does |
| 15    Q.  What do you discuss with the | 15  that. |
| 16  overseas offices with respect to the au pair | 16    Q.  How many people are in the AIFS |
| 17  program in the United States? | 17  Australia office? |
| 18    A.  Recruitment, you know. | 18    A.  I don't have a clue. |
| 19    Q.  Is that -- | 19    Q.  Is it as big as Stamford? |
| 20    A.  Quality of the program, education, | 20    A.  No. |
| 21  cultural components, really soup to nuts. | 21    Q.  Close? |
| 22    Q.  Is the primary purpose of the | 22    A.  I don't think so.  It might be, but |
| 23  overseas offices to help with recruitment for | 23  I don't recall how many people are there. |
| 24  the au pair program in the United States? | 24    Q.  What about Germany, how does -- how |
| 25    A.  It would depend on the office. | 25  many staff AIFS staff are in the Germany |



Page 62

```
1                W. Gertz
2    office?
3         A.  I don't know exact number, but it's
4    less than Stamford.
5         Q.  You said there were 170 employees
6    in Stamford?
7         A.  Uh-huh.
8         Q.  So there is a big birth between
9    zero and 170?
10        A.  Correct.
11        Q.  Is it your understanding that
12   Germany has approximately the same amount of
13   employees in Stamford or substantially less?
14        A.  Substantially less.
15        Q.  Is it your understanding that
16   Australia has approximately the same
17   employees as Stamford in the Australia office
18   or substantially less?
19        A.  Substantially less.
20        Q.  Let's move on to the AIFS office in
21   London.
22        A.  Correct.
23        Q.  Is the primary purpose of that
24   office to recruit participants for the au
25   pair program in the United States?
```

Page 63

```
1                W. Gertz
2         A.  No.
3         Q.  What does that office do?
4         A.  Au pair, camp counseling, those
5    would be the two largest things that they do.
6         Q.  Is the staff for the London office
7    approximately the same as the Stamford office
8    or substantially less?
9         A.  Substantially less.
10        Q.  Is the Stamford office of AIFS the
11   main office of AIFS?
12        A.  In terms of staff, yes, more staff
13   in the Stamford office.
14        Q.  Is the AIFS office in Stamford the
15   main office when it comes to revenue?
16             MR. MACRI:  I'm going to object as
17   to form and foundation.
18        A.  Repeat the question, please.
19   ████████████████████████████████████████████
20   ████████████████████████████████████████████
21   ████████████████████████████████████████████
22   ████████████████████████████████████████████
23        Q.  Is the AIFS Stamford office the
24   main AIFS office with respect to program
25   activity?
```

Page 64

```
1                W. Gertz
2             MR. MACRI:  I'm going to object as
3    to form and foundation.
4         A.  Yes.
5         Q.  Is AIFS Stamford the headquarters
6    of AIFS?
7             MR. MACRI:  I'm going to object as
8    to form.
9         A.  I would say no, the chairman is in
10   London so -- we have more people here -- we
11   don't use headquarters much, but I don't know
12   -- it might be -- that term is not -- we are
13   a global company, so we don't usually use
14   terms, but it is the, as you said, the more
15   staff here, more revenues here, yes.
16        Q.  Where is the headquarters of AIFS?
17             MR. MACRI:  Object as to form.
18        A.  I would say Stamford, I guess.
19        Q.  What are AIFS's main sources of
20   revenue?
21             MR. MACRI:  I'm going to object as
22   to form and foundation.
23        Q.  Let's back up.
24             Does AIFS take in revenue?
25        A.  Yes.
```

Page 65

```
1                W. Gertz
2    ████████████████████████████████████████████
3    ████████████████████████████████████████████
4    ████████████████████████████████████████████
5    ████████████████████████████████████████████
6    ████████████████████████████████████████████
7    ████████████████████████████████████████████
8    ████████████████████████████████████████████
9    ████████████████████████████████████████████
10   ████████████████████████████████████████████
11   ████████████████████████████████████████████
12   ████████████████████████████████████████████
13   ████████████████████████████████████████████
14   ████████████████████████████████████████████
15   ████████████████████████████████████████████
16   ████████████████████████████████████████████
17   ████████████████████████████████████████████
18   ████████████████████████████████████████████
19   ████████████████████████████████████████████
20   ████████████████████████████████████████████
21   ████████████████████████████████████████████
22   ████████████████████████████████████████████
23   ████████████████████████████████████████████
24   ████████████████████████████████████████████
25   ████████████████████████████████████████████
```





Page 66

1
2        W. Gertz
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 67

1        W. Gertz
2    Q.  You testified that there is
3 operating division staff and then there is
4 support division staff.
5    A.  Correct.
6    Q.  Could the operating divisions run
7 their programs without the support division
8 staff?
9    A.  It's a hypothetical, but I would
10 say no, they need support divisions.
11    Q.  So the support divisions provide
12 critical services to each of the divisions in
13 running their programs?
14        MR. MACRI:  I'm going to object as
15    to form.
16    Q.  Is that correct?
17    A.  Yes, that's correct.
18    Q.  Given the fact that those resources
19 are shared among the different divisions, do
20 you have a way of accounting internally how
21 each program uses each of the resources or
22 the services provided by the support
23 divisions?
24        MR. MACRI:  Object as to form.
25    A.  We do have a way.

Page 68

1        W. Gertz
2    Q.  What is that?
3    A.  I don't know how that works
4 frankly.
5    Q.  So what's your understanding of how
6 that works in terms of that accounting?
7    A.  I don't have an understanding of
8 how it works, but it's each division is
9 allocated part of the support divisions, but
10 I don't know exactly how it's done.  I
11 wouldn't know that.
12    Q.  When you say, allocated, does that
13 mean that they're allocated a specific amount
14 of time or resources that they can use?
15    A.  Resources, if not resources, time,
16 those kind of things.
17    Q.  What happens if a division goes
18 over their allocation?
19    A.  It doesn't work like that.
20    Q.  How does it work?
21    A.  Good question.  They have to get
22 the job done and we have it organized so the
23 support divisions can provide the necessary
24 service for the operating divisions.
25

Page 69

1        W. Gertz
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17    (Gertz Exhibit 5, 2011 business
18 plan, marked for identification.)
19        MR. TUCKER:  This document is
20 highly confidential, attorneys' eyes
21 only.  This is going to be Exhibit 6 --
22 5.
23        MS. SMALLS:  Are you stating that
24 for the record, because it doesn't have
25 it on the document itself?





## Page 70

```
 1            W. Gertz
 2       MR. TUCKER:  Correct.
 3     Q.  Do you recognize this document?
 4     A.  It's a business plan from 2011.
 5     Q.  Have you seen it before?
 6     A.  I must have, but, again, I don't
 7  know if I have seen it in this form, but if
 8  it's a business plan, I probably would have
 9  seen it.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 72

```
 1            W. Gertz
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17       MR. MACRI:  Objection as to form.
18     A.  I don't know how we do this.
19     Q.  But you do know that you calculate
20  your gross margin per au pair?
21       MR. MACRI:  I'm going to object as
22  to form and foundation.  His
23  testimony -- we can read it back, but
24  that's not my recollection of his
25  testimony.
```

## Page 71

```
 1            W. Gertz
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 73

```
 1            W. Gertz
 2     Q.  The question was, do you do
 3  accountings of what your gross margin is per
 4  au pair?
 5       MR. MACRI:  He is talking about how
 6  do you calculate your gross margin, I
 7  don't know, so now you are using the
 8  term gross margin again.
 9       MS. SMALLS:  No, I'm not.  67:02.
10       MR. MACRI:  Okay, thank you.
11     Q.  Just to review the ground rules,
12  your counsel is going to make objections.  If
13  you understand my question, I'm going to
14  allow him to speak and make his objection for
15  the record, we will allow him to finish
16  speaking and then you should go ahead and
17  answer my question.
18       I know that it's -- sometimes it's
19  hard to remember my question.
20     A.  It is.
21     Q.  If that's the case, ask me to
22  repeat it.
23     A.  Isn't that what I am doing?
24     Q.  That is what you are doing.  I am
25  just reviewing the ground rules for you and
```



Page 74

1         W. Gertz
2 your counsel in terms of objections to form
3 and when I have a question on the record, and
4 I understand from your perspective, it gets
5 confusing when there is a lot of back and
6 forth between him and I.
7     A.  That's why I ask to repeat the
8 question, which is okay to do, right?
9     Q.  Yes.  I don't want you to answer
10 any question that you don't have a very clear
11 understanding of what I am asking.
12         MR. MACRI:  I never have so
13     instructed my client otherwise, but to
14     answer the question after form and
15     foundation objections are made.
16         MS. SMALLS:  I think we would avoid
17     a lot of confusion and a lot of back and
18     forth if we just limited the objections
19     to form and foundation and actually
20     limited them to objections where there
21     was a problem with form or foundation.
22         MR. MACRI:  I have to do that from
23     my own intellectual sense of what that
24     is, so I state them when I see them.
25         MS. SMALLS:  Understood.

Page 75

1         W. Gertz
2         MR. MACRI:  I don't know whether
3     you are going to agree or not agree when
4     I make them, but I will say them as I
5     see them.
6     Q.  Since we are on this document,
7 let's move to page 6.
8         Do you see the heading Competition?
9     A.  Uh-huh.
10     Q.  Then it says, Competition for
11 families.
12         Can you read the first bullet out
13 loud?

Page 76

1         W. Gertz
2
3     Q.  Are au pairs in the same childcare
4 market as nannies and babysitters?
5     A.  It's a lot different.
6     Q.  How is it different?
7     A.  Well, the au pair program is a
8 cultural exchange program.  People come to
9 this country to live with American families,
10 assist with the childcare and a full range of
11 activities like we mentioned, so the persons
12 coming here are not normally coming here
13 necessarily to do a job, they're here
14 basically to see the country and learn more
15 about America.
16         Nannies are here for the job,
17 that's what they do, they take care of
18 children and do whatever else, my
19 understanding, whatever else needs to be done
20 around the house and they can work longer
21 hours, I think it's totally different, my
22 understanding of it.
23     Q.  What are the understanding --
24 the -- as you state them, the cultural
25 benefits of being an au pair, what are the

Page 77

1         W. Gertz
2 duties of being an au pair, as you understand
3 it?
4     A.  As I understand it, it's basically
5 in addition to the cultural part and
6 education part, which I know you know about,
7 it's to take care of the children and as
8 almost like a quasi member of the family, so
9 they live -- they become like big sisters, so
10 they take care of the kids like a daughter
11 would and then they don't do anything else
12 around the house, they don't do other washing
13 the floors and stuff like that, so it's not
14 really comparable.
15     Q.  So when you say, taking care of the
16 kids, what are the au pair's duties, as you
17 understand them, in terms of taking care of
18 the kids?
19     A.  As I understand them, general
20 taking them places, doing their laundry,
21 children's laundry, not the family laundry,
22 mostly running errands for the kids,
23 child-centered activities.
24     Q.  What is it you understand the
25 duties of a nanny to be?



Page 78

```
1              W. Gertz
2      A.  The way I understand it is more of
3  they can do anything a family asks them to
4  do, they can work as many hours as the family
5  wants, that's my understanding of a nanny, so
6  more of an employee, paid on -- worker.
7      Q.  What is your definition of an
8  employee, how do you use that word?
9      A.  In my office?
10      Q.  No.  You said just now, you said
11  that a nanny was different from an au pair
12  because they were more --
13      A.  An au pair is coming for a specific
14  purpose, an employee is doing a job for a
15  company.
16      Q.  What are the duties?  You said that
17  you understand that a nanny can do whatever
18  the family wants them to do, but as you
19  understand it, what are the duties of a
20  typical nanny?
21      A.  A nanny?
22      Q.  Yes.
23      A.  I never had a nanny, but as I
24  understand it, it would be whatever the
25  people in the house want them to do,
```

Page 79

```
1              W. Gertz
2  primarily focus on the children, but not
3  limited to the children.
4      Q.  How many hours do you think a
5  typical nanny works?
6      A.  I don't know, 60, I don't know, I
7  never had a nanny, so I'm just guessing.
8      Q.  I'm asking you these questions
9  because you said the au pair and nanny are
10  totally different.
11      A.  Correct.
12      Q.  So I'm trying to understand the
13  difference.
14      A.  The motivation is totally
15  different.
16      Q.  But are the -- understanding that
17  you believe that the motivation for serving
18  as an au pair versus the motivation for
19  serving as a nanny are totally different, is
20  there a difference between the duties between
21  an au pair and a typical nanny?
22      A.  My understanding, yes.
23      Q.  What is that difference?
24      A.  The nanny can do whatever the host,
25  the parents say, whatever they want them to
```

Page 80

```
1              W. Gertz
2  do.  I don't think they have specific duties
3  as just this, they can say, you have to clean
4  the floors and I think the nanny has to do
5  it.  I don't know if -- that's my
6  understanding of it.  I never had a nanny, so
7  I don't know for sure.
8      Q.  So you don't know if the job is the
9  same as an au pair?
10      A.  It's not the same.  From everything
11  I've ever seen, it's not the same, it's not a
12  cultural exchange program, it's just not.
13      Q.  Again, I'm trying to --
14      A.  The duties.
15      Q.  I'm putting aside the cultural
16  aspects, as you put them forward.  I
17  understand that's a component of the au pair
18  program.
19      A.  Right.
20      Q.  As you --
21      A.  Right.
22      Q.  As you promote it.  What I am
23  trying to ask.  Well, let break this down.
24  How many hours a week does an au pair
25  typically work?
```

Page 81

```
1              W. Gertz
2      A.  No clue.  It depends on the family
3  situation.  Not more than 45, though.  That's
4  the State Department regulation, no more than
5  45 hours childcare per week.
6      Q.  Does the typical au pair work 45
7  hours or less than that?
8          MR. MACRI:  Object to form.
9      A.  I don't know how many hours.  We
10  are not the employer, you would have to ask
11  the families how many hours, you know.
12      Q.  And in the zero to 45 hours that an
13  au pair can work by regulation, what is that
14  au pair doing or what are their
15  responsibilities during that 45 hours?
16      A.  Just what I said, taking care of
17  the children, bringing them to errands, doing
18  the kids' laundry, that's pretty much it.
19      Q.  Are those duties work or are they
20  part of the cultural exchange?
21      A.  All part of the cultural exchange,
22  in my mind.
23      Q.  In your mind, do you think the au
24  pairs thinks of the 45 hours they spend on
25  childcare as part of their --
```



21 (Pages 78 to 81)

---

Page 82

```
1              W. Gertz
2         MR. MACRI:  Objection as to form.
3    Q.  I'm not done with my question.
4         Do you think that the au pairs
5    think that the 45 hours that they spend on
6    childcare duties are part of the cultural
7    exchange?
8         MR. MACRI:  I'm going to object as
9    to form and foundation.
10    A.  I don't think they're part of the
11    cultural exchange in its purest form, but
12    it's more like chores, they come to this
13    country and take care of kids.  I have never
14    spoken to au pairs.  I don't know what they
15    think.  It depends on the number of hours.  I
16    don't know how many hours they work.
17    Q.  You've never spoken to au pairs?
18    A.  I have.  I never asked them how
19    many hours they worked -- I know what they
20    do.  I'm not that familiar with the au pair
21    regulations, but I know enough of what I have
22    seen over the years, they can't work more
23    than 45 hours and I know it's more of a
24    cultural exchange program and more of -- au
25    pair means on par, so it's -- they're a
```

Page 83

```
1              W. Gertz
2    member of the family and that's what families
3    do.
4    Q.  And in your experience, in your
5    conversations with au pairs, have they
6    conveyed to you this feeling of feeling like
7    they are part of the family?
8    A.  Yes, I mean, I can't remember
9    specific conversations with au pairs, no.  I
10    would say I don't know, but if I was going to
11    ask them a question, it would be how is it
12    going, how do you like America, but I can't
13    now remember the last time I spoke to an au
14    pair.  I don't remember, I don't remember the
15    last time I spoke with an au pair, I don't.
16    It's not my job to speak to au pairs.
17    Q.  But the answer is, you don't know
18    how au pairs feel about --
19    A.  I don't, I don't know, how could
20    I...
21    Q.  So you testified that au pairs,
22    during their set hours that are up to 45
23    hours, have childcare duties, and you also
24    testified that nannies' primary
25    responsibilities are also childcare duties,
```

Page 84

```
1              W. Gertz
2    is that correct?
3    A.  If that's what I testified, yes.
4    As far as I know, yes, that's correct.
5    Q.  Is that correct?
6    A.  That's correct, primary duties.
7    Q.  So, again, you also testified that
8    nannies -- that you believed nannies were
9    different because employers could ask nannies
10    to do more household activities than they
11    could ask an au pair?
12    A.  That's my understanding.
13    Q.  Is that correct?
14    A.  That's my understanding, yes.
15    Q.  Do you know whether most nannies do
16    additional duties beyond childcare duties?
17    A.  No, I have no clue.
18    Q.  If a nanny had exclusive -- strike
19    that.
20         If a nanny was limited to
21    responsibilities for taking care of the
22    children and doing laundry for the children
23    and cleaning up after the children and did
24    not have additional household duties, how
25    would that nanny be different than an au
```

Page 85

```
1              W. Gertz
2    pair?
3         MR. MACRI:  Objection as to
4    foundation.
5    A.  The nanny motivation would be for a
6    job which is different than an au pair,
7    obviously.
8    Q.  Is the only difference in that
9    scenario the motivation or are there other
10    differences between a nanny and an au pair in
11    a situation where the nanny does not have
12    additional household duties, like mopping the
13    floor, but is limited to taking care of
14    children?
15    A.  I'm sorry, I zoned out.  One more
16    time.
17    Q.  It was a long question.
18    A.  Yeah, it was.
19    Q.  Are there other differences between
20    a nanny and an au pair in a situation where
21    the nanny does not have additional household
22    duties, like mopping the floor, but is
23    limited to taking care of the children?
24    A.  I don't know that much about
25    nannies, frankly.  I know they don't come
```



22 (Pages 82 to 85)

Page 86

1                W. Gertz
2   from other countries.  Au pairs all are
3   international and they are all coming here on
4   a J-1 program, that's a difference.  Nannies
5   can come and go.  I don't know if it's an
6   annual contract or two-month contract.  I
7   just don't know how it works, enough to --
8        Q.   Do you know if nannies are
9   international?
10       A.   I don't know.
11       Q.   Let me rephrase that.
12       A.   I don't know if there are programs,
13  I don't know.
14       Q.   Do you know if nannies come from
15  other countries?
16       A.   Some, I have read, yes.
17       Q.   Do you know if nannies speak other
18  languages?
19       A.   If they come from other countries,
20  they probably do.
21       Q.   If a nanny comes from another
22  country and speaks another language, would
23  they be bringing that culture to the
24  household?
25       A.   It would not be the primary purpose

Page 87

1                W. Gertz
2   necessarily of their job and that would be a
3   job, their primary purpose would be -- I
4   assume, again, I don't want to get too far
5   into the nannies because I'm just giving you
6   best guesses really.  I would assume it's
7   more of a financial reason.
8        Q.   Is the primary purpose of an au
9   pair to serve as a childcare provider or to
10  share their cultural experiences?
11       A.   There is no primary, it's all
12  wrapped into one.
13       Q.   I think I asked you this, but do
14  you talk to host families?
15       A.   Not on a regular basis, I can't
16  remember the last time.
17
18
19
20
21
22
23
24
25

Page 88

1                W. Gertz
2
3
4
5
6
7
8        Q.   How do you define cultural
9   exchange?
10       A.   I think it's the sharing of two
11  different value systems, lifestyles.  The
12  whole idea of au pair program is based on the
13  J-1 exchange, which is based on world peace.
14  That's the reason that I got into this
15  cultural exchange area, because I believed we
16  need to get together as a world and -- I am a
17  globalist and I think that we are all
18  globalists as opposed to someone who wants to
19  narrowly look at America, because America is
20  a melting pot.  It's a cliche to say that,
21  but we are trying to get people from around
22  the world to meet each other and learn from
23  each other and so that American families
24  learn about the world, American children
25  especially learn about the world, so they can

Page 89

1                W. Gertz
2   go out there and really make something of
3   their lives with a perspective that it's not
4   just American-based own, America, America,
5   America, and it's kind of a global view and
6   that leads to international understanding
7   which ultimately, in my opinion, leads to
8   world peace, which is the overall goal of
9   AIFS.
10       MR. MACRI:  Are we going to get
11  into a different subject area at this
12  juncture?
13       MS. SMALLS:  Do you want to break
14  for lunch?
15       MR. MACRI:  We've been going about
16  an hour and a half.
17       THE VIDEOGRAPHER:  We are now off
18  the record.  The time is 12:22 p.m.
19       (Recess.)
20
21
22
23
24
25



Page 90

1        W. Gertz
2        A F T E R N O O N   S E S S I O N
3        (Time noted: 1:26 p.m.)
4    W I L L I A M  L.  G E R T Z,  resumed and
5    testified as follows:
6        THE VIDEOGRAPHER:  We are now on
7    the record.  The time is 1:26 p.m.
8        (Gertz Exhibit 6, revenues, marked
9    for identification.)
10       MR. TUCKER:  This document is also
11   highly confidential, attorneys' eyes
12   only.
13   EXAMINATION BY (Cont'd.)
14   MS. SMALLS:
15       Q.  Do you recognize this document?
16       A.  I don't.
17       Q.  Do you know what it is?
18       A.  I know what it is, yes.
19       Q.  What is it?
20       A.  It looks like our revenues, land
21   costs, air costs, margin, all the charges,
22   allocation of overhead, investment
23   allocation, interest.
24       Q.  Is this what you normally review
25   when you're reviewing revenues for the -- at

Page 91

1        W. Gertz
2    least the au pair division?
3        A.  This format, I don't know where
4    this came from, I don't know this document, I
5    don't know where it came from.
6        Q.  What format do you usually review
7    division revenues?
8        A.  Again, that would be more of -- I
9    don't usually get that involved in the
10   finance side of AIFS, it's just not my role,
11   so I don't review finances in particular.  I
12   look at things, but I wouldn't be the one
13   creating it.
14       Q.  Understanding that you would not be
15   the one creating it...
16       A.  Right.
17       Q.  ...as CEO, do you review the
18   revenues of each of your divisions?
19       A.  I look at them, but I don't review
20   them -- I would say no, I don't review
21   revenues, it's not something I do.  It would
22   be something the chief financial officer
23   would do.  I'm not on the -- that side of --
24   it's not really my role.
25       Q.  When you say that you review them,

Page 92

1        W. Gertz
2    what do you review them for?
3        A.  I just look at them, when we look
4    at finances, you know, we do have a --
5    financial statements and things, but, again,
6    I'm not cognizant of how this works, how that
7    works, how that works.
8        Q.  What is usually included on your
9    financial statement?
10       A.  These kinds of things, revenues,
11   costs.  This looks like to me revenues costs
12   and then margin, but I don't know exactly
13   what this would be, it's not really my area.
14       Q.  Are there other points of
15   information that are included on your
16   financial reports?
17       A.  Yeah.
18       Q.  That are not included here?
19       A.  Yeah.
20       Q.  Like what?
21       A.  I couldn't tell you, but this is
22   short and ours seemed to be longer.
23       Q.  Are there any -- when you review
24   them -- when you review the financial
25   statements, are you looking for anything in

Page 93

1        W. Gertz
2    particular?
3        A.  I'm not.  Again, as I said, I don't
4    review financial statements, it's not what I
5    do, but there is nothing in particular I look
6    for, to make sure that we didn't have a bad
7    year or good year, you know.
8        Q.  And when you look at the financial
9    statements, do you look to see which division
10   is bringing in more revenues versus...
11       A.  Not necessarily, no, that would be
12   a no, not interested.
13       Q.  Do you look at the costs that are
14   associated with each program?
15       A.  If I hear about a cost, I might
16   look at it, but, in general, I don't see the
17   cost budgets, I wouldn't even see -- that
18   would be the divisions would look at the
19   costs, so Ruth would look at her costs.
20       Q.  And when -- do you know if the
21   costs are delineated by division or are they
22   delineated only AIFS wide?
23       A.  They would be by division.
24       Q.  What kind of costs are included in
25   those statements?



24 (Pages 90 to 93)

Page 94

W. Gertz



Page 95

Page 96

W. Gertz

Page 97

W. Gertz
2    A.  Yeah, it is part of the State
3  Department regulations that we are
4  responsible for the third party people, so we
5  would have to make sure that they -- it's in
6  accordance -- that it's verifiable.
7    Q.  And you mentioned the State
8  Department regulations that state that you
9  are responsible for the third party --
10    A.  AIFS, yes.
11    Q.  AIFS, not you, Bill Gertz?
12    A.  Correct.
13    Q.  But AIFS is responsible for the
14  actions and the representations of third
15  party agents, is that correct?
16    A.  Correct.
17      MR. MACRI:  I'm going to object as
18  to form and foundation.
19      THE WITNESS:  But do I answer that?
20      MS. SMALLS:  Yes.
21      MR. MACRI:  Yes, please.
22    A.  The answer is yes.
23      I forgot the question, believe it
24  or not.  Ask me the question one more time.
25    Q.  Don't answer it if you don't know



25  (Pages 94 to 97)

Page 98

```
1              W. Gertz
2   what question I'm asking.
3        A.  I remember the answer was yes, but
4   I don't remember the question.  If you ask me
5   the question again.
6        Q.  I said, is --
7        A.  The response is yes.
8        Q.  Is AIFS responsible for the actions
9   and representations of third party agents?
10       A.  Yes.
11       Q.  Do you know if third party agents
12  use marketing materials to reach and recruit
13  au pair candidates?
14       A.  Yes.
15       Q.  Do you review those materials?
16       A.  I do not.
17       Q.  Does AIFS review the marketing
18  materials --
19       A.  Yes.
20       Q.  Of third party agents before -- I
21  will leave it at that.
22           Does AIFS review the marketing
23  materials used by third party agents to
24  recruit au pairs in other countries?
25       A.  Yes.
```

Page 99

```
1              W. Gertz
2        Q.  Who does that review?
3        A.  Overseas people, AIFS in London.
4        Q.  So if we were talking about a third
5   party agent in Panama and they were creating
6   marketing materials in Spanish.
7        A.  Uh-huh.
8        Q.  Those materials would be reviewed
9   by an AIFS employee?
10       A.  Yes.
11       Q.  And you are testifying that that
12  employee would be at AIFS London?
13       A.  Yes.
14       Q.  So AIFS takes responsibility in
15  ownership for the materials that are used by
16  third party agents?
17           MR. MACRI:  Objection as to form
18       and foundation.
19       Q.  To recruit au pairs in other
20  countries?
21           MR. MACRI:  I'm sorry for not
22       waiting for the end of your question.  I
23       apologize.
24       A.  Yes.
25       Q.  Let's go back.  This is exhibit, I
```

Page 100

```
1              W. Gertz
2   think it's 6, these financial statements and
3   so we've established there are other
4   financial statements that include more
5   detail, is that correct?
6        A.  Yes.
7        Q.  And that this format you have never
8   seen before, but that this document seems to
9   represent broad numbers for revenues and some
10  costs, is that correct?
11       A.  I have never seen this document,
12  that's correct.  It looks in line, but,
13  again, this is 2009, I don't know if these
14  figures are accurate.
15       Q.  Why don't you take a moment,
16  because there is a year, there is a page for
17  every year through 2014, so why don't you
18  take a moment to review that.
19       A.  Okay.
20       Q.  Again, I will ask you, what is
21  this?  What does this seem to you to be?  It
22  was produced to plaintiffs from your counsel
23  and so I'm asking you, what is this and what
24  are these numbers and what do they represent
25  to you?
```

Page 101

```
1              W. Gertz
2        A.  I didn't create these numbers.  It
3   could have been created by our financial
4   folks.  That's what I would assume.
5        Q.  But this is not the form or format
6   that you would normally see numbers?
7        A.  This looks more like a short form,
8   but the categories.
9        Q.  You are generally familiar with the
10  categories?
11       A.  Yeah, generally.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



26 (Pages 98 to 101)



**Page 102**

W. Gertz

20    Q.   And let me just ask, since there is
21 no key here, is this in the thousands or is
22 this, as you read this, it says ▓▓▓?
23    A.   No, ▓▓▓▓▓▓▓▓▓▓.
24    Q.   What I'm asking is, when it says,
25 revenues, does this represent ▓▓▓ or does

**Page 103**

W. Gertz

2 this represent ▓▓▓▓?
3    A.   This would represent ▓▓▓▓▓.
4    Q.   So these are in the
5 these numbers are --
7    ▓▓▓▓▓▓▓?
8    A.   Yes, that's correct.
9    Q.   Then under revenues, it says, land
10 costs.
11    A.   Uh-huh.
12    Q.   That number appears to be
13 ▓▓▓ do you know what land costs are?
14    A.   I don't.
18    Q.   Do you have any idea what it could it
19 be?
22    Q.   Is there a land component of the au
23 pair program?

**Page 104**

W. Gertz

6    Q.   Then under land costs, it says, air
7 costs.
8        Do you know what that is?
9    A.
10    Q.                                   ?
11    A.                                    .
15    Q.   So under the ▓▓▓▓ on for air
16 costs, that number reflects ▓▓▓▓▓▓▓
17                                       e
19    A.
20    Q.   The next number is -- which is
21 represented as a cost is selling, general and
22 administrative allocated overhead.
23        Do you know what that is or what
24 that represents?
25    A.

**Page 105**

W. Gertz

12    Q.   So the first number is
13    ▓▓?
14    A.   Correct.
15    Q.   And then the second -- though,
16 there is no minus sign, it's not explicit,
17 but the second entry here is land costs of
18 ▓▓▓▓ right?
19    A.   Yes.
20    Q.   And then the third entry is air
21 costs and that's ▓▓▓▓▓▓ and then the
22 fourth entry says, margin, and there is --
23 the number there is ▓▓▓▓ and that
24 seems to be the ▓▓▓▓▓

MAGNA
LEGAL SERVICES



Page 106

W. Gertz

1
2
3      A.
4
5
6
7      A.
8          .
9          Q.   Then the next entry says, selling,
10    general and administrative allocated
11    overhead.  We talked about -- those are two
12    different line items, selling, general
13    administrative is ▮ and then allocated
14    overhead is ▮▮ and the total of that is
15    ▮▮, is that correct?
16        A.   Yes.
17
18
19
20
21
22
23
24
25

Page 108

W. Gertz

1
2
3      A.                          .
4      Q.   And then the next line, it says,
5    Income before allocated Inc. OH.
6          Do you know what that is?
7
8
9
10
11
12        Q.   It says, Income before allocated
13    Inc. OH.
14
15
16
17
18
19
20
21
22
23
24
25

Page 107

W. Gertz

1
2
3
4
5
6
7
8
9
10        Q.   Then it has a number here of ▮▮
11    for investment allocation.
12          Do you know what that is?
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 109

W. Gertz

1
2                                          ?
3      A.   It's ▮▮.
4      Q.   So that would be ▮▮▮?
5      A.   Correct.
6      Q.   And Inc. here is what?
7
8
9
10
11
12
13
14
15
16
17        Q.   So I want to start again at the
18    top.
19        A.   Okay.
20        Q.   The first line is revenues,
21    correct?
22        A.   Yes.
23        Q.   And that number is what?
24        A.              .
25        Q.   ▮▮▮?

MAGNA
LEGAL SERVICES



**Page 110**

1                W. Gertz
2    A.   Correct.
3    Q.   Right?
4    A.   ███  correct.
5    Q.   That's the top number?
6    A.   Uh-huh.
7    Q.   And then below that, we first have
8    land costs?
9    A.   Uh-huh.
10   Q.   Which come in as ███████, is
11   that correct?
12   A.   Correct.
13   Q.   And then we have air costs, which
14   is ███████?
15   A.   Right.
16   Q.   Is that correct?
17
18
19
20
21
22
23
24
25

**Page 111**

1                W. Gertz
2
3
4
5    Q.   And that cost is ████████, is
6    that correct?
7    A.   Yes.
8    Q.   Then we have another cost of
9    allocated overhead which is another ██████
10   ███████ is that correct?
11   A.   Yes.
12   Q.   Now, the total of those two costs
13   is the ███████ that appears as a sub
14   total under those two costs, is that correct?
15   A.   Yes.
16   Q.   Now, if you take the ███████
17   that is identified as the margin, do you know
18   what margin means here?
19
20
21
22
23
24
25

**Page 112**

1                W. Gertz
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17   Q.   I'm asking you, this is your
18   document, this is AIFS APIA's document.
19   A.   I have never seen this document.
20   Q.   I'm asking about these numbers.  I
21   certainly don't know, plaintiffs don't know
22   what these numbers represent.
23   A.   I haven't seen this document.
24   Q.   You are the CEO of the company, so
25   this is the document that was produced asking

**Page 113**

1                W. Gertz
2    for information about revenues and costs
3    related to the au pair program and
4    specifically for audited financial
5    statements.  This is what was produced to
6    plaintiffs, so I am asking you what these
7    numbers mean because I certainly don't know
8    what they mean, so that's why we are going
9    through the process of -- because I'm trying
10   to get more information.  I'm reading it the
11   way you are reading it, but I assume, as CEO
12   of the company, that you have more
13   information and can tell me -- and more
14   background on what these numbers actually
15   mean, is that correct?
16   A.   That's what you are assuming, yes.
17   Q.   As CEO of this company, are you
18   generally familiar with the financials of the
19   au pair program?
20   A.   Generally familiar.
21   Q.   And is it fair to say that you, as
22   CEO of AIFS, would be more familiar with the
23   au pair program than, say, a person that's
24   reading this financial statement for the
25   first time?



**Page 114**

W. Gertz

1
2      A.   It depends, right, if they were a
3   financial person, they might understand this
4   better than I would.  I understand this, you
5   know, a little bit, but I don't have the
6   detail.
7      Q.   Let's take me, I'm not an
8   accountant, I'm reading this for the first
9   time.
10      A.   Okay.
11      Q.   Is it fair to say, as CEO of AIFS,
12   that you have a better understanding and more
13   knowledge with respect to what these numbers
14   mean with respect to the au pair program
15   than, say, I would?
16      A.   Yes.
17      Q.   Is that a reasonable --
18      A.   I think it's reasonable, not
19   knowing you and not knowing what you know,
20   but, yes, I would say yes.
21      Q.   Let me ask you a different
22   question, because you seem to be struggling
23   your way through this document, even knowing
24   the program, are you able to accurately
25   determine what the revenues and costs are for

**Page 115**

W. Gertz

1
2   the au pair program from this document?
3      A.   Yes, these numbers are revenues and
4   costs.
5      Q.   Does this document give a
6   sufficient amount of detail to describe the
7   costs and revenues associated with running
8   the au pair program?
9      A.   Yes, but there is more detail.
10   This looks very short to me in terms of...
11      Q.   In terms of -- it does look very
12   short, I agree with you.
13         Does this document give a
14   sufficient amount of detail to describe the
15   costs and revenues associated with running
16   the au pair program?
17      A.   I think so.
18
19
20
21
22
23
24
25

**Page 116**

W. Gertz

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 117**

W. Gertz

1
2
3
4
5
6
7
8
9
10      Q.   We have been told that this
11   document provides a sufficient amount of
12   detail?
13      A.   Okay.
14      Q.   Can you tell me, it has general,
15   you said general --
16      A.   General.
17      Q.   -- categories?
18      A.   Uh-huh.
19      Q.   Can you surmise, can you -- this is
20   a program you are familiar with?
21      A.   Yes.
22
23
24
25

MAGNA
LEGAL SERVICES



Page 118

```
 1                 W. Gertz
 2      A.  I don't know.
 3      Q.  If you cannot tell, if you are CEO
 4  of the company and you cannot tell from this
 5  document, would you expect somebody that does
 6  not work at AIFS to know how much you spend
 7  on marketing -- let me finish my question.
 8          MR. MACRI:  I'm trying and being
 9      patient and you've asked the same
10      question about nine times at this point.
11      Q.  I will go back and answer my
12  question and then your counsel can make his
13  objection.
14          I didn't even finish my sentence.
15          From this document, which is the
16  only document that has been provided to
17  plaintiffs, if you cannot tell and if you are
18  CEO of the company, what the marketing
19  expenses were from 2009, would somebody who
20  does not work at AIFS and is seeing this
21  document for the first time be able to
22  determine how much AIFS spent on marketing in
23  2009?
24          MR. MACRI:  Objection as to form
25      and foundation.
```

Page 119

```
 1                 W. Gertz
 2      A.  No.
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 120

```
 1                 W. Gertz
 2      A.  Uh-huh.
 3      Q.  And then the last entry is income
 4  before income taxes and that number is
 5             is that correct?
 6      A.  Correct.
 7
 8
 9
10
11
12
13
14
15
16
17
18      A.  Uh-huh.
19      Q.  Let's turn to 2012.
20      A.  Uh-huh.
21      Q.  In this year, it says the
22  categories are all the same as the first page
23  that we reviewed on 2009, is that correct?
24      A.  That is correct.
25      Q.  But in 2012, the revenues were
```

Page 121

```
 1                 W. Gertz
 2                    , is that correct?
 3      A.  That is correct.
 4      Q.  Then land costs were
 5  and air costs                    , is that
 6  right?
 7      A.  Correct.
 8      Q.  So if we go down -- let's start
 9  from the bottom.  The bottom number here is
10  income before income taxes.  That number is
11                    , is that right?
12      A.  Yes.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

MAGNA
LEGAL SERVICES



Page 122

1              W. Gertz
2      Q.  I will rephrase my question.
3          The number for 2009 is ███, is
4  that correct, for income before income taxes?
5      A.   That is correct.
6
7
8
9
10
11     Q.   Let's go to 2012, that number, the
12  same category income before income taxes is
13  ███ in 2012?
14     A.   Uh-huh.
15     Q.   Is that right?
16     A.   That's correct.
17     Q.   So that is a ████████ and
18  ██████?
19     A.   Uh-huh.
20     Q.  ██████
21     A.   Uh-huh.
22
23
24
25

Page 123

1              W. Gertz
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 124

1              W. Gertz
2      A.   ██████████████
3
4
5
6
7
8
9
10
11
12     Q.   But in 2012, the allocation of Inc.
13  overhead was approximately ██████  █████
14  ███.
15
16
17
18
19
20
21  to read your question, please.
22      MS. SMALLS:  I will strike it.
23      MR. MACRI:  I don't understand the
24  question, I'm sorry.
25     Q.   So the number income before income

Page 125

1              W. Gertz
2  taxes, that last number.
3      A.   Yes.
4      Q.   That's the number you said you look
5  at when you are reviewing numbers?
6      A.   Yes.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 126

```
 1                    W. Gertz
 2
 3
 4
 5
 6
 7
 8
 9          MR. MACRI:  Are you going to shift
10   to another document?  If you are going
11   to stay on this document, otherwise, I
12   would like to take an after lunch break.
13          MS. SMALLS:  How long have we been
14   on the record?
15          THE VIDEOGRAPHER:  Forty-eight.
16          MS. SMALLS:  What I would say, I
17   don't consider this -- I am moving away
18   from this document.
19          MR. MACRI:  It's just a restroom
20   break.
21          MS. SMALLS:  We will go off the
22   record.
23          THE VIDEOGRAPHER:  The time is 2:14
24   p.m. and we are off the record.
25          (Recess.)
```

Page 127

```
 1                    W. Gertz
 2          (Gertz Exhibit 7, minutes of
 3   executive committee meeting of the
 4   American Institute For Foreign Study
 5   Stamford office, marked for
 6   identification.)
 7          THE VIDEOGRAPHER:  We are now on
 8   the record.  The time is 2:20 p.m.
 9          MR. TUCKER:  This is another
10   attorneys' eyes only document.  This is
11   Gertz Exhibit 7.
12       Q.  I will give you a moment to review
13   the document, but let me know when you are
14   ready.
15       A.  Okay.
16       Q.  What is this document?
17       A.  These are minutes of an executive
18   committee meeting.
19       Q.  Executive committee meeting of
20   what?
21       A.  Of the American Institute For
22   Foreign Study Stamford office.
23       Q.  You are the first name listed here.
24          Who is Jack Burg?
25       A.  He is the chief financial officer.
```

Page 128

```
 1                    W. Gertz
 2       Q.  Of what?
 3       A.  Of American Institute For Foreign
 4   Study AIFS, Inc., American Institute For
 5   Foreign Study would be the correct answer.
 6       Q.  Who is Mike DiMauro?
 7       A.  He is the marketing executive.
 8       Q.  He is the head of marketing?
 9       A.  Uh-huh.
10       Q.  Who is Gene Maillet?
11       A.  He is the IT director.
12       Ruth Ferry, we know.
13          Melanie French, who is that?
14       A.  She runs the academic Here In
15   America program.
16       Q.  The next name is Dennis Regan.
17       A.  He runs Camp America.
18       Q.  The next name is Paul Watson.
19       A.  Runs the college division.
20       Q.  The next name is James Mahoney.
21       A.  He is the VP accounting.
22       Q.  The next name is Barbara Swicord.
23       A.  She runs the Summer Institute For
24   The Gifted.
25       Q.  The next name is Nancy Varsos.
```

Page 129

```
 1                    W. Gertz
 2       A.  That is HR.
 3       Q.  Was there somebody else that you
 4   just listed who was also HR?
 5       A.  No.
 6       Q.  The next name is Linda Langin, who
 7   was that?
 8       A.  She runs the insurance division.
 9       Q.  Then the last name is Paulette
10   waychowsky.
11       A.  Secretary.
12       Q.  Is she your secretary?
13       A.  Uh-huh.
14       Q.  Is she one of your two assistants?
15       A.  Yes.
16
17
18
19
20
21
22
23
24
25
```



Case 1:14-cv-03074-CMA-KMT   Document 788-2   Filed 01/09/18   USDC Colorado   Page 35 of 66





Page 134

W. Gertz

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 135

W. Gertz

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 136

W. Gertz

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 137

W. Gertz

1
2    Q.   Let's go to the numbers for 2009.
3    A.   Okay.
4    Q.   And then that number, which is the
5   last number, which is the number you say you
6   looked at for 2009.
7    A.   Uh-huh.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25







Page 142

W. Gertz

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 143

W. Gertz

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 144

W. Gertz

1
2
3
4
5
6
7
8
9
10
11
12
13      (Gertz Exhibit 8, document, marked
14   for identification.)
15      MR. TUCKER:  This is Gertz Exhibit
16   8.  This is also highly confidential,
17   attorneys' eyes only.
18   A.  Okay.
19
20
21
22
23
24
25

Page 145

W. Gertz

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

37 (Pages 142 to 145)

Case 1:14-cv-03074-CMA-KMT Document 782-6 Filed 01/09/18 USDC Colorado Page 39 of 66





Case No. 1:14-cv-03074-CMA-KMT   Document 808-2   filed 01/09/18   USDC Colorado   pg 41
of 67
Case 1:14-cv-03074-CMA-KMT   Document 783-2   Filed 01/09/18   USDC Colorado   Page 40 of
66





39 (Pages 150 to 153)

Case 1:14-cv-03074-CMA-KMT   Document 782-8   Filed 01/09/18   USDC Colorado   Page 41 of 66





Page 158

```
 1              W. Gertz
 2
 3
 4
 5
 6
 7
 8
 9
10      Q.  So is the U.K. office primarily
11 responsible for the recruitment of au pairs?
12      A.  Yes.
13      Q.  Are they exclusively responsible
14 for the recruitment of au pairs?
15      A.  Well, I would say yes, yes.
16      Q.  What is the Stamford office
17 primarily responsible for?
18      A.  Program quality, the activities for
19 the au pairs, community counselors, finding
20 families, a million different things.
21      Q.  When do you, you being AIFS
22 Stamford, first interact with an au pair in
23 the process?
24      A.  I couldn't tell you.
25      Q.  So if an au pair --
```

Page 159

```
 1              W. Gertz
 2      A.  Probably if they inquired, somebody
 3 would -- that would be like a potential au
 4 pair, do you mean?
 5      Q.  I mean an au pair in Brazil, an au
 6 pair candidate in Brazil and --
 7      A.  I don't know at what point.
 8      Q.  If there was an au pair candidate
 9 in Brazil and they saw an advertisement by
10 AIFS about the au pair program, who would
11 have created that advertisement?
12      MR. MACRI:  Objection as to form
13 and foundation, please.
14      A.  It could be the local person or it
15 could be the U.K. office.
16      Q.  So the primary interfaces for au
17 pairs prior to coming to the United States
18 are either AIFS U.K. or the local agent, is
19 that correct?
20      A.  Or our other offices, yes, which is
21 AIFS, so to answer your question, yes.
22      Q.  Does AIFS Germany have
23 responsibility for the recruitment of au
24 pairs outside of Germany?
25      A.  I would say they would in -- I
```

Page 160

```
 1              W. Gertz
 2 think Austria might be a country that they
 3 do, possibly Australia, but we don't get a
 4 lot of au pairs from Australia.  It's just a
 5 small country for the au pair program.
 6      The au pair office in Germany, the
 7 AIFS Germany concentrates on Germany, to
 8 answer your question.
 9      Q.  So I'm trying to determine, what is
10 the area of focus for AIFS U.K.?
11      A.  I would say the world, that's their
12 responsibility, the world, but we do have
13 offices in place that have quasi kind of
14 responsibility but, ultimately, it's the U.K.
15 office.
16      Q.  So the U.K. office is primarily
17 responsible for the recruitment and the
18 interface with au pairs prior to coming to
19 the United States, is that correct?
20      A.  Yes.
21      Q.  And the U.K. office collects fees
22 from au pairs outside of the United States?
23      A.  Yes.
24      Q.  Prior to coming to the United
25 States, is that correct?
```

Page 161

```
 1              W. Gertz
 2      A.  Yes.
 3      Q.  You mentioned partners?
 4      A.  Uh-huh.
 5      Q.  Do you know how many partners you
 6 have?
 7      A.  Lots, but I couldn't give you a
 8 number, many.
 9      Q.  Do you have one partner per country
10 or multiple partners?
11      A.  Sometimes one partner, sometimes
12 multiple, it depends on the country.
13      Q.  And do you know how those
14 relationships are structured?
15      A.  In what way?
16      Q.  How do you determine what the
17 partners get paid?
18      A.  I don't know, I don't do that, so I
19 don't know, no clue.
20      Q.  Does payment to the partners come
21 exclusively from au pair fees or does it also
22 come from host family fees?
23      A.  I don't know that answer.
24      Q.  When we started, you also testified
25 that you serve as chair of the Alliance?
```



Page 162

1                W. Gertz
2      A.   Yes.
3      Q.   How long have you had that role?
4      A.   Two years.
5      Q.   When did you assume that role?
6      A.   A couple of years ago, I can't give
7   you a date, I really don't know.
8      Q.   Do you remember, was it before the
9   initiation of this litigation or after the
10  initiation of this litigation?
11     A.   I'm pretty sure it was after, but I
12  couldn't tell you directly.
13     Q.   What is the role of the chair of
14  the Alliance?
15     A.   Keep the peace, frankly, the
16  Alliance is 75 organizations, so, you know,
17  ranking from quasi governmental organizations
18  to organizations that have J-1 programs or
19  F-1 programs, so the role there is to really
20  make sure it's operating the way it should be
21  operating and to make sure all the members
22  are kind of happy with the direction, so that
23  we don't spend too much time on any one
24  topic.  That's the hot topic now, we have
25  that -- we need to be cognizant, the Alliance

Page 163

1                W. Gertz
2   needs to be cognizant that everybody is
3   getting -- because it's a dues-paying
4   organization, so everybody is getting
5   something out of it and the activities are
6   all kinds of stuff, lobbying, dealing with
7   Congress, State Department regulations, but I
8   think it's more to tie everything together,
9   so the 75 organizations would get together
10  with the Department of State, say, every
11  October, there is a big meeting and they
12  brainstorm things.  The Department of State
13  goes through regulations sometimes or just
14  any issues that the Alliance has for all the
15  programs, government funded programs and the
16  Alliance also tries to advocate for increased
17  appropriations for cultural exchange programs
18  and educational programs, both in public and
19  private sectors.  That's, in a nutshell, what
20  my role is.
21     Q.   Who did you succeed as chair of the
22  Alliance?
23     A.   Let's see, what's her name?  A
24  woman that was responsible for center for
25  immigration, but really -- some really smart

Page 164

1                W. Gertz
2   people there, really very dedicated, I was
3   happy to do it.
4      Q.   How were you chosen to be chair?
5      A.   Just like, how about you, Bill,
6   because it's a job nobody wants, a lot of
7   work, meetings and phone calls and that, so
8   there was not -- I guess there was a vote, I
9   don't remember, but it was the -- Michael
10  McCarry who was the chair, I think it was
11  Michael, I'm not sure, he said, how about
12  you, Bill.  I think it was Michael, and I
13  said, sure, I will do it, it was important,
14  so I will do it.  It's a little more work
15  than I thought it would be, but I'm happy to
16  do it.
17     Q.   What is the governing structure for
18  the Alliance?
19     A.   There is an executive committee,
20  executive committee, then there is a board of
21  directors, then there are members.
22     Q.   Who is on the executive committee?
23     A.   If I knew you were going to ask me
24  that, I would have brought the list.  There
25  is Lara Rose, who runs a high school program;

Page 165

1                W. Gertz
2   myself; Ellen, who runs an au pair and a high
3   school exchange program and then there is a
4   world learning, the director, who kind of
5   gets a lot of government grants and that's
6   all I remember right now.  There is another
7   guy from another organization, Meridian is, I
8   think on the executive committee, so five or
9   six people; and Ilir Zherka is the executive
10  director.
11     Q.   Who is on the board of directors?
12     A.   Sixteen people from CIEEIIE, IIE is
13  also, I think on the executive committee now.
14  All these organizations that have a common
15  purpose and theme with AIFS, so they would be
16  all organizations interested in increasing
17  international understanding and in
18  facilitating exchanges, so Alliance is the
19  international exchange's kind of all
20  different types, all different types, no real
21  focus on one specific program, just
22  multiplicity of organizations and programs.
23     Q.   How big is the membership overall?
24     A.   Seventy-five I think, 75 members.
25     Q.   So 75 total members?

MAGNA ▶
LEGAL SERVICES

| Page 166 | Page 168 |
|---|---|
| W. Gertz | W. Gertz |
| 1 | 1 |
| 2    A.  Organizations, the organization is | 2    A.  One woman's name is Laine.  I don't |
| 3  the member, but organizations can bring | 3  know the other people.  There are a bunch of |
| 4  individuals to meetings, not board meetings, | 4  interns, a couple of interns.  Laine is the |
| 5  but to the annual meeting or when we go to | 5  person that I know who is on there now. |
| 6  the Hill for lobbying to increase | 6    Q.  What does Laine do? |
| 7  appropriations.  Every year there is a | 7    A.  Helps Ilir with stuff. |
| 8  appropriations budget, so every year, the | 8       MS. KOZAL:  I'm having a difficult |
| 9  Alliance gets involved in that process, so | 9  time hearing the witness. |
| 10  people go up to the Hill and advocate. | 10       THE WITNESS:  Is this better? |
| 11    Q.  So 75 member organizations, about | 11       MS. KOZAL:  It is better.  Thank |
| 12  16 on the board of directors, is that | 12  you very much. |
| 13  correct? | 13    Q.  Do you know Laine's title? |
| 14    A.  Something like that. | 14    A.  I do not. |
| 15    Q.  And then five or six on the | 15    Q.  Do you know pronounce his name |
| 16  executive committee, is that right? | 16  Ilir? |
| 17    A.  That's correct. | 17    A.  I'm saying it Ilir, I think it's |
| 18    Q.  Where do you keep this information | 18  Ilir.  He usually says yes when I say Ilir. |
| 19  about who is on each of these committees? | 19  His last name I always get wrong, so, Zherka |
| 20    A.  Alliance keeps it somewhere. | 20  I think it is, I don't know if it's with an H |
| 21    Q.  Is it publicly available? | 21  or an E, I usually get that wrong. |
| 22    A.  Yes. | 22    Q.  Who is Ilir? |
| 23    Q.  Of the five or six on the executive | 23    A.  He is executive director of the |
| 24  committee, how many are au pair | 24  Alliance. |
| 25  organizations? | 25    Q.  How long has he been there? |

| Page 167 | Page 169 |
|---|---|
| W. Gertz | W. Gertz |
| 1 | 1 |
| 2    A.  None that just have au pair, if | 2    A.  A couple of years maybe, two years |
| 3  that is your question. | 3  something like that. |
| 4       Is that your question? | 4    Q.  Was he in that role before you took |
| 5    Q.  How many organizations on the | 5  over as chair? |
| 6  executive committee have au pair programs? | 6    A.  I don't remember, I don't remember. |
| 7    A.  Two. | 7  I don't spend that much time on the Alliance, |
| 8    Q.  So two out of five or six? | 8  I should, but I don't know, I don't know the |
| 9    A.  Yeah. | 9  people in the office names or I just -- I |
| 10    Q.  How many members of the board of | 10  don't know the timeframe of when I was in or |
| 11  directors have au pair programs? | 11  when I was made chair. |
| 12    A.  I would say five of the 20 or so, | 12    Q.  As chair, you said that your job |
| 13  15 to 20, but this is automatic information | 13  is, quote-unquote, keeping the peace. |
| 14  available, so I don't know offhand how many | 14       Do you have more specific |
| 15  have au pair programs, but it's -- | 15  responsibilities with respect to the |
| 16    Q.  It's your understanding that this | 16  Alliance? |
| 17  information is available to the public? | 17    A.  Yes, I mean, specifically, let's |
| 18    A.  It's my understanding.  I think | 18  see, I help with the -- if there is a program |
| 19  it's on the website, it's definitely on the | 19  or something, I might suggest topics.  We |
| 20  website, at least the board of directors, | 20  spend a lot of time on the board meetings and |
| 21  definitely on the website. | 21  things -- it seems more like a foundation to |
| 22    Q.  And what is the staff of the | 22  me than -- it's not a business, it's just |
| 23  Alliance? | 23  not, it's like a nonprofit foundation, it's a |
| 24    A.  Small staff, three or four people. | 24  small organization, it's tiny, so I chair the |
| 25    Q.  Who are the staff of the Alliance? | 25  meetings also.  It's probably the main thing |

MAGNA ▶
LEGAL SERVICES

| Page 170 | Page 172 |
|---|---|

**Page 170**

W. Gertz

1     I do, is chair the meetings.
2        Q.  Which meetings?
3        A.  The board meetings, there is one --
4   a couple a year.
5        Q.  Do you ever have meetings of the
6   entire membership?
7        A.  Sure.
8        Q.  Do you chair those meetings?
9        A.  They're not really meetings.  At
10  the annual conference, the entire membership
11  gets together.  I might make a speech or talk
12  about the importance of the work we do, but I
13  don't -- that's my major role.
14       Ilir would do more of the -- he is
15  the executive director, so he does all the
16  stuff that companies do.
17      Q.  So in terms of formal gatherings of
18  Alliance members, there is the -- there are
19  executive committee meetings, is that
20  correct?
21      A.  Correct.
22      Q.  And then there are board meetings?
23      A.  Right.  An executive committee
24  meeting would normally be at a board meeting,

*(lines 1–25, Page 170)*

**Page 171**

W. Gertz

1  the same timeframe, October is the meeting.
2      Q.  Are executive committee members a
3  subset of the board?
4      A.  Yes.
5      Q.  So there are board meetings that
6  also include or provide time for the
7  executive committee meetings?
8      A.  The executive committee meets to
9  prepare for the board meeting.  I know it's
10  silly, it's not like a decisionmaking group,
11  it doesn't really decide a lot.  The way I
12  see it, the main function of the executive
13  committee is to talk a little more amongst
14  the executive committee about any issues that
15  the Alliance -- salary or something like
16  that, which there wouldn't normally be in the
17  total board.
18      The executive committee also
19  prepares for the board meeting -- this is a
20  very important part, to make sure the board
21  meeting goes smoothly and the agenda is
22  carried out.
23      Q.  What is the purpose of the board?
24      A.  I think it's to really, you know,

*(lines 1–25, Page 171)*

**Page 172**

W. Gertz

1  run the organization, to vote on things, we
2  don't vote on a lot, but to make sure that
3  the mission of the board doesn't -- that the
4  organizational mission doesn't sway because
5  the Alliance is charged with being an
6  organization of organizations, so the board
7  makes sure that the Alliance stays true to
8  the routes of what we do, which is the
9  cultural exchange elements, educational
10  programs, so the board is -- you can't get 75
11  members in a room and agree on anything.  The
12  board, you can get, so it kind of provides a
13  little bit of direction to Ilir, but he is
14  pretty independent, so he doesn't really need
15  it.
16      Q.  How do the agendas for -- how are
17  the agendas for board meetings created?
18      A.  Ilir creates the agendas.
19      Q.  Do you have input into the agenda?
20      A.  I may see a draft agenda, sure.
21      Q.  You provide input?
22      A.  If I think so.  Usually, I don't,
23  but I could, yes, theoretically, I could.
24  The other members of the board get the

*(lines 1–25, Page 172)*

**Page 173**

W. Gertz

1  agenda, maybe it's just the executive
2  committee, I don't remember offhand.
3      Q.  What is discussed at a typical
4  Alliance board meeting?
5      A.  I think we go through regulations,
6  you know, if there is a regulatory issue or
7  if there is a congressional issue, we would
8  go through, you know, any kind of issue we're
9  having or we would go through best practices
10  sometimes, but not that much.  We would go
11  through the state of the world, believe it or
12  not, visas and a lot of things we are looking
13  at now is a real advocacy program to save the
14  J-1 programs because they are under attack
15  from the administration in terms of its -- we
16  may not be here next year, that's a very good
17  possibility, that these programs will be
18  cancelled, so there has been a tremendous
19  advocacy effort now amongst all participants
20  in J-1 sponsors to make sure that the
21  programs continue because we think it's an
22  important thing to do, so there is a whole
23  bunch of things the Alliance does.
24      I mentioned appropriation, I

*(lines 1–25, Page 173)*

Page 174

```
 1              W. Gertz
 2   mentioned working with -- they have access to
 3   the State Department, so they can get people
 4   to come to the meeting, so, say, our October
 5   meeting, we could have 50, 75 people from the
 6   State Department coming to the meeting, which
 7   is a tremendous asset, which makes people
 8   want to join the Alliance because they have
 9   access to the program people.  The way the
10   State Department is run, if there is a
11   program person in charge of the au pair
12   program or whatever, so they get access and
13   we make sure they're happy with what we are
14   doing and we're happy with what they're
15   doing.
16        So that's pretty much the Alliance.
17   It's a high quality organization.  People
18   work really hard.  It's been a lot of fun for
19   me, but it's sometimes more work than I want
20   it to because I'm spread out in a lot of
21   different directions.
22        Q.   You said one of the things the
23   Alliance does is discuss best practices?
24        A.   Yeah.  I mean, I would say that's a
25   pretty minor role.  That would be more State
```

Page 175

```
 1              W. Gertz
 2   Department than the Alliance best practices.
 3   The State Department discusses best
 4   practices, the Alliance, there is not a lot
 5   of best practices there, so it would be State
 6   Department.
 7        Q.   How often do you talk to other
 8   sponsors?
 9        MR. TUCKER:  Object to form,
10   foundation.
11        Q.   Do you talk to other sponsors?
12        A.   On occasion, but not very often.
13        Q.   How often do you talk to other
14   sponsors?
15        A.   If I see them at a conference,
16   sure, but I don't have close relationships.
17   Ellen was on the board, the Alliance, so was
18   Marcie Schneider is on the board.  Marci I
19   know from our time at AIFS, so we talk about
20   family stuff a lot, a lot of family talk.
21   The other people, I'm known to say hello.
22   The guy, Yaren, I know to say hello.  I've
23   been doing this a long time.  The other
24   people, I know some of them, some of them I
25   don't know.
```

Page 176

```
 1              W. Gertz
 2        Q.   Do you ever talk about --
 3        A.   Sorry, I just got a fly in my head.
 4        Q.   Do you ever talk about issues
 5   relating to the au pair industry with other
 6   sponsors?
 7        A.   What issues?
 8        Q.   Do you ever talk about the au pair
 9   stipend?
10        A.   No.
11        Q.   Have you ever talked about the au
12   pair stipend with other sponsors?
13        A.   I will say we have talked at --
14   after the litigation, there was certainly --
15   must have been talk about -- it was not --
16   there would be no specific talk about the
17   stipend in terms of the case, we try not to
18   talk about the case.  Can I say we never
19   said, oh, boy, we are nervous, why did this
20   happen, whatever?  No, I can't say that, but,
21   in general, it's not something we talk about.
22   We don't talk about the industry much.  Other
23   than if we are having an issue on lobbying or
24   legislation, we might get into some of it a
25   little bit because those kinds of issues
```

Page 177

```
 1              W. Gertz
 2   are -- impact the survival of the program, so
 3   if there is legislation, right now, we are
 4   talking about the survival of the program, so
 5   there has been some talk.  I haven't done
 6   much of it.  I do know the program, I run into
 7   them a lot, it's a pretty small industry,
 8   it's not huge, so we run into the au pair
 9   sponsors occasionally, but we don't have a
10   lot of interplay.
11        Q.   Do you talk about --
12        MS. KOZAL:  I'm sorry to do this
13   again, I know other people on the phone
14   are also having problems, we've got to
15   get this problem fixed.  I can hear Dawn
16   Smalls asking the question, I cannot
17   hear the witness.  I can hear bits and
18   pieces of what he is saying.  Oftentimes
19   the words are getting eaten, so if we
20   need to go off the record, let's go off
21   the record, but let's get the problem
22   fixed.
23        THE WITNESS:  Can I go to the
24   bathroom now.
25        THE VIDEOGRAPHER:  We are now off
```

MAGNA
LEGAL SERVICES

| Page 178 | Page 180 |
|---|---|
| W. Gertz | W. Gertz |
| 1       W. Gertz | 1       W. Gertz |

Page 178

1           W. Gertz
2    the record.  The time is 3:31 p.m.
3        (Recess.)
4        THE VIDEOGRAPHER:  We are now on
5    the record.  The time is 3:49 p.m.
6        Q.   Before the break, I was getting
7    ready to ask you --
8        MS. SMALLS:  Before we start, can
9    you just do a check?
10       THE WITNESS:  Check, check.
11       MS. SMALLS:  Can you guys hear him?
12       MS. KOZAL:  Yes, we can.  Thank you
13   very much.
14       Q.   Before the break, I was getting
15   ready to ask you whether you ever talked
16   about, at the Alliance, whether you wanted
17   the au pair stipend to be tied to the minimum
18   wage?
19       A.   I don't remember having a
20   conversation like that at the Alliance
21   meeting.
22       Q.   Or anywhere?
23       A.   I don't recall.
24       Q.   Have you ever discussed with
25   anybody the connection between the au pair

Page 179

1           W. Gertz
2    stipend and minimum wage?
3        A.   In the context of lobbying or
4    regulations, it's possible.
5        Q.   Would that person have been at AIFS
6    or would that person have been at another
7    sponsor?
8        MR. TUCKER:  Objection as to form.
9        A.   I think it would be more, I mean,
10   it could be -- maybe Ruth, but maybe another
11   sponsor at an Alliance meeting, it's
12   possible.
13       Q.   Has the au pair stipend ever been
14   on the agenda of an Alliance meeting?
15       A.   I don't think so, but I don't
16   recall if it was, but I don't think so, but,
17   again, it's possible.
18       Q.   You testified that you have board
19   meetings of the Alliance and then you have
20   general membership meetings, then you also
21   testified you have general committee meetings
22   which are done in tangent with board
23   meetings, is that correct?
24       A.   Yes.
25       Q.   Are those meetings generally in

Page 180

1           W. Gertz
2    person or by phone?
3        A.   They could be either.
4        Q.   What are they most often?
5        A.   I would say more likely by phone on
6    executive committee meetings, recently
7    because, you know, last year or so, Ilir has
8    had many more meetings, phone meetings.
9    Prior to him, I would say more just a couple
10   of in-person meetings.
11       Q.   Why have there been more meetings
12   in the last year?
13       A.   Ilir, he is into advocacy and he is
14   a real go-getter and a different kind of
15   person than the last executive director, just
16   more engaged in lobbying in congressional
17   work and work with the State Department and
18   plus the program with the Trump
19   administration is in much more trouble, so he
20   is out there having meetings and with all
21   different sponsors, not au pair sponsors, all
22   sponsors.  It seems to be ratcheting up.
23       Q.   And how often does the membership
24   meet?
25       A.   Let's see, once a year is the big

Page 181

1           W. Gertz
2    membership meeting in October.
3        Q.   Is that in person or by phone?
4        A.   It's in person.
5        Q.   Does the membership get together by
6    phone, in addition to the in-person meetings?
7        A.   There could be, there could be
8    subgroups sometimes, but normally not.
9    Normally, it's just the in person, with the
10   total 75 organizations, it's once a year in
11   October.
12       Q.   And how was the agenda for the
13   membership meeting created?
14       A.   The Alliance creates it.
15       Q.   Who is the Alliance, when you say,
16   the Alliance creates it?
17       A.   It's Ilir, it's Laine now.  It was
18   somebody else before.  There has always been
19   two or three people at the Alliance
20   responsible for things.
21       Q.   And does anyone take notes of any
22   of those meetings in the regular course?
23       A.   The -- yes, there is minutes, there
24   is minutes to the board meetings, correct.
25       Q.   Are there minutes or notes of the



46 (Pages 178 to 181)

Page 182

W. Gertz

1
2  executive committee meetings?
3      A.  I don't think so, no, I don't think
4  so.  It's more -- as I said, a get-together
5  to decide -- it's a run through of the board
6  meeting, that's what it is.  The executive
7  meeting, there is no notes or minutes, there
8  wouldn't be.
9      Q.  And are there minutes, notes or
10  minutes of the board meetings?
11      A.  Yes.
12      Q.  And who takes those?
13      A.  The Alliance.
14      Q.  Who at the Alliance?
15      A.  Takes the minutes?
16      Q.  Takes the notes or the minutes that
17  are associated with board meetings?
18      A.  The minutes, it would be either
19  Ilir or Laine or before them, they had other
20  people do it, just general staff would take
21  the minutes.
22      Q.  Those board meetings include both
23  au pair sponsors and other sponsors that are
24  not engaged in the au pair program, is that
25  correct?

Page 183

W. Gertz

1
2      A.  That would be correct, yeah.
3      Q.  Are there submeetings of the
4  Alliance just for au pair sponsors?
5      A.  Submeetings, there is
6  submeetings -- it could be with the State
7  Department folks, like Ilir.  It could be --
8  I don't recall a submeeting that was called
9  by the Alliance, I can't recall that, on au
10  pair, there has been some on summer work
11  travel and some other issues.  There has been
12  some meetings, people come -- I don't know if
13  there are formal meetings, people coming into
14  his office to talk, various things like that.
15      Q.  So you mentioned summer work
16  travel.
17          Are there specific meetings that
18  focus on the summer work travel program
19  called by the Alliance?
20      A.  There would be not formal meetings,
21  but he could talk to a few of the members
22  about summer work travel.  There is sometimes
23  a working group or something like that.
24      Q.  Are there specific meetings of au
25  pair sponsors called by the Alliance?

Page 184

W. Gertz

1
2      A.  There could be, but I don't know
3  the timeframe, sponsor meetings, it's
4  possible, but I think probably -- I don't
5  recall whether I've attended and it wouldn't
6  be a formal meeting, so it might be a couple
7  of sponsors, it's possible, you know, again,
8  au pair sponsors also have other programs,
9  some of them, so I don't know what the
10  meetings would be.
11      Q.  So for the meetings that are
12  formally called by Alliance, those meetings
13  cross programs?
14      A.  Correct.
15      Q.  And are you saying that there are
16  no formal meetings called by the Alliance
17  that focus in on specific programs, like the
18  summer work travel program or the au pair
19  program?
20      A.  I don't think it would be -- I
21  don't recall, like, official meetings, but
22  there certainly have been sponsors talking to
23  the Alliance in three people, four people.
24  It's usually a subgroup of summer work
25  travel, that seems to be the big program now.

Page 185

W. Gertz

1
2      Q.  Have you ever talked to another
3  sponsor either at an Alliance meeting or
4  outside of an Alliance meeting about the need
5  to keep the stipend uniform?
6      A.  No, I don't think so.
7      Q.  Have you ever --
8      A.  The stipend is set by the State
9  Department, so it is -- the minimum stipend
10  is set.
11      Q.  You just said the minimum stipend
12  is set by the State Department.
13          Is there a maximum that's set by
14  the State Department?
15      A.  No.  Families decide what they want
16  to pay the au pair, it's not the sponsor's
17  decision, it's the families', so it would
18  depend on the family and how much they want
19  to give her.  They have to give her the
20  Federal minimum, that's for sure.
21      Q.  And you communicate that, that it's
22  a minimum to host families?
23      A.  I believe so, yes.
24      Q.  When they're first looking at the
25  program and when families are first looking

MAGNA
LEGAL SERVICES

Page 186

```
 1                W. Gertz
 2   at the program, do you communicate that the
 3   weekly stipend of 195.75 is a minimum
 4   stipend?
 5       A.  I believe it's on the website.  It
 6   should be on the website.  I don't create the
 7   website, but pretty much, that's our
 8   understanding, that it's a minimum of, so I
 9   assume we would communicate that to families.
10       Q.  Has that always been your
11   understanding, that the 195.75 is a minimum?
12       A.  Yeah, I think so.  I don't remember
13   anything other than that.  I mean, it used to
14   be lower, if that's what you are asking.
15       Q.  You said that families decide what
16   they want to pay the au pair and the stipend
17   amount would depend on the family and how
18   much they want to give the au pair, is that
19   correct?
20       A.  There is a minimum, which is out of
21   our control, the State Department and there
22   is no maximum that the family can -- there is
23   no -- you know, depends on the family.
24       Q.  Would you ever dissuade a family
25   from paying an au pair more?
```

Page 187

```
 1                W. Gertz
 2       A.  No, I don't think so.
 3       Q.  Would you ever caution an au pair
 4   that --
 5       A.  Again, I don't deal with au pairs.
 6   You are saying the company, would they do
 7   that, I wouldn't know that.  This kind of
 8   information is beyond what I would know, just
 9   because I don't deal with the au pairs on an
10   ongoing basis.  I've seen the website where
11   it's a minimum of.
12       Q.  You stated, and the reason that I'm
13   asking you these questions, is that the
14   stipend is set by the State Department?
15       A.  Minimum stipend is set by the State
16   Department.
17       Q.  The minimum stipend is set by the
18   State Department?
19       A.  Yes.
20       Q.  What is that minimum currently?
21       A.  It's like 190 something, 195.
22       Q.  195.75 sound right to you?
23       A.  Sounds right to me.
24       Q.  Would you ever tell an au pair that
25   if a family paid them more than 195.75, it
```

Page 188

```
 1                W. Gertz
 2   might be a scam?
 3       A.  I don't think so, but, no, that
 4   doesn't sound right, I mean -- are you
 5   talking about an au pair on our program --
 6   that doesn't sound right, unless it was in
 7   response to some kind of advertisement or it
 8   was the program, you know -- scam, I think
 9   maybe it's from an advertisement or
10   something, but I would say no, the answer
11   would be.
12       Q.  Well --
13            MR. MACRI:  Mr. Gertz is not here
14       under 30(b)(6).  So when you use the
15       question you, it should be to Mr. Gertz
16       and not about the company.
17            MS. SMALLS:  Thank you.
18       Q.  Does AIFS have responsibility for
19   the information that is communicated to host
20   families and au pairs about the program?
21       A.  Yes.
22       Q.  Is AIFS responsible for ensuring
23   that the information that is shared with host
24   families and au pairs is accurate?
25       A.  Yes.
```

Page 189

```
 1                W. Gertz
 2       Q.  You stated that the au pair's
 3   stipend is a minimum and that it was up to
 4   the family whether they wanted to pay the au
 5   pair more, is that correct?
 6       A.  That's correct.
 7       Q.  Would you ever discourage the
 8   practice of a family paying an au pair more?
 9       A.  I would not personally, no.
10       Q.  Would AIFS, the company of which
11   you are CEO, ever discourage a host family
12   from paying an au pair more than 195.75?
13       A.  I don't think so, but I don't know
14   every communication that goes out, but I
15   don't think so.
16            (Gertz Exhibit 9, document, marked
17       for identification.)
18       A.  Okay.
19       Q.  Can you read the second to last
20   bullet in the second box, please, out loud?
21       A.  Which one?
22       Q.  Under the box, the text box that
23   says, Au Pair In America Policy/Procedure?
24       A.  Okay.
25       Q.  Can you read out loud the second to
```

MAGNA
LEGAL SERVICES

Page 190

```
1              W. Gertz
2   last bullet in that box?
3       A.  Although some families may consider
4   increasing their au pair stipend, Au Pair in
5   America discourages this practice.  Instead,
6   the family may consider end of year bonus for
7   excellent childcare.
8       Q.  So, again, I will ask you if the au
9   pair stipend is a minimum?
10      A.  Right.
11      Q.  Whether Au Pair In America or AIFS
12  would ever discourage a family from paying
13  the au pair more than the minimum stipend?
14      A.  I have not seen this document.  My
15  understanding is that we do not discourage
16  families from paying it, it's up to the
17  family to pay the au pair whatever they want
18  to pay based on the -- how they feel about
19  the au pair, it's totally up to them on the
20  maximum side.  The minimum side is set by the
21  Federal Government.
22      Q.  What is that understanding based
23  on?
24      A.  Just --
25      Q.  You keep saying, my understanding
```

Page 191

```
1              W. Gertz
2   is.
3       A.  It's just I don't remember seeing
4   anything about -- I don't think we
5   discouraged this practice.  It says we do, so
6   this must be from somewhere, but I did not
7   know we discouraged this practice, that's my
8   answer.
9       Q.  You said that you joined the
10  Alliance's chair about two years ago?
11      A.  Yes.
12      Q.  Is that correct?
13      A.  Something like that, yes.
14      Q.  And you couldn't remember whether
15  it was before or after the litigation was
16  initiated?
17      A.  I don't remember.
18      Q.  You were a member of Alliance when
19  the litigation was initiated?
20      A.  Yeah, I was a member.
21      Q.  So for meetings of the Alliance,
22  either upon initiation of the lawsuit or
23  after, have you had attorneys attend Alliance
24  meetings?
25      A.  I wasn't at all the Alliance
```

Page 192

```
1              W. Gertz
2   meetings, so I can't say, I don't know.  As a
3   general practice, we don't have outside
4   attorneys at the Alliance board meeting.  I
5   don't recall ever having one, but, again, if
6   there was a meeting that I didn't attend, I
7   don't go to all the board meetings, I
8   couldn't say with certainty there wasn't one
9   there, but I don't recall seeing one.
10      Q.  If there was a decision to be made
11  about allowing attorneys to attend Alliance
12  meetings, would that be made by the board of
13  directors?
14          MR. MACRI:  I'm going to object as
15      to form.
16      A.  Again, it's a hypothetical, so I
17  have no -- I wouldn't even know how that
18  would happen.
19      Q.  To your knowledge?
20      A.  Again.
21      Q.  There has been no meeting --
22      A.  To my knowledge, the meetings I've
23  attended, I don't remember an attorney being
24  present, but to say the meeting I didn't
25  attend or there wasn't -- you know, it's
```

Page 193

```
1              W. Gertz
2   always possible, but there is no process we
3   should have an attorney present or something
4   like that, that I can recall.
5       Q.  Do you know what a joint defense
6   agreement is?
7       A.  Joint defense agreement?
8       Q.  Yes.
9       A.  Yeah, sure.
10      Q.  Has the Alliance ever entered into
11  a joint defense agreement with anyone or any
12  organization?
13      A.  Not to my knowledge.
14          MS. KOZAL:  Objection to form and
15      foundation.
16      A.  Not to my knowledge.
17      Q.  Is the Alliance party currently a
18  party to any joint defense agreement?
19      A.  Not to my knowledge.
20          MS. KOZAL:  Same objection.
21      Q.  Is the Alliance a party to any
22  lawsuit currently -- excuse me, strike that.
23          Is the Alliance a party, currently
24  a party to any lawsuit?
25      A.  I would say no, I am not aware of
```

MAGNA
LEGAL SERVICES

Page 194

```
 1            W. Gertz
 2    one.  Again, I am the chair, so it would be
 3    brought to my attention if there was a law
 4    suit, I don't recall any lawsuits.
 5        Q.  Does the Alliance have a general
 6    counsel?
 7        A.  It has, like, a guy.  I know from a
 8    budget prospective, there is not a lot of
 9    money budgeted for legal, I don't know the
10    firm, I didn't meet the lawyer, I don't know
11    who he or she is, I don't know much about it.
12    It certainly is not a law firm, big law firm
13    that I know of.  I don't know even know the
14    name of the firm.
15        Q.  Has counsel been engaged by the
16    Alliance in the context of this lawsuit?
17        A.  I believe so, yeah.
18        Q.  Do you know when that occurred?
19        A.  No, I don't know.
20        Q.  Do you know whether it occurred in
21    2017, in 2016, in 2015, do you have any sense
22    even by year?
23        A.  It's probably not 2015 -- they've
24    always had a counsel at some point, my
25    understanding is forever, but I don't know if
```

Page 195

```
 1            W. Gertz
 2    when or how or it would depend -- you are
 3    talking about this specific case?
 4        Q.  I am talking about this specific
 5    case.
 6        A.  It would depend, I don't think it
 7    was, like, a new counsel, but I'm sure if
 8    there was discovery or whatever, there would
 9    be counsel involved, that would make sense,
10    but I don't know when or how or why.
11        Q.  Who is the sponsor, other than
12    APIA, that you talked to the most?
13            MR. MACRI:  I object as to form and
14    foundation.
15        A.  I would say since the lawsuit, I
16    would say probably, to answer the question
17    truthfully, which I have to do, Marcie
18    Schneider from one of those companies, AuPair
19    Care, I believe.
20        Q.  Does Marcie Schneider work for
21    AuPair Care?
22        A.  Yeah.
23        Q.  I'm asking the question.
24        A.  She does, yeah.
25        Q.  So you speak the most with Marcie
```

Page 196

```
 1            W. Gertz
 2    Schneider from AuPair Care, is that also the
 3    case prior to the filing of the lawsuit?
 4        A.  She was -- she was a friend of
 5    mine, she is a friend of mine, so, yes, no
 6    question, before the lawsuit, after the
 7    lawsuit, whatever.
 8        Q.  So given the fact that she is a
 9    friend, you talked to her about a lot of
10    things?
11        A.  We don't talk that much, we talk --
12    she is on Facebook, she will put a comment
13    on, I will comment back, we don't talk on the
14    phone or I've never been to her house.  A
15    friend is a relative term in this industry we
16    are in, we are all friends, but we don't have
17    giant meals together or whatever.
18        Q.  Have you ever had conversation with
19    Marcie about issues of concern with respect
20    to the industry?
21            MR. MACRI:  Objection as to form
22    and foundation.
23        A.  We really try not to talk about the
24    business.  We are more social friends, I know
25    her daughter and -- I don't know her
```

Page 197

```
 1            W. Gertz
 2    daughter, I know she has a daughter, I met
 3    her husband many times, we don't really,
 4    especially now, obviously, we never really
 5    talked about the business.  She also was not
 6    at AuPair Care a long time, she was somewhere
 7    else.  She did study abroad for a while, so
 8    we talk about personal issues sometimes.
 9        Q.  Okay.  You also talked to Goran
10    Rannefors, G-O-R-A-N, R-A-N-N-E-F-O-R-S?
11        A.  Very rarely, but he has been on the
12    Alliance board, so, again, I see these people
13    at meetings, we don't have a friendship, but
14    I've been out to dinner with him and others
15    at the same time, but we don't speak much,
16    no.
17            MS. SMALLS:  At this time, I would
18    like to ask if the witness can step out
19    of the room so that I can speak with
20    counsel.
21            MR. MACRI:  Sure.
22            (Witness temporarily excused.)
23            MS. SMALLS:  Plaintiffs received a
24    letter last night objecting to the
25    production and requesting the sequester
```

MAGNA
LEGAL SERVICES

| Page 198 | Page 200 |
|---|---|
| 1          W. Gertz | 1          W. Gertz |
| 2   of documents produced by the Alliance to | 2   defense group before giving you the |
| 3   plaintiffs several weeks ago. | 3   answer. |
| 4      We have now responded in the course | 4      From what I understand, Mr. Quinn |
| 5   of this deposition. It is our position | 5   sent that letter on behalf of the entire |
| 6   that those documents are not protected | 6   JDG, so we are certainly a part of the |
| 7   and to the extent that they are | 7   JDG and we partake in that objection and |
| 8   protected, that that protection has been | 8   we partake in the assertion of the |
| 9   waived. | 9   privilege, but we are not individually |
| 10      The document, the Alliance | 10   going to strike a deal with plaintiff's |
| 11   documents were put forward -- | 11   counsel without consulting with |
| 12      MR. MACRI: You sent a response | 12   plaintiff's counsel and the members of |
| 13   while we have been in this deposition? | 13   the JDG. |
| 14      MS. SMALLS: Yes. | 14      MS. SMALLS: Understood, but we are |
| 15      MR. MACRI: I haven't seen it. | 15   also in the position of -- |
| 16      MS. SMALLS: Which basically | 16      MR. MACRI: I hear you loudly and |
| 17   outlines what I just said, we don't | 17   clearly, but I will not individually |
| 18   believe that the documents are protected | 18   take a position without consulting with |
| 19   under -- | 19   the JDG, it's a collective assertion of |
| 20      MR. MACRI: That, I got. I was | 20   privilege. |
| 21   just asking about the timing of the | 21      MS. SMALLS: Understood. |
| 22   response. | 22      MS. KOZAL: Which document is it |
| 23      MS. SMALLS: I don't know what time | 23   that you are proposing to present to the |
| 24   we received the letter, but -- | 24   witness on? |
| 25      MR. MACRI: You said we sent a | 25      MR. PACHECO: The documents aren't |

| Page 199 | Page 201 |
|---|---|
| 1          W. Gertz | 1          W. Gertz |
| 2   response. I am not aware of it. | 2   Bates stamped. |
| 3      MS. SMALLS: For a deposition that | 3      MR. MACRI: If you can identify it |
| 4   was scheduled today at 10:00 a.m., I | 4   sort of colloquially. |
| 5   believe that we received a letter post | 5      MR. PACHECO: We should state that |
| 6   7:00 p.m. Eastern, I don't remember the | 6   we have -- do you have it with you? |
| 7   exact time of dissemination, objecting | 7      MS. SMALLS: It is specifically the |
| 8   to the use of these documents and | 8   document -- my colleague is asking me to |
| 9   requesting an immediate sequester. | 9   reiterate on the record that we have |
| 10   Plaintiffs disagree with defendants. | 10   sequestered the documents as requested, |
| 11      MR. MACRI: I understand that. | 11   but in the prep for this deposition, |
| 12      MS. SMALLS: Assertion of | 12   which had been taking place before 7:00 |
| 13   protection and privilege and there is | 13   p.m., upon receipt of this letter, those |
| 14   one document that prior to the receipt | 14   documents were reviewed and prepped and |
| 15   of this letter late last night that we | 15   there was a document that was pulled for |
| 16   had pulled to use with Mr. Gertz. | 16   use at this deposition. |
| 17      My proposal would be to follow the | 17      MR. MACRI: So noted and |
| 18   same procedure that we used in the | 18   appreciated. |
| 19   deposition of Ms. Hayes where we are | 19      MS. SMALLS: That document, which I |
| 20   able to use the document and question | 20   don't seem to have -- so it's the |
| 21   Mr. Gertz with your rights reserved. | 21   document that at the top, it says, 1/12, |
| 22      MR. MACRI: The objection would be | 22   I assume that's a 16, and it says, Au |
| 23   on behalf of myself and the members of | 23   Pair Member Conference Call, and |
| 24   the joint defense group, so I would need | 24   specifically it seems to be an account |
| 25   to confer with the members of the joint | 25   of what specific people said during that |



51 (Pages 198 to 201)

| Page 202 | Page 204 |
|---|---|
| 1 W. Gertz<br>2 call and there is a Bill that is<br>3 referred to in those notes.<br>4   MR. MACRI:  Thank you.<br>5   MS. SMALLS:  So the purpose was to<br>6 ask whether he is the Bill being<br>7 referred to in those notes, if that is<br>8 his recollection, if he participated in<br>9 that conference call and whether those<br>10 statements are his and what his position<br>11 is on the statements that are<br>12 specifically attributed to Bill.<br>13   MR. MACRI:  On the subsequent<br>14 questions -- I appreciate you laying<br>15 them out for me.  On the subsequent<br>16 questions, I will look on it on the<br>17 principal question.  I have no idea who<br>18 created those notes and I have no idea<br>19 who was referencing what, when they<br>20 created those notes, nor does Mr. Gertz<br>21 because he didn't create the notes.<br>22   MS. SMALLS:  I don't know that<br>23 because I haven't asked him.  I don't<br>24 know whether he was on this specific --<br>25 I'm not asking who created the notes. | 1 W. Gertz<br>2 that went out and I would like to the<br>3 ability to confer with Mr. Quinn, who<br>4 wrote the letter in the first instance.<br>5   MS. SMALLS:  I'm not disputing or<br>6 challenging any of that, but we are in<br>7 the challenge where we received a letter<br>8 post business hours the night before a<br>9 deposition that we had prepped and<br>10 pulled this document before and we have<br>11 the witness here.<br>12   MR. MACRI:  I understand.<br>13   MS. SMALLS:  We are willing to<br>14 leave the deposition open so you can<br>15 confer and decide what you guys want to<br>16 do, if you want to take that.  If you<br>17 decide to do that, we would ask that you<br>18 bear the costs of bringing him back to<br>19 ask questions about this document.<br>20   Again, we are also trying to deal<br>21 with the fact that how to deal with the<br>22 situation where we had already reviewed<br>23 and pulled the document for use at a<br>24 deposition at 10:00 a.m. and there is a<br>25 dispute about whether we can use the |

| Page 203 | Page 205 |
|---|---|
| 1 W. Gertz<br>2 This person ran through everybody on<br>3 that call and there is a Bill that is<br>4 referred to.  I'm not asking him about<br>5 anybody else, other than the name Bill<br>6 and there is more than one Bill that it<br>7 could be.  It could be Bill Gertz or I<br>8 guess a Coppler, so I'm trying to<br>9 determine --<br>10   MR. MACRI:  You are going to ask<br>11 questions about the substance of the<br>12 phone call and on that respect, we are<br>13 asserting a privilege on the basis of<br>14 the American Institute For Foreign<br>15 Study, Inc., the defendant named in this<br>16 action, and on behalf of the joint<br>17 defense group, although the rest of the<br>18 joint defense group can answer on this<br>19 question.<br>20   MS. SMALLS:  What I would ask you<br>21 guys is what you propose, given the fact<br>22 this came in?<br>23   MR. MACRI:  I haven't seen your<br>24 response and I would like the ability to<br>25 read your firm's response to the letter | 1 W. Gertz<br>2 document or not.  We followed the<br>3 procedures you asked us to do, but we<br>4 also shouldn't be prejudiced by the fact<br>5 that we received a letter at 7:00 p.m.<br>6 --<br>7   MR. MACRI:  I hear and understand<br>8 your position, Dawn.  I appreciate it<br>9 and I would like the opportunity to<br>10 think about it a few moments and to talk<br>11 with my colleagues a few moments.<br>12   Beyond that, I can't give you a<br>13 definitive answer.  I hear what you are<br>14 saying, I appreciate what you are<br>15 saying.  I want the ability to confer<br>16 for a few minutes, okay.  I don't know<br>17 if you want to go off the record, stay<br>18 on the record while we are doing that.<br>19 It doesn't matter to me.  I will not<br>20 confer with my colleagues on the record.<br>21   MS. SMALLS:  I understand that.  I<br>22 think my proposal --<br>23   MR. MACRI:  Maybe the best thing<br>24 would be that we put both letters in as<br>25 exhibits in this deposition, since we |

MAGNA
LEGAL SERVICES

Page 206

1    W. Gertz
2  have done this on the record.
3    MS. SMALLS:  That's fine with me.
4    MR. MACRI:  Why don't we do that.
5  This way, we have a very clear record
6  and we have the documents in the record.
7  I think that would be helpful and it
8  would be helpful if I could physically
9  see the letter.
10   MS. SMALLS:  That's fine.  I just
11 don't know, the question is whether you
12 want to litigate this now --
13   MR. MACRI:  I hear the question.
14   MS. SMALLS:  -- or whether we leave
15 the deposition open and reserve
16 plaintiff's right to ask him questions
17 about this document, understanding that
18 we would need to come back at another
19 time.
20   So what I would propose to do is
21 why don't we break for, let's say, 30
22 minutes, is that reasonable?
23   MR. MACRI:  5:00, sure.  Why don't
24 we say till 5:00.
25   MS. SMALLS:  Okay.  We will make it

Page 207

1    W. Gertz
2  till 5:00.
3    MR. MACRI:  If we are done early, I
4  will come and get you.  Just tell me
5  where to come and get you.
6    MS. SMALLS:  You can email me.  Why
7  don't we do that, so you can confer and
8  let me know whether you want to tee this
9  up and call the court now or whether you
10 want to leave the deposition open and
11 reconvene at your cost.
12   MR. MACRI:  I go it.  Thank you.
13   MS. SMALLS:  We are going off the
14 record.
15   THE VIDEOGRAPHER:  We are now off
16 the record.  The time is 4:27.
17   MR. MACRI:  Before we go off the
18 record, can we put both records on the
19 record.
20   MR. PACHECO:  We don't have ours.
21   MR. MACRI:  We have ours.  So we
22 can mark this --
23   MR. PACHECO:  Why don't we do it at
24 the same time, we will get ours back and
25 do it at the same time.

Page 208

1    W. Gertz
2    MS. SMALLS:  Are we off or are we
3  on?
4    MR. MACRI:  Why don't you just say
5  we are back on the record, if you would,
6  please.
7    THE VIDEOGRAPHER:  We are back on
8  the record.  The time is 4:28 p.m.
9    (Gertz Exhibit 10, document, marked
10 for identification.)
11   MR. MACRI:  Just so I understand
12 the proposal, if we took your option to
13 leave the deposition opened, we would be
14 preceding with the balance of the
15 deposition today?
16   MS. SMALLS:  That's correct.
17   MR. TUCKER:  We would be talking
18 about expenses of court reporting and
19 video?
20   MS. SMALLS:  The bonus, Mr. Gertz
21 is local and I think most of the
22 counsel, with the exception of Mr.
23 O'Keefe, is local and we are here, so
24 there is no cost, but in terms of the
25 videographer and the court reporter --

Page 209

1    W. Gertz
2    MR. MACRI:  Got that.  We should
3  not waste this time.  I appreciate that
4  you are scurrying for the document.  We
5  will put it in and mark it as 11,
6  please, and I think it's on my email, so
7  I can look at it.
8    (Gertz Exhibit 11, document, marked
9  for identification.)
10   THE VIDEOGRAPHER:  We are now off
11 the record.  The time is 4:32 p.m.
12   (Recess.)
13   THE VIDEOGRAPHER:  We are now on
14 the record.  The time is 5:03 p.m.
15   MR. MACRI:  Thank you for the
16 proposal and the opportunity to have a
17 conference with my colleagues and at the
18 conclusion of that, we would like to
19 accept your offer to hold open and hold
20 over the deposition with respect to this
21 issue.
22   Thank you very much.  We understand
23 that we are liable for the court
24 reporting costs associated with that and
25 the videographer.



Page 210

1 W. Gertz
2 MS. SMALLS: Is the agreement only
3 on this issue or are you limiting it
4 with respect to just this particular
5 document, all Alliance documents?
6 MR. MACRI: Anything that the
7 Alliance, I -- didn't know you had any
8 intention of discussing anything else.
9 I thought you only wanted to discuss
10 that one document.
11 MS. SMALLS: I wanted to discuss
12 that one Alliance document.
13 I do have other non-Alliance
14 documents that I want to cover, I'm
15 happy to do that.
16 MR. MACRI: If they are AIFS
17 documents, I have no problem with that.
18 MS. SMALLS: The question is, if we
19 are reconvening, if you want to do that
20 today?
21 MR. MACRI: We would like to go
22 forward just to hold over just on the
23 issue of the privileged communications.
24 We would like to conclude on everything
25 else, please. Thank you very much.

Page 211

1 W. Gertz
2 I wasn't sure that we weren't clear
3 on that.
4 (Witness resumes.)
5 EXAMINATION BY (Cont'd.)
6 MS. SMALLS:
7 Q. Before we took our break, I was
8 asking you a question about notetaking at the
9 Alliance.
10 I have a few additional questions
11 that I would like to ask you about that.
12 Is it a policy of the Alliance to
13 regularly take notes during meetings?
14 A. Not to my knowledge.
15 Q. You mentioned minutes before we
16 broke.
17 Is it a policy of the Alliance to
18 regularly take minutes of the meetings?
19 A. The board meeting, yes.
20 Q. Is it a policy of the Alliance to
21 regularly take minutes of the executive
22 committee meeting?
23 A. No.
24 Q. Do people take notes at the
25 executive committee meeting?

Page 212

1 W. Gertz
2 MR. MACRI: Objection as to form
3 and foundation.
4 A. People write things down.
5 Q. Do you take notes at the executive
6 committee meeting?
7 A. No, not that I recall.
8 Q. Do you take notes at the board
9 meetings?
10 A. Not real notes, I might scribble
11 something, but usually not.
12 Q. Do you keep those notes?
13 A. No.
14 Q. In terms of the minutes, do you
15 know how those are kept or stored?
16 A. I don't know.
17 Q. Does the Alliance have any written
18 policies governing the taking storage or
19 destruction of notes?
20 A. I don't know.
21 Q. In your role as CEO, do you
22 generally or do you ever have occasion to
23 deal with the State Department?
24 A. Yes.
25 Q. How often and in what capacity do

Page 213

1 W. Gertz
2 you interact with the State Department?
3 A. Not on a regular basis.
4 Q. Are you the responsible officer for
5 APIA?
6 A. I am not.
7 Q. So in what context would you
8 generally interact with officials from the
9 State Department?
10 A. Just try to see the higher-ups at
11 the State Department just to see how things
12 are going, introduce myself.
13 Q. Do you generally participate in
14 Alliance meetings that are with State
15 Department officials?
16 A. Not generally.
17 Q. Who from AIFS would generally
18 attend Alliance meetings with State
19 Department officials?
20 MR. MACRI: Objection as to form
21 and foundation.
22 A. Ruth Ferry.
23 (Gertz Exhibit 12, emails, marked
24 for identification.)
25 Q. Let me know when you are ready?



54 (Pages 210 to 213)

| Page 214 | Page 216 |
|---|---|

W. Gertz

1  
2      A.  I'm ready.
3      Q.  Do you recognize this email?
4      A.  I do not.
5      Q.  Have you ever seen this email
6  before?
7      A.  Not to my knowledge.
8      Q.  Would you have -- let me -- did you
9  ever have a conversation with Ilir about his
10  response to the Department of State's
11  invitation to meet on May 2nd?
12      MR. MACRI:  I'm going to object on
13      all form and foundation, but I'm also
14      not sure whether this falls under our
15      last discussion.
16      MS. SMALLS:  It doesn't, it's Apex
17      2020.  This isn't an Alliance produced
18      document.
19      MR. MACRI:  I can't read it.
20      MS. SMALLS:  The Bates number is
21      Apex 2020493, it doesn't -- so just like
22      any other document --
23      MR. MACRI:  I didn't see that, I'm
24      sorry, Dawn.  I can't see it on this
25      copy, it's over the print.  I didn't

W. Gertz

1  
2  whether Ilir consulted with him before
3  he sent a response.
4      MR. MACRI:  Okay.
5      Q.  Were you aware that the State
6  Department issued an invitation to the au
7  pair sponsor community to meet on May 2nd of
8  2016?
9      MR. MACRI:  Objection as to form
10      and foundation.
11      A.  I'm not sure what this meeting is
12  so I don't recall anything about it.  I don't
13  think -- I don't remember the meeting, 2016,
14  I don't remember the meeting, I wasn't there.
15  There have been a number of au pair meetings.
16      Q.  This would have been last year?
17      A.  Correct, this one, I don't recall
18  exactly who was invited.  This email, I have
19  never seen, it doesn't look familiar.
20      Q.  Does Ilir generally check with you
21  or the board of directors about the formal
22  Alliance response to State Department
23  inquiries or requests?
24      MR. MACRI:  Objection as to form
25      and foundation.

| Page 215 | Page 217 |
|---|---|

W. Gertz

1  
2  know what it was.  I thought it might
3  have been a water mark.
4      MS. SMALLS:  So for people on the
5      phone, we are discussing Apex 2020493.
6      A.  Can you repeat the question?
7      Q.  So in this email, Ilir is
8  responding to the State Department's
9  invitation to the au pair sponsor community
10  to meet on May 2nd, is that correct?
11      MR. TUCKER:  Objection as to form
12      and foundation.
13      MR. MACRI:  You are asking him
14      about something outside of his own
15      knowledge.  He is not a recipient on
16      this document, he is not the author of
17      this document, so why are you asking him
18      what Ilir did?
19      MS. SMALLS:  He is the chair of the
20      Alliance.
21      MR. MACRI:  He is not copied on the
22      document, it's not to him, he is not the
23      author of document.
24      MS. SMALLS:  The question I asked
25      him, he works with Ilir, I'm asked him

W. Gertz

1  
2      A.  Not necessarily.
3      Q.  Does he ever check with you before
4  he responds to an official State Department
5  inquiry or request?
6      MR. MACRI:  Objection as to form
7      and foundation.
8      A.  Not that I can recall.
9      Q.  So Ilir has never checked in with
10  you?
11      A.  Not that I can recall on your
12  specific question.
13      Q.  To get input on the Alliance's
14  response to a State Department request or
15  inquiry?
16      A.  Or a meeting, not that I can
17  recall, I can't recall a specific instance.
18      Q.  I'm not talking about just a
19  meeting.  Any State Department inquiry or
20  request of the Alliance or sponsors, does
21  Ilir -- has Ilir ever checked in with you to
22  get your input and/or approval before sending
23  a formal response back to the State
24  Department?
25      MR. MACRI:  Same objections.

MAGNA
LEGAL SERVICES

Page 218

1          W. Gertz
2     A.  The answer would be not
3 necessarily, no, I don't remember him ever
4 doing that.
5     Q.  Can you read out loud the third
6 paragraph?
7     A.  Furthermore, our members have not
8 requested any clarification regarding the
9 history of the stipend as Department of State
10 has made the appropriate implementation of
11 the stipend clear throughout through its
12 directors, its own websites, as well as
13 ongoing program audits.  At no time has there
14 been a question for our members.  The sponsor
15 community does have questions about potential
16 new policies and regulatory changes on the
17 issue and the impact of such changes and
18 policies on the au pair program overall.
19     Q.  Then can you just read what is in
20 bold right below that?
21     A.  Subject to these discussion
22 parameters, our members accept your
23 invitation, we look forward to meeting with
24 you on May 2nd.  Also, thank you for offering
25 to work with us on an agenda and I'm

Page 219

1          W. Gertz
2 attaching a draft of suggested document
3 discussion items and welcome your thoughts.
4     Q.  Do you recall any discussion of
5 Alliance members about responding to a
6 request from the State Department to meet to
7 discuss the au pair stipend?
8       MR. MACRI:  I have a couple of
9    objections here, please.  So any time
10    every, this one -- I've got form and
11    foundation objections on your question.
12    To the extent you are talking about any
13    other discussions that may be subject to
14    the privilege that we've asserted
15    earlier, then I'm going to direct Mr.
16    Gertz not to respond to those questions
17    and we will hold those questions over,
18    as well, please.
19       MS. SMALLS:  This document is not
20    privileged in any form and so we've just
21    read, you made your objections for the
22    record.
23     Q.  I am specifically referring to the
24 information that is referred to in this
25 document, so to clarify, as your counsel

Page 220

1          W. Gertz
2 asked me to do, I'm specifically talking
3 about the request made in the early part of
4 2016 to meet in May of 2016, were you part of
5 a discussion among au pair sponsors regarding
6 the appropriate response to the State
7 Department regarding a meeting to discuss the
8 au pair stipend particular?
9       MR. TUCKER:  Objection to form and
10    foundation.
11     A.  I don't recall, one way or the
12 other.
13     Q.  Are you always on au pair member
14 calls?
15       MR. MACRI:  Objection as to form.
16     A.  No.
17     Q.  Are there calls that are conducted
18 of just au pair members?
19     A.  Yes.
20     Q.  And is there somebody else from
21 your organization that would participate in
22 those au pair member calls?
23     A.  Yes.
24     Q.  Who is that?
25     A.  Ruth Ferry.

Page 221

1          W. Gertz
2       (Gertz Exhibit 13, document from
3    the State Department to Ruth Ferry,
4    marked for identification.)
5     Q.  I will give you a moment to review
6 it.  If you can let me know when you are
7 ready.
8     A.  Okay.
9     Q.  What is this document?
10     A.  It's a document from the State
11 Department to Ruth about some issues with
12 duties, responsibilities, et cetera, et
13 cetera.
14     Q.  What were the issues with the State
15 Department raised or discussed in this email?
16     A.  According to this email, that the
17 work schedule should be jointly developed,
18 work hours, payment receipt.
19     Q.  I'm sorry?
20     A.  Payment receipt.
21     Q.  Your account of this email is that
22 it relates to the State Department concerns
23 regarding sponsors taking action to document
24 receipt of payment?
25       MR. MACRI:  Objection as to form



Page 222

1    W. Gertz
2  and foundation.
3    MS. SMALLS:  The way he answered
4  the question --
5    MR. MACRI:  The document speaks for
6  itself.
7    MS. SMALLS:  I have questions.
8    MR. MACRI:  You are asking him to
9  say what does the document say.
10   MS. SMALLS:  You already said form
11 and foundation, it's on the record, we
12 got it.
13   Q.  One of the issues in this email --
14 let's start, in the email from Maha to Ruth
15 Ferry, she relates -- she refers to serious
16 labor law related issues, that's in the first
17 paragraph right under, Hope all is well in
18 Connecticut.
19   A.  Yes.
20   Q.  Do you know what serious labor law
21 related issues she is referring to?
22   A.  I do not.
23   Q.  You received this email, is that
24 correct?
25   A.  Not the original one.

Page 223

1    W. Gertz
2    Q.  You were -- the original email was
3  sent on Tuesday, September 20, 2011 and you
4  were forwarded this email on September 26,
5  2011, is that correct?
6    A.  Uh-huh.
7    Q.  Did you reply to this email?
8    A.  I did.
9    Q.  What was your reply?
10   A.  Suggest Alliance sends our Ruth a
11 letter immediately before he drafts one.
12   Q.  Does your reply suggest that you
13 read the information in the email below it?
14   A.  Not necessarily, it just would say
15 send somebody in the State Department an
16 email to get clarification of what this is.
17 This Maha, I don't think she is an officer of
18 the State Department, so I don't know who she
19 is, sending Ruth an email like that, so I
20 said, send it to, you know, Rick Ruth a
21 letter, not getting Alliance to do it because
22 Michael knows, Michael McCarry, who Rick Ruth
23 who is a more senior person at the State
24 Department.
25   Q.  This email raises the prospect of

Page 224

1    W. Gertz
2  timesheets or proof of days off, work hours
3  payment and payment in response to complaints
4  that they had received from au pairs?
5    MR. MACRI:  Objection as to form
6  and foundation.
7    Q.  Is that correct?
8    A.  Let me read that email again.
9    That's what this email says, yes.
10   Q.  Do you know if there was ever a
11 discussion among sponsors at any point about
12 the State Department's articulation of
13 concerns about timesheets or lack of records
14 regarding work hours or payment?
15   A.  Not to my knowledge, no.
16   Q.  Did you ever participate in any
17 conversations with other sponsors about State
18 Department suggestions that they may impose a
19 requirement for timesheets?
20   A.  Not that I can remember, but I
21 don't remember having that conversation.
22   Q.  Did you ever discuss internally at
23 AIFS or with another sponsor the, quote,
24 serious labor law related issues raised by
25 the State Department?

Page 225

1    W. Gertz
2    MR. MACRI:  Objection as to form.
3    A.  No.
4    Q.  If you were notified of serious
5  labor law related issues, is that something
6  you would follow-up on as CEO of AIFS?
7    MR. MACRI:  Objection as to form
8  and foundation.
9    A.  I might check with an attorney to
10 see what those things were and whether -- it
11 says, objections from au pairs, I don't know
12 how many.  This is a very vague email
13 following up on complaints from au pairs.  I
14 don't know if that's one au pair or two au
15 pairs and we don't, you know, really look at
16 labor laws.  I don't personally have an
17 attorney for that.  This is not a labor-based
18 program, it's a cultural exchange program, so
19 I would say -- but if I had an issue, I would
20 check with my attorney, but not if somebody
21 said there are three complaints or whatever,
22 I don't know.
23   Q.  So earlier in the deposition, you
24 testified that the stipend, the minimum
25 stipend was set by the State Department, is

MAGNA
LEGAL SERVICES

Page 226

```
1              W. Gertz
2  that correct?
3      A.  Correct, yes.
4      Q.  Do you know what else the State
5  Department regulations says about the minimum
6  stipend?
7          MR. TUCKER:  Objection as to form.
8      A.  No.
9      Q.  Are you aware that the minimum
10 stipend set by the State Department is
11 subject to the Fair Labor Standards Act?
12     A.  I don't know much about the Fair
13 Labor Standards Act.
14     Q.  Are you aware that's a labor law?
15     A.  Yes.
16     Q.  That's a regulation promulgated by
17 the Department of Labor?
18         MR. MACRI:  Objection as to form
19 and foundation.
20     A.  I am not aware it's a Department of
21 Labor, who was in charge of FLSA.
22     Q.  Are you aware that the FLSA is a
23 labor law?
24     A.  I am aware that it's a labor law,
25 Fair Labor Standards Act.
```

Page 227

```
1              W. Gertz
2      Q.  Are you aware that the State
3  Department regulation with respect to the
4  stipend specifically refers to the Fair Labor
5  Standards Act?
6          MR. MACRI:  Objection as to form and
7  and foundation.
8      A.  The regulation --
9      Q.  That you referred to.
10     A.  I am aware that they had said
11 something about the Fair Labor Standards,
12 but, again, I don't know the details of that,
13 I don't know the act.
14     Q.  You cited the regulation earlier in
15 this deposition?
16     A.  I did.
17     Q.  You did and you said the minimum
18 stipend --
19     A.  Is that part of the Fair Labor
20 Standards Act?
21     Q.  The minimum stipend, you said the
22 minimum stipend is set by the State
23 Department in regulation?
24     A.  Correct.
25     Q.  Are you aware that that regulation
```

Page 228

```
1              W. Gertz
2  that sets the minimum stipend says that it is
3  subject to the Fair Labor Standards Act?
4      A.  The language is familiar, yes.
5      Q.  And that Fair Labor Standards Act
6  is a labor law?
7      A.  Okay.
8      Q.  Is it?
9      A.  Is that a question?
10     Q.  Yes.  Is the Fair Labor Standards
11 Act a labor law?
12     A.  Yes.
13     Q.  So the au pair regulation that sets
14 the minimum stipend specifically refers to a
15 labor law, is that correct?
16         MR. MACRI:  Objection as to form.
17     A.  Correct.
18     Q.  Do you know why that would be if au
19 pairs are just big sisters that do chores?
20     A.  I don't know why they would be
21 responsible.  My understanding is the State
22 Department is overall responsible for the
23 program.
24     Q.  Again, you were forwarded this
25 initial email, correct?
```

Page 229

```
1              W. Gertz
2      A.  Yeah.
3      Q.  In this email, it talks about how
4  Maha, who is at the State Department, is
5  flabbergasted that sponsors who have been
6  operating for years would not have
7  timesheets, payroll details firmly in place
8  to call upon at a moment's notice, that is
9  what the email says, is that correct?
10     A.  That's correct.
11     Q.  What did you do when you learned of
12 the State Department's shock and surprise
13 that au pair agencies that had been operating
14 for years did not have timesheets or payroll
15 details firmly in place?
16         MR. MACRI:  Objection as to form
17 and foundation.
18     A.  Can you please repeat the question?
19     Q.  You received this email?
20     A.  Correct.
21     Q.  You read this email, is that
22 correct?
23     A.  Correct.
24     Q.  You replied to this email, is that
25 correct?
```

MAGNA
LEGAL SERVICES

---

**Page 230**

W. Gertz

1
2     A.   Correct.
3     Q.   In this email, my question to you
4  is, what did you do or what was your response
5  when you learned that the State Department
6  was flabbergasted that sponsors who had been
7  operating for years did not have timesheets
8  or payroll details firmly in place to call
9  upon at a moment's notice?
10    A.   I was surprised by this email.
11 Looking at it now, and the -- it's not part
12 of the regulations, so this is an incorrect
13 email by this Maha, you know, it could be
14 flabbergasted that there are no payroll
15 sheets because she would know there are no
16 payroll sheets required, it's not part of the
17 program.
18    Q.   So the regulation that you just
19 referred to is a State Department regulation,
20 is that correct, when you say timesheets are
21 --
22    A.   State Department regulations.
23    Q.   Right, so there are no -- it's your
24 testimony there are no timesheets required as
25 part of the State Department regulation?

---

**Page 231**

W. Gertz

1
2     A.   To my knowledge, there are not.
3     Q.   It's your testimony that Maha is
4  wrong to inquire about timesheets or proof of
5  days off, work hours or anything else
6  relating to hours or receipt of the weekly
7  stipend?
8        MR. TUCKER:  Objection to form.
9     A.   There are no timesheets required,
10 so that is wrong to say there are timesheets
11 required.
12    Q.   Who determines whether timesheets
13 are required or not?
14    A.   Whether we give it, I guess the
15 State Department, if it's not in the
16 regulation, unless it's -- the families want
17 to do schedules, I think we have some
18 schedules, we have schedules, families and
19 the au pairs have schedules, but there are no
20 timesheets required, to my knowledge, in any
21 State Department regulation.
22    Q.   My question to you is, who would be
23 the best interpreter of what a State
24 Department regulation requires?
25        MR. TUCKER:  Objection to form.

---

**Page 232**

W. Gertz

1
2        MR. MACRI:  Objection to form.
3     Q.   Would it be a State Department
4  official or would it be a sponsor agency?
5     A.   It would be a State Department
6  official, but on a high -- I would think not
7  on this lower level, because I don't
8  recognize the name, et cetera.
9     Q.   Again, the date of this
10 correspondence was in 2011, is that correct?
11    A.   Yes.
12    Q.   After hearing or learning of at
13 least this State Department official's being
14 flabbergasted that there were no timesheets
15 or payroll details firmly in place to call
16 upon at a moment's notice, did you do
17 anything after that time to account for au
18 pair time?
19    A.   No, not to my knowledge, I wouldn't
20 have the details on it, but I doubt it.
21 There is no regulation there, it's one State
22 Department person saying something.  I don't
23 know if we did anything, but Ruth would know,
24 but I don't think so.
25    Q.   When you are unclear about

---

**Page 233**

W. Gertz

1
2  something in terms of State Department
3  policies or regulations, where do you seek
4  guidance?
5     A.   From the State Department.
6     Q.   Are you always open to hearing that
7  guidance from the State Department when there
8  is -- seems to be some confusion or ambiguity
9  about what a State Department regulation or
10 what a State Department policy is?
11       MR. MACRI:  Objection as to form
12    and foundation.
13    A.   You are going to have to read the
14 question because I can't remember it.
15    Q.   Are you always open to hearing that
16 guidance from the State Department when there
17 seems to be some confusion or ambiguity about
18 what a State Department regulation or State
19 Department policy requires?
20    A.   My understanding is the State
21 Department has a pretty formal policy on
22 regulations, so we would get a guidance
23 directive on an issue if it was a real issue.
24    Q.   Was the timesheet issue a real
25 issue?

---

**MAGNA**
LEGAL SERVICES

Page 234

```
 1              W. Gertz
 2      A.  I don't recall it as being an
 3 issue.
 4      Q.  You mentioned that Maha was a lower
 5 level employee at the State Department than
 6 you were familiar with or regularly
 7 interacted with, is that correct?
 8      A.  She is, as far as I know -- I don't
 9 know the name, so she is not the assistant
10 secretary of state, I know that.  I don't
11 know their structure.
12      Q.  So having received this email from
13 Maha, at whatever level she is at, did you
14 ever elevate it to elevate the issue to a
15 more senior level at the State Department to
16 ensure that you were clear on what the
17 regulations required and were in complete
18 compliance with the regulation?
19          MR. MACRI:  I'm going to object to
20      form and foundation.
21      Q.  Got it.  Please answer the
22 question.
23      A.  Yes.
24      Q.  You did elevate the timesheet
25 issue?
```

Page 235

```
 1              W. Gertz
 2      A.  Not the timesheet issue.
 3      Q.  I'm specifically talking about --
 4      A.  I have no recollection of elevating
 5 the timesheet issue.
 6      Q.  She is raising in this email
 7 accounting by sponsors of the hours worked by
 8 au pairs and their payment.  She is
 9 expressing serious concern about the process
10 and procedures that sponsors have in place
11 with regard to timesheets and payroll.
12          MR. TUCKER:  Objection, form.
13      Q.  You received this email and what I
14 am asking you is, having received a
15 communication from the State Department
16 expressing serious concern, did you do
17 anything, did you do any follow-up or did you
18 follow-up with anyone else at the State
19 Department to ensure that you were in full
20 compliance with the regulation?
21          MR. MACRI:  I'm going to object.
22      You are continuing to characterize that
23      Mr. Gertz received the communication
24      from the State Department.  He did not
25      and there is no evidence on this
```

Page 236

```
 1              W. Gertz
 2 document that he received it from the
 3 State Department.  You keep
 4 characterizing it that way.
 5          MS. SMALLS:  Mr. Gertz received --
 6          MR. MACRI:  The email from Ruth
 7      Ferry.
 8          MS. SMALLS:  Hold on.  You said
 9      form and foundation.  There is no need
10      to say anything else.  You made an
11      objection.  I heard it.
12      Q.  It says -- the email, for
13 clarification of the record, the email is
14 from Maha Ammar to Ruth Ferry, cc Karen
15 Hawkins.
16          Who is Karen Hawkins?
17      A.  State Department person.
18      Q.  So this email is sent from the
19 State Department specifically to Ruth Ferry
20 who works at AIFS, is that correct?
21      A.  That's correct.
22      Q.  And then Ruth, being the sole
23 recipient of this email, forwards it to
24 Michael McCarry and where did Michael McCarry
25 work?
```

Page 237

```
 1              W. Gertz
 2      A.  At the Alliance.
 3      Q.  So Ruth forwards the email to
 4 Michael McCarry at the Alliance and she cc's
 5 you?
 6      A.  Uh-huh.
 7      Q.  So you received this email, you
 8 received Ruth's forward and you received the
 9 original email from the State Department?
10      A.  Correct.
11      Q.  Did you read and -- did you read
12 both emails?
13      A.  I don't think so.  To me, it sounds
14 like I just said, forward it on.  I don't
15 remember reading this email specifically.
16      Q.  Did you read Ruth's email?
17      A.  I don't recall this email.
18      Q.  In Ruth's email, Ruth forwards to
19 you, she refers to a letter that Maha is
20 currently drafting that will come out under
21 Rick Ruth's signature.  That's in kind of the
22 third bullet on page 2.
23          Do you see that?
24      A.  I don't.
25      Q.  If you go on page 2 --
```

MAGNA
LEGAL SERVICES

Page 238

```
 1              W. Gertz
 2      A.  I see it, I see that.
 3      Q.  Can you just read that sentence
 4   that starts with, Maha?
 5      A.  Maha is currently drafting a letter
 6   that will come out under Rick Ruth's
 7   signature, as I understand it, just being
 8   that sponsors must have proper procedures
 9   place to track pay type and hours worked.
10   She feels local coordinators cannot be
11   counted on to be held accountable, as they
12   may not be impartial.  I am under the
13   impression this was the case in one of these
14   instances.
15      Q.  Can you just review the email from
16   Maha to Ruth and see if Rick Ruth is
17   mentioned anywhere in that email?
18      A.  I don't see Rick Ruth's name here.
19      Q.  So the first mention of Rick Ruth
20   is in Ruth's email that she forwards to you?
21      A.  Right.
22      Q.  Is that correct?
23      A.  Yes.
24      Q.  Then can you read your reply to
25   Ruth's email?
```

Page 239

```
 1              W. Gertz
 2      A.  Suggest Alliance send R. Ruth a
 3   letter immediately before he drafts one.
 4      Q.  Does your reply suggest that at a
 5   minimum, you read Ruth's email to you?
 6      A.  No.
 7      Q.  Why is that?
 8      A.  Because if I saw -- if I read it
 9   and, you know, I saw Rick Ruth's name there,
10   I would say, you know, I didn't -- I get a
11   lot of emails, so I wouldn't have read the
12   entire email.  It sounds to me I just fobbed
13   it off.
14          (Gertz Exhibit 14, email chain,
15          marked for identification.)
16      Q.  Just let me know when you are
17   ready.
18      A.  Okay.
19      Q.  Can you tell me who the top -- the
20   first, the top email is from and who it's to?
21      A.  Michael McCarry to Ruth Ferry,
22   Goran Rannefors, Natalie Jordan and me.
23      Q.  And what are the organizations that
24   are represented by those four individuals?
25      A.  AIFS and Cultural Care.
```

Page 240

```
 1              W. Gertz
 2      Q.  And in the message below, if you
 3   can just read -- let me just ask, did you
 4   receive this email?
 5      A.  I don't recall it, but my name is
 6   on it.  It's six years ago.
 7      Q.  Okay.  Can you read the paragraph
 8   where it starts with, Just to reiterate my
 9   earlier message?
10      A.  Just to reiterate my earlier
11   message, sponsors are deeply concerned about
12   the idea of timesheets for au pairs.  It
13   seems both politically unwise at a time when
14   we are all arguing that these are
15   fundamentally exchange, not work programs and
16   programatically damaging, as well.  Part of
17   the ethos of the program is that au pairs
18   become part of the family.  Adding a formal
19   punching the clock element will undermine
20   that goal and I'm sure many host families
21   will react negatively to the idea.
22      Q.  Can you tell me the date of this
23   email from Michael McCarry to Rick Ruth?
24      A.  It's October 5th.
25      Q.  Of?
```

Page 241

```
 1              W. Gertz
 2      A.  2011.
 3      Q.  What was the date of the other
 4   email exchange that you replied to suggesting
 5   that Michael McCarry write an email -- write
 6   a letter to Rick Ruth?
 7          MR. TUCKER:  Objection to form.
 8      A.  26th of September.
 9      Q.  So this would have been -- this
10   email from Michael McCarry to Rick Ruth would
11   have been roughly a week to two weeks after
12   the email where you said that you suggest
13   that Michael send an email to Rick Ruth, is
14   that correct?
15      A.  Correct.
16      Q.  And does that email specifically
17   touch on the issue of timesheets, as was
18   outlined in the September 26th email?
19      A.  Yes.
20      Q.  So I will ask you again, do you
21   remember discussing, at the Alliance or with
22   another sponsor, the issue of timesheets for
23   au pairs?
24      A.  I don't remember.
25          MS. SMALLS:  Where are we on time?
```

MAGNA
LEGAL SERVICES

| | |
|---|---|
| Page 242 | Page 244 |

Page 242

W. Gertz

1
2    THE VIDEOGRAPHER:  We are at 5:20.
3    MS. SMALLS:  Five hours and 20
4 minutes?
5    THE VIDEOGRAPHER:  Correct.
6    Q.   Have you ever spoken with Dr.
7 Newlon or Dr. Stiroh?
8    A.   No.
9    Q.   Do you know who Dr. Newlon or Dr.
10 Stiro, S-T-I-R-O, I don't know if I'm
11 pronouncing her name right, do you know who
12 they are?
13    A.   No.
14    Q.   Do you recall giving an interview
15 to either a Dr. Newlon or Dr. Stiroh?
16    A.   No.
17    Q.   Dr. Newlon and Dr. Stiroh are
18 experts in this case and they have used an
19 interview with you as a support for their
20 expert report.  They have testified that they
21 conducted an interview with you by phone.
22    Do you recall that interview?
23    A.   I do not.
24    Q.   Do you have any recollection of the
25 information that you provided to either Dr.

Page 243

W. Gertz

1
2 Newlon or Dr. Stiroh?
3    MR. TUCKER:  Objection as to form
4 and foundation.
5    A.   I do not.
6    Q.   Do you recall any of the questions
7 that Dr. Newlon or Dr. Stiroh may have asked
8 you?
9    MR. TUCKER:  Same objection.
10    A.   I do not.
11    MS. SMALLS:  I would like to break
12 and just see where we are and see what
13 we have remaining.
14    THE VIDEOGRAPHER:  We are off the
15 record.  The time is 5:53.
16    (Recess.)
17    THE VIDEOGRAPHER:  We are now on
18 the record.  The time is 6:05 p.m.
19    (Gertz Exhibit 15, document bearing
20 Bates Stamp Nos. Cultural Care 8841,
21 marked for identification.)
22    Q.   So will give you a minute to review
23 this document and let me know when you are
24 ready.
25    A.   Okay.

Page 244

W. Gertz

1
2    MS. SMALLS:  For people on the
3 phone, it's Cultural Care 8841.
4    A.   Okay.
5    Q.   Can you tell me what this document
6 is?
7    A.   It's basically an email to a bunch
8 of people on it, Michael, regarding au pair
9 issues, specifically regarding some kind of
10 immigration bill, so this is regarding an
11 immigration bill talking about how we would
12 address possible legislation, that's what
13 this looks like.
14    Q.   I specifically want to focus on
15 your email.
16    A.   Okay.
17    Q.   And can you tell me who your email
18 is to and who those individuals work for?
19    A.   It's to Michael McCarry at
20 Alliance, Natalie Jordan of Cultural Care,
21 Goran Rannefors of Cultural Care, Ruth and
22 Mark Overmann at Alliance and Heidi Woehl,
23 I'm not sure what organization she is with,
24 but she is a sponsor -- she is with one of
25 the sponsor organizations.

Page 245

W. Gertz

1
2    Q.   And can you tell me what you are
3 responding to in your email to this group and
4 what content -- why don't we start from this,
5 why don't you read your email?
6    A.   There are some things I would like
7 to put on the table, but only as a last
8 resort.  They may be standard country
9 recruitment fees or maximums, $5,000, as in
10 case 3 is crazy and should not be tolerated,
11 better enforcement of 45-hour rule, including
12 monthly review of hours.  I hate this, but
13 more education than working -- that working
14 more than 45 hours is illegal for family and
15 au pair, no side deals, as in case 4, which
16 is a violation of rules, civil penalties,
17 families and agencies breaking the rules.
18 Again, speaking for myself, I would make this
19 deal, but only if the rest of the bill was
20 dropped, including all the foreign
21 contracting stuff.
22    Q.   So when you refer in this email to
23 the better enforcement of the 45-hour rule,
24 including the monthly review of hours and you
25 refer to education that working more than 45

MAGNA▸
LEGAL SERVICES

Page 246

1              W. Gertz
2   hours is illegal, is that responsive to
3   concerns that had been raised about the hours
4   that au pairs are working?
5        A.   Yeah, it could be some au pairs
6   working more than five hours in this case.
7        Q.   And how did you propose to conduct
8   a monthly review of hours, as you proposed it
9   here in this email?
10       A.   I did not proportion how to conduct
11  it.
12       Q.   How would it be conducted?
13       A.   I have no idea.
14       Q.   Would timesheets be one way of
15  reviewing hours on a monthly basis?
16       A.   Possibly, but again -- possibly is
17  the answer.
18       Q.   Is this a discussion with other au
19  pair sponsors regarding the 45-hour rule and
20  the enforcement of the 45-hour rule?
21       A.   This mentions the 45-hour rule, it
22  reiterates that it is illegal for families
23  and au pairs.
24       Q.   Is this a substantive discussion
25  regarding the 45-hour rule, as you frame it

Page 247

1              W. Gertz
2   in this email, with other sponsors?
3        MR. TUCKER:  Objection to form.
4        MR. O'KEEFE:  Objection to form,
5   Kevin O'Keefe from Cultural Care.
6        A.   My memory is bad.
7        Q.   Is this a substantive discussion
8   regarding the 45-hour rule with other
9   sponsors?
10       MR. TUCKER:  Object to form.
11       MR. O'KEEFE:  Same objection.
12       A.   I wouldn't say substantive.  It's a
13  comment that I made.  That's all it is.
14       Q.   Is this a discussion of the 45-hour
15  rule with other sponsors?
16       MR. O'KEEFE:  Kevin O'Keefe,
17  objection to form.
18       A.   It mentions the 45-hour rule, so in
19  that context, yes, it would be mentioning the
20  45-hour rule.
21       Q.   Do you in your email offer proposed
22  solutions to respond to concerns about the
23  45-hour rule?
24       A.   Better enforcement, that's what I'm
25  saying.

Page 248

1              W. Gertz
2        Q.   Better enforcement on what?
3        A.   The 45-hour rule.
4        Q.   So in this email, you are offering
5   solutions or options for better enforcement
6   with respect to the 45-hour rule, is that
7   correct?
8        MR. MACRI:  Objection as to form.
9        A.   Yeah, I'm offering a better
10  enforcement, including monthly review of
11  hours, exactly what it says.
12       Q.   This email includes other sponsors,
13  is that correct?
14       A.   That's correct.
15       Q.   Who is your current marketing
16  director?
17       A.   Kim Fleming.
18       Q.   How long has she been in that role?
19       A.   Ten years-ish, but I would say she
20  has been in marketing for 10 years, not the
21  director for 10 years.
22       MS. SMALLS:  All right.  I'm going
23  to recess this deposition --
24       MR. MACRI:  We are holding over
25  just on that issue.

Page 249

1              W. Gertz
2        MS. SMALLS:  We are holding over
3   just on that issue.  We need to check
4   whether anybody has any rebuttal or
5   questions they want to ask.
6        MR. MACRI:  I do not.
7        MS. SMALLS:  Does anyone on the
8   phone?
9        I think we can go off the record.
10       THE VIDEOGRAPHER:  We are now off
11  the record.  The time is 6:16 p.m.  This
12  ends today's deposition.
13       (Time noted:  6:16 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25

MAGNA
LEGAL SERVICES

## Page 250

1
2                    - - -
3             I N D E X
4                    - - -
5
6   WILLIAM L. GERTZ                    PAGE
7     By Ms. Smalls            5
8
9             - - -
10        E X H I B I T S
11            - - -
12  GERTZ EXHIBIT              PAGE
13  Exhibit 1 Document            8
14  Exhibit 2 AIFS, Inc. company brochure  14
15  Exhibit 3 Document           14
16  Exhibit 4 William L. Gertz' LinkedIn   48
17     page
18  Exhibit 5 2011 business plan       69
19  Exhibit 6 Revenues           90
20  Exhibit 7 Minutes of executive      126
21     committee meeting of the
22     American Institute For Foreign
23     Study Stamford office
24  Exhibit 8 Document          144
25  Exhibit 9 Document          189

## Page 251

1
2                    - - -
3        E X H I B I T S
4                    - - -
5   GERTZ EXHIBIT              PAGE
6   Exhibit 10 Document         208
7   Exhibit 11 Document         209
8   Exhibit 12 Emails           213
9   Exhibit 13 Document from the State   220
10     Department to Ruth Ferry
11  Exhibit 14 Email chain        239
12  Exhibit 15 Document bearing Bates    243
13     Stamp Nos. Cultural Care 8841
14
15
16
17
18
19
20
21
22
23
24
25

## Page 252

```
1
2                    - - -
3        DEPOSITION SUPPORT INDEX
4                    - - -
5   Direction to Witness Not to Answer
    Page Line    Page Line Page    Line
6   None
                 - - -
7
    Request for Production of Documents
8   Page Line    Page Line Page    Line
    None
9
                 - - -
10
    Stipulations
11  Page Line    Page Line Page    Line
    None
12               - - -
13  Questions Marked
    Page Line    Page Line Page    Line
14  None
                 - - -
15
    To Be Filled In
16  Page Line    Page Line Page    Line
    None
17               - - -
18
19
20
21
22
23
24
25
```

## Page 253

```
1
2             CERTIFICATE
3
        I HEREBY CERTIFY that the witness,
4   WILLIAM L. GERTZ, was duly sworn by me and
    that the deposition is a true record of the
5   testimony given by the witness.
6
    Leslie Eagin,
7   Registered Professional Reporter
    Dated: September 14, 2017
8
9
10
        (The foregoing certification of
11  this transcript does not apply to any
12  reproduction of the same by any means, unless
13  under the direct control and/or supervision
14  of the certifying reporter.)
15
16
17
18
19
20
21
22
23
24
25
```



```
                                               Page 254

1
2            ACKNOWLEDGMENT OF DEPONENT
3
          I,              , do hereby
4    certify that I have read the foregoing pages,
     and that the same is a correct transcription
5    of the answers given by me to the questions
     therein propounded, except for the
6    corrections or changes in form or substance,
     if any, noted in the attached Errata Sheet.

7
8
9    WILLIAM L. GERTZ            DATE
10
11   Subscribed and sworn
     to before me this
12        day of            , 2017.
13   My commission expires:
14
     Notary Public
15
16
17
18
19
20
21
22
23
24
25
```

```
                                               Page 255

1
2          - - - - - -
            E R R A T A
3          - - - - - -
     PAGE  LINE  CHANGE
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



65 (Pages 254 to 255)