IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Magistrate Judge Kathleen M. Tafoya**

Civil Action No. 14–cv–03074–CMA–KMT

JOHANA PAOLA BELTRAN,
LUSAPHO HLATSHANENI,
BEAUDETTE DEETLEFS,
DAYANNA PAOLA CARDENAS CAICEDO,
ALEXANDRA IVETTE GONZALEZ,
SARAH CAROLINA AZUELA RASCON,
LAURA MEJIA JIMENEZ,
JULIANE HARNING,
NICOLE MAPLEDORAM, and those similarly situated,

    Plaintiffs,

v.

INTEREXCHANGE, INC,
USAUPAIR, INC.,
GREAT AUPAIR, LLC,
EXPERT GROUP INTERNATIONAL INC., d/b/a Expert AuPair,
EURAUPAIR INTERCULTURAL CHILD CARE PROGRAMS,
CULTURAL HOMSTAY INTERNATIONAL,
CULTURAL CARE, INC. d/b/a Cultural Care Au Pair,
AUPAIRCARE INC.,
AU PAIR INTERNATIONAL, INC.,
APF GLOBAL EXCHANGE, NFP, d/b/a AuPair Foundation,
AMERICAN INSTITUTE FOR FOREIGN STUDY d/b/a Au Pair in America,
AMERICAN CULTURAL EXCHANGE, LLC, d/b/a GoAuPair,
GOAUPAIR OPERATIONS, LLC, d/b/a GoAuPair,
AGENT AU PAIR,
A.P.EX. AMERICAN PROFESSIONAL EXCHANGE, LLC d/b/a/ ProAuPair, and
20/20 CARE EXCHANGE, INC. d/b/a The International Au Pair Exchange,

    Defendants.

**ORDER**

This matter is before the court on "Defendants' Motion to Exclude Expert Testimony of William Kerr Pursuant to F.R.E. 702" [Doc. No. 606]. *"Plaintiffs' Opposition to Defendants' Daubert Motion as to Class Certification Opinions"* [Doc. No. 650] was filed on August 8, 2017 and Defendants' Reply in Support of Defendants' Motion to Exclude Expert Testimony of William Kerr Pursuant to F.R.E. 702 (ECF No. 606)" [Doc. No. 666] was filed on August 21, 2017. A hearing was conducted on January 9, 2018.

A detailed and lengthy motion for Fed. R. Civ. P. 23 class certification has been filed by the Plaintiffs.[1] [Doc. No. 562/559.] Defendants vigorously oppose such certification. The class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Califano v. Yamasaki,* 442 U.S. 682, 700–701 (1979). To come within the exception, a party seeking to maintain a class action "must affirmatively demonstrate his compliance" with Rule 23. *Wal–Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 350 (2011). The Rule "does not set forth a mere pleading standard." *Id.* Rather, a party must not only be prepared to prove that there are, in fact, sufficiently numerous parties, common questions of law or fact, typicality of claims or defenses, and adequacy of representation, as required by Rule 23(a), but also satisfy through evidentiary proof at least one of the provisions of Rule 23(b). Rule 23(b)(3) requires a court to find that "the questions of law or fact common to class members predominate over any questions affecting only individual members." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). As stated by the dissent in *Comcast,* "it remains the 'black letter rule' that a class may obtain certification under Rule 23(b)(3) when liability questions common to the class predominate over damages questions unique to class members." *Id.* at 42–43.

---

[1] Preliminary certification of an FLSA collective action was entered on June 9, 2017. [Doc. No. 569.]

In attempting to meet the burden to show treatment as a class action is justified in this case, the plaintiffs presented two expert reports from William O. Kerr. (See "Expert Report of William O. Kerr" ("Kerr Rpt.") [Doc. No. 560-65] and "Rebuttal Expert Report of William O. Kerr" ("Kerr Rebut. Rpt.") [Doc. No. 560-66].) As it relates to Dr. Kerr's reports and expert testimony, the District Court will be required to consider the common impact on the members of the proposed class from the complained-of activities. The activity is allegedly conspiring to fix the stipend paid to au pairs at an artificially and illegally low $195.75 per week. Dr. Kerr, an economist, presents two models which address the harm (or damages) to the au pair class(es) caused by Defendants' alleged anti-competitive behavior. Both models utilize the so-called "but-for" comparative analysis, meaning that the expert looks to the economic circumstances that would likely have transpired absent the wrongdoing by Defendants.

Dr. Kerr concludes that "but-for the actions of the defendants, standard au pairs would have been paid *at least* the legally required amount of weekly stipend."[2] (Kerr Rebut. Rpt. at 11, ¶ 20, emphasis added.) Given this conclusion, Dr. Kerr presents the court with a model for calculation of damages for the proposed classes at the floor – to wit: *at least* the legally required amount of stipend pursuant to federal and state minimum wage laws – and another model applicable to the competitive ceiling – to wit: comparing the au pair class in this case against benchmark groups of workers operating in the free market of the United States, which includes within it, the market's legislative restrictions such as minimum wage laws.

---

[2] What dollar figure actually represents the "legally required amount" is also in dispute. *See* Second Amended Complaint [Doc. No. 395], Count VIII, violations of the Fair Labor Standards Act.

Defendants assert Dr. Kerr's opinions should be disallowed because he lacks any workable methodology for calculating damages on a class-wide basis. As a preliminary challenge, Defendants claim that a survey Dr. Kerr relied upon in determining that all the au pair classes nearly uniformly received $195.75 per week as a stipend did not comply with professional standards that govern survey research. Second, Defendants claim Dr. Kerr's "Wage and Hour Law Compliance Model" for computing damages for the classes is a mere restatement of Plaintiffs' legal position concerning labor law violations and is therefore inapplicable to an antitrust class. Third, Defendants claim Dr. Kerr's "Price Competition Model" lacks a reliable basis for calculating damages because the benchmark comparative groups chosen by Dr. Kerr are flawed and the Price Competition Model does not live up to the standards set by *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) for the admissibility of expert opinion testimony. Defendants therefore urge that Dr. Kerr's reports and testimony should be stricken and not considered for any purpose in the court's determination regarding Rule 23 class certification.

### A. Dr. Kerr's Survey Results

Commonality requires the plaintiffs to demonstrate that the class members have suffered the same injury. *Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 157 (1982). This does not mean merely that they have all suffered a violation of the same provision of law. *Dukes*, 564 U.S. at 349–50. In considering the applicability of class treatment, the District Court's analysis will likely entail "overlap with the merits of the plaintiff[s'] underlying claim[s]." *Id*. That is so because the "'class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'" *Falcon*, 457 U.S. at 160

(internal quotations omitted); *Comcast,* 569 U.S. at 33-34.  Dr. Kerr opines that the proposed classes suffered common harm from the complained-of actions of Defendant because the au pairs "were paid for employment at amounts below what they would have been paid had Defendants' complied with the law[.]"  (Kerr Rebut. Rpt. at p. 5, ¶ 4.)

Obviously, the amount of money the putative class members were paid is the first step in any analysis which seeks to prove that the payment was insufficient.  To determine that amount, Dr. Kerr reviewed the extensive evidence of Defendants' business practices, which show that every one of the defendants consistently represented the stipend as "fixed," "set," or that it simply "is" $195.75.  (Kerr Rep. at 16.)  The evidence relied upon by Dr. Kerr included: contemporaneous business records of the actual stipend amount, including statements Defendants made about the stipend in their marketing materials, policies and guidelines (Kerr. Rebut. Rpt. at ¶ 14); Defendants' standard form contracts, which attempt to legally bind the *au pairs* to the represented stipend (*id.* at 17-18, 20); Defendants' own ordinary-course surveys, showing that host families uniformly adhere to Defendants' fixed wages (*id.* at 22); and the parties' depositions, which also support the proposition that au pairs were paid a fixed wage (*id.* at 17, 19-22).  (*See also* Kerr Rep. ¶¶ 39-55 & Exs. 7-10.)

Dr. Kerr also gathered information to support his findings from sponsor announcements to au pair candidates and potential host families, sponsor organization marketing material directed toward host families, a declaration from a host parent, deposition testimony of a foreign au pair agency director who worked with U.S. sponsors to place au pairs, monthly contact reports administered by certain sponsors and audit reports submitted to the Department of State.  (Kerr Rebut. Rpt. at 7-8.)  In paragraph 18, *id.*, Kerr lists at least five other sources evidencing that au

5

pairs were paid $195.75 per week by host families at the direction of all the sponsor organizations. All those sources—direct and indirect, contemporaneous and retrospective—show the same thing. Au pairs' wages were consistently fixed at or very near $195.75 per week. *Id.*; *see also* Rule 23 Mot. at 33 n.43 (Rodr. Decl. Ex. 30); Kerr Rep. ¶ 51. Into this broad mix of evidentiary sources comes the survey about which Defendants complain.

Dr. Kerr's survey was provided to every host family for which Defendants provided an email. There was "no sampling involved at all." (Resp. at 10.) A total of 8,806 families responded, of which 4,583 both (1) concerned an au pair within one of the alleged classes and (2) contained a specific response to the question "what was the typical weekly stipend amount paid?" (*Id.*) The only other question on the survey was the year the au pair worked and the type of au pair the host family employed. While the numbers of responses were in the thousands, as a percentage of the whole, the number of responding host families represented only an 18% response rate from the total number of surveys sent out. (Mot. at 13.)

If the survey were the only evidence supporting the base finding that au pairs were paid $195.75 per week, such a low response rate would have to be carefully considered, even though it reached a very broad spectrum of host families in the au pair group.[3] But such is not the case here. The survey in question was merely some confirmation of all the other voluminous evidence supporting the conclusion that putative class member au pairs were almost uniformly paid $195.75 per week as a stipend by the host families.

The court finds that even if the survey and its results were discounted entirely, Dr. Kerr's conclusion that "all, or a substantial majority of, au pairs were offered and paid a weekly stipend

---

[3] The responses covered every Defendant and almost every state, spanning a period of 10 years. (Resp. at 10.)

of approximately $195.75" (Kerr Rpt. ¶ 39) is amply supported by the other overwhelming evidence he considered. For class certification purposes, Dr. Kerr's expert opinion that the record demonstrates commonality with regard to the weekly stipend amount is based on sufficient facts, data and testimony to render it reliable. *See* Fed. R. Evid. 702.

### B.  *Wage and Hour Law Compliance Model*

The general principles governing antitrust damages are settled. A plaintiff must prove there is a causal connection between an antitrust violation and an injury sufficient to establish the violation as a substantial factor in the occurrence of damage. *Sharp v. United Airlines, Inc.*, 967 F.2d 404, 407 (10th Cir. 1992). In other words, there must be some element of actual damages caused by the defendant's violation of the antitrust laws. *Eleven Line, Inc. v. N. Texas State Soccer Ass'n, Inc.*, 213 F.3d 198, 206 (5th Cir. 2000). If some damages attributable to the antitrust activities are shown, a more relaxed burden of proof applies for the amount of damages than would justify an award in other civil cases. *Id*.

Relying upon the Supreme Court reasoning in *Comcast Corp. v. Behrend*, Defendants argue that when a plaintiff asserts an antitrust injury, presenting a damages model pertinent to a wage law claim is not adequate to support commonality of damages in an antitrust class certification. Defendants broadly advance the holding of *Comcast* as "Plaintiff cannot utilize a damages theory for one claim (i.e. labor) to obtain certification for another (i.e. antitrust)." Reply at 3. This court disagrees with Defendants' reading of *Comcast*.

In *Comcast*, the Respondents[4] claimed that they, and other Comcast subscribers in the Philadelphia area, were harmed by Comcast's behavior of 'clustering' which they claimed

---

[4] Respondents were the named plaintiffs in the underlying class-action antitrust suit.

resulted in four different kinds of antitrust injury which lessened area competition and led to supra-competitive prices. The Respondents' theories of antitrust injury were that: (1) Comcast's clustering made it profitable for Comcast to withhold local sports programming from its competitors, resulting in decreased market penetration by direct broadcast satellite providers; (2) Comcast's clustering reduced the level of competition from "overbuilders," companies that build competing cable networks in areas where an incumbent cable company already operates; (3) Comcast's clustering reduced the level of "benchmark" competition on which cable customers could rely to compare prices, and; (4) Comcast's clustering increased its bargaining power relative to other content providers. Each of these forms of impact, Respondents alleged, increased Comcast's cable subscription rates throughout the Philadelphia area. *Comcast*, 569 U.S. at 31. The District Court accepted only one of Respondent's theories of antitrust injury − that Comcast's clustering intentionally lessened competition from "overbuilders." *Id.* Accordingly, in its certification order, the District Court limited Respondents' "proof of antitrust impact" to "the theory that Comcast engaged in anticompetitive clustering conduct, the effect of which was to deter the entry of overbuilders in the Philadelphia DMA." *Id.* Given that ruling, if the Respondents were to prevail on their claim, the Supreme Court held they would be entitled only to damages resulting from reduced overbuilder competition, since that is the only theory of antitrust impact accepted for class-action treatment by the District Court, stating,

> It follows that a model purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory. If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3).

*Id.* at 35. Simply put, the Supreme Court held

> at the class-certification stage (as at trial), any model supporting a "plaintiff's damages case must be consistent with its liability case, particularly with respect to the alleged anticompetitive effect of the violation."

*Id*. (quoting ABA Section of Antitrust Law, Proving Antitrust Damages: Legal and Economic Issues 57, 62 (2d ed. 2010).

Unfortunately for Respondents in *Comcast*, their expert put forth a model for damages which considered all four liability injury theories together, without a provision for calculating injury arising just from the overbuilders behavior. In fact, at a hearing before the lower court, Respondents' expert admitted that his model calculated damages resulting from "the alleged anticompetitive conduct as a whole" and did not attribute damages to any one particular theory of anticompetitive impact. *Id*. at 36-37. The court found it improper to consider a methodology in support of commonality that identifies damages that are not the result of the specific antitrust damage alleged. *Id*. at 37-38.

In this case, there is one theory of antitrust misconduct – that Defendants conspired to fix the weekly stipend payable to au pairs by their host family at $195.75. So far this is similar to *Comcast*. There, the antitrust misconduct was alleged to be 'clustering.' In *Comcast*, the Respondents identified four distinct types of antitrust injury arising from the misconduct. Here, Plaintiffs identify two types of antitrust injury, the failure to pay au pairs at least a minimum wage as prescribed by law and the failure to pay au pairs comparable to other groups of childcare workers in the United States. In *Comcast*, there was one model of damages which the court held impermissibly conflated all four injury theories and which was, thus, not supportive of the commonality prong pertaining to class-wide injury. In this case, Dr. Kerr presents two models of damages corresponding to the two theories of antitrust injury. Both models, together and

separately, apply to the class as a whole. If the case ultimately moves forward on both injury theories, the models work together to show both the floor of damages accounting for minimum wage laws and also the ceiling supported by a competitive model. If one of the theories of antitrust injury were to not go forward, the expert has presented separate models each aimed at the specific antitrust injury alleged. Each model would separately address the but-for calculation showing wages au pairs should have expected to receive absent a conspiracy to fix the amount of stipend paid to au pairs. The existence of the two separate damages models successfully remedies the problem the Supreme Court discussed in *Comcast*.

The court finds that *Comcast* does not bar a model of damage calculation based on au pairs' entitlement to at least the federal, state and local minimum wage laws, simply because a similar method would be used to calculate damages for the labor law claims involving the same classes of au pairs also brought in the case. The antitrust laws' underlying policy is to assure that anticompetitive conduct does not go unpunished for mere uncertainty in the amount of loss inflicted. *Eleven Line, Inc.,* 213 F.3d at 209. This is precisely the reason behind inclusion of the Wage Loss Model of damages proposed by Dr. Kerr. His models provide that in no event, should the Plaintiffs prevail on their wage loss and antitrust claims, should the stipend payable to au pairs have been less that that prescribed by the federal, state and local minimum wage laws. In the antitrust context, the damages are based on a but-for scenario, to wit: but for the defendants' antitrust conduct, i.e. the conspiracy to fix the weekly stipend payable to all au pairs at $195.75, the au pairs' weekly pay rate would have been at least the minimum wage set by federal, state and/or local authorities.

This court finds the Wage and Hour Compliance model set forth by Dr. Kerr is appropriate under the holding of *Comcast* and supports one theory of antitrust injury derived from Defendants' alleged antitrust behavior.

C.  *Scientific Methodology – Reliability and Fit*

The proponent of an expert's opinion testimony on the issue of class certification as well as other litigation issues bears the burden of establishing that the expert is qualified, that the methodology he or she uses to support his or her opinions is reliable, and that his or her opinion fits the facts of the case and thus will be helpful to the tribunal.  *Norris v. Baxter Healthcare Corp.,* 397 F.3d 878, 881 (10th Cir. 2005).  *See Ralston v. Smith & Nephew Richards, Inc.,* 275 F.3d 965, 970 n.4 (10th Cir. 2001); *Mitchell v. Gencorp Inc.,* 165 F.3d 778, 781–82 (10th Cir. 1999); *Cook v. Rockwell Int'l Corp.*, 580 F. Supp. 2d 1071, 1083 (D. Colo. 2006) (the proponent of an expert witness must demonstrate the expert's proffered testimony meets Rule 702's requirements—relevance/fit, qualifications, and reliability—before the expert's testimony will be admitted.)  The qualification standard is expressed in the Rule itself and is not, alone, the thrust of Defendants' motion.[5]  Rule 702 allows expert testimony if the witness is "qualified as an expert by knowledge, skill, experience, training, or education."  Fed. R. Evid. 702.

In addition to the expert's qualifications, however, expert testimony must be based on a reliable methodology to be admissible.  *See, e.g., Bitler v. A.O. Smith Corp.,* 400 F.3d 1227, 1232 (10th Cir. 2005).  The "reliability" prong requires that "the expert's opinion must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported

---

[5] Defendants have not attacked Dr. Kerr's credentials other than his qualification to design and administer a survey.  (*See* Section A herein.)  Given the court's findings concerning the survey's impact, it is unnecessary to address Dr. Kerr's expertise in survey drafting.

11

speculation'; the expert must have 'good grounds' for his or her belief." *Magdaleno v. Burlington N. R. Co.*, 5 F. Supp. 2d 899, 902 (D. Colo. 1998) (quoting *Daubert*, 509 U.S. at 592-93.) An assessment of "the reliability of scientific evidence under Rule 702 requires a determination as to its scientific validity." *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 742 (3d Cir. 1994) Where the expert's "factual basis, data, principles, methods, or their application are called sufficiently into question, . . . the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999) (internal quotations omitted).

Reliability does not mean, however, that the offering party must prove "that the expert is indisputably correct" for the expert evidence to be admissible. *Cook*, 580 F. Supp. 2d at 1085 (internal quotations omitted). Rather, the party need only prove that "the method employed by the expert in reaching the conclusion is scientifically sound and that the opinion is based on facts which sufficiently satisfy Rule 702's reliability requirements." *Id*. (internal quotations omitted). "The evidentiary requirement of reliability is lower than the merits standard of correctness." *In re Paoli,* 35 F.3d at 744 (quoted with approval in Fed. R. Evid. 702, 2000 advisory committee's note), and gaps or inconsistencies in an expert's reasoning may go to the weight of the expert evidence, not its admissibility. *Cook,* 580 F. Supp. 2d at 1085. *See, e.g., Campbell v. Metro. Prop. & Cas. Ins. Co.,* 239 F.3d 179, 186 (2d Cir.2001). As the Supreme Court acknowledged in *Daubert,* expert evidence can be "shaky" and yet still admissible, and may be attacked through the traditional means of "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof . . . ." *Daubert,* 509 U.S. at 596. Maintaining this distinction between the evidentiary requirement of reliability and the higher standard of whether

the expert's conclusions are correct or sufficient to prove the merits "is indeed significant as it preserves the fact finding role of the jury." *In re TMI Litig.,* 193 F.3d 613, 665 n.90 (3d Cir. 1999); *Cook, id.* A key component of the analysis here is that the expert testimony is offered to assist the court, not the jury, in making a decision concerning certification of a Rule 23 class.

If the two prongs of reliability and qualification are satisfied, the court must then decide whether the expert testimony "fits." "The Supreme Court has described the consideration of relevant evidence as one of 'fit.'" *Bitler,* 400 F.3d at 1234 (quoting *Daubert,* 509 U.S. at 591). In other words, the court must also look to relevance. "It is the specific relationship between an expert's method, the proffered conclusions, and the particular factual circumstances of the dispute that renders testimony both reliable and relevant." *Basanti v. Metcalf*, 35 F. Supp. 3d 1337, 1342 (D. Colo. 2014), *aff'd sub nom. Basanti v. United States*, 666 F. App'x 730 (10th Cir. 2016). Even if an expert's proffered evidence is scientifically valid and follows appropriately reliable methodologies, it might not have sufficient bearing on the issue at hand to warrant a determination that it has relevant fit.

The two most common methods of quantifying antitrust damages are the "before and after" and "yardstick" measures of lost profits. *See Lehrman v. Gulf Oil Corp.,* 500 F.2d 659, 668 (5th Cir. 1974). In the business profits context, the before and after theory compares the plaintiff's profit record prior to the violation with that subsequent to it. The yardstick test consists of a study of the profits of entities or businesses that are closely comparable to the plaintiff's and who have not engaged in the complained of antitrust behavior. Although allowances can be made for differences between the business to which the subject is compared, the business used as a standard must be as nearly identical to the plaintiff's as possible. *Lehrman*

at 667. In terms of considering an expert's opinion, "Rule 702 and *Daubert* do not require an expert to use the best method available, they only require that the evidence be relevant and reliable." *Bullock v. Daimler Trucks N. Am., LLC*, No. 08-CV-00491-PAB-MEH, 2010 WL 3922084, at *4 (D. Colo. Sept. 30, 2010) (internal quotations omitted).

Dr. Kerr's Price Competition Model of antitrust damages is of the yardstick variety and examines whether an au pair would have been paid <u>more</u> than the stipend they were actually paid under Defendants' regime (including whether an au pair would be paid more than the minimum wage) under competitive conditions. (Kerr Rep. at ¶ 88.) This requires more inputs than the Wage Compliance Model because two primary drivers of competitive wages are the local cost of living in the area of the country where the au pair is employed, over a period of time, and the relevant level of competition – the labor supply and demand across geographies. (Kerr. Rep. at ¶¶ 73, 97, 103.) The other key axis for labor markets according to Dr. Kerr is the qualification and quality of workers in a given field and in a given location. (*Id.* at ¶¶ 70, 101.) A yardstick comparison model therefore needs to predict the direction and degree of variation over time and across geographies. It also needs to estimate the amount of a premium, if any, that buyers of labor put on experience and qualifications. The process is known as "calibrating" the model, and the first step is finding market-priced benchmarks. (Resp. at 7.)

The benchmarks proposed by Dr. Kerr are "childcare workers" as defined by the U.S. Bureau of Labor Statistics ("BLS") (Kerr Rpt. At ¶ 71) and "nannies" as described by the International Nanny Association ("INA") surveys. (Kerr Rpt. At ¶ 74.) The BLS explains that "Childcare Workers" (Standard Occupational Classification 39-9011) tend "children at schools, businesses, private households, and childcare institutions" and perform "a variety of tasks, such

14

as dressing, feeding, bathing, and overseeing play." Bureau of Labor Statistics, Standard Occupational Classification 39-9011, *available at* https://www.bls.gov/soc/2010/soc399011.htm. The defendants object to this group as a benchmark for its au pairs because they claim that although the BLS definition encompasses *some* workers in private households, Dr. Kerr does not account for what proportion of the workers underlying the index work in private households - or whether childcare workers in the other settings earned more or less than those in private households.

The INA conducts surveys to estimate prevailing wages in various locales. Dr. Kerr obtained survey results for 2009, 2011, 2012, 2013, and 2014. (Kerr Rep. ¶ 75.) The data available as of the date of the class certification report already demonstrated that variables such as experience levels could be estimated using the INA data. (*Id.* at ¶¶ 78-84.) The defendants object to the use of the INA surveys as benchmarks because Kerr did not account for the specialty types of nannies included in the survey, such as household managers, newborn care specialists, or specialty nurses, did not analyze the differences in education levels and college degrees, and did not analyze whether living with the family affects compensation. (Mot. at 6-7.) Further, Defendants argue Dr. Kerr did not undertake any analysis to determine whether nanny wages and au pair stipends had a predictable economic relationship during periods in which Plaintiffs do not allege a conspiracy. (Mot. at 7.)

While there are differences between any group of workers, in order to be a benchmark the group has to be similar but cannot be the same. A full analysis and proper calibration could account for variables in the groups. Dr. Kerr's model explains the presence of explicit differentials and does not rely on national averages. *See In re Pharmacy Benefit Managers*

*Antitrust Litig.*, No. CV 03-4730, 2017 WL 275398, at *21 (E.D. Pa. Jan. 18, 2017), *reconsideration denied,* No. CV 03-4730, 2017 WL 1493029 (E.D. Pa. Apr. 26, 2017) (noting that numerous courts have rejected the use of average price differentials to show evidence of antitrust impact that is common to the class.) Dr. Kerr explains that the data and analysis he used in his report are preliminary and that "additional factual development would allow for the full specification of a mode." (Kerr Rpt. at ¶ 103.) Dr. Kerr states that to complete an estimate based on his Price Comparison Model he would look to obtain information of greater specificity on various demographic, geographic, and economic factors that might explain the observed differences in the earnings of the worker groups. Dr. Kerr acknowledges that a mere comparison of au pairs to nannies, for instance, without accounting for numerous other factors would be insufficient to attribute any difference in pay between the groups to the antitrust conduct allegedly engaged in by the defendants. This does not render the Model insufficient or unscientific at this stage, however. Instead, it is merely incomplete. Only if the defendants were able to show that the differentials could not be analyzed and accounted for would the Model itself be unfit.

If a model presented by an expert is workable, a District Court can only deny class certification on the basis of this portion of the test "if it conclude[s] that no reasonable juror could have believed" the model and its output. *Tyson Food v. Bouaphakeos,* ___ U.S. ___, 136 S. Ct. 1036, 1049 (2016). *Daubert* must be carefully applied and "tailored" to the importance of the expert opinion to the class certification decision. *In re Zurn Pex Plumbing Prod. Liab. Litig.*, 644 F.3d 604, 612 (8th Cir. 2011). The district court's "gatekeeping function" under *Daubert* ensures that expert evidence "submitted *to the jury*" is sufficiently relevant and reliable, *Bonner*

16

*v. ISP Technologies, Inc.,* 259 F.3d 924, 929 (8th Cir.2001) (emphasis added), but "[t]here is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself." *United States v. Brown,* 415 F.3d 1257, 1269 (11th Cir. 2005). A full and stringent application of *Daubert* to this preliminary finding process can be both prejudicial or impractical where (as in this case), the class certification and expert phases take place before the close of discovery and therefore before the parties have the chance to fully develop the facts. Class certification does not make final judgments or determinations, but looks forward to how the case is likely to unfold and whether it will be practical, superior, and manageable to litigate on a class basis. *Id.*

This court finds that, in this case, Dr. Kerr's Report and Rebuttal Report meet the criteria for consideration by the District Court at this stage of the class certification analysis and that striking them on an over-technical application of *Daubert* is inappropriate at this time. *See also In re Urethane Antitrust Litig.*, 251 F.R.D. 629, 637 (D. Kan. 2008) (refusing to "disregard" the plaintiffs' expert's opinion "[a]t this procedural juncture" because the court was "satisfied that [plaintiffs' expert's] opinions are grounded in a sufficiently accurate understanding" of the relevant industry), *aff'd*, 768 F.3d 1245, 1256 (10th Cir. 2014) (observing that the district court certified the class despite the fact that "the court did not even have [plaintiffs' expert's] models or any other sort of extrapolation evidence"); *Johnson v. Arizona Hosp. & Healthcare Ass'n*, No. CV07-1292-PHX-SRB, 2009 WL 5031334, at *10 (D. Ariz. July 14, 2009) ("While the benchmark model is not fully fleshed out in [the expert's] report, the Court is satisfied that it could be used to provide an estimate," which "the Court can revisit . . . if it becomes clear at a later point in the litigation that the benchmark method is flawed.").

Accordingly, it is

**ORDERED** that "Defendants' Motion to Exclude Expert Testimony of William Kerr Pursuant to F.R.E. 702" [Doc. No. 606] is **DENIED**.

Dated January 24, 2018.

BY THE COURT:

Kathleen M. Tafoya
United States Magistrate Judge