IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1: 14-cv-03074-CMA-KMT

JOHANA PAOLA BELTRAN; et al.

    Plaintiffs,

v.

INTEREXCHANGE, INC.; et al.

    Defendants.

---

**CERTAIN DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................................. iii

I.   DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON
PLAINTIFFS' ANTITRUST CLAIM ........................................................................ 2

    A.   Burden of Proof and Elements ................................................................ 4

    B.   Plaintiffs Cannot Prove That There Was an Agreement......................... 5

        1.   Applicable Law ................................................................................ 5

        2.   Plaintiffs Cannot Show That There Is a Genuine Issue of
Material Fact Regarding Whether There Was an Agreement. ........ 6

    C.   Plaintiffs Cannot Prove Antitrust Injury. ................................................ 20

II.   DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON
PLAINTIFFS' RICO CLAIM................................................................................. 22

    A.   Burden of Proof and Elements .............................................................. 22

    B.   Plaintiffs Cannot Prove an Actionable Enterprise................................. 23

    C.   Plaintiffs Cannot Prove Predicate Racketeering Activity. ..................... 24

III.   FEDERAL PREEMPTION ENTITLES DEFENDANTS TO SUMMARY
JUDGMENT ON PLAINTIFFS' STATE WAGE-AND-HOUR CLAIMS ................ 25

    A.   Burden of Proof and Elements .............................................................. 25

    B.   Field Preemption Bars the Application of State Wage-and-Hour
Laws to Au Pairs. .................................................................................. 25

        1.   Applicable Law .............................................................................. 25

        2.   The Undisputed Facts Establish That the Federal
Government Intended for the Statutes and Regulations
Governing the Au Pair Program to Preempt State and Local
Regulation. .................................................................................... 26

    C.   Applying State Wage-and-Hour Laws to Au Pairs Would Conflict
with the Federal Goals of the Au Pair Program. ................................... 32

IV.     DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON
        PLAINTIFFS' FEDERAL MINIMUM WAGE AND OVERTIME CLAIMS ............. 34

        A.     Plaintiffs Cannot Prove That Sponsors Are Their "Employers"
               Under the FLSA. .................................................................................. 35

               1.     Burden of Proof and Elements ....................................................... 35

               2.     Undisputed Facts Show That Sponsors Are Not Employers. ........ 36

        B.     Plaintiffs Cannot Prove That the Stipend Violates the FLSA. ............... 42

               1.     Burden of Proof and Elements ....................................................... 42

               2.     The Undisputed Facts Confirm That the Stipend Complied
                      with the FLSA. ................................................................................ 42

V.      DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON
        PLAINTIFFS' CLAIM UNDER THE FLSA FOR UNPAID TRAINING .................. 47

        A.     Burden of Proof and Elements ............................................................. 47

        B.     The Undisputed Facts Establish That the Training Occurred
               Before Au Pairs Became Employees of Their Host Families or
               Started Providing Childcare .................................................................. 49

CONCLUSION ........................................................................................................ 50

# TABLE OF AUTHORITIES

## Cases

*Abraham v. Intermountain Health Care, Inc.*,
    461 F.3d 1249 (10th Cir. 2006) ................................................................. 16

*AD/SAT, Div. of Skylight, Inc. v. Associated Press*,
    181 F.3d 216 (2d Cir. 1999) ....................................................................... 5

*Arizona v. United States*,
    567 U.S. 387 (2012) ...................................................................... 25, 26, 27

*ASSE Int'l, Inc. v. Kerry*,
    803 F.3d 1059 (9th Cir. 2015) .................................................................. 27

*Auer v. Robbins*,
    519 U.S. 452 (1997) ................................................................................. 31

*Baker v. Barnard Constr. Co.*,
    146 F.3d 1214 (10th Cir. 1998) ........................................................... 42, 47

*Bd. of Cty. Comm'rs v. Liberty Gp.*,
    965 F.2d 879 (10th Cir. 1992) .................................................................. 23

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ......................................................................... 3, 6, 16

*Bienkowski v. Northeastern Univ.*,
    285 F. 3d 138 (1st Cir. 2002) .............................................................. 48, 49

*Blomkest Fertilizer, Inc. v. Potash Corp. of Sask., Inc.*,
    203 F.3d 1028 (8th Cir. 2000) .................................................................. 18

*Boyle v. United States*,
    556 U.S. 938 (2009) ................................................................................. 23

*Boyle v. United Techs. Corp.*,
    487 U.S. 500 (1988) ................................................................................. 33

*Bristol v. Bd. of Cty. Comm'rs*,
    312 F.3d 1213 (10th Cir. 2002) ................................................................ 36

*Brock v. Carrion, Ltd.*,
    332 F. Supp. 2d 1320 (E.D. Cal. 2004) .................................................... 43

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477 (1977) ............................................................................. 5, 20

*Buckman Co. v. Plaintiffs' Legal Comm.*,
   531 U.S. 341 (2001) ................................................................................ 34

*Cal. Dental Ass'n v. FTC*,
   526 U.S. 756 (1999) .................................................................................. 4

*Caplinger v. Medtronic, Inc.*,
   784 F.3d 1335 (10th Cir. 2015) ................................................................ 25

*Champagne Metals v. Ken-Mac Metals, Inc.*,
   458 F.3d 1073 (10th Cir. 2006) ................................................................ 13

*Chavez v. City of Albuquerque*,
   630 F.3d 1300 (10th Cir. 2011) ................................................................ 46

*Choa v. Tradesmen Int'l, Inc.*,
   310 F. 3d 905 (6th Cir. 2002) ............................................................ 48, 49

*Christopher v. SmithKline Beecham Corp.*,
   567 U.S. 142 (2012) ................................................................................ 31

*City of Tuscaloosa v. Harcros Chems.*,
   158 F.3d 548 (11th Cir. 1998) ................................................................. 12

*Coldwell v. Ritecorp. Envt'l Prop. Solutions*,
   No. 16-cv-01998-NYW, 2017 WL 1737715 (D. Colo. May 4, 2017) .................... 36, 37

*Cosme Nieves v. Deshler*,
   786 F.2d 445 (1st Cir. 1986) ............................................................. 29, 30

*Crosby v. Nat'l Foreign Trade Council*,
   530 U.S. 363 (2000) ................................................................................ 32

*Democratic Union Organizing Comm., etc. v. NLRB*,
   603 F.2d 862 (D.C. Cir. 1978) ................................................................. 41

*Digital Ally, Inc. v. Util. Assocs.*,
   No. 14-2262-CM, 2017 WL 1197561 (D. Kan. March 30, 2017) .................................. 5

*Doron Precision Sys. v. FAAC, Inc.*,
   423 F. Supp. 2d 173 (S.D.N.Y. 2006) ...................................................... 20

*Eastern R. Presidents Conference v. Noerr Motor Freight, Inc.*,
   365 U.S. 127 (1961) ................................................................................ 13

*Elliott Indus v. BP Am. Prod. Co.*,
   407 F.3d 1091 (10th Cir. 2005) ................................................................ 20

*Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*,
   458 U.S. 141 (1982) ................................................................................ 25

*Freeman v. Total Sec. Mgmt. – Wisconsin, LLC,*
No. 12-cv-461-wmc, 2013 WL 4049542 (W.D. Wis. Aug. 9, 2013) ........................... 48

*Fuentes v. Compadres, Inc.,*
No. 17-cv-01180-CMA-MEH, 2017 WL 6335669 (D. Colo. Dec. 12, 2017) ......... 36, 37

*Garbade v. Great Divide Mining & Milling Corp.,*
831 F.2d 212 (10th Cir. 1987) ................................................................................. 24

*GF Gaming Corp. v. City of Black Hawk,*
405 F.3d 876 (10th Cir. 2005) ................................................................................. 13

*Godlewska v. HDA,*
916 F. Supp. 2d 246 (E.D.N.Y. 2013) ................................................................. 37, 40

*Hernandez v. Jrpac Inc.,*
14 Civ. 4176 (PAE), 2016 WL 3248493 (S.D.N.Y. June 9, 2016) ............................. 30

*Hines v. Davidowitz,*
312 U.S. 52 (1941) ............................................................................................ 26, 28

*In re Baby Food Antitrust Litig.,*
166 F.3d 112 (3d Cir. 1999) ..................................................................................... 12

*In re Chocolate Confectionary Antitrust Litig.,*
801 F.3d 383 (3d Cir. 2015) ............................................................................ 6, 16, 18

*In re Ins. Brokerage,*
618 F.3d 300 (3d Cir. 2010) ..................................................................................... 16

*In re Musical Instruments,*
798 F.3d 1186 (9th Cir. 2015) ................................................................................... 17

*In re Polyurethane Foam Antitrust Litig.,*
152 F. Supp. 3d 968 (N.D. Ohio 2015) ..................................................................... 12

*In re Text Messaging Antitrust Litig.,*
782 F.3d 867 (7th Cir. 2015) ................................................................................. 6, 12

*Integrity Staffing Solutions, Inc. v. Busk,*
136 S. Ct. 513 (2014) .............................................................................................. 42

*Ivanov v. Sunset Pools Mgmt.,*
567 F. Supp. 2d 189 (D.D.C. 2008) .......................................................................... 41

*Jacobson v. Comcast Corp.,*
740 F. Supp. 2d 683 (D. Md. 2010) .......................................................................... 37

*Johnson v. Serenity Transp., Inc.,*
No. 15-cv-2004-JSC, 2017 WL 1365112  (N.D. Cal. Apr. 14, 2017) .......................... 37

*King v. Burwell*,
　135 S. Ct. 2480 (2015) ........................................................................... 30

*Kleen Prods. LLC v. Int'l Paper*,
　No. 10 C 5711, 2017 WL 3310975 (N.D. Ill. Aug. 3, 2017) ............................. 7, 12, 18

*Kosakow v. New Rochelle Radiology Assocs., P.C.*,
　274 F.3d 706 (2d Cir. 2001) ................................................................ 48, 49

*Lantec, Inc. v. Novell, Inc.*,
　306 F.3d 1003 (10th Cir. 2002) ................................................................. 6

*Lanzetta v. Florio's Enters.*,
　No. 08 Civ. 6181 (DC), WL 3209521 (S.D.N.Y. July 27, 2011) ................................. 29

*Marlow v. New Food Guy, Inc.*,
　861 F. 3d 1157 (10th Cir. 2017) ................................................................ 46

*Martinez-Mendoza v. Champion Int'l Corp.*,
　340 F.3d 1200 (11th Cir. 2003) ................................................................ 35

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
　475 U.S. 574 (1986) ................................................................... 3, 6, 9, 14

*Mitchael v. Intracorp, Inc.*,
　179 F.3d 847 (10th Cir. 1999) ................................................................. 16

*Monsanto Co. v. Spray Rite Serv. Corp.*,
　465 U.S. 752 (1984) ....................................................................... 3, 5, 6

*Moreau v. Air France*,
　356 F.3d 942 (9th Cir. 2004) .................................................................. 37

*Nat'l Fed. of the Blind v. United Airlines*,
　813 F.3d 718 (9th Cir. 2016) .................................................................. 29

*Phila. Taxi Ass'n v. Uber Techs., Inc.*,
　218 F. Supp. 3d 389 (E.D. Pa. 2016) ........................................................... 20

*PLIVA Inc. v. Mensing*,
　564 U.S. 604 (2011) ........................................................................... 32

*R.J. Reynolds Tobacco Corp. v. Durham Cnty.*,
　479 U.S. 130 (1986) ........................................................................... 26

*Ramos-Barrientos v. Bland*,
　661 F.3d 587 (11th Cir. 2011) ................................................................. 43

*Resolution Tr. Corp. v. Stone*,
　998 F.2d 1534 (10th Cir. 1993) ................................................................ 22

*Rice v. Santa Fe Elevator Corp.*,
   331 U.S. 218 (1947) ............................................................................. 25, 26

*Russello v. United States*,
   464 U.S. 16 (1983) .................................................................................... 28

*Salinas v. Commercial Interiors, Inc.*,
   848 F.3d 125 (4th Cir. 2017) ..................................................................... 37

*Sanchez v. Simply Right, Inc.*,
   No. 15-cv-974-RM-MEH, 2017 WL 2222601 (D. Colo. May 22, 2017) ............... 37, 41

*Sandoz v. Amgen, Inc.*,
   137 S. Ct. 1664 (2017) .............................................................................. 29

*Sharp v. United Airlines, Inc.*,
   967 F.2d 404 (10th Cir. 1992).................................................................... 20

*Snyder v. Acord Corp.*,
   No. 14-cv-01736-JLK, 2016 WL 192270 (D. Colo. Jan. 15, 2016)............................ 24

*Soler v. G. & U., Inc.*,
   833 F.2d 1104 (2d. Cir. 1987).................................................................... 46

*Story Parchment Co. v. Patterson Parchment Paper Co.*,
   282 U.S. 555 (1931) ................................................................................... 5

*Systemcare v. Wang Labs. Corp.*,
   117 F.3d 1137 (10th Cir. 1997)................................................................... 5

*Thomas Jefferson Univ. v. Shalala*,
   512 U.S. 504 (1994) ................................................................................. 31

*Ulrich v. Alaska Airlines, Inc.*,
   2009 WL 364056 (W.D. Wash. Feb. 9, 2009)........................................... 47

*United Mine Workers v. Pennington*,
   381 U.S. 657 (1965) ................................................................................. 13

*United States v. Chavis*,
   461 F.3d 1201 (10th Cir. 2006)................................................................. 24

*United States v. Mullins*,
   613 F.3d 1273 (10th Cir. 2010).................................................................. 24

*United States v. Siemens Corp.*,
   621 F.2d 499 (2d Cir. 1980)....................................................................... 12

*Valspar Corp. v. E. I. du Pont de Nemours & Co.*,
   873 F.3d 185 (3d Cir. 2017)........................................................................ 6

*Valverde v. Xclusive Staffing, Inc.*,
   No. 16-cv-00671-RM-MJW, 2017 WL 3866769 (D. Colo. Sept. 5, 2017) ................. 22

*Walling v. Portland Terminal Co.*,
   330 U.S. 148 (1947) .......................................................................................... 47

*Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*,
   513 F. Supp. 1100 (E.D. Pa. 1981)..................................................................... 20

*Zhao v. Bebe Stores, Inc.*,
   247 F. Supp. 2d 1154 (C.D. Cal. 2003) .............................................................. 37

*Zheng v. Liberty Apparel Co.*,
   355 F.3d 61 (2d Cir. 2003).................................................................................. 37

## Rules

18 USC § 1351(a) ................................................................................................. 24
20 C.F.R. § 655.122 .............................................................................................. 45
22 C.F.R. § 62.1 (2015).................................................................................... 26, 33
22 C.F.R. § 62.13 .................................................................................................. 45
22 C.F.R. § 62.23 (2008)....................................................................................... 35
22 C.F.R. § 62.24 (2016)....................................................................................... 28
22 C.F.R. § 62.30 (2016)....................................................................................... 28
22 C.F.R. § 62.31 ............................................... 27, 28, 29, 38, 39, 40, 50
22 C.F.R. § 62.32 (2012)....................................................................................... 28
22 C.F.R. § 62.9 (2015)........................................................................................... 8
22 U.S.C. § 2460 (2002) ....................................................................................... 33
29 C.F.R. § 552.109 .............................................................................................. 46
29 U.S.C. § 203..................................................................................................... 46
29 U.S.C. § 203(m) ............................................................................................... 42
29 U.S.C. § 213(b)(21) (2014)............................................................................... 46

## Federal Regulations

59 Fed. Reg. 64296............................................................................................... 38
60 Fed. Reg. 8547........................................................................................... 39, 44
60 Fed. Reg. 8550................................................................................................. 44
60 Fed. Reg. 8551........................................................................................... 33, 46

## Other Authorities

A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts
   (West, 1st ed. 2012) ....................................................................................... 29
Dep't of Labor, Field Operations Handbook .................................................... 47
U.S. Constitution, Article VI ............................................................................... 25

The central purpose of the United States Au Pair Program (the "Program") is cultural exchange. The Program provides young, foreign nationals—many of whom would not otherwise have the means to study or travel abroad—with the opportunity to come to the United States on a time-limited visitor visa, live with a family, take classes, engage in cultural exchange activities, improve language skills, and, in return, assist families with limited childcare services. Each part of this Program–including eligibility and screening, training, monitoring, the amount of coursework an au pair must complete and the amount host families must pay toward it, and the amount and nature of childcare an au pair can provide for a host family–is regulated by the United States Department of State (the "State Department"). In addition, the State Department, by regulation, has adopted a formula to calculate the stipend that host families must pay au pairs. In official notices and website postings for more than a decade, the State Department has informed Sponsors, host families, and au pairs of the dollar amount of the stipend. The sponsor organizations, all but one of which are Defendants in this lawsuit, perform screening, training, monitoring, and reporting obligations, all outlined by the regulations. The Sponsors have, as part of their responsibilities, provided host families and au pairs with the same information regarding the stipend that was provided to Sponsors by the State Department.

Notwithstanding this framework, Plaintiffs have advanced novel theories–unsupported by fact or law–that Sponsors have somehow violated a host of federal and state laws by complying with and communicating the federal Program regulations. Plaintiffs' attempt to prevail with virtually no evidence on antitrust and RICO claims must

be rejected. Sponsors did not conspire, or collude, or defraud au pairs by communicating State Department guidance. Likewise, because Sponsors acted only to enforce regulatory requirements, Plaintiffs' attempt to expand joint employment liability to an unprecedented scope must be rejected as a matter of law. Finally, Plaintiffs' wage claims fail as a matter of law under both state and federal statutes because those statutes are inapplicable to the Program and, even if they were applicable, Plaintiffs have not carried their burden of proving that the stipend violates those laws. In sum, Plaintiffs have not met their burden on any of their claims, and Defendants are entitled to summary judgment on all counts of the Second Amended Complaint.[1]

## I.   DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' ANTITRUST CLAIM

Plaintiffs have not presented a legitimate antitrust claim in this case. Plaintiffs originally based their antitrust claim upon allegations of an illegal "cartel" that sets "uniform wages" for the industry. Second Am. Compl. ¶ 5, ECF No. 395 ("SAC"). Finding no evidence of this purported conspiracy—an unsurprising result because Sponsors do not pay and therefore cannot "fix" the stipend—Plaintiffs now accuse the Sponsors of conspiring to suppress the weekly stipend by agreeing to "tell" au pairs and host families that the weekly stipend must be "precisely $195.75." Pls.' Mot. for Rule 23 Cert. 5, ECF No. 565-254; *see also* SAC ¶¶ 1, 5.

Plaintiffs survived the motion to dismiss by arguing that they did not need to prove the existence of an unlawful conspiracy at the pleading stage, but only needed to

---

[1] Defendants' arguments on certain of these claims are addressed in this brief, and Defendants' arguments as to others are addressed (or addressed more fully) in their individual briefs, filed contemporaneously herewith.

plead enough facts "to raise a reasonable expectation that discovery will reveal evidence of [an] illegal agreement." Pls.' Opp. to Mot. to Dismiss 10, ECF No. 199 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). But they now face the much higher burden of proffering evidence tending "to exclude the possibility that the [Defendants] were acting independently." *Monsanto Co. v. Spray Rite Serv. Corp.*, 465 U.S. 752, 764 (1984). Plaintiffs cannot meet this burden. The challenged conduct is completely explained by each Sponsor's independent incentives, and Plaintiffs cannot exclude the innocent explanation for the conduct in favor of their conspiracy theory because discovery has revealed no direct evidence of a conspiracy, and any circumstantial evidence does not support an inference of conspiracy as a matter of law.

The so-called "direct evidence" of conspiracy in the Second Amended Complaint—statements by a private investigator hired by Plaintiffs' counsel—has been revealed as baseless. And after conducting broad ranging discovery Plaintiffs cannot point to a single document or witness statement directly evidencing the alleged conspiracy.

Plaintiffs must therefore resort to circumstantial evidence to show that conspiracy better explains the conduct than individual action. When seeking to prove a conspiracy based on parallel conduct rather than direct evidence, the Supreme Court has strictly limited "the range of permissible inferences" that can be drawn from "ambiguous evidence." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986). Conduct that is "as consistent" with unilateral action "as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Id.*

Here, Plaintiffs cannot meet that standard because their evidence—consisting almost exclusively of the fact that each Sponsor references the State Department's $195.75 stipend amount in advertising and promotional materials—is perfectly consistent with independent decision making by the Sponsors. Each Sponsor was (i) notified of the $195.75 stipend amount by the State Department on at least three separate occasions since 1997, and (ii) required by State Department regulations to communicate that amount to host families and au pairs to ensure that au pairs received a weekly stipend of at least that amount. Moreover, the undisputed economic evidence shows that each Sponsor had a unilateral economic incentive to set that stipend as low as possible, regardless of what other Sponsors did.

For these reasons, and because Plaintiffs cannot satisfy their burden of establishing antitrust injury or an unreasonable restraint of trade, Defendants' motion for summary judgment should be granted and the antitrust claims dismissed.

## A.    Burden of Proof and Elements

To prevail on their antitrust claim under Section One of the Sherman Act, Plaintiffs have the burden of proving (1) that Defendants consummated an agreement, 15 U.S.C. § 1, (2) that the agreement constituted an unreasonable restraint of trade,[2]

---

[2] Plaintiffs assert that the alleged conspiracy was both per se unreasonable and unreasonable under the rule of reason. SAC ¶¶ 570, 571. In fact, the rule of reason clearly applies here. The rule of reason is the default standard in Section One cases, and the Supreme Court has refused to apply the per se rule to agreements regarding advertising. *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 780–81 (1999). There is no judicial experience in Section One cases based upon the allegations here—that providers of matching platforms provided information on the price that one set of their customers (the host families) should pay to another set of their customers (the au pairs). Nor is there an obvious reason that such a conspiracy would make any sense, or would be

*Systemcare v. Wang Labs. Corp.*, 117 F.3d 1137, 1139 (10th Cir. 1997) (*en banc*), (3) which caused Plaintiffs to suffer an antitrust injury, *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977), (4) resulting in damages, *Story Parchment Co. v. Patterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931).

Further, to survive summary judgment, Plaintiffs "must first demonstrate the existence of an agreement" as to "*each* defendant." *AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 234 (2d Cir. 1999) (emphasis added).

In this motion, Defendants demonstrate that Plaintiffs cannot meet the conspiracy, "unreasonable" restraint of trade, and antitrust injury elements. Plaintiffs' failure to satisfy their burden with respect to any one of these elements requires entry of summary judgment for the Defendants.

### B.   Plaintiffs Cannot Prove That There Was an Agreement.

#### 1.   Applicable Law

Section One of the Sherman Act does not proscribe independent or unilateral action, so Plaintiffs must prove that Sponsors acted pursuant to an agreement. *Monsanto*, 465 U.S. at 764. More precisely, Plaintiffs must show that Defendants "had a conscious commitment to a common scheme designed to achieve an unlawful

---

anticompetitive in all cases.

Plaintiffs' expert has not attempted to define a relevant market or to make any meaningful attempt to balance the obvious procompetitive benefits of communicating the announced stipend to market participants against any alleged anticompetitive effects, all of which is required under a rule of reason analysis. *See id.* Indeed, the failure to define the relevant antitrust market at this stage is fatal to a rule of reason claim. *See, e.g.*, *Digital Ally, Inc. v. Util. Assocs.*, No. 14-2262-CM, 2017 WL 1197561, at *25 (D. Kan. March 30, 2017) (granting summary judgment where plaintiffs failed to provide sufficient evidence of a relevant market under the rule of reason).

objective." *Id.* at 764.

An antitrust plaintiff may seek to prove the existence of a conspiracy by means of direct evidence. *Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1028 (10th Cir. 2002). Where plaintiffs do not have direct evidence and must instead rely on circumstantial evidence, it is not sufficient merely to point to similar or "parallel" conduct by the alleged conspirators. *Twombly*, 550 U.S. at 556-57. Thus, Plaintiffs cannot satisfy their burden simply by pointing to "independent responses to common stimuli." *See id.* at 556 n.4. Rather, Plaintiffs must show that the circumstantial evidence "tends to exclude the possibility" that Defendants acted independently. *Matsushita*, 475 U.S. at 588.

Following this law, many courts have granted summary judgment where a plaintiff failed to come forward with evidence that "tends to exclude" the possibility that defendants acted unilaterally. *See, e.g.*, *Valspar Corp. v. E. I. du Pont de Nemours & Co.*, 873 F.3d 185, 198 (3d Cir. 2017); *In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 879 (7th Cir. 2015); *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 412 (3d Cir. 2015).

### 2. Plaintiffs Cannot Show That There Is a Genuine Issue of Material Fact Regarding Whether There Was an Agreement.

The conduct challenged in this case is a textbook example of a common response to common stimuli, which does not suggest the existence of a conspiracy. *See Twombly*, 550 U.S. at 556-57. It is completely explained by each Sponsor's unilateral reaction to individual incentives, without resorting to conspiracy theories. When this Court considers "both the evidence that has been presented and that which is missing," summary judgment is appropriate. *Kleen Prods. LLC v. Int'l Paper*, No. 10 C 5711, 2017

WL 3310975, at *25-26 (N.D. Ill. Aug. 3, 2017) (granting motion for summary judgment due to lack of evidence of conspiracy).

### a.   The Prevailing Stipend Is a Common Response to Common Stimuli.

The Sponsors' actions in passing on stipend information provided by the regulatory agency that oversees them are perfectly consistent with independent, unilateral decision-making.

Until 1999, the United States Information Agency ("USIA") oversaw the Program. Congress dissolved the USIA, and the State Department took over. It is undisputed that since 1997, both agencies repeatedly issued notices to Sponsors containing the stipend amount, with a description of the formula used to calculate it.

- On March 14, 1997, the USIA issued a Fact Sheet to sponsor agencies to "[d]ispel any confusion" regarding "payment of the au pair stipend," which explained that the current "minimum weekly stipend" would increase in conjunction with future federal minimum wage increases. Defendants' Appendix ("App.")[3] 70 (1997 USIA Fact Sheet: Au Pair Stipend. The Fact Sheet identified a specific stipend amount of $128.25. It also stated that "the au pair stipend will be increased to $139.05" on September 1, 1997, when the federal minimum wage increased.[4]

- In 2001, the State Department reissued guidance regarding the "weekly wage due to au pairs" and again tied the stipend amount to the federal minimum wage. App. 73 - 2001 DOS Wage Handout ("2001 DOS Notice"). This notice reiterated the "weekly wage due to au pairs is $139.05."

- In 2007, the State Department issued a "Notice of Federal Minimum Wage Increase" confirming that the "weekly stipend" is "directly connected to the federal

---

[3] For the convenience of the court and the parties, Defendants have submitted a combined appendix to which they cite both in this brief and their individual briefs.

[4] This notice repeatedly referred to "the au pair stipend," "the stipend," and "the weekly stipend." App. 70 – 1997 USIA Fact Sheet. It described the stipend as a "minimum" once. *Id.*

minimum wage" and should increase accordingly. App. 75 - 2007 DOS Fed. Min. Wage Handout ("2007 DOS Notice"). The Notice specified that "the weekly stipend for the standard Au Pair Program" would increase to "$195.75" on July 24, 2009.

- In June 2009, the State Department again advised au pair sponsors that, as of July 24, 2009, "the weekly stipend for the standard Au Pair Program" would increase to "$195.75." App. 478 - 2009 DOS Fed. Min. Wage Handout ("2009 DOS Notice").

In 2007 and 2009, at the time Plaintiffs claim the alleged conspiracy was formed, the State Department Notices simply stated that the "weekly stipend (including room and board) for the standard Au Pair" program would be $195.75 beginning July 24, 2009.

Thus, there is no dispute that the $195.75 stipend amount originated with the State Department's Notices, not with the Sponsors. Plaintiffs' expert could not identify any other source for the stipend amount, and even agreed that it made sense for the Sponsors to relay it to au pairs and host families. App. 1192-93 - Kerr Merits Dep. 41:2-6, 65:15-23. In fact, the Sponsors were *required* to pass it along. State Department regulations require each Sponsor to provide Program-related information, including information related to stipends, to its au pairs. 22 C.F.R. § 62.9(d)(3) (2015).

Ultimately, each Sponsor testified through a corporate representative that its statements regarding the stipend amounts were based on the State Department's guidance.[5] Thus, Sponsors' unilateral reactions to the State Department's notices,

---

[5] App. 1078 - McHugh Dep. 120:2-20 ($195.75 "was the amount that was sent to us from the State Department in their notice"); App. 1100-01 - Young Dep. 78:13-79:13 (USAuPair tells host families that the weekly stipend is $195.75 "in accordance with the guidelines from the State Department"); App. 1089-90 - Pitts Dep. 99:25-100:8 ("We don't get involved in the calculation of the stipend. The Department of State has determined what the au pair stipend is, and GreatAuPair simply provides that information to the host families."); App. 1102 - Gaulter Dep. 138:3-10 (the Department

rather than any conspiracy, fully explain the challenged conduct. As a matter of law, where independent action fully explains the challenged conduct, the Plaintiffs cannot proceed to trial based upon speculation that there was a conspiracy. *See Matsushita*, 475 U.S. at 588.

> **b.     Plaintiffs Cannot Prove an Agreement by Either Direct or Circumstantial Evidence.**

Against this backdrop, it is Plaintiffs' burden to establish, through direct or circumstantial evidence, that the Sponsors did not act independently in response to the State Department notices, but instead formed an illegal conspiracy. However, Plaintiffs' extensive discovery has not yielded the evidence needed to satisfy their burden.

> **i.     There Is No Probative "Direct Evidence" of a Conspiracy.**

At the pleadings stage, Plaintiffs relied on what they called "direct evidence" of an

---

of State "determined that the amount should be" $195.75); App. 1086-87 - Parker Dep.139:24-140:2 (the stipend amount, "calculated as being $195.75," was "done by the U.S. Department of State and provided to au pair program sponsors"); App. 1092-93 - Reilly Dep. 134:25-135:5 ("per the directive issued by the Department of State," the stipend was set at $195.75); App. 1072 - Jordan Dep. 124:8-13 ("we do provide [the stipend amount] as it's been issued by the Department of State" in materials issued to host families); App. 1081 - McNamara Dep. 20:18-20 ("Our understanding is that per the Department of State, that host families should pay the au pair $195.75 per week."); App. 1076 - Lehan Dep. 27:5-12 ("It's API's understanding that the host families are allowed to compensate the au pairs at the amount specified by the Department of State, which is the 195.75."); App. 1084 - Nelson Dep. 189:2-5 (APF "relied upon the wording and the – the regulation as set forth by the Department of State"); App. 1068 - Ferry Dep. 103:12-15 ("We give the guidance that the Department of State has provided on what the minimum weekly stipends are to be set at."); App. 1074 - Kapler Dep. 83:2-5 ($195.75 is "the stipend amount that the Department of State has dictated as the one that's the minimum wage, as based upon federal minimum wage."); App. 1070 - Frank Dep. 67:1-6 (referencing letter "telling au pair agencies what the new minimum stipend is as guidance from the Department of State").

alleged agreement, citing statements that employees of three Sponsors allegedly made to a private investigator retained by Plaintiffs to anonymously cold call the sponsor agencies. *See* Order Adopting and Affirming in Part Feb. 22, 2016 Rec. of U.S. Magistrate Judge 9-10, ECF No. 258 ("Mot. to Dismiss Order"). The investigator posed leading questions designed to elicit admissions regarding the existence of an industry-wide agreement to fix the stipend, and recorded any affirmative answers he received. *See, e.g.*, App. 602-04 - Keil Dep. Ex. 5. If an answer did not suit Plaintiffs' purposes, he pushed until he got one that could be characterized as an "admission," even though the statements were more those of the investigator than the Sponsor representative.[6]

At the motion-to-dismiss stage, the Court was obliged to take these allegations as true and to evaluate them without the context of a full discovery record. Mot. to Dismiss Order 18. Even so, the Court observed that the statements do not "provide critical details, such as the individuals with whom the investigator spoke, and whether such individuals (who allegedly identified themselves as 'Directors') had the 'authority to speak for one, much less all, of sponsor Defendants.'" *Id.* at 14; *see* Order Overruling Def. Obj. to the Magistrate Judge 5, ECF No. 567. The Court therefore deemed the admissions to be "weak direct evidence" of an agreement. Mot. to Dismiss Order 14. On that basis, the Court permitted the case to proceed to discovery, noting that "the

---

[6] For example, after one employee told him that the Sponsors "are all subject to the same federal guidelines, so we all stay within that,"  the investigator called back and asked for "clarification."  App. 602 - Keil Dep. Ex. 5.  The employee again explained that "the government sets an amount, and we all pay that amount." *Id.* The investigator "then asked 'So, you're saying that the government sets a minimum amount to pay, and all the agencies agree to pay that exact same minimum amount?  And Carrie answered "Correct, correct!  Everybody agrees, correct!"  *Id.*

summary judgment calculus could shift significantly" if Plaintiffs failed "to uncover evidence in discovery to shore up their allegations of a direct agreement." *Id.* at 15 n.11.

Discovery has now closed, and rather than shoring up these allegations, the record reveals that the alleged statements are not evidence of the alleged agreement. At most, the "direct evidence" shows that the three Sponsor employees contacted by Plaintiffs' investigator all "agreed" with the uncontroversial proposition that the State Department had set a minimum stipend of $195.75. *See, e.g.,* App. 601- Keil Dep. 180:4-8 ("[t]he individuals I spoke to in these conversations plus others that are not documented here led me to believe it was a minimum amount set by law and that everyone in the industry followed that minimum amount.").[7] Agreement as to the contents of industry-wide notices issued by a common government regulator is not evidence—direct or otherwise—of an illegal antitrust agreement.

Each individual with whom the investigator spoke has now testified in this case (by deposition, declaration, or both). Not one had the authority to set prices[8] or was aware of any alleged agreement. App. 597 - Crompton Dep. 125:8-11; App. 143 - Gorry Dep. 147:14-18; *see also* App. 1096-97 - Shetty Decl. ¶¶ 19-21.

---

[7] *See also* App. 1206 - Keil Dep. 152:15-16 (APF representative "seemed to believe that the ability to pay more [than the DOS minimum] was okay."); App. 1207 - Keil Dep. 171:22-24 (when the investigator was asked: "So everybody agrees that's the minimum amount; is that right?" He responded, "[T]hat's what this person stated.").

[8] One employee, Joanna Gorry, was a "part-time placement coordinator" who answered the phones for prospective host families. Gorry Decl. ¶ 1-2, ECF No. 134-7. The second was the "Eastern Regional Director" at EurAupair who similarly answered phone calls from prospective host families. App. 1094 - Shetty Decl. ¶¶ 4-5. The third employee supervised field operations, meaning she answered telephone calls from host families and supervised five independent contractors. App. 1065-66 - Crompton Dep. 25:16-21, 26:22-24.

As courts around the country routinely observe, stray statements by low-level employees do not prove a conspiracy. *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 127 (3d Cir. 1999) (disregarding statement by employee "without price-fixing authority" that was offered as direct evidence); *In re Polyurethane Foam Antitrust Litig.*, 152 F. Supp. 3d 968, 983 (N.D. Ohio 2015) (observing that "discussions about pricing or market conditions between low-level salesmen who lack pricing authority is not probative of conspiracy").[9] In all, Plaintiffs deposed senior decision makers at each Sponsor and received tens of thousands of internal documents and emails, none of which shows an agreement to communicate that the stipend cannot exceed $195.75.

These alleged admissions look weaker still when viewed through the lens of the evidence that is missing. *See Kleen Prods.*, 2017 WL 3310975, at *24 (considering "both the evidence that has been presented and that which is missing"). After broad ranging discovery of all 15 Sponsors, including hundreds of thousands of documents and dozens of depositions, Plaintiffs cannot point to a single document or witness corroborating the conspiracy to which these rank and file employees allegedly admitted to a stranger on the phone. *See In re Text Messaging*, 782 F.3d at 879 (rejecting so-called direct evidence of a conspiracy and granting summary judgment).

Since the employee statements cited in the Second Amended Complaint are in

---

[9] *Cf. City of Tuscaloosa v. Harcros Chems.*, 158 F.3d 548, 561 (11th Cir. 1998) (holding that statements about price-fixing by employee who "did not set prices" and was "only ministerially involved" in sales was not admissible against his employer); *United States v. Siemens Corp.*, 621 F.2d 499, 508 (2d Cir. 1980) (refusing to credit the "opinions of lower level employees without management responsibility, absent some indication that the senior management has seriously considered and endorsed those views").

fact admissions of nothing, Plaintiffs will likely argue that activities of the industry trade association, the Alliance (which counts some but not all Defendants as members), are direct evidence of the alleged conspiracy. This is a red herring because the Alliance activities took place after this lawsuit was filed. In any event, the Court need not take much time in considering—and rejecting—this new angle because the only Alliance evidence relates to either the litigation or potential lobbying efforts involving the State Department.[10] Such activities are constitutionally immune from antitrust challenge under the First Amendment and the *Noerr-Pennington* doctrine. *See Eastern R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 139 (1961); *United Mine Workers v. Pennington*, 381 U.S. 657, 670 (1965); *GF Gaming Corp. v. City of Black Hawk*, 405 F.3d 876, 884 (10th Cir. 2005).

> **ii.    Plaintiffs' "Circumstantial Evidence" Does Not Support an Inference of Conspiracy as a Matter of Law.**

Where, as here, Plaintiffs have failed to identify any competent direct evidence of a conspiracy, they may not ask the Court to infer a conspiracy from parallel conduct alone. *See Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1084–85 (10th Cir. 2006). Instead, they must present circumstantial evidence that tends to exclude the possibility that the parallel conduct is the result of independent decision-making by each

---

[10] App. 1103 - McCarry Dep. 29:2-5 (the Alliance's advocacy work "involve[d] interactions with members of Congress and their staff"); App. 1105 - Zherka Dep. 114:9-115:14 (letter from Zherka to Evan Ryan at ECA reiterating "our view that it would be inappropriate for the Department to issue to Congress a report on whether state or local minimum wages apply to the Au Pair Program before the resolution of either a pending lawsuit or a regulatory proceeding").

defendant. *Matsushita*, 475 U.S. at 588. Antitrust plaintiffs face an even higher burden where, as here, their underlying theory "simply makes no economic sense." *Id.* at 587.

Plaintiffs hypothesize that the Sponsors colluded in order to depress the stipend industry wide, *see* Kerr Merits Rpt. ¶ 105, ECF No. 831, yet the undisputed evidence shows that they have no way of knowing the stipend actually paid to any au pair. And while the benefit supposedly gained by the Sponsors from the conspiracy was the ability to charge more to host families, *see* Kerr Merits Rpt. ¶¶ 93–95, it is undisputed that Sponsors compete vigorously regarding the fees they charge host families, which vary widely. Kerr Class Cert. Rpt. ¶ 31, ECF No. 560-65. Moreover, discovery revealed no documents or testimony indicating that the Sponsors believed they had such an incentive, much less conspired to act on it. *See* Kerr Merits Rpt. ¶¶ 93–95.

As a threshold matter, Plaintiffs have failed to identify any truly parallel conduct. Plaintiffs claim that that Sponsors all agreed to suppress the au pair stipend by informing au pairs and host families that au pairs must be paid precisely the State Department stipend (and no more) in order to keep stipends down. But the Sponsors did not uniformly communicate the stipend that way: their communications varied in multiple, significant ways: (1) several generally said the stipend was $195.75 (Au Pair Care, Au Pair Foundation, US AuPair, EurAuPair, GreatAuPair, Agent Au Pair); (2) one sponsor generally said in its marketing materials that the stipend was $195.75, but informed host families once they enrolled that they could pay more (Cultural Care);[11] (3) others most often described the $195.75 weekly stipend as a "minimum" or stated that

---

[11] App. 144 - Jordan Decl. ¶¶ 22-29.

the host family "could pay more" (AIFS, GoAuPair, Au Pair International);[12] (4) another sponsor also stated at times that au pairs are to receive, at a minimum, the weekly stipend under DOS regulations, without providing a specific figure (AIFS);[13] (5) one referenced the regulations and gave the au pairs and host families a copy of the 2007 DOS Notice (CHI);[14] and (6) some sponsors communicated a combination of these alternatives (Interexchange).[15]

Finally, several sponsors advertised higher minimum stipend amounts for au pairs with certain qualifications. Kerr Merits Rpt. ¶ 116 & n.118 ("Several sponsors, including 20/20 Care Exchange, APEX, Au Pair in America, and EurAupair Intercultural Child Care advertise that the weekly stipend for their premium program is $250.") *see also* App. 744-45 – Kapler Dec. ¶¶ 50-52, App. 121 – Lehan Dec. ¶ 6. When viewed in its entirety, the undisputed evidence demonstrates that—far from uniformly advising that host families could not pay a stipend of more than $195.75—the Sponsors frequently used differing language regarding the amount of the stipend.[16]

In addition, even Plaintiffs' observation that au pair stipends tend to cluster around the stipend amount announced by the State Department does not describe

---

[12] App. 4 - Ferry Decl. ¶¶ 10-11; App. 728 - Kapler Decl. ¶¶ 26-27; App. 120 - Lehan Decl. ¶¶ 11-12.

[13] App. 4 - Ferry Decl. ¶¶ 10-11.

[14] App. 454 - Reilly Decl. ¶¶ 17(a), (b), 50(c).

[15] App. 916 - McHugh Dep. 123:3-25, 124:1-12; App. 938 - McHugh Decl. Ex. A at 0000051; App. 956, 985 - McHugh Decl. Ex. B at 0000017, 0000046.

[16] Sponsors' individual briefs set forth in greater detail how each Sponsor's communications differ from the purportedly uniform messaging that forms the basis of the alleged conspiracy.

parallel conduct indicative of conspiracy. It is undisputed that host families, not Sponsors, actually pay the stipend. So the payment of the stipend is not the Sponsors' conduct at all. Moreover, wages tend to cluster around the minimum wage in markets where the minimum wage exceeds the market-clearing price, like the alleged au pair market. *See* App. 1105 – Stiroh Merits Rpt. ¶ 15. Additionally, prices tend to cluster in competitive markets characterized by undifferentiated products, which is how Plaintiffs' characterize the alleged market for au pairs. *See* Kerr Merits Rpt. ¶ 109 (contending that Sponsors make large volumes of "homogenous sales"); *see Twombly*, 550 U.S. at 553–54; *In re Ins. Brokerage*, 618 F.3d 300, 319 n.19 (3d Cir. 2010). There is therefore nothing suggestive of collusion in the fact that stipends in this regulated, undifferentiated market clustered around the State Department minimum stipend.

Even if there were parallel conduct consistent with a conspiracy, Plaintiffs must come forward with "plus factors" suggesting that the conduct is likely explained by a conspiracy rather than independent action. *See, e.g.*, *Abraham v. Intermountain Health Care, Inc.*, 461 F.3d 1249, 1263 (10th Cir. 2006). One key plus factor is whether defendants' conduct absent an agreement, is against each defendant's individual self-interest. *Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 858-59 (10th Cir. 1999). In other words, Plaintiffs must show that certain Sponsors' omission of the word "minimum" in some communications referring to the State Department weekly stipend was "so unusual that in the absence of an advance agreement, no reasonable firm would have engaged in it." *In re Chocolate Confectionary Antitrust Litig.,* 801 F.3d at 400.

Here, of course, the opposite is true. The absence of the word "minimum" in

Sponsors' promotional materials is just as credibly explained by a desire to use the verbatim language from the State Department Notices. Further, due to the scarcity of available host families, each Sponsor had a unilateral interest to advertise low stipend levels for its own au pairs in order to maximize that Sponsor's chances of attracting new host families to the Program. Because it is undisputed that there are more than enough au pair candidates willing to participate in the Program with the $195.75 minimum stipend—and insufficient host families to match with them—there was simply no economic reason for Sponsors to advertise a higher stipend amount. *See infra* at 21.

Indeed, no conspiracy is even necessary here because each defendant can unilaterally advertise a weekly stipend at the $195.75 level without the cooperation of any other. *Id.* To the extent that any other Sponsor decided to advertise a higher amount for its own au pairs, that would benefit the Sponsors advertising the lower stipend levels because it would increase their likelihood of obtaining new host families. *Id.* Accordingly, because the omission of the term "minimum" from promotional materials is consistent with each Sponsor's individual economic self-interest even absent a conspiracy, the most important plus factor in this case points to unilateral conduct, not conspiracy. *See In re Musical Instruments*, 798 F.3d 1186, 1195 (9th Cir. 2015) (examining the parties' incentives and concluding that the challenged conduct was "self-interested independent parallel conduct").

Another important plus factor is the existence of a mechanism for identifying "cheaters" among the co-conspirators, which courts and Plaintiffs' expert economist agree is essential to any price-fixing agreement. *See, e.g.*, *Blomkest Fertilizer, Inc. v.*

*Potash Corp. of Sask., Inc.*, 203 F.3d 1028, 1043 (8th Cir. 2000) ("[A] cartel can only succeed for any period of time if it has the ability to detect cheating and punish it effectively."); *Kleen Prods.*, 2017 WL 3310975, at *23 (granting summary judgment where there was "no evidence of a punishment mechanism at all"); App. 1194 - Kerr Merits Dep. 73:14-17. The undisputed evidence shows that the alleged cartel in this case did not punish "cheaters." As noted, *supra* at 15, many Sponsors openly communicated—in direct contravention of the essence of the claimed conspiracy—that stipends could exceed $195.75, without consequence.[17]

Finally, some courts consider it a plus factor when defendants engaged in a sudden change in behavior. *Kleen Prods.*, 2017 WL 3310975, at *10. But here, the evidence indicates that many of the Sponsors historically had referred to the government calculated stipend amount as fixed, and there is no evidence of a sudden change other than to pass along updates on the amount from the State Department. In fact, five of the 16 sponsor organizations entered the market after Plaintiffs claim the alleged conspiracy began—including the entry of one sponsor after the lawsuit began. Stiroh Class Cert. Rpt. Tbl. 1, ECF No. 603-45. There is no indication or allegation that the latest entrant joined an existing conspiracy; and there is no indication that it acted differently from the existing sponsors. This tends to prove there was no conspiracy. *See In re Chocolate*, 801 F.3d at 410 (affirming a grant of summary judgment because "we

---

[17]   Recent depositions of au pairs show that many were paid substantial additional amounts—in one case as high as $300—by host families. App. 435 – Ligarreto Dep. 81:6-22. Sponsors did not make any attempt to track, chill or punish these payments. Sponsors do not care what amount is paid, so long as it complies with the State Department requirement.

fail to see why we should infer a conspiracy existed between 2002 and 2007 from behavior that is in fact consistent with how this industry has historically operated").

The economic plus factors in the report of their economic expert simply do not support Plaintiffs' conspiracy theory. For example, Dr. Kerr claimed that the State Department's approval process for Sponsors posed a barrier to entry, but he did not undertake any analysis of how difficult it is to gain approval, nor was he aware of any applicant who had tried to gain approval and failed. App. 1198-99 - Kerr Merits Dep. 106:17-108:10. The significant entry that took place during the alleged class period alone demonstrates that this plus factor does not exist here.

Dr. Kerr similarly claimed that the au pair industry was heavily concentrated, but acknowledged that industry concentration is relevant only in a properly defined antitrust market. *See* App. 1200-01 - Kerr Dep. 111:22-112:2 (agreeing that the relevant calculation must include "all market participants"). Nowhere in his reports, however, does Dr. Kerr attempt to define a relevant antitrust market, and Plaintiffs' industry expert opined that au pairs are in the same market as nannies. Gold Class Cert Rpt. ¶ 25, ECF No. 603-49 ("It is my expert view that live-in nannies and au pairs are generally in the same market for childcare."). Dr. Kerr's market-concentration analysis did not include nannies, and is therefore meaningless. *See* App. 1200 - Kerr Merits Dep. 111:13-16. Thus, Plaintiffs do not have any economic evidence from which a factfinder could infer the existence of a conspiracy.

In short, the record does not reveal any competent direct or circumstantial or economic evidence from which a factfinder reasonably could infer the existence of a

conspiracy, and therefore the antitrust claim should be dismissed.

## C.     Plaintiffs Cannot Prove Antitrust Injury.

To prevail on their antitrust claims, Plaintiffs must also show that they suffered an "antitrust injury." *Brunswick*, 429 U.S. at 489. An "antitrust injury" is "an injury of the type the antitrust laws were intended to prevent." *Elliott Indus v. BP Am. Prod. Co.*, 407 F.3d 1091, 1124 (10th Cir. 2005). To prove antitrust injury, Plaintiffs must show that their alleged damages flow from a reduction of competition. *Sharp v. United Airlines, Inc.*, 967 F.2d 404, 408 (10th Cir. 1992); *see Brunswick*, 429 U.S. at 488.

Plaintiffs cannot satisfy that requirement simply by showing that Sponsors' conduct violated some other law or laws. As the Supreme Court has explained, Plaintiffs must establish a direct link between the challenged conduct and a diminution in competition that caused Plaintiffs' injury. See *Brunswick*, 429 U.S. at 488. For that reason, Plaintiffs' attempt to use minimum wage laws to establish antitrust injury fails as a matter of law. *See, e.g.*, *Phila. Taxi Ass'n v. Uber Techs., Inc.*, 218 F. Supp. 3d 389, 393 (E.D. Pa. 2016) (holding that a "violation of state law or municipal regulations does not give rise to an antitrust injury"); *Doron Precision Sys. v. FAAC, Inc.*, 423 F. Supp. 2d 173, 183 (S.D.N.Y. 2006) ("To the extent that the [challenged conduct] violated state or local law, Doron's proper remedy is a bid protest or a lawsuit in the New York state courts, not a federal antitrust lawsuit."); *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 513 F. Supp. 1100, 1239 (E.D. Pa. 1981) (holding that it was "irrelevant" whether the challenged conduct in an antitrust case violated "the Antidumping Act of 1921, a nonantitrust, protectionist statute").

The undisputed economic evidence shows that Plaintiffs cannot trace their alleged injury to any reduction of competition. App. 1105 – Stiroh Merits Rpt. ¶¶ 42-48. There are more qualified au pairs than host families with whom they could match. *Id.* ¶¶ 44-49 (providing average placement statistics of 77%, 77.13%, and 71.42% for Sponsors APIA, AuPair Care, and Cultural Care, respectively); App. 1195-96 - Kerr Merits Dep. 79:13-80:23 (agreeing that he has no basis on which to doubt those statistics). The unrebutted testimony of the Sponsors accords with the undisputed statistics and shows that Sponsors always had more than enough au pairs to satisfy host family demand. Jordan Decl. ¶ 6, Mar. 10, 2017, ECF No. 603-36 (Cultural Care "has always had an excess of qualified au pairs relative to its allotment of Form DS-2019"); Ferry Decl. ¶ 4, ECF No. 605-4 (APIA "has always had more than enough individuals who are qualified and willing to participate as au pairs" in the Program); App. 748 – Kapler Dec. ¶ 63; *see* App. 1204 - Kerr Class Cert. Dep. Tr. 122:16–19 ("And I guarantee that that's the truth, that everybody—that every [sponsor] always has more [potential au pairs] on their website than they have positions to fill.").

This excess supply means that the "market equilibrium" for au pair stipends is below the State Department minimum—meaning that competitive pressure would not cause stipends to rise even if the alleged "conspiracy" or "conspiratorial communications" ceased. Because there is an excess supply of au pairs willing to participate in the Program at current stipend levels, Sponsors can attract as many au pairs as they need to without advertising a higher stipend. App. 1105 - Stiroh Merits Rpt. ¶ 54; Jordan Decl. ¶ 6, Mar. 10, 2017, ECF No. 603-36 (Cultural Care "has always had

an excess of qualified au pairs relative to its allotment of Form DS-2019"); Ferry Decl. ¶ 4 ("APIA has always had more than enough individuals who are qualified and willing to participate as au pairs in" the Program). Sponsors therefore would be able to maintain their au pair programs at current stipend levels without an agreement, and thus have no incentive to collude to prevent other sponsors from advertising au pair services at a higher stipend level. *See* App. 1105 - Stiroh Merits Rpt. ¶ 33; Ferry Decl., ¶ 8 ("APIA would neither be required nor feel pressure to increase the minimum weekly stipend for participation in its program, should another sponsor agency encourage its host families to pay a stipend in excess of the current DOS specified minimum.").

The alleged agreement thus could not have caused an antitrust injury, for the stipend would be the same under competitive conditions. Sponsors therefore are entitled to summary judgment on Plaintiffs' antitrust claim.

## II. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' RICO CLAIM

### A. Burden of Proof and Elements

To prevail on their RICO claim, Plaintiffs have the burden to prove that the RICO Defendants (InterExchange, Cultural Care, and AIFS[18]) "(1) participated in the conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Resolution Tr. Corp. v. Stone*, 998 F.2d 1534, 1541 (10th Cir. 1993).[19]

---

[18] AuPairCare is named as a RICO defendant, but the claim is stayed. *See* Order Granting in Part and Denying in Part AuPairCare, Inc.'s Mot. to Stay, ECF No. 756.

[19] Judge Moore recently upheld dismissal of a RICO claim where the alleged conduct overlapped with conduct alleged to violate the FLSA. *Valverde v. Xclusive Staffing, Inc.*, No. 16-cv-00671-RM-MJW, 2017 WL 3866769, *4-5 (D. Colo. Sept. 5, 2017).

**B.      Plaintiffs Cannot Prove an Actionable Enterprise.**

Plaintiffs allege four "enterprises": each RICO defendant, its agents, and its host families. SAC ¶ 222.[20] These groupings are not "enterprises," however, because they lack "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009). There is no evidence that these purported enterprises had a common purpose, and no evidence of the required long-standing relationships between sponsor organizations, unnamed agencies, and thousands of host families (the roster of which constantly changes). *See id.* at 948.

Further, Plaintiffs must prove that "the 'person' and the 'enterprise' engaged in racketeering activities [are] different entities." *Bd. of Cty. Comm'rs v. Liberty Gp.*, 965 F.2d 879, 885 (10th Cir. 1992). Plaintiffs' attempt to circumvent this requirement by alleging that host families are part of a racketeering enterprise strains credulity. Plaintiffs have no evidence that host families did any more than participate in a cultural exchange program, one facet of which involved limited childcare services. Once host families and unidentified "agents" are removed from the alleged enterprises, as they must be, there is nothing left but the Sponsors themselves. The law requires a separation between enterprises and persons who commit wrongful conduct from within the alleged enterprises. *Id.*; *see also Garbade v. Great Divide Mining & Milling Corp.*, 831 F.2d 212,

---

[20] At class certification the Plaintiffs apparently assumed one RICO enterprise of "the defendants." Pls.' Mot. for Rule 23 Class Cert. 30, ECF No. 565-254. Plaintiffs have never alleged such an enterprise, so this motion addresses the claim as alleged in the Second Amended Complaint. Defendants reserve the right to supplement if Plaintiffs are allowed to amend their enterprise allegations in the future.

213 (10th Cir. 1987). There is no separation here, and thus no RICO enterprise.

>        **C.      Plaintiffs Cannot Prove Predicate Racketeering Activity.**

Plaintiffs cannot prove that the RICO Defendants engaged in a pattern of "racketeering activity" (18 U.S.C. § 1962(c) (1988)), such as wire fraud (18 USC § 1343 (2008)) or fraud in foreign labor contracting (18 USC § 1351 (2013)). SAC ¶ 578. Wire fraud requires "(1) a scheme to defraud; (2) an interstate wire communication; and (3) a purpose to use the wire communication to execute the scheme." *United States v. Mullins*, 613 F.3d 1273, 1284-85 (10th Cir. 2010). Fraud in foreign labor contracting is the recruiting, soliciting or hiring of a person outside of the United States "by means of materially false or fraudulent pretenses, representations or promises . . ." 18 USC § 1351(a). Plaintiffs cannot support either predicate crime.

Plaintiffs have no evidence of a scheme to defraud or intent to use a wire communication to execute that scheme. "A defendant is not guilty of mail [or wire] fraud if he in good faith believed that the plan would succeed, that the promises made would be kept and the representations carried out." *United States v. Chavis*, 461 F.3d 1201, 1208 (10th Cir. 2006) (internal quotation marks omitted). As explained above, statements regarding the DOS-calculated stipend were accurate. There is no evidence of falsity, and no evidence specifying the required "who, what, when, where and how of the alleged fraud." *Snyder v. Acord Corp.*, No. 14-cv-01736-JLK, 2016 WL 192270, at *4 (D. Colo. Jan. 15, 2016) (internal quotation marks omitted). As shown in their Individual Briefs, Defendants intended to, and did, keep every "promise" made regarding the stipend.

**III.    FEDERAL PREEMPTION ENTITLES DEFENDANTS TO SUMMARY JUDGMENT ON PLAINTIFFS' STATE WAGE-AND-HOUR CLAIMS**

**A.    Burden of Proof and Elements**

Federal preemption is an affirmative defense to state-law claims. *See Caplinger v. Medtronic, Inc.*, 784 F.3d 1335, 1341 (10th Cir. 2015). Defendants bear the burden of showing that the federal government has occupied the relevant field or that state law conflicts with federal law. *See Arizona v. United States*, 567 U.S. 387, 399–400 (2012).

**B.    Field Preemption Bars the Application of State Wage-and-Hour Laws to Au Pairs.**

**1.    Applicable Law**

Whether state wage-and-hour laws apply to au pairs turns on the doctrine of preemption. The Supremacy Clause provides that federal law "shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. That provision gives the federal government the power to preempt state law, through both statutes and regulations. *See Arizona*, 567 U.S. at 399; *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982).

If Congress determines that a field "must be regulated by its exclusive governance," then state laws in that field are preempted. *Arizona*, 567 U.S. at 399. Courts will find preemption in a field when the "federal interest" in the field is "so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947).

Courts likewise hold that Congress has occupied a field where it or the responsible agency crafts "a framework of regulation so pervasive" that there is "no

room for the states to supplement it." *Rice*, 331 U.S. at 230; *cf. R.J. Reynolds Tobacco Corp. v. Durham Cnty.*, 479 U.S. 130, 149 (1986). A regulatory scheme is "pervasive" if the regulations are "comprehensive" and were designed "as a harmonious whole." *Arizona*, 567 U.S. at 401 (internal quotation marks omitted).

> ### 2. The Undisputed Facts Establish That the Federal Government Intended for the Statutes and Regulations Governing the Au Pair Program to Preempt State and Local Regulation.

The Program operates in two fields that have long been considered the exclusive province of the federal government: foreign affairs and immigration. The federal government "is entrusted with full and exclusive responsibility for the conduct of affairs with foreign sovereignties." *Hines v. Davidowitz*, 312 U.S. 52, 63 (1941). The Constitution likewise gives the federal government "broad, undoubted power over the subject of immigration and the status of aliens." *Arizona*, 567 U.S. at 394. Because the Program reflects the exercise of these uniquely federal powers, it should come as no surprise that the Program pursues a uniquely federal purpose, namely: "to increase mutual understanding between the people of the United States and the people of other countries." 22 C.F.R. § 62.1 (2015).

To achieve that federal objective, the State Department has issued a comprehensive set of regulations that govern the exchange-visitor program generally and the Program in particular. Since 1994, when Congress directed the USIA to publish rules governing the Program, the applicable regulations have contemplated a uniform, national minimum stipend. *Supra* at 7-8. Congress has repeatedly reauthorized the Program on those terms. An Act to Extend Au Pair Programs, Pub. L. No. 104-72, 109

26

Stat. 776 (1995); An Act to Provide Permanent Authority for the Administration of Au Pair Programs, Pub. L. No. 105-48, 111 Stat. 1165 (1997). The agencies' unbroken practice and Congress's reauthorizations show that the calculation of the stipend is not merely incidental to the Program's foreign-exchange goals. To the contrary, and as described below, the comprehensive federal regulations that govern the Program deal with the subject of minimum compensation in detail precisely because the amount of the stipend is crucial to the successful operation of the Program. For the reasons that follow, the Fulbright-Hays Act and its implementing regulations preempt the application of state wage-and-hour laws to au pairs.

### a. The Federal Government Pervasively Regulates the Au Pair Program.

The State Department has promulgated a detailed set of regulations that govern all aspects of the exchange-visitor program. Those regulations create the program, define all the relevant terms, and provide rules for participants and Sponsors alike. *See ASSE Int'l, Inc. v. Kerry*, 803 F.3d 1059, 1070 (9th Cir. 2015). After reviewing these regulations, the Ninth Circuit thought it "obvious . . . that they establish a comprehensive scheme for administering an exchange program." *Id.*

The specific regulations that govern the Program are exactingly precise. They set forth everything from age, education, physical, and personal requirements for au pairs, 22 C.F.R. § 62.31(d)(1)–(6); to immigration status, English fluency, financial, and personal requirements for host families, *id.* § 62.31(h)(1)–(7). The regulations governing exchange visitors—and au pairs in particular—thus bear all the hallmarks of a "comprehensive" regime designed to operate as a "harmonious whole." *See Arizona*,

567 U.S. at 401. This regulatory regime leaves no room for "complementary state regulation" on the subject of minimum compensation. *See id.*; *Hines*, 312 U.S. at 74.

That is clear not only from the pervasive character of the regulations generally, but from their specific treatment of minimum compensation. The regulations in this foreign-affairs program specifically indicate to which programs state labor laws apply and, by omission, to which they do not. Thus, exchange visitors engaged in "summer work travel" must receive, at least, "the applicable Federal, State, or Local Minimum Wage." 22 C.F.R. § 62.32(i) (2012). In marked contrast, the regulation governing au pairs, which immediately precedes the regulation regarding summer work travel, makes no mention of state or local law. 22 C.F.R. § 62.31(j)(1). Instead, it requires only that au pairs be "paid in conformance with the requirements of the [FLSA]." *Id.*[21]

The State Department's decision to incorporate state law in some places confirms that it displaced state law in others. *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (internal quotation marks omitted). If the State Department meant to require compliance with state and local minimum wage laws when it came to the au pair stipend, then "it

---

[21] The key difference between these sections is no mere aberration. The regulations also specifically address the minimum compensation owed to teachers and camp counselors. *See* 22 C.F.R. § 62.24(e)(5) (2016) (teachers must receive compensation that is "commensurate with those of similarly-situated U.S. teachers in the school district or host school where that exchange teacher is assigned to teach."); 22 C.F.R. § 62.30(f) (2016) (camp counselors must receive "pay and benefits commensurate with those offered to their American counterparts.").

presumably would have done so expressly as it did in the immediately following"

section. *Sandoz v. Amgen, Inc.*, 137 S. Ct. 1664, 1677 (2017). Any other interpretation

would fail to treat these differing provisions differently. *See, e.g.*, *id.*; A. Scalia & B.

Garner, Reading Law: The Interpretation of Legal Texts at 170 (West, 1st ed. 2012)

("[A] material variation in terms suggests a variation in meaning.").

The State Department's regulations are comprehensive and expressly indicate

where state law applies. They therefore leave no room for the application of state wage-

and-hour laws to au pairs. *See, e.g.*, *Nat'l Fed. of the Blind v. United Airlines*, 813 F.3d

718, 735 (9th Cir. 2016) (explaining that a regulatory regime is "pervasive" if it

"exhaustively regulates the relevant attributes" of the field).

> **b.    The Reference to the FLSA in the Au Pair Regulations Does Not Incorporate State and Local Law.**

Plaintiffs previously observed that the regulations require compliance with the

FLSA, and that the FLSA contains a savings clause. Pls.' Resp. to Defs.' Objs. to

Magistrate Judge's Rec. 10-11, ECF No. 256. Therefore, the argument runs, the

regulations cannot displace state law. *See id.*

Not so. The au-pair regulation requires only that au pairs be "paid in

conformance with the *requirements* of the Fair Labor Standards Act." 22 C.F.R.

§ 62.31(j)(1) (emphasis added). Nothing in the FLSA, including its savings clause,

"requires" compliance with state law. On the contrary, as courts across the country have

recognized, the FLSA does not incorporate state wage-and-hour laws into federal law.

*Cosme Nieves v. Deshler*, 786 F.2d 445, 452 (1st Cir. 1986); *Lanzetta v. Florio's*

*Enters.*, No. 08 Civ. 6181 (DC), WL 3209521, at *3-4 (S.D.N.Y. July 27, 2011),

*superseded by statute*, *Hernandez v. Jrpac Inc.*, 14 Civ. 4176 (PAE), 2016 WL 3248493 (S.D.N.Y. June 9, 2016) (collecting cases). The savings clause "simply makes clear that the FLSA does not preempt any existing state law that establishes a higher minimum wage." *Cosme Nieves*, 786 F.2d at 452.

Whether the FLSA itself preempts state law, however, has nothing to do with this case. Defendants do not argue that the FLSA preempts state and municipal labor codes. Rather, Defendants contend that it is the Fulbright-Hays Act and related au pair regulations that preempt application of state and municipal labor codes to the Program. The FLSA's savings clause therefore sheds no light on the question presented: whether the Fulbright-Hays Act and its implementing regulations preempt state law. The regulations' comprehensive treatment of minimum compensation shows that they do, and the reference to the FLSA does not point to a contrary conclusion.[22]

### c.   Any Ambiguity in the Regulations Should Be Resolved by Reference to the Administering Agencies' Consistent and Decades-Long Practice.

As explained above, a plain reading of the regulations resolves the question presented. Any doubt, however, should be resolved by deferring to the administering agencies' consistent practice. Where an agency interprets its own regulations, its interpretation is entitled to deference, particularly where the agency speaks with a single

---

[22] The reference in the regulations to payment "in conformance with the requirements of the [FLSA]" cannot amount to incorporation of state and local law into the regulations when read—as it must be—in the context of the full J-1 program regulations. *See King v. Burwell*, 135 S. Ct. 2480, 2492 (2015) ("words of a statute must be read in their context and with a view to their place in the overall statutory scheme."). The context demonstrates that this reference to the FLSA—with absolutely no reference to state or municipal laws—displaces rather than incorporates state law. *See supra* at p. 28.

voice for decades. *Auer v. Robbins*, 519 U.S. 452, 461 (1997); *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 515 (1994). Where an industry engages in "decades-long practice" in plain view of an agency, courts consider whether the agency ever took enforcement action or "otherwise suggested that it thought the industry was acting unlawfully." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 157 (2012). If not, then the agency likely did not regard the practice as illegal: "while it may be possible for an entire industry to be in violation of the [FLSA] for a long time without the Labor Department noticing, the more plausible hypothesis is that the Department did not think the industry's practice was unlawful." *Id.* at 158 (internal quotation marks omitted).

The agencies responsible for administering the Program have consistently interpreted the regulations to require the payment of a single, national, minimum stipend, which has been $195.75 since 2009. That is clear from State Department guidance (styled as notices), testimony from the author of the au pair regulations, and the lack of any enforcement action against the Sponsors:

- **The Notices**: Since 1997, and in at least four separate guidance documents styled as "Notices," the State Department has informed Sponsors of "the stipend" for au pairs in terms of a set dollar amount. App. 70, 73, 75, 478 – 1997, 2001, 2007, 2009 Notices. As the 2007 and 2009 Notices explained, "[t]he weekly stipend for the standard Au-pair program" is "directly connected to the federal minimum wage," and "based on a U.S. Department of Labor formula[] that includes credit for the room and board Host Families provide for their Au Pairs." App. 75, 478 – 2007, 2009 Notices. The result is a stipend (in the amount of $195.75, since the federal minimum wage was last increased in July 2009) that is consistent with the federal minimum wage, but lower than many state and local minimum wages—i.e., a stipend that is lawful only if state and local minimum wage laws do not apply to au pairs.

- **Stanley Colvin's Testimony**: Stanley Colvin is a former attorney-advisor to the USIA and the DOS. He was the principal author of the original regulations that governed the Program. App. 61-62 – Colvin Aff.¶ 13. He personally drafted or

supervised the preparation of the 1997 and 2001 notices, as well as other documents interpreting the au-pair regulations. *Id.* at 65-66 ¶¶ 23–24. He testified in this case that the DOS never withdrew the 2007 Notice, and that it still accurately reflects the administering agencies' view—which has not changed since 1997—that the minimum stipend is calculated by applying a particular federal formula to the federal minimum wage. *Id. at* 64, 67 ¶¶ 20, 28.

- **The Lack of Any Enforcement Action**: The exchange-visitor program is no fly-by-night operation. Sponsors are required to inform the Department of the precise terms that govern their dealings with exchange visitors, and they must provide "accurate program information to prospective exchange visitors," including information regarding "wages and compensation, and any typical deductions for housing." 22 C.F.R. §§ 62.9(d)(1)-(3), 62.10. The Sponsors therefore have advertised a weekly stipend of $195.75 (or at least $195.75) for years, and reported as much to the USIA and the DOS regularly as part of their annual audits. *See, e.g.*, App. 144-45 - Jordan Decl. ¶¶ 6-7. Yet neither agency ever commenced an enforcement action against the Sponsors for failing to comply with the applicable rules governing minimum compensation.

The judgment of the responsible federal agencies thus accords with the plain import of the regulatory text: the minimum, national stipend is $195.75, regardless of whether state and local laws might otherwise provide for a higher amount.

### C. Applying State Wage-and-Hour Laws to Au Pairs Would Conflict with the Federal Goals of the Au Pair Program.

#### a. Applicable Law

If a federal law and a state law conflict, the state law is preempted by the federal law. *PLIVA Inc. v. Mensing*, 564 U.S. 604, 618 (2011). State law "conflicts with" federal law if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372-73 (2000). What qualifies as a "sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Id.* at 373.

**b.** **It Is Undisputed That the Federal Government Sought to Design a Uniform Regulatory Regime and Stipend.**

Applying state wage-and-hour laws to au pairs would frustrate the cultural-exchange and foreign-relations goals of the Program. The Program aims to "provide foreign nationals with opportunities to participate in educational and cultural programs in the United States and return home to share their experiences[.]" 22 C.F.R. § 62.1(b). Congress has directed that all foreign-exchange programs must "be balanced and representative of the diversity of American political, social, and cultural life." 22 U.S.C. § 2460(c) (2002). Like other "federal interest[s]," these cultural-exchange goals require certain "uniform rule[s]," *see Boyle v. United Techs. Corp.*, 487 U.S. 500, 508 (1988), to ensure that the Program retains its national character. That is why the administering agencies recognize a "programmatic need for a uniform wage." 60 Fed. Reg. 8551; *see, e.g.*, App. 75 - 2007 Notice (providing amount of "the weekly stipend").

Applying state wage-and-hour laws to au pairs would create untenable conflicts. Subjecting the Program to 50 different state wage-and-hour regimes (to say nothing of municipal law) would destroy the federal government's express objective of designing a regulatory scheme that serves the "programmatic need for a uniform wage." 60 Fed. Reg. 8551. The very point of a national weekly stipend set by federal law is to operate the Program on a uniform basis nationwide. *See id.* It ensures that au pairs will be subject to the same rules wherever they go, and will choose host families based on personal or cultural compatibility rather than geographic variations in compensation. Uniform regulations also make it easier for host families to participate in the Program. Indeed, the USIA specifically explained that a uniform stipend was necessary to

"eliminate the need for host families to keep individualized records," which the agency viewed as critical to continuing to attract families to participate in the Program. *Id.*

The burdens that would accompany individual record-keeping, however, are just a preview of the ways in which applying state wage-and-hour laws would frustrate the Program's ability to attract host families. Most fundamentally, applying state wage laws to au pairs would increase host families' costs substantially. Plaintiffs say that au pairs should have received a stipend that is at least 62% higher than the one set by the State Department. App. 1104 - Stiroh Merits Reb. Rpt. ¶ 48. It is undisputed that such a stipend would "require[] a substantial increase in total costs to host families." *Id.* ¶ 50. The economic implications of such an increase are straightforward: "with higher costs, fewer families would be willing to participate in the program and fewer au pairs would be matched." *Id.* ¶ 51. A stipend that drives host families from the market—and reduces the number of participants—conflicts with the Program's cultural-exchange goals. It is therefore preempted. *See Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 350 (2001) (finding conflicting preemption where complying with "50 States' tort regimes will dramatically increase the burdens" on regulated parties).

## IV.    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' FEDERAL MINIMUM WAGE AND OVERTIME CLAIMS

Plaintiffs assert claims for unpaid minimum wage and overtime pay under the Fair Labor Standards Act ("FLSA") based on their theory that a weekly stipend of $195.75—which the State Department identified as the required minimum—fails to pay: (a) the minimum wage because it improperly includes a room and board credit; and (b) a premium for hours in excess of 40 per week. These claims fail as a matter of law. As a

threshold matter, Defendants cannot be held liable for any alleged FLSA violation because they are not au pairs' "employers." And, even if they were, Plaintiffs' main premise—that a weekly stipend of $195.75 violates the FLSA—fails on its merits.

In truth, there is no reason to address those questions, for Plaintiffs cannot show that the FLSA applies in full to the Program. Although Plaintiffs have assumed throughout this case that it does, regulatory history and Congressional action (*see* Section III.B, *supra*) cast considerable doubt on that assumption: The original stipend was not connected to the minimum wage, and neither Congress nor the responsible agencies have declared that the FLSA applies fully to au pairs—as they have for other exchange visitors. *See, e.g.,* 22 C.F.R. § 62.23(i)(3)(ii)(C) (2008) ("student internship programs in the field of agriculture [must] meet all the requirements of the Fair Labor Standards Act"). Instead, the State Department calculated a stipend based on some portions of the FLSA. The State Department has never directed that the FLSA applies in full. *See, e.g.*, App. 853 - Stipend Fact Sheet; App. 73 - 2001 DOS Notice; App. 75 - 2007 DOS Notice; App. 478 - 2009 DOS Notice. Even if the FLSA applies in full, however, Plaintiffs' claims still fail.

### A.   Plaintiffs Cannot Prove That Sponsors Are Their "Employers" Under the FLSA.

#### 1.   Burden of Proof and Elements

Plaintiffs bear the burden of establishing that au pairs are "employees," and that Sponsor Defendants are Plaintiffs' "employers," under the FLSA. *See, e.g.*, *Martinez-Mendoza v. Champion Int'l Corp.*, 340 F.3d 1200, 1209 (11th Cir. 2003) (plaintiff bears burden of establishing that an entity is a joint employer under the FLSA).

### 2.      Undisputed Facts Show That Sponsors Are Not Employers.[23]

Plaintiffs ask this Court to expand the definition of "joint employer" beyond what any court or government agency has previously found.[24] If the Court adopts Plaintiffs' theory, a range of entities—including corporate recruiters, placement agencies, and government regulatory bodies themselves—could suddenly face liability under the FLSA. Plaintiffs present no justification for enlarging the scope of the law in this manner.

Whether an entity is an employer (or joint employer) under the FLSA is a legal question. *Coldwell v. Ritecorp. Envt'l Prop. Solutions*, No. 16-cv-01998-NYW, 2017 WL 1737715, at *5 (D. Colo. May 4, 2017). Entities are joint employers if they "share or co-determine those matters governing the essential terms and conditions of employment" or "exercise significant control over the same employees." *Bristol v. Bd. of Cty. Comm'rs*, 312 F.3d 1213, 1218-19 (10th Cir. 2002) (*en banc*). Courts in this circuit typically apply the "economic realities" test to evaluate a claim of joint employment, recognizing that not all factors in the test are relevant to inquiry. *See Coldwell*, 2017 WL 1737715, at *4-8; *Fuentes v. Compadres, Inc.*, No. 17-cv-01180-CMA-MEH, 2017 WL 6335669, at *13 (D. Colo. Dec. 12, 2017); *cf. Bristol*, 312 F.3d at 1218-19.

In applying the economic-realities test to the joint-employer inquiry, courts focus almost exclusively on the degree of control exerted by the putative employer in areas

---

[23] Although Defendants outline the relevant legal standard and discuss the general factual framework in this brief, the question of joint employment must be determined individually for each Sponsor. Therefore, FLSA Defendants have addressed this issue in their individual briefs as well.

[24] Under Plaintiffs' theory of the case, host families are au pairs' employers-in-fact, and Sponsors are joint employers. SAC ¶ 317.

such as the hiring and firing of employees, the supervision and control of work schedules and employment conditions (including the ability to modify conditions), setting the rate and method of payment, and maintaining employment records. *See, e.g.*, *Coldwell*, 2017 WL 1737715, at *7-9; *Fuentes*, 2017 WL 6335669, at *12-13; *Johnson v. Serenity Transp., Inc.*, No. 15-cv-2004-JSC, 2017 WL 1365112, at *13 (N.D. Cal. Apr. 14, 2017) (control factors "weigh the heaviest").

Moreover, the nature and purpose of the putative employer's control is significant. *See Godlewska v. HDA*, 916 F. Supp. 2d 246, 260 (E.D.N.Y. 2013); *Jacobson v. Comcast Corp.*, 740 F. Supp. 2d 683, 690-91 (D. Md. 2010). In particular, courts have found that monitoring for legal compliance, safety concerns, or quality control is not sufficient control to establish a joint employer relationship. *See Salinas v. Commercial Interiors, Inc.*, 848 F.3d 125, 148 (4th Cir. 2017) ("[A]n entity does not become a joint employer by engaging in the oversight necessary to ensure that a contractor's services meet contractual standards of quality and timeliness."); *Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 75 (2d Cir. 2003) (monitoring for quality control "has no bearing on the joint employment inquiry"); *Moreau v. Air France*, 356 F.3d 942, 951 (9th Cir. 2004); *Godlewska*, 916 F. Supp. 2d at 260-61 (monitoring for legal compliance in defendant's business of "providing heavily-regulated, government-funded health services," did not indicate joint-employer status); *Zhao v. Bebe Stores, Inc.*, 247 F. Supp. 2d 1154, 1161 (C.D. Cal. 2003); *Sanchez v. Simply Right, Inc.*, No. 15-cv-974-RM-MEH, 2017 WL 2222601, at *13 (D. Colo. May 22, 2017) (monitoring for "effective compliance" with contractual obligations was not "control of plaintiffs' employment").

### a.    Sponsors' Roles Are Limited and Defined by Regulation.

Sponsors do not perform "employer" functions such as paying au pairs, setting au pairs' schedules or work duties, or supervising au pairs. Instead, Sponsors' relationship with au pairs is defined by the Program regulations. The State Department requires screening of au pair applicants in order to ensure that they meet the State Department's qualifications. 22 C.F.R. § 62.31(c) (2008). Some Sponsors participate in recruitment and screening themselves; for others, third parties fulfill this function. The matching process is within the exclusive control of prospective au pairs and host families. App. 928 - McHugh Decl. ¶¶ 7, 10 Once an au pair is screened and matches with a family, Sponsors facilitate State Department mandated training for the au pairs. 22 C.F.R. § 62.31(f)-(g) (mandating specific training and orientation for all au pairs, including "not less than eight hours of child safety instruction" and "not less than twenty-four hours of child development instruction"). Notably, this training does *not* involve family-specific training. App. 929 - McHugh Decl. ¶ 12.

After au pairs are placed with their prospective host families, a Sponsor's role continues to be limited to the responsibilities mandated by the Program regulations. 22 C.F.R. § 62.31(l). Sponsors, through local representatives who reside within a one-hour drive of any au pairs for whom they have responsibility, contact each au pair monthly to confirm that the au pair is receiving the State Department-mandated minimum stipend of $195.75 and is providing no more than 45 weekly hours of childcare. *Id.* §§ 62.31(c)(5), (l); 59 Fed. Reg. 64296-01 (December 14, 1994) (codified at 22 C.F.R. pt. 514). As the regulation explains:

> [w]ith an eye towards program efficiency and effectiveness, and cognizant of limited Agency resources, the Agency is imposing four specific monitoring requirements designed to ensure satisfactory compliance with these regulatory provisions. Pursuant to Sec. 514.31(m), au pair sponsors are responsible for ensuring monthly personal contact with each au pair and host family participating in their program. In part, this contact will ensure that the au pair is not working in excess of forty-five hours per week and is enrolled and making satisfactory progress in his or her academic pursuits. This monthly contact will also allow for the resolution of conflicts between the host family and the au pair before the conflicts become insurmountable and necessitate the au pair's possible removal from the home or the host family's possible removal from the program. As an additional safeguard, regional representatives acting on behalf of the au pair sponsors will be required to make quarterly contact with each host family and au pair.

*Id.* The host family (not the Sponsor) is responsible for setting an au pair's childcare schedule, establishing the au pair's duties and any household rules, setting and providing compensation and benefits, compensating the au pair, and supervising the au pair. 22 C.F.R. § 62.31(n)(3) (requiring "*host family's* compliance with the stipend and hours requirements set forth . . .") (emphasis added); 60 Fed. Reg. 8547-02 (codified at 22 C.F.R. pt. 514), 8550-51 (Feb. 15, 1995) ("The 'family' determines what hours of the day the au pair will work. The 'family' determines what additional duties may be necessary for the au pair to perform on a daily basis. The 'family' dictates what the child, under the care of the au pair, will eat, when he will play, and when he will nap."); App. 441 - Sahin Dep. 98:12-17 ("Q: And the host family set your schedule, correct?  A: Yes.  Q:  Did Cultural Care ever set your schedule?  A: No."); App. 420 - Bobboni Dep. 122:3-9; App. 439 - Pavot Dep. 67:14-17; App. 1212 - Jordan Dep. 206-09; App. 271, 328-330 - 2010 HF handbook (CC00000329, 386-88); App. 939 - McHugh Decl. Ex. A at 0000052. The host family also has the ability to terminate its relationship with the au

pair, if it determines that the au pair is not the right match for its family. App. 913 - McHugh Dep. 78:5-10; 79:4-9; App. 1212 - Jordan Dep. 208:15-209:7.

Sponsors thus do not set au pairs' schedules, do not pay au pairs, do not assign or supervise au pairs' duties, and do not set compensation or benefits (other than confirming compliance with the regulatory minimums). *See Godlewska*, 916 F. Supp. 2d at 258, 261 (inclusion of union wages in contract between city and contractor was not attributable to city because regulations required that provision). Sponsors can unilaterally end an au pair's Program participation only if the au pair ceases to be Program-eligible. 22 C.F.R. § 62.31(l)(3-4) (sponsors must report to DOS "unusual or serious situations or incidents" and "incidents involving or alleging a crime of moral turpitude"); App. 148, 159 - Jordan Decl. ¶ 29, Ex. A; App. 1212 - Jordan Dep. 209; App. 260 - DOS Incident Rpt. Handout.

> **b.** **The State Department's Delegation of Regulatory Authority Does Not Make the Sponsors Joint Employers.**

Sponsors have been deputized by the State Department to ensure its regulations are enforced. The regulations define both what the Sponsors must do (facilitate government-mandated training, ensure that host families are complying with the stipend and hours regulations) and how they must do it (through local representatives). Beyond the requirements set forth in the regulations—which are put in place to ensure au pairs' well-being and to promote a positive cultural exchange experience—Sponsors have little or no additional involvement in the childcare component of the Program.[25]

---

[25] Many Sponsors, often through local counselors, arrange for educational, cultural, and social opportunities for au pairs in order to enhance the cultural exchange visit. These

These government-mandated obligations do not convert the relationship between Sponsors and au pairs into an employer/employee relationship. *See Ivanov v. Sunset Pools Mgmt.*, 567 F. Supp. 2d 189, 195 (D.D.C. 2008); *Democratic Union Organizing Comm., etc. v. NLRB,* 603 F.2d 862, 876 (D.C. Cir. 1978) ("incorporation of government regulations into a contract does not alone establish an employer/employee relationship"). "Only where 'pervasive control' by the putative employer '(exceeds) governmental regulations to a significant degree' [will] employee status [] be found." *Democratic Union*, 603 F.2d at 876. Plaintiffs cannot show such "pervasive control" over the "employment" aspects of the host family / au pair relationship.

More specifically, Plaintiffs cannot show that Sponsors engage in any core "employment" functions—such as hiring, firing, paying wages, or setting schedules, work duties or rules. The functions identified by Plaintiffs—screening, training, and mediation of disputes—are all regulatory obligations that fall far short of the indicia of control necessary to establish an employment relationship. *See Sanchez*, 2017 WL 2222601, *12 (finding that putative employer did not exercise control indicative of joint employment by setting the "permissible start and end points" during which work could be performed). Indeed, as one court has found, "[f]acilitating completion of paperwork, mediating disputes and working to ensure the arrival of the workers does not render [sponsor] somehow responsible for hiring plaintiffs. To the contrary, it is consistent with [sponsor's] role as a recruiter and Sponsor." *Ivanov*, 567 F. Supp. 2d at 195.

opportunities are voluntary and are separate from any childcare or "work" component and therefore bear no relevance as to whether Sponsors are "joint employers."

**B.   Plaintiffs Cannot Prove That the Stipend Violates the FLSA.**

**1.   Burden of Proof and Elements**

If Plaintiffs are able to establish that Sponsors are their "employers," they can only prevail on their claims if they establish that Plaintiffs worked compensable time for which they were not paid in conformance with the FLSA. *Integrity Staffing Solutions, Inc. v. Busk*, 136 S. Ct. 513 (2014); *Baker v. Barnard Constr. Co.*, 146 F.3d 1214, 1220 (10th Cir. 1998). To make such a showing, Plaintiffs must establish that the compensation that they actually received did not comport with FLSA requirements.

**2.   The Undisputed Facts Confirm That the Stipend Complied with the FLSA.**

Plaintiffs cannot prove that sponsors are liable under the FLSA because the weekly stipend, calculated by the State Department, is consistent with the FLSA.

**a.   Deduction of Room and Board from Au Pair Stipends Is Permissible Under the Fair Labor Standards Act.**

Department of Labor regulations allow employers to deduct the "reasonable cost" of room and board if it is "customarily furnished" to employees. These regulations require that: (1) the lodging is regularly provided by the employer or similar employers; (2) the employee voluntarily accepts the lodging; (3) the lodging is furnished in compliance with applicable laws; (4) the lodging primarily benefits the employee; and (5) the employer maintains accurate records of costs incurred in furnishing the lodging. The record is clear and undisputed that these five conditions are met for au pairs.

1.   First, room and board is "customarily furnished" to au pairs. 29 U.S.C. § 203(m). As the Department of Labor explains, that requirement is met, for example, by

live-in domestic service employees (such as home care workers and nannies). App.
1107-10 - U.S. Dep't of Labor, Credit Towards Wages under Section 3(m) Questions
and Answers, https://www.dol.gov/whd/homecare/credit_wages_faq.htm (last visited
February 15, 2018). There is no genuine dispute that room and board is regularly and
customarily provided to au pairs. 22 CFR § 62.31(e)(6).

      2.     Second, au pairs voluntarily accept room and board by signing up for a
cultural exchange program which involves living with a host family. The Department of
Labor has stated that accepting housing as a condition of employment is voluntary. App.
1107 - Credit FAQ; *see also* App. 1112 - Field Assistance Bulletin No. 2015-1 ("WHD
will normally consider the lodging as voluntarily accepted by the employee when living
at or near the site of the work is necessary to performing the job. This requirement is
typically met when a live-in domestic service employee and the employer have an
understanding that the employee will live on site as a condition of employment"); *see
also Brock v. Carrion, Ltd.*, 332 F. Supp. 2d 1320, 1324 n.4, 1325 (E.D. Cal. 2004)
(finding that lodging was accepted voluntarily where an on-site apartment manager
"does not actually assert that he was coerced" and had signed an agreement).

      Plaintiffs have, in previous filings, relied on two 1997 Department of Labor
opinion letters, an amicus brief submitted in *Ramos-Barrientos v. Bland*, 661 F.3d 587
(11th Cir. 2011), and the Wilberforce Pamphlet to argue that room credits are
unavailable because housing is required by law. Opp. to Mot. to Dismiss 35, ECF No.
199. As explained below, *Bland* is factually distinguishable, and Plaintiffs' reliance on
the opinion letters and pamphlet is inapposite.

The Department of Labor's analysis in the 1997 letters is not germane to room and board credits. The letters express the Department's opinion that educational expenses and insurance may not be credited. These credits are not expressly allowed under State Department guidance. The room and board credit, in contrast, is expressly allowed. *See* App. 853 - Stipend Fact Sheet; App. 73 - 2001 DOS Notice; App. 75 - 2007 DOS Notice; App. 478 - 2009 DOS Notice; 60 Fed. Reg. 8547 (Feb. 15, 1995). Moreover, when writing these 1997 opinion letters, the Department of Labor noted the stipend amount—which included a room and board deduction—and the Department neither commented that the deduction was unlawful nor took any enforcement action. The Department thus implicitly affirmed the long-standing 40% deduction for room and board, which was explicitly implemented in guidance issued by the State Department *and attributed to the Department of Labor*. 60 Fed. Reg. at 8550-51.

The regulation at issue in *Bland*, by contrast, specified that H2A visa holders receive housing "at no cost." 20 CFR 655.122 (2010) ("Obligation to provide housing. The employer must provide housing at no cost to the H-2A workers . . ."). It, of course, follows that employers cannot take a credit when regulations prohibit from taking it.

The Wilberforce Pamphlet's statement that an "employer usually may not deduct for housing (with some visa classifications, housing must be provided free of charge)" is of no import. The pamphlet is provided to A-3, G-5, H, J, NATO-7 and B-1 visa holders. App. 1161-62 – Know Your Rights Pamphlet. The language is of general applicability and explicitly provides for possible exceptions by use of the word "usually." As discussed below, regulations surrounding the different visas differ. *Compare* 20 C.F.R.

§ 655.122(d)(1) *with* 22 C.F.R. § 62.13 (2015).

3.      Third, the lodging furnished to au pairs complies with applicable laws, and the record is replete with evidence of satisfactory housing conditions. App. 1177 – Swartz Dep. 131:13-25; App. 1184 - Pavot Dep. 51:17-25; App. 1185 – Leon Dep. 49:25-50:4.

4.      Fourth, the provision of room and board primarily benefits the au pairs. "Lodging is ordinarily presumed to be for the primary benefit and convenience of the employee unless there is an indication that the lodging is of little benefit to employees. . ." App. 1108 - Credit FAQ. The purpose of the Program is cultural exchange. App. 247 – ECA 2015 Deck. Living with a host family is the main way (alongside participation in cultural activities and coursework) that au pairs are exposed to American culture and the host family is exposed to the au pair's culture. The cultural exchange is a key benefit to au pairs, as noted by a large number of au pairs in their applications to the Program and their sworn testimony. App. 901-02 – Beltran Dep. 44:18-45:2;; App. 1177 – Swartz Dep. 59:15-19; App. 1179 – Kruschwitz Dep. 22:1-5; App. 1183 – Ligarreto Dep. 32:12-14. In addition, these au pairs have repeatedly confirmed that housing was a benefit because it eliminated the burden and stress of affording and locating housing upon arrival to the U.S. App. 1186 – Bobboni Dep. 46:18-47:16; App. 1188 – Sahin Dep. 52:4-14; App. 1184 – Pavot Dep. 29:8-10.[26]

---

[26] Moreover, courts have recognized the reason behind allowing a room and board deduction: "housing facilities, like meals, are essential for human existence and are ordinarily paid for from an employee's earnings. An employee has to reside somewhere, and therefore rental payments for the employee are usual and customary items of his or her living expenses. If an employer absorbs this expense for an employee, it is only

5.      Finally, the recordkeeping requirement is inapposite because the State Department made an explicit decision, as discussed in Section IV.B.2, *supra*, to adopt a standardized 40% deduction in lieu of requiring specific record keeping. The Department also declined to adopt any number of other methodologies the Department of Labor has propounded over the years, and proposed the 40% deduction for room and board in 1995. 60 Fed. Reg. 8551. Moreover, the Department of Labor recordkeeping requirement is outside the bounds of its statutory mandate and, thus, invalid.[27]

### b.      Plaintiffs Cannot Show That They Are Entitled to Overtime Premium Pay Under the FLSA.

It is well-established that live-in domestic workers are exempt from overtime premium pay under the FLSA. 29 U.S.C. § 213(b)(21) (2014). Plaintiffs allege au pairs who provided childcare services after January 1, 2015 are entitled to overtime premium pay under 29 C.F.R. § 552.109. Plaintiffs' argument fails, however, because the regulation applies only when there is a third-party joint employer of the domestic worker. As discussed in Section IV.A, *supra*, sponsors are not joint employers.[28]

---

equitable and reasonable that the employee "reimburse" the employer from wages earned." *Soler v. G. & U., Inc.*, 833 F.2d 1104, 1108 (2d. Cir. 1987).

[27] See 29 U.S.C. § 203(m) ("…the Secretary is authorized to determine the fair value of such board, lodging, or other facilities for defined classes of employees and in defined areas, based on average cost to the employer or to groups of employers similarly situated, or average value to groups of employees, or other appropriate measures of fair value. Such evaluations, where applicable and pertinent, **shall be used in lieu of actual measure of cost in determining the wage paid to any employee**.); *Marlow v. New Food Guy, Inc.*, 861 F. 3d 1157, 1162-64 (10th Cir. 2017).

[28] Moreover, overtime premium pay is due only for time *actually worked. Chavez v. City of Albuquerque*, 630 F.3d 1300, 1306 (10th Cir. 2011).  Plaintiffs would have to establish that they worked overtime hours, and some admit that they have not.  App. 1213 - Pavot Dep. 60:24-61:1; App. 1190 - Sahin Dep. 92:3-5; App. 433 - Ligarreto Dep.

**V.    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' CLAIM UNDER THE FLSA FOR UNPAID TRAINING**

Plaintiffs allege that they are due payment under the FLSA for time spent in State

Department-mandated training. This claim fails.

**A.    Burden of Proof and Elements**

As discussed above, Plaintiffs bear the burden of proof. *Baker*, 146 F.3d at 1220.

The Department of Labor has set forth two tests to determine whether training is

compensable. The first test, which has six factors, applies to "trainees" or apprentices

who have not yet been hired.[29] *See, e.g.,* App. 1132 – Dep't of Labor, Field Operations

Handbook § 10(b)(11) ("DOL Field Handbook"); *Walling v. Portland Terminal Co.*, 330

U.S. 148, 152 (1947) (training time is not compensable when trainees spent one week

---

69:18-20.

[29] Even if this court were to apply the six-factor test, rather than the test established by other courts for training that is a pre-condition of employment, Plaintiffs still cannot show that they should be compensated for training time. The six-factor test consider: (1) whether training is similar to that which would be given in a vocational school, (2) training is for the benefit of the trainees, (3) trainees do not displace regular employees, (4) employer that provides the training derives no immediate advantage from the activities of the trainees, (5) trainees are not necessarily entitled to a job at the end of training, and (6) the employer and the trainees understand that the trainees are not entitled to wages for time spent in training. Field Operations Handbook at § 10b(11). However, when applying to six-factor test to trainees, courts apply a less stringent test than they do to employees. *See, e.g., Ulrich v. Alaska Airlines, Inc.*, 2009 WL 364056 at *3 (W.D. Wash. Feb. 9, 2009) (flight attendants not entitled to compensation for time spent in training, even though they performed some tasks of flight attendants because work did not "immediately benefit" the airline). As to Plaintiffs, this test is satisfied – and therefore training time is not compensable time - because au pairs receive generalized childcare and safety training, they do not displace any childcare workers during training, the training benefits the au pair and provides no immediate benefit to Sponsors, and both Sponsors and au pairs understand that there is no compensation for the days spent in training. *See id.* Moreover, au pairs are not guaranteed "employment" with a host family for any set amount of time after completing training; rather, that are just entitled to join the family and begin providing childcare. *See infra* at 38-39.

learning requirements of the position through observation and closely-supervised work). The second test, which is outlined in Department of Labor regulations, applies to employees who have already begun working. 29 C.F.R. § 785.27 (2018). Courts have recognized that these two tests arguably leave a gap in guidance as to whether time spent in post-hire training that is a condition of employment is compensable. *See, e.g., Choa v. Tradesmen Int'l, Inc.*, 310 F. 3d 905, 909 (6th Cir. 2002). Courts have held, however, that post-hire training that is a job prerequisite is not compensable, even if such training is arguably "involuntary." *See id*; *Bienkowski v. Northeastern Univ.*, 285 F. 3d 138, 141 (1st Cir. 2002) (finding the FLSA regulations do require compensation "where the training is not continuing education relating to existing job duties, but instead a pre-condition for employment. . .").

Under the second test, training time is not compensable if (1) it occurs outside of regular working hours, (2) attendance is voluntary, (3) it is not directly related to the employee's job, and (4) the employee does not perform any productive work during training. 29 CFR § 785.27. Courts have found that these criteria are met if an employee attends training that is mandated by the government. *See Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 721-22 (2d Cir. 2001) (if training is required by law, the "voluntariness" prong of the FLSA test is met); *Freeman v. Total Sec. Mgmt. – Wisconsin, LLC*, No. 12-cv-461-wmc, 2013 WL 4049542, at *7-10 (W.D. Wis. Aug. 9, 2013) (denying conditional certification to plaintiffs from Illinois because training time was not compensable since it was required by state law, but allowing plaintiffs from Wisconsin to proceed because Wisconsin did not have state training requirements).

**B.     The Undisputed Facts Establish That the Training Occurred Before Au Pairs Became Employees of Their Host Families or Started Providing Childcare.**

Plaintiffs cannot show that they were due compensation for time spent training before they actually began providing childcare for their host families. The State Department requires that the training occurs before the au pair joins the family and begins providing childcare. 22 C.F.R. §62.31(b)-(c), (f)-(g); App. 1176 - Jordan Dep. 81:2-6; Restricted App.1024 - Swartz Dep. 229:10-14. Under this circumstance, the training is not compensable. *Choa*, 310 F. 3d at 909; *Bienkowski*, 285 F. 3d at 141.

Even if Plaintiffs argue that au pairs were already "employees" who had been "hired" at the time of training, they cannot establish that training time was compensable. Au pairs' training is not compensable because it satisfies all four prongs of the FLSA regulation. Depending on the Sponsor, au pairs' training occurs either in their home country before they travel to the United States or at an orientation and training school in the United States. *Compare* App. 1079 - McHugh Dep. 180:18-20 (InterExchange's online training occurs prior to travel to the United States), *with* App. 1176 - Jordan Dep. 81:2-9 (Cultural Care's training school takes place in New York before au pairs travel to host families). In either case, the training occurs before au pairs travel to their host families or begin any childcare duties. *Id. See also* App. 1210 - Gaulter May 31, 2017 Dep. 23:8-14; App. 1082 - McNamara Dep. 83:1-3; App. 929 - McHugh Decl. ¶ 12. Therefore, this training does not occur during regular working hours.

Second, this training is "voluntary" under the FLSA because it is mandated by the government. *See Kosakow*, 274 F.3d at 721-22. As discussed above, State Department

regulations dictate the training and its content. 22 C.F.R. §62.31 (b)-(c), (f)-(g). Because the content relates generally to safety and childcare, and not to an au pair's specific duties with its individual host family, the training also meets the third prong of the FLSA test. *See* App. 1020 - Swartz Dep. 126:11-14; App. 1180-81 - Kruschwitz Dep. 45:20-46:1; App. 1189 - Sahin Dep. 70:14-17; App. 929 - McHugh Decl. ¶ 12.

Finally, it is undisputed that au pairs perform no productive work during their training. The training occurs before they meet their host family, and no actual childcare is performed during the training. 22 C.F.R. §62.31(b)-(c), (f)-(g); App. 1181 - Kruschwitz Dep. 46:6-10; App. 1186 - Bobboni Dep. 78:2-4; App. 1184 - Pavot Dep. 46:8-49:4; *See also* App. 929 - McHugh Decl. ¶ 12. For these reasons, au pairs' training time is not compensable, and Defendants are entitled to summary judgment on these claims.

## CONCLUSION

For the reasons set forth herein and in Defendants' supplemental individual briefs, Defendants are entitled to summary judgment on all of Plaintiffs' claims.

Respectfully submitted,

s/ Kathryn A. Reilly
Kathryn A. Reilly (reilly@wtotrial.com)
Brett M. Mull (mull@wtotrial.com)
Wheeler Trigg O'Donnell LLP
370 Seventeenth Street, Suite 4500
Denver, CO 80202-5647

**Attorneys for Defendants Agent Au Pair,
Go Au Pair Operations, and American
Cultural Exchange, LLC d/b/a Go Au Pair**

s/ Joan A. Lukey
Joan A. Lukey (joan.lukey@choate.com)
Robert M. Buchanan, Jr.
(rbuchanan@choate.com)
Michael T. Gass (mgass@choate.com)
Justin J. Wolosz (jwolosz@choate.com
Lyndsey M. Kruzer (lkruzer@choate.com)
CHOATE HALL & STEWART LLP
Two International Place
Boston, Massachusetts  02110
Telephone:  (617) 248-4790

James M. Lyons (jlyons@lrrc.com)
Jessica L. Fuller (jfuller@lrrc.com)
Diane Hazel (dhazel@lrrc.com)
LEWIS ROCA ROTHGERBER CHRISTIE
LLP
One Tabor Center, Suite 3000
1200 Seventeenth Street
Denver, CO 80202
Tel: (303) 623-9000
Fax: (303) 623-9222

**Attorneys for Defendant Cultural Care,
Inc. d/b/a Cultural Care Au Pair**

s/ Stephen J. Macri
Stephen J. Macri
(stephen.macri@ogletree.com)

Joseph B. Cartafalsa
(joseph.cartafalsa@ogletree.com)
Robert M. Tucker
(robert.tucker@ogletreedeakins.com)
Ogletree, Deakins, Nash, Smoak & Stewart,
P.C.
1745 Broadway
New York, New York
(212) 492-2071


s/ Eric J. Stock
Eric J. Stock
(estock@gibsondunn.com)
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166
(212) 351-2301

**Attorneys for Defendant American
Institute for Foreign Study d/b/a Au Pair
in America**

s/ James E. Hartley
James E. Hartley
(jhartley@hollandhart.com)
Adam A. Hubbard
(aahubbard@hollandhart.com)
Holland & Hart LLP
1800 Broadway, Suite 300
Boulder, CO 80302

Jonathan S. Bender
(jsbender@hollandhart.com)
Holland & Hart LLP
555 Seventeenth Street, Suite 3200
Denver, CO 80202

**Attorneys for Defendant Cultural
Homestay International**

_s/ Susan M. Schaecher_
Susan M. Schaecher, Esq.
(sschaecher@laborlawyers.com)
FISHER & PHILLIPS, LLP
1801 California Street, Suite 2700
Denver, CO 80202
Tel: 303-218-3650
Fax: 303-218-3651

**Attorneys for Defendants APF Global Exchange, NFP**

_s/ Bogdan Enica_
Bogdan Enica
(Bogdan@expertaupair.com)
Expert AuPair
111 Second Ave NE, Ste. 213
St. Petersburg, FL 33701

**Attorney for Defendant Expert Group International, Inc. d/b/a Expert Au Pair**

_s/ Peggy E. Kozal_
Peggy E. Kozal
(pkozal@gordonrees.com)
Thomas Baker Quinn
(tquinn@gordonrees.com)
Nathan A. Huey (nhuey@gordonrees.com)
Heather K. Kelly (hkelly@gordonrees.com)
Jennifer Arnett-Roehrich (jarnett-roehrich@grsm.com)
Gordon & Rees LLP
555 17th Street, Suite 3400
Denver, CO 80202

**Attorneys for Defendant AuPairCare, Inc.**

<u>s/ Martha L. Fitzgerald</u>
Martha L. Fitzgerald
(mfitzgerald@bhfs.com)
David B. Meschke
(dmeschke@bhfs.com)
Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street, Suite 2200
Denver, CO 80202-4432

**Attorneys for Defendant EurAuPair**
**Intercultural Child Care Programs**

<u>s/ Brooke A. Colaizzi</u>
Brooke A. Colaizzi
(bcolaizzi@shermanhoward.com)
Heather F. Vickles
(hvickles@shermanhoward.com)
Raymond M. Deeny
(rdeeny@shermanhoward.com)
Joseph Hunt
(jhunt@shermanhoward.com)
Alyssa L. Levy
(alevy@shermanhoward.com)
SHERMAN & HOWARD L.L.C.
633 Seventeenth Street, Suite 3000
Denver, CO 80202

**Attorneys for Defendant InterExchange,**
**Inc.**

<u>s/ William J. Kelly III</u>
William J. Kelly III
(wkelly@kellywalkerlaw.com)
Chandra Marie Feldkamp
(cfeldkamp@kellywalkerlaw.com)
KELLY & WALKER LLC
1512 Larimer Street, Suite 200
Denver, CO 80202

**Attorneys for Defendant USAuPair, Inc.**

s/ Meshach Y. Rhoades
Meshach Y. Rhoades
Martin J. Estevao
Vance O. Knapp
1700 Broadway, Suite 2100
Denver, CO 80290-2101
(720) 722-7195
mrhoades@armstrongteasdale.com
mestevao@armstrongteasdale.com
vknapp@armstrongteasdale.com

**Attorneys for Defendant GreatAuPair, LLC**

## <u>CERTIFICATE OF SERVICE (CM/ECF)</u>

I hereby certify that on February 16, 2018, I caused to be electronically filed the foregoing CERTAIN DEFENDANTS' MOTION FOR SUMMARY JUDGMENT with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*s/ Claudia Jones*