Defs.' Appx. 00000387

# Repeat Family Rewards

Cultural Care Repeat Family Rewards Program is offered exclusively to families who decide to extend with their current au pair or to host a new au pair from overseas. Repeat families are entitled to great benefits including:

- The most generous program discounts in the industry
- Prioritized matching
- Free overseas connection services

Whether you decide to extend with your current au pair or welcome a new au pair, our repeat family discounts allow you to save a significant amount of money and enjoy priority status. For more information on extension pricing and the savings you receive as a host family, please visit the program costs section on **culturalcare.com.**

We encourage families to repeat with Cultural Care Au Pair and apply all that they've learned about being a host family to another great year with their current au pair or a new au pair from overseas.

# Extending with your current au pair

Host families who are having a great year with their current au pair may want to consider the Cultural Care Extension Program. This program allows all au pairs in good standing to extend their time in the U.S. for an additional 12, 9 or 6 months once their first year is over.

Extending with your au pair allows you to enjoy:

- Consistent care for you and your children
- Continuous program support from your LCC
- Significant savings
- Time saved finding a replacement
- Effort saved training a new au pair

Four to five months before your program year ends, you and your au pair will receive information about the Cultural Care Extension Program, and we suggest using this as an opportunity to talk about the possibility of an extension. Although it may seem early to bring up, the deadline for submitting extension registrations is 60 days before your au pair's legal departure date. Your au pair must also submit documentation showing she completed or will complete the educational component 30 days before her legal departure date. (Acceptable documentation includes a Certificate of Completion, a letter from the professor or an official transcript.)

The decision to stay together for an additional 12, 9, or 6 months is an important one, and it requires an open dialogue and careful consideration from each person involved. In the end, all parties should feel completely comfortable with the decision to remain together.

If you know you want your au pair to extend, share why you appreciate her and how the next year might look for your family. Most au pairs who extend decide to do so with their current families because of their love for their host families, their new community and all the new friends they've made.

**BENEFITS TO REPEATING WITH YOUR CURRENT AU PAIR INCLUDE:**

- Consistent care for you and your children.
- Continuous program support from your LCC.
- Significant program fee savings.
- Time saved finding a replacement.
- Effort saved training a new au pair.

**OR, WELCOME A NEW AU PAIR AND LOOK FORWARD TO:**

- Continuous program support from your LCC.
- A savings of up to $1,100!*
- The chance to expose your family to a new language and culture.

CC00000754

Defs.' Appx. 00000388

If you won't be inviting your au pair to extend with your family, it's also important to let your au pair know. Every au pair has the opportunity to extend with a new family during her extension term so this will be an option for her to consider. In fact, there are some au pairs who prefer to spend their additional 12, 9 or 6 months with a new family so they can see a different part of the country or to experience caring for children of different ages.

If you do decide to extend with your current au pair, you are entitled to the same 45 hours per week of personalized, live-in childcare including help with any child-related household help. All extension au pairs have basic travel insurance coverage but may purchase an optional extended insurance policy for a 6, 9, or 12 month extension term. Just like during the first year, host families are responsible for providing their au pair with paid vacation (2 weeks for 12- and 9-month extensions; 1 week for 6-month extensions) and contributions toward their coursework (up to $500 for 12- and 9-month extensions; $250 for 6-month extensions)[1].

## Welcoming a new au pair

If you decide not to or are unable to extend with your current au pair, we encourage you to register to host a new au pair. Families who decide to welcome new au pairs can look forward to:

- Continuous program support from your LCC
- Significant savings
- The option to expose your family to a new language and culture

We recommend re-applying early to welcome your new au pair for two reasons. First, it gives you and your placement manager more time to find a candidate who meets all of your family's criteria. In addition, repeat families who register early enough are entitled to an early matching bonus. To make sure you qualify for this bonus, we recommend you reference looking at the early matching bonus deadline chart available through your Host Family Account.

Once you've submitted your registration, you can begin reviewing candidates and schedule your next in-home interview with your LCC.

[1] *The amount a host family is required to contribute their au pair's educational component during her extension term is determined by the U.S. Department of State and is subject to change. Host families must comply with any change in the contribution amount.*

## CHAPTER 12

# Preparing for your au pair's departure

## Your au pair's return flight

About three months before the end of your au pair's year, she will receive an email from Cultural Care Au Pair asking her to select her return flight option within a three-week deadline. She will be prompted to speak with you about this decision so you can mutually decide on a time that is convenient. All au

---

**HELP YOUR AU PAIR PREPARE TO RETURN HOME BY DOING THE FOLLOWING:**

- Discuss the best and the most challenging moments for each of you.

- Explore what you've learned from each other.

- Share what you've learned about yourself.

- Discuss your answers to the following questions: What have you learned about each other's country and culture? What would you do differently if you had to do it over again? What would you keep the same? What's the one thing you will miss the most?

- Put together a scrapbook of photos and/or souvenirs, organize a farewell dinner or a weekend away, or give your au pair a special gift (family photo, art print of host city, etc.); any of these gestures will mean a great deal to your au pair.

- Write a letter of recommendation for your au pair to help with her job search back home.

- Finalize all financial matters with your au pair, such as payment of phone bills, medical bills, closing of bank accounts, etc.

CC00000755

Defs.' Appx. 00000389

pairs must return to their home countries no later than 30 days after their legal departure date, and Cultural Care Au Pair cannot book flights beyond this grace period. Approximately four to six weeks prior to her date of travel, your au pair's itinerary can be accessed in the "Current Au Pair" tab in your online account. As a host family, you are responsible for ensuring that your au pair gets to the airport in time to leave for home.

Should you or your au pair want to make changes to the requested departure date, she will need to contact Cultural Care within three days after submitting her return flight option. After that, changes are subject to a change fee plus any additional fees charged by the airline.

Your au pair can fly from any gateway Cultural Care Au Pair serves, however there may be additional fees involved if the gateway from which she departs is different than the one to which she arrived. Cultural Care Au Pair cannot guarantee one specific date or a specific gateway, since we require flexibility, but we will try our best to accommodate your au pair's first choice.

## 30-day grace period

At the end of a successful au pair's year, she is entitled to what's called a 30-day grace period. For the 30-day grace period, au pairs can stay legally in the country to do what they want, although they are not permitted to provide childcare during this time. If an au pair decides to extend her year, the 30-day grace period cannot be taken at the end of her first year. Rather, she is entitled to a 30-day grace period at the end of her extension term.

Many au pairs take advantage of their 30-day grace period to travel within the continental U.S. (with the exception of Alaska and Hawaii.) There are many tours geared toward au pair travel, and many au pairs plan trips with other au pairs who have the same month off. When it is time for your au pair to fly back home, she is responsible for returning to your area, and you are responsible for getting her to the airport for her flight.

If your au pair does plan to stay and travel during her 30-day grace period, the basic or extended insurance policy under which she was covered during her time as an au pair will expire. Erika Travel Insurance does not automatically cover your au pair during this grace period. Additional insurance must be purchased or she must show proof of insurance coverage by the end of her regular program term in order to have her return flight booked through Cultural Care Au Pair. For more information, please see the Insurance section of InfoSource.

## Reverse culture shock

As you and your au pair reflect upon the year spent together, it is natural to feel a range of emotions from sadness and confusion to relief and excitement. You might experience a renewed closeness or a loosening of bonds as you prepare to separate. In the latter case, you might notice an increase in irritability and tension. It is important to take time to express your thoughts and feelings if this occurs. You and your au pair are about to make a major change and are searching for a meaningful closure. Therefore, good communication is just as important at this time during your cultural exchange year.

It has been said that cultural exchange participants travel to not one but two

CC00000756

foreign cultures: the one they are visiting and the one to which they are returning. Upon returning home, au pairs often find their native culture strange and uninviting. You can prepare your au pair for reverse culture shock by talking about her feelings about going back home and asking questions about what expectations she has.

**PREVENT REVERSE CULTURE SHOCK: QUESTIONS FOR YOUR AU PAIR**

- Do you think your family and friends will notice the ways in which you have grown and matured while here? How will you handle it if they don't?

- You might be criticized for becoming "too American." How will you handle this if it happens?

- After first hearing about your exchange experience nobody seems to want to hear about it any more. How will you feel and what will you do?

- You might feel a little out of step with your friends. What will you do if old friends seem to ignore you?

- How will you integrate what you have learned here into your daily life back in your home country?

## Saying goodbye

You might find yourself in a state of shock and disbelief, emotionally unprepared for the fact that when you wake up tomorrow, your au pair will not be there. Whatever your emotions may be, know that it is natural to experience a period of re-adjustment after your au pair leaves. Most families find that they begin to adjust within a month or so, as they resume their routines, re-establish comfortable schedules and interact as a family with a new au pair (or with one less family member if you decide not to host another au pair).

One way to ease feelings of loss is to stay in contact with your au pair after she departs. Many families stay in touch with their previous au pairs for many, many years and some even decide to visit their previous au pairs or invite them back to the U.S. to visit. Even though the nature of the relationship must change, the bond can last a lifetime.

## Making the transition to a new au pair

As you say farewell to one au pair and welcome another, please remember to be sensitive to the needs of both. While the departing au pair will want to know she will be missed and was appreciated, the arriving au pair is probably nervous about being compared to her predecessor. Try to limit your discussion of the "old" au pair in front of the "new" au pair. Each au pair is unique and will have different personality traits, strengths and weaknesses.

Allow time for your children to adjust to your new au pair. Naturally, they will probably miss your previous au pair, and creating a bond with your new au pair might take anywhere from a few days to a few weeks. Anything you can do to ease the transition will be appreciated by both of your au pairs. If you have questions or need help managing the transition, please call your LCC or program director.

"Saying goodbye to an au pair isn't always easy. Our older daughter tends to become more attached than anyone else in our family and so for her it is particularly tough. But we've learned that keeping in touch through Facebook and emails make it all easier. As a family we check in with them regularly to share what's going on with us and to find out what adventures they are up to."

**Johnson Family in California**

CC00000757

# CHAPTER 13

# *Appendix*

## *U.S. Department of State regulations*

**(a) Introduction.**

This section governs Department of State-designated exchange visitor programs under which foreign nationals are afforded the opportunity to live with an American host family and participate directly in the home life of the host family. All au pair participants provide child care services to the host family and attend a U.S. post-secondary educational institution. Au pair participants provide up to forty-five hours of child care services per week and pursue not less than six semester hours of academic credit or its equivalent during their year of program participation. Au pairs participating in the EduCare program provide up to thirty hours of child care services per week and pursue not less than twelve semester hours of academic credit or its equivalent during their year of program participation.

**(b) Program designation.**

The Department of State may, in its sole discretion, designate bona fide exchange visitor programs satisfying the objectives set forth in paragraph (a) of this section. Such designation shall be for a period of two years and may be revoked by the Department of State for good cause.

**(c) Program eligibility.**

Sponsors designated by the Department of State to conduct an au pair exchange program shall:

    (1) Limit the participation of foreign nationals in such programs to not more than one year;

    (2) Limit the number of hours an EduCare au pair participant is obligated to provide child care services to not more than 10 hours per day or more than 30 hours per week and limit the number of hours all other au pair participants are obligated to provide child care services to not more than 10 hours per day or more than 45 hours per week;

    (3) Require that EduCare au pair participants register and attend classes offered by an accredited U.S. post-secondary institution for not less than twelve semester hours of academic credit or its equivalent and that all other au pair participants register and attend classes offered by an accredited U.S. post-secondary institution for not less than six semester hours of academic credit or its equivalent;

    (4) Require that all officers, employees, agents, and volunteers acting on their behalf are adequately trained and supervised;

    (5) Require that the au pair participant is placed with a host family within one hour's driving time of the home of the local organizational representative authorized to act on the sponsor's behalf in both routine and emergency matters arising from the au pair's participation in their exchange program;

    (6) Require that each local organizational representative maintain a record of all personal monthly contacts (or more frequently as required) with each au pair and host family for which he or she is responsible and issues or problems discussed;

    (7) Require that all local organizational representatives contact au pair participants and host families twice monthly for the first two months following a placement other than the initial placement for which the au pair entered the United States.

    (8) Require that local organizational representatives not devoting their full time and attention to their program obligations are responsible for no more than fifteen au pairs and host families; and

    (9) Require that each local organizational representative is provided adequate support services by a regional organizational representative.

**(d) Au pair selection.**

In addition to satisfying the requirements of §62.10(a), sponsors shall ensure that all participants in a designated au pair exchange program:

    (1) Are between the ages of 18 and 26;

    (2) Are a secondary school graduate, or equivalent;

    (3) Are proficient in spoken English;

    (4) Are capable of fully participating in the program as evidenced by the satisfactory completion of a physical;

    (5) Have been personally interviewed, in English, by an organizational representative who shall prepare a report of the interview which shall be provided to the host family; and

    (6) Have successfully passed a background investigation that includes verification of school, three, non-family related personal and employment references, a criminal background check or its recognized equivalent and a personality profile. Such personality profile will be based upon a psychometric test designed to measure differences in characteristics among applicants against those characteristics considered most important to successfully participate in the au pair program.

**(e) Au pair placement.**

Sponsors shall secure, prior to the au pair's departure from the home country, a host family placement for each participant. Sponsors shall not:

    (1) Place an au pair with a family unless the family has specifically agreed that a parent or other responsible adult will remain in the home for the first three days following the au pair's arrival;

    (2) Place an au pair with a family having a child aged less than three months unless a parent or other responsible adult is present in the home;

    (3) Place an au pair with a host family having children under the age of two, unless the au pair has at least 200 hours of documented infant child care experience. An au pair participating in the EduCare program shall not be placed with a family having pre-school children in the home unless alternative full-time arrangements for the supervision of such pre-school children are in place;

    (4) Place an au pair with a host family having a special needs child, as so identified by the host family, unless the au pair has specifically identified his or her prior experience, skills, or training in the care of special needs children and the host family has reviewed and acknowledged in writing the au pair's prior experience, skills, or training so identified;

    (5) Place an au pair with a host family unless a written agreement between the au pair and the host family detailing the au pair's obligation to provide child care has been signed by both the au pair and the host family prior to the au pair's departure from his or her home country. Such agreement shall clearly state whether the au pair is an EduCare program participant or not. Such agreement shall limit the obligation to provide child care services to not more than 10 hours per day or more than 45 hours per week unless the au pair is an EduCare participant. Such agreement shall limit the obligation of an EduCare participant to provide child care service to not more than 10 hours per day or more than 30 hours per week.

    (6) Place the au pair with a family who cannot provide the au pair with a suitable private bedroom; and

    (7) Place an au pair with a host family unless the host family has interviewed the au pair by telephone prior to the au pair's departure from his or her home country.

**(f) Au pair orientation.**

In addition to the orientation requirements set forth at §62.10, all sponsors shall provide au pairs, prior to their departure from the home country, with the following information:

    (1) A copy of all operating procedures, rules, and regulations, including a grievance process, which govern the au pair's participation in the exchange program;

    (2) A detailed profile of the family and community in which the au pair will be placed;

    (3) A detailed profile of the educational institutions in the community where the au pair will be placed, including the financial cost of attendance at these institutions;

CC00000758

(4) A detailed summary of travel arrangements; and

(5) A copy of the Department of State's written statement and brochure regarding the au pair program.

**(g) Au pair training.**

Sponsors shall provide the au pair participant with child development and child safety instruction, as follows:

(1) Prior to placement with the host family, the au pair participant shall receive not less than eight hours of child safety instruction no less than 4 of which shall be infant-related; and

(2) Prior to placement with the American host family, the au pair participant shall receive not less than twenty-four hours of child development instruction of which no less than 4 shall be devoted to specific training for children under the age of two.

**(h) Host family selection.**

Sponsors shall adequately screen all potential host families and at a minimum shall:

(1) Require that the host parents are U.S. citizens or legal permanent residents;

(2) Require that host parents are fluent in spoken English;

(3) Require that all adult family members resident in the home have been personally interviewed by an organizational representative;

(4) Require that host parents and other adults living full-time in the household have successfully passed a background investigation including employment and personal character references;

(5) Require that the host family have adequate financial resources to undertake all hosting obligations;

(6) Provide a written detailed summary of the exchange program and the parameters of their and the au pair's duties, participation, and obligations; and

(7) Provide the host family with the prospective au pair participant's complete application, including all references.

**(i) Host family orientation.**

In addition to the requirements set forth at §62.10 sponsors shall:

(1) Inform all host families of the philosophy, rules, and regulations governing the sponsor's exchange program and provide all families with a copy of the Department of State's written statement and brochure regarding the au pair program;

(2) Provide all selected host families with a complete copy of Department of State-promulgated Exchange Visitor Program regulations, including the supplemental information thereto;

(3) Advise all selected host families of their obligation to attend at least one family day conference to be sponsored by the au pair organization during the course of the placement year. Host family attendance at such a gathering is a condition of program participation and failure to attend will be grounds for possible termination of their continued or future program participation; and

(4) Require that the organization's local counselor responsible for the au pair placement contacts the host family and au pair within forth-eight hours of the au pair's arrival and meets, in person, with the host family and au pair within two weeks of the au pair's arrival at the host family home.

**(j) Wages and hours.**

Sponsors shall require that au pair participants:

(1) Are compensated at a weekly rate based upon 45 hours of child care services per week and paid in conformance with the requirements of the Fair Labor Standards Act as interpreted and implemented by the United States Department of Labor. EduCare participants shall be compensated at a weekly rate that is 75% of the weekly rate paid to non-EduCare participants;

(2) Do not provide more than 10 hours of child care per day, or more than 45 hours of child care in any one week. EduCare participants may not provide more than 10 hours of child care per day or more than 30 hours of child care in any one week;

(3) Receive a minimum of one and one half days off per week in addition to one complete weekend off each month; and

(4) Receive two weeks of paid vacation.

**(k) Educational component.**

Sponsors must:

(1) Require that during their initial period of program participation, all EduCare au pair participants complete not less than 12 semester hours (or their equivalent) of academic credit in formal educational settings at accredited U.S. post-secondary institutions and that all other au pair participants complete not less than six semester hours (or their equivalent) of academic credit in formal educational settings at accredited U.S. post-secondary institutions. As a condition of program participation, host family participants must agree to facilitate the enrollment and attendance of au pairs in accredited U.S. post secondary institutions and to pay the cost of such academic course work in an amount not to exceed $1,000 for EduCare au pair participants and in an amount not to exceed $500 for all other au pair participants.

(2) Require that during any extension of program participation, all participants ( i.e. , Au Pair or EduCare) satisfy an additional educational requirement, as follows:

(i) For a nine or 12-month extension, all au pair participants and host families shall have the same obligation for coursework and payment therefore as is required during the initial period of program participation.

(ii) For a six-month extension, EduCare au pair participants must complete not less than six semester hours (or their equivalent) of academic credit in formal educational settings at accredited U.S. post-secondary institutions. As a condition of participation, host family participants must agree to facilitate the enrollment and attendance of au pairs at accredited U.S. post secondary institutions and to pay the cost of such academic coursework in an amount not to exceed $500. All other au pair participants must complete not less than three semester hours (or their equivalent) of academic credit in formal educational settings at accredited U.S. post-secondary institutions. As a condition of program participation, host family participants must agree to facilitate the enrollment and attendance of au pairs at accredited U.S. post secondary institutions and to pay the cost of such academic coursework in an amount not to exceed $250.

**(l) Monitoring.**

Sponsors shall fully monitor all au pair exchanges, and at a minimum shall:

(1) Require monthly personal contact by the local counselor with each au pair and host family for which the counselor is responsible. Counselors shall maintain a record of this contact;

(2) Require quarterly contact by the regional counselor with each au pair and host family for which the counselor is responsible. Counselors shall maintain a record of this contact;

(3) Require that all local and regional counselors are appraised of their obligation to report unusual or serious situations or incidents involving either the au pair or host family; and

(4) Promptly report to the Department of State any incidents involving or alleging a crime of moral turpitude or violence.

**(m) Reporting requirements.**

Along with the annual report required by regulations set forth at §62.17, sponsors shall file with the Department of State the following information:

(1) A summation of the results of an annual survey of all host family and au pair participants regarding satisfaction with the program, its strengths and weaknesses;

(2) A summation of all complaints regarding host family or au pair participation in the program, specifying the nature of the complaint, its resolution, and whether any unresolved complaints are outstanding;

(3) A summation of all situations which resulted in the placement of au pair participant with more than one host family;

(4) A report by a certified public accountant, conducted pursuant to a format designated by the Department of State, attesting to the sponsor's compliance with the

**CC00000759**

Defs.' Appx. 00000393

procedures and reporting requirements set forth in this subpart;

(5) A report detailing the name of the au pair, his or her host family placement, location, and the names of the local and regional organizational representatives; and

(6) A complete set of all promotional materials, brochures, or pamphlets distributed to either host family or au pair participants.

**(n) Sanctions.**

In addition to the sanctions provisions set forth at §62.50, the Department of State may undertake immediate program revocation procedures upon documented evidence that a sponsor has failed to:

(1) Comply with the au pair placement requirements set forth in paragraph (e) of this section;

(2) Satisfy the selection requirements for each individual au pair as set forth in paragraph (d) of this section; and

(3) Enforce and monitor host family's compliance with the stipend and hours requirements set forth in paragraph (j) of this section.

**(o) Extension of Program.**

The Department, in its sole discretion, may approve extensions for au pair participants beyond the initial 12-month program. Applications to the Department for extensions of six, nine, or 12 months, must be received by the Department not less than 30 calendar days prior to the expiration of the exchange visitor's initial authorized stay in either the Au Pair or EduCare program ( i.e. , 30-calendar days prior to the program end date listed on the exchange visitor's Form DS–2019). The request for an extension beyond the maximum duration of the initial 12-month program must be submitted electronically in the Department of Homeland Security's Student and Exchange Visitor Information System (SEVIS). Supporting documentation must be submitted to the Department on the sponsor's organizational letterhead and contain the following information:

(1) Au pair's name, SEVIS identification number, date of birth, the length of the extension period being requested;

(2) Verification that the au pair completed the educational requirements of the initial program; and

(3) Payment of the required non-refundable fee (see 22 CFR 62.90) via Pay.gov.

**(p) Repeat Participation.**

A foreign national who enters the United States as an au pair Exchange Visitor Program participant and who has successfully completed his or her program is eligible to participate again as an au pair participant, provided that he or she has resided outside the United States for at least two years following completion of his or her initial au pair program.

[60 FR 8552, Feb. 15, 1995, as amended at 62 FR 34633, June 27, 1997; 64 FR 53930, Oct. 5, 1999. Redesignated at 64 FR 54539, Oct. 7, 1999; 66 FR 43087, Aug. 17, 2001; 71 FR 33238, June 8, 2006; 73 FR 34862, June 19, 2008]

**United States Department of State**
**Office of Exchange Coordination and Designation**
**ECA/EC/PS - SA-44, Room 734**
**301 4th Street, S.W.**
**Washington, D.C. 20547**
jvisas@state.gov

CC00000760

Defs.' Appx. 00000394

# *Notes*

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

CC00000761

Defs.' Appx. 00000395

### *Learn more about:*

- **Your role as a host family**
- **Preparing for your au pair**
- **What your au pair will expect**
- **Tips for communicating with your au pair**
- **Program regulations and guidelines**
- **And more!**





*Cultural Care Au Pair*
*One Education Street*
*Cambridge, MA 02141*

*Phone: 1-800-333-6056*
*Fax: 1-617-619-1101*
*E-mail: aupair@culturalcare.com*

CC00000762

Defs.' Appx. 00000396

## 2014 Host Family Agreement

This agreement is between Cultural Care, Inc. of Cambridge, MA (hereinafter referred to as "CC") and
_____ and _____, of (City), (State),
_____(hereinafter referred to as "Host Family")
In good and sufficient consideration, including but not limited to the Host Families acceptance into the CC Au Pair program, the receipt of which is hereby acknowledged and the Host Families agreement to be bound by the following terms and conditions, Host Family agrees as follows:

1. This agreement shall govern in all respects (except financial obligations which are set forth in the Host Family Financial Responsibility Agreement) the relationship between CC and the Host Family unless modified by a subsequent written agreement signed by the parties. This agreement can only be modified by a writing signed by both parties and any purported oral agreement or statements shall be without any force or effect. The Host Family has reviewed and understands the financial obligations of participating in the Au Pair program as set forth in the Host Family Financial Responsibility Agreement. Host Family agrees to execute said document as a condition of acceptance into the Au Pair program.

2. Host Family understands and acknowledges that the Au Pair program is a cultural exchange program sponsored and regulated by the U.S. Department of State. Host Family will accept an au pair and any cultural differences in the spirit of international exchange and accept their role as a fellow program participant with responsibilities and obligations to the au pair and CC as outlined in this agreement. Host Family agrees to comply with all of the regulations published by U.S. Department of State in 22 CFR Part 62, as the same may be amended from time to time in the future ("the Regulations") in all respects as they are the governing standards of the program. Host Family acknowledges receipt of a copy of the U.S. Department of State publication "The Au Pair Exchange Program" (available on host family web account). Host Family affirms that they are U.S. citizens or legal permanent residents.

3. Host Family understands that CC has the exclusive right to determine the suitability of Host Families' home for placement of an au pair and Host Families' continued participation in the au pair program. CC may determine at its sole discretion that the home environment and/or proposed au pair responsibilities are not compatible with the spirit of the Cultural Care program. Host Family acknowledges that CC has complete and unfettered discretion to utilize whatever methods it deems appropriate to assist it in making this determination.

4. Host Family agrees that CC may immediately terminate Host Family's participation in the program and remove the au pair from Host Family's home, if a) CC determines, at its sole discretion, that the au pair is in an unsuitable environment or is being treated in an inappropriate manner by Host Family; or b) Host Family fails to comply with any provision of the Host Family Financial Responsibility Agreement; or c) Host Family fails to comply with any of the aforementioned regulations of the U.S. Department of State. In the case of any termination pursuant to this paragraph the Host Family may not be eligible for a program fee refund or a replacement au pair.

5. Host Family understands and acknowledges that it is the Host Family's sole responsibility to thoroughly interview and carefully choose an au pair from the candidate(s) presented to the Host Family, and that there is no guarantee as to the Host Family's satisfaction or to the compatibility of any particular candidate as an au pair in the Host Family. Host Family acknowledges and understands that the au pair is not an employee or agent of CC, and as such CC does not exercise dominion or control over the actions of the au pair. CC is not responsible for any act or omission on the part of the au pair.

6. Host Family understands that CC does not guarantee continuous childcare coverage during the program year under any circumstance, including, but not limited to, circumstances in which the au pair becomes ill or otherwise unable or unwilling to fulfill her or his duties hereunder; and that CC is not responsible for the costs of supplemental, replacement, or interim childcare. In addition, CC is not responsible for delays in the au pair's arrival due to visa rejections, visa delays, and flight delays.

7. Host Family will provide board and lodging in a suitable private bedroom that complies with local building codes in their home for the au pair throughout participation in the program. Host Family agrees to pay a weekly stipend in accordance with the Regulations. The stipend shall be paid to the au pair on the same mutually agreed upon day each week for fifty-one (51) weeks and cannot be withheld or pro-rated for any reason, including, but not limited to, outstanding phone bills, auto accidents, partially worked weeks, or lost time due to illness. Non-payment of the stipend on a weekly basis is grounds for program termination.

8. If the au pair will be driving a car owned or leased by any member of the Host Family, the Host Family will provide automobile insurance for the au pair at Host Family's sole cost. The insurance coverage shall not be less than the minimum mandatory insurance coverage required by law in the state in which the Host Family resides. In the case of an accident while the au pair is off duty, the au pair shall not be responsible for a deductible that exceeds $500.00 per incident. Host Family will

HIGHLY CONFIDENTIAL -
ATTORNEYS' EYES ONLY

CC00000787

Defs.' Appx. 00000397

not hold CC liable for any damage or loss resulting from the au pair's use of a vehicle. Host Family will pay for gas, and for the entire deductible resulting from any loss, for the vehicle(s) used by the au pair when performing his/her duties or requirements of the program. Host Family acknowledges that it is the Host Family's responsibility to conform to any and all state or local laws regarding the au pair's use of Host Family's automobile, including the au pair obtaining a local driver's license, if required. Host Family acknowledges that CC makes no representation of the ability of an au pair to drive an automobile. It is the sole responsibility of the Host Family to independently evaluate the driving abilities of the au pair in both the interview and on the road upon arrival, and the Host Family assumes responsibility for any driving courses or other instruction that Host determines to be necessary upon arrival.

9. Host Family agrees that during the first three (3) days of an au pair's stay in the home, a parent or another responsible adult shall remain in the home to facilitate the adjustment of the au pair into the family, household, and community.

10. Host Family agrees that au pair's will perform childcare services and light housekeeping related to childcare and that the au pair's duties are not to include heavy chores, including, but not limited to, yard work, window washing, or scrubbing floors. The au pair's duties relating to childcare may include active duties, including, but not limited to, general supervision of play, preparing children's meals, straightening their rooms, and doing the children's laundry; and passive duties, such as being present when the children are sleeping, which time is considered working hours.  Au pairs are not to be made responsible for homeschool instruction of the children, however as with traditional education may provide supervision and assistance with homework.

11. Host Family agrees that the au pair hours and work schedule will be limited to forty five (45) hours per week with a maximum of ten (10) hours per day and no more than five and one half (5.5) days per week. Host Family agrees that the au pair will have one (1) full weekend (Friday evening to Monday morning) off duty per month and one and one half (1.5) consecutive days off per week. The au pair will also receive two (2) calendar weeks (14 days) of paid vacation, to be taken at mutually agreed upon times. Host Family also understands that asking the au pair to work additional hours and/or offering additional compensation for additional hours is a violation of the U.S. Department of State guidelines. Host Family understands that violating any part of the working schedule rules will be cause for program termination.

12. Host Family may take their au pair on family holidays.  Should their travels take them outside the continental US, Host Family acknowledges that the au pair must contact CC to check on any visa restrictions.  Should the Host Family require the au pair to work during any part of the vacation, all program rules apply, included, but not limited to, private bedroom, working schedule and hours, and weekly stipend payments.

13. Host Family will facilitate enrollment and provide time off and transportation for the au pair to study at an accredited post-secondary institution of au pair's choice (for a minimum of six (6) credit hours or its equivalent). Host Family agrees to pay up to $500.00 per year for au pair's tuition and related educational expenses.  Host Family is responsible for transport to and from local classes.

14. Host Family will facilitate attendance and provide time off and transportation for the au pair to attend monthly meetings with CC's Local Childcare Consultant. Host Family agrees to at all times respond to the inquiries of CC's Local Childcare Consultant and other CC agents and employees; and Host Family agrees to attend at least one of two family day conferences sponsored by CC during the program year.

15. Host Family agrees that if an infant less than three (3) months old is living in the home, a parent or another responsible adult shall be present in the home at all times and the au pair shall not be the sole care giver for that child at any time (including sleeping hours). Host Family agrees to notify CC if a child less than three (3) months is added to the household at any time during the program term. Host Family agrees to notify CC in the event there is a change of composition of the household, including, but not limited to, divorce, custody change, death, adoption, pregnancy, or possible move to a different home.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

CC00000788

Defs.' Appx. 00000398

16. Host Family acknowledges that it is Host Family's responsibility to investigate and comply with any state or local laws which relate in any manner to having an individual live in the Host Family's home to provide childcare.

17. If a serious problem develops between the Host Family and the au pair, the Host Family shall notify CC immediately both by telephone and in writing. If CC in its sole discretion believes that its involvement might help to reach a resolution, the Host Family agrees to consult with and cooperate in all respects with CC representatives. Host Family agrees to follow CC's mediation and transition guidelines as outlined in the Host Family Handbook. Host Family further understands that the first month is a period of adjustment; and accordingly CC will not process non-emergency transitions during this time period

18. In the event of au pair replacement, CC will use reasonable efforts to locate another au pair for Host Family. The Host Family recognizes that CC may not be able to immediately find a new placement for the Host Family's departing au pair. If a new placement cannot be so immediately found, the Host Family is required to allow the departing au pair to continue to live with them for a period not in excess of two (2) weeks. During such interim period, the Host Family in its discretion may request the departing au pair to provide, or not to provide, any childcare services. Host Family will provide reasonable assistance to CC in transporting departing au pair to nearest departure gateway. The Host Family understands and acknowledges that it is the practice of CC to review the accounts of all Host Families that have had more than two placements within a thirty week period. CC may in its sole discretion require any Host Family so reviewed to pay a fee, the amount of which shall be in CC discretion enough to cover the travel and training costs of a new au pair. Said fee shall be a condition precedent to a new placement. Nothing contained in this provision modifies or alters in any manner the right of CC to determine any Host Family as unsuitable and to terminate their participation as set forth in the Host Family Agreement.

19. Host Family agrees to complete a new host family application, including host family agreement, weekly schedule, references, letter to the au pair, and photos in the event that:

a) Host Family completes at least thirty (30) program weeks (30 weeks or more is considered a program year).

b) Host Family transitions with their current au pair after completing at least 30 program weeks. Host Family understands they may be responsible for any tuition costs or vacation days for the replacement au pair if he/she has not previously received his/her allotment.

c) Host Family wishes to welcome an au pair into their home and their previously submitted application is older than six (6) months.

20. In the event that Host Family has received less than thirty (30) program weeks and chooses to extend with current au pair, Host Family understands that they are not eligible for extension pricing and the regular program fee rates apply. The au pair with whom the Host Family is extending must have arrived at Host Family's home more than thirty (30) weeks before the end of their first-year legal departure date to be eligible for Extension Program fee savings.

21.  Host Family agrees to notify CC should the au pair require any medical care that will render them unable to work for more than 1 week.  In the event of an accident or serious illness which, in the sole judgment of CC, prevents the au pair from continuing her/his duties for an extended period, she or he will end the exchange early and return home and CC will use reasonable efforts to find a replacement au pair for Host Family.  In acknowledgement of the nature of the au pair program and restrictions surrounding an au pair's insurance coverage, Host Family understands that u pairs are covered by travel health insurance, not comprehensive health insurance, and Host Family understands that should the au pair require ongoing care, s/he may be stabilized and then returned home for ongoing care.

22. Host Family understands that au pair term begins upon arrival to the CC training school. Host Family further agrees to assist CC in ensuring that the au pair leaves the United States at the conclusion of the program term.

23. Host Family acknowledges that CC is not responsible for any expenses incurred by the au pair or by the Host Family, including, but not limited to, telephone bills, automobile expenses, property damage, travel expenses, and health expenses not covered by insurance. Accordingly, Host Family agrees not to seek payment from CC for any of these expenses or costs.

24. Host Family agrees to inform CC in writing in the event Host Family wishes to withdraw from the program before completion of the program term. In the event of such withdrawal, Host Family shall be subject to the refund policy set forth in the Host Financial Responsibility Document executed by the Host Family. If Host Family withdraws from the program before the au pair arrives, Host Family is subject to cancellation fees.

25. Host Family acknowledges and understands that the Au Pair program is an International exchange program that is dependent on the U.S. government and foreign governments for support and assistance for its ability to function. Host Family agrees that CC is not responsible in any manner for any act of non-performance as a result of government regulations, sickness, epidemics, health risks, civil strife, industrial action, natural disaster, fire, adverse weather conditions, war or threat of war, actual or threatened terrorist activity or any other act or event beyond CC's control.

26. All adults residing in the home where the Au Pair will reside are required to be screened by CC in a manner solely determined by CC to be appropriate which shall include but not be limited to a criminal background check. Host Family hereby

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

CC00000789

Defs.' Appx. 00000399

consents to said criminal background check and agrees to acquire the consent to said criminal background from any other adult living in the household. Host Family hereby states that all adults living in the house have been so identified to CC staff. All adults living in the household who are legal guardians/parents of the involved children must execute this agreement. Host Family's obligation hereunder shall be joint and several. This Agreement shall be governed by the laws of the Commonwealth of Massachusetts, without regard to the conflict of law principles in Massachusetts or any other jurisdiction. In the event of any claim, dispute or proceeding arising out of the relationship of the Host Family and CC, or any claim whether in contract, tort, or otherwise, or at law or in equity that arises between the parties, whether or not related to this agreement, the parties hereby submit and consent to the exclusive jurisdiction and venue of the courts of the Commonwealth of Massachusetts and of the United States District Court for the District of Massachusetts.

27. CC may assign this agreement to another U.S. State Department approved entity who is an affiliate of CC or who acquires all or substantially all of the assets of CC.

28. Host Family agrees on their own behalf and on behalf of their children, to irrevocably, unconditionally, and fully remise, release, and forever discharge CC and CC's respective officers, directors, successors, assigns, attorneys, insurance companies, agents, employees and affiliates (all of said persons hereinafter, in the aggregate, being referred to as "Released Parties"), from any and all claims or causes of action which Host Family has or may hereafter have, which arise out of injury, damage, or loss of any other kind to the Host Family or their property resulting from participation in the CC program. This includes, without limitation, the au pair's performance of services for and involvement with the Host Family, regardless of how such injury, damage, or loss may arise and regardless of whether the injury, damage, or loss is in whole or in part caused by the negligence of any one or more of the Released Parties. Host Family further agrees to indemnify and hold harmless the Released Parties from and against any losses, claims, damages, or liabilities related to or arising out of the participation of Host Family in the CC program, including, but not limited to, any injury or damage to the Host Family or their children that the au pair causes or to which s/he contributes.

My (our) signature(s) below indicates acceptance of the terms of this agreement, and is legally binding and we agree to follow these terms and conditions if accepted into the program by CC. No alterations to the terms of this agreement will be valid unless approved in writing by CC.

_____
_____ _____
*Host_parent's_signature_Date*

_____
_____ _____
*Host_parent's_signature_Date*

*Please contact us with questions or for more information. Phone:* **1-800-333-6056** • *Email:* **aupair@culturalcare.com** • *Website*

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

CC00000790

Defs.' Appx. 00000400

# Report of Independent Accountants
## On Applying Agreed-Upon Procedures

Addressed to Sponsor

We have performed the procedures included in the Au Pair Compliances Audit Procedures which were supplementally issued in connection with the Exchange Visitor Program Regulations (the "Regulations"), Au Pair "Final Rule" (CFR 22 62.31(m), dated February 15, 1995, as amended June 27, 1997 by the former United States Information Agency, now administered by the United States Department of State (the "Department of State"), and enumerated below, for _____ _____. These procedures were agreed to by the management of _____ solely to assist you in your assertion of compliance with certain Department of State regulations during the year ended December 31, _____ This agreed-upon procedures engagement was performed in accordance with standards established by the American Institute of Certified Public Accountants. The sufficiency of these procedures is solely the responsibility of the specified users of the report. Consequently, we make no representation regarding the sufficiency of the procedures described below either for the purpose for which this report has been requested or for any other purpose.

1. We requested confirmation from the Department of State that _____(the Sponsor") is designated as a bona-fide program Sponsor authorized by the Department of State as of December 31, ___. _____, Director, Private Sector Division, Office of Exchange Coordination and Designation, confirmed on February 12 that _____ was a Department of State designated program for the year ended December 31.

From the Sponsor's listing of Au Pair Participants who arrived in the United States during the year ended December 31, _____, we randomly selected _____ of Program Participant files, as well as the associated Host Family files.   In connection with those files:

2. We read the DS-2019 (formerly IAP-66 Form), which is issued by the Sponsor, to determine that the participation of foreign nationals in the program is limited to not more than one year.

CONFIDENTIAL

CC00009096

Defs.' Appx. 00000401

3.  We read the program literature and the signed agreement between the Host Family and the Au Pair Participant (the "Host Family/Au Pair Agreement") to determine that these documents limit the number of hours an Au Pair Participant is obligated to provide childcare services to not more than 10 hours per day and 45 hours per week. _____ of the Host Family/Au Pair Agreement could not be located. We have confirmed directly with the Au Pair Participants whether this provision was adhered to (see results of umber 28a and b, respectively).

4.  We read the program literature and the Host Family/Au Pair Agreement to determine that these documents include a requirement that the Au Pair Participant register and attend classes offered at an accredited U.S. post-secondary institution for not less than six semester hours of academic credit or its equivalent. _____ of the Host Family/Au Pair Agreements could not be located. We have confirmed directly with the Au Pair Participants and Host Families whether the Au Pair participants have enrolled or will enroll in an accredited U.S. post-secondary institution (see results at number 28k and 29d, respectively).

5.  We inquired of Sponsor personnel and were informed that all officers, employees, agents and volunteers acting on their behalf are trained and supervised. We reviewed the listing of the Sponsor's annual training conference to determine local organizational representatives who attended. Those who did not attend the annual conference were required to attend regional meetings. Through review of the listing of those who attended either the annual conference or the regional meetings, it was noted that for _____ who were required to attend these sessions _____ did not attend either session. We reviewed the listing of those hired in _____. Of the _____ hired in _____ we randomly selected five files and verified by reference to training sessions reports that the one-on-one training sessions with the regional organizational representative, which are required, were conducted.

CONFIDENTIAL

CC00009097

6.     We inquired of Sponsor personnel and were informed that each Au Pair Participant is placed with a Host Family within one hour's driving time of the home of their local organizational representative authorized to act on the Sponsor's behalf.  We reviewed and tested the Sponsor's cluster and area mileage report identifying the distance between the Host Families selected for testing and their respective local organizational representative to determine that the distance was within one hour's driving time.

7.     We read the Host family/Au Pair Status Reports prepared by the Sponsor and actual Contact Records prepared by the local organizational representatives to determine that each local organizational representative maintained a schedule of personal, monthly contact with each Au Pair participant and Host Family for which he or she was responsible.  _____ of  the Host Family/Au Pair Status Reports and _____ of the Contact Records could not be located for a minimum of one quarter of the year.  As a result of applying this procedure to the remaining Host Family/Au Pair Status Reports and Contact Records, _____ of   the   Host Family/Au Pair Status Reports and _____ Contact  Records  contained  evidence  that  the  Au Pair Participant/Host Family were contacted monthly.  The remaining _____Host Family/Au Pair Status Reports and _____  Contact Records did not contain evidence that the Au  Pair  Participant/Host  Family  was  contacted  on  a  monthly  basis  throughout  the placement  period.   We  have  confirmed  directly  with  the  Au  Pair  Participants  and  Host Families whether monthly contact with the local representative was being adhered to (see results at number 28j and 29c, respectively).

8.     We read the Host Family/Au Pair Status Reports and actual Contact Records to determine that all local organizational representatives contacted Au Pair Participants and Host Families twice  monthly  for  the  first  two  months  following  a  placement  other  than  the  initial placement (a "rematch") for which the Au Pair entered the United States.  Of the _____ rematches tested, _____ Host Family/Au Pair Status Reports and _____ Contact Records could not be located.

**CONFIDENTIAL**

Defs.' Appx. 00000403

9.   We inquired of Sponsor personnel and were informed that the local organizational representatives not devoting their full time and attention to the program are responsible for not more than 15 Au Pairs and Host Families.  We randomly selected _____ and confirmed directly with them, via telephone, that they devoted their full time and attention to the program.  If they indicated that they did not devote their full time and attention to the program, we confirmed directly with them that they are responsible for not more than 15 Au Pairs and Host Families .

10.   We inquired of Sponsor personnel and were informed that each local organizational representative acting on their behalf is provided adequate support services by a regional organizational representative.   We reviewed the allocation of local organizational representatives to the regional organizational representatives.  We then randomly selected _____ local organizational representatives and read the personnel evaluation reports prepared by the regional organization representatives to determine that local organizational representatives are supervised.

11.   We examined the Au Pair Participant files which include the application, interview worksheets, physical examinations and signed Au Pair Agreements to determine that each Au Pair Participant selected satisfied each of the following requirements to be eligible to participate in the program:

    a.   Are between the ages 18 and 26;

    b.   Are secondary school graduates, or equivalent;

    c.   Are proficient in spoken English

    d.   Are capable of fully participating in the Program as evidenced by the satisfactory completion of a physical examination

    e.   Have been personally interviewed, in English, by an organizational representative; and

    f.   Have not previously participated in an Au Pair Program.

CONFIDENTIAL

CC00009099

12. We examined the Au Pair Participant files for completeness and to determine that each Au Pair Participant selected had successfully passed a background investigation that included:

    a.   Verification of school/presence of high school diploma

    b.   Three non-family related personal and employment references and notations of verification for each reference

    c.   A criminal background check or its recognized equivalent

    d.  A personality profile based upon a psychometric test designed to measure differences in characteristics among applicants against those characteristics considered most important to successfully participate in the au pair program.

In addition, the files included:

    e.   A signed Au Pair/Host Family Agreement

    f.   Notation that Host Family interviewed the Au Pair by telephone prior to his/her departure from the home country.

13. We read the signed Host Family Agreements to determine that the family agreed to comply with the requirement that a parent or other responsible adult will remain in the home for the first three days following the Au Pair's arrival.

14. We read the signed Host Family Agreement and program literature to determine that any Host Family that has a child aged less than three months has agreed that a parent or other responsible adult is present in the home

15a. We read the childcare references and the Au Pair application of Au Pair Participants who are placed with Host Families that have a child under the age of two, to determine that the Au Pair Participant had at least 200 hours of documented infant child care experience.

15b. We read the childcare references and the Au Pair application of Au Pair Participants who are placed with Host Families having a special needs child, as so identified by the Host Family, to determine that the Au Pair Participants have specifically identified their prior experience, skills, or training in the care of special needs children and the Host Family has reviewed and acknowledged in writing the Au Pair Participant's prior experience, skills, or training so identified.

CONFIDENTIAL

Defs.' Appx. 00000405

16.   We read the signed Host Family Agreement to determine that each Host Family agreed to provide a suitable private bedroom for the Au Pair Participant.  No Exceptions were found as a result of applying this procedure.  We have confirmed with the Au Pair Participants whether a private bedroom has been made available for their use (see results at number 28g).

17.   We inquired of Sponsor personnel and read the Au Pair pre-departure program literature to determine that the Sponsor has provided the Au Pair Participant with the following prior to their departure from their home country.

   a.   A copy of all operating procedures, rules and regulations, grievance procedures, and the Department of State's written statement regarding the Au Pair program that govern the Au Pair's participation in the exchange program.

   b.   A detailed profile of the host family and community in which the Au Pair Participant will be placed.

   c.   A detailed profile of the educational institutions in the community where the Au Pair Participant will be placed, including the cost of attendance at these institutions

   d.   A detailed summary of travel arrangements; and

   e.   A pre-departure package clearly describing childcare responsibilities and expectations, and enumerating behavior that is unacceptable.

18.   We read the materials used by the instructor for the Au Pair Participants' orientation program and including a detail of time by activity and discussed the orientation time and activities with management to determine that the Sponsor had provided the Au Pair Participants with the following prior to the placement with the Host Family:

   a.   Not less than eight hours of child safety instruction, no less than four of which was infant-related; and

   b.   Not less than twenty-four hours of child development instruction, of which no less than four was devoted to specific training for children under the age of two.

All hours required for the child safety instruction were completed prior to placement with the Host Family.  All hours required for child development instruction were completed prior to placement with the Host Family.  We have confirmed with the Au Pair Participants whether the orientation program included child safety and child development instruction (see results at number 28l).

CC00009101

Defs.' Appx. 00000406

19. We examined the Host Family Participant file for completeness, and to determine that each file examined contains their application, personal interview form, employment and personnel references and signed Host Family Agreement, and to determine that all Host Families met the following requirements:

    a.   Host parents are U.S. citizens or legal permanent residents;

    b.   The Host Parents are fluent in spoken English;

    c.   All adult family members resident in the home have been personally interviewed by an organizational representative;

    d.   The Host parents have successfully passed a background investigation, including employment and personal references;

    e.   The Host Family has financial resources to undertake hosting obligations; and

    f.   The Host Family has been provided with a written detailed summary of the exchange program and the parameters of their and the Au Pair Participant's duties, participation and obligations.

_____ of the personal interview forms could not be located. ____ of the employment and personal references could not be located for step d. No exceptions were found as a result of applying this procedure to the remaining ____ of the personal interview forms and _____ of the employment and personal references.

20. We read the program literature and the signed Host Family Agreement to determine that the Sponsor has informed the Host Families of the philosophy, rules and regulations governing the Au Pair exchange program, and that the Host Family has received a copy of the Department of State's written statement regarding the Au Pair program and promulgated Exchange Visitor Program regulations including the published supplemental information.

21. We read the program literature and the signed Host Family Agreement to determine that the Sponsor has informed the Host Families of their obligation to attend at least one family day conference to be sponsored by the Sponsor during the course of the placement year.

**CONFIDENTIAL**
CC00009102

22. We read the program literature to determine that the Sponsor's counselors are responsible for contacting the Au Pair Participant and the Host Family within 48 hours of the Au Pair Participant's arrival and must meet, in person, at the Host Family's home, with the Au Pair Participant and the Host Family within two weeks of the Au Pair's arrival. We read the local representative's Two-Week Placement Evaluation Report and the Host Family/Au Pair Status Reports to determine that compliance with these procedures was documented.

_____ of the Two-Week Placement Evaluation Reports and Host Family/Au Pair Status Reports could not be located. Of the remaining Two-Week Placement Evaluation Reports and Host Family/Au Pair Status Reports, _____ did not contain evidence of contact within 48 hours or a visit within two weeks of the Au Pair's arrival and _____ contained   evidence of both contact and a visit.

_____ Placement Evaluation Reports and Host Family/Au Pair Status Reports did not contain evidence of contact within 48 hours but did contain evidence of a visit within two weeks of the Au Pair's arrival.

_____Placement Evaluation Reports and Host Family/Au Pair Status Reports contained evidence of contact within 48 hours but did not contain evidence of a visit within two weeks. Of these, _____ contained evidence of a visit within three weeks, _____ contained evidence of a visit within one month and the remainder contained evidence of a visit beyond one month. We have confirmed directly with the Au Pair Participants and Host Families whether this requirement was adhered to (see results at number 28h and I and 29 a and b, respectively).

23. We read the signed Host Family/Au Pair Agreements to determine that the Host Family has agreed that the Au Pair Participants will:

   a. be compensated at a weekly rate based on 45 hours per week and paid in conformance with the requirements of the Fair Labor Standards Act. Compensation must be no less than $139.05 per week;

   b. not provide more than ten hours of childcare on any given day;

   c. receive a minimum of one and a half days off per week, in addition to one complete weekend off each month; and

   d. receive two weeks of paid vacation.

   e. receive up to $500 toward the costs of required academic course work.

_____ Of the Host Family/Au Pair Agreements could not be located. We have confirmed with the AU Pairs whether these provisions were adhered to (see results at number 28b, c, d, e and f).

Defs.' Appx. 00000408

24.  We read the program literature to determine that the Sponsor requires the Au Pair Participants to enroll in an accredited U.S. post-secondary institution for not less than six semester hours of academic credit or its equivalent.  We read Host Family/Au Pair Status Reports and sponsor documentation to confirm that this requirement is being met.  Of the _____ Au Pair Participants covered by the Host Family/Au Pair Status Reports, _____ returned home or left the program prior to the completion of one year and the educational requirement was not met.  _____ Of the Host Family/Au Pair Status reports contained evidence that the Au Pair Participants arrived at the Host Family's home in the last quarter of _____ and have not yet enrolled in an accredited U.S. post-secondary institution.  Through our review of the Host Family/Au Pair Agreement, we noted that these Au Pair Participants have agreed that they will enroll in an accredited U.S. post-secondary institution.   Of the remaining Host Family/Au Pair Status Reports and sponsor documentation reviewed, _____ did not contain evidence of enrollment in or attendance at an accredited U.S. post-secondary institution or its equivalent.  The remaining _____ contained evidence that the Au Pair Participant has enrolled in or attended classes.

We also read the Host Family/Au Pair Agreement to determine that as a condition of program participation, the Host Family agrees to facilitate the enrollment and attendance of the Au Pair Participant and to reimburse or pay up to $500 toward the costs of required academic coursework incurred by the Au Pair in meeting this education requirement for the Au Pair Participant's year.  _____ of the Host Family/Au Pair Agreements could not be located.

25.  We read the Host Family/Au Pair Status Reports and actual contact records prepared by the local and regional counselors that document contact between the Au Pair Participants, Host Families and their local organizational representatives, to determine that the Sponsor requires monthly contact among them and quarterly contact between the Au Pair Participant, Host Families, and the regional counselors.  _____ of the Host Family/Au Pair Status Reports and _____ of the actual contact records could not be located for a minimum of one quarter of the year.  As a result of applying this procedure to the remaining Host Family/Au Pair Status Reports and actual contact records, _____ of the Host Family/Au Pair Status Reports and _____ of the actual contact records contained evidence that the Au Pair Participant/Host Family were contacted monthly.  The remaining _ __ Host Family/Au Pair Status Reports and _____ actual contact records did not

CONFIDENTIAL

Defs.' Appx. 00000409

contain evidence that the Au Pair Participant/Host Family were contacted on a monthly basis throughout the placement period.  We noted that _____ of the four required regional quarterly contacts were documented.

26. We read the Host Family/Au Pair Status Reports, which counselors are required to prepare for unusual or serious situations, as defined in the Regulations, or incidents involving either the Au Pair of Host Family.  Any incidents involving or alleging a crime of moral turpitude or violence, as defined in the Regulations, are to promptly be reported to the Department of State.  _____ of the Host Family/Au Pair Status Reports could not be located for a minimum of one quarter of the year.  See number 25 above for results of monthly contact testing on the remaining Host Family/Au Pair Status reports.

27a. We have reviewed all complaints submitted to the sponsor, including those initiated by Au Pair Participants and those initiated by the Host Family Participants for completeness.  A summation each complaint setting forth the following details is appended.

   a.  The name of the host family and the number of years participating in the program,
   b.  The name of the au pair, and whether placement is first or subsequent (rematch)
   c.  Who initiated complaint and date of complaint
   d.  Whether complaint was reported to the Department of State, and if so, date of report
   e.  How complaint was resolved (action taken by Sponsor) and date of resolution.

27b. We have reviewed all reports of incidents involving or alleging a crime of moral turpitude or violence, including those committed by the Au Pair Participants and those committed by any member of the Host Family, for completeness and to determine if they were submitted by the Sponsor to the Department of State.

28. We sent confirmations to the _____ Au Pair Participants selected for testing.  Of the ____ confirmations sent, _____ have responded.  The following outlines the responses to the confirmation questions.

   a.  _____ responded that they worked 45 hours or less per week.
   b.  _____ responded that they were required to provide no more than 10 hours per day of childcare.  Of the remaining _____, _____ responded that they worked

CC00009105

more than 10 hours per day at least once a week. _____ is the average number of hours per day the Au Pair Participants reported they were expected to provide childcare.

c. _____ responded that they received at least $139.05 per week as compensation.

d. _____ responded that they received at least one-and-a-half days off per week.

e. _____ responded that they received one complete weekend off per month.

f. _____ responded that they did, or will, receive two weeks paid vacation.

g. _____ responded that they had a private room.

h. _____ responded that their Local organizational representative contacted them within 48 hours of their arrival at the Host Family's home.

i. _____ responded that they Local organizational representative met, in person, with them and their Host Family within two weeks of their arrival at the Host Family's home.

j. _____ responded that they had monthly contact with their Local organizational representative.

k. _____ responded that they had enrolled, or will enroll before the completion of the year, in a U.S. post-secondary institution of higher learning.

l. _____ responded that the orientation program they attended included _____ hours of child safety and _____ hours of child development instruction.

m. _____ responded that they were reimbursed or paid up to $500 toward the costs of the required academic coursework.

29. We sent confirmations to the _____ Host Families (including rematches) selected for testing. Of the _____ confirmations sent, _____ have responded. The following outlines the responses to the confirmation questions.

a. _____responded that their counselor contacted them within 48 hours of the Au Pair Participant's arrival at their home.

b. _____ responded that their counselor met, in person, with them and their Au Pair Participant within two weeks of the Au Pair Participant's arrival at their home.

c. _____ responded they had monthly contact with their counselor.

d. _____ responded that their Au Pair Participant had enrolled or will enroll before the completion of the year in a U.S. post-secondary institution of higher learning.

**CONFIDENTIAL**

Defs.' Appx. 00000411

30. We read a draft of the annual report to be filed by the *Sponsor* with the Department of *State* noting that the following requirements were included therein:

   a. A summation of the results of an annual survey of all Host Families and Au Pair Participants regarding their satisfaction with the Program, and its strengths and weaknesses, as defined in the Regulations;

   b. A summation of all complaints involving Host Family or Au Pair Participants in the program.   SEE TABLE D and new SUMMATION REPORT

   c. A summation of all situations which resulted in the placement of an Au Pair with more than one Host Family;

   d. A Report detailing the name of the Au Pair Participant, his or her Host Family placement, location and names of the local and regional organizational representatives; and

   e. A complete set of all promotional materials, brochures or pamphlets distributed to either Host Family or Au Pair Participants.

**CONFIDENTIAL**

Defs.' Appx. 00000412

We were not engaged to, and did not perform an examination, the objective of which would be the expression of an opinion on management's assertions.   Accordingly, we do not express such an opinion.   Had we performed additional procedures, other matters might have come to our attention that would have been reported to you.

This report is intended solely for the use of the management of _____ and  the  Department of State and should  not  be  used  by  those  who  have  not  agreed  to  the  procedures  and  taken responsibility for the sufficiency of the procedures for their purposes.

**CONFIDENTIAL**

ADD THE FOLLOWING STATISICAL REPORT, DRAWN FROM ENTIRE POOL OF PARTICIPANTS DURING REPORTING PERIOD

| TABLE A.  Participation Levels | Au Pairs |
|---|---|
| Total Number of Au Pair Participants Active in Program (in J-1 Status) during Reporting Period | |
| Number of Au Pair Participants Beginning Program during Reporting Period | |
| Number of these Participants who were rematched once | |
| Number of these Participants who were rematched two or more times | |
| Number of Participants Successfully Completing Program (12 month) During the Reporting Period | |
| Number of Participants leaving the program prior to the completion of their 12 months During the Reporting Period | |

| TABLE B.  Educational Component | Au Pair |
|---|---|
| Number of Au Pair Participants who successfully completed program (from Table A) | |
| Number of these participants who completed the educational component. | |
| Number of these participants who did not complete the educational component. | |

| TABLE C.  Early Terminations | Au Pair |
|---|---|
| Number of Participants leaving the program prior to the completion of their 12 months (from Table A) | |
| Of these, number of participants leaving program of their own choice | |
| Please specify reasons, and number of participants leaving program for each reason | |
| Of these, number of participants terminated by sponsor prior to the completion of their 12-month program | |
| Please specify reasons, and number of participants terminated by sponsor for each reason | |

**CONFIDENTIAL**

| TABLE D.  Complaints | Au Pair |
|---|---|
| A Complaint is defined as a statement of dissatisfaction received by the Sponsor directly or indirectly (through the DOS) from either Host Family or Au Pair Participants and requiring action on the part of Sponsor to resolve | |
| Total number of Complaints received by Sponsor during the reporting period | |
| Number of complaints initiated by both Au Pair and Host Family Particpants | |
| Number of complaints initiated by Au Pair Participants | |
| Number of complaints initiated by Host Family Participants | |
| Number of complaints resolved by mediation | |
| Number of complaints resolved by rematching the Au Pair Participant | |
| Number of complaints resolved by terminating the Au Pair Participant | |
| Number of complaints resolved by terminating the Host Family | |

| Reason for Complaints | |
|---|---|
| Host family not cooperative regarding au pair's educational component | |
| Host family requesting/requiring more than 45 hours/week or more than 10 hours/day of childcare | |
| Host family requesting/requiring housekeeping chores beyond those directly related to childcare responsibilities | |
| Au Pair is unwilling to work required time | |
| Au Pair provides inadequate childcare | |
| Au Pair is not proficient in the English language | |
| Au Pair did not receive required training | |
| Au Pair does not have required experience | |
| Issues concerning scheduling -- time off, vacation, daily routine | |
| Issues regarding money – pay, reimbursements for damages, calls, etc. | |
| Issues concerning hygiene and privacy | |
| Issues concerning behavior and/or inappropriate activity | |
| Other Complaints, Please specify | |

CC00009110

# SUMMATION OF COMPLAINTS

## *ALL Complaints Should be Included in the Summation*

Suggested format – to be used by ALL Sponsors

---

Host Family Name                     # of Years Participating in Program

Au Pair Name                         First Placement/Rematch (# of Rematch)

Complaint Initiated by:    Host Family   |_____|      Au Pair   |____|       Date: _____

Reported to the DOS?      Yes    |_____|      No    |_____|      If Yes, Date: _____

Description of Issues

How Resolved (Sponsoring Organization's Action) and Date

---

**CONFIDENTIAL**                                                                          **CC00009111**

Defs.' Appx. 00000416

**RESTRICTED - EXCERPTS OF MARIEL BOBBONI
12-29-17 DEPOSITION.
SEE RESTRICTED APPENDIX AT
Defs.' R. Appx. 1068**

Defs.' Appx. 00000417

**DEFS.' APPX. 00000417
INTENTIONALLY LEFT BLANK**

Defs.' Appx. 00000418

**DEFS.' APPX. 00000418
INTENTIONALLY LEFT BLANK**

Defs.' Appx. 00000419

**DEFS.' APPX. 00000419
INTENTIONALLY LEFT BLANK**

Defs.' Appx. 00000420

**DEFS.' APPX. 00000420**
**INTENTIONALLY LEFT BLANK**

Page 1

1                UNITED STATES DISTRICT COURT

2                   DISTRICT OF COLORADO

3     _____

4     JOHANA PAOLA BELTRAN, et al.,

5                        Plaintiffs,

6         vs.                 Case No. 1:14-CV-03074-CMA-KMT

7     INTEREXCHANGE INC., et al.,

8                        Defendants.

9     _____

10

11

12       THE VIDEOTAPED DEPOSITION OF EILEEN BOEHNE

13                  DECEMBER 20, 2017

14

15

16

17

18

19

20          PATRICIA A. NILSEN, RMR, CRR, CRC

21

22

23

24

25

Page 100

```
 1        Q.      So --
 2        A.      So I'm not sure if the word is not allowed
 3        or not supposed to.  But that's what I came away
 4        with.  My understanding through all the years was
 5        you -- you know, you -- you're not supposed to give
 6        them any more money, whether it's allowed or
 7        supposed to or what will happen.  That was my
 8        understanding.
 9        Q.      Okay.  But when you -- in paragraph eight,
10        and it says, I spoke with Ms. Fritz --
11        A.      Yeah.
12        Q.      -- who told me that families were not
13        allowed.
14                So this is -- this is your interpretation
15        of what she said, or is this what she said?
16        A.      I can't tell you exactly her words,
17        because it was verbal, and I didn't record it.
18        Q.      Okay.  But it's your --
19        A.      That's my interpretation.
20        Q.      It's your interpretation.  So you don't
21        know whether it was should not or --
22        A.      Or.
23        Q.       -- were not allowed?
24        A.      Or if it was illegal to pay them.  I don't
25        know -- she didn't say it's illegal, but I
```

Page 101

```
 1        remember -- my interpretation was, you shouldn't
 2        give them any more money.  And I don't know if she
 3        said you're not allowed to, you shouldn't; I don't
 4        remember that exact word that she said.  I don't
 5        remember it.
 6        Q.      But this declaration here reflects sort of
 7        your takeaway from it?
 8        A.      Yeah.
 9        Q.      Your interpretation --
10        A.      Yes.
11        Q.       -- of what she said?
12        A.      That was my interpretation.
13        Q.      Okay.  But --
14        A.      And had been my interpretation for many
15        years.
16        Q.      Do you think Ms. Goldstein Fritz would
17        disagree with this?
18        A.      I have no idea.
19        Q.      Okay.  And when did you find out about the
20        lawsuit?
21        A.      When I contacted -- I told you when I got
22        the e-mail.
23        Q.      Right.  Which you think was fall 2016?
24        A.      Somewhere.  I don't remember.  I'm
25        guessing November, December maybe.  Maybe it was
```

# D E P O S I T I O N

## HELD AT CAPE TOWN, SOUTH AFRICA

<u>DATE</u>:                                          21 SEPTEMBER 2016

In:

<u>JOHANA PAOLA BELTRAN</u>

and

<u>INTEREXCHANGE</u>

<u>BEFORE</u>:

                    (TRANSPERFECT DEPOSITION SERVICES)

<u>COMMISSIONER OF OATHS</u>:

<u>ON BEHALF OF PLAINTIFF</u>:          MR DANIEL SCHWARTZ

<u>ON BEHALF OF DEFENDANT</u>:          MR JUSTIN WOLOSZ

VERITAS A DIVISION OF EOH LEGAL SERVICES (PTY) LIMITED

7765548v1

MR WOLOSZ                                    124                                    B DEETLEFS

MR WOLOSZ: I know. ~~No~~ I'm trying to get at what the discussion was. Did you ask them if you could be paid overtime?

MS DEETLEFS: I asked them what the — sorry, I'm just
5   searching for the — so we discuss — I know this is — basically what happened is they — when we got to that point they asked me what they told me what they informed me about when I came in regards to overtime because they wanted to hire someone to come and look after the kids. And that's what led
10  to the conversation. I explained to them that my understanding is I can't get paid more but obviously I am — I'm supposed to work 45 hours a week so if it's within that time. And then we discussed the fact of being paid for that and then they just told me again that they're not allowed to. The 195.75
15  is all that we were allowed to get paid.

MR WOLOSZ: You said that when you were with the
            REDACTED            you had weekends off?

MS DEETLEFS: Yes.

MR WOLOSZ: What did you do in your free time?

20  MR SCHWARTZ: Objection. I have to just pause for a second. Subject to our protective order I don't believe that things that happen outside of working hours are subject to this lawsuit so I'm going to say that to the extent that these questions make Bella uncomfortable I don't believe she should have to answer
25  them.

21.09.16                                                                        /...
7765548v1

Defs.' Appx. 00000426

**In the Matter Of:**

JOHANA PAOLA BELTRAN

vs

INTEREXCHANGE, INC.

---

# RAQUEL EASTRIDGE

*December 15, 2017*

---



203 WEST WAYNE STREET, SUITE 406
FORT WAYNE INDIANA 46802
260.486.3954 | 800.977.3376
WWW.SUMMITCITYREPORTING.COM

Defs.' Appx. 00000427

JOHANA PAOLA BELTRAN vs INTEREXCHANGE, INC.
Eastridge, Raquel on 12/15/2017

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO


JOHANA PAOLA BELTRAN; et        )
al.,                            )
                                )
        Plaintiffs,             )
                                )   Civil Action No.
        -v-                     )   1:14-cv-03074-CMA-KMT
                                )
INTEREXCHANGE, INC.; et         )
al.,                            )
                                )
        Defendants.             )

**COPY**

The videotaped deposition upon oral examination of RAQUEL EASTRIDGE, a witness produced and sworn before me, Drea Sasse, CSR, RPR, Notary Public in and for the County of Porter, State of Indiana, taken on behalf of the Defendant, Cultural Care, Inc., d/b/a Cultural Care Au Pair, at Eichorn & Eichorn, 200 Russell Street, Hammond, Indiana, on Friday, December 15, 2017, at 8:52 a.m., pursuant to the Federal Rules of Civil Procedure.

JOHANA PAOLA BELTRAN vs INTEREXCHANGE, INC.
Eastridge, Raquel on 12/15/2017                                        Page 56

```
 1   A.    I don't recall.

 2             MR. WOLOSZ:  We've been going just over an

 3         hour.  Would you like to take a short break, or are

 4         you okay?

 5             THE WITNESS:  Sure.

 6             MR. WOLOSZ:  Okay.

 7             THE WITNESS:  I'll take a break.

 8             MR. WOLOSZ:  Could we take just five or ten

 9         minutes.

10             MS. SMALLS:  Sure.

11             THE VIDEOGRAPHER:  The time is 10:01, the end

12         of DVD 1.  We're off the record.

13             (A short break was taken.)

14             THE VIDEOGRAPHER:  The time is 10:14, the

15         beginning of DVD 2, and we're back on the record.

16             MR. WOLOSZ:

17   Q.    Before we broke, we were still talking about the

18         REDACTED family, and so I'd like to stay on that topic

19         for a bit.  So, Raquel, you told us about your

20         schedule.  Who set your schedule?

21   A.    The family.

22   Q.    And your schedule was not set by Cultural Care;

23         correct?

24   A.    Nope.

25   Q.    Who set your job duties?
```

JOHANA PAOLA BELTRAN vs INTEREXCHANGE, INC.
Eastridge, Raquel on 12/15/2017                                          Page 57

```
 1   A.   The family.

 2   Q.   And, again, your job duties were not set by

 3        Cultural Care; correct?

 4   A.   No, but Cultural Care, when I first applied, said

 5        what it was about.  If it was about kids, then it

 6        would be about caring for the children.

 7             THE VIDEOGRAPHER:  Ma'am, could we bring your

 8        microphone up.

 9             THE WITNESS:  (Witness complies.)

10             THE VIDEOGRAPHER:  Thank you.

11             MR. WOLOSZ:

12   Q.   What stipend amount did the REDACTED family pay you?

13   A.   $200 a week.

14   Q.   And that was paid by the family; correct?

15   A.   Yes.

16   Q.   That was not paid by Cultural Care?

17   A.   No, it was a check from the family.

18   Q.   You said that at times you were paid more than

19        that; is that right?

20   A.   Yes.

21   Q.   How often were you paid more than $200 a week?

22   A.   Whatever time I had to work extra.

23   Q.   And define what you mean by extra?

24   A.   Over 45 hours.

25   Q.   So every time you worked over 45 hours, you were
```

Defs.' Appx. 00000430

Page 1

1          THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF COLORADO

2
     ------------------------------:
3    JOHANA PAOLA BELTRAN, et al.,  :
                                    :
4              Plaintiffs,          :
                                    :
5         vs.                       : Civil Action No.
                                    : 1:14-cv-03074
6    INTEREXCHANGE, INC., et al.,   :
                                    :
7              Defendants.          :
     ------------------------------:

8

9

10     VIDEOTAPED DEPOSITION OF ANNIKA KRUSCHWITZ

11

12   DATE:            Tuesday, January 23, 2018

13   TIME:            12:57 p.m.

14   LOCATION:        Boies Schiller Flexner, LLP
                      1401 New York Avenue, NW
15                    Washington, D.C. 20005

16

17   REPORTED BY:     Shari R. Broussard, RPR, CSR
                      Reporter, Notary

18

19

20

21

22

Page 69

1    Q    Did the REDACTED family pay you a stipend?

2    A    Yes.

3    Q    How much did they pay you?

4    A    $195.75.

5    Q    And how did they pay you?

6    A    Bank transfer.

7    Q    And how often?

8    A    Every week.

9    Q    Do you remember what day they paid you

10   on?

11   A    I don't recall.

12   Q    Did they ever miss a payment to you?

13   A    I don't think so, no.

14   Q    Did the REDACTED family ever give you any

15   money besides your 195.75 per week?

16   A    No.

17   Q    Did they ever give you any gifts?

18   A    Yes.

19   Q    What did they give you as gifts?

20   A    My host mom gave me a bracelet for my

21   birthday and pajama and my host dad did like a --

22   a second key for the car.  We had a shared car, so

Page 1

1

2    IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

3

Civil Action No. 1:14-cv-03074-CMA-KMT

4    - - - - - - - - - - - - - - - - - - - - - x

5    JOHANA PAOLA BELTRAN, et al.,

6                        Plaintiffs,

7             - against -

8    INTEREXCHANGE INC., et al.,

9                        Defendants.

- - - - - - - - - - - - - - - - - - - - - x

10

11                        January 26, 2018

8:15 a.m.

12

575 Lexington Avenue

13                        New York, New York

14

15        VIDEOTAPED DEPOSITION upon oral examination of

16    LAURA JULIANA CANO LIGARRETO, held at the above time

17    and place, taken before Brittany Saline, a

18    Professional Shorthand Reporter and Notary Public

19    of the State of New York, pursuant to the Federal

20    Rules of Civil Procedure, with written notice as

21    to time and place thereof.

22

23

24

25

```
                                              Page 69

 1          Laura  Juliana  Cano  Ligarreto

 2     REDACTED    family?

 3        A     Yes.

 4        Q     Okay.   When did you speak with

 5     them?

 6        A     After my first week with the

 7     family.

 8        Q     What did you discuss?

 9        A     About the schedule and what kind

10     of duties she was doing.

11        Q     Did you have any specific

12     questions?

13        A     Yes.  I asked about the car and

14     my host mom personality.

15        Q     Did you have trouble getting

16     along with the host mom?

17        A     Yes.

18        Q     Did you ever work more than 45

19     hours per week with the   REDACTED   family?

20        A     No.

21        Q     No?

22        A     No.

23        Q     Okay.  And did the   REDACTED

24     family pay you a stipend every week?

25        A     Yes.
```

```
                                           Page 70

 1          Laura  Juliana  Cano  Ligarreto

 2      Q    Okay.  How much was that?

 3      A    195.75.

 4      Q    Did that amount ever vary?

 5      A    Excuse me?

 6      Q    Did that amount ever change?

 7      A    Yes, sometimes she was paying me

 8  200.

 9      Q    Any other money that you received

10  from the family?

11      A    No.

12      Q    Did Cultural Care set your work

13  schedule with the   REDACTED   family?

14          MR. LIBLING:  Objection to form.

15      A    No.

16      Q    Did Cultural Care define what

17  tasks you would perform for the   REDACTED

18  family?

19      A    No.

20          MR. LIBLING:  Objection to form.

21      Q    Did you have access to a car with

22  the   REDACTED   family?

23      A    No.

24      Q    What about a cell phone?

25      A    Yes.
```

```
                                          Page 81

 1          Laura  Juliana  Cano  Ligarreto

 2      A     Yes.

 3      Q     And  did  you  have  your  own  bedroom

 4   with  the  REDACTED ?

 5      A     Yes.

 6      Q     Did  they  pay  you  a  stipend  every

 7   week?

 8      A     Yes.

 9      Q     And  how  much  was  that?

10      A     Two  hundred  fifty.

11      Q     Did  that  amount  ever  change?

12      A     Yes.

13      Q     Okay.   When?

14      A     I  don't  know  the  exact  day,  it

15   probably  was  after  a  month  with  them.

16      Q     Okay.   What  did  it  change  to?

17      A     Why?

18      Q     No.   What.   What  was  the  amount

19   that  it  changed?

20      A     To  300.

21      Q     And  did  it  change  after  that?

22      A     No.

23      Q     And  you  were  with  the  REDACTED

24   family  until  May  2016;  does  that  seem

25   right?
```

```
                                            Page 89
 1          Laura Juliana Cano Ligarreto
 2    were there any other gifts that you
 3    received from the family?
 4         A    No.
 5         Q    So if you go back to Exhibit 3,
 6    and it's -- it's the same page, I believe,
 7    we were looking at before where it says B,
 8    Placement 2?
 9         A    (Perusing.)
10         Q    And there's a question there,
11    "What was the weekly stipend that you were
12    paid?"  And it says "250."  So should that
13    have been 250/300?
14         A    Yes.
15              MR. LIBLING:  Objection to form.
16         Q    And I believe there was some
17    formatting issues, but the preceding
18    question, "How did you and the host family
19    decide the amount of the weekly stipend?"
20    Can you just tell me that in English, I
21    think I get the gist, but it's been a while
22    since --
23         A    Like how did we like decide the
24    amount?
25         Q    Yeah, yeah, just the English.
```

```
                                            Page 90
 1          Laura  Juliana  Cano  Ligarreto
 2              MR.  LIBLING:   I  think  he's  asking
 3      you  to  translate  --
 4      A     Oh,  this  part.
 5      Q     Yeah.
 6      A     Oh,  because  my  host  dad  told  me
 7  that  he  thought  it  was  unfair,  the  stipend
 8  that  we  were  getting,  the  195,  so  he
 9  decided  he  wanted  to  pay  more.
10      Q     Okay.   And  when  did  you  have  that
11  conversation?
12      A     When,  at  the  meeting  we  had  when
13  he  went  to  New  Jersey  to  my  LCC's  house.
14      Q     So  that  was  before  --
15      A     Before.
16      Q     Did  you  ever  discuss  the  stipend
17  any  other  time  after  that,  with  the  REDACTED
18  family?
19      A     No.
20      Q     Did  they  say  why  they  increased
21  the  payment  from  250  to  300?
22      A     Yes,  because  he  considered  I  was
23  doing  a  good  job.
24      Q     Okay.   And  then  it  remained  300
25  for  the  rest  of  your  time  with  the  family?
```

Page 1

1           IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLORADO

2
    ------------------------------------
3   JOHANA PAOLA BELTRAN, et al.,      : Civil Action
                                         No. 1:14-cv-03074
4            Plaintiffs,               :
5        v.                            : VIDEOTAPED
                                         DEPOSITION OF:
6   INTEREXCHANGE, INC., et al.,       : CECILE PAVOT
7            Defendants.               :
    ------------------------------------

8

9               TRANSCRIPT of the stenographic notes of

10  the proceedings in the above-entitled matter, as taken

11  by and before TERESA M. CATULLO, a Certified Court

12  Reporter, Registered Professional Reporter and Notary

13  Public of the State of New Jersey, held at the

14  SPRINGHILL SUITES BY MARRIOTT, 1000 Charles Ewing

15  Boulevard, Ewing, New Jersey, on Friday, January 19,

16  2018, commencing at 8:06 in the forenoon.

17

18

19

20

21

22

23

24

25

Defs.' Appx. 00000439

```
                                              Page 67

 1          A.   Yes.

 2          Q.   Where did you go skiing?

 3          A.   In Vail.

 4          Q.   In Vail.  And you flew there?

 5          A.   Yes.

 6          Q.   Where did you stay when you were in Vail?

 7          A.   With them in the hotel.

 8          Q.   It was in a hotel?

 9          A.   Yeah.

10          Q.   Do you remember what hotel?

11          A.   No.

12          Q.   Was it nice?

13          A.   Yes.

14          Q.   Who sets your schedule?

15          A.   The host family.

16          Q.   Did Cultural Care set your schedule?

17          A.   No.

18          Q.   Did they have any input into the hours

19   that you worked?

20          A.   We can't work more than 45 hours.

21          Q.   But other than that?

22          A.   No.

23          Q.   And who set the types of things that you

24   did around the home?

25          A.   The host family.
```

Page 1

1

2    IN THE UNITED STATES DISTRICT COURT

3    FOR THE DISTRICT OF COLORADO

4    Civil Action No. 1:14-cv-03074-CMA-KMT

5    ----------------------------------x

6    JOHANA PAOLA BELTRAN, LUSAPHO

     HLATSHANENI, BEAUDETTE DEETLEFS,

7    DAYANNA PAOLA CARDENAS CAICEDO and

     ALEXANDRA IVETTE GONZALEZ, on behalf of

8    themselves and others similarly situated,

9              Plaintiffs,

10

         - against -

11

12   INTEREXCHANGE, INC., et al.,

13            Defendants.

14   ----------------------------------x

                    January 26, 2018

15                  9:05 a.m.

16

17       Videotaped Deposition of KUBRA SAHIN,

18   taken by Defendants, pursuant to Notice,

19   held at the offices of Boies Schiller &

20   Flexner LLP, 575 Lexington Avenue, New

21   York, New York, before Todd DeSimone, a

22   Registered Professional Reporter and Notary

23   Public of the State of New York.

24

25

Page 98

1                    SAHIN

2        Q.      Did you sometimes go out to eat

3    with your friends?

4        A.      Yeah.

5        Q.      When you ate in the house on

6    the weekends, did you buy your own

7    groceries?

8        A.      No.

9        Q.      Did the host family buy

10   groceries?

11       A.      Yes.

12       Q.      And the host family set your

13   schedule, correct?

14       A.      Yes.

15       Q.      Did Cultural Care ever set your

16   schedule?

17       A.      No.

18       Q.      You just testified that you

19   didn't keep any records of your schedule,

20   correct?

21       A.      Written records.

22       Q.      Written records.

23       A.      Yeah.

24       Q.      What about the other duties?

25       A.      What do you mean by that?

Page 110

1                        SAHIN

2        Q.      That's okay.   They paid you

3    $200 every week?

4        A.      Yes.

5        Q.      Did that ever vary?

6        A.      No, it would always be $200.

7        Q.      Did they ever miss a payment?

8        A.      Never.

9        Q.      Cultural Care never paid you

10   your stipend, did it?

11       A.      No.

12       Q.      Did you ever ask for more

13   money?

14       A.      No.

15       Q.      Why not?

16       A.      I thought it wasn't allowed.

17       Q.      Who told you that you weren't

18   allowed to ask for more?

19               MR. PACHECO:   Objection.

20       A.      First in the information

21   evening -- they never said I couldn't ask

22   for more, but they just always promoted the

23   $195.75, and we knew that every agency had

24   the same amount for the au pairs, so we

25   automatically understood that it was

Defs.' Appx. 00000443

Page 111

1              SAHIN

2    $195.75 for every au pair.

3        Q.    Did you ever discuss with the

4    family why you were paid $200 a week?

5        A.    They rounded it up.

6        Q.    Did you ever discuss the

7    stipend with them more generally?

8        A.    No.

9        Q.    But the host family decided to

10   round up, right?

11       A.    Yes.  So they first paid me in

12   cash, because I didn't -- well, yeah, I

13   didn't have the card.  They paid in me in

14   cash, and it would be too hard to pay

15   $195.75 in cash, so they rounded it up.

16       Q.    Were you paid in cash the

17   entire year and a half?

18       A.    No.

19       Q.    What changed?

20       A.    I got a bank account.

21       Q.    Is it your own bank account?

22       A.    Yes.

23       Q.    Was it linked to your host

24   parents' account?

25       A.    No.

```
                                                    Page 1

 1

 2    IN THE UNITED STATES DISTRICT COURT
      FOR THE DISTRICT OF COLORADO
 3    Civil Action No. 14-cv-03074-CMA-KMT
 4    -----------------------------------x
      JOHANA PAOLA BELTRAN, LUSAPHO
 5    HLATSHANENI, BEAUDETTE DEETLEFS,
      DAYANNA PAOLA CARDENAS CAICEDO and
 6    ALEXANDRA IVETTE GONZALEZ, on behalf
      of themselves and others similarly
 7    situated,
 8                         Plaintiffs,
 9
              -against-
10
      INTEREXCHANGE, INC., et al.,
11
                         Defendants.
12    -----------------------------------x
13
                         January 13, 2018
14                       9:07 a.m.
15
16       EXAMINATION BEFORE TRIAL of YENTL ROSE
17    PAGAN SWARTZ, one of the Plaintiffs
18    herein, taken by one of the Defendants,
19    pursuant to Notice, held at the office of
20    Boies Schiller Flexner, LLP, 575
21    Lexington Avenue, New York, New York,
22    before Lisa H. MacDonald, RPR, and Notary
23    Public of the State of New York.
24
25
```

Page 139

1              Y.R. Pagan Swartz

2      Q        How much do they pay you?

3      A        195.75.

4      Q        What means do they use to

5  pay you?

6      A        She transfers it to my --

7  well, my bank account is linked to her

8  bank account, so she does an ETF

9  transfer.

10     Q        How often does she transfer

11  the 195.75 to you?

12     A        It is scheduled for a

13  Friday.

14     Q        It's scheduled for each

15  Friday?

16     A        Yes.

17     Q        Other than the 195.75 weekly

18  transfer and the time the Swansons paid

19  for half of your plane ticket to South

20  Africa, have they given you any other

21  money?

22              MR. PACHECO:  Objection.

23      You can answer.

24      A        Not for work, but they have

25  given me for gifts, if it's my birthday

Defs.' Appx. 00000446

**RESTRICTED - CC00008224 - 8227.
SEE RESTRICTED APPENDIX AT
Defs.' R. Appx. 00000336.**

Defs.' Appx. 00000447

**RESTRICTED - CC00010503 - 10505. SEE RESTRICTED APPENDIX AT Defs.' R. Appx. 00000340.**

**RESTRICTED - CC00014815 - 16689.
SEE RESTRICTED APPENDIX AT
Defs. R. Appx. 00000343.**

Defs.' Appx. 00000449

**RESTRICTED - CC00019041 - 19042.
SEE RESTRICTED APPENDIX AT
Defs.' R. Appx. 00000514.**

Defs.' Appx. 00000450

**RESTRICTED - CC00034827.
SEE RESTRICTED APPENDIX AT
Defs.' R. Appx. 00000516.**

Defs.' Appx. 00000451

**RESTRICTED - CULTURAL CARE'S ANSWERS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES. SEE RESTRICTED APPENDIX AT Defs.' R. Appx. 00000517.**

Defs.' Appx. 00000452

**RESTRICTED - EXCERPTS OF NATALIE JORDAN 4-14-17 DEPOSITION.**
**SEE RESTRICTED APPENDIX AT Defs.' R. Appx. 00000530.**

Defs.' Appx. 00000453

**RESTRICTED - EXCERPTS OF GORAN RANNEFORS
6-12-17 DEPOSITION.
SEE RESTRICTED APPENDIX AT
Defs.' R. Appx. 00000561.**