Defs.' Appx. 00000598

1          IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLORADO

2

  Civil Action No. 14-cv-03074-CMA-KMT

3  _____

4  VIDEOTAPE DEPOSITION OF:  DAVID KEIL - July 21, 2016

5  _____

  JOHANA PAOLA BELTRAN; LUSAPHO HLATSHANENI; BEAUDETTE
6  DEEELEFS; DAYANNA PAOLA CARDENA CAICEDO; ALEXANDRA
  IVETTE GONZALEZ; on behalf of themselves and others
7  similarly situated,

8  Plaintiffs,

9  v.

10 INTEREXCHANGE, INC.; USAUPAIR, INC.; GREATAUPAIR, LLC;
  EXPERT GROUP INTERNATIONAL INC., d/b/a EXPERT AUPAIR;
11 EURAUPAIR INTERCULTURAL CHILD CARE PROGRAMS; CULTURAL
  HOMESTAY INTERNATIONAL; CULTURAL CARE, INC. d/b/a
12 CULTURAL CARE AU PAIR; AUPAIRCARE INC.; AU PAIR
  INTERNATIONAL, INC.; APF GLOBAL EXCHANGE, NFP d/b/a
13 AUPAIR FOUNDATION; AMERICAN INSTITUTE FOR FOREIGN STUDY
  d/b/a AU PAIR IN AMERICA; AMERICAN CULTURAL EXCHANGE,
14 LLC, d/b/a GOAUPAIR; AGENT AU PAIR, INC.; A.P.EX.
  AMERICAN PROFESSIONAL EXCHANGE, LLC d/b/a PROAUPAIR;
15 and 20/20 CARE EXCHANGE, INC. d/b/a THE INTERNATIONAL
  AU PAIR EXCHANGE, and ASSOCIATES IN CULTURAL EXCHANGE,
16 d/b/a GOAUPAIR,

17 Defendants.

  _____

18

19

20

21

22

23     **H+G**

24

25  Hunter+Geist, Inc.

303.832.5966          1900 Grant Street, Suite 1025          ▪ www.huntergeist.com
800.525.8490          Denver, CO 80203                        ▪ scheduling@huntergeist.com

Your Partner in Making the Record

Court Reporting, Legal Videography, and Videoconferencing

**EXHIBIT C**

Case No. 1:14-cv-03074-CMA-KMT   Document 861-10   filed 02/16/18   USDC Colorado   pg 2 of 153

Beltran v. Interexchange, Inc.          Defs.' App. 000599          7/21/2016

**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-03074-CMA-KMT
_____

VIDEOTAPE DEPOSITION OF:  DAVID KEIL - July 21, 2016
_____

JOHANA PAOLA BELTRAN; LUSAPHO HLATSHANENI; BEAUDETTE
DEEELEFS; DAYANNA PAOLA CARDENA CAICEDO; ALEXANDRA
IVETTE GONZALEZ; on behalf of themselves and others
similarly situated,
Plaintiffs,
v.
INTEREXCHANGE, INC.; USAUPAIR, INC.; GREATAUPAIR, LLC;
EXPERT GROUP INTERNATIONAL INC., d/b/a EXPERT AUPAIR;
EURAUPAIR INTERCULTURAL CHILD CARE PROGRAMS; CULTURAL
HOMESTAY INTERNATIONAL; CULTURAL CARE, INC. d/b/a
CULTURAL CARE AU PAIR; AUPAIRCARE INC.; AU PAIR
INTERNATIONAL, INC.; APF GLOBAL EXCHANGE, NFP d/b/a
AUPAIR FOUNDATION; AMERICAN INSTITUTE FOR FOREIGN STUDY
d/b/a AU PAIR IN AMERICA; AMERICAN CULTURAL EXCHANGE,
LLC, d/b/a GOAUPAIR; AGENT AU PAIR, INC.; A.P.EX.
AMERICAN PROFESSIONAL EXCHANGE, LLC d/b/a PROAUPAIR;
and 20/20 CARE EXCHANGE, INC. d/b/a THE INTERNATIONAL
AU PAIR EXCHANGE, and ASSOCIATES IN CULTURAL EXCHANGE,
d/b/a GOAUPAIR,
Defendants.
_____

**2**

PURSUANT TO NOTICE AND SUBPOENA, the
videotape deposition of DAVID KEIL was taken on behalf
of the Defendant Cultural Care, Inc. d/b/a Cultural
Care Au Pair at 1200 17th Street, Suite 3000, Denver,
Colorado 80202, on July 21, 2016, at 9:05 a.m., before
Carol M. Bazzanella, Registered Professional Reporter,
Certified Realtime Reporter, and Notary Public within
Colorado.

A P P E A R A N C E S

For the Plaintiffs:

    LAUREN FLEISCHER LOUIS, ESQ.
    Boies, Schiller & Flexner LLP
    401 East Las Olas Boulevard, Suite 1200
    Fort Lauderdale, Florida 33301
    ALEXANDER HOOD, ESQ.
    Towards Justice
    1535 High Street, Suite 300
    Denver, Colorado 80218

For the Defendant InterExchange, Inc.:
    BROOKE A. COLAIZZI, ESQ.
    Sherman & Howard L.L.C.
    633 17th Street, Suite 3000
    Denver, Colorado 80202

For the Defendant Expert Group International Inc. d/b/a
Expert AuPair:

    BOGDAN ENICA, ESQ.
    Law Office of Bogdan Enica
    111 2nd Avenue NE, Suite 213
    St. Petersburg, Florida 33701

For the Defendant EurAuPair Intercultural Child Care
Programs:
    MARTHA L. FITZGERALD, ESQ.
    DAVID B. MESCHKE, ESQ.
    Brownstein Hyatt Farber Schreck, LLC
    410 17th Street, Suite 2200
    Denver, Colorado 80202

**3**

For the Defendant Cultural Homestay International:
    JONATHAN S. BENDER, ESQ.
    Holland & Hart LLP
    555 17th Street, Suite 3200
    Denver, Colorado 80202

For the Defendant Cultural Care, Inc. d/b/a Cultural
Care Au Pair:

    JOAN A. LUKEY, ESQ.
    Choate Hall & Stewart LLP
    Two International Place
    Boston, Massachusetts 02110
    JAMES M. LYONS, ESQ.
    Lewis Roca Rothgerber Christie LLP
    1200 17th Street, Suite 3000
    Denver, Colorado 80202

For the Defendant AuPairCare, Inc.:
    PEGGY E. KOZAL, ESQ.
    Gordon Rees Scully Mansukhani
    555 17th Street, Suite 3400
    Denver, Colorado 80202

For the Defendant APF Global Exchange, NFP:
    SUSAN M. SCHAECHER, ESQ.
    Fisher & Phillips LLP
    1801 California Street, Suite 2700
    Denver, Colorado 80202

For the Defendants Agent Au Pair, American Cultural
Exchange, LLC d/b/a GoAupair and Associates in Cultural
Exchange, d/b/a GoAupair:
    KATHRYN A. REILLY, ESQ.
    Wheeler Trigg O'Donnell LLP
    370 17th Street, Suite 4500
    Denver, Colorado 80202

**4**

For the Defendant A.P.EX. American Professional
Exchange, LLC d/b/a ProAuPair and 20/20 Care Exchange,
Inc., d/b/a The International Au Pair Exchange:

    KATHLEEN CRAIGMILE, ESQ.
    Nixon Shefrin Hensen Ogburn, P.C.
    5619 DTC Parkway, Suite 1200
    Greenwood Village, Colorado 80111

Also Present:
    John Jensen, Videographer

Case No. 1:14-cv-03074-CMA-KMT   Document 861-10   filed 02/16/18   USDC Colorado   pg 3 of 153

Beltran v. Interexchange, Inc.                    Defs.' App.0001600                    7/21/2016
App.ID 02600

**5**

```
                I N D E X
EXAMINATION OF DAVID KEIL:                    PAGE
July 21, 2016

By Ms. Lukey                                    8

By Ms. Kozal                                  206

By Ms. Louis                                  214

                                          INITIAL
DEPOSITION EXHIBITS:                      REFERENCE
Exhibit 1  Renewed Notice of Deposition        12
Exhibit 2  Subpoena Recipient David Keil's     13
           Privilege Log

Exhibit 3  Collection of information printed    25
           from website David Keil
           Investigations

Exhibit 4  Response to Joint Motion to Strike   65
           Amended Complaint Sections 90 to 94
           by Certain Moving Defendants

Exhibit 5  Towards Justice: CONFIDENTIAL -     144
           Attorney-Client Work Product
           three-page report of Keil

Exhibit 6  Department of Regulatory            207
           Agencies Division of Professions
           and Occupations Office of Private
           Investigator Licensing 4 CCP 750-1,
           pages 1, 11, and 12
```

**6**

08:16:12  1       WHEREUPON, the following proceedings were
08:16:12  2  taken pursuant to the Federal Rules of Civil Procedure.
08:16:12  3       *   *   *   *   *
09:05:19  4       THE VIDEOGRAPHER:  Good morning.  We are
09:05:20  5  on the record.  The time is 9:05 a.m. on July 21, 2016.
09:05:26  6  This is the beginning of Media Unit No. 1.
09:05:30  7       We are here for the videotaped deposition
09:05:31  8  of David Keil in the matter of Johana Paola Beltran, et
09:05:37  9  al., versus InterExchange, Inc., et al., in the United
09:05:42  10  States District Court, the District of Colorado, Civil
09:05:45  11  Action No. 1:14-cv-03074-CMA-KMT.
09:05:55  12      The deposition is being held at 1200 17th
09:05:59  13  Street, Suite 3000, Denver, Colorado.  The videographer
09:06:03  14  is John Jensen and the court reporter is Carol
09:06:06  15  Bazzanella with Hunter + Geist, Inc., of Denver,
09:06:08  16  Colorado.
09:06:09  17      Please note that audio and video recording
09:06:12  18  will take place until all parties have agreed to go off
09:06:15  19  the record.  Microphones are sensitive and may pick up
09:06:18  20  whispers, private conversations, and cellular
09:06:21  21  interference.
09:06:21  22      Will counsel please state their
09:06:21  23  appearances, beginning with plaintiffs' counsel.
09:06:26  24      MS. LOUIS:  Good morning.  Lauren Louis of
09:06:26  25  Boies, Schiller & Flexner on behalf of the plaintiff

**7**

09:06:26  1  class.
09:06:27  2       MR. HOOD:  Alexander Hood from Towards
09:06:27  3  Justice on behalf of the plaintiff class.
09:06:31  4       MR. ENICA:  And for Defendant Expert Group
09:06:31  5  Bogdan Enica.
09:06:31  6       MS. KOZAL  Peggy Kozal for AuPairCare.
09:06:40  7       MS. COLAIZZI:  Brooke Colaizzi of Sherman
09:06:40  8  & Howard on behalf of Defendant InterExchange.
09:06:45  9       MS. CRAIGMILE:  Kathleen Craigmile on
09:06:47  10  behalf of Defendants A.P.EX. American Professional
09:06:49  11  Exchange and 20/20 Care Exchange.
09:06:52  12      MS. FITZGERALD:  Martha Fitzgerald and
09:06:53  13  David Meschke from Brownstein Hyatt on behalf
09:06:57  14  EurAuPair.
09:06:57  15      MR. BENDER:  John Bender from Holland &
09:06:59  16  Hart for Cultural Homestay International.
09:07:02  17      MS. SCHAECHER:  Sue Schaecher, Fisher &
09:07:03  18  Phillips, on behalf of AIFS and APF Global.
09:07:08  19      MR. LYONS:  Jim Lyons on behalf of -- with
09:07:11  20  Lewis Roca Rothgerber Christie on behalf of Cultural
09:07:14  21  Care.
09:07:14  22      MS. LUKEY:  Joan Lukey, Choate Hall &
09:07:16  23  Stewart, also on behalf of Cultural Care.
09:07:26  24          DAVID KEIL,
09:07:26  25  having been first duly sworn to state the whole truth,

**8**

09:07:26  1  testified as follows:
09:07:27  2          EXAMINATION
09:07:27  3  BY MS. LUKEY:
09:07:27  4       Q.  Good morning.  Could you state your full
09:07:30  5  name for the record, please.
09:07:31  6       A.  Yes.  My name is David Eric Keil.
09:07:35  7       MS. LUKEY:  I would like to establish
09:07:36  8  whether stipulations are going to be used.  I would
09:07:38  9  propose that we use the standard stipulation of
09:07:40  10  reserving all objections except as to form and
09:07:42  11  reserving motions to strike until time of trial, that
09:07:45  12  the witness be asked to read, correct, and sign within
09:07:48  13  30 days or such further period as all parties may agree
09:07:51  14  in writing, and that if the deposition is not returned
09:07:56  15  signed and with a corrected errata sheet, it will be
09:08:00  16  deemed final.  Is that acceptable?
09:08:02  17      MS. LOUIS:  Yes.
09:08:03  18      MS. LUKEY:  Acceptable to all
09:08:05  19  co-defendants?
09:08:06  20      (Indicated in the affirmative.)
09:08:06  21      MS. LUKEY:  Thank you.
09:08:08  22      Q.  (BY MS. LUKEY)  Mr. Keil, just by way of
09:08:09  23  background so that you understand the process we'll be
09:08:12  24  following this morning, on behalf of Cultural Care,
09:08:15  25  which is the party that noticed this deposition, I will

Beltran v. Interexchange, Inc.   Defs.' App. 000601   7/21/2016

---

**177**

```
13:58:59  1   that information, but because I was asking very generic
13:59:03  2   questions, I was receiving very generic answers back
13:59:07  3   about fees.
13:59:08  4        Q.  Did you get information -- other than
13:59:09  5   Ms. Crompton's general statement that her sponsor
13:59:15  6   agency was in the middle price wise, did you get
13:59:18  7   information from any of them regarding how and in what
13:59:22  8   amount they were compensated?
13:59:24  9        A.  Again, I don't recall anybody giving me
13:59:28 10   specific amounts about how they were compensated.  And,
13:59:32 11   frankly, if those conversations did occur, I don't
13:59:36 12   recall them.  But I don't recall anyone giving me
13:59:40 13   specific numbers.
13:59:42 14        Q.  Were you asking for specific numbers?
13:59:44 15        A.  No.  I was asking more generic questions,
13:59:47 16   as I've said.  How does this program work?  How
13:59:52 17   are -- you know, how are au pairs compensated?  How are
13:59:56 18   you guys compensated?  What type of expenses could a
13:59:59 19   family expect?  I was asking very general questions,
14:00:02 20   and I was receiving back pretty general answers on a
14:00:06 21   lot of those topics.
14:00:07 22        Q.  So you did not hear anything that you
14:00:11 23   considered important to note with regard to the
14:00:15 24   compensation of sponsors other than Ms. Crompton's
14:00:18 25   reference to being in the middle of the pack; is that
```

**178**

```
14:00:21  1   right?
14:00:21  2        A.  I didn't note anything beyond what's
14:00:24  3   currently in my statement.
14:00:25  4        Q.  Okay.  And you did not find any agreement
14:00:28  5   among sponsors as to the amount that they're paid,
14:00:31  6   correct?
14:00:32  7        A.  I didn't obtain enough information to know
14:00:34  8   that, no.
14:00:35  9        Q.  Okay.  So looking at what you did inquire
14:00:39 10   of with Irina Gussev.  Again, the questions relate to
14:00:47 11   the amount of the stipends paid to the au pairs,
14:00:51 12   correct?
14:00:52 13        A.  That appears to be the case.
14:00:53 14        Q.  Okay.  In this instance you say -- you
14:01:00 15   quote your own question, "Are you saying that each and
14:01:04 16   every one of the 15 companies have gotten together and
14:01:08 17   they made an agreement to pay all au pairs a stipend
14:01:12 18   that is no more than" 120 -- I'm sorry -- "$195.75 per
14:01:18 19   week?"  That was your question.
14:01:20 20        A.  That was my question.
14:01:21 21        Q.  Okay.  And her answer was initially, "Yes,
14:01:26 22   they all agreed to pay that amount, no more."  But then
14:01:30 23   she added, "We have" a -- "one family who pays a little
14:01:35 24   bit more, so I guess you could pay more if you wanted
14:01:37 25   to . . ."  She said that to you, right?
```

**179**

```
14:01:40  1        A.  Yes.
14:01:40  2        Q.  Okay.  Did you ask her whether there was
14:01:45  3   an agreement among the companies to pay the same
14:01:50  4   amount?
14:01:52  5        A.  I -- if you look again at paragraph 2, she
14:01:59  6   discussed -- and this is the flow of the conversation.
14:02:02  7   She discussed the $500 educational fee and that all 15
14:02:07  8   companies agreed to require that same amount.  She
14:02:11  9   answered yes.  I then asked what I thought was the
14:02:14 10   logical follow-up question, "What about the amount paid
14:02:17 11   directly to the au pair?"  She answered, "Yes, it's
14:02:21 12   called a stipend," and quoted the amount of 195.75.
14:02:25 13   And then I asked again what I thought was just a
14:02:28 14   logical follow-up question, and she answered, "Yes,
14:02:33 15   it's exactly the same amount, equal in all programs."
14:02:36 16   I didn't prompt that question.  That was her response
14:02:39 17   to a more broad question.
14:02:42 18        Q.  Except she added that you could pay more
14:02:43 19   if you wanted to?
14:02:47 20        A.  Yes.
14:02:47 21        Q.  Was it of any significance to you in
14:02:51 22   conducting your interviews what the Department of State
14:02:53 23   directive or notification says?
14:02:56 24        A.  I -- I'm sorry?  Ask --
14:02:59 25        Q.  Was it of any importance to you whether,
```

**180**

```
14:03:01  1   in fact, there is a directive or notification from the
14:03:04  2   Department of State that sets forth elements of the
14:03:10  3   compensation of au pairs?
14:03:12  4        A.  The individuals I spoke to in these
14:03:15  5   conversations plus others that are not documented here
14:03:17  6   led me to believe it was a minimum amount set by law
14:03:21  7   and that everyone in the industry followed that minimum
14:03:27  8   amount, and I didn't see a need to research that
14:03:30  9   further.  It seemed to be a consensus, and I took it at
14:03:33 10   face value.
14:03:41 11        Q.  Did you obtain information from anyone
14:03:46 12   regarding any purported agreement, that is,
14:03:50 13   communications among sponsors, to use the stipend
14:04:01 14   included in the Department of State guidance and
14:04:01 15   notification?
14:04:02 16        MS. LOUIS:  Object to form.
14:04:03 17        A.  And, I'm sorry, I'm not understanding the
14:04:05 18   question.
14:04:06 19        Q.  (BY MS. LUKEY)  Agreement, sir.  Like I
14:04:13 20   say to you, "Let's do this.  Let's pay $190 a week."
14:04:15 21        A.  I -- I think --
14:04:16 22        MS. LOUIS:  There's no question.
14:04:18 23        THE DEPONENT:  Oh.  Yes.
14:04:19 24        Q.  (BY MS. LUKEY)  I haven't gotten there
14:04:20 25   yet.
```

45 (Pages 177 to 180)

Defs.' Appx. 00000602

### Towards Justice:  CONFIDENTIAL - Attorney-Client Work Product.

**Carrie Crompton, Director of Field Operations**
**Au Pair Foundation – APF Global Exchange NFP.**
**Saint Louis, Missouri Field Office**
**(866) 428-7247**

On November 20, 2014, I called and spoke with the above individual.

Ms. Crompton explained her companies "program fees" and payment schedules. She also explained their pricing model, which is based on being a small organization, thus allowing them to keep the pricing low. She explained, "We are in the middle, price-wise" compared to the competition.

Then she began to explain what she called "the more fixed expenses, like the stipend paid to the au pairs."

She stated "That is where pricing becomes standard across all agencies. There is no difference in prices, as far as the stipend goes, between all of the agencies."

I asked, "So, is there an understanding among all the agencies about paying the au pairs this set amount?"

She answered, " Well, yea, it's that".

Then after a long pause, she added "Plus, we are all subject to the same federal guidelines, so we all stay within that."

Later that day, I called back and spoke Ms. Crompton, seeking clarification.

I stated, "I'm still a little confused on the stipend amount. Can you explain it to me?"

She responded, "Sure, the government sets an amount, and we all pay that amount."

I then asked, " So, you're saying that the government sets a minimum amount to pay, and all the agencies agree to pay that exact same minimum amount?"

And Carrie answered, "Correct, correct! Everybody agrees, correct!

At the end of the conversation, Ms. Crompton, who seemed to need to explain further, volunteered, that since these fees are paid directly to the au pair, and since the $196 is a minimum amount, that nobody would have to know if a particular family elected to pay an au pair little bit more.

### EXHIBIT D



Exhibit No.: 5
Deponent: Keil
Date/RPR: 7-21-16
Hunter + Geist, Inc.

Defs.' Appx. 00000603

**Au Pair International, Inc.**
**4450 Arapahoe Ave., Suite 100**
**Boulder, Colorado, 80303**
**(720) 221-3563**

**Joanna (LNA)- Placement Coordinator/Area Director**
**(Her Location) Santa-Fe New Mexico**
**(Direct #) (720)-221-3570**
**Email: Joanna@AuPairint.com**

On November 21, 2014, I called Au Pair International in Boulder Colorado. My call was transferred to Joanna, who was located in New Mexico.

After explaining their program in detail, and describing her personal experiences as an Au Pair, She began to explain the costs and fees. She focused on issues where her employer was less expensive then some others.

When she began to address the Au Pair's stipend, she stated, "The Department of State sets all of the rules. The rules, so of course the stipend is identical across all companies."

She then added, "It's a base rate, it's a minimum."

I asked, "So, everybody agrees…"

She answered, "Everybody agrees, yea."

I then asked, "So all the companies agree to pay that same exact minimum rate?"

Joanna answered, "Everybody agrees, yep, exactly!"

She then explained that while she was working for this company, as an Au Pair in Florida, her host family rounded her weekly stipend up, to $200 a week.
She added, if your Au Pair did something extra nice for you child one week, like cleaning out a dresser, you could maybe pay a little more that one-week. It's fine, it's up to you."

**Irina Gussev – Regional Director for The East Coast Region**
**EurAuPair Intercultural Child Care Programs**
**250 North Coast Highways**
**Laguna Beach, CA., 92651**
**(949) 949-5500**

It was apparent that Ms. Gussev was reading from a prepared script. Each time I asked a question she seemed to get lost, answer the question quickly, and then return to the script.

Defs.' Appx. 00000604

When I was finished, she still had multiple points to cover, per the script, and was reluctant to let me end the call. There was a very hard close at the end, trying hard to encourage me to sign up right then!

When she came to the point in the script were she was describing the "educational fee of $500, which is paid directly to the au pair, I asked "Do all of the fifteen companies each agree to require the same amount?"

She answered, " Yes, it's exactly the same, equal in all programs."

Then, before she could get to the next point in her prepared script, I asked, "what about the amounts paid directly to the au pair?"

She answered, "Yes, that called the Stipend. It's $195.75"

I asked, "Is that just like the educational fee? Do all of the companies require a family to pay that exact same amount?"

She answered, "Yes, it's exactly the same amount, equal in all programs" (As if this is a prepared answer to certain questions.

I then asked, "Are you saying that each an every one of the fifteen companies have gotten together and they made an agreement to pay all au pairs a stipend that is no more then $195.75 per week?"

She first answered, "Yes, they all agreed to pay that amount, no more." Then she added, "we have one family who pays a little bit more, so I guess you could pay more if you wanted to, but yes, it's exactly the same, equal in all programs."

**Other Calls:**

In addition to the three phone calls described above, I also called several other providers. In many of those cases, I was unable to reach a live person, and instead was transferred directly to voice mail. I declined to leave any messages.

I was able to reach live representatives at a few other companies. In these instances, I found that the people I was speaking with had little or no knowledge regarding the stipend, or how that amount was set, other then to quote the amount being paid, and that they though it was a minimum amount set by the government.

Case No. 1:14-cv-03074-CMA-CBS-KMT   Document 186-10   filed 04/20/16   USDC Colorado   pg 2
of 153
Case 1:14-cv-03074-CMA-CBS-KMT   Document 115-1   Filed 04/20/15   USDC Colorado   Page 2 of 3
Defs.' Appx. 00000605



## Au Pairs

"Au pair" is a French phrase meaning "at the par" or "at the peer" [level], and is used to describe someone who boards temporarily in someone else's home. In the United States the term has come to have a narrow, technical meaning which describes a class of Exchange Visitors who come to the United States under the auspices of a program administered initially by the United States Information Agency (USIA), and more recently by the Bureau of Educational and Cultural Affairs (ECA) of the Department of State. At any one time, there are approximately 12,000 au pairs in the United States. An au pair is always admitted into the United States on a J-1 visa, and is not allowed to remain in the United States longer than one year. An au pair must be between the ages of 18 and 26. They are usually students who participate in the program in the United States for the educational and cultural experiences it provides them.

Au pairs stay with host families chosen by sponsoring organizations, and are provided a private bedroom, meals, a full weekend off each month, two weeks paid vacation, up to $500 toward attending an institution of higher education, and a cash stipend tied to the U.S. minimum wage. They are not allowed to work more than 10 hours a day and not more than 45 hours per week. They are not expected to perform general housekeeping tasks, but are expected to perform child-care functions. Au pairs are required to enroll for not less than 6 semester hours of classes at a post-secondary educational institution; but may audit the classes for no credit if they wish.

In 1994, the U.S. Department of Labor determined that the au pair stipend constitutes "wages" because an employer-employee relationship exists between the au pair and his host family. On September 1, 1997 the au pair wage was set at $139.05 per week, however recent legislative changes have increased the U.S. Minimum Wage. The following are the increases in the weekly stipend (including room and board) for the standard Au Pair participants as follows:

- July 24, 2007 - $157.95
- July 24, 2008 - $176.85
- July 24, 2009 - $195.75

Changes to the federal minimum wage may be found on the Department of Labor's Fair Labor Standards Act Advisor.

Au Pair wages are essentially in the nature of household employment. Refer to Publication 926, Household Employer's Tax Guide.

**Social Security and Medicare Taxes**
Au pair wages are not usually subject to social security and Medicare taxes because of the au pair's status as a J-1 nonimmigrant and as a nonresident alien. However, if the au pair had previously been in the United States as a student, teacher, trainee, or researcher in F, J, M, or Q nonimmigrant status, then the au pair might be a resident alien during his current stay in the United States, and might be subject to social security and Medicare taxes if his annual au pair wages exceed the applicable dollar threshold found in Publication 926. Please refer to Alien Liability for Social Security and Medicare Tax. If the au pair is a resident alien and his annual au pair wages exceed the applicable dollar threshold, then the host family must withhold social security and Medicare taxes and report them on Schedule H, Household Employment Taxes (PDF), of Form 1040 and on Form W-2 (PDF). The host family will need to apply for an Employer Identification Number (EIN) if it is required to withhold tax and file Form W-2. The au pair will need to apply for a U.S. social security number.

**Income Tax Withholding**
Because au pair wages are paid for domestic service in a private home, they are not subject to mandatory U.S. income tax withholding and reporting on Forms 941 and W-2. However, au pair wages are includible in the gross income of the recipients, and au pairs are required to file U.S. individual income tax returns.

At the current wage rate it is likely that the au pair will have an income tax liability on his U.S. individual income tax return because nonresident aliens (with certain exceptions) are not able to claim the Standard Deduction. For this reason it is recommended that the au pair take one of the following two steps:

1. File and pay U.S. estimated income tax payments during the year on Form 1040ES-NR (PDF) if the au pair is is a nonresident alien, or on Form 1040-ES if the au pair is a resident alien, or
2. If both the au pair and the host family agree, file Form W-4 with his host family, indicating on line 6 of such form that the au pair voluntarily wishes a withholding amount of U.S. federal income tax deducted from his weekly au pair wages. The host family will report and pay over this withheld federal income tax on Schedule H of Form 1040. The host family will also issue Form W-2 Wage and Tax Statement to the au pair to report his au pair wages and income tax withholding. The host family will need to apply for an Employer Identification Number (EIN) if it decides to withhold tax and file Form W-2. The au pair will need to apply for a U.S. social security number.

**Federal Unemployment Taxes (FUTA)**
Most au pairs are nonresident aliens, and therefore their host families would be exempt from paying federal unemployment taxes on their au pair wages. However, an au pair who had previously been in the United States as a student, teacher, trainee, or researcher in F, J, M, or Q nonimmigrant status might be a resident alien during his current stay in the United States. In this situation, the host family

**EXHIBIT E**

would be liable to pay federal unemployment tax if the au pair's wages during any calendar quarter, or during the preceding calendar year, equaled or exceeded a certain dollar threshold amount. This certain dollar threshold amount, and the annual maximum amount of wages subject to FUTA tax, may be found under Federal Unemployment Tax in Publication 926, Household Employer's Tax Guide.

The host family would also use Schedule H of Form 1040 to report and pay over any FUTA liability which might arise from the au pair's wages.

**Income Tax Filing**

Most au pairs are nonresident aliens, and therefore will be required to file Form 1040NR or Form 1040NR-EZ to report their au pair wages. As a nonresident alien, an au pair is not eligible for the Earned Income Tax Credit, the Hope Credit and the Lifetime Learning Credit. An au pair is not really a "student" in the United States, and therefore is not eligible to exclude his au pair wages from gross income under the student article of any U.S. income tax treaty. An Au Pair who is a nonresident alien is not required to file a U.S. federal individual income tax return if his only U.S. source income is wages in an amount less than the personal exemption amount (Refer to Publication 501, Exemptions, Standard Deduction, and Filing Information).

*Page Last Reviewed or Updated: 28-May-2014*

Defs.' Appx. 00000607

# RESTRICTED - DECLARATION OF CELIA PARKER. SEE RESTRICTED APPENDIX AT Defs.' R. Appx. 00000571.

Defs.' Appx. 00000608



**NOTICE**

**FEDERAL MINIMUM WAGE INCREASE**

All Au Pair sponsors are advised that on May 25, 2007, President Bush signed into law (P.L. 110-28) an appropriations bill, (HR 2206) raising the federal minimum wage by $2.10 an hour.  The increase from $5.15 to $7.25 will be phased in over the next two years in three increments as follows:

∞  On the 60th day following enactment of P.L. 110-28  (July 24), the minimum wage will increase to $5.85
∞  12 months after that 60th day, it increases to $6.55 an hour
∞  24 months after that 60th day, it increases to $7.25 an hour

The weekly stipends for the standard Au Pair Program and EduCare Program are directly connected to the federal minimum wage.  The Au Pair stipend is based on a U.S. Department of Labor's formula that includes credit for the room and board Host Families provide for their Au Pairs.  The room and board credit currently is 40% of an au pair's credited compensation.  The increases in the stipends affect all au pairs currently in the country as well as those who arrive after these changes go into effect.

The following are the increases in weekly stipend (including room and board) for the standard Au Pair and EduCare participants as follows:

|  | Au Pair | EduCare |
|---|---|---|
| Phase I –July 24, 2007 | $157.95 | $118.46 |
| Phase II – July 24, 2008 | $176.85 | $132.64 |
| Phase III – July 24, 2009 | $195.75 | $146.81 |

Questions regarding this matter can be referred to Ida Abell at (202) 203-5073.

June 14, 2007

Exhibt A

EAP0000387

Defs.' Appx. 00000609

**RESTRICTED - EXHIBIT B TO DECLARATION OF CELIA PARKER. SEE RESTRICTED APPENDIX AT Defs.' R. Appx. 00000579.**

Defs.' Appx. 00000610



## A Sensible and Flexible Child Care Solution



Intercultural Child Care Programs

www.EurAupair.com   |   2013

Exhibit C

EAP0000072

Defs.' Appx. 00000611

# A European Solution
## for American Families



Experience the difference by partaking in an enriching cultural exchange by opening your home - and your heart, to the world with an au pair.

EurAupair is child care on your schedule! It's adaptable, affordable, and dependable full-time, in-home care for your children. Where you can conveniently choose online from a generous pool of qualified au pairs to ensure you find the perfect au pair for your individual family needs.

We are one of the oldest and largest au pair organizations in the U.S. with an established and respected reputation abroad. With EurAupair, your family is getting the care you require, backed by an experienced organization that specializes in connecting families to nurturing au pairs. For over twenty-five years, EurAupair has fostered versatile child care programs. Our enriching family options provide parents with a fully screened Au Pair with child development and safety instruction, or our Au Pair Par Experiénce, an older, educated au pair that has the experience, or a teaching degree.

We utilize decades of old world practices of having a responsible young person with an extensive love of children from another culture to aid the lifestyles of today's active parents with caring for their children. The rewards that EurAupair families have discovered, have made this established European tradition increasingly popular in America.

An au pair helps you balance your work and your family life by providing  parents the much needed extra pair of hands. When you welcome an au pair into your home, you can be assured that your children will be cared for by an accomplished and responsible young adult, one who will enrich your family by expanding your knowledge of other countries and cultures. And, because your au pair is considered an extension of your family, your children soon look upon the au pair as a trusted older sister (or brother.) Leaving your children in your au pair's care becomes natural for your children and minimizes the worries you as a parent may have.

## Share your home and your culture
—
### Host a EurAupair Au Pair

1

Exhibit C

EAP0000073

Defs.' Appx. 00000612



Juggling a busy schedule is now easier with an au pair. She can easily transport your children to music lessons, sports practice, Scout meetings, or doctors' appointments. With an au pair, your children won't miss out on anything! Au pairs can quickly get children ready for school in the morning, cheerfully greet them when they come home in the afternoon, and help them with homework in the evenings. They can even look after a child with a cold or moderate case of the flu when you can't be there due to other obligations. With this kind of personal assistance at home, you'll be able to collectively spend the precious time you have with your family, as you choose, giving you a higher degree of quality time together.

Our continued commitment to children and their care transcends into our long-standing partnership with the Ronald McDonald House®, where we've raised thousands of dollars for sick children due to the EurAupair patronage of caring families - just like yours. By choosing EurAupair, a donation will be made on your behalf.

Because EurAupair is an official United States government designated exchange visitor program sponsor, your au pair arrives with the proper legal documentation, and you avoid the costly immigration hassles that often result with an undocumented caregiver.



Average cost per week
for up to four children

The approximate $344 weekly cost (including the $195.75 U.S. government required weekly au pair pocket money, and excluding any educational or domestic flight fees) is an exceptional value for such flexible and loving in-home care. This weekly cost is for children of all ages and per family, not per child, giving you significant savings annually from the exorbitant fees of traditional child care.

**EurAupair offers today's families a child care alternative that is culturally enriching, convenient, legal... and affordable too! Approximately $344/week.**

Exhibit C

**2**

EAP0000074

# The Au Pair Tradition

For generations, many young adults around the world have eagerly chosen to spend a year in another country living as an au pair and part of a supportive family while looking after the children.

This shared experience provides them with an opportunity to learn about a different culture, enhance their foreign language skills and expand their own understanding of the world around them. In turn, the host family not only broadens its cultural awareness but develops a unique view of the au pair's customs. Children gain the relationship of an older "sister" or "brother" who will care for them and offer companionship, love and guidance.

Like an older sibling, an au pair is included in family activities, unlike an "employee" or a "servant" who might be excluded from family meals, holiday celebrations and other activities. Globally, tens of thousands of new families and au pairs continue this enriching and mutually valuable tradition.

As your children age, they will look back fondly on their time with their au pair as a treasured gift - a friendship that will have long lasting effects. Children who've had an international au pair are given an invaluable life lesson on diversity, and have a deeper understanding of the world from their own personal experiences. Your children will be more adept at accepting others and will openly learn from different cultures and traditions.



## Becoming an Au Pair in the USA

Over 25 years ago, it was impossible for an American family to take advantage of this child care resource legally. Since then, government sponsor organizations like EurAupair, may bring young adults from abroad to host families looking for a trusted au pair.

Like the au pair tradition itself, the EurAupair Intercultural Child Care Program has a long-standing heritage. EurAupair brings to the United States bright, personable and responsible au pairs who assist in caring for your children, in exchange

**Founded to improve understanding among people of different countries through cultural exchange.**

Exhibit C

EAP0000075




for inclusion in "The American Dream" - actively participating in American family life and being given the opportunity to study at an American college (or other accredited post-secondary institution) where they can gain exposure and learn about your own culture and beliefs.

## The EurAupair Organization

EurAupair was founded to improve understanding among people of different countries through cultural exchange. Through its network of affiliated overseas offices, EurAupair carefully screens young people from many countries throughout the world who wish to become au pairs. Generally females, au pairs are 18 through 26 years old, and are conversant in English. All EurAupair au pairs are licensed drivers. They are well-educated and have all attained at minimum a secondary school degree or its equivalent. A number have post-secondary education from some of the finest schools in the world, or are a university graduate. Many plan to begin their careers or continue their schooling following their inspiring year abroad. EurAupair au pairs are in good health and are fully insured for medical costs. EurAupair's au pair insurance is the most comprehensive available, also including coverage for travel, personal liability and accidental death insurance. While au pairs are not professional child care providers, they have experience caring for children, from babysitting to vocational experience.

In short, they are many of the world's most sincere, enthusiastic and conscientious young adults who are eager to join your loving family and look after your cherished children.

"How much does it mean to me to be an au pair for the Winters family? It means the world. I have the most wonderful children an au pair could ever ask for. My experience in America has been a wonderful one, and definitely something I will remember for the rest of my life. "
**Au Pair Laura from Finland**

4

Exhibit C

EAP0000076

# The Benefits of the EurAupair Program



## Security and Stability

Your EurAupair au pair will live in your home and will be available to easily assist with the care of your children, for up to 45 hours per week. You'll quickly appreciate the benefits of this arrangement. An au pair allows your children to play and learn in the familiar surroundings of their home. Your children will feel secure with an au pair who will devote full attention to them — knows their likes and dislikes, daily routines and unique personalities, all while participating in their daily growth and development.

## Flexibility and Convenience

You and your au pair can schedule her child care duties over a period of 5 ½ days a week, or up to 10 hours per day in a timetable that is convenient for your changing needs. In addition to your daily schedule, an au pair is there to assist when an unexpected event happens, such as a sick child or an unplanned late meeting. If you have school-age children, the au pair's schedule can be rearranged around their school breaks. However, au pairs must receive at least 1 ½ continuous days off - each week. One of the days off must be a weekend day and they must have at least one full weekend free each month.

## Meeting Individual Needs

An au pair is not just a babysitter, she is like family. Au pairs may be given the responsibility of infant care (minimum three months and older) — from bathing and dressing to feeding and diapering. They interact by entertaining and instructing preschoolers, reading, playing games and taking them for walks and outings to the park.

**Your children will have the security of a new family member
who can devote full attention to them.**

5

Exhibit C

EAP0000077

Defs.' Appx. 00000616

www.EurAupair.com

When things get hectic, they can assist with the grocery shopping, and occasionally, even prepare a family meal. Although heavy housework is not permitted, au pairs may share in a few routine family chores and light housework such as making the kids beds or helping them straighten their rooms. In addition, the hours of au pair care are so flexible, an au pair can watch the children when parents go out for an evening, or if needed, for an occasional short business trip. The au pair, however, must not be left with total child care responsibilities for extended periods of time, overnights or for more than 10 hours per day.

Quite simply, au pairs not only provide a cultural advantage, they provide a unique affordability and flexibility in child care. An au pair's generous spirit can handle many aspects of diverse child care by responsibly and efficiently adapting to your specific needs. Whatever child care and support you might ask of an older son or daughter, you may gladly ask of an au pair — because we ask that you, as a EurAupair host family, honor and include your au pair in your daily lives as you would a cherished family member.

As a result, you will trust and gain a more meaningful relationship than with a traditional caregiver — your entire family will forge a unique bond with your new young friend for life. They will forever be a special part of your family. You will embrace the differences, celebrate the similarities and see the world in a new light.



Intercultural Child Care Programs

**"I love having someone help out with the kids. The counselors are always accessible and helpful. It really makes my life so much better, helps get through the day in a great way. I know I have an au pair who can help."**
**The Fillman Host Family, Ohio**



**6**

Exhibit C

EAP0000078

# Becoming a EurAupair Host Family



Families that are interested in hosting an au pair must complete a EurAupair Host Family Application Form - located at the back of this brochure or at www.euraupair.com. You will also need to arrange for two references, one from an employer and one from a personal friend when you submit the application form (and a $350 Application Fee to EurAupair.) Following the receipt of your application form, a local EurAupair Community Counselor in your area will be assigned to your family. The EurAupair Community Counselor is available to answer any questions and provide assistance to both you and your au pair throughout your year together.

One of the first responsibilities of your EurAupair Community Counselor is to arrange a convenient time for an interview in your home, to meet you and your family. During the interview, you will assist the EurAupair Community Counselor in completing a Host Family Profile which will be utilized in the placement process. Upon review of your application form, Host Family Profile and positive personal reference forms, your EurAupair Community Counselor will consult in *your* selection of a qualified, caring au pair. The final choice is always yours, as you will know who best suits your family structure and immediate needs. Placement is complete upon EurAupair's receipt of your EurAupair Community Counselor packet and the Program Fee Deposit.

**The EurAupair Community Counselor is available to answer questions and provide assistance to both you and your au pair throughout your year together.**

Exhibit C

EAP0000079

Defs.' Appx. 00000618

# A Closer Look at the EurAupair Program

## Au Pair Selection and Placement

To help you select the most compatible au pair for your family, you can easily review and select your au pair by using our user-friendly Online Au Pair Selection Service. The application package consists of personally written "Dear Host Family" letters, photos, references, a health certificate and detailed interview reports. This vital information will provide you with a personality profile and insights of your new potential family member from overseas. The host family is also required to interview the au pair by phone prior to making their final decision to gauge full compatibility.

Upon confirmation of your selection of an au pair, EurAupair encourages you to continue communication with your newly chosen au pair. A warm and informal email or letter with photos of you, your children, pets, etc. will let your au pair get to know you and your family before arrival. This dialogue will aid in the transition process of your exciting year together.

You will also receive the comprehensive EurAupair Host Family Handbook, an invaluable resource as you prepare to share your life with your au pair. It contains essential information and advice on many aspects of the EurAupair program, starting with a pre-arrival checklist and continuing through all the nuances of your year with your new family member. You'll find helpful hints to ease an au pair's adjustment to your family and a new culture; explanation of program support and resources. Useful sample forms for scheduling household chores and child care duties and listing important contact information and submitting insurance claims are also a few of the advantageous topics included in the Handbook.

## EurAupair Host Family Orientation

To make the most of this special year with your au pair, you will be provided with the opportunity to attend an informative EurAupair Host Family Orientation meeting. Your local EurAupair Community Counselor will introduce you to other EurAupair host families in your area, give you information and advice on helping your au pair become part of your family, helping your children feel comfortable with your au pair's arrival, recognizing and appreciating cultural differences, managing your au pair's schedule, EurAupair's emergency procedures, au pair medical insurance coverage and claims procedures. Your EurAupair Community Counselor will review the EurAupair program in detail; your au pair's educational requirement, monthly activities, cultural events, au pair vacations and travel. You'll discuss what you can expect from your au pair and ways to maximize this year-long exchange of cultures. You and your family will be prepared and eager for your new family member to arrive!



Intercultural Child Care Programs

w w w . E u r A u p a i r . c o m

"As a single Dad to two little girls, I'm not sure how I would have managed over the last 7 years without EurAupair. The experience has been fantastic for us."

The Honse Host Family, Virginia

8

Exhibit C

EAP0000080

Defs.' Appx. 00000619



## Au Pair Travel

Following placement, EurAupair will advise you of the week your au pair will arrive at your choice of one of 85 U.S. metropolitan airports (see page 17.) Upon final booking and ticketing, your au pair's arrival date and flight information will be confirmed in writing to you approximately three weeks before arrival. EurAupair arranges everything so there's no hassle.

## EurAupair's Au Pair Workshop®

While au pairs are not child care professionals, they are all caring individuals who have been carefully screened and are indeed well prepared for their EurAupair program year. Each au pair attends a comprehensive 5 day EurAupair "Au Pair Workshop" in New York City when they arrive in the United States. They attend these workshop sessions with other newly arrived au pairs and receive a minimum of 24 hours of basic child development instruction, and 8 hours of child safety instruction prior to arrival in your home.

The child safety workshop sessions include common safety hazards and injury prevention, as well as basic first aid for childhood injuries. EurAupair's child development instructors discuss the various developmental stages of early childhood with emphasis on techniques for "getting off to a good start" and building the foundation for success for children of any age. Your au pair will be instructed on how to engage your children in age appropriate activities, like playing pat-a-cake with a baby, or make-believe and puzzles with a preschooler, or art projects with a school-aged child. The child safety and development program also gives your au pair a chance to recover from a long journey before continuing on to their new "home away from home." The instructions received, along with the textbook and au pair handbook will prepare your au pair for the needs of her new loving host family.

**Orientation will provide everyone with the essential practical information about such things as cultural differences, program guidelines, insurance claims processing, community resources and educational opportunities in the area.**

9

Exhibit C

EAP0000081

Defs.' Appx. 00000620

## Au Pair Arrival

Within a few days of the au pair's arrival at your home, you will be notified of the date of the EurAupair Au Pair Orientation meeting. This mandatory orientation meeting, conducted by your local EurAupair Community Counselor will include other recently arrived au pairs in your area. The orientation will provide everyone attending with the essential practical information about such things as cultural differences, program guidelines, insurance claims processing, community resources and educational opportunities in the area. Just as importantly, it will give your au pair a chance to make friends with other au pairs in your community.

## On-Going Support

During your year together, your au pair will benefit from the on-going availability and support of your local EurAupair Community Counselor and our knowledgeable area and regional staff. Your au pair will be included in periodic get-togethers; pot-luck dinners, ball games, shopping trips — and your EurAupair Community Counselor will organize cultural events twice a year, such as a museum visit, concert or even an authentic western rodeo, for your au pair. The EurAupair organized activities give your au pair an opportunity to socialize with peers while seeing more of what America has to offer.

You and your au pair receive additional support with regular, routine phone calls from your EurAupair Community Counselor. The EurAupair Community Counselor is also available to answer your questions and offer guidance throughout the year.

## EurAupair Newsletter

The EurAupair Gazette®, EurAupair's quarterly newsletter, is an entertaining and informative "newspaper" that connects everyone in the EurAupair community, from the staff in America and abroad to the host family children.

It's a great way to get to know the world-wide members of the EurAupair family. We publish news from host families around the USA, profiles of EurAupair Community Counselors as well as regularly highlighted au pairs and informative facts of their originating country. This newsletter will provide a wealth of cross-cultural and international information for the whole family.

## Au Pair Education

U.S. government regulations require that au pairs be provided with opportunities for cultural and educational enrichment. As part of this educational and cultural requirement, the host family is asked to ensure that the au pair enrolls in, and satisfactorily completes, academic coursework relating to the study of American culture, values, history, geology, politics or the arts. Host families are required to cover any necessary fees, totaling up to no more than $500 over the year. All au pairs must successfully complete six credit hours of coursework during the program year, the equivalent of 3 hours of class time per week.



Intercultural Child Care Programs

"Our au pair, Steffi, is really great and we feel so fortunate to have her here! It makes me happy to know she is also really enjoying her time in Seattle and she has made a lot of friends."

The Graham Host Family, Washington

**10**

Exhibit C

EAP0000082

Defs.' Appx. 00000621

# A Year of Growth and Caring

Just as your au pair will be learning about life in the United States, your family will be acquiring knowledge about your au pair's country. And as you share your culture with one another, you and your family will gain a new appreciation for your own way of life. Not only will you watch the emotional and educational growth of your children as they learn from your au pair, you'll also share in the enthusiasm as your au pair discovers unique aspects of your own country.

You will be able to relax, feeling confident that your children are responsibly cared for. You'll know you've chosen the best and most enriching child care experience imaginable. Your children will thrive in this cultural arrangement and will grow to love and admire your au pair and will take this moment of time with them to adulthood.

The time for your au pair to return to her country will come quickly. At the end of the program year, saying good-bye may be difficult, but you and your children have gained a life-long friend and 'pen pal' from overseas, and an extended family abroad to visit in the future. After all, this is what cultural exchange is all about: sharing traditions, making friends, and gaining a greater international understanding of our world. You will feel gratified that your children, your au pair, and you have all benefited tremendously from this exceptional experience.



## Program Continuation

The majority of EurAupair host families choose to repeat their program participation over the years, and with each new year, their overseas family grows. You may choose to participate with a new and exciting culture or prefer to extend your family's exposure to the culture you've come to appreciate. Either way, arranging for a new au pair through EurAupair gives you continuity in care, so your family life runs smoothly. And you have the on-going support of your local EurAupair Community Counselor who you've known to trust for their guidance and expertise.

The EurAupair program also benefits greatly from the continued support of its returning families who have successfully hosted for a year or more, and we show our appreciation by offering a $600 reduction in program fees for our special "repeat families" (see page 18 for more details.)

Just as your au pair will be learning about life in the United States, your family will be acquiring new knowledge about your au pair's native country and language.

Exhibit C

EAP0000083

Defs.' Appx. 00000622

# Caring for Your Children Means Caring for Others

By choosing EurAupair, you provide exceptional care and invaluable cultural opportunities for your own children. You will also be contributing to the welfare of children who have been stricken with life-threatening, and often terminal, illnesses as it's our belief to give back and aid children everywhere.

EurAupair proudly makes a personal contribution to Ronald McDonald House Charities® in your family's name. Our involvement with the Ronald McDonald House dates back to 1989 and has raised thousands of dollars annually to provide an affordable place for families to stay while their children are undergoing treatment. Because of the efforts of Ronald McDonald House, seriously ill children can have their families where they need them most — by their sides. Through this charitable donation, you will be touching the lives of parents and the hearts of their children by creating a nurturing atmosphere of love, compassion and healing. Together - your family and EurAupair can make a positive difference in the life of a child for a healthier tomorrow.





Intercultural Child Care Programs

w w w . E u r A u p a i r . c o m



RONALD MCDONALD
HOUSE CHARITIES

**You will also be contributing to the welfare of children who have been stricken with life-threatening, and often terminal, illnesses.**

Exhibit C

⑫

EAP0000084

# Choosing EurAupair Gives Your Family the Advantage





## Large and Experienced Au Pair Organization.

EurAupair is one of the oldest, largest and most experienced au pair organizations with over 70,000 qualified participants over a 25 year period.

## Final decision is yours.

With EurAupair, the final decision in selecting an au pair is always yours. We realize that you know your family best, and we are committed to helping you choose the au pair that is most suited to your family.

## Online Au Pair Selection.

It's fast, easy and convenient! Once you have been accepted into the program, you will be able to review all available applicants and select your au pair online!

## Low weekly cost.

The approximate $344 weekly cost is a real value for such flexible, loving, in-home care. And, unlike other forms of child care, the fee is for children of all ages, and per family - not per child.

## Large pool of au pair candidates.

EurAupair provides families with a large selection of au pair candidates, from a variety of countries.

## Most conscientious local support.

EurAupair's Community Counselors provide host family and au pair orientation meetings, cultural activities, advice, assistance with any problems, and valued support throughout the program year.

## Round-trip airfare - No hidden costs.

EurAupair provides complete travel arrangements for your au pair — from her closest major airport to yours and back again at the successful completion of her program year. Neither you, nor your au pair have to worry about setting up any other complicated, and often expensive, travel arrangements (as with other au pair programs).

## Comprehensive au pair insurance coverage.

You can feel secure knowing that your EurAupair's au pair insurance package provides her with full medical coverage, as well as travel, personal liability and accidental death insurance. This coverage is so comprehensive that host families need not rely on their au pair to voluntarily upgrade her coverage.

**EurAupair is one of the oldest, largest and most experienced au pair organizations with over 70,000 qualified participants over a 25 year period.**

Exhibit C

EAP0000085

Defs.' Appx. 00000624

w w w . E u r A u p a i r . c o m

## EurAupair Au Pair Workshop.

EurAupair's Au Pair Workshop in New York City, provided by instructors who are American Red Cross certified and experienced in the field of cross-cultural exchange and child development, is among the most extensive and comprehensive.

## Largest "repeat family" discount.

EurAupair shows its appreciation to experienced or "repeat families" through a generous fee discount and priority placements. Not only do you enjoy continuity of care, you also receive a $600 reduction in program fees after having hosted for a full year, the largest offered by any au pair organization.

## Ronald McDonald House® donation.

EurAupair host families help provide other parents and children with a "home away from home" during critical childhood illnesses, as EurAupair makes a donation to Ronald McDonald House on behalf of each family who hosts a EurAupair au pair.

## The EurAupair Gazette.

EurAupair's quarterly newsletter helps keep your au pair and family entertained and informed.



**With all of these benefits, no wonder so many EurAupair host families return to our program year after year.**

"We like her very much. She is always happy and in a good mood. She is creative, inventive, attentive and sweet. We feel happy and lucky to have her as part of our family. I already hope she will extend!"
**The Sasaki Host Family, California**

14

Exhibit C

EAP0000086

Defs.' Appx. 00000625

# Host Family Qualifications

## Families must:

1) Be parents or legal guardians (couples or single parents) with the children living at home. Au pairs may not provide care for infants under three months or children older than 15 years of age.

2) Be U.S. citizens or Legal Permanent Residents with host parents/guardians who are fluent in English.

3) Be congenial, hospitable and of good moral character. Provide a spare, separate, adequately furnished bedroom for the au pair and have a home or apartment in a safe location, which is suitable for an additional person.

4) Personally interview their au pair by telephone prior to making a final selection.

5) Attend a local orientation meeting prior to the au pair's arrival. The orientation explains the philosophy of the EurAupair exchange program, emergency and support services, insurance coverage and provides practical and helpful guidance on helping the au pair adjust to your family. Child care and cross-cultural issues, au pair activities and educational opportunities are also discussed.

6) Familiarize the au pair with your children and family routines. You'll need to be available at home, or make another responsible adult available, for the first three days after the au pair arrives in order to supervise this important transition process.

7) Agree in advance to a child care schedule that will not exceed 45 hours per week, and 10 hours per day.

8) Accept that the au pair is an exchange program participant. Although the au pair will assist in the care of your children (up to four children maximum), an au pair must be accepted as a full member of the family and be included in family meals, outings and activities.

9) Provide the au pair with $195.75* pocket money, per week.. The EurAupair au pair weekly pocket money is per family, not per child. Pocket money is provided on a weekly basis, and may not be prorated depending upon the number of hours of child care provided.

10) Agree to one full weekend free, per month, for the au pair. This will consist of a Friday night through Monday morning, and a minimum of 1 ½ consecutive days, per week, free for the remainder of the month with 1 day and night falling on a Friday, Saturday or Sunday.

11) Ensure that the au pair completes at least six credit hours, per year, of educational or cultural instruction, and reimburse the au pair for any required tuition or fees of up to $500 over the year.

12) During the year, provide the au pair with two weeks of vacation with weekly pocket money, the timing to be mutually agreed upon in advance between the family and the au pair.

13) Understand that an au pair is not an experienced, professional child care provider, but rather a young person from abroad who has basic child care skills and wants to learn about the American culture by living with a family and assisting the children.

*The au pair weekly pocket money amount is established by regulations promulgated by the United States Department of State in compliance with the Fair Labor Standards Act and is subject to change.

"Everything is going great with my host family. It's been a wonderful year and I'm very happy that I'm having the chance to stay one more. EurAupair has always been there for me to give me assistance when needed and every day I have the chance to live new experiences with the kids and with my friends."

**Au Pair Maria from Brazil**

Exhibit C

15

Defs.' Appx. 00000626

# Profile of an Au Pair

## Au pairs are:

1) 18 through 26 years old.

2) Generally female, although some males apply.

3) High school graduates or equivalent.

4) English speaking (most as a second language).

5) Experienced, though not extensively or professionally, in caring for children, although some have more experience than others (see page 22).

6) Willing to share their language and culture with an American family.

7) Responsible young adults of good character. All have had references verified, have passed a criminal background check (or its equivalent) and a psychometric test and evaluation*.

8) In good health with a medical certificate.

9) Fully insured including medical, travel, personal liability and accidental death coverage.

10) Available with a driver's license. The host family must provide automobile insurance.



11) Available from a variety of countries:

| Argentina | Finland | Portugal | Sweden |
|---|---|---|---|
| Brazil | France | Romania | Taiwan |
| China | Germany | Russia | Thailand |
| Colombia | Italy | South Africa | Turkey |
| Denmark | Mexico | Spain | |

12) Energetic, conscientious and enthusiastic.

13) Required to attend the EurAupair Au Pair Workshop upon arrival in the United States. The workshop includes instruction on cross cultural topics, insights into American lifestyles, basic child safety and development and will assist the au pair in adjusting to her new home, family and culture.

14) Willing to make a 12-month family participation and child care commitment and legally authorized to live in the USA with an issued J-1 Visa.

15) Exchange participants who are eager to learn about America while participating in daily life and as part of a loving American family.

* Experts in the field of psychometric evaluation believe that no test can accurately predict the future behavior or level of functioning of any individual.

**"I cannot speak highly enough of Jasmin as a child care provider, educator and big sister to my boys."**

**The Russell Host Family, Missouri**

16

Exhibit C

EAP0000088

# 2013 Host Family Fees & Costs

(Prices for programs commencing February 2013 through January 2014)



| | Au Pair (Regular) | Au Pair 'Par Expérience' |
|---|---|---|
| **Application Fee** (Submitted with Host Family Application Form) | $350* | $350* |
| **Program Fee** | $7695 | $8595 |
| **Round Trip Domestic Flight Fees** | | (see chart below) |
| Fares are based upon round trip travel. All taxes and handling fees are included. | | |
| **Repeat Family Discount** | | ($600, if applicable) |

## Payment of Program and Flight Fees:

| | | |
|---|---|---|
| **Deposit** (Payable upon selection of au pair) | $1500 | $1500 |
| **Final Payment** (Payable 30 days prior to the U.S. workshop arrival) | Balance of Program and Flight Fees | |

## Other Family Costs:

| | | |
|---|---|---|
| **Au pair "pocket money"** (Payable weekly) | $195.75† | $250 |
| **Educational fees** (if any) As required | $0-500 | $0-500 |

### Round Trip Domestic Flight Fees

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Albany | $300 | Des Moines | $375 | Minneapolis | $375 | Raleigh-Durham | $350 |
| Anchorage | $600 | Detroit | $375 | Mobile, AL | $350 | Reno | $450 |
| Aspen | $600 | Eugene, OR | $475 | Nashville | $350 | Richmond, VA | $300 |
| Atlanta | $400 | Ft. Lauderdale | $325 | New Orleans | $325 | Rochester, NY | $300 |
| Austin | $450 | Ft. Myers | $325 | New York (JFK) | $ 0 | Sacramento | $475 |
| Baltimore** | $125 | Grand Rapids, MI | $400 | Newark | $ 0 | Saginaw | $325 |
| Boise | $500 | Hartford | $100 | Norfolk | $300 | San Antonio | $425 |
| Boston | $125 | Honolulu | $600 | Oakland | $475 | San Diego | $475 |
| Buffalo | $300 | Houston (IAH) | $425 | Oklahoma City | $400 | San Francisco | $475 |
| Burlington, VT | $300 | Indianapolis | $375 | Omaha | $350 | San Jose | $500 |
| Cedar Rapids, IA | $425 | Jacksonville, FL | $325 | Orange County, CA | $475 | Santa Barbara, CA | $475 |
| Charleston (SC) | $350 | Kansas City | $400 | Orlando | $325 | Savannah | $400 |
| Charlotte | $350 | Knoxville | $350 | Palm Springs | $475 | Seattle/Tacoma | $475 |
| Chicago (ORD) | $375 | Las Vegas | $450 | Panama City | $375 | St. Louis | $400 |
| Cincinnati | $400 | Lexington, KY | $325 | Pensacola, FL | $325 | Tampa | $300 |
| Cleveland | $375 | Los Angeles (LAX) | $475 | Philadelphia** | $125 | Tucson | $450 |
| Colorado Springs | $475 | Louisville | $375 | Phoenix | $450 | Tulsa | $400 |
| Columbus, OH | $400 | Madison | $400 | Pittsburgh, PA | $300 | Vail | $600 |
| Corpus Christi | $475 | Memphis | $350 | Portland, ME | $325 | Washington, D.C.** | $125 |
| Dallas/Ft. Worth | $425 | Miami | $325 | Portland, OR | $475 | Wausau, WI | $350 |
| Denver | $450 | Milwaukee | $375 | Providence | $125 | West Palm Beach | $325 |
| | | | | | | Wilmington, NC | $350 |

**Ground or air transfer, at EurAupair's discretion

**17**

* Waived for EurAupair repeat host families.

† Au pair weekly pocket money amount is established by regulations promulgated by the United States Department of State in compliance with the Fair Labor Standards Act and is subject to change.

Exhibit C

Defs.' Appx. 00000628

www.EurAupair.com

## Host Family Fees Include:

Application processing, family interview, full au pair medical, travel, personal liability and accidental death insurance, au pair recruitment, screening (including criminal background check and psychometric evaluation) and selection, visa assistance, round trip airfare from home country (from some countries, host family fees do not fully cover airfare costs), round trip domestic airfare, "SEVIS" (US Homeland Security student database system) Fee, Host Family Orientation, EurAupair Au Pair Workshop, Au Pair Orientation, local Community Counselor support and assistance to host family and au pair, regular au pair cultural and recreational get-togethers, EurAupair quarterly newsletter and 12-Month Au Pair Commitment.

## Host Family Fees Exclude:

Room, meals, educational fees, pocket money and auto insurance (if necessary).

## Payment Method:

All payments (Application, Program and Flight Fees) may be made by check or by credit card (Visa, MasterCard, American Express, Diners Club or Discover). Checks should be made payable to "EurAupair."**

## Repeat Family Discount:

EurAupair values the support of those returning families who have successfully hosted a EurAupair au pair for a year or more. Through their participation in EurAupair's cross-cultural child care program, our repeat families are working with EurAupair to contribute to increased intercultural understanding. EurAupair wishes to recognize the commitment of these families to the EurAupair program, and is pleased to offer them a $600 reduction in program fees. Discounts are also available to participants of other U.S. government designated au pair programs.

## Payment/Installment Plan:

In order to better accommodate those families wishing to spread the payment of their Program Fee over an extended period, EurAupair offers an easy payment plan. This plan allows for payment of fees as follows:

|  | Regular | Par Expérience |
|---|---|---|
| Application Fee: (upon application) | $350* | $350* |
| Deposit: (upon selection) | $1500 | $1500 |
| Domestic Flight Fee (if any) | 30 Days Prior to Arrival | |

Installments on Final Payment
(each installment includes a $60 handling fee)

| | Regular | Par Expérience |
|---|---|---|
| 30 days prior to arrival | $1092.50 | $1242.50 |
| 1 month after arrival | $1092.50 | $1242.50 |
| 2 months after arrival | $1092.50 | $1242.50 |
| 3 months after arrival | $1092.50 | $1242.50 |
| 4 months after arrival | $1092.50 | $1242.50 |
| 5 months after arrival | $1092.50* | $1242.50* |

*Repeat Family Discount: For final payment deduct $600 for returning EurAupair (or other U.S. government designated) Program host families.

**$25 charge for any returned checks or declined credit cards.





Intercultural Child Care Programs

18

Exhibit C

EAP0000090

# Joining the EurAupair Program

## EurAupair Application Checklist

❏ 1) Complete and submit the enclosed EurAupair Host Family Application Form together with the $350 Application Fee or apply online at www.euraupair.com.

❏ 2) Arrange for two (2) completed Reference Forms; 1 character and 1 employment to be submitted online at www.euraupair.com by business or professional colleagues, civic or religious leaders, or other prominent and responsible individuals who know you and your family well.

❏ 3) Upon EurAupair's receipt of the completed Host Family Application Form, you will be contacted by your local EurAupair Community Counselor who will arrange a convenient time for an in-home family interview.

❏ 4) During the in-home family interview, your EurAupair Community Counselor will complete a Host Family Profile.

❏ 5) Upon completion of the family interview and review of your Host Family Profile and two Reference Forms which are acceptable to EurAupair, your Community Counselor will assist you in your selection of an au pair. EurAupair's receipt of the $1500 deposit secures the au pair of your choice.

❏ 6) All Program and Flight Fees are due a minimum of 30 days prior to the au pair's arrival, unless your family is enrolled in EurAupair's payment plan (see page 18).

❏ 7) A minimum of 3 weeks prior to your au pair's arrival, you will be advised of all final travel arrangements (including date, flight numbers, arrival times, etc.).



Intercultural Child Care Programs

www.EurAupair.com

## Arrival Months & Application Deadlines

| Arrival Month | Final Deadline to Apply* |
| --- | --- |
| January 2013 | November 22, 2012 |
| February 2013 | January 5, 2013 |
| March 2013 | February 1, 2013 |
| April 2013 | February 22, 2013 |
| May 2013 | March 22, 2013 |
| June 2013 | April 22, 2013 |
| July 2013 | May 22, 2013 |
| August 2013 | June 22, 2013 |
| September 2013 | July 22, 2013 |
| October 2013 | August 22, 2013 |
| November 2013 | September 22, 2013 |
| January 2014 | November 22, 2013 |

**\*Urgent Care Needed**
If your preferred arrival deadline has passed and you have an urgent child care need, priority arrangements are possible. Please contact EurAupair immediately for information about availability and additional expediting fees.

19

Exhibit C

It is recommended that Host Family Applications be submitted as early as possible since a limited number of au pair applicants are available for any particular arrival month. Families are accepted and placements are made based upon the date of EurAupair's receipt of the Host Family Application Form. If a particular arrival month is unavailable, the family will be advised and a priority will be given for the next available arrival month.

# EurAupair's "12-Month Au Pair Commitment"

EurAupair wants to ensure that each host family receives the greatest benefit from participating in the program, and has made a firm commitment to provide each host family with 12-months of au pair child care assistance and cultural enrichment.

In the vast majority of cases, the host family and the au pair are compatible and develop a warm and close relationship. However, in the unlikely circumstance that problems develop which prove to be irresolvable and irreconcilable, EurAupair stands behind its commitment.

If, after a 60-day adjustment period, the host family and the EurAupair Community Counselor have determined that the au pair is incompatible with the host family's lifestyle, and the problems and differences are irreconcilable and irresolvable, or the au pair withdraws from the program not due to host family cause, the EurAupair Program will provide the host family with a replacement au pair as soon as possible.

## Cancellation/Refund Policy

| Application Fee | $350 | Non-refundable. |
|---|---|---|
| Program and Flight Fees | See Program Fee Schedule Page 17-18 | Program and Flight Fees refundable, less $1500, if cancellation is received in writing by EurAupair at least 30 days prior to the au pair's arrival to the U.S. workshop (35 days prior to arrival to host family). |
| | | Program and Flight Fees refundable, less $1500 and less the cost of any non-refundable airfare, if cancellation is received in writing by EurAupair less than 30 days prior to the au pair's arrival date. |
| Refund Policy | | A refund of $400 per month may be considered during the first 6 months of a 12-month program commitment. No refunds after the first 6 months of program participation; however a full credit will be kept on file for paid program fees less non-refundable charges. |

"It was really difficult choosing from all those EurAupair applicants… so many of them seemed perfect for our family."

The Sager Host Family, Ohio

20

Exhibit C

Defs.' Appx. 00000631

EurAupair will provide you with suitable replacement candidates from which you can choose an au pair based upon the information provided in the Host Family Profile and Agreement, and, if possible, any other reasonable criteria provided by the host family. It can happen that the time remaining on the visa of the replacement au pair extends beyond the original 12-month commitment of the host family. Because EurAupair is required to provide each au pair with a full one-year experience, the host family gains additional



months to their EurAupair program year. In this case, a pro-rata fee of $642 ($592 for repeat families) per additional month (or portion thereof), plus any domestic transportation costs, will be due prior to arrival of the replacement au pair. If the replacement au pair's remaining visa period is less than the time remaining on the family's original au pair's visa, the host family will receive a refund of $642 ($592 for repeat families) for each remaining month of its 12-month commitment and be responsible for domestic travel arrangements, if any. The pro-rata fee for the Au Pair par Expérience program is $717 ($667 for repeat families) per month.

In the event of au pair reassignment, repatriation, or withdrawal, EurAupair cannot guarantee continuous child care assistance between the original au pair's departure from the family and the arrival of a replacement au pair. We will, however, do everything possible to ensure that, should any lapse in child care assistance occur, it will be minimal.

The host family is obligated to continue hosting and to provide for the health, welfare and safety of the au pair exchange participant until the au pair returns home or joins another host family. Host families must conform to all U.S. government regulations, program guidelines and rules. Of course, EurAupair will not provide a replacement au pair to any host family that EurAupair determines has violated U.S. government regulations, federal, state or local laws or its obligations to the au pair or the program. After the initial six-month family stay, all placements are considered final and, consequently, no replacements will be made.

Through EurAupair's 12-Month Au Pair Commitment, host families and au pair participants are ensured an entire year of a mutually beneficial and rewarding intercultural child care exchange experience.

**Through EurAupair's 12-Month Au Pair Commitment, host families and au pair participants are ensured an entire year of a mutually beneficial and rewarding intercultural child care exchange experience.**

**21**

Exhibit C

EAP0000093

Defs.' Appx. 00000632

# Au Pair par Expérience®

For those families wanting a more experienced au pair, EurAupair goes an extra step with its "Au Pair par Expérience" program. Through this program, host families choose from a pool of au pair candidates who have additional experience and/or more formal training in child care.

To become part of the Au Pair par Expérience program, au pair candidates must meet the following requirements:

- Have at least 2 years of full time child care experience or be a certificated child care provider or hold a kindergarten or elementary school teaching degree

- Be at least 20 years of age (but no older than 26 years) upon arrival



As with any EurAupair au pair, your Au Pair par Expérience au pair will live in your home as a family member, and will be available to assist with the care of your children for up to 45 hours per week. Families interested in hosting an Au Pair par Expérience au pair for a year must check the appropriate box on the EurAupair Host Family Application Form, arrange for two references and submit to EurAupair the Application Form and a $350 Application Fee. Au pairs in the Au Pair par Expérience program receive pocket money in the amount of $250 per week.

As with all EurAupair au pairs, the final decision in selecting an au pair from the Au Pair par Expérience program is yours. With EurAupair's Au Pair par Expérience program, EurAupair offers you one more option in helping you meet your child care needs. Call and ask about the EurAupair Au Pair par Expérience program and start choosing your Par Expérience Au Pair today!

www.EurAupair.com



Intercultural Child Care Programs



"I can't say enough about our au pair Melanie. She is one in a million."
The Levitch Host Family, New Jersey

22

Exhibit C

EAP0000094

# EurAupair Online Selection Option!



Choosing a EurAupair au pair to help care for your children is an important decision and one that's best made when and where *you* feel comfortable. By being able to select your au pair online, EurAupair offers you the flexibility and convenience of reviewing applications 24 hours a day in the comfort of your own home. What could be better? By using EurAupair's Online Au Pair Selection, you and your family can review a variety of au pair applications in color and choose the most compatible new member of your family. Our online au pair selection is just one more way that EurAupair strives to give you and your family the world without having to leave the comfort and privacy of your own home.

- Ease – It's as easy as one, two, three! One – simply log on and choose your user name and password, two – after being accepted as a EurAupair host family, select and interview your au pair from a variety of candidates, and three – confirm placement online with your credit card.

- Round the clock access – EurAupair au pair applications are online 24 hours a day, 7 days a week, 365 days a year to suit your busy schedule.

- Comfort and convenience – Reviewing applications in your home means everyone can be part of the selection process. You can even print out the au pair's application, colorful photo collage, references and other documentation.

- Security – Have the peace of mind that comes from knowing that you can place a 24-hour hold on a particular au pair application at any given time.

No shuffling of application packets or trying to make a meeting time. With EurAupair's Online Au Pair Selection, choosing your au pair is fun and easy for the whole family! With all the advantages, why not log on today and start finding that special au pair for your family?

**"I couldn't wish for a better host family. I love them. They always included me. I feel like home, my host child is now my little sister."**

**Au Pair Sanaa from France**

23

Exhibit C

EAP0000095

Defs.' Appx. 00000634



**You can apply online at www.euraupair.com**

Intercultural Child Care Programs

## Host Family Application Form

Families interested in hosting a EurAupair au pair must complete a Host Family Application Form and submit it with a $350 Application Fee (non-refundable) to EurAupair. Mail Form and Application Fee, payable by check or credit card (Visa, MasterCard, American Express, Diners Club or Discover). If paying by credit card, this form may be submitted via fax, mail, or online at www.euraupair.com. Mail or fax to:

**"EURAUPAIR REGISTRAR"**
**250 North Pacific Coast Highway**
**Laguna Beach, CA 92651 USA**
**Fax: (949) 497-6235**

Upon receipt of this Host Family Application Form, EurAupair will contact you for a convenient in-home interview.

**Please print clearly or type:**

Au Pair Arrival Month Preferred:

_____     _____     _____

   month          year

I / We prefer the:  ❏ Regular program     ❏ 'Au Pair par Expérience' program

Name of Mother/Guardian _____
                          Last                      First               Middle

Name of Father/Guardian_____
                          Last                      First               Middle

Address _____
                                           Street

_____
               City                         State               Zip

Nearest major city_____
               City                         State        Miles from home

Telephone(s) Mother _____     _____     _____
                      Home                      Work               Cell

Telephone(s) Father _____     _____     _____
                      Home                      Work               Cell

Host Family's primary e-mail address _____

Have you previously hosted an au pair through EurAupair? _____     If so, most recent year? _____

Through another organization? _____     If so, most recent year? _____

If you have a preference of nationality(ies), please indicate below (availability may be limited):

| ❏ French | ❏ Italian | ❏ Finnish | ❏ South African | ❏ Turkish | ❏ Brazilian | ❏ Colombian |
|----------|-----------|-----------|-----------------|-----------|-------------|-------------|
| ❏ German | ❏ Danish | ❏ Portuguese | ❏ Thai | ❏ Mexican | ❏ Chinese | ❏ No Preference |
| ❏ Swedish | ❏ Spanish | ❏ Russian | ❏ Taiwanese | ❏ Argentinean | ❏ Romanian | |

Exhibit C

EAP0000096

Do you require a licensed driver? ❑ Yes ❑ No

Please provide us with the first names of all children living at home, and indicate their sex, age, birthdate and any physical, mental or learning disabilities, illnesses or special needs which they may have.

| Name | Sex | Age | Birthdate | Disabilities or Special Requirements |
|------|-----|-----|-----------|--------------------------------------|
| 1.) _____ | | | | _____ |
| 2.) _____ | | | | _____ |
| 3.) _____ | | | | _____ |
| 4.) _____ | | | | _____ |
| 5.) _____ | | | | _____ |

Are you expecting? _____   If yes, what is your due date? _____

Please indicate a few of your family's major interests or hobbies: _____

_____

Do you feel that you can include your au pair in family meals and other activities, considering her a regular member of your family? _____

Do you have pets? _____ If yes, what pets do you have? _____

Do you smoke? _____ Would an au pair be permitted to smoke in your home? _____

Does Mother/Guardian work (volunteer work included)? _____ If yes, full or part time? _____

Occupation/Title _____ Is work during day or night? _____

Including commuting time, how many hours are spent away from home for work per day? _____

Does Father/Guardian work (volunteer work included)? _____ If yes, full or part time? _____

Occupation/Title _____ Is work during day or night? _____

Including commuting time, how many hours are spent away from home for work per day? _____

Has anyone in your family ever been convicted of a felony? _____ If yes, please explain who and the circumstances. _____

_____

Mother/Guardian Driver's License No. _____ State: _____ Expiration Date: _____

Father/Guardian Driver's License No. _____ State: _____ Expiration Date: _____

---

**Payment Method:**   ($350 Non-Refundable Application Fee)   ❑ Check enclosed. ❑ Charge my credit card. If credit card, charge my:
❑ American Express ❑ Visa ❑ MasterCard ❑ Diners Club ❑ Discover

My credit card number _____ Expires _____

Name as stated on credit card _____

Signature of cardholder _____

---

I'm interested in EurAupair's Payment Plan ❑ Yes ❑ No

If you fully understand and agree to the foregoing program terms and conditions contained in this brochure, and the information you have provided above is true and complete, please sign and date this form and return it together with your Application Fee to the EurAupair Registrar (see address and/or fax number, on previous page):

Signature of Applicant (Mother/Guardian) _____ Date _____

Signature of Applicant (Father/Guardian) _____ Date _____   Exhibit C

EAP0000097

Defs.' Appx. 00000636

# EurAupair Extended Stay Program



For those host families finishing their EurAupair year, the Extended Stay Program offers a welcome alternative to selecting a new au pair. With the Extended Stay Program, you and your au pair can enjoy an additional 6 or 12 months together.

During your EurAupair year, your au pair has become more than simply someone to help you with your child care needs. She has become family; someone whom you have come to love and trust with your most precious gift – your children. The EurAupair Extended Stay Program respects this bond by providing the opportunity for you to continue your relationship for another 6 or 12 months.

How will someone else make your son laugh the way that she does? Will another au pair know how to teach your daughter crafts like she did? Now, with EurAupair's new Extended Stay Program, you don't need to worry about these questions and your children don't have to say good-bye so soon to their "big sister" from abroad.

Once you both decide to extend, it's really quite easy. All it takes is a quick phone call to your local EurAupair Community Counselor and a little bit of paperwork. It's that simple!

With the EurAupair Extended Stay Program, you will continue to have reliable, affordable child care assistance by the au pair whom you have come to love and trust. There are no real changes, no new requirements to learn. Just as during your first year, your au pair will receive vacation time and weekly pocket money. And, just as with her first year, she'll need to complete a class or two for her educational requirement.

Approximately three months before your EurAupair au pair is due to return home, you will be sent a EurAupair Extension letter, inviting you to join the EurAupair Extended Stay Program. So watch your mailbox and know that you and your au pair can have another six months or more together!

w w w . E u r A u p a i r . c o m



Intercultural Child Care Programs

"Our kids just fell in love with Katja and now they can enjoy another year with her thanks to EurAupair!"

The Lee Host Family, Indiana



Exhibit C

EAP0000098



**Intercultural Child Care Programs**

# A Year of Growth and Caring

250 North Coast Highway

Laguna Beach, CA 92651

Telephone: 949-494-5500

**Toll Free: 800-333-3804**

Fax: 949-497-6235

E-mail: info@euraupair.com

 facebook.com/EurAupair

 Visit www.EurAupair.com or use your smart phone to scan the code.

   



**w w w . E u r A u p a i r . c o m**

Printed on Recycled Paper

Exhibit C

EAP0000099

Defs.' Appx. 00000638

**RESTRICTED - EXHIBIT D TO DECLARATION OF CELIA PARKER. SEE RESTRICTED APPENDIX AT Defs.' R. Appx. 00000587**

Defs.' Appx. 00000639

**RESTRICTED - EXHIBIT E TO DECLARATION OF CELIA PARKER. SEE RESTRICTED APPENDIX AT Defs.' R. Appx. 00000694.**

Defs.' Appx. 00000640

# RESTRICTED - EXHIBIT F TO DECLARATION OF CELIA PARKER. SEE RESTRICTED APPENDIX AT Defs.' R. Appx. 00000696

Defs.' Appx. 00000641

**RESTRICTED - EXHIBIT G TO DECLARATION OF CELIA PARKER. SEE RESTRICTED APPENDIX AT Defs.' R. Appx. 00000697**

Defs.' Appx. 00000642

# RESTRICTED - EXHIBIT H TO DECLARATION OF CELIA PARKER. SEE RESTRICTED APPENDIX AT Defs.' R. Appx. 00000698.

Defs.' Appx. 00000643

September 1, 2009



Dear Redacted

It has been brought to our attention that there have been some issues between you and your current au pair, Redacted Even though we have agreed to replace Redacted and allow you the opportunity of selecting an in-country au pair as replacement, we would like to stress some of the Program Regulations.

It is required by the U.S. Department of State that au pair participants are compensated at a weekly rate in conformance with the federal minimum wage of $195.75. It is our responsibility as a sponsor organization to make sure that all au pairs receive the above amount once a week.

In addition, host families are entitled to a maximum of 10 hours a day/45 hours a week of child care. Au pairs do receive a minimum of one and a half days off per week in addition to one complete weekend off each month. It is a Department of State regulation that these days off are guaranteed to the au pair and can be used at their discretion.

It is our responsibility to ensure that the Au Pair Program reflects the regulations of the Department of State as well as EurAupair's standards and we therefore ask you to respect these rules and regulations. We appreciate your understanding in this matter.

Please feel free to contact your Community Counselor, Area Coordinator or myself, if you have any questions.

Best Regards

Miriam Weyand
Regional Director

cc:     Ms. Gila Peller, Community Counselor
        Ms. Vivi Frumkin, Area Coordinator
        Ms. Susan Hayes, Executive Director

Exhibit I

Defs.' Appx. 00000644

Message

| | |
|---|---|
| **From**: | Miriam Weyand [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=F068DBE74C2F44E3BEA15CC44C2FB0B2-MIRIAM WEYAND (EAP)] |
| **Sent**: | 7/14/2014 8:40:46 PM |
| **To**: | Redacted |
| **Subject**: | RE: EurAupair Payment |

Hi Redacted

While I appreciate your email, your family can no longer host a EurAupair au pair. We have been trying to get in touch with you for months regarding the outstanding balance; you were copied on all email correspondence which included information on the amount of the payment due. Also, it is a Department of State regulation that the stipend of $195.75 is paid to the au pairs weekly and according to your email below, the full amount has not always been paid to Redacted

My apologies if you feel that EurAupair's methods of communication have been inappropriate; after numerous voice messages and emails that stayed unanswered, we were running out of options to get in touch with you.

We are more than happy to offer rematch to Redacted and are waiting for her response on whether she would like to join a new family or return home at her own expense, by end of business day today.

Best regards,

Miriam

Miriam Weyand

Western Regional Director

EurAupair Intercultural Child Care Programs

800-333-3804 ext. 257

www.euraupair.com



Exhibit J

EAP0001936

Defs.' Appx. 00000645

**From:** [Redacted]
**Sent:** Sunday, July 13, 2014 10:28 PM
**To:** Miriam Weyand
**Subject:** Re: EurAupair Payment

Hi Miriam,

I apologize for not replying to your agency for I had left this matter for my husband to handle long ago. However, I do understand that matters have gotten out of hand and I apologize for his behalf. He does work 16 hour shifts so he's not always making decisions with his best mind.

I did speak with Sarah Norman last week and immediately after speaking with her, I called you. Unfortunately, our schedules do not match and was unsuccessful in reaching you. Sarah did tell me that the arrangement made was for $300.00 but she was not able to tell me the balance. I immediately wrote a check out for $750.00 and brought it down to the hotel front desk to mail out for me. If you let me know the balance, I'll personally send that to your agency as well.

With all due respect, please check your sources of information in regards to [Redacted] stipend. I had always given her $200.00 every Friday since the day she landed. It wasn't until recently that she's given anywhere around $150-$200. However, bear in mind that we support her 100%. Whether she has personal needs or money to go out with friends. We supply it all. Clothes, cell phone w/unlimited data, computer, shoes, dinner outs, her airplane tickets, whatever. Her money, she is supposed to save and send home to her parents. So, as you can see, we pay her beyond the contracted $197....amount. She's aware of that. We love her like our own. My entire family loves her and my younger brother and her are building a relationship so I assure you, we would not mistreat her.

Another note I'd like to mention is that I am happy that Sarah was professional on the phone with me. Because she surely was not in her Facebook message. She's lucky that I just read the message now since I rarely check my messages there...Really?! EurAupair uses Facebook to contact their clients??! I'll be sure to spread that when I speak about my experience. It's a bit unprofessional, don't you agree? Then to start the message with "this is ridiculous..." Wow, just wow... If you need to see that, do let me know. I will be happy to send the message to you for your reading pleasure.

Frankly, it seems to me that your agency is trying all that they can to remove [Redacted]. Of course, we'll cooperate if that's what she wishes.

Exhibit J

EAP0001937

Defs.' Appx. 00000646

However, if you do take her, please treat her kindly and with some respect. While her counselorshave been helpful, she has now shown me all communication with them and Sarah. She has expressed to me that Sarah is very pushy and rude to her. That she is often not heard. Should you need those text and email logs, let me know as well. I'll be glad to send them as well. I think one of your employees may need some more training.... Starting first with calling **Redacted** not ⸨Redacted⸩, at least get the simple nickname correct.....

Let me know how to proceed since your check has already been sent and your information about the stipend is incorrect.

Best,

**Redacted**

Sent from my iPhone

On Jul 11, 2014, at 1:18 PM, Miriam Weyand <miriam@euraupair.com> wrote:

Dear **Redacted**,

It has been brought to our attention that Redacted has not received her weekly stipend in quite some time. Therefore, your placement will be terminated immediately, you are no longer a EurAupair host family.

We offer Redacted to be placed with a different host family of ours and we need to remove her from your house by Monday, July 14th. We appreciate your cooperation in this matter and hope you will help Redacted to complete her au pair experience.

Thank you,
Miriam

Miriam Weyand

Western Regional Director

EurAupair Intercultural Child Care Programs

Exhibit J

EAP0001938

Defs.' Appx. 00000647

800-333-3804 ext. 257

www.euraupair.com

<image001.jpg>

**From:** Miriam Weyand
**Sent:** Tuesday, July 01, 2014 5:25 PM
**To:** [Redacted]
**Cc:** Sarah Norman; Becky Snyder (EAP)
**Subject:** RE: EurAupair Payment
**Importance:** High

Hi [Redacted]

Since we have not heard from you yesterday or today, please ask [Redacted] to pack her things so she is ready to move on Thursday, July 3rd. We are currently working on finding a place for her to stay and we will post her application on our in-country site.

Thank you,
Miriam

Miriam Weyand

Western Regional Director

EurAupair Intercultural Child Care Programs

800-333-3804 ext. 257

www.euraupair.com

<image001.jpg>

**From:** Miriam Weyand
**Sent:** Monday, June 30, 2014 11:32 AM
**To:** [Redacted]
**Subject:** RE: EurAupair Payment

Exhibit J

EAP0001939

Defs.' Appx. 00000648

Hi 

In order to discuss payment options, it is very important that we talk on the phone today. Please call me at 800 333 3804 ext. 257 or let me know what is the best phone number and time to reach you today.

Thank you,
Miriam

Miriam Weyand

Western Regional Director

EurAupair Intercultural Child Care Programs

800-333-3804 ext. 257

www.euraupair.com

<image001.jpg>

**From:** [Redacted]
**Sent:** Monday, June 30, 2014 6:07 AM
**To:** Miriam Weyand
**Subject:** Re: EurAupair Payment

Hi Miriam,

I am having trouble making a payment this month due to other overdue bills and short on moving costs. My job has been picking up but [Redacted] job has been slow this summer.

I need more time to make a payment, preferably a month extension to give me time if that's possible.

[Redacted]

Sent from my iPhone

Exhibit J

EAP0001940

Defs.' Appx. 00000649

On Jun 26, 2014, at 2:16 PM, Miriam Weyand <miriam@euraupair.com> wrote:

Dear **Redacted**,

We have tried to reach you numerous times this week. If we do not receive payment over the next installment of $920.40 by end of business day on Friday, June 27th, Redacted will be removed from your home on Monday, June 30th.

It is extremely time-consuming having to follow-up on each payment several times and EurAupair does not accept any further delay.

Thank you for your understanding,

Miriam

Miriam Weyand

Western Regional Director

EurAupair Intercultural Child Care Programs

800-333-3804 ext. 257

www.euraupair.com

**Redacted**

Exhibit J

EAP0001941

Defs.' Appx. 00000650

**RESTRICTED - EXHIBIT K TO DECLARATION OF CELIA PARKER. SEE RESTRICTED APPENDIX AT Defs.' R. Appx. 00000742.**

Defs.' Appx. 00000651

**RESTRICTED - EXHIBIT L TO DECLARATION OF CELIA PARKER. SEE RESTRICTED APPENDIX AT Defs.' R. Appx. 00000754.**

Defs.' Appx. 00000652

# RESTRICTED - EXHIBIT M TO DECLARATION OF CELIA PARKER. SEE RESTRICTED APPENDIX AT Defs.' R. Appx. 00000766.

Defs.' Appx. 00000653

**RESTRICTED - EXHIBIT N TO DECLARATION OF CELIA PARKER. SEE RESTRICTED APPENDIX AT Defs.' R. Appx. 00000778.**

Defs.' Appx. 00000654

**RESTRICTED - EXHIBIT O TO DECLARATION OF CELIA PARKER. SEE RESTRICTED APPENDIX AT Defs.' R. Appx. 00000790.**

Defs.' Appx. 00000655

**RESTRICTED - EXHIBIT P TO DECLARATION OF CELIA PARKER. SEE RESTRICTED APPENDIX AT Defs.' R. Appx. 00000802.**

Defs.' Appx. 00000656

**RESTRICTED - EXHIBIT Q TO DECLARATION OF CELIA PARKER. SEE RESTRICTED APPENDIX AT Defs.' R. Appx. 00000814**

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO


JOHANA PAOLA BELTRAN, et al.,

              Plaintiffs,

      vs.                         No. 14-cv-03074-CMA-KMT

INTEREXCHANGE, INC., et al.,

              Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~


VIDEOTAPED DEPOSITION OF 30(b)(6) EXPERT OF EURAUPAIR

CELIA PARKER

Volume I


Sunday, April 30, 2017

10:21 a.m. - 7:25 p.m.


686 Anton Boulevard

Costa Mesa, California  92626


Magna Legal Services

866-624-6221

www.MagnaLS.com


Reported by:  Marceline F. Noble, CSR No. 3024



Page 13

1        MR. KELLY:  William Kelly on behalf of

2   USAuPair.

3        MS. LEVY:  Alyssa Levy --

4        MR. HUEY:  Nathan Huey on behalf of --

5        MS. LEVY:  Sorry.  Go ahead.

6        MR. HUEY:  Nathan Huey on behalf of

7   AuPairCare.

8        MS. LEVY:  Alyssa Levy from Sherman Howard,

9   on behalf of InterExchange.

10       MR. VALDIVIESO:  Do we have anyone else?

11       That's it.

12       THE VIDEOGRAPHER:  Okay.  Court Reporter may

13  now swear in the witness.

14

15                   CELIA PARKER,

16  having been first duly sworn, testifies as follows:

17

18                   EXAMINATION

19  QUESTIONS BY MR. VALDIVIESO:

20     Q.  What is your name?

21     A.  Celia Parker.

22     Q.  Ms. Parker, who is your employer?

23     A.  I am here on behalf -- representing

24  EurAuPair Intercultural Child Care Programs.

25     Q.  Are you employed by anyone else?



Page 99

1           Go off the record.

2           THE VIDEOGRAPHER:  All right.

3           We are off the record at 1:28 p.m.

4           (Brief recess.)

5           THE VIDEOGRAPHER:  We are back on the record

6    at 1:35 p.m.

7       Q.  (By Mr. Valdivieso) You have two categories

8    of au pairs; is that right?

9       A.  Yes.

10      Q.  What are those two categories?

11      A.  One we would simply refer to as being an

12   au pair, and then the second of the two we would call

13   par experience.

14      Q.  What's the difference between the two

15   categories?

16      A.  The level of experience prior to coming into

17   the program and -- and education in child care.

18      Q.  Are most of the au pairs in the EurAuPair

19   program regular au pairs?

20      A.  Yes.

21      Q.  And roughly, what's the breakdown between

22   regular and par experience au pairs?

23      A.  Par experience is -- is very small,

24   typically less than 5 percent of the population.

25      Q.  And do the host families pay the au pairs



1    any amount?

2         A.  Host families provide pocket money to au

3    pairs, yes, according to federal regulation.

4         Q.  And why do you call it pocket money?

5         A.  Because I was involved in the initial setup

6    of this program, and that's how it was characterized

7    at the -- from the beginning.

8         Q.  Who characterized it that way?

9         A.  U.S. Department of State.

10        Q.  And how did the -- when you said that they

11   characterized it, in what -- in what form were they

12   characterizing it?

13            Was it in written form?

14        A.  I'm sorry, in?

15        Q.  Was it in written form that they

16   characterized it in that manner?

17        A.  Yes.  All dialogue and descriptions of the

18   programs and the operation of the program stipulated

19   that one of the regulations would be host families

20   providing pocket money to the au pair they were

21   hosting.

22        Q.  Do you know if that's how the

23   Department of State still characterizes the amount

24   that's paid to the au pairs each week?

25        A.  I do not know.



Page 107

1    Q.  Yes.

2    A.  No.

3    Q.  Do you know how long the website has stated

4  that this is the weekly stipend amount?

5    A.  I can't give you a specific date.  It would

6  have been there since the stipend amount was changed

7  by the U.S. Department of State.

8    Q.  Do you recall when the U.S. Department of

9  State changed the stipend amount?

10    A.  I don't have a date in my head.  I certainly

11  could look.

12    Q.  Is it EurAuPair's position today that this

13  representation is accurate?

14    A.  Yes.

15    Q.  And I want to go back to something you told

16  me a little bit earlier before the break.

17        I asked you about the international partners

18  and the promotional materials, when I asked you if

19  they provided those materials to you, and I believe

20  you told me that you said it was provided to you on

21  an annual basis.

22        Do you -- are you aware if those promotional

23  materials have been produced?

24    A.  I'm not aware.

25        And produced to you, I presume, is your



Defs.' Appx. 00000662

Page 139

1      Q.   (By Mr. Valdivieso) -- directing you not to

2   answer.

3          MS. FITZGERALD:   No.   I'm not, no.

4          THE WITNESS:   Okay.

5          MS. FITZGERALD:   You -- you can answer.

6          THE WITNESS:   Okay.   The United States

7   Department of State has calculated the amount of the

8   weekly pocket money that's to be provided to

9   au pairs.

10          Is that the question?

11          And -- and given that number to au pair

12   program sponsors throughout the years.

13      Q.   (By Mr. Valdivieso) And does -- No. 9, under

14   "Host family qualifications," does it state that the

15   195.75 is a minimum amount?

16      A.   Does it state that it's a minimum amount?

17          No.

18      Q.   Is it accurate to state that 195.75 is a

19   fixed amount -- an amount fixed by the State

20   Department?

21          MS. FITZGERALD:   Object to the form.

22          THE WITNESS:   Yeah.   I'm not understanding

23   "fixed."

24          The amount of pocket money to be provided to

25   an au pair, being -- calculated as being $195.75, was



Defs.' Appx. 00000663

1          My answer is no.  The minimum stipend amount

2     or pocket money amount, as you choose, is the same

3     regardless which au pair program sponsor a family

4     chooses to host with.

5          Q.   (By Mr. Valdivieso) If the stipend amount

6     that EurAuPair host families were required to pay

7     au pairs on a weekly basis increased from 195.75 by,

8     hypothetically speaking, $20, would you expect fewer

9     host families to apply to be -- to host au pairs?

10          MS. FITZGERALD:  Object to the form and lack

11     of foundation.

12          THE WITNESS:  It's speculation.  So I really

13     can't -- can't know.

14          As of 2008 and no one has employment, I --

15     I -- there's too many factors.  I'm -- I -- I

16     couldn't -- couldn't answer.

17          Q.   (By Mr. Valdivieso) All -- all other things

18     being equal, if the price -- if the weekly stipend

19     were to increase from 195.75, do you, based on your

20     many years of experience in the au pair program,

21     expect that fewer host families would apply to host

22     au pairs?

23          MS. FITZGERALD:  Form and foundation.

24          THE WITNESS:  And given your objection, I'm

25     to respond anyway?



Page 282

1

2                    REPORTER'S CERTIFICATION

3

4       I, MARCELINE F. NOBLE, a Certified Shorthand

5  Reporter in and for the State of California, do

6  hereby certify:

7

8       That the foregoing witness was by me duly sworn;

9  that the deposition was then taken before me at the

10  time and place herein set forth; that the testimony

11  and proceedings were reported stenographically by me

12  and later transcribed into typewriting under my

13  direction; that the foregoing is a true record of the

14  testimony and proceedings taken at that time.

15            That before the conclusion of the

16  deposition, the witness has requested a review of

17  this transcript pursuant to Rule 30(e)(1).

18

19       IN WITNESS WHEREOF, I have subscribed my name

20  this 4th day of May, 2017.

21

22                    _____

23                    MARCELINE F. NOBLE, CSR No. 3024

24

25



Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

JOHANA PAOLA BELTRAN, et  )
                          )
al.,                      )
                          )
        Plaintiff,        )
                          )
    vs.                   )  Civil Case No.
                          )  14-cv-03074-CMA-KMT
INTEREXCHANGE INC., et    )
al.,                      )
                          )
        Defendants.       )
_____)

Videotaped Deposition of SUSAN HAYES, taken
on behalf of the Plaintiff, at 686 Anton
Boulevard, Costa Mesa, California, commencing
at 8:38 A.M. on Thursday, August 24, 2017,
before SHANNA GRAY, Certified Shorthand
Reporter, Certificate No. 13690.

CONFIDENTIAL EXCERPT BOUND UNDER SEPARATE COVER

-   -   -

MAGNA LEGAL SERVICES
(866) 624-6221
www.magnaLS.com



```
                                                      Page 13
1              THE VIDEOGRAPHER:  The court reporter will now

2    swear in the witness.

3                          SUSAN HAYES,

4        having been first duly sworn by the court reporter,

5                      testified as follows:

6

7                          EXAMINATION

8    BY MR. VALDIVIESO:

9        Q.   Good morning, Ms. Hayes.

10       A.   Good morning.

11       Q.   Have you been deposed before?

12       A.   No.

13       Q.   Have you ever given testimony in a nondeposition

14   setting?

15       A.   No.

16       Q.   So given that this is your first time --

17       A.   Yes.

18       Q.   -- I'll walk you through some ground rules so

19   that we're all on the same page so that today can go

20   smoothly.  First of all, we're going to be on the record

21   today.  We have a court reporter who's transcribing what

22   you're saying, and we have a videographer who's taking a

23   video of you.  I would request that your answers be verbal

24   rather than nodding or shaking your head or making any

25   gestures so that we can have an accurate record.  Is that
```



Page 40

 1   do you see where it says "provide the au pair with 195.75

 2   weekly pocket money"?

 3        A.   I do.

 4        Q.   And were you responsible for approving the

 5   content of that sentence?

 6        A.   I was.

 7        Q.   And does anything in that sentence indicate the

 8   195.75 is a minimum?

 9        A.   I think it's implicit.  It doesn't say a maximum

10   either.  So...

11        Q.   But if you go two bullets above that, it says

12   "agree in advance to a child care schedule not exceeding

13   45 hours per week"?

14        A.   Correct.

15        Q.   "And ten hours per day"?

16        A.   Mm-hm.

17        Q.   And is 45 hours per week a maximum?

18        A.   It is a maximum.

19        Q.   And are there words in that sentence that

20   indicate that it's a maximum?

21        A.   "Not exceeding."

22        Q.   So the words "not exceeding" to you indicate that

23   45 hours is a maximum amount of time that an au pair can

24   work?

25        A.   Yes.



Page 49

1   meant to inform the host family what their

2   responsibilities are with respect to the au pair stipend?

3       A.   Yes.

4       Q.   And is there anything in that sentence that

5   indicates to a host family that the 195.75 is a minimum?

6       A.   Again, I believe it's implicit.

7       Q.   And what do you think -- what, if anything, would

8   lead a reader to find that it's implicit?

9            MS. FITZGERALD:  Object to the form.

10           THE WITNESS:  I -- maybe just based on historical

11  action.  I mean, the -- again, it's -- there's nothing

12  that says a maximum there either.

13  BY MR. VALDIVIESO:

14      Q.   The very next sentence says "au pair cannot

15  provide more than 45 hours of child care for extra money."

16  Do you see that?  It's in the same --

17      A.   Oh, I'm sorry.  On the same -- mm-hm.

18      Q.   -- item.

19           Now, is the 45 hours of child care, is that a

20  maximum or a minimum?

21      A.   That's a maximum.

22      Q.   And what in that sentence indicates to a host

23  family that 45 hours of child care is a maximum?

24      A.   Well, it says "cannot provide more than 45 hours

25  of child care."



Page 55

```
 1        Q.    When you decided to add "not less than" to the

 2   sentence describing the au pair stipend, did you take into

 3   consideration what other sponsors did with respect to

 4   their materials and their description of the au pair

 5   stipend --

 6        A.    Absolutely not.

 7        Q.    -- when making that change?

 8        A.    Absolutely not.  None.

 9        Q.    And did you discuss with any defendant -- sorry.

10   Did you discuss with anyone, any of the sponsor agencies

11   best practices with respect to the description of the

12   au pair stipend?

13        A.    Never.

14        Q.    And did you discuss with any of the au pair

15   sponsors, anyone -- anyone who works for one of the

16   au pair sponsors best practices with respect to the number

17   of hours that an au pair can work?

18        A.    No.

19        Q.    You said earlier that part of your

20   responsibilities as alternate responsible officer you had

21   some responsibility for interacting with the Department of

22   State; is that right?

23        A.    Mm-hm.  It means I have the opportunity to,

24   mm-hm.

25        Q.    Do you consider yourself EurAupair's primary
```



Page 81

 1   Colombian partners.  I'm asking John Fredy what could he

 2   provide me before I consider working with another partner

 3   in Colombia.

 4        Q.   And why do you prefer not to work with multiple

 5   companies in the same country?

 6        A.   We've always preferred exclusivity if possible.

 7        Q.   And why is that?

 8        A.   Consistency.

 9        Q.   Turning to page 1179, I'm looking at an e-mail

10   from you to Mr. Fredy dated April 8, time stamped 4:03.

11   You wrote "The two applicants you already sent are par

12   experience applicants which are a bit harder to place as

13   the families have to pay a higher program fee and they

14   have to pay the au pairs $250 per week rather than 195.75

15   per week.", Did I read that accurately?

16        A.   Yes, you did.

17        Q.   And do you believe that it is harder to place par

18   experience applicants?

19        A.   Not always.  Maybe at this time it was.  Simply

20   due to the increased cost.

21        Q.   And is the category par experience is that unique

22   to EurAupair?

23        A.   The term is.  I don't know if the category is.

24        Q.   Is the category a category that's created by the

25   Department of State?



Page 82

1      A.   No.

2      Q.   Did that category already exist when you came to

3  EurAupair in 2001 or was it created during your time?

4      A.   Oh, goodness.  I don't remember.  I really don't

5  remember.

6      Q.   And do you recall the rationale for why par

7  experience au pairs were paid $250 per week rather than

8  195.75 per week?

9      A.   I think it was simply more because they had

10  more -- either more education or more experience.

11     Q.   And so these two au pairs that Mr. Fredy was

12  asking you to place, you believed that they had the --

13  they met the requirements for par experience?

14     A.   Mm-hm, yes.

15     Q.   Then I'm looking at the bottom of 1177.  Fredy

16  wrote you at 3:12 p.m.  "Both girls could be PE, but we

17  need to place them asap.  So I would appreciate if you

18  could place them as regular ones in order to place them

19  faster."  Do you see that?

20     A.   I do.

21     Q.   And by "PE" is he referring to par experience?

22     A.   Yes.

23     Q.   And then at 3:23 p.m. you wrote Ms. Fass, a

24  person named Tiare Toulon, Miriam Weyand, and someone

25  named Jill McFadden; is that right?



Page 85

    1        A.    Correct.

    2        Q.    Do you see that?

    3        A.    Uh-huh.

    4        Q.    What do you mean by "infant care experience"?

    5        A.    Okay.  These would be for our purpose anyone

    6    between 19 and 26 who has at least 200 hours of infant

    7    care experience or dealing with children under two.

    8        Q.    And what is the stipend that applies to regular

    9    au pairs with infant care experience?

   10        A.    Minimum 195.75.

   11        Q.    And why -- is it fair to say that you were

   12    expressing a preference for a regular program applicant

   13    with infant care experience?

   14        A.    I just was looking for more applicants, I think,

   15    at that time.

   16        Q.    Well, why did you use the word "hopefully" in

   17    describing the infant care experience?

   18        A.    Infant care experience is preferable with most of

   19    our families.

   20        Q.    And that's based on your experience as executive

   21    director of EurAupair?

   22        A.    Mm-hm.

   23        Q.    So in their application materials do they

   24    indicate a preference whether there's infant care

   25    experience or not?



Page 201

1    STATE OF CALIFORNIA        )

                              ) SS.

2    COUNTY OF LOS ANGELES     )

3

4              I, Shanna Gray, a Certified Shorthand Reporter,

5    in and for the State of California, do hereby certify:

6              That the witness named in the foregoing

7    deposition had, before the commencement of the deposition,

8    solemnly stated under penalty of perjury that the evidence

9    given in this issue or matter shall be the truth, the

10   whole truth, and nothing but the truth;

11             That said proceedings were taken down in

12   stenographic writing by me and thereafter reduced to a

13   transcript under my direction;

14             I further certify that the foregoing is a full,

15   true, and correct transcript of said proceedings.

16             I further certify that I am neither counsel for,

17   nor related to, any party to said action, nor in anywise

18   interested in the outcome thereof.

19             That prior to the completion of the foregoing

20   deposition, review of the transcript was not requested.

21             In witness whereof, I have hereunto subscribed my

22   name this 8th day of September, 2017.

23

24                        _____

                          Shanna Gray, CSR No. 13690

25



Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

--------------------------------X

JOHANA PAOLA BELTRAN, et al.,   )

              Plaintiffs,       ) Civil Case No.

        v.                      ) 14-cv-03074-CMA-KMT

INTEREXCHANGE INC., et al.,     )

              Defendants.       )

--------------------------------X

VIDEOTAPED DEPOSITION OF HOLLY HAWTHORNE BROWN
Thursday, August 24, 2017; 9:07 a.m.

Job No.:   328846
Pgs.   1 - 186
Reported by:  Cindy L. Sebo, RMR, CRR, RPR, CSR,
CCR, CLR, RSA, LiveDeposition Authorized Reporter
MAGNA LEGAL SERVICES
(866) 624-6221
www.MagnaLS.com



```
 1                         -  -  -

 2                 HOLLY HAWTHORNE BROWN,

 3        after having been first duly sworn, was

 4            examined and testified as follows:

 5                         -  -  -

 6                         -  -  -

 7        EXAMINATION BY COUNSEL FOR PLAINTIFFS

 8                         -  -  -

 9   BY MR. LIBLING:

10        Q.    Good morning, Ms. Brown.

11        A.    Good morning.

12        Q.    So have you ever been deposed

13   before?

14        A.    I have not.

15        Q.    All right.  So there are many ground

16   rules.  The -- it will go easiest if we don't

17   speak over each other.  So I will endeavor to

18   let you finish.  And even if you know what the

19   question is going to be, if you could let the

20   question finish and then give your answer, we'll

21   have a cleaner record.

22        A.    Very good.
```



Page 24

1    and up to 10 hours a day; they have to have a

2    day and a half off each week and one full

3    weekend a month.

4         Q.    Do you discuss anything about the

5    stipend that au pairs will receive during the

6    screening?

7         A.    We -- yes, it comes up.

8         Q.    What do you discuss during the

9    screening about the stipend?

10        A.    Well, it's -- that the stipend is

11   paid weekly.  It's not based on the number of

12   hours they work.  While they cannot work more

13   than 45, it cannot -- it cannot get any less

14   than the weekly stipend.  And -- what else?

15   They can't bank hours, so they can't work less

16   one week and work more the rest -- the next

17   week.  But the stipend has to be paid each week

18   in full.

19        Q.    Do you discuss the amount of the

20   stipend?

21        A.    It's a minimum of 195.75 per week,

22   provided it's a regular-placed au pair.



Page 25

1        Q.        When you say "it's a minimum," do

2    you tell host families that they can pay more

3    than 195.75?

4        A.        Certainly, yeah.

5        Q.        Do they -- is that something that

6    you volunteer as part of your general -- as part

7    of every screening or only when it comes up?

8        A.        That they -- I word it just like I

9    said to you: The minimum -- the minimum stipend

10   is 195.75 per week.

11       Q.        And is that normally the end of the

12   conversation, or is there --

13       A.        No, sometimes families will ask,

14   just what you said, Is it okay to pay more? And

15   I say, Certainly, absolutely; if you think that

16   they're doing a good job and they're worth it,

17   then absolutely.

18       Q.        You also mentioned orientation for

19   host families and au pairs as something that you

20   would work on?

21       A.        Correct.

22       Q.        What is involved in the orientation



Page 32

1          Q.     I'm asking what you say about the

2    stipend during the orientation.

3          A.     Okay.

4                 Then -- well, then we discuss that

5    the stipend should be paid weekly and it's --

6    and it's paid -- it can't be prorated.  So a

7    family can't say, You were sick one day, so you

8    get less of a stipend.

9                 The stipend, again, is paid for up

10   to 45 hours of childcare.  It's not paid for a

11   certain -- there's -- it's -- the stipend is the

12   stipend.

13         Q.     Do you discuss the amount of the

14   stipend?

15         A.     I would say that that would vary,

16   because they already know the stipend.  It's

17   not -- so I don't know that I would actually go

18   back and reiterate something that they would

19   already know, but if they asked, absolutely.

20         Q.     If they asked, what would you tell

21   them?

22         A.     That it's a minimum of 195.75 per



Page 33

1     week.

2          Q.     Do you ever discuss negotiating the

3     stipend with an au pair?

4          A.     That -- I don't know that I've been

5     asked that, about --

6          Q.     You said that the --

7          A.     -- negotiating.  I -- I don't

8     know -- I don't think anybody's asked me that.

9          Q.     And it's not something you

10    volunteer?

11         A.     Negotiations?

12         Q.     Yeah.

13         A.     No, I don't.

14         Q.     You said that they already know the

15    stipend by the time they get to the orientation,

16    the au pairs; is that right?

17         A.     Um-hum.

18         Q.     How do they know the stipend

19    already?

20         A.     Well, they are told that before they

21    come over.  They have an agreement, or

22    something, I think, that they sign.  I don't



Page 36

1    that.

2              Anytime anybody wanted to speak,

3    they don't have to wait for the monthly meeting.

4    They can reach out to a community counselor at

5    any time.  But it -- if that was something that

6    was important to her, absolutely.

7         Q.    Okay.  So by "it can be," were you

8    telling me that it's not mandatory that you

9    discuss that at every face-to-face meeting, but

10   it is an opportunity to discuss that if that is

11   something the au pair wants to discuss?

12        A.    Correct.

13        Q.    With that same understanding, can it

14   also be an opportunity to ensure that au pairs

15   are working the appropriate number of hours?

16        A.    Yes.

17        Q.    And can it also be an opportunity to

18   ensure that au pairs are receiving the stipend

19   they're entitled to?

20        A.    Yes.

21        Q.    And if au pairs are not receiving

22   the stipend they're entitled to or they're



Page 37

1    working too many hours or the wrong kind of job

2    responsibilities, what are your obligations when

3    you learn that information?

4         A.     In the case of an au pair that says

5    she's working too many hours, you would have

6    to ask -- you have to ask some questions.  In

7    some cases, they are -- in some cases, it's just

8    a communication hiccup between a family and an

9    au pair.  So you -- first you have to look into

10   it and ask her to write down the number of hours

11   that she's actually working, talk to the host

12   family, and you have to determine first that

13   it's accurate.

14        Q.     So once you have investigated, and

15   let's say it is accurate, in this particular

16   instance, that the au pair is working too many

17   hours, what do you do then?

18        A.     Well, the host family is told they

19   have to stop immediately.

20        Q.     And if it becomes a repeated

21   problem, which I know, hopefully, it doesn't --

22   but if it becomes a repeated problem, what do



Page 48

1        A.      I -- yes, it would be brought up

2   because I know that's where . . .

3        Q.      What would you be told about the

4   stipend at the in-person training?

5        A.      Again, that it's a minimum of 195.75

6   per week.

7        Q.      Are community counselors -- is it

8   part of community counselors' job

9   responsibilities to be involved in the

10   discussions between au pairs and host families

11   about what the stipend is actually going to be?

12        A.      Repeat that again.

13        Q.      Is it part -- it's part of a

14   community coordinator's -- sorry -- a community

15   counselor's job responsibilities to ensure that

16   the 195.75, as a minimum, is paid, correct?

17        A.      I'm hesitant because I -- it's --

18   really, it's EurAupair that does that --

19   enforces things when something goes wrong.

20   We're just the monitors.  Does that make sense?

21        Q.      It does.

22        A.      Yeah.  So I -- I wouldn't go in



Page 89

1        Q.      You mentioned being paid weekly.

2                Is there anything else about the

3    stipend that you would train community

4    coordinators on?

5        A.      Do you have a specific question?

6        Q.      The amount of the stipend.

7        A.      Well, what I mentioned before, that

8    the stipend is a minimum payment of 195.75, and

9    if it was a par Expérience au pair, it would be

10   a minimum of $250.

11       Q.      Anything else about the stipend that

12   you tell community counselors?

13       A.      That it can't be prorated, it has to

14   be paid in full each week, and, again -- and --

15   and it's not based -- it's based on up to 45

16   hours; if an au pair is sick, she still has to

17   be paid.

18               That's all I can think of off the

19   top of my head.

20       Q.      Are you involved in marketing the

21   au pair program?

22       A.      Marketing?



Page 183

1                    C E R T I F I C A T E

2   DISTRICT OF COLUMBIA:

3             I, Cindy L. Sebo, a Notary Public within

4   and for the Jurisdiction aforesaid, do hereby

5   certify that the foregoing deposition was

6   taken before me, pursuant to notice, at the

7   time and place indicated; that said deponent

8   was by me duly sworn to tell the truth, the

9   whole truth, and nothing but the truth;

10  that the testimony of said deponent was

11  correctly recorded in machine shorthand by

12  me and thereafter transcribed under my

13  supervision with computer-aided transcription;

14  that the deposition is a true record of the

15  testimony given by the witness; and that I am

16  neither of counsel nor kin to any party in said

17  action, nor interested in the outcome thereof.

18

19  _____

20            Cindy L. Sebo, RMR, CRR, RPR, CSR,

21                 CCR, CLR, RSA, Notary Public

22



1

1          IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLORADO
2
     Civil Action No. 1:14-cv-03074-CMA-KMT
3    _____

4          CONFIDENTIAL VIDEOTAPE DEPOSITION OF:

5    MICHELLE CAROLINA DEL POZO AGUILAR - February 5, 2018
6    _____

     JOHANA PAOLA BELTRAN; et al.,
7
     Plaintiffs,
8
     v.
9
     INTEREXCHANGE, INC.; et al.,
10
     Defendants.
11   _____

12
            PURSUANT TO NOTICE, the videotape deposition
13   of MICHELLE CAROLINA DEL POZO AGUILAR was taken on
     behalf of the Defendant American Cultural Exchange,
14   LLC, at 2580 East Harmony Road, Conference Room 4,
     Fort Collins, Colorado 80528, on February 5, 2018, at
15   10:12 a.m., before Lisa B. Kelly, Registered
     Professional Reporter, Certified Realtime Reporter,
16   and Notary Public within Colorado.

17

18

19

20

21

22      **H+G**

23

24   Hunter + Geist, Inc.

25

303.832.5966     1900 Grant Street, Suite 1025     ■ www.huntergeist.com
800.525.8490     Denver, CO 80203                   ■ scheduling@huntergeist.com

                 Your Partner in Making the Record

Court Reporting, Legal Videography, and Videoconferencing

**MICHELLE CAROLINA DEL POZO AGUILAR - CONFIDENTIAL - 2/5/2018**
**Johana Paola Beltran, et al. v. Interexchange, Inc.**

---

**17**

```
10:28:27  1    preparation for today?
10:28:29  2        A.  No.
10:28:34  3        Q.  Other than because you signed a contract
10:28:36  4    with GoAuPair, is there any other reason that you
10:28:38  5    think GoAuPair was your employer?
10:28:40  6        A.  No.  That was my first communication way,
10:28:49  7    and all the information that I received about the
10:28:52  8    program was through them.
10:28:54  9        Q.  Did GoAuPair ever pay you any money?
10:28:57 10        A.  No.
10:28:58 11        Q.  Your weekly stipend was paid only by your
10:29:01 12    host family to you?
10:29:03 13        MR. SELIGMAN:  Objection.
10:29:04 14        A.  I was paid monthly.
10:29:05 15        Q.  (BY MS. REILLY)  You were paid monthly by
10:29:07 16    your host family; correct?
10:29:08 17        A.  Yes.
10:29:08 18        Q.  And never by GoAuPair?
10:29:10 19        A.  No.
10:29:10 20        Q.  And did you ever provide any child care
10:29:13 21    services for GoAuPair?
10:29:14 22        A.  No.
10:29:15 23        Q.  Did GoAuPair ever supervise your work,
10:29:18 24    with respect to taking care of kids?
10:29:19 25        A.  No.
```

**18**

```
10:29:20  1        MR. SELIGMAN:  Objection.
10:29:21  2        Q.  (BY MS. REILLY)  Do you think that
10:29:37  3    GoAuPair ever lied to you about anything?
10:29:43  4        A.  What does "ever lied" mean?
10:29:45  5        Q.  Do you think that GoAuPair ever told you
10:29:48  6    anything that was false, not true?
10:29:53  7        MR. SELIGMAN:  Objection.
10:29:54  8        A.  That I was only allowed to be paid
10:29:57  9    195.75.
10:29:57 10        Q.  (BY MS. REILLY)  Who told you at GoAuPair
10:30:02 11    that you were only allowed to be paid 195.75?
10:30:07 12        A.  Who told me from GoAuPair?
10:30:08 13        Q.  Uh-huh.
10:30:09 14        A.  I never get to know anybody but the
10:30:15 15    person that was in the area.  But I don't know anybody
10:30:19 16    directly from GoAuPair.  Nobody contact me.
10:30:22 17        MR. SELIGMAN:  Objection.  And, Katie, so
10:30:24 18    our understanding is that Ms. Del Pozo is here as a
10:30:29 19    FLSA opt-in, and so the testimony today has to do with
10:30:31 20    how much she was paid and her hours.
10:30:34 21        So we just generally object to anything
10:30:36 22    beyond her working hours and her pay, which seems to
         23    be --
10:30:41 24        MS. REILLY:  Well, a joined employer.  I
10:30:43 25    mean, there were many issues that are part of the FLSA
```

**19**

```
10:30:45  1    issue.  And also, now that the class has been
10:30:47  2    certified, are you going to put her forward again on
10:30:49  3    the other claims?
10:30:50  4        MR. SELIGMAN:  Well, she's been noticed
10:30:52  5    here.  You've noticed her for a FLSA opt-in
10:30:54  6    deposition.  And our understanding is that there's no
10:30:56  7    just general discovery from absent class members.  And
10:30:59  8    that's something that -- of course, that, you know,
10:31:01  9    may be at issue later in the case.  But for now, she's
10:31:04 10    here as a FLSA opt-in, and we'll continue to object to
10:31:09 11    any -- to any questions that have to do with other
10:31:11 12    claims in this case.  She's here for the purposes of
10:31:13 13    testifying about FLSA --
10:31:15 14        MS. REILLY:  Okay.  That's fine.  Your
10:31:16 15    objection is noted, and I'll proceed.
10:31:26 16        Q.  (BY MS. REILLY)  Other than what was in
10:31:34 17    the contract between GoAuPair and you, that you've
10:31:38 18    referred to, did GoAuPair otherwise tell you that you
10:31:42 19    could receive only 195.75?
10:31:46 20        A.  No.
10:31:59 21        MR. REILLY:  Give this to the witness,
10:32:00 22    please.
10:32:01 23        (Deposition Exhibit 3 was marked.)
10:32:01 24        Q.  (BY MS. REILLY)  Do you recognize this
10:32:43 25    document?
```

**20**

```
10:32:44  1        A.  Yes.
10:32:44  2        Q.  And what is it?
10:32:45  3        A.  It's the -- what do you call this -- the
10:32:52  4    lawsuit information.
10:32:56  5        Q.  Did you review this document before you
10:32:58  6    decided to join the lawsuit?
10:33:00  7        A.  Yes.
10:33:01  8        Q.  And where did you -- was it provided to
10:33:04  9    you as a hard paper document, like you're looking at
10:33:08 10    now, or online, by e-mail?
10:33:12 11        A.  Through e-mail.
10:33:14 12        Q.  And did you speak to anyone about your
10:33:16 13    decision to join the lawsuit before you joined?  And
10:33:19 14    this is other than lawyers.
10:33:20 15        A.  No.
10:33:22 16        Q.  You didn't discuss it with your friends?
10:33:23 17        A.  No.
10:33:24 18        Q.  Or your family?
10:33:25 19        A.  No.
10:33:27 20        Q.  Any other au pair?
10:33:28 21        A.  No.
10:33:29 22        Q.  How about your host family?
10:33:30 23        A.  No.
10:33:32 24        Q.  Does your host family know that you're
10:33:34 25    being deposed today?
```

5 (Pages 17 to 20)

Defs' Appx. 00000686

MICHELLE CAROLINA DE SPEZIO AGOCLARY - CONFIDENTIAL - 2/5/2018
Johana Paola Beltran, et al. v. Interexchange, Inc.

---

**33**

| | | |
|---|---|---|
| 10:47:35 | 1 | A.  Yes. |
| 10:47:36 | 2 | Q.  So.  Did you receive any training in your |
| 10:47:39 | 3 | home country before coming to the United States as an |
| 10:47:43 | 4 | au pair? |
| 10:47:43 | 5 | A.  No. |
| 10:47:55 | 6 | Q.  On the stipend questions, on page 2, that |
| 10:47:58 | 7 | weren't answered, were you asked to fill in answers to |
| 10:48:01 | 8 | those questions after you sent in your response? |
| 10:48:05 | 9 | A.  Can you repeat the question? |
| 10:48:06 | 10 | Q.  Fair.  After you sent in your answers to |
| 10:48:09 | 11 | these survey questions, were you asked, after that, to |
| 10:48:13 | 12 | fill in responses to these two questions that you |
| 10:48:17 | 13 | hadn't answered? |
| 10:48:18 | 14 | A.  No.  I would have filled them if I -- if |
| 10:48:21 | 15 | I noticed that I didn't before. |
| 10:48:32 | 16 | Q.  So APW, do they have a relationship with |
| 10:48:36 | 17 | any sponsor other than GoAuPair? |
| 10:48:39 | 18 | A.  Yes. |
| 10:48:39 | 19 | Q.  Who else? |
| 10:48:40 | 20 | A.  I don't remember.  I only remember |
| 10:48:46 | 21 | InterExchange.  That's the only one that I can recall. |
| 10:48:52 | 22 | Q.  And GoAuPair? |
| 10:48:53 | 23 | A.  Yes. |
| 10:48:56 | 24 | Q.  I know this was a while ago, and it was, |
| 10:48:58 | 25 | you said, maybe six or seven meetings.  But can you |

---

**34**

| | | |
|---|---|---|
| 10:49:01 | 1 | just tell me what you remember about what was |
| 10:49:03 | 2 | discussed at the meetings with APW? |
| 10:49:06 | 3 | A.  It was just about the process, fill in |
| 10:49:11 | 4 | documents, forms, giving them documents, visa |
| 10:49:14 | 5 | application, placing me with a family. |
| 10:49:19 | 6 | Q.  Okay.  When did you decide to go with |
| 10:49:23 | 7 | GoAuPair, rather than InterExchange or some other |
| 10:49:26 | 8 | sponsor? |
| 10:49:27 | 9 | MR. SELIGMAN:  Objection. |
| 10:49:28 | 10 | A.  I -- I didn't decide.  They placed me |
| 10:49:31 | 11 | with them. |
| 10:49:31 | 12 | Q.  (BY MS. REILLY)  Okay.  So you didn't |
| 10:49:32 | 13 | pick between the different sponsors? |
| 10:49:35 | 14 | A.  No. |
| 10:49:38 | 15 | Q.  Did you have any understanding as to what |
| 10:49:39 | 16 | the differences were with the different sponsors? |
| 10:49:44 | 17 | A.  No. |
| 10:49:55 | 18 | Q.  Do you remember in those conversations if |
| 10:49:57 | 19 | you asked anyone at APW whether you could be paid more |
| 10:50:01 | 20 | than 195.75? |
| 10:50:02 | 21 | MR. SELIGMAN:  Objection. |
| 10:50:03 | 22 | A.  They told me, for all companies, they |
| 10:50:08 | 23 | were going to pay me 195.75. |
| 10:50:10 | 24 | Q.  (BY MS. REILLY)  And do you recall asking |
| 10:50:12 | 25 | if you could get paid -- be paid more than that? |

---

**35**

| | | |
|---|---|---|
| 10:50:17 | 1 | A.  I said, like, if I -- I said it was, |
| 10:50:20 | 2 | like, very low.  So they told me I could try.  Like, |
| 10:50:24 | 3 | it was up to me and the family. |
| 10:50:31 | 4 | Q.  And that's what ended up happening; |
| 10:50:33 | 5 | right? |
| 10:50:33 | 6 | A.  Yes. |
| 10:50:41 | 7 | Q.  And you can look to your survey |
| 10:50:44 | 8 | responses, if you need help refreshing your memory. |
| 10:50:46 | 9 | But I would like you to go through the fees, the |
| 10:50:48 | 10 | different fees that you paid, when you applied to |
| 10:50:51 | 11 | become an au pair. |
| 10:50:52 | 12 | A.  What page is that? |
| 10:50:53 | 13 | Q.  Let me find it.  Here we go.  Page 2. |
| 10:51:16 | 14 | A.  Yes. |
| 10:51:18 | 15 | Q.  Yes.  You can use that.  I'm not going to |
| 10:51:20 | 16 | ask you about it, but it's there if you need it.  I |
| 10:51:22 | 17 | would like you to just go through and tell me what |
| 10:51:32 | 18 | fees you paid as part of the au pair application |
| 10:51:32 | 19 | process.  Can you just -- |
| 10:51:47 | 20 | A.  So what should I do? |
| 10:51:49 | 21 | Q.  Just tell me what fees you paid, and for |
| 10:51:51 | 22 | what, as part of the au pair application process? |
| 10:51:54 | 23 | A.  Oh, around 2,000, approximate. |
| 10:51:58 | 24 | Q.  And when you were preparing these survey |
| 10:52:01 | 25 | responses, did you check any documents? |

---

**36**

| | | |
|---|---|---|
| 10:52:05 | 1 | A.  No. |
| 10:52:06 | 2 | Q.  So did you just do it based off of |
| 10:52:08 | 3 | memory? |
| 10:52:08 | 4 | A.  An approximate, yes. |
| 10:52:11 | 5 | Q.  Okay.  Do you have any records that would |
| 10:52:20 | 6 | support exactly how much you paid? |
| 10:52:23 | 7 | A.  I don't know. |
| 10:52:26 | 8 | Q.  But you didn't check any records in |
| 10:52:27 | 9 | responding to these survey requests? |
| 10:52:29 | 10 | A.  No. |
| 10:52:30 | 11 | Q.  Okay.  So 2,000 was for what? |
| 10:52:34 | 12 | A.  For all the program.  For the agency, the |
| 10:52:37 | 13 | APW agency, for GoAuPair, you know, the permits and |
| 10:52:45 | 14 | process. |
| 10:52:46 | 15 | Q.  Okay.  And were there any other fees that |
| 10:52:47 | 16 | you paid beyond the 2,000? |
| 10:52:50 | 17 | A.  Well, the visa application, getting some |
| 10:52:53 | 18 | documents, the international driver's license. |
| 10:52:58 | 19 | Q.  And so just looking at your survey, it |
| 10:52:58 | 20 | looks like the visa was about $300. |
| 10:53:01 | 21 | A.  Probably. |
| 10:53:05 | 22 | Q.  Is that what you recall? |
| 10:53:06 | 23 | A.  Yes. |
| 10:53:08 | 24 | Q.  And the amount for the international |
| 10:53:11 | 25 | driver's license was $200? |

9 (Pages 33 to 36)

Defs.' Appx. 00000687

**MICHELLE CAROLINA DE LA PAZ ACEVEDO - CONFIDENTIAL - 2/5/2018**
**Johana Paola Beltran, et al. v. Interexchange, Inc.**

---

37

| | | |
|---|---|---|
| 10:53:12 | 1 | A.  Yes. |
| 10:53:14 | 2 | Q.  Do you recall paying any other fees? |
| 10:53:18 | 3 | A.  I don't know. |
| 10:53:20 | 4 | Q.  Who paid for your flight to the United |
| 10:53:23 | 5 | States? |
| 10:53:23 | 6 | MR. SELIGMAN:  Objection. |
| 10:53:23 | 7 | A.  It was included in the cost of the |
| 10:53:27 | 8 | program. |
| 10:53:32 | 9 | Q.  (BY MS. REILLY)  So the $2,000 fee, who |
| 10:53:34 | 10 | did you pay that to? |
| 10:53:37 | 11 | A.  APW. |
| 10:54:00 | 12 | Q.  I want to go through, in a little bit |
| 10:54:02 | 13 | more detail, and talk about what your expectations |
| 10:54:04 | 14 | were for the program.  Okay? |
| 10:54:07 | 15 | Did you understand that you would be |
| 10:54:08 | 16 | living with a host family? |
| 10:54:10 | 17 | A.  Yes. |
| 10:54:11 | 18 | Q.  Did you want to live with a host family |
| 10:54:14 | 19 | in the United States? |
| 10:54:14 | 20 | A.  Yes. |
| 10:54:15 | 21 | MR. SELIGMAN:  Objection. |
| 10:54:16 | 22 | Q.  (BY MS. REILLY)  Did you understand that |
| 10:54:17 | 23 | the host family would be providing you somewhere to |
| 10:54:20 | 24 | live? |
| 10:54:21 | 25 | A.  Yes. |

---

38

| | | |
|---|---|---|
| 10:54:22 | 1 | Q.  And that you wouldn't be paying any money |
| 10:54:24 | 2 | to live in the host family's house? |
| 10:54:26 | 3 | A.  Yes. |
| 10:54:27 | 4 | MR. SELIGMAN:  Objection. |
| 10:54:28 | 5 | Q.  (BY MS. REILLY)  And did you understand |
| 10:54:29 | 6 | that the host family would be providing you with |
| 10:54:30 | 7 | meals? |
| 10:54:31 | 8 | A.  Yes. |
| 10:54:32 | 9 | Q.  And that you wouldn't be paying the host |
| 10:54:35 | 10 | family any money for those meals? |
| 10:54:36 | 11 | MR. SELIGMAN:  Objection. |
| 10:54:37 | 12 | A.  Yes. |
| 10:54:38 | 13 | Q.  (BY MS. REILLY)  Did you consider the |
| 10:54:41 | 14 | housing and the meals part of the benefit of the |
| 10:54:44 | 15 | program? |
| 10:54:44 | 16 | A.  Yes. |
| 10:55:19 | 17 | MS. REILLY:  It is getting hot in here. |
| 10:55:30 | 18 | (Discussion off the record.) |
| 10:55:35 | 19 | MR. SELIGMAN:  Thank you. |
| | 20 | (Deposition Exhibit 5 was marked.) |
| 10:56:07 | 21 | THE DEPONENT:  I did such a good job. |
| 10:56:09 | 22 | Q.  (BY MS. REILLY)  You really did.  Do you |
| 10:56:16 | 23 | recognize this document?  It looks like you do. |
| 10:56:18 | 24 | A.  Yes. |
| 10:56:18 | 25 | Q.  And what is it? |

---

39

| | | |
|---|---|---|
| 10:56:20 | 1 | A.  It's part of my application process. |
| 10:56:24 | 2 | Q.  Okay.  And were the -- if you flip to the |
| 10:56:27 | 3 | last page of the exhibit -- go to the end.  Is that |
| 10:56:30 | 4 | your signature? |
| 10:56:30 | 5 | A.  Yes. |
| 10:56:32 | 6 | Q.  And is the information that you included |
| 10:56:34 | 7 | in this application accurate? |
| 10:56:37 | 8 | A.  Yes. |
| 10:56:42 | 9 | Q.  And the first couple pages, is that a |
| 10:56:45 | 10 | letter that you wrote? |
| 10:56:47 | 11 | A.  Yes. |
| 10:56:50 | 12 | Q.  And, again, are the statements in that |
| 10:56:51 | 13 | letter accurate? |
| 10:56:52 | 14 | A.  Yes. |
| 10:57:00 | 15 | Q.  How did the GoAuPair matching process |
| 10:57:02 | 16 | work? |
| 10:57:03 | 17 | MR. SELIGMAN:  Objection. |
| 10:57:04 | 18 | A.  I don't know. |
| 10:57:06 | 19 | Q.  (BY MS. REILLY)  You don't recall? |
| 10:57:08 | 20 | A.  I just filled the application.  I don't |
| 10:57:10 | 21 | know how they match it.  I just do -- I just give them |
| 10:57:14 | 22 | my information. |
| 10:57:15 | 23 | Q.  Okay.  And were you provided with |
| 10:57:18 | 24 | information about different host families? |
| 10:57:20 | 25 | A.  Yes. |

---

40

| | | |
|---|---|---|
| 10:57:21 | 1 | Q.  And can you say more about that? |
| 10:57:22 | 2 | A.  Yes.  So I did receive information about |
| 10:57:29 | 3 | a couple of families.  So -- |
| 10:57:31 | 4 | Q.  What kind of information? |
| 10:57:33 | 5 | A.  The same as mine. |
| 10:57:37 | 6 | Q.  And how did you evaluate that |
| 10:57:41 | 7 | information? |
| 10:57:43 | 8 | A.  Depending on the state, the |
| 10:57:48 | 9 | characteristics of the family, if they were willing to |
| 10:57:52 | 10 | pay me more, the number of kids, the age of the kids. |
| 10:58:03 | 11 | Q.  And was it your choice ultimately as to |
| 10:58:05 | 12 | which host family you would place with? |
| 10:58:09 | 13 | A.  In my case, yes. |
| 10:58:15 | 14 | Q.  Is there someone else you know where that |
| 10:58:18 | 15 | wasn't the case? |
| 10:58:20 | 16 | A.  I know that for some au pairs they don't |
| 10:58:23 | 17 | have options to pick, because the families have to |
| 10:58:26 | 18 | pick them as well.  I was blessed, and a couple of |
| 10:58:30 | 19 | families picked me, so I got to choose which one I |
| 10:58:33 | 20 | wanted to go with. |
| 10:58:35 | 21 | Q.  And GoAuPair didn't make that choice for |
| 10:58:37 | 22 | you; right? |
| 10:58:38 | 23 | A.  No. |
| 10:58:38 | 24 | Q.  That was your decision? |
| 10:58:39 | 25 | A.  Yes. |

---

10 (Pages 37 to 40)

Defs' Appx. 00000688

MICHELLE CAROLINA DE PAZ PACHECO - CONFIDENTIAL - 2/5/2018
Johana Paola Beltran, et al. v. Interexchange, Inc.

---

41

| | |
|---|---|
| 10:58:48 | 1 |
| 10:58:52 | 2 |
| 10:58:55 | 3 |
| 10:58:57 | 4 |
| 10:59:00 | 5 |
| 10:59:01 | 6 |
| 10:59:04 | 7 |
| 10:59:08 | 8 |
| 10:59:10 | 9 |
| 10:59:15 | 10 |
| 10:59:19 | 11 |
| 10:59:21 | 12 |
| 10:59:27 | 13 |
| 10:59:28 | 14 |
| 10:59:30 | 15 |
| 10:59:31 | 16 |
| 10:59:33 | 17 |
| 10:59:34 | 18 |
| 10:59:41 | 19 |
| 10:59:41 | 20 |
| 10:59:42 | 21 |
| 10:59:47 | 22 |
| 10:59:53 | 23 |
| 11:00:01 | 24 |
| 11:00:03 | 25 |

Q.  How many families chose you, if you recall?

A.  Three.

Q.  And did you meet with all three families by Skype?

A.  I met with -- yes, with the three of them.

Q.  How many times did you meet with each family, if you remember, by Skype?

A.  With one only once.  With the other two -- well, with the other one, two.  And with the one that I stick with, three, four times.

Q.  Can you go through what you remember about each of those calls?

MR. SELIGMAN:  Objection.

Q.  (BY MS. REILLY)  Whatever you can remember.

A.  The calls or the characteristics of the families?

Q.  Either one.

A.  Well, they were all really nice families.  One of them was in New Jersey.  The other one was in Virginia.  The other one was in New Orleans.

They were really nice.  They just explained to me that I was going to have my room.  I

---

42

| | |
|---|---|
| 11:00:09 | 1 |
| 11:00:11 | 2 |
| 11:00:18 | 3 |
| 11:00:22 | 4 |
| 11:00:27 | 5 |
| 11:00:33 | 6 |
| 11:00:36 | 7 |
| 11:00:39 | 8 |
| 11:00:41 | 9 |
| 11:00:45 | 10 |
| 11:00:45 | 11 |
| 11:00:47 | 12 |
| 11:00:49 | 13 |
| 11:00:51 | 14 |
| 11:00:51 | 15 |
| 11:00:52 | 16 |
| 11:00:54 | 17 |
| 11:00:54 | 18 |
| 11:00:55 | 19 |
| 11:00:57 | 20 |
| 11:00:57 | 21 |
| 11:01:01 | 22 |
| 11:01:04 | 23 |
| 11:01:06 | 24 |
| 11:01:08 | 25 |

didn't have to pay housing.  They were required to pay me 195.75.  One family had three kids.  The other family had two kids.  And the other one family had one kid, one baby.  One of the families was just a single mom.

Q.  And did you -- I think you had mentioned that how much they were willing to pay was a factor for you in choosing a host family.

A.  If they were going to be able to pay me more, yes.

Q.  And did you ask each of the three families whether they were willing to pay you more than the 195.75?

A.  No.

MR. SELIGMAN:  Objection.

Q.  (BY MS. REILLY)  How many host families did you ask that question to?

A.  Only one.

Q.  And that's the one that you ended up with?

A.  Yes.  Because I really liked them.

Q.  Do you remember which call you asked that question?  I think you said that there were three or four Skype calls with that family.

A.  The second call.

---

43

| | |
|---|---|
| 11:01:10 | 1 |
| 11:01:13 | 2 |
| 11:01:14 | 3 |
| 11:01:16 | 4 |
| 11:01:18 | 5 |
| 11:01:22 | 6 |
| 11:01:25 | 7 |
| 11:01:26 | 8 |
| 11:01:28 | 9 |
| 11:01:33 | 10 |
| 11:01:37 | 11 |
| 11:01:38 | 12 |
| 11:01:41 | 13 |
| 11:01:42 | 14 |
| 11:01:45 | 15 |
| 11:01:47 | 16 |
| 11:01:47 | 17 |
| 11:01:50 | 18 |
| 11:01:54 | 19 |
| 11:01:55 | 20 |
| 11:01:57 | 21 |
| 11:01:58 | 22 |
| 11:01:59 | 23 |
| 11:02:01 | 24 |
| 11:02:04 | 25 |

Q.  And tell me what you remember about that conversation.

MR. SELIGMAN:  Objection.

A.  They told me they really liked me.  They wanted to, you know, choose me.  And this was the first family that I interviewed, and I really liked them, too.

So we were both interested in each other, working together and living together.  And I asked them if they will consider it.  So they said yes.

Q.  (BY MS. REILLY)  And did they say yes on that same call, or did they need to get back to you?

A.  They needed to get back to me.

Q.  Okay.  And so did they get back to you on that on the next Skype call?

A.  Yes.

Q.  And what did they say?

A.  That they agreed.

Q.  And that's to the 840 a month?

A.  Yes.

Q.  And was that a number that you had suggested?

A.  No.

Q.  What -- what -- who came up with that number?

---

44

| | |
|---|---|
| 11:02:05 | 1 |
| 11:02:08 | 2 |
| 11:02:09 | 3 |
| 11:02:12 | 4 |
| 11:02:15 | 5 |
| 11:02:17 | 6 |
| 11:02:18 | 7 |
| 11:02:19 | 8 |
| 11:02:26 | 9 |
| 11:02:29 | 10 |
| 11:02:31 | 11 |
| 11:02:37 | 12 |
| 11:02:38 | 13 |
| 11:02:41 | 14 |
| 11:02:42 | 15 |
| 11:02:43 | 16 |
| | 17 |
| 11:24:46 | 18 |
| 11:24:47 | 19 |
| 11:24:48 | 20 |
| 11:24:52 | 21 |
| 11:24:54 | 22 |
| 11:24:55 | 23 |
| 11:24:56 | 24 |
| 11:24:59 | 25 |

A.  The host dad, or them together, but he told me that.

Q.  Got it.  So when you, on the second call, asked about getting more than the 195.75, did you ask for a particular stipend amount?

A.  No.

Q.  You just asked for more than the minimum?

A.  What they were required, yes.

Q.  Did GoAuPair play any role in coming up with that $840-a-month number?

A.  No.

MS. REILLY:  Okay.  Let's take a short break.  I'm worried that the heat is going to get out of control.

THE VIDEOGRAPHER:  Going off the record.  The time is 11:01.

(Recess taken, 11:01 a.m. to 11:23 a.m.)

THE VIDEOGRAPHER:  We are back on the record.  The time is 11:23.

Q.  (BY MS. REILLY)  So going back to the conversations with the host families at the beginning of the process.

A.  Yes.

Q.  You listed a number of factors that were important to you in figuring out which host family to

---

11 (Pages 41 to 44)

MICHELLE CAROLINA DELGADO AGUILAR - CONFIDENTIAL - 2/5/2018
Johana Paola Beltran, et al. v. Interexchange, Inc.

---

**49**

```
11:28:59   1   discussion with the New Orleans family about house
11:29:02   2   rules?
11:29:03   3           MR. SELIGMAN:  Objection.
11:29:04   4       A.  I don't remember.
11:29:05   5       Q.  (BY MS. REILLY)  And finally, turning to
11:29:09   6   Virginia.  And how do you pronounce their name?  Is it
11:29:12   7   the Sowells?
11:29:12   8       A.  Sowell.
11:29:13   9       Q.  Sowell.  Okay.  So with the Sowell
11:29:16  10   family, in your Skype discussions, did you ever ask
11:29:21  11   about what exactly your child care schedule would be?
11:29:25  12           MR. SELIGMAN:  Objection.
11:29:27  13       A.  Yes.
11:29:28  14       Q.  (BY MS. REILLY)  And tell me what you
11:29:29  15   remember about that.
11:29:29  16       A.  That it will vary, depending on their
11:29:36  17   availability and their jobs.
11:29:39  18       Q.  And did they give any other information
11:29:41  19   as to what it might look like?
11:29:43  20           MR. SELIGMAN:  Objection.
11:29:44  21       A.  No.
11:29:45  22       Q.  (BY MS. REILLY)  Did they -- did you
11:29:47  23   discuss how many hours a week they expected you to
11:29:50  24   provide child care?
11:29:52  25       A.  They told me I was going to have the
```

---

**50**

```
11:29:54   1   weekends off, both days.
11:30:01   2       Q.  And did they say anything about how many
11:30:03   3   hours you would be expected to provide child care
11:30:05   4   during the week?
11:30:06   5       A.  Yes.
11:30:07   6       Q.  What did they say?
11:30:08   7       A.  Eight hours.
11:30:13   8       Q.  And did they -- did they say when those
11:30:16   9   eight hours would fall, what time of day they would
11:30:19  10   be?
11:30:20  11       A.  It will depend on their schedule.
11:30:25  12       Q.  Did they describe what exactly the job
11:30:28  13   duties would be?
11:30:29  14       A.  Yes.
11:30:30  15       Q.  And tell me what they told you.
11:30:32  16       A.  Feeding the baby, changing the baby,
11:30:35  17   playing with the baby, supervising the baby.
11:30:43  18       Q.  Anything else?
11:30:48  19       A.  Whatever a baby can do.  So it's not
11:30:51  20   much.
11:30:52  21       Q.  Okay.  Did they discuss any other job
11:30:55  22   duties you would have, other than taking care of the
11:30:57  23   baby?
11:30:58  24       A.  No.
11:31:03  25       Q.  With the Sowell family in the Skype
```

---

**51**

```
11:31:06   1   conversations, was there any discussion about any
11:31:08   2   other benefits you would receive, other than the
11:31:11   3   weekly stipend?
11:31:12   4       A.  I was paid monthly.
11:31:14   5       Q.  I'm sorry.  The monthly amount you
11:31:16   6   received.
11:31:17   7       A.  That I will have the weekends off.
11:31:23   8       Q.  Any other benefits?
11:31:26   9       A.  They were going to pay me 840 a month.
11:31:31  10       Q.  Anything else?
11:31:31  11       A.  I wouldn't be working more than eight
11:31:34  12   hours.
11:31:42  13       Q.  Anything else, in terms of benefits that
11:31:45  14   were discussed?
11:31:46  15       A.  That I won't need to pay for food.
11:31:53  16       Q.  Anything else?
11:31:55  17       A.  Not that I can remember.
11:31:59  18       Q.  And with these conversations with the
11:32:02  19   Sowell family, the Skype conversations, was anyone
11:32:03  20   from GoAuPair ever present?
11:32:08  21       A.  After the second week -- the first week
11:32:10  22   that I arrived, we had the meeting with the
11:32:13  23   coordinator, the local coordinator.  That was the only
11:32:17  24   time that I seen her.
11:32:18  25       Q.  Okay.  So focusing on the Skype
```

---

**52**

```
11:32:20   1   conversations, when you were still in Ecuador, with
11:32:22   2   the Sowell family, did anyone from GoAuPair ever
11:32:26   3   participate in any of those conversations?
11:32:27   4       A.  No.
11:32:28   5       Q.  Did anyone from APW ever participate in
11:32:30   6   any of those conversations --
11:32:31   7       A.  No.
11:32:31   8       Q.  -- between you and the Sowell family?
11:32:33   9       A.  No.
11:32:38  10       Q.  Do you recall when you officially were
11:32:45  11   matched with the Sowell family?
11:32:46  12       A.  Sorry.  If I recall when I was officially
11:32:51  13   matched?
11:32:51  14       Q.  Let me strike that and ask it better;
11:32:53  15   okay?
11:32:53  16       A.  Thank you.
11:32:54  17       Q.  Do you recall when you decided to accept
11:32:57  18   the Sowell family as a match?
11:33:00  19       A.  I don't remember.
11:33:02  20       Q.  And about how much time passed between
11:33:05  21   deciding to accept the Sowell family and actually
11:33:07  22   leaving for the United States?  Just approximate.
11:33:12  23       A.  I would say four months.
11:33:21  24       Q.  And was that what you expected, that
11:33:23  25   timing?
```

---

13 (Pages 49 to 52)

Defs.' Appx. 00000690

**MICHELLE CAROLINA DELSPED ACEDO AGUILAR - CONFIDENTIAL - 2/5/2018**
**Johana Paola Beltran, et al. v. Interexchange, Inc.**

---

61

| | | |
|---|---|---|
| 11:44:04 | 1 | to make it more than once. |
| 11:44:06 | 2 | Q.  (BY MS. REILLY)  Did you understand, |
| 11:44:11 | 3 | based on this agreement with GoAuPair, that you |
| 11:44:13 | 4 | weren't supposed to work more than 45 hours a week? |
| 11:44:16 | 5 | A.  That I weren't supposed -- more than |
| 11:44:21 | 6 | 45 hours a week, yes. |
| 11:44:21 | 7 | Q.  45 hours a week was the maximum you were |
| 11:44:23 | 8 | supposed to work? |
| 11:44:25 | 9 | A.  Yes. |
| 11:44:34 | 10 | Q.  If you turn to page -- I guess we're |
| 11:44:37 | 11 | already on page 3.  Do you see Section 3.6?  I'll let |
| 11:44:42 | 12 | you get there.  It's just below the chart. |
| 11:44:48 | 13 | Do you see where it says, 3.6, "I will |
| 11:44:50 | 14 | prepare a hard copy weekly hours and wages log of the |
| 11:44:54 | 15 | hours worked by day, stipend paid, vacation days used, |
| 11:44:59 | 16 | and educational financial contributions made"  do you |
| 11:45:03 | 17 | see that language? |
| 11:45:04 | 18 | A.  Yes. |
| 11:45:05 | 19 | Q.  Okay.  Did you do that?  Did you keep a |
| 11:45:09 | 20 | weekly log tracking your hours and stipend amount? |
| 11:45:12 | 21 | A.  No. |
| 11:45:15 | 22 | Q.  And if you look at the next sentence of |
| 11:45:18 | 23 | Section 3.6, where it says, "I will have the host |
| 11:45:21 | 24 | family agree to this by initialing the log."  That |
| 11:45:25 | 25 | didn't -- am I right, that didn't happen because there |

62

| | | |
|---|---|---|
| 11:45:27 | 1 | was no log? |
| 11:45:28 | 2 | A.  What is initialing in the log?  What is a |
| 11:45:31 | 3 | log? |
| 11:45:31 | 4 | Q.  Sure.  So if you look at the first |
| 11:45:33 | 5 | sentence it says, "I will prepare a hard copy weekly |
| 11:45:36 | 6 | hours and wages log of the hours worked by day, |
| 11:45:39 | 7 | stipend paid, vacation days used, and educational |
| 11:45:43 | 8 | financial contributions made."  So that's the log. |
| 11:45:46 | 9 | And the question is, did the host family |
| 11:45:49 | 10 | ever sign the log? |
| 11:45:50 | 11 | A.  No. |
| 11:45:51 | 12 | Q.  Okay.  Did you keep anything remotely |
| 11:45:54 | 13 | like the log described in 3.6? |
| 11:45:57 | 14 | A.  No. |
| 11:46:02 | 15 | Q.  Did you write down, or otherwise |
| 11:46:05 | 16 | document, the hours that you were working each week |
| 11:46:08 | 17 | for the Sowell family? |
| 11:46:10 | 18 | A.  The Sowell family had -- how do you -- a |
| 11:46:16 | 19 | calendar, because their schedule varied.  So they just |
| 11:46:21 | 20 | put what were going to be my times of work. |
| 11:46:24 | 21 | Q.  And was that on the computer or was that |
| 11:46:28 | 22 | a document?  How was the calendar tracked? |
| 11:46:30 | 23 | A.  It was a notebook. |
| 11:46:31 | 24 | Q.  Notebook.  And did the notebook just list |
| 11:46:39 | 25 | the hours you were to work, or did it have any other |

63

| | | |
|---|---|---|
| 11:46:42 | 1 | information in it? |
| 11:46:45 | 2 | A.  It was their schedule. |
| 11:46:49 | 3 | Q.  Did it specify when you were supposed to |
| 11:46:52 | 4 | provide child care for the baby? |
| 11:46:55 | 5 | A.  Well, they just put their schedule, and I |
| 11:46:57 | 6 | was supposed to take care of the baby all the time |
| 11:47:00 | 7 | that they were not going to be home.  So if they |
| 11:47:04 | 8 | write, I'll be coming back at 8:00 at night, I will |
| 11:47:07 | 9 | have to work until 8:00. |
| 11:47:10 | 10 | Q.  Got it.  We'll come back to that. |
| 11:47:14 | 11 | Was there any other -- other than the |
| 11:47:21 | 12 | calendar you just described, were there any other |
| 11:47:24 | 13 | documents that would have tracked the number of hours |
| 11:47:27 | 14 | of child care you provided -- |
| 11:47:29 | 15 | A.  No. |
| 11:47:29 | 16 | Q.  -- every week?  That was it? |
| 11:47:31 | 17 | A.  Yes. |
| 11:47:31 | 18 | Q.  How about any documents that would have |
| 11:47:34 | 19 | recorded the amount -- the stipend amount you |
| 11:47:37 | 20 | received? |
| 11:47:40 | 21 | A.  I was paid in cash. |
| 11:47:42 | 22 | Q.  So were there any documents?  Did you |
| 11:47:45 | 23 | keep track of the stipend amounts, or did anyone else, |
| 11:47:48 | 24 | as far as you know? |
| 11:47:49 | 25 | A.  No. |

64

| | | |
|---|---|---|
| | 1 | (Deposition Exhibit 7 was marked.) |
| 11:48:25 | 2 | Q.  Do you recognize this one? |
| 11:49:06 | 3 | A.  Yes. |
| 11:49:07 | 4 | Q.  What is it? |
| 11:49:08 | 5 | A.  Child care services agreement. |
| 11:49:11 | 6 | MS. REILLY:  And I'm sorry.  What number |
| 11:49:13 | 7 | are we on?  I missed it. |
| 11:49:14 | 8 | THE REPORTER:  7. |
| 11:49:15 | 9 | MR. SELIGMAN:  7. |
| 11:49:17 | 10 | Q.  (BY MS. REILLY)  Is this an agreement |
| 11:49:19 | 11 | that you signed?  I'll have you -- this isn't a trick |
| 11:49:25 | 12 | question, so you can flip to page 9.  There's a |
| 11:49:28 | 13 | signature there. |
| 11:49:28 | 14 | A.  Yes. |
| 11:49:32 | 15 | Q.  Is that your electronic signature on |
| 11:49:34 | 16 | page 9? |
| 11:49:34 | 17 | A.  Yes. |
| 11:49:37 | 18 | Q.  Do you recall what this agreement was |
| 11:49:40 | 19 | about? |
| 11:49:43 | 20 | A.  I don't remember. |
| 11:49:44 | 21 | Q.  Okay.  So just look at page 9.  Can you |
| 11:49:47 | 22 | see who else signed the agreement, other than you? |
| 11:49:50 | 23 | A.  Carlos Sowell. |
| 11:49:52 | 24 | Q.  Is that your host family father? |
| 11:49:53 | 25 | A.  Yes. |

16 (Pages 61 to 64)

Defs'. Appx. 00000691

MICHELLE CAROLINA DE SPEZIO ACOSTA - CONFIDENTIAL - 2/5/2018
Johana Paola Beltran, et al. v. Interexchange, Inc.

65

| | |
|---|---|
| 11:49:54 | 1 |
| 11:49:56 | 2 |

Q. Is this the agreement, between you and your host family, regarding your au pair placement?
A. I don't know.
Q. If you look at page 9, next to your electronic signature, do you see the date March 18, 2016?
A. Yes.
Q. And you can go back and look, if you don't remember. But the -- your agreement with GoAuPair, we just looked at, was -- had a date of February 2016.
A. Uh-huh.
Q. So do you agree that this host family agreement was signed by you after the GoAuPair agreement was signed by you?
A. Yes.
Q. Do you recognize that signature of Carlos Sowell? I know it's electronic, but --
A. I don't know if that's his.
Q. Okay. I'm just wondering. So let's go through this agreement. If you look at page 2, can you describe what is on page 2?
A. These are the schedule hours and the description of duties and activities.
Q. Okay. And do you have an understanding

66

as to who came up with the content in that chart?
A. I don't know.
Q. Did you come up with it?
A. I don't remember.
Q. Do you recall receiving this information, before you decided to match with the Sowell family, and getting a chance to see this detail?
A. Before matching?
Q. Uh-huh.
A. I don't remember.
Q. Is the work schedule described on page 2 consistent with what your work schedule for the Sowell family ended up being?
A. No.
Q. How so? How is it different?
A. I was going to have off Saturday. And, again, my schedule will depend on their job schedule.
Q. Okay. So this schedule actually says that you were supposed to work on Saturdays for four hours. So what ended up happening on Saturdays once you got there?
A. At first, I had them off.
Q. And then at some point you started working Saturdays?
A. It varied.

67

Q. Okay. How about the description of duties and activities that are described? Is that accurate, as to the child care services you, in fact, provided for the Sowell family once you arrived in the United States?
A. Most of it.
Q. What is not included -- or how is it not accurate?
A. We didn't went outdoors. Never. We didn't did swimming programs.
Q. And is there any reason why you never went outdoors?
A. They decided not to.
Q. Same with the swimming program? Was that the host family's decision?
A. Yes.
Q. So this description of duties, who decided what exactly you would be doing for the baby?
A. Them.
Q. And who is "them"?
A. The Sowell family.
Q. And it wasn't you who decided exactly what the job duties would be?
A. No.
Q. And it wasn't GoAuPair who decided what

68

the job duties would be?
A. I don't know.
Q. Do you believe it was the Sowell family who decided what exactly you would be doing at their house?
A. Mostly.
Q. When you say "mostly," how is that not the case?
A. I don't know how GoAuPair worked with the family arranging that. I don't know.
Q. Okay. But as far as you're concerned, it was the Sowell family communicating to you what the job duties were that you would be doing at their home?
A. Yes.
Q. And it was never GoAuPair who told you what job duties you would be doing at the Sowell family home; right?
A. No.
Q. And I just kind of -- I just asked you a double negative, so let me ask it so the record is clear; okay?
Did GoAuPair ever give you instructions as to what your job duties would be at the Sowell family home?
A. Just generalities, like, you know, feed

17 (Pages 65 to 68)

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

MICHELLE CAROLINA DELGADO AGUDELO - CONFIDENTIAL - 2/5/2018
Johana Paola Beltran, et al. v. Interexchange, Inc.

---

69

```
11:55:08   1    the baby, take care of the baby.  You know, just like
11:55:11   2    what is in the contract, like a GoAuPair should do
11:55:14   3    with the kids.
11:55:17   4         Q.  Okay.  I'm going to ask that again.  So
11:55:20   5    in terms of what specifically you would be doing in
11:55:23   6    the Sowell family baby and what other duties you would
11:55:26   7    be doing in the Sowell family home --
11:55:28   8         A.  Uh-huh.
11:55:30   9         Q.  -- you just testified it was the Sowell
11:55:33  10    family who gave you that instruction; correct?
11:55:35  11         A.  Yes.
11:55:35  12             MR. SELIGMAN:  Objection.
11:55:37  13         Q.  (BY MS. REILLY)  Did GoAuPair ever give
11:55:38  14    you specific instructions as to what duties you would
11:55:40  15    be performing in the Sowell family home?
11:55:41  16             MR. SELIGMAN:  Objection.
11:55:42  17         A.  No.
11:55:42  18         Q.  (BY MS. REILLY)  Okay.  Back to the
11:55:56  19    stipend, page 4.
11:55:58  20         A.  On this same one?
11:55:59  21         Q.  Yeah.  Same document.  Let's start with
11:56:06  22    the very top of the page.  Do you see Section 3 that
11:56:10  23    says "Compensation, Vacation & Education"?  Are you
11:56:13  24    with me?
11:56:14  25         A.  Yes.
```

70

```
11:56:14   1         Q.  And you see Section 3.1, where it says,
11:56:17   2    "The host family agrees to pay the au pair at least
11:56:20   3    the minimum weekly stipend of 195.75"?  Do you see
11:56:24   4    that?
11:56:26   5         A.  Yes.
11:56:28   6         Q.  And then below, about halfway down the
11:56:30   7    page, do you see where it says, "Stipend."  And then
11:56:34   8    it says, "Weekly stipend is," and then the blank has
11:56:38   9    been filled in to say "$210."  Do you see that?
11:56:41  10         A.  Yes.
11:56:42  11         Q.  Okay.  And I'll represent to you I've
11:56:44  12    done some math, and 210 times 4 is 840; okay?
11:56:51  13             And so the 840 monthly stipend that
11:56:55  14    you've testified about, is that the same as this 210
11:56:59  15    weekly stipend amount that's in the contract?
11:57:01  16             MR. SELIGMAN:  Objection.
11:57:02  17         A.  I just know that I was paid 840 a month.
11:57:05  18         Q.  (BY MS. REILLY)  Let's go back to your
11:57:07  19    survey, okay, that you filled out and that's accurate.
11:57:09  20         A.  Uh-huh.
11:57:11  21         Q.  Okay.  Turn to page 4.  And do you -- and
11:57:24  22    I'll let you get there.  Sorry.
11:57:26  23         A.  4.  Okay.
11:57:27  24         Q.  The very first question, where it says,
11:57:30  25    "What was the weekly stipend that you were paid by the
```

71

```
11:57:32   1    host family in U.S. dollars," do you see that
11:57:34   2    question?
11:57:35   3         A.  (Nodded head up and down.)
11:57:35   4         Q.  And what was your answer?
11:57:37   5         A.  210.
11:57:37   6         Q.  Was that accurate?
11:57:39   7         A.  It's an approximate.
11:57:41   8         Q.  So it's not accurate?
11:57:45   9         A.  I just divided 840.  Because if it's
11:57:49  10    weekly, it was 210, an approximate.
11:57:52  11         Q.  Okay.  And so you just basically did what
11:57:55  12    I just did, right, which is the math.  But your point
11:57:58  13    is you were paid monthly 840.
11:58:00  14         A.  Yes.
11:58:00  15         Q.  Right?  And so now I understand it's an
11:58:03  16    approximate because months versus weeks, the math does
11:58:08  17    end up being a little bit different.
11:58:11  18             You don't need to respond to that.  It's
11:58:14  19    math.  We're back to math.
11:58:15  20             So I'm going to refer to the 840 to be
11:58:19  21    very precise; okay?
11:58:21  22         A.  Okay.
11:58:21  23         Q.  And I'm just trying to understand -- get
11:58:23  24    the most accurate information, not trap and certainly
11:58:25  25    not make anyone do math.
```

72

```
11:58:27   1         A.  That's perfect.  Thanks.
11:58:28   2         Q.  But let me ask you this, just to make
11:58:30   3    sure that I get the exact correct survey response.
11:58:33   4             So am I right that when this question
11:58:36   5    says, "What was the weekly stipend that you were paid
11:58:38   6    by the host family," is it fair to say that you were
11:58:41   7    paid $840 per month, every month, by the Sowell
11:58:45   8    family?
11:58:46   9         A.  Yes.
11:58:46  10         Q.  That's more accurate probably; right?
11:58:48  11         A.  Yes.
11:58:49  12         Q.  Okay.  Thank you for your clarification,
11:58:50  13    and then we don't have to do math anymore.
11:58:53  14         A.  Thank you.
11:58:57  15         Q.  Okay.  So going back to the contract,
11:58:58  16    though, the contract refers to a weekly stipend amount
11:59:01  17    of $210.
11:59:04  18         A.  Uh-huh.
11:59:10  19             MR. SELIGMAN:  Carolina, just because
11:59:12  20    there's a transcript, it's helpful to say yes or no.
11:59:12  21         A.  Yes.
11:59:17  22             MS. REILLY:  Thank you.  That should have
11:59:18  23    been my job.  And thank you, David, for doing that.
11:59:21  24         Q.  (BY MS. REILLY)  Were you, in fact, paid
11:59:27  25    by the Sowell family $840 in cash every month that you
```

18 (Pages 69 to 72)

Defs' Appx. 00000693

**MICHELLE CAROLINA DE SPEZIO AGUDELO - CONFIDENTIAL - 2/5/2018**
**Johana Paola Beltran, et al. v. Interexchange, Inc.**

---

### 113

```
13:48:51   1          Q.  So other than when you were working,
13:48:53   2     which would be the time marked on the calendar, were
13:48:58   3     you expected to do any other duties for the Sowell
13:49:02   4     family?
13:49:03   5          A.  No.
13:49:04   6          Q.  So when you weren't taking care of the
13:49:06   7     baby, was it fully your own time?
13:49:09   8          A.  Yes.
13:49:24   9          Q.  So the scheduling issue -- let's start
13:49:28  10     with the first period of time, when you were working
13:49:31  11     eight hours a day, five days a week.
13:49:33  12          A.  Uh-huh.
13:49:34  13          Q.  That schedule was determined by your host
13:49:37  14     family?
13:49:37  15          A.  Yes.
13:49:38  16          Q.  And GoAuPair didn't, as far as you know,
13:49:42  17     play any role in coming up with that exact schedule?
13:49:46  18          A.  I don't know.
13:49:46  19          Q.  So you don't have any information, right,
13:49:49  20     today that GoAuPair was involved with determining that
13:49:54  21     specific schedule?
13:49:55  22          A.  They suggested.
13:49:57  23          Q.  Who suggested?
13:49:58  24          A.  GoAuPair.
13:49:59  25          Q.  Tell me more about that.
```

### 114

```
13:50:00   1          A.  Well, they suggested that, you know, I
13:50:05   2     can work -- well, they didn't suggest it.  They said
13:50:08   3     that I can work until 45 hours, but it can be from 8
13:50:11   4     to 10 hours, maximum 12, a day.
13:50:15   5          Q.  And who at GoAuPair said that?
13:50:21   6          A.  Marylynn Coalson in our meeting.
13:50:24   7          Q.  Okay.  Did Marylynn -- other than
13:50:25   8     Marylynn Coalson, did anyone else at GoAuPair say
13:50:28   9     anything about your specific schedule at the Sowell
13:50:31  10     home?
13:50:31  11          A.  That I know?  I don't know.
13:50:33  12          Q.  Okay.  And going back to what Marylynn
13:50:35  13     Coalson said, did Marylynn Coalson make any decisions
13:50:39  14     about exactly when your start and end time would be
13:50:42  15     for the Sowell family?
13:50:45  16          A.  End and start time of what?
13:50:46  17          Q.  Of your work.
13:50:50  18          A.  No.  Just suggestions.
13:50:53  19          Q.  Was it the Sowell family who ultimately
13:50:56  20     decided exactly when you would start and stop work?
13:50:59  21          A.  Yes.
13:51:14  22          Q.  So other -- I think -- I know I've asked
13:51:16  23     you this, so I apologize, but just to be clear.
13:51:19  24          A.  That's okay.
13:51:19  25          Q.  Other than taking care of the baby, did
```

### 115

```
13:51:21   1     you have any other duties at the Sowell house?
13:51:23   2          A.  No.
13:51:23   3          Q.  Okay.
13:51:25   4          A.  Well, cleaning the kitchen, of course, if
13:51:27   5     I use it.  If I cook, cleaning.
13:51:31   6          Q.  That would be cleaning up just after
13:51:31   7     yourself?
13:51:32   8          A.  Yes.
13:51:33   9          Q.  Did you ever have to clean up after
13:51:34  10     anyone else?
13:51:35  11          A.  No.
13:51:39  12          Q.  So no other job duties, other than taking
13:51:44  13     care of the baby and cleaning up after yourself?
13:51:44  14          A.  Yes.  And cleaning my room, cleaning my
13:51:48  15     bathroom, like my personal things.  Other than that,
13:51:50  16     no.
13:51:50  17          Q.  Got it.  Thank you.
13:51:53  18          A.  Yeah.
13:51:54  19          Q.  I just wanted to make sure I didn't miss
13:51:56  20     anything there.
13:51:59  21          A.  That's okay.
13:52:04  22          Q.  And in terms of the duties that you just
13:52:08  23     described -- and let's focus on the child care, okay,
13:52:08  24     taking care of the baby.  Was it the Sowell family who
13:52:08  25     told you that that's what you would be doing for them?
```

### 116

```
13:52:13   1          A.  Yes.
13:52:21   2          Q.  Did Mr. or Mrs. Sowell ever supervise you
13:52:24   3     with the baby?
13:52:26   4          A.  Only the first couple of days.
13:52:29   5          Q.  Okay.  And during that time, what kind of
13:52:32   6     supervision did they give you?
13:52:34   7          A.  They were just there.
13:52:36   8          Q.  Did they give you any feedback on how you
13:52:39   9     were doing and what you should be doing with the baby?
13:52:42  10          A.  No.  Suggestions and recommendations, but
13:52:44  11     feedback, no.
13:52:47  12          Q.  Okay.  And then after the first few days,
13:52:49  13     were the Sowells ever around you when you were taking
13:52:52  14     care of the baby?
13:52:54  15          A.  She was, most of the time, in the house,
13:52:55  16     if she was not working.  But she was not with me and
13:53:01  17     the baby.  She was in the house.
13:53:02  18          Q.  Right.  And this is Mrs. Sowell you're
13:53:05  19     talking about?
13:53:05  20          A.  Yes.
13:53:06  21          Q.  Okay.  So after the first few days, was
13:53:08  22     Mrs. Sowell ever in the same room with you when you
13:53:10  23     were taking care of the baby?
13:53:12  24          A.  Not generally.
13:53:16  25          Q.  And let's go back to Marylynn Coalson for
```

29 (Pages 113 to 116)

Defs'. Appx. 00000694

**MICHELLE CAROLINA DELGADO CONLAGO - CONFIDENTIAL - 2/5/2018**
**Johana Paola Beltran, et al. v. Interexchange, Inc.**

---

### 117

| | |
|---|---|
| 13:53:19  1 | a minute. |
| 13:53:20  2 | A.  Uh-huh. |
| 13:53:20  3 | Q.  Other than the one meeting at the Sowell |
| 13:53:23  4 | house, did you ever see Mrs. -- Ms. Coalson again? |
| 13:53:28  5 | A.  Not that I can remember. |
| 13:53:30  6 | Q.  Did Ms. Coalson ever supervise you taking |
| 13:53:33  7 | care of the baby? |
| 13:53:34  8 | A.  No. |
| 13:53:35  9 | Q.  Did Ms. Coalson, or anyone else at |
| 13:53:38  10 | GoAuPair, ever provide feedback to you regarding your |
| 13:53:41  11 | child care services? |
| 13:53:42  12 | A.  No. |
| 13:53:49  13 | Q.  What other contact did you have with |
| 13:53:51  14 | Marylynn Coalson, after that initial in-person |
| 13:53:55  15 | meeting? |
| 13:53:56  16 | A.  She invited me, a couple of times, to the |
| 13:53:59  17 | GoAuPair activities, but she was the closest |
| 13:54:04  18 | coordinator to me and she was a bit far.  So it was |
| 13:54:09  19 | not easy for me to get -- to get there.  I had to |
| 13:54:12  20 | drive a long way, and then come back.  And I was |
| 13:54:15  21 | studying during the weekend, so I never could go to |
| 13:54:19  22 | those meetings. |
| 13:54:19  23 | Q.  So tell me about your studies.  What were |
| 13:54:21  24 | you studying? |
| 13:54:22  25 | A.  I was studying in Georgetown, digital |

### 118

| | |
|---|---|
| 1 | marketing. |
| 13:54:26  2 | Q.  You were studying at Georgetown.  It was |
| 13:54:28  3 | a class for telemarketing? |
| 13:54:30  4 | A.  It was a class, yes.  It was a |
| 13:54:33  5 | certificate program, professional certificate program |
| 13:54:35  6 | degree. |
| 13:54:36  7 | Q.  And what was the certificate? |
| 13:54:42  8 | A.  Digital marketing. |
| 9 | THE REPORTER:  The first word? |
| 10 | THE DEPONENT:  Digital. |
| 13:54:44  11 | Q.  (BY MS. REILLY)  Digital telemarketing. |
| 13:54:44  12 | Okay.  Sorry.  I couldn't get that.  And do you recall |
| 13:54:47  13 | when you started that class? |
| 13:54:48  14 | A.  I don't remember.  September. |
| 13:54:51  15 | Q.  So a few months in to your time as an |
| 13:54:54  16 | au pair? |
| 13:54:55  17 | A.  Yes. |
| 13:54:56  18 | Q.  And when did that class end? |
| 13:55:00  19 | A.  April. |
| 13:55:06  20 | Q.  And I think you mentioned that the class |
| 13:55:08  21 | was every other weekend in D.C.? |
| 13:55:09  22 | A.  (Nodded head up and down.) |
| 13:55:10  23 | Q.  Is that right? |
| 13:55:11  24 | A.  Yes. |
| 13:55:11  25 | Q.  And was the class actually at Georgetown? |

### 119

| | |
|---|---|
| 13:55:14  1 | A.  Yes. |
| 13:55:17  2 | Q.  And did you have homework or work to do |
| 13:55:19  3 | in between the classes every other weekend? |
| 13:55:22  4 | A.  Yes. |
| 13:55:23  5 | Q.  About how many hours a week? |
| 13:55:25  6 | A.  Of homework? |
| 13:55:26  7 | Q.  Yeah. |
| 13:55:26  8 | A.  For this certificate program? |
| 13:55:30  9 | Q.  Yes. |
| 13:55:31  10 | A.  I don't know.  Three hours. |
| 13:55:34  11 | Q.  Three hours a week? |
| 13:55:35  12 | A.  (Nodded head up and down.) |
| 13:55:38  13 | Q.  Did you get to do anything for fun, other |
| 13:55:41  14 | than the child care and the classes you were taking, |
| 13:55:43  15 | during your time at the Sowell house? |
| 13:55:47  16 | A.  Only the first month. |
| 13:55:49  17 | Q.  What did you do? |
| 13:55:50  18 | A.  I drove to Virginia Beach a couple of |
| 13:55:53  19 | times.  I went to Norfolk to see for studies and |
| 13:56:00  20 | classes to take.  That was pretty much it. |
| 13:56:05  21 | Q.  Did you get to see other au pairs? |
| 13:56:07  22 | A.  No. |
| 13:56:07  23 | Q.  And is there a reason why, after the |
| 13:56:15  24 | first month, you didn't get to do fun things anymore? |
| 13:56:19  25 | A.  Because I was working, I was studying for |

### 120

| | |
|---|---|
| 13:56:22  1 | the GRE and the TOEFL, and I was studying for |
| 13:56:25  2 | Georgetown so -- |
| 13:56:26  3 | Q.  There we go.  I was wondering where all |
| 13:56:28  4 | the studying came from.  Three hours a week is a lot, |
| 13:56:31  5 | but it sounds like you were studying for the GRE and |
| 13:56:34  6 | the -- I don't know how to pronounce it -- TOEFL -- |
| 13:56:36  7 | MR. SELIGMAN:  TOEFL. |
| 13:56:36  8 | A.  TOEFL. |
| 13:56:36  9 | Q.  (BY MS. REILLY)  How do you spell that? |
| 13:56:38  10 | MR. SELIGMAN:  T-O-E-F-L. |
| 13:56:39  11 | A.  T-O-E-F-L. |
| 12 | Q.  (BY MS. REILLY)  T-O-E-F-L. |
| 13:56:43  13 | A.  Yes.  I think there's an "E" at the end. |
| 13:56:44  14 | Q.  Okay.  So when did you start studying for |
| 13:56:47  15 | the GRE and the TOEFL? |
| 13:56:49  16 | A.  I don't remember.  December.  November. |
| 13:56:56  17 | Q.  Okay.  And do you recall when you ended |
| 13:56:58  18 | up taking those tests? |
| 13:56:59  19 | A.  April. |
| 13:57:03  20 | Q.  About how many hours a week did you spend |
| 13:57:06  21 | studying for TOEFL and GRE? |
| 13:57:10  22 | A.  The rest of the time that I had.  It was, |
| 13:57:14  23 | like, for three hours. |
| 13:57:16  24 | Q.  I'm sorry. |
| 13:57:17  25 | A.  For three hours every day. |

30 (Pages 117 to 120)

Defs.' Appx. 00000695

**MICHELLE CAROLINA DE LA PAZ ACOSTA SEE - CONFIDENTIAL - 2/5/2018**
Johana Paola Beltran, et al. v. Interexchange, Inc.

---

141

| | |
|---|---|
| 14:21:00 1 | went up to D.C., did you ever receive any more stipend |
| 14:21:03 2 | money from the Sowell family? |
| 14:21:05 3 | A. No. |
| 14:21:08 4 | Q. Was there any period of time where you |
| 14:21:10 5 | were still living with the Sowell family but not |
| 14:21:13 6 | taking care of the baby anymore? |
| 14:21:14 7 | A. A couple of days, yes. |
| 14:21:22 8 | Q. And I'm trying to put those couple of |
| 14:21:26 9 | days into this chronology. So how does that fit in? |
| 14:21:30 10 | Was that after the talk? So you take the exam, the |
| 14:21:34 11 | GRE, then you come home. And it sounds like you had |
| 14:21:35 12 | that talk with the Sowells that same day; is that |
| 14:21:38 13 | right? |
| 14:21:38 14 | A. Yes. |
| 14:21:38 15 | Q. And then was there a couple of days where |
| 14:21:40 16 | you're still there, but not taking care of the baby |
| 14:21:43 17 | anymore, before you went to D.C.? |
| 14:21:44 18 | A. Yes. |
| 14:21:46 19 | Q. Okay. Do you recall when is the last |
| 14:21:49 20 | time Mr. Sowell paid you any stipend money, kind of as |
| 14:21:55 21 | it compares to that story, the GRE? |
| 14:21:59 22 | A. After I left to D.C. |
| 14:22:03 23 | Q. So when is the last time he paid you? |
| 14:22:05 24 | A. I don't remember. |
| 14:22:09 25 | Q. Do you recall if he paid you any amount |

---

142

| | |
|---|---|
| 14:22:12 1 | after the GRE? |
| 14:22:16 2 | A. I don't remember. He paid me monthly, so |
| 14:22:20 3 | I don't remember exactly the day of the GRE exam. |
| 14:22:24 4 | Q. Got it. And did he tend to pay you the |
| 14:22:26 5 | same day every month? |
| 14:22:27 6 | A. Yes. |
| 14:22:28 7 | Q. What day was that? |
| 14:22:29 8 | A. The 1st or 5. Like around the first |
| 14:22:33 9 | days. |
| 14:22:33 10 | Q. Okay. I'm looking back at your survey |
| 14:22:43 11 | response, which is Exhibit 4. And just to help us |
| 14:22:47 12 | with this chronology, it looks like your job end date, |
| 14:22:52 13 | you said, was April 27th. |
| 14:22:54 14 | A. Uh-huh. |
| 14:22:55 15 | Q. So that makes sense, right, with what |
| 14:22:58 16 | you're describing? So if he paid the 1st of every |
| 14:23:01 17 | month, he would have paid April 1st, and there |
| 14:23:04 18 | wouldn't have been another payment date in between the |
| 14:23:06 19 | GRE, D.C., and you leaving for Ecuador. I'm just |
| 14:23:11 20 | trying to put it together datewise. |
| 14:23:13 21 | A. I don't remember. |
| 14:23:14 22 | Q. Fair enough. So whose decision was it to |
| 14:23:21 23 | terminate your placement? |
| 14:23:24 24 | A. Hers. |
| 14:23:26 25 | Q. Is that Mrs. Sowell? |

---

143

| | |
|---|---|
| 14:23:28 1 | A. Sowell. |
| 14:23:28 2 | Q. Sowell. Sorry. |
| 14:23:30 3 | A. It's okay. |
| 14:23:32 4 | Q. So I'm going to ask it again so we have a |
| 14:23:35 5 | clearer record. |
| ==14:23:35 6== | ==Whose decision was it to terminate your== |
| ==14:23:39 7== | ==placement at the Sowell house?== |
| ==14:23:41 8== | ==A. Egle Sowell.== |
| ==14:23:45 9== | ==Q. And is Egle Sowell the host family== |
| ==14:23:48 10== | ==mother?== |
| ==14:23:48 11== | ==A. Yes.== |
| 14:23:53 12 | Q. Am I right that GoAuPair did not decide |
| 14:23:55 13 | to terminate your placement at the Sowell house? |
| 14:23:58 14 | A. No. |
| 14:24:20 15 | Q. Am I right that you were successful on |
| 14:24:24 16 | that GRE, or did you have to take it again? |
| 14:24:26 17 | A. I was successful in that. |
| 14:24:27 18 | Q. You were successful? |
| 14:24:29 19 | A. Yes. |
| 14:24:29 20 | Q. Congratulations. That's awesome. |
| 14:24:31 21 | A. Thank you. |
| 14:24:34 22 | Q. So other than what we've already |
| 14:24:38 23 | discussed, the communications with Ms. Coalson, with |
| 14:24:42 24 | Marylynn Coalson, that we've talked about, did you |
| 14:24:45 25 | complain or share, about these bad experiences with |

---

144

| | |
|---|---|
| 14:24:48 1 | Mrs. Sowell, with anyone else during the time you were |
| 14:24:51 2 | an au pair? |
| 14:24:53 3 | A. That is not GoAuPair? |
| 14:24:55 4 | Q. Correct. |
| 14:24:56 5 | A. No. |
| 14:24:57 6 | Q. Did you tell your family or your friends |
| 14:24:59 7 | back home, or anyone else, that you were having these |
| 14:25:01 8 | problems with Mrs. Sowell? |
| 14:25:04 9 | A. My mom, at the very last ending. |
| 14:25:08 10 | Q. No one else, though? |
| 14:25:09 11 | A. No. |
| 14:25:13 12 | Q. And you had no other au pair friends in |
| 14:25:15 13 | the United States? |
| 14:25:16 14 | A. No. |
| 14:25:16 15 | Q. Did you keep a journal during your time |
| 14:25:32 16 | as an au pair? |
| 14:25:34 17 | A. No. |
| 14:25:37 18 | Q. Did you ever blog about your experiences |
| 14:25:40 19 | as an au pair? |
| 14:25:41 20 | A. No. |
| 14:25:41 21 | Q. How about Facebook entries about it? |
| 14:25:43 22 | A. No. |
| 14:25:46 23 | Q. Did you write letters to family or |
| 14:25:48 24 | friends about your au pair experience? |
| 14:25:49 25 | A. No. |

---

36 (Pages 141 to 144)

Defs' Appx. 00000696

Defs.' Appx. 00000697

*Johana Paola Beltran, et al. vs.*

*Interexchange, Inc., et al.*

---

*Confidential Video Deposition of Ivette Alexandra Gonzalez*

*September 28, 2016*

---



700 17th Street, Suite 1750
Denver, CO  80202
303-988-8470 (Office)   303-988-8478 (Fax)
SKReporting.com

Stevens-Koenig
Reporting

Defs.' Appx. 00000697

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Defs.' Appx. 00000698 Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 5

|  | INITIAL |
| EXHIBITS: | REFERENCE |

107   GoAuPair Orientation Packet,        101
      GONZALEZ000482-488
108   GoAuPair Grievance Policy,          107
      GONZALEZ001214-1215
109   GoAuPair Survey completed by Ms.    118
      Gonzalez, GAP_00003919-3921
110   Notes made by Amanda Gray,          148
      GAP_00003925-3926
111   Email chain between Ms. Gonzalez and 159
      Ms. Hardman with attached text
      messages from Ms. Sanders,
      GONZALEZ000728-733
112   Email chain between Ms. Gonzales and 160
      Ms. Hardman regarding rematch,
      GONZALEZ001221-1223
113   Email to Ms. Zapata from Ms. Gonzalez 161
      dated 2/2/15, GONZALEZ000743
114   Email to Ms. Gonzalez from Ms. Gray   162
      dated 2/17/15, GONZALEZ001254
115   Email chain between Ms. Gonzalez and  169
      Ms. Hardman with attached letter from
      Ms. Sanders, GONZALEZ001266-1268
116   GoAuPair Survey completed by Ms.     175
      Gonzalez, GAP_00003922-3924
117   Email chain between Ms. Gonzalez and  180
      Ms. Moore, GONZALEZ000759-760

Page 6

P R O C E E D I N G S

THE VIDEOGRAPHER:  We are on the record at
9:09 on September 28, 2016.  Will the reporter please
swear in the interpreter.

ANABEL CUADROS YEISER,

having been first duly sworn, testifies to translate the
questions asked and the answers given to the best of
their ability:

THE VIDEOGRAPHER:  We are at 370
17th Street, Suite 4500, Denver, Colorado.  We are here
for the video deposition of Ivette Alexandra Gonzalez in
the matter of Johana Paola Beltran, et al. versus
InterExchange, Inc., et al. in the United States District
Court for the District of Colorado, Case Number
1:14-cv-03074-CMA-KMT.  The videographer is Jerry DeBoer,
and the court reporter is Debbie VanDemark from
Stevens-Koenig Reporting.

Will counsel please state their
appearances beginning with plaintiffs' counsel.

MS. McELROY:  Sabria McElroy from Boies
Schiller & Flexner for the plaintiff.

MS. REILLY:  Katie Reilly on behalf of
GoAuPair, Agent Au Pair, and Au Pair International.

MS. KOZAL:  Peggy Kozal on behalf of
AuPairCare.

Page 7

MR. LEE:  Larry Lee here on behalf of AIFS
for APF.

THE VIDEOGRAPHER:  And counsel on the
phone?

MR. DREW:  This is Mike Drew.  I represent
A.P.EX and 20/20 Care Exchange.

MS. KRUZER:  This is Lyndsey Kruzer.  I
represent Cultural Care.

MS. LOUIS:  Lauren Louis with Boies
Schiller on behalf of plaintiff.

MR. ENICA:  And Bogdan Enica on behalf of
Expert Group International doing business as Expert
AuPair.

MS. FITZGERALD:  Martha Fitzgerald on
behalf of EurAupair.

MS. REILLY:  Also let the record reflect
with me today is Bill Kapler from GoAuPair.

THE VIDEOGRAPHER:  Will the reporter
please swear in the witness.

IVETTE ALEXANDRA GONZALEZ,

having been first duly sworn, was examined and testified
as follows:

EXAMINATION
BY MS. REILLY:

Q.  Good morning, Ms. Gonzalez.  I'm Katie

Page 8

Reilly, and I represent GoAuPair, Agent Au Pair, and
Au Pair International in the lawsuit.  Ms. Gonzalez, why
did you join this lawsuit?

A.  Because I thought that the salary was not
fair.

Q.  And what was not fair about it?

A.  It was not fair to work 9 hours a day and
receive that salary having personal needs.

Q.  Did you know what the salary would be
before you entered the au pair program?

A.  Yes, of course, but in Colombia that's a
lot of money.

Q.  What do you think GoAuPair did wrong?

A.  I think introducing the girls to the
United States without knowing how is the life here, how
it is, how the money is here, and if that money really
works here for our personal needs.

Q.  The salary you received was paid by your
host family, right?

A.  Yes.

Q.  And it was your host family who decided
how much to pay you?

A.  I'm not sure I understand the question
because there's two parts here.  GoAuPair in Colombia
told me the salary, and they told me that the family

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Defs.' Appx. 00000699 Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 9

1   already know -- or already knew the salary, but here --
2   and nonetheless here in the U.S. the services were
3   ratified at $200 with Amanda that was here.
4        Q.   What do you mean ratified?
5        A.   Amanda accepted the $200.
6        Q.   Amanda accepted the $200, but it was the
7   Sanders who decided the $200, correct?
8        MS. McELROY:  Object, mischaracterizes
9   testimony.  You can answer.
10       A.   The Sanders put the $200, but Amanda wrote
11  them down when I arrived to the United States.
12       Q.   (By Ms. Reilly)  Did GoAuPair ever lie to
13  you about anything?
14       MS. McELROY:  Objection, foundation.
15       A.   I'm not sure that I have to answer that
16  question.
17       Q.   (By Ms. Reilly)  You do have to answer that
18  question.
19       A.   No, they didn't lie because in reality
20  they told me the salary that it was going to be, no more
21  or less.  It was what it was.
22       Q.   Have you ever been deposed before?
23       A.   No, never.
24       Q.   Okay.  So I'm going to go over just some
25  ground rules for today's deposition.

Page 10

1        A.   Thank you very much.
2        Q.   So first you have to give verbal answers,
3   which you've been doing a good job of so far.  Verbal
4   answers means with words and not just by shaking the head
5   or making hand gestures, so using words so that the court
6   reporter can make a record.  And if you don't understand
7   a question that I'm asking, just let me know.  And I'm
8   happy to rephrase it.
9        A.   Yes.  Thank you.
10       Q.   And if you do not ask me to rephrase it, I
11  will assume that you understood my question, okay?  If
12  you need a break at any point, just let us know.  As long
13  as a question isn't pending, we can take a break.
14       A.   Thank you.
15       Q.   Other than today -- or other than this
16  case, have you ever given sworn testimony in the form of
17  an affidavit or in court?
18       A.   No, not in court.
19       Q.   And have you taken any medication within
20  the last 24 to 48 hours that would impair your ability to
21  remember things today or give testimony?
22       A.   No, no.
23       Q.   Did you prepare for today's deposition?
24       A.   No.
25       Q.   Did you meet with your lawyer in advance

Page 11

1   of the deposition to talk about the deposition?
2        (Mr. Lyons joined the proceedings.)
3        A.   Yes, I did talk to my lawyer obviously
4   about this deposition in the terms -- obviously very
5   general terms about what was going to happen.
6        Q.   And I'm not going to ask you today about
7   anything you've discussed with your lawyer, okay?  Did
8   you meet with your lawyer in person?
9        A.   Yes.
10       Q.   And when was that?
11       A.   On Monday.
12       Q.   And who was that that you met with,
13  Sabria?
14       A.   Yes.
15       Q.   If you could give a louder answer.
16       A.   (In English)  Yes, yes.
17       Q.   Any other lawyer?
18       A.   Lauren.
19       Q.   Lauren Louis?
20       A.   Yes, ma'am.
21       Q.   And was Lauren on the phone?
22       A.   No, in person.
23       Q.   And where did you meet?
24       A.   In Miami.
25       Q.   Was any other lawyer present?

Page 12

1        A.   No, ma'am.
2        Q.   Okay.  And did you review any documents to
3   prepare for today's deposition?
4        A.   Yes, of course.
5        Q.   Which ones?
6        A.   The statements that I have given them.
7        Q.   You mean your declaration?
8        A.   Yes.
9        Q.   Your discovery responses?
10       A.   Uh-huh.
11       Q.   The complaint that's been filed in this
12  case?
13       A.   Yes, ma'am.
14       Q.   Anything else?
15       A.   No, ma'am.
16       MS. McELROY:  Can we take a short break?
17       THE VIDEOGRAPHER:  Going off the record.
18  The time is 9:23.
19       (Recess taken from 9:23 a.m. to 9:33 a.m.)
20       THE VIDEOGRAPHER:  We are back on the
21  record.  The time is 9:33.
22       Q.   (By Ms. Reilly)  Ms. Gonzalez, do you have
23  any corrections you'd like to make to your testimony?
24       A.   Yes.
25       Q.   What is that?

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Defs.' Appx. 00000700
Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 37

1  translation of a single word.  So for us to get through
2  this deposition in a timely manner, we're going to have
3  to cut the long breaks or at least have them be planned.
4  Does that work for everyone?
5         MR. LEE:  Yes.
6         MS. McELROY:  And we agree with cutting
7  long breaks, and we hope the translation issues will go
8  more smoothly.  But we want to state that the reason --
9  the primary reason for the long breaks has been the issue
10  with translation and the confusion that that's caused.
11         MS. REILLY:  Well, the first break was
12  not.  It was -- there was a change in testimony that had
13  nothing to do with the translation issue, but we can go
14  back on the record and get going.
15         Q.  (By Ms. Reilly)  Ms. Gonzalez, can you
16  please look at Exhibit 100 and tell me if you recognize
17  this document?
18         A.  Yes.
19         Q.  Okay.  And if you turn to the second page,
20  is that your signature?
21         A.  Yes, ma'am.
22         Q.  And did you carefully review this document
23  before signing it?
24         A.  Yes, ma'am.
25         Q.  Okay.  And is every statement in this

Page 38

1  declaration accurate?
2         A.  Yes, ma'am.
3         Q.  In Paragraph 2 do you see the final
4  sentence that you were advised by the representative of
5  Intercambio that as an au pair for either sponsor you
6  would be paid a $195.75 weekly stipend and would be
7  expected to work for 45 hours per week?
8         A.  Yes.
9         Q.  And did you understand these words in
10  English when you signed this declaration?
11         A.  Yes.
12         Q.  Okay.  So you understand the word "weekly
13  stipend" and are comfortable using that language in this
14  deposition today?
15         A.  You mean weekly payment?
16         Q.  Yes, weekly stipend.  If I use the word
17  "stipend," do you understand what I mean?
18         A.  Yes.
19         Q.  Do you have an understanding as to whether
20  the 195.75 weekly stipend is a minimum set by the
21  Department of State?
22         MS. McELROY:  Objection.
23         A.  No.
24         Q.  (By Ms. Reilly)  You, in fact, received
25  more than 195.75, correct?

Page 39

1         A.  Yes, 200.
2         Q.  Did you decide in October 2013 that you
3  wanted to participate in the au pair program?
4         A.  Yes, ma'am.
5         Q.  What was the most important factor in your
6  decision to participate in the au pair program?
7         A.  To have an intercultural exchange in the
8  United States and get to know another culture.
9         Q.  Were you hoping to improve your English
10  skills?
11         MS. McELROY:  Objection.
12         A.  Yes, of course.
13         Q.  (By Ms. Reilly)  Was it important for you
14  to live with a host family?
15         A.  Well, the program offered it.  It was what
16  the program offered.
17         Q.  Would you have been interested in the
18  au pair program if you did not have the opportunity to
19  live with a host family?
20         MS. McELROY:  Objection.
21         A.  I haven't really thought about it.
22         Q.  (By Ms. Reilly)  Sitting here now, would
23  you have been interested in joining the au pair program
24  if it hadn't included living with a host family?
25         MS. McELROY:  Objection.

Page 40

1         A.  Well, yes.
2         Q.  (By Ms. Reilly)  And did the amount of the
3  weekly stipend influence your decision to become an
4  au pair?
5         A.  No, not entirely.
6         Q.  Did it influence it somewhat?
7         MS. McELROY:  Objection.
8         A.  Not entirely was the dollar amount.  It
9  was to get to know a culture outside of Colombia.
10         Q.  (By Ms. Reilly)  Would you have joined the
11  au pair program if the stipend was $150 a week?
12         MS. McELROY:  Objection.
13         A.  Yes, because I didn't understand -- in
14  Colombia that's good money, but in the United States I
15  had no idea.
16         Q.  (By Ms. Reilly)  Okay.  Knowing what you
17  know now, would you be -- would you have been willing to
18  participate in the au pair program if the stipend was
19  just $150 a week?
20         MS. McELROY:  Objection.
21         A.  No.
22         Q.  (By Ms. Reilly)  Were there any other
23  benefits other than the ones we discussed already that
24  you were looking to obtain from the au pair program?
25         A.  No.

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Defs.' Appx. 00000700 Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 49

1    Q.   And what's the name of the bank that you
2  made the deposits?
3    A.   Bancolombia.
4    Q.   Just to clarify, the third payment of
5  1,200,000 pesos, you understood that was a completion
6  deposit?
7    MS. McELROY:  Objection.
8    A.   I don't understand.
9    Q.   (By Ms. Reilly)  You understood you would
10  receive the 1,200,000 pesos upon completion of the
11  au pair program?
12    A.   Yes, yes, that cash was going to be given
13  back to me.
14    Q.   How many times did you meet Lina Maria
15  Patel (sic) in person in 2013 and '14?
16    A.   Perhaps three times.  I'm not really sure,
17  around three times.
18    Q.   Did you understand that she was a
19  representative of GoAuPair?
20    A.   She work for Intercambio and tourism, not
21  exactly said anything about au pair.  She worked for the
22  agency that represented those agencies.
23    Q.   Did you ever meet anyone from GoAuPair in
24  2013 or the winter of 2014?
25    MS. McELROY:  Objection, form.

Page 50

1    A.   No, no.  Lina.
2    Q.   (By Ms. Reilly)  Lina was an employee of
3  Intercambio.  Did you meet any employee of GoAuPair in
4  2013 or the winter of 2014?
5    MS. McELROY:  Objection, form.
6    A.   Somebody that would tell me I am a
7  representative of GoAuPair, no.  Lina was -- she was the
8  person that represented or the person that worked in
9  Intercambio that gave me that information.
10    Q.   Who paid for your flight to the United
11  States?
12    MS. McELROY:  Objection.
13    A.   I'm not sure.  I suppose that it was the
14  family.
15    Q.  (By Ms. Reilly)  Other than the three
16  payments we discussed, did you incur any other costs in
17  connection with applying for the au pair program?
18    A.   No.  That was all I paid on that agency.
19    Q.   Did you have any other costs in connection
20  with the au pair program participation?
21    A.   Of course, the visa, the international
22  license, the national license.  That's it.
23    Q.   How much did you pay for the visa?
24    A.   About 250,000 pesos.
25    Q.   And how much for the international

Page 51

1  driver's license?
2    A.   Around 200, 220, around 200.
3    Q.   Were you told that it was a requirement to
4  be able to drive of the au pair program?
5    A.   Yes, ma'am.
6    Q.   Who told you that?
7    A.   Lina Maria.
8    Q.   And how much did you pay for the national
9  license, the national driver's license?
10    A.   About 150, 120, 150.  I'm not exactly
11  sure.
12    Q.   Any other costs that you incurred to
13  participate in the au pair program?
14    A.   No, ma'am.
15    (Exhibit 102 was marked.)
16    Q.   Do you recognize this document?
17    A.   Yes, ma'am.
18    Q.   And is this your handwriting on the first
19  page with your name?
20    A.   Yes, ma'am.
21    Q.   And is it your signature on the last page?
22    A.   Yes, ma'am.
23    Q.   And what is this document?
24    A.   The document of agreement, what I have to
25  do to be an au pair.

Page 52

1    Q.   If you could turn to the second page.  Do
2  you see the first sentence, "I agree my weekly stipend
3  will be no less than 195.75 per week"?
4    A.   Yes, I do see.
5    Q.   And was that your understanding when you
6  joined the au pair program, that you would be paid at
7  least 195.75 a week?
8    A.   Yes, ma'am.
9    Q.   And the second part of that sentence says
10  that you would receive that amount in exchange for
11  working up to 10 hours per day for a maximum of 45 hours
12  per week.  Do you see that?
13    A.   Yes, ma'am.
14    Q.   And was that your understanding when you
15  joined the au pair program, that you could work no more
16  than 45 hours per week?
17    A.   Yes, ma'am.
18    MS. REILLY:  Mark this exhibit, please.
19    (Exhibit 103 was marked.)
20    MS. REILLY:  And I'm just going to make a
21  record of the fact that some of the exhibits that we're
22  showing the witness have been marked "Highly
23  Confidential, Attorney Eyes Only."  We are changing the
24  designation of these documents to "Confidential."
25    A.   So I can see them?

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Defs.' Appx. 00000702   Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

**Page 61**

1  or -- but I think there were three perhaps that wrote me
2  before the Sanders did.  They would write me to the
3  email.  GoAuPair would send me like -- I don't know, but
4  like -- I don't know how to say it, but like a format
5  where the families would say, you know -- and they would
6  tell me like such-and-such family wants to get in touch
7  with you.
8        Q.  (By Ms. Reilly)  Okay.  So are we talking
9  now just about GoAuPair families, not EurAupair?
10       A.  I never got a call from EurAupair.
11       Q.  So you never talked to any EurAupair
12  family at any point?
13       A.  Not that I remember.
14       Q.  Did EurAupair accept your application?  Do
15  you remember?
16       A.  I suppose that, yes.
17       Q.  But you never heard from any EurAupair
18  host family?
19       A.  No.  I would get more from GoAuPair.
20       Q.  Did you get any from EurAupair?
21       A.  No, not that I remember, no.
22       Q.  Okay.  So for GoAuPair, how would you hear
23  from a host family?
24       A.  Can you change the question?  I don't
25  understand it.

**Page 62**

1        Q.  Sure.  What was your first interaction
2  with host families through GoAuPair?
3        A.  The first one, they wrote me.  And we had
4  an appointment via Skype.  And she told me, I am
5  selecting from seven girls.  If I am interested in you, I
6  will let you know.  I will write you.  And if not, I will
7  also let you know that I'm not interested.
8            The second family wrote me so that we
9  would be interviewed through Skype, and I thought it was
10  disrespectful because they did not comply with the agreed
11  upon time.  And I had to ask for permission at work for
12  that one appointment, and I told Lina Maria that I don't
13  believe that this family should take advantage of the
14  time of this people -- of us.  I'm sorry.
15           And finally, I talked with that family,
16  and then they later told me that they did not want an
17  au pair anymore.  They were going to get out of the
18  program.  I did know that another family got to me, but
19  at that time I was in conversations with the familia
20  Sanders, and it was the same way.  They sent me an email,
21  and I did the interview via Skype.
22       Q.  The families who sent you an email, had
23  you chosen them, or did they choose you?
24       A.  I would have liked to choose them myself,
25  but they chose me.

**Page 63**

1        Q.  And was it GoAuPair or Intercambio who
2  chose which host families would talk to you, or was it
3  the host families who decided?
4            MS. McELROY:  Objection, form.
5        A.  No, I don't understand.
6        Q.  (By Ms. McElroy)  Do you have any
7  understanding as to whether the three host families who
8  emailed you had picked you to talk to?
9        A.  Can you change the question around,
10  please?
11       Q.  Sure.  When the host families contacted
12  you, did they send information about themselves?
13       A.  Yes, of course.  Them -- they will -- I
14  would get an email that would come from GoAuPair, and
15  then afterwards the families themselves would contact
16  me -- or they would write me to my personal email.
17       Q.  When the host families wrote you, did they
18  copy anyone from GoAuPair on the email to you?
19       A.  I don't remember.
20            THE INTERPRETER:  I need to get another
21  pen.  I'm sorry.
22       Q.  (By Ms. Reilly)  When you spoke to the host
23  families on Skype, was anyone from GoAuPair present?
24       A.  Never.
25       Q.  Was it up to you whether to actually talk

**Page 64**

1  to one of these host families on Skype?  Could you have
2  said no?
3            MS. McELROY:  Objection, form.
4        A.  Yes, of course.  But I did need to find
5  the family, so I had to speak with all of them.
6        Q.  (By Ms. Reilly)  But GoAuPair and
7  Intercambio didn't force you to talk to any particular
8  host family, correct?
9        A.  No, no, ma'am.
10       Q.  And when you received the emails from the
11  host families, did they send you information about
12  themselves and their kids?
13       A.  Yes, ma'am.
14       Q.  (By Ms. Reilly)  And would you review that information
15  before deciding to have a Skype call?
16       A.  Yes, of course.
17       Q.  Were there any important factors about the
18  host family when you were deciding whether to have a
19  Skype call?
20            MS. McELROY:  Objection.
21       A.  Yes.
22       Q.  (By Ms. Reilly)  And what were those
23  factors?
24       A.  I wanted a family where there wouldn't be
25  a lot of kids or too many kids.  Basically that's all I

Defs.' Appx. 00000702

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Defs.' Appx. 00000703Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 69

1       MS. McELROY: Objection.
2       A.  Mrs. Sanders was selecting between another
3   girl, another au pair.  She sent me an email that said I
4   would be part of the family, and then afterwards Lina
5   contacted me and said that the Sanders had taken that
6   decision that I was the one.  And we started the process
7   of the visa and payment of the million 200.
8       Q.  (By Ms. Reilly)  When the Sanders -- when
9   Mrs. Sanders sent you an email saying that they had
10  chosen you, did they copy anyone from GoAuPair or
11  Intercambio on that email?
12      A.  No, I couldn't tell you.  I don't know.
13      Q.  Was the decision to extend an au pair
14  position to you made by the Sanders family, or was it
15  made by GoAuPair or --
16      THE INTERPRETER:  The interpreter needs
17  repetition.  Was the decision what?
18      Q.  (By Ms. Reilly)  Was the decision to offer
19  you an au pair position with the Sanders made by the
20  Sanders family, or was that decision made by Intercambio
21  or GoAuPair?
22      MS. McELROY:  Objection.
23      THE INTERPRETER:  By whom?
24      MS. REILLY:  By Intercambio or GoAuPair.
25      THE VIDEOGRAPHER:  Counsel, your

Page 70

1   microphone has come off.
2       A.  I don't understand the question.
3       Q.  (By Ms. Reilly)  Is it your understanding
4   that it was the Sanders family who chose for you to be
5   their au pair?
6       A.  Yes, ma'am.
7       Q.  Okay.  And did you have a choice as to
8   whether you would accept their offer to be their au pair?
9       A.  Yes, of course.
10      Q.  And you decided yes?
11      A.  Yes, I decided to be with the Sanders
12  family.
13      Q.  And why did you decide to accept their
14  offer?
15      A.  Like I told you, I thought they were an
16  excellent family.  And I really focused my attention on
17  them, especially because Don Monte was working in
18  fitness.  That caught my attention.
19      MS. REILLY:  Excuse me.  Someone on the
20  phone, if you can mute your line.  We're getting some
21  nice music, but it's a little distracting.  Thank you.
22  Nope.  It's back.  It appears to be jazz whoever appears
23  to be listening to --
24      MS. KOZAL:  I wonder if it's someone's
25  phone on hold.

Page 71

1       MS. REILLY:  Oh, no.
2       MS. KOZAL:  Do you want me to send out an
3   email?
4       THE VIDEOGRAPHER:  Would you like to go
5   off the record, Counsel?
6       MS. REILLY:  I guess so.
7       THE VIDEOGRAPHER:  Going off the record.
8   The time is 1:08.
9       (Discussion off the record.)
10      THE VIDEOGRAPHER:  We are back on the
11  record.  The time is 1:10.
12      MS. KOZAL:  Let's go back off the record.
13      THE VIDEOGRAPHER:  Going off the record.
14  The time is 1:10.
15      (Discussion off the record.)
16      THE VIDEOGRAPHER:  We are back on the
17  record.  The time is 1:14.
18      Q.  (By Ms. Reilly)  Did you feel any pressure
19  from either Intercambio or GoAuPair to choose the Sanders
20  family?
21      MS. McELROY:  Objection.
22      A.  No, no pressure, no.
23      Q.  (By Ms. Reilly)  That decision was
24  completely up to you?
25      A.  Yes.

Page 72

1       Q.  On the call with the Sanders did you ask
2   any questions about food?
3       A.  Not that I remember.  Like I told you
4   earlier, Lina Maria told me that they had that clear, the
5   food, the lodging, all that.
6       Q.  Did you ask any questions about house
7   rules?
8       A.  No, ma'am.
9       Q.  Did you ask any questions about driving?
10      A.  Yes, ma'am.
11      Q.  What was discussed about driving?
12      A.  I don't remember exactly the question, but
13  it was around if I could drive.  And she told me that I
14  could use her car.
15      Q.  Was there any discussion about a curfew?
16      A.  In that call by Skype I don't remember.
17      Q.  And who handled the preparation of your
18  visa?
19      MS. McELROY:  Objection.
20      A.  Lina Maria told me in general terms how it
21  was, that one should fill out the form on the page.  But
22  I was the one that got to do the visa -- I mean, get the
23  visa.  I did it.
24      Q.  (By Ms. Reilly)  So you handled the visa
25  application process yourself?

Defs.' Appx. 00000703

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Defs.' Appx. 00000704 Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

**Page 81**

1    MS. McELROY:  Objection.
2         A.  I don't know who filled this out.  Simply
3  they send it to me, and I signed it as part of the
4  procedure.
5         Q.  (By Ms. Reilly)  You understood, though,
6  that this would be the work schedule -- that would be
7  your work schedule in the Sanders house, right?
8         A.  Yes, correct.  That's what I understood
9  when I saw this.
10        Q.  And this is what the Sanders were
11  expecting from you?
12        MS. McELROY:  Objection.
13        A.  Yes, I suppose that it was because she
14  told me that I had to work early, early.
15        Q.  (By Ms. Reilly)  And these are early hours
16  in the work schedule, right?
17        A.  Yes, ma'am.
18        Q.  And when you saw this written agreement,
19  did you have a problem with any of the terms?
20        MS. McELROY:  Objection.
21        A.  In that moment, no.  It was when I went to
22  au pair -- when I was an au pair.
23        Q.  (By Ms. Reilly)  So the work schedule
24  that's set forth in this written agreement, did this end
25  up being consistent with the hours that you worked at the

**Page 82**

1  Sanders?
2         MS. McELROY:  Objection.
3         A.  No.  This changed.
4         Q.  (By Ms. Reilly)  How did it change?
5         A.  It was not at 3:00 in the morning.  It was
6  at 4:00 a.m.  And it was from 4:00 and from 1:00 or 2:00.
7  And it would change depending on the needs of lady
8  basically, of the Mrs.
9         Q.  Would the schedule be set every week?
10        A.  Yes, ma'am.  She had a big schedule, a
11  chart.  And she would write in the time to begin and the
12  time to end.
13        Q.  And how about the curfew?  Here it says
14  there's a weekday curfew of 9:00 p.m.  Is that what ended
15  up happening?
16        A.  Not always was it 9:00 p.m.  That would
17  change depending on the schedule that I had, but I did
18  have a time to come in at curfew.
19        Q.  Was that on the board as well?
20        A.  No, no, no.  She would -- she had told me.
21  She told me that I had to arrive 6 or 8 hours before -- 6
22  or 7, I'm sorry, 6 or 7 hours before I had to take care
23  of the child because she needed to see that I was well
24  rested to take care of the child.
25        Q.  Was there any curfew for days that you

**Page 83**

1  were not taking care of the child?
2         A.  No.  On my free days she wouldn't give me
3  a curfew, but for the days that I did have to work -- on
4  Monday, for example, there was a curfew.
5         Q.  Did you ask Intercambio any questions
6  about this agreement before signing it?
7         A.  Not that I remember really.
8         Q.  Going back quickly to your declaration,
9  Exhibit 100, Number 4, do you see where it says,
10  "GoAuPair matched me with a family in Maryland"?
11        A.  (In English)  Yes, yes.
12        Q.  We talked about the Sanders chose you.
13  You decided to accept with the Sanders.  What did
14  GoAuPair do?
15        MS. McELROY:  Objection.
16        A.  Before I went back to Colombia, Lina
17  Maria, as their representative of all this, was the one
18  that prepared all the papers, got all the papers ready,
19  all this.  And then over here in the United States the
20  first representative that showed up at the house was
21  Amanda.
22        Q.  (By Ms. Reilly)  And who is Amanda?
23        A.  The local representative.
24        Q.  And by the time you met Amanda, you had
25  already been matched with the Sanders family, correct?

**Page 84**

1         A.  Yes, because I was already in their home
2  with them right there.
3         Q.  Before you went to the United States, did
4  you do any training for the au pair program?
5         A.  Yes, ma'am.
6         Q.  And what training did you do?
7         A.  It was online.  It was by computer, all of
8  it.  Well, it was all online.  And it talked about how
9  you had to put the chair, that the chair was an important
10  thing here in the United States.  And it talked about how
11  it was supposed -- you were supposed to bathe a child.  I
12  don't remember everything that it said, but those are
13  some of the things that come to my mind.
14        Q.  And where did you watch the online
15  training programs?
16        A.  In my home.
17        Q.  And how many days did it take you to get
18  through the training?
19        A.  I don't remember, but it was more than
20  eight.
21        Q.  And how many hours a day would you spend
22  on the training?
23        A.  I cannot tell exactly how many, but I can
24  say that it was around 1:30 -- I'm sorry, 1 and a half
25  hours or 2 or sometimes 3.

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Defs.' Appx. 00000705   Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 85

1    Q.   Do you know how many total hours you spent
2 on the training?
3    A.   The total, no.  But I did have to spend
4 more time on it because I had to translate some words
5 that I did not understand, so it did take me a little bit
6 longer.
7    Q.   And did you have to complete any tests as
8 part of this training?
9    A.   Yes, of course.  They did send me some
10 tests like an evaluation.
11    Q.   And did you complete the tests?
12    A.   All of them, yes.
13    Q.   Was it your understanding that you had to
14 get certain scores on the tests to be able to participate
15 in the program?
16    A.   Yes, ma'am.  That's what Lina had told me,
17 and I also realize that.
18    Q.   And did you pass the test the first try?
19    A.   I don't remember any of those tries.
20    Q.   Did you ultimately pass the test?
21    A.   Yes, because I was an au pair.
22    Q.   But do you remember passing the tests?
23    A.   Well, I suppose that I did because I was
24 an au pair.
25    Q.   Yeah.  And I'm asking you about what your

Page 86

1 memory is.  Do you remember passing the test?
2    A.   Well, yes.
3    Q.   And did you receive any payment for the
4 time you spent on the training?
5    A.   Never.
6    Q.   Did you ask Intercambio to pay you for the
7 time you spent on the training?
8    A.   No, because I thought that was a part of
9 the normal process.
10    Q.   And was the training -- do you remember if
11 it was focused specifically on GoAuPair or whether it was
12 more general childcare skills?
13    A.   I do not remember exactly, but I do know
14 that that training was from GoAuPair.  The books were
15 from GoAuPair, and it was specific to GoAuPair.
16    Q.   And did you attend any training in the
17 United States?
18    A.   Never.
19    MS. REILLY:  So this is a good time for a
20 break.  Can we take just like a 10-minute break?
21    THE VIDEOGRAPHER:  Going off the record.
22 The time is 1:47.
23    (Recess taken from 1:47 p.m. to 2:05 p.m.)
24    (Mr. Lyons left the proceedings.)
25    THE VIDEOGRAPHER:  We are back on the

Page 87

1 record.  The time is 2:05.
2    MS. REILLY:  So here are my concerns:
3 It's after 2:00.  We've been on the record for only three
4 hours due to multiple lengthy breaks taken by the
5 plaintiffs.  And now just before 2:00 p.m. there was a
6 production of -- a supplemental production of documents
7 from Plaintiff Gonzalez that we understand was provided
8 to plaintiffs' counsel either Monday or yesterday that
9 could have been and should have been produced to us in
10 advance of the deposition, that we're now in a position
11 of needing to review and assess whether we need to ask
12 additional deposition questions based on those documents.
13    So I guess we're looking at a situation
14 where we either need to go very late this evening or go
15 for a couple more hours and resume tomorrow morning,
16 which let me see -- so before assessing that, I'd like to
17 hear from the videographer, the court reporter, and the
18 interpreter whether they're even available to go late
19 tonight.
20    THE VIDEOGRAPHER:  I'm able to.  As far as
21 tomorrow, I do not know what the schedule is.  But I'm
22 available to go with the rest of you this evening.
23    MS. REILLY:  And are you available to go
24 this evening?  By late I think it's -- you know, the rate
25 we're going, it could be 9 or 10:00 p.m.  You would?

Page 88

1    THE REPORTER:  I would prefer to do it
2 tonight.
3    MS. REILLY:  And how about you?
4    THE INTERPRETER:  I would prefer to do it
5 tonight.
6    MS. REILLY:  Okay.  So here's what I
7 suggest:  I suggest that we go for another couple of
8 hours.  And to the extent that the witness can give
9 succinct answers to the questions that are being asked
10 and we can make some gains with the timing, I think we
11 see where we are at 5:00 and make a decision as to
12 whether we can finish tonight or resume tomorrow.
13    MS. McELROY:  With respect to the timing,
14 we're around 3 hours.  We have 7 hours total.  So I don't
15 expect we'd be going all night.
16    MS. REILLY:  The rate we're going, though.
17    MS. McELROY:  But we've covered 3 hours in
18 5 hours, correct?  So I don't think we'd be here until
19 10:00.  With the documents, we would suggest you take
20 some time to -- like I said, they're all documents that
21 were in GoAuPair's possession or forms they've seen
22 before.  It's like her Social Security application.
23 There's, as you said, less than a hundred pages.  We
24 would suggest you take some time to print them, or we
25 could email them to you.  You could look through them

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Defs.' Appx. 00000706Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 97

1    A.  Yeah.
2    Q.  Was the pool nice?
3        MS. McELROY:  Objection.
4    A.  I never used it much.
5    Q.  (By Ms. Reilly)  Do you know how to swim?
6    A.  Yes, I do swim.
7    Q.  Why didn't you ever use it?
8    A.  Because I was by myself, and I didn't feel
9    comfortable swimming by myself.
10   Q.  Were you allowed to use the pool if you
11   wanted to?
12   A.  Yes, of course.
13   Q.  How about the town, Finksburg, right?
14   A.  It was a town in the middle of nowhere for
15   me.
16   Q.  How far was it from Baltimore?
17   A.  About an hour, I think, I believe.
18   Q.  And how far from Washington, D.C.?
19   A.  A little bit farther.  I'm not exactly
20   sure how far, but yes, farther.
21   Q.  How far was the closest grocery store?
22   A.  Walking it was about 27 or so minutes.
23   Q.  And how did this town compare to your
24   hometown?
25   A.  I live in a city, so this was a new

Page 98

1    experience for me.
2    Q.  When you were applying for the au pair
3    program, did you prefer to be in a city or a small town?
4    A.  To be honest, I didn't understand how the
5    situation was in the United States, the houses, you know.
6    I just didn't know what the difference was.
7    Q.  And when you first got to the Sanders'
8    house in the first week or two, did you have a
9    conversation with them about ground rules?
10   A.  No, until Amanda arrived.
11   Q.  So before Amanda arrived, was there anyone
12   else providing childcare to the baby?
13       MS. McELROY:  Objection.
14   A.  Yes, ma'am.  There was a private nanny
15   that would take care of the child until I arrived.
16   Q.  (By Ms. Reilly)  And once you got there,
17   did the nanny train you?
18   A.  Yes, ma'am.
19   Q.  How long was the nanny there with you?
20   A.  Perhaps it was a week.  I don't remember
21   exactly, but it was about a week.
22   Q.  What hours did you work that first week
23   when the nanny was there?
24   A.  From 4:00 to 1:00 or 2:00.
25   Q.  Is that it?

Page 99

1    A.  Yes.  4:00 a.m. I mean.
2    Q.  Five days a week?
3    A.  Yes.
4    Q.  And what would you do during those hours?
5    A.  She would basically explain to me how the
6    schedule of the baby worked, how I had to prepare the
7    bottle.  And that's it, and it was playing with the girl.
8    Q.  Was it a good baby?
9    A.  Excellent.
10   Q.  So Amanda Gray.  And what was her
11   position, as you understood it?
12   A.  LAR.
13   Q.  Local area representative, LAR?
14   A.  Yes, ma'am.
15   Q.  And she worked with GoAuPair?
16   A.  Yes, ma'am.
17   Q.  And you mentioned -- so she came to the
18   house at some point?
19   A.  Yes, the first day that I started working
20   as an au pair.
21   Q.  And what was her job, as you understood
22   it?
23   A.  She was the intermediary between the
24   family and myself.  And she was the one that had to be
25   looking out, you know, for me, looking out for the

Page 100

1    family, sort of integrate all the girls in the area.  She
2    was the person with which I had to have communication
3    with.
4    Q.  And about how old was she?
5        MS. McELROY:  Objection.
6    A.  I have no idea.
7    Q.  (By Ms. Reilly)  Can you describe her?
8    What was her personality like?
9        MS. McELROY:  Objection.
10   A.  She was really kind.
11       (Mr. Lee left the proceedings.)
12   A.  She always tried to talk to us, integrate
13   us.  And she would always ask how we were doing in
14   general.  Yes, that's it.  I don't remember anything
15   else.
16   Q.  (By Ms. Reilly)  And was she the first
17   person you met from GoAuPair?
18   A.  The only one, yes.
19   Q.  Do you feel like she did a good job?
20       MS. McELROY:  Objection.
21   A.  I believe that, no, that her work was not
22   sufficient, I feel.
23   Q.  (By Ms. Reilly)  How so?
24   A.  Because I felt that if I would give her a
25   complaint, say, from the family, she was going to go tell

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Defs.' Appx. 00000707Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 113

1    A.  Bank of America.

2    Q.  Do you still have that account open with

3  Bank of America?

4    A.  I don't know.

5    Q.  Do you have copies of the checks that you

6  received from the Sanders?

7    A.  No, not really.

8    Q.  Do you have any records as to what was

9  paid to you while you were an au pair?

10    A.  No, what is here.  I don't have anything

11  else.

12    Q.  And those checks always came from the

13  Sanders family; is that correct?

14    A.  From Ms. Patrice.

15    Q.  You never received a check from GoAuPair?

16    A.  At the end of the program I did receive a

17  check from GoAuPair when I was in Colombia, but that

18  didn't serve me.

19    Q.  Other than that last payment that was made

20  to you in Colombia, did you ever receive any payment of

21  any kind from GoAuPair?

22    A.  At the end when -- until they solved the

23  payment problem in June, July I -- the agency of

24  Intercambio, they told me GoAuPair would transfer the

25  money to them in Colombia so that the agency Intercambio

Page 114

1  would give it to me.

2    Q.  And that was money that the Sanders family

3  owed you that they hadn't been able to get to you for the

4  last two weeks, correct?

5    MS. McELROY:  Objection.

6    A.  Yes, they weren't able to give it to me,

7  but it was not complete.  It was not complete.

8    MS. REILLY:  So let's break.

9    THE VIDEOGRAPHER:  This is the end of

10  Media Number 2.  Going off the record.  The time is 2:59.

11    (Recess taken from 2:59 p.m. to 3:08 p.m.)

12    (Mr. Lee and Ms. Salazar are not present.)

13    THE VIDEOGRAPHER:  We are back on the

14  record.  The time is 3:08.  This is the beginning of

15  Media Number 3 in the deposition of Ivette Alexandra

16  Gonzalez.

17    Q.  (By Ms. Reilly)  So back to the work

18  schedule and the board that Patrice would write your

19  weekly work schedule on.  Was it always Patrice who

20  decided what your schedule would be for that week?

21    A.  She's the one that would write on the

22  board.  I don't know what decision she would take with

23  her husband, but she's the one that would write.

24    Q.  But the decision on what your work

25  schedule would be was made by the Sanders family; is that

Page 115

1  correct?

2    MS. McELROY:  Objection.

3    (Mr. Lee joined the proceedings.)

4    A.  You're talking about when I was actually

5  working, correct?

6    Q.  (By Ms. Reilly)  Yes.

7    A.  Mrs. Sanders was the one that would write

8  in there, but I don't know what decisions she had made

9  with her husband or both of them decided before she would

10  actually write on there.

11    Q.  Correct.  But it was the Sanders, Mr. and

12  Mrs. Sanders, who determined your work schedule every

13  week, correct?

14    MS. McELROY:  Objection.

15    (Ms. Salazar joined the proceedings.)

16    A.  Yes, I would imagine that in between them

17  they would talk about that schedule.

18    Q.  (By Ms. Reilly)  But it wasn't Amanda Gray

19  who was determining your work schedule?

20    MS. McELROY:  Objection.

21    A.  No, no, it wasn't her because she wasn't

22  living with us.

23    Q.  (By Ms. Reilly)  And it was no one from

24  GoAuPair who was setting your weekly work schedule?

25    MS. McELROY:  Objection.

Page 116

1    A.  No, they were not the ones that

2  determined, but I had to follow those rules because from

3  the very beginning in that meeting with Amanda it was

4  defined.  So we determined what the working schedule was

5  going to be.  And Amanda wasn't there to write it, but

6  she was -- she knew what the work schedule was like.

7    Q.  (By Ms. Reilly)  But she didn't --

8    A.  In general terms.

9    Q.  But Amanda did not decide what your work

10  schedule was going to be ever?

11    MS. McELROY:  Objection.

12    A.  No, no.  It was of the Sanders family that

13  took those decisions about the schedule.

14    Q.  (By Ms. Reilly)  And it was the Sanders

15  family who decided when and how much to pay you, correct?

16    MS. McELROY:  Objection.

17    A.  They were the ones who said 200, yes, and

18  that it was going to be every two weeks.  They were the

19  ones that said that.

20    Q.  (By Ms. Reilly)  And did the Sanders family

21  ever pay you more when you worked beyond the set work

22  schedule?

23    A.  One time.

24    Q.  What was that?

25    A.  One time they had to go to some race of

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Defs.' Appx. 00000708

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 121

1    Q. So my only question is: At the time you
2 filled out this survey were these statements accurate?
3    MS. McELROY: Objection.
4    A. At that moment, yes, I felt comfortable
5 with this family.
6    Q. (By Ms. Reilly) And you felt like you were
7 having a good cultural exchange experience?
8    MS. McELROY: Objection.
9    A. At that moment, yes, because I felt like I
10 was getting to know people from other countries.
11    Q. (By Ms. Reilly) And you felt like the
12 family was trying to learn your language?
13    MS. McELROY: Objection.
14    A. Don Monte.
15    Q. (By Ms. Reilly) And that's the host
16 father?
17    A. Yeah.
18    Q. And you felt the Sanders family was
19 bringing you a lot of opportunities for your personal
20 growing?
21    MS. McELROY: Objection.
22    A. Yes, because I would see the work of
23 Mrs. Sanders and the work of Mr. Monte, and I would see
24 that they had very good positions. And some day I wanted
25 to be like that and have an excellent position just like

Page 122

1 them.
2    Q. (By Ms. Reilly) So say more about
3 Mr. Sanders was trying to learn Spanish.
4    MS. McELROY: Objection.
5    A. I spoke to the little girl everything in
6 Spanish. And they both liked it, especially Mr. Sanders
7 because he would ask me, How do you say this or that or
8 such thing. And when the housekeeping lady latina would
9 arrive, he would tell her, hola, how are you in Spanish.
10    Q. (By Ms. Reilly) And before the question we
11 just looked at, there are five questions that you
12 actually answered with a number with 4 being high, good
13 score. And if you could just take a minute and look at
14 those and tell me if that was accurate at that point in
15 time.
16    A. What happened was that I gave them a very
17 good score on this because I was well. I mean, this was
18 the beginning of the program. Everything was perfect.
19    Q. How long -- how many months into your
20 experience did the experience remain positive?
21    MS. McELROY: Objection.
22    A. I think that at the middle of this process
23 is where some things started happening.
24    Q. (By Ms. Reilly) What happened?
25    A. That, for example, Mrs. Sanders would tell

Page 123

1 me I need from you one more time. And Mr. Sanders would say,
2 Help Patrice because Patrice -- I don't know how to say
3 in Spanish, but I know how to say it in English. It was
4 easy -- fussy.
5    Q. Fussy. English.
6    A. It was fussy.
7    Q. I got it. How was Mrs. Sanders fussy?
8    MS. McELROY: Objection.
9    A. No, I don't know why them over there, you
10 know, Mrs. -- Mr. Sanders would tell this to me like in a
11 joke, but I -- but I knew that she was very controlling
12 when it came to the time.
13    Q. (By Ms. Reilly) How was she controlling
14 about time?
15    A. For example, with the girl she had to
16 write -- for example, she had to write down exactly the
17 time that she was eating, exactly the time that we were
18 going to, you know, change the diaper, exactly the time
19 that we were going to do X.
20    Q. So during this first part of the
21 experience when it was going well were you meeting other
22 au pairs in the area?
23    MS. McELROY: Objection.
24    A. Yes.
25    Q. (By Ms. Reilly) And how many au pairs did

Page 124

1 you meet --
2    MS. McELROY: Objection.
3    Q. (By Ms. Reilly) -- during your au pair
4 experience?
5    A. Perhaps four -- well, several. I mean
6 several. But you mean close to me? One.
7    Q. Who was close to you?
8    MS. McELROY: Objection.
9    A. One girl that worked for Cultural Care.
10 Her name is Joyce.
11    Q. (By Ms. Reilly) Where did she live?
12    MS. McELROY: Objection.
13    A. Baltimore.
14    Q. (By Ms. Reilly) How did you meet her?
15    A. One of the girls who was an au pair from
16 GoAuPair introduced me to her.
17    Q. Which one?
18    A. Alona.
19    Q. And where did Alona live?
20    A. I don't recall the name of the town.
21    Q. Did Amanda Gray introduce you to other
22 au pairs?
23    A. Yes, of course during the gatherings.
24    Q. What -- what were the gatherings?
25    A. It was like going to eat something, just

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Defs.' Appx. 00000709

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 149

1 another year."  Do you remember telling Amanda that?
2       A.  I did tell Amanda that I love that girl.
3 And I was really, really -- I felt I was really close to
4 the little girl.  And if I wouldn't leave from that
5 house, it would be because I adored that child.
6       Q.  Do you remember asking Amanda in
7 November 2014 about extending with the Sanders family?
8       A.  I did tell her about the extension, yes.
9 But I don't recall if it was November exactly, but I did
10 tell her that.
11       Q.  And did you ever talk to the Sanders about
12 extending for another year?
13       A.  No, I never did tell them that.
14       Q.  If you go to the bottom row and see the
15 date there, January 2015.  It's this one.
16       A.  Uh-huh.
17       Q.  So this one says that, "Amanda received a
18 call from Alexa.  Well, she said it was Alexa, but it
19 didn't sound like her."  If you go down, "She said she
20 wanted to ask about the extension process."  Do you
21 remember talking to Amanda in January very shortly before
22 the fight with the Sanders about extending for another
23 year?
24       A.  No.
25       Q.  Okay.  In January 2015 were you

Page 150

1 considering extending with another family possibly?
2       A.  When I arrived from Las Vegas, yes.
3       Q.  When was that?
4       A.  I arrived from Las Vegas around the first
5 weekend in January.
6       Q.  Okay.  And at that point what was your
7 plan about extending?
8       MS. McELROY:  Objection.
9       A.  When I wanted another year was like I told
10 you, perhaps I had the chance to be with another family,
11 perhaps I had the chance to get another car -- or get a
12 car and get to see more things once I had the car.
13       Q.  (By Ms. Reilly)  And did you tell the
14 Sanders that you were thinking of matching with another
15 family?
16       A.  No, no, I never told them that.
17       Q.  So after you left the Sanders house, did
18 you understand that the Sanders decided to terminate your
19 au pair position with them?
20       (Ms. Salazar left the proceedings.)
21       A.  I was the one that finished with them.
22       Q.  So you made the decision to terminate
23 being an au pair?
24       A.  Of them, yes.
25       Q.  And did you communicate that decision to

Page 151

1 GoAuPair.
2       A.  Yes, ma'am.
3       Q.  Did you understand that the Sanders family
4 would accept you back into the house after the fight if
5 you wanted to go?
6       A.  Yes, ma'am.
7       Q.  But you decided not to go back?
8       A.  No, because I was afraid of that lady.
9       Q.  Because of the one fight?
10       MS. McELROY:  Objection.
11       A.  Because she yelled at me.
12       Q.  (By Ms. Reilly)  During that fight that you
13 told me about?
14       A.  Yes, ma'am.
15       Q.  So after you left the Sanders' house, were
16 you staying with Maria for several days?
17       A.  Yes, ma'am.
18       Q.  And how long did you stay with her?
19       A.  Until February 10th.
20       Q.  And what happened on February 10th?
21       A.  I went back to Colombia.
22       Q.  Who paid for your flight?
23       A.  My friends.
24       Q.  Which ones?
25       A.  Maria and a friend of hers.

Page 152

1       Q.  Did Maria ask you to leave her house?
2       A.  No.
3       Q.  So after you left the Sanders' house, did
4 you try to rematch with another family?
5       A.  Yes, ma'am.
6       Q.  And what happened?
7       A.  The majority of them wouldn't accept me
8 because I didn't have a driver's license.
9       Q.  Well, you had an international driver's
10 license, right?
11       A.  Yes, ma'am.
12       Q.  And you had taken the driving class in
13 Maryland?
14       A.  Yes, ma'am.
15       Q.  So what was it that you were missing that
16 they wanted?
17       A.  The driver's license from here in the U.S.
18       Q.  And did any of the host families express
19 interest in having you as an au pair?
20       A.  Yes.
21       Q.  Who?
22       A.  A Jewish family, but I don't remember
23 exactly where they were.
24       Q.  Anyone else?
25       A.  Some of them wrote me.  I don't remember

Defs.' Appx. 00000709

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.
Defs.' Appx. 00000710 Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

**Page 181**

1 and read this. We'll come back on, and I think we're 5
2 minutes away from finishing.
3        THE VIDEOGRAPHER: Going off the record.
4 The time is 6:27.
5        (Recess taken from 6:27 p.m. to 6:33 p.m.)
6        THE VIDEOGRAPHER: We are back on the
7 record. The time is 6:33.
8        Q. (By Ms. Reilly) When you were with the
9 Sanders family, did GoAuPair ever supervise or provide
10 feedback regarding the childcare services you were
11 providing to the Sanders family?
12        MS. McELROY: Objection, form.
13        A. Amanda was the one that called me, and
14 she -- she would tell me that Mrs. Patrice was very happy
15 with the job that I was doing with the baby girl.
16        Q. (By Ms. Reilly) But it was Mrs. Sanders
17 who was actually supervising the work you were doing with
18 the baby?
19        MS. McELROY: Objection.
20        A. Well, both of them, the mom and the dad.
21 But the ones that they would call was Mrs. Patrice, and
22 Patrice said that it was all right.
23        Q. (By Ms. Reilly) This email, Exhibit 117,
24 so who is Jasmine Moore?
25        A. I did write this, but I don't really

**Page 182**

1 remember why.
2        Q. Do you remember how you found Jasmine
3 Moore?
4        A. No, ma'am.
5        Q. Did you -- this is from 2016. After
6 coming back to Colombia, did you ever apply to any other
7 au pair program?
8        A. I don't remember really.
9        Q. Do you know if this email exchange was
10 through an agency?
11        MS. McELROY: Objection.
12        A. I don't know. I don't remember. I should
13 have written this, but I don't know. I don't recall.
14        Q. (By Ms. Reilly) Do you remember going to
15 Intercambio or another agency and going through the whole
16 application process again?
17        MS. McELROY: Objection, form.
18        A. No.
19        Q. (By Ms. Reilly) You would remember that,
20 right?
21        MS. McELROY: Objection.
22        A. Yes, obviously.
23        Q. (By Ms. Reilly) Have you made any attempts
24 to find a position in the United States since you've been
25 back in Colombia?

**Page 183**

1        A. Yes, yes.
2        Q. And what have those been, those attempts?
3        A. Well, one like I told you was to work on
4 ships.
5        Q. Anything else?
6        A. And some others and another one is to work
7 again like an au pair but not through an agency, not
8 au pair, not au pair, like a nanny but not any agency
9 involvement.
10        Q. And what -- under what visa program would
11 you do that?
12        A. No, the idea is to just test my abilities,
13 you know. Well, there is things that are not really part
14 of my plans of like. They're things like a chance
15 perhaps, if you're able -- if it's able -- like perhaps
16 somebody would look at my abilities, and then they would
17 give me a legal job in here, like a -- but it's not
18 really part of my plans for life or -- no.
19        Q. Was the information in the top email from
20 you to Jasmine Moore accurate?
21        MS. McELROY: Objection.
22        A. It's just that I honestly can't recall. I
23 mean, I perhaps did write this, but I don't remember the
24 reasons why.
25        Q. (By Ms. Reilly) That's not my question.

**Page 184**

1 Sitting here now, are the statements you made in this
2 email to Jasmine Moore accurate and truthful?
3        A. I don't really remember, and I don't know
4 why I don't remember. I honestly don't remember.
5        Q. It doesn't really matter if you don't
6 remember. Just looking at these statements, are they
7 accurate?
8        A. Well, separate -- I don't really know why
9 I wrote -- why I wrote that, that I did help my friend
10 with four kids. But yes, yes, this information is
11 accurate indeed.
12        Q. Okay. We are done. Thank you.
13        A. Okay.
14        THE VIDEOGRAPHER: This is the end of
15 Media 4 of 4. Going off the record. The time is 6:40.
16        MS. McELROY: We don't have anything.
17        * * * * * * *
18        (WHEREUPON, the foregoing deposition was
19 concluded at the hour of 6:40 p.m. Total time on the
20 record was 6 hours and 23 minutes.)
21
22
23
24
25

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Defs.' Appx. 00000711 Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

**Page 185**

```
1            I, IVETTE ALEXANDRA GONZALEZ, the deponent in
2    the above deposition, do hereby acknowledge that I have
3    read the foregoing transcript of my testimony, and state
4    under oath that it, together with any attached Amendment
5    to Deposition pages, constitutes my sworn testimony.

6
        _____ I have made changes to my deposition
7
        _____ I have NOT made any changes to my deposition
8
9            _____

        IVETTE ALEXANDRA GONZALEZ
10
11
        Subscribed and sworn to before me this _____
12
    day of _____, 20____.
13
        My commission expires:  _____.
14
15
            _____
16            NOTARY PUBLIC
17
18
19
20
21
22
23
24
25
```

**Page 186**

```
1        CERTIFICATE OF DEPOSITION OFFICER
2    STATE OF COLORADO        )
3    CITY AND COUNTY OF DENVER    )
4            I, Deborah A. VanDemark, a Registered
5    Professional Reporter and Notary Public within and for
6    the State of Colorado, commissioned to administer oaths,
7    do hereby certify that previous to the commencement of
8    the examination, the witness was duly sworn by me to
9    testify to the truth in relation to matters in
10   controversy between the said parties; that the said
11   deposition was taken in stenotype by me at the time and
12   place aforesaid and was thereafter reduced to typewritten
13   form by me; and that the foregoing is a true and correct
14   transcript of my stenotype notes thereof.
15        That I am not an attorney nor counsel nor in any
16   way connected with any attorney or counsel for any of the
17   parties to said action nor otherwise interested in the
18   outcome of this action.
19        My commission expires:  March 4, 2017.
20
21            _____
        DEBORAH A. VANDEMARK
22        Registered Professional Reporter
        Colorado Realtime Certified Reporter
23        Notary Public, State of Colorado
24
25
```

Defs.' Appx. 00000711

1        I, IVETTE ALEXANDRA GONZALEZ, the deponent in

2    the above deposition, do hereby acknowledge that I have

3    read the foregoing transcript of my testimony, and state

4    under oath that it, together with any attached Amendment

5    to Deposition pages, constitutes my sworn testimony.

6
        X   I have made changes to my deposition
7
        _____ I have NOT made any changes to my deposition
8

9        _____
         IVETTE ALEXANDRA GONZALEZ
10

11
        Subscribed and sworn to before me this 6
12
    day of November_____, 20 16.
13
        My commission expires:  _____.
14

15

16        _____
          NOTARY PUBLIC
17

18

19

20
        Stevens-Koenig Reporting
21
        NOV 0 8 2016
22
        RECEIVED
23

24

25

Defs.' Appx. 00000712

Defs.' Appx. 00000713

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 14-cv-03074-CMA-KMT

JOHANA PAOLA BELTRAN, et al.,

Plaintiff,

INTEREXCHANGE, INC., et al.,

Defendants.

_____/

## DECLARATION OF IVETTE ALEXANDRA GONZALEZ

I, IVETTE ALEXANDRA GONZALEZ, respectfully submit this Declaration regarding

my Deposition Transcript dated September 28, 2016.  I hereby certify that I have read my

transcript dated September 28, 2016 and that the accompanying correction sheets, if any,

constitute a true and complete copy of my testimony.

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

Executed on this _8_ day of November, 2016.

_____
Ivette Alexandra Gonzalez

Defs.' Appx. 00000714

## ERRATA SHEET

### CONFIDENTIAL DEPOSITION OF IVETTE AEXANDRA GONZALEZ

### SEPTEMBER 28, 2016

| Page | Line | Original Text | Corrected Text | Reason |
|---|---|---|---|---|
| 12 | 10 | Uh huh | Yes | Clarification |
| 14 | 5 | believe you are very good | know if that was right | Translation Error |
| 15 | 7 | I did not have that local coordinator | I had a coordinator but I felt like she was not with me, and was there more in support of the family | Clarification |
| 18 | 21 | professor of artistic gymnastics | physical education teacher | Translation Error |
| 19 | 12-13 | a contract of services rendered | employee benefits | Translation Error |
| 22 | 24 | work | worked | Translation Error |
| 23 | 21 | A caregiver | An entertainer | Translation Error |
| 23 | 24 | animator | entertainer | Translation Error |
| 23 | 25 | children in | children or in | Translation Error |
| 23 | 25 | or adults | for adults | Translation Error |
| 23 | 25 | that | they | Translation Error |
| 24 | 1 | Handles | handle | Translation Error |
| 32 | 12 | Sawn | Suan | Clarification |
| 32 | 21 | deal. | relationship. | Translation Error |
| 33 | 11 | gathering | meeting | Translation Error |
| 34 | 5 | for the family | vacation | Translation Error |
| 44 | 5 | interexchange | | Strike |
| 44 | 6 | solicit | apply | Clarification |
| 47 | 22 | acquired the | was matched with the | Clarification |
| 49 | 20 | work for Intercambio and tourism | worked for Intercambio Y Turismo | Clarification |
| 55 | 9 | the girl and anything that had to with the boy. | the baby girl and anything that had to do with her. | Translation Error |
| 56 | 23 | Fortunately, yes | Yes | Clarification |

| Page | Line | Original Text | Corrected Text | Reason |
|------|------|---------------|----------------|--------|
| 60 | 13 | would buy | would sometimes buy | Clarification |
| 61 | 4 | format | form | Translation Error |
| 62 | 19-20 | the familia Sanders | the Sanders family | Clarification |
| 63 | 6 | McElroy | Reilley | Transcription Error |
| 68 | 5 | Mrs. | Mrs. Sanders | Clarification |
| 84 | 9 | put the chair, that the chair | place a carseat, that the car seat | Translation Error |
| 96 | 4 | Mrs. | Mrs. Sanders | Clarification |
| 98 | 4-5 | how the situation was in the United States, the houses | how the United States was organized into cities and small towns | Translation Error |
| 102 | 13-14 | to me the car | the car to me | Translation Error |
| 108 | 22 | Changed. | changed it. | Translation Error |
| 109 | 8 | she would take | I would work | Translation Error |
| 109 | 12 | ask sometimes | sometimes ask | Clarification |
| 109 | 15 | For example I need to get a call. | For example, she would say I need to take a call. | Clarification |
| 109 | 23 | call | tell | Translation Error |
| 109 | 25 | But I understand that to | I understood that to mean | Clarification |
| 113 | 18 | didn't serve me | check was no good | Translation Error |
| 118 | 2 | with such intensity | in detail, it | Translation Error |
| 118 | 3 | I have | I must have | Clarification |
| 122 | 8 | housekeeping lady Latina | Latina houskeeper | Translation Error |
| 123 | 4 | easy | | Strike |
| 123 | 9 | them over there, | he said this | Translation Error |
| 123 | 16 | she | I | Translation Error |
| 125 | 21 | twice a month, | every two months, | Translation Error |
| 126 | 18-19 | really wasn't useful | it was useless | Translation Error |
| 127 | 1 | me a driving class | paid for a driving class for me | Translation Error |
| 128 | 9 | I had to pay for my own salary a type of | I had to pay from my own salary for a type of | Translation Error |
| 137 | 13 | of telling | from asking | Translation Error |
| 139 | 3 | initiated | started | Clarification |
| 139 | 22 | on it | | Strike |

| Page | Line | Original Text | Corrected Text | Reason |
|------|------|---------------|----------------|--------|
| 140 | 1 | yeah | yes. | Clarification |
| 140 | 12 | all of a sudden | maybe | Translation Error |
| 143 | 14 | for having | in order to have | Translation Error |
| 143 | 18 | pick | picked | Translation Error |
| 143 | 20 | she | Mrs. Sanders | Clarification |
| 143 | 24 | be if | be ok if | Translation Error |
| 144 | 13 | whatever | "whatever" | Clarification |
| 144 | 15 | she arrive | | Strike |
| 144 | 16 | here | the house | Translation error |
| 144 | 20 | crashed | slammed | Translation error |
| 145 | 5 | handed | placed | Translation Error |
| 145 | 8 | sir | Mr. Sanders | Clarification |
| 145 | 9 | leave. | leave." | Clarification |
| 145 | 9 | I go. | I left. | Translation Error |
| 145 | 10 | grab | grabbed | Translation Error |
| 145 | 10 | my things." | my things. | Clarification |
| 145 | 11 | a horrible | horribly | Clarification |
| 145 | 12 | this | these | Translation Error |
| 146 | 10 | mom | host mom | Clarification |
| 147 | 12 | Don | Mr. | Translation Error |
| 147 | 23 | January and February | December and January | Translation Error |
| 156 | 16 | kick | kicked | Translation Error |
| 161 | 18 | From | On | Translation Error |
| 162 | 12 | ma'am with the mom | host mom | Translation Error |
| 162 | 14 | decide | decided | Translation Error |
| 162 | 16 | for finding | to find | Translation Error |
| 164 | 15 | ma'am | host mom | Clarification |
| 164 | 16 | other that | other thing that | Translation Error |
| 164 | 17 | at this moment that that | at the time was that that | Clarification |
| 165 | 7 | like with all this excuses saying | giving all these excuses | Clarification |

Defs.' Appx. 00000717

| Page | Line | Original Text | Corrected Text | Reason |
|------|------|---------------|----------------|--------|
| 172 | 16 | know one | know of one | Translation Error |
| 172 | 17 | look for | read about | Translation Error |
| 175 | 9 | Yeah. | Yes. | Clarification |
| 178 | 4 | You | Are you | Translation Error |
| 180 | 4 | Dayana | Diana | Clarification |

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Case No. 14-cv-03074-CMA-KMT

_____

JOHANA PAOLA BELTRAN, ET AL.,

　　　　　Plaintiffs,

vs.

INTEREXCHANGE, INC., ET AL.,

　　　　　Defendants.

_____

VIDEOTAPED DEPOSITION OF

A. WILLIAM KAPLER, III

30(b)(6) REPRESENTATIVE FOR GOAUPAIR

MAY 11, 2017

DENVER, COLORADO

10:11 A.M.

Magna Legal Services
866-624-6221
www.magnals.com



Page 90

1  or -- or nannies over the course of the first four
2  years we had, I'd -- I'd -- I'd be surprised.  So we
3  wouldn't use a number like that.
4      Q.   As GoAuPair's corporate representative,
5  do you know, do you have any idea how the people
6  responsible for creating the content of GoAuPair's
7  website would go about getting such an estimate?
8      A.   For something like this, yes.  They
9  probably would have done some sort of search to look
10 at a series of numbers they got from -- I'm not sure
11 what the websites would be.  But there are pools of
12 information that can show you, whether it's
13 Department of Labor or whatever, that there's sort
14 of standards across various components in the United
15 States.
16           I know we use something like this
17 for salaries for, like, a recent person we hired
18 from -- for IT.
19     Q.   You said -- said that the Department of
20 Labor may use standards across various components
21 across the United States.  What do you mean by that?
22     A.   And I've just seen tables of stuff for
23 areas not even related to this.  I'm assuming there
24 must be some type that's similar.
25     Q.   Is it fair to say that the number in --

Page 91

1  on -- in that cell that we were describing on the
2  "Nanny" row and -- and the "Budget" column, that it
3  describes a range of cost, typical range?
4      A.   Yes, probably does.
5      Q.   Do you know why that cell includes a
6  range, whereas the cell we were looking at earlier
7  in the "GoAuPair" row and the "Budget" column does
8  not include a range?
9      A.   We have more experience in the GoAuPair
10 line.  We have limited experience in the nanny side.
11     Q.   When you said that the Department of
12 Labor may use standards across various components
13 across the United States, does that mean that the
14 data for certain jobs varies depending on location
15 in the United States?
16     A.   I believe it does.
17     Q.   Do you think the cost -- do you know if
18 the cost of nanny care varies by location in the
19 United States?
20     A.   Not specifically, but I wouldn't be
21 surprised if it did.
22     Q.   Does the cost of au pairs vary depending
23 on location in the United States?
24     A.   Yes, it does.
25     Q.   How does it vary?

Page 92

1      A.   The host families determine what the
2  wage -- the wage -- the stipend is, and they decide
3  whatever they want to.  It could be by whatever
4  their criteria is.
5      Q.   In your experience, is that location
6  would be a variable that would help predict?
7      A.   I don't have any experience with that.
8      Q.   So what was the basis for your saying
9  that the cost of au pairs varies by location?
10     A.   Because we don't know that it doesn't.
11     Q.   Does anything in the text that appears in
12 the cell at the "GoAuPair" row and the "Budget"
13 column indicate that the cost of an au pair varies
14 by location?
15     A.   No, it doesn't.
16     Q.   Now, under the "Daycare" in the first
17 column --
18     A.   Uh-huh.
19     Q.   -- which talks about skills and
20 regulations, do you see that?
21     A.   Yes, I do.
22     Q.   Under the "Daycare" and the "Daycare"
23 section of the table, can you read what appears in
24 the first column?
25     A.   Which one, the nanny and what?

Page 93

1      Q.   In the "Daycare" --
2      A.   Daycare.  Daycare.  Sorry.
3      Q.   What follows under "Skills and
4  Regulations"?
5      A.   "Skills" -- it says, "Skills vary, and
6  regulations vary by state."
7      Q.   And going back up to the "Au Pair"
8  section, the "GoAuPair" section.
9      A.   Yeah.
10     Q.   What does it say in the "Skills and
11 Regulations"?
12     A.   It says, "Au pairs complete a 32-hour
13 childcare training services" -- or "series."  And it
14 also says, "The U.S. Department of State regulates
15 all au pair agencies."
16     Q.   And in the -- is it fair to say that,
17 "The U.S. Department of State regulates all au pair
18 agencies," that that text corresponds to the
19 regulations part of "Skills and Regulations"?
20     A.   Absolutely.
21     Q.   In that section for the au pair -- strike
22 that.
23           So in the regulations portion of
24 the "GoAuPair" section, it doesn't say anything
25 about the regulations varying by state, does it?



Defs.' Appx. 00000720

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-03074-CMA-KMT

JOHANA PAOLA BELTRAN, et al.,

Plaintiff,

INTEREXCHANGE, INC., et al.,

Defendants.

_____/

## PLAINTIFF, ALEXANDRA IVETTE GONZALEZ'S AMENDED ANSWERS TO DEFENDANT'S FIRST INTERROGATORIES

Plaintiff, Alexandra Ivette Gonzalez ("Gonzalez"), by and through her undersigned counsel files Plaintiff's Amended Answers to Interrogatories propounded by Defendant, American Cultural Exchange, LLC d/b/a Go Au Pair.

## PRELIMINARY STATEMENT

The answers below reflect the current state of Gonzalez's knowledge, understanding and belief based upon the investigation and discovery to date.  Gonzalez reserves the right to make subsequent revisions and to supplement her responses as additional information is discovered, if any.

Gonzalez further reserves the right to object on any ground and at any time to a demand for further answers to these Interrogatories.  In responding to the Interrogatories, Gonzalez does not waive, or intend to waive, any privilege or objection, including but not limited to, any objection to the competency, relevance, materiality, or admissibility of any of the Interrogatories.

Defs.' Appx. 00000721

The preceding Preliminary Statement is incorporated into Gonzalez's answers to each and every Interrogatory.  No response to any Interrogatory is, or shall be deemed to be, a waiver of Gonzalez's General Objections or Preliminary Statement.

## ANSWERS AND OBJECTIONS TO INTERROGATORIES

INTERROGATORY 1:   Describe all amounts, in any currency, that you paid to participate in the Au Pair Program, including: (a) the currency and amount; (b) the date the amount was paid; (c) the entity to whom you directed payment; (d) the entity that was ultimately paid; (e) the purpose of the payment; and (f) the method of payment of the amount.

**RESPONSE:**  Gonzalez objects to this interrogatory on the grounds that subsection d seeks information outside of her personal knowledge and information that she is unable to obtain through a reasonably diligent search.  Subject to the foregoing objection, Gonzalez states that, to the best of Gonzalez's knowledge, she paid approximately $1600 USD to Intercambio in 2014 to join the Au Pair Program, of which she understood $1000 USD to be an administrative fee and $600 USD to be a completion deposit that would be returned to her upon completion of the Au Pair Program.  Gonzalez made the payment at a bank in cash.  She additionally paid approximately $150 USD for her Visa application and approximately $250,000 Colombian pesos (COP) to obtain an international driver's license.  She does not recall the dates of these payments.  Gonzalez further states that information regarding the entity or entities that were ultimately paid is unknown to Gonzalez and her agents.

INTERROGATORY 2:   Identify all representations made to you by, or communications that you had with, Go Au Pair relating to your participation in the Au Pair Program, including but not limited to any representation relating to any payments you could or were to receive as an au pair.

**RESPONSE**:  Gonzalez objects to this interrogatory on the grounds that it is

2

overbroad, unduly burdensome, and vague with respect to the phrase "all representations made to you by, or communications that you had with, Go Au Pair."  As phrased, this interrogatory requires Gonzalez to recall each and every communication with Go Au Pair.  Without waiving the foregoing objections, Gonzalez states that she recalls that prior to her start of work as an au pair the following representations were made by Go Au Pair and/or their agents:  (1) Gonzalez would be matched with a family in the United States; (2) Gonzalez would be paid a $197.75 weekly stipend as an au pair; (3) Gonzalez would be expected to work 45 hours per week; (4) Gonzalez would have to complete a mandatory, unpaid training that was directly related to her au pair childcare duties; (5) Gonzalez's host family would provide her with a private room, bathroom, and food; (6) Gonzalez would receive a $500 education stipend to apply towards educational studies that would help improve her English; and (7) Gonzalez would have to meet certain requirements in order to be an au pair.  Each of these communications was made by Lina Maria Zapata, an Intercambios employee, on or around August 2013 in Bogota, Colombia.  The representations numbered 1, 2, 5, and 7 were directed at Gonzalez and made orally and in writing, transmitted to Gonzalez via email.  The representations numbered 3, 4, and 5 were directed at Gonzalez and made orally.  Persons with knowledge of these communications include Gonzalez and Zapata.

INTERROGATORY 3:     Describe all payments made to you, or amounts of money you received, during or as a result of your participation in the Au Pair Program, including: (a) the date(s) on which you were paid; (b) the amount you received with each payment; (c) the method of payment; (d) the person or entity from whom you received each payment; and (e) the purpose for the payment (e.g., compensation for services performed, reimbursement for expenses, monetary gifts or bonuses, etc.).

     **RESPONSE**:  Gonzalez states that from approximately July 2014 until January

3

Defs.' Appx. 00000723

DATED this 19th day of September, 2016.

Respectfully submitted,

BOIES, SCHILLER & FLEXNER LLP

*/s/ Lauren Louis*

Lauren Fleischer Louis
Sigrid S. McCawley
Sabria McElroy
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
Boies Schiller & Flexner, LLP-Ft. Lauderdale
401 East Las Olas Boulevard, Suite 1200
Ft. Lauderdale, FL 33301
llouis@bsfllp.com
smccawley@bsfllp.com

Matthew L. Schwartz
Peter Skinner
Randall W. Jackson
Boies Schiller & Flexner, LLP-New York
575 Lexington Avenue, 7th Floor
New York, NY 10022
mlschwartz@bsfllp.com
pskinner@bsfllp.com
rjackson@bsfllp.com

Alexander Hood
Towards Justice
601 16th Street, Suite C #207
Golden, CO 80401
Email: alex@towardsjustice.org

Defs.' Appx. 00000724

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-03074-CMA-KMT

JOHANA PAOLA BELTRAN, et al.,

       Plaintiff,

v.

INTEREXCHANGE, INC., et al.,

       Defendants.

_____/

### DECLARATION OF ALEXANDRA IVETTE GONZALEZ

    I, ALEXANDRA IVETTE GONZALEZ, respectfully submit this Declaration in support of Plaintiff's, Alexandra Ivette Gonzalez's, Amended Answers to Defendant's First Set of Interrogatories.  I affirm and attest that the foregoing Answers to the Interrogatories are true and correct to the best of my knowledge, information and belief.

    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on this 18 day of September, 2016.

                          _____
                          Ivette Alexandra Gonzalez

Defs.' Appx. 00000725

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-03074-CMA-KMT

JOHANA PAOLA BELTRAN, et al.,

Plaintiff,

INTEREXCHANGE, INC., et al.,

Defendants.

---

## PLAINTIFF'S, ALEXANDRA IVETTE GONZALEZ, AMENDED RESPONSES TO DEFENDANT'S FIRST REQUESTS FOR ADMISSIONS

Plaintiff, Alexandra Ivette Gonzalez ("Gonzalez"), by and through her undersigned counsel files Plaintiff's Amended Responses to Requests for Admissions propounded by Defendant, American Cultural Exchange, LLC d/b/a Go Au Pair.

## PRELIMINARY STATEMENT

The responses below reflect the current state of Gonzalez's knowledge, understanding and belief based upon the investigation and discovery to date.  Gonzalez reserves the right to make subsequent revisions and to supplement her responses as additional information is discovered, if any.

Gonzalez further reserves the right to object on any ground and at any time to a demand for further responses to these Requests for Admissions.  In responding to these Requests, Gonzalez does not waive, or intend to waive, any privilege or objection, including but not limited to, any objection to the competency, relevance, materiality, or admissibility of any of the Requests.

1

remaining two weeks of your participation in the Au Pair program for which you alleged (in paragraph 425 of the Complaint) that payment was outstanding.

**RESPONSE:**  Gonzalez admits that around July 2015, several months after the Amended Complaint in this action was filed, she received $161.00, which was partial payment for the $400 that was owed for her last 2 weeks of work for her Host Family.

ADMISSION REQUEST 11:  Admit that you did not sign an extension agreement with Go Au Pair.

**RESPONSE**:  Gonzalez objects to this request on the grounds that it is ambiguous in that it implies that Gonzalez had a choice to sign an extension agreement with Go Au Pair.  Subject to the foregoing objection, Gonzalez admits that she did not sign an extension agreement with Go Au Pair.

ADMISSION REQUEST 12:       Admit that your Host Family decided to terminate your placement with them as an au pair.

**RESPONSE**:  Admitted.

Defs.' Appx. 00000727

DATED this 19th day of September, 2016.

Respectfully submitted,

BOIES, SCHILLER & FLEXNER LLP

/s/*Lauren Louis*
Lauren Fleischer Louis
Sigrid S. McCawley
Sabria McElroy
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
Boies Schiller & Flexner, LLP-Ft. Lauderdale
401 East Las Olas Boulevard, Suite 1200
Ft. Lauderdale, FL 33301
llouis@bsfllp.com
smccawley@bsfllp.com

Matthew L. Schwartz
Peter Skinner
Randall W. Jackson
Boies Schiller & Flexner, LLP-New York
575 Lexington Avenue, 7th Floor
New York, NY 10022
mlschwartz@bsfllp.com
pskinner@bsfllp.com
rjackson@bsfllp.com

Alexander Hood
Towards Justice
601 16th Street, Suite C #207
Golden, CO 80401
Email: alex@towardsjustice.org

Defs.' Appx. 00000728

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1: 14-cv-03074-CMA-KMT

JOHANA PAOLA BELTRAN; et al.

        Plaintiffs,

v.

INTEREXCHANGE, INC.; et al.

        Defendants.

---

**DECLARATION OF BILL KAPLER IN SUPPORT OF GO AU PAIR'S MOTION FOR SUMMARY JUDGMENT**

---

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

I, Bill Kapler, declare as follows:

1.    My name is Bill Kapler. I am over the age of 18, and I make this declaration based upon personal knowledge.

2.    I am the manager of both American Cultural Exchange, LLC and Go Au Pair Operations, LLC (together, "Go Au Pair"), defendants in the above-captioned action. Go Au Pair is one of 16 designated sponsors of the United States Department of State's J-1 visa au pair exchange program ("Au Pair Program").

3.    Given my responsibilities with Go Au Pair, I am familiar with all processes and procedures used by Go Au Pair to administer its program and to comply with all applicable regulations governing that program.

Defs.' Appx. 00000729

## I.     GO AU PAIR'S ROLE AS A J-1 VISA SPONSOR

4.      The Department of State ("DOS") has established a comprehensive set of regulations to protect the interests and safety of both the au pairs and the host families and their children. These regulations govern all J-1 visa exchange programs administered pursuant to the Au Pair Program.

5.      As a DOS-designated sponsor, Go Au Pair is required to ensure and monitor all Au Pair Program participants' compliance with the program guidelines established by DOS. As explained in more detail below, this function includes vetting applicants for eligibility under DOS guidelines,  ensuring that host-family placements conform to the minimum conditions set by DOS, and monitoring au pairs and host families to confirm continued compliance with DOS requirements.

6.      All sponsors are required to abide by DOS regulations. If a sponsor fails to comply with those regulations, it may be sanctioned by DOS, and its designation as a program sponsor could be canceled or not renewed.

### A.     Overview of Relationships Between and/or Among Go Au Pair, Host Families, and Au Pairs

7.      There are three core relationships in the Au Pair Program: (1) the sponsor-au pair relationship; (2) the sponsor-host family relationship; and (3) the host family-au pair relationship.

8.      Go Au Pair uses standard agreements with host families and au pairs (respectively, the "Host Family Agreement" and the "Au Pair Agreement") to clarify the relationship between and obligations of Go Au Pair vis-à-vis host families and au pairs,

**HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY**

Defs.' Appx. 00000730

and vice versa. These agreements specify the services Go Au Pair provides (or does not provide) as a sponsor of the Au Pair Program, as well as host families' and au pairs' obligations and rights as related to their participation in the program. To that end, these agreements acknowledge host families' agreement to, and au pairs' understanding of, the program requirements set by DOS regulations (e.g., the au pair must receive a minimum weekly stipend, the au pair may work only a maximum of 45 hours per week or 10 hours per day, the au pair may only perform childcare-related duties, the au pair must receive a specified minimum amount time off, etc.). But, other than reflecting DOS-specified requirements, the Host Family Agreement and the Au Pair Agreement do not otherwise concern or relate to the au pair's host-family placement.

9.     As to the host-family placement, DOS regulations require that each host family and au pair enter into a written agreement "detailing the au pair's obligation to provide child care" before the au pair departs his or her home country (the "HF-AP Agreement"). 22 C.F.R. § 62.31(e)(5). Go Au Pair provides a standard template for this agreement that requires the host family to manually write in the essential terms of any placement with them, including the amount of the weekly stipend the host family agrees to pay, the payment interval, the au pair's anticipated work schedule and weekly hours, the au pair's expected duties, vacation days, any "house rules," car privileges, and any additional benefits or compensation.

10.     The HF-AP Agreement, to which Go Au Pair is not a party, defines the relationship and obligations between the au pair and his or her host family, including the

**HIGHLY CONFIDENTIAL –**
**ATTORNEYS' EYES ONLY**

Defs.' Appx. 00000731

amount of the stipend, the au pair's duties, and the au pair's anticipated schedule. The HF-AP Agreement is, therefore, unique to each au pair and his or her host family.

11.     A visual overview of the nature of and responsibilities associated with Go Au Pair's separate relationships with host families and au pairs, as well as that between the host family and au pair, is attached hereto as <u>Exhibit A</u>.

12.     True and correct copies of each of these agreements are discussed in relevant detail in, and are attached as exhibits to, this declaration. *See* Exhibits B-C, E-I.

**B.      Go Au Pair Vets Applicants for Program Eligibility Pursuant to DOS Regulations, But Host Families Are Solely Responsible for Selecting Their Au Pairs**

13.     Under DOS regulations, foreign nationals who want to participate in the Au Pair Program must meet certain eligibility criteria. Au pair participants must be between the ages of 18 and 26, be a secondary school graduate (or equivalent), be "proficient in spoken English," and be "fully capable of participating in the program as evidenced by the satisfactory completion of a physical." 22 C.F.R. § 62.31(d).

14.     Through its application process, Go Au Pair vets program applicants to make sure they meet the eligibility requirements established by DOS. Pursuant to DOS regulations, this process includes a criminal background check, reference checks, completion of a psychometric test prescribed by DOS, and a personal interview in English. 22 C.F.R. § 62.31(d).

15.     To actually participate in the Au Pair Program as an au pair, an au pair applicant must successfully "match" with a host family. Only after an au pair has been selected by a host family can Go Au Pair issue a DS-2019, which permits the au pair to

**HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY**

Defs.' Appx. 00000732

schedule an interview at a United States embassy or consulate to request issuance of a J-1 visa. Go Au Pair does not—and cannot—issue a visa; DOS must issue the au pair a visa and is the only entity that may terminate that visa.

16.     Go Au Pair does not assign an au pair to a host family or vice versa. Instead, it uses a "Mutual Match" process that operates like a free, open-market exchange in which the host family and au pair control the matching process. All applicants who satisfactorily demonstrate their eligibility to participate in the Au Pair Program, per the requirements set by DOS, are placed in Go Au Pair's pool of available au pair candidates. These candidates' profiles are made available to all prospective host families looking for an au pair through Go Au Pair's online "host family portal." Using this platform, host families may view all of the available au pair candidates and perform whatever screening process they require to fulfill their unique family needs. Host families can communicate with and interview as many candidates as they want. They are ultimately responsible for choosing the au pair candidate they feel best meets the needs of their home.

17.     While it offers support services, such as a Placement Coordinator, to help host families and au pairs navigate the matching process, all communications and decisions during that process—and the ultimate decision to match—are between and made by the host family and au pair.  Host families set their own selection criteria and independently search for prospective au pairs, or "au pair candidates," who meet their unique criteria using the "host family portal." This portal allows host families to tag an au

**HIGHLY CONFIDENTIAL –**
**ATTORNEYS' EYES ONLY**

Defs.' Appx. 00000733

**RESTRICTED - PAGE 6 TO DECLARATION OF BILL KAPLER IN SUPPORT OF GO AU PAIR'S MOTION FOR SUMMARY JUDGMENT. SEE RESTRICTED APPENDIX AT Defs.' R. Appx. 00000817.**

Defs.' Appx. 00000734

one favorite to one au pair who had 236 favorites; (4) on average each au pair was provided 4.3 host family applications to review; (5) 199 au pairs rejected offers from host families. Go Au Pair's records show that during this same period, 37% of prospective au pairs did not match with a host family.

22.     Go Au Pair has no decision-making authority with respect to any host family's selection of an au pair. To the contrary, pursuant to the Host Family Agreement, every host family agrees that selecting the au pair is their sole responsibility. A true and correct copy of the Host Family Agreement signed by the host family with whom Plaintiff Ivette Alexandra Gonzalez Cortes was placed, which is reflective of and consistent with agreements signed by all host families from 2009 to early 2015, is attached hereto as Exhibit B. A true and correct copy of the revised Host Family Agreement signed by the host family with whom Michelle Carolina Del Pozo Aguilar (an FLSA opt-in plaintiff) was placed, which is reflective of and consistent with agreements signed by all host families from early 2015 to the present, is attached hereto as Exhibit C.

**C.     Subject to Federal Regulations, and Under Go Au Pair's Standard Agreements, the Au Pair's Weekly Stipend, Hours, and Duties Are Determined by the Host Family and Offered to and Accepted by the Au Pair**

23.     DOS regulations set forth certain minimum placement conditions to which host families must adhere. These include: (1) payment of a certain minimum weekly stipend, the amount of which is set by DOS; (2) limiting the au pair's duties to "childcare services"; and (3) limiting the au pairs hours to a maximum of 10 hours per day and 45 hours per week. 22 C.F.R. §§ 62.31(a), 62.31(j).

**HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY**

Defs.' Appx. 00000735

24.      In 2007, DOS advised sponsor organizations that, beginning July 24, 2009, the required minimum amount of the weekly stipend would be $195.75 (the "2007 DOS Notice"). A true and correct copy of the 2007 DOS Notice Go Au Pair received is attached hereto as <u>Exhibit D</u>.

25.      Go Au Pair never entered into any agreement with any other sponsor of an au pair program regarding the amount of the stipend Go Au Pair would advertise and communicate to prospective host families and au pairs. Rather, Go Au Pair understands that DOS sets the required minimum stipend amount and that Go Au Pair is required to communicate that minimum amount to host families and au pairs. All of Go Au Pair's promotional materials and Go Au Pair's standard contracts with both host families (the Host Family Agreement) and au pairs (the Au Pair Agreement) have always reflected this understanding and approach.

26.      As noted above, Go Au Pair requires that every host family enter into the Host Family Agreement. That agreement provides, among other things, that the host family agrees to pay a weekly stipend of "<u>not less than</u>" $195.75 (or the specific minimum stipend amount for the program in which the host family and au pair agree to participate) (emphasis added). *See* Exhibits B, C.

27.      Similarly, Go Au Pair requires every au pair to enter into the Au Pair Agreement before he or she is accepted as an au pair candidate and becomes available for matching with a host family. By signing this agreement, all prospective au pairs acknowledge and agree that they will be paid a weekly stipend that is "<u>no less than</u>"

**HIGHLY CONFIDENTIAL –**
**ATTORNEYS' EYES ONLY**

Defs.' Appx. 00000736

$195.75. A true and correct copy of the Au Pair Agreement Plaintiff Gonzalez signed, which is indicative of and consistent with agreements signed by all prospective au pairs from 2009 through early 2015, is attached hereto as Exhibit E. A true and correct copy of the revised Au Pair Agreement signed by Plaintiff Aguilar, which is reflective of and consistent with agreements signed by all prospective au pairs from early 2015 to the present, is attached hereto as Exhibit F.

28.     As noted, all host families and au pairs must enter into a written agreement—the HF-AP Agreement—that sets forth the unique details of the au pair's host-family placement. Using the template provided by Go Au Pair, each host family must manually write in the au pair's work schedule and weekly hours, vacation days, any "house rules," the au pair's expected duties, the amount of the weekly stipend, the pay interval, car privileges, and any additional benefits or compensation. The completed form, which now reflects the host family's unique situation and requirements, is then offered to au pairs for review and acceptance upon the prospect of a match. While each agreement is individualized, all include standard contractual language that clearly discloses the minimum amount of the weekly stipend required by DOS and the maximum work hours allowed under DOS regulations. A true and correct copy of the HF-AP Agreement prepared and signed by Plaintiff Gonzalez's host family (and sent to Go Au Pair) is attached as Exhibit G. A true and correct copy of the countersigned HF-AP Agreement, signed by Plaintiff Gonzalez upon her review and acceptance, is attached as Exhibit H. In its blank form, the HF-AP Agreement executed by Plaintiff

**HIGHLY CONFIDENTIAL –**
**ATTORNEYS' EYES ONLY**

Defs.' Appx. 00000737

Gonzalez and her host family is reflective of and consistent with agreements signed by all au pairs and host families from 2009 to early 2015. (During this period, Go Au Pair referred to the HF-AP Agreement as the "Written Agreement").

29.     Beginning in early 2015, Go Au Pair revised the form of the HF-AP Agreement. The revised agreement also discloses the DOS requirements that host families must pay a <u>minimum</u> weekly stipend of $195.75, and that au pairs may work no more than 45 hours each week. Further, it maintains the practice of requiring the host family to describe the expected weekly schedule, including the anticipated number of hours per week, identify the au pair's responsibilities, and state the amount of the weekly stipend. A true and correct copy of the HF-AP Agreement prepared and signed by Plaintiff Aguilar's host family, and counter-signed upon acceptance by Plaintiff Aguilar, is attached hereto as <u>Exhibit I</u>. In its blank form, the HF-AP Agreement executed by Plaintiff Aguilar and her host family is reflective of and consistent with agreements signed by all au pairs and host families from early 2015 to the present. (The revised HF-AP Agreement is now titled the Child Care Services Agreement ("CCSA"). This declaration uses the term "HF-AP Agreement" to refer the Written Agreement and CCSA collectively.)

30.     DOS regulations require that, after the au pair arrives in the United States, each host family and au pair must complete an orientation with one of Go Au Pair's local area representatives ("LAR"). The purpose of the orientation is to help the parties adjust by ensuring that the host family and the au pair are "on the same page" as to the critical

**HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY**

Defs.' Appx. 00000738

elements of the HF-AP Agreement and the parties' living arrangements. The LAR records on Go Au Pair's orientation form ("Orientation") the important aspects of the relationship as described by the host family and au pair. This includes the au pair's responsibilities, hours, stipend amount, house rules, and the au pair's requirements. The host family and au pair each sign the Orientation, which then becomes part of the written contract between the host family and au pair. Like all other relevant agreements, the Orientation states that the weekly stipend—as determined by the host family and accepted by the au pair—must be a "minimum of $195.75" and that both parties "understand and will comply with . . . the 45 hours/week maximum." A true and correct copy of the Orientation signed by Plaintiff Gonzalez and her host family is attached as Exhibit J. In its blank form, the Orientation executed by Plaintiff Gonzalez and her host family is reflective of and consistent with agreements signed by all au pairs and host families from 2009 to the present.

31.     As reflected in its standard agreements, Go Au Pair has no policy regarding how much each host family should pay its au pair other than the amount must be no less than the weekly $195.75 required by DOS, regardless of how many hours the au pair actually works per week. It is the host family that determines the amount of the weekly stipend, as stated in the HF-AP Agreement.

32.     Similarly, Go Au Pair does not dictate the number of hours an au pair will work (other than to ensure compliance with maximum hours prescribed by regulation),

**HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY**

Defs.' Appx. 00000739

the au pair's schedule, or the au pair's specific duties. Each of these aspects of the au pair's placement is determined by the host family, as provided in the HF-AP Agreement.

33.     If a host family decides that it would like to match an au pair candidate after interviewing him or her, the host family will send a completed and signed copy of their unique HF-AP Agreement to the prospective au pair. Under Go Au Pair's "Mutual Match" policy, the prospective au pair can then review the HF-AP Agreement, potentially compare it against any offers made by other host families, and either accept or reject the stipend amount and other terms offered by the host family. Any substantial changes to the parties' agreement, as reflected in the HF-AP Agreement or Orientation, may only be made with the written consent of both parties.

34.     Other than to confirm that the au pair's placement conforms to the minimum requirements set by DOS, Go Au Pair does not exercise any approval or decision-making authority concerning the terms and conditions of the au pair's placement, to which the host family and au pair have mutually agreed.

35.     Similarly, Go Au Pair does not provide any day-to-day management or oversight of au pairs; nor does it create or keep any performance reviews or evaluations concerning the au pair's childcare services. Direction and supervision of the au pair's work is solely up to the host family. This includes, for example, enforcement of any house rules established by the host family, direction or critiques concerning the au pair's provision of childcare services, granting time off requests, and communicating with the au pair about his or her day-to-day duties and schedules.

**HIGHLY CONFIDENTIAL –**
**ATTORNEYS' EYES ONLY**

Defs.' Appx. 00000740

36.     Go Au Pair maintains copies of all agreements executed by host families and au pairs. However, Go Au Pair does not keep, and does not have, records of the actual amount of the stipend paid to or the hours worked by au pairs. Since early 2015, Go Au Pair has recommended that au pairs track and record the hours they work and payments received from the host family so that they have documentation of these matters in the event a dispute with the host family arises. Au pairs do not submit these records to Go Au Pair, and Go Au Pair does not otherwise maintain them.

37.     Go Au Pair does not pay the au pair or perform any payroll activities with respect to au pairs.

38.     Go Au Pair does not create or maintain performance evaluations of au pairs.

**D.      Early Termination of the Au Pair's Placement Is at the Discretion of Host Families and Au Pairs**

39.     The decision to terminate an au pair's host-family placement early is wholly within the discretion of the host family and/or the au pair, provided that both the au pair and the host family have complied with the rules and regulations governing the program.

40.     If a host family and/or au pair decide to terminate the host-family placement early, the au pair may continue to participate in the Au Pair Program, provided that he or she is eligible to and does in fact rematch with another host family.

41.     In its role as an exchange-program sponsor, Go Au Pair is required by regulation to report changes to an au pair's program "status," in SEVIS, which is the

**HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY**

Defs.' Appx. 00000741

electronic system used by the Departments of State and Homeland Security to maintain and track information concerning J-1 visa holders. Under DOS regulations, Go Au Pair has the authority to cancel an au pair's participation in the Au Pair Program if he or she fails to comply with the rules and regulations governing the program. If necessary, this is done by changing the status of the au pair's electronic record in SEVIS.

42.    I am not aware of any instance in which Go Au Pair has needed to terminate an au pair's participation in the Au Pair Program despite both the host family's and the au pair's satisfaction with the placement.

### E.    Additional Sponsor Obligations

43.    DOS regulations require that all sponsor organizations provide au pairs with general training related to child safety and child development, which all au pairs must complete before they arrive at their host-family placement. 22 C.F.R. § 62.31(g). Go Au Pair provides this training through a multi-media training course that all Go Au Pair-sponsored au pairs complete in their home country. This training does not include any training specific to the au pair's host-family placement; any instruction related to the specific host family's needs or desires must be given by the host family directly.

44.    As required by DOS regulations, Go Au Pair monitors au pairs and host families through regular contact to gauge overall satisfaction with their experience and ensure compliance with regulatory requirements. On behalf of Go Au Pair, an assigned Local Area Representative ("LAR") will contact host families and au pairs on a monthly basis. Such contact often consists of a single call, text message, or email, but LARs may have further contact with au pairs and host families if necessary to address

**HIGHLY CONFIDENTIAL –**
**ATTORNEYS' EYES ONLY**

Defs.' Appx. 00000742

questions or to help facilitate the resolution of any issues or disputes that have arisen during the au pair's placement.

45.    Go Au Pair is also required to submit annual audit reports to DOS, which reports include a summation of results from an annual survey of au pairs and host families conducted by independent auditors. The audit template provided by DOS includes a series of "confirmation questions" designed to monitor compliance with DOS regulations. One of these questions expressly asks how many au pairs within the survey "responded that they received at least $195.75 per week as compensation." True and correct copies of the relevant excerpts of the independent auditors' reports from 2010 through 2014, which Go Au Pair submitted to DOS, are attached hereto as Exhibits K-O, respectively.

46.    Go Au Pair's annual audit reports to DOS also include copies of all promotional materials used by Go Au Pair in advertising its au pair program to host families and au pairs. These materials include any brochures or pamphlets distributed to host families and au pairs and Go Au Pair's website. DOS has never advised Go Au Pair that any of its promotional materials is inaccurate or that any such materials misstate any aspect of the United States Au Pair Program.

47.    DOS regulations (22 C.F.R. § 62.14) require that au pairs have insurance that covers them for sickness and accidents while they participate in the Au Pair Program. To ensure compliance with this regulation, Go Au Pair handles the administrative aspects of securing insurance for au pairs, as well as canceling that

**HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY**

insurance when the au pair's participation in the Au Pair Program has ended. Go Au

Pair does not pay for this insurance. Rather, host families pay for their au pair's

insurance as part of the program fees they pay to Go Au Pair.

## II.   GO AU PAIR'S ANALYSIS OF HOST FAMILY-AU PAIR AGREEMENTS SHOWS SIGNIFICANT VARIATION AMONG THE STIPENDS PAID TO AU PAIRS AND THE HOURS THEY WORK

48.     Based on an analysis of all HF-AP Agreements executed in connection

with au pair placements from 2010 to 2015—totaling 3,750—Go Au Pair can confirm

that the agreed-upon stipend and the anticipated weekly work hours stated in those

agreements varies significantly. A true and correct copy of the spreadsheet showing the

results of that analysis, which Go Au Pair produced during discovery, is attached as

Exhibit P.[1]

49.     In particular, Go Au Pair's analysis of HF-AP Agreements shows that:

- Host families offered to pay, and au pairs accepted, over 60 different weekly stipend amounts;

- 58% of host families offered au pairs a weekly stipend above $195.75;

- Over 11% of host families offered au pairs a weekly stipend above $200;

---

[1] The spreadsheet containing Go Au Pair's analysis and underlying data was produced in native format as GAP_00035647. The native Excel spreadsheet contains three tabs, one showing the relevant raw data from each HF-AP Agreement (e.g., date, identifier, stipend amount, anticipated work hours, etc.) ("Placements2010-2015"); a second identifying whether fees were paid for a premiere placement (*see* Section III, *supra*) ("OppPremiereFees"); and a third showing Go Au Pair's analysis of the aggregate data ("Analysis-Stipend-Std-Hrs"). Exhibit P is a PDF of the "Analysis-Stipend-Std-Hrs" tab. Due to its size, Go Au Pair has not converted and filed the entire Excel file, but will provide it to the Court if requested.

**HIGHLY CONFIDENTIAL –**
**ATTORNEYS' EYES ONLY**

Defs.' Appx. 00000744

- Only about 0.27% of host families offered au pairs a weekly stipend above $344;

- Host families requested, and au pairs agreed to, weekly schedules reflecting 125 different hourly totals;

- 53% of au pairs were scheduled to work less than 45 hours per week;

- Over 34% of au pairs were scheduled to work 40 hours or less per week;

- Over 16% of au pairs were scheduled to work 35 hours or less per week;

- Over 7% of au pairs were scheduled to work 30 hours or less per week;

- Host families offered 485 different combinations of weekly stipends and hours; and

- Only 19.8% of au pairs that accepted a stipend of $195.75 were scheduled to work 45 hours per week.

### III.   GO AU PAIR ADVERTISES MINIMUM STIPEND AMOUNTS ABOVE THE DOS-REQUIRED MINIMUM OF $195.75 FOR MORE EXPERIENCED AU PAIRS

50.     Independent from the DOS program requirements and other Sponsors, Go Au Pair has created three au pair programs: the Standard Au Pair program, the Au Pair Plus program, and the Premiere Au Pair program. Prospective au pairs who qualify to participate in the Standard Au Pair program must only meet the minimum requirements for eligibility set by DOS. Go Au Pair created its Plus and Premiere programs to appeal to prospective au pairs who have more experience and qualifications than the typical au pair applicant, as well as to host families that want to host a more qualified au pair.

**HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY**

Defs.' Appx. 00000745

51.     To qualify for the Au Pair Plus program, prospective au pairs must have previous experience as an au pair in another country. Go Au Pair advertises a minimum weekly stipend of $215 for Plus Au Pairs.

52.     To qualify for the Premiere Au Pair program, prospective au pairs must me the following criteria: (1) have a degree in a childcare-related field or at least two years of full-time childcare experience; (2) be at least 20 years old; (3) have at least six months of driving experience; and (4) have strong English skills. Go Au Pair advertises a minimum weekly stipend of $255 for Premiere Au Pairs.

53.     Go Au Pair's "Plus" and "Premiere" programs are products of its own creation. These skill levels or categories of au pairs are not recognized by DOS. Nor are they commonly defined, or even recognized, across the au pair industry.

54.     Go Au Pair has found that au pairs who qualify for either the Plus or Premiere programs—and, thus, one of the higher minimum stipend amounts—often accept an offer for a lower stipend in order to match with a host family. Go Au Pair's analysis of HF-AP Agreements from 2010 to 2015 indicates that 64% of au pairs who qualified as a Plus or Premiere Au Pair nonetheless chose to accept a stipend of $200 or less.

## IV.     PROSPECTIVE AND PARTICIPATING AU PAIRS ARE REPEATEDLY TOLD THAT $195.75 IS A MINIMUM STIPEND AND THEY REGULARLY ASK QUESTIONS ABOUT THE TERMS OF THE AU PAIR AGREEMENT

55.     Prospective au pairs do not pay any fees to Go Au Pair to participate in the Au Pair Program until they have matched with a host family. This means that all au pairs must sign the Au Pair Agreement and the HF-AP Agreement before they pay any

**HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY**

18

Defs.' Appx. 00000746

fees to Go Au Pair. Both of these agreements clarify that $195.75 is the required underline{minimum} stipend amount. Further, prospective au pairs first sign the Au Pair Agreement with Go Au Pair before they are interviewed by and presented with placement offers from host families. Accordingly, prior to interviewing with and accepting a host family's placement offer, au pairs have been advised in their Au Pair Agreement with Go Au Pair that they are entitled to a underline{minimum} stipend amount of $195.75. In addition, when the placement offer is conveyed by the host family in the form of the HF-AP Agreement, the au pairs are again informed in that agreement that the $195.75 stipend amount is only a minimum.

56.     Through its standard training process, Go Au Pair instructs all staff and local representatives that the current federally-required minimum stipend is $195.75 per week.

57.     As part of its regulatory compliance monitoring, and to assess the au pair's general satisfaction with his or her experience, Go Au Pair sends all participating au pairs a survey six weeks into their placement with a host family. This survey asks au pairs if they are "being paid a weekly stipend of underline{at least} $195.75."

58.     As part of the annual audit process required by DOS, independent auditors send a survey to approximately 160 to 200 au pairs, and the first 80 to 100 returned surveys are included in the annual audit. This survey also asks au pairs to confirm whether they "received at least $195.75 per week as compensation." *See* Exhibits K-O.

**HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY**

59.     Go Au Pair regularly receives questions or complaints from au pairs concerning their rights under the Au Pair Agreement, and we encourage prospective and participating au pairs to ask these questions. It is common for au pairs to ask for clarification about items addressed in the Au Pair Agreement after having reviewed it. The most common questions typically concern: (1) the required education credits (e.g., what institution is accredited versus not accredited and/or converting class hours to credit hours); (2) vacation time; (3) duration of the transition period when either party terminates a placement; (4) payment due from the host family to the au pair from the transition period; (5) return airfare (e.g., under what circumstances would the au pair be responsible for return airfare). Go Au Pair has also received questions about whether luggage fees charged by airlines are included in their covered airfare to/from their home country and America.

60.     To the best of my knowledge, other than this lawsuit, Go Au Pair has never received a single complaint from an au pair stating that she or he misunderstood the nature of the stipend amount or thought it was a fixed amount.

## V.     GO AU PAIR'S SUPPLY OF QUALIFIED AU PAIRS ALWAYS EXCEEDS HOST FAMILIES' DEMAND FOR AU PAIR SERVICES

61.     Given my responsibilities with Go Au Pair, I am familiar with Go Au Pair's processes and procedures for matching host families and au pairs, including the constraints on the number of au pairs it can sponsor due to the amount of available host families. I am also familiar with the supply/demand dynamics of au pairs and host families as they apply to the Au Pair Program generally.

**HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY**

Defs.' Appx. 00000748

**RESTRICTED - PAGES 21-23 TO DECLARATION OF
BILL KAPLER IN SUPPORT OF GO AU PAIR'S
MOTION FOR SUMMARY JUDGMENT.
SEE RESTRICTED APPENDIX AT
Defs.' R. Appx. 00000819.**

**VI.    GO AU PAIR'S WEBSITE HAS ALWAYS INCLUDED INFORMATION ON THE CALCULATION OF THE MINIMUM STIPEND SET BY DOS**

71.    In paragraph 102 of their Second Amended Complaint, Plaintiffs allege that, as of November 2014, Go Au Pair's website advertised the au pair stipend as $195.75 per week.

72.    Included within the table referenced by Plaintiffs is a hyperlink to further information on the "weekly stipend." That information included then, as it does now, a detailed description of the calculation of the minimum weekly stipend. In November 2014, as now, this information appears as follow Go Au Pair's website:

> The calculation for the Au Pair stipend is as follows:
> (Federal Minimum Wage) x (Number Hours worked per week) – (40% credit for room and board)
> = (Au Pair stipend)
>
> ($7.25) x (45 hours) – (40% credit) = $195.75 per week

73.    I declare under penalty of perjury that the foregoing is true and correct. Executed on February 13, 2018.

_Bill Kapler_
Bill Kapler

**HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY**

# Overview of Go Au Pair-Host Family-Au Pair Contractual Relationships



**Go Au Pair**

**Go Au Pair Responsibilities to Au Pair**

• Inform APs of DOS regulations
• Vet APs for conformance to DOS requirements
• Provide general, mandated training to APs (in home country) per DOS regulations
• Conduct orientation per DOS regulations
• Facilitate issuing of J-1 visa (US Consular officers issue the J-1 visas)
• Arrange airfares and medical insurance for AP
• Contact AP monthly for general support and regulatory-compliance monitoring
• Arrange cultural-exchange events for APs

**Go Au Pair Responsibilities to Host Family**

• Inform HFs of DOS regulations
• Facilitate Mutual Match process
• Contact HF monthly for general support and regulatory-compliance monitoring
• Arrange family day conference for HF and AP
**\*No Hiring or Supervision Rights or Duties\***

**Visa Sponsor Agreement**

•Au Pair Agreement

**Child Care Services Contracts (Employment)**

•Au Pair/Host Family Agreement
•Au Pair/Host Family Orientation
**\*Go Au Pair not party to agreement\***

**Au Pair Program Participant Contracts**

•Host Family Agreement

**Au  Pair (AP)**

•HF offers placement to AP
•AP accepts or declines

**Host Family (HF)**

**Responsibilities of Au Pair**

• Participate in phone interviews with HFs
• Accept HF placement offer
• Provide child care services
• Employee of HF
• Complete education requirement
• Return home when visa expires
• Abide by all DOS regulations
• Ability to terminate employment with HF

**Responsibilities of Host Family**

• Screen AP candidates for HF requirements
• Conduct phone interview(s) with AP
• Full responsibility for selecting AP
• Determine AP duties and schedules
• Supervise AP in all activities
• Set and pay AP weekly stipend – minimum of $195.75
• Instruct APs on specific HF requirements
• Provide room & board (valued at $130.50 / wk)
• Pay for AP education - $500
• Attend one family day conference with AP
• Abide by all DOS regulations
• Ability to terminate employment with AP

**KAPLER DEC. EXHIBIT A**