Defs.' Appx. 00000872

**THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Case No. 14-cv-03074-CMA-KMT

JOHANA PAOLA BELTRAN, *ET AL.*

      Plaintiffs,

v.

INTEREXCHANGE, INC., *ET AL.*

      Defendants.

---

**PLAINTIFF ALEJANDRA MARCELA GARCIA VASQUEZ'S RESPONSES AND OBJECTIONS TO DEFENDANT INTEREXCHANGE, INC.'S INTERROGATORIES, REQUESTS FOR PRODUCTION, AND REQUESTS FOR ADMISSION TO FLSA OPT-IN PLAINTIFFS**

---

Plaintiff Responds and Objects, pursuant to Federal Rules of Civil Procedure 26, 33, 34, 36, 37 and the Local Rules of the District of Colorado ("Local Rules"), to Defendant InterExchange's ("InterExchange") Interrogatories, Requests for Production, and Requests for Admission to FLSA Opt-In Plaintiffs.

### GENERAL OBJECTIONS

Plaintiff asserts the following general objections and limitations, including those related to the Definitions and Instructions (collectively, the "General Objections"), to the Interrogatories, Requests for Production, and Requests for Admission, each of which is incorporated into the specific responses by Plaintiff. Each response is made without waiving the General Objections. Each general objection and limitation is set forth below:

1.      Plaintiff's responses are made without waiving any valid privilege, work product

**RESPONSE:**  Plaintiff objects to each subpart as overbroad and unduly burdensome to the extent the requested information is already in InterExchange's possession, custody or control. *See Fast v. Applebee's Intern., Inc.*, 2008 WL 5432288, at *2 (W.D. Mo. 2008) (discovery of opt-ins must not otherwise be available to defendants).  Plaintiff further objects to each subpart on the grounds that they seek information that is not relevant to the FLSA claims in this action. In light of these objections, Plaintiff declines to respond to this interrogatory.

3.       If your host family asked you to perform duties or take on responsibilities not listed in response to Interrogatory No. 2 above, describe in detail the specific duties and responsibilities and state the specific day or days of each week that you were required to perform that duty or responsibility.

**RESPONSE:**  Plaintiff objects to each subpart on the grounds that they seek information that is not relevant to the FLSA claims in this action.  In light of this objection, Plaintiff declines to respond to this interrogatory.

4.       For each week that you participated in the au pair program, identify (a) the amount that you were paid for that week's duties and responsibilities; (b) the method by  which you were paid (e.g. cash, check, etc.); and (c) the person or entity from whom you received each payment.

**RESPONSE**: Plaintiff objects to each sub-part as overbroad and unduly burdensome to the extent the requested information is already in InterExchange's possession, custody or control. *See Fast v. Applebee's Intern., Inc.*, 2008 WL 5432288, at *2 (W.D. Mo. 2008) (discovery of opt ins must not otherwise be available to defendants).  Subject to this objection, Plaintiff responds as follows:

(a) The amount that you were paid for that week's duties and responsibilities: **$200**
(b) The method by which you were paid (e.g. cash, check, etc.): **Check**

(c) The person or entity from whom you received each payment: **La familia con las que vivia**

5.      Identify all other payments and/or benefits that you received from each host family with whom you lived. Examples of other payments and/or benefits include, but are not limited to, cash; gifts; bonuses; personal use of a car, cell phone, or computer; gas money; clothing; personal items; family vacations; and travel expenses.

**RESPONSE**: Plaintiff objects to each subpart on the grounds that they seek information that is not relevant to the FLSA claims in this action.  In light of this objection, Plaintiff declines to respond to this interrogatory.

6.      If you made any complaint to your host family(ies), InterExchange, the United States Department of State, or any other person or entity regarding wages, benefits, the stipend, your responsibilities as an au pair, or living conditions, identify (a) the date of the complaint; (b) the method of communication of the complaint; (c) the person or entity to whom you directed the complaint; (d) the substance of the complaint; and (e) how the complaint was resolved.

**RESPONSE**: Plaintiff objects to each sub-part as overbroad and unduly burdensome to the extent the requested information is already in InterExchange's possession, custody or control. *See Fast v. Applebee's Intern., Inc.*, 2008 WL 5432288, at *2 (W.D. Mo. 2008) (discovery of opt ins must not otherwise be available to defendants).  Plaintiff also objects to each subpart on the grounds that they seek information that is not relevant to the FLSA claims in this action.  In light of these objections, Plaintiff declines to respond to this interrogatory.

## II.      REQUESTS FOR PRODUCTION

1.      All documents identified or referenced in your answer to any Interrogatory.

Defs.' Appx. 00000875

## **VERIFICATION**

Pursuant to 28 U.S.C. §  1746, I, Alejandra Marcela Garcia Vasquez, hereby declare, under the penalty of perjury under the laws of the United States of America, that my responses to InterExchange's Interrogatories, Requests for Production, and Requests for Admission are true and correct to the best of my knowledge, belief and information.

Dated this 5 day of February, 2018.

_____Bogata_____, _____Colombia_____.

BY: _____

Defs.' Appx. 00000876

**THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Case No. 14-cv-03074-CMA-KMT

JOHANA PAOLA BELTRAN, *ET AL.*

     Plaintiffs,

v.

INTEREXCHANGE, INC., *ET AL.*

     Defendants.

---

**PLAINTIFF ALISON PATON'S RESPONSES AND OBJECTIONS TO DEFENDANT
INTEREXCHANGE, INC.'S INTERROGATORIES, REQUESTS FOR PRODUCTION,
AND REQUESTS FOR ADMISSION TO FLSA OPT-IN PLAINTIFFS**

---

Plaintiff Responds and Objects, pursuant to Federal Rules of Civil Procedure 26, 33, 34, 36, 37 and the Local Rules of the District of Colorado ("Local Rules"), to Defendant InterExchange's ("InterExchange") Interrogatories, Requests for Production, and Requests for Admission to FLSA Opt-In Plaintiffs.

**<u>GENERAL OBJECTIONS</u>**

Plaintiff asserts the following general objections and limitations, including those related to the Definitions and Instructions (collectively, the "General Objections"), to the Interrogatories, Requests for Production, and Requests for Admission, each of which is incorporated into the specific responses by Plaintiff. Each response is made without waiving the General Objections. Each general objection and limitation is set forth below:

    1.    Plaintiff's responses are made without waiving any valid privilege, work product

1

Defs.' Appx. 00000877

**RESPONSE**:  Plaintiff objects to each subpart as overbroad and unduly burdensome to the extent the requested information is already in InterExchange's possession, custody or control. *See Fast v. Applebee's Intern., Inc.*, 2008 WL 5432288, at *2 (W.D. Mo. 2008) (discovery of opt-ins must not otherwise be available to defendants).  Plaintiff further objects to each subpart on the grounds that they seek information that is not relevant to the FLSA claims in this action. In light of these objections, Plaintiff declines to respond to this interrogatory.

3.      If your host family asked you to perform duties or take on responsibilities not listed in response to Interrogatory No. 2 above, describe in detail the specific duties and responsibilities and state the specific day or days of each week that you were required to perform that duty or responsibility.

**RESPONSE**:  Plaintiff objects to each subpart on the grounds that they seek information that is not relevant to the FLSA claims in this action.  In light of this objection, Plaintiff declines to respond to this interrogatory.

4.      For each week that you participated in the au pair program, identify (a) the amount that you were paid for that week's duties and responsibilities; (b) the method by  which you were paid (e.g. cash, check, etc.); and (c) the person or entity from whom you received each payment.

**RESPONSE**: Plaintiff objects to each sub-part as overbroad and unduly burdensome to the extent the requested information is already in InterExchange's possession, custody or control. *See Fast v. Applebee's Intern., Inc.*, 2008 WL 5432288, at *2 (W.D. Mo. 2008) (discovery of opt ins must not otherwise be available to defendants).  Subject to this objection, Plaintiff responds as follows:

(a) The amount that you were paid for that week's duties and responsibilities: **$195.75**
(b) The method by which you were paid (e.g. cash, check, etc.): **Check**

(c) The person or entity from whom you received each payment: **Parents**

5.      Identify all other payments and/or benefits that you received from each host family with whom you lived. Examples of other payments and/or benefits include, but are not limited to, cash; gifts; bonuses; personal use of a car, cell phone, or computer; gas money; clothing; personal items; family vacations; and travel expenses.

**RESPONSE**: Plaintiff objects to each subpart on the grounds that they seek information that is not relevant to the FLSA claims in this action.  In light of this objection, Plaintiff declines to respond to this interrogatory.

6.      If you made any complaint to your host family(ies), InterExchange, the United States Department of State, or any other person or entity regarding wages, benefits, the stipend, your responsibilities as an au pair, or living conditions, identify (a) the date of the complaint; (b) the method of communication of the complaint; (c) the person or entity to whom you directed the complaint; (d) the substance of the complaint; and (e) how the complaint was resolved.

**RESPONSE**: Plaintiff objects to each sub-part as overbroad and unduly burdensome to the extent the requested information is already in InterExchange's possession, custody or control. *See Fast v. Applebee's Intern., Inc.*, 2008 WL 5432288, at *2 (W.D. Mo. 2008) (discovery of opt ins must not otherwise be available to defendants).  Plaintiff also objects to each subpart on the grounds that they seek information that is not relevant to the FLSA claims in this action.  In light of these objections, Plaintiff declines to respond to this interrogatory.

## II.      REQUESTS FOR PRODUCTION

1.      All documents identified or referenced in your answer to any Interrogatory.

**RESPONSE**: Plaintiff will produce any relevant, non-privileged documents responsive to this request after a reasonable search.

Defs.' Appx. 00000879

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, I, __Alison Paton__, hereby declare, under the penalty of perjury under the laws of the United States of America, that my responses to InterExchange's Interrogatories, Requests for Production, and Requests for Admission are true and correct to the best of my knowledge, belief and information.

Dated this __05__ day of __February__, __2018__.

_____[CITY]_____, _____[COUNTRY]_____.

Stevenston, Ayrshire        Scotland

BY:     __A. Paton__

Defs.' Appx. 00000880

**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Case No. 14-cv-03074-CMA-KMT

JOHANA PAOLA BELTRAN, *ET AL.*

      Plaintiffs,

v.

INTEREXCHANGE, INC., *ET AL.*

      Defendants.

---

**PLAINTIFF BRENDA MEJIA CANALES'S RESPONSES AND OBJECTIONS TO**
**DEFENDANT INTEREXCHANGE, INC.'S INTERROGATORIES, REQUESTS FOR**
**PRODUCTION, AND REQUESTS FOR ADMISSION TO FLSA OPT-IN PLAINTIFFS**

---

Plaintiff Responds and Objects, pursuant to Federal Rules of Civil Procedure 26, 33, 34, 36, 37 and the Local Rules of the District of Colorado ("Local Rules"), to Defendant InterExchange's ("InterExchange") Interrogatories, Requests for Production, and Requests for Admission to FLSA Opt-In Plaintiffs.

## GENERAL OBJECTIONS

Plaintiff asserts the following general objections and limitations, including those related to the Definitions and Instructions (collectively, the "General Objections"), to the Interrogatories, Requests for Production, and Requests for Admission, each of which is incorporated into the specific responses by Plaintiff.  Each response is made without waiving the General Objections.  Each general objection and limitation is set forth below:

    1.    Plaintiff's responses are made without waiving any valid privilege, work product

Defs.' Appx. 00000881

**RESPONSE:**  Plaintiff objects to each subpart as overbroad and unduly burdensome to the extent the requested information is already in InterExchange's possession, custody or control. *See Fast v. Applebee's Intern., Inc.*, 2008 WL 5432288, at *2 (W.D. Mo. 2008) (discovery of opt-ins must not otherwise be available to defendants).  Plaintiff further objects to each subpart on the grounds that they seek information that is not relevant to the FLSA claims in this action. In light of these objections, Plaintiff declines to respond to this interrogatory.

3.      If your host family asked you to perform duties or take on responsibilities not listed in response to Interrogatory No. 2 above, describe in detail the specific duties and responsibilities and state the specific day or days of each week that you were required to perform that duty or responsibility.

**RESPONSE:**  Plaintiff objects to each subpart on the grounds that they seek information that is not relevant to the FLSA claims in this action.  In light of this objection, Plaintiff declines to respond to this interrogatory.

4.      For each week that you participated in the au pair program, identify (a) the amount that you were paid for that week's duties and responsibilities; (b) the method by  which you were paid (e.g. cash, check, etc.); and (c) the person or entity from whom you received each payment.

**RESPONSE**: Plaintiff objects to each sub-part as overbroad and unduly burdensome to the extent the requested information is already in InterExchange's possession, custody or control. *See Fast v. Applebee's Intern., Inc.*, 2008 WL 5432288, at *2 (W.D. Mo. 2008) (discovery of opt ins must not otherwise be available to defendants).  Subject to this objection, Plaintiff responds as follows:

(a) The amount that you were paid for that week's duties and responsibilities: **$195.75**
(b) The method by which you were paid (e.g. cash, check, etc.): **Online Bank Transfer**

(c) The person or entity from whom you received each payment: **Ryan Morris or Margaret Morris**

5.      Identify all other payments and/or benefits that you received from each host family with whom you lived. Examples of other payments and/or benefits include, but are not limited to, cash; gifts; bonuses; personal use of a car, cell phone, or computer; gas money; clothing; personal items; family vacations; and travel expenses.

**RESPONSE**: Plaintiff objects to each subpart on the grounds that they seek information that is not relevant to the FLSA claims in this action.  In light of this objection, Plaintiff declines to respond to this interrogatory.

6.      If you made any complaint to your host family(ies), InterExchange, the United States Department of State, or any other person or entity regarding wages, benefits, the stipend, your responsibilities as an au pair, or living conditions, identify (a) the date of the complaint; (b) the method of communication of the complaint; (c) the person or entity to whom you directed the complaint; (d) the substance of the complaint; and (e) how the complaint was resolved.

**RESPONSE**: Plaintiff objects to each sub-part as overbroad and unduly burdensome to the extent the requested information is already in InterExchange's possession, custody or control. *See Fast v. Applebee's Intern., Inc.*, 2008 WL 5432288, at *2 (W.D. Mo. 2008) (discovery of opt ins must not otherwise be available to defendants).  Plaintiff also objects to each subpart on the grounds that they seek information that is not relevant to the FLSA claims in this action.  In light of these objections, Plaintiff declines to respond to this interrogatory.


II.      **REQUESTS FOR PRODUCTION**

1.      All documents identified or referenced in your answer to any Interrogatory.

## **VERIFICATION**

Pursuant to 28 U.S.C. § 1746, I, Brenda Mejia Canales, hereby declare, under the penalty of perjury under the laws of the United States of America, that my responses to InterExchange's Interrogatories, Requests for Production, and Requests for Admission are true and correct to the best of my knowledge, belief and information.

Dated this 5th day of February 2018.

San Miguel de Allende, Mexico.

BY: _____

Defs.' Appx. 00000884

**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Case No. 14-cv-03074-CMA-KMT

JOHANA PAOLA BELTRAN, *ET AL.*

      Plaintiffs,

v.

INTEREXCHANGE, INC., *ET AL.*

      Defendants.

---

**PLAINTIFF LAURA CAMILA BARRIGA RODRIGUEZ'S RESPONSES AND OBJECTIONS TO DEFENDANT INTEREXCHANGE, INC.'S INTERROGATORIES, REQUESTS FOR PRODUCTION, AND REQUESTS FOR ADMISSION TO FLSA OPT-IN PLAINTIFFS**

---

Plaintiff Responds and Objects, pursuant to Federal Rules of Civil Procedure 26, 33, 34, 36, 37 and the Local Rules of the District of Colorado ("Local Rules"), to Defendant InterExchange's ("InterExchange") Interrogatories, Requests for Production, and Requests for Admission to FLSA Opt-In Plaintiffs.

**GENERAL OBJECTIONS**

Plaintiff asserts the following general objections and limitations, including those related to the Definitions and Instructions (collectively, the "General Objections"), to the Interrogatories, Requests for Production, and Requests for Admission, each of which is incorporated into the specific responses by Plaintiff. Each response is made without waiving the General Objections. Each general objection and limitation is set forth below:

1.     Plaintiff's responses are made without waiving any valid privilege, work product

**RESPONSE:**  Plaintiff objects to each subpart as overbroad and unduly burdensome to the extent the requested information is already in InterExchange's possession, custody or control. *See Fast v. Applebee's Intern., Inc.*, 2008 WL 5432288, at *2 (W.D. Mo. 2008) (discovery of opt-ins must not otherwise be available to defendants).  Plaintiff further objects to each subpart on the grounds that they seek information that is not relevant to the FLSA claims in this action. In light of these objections, Plaintiff declines to respond to this interrogatory.

3.      If your host family asked you to perform duties or take on responsibilities not listed in response to Interrogatory No. 2 above, describe in detail the specific duties and responsibilities and state the specific day or days of each week that you were required to perform that duty or responsibility.

**RESPONSE:**  Plaintiff objects to each subpart on the grounds that they seek information that is not relevant to the FLSA claims in this action.  In light of this objection, Plaintiff declines to respond to this interrogatory.

4.      For each week that you participated in the au pair program, identify (a) the amount that you were paid for that week's duties and responsibilities; (b) the method by  which you were paid (e.g. cash, check, etc.); and (c) the person or entity from whom you received each payment.

**RESPONSE**: Plaintiff objects to each sub-part as overbroad and unduly burdensome to the extent the requested information is already in InterExchange's possession, custody or control. *See Fast v. Applebee's Intern., Inc.*, 2008 WL 5432288, at *2 (W.D. Mo. 2008) (discovery of opt ins must not otherwise be available to defendants).  Subject to this objection, Plaintiff responds as follows:

(a) The amount that you were paid for that week's duties and responsibilities: **$200**
(b) The method by which you were paid (e.g. cash, check, etc.):  **Electronic Payment**

(c) The person or entity from whom you received each payment: **Host mom**

5.　　　Identify all other payments and/or benefits that you received from each host family with whom you lived. Examples of other payments and/or benefits include, but are not limited to, cash; gifts; bonuses; personal use of a car, cell phone, or computer; gas money; clothing; personal items; family vacations; and travel expenses.

**RESPONSE**: Plaintiff objects to each subpart on the grounds that they seek information that is not relevant to the FLSA claims in this action.  In light of this objection, Plaintiff declines to respond to this interrogatory.

6.　　　If you made any complaint to your host family(ies), InterExchange, the United States Department of State, or any other person or entity regarding wages, benefits, the stipend, your responsibilities as an au pair, or living conditions, identify (a) the date of the complaint; (b) the method of communication of the complaint; (c) the person or entity to whom you directed the complaint; (d) the substance of the complaint; and (e) how the complaint was resolved.

**RESPONSE**: Plaintiff objects to each sub-part as overbroad and unduly burdensome to the extent the requested information is already in InterExchange's possession, custody or control. *See Fast v. Applebee's Intern., Inc.*, 2008 WL 5432288, at *2 (W.D. Mo. 2008) (discovery of opt ins must not otherwise be available to defendants).  Plaintiff also objects to each subpart on the grounds that they seek information that is not relevant to the FLSA claims in this action.  In light of these objections, Plaintiff declines to respond to this interrogatory.

## II.　　**REQUESTS FOR PRODUCTION**

1.　　　All documents identified or referenced in your answer to any Interrogatory.

**RESPONSE**: Plaintiff will produce any relevant, non-privileged documents responsive to this request after a reasonable search.

Defs.' Appx. 00000887

## **VERIFICATION**

Pursuant to 28 U.S.C. §  1746, I, Laura Camila Barriga Rodriguez, hereby declare, under the penalty of perjury, that my responses to InterExchange's Interrogatories, Requests for Production, and Requests for Admission are true and correct to the best of my knowledge, belief and information.

Dated this 5 day of February, 2018.

Philadelphia, Pennsylvania.

BY: _____

Defs.' Appx. 00000888

**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Case No. 14-cv-03074-CMA-KMT

JOHANA PAOLA BELTRAN, *ET AL.*

      Plaintiffs,

v.

INTEREXCHANGE, INC., *ET AL.*

      Defendants.

---

**PLAINTIFF NICOLLE GARIBALDI SARTORI'S RESPONSES AND OBJECTIONS TO DEFENDANT INTEREXCHANGE, INC.'S INTERROGATORIES, REQUESTS FOR PRODUCTION, AND REQUESTS FOR ADMISSION TO FLSA OPT-IN PLAINTIFFS**

---

Plaintiff Responds and Objects, pursuant to Federal Rules of Civil Procedure 26, 33, 34, 36, 37 and the Local Rules of the District of Colorado ("Local Rules"), to Defendant InterExchange's ("InterExchange") Interrogatories, Requests for Production, and Requests for Admission to FLSA Opt-In Plaintiffs.

## GENERAL OBJECTIONS

Plaintiff asserts the following general objections and limitations, including those related to the Definitions and Instructions (collectively, the "General Objections"), to the Interrogatories, Requests for Production, and Requests for Admission, each of which is incorporated into the specific responses by Plaintiff.  Each response is made without waiving the General Objections.  Each general objection and limitation is set forth below:

1.      Plaintiff's responses are made without waiving any valid privilege, work product

Defs.' Appx. 00000889

**RESPONSE:**  Plaintiff objects to each subpart as overbroad and unduly burdensome to the extent the requested information is already in InterExchange's possession, custody or control. *See Fast v. Applebee's Intern., Inc.*, 2008 WL 5432288, at *2 (W.D. Mo. 2008) (discovery of opt-ins must not otherwise be available to defendants).  Plaintiff further objects to each subpart on the grounds that they seek information that is not relevant to the FLSA claims in this action. In light of these objections, Plaintiff declines to respond to this interrogatory.

3.      If your host family asked you to perform duties or take on responsibilities not listed in response to Interrogatory No. 2 above, describe in detail the specific duties and responsibilities and state the specific day or days of each week that you were required to perform that duty or responsibility.

**RESPONSE:**  Plaintiff objects to each subpart on the grounds that they seek information that is not relevant to the FLSA claims in this action.  In light of this objection, Plaintiff declines to respond to this interrogatory.

4.      For each week that you participated in the au pair program, identify (a) the amount that you were paid for that week's duties and responsibilities; (b) the method by  which you were paid (e.g. cash, check, etc.); and (c) the person or entity from whom you received each payment.

**RESPONSE**: Plaintiff objects to each sub-part as overbroad and unduly burdensome to the extent the requested information is already in InterExchange's possession, custody or control. *See Fast v. Applebee's Intern., Inc.*, 2008 WL 5432288, at *2 (W.D. Mo. 2008) (discovery of opt ins must not otherwise be available to defendants).  Subject to this objection, Plaintiff responds as follows:

(a) The amount that you were paid for that week's duties and responsibilities: **$195.75**
(b) The method by which you were paid (e.g. cash, check, etc.): **Cash and Bank Deposit**

(c) The person or entity from whom you received each payment: **John and Louie Nowak and Michael and Melissa Phillips**

5.      Identify all other payments and/or benefits that you received from each host family with whom you lived. Examples of other payments and/or benefits include, but are not limited to, cash; gifts; bonuses; personal use of a car, cell phone, or computer; gas money; clothing; personal items; family vacations; and travel expenses.

**RESPONSE**: Plaintiff objects to each subpart on the grounds that they seek information that is not relevant to the FLSA claims in this action.  In light of this objection, Plaintiff declines to respond to this interrogatory.

6.      If you made any complaint to your host family(ies), InterExchange, the United States Department of State, or any other person or entity regarding wages, benefits, the stipend, your responsibilities as an au pair, or living conditions, identify (a) the date of the complaint; (b) the method of communication of the complaint; (c) the person or entity to whom you directed the complaint; (d) the substance of the complaint; and (e) how the complaint was resolved.

**RESPONSE**: Plaintiff objects to each sub-part as overbroad and unduly burdensome to the extent the requested information is already in InterExchange's possession, custody or control. *See Fast v. Applebee's Intern., Inc.*, 2008 WL 5432288, at *2 (W.D. Mo. 2008) (discovery of opt ins must not otherwise be available to defendants).  Plaintiff also objects to each subpart on the grounds that they seek information that is not relevant to the FLSA claims in this action.  In light of these objections, Plaintiff declines to respond to this interrogatory.


II.      **REQUESTS FOR PRODUCTION**

1.      All documents identified or referenced in your answer to any Interrogatory.

Defs.' Appx. 00000891

## **VERIFICATION**

Pursuant to 28 U.S.C. § 1746, I, Nicolle Garibaldi Sartori, hereby declare, under the penalty of perjury under the laws of the United States of America, that my responses to InterExchange's Interrogatories, Requests for Production, and Requests for Admission are true and correct to the best of my knowledge, belief and information.

Dated this 4th day of February, 2018.

_____[Caxias do Sul]_____, _____[Brazil]_____.

BY: _____

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Case No. 14-cv-03074-CMA-KMT

JOHANA PAOLA BELTRAN, *ET AL.*

     Plaintiffs,

v.

INTEREXCHANGE, INC., *ET AL.*

     Defendants.

---

**PLAINTIFF SARA MEJIA ALVAREZ'S RESPONSES AND OBJECTIONS TO DEFENDANT INTEREXCHANGE, INC.'S INTERROGATORIES, REQUESTS FOR PRODUCTION, AND REQUESTS FOR ADMISSION TO FLSA OPT-IN PLAINTIFFS**

---

Plaintiff Responds and Objects, pursuant to Federal Rules of Civil Procedure 26, 33, 34, 36, 37 and the Local Rules of the District of Colorado ("Local Rules"), to Defendant InterExchange's ("InterExchange") Interrogatories, Requests for Production, and Requests for Admission to FLSA Opt-In Plaintiffs.

## <u>GENERAL OBJECTIONS</u>

Plaintiff asserts the following general objections and limitations, including those related to the Definitions and Instructions (collectively, the "General Objections"), to the Interrogatories, Requests for Production, and Requests for Admission, each of which is incorporated into the specific responses by Plaintiff.  Each response is made without waiving the General Objections.  Each general objection and limitation is set forth below:

1.    Plaintiff's responses are made without waiving any valid privilege, work product

**RESPONSE:** Plaintiff objects to each subpart as overbroad and unduly burdensome to the extent the requested information is already in InterExchange's possession, custody or control. *See Fast v. Applebee's Intern., Inc.*, 2008 WL 5432288, at *2 (W.D. Mo. 2008) (discovery of opt-ins must not otherwise be available to defendants). Plaintiff further objects to each subpart on the grounds that they seek information that is not relevant to the FLSA claims in this action. In light of these objections, Plaintiff declines to respond to this interrogatory.

3.  If your host family asked you to perform duties or take on responsibilities not listed in response to Interrogatory No. 2 above, describe in detail the specific duties and responsibilities and state the specific day or days of each week that you were required to perform that duty or responsibility.

**RESPONSE:** Plaintiff objects to each subpart on the grounds that they seek information that is not relevant to the FLSA claims in this action. In light of this objection, Plaintiff declines to respond to this interrogatory.

4.  For each week that you participated in the au pair program, identify (a) the amount that you were paid for that week's duties and responsibilities; (b) the method by which you were paid (e.g. cash, check, etc.); and (c) the person or entity from whom you received each payment.

**RESPONSE**: Plaintiff objects to each sub-part as overbroad and unduly burdensome to the extent the requested information is already in InterExchange's possession, custody or control. *See Fast v. Applebee's Intern., Inc.*, 2008 WL 5432288, at *2 (W.D. Mo. 2008) (discovery of opt ins must not otherwise be available to defendants). Subject to this objection, Plaintiff responds as follows:

(a) The amount that you were paid for that week's duties and responsibilities: **$195.75**
(b) The method by which you were paid (e.g. cash, check, etc.): **Automatic Transfer**

Defs.' Appx. 00000894

(c) The person or entity from whom you received each payment: **The Weisner Family**

5.      Identify all other payments and/or benefits that you received from each host family with whom you lived. Examples of other payments and/or benefits include, but are not limited to, cash; gifts; bonuses; personal use of a car, cell phone, or computer; gas money; clothing; personal items; family vacations; and travel expenses.

<u>**RESPONSE**</u>: Plaintiff objects to each subpart on the grounds that they seek information that is not relevant to the FLSA claims in this action.  In light of this objection, Plaintiff declines to respond to this interrogatory.

6.      If you made any complaint to your host family(ies), InterExchange, the United States Department of State, or any other person or entity regarding wages, benefits, the stipend, your responsibilities as an au pair, or living conditions, identify (a) the date of the complaint; (b) the method of communication of the complaint; (c) the person or entity to whom you directed the complaint; (d) the substance of the complaint; and (e) how the complaint was resolved.

<u>**RESPONSE**</u>: Plaintiff objects to each sub-part as overbroad and unduly burdensome to the extent the requested information is already in InterExchange's possession, custody or control. *See Fast v. Applebee's Intern., Inc.*, 2008 WL 5432288, at *2 (W.D. Mo. 2008) (discovery of opt ins must not otherwise be available to defendants).  Plaintiff also objects to each subpart on the grounds that they seek information that is not relevant to the FLSA claims in this action.  In light of these objections, Plaintiff declines to respond to this interrogatory.

II.      <u>**REQUESTS FOR PRODUCTION**</u>

1.      All documents identified or referenced in your answer to any Interrogatory.

<u>**RESPONSE**</u>: Plaintiff will produce any relevant, non-privileged documents responsive to this request after a reasonable search.

Defs.' Appx. 00000895

## **VERIFICATION**

Pursuant to 28 U.S.C. § 1746, I, Sara Mejia Alvarez, hereby declare, under the penalty of

perjury, that my responses to InterExchange's Interrogatories, Requests for Production, and

Requests for Admission are true and correct to the best of my knowledge, belief and information.

Dated this 5 day of February, 2018.

_____BETHESDA_____ ____, MARYLAND_____       .

                                          BY: _____

Defs.' Appx. 00000896

## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Case No. 14-cv-03074-CMA-KMT

JOHANA PAOLA BELTRAN, *ET AL.*

     Plaintiffs,

v.

INTEREXCHANGE, INC., *ET AL.*

     Defendants.

---

## PLAINTIFF SILVIA ROJAS CASTRO'S RESPONSES AND OBJECTIONS TO DEFENDANT INTEREXCHANGE, INC.'S INTERROGATORIES, REQUESTS FOR PRODUCTION, AND REQUESTS FOR ADMISSION TO FLSA OPT-IN PLAINTIFFS

---

Plaintiff Responds and Objects, pursuant to Federal Rules of Civil Procedure 26, 33, 34, 36, 37 and the Local Rules of the District of Colorado ("Local Rules"), to Defendant InterExchange's ("InterExchange") Interrogatories, Requests for Production, and Requests for Admission to FLSA Opt-In Plaintiffs.

### GENERAL OBJECTIONS

Plaintiff asserts the following general objections and limitations, including those related to the Definitions and Instructions (collectively, the "General Objections"), to the Interrogatories, Requests for Production, and Requests for Admission, each of which is incorporated into the specific responses by Plaintiff. Each response is made without waiving the General Objections. Each general objection and limitation is set forth below:

1.     Plaintiff's responses are made without waiving any valid privilege, work product

Defs.' Appx. 00000897

**RESPONSE:**  Plaintiff objects to each subpart as overbroad and unduly burdensome to the extent the requested information is already in InterExchange's possession, custody or control. *See Fast v. Applebee's Intern., Inc.*, 2008 WL 5432288, at *2 (W.D. Mo. 2008) (discovery of opt-ins must not otherwise be available to defendants).  Plaintiff further objects to each subpart on the grounds that they seek information that is not relevant to the FLSA claims in this action. In light of these objections, Plaintiff declines to respond to this interrogatory.

3.      If your host family asked you to perform duties or take on responsibilities not listed in response to Interrogatory No. 2 above, describe in detail the specific duties and responsibilities and state the specific day or days of each week that you were required to perform that duty or responsibility.

**RESPONSE:**  Plaintiff objects to each subpart on the grounds that they seek information that is not relevant to the FLSA claims in this action.  In light of this objection, Plaintiff declines to respond to this interrogatory.

4.      For each week that you participated in the au pair program, identify (a) the amount that you were paid for that week's duties and responsibilities; (b) the method by  which you were paid (e.g. cash, check, etc.); and (c) the person or entity from whom you received each payment.

**RESPONSE**: Plaintiff objects to each sub-part as overbroad and unduly burdensome to the extent the requested information is already in InterExchange's possession, custody or control. *See Fast v. Applebee's Intern., Inc.*, 2008 WL 5432288, at *2 (W.D. Mo. 2008) (discovery of opt ins must not otherwise be available to defendants).  Subject to this objection, Plaintiff responds as follows:

(a) The amount that you were paid for that week's duties and responsibilities: **$195.75**
(b) The method by which you were paid (e.g. cash, check, etc.): **Check**

(c) The person or entity from whom you received each payment: **The Parents (Host Family)**

5.      Identify all other payments and/or benefits that you received from each host family with whom you lived. Examples of other payments and/or benefits include, but are not limited to, cash; gifts; bonuses; personal use of a car, cell phone, or computer; gas money; clothing; personal items; family vacations; and travel expenses.

**RESPONSE**: Plaintiff objects to each subpart on the grounds that they seek information that is not relevant to the FLSA claims in this action.  In light of this objection, Plaintiff declines to respond to this interrogatory.

6.      If you made any complaint to your host family(ies), InterExchange, the United States Department of State, or any other person or entity regarding wages, benefits, the stipend, your responsibilities as an au pair, or living conditions, identify (a) the date of the complaint; (b) the method of communication of the complaint; (c) the person or entity to whom you directed the complaint; (d) the substance of the complaint; and (e) how the complaint was resolved.

**RESPONSE**: Plaintiff objects to each sub-part as overbroad and unduly burdensome to the extent the requested information is already in InterExchange's possession, custody or control. *See Fast v. Applebee's Intern., Inc.*, 2008 WL 5432288, at *2 (W.D. Mo. 2008) (discovery of opt ins must not otherwise be available to defendants).  Plaintiff also objects to each subpart on the grounds that they seek information that is not relevant to the FLSA claims in this action.  In light of these objections, Plaintiff declines to respond to this interrogatory.

II.      **REQUESTS FOR PRODUCTION**

1.      All documents identified or referenced in your answer to any Interrogatory.

Defs.' Appx. 00000899

## **<u>VERIFICATION</u>**

Pursuant to 28 U.S.C. § 1746, I, Silvia Rojas Castro, hereby declare, under the penalty of perjury under the laws of the United States of America, that my responses to InterExchange's Interrogatories, Requests for Production, and Requests for Admission are true and correct to the best of my knowledge, belief and information.

Dated this 05 day of February, 2018.

<u>San José</u>, Costa Rica.

BY: _____

1

1          IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO
2
     Civil Action No. 14-cv-03074-CMA-KMT
3    ─────────────────────────────────────────────

4    VIDEOTAPE DEPOSITION OF:   JOHANA PAOLA BELTRAN
                                August 30, 2016
5    ─────────────────────────────────────────────

6    JOHANA PAOLA BELTRAN; LUSAPHO HLATSHANENI; BEAUDETTE
     DEEELEFS; DAYANNA PAOLA CARDENA CAICEDO; ALEXANDRA
7    IVETTE GONZALEZ; on behalf of themselves and others
     similarly situated,
8
     Plaintiffs,
9
     v.
10
     INTEREXCHANGE, INC.; USAUPAIR, INC.; GREATAUPAIR, LLC;
11   EXPERT GROUP INTERNATIONAL INC., d/b/a EXPERT AUPAIR;
     EURAUPAIR INTERCULTURAL CHILD CARE PROGRAMS; CULTURAL
12   HOMESTAY INTERNATIONAL; CULTURAL CARE, INC. d/b/a
     CULTURAL CARE AU PAIR; AUPAIRCARE INC.; AU PAIR
13   INTERNATIONAL, INC.; APF GLOBAL EXCHANGE, NFP d/b/a
     AUPAIR FOUNDATION; AMERICAN INSTITUTE FOR FOREIGN STUDY
14   d/b/a AU PAIR IN AMERICA; AMERICAN CULTURAL EXCHANGE,
     LLC, d/b/a GOAUPAIR; AGENT AU PAIR, INC.; A.P.EX.
15   AMERICAN PROFESSIONAL EXCHANGE, LLC d/b/a PROAUPAIR;
     and 20/20 CARE EXCHANGE, INC. d/b/a THE INTERNATIONAL
16   AU PAIR EXCHANGE, and ASSOCIATES IN CULTURAL EXCHANGE,
     d/b/a GOAUPAIR,
17
     Defendants.
18   ─────────────────────────────────────────────

19

20

21

22   H+G

23

24   Hunter + Geist, Inc.

25
     303.832.5966      1900 Grant Street, Suite 1025    ■ www.huntergeist.com
     800.525.8490      Denver, CO 80203                 ■ scheduling@huntergeist.com

                       Your Partner in Making the Record

Court Reporting, Legal Videography, and Videoconferencing

**JOHANA PAOLA BELTRAN - 8/30/2016**
**Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.**

41

```
10:33:16   1   their website?
10:33:36   2       A. Well, it was going to offer an opportunity
10:33:39   3   to go abroad to study and also to have a family with
10:33:44   4   which to share things.
10:33:50   5       Q. What else did you look at or read on
10:33:53   6   InterExchange's website prior to applying for the
10:33:56   7   au pair program?
10:34:13   8       A. In exchange for the work doing -- with the
10:34:15   9   kids and helping them, that they would give us a tip to
10:34:23   10  be able to study.
10:34:24   11      Q. Did you read on InterExchange's website
10:34:27   12  how much you would receive for your education as part
10:34:30   13  of the au pair program?
10:34:31   14      A. Nowhere.
10:34:47   15      Q. When you were looking at the InterExchange
10:34:50   16  website, did you read anything about job duties that
10:34:53   17  you might be expected to perform for the host family?
10:35:15   18      A. No. It just said that we would help --
10:35:19   19  specifically we'd help the children, help them with the
10:35:23   20  children.
10:35:23   21      Q. When you were looking on the InterExchange
10:35:26   22  website, did you read anything about the hours you
10:35:29   23  might be asked to work as part of the au pair program?
10:35:39   24      A. No.
10:35:40   25      Q. When you were looking at the InterExchange
```

42

```
10:35:42   1   website, did you read anything about how much money you
10:35:46   2   might make from the host families as part of the
10:35:50   3   au pair program?
10:36:00   4       A. No.
10:36:03   5       Q. Is there anything else that you recall
10:36:06   6   reading or looking at on the InterExchange website
10:36:08   7   before you applied for the au pair program?
10:36:20   8       A. No.
10:36:27   9       Q. Other than InterExchange, did you look
10:36:30   10  into applying to any of the other sponsors of the
10:36:34   11  au pair program?
10:36:45   12      A. No.
10:36:47   13      Q. Other than what you were told by your
10:36:50   14  friend Ms. Camargo and the research you did on the
10:36:55   15  InterExchange website, did you look at anything or read
10:36:57   16  anything about the au pair program before you applied?
10:37:14   17      A. No.
10:37:18   18      Q. At any time prior to applying for the au
10:37:21   19  pair program, did you look at the -- at the U.S.
10:37:24   20  Department of State's website?
10:37:25   21      A. No.
10:37:39   22      Q. At any -- have you ever been on the
10:37:41   23  Department of State's website?
10:37:48   24      A. What is that?
10:37:50   25      Q. Do you know what the U.S. Department of
```

43

```
10:37:52   1   State is?
10:38:03   2       A. I don't understand.
10:38:05   3       Q. Do you know what the -- I'm just asking if
10:38:07   4   you know what the Department of State is?  The
10:38:09   5   U.S. -- United States Department of State.
10:38:17   6       A. No.
10:38:20   7       Q. Do you understand that the au pair program
10:38:22   8   is run by the U.S. Government?
10:38:35   9       A. Yes.
10:38:35   10      Q. What is your understanding of the U.S.
10:38:37   11  Government's involvement in the au pair program?
10:38:52   12      A. They are the ones that approve the visas.
10:38:56   13      Q. Other than approving visas, do you have
10:38:58   14  any belief as to the U.S. Government's involvement in
10:39:02   15  the au pair program?
10:39:05   16      A. No.
10:39:22   17      Q. Before you decided to apply to become an
10:39:24   18  au pair, did you discuss your decision with anyone,
10:39:28   19  your family, friends, anybody like that?
10:39:41   20      A. Family.
10:39:42   21      Q. Who in your family did you talk to?
10:39:47   22      A. With my mom.
10:39:49   23      Q. Anyone else?
10:39:51   24      A. Sisters.
10:39:55   25      Q. Anyone else?
```

44

```
10:39:57   1       A. No.
10:40:00   2       Q. Did they support your decision to apply to
10:40:02   3   become an au pair?
10:40:13   4       A. Yes.
10:40:13   5       Q. So you spoke with your family.  Any
10:40:15   6   friends that you spoke to other than Ms. Camargo prior
10:40:18   7   to applying?
10:40:28   8       A. No.
10:40:30   9       Q. Other than Ms. Camargo, who I understand
10:40:34   10  was applying for the program, did you speak with
10:40:41   11  any -- anybody who had been an au pair before?  Prior
10:40:45   12  to applying.
10:41:03   13      A. No.
10:41:08   14      Q. Prior to actually arriving in Colorado to
10:41:13   15  live with the Noonans, did you talk to any au pairs or
10:41:18   16  previous au pairs about their experience?
10:41:33   17      A. No.
10:41:48   18      Q. What did you hope to get from the au pair
10:41:51   19  program?  What experiences or benefit did you hope to
10:41:56   20  get?
10:42:05   21      A. To learn a new language.
10:42:09   22      Q. Anything else?
10:42:12   23      A. And a new culture.
10:42:17   24      Q. Anything else?
10:42:20   25      A. New friends.
```

11 (Pages 41 to 44)

JOHANA PAOLA BELTRAN - 8/30/2016
Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.

45

Q. Anything else?
A. No.
Q. Had you ever been to the United States before you arrived to work and live with the Noonans?
A. No.
Q. How much English -- strike that.
How would you describe your ability to speak English at the time you applied to become an au pair?
MR. HOOD: I'm going to mark the answer to this question as confidential, but instruct the witness to answer.
MS. COLAIZZI: Just --
MR. HOOD: Under the protective order. I apologize.
MS. COLAIZZI: Just -- just so I'm clear, what's the grounds for the confidentiality reservation?
MR. HOOD: I don't think we have to present our grounds now.
MS. COLAIZZI: Well, it's for purposes of protecting confidential information. I'm just trying to understand why you think it's confidential.
MR. HOOD: Well, you have the grounds to challenge any markings under the protective order.
MS. COLAIZZI: Right. But I have to have

46

a reason. So . . .
MR. HOOD: Well, we can -- that's for motion practice. Right now I'd just like to mark things as confidential, and if you disagree, we can have that disagreement later.
MS. COLAIZZI: So you're not willing to provide a reason for confidentiality designations?
MR. HOOD: I'm not going to provide a reason each time I mark something as confidential, nor do people provide a reason each time they mark a document as confidential. I'd be happy to talk about a way to do this more efficiently so it doesn't interrupt your questions.
MS. COLAIZZI: No, I just -- I understand before your issues. I'm just wondering now why this is confidential.
MR. HOOD: I -- I think -- we have the right to mark things as confidential, and you have the ability to challenge it under the protective order. But I would be happy to discuss ways to do this more efficiently if you feel like it's interrupting your questions.
MS. COLAIZZI: It's not interrupting. I -- I just don't get it, frankly.
MR. HOOD: Okay.

47

Q. (BY MS. COLAIZZI) How would you describe your ability to speak English at the time you applied to become an au pair?
MR. HOOD: And I mark the answer to this question as confidential, but -- under the protective order, but instruct the witness to answer the question.
A. The basic.
Q. (BY MS. COLAIZZI) What does "the basic" mean to you?
A. Ask questions and greet people, like asking, "Where's the bathroom?" Answering basic questions, your name, where are you from, why are you here, what are you doing.
Q. Prior to applying to become an au pair, had you taken English classes of any kind?
MR. HOOD: I'm going to mark the -- this line of questions regarding Ms. Beltran's English proficiency as confidential under the protective order.
A. Yes.
Q. (BY MS. COLAIZZI) How many English classes had you taken prior to applying to become an au pair?
A. Around eight months.
Q. And did you take them while you were in school or on your own, in some other way?

48

A. Another way.
Q. And tell me about those classes, where you took them.
A. It was at a school that was called Berlitz that was in Bogota, Colombia.
Q. And why did you start taking classes with Berlitz?
A. Because the agency told me it's one of the requirements.
Q. Okay. Had you already applied for the au pair program at the time you took the English classes?
A. Yes.
Q. Before you applied to become an au pair, had you taken any English classes?
A. No.
Q. So at the time that you applied to become an au pair, how had you learned the English that you knew at that point?
A. I didn't know English.
Q. Well, you told me a minute ago that you knew the basics at the time that you applied. Is that correct?
A. I wanted to say when they interviewed me.
Q. Okay. I want to make sure I understand.

12 (Pages 45 to 48)

JOHANA PAOLA BELTRAN - 8/30/2016
Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.

57

| | | |
|---|---|---|
| 11:19:23 | 1 | video of Ms. Beltran's cell phone that has the website |
| 11:19:26 | 2 | pulled up. At the top it says, "Au Pair Exchange," |
| 11:19:30 | 3 | www.aupaircol, c-o-l, .com. In the upper left-hand |
| 11:19:37 | 4 | corner there is a logo, Global Exchange. |
| 11:19:41 | 5 | Q. (BY MS. COLAIZZI)  Ms. Beltran, thank you |
| 11:19:54 | 6 | for pulling the website up on your phone. |
| 11:20:03 | 7 | A. My pleasure. |
| 11:20:05 | 8 | Q. When you were looking at that website |
| 11:20:06 | 9 | prior to applying to become an au pair, what prompted |
| 11:20:10 | 10 | you to go to that specific website? |
| 11:20:32 | 11 | A. Karina gave it to me to be able to look |
| 11:20:34 | 12 | for the address of their offices. |
| 11:20:36 | 13 | Q. When you say, "their offices," who are you |
| 11:20:38 | 14 | referring to? |
| 11:20:42 | 15 | A. Where you would go to apply for the |
| 11:20:44 | 16 | program. |
| 11:20:47 | 17 | Q. And were you specifically looking for the |
| 11:20:49 | 18 | office where you could apply to be sponsored by |
| 11:20:54 | 19 | InterExchange? |
| 11:21:05 | 20 | A. Yes. |
| 11:21:05 | 21 | Q. Have you ever at any point in time visited |
| 11:21:11 | 22 | InterExchange's website? |
| 11:21:20 | 23 | A. No. |
| 11:21:22 | 24 | Q. Other than Global Exchange, have you ever |
| 11:21:26 | 25 | visited any other website related to the au pair |

58

| | | |
|---|---|---|
| 11:21:29 | 1 | program in any way? |
| 11:21:40 | 2 | A. No. |
| 11:21:43 | 3 | Q. Other than looking at the Global Exchange |
| 11:21:45 | 4 | website, did you do any other research or investigation |
| 11:21:49 | 5 | on your own prior to applying to become an au pair? |
| 11:22:11 | 6 | A. No. |
| 11:22:14 | 7 | Q. Thank you for allowing us to clarify. |
| 11:22:20 | 8 | A. No need to thank me. |
| 11:22:26 | 9 | Q. Where did you go to apply to become an |
| 11:22:28 | 10 | au pair? |
| 11:22:36 | 11 | A. Bogota. |
| 11:22:39 | 12 | Q. What specific location in Bogota? |
| 11:22:48 | 13 | A. Downtown Bogota. |
| 11:22:50 | 14 | Q. And how did you -- how did you learn that |
| 11:22:54 | 15 | that was the place you needed to go in order to apply? |
| 11:23:05 | 16 | A. Karina told me, and then I saw that it was |
| 11:23:09 | 17 | on the page. |
| 11:23:09 | 18 | Q. And by "page," are you referring to the |
| 11:23:12 | 19 | Global Exchange website that we just discussed a moment |
| 11:23:14 | 20 | ago? |
| 11:23:22 | 21 | A. Yes. |
| 11:23:22 | 22 | Q. Was anyone with you when you went to |
| 11:23:24 | 23 | apply? |
| 11:23:31 | 24 | A. No one. |
| 11:23:33 | 25 | Q. Did you fill out an application when you |

59

| | | |
|---|---|---|
| 11:23:36 | 1 | visited the office in downtown Bogota? |
| 11:23:45 | 2 | A. The first day. |
| 11:23:51 | 3 | THE DEPONENT:  (In English)  No. |
| 11:23:53 | 4 | A. Not the first day. |
| 11:23:53 | 5 | Q. (BY MS. COLAIZZI)  Okay.  What happened |
| 11:23:54 | 6 | the first day you visited the office in downtown |
| 11:23:57 | 7 | Bogota? |
| 11:24:06 | 8 | A. They told me the price, the cost, and what |
| 11:24:08 | 9 | I'd have to do in terms of requirements. |
| 11:24:13 | 10 | Q. Do you recall what name was on the |
| 11:24:15 | 11 | building or the office that you visited in downtown |
| 11:24:18 | 12 | Bogota? |
| 11:24:27 | 13 | A. I don't remember. |
| 11:24:29 | 14 | Q. How many people did you speak with at the |
| 11:24:31 | 15 | office that first time you visited? |
| 11:24:41 | 16 | A. I think it was two. |
| 11:24:43 | 17 | Q. Do you remember their names? |
| 11:24:45 | 18 | A. No. |
| 11:24:46 | 19 | Q. Were they men or women? |
| 11:24:50 | 20 | A. One man and one woman. |
| 11:24:57 | 21 | Q. And what did they tell you about the |
| 11:24:59 | 22 | price? |
| 11:25:07 | 23 | A. That it did -- it didn't have to be paid |
| 11:25:11 | 24 | all the same day, that it could be done by payments. |
| 11:25:14 | 25 | Q. And what was the total amount that they |

60

| | | |
|---|---|---|
| 11:25:15 | 1 | gave you that day? |
| 11:25:26 | 2 | A. I don't remember exactly, but I think that |
| 11:25:30 | 3 | they said it was about 5 million pesos. |
| 11:25:35 | 4 | Q. Do you know how much that was in U.S. |
| 11:25:37 | 5 | dollars? |
| 11:25:42 | 6 | A. No. |
| 11:25:53 | 7 | Q. And you also indicated that they talked to |
| 11:25:57 | 8 | you about what you would have to do, or the |
| 11:25:57 | 9 | requirements; is that correct? |
| 11:26:06 | 10 | A. Yes. |
| 11:26:06 | 11 | Q. What did they tell you about the |
| 11:26:08 | 12 | requirements? |
| 11:26:13 | 13 | A. I would have to take English classes. |
| 11:26:19 | 14 | Q. What else? |
| 11:26:22 | 15 | A. Swimming. |
| 11:26:27 | 16 | Q. What else? |
| 11:26:29 | 17 | A. First aid. |
| 11:26:34 | 18 | Q. And what else? |
| 11:26:38 | 19 | A. Driving classes. |
| 11:26:43 | 20 | Q. What else? |
| 11:26:55 | 21 | A. I would have to be enrolled in a school |
| 11:26:57 | 22 | like -- well, not a secondary school, but some sort of |
| 11:27:01 | 23 | university course. |
| 11:27:03 | 24 | Q. Was that university course something you |
| 11:27:05 | 25 | would take in Colombia? |

15 (Pages 57 to 60)

**JOHANA PAOLA BELTRAN - 8/30/2016**
**Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.**

---

105

```
14:02:46   1    up. When you say, "that," what are you referring to?
14:02:52   2        A. The first week that I received a check.
14:02:54   3        Q. Okay. I want to stick for just a minute
14:02:57   4    with the conversations you had while you were still in
14:03:00   5    Colombia. Okay?
14:03:07   6        A. Okay.
14:03:08   7        Q. While you were still in Colombia did you
14:03:10   8    have any conversations with Mrs. Noonan about what you
14:03:14   9    would be paid?
14:03:22  10        A. No.
14:03:24  11        Q. Did you have any conversations with
14:03:26  12    Mrs. Noonan while you were still in Colombia about how
14:03:29  13    many hours they would ask you to work in a week?
14:03:43  14        A. I think so.
14:03:44  15        Q. What do you recall about those
14:03:45  16    conversations?
14:03:50  17        MR. HOOD: I'm going to mark the response
14:03:51  18    to this question and any line of questions about the
14:03:54  19    number of hours worked as confidential under the
14:03:56  20    protective order, but I instruct the witness -- I'm
14:03:59  21    sorry. But I instruct the witness to respond to the
14:04:13  22    question.
14:04:22  23        A. Can you repeat the question, please.
14:04:24  24        MS. COLAIZZI: Can you read it back,
14:04:25  25    please.
```

106

```
14:03:44   1        (The last question was read back as
14:03:44   2    follows: "What do you recall about those
14:03:45   3    conversations?")
14:04:38   4        Q. (BY MS. COLAIZZI) And just for
14:04:39   5    clarification, it was the conversations about the
14:04:41   6    number of hours they would have you work in a week.
14:04:55   7        A. 45.
14:05:15   8        Q. Prior to going to live with the Noonans
14:05:17   9    you spent some time in New York, correct?
14:05:26  10        A. That's true.
14:05:27  11        Q. Okay. And you flew to New York from
14:05:30  12    Bogota, correct?
14:05:35  13        A. Yes.
14:05:36  14        Q. When you flew to New York did you
14:05:37  15    understand what you would be doing during that time in
14:05:40  16    New York?
14:05:51  17        A. Yes.
14:05:51  18        Q. What was your understanding of what you
14:05:53  19    would be doing in New York?
14:06:01  20        A. It was a training with other au pairs.
14:06:04  21        Q. Did you know ahead of time what the
14:06:07  22    subject matter of that training would be?
14:06:16  23        A. No.
14:06:18  24        Q. Did you ask anyone? Meaning before you
14:06:23  25    left for New York from Colombia.
```

107

```
14:06:27   1        A. No.
14:06:29   2        Q. How many days did you spend in New York
14:06:32   3    prior to going to live with the Noonans?
14:06:39   4        A. Around a week.
14:06:42   5        Q. And you received training during that
14:06:44   6    week; is that correct?
14:06:50   7        A. That's true.
14:06:51   8        Q. Okay. What types of things did you
14:06:53   9    receive training about during that week?
14:07:08  10        A. I don't remember everything, but I can say
14:07:10  11    that they were showing us how to change diapers, they
14:07:17  12    would have a doll that we would practice on on how to
14:07:21  13    do it. And in case of an accident with the children,
14:07:32  14    what things we were -- we were to do. And so we also
14:07:47  15    learned what would happen -- what to do if one of the
14:07:49  16    children were eating and started to get choking on food
14:07:53  17    and how to use first aid to -- to resolve that.
14:08:01  18        Q. Do you recall receiving any training
14:08:03  19    during your week in New York that was not related in
14:08:05  20    some way to taking care of children?
14:08:17  21        A. No.
14:08:27  22        Q. When you left Colombia to travel to New
14:08:30  23    York, did you expect to be paid for your time in New
14:08:33  24    York?
14:08:42  25        A. Yes.
```

108

```
14:08:42   1        Q. And why did you expect to be paid?
14:08:50   2        A. That was part of what happens when you
14:08:53   3    were becoming an au pair.
14:08:54   4        Q. What do you mean, that's part of what -- I
14:08:56   5    don't understand your answer. Can you explain?
14:09:11   6        A. Well, when you get to the United States,
14:09:16   7    that's part of when you're becoming an au pair.
14:09:18   8        Q. Did anybody specifically tell you that you
14:09:29  10    would be paid for any part of your time in New York?
14:09:30  11        A. No.
14:09:31  12        Q. Did you ask anyone that question, whether
14:09:33  13    you would be paid?
14:09:40  14        A. No.
14:09:42  15        Q. Did you stay in a hotel while you were in
14:09:45  16    New York?
14:09:49  17        A. Yes.
14:09:50  18        Q. Who paid for your hotel?
14:09:56  19        A. I don't know very well.
14:09:57  20        Q. Did you pay for it?
14:09:59  21        A. No.
14:10:00  22        Q. Did you receive any money for meals during
14:10:03  23    your time in New York?
14:10:07  24        A. No.
14:10:17  25        Q. Did -- during your time in New York were
14:10:19       you given any papers or documents to keep and take with
```

27 (Pages 105 to 108)

Defs.' Appx. 00000905

**JOHANA PAOLA BELTRAN - 8/30/2016**
**Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.**

---

113

| | |
|---|---|
| 14:17:45 1 | if they could help you understand any document? |
| 14:17:58 2 | A. No. |
| 14:17:59 3 | Q. Why not? |
| 14:18:04 4 | A. Because I thought everybody there spoke |
| 14:18:06 5 | English. |
| 14:18:09 6 | Q. But if somebody speaks English, they could |
| 14:18:12 7 | help you; isn't that right? |
| 14:18:18 8 | A. Well, my English wasn't so good to be able |
| 14:38:20 9 | to understand it. |
| 14:18:21 10 | Q. So you didn't think you would be able to |
| 14:18:23 11 | understand their help; is that what I'm hearing? |
| 14:18:37 12 | A. Well, for the document, if they were to |
| 14:18:41 13 | explain it to me in English, no. |
| 14:18:42 14 | Q. Okay. So you believed in order to get any |
| 14:18:46 15 | assistance with the document, you needed somebody who |
| 14:18:49 16 | was bilingual in both English and Spanish; is that |
| 14:18:53 17 | correct? |
| 14:19:09 18 | A. Yes. |
| 14:19:09 19 | Q. When you agreed to become an au pair, did |
| 14:19:13 20 | you have any understanding of the circumstances under |
| 14:19:18 21 | which your participation in the program could end |
| 14:19:21 22 | early? |
| 14:19:38 23 | A. What does that mean? |
| 14:19:41 24 | Q. When you decided to become an au pair, did |
| 14:19:42 25 | you think that you could leave the program at any time? |

---

114

| | |
|---|---|
| 14:19:55 1 | A. Yes. |
| 14:19:55 2 | Q. Okay. Did you believe that your host |
| 14:19:57 3 | family could decide not to have you live with them |
| 14:20:02 4 | anymore at any time? |
| 14:20:17 5 | A. Yes. |
| 14:20:17 6 | Q. Did you have any understanding as to |
| 14:20:19 7 | whether or not InterExchange could end your |
| 14:20:22 8 | participation in the program? |
| 14:20:34 9 | A. No. |
| 14:20:52 10 | Q. Prior to arriving in the United States to |
| 14:20:59 11 | begin living with the Noonans, did you have any |
| 14:21:02 12 | understanding of why your weekly pay would be 195.75? |
| 14:21:28 13 | A. More or less. |
| 14:21:28 14 | Q. What was your understanding? |
| 14:21:35 15 | A. That it was a tip for helping the family |
| 14:21:37 16 | with the kids. |
| 14:21:38 17 | Q. But do you know why the number was 195.75 |
| 14:21:43 18 | as opposed to something else? |
| 14:21:52 19 | A. No. |
| 14:21:53 20 | Q. At any point during your participation in |
| 14:21:55 21 | the au pair program did you come to an understanding of |
| 14:21:59 22 | why the figure was 195.75 as opposed to something else? |
| 14:22:17 23 | A. Yes. |
| 14:22:17 24 | Q. When did you come to an understanding of |
| 14:22:20 25 | that? |

---

115

| | |
|---|---|
| 14:22:24 1 | A. After a week of work. |
| 14:22:25 2 | Q. Okay. And how did you come to that |
| 14:22:28 3 | understanding? |
| 14:22:39 4 | A. The family said that InterExchange said |
| 14:22:42 5 | that that was going to be my weekly pay. |
| 14:22:45 6 | Q. When did the family say that? |
| 14:22:50 7 | A. When they gave me the first check. |
| 14:22:52 8 | Q. How much was your first check? |
| 14:23:00 9 | A. 195 and 75 cents. |
| 14:23:03 10 | Q. Okay. Is that what you were expecting for |
| 14:23:05 11 | your first week of work? |
| 14:23:11 12 | A. No. |
| 14:23:11 13 | Q. Why not? |
| 14:23:14 14 | A. 'Cause I didn't know. |
| 14:23:16 15 | Q. Well, weren't you told in Colombia that it |
| 14:23:19 16 | would be 195.75? |
| 14:23:27 17 | A. Yeah, I saw that it was in a contract |
| 14:23:29 18 | there. |
| 14:23:30 19 | Q. Okay. So if it -- if you didn't expect to |
| 14:23:33 20 | get 195.75, what did you expect to get? |
| 14:23:47 21 | A. I didn't understand exactly the value of |
| 14:23:50 22 | it and how much it was. |
| 14:23:53 23 | Q. What do you mean by you didn't understand |
| 14:23:54 24 | the value of it? |
| 14:24:00 25 | A. It was all in dollars, and it was new to |

---

116

| | |
|---|---|
| 14:24:03 1 | me. |
| 14:24:04 2 | MR. HOOD: I'd just like to object to the |
| 14:24:06 3 | translation again, and "valor" can mean either value or |
| 14:24:10 4 | cost in English. |
| 14:24:12 5 | MS. COLAIZZI: Okay. |
| 14:24:13 6 | Q. (BY MS. COLAIZZI) When you were in |
| 14:24:15 7 | Colombia, I believe it was during the interview at your |
| 14:24:18 8 | third meeting at the office in downtown Bogota you were |
| 14:24:28 9 | told that you would be paid 195.75 a week, correct? |
| 14:24:44 10 | A. Yes, because I asked them. |
| 14:24:46 11 | Q. Okay. And that's what -- and you were, in |
| 14:24:48 12 | fact, paid 195.75 for your first week of work with the |
| 14:24:53 13 | Noonans, correct? |
| 14:25:03 14 | A. Yes. |
| 14:25:03 15 | Q. Okay. |
| 14:25:05 16 | THE VIDEOGRAPHER: Counsel, five minutes |
| 14:25:06 17 | to media change. |
| 14:25:06 18 | MS. COLAIZZI: Okay. Why don't we go |
| 14:25:08 19 | ahead and change. |
| 14:25:11 20 | THE DEPONENT: Can I have a break? |
| 14:25:13 21 | THE VIDEOGRAPHER: Going off the record. |
| 14:25:15 22 | This is the end of Media Unit No. 2 in the videotape |
| 14:25:16 23 | deposition of Johana Paola Beltran. The time is |
| 14:25:20 24 | 2:25 p.m. We are off the record. |
| 14:25:24 25 | (Recess taken, 2:25 p.m. to 2:39 p.m.) |

---

29 (Pages 113 to 116)

**JOHANA PAOLA BELTRAN - 8/30/2016**
**Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.**

---

129

| | | |
|---|---|---|
| 15:01:28 | 1 | up anymore. |
| 15:01:29 | 2 | Q. So if you didn't have a schedule to look |
| 15:01:32 | 3 | at, how did you know what you were supposed to be doing |
| 15:01:35 | 4 | when? |
| 15:01:45 | 5 | A. And she would tell me that day from one |
| 15:01:48 | 6 | hour to the next hour what to do. |
| 15:01:57 | 7 | Q. Did you keep any records of what -- let me |
| 15:02:02 | 8 | back up. |
| 15:02:03 | 9 | I'm assuming that by "she," you mean |
| 15:02:05 | 10 | Mrs. Noonan; is that correct? |
| 15:02:10 | 11 | A. Yes. |
| 15:02:11 | 12 | Q. Did you ever take direction as far as what |
| 15:02:14 | 13 | you were supposed to be doing from anyone other than |
| 15:02:17 | 14 | Mrs. Noonan? |
| 15:02:17 | 15 | A. No. |
| 15:02:26 | 16 | Q. Did you make any effort to keep a record |
| 15:02:29 | 17 | of the hours that you worked or the things that the |
| 15:02:33 | 18 | Noonans asked you to do on a daily basis? |
| 15:02:47 | 19 | A. No. |
| 15:03:07 | 20 | MS. COLAIZZI: 19. |
| 15:03:07 | 21 | THE DEPONENT: Thank you. |
| 15:03:07 | 22 | (Deposition Exhibit 19 was marked.) |
| 15:03:07 | 23 | Q. (BY MS. COLAIZZI) Ms. Beltran, you've |
| 15:03:11 | 24 | been handed what's been marked as Exhibit 19. Do you |
| 15:03:14 | 25 | recognize this document at all? |

---

130

| | | |
|---|---|---|
| 15:03:26 | 1 | A. I'm looking at it. No. |
| 15:03:34 | 2 | Q. Do you recall if you received anything |
| 15:03:36 | 3 | like this during your training in New York? |
| 15:03:50 | 4 | A. I'm not sure, but I don't think so. |
| 15:03:58 | 5 | Q. When you first arrived to work for the |
| 15:04:00 | 6 | Noonans, did you have kind of a first conversation with |
| 15:04:03 | 7 | Mrs. Noonan about what she was going to expect of you? |
| 15:04:18 | 8 | A. Like what? |
| 15:04:20 | 9 | Q. Was there some point when you arrived when |
| 15:04:22 | 10 | Mrs. Noonan explained to you what she was going to |
| 15:04:26 | 11 | expect you to do? |
| 15:04:32 | 12 | A. No. |
| 15:04:34 | 13 | Q. So did she just tell you on a day-to-day |
| 15:04:36 | 14 | basis? |
| 15:04:46 | 15 | A. Yes. |
| 15:04:46 | 16 | Q. You mentioned before that you worked some |
| 15:04:48 | 17 | hours in the morning. Explain to me generally what |
| 15:04:51 | 18 | your mornings looked like while you were working for |
| 15:04:53 | 19 | the Noonans. |
| 15:05:09 | 20 | A. Something around like this. That we'd |
| 15:05:12 | 21 | start out at 7:00, clean the kitchen, and then from |
| 15:05:21 | 22 | there do laundry and then have a break. |
| 15:05:31 | 23 | Q. Did Ms. Noonan schedule your breaks? |
| 15:05:40 | 24 | A. Well, they really weren't breaks. |
| 15:05:45 | 25 | Q. What were they? It was your word. So |

---

131

| | | |
|---|---|---|
| 15:05:47 | 1 | what were they? |
| 15:05:58 | 2 | A. If it was like that I didn't -- she didn't |
| 15:06:02 | 3 | need me to do anything else at that moment because I |
| 15:06:05 | 4 | was going to do something else later on in the |
| 15:06:07 | 5 | afternoon or in the evening. |
| 15:06:08 | 6 | Q. So your mornings typically involved |
| 15:06:11 | 7 | cleaning the kitchen and laundry. Anything else? |
| 15:06:25 | 8 | A. And then it would be starting out with the |
| 15:06:27 | 9 | chickens. |
| 15:06:28 | 10 | Q. What do you mean, "starting out with the |
| 15:06:31 | 11 | chickens"? |
| 15:06:33 | 12 | A. Giving them food. Feeding them. |
| 15:06:36 | 13 | Q. Did you feed them every day? |
| 15:06:44 | 14 | A. Yes. |
| 15:06:44 | 15 | Q. Did you do anything with the children in |
| 15:06:46 | 16 | the mornings? |
| 15:06:50 | 17 | A. No. |
| 15:06:50 | 18 | Q. No. How old were the children? |
| 15:07:00 | 19 | A. I think the youngest was 9 or 10. And the |
| 15:07:06 | 20 | oldest was 12. I think. |
| 15:07:11 | 21 | Q. Did you have a good relationship with the |
| 15:07:12 | 22 | children? |
| 15:07:20 | 23 | A. Yes. |
| 15:07:20 | 24 | Q. So you mentioned that in the mornings you |
| 15:07:22 | 25 | cleaned the kitchen. Was that every morning? |

---

132

| | | |
|---|---|---|
| 15:07:37 | 1 | A. Yes. |
| 15:07:37 | 2 | Q. And did Mrs. Noonan ask you to do that? |
| 15:07:45 | 3 | A. Yes, of course. |
| 15:07:51 | 4 | Q. Did the family usually eat breakfast in |
| 15:07:54 | 5 | the kitchen in the mornings? |
| 15:08:00 | 6 | A. Yes. |
| 15:08:01 | 7 | Q. So when you cleaned it, it would be after |
| 15:08:03 | 8 | breakfast? |
| 15:08:09 | 9 | A. Before. |
| 15:08:10 | 10 | Q. You cleaned the kitchen before breakfast? |
| 15:08:16 | 11 | A. Yes. |
| 15:08:16 | 12 | Q. What did you have to do when you cleaned |
| 15:08:17 | 13 | the kitchen? Walk me through the things you had to do. |
| 15:08:29 | 14 | A. Wash the dishes. To clean around the |
| 15:08:36 | 15 | counters, and clean the stove. And sometimes the |
| 15:08:47 | 16 | refrigerator. |
| 15:08:49 | 17 | Q. Anything else? |
| 15:08:52 | 18 | A. And sweep and clean the floor too. |
| 15:08:58 | 19 | Q. Anything else? |
| 15:09:01 | 20 | A. Not that I can recall. |
| 15:09:03 | 21 | Q. If you were cleaning before breakfast, |
| 15:09:06 | 22 | what dishes were you washing? |
| 15:09:17 | 23 | A. The ones from the night before. |
| 15:09:20 | 24 | Q. Did you ever have to clean the kitchen |
| 15:09:21 | 25 | the -- at night? |

---

33 (Pages 129 to 132)

JOHANA PAOLA BELTRAN - 8/30/2016
Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.

149

```
15:44:25   1        Q.  And why was she calling you?
15:44:32   2        A.  Because she knew that I wanted to leave
15:44:35   3   the house.
15:44:36   4        Q.  And how did she know that?
15:44:44   5        A.  I don't know, but I think the Colorado
15:44:46   6   representative told them.
15:44:47   7        Q.  Had you told the Colorado representative
15:44:49   8   that you wanted to leave?
15:44:55   9        A.  No.
15:44:56  10        Q.  So how would she possibly know that you
15:45:00  11   wanted to leave?
15:45:04  12        A.  The family.
15:45:04  13        Q.  You told the family you wanted to leave?
15:45:09  14        A.  Yes.
15:45:09  15        Q.  When did you tell the family you wanted to
15:45:11  16   leave?
15:45:16  17        A.  I don't remember exactly.
15:45:17  18        Q.  Do you remember the month?
15:45:20  19        A.  No.
15:45:22  20        Q.  Do you remember how long it was after you
15:45:23  21   started?
15:45:33  22        A.  It was around probably when I was about
15:45:37  23   finished with three months, around there.
15:45:40  24        Q.  And what did you tell the family about why
15:45:42  25   you wanted to leave?
```

150

```
15:45:53   1        A.  I told them really that they didn't really
15:45:55   2   need an au pair, that what they really needed was a
15:46:00   3   housekeeper.
15:46:00   4        Q.  Prior to talking to the family about
15:46:03   5   wanting to leave, had you talked about your concerns
15:46:05   6   with your experience with anyone else?
15:46:19   7        A.  Yes.
15:46:19   8        Q.  Who?
15:46:23   9        A.  With my mom.
15:46:23  10        Q.  Okay.  Anyone other than your mother?
15:46:28  11        A.  No.
15:46:29  12        Q.  Who was it from the Noonan family that you
15:46:33  13   told you wanted to leave?
15:46:40  14        A.  With Mrs. Noonan.
15:46:45  15        Q.  And how did she respond?
15:46:52  16        A.  She asked me if I could wait a little
15:46:54  17   while longer.
15:46:54  18        Q.  Did she say why?
15:47:00  19        A.  She had a lot of things that had piled up
15:47:03  20   on her.
15:47:04  21        Q.  Like what types of things, do you know?
15:47:13  22        A.  She was going to have some remodeling done
15:47:15  23   in the house, and she needed some help with that.
15:47:19  24        Q.  Okay.  Was Priscilla still living in the
15:47:22  25   house at the time you told Mrs. Noonan you wanted to
```

151

```
15:47:26   1   leave?
15:47:30   2        A.  No.
15:47:35   3        Q.  How did you respond to Mrs. Noonan's
15:47:38   4   request that you wait a little while longer?
15:47:50   5        A.  I told her that I was sorry, but I
15:47:53   6   couldn't.  I didn't want to stay any longer.
15:47:56   7        Q.  And how did she respond to that?
15:48:01   8        A.  She said she was going to talk to the
15:48:02   9   representative.
15:48:07  10        Q.  Prior to your conversation with
15:48:10  11   Mrs. Noonan, had you made any effort to reach out to
15:48:10  12   anyone from InterExchange about your concern?
15:48:23  13        A.  Yes.
15:48:23  14        Q.  Who did you -- how?  Or who did you try to
15:48:27  15   contact and by what method?
15:48:34  16        A.  When they called me directly from
15:48:37  17   InterExchange in New York.
15:48:38  18        Q.  But that was after your conversation with
15:48:40  19   Mrs. Noonan, correct?
15:48:45  20        A.  Yes.
15:48:45  21        Q.  Okay.  Before your conversation with
15:48:47  22   Mrs. Noonan, did you make any effort to contact
15:48:50  23   InterExchange about your concern?
15:48:59  24        A.  No.
15:48:59  25        Q.  Why not?
```

152

```
15:49:02   1        A.  I didn't know how to get ahold of them.
15:49:05   2        Q.  You had access to a computer, right?
15:49:10   3        A.  Yes.
15:49:10   4        Q.  Could you have looked on the Internet?
15:49:16   5        A.  I didn't know how.
15:49:18   6        Q.  Did you know how to run a search engine?
15:49:27   7        A.  For why?
15:49:28   8        Q.  Did you know how to use the Internet at
15:49:33   9   that time?
15:49:39  10        A.  The basic.
15:49:40  11        Q.  You could use Facebook, right?
15:49:44  12        A.  Yes.
15:49:44  13        Q.  Did you ever use Google?
15:49:49  14        A.  Yes.
15:49:50  15        Q.  And did you know how to search for
15:49:51  16   something in Google?
15:49:57  17        A.  Yes.
15:49:57  18        Q.  You mentioned before you had been to a
15:49:59  19   meeting at Patti's house, correct?
15:50:07  20            THE DEPONENT:  Si.  (In English)  Sorry.
15:50:07  21        A.  Yes.
15:50:10  22        Q.  (BY MS. COLAIZZI)  Other than that
15:50:10  23   meeting, had you had any contact with Patti at any
15:50:13  24   other times during your experience -- during your time
15:50:15  25   with the Noonans?
```

38 (Pages 149 to 152)

Defs.' Appx. 00000908

**JOHANA PAOLA BELTRAN - 8/30/2016**
**Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.**

---

157

| | | |
|---|---|---|
| 15:56:58 | 1 | home in the middle of November, correct? |
| 15:57:04 | 2 | A. Yes. |
| 15:57:04 | 3 | Q. Okay. So you left, and the Noonans knew |
| 15:57:08 | 4 | you were leaving, correct? |
| 15:57:13 | 5 | A. Yes. |
| 15:57:13 | 6 | Q. Did InterExchange know you were leaving? |
| 15:57:19 | 7 | A. Yes. I'm sorry. Can I use the bathroom? |
| 15:57:26 | 8 | Q. Yeah. Let's just finish this question, if |
| 15:57:28 | 9 | you can. |
| 15:57:30 | 10 | A. Uh-huh. |
| 15:57:30 | 11 | Q. Did InterExchange know you were leaving? |
| 15:57:33 | 12 | A. Yes. |
| 15:57:34 | 13 | Q. Okay. Who told them? |
| 15:57:41 | 14 | A. I think it was their representative. I'm |
| 15:57:43 | 15 | not sure. |
| 15:57:43 | 16 | Q. The one who called you in November 2012? |
| 15:57:52 | 17 | A. No. |
| 15:57:55 | 18 | Q. Patti? |
| 15:57:57 | 19 | A. I think so. |
| 15:57:58 | 20 | Q. But you never spoke with Patti about your |
| 15:58:00 | 21 | desire to leave the Noonans, correct? |
| 15:58:05 | 22 | A. No. |
| 15:58:07 | 23 | MS. COLAIZZI: We can go ahead and take a |
| 15:58:08 | 24 | break. |
| 15:58:12 | 25 | THE DEPONENT: Thank you. |

---

158

| | | |
|---|---|---|
| 15:58:13 | 1 | THE VIDEOGRAPHER: Going off the record. |
| 15:58:14 | 2 | The time is 3:58 p.m. |
| 15:58:16 | 3 | (Recess taken, 3:58 p.m. to 4:13 p.m.) |
| 16:13:36 | 4 | THE VIDEOGRAPHER: We are back on the |
| 16:13:37 | 5 | record. The time is 4:13 p.m. |
| 16:13:41 | 6 | Q. (BY MS. COLAIZZI) Ms. Beltran, do you |
| 16:13:42 | 7 | know how many hours you worked each week that you were |
| 16:13:50 | 8 | living with the Noonans? |
| 16:13:58 | 9 | A. I'm not sure, but it wasn't less than 45. |
| 16:14:04 | 10 | Q. Do you know for certain that it was more |
| 16:14:05 | 11 | than 45? |
| 16:14:10 | 12 | A. I'm not sure. |
| 16:14:12 | 13 | THE VIDEOGRAPHER: I'm sorry, Ms. Beltran, |
| 16:14:15 | 14 | can you keep your voice up? |
| 16:14:18 | 15 | MR. HOOD: She doesn't have her microphone |
| 16:14:20 | 16 | on. Is that okay? |
| 16:14:22 | 17 | THE DEPONENT: Sorry. I forgot about it. |
| 16:14:24 | 18 | MR. HOOD: Was that all on the record? |
| 16:14:30 | 19 | THE VIDEOGRAPHER: I did pick it up, |
| 16:14:32 | 20 | yes. |
| 16:14:32 | 21 | MR. HOOD: Oh, okay. |
| 16:14:33 | 22 | MS. COLAIZZI: Thank you. |
| 16:14:35 | 23 | Q. (BY MS. COLAIZZI) And you did not keep |
| 16:14:36 | 24 | any records of the hours you worked on a weekly basis, |
| 16:14:39 | 25 | correct? |

---

159

| | | |
|---|---|---|
| 16:14:46 | 1 | A. No, I didn't. |
| 16:14:52 | 2 | Q. To your knowledge, did InterExchange have |
| 16:14:55 | 3 | any input into how many hours a week you worked when |
| 16:14:58 | 4 | you lived with the Noonans? |
| 16:15:15 | 5 | A. What do you mean, that they would -- they |
| 16:15:18 | 6 | would track them? |
| 16:15:19 | 7 | Q. Yes. Do you have any knowledge that they |
| 16:15:22 | 8 | tracked your hours? |
| 16:15:28 | 9 | A. Not that I'm aware of. |
| 16:15:31 | 10 | Q. Do you have any knowledge that they told |
| 16:15:32 | 11 | the Noonans how many hours you should work a week? |
| 16:15:44 | 12 | A. I don't know. |
| 16:15:46 | 13 | Q. Do you have any information that anyone |
| 16:15:48 | 14 | from InterExchange told the Noonans what duties to have |
| 16:15:52 | 15 | you perform? |
| 16:16:05 | 16 | A. No, I don't know. |
| 16:16:07 | 17 | Q. Are you aware of any communications |
| 16:16:10 | 18 | between the Noonans and InterExchange at all during |
| 16:16:18 | 19 | your time living with the Noonans? |
| 16:16:27 | 20 | A. Can you repeat the question? |
| 16:16:29 | 21 | Q. Let me try it this way. Were you present |
| 16:16:32 | 22 | for any conversation between anyone in the Noonan |
| 16:16:36 | 23 | family and anyone from InterExchange during the time |
| 16:16:39 | 24 | you lived with the Noonans? |
| 16:16:51 | 25 | A. No. |

---

160

| | | |
|---|---|---|
| 16:16:58 | 1 | (Interruption occurred in the |
| 16:16:58 | 2 | proceedings.) |
| 16:16:58 | 3 | MS. COLAIZZI: Can someone press 1, |
| 16:17:00 | 4 | please. |
| 16:17:01 | 5 | MR. HOOD: Someone press 1. |
| 16:17:01 | 6 | MS. COLAIZZI: Thank you. Boss me around. |
| 16:17:10 | 7 | Q. (BY MS. COLAIZZI) Okay. Ms. Beltran, you |
| 16:17:12 | 8 | left the Noonans in mid-November 2012, correct? |
| 16:17:24 | 9 | A. Yes. |
| 16:17:24 | 10 | Q. At that point in time were you wanting to |
| 16:17:26 | 11 | find another host family to live with? |
| 16:17:40 | 12 | A. How's that? |
| 16:17:41 | 13 | Q. When you left the Noonans, were you |
| 16:17:46 | 14 | wanting to find another host family to live with as an |
| 16:17:49 | 15 | au pair? |
| 16:17:50 | 16 | A. Yes. |
| 16:17:59 | 17 | Q. And did you have conversations with anyone |
| 16:18:02 | 18 | from InterExchange about your desire to find another |
| 16:18:05 | 19 | host family? |
| 16:18:14 | 20 | A. Yes. |
| 16:18:14 | 21 | Q. Do you know who you were speaking with? |
| 16:18:19 | 22 | A. No. |
| 16:18:20 | 23 | Q. Were those communications by email or by |
| 16:18:23 | 24 | some other method? |
| 16:18:30 | 25 | A. Telephone. |

40 (Pages 157 to 160)

---

**Hunter + Geist, Inc.**
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

**JOHANA PAOLA BELTRAN - 8/30/2016**
**Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.**

---

177

| | |
|---|---|
| 16:58:07  1 | A.  Yes. |
| 16:58:07  2 | Q.  Where did you go after that? |
| 16:58:13  3 | A.  To New Jersey. |
| 16:58:14  4 | Q.  Okay.  Why did you go to New Jersey? |
| 16:58:23  5 | A.  Because they had sent my papers for the |
| 16:58:25  6 | student visa. |
| 16:58:27  7 | Q.  When did -- do you recall when it was that |
| 16:58:29  8 | you first requested a student visa? |
| 16:58:40  9 | A.  When I was in California. |
| 16:58:41 10 | Q.  Do you remember a month? |
| 16:58:44 11 | A.  No. |
| 16:58:44 12 | Q.  Was it in 2012 or 2013? |
| 16:58:51 13 | A.  I don't remember. |
| 16:58:52 14 | Q.  Were you living -- you were living with |
| 16:58:54 15 | Jorge at the time you requested it; is that correct? |
| 16:59:00 16 | A.  Yes. |
| 16:59:01 17 | Q.  Okay.  So you got your student visa, and |
| 16:59:03 18 | you elected to go to New Jersey, correct? |
| 16:59:11 19 | A.  Yes.  When I sent my paperwork. |
| 16:59:14 20 | Q.  Okay.  And when you sent your paperwork, |
| 16:59:16 21 | you had to tell them where you were going to go to |
| 16:59:19 22 | school; is that correct? |
| 16:59:26 23 | A.  I sent them directly to the school. |
| 16:59:28 24 | Q.  Why did you pick New Jersey? |
| 16:59:35 25 | A.  Because my representative lives there. |

178

| | |
|---|---|
| 16:59:38  1 | Q.  Meaning Mr. Salazar? |
| 16:59:40  2 | A.  Yes. |
| 16:59:40  3 | Q.  How did it come to be that Mr. Salazar |
| 16:59:43  4 | agreed to sponsor your student visa? |
| 16:59:55  5 | A.  Because he's from the same country. |
| 16:59:59  6 | Q.  Meaning Colombia? |
| 17:00:00  7 | A.  Yes. |
| 17:00:01  8 | Q.  Okay.  Did you ask him to sponsor it, or |
| 17:00:04  9 | did he offer? |
| 17:00:13 10 | A.  He offered it. |
| 17:00:14 11 | Q.  Okay.  And did you give him money or |
| 17:00:16 12 | anything in exchange for his agreement to sponsor your |
| 17:00:20 13 | student visa? |
| 17:00:30 14 | A.  Can you repeat the question, please. |
| 17:00:31 15 | MS. COLAIZZI:  Can you read it back, |
| 17:00:32 16 | please. |
| 17:00:15 17 | (The last question was read back as |
| 17:00:15 18 | follows: "And did you give him money or anything in |
| 17:00:17 19 | exchange for his agreement to sponsor your student |
| 17:00:21 20 | visa?") |
| 17:00:48 21 | A.  No. |
| 17:00:52 22 | Q.  (BY MS. COLAIZZI)  And when you went to |
| 17:00:54 23 | New Jersey, did you start living with Mr. Salazar |
| 17:00:56 24 | immediately? |
| 17:01:07 25 | A.  Yes. |

---

179

| | |
|---|---|
| 17:01:07  1 | Q.  During your time with the Noonans did you |
| 17:01:11  2 | receive your stipend payment every week? |
| 17:01:23  3 | A.  Yes. |
| 17:01:23  4 | Q.  During your time with the Noonans were you |
| 17:01:26  5 | receiving extra financial support from anyone or any |
| 17:01:30  6 | other source? |
| 17:01:39  7 | A.  No. |
| 17:01:42  8 | Q.  I want to go back for a minute to the |
| 17:01:43  9 | testimony about your meals.  Did you leave the house at |
| 17:01:52 10 | any point in time while you were living with the |
| 17:01:55 11 | Noonans? |
| 17:02:03 12 | A.  What do you mean by that? |
| 17:02:05 13 | Q.  Did you go places? |
| 17:02:12 14 | A.  Yes. |
| 17:02:13 15 | Q.  How did you get to those places? |
| 17:02:20 16 | A.  With the bicycle. |
| 17:02:22 17 | Q.  You had a bicycle? |
| 17:02:25 18 | A.  Yes. |
| 17:02:25 19 | Q.  Was it a belonging of the Noonan family or |
| 17:02:31 20 | did you get it from somewhere else? |
| 17:02:38 21 | A.  It was from the Noonans. |
| 17:02:41 22 | Q.  Okay.  Any other way that you got around |
| 17:02:54 23 | other than bicycle? |
| 17:02:57 24 | A.  Well, Priscilla's friends, sometimes they |
| 17:02:57 25 | would come and pick us up. |

180

| | |
|---|---|
| 17:02:58  1 | Q.  Okay.  And you testified before that |
| 17:03:01  2 | Mrs. Noonan had told you you could not take food out of |
| 17:03:05  3 | her fridge, correct? |
| 17:03:13  4 | A.  Yes. |
| 17:03:13  5 | Q.  When she did buy food for you, where was |
| 17:03:16  6 | it stored? |
| 17:03:26  7 | A.  There was a small refrigerator that was in |
| 17:03:30  8 | the basement. |
| 17:03:32  9 | Q.  During the time that the Noonans didn't |
| 17:03:34 10 | buy you food, did you ever go to the grocery store on |
| 17:03:37 11 | your own? |
| 17:03:43 12 | A.  No. |
| 17:03:43 13 | Q.  Why not? |
| 17:03:48 14 | A.  I didn't have a car to be able to get |
| 17:03:50 15 | around. |
| 17:03:50 16 | Q.  Could you have gone on your bicycle? |
| 17:03:56 17 | A.  No.  What about the bags though? |
| 17:04:00 18 | Q.  Could you have carried any groceries on |
| 17:04:02 19 | your bicycle? |
| 17:04:07 20 | A.  I don't know. |
| 17:04:08 21 | Q.  Okay.  But you never tried? |
| 17:04:11 22 | A.  No. |
| 17:04:14 23 | Q.  Did Priscilla's friends ever take you to |
| 17:04:17 24 | the grocery store? |
| 17:04:22 25 | A.  No. |

45 (Pages 177 to 180)

**JOHANA PAOLA BELTRAN - 8/30/2016**
**Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.**

---

185

```
17:11:33   1    an au pair.
17:11:34   2        Q.  Okay.  So if I understand you correctly,
17:11:37   3    you're saying that because InterExchange knew about the
17:11:40   4    work you were doing, they should have known you weren't
17:11:44   5    being paid enough; is that accurate?
17:12:03   6        A.  I suppose so.
17:12:06   7        Q.  Is there anything inaccurate about that?
17:12:13   8        A.  I don't know.
17:12:16   9        Q.  Well, you indicated to me -- let me back
17:12:18  10    up.
17:12:19  11            I asked you if you ever attempted to talk
17:12:21  12    to InterExchange about the fact that you believed you
17:12:23  13    weren't being paid enough.  Do you remember that
17:12:25  14    question?
17:12:38  15        A.  Yes.
17:12:38  16        Q.  Did you ever attempt to talk to someone
17:12:40  17    from InterExchange about the belief that you had that
17:12:43  18    you were not being paid enough?
17:12:54  19        A.  No.
17:12:58  20        Q.  Did you understand that during your
17:13:01  21    participation in the au pair program you were entitled
17:13:04  22    to time off on a weekly basis?
17:13:21  23        A.  Yes.
17:13:21  24        Q.  Were there any weeks in which you did not
17:13:23  25    get the time off that you were entitled to?
```

186

```
17:13:37   1        A.  Yes.
17:13:37   2        Q.  How many weeks?
17:13:40   3        A.  I'm sorry, I didn't understand the
17:13:42   4    question well.
17:13:44   5        Q.  Did you understand that during your
17:13:46   6    participation in the program you were entitled to
17:13:47   7    one-and-a-half days off a week?
17:13:59   8        A.  Yes.
17:13:59   9        Q.  Did you get that time off every week?
17:14:07  10        A.  Yes.
17:14:07  11        Q.  Did you also understand you were entitled
17:14:09  12    to a weekend off every month?
17:14:20  13        A.  I'm not sure.
17:14:22  14        Q.  Meaning you don't know for sure if that
17:14:25  15    was something you were entitled to?
17:14:32  16        A.  Yes, I'm not sure of that.
17:14:34  17        Q.  Okay.  Did you understand that as a
17:14:37  18    participant in the program, you were entitled to
17:14:40  19    vacation time?
17:14:49  20        A.  Yes.
17:14:50  21        Q.  Okay.  Did you ask the Noonans for any
17:14:53  22    vacation time during the time you lived with them?
17:15:03  23        A.  I don't remember.
17:15:06  24        Q.  Do you know how much Mr. Salazar asked the
17:15:12  25    Noonans to pay you for your time with them?
```

187

```
17:15:26   1        A.  I don't remember.
17:15:28   2        Q.  If I say it was a little bit over $12,000,
17:15:31   3    do you have any reason to disagree with that?
17:15:39   4        A.  I don't remember.
17:15:40   5        Q.  Did you at any point sit down to try to
17:15:44   6    figure out how much you believed the Noonans owed you?
17:15:57   7        A.  Yes.
17:15:57   8        Q.  And what figure did you come up with?
17:16:03   9        A.  I don't remember.
17:16:04  10        Q.  Do you remember how you did those
17:16:06  11    calculations, what information you used?
17:16:18  12        A.  Based on what a housekeeper would make.
17:16:20  13        Q.  And where did you find that information?
17:16:27  14        A.  In New Jersey.
17:16:28  15        Q.  Where in New Jersey?
17:16:36  16        A.  With a person who cleans houses, I think.
17:16:40  17        Q.  Okay.  What -- sorry.  Were you finished?
17:16:43  18        A.  That's what she was making.
17:16:44  19        Q.  Okay.  Did she live in the houses she
17:16:48  20    cleaned?
17:16:52  21        A.  I don't think so.
17:16:53  22        Q.  Did anybody help you when you were sitting
17:16:57  23    down and figuring out how much you believed the Noonans
17:17:00  24    owed you?
17:17:10  25        A.  Yes.
```

188

```
17:17:11   1        Q.  Who?
17:17:13   2        A.  Orlando.
17:17:14   3        Q.  Okay.  Of the amount, which I understand
17:17:18   4    you don't remember that you believed you were owed,
17:17:22   5    have you received any of that from any source?
17:17:34   6        A.  Yes.
17:17:34   7        Q.  How much?
17:17:38   8        A.  Around $4,500.
17:17:42   9        Q.  So sitting here today, do you have a
17:17:46  10    number that you still believe you are owed for the time
17:17:49  11    that you worked with the Noonans?
17:18:02  12        A.  Can you repeat the question, please.
17:18:04  13            MS. COLAIZZI:  Can you read it back,
17:18:05  14    please.
17:17:42  15            (The last question was read back as
17:17:42  16    follows:  "So sitting here today, do you have a number
17:17:46  17    that you still believe you are owed for the time that
17:17:49  18    you worked with the Noonans?")
17:18:26  19        A.  No.
17:18:28  20        Q.  (BY MS. COLAIZZI)  When you sat down to
17:18:29  21    try to figure out how much the Noonans owed you, how
17:18:31  22    many hours a week did you assume that you worked for
17:18:38  23    them?
17:18:53  24        A.  I don't remember.
17:18:58  25        Q.  When you lived with the Noonans did you
```

47 (Pages 185 to 188)

Defs.' Appx. 00000911

**JOHANA PAOLA BELTRAN - 8/30/2016**
**Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.**

---

197

| | |
|---|---|
| 17:42:57 | 1 | stipend at 195.75?") |
| 17:44:14 | 2 | A. No. |
| 17:44:18 | 3 | Q. (BY MS. COLAIZZI) When you were living at |
| 17:44:18 | 4 | home in Colombia before becoming an au pair, did you do |
| 17:44:22 | 5 | any volunteer work with children? |
| 17:44:37 | 6 | A. No. |
| 17:44:37 | 7 | Q. The classes that you're currently taking |
| 17:44:40 | 8 | at Union County College, are they in English? |
| 17:44:52 | 9 | A. Yes. |
| 17:44:52 | 10 | Q. Are all of them in English? |
| 17:44:57 | 11 | A. All of them. |
| 17:44:59 | 12 | Q. And you indicated a few moments ago that |
| 17:45:02 | 13 | you still have an active Facebook account; is that |
| 17:45:05 | 14 | correct? |
| 17:45:11 | 15 | A. Yes. |
| 17:45:12 | 16 | Q. Do you have any other social media sites |
| 17:45:14 | 17 | or handles of any kind? |
| 17:45:28 | 18 | A. Yes. |
| 17:45:29 | 19 | Q. What do you have? |
| 17:45:32 | 20 | A. All of them. |
| 17:45:35 | 21 | Q. You're going to have to list them for me. |
| 17:45:37 | 22 | I'm sorry. |
| 17:45:41 | 23 | A. Instagram. Snapshot. |
| 17:45:50 | 24 | MR. HOOD: Snapchat. |
| 17:45:52 | 25 | A. Snapchat. Skype. Facebook. Gmail. |

198

| | |
|---|---|
| 17:46:01 | 1 | Hotmail. |
| 17:46:07 | 2 | Q. (BY MS. COLAIZZI) Any others? |
| 17:46:09 | 3 | A. Yes. With the school, Canvas. It's new. |
| 17:46:22 | 4 | Q. What does it do? |
| 17:46:33 | 5 | A. The professors send us emails with our |
| 17:46:37 | 6 | homework or they send us class notes. |
| 17:46:40 | 7 | Q. Okay. Anything else? |
| 17:46:45 | 8 | A. I don't believe so. |
| 17:46:45 | 9 | Q. Okay. You had -- we've looked today at |
| 17:46:49 | 10 | some emails that were sent to you at a Hotmail email |
| 17:46:52 | 11 | address. Is that the only Hotmail email address that |
| 17:46:55 | 12 | you have? |
| 17:47:10 | 13 | A. I have Gmail. But that was more for doing |
| 17:47:16 | 14 | work related to school. |
| 17:47:18 | 15 | Q. So you only have the one Hotmail account; |
| 17:47:21 | 16 | is that correct? |
| 17:47:27 | 17 | A. Yes. |
| 17:47:27 | 18 | MS. COLAIZZI: Okay. Let's take five. I |
| 17:47:28 | 19 | think I'm done, or very close to it. |
| 17:47:31 | 20 | MR. HOOD: Great. |
| 17:47:32 | 21 | THE VIDEOGRAPHER: Going off the record. |
| 17:47:34 | 22 | The time is 5:47 p.m. |
| 17:47:39 | 23 | (Recess taken, 5:47 p.m. to 5:54 p.m.) |
| 17:55:04 | 24 | THE VIDEOGRAPHER: We are back on the |
| 17:55:05 | 25 | record. The time is 5:54 p.m. |

199

| | |
|---|---|
| 17:55:09 | 1 | Q. (BY MS. COLAIZZI) Ms. Beltran, I just |
| 17:55:10 | 2 | have three last-minute questions for you. Okay? |
| 17:55:19 | 3 | A. Yes, that's fine. |
| 17:55:19 | 4 | Q. When you went from California to New |
| 17:55:22 | 5 | Jersey, did you fly or drive or take a train? How did |
| 17:55:25 | 6 | you get there? |
| 17:55:34 | 7 | A. Airplane. |
| 17:55:34 | 8 | Q. Who paid for your ticket? |
| 17:55:38 | 9 | A. My sponsor. |
| 17:55:40 | 10 | Q. Mr. Salazar? |
| 17:55:42 | 11 | A. Yes. |
| 17:55:43 | 12 | Q. We talked this morning about the use of |
| 17:55:45 | 13 | that word "partner" in your discovery responses whom |
| 17:55:49 | 14 | you identified as Mr. Salazar. Do you remember those |
| 17:55:51 | 15 | questions? |
| 17:56:06 | 16 | A. Yes. |
| 17:56:07 | 17 | Q. Do you currently have a boyfriend or |
| 17:56:08 | 18 | somebody that you date? |
| 17:56:16 | 19 | A. No. |
| 17:56:17 | 20 | Q. Have you at any point in time since |
| 17:56:19 | 21 | leaving the Noonans? |
| 17:56:30 | 22 | A. No. The -- I've been kidnapped just to be |
| 17:56:34 | 23 | in school all the time. |
| 17:56:35 | 24 | Q. Okay. And do you know anyone named Ellen |
| 17:56:42 | 25 | Goddard? |

200

| | |
|---|---|
| 17:56:46 | 1 | A. No, I don't recall that. |
| 17:56:48 | 2 | MS. COLAIZZI: Okay. I don't have any |
| 17:56:49 | 3 | further questions. I will turn it over to any other |
| 17:56:53 | 4 | defendant attorneys who may have questions. |
| 17:57:04 | 5 | MS. REILLY: Just one quick question. |
| 17:57:07 | 6 | MR. HOOD: Does she -- does she need to be |
| 17:57:08 | 7 | mic'd up to -- |
| 17:57:11 | 8 | MS. COLAIZZI: How about you just switch |
| 17:57:12 | 9 | with me? |
| 17:57:14 | 10 | MS. REILLY: I'll go over here. |
| 17:57:16 | 11 | MR. HOOD: Okay. |
| 17:57:16 | 12 | THE DEPONENT: You can come up here and |
| 17:57:17 | 13 | sit down. |
| 17:57:26 | 14 | EXAMINATION |
| 17:57:26 | 15 | BY MS. REILLY: |
| 17:57:26 | 16 | Q. Hi. I'm Katie Reilly. I represent |
| 17:57:31 | 17 | GoAuPair, Agent Au Pair, and Au Pair in America. Not |
| 17:57:40 | 18 | Au Pair in America, Au Pair International. I'm sorry. |
| 17:57:44 | 19 | Long day. On your Facebook page, who was it who sent |
| 17:57:53 | 20 | you the beautiful flowers for Valentine's Day? |
| 17:57:58 | 21 | A. Somebody from the school. |
| 17:58:08 | 22 | Q. Not Orlando? |
| 17:58:10 | 23 | A. No. |
| 17:58:13 | 24 | MS. REILLY: Okay. Nothing further. |
| 17:58:14 | 25 | Thank you. |

50 (Pages 197 to 200)

JOHANA PAOLA BELTRAN - 8/30/2016
Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.

---

193

```
17:27:05  1   Because there was no --
17:27:07  2         MR. HOOD:  Can we just go off the record
17:27:08  3   for a second?
17:27:10  4         MS. COLAIZZI:  Go off the record.
17:27:11  5         THE VIDEOGRAPHER:  Going off the record.
17:27:16  6   The time is 5:27 p.m.
17:27:20  7         (Discussion off the record, after which
17:27:22  8   time Ms. Hazel was no longer present.)
17:36:39  9         THE VIDEOGRAPHER:  We are back on the
17:36:40  10  record.  The time is 5:36 p.m.
17:36:44  11        MS. COLAIZZI:  The parties have reached a
17:36:46  12  stipulation with respect to certain documents.  First
17:36:49  13  Exhibit 25, which bears Bates Nos. Beltran 22 through
17:36:55  14  56.  Bates Nos. Beltran 57 to Beltran 91.  Beltran 107
17:37:04  15  to 142.  Beltran 143 to 184.  Beltran 185 to 228.
17:37:19  16  Beltran 229 to 286.  Beltran 287 to 464.  And Beltran
17:37:34  17  465 to 466.  And I believe counsel's ready to stipulate
17:37:46  18  that none of those documents were ever in the
17:37:47  19  possession of Ms. Beltran; is that correct?
17:37:49  20        MR. HOOD:  So stipulated.
17:37:57  21        Q.  (BY MS. COLAIZZI)  Ms. Beltran, do you
17:37:58  22  know somebody named Lynn Shotwell?
17:38:02  23        A.  I don't remember.
17:38:09  24        Q.  Do you know somebody named Laura Rose?
17:38:16  25        A.  What's the name?
```

---

194

```
17:38:18  1         Q.  Laura Rose.
17:38:22  2         A.  In Spanish?
17:38:25  3         Q.  I don't think it's a Spanish name.  That's
17:38:28  4   her name.
17:38:31  5         A.  I don't remember.
17:38:32  6         Q.  Do you know someone named Ellen Hoggard?
17:38:40  7         A.  I don't remember.
17:38:41  8         Q.  Do you know somebody named Mariam Assefa?
17:38:48  9         A.  I don't remember.
17:38:49  10        Q.  Do you know somebody named Beverly
17:38:52  11  Attallah?
17:38:56  12        A.  I don't remember.
17:38:57  13        Q.  Do you know somebody named Dr. Paul
17:39:01  14  Beresford-Hill?
17:39:07  15        A.  No.
17:39:08  16        Q.  Do you know anyone named Jennifer Clinton?
17:39:16  17        A.  That name sounds familiar, but I don't
17:39:20  18  remember how.
17:39:20  19        Q.  Do you know anyone named Dr. Dan Davidson?
17:39:26  20        A.  No, I don't recall that.
17:39:28  21        Q.  Do you know somebody named Robert
17:39:31  22  Fenstermacher?
17:39:35  23        A.  No, I don't recall that.
17:39:38  24        Q.  Do you know somebody named William Gertz?
17:39:42  25        A.  No.  No, I don't recall that.
```

---

195

```
17:39:45  1         Q.  Do you know someone named Michael Hill?
17:39:56  2         A.  I don't know.  I know somebody named
17:39:58  3   Michael, but in Colorado.  I don't know if it's the
17:40:00  4   same one or not.
17:40:01  5         Q.  Where's the Michael that you know live?
17:40:06  6         A.  Colorado.
17:40:07  7         Q.  Did you meet him while you were living
17:40:09  8   with the Noonans?
17:40:15  9         A.  Yes.
17:40:15  10        Q.  Was he an au pair?
17:40:19  11        A.  No.  No.
17:40:21  12        Q.  To your knowledge, would the Michael that
17:40:23  13  you know have any information related to this lawsuit?
17:40:31  14        A.  No.
17:40:32  15        Q.  Do you know someone named Carol Jenkins?
17:40:39  16        A.  I don't remember, no.
17:40:40  17        Q.  Do you know someone named Theodore
17:40:43  18  Kattouf?
17:40:46  19        A.  No.
17:40:46  20        Q.  Do you know someone named Patti McGill
17:40:49  21  Peterson?
17:40:53  22        A.  I don't remember that.
17:40:55  23        Q.  Do you know someone named Celia Harquail?
17:41:01  24        A.  I don't believe so.
17:41:05  25        Q.  Ms. Beltran, are you aware that there's a
```

---

196

```
17:41:09  1   claim in this case that all of the J-1 visa sponsors
17:41:14  2   conspired to set the au pair stipend at 195.75?
17:41:49  3         A.  Can you ask me the question again?
17:41:52  4         MS. COLAIZZI:  Can you read it back,
17:41:53  5   please.
17:41:56  6         THE DEPONENT:  I'm sorry.
17:41:57  7         MS. COLAIZZI:  That's all right.
17:41:07  8         (The last question was read back as
17:41:07  9   follows:  "Ms. Beltran, are you aware that there's a
17:41:09  10  claim in this case that all of the J-1 visa sponsors
17:41:14  11  conspired to set the au pair stipend at 195.75?")
17:42:35  12        A.  Yes.
17:42:37  13        Q.  (BY MS. COLAIZZI)  With respect to this
17:42:38  14  next question I don't want to know about any
17:42:40  15  communications with your lawyers.  Do you have any
17:42:50  16  personal knowledge of any communications between
17:42:54  17  sponsors related to setting the stipend at 195.75?
17:43:17  18        A.  I don't understand the question.
17:43:22  19        MS. COLAIZZI:  Let's try reading it one
17:43:24  20  more time.
17:42:37  21        (The last question was read back as
17:42:37  22  follows:  "With respect to this next question I don't
17:42:39  23  want to know about any communications with your
17:42:41  24  lawyers.  Do you have any personal knowledge of any
17:42:53  25  communications between sponsors related to setting the
```

---

49 (Pages 193 to 196)

Page 1

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
----------------------------x

JOHANA PAOLA BELTRAN, et al.,

                    Plaintiffs,

        v.                      Civil Case No.
                                14-cv-03074-CMA-KMT

INTEREXCHANGE, INC., et al.,

                    Defendants.

----------------------------x



        VIDEOTAPED DEPOSITION OF MICHAEL MCHUGH
                NEW YORK, NEW YORK
            Thursday, April 6, 2017



HIGHLY CONFIDENTIAL PAGES: 300-301


Reported by:

JEREMY RICHMAN

JOB NO:  308029


            MAGNA LEGAL SERVICES

        320 West 37th Street, 12th Floor

            New York, New York 10018

                (866) 624-6221



Page 78

1            M. MCHUGH
2  be considered final.
3        Is that still a requirement?
4     A.   I believe so.
5     Q.   Can the host family fire an
6  Au Pair?
7     A.   Absolutely.
8     Q.   Can they do so without
9  InterExchange's agreement?
10    A.   Absolutely.
11    Q.   So what does it mean that
12 any decision regarding an Au Pair's
13 program status dismissal or
14 replacement will be made at the sole
15 discretion of InterExchange?
16    A.   This, as it's written, is
17 intended to describe the program
18 status, whether the Au Pair is on the
19 program or not.
20    Q.   I see.  If a host family
21 wants to fire an Au Pair, how would it
22 go about doing so?
23    A.   There's, it could happen a
24 variety of different ways.
25    Q.   Would it -- let me put it

Page 79

1            M. MCHUGH
2  this way -- let me ask a different
3  question then.
4        Can the host family tell the
5  Au Pair, you're fired, get out today?
6     A.   Yes.
7     Q.   And the Au Pair would have
8  to leave their placement immediately?
9     A.   Yes.
10    Q.   Can InterExchange say to the
11 Au Pair, can InterExchange pull an Au
12 Pair out of a placement -- can
13 InterExchange pull an Au Pair out of a
14 placement?
15    A.   Yes, of course InterExchange
16 can remove an Au Pair from a home for
17 a variety of reasons.
18    Q.   And does InterExchange need
19 the host family's permission to do
20 that?
21    A.   Does InterExchange need the
22 host family's permission to remove --
23 do we -- so there's so many different
24 situations that could arise.  It may
25 be that the host family is the

Page 80

1            M. MCHUGH
2  problem, and therefore we have to
3  remove the Au Pair for her health,
4  safety and welfare, so in that case of
5  course the host family does not have
6  to approve.  We're removing her from
7  the home.
8     Q.   If the host family doesn't
9  pay its fees, would InterExchange
10 remove the Au Pair?
11    A.   On occasion, on occasion
12 InterExchange has threatened to remove
13 the Au Pair from a home for failure to
14 pay fees.  I cannot think of an
15 instance where we actually removed the
16 Au Pair from the home.
17    Q.   Does InterExchange have the
18 right to remove the Au Pair from the
19 home for nonpayment of fees by the
20 host family?
21    A.   I believe we do.
22    Q.   Does InterExchange have the
23 right to remove the Au Pair from the
24 home for any reason that InterExchange
25 deems to be sufficient?

Page 81

1            M. MCHUGH
2     A.   Any reason that
3  InterExchange deemed sufficient,
4  ultimately as the program sponsor it's
5  our responsibility to make sure that
6  the Au Pair's in a good environment,
7  her health, safety and welfare is
8  protected and that it's an environment
9  where a cultural exchange program can
10 flourish, so if we believe that that
11 is not the case, then we can remove
12 the Au Pair from that situation and
13 look for a rematch or ask her what she
14 wants to do.
15    Q.   Okay.  So I'm happy to go to
16 the next exhibit, but we've been going
17 for a while.  If you would like a
18 break, I'm happy to take a break now,
19 or we can just keep going, it's up to
20 you.
21    A.   I can keep going.
22    Q.   Okay.
23        THE VIDEOGRAPHER:  There's
24 about 20 minutes left on the DVD.
25        THE WITNESS:  That sounds



21  (Pages 78 to 81)

Page 102

M. MCHUGH

1
2      Q.   So I guess just one more
3   question on this document.  The
4   information in this document is
5   provided to host families by local
6   coordinators; is that right, or is the
7   document itself provided to the host
8   families?
9      A.   This document is not
10  provided to the host families, this is
11  a document that our local coordinators
12  work from and then provide to
13  InterExchange.
14     Q.   So this is an instructional
15  document to the local coordinators
16  about what they should cover with the
17  host families, what information they
18  should provide to the host families?
19     A.   That's one of the, one of
20  the reasons for producing this
21  document.
22     Q.   What are the other reasons
23  for producing the document?
24     A.   Well, of course it's a
25  Department of State regulation that

Page 103

M. MCHUGH

1
2   all adults in the home be interviewed
3   personally by the local coordinator,
4   so that's another reason.  To go over
5   details, to give tips and tricks, or
6   tips and advice.
7      Q.   Okay.
8      A.   And also to facilitate
9   discussion points where the host
10  family may have questions about a
11  topic, to mark those up.
12     Q.   Okay, thank you.  Does
13  InterExchange recruit Au Pairs?
14     A.   InterExchange works with a
15  network of international cooperators
16  who are independent agents,
17  independent companies who recruit Au
18  Pair candidates and send the
19  applications for those candidates to
20  InterExchange.
21     Q.   Does InterExchange have
22  contracts with the international
23  cooperators?
24     A.   We do.
25     Q.   And do you know whether

Page 104

M. MCHUGH

1
2   those contracts were collected and
3   produced in this action?  Do you know?
4      A.   I don't know.
5      Q.   Okay.  All right.  So are
6   there methods of Au Pair recruitment
7   other than through international
8   cooperators that InterExchange uses?
9      A.   No.
10     Q.   Okay.  Does InterExchange
11  have a website?
12     A.   It does.
13     Q.   Is the website a tool that's
14  used as part of InterExchange's
15  recruitment of Au Pairs?
16     A.   In that we collect, if
17  somebody submits information, we then
18  push that out to our international
19  cooperators.
20     Q.   So if an Au Pair submitted
21  information through a website --
22     A.   Our website.
23     Q.   -- through your website,
24  thank you, you would then identify
25  which international cooperator covers

Page 105

M. MCHUGH

1
2   the Au Pair's region and forward that
3   to the international cooperator?
4      A.   Among other decision
5   factors.
6      Q.   What other --
7      A.   Not just region, it could be
8   a number of things.
9      Q.   How many international
10  cooperators do you work with?
11     A.   I believe currently there
12  are about 80 international cooperators
13  who we have contracts with.
14     Q.   How many countries do those
15  international cooperators cover?
16     A.   I believe they cover 29 or
17  30 countries.
18     Q.   Do they have overlapping
19  regions that they cover?
20     A.   They do.
21     Q.   Does InterExchange have any
22  approval or control over the methods
23  that international cooperators use to
24  recruit Au Pairs?
25     A.   Do we have approval or

Page 122

```
1              M. MCHUGH
2      A.   It does not.
3      Q.   What makes you say that?
4      A.   The first document that you
5  gave me appears to be directed towards
6  potential Au Pair candidates.  The
7  second document that you gave me
8  appears to be directed towards host
9  families.
10     Q.   Okay.  So you think this is
11 the frequently asked questions page
12 directed at host families?
13     A.   The version that says
14 Wayback Machine at the top?
15     Q.   Yes.
16     A.   It sounds as if the
17 questions are written to the host
18 family.
19     Q.   Okay.  Would you have
20 approved the language in this
21 document?
22     A.   Yes.
23     Q.   Do you tell host families
24 that the weekly payment of about
25 195.75 is based on -- sorry, not based
```

Page 123

```
1              M. MCHUGH
2  on, I'm going to start again.
3          Does InterExchange tell host
4  families that the weekly payment of
5  195.75 is determined by the U.S.
6  Department of State?
7      A.   Currently InterExchange
8  tells host families that the minimum
9  payment of 195.75 per week is
10 determined by the Department of State.
11     Q.   You used the word currently,
12 when did that start to be the message
13 that was conveyed?
14     A.   Well, it hadn't always been
15 one or the other, the lawsuit brought
16 to our attention that we could do a
17 better job of consistently describing
18 it as a minimum, similar to the way
19 the State Department documents
20 occasionally refer to it as the
21 stipend is 195.75, and occasionally
22 they refer to it as the minimum of
23 195.75.  Unfortunately we followed
24 their -- we could have been more
25 accurate about it.
```

Page 124

```
1              M. MCHUGH
2      Q.   So prior to the lawsuit,
3  this lawsuit, did you tell host
4  families that the 195.75 stipend was
5  set by the U.S. Department of State?
6      A.   Prior to the lawsuit there
7  were occasions where documents may
8  have said the stipend is 195.75, and
9  there may have been documents where
10 the stipend said at least 195.75, but
11 that it was set by the Department of
12 State.
13     Q.   Okay.  I want to ask you a
14 couple of questions about the produced
15 version of the website.  And on the
16 second page of the document --
17     A.   This is exhibit, this one,
18 15?
19     Q.   Yes, it should be
20 Exhibit 15.  Under life as an Au Pair,
21 question, how much will I be paid --
22 actually, before I ask you about this,
23 do you know when this version went
24 into effect?
25     A.   I do not.
```

Page 125

```
1              M. MCHUGH
2      Q.   Was it after the lawsuit?
3      A.   I am not sure.  There's
4  nothing on here that can tell me that.
5      Q.   Okay.  It says currently Au
6  Pairs must receive a weekly stipend of
7  at least 195.75.  This amount is set
8  by the Department of State and
9  Department of Labor.  The amount is
10 based on the federal minimum wage of
11 7.25 per hour times 45 hours, but also
12 reflects a credit of 40 percent for
13 the room and board provided by the
14 host family.
15         So does the stipend vary by
16 state or local minimum wages?
17         MS. VICKLES:  Object to
18 form.
19     A.   We have never received any
20 information from the Department of
21 State that says the stipend varies by
22 state or local minimum wages.  It's
23 always been based off of the federal
24 minimum wage.
25     Q.   Do you tell host families or
```

Defs.' Appx. 00000917

Page 182

1           M. MCHUGH
2    number of materials.  They receive a
3    childcare training handbook, a
4    childcare training workbook.  The Au
5    Pair handbook, directions to the
6    orientation and training in New York
7    City, that portion of it.  A flow
8    chart of who to call if they have a
9    problem.  Instructions on how to apply
10   for their Visa.  Yeah, a number of
11   documents.
12       Q.   Okay.
13           (McHugh Exhibit 28, Bates
14       stamped InterExchange 005191
15       through 5220, was marked for
16       identification.)
17       Q.   I put before you an exhibit
18   which is Bates numbered InterExchange
19   005191 through 5220, and it's an email
20   and an attachment.  The attachment is
21   called the online tutorial outline.
22           My question is whether you
23   know whether this outline was ever
24   actually put up onto the website.
25       A.   Your question is whether

Page 183

1           M. MCHUGH
2    this paper document, or this written
3    document, was put onto the website?
4        Q.   The way you asked that
5    suggests I have a misunderstanding
6    about what this document is.  So what
7    is this document?
8        A.   So -- give me a minute.
9    Right, so this is a document that was
10   used in designing and building the
11   online orientation tutorial, which is
12   a website, a module website.
13       Q.   Is it the module website you
14   were discussing a moment ago?
15       A.   It's one of them.
16       Q.   It's one of them.  How many
17   are there?
18       A.   Two different systems, this
19   is one system.  And then there's a
20   second system that involves four
21   sections, multiple chapters each
22   section.
23       Q.   Okay.  Do the two systems
24   serve different purposes?
25       A.   Yes.

Page 184

1           M. MCHUGH
2        Q.   What system, what purpose
3    does, let's start with this system,
4    serve?
5        A.   So this is more of a general
6    overview.  This is not child
7    development training as much as it is
8    how to prepare for your arrival to the
9    United States.  Program regulations,
10   information like that.  Cultural
11   information.  How to get to the
12   orientation in New York.  Be prepared
13   for the weather in your host
14   community, researching climate, and
15   then you can see scripts of cartoon
16   characters that would appear on the --
17   on the system, speaking.
18       Q.   So scripts of cartoon
19   characters?
20       A.   So if you've done an online
21   training before, you know, they'll
22   have animated characters come in from
23   the side and say, hi, I'm Anna, I'm an
24   Au Pair.
25       Q.   Oh, I see.  What page are

Page 185

1           M. MCHUGH
2    you looking at, just so the record is
3    clear?  Or were you not looking at a
4    specific page then?
5        A.   I'm looking at this page,
6    5196.
7        Q.   5196.  I see, I see.
8        A.   So that would be Anna
9    saying, when you arrive to the U.S.
10   you'll need to go through Customs.
11   And then there will be an animation of
12   an immigration officer, and then some
13   quiz questions.
14       Q.   Okay.
15       A.   Online training.
16       Q.   All right, so this document
17   would not itself be uploaded anywhere?
18       A.   No.
19       Q.   But this document describes
20   what the -- what those online -- the
21   content of those online modules?
22       A.   Yes.  And acts as a script.
23       Q.   And acts as a script, got
24   it.  That's helpful, thank you.
25           And you said there was a

MAGNA ●
LEGAL SERVICES

47 (Pages 182 to 185)

Page 186

```
1            M. MCHUGH
2    second system?
3        A.   Yes.
4        Q.   What is the purpose of the
5    second system?
6        A.   The second system is
7    specifically focused on child
8    development training.
9        Q.   Anything more specific than
10   that, or --
11       A.   It's, it came after this
12   system.
13       Q.   Okay.  Do all Au Pairs use
14   both systems?
15       A.   Yes.
16       Q.   How do you ensure that all
17   Au Pairs have used both systems?
18       A.   Before the Au Pair arrives,
19   we can see within our system whether
20   the modules have been checked off as
21   complete or incomplete.
22       Q.   Got it.  And so once the Au
23   Pairs have completed these in their
24   home countries, is there anything else
25   they do in their home countries before
```

Page 187

```
1            M. MCHUGH
2    they come to the U.S.?
3        A.   Well, they apply for their
4    Visa, they go to their Visa interview.
5    They may meet with their local or
6    international cooperator to go through
7    any last-minute details or questions
8    they may have.
9        Q.   Okay.
10       A.   Like I said, they'll have
11   the Au Pair handbook, so they're meant
12   to read through all of the materials
13   that we provide.
14       Q.   And is the next step that
15   they come to the U.S. for a training
16   in New York?
17       A.   Once they've secured their
18   Visa, so they would have a scheduled
19   arrival date that they've agreed on
20   with their family, and then they would
21   arrive to New York for that training.
22       Q.   How regularly are these New
23   York trainings conducted?
24       A.   These days we have it's, you
25   know, two a month, but sometimes
```

Page 188

```
1            M. MCHUGH
2    they're back to back in busier
3    seasons, but, yeah, 24 to 26 per year.
4        Q.   And are they always in New
5    York?
6        A.   Yes.
7            (McHugh Exhibit 29, Bates
8        stamped INTEREXCHANGE 0028522
9        through 8544, was marked for
10       identification.)
11       Q.   You should now have in front
12   of you a document marked InterExchange
13   0028522 through 544.  Is this a
14   document that's used during that New
15   York City training?
16       A.   This is not the most
17   up-to-date version, but this is one
18   version that we may have used in the
19   past.
20       Q.   Do you know when the most
21   up-to-date version was adopted?
22       A.   I believe it would be at the
23   beginning of 2016.
24       Q.   At the beginning of 2016.
25   So is this, could this be the version
```

Page 189

```
1            M. MCHUGH
2    that was in use prior to the 2016
3    version?
4        A.   I'm not sure.
5        Q.   Okay.  How frequently are
6    these materials updated?
7        A.   They could be modified
8    slightly each year.
9        Q.   Okay.  On page eight of this
10   document, that's not going by the
11   Bates numbers, but the native numbers.
12       A.   Mm-hmm.
13       Q.   It describes an orientation,
14   one of the orientation workshops is
15   the program rules, regulations, and
16   culture shock.
17       A.   Mm-hmm.
18       Q.   Are there handouts or
19   materials provided for these
20   workshops?
21       A.   To be honest, I don't know.
22   For this, I know there is an
23   orientation workbook that they work
24   through, but as I said, I think this
25   is an older version of that document.
```

MAGNA
LEGAL SERVICES

Defs.' Appx. 00000919

Page 194

```
1              M. MCHUGH
2   that's uploaded into our system.
3        Q.   Pre-application information,
4   okay.  All right, and so after -- are
5   there any steps between the training
6   in New York and beginning the
7   placement with the host family?
8        A.   So they travel to the host
9   family after the orientation finishes.
10  They arrive to the host family home.
11  The family is required to stay at home
12  with the Au Pair and have them
13  acclimated to the environment for the
14  first three days.  During that time
15  the local coordinator needs to call
16  them within the first 48 hours and
17  establish contact with them, and the
18  family can choose to work through the
19  home orientation handbook if they
20  want.
21       Q.   One part of this process we
22  have not discussed is the matching.
23  Where in this process does the
24  matching occur?
25       A.   Before the orientation.
```

Page 195

```
1              M. MCHUGH
2        Q.   So before even the modules,
3   the online modules?
4        A.   Yes.
5        Q.   So what are the steps then,
6   before -- what are the steps before
7   you get to the matching process for an
8   Au Pair?
9        A.   What are the steps before
10  you get to the matching process?
11  Well, they would meet with the
12  international cooperator, they would
13  have the interview, so they have to be
14  interviewed in person.  They have to
15  perform an English evaluation.  They
16  have to submit two childcare
17  references.  Those need to be verified
18  by the international cooperator.
19       They have to submit one
20  character reference.  Also needs to be
21  verified by the international
22  cooperator.  They have to supply proof
23  that they've graduated from secondary
24  school or its equivalent in their
25  country.  They have to have a police
```

Page 196

```
1              M. MCHUGH
2   report that says they have no criminal
3   activity.
4        They have to have a medical
5   report saying that they're fit for the
6   program, physically capable of
7   performing the job duties.  They have
8   to take a personality test, DISC
9   assessment.  They have to have a
10  passport.  So all of this is submitted
11  into our system.
12       We review all the materials,
13  and once the Au Pair is complete, once
14  the file is complete and everything's
15  there, then -- sorry, they also write
16  a letter, a dear host family letter.
17  They can upload a video if they
18  choose, and they can upload photos if
19  they choose.
20       So once all of those are
21  compiled, we review the documents to
22  make sure they meet eligibility for
23  the program.  If they do, then they're
24  put into the pool of matching
25  candidates.
```

Page 197

```
1              M. MCHUGH
2        Q.   And I think I read
3   somewhere, I think we'll probably get
4   to the document, but maybe you can
5   tell me anyway.  I think I read that
6   one of the requirements is that the Au
7   Pair never have been married; is that
8   right?
9        A.   That is not our current
10  policy.
11       Q.   Do you know if that was ever
12  the policy?
13       A.   I don't know.
14       Q.   All right, let's just deal
15  with it when we go to the document.
16       A.   Yeah.
17       Q.   So then that brings us to
18  the matching process.  Can you
19  describe the matching process for me?
20       A.   Sure.  So host families have
21  been vetted on their side, Au Pairs
22  have been vetted on their side.
23  Families can use our database to
24  search for candidates who they're
25  interested in.  They can request an
```

Page 198

M. MCHUGH

1  M. MCHUGH
2  interview with a candidate, they can
3  have an interview with the candidate
4  and they can release the candidate.
5  The Au Pair can ask to be released.
6  They can have, I think, three
7  candidates on view at any time.
8      Q.   The host family can?
9      A.   The host family, for
10  72 hours.
11      Q.   And for each 72-hour period
12  the Au Pair is exclusively viewable by
13  one host family?
14      A.   That's right.
15      Q.   Does the Au Pair choose
16  which host family they become
17  exclusively viewable to?
18      A.   They choose who they no
19  longer wish to be exclusively viewable
20  to.
21      Q.   They can opt out?
22      A.   Yes.
23      Q.   How is -- how does an Au
24  Pair get chosen to be one of the
25  exclusively viewable Au Pairs for a

Page 199

M. MCHUGH

1  M. MCHUGH
2  specific host family?
3      A.   Well, the family has a
4  number of filters that they can use to
5  narrow down the total pool of
6  candidates, and then they have a
7  button that they can press that says,
8  put this candidate on view.  When they
9  select that, it will say, you have
10  this candidate on view until
11  such-and-such a date.
12      Q.   I see.  So is there anything
13  that the InterExchange requires happen
14  during that view period before the Au
15  Pair and the host family both say,
16  yes, this is the match we want?
17      A.   Well, we ensure that the
18  State Department regulations are met
19  in that the State Department
20  regulations say that an interview has
21  to take place between the Au Pair and
22  the host family.
23      Q.   Can those interviews happen
24  over video?
25      A.   Yes.

Page 200

M. MCHUGH

1  M. MCHUGH
2      Q.   Can they happen over the
3  telephone?
4      A.   They can.
5      Q.   So you ensure that a video
6  -- sorry, strike that.
7          Okay.  I take it there is no
8  way for an Au Pair to be matched with
9  a host family other than through a
10  sponsor such as InterExchange?
11      A.   Outside of the State
12  Department program?  I'm not sure.  I
13  don't know what -- if other Visas are,
14  I know that -- I don't know what other
15  Visas are available to families to
16  hire somebody.
17      Q.   Can host -- can host
18  families and Au Pairs decide amongst
19  themselves outside of the -- outside
20  of your matching process who they want
21  to be matched together?
22      A.   Yes.
23      Q.   How does that happen?
24      A.   Sometimes they'll use
25  third-party sites where a family will

Page 201

M. MCHUGH

1  M. MCHUGH
2  register and an Au Pair will register,
3  and they'll find each other that way.
4      Q.   Are there major third-party
5  sites that get used, or?
6      A.   I'm not sure what the most
7  popular one is.
8      Q.   Are there any that are
9  popular enough that you know their
10  names?
11      A.   Sure, there's Au Pair World,
12  Great Au Pair, AuPair.com.
13      Q.   So if they get together
14  through one of these outside sources,
15  then internally in the InterExchange
16  system, would the host family have to
17  find the Au Pair on the system and
18  check them out still, or is there an
19  alternative system?
20      A.   So they may come to us and
21  say, we have what's called a
22  pre-match, we found an Au Pair we want
23  to match with.  We would direct that
24  candidate towards our partner overseas
25  to begin the process, filling in all



Page 202

M. MCHUGH
1    the application materials, and we
2    would begin the process with the host
3    family in a very similar way to any
4    other family. It's just that when
5    they get to the matching part, we know
6    to put them on view with each other,
7    and then they can decide.
8        Q.   Do they still have to do an
9    interview as well?
10       A.   Yes. And they still have to
11   confirm the match, record the date
12   that they've interviewed with each
13   other, select the date that they want
14   their Au Pair to arrive, etcetera.
15       Q.   Is there any -- and so that
16   matching process occurs, are there any
17   steps between that and the online
18   modules that you discussed earlier?
19       A.   Well, it's, you know, it's a
20   multi, multi, multi-step process, so
21   on our side we are adding that
22   exchange visitor to the Student
23   Exchange Visitor Information System,
24   which is known as SEVIS. We're

Page 203

M. MCHUGH
1    registering them in the SEVIS
2    database. We're producing what's
3    called the DS2019 form. We're paying
4    what's called the SEVIS fee. We're
5    printing out the receipts of that,
6    sending that, and then we put, so we
7    have to -- we have to sign the DS2019
8    form, and ARO, we talked about that
9    earlier, has to sign that in blue ink,
10   that has to be put into a Fedex or UPS
11   envelope with other materials, and
12   then we ship that overseas to the
13   international cooperator, and then
14   it's delivered to the Au Pair
15   candidate.
16       Q.   You mentioned again AROs.
17   What is the significance of being an
18   ARO?
19       A.   An ARO has an account into
20   SEVIS, and an ARO can report or
21   respond to incidents from the
22   Department of State.
23       Q.   Are there any other -- is
24   there anything else significant about

Page 204

M. MCHUGH
1    being an ARO?
2        A.   In what sense?
3        Q.   I was asking you. I don't
4    know, are there any particular duties
5    placed upon AROs?
6        A.   Just what we've described.
7    Oh, sorry, there is -- once the Au
8    Pairs arrive into New York at the
9    orientation and training program, then
10   we will take their DS2019 forms back
11   to the office, make sure all the
12   information is correct, and we have to
13   do what is called validating their
14   records, sign off on them again, take
15   them back to the Au Pairs. So an ARO
16   also validates.
17       Q.   How does an ARO validate
18   their records?
19       A.   It's through the SEVIS
20   system. Just pull out their record,
21   check that their address and name and
22   everything is correct, press the
23   button that says validate, and that's
24   it.

Page 205

M. MCHUGH
1        Q.   Okay.
2        A.   Also, if somebody were to
3    end their program early, an ARO is the
4    one who ends their program in SEVIS.
5        Q.   Is there anything else an
6    ARO can do?
7        A.   If an Au Pair has to be,
8    quote, unquote terminated, terminated
9    in the SEVIS system, then an ARO does
10   that as well.
11       Q.   Under what circumstances is
12   an Au Pair terminated in the SEVIS
13   system?
14       A.   An Au Pair could be
15   terminated for, there's a drop-down
16   menu of choices. But breaking the
17   law -- I haven't seen it in a while.
18   They're considered -- they're
19   considered stronger offenses, stronger
20   issues. That may have come from a
21   transition.
22       So for example, working
23   illegally with, using -- working
24   outside of the Au Pair Visa is a

Page 270

```
1              M. MCHUGH
2    standardizing the calculation of the
3    deduction for room and board?
4         A.   So let's see if there's a
5    hint of it in here. So the agency
6    concludes that this approach, which
7    isn't included in here, but I
8    mentioned earlier was they looked at
9    the fixed deduction of $36. They
10   found that that was outdated. They
11   did a survey unrelated to Bill
12   Kapler's survey, they did a survey of
13   the real cost to house and provide
14   room and board to an Au Pair. They
15   came back with a number like 65. They
16   found that to be more reasonable than
17   the $46, and they went through a
18   discussion, well, we would like to
19   have a fixed amount for the room and
20   board to keep, to -- because of the
21   programatic need for a uniform
22   stipend. So when I'm saying to
23   standardize the deduction, I'm talking
24   about their need and the discussion
25   they engaged in in this document to
```

Page 271

```
1              M. MCHUGH
2    work towards a uniform or programatic
3    need for a uniform stipend, which
4    includes, starts with the federal
5    minimum wage and includes a standard
6    deduction for room and board, which
7    they followed up with, with every
8    single notice that they sent in a
9    similar way. So that's what we're
10   talking about here.
11        Q.   Okay. So do you understand
12   there to be a programatic need for a
13   uniform stipend?
14        A.   Yes.
15        Q.   Do you know whether the
16   other sponsors share that
17   understanding?
18             MR. LIBLING: Object to
19   form.
20        A.   I can't say. I'm sure
21   they've read the same materials I
22   have.
23        Q.   Have you ever discussed a
24   programatic need for a uniform stipend
25   with the other sponsors?
```

Page 272

```
1              M. MCHUGH
2         A.   I don't think so.
3         Q.   Has it ever come up in
4    conversation, even if it wasn't the
5    topic?
6         A.   No. This is really since
7    the lawsuit came up, we've gone
8    backwards to find out how we arrived
9    where we are, and that has been
10   illuminating. But the stipend is
11   really one topic that never had to be
12   discussed among the sponsors, because
13   it was so clear what the stipend was
14   and is.
15        Q.   How has this -- when you
16   say, we've gone backwards to find out
17   how we arrived where we are, what have
18   you done to do that?
19        A.   I mean, I'm saying that
20   personally.
21        Q.   What have you done to do
22   that?
23        A.   We reviewed all the
24   regulations, the discussion around the
25   regulation that's spelled out in the
```

Page 273

```
1              M. MCHUGH
2    PDF here, the notices sent since then.
3         Q.   And you said it was
4    illuminating, how is it illuminating?
5         A.   Oh, I think especially the
6    1995 regs provide a really thorough
7    explanation and analysis of what the
8    intention of the State Department was,
9    starting with the need for -- starting
10   with their approval of the program,
11   their desire to house the program, the
12   fact that the educational component
13   provided the link to the
14   Fulbright–Hays Act and gave them the
15   ability to operate the program. The
16   fact that it fits into their foreign
17   policy objectives.
18             They go into a discussion of
19   the challenges to the program and
20   explain why they believe the program
21   is valuable through the stipend and,
22   yeah, it's just a really thorough
23   analysis, and I think provides a great
24   backbone and explanation for the
25   regulations that have followed from
```



Defs.' Appx. 00000923



# Host Family Handbook





# Chapter 6 - The J-1 Visa

Au pairs participating in the InterExchange Au Pair USA program must acquire a J-1 Visa, valid for one year. No other visa is valid for participation in the program. The vast majority of our au pair candidates get the J-1 Visa without any problems.

InterExchange is designated by the U.S. Department of State to sponsor the J-1 Au Pair Visa and issues a DS-2019 Form for au pairs so they can go to the U.S. Embassy/Consulate in their home country to apply for the visa. The DS-2019 Form identifies InterExchange as the program sponsor, outlines the purpose of the program, and states the exact period during which the applicant is legally permitted to work as an au pair in the USA. Although InterExchange provides the appropriate forms and the International Cooperator assists the applicant through the process, it is the U.S. Consular Official who makes the determination as to whether the applicant will receive the J-1 Visa.

If the au pair's J-1 Visa application is approved, the Consular Officer will put a J-1 Visa stamp in the au pair's passport. The J-1 Visa provides permission to enter the USA as an au pair participating in a cultural exchange program.

▸ Once the au pair arrives in the United States, the immigration officer will validate the visa by stamping the passport and the accompanying DS-2019 Form. The immigration officer will also staple an "I-94 Arrival and Departure Card" in the au pair's passport.

▸ The validity period shown on the non-immigrant J-1 Visa stamped in the passport refers only to the period during which someone may enter the United States. When the immigration officer validates the au pair's visa at the time of their arrival in New York, the DS-2019 Form is stamped "J-1 D/S." This grants the au pair permission to stay under the J-1 Visa for the "Duration of Status" of the program. The duration of status is the date range indicated in box #3 of the DS-2019 form: the au pair's arrival date to one year after their arrival date.

▸ The DS-2019 Form should be kept with the au pair's passport. It is recommended that au pairs carry photocopies of both of these documents and leave the originals in a safe place. If the DS-2019 Form is lost or stolen, the Logistics Coordinator in the New York office should be contacted immediately and a replacement form will be issued. If the passport is lost or stolen, the au pair must contact their Embassy immediately to obtain a replacement passport.

## What Can/Cannot an Au Pair Do Under the Terms of Their Visa?

Your au pair can be directly responsible for your children and their needs, including laundry, cleaning of the children's bedrooms, play areas and eating areas. Some au pairs help with meal preparation and clean-up if the host family eats together. The au pair may not earn extra money by working during their stay (either for the host family beyond the permitted 45 hours or in work outside the home). Even baby-sitting at the home of a neighbor is considered employment outside the parameters of the J-1 Visa for au pairs and is not allowed.

## Travel Outside of the United States During the Au Pair Year

Au pairs may travel outside of the U.S. during their original program year (this may not be the case during an Extension). However, the intent of the program is for the au pair to experience American culture through living in a host family's home and community. Therefore, extended stays outside the U.S. (of more than four weeks) with or without the host family would not be in the spirit of the program and are not permitted.

It is the au pair's responsibility to research the visa requirements for travel outside the U.S., including Canada and Mexico. This is usually done by contacting the Consulate of the country he/she plans to visit. Au pairs should always take their DS-2019 Form with them when they travel abroad.

The Au Pair program regulations permit au pairs on a J-1 Visa to travel around the U.S. for an additional month at the end of their 12-month program year. The J-1 Visa is not valid for re-entry into the U.S. during this period so travel outside the country, even to Canada or Mexico, should not be part of the au pair's travel plans in the 13th month if they intend to re-enter the U.S. before returning to their home country. Au pairs must have medical coverage for travel during the 13th month as the program insurance coverage expires at the end of the 12th month. Au pairs may arrange an additional month of insurance through InterExchange to cover themselves for medical expenses during this time. The cost to do so is the au pair's responsibility.

# Chapter 8 - The Au Pair USA Orientation & Training Program in New York City

InterExchange Au Pair USA provides an Orientation & Training Program in accordance with the U.S. Department of State's regulations governing au pair programs. While the program meets these requirements, it is not intended to replace the host family's training of an au pair on how they want their children cared for. Nor is it intended to train an au pair to become a professional child care provider.

The Au Pair USA Orientation & Training Program was designed by and is taught by professionals from both the education and healthcare fields. The format includes the use of workbooks, lectures, videos and hands-on training. The content includes general information regarding health, safety and childhood development ranging from newborns to age 12. In addition, there are discussions about cultural differences, adjusting to the United States and their new life living with an American family. The J-1 Visa regulations, InterExchange Au Pair USA program information and policies, insurance information, Social Security cards, bank accounts in the USA and other related topics are also reviewed.

The goals of the Au Pair USA Orientation & Training Program are to:

‣ Help the au pair adjust to a new country before joining his/her American host family
‣ Give the au pair information regarding the ages and stages of child development and how to safely care for children
‣ Provide an opportunity to reinforce the U.S. government regulations for au pair programs
‣ Help au pairs cope with the challenges of living in a new culture by discussing cultural issues
‣ Respond to any questions or concerns au pairs may have and to clarify program policies as needed

### Logistics

The program is held at a hotel in the heart of New York City. An InterExchange Au Pair USA representative will be available in the lobby of the hotel on Monday from mid-afternoon until late at night, when the majority of au pairs arrive. Most au pairs will travel from the airport to the hotel on a Super Shuttle van. All au pairs receive a pre-departure packet that includes a section on transportation to the hotel in New York City.

### Cultural Adaptation and Culture Shock

Much of the introductory phase of the Au Pair USA Orientation & Training Program focuses on American culture and cultural adaptation. The trainers discuss American values and how they might differ from those found in the au pair's native culture. The different phases of culture shock are reviewed so au pairs can recognize the signs of culture shock should they experience it and be reassured that these feelings are common for people who leave their home environment for an extended period of time.

### Child Development Training

The child development session explores the development of children from newborns through school-aged children. Several separate training workshops are used to share information about the various ages and stages of a child's growth and development.

In discussing caring for very young children, the au pairs review charts that outline the physical, intellectual/cognitive, and emotional/social development of young children. They also receive packets that contain worksheets, written work and sample situations that are used to help the au pairs understand the needs of young children.

The basic skills of feeding, bathing, changing diapers and responding to a sick child are demonstrated through role-playing exercises. The use of videos, art, songs, games, poems and activities that focus on cultural exchange among the au pairs all add to the fun and learning that takes place during this workshop.

Other workshops focus on specific important areas of growth and development that take place with school-age children. Au pairs talk about "the average child" at different ages, but are reminded to keep in mind that every child is an individual, with his/her own personality and ability. Au pairs must always do "developmentally appropriate" activities with a child to challenge him/her without overwhelming the child.

Defs.' Appx. 00000926

The group also talks about intellectual growth, personality changes, peer-group influence, physical growth, the importance of play, discipline issues and problem solving with school-age children. They review special situations and conflict resolution in respect to the entire family. Au pairs participate in role-plays, exercises, hands-on projects and work together in groups to learn how to work effectively, creatively and assure a respectful and fun relationship with school-age children. Au pairs also share their ideas with the group.

The last part of this portion of the program leads the au pairs through a discussion of ways to communicate with the parents about the children.

## Child Health and Safety Training

The child health and safety portion of the training and orientation program is led by licensed American Red Cross instructors. Information and demonstrations about first aid techniques, recognizing illnesses, avoiding common accidents with children and how to respond to flood, fire, gas and related emergencies are addressed. Instruction on infant and child CPR and the Heimlich maneuver are provided. Prior to arriving in the United States, au pairs receive a copy of the *Au Pair USA Child Care Guide*, which covers important topics on child development as well as important topics on child health and safety.

While the Au Pair USA Orientation & Training Program is comprehensive in providing information on child development and child health and safety, the au pair must ultimately gain direction and instructions from the host family. Each child is unique and develops at his/her own pace and each family has their own philosophy on child rearing and their own instructions on what to do in emergencies. The host family must discuss with the au pair all critical information and instructions before leaving children in the au pair's care. The host family must also monitor the health, safety and well-being of their children and address any concerns with their au pair and Local Coordinator immediately.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-03074-CMA-KMT

JOHANA PAOLA BELTRAN;
LUSAPHO HLATSHANENI;
BEAUDETTE DEETLEFS;
DAYANNA PAOLA CARDENAS CAICEDO;
ALEXANDRA IVETTE GONZALEZ;
and those similarly situated,

      Plaintiffs,

v.

INTEREXCHANGE, INC.;
USAUPAIR, INC.;
GREATAUPAIR, LLC;
EXPERT GROUP INTERNATIONAL INC., DBA EXPERT AUPAIR;
EURAUPAIR INTERCULTURAL CHILD CARE PROGRAMS;
CULTURAL HOMESTAY INTERNATIONAL;
CULTURAL CARE, INC., D/B/A CULTURAL CARE AUPAIR;
AUPAIRCARE INC.;
AU PAIR INTERNATIONAL, INC.;
APF GLOBAL EXCHANGE, NFP;
AMERICAN INSTITUTE FOR FOREIGN STUDY, DBA AU PAIR IN AMERICA;
AMERICAN CULTURAL EXCHANGE, LLC, DBA GOAUPAIR;
AGENT AU PAIR;
A.P.EX. AMERICAN PROFESSIONAL EXCHANGE, LLC, DBA PROAUPAIR; and
20/20 CARE EXCHANGE, INC., DBA THE INTERNATIONAL AU PAIR EXCHANGE,

      Defendants.

---

## DECLARATION OF MICHAEL MCHUGH

---

    1. My name is Michael McHugh. I over the age of 18 years and competent to testify about the facts stated herein based upon my own personal knowledge.

Defs.' Appx. 00000928

2.  I am the Vice President for AuPair USA, the J-1 au pair cultural exchange program operated by InterExchange, Inc.  I have held this position since April 23, 2015. I was Program Manager of the au pair program from July 1, 2004 to April 30, 2007, and Program Director of the program from May 1, 2007 to April 22, 2015.

3.  InterExchange is a not-for-profit organization.

4.  InterExchange sponsored Plaintiff Johana Paola Beltran's J-1 visa in 2012.

5.  Ms. Beltran participated in the program as an au pair with a host family in Colorado from August 2012 to November 2012.

6.  As I testified to in my deposition, InterExchange works with a network of international cooperators, independent contractors who recruit au pair candidates.

7.  Although InterExchange determines whether au pair candidates and host families meet the requirements for participation in the program, InterExchange does not place or match an au pair with a host family or vice versa.  Placement Specialists are available to help host families identify the best au pair candidates for them, but the ultimate matching decision is made solely by the host family and the au pair.  InterExchange cannot and does not require any host family or au pair to consent to a placement that it or she does not want.

8.  Indeed, it is the fact that a host family has selected an au pair with whom to match that entitles the au pair to visa sponsorship by InterExchange.

9.  InterExchange also serves as a sponsor for "pre-matched" au pairs.  A pre-match occurs when a host family and au pair find each other independently of the Au Pair USA

Defs.' Appx. 00000929

program.  They then register with InterExchange and complete the typical application process and use Au Pair USA to facilitate the J-1 visa process.

10. The au pair's relationship with her host family does not represent the entirety of the au pair's participation in the au pair program.  If an au pair's relationship with her host family breaks down, whenever possible InterExchange will assist the au pair in matching with a new host family so that the au pair's program participation can continue.  The ultimate decision to rematch, however, remains with the au pair and prospective new host family.

11. Host families are InterExchange's "clients" or "customers."  Although InterExchange and host families have to comply with DOS regulations, there is no common control of any kind among them.

12. DOS regulations require that InterExchange provide au pair participants with training related to child safety and child development.  InterExchange does not train au pairs on how any specific host family wants their children cared for; that information is not shared by host families with InterExchange at any point in the process, unless InterExchange is consulted or asked to assist with a dispute.

13. Au pairs enter into individual agreements with their host families, the terms of which are decided between them, including but not limited to work schedule work tasks, hours per week, and the specific stipend to be paid, subject to the restrictions and requirements of the Department of State.  Au pairs and host families also enter into separate agreements with InterExchange.  Exhibit A (InterExchange0000050-65) is a copy of the agreement that Plaintiff Johana Paola Beltran entered into with

InterExchange.   Exhibit B (InterExchange0000014-49)  is a copy of the agreement that Ms. Beltran's host family, the Noonans, signed with InterExchange.   These are similar in form and content to the agreements InterExchange has used since Ms. Beltran's participation in 2012.

14. InterExchange maintains a file on each au pair that matches with a host family. The file contains the au pair's program application, interview report, English evaluation, child care references, character references, personality test results, education verification, medical report, contact logs, and copies of important documents for the visa process, such as the au pair's passport.  InterExchange is required to keep these records to comply with DOS Program regulations.   InterExchange also maintains a host family file.

15. DOS has never required InterExchange to track or report the precise number of hours that au pairs work each week or the precise amount of the stipend paid.  Rather, InterExchange has been required only to confirm "yes" or "no" that the au pairs' schedules and stipend payments comply with DOS regulations.  As such, InterExchange does not maintain records of au pairs' hours worked.

16. InterExchange provides au pairs with a schedule planner that allows the au pair to track his or her work hours, pay, and time off.  An example is Exhibit C (InterExchange0000614-25.) hereto.  InterExchange in no way requires an au pair and host family to use the document, and the au pair does not submit the records to InterExchange unless necessary to resolve a dispute.  DOS complimented

InterExchange on the document as an excellent example of monitoring compliance with the program regulations.

17. Au Pair USA's Local Coordinators are InterExchange employees who serve as InterExchange representatives in the host family community and are an informational resource, placement monitor, and occasional mediator during an au pair's participation in the program.

18. Local Coordinators do not track au pairs' hours worked or the precise amount of stipend paid. Neither Local Coordinators nor InterExchange as an organization dictate or collaborate with host families in establishing au pairs' schedules or duties, except as needed to address a conflict and to ensure that the host family is complying with DOS regulations.

19. Au pairs do not perform any work for InterExchange; they provide childcare solely to their host families, in the host families' homes.

20. InterExchange does not assign tasks to the au pairs and does not evaluate the au pairs' performance of childcare duties. Although the host family pays fees to InterExchange to participate in the program, InterExchange does not receive any fees related specifically to the au pair's childcare duties. InterExchange does not pay taxes on behalf of any au pair and does not take any stipend or tax deductions related to the childcare that an au pair provides to a host family.

21. Although InterExchange has many families who have hosted more than one au pair over the years, host families are in no way obligated to use InterExchange as a J-1 visa sponsor, and InterExchange has no agreements with host families creating any

Defs.' Appx. 00000932

kind of exclusive relationship beyond a one-year period, which is the typical program participation time for an au pair.

22. InterExchange has been informed by DOS and its predecessor, the United States Information Agency, that au pairs and host families have an "employment" relationship. For example, see Exhibit D. (InterExchange000468-69.)   This particular notice from USIA specifically stated that sponsors and au pairs do *not* have an employment relationship.

23. InterExchange is required every year to submit an audit report on the au pair program to DOS.  An excerpted example is Exhibit E (InterExchange0020936-55, 74) hereto.

24. Each year InterExchange also submits its marketing and program materials to DOS for review.  These materials include the host family brochure, price list, website, handbook, and orientation guide.

25. DOS has never informed InterExchange that representing the stipend as "$195.75" is in any way inaccurate or incomplete.  Although InterExchange often refers to $195.75 as the minimum stipend, DOS has never informed InterExchange that $195.75 must be accompanied by words such as "at least" or "minimum."  USIA and DOS communications that InterExchange has received over the years do not always refer to the stipend amount as a "minimum."  See Exhibit F (InterExchange0000066, 106, 120-22, 146-47.)  As host families and au pairs may agree on a higher weekly stipend, InterExchange cannot fairly make any representations to au pair candidates regarding the stipend, aside from confirming that they certainly will receive $195.75.

InterExchange has received praise from DOS for its practices related to helping au pairs to track hours and stipend payments when it is clear that "$195.75" is what is being communicated to au pairs about the stipend.  See Exhibit G (InterExchange0000107-08, 115-119.)

26. Exhibit H (InterExchange0009206-07) is an email chain between an InterExchange Transitions Coordinator and a host family.  As the email demonstrates, the host family represented to InterExchange that they paid their au pair $200.00 per week.  The InterExchange employee correctly informed the host family that the stipend increase was a matter between the host family and the au pair, but the agreed-upon stipend could not be used to offset the vacation time the host family owed to the au pair under the regulations.  If a host family pays its au pair more than $195.75 per week, it is a matter of negotiation between the host family and the au pair.  InterExchange does not participate in the negotiations, nor does it track or keep records as to the ultimate stipend payment agreed on between the host family and the au pair.

27. Exhibit I (InterExchange0007413-7414) is an email exchange in which an InterExchange described to an au pair the DOS-published calculation of the stipend, with references to the DOS documents.

28. As I testified to in my deposition, InterExchange has never received any information from DOS that says the stipend varies by state or local minimum wages.

29. InterExchange has never been corrected, reprimanded, sanctioned, or otherwise disciplined by DOS regarding its approach to or representations about the payment of the stipend.

30. For example, Exhibit J (InterExchange0004297-4304) is a copy of a complaint report that InterExchange submitted to DOS regarding au pair Maria Lopez Videla Gaymer. The au pair raised a complaint about the sufficiency of $195.75 per week. InterExchange submitted to DOS its understanding of how the stipend is calculated, with no reference whatsoever to state and local wage laws. DOS did not correct InterExchange's understanding of the stipend calculation in any way. InterExchange received no response from DOS.

31. In my deposition in April 2017, I was questioned about an email I wrote in response to a complaint letter from a former au pair. (McHugh Dep. Ex. 17.) The letter included statements from InterExchange about the $195.75 stipend and the dollar value of the 40 percent room and board deduction. As stated in that email, I forwarded the former au pair's letter to the Department of State. InterExchange never received any response from DOS, much less a response directed at InterExchange's description of the stipend.

32. DOS has never informed InterExchange that the room and board credit is anything other than a DOS- and DOL-approved component of the au pair stipend, although DOS has in the past informed sponsors when a compensation practice was impermissible. For example, in 1997, DOS' predecessor, the United States Information Agency, sent notice to sponsors, including InterExchange, that DOL had determined that host families could not take a credit against the minimum wage for tuition costs or medical insurance. See Exhibit K (InterExchange0000128). InterExchange has never received any such notice regarding the room and board credit. Moreover, the formal

Defs.' Appx. 00000935

stipend notices in Exhibit 6 specifically include a 40 percent credit for room and board. Moreover, it is the host families, not InterExchange, who receive the benefit of the credit, as it is the host families, and not InterExchange who pay the au pairs.

33. I first learned about this lawsuit in November 2014, during InterExchange's 25th anniversary conference related to the au pair program. Stacy Gomelsky and Holly Stephens from DOS were in attendance. When I informed them about the lawsuit, Holly Stephens represented to me that she was aware of it, that I should not worry, and "this too shall pass."

34. On December 31, 2014 and January 2, 2015, I sent an email to Holly Stephens and Diane Culkin, respectively, who work with DOS' Bureau of Educational and Cultural Affairs (ECA). See Exhibit L hereto (InterExchange0039954-55.)   In the wake of the filing of this lawsuit, I was asking for guidance, specifically, on the Plaintiffs' allegation that host families were breaking state minimum wage laws. Ms. Stephens responded that ECA had looked into the minimum wage law, and she would check to make sure she had the most correct answer and get back with me. See Exhibit M (InterExchange0039952.)   I never received any additional information from Ms. Stephens or Ms. Culkin.

35. Plaintiffs allege that InterExchange has made misrepresentations about the stipend by warning au pair participants that one possible warning sign of a scammer is the offer of significantly more than $195.75. Exhibit N hereto (InterExchange0001983-84) is one example of a scam email, which purports to offer the au pair a weekly stipend

Defs.' Appx. 00000936

of $300.75.  This is one example of many such emails InterExchange becomes aware of on a regular basis.  Almost all of them offer more than $195.75.

 

     I declare under penalty of perjury that the foregoing is true and correct.  Executed this ___9th___ day of ____February_____ 2018 by Michael McHugh.

_____

Defs.' Appx. 00000937

**INTEREXCHANGE AU PAIR USA**

**AU PAIR AGREEMENT**

This agreement (herein the "Agreement" or "Main Agreement") describes the terms and conditions of my participation in InterExchange's Au Pair USA Cultural Exchange Program and its sponsorship of my J-1 Visa.

**Background**

InterExchange is a designated sponsor of the Au Pair J-1 Visa Program administered by the U.S. Department of State's Bureau of Educational and Cultural Affairs (the "Program"). The Program allows foreign participants ("Participant" herein defined below) to enter the United States to work as Au Pairsso that the Participant may increase their understanding of American culture and society and enhances the American Host Family's knowledge of foreign cultures through an open interchange of ideas.

This J-1 Visa Program requires employment for Au Pair Participants as part of the Cultural Exchange Program so that cost and expenses incurred during the Participant's time in the U.S. may be offset by the Program Stipend paid by the Host Family.

Now having understood the background and nature of this Agreement and Program, InterExchange and I hereby agree to the following terms and conditions:

1. **Definitions**. I agree to the following definitions:

   a. "**Adjustment Period**" begins when an Au Pair (see definition) first arrives to live in a Host Family's (see definition) home and ends thirty (30) days after the Au Pair has been living in a Host Family's home. During this period, an Au Pair cannot Transition (see definition) to a Rematch (see definition) Host Family except, in rare cases, Au Pairs may be moved as required by InterExchange.

   b. An "**Applicant**" or "**Candidate**" is anyone who applies to the Au Pair USA Program about whom InterExchange has not yet determined his or her suitability for the Program.

   c. An "**Au Pair**" is a carefully screened Participant (see definition), who is between the ages of 18 and 26, is a secondary school graduate or the equivalent, and is proficient in spoken English. Au Pairs are Matched (see definition) with a Host Family for cultural exchange purposes. The Au Pair lives with and provides child care services to a Host Family for up to ten (10) hours a day and forty-five (45) hours per week over five and a half (5 ½) days per week per Program regulations. The Au Pair is provided numerous cross-cultural activities, including, without limitation, taking at least six (6) credit hours of educational course work at a U.S. educational institution while participating in the Au Pair USA Program.

   d. "**At-Will Employment**" means either the Host Family or the Au Pair may end the employment relationship between the two parties at any time.

   e. "**Culture Exchange Program**" is a non-immigrant program operated by the U.S. Department of State's Bureau of Education and Cultural Affairs that increases a Participant's understanding of American culture and society and enhances the Host Family's knowledge of foreign cultures through an open interchange of ideas between Au Pairs and Host Families and the communities in which they live.

   f. "**Extension**" is a period of time in which the U.S Department of State allows a one-time extension of the Au Pair Program for six (6), nine (9), or twelve (12) additional months contingent upon successful completion of the initial 12-month Program and subject to certain limitations.

   g. "**30-Day Travel/Grace Period**" is the 30-day cultural exchange travel or "grace" period to which Au Pairs are entitled upon successful completion of the requirements of the Au Pair USA Program. During this 30-day period, Au Pairs are not permitted to engage in any employment. Au Pairs are required to leave the U.S. before the end of this 30-day period.

   h. "**Host Family**" is a carefully screened family of U.S. citizens or legal permanent residents who participate in the Au Pair USA Program by matching with an Au Pair to utilize the Au Pair's child care services for cultural exchange purposes.

   i. "**In-Country**" means an Au Pair is already in the U.S. An In-Country Au Pair may be in the U.S. due to an Extension or Transition.

   j. "**Insurance**" is accident and sickness coverage from an insurance company authorized by InterExchange (or, in rare cases, an International Cooperator (see definition below)) that meets or exceeds U.S. Department of State requirements.

   k. "**International Cooperator**" or "**IC**" is an independent contractor that performs services for InterExchange including, without limitation, recruiting Au Pairs for the Program, assisting the Candidates and InterExchange with the application process and

Defs.' Appx. 00000938

providing additional pre-arrival support after an Au Pair is matched with a Host Family.

l. "**J-1 Visa Sponsorship**" means a non-immigrant cultural exchange visa issued pursuant to 8 U.S.C. 1101(a)(15)(J).

m. "**Local Coordinator**" is the InterExchange independent contractor or representative who liaises with the Au Pair and Host Family in the Host Family community. The Local Coordinator provides information in compliance with InterExchange Au Pair USA rules and requirements and coordinates monthly gatherings for InterExchange Au Pairs in the cluster area.

n. "**Match**" is the process by which the Host Family chooses to host the Au Pair, who as a result of being matched receives sponsorship for cultural exchange purposes under a J-1 visa sponsored by InterExchange.

o. "**Orientation**" is the period of time during which Participants visit New York City to be trained by InterExchange and are provided detailed information about the Program before the Participants start employment as an Au Pair for Host Families.

p. "**Participant**" is a suitable and qualified Candidate who matches with a Host Family and takes part in the InterExchange Au Pair USA Program under the U.S. Department of State regulations and InterExchange's requirements.

q. "**Program**" or "**Au Pair USA Program**" or "**Au Pair USA**" means the Cultural Exchange Program as administered by InterExchange. The Program includes the initial twelve (12) month program, Transitions and Extensions.

r. "**Rematch**" is the process by which an in-country Au Pair is Matched to a Host Family other than the one to which he or she was originally Matched. Please see the definition of "Match."

s. "**Replacement**" is an Au Pair who replaces another Au Pair after a Host Family enters Transition.

t. "**Social Media**" means a wide range of new and evolving communication tools including, without limitation, multi-media and social networking websites such as MySpace, Facebook, Yahoo! Groups, Linkedin, Flickr and YouTube and other media or video sharing sites; Blogs; Wikis such as Wikipedia and any other site where text or photos can be posted; Sites and/or apps like Twitter on smart devices such as cell phones, digital tablets and similar communication devices.

u. "**Special Needs Child**" is a Host Family child with emotional, physical or psychological needs, as identified by the Host Family, that require additional child care services from an Au Pair other than child care services generally provided to Host Families.

v. "**Sponsor**" is a legal entity designated by the U.S. Department of State to conduct Cultural Exchange Programs under the J-1 Visa.

w. The "**Stipend**" is the minimum amount that the Host Family is required to pay the Au Pair pursuant to U.S. Department of State regulations and employment and labor laws of the U.S. The current minimum required weekly amount is one hundred ninety-five dollars and seventy-five cents ($195.75).

x. "**Suitable Candidate**" means a candidate who meets the Program requirements of the both the U.S. Department of State regulations and InterExchange guidelines.

y. "**Transition**" is the process by which a Host Family or Au Pair may either leave the Program or be Rematched with a new placement.

z. "**Withdrawal**" means that a Host Family or Au Pair voluntarily ends its relationship with InterExchange.

aa. "**3-Point Meeting**" is an optional meeting facilitated by a Local Coordinator or InterExchange to mediate differences between a Host Family and an Au Pair.

2. **Program Overview**. I understand and agree that InterExchange operates Au Pair USA solely as a Cultural Exchange Program. I acknowledge receipt of a copy of 22 CFR Part 62.31, the Wilberforce Brochure (see below, "Dispute Process") and the Department of State publication "The Au Pair Exchange Program" from InterExchange. I further understand and agree that any conflict between the cultural exchange purposes of the Au Pair USA Program and the child care services offered by me as an Au Pair shall be decided in favor of the cultural exchange purposes and regulations of the Program.

3. **Certification, Application, Interview & Selection**.

   a. **Certification**. I certify that I have not previously participated in an Au Pair program based in the U.S. within the last twenty-four (24) months.

   b. **Application**. I agree that I must submit a complete application to be considered as an Au Pair Candidate by InterExchange and a Host Family. I agree that the application process and information requested on the application are responsibilities that I must fulfill under my Agreement with InterExchange. I further understand and agree that all information submitted under this application and Agreement is for the sole purpose of determining my suitability for the Au Pair USA Program.

Defs.' Appx. 00000939

c. **Background Investigation.** I understand and agree that I must successfully pass a background investigation that includes, without limitation, verification of school or high school diploma (minimally a secondary school or the equivalent); three, non-family related child care references; a criminal background check or its recognized equivalent; health screening report; and a psychometric personality test.

d. **Additional Information.** I agree that InterExchange may request, and I agree to supply, additional information other than the originally requested information for the purpose of making a final decision about my suitability for the Program.

e. **Read All Materials.** I certify that I have read and understood all application materials sent to me by InterExchange, including, without limitation, the InterExchange and U.S. Department of State rules and regulations required for me to participate in the Program.

f. **Interview**. I understand that an in-person interview conducted in English is a requirement that must be fulfilled as a condition of my application to the Au Pair USA Program. Further, I must be contacted by a potential Host Family by telephone prior to an agreement to a Match. As explained under Sections on Extensions and Transitions, I understand and agree that the requirements regarding Host Family interviews also apply to Extensions and Transitions for any potential Rematch Host Family.

g. **InterExchange Decision**. I agree that InterExchange makes the final decision about my participation in the Au Pair USA Program. I agree that InterExchange makes the final decision about approving my Match or Rematch with a Host Family. I understand and agree that all decisions are based on InterExchange's role as Sponsor of my Cultural Exchange Program as set forth under this Agreement.

4. **Program**.

a. **Orientation**. I must attend the Orientation provided by InterExchange in New York City. I must not arrive before my scheduled arrival date for my Orientation.

b. **Training**. I agree to attend and engage in child development and child safety instructions provided by InterExchange to the best of my abilities. I understand and agree that I must successfully complete my training in the U.S. prior to starting my child care duties with the Host Family.

c. **Nature of Au Pair Work Performed.**

i. **Host Family/Au Pair Agreement.** Prior to departure from my home country, I must enter into a signed written agreement with the Host Family. I understand the Host Family will provide an outline of my duties and schedule in the Host Family application, which may be amended from time to time, but shall in no way conflict with Program rules, regulations and the terms and conditions of this Agreement. I agree to read and understand the obligations expected of me by the Host Family as detailed through the Host Family application and the Host Family/Au Pair Agreement. I understand that the Host Family/Au Pair Agreement shall include, without limitation, the terms of this Agreement and that the Host Family must conform to the Fair Labor Standards Act. I understand that the agreement between the Host Family and me must be signed only after my Match or Rematch with the Host Family. I understand that InterExchange does not offer, nor am I a Participant in, an Educare program, and, therefore, I am not subject to any Educare requirements regarding the Host Family/Au Pair Agreement.

ii. **Duties**. I understand that my duties shall only include child care and activities related to care of the children of my Host Family. I agree that I cannot be directly responsible for the care of any non-Host Family children. Child care may include, without limitation, active duties such as taking care of children as they play, preparing children's meals, driving children to school and activities, light cleaning of their rooms, assisting children with school assignments and doing the children's laundry as well as passive duties such as being present when the children are sleeping.

iii. **Permissible Duties**. I am not obligated to perform heavy chores, including, without limitation, yard work, taking care of pets, window washing or scrubbing floors. If I choose to engage in heavy chores, I must follow the safety standards under Section 7 of this Agreement.

iv. **Medication**. I must not administer any medicine or medical/therapeutic treatment to children.

v. **Disciplining Children**. I agree that I am not permitted under any circumstances to physically discipline children in any way (e.g., hitting children or withholding food as punishment). The terms of this Agreement are to be enforced even if the Host Family requests that I discipline the children. If I have questions over appropriate behavior, I shall ask my Local Coordinator for guidance.

d. **Local Coordinator**. While I should seek general direction and advice about the Program from the Local Coordinator, I understand that InterExchange makes all final decisions. I agree that statements by the Local Coordinator are not binding on InterExchange unless confirmed in written policy and under the terms and conditions of this Agreement. If I have any questions or concerns regarding my Local Coordinator, I must contact an InterExchange manager directly.

e. **Au Pair's Age**. I can only begin the Program between the ages of eighteen (18) and twenty-six (26).

Defs.' Appx. 00000940

f. **Age of Children.**

    i. I agree that InterExchange cannot place or allow me to remain as an Au Pair in a Host Family home with a child under the age of two (2) unless I have at least two hundred (200) hours of documented experience working with children under the age of two (2). I must promptly notify InterExchange if a child under the age of two (2) years is a member of or joins the household at any time during the Program.

    ii. **I agree that if there are any children under three (3) months old living in the home there must be a responsible adult (e.g., baby nurse, grandparents) in the home at all times and I cannot be left as the sole child care provider, even for a limited amount of time, including sleeping hours.**

g. **Special Needs Children**. I must inform InterExchange and the Local Coordinator about the new arrival or request for me to take care of a special needs child, which may include, without limitation, children with physical or mental disabilities. I understand that I must identify my prior experience, skills or training and willingness to care for special needs children if the circumstances arise in which I am to provide child care to special needs children.

h. **3-Day Settling In Period**. I understand that during the first three (3) days of my stay with the Host Family, a parent or another responsible adult (e.g., grandparents) must remain in the home to facilitate my adjustment into the Host Family, household and community. Failure of this condition by the Host Family must be immediately reported to InterExchange and the Local Coordinator.

i. **45-Hour Work Week.** I cannot provide more than ten (10) hours of child care services on any given day or more than forty-five (45) hours of child care in any one (1) week. Generally, I understand that the Host Family must arrange a consistent schedule of work hours per week to conform to Program requirements (e.g., if the Host Family schedules my hours from Monday through Saturday, this means I must work Monday through Saturday throughout the duration of my employment with the Host Family without variation), provided, however, that the Host Family and I may negotiate a mutually agreed upon change of schedule that does not violate this Agreement, U.S. Department of State regulations or employment and labor laws. I must be compensated at a weekly rate based on forty-five (45) hours per week and paid in conformance with the requirements of the Fair Labor Standards Act. I must notify InterExchange if the Host Family requires or asks me to work over forty-five (45) hours a week or more than ten (10) hour a day.

j. **Room and Board.** I understand that the Host Family must provide me with board and lodging. I further understand that lodging shall be limited to a private room set aside by the Host Family for the purpose of my lodging rather than a room used for other purposes (e.g., sharing the room with another Au Pair is not permitted and a Host Family cannot require me to sleep in a room that is used for laundry or family entertainment).

k. **Stipend**. I understand that my Stipend from the Host Family must meet the minimum requirement set by U.S. Department of State regulation, which may be amended from time to time. I agree to notify InterExchange if there is any problem with receiving my weekly Stipend. If paid by check, I agree to deposit or cash my Stipend within four (4) weeks of receiving the Stipend from the Host Family.

l. **Weekly Time Off**. I must receive a minimum of one and a half (1½) days off per week, in addition to one (1) complete weekend (Friday evening until Monday morning) off each month. I must notify InterExchange if the Host Family fails to provide me with time off.

m. **Vacation.** The Host Family must provide me two (2) weeks of paid vacation during the Program to be taken at a time mutually agreed upon between the Host Family and me. I must contact InterExchange if the Host Family fails to provide me with paid vacation. If joining the Host Family on vacation, I agree not to share lodging with any adult member of the Host Family or share a bed with anyone, including, without limitation, children.

n. **Education.**

    i. **Required Educational Courses**. I agree to follow the applicable U.S. Department of State education regulations for Au Pairs participating in the initial twelve (12) month Program. Specifically, I must enroll in and complete classes or programs offered by an accredited, post-secondary institution for at least six (6) semester hours of academic credit or its equivalent. I understand that the Host Family must facilitate my enrollment and attendance and pay the cost of such academic course work in an amount not less than five hundred dollars ($500) for a twelve (12) month Au Pair Program. The Host Family is not obligated to pay an amount greater than the five hundred dollars ($500). I understand that the Host Family is responsible for facilitating my transportation to such classes or programs.

    ii. **Educational Requirements After Transition**. If I am placed in Transition (See Transition below) before completing the educational requirements, I agree to complete the requirements with the new Host Family to whom I am Rematched as described in the sections on Required Educational Courses and Transition, including, without limitation, restarting the six (6) semester hours in the manner required by the U.S. Department of State. I understand that my new Host Family is only required to pay a pro rated amount of the five hundred dollars ($500) based on my remaining time in the Program, which shall mean a pro rated value equaling nine dollars and sixty-two cents ($9.62) per week in a standard fifty two (52) week Program (e.g., if Transition to a Rematch Host Family after twenty-five (25) weeks, then the Rematch Host Family will be required to pay two hundred fifty-nine dollars and seventy-four cents ($259.74) towards my educational courses).

**CONFIDENTIAL**                    **InterExchange0000053**

Defs' Appx. 00000941

iii. **Additional Cost of Courses**. I understand and agree that all additional costs of meeting the educational requirements of the Program are my responsibility.

iv. **Optional Educational Courses**. If I complete the required number of credit hours in the manner required by InterExchange and U.S. State Department regulations, and there is an amount left over from the five hundred dollars ($500) contribution required of the Host Family, I, at my sole discretion, may elect to use the remaining balance to cover the cost of taking additional courses, provided, however, that the courses meet the academic requirements as set forth by InterExchange and the U.S. State Department. I understand that the Host Family is responsible for facilitating my transportation to and from the courses.

v. **Driver's Education**. If required by the Host Family, I understand that I shall be responsible for taking a driver's education course. provided, however, that the Host Family pays for the cost of the driver's education course. If not required by the Host Family, I shall be responsible for the cost of the course if I elect to take a driver's education course.

o. **Cluster Meetings**. I agree to attend all monthly Cluster Meetings with the Local Coordinator. I understand that the Host Family must facilitate attendance and provide time off and transportation for the meetings.

p. **Insurance.**

i. **Insurance**. I agree to the terms and conditions of the Insurance policy provided by the vendor authorized by InterExchange or the International Cooperator. I understand that InterExchange requires me to hold the Insurance policy through the authorized vendor solely for the purpose of ensuring the policy's compliance with U.S. Department of State regulations. I understand that neither InterExchange nor the International Cooperator are sellers or resellers of the Insurance. I understand that the Insurance arranged by InterExchange or the International Cooperator meets or exceeds Program regulation requirements, but is not comprehensive. For additional information about the Insurance policy from InterExchange, I agree to read the terms and conditions of the policy in the brochure and literature sent to me by InterExchange and by visiting InterExchange's web site. Except for the 30-Day Travel Period/ Grace Period Insurance, I understand that cost of the insurance policy is included in fees paid by the Host Family.

ii. **30-Day Travel Period/Grace Period Insurance**. I agree to request and pay for the Insurance policy that covers the 30-Day Travel/Grace Period before the start of the 30-Day Travel/Grace Period.

iii. **Supplemental Insurance**. I understand that the Insurance policy is limited to accident and medical sickness coverage and may have exclusions or limitations that may cause me to incur out of pocket expenses if I seek treatment for such exclusions or limitations. I agree to investigate and InterExchange strongly recommends that I obtain supplemental insurance to meet my medical and travel insurance needs above those covered by the InterExchange authorized Insurance policy for the duration of the Program.

iv. **Automobile Insurance**. I understand that the Host Family must provide automobile insurance at the Host Family's sole cost if I use any of the Host Family's vehicles for work or personal use. I further understand that the insurance coverage shall not be less than the minimum mandatory insurance coverage required by law in the Host Family's state of residence. I agree that I am responsible for understanding the limitations of any insurance policy and the costs related to the policies.

q. **Passport.** I understand that I am responsible for obtaining a valid passport. I must keep my passport valid at least thirteen (13) months longer than the Program end date found on the DS-2019 form. If I lose my passport, I am responsible for replacing it at my own expense. I am solely responsible for safeguarding my passport and agree not to surrender it to any unauthorized person or entity. If I am in doubt about whether an organization should possess my passport, it is my duty to investigate.

r. **Visa**. I must complete all visa requirements in accordance with instructions provided by InterExchange and the U.S. government.

s. **Tax ID/Social Security Number**. I understand that I may need to secure either a tax payer id or social security number. I further understand that I must safeguard my personal information. If I am in doubt about whether an entity should possess my personal information, it is my duty to investigate.

t. **English**. I agree that my English language skills must be sufficient to communicate with the Host Family and during emergencies. I understand insufficient language skills may be a reason for my visa denial and/or my Program to end early.

u. **Failure to Return to the United States during Program Dates**. I understand that if I leave the U.S. at any time during my Program for any reason I must provide notice to InterExchange. Furthermore, I agree that my sponsorship will end if I fail to return to the U.S. or the Program within thirty (30) days.

v. **30-Day Travel/Grace Period**. I understand that upon successful completion of the Program I am permitted a 30-Day Travel/Grace Period during which I am allowed to travel within the United States. I understand that it is a violation of immigration law and Program regulations to conduct any form of employment (including working for my Host Family) during the 30-day Travel/Grace Period.

w. **Leaving Program Early or Overstaying 30-Day Travel/Grace Period.** If I leave the Program before the Program end dates or over-stay the 30-Day Travel or Grace Period, I forfeit my return flight, vacation time and unearned Stipend, and my Insurance will

Defs.' Appx. 00000942

be cancelled. I understand that InterExchange will report any circumstances of the Program ending early and/or violation of immigration laws to the U.S. Department of State and/or the Department of Homeland Security.

x. **Leave U.S. At End Of Program. I will** return to my home country or leave the U.S. at the end of my Program, which is defined **by the end date of my DS-2019 form plus my 30-Day Travel/Grace Period or, if the Program ends early, the date that I am required to leave the U.S. under immigration law and InterExchange requirements.**

y. **Visa Requirements of Other Countries**. During the Program, I agree that it is my obligation to research and meet any visa requirements for countries to which I plan to travel.

5. **Employment & Sponsorship.**

a. **Notice of At Will Employment**. I understand that my position as an Au Pair is At-Will Employment as defined under the Definitions Section.

b. **No outside employment.**I must not work in any additional position, including, without limitation, volunteer or paid employment or internships, during the Program. I must only work with the Host Family that has been approved by InterExchange.

c. **InterExchange is not an Employer or Employment Agency.** I agree that InterExchange is not my employer or an employment or staffing agency.

d. **Sponsorship**. I agree that InterExchange solely functions as my J-1 Visa sponsor.

e. **Best of Abilities**. I understand that keeping my J-1 Visa sponsorship is based on remaining in good status throughout the duration of the Program. To increase the chances of keeping my sponsorship, I have investigated the duties and functions of an Au Pair. I am willing and able to function as an Au Pair in every way, including physical and mental stamina. To further promote the cultural exchange ideals of the Program and act as an ambassador of my home country to the Host Family and Host Family's children, I agree to carry out my child care duties and other responsibilities to the best of the abilities and with due respect.

6. **Air Travel & Transportation.**

a. **Travel**.

i. I agree to allow InterExchange, its officers, affiliates, independent contractors, vendors, agents and employees to act on my behalf in arranging transportation to and from InterExchange designated locations.

ii. I must be present in enough time for all flights or other transportation provided or arranged by InterExchange. I understand and agree that InterExchange is not responsible for providing alternative transportation. I agree to bear the cost of any fees or charges incurred as a result of any failure to follow these instructions.

iii. I understand that flights will depart from and return to assigned airports, and that I am responsible for any flight or other supplemental transportation to reach the designated points of departure.

iv. I agree to notify InterExchange of any deviation from the arrangements that InterExchange made on my behalf.

b. **Transportation- Motor Vehicle**. If I am required to drive and given access to a motor vehicle, I understand that the Host Family must pay for gas used by me and maintain the motor vehicle in good working order when performing my duties or when driving to/from meetings and/or classes in fulfillment of Program requirements. I agree to report any concerns about the working condition of the motor vehicle to my Host Family immediately. I further understand that a motor vehicle may or may not be available.

7. **Safety, Problems & Emergencies.**

a. **Precautions**.

i. I am responsible for my personal health and safety needs while participating in the Au Pair USA Program. If I suffer from any health or other condition that would create a risk to others or me, I should not apply or participate.

ii. I must take reasonable precautions to prevent injury or harm to myself or a third party or damage to the property of a third party or myself.

b. I agree to the following:

i. I must notify InterExchange in the manner required under Communications and Notification Section if I experience any serious medical, psychological or criminal incident.

ii. **I must contact InterExchange immediately if the Host Family endangers my safety or the safety of others or acts in a manner that raises questions about my safety or those of others.**

Defs.' Appx. 00000943

    iii. **I must remain available and/or stay in contact if contacted by my Local Coordinator during any natural disaster or emergency. If I am unable to contact the Local Coordinator after my Local Coordinator contacts me, I must reach authorized staff at InterExchange to confirm my circumstances as soon as it is reasonably feasible to do so.**

    iv. **Emergency Messaging.** In addition to following any emergency plan available to me from local authorities or the Host Family, if I supplied my mobile number,I agree to follow suggestions as may be sent through InterExchange emergency messaging, including, without limitation, emergency texts from InterExchange. If local authorities or the Host Family recommends actions that conflict with any messages sent via InterExchange emergency messaging, I shall follow the direction of the Host Family or local authorities as they may be better aware of local circumstances. I understand and agree that InterExchange is not obligated to provide me emergency messaging and that this is an additional service that InterExchange may provide to me as circumstances may permit.

    v. I must immediately contact InterExchange if the Host Family requests that I engage in any illegal activities (e.g., illegal drugs).

  c. **InterExchange.**

    i. In circumstances involving my health and safety, I agree that InterExchange may discuss my circumstances with my family (e.g., my Host Family and actual family), emergency contacts, the International Cooperator, my insurance company, healthcare officials, law enforcement, the U.S. Department of State or any other critical party with a need-to-know.

    ii. I agree that InterExchange, its officers, employees, independent contractors, vendors affiliates and agents or any Local Coordinator may, without liability, or expense to themselves (as explained in further detail under the Liability section), take whatever action they deem appropriate with regard to my health and safety and may place me in a hospital or health-related facility for medical services and treatment or, if no hospital or health-related facility is readily available, may place me in the care of a local medical doctor or health provider for treatment or service.

  d. **InterExchange Health, Safety or Exploitation.**

    i. I understand that in the event of an accident or serious illness that, in the judgment of InterExchange, prevents me from continuing my duties, I will end the exchange early and return home at my own expense.

    ii. If InterExchange finds that I am subject to exploitative or other unreasonable circumstances or conditions in Host's household (e.g. failure to pay the appropriate weekly Stipend or to provide the agreed upon free time or educational benefits), InterExchange, at InterExchange's sole judgment, may immediately withdraw me from the household.

    iii. I agree that any decision regarding my status as an Au Pair, dismissal, or replacement will be made at the sole discretion of InterExchange and shall be considered final.

  e. **Emergency Plan.**

    i. I must become aware of emergency plans set up by the Host Family and as issued by local authorities.

    ii. In case of emergencies (e.g., hurricanes, earthquakes, fires, terrorist attacks), I agree to follow the emergency plan, if any, issued to me by InterExchange, the Host Family and local authorities. I agree that InterExchange is not obligated to provide an emergency plan and that this is an additional service that InterExchange may provide as circumstances may permit. I understand that the instructions provided to me from the Host Family and local authorities take priority over InterExchange instructions.

8. **Extensions & Transitions.**

  a. **Extensions**. Extensions are explained in greater detail in the Extension Term Sheet found in Exhibit A and the clauses below. I understand that: I must be eligible for the Extension upon submitting my application and that I must meet the requirements of the Program as follows:

    i. If I wish to participate in the Extension Program, I must submit my application on or before InterExchange Au Pair USA's published Extension application deadline date which is found on InterExchange's website. I understand and agree that InterExchange cannot guarantee that the U.S. Department of State will approve my Extension request and that failure to meet the application deadline is an automatic disqualification.

    ii. I understand that if my Extension is approved I will receive an updated DS-2019 form for participating in the Extension Program that reflects the updated Program dates. Although I will have a valid DS-2019 form, I understand that the J-1 Visa in my passport may have expired during the first 12-months of stay in the U.S. Therefore, I understand that InterExchange discourages me from traveling outside of the U.S. after the J-1 Visa expires because I may not be allowed re-entry into the U.S., and InterExchange has no jurisdiction over U.S. immigration personnel or their decisions.

    iii. By signing this Agreement, I agree to the terms of the Extension Agreement if the following terms and conditions are met:

Defs.' Appx. 00000944

a. Timely submission of my Extension application.

b. U.S. Department of State approval of my application.

c. My meeting the terms of this Agreement (including educational requirements).

d. The Host Family has paid all money owed and adhered to Program regulations including, without limitation, attendance at Host Family Day.

e. InterExchange's approval of the Host Family.

Except as set forth in the attached Extension Agreement, the general terms of this Agreement shall remain in effect and control.

iv. **Approval. I understand and agree that completion of the terms and conditions described in this section of the Agreement or in the Extension Term Sheet does not guarantee an Extension. I further understand that nothing in this Agreement implies or requires me to participate in an Extension. The terms and conditions described are effective only if I participate in an Extension Program.**

b. **Transitions**. After the initial adjustment time of one month following arrival, InterExchange has set up a Transition procedure regarding a possible breakdown in the relationship between the Host Family and me.

i. **Transitions-General Procedure**e. I agree to following:

a. The Host Family or I must communicate to InterExchange that there is a breakdown in the relationship between the Host Family and myself.

b. Upon becoming aware of a breakdown in the relationship, the Local Coordinator, at his or her discretion, may decide to mediate a meeting between the Host Family and myself.

c. If there is not a resolution of the problem(s) raised, the Host Family and I shall be placed into Transition, which shall mean for me either a Rematch or Withdrawal (see below) from the Program. During Transition, I may remain in residence with the Host Family for several weeks or be moved, if reasonably feasible, into temporary housing arranged by the Local Coordinator and authorized and approved by InterExchange. If I remain in residence with the Host Family, I may be asked to continue to fulfill my child care responsibilities. If I am asked to continue child care duties, I must receive the appropriate weekly Stipend and follow Program requirements and regulations until a new placement can be found. I understand InterExchange will make best efforts to move me from the Host Family as quickly as is reasonably possible so that I may continue, if possible, my Cultural Exchange Program. I understand that I may not arrange my own temporary accommodations and doing so may endanger my continued sponsorship.

d. I agree to fully cooperate with InterExchange during the Transition and not to involve outside parties.

ii. There are three outcomes that define the status of my continued involvement or lack therefore in the Au Pair USA Program:

a. **Transitions- Rematch.**

i. InterExchange will make reasonable attempts to locate a Rematch Host Family for me for up to two weeks during the Transition process. If after two (2) weeks, InterExchange cannot find a suitable Host Family for me, InterExchange may require me to return to my home country under the terms and conditions set forth in this Agreement. I understand and agree that any decision regarding my Program status shall be made at the sole discretion of InterExchange and shall be considered final.

ii. I agree to carefully consider the potential Rematch Host Family with whom I may be Rematched. I understand that my Rematch will possibly take me out outside of the area in which my existing Host Family resides.

iii. My Rematching shall comply with the remaining length of my original Program (e.g., If I have five (5) months left in the Program, then the Rematch contract length for me would be five (5) months).

iv. I agree that if a Rematch takes place, travel details will be organized by InterExchange and Local Coordinator working with the Host Family and me.

b. **Transitions – Withdrawal.** I may elect to withdraw from the Program. I understand that this Agreement must automatically terminate under the terms and conditions set forth in the Termination section of the Agreement. As explained in Sections 9 and 16, I agree that I am responsible for the cost of my airfare home and other costs incurred in the Program.

    c. **Transitions – Unsuitable or Lack of Suitable Placement**. InterExchange, at its sole discretion, may determine that I am unsuitable to remain in the Au Pair USA Program and/or no suitable placement is available after a reasonable time period has passed. I agree that I am responsible for the cost incurred in the Program.

9. **Fees, Expenses, Costs and Payment.**

    a. **Costs, Fees & Expenses**. I understand and agree that I am responsible for, without limitation, any educational cost and expenses above the amount that the Host Family is required to disburse; federal, state and local income taxes; withholding taxes; copayments and deductibles on the Insurance from the authorized vendor (Please see terms and conditions of Insurance policy coverage); the fee for my Insurance coverage during the 30-Day Travel/Grace Period; the cost of my return air flight (if applicable) under the conditions as described in this Agreement; all additional expenses of the Transitions including the education requirement as defined in this Agreement; damage to Host Family's car with the limitations as set forth in this Agreement; any driver's education course costs pursuant to the terms and conditions defined in this Agreement; any costs incurred by the Host Family or InterExchange regarding a change of sponsor as described below; any other costs related to me returning home early from the Program; any damages as described in this Agreement; the cost of any translations of application and background check costs; and any fees, costs and expenses not expressly covered under this Agreement.

    b. **Emergency Messaging Fee**. If I provide my mobile number for emergency contact (e.g., emergency texting) from InterExchange, I agree to assume all necessary charges per carrier fees for usage that may arise if InterExchange sends emergency messaging to me.

    c. **Payment**. I agree that the Credit Card Approval Form that I may sign for the purpose of paying any costs, fees and expenses described in Section 9 is incorporated into this Agreement in **Exhibit C**.

10. **Notice & Communications.**

    a. I must contact InterExchange by means of the contact information provided by InterExchange (e.g., telephone number or e-mail address). I must include InterExchange contact information in my address book to ensure receipt of communications from InterExchange. In the case of an emergency, safety or health issues, I agree to contact InterExchange immediately or as soon as it is reasonable under the circumstances. In addition, I agree to contact the Local Coordinator and InterExchange via the emergency contact information provided by InterExchange.

    b. InterExchange will contact me through the contact information that I provide to InterExchange, the Local Coordinator or Host Family. I agree to respond to communications from InterExchange in a timely manner. I understand that a failure to communicate with InterExchange may be a reason for withdrawal of InterExchange's Program sponsorship.

    c. **Emergency Messaging**. For the purpose of emergency messaging, I agree that InterExchange may contact me via text message and/or voice services through my mobile phone and/or by email.

    d. **Contact with Local Coordinator.** I understand that InterExchange's Local Coordinator will contact me and my Host Family within forty-eight (48) hours of my arrival to my Host Family. I also understand that InterExchange's Local Coordinator will visit my Host Family within two (2) weeks of my arrival. I understand that my Local Coordinator will call me twice monthly for the first two (2) months following a placement other than the initial placement for which I entered the U.S. I understand that my Host Family will also attend at least one of two Family Day Conferences sponsored by the Local Coordinator during the Program year. As stated in the Agreement above, I understand that I must also attend monthly cluster meetings with the Local Coordinator.

    e. **Student & Exchange Visitor Information System (SEVIS) Reporting**. I agree to provide notice to InterExchange about where I reside for the duration of the Program to ensure SEVIS and Au Pair status reporting requirements are met. I further agree to provide all relevant personal data for the purpose of InterExchange maintaining my record with SEVIS.

11. **Release, Intellectual Property, Social Media & Disrepute**

    a. **Release**

        i. I give permission to InterExchange to (i) take and retain any photographs (including group or Host Family photos), copies of images from passports, videos, audio recordings and other depictions of me (collectively, the "Reproductions") during activities associated with InterExchange; (ii) retain any Reproductions that Host Family submits to InterExchange, or that Host Family posts on any InterExchange-branded or InterExchange-affiliated media site, social networking site or video upload site or "channel" or blog, including, without limitation, Facebook, Linked-In, YouTube, Twitter, or any other electronic site; and (iii) publish, distribute and display, either in whole or in part, any Reproductions in any and all media throughout the world, including, without limitation, media sites, social networking sites, video upload sites or "channels," blogs, electronic postings, calendars, brochures, advertisements and other promotional materials.

        ii. I hereby waive compensation and any right to inspect or approve any such uses and Reproductions. I shall not submit any Reproduction unless I first obtained permission from each person whose name, image, voice, or likeness is included in the Reproduction, and each such person has granted me and InterExchange all copyright and other intellectual property rights, including renewal rights, necessary to use the Reproduction and his or her name, image, voice and likeness in it. I

**InterExchange0000058**

Defs.' Appx. 00000946

hereby release, discharge and agree to hold InterExchange harmless from any liability arising out of InterExchange's use of the Reproductions, including any blurring, distortion, alteration, optical illusion or use in composite form with other works. I hereby assign all copyright and other intellectual property rights, including renewal rights, to InterExchange, in any materials produced that are the subject of this Release.

b. **Use of InterExchange Intellectual Property**. If I desire to use InterExchange Intellectual Property for any reason, I shall contact InterExchange's Marketing Department to request permission. I shall not use InterExchange's Intellectual Property without having obtained prior written permission. InterExchange Intellectual Property shall mean, without limitation, InterExchange copyrights, trademarks and trade secrets, patents, online content appearing on InterExchange's website, Facebook and other Social Media content and marketing tools, marketing material and the application and other materials that I submitted to InterExchange.

c. **Disrepute**. I must not act in a manner that brings InterExchange, the Exchange Visitor Program, me, my country or the U.S. Department of State into notoriety or disrepute.

12. **Social Media Policy**. I understand and agree to the following terms when using Social Media:

   a. I must respect privacy by not disclosing any information that could reasonably be considered identifying information, including, without limitation, social security numbers, tax payer identification numbers, full names, addresses (beyond web site or business addresses) and financial account information of anyone involved with the InterExchange Cultural Exchange Program.

   b. I must not post any images of anyone without written documentation of their knowledge. I must also not post images of children without the permission and knowledge of their parents. I understand that posting these images may subject me to violation of not only privacy law, but also other international or U.S. federal, state and local laws.

   c. I agree that my time and effort spent using Social Media should not interfere with meeting my requirements under my contract with InterExchange or duties or work commitments to my Host Family.

   d. **I must not use Social Media in a way that will subject anyone to liability (criminal or civil) such as by posting obscene or illegal material or services or harassment of others. I must not engage in any activity that may result in legal action against InterExchange or those in a contractual or business relationship with InterExchange.**

   e. I agree to use my common sense in all communications, particularly when using publically accessible Social Media platforms in a manner that may lead to disrepute. I understand that what I say or display online could potentially be harmful to InterExchange, others and myself.

   f. If I have any questions about this policy, I must contact InterExchange for guidance.

13. **Privacy & Background Check.**

   a. **Privacy**.

      i. **InterExchange Privacy Policy.** By signing below, I accept and agree to be bound by InterExchange's Privacy Policy pursuant to InterExchange's Terms of Use located at www.InterExchange.org/terms-use, its Privacy Policy located at www.InterExchange.org/privacy-policy, my application and the terms and conditions set forth in this Agreement. I agree that I have read each of these documents, which (if applicable) are incorporated herein by this reference, as they form a legal agreement between InterExchange and myself regarding the Privacy Policy of the Program. I understand that in the event of any conflict between the application, this Agreement and those of the Terms of Use and Privacy Policy, the Terms of Use and Privacy Policy shall supersede with regard to the Privacy Policy.

      ii. **Au Pair duty to provide privacy**. In addition to the specific requirement for Social Media listed under this Agreement, I understand and agree that I must protect the privacy of the Host Family. In addition, I agree to protect the privacy of any party in a relationship with InterExchange and/or Au Pair USA, including, without limitation, InterExchange staff and Local Coordinators. If I have questions about my duties under this clause of the Agreement, I shall contact the Local Coordinator and/or authorized InterExchange managers for guidance.

   b. **Background Check**.

      i. **InterExchange**. I agree that the **Background Information Usage Notice** is incorporated into this Agreement in **Exhibit B**. The Background Information Usage Notice authorizes InterExchange to obtain and use background information (e.g., police reports and child care references obtained by me) for the purpose of determining my suitability for the Au Pair USA Program. By signing this Agreement, I certify that I understand and agree to the purpose for which InterExchange procures the background information from me. By signing this Agreement, I further certify that I agree to the methods by which InterExchange procures the background information.

      ii. **Host Family**. I understand and agree that the Host Family may request additional screening of me at the Host Family's own expense. I understand that the Host Family must conduct such investigation pursuant to the laws of the U.S. and state and local laws in which the Host Family resides.

Defs.' Appx. 00000947

14. **Additional Agreement Terms.**

a. **Entire Agreement.** I understand and agree that this Agreement contains the entire understanding of the parties with respect to the matters contained herein and supersedes any previous agreements (oral, written or otherwise) and may be altered or amended only by a written instrument duly executed by both parties hereto.

b. **Documents Incorporated into Agreement.** I understand and agree that 22 CFR Part 62, the Wilberforce Brochure (see below, "Dispute Process"), the Extension Agreement (if applicable and as described in the Agreement), the Au Pair Handbook, and the Department of State publication "The Au Pair Exchange Program" from InterExchange are incorporated into this Agreement. With regard to the use of InterExchange's website located at **www.InterExchange.org** ("Site"), I understand and agree that I must follow terms and conditions of **www.InterExchange.org/terms-use** and **www.InterExchange.org/privacy-policy**, which are incorporated into this Agreement for the purpose of Privacy Policy and site use only rather than for the general terms and conditions of the Program. Unless required by law or regulation (e.g., required 22 CFR Part 62, Wilberforce, the Department of State or federal, state or foreign law) or involving InterExchange's Privacy Policy, if there is a conflict between this Agreement and other documents incorporated into this Agreement, the Agreement shall be controlling.

c. **Agreement in English.** This Agreement and correspondence between InterExchange and myself shall be written in English. In the case of any disputes between InterExchange and myself, the language that shall govern interpreting this Agreement or any issue arising out of communications, including, but not limited to correspondence, shall be English. I am responsible for any cost associated with translation if any language other than English is required by me for any reason.

d. **Assignment.** This Agreement is restricted solely to myself and shall not be assigned, transferred, encumbered, or subject to any third party agreement without the written consent of InterExchange. Any attempted assignment will be void and of no effect. InterExchange may assign this Agreement to a successor (whether by merger, a sale of all or a significant portion of its assets, a sale of a controlling interest of the company or otherwise), which agrees in writing to assume InterExchange's obligations under this Agreement.

e. **Amendments.** I agree that InterExchange, at its sole discretion, may amend this Agreement, provided, however, that the amendment is in writing and InterExchange gives me thirty (30) days notice. I agree that any changes required by the U.S. Department of State or any other government entity with legal authority over InterExchange must be adhered to immediately without 30-days notice. I understand and agree that I cannot amend the Agreement.

f. **Third Parties and Third Party Beneficiaries.** I understand and agree that the terms and conditions of this Agreement, expressed or implied, exist only for the benefit of the parties to this Agreement. No other person or entity will be deemed to be a third party beneficiary of this Agreement.

g. **Waiver.** I agree that InterExchange's failure to enforce any provision of this Agreement shall not be construed as a waiver or limitation of InterExchange's right to subsequently enforce and compel strict compliance with each and every provision of this Agreement.

h. **Void Provision.** I agree that if any provision of this Agreement is held to be void or contrary to law, such provision shall be construed as nearly as possible to reflect the intention of the parties, with the other provisions remaining in full force and effect.

i. **Headings.** I agree that all headings are for purposes of convenience only and are not to be used in interpretation or enforcement of this Agreement.

j. **Change of Sponsor.** I understand and agree that InterExchange is not required to facilitate a request to change sponsors during the Program. I understand and agree that if I terminate this Agreement or otherwise end my Program that I am to return to my home country rather than stay in the U.S. I agree that I shall owe InterExchange or Host Family for any costs and/or expenses incurred by either InterExchange or the Host Family due to a change of sponsor.

15. **Laws, Regulations & Culture**

a. **U.S. State Department Regulations.** I acknowledge and agree that I am participating in a Cultural Exchange Program and agree to comply with all of the regulations published by United States Department of State under 22 CFR Sec. 62, which may be amended from time to time in the future.

b. **Federal, state and local laws.** I must comply with federal, state and local laws of the U.S., including income tax filing requirements (see below), licensing for use of motor vehicles (and other motor vehicle requires described in this Agreement) and laws regarding alcohol and drug use (see below for further details). I am responsible for reading and carefully considering all materials made available to me that relate to safety, health, legal, environmental, political, cultural and religious customs and conditions in the U.S. I take full responsibility in the event that laws, regulations or customs are broken and for obtaining actual knowledge of these laws, regulation or customs.

c. **Taxes.** I am hereby given notice that I may be considered, under most circumstances, a non-resident alien who is not subject to Social Security (FICA), Medicare, or federal unemployment (FUTA) withholding taxes. Under rare circumstances involving Participants who previously entered the U.S. under a J Visa program or as a student under the F Visa, I understand that I may be considered a resident immigrant for tax purposes and subject to paying Social Security (FICA), Medicare, or federal unemployment

Defs' Appx. 00000948

(FUTA) withholding taxes. I understand it is my responsibility to contact a tax professional to determine the extent (if any) of any taxes that I may owe. For more information, I understand that I should visit the IRS website and search for "Au Pair." Under all circumstances, I am subject to paying federal, state (if applicable) and local (if applicable) income taxes on my Stipend. This information is provided for notice purposes only, "as is" and is subject to change.

d. **Driving**. I agree to be responsible for determining whether I will be able to legally drive in the Host Family's state of residence. I acknowledge responsibility to conform to any and all state or local laws regarding my use of Host Family's automobile (if one is made available); including obtaining a local driver's license (if required) and any car insurance requirements. I agree to comply with requests made by Host Family for additional driving related education and instructions in compliance to the terms and conditions of this Agreement.

e. **Drugs and Alcohol**. I understand that the drug and alcohol laws of the U.S. may differ significantly from those of my home country even in the case of over the counter drugs and herbal remedies. I agree to investigate and follow all U.S. federal, state and local laws regarding drugs and alcohol.

f. **Cooperation with InterExchange**. I will cooperate fully with those supervising the Program on behalf of and in cooperation with InterExchange. I agree to abide by any reasonable instructions they may give me.

16. **Warranties, Liability, Indemnification & Act of God**

a. **No Guarantee of Match or Participation**. I agree that InterExchange neither guarantees a Match (or Rematch) nor participation in the Program.

b. **No Guarantee of Satisfaction or Suitability**. I agree that InterExchange neither guarantees satisfaction nor suitability with the Program or a Host Family.

c. **Information Provided "As Is" Without Warranty or Guarantees**. I agree that any information (e.g., tax and labor law requirements and emergency information and plans) communicated by InterExchange to me is provided "as is" without warranties or guarantees either expressed or implied that information is "up to date", correct and/or accurate.

d. **Participant General Liability**. I waive and release InterExchange from any and all claims for contract damages, torts arising out of or concerning my employment with the Host Family and any liability that I incur that arise out of or concerning my participation in the Program, including, without limitation, any lost, stolen or damaged property and/or any bodily injuries that harms a third party or me.

e. **Limitation of Liability**. If a court, government agency or legal authority finds that InterExchange has a duty under foreign or U.S. federal, state or local law, I understand and agree that InterExchange's liability (if any) shall be no greater than its role as a nonprofit Sponsor under the U.S Department of State regulations. I agree that nothing herein described in this paragraph or in the Agreement creates a duty or obligation under the law, and that the language written herein is provided solely for the purpose of limiting liability to InterExchange's role as my Sponsor. I further agree that InterExchange's liability is subject to the limitations set forth in separate paragraphs described in Section 16.

f. **Change of Sponsorship Costs**. In compliance with Section 14(j), I agree that I shall owe InterExchange for any costs and expenses that arise from a change of sponsor.

g. **Specific Liability**.

i. **Motor Vehicle**. If I have an accident while driving the Host Family's motor vehicle during work hours, I understand that I will not be liable and responsible for any cost and/or damages arising out of or concerning the repair of the motor vehicle, provided, however, that I did not violate any drug and/or alcohol laws while using the motor vehicle. If I violated any drug and/or alcohol laws while driving the motor vehicle, I am liable and responsible for damages and/or costs arising out of or concerning the accident. If there is damage to the Host Family motor vehicle during non-working hours, I am liable and responsible for one half (½) the costs and/or damages up to five hundred dollars ($500) per accident, provided, however, that I did not violate any drug and/or alcohol laws while driving the motor vehicle. If I violated drug and/or alcohol laws while driving the motor vehicle, I am liable and responsible for costs and/or damages arising out of or concerning any accidents involving drug and/or alcohol use by me. I understand that the five hundred dollars ($500) shall only be payable upon Host Family presenting proof of repair that shall include, without limitation, photos of the damaged and repaired vehicle. I agree that InterExchange is not liable for any damages or loses resulting from my use of the Host Family's or any other party's motor vehicle or transportation during my participation in the Program.

ii. **Expenses**. I am responsible for all my personal debts, including, without limitation, phone calls, gym memberships, and medical insurance co-pay. I agree that InterExchange shall not be liable for any personal bills incurred by me during the Program. I agree that I am responsible directly to the Host Family for all personal debts including without limitation, phone calls and gym memberships.

iii. **Transportation**. I agree not to hold InterExchange, its officers, affiliates, independent contractors, agents and employees liable for arranging transportation in the Program, and I agree not to hold any of them liable in connection with any loss, damage, personal injury, delay or expense suffered or incurred by me, resulting from any act or omission of any carrier.

**CONFIDENTIAL**                    InterExchange0000061

Defs' Appx. 00000949

any member of the host family or any other body corporate or non corporate entity, in relation to transportation to and from and within the United States, my duties as an Au Pair or any other facility or service organized on my behalf.

iv. **Specific Liabilities**. I agree that I am responsible, and that I shall hold InterExchange as not liable or responsible for any claims, liability, damages or costs incurred by reason of any breach, act, error, negligence or omission that arises out of or concerns, without limitation, the following:

    a. My performance of child care duties

    b. My disciplining children

    c. Decisions and actions carried out by the Host Family

    d. Section 7(c)(i) and (ii), which respectively address InterExchange discussing health and safety circumstances with third parties and taking action in case of health or safety emergencies. Although InterExchange may elect to act as set forth in Section 7(c)(i) and (ii), I agree that InterExchange is not liable if InterExchange fails to act. I agree that neither Section 7(c)(i) and (ii) nor any other term under the Agreement creates an affirmative duty, either expressed or implied, for InterExchange to act. In compliance with Section 7(c)(i) and (ii), I agree that InterExchange is not liable for acting on my behalf under the circumstances described in Section 7(c)(i) and (ii).

    e. Insurance (including car insurance for vehicles) or medical, dental and health care needs that I may have during the Program

    f. Alternative flights to and from the U.S.

    g. My failure to meet immigration status requirements while in Program (e.g., travel outside of U.S. with expired J-1 Visa)

    h. My failure to follow emergency, safety and problems rules suggested or required by InterExchange, the Host Family or local authorities

    i. My disclosure of information and/or documents to unauthorized parties (e.g., tax payer id number or passport)

    j. My failure to apply for and obtain necessary documentation and information as described in this Agreement

    k. Leaving the Program. If I leave the Program for any reason before my commitment is finished or over-stay my visa, I forfeit my return flight and any vacation time, unearned Stipend and my Insurance will be cancelled (and therefore I agree that I will be responsible for any medical costs or damages caused by my lack of Insurance coverage). I also agree that I will be liable for all costs and damages that are incurred or arise out of InterExchange acting to address my actions.

    l. Inadvertent disclosure to third parties in the course of conducting an investigation involving my well-being or suitability for the Program.

    m. Breaching any other term of this Agreement (e.g., failure to follow laws of the U.S. or guidance from states and local authorities).

    n. Violations of U.S. federal, state and local laws, regulations and customs

h. **Act of God**. I agree that InterExchange and/or its officers, employees, independent contractors, Local Coordinators and agents are neither responsible nor liable for any events beyond their control, including, without limitation, Government restrictions that may interfere with or preclude operation of the Program; any events directly or indirectly caused by any intentional or negligent acts or omissions by the Host Family or those with whom Au Pair comes into contact as a consequence of participating in the Program; the necessity of returning me to my home country early or ending my program early due to health reasons, transportation (e.g., air travel); terrorism; wars; and natural disasters.

i. **Indemnification**. I shall indemnify, without limitation, InterExchange, its officers, employees, agents, Local Coordinators, independent contractors, and organizations affiliated with InterExchange, against any loss or damage suffered by any of them, or any claims made against any of them as a result of any breach, act, error, omission or negligence by me during my participation in the Program and for the duration of my stay in the U.S.

17. **Dispute Process.**

a. **Complaints Procedure.** I have the right to contact the U.S. Department of State regarding any serious allegation arising under the Wilberforce Anti-trafficking requirement as set forth in the Wilberforce brochure that I received from InterExchange or upon refusal of InterExchange to address claims. I also understand that allegations by third parties about my progress, well-being and suitability in the Program will be investigated by InterExchange. I understand that InterExchange will not divulge any background information about me other than the information required to conduct the investigation.

Defs.' Appx. 00000950

b.  In the event that I wish to lodge a complaint about any services provided by InterExchange, its suppliers, agent, representatives, independent contractors, vendors and/or affiliates (e.g., Insurance vendor, Host Family, Local Coordinators, International Cooperator, hotel or anyone in a relationship with InterExchange), I must first notify both my Local Coordinator and an authorized InterExchange manager in writing in order to give InterExchange the chance to rectify the problem.

c.  I understand and agree this Agreement is governed by laws of the state of New York.

d.  I agree that any controversy, dispute or claim arising out of or in connection with this Agreement, the relationship of the parties, or its interpretation, performance or nonperformance, or any breach thereof shall be determined solely in arbitration conducted in New York City in accordance with the then existing rules of the American Arbitration Association.

e.  **Cost of Arbitration**. In the event of arbitration as described in 17(d), I understand and agree that the non-prevailing party must reimburse the prevailing party for all reasonable attorneys' fees and costs resulting therefrom.

f.  **Cost of Litigation**. In the event that a court or legal authority fails to enforce the arbitration clause set forth in 17(d), I understand and agree that the non-prevailing party shall reimburse the prevailing party for all reasonable attorneys' fees and costs resulting from the cost of the litigation, including, but not limited to any trial and/or appeals.

18.  **Terms, Termination and Survivorship**

a.  **Start Date**. I agree that this Agreement shall be effective as of the date of my submitting an application to the International Cooperator for the purpose of participating in the InterExchange Au Pair USA Program (the "Effective Date").

b.  **End Date**. I agree that this Agreement shall automatically terminate at the end of the Au Pair USA Program for standard 12-month Programs, in-country placements, rematches or Extension Programs, whichever is latest, plus my 30-Day Travel/Grace Period. I understand and agree that the Agreement may automatically terminate once my Program with InterExchange ends, which may end at the end of my 30-Day Travel/Grace Period in the Program, or earlier subject to the terms and conditions of termination of the Agreement, whichever occurs first.

c.  **Termination**. This Agreement may be terminated by InterExchange at any time and will terminate automatically if InterExchange ends its sponsorship of my J-1 Visa. Provided that I meet my obligations under this Agreement, I may terminate this Agreement by withdrawing from the Program and leaving the U.S., provided, however that I provide InterExchange with 2-weeks notice prior to termination.

d.  **Survivorship**. I agree that any terms and conditions regarding definitions, liability, fees, privacy, releases, intellectual property, Social Media, reputation, confidentiality and expenses/costs shall survive the termination of this Agreement.

19.  **Full Disclosure**. I am solely responsible for the full disclosure and accuracy of any information provided by me, my agent or a legal guardian. I confirm that the information I have provided is true, complete and accurate, and upon request I will provide any additional documentation necessary to participate in this Program. I agree to keep all information complete, fully accurate and up to date.

20.  **Signature**. This Agreement must be signed by electronic signature under the procedures set forth in InterExchange's online Passport system.

---

**Exhibit A**

**Au Pair**

**Extension Term Sheet**

The following terms apply if and when my Cultural Exchange Program as an Au Pair is extended under the terms and conditions described in the Extensions section of the Main Agreement. I understand that neither InterExchange nor I shall be obligated to follow these additional terms and conditions unless and until the Extension is approved (i.e., by both InterExchange and the U.S. Department of State) and I accept the Extension pursuant to the terms and conditions set forth in the Main Agreement:

1.  **Extension**. I agree to all terms and conditions of the InterExchange Au Pair USA Extension Program as mandated by the United States Department of State, other U.S. regulatory agencies and InterExchange.

2.  **Extension Request Final Once Submitted**. I understand and agree that Extension requests are final and cannot be changed once submitted to the U.S. Department of State, but I understand that I may decide to withdraw my participation in the Program for any reason and at any time.

3.  **U.S. State Department Determines Approval**. I agree that the Extension is at the sole discretion of the U.S. Department of State. I

**CONFIDENTIAL**                    **InterExchange0000063**

Defs'. Appx. 00000951

understand and agree that InterExchange cannot be held accountable for any delay or denial of the Extension by the U.S. Department of State.

4. **Au Pair Agreement Remains In Effect**. Unless expressly modified in this Extension Term Sheet, I agree to comply with the terms and conditions of the Main Agreement, which shall remain in effect for the duration of the Extension.

5. **Educational Requirement**. I agree to complete the required academic courses as follows during my Extension and, except for the number of credit hours, meet the requirements of Section 4(n) of the Main Agreement:

   a. I shall take the following credit hours:

      i. Three (3) semester hours for a six (6)-month extension

      ii. Six (6) semester hours for nine (9) and twelve (12)-month extensions.

   b. I will receive from the Host Family, if applicable, transportation to and from the place of instruction, and the Host Family shall make a tuition payment for the me as follows:

      i. Up to a maximum of two hundred fifty dollars ($250) for six (6) month extensions

      ii. Up to a maximum of five hundred dollars ($500) for nine (9) and twelve (12) month extensions.

   c. If a remaining balance is left from the tuition payment after I complete the requisite semester hours, I, at my sole election, may use the balance to take additional course work that meets the academic requirements of U.S. State Department regulations. I understand that the Host Family must provide me adequate time to attend courses at an accredited post secondary institution.

   d. **Failure To Meet Educational Requirement**. If I fail to meet the educational requirements as set forth by U.S. State Department regulations and InterExchange policy, I agree that I must pay for my return ticket to my home country.

6. **Paid Vacation**. I understand that I must receive the following paid vacation time from my Host Family:

   a. Six (6) Month Extension receives one (1) week paid vacation

   b. Nine (9) Month Extension receives one and a half (1½) weeks paid vacation

   c. Twelve (12) Month Extension receives two (2) weeks paid vacation

7. **Travel**.

   a. **Domestic Travel**. I understand and agree that my optional 30-Day Travel/Grace Period is a one-time component of this Cultural Exchange Program and can only be taken at the end of my Extension period.

   b. **Travel Abroad**. I understand that InterExchange recommends that I only return home or travel abroad during the time of my Extension with a visa that has not expired. Additionally, I agree that I am responsible for obtaining any necessary visas for each country that I intend to travel.

8. **J-1 Visa**. I understand I may not leave and re-enter the United States after the expiration date on my J-1 Visa without acquiring a new visa. I understand it is my responsibility to acquire this J-1 Visa at an American Embassy or Consulate outside the USA, and I cannot hold InterExchange liable if a new visa is not issued. There is no guarantee that I will receive a visa.

---

**Exhibit B**

**Background Information Usage Notice**

1. I understand that the purpose of this Background Information Usage Notice is to provide additional communication to me to ensure my awareness of why and how background information is provided to InterExchange.

2. As explained in the Main Agreement between InterExchange and myself, I understand that criminal records, child care references, school records and health information forms gathered by me and delivered to InterExchange via the International Cooperator are for the sole purpose of determining my suitability for the Program.

3. By signing the Main Agreement, I confirm that I agreed to assist InterExchange by providing the background information as requested. I hereby release InterExchange and any and all persons, business entities (e.g., International Cooperators) and governmental agencies (e.g., U.S. Department of State), whether public or private, from any and all liability, claims and/or demands, by me, my heirs or others making such claims or demands on my behalf, for gathering Background Information and/or providing an investigative report based on

**CONFIDENTIAL**

InterExchange0000064

Defs.' Appx. 00000952

background information.

4. I understand that this Notice shall remain in effect for the duration of my association with InterExchange.

5. If I have questions about the background information and any reports derived from the background information, I must contact InterExchange management. I am entitled to a complete and accurate disclosure of the nature and scope of any investigation into my background of which I am the subject upon my written request to InterExchange, provided, however, requests are made in writing before the completion of the Program, or not longer than 12 months after, the background information is requested, whichever is shorter.

---

**Au Pair Candidate Signature:** /s/Johana Paola Beltran
**Time & Date:** 03/05/2012 5:43 PM (EST)
**IP Address:** 186.103.115.77

**CONFIDENTIAL**                    **InterExchange0000065**