Defs. Appx. 00001020

**Cc:**     Cara Harper[charper@ic.interexchange.org]; Michael Gates[mgates@interexchange.org]; Jodi Laub[jlaub@interexchange.org]; Kate Ferrin[kferrin@interexchange.org]
**To:**     ribu_92@hotmail.com[ribu_92@hotmail.com]
**From:**   Michael McHugh
**Sent:**   Mon 8/5/2013 10:07:07 PM
**Importance:**   Normal
**Subject:**   Weekly Stipend
**Received:**   Mon 8/5/2013 10:07:07 PM

Hi Maria,

I'm sorry to hear that you have the chickenpox! I wish you a speedy recovery.

We were notified by the U.S. Department of State today that you had questions about your weekly stipend. We were told that you received a brochure from the Embassy in Chile stating that the minimum wage in the U.S. is $7.25 per hour for all workers. While this is correct, you are taking part in a special exchange program, the au pair program, that requires you receive at least $195.75 per week as a weekly stipend. This amount is set by the U.S. Department of State and the Department of Labor and is based on a set calculation that was most likely not included in the brochure that your received.

**The way the au pair program stipend is calculated is as follows.**

1. Au pairs can work up to 45 hours a week and the minimum wage is $7.25. This results in a net pay of $326.25
*45 x $7.25 = $326.25*

2. The Department of Labor states that the cost of the room and board provided by a host family can be determined to be 40% of this wage.
*$326.25 x 40% (.40) = $130.50 (cost of room and board)*

3. This amount is then deducted from the au pair wages.
*$326.25 (total wages) - $130.50 (room and board)  = $195.75 (minimum weekly stipend)*

**Therefore, the stipend that you must be paid is at least $195.75 per week**

Here is the document from the department of State's website form 2007, which is when the amount last increased

http://j1visa.state.gov/wp-content/uploads/2012/09/aupair_wageincrease.pdf

You can also see the same information at the Internal Revenue service:
http://www.irs.gov/Individuals/International-Taxpayers/Au-Pairs

This minimum stipend is set by the government and is the same for all au pair sponsors. We believe that this was explained to you before you left Chile for the U.S. This amount was also included in the descriptive section of your Au Pair Agreement.

Here is the first instance of this language on the agreement your signed. You may want to receive the entire document. You can do this through Passport.

   a.  The "Stipend" is the minimum amount that the Host Family is required to pay the Au Pair pursuant to U.S. Department of State regulations and employment and labor laws of the U.S. The current minimum required weekly amount is one hundred ninety-five dollars and seventy-five cents ($195.75).

Please let me know if you have any additional questions about this or anything else.



**EXHIBIT I**

InterExchange0007413

Defs.' Appx. 00001021

Michael McHugh | Program Director | Au Pair USA
TEL: 917.305.5450 | FAX: 212.924.0575 | EMAIL: mmchugh@interexchange.org
161 Sixth Avenue, New York, NY 10013

**CONFIDENTIAL**                                                    InterExchange0007414

| To: | Au Pair Program[AuPairProgram@state.gov] |
| Cc: | Christine La Monica-Lunn[clamonica-lunn@interexchange.org]; Michael McHugh[mmchugh@interexchange.org] |
| From: | Michael Gates |
| Sent: | Wed 8/7/2013 7:24:21 PM |
| Importance: | High |
| Subject: | Re: Complaint - InterExchange - Maria Lopez Videla Gaymer - Pay Issue |
| Received: | Wed 8/7/2013 7:24:23 PM |

Defs. Appx. 00001022

Complaint Received from Maria Lopez Videla Gaymer (N0010432369).pdf

Dear Sir or Madam,

My name is Michael Gates and I am an ARO at InterExchange, Inc. Attached please find our full report regarding the complaint received by the Office of Private Sector Exchange Administration (ECA/EC/OPA) from au pair Maria Lopez Videla Gaymer (N0010432369). I have sent a copy of our report and 12 supporting documents via overnight courier service. The UPS tracking number is 1Z 2E5 1W2 13 4475 3833.

Please confirm receipt of the package and do not hesitate to contact me with any further questions, comments or concerns.

Best Regards,
Michael Gates



Michael Gates | International Recruitment & Placement Manager | Au Pair USA
TEL: 917.305.5461 | FAX: 212.924.8873 | EMAIL: mgates@interexchange.org
161 Sixth Avenue, New York, NY 10013 | SKYPE: michaelgatesapusa

**From:** Michael McHugh <mmchugh@interexchange.org>
**Subject: Re: Complaint - InterExchange - Maria Lopez Videla Gaymer - Pay Issue**
**Date:** August 5, 2013 7:14:18 PM EDT
**To:** Au Pair Program <AuPairProgram@state.gov>

Dear Sir or Madam,
We are in receipt of this complaint about wages from Au Pair Maria Lopez Videla Gaymer.

We have written to Maria clearly explaining how the minimum weekly stipend of $195.75 is arrived at. We regret any misunderstanding she may have had about this matter but can assure you that she was well-informed about the amount of the stipend (at least $195.75 per week) in the following ways: 1) in local marketing materials provided; 2) during interviews with her Local Agent in Chile, 3) in the au pair agreement she signed, 4) upon arrival in the U.S. at the New York Orientation and Training program, 5) during the 2-week meeting with her Local Coordinator and 6) throughout our website and FAQ sections.

We will be sending documentation of this by COB on Wednesday. We believe the issue is not that we neglected to inform her of the stipend amount, but that she was presented with contradictory information from the U.S. Embassy in Chile that referred to higher gross rates of pay.

As mentioned, we will send the requested documentation by COB on 8/7/13

Best regards,



Michael McHugh | Program Director | Au Pair USA
TEL: 917.305.5450 | FAX: 212.924.0575 | EMAIL: mmchugh@interexchange.org <x-msg://100/mmchugh@interexchange.org>
161 Sixth Avenue, New York, NY 10013

On Aug 5, 2013, at 3:38 PM, Au Pair Program wrote:

Dear InterExchange Staff:

**EXHIBIT J**

CONFIDENTIAL

InterExchange0004297

Defs.' Appx. 0001023

The Office of Private Sector Exchange Administration (ECA/EC/ORA) received a complaint from Maria Lopez Videla Gaymer (N0010432369) via the Department's Hotline regarding her hourly wage and rights as an au pair.  Maria reported that she read in a brochure from her embassy that she has the right to earn a minimum salary of $7.25 per hour, but she is paid only $4.50 per hour.  She works 45 hours a week and receives $195.75 per week.  Maria stated that she contacted her local coordinator to ask why her pay was so low when her embassy's brochure states a higher minimum wage.  Maria claims that her sponsor told her the information was wrong and that nothing can be done.

The Department understands that many sponsors set a weekly rate that take into consideration the costs for room and board.  Please contact Maria and work to resolve this situation.  In addition, please send us (1) a description of InterExchange's process for communicating to participants the pay/wage on the Au Pair program; (2) a copy of InterExchange's marketing and/or orientation materials that clearly state the au pair wage; and (3) InterExchange's justification for its weekly rate.

Thank you,

Office of Private Sector Exchange Administration
U.S. Department of State


Initial:  8/5/2013

Complaint:  Pay Issue
Exchange Visitor:  Maria Lopez Videla Gaymer (N0010432369) – Chile

Reporter:  Exchange Visitor

Host Family:  Laura and Derek Elder // Alpharetta, GA

Sponsor:  InterExchange

SBU
This email is UNCLASSIFIED.

InterExchange0004298

Defs.' Appx. 00001024



- AU PAIR USA
- H-2B VISA USA
- CAMP USA
- WORKING ABROAD
- CAREER TRAINING USA
- WORK & TRAVEL USA

## REPORT
Re: Complaint Received from Maria Lopez Videla Gaymer (N0010432369)
P-3-05382
InterExchange, Inc.
August 7, 2013

**To:** Aniesa Brassil
Private Sector Programs Division, Office of Private Sector Administration (ECA/EC/OPA)
Bureau of Educational and Cultural Affairs
U.S. Department of State
SA-44, Suite 668
301 4th Street, SW
Washington, DC 20547
Tel: 202-632-2805
Fax: 202-203-7779

**Au Pair:** Maria Lopez Videla Gaymer
Sevis ID#: N0010432369
DOB: 05/01/1992
US Arrival: 07/22/2013

**Host Family:** Elder, Laura and Elder, Derek
Children: 2 Girls (Ages 8 and 4)
Address:       REDACTED
Alpharetta, GA 30004
Tel:   REDACTED

**Local Coordinator:** Cara Harper
Tel: 770-438-6458

Dear Sir or Madam:

This report is in response to the message InterExchange RO and AROs received on Monday, August 5, 2013:

*Subject: Complaint - InterExchange - Maria Lopez Videla Gaymer - Pay Issue*

*Dear InterExchange Staff:*

*The Office of Private Sector Exchange Administration (ECA/EC/OPA) received a complaint from Maria Lopez Videla Gaymer (N0010432369) via the Department's Hotline regarding her hourly wage and rights as an au pair. Maria reported that she read in a brochure from her embassy that she has the right to earn a minimum salary of $7.25 per hour, but she is paid only $4.50 per hour. She works 45 hours a week and receives $195.75 per week. Maria stated that she contacted her local coordinator to ask why her pay was so low when her embassy's brochure states a higher minimum wage. Maria claims that her sponsor told her the*

**CONFIDENTIAL**                    **InterExchange0004299**

Defs.' Appx. 00001025

*information was wrong and that nothing can be done.*

*The Department understands that many sponsors set a weekly rate that takes into consideration the costs for room and board. Please contact Maria and work to resolve this situation. In addition, please send us (1) a description of InterExchange's process for communicating to participants the pay/wage on the Au Pair program; (2) a copy of InterExchange's marketing and/or orientation materials that clearly state the au pair wage; and (3) InterExchange's justification for its weekly rate.*

*Thank you,*

*Office of Private Sector Exchange Administration*
*U.S. Department of State*

*Initial: 8/5/2013*
*Complaint: Pay Issue*
*Exchange Visitor: Maria Lopez Videla Gaymer (N0010432369) – Chile*
*Reporter: Exchange Visitor*
*Host Family: Laura and Derek Elder // Alpharetta, GA*
*Sponsor: InterExchange*
*SBU*
*This email is UNCLASSIFIED.*

InterExchange ARO and Program Director, Michael McHugh, responded that same day to this message:

**From:** *Michael McHugh <mmchugh@interexchange.org>*
**Subject: Re: Complaint - InterExchange - Maria Lopez Videla Gaymer - Pay Issue**
**Date:** *August 5, 2013 7:14:18 PM EDT*
**To:** *Au Pair Program <AuPairProgram@state.gov>*

*Dear Sir or Madam,*
*We are in receipt of this complaint about wages from Au Pair Maria Lopez Gaymer.*

*We have written to Maria clearly explaining how the minimum weekly stipend of $195.75 is arrived at. We regret any misunderstanding she may have had about this matter but can assure you that she was well-informed about the amount of the stipend (at least $195.75 per week) in the following ways: 1) in local marketing materials provided;  2) during interviews with her Local Agent in Chile, 3) in the au pair agreement she signed,  4) upon arrival in the U.S. at the New York Orientation and Training program, 5) during the 2-week meeting with her Local Coordinator and 6) throughout our website and FAQ sections.*

*We will be sending documentation of this by COB on Wednesday. We believe the issue is not that we neglected to inform her of the stipend amount, but that she was presented with contradictory information from the U.S. Embassy in Chile that referred to higher gross rates of pay.*

*As mentioned, we will send the requested documentation by COB on 8/7/13*

**CONFIDENTIAL**                    **InterExchange0004300**

Defs.' Appx. 00001026

*Best regards,*
*Michael McHugh | Program Director | Au Pair USA*

Michael McHugh contacted Maria Gaymer directly to explain the weekly stipend formula on that same day:

**From:** *Michael McHugh <mmchugh@interexchange.org>*
**Date:** *Mon, 5 Aug 2013 18:07:07 -0400*
**To:** *<riby_92@hotmail.com>*
**Cc:** *Cara Harper <charper@lc.interexchange.org>, Michael Gates <mgates@interexchange.org>, Jodi Laub <jlaub@interexchange.org>, Kate Ferrin <kferrin@interexchange.org>*
**Subject:** *Weekly Stipend*

*Hi Maria,*

*I'm sorry to hear that you have the chickenpox! I wish you a speedy recovery.*

*We were notified by the U.S. Department of State today that you had questions about your weekly stipend. We were told that you received a brochure from the Embassy in Chile stating that the minimum wage in the U.S. is $7.25 per hour for all workers. While this is correct, you are taking part in a special exchange program, the Au Pair Program, that requires you receive at least $195.75 per week as a weekly stipend. This amount is set by the U.S. Department of State and the Department of Labor and is based on a set calculation that was most likely not included in the brochure that your received.*

**The way the au pair program stipend is calculated is as follows.**

*1. Au pairs can work up to 45 hours a week and the minimum wage is $7.25. This results in a net pay of $326.25*
*45 x $7.25 = $326.25*

*2. The Department of Labor states that the cost of the room and board provided by a host family can be determined to be 40% of this wage.*
*$326.25 x 40% (.40) = $130.50 (cost of room and board)*

*3. This amount is then deducted from the au pair wages.*
*$326.25 (total wages) - $130.50 (room and board)  = $195.75 (minimum weekly stipend)*

**Therefore, the stipend that you must be paid is at least $195.75 per week**

*Here is the document from the department of State's website from 2007, which is when the amount last increased:*

*http://i1visa.state.gov/wp-content/uploads/2012/09/aupair_wageincrease.pdf*

*You can also see the same information from the Internal Revenue Service:*
*http://www.irs.gov/Individuals/International-Taxpayers/Au-Pairs*

**CONFIDENTIAL**          **InterExchange0004301**

Defs.' Appx. 00001027

*This minimum stipend is set by the government and is the same for all au pair sponsors. We believe that this was explained to you before you left Chile for the U.S. This amount was also included in the descriptive section of your Au Pair Agreement.*

*Here is the first instance of this language on the agreement your signed. You may want to receive the entire document. You can do this through Passport.*

1. *The "Stipend" is the minimum amount that the Host Family is required to pay the Au Pair pursuant to U.S. Department of State regulations and employment and labor laws of the U.S. The current minimum required weekly amount is one hundred ninety-five dollars and seventy-five cents ($195.75).*

*Please let me know if you have any additional questions about this or anything else.*

*Michael McHugh | Program Director | Au Pair USA*

I had also received an email message from Cara Harper, the Local Coordinator (LC) for Maria Gaymer and her host family, the Elder Family. After performing the Two Week Visit with this family and au pair, LC Harper informed me that AP Gaymer had received information from the U.S. Embassy in Chile that states she would be paid the current hourly federal minimum wage of $7.25. This general brochure about working in the United States did not clearly explain the government's formula for determining the Au Pair Program weekly stipend. I immediately replied to LC Harper's email, clarifying that the weekly stipend of $195.75 is indeed based on the federal minimum wage but also includes the aforementioned room and board credit. I also told LC Harper that I would contact AP Gaymer's agency in Chile to request further information and inform them about this information that AP Gaymer had received from the embassy. LC Harper called AP Gaymer to relay this information and check-in on her.

I wrote to the manager of AP Gaymer's agency, Mr. Fernando Loyola, who has successfully cooperated with InterExchange Au Pair USA for over 10 years. Mr. Loyola assured me that AP Gaymer had been properly informed of the correct stipend through her agreement with this agency, through the marketing materials provided by InterExchange and through the information published on this agency's website.

Item 1: AP Gaymer's signed agreement with agency Intercambio Internacional - Chile
Item 2: Printouts of Intercambio Internacional's website, detailing stipend information

This information can also be found in the InterExchange website at http://www.interexchange.org/au-pair-usa/life-changing-year and at http://www.interexchange.org/au-pair-usa/jobs/frequently-asked-questions.

Item 3: Printouts of InterExchange's website, detailing stipend information

There is also an extensive database of FAQs available to au pairs through InterExchange Passport, our online program portal. There are several questions and answers that deal specifically with the Au Pair Program stipend:

Defs.' Appx. 00001028

Item 4: Printout of InterExchange Passport Knowledge Base (FAQ) site for au pairs

We also share this information in our standard InterExchange Au Pair USA program brochure that is distributed by international cooperators to au pair candidates:

Item 5: InterExchange Au Pair USA Program Brochure

As part of the application process, AP Gaymer also had to sign an agreement with InterExchange. The stipend is explained in both 1.w and 4.k:

Item 6: AP Gaymer's signed agreement with InterExchange

Before AP Gaymer's arrival, InterExchange sent her a pre-arrival packet on May 31, 2013, with information to help her prepare for her upcoming program. The "Wages Letter" was part of this packet and Maria was given instructions by InterExchange to bring this letter with her to her J-1 visa interview at the U.S. Embassy in Chile, where she said she received the general brochure about working in the United States. AP Gaymer also received her own copy of the Au Pair USA Handbook, which includes a copy of the U.S. Department of State Au Pair J-1 Visa Regulations:

Item 7: AP Gaymer's "Wages Letter" that was sent on May 31, 2013
Item 8: Copy of the Au Pair USA Handbook, sent on May 31, 2013

At the Au Pair USA Orientation & Training Program, AP Gaymer was instructed on how to use the Au Pair Schedule & Weekly Planner; the weekly stipend amount was repeated to all attendees as a standard part of our regulation review:

Item 9: Weekly Stipend and Hours Worked Instructions
Item 10: Au Pair Schedule and Weekly Planner

Finally, LC Harper discussed the weekly stipend at length with both HF Elder and AP Gaymer during her Two Week Visit:

Item 11: Two Week Visit Report by LC Harper

AP Gaymer signed the Two Week Visit checklist, acknowledging that she had indeed discussed the weekly stipend with LC Harper.

*The Department understands that many sponsors set a weekly rate that takes into consideration the costs for room and board.  Please contact Maria and work to resolve this situation.  In addition, please send us (1) a description of InterExchange's process for communicating to participants the pay/wage on the Au Pair program; (2) a copy of InterExchange's marketing and/or orientation materials that clearly state the au pair wage; and (3) InterExchange's justification for its weekly rate.*

InterExchange's goal is to comply fully with all Department of State Au Pair J-1 Visa Regulations while maintaining a high-quality program for our participants. We require host families to pay the rate that is set by the Department of State using the formula developed by the Department of Labor, at least $195.75 per week. This information is available on the Department of State's website at http://j1visa.state.gov/wp-

Defs.' Appx. 00001029

content/uploads/2012/09/aupair_wageincrease.pdf

Item 12: Notice of Federal Minimum Wage Increase

I hope I have been able to clarify our process for communicating the weekly stipend to our participants, and where participants may be able to find this information in our materials. If you require additional information or have any other questions, please do not hesitate to contact me.

Sincerely,

Michael Gates
ARO, InterExchange Inc.

International Recruitment & Placement Manager | Au Pair USA
TEL: 917.305.5461 | FAX: 212.924.8873 | EMAIL: mgates@interexchange.org
161 Sixth Avenue, New York, NY 10013 | SKYPE: michaelgatesapusa

**CONFIDENTIAL**                    **InterExchange0004304**

Defs.' Appx. 00001030

**United States
Information
Agency**

*WASHINGTON DC 20547-0001*



*3/18/97*

**Transmitted via Fax and Certified Mail**

## NOTICE TO ALL USIA DESIGNATED AU PAIR PROGRAM SPONSORS

March 12, 1997

The U.S. Department of Labor has determined that au pair host families may <u>not</u> take credit in meeting its minimum wage obligations for either tuition costs or medical insurance. For further details, see the attached copy of the February 28, 1997 letter from John R. Fraser, Acting Administrator, Employment Standards Administration, Wage and Hour Division, U.S. Department of Labor, which responds to the U.S. Information Agency's request for an opinion of whether an au pair host family may take credit against the minimum wage for the payment of tuition.

Sincerely,

Vicki Rose
Program Designation Officer
Exchange Visitor Program Services

InterExchange0000128
**EXHIBIT K**

# REDACTED

---------- Forwarded message ----------
From: **Michael McHugh** <mmchugh@interexchange.org>
Date: Wed, Dec 31, 2014 at 1:49 PM
Subject: Lawsuit question
To: "Stephens, Holly D" <StephensHD@state.gov>


Hi Holly,
First of all, Happy New Year in advance! I hope 2015 is a great year for everyone at ECA!

Second comes my question: As you know we were served with a lawsuit alleging a few different things. One of the allegations is that the host families are breaking minimum wage laws in some states. The idea is that the $195.75 stipend is not in conformance with some state and local minimum wage laws when the state or local laws require a minimum wage that is higher than the federal minimum.

Has ECA's legal department ever looked into this topic? Is there any written interpretation about this discrepancy that we could reference? Any information you can provide would be appreciated!

All the best,


--

Michael McHugh | Program Director | Au Pair USA


TEL: 917.305.5450 | FAX: 212.924.0575 | EMAIL: mmchugh@interexchange.org

161 Sixth Avenue, New York, NY 10013

**EXHIBIT L**
**InterExchange0039954**

Defs.' Appx. 00001032

# REDACTED

---------- Forwarded message ----------
From: **Michael McHugh** <mmchugh@interexchange.org>
Date: Fri, Jan 2, 2015 at 11:39 AM
Subject: Minimum wage rules
To: CulkinDE@state.gov

Dear Diane,

First of all, Happy New Year! I hope 2015 is a great year for you and everyone at ECA!

Second comes my question: As you may know au pair sponsors were served with a lawsuit alleging a few different things. One of the allegations is that the host families are breaking minimum wage laws in some states. The idea is that the $195.75 stipend is not in conformance with some state and local minimum wage laws when the state or local laws require a minimum wage that is higher than the federal minimum.

Do you know if the ECA's legal department ever looked into this topic? Is there any written interpretation about this discrepancy that we could reference? Any information you can provide would be appreciated!

All the best,

--

Michael McHugh | Program Director | Au Pair USA

TEL: 917.305.5450 | FAX: 212.924.0575 | EMAIL: mmchugh@interexchange.org

161 Sixth Avenue, New York, NY 10013

InterExchange0039955

# REDACTED

---------- Forwarded message ----------
From: **Michael McHugh** <mmchugh@interexchange.org>
Date: Mon, Jan 5, 2015 at 5:42 PM
Subject: Re: Lawsuit question
To: "Stephens, Holly D" <StephensHD@state.gov>


Dear Holly,
Thanks for the quick response! I look forward to hearing from you...
Best regards,


On Mon, Jan 5, 2015 at 5:25 PM, Stephens, Holly D <StephensHD@state.gov> wrote:

   Hi Michael,

   Happy New Year to you, too – I hope you had a wonderful holiday and wishing you all the best in 2015!

   We have looked into the minimum wage law, but let me check on a couple of things regarding those states that have a higher minimum wage and get back to you soonest. I want to be sure I have the most correct answer.

   All best and kind regards,

   Holly

   **From:** Michael McHugh [mailto:mmchugh@interexchange.org]
   **Sent:** Wednesday, December 31, 2014 1:49 PM
   **To:** Stephens, Holly D
   **Subject:** Lawsuit question

Hi Holly,

First of all, Happy New Year in advance! I hope 2015 is a great year for everyone at ECA!

Second comes my question: As you know we were served with a lawsuit alleging a few different things. One of the allegations is that the host families are breaking minimum wage laws in some states. The idea is that the $195.75 stipend is not in conformance with some state and local minimum wage laws when the state or local laws require a minimum wage that is higher than the federal minimum.

Has ECA's legal department ever looked into this topic? Is there any written interpretation about this discrepancy that we could reference? Any information you can provide would be appreciated!

**EXHIBIT M**
InterExchange0039952

Defs.' Appx. 00001034

All the best,

--

Michael McHugh | Program Director | Au Pair USA

TEL: 917.305.5450 | FAX: 212.924.0575 | EMAIL: mmchugh@interexchange.org

161 Sixth Avenue, New York, NY 10013

This email is UNCLASSIFIED.

--

Michael McHugh | Program Director | Au Pair USA

TEL: 917.305.5450 | FAX: 212.924.0575 | EMAIL: mmchugh@interexchange.org

161 Sixth Avenue, New York, NY 10013

InterExchange0039953

# REDACTED

---------- Forwarded message ----------
From: **Kate Ferrin** <kferrin@interexchange.org>
Date: Mon, May 2, 2016 at 9:42 AM
Subject: Fwd: GET A JOB
To: Michael McHugh <mmchugh@interexchange.org>


Another one...
Kate Ferrin | Participant Services Manager
InterExchange
100 Wall Street, Suite 301
New York, NY 10005
tel 917.305.5465 | fax 212.924.0575
www.interexchange.org

---------- Forwarded message ----------
From: **Getnet gebremedhin** <getnetgebrenyc@gmail.com>
Date: Sat, Apr 30, 2016 at 3:46 AM
Subject: Fwd: GET A JOB
To: kferrin@interexchange.org


---------- Forwarded message ----------
From: **Williams Swanky** <williams4swanky@aol.com>
Date: Fri, Apr 29, 2016 at 2:15 AM
Subject: Re: GET A JOB
To: getnetgebrenyc@gmail.com


Hi Dear,


Thanks for your message and Interest!

I am Glad we are in contact and i am once again thanking you for your interest on my post searching for an Au Pair for my daughter. We are Loving and Energetic Family Staying at Ohio City,Ohio USA.Am a Single Host Dad  Williams Kelvins ,I work as an assistant manager in the oil and gas with fixing appliances company, which it has taken a lot of my time and chances of looking after my kids, am in the company business organization department which makes me travel out of the country to other countries in approving some contract and documents of some of our clients so thereby I really need you service to join the family ,  in Ohio City,Ohio,USA i have one lovely Child , she is a briliant girl  4 years old  ..she name is Keyla. she his in  Year 2 at the Primary School.Am looking for an Au Pair to care for my lovely Daughter, monitor her daily routine and teaches her new culture


Details about the Family:


Our family do not like to judge a book by the cover or take gossip to determine who will be around. We always try to stay positive and find the best in anyone or any situation including the worst ones. Our Kids are energetic but delightful and We got wonderful dogs. Don't be freak out if i call them baby, becuz they are really my baby too and i treat him with love and care like my own kid. You don't have to worry am sure you are going to get along with them and my daughter too becaus they are all friendly and like meeting new people. Kayla is four years, she's welcoming and though she is young, and she love soccer, playing basketball, swimming, dancing, writing, reading, and watching movies or TV.... They have a warm and friendly attitude. she like's playing a lot

InterExchange0001983
EXHIBIT N

Defs. Appx. 00001036

and i do not think you will have any problem with her so far she eats and plays well. she is very intelligent and loves to take after people,this is the more reason i will appreciate someone with good qualities to be Au pair/Nanny so that she doesn't take to bad influence.

You'll be working 6-7 hours a day, you are to take her to school in the morning and later go back to pick her back home from school in the afternoon. On weekends you'll take her out to new places like beach and other recreational places (You have free time). You are required to spend time with my daughter, running errands, house cleaning and light cooking is a possibility, but not really a requirement. I prefer someone who will reinforce our desire to teach my daughter responsibilities and do not expect to undertake the children assigned tasks but instead to find ways to encourage them to complete tasks.You will be staying with us when you get here, You will have your Private Room which will have Bathroom/Toilet, Television, Air-Conditional and Internet Computer. You will have access to the Internet and a Telephone at home to get in touch with your friends and love ones. You will be having a full weekend every 2 weeks as your off days while i will be at home to take care of the kid, you will be having all the privacy you want, so to enable you have enough time for yourself.


Financial Benefits:


These financial benefit is scheduled by my Au Pair Agency for the Exchange Program.Financial benefits are not just limited to your Au pair salary. As an Au pair with  INTEREXCHANGE AU PAIR  InCyou can also:Earn a weekly stipend of $300.75, or $15,000+ a year! while we as the host family will be paying $1850 as your Monthly Salary.Enjoy two weeks of paid vacation for travel in the U.S.Receive an educational allowance up to $500 to study in the U.S.Extend your stay for an additional year and earn another $15,000+ a year I need someone who is Honest, Caring, Trustworthy, Loving, Affectionate, Concerned, Understanding, friendly and Who loves Kids, i want to play a role of a real mother or Big Sister to my Kids because the are all I have. Note that you have nothing to worry about because you will be treated like one of the family member, all i need from you is that you take good care of my kids as your attitude towards them will go a long way in future..I will like to read back from you as soon as you get my email to direct you to my Au Pair Agency for your Application, Documentation and Background checks process.( I hope you are informed that we are member of  INTEREXCHANGE AU PAIR   )


MORE ABOUT MY AGENCY AND INTEREXCHANGE AU PAIR   InterExchange Au Pair

Note: we are registered under an Au pair agency called INTEREXCHANGE AU PAIR   and the total cost of the Visa and documentation processing is $1,300 USD. and my family will be the one responsible to pay for your ticket and flight fees and my agency is one of the best agency in USA .They are very fast in visa and documentation processing and i assure you that you will never regret in working with my family and you will really appreciate me and my agency ...


Thank you

Williams Kelvins


--
Michael McHugh - Vice President Au Pair USA
**InterExchange.org**

tel 1.917.305.5450 | fax 1.212.924.0575
100 Wall Street, Suite 301
New York, NY 10005

Follow @InterExchange: Facebook | Twitter | Instagram | Blog

InterExchange0001984

Defs.' Appx. 00001037

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Case No. 1:14-CV-03074-CMA-KMT

JOHANA PAOLA BELTRAN, ET AL.,

     Plaintiff,

v.

INTEREXCHANGE, INC., ET AL.,

     Defendants.

---

## DECLARATION OF HELENE YOUNG

---

1.     I am a person of full age of majority and I am competent to testify as to the below facts in connection with the Motion for Summary Judgment in the referenced action of USAuPair, Inc. ("USAP") and the Defendants' Joint Motion for Summary Judgment ("Defs.' Joint MSJ") filed February 16, 2018 to which USAP has joined ("the Motions").

2.     As the sole owner, agent and employee of my company, USAP, the below facts are all known personally to me and there is no one else at the company competent to testify as to the facts set-forth below.

3.     During and after hosting approximately 4-5 au pairs starting in 1994, I initially worked as a local counselor and then as a part-time area manager for EurAupair, from approximately 1995 until approximately 2001.

4.    In late 2001, I formed USAP and applied to the Department of State ("DOS") to become a J1 visa program sponsor. My application was approved in 2003, when I started acting as a sponsor organization duly licensed and designated by the DOS.

5.    As of the date of verifying this testimony, USAP is and has been one of 16 sponsor organizations designated by the DOS to administer an au pair exchange-visitor program (the "Au Pair Program").

6.    From 2009 to 2015, inclusive, my one-person sponsor organization USAP has made a total of 151 placements, having an average of 21 placements per year during that period.

7.    As an Au Pair Program sponsor, USAP is required to ensure and monitor all participants' compliance with the program regulations established by DOS, pursuant to 22 C.F.R. §§ 62.1-62.17, § 62.31.

8.    As specified by regulation, this process includes background and reference checks, interviews to assess the applicant's English proficiency and suitability for program participation, and confirmation that the applicant meets the educational, medical, age, and other requirements prescribed by DOS.

9.    In my fulfillment of the DOS requirements to remain in good standing, and pursuant to what I consider to be my legally mandated obligations, since the inception of USAP, I have always followed the stipend payment amount guidelines the DOS has published from time to time.

2

Defs.' Appx. 00001039

10.    On my website, I indicate that au pairs will "receive $195.75 USD each week" with other terms consistent with the DOS regulations and law. *See*, **Exhibit A**.

11.    In my description of Program Fees and Schedules, which I update annually and deliver to all host families in the USAP program, I indicate that the "Weekly Stipend for 51 weeks is $195.75 (effective July 24, 2009)" and also indicate that this weekly stipend is "subject to change in accordance with Federal Minimum Wage Laws." *See*, **Exhibit B**, 2009 Program Fees and Schedules; **Exhibit C**, 2010 Program Fees and Schedules; **Exhibit D**, 2011 Program Fees and Schedules; **Exhibit E**, 2012 Program Fees and Schedules; **Exhibit F**, 2013 Program Fees and Schedules; **Exhibit G**, 2014 Program Fees and Schedules; **Exhibit H**, 2015 Program Fees and Schedules; **Exhibit I**, 2016 Program Fees and Schedules.

12.    In my Host Family Agreement, which I use in each placement, the Host Family agrees and acknowledges that its au pair will receive "a weekly stipend consistent with applicable law and paid weekly." *See*, **Exhibit J**.

13.    As part of the onboarding and matching process for a host family and an au pair, around the time of executing the Host Family Agreement, I would always provide the host family a copy of the program regulations, and program fee schedule which included a statement of the minimum stipend amount.

14.    I do not have a specific recollection of ever telling any host family that they could pay more than the DOS stated stipend amount.

3

15.     I do not have a specific recollection of ever telling any host family that they could not pay more than the DOS stated stipend amount.

16.     None of my documentation, marketing materials or agreements indicate that USAP ever represented that au pairs may *not* be compensated more than the weekly stipend amount of $195.75.

17.     To the best of my recollection, I have never advised or communicated to any host family or au pair that au pairs may *not* be compensated more than the weekly stipend amount of $195.75.

18.     To the contrary, my Host Family Confirmation questionnaire, which I used to assure that the host family is operating in compliance with all laws and regulations attributable to the au pair exchange program, asks host families:

"Have you paid your au pair ***the minimum*** weekly stipend of $195.75?" *See*, **Exhibit K**, at Q9 (emphasis added).

19.     Each host family in my program would receive the Host Family Confirmation questionnaire, meaning that each host family matched with an au pair at USAP was advised that the stipend of $195.75 was a ***minimum***.

20.     I am aware of the fact that other sponsor organizations offer matchings between host families and au pairs that require different levels of experience and/or training. I am aware that those au pairs are generally placed on an agreed stipend that is more than the DOS published stipend amount. I do not offer such au pair services and have no understanding of how they relate to the DOS regulations.

4

21.    The Complaint, as amended, defines collusive practices of sponsor
agencies relating to "standard au pairs" and "non-standard au pairs." These are not
terms I have ever used and these are not terms with which I am familiar.  I have never
discussed stipend or wage amounts for au pairs in these categories, whether using
these terms or otherwise in the context of those definitions, generally.  Accepting such
definitions in the Amended Complaint, for purposes of the Motions, USAP has only
offered what the Amended Complaint refers to as "standard au pairs" and has never
matched a host family with what the Amended Complaint refers to as "non-standard au
pairs."  I do not understand how I, as a single person entity operating in Oregon, can be
alleged to have colluded about terms, conditions, and stipends about which I have no
knowledge or experience of any kind.

22.    I obtained the $195.75 stipend amount from the DOS published bulletins,
corresponding regulations, and communication with the DOS.  I relied on those
statements as having the force of law and as mandating what I could advise hosts and
au pairs of the minimum stipend amount.

23.    I did not reach this stipend amount independently, nor did I reach this
stipend amount as a result of any coordination, discussion or agreement with any other
sponsor organization.  I reached the stipend amount of $195.75 in review of what I
considered to be the mandate of the DOS effective July 24, 2009.

24.    Once I place an au pair and a family together, I do not control or even
have knowledge of the amounts paid by hosts to au pairs.  Although I have copies of
agreements between host families and au pairs specifying the weekly stipend amount

5

Defs.' Appx. 00001042

to be paid by the host family to the au pair, I do not posses records establishing the amounts paid by host families to au pairs, and I do not know what those amounts are. I have audits asking if host families had paid to au pairs the minimum amount of $195.75 weekly, as is set-forth in Paragraph 19 of this Declaration and as is attached in **Exhibit K** hereto.

I declare under penalty of perjury that the foregoing is true and correct. Executed on February __9__, 2018.

_____
Helene Young

Defs.' Appx. 00001043

# USAuPair
### A Cultural Exchange Program

Search


Find us on Facebook

au pairs    host families    americans abroad    about us    contact us    faq    home



## Become an Au Pair


## Host an Au Pair

## More Than 25 Years Experience

USAuPair is a U.S. State Department-designated sponsor for an au pair cultural exchange program. We bring to our program more than 25 years of experience in cultural exchange and hosting au pairs, including those for our own children.

## A Child Care Program That Is:

- Flexible
- Dependable
- Affordable
- Personal
- Educational
- Intercultural


Au Pair Gallery

- Foreign Partners
- Community Reps

## Everything about being an Au Pair is Wonderful
### - Areeya from Thailand

**EXHIBIT A**

Copyright @ USAupair, Inc. | privacy policy   USA  00868

ScreenCapture Result
Defs.' Appx. 00001044



USA  00869



chrome-extension://fdpohaocaechififmbbbbknoalclad/capture/index.html?src=screencapture-usaupair-au-pair-info-interest-form-1485280597872.png

USA  00870

2/3

Defs.' Appx. 00001046



A Cultural Exchange Program

**2009**
**Program Fees & Schedules**

USAuPair program fees include a full range of services and activities to support the au pair cultural exchange program.  A host family interview is scheduled after the application fee is received.

|  | New Families | Transferring Families[1] | Repeat Families[2] |
|---|---|---|---|
| Application Fee | $   300.00 | $   300.00 | $   300.00 |
| Program fee | $ 5,950.00 | $ 5,700.00 | $ 5,450.00 |
| Weekly Stipend for  51 weeks (effective July 24, 2009)[3] | $   195.75 | $   195.75 | $   195.75 |
|  |  |  |  |
| Average Weekly Cost | $318 | $313 | $309 |
|  |  |  |  |
| Education Allowance | Up to $500 | Up to $500 | Up to $500 |

[1] Families who have been participants in other government au pair sponsored programs within the last two years and for one continuous year (as evidenced with a receipt from the agency) will receive a $250 discount when transferring to USAuPair.

[2] USAuPair rewards families who continue with USAuPair when selecting their next au pair.  A $500 discount is offered to families who have completed one full year with USAuPair within the last two years.

[3] Subject to change in accordance with Federal Minimum Wage Laws.

Fees do not include travel from San Francisco to host family, auto insurance or licensing fees to drive automobile.  Education fees are applied to each au pair, including au pairs who change families and have not completed their education requirements.

**Payment Schedule**

|  | New Families | Transferring Families[1] | Repeat Families[2] |
|---|---|---|---|
| Deposit due upon selection of au pair | $ 2,000 | $ 2,000 | $ 2,000 |
| Balance due 45 days prior to au pair arrival in USA | $ 3,950 | $ 3,700 | $ 3,450 |
| Late Payment fee | $   250 | $   250 | $   250 |
| Expedite fee — if host family has selected past due date | $   150 | $   150 | $   150 |

Payments may be made by check or credit card (Visa, MasterCard, Discover) with written authorization to charge credit cards.  Checks are payable to USAuPair, Inc.

Host families are responsible for travel arrangements for their au pairs from San Francisco to their home.  Instructions regarding this process are sent to families prior to the au pair's arrival to the US.

All fees are subject to change.

**EXHIBIT B**

USA  00001

Defs.' Appx. 00001047



A Cultural Exchange Program

**2010**
**Program Fees & Schedules**

USAuPair program fees include a full range of services and activities to support the au pair cultural exchange program. A host family interview is scheduled after the application fee is received.

|  | New Families | Transferring Families[1] | Repeat Families[2] |
|---|---|---|---|
| Application Fee | $   300.00 | $   300.00 | $   300.00 |
| Program fee | $ 5,950.00 | $ 5,700.00 | $ 5,450.00 |
| Weekly Stipend for  51 weeks (effective July 24, 2009)[3] | $   195.75 | $   195.75 | $   195.75 |
|  |  |  |  |
| Average Weekly Cost | $318 | $313 | $309 |
|  |  |  |  |
| Education Allowance | Up to $500 | Up to $500 | Up to $500 |

[1] Families who have been participants in other government au pair sponsored programs within the last two years and for one continuous year (as evidenced with a receipt from the agency) will receive a $250 discount when transferring to USAuPair.

[2] USAuPair rewards families who continue with USAuPair when selecting their next au pair. A $500 discount is offered to families who have completed one full year with USAuPair within the last two years.

[3] Subject to change in accordance with Federal Minimum Wage Laws.

Fees do not include travel from San Francisco to host family, auto insurance or licensing fees to drive automobile. Education fees are applied to each au pair, including au pairs who change families and have not completed their education requirements.

**Payment Schedule**

|  | New Families | Transferring Families[1] | Repeat Families[2] |
|---|---|---|---|
| Deposit due upon selection of au pair | $ 2,000 | $ 2,000 | $ 2,000 |
| Balance due 45 days prior to au pair arrival in USA | $ 3,950 | $ 3,700 | $ 3,450 |
| Late Payment fee | $   250 | $   250 | $   250 |
| Expedite fee – if host family has selected past due date | $   150 | $   150 | $   150 |

Payments may be made by check or credit card (Visa, MasterCard, Discover) with written authorization to charge credit cards. Checks are payable to USAuPair, Inc.

Host families make travel arrangements for their au pairs from Portland, Oregon to their home. Instructions regarding this process are sent to families prior to the au pair's arrival to the U.S.

All fees are subject to change.

**EXHIBIT C**

USA  00002

Defs.' Appx. 00001048



A Cultural Exchange Program

**2011**
**Program Fees & Schedules**

USAuPair program fees include a full range of services and activities to support the au pair cultural exchange program.  A host family interview is scheduled after the application fee is received.

|  | New Families | Transferring Families[1] | Repeat Families[2] |
|---|---|---|---|
| Application Fee | $   300.00 | $   300.00 | $   300.00 |
| Program fee | $ 5,950.00 | $ 5,700.00 | $ 5,450.00 |
| Weekly Stipend for  51 weeks | $  195.75 | $  195.75 | $  195.75 |
|  |  |  |  |
| Average Weekly Cost | $318 | $313 | $309 |
|  |  |  |  |
| Education Allowance | Up to $500 | Up to $500 | Up to $500 |

[1] Families who have been participants in other government au pair sponsored programs within the last two years and for one continuous year (as evidenced with a receipt from the agency) will receive a $250 discount when transferring to USAuPair.

[2] USAuPair rewards families who continue with USAuPair when selecting their next au pair.  A $500 discount is offered to families who have completed one full year with USAuPair within the last two years.

[3] Subject to change in accordance with Federal Minimum Wage Laws.

Fees do not include domestic travel from Portland to host family, auto insurance or licensing fees to drive automobile.  Education fees are applied to each au pair, including au pairs who change families and have not completed their education requirements.

**Payment Schedule**

|  | New Families | Transferring Families[1] | Repeat Families[2] |
|---|---|---|---|
| Deposit due upon selection of au pair | $ 2,000 | $ 2,000 | $ 2,000 |
| Balance due 45 days prior to au pair arrival in USA | $ 3,950 | $ 3,700 | $ 3,450 |
| Late Payment fee | $  250 | $  250 | $  250 |
| Expedite fee – if host family has selected past due date | $  150 | $  150 | $  150 |

Payments may be made by check or credit card (Visa, MasterCard, Discover) with written authorization to charge credit cards.  Checks are payable to USAuPair, Inc.

Host families make travel arrangements for their au pairs from Portland, Oregon to their home.  Instructions regarding this process are sent to families prior to the au pair's arrival to the U.S.

All fees are subject to change.

**EXHIBIT D**

USA  00003

Defs.' Appx. 00001049



A Cultural Exchange Program

**2012**
**Program Fees & Schedules**

USAuPair program fees include a full range of services and activities to support the au pair cultural exchange program.  A host family interview is scheduled after the application fee is received.

|  | New Families | Transferring Families[1] | Repeat Families[2] |
|---|---|---|---|
| Application Fee | $   300.00 | $   300.00 | $   300.00 |
| Program fee | $ 6,100.00 | $ 5,850.00 | $ 5,600.00 |
| Weekly Stipend for  51 weeks | $  195.75 | $  195.75 | $   195.75 |
|  |  |  |  |
| Average Weekly Cost | $321 | $316 | $311 |
|  |  |  |  |
| Education Allowance | Up to $500 | Up to $500 | Up to $500 |

[1] Families who have been participants in other government au pair sponsored programs within the last two years and for one continuous year (as evidenced with a receipt from the agency) will receive a $250 discount when transferring to USAuPair.

[2] USAuPair rewards families who continue with USAuPair when selecting their next au pair.  A $500 discount is offered to families who have completed one full year with USAuPair within the last two years.

[3] Subject to change in accordance with Federal Minimum Wage Laws.

Fees do not include domestic travel from Portland to host family, auto insurance or licensing fees to drive automobile.  Education fees are applied to each au pair, including au pairs who change families and have not completed their education requirements.

**Payment Schedule**

|  | New Families | Transferring Families[1] | Repeat Families[2] |
|---|---|---|---|
| Deposit due upon selection of au pair | $ 2,000 | $ 2,000 | $ 2,000 |
| Balance due 45 days prior to au pair arrival in USA | $ 4,100 | $ 3,850 | $ 3,600 |
| Late Payment fee | $  250 | $  250 | $  250 |
| Expedite fee – if host family has selected past due date | $  150 | $  150 | $  150 |

Payments may be made by check or credit card (Visa, MasterCard, Discover) with written authorization to charge credit cards.  Checks are payable to USAuPair, Inc.

Host families make travel arrangements for their au pairs from Portland, Oregon to their home. Instructions regarding this process are sent to families prior to the au pair's arrival to the U.S.

All fees are subject to change.

**EXHIBIT E**

CONFIDENTIAL

USA  00004

Defs.' Appx. 00001050



A Cultural Exchange Program

**2013**
**Program Fees & Schedules**

USAuPair program fees include a full range of services and activities to support the au pair cultural exchange program.  A host family interview is scheduled after the application fee is received.

|  | New Families | Transferring Families[1] | Repeat Families[2] |
|---|---|---|---|
| Application Fee | $   300.00 | $   300.00 | $   300.00 |
| Program fee | $ 6,250.00 | $ 6,000.00 | $ 5,750.00 |
| Weekly Stipend for  51 weeks | $  195.75 | $  195.75 | $  195.75 |
|  |  |  |  |
| Average Weekly Cost | $324 | $319 | $314 |
|  |  |  |  |
| Education Allowance | Up to $500 | Up to $500 | Up to $500 |

[1] Families who have been participants in other government au pair sponsored programs within the last two years and for one continuous year (as evidenced with a receipt from the agency) will receive a $250 discount when transferring to USAuPair.

[2] USAuPair rewards families who continue with USAuPair when selecting their next au pair.  A $500 discount is offered to families who have completed one full year with USAuPair within the last two years.

[3] Subject to change in accordance with Federal Minimum Wage Laws.

Fees do not include domestic travel from Portland to host family, auto insurance or licensing fees to drive automobile.  Education fees are applied to each au pair, including au pairs who change families and have not completed their education requirements.

**Payment Schedule**

|  | New Families | Transferring Families[1] | Repeat Families[2] |
|---|---|---|---|
| Deposit due upon selection of au pair | $ 2,500 | $ 2,500 | $ 2,500 |
| Balance due 45 days prior to au pair arrival in USA | $ 3,750 | $ 3,500 | $ 3,250 |
| Late Payment fee | $  250 | $  250 | $  250 |
| Expedite fee — if host family has selected past due date | $  150 | $  150 | $  150 |

Payments may be made by check or credit card (Visa, MasterCard, Discover) with written authorization to charge credit cards.  Checks are payable to USAuPair, Inc.

Host families make travel arrangements for their au pairs from Portland, Oregon to their home. Instructions regarding this process are sent to families prior to the au pair's arrival to the U.S.

All fees are subject to change.

**EXHIBIT F**

Defs.' Appx. 00001051



**US**AuPair

A Cultural Exchange Program

**2014**
**Program Fees & Schedules**

USAuPair program fees include a full range of services and activities to support the au pair cultural exchange program.  A host family interview is scheduled after the application fee is received.

|  | New Families | Transferring Families[1] | Repeat Families[2] |
|---|---|---|---|
| Application Fee | $   300.00 | $   300.00 | $   300.00 |
| Program fee | $ 6,250.00 | $ 6,000.00 | $ 5,750.00 |
| Weekly Stipend for  51 weeks | $  195.75 | $   195.75 | $   195.75 |
|  |  |  |  |
| Average Weekly Cost | $324 | $319 | $314 |
|  |  |  |  |
| Education Allowance | Up to $500 | Up to $500 | Up to $500 |

[1] Families who have been participants in other government au pair sponsored programs within the last two years and for one continuous year (as evidenced with a receipt from the agency) will receive a $250 discount when transferring to USAuPair.

[2] USAuPair rewards families who continue with USAuPair when selecting their next au pair.  A $500 discount is offered to families who have completed one full year with USAuPair within the last two years.

[3] Subject to change in accordance with Federal Minimum Wage Laws.

Fees do not include domestic travel from Portland to host family, auto insurance or licensing fees to drive automobile.  Education fees are applied to each au pair, including au pairs who change families and have not completed their education requirements.

**Payment Schedule**

|  | New Families | Transferring Families[1] | Repeat Families[2] |
|---|---|---|---|
| Deposit due upon selection of au pair | $ 2,500 | $ 2,500 | $ 2,500 |
| Balance due 45 days prior to au pair arrival in USA | $ 3,750 | $ 3,500 | $ 3,250 |
| Late Payment fee | $  250 | $  250 | $  250 |
| Expedite fee – if host family has selected past due date | $  150 | $  150 | $  150 |

Payments may be made by check or credit card (Visa, MasterCard, Discover) with written authorization to charge credit cards.  Checks are payable to USAuPair, Inc.

Host families make travel arrangements for their au pairs from Portland, Oregon to their home. Instructions regarding this process are sent to families prior to the au pair's arrival to the U.S.

All fees are subject to change.

**EXHIBIT G**

USA  00006

CONFIDENTIAL

**US**Au**Pair**

Defs.' Appx. 00001052

A Cultural Exchange Program

**2015**
**Program Fees & Schedules**

USAuPair program fees include a full range of services and activities to support the au pair cultural exchange program.  A host family interview is scheduled after the application fee is received.

|  | New Families | Transferring Families[1] | Repeat Families[2] |
|---|---|---|---|
| Application Fee | $   300.00 | $   300.00 | $   300.00 |
| Program fee | $ 6,450.00 | $ 6,200.00 | $ 5,950.00 |
| Weekly Stipend for  51 weeks | $   195.75 | $   195.75 | $   195.75 |
|  |  |  |  |
| Average Weekly Cost | $328 | $323 | $318 |
|  |  |  |  |
| Education Allowance | Up to $500 | Up to $500 | Up to $500 |

[1] Families who have been participants in other government au pair sponsored programs within the last two years and for one continuous year (as evidenced with a receipt from the agency) will receive a $250 discount when transferring to USAuPair.

[2] USAuPair rewards families who continue with USAuPair when selecting their next au pair.  A $500 discount is offered to families who have completed one full year with USAuPair within the last two years.

[3] Subject to change in accordance with Federal Minimum Wage Laws.

Fees do not include domestic travel from Portland to host family, auto insurance or licensing fees to drive automobile.  Education fees are applied to each au pair, including au pairs who change families and have not completed their education requirements.

**Payment Schedule**

|  | New Families | Transferring Families[1] | Repeat Families[2] |
|---|---|---|---|
| Deposit due upon selection of au pair | $ 2,600 | $ 2,600 | $ 2,600 |
| Balance due 45 days prior to au pair arrival in USA | $ 3,850 | $ 3,600 | $ 3,350 |
| Late Payment fee | $   250 | $   250 | $   250 |
| Expedite fee – if host family has selected past due date | $   150 | $   150 | $   150 |

Payments may be made by check or credit card (Visa, MasterCard, Discover, Amex) with written authorization to charge credit cards.  Checks are payable to USAuPair, Inc.

Host families make travel arrangements for their au pairs from Portland, Oregon to their home. Instructions regarding this process are sent to families prior to the au pair's arrival to the U.S.

All fees are subject to change.

**EXHIBIT H**

USA  00007

CONFIDENTIAL

**US**Au**Pair**

A Cultural Exchange Program

Defs.' Appx. 00001053

**2016**
**Program Fees & Schedules**

USAuPair program fees include a full range of services and activities to support the au pair cultural exchange program.  A host family interview is scheduled after the application fee is received.

| | New Families | Transferring Families[1] | Repeat Families[2] |
|---|---|---|---|
| Application Fee | $   300.00 | $   300.00 | $   300.00 |
| Program fee | $ 6,450.00 | $ 6,200.00 | $ 5,950.00 |
| Weekly Stipend for  51 weeks [3] | $   195.75 | $   195.75 | $   195.75 |
| | | | |
| Average Weekly Cost | $328 | $323 | $318 |
| | | | |
| Education Allowance | Up to $500 | Up to $500 | Up to $500 |

[1] Families who have been participants in other government au pair sponsored programs within the last two years and for one continuous year (as evidenced with a receipt from the agency) will receive a $250 discount when transferring to USAuPair.

[2] USAuPair rewards families who continue with USAuPair when selecting their next au pair.  A $500 discount is offered to families who have completed one full year with USAuPair within the last two years.

[3] Subject to change in accordance with Federal Minimum Wage Laws.

Fees do not include domestic travel from Portland to host family, auto insurance or licensing fees to drive automobile.  Education fees are applied to each au pair, including au pairs who change families and have not completed their education requirements.

**Payment Schedule**

| | New Families | Transferring Families[1] | Repeat Families[2] |
|---|---|---|---|
| Deposit due upon selection of au pair | $ 2,600 | $ 2,600 | $ 2,600 |
| Balance due 45 days prior to au pair arrival in USA | $ 3,850 | $ 3,600 | $ 3,350 |
| Late Payment fee | $   250 | $   250 | $   250 |
| Expedite fee – if host family has selected past due date | $   150 | $   150 | $   150 |

Payments may be made by check or credit card (Visa, MasterCard, Discover, Amex) with written authorization to charge credit cards.  Checks are payable to USAuPair, Inc.

Host families make travel arrangements for their au pairs from Portland, Oregon to their home. Instructions regarding this process are sent to families prior to the au pair's arrival to the U.S.

All fees are subject to change.

**EXHIBIT I**

CONFIDENTIAL

USA  00008

Defs.' Appx. 00001054

**US**AuPair

A Cultural Exchange Program

# HOST FAMILY AGREEMENT

US Au Pair, Inc. ("USAuPair") and _____ (collectively, "Host Parents") enter into this USAuPair Host Family Agreement, dated as of _____ ("Agreement"), and agree as follows:

1. Host Parents live at _____.
Host Parents are acting on behalf of all members of their household and family (Host Parents and all members of their household and family are collectively called "Host Family"). Host Family is applying to USAuPair for the USAuPair, cultural exchange program ("Program"). As a participant in the Program, Host Family must comply fully and timely with all of the (i) provisions in this Agreement, (ii) provisions in the Program's guidelines published by USAuPair, as amended from time to time in USAuPair's sole discretion ("Guidelines"), (iii) provisions in the Program's brochure published by USAuPair, as amended from time to time in USAuPair's sole discretion ("Brochure"), and (iv) regulations published by the USA Department of State in 22 CFR Part 62, as amended from time to time ("Regulations"). If Host Family violates any provision of this Agreement, the Orientation Guidelines, the Brochure, the Regulations, the Handbook (defined below), the Code of Conduct (defined below), or the Fee Schedule (defined below), then USAuPair may, in its sole discretion, immediately terminate this Agreement and as a result any and all refunds will be automatically and fully forfeited by Host Family. Host Family must live within a 1-hour's drive of a USAuPair counselor. If Host Family moves and if a USAuPair counselor is not within a 1 hour's drive of the new home, then (i) the au pair will be removed, (ii) Host Family is no longer eligible to participate in the Program, and (iii) Host Family may receive a refund under USAuPair's refund policy.

2. In exchange for Host Family's participation in the Program, USAuPair must provide au pair applicants for Host Family's consideration, and USAuPair must provide reasonable support with respect to issues relating to the Program. USAuPair will use reasonable efforts to screen au pair candidates; however, Host Family agrees that USAuPair cannot guarantee that an au pair offered to Host Family will be compatible with Host Family or free from behaviors or personal characteristics that Host Family might find objectionable. Host Family agrees that USAuPair's function is to locate and present Host Family with au pair candidates whom USAuPair believes are suitable, but that the final interviewing and selection of an au pair are Host Family's sole responsibility; consequently, Host Family must review au pair candidates carefully, interview them by telephone before selection, and make a careful selection that reflects the best choice and placement for the au pair and Host Family, and Host Family agrees that the chosen au pair may not meet Host Family's expectations. Because the Program's goal is to place au pairs in American homes so that the au pairs may learn about American culture, receive meals and lodging, and provide limited childcare, Host Family must encourage its au pair to take advantage of the educational, cultural, and natural opportunities of Host Family's community. Host Family agrees that au pairs are not professional childcare providers and that au pairs are cultural exchange participants with some childcare experience. Host Family must treat its au pair as a family member and must include its au pair in family activities. Host Family consents to having USAuPair make inquiries about Host Family to any third person or private or government entity and investigate Host Family's suitability to participate in the Program.

3. Host Family must meet with a USAuPair counselor for orientation, must maintain monthly contact with a USAuPair counselor, must follow USAuPair's grievance process, and must attend an annual host family event as required by the Regulations. Host Family must monitor the performance of its au pair and promptly notify USAuPair of any problems. A 60-day adjustment period following an au pair's arrival is required before any placement change may be considered. If a placement is unsatisfactory to Host Family or an au pair for any reason, then Host Family must follow USAuPair's grievance process described in the Host Family Handbook and Guide ("Handbook") and must remain in communication with both the au pair and USAuPair. If an accident or illness prevents an au pair from continuing au pair duties for an extended period of time, then the au pair's program may be terminated and the au pair sent home. If USAuPair learns that the au pair is subject to any exploitive condition in Host Family's home (e.g., any failure to provide stipend, free time, or educational benefits, or any physical or emotional abuse), or if Host Family breaches this Agreement, then USAuPair may in its sole discretion withdraw the au pair from the Host Family's home and Host Family will not be entitled to any replacement au pair or refund. Host Family agrees that all decisions regarding an au pair's status, dismissal, or replacement may be made by USAuPair in its sole discretion, and any decision by USAuPair is final and binding on Host Family.

4. Host Family must ensure that its au pair: (a) has a private room approved by a USAuPair counselor, and receives meals as a regular member of Host Family; (b) assists Host Family with childcare and day-to-day family duties, excluding general housekeeping or yard work, but the time required for the duties must not exceed 10 hours per day or 45 hours per week, pursuant to the Regulations; (c) receives a weekly stipend consistent with applicable law and paid weekly, but the stipend must not be reduced or withheld for any time lost by illness, and is given 1½ free continuous days per week plus 1 free weekend (Friday evening to Monday morning) per month, and has 2 calendar weeks of paid vacation, at mutually agreeable times; (d) is given time to attend courses for language study or cultural understanding at an accredited postsecondary institution for at least 6 credit hours or its equivalent during the Program year, and Host Family must facilitate transportation to and from the place of instruction and must pay up to $500 per year for related tuition; (e) is included as a member of the Host Family, is treated as a participant in a cultural exchange program, and is not considered or treated as domestic help; (f) does not provide care for a child under 3 months old, unless a responsible adult is present at all times, and is supervised by a responsible adult in the Host Family's home for 3 days following the au pair's arrival; and (g) attends at least 2 cultural events annually that are organized by a USAuPair counselor, and (h) obtains a local driver's license and is covered by a reasonably sufficient amount of auto insurance.

5. Host Family represents and warrants to USAuPair that: (i) Host Family has the power and authority to enter into this Agreement and to undertake and perform all of its duties and obligations; (ii) there is no contract or any other obligation that prevents Host Family from entering into this Agreement or from undertaking or performing all of its duties and obligations, (iii) this Agreement is Host Family's legally binding Agreement; (iv) all information provided on the Host Family Interview form is true and complete; (v) all Host Family members are citizens or legal permanent residents of the United States of America and are fluent in English; and (vi) Host Family must pay all fees to USAuPair as required by the Program.

6. USAuPair has published a code of minimum standards of conduct for au pairs participating in the Program ("Code of Conduct"), and each au pair is required to sign a Code of Conduct agreement. Host Family must support its au pair's compliance with the Code of Conduct and with all Regulations. The Code of Conduct may be amended from time to time in USAuPair's sole discretion. Host Family agrees that the au pair cannot switch to student status and must live with the Host Family. At Host Family's expense, Host Family must provide its au pair with transportation from Portland, OR to Host Family's home. Travel arrangements must be made before the au pair's departure for the U.S., with the itinerary sent to

**EXHIBIT J**
USA  00266

Defs.' Appx. 00001055

USAuPair.  Travel must occur on the same day after completion of the au pair's mandatory introductory workshop, unless cancellations initiated by the transportation companies force an overnight stay, in which case Host Family must pay for all of the au pair's meals and lodging until travel begins.  At the conclusion of the Program, the au pair will receive a return ticket to his or her home country from the major international airport nearest to Host Family's home, and Host Family must assist USAuPair at the conclusion of its au pair's Program year by providing and paying for transportation to the airport to help the au pair in leaving the United States.  Host Family agrees that any stay by its au pair or by any other au pair beyond the specified Program dates is a breach of this Agreement and the Regulations and that notification of the breach will be sent to the appropriate government authorities.

7.  USAuPair has published a fee schedule for the Program ("Fee Schedule"), and Host Family must pay to USAuPair all fees described in the Fee Schedule.  The Fee Schedule may be amended from time to time in USAuPair's sole discretion, and Host Family agrees that all fees are subject to change.  The fees include expenses relating to the au pair's recruiting and screening process, round trip international airfare, orientations, transportation to and from hotel, 3.5-day workshop, lodging and meals during workshop, medical insurance, placement and supervision by a local counselor, and administrative costs.  Because many of those expenses are incurred before the au pair's arrival to the Host Family's home, Host Family must comply with the Fee Schedule and make timely payments.  USAuPair's refund policy may be included in the Fee Schedule.  USAuPair is not responsible for any personal bills (e.g., telephone bills, credit card charges, purchases, or debts) incurred while the au pair lives with Host Family.  USAuPair cannot guarantee 51 weeks of uninterrupted child care and interim alternative care is at Host Family expense.

8.  Host Family agrees that the Program is a cultural exchange program and is not a domestic services business, and that USAuPair is not responsible for any economic damage or loss relating to or arising from any loss or unavailability of the au pair's services.  Host Family agrees that au pairs and USAuPair's counselors and recruiting agents are not USAuPair employees and that an au pair or a USAuPair counselor or recruiting agent cannot legally bind USAuPair in any manner.  Host Family releases USAuPair and its owners, affiliates, agents, successors, and assigns from any and all claims, liabilities, obligations, and damages (including but not limited to attorneys' fees) arising from or relating to for any event:  (i) beyond USAuPair's control, or (ii) caused by an au pair or counselor.  Host Family must indemnify, defend, and hold harmless USAuPair and its owners, affiliates, agents, successors, and assigns (collectively, "Indemnified Party") from and against any and all liabilities, obligations, and damages caused by Host Family or relating to any unavailability of an au pair.

9.  USAUPAIR MAKES NO EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY REGARDING THE PROGRAM OR ANY AU PAIR.  USAUPAIR AND HOST FAMILY ARE NOT LIABLE FOR ANY PUNITIVE, CONSEQUENTIAL, INDIRECT, INCIDENTAL, OR SIMILAR DAMAGES CLAIMED UNDER ANY STATUTE OR UNDER ANY LEGAL OR EQUITABLE THEORY.  THE TOTAL LIABILITY OF USAUPAIR FOR ANY AND ALL CONTRACT, TORT (INCLUDING BUT NOT LIMITED TO NEGLIGENCE), STATUTORY, OR OTHER CLAIMS ARISING FROM OR RELATING TO THIS AGREEMENT, THE PROGRAM, OR ANY AU PAIR IS LIMITED TO $500.  THE TOTAL LIABILITY OF HOST FAMILY FOR ANY AND ALL CONTRACT, TORT (INCLUDING BUT NOT LIMITED TO NEGLIGENCE), STATUTORY, OR OTHER CLAIMS ARISING FROM OR RELATING TO THIS AGREEMENT, THE PROGRAM, OR ANY AU PAIR IS LIMITED TO $500.

10.  This Agreement, the Orientation Guidelines, Brochure, the Regulations, the Handbook, the Code of Conduct, and the Fee Schedule contain the complete, final, and exclusive integrated agreement between the parties.  An amendment to this Agreement must be written and signed by USAuPair.  This Agreement may be assigned by USAuPair, but it may not be assigned by you without the prior written consent of USAuPair, which may be withheld in its sole discretion.  This Agreement is governed by, and must be construed and enforced in accordance with, the laws of the State of Oregon, excluding principles of conflict of law.  The parties each consent to the jurisdiction of the courts of the State of Oregon and agree that the courts have personal jurisdiction over each party.  Plural terms refer to all members of the relevant class, and singular terms refer to any one or more members of the relevant class.  "Or" is not exclusive in its meaning.  This Agreement may be signed in counterparts, and facsimile signatures are acceptable.  No waiver of any breach of this Agreement is a waiver of any other breach.  All rights and remedies are cumulative and nonexclusive.  The termination of this Agreement does not terminate any duty or obligation that continues past the termination of this Agreement.

The parties execute this Agreement as of the date first written above.

USAuPair, Inc.

By: _____

Host Parents:

_____

_____
Officer                                                    Signature                                                    Date

_____
Date                                                       Print Name

_____
                                                           Signature                                                    Date

                                                           Print Name

**Host Family/Au Pair Agreement**

By signing below in counterpart, the Host Family and the Au Pair agree that the Au Pair is participating in a non-EduCare program and shall not be obligated to provide more than 10 hours per day or more than 45 hours of child care assistance per week.

X _____
Au Pair Signature                              Date

X _____
Host Mother Signature                        Date

x _____
Host Father Signature                         Date

USA  00267

CONFIDENTIAL

Defs.' Appx. 00001056

**USAuPair**

A Cultural Exchange Program

## Host Family Confirmation

| Questions – Please mark the box next to each question.  Thank you. | Yes | No |
|---|---|---|
| 1.  Were you contacted by USAuPair's local coordinator within 48 hours after the arrival of your au pair into your home? | | |
| 2.  Did USAuPair's local coordinator meet with you and your family within two weeks of your au pair's arrival into your home? | | |
| 3.  Do you have monthly contact with USAuPair's local coordinator? | | |
| 4.  If you have _re-matched with a replacement au pair_ please answer this question.  If not, please skip to question number five.  Did USAuPair's local coordinator contact you twice monthly for the first two months following your replacement au pair's arrival? | | |
| 5. Were you advised by USAuPair's local coordinator to attend at least one family day gathering/event sponsored by USAuPair during the placement year? | | |
| 6.  Did your au pair provide more than 45 hours per week of childcare? | | |
|     If yes, please indicate the number of hours and explain in detail. Please use the back of this paper if additional space is needed. | | |
| 7.  Did your au pair work more than 10 hours per day? | | |
|     If yes, please indicate the number of hours per day and explain in detail. | | |
| 8.  Have you provided a private bedroom to your au pair? | | |
| 9.  Have you paid your au pair the minimum weekly stipend of $195.75? | | |
|     If no, please explain why. | | |
| 10. Have you provided up to $500 for your au pair's enrollment at an American accredited educational institution of higher learning? | | |

**EXHIBIT K**
USA  00270

CONFIDENTIAL

Defs.' Appx. 00001057

**Host Family Confirmation**

If No, please explain why:

Over all comments/suggestions:

I have answered the above questions as truthfully as possible.

Host Family Name: _____
                              (Print)

Host Family's Signature: _____

Date: _____

Thank you for completing this questionnaire.  Please return this questionnaire by **May 6, 2011**.  You can mail the completed form in the enclosed, postage-paid envelope.

Call 510-337-0888, ext 1 or email rklcpa@aol.com if you have any questions.  Your timely response is greatly appreciated.

CONFIDENTIAL

USA  00271

Defs.' Appx. 00001058

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1: 14-cv-03074-CMA-KMT

JOHANA PAOLA BELTRAN; et al.

       Plaintiffs,

v.

INTEREXCHANGE, INC.; et al.

       Defendants.

---

## DECLARATION OF MARK GAULTER IN SUPPORT OF EXPERT AU PAIR'S MOTION FOR SUMMARY JUDGMENT

---

I, Mark Gaulter, declare as follows:

1.    My name is Mark Gaulter, I am over the age of 18 and I make this declaration based upon personal knowledge. If called as a witness I am able to testify competently to the matters set forth in this declaration.

2.    I am the CEO or Expert Group International Inc., d/b/a Expert AuPair ("Expert AuPair"), defendant in the above captioned action. Expert AuPair is one of the 16 designated sponsors administering the J-1 au pair exchange program.

3.    As a designated sponsor, Expert AuPair is mandated to ensure participant's compliance with the program guidelines established by the U.S. Department is State ("DOS").

4.    All the DOS-designated sponsors, including Expert AuPair, are initially approved by DOS and are reassessed every two years through a process

1

Defs.' Appx. 00001059

called re-designation. In order to be able to receive re-designation Expert AuPair must demonstrate compliance with the program regulations and guidelines. Expert AuPair was re-designated on each occasion since its initial designation.

5.     In order for an au pair to be able to participate in the J-1 cultural exchange program and obtain J-1 status in the United States, the au pair candidate should meet eligibility criteria established by DOS and have a host family willing to participate in the program and host the au pair candidate.

6.     The supply of qualified au pairs willing to be placed with a host family in the United States exceeds by far the number of families willing to participate in the program and host an au pair. Expert AuPair is unable to find host families for all of the au pairs that have successfully completed the application process and are ready to match with a host family.

7.     The process through which a host family selects an au pair is called "matching." Some of the au pairs "match" with a host family prior to contacting Expert AuPair while others require Expert AuPair's help to find a family to match with. Many au pairs are using on-line matching websites or social media networks in order to "match" with host families. Expert AuPair does not assign au pairs to families or vice versa.

8.     The DOS regulations require the host families and the au pair to enter into a written agreement before the au pair departs her home country 22 C.F.R. § 62.31(e)(5). Upon matching, and prior to the start of the program, both the au pair and the host family are provided with fillable contracts. Such contracts contain clauses designed to protect the au pair while following the DOS guidelines.

Defs.' Appx. 00001060

The contracts provide empty fields for the schedule of hours, the rate of pay, the number of children and other information specific for each family. Expert AuPair does not fill in the fields regarding the number of hours of childcare provided or the weekly stipend. Expert AuPair does not advise on a minimum number of hours of childcare or a maximum stipend.

9.      In accordance with the DOS regulations, Expert AuPair provides information to both the host family and the au pair regarding their rights and responsibilities, specifically: payment of a certain minimum weekly stipend based on the prevailing federal minimum wage; limiting the au pair duties to "childcare," and limiting the au pair hours to 10 hours per day and to 45 hours per week. 22 C.F.R §§ 62.31(a), 62.31(j).

10.      In 2007, DOS advised Expert AuPair that, beginning July 24, 2009, the required minimum amount of the weekly stipend would be $195.75.

11.      While communicating the amount of the minimum stipend as required by DOS, Expert AuPair always advised host homilies that they can pay more than the minimum stipend. Expert AuPair specifically mentioned on its website that "you can pay more…".

12.      At no point during the au pair's stay in the United States is Expert AuPair involved in day-to-day management or oversight of au pairs. Also, Expert AuPair does not conduct performance reviews or evaluate the au pair's childcare services. Direction, supervision and evaluation of the au pair's work is done exclusively by the host family.

13.      While Expert AuPair is presented with a copy of the contract signed

Defs.' Appx. 00001061

between the au pair and the host family, it does not keep records of the actual amount of the stipend paid or the number of hours of childcare provided by each au pair.

14.    Expert AuPair has no role in the decision of terminating the relationship between a host family and an au pair. While the word "termination" appears in the DOS Regulations as a status type in the Student and Exchange Visitor Information System ("SEVIS") it refers to the process of changing the status of an exchange visitor as a result of failure to comply with the laws governing the program. As used in SEVIS, the word "termination" does not refer to employment termination.

15.    DOS Regulations also require sponsor organizations like Expert AuPair to provide training related to child safety and child development, which au pairs are required to complete before they arrive at their host family 22 C.F.R. § 62.31(g). If au pair candidates can demonstrate previous knowledge in the area of child development or safety, at a satisfactory level, Expert AuPair does not require the au pair candidates to attend the training organized and provided for free by Expert AuPair. If the au pairs do not have the required knowledge, Expert AuPair, using specialized contractors like the St. Petersburg Fire Department, provides, free of charge, the required training. Expert AuPair also provides hotel accommodation for the au pairs in training, and breakfast and lunch.

16.    Expert AuPair is required to submit yearly audit reports to DOS. These audits are based on surveys conducted by independent auditors and follow a template provided by DOS. One of the questions provided by DOS in the

template expressly asks how many au pair responded to the survey that "they received at least $195.75/week as compensation."

17.   DOS regulations require that au pairs have medical insurance that covers them for sickness and accidents while exchange visitors in the United States. 22 C.F.R. §62.14.  Expert AuPair handles certain administrative aspects in relation with purchasing a travel medical insurance policy for the au pairs. The host family pay for their au pair's insurance as part of their placement fees.

18. Based on an analysis of the agreements between the host families and the au pairs sponsored by Expert AuPair, I am able to confirm that both the number of hours and the weekly stipend vary significantly.

I declare under the penalty of perjury that the foregoing is true and correct.

Dated on: February 14, 2018.


Mark Gaulter, PhD

Defs.' Appx. 00001063

STATE OF FLORIDA
COUNTY OF _Pinellas_

Sworn to and subscribed before me this _14_ day of _February_____, 20_18_, by
_Mark J Gaultr_.



KATHLEEN VERONICA MCCORMICK
Commission # FF 165634
My Commission Expires
October 05, 2018

Personally known _____✓_____
Or Produced identification _____
Type of identification _____

_Kathleenveronicamccormick_____
Notary Public

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO


JOHANA PAOLA BELTRAN, et al.,


        Plaintiffs,


vs.                  No. 14-cv-03074-CMA-KMT


INTEREXCHANGE, INC., et al.,


        Defendants.


    Deposition of CARRIE CROMPTON, taken on behalf of the Plaintiffs, at the offices of GorePerry Reporting & Video, 515 Olive Street, Suite 300, in the City of St. Louis, State of Missouri, on the 22nd day of September, 2016, before Kristine A. Toennies, RMR, CRR, CBC, MO-CCR #769, CSR (IL #084-004388 & IA), and Notary Public.



Defs.' Appx. 00001065

Page 25

1    service.

2        Q    When you say that you were responsible for

3    sales and growth, what did you do in that role?

4        A    I worked closely with my superiors on

5    marketing plans for the year, growth numbers, target

6    goals for the recruitment of new host families and

7    placements, and then implementing that.

8        Q    Did you have any role with recruitment of

9    au pairs?

10       A    I did not.

11       Q    Did you have any role with recruitment of

12   host families?

13       A    I did.

14       Q    What was your role in recruiting host

15   families?

16       A    I received all inbound phone calls through

17   the 800 number.  I received all website inquiries in

18   the various forms that they would come.  I would

19   receive the new host family application.  I would

20   speak to host families about the program, answer

21   their questions, help them learn more.

22       Q    When you spoke to host families, was it

23   always by phone or e-mail?

24       A    It was.

25       Q    So you never met with host families in



Defs.' Appx. 00001066

Page 26

```
1    person?

2         A    While at APF -- while at APF there were a

3    few local families here to St. Louis, one of which

4    was actually my friend, a family friend, so I did

5    meet with them and in an au pair capacity.  And I

6    don't believe that I met in person with any of the

7    other St. Louis families.

8         Q    Who did you report to in this role?

9         A    I reported to Ellen Hoggard.

10        Q    Do you know what her title is?

11        A    She's the president.

12        Q    Does she report to anybody?

13        A    She does.  She reports to someone in Sweden.

14        Q    I'm assuming you don't know that person's

15   name?

16        A    I don't know who that person is, no.

17        Q    And you said you were responsible for

18   managing a regional team?

19        A    Uh-huh.

20        Q    Approximately how many employees did you

21   manage?

22        A    Well, first of all, they weren't employees.

23   They were independent contractors, and I had a

24   regional team of five.  Five.

25        Q    What was the role of these regional team
```



Page 1

THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

------------------------------x

JOHANA PAOLA BELTRAN, ET AL,

                    Plaintiffs,

       v.              Civil Case No.

                       14-cv-03074-CMA-KMT

INTEREXCHANGE, INC., ET AL.,

               Defendants.

------------------------------x

CONFIDENTIAL VIDEOTAPED DEPOSITION

OF RUTH FERRY

NEW YORK, NEW YORK

Thursday, May 11, 2017

Reported by:

JEREMY RICHMAN

JOB NO:  314334

MAGNA LEGAL SERVICES

320 West 37th Street, 12th Floor

New York, New York 10018

(866) 624-6221



Defs.' Appx. 00001068

Page 103

1

2   money is that they're supposed to pay

3   the au pairs?

4       A.    If a customer contacts the

5   office, then we will review the

6   minimum payment levels, and that

7   typically answers the question.

8       Q.    Besides the minimum payment

9   levels, is any guidance given as to

10  what the expected payment levels are

11  for au pairs?

12      A.    Yes.  We give the guidance

13  that the Department of State has

14  provided on what the minimum weekly

15  stipends are to be set at.

16      Q.    Right.  What I'm asking is,

17  apart from the guidance of what the

18  minimum levels are, does your

19  organization give any guidance as to

20  what -- as to what the payments might

21  be, apart from the minimum?

22      A.    The only differential we

23  have is with our extraordinaire

24  program, where we set the minimum at

25  $250 pocket money per week.



Defs.' Appx. 00001069

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO


Civil Case No. 14-cv-03074-CMA-KMT

_____

JOHANA PAOLA BELTRAN, ET AL.,

          Plaintiffs,

vs.

INTEREXCHANGE, INC., ET AL.,

          Defendants.

_____



VIDEOTAPED DEPOSITION OF

STACEY FRANK

30(b)(6) REPRESENTATIVE FOR AGENT AU PAIR

MAY 12, 2017

DENVER, COLORADO

8:28 A.M.




Magna Legal Services

866-624-6221

www.magnals.com



Defs.' Appx. 00001070

Page 67

```
 1        A.     Yes.   That refers to the letter that the

 2   Department of State sent out, I believe, in --

 3   regarding the -- the minimum wage increase stipend

 4   from Department of State, telling au pair agencies

 5   what the new minimum stipend is as guidance from the

 6   Department of State, signed by George W. Bush.

 7        Q.     And do you see where it says, "Some

 8   sponsors raised" -- "raised concerns that the

 9   stipend increase would deter families from joining

10   the program"?

11        A.     Yes.

12        Q.     Do you recall if Agent Au Pair raised

13   concerns that the stipend increase would deter

14   families?

15        A.     I -- I don't recall.

16        Q.     Do you recall ever raising that concern

17   with the Department of State?

18        A.     No.   I mean, yes, I recall, and I didn't

19   raise that concern.

20        Q.     Do you recall other sponsors -- do you

21   know if other sponsors raised concerns?

22        A.     I know they raised concerns about

23   increasing the min -- the minimum stipend.   Sorry,

24   the minimum -- I don't know what you call it.   The

25   minimum $500 educational requirement because they --
```



Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

------------------------------x

JOHANA PAOLA BELTRAN, et al.,

          Plaintiffs,         Civil Action No.

vs.                           14-cv-03074-CMA-KMT

INTEREXCHANGE, INC., et al.,

          Defendants.

------------------------------x

   VIDEOTAPED DEPOSITION of CULTURAL CARE,

INC., pursuant to Rule 30(b)(6), designee

NATALIE JORDAN

          April 14, 2017

          Boston, Massachusetts

Magna Legal Services  Reported By:

(866) 624-6221        MaryJo O'Connor, RMR/CSR

www.MagnaLS.com       Job No:  308025



Defs.' Appx. 00001072

Page 124

1    paragraph?

2          Q.   No.

3          A.   Okay.

4          Q.   Is that guidance consistent with

5    the guidance that you give to host families

6    regarding the stipend?

7          A.   Yes.

8          Q.   And that guidance is, that the

9    stipend is $195.75 on a weekly basis?

10         A.   We would take the position it's a

11   minimum stipend, but we do provide that

12   number as it's been issued by the Department

13   of State.

14         Q.   Can you read that first sentence

15   again?

16         A.   Sure.   "The weekly stipend you give

17   your au pair is a living stipend of $195.75."

18         Q.   Is there anything about that

19   guidance -- and you can read and reference

20   the entire paragraph -- but is there anything

21   in that paragraph that suggests that the

22   $195.75 is a minimum?

23         A.   There is no reference to either a

24   minimum nor a maximum.

25         Q.   So the guidance to host families is



Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO


Civil Case No. 14-cv-03074-CMA-KMT

_____

JOHANA PAOLA BELTRAN, ET AL.,

           Plaintiffs,

vs.

INTEREXCHANGE, INC., ET AL.,

           Defendants.

_____



VIDEOTAPED DEPOSITION OF

A. WILLIAM KAPLER, III

30(b)(6) REPRESENTATIVE FOR GOAUPAIR

MAY 11, 2017

DENVER, COLORADO

10:11 A.M.




Magna Legal Services

866-624-6221

www.magnals.com



Page 83

1    why the number 195.75 appears in that cell?

2         A.    Yes.   That's the stipend amount that the

3    Department of State has dictated as the one that's

4    the minimum wage, as based upon federal minimum

5    wage.

6         Q.    And when you say "dictated," what do you

7    mean by that?

8         A.    And they sent us two or three e-mails

9    right from the very beginning on -- I guess they've

10   sent the Fact Sheet, and there's another one that's

11   the weekly something or other, and then there's the

12   more recent one that talked about the increases in

13   the federal minimum wage.

14              THE VIDEOGRAPHER:   Do you want me to

15   change the media sometime in the next five minutes?

16              MS. REILLY:   Yeah, we have been -- I

17   think it's about time for a break.   So whenever

18   you're ready, Juan.

19              MR. VALDIVIESO:   We can take a break

20   right now and change the media.

21              THE VIDEOGRAPHER:   Going off the

22   record at 12:06.   This marks the end of media 1.

23                   (Whereupon, a lunch break was had

24                    from 12:06 p.m. to 12:54 p.m.)

25                   (Exhibit No. 6 was marked.)



Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO


Civil Case No. 14-cv-03074-CMA-KMT

_____

JOHANA PAOLA BELTRAN, ET AL.,

           Plaintiffs,

vs.

INTEREXCHANGE, INC., ET AL.,

           Defendants.

_____



VIDEOTAPED DEPOSITION OF

STEVE LEHAN

30(b)(6) REPRESENTATIVE FOR AU PAIR INTERNATIONAL

MAY 12, 2017

DENVER, COLORADO

1:59 P.M.




Magna Legal Services

866-624-6221

www.magnals.com



Page 27

1    supposed to do within the regulations.  And

2    there's -- there's not area left to interpretation

3    typically.  So it's certainly our characterization

4    that that is the stipend that is to be paid.

5        Q.    Is it API's understanding that a host may

6    pay less than that host's state or local minimum

7    wage?

8              MS. REILLY:  Objection to form.

9        A.    It's API's understanding that the host

10   families are allowed to compensate the au pairs at

11   the amount specified by the Department of State,

12   which is the 195.75.

13       Q.    Irrespective of state and local law?

14       A.    Correct.

15       Q.    And you believe that's consistent with

16   your prior testimony, which I believe it's accurate

17   to say, was to the effect that you agree that

18   au pairs are subject to state and local labor laws,

19   correct?

20             MS. REILLY:  Objection to form.

21       A.    I didn't.  Yeah, I didn't say that.  I

22   said that was in that communication from the

23   Department of State.

24       Q.    So the Department of State has said that

25   au pairs must be paid in conformance with state and



Page 1

THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

------------------------------x

JOHANA PAOLA BELTRAN, et al.,

                  Plaintiffs,

      v.              Civil Case No.

                        14-cv-03074-CMA-KMT


INTEREXCHANGE, INC., et al.,


                Defendants.


------------------------------x



VIDEOTAPED DEPOSITION OF MICHAEL MCHUGH

NEW YORK, NEW YORK

Thursday, April 6, 2017



HIGHLY CONFIDENTIAL PAGES: 300-301


Reported by:

JEREMY RICHMAN

JOB NO: 308029


MAGNA LEGAL SERVICES

320 West 37th Street, 12th Floor

New York, New York 10018

(866) 624-6221



Defs.' Appx. 00001078

Page 120

1                       M. MCHUGH

2        Q.      Sure.  Did you believe that,

3   did you believe that the description

4   of the Au Pair stipend was accurate at

5   the time that you approved that

6   language?

7        A.      In that the Au Pair stipend

8   amount was 195.75 per week?

9        Q.      That's right.

10       A.      Yes, I believe that was

11  accurate.  However, that's not to say

12  that I believed that was a maximum

13  amount.  I believe that that was the

14  amount that was sent to us from the

15  State Department in their notice where

16  they said the stipend from this day

17  forward will be 195.75 per week.  I'm

18  of the opinion that anything based off

19  of a minimum wage can always be higher

20  than that.

21       Q.      Okay.  Let's go to the next

22  website.

23               (McHugh Exhibit 15, Bates

24       stamped INTEREXCHANGE 0002444

25       through 2445, was marked for



Page 180

                    M. MCHUGH

1

2        A F T E R N O O N   S E S S I O N

3            (Time noted:  2:15 p.m.)

4            THE VIDEOGRAPHER:  We are

5        now on the record, time is

6        2:15 p.m., this begins DVD number

7        three.

8            MICHAEL MCHUGH, RESUMED,

9        having been previously and duly

10       sworn, was examined and testified

11       further, as follows:

12           CONTINUED EXAMINATION

13           BY MR. LIBLING:

14       Q.    Good afternoon, Mr. McHugh.

15   So I want to ask you now about the

16   training of Au Pairs.

17       A.    Mm-hmm.

18       Q.    Is any training of Au Pairs

19   done in the Au Pairs' home country?

20       A.    It is.

21       Q.    And what training is done in

22   -- let me first ask, who trains the Au

23   Pairs in their home country?

24       A.    They train themselves in

25   their home country.



Defs.' Appx. 00001080

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE STATE OF COLORADO

JOHANA PAOLA BELTRAN, et )
al.,                      )
        Plaintiffs,       )
vs.                       ) Case No.:  14-cv-03074
                          )                 CMA-KMT
                          )
INTEREXCHANGE, INC., et   )
al.,                      )
        Defendants.       )
_____)

VIDEOTAPED DEPOSITION of AUPAIRCARE, INC.,

pursuant to Rule 30(b)(6), designee

SARAH MCNAMARA

Thursday, May 4, 2017

MAGNA LEGAL SERVICES

866-624-6221

www.MagnaLS.com

Taken before:

HEIDI BELTON, CSR, RPR, CRR, CCRR, CLR

CSR No. 12885



Page 20

1          Q.    True or false:   APC understands DoS has

2     issued a directive stating that the stipend must

3     equal $195.75?

4          A.    APC's understanding of the Department of

5     State guidelines is, yes, the au pair should receive

6     $195.75 weekly stipend.

7          Q.    My question was about a directive stating

8     that the stipend must equal.   And I believe you

9     answered in terms of "should receive."   So I'm going

10    to ask again.

11              Is it APC's understanding that DoS has

12    issued a directive stating that the stipend must

13    equal $195.75?

14         A.    No.

15         Q.    Can you articulate what APC understands

16    DoS to require concerning the stipend?

17         A.    Sure.   I'll repeat what I just said.

18              Our understanding is that per the

19    Department of State, that host families should pay

20    the au pair $195.75 per week.

21         Q.    "Should pay."   That means that DoS does

22    not have a requirement of $195.75 a week; is that

23    right?

24              MR. QUINN:   Object to form.

25              THE WITNESS:   The guidance that we



Page 83

1    And then the au pair attends the mandatory training

2    and orientation, which is the first week, and then

3    she travels to the host family's home.

4         Q.   So the au pair is generally in the country

5    for 52 weeks; fair?

6         A.   Yes.

7         Q.   But she's not paid for one of those weeks;

8    correct?

9         A.   Correct.

10        Q.   Okay.  And she's not paid for that week

11   while she is in training; correct?

12        A.   Correct.

13                              (Exhibit 18 marked.)

14   BY MR. RODRIGUEZ:

15        Q.   I've placed before the witness the exhibit

16   marked 18.

17             For those of you on the phone, Exhibit 18

18   was not produced in this litigation.  It -- I will

19   represent to you that I printed it last night from

20   the website

21   aupaircare.com/host-families/program-costs.

22             Ms. McNamara, do you recognize the

23   material contained in Exhibit 18?

24        A.   Yes.

25        Q.   What is it?



Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Case No. 14-cv-03074-CMA-KMT

_____

JOHANA PAOLA BELTRAN, ET AL.,

          Plaintiffs,

vs.

INTEREXCHANGE, INC., ET AL.,

          Defendants.

_____

VIDEOTAPED DEPOSITION OF

THERESA NELSON

30(b)(6) REPRESENTATIVE FOR AU PAIR FOUNDATION

MAY 9, 2017

DENVER, COLORADO

9:06 A.M.

Magna Legal Services

866-624-6221

www.magnals.com



Page 189

1                    MS. SCHAECHER:  Same objections.

2          A.    It's my understanding APF did not possess

3     any legal understanding, and we relied upon the

4     wording and the -- the regulation as set forth by

5     the Department of State.

6          Q.    Who is the in -- intended signatory of

7     the Host Family Application?  Sorry.  Strike that.

8                    Who is the intended sig --

9     signatory of the Host Family Agreement?

10         A.    The host family.

11         Q.    Is it fair to say that the words in this

12    agreement are drafted such that a host family -- a

13    reasonable host family reading them would understand

14    them?

15                   MS. SCHAECHER:  Objection to form and

16    foundation.

17         A.    I -- I can't make that speculation.

18         Q.    Let's turn back to Exhibit 1, page 5 of

19    the topics you were prepared to testify on today.

20                   MS. SCHAECHER:  It's over here.

21         Q.    Do you see on page 5, under the topics,

22    Topic No. 3?

23         A.    Yes, I do.

24         Q.    And there is a letter G there; is that

25    right?



Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO


JOHANA PAOLA BELTRAN, et al.,

          Plaintiffs,

     vs.               No. 14-cv-03074-CMA-KMT

INTEREXCHANGE, INC., et al.,

          Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~



VIDEOTAPED DEPOSITION OF 30(b)(6) EXPERT OF EURAUPAIR

CELIA PARKER

Volume I



Sunday, April 30, 2017

10:21 a.m. - 7:25 p.m.



686 Anton Boulevard

Costa Mesa, California  92626



Magna Legal Services

866-624-6221

www.MagnaLS.com


Reported by:  Marceline F. Noble, CSR No. 3024



Page 139

1      Q.   (By Mr. Valdivieso) -- directing you not to

2  answer.

3           MS. FITZGERALD:  No.  I'm not, no.

4           THE WITNESS:  Okay.

5           MS. FITZGERALD:  You -- you can answer.

6           THE WITNESS:  Okay.  The United States

7  Department of State has calculated the amount of the

8  weekly pocket money that's to be provided to

9  au pairs.

10          Is that the question?

11          And -- and given that number to au pair

12  program sponsors throughout the years.

13     Q.   (By Mr. Valdivieso) And does -- No. 9, under

14  "Host family qualifications," does it state that the

15  195.75 is a minimum amount?

16     A.   Does it state that it's a minimum amount?

17          No.

18     Q.   Is it accurate to state that 195.75 is a

19  fixed amount -- an amount fixed by the State

20  Department?

21          MS. FITZGERALD:  Object to the form.

22          THE WITNESS:  Yeah.  I'm not understanding

23  "fixed."

24          The amount of pocket money to be provided to

25  an au pair, being -- calculated as being $195.75, was



Page 140

1   done by the U.S. Department of State and provided to

2   au pair program sponsors.

3          So I don't know what you mean by "fixed."

4      Q.   (By Mr. Valdivieso) How did they provide it

5   to program sponsors?

6      A.   And by that, I think you mean in memo form?

7          Yes, there was a memo.

8      Q.   There was a memo?

9      A.   Mm-hmm.

10     Q.   Do you recall the date of the memo?

11     A.   Oh, gosh, no.  We've established I don't do

12  dates.

13         But I could certainly look it up and get

14  that for you.

15     Q.   I'll direct your attention to page 17.  It's

16  Bates No. 1416.  Under 2012 "Host family fees and

17  costs," there are "other family costs."

18         What does it state on the first line under

19  "other family costs"?

20     A.   Au pair pocket money payable weekly.

21     Q.   And does -- does page 17 make any reference

22  to 195.75 being a minimum amount?

23     A.   Make reference to being a minimum amount?

24  No.  That's not...

25     Q.   And when you said that the State



Defs.' Appx. 00001088

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO


Civil Case No. 14-cv-03074-CMA-KMT

_____

JOHANA PAOLA BELTRAN, ET AL.,

        Plaintiffs,

vs.

INTEREXCHANGE, INC., ET AL.,

        Defendants.

_____



VIDEOTAPED DEPOSITION OF

SHANNON PITTS

30(b)(6) REPRESENTATIVE FOR GREAT AU PAIR

MAY 31, 2017

DENVER, COLORADO

9:21 A.M.




Magna Legal Services

866-624-6221

www.magnals.com



Page 99

1    broken -- let's say the -- the -- we try to rematch

2    the au pair, and we try to do it within two weeks.

3    And if we can do that within two weeks, then the

4    au pair would be rematched.  But if the au pair

5    doesn't complete her 12-month program, she would be

6    responsible for finding her own transportation back

7    home.

8         Q.    Going back to if the year is successful,

9    how does GreatAuPair USA handle the extension of the

10   program year?

11        A.    How do you handle the extension?

12        Q.    Uh-huh.

13        A.    Meaning if they wanted to extend with the

14   same host family?

15        Q.    Sure.

16        A.    Then basically her -- within SIVAS --

17   that's the government system through which we issue

18   the -- the DS-2019s -- we would change her status as

19   an extending au pair in SIVAS, and her visa or her

20   DS-2019 would be extended for another year and she

21   would be able to remain with that family.

22                  So it's more of a -- just a

23   technical operation within the SIVAS system to

24   extend an au pair for up to a year.

25        Q.    Does GreatAuPair encourage host families



Page 100

1    extending their au pair to pay a higher weekly

2    stipend in the following year?

3         A.    We don't get involved in the calculation

4    of the stipend.  The Department of State has

5    determined what the au pair stipend is, and

6    GreatAuPair simply provides that information to the

7    host families.  We're not getting involved in the

8    calculations of au pair wages.

9              (Exhibit No. 10 was marked.)

10        Q.    I'm handing you what I have marked as

11   Exhibit 10.

12             MR. VALDIVIESO:  For those of you on

13   the phone, it's a document ending in 29026.

14        Q.    When you've had a chance to look at this

15   document, could you tell me what Exhibit 10 is,

16   please, Mr. Pitts.

17        A.    It looks like a draft e-mail related to

18   GreatAuPair extension.

19        Q.    Does the content of the draft e-mail look

20   familiar to you?

21        A.    Yeah, I suppose so.

22        Q.    And when you call it a draft e-mail, you

23   earlier referred to some draft e-mails being kept in

24   the Support@GreatAuPair.com outbox as a resource

25   from which the people responding to inquiries



Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Case No. 14-cv-03074-CMA-KMT

_____

JOHANA PAOLA BELTRAN, ET AL.,

          Plaintiffs,

vs.

INTEREXCHANGE, INC., ET AL.,

          Defendants.

_____

VIDEOTAPED DEPOSITION OF

CHRISTINA REILLY

30(b)(6) REPRESENTATIVE FOR CULTURAL HOMESTAY

MAY 16, 2017

DENVER, COLORADO

11:16 A.M.

Magna Legal Services

866-624-6221

www.magnals.com



Page 134

1    form, and then this e-mail would be generated?

2         A.    Yes.

3         Q.    Okay.  So -- and then the next e-mail

4    from Deborah Herlocker -- Herlocker, who we've

5    spoken about earlier, the former operations manager,

6    says, "Hi Heidi.  This is Deborah from the main

7    office of CHI's au pair program.  I've told the

8    agency to go ahead and get Rodica started on the

9    au pair application, if they have not yet done so.

10   I have started your family on the HF application.

11   The application is online, and you can access it

12   using the login below.

13                    "In addition to the website listed

14   below, you can log into our main website

15   www.chiaupairusa.org.  Here is the information on

16   the cost.  Agency fees are $7,200, including the

17   application fee.  As prearranged placement, you

18   would receive an additional $300 off in addition to

19   the application fee being waived if you sign up by

20   September 1st, 2010.  I'm attaching a pdf explaining

21   the costs in more detail.  The weekly stipend is

22   currently 195.75."

23                    Does that e-mail comport to CHI's

24   policy?

25        A.    It -- it's clearly referencing -- and I



Page 135

1    believe this is dated 2010.  Yeah.  This is clearly

2    referencing that the stipend has been set at 195.75.

3    And per the directive issued by the Department of

4    State, that is what -- what is indicated, that it

5    was set at 195.75.

6         Q.    Is that accurate?

7         A.    It is accurate here.  It was set, it is

8    set at 195.75, and that is what she's indicating.

9         Q.    So...

10        A.    At a minimum, is my -- yeah.

11              MR. BENDER:  Wait for a question.

12              THE WITNESS:  Yeah.  Sorry.

13        Q.    So what was it you were going to say?

14        A.    I mean, I think the intention here is

15   that she's just expressing that it is set at a

16   minimum of.

17        Q.    You --

18        A.    And not as --

19        Q.    -- you think that's her intention,

20   that it --

21        A.    Yes.  But it's hard for me to speak to, I

22   guess, her intention, so yeah.

23        Q.    So let's turn to the attachment, which I

24   gave you as a separate piece of paper and is Bates

25   stamped 18999 through 19000.



Defs.' Appx. 00001094

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 14-cv-03074-CMA-KMT

JOHANA PAOLA BELTRAN, et al.

    Plaintiffs,

       v.

INTEREXCHANGE, INC., et al.

    Defendants.

---

**AFFIDAVIT OF IRINA SHETTY**

---

I, Irina Shetty, having been duly sworn, states as follows:

    1.    I recently changed my name upon getting married.  My former name was Irina Gussev.

    2.    In late 2014, I received a memorable and unusual phone call from an unidentified man.

    3.    The phone call was brief, about four to five minutes long.

    4.    At that time, I was an employee of EurAupair Intercultural Child Care Programs ("EurAupair").  My title was Eastern Regional Director.  I started working for EurAupair on February 21, 2014.

    5.    One of my responsibilities was to answer phone calls from parents of prospective host families to assess whether the caller's family would be a good host family with EurAupair.

Defs.' Appx. 00001095

6.      When I answer a phone call from a prospective host family, I do not use a script. Instead, I explain what EurAupair does and ask questions to assess from the phone call if the caller could become a host.

7.      My questions vary based on what information the caller provides to me.

8.      When I answer initial inquiry phone calls, I always ask for the caller's city or ZIP code to determine whether EurAupair conducts a program in the caller's area.

9.      Because the caller, referenced at Paragraph 2 (above), would not disclose where he lived, I was unable to talk to him about whether EurAupair could cover his area.

10.     Also, when I answer these initial inquiry phone calls, I always ask the caller questions about their children, such as how many, what are their ages, and if they are boys or girls.

11.     I ask about the number of children, their ages, and their gender because it aids my determination about whether the caller could become a host with EurAupair.

12.     When I asked the caller about his children, he was very reluctant to provide information.

13.     In particular, when I asked the caller if he had any children less than two years of age, he waivered and said that the answer "does not matter."

14.     I found the caller's answer about children to be unusual, because most callers normally like to talk about their children.  A family hosts an au pair because the family needs childcare assistance and has an interest in cultural exchange.

15.     The caller also asked for my last name, which was also unusual.  Most callers ask for my first name, if I have not already introduced it, and call me by my first name.

Defs.' Appx. 00001096

16.    I now have read the notes of David Keil [Keil Deposition Ex. 005], in which he describes my alleged comments to him.  On page 3 of his notes, he states:

> Then, before she could get to the next point in her prepared script, I asked, "what about the amounts paid directly to the au pair?"
>
> She answered, "Yes, that called the Stipend. It's $195.75"
>
> I asked, "Is that just like the educational fee? Do all of the companies require a family to pay that exact same amount?"
>
> She answered, "Yes, it's exactly the same amount, equal in all programs" (As if this is a prepared answer to certain questions.
>
> I then asked, "Are you saying that each an [sic] every one of the fifteen companies have gotten together and they made an agreement to pay all au pairs a stipend that is no more then [sic] $195.75 per week?"
>
> She first answered, "Yes, they all agreed to pay that amount, no more." Then she added, "we have one family who pays a little bit more, so I guess you could pay more if you wanted to, but yes, it's exactly the same, equal in all programs."

17.    When I told the caller that the au pair minimum stipend amount and educational fees are "equal in all programs," it is because I understand that an au pair's minimum stipend and educational fees are set by the U.S. Department of State and I assume that host families using other au pair program sponsors follow the regulations.

18.    I was trying to demonstrate to this caller, like I do with other callers, why the caller should select EurAupair as opposed to other au pair program sponsors.

19.    I have never had any interactions with other au pair program sponsors or their employees.

20.    I have not spoken to or met any employee or director at another au pair program sponsor.

Defs.' Appx. 00001097

21.    I never told the caller that the au pair program sponsors have an agreement or an understanding to pay all au pairs the same stipend because I am aware of the U.S. Department of State regulations regarding the stipend for au pairs.

22.    The caller did not ask about or mention the federal regulations regarding the educational fees and the stipend.

23.    If a caller asks, I tell the caller that host families can pay more than the minimum stipend.

24.    I do not recall if the caller asked for my position at EurAupair, but I am certain that the caller did not ask about the scope of my responsibilities within EurAupair.

25.    If I determine that a caller may be a potential host, I ask for the caller's name and phone number.

26.    Because I did not perceive the caller as being a legitimate host, I did not ask for these details.

27.    This call stands out in my mind because the caller would not discuss his children or provide other personal details typical of other callers.

28.    I did not speak with the caller again.

Dated: November _18th_, 2016.

_____
Irina Shetty

4

Defs.' Appx. 00001098

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

## NOTARIAL ACKNOWLEDGMENT

State of _California_

County of _Orange_

On _November 18_, 2016 before me, _Rebecca Sue Snyder_, Notary Public, personally appeared Irina Shetty, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her authorized capacity, and that by her signature on the instrument the person, or entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_Rebecca Sue Snyder_
(Signature of Notary Public)

(Seal)

REBECCA SUE SNYDER
Commission # 2081303
Notary Public - California
Orange County
My Comm. Expires Sep 11, 2018

5

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Case No. 14-cv-03074-CMA-KMT

_____

JOHANA PAOLA BELTRAN, ET AL.,

        Plaintiffs,

vs.

INTEREXCHANGE, INC., ET AL.,

        Defendants.

_____

VIDEOTAPED DEPOSITION OF

HELENE YOUNG

30(b)(6) REPRESENTATIVE FOR USAUPAIR, INC.

MAY 1, 2017

DENVER, COLORADO

11:08 A.M.

Magna Legal Services

866-624-6221

www.magnals.com



Page 78

1        A.      Automobile insurance.

2        Q.      Sure.

3        A.      They might have that as a cost.  I don't

4   know what other costs host families might have.

5        Q.      Do you tell the host families what they

6   should be paying the au pair?

7        A.      The host families are -- are told what

8   the regulations are.

9        Q.      The host family --

10       A.      The guidelines that we were given by the

11  State Department.

12       Q.      So what -- do -- okay.

13               So you -- you don't tell the host

14  families a specific stipend that they should pay to

15  au pairs?

16       A.      We state 195.75, in accordance with the

17  guidelines from the State Department.

18       Q.      Guidelines?  Wait.  So are these -- are

19  you describing anything in the Code of Federal

20  Regulations?

21       A.      I'm describing a document that the State

22  Department sent to me --

23       Q.      Uh-huh.

24       A.      -- that listed what the stipend would be.

25       Q.      Okay.  So do you tell host families that



Page 79

1    they can pay more to au pairs?

2         A.    No.  I tell them exactly what the State

3    Department provided me.

4         Q.    So you've never told a host family that

5    the stipend is a minimum stipend?

6         A.    I've told the families this is what the

7    State Department provided me as the weekly stipend

8    for the au pair.  This is -- this is it.  This is

9    fact.  This is it.

10        Q.    Could a host family pay more?

11        A.    Obviously.  I guess, yes.  I just know

12   that the 195.75 is what the State Department

13   provided USAuPair.

14        Q.    Are you familiar -- you're familiar with

15   the regulations of the au pair program, correct?

16        A.    Yes.

17        Q.    So I'm marking -- we're going to mark for

18   you Exhibit No. --

19                MR. SCHWARTZ:  What are we up to, 8?

20   9?

21                MR. KELLY:  9.

22                (Exhibit No. 9 was marked.)

23        Q.    So you recognize these regulations?

24        A.    Yes.

25        Q.    Okay.  If I could take you to Section J.



**RESTRICTED - EXCERPTS OF MARK GAULTER
5-9-17 DEPOSITION.
SEE RESTRICTED APPENDIX AT
Defs.' R. Appx. 00000903**

Defs.' Appx. 00001103

**RESTRICTED - EXCERPTS OF MICHAEL McCARRY 1-26-18 DEPOSITION. SEE RESTRICTED APPENDIX AT Defs.' R. Appx. 00000905**

Defs.' Appx. 00001104

# RESTRICTED - EXPERT REBUTTAL REPORT OF LAUREN J. STIROH, Ph.D.
# SEE RESTRICTED APPENDIX AT
# Defs.' R. Appx. 00000907

Defs.' Appx. 00001105

# RESTRICTED - EXPERT REPORT OF LAUREN J. STIROH, Ph.D.
# SEE RESTRICTED APPENDIX AT Defs.' R. Appx. 00000957

Defs.' Appx. 00001106

# RESTRICTED - EXCERPTS OF ILIR ZHERKA 1-29-18 DEPOSITION.
## Defs.' R. Appx. 00001013

Credit towards Wages under Section 3(m) Questions and Answers - U.S. Department of Labor      Page 1 of 8

Defs.' Appx. 00001107

# United States Department of Labor
## Wage and Hour Division

**Credit towards Wages under Section 3(m) Questions and Answers**

## Questions

1. Q. What is a section 3(m) credit?
2. Q. Under what circumstances may an employer claim the Section 3(m) credit for lodging?
3. Q. What does it mean for lodging to be "regularly provided by the employer or similar employers"?
4. Q. How do you determine if the employee "voluntarily accepted" the lodging?
5. Q. What does is mean for lodging to be provided "in compliance with Federal, State, and Local Laws"?
6. Q. What does it mean for an employee to receive the "primary benefit of the lodging" in the section 3(m) context?
7. Q. When is housing "adequate" for purposes of whether an employer can claim a section 3(m) credit?
8. Q. How does an employer comply with the requirement to keep accurate records with regard to section 3(m)?
9. Q. How does Section 3(m) apply if a live-in home care worker is a member of a union or subject to a collective bargaining agreement (CBA)?
10. Q. How do you determine the amount of a section 3(m) credit?
11. Q. What is the "reasonable cost" of the facilities?
12. Q. What is the "fair value" of the facilities?
13. Q. What portion of the cost or value of lodging can be applied as a section 3(m) credit?
14. Q. Once the "reasonable cost" and/or "fair value" is determined, how do you determine if you're in compliance with minimum wage and/or overtime provisions?
15. Q. Please provide an example of how to determine if I have met the minimum wage and overtime provisions for a live-in employee.
16. Q. Are employers required to pay a cash wage if they are claiming the 3(m) credit, if the credit covers the federal minimum wage rate?
17. Q. If joint employment exists, can section 3(m) be claimed by both employers?
18. Q. Where can I find more information on 3(m) and/or Home Care?

## Answers

**1. Q. What is a section 3(m) credit?**

A. Section 3(m) of the FLSA allows an employer to count the value of food, housing, or other facilities provided to employees towards wages under certain circumstances.

**2. Q. Under what circumstances may an employer claim the Section 3(m) credit for lodging?**

A. An employer who wishes to claim the section 3(m) credit for lodging must ensure that the following five requirements are met:

1. Lodging must be regularly provided by the employer or similar employers;
2. The employee must voluntarily accept the lodging;
3. The lodging must be furnished in compliance with applicable federal, state, or local laws;
4. The lodging must primarily benefit the employee, rather than the employer; and
5. The employer must maintain accurate records of the costs incurred in the furnishing of the lodging.

**3. Q. What does it mean for lodging to be "regularly provided by the employer or similar employers"?**

A. Employers may only take advantage of section 3(m) if the lodging is "furnished regularly by the employer to his employees or if the same or similar facilities are customarily furnished by other employers engaged in the same or similar trade, business, or occupation in the same or similar communities." For example, live-in domestic service employees (such as home care workers and nannies who live at the home where they provide services) often reside at their employers' private homes without paying rent, so this requirement is met for those workers.[1] Similarly, agricultural workers are often provided housing during harvest season by their employers, so this requirement is met for workers under those circumstances as well.

**4. Q. How do you determine if the employee "voluntarily accepted" the lodging?**

A. Employees must accept lodging voluntarily and without coercion in order for an employer to take advantage of section 3(m). DOL will normally consider the lodging as voluntarily accepted by the employee when living at or near the site of the work is necessary to performing the job. For example, this requirement is typically met when a live-in domestic service employee and the employer have an understanding that the employee will live on the premises as a condition of employment, or when an apartment complex provides a free apartment to the complex manager. In other circumstances, DOL will look for an indication, such as a written agreement, that the employee voluntarily agreed to live in a residence provided by the employer.

**5. Q. What does is mean for lodging to be provided "in compliance with Federal, State, and Local Laws"?**

A. Employers may not include the cost of lodging as part of employees' wages if the lodging provided is in violation of any Federal, State, or local laws, ordinance or prohibition. For example, the DOL will not allow a section 3(m) credit if the lodging provided does not have or has been denied a required occupancy permit or is not zoned for residential use. Similarly, courts have disallowed an employer's use of the section 3(m) credit in circumstances in which lodging was substandard or not compliant with law. DOL will look into any suggestions that employer-provided lodging is substandard such that its condition violates law.

**6. Q. What does it mean for an employee to receive the "primary benefit of the lodging" in the section 3(m) context?**

A. Lodging is ordinarily presumed to be for the primary benefit and convenience of the employee unless there is an indication that the lodging is of little benefit to employees, such as where an employer requires an employee to live on the employer's premises to meet some need of the employer. It's likely that an employer **may not** claim the section 3(m) credit if the employer requires the employee to leave an existing home and live on the employer's premises to be 'on call' to meet the needs of the employer.

**7. Q. When is housing "adequate" for purposes of whether an employer can claim a section 3(m) credit?**

A. Whether the employer has provided an employee with adequate lodging is a factor that may help determine who primarily benefits from the living arrangement and the lodging provided—and therefore whether an employer may take the credit. For example, if an employer provides an employee with private living quarters such as a separate bedroom that is furnished (with, for example, a bed, night table, and dresser) where the employee is able to leave her belongings and spend her off-duty time, those facts are indications (to be considered along with other facts about the arrangement) that the primary beneficiary of the lodging is the employee. Similarly, if the employer provides the employee with access to a kitchen and a private bathroom, such facilities support a finding that the lodging is primarily for the benefit of the employee (although such facilities are not a prerequisite for taking the section 3(m) credit). Such private quarters typically ensure that the employee is able to engage in normal private pursuits as she would in her own home.

**8. Q. How does an employer comply with the requirement to keep accurate records with regard to section 3(m)?**

A. An employer claiming the section 3(m) credit must generally keep two kinds of records: (1) records regarding the cost to the employer of providing the housing and (2) records regarding wage calculations taking lodging into account.

Records regarding the cost to the employer of providing the housing should show how much money the employer spends on the housing, such as proof of mortgage or rental payments and/or utility bills. With respect to *live-in domestic service employees only*, an employer that does not provide such records may claim a certain amount—up to seven and one-half times the statutory minimum hourly wage for each week lodging is furnished, currently $54.38 (7.5 x $7.25)—toward wages rather than the reasonable cost or fair value of the housing provided.

Records regarding wage calculations must show section 3(m) additions to or deductions from wages if those additions or deductions affect the total cash wages owed. Specifically, if because of a section 3(m) credit, an employee receives less in cash wages than the minimum wage for each hour worked in the workweek, the employer must maintain records showing on a workweek basis those additions to or deductions from wages. An employer must also maintain such records if an employee is owed overtime in a workweek and the employer has taken a section 3(m) credit.

**9. Q. How does Section 3(m) apply if a live-in home care worker is a member of a union or subject to a collective bargaining agreement (CBA)?**

A. An employer **may not** include in an employee's wage the cost of lodging if it is excluded under the terms of a bona fide collective bargaining agreement (CBA) applicable to the particular employee. The determination of whether a CBA contains an exclusion of the cost of lodging that would otherwise qualify for a section 3(m) credit will be based upon the written provisions of the CBA.

**10. Q. How do you determine the amount of a section 3(m) credit?**

A. The section 3(m) credit may not exceed the "reasonable cost" or "fair value" of the facilities furnished, whichever is less. If the actual cost to the employer exceeds the rental value of the lodging, or the employer otherwise establishes a "reasonable cost" that appears to be excessive in relation to the facilities furnished, the employer may only count the lower, fair value of the lodging toward wages. Similarly, an employer may only use the fair value of housing as the amount credited toward wages if that amount is equal to or lower than the amount the employer actually pays for the housing.

**11. Q. What is the "reasonable cost" of the facilities?**

A. The "reasonable cost" is not more than the actual cost to the employer of the housing. In other words, "reasonable cost" **does not** include a profit to the employer. The actual cost to an employer of providing lodging to such a worker could be, for example, a portion of the monthly mortgage or rental payment as well as utility payments.

The source of the funds the employer uses to provide the property is not relevant. The actual cost an employer pays may include private money and/or other funds provided to the employer, such as public assistance provided to certain individuals who employ home care workers. For purposes of calculating a section 3(m) credit, it is significant *only* that an employer, rather than the employee or another party that is not an employer, pays for the housing, not how the employer obtained the funds for such payments.

**12. Q. What is the "fair value" of the facilities?**

A. There is no specific formula for determining fair value. DOL may approximate the fair value of lodging by considering average rental prices in the area for similar homes. DOL may estimate these amounts by, for example, using fair market rent data for a particular locality as published by the U.S. Department of Housing and Urban Development, available at http://www.huduser.org/portal/datasets/fmr.html, searching for comparable rental units online, or requesting information from local real estate brokers or other experts. DOL may also consider the reasonable cost of lodging claimed by similarly situated employers if such information is available.

**13. Q. What portion of the cost or value of lodging can be applied as a section 3(m) credit?**

A. The portion of the cost of the residence in which an employee lives that may be counted as part of wages must be a reasonable approximation of the worker's share of the housing. There is no formula for determining the appropriate fraction of the mortgage, rental, or other costs of the lodging that applies to a particular employee; instead, the employer or DOL must take into account the specific circumstances.

**Example 1:** In a large house in which a family of five and a home care worker reside, the amount might most appropriately be determined based on the ratio of the square footage of the employee's bedroom to the square footage of the entire house.

**Example 2:** In an apartment shared by a recipient of home care services and a paid roommate, where the two individuals have equal use of the kitchen and common living spaces, the appropriate amount of a section 3(m) credit might be half of the rental cost of the unit.

**Example 3:** If three agricultural workers are sharing a small cottage provided by the employer, then the appropriate amount of a section 3(m) credit that could properly be counted toward each employee's wages would likely only be one-third of the cost of the cottage.

**14. Q. Once the "reasonable cost" and/or "fair value" is determined, how do you determine if you're in compliance with minimum wage and/or overtime provisions?**

A. To calculate an hourly rate including the section 3(m) credit, the value of the lodging is added to cash wages (excluding overtime compensation) and divided by the hours worked in a given week. The credit goes toward the employer's minimum wage obligation and therefore is included in the determination of the employee's regular rate of pay for purposes of calculating any overtime compensation due.

The value of lodging must be calculated on a workweek-by-workweek basis so it can be added to cash wages for purposes of assessing whether the employer's minimum wage obligation has been met and determining the regular rate of pay upon which any overtime compensation due must be calculated. For example, the weekly reasonable cost can be calculated based on a monthly mortgage or rental amount by multiplying the monthly amount by 12 and dividing by 52. As to costs that vary over time, such as utility bills, DOL will consider the specific costs for the time period covered in an investigation, based on the employer's records, although DOL may in its discretion use (or accept an employer's use of) average amounts, if the approximation is reasonable.

**15. Q. Please provide an example of how to determine if I have met the minimum wage and overtime provisions for a live-in employee.**

**Example 1:** Assume a live-in domestic service employee (including home care workers) receives $6 per hour as well as room and board, for which the reasonable cost is $100 per week. If the employee works 30 hours in a workweek, the $180 ($6 x 30) cash wages is added to the $100 in section 3(m) credit for a total of $280 received in the week, which amounts to a regular rate of $9.33 ($280 / 30) per hour. Assuming the room and board credit is properly taken, this payment structure complies with the federal minimum wage requirement (that an employer pay at least $7.25 per hour).

**Example 2:** If during the following week, the same live-in domestic service employee (including home care workers) worked for 50 hours, the employer's minimum wage obligation would still be met, but the employee may or may not be due additional compensation for the hours worked over 40. Specifically, she would receive $300 ($6 x 50) in cash wages plus $100 in section 3(m) credit for a total of $400, which amounts to a regular rate of pay of $8 ($400 / 50) per hour. If this live-in domestic service employee is employed by an agency or other third party employer, she would be owed an additional $40 ($8 x .5 x 10) in overtime compensation because live-in domestic service employees employed by an agency or other third party employer are entitled to overtime compensation. If the live-in domestic service employee is employed by the consumer (or the consumer's family or household) and not by any agency or other third party, the consumer (or family or household) could claim the live-in domestic service employee overtime exemption and the $400 in compensation would suffice because she would be paid at least the federal minimum wage for each hour worked.

**Note:** If it is determined, after applying the fact-specific economic realities test, that joint employment exists, all joint employers are responsible, both individually and jointly, for compliance with all of the applicable provisions of the act, including the overtime provisions, with respect to the entire employment for the particular workweek. However, the live-in exemption from overtime in this situation, can only be claimed by the consumer (or the consumer's family or household).

**Note:** An employer may not use the section 3(m) credit for the purpose of evading the overtime compensation requirement.

**16. Q. Are employers required to pay a cash wage if they are claiming the 3(m) credit, if the credit covers the federal minimum wage rate?**

A. No. The section 3(m) credit may be the sole payment an employee receives, provided it is sufficient to cover the employer's minimum wage obligation.

For example, a maintenance supervisor at an apartment complex who works for 12 hours per week could be compensated entirely by not being charged rent. If the reasonable cost of his lodging is $500 per month (or $115.38 per week, calculated by multiplying $500 by 12 months and dividing by 52 weeks), and the employer has complied with the requirements for claiming a section 3(m) credit, this arrangement complies with the FLSA because the employee receives a regular rate of $9.62 per hour ($115.38/12).

**17. Q. If joint employment exists, can section 3(m) be claimed by both employers?**

A. If it is determined, after applying the fact-specific economic realities test, that more than one person or entity employs a worker for purposes of the FLSA (that is, that joint employment exists under the FLSA), all employers may take credit toward their joint wage obligation for the housing costs paid by any of them.

For example, a farm owner and a farm labor contractor may jointly employ agricultural workers who receive housing as part of their employment arrangement; in such circumstances, regardless of which employer pays for the housing, provided the section 3(m) credit is properly claimed, the reasonable cost or fair value of the housing may be credited toward the employers' joint FLSA wage obligations.

**Note:** Joint employment is prevalent in the home care industry; a recipient of home care services (consumer) and a private home care agency, or a consumer and a public entity administering a Medicaid-funded home care program, might jointly employ a home care worker. It is not uncommon for a consumer and home care agency to jointly employ a live-in domestic service employee, and for the employee to receive cash wages from the agency and housing from the consumer (such as if the home care agency pays a set amount per hour of work to that employee and the consumer pays rent on an apartment in which the employee and consumer reside). In such circumstances, the amount properly claimed as a section 3(m) credit and the cash wages are combined, as described above, to determine the total wages received for purposes of determining whether the employee has been paid in compliance with the FLSA and calculating any overtime compensation due.

**18. Q. Where can I find more information on 3(m) and/or Home Care?**

For more information about claiming the section 3(m) credit for lodging, see Field Assistance Bulletin No. 2015-1, Credit toward Wages under Section 3(m) of the FLSA for Lodging Provided to Employees.

1. You can visit our website at www.dol.gov/whd; or,
2. Visit our website at www.dol.gov/homecare; or,
3. See the relevant regulations, available online, at 29 CFR Part 531; or
4. Call our toll free number at 1-866-4US-WAGE (866-487-9243).

---

**Footnote**

[1] Detailed information about the Home Care Final Rule, including the regulatory changes it made and the meaning of several terms referenced in these FAQs such as "domestic service employment," "third party employer," and "private home," is available at http://www.dol.gov/whd/homecare/. In particular, the preamble to the Final Rule explains that a "live-in domestic service employee" is a domestic service employee, such as a home care worker or nanny, who resides at the worksite on a "permanent basis" or for "extended periods of time." See 29 C.F.R. § 785.23; FOH § 31b20; 78 Fed. Reg. 60,474.

 Learn more about whether the minimum wage and overtime pay requirements apply to you.

# United States Department of Labor
## Wage and Hour Division
## Wage and Hour Division (WHD)

**U.S. Department of Labor**

Wage & Hour Division
Washington D.C. 20210

December 17, 2015

FIELD ASSISTANCE BULLETIN NO. 2015-1

| | |
|---|---|
| MEMORANDUM FOR: | REGIONAL ADMINISTRATORS<br>DISTRICT DIRECTORS |
| FROM: | Dr. David Weil<br>Wage and Hour Administrator |
| SUBJECT: | Credit toward Wages under Section 3(m) of the FLSA for Lodging Provided to Employees |

This memorandum provides guidance to Wage and Hour Division (WHD) field staff regarding credit toward wages under section 3(m) of the Fair Labor Standards Act (FLSA) for lodging provided to employees. Section 3(m) of the FLSA allows an employer to, under certain circumstances, count as wages "the reasonable cost … to the employer of furnishing such employee with board, lodging, or other facilities." 29 U.S.C. § 203(m). This memorandum explains the requirements for taking the credit, as well as the proper method of accounting for it in calculating wages, when an employer provides lodging to employee.

Although the topics addressed in this memorandum apply broadly, a number of examples specific to live-in domestic service employees appear below because WHD anticipates that many employers of home care workers will make use of the section 3(m) credit now that Federal minimum wage and overtime protections apply to many such workers pursuant to the Home Care Final Rule, Application of the Fair Labor Standards Act to Domestic Service, 78 Fed. Reg. 60,454 (Oct. 1, 2013).[1] WHD emphasizes, however, that Section 3(m) applies in a variety of contexts, and nothing in this FAB is meant to limit an employer's use of section 3(m) under other circumstances in any way.

**Discussion**

Section 3(m) provides, in relevant part, that:

"Wage" paid to any employee includes the reasonable cost, as determined by the Administrator, to the employer of furnishing such employee with board, lodging, or other facilities, if such board, lodging, or other facilities are customarily furnished by such employer to his employees: *Provided*, That the cost of board, lodging, or other facilities shall not be included as a part of the wage paid to any employee to the extent it is excluded therefrom under the terms of a bona fide collective-bargaining agreement applicable to the particular employee: *Provided further*, That the Secretary is authorized to determine the fair value of such board, lodging, or other facilities for defined classes of employees and in defined areas, based on average cost to the employer or to groups of employers similarly situated,

or average value to groups of employees, or other appropriate measures of fair value.

29 U.S.C. § 203(m). The question whether an employer may properly count the value of lodging as a part of an employee's wages can arise in a variety of contexts. For example, some farm workers live in employer-provided housing near the fields in which they work. Additionally, some domestic service workers, such as home care workers or nannies, live at the home in which they provide services.

A. **Requirements for Claiming a Section 3(m) Credit**

Based on the Department's regulations and longstanding interpretation of section 3(m), an employer who wishes to claim the section 3(m) credit for lodging must ensure that the following five requirements are met:

1. The lodging is regularly provided by the employer or similar employers;

2. The employee voluntarily accepts the lodging;

3. The lodging is furnished in compliance with applicable federal, state, or local law;

4. The lodging is provided primarily for the benefit of the employee rather than the employer; and

5. The employer maintains accurate records of the costs incurred in furnishing the lodging.

1. **Lodging Regularly Provided by the Employer or Similar Employers**

Employers may take advantage of section 3(m) only if the lodging is "furnished regularly by the employer to his employees or if the same or similar facilities are customarily furnished by other employers engaged in the same or similar trade, business, or occupation in the same or similar communities." 29 C.F.R. § 531.31 (citing *Walling v. Alaska Pac. Consol. Mining Co.*, 152 F.2d 812 (9th Cir. 1945); Field Operations Handbook (FOH) § 30c02(a)).

Because live-in domestic service employees, for example, often reside at their employers' private homes without paying rent, this requirement is met for those workers. Similarly, agricultural workers are often provided housing during the harvest season by their employers, so this requirement is met for workers under those circumstances as well. Wage and Hour investigators (WHIs) will need to consider whether this requirement is met for other types of employees whose employers claim a section 3(m) credit based on the circumstances presented in the particular investigation.

2. **Voluntary Acceptance**

Employees must accept lodging voluntarily and without coercion in order for an employer to take advantage of section 3(m). 29 C.F.R. § 531.30; *see also* 552.100(b); Wage & Hour Opinion Letter WH 513 (Feb. 24, 1982).[2] WHD will normally consider the lodging as voluntarily accepted by the employee when living at or near the site of the work is necessary to performing the job. For example, this requirement is typically met when a live-in domestic service employee and the employer have an understanding that the employee will live on the premises as a condition of employment, or when an apartment complex provides a free apartment to the complex manager. *See* Wage & Hour Opinion Letter WH 513 (noting that "voluntary acceptance of a job can be construed as voluntary acceptance of the facilities only when the facilities are integral to performing the job (as with room and board for a live-in housekeeper and babysitter) and the employee understood this when accepting the job" (citing *Lopez v. Rodriguez*, 668 F.2d 1376 (D.C. Cir. 1981))); *see also Brock v. Carrion, Ltd.*, 332 F. Supp. 2d 1320, 1325 (E.D. Cal. 2004) (determining that lodging was accepted voluntarily where an apartment manager who lived on-site "does not actually assert that he was coerced" and had signed an employment agreement).[3] In other circumstances, WHIs should look for an indication, such as a written agreement, that the employee voluntarily agreed to live in a residence provided by the employer.

3. **Compliance with Federal, State, and Local Laws**

Employers may not include the cost of lodging as part of employees' wages if the lodging is "in violation of any Federal, State, or local laws, ordinance or prohibition." 29 C.F.R. § 531.31; *see also* FOH § 30c02(b). For example, the WHD will not allow a section 3(m) credit if the lodging provided does not have or has been denied a required occupancy permit or is not zoned for residential use. *See* FOH § 30c02(b). Similarly, courts have disallowed an employer's use of the section 3(m) credit in circumstances in which lodging was substandard or not compliant with law. *See, e.g., Soler v. G & U, Inc.*, 768 F. Supp. 452, 465-66 (S.D.N.Y. 1991) (holding that an employer could not take advantage of section 3(m) because migrant farm workers' camp was operated in violation of the relevant state permit due to overcrowding); *Osias v. Marc*, 700 F. Supp. 842, 845 (D. Md. 1988) ("Because the Department of Labor's investigative report found the housing to be seriously substandard, the employer may not credit the cost of furnishing the facilities against minimum wage obligations."); *Strong v. Williams*, No. 78-124-Civ-TG, 1980 WL 8134, at *4, 5 (M.D. Fla. April 22, 1980) (holding that an employer could not claim credit for housing provided to migrant farm workers when the employer was "not authorized to house migrant workers under 7 U.S.C. § 2044(a)(4)," the Federal Farm Labor Contractors Registration Act).

WHIs should be aware of and look into any suggestions that employer-provided lodging is substandard such that its condition violates law.

### 4. Primary Beneficiary

An employer may not include the cost of lodging in an employee's wages unless the employee receives the primary benefit of the lodging. *See* 29 C.F.R. § 531.3(d)(1); *see also* FOH § 30c01(c); *Ramos-Barrientos v. Bland*, 661 F.3d 587, 595-98 (11th Cir. 2011) (accepting as consistent with statutory and regulatory texts the Secretary's position that lodging must primarily benefit the employee in order for a wage credit to be taken). Lodging is ordinarily presumed to be for the primary benefit and convenience of the employee. *See* FOH § 30c03(a) (2).[4] But this presumption is rebutted in circumstances in which lodging is "of little benefit to employees," such as "where an employer requires an employee to live on the employer's premises to meet some need of the employer." *Id; see also Soler v. G. & U., Inc.*, 833 F.2d 1104, 1110 (2d Cir. 1987) (explaining that "in appropriate circumstances, … the presumption [that housing facilities may be included in wages under section 3(m)] is subject to challenge and rebuttal under the Regulation's balancing of benefits standard" and that if housing "is not a benefit running primarily to the employee, but rather a burden imposed upon the employee in furtherance of the employer's business," the housing may not be included in the employee's wage).[5]

In particular, an employer may not claim the section 3(m) credit if "the employer requires the employee to leave an existing home and live on the employer's premises to be 'on call' to meet the needs of the employer." Wage & Hour Opinion Letter FLSA-1331 (Nov. 5, 1996); *see also Soler*, 833 F.2d at 1110-11 (holding that, among other factors, where workers "were not required to live on the farms as a condition of employment" and "were not 'on call,'" a determination that housing was for their benefit was not arbitrary and capricious).

WHIs must consider the nature of the employment relationship and review the specific circumstances of each case to determine whether the lodging provided is primarily for the benefit of the employee. In the case of live-in domestic service employees, the Department recognizes that such employees typically are not working all of the time that they are on the premises of their employer and, ordinarily, they may at times engage in normal private pursuits, such as sleeping, eating, watching television, or reading a book and may leave the premises if they choose. 29 C.F.R. § 785.23; 29 C.F.R. § 552.102(a). There are, however, scenarios in the home care context in which an employee lives with a recipient of home care services in order to provide assistance throughout the day and/or night. Although the acuity level of the recipient of services does not determine whether the lodging is for the benefit of the employer or the

employee, the employer's demands on an employee's time is relevant to a determination of who primarily benefits from the employee's living at the residence. In other words, whether the employer has provided a live-in domestic service employee with specific time periods during which the employee is completely relieved from duty and which are long enough to enable the employee to use the time effectively for her own purposes (*i.e.*, has provided bona fide off-duty time) is one factor that may help determine who primarily benefits from the living arrangement and the lodging provided. For example, if a college student moved into the extra bedroom in a home owned by an 80-year-old man to provide him assistance with bathing and dressing for two hours in the mornings and preparing for sleep for one hour each night, but the student was otherwise free to spend her time as she pleased, those facts would weigh in favor of a finding that the lodging was primarily for the benefit of the employee. Similarly, if a property management company provided a plumber with a reduced-rent apartment in one of its complexes in exchange for the plumber being available two weekends per month for emergency calls, that factual scenario would weigh in favor of a finding that the lodging was provided primarily for the benefit of the employee.

As explained, however, if the employer's demands on an employee's time are so great or constant that the employee is working or is "engaged to wait" while on the premises, particularly overnight in the domestic service context, these facts would likely support a finding that the lodging is primarily for the benefit of the employer. Therefore, where an employee provides round-the-clock care, or if the employee's sleep or off-duty time is regularly interrupted to perform work for the employer, the lodging typically will be deemed as primarily for the benefit of the employer. In such circumstances, a section 3(m) credit for the lodging will not be permissible (recognizing, however, that circumstances can change over time and the credit may be available at a later date). These circumstances could arise, for example, in the case of a live-in nanny who tends to a baby throughout the night, a home health aide who serves an individual with a health condition that requires her to have constant assistance, including overnight, or a handyman who provides services to the apartment complex in which he resides who is constantly responding to emergency calls during his off-duty hours.

Whether the employer has provided an employee with adequate lodging is another factor that may help determine who primarily benefits from the living arrangement and the lodging provided. For example, if an employer provides an employee with private living quarters such as a separate bedroom that is furnished (with, for example, a bed, night table, and dresser) where the employee is able to leave her belongings and spend her off-duty time, this factor weighs in favor of a finding that the primary beneficiary of the lodging is the employee. Similarly, if the employer provides the employee with access to a kitchen and a private bathroom, such facilities support a finding that the lodging is primarily for the benefit of the employee (although such facilities are not a prerequisite for taking the section 3(m) credit). Such private quarters typically ensure that the employee is able to engage in normal private pursuits as she would in her own home. Even when the employee is provided private living quarters, however, lodging will typically be deemed primarily for the employer's benefit if the employee is "on-call" 24 hours a day or his or her sleep and off-duty time is regularly interrupted. If an employee is only provided a cot or couch to sleep on in a living space shared with the employer, this fact would suggest that the employee is not provided adequate off-duty time or is unable to use such time as she chooses and therefore that the lodging is primarily for the benefit of the employer.

5. **Accurate Recordkeeping**

*Records substantiating the cost of furnishing lodging.* Pursuant to the FLSA recordkeeping regulations, in order to take a wage credit under section 3(m), an employer must maintain accurate records of the costs incurred in furnishing lodging to the employee. *See* 29 C.F.R. § 516.27(a); *see also* 29 C.F.R. § 552.100(d); Wage & Hour Opinion Letter, 1994 WL 1004832 (June 1, 1994); FOH § 30c05(a). These records "shall include itemized accounts showing the nature and amount of any expenditures entering into the computation of the reasonable cost."

Defs.' Appx. 00001115

29 C.F.R. § 516.27(a)(1). For example, records could include proof of mortgage or rental payments and utility bills. If an employer does not provide records to support its claim of a section 3(m) lodging credit, the employer has not met this prerequisite for including lodging costs in employees' wages.[6]

With respect to live-in domestic service employees only, an employer that does not provide such records may claim a certain amount—up to seven and one-half times the statutory minimum hourly wage for each week lodging is furnished, currently $54.38 (7.5 x $7.25)—toward wages rather than the reasonable cost or fair value of the housing provided. 29 C.F.R. § 552.100(d).

*Records regarding wage calculations.* The Department's regulations require an employer to keep records showing section 3(m) additions to or deductions from wages if those additions or deductions affect the total cash wages owed. *See* 29 C.F.R. § 516.27(b). Specifically, if because of a section 3(m) credit, an employee receives less in cash wages than the minimum wage for each hour worked in the workweek, the employer "shall maintain records showing on a workweek basis those additions to or deductions from wages." *Id.* An employer must also maintain such records if an employee is owed overtime in a workweek and the employer has taken a section 3(m) credit. *Id.*

A number of courts have denied employers' attempts to claim a section 3(m) credit in circumstances in which those employers have not maintained proper records of costs or wage calculations. *See, e.g., Caro-Galvan v. Curtis Richardson, Inc.*, 993 F.2d 1500, 1514 (11th Cir. 1993) (reversing a district court's dismissal of workers' claims of minimum wage violations because deductions for the cost of housing and utilities are impermissible when employer has failed to comply with the recordkeeping provisions of the FLSA and thus cannot substantiate the alleged reasonable cost of the housing provided (citing *Marshall v. DeBord*, No. 77-106-C, 1978 WL 1705 (E.D. Okla. July 27, 1978))); *Donovan v. Williams Chem. Co.*, 682 F.2d 185, 189-90 (9th Cir. 1982) (reversing a district court's allowance of a section 3(m) credit for housing because "[t]he employer has the obligation, under the regulations, to keep records concerning costs" and that burden does not shift in the absence of evidence of the cost of the housing (citing *Donovan v. New Floridian Hotel, Inc.*, 676 F.2d 468 (11th Cir. 1982))); *Chao v. Min Fang Yang*, No. 05–2563, 2007 WL 7209596, at *6 (W.D. Tenn. Aug. 13, 2007) (prohibiting employer from taking a section 3(m) credit where the employer "failed to make or keep records as required by 29 C.F.R. § 516.27 with respect to the cost of providing meals and lodging, or the requirement of maintaining records of any deductions claimed on a weekly basis"); *Carrion, LTD.*, 332 F. Supp. 2d at 1326-27 (holding that an employer could not use section 3(m) to offset backwages owed for FLSA violations because the employer failed to produce documentation demonstrating the cost of providing employee with lodging, and explaining that an agreement to charge employees a certain amount of rent did not satisfy this requirement).

## B. **Collective Bargaining Agreements**

An employer may not include in an employee's wage the cost of lodging "to the extent it is excluded therefrom under the terms of a bona fide collective bargaining agreement [(CBA)] applicable to the particular employee." 29 C.F.R. § 531.6(a); *see also* 29 U.S.C. § 203(m); FOH § 30c01(b). The determination of whether a CBA contains an exclusion of the cost of lodging that would otherwise qualify for a section 3(m) credit "will be based upon the written provisions" of the CBA. FOH § 30c01(b).

In the course of an investigation, the WHI should determine whether the employee is a member of a union or subject to a CBA. For example, some live-in home care workers are parties to CBAs with the State administering the Medicaid-funded program through which they are employed. If so, the WHI should obtain a copy of the CBA to determine whether it prohibits the employer from claiming a section 3(m) lodging credit.

## C. **Application of a Section 3(m) Credit**

If an employer satisfies the five requirements for claiming the section 3(m) credit and the value of the

facilities furnished is not excluded from wages pursuant to a CBA, the amount claimed must comply with statutory and regulatory guidelines, and the employee's wages must be properly calculated.

### D. **Reasonable Cost or Fair Value**

The section 3(m) credit may not exceed the "reasonable cost" or "fair value" of the facilities furnished, whichever is less. 29 U.S.C. § 203(m); FOH § 30c01(a).

*Reasonable cost.* In this context, "reasonable cost" is "not more than the actual cost to the employer of the board, lodging, or other facilities customarily furnished by him to his employees." 29 C.F.R. § 531.3(a); *see also* FOH § 30c05(a). In other words, "reasonable cost" "does not include a profit to the employer or to any affiliated person." 29 C.F.R. § 531.3(b).[7] The actual cost to an employer of providing lodging to such a worker could be, for example, a portion of the monthly mortgage or rental payment as well as utility payments. *See, e.g.*, FOH § 30c06(d)(2) ("When the employer leases a property from another person, the amount of rent paid by the employer to the other person is considered part of the 'reasonable cost' provided that the rent charged provides no profit for the employer, directly or indirectly.").[8]

The source of the funds the employer uses to provide the property is not relevant. The actual cost an employer pays may include money from the employer's savings or income and/or other funds provided to the employer, such as public assistance provided to certain individuals who employs home care workers. For purposes of calculating a section 3(m) credit, it is significant only that an employer, rather than the employee or another party that is not an employer, pays for the housing, not how the employer obtained the funds for such payments.

The portion of the cost of the residence in which an employee lives that may be counted as part of wages must be a reasonable approximation of the worker's share of the housing. *See* FOH § 30c06(d)(3) (explaining that the cost of lodging is to be divided among the employees living in a particular facility based on the amount of space provided to each employee). There is no formula for determining the appropriate fraction of the mortgage, rental, or other costs of the lodging that applies to a particular employee; instead, the employer or WHI must take into account the specific circumstances. For example, in a large house in which a family of five and a home care worker reside, the amount might most appropriately be determined based on the ratio of the square footage of the employee's bedroom to the square footage of the entire house. On the other hand, in an apartment shared by a recipient of home care services and a paid roommate, where the two individuals have equal use of the kitchen and common living spaces, the appropriate amount of a section 3(m) credit might be half of the rental cost of the unit. Similarly, if three agricultural workers are sharing a small cottage provided by the employer, then the appropriate amount of a section 3(m) credit that could properly be counted toward each employee's wages would likely only be one-third of the cost of the cottage.

Additionally, reasonable cost is to be calculated on a workweek-by-workweek basis so it can be added to cash wages for purposes of assessing whether the employer's minimum wage obligation has been met and determining the regular rate of pay upon which any overtime compensation due must be calculated, as described below. *See* FOH § 30c06(d)(3) (explaining that it is necessary to determine the "weekly reasonable cost"). The weekly reasonable cost can be calculated based on a monthly mortgage or rental amount by multiplying the monthly amount by 12 and dividing by 52. As to costs that vary over time, such as utility bills, a WHI should consider the specific costs for the time period covered in an investigation, based on the employer's records, although the WHI may in his or her discretion use (or accept an employer's use of) average amounts, if the approximation is reasonable.

The employer bears the burden of establishing, with records, the reasonable cost of lodging. 29 C.F.R. § 516.27; FOH § 30c05(a). Records of mortgage payments, a rental agreement and records of rent checks, or utility bills, for example, suffice as bases for actual cost calculations. In addition, records regarding sources of public assistance to the employer used to pay for housing, such as records regarding Housing Choice Vouchers, may be among the records used to fulfill this requirement. As noted above, an employer of a live-in domestic service employee that does not provide records is subject to an exception to this general rule: the employer may claim up to seven and one-half times the statutory minimum hourly wage, currently $7.25, for

Defs.' Appx. 00001117

each week lodging is furnished toward wages. 29 C.F.R. § 552.100(d). In other words, in the absence of records, the employer may credit for lodging no more than $54.38 (7.5 x $7.25) per week to the wages if the employee is a live-in domestic service employee.

*Fair value.* Section 3(m) of the FLSA gives the Secretary authority to determine the "fair value" of lodging for purposes of an employer's claiming the section 3(m) credit. 29 C.F.R. § 531.2(a); FOH § 30c01(a). If the actual cost to the employer exceeds the rental value of the lodging, 29 C.F.R. § 531.3(c); FOH § 30c06(c), or the employer otherwise establishes a "reasonable cost" that "appears to be excessive in relation to the facilities furnished," FOH § 30c01(a), the employer may only count the lower fair value of the lodging toward wages.

As with assessments of reasonable cost, there is no formula for determining fair value. WHIs may approximate the fair value of lodging by considering average rental prices in the area for similar homes. Investigators may estimate these amounts by, for example, using fair market rent data for a particular locality as published by the U.S. Department of Housing and Urban Development, available at http://www.huduser.org/portal/datasets/fmr.html, searching for comparable rental units online, or requesting information from local real estate brokers or other experts. Investigators may also consider the reasonable cost of lodging claimed by similarly situated employers if such information is available.

Because an employer may not profit from the section 3(m) credit, an employer may only use the fair value of housing as the amount credited toward wages if that amount is equal to or lower than the amount the employer actually pays for the housing.

## E. **Wage Calculations**

To calculate an hourly rate including the section 3(m) credit, the value of the lodging is added to cash wages (excluding overtime compensation) and divided by the hours worked in a given week. The credit goes toward the employer's minimum wage obligation and therefore is included in the determination of the employee's regular rate of pay for purposes of calculating any overtime compensation due. *See* 29 C.F.R. § 531.37(b) ("Where deductions are made from the stipulated wage of an employee, the regular rate of pay is arrived at on the basis of the stipulated wage before any deductions have been made. Where board, lodging, or other facilities are customarily furnished as additions to a cash wage, the reasonable cost of the facilities to the employer must be considered as part of the employee's regular rate of pay."); 29 C.F.R. § 778.116 ("Where … an employer furnishes lodging to his employees in addition to cash wages the reasonable cost or the fair value of the lodging (per week) must be added to the cash wages before the regular rate is determined."); FOH § 30c01(c) ("[T]he reasonable cost to the employer of furnishing board, lodging, or other facilities (or the fair value thereof) must be included in the employee's [regular rate] of pay for the purposes of computing [overtime] pay.").

An employer's claiming the section 3(m) credit only in overtime weeks, or in a greater amount in overtime weeks, is cause for suspicion. 29 C.F.R. § 531.37. An employer may not use the section 3(m) credit for the purpose of evading the overtime compensation requirement. *Id.*

For example, assume a live-in domestic service employee receives $6 per hour as well as room and board, for which the reasonable cost is $100 per week. If the employee works 30 hours in a workweek, the $180 ($6 x 30) cash wages is added to the $100 in section 3(m) credit for a total of $280 received in the week, which amounts to a regular rate of $9.33 ($280 / 30) per hour. Assuming the room and board credit is properly taken, this payment structure complies with the federal minimum wage requirement (that an employer pay at least $7.25 per hour).[9]

If during the following week, the same live-in domestic service employee worked for 50 hours, the employer's minimum wage obligation would still be met, but the employee, if not exempt from the overtime requirement,[10] would be due overtime compensation of one and a half times her regular rate of pay for each hour worked over 40. Specifically, she would receive $300 ($6 x 50) in cash wages plus $100 in section 3(m) credit for a total of $400, which amounts to a regular rate of $8 ($400 / 50) per hour. Her third party

employer would then owe her an additional $40 ($8 x .5 x 10) in overtime compensation.

The section 3(m) credit may also be the sole payment an employee receives, provided it is sufficient to cover the employer's minimum wage obligation. *See* 29 C.F.R. § 531.36(a) ("Deductions for board, lodging, or other facilities may be made in nonovertime workweeks even if they reduce the cash wage below the minimum wage."). For example, a maintenance supervisor at an apartment complex who works for 12 hours per week could be compensated entirely by not being charged rent. If the reasonable cost of his lodging is $500 per month (or $115.38 per week, calculated by multiplying $500 by 12 months and dividing by 52 weeks), and the employer has complied with the section 3(m) requirements described above, this arrangement complies with the FLSA because the employee receives a regular rate of $9.62 per hour ($115.38 / 12).

Furthermore, section 3(m) applies to lodging furnished by the employer as compensation to an employee regardless of whether the employer calculates charges for such lodging as additions to or deductions from wages. 29 C.F.R. § 531.29. In other words, it is not relevant for purposes of calculating an employee's wages whether the employee has received housing free of charge (additions to cash wages) or has paid rent as a deduction from a paycheck or otherwise (deductions from wages).[11]

### F. **Joint Employment**

As a general matter, under the FLSA any worker may be jointly employed by more than one employer. 29 C.F.R. § 791.2(a); *see also Baystate Alternative Staffing, Inc. v. Herman*, 163 F.3d 668, 675 (1st Cir. 1998) ("The FLSA contemplates several simultaneous employers, each responsible for compliance with the Act."). If it is determined, after applying the fact-specific economic realities test, that joint employment exists, then both or all employers will be jointly and severally liable for compliance with the FLSA. 29 C.F.R. § 791.2(a). In such circumstances, all employers may take credit toward their joint wage obligation for housing costs paid by any of them. *See id.* ("[A]ll joint employers are responsible, both individually and jointly, for compliance with all of the applicable provisions of the act, including the overtime provisions, with respect to the entire employment for the particular workweek. In discharging the joint obligation each employer may, of course, take credit toward minimum wage and overtime requirements for all payments made to the employee by the other joint employer or employers."). For example, a farm owner and a farm labor contractor may jointly employ agricultural workers who receive housing as part of their employment arrangement; in such circumstances, regardless of which employer pays for the housing, provided all of the requirements described above are met, the reasonable cost or fair value of the housing may be credited toward the employers' joint FLSA wage obligations.

Joint employment is prevalent in the home care industry; a recipient of home care services (consumer) and a private home care agency, or a consumer and a public entity administering a Medicaid-funded home care program, might jointly employ a home care worker.[12] It is not uncommon for a consumer and home care agency to jointly employ a live-in domestic service employee, and for the employee to receive cash wages from the agency and housing from the consumer (such as if the home care agency pays a set amount per hour of work to that employee and the consumer pays rent on an apartment in which the employee and consumer reside). In such circumstances, the amount properly claimed as a section 3(m) credit and the cash wages are combined, as described above, to determine the total wages received for purposes of determining whether the employee has been paid in compliance with the FLSA and calculating any overtime compensation due.[13]

Conclusion

If an employer claims a section 3(m) credit for lodging provided to an employee, the WHI must conduct a detailed analysis that includes interviews and a review of all necessary records to determine if the requirements described above are met and if so, the appropriate amount of the credit.

Please contact Derrick Witherspoon, Chief, Branch of FLSA/Child Labor at (202) 693-0715 with any questions.

---

[1]  Detailed information about the Home Care Final Rule, including the regulatory changes it made and the meaning of several terms used in this FAB, such as "domestic service employment," "third party employer," and "private home," is available at http://www.dol.gov/whd/homecare/. In particular, the preamble to the Final Rule explains that a "live-in domestic service employee," a term used frequently in this document, is a domestic service employee, such as a home care worker or nanny, who resides at the worksite on a "permanent basis" or for "extended periods of time." *See* 29 C.F.R. § 785.23; FOH § 31b20; 78 Fed. Reg. 60,474.

[2]  Several courts have rejected the WHD's position, expressed in 29 C.F.R. § 531.30, that employees must voluntarily accept meals instead of cash wages for the employer to properly count toward its minimum wage obligation the reasonable cost or fair value of those meals. *See, e.g., Herman v. Collis Foods, Inc.*, 176 F.3d 912, 916-18 (6th Cir. 1999); *Donovan v. Miller Properties, Inc.*, 711 F.2d 49, 50 (5th Cir. 1983); *Davis Bros., Inc. v. Donovan*, 700 F.2d 1368, 1369-72 (11th Cir. 1983). Accordingly, the WHD "no longer enforces the 'voluntary' provision" of 29 C.F.R. § 531.30 "with respect to meals." FOH § 30c09(b) ("Therefore, where an employee is required to accept a meal provided by the employer as a condition of employment, [the WHD] will take no enforcement action, provided that the employer takes credit for no more than the actual cost incurred.").

[3]  This presumption of voluntariness can, of course, be overcome, such as in cases involving coercion. *See Lopez*, 668 F.2d at 1380 (explaining that "even where an employee voluntarily and knowingly accepts a job which, by its nature, requires board and lodging in the employer's home, an employer may impose 'coercive' conditions—that is, conditions so onerous and restrictive that the employee's continued employment and acceptance of the board and lodging ceases to be voluntary"); *Marshall v. Intraworld Commodities Corp.*, No. 79 C 918, 1980 WL 2097, at *4 (E.D.N.Y. June 9, 1980) (rejecting an employer's claim of section 3(m) credit because the employee, brought from outside the United States and made to work six or seven days a week at his employer's home and office, "had no other place to live and no choice but to accept the food and facilities provided to him" and therefore the voluntary acceptance requirement was not met). Although such circumstances are not the norm, WHIs are advised to be attentive to any signs that the presumption of voluntariness is not applicable in a particular case.

[4]  In contrast, the primary benefit requirement typically prohibits employers from claiming certain other types of expenses as part of wages pursuant to section 3(m). Specifically, an employer's business expenses, such as tools of the trade, other materials and services incidental to carrying on the employer's business, utilities, taxes and insurance, business-related travel expenses, and uniforms required by the nature of the business, are primarily for the convenience of the employer. 29 C.F.R. § 531.3(d); FOH § 30c04. Furthermore, expenses imposed on the employer by law are for the primary benefit of the employer. Wage & Hour Opinion Letter, 1997 WL 998029 (Aug. 19, 1997) (explaining that "an employer may not take credit for facilities which the employer is required by law or regulation to provide"); *see also Bland*, 661 F.3d at 595-98 (accepting the Department's position that the cost of housing provided to employees on H-2A visas was primarily for the benefit of the employer, and thus could not be credited as part of wages under section 3(m), because regulations required that employers provide housing free of charge to H-2A workers).

[5]  Lodging will also be considered for the primary benefit of the employer if "the employee must travel away from home to further the employer's business." FOH § 30c03(a)(2). For example, hotel or other expenses incurred when an employer requires an employee to travel with the employer (such as if a home health aide accompanies an individual with disabilities to a work conference across the country or a nanny accompanies her employer's family on vacation to provide child care services) may not be included as part of wages under section 3(m). Similarly, lodging would be considered to be for the primary benefit of the employer if an employee of a chain of retail stores incurs lodging expenses because she was required to travel to a store in another state in order to train new employees at that location.

[6]  An exception applies in circumstances in which the amount of any possible section 3(m) credit is not relevant: if in any workweek an employee whose employer furnishes lodging to her receives at least the minimum wage in cash and is not owed any overtime compensation, her employer is not required to keep records of the value of the lodging as to that workweek. 29 C.F.R. § 516.27(c).

[7]  Whether an individual is an "affiliated person" depends upon the facts of the situation, although "[a] spouse, child, parent, or other close relative of the employer," "a partner, office, or employee in the employer company or firm," "a parent, subsidiary, or otherwise closely connected corporation" or "an agent of the employer" who furnishes lodging will be deemed an "affliated person." 29 C.F.R. § 531.33(b).

[8]  In the domestic service context, if a person receiving services owns the home in which he and his employee live and therefore makes no mortgage or rental payment, the section 3(m) credit could be for the cost of paying property taxes, utilities, and other necessary costs of maintaining the home.

[9]  This example also appears in Administrator's Interpretation No. 2014-1, available at http://www.dol.gov/whd/opinion/adminIntrprtn/FLSA/2014/FLSAAI2014_1.pdf, which addresses the application of the FLSA to shared living arrangements for the provision of home care services.

[10]  If a live-in domestic service employee is solely employed by the recipient of services (or that person's family or household member), no overtime compensation is due because the sole employer may claim the live-in domestic service employee exemption from the Act's overtime requirements. 29 U.S.C. § 213(b)(21); 29 C.F.R. § 552.102, .109(c).

[11]  When an employee is reimbursed for expenses incurred on behalf of his or her employer, however, such payments are not considered to be compensation for hours worked. Such payments therefore do not count toward wages under section 3(m) (and are excluded from the regular rate for purposes of overtime calculations).

[12]  Administrator's Interpretation No. 2014-2, available at http://www.dol.gov/WHD/opinion/adminIntrprtn/FLSA/2014/FLSAAI2014_2.pdf, addresses joint employment by public entities of home care workers employed through consumer-directed programs, a home care services delivery model funded by Medicaid.

[13]  In circumstances involving a live-in domestic service employee, joint employers can have different wage obligations, because those receiving home care services and their families or households may take advantage of the live-in domestic service employee exemption from the FLSA's overtime compensation requirement, but any third party employer may not. *See* 29 C.F.R. § 552.109(c). Nevertheless, any contribution toward wages the consumer (or the consumer's family or household) has made, including by paying for lodging provided to the employee, may be counted toward the third party employer's wage obligation.

# Chapter 10

## FLSA COVERAGE: EMPLOYMENT RELATIONSHIP, STATUTORY EXCLUSIONS, GEOGRAPHICAL LIMITS

> **Source: FOH Modernization revision 677, published 03/31/2016. Substantive revisions made *after* 03/31/2016 are noted at the end of affected provisions below. Historical information on revisions published *prior to* 03/31/2016 can be found at the link beside this chapter at www.dol.gov/whd/foh.**

## Table of Contents

**10a**     **GENERAL**

    10a00     Purpose of chapter.

**10b**     **THE EMPLOYMENT RELATIONSHIP**

    10b00     Employment relationship required for FLSA to apply.
    10b01     FLSA employment relationship distinguished from the common law concept.
    10b02     Method of compensation not material.
    10b03     Religious, charitable, and nonprofit organizations, schools, institutions, volunteer workers, members of religious orders.
    10b04     Employer asserts homework performed by independent contractor.
    10b05     Test of the employment relationship: "suffer or permit."
    10b06     Misclassification of employees as independent contractors: applying the economic realities factors.
    10b07     Facts that are not relevant to the ultimate determination of the worker's status.
    10b08     Effect of sale on the employment relationship.
    10b09     Subject-matter of the employment relationship.
    10b10     Effect of determination of the employment relationship.
    10b11     Trainees and student-trainees.
    10b12     Government-sponsored employment development programs.
    10b13     Employer identification numbers issued by Internal Revenue Service.
    10b14     Students training in skilled paramedical occupations: nurses, x-ray technicians, etc.
    10b15     Golf course caddies.
    10b16     Special duty nurses or sitters in hospitals and nursing homes.
    10b17     Newspaper area correspondents or stringers.
    10b18     Graduate students: research assistants.
    10b19     Externs.
    10b20     Administrative residents in hospitals.
    10b21     Student observers in hotels and motels.
    10b22     Job Corps enrollees.
    10b23     School employees: after hours work.
    10b24     University or college students.
    10b25     Fraternal orders: officers and volunteers.
    10b26     School-related work programs.
    10b27     Prison inmates.
    10b28     Jurors.
    10b29     Foster parents.
    10b30     Volunteers under the Domestic Volunteer Services Act of 1973.

| 10b31 | Government activities: volunteer services. |
| 10b32 | Government-financed child care services. |
| 10b33 | Election judges and officials. |
| 10b34 | Patient workers. |
| 10b35 | Residential drug abuse and alcohol treatment programs. |
| 10b36 | Veterans making artificial poppies. |
| 10b37 | Pharmaceutical externs and interns. |
| 10b38 | Programs for youthful or first-time offenders designed as an alternative to incarceration. |
| 10b39 | Drying out period for alcoholics in sheltered workshops (SWS). |
| 10b40 | Welfare/workfare programs. |

**10c**       **TYPES OF EMPLOYERS**

| 10c00 | Scope of the term "employer." |
| 10c01 | A partnership as an employer. |
| 10c02 | Cooperatives as employers. |
| 10c03 | Corporations as employers. |
| 10c04 | Excluded employers. |
| 10c05 | Political subdivisions of a state. |
| 10c06 | Status of contractors with a government. |
| 10c07 | Federal Reserve Bank employees. |
| 10c08 | Farm Credit Administration Banks and Associations. |
| 10c09 | Status of state-sponsored workshops. |
| 10c10 | Status of foreign governments. |
| 10c11 | States and political subdivisions: single employers. |
| 10c12 | Community action agency. |

**10d**       **TYPES OF EMPLOYEES**

| 10d00 | Scope of the term "employee." |
| 10d01 | Employees of the Library of Congress. |
| 10d02 | Employees of the United States. |
| 10d03 | Suits by federal, state, and local government employees under section 16(b). |
| 10d04 | (Reserved.) |
| 10d05 | Member of the elected official's personal staff. |
| 10d06 | National Guard technicians. |

**10e**       **GEOGRAPHICAL LIMITS**

| 10e00 | Geographical limits of FLSA. |
| 10e01 | FLSA application to employees performing duties both in the U.S. and foreign countries such as Canada, Mexico, or Panama. |
| 10e02 | Employees in foreign countries. |

**10f**       **JOINT EMPLOYMENT**

| 10f00 | General. |
| 10f01 | Scope of employment and joint employment under FLSA and MSPA. |
| 10f02 | Types of joint employment. |
| 10f03 | Horizontal joint employment. |

**CHAPTER 10 TABLE OF CONTENTS**

10f04        Vertical joint employment.
10f05        Joint employment and enterprise coverage are different.
10f06        Joint employment and individual liability are different.
10f07        Joint employment and joint responsibility under the MSPA are different.

## 10a        GENERAL

### 10a00        Purpose of chapter.

FOH chapter 10 contains interpretations regarding the employment relationship required for the Fair Labor Standards Act (FLSA or Act) to apply, the geographical limits of the Act's applicability, and employment which is specifically excluded from coverage under the Act. These coverage concepts are equally applicable to activities which constitute engagement in or production for interstate or foreign commerce and to employment in an enterprise described in section 3(s).

## 10b        THE EMPLOYMENT RELATIONSHIP

### 10b00        Employment relationship required for FLSA to apply.

In order for the FLSA to apply there must be an employer-employee relationship. This requires an "employer" and "employee" and the act or condition of employment. FLSA sections 3(d), (e), and (g) define the terms "employer," "employee," and "employ."

### 10b01        FLSA employment relationship distinguished from the common law concept.

The courts have made it clear that the employment relationship under the FLSA is broader than the traditional common law concept of the master and servant relationship.  The difference between the FLSA employment relationship and the common law employment relationship arises from the FLSA statement that "*[E]mploy* includes to suffer or permit to work." The courts have indicated that, while "to permit" requires a more positive action than "to suffer," both terms imply much less positive action than required by the common law. Mere knowledge by an employer of work done for him or her by another is sufficient to create the employment relationship under the FLSA.

### 10b02        Method of compensation not material.

The fact that no compensation is paid and the worker is dependent entirely on tips does not negate his/her status as an employee, if other indications of employment are present.  If the worker is paid, the fact that he or she is paid by the piece or by the job or on a percentage or commission basis rather than on the basis of work time does not preclude a determination that the worker is, on the facts, an employee with respect to the work for which such compensation is received.

### 10b03        Religious, charitable, and nonprofit organizations, schools institutions, volunteer workers, members of religious orders.

(a)        There is no special provision in the FLSA which precludes an employer-employee relationship between a religious, charitable or nonprofit organization and persons who perform work for such an organization.  For example, a church or religious order may operate an establishment to print books, magazines, or other publications and employ a regular staff

who does this work as a means of livelihood.  In such cases there is an employer-employee relationship for purposes of the Act.

**(b)**   Persons such as nuns, monks, priests, lay brothers, ministers, deacons, and other members of religious orders who serve pursuant to their religious obligations in the schools, hospitals, and other institutions operated by their church or religious order shall not be considered to be "employees."  However, the fact that such a person is a member of a religious order does not preclude an employer-employee relationship with a state or secular institution.

**(c)**   In many cases the nature of religious, charitable, and similar nonprofit organizations and schools is such that individuals may volunteer their services in one capacity or another, usually on a part-time basis, not as employees or in contemplation of pay for the services rendered.  For example, members of civic organizations may help out in a sheltered workshop; women's organizations may send members or students into hospitals or nursing homes to provide certain personal services for the sick or the elderly; mothers may assist in a school library or cafeteria as a public duty to maintain effective services for their children; or fathers may drive a school bus to carry a football team or band on a trip.  Similarly, individuals may volunteer to perform such tasks as driving vehicles or folding bandages for the Red Cross; working with children with disabilities or disadvantaged youth; helping in youth programs as camp counselors, scoutmasters, or den mothers; providing child care assistance for needy working mothers; soliciting contributions or participating in benefit programs for such organizations; and volunteering other services needed to carry out their charitable, educational, or religious programs.  The fact that services are performed under such circumstances is not sufficient to create an employer-employee relationship.

**(d)**   Although the volunteer services (as described in (c) above) are not considered to create an employment relationship, the organizations for which they are performed will generally also have employees performing compensated services whose employment is subject to the standards of the Act.  Where such an employment relationship exists, the Act requires payment of not less than the statutory wages for all hours worked in the workweek.  However, there are certain circumstances where such an employee may donate services as a volunteer, and the time so spent is not considered to be compensable work.  For example, an office employee of a hospital may volunteer to sit with a sick child or elderly person during off-duty hours as an act of charity.  The Wage and Hour Division (WHD) will not consider that an employer-employee relationship exists with respect to such volunteer time between the establishment and the volunteer or between the volunteer and the person for whose benefit the service is performed.  Another example is where an office employee of a church may volunteer to perform non-clerical services in the church preschool during off-duty time from his or her office work as an act of charity.  Conversely, a preschool employee may volunteer to perform work in some other facet of the church's operations without an employment relationship being formed with respect to such volunteer time.  However, this does not mean that a regular office employee of a charitable organization can volunteer services on an uncompensated basis to handle correspondence in connection with a special fund drive or to handle other work arising from exigencies of the operations conducted by the employer.

**(e)**   As part of their overall educational program, public or private schools and institutions of higher learning may permit or require students to engage in activities in connection with dramatics, student publications, glee clubs, bands, choirs, debating teams, radio stations, intramural and interscholastic athletics and other similar endeavors.  Activities of students in such programs, conducted primarily for the benefit of the participants as a part of the

**CHAPTER 10 TABLE OF CONTENTS**

educational opportunities provided to the students by the school or institution, are not work of
the kind contemplated by section 3(g) of the Act and do not result in an employer-employee
relationship between the student and the school or institution.  Also, the fact that a student
may receive a minimal payment for participation is such activities would not necessarily
create an employment relationship.

**(f)**     The sole fact that a student helps in a school lunchroom or cafeteria for periods of 30 minutes
to an hour per day in exchange for their lunch is not considered to be sufficient to make him
or her an employee of the school, regardless of whether he or she performs such work
regularly or only on occasion.  Also, the fact that students on occasion do some cleaning up
of a classroom, serve the school as junior patrol officers or perform minor clerical work in the
school office or library for periods of an hour per day or less without contemplation of
compensation or in exchange for a meal or for a cash amount reasonably equivalent to the
price of a meal or, when a cash amount is given in addition to a meal, it is only a nominal
sum, is not considered sufficient in itself to characterize the students as employees of the
school.  A similar policy will be followed where the students perform such tasks less
frequently but for a full day, with an arrangement to perform their academic work for such
days at other times.  For example, the students may perform full-day cafeteria service four
times per year. In such cases, the time devoted to cafeteria work in the aggregate would be
less than if the student worked an hour per day.  However, if there are other indicia of
employment, or the students normally devote more than an hour each day or equivalent to
such work, the circumstances of the arrangement should be reviewed carefully.

**(g)**     In the ordinary case, tasks performed as a normal part of a program of treatment,
rehabilitation, or vocational training in the following situations will not be considered, under
section 3(g) of the Act, as work of a kind requiring a hospital patient, school student, or
institutional inmate to be considered an employee of the hospital, school, or institution
conducting the program, for purposes of the FLSA: tasks performed by individuals
committed to training schools of a correctional nature, which are required as a part of the
correctional program of the institution as a part of the institutional discipline and by reason of
their value in providing needed therapy, rehabilitation, or training to help prepare the inmate
to become self-sustaining in a lawful occupation after release.

**(h)**     The WHD will not assert that initial participation by a student with disabilities in a school-
work program constitutes an employment relationship if certain conditions are met.
However, after an employment relationship has developed, the provisions of the Act will be
applicable.

**(i)**     The conditions under which an employment relationship initially will not be asserted are:

(1)     The activities are basically educational, are conducted primarily for the benefit of the
participants, and comprise one of the facets of the educational opportunities provided
to the students.  The student may receive some payment for their work in order to
have a more realistic work situation, or as an incentive to the student or to insure that
the employer will treat the student as a worker.

(2)     The time in attendance at the school plus the time in attendance at the experience
station (either in the school or with an outside employer) does not substantially
exceed the time the student would be required to attend school if following a normal
academic schedule.  Time in excess of 1 hour beyond the normal school schedule or

**CHAPTER 10 TABLE OF CONTENTS**

attendance at the experience station on days when school is not in session would be considered substantial.

(3)   The student does not displace a regular employee or impair the employment opportunities of others by performing work which would otherwise be performed by regular employees who would be employed by the school or an independent contractor including, for example, employees of a contractor operating the food service facilities at the school.

**(j)**   The shift to an employment relationship may occur shortly after the placement or it may occur later.  As a general guide, work for a particular employer, either a private employer or the school, after 3 months will be assumed by the WHD to be part of an employment relationship unless the facts indicate that the training situation has not materially changed.  Thus, if the conditions which warranted the finding that the student is not considered an employee continue, he or she may remain for a period of time as a trainee rather than an employee.  On the other hand, if after the 3-month period the training aspects are subordinated and the work aspects clearly predominate, the student will be considered as an employee.

**10b04**   **Employer asserts homework performed by independent contractor.**

**(a)**   For investigation purposes, it can be assumed that a homeworker is an employee, even though there may be a buying and selling arrangement between the parties.

**(b)**   If the employer asserts their outside work or homework is performed by independent contractors, the following factors should be considered concerning the employer-employee relationship:

(1)   Does the employer have the right to control the manner of the performance of the work or the time in which the work is to be done?

(2)   Is the employer paying taxes for social security, unemployment, or workmen's compensation insurance?

(3)   Has the homeworker ever collected any benefits, such as unemployment or workmen's compensation, because of employment by the employer?

(4)   Does the employer furnish the material, or finance directly or indirectly the purchase of the material, which the homeworker uses?

(5)   When did the practice of buying and selling between the employer and the homeworker begin, and what are the mechanics of the transaction?

(6)   Does the homeworker bill the employer for the work done?  Are bills of sale prepared?  Are sales taxes paid, or are state or local exemptions obtained because of retail purposes?  Are payments made in cash or by check?

(7)   How does the homeworker's profit under the buying-selling arrangement compare with their wages as a homeworker?

(8)   Whom does the homeworker consider to be the employer?

**CHAPTER 10 TABLE OF CONTENTS**

(9)     Does the homeworker have a state certificate to do homework?

(10)     What equipment is used, what is its value, and who furnishes it?

**10b05     Test of the employment relationship: "suffer or permit."**

(a)     Under the FLSA and Migrant and Seasonal Worker Protection Act (MSPA), the definition of employ includes "to suffer or permit to work." This broad definition specifically rejects the common law standard, which focuses on the employer's control over the worker, as the test for employment. As a result, most workers are employees.

Using this definition, a worker is an employee under the FLSA and MSPA if, as a matter of economic reality, he or she is economically dependent on the employer. An independent contractor, on the other hand, is in business for himself or herself and depends on his or her business for work. There are bona fide independent contractors, and they generally do not receive the rights or benefits provided by the FLSA or MSPA.

FOH 10b06 -07 discuss the analysis for determining whether a worker is an independent contractor as opposed to an employee. If an employer asserts that a worker is not an employee for another reason (*e.g.*, because the worker is a volunteer or trainee), a different analysis may apply. *See* generally FOH 10b.

[07/07/2017]

[01/03/2017]

**10b06     Misclassification of employees as independent contractors: applying the economic realities factors.**

(a)     **Examine the totality of the relationship**

To determine whether a worker is an employee or independent contractor under the FLSA and MSPA, the economic realities of the worker's relationship with the employer must be examined. If the totality of the economic realities shows that the worker is economically dependent on the employer, then the worker is an employee. If the totality of the economic realities shows that the worker is in business for himself or herself, then the worker is an independent contractor.

Although the economic realities factors may differ some depending on applicable court decisions, the factors set forth in this section are generally considered when determining if a worker is an employee or independent contractor. These economic realities factors are not exhaustive; other factors that are relevant to the economic realities of the working relationship may be considered.

No single factor is determinative, and the factors should not be applied as a checklist. All of the evidence gathered as a result of applying the factors should be considered to determine whether the worker is economically dependent on the employer, and thus an employee.

(b)     **The economic realities factors**

**CHAPTER 10 TABLE OF CONTENTS**

Defs.' Appx. 00001128

The examples and questions below are intended to help the Wage and Hour Investigator (WHI) in gathering relevant evidence to assess the economic reality of the working relationship.

(1)    *Is the work an integral part of the employer's business?*

Integral does not mean important or unique. Integral work is work that is part of producing the good or providing the service that the employer is in business to produce or provide. It does not matter how many other employees may perform the same work. Work can be integral to an employer's business even if the work is just one component of the business and/or is performed by hundreds or thousands of other workers.

The closer that the service provided by the worker is to the type (or one of the types) of work that the employer performs for its customers and clients, the greater the likelihood that the worker is an employee. By contrast, the work performed by an independent contractor is generally outside the scope of the goods and/or services that the employer is in business to provide.

(2)    *Does the worker's managerial skill affect the worker's opportunity for profit or loss?*

Whether the worker applies managerial skill to make independent business decisions that will affect his or her opportunity for profit or loss is relevant to the worker's economic dependence. The ability to determine workforce size (such as by hiring helpers) may demonstrate the exercise of managerial skill because the number of workers engaged in work can affect the opportunity for profit or loss. On the other hand, a worker's decision to work more hours or work more jobs to earn more is not a managerial skill and does not suggest that the worker is in business for himself or herself; employees make the same decisions.

Generally, the less business risk that the worker carries in the relationship with the employer, the greater likelihood that an employment relationship exists.

(3)    *How does the worker's relative investment compare to the employer's investment?*

If the amount of the worker's investment compares favorably with that of the employer and there is some risk that the worker will suffer a loss, those facts would indicate that the worker is in business for himself or herself.

The worker's investment will generally be smaller in scope and value than the employer's investment. Nonetheless, the worker's investment compares favorably with the employer's when the investment is relatively substantial and when the investment is used for the purpose of sustaining an independent business beyond the job or project that the worker is performing. A favorable investment by the worker indicates that he or she is on similar footing as the employer.

The fact that a worker has made an investment is not enough to suggest that the worker is in business for himself or herself. Any investment should be a capital investment that indicates a sustainable business to suggest that the worker is an independent contractor.

**CHAPTER 10 TABLE OF CONTENTS**

(4)    *Does the work performed require special skill and initiative?*

There is a reasonable correlation between the worker's degree of skill and the marketability and value of his or her services.  An unskilled task which may be easily learned and performed by almost any worker is a task for which many workers (both trained and untrained) can realistically compete and is also a task for which the competing workers would not be able to demand or expect higher wages.  The lower the worker's skill level, the lower the value and marketability of his or her services, and the greater the likelihood of his or her economic dependence on the employer using those services.

Although a worker's lack of specialized skill generally suggests that he or she is an employee, the fact that a worker is skilled or in possession of specialized skill is not itself indicative of independent contractor status.  Specialized skills alone do not suggest that the worker is an independent business, especially if those skills are technical and used to perform the work.  Many employees possess very specialized skills.  For skills to be indicative of independent contractor status, they should demonstrate that the worker exercises independent business judgment.

(5)    *Is the relationship between the worker and the employer permanent or indefinite?*

The greater the length of the relationship or the more frequent the work, the greater the likelihood that an employment relationship exists between the parties.  Ongoing or indefinite relationships that do not have a stated termination date suggest that the worker is an employee.

If the relationship is not permanent or indefinite, the reason for the lack of permanence or indefiniteness is significant.  Sometimes, the lack of permanence is due to operational characteristics intrinsic to the industry, such as when employers hire part-time workers and/or use staffing agencies or, in the agricultural industry, when employers hire workers only for the growing and/or harvest season.  In situations like these, the lack of permanence may not indicate that the worker is in business for himself or herself.  When the work is, by its nature, seasonal, intermittent, or part-time, it may be consistent with an employment relationship.  On the other hand, if the lack of permanence is due to the worker's own business initiative, this indicates that the worker is in business for himself or herself.

(6)    *What is the nature and degree of the employer's control?*

Control may be direct, such as when the employer directly tells the worker what tasks to do and how to do them.  Control may also be indirect.  For example, the employer may not continuously observe and direct the workers doing their jobs, but may exert control through the quality control process or by a pricing or piece-rate structure.  If the employer retains control over how the work is performed or the progress of the work, that control suggests an employment relationship with the worker.

On the other hand, if an employer's quality control is more limited and focuses on reviewing the final product of the work, then the worker may be working independently.  It is also important to note that the employer can exercise control over the worker even if the worker works off-site, such as at home or on the premises of the employer's customers.

**CHAPTER 10 TABLE OF CONTENTS**

Defs.' Appx. 00001130

Low-skilled work may require only minimal instruction to the worker that does not need to be repeated multiple times each day or even every day.  In such cases, the minimal instruction is more a function of the type of work performed and may not suggest that the worker is working independently.  Moreover, the worker's work may be subject to control by the employer's customer.  If the employer exercises limited control, but the employer's customer exercises control in place of the employer, the worker is not working independently and is more likely to be economically dependent on the employer.

**(c)**      **Other considerations**

The six economic realities factors identified above may not be the exclusive factors to consider when determining whether a worker is an employee or independent contractor under the FLSA or MSPA.  Some courts may apply a variation of the above factors, and other factors that are relevant to the economic realities of the working relationship may be considered.  However, only evidence that examines whether the worker is, as a matter of economic reality, economically dependent on the employer or in business for himself or herself should be considered.

[07/07/2017]

[01/03/2017]

**10b07      Facts that are not relevant to the ultimate determination of the worker's status.**

**(a)**      In an FLSA or MSPA case, the following are examples of facts that are not relevant to the ultimate decision of whether the worker is an employee or independent contractor:

(1)      The worker is licensed by a state or local government

(2)      The worker relies entirely on tips

(3)      Where the work is performed (working at home or at the sites of the employer's customers does not indicate that the worker is an independent contractor)

(4)      The absence of a formal employment agreement

(5)      An agreement stating that the worker is an independent contractor (the economic realities of the relationship as opposed to the employer's characterization of the relationship are relevant)

(6)      The worker receives an Internal Revenue Service (IRS) Form 1099-MISC from the employer

(7)      The worker has obtained an employer identification number or has incorporated, for example as an LLC, especially if the employer required or requested him or her to do so

(8)      The worker has obtained worker's compensation insurance, especially if the employer required or requested him to do so

**CHAPTER 10 TABLE OF CONTENTS**

(9)     Any other evidence that the parties intended the relationship to be an independent contractor one

[07/07/2017]

[01/03/2017]

**10b08     Effect of sale on the employment relationship.**

   **(a)**     An employment relationship may exist between the parties to a transaction which is nominally a sale.  Thus, house-to-house canvassers who sell at retail the products of a particular company are employees of the company, although their contracts with the company are in the form of dealer contracts under which the company purports to sell its products to them at fixed wholesale prices and to recommend retail prices at which the products should be sold, where the control exercised by the company over the so-called dealers is not substantially different than that exercised by an employer over their outside salesmen.

   **(b)**     Likewise, an employee is not converted into an independent contractor by virtue of a fictitious sale of the goods produced by him or her to an employer, so long as the other indications of the employment relationship exist.  Homeworkers who sell their products to a manufacturer are his or her employees where the control exercised by the manufacturer over the homeworkers through their ability to reject or refuse to buy the product is not essentially different from the control ordinarily exercised by a manufacturer over employees performing work for him or her at home on a piece rate basis.

**10b09     Subject-matter of the employment relationship.**

   **(a)**     The subject-matter of the employment relationship must be work or its equivalent. The Supreme Court has set forth the essential elements of work as:

      (1)     Physical or mental exertion (whether burdensome or not)

      (2)     Controlled or required by the employer

      (3)     Pursued necessarily and primarily for the benefit of the employer and his or her business

   **(b)**     An essential element of work is not only that the employer receives certain benefits from the services of the alleged employees but that "the work necessarily or primarily benefits the company."

**10b10     Effect of determination of the employment relationship.**

   **(a)**     Once it is determined that one who is reputedly an independent contractor, lessee, partner, or the like, is in fact an employee, then all the employees of this so-called independent contractor engaged in the work for the principal employer likewise become the employees of the principal employer, who must guarantee compliance with the FLSA.  Thus, the one who is responsible will be charged with seeing to compliance with the FLSA and must keep the records of the employees.

**CHAPTER 10 TABLE OF CONTENTS**

**(b)**     However, a manufacturer or producer may undertake to see to it that a true independent contractor complies with the FLSA, in order to avoid interference with the manufacturer's own operations through a "hot goods" action under FLSA section 15(a)(1). Such an arrangement does not make the manufacturer or producer the employer.

**10b11      Trainees and student-trainees.**

**(a)**     The Supreme Court has held that the words "to suffer or permit to work," as used in the FLSA to define "employ," do not make all persons employees who, without any express or implied compensation agreement, may work for their own advantages on the premises of another.

**(b)**     Whether trainees or students are employees of an employer under the FLSA will depend upon all of the circumstances surrounding their activities on the premises of the employer. If all six of the following criteria apply, the trainees or students are not employees within the meaning of the FLSA:

     **(1)**     The training, even though it includes actual operation of the facilities of the employer, is similar to that which would be given in a vocational school.

     **(2)**     The training is for the benefit of the trainees or students.

     **(3)**     The trainees or students do not displace regular employees, but work under their close observation.

     **(4)**     The employer that provides the training derives no immediate advantages from the activities of the trainees or students, and on occasion operations may actually be impeded.

     **(5)**     The trainees or students are not necessarily entitled to a job at the conclusion of the training period.

     **(6)**     The employer and the trainees or students understand that the trainees or students are not entitled to wages for the time spent in training.

**10b12      Government-sponsored employment development programs.**

**(a)**     Certain federal and state training programs are designed to equip the labor force in an area with needed and marketable skills and may be specifically directed toward providing local industries with a labor pool from which workers having particular skills may be drawn.

**(b)**     Investigators may encounter programs of this type conducted under the auspices of federal and state agencies in which the facilities of business establishments are utilized during training hours under an agreement or lease arrangement with the agency. The instructors for such programs may, outside of training hours, be employed by the establishment whose facilities are used. Certain of the workers being trained may also be employed by this establishment outside of training hours.

**(c)**     Where the employees of the establishment are involved as either instructors or trainees, particular care shall be taken to determine whether there exists in actual fact an employment relationship, between the employer being investigated and the employees involved, during the

**CHAPTER 10 TABLE OF CONTENTS**

hours devoted exclusively to the training program. The fact that the employer's facilities are utilized in the training program is not determinative of the existence of an employment relationship between the employer and trainees or instructors involved insofar as the hours devoted exclusively to such training is concerned. Nor is the fact that the training program is directly related to the employees' regular jobs in itself controlling where, as may be the case, the program is an independent training course conducted by the agency from which both employees and the employer benefit. *See* FOH 10b11 and 29 CFR 785.27 -.32.

**(d)**    These instructions do not reflect a change in policy regarding the applicability of FLSA to trainees who are *employees*, during the training periods, of establishments investigated. They are designed, instead, to call attention to the need for a careful examination of the facts in each situation where training programs of the general type described are encountered. The existence of an employment relationship during training periods is of particular significance since an employee may be subject to the FLSA by virtue of employment in a covered enterprise even though not engaged in or producing goods for interstate commerce.

**10b13**    <u>Employer identification numbers issued by Internal Revenue Service.</u>

The issuance of employer identification numbers by the Internal Revenue Service (IRS) does not constitute a determination as to employer-employee relationship under the FLSA.

**10b14**    <u>Students training in skilled paramedical occupations: nurses, x-ray technicians, etc.</u>

**(a)**    Whether a student training for certain paramedical occupations is viewed as an employee of a hospital within the meaning of the Act will depend upon all the circumstances of the student's activities on the premises of the establishment. Where a bona fide student training program exists for such paramedical occupations and such program meets the criteria in FOH 10b11, no employment relationship will be deemed to exist. Generally this involves students training for such occupations as registered nurse, licensed vocational or practical nurse, x-ray technician, certified laboratory assistant, or any other skilled paramedical position. Such programs involve on-the-job training combined with extensive classroom lectures and laboratory instruction generally resulting in students receiving degrees, licensing, registration, or certification by an appropriate board or society. The mere payment of a scholarship, stipend, or allowance (as long as it does not exceed a reasonable approximation of the expenses incurred by the trainee taking the course or where it serves as an allowance for subsistence) will not be considered to establish an employment relationship.

**(b)**    Situations may be encountered where such a student will work in the hospital for compensation outside of the training schedule. In the typical case a student may do office or switchboard work. In such cases the student will be considered an employee during the time spent on such work and must be paid in compliance with the Act's requirements for such time. However, the fact that the student would be considered an employee during such time would not require the time spent in activities described in (a) above to be counted as hours worked.

**(c)**    On the other hand, the principles in (a) above do not include certain training programs such as those conducted for nurses' aides and orderlies where much of the training consists of on-the-job training and work experience with little if any related classroom lectures or laboratory instructions and which ordinarily do not lead to licensing, registration or certification. In many cases these programs exist only for the purpose of filling existing vacancies on the hospital staff. In such cases the students would be considered employees of the hospital. In

**CHAPTER 10 TABLE OF CONTENTS**

this regard any time spent in the classroom or attending lectures would not be considered hours worked.

**10b15**   **Golf course caddies.**

Golf course caddies are engaged to serve the needs of particular players for substantial periods of time and their services are generally directed by and are of most immediate benefit to the players themselves.  Arrangements may vary but the players, in one way or another, are expected to pay for the services rendered to them by the caddy.  Because of these circumstances, the WHD is not prepared to assert that caddies are employees of the golf course operator.

**10b16**   **Special duty nurses or sitters in hospitals and nursing homes.**

**(a)**   In some cases a special duty nurse or sitter may be employed to care for a patient in a hospital or nursing home.  Whether the employee is employed by the patient or by the hospital or nursing home is a question of fact.  For example, if the hospital or nursing home determines whether use of a special duty nurse or sitter will be permitted, what the pay is to be (even though paid directly by the patient), and decides which special duty nurse or sitter will be assigned to a particular patient, the hospital or nursing home is considered to be the employer.

**(b)**   On the other hand, if the patient or their representative contracts directly with the special duty nurse or sitter as to pay, hours of work and other working conditions, and the establishment does not control or supervise such work, an employment relationship does not exist between the special duty nurse or sitter and the establishment.  This same principle will apply to a nurse or other employee on the hospital or nursing home staff who is employed during her off-duty hours as a special duty nurse or sitter by a patient in the establishment.  During the period or periods in which the employee is so engaged on this special duty by the patient, the WHD will consider the employment relationship as with the patient and not with the hospital or nursing home.

**(c)**   A special duty nurse or sitter who is employed *by the patient* to care for such patient in a hospital or nursing home, as described in (b) above, is not employed "in connection with the operation of" the hospital or nursing home (*see* 29 USC 203(r)).  The employment is in the nursing home or hospital only because the patient is there and the work is not connected "with the operation of" the hospital or nursing home *as* such.

**10b17**   **Newspaper area correspondents or stringers.**

Some newspapers have arrangements to obtain news stories (particularly local interest stories from outlying areas served by the newspaper) from persons identified in the industry as area correspondents or stringers.  These writers ordinarily select their own materials which they obtain in the course of other occupations or while attending local events such as parties, athletic contests, and the like.  They are paid on a per word or per line basis for stories submitted and accepted by the newspaper.  The arrangements vary but traditionally the newspapers have considered these people to be in the same general category as professional free-lance writers and not employees.  The WHD will not assert that an employer-employee relationship exists in such cases.

**10b18**   **Graduate students: research assistants.**

**CHAPTER 10 TABLE OF CONTENTS**

Defs.' Appx. 00001135

In some cases graduate students in colleges and universities are engaged in research in the course of obtaining advanced degrees and the research is performed under the supervision of a member of the faculty in a research environment provided by the institution under a grant or contract. Normally, the graduate students involved in these programs are simultaneously performing research under the grants or contracts and fulfilling the requirements of an advanced degree. Under such circumstances the WHD will not assert an employer-employee relationship between the students and the school, or between the student and the grantor or contracting agency, even though the student receives a stipend for their services under the grant or contract.

**10b19**      **Externs.**

In some cases medical students elect in their senior year of medical school to work as externs in a hospital for a short period, sometimes 6 weeks. An extern is assigned to one of the hospital's major areas of post-graduate training, such as medicine, general surgery or obstetrics. They attend the needs of patients under the immediate supervision of licensed physicians and also attend conferences, teaching rounds, and classroom exercises. The program is designed to provide the student with professional experience in the furtherance of their medical education in the same general manner as that provided interns. Such a program constitutes a part of the educational opportunities provided to the externs. Since such training is so predominantly for the benefit of the extern, the WHD will not assert that such externs are employees of the hospital to which they are assigned.

**10b20**      **Administrative residents in hospitals.**

**(a)**      Some college graduate school programs provide that candidates for the degree of Master of Hospital Administration (sometimes identified as Master of Business Administration, Master of Arts, Master of Public Health, etc.) must serve a certain period (often 12 months) of administrative residency in a hospital. The candidates continue as students on the rolls of the college. In the usual case, the hospital administrator responsible for the resident is also on the college faculty. The resident performs various tasks in the hospital, and generally prepares a thesis or various reports to the college concerning hospital administration. The resident may receive a stipend or allowance from the hospital. Pending interpretation by the courts, the WHD for purposes of enforcement of the Act will not assert that such students are employees of the hospital to which they are assigned as residents.

**(b)**      In some instances, the resident to augment income may secure employment in the hospital entirely apart from any duties performed as a resident. The principles stated in FOH 10b14(b) apply to such employment.

**10b21**      **Student observers in hotels and motels.**

**(a)**      Certain colleges providing academic training in hotel administration require their students to obtain a stipulated number of practice credits in order to qualify for a degree. These students act as observers in hotels and motels, usually during the summer months. Typically, the students have some assigned duties and move from department to department to learn the business. Generally, the students are paid a nominal sum, such as $100 per month plus room and meals.

**(b)**      Where such a program is designed to provide a student with professional practice in the furtherance of his or her college education and the training is academically oriented for the

**CHAPTER 10 TABLE OF CONTENTS**

benefit of the student, the WHD will not assert that the students are employees of the hotel or motel to which they are assigned.

**10b22**    **Job Corps enrollees.**

**(a)**    The Job Corps is a residential program for youths between 16 and 21 years of age established under the Economic Opportunity Act of 1964, as amended.  Enrollees live in a Job Corps center (or camp) which is operated by either a governmental organization or a private organization, in either case supervised by a federal agency.  Under section 107(a) of this act, the Director of the Job Corps is authorized to "provide or arrange for the provision of programs of useful work experience and other appropriate activities for enrollees."

**(b)**    In implementing this provision, the Job Corps has made arrangements for the enrollees to work in private firms where they may perform work covered by the FLSA.  Such arrangements with private employers are usually for part-time work and the average duration is 4 months.  In such work experience programs, supervision over the enrollees is maintained in order to monitor their progress and maximize the quality of training given them.  Arrangements are made between the Job Corps and the private employer-trainer regarding the division of training costs and the payment of wages.

**(c)**    If a Job Corps enrollee performs work subject to the FLSA in a private firm in such a work experience program he would be considered for purposes of the FLSA to be jointly employed by the corporation operating the center or camp and the private employer.  Wages paid to enrollees by either of the joint employers will be considered in determining compliance with the Act.

**(d)**    It is the position of the WHD that where such an enrollee is assigned to receive training and work experience with a private employer in an off-the-center work site, the following activities will not create an employer-employee relationship:

(1)    In the preliminary stages of work experience, when the enrollee has had little or no previous training in the occupation and does no useful work, but is merely being acquainted with the employer's business

(2)    Time spent by the enrollee in a classroom situation in which no useful work is performed

**(e)**    The following activities will generally create an employer-employee relationship assuming productive work is performed:

(1)    When an enrollee has been sent to the employer for a short period in order to determine his or her aptitude and interest in an occupation preliminary to giving training

(2)    When the enrollee has been sent to the employer for a short period in order to determine whether the training received is adequate to enable him or her to get and keep a job in the occupation

**(f)**    Job Corps enrollees also engage in on-site work experience, in connection with the conservation and development of natural resources and public recreational areas usually in conservation centers, and in performing other tasks at the center itself.  No such work

**CHAPTER 10 TABLE OF CONTENTS**

performed by enrollees inures to the benefit of the contractor who provides the training program and the WHD will not assert that these activities are considered as work for an employer within the coverage of the Act.  Similarly, classroom activities whether or not resulting in a useful product would be part of or incidental to the vocational training program.

**(g)**     In determining the wages paid employees described in (c) above the joint employers may include the reasonable cost of such items as food, lodging, clothing, laundry, transportation to and from work, and medical and dental care in accordance with 29 CFR 531.  The reasonable cost of providing an employee with medical and dental care may be based on the average of the costs actually incurred for all employees over a representative period.

**(h)**     In a Job Corps center (or camp) operated by a private employer, the above principles in no way affect the application of the FLSA, McNamara-O'Hara Service Contract Act (SCA) or Walsh-Healey Public Contracts Act (PCA) to the employer's own employees or employees of any subcontractors involved.  *See* FOH 13b10 and FOH 14c01.

**10b23**     **School employees: after hours work.**

**(a)**     In some cases school employees will work outside of their normal working hours where a third party (either public or private) uses the school facilities.  For example, a community organization may use the school cafeteria for a banquet or the auditorium for a concert, and the food service or custodial employees of the school will perform the necessary services.  Time spent in the operation of a school and the maintenance of school property, both during and after regular school hours is normally considered hours worked under the Act.  School employees engaged in the operation and maintenance of school facilities during periods in which their services are made available to a third party are considered to be jointly employed by the school and the third party if the school itself contracts for the use of such employees.  The total time spent in work for the joint employers will be counted as hours worked and paid for in compliance with the minimum wage and overtime pay provisions of the Act.

**(b)**     If the school does not require that its employees be utilized by nonschool organizations when using school facilities but such employees are hired merely for the convenience of the outside group and are paid directly by them, the hours worked and compensation paid to such employees for this time need not be included in determining compensation due to the employee for their employment by the school.

**10b24**     **University or college students.**

**(a)**     University or college students who participate in activities generally recognized as extracurricular are generally not considered to be employees within the meaning of the Act.  In addition to the examples listed in FOH 10b03(e), students serving as residence hall assistants or dormitory counselors, who are participants in a bona fide educational program, and who receive remuneration in the form of reduced room or board charges, free use of telephones, tuition credits, and the like, are not employees under the Act.

**(b)**     On the other hand, an employment relationship will generally exist with regard to students whose duties are not part of an overall educational program and who receive some compensation.  Thus, students who work at food service counters or sell programs or usher at athletic events, or who wait on tables or wash dishes in dormitories in anticipation of some compensation (money, meals, etc.) are generally considered employees under the Act.

**CHAPTER 10 TABLE OF CONTENTS**

**10b25**    **Fraternal orders: officers and volunteers.**

The WHD will not assert that an employment relationship exists under the Act for persons who volunteer their services, including those who are elected, to a fraternal order not as employees and without contemplation of pay.  Included would be such persons as the secretary and director or trustees of individual lodges.  The payment of a nominal sum would not affect the status of a bona fide volunteer.  *See* FOH 12a03.

**10b26**    **School-related work programs.**

(a)    Pursuant to the provisions of section 14(d) of the FLSA, the WHD will take no enforcement action with respect to minimum wage or overtime for public or private elementary or secondary students employed by any school in their school district in various school-related work programs, provided that such employment is in compliance with applicable child labor provisions.  This position is adopted without prejudice to the rights of individual employees under section 16(b).  This non-enforcement policy is not applicable to workers with disabilities in sheltered workshops operated by elementary or secondary schools since sheltered employment is not considered to be an integral part of a regular education program.

(b)    If such employment is not in compliance with applicable child labor provisions, the students so employed must be paid minimum wage and overtime for all hours worked in any workweek in which they were so employed.  Also, the employer will be subject to child labor civil money penalties (CMPs).

**10b27**    **Prison inmates.**

(a)    Generally, a prison inmate who, while serving a sentence, is required to work by or who does work for the prison, within the confines of the institution, on prison farms, road gangs, or other areas directly associated with the incarceration program, is not an employee within the meaning of the Act (*see* FOH 10b03(g)).

(b)    A different situation exists, however, where inmates are contracted out by an institution to a private company or individual. In such instances an employer-employee relationship is created between the private company or individual and the prisoners.  This is true regardless of whether the work is performed within the confines of the institution or elsewhere.

**10b28**    **Jurors.**

Service on jury duty for either a petit or grand jury does not result in the establishment of an employment relationship.  Thus, all jurors and prospective jurors called to serve by the requesting public agency are not employees under the Act.

**10b29**    **Foster parents.**

(a)    Some governmental agencies operate social service programs which arrange for and finance the rearing of children by foster parents.  No employment relationship will be deemed to exist where:

**CHAPTER 10 TABLE OF CONTENTS**

(1)      A state or licensed private agency selects an individual who voluntarily agrees to become a foster parent *in accordance with state standards*, *and*

(2)      The foster parent services are provided in the foster parent's home, *and*

(3)      The state either directly or indirectly finances the foster parent services.

**10b30**      **Volunteers under the Domestic Volunteer Service Act of 1973.**

**(a)**      **"Foster Grandparent" and "Senior Companion" programs**

Volunteers participating in either the "Foster Grandparent" or "Senior Companion" programs under the Domestic Volunteer Service Act of 1973 (DVSA) are not employees under the FLSA.

**(b)**      **"University Year for Action" (UYA) programs**

(1)      Situations may be encountered where a university has established a federally-funded "University Year for Action" service learning program pursuant to the DVSA. These programs provide that students will receive college credits when they volunteer to perform various services, often for a nonprofit private organization, on a full-time basis for a year. The students receive a subsistence-level stipend to cover their expenses, and they are required to live at the low income level of the people they serve. The legislative history of the DVSA and the FLSA make clear that these students are not considered employees for purposes of the FLSA.

(2)      Universities which receive federal UYA funds have a 5 year funding limit, but are required to make every effort to continue the program after federal funds cease. Under such UYA continuation programs, the students generally receive college credit, pay tuition, receive a stipend, keep a journal of their experiences, make presentations of their work and learning, and present periodic written reports of their progress in achieving the program's objectives. In addition, the sponsor, ordinarily a faculty member, evaluates their internship performance.

(3)      Where a UYA continuation program meets this description, the WHD will not assert that an employment relationship exists. However, where programs are encountered which differ materially from the above described circumstances, obtain all the facts of the case and refer the file to the National Office (NO)/Division of Enforcement Policy and Procedures (DEPP), ATTN: FLSA/Child Labor Branch.

**10b31**      **Government activities: volunteer services.**

The principles in FOH 10b03(c) may apply with respect to certain governmental activities. For example, an office employee of the city may volunteer to perform non-clerical services, such as coaching a softball or basketball team in a city-sponsored program during his or her off-duty time as a charitable or civil act. Similarly a person may participate in the civil defense program for civil or personal motives. Where a person performs such volunteer services without promise or expectation of compensation, at hours that suit his or her own convenience whether by schedule or otherwise, and where no regular employee is replaced in the performance of normal duties, no employer-employee relationship exists with respect to such time. The activity may be performed on the employer's premises so long as it is not

**CHAPTER 10 TABLE OF CONTENTS**

done during any time the employee is required to be on the premises and the control exercised by the employer is only minimal.  A person, however, may not be both an employee and a volunteer while performing essentially the same duties.  Thus, a person employed in park activities cannot have his or her time divided into working hours and volunteer hours while performing the same or related duties.

**10b32**     **Government-financed child care services.**

**(a)**     Whether individuals who provide child care services in their own homes under an agreement with a government social service agency are employees of such agency would depend upon the total fact situation involved in the arrangement.  If the parent (or person standing in the place of a parent) is free to select, and in fact does select, an individual from a list of persons supplied by the agency as qualified to perform the child care services, with the agency merely agreeing to reimburse the child care operator selected, an employer-employee relationship would not exist between the government agency and the operator.  Further, if the agency utilizes bona fide volunteers as day care operators over whom no control is exercised, and the monetary payment is simply to reimburse the operator for expenses, no employment relationship would exist.  However, the activities of such day care homes may be covered under the Act, and the operator responsible for compliance with respect to any employees employed in connection with the operation of the child care center.  *See* FOH 12g00.

**(b)**     Conversely, if in fact such freedom of choice does not exist, and the parent is told to which home the child must be taken for this service, and the agency is closely involved in directing and controlling the operator in performing the duties in rendering the child care services, an employer-employee relationship would exist between the agency and the operator.

**10b33**     **Election judges and officials.**

The WHD will take no position as to whether persons employed by a public agency, such as a Board of Elections or similar office, to serve as election judges and officials on election days are employees of the public agency and covered by the Act.

**10b34**     **Patient workers.**

**(a)**     The court has held that patient workers in hospitals or institutions whose work is of any consequential economic benefit to the facility are to be treated as employees. While the court has generally considered all circumstances in determining whether an employment relationship existed, the court specifically rejected as determinative the alleged therapeutic value of the work or the patient's level of performance.  In general, we would hold that there is consequential economic benefit to the institution if the work in question would be performed by someone else if it were not done by the patient.  However, where a patient is undergoing evaluation or training, we will not hold the patient to be an employee during the first three months of engagement in a work activity or activities provided the patient spends no more than 1 hour a day and no more than 5 hours a week in such activities and provided further that competent instruction and supervision is provided the patient during such period.

**(b)**     A patient in a hospital or institution may volunteer and need not be considered an employee for such services which would not be compensated by the institution if performed by a person other than a patient.  Such volunteer services may include wheeling another patient in a wheelchair to and from certain activities, planting a vegetable garden if the fruits of such labor belong to the patient, and other similar activities.  However, the ordinary maintenance,

patient care, office work and other activities that are performed in the operation of an institution would create an employment relationship.

**10b35**   **Residential drug abuse and alcohol treatment programs.**

**(a)**   There are certain types of situations in residential drug abuse and alcohol treatment programs where an employment relationship would not be deemed to exist. For example, a residential care program which seeks to establish a family setting for treatment of persons with drug or alcohol problems would *not* create an employment relationship under the Act between the residents and the institution where:

**(1)**   The work performed by the residents is that which is ordinarily done on a daily basis in a private home and is solely for the mutual benefit of the occupants of the home (institution).

**(2)**   Residents do not perform work activities which would ordinarily be performed by full-time employees of the institution so that there is no displacement of regular full-time employees through substitution of resident workers.

**(3)**   Residence in the institution and performance of activities by the occupants is short-term (usual no more than a year) as opposed to generally long term occupancy in such institutions as those concerned with the mentally ill, individuals with intellectual or developmental disabilities, the aged, or the terminally ill.

**(4)**   The institution is relatively small, houses a limited number of residents, and has no paid staff other than counselors.

**10b36**   **Veterans making artificial poppies.**

It has long been the practice in United States (U.S.) Department of Veterans Affairs (VA) hospitals to have disabled veterans make artificial poppies that are dispensed on street corners by the Veterans of Foreign Wars and the American Legion. Whether these veterans are performing this work as employees would depend on the fact in each case. However, in view of VA's involvement, the WHD will not handle complaints or investigate in this area but will refer such matters to the VA.

**10b37**   **Pharmaceutical externs and interns.**

**(a)**   Colleges and universities which offer degree programs in pharmacy may require clinical or work experience at a pharmacy site. These externship courses combine classroom lectures and lab work with on-site work training under the supervision of a qualified pharmacist. Participation by students in such extern courses as part of their pharmacy curriculum is predominantly for their benefit and in furtherance of their educational opportunities. In some states completion of such courses may reduce the postgraduation and prelicensing internship requirements, thus enabling the students to become licensed in a shorter time. Therefore, the WHD will not assert that an employment relationship exists because of such work training.

**(b)**   The states generally have a requirement that graduates of a pharmacy degree program must serve as an apprentice or intern for up to a year prior to licensure. However, where such individuals are serving in a postgraduation internship, an employment relationship would exist between the graduate interns and the pharmacies at which they work prior to licensing.

**CHAPTER 10 TABLE OF CONTENTS**

**10b38**     **Programs for youthful or first-time offenders designed as an alternative to incarceration.**

(a)     As part of their sentences, youthful or first-time offenders may spend a number of hours in public service activities in community action programs or nonprofit organizations formed for a public purpose.  The WHD will not assert that an employment relationship exists between offenders and participating organizations where the juvenile or first-time offenders:

   (1)     voluntarily enter into the program for their own benefit,

   (2)     do not displace regular employees or impinge on the employment opportunities of others,

   (3)     are under the supervision or control of the courts, and

   (4)     perform the work without contemplation of pay.

**10b39**     **Drying out period for alcoholics in sheltered workshops (SWS).**

An alcoholic admitted to an SWS frequently requires a drying out period before he/she is capable of performing work.  The alcoholic's presence in the SWS during this period is primarily intended to keep him/her away from alcohol and *not* to perform any significant productive work.  Consequently, the WHD will not assert that an employment relationship exists in the case of an individual who is substantiated to be an alcoholic (*see* FOH 64f09) during the first 4 weeks (28 consecutive calendar days) in the SWS unless it is clearly evident that the individual has been engaged in activities which provide consequential service or benefit to the SWS (*see* FOH 64f05).

**10b40**     **Welfare/workfare programs.**

(a)     More and more states are adopting welfare/workfare programs, *i.e.* programs that require persons to perform work in some capacity in exchange for receiving welfare assistance. These programs need to be carefully examined to determine if an employer-employee relationship subject to the FLSA exists. If the welfare recipient is an employee subject to the FLSA, the following facts must be determined:

   (1)     Does the state welfare/workfare statute grant the state authority to require the welfare recipient to work for their assistance?

   (2)     What hours of work are required of welfare recipients and are records kept of those work hours?

   (3)     Does the welfare assistance (cash/benefits) provide a wage of not less than the applicable minimum wage and proper payment of overtime when worked?

   (4)     Are recipients employed in violation of the child labor provisions?

(b)     If FLSA violations exist, potential back wage and CMP liability should be determined, and copies of documentation supporting the facts obtained above, forwarded to the DEPP for review *prior* to any discussion with state authorities regarding FLSA compliance.  After this

**CHAPTER 10 TABLE OF CONTENTS**

review, the Assistant Administrator for the Office of Policy will advise the Regional Office
(RO) on how to proceed.

## 10c      TYPES OF EMPLOYERS

### 10c00      Scope of the term "employer."

**(a)**      Section 3(d) of the amended Act defines "employer" to include "… any person acting... in the
interest of an employer in relation to an employee and includes a public agency..." and
section 3(a) defines "person" to mean "...an individual, partnership, association, corporation,
business trust, legal representative, or any organized group of persons." Thus, by
interpolation of the definition of "person" into the definition of "employer," the scope of the
term "employer" becomes apparent.

**(b)**      Section 3(x) of the amended Act defines "public agency" to mean the Government of the
U.S., the government of a state or political subdivision thereof, any agency of the U.S.
(including the U.S. Postal Service and Postal Rate Commission), a state, a political
subdivision of a state, or any interstate governmental agency.

### 10c01      A partnership as an employer.

A partnership is a "person" for purposes of the FLSA, and may be a party to the employment
relationship as an employer. The employment relationship is not considered to exist between
a bona fide partnership and the partners of whom it is composed. Such partners are self-
employed, since they cannot be said to be employed by an employer separate and distinct
from themselves. Merely calling individuals who are essentially employees by the term
partners under a so-called partnership agreement, which fails to invest them with the usual
attributes of partnership in an enterprise, does not make them such.

### 10c02      Cooperatives as employers.

The FLSA contains nothing to indicate that cooperative organizations, as such, are to be
excluded from the category of employers subject to its terms. It is clear that the employment
relationship may exist at least between such an organization and non-members whom it hires
or suffers or permits to work. Nor can it be said that membership in a cooperative in the
ordinary case establishes a mutual agency analogous to a partnership or otherwise identifies
the member so closely with the cooperative that they cannot become, respectively, employer
and employee. Among the circumstances which may be taken to indicate that a cooperative
is an entity separate and distinct from its worker-members, are a corporate form of
organization, the presence of the usual incidents of the employment relationship (*i.e.*, control
by the governing body or a designated officer over the work performed, the member's hours
of labor, selection for and discharge from the job and the like) and the exercise of financial or
managerial control or the furnishing of capital or management services by outsiders,
especially if such outsiders are wholesalers, manufacturers, or others who purchase or dispose
of the products of the cooperatives.

### 10c03      Corporations as employers.

A corporation is a legal entity separate and distinct from its stockholders. In the ordinary
case, a corporation and a stockholder therein can become parties to the employment
relationship as employer and employee, and a worker who is, in other respects, in the position

of an employee of a corporation must be treated as such for the purposes of the FLSA, even though the worker owns shares of stock in his or her corporate employer.  Ownership of stock does not destroy the duality of the parties to the relationship, even where the worker is an officer of the corporation or where none but stockholders do the corporation's work.

**10c04**  **Excluded employers.**

The term "employer," as used in section 3(d) of the FLSA, "does not include any labor organization (other than when acting as an employer) or anyone acting in the capacity of officer or agent of such labor organization."  The qualifying phrase, "other than when acting as an employer," indicates observance of the FLSA with respect to any individuals directly employed by it, whether or not such individuals are members of the organization, and even though they are elected to their positions by the entire membership.

**10c05**  **Political subdivisions of a state.**

The determination of whether a particular body is a "political subdivision" of a state within the meaning of FLSA section 3(d) must be controlled by the intention of Congress.  In general, the term "political subdivision" is interpreted for purposes of the FLSA to include counties, townships, cities, towns, villages, school districts, drainage districts, etc.

**10c06**  **Status of contractors with a government.**

The fact that an employer is doing work for the federal government or a state government does not transform the employer into a government instrumentality, nor place him/her in the position of the "United States or any [s]tate or political subdivision of a [s]tate."  Not even the fact that the federal or a state government has contracted for the performance by a private employer of a function purely governmental in character is sufficient to make the government the employer of the individuals employed by the contractor to perform the function.

**10c07**  **Federal Reserve Bank employees.**

Federal Reserve Bank employees are not employees of the U.S. within the meaning of FLSA section 3(d).

**10c08**  **Farm Credit Administration Banks and Associations.**

Employees of the following Farm Credit Administration Banks and Associations are considered as "employees" within the meaning of FLSA and subject to its provisions in the same manner as employees of the ordinary commercial bank or credit establishment: Federal Land Banks, Federal Land Bank Associations, Federal Intermediate Credit Banks, Production Credit Associations, and Banks for Cooperatives.

**10c09**  **Status of state-sponsored workshops.**

**(a)**  A state-sponsored workshop or other institution for aid to the handicapped may or may not be considered the same as the state, depending on the facts concerning the establishment and operation of the particular institution.  Employment in a state workshop for the blind is considered to be employment by the state itself where:

**CHAPTER 10 TABLE OF CONTENTS**

(1)     The institution was founded by an act of the legislature for the purpose of providing a central and responsible state unit to administer relief to the blind.

(2)     The financial operations of the institution were audited by a fiscal officer of the state.

(3)     Its identity with the state was further established by statutory provisions vesting supervision and control in a board of trustees, of whom a majority were appointed by the Governor, and providing for the financing of the institution out of public funds.

**10c10      Status of foreign governments.**

Although the FLSA does not expressly exclude foreign governments from the category of employers subject to its provisions, the usual principles of international comity are applied to exclude the direct agencies of such governments from compliance with the Act.  This rule, however, applies only if the agency is exercising part of the sovereign power of the foreign government.  If the agency is a commercial one engaged in commercial operations in competition with American industries, the agency is not excluded under this principle and the employees are entitled to the benefits of the FLSA. The United Nations is in the same category as a foreign government.

**10c11      States and political subdivisions: single employers.**

**(a)**     The government of a state, that is, all the departments and agencies of any of the 50 states, constitutes a single employer under the Act.  Similarly, the government of a political subdivision, *e.g.*, county, city, etc., with all of its departments and agencies, constitutes a single employer under the Act.  However, such entities are separate and distinct from the government of the state and from other political subdivisions.  Thus, where an employee works for more than one agency of the state government, or for more than one agency of a political subdivision, such employee's employment is by a single employer.  Each agency is both individually and coequally responsible for compliance with all applicable provisions of the Act with respect to such employee.  However, *see* FOH 59d.

**(b)**     Political subdivisions (*see* FOH 10c05) and interstate agencies have traditionally been recognized as entities separate and distinct from the government of the state.

**10c12      Community action agency.**

**(a)      Public agencies**

(1)     Whether a community action agency, which administers various antipoverty and economic opportunity programs, is a covered employer under the FLSA depends upon the facts in a particular situation.  Any community action agency which is an entity of a state, a political subdivision of a state, or a combination of public agencies is clearly an employer covered under the Act.  *See* 29 USC 203(d), 29 USC 203(x), and FOH 10c05.

(2)     However, a community action agency which consists solely of a private nonprofit agency or organization that has been *designated* by the state (or political subdivision thereof) would not thereby become a "public agency."  This does not, of course, preclude coverage of such private community action agency under another provision of the FLSA.  A private community action agency does not become a "public

**CHAPTER 10 TABLE OF CONTENTS**

agency" merely because it receives and disburses federal funds.  However, *see* FOH 59d.

**(b)**    **Enterprise coverage**

Enterprise coverage does not apply to the charitable, educational, religious or similar activities of private nonprofit organizations *except* where such activities are performed in connection with the type of institution set out in section 3(s)(1) of the Act or in connection with commercial ventures.

**(c)**    **Individual coverage**

Individual coverage may apply to employees of such organizations.

**10d**    **TYPES OF EMPLOYEES**

**10d00**    **Scope of the term "employee."**

**(a)**    Section 3(e)(1) of the amended Act defines the term "employee" to include any individual employed by an employer, except as provided in sections 3(e)(2), (3), and (4).

**(b)**    Section 3(e)(2) of the amended Act provides that in the case of an individual employed by a public agency, the term "employee" means:

(1)    any individual employed by the Government of the United States -

a.    as a civilian in the military departments (as defined in section 102 of title 5, United States Code),

b.    in any executive agency (as defined in section 105 of such title),

c.    in any unit of the legislative or judicial branch of the Government which has positions in the competitive service,

d.    in a nonappropriated fund instrumentality under the jurisdiction of the Armed Forces, or

e.    in the Library of Congress;

(2)    any individual employed by the United States Postal Service or the Postal Rate Commission, and

(3)    any individual employed by a state, political subdivision of a state, or an interstate governmental agency, other than such an individual -

a.    who is not subject to the civil service laws of the state, political subdivision, or agency which employs him, and

b.    who

**1.**    holds a public elective office of that state, political subdivision, or agency,

**CHAPTER 10 TABLE OF CONTENTS**

2.      is selected by the holder of such an office to be a member of his personal staff,

3.      is appointed by such an office holder to serve on a policy-making level, or

4.      who is an immediate adviser to such an office holder with respect to the constitutional or legal powers of his or her office, or

5.      is an employee in the legislative branch or legislative body of such state, political subdivision, or agency and is not employed by the legislative library of such state, political subdivision, or agency.

c.      The first category (FOH 10d00(b)(3)b.1., above) is limited to those persons who are elected by the voters of the pertinent jurisdiction.

With respect to the second and third categories (FOH 10d00(b)(3)b.2. and 3., above) the following are examples of tests which are to be considered:

1.      Is the person's employment entirely at the discretion of the elected office holder?

2.      Is the position not subject to approval or clearance by the personnel department or division of any part of the government?

3.      Is the work performed outside of any position or occupation established by a table of organization as part of a legislative, executive, or judicial branch, or a committee or commission established by such a branch?

4.      Is the person's compensation dependent upon a specific appropriation or is it paid out of an office expense allowance provided to the office holder?

The fourth category (FOH 10d00(b)(3)b.4., above) is limited to that of a legal advisor (*i.e.*, a lawyer).

d.      Thus individuals such as pages, stenographers, telephone operators, clerks, typists and others employed by the branch or commission as a whole, may be considered "employees" under the Act.  An additional example would be deputy sheriffs who, although they are selected by and work under the direction of the sheriff, are employed only after approval of their employment by the Board of Commissioners. They are not employed at the sole discretion of the sheriff pursuant to the second (FOH 10d00(b)(3)b.2., above) category.

**(c)**      Of course, employees who are not excluded by the provisions of section 3(e)(2)(C) may qualify for exemption under 29 CFR 541 if the tests are met.

**CHAPTER 10 TABLE OF CONTENTS**

**(d)**    Pursuant to section 3(e)(4) of the FLSA, the term "employee" does not include any individual who volunteers to perform services for a public agency which is a state, a political subdivision of a state, or an interstate government agency, if-

**(1)**    the individual receives no compensation or is paid expenses, reasonable benefits, or a nominal fee to perform the services for which the individual volunteered, and

**(2)**    such services are not the same type of services which the individual is employed to perform for such public agency.

**(e)**    An employee of a public agency which is a state, political subdivision of a state, or an interstate governmental agency may volunteer to perform services for any other state, political subdivision, or interstate governmental agency, including a state, political subdivision or agency with which the employing state, political subdivision, or agency has a mutual aid agreement.

## 10d01    Employees of the Library of Congress.

Pursuant to section 4(f) of the amended Act, the Secretary is authorized to enter into an agreement with the Librarian of Congress for enforcement of the FLSA with respect to any individual employed in the Library of Congress.  An agreement is now in effect which provides that the Library of Congress will investigate its own complaints.

## 10d02    Employees of the United States.

Section 4(f) of the amended Act authorizes the Civil Service Commission (now the Office of Personnel Management) to administer the provisions of the FLSA with respect to any individual employed by the U.S. (other than an individual employed in the Library of Congress, U.S. Postal Service, Postal Rate Commission, or the Tennessee Valley Authority).

## 10d03    Suits by federal, state, and local government employees under section 16(b).

Section 16(b) of the FLSA and section 6 of the Portal-to-Portal Act provide that employees of a public agency may sue for back wages in any federal or state court of competent jurisdiction for themselves or other employees.

## 10d04    (Reserved.)

## 10d05    Member of the elected official's personal staff.

**(a)**    Section 3(e)(2)(C) excludes from the definition of employee under the FLSA individuals who are selected by an elected office holder to be a member of his or her personal staff.  The personal staff does not include individuals who are directly supervised by someone other than the elected official even though they may be selected by and serve at the pleasure of such official.

**(b)**    Generally personal staff includes only persons who are under the direct supervision of the elected official and who have almost daily contact with him or her. It would, for example, include the official's private secretary, but not the secretary to his or her assistant, or the stenographers in a pool that services the official's department, or staff members in an operational unit whose head reports to the elected official.  It would typically not include all

**CHAPTER 10 TABLE OF CONTENTS**

members of an operational unit, since all the members could not have a personal working relationship with the elected official.

**10d06**     **National Guard technicians.**

National Guard technicians, whose positions are created by federal statute, are federal civilian employees and the application of the FLSA to them is a matter within the jurisdiction of the Civil Service Commission (now Office of Personnel Management) under section 4(f) of the Act.  *See* FOH 10d02.

**10e**     **GEOGRAPHICAL LIMITS**

**10e00**     **Geographical limits of FLSA.**

(a)     Pursuant to section 13(f) of the FLSA, the provisions of sections 6, 7, 11, and 12 of the Act do not apply to any employee whose services are performed in a work place within a foreign country or within territory under the jurisdiction of the U.S. states other than the following:

    (1)     A state of the United States

    (2)     The District of Columbia

    (3)     Puerto Rico

    (4)     Virgin Islands

    (5)     Outer Continental Shelf lands as defined in the Outer Continental Shelf Lands Act (43 USC 1331)

    (6)     American Samoa

    (7)     Guam

    (8)     Wake Island

    (9)     Johnston Island

(b)     Effective 03/24/1976, the FLSA, except for section 6, applied to the Northern Mariana Islands.

(c)     Effective 10/21/1986, the FLSA no longer applied to Eniwetok Atoll or Kwajalein Atoll (99 Stat. 1770).

**10e01**     **FLSA application to employees performing duties both in the U.S. and foreign countries such as Canada, Mexico, or Panama.**

(a)     Coverage shall be asserted for U.S. and foreign citizens employed at or working out of an establishment or work site, located in a state, as defined in the Act, even though the employer is a foreign citizen, when such employees are engaged in or producing goods for interstate commerce or are employed in an enterprise described in section 3(s).

**CHAPTER 10 TABLE OF CONTENTS**

(b)     Employees employed by and working in an establishment located in a foreign country are not considered subject to the FLSA merely because they make deliveries in the states, or pick up materials in the states for transport to a foreign country.

On the other hand, where an employee of such an establishment is working in the U.S. for a substantial period of time and performs covered, nonexempt work, coverage would be asserted. A worker who travels more than 25 miles from the U.S. border or spends more than 72 hours in the U.S. on a single visit (whichever occurs first) is considered to have spent a substantial period of time in the U.S. Once a worker has spent a substantial period in the U.S., all hours of work in the U.S. on that visit must be compensated at no less than the minimum wage, including hours of work prior to the worker reaching the 25 mile or 72 hour mark.

## 10e02     **Employees in foreign countries.**

The FLSA does not apply to employees exclusively employed in foreign countries even though they may be American citizens and employees of an American employer.

## 10f     JOINT EMPLOYMENT

[01/03/2017]

## 10f00     **General.**

Joint employment exists when an employee is employed by two (or more) employers such that the employers are responsible, both individually and jointly, for compliance with a law. The purpose of this section is to provide guidance on two types of joint employment under the FLSA and the MSPA: horizontal joint employment and vertical joint employment.

Both the FLSA (29 CFR 791.2) and MSPA (29 CFR 500.20(h)) have regulations providing guidance regarding joint employment.  As discussed below, given that the FLSA and MSPA define the scope of employment and joint employment in the same manner, guidance in the FLSA joint employment regulation may be useful in MSPA investigations, and guidance in the MSPA joint employment regulation may be useful in FLSA investigations.

Although this chapter focuses on horizontal and vertical joint employment, the scope of employment under the FLSA and MSPA is very broad given that both statutes define "employ" as including "to suffer or permit to work."  *See* FOH 10f01 below.  Although it does not appear in the regulations, the "horizontal" and "vertical" terminology is frequently used by courts and may be helpful in identifying potential joint employment scenarios.  It is not critical, however, to use this terminology or classify every factual scenario as vertical or horizontal.  There may be additional situations where two or more employers satisfy that broad definition of employment with respect to an employee's work and therefore jointly employ the employee.

[01/03/2017]

## 10f01     **Scope of employment and joint employment under FLSA and MSPA.**

(a)     As noted in FOH 10b01, courts have consistently held that the FLSA's definition of "employ," which includes "to suffer or permit to work," is broader than the traditional common law concept of employment.  Most workers are employees under the FLSA.

**CHAPTER 10 TABLE OF CONTENTS**

**(b)**      The MSPA defines "employ" in exactly the same way as the FLSA, using the suffer or permit standard, and the scope of employment relationships under the MSPA is the same as it is under the FLSA.

**(c)**      Both the FLSA and MSPA provide for joint employment when an employee is employed by two (or more) employers at the same time, and the WHD has promulgated regulations for the FLSA and MSPA that provide guidance regarding joint employment.  As discussed below, the FLSA and MSPA regulations address two types of joint employment.  Because the suffer or permit standard includes joint employment and ensures that the scope of employment relationships subject to the FLSA and MSPA is as broad as possible, the concept of joint employment should also be defined expansively under these laws.  Moreover, because the FLSA and MSPA both define "employ" using the same suffer or permit standard and because the MSPA expressly incorporates the FLSA's joint employment principles, the guidance in the FLSA and MSPA regulations may be relied on interchangeably across the two statutes.  In other words, the type of joint employment addressed in the MSPA regulation will arise in FLSA cases, and the guidance in the MSPA regulation is helpful to analyzing joint employment in those FLSA cases.  And, the types of joint employment addressed in the FLSA regulation will arise in MSPA cases, and the guidance in the FLSA regulation is helpful to analyzing joint employment in those MSPA cases.

**(d)**      Using the broad suffer or permit standard, the WHD examines whether an employment relationship exists in each investigation, and whether joint employment exists in each investigation where there is more than one possible employer.  Joint employment means that there is an employment relationship between an employee and additional employers.  Joint employment is employment under the FLSA and MSPA, and each joint employer has all of the obligations and responsibilities of an employer.  One employer's obligations and responsibilities are not primary or secondary to any other employers' obligations and responsibilities under the FLSA and MSPA.

[07/07/2017]

[01/03/2017]

**10f02**      **Types of joint employment.**

**(a)**      **Horizontal joint employment**

Horizontal joint employment exists where two (or more) employers each separately employ an employee and are sufficiently associated with or related to each other with respect to the employee.  In possible horizontal joint employment situations, there is an employment relationship between the employee and each of the employers, and often the employee performs separate work or works separate hours for each employer.  A horizontal joint employment analysis focuses on the relationship between the two (or more) employers and whether they are sufficiently related such that they jointly employ the employee.

The FLSA regulation provides guidance regarding horizontal joint employment.  *See* 29 CFR 791.2(b).

Horizontal joint employment is explained in more detail in FOH 10f03.

[07/07/2017]

**CHAPTER 10 TABLE OF CONTENTS**

Defs.' Appx. 00001152

**(b)**     **Vertical joint employment**

Vertical joint employment exists where an employee of one employer (referred to as an intermediary employer) is also, with regard to the work performed for the intermediary employer, economically dependent on another employer, the possible joint employer.

Unlike in horizontal joint employment cases, where the association between the possible joint employers is relevant, the vertical joint employment analysis examines the economic realities of the relationship between the employee and the possible joint employer to determine whether the employee is economically dependent on the possible joint employer and is its employee too.

The MSPA regulation describes seven economic realities factors to analyze joint employment. *See* 29 CFR 500.20(h).  These seven economic realities factors provide useful guidance in vertical joint employment cases to determine whether an employee is economically dependent on a possible joint employer and are not limited to the agricultural context.

Vertical joint employment is explained in more detail in FOH 10f04.

[07/07/2017]

**(c)**     **FLSA and MSPA joint employment concepts are complementary**

**(1)**     *The joint employment principles in the FLSA regulation may be helpful in MSPA cases, and the joint employment principles in the MSPA regulation may be helpful in FLSA cases*

The horizontal joint employment discussed in the FLSA regulation may arise in MSPA cases; in such MSPA cases, the guidance provided in the FLSA regulation may be useful in resolving that case.  Likewise, the vertical joint employment discussed in the MSPA regulation will arise in FLSA cases; in such FLSA cases, the guidance provided in the MSPA regulation may be useful in resolving that case.

**(2)**     *Either type of joint employment may arise (and the guidance in either regulation may be useful) in a given situation*

Even though the FLSA regulation's focus is the relationship between the two possible joint employers while the MSPA regulation's focus is the relationship between the grower (*i.e.*, the possible joint employer) and the worker, both regulations have as their foundation the broad scope of employment that derives from defining the term employ as including "to suffer or permit" work.  Moreover, the MSPA adopted the FLSA's joint employer principles as its own.

**(3)**     *The MSPA regulation's guidance may be useful in analyzing possible joint employment arising in industries other than agriculture*

The MSPA regulation's guidance on joint employment is useful in any case where an employer contracts with an intermediary employer for the provision of workers or services.  For instance, a staffing agency in the janitorial industry provides workers to clean a hospital.  The staffing agency is the intermediary employer, like a farm labor

contractor (FLC), and assuming that it is an independent contractor of the hospital, the issue is whether the hospital is a joint employer of the janitorial workers.  This is possibly a vertical joint employment relationship, and the economic realities factors described in the MSPA joint employment regulation may help to determine whether the workers are economically dependent and thus employees of the hospital (in addition to the staffing agency).

(4)    *The FLSA regulation's guidance may be useful in a MSPA case*

The FLSA regulation's guidance may be useful in a MSPA case where, for instance, two growers employ the same workers and there is evidence that one grower is controlled by the other.  In this case, there may be horizontal joint employment, and the joint employment analysis would benefit from the guidance in the FLSA regulation to determine if the two growers are associated and share control of the workers because of their association.

(5)    *There are complex situations in which both regulations can be used to analyze the potential for joint employment*

For example, a temporary help agency may provide workers to a warehouse that is operated by two different big box retailers.  There could be vertical joint employment between the workers of the temporary help agency and each of the big box retailers, and the arrangement or association between the retailers to operate the warehouse could be horizontal joint employment.

[01/03/2017]

**10f03    Horizontal joint employment.**

(a)    In horizontal joint employment cases, the employee is employed by two or more employers, and the issue is whether these employers, because of their association with each other or other considerations, jointly employ the employee.  The focus in a horizontal joint employment case is the relationship between the possible joint employers.

[07/07/2017]

(b)    **The FLSA regulation provides guidance regarding horizontal joint employment**

The FLSA regulation provides that a single worker may be "an employee to two or more employers at the same time."  *See* 29 CFR 791.2(a).  In such cases, the employee's work for the joint employers during the workweek is considered as one employment, the hours worked for each employer are aggregated to determine the employee's total hours worked for overtime purposes, and the joint employers are responsible, both individually and jointly, for FLSA compliance, including paying overtime compensation for all hours worked over 40 during the workweek.  *See* FOH 32j12.  An employee has joint employers where the employee performs work which simultaneously benefits two or more employers or works for two or more employers at different times during the workweek and one of the following is present:

(1)    There is an arrangement between the employers to share the employee's services (*e.g.*, to interchange employees)

**CHAPTER 10 TABLE OF CONTENTS**

Defs.' Appx. 00001154

(2)     One employer is acting directly or indirectly in the interest of the other employer in relation to the employee

(3)     The employers are not completely disassociated with respect to the employment of a particular employee and share control of the employee, directly or indirectly, because one employer controls, is controlled by, or is under common control with the other employer

29 CFR 791.2(b)

**(c)     Facts to consider when assessing the relationship or degree of association between the possible joint employers**

The focus in most horizontal joint employment cases is the degree of association between the possible joint employers with respect to the employee.  *See* 29 CFR 791.2(a).  In other words, the third scenario described above is the most common.  Particular facts to consider when analyzing the degree of association between, and sharing of control by, the possible joint employers include:

(1)     Do the possible joint employers share some common ownership (*i.e.*, one owns the other or they have the same owner)?

(2)     Do the possible joint employers share control over operations (*i.e.*, hiring, firing, payroll, advertising, overhead costs)?

(3)     Are the possible joint employers' operations inter-mingled (*i.e.*, is there one administrative operation for both employers, or the same person schedules and pays the employees no matter which employer they work for)?

(4)     Do the possible joint employers have any overlapping officers, directors, executives, or managers?

(5)     Does one possible joint employer supervise the work of the other?

(6)     Do the possible joint employers share supervisory authority for the employee?

(7)     Do the possible joint employers treat the employees as a pool of employees available to both of them?

(8)     Do the possible joint employers share clients or customers?

(9)     Are there any agreements between the possible joint employers?

These facts have been used by the Department of Labor and courts in horizontal joint employment cases, but they are not an all-inclusive list of evidence that is relevant to the analysis.  Moreover, not all or even most of these facts need to be present for joint employment to exist.  Horizontal joint employment exists when there is sufficient evidence that the two employers use the workers and their businesses for their mutual benefit.  In many cases, the possible joint employers are separate legal entities and employ the employee at different locations; horizontal joint employment may exist in such situations.

**CHAPTER 10 TABLE OF CONTENTS**

29 CFR 791.2(a)

**(d)    When the analysis indicates horizontal joint employment**

If the employee's work for the two or more employers during the workweek is considered as one employment, then the employee's hours worked for all of the joint employers must be combined.  The joint employers are responsible, both individually and jointly, for compliance with the FLSA and MSPA, including paying at least the equivalent of minimum wage for all hours worked and paying overtime for all hours worked over 40 during a workweek.

**(e)    When the analysis does *not* indicate horizontal joint employment**

If the employers act entirely independently of each other and are completely disassociated with respect to an employee who works for both of them, each employer may disregard all work performed by the employee for the other when determining its own responsibilities under the FLSA and MSPA.

**(f)    Horizontal joint employment may be found in MSPA cases**

Although horizontal joint employment is addressed in the FLSA joint employment regulation, it may also exist in MSPA cases.  In such MSPA cases, the FLSA regulation provides guidance for determining whether there is joint employment.  The FLSA regulation's guidance may be useful in a MSPA case where, for instance, two growers employ the same workers and there is evidence that one grower is controlled by the other.  In this case, the joint employment analysis would rely on the FLSA regulation's guidance to determine if the two growers are associated and share control of the workers because of their association.

[01/03/2017]

**10f04    <u>Vertical joint employment.</u>**

**(a)    Intermediary employer**

The term "intermediary employer" refers to an employer, such as a staffing agency, subcontractor, or FLC, who provides labor or workers to another employer.

**(b)    Possible joint employer**

The term "possible joint employer" refers generally to the other entity that contracts with the intermediary employer to obtain labor, such as the end-employer, higher-tier contractor, client of the staffing agency, grower, or agricultural association.

**(c)    Consider first whether an employment relationship exists between the intermediary employer and the possible joint employer**

The existence of a vertical joint employment relationship depends, as an initial matter, on whether the intermediary employer itself is an independent contractor or an employee of the possible joint employer.  Where the intermediary employer is itself (or himself or herself if the intermediary is an individual) an employee of the possible joint employer, no joint employment inquiry is necessary or appropriate because the possible joint employer is the one employer of both the intermediary employer and the workers.  Where the intermediary

**CHAPTER 10 TABLE OF CONTENTS**

Defs.' Appx. 00001156

employer is not an employee (but is an independent contractor) of the possible joint employer or the question is a close one, a vertical joint employment analysis may be necessary.

29 CFR 500.20(h)(4)

[07/07/2017]

**(d)      Focus on the nature of the relationship between the worker and the possible joint employer**

When assessing a possible vertical joint employment relationship, the focus is on whether the employee of the intermediary employer is also employed by the possible joint employer. This analysis is an employment relationship analysis, and, under the FLSA and MSPA, the analysis must examine, as matter of economic reality, the degree of the employee's economic dependence on the possible joint employer. As discussed below, the MSPA joint employment regulation provides seven economic realities factors to apply in vertical joint employment cases.

**(e)      Joint employment economic realities factors from the MSPA regulation**

The MSPA joint employment regulation provides seven economic realities factors to guide the analysis whether the worker is economically dependent on the possible joint employer in vertical joint employment cases. These factors should not to be applied as a checklist, and no single factor determines the outcome. Additional evidence relevant to the economic realities may be considered. The weight given to each factor individually and in total depends on all of the facts and circumstances of the case. The factors themselves are not the analysis; instead, they are guides to answering the ultimate question of economic dependency. The factors should also be applied with the understanding that the MSPA defines the scope of the employment relationship very broadly. The seven factors are:

(1)      *Directing, controlling, or supervising the work performed*

This factor examines whether the possible joint employer has the power, either alone or through control of the intermediary employer, to direct, control, or supervise the employee or the work performed (such control may be either direct or indirect, taking into account the nature of the work performed and a reasonable degree of contract performance oversight and coordination with third parties).

To the extent that the work performed by the employee is controlled or supervised by the possible joint employer beyond reasonable oversight to ensure contract performance, such control suggests that the employee is economically dependent on the possible joint employer. The possible joint employer's control can be indirect (*i.e.*, exercised through the intermediary) and still be sufficient to indicate economic dependence by the employee. Additionally, the possible joint employer need not exercise more control than, or the same control as, the intermediary to exercise sufficient control to indicate economic dependence by the employee.

Where the possible joint employer's control or supervision is less because the employee's work is routine or occurs off-site, the lack of control or supervision may not be indicative of a lack of economic dependency on the possible joint employer.

**CHAPTER 10 TABLE OF CONTENTS**

(2)     *Controlling employment conditions*

This factor explores whether the possible joint employer has the power, either alone or in addition to the intermediary employer, directly or indirectly, to hire or fire, modify the employment conditions, or determine the pay rate or method of payment for the employee.

To the extent that the possible joint employer has the power to hire or fire the employee, modify employment conditions, or determine the rate or method of pay, such control suggests that the employee is economically dependent on the possible joint employer. Again, the possible joint employer may exercise such control indirectly and need not exclusively exercise such control for there to be an indication of joint employment.

(3)     *Permanency and duration of relationship*

This factor looks at the degree of permanency and duration of the relationship of the parties, in the context of the particular work performed.

An indefinite, permanent, full-time, or long-term relationship by the employee with the possible joint employer suggests economic dependence. This factor should be considered in the context of the particular industry at issue. For example, if the work in the industry is by its nature seasonal, intermittent, or part-time, such industry practice should be considered when analyzing the permanency and duration of the employee's relationship with the possible joint employer.

(4)     *Repetitive and rote nature of work*

This factor examines the extent to which the services rendered by the employee are repetitive, rote tasks requiring skills which are acquired with relatively little training.

To the extent that the employee's work for the possible joint employer is repetitive and rote or involves skills requiring little training, that evidence indicates that the employee is economically dependent on the possible joint employer.

(5)     *Integral to business*

This factor explores whether the activities performed by the employee are an integral part of the possible joint employer's overall business operation.

If the employee's work is an integral part of the possible joint employer's business, that evidence suggests that the employee is economically dependent on the possible joint employer. An employee's work does not have to be important to be integral to the business, and the employee's work can be integral even if there are many others who do the same work. An employee's work can be integral if the employee plays a role in producing a good or providing a service that the potential joint employer is in business to produce or provide. Whether the work is integral to the grower's business has long been a hallmark of determining whether an employment relationship exists.

(6)     *Work performed on premises*

**CHAPTER 10 TABLE OF CONTENTS**

This factor looks at whether the work is performed on the possible joint employer's premises.

The employee's performance of the work on premises owned or controlled by the possible joint employer indicates that the employee is economically dependent on the possible joint employer.  The possible joint employer's leasing as opposed to owning the premises where the work is performed is immaterial because the possible joint employer, as the lessor, controls the premises.  Also, if the employee works on the premises of customers or clients of the possible joint employer, that evidence suggests that the possible joint employer controls where the work is performed and that the employee is economically dependent on the possible joint employer.

(7)     *Performing administrative functions commonly performed by employers*

This factor explores whether the possible joint employer undertakes any responsibilities in relation to the employee which are commonly performed by employers, such as preparing or making payroll records, preparing or issuing pay checks, paying Federal Insurance Contributions Act (FICA) taxes, providing workers' compensation insurance, providing field sanitation facilities, housing or transportation, or providing tools, equipment, or materials required for the job (taking into account the amount of investment).

To the extent that the possible joint employer performs any of the above or similar administrative functions for the employee, that evidence suggests economic dependence by the employee on the possible joint employer.

As mentioned above, not all of the factors need to be met for there to be vertical joint employment.  In particular, there may be little evidence in a case that the possible joint employer undertakes responsibilities in relation to the workers that are commonly performed by employers.  After all, the possible joint employer engages the intermediary employer to perform those responsibilities for it.  Any lack of evidence on this factor should not preclude a finding of joint employment where the facts taken as a whole indicate that the workers are economically dependent on the possible joint employer.

**(f)     When the analysis indicates vertical joint employment**

If the employee is economically dependent on both the intermediary employer and the possible joint employer(s), then joint employment exists.  The joint employers are responsible, both individually and jointly, for compliance with the FLSA and MSPA, including paying at least the equivalent of minimum wage for all hours worked and paying overtime for all hours worked over 40 during a workweek under the FLSA and paying the promised wage under the MSPA.

**(g)     When the analysis does *not* indicate vertical joint employment**

If the analysis shows that the employee is not economically dependent on both the intermediary employer and the possible joint employer, then vertical joint employment does not exist.  As such, only the intermediary is liable for compliance with the FLSA and MSPA as those laws relate to the employee.

[01/03/2017]

**CHAPTER 10 TABLE OF CONTENTS**

**10f05**     <u>**Joint employment and enterprise coverage are different.**</u>

The joint employment analysis in the FLSA is distinct from determining whether two or more employers are a single enterprise covered by the FLSA.  Although some facts that support a finding that two employers are a covered enterprise may also support a finding that they are joint employers, the two analyses are different.  Therefore, a single enterprise may be found involving two separate establishments if those establishments exhibit unified operation or common control for a common business purpose (*see* 29 CFR 779.200 -.235 and FOH 12a), but those establishments will be joint employers only if the analysis discussed above indicates that there is joint employment.

[01/03/2017, 07/07/2017]

**10f06**     <u>**Joint employment and individual liability are different.**</u>

The joint employment analysis in the FLSA is not applicable when determining whether an individual owner or officer of an entity is also the employer of the entity's employees and individually liable under the FLSA.  Sometimes, the individual and the entity are said to jointly employ the employees; however, courts generally apply a different test than the joint employment analyses discussed above when determining whether an individual is an employer.  Because there is already an employment relationship between the business and the employee, whether the individual business owner or officer is also liable as an employer depends on whether, as a matter of economic reality, the individual has operational control over the employees, and examines whether the individual has the power to hire and fire them, supervise and control their work schedules and conditions of employment, determine their rate and method of payment, and maintain their employment records.

[01/03/2017]

**10f07**     <u>**Joint employment and joint responsibility under the MSPA are different.**</u>

Many MSPA requirements are applicable to the person or entity responsible for the matter at issue, even without an employment relationship between that person or entity and the affected farmworkers.  When any person not otherwise exempt from the MSPA recruits, solicits, hires, employs, furnishes, or transports workers, that person is required to comply with the applicable protective provisions of the MSPA.

[01/03/2017]

**CHAPTER 10 TABLE OF CONTENTS**

Defs.' Appx. 00001160

# KNOW YOUR RIGHTS

An information pamphlet describing your rights while working in the United States.

National Human Trafficking Hotline
**1-888-373-7888** (within the United States)











# KNOW YOUR RIGHTS

We are confident that you will have a rewarding stay in the United States. However, if bad situations happen, you have rights and you can get help!

## You Have the Right to:

- Be paid fairly
- Be free from discrimination
- Be free from sexual harassment and sexual exploitation
- Have a healthy and safe workplace
- Request help from union, immigrant, and labor rights groups
- Leave an abusive employment situation

**IF YOU ARE MISTREATED, CONTACT THE NATIONAL HUMAN TRAFFICKING HOTLINE AT 1-888-373-7888 (WITHIN THE U.S.), TEXT "HELP" TO 233733 (WITHIN THE U.S.) OR EMAIL *NHTRC@POLARISPROJECT.ORG.***

**TRAINED SPECIALISTS ARE ALWAYS AVAILABLE TO HELP IN MORE THAN 200 LANGUAGES. YOU DO NOT HAVE TO GIVE YOUR NAME OR IDENTIFY YOURSELF. LEARN MORE AT *WWW.TRAFFICKINGRESOURCECENTER.ORG.***

If you are in immediate danger, call the police at 911 (within the U.S.). Tell them the emergency, your location and the phone number from which you are calling. Ask for an interpreter if you do not speak English. When the police arrive, you can show them this pamphlet and tell them about the abuse you have suffered.

If you receive an A-3, G-5, H, J, NATO-7, or B-1 domestic worker nonimmigrant visa, you should receive this pamphlet during your visa interview. A consular officer must verify that you have received, read, and understood the contents of this pamphlet before you receive a visa. If you have not, the consular officer should provide the pamphlet and discuss it with you. In addition, the consular officer should answer any questions you have about the information in the pamphlet.

1

# YOUR RIGHTS REGARDLESS OF VISA STATUS

If you believe that your rights have been violated, report it to a government agency, union, non-governmental organization, or other organization that can assist you. If you do not speak English, ask for an interpreter.

### 1. Your Right to Be Paid Fairly

- You have the right to be paid for all work you do.

- You have the right to earn at least the federal legal minimum wage for most jobs. See *www.dol.gov/whd/minimumwage.htm* for the current federal minimum.

- You may be entitled to earn more than the federal minimum wage if:

  - You work in a state, city, or county that has a higher minimum wage.

  - Your employment contract/visa program requires a higher amount.

- You may be entitled to overtime pay of one and a half times the amount of your hourly wage for any hours worked over 40 hours per week. For example, if your regular wage rate is $10 per hour, your employer may be required to pay you $15 for each hour you work above 40 hours in a single week.

- If your employer takes money from your paycheck, this is called a deduction. Your employer must clearly identify for you each deduction taken from your paycheck.

- Deductions may be illegal if you are left with less than the legally required wage rate after the deduction. An employer usually may not deduct for the cost of uniforms, safety equipment, required tools, supplies, equipment or recruitment fees. For some visa categories, housing must be provided free of charge.

- Lawful deductions include those you choose, such as health insurance, union dues, or wage advances, as well as deductions an employer must make due to court-ordered withholdings for child support or alimony, or bankruptcy proceedings. With few exceptions, nonimmigrant visa holders working in the United States

TIP: Bring this pamphlet with you to the United States for future reference.

2



TIP: Depending on your length of stay, you may be required to have health insurance while in the United States. You may also qualify for financial help to lower the cost of health insurance.

are subject to federal and state income and employment taxes. You and your employer may agree to have income tax withheld directly from your paycheck. Your employer will generally withhold employment taxes, including Social Security and Medicare taxes, directly from your paycheck.

## 2. Your Right to Be Free from Discrimination

- It is unlawful for your employer to treat you differently or badly at work because of your age (if you are 40 or older), gender or sex, race, national origin and ethnicity, color, religion, genetic information (including family medical history), or disability.

- Your employer may not treat you differently because you are a woman or because you are pregnant, nursing, or may become pregnant.

## 3. Your Rights to Be Free from Sexual Harassment and Sexual Exploitation

- It is unlawful for your employer to sexually harass you. Your employer should not make any offensive sexual or gender-based comments.

- It is unlawful for your employer to sexually exploit you, including:

  - Demanding that you perform any sex act;

  - Touching you in a sexual manner;

  - Forcing, tricking or coercing you to perform any sex act.

## 4. Your Right to a Healthy and Safe Workplace

As a worker in the United States, you have a right to safe, healthy work conditions including:

- **Medical Treatment:** You have the right to report work-related injuries and illnesses to your employer. If you are injured or get sick at work, you may seek medical treatment. In most cases, for work related

3

TIP: Before leaving for the United States, get advice from migrant worker organizations or former migrant workers. They can give you names and numbers of persons or organizations you can contact if you have problems or questions when you are in the United States.



injuries or illnesses, your employer should provide free medical treatment and part of the wages lost while injured. You may have to file for workers' compensation in the state where you work.

- **Protective equipment:** If you work with or around pesticides or dangerous chemicals, your employer must pay for and provide protective equipment required for the job (such as a respirator or gloves).

- **Training:** You have the right to receive information and training about hazards, methods to prevent harm, and the safety and health standards that apply to your workplace. The training must be in a language and vocabulary you can understand.

- **Housing:** If your employer provides housing, it should be clean and safe. You must be allowed to leave your housing during non-working hours.

- **Bathrooms:** Bathrooms should be clean and accessible. Your employer should grant you access to bathroom facilities as needed.

- **Potable Water:** You have the right to receive clean drinking water.

- **Soap and Clean Water:** You have the right to wash your hands as needed with soap and water especially after handling pesticides/chemicals, including vegetables or fruit treated with pesticides/chemicals.

- **Medical Emergencies:** Your expenses may be paid for, so you should tell your employer about your injury or illness as soon as possible so the employer can file the necessary paperwork. When you are at the doctor, clinic, or hospital, ask for copies of the paperwork regarding your illness or injury.

Defs.' Appx. 00001165



If you are working with or around pesticides or dangerous chemicals:

- You have a right to know and understand the chemicals you are working with, and your employer must provide you with paid training on workplace chemicals.

- Your employer must tell you where and when pesticides were sprayed and when it is safe to re-enter a treated area to avoid accidental exposure. Do not be in an area where pesticides are being applied.

## 5. Your Right to Request Help from Union, Immigrant, and Labor Rights Groups

- With few exceptions, you have the right to join together with your coworkers to ask your employer to improve your wages or working conditions. Most workers also have the right to form, join, and support a union in your workplace.

- When you are not working, you can attend public speeches, rallies and demonstrations supporting higher wages or better working conditions at your workplace.

- You have this right regardless of your immigration status. Your employer cannot take action against you for asserting your rights.

## 6. Your Right to Leave an Abusive Employment Situation

- The most important thing is for you to seek safety if you are being abused. You do not have to stay in your job if your employer is abusing you.

- Though your visa status will no longer be valid if you leave your employer, you may be able to change your visa status or employer. You may need to leave the United States to do so. Even if your visa status is not valid, help is available once you leave your abusive employer.

- You may make a formal complaint or file a lawsuit against your employer while you are working or after you leave your employer. If your employer takes action (or retaliates) against you for doing so, they are violating the law.

TIP: Legal advice from your employer, contractor, or recruiter may be biased. Seek advice from an independent attorney.

Defs.' Appx. 00001166

# ADDITIONAL RIGHTS BASED ON YOUR NONIMMIGRANT STATUS

### A-3, G-5, NATO-7, and B-1 Domestic Employees

- Your employer must provide you with an employment contract that complies with U.S. law.

- The contract must state the hourly wage to be paid to the domestic employee. The hourly wage must be the greatest of the minimum wage under U.S. Federal, state, or local law.

- Employers must provide you with a contract in a language that you understand. Make sure that you know the terms of the contract and do not sign a document if you do not know what it says.

### Additional Requirements for A-3, G-5, and NATO-7 Domestic Workers

*At a minimum, the contract must include the following provisions:*

- An agreement by your employer to abide by all laws in the United States;

- Information on the frequency and form of payment, work duties, weekly work hours, holidays, sick days, and vacation days; and

- An agreement by your employer not to keep your passport, employment contract, or other personal property from you.

### H-2A Temporary Agricultural Worker Visas

- You should never have to pay fees to a labor recruiter.

- You must receive a written work contract in a language you understand. It must contain detailed information about the wages, work duration, hours, benefits (including transportation, housing and meals or cooking facilities), and any deductions from your paycheck.

- You have the right to be paid fairly even if you are paid at a piece rate.

- Your employer must either provide or pay for inbound transportation and daily subsistence from the place from which you have come to work for the employer to the place of employment, or reimburse you for reasonable costs once you complete half of your work contract. Once you complete the work contract, your employer must provide or pay for your return transportation and daily subsistence from the place of employment to the place from which you departed to work for the employer. Your employer may be required to reimburse your inbound travel and visa costs in the first workweek if your wages minus your

6

expenses are less than the U.S. minimum wage. Your employer must also provide transportation from your employer-provided housing to the worksite at no charge.

- You are exempt from U.S. Social Security and Medicare taxes on compensation paid for services performed in connection with your H-2A visa.

- Generally, your employer must offer you employment for a total number of hours equal to at least 3/4 of the workdays in the contract period.

### H-2B Temporary Non-Agricultural Worker Visas

- You should never have to pay fees to a labor recruiter.

- You must receive a written job order in a language you understand. It must contain detailed information about the wages, work duration, hours, benefits (including transportation, housing and meals or cooking facilities), and any deductions from your paycheck.

- Generally, your employer must offer you employment for a total number of hours equal to at least 3/4 of the workdays in each 12-week period.

- You have the right to be paid fairly even if you are paid at a piece rate.

- Your employer must either provide or reimburse you for inbound transportation and subsistence from overseas by the time you complete half of the contract period. Additionally, your employer must pay costs for your transportation home, including subsistence, if you complete the period of employment or are dismissed by your employer for any reason before the end of your authorized period of employment. Your employer may also be required to reimburse your inbound travel and visa costs in the first workweek if your wages minus your expenses are less than the U.S. minimum wage.

### J-1 Exchange Visitor Visas

- Your approved DS-2019 explains your program dates, category of exchange, the name of your sponsor, and the hosting entity where your exchange program will take place.

- Your sponsor must accurately explain all costs, conditions, and restrictions on your exchange program.

7



TIP: Your employer must pay you on time. It is a common practice in the United States for employees to be paid once every two weeks.

### Summer Work Travel

- If you do not have pre-placed employment, your sponsor must assist you in locating employment once you arrive in the United States.

### Intern or Trainee

- Your sponsor must interview you in person, by telephone, or by web camera.

- Your sponsor must give you an intern or trainee placement plan (DS-7002) that includes a written statement of any income you will receive and a summary of the training objectives of the program. You must be given at least 32 hours of work per week.

- Your sponsor must give you a written statement of the costs and fees you will have to pay and an estimate of living expenses in the United States.

- Your sponsor must ensure that you have medical insurance coverage, though your sponsor does not need to provide or pay for this coverage.

### Au Pair:

- Your host-family must help you enroll in and attend classes at a post-secondary institution and pay up to $500 in costs for those classes.

- You are not required to work more than 10 hours per day or 45 hours per week.

- Your counselor should regularly maintain contact with you and your host family.

8

TIP: Before you travel, make two copies of all important documentation, especially your passport and U.S. visa, your employment contract, and any additional identity documents. Give one set of these copies to someone you trust in your home country, and take the other set with you.



**First Name**

**Last Name**

**Where your visa was issued**

**Your birth date**

**"R"** means "regular" passport. "Class" is the type of visa.

**"Expiration Date"** is the last day you can use your visa to seek entry into the U.S. It has nothing to do with how long you may stay in the U.S.

**"M"** means that you can seek entry into the U.S. multiple times. If there is a number here, you may apply for entry that many times.

**"Annotation"** may include additional information about your visa. For example, on a student visa, it will show your SEVIS number and name of your school.

# YOUR NONIMMIGRANT VISA

A nonimmigrant visa is a U.S. government document that permits individuals who travel to the United States to request entry for a particular purpose, including to work, study, or participate in a cultural exchange program. You must apply for a visa at a U.S. embassy or consulate abroad. Once you obtain a nonimmigrant visa, you can travel to the United States and present it to a U.S. immigration official for admission. If your visa expires, you need to obtain a new visa before you reenter the United States.

When you are admitted to the United States, an immigration official will stamp your passport and mark it with the date of admission, class



of admission and "admit until" date. You need to leave the United States before your I-94 "admit until" date to remain in legal status unless you file for an extension with the U.S. Citizenship and Immigration Services. You can check your I-94 records at *https://i94.cbp.dhs.gov.*



TIP: Once you arrive in the United States, keep your passport and other travel documents in a safe place where you can access them at all times. It is illegal for your employer to take your passport.

# HUMAN TRAFFICKING

Victims of human trafficking are entitled to protections and services, and may be eligible for some public benefits. Human trafficking is a crime involving the exploitation of children for commercial sex, of adults for commercial sex through the use of force, fraud or coercion, and of any individual for compelled labor. Perpetrators of such exploitation, which can include labor traffickers, pimps and buyers of commercial sex, can be prosecuted under federal and state anti-trafficking laws. Labor traffickers and sex traffickers may be prosecuted criminally and may face civil liability as well. The following are some warning signs that may indicate human trafficking.

### Threats and Fear

Traffickers, and people who help them, may use threats and other intimidating acts to make you or others feel too afraid to try to leave. For example:

- Beatings, physical abuse, or sexual abuse;
- Threats of beatings, physical abuse, or sexual abuse;
- Locking in or preventing a worker from leaving the workplace or housing;
- Threats to harm you or your family if you try to leave, complain of mistreatment, report the situation to authorities, or seek help;
- Threats you could be deported or arrested for seeking help; or
- Threats or harm toward other workers who have tried to leave, complain, report the situation or seek help, or threats that anyone who tries to escape will be found and brought back.

10

### Debt

Traffickers, and people who help them, may demand that you perform labor, services or commercial sex acts (prostitution) to repay a debt. In some instances the debt is created and imposed by the trafficker. It is against the law to use a debt to compel you to continue providing labor, services or commercial sex acts, or to prevent you from leaving. Traffickers may manipulate your debt to make it harder to pay off and may cause you to believe that you must remain in the trafficker's service until the debt is paid. Examples of manipulating debts include:

- Imposing a debt that is difficult or impossible to pay off in a reasonable time and that is out of proportion to what you will earn;
- Imposing a debt that you did not agree to in advance or is greater than the debt agreed to;
- Refusing to apply your earnings toward the payment of the debt;
- Refusing to define how long you would have to stay in the trafficker's service to repay the debt;
- Adding fees for transportation, housing, food, and charges to the debt that you did not agree to in advance; and
- Adding charges, fines or penalties for breaking rules, for not earning enough, or for not performing enough labor, services or commercial sex acts.

### Rules and Controls

Traffickers, and people who help them, may use rules and controls to make it harder for you and others to leave, complain, or seek help. For example:

- Rules against leaving the workplace, or strict rules about where you can go when not working;
- Rules against keeping your own passport, visa, birth certificate, or other identification documents;
- Denial of access to adequate food, sleep, or medical care; or
- Preventing, restricting or monitoring communications with your family, other workers, customers, or other persons outside the workplace, such as legal or social service outreach workers.

### Deception and Lies

Traffickers, and people who help them, may use deception and lies. For example:

- False promises about the type of work, working hours, working or living conditions, or pay;

11

Defs.' Appx. 00001172

**TIP:** Keep a detailed record of any inappropriate comment and/or action your employer takes against you and write down the names and phone numbers of any witnesses.

- Promising a good job and then requiring you to work significantly longer hours, under harsher conditions, or for less pay than promised; or

- Promising a good job and then making you perform another type of labor, services, or commercial sex acts; this could include promising a job as a nursing professor, then compelling you to work as staff in a nursing home, or promising work as a nanny and then compelling you to engage in exotic dancing or commercial sex acts (prostitution).

- Telling you that you have no rights;

- Telling you that you will not be believed or will be deported if you try to seek help; or

- Instructing you to lie about the identity of a trafficker.

## Will You Be Deported if You Report the Abuse?

There are programs to protect people who report abuse. You should not be afraid to seek help even if you have immigration concerns. You should consult with an immigration attorney who does not work for your employer.

If you believe you are a victim of human trafficking or of another serious crime, including rape or sexual assault, you may be eligible for a different nonimmigrant status, such as "T" (for trafficking victims) or "U" (for victims of trafficking or other serious crimes) nonimmigrant status or otherwise be permitted to remain temporarily in the United States. These nonimmigrant classifications were created to protect victims. Many people in the United States are unfamiliar with T or U nonimmigrant status and you may need to tell the people assisting you about them.

## What Services are Available for Victims of Human Trafficking?

Trafficking victims in the United States may be eligible for benefits, services and immigration relief under federal or state programs. Many organizations can help you access these services, which include medical/dental care, mental health care, housing, legal help for immigration, and other legal needs, employment assistance, and public benefits.

Defs.' App.x. 00001173

# VISIT THESE WEBSITES FOR MORE INFORMATION ABOUT:

- The visa application process and your U.S. visa: *usvisas.state.gov.*

- Human trafficking: *www.state.gov/j/tip.*

- The J-1 visa exchange program: *j1visa.state.gov.*

- Equality, and your rights to be free from discrimination at work because of your race, color, religion, sex (including pregnancy), national origin, age (40 or older), disability or genetic information, and to file a discrimination charge: *www.eeoc.gov.*

- Your workplace safety rights, or if you think your job is unsafe and you want to request an inspection: *www.osha.gov.*

- How to get unpaid wages from your employer: *webapps.dol.gov/wow.*

- Your rights to be paid fairly, including how to file a wage complaint: *www.dol.gov/WHD/immigration.*

- Your right not to face discrimination because of your citizenship status and to file a discrimination complaint: *www.justice.gov/crt/filing-charge.*

- Your right to join with other workers to improve your pay or working conditions, including how to file a charge: *www.nlrb.gov.*

- Your rights, obligations and exemptions to health insurance: *localhelp.healthcare.gov* (English) and *ayudalocal.cuidadodesalud.gov* (Spanish).

**TIP:** It's a good idea to keep a written record of all the time that you work. Get a notebook and write down all of the days and hours that you worked, how much you were paid, the dates you received a payment, any deductions taken from your paycheck, and the reasons for those deductions.

## SAMPLE WEEKLY WORK LOG

| Employee: | | Supervisor: | |
|---|---|---|---|
| **Date** | **Activities** | **Hours** | **Payment** |
| | | In:_____<br>Out: _____<br>Total: _____ | |
| | | In:_____<br>Out: _____<br>Total: _____ | |

13

Defs.' Appx. 00001174

This pamphlet was created pursuant to section 202 of the William Wilberforce
Trafficking Victims Protection Reauthorization Act of 2008, Public Law 110-457.

Defs.' Appx. 00001175

**RESTRICTED - EXCERPTS OF MARK GAULTER
5-31-17 DEPOSITION.
SEE RESTRICTED APPENDIX AT
Defs.' R. Appx. 00001016.**

Defs.' Appx. 00001176

**RESTRICTED - EXCERPTS OF NATALIE JORDAN
4-14-17 DEPOSITION.
SEE RESTRICTED APPENDIX AT
Defs.' R. Appx. 00001018.**

Defs.' Appx. 00001177

**RESTRICTED - EXCERPTS OF YENTL SWARTZ
1-13-18 DEPOSITION.
SEE RESTRICTED APPENDIX AT
Defs.' R. Appx. 00001020.**

Page 1

1          THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF COLORADO
2
    ------------------------------:
3   JOHANA PAOLA BELTRAN, et al., :
                                   :
4            Plaintiffs,           :
                                   :
5        vs.                       : Civil Action No.
                                   : 1:14-cv-03074
6   INTEREXCHANGE, INC., et al.,   :
                                   :
7            Defendants.           :
    ------------------------------:
8
9
10    VIDEOTAPED DEPOSITION OF ANNIKA KRUSCHWITZ
11
12  DATE:              Tuesday, January 23, 2018
13  TIME:              12:57 p.m.
14  LOCATION:          Boies Schiller Flexner, LLP
                       1401 New York Avenue, NW
15                     Washington, D.C. 20005
16
17  REPORTED BY:       Shari R. Broussard, RPR, CSR
                       Reporter, Notary
18
19
20
21
22

```
                                                    Page 22

1         Q     What made you decide to become an au

2    pair?

3         A     The opportunity to be in a foreign

4    country, to have the international experience, to

5    grow, to learn English, cultural exchange.

6         Q     So you stated earlier that you took the

7    internship at the kindergarten because you knew

8    you wanted to be an au pair.

9         A     Yes.

10        Q     Can you explain why wanting to be an au

11   pair led you to take the internship?

12        A     I think it's always good to have more

13   experience with kids.  I didn't have my family at

14   that point yet, so I just wanted to make sure that

15   I'm prepared very good for what's going -- what

16   I'm going to experience.

17        Q     At the time you took the internship in

18   the kindergarten had you already applied to become

19   an au pair?

20        A     I don't recall.

21        Q     Do you have any recollection of when you

22   applied to be an au pair?
```

```
                                        Page 45

 1    issues?

 2         A    Yes.

 3         Q    Do you remember how long the training

 4    was?

 5         A    I don't recall.

 6         Q    Was it more than a week?

 7         A    No.

 8         Q    Was it more than a day?

 9         A    Yes.

10         Q    So it was somewhere between a day and a

11    week?

12         A    Yes.

13         Q    Do you remember approximately how many

14    other au pairs went through training at the same

15    time as you?

16         A    I have no idea.

17         Q    You've testified so far that the

18    training contained CPR, correct?

19         A    Yes.

20         Q    And some other general safety skills?

21         A    Yes.

22         Q    And some other general childcare skills?
```

```
                                              Page 46

 1        A     Yes.

 2        Q     Do you remember anything else --

 3        A     No.

 4        Q     -- about training?

 5        A     No.

 6        Q     What do you remember happening after

 7   training concluded?

 8        A     We took a trip to New York City and then

 9   the next day we took buses down to D.C. to meet

10   our host families.

11        Q     So when you say we took a --

12        A     Au pairs.

13        Q     -- trip to New York City, that was with

14   au pairs?

15        A     Yeah.

16        Q     Was it with all -- other Cultural Care

17   au pairs?

18        A     Yes.

19        Q     And did Cultural Care arrange that trip?

20        A     Yes.

21        Q     And did Cultural Care arrange your

22   transportation to the D.C. area?
```

Defs.' Appx. 00001182

```
                                                    Page 1

 1

 2    IN THE UNITED STATES DISTRICT COURT

      FOR THE DISTRICT OF COLORADO

 3

      Civil Action No. 1:14-cv-03074-CMA-KMT

 4    - - - - - - - - - - - - - - - - - - - - - x

 5    JOHANA PAOLA BELTRAN, et al.,

 6                        Plaintiffs,

 7              - against -

 8    INTEREXCHANGE INC., et al.,

 9                        Defendants.

      - - - - - - - - - - - - - - - - - - - - - x

10

11                        January 26, 2018

                          8:15 a.m.

12

                          575 Lexington Avenue

13                        New York, New York

14

15        VIDEOTAPED DEPOSITION upon oral examination of

16    LAURA JULIANA CANO LIGARRETO, held at the above time

17    and place, taken before Brittany Saline, a

18    Professional Shorthand Reporter and Notary Public

19    of the State of New York, pursuant to the Federal

20    Rules of Civil Procedure, with written notice as

21    to time and place thereof.

22

23

24

25
```

```
                                                  Page 32
 1          Laura  Juliana  Cano  Ligarreto
 2      Q     What  aspects  of  the  program  did
 3  you  like?
 4          MR.  LIBLING:   Objection  to  form.
 5          Are  you  asking  at  that  point  in
 6      time  or  during  the  program  itself?
 7          MR.  O'KEEFE:   I  should  clarify.
 8      Q     So  back  when  you  --  when  you  were
 9  originally  considering  whether  or  not  to
10  join  the  program  or  apply  to  the  program,
11  what  aspects  of  the  program  did  you  like?
12      A     That  it  was  going  to  be  a
13  cultural  exchange  and  I  could  practice  my
14  English  and  learn  about  the  culture.
15      Q     Did  you  have  any  desire  to  travel
16  outside  of  Colombia?
17      A     Yes.
18      Q     Okay.   Generally  or  specifically
19  to  the  U.S.?
20      A     Generally.
21      Q     Did  you  know  that  as  part  of  the
22  U.S.  au  pair  program,  you  were  required  to
23  stay  with  a  family?
24      A     Yes.
25      Q     Did  you  find  that  appealing?
```

Defs.' Appx. 00001184

# RESTRICTED - EXCERPTS OF CECILE PAVOT 1-19-18 DEPOSITION. SEE RESTRICTED APPENDIX AT Defs.' R. Appx. 00001025.

Defs.' Appx. 00001185

**RESTRICTED - EXCERPTS OF ERIKA LEON 12-21-17 DEPOSITION. SEE RESTRICTED APPENDIX AT Defs.' R. Appx. 00001033.**

Defs.' Appx. 00001186

**RESTRICTED - EXCERPTS OF MARIEL BOBBONI
12-29-17 DEPOSITION.
SEE RESTRICTED APPENDIX AT
Defs.' R. Appx. 00001036.**

Page 1

1

2    IN THE UNITED STATES DISTRICT COURT

3    FOR THE DISTRICT OF COLORADO

4    Civil Action No. 1:14-cv-03074-CMA-KMT

5    ----------------------------------x

6    JOHANA PAOLA BELTRAN, LUSAPHO

     HLATSHANENI, BEAUDETTE DEETLEFS,

7    DAYANNA PAOLA CARDENAS CAICEDO and

     ALEXANDRA IVETTE GONZALEZ, on behalf of

8    themselves and others similarly situated,

9          Plaintiffs,

10

       - against -

11

12    INTEREXCHANGE, INC., et al.,

13          Defendants.

14    ----------------------------------x

                    January 26, 2018

15                  9:05 a.m.

16

17      Videotaped Deposition of KUBRA SAHIN,

18    taken by Defendants, pursuant to Notice,

19    held at the offices of Boies Schiller &

20    Flexner LLP, 575 Lexington Avenue, New

21    York, New York, before Todd DeSimone, a

22    Registered Professional Reporter and Notary

23    Public of the State of New York.

24

25

```
                                              Page 52
 1                    SAHIN
 2        A.     I didn't say that, but I did
 3    like the idea of living with a family.
 4        Q.     You wanted to live with a host
 5    family?
 6        A.     Yes.
 7        Q.     You also knew that the host
 8    family would provide you with meals,
 9    correct?
10        A.     I knew, yes.
11        Q.     Did you prefer the idea of
12    living with the host family over the idea
13    of living alone in the United States?
14        A.     At the time, yes.
15        Q.     How much did the stipend amount
16    impact your decision to become an au pair?
17              MR. PACHECO:   Objection to
18    form.
19        A.     I knew we would get paid, and
20    at the time I thought that the amount we
21    would get paid would be enough for us to
22    get through the year.
23        Q.     Did you bring any money with
24    you to the United States?
25        A.     I borrowed money.
```

```
                                        Page 70

 1                   SAHIN
 2        Q.      That's okay.  Did you learn
 3   self-defense?
 4        A.      No.
 5        Q.      Were these things -- were these
 6   skills things you had learned previously in
 7   the Netherlands?
 8        A.      One time, for France, when I
 9   worked as a camp counselor.
10        Q.      You went through a similar
11   childcare training before you were a camp
12   counselor?
13        A.      Yes.
14        Q.      So you consider these to be
15   very general childcare skills?
16              MR. PACHECO:  Objection.
17        A.      Yes.
18        Q.      Were there any other areas of
19   the training?
20        A.      That was mostly it.
21        Q.      When the training finished,
22   where did you go?
23        A.      We got on a bus and everybody
24   went to their host families.
25        Q.      Did the bus take you directly
```

```
                                            Page 92
 1                    SAHIN
 2    45 hours a week, and we would say no.
 3         Q.    Did you ever work more than 45
 4    hours a week?
 5         A.    No.
 6         Q.    Did she ask about your stipend?
 7         A.    Yes, if we got paid the
 8    $195.75.
 9         Q.    And what would you tell her?
10         A.    That I did.
11         Q.    Were you ever not paid your
12    stipend?
13         A.    No.
14         Q.    Were there any other adults
15    that lived in the Brooklyn brownstone and
16    helped with childcare?
17         A.    Aside from my host parents?
18         Q.    Aside from your host parents.
19         A.    No.
20         Q.    Did you keep track of the hours
21    that you worked?
22         A.    No, because they never really
23    changed.
24         Q.    Did you ever have a schedule?
25         A.    Yes.
```

Defs.' Appx. 00001191

1

1

2   UNITED STATES DISTRICT COURT
    DISTRICT OF NEW YORK COLORADO
3   ----------------------------------------X
    JOHANA PAOLA BELTRAN, et al.,
4
                            PLAINTIFFS,
5
6        -against-        Case No.:
                   1:14-CV-03074-CMA-KMT
7
8   INTEREXCHANGE, INC., et al.,
9                           DEFENDANTS.
    ----------------------------------------X
10
11                  DATE: December 21, 2017
12                  TIME: 9:03 A.M.
13
14           VIDEOTAPED and TELECONFERENCED
15   DEPOSITION of a Non-Party Witness, WILLIAM
16   O. KERR, Ph.D., taken by the Defendants,
17   pursuant to a Notice and to the Federal
18   Rules of Civil Procedure, held at the
19   offices of Putney Twombly Hall & Hirson,
20   LLP, 521 Fifth Avenue, New York, New York
21   10175, before Suzanne Pastor, an RPR and
22   Notary Public of the State of New York.
23
24
25

Case No. 1:14-cv-03074-CMA-KMT   Document 861-17   filed 02/16/18   USDC Colorado   pg
173 of 217
Defs.' Appx. 00001192

41

1                    W. KERR

2        Q.    Do you have any information to

3    suggest that the defendants came up with

4    the stipend amount of 195.75 from any

5    source other than the DOS notice?

6        A.    No.

7        Q.    And I take it you don't have

8    any reason to believe that the DOS notice

9    is the result of collusion by the

10   defendants.

11       A.    No.

12       Q.    Is it your understanding that

13   all 15 defendant sponsors are party to the

14   conspiracy -- to the collusion?

15       A.    I don't know.

16       Q.    Well, don't you need to know

17   who are the members of the alleged illegal

18   conduct to perform your work?

19       A.    I assume they are.  I've been

20   asked to assume they are.  I don't have any

21   knowledge of the 15 defendants all being

22   part of a collusive group.

23       Q.    Have you done any analysis to

24   determine whether some of the defendants

25   are not part of the alleged collusion?

```
 1                    W. KERR
 2   supervised, I think they're probably
 3   supervised by the State Department.
 4        Q.    Okay, so the State Department
 5   issued a notice in 2007 and then again in
 6   2009 saying that the stipend is 195.75,
 7   correct?
 8        A.    Well, they said what they said.
 9   I know an announcement came out, yes.
10        Q.    And you said earlier that you
11   have no reason to believe that that DOS
12   announcement was the result of collusion
13   between the sponsors, correct?
14        A.    Yes, that's right.
15        Q.    And it would have been rational
16   for a sponsor to pass on that information
17   to prospective host families and au pairs
18   that was provided to it by its regulatory
19   agency, correct?
20             MR. RODRIGUEZ:  Object to the
21        form.
22        A.    It certainly would have been
23   rational.  It also would have been rational
24   to look at the regulation and say is this
25   right and maybe ask questions as an
```

```
 1                    W. KERR
 2   They're not one of the defendants.
 3        Q.    Are the others that entered
 4   after the collusion began also parties to
 5   the collusion?
 6        A.    I've been asked to assume, yes.
 7        Q.    But you have not independently
 8   determined that.
 9        A.    No, I haven't determined -- I
10   have not independently determined what the
11   collusive group is or how the collusive
12   group communicates.  Those are factual
13   issues.
14        Q.    Would you agree, Dr. Kerr, that
15   successful cartels must have the ability to
16   detect and punish members who cheat?
17        A.    Certainly helps.
18        Q.    Well, if you can't discipline
19   members of the cartel, then it's hard to
20   maintain the desired effect of the cartel,
21   correct?
22        A.    It was certainly a weakened
23   cartel, yes.
24        Q.    That's a basic economic
25   principle that's generally recognized,
```

```
 1                        W. KERR
 2        A.    Please.
 3        Q.    Are you done looking at it?
 4        A.    Yes, thanks.
 5        Q.    So you recall that Dr. Stiroh
 6   did some analysis with respect to the
 7   placement rate of au pairs that had been
 8   qualified by sponsors, correct?  That is,
 9   the percentage of qualified au pairs that
10   actually got placed with host families.
11        A.    For certain of the defendants
12   she calculated a placement rate, yes.
13        Q.    And table 3 reflects a
14   placement rate for APIA for the years 2009
15   through 2014, and on average it was about
16   77 percent.  Do you see that?
17        A.    Exactly 77 percent.
18        Q.    Exactly 77 percent.  Do you
19   have any reason to quarrel with those
20   numbers?
21        A.    No.
22        Q.    So that means that 23 percent
23   of the au pairs that they had qualified,
24   that had met the Department of State
25   qualifications were not placed with host
```

```
 1                   W. KERR
 2   families, correct?
 3        A.    77 percent of the people who
 4   they received applications -- they accepted
 5   applications from were ultimately placed
 6   with host families.  That's what the
 7   percentage means.
 8        Q.    As a percentage, right.  Which
 9   means that 23 percent of them that had been
10   qualified were not placed with host
11   families.
12        A.    Right.  Right.
13        Q.    And you said you don't have any
14   objection to those statistics.
15        A.    No.
16        Q.    And there are similar
17   statistics for other sponsors.  So for
18   example, table 6 on page 23 shows a similar
19   analysis for Cultural Care with the
20   conclusion that on average, their placement
21   rate was a little over 71 percent, correct?
22        A.    Yes.  Yes, I calculate it a
23   little differently, but yes.
24        Q.    Now, what you said in your
25   merits report was that there may be an
```

Defs.' Appx. 00001197

```
 1                         W. KERR
 2        A.      It sounds familiar.
 3        Q.      Sounds like you?
 4        A.      What paragraph is that?
 5        Q.      That would be paragraph 106.
 6   And you have concluded that there are
 7   significant barriers to entry in the au
 8   pair market for sponsors?
 9        A.      Yes, there are.
10        Q.      What is the basis for that?
11        A.      The observation that a
12   sponsor -- an entrant can't, as in most
13   markets, just hang up a shingle and get
14   into the market.  They have to apply for
15   and receive an allocation of visas from the
16   State Department.
17        Q.      Okay.  And have you assessed
18   how difficult that process is?
19        A.      I have reviewed the State
20   Department regulations and observed the way
21   the market functions.  I haven't
22   quantitatively attempted to do anything
23   like that.
24        Q.      Isn't it true that there's been
25   a fair amount of entry in this market in
```

```
 1                      W. KERR
 2    recent years?
 3         A.     There have been entrants.
 4    Clearly there have been entrants.  You
 5    mentioned before a new entrant last year.
 6         Q.     Au Pair For Me.
 7         A.     Au Pair For Me.  Relatively
 8    small entrant, but an entrant nonetheless.
 9    And you mentioned that there's been some
10    moving around within the group of
11    defendants, some of which -- another one
12    entered the profession, is it called
13    Professional Au Pair?  The one out in
14    California.  Entered somewhere along the
15    way.  I think it was 2011.
16              Some of the entries -- there
17    are other names that have shown up.  It's
18    not clear to me that those were truly
19    entrants in the sense that the entity may
20    have been new but the people in it have
21    been part of the community or a related
22    entity may have been already approved and
23    may have been more of a transfer.  But I
24    don't know about that.
25         Q.     Are you aware of any entity
```

```
 1                    W. KERR
 2   that has attempted to enter and has failed
 3   or been refused?
 4        A.    There's two different
 5   questions.  There are entities that have
 6   left and there are entities that have said
 7   that they are leaving.  So in the sense
 8   that they failed in that regard.  I don't
 9   know of anyone who applied and was denied
10   entry by the State Department.
11        Q.    Okay, and that was a poor
12   question.  I didn't mean to suggest that
13   they failed in the market, but that they
14   attempted to enter and failed to enter.
15        A.    Okay.
16        Q.    Wouldn't the fact that -- so I
17   think before we talked about five different
18   entrants who had come into the market since
19   2011.  Do you recall that?
20        A.    I don't remember if there were
21   five.  I know there are several who were
22   listed.  I think they were listed by
23   Dr. Newlon or maybe Dr. Stiroh who had a
24   list of entry dates for some of the
25   entities that are currently involved in
```

```
 1                    W. KERR
 2    the au pair business.
 3         Q.     In your merits report you said
 4    there was high concentration in the au pair
 5    market.
 6         A.     There is, yes.
 7         Q.     And you did a Herfindahl
 8    Hirschman index calculation, correct?
 9         A.     I did.
10         Q.     Which showed high concentration
11    as that standard is used, correct?
12         A.     Yes.
13         Q.     And you only included au pair
14    sponsors in your calculation, correct?
15         A.     That's what we're talking
16    about, yes, au pair sponsors.
17         Q.     Have you concluded that au pair
18    sponsors are a relevant antitrust market?
19         A.     The -- whether au pair sponsors
20    are a relevant -- no, au pair sponsors are
21    not a relevant market.
22         Q.     The Herfindahl index is used by
23    calculating -- by summing the squares of
24    the individual market shares of all market
25    participants, right?
```

```
 1                    W. KERR
 2        A.    That's right.
 3        Q.    And in doing that you -- strike
 4   that.
 5             A relevant antitrust market is
 6   determined by the interchangeability of the
 7   products or services that are being
 8   offered, correct?
 9        A.    It's an important factor, yes.
10        Q.    And you have testified in your
11   prior deposition that nannies are
12   interchangeable with au pairs, correct?
13        A.    There's a degree of
14   interchangeability between nannies and au
15   pairs, yes.
16        Q.    And is there a degree of
17   interchangeability between au pairs and
18   daycare centers?
19        A.    Sure there is.
20        Q.    And other child care options I
21   take it.
22        A.    Sure.
23        Q.    And that is because parents who
24   are making a decision about child care have
25   a variety of options to look at, correct?
```

Defs.' Appx. 00001202

*Johana Paola Beltran, et al. vs.*

*Interexchange, Inc., et al.*

*Video Deposition of William Owen Kerr, Ph.D.*

*May 04, 2017*



700 17th Street, Suite 1750
Denver, CO  80202
303-988-8470 (Office)   303-988-8478 (Fax)
SKReporting.com

Defs.' Appx. 00001203

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Video Deposition of William Owen Kerr, Ph.D.
May 04, 2017

```
 1   UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF COLORADO
 2   ----------------------------------------------X
     JOHANA PAOLA BELTRAN; et al.,
 3
                              PLAINTIFFS,
 4
 5        -against-        Civil Action No.
                          1:14-cv-03074-CMA-KMT
 6
 7   INTEREXCHANGE, INC.; et al.,
 8                         DEFENDANTS.
 9   ----------------------------------------------X
10
11
12                      DATE: May 4, 2017
13                      TIME: 9:05 A.M.
14
15
16                      VIDEO DEPOSITION of a
17   Non-Party Witness, WILLIAM OWEN KERR, PH.D., taken
18   by the Defendants, pursuant to Notice and to the Federal
19   Rules of Civil Procedure, held at the offices of
20   Putney Twombly Hall & Hirson LLP, 521 Fifth Avenue,
21   New York, New York 10175, before Anita M. Trombetta,
22   an RPR, CRR, and Notary Public of the State of
23   New York.
24
25
```

Johana Paola Beltran, et al. vs.                    Video Deposition of William Owen Kerr, Ph.D.
Interexchange, Inc., et al.                                                        May 04, 2017

Page 122

 1   website, listed on the sponsor's website is a

 2   qualified candidate in the sense that they're ever

 3   going to get picked by a host family.

 4              If you only had 3,000 slots and you were

 5   a sponsor, you wouldn't want to have 3,000 people on

 6   your website, because you guarantee that you wouldn't

 7   make the proper matches.

 8              You need to have 6,000, 9,000, because

 9   this isn't, again, bushels of corn.  People don't just

10   line up and take the first au pair they see.

11              They have an interview process, they have

12   to interview multiple people.  And many of those

13   people are never going to get picked, even though

14   technically they qualify and they're listed, in this

15   case, on Culture Care's website.

16              And I guarantee you that that's the

17   truth, that everybody -- that every one of them always

18   has more on their website than they have positions to

19   fill.

20       **Q.    So you agree that for all the sponsors,**

21   **there is an oversupply of qualified candidates for the**

22   **au pair positions at the set stipend level, correct?**

23       A.    No.

24       **Q.    You don't agree?**

25       A.    I just said that there's an oversupply,

Defs.' Appx. 00001205

1           IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLORADO
2
    Civil Action No. 14-cv-03074-CMA-KMT
3   _____

4   VIDEOTAPE DEPOSITION OF:  DAVID KEIL - July 21, 2016

5   _____

    JOHANA PAOLA BELTRAN; LUSAPHO HLATSHANENI; BEAUDETTE
6   DEEELEFS; DAYANNA PAOLA CARDENA CAICEDO; ALEXANDRA
    IVETTE GONZALEZ; on behalf of themselves and others
7   similarly situated,

8   Plaintiffs,

9   v.

10  INTEREXCHANGE, INC.; USAUPAIR, INC.; GREATAUPAIR, LLC;
    EXPERT GROUP INTERNATIONAL INC., d/b/a EXPERT AUPAIR;
11  EURAUPAIR INTERCULTURAL CHILD CARE PROGRAMS; CULTURAL
    HOMESTAY INTERNATIONAL; CULTURAL CARE, INC. d/b/a
12  CULTURAL CARE AU PAIR; AUPAIRCARE INC.; AU PAIR
    INTERNATIONAL, INC.; APF GLOBAL EXCHANGE, NFP d/b/a
13  AUPAIR FOUNDATION; AMERICAN INSTITUTE FOR FOREIGN STUDY
    d/b/a AU PAIR IN AMERICA; AMERICAN CULTURAL EXCHANGE,
14  LLC, d/b/a GOAUPAIR; AGENT AU PAIR, INC.; A.P.EX.
    AMERICAN PROFESSIONAL EXCHANGE, LLC d/b/a PROAUPAIR;
15  and 20/20 CARE EXCHANGE, INC. d/b/a THE INTERNATIONAL
    AU PAIR EXCHANGE, and ASSOCIATES IN CULTURAL EXCHANGE,
16  d/b/a GOAUPAIR,

17  Defendants.
    _____
18

19

20

21

22

23  H+G

24

25  Hunter + Geist, Inc.

303.832.5966     1900 Grant Street, Suite 1025     ■ www.huntergeist.com
800.525.8490     Denver, CO 80203                   ■ scheduling@huntergeist.com

Your Partner in Making the Record

Court Reporting, Legal Videography, and Videoconferencing

---

149

13:16:57  1   recitation of her words, to the best of your memory?
13:16:59  2       A.  To the best of my memory, yes.
13:17:01  3       Q.  And then you indicated that Ms. Crompton
13:17:06  4   volunteered toward the end of the conversation or at
13:17:08  5   the end of the conversation that since the fees are
13:17:11  6   paid directly to the au pair and since the $196 is a
13:17:18  7   minimum amount, nobody has to know if a particular
13:17:21  8   family elects to pay an au pair a little bit more,
13:17:24  9   right?
13:17:26  10      A.  That -- yes.
13:17:27  11      Q.  And that's what she said to you?
13:17:28  12      A.  Yes.  I remember the context of that a
13:17:30  13  little bit, but -- a little bit more.  But, yes, that's
13:17:33  14  what she said to me.
13:17:35  15      Q.  So there was something about context that
13:17:37  16  you chose not to put in the notes?
13:17:39  17      A.  There was something that I just -- my
13:17:41  18  memory was just sparked by reading this note that
13:17:44  19  reminds me of the context of this.
13:17:46  20      Q.  The last -- the context of the last
13:17:48  21  paragraph?
13:17:49  22      A.  Correct.
13:17:50  23      Q.  And you're just remembering it now?
13:17:52  24      A.  Yes.
13:17:53  25      Q.  Would you tell us what you now remember?

---

150

13:17:56  1   Is this the first time that you've looked -- let me
13:17:59  2   back up.  Have you looked at this document at any time
13:18:02  3   since you sent it to --
13:18:03  4       A.  No.
13:18:04  5       Q.  -- Mr. Hood?
13:18:05  6       A.  I haven't looked at it in two-plus years,
13:18:08  7   since November of '14.  I may have looked at it with --
13:18:12  8   you know, within a day or two of delivering it to
13:18:13  9   Mr. Hood, but I've not looked at it since.
13:18:15  10      Q.  Have you had any communications regarding
13:18:19  11  the document, without for the moment telling us the
13:18:22  12  content, with Mr. Hood since you sent it to him?
13:18:27  13      A.  No.
13:18:29  14      Q.  Were you aware that Mr. Hood was going to
13:18:31  15  be using portions of this document in his own
13:18:34  16  declaration filed with the court?
13:18:37  17      A.  No.
13:18:39  18      Q.  Were you asked to review the portion --
13:18:41  19  all or the portion of the amended complaint in this
13:18:44  20  case that referred to your work in this case?
13:18:48  21      A.  No.
13:18:50  22      Q.  Did you approve any language relating to
13:18:53  23  your work in this case for inclusion in the complaint?
13:18:57  24      A.  I'm sorry, I don't understand the
13:19:00  25  question.

---

151

13:19:00  1       Q.  Let me rephrase it.  It was poorly stated.
13:19:03  2           Were you asked to sign off on the accuracy
13:19:06  3   of the paragraphs in the amended complaint that purport
13:19:10  4   to summarize the information that you provided from
13:19:14  5   your investigation?
13:19:15  6       A.  No.
13:19:17  7       Q.  Have you ever seen the language that was
13:19:20  8   used to summarize your work in this investigation as
13:19:26  9   included in the amended complaint?
13:19:29  10      A.  Unless I saw it in one of these two
13:19:31  11  documents that were placed before me today, the
13:19:33  12  answer's no.
13:19:34  13      Q.  The documents before you today, for the
13:19:36  14  record, do not include the amended complaint.  Is it
13:19:40  15  your testimony that you have never seen the amended
13:19:43  16  complaint?
13:19:44  17      A.  Correct.
13:19:45  18      Q.  And you never saw an excerpt of the
13:19:48  19  amended complaint that related to your work?
13:19:56  20      A.  I believe that's true.  I believe that's
13:20:02  21  correct.
13:20:02  22      Q.  So this is now the first time that you are
13:20:04  23  reviewing this document since you forwarded it to
13:20:08  24  Mr. Hood sometime in the last quarter of 2014; is that
13:20:13  25  right?

---

152

13:20:13  1       A.  Yes.  Correct.
13:20:14  2       Q.  But you don't know what date?
13:20:15  3       A.  No.
13:20:17  4       Q.  What is it that you now remember that
13:20:20  5   comes to mind after reviewing the last paragraph on
13:20:23  6   page 1?
13:20:31  7       A.  I remember this conversation with
13:20:33  8   Ms. Crompton.  I was -- again, in trying to ask plain
13:20:42  9   vanilla questions, and Ms. Crompton was -- was
13:20:47  10  answering them as if this was her or someone like her.
13:20:52  11  And she was discussing the fact that if a particular au
13:20:56  12  pair did a wonderful job, that a family like mine could
13:21:01  13  elect to pay more, no one would have to know.  Now, of
13:21:06  14  course, I didn't give her any indication that I had a
13:21:09  15  family or was going to hire an au pair, but she seemed
13:21:12  16  to believe that the ability to pay more was okay.  If
13:21:17  17  you really loved your EurAuPair, it was okay, you just
13:21:21  18  don't have to tell us.
13:21:22  19          So that -- that was sort of the context
13:21:27  20  for this statement where she said no one would have to
13:21:28  21  know if a particular family elected to pay a little bit
13:21:31  22  more.  She seemed to be trying to make me happy if I
13:21:36  23  wanted -- if I wanted to pay an au pair more, which,
13:21:39  24  again, we didn't discuss, she seemed to be trying to
13:21:42  25  explain that that was an option.

---

38 (Pages 149 to 152)

---

169

13:48:41  1  not included here?
13:48:43  2     A.  I remember that these conversations
13:48:46  3  included some back and forth and some discussion of
13:48:51  4  their services, how their services were conducted,
13:48:55  5  where the au pairs came from.  All of these interviews
13:48:58  6  had preamble and sort of boilerplate portions to them,
13:49:04  7  and what I reflected was, you know, what I thought was
13:49:07  8  unique and substantive of that conversation.  So that's
13:49:10  9  what appears here.
13:49:12  10     Q.  So in your own words, would you describe
13:49:16  11  what you chose to include and what you chose to
13:49:19  12  exclude, please.
13:49:21  13     A.  Things that I would characterize as
13:49:24  14  boilerplate I chose to exclude.
13:49:28  15     Q.  And what did you choose to include?
13:49:30  16     A.  I chose to include the items that are
13:49:32  17  reflected here.
13:49:33  18     Q.  Here again, sir, everything that you chose
13:49:36  19  to include and put in quotes relates to whether there
13:49:39  20  was an agreement among the sponsors as to the amount to
13:49:42  21  pay the au pairs.  Is there a reason for that?
13:49:46  22     A.  Again, I would from my recollection say
13:49:50  23  that that's the -- the issue that caught my attention
13:49:55  24  during the interview.  During the interview we talked
13:49:57  25  about their policies, we talked about their fee

---

170

13:50:01  1  structures to some degree, and what I noticed was a
13:50:05  2  consistency through each interview on this one topic,
13:50:09  3  and I'd say that caught my attention and I asked
13:50:13  4  appropriate follow-up questions for that reason.
13:50:15  5     Q.  Are you stating that you, yourself came up
13:50:17  6  with the concept that what was significant in the
13:50:25  7  interviews that you conducted was the discussion of an
13:50:29  8  agreement among sponsors regarding stipends?
13:50:33  9         MS. LOUIS:  Objection.
13:50:38  10     A.  I -- I would answer it this way.  I took
13:50:41  11  the interviews where they went based on the
13:50:46  12  conversations and the representations that the
13:50:48  13  interview subject was making.  I asked the appropriate
13:50:51  14  follow-up questions, and I noted where I saw a stark
13:50:56  15  similarity.
13:50:57  16     Q.  (BY MS. LUKEY)  And that's what you wrote
13:50:58  17  down on your own?
13:51:00  18     A.  Yes.
13:51:00  19     Q.  Nobody asked you at any point to look into
13:51:03  20  the issue of agreement among the sponsors with regard
13:51:06  21  to the stipend --
13:51:07  22     A.  Correct.
13:51:08  23     Q.  -- is that right?
13:51:08  24     A.  That's right.
13:51:09  25     Q.  So you were providing Mr. Hood with

---

171

13:51:11  1  information of this interesting phenomenon that you
13:51:15  2  developed in the course of the three conversations that
13:51:17  3  you had substantively; is that right?
13:51:19  4     A.  I was simply --
13:51:20  5         MS. LOUIS:  Object to form.
13:51:21  6     A.  I was simply reporting on the
13:51:23  7  conversations and the issues that I felt were important
13:51:27  8  within.
13:51:28  9     Q.  (BY MS. LUKEY)  Now, I noticed in both of
13:51:30  10  these that you quote both Ms. Crompton and Joanna as
13:51:44  11  saying, "everybody agrees," in Ms. Crompton's case, and
13:51:48  12  then Joanna, the same thing, "everybody agrees."
13:51:54  13  That's the language that each of them used; is that
13:51:57  14  right?
13:51:58  15     A.  Well, to follow this, she -- paragraph
13:52:02  16  one, two -- four, she says, "It's a base rate.  It's a
13:52:06  17  minimum."  And I inferred the follow-up question being
13:52:12  18  is it a minimum -- this is paraphrasing.  Is it a
13:52:15  19  minimum that everybody uses, is it something that
13:52:17  20  everybody agrees to, and her answer was, "Everybody
13:52:20  21  agrees, yeah."
13:52:21  22     Q.  So everybody agrees that's the minimum
13:52:23  23  amount; is that right?
13:52:24  24     A.  That's what this person stated.
13:52:26  25     Q.  All right.  Have you ever seen the

---

172

13:52:28  1  Department of State notification?
13:52:31  2     A.  No.
13:52:32  3     Q.  Do you know what that says?
13:52:35  4     A.  No.
13:52:35  5     Q.  Do you know if the quotes that you have in
13:52:37  6  here accurately reflect what the Department of State
13:52:41  7  notification says?
13:52:42  8     A.  I don't think I was attempting to
13:52:43  9  accurately reflect what the Department of State says, I
13:52:46  10  was trying to accurately reflect what these witnesses
13:52:49  11  stated.
13:52:49  12     Q.  I'm suggesting to you that what the
13:52:51  13  witnesses said is consistent with what the Department
13:52:53  14  of State notification says, and I'm asking if you were
13:52:56  15  aware of that?
13:52:57  16     A.  I was not.
13:52:57  17     Q.  Okay.  And in both instances, they also,
13:53:00  18  also agreed that if somebody wanted to pay more, they
13:53:03  19  could?
13:53:04  20     A.  In -- in small -- small amounts, yes.
13:53:06  21     Q.  Did they say in small, small amounts, or
13:53:09  22  did they happen to give you examples that were small
13:53:12  23  amounts?
13:53:12  24     A.  They happened to give me examples of small
13:53:14  25  amounts.

---

43 (Pages 169 to 172)

**RESTRICTED - ExpertAuPair000273 - 279.**
**SEE RESTRICTED APPENDIX AT**
**Defs.' R. Appx. 00001040.**

Defs.' Appx. 00001209

**RESTRICTED - EXCERPTS OF MARK JEFFERY
12-5-16 DEPOSITION.
SEE RESTRICTED APPENDIX AT
Defs.' R. Appx. 00001047.**

Defs.' Appx. 00001210

**RESTRICTED - EXCERPTS OF MARK GAULTER
5-9-17 DEPOSITION.
SEE RESTRICTED APPENDIX AT
Defs.' R. Appx. 00001053.**

Defs.' Appx. 00001211

# RESTRICTED - EXCERPTS OF MARK GAULTER 5-31-17 DEPOSITION. SEE RESTRICTED APPENDIX AT Defs.' R. Appx. 00001057.

Defs.' Appx. 00001212

**RESTRICTED - EXCERPTS OF NATALIE JORDAN
4-14-17 DEPOSITION.
SEE RESTRICTED APPENDIX AT
Defs.' R. Appx. 00001060.**

Defs.' Appx. 00001213

**RESTRICTED - EXCERPTS OF CECILE PAVOT 1-19-18 DEPOSITION.
SEE RESTRICTED APPENDIX AT
Defs.' R. Appx. 00001065.**

Defs.' Appx. 00001214

# THE AU PAIR EXCHANGE PROGRAM
## BROCHURE

Thousands of American families and foreign nationals have participated in the Au Pair Program. Most have found it to be a rewarding experience, but it is important to fully understand the program before deciding to participate. This brochure explains the program and answers some frequently asked questions.

## BACKGROUND

The Au Pair Exchange Program was established in 1986 as an educational and cultural exchange program with a strong child care component. Program participants enter the United States for 12 months to care for children of the American family in whose home they live. At the same time, au pairs are required to complete an educational component of six semester hours of academic credit or its equivalent. At the end of one year, au pairs return to their home country.

"Au pair" is French for "on par," reminding host families that, although an employee, their international visitor is to be treated like a member of the family. The rules are clear: au pairs are provided a private bedroom, meals, remuneration tied to the minimum wage, one and one-half days off weekly plus a full weekend off each month, two weeks' paid vacation, and $500 toward the cost of required course work to be completed at an accredited U.S. institution of higher education in order to satisfy the requirements of the educational component of the program. Au Pairs are responsible for the host families' child(ren) entrusted to their care.

Au pairs are not to work more than 10 hours a day/45 hours a week. They are not to serve as general housekeepers or assume responsibility for household management.

In August 2001 the regulations governing the Au Pair Program were amended to create a sub-category called EduCare. This component is specifically designed for families with school-aged children requiring limited childcare assistance. Au pairs participating in the EduCare component may not be placed with families having pre-school aged children unless alternative arrangements are in place for these children.

EduCare participants are not to work more than 10 hours a day/30 hours a week. They must complete a minimum of 12 semester hours of academic credit, or its equivalent, during their program. Host families provide the first $1,000 to the au pair toward the cost of the educational component. All au pair participants are paid in accordance with the provisions of the Fair Labor Standards Act. As a matter of administrative convenience for both the Department-designated sponsors and participating host families, EduCare participants receive 75 percent of the predetermined weekly wage that is required for au pair participants.

If these requirements cause you any concern, you may wish to reconsider participating in the Au Pair Program. There are other considerations as well. When occasional problems arise, one mistake that host families and au pairs often make is to hope that conditions will improve and problems will correct themselves. It is important, however, to fully understand the program and conduct the necessary due diligence before deciding to participate. Host families and au pairs must communicate their expectations at the very beginning. As you consider whether the Au Pair Program is right for you, host families should think about how they will adjust to having

EXHIBIT C

an international visitor in their home. Au pairs should think about how they will adjust to living with a new family in a different country. For each, the values and cultural perspectives of the other may be vastly different.  The following questions and answers might help you to make that decision.

## OVERVIEW

### *The Au Pair Program*

The Au Pair Program is an educational and cultural exchange program with a child care component. Au pairs come to the United States for one year to provide not more than 10 hours per day or more than 45 hours per week of child care for their host family while pursuing educational credits. The EduCare participant is not to provide more than 10 hours per day or more than 30 hours per week of child care while pursuing educational credit.

Sponsoring organizations in the U.S. have the responsibility for administering the program, within the regulations set by the Department of State.  Although the Department designates organizations to conduct au pair programs, the responsibility for choosing the right organization rests solely with the host family and the au pair.

### *Role and Responsibilities of the Sponsoring Organizations*

The Department of State designates bona fide  organizations who have demonstrated the ability to   satisfy the objectives set forth in the Code of Federal Regulations 22 CFR § 62 including section 62.31.  Designated sponsor organizations carry out the day-to-day operation of their Au Pair Programs.  They identify, screen, select, and match au pairs and host families. They ensure background investigations (including criminal history checks) are performed on au pairs, psychometric tests designed to assess the au pairs' character traits are conducted, and the financial resources of potential host families are assessed to ensure their ability to participate in the program.

Sponsoring organizations interview au pairs for spoken English proficiency and suitability to participate in the program. They also interview potential host parents to ensure spoken English fluency and suitability to host an international visitor.

Sponsoring organizations provide au pairs with a copy of all operating procedures, rules, and regulations, including a grievance process, which govern the au pair's participation in the exchange program; a detailed profile of the host family and community into which they will be placed; a detailed profile of the educational institutions available in the community where the au pair will be placed, including the financial cost of attendance; a detailed summary of travel arrangements; and a copy of the Department of State's  written statement and brochure on the program.

Sponsoring organizations ensure that au pairs have all the child care training required by the Department prior to placement   in the host family home.  They monitor the au pair/host

family relationship throughout the au pairs stay in the United States through mandated monthly contact by local and/or regional counselors to ensure compliance with the regulations.

### Role and Responsibilities of Local and Regional Counselors

Local and regional counselors maintain ongoing contact with, and support, au pairs and host families. Local counselors are required to have monthly personal contact with the au pairs and host families for whom they are responsible and must maintain a record of these monthly contacts. They must report to the sponsoring organization any unusual or serious situations or incidents involving au pairs and/or host families. Any incidents involving or alleging a crime of moral turpitude or violence are immediately to be relayed by the sponsoring organization to the Department. Moral turpitude is defined to include, but is not limited to, acts of theft, sexual misconduct, and child abuse.

### Role of the Department of State

The Department of State oversees the sponsoring organizations and ensures compliance with the regulations governing the Au Pair Program. Sponsoring organizations must annually submit to the Department copies of their advertisement and recruitment materials. The Department annually reviews a sponsor organization's summary of the annual survey they conduct of host families and au pairs, all complaints received and their resolutions, and all situations that result in the placement of an au pair with more than one host family. Sponsoringorganizations are audited annually to ensure compliance with the procedures and reporting requirements set forth in the Department's regulations.

### Costs of the Au Pair Program

The average annual cost to an American host family is about $17,000. This includes fees to the sponsoring organization (may vary from sponsor to sponsor), a weekly payment to the au pair tied to the minimum wage, an educational allowance of $500, and room/board. EduCare participants also receive a weekly payment tied to minimum wage and an educational allowance of $1,000.

### Mandatory "Educational Component" of the Au Pair Program

Au pairs are required to enroll and attend a U.S. accredited post-secondary academic institution for not less than six semester hours of academic credit or its equivalent. Its equivalent would include the generally accepted number of trimester or quarter hours. The EduCare participant is required to enroll and attend a U.S. accredited post-secondary institution for not less than twelve semester hours of academic credit or its equivalent. Accredited two-year community colleges are eligible institutions.

### Role and Responsibilities of the American Host Family in Compliance with the Mandatory "Educational Component"

In order for an American family to host an exchange visitor under the Au Pair Program they must agree to (1) facilitate the enrollment and attendance of the au pair in a U.S. "post-

Defs.' Appx. 00001217

secondary" educational institution; (2) ensure that the au pair has adequate transportation to attend; and (3) pay up to $500 ($1,000 for EduCare participants) toward the cost of required academic course work. Any additional costs associated with acquiring the required six academic credits (twelve for the EduCare participant) are to be absorbed by the au pair.

## SCREENING AND SELECTION PROCESS

### *Au Pairs Ages and Countries of Origin*

Au pairs must be between the ages of 18 and 26 years upon the start of their exchange program..  They can be from any foreign country except those with which the U.S. does not have diplomatic relations.

### *Required Training and Experience of Prospective Au pairs*

Au pairs must be proficient in spoken English and have a high school diploma or its equivalent.  *Host parents must interview a prospective au pair by telephone (before the au pair departs for the United States) prior to accepting them as an au pair candidate. .*

Before being placed with a host family, au pairs must receive at least eight hours of child safety and 24 hours of child development instruction. At least four hours of the child safety training must be infant-related and at least four hours of the child development instruction must be devoted to the care of children under two years of age.

The child safety training, provided by qualified organizations, includes topics such as stress management, shaken baby syndrome, and CPR.   Au pairs responsible for children under two years of age must have at least 200 hours of documented infant child care experience. *Au pairs may not be placed with a family having a child less than three months of age unless a parent or other responsible adult is present in the home.*

Au pairs will **NOT** have specialized training in nursing. They are **NOT** to provide child care services relating to the care and protection of infants and children performed by such trained personnel, as registered or practical nurses.

## AU PAIRS IN THE HOST FAMILY HOMES

### *Au pairs Are Entitled To*

Au pairs are entitled to a private bedroom, meals, a weekly wage that will increase if the minimum wage increases, one and one-half days off each week, a full weekend off each month, two weeks of paid vacation, and the first $500 ($1,000 for EduCare participants) toward the cost of required academic course work.

*Host Families Are Entitled To*

Host families are entitled to a maximum of 10 hours a day or 45 hours a week (10 hours a day or 30 hours a week for EduCare participants) of child care, and they have the benefit of someone from another culture living in their home.

*Responsibilities of Au Pairs and Host Families vis-à-vis Program*

Either a parent or responsible adult must be present in the home for the first three days that the au pair is with the host family, which may include a weekend. The host family and au pair must attend at least one of their sponsoring organization's family day events during the au pair's stay.

There must be a signed written agreement between the host family and the au pair outlining the obligations of both parties. In addition, the sponsoring organizations generally require the host family and the au pair to sign written agreements that outline the obligations of each party to the organization.

*Duration of the Au Pair Program and Extensions*

Au pairs may stay with their host families in the U.S. for one year. An extension of an au pair's exchange program is possible if they are in good standing within the program and the Sponsor recommends a program extension on behalf of an au pair. To obtain a program extension, the Sponsor organization must submit a request to the Department of State for approval. Sponsors may request a six, nine or 12 month program extension on behalf of an au pair. The request must, without exception, be received no less than 30 calendar days prior to the expiration of the au pair's initial authorized period of stay (The program end date reflected on the Form DS-2019). The approval of a program extension is at the sole discretion of the Department of State.

QUESTIONS OR PROBLEMS

*What if I have questions after the initial selection and match have been made, or what if a problem arises?*

All Au Pair sponsor organizations have local and regional representatives who are available to help and counsel one or both parties of an Au Pair Program match. You can contact them or the sponsoring organization through which you entered the program.

The Department's Office of Designation staff is available to answer questions at (202) 632-2805. A listing of designated sponsors and related information can be obtained from the Department's web site http://J1visa.state.gov.

*What are my options if I am not happy with the arrangement?*

Both the host family and the au pair have options if they are not happy with the au pair arrangement. Since the terms of these options are contractual in nature and may vary from one

Defs.' Appx. 00001219

sponsoring organization to another, it is suggested that you check your contract with the
sponsoring organization for specific information on cancellation conditions or talk with your
sponsoring organization directly.

***Please Read Your Contract For Time Limits And Conditions***

*Please Note: No guarantee of performance or competency is made by the designation of sponsor
organizations.*

U.S. Department of State
Office of Designation, Private Sector Programs Division
State Annex 5, 5<sup>th</sup> Floor
2200 C Street, NW, Washington, DC 20522-0505
October 2011

## Your Child's Safety is Our Top Priority

AuPairCare provides thorough screening and training to ensure your au pair is capable and trustworthy before entering your home.

All AuPairCare au pairs must:

- Pass a criminal background check
- Have previous documented childcare experience
- Receive personalized training in CPR and first aid by the American Heart Association
- Attend our rigorous Safety Care™ Program to receive training in important child, driving, and household safety measures.

Additionally, you will always have access to an AuPairCare representative in your community as well as 24/7 emergency assistance for the duration of the program.

### Affordable Childcare

At a fixed cost of under **$8 an hour** for full-time, personalized childcare, AuPairCare is an economical option for families.

Additionally, AuPairCare offers a convenient monthly payment plan option to give you even more flexibility when budgeting childcare expenses.

> Meet our au pairs now! Call AuPairCare today at **800.428.7247** or visit us online at **www.aupaircare.com**

## AuPairCare Program Options

**One-Year Program**

Au pairs provide up to 45 hours of care per week, up to 10 hours per day.

**Infant Specialized™ Program**

All the benefits of the One-Year Program with the added bonus of an au pair who has previous experience caring for infants and receives extra training in infant specific topics.

### Optional Extension Program

You and your au pair can agree to extend the program for six, nine or twelve months, providing up to two years of continuous childcare.

**800.428.7247**    **www.aupaircare.com**

   

## intrax

AuPairCare is part of Intrax, a globally-oriented company that provides a lifetime of high-quality educational, work and volunteer programs that connect people and cultures, with operations in more than 100 countries worldwide. For more information visit: www.intraxinc.com.

**Intrax**    **AuPairCare**    **Ayusa**

© 2015 Intrax, Inc. All rights reserved.    INX.APC.03201Z



# AuPairCare
by Intrax

**25** CELEBRATING 25 YEARS OF LIVE-IN CHILDCARE

APC 000013

EXHIBIT J

Defs.' Appx. 00001221

## What is an Au Pair?

*Au Pair [oh pair]*

*A young adult from another country who lives with your family and provides childcare for up to 45 hours per week / 10 hours per day.*

Your au pair will:

- Supervise and entertain your children
- Prepare your children's meals and clean up afterwards
- Assist with light housework like children's laundry and keeping their rooms tidy
- Bathe and dress your children
- Pack lunches, help with homework and take your children to and from school
- Teach your children a second language and a new culture
- Drive your children to park outings, play groups and other activities



*The Stanley Family with their au pair, Jessica*

## Childcare That Fits You!

What would make your childcare better? Affordable care that works around your schedule? An extra pair of hands in the morning? A consistent, reliable caregiver for up to two years? AuPairCare can help.

## Why Choose AuPairCare?

- More than 25 years of experience as a designated U.S. Department of State Au Pair Sponsor
- Broad selection of high-quality, carefully screened au pairs from 40+ countries
- Easy au pair selection process: use our online matching system or receive personalized au pair recommendations from our team of Matching Experts
- Hands-on au pair training program including personalized training in CPR and first aid
- Flexible childcare hours: you decide the best schedule for your au pair to work
- Full-time, live-in childcare for under $8 an hour, regardless of the number of children in your family
- Support staff in your community who assist you and your au pair throughout the program

## The AuPairCare Advantage

Full-time childcare options are traditionally limited to daycares and nannies, but neither offers the combined solution of flexibility, affordability and reliability that AuPairCare provides.

|  | AuPairCare | Daycares | Nannies |
|---|---|---|---|
| In-home childcare | ✓ | — | ✓ |
| Personalized, one-on-one care | ✓ | — | Varies |
| Fixed cost regardless of number of children | ✓ | — | — |
| Flexible childcare schedule | ✓ | Varies | Varies |
| Personalized training in CPR and first aid | ✓ | Varies | Varies |
| Local support staff and 24/7 emergency assistance | ✓ | — | — |
| Thorough screening and background checks | ✓ | Varies | Varies |
| Regulated by U.S. Department of State | ✓ | — | — |
| Cultural experience/second language learning | ✓ | — | Varies |
| Academy – Safety training and child development | ✓ | Varies | Varies |

APC 000014

Defs.' Appx. 00001222



APC 000015

Defs.' Appx. 00001223

Dear Prospective Host Family,

Many of us who work at AuPairCare are also parents. We understand the challenge of finding and keeping good childcare, as well as the uncertainty of bringing a new caregiver into your life. Like you, we try to balance our work and family life, and we know that finding the right childcare solution is a top priority.

AuPairCare au pairs have helped us create balance in our own lives, and some of us are currently on our third and fourth au pairs. We've been reassured by the screening, qualifications and credentials of the au pairs we've invited into our homes, grateful that our kids are well cared for, and delighted at the stability and fun AuPairCare childcare brings to our family life.

Instead of spending our evenings managing dinner and chores, we can actually play with our kids after work, enjoy increased flexibility in our work day, and even escape for the occasional date night. We love our au pairs and we want to make it as easy for you as it has been for us, which is why we've dedicated ourselves to making it happen for more than 25 years.

We'd like to invite you to find out more about AuPairCare and learn how our program is benefitting families like yours and ours.

Warm regards,

AuPairCare

*"Both my husband and I work, and the most important thing for us is to know that our kids are safe while we're away. With Fatima at home, we know that not only are they cared for, but also are loved, hugged and played with."*

*– Punzzo family | Three children ages 4, 3 and 2*

## Childcare That Fits You

Since 1989, we have placed more than 55,000 au pairs from around the world with families nationwide. Our au pairs are well-screened, qualified and love working with children. Host an au pair and enjoy dependable, flexible childcare while you introduce your children to the language and rich traditions of another country.

### Why Choose AuPairCare

- One of the first premier au pair agencies designated by the U.S. Department of State to legally sponsor au pairs
- Broad selection of high quality, pre-screened au pairs from more than 40 countries
- An advanced online matching system that lets you search and connect with au pairs when it's convenient for you
- Matching experts who provide personalized au pair recommendations based on your family's lifestyle and needs
- Flexible, live-in childcare for about $350 a week
- Professional staff in your local area who provide counsel and support throughout the program for you and your au pair

*Cover image: Tamikawa family | Three children ages 7, 5 and 2    This Page: Donati Family | Two children ages 3 and 2*

1









Defs.' Appx. 00001224

## The AuPairCare Advantage

Only AuPairCare can provide the affordability and convenience of live-in, personalized care. Daycares can't offer one-on-one care and nannies don't automatically come with a year-long commitment, background check or childcare training.

**Your au pair will work up to 45 hours per week/10 hours per day performing childcare and related tasks, including:**

• Assisting with light household duties such as doing your children's laundry and keeping their rooms tidy
• Preparing your children's meals and cleaning up after mealtime
• Bathing and dressing your children
• Packing lunches, helping with homework and taking your children to and from school
• Entertaining your children and teaching them a second language and a new culture
• Driving your children to park outings, play groups and other activities
• Traveling with you on family vacations and providing care for your children



*"Paola became a member of our family, ready to pitch in when needed so my husband and I could play tennis, or have 'special time' with one daughter at a time."*
—Ascher Family | Two children ages 3 and 5

2  www.aupaircare.com | 1.800.42K.7247

3

APC 000017

## A Day in the Life of an AuPairCare Mom

**Name:** Heather Goodworth
**Status:** Married with two children ages 3 and 5
**Occupation:** Vice President, Global Education and Training



*"Once Sonia joined our family, I could finally relax. At work, I can relax knowing that my children run to hug her at school pick-up. At home, I can play with my kids instead of fold their laundry. And now my husband and I can have regular date nights without breaking the bank—what more could I ask for?"*

—Heather Goodworth, AuPairCare Host Mom

**7:30am**
Shower and get ready for work. My husband is traveling, but Sonia is home to help the kids get ready for school. She's packing lunchboxes while the kids eat pancakes.

**8:00am**
Kiss kids goodbye and leave for work. No more daycare drop-off madness! Have time to talk to my mom during the commute and swing by the dry cleaners on my way to the office.

**9:00am**
Text from Sonia as I head into a meeting: "Emma happy at drop-off :) Taking Oliver to park for playgroup now."

**1:00pm**
Nap time for Oliver. Sonia is tidying up the kids' toys and folding their laundry.

**2:00pm**
Sonia picks up Emma from school then makes healthy snacks for the kids while they goof off with each other. When they were in daycare, they didn't get to see each other all day!

**3:30pm**
Video text from Sonia at swim lessons: Oliver shows off his kicking and Emma jumps off the diving board.

**5:00pm**
Leave work and head home. Sonia is bathing the kids and preparing their dinner.

**5:30pm**
Kids tackle me at the door with an a "hola" and a big hug. Even a year into this, I'm still surprised when I come home and don't see toys scattered all over the place!

**6:00pm**
We all eat dinner together (even though Sonia is off duty for the day) and then Sonia goes to her room to Skype with her family in Paraguay.

**7:30pm**
Emma and Oliver kiss Sonia goodnight before she heads out to a movie with her au pair friends. I snuggle in for bedtime books and songs.

**8:30pm**
After the kids are asleep, I catch up on some email and RSVP for a school fundraiser tomorrow night that I'd forgotten about—thank goodness I don't need to scramble for a last minute babysitter!

**10:30pm**
Bedtime for me.

4   www.aupaircare.com | 1.800.428.7247

## Au Pair Spotlight

**Name:** Sonia
**Age:** 24
**Country:** Paraguay

While I was at university, I worked with kindergarteners and first graders. I loved teaching children, so becoming an au pair was very natural for me.

After I graduated, I looked for work and travel opportunities and researched a few programs. A friend told me about her good experience with AuPairCare, and I called the local office in my country. When I found out AuPairCare would let me combine my love for teaching children with travel and English language immersion, I applied, was interviewed and then matched with the Goodworth family soon after.

I was nervous to leave my family and come to America, but the Goodworth family welcomed me into their home and helped me get accustomed to living in the States. I am able to take English classes at the local community college, teach the children Spanish and cook them Paraguayan meals. I am hoping for a career in international business, and this experience has been a great way for me to improve my English and learn more about American culture.

*"...becoming an au pair was very natural for me."*

—Sonia, AuPairCare au pair

## AuPairCare Dad Corner

**Name:** Mark Goodworth
**Status:** Married to Heather Goodworth
**Occupation:** Senior Brand Manager

Having an au pair has helped our family relax and given us flexibility that we didn't have before Sonia arrived. An extra pair of hands means that every home responsibility is not divided between Heather and me. Previously, if a child was sick, one of us had to stay home or if we had work-related events in the evening, one of us had to get home early. Now that Sonia is here, the kids can do play dates after school and we can even get in a regular date night. It has definitely improved both our family and our marriage.

*"It has definitely improved both our family and our marriage."*

—Mark Goodworth, AuPairCare Host Dad



The Goodworth Family with their au pair, Sonia

5

APC 000018

Defs.' Appx. 00001226

## Identifying, Screening and Accepting the Best Au Pairs

Inviting someone into your home to care for your children is a big step. That's why AuPairCare provides thorough screening and training to make sure your au pair is capable and trustworthy.

Our 25-year reputation and status as an industry leader enable us to attract only the most qualified au pairs and turn away anyone who doesn't pass our rigorous admissions process.

### An AuPairCare au pair must:

• Have previous documented childcare experience
• Be between the ages of 18 and 26 years old
• Speak conversational English
• Pass a criminal background check
• Have completed secondary education
• Be in good physical health verified by a physician
• Submit a personal essay to share his or her values and interests
• Provide two childcare references and one personal reference verified by AuPairCare
• Complete an in-person interview conducted in English
• Hold a valid international driver's license

On top of our rigorous screening process, AuPairCare has invested in the DISC personality test, which offers a unique insight into an au pair's personality and character. The test provides a detailed profile of the au pair's Dominance, Influence, Steadiness and Compliance traits, which adds further depth to our screening process and can help you determine if a particular au pair will be a good fit for your family.



6  www.aupaircare.com | 800-xxx-xxxx   Cavel Family | Two children ages 2 and 9 months

## Choosing Your Au Pair

Whether you would like a male au pair to kick a soccer ball with your boys or an au pair with infant care experience to rock your baby to sleep so you can read with your kindergartener, we can help you find an au pair who fits your lifestyle. We offer two unique ways of guiding you through the selection process.

### AuPairCare Family Room™

Our online Family Room™ is available 24/7 and makes it easy for you to find an au pair for your family. Using our award-winning online matching system, you can search our entire pool of au pairs based on fifteen different criteria including nationality, gender, language, ability to drive, interests, skills, and childcare experience. You will also be able to view au pair photos, videos and read their applications.

### AuPairCare Match Experts

Our team of Match Experts is available to guide you through the selection process. We can provide customized au pair recommendations and match you with au pairs whose skills and personalities are likely to suit you. We can also answer questions, offer advice and set up international interview phone calls for free.

7

APC 000019

## Hands-On Safety Training at the Au Pair Academy

All of our au pairs are experienced caregivers. Our proprietary SafetyCare™ program provides them with the training they need to be even safer and more vigilant while caring for your children.

During our mandatory 4-day orientation and training program, au pairs receive training in child development, household and driving safety, and cultural awareness. Our curriculum was designed in concert with child and safety experts and incorporates best practices from the American Heart Association and National Safety Council. Through a combination of hands-on professional instruction and situational role-plays, au pairs leave the Au Pair Academy confident and ready to begin their year.

### Au pair training topics include:

- CPR and first aid training by the American Heart Association
- Common child and household safety hazards, including choking and water safety
- An online interactive driving course on U.S. driving laws and how to keep children safe while behind the wheel
- American culture and the "American Way" of caregiving
- Stages of child development (infancy to adolescence)
- Strategies for caring for more than one child at a time
- Games and activities for stimulating child development
- Creating a positive working relationship with host parents

 

## Infant Specialized™ Program

The AuPairCare Infant Specialized™ program was created in concert with leading specialists to prepare au pairs for the additional responsibilities of caring for infants.

Au pairs accepted to our Infant Specialized™ program have previous experience caring for children under two years old and attend a separate 5-day, hands-on orientation and training program devoted to baby care and infant development at the Au Pair Academy.

### Our Infant Specialized™ training includes:

- Infant care basics, including feeding, bathing, changing and transportation
- Certification in infant CPR and first aid by the American Heart Association
- Creating and monitoring a baby's daily routine and communicating with parents
- Games and activities to stimulate infant mental and physical development, including infant sign language and baby massage
- Infant soothing techniques



O'Sullivan Family | Four children ages 7, 5, 4 and 5 months

APC 000020

Defs.' Appx. 00001228

## Finding High Quality, Cost-Effective Childcare

Full-time childcare options for families are traditionally limited to daycares and nannies, but neither offers a complete solution combining the flexibility, affordability and reliability that AuPairCare provides.

### See the AuPairCare Difference

| | AuPairCare | Daycares | Nannies |
|---|---|---|---|
| **Location**<br>In-home childcare | ✓ | — | ✓ |
| **Attentive, Personalized Care**<br>Low caregiver to child ratio and up to two years of consistent childcare | ✓ | — | Varies |
| **Cost**<br>Fixed cost regardless of number of children | ✓ | — | — |
| **Flexibility of Schedule**<br>Can work 45 hours per week, based on parent's schedule | ✓ | Varies | Varies |
| **Training**<br>Childcare provider is trained in CPR, first aid and child development | ✓ | Varies | Varies |
| **Supporting Staff**<br>Professional, helpful representative in your community and 24/7 emergency support | ✓ | — | — |
| **Screening and Security**<br>Thorough screenings, interviews and background checks are done for you | ✓ | Varies | Varies |
| **Regulated**<br>Follows a strict set of guidelines set by the U.S. Department of State | ✓ | — | — |
| **Cultural Experience / Second Language**<br>Provides a cultural learning experience for your family | ✓ | — | Varies |

## AuPairCare Family Local Support

Our local Area Directors are there to support you and your au pair for the entire duration of the program. They will meet with you and your au pair shortly after his or her arrival, organize monthly au pair activities and maintain regular communication with you and your au pair.



*"In my community, I take great pride in being known as the "Au Pair Lady." In my 24 years as an AuPairCare Area Director, I have developed close relationships with many families as well as au pairs from all over the world. It warms my heart when I hear stories about au pairs from years ago who stay in touch with their host families, and come back to visit with families of their own. This is one of the most wonderful aspects of the au pair program—bonds that last a lifetime."*

—Brigette Skistimas, AuPairCare Area Director



Our history of quality has earned us an A+ rating from the Better Business Bureau—a result of our commitment to providing responsive and valuable customer service.

*Donati Family | Two children, ages 3 and 7*

APC 000021

Defs.' Appx. 00001229

# AuPairCare Programs



## What are My Options?

Choose the program that best fits the needs of your family. Hours are flexible so you and your au pair can create a schedule that works for everyone.

### One-Year Program

Au pairs provide up to 45 hours of care per week, up to 10 hours per day.

### Infant Specialized Program

All the benefits of the One-Year Program with the added bonus of an au pair who has previous experience caring for infants and receives extra training in infant specific topics.

### Optional Extension Program

You and your au pair can agree to extend the program for six, nine or twelve months, providing up to two years of continuous childcare.

## What are the Program Costs?

At an average cost of about $350 a week (under $8 an hour) for full-time, live-in care, the AuPairCare program is an economical option for families.

Additionally, AuPairCare offers you the convenience of paying program fees over an extended period of time by using our Family Friendly Payment Plan. For detailed information on our program costs and payment plan, please visit our website at www.aupaircare.com.

## Ready to Join the AuPairCare Family?

Prior to hosting an au pair, host families must meet the following U.S. Department of State requirements:

• Be willing to welcome an au pair as a family member
• Provide the au pair with a private bedroom
• Be U.S. citizens or permanent legal residents
• Speak English as the primary language in the home
• Submit a completed application and provide two references
• Have an in-home interview with an AuPairCare representative

## How to Get Started

 

**APPLY ONLINE**
Apply at aupaircare.com or call 1.800.428.7247 to speak with a Program Advisor.



**REVIEW & SELECT**
Review au pair profiles and select those who are compatible with your family's needs.



**INTERVIEW**
Interview au pairs via telephone (for free) or Skype and decide who is the right fit.



**WELCOME YOUR AU PAIR**
Once you've made your choice, AuPairCare takes care of all the details to coordinate your au pair's arrival on your desired date.





## Making Parenthood a Little Easier

If you're ready to trade in chaotic mornings, daycare late pick-up fees and expensive childcare, call AuPairCare today at **1.800.428.7247** or visit us online at www.aupaircare.com.

APC 000022

Defs.' Appx. 00001230

AuPairCare is a leading au pair agency providing affordable live-in childcare services to American families since 1989. Designated by the U.S. Department of State, AuPairCare offers superior childcare to fit families' unique needs. AuPairCare has matched more than 55,000 au pairs with American families across the U.S. AuPairCare is a division of Intrax, a family of organizations that provide a lifetime of high-quality educational, work and volunteer programs that connect people and cultures. Intrax is headquartered in San Francisco with offices on four continents.

1.800.428.7247 | www.aupaircare.com

**USA Accreditation** - In maintaining accreditation, Intrax is committed to quality and continuous assessment and improvement of our programs and services.

     



Intrax is a globally-oriented company that provides a lifetime of high-quality educational, work and volunteer programs that connect people and cultures, with operations in more than 100 countries worldwide. For more information visit: www.intraxinc.com.

**Intrax**          **AuPairCare**          **Ayusa**

© 2016 Intrax, Inc. All rights reserved.

INX APC 072013

APC 000023

Find An Au Pair: Affordable Childcare for Host Families | Au Pair Care                    Page 1 of 4



- Find an au pair
- Become an au pair
- Read our blog
- Watch our videos
- New Family? apply now
- Current Family login here
- New Au Pair? request info
- Current Pair login here

- what is au pair childcare
  - Responsibilities
  - Affordable
  - Nannies vs. Au Pairs
  - Au Pair Language Learning
- program costs
  - Payment Plan
  - Discounts
  - Value Comparison
  - Extension Pricing
- why au pair care
  - Program Options
  - Infant Care Program
  - Au Pair Training
  - Quality & Screening
  - EasyMatch
  - Safety Care Program
  - Local Support
  - National Safety Month
- meet our au pairs
  - Infant Care Au Pairs
  - Ultimate Au Pairs
- getting started
  - Family Qualifications
  - How to Apply
  - Selection Process
  - Areas Serviced
  - Arrival Dates
  - Domestic Airfare
  - Request Information
  - Apply Online
- current host families
  - Family Log-in

# Find An Au Pair: Affordable Childcare for Host Families

Au Pair Care understands that each family is unique. That's why our au pair programs are customized to help you find an au pair that fits your childcare needs, lifestyle and timing. Our carefully screened au pairs provide the highest quality of in-

APC 000126

EXHIBIT K



home care to ensure that your child will be safe, happy and healthy. Au Pair Care offers you a dependable, flexible... You'll have affordable childcare that fits your budget.

find out more about our great service!

## What is an Au Pair?

Not sure of the advantages of au pairs vs nannies, or the responsibilities of an au pair? You'll find that au pairs provide all the benefits of a nanny or daycare, while providing a great cultural experience at a better value than other child care services.

## Meet Our Au Pairs

Au Pair Care has hundreds of carefully screened au pairs from around the world available for placement. When you welcome an au pair to your home, you gain superior live-in childcare at a surprisingly affordable price. Meet some of our amazing au pairs!

# Why Au Pair Care?



**childcare that fits your budget**
Hosting an au pair is a surprisingly affordable childcare solution. For about **$350 a week**, you'll receive full-time childcare up to 45 hours per week, regardless of the number of children in your family. Make the program even more affordable by using our Family Friendly Payment Plan and pay program fees over an extended period.



**childcare that fits your lifestyle**
Au pair childcare offers you flexibility. The diversity of our au pair selection allows you to choose the au pair with the childcare experience, special skills, interests and personality that will best fit your family's lifestyle. You set your au pair's schedule and working hours to meet your needs.



**childcare that fits your timing**
Au Pair Care is the only U.S. Department of State regulated au pair agency that allows you to view au pair profiles right when you apply. Au Pair Care's innovative matching technology EasyMatch™ lets you view our entire pool of qualified au pairs 24 hours a day. Our Matching Experts are also available to guide your au pair search, connect international calls for free, and help you find the best au pair for your family.



**childcare that fits your children**
Au Pair Care offers a range of programs to fit your childcare needs. In addition to our standard 12-month program, Au Pair Care offers an Infant Specialized au pair program, short-term placements with au pairs already in the U.S., and Year 2 au pairs who have already completed one year in the United States. Au Pair Care also places male au pairs and au pairs with special needs experience.

Get started today -- you can browse our au pair profiles or apply now if you're ready to choose!

Defs.' Appx. 00001233



**Search for Au Pairs!**

All Languages ▾

Do you have children under 2 yrs?

○ No

◉ Yes

[Apply] [Search]





- **AuPairCare Home**
  - About Us
  - Contact Us
  - Chat with Us
  - Watch Our Videos
  - Read Our Blog
- **For Host Families**
  - What is Au Pair Childcare
  - Program Costs
  - Value Comparison
  - Search Au Pairs
  - Discounts
  - Current Host Family Login
- **For Au Pairs**
  - Being an Au Pair
  - Why Au Pair Care
  - Getting Started

APC 000128

Defs.' Appx. 00001234

Find An Au Pair: Affordable Childcare for Host Families | Au Pair Care                Page 4 of 4



- Meet Our Staff
- Our Host Families
- Current Au Pair Login

Useful Links
  - Press Room
  - Frequently Asked Questions
  - Jobs
  - Partner with Us
  - Current Partner Login

Follow Us
On Facebook

San Francisco Bay Area | NYC - NJ | Boston | Minneapolis | Chicago | Houston | Seattle | Los Angeles | Philadelphia |
Atlanta | San Jose | Washington DC | More Cities

Au Pair Care is part of the Intrax family of organizations that provide a lifetime of high quality educational, work, and
volunteer programs that connect people and cultures, with operations in more than 100 countries worldwide.



## intrax

Intrax Inc.
Copyright © 2012 All Rights Reserved | Sitemap | Privacy Policy

- Intrax
- AuPairCare
- Ayusa
- Lango
- ProWorld

X close
Forgot your password?
Current Family Login
Email: [              ]   Password: [              ]
X close

Login

Au Pair Care's proprietary Infant Specialized Training utilizes a hands-on approach to train au pairs in infant safety, the
"American way" of infant care giving, infant stimulation and development. Infant Specialized au pairs are certified in infant
CPR and first aid by the American Heart Association and also receive instruction in infant sign language and baby massage.
This additional infant care training will help nurture your baby's healthy growth and encourage language development.

APC 000129

Defs.' Appx. 00001235

Find An Au Pair: Affordable Childcare for Host Families | Au Pair Care

Page 1 of 2



APC 000130

EXHIBIT L

Defs.' Appx. 00001236

Find An Au Pair: Affordable Childcare for Host Families | Au Pair Care                    Page 2 of 2



APC 000131