IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 14-cv-03074-CMA-KMT

JOHANA PAOLA BELTRAN, et al.,

Plaintiffs,

v.

INTEREXCHANGE, INC., et al.,

Defendants.

_____

## APEX AND 20/20'S MOTION FOR SUMMARY JUDGMENT
_____

These Defendants respectfully submit their Motion for Summary Judgment:

## SUMMARY OF ARGUMENT

Plaintiffs cannot demonstrate genuine issues of fact supporting their antitrust claim against APEX and 20/20, for whom "standard" au pair placements represented only a tiny fraction of their "professional" au pair-focused business. Plaintiffs have no direct evidence APEX and 20/20 conspired with other sponsors to fix the standard au pair stipend. Their circumstantial evidence barely amounts to even ambiguous evidence of parallel conduct, which is insufficient as a matter of law to prove APEX and 20/20 participated in any stipend-fixing conspiracy. Because Plaintiffs have no evidence "that tends to exclude the possibility that [APEX and 20/20] acted independently" regarding standard au pair stipends, they cannot meet their burden under *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 588 (1986). APEX and 20/20 are entitled to summary judgment on Plaintiffs' antitrust claim, the only claim asserted against them.

## THE ANTITRUST CLASS

As certified by the Court on February 2, 2018, the Antitrust Class consists of:  "All persons sponsored by any Defendant to work as a standard *au pair* in the United States pursuant to a J-1 Visa."  (ECF 828, p. 34)

For purposes of this Motion, it is critical to distinguish "standard"[1] au pairs from "professional" or "premium" au pairs. Professional au pairs have additional experience, education, and training in areas such as nursing, physical or occupational therapy, speech therapy, teaching or social work, over and above the experience levels of "standard" au pairs, which makes them uniquely suited for families with children who have special medical needs or require a higher level of care. APEX and 20/20's professional au pairs command a higher stipend, typically $250.00 per week or more, depending on their expertise. Professional au pairs are not part of Plaintiffs' alleged price-fixing Class. *APEX Appx. pp. 9-10, Kerr depo. Dec. 21, 2017 (212:19-213:15)* ("[The price-fixing class] doesn't include people who are not standard au pairs.")

Defendants APEX and 20/20 occupy a unique niche among au pair sponsor agencies. Since their inception,[2] APEX and 20/20 have modeled their business to focus on sponsoring professional au pairs. *APEX Appx. p. 25, Mispagel depo. (29:19-22)* ("the bulk of our business is dedicated to families that have children with special needs and professional au pairs."); *id., p. 26* (*30:24-31:2)* ("[APEX] is the only J-1 au pair sponsor

---

[1]  Within their business, APEX and 20/20 refer to non-professional au pairs as "regular" au pairs, but for purposes of this Motion, will refer to them as "standard" au pairs.

[2]  Both APEX and 20/20 are owned by Susan Asay.  *APEX Appx. p. 23, Mispagel depo (12:7-13).* APEX became a DOS- approved sponsor and began placing au pairs in August 2011, and 20/20 was approved as a sponsor in 2013. *Id. p. 24 (19:9-13).*

that is specifically dedicated to families with special needs"); *id.* (*32:3-33:17*) (professional au pair qualifications). The professional au pairs placed by APEX and 20/20 are paid stipends of $250.00 or more per week. *Id., pp. 27, 31 (36:18-21; 54:4-7).*

During the time period at issue (2011-2016), APEX and 20/20 placed 765 au pairs in the U.S. *APEX Appx. pp. 46-64, APEX-20/20 10700-10718 (Highly Confidential-Attorney's Eyes Only).* Of those 765 au pairs, 735 were placed as "professional" au pairs who were paid from $250.00 to as much as $350.00 per week. *Id.* Only 30 au pairs were placed in "standard" au pair positions. *APEX Appx. p. 65, APEX-20/20 10698 (Highly Confidential-Attorney's Eyes Only).* These "standard" au pair placements were exceptions to APEX and 20/20's business norm, undertaken as a courtesy in certain limited situations, such as where: (1) a professional au pair candidate turned out to lack qualifications for professional placement; (2) a host family had already "pre-matched" with an au pair of their own choosing, and requested assistance with the visa process; or (3) a host family decided it did not need, or could not afford, a professional au pair. *APEX Appx. pp. 28, 32 (44:10-17; 90:11-15, 93:22-24).*

In 2015, APEX and 20/20 determined they would no longer place standard au pairs, even as a courtesy, and that they would focus exclusively on professional au pairs. *Id., p. 28 (43:12-25).* The last standard au pair placed by APEX or 20/20 was processed in late 2015 and began his host family assignment in February 2016. *Id., pp. 28-29 (45:21-46:1); APEX Appx. p. 65 (No. 105004).*

Based on APEX and 20/20's census numbers—which Plaintiffs have no evidence to dispute—*more than 96 percent* of APEX's and 20/20's au pairs are professional au

pairs who are *excluded* from Plaintiffs' alleged price-fixing class. Indeed, Plaintiffs' expert William Kerr admits he has identified no basis for finding any collusion regarding "professional" au pairs. *APEX Appx. p. 68, Kerr Report (Jan. 13, 2017), ¶ 70* ("I have not seen evidence of collusion with regard to stipends for premium au pairs, nor has collusion been alleged."); *APEX Appx. pp. 6, 8, Kerr depo (206:5-24; 208:3-8)* (aware of no evidence of collusion regarding stipend for APEX and 20/20 professional au pairs).

Thus, it is undisputed that *fewer than 4 percent* of APEX's and 20/20's au pair placements (30/765) are even arguably within Plaintiffs' alleged Price-Fixing Class.

## SUMMARY JUDGMENT

Fed. R. Civ.P 56(c) directs the entry of summary judgment when a party who "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Id.* An issue is "genuine" if sufficient evidence exists "so that a rational trier of fact could resolve the issue either way" and "[a]n issue is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir.1998). On summary judgment, the Court must determine "whether there is the need for a trial-whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986).

There is an "important distinction" to this general summary judgment standard in antitrust cases, in that "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case." *In re Flat Glass Antitrust Litig.,* 385 F.3d 350, 357

(3d Cir.2004), quoting *Matsushita,* 475 U.S. at 588. Specifically, "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Matsushita,* at 588. The reason for this more rigorous standard is that mistaken inferences are especially costly in antitrust cases, since they could penalize desirable competitive behavior and "chill the very conduct the antitrust laws are designed to protect." *Id.* at 594.

### PLAINTIFFS' PRICE-FIXING CLAIM UNDER § 1 OF THE SHERMAN ACT

In their Second Amended Complaint, Plaintiffs allege that the 17 sponsor-Defendants, including APEX and 20/20, committed "wage-fixing" to suppress compensation for standard au pairs, *SAC, ¶ 570; see also ¶ 80:*.

> 570.    As a group, the Sponsors conspired and agreed to fix all of their sponsored standard *au pairs*' weekly wages at exactly the minimum amount viewed as allowable under the FLSA. This fixed weekly rate was and continues to be an artificially depressed wage for standard au pair services. The Sponsors' agreement to fix the standard au pair wage constitutes a per se violation of Section 1 of the Sherman Act.

### ARGUMENT

**A.      Plaintiffs Bear the Burden of Proof on Their Section 1 Price-Fixing Claim.**

Plaintiffs bear the burden of proving their Section 1 antitrust claim. To recover, they must prove: 1) a contract, combination, or conspiracy; 2) a resultant unreasonable restraint of trade in the relevant market; and 3) an accompanying injury. *Full Draw Prods. v. Easton Sports, Inc.,* 182 F.3d 745, 756 (10th Cir.1999)(citation omitted).

**B.      APEX and 20/20 are Entitled to Summary Judgment Because Plaintiffs Cannot Prove These Defendants Conspired to Fix the Stipend.**

The essence of a claim for violation of Section 1 is the agreement itself. *See*

*Summit Health, Ltd. v. Pinhas,* 500 U.S. 322, 330 (1991); *Monsanto Co. v. Spray-Rite Serv. Corp.,* 465 U.S. 752, 761 (1984) (there must be "a 'contract, combination ... or conspiracy' ... in order to establish a violation.")(citation omitted).

Section 1 does not reach unilateral action, but requires an actual concert of action between separate entities. *Fisher v. City of Berkeley,* 475 U.S. 260, 266-67 (1986). A plaintiff must show "a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto,* at 764 (internal quotation omitted).

Thus, "to survive [a] motion for summary judgment, the plaintiff[] must first demonstrate the existence of an agreement, whether by direct or by circumstantial evidence." *Mitchael v. Intracorp, Inc.,* 179 F.3d 847, 856-57 (10th Cir.1999).

"[E]ach defendant must be shown to have participated in the conspiracy alleged." *Heartland Surg. Spec. Hosp., LLC v. Midwest Div., Inc.*, 527 F.Supp.2d 1257, 1295 (D.Kan. 2007). Plaintiffs must prove, using APEX and 20/20's statements and conduct, that APEX and 20/20 knew of the conspiracy and voluntarily and intentionally participated in it. *United States v. Locascio,* 6 F.3d 924, 945 (2d Cir. 1993) (approving jury instruction stating that "[defendant] must not only have been present, he must have known about the conspiracy, he must have intended by his presence to participate in the conspiracy or to help it succeed"); *United States v. Rawwad,* 807 F.2d 294, 296 (1st Cir. 1986) ("membership of any defendant in a conspiracy must be established on the basis of the evidence as to what he himself did and what he himself said").

### 1.    Plaintiffs Have No Direct Evidence that A.P.E.X. or 20/20 Conspired with Other Sponsors to Fix Prices for Standard Au Pair Stipends.

"Direct evidence in a Section 1 conspiracy case must be evidence that is explicit

and requires no inferences to establish the proposition or conclusion being asserted." ; *Champagne Metals v. Ken-Mac Metals, Inc.,* 458 F.3d 1073, 1083 (10th Cir. 2006) (quoting *In re Baby Food Antitrust Litig.,* 166 F.3d 112, 118 (3d Cir.1999)). "With direct evidence the fact finder is not required to make inferences to establish facts." *Id.*

Plaintiffs' SAC alleges almost nothing about APEX and 20/20,  except that they listed a figure of $195.75 for standard au pair stipends on their informational websites[3]:

> 112. As of November 2014, A.P.EX.['s] …website included the following text, advertising standard *au pair* employment for $195.75 per week: "You receive: Pocket Money: …Regular Au Pair - $195.75 per week."

> 113. As of November 2014, 20/20['s] … website included the following text, advertising standard *au pair* employment for $195.75 per week: "Weekly Stipend $195.75 paid directly to the au pair."

Even assuming these allegations are true, nothing therein, or in any other evidence Plaintiffs have produced, supports a conclusion that APEX or 20/20 imposed a fixed or maximum stipend of $195.75, much less that they *agreed with other sponsors* to fix the maximum stipend at $195.75.

Next, Plaintiffs point to "an article" published by an unnamed individual who allegedly spoke at a national association conference for au pair sponsors in 2014:

> 133. In 2014, the featured speaker at the IAPA annual conference has published an article arguing for strict maintenance of a fixed $195.75 weekly wage for standard *au pairs.* Her publication states that "host families do each other a disservice when they start to compete with each other (or try to stand out as a 'better family') by offering more pocket money. We don't want *au pairs* to be

---

[3]   APEX (ProAupair) is mentioned only four times in the Second Amended Complaint: in the caption; in allegations identifying the parties, ¶ 42, in ¶ 112 (statement on APEX website concerning stipend), and in ¶ 130 (as a member of the International Au Pair Association, IAPA).  20/20 is mentioned only three times, in the caption, in the party allegations, ¶ 43, and in ¶ 113 (statement on 20/20 website regarding stipend).

'shopping' for a higher stipend."

Leaving aside Plaintiffs' selective and misleading quotation --which is from a blog post by "CVHarquail," published February 15, 2011– before APEX and 20/20 even became DOS approved sponsors)[4] – Plaintiffs have no evidence that any representative of APEX or 20/20 ever read this post, ascribed to the same views, or most importantly, agreed with other sponsors to fix the maximum stipend for standard au pairs at $195.75. This article is not evidence of anything other than the author's views, and is certainly not evidence of any agreement between APEX and 20/20 and other sponsors.

As for Plaintiffs' "smoking gun" allegation that certain unidentified sponsors "admitted" to a stipend-fixing conspiracy in a series of telephone calls with Plaintiffs' investigator in November 2014 (*SAC, ¶¶ 93-97*), Plaintiffs have no evidence that APEX or 20/20 had any involvement in any alleged admissions, or in any alleged agreements these unknown persons supposedly admitted.

Plaintiffs' investigator, David Keil, was deposed July 21, 2016. Mr. Keil produced a Memorandum of his telephone calls to sponsors, which (besides being remarkable for its sparsity) makes no mention of any statements implicating APEX or 20/20 in any conspiracy. *APEX Appx. pp. 79-81.* Mr. Keil had no substantive recollection of any conversations other than the three calls listed in his memo, which did not involve APEX or 20/20, *id.; APEX Appx. p. 85, Keil depo (188:1-20),* and he has no recollection of

---

[4] The last sentence actually reads:  "We don't want au pairs to be "shopping" for a higher stipend– we want them to choose a family based on the criteria that will make them happy in the family day in and day out– and an extra $20-$50 a week won't do this." *APEX Appx. p. 69,* http://aupairmom.com/au-pair-pocket-money-do-you-pay-more-than-the-required-stipend-poll/2011/02/15/celiaharquail/ (accessed Feb. 14, 2018).

speaking with anyone from APEX or 20/20.  *Id., p. 87 (202:14-203:2).* And he admitted

he has *no evidence* of any communications between two or more sponsors in which

they agreed to set the amount of the weekly stipend.  *Id., p. 85 (187:21-25).*

Moreover, Plaintiffs have no evidence that any representative of APEX or 20/20

was a party to any written or oral agreements, or any other activities which evidenced

an agreement by APEX or 20/20 to fix the weekly stipends of standard au pairs at the

DOS minimum stipend.

Plaintiffs' expert, Dr. Kerr, admitted he has no knowledge of any evidence of

collusion by APEX or 20/20: "I don't know of any factual evidence about the collusive

activities, or the alleged collusive activities of APEX or 20/20." *APEX Appx. pp. 11-12,*

*Kerr depo (221:25-222:10).* He is unable to state who, on behalf of APEX and 20/20,

allegedly entered into the price-fixing agreement, when they allegedly joined the

conspiracy, or how long these Defendants were allegedly part of the conspiracy. *Id., pp.*

*13-14, 17 (223:9-224:1; 227:10-15)* ("I don't have any factual basis for saying what the

acts of joining the conspiracy consisted of.  Or the date of those acts.")

To the contrary, Heidi Mispagel, Fed.R.Civ.P. 30(b)(6) representative of APEX

and 20/20, has testified that it has always been APEX and 20/20's understanding,

based on DOS guidance, that $195.75 was the *minimum* for a standard au pair stipend:

> A. [I]t's A.P.E.X.'s belief, and it always has been, that there's a minimum
> stipend for au pairs based on federal minimum wage, and that our
> professionals have always gotten paid more, and that's been the
> company's understanding.
> Q. And just to be clear, that minimum that you referred to is 195.75?
> A. Yes.

*APEX Appx. pp. 41-42 (219:2-9; 225:7-9)* (APEX's understanding has always been that the stipend has been a minimum stipend based on federal minimum wage).

It was APEX's and 20/20's practice to inform host families, during the initial contact, that $195.75 was the *minimum* stipend for a standard au pair, *id., 29 (46:5-14):*

> Q. What would you have told the host family during the initial phone call, that we were discussing earlier, about pricing for regular au pairs? …
>
> A. So what we would have told them about pricing is that the program fee was in the neighborhood of almost $8,000, and that the minimum stipend to the au pair was 9 -- 195.75 a week.

Ms. Mispagel further testified she has no knowledge of what other sponsors understood or believed about the stipend amount, or whether they had the same understanding as APEX and 20/20. *Id., p. 42 (225:3-90).* She has never had discussions with other sponsors, or the Alliance, about the amount of the standard au pair stipend. *Id., pp. 37, 28, 40-42 (196:7-22; 208:1-6; 217:20-218:12; 223:17-23).* In fact, she would not have had such discussions with other sponsors about the stipend, "because, remember, APEX has a different stipend." *Id., p. 37 (196:14-17).*

Ms. Mispagel has never participated in discussions in which she, or other sponsors, provided their perspectives as to whether the stipend is based on the federal minimum wage versus state or local minimum wage. *Id., pp. 38-39 (212:3-19; 208:1-6).*

Plaintiffs have no direct evidence to dispute Ms. Mispagel's testimony or to otherwise establish that APEX or 20/20 joined in any agreement with other sponsors to fix the stipend for standard au pairs at the minimum level of $195.75 per week.

**2.    Plaintiffs Have No Circumstantial Evidence that APEX or 20/20 Engaged in any Wage-Fixing Conspiracy.**

10

While direct evidence of a formal agreement to fix prices is not required, Plaintiffs must still produce sufficient circumstantial evidence to support a finding that such agreement existed. Here, Plaintiffs cannot cobble together even circumstantial evidence supporting a finding that APEX and 20/20 engaged in any agreement to suppress wages for standard au pairs.

To prove a Section 1 claim, Plaintiffs must submit "more than ambiguous evidence of the alleged conspiracy to withstand a motion for summary judgment." *Smalley & Co. v. Emerson and Cuming, Inc.,* 808 F.Supp. 1503, 1508 (D.Colo. 1992). On summary judgment, antitrust law limits the range of permissible inferences from ambiguous evidence. *Champagne Metals,* 458 F.3d at 1085. "Conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Matsushita,* 475 U.S. at 588.

Thus, in the face of ambiguous circumstantial evidence of an agreement, an antitrust plaintiff who wishes to survive summary judgment must come forward with "evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently." *Matsushita*, 475 U.S. at 588 (quoting *Monsanto*, 465 U.S. at 764).

The Tenth Circuit has applied the *Matsushita* summary judgment standard as a two-part evidentiary test: (1) is plaintiff's evidence of conspiracy ambiguous, *i.e.,* is it as consistent with defendant's permissible independent interests as with an illegal conspiracy?; and, if so, (2) is there any evidence that tends to exclude the possibility that defendant was pursuing these independent interests? *Gibson v. Greater Park City*

11

*Co.,* 818 F.2d 722, 724 (10th Cir.1987). "A plaintiff thus fails to demonstrate a conspiracy if, using ambiguous evidence, the inference of a conspiracy is less than or equal to an inference of independent action." *Riverview Inv., Inc. v. Ottawa Comm'ty. Improv. Corp.,* 899 F.2d 474, 483 (6th Cir.1990).

In this case, Plaintiffs' circumstantial evidence does not rise even to the level of "ambiguous" evidence of conspiracy.

### 1.      Evidence of Parallel Conduct is Ambiguous, at Best.

Antitrust plaintiffs typically structure their circumstantial case around parallel conduct or "conscious parallelism." Parallel conduct, alone, is insufficient to establish an anticompetitive agreement, but requires evidence of "plus factors," *i.e.,* additional evidence from which conspiracy can be inferred.[5]  *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 553 (2007) ("While a showing of parallel 'business behavior is admissible circumstantial evidence from which the fact finder may infer agreement,' it falls short of 'conclusively establishing agreement or ... itself constituting a Sherman Act offense.'") (quotation omitted); *Mitchael,* 179 F.3d at 859.

 With respect to APEX and 20/20, an inference of parallel conduct is tenuous, at the very best.

As discussed above, between 2011 and 2016, 96% of APEX and 20/20's au pairs were placed as professional au pairs with weekly stipends of $250.00 or more.

---

[5]    Such "plus factors" include: (1) evidence that the defendant had a motive to enter into a price fixing conspiracy, (2) evidence that the defendant acted contrary to its interests, and (3) evidence implying a traditional conspiracy, such as "non-economic evidence that there was an actual manifest agreement not to compete." *Flat Glass,* 385 F.3d at 360-61; *Mitchael,* 179 F.3d at 859.

Fewer than 4% were placed as standard au pairs. Because of the small number of standard au pair placements, APEX and 20/20 are able to establish that the weekly stipends of its 30 standard au pairs were determined based on independent factors specific to the au pair/host family situation, unrelated to any purported collusion.  A substantial number of the 30 standard au pairs—more than 25%—received weekly stipends of $200.00 to $250.00, contradicting Plaintiffs' allegation that APEX and 20/20 colluded with other sponsors to fix the stipend at $195.75. *See Llacua v. W. Range Ass'n,* No. 15-1889-REB-CBS, 2016 U.S.Dist. LEXIS 177985, *18-19 (D.Colo. Dec. 21, 2016)(noting that job orders offering payment above minimum wage "contradict" alleged wage-fixing conspiracy; therefore conspiracy to fix offered wages cannot be inferred).

Moreover, Plaintiffs have no evidence that, for the 22 standard APEX or 20/20 au pairs who were paid a weekly stipend of $195.75, the stipend amount resulted from illegal agreement with other sponsors, as opposed to independent, non-collusive action. To the contrary, APEX and 20/20's evidence establishes that these stipends were determined independently for each standard au pair placement.

*APEX Appx. p. 65* is a spreadsheet detailing the stipends paid to each of the 30 standard au pairs placed by APEX and 20/20 and, where known, the circumstances surrounding the stipend determination. This information, unrebutted by any evidence produced by Plaintiffs, establishes the following undisputed facts:

i.  One of APEX's 30 standard au pairs was paid $277.00 per week (47315), two were paid $250.00 per week (6201, 72195), and a total of eight were paid more than $195.75 per week (47315, 6201, 72195,

17782, 19333, 55071, 55481, 73133);[6]

ii.  At least six of the 30 standard au pairs were "pre-matches," in which the host family preselected the au pair, determined the amount of the stipend and then asked APEX or 20/20 to obtain the au pair's J-1 visa (17782, 19333, 45225, 55071, 55481);

iii.  One host family (105004) had recently experienced the death of a spouse and needed an au pair but could not afford more than $195.75 per week for the stipend;

iv.  APEX and 20/20's owner, Susan Asay, hosted a standard au pair in 2014 and 2015 (47315), paying a stipend of $195.75 for year one and $1200.00/month ($277.00/week) for year two, plainly inconsistent with the inference that she, as owner of the companies, had entered into and was participating in the alleged price fixing conspiracy;

v.  One of the 30 standard au pairs (64177) qualified as a professional at a stipend of $250.00 per week but chose to be placed as a standard au pair because the cultural exchange aspect of the au pair program was more important to her than the amount of the stipend;

vi.  One family which sponsored three au pairs would only sponsor standard au pairs at the rate of $195.75 (64029, 64177, 93795);

vii.  Several host families which sponsored standard au pairs lacked the financial resources to sponsor a professional au pair (11241, 64029, 64177, 78263, 93795, 105004);

viii.  Two families requested Spanish speaking au pairs from South America but APEX's South American agent was unable to provide professionals; the families accepted standard au pairs (88433, 85407).

**2.      Website Information and Promotional Materials Referring to a Stipend of $195.75 Do Not Support an Inference of Conspiracy.**

The fact that APEX and 20/20's websites referred to "$195.75" as the stipend for standard au pairs, and even the fact that other sponsors also posted $195.75 as the standard stipend, is not circumstantial evidence of collusion, and here, is even less

---

[6]  For two au pairs (60889, 60899), the weekly stipend amount could not be determined.

significant because, as shown above, a substantial number of APEX and 20/20's standard au pairs were paid *more* than $195.75.

As the court observed in *In re Fructose Corn Syrup Antitrust Litig.,* 295 F.3d 651, 656 (7th Cir. 2002), the existence of list prices and transactions based off of them do not in themselves show anything more than parallel conduct: "[I]f many sales are made at prices below the list price, the fact that the sellers' list prices are the same is not compelling proof of collusion. … But it wouldn't be anyway, since identical list prices might be adopted by imitation rather than by explicit agreement." *See also Res. Supply Corp. v. Owens-Corning Fiberglas Corp.,* 971 F.2d 37, 53-54 (7th Cir. 1992) ("The fact that a standard product is priced according to a standard formula does not indicate that a conspiracy exists; one manufacturer could have implemented the pricing system, and its competitors could have decided independently to adopt it."); *Llacua,* at *21-22 ("[I]in light of the incentives resulting from the H-2A [visa] program, [defendants'] "minimum wage plus" offers are at best only consistent with an agreement to fix the base wage, not suggestive of such an agreement.")

It is equally—even more—plausible that APEX and 20/20 (and other sponsors) referenced $195.75 as the standard au pair stipend because that is the amount the DOS designated as the minimum stipend. *See Llacua,* at *36 ("individual parallel actions under the unique influence of the DOL regulatory scheme [governing wages for foreign and domestic shepherds] are more likely explanations for all of the alleged concerted conduct."); *United States v. Apple, Inc.*, 791 F.3d 290, 315 (3d. Cir. 2015) (parallel action is insufficient to prove conspiracy because "such behavior could be the result of

… independent responses to common stimuli").

Finally, Plaintiffs' expert Dr. Kerr's sole contention regarding APEX and 20/20's participation in the alleged conspiracy is that APEX and 20/20 consistently "misrepresented" to host families and au pairs that "the weekly stipend should be $195.75," rather than indicating that $195.75 was a "minimum." *APEX Appx. pp. 90-91, Kerr Merits Rebuttal, Oct. 30, 2017, ¶ 82.* But even if APEX and 20/20's website statements are ambiguous or even misleading in failing to specify that the figure represents a "minimum," they are not evidence that APEX and 20/20 *conspired* with other sponsors to fix the stipend at this level, or agreed to join an existing conspiracy.

The court in *Llacua* rejected the same argument made by Mr. Kerr. The *Llacua* plaintiffs argued the ranching Associations' contracts were "misleading" in stating that the shepherd occupation "pays $750 monthly, with house and food" instead of stating that $750 was *minimum* wage, and that this misrepresentation "supports the conspiracy to fix offered wages." *Llacua,* at *23-24. The court rejected this argument, concluding that while these allegations might support plaintiffs' general allegations that the Association sets the offered wage at the minimum and seeks to exploit shepherds' immigration status, "in the H-2A regulatory system, neither of those facts suggest that [the Association] agreed with anyone to fix wages." *Id.* at *24.

Moreover, any inference of conspiracy is further contradicted by the undisputed evidence that (1) APEX and 20/20 routinely informed families that $195.75 was the minimum stipend; and (2) a significant number of APEX and 20/20's standard au pairs received stipends exceeding $195.75. Mr. Kerr has nothing more to say about APEX

16

and 20/20 and their purported participation in the alleged stipend-fixing conspiracy, and Plaintiffs have no other evidence to fill this evidentiary gap.

### 3. Plaintiffs Lack Any Evidence of Motive for APEX and 20/20 to Conspire to Fix the Stipend for Standard Au Pairs.

Plaintiffs argue that by allegedly conspiring to suppress the weekly stipend paid to standard au pairs, Defendants have been able to increase both the number of "potential host families" they attract for standard au pair placements, and the fees they charge to host families, without increasing the overall costs to families. *SAC, ¶ 135.* According to Plaintiffs, the ability to increase fees and host family participants provides a motive to engage in a stipend fixing conspiracy.

Plaintiffs allege that, but for Defendants' collusive conduct (1) sponsors would compete for standard au pairs by offering different weekly stipends, (2) the au pairs would negotiate their weekly stipend with sponsors and host families, and (3) weekly stipends to standard au pairs would be higher. *Id. ¶¶ 150-151.*

These alleged motives are economically implausible as applied to APEX and 20/20. An inference of conspiracy is impermissible if the defendants "had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations." *Matsushita*, at 596.

Plaintiffs' antitrust class is limited to *standard* au pairs who were paid $195.75. APEX's and 20/20's business model is based on placement of *professional* au pairs at stipends of $250.00 or more. Their standard au pair placements were pre-matches, the occasional au pair who could not meet professional qualifications, or accommodation of

specific families' limited financial resources. And, in 2015, APEX and 20/20 stopped placing standard au pairs entirely. *APEX Appx. p.28 (43:12-25).*

Even before they decided to discontinue occasional standard au pair placements, APEX and 20/20 had no economic motivation to seek to increase the number of host families they attracted for standard au pairs, so as to increase their fee revenues from these standard placements. Rather, APEX and 20/20's host family fee structure is unique in that their host family fees for professional au pair placements are nearly twice the fees they collect for standard placements—for the same amount of effort.  For example, since 2012, APEX and 20/20 have collected host family fees of $15,464.00 to $15,959 for professional placements, but only $7,495.00 to $7,895.00 for standard placements. *See APEX Appx. pp. 94-95, APEX and 20/20's Second Am. Resp. to Plaintiffs' Second Set of Interrogs., No. 6.*[7]

Because it is far more profitable for APEX and 20/20 to attract host families who wish to hire a *professional* au pair, APEX and 20/20 have never had any incentive to attract *more* families seeking standard au pairs, and therefore no motive to agree to suppress standard au pair stipends to achieve this goal. *See APEX Appx. p. 28 (44:8-45:9).* The fact that 96% of APEX and 20/20's placements are for professional au pairs confirms their financial interest lies in increasing professional placements, not in increasing their standard placements. This lack of economic motivation is confirmed in the Rebuttal Report of Mark Glick, Ph.D., J.D. (Oct., 2017), *APEX Appx. pp.101-102*:

---

[7]  These fees are for families who have not previously sought a professional au pair from APEX or 20/20. "Repeat" families seeking a subsequent professional au pair pay lower "original" fees, from $9,345.00  to $11,495.00. *Id; APEX Appx. p. 36 (119:5-13).*

The Companies earn the vast majority of their revenue from the placement of professional au pairs, and have earned very little from the placement of standard au pairs (which has been discontinued). Moreover, the profit margin the Companies receive for the placement of professional au pairs is much higher than the profit margin they receive for placement of standard au pairs. A cartel which makes standard au pairs more attractive to host families by lowering their price (i.e., the stipend and host family fees) as envisioned by Dr. Kerr would not be in the economic interest of the Companies.

Similarly, Plaintiffs' "but for" theory—that absent the alleged collusion "sponsors would compete for [standard] *au pairs* by offering, or facilitating, higher wages … than other Sponsor competitors" has no plausibility within APEX's and 20/20's business. Even absent the hypothetical collusion, APEX and 20/20 would have no financial motivation to compete to attract *more* standard au pairs, because APEX and 20/20 are able to collect substantially higher fees for their niche placements of professional au pairs, without increasing their workload or overhead expense.  *APEX Appx. pp. 28, 34-35 (44:8-45:9, 105:6-106:9).* The standard au pair business is simply not their business.

### 4.     APEX's and 20/20's Actions, If Taken Independently of Alleged Collusion, Would Not Contradict their Economic Self-Interest.

Similarly, the "economic self-interest" plus-factor examines whether the actions of the Defendants, if taken independently, would be contrary to their economic interests – in other words, that the actions would not make economic sense in a competitive market and would not amount to a "good faith business judgment."  *Cayman Explor. Corp. v. United Gas Pipe Line Co.,* 873 F.2d 1357, 1361 (10th Cir. 1989) ("The antitrust plaintiff who relies on a theory of 'conscious parallelism' must establish that 'defendants engaged in consciously parallel action ... which was contrary to their economic self-

interest so as not to amount to good faith business judgment'") (citations omitted). Conversely, "the conspiracy allegation will fail if there is an independent business justification which explains the alleged conspirators' conduct." *Id.*

The undisputed evidence demonstrates that APEX and 20/20, in referring to the figure of $195.75 as the standard au pair stipend, did not act contrary to their economic interests. Their business focus lies in the placement of professional au pairs, which produce substantially higher placement fees, and not in committing their resources to attract more standard au pairs or the families who wish to host them.  It made perfect business sense for APEX and 20/20 to simply refer families to the minimum standard au pair stipend of $195.75 stated in the DOS guidance, rather than to promote payment of higher stipends, which would merely attract more standard au pairs to their agencies.

### 5.      Plaintiffs Have No Evidence Implying a Traditional Conspiracy.

The third plus factor is described as "evidence implying a traditional conspiracy, such as non-economic evidence of actual or manifest agreement." *Flat Glass,* at 360-61.  Such evidence may be shown by "customary indications of traditional conspiracy," or by other proof "that the defendants got together and exchanged assurances of common action or otherwise adopted a common plan." *Id.,* at 361.

As discussed in Section B.1., Plaintiffs simply have no evidence of traditional conspiracy between APEX, 20/20 and any other sponsors (or the Alliance) to suppress the standard au pair stipend.  APEX and 20/20 did not discuss the amount of the standard au pair stipend with other sponsors; indeed, it would not have made sense to have such discussions, "because remember, APEX has a different stipend" for its

professional au pair-focused business.  *APEX Appx. p. 37 (196:14-17).*

## CONCLUSION

As discussed herein, Plaintiffs cannot demonstrate genuine issues of fact regarding APEX and 20/20's alleged participation in any conspiracy under the *Matsushita* standard.  Hence, these defendants are entitled to summary judgment.

Respectfully submitted this 16th day of February, 2018.

NIXON SHEFRIN HENSEN OGBURN, P.C.


*s/ Lawrence D. Stone*
Lawrence D. Stone
5619 DTC Parkway, Suite 1200
Greenwood Village, CO 80111
(303) 773-3500
lstone@nixonshefrin.com

Attorneys for Defendants A.P.EX. American
Professional Exchange, LLC dba ProAuPair; and
20/20 Care Exchange, Inc. dba The International
Au Pair Exchange

**CERTIFICATE OF SERVICE**

I hereby certify that on this 16th day of February, 2018, I have electronically filed the foregoing **APEX AND 20/20'S MOTION FOR SUMMARY JUDGMENT** with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*s/ Carol A. Larsen Cook*
Carol A. Larsen Cook