**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:14-cv-03074-CMA-KMT

JOHANA PAOLA BELTRAN; et al.,

      Plaintiffs,

v.

INTEREXCHANGE, INC.; et al.,

      Defendants.

_____

**APIA'S SUPPLEMENTAL BRIEF IN SUPPORT OF**
**DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT**

      American Institute for Foreign Study, d/b/a Au Pair in America ("APIA"), moves for an order entering summary judgment for APIA on all claims asserted by Plaintiffs. APIA adopts and incorporates, as if fully set forth herein, Defendants' Joint Motion for Summary Judgment (ECF Dkt. # 860) ("Joint MSJ Brief").   APIA's individual submissions supplement the Joint MSJ Brief with information and legal argument specific to APIA.

**I.**    **APIA IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' ANTITRUST CLAIMS BECAUSE THE UNDISPUTED FACTS SHOW ONLY UNILATERAL, INDEPENDENT CONDUCT BY APIA**

      To survive summary judgment on their antitrust claims, Plaintiffs "must first demonstrate the existence of an agreement" as to ***each*** defendant.  *Champagne Metals, Inc. v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1082 (10th Cir. 2006); *see also AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 234 (2d Cir. 1999) (plaintiffs must "demonstrate the existence of an agreement" as to "each defendant"); *Heartland Surgical Specialty Hosp. v. Midwest Div., Inc.*, 527 F. Supp. 2d 1257, 1302 (D. Kan. 2007) ("[E]ach

defendant must be shown to have participated . . . .").

Plaintiffs can seek to prove APIA's participation in the alleged unlawful conspiracy through direct evidence of the agreement (e.g., testimony regarding a meeting at which such an agreement was made), or through circumstantial evidence that such agreement must have been entered into. *Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1028 (10th Cir. 2002). If Plaintiffs base their claims on circumstantial evidence, they can seek to rely upon "parallel conduct" by APIA and the other alleged conspirators, but evidence of conduct by APIA that is merely "consistent" with conspiracy is not sufficient on its own to defeat summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556-57 (2007). Instead, Plaintiffs must provide additional evidence that "tends to exclude" the possibility that the parallel conduct was the result of independent decision-making. *Champagne Metals*, 458 F.3d at 1082; *Matsushita*, 475 U.S. at 588.

Here, Plaintiffs' evidence fails with respect to APIA for three reasons. First, they cannot show that APIA engaged in the alleged "parallel conduct." Second, the evidence relating to APIA is inconsistent with its participation in the alleged conspiracy. Third, APIA's conduct is perfectly consistent with unilateral and independent decision-making.

Plaintiffs define the alleged conspiracy as an agreement to "fix" au pairs' weekly stipend at "***exactly***" $195.75 by "telling" au pairs and host families that $195.75 was the required stipend level. Second Amended Complaint ("SAC") ¶ 570 (emphasis added), ECF Dkt. # 395; *see also* Plaintiffs' Motion for Rule 23 Certification ("Pls.' Mot. for Class

2

Cert.") 4-5, ECF Dkt. # 559 (alleging that "every defendant has agreed that all standard au pairs should be paid $195.75 per week" and "told au pairs and host families that [au pairs] must be paid *precisely* $195.75 per week" (emphasis added).)  Plaintiffs have no direct evidence that APIA participated in any such conspiracy – *i.e.,* proof of meetings or communications between APIA and other sponsors during the class period where such an agreement was entered into.[1]   Accordingly, they are likely to seek to prove their conspiracy theory through circumstantial evidence of supposedly parallel conduct.  The "parallel conduct" that Plaintiffs will likely rely upon here is supposedly similar communications by the sponsors that Plaintiffs believe fail to convey to host families and au pairs that the $195.75 stipend level set by the Department of State ("DOS") is only a *minimum*.  *See* ECF Dkt. # 860, pp. 22-29 (discussing Plaintiffs' circumstantial evidence).

But that will not work for APIA.  As noted, the evidence for each sponsor must be evaluated independently – and there is no evidence that *APIA* engaged in any of the parallel conduct cited by Plaintiffs as evidence of conspiracy.  APIA did *not* have a policy of telling "au pairs and host families that [au pairs] must be paid precisely $195.75 per week," but instead expressly communicated that amount was a *minimum*.

―――――――――――――――――

[1] Plaintiffs may cite to statements made at recent meetings of an industry trade association, but those statements are not "direct" evidence of a price-fixing conspiracy. They simply demonstrate joint efforts to lobby the DOS (their regulator) and/or oppose the instant lawsuit.  This is protected petitioning activity under the First Amendment and not direct evidence of a pre-existing "conspiracy" during the class period.  *See E. R.R. Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961); *GF Gaming Corp. v. City of Black Hawk*, 405 F.3d 876, 884 (10th Cir. 2005).

APIA's disclosure of the "minimum" nature of the $195.75 stipend is shown in several types of evidence.  First and foremost, APIA's standard contracts expressly reference $195.75 as a "***minimum***" and provide the host families with the discretion to pay au pairs more.  Specifically, under the relevant standard APIA contract, each host family agrees that "an au pair / companion is to receive, ***at a minimum***, the weekly stipend as stipulated by regulations governing au pair programs and set forth in Au Pair in America's program materials."  ECF Dkt. # 605-6 at 2 (emphasis added); *accord id.* at 3-4 (different versions); *see also* ECF Dkt. # 605-4 ¶¶ 15-17 (authenticating agreements and explaining that the agreements permit the host family and au pair to "independently determine the actual [stipend] amount").

Second, the evidence demonstrates that APIA regularly advises host families that they have the discretion to select a higher stipend if they so choose.  These communications are evidenced by APIA's internal documents, which record its employees advising host families, in sum and substance, that they are "free to pay anything above stipend amount."[2]

---

[2] ECF Dkt. # 605-9 at 2 ("family is free to pay anything above stipend amount"); *id.* at 9 ("Any additional payments/bonuses/gifts over the weekly stipend are completely up to you"); *id.* at 13 ("Host families have the option to pay more than the minimum standards but under no circumstance may the host family pay less than the minimum . . . ."); *id.* at 4 (in response to host family question about a gift, community counselor suggests a gift "based on [your] individual budget[]"); *see also* ECF Dkt. # 605-4 ¶ 7 (stating that "[s]o long as the minimum [stipend] is satisfied, the precise amount paid remains the host family's independent decision, and varies by each host family").

Third, APIA's website during the class period expressly stated that the $195.75 stipend level set by the DOS is a "*minimum*."  For each of the years of the alleged "conspiracy," the APIA's webpage stated expressly that "[t]he *minimum weekly stipend* is established by the United States government based on a formula which calculates the federal minimum wage less an allowance for room and board."  ECF Dkt. # 605-5 (screenshots of APIA's website from the years 2009 through 2017) (emphasis added); ECF Dkt. # 605-4 ¶ 17 (authenticating screenshots).  Similar statements appear in APIA's other promotional materials.  *See generally* ECF Dkt. # 605-6.  So it is simply not the case, for APIA, that host families or au pairs were never informed that the DOS stipend amount was a minimum.[3]

In opposing this motion, Plaintiffs may point to isolated examples where the term "minimum" was left out in a specific communication.  That is irrelevant.  As explained above, APIA repeatedly and expressly informed its clients that the $195.75 was a minimum: in its contracts, on its website and elsewhere.  It need not repeat that word in every single communication.  To show parallel conduct by APIA consistent with the alleged conspiracy, Plaintiffs must at least show APIA was *hiding* from its clients the fact

---

[3] While it is not necessary to so demonstrate for this motion, it is also true that APIA host families understood they had discretion to pay more than the minimum, either as part of the weekly stipend itself or through periodic bonuses, gift cards, or other benefits.  *See, e.g.,* ECF Dkt. # 605-9 at 12 ($220.75 weekly stipend); *id.* at 22 (host parent pays for additional language courses); *id.* at 10 ($200 per month Uber allowance); *id.* at 11 (additional time off / extra paid vacation days); *id.* at 5 ($200 bonus, and $75 in gift cards); *id.* at 6 (bonus); *id.* at 14 (cell phone and a gift card).

that $195.75 was only a minimum requirement.  This, Plaintiffs cannot show.  Plaintiffs do not allege a conspiracy pursuant to which the sponsors would "sometimes" use the term "minimum," and that would make no sense.  Plaintiffs therefore cannot show that APIA engaged in "parallel conduct" suggesting the existence of a conspiracy.

The foregoing evidence also warrants summary judgment because it is completely inconsistent with the notion that APIA joined the conspiracy.  In the face of APIA's express and repeated use of the term "minimum" in its website, communications and other materials, no reasonable juror could conclude that APIA joined a conspiracy to hide from host families and/or au pairs that the $195.75 stipend set by the DOS was a minimum. *See Dahl v. Bain Capital Partners, LLC*, 963 F. Supp. 2d 38, 48-49 (D. Mass. 2013) (granting summary judgment where evidence showed defendant's actions were "inconsistent with the overarching conspiracy").

In addition to this evidence, there is yet another reason why APIA is entitled to summary judgment.  Even if Plaintiffs could find examples where APIA sought to encourage host families or au pairs to contract at the minimum stipend level, that would not support Plaintiffs' conspiracy allegations because it is perfectly consistent with unilateral conduct. *Valspar Corp. v. E. I. du Pont de Nemours & Co.*, 873 F.3d 185, 198 (3d Cir. 2017) (affirming summary judgment in antitrust case for defendants where conduct was consistent with independent action); *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 400 (3rd Cir. 2015) (same).

It was in APIA's *unilateral* economic interest to keep stipend levels down for its

own au pairs so as to maximize the number of host families working with APIA, and thus maximize the number of its au pair candidates that received a placement.  After all, APIA was constantly facing an excess of available au pairs, and a critical shortage of host families.  *See* ECF Dkt. # 605-4 ¶ 5.  Despite having an excess of qualified au pairs ready and willing to be placed at current stipend levels, APIA was generally unable to find enough host families to host them; it could not even make enough placements to fulfill its allotment of J-1 Visas from the DOS.  *Id.* ¶ 11; ECF Dkt. # 603-48 at 131:16-22.  Higher au pair stipends would only have exacerbated that supply and demand imbalance and ***decreased*** APIA's au pair placement rate.  As the head of APIA's au pair program explained at her deposition: "There's no value in raising . . . the weekly stipend for an au pair if I have more au pairs anytime than are possibly going to be placed."  ECF Dkt. # 603-48 at 110:2-111:14.  *See also id.* (explaining that promoting a higher stipend for APIA au pairs could push host families to other sponsors and thus weaken APIA's ability to place the au pairs it had recruited).

In sum, these undisputed facts require summary judgment because they preclude Plaintiffs from showing APIA's participation in a conspiracy.  APIA did not engage in "parallel conduct," and its conduct is instead inconsistent with the purported conspiracy.  And, moreover, because low stipend levels for its own au pairs were in APIA's unilateral interest, even if APIA did indicate a preference for its own host families to pay the minimum stipend level to their au pairs, that would not "tend to exclude" the possibility that APIA acted independently when doing so.

7

## II. APIA IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' MINIMUM WAGE AND OVERTIME CLAIMS

### a. APIA DID NOT EMPLOY HLATSHANENI OR OTHER APIA-SPONSORED AU PAIRS

APIA is entitled to summary judgment on Plaintiffs' minimum wage and overtime claims because Plaintiffs cannot demonstrate that APIA employed the au pairs who participated in the APIA program.  In order to establish liability, Plaintiffs bear the burden of proving that APIA was the au pairs' "employer" within the meaning of the FLSA, the California Labor Code ("CLL"), or the Virginia Minimum Wage Act ("VMWA").  *See, e.g.*, *Martinez-Mendoza v. Champion Int'l Corp.*, 340 F.3d 1200, 1209 (11th Cir. 2003).

The FLSA, CLL, and VMWA define "employer" in substantially the same terms— as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d); *accord* Cal. Labor Code § 350(a); V.C.A. § 40.1-28.9(A). Separate entities may be "joint employers" when they share ***substantial*** control over the same employee. *Coldwell*, 2017 WL 1737715, at *4.

Although the Tenth Circuit has not articulated a standard for evaluating an FLSA joint employment claim, courts within this circuit have applied an "economic realities" test. *See, e.g.*, *Coldwell*, 2017 WL 1737715, at *5-9; *Fuentes v. Compadres, Inc.*, 2017 WL 6335669, at *11-13 (D. Colo. Dec. 12, 2017). Courts addressing CLL and VMWA claims have used substantially the same analysis. *See, e.g.*, *Johnson v. Serenity Transportation, Inc.*, 2017 WL 1365112, at *19 (N.D. Cal. Apr. 14, 2017); *Brooks v. Buleridge General, Inc.*, 67 Va. Cir. 274 (2005) (citing *Metro Machine Corp. v. Mizenko*, 244 Va. 78, 83

8

(1992)) (applying similar "joint employer" factors as under federal test).

Under the test, courts consider: (1) the nature and degree of the putative employer's control over the worker; (2) the worker's opportunity for profit or loss; (3) the worker's investment in the business; (4) the permanence of the working relationship; (5) the degree of skill required to perform the work; and (6) the extent to which the worker's services are an integral part of the putative employer's business.[4] Courts have also considered whether the putative employer owns or controls the premises where the work is performed and/or the equipment used.[5]  *See Coldwell*, 2017 WL 1737715, at *7-8.

When applying the economic-realities test, courts focus on the degree of control exerted by the alleged employer over the following factors: (1) the power to hire and fire the worker(s); (2) the power to supervise and/or control work schedules, work methods and/or conditions of employment; (3) the power to determine the rate and method of payment; and (4) the maintenance of employment records.[6]  *See, e.g.*, *Coldwell*, 2017 WL 1737715, at *7-9; *Fuentes*, 2017 WL 6335669, at *12-13; *Johnson v. Serenity Transp., Inc.*, 2017 WL 1365112, at *13 (N.D. Cal. Apr. 14, 2017).

––––––––––––––––––––––

[4] Au pairs do not perform any work for APIA.  ECF Doc. # 605-4 ¶ 21.  Instead, they provide childcare exclusively for their respective host families.  *Id.*

[5] APIA does not own or control any of the homes (or the contents of those homes) in which APIA-sponsored au pairs are placed.  ECF Doc. # 605-4 ¶ 22.

[6] APIA does not prepare or maintain "employment" records for au pairs, including payroll records, work schedules, records of actual hours of childcare, and personnel files.  ECF Doc. #605-4 ¶ 23.

Joint-employer status cannot be established when the control is limited to monitoring compliance with statutory/regulatory requirements.  *See e.g.*, *Godlewska*, 916 F. Supp. 2d at 260-61; *Ivanov v. Sunset Pools Mgmt.*, 567 F. Supp. 2d 189, 195 (D.D.C. 2008); *Zhao v. Bebe Stores, Inc.*, 247 F. Supp. 2d 1154, 1161 (C.D. Cal. 2003).

As a DOS-authorized sponsor organization, APIA ***must*** partner with the DOS to ensure compliance with program regulations. Specifically, APIA is legally required to confirm each host family's and each au pair's adherence to ***minimum*** program requirements. 22 C.F.R. § 62.31(c).  Those requirements include, *inter alia*: each au pair must receive a weekly stipend of ***at least*** $195.75; may provide ***no more than*** 10 hours of daily childcare assistance; and may provide ***no more than*** 45 hours of weekly childcare assistance.  22 C.F.R. § 62.31(j).  As APIA has no independent business or economic reason for such monitoring, these DOS-imposed obligations do not convert the sponsorship relationship between APIA and au pairs into an employer/employee relationship.  *See Ivanov*, 567 F. Supp. 2d at 195; *Democratic Union Organizing Comm., etc. v. NLRB*, 603 F.2d 862, 876 (D.C. Cir. 1978) ("incorporation of government regulations into a contract does not alone establish an employer/employee relationship").

Each host family and the au pair whom they selected to reside with them are free to determine the actual terms and conditions of the au pair's placement in excess of DOS

minimum requirements.[7]  Numerous APIA host families, including Hlatshaneni's, regularly

exercised their discretion to provide their au pairs with a superior stipend and/or additional

compensation; many required far fewer hours of assistance than the weekly maximum.[8]

Hlatshaneni confirmed this independent discretion during her deposition:

> Q:    Au Pair in America had nothing to do or no input with either
>        setting your duties or scheduling your time off or even
>        scheduling your work, correct?
>
> A:    Au Pair In America said which duties I'm not allowed to do.
>        They said how many hours I'm not supposed to work.  And so
>        in the end, we finalized within those -- those guidelines
>        provided by Au Pair In America.

---

[7] ECF Doc. #605-9, p. 2 ("family is free to pay anything above stipend amount"); *Id.*, p. 9 ("Any additional payments/bonuses/gifts over the weekly stipend are completely up to you"); *Id.*, p. 13 ("Host families have the option to pay more than the minimum standards but under no circumstance may the host family pay less than the minimum nor may the family have the au pair provide more than 45 hours per week"); *Id.*, p. 3 (vacation beyond two weeks may be agreed upon by host family and au pair); *Id.*, p. 4 (suggests gift "based on [your] individual budget[]").

[8] ECF Doc. #605-9, p. 12($220.75 weekly stipend); *Id.*, p. 22 (host parent pays for additional language courses); *Id.*, p. 10 ($200 per month Uber allowance); *Id.*, p. 11 (additional time off / extra paid vacation days); *Id.*, p. 5 ($200 bonus, and $75 in gift cards); *Id.*, p. 6 (bonus); *Id.*, p. 14 (cell phone and a gift card); *Id.*, p. 8 ($200 birthday present); *Id.*, p. 15 ("won't need as many hours" because child will be in school); *Id.*, p. 19 (anticipated schedule is only 5 hours on Monday and "some hours" on Saturday); *Id.*, p. 23 (anticipated schedule is only 5 hours on Monday through Friday and "as needed" on Saturday; off on Sunday); *Id.*, p. 27 (fewer than 35 hours per week); *Id.*, p. 17 (au pair "will work very few hours"); *Id.*, p. 7 (only  provides four days of assistance per week); *Id.*, pp. 26-27 ("does not really need" the au pair's childcare that much, and au pair "does not work very many hours…[.]"); *Id.*, p. 8 (au pair typically  provides 33 hours, 4 days of service per week). ECF Dkt. # 605-3 at 120:10-24, 145:5-18, and 149:1-10 (Hlatshaneni testified she received $200 weekly stipend, $200 cash gift, $100 for gas, a Kindle, a watch, and other items and gift cards). ECF Dkt. # 560-42 at ¶ 7 ($200 weekly stipend).

ECF Dkt. # 861-1, p. 45, 195:25-196:7.

Host families retain exclusive and independent control over the critical "employer" functions of the "employment" relationship.  Indeed, each host family retains exclusive control over the following "employer" functions:

- interviewing and selecting or "hiring" the au pair;[9]
- supervision of the au pair;
- assignment of duties to the au pair;[10]
- weekly payment of au pair stipends or other compensation;[11]
- determination of weekly stipend amount(s) or other compensation/benefits;
- setting the schedule(s) of childcare assistance;[12]
- evaluation of au pair performance;
- determination of the number of daily/weekly hours of childcare assistance;[13]
- promulgation/implementation of "work" rules or policies; and
- "termination" of the au pair's relationship with the host family for reasons unrelated to DOS compliance.[14]

ECF Dkt. # 605-4 ¶¶ 6, 8, 18, 20.  With the exception of the determination of weekly

---

[9] ECF Dkt. # 861-1, pp. 26, 28-30, 33, 80:3-8; 91:1-3; 91:8-17; 93:4-6; 93:24-94:7; 100:6-10.

[10] *Id.*, pp. 41, 46. 121:13-17, 195:16-20.

[11] *Id.*, pp. 26, 35, 80:9-11; 105:11-20.

[12] *Id.* pp. 36, 46-47, 109:15-22; 195:21-24; 196:18-21.

[13] *Id.*, pp. 37, 41. 111:25-112:11; 121:3-6.

[14] *Id.*, p. 32, 97:15-18.

stipend amount(s), it is **<u>undisputed</u>** that each of the enumerated functions are and were performed by each individual host family, not APIA.

Hlatshaneni's testimony and the responses to Plaintiffs' flawed host family survey directly contradict the unsupported assertion that APIA imposed a maximum weekly stipend of $195.75.  First, Hlatshaneni testified that she received a weekly stipend of $200.  (*See* fn.3 *supra*).  Second, the survey responses also undermine Plaintiffs' contentions about an APIA mandated, uniform payment.  Specifically, of the 1,598 survey respondents who identified themselves as APIA program families, 60.01% recalled providing their au pair with a weekly stipend of more than $195.75, while 11.64% recalled providing their au pair with a weekly stipend of more than $200.  EFC Dkt. # 605-1, p. 2, ¶ 6.  Of the 181 host families from California, 70.72% recalled providing a weekly stipend above $195.75, while 13.26% recalled providing a weekly stipend above $200.  *Id.*

As discussed in Section I above, APIA has provided substantial evidence that it consistently communicated that $195.75 was *a minimum*.  These communications rebut Plaintiffs' allegations and further establish that APIA had no control over the terms and conditions of each au pairs' placement beyond merely confirming adherence to *minimum* requirements.  Even if APIA had determined the stipend amount, APIA's undisputed lack of control over the numerous other critical employer functions precludes a finding of joint-employer status.  *See Godlewska v. HDA*, 916 F. Supp. 2d 246, 260 (E.D.N.Y. 2013).

### b. HOST FAMILIES HAVE PROPERLY APPLIED ROOM AND BOARD CREDITS TOWARD ANY MINIMUM-WAGE OBLIGATIONS

Hlatshaneni and other au pairs voluntarily accepted room and board provided by their host families as a condition of program participation. ECF Dkt. #s 605-5, 605-6; ECF Dkt. # 861-1, pp. 25, 39-40, 44, at 78:4-78:18; 119:22-120:4; 148:10-13; 148:19-23. APIA confirms that each host family provides the au pair with a private bedroom and board. ECF Dkt. # 605-4. ¶ 21; 22 C.F.R. § 62.31(e)(6). Hlatshaneni confirmed that she received/accepted room and board from each host family. ECF Dkt. #s 605-5, 605-6; ECF Dkt. # 861-1, pp. 25, 39-40, 44, at 78:4-78:18; 119:22-120:4; 148:10-13; 148:19-23. For the reasons set forth in the Joint MSJ Brief, host families have properly credited room and board expenses towards satisfaction of any minimum-wage obligations they may have under the FLSA or the CLL[15].

### c. TIME SPENT IN DOS-REQUIRED TRAINING IS NOT COMPENSABLE

Plaintiffs have alleged a claim for unpaid training under the New York Labor Law ("NYLL")[16] in addition to the FLSA, because Hlatshaneni and other au pairs participating in APIA's program after January 2013 received training in Tarrytown, New York. Claims for unpaid training under the NYLL have been evaluated using substantially the same analysis used for claims under the FLSA. *DeSilva v. N. Shore-Long Island Jewish Health Sys., Inc.*, 770 F. Supp. 2d 497, 548 n. 5 (E.D.N.Y. 2011).

DOS regulations require APIA to provide au pairs with at least 32 hours of child safety and child development instruction before host family placement. 22 C.F.R. §

62.31(g).   In satisfaction of this obligation, APIA provides such a course during a mandatory four-day, pre-placement orientation.[17]   Hlatshaneni attended the pre-placement orientation in February 2013. SAC, ¶ 403.   During the orientation, APIA provides each au pair with instruction, meals, lodging and transportation at no cost.[18] ECF Dkt. # 861-1, pp. 11-12, ¶ 12.  For the reasons set forth in the Joint MSJ Brief, time spent in DOS-required training is not compensable under the FLSA or the NYLL.  *See also* NYSDOL RO-08-0020 (advising that a daycare provider need not compensate for time spent in state-mandated childcare training).

---

[15] The APIA Host Family and Au Pair / Companion Agreement satisfies the CLL's requirement that an agreement to accept minimum-wage credits must be memorialized in a writing. *IWC Order 15-2001, Section 10*; *see* Ferry MSJ Dec. Exs. A, B.

[16] As discussed in Defendants' Joint Opposition to Class Certification, APIA disputes the notion that the law of the training situs unquestionably and uniformly applies to Plaintiffs' unpaid training claims.  ECF Dkt. # 603, pp. 42-45.

[17] The FLSA and NYLL do not apply to any training that occurs outside of the United States.  *Al-Kaysey v. L-3 Servs., Inc.*, 2013 WL 5447830, at *6 (E.D.N.Y. Sept. 27, 2013) (quoting 29 U.S.C. § 213(f)); *Hart v. Dresdner Kleinwort Wasserstein Sec., LLC*, 2006 WL 2356157, at *7 (S.D.N.Y. Aug. 9, 2006).

[18] In addition to instruction, APIA organizes workshops, tours and social events during the orientation. *See, e.g.*, EFC Dkt. # 605-10, p. 3 ("You will have an opportunity to take a tour of New York . . . ."). These optional events are not compensable. *See e.g.*, *Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 722 (2d Cir. 2001); *Abbe v. City of San Diego*, 2009 WL 10673096, at *2 (S.D. Cal. Aug. 4, 2009).

### d. HLATSHANENI'S VMWA CLAIMS FAIL AS A MATTER OF LAW

In addition to the reasons discussed in Section II.a, Hlateshaneni's VMWA minimum wage and overtime claims must fail because: (i) she is exempt from the Virginia minimum wage requirement; and (ii) overtime pay is not required under the VMWA.  *See* V.C.A. § 40.1-28.9(b); *Walker v. Serv. Corp. Int'l*, 2011 WL 1370575, at *6 (W.D. Va. Apr. 12, 2011).  Specifically, the VMWA exempts "any person employed in domestic service or in or about a private home. . . ."  V.C.A. § 40.1-28.9(b).  Additionally, to the extent that Hlatshaneni's "employment" is covered by the FLSA, the VMWA does not apply. V.C.A. § 40.1–28.9(12); *Walker*, 2011 WL 1370575, at *6; ECF Dkt. # 258, p. 35.

### e. MEMBERS OF THE CALIFORNIA SUBCLASS ARE INELIGIBLE FOR OR NOT ENTITLED TO OVERTIME UNDER THE CLL

 If au pairs are "employees" subject to the California wage law, then they must also be "personal attendants" within the meaning of that law.[19]  Until January 1, 2014, personal attendants were not entitled to overtime, regardless of weekly hours worked.  *See Cal. Lab. Code § I454; IWC Order 15-2001, Section 1(B)*. Therefore, the vast majority of the members of the California subclass are ***ineligible for overtime as a matter of law***.  *Id*

The remaining members of the putative subclass (*i.e.* post-2013 program participants) are similarly ineligible for overtime because the DOS regulations cap

---

[19]  "Personal attendant" includes baby sitters and means any person employed by a private householder or by any third-party employer recognized in the health care industry to work in a private household, to supervise, feed, or dress a child, or a person who by

childcare assistance at a maximum of 45 weekly hours. Effective January 1, 2014, weekly overtime became available only to those personal attendants whose work exceeds 45 hours in a week. *Cal. Lab. Code § 1451(d)*.  Plaintiffs have not shown, and cannot show, either of the following: that au pairs uniformly provided more than 45 hours of weekly service; and/or that APIA prohibited additional or "overtime" payments.

### III.    ALL MISREPRESENTATION-BASED CLAIMS FAIL AS A MATTER OF LAW

Plaintiffs' assert the following misrepresentation-based claims under California and/or Virginia law: (1) breach of fiduciary duty;[20] (2) negligent misrepresentation;[21] (3) fraudulent concealment and/or constructive fraud;[22] and (4) violation of consumer

---

reason of advanced age, physical disability, or mental deficiency needs supervision.  *Cal. Lab. Code § 1451(d)*; *IWC Order 15-2001, Section 2(j)*.

[20] Plaintiffs bear the burden of proving: (1) the existence of a fiduciary relationship, (2) its breach, and (3) damage proximately caused by that breach.  *O'Neal v. Stanislaus Cty. Employees' Ret. Ass'n*, 214 Cal. Rptr. 3d 591, 612 (Cal. Ct. App. 2017), *review denied* (May 10, 2017); *see Carstensen v. Chrisland Corp.*, 442 S.E.2d 660, 666 (Va. 1994).

[21] Plaintiffs must demonstrate: (1) the misrepresentation of a past/existing material fact; (2) without reasonable ground for believing it to be true; (3) with intent to induce another's reliance on the fact misrepresented; (4) justifiable reliance; and (5) resulting damage. *Apollo Capital Fund LLC v. Roth Capital Partners, LLC*, 70 Cal. Rptr. 3d 199, 213 (Cal. Ct. App. 2007). Virginia does not recognize negligent misrepresentation.  *Sun Hotel, Inc. v. Summitbridge Credit Invs. III, LLC*, 86 Va. Cir. 189, 194 (Va. Cir. Ct. 2013).

[22] Under California law, Plaintiffs must show: (1) false representation; (2) knowledge of falsity (or scienter); (3) intent to defraud, i.e., to induce reliance; (4) justifiable reliance; and (5) resulting damage. *Robinson Helicopter Co. v. Dana Corp.*, 34 Cal. 4th 979 (Cal. 2004).  Under Virginia law, Plaintiffs must demonstrate: (1) false representation; (2) of a material fact; (3) made intentionally/knowingly; (4) with intent to mislead, (5) reliance; and (6) resulting damage. *Cohn v. Knowledge Connections, Inc.*, 266 Va. 362, 367 (2003).

protection laws of California[23] and Virginia.[24]  (*See* Second Amended Complaint, Counts III-VI.)  APIA is entitled to summary judgment on each of these claims.

The misrepresentation-based claims are based on Hlatshaneni's unsupported assertions that: (i) APIA misrepresented the stipend to her and other au pairs by representing the $195.75 amount as fixed; (ii) APIA intended to defraud/misrepresent and intended to induce reliance on the alleged misrepresentation; (iii) au pairs relied on the alleged misrepresentation; and (iv) they were damaged as a result.  (*See* SAC, Counts III-VI.)  Plaintiffs cannot meet their burden of proving any of these allegations.

First, APIA has provided substantial evidence to rebut the allegations that it communicated that $195.75 was a fixed amount or that it otherwise misrepresented the stipend.  Moreover, the DOS has never concluded that APIA depicts the weekly stipend in an inaccurate, incomplete or misleading manner.[25]  ECF Dkt. # 861-1, p. 15, ¶ 28.

---

[23] Under the California Unfair Competition Law, Plaintiffs are required to prove: (1) an economic injury, (2) resulting from an unfair, unlawful, or fraudulent business practice. *Kwikset Corp. v. Super. Ct.*, 51 Cal. 4th 310, 322 (2011).

[24] Under the Virginia Consumer Protection Law, Plaintiffs are required to prove: (1) the defendant acted with an intent to deceive or otherwise mislead, i.e., with fraudulent intent, (2) as to a material fact (3) on which plaintiff relied to his detriment and which resulted in measurable damages.  *Padin v. Oyster Point Dodge*, 397 F. Supp. 2d 712, 722 (E.D. Va. 2005).

[25] Each year, the DOS audits APIA promotional materials for compliance with program requirements.  ECF Dkt. # 861-1, ¶ 28.  The DOS has not identified any compliance-related issues or concerns to APIA in response to the submission of these materials. *Id.*,

Second, Plaintiffs have not supplied and cannot supply any evidence that APIA intended to defraud au pairs and/or misrepresent the stipend.  APIA's communications regarding the stipend dispel the notion that APIA acted with intent to defraud and/or misrepresent.  Had APIA intended to defraud au pairs and/or misrepresent the stipend as a fixed amount, it would not have consistently communicated $195.75 as a *minimum*.

Third, Plaintiffs cannot establish reliance or damages because au pairs received and accepted compensation beyond the minimum weekly stipend.  Hlatshaneni and California subclass members regularly received weekly stipends in excess of $195.75 and $200.00.  ECF Dkt. # 861-1, p. 7, ¶ 7; ECF Dkt. # 861-1, p. 42, 144:13-144:17.  These au pairs also received additional compensation beyond their weekly stipends.  (*See* fn. 3 *supra*).

## IV.    PLAINTIFFS HAVE NO STANDING UNDER ILLINOIS LAW

Any claims based in Illinois law must be dismissed as a matter of law, as Plaintiffs lack standing.  It is **undisputed** that neither Ms. Hlatshaneni nor any other nominal Plaintiff ever "worked," lived or resided in Illinois.  Accordingly, Plaintiffs are unable to assert Illinois claims against APIA both in their individual capacities and as class

---

¶ 29.  Indeed, APIA has never been sanctioned or otherwise admonished based upon any information contained in the materials.  ECF Dkt. #*Id.*, ¶ 30.

representatives.[26]   *See Rector v. City & County of Denver*, 348 F.3d 935, 949-50 (10th Cir. 2003), *Avendano v. Averus, Inc.*, 14-cv- 01614-CMA, ECF # 92 at 10-11 (D. Colo. Sept. 29, 2016); *Smith v. Pizza Hut, Inc.,* 2011 WL 2791331 (D. Colo. July 14, 2011). Therefore, all Illinois claims must be dismissed as a matter of law.

## CONCLUSION

For all the foregoing reasons, and those in the Joint MSJ Brief, APIA respectfully requests that the Court grant the instant Motion in its entirety, together and with such other and further relief as the Court deems just and proper.

Respectfully submitted this 16th day of February, 2018.

s/ *Stephen J. Macri*
Stephen J. Macri
Robert M. Tucker
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
1745 Broadway, 22nd Floor
New York, NY 10019
(212) 492-2071
Email:   stephen.macri@ogletree.com
         robert.tucker@ogletree.com

*Attorneys for American Institute for Foreign Study d/b/a Au Pair in America*

---

[26] The Court ostensibly certified the APIA Illinois subclass based solely on a mistaken belief that a nominal plaintiff from the APIA program "worked," lived or resided in Illinois. (ECF Dkt. # 828, p. 14). The subclass representative, Camila Gabriela Perez Reyes, is not a nominal Plaintiff (*see* ECF Dkt. # 850) and, thus, cannot serve as a representative.

## CERTIFICATE OF SERVICE (CM/ECF)

I hereby certify that on February 16, 2018, I have caused to be electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record, including:

Adam A. Hubbard        aahubbard@hollandhart.com

Alexander Neville Hood        alex@towardsjustice.org

Alyssa Lauren Levy        alevy@shermanhoward.com

Aubrey Jane Markson        amarkson@nixonshefrin.com

Bogdan Enica        bogdane@hotmail.com

Brett Michelle Mull        mull@wtotrial.com

Brian Alan Birenbach        brian@rietzlawfirm.com

Brooke A. Colaizzi        BColaizzi@shermanhoward.com

Byron Pacheco        bpacheco@bsfllp.com

Chanda Marie Feldkamp        cfeldkamp@kellywalkerlaw.com

David Meschke        dmeschke@bhfs.com

Dawn Smalls        DSmalls@BSFLLP.com

Diane Rebecca Hazel        dhazel@lrrc.com

Eric Jonathan Stock        estock@gibsondunn.com

Harvey J. Wolkoff        harvey.wolkoff@ropesgray.com

Heather Fox Vickles        hvickles@shermanhoward.com

James Edward Hartley        jhartley@hollandhart.com

James Michael Lyons      jlyons@lrrc.com

Jennifer Arnett Roehrich      jarnett-roehrich@grsm.com

Jessica Lynn Fuller      jfuller@lrrc.com

Joan A. Lukey      joan.lukey@choate.com

John B. Fulfree      jfulfree@putneylaw.com

Jonathan S. Bender      jsbender@hollandhart.com

Joseph B. Cartafalsa      joseph.cartafalsa@ogletreedeakins.com

Joseph H. Hunt      jhunt@shermanhoward.com

Joshua James Libling      jlibling@bsfllp.com

Juan Pablo Valdivieso      jvaldivieso@bsfllp.com

Justin J. Wolosz      jwolosz@choate.com

Kathleen E. Craigmile      kcraigmile@nixonshefrin.com

Kathryn A. Reilly      reilly@wtotrial.com

Kevin Patrick O'Keefe      kokeefe@choate.com

Lauren Fleischer Louis      llouis@bsfllp.com

Lawrence Daniel Stone      lstone@nixonshefrin.com

Lyndsey Marie Kruzer      lkruzer@choate.com

Margo J. Arnold (Terminated)      marnold@bhfs.com

Martha Louise Fitzgerald      mfitzgerald@bhfs.com

Martin Jose Estevao      mestevao@armstrongteasdale.com

Matthew Lane Schwartz      mlschwartz@bsfllp.com

Meshach Yustine Rhoades     mrhoades@armstrongteasdale.com

Michael T. Gass     mgass@choate.com

Natalie Elizabeth West     west@wtotrial.com

Nathan Andrew Huey     nhuey@gordonrees.com

Peggy E. Kozal     pkozal@gordonrees.com

Peter Murray Skinner     pskinner@bsfllp.com

Randall Wade Jackson     rjackson@bsfllp.com

Raymond Myles Deeny     rdeeny@shermanhoward.com

Robert M. Buchanan , Jr     rbuchanan@choate.com

Sabria Alexandria McElroy     smcelroy@bsfllp.com

Samuel Newland Rudman     srudman@choate.com

Sean Phillips Rodriguez     srodriguez@bsfllp.com

Sigrid Stone McCawley     smccawley@bsfllp.com

Susan M. Schaecher     sschaecher@fisherphillips.com

Susan Penniman Klopman     sklopman@hklawllc.com

Thomas Baker Quinn     tquinn@gordonrees.com

Vance Orlando Knapp     vknapp@armstrongteasdale.com

William James Kelly , III     wkelly@kellywalkerlaw.com

s/ *Stephen J. Macri*
Stephen J. Macri