# EXHIBIT 1

Case No. 1:14-cv-03074-CMA-KMT   Document 898   filed 02/02/18   USDC Colorado   pg 1 of 3
Case 1:14-cv-03074-CMA-KMT   Document 823   Filed 02/20/18   USDC Colorado   Page 1 of 38
of 49
Appellate Case: 18-703   Document: 01019947007   Date Filed: 02/20/2018   Page: 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 14-cv-03074-CMA-CBS

JOHANA PAOLA BELTRAN,
LUSAPHO HLATSHANENI,
BEAUDETTE DEETLEFS,
ALEXANDRA IVETTE GONZALEZ,
JULIANE HARNING,
NICOLE MAPLEDORAM,
LAURA MEJIA JIMENEZ, and
SARAH CAROLINE AZUELA RASCON,

      Plaintiffs,

v.

INTEREXCHANGE, INC.,
USAUPAIR, INC.,
GREATAUPAIR, LLC,
EXPERT GROUP INTERNATIONAL INC., d/b/a Expert AuPair,
EURAUPAIR INTERCULTURAL CHILD CARE PROGRAMS,
CULTURAL HOMESTAY INTERNATIONAL,
CULTURAL CARE, INC., d/b/a Cultural Care Au Pair,
AUPAIRCARE INC.,
AU PAIR INTERNATIONAL, INC.,
APF GLOBAL EXCHANGE, NFP, d/b/a Aupair Foundation,
AMERICAN INSTITUTE FOR FOREIGN STUDY, d/b/a Au Pair in America,
AMERICAN CULTURAL EXCHANGE, LLC, d/b/a GoAuPair,
AGENT AU PAIR,
A.P.EX. AMERICAN PROFESSIONAL EXCHANGE, LLC, d/b/a ProAuPair,
20/20 CARE EXCHANGE, INC., d/b/a The International Au Pair Exchange,
ASSOCIATES IN CULTURAL EXCHANGE, d/b/a GoAu Pair, and
GOAUPAIR OPERATIONS, LLC,

      Defendants.

---

**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR
RULE 23 CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL**

---

This matter is before the Court on Plaintiffs' Motion for Rule 23 Class Certification
and Appointment of Class Counsel.  (Doc. # 559.)  Pursuant to Federal Rule of Civil
Procedure 23, named Plaintiffs seek certification of several classes and subclasses.
(*Id.* at 2.)  Plaintiffs also request an order appointing class counsel and requiring the
parties to submit a joint notification plan.  (*Id.* at 3, 50.)

Plaintiffs allege in the underlying action that each of the Defendants falsely
represented that *au pair* wages were set at $195.75 per week "as part of an illegal
agreement to suppress wages and accordingly inflate their own fees" and thereby
violated federal and state wage laws.  (*Id.* at 1.)  Plaintiffs make ten claims against
Defendants, including that they violated the Sherman Antitrust Act, 15 U.S.C. § 1, *et
seq.*, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C.
§ 1694, *et seq.*, the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*, and
the laws of several states.  (Doc. # 395 at 94–100, 104–16.)

For the reasons detailed below, Plaintiffs' Motion for Rule 23 Class Certification
is granted in part and denied in part.

## I.    __BACKGROUND__

The Court's previous Orders and United States Magistrate Judge Kathleen M.
Tafoya's Report and Recommendation on past motions provide detailed recitations of
the factual and procedural background of this case and are incorporated herein.  *See,*

*e.g.*, (Doc. ## 569, 240.)  The background of this dispute will thus be reiterated here

only to the extent necessary to address Plaintiffs' Motion for Class Certification.

Defendants are business entities authorized by the United States Department of

State ("DOS") pursuant to the J-1 visa program to recruit and place *au pairs* with host

families in the United States.  Plaintiffs, former *au pairs* sponsored by Defendants,

initiated this action more than three years ago, *see* (Doc. # 1), and the parties have

vehemently litigated it since then.  Plaintiffs assert several claims:

    I.     Restraint of Trade in Violation of the Sherman Antitrust Act
    II.    Violation of Civil RICO
    III.   Breach of Fiduciary Duty Under the Laws of the Several States and the District of Columbia
    IV.   Negligent Misrepresentation Under the Laws of the Several States and the District of Columbia
    V.    Constructive Fraud or Fraudulent Concealment Under the Laws of the Several States and the District of Columbia
    VI.   Violation of Several States' and the District of Columbia's Consumer Protection Laws
    VII.   [Count VII is not included in Plaintiffs' Second Amended Complaint]
   VIII.  Failure to Pay Minimum Wage and Overtime in Violation of FLSA
    IX.   Claims for Unpaid Wages Under the Laws of Several States and the District of Columbia
    X.    Violations of the New York Wage Act
    XI.   Violations of the New Jersey Wage Act

(Doc. # 395 at 104–18.)  Relevant here, Plaintiffs allege that Defendants maintain a

"uniform policy" and have a "collective agreement" to "artificially suppress *au pair* wages

at an unlawfully low level."  (Doc. # 559 at 4.)  This, Plaintiffs contend, is "the product of

[Defendants'] *per se* illegal price fixing, . . . fraud, . . . and collusion."  (*Id.* at 7–8.)

Plaintiffs allege that Defendants' conduct "adversely affected" each Plaintiff and every

potential class member "by keeping their wages illegally low, and by lying to them about

their ability to seek higher wages."  (*Id.* at 10.)

On June 6, 2017, Plaintiffs filed this Motion for Rule 23 Class Certification and

Appointment of Counsel on all claims other than the FLSA Claim (Claim VIII).[1]  (Doc.

# 559.)  Plaintiffs seek certification of six classes and thirteen subclasses.  (*Id.*)  First,

Plaintiffs request certification of two national classes under federal law:

> 1.  A national "Antitrust Class": "all persons sponsored by any Defendant to
>     work as a standard *au pair* in the United States pursuant to a J-1 Visa"
> 2.  A national "RICO Class": "all persons sponsored by Defendants Au Pair in
>     America, AuPairCare, Inc., Cultural Care, Inc., or InterExchange, Inc. to
>     work as a standard *au pair* in the United States pursuant to a J-1 Visa"

(*Id*. at 3; Doc. # 559-1.)  Second, Plaintiffs propose national classes against Defendants

who require *au pairs* to attend unpaid training in a specific state, regardless of where

the *au pairs* are ultimately placed:

> 3.  A national "NJ Training Class": "all *au pairs* who were subjected to
>     mandatory unpaid training in New Jersey by AuPairCare"
> 4.  A national "NY Training Class": all *au pairs* who were subjected to
>     mandatory unpaid training in New York "by InterExchange, Au Pair in
>     America, Cultural Care, and GoAuPair"
> 5.  A national "FL Training Class": all *au pairs* subject to "unpaid training in
>     Florida by Expert Au Pair"

(*Id*.)  Third, Plaintiffs seek certification of national and state-specific classes arising

under state law.  (*Id*.)

> 6.  A nationwide "State-Claim Class": all *au pairs* "asserting state law claims
>     against certain defendants"
> 7.  Subclasses specific to the defendant and where the current named
>     Plaintiffs worked, the "defendant-and-state-specific Subclasses"
>     a.  An "Au Pair in America California Subclass"

---

[1] The Court conditionally certified eleven plaintiff opt-in classes and subclasses pursuant to the
FLSA's collective action provision, 29 U.S.C. § 216(b), in June 2017.  (Doc. # 569.)  That
conditional certification concerned only six Defendants (the "FLSA Defendants") and Claim VIII.
(*Id*. at 2.)  Pursuant to the Court's certification and a motion hearing, Plaintiffs and the FLSA
Defendants agreed to notification procedures and deadlines.  *See* (Doc. # 686.)  The opt-in
window for potential FLSA collective action plaintiffs is due to close on April 19, 2018.  (Doc.
# 795.)

      b. An "Au Pair in America Illinois Subclass"

      c. An "AuPairCare Michigan Subclass"

      d. An "AuPairCare Pennsylvania Subclass"

      e. A "Cultural Care Maryland Subclass"

      f. A "Cultural Care Massachusetts Subclass"

      g. A "Cultural Care Pennsylvania Subclass"

      h. A "Cultural Care Texas Subclass"

      i. A "Cultural Care Utah Subclass"

      j. A "Cultural Care Virginia Subclass"

      k. An "Expert Au Pair Colorado Subclass"

      l. A "GoAuPair Maryland Subclass"

      m. An "InterExchange Colorado Subclass"

(*Id*.)  Plaintiffs also move the Court to appoint Boies Schiller Flexner ("BSF") and

Towards Justice as co-class counsel.  (*Id.* at 49–50.)  Finally, should the Court grant

Plaintiffs' Motion, Plaintiffs ask that the Court order the parties to confer about class

notice procedures and to submit a plan and proposed notice form(s) within ten days of

the Court's order on the instant Motion.  (*Id*. at 50.)

     Defendants jointly filed a Response in Opposition to Plaintiffs' Motion for Rule 23

Class Certification and Appointment of Class Counsel on July 17, 2017.  (Doc. # 610.)

A number of Antitrust Defendants also independently filed additional briefs in opposition

to class certification.  (Doc. ## 599, 608, 609, 611, 612, 614.)  Plaintiffs thereafter

replied on August 2, 2017.  (Doc. # 643.)  Many of the arguments in these briefs far

exceed the analysis required for class certification pursuant to Rule 23, but the Court

has nonetheless diligently reviewed all filings.

## II.   **LEGAL STANDARD**

     When addressing class certification, the district court undertakes a "rigorous

analysis" to satisfy itself that the prerequisites of Federal Rule of Civil Procedure 23 are

met.  *CGC Holding Co., LLC v. Broad & Cassel*, 773 F.3d 1076, 1086 (10th Cir. 2014).

Under Rule 23(a), plaintiffs seeking class certification bear the burden of establishing four threshold requirements:

(1) "the class is so numerous that joinder of all members is impracticable";
(2) "there are questions of law or fact that are common to the class";
(3) "the claims or defenses of the representative parties are typical of the claims or defenses of the class"; and
(4) "the representative parties will fairly and adequately represent the interests of the class."

*Id.*

Plaintiffs must also show that the case falls into one of the three categories set forth in Rule 23(b).  *Trevizo v. Adams*, 455 F.3d 1155, 1161–62 (10th Cir. 2006); *Shook v. El Paso Cty.*, 386 F.3d 963, 971 (10th Cir. 2004).  In this case, Plaintiffs move for class certification under Rules 23(b)(2) and 23(b)(3).  (Doc. # 559 at 11.)  Certification is available under Rule 23(b)(2) where the class seeks declaratory or injunctive relief because "the party opposing the class has acted or refused to act on grounds that apply generally to the class."  Fed. R. Civ. P. 23(b)(2).  Certification is available under Rule 23(b)(3) where "questions of law or fact common to class members predominate over any questions affecting only individual members, and . . . a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

When deciding whether the proposed class meets the requirements of Rule 23, the Court accepts a plaintiff's substantive allegations as true, though it need not blindly rely on conclusory allegations and may consider the legal and factual issues which the complaint presents. *Shook*, 386 F.3d at 968; *see also Vallario v. Vandehey*, 554 F.3d 1259, 1265 (10th Cir. 2009); *Rutstein v. Avis Rent-A-Car Sys., Inc.*, 211 F.3d 1228,

1234 (11th Cir. 2000) ("Going beyond the pleadings is necessary, as a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues.").

The decision whether to grant or deny class certification "involves intensely practical considerations and therefore belongs within the discretion of the trial court." *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1227 (10th Cir. 2013).  In doubtful cases, class certification is favored.  *See Esplin v. Hirschi*, 402 F.2d 94, 101 (10th Cir. 1968); *Abraham v. WPX Prod. Prods., LLC*, 317 F.R.D. 169, 218 (D.N.M. 2016).

### III.    **ANALYSIS**

### A.    **SATISFACTION OF RULE 23(A) REQUIREMENTS**

The Court is satisfied that each of Plaintiffs' proposed classes, with one exception explained below, satisfy the four prerequisites of Rule 23(a) for the following reasons.

#### 1.    **Numerosity**

In order to meet the first element of Rule 23(a), "[t]he burden is upon plaintiffs seeking to represent a class to establish that the class is so numerous as to make joinder impracticable."  *Peterson v. Okla. City Hous. Auth.*, 545 F.2d 1270, 1273 (10th Cir. 1976).  However, there is "no set formula to determine if the class is so numerous that it should be certified."  *Rex v. Owens ex rel. State of Okla.*, 585 F.2d 432, 436 (10th Cir. 1978).  Rather, "the determination is to be made in the particular circumstances of the case," *id.*, and is "a fact-specific inquiry best left to the district court's discretion," *Gonzales v. City of Albuquerque*, No. CIV 09-0520 JB/RLP, 2010 WL 4053947, *7

(D.N.M. Aug. 21, 2010).  Factors bearing on this inquiry include "the nature of the action, the size of the individual claims, and the location of the members of the class . . . that is the subject matter of the dispute."  *Colo. Cross Disability Coal. v. Abercrombie & Fitch Co.*,  765 F.3d 1205, 1215 (10th Cir. 2014) (quoting 7A Charles Alan Wright, et al., Federal Practice & Procedure § 1762, at 206–07 (3d ed. 2005)).  This Court and others within the Tenth Circuit have certified classes ranging in size from tens to hundreds of thousands of class members.  *See, e.g.*, *Rex*, 585 F.2d at 435 ("Class actions have been deemed viable in instances where as few as 17 to 20 persons are identified as the class"); *Bennett v. Sprint Nextel Corp.,* 298 F.R.D. 498, 504–05 (D. Kan. 2014) ("Courts have found that classes as small as twenty members can satisfy the numerosity requirement, and a good faith estimate of at least 50 members is a sufficient size to maintain a class action" (internal quotations omitted)).

In the matter presently before the Court, it is indisputable that Plaintiffs' proposed classes are sufficiently numerous to satisfy Rule 23(a)(1).  At the time Plaintiffs filed their Motion for Rule 23 Class Certification in mid-2017, the proposed national classes had more than 91,201 members, with new class members frequently being added. (Doc. # 559 at 13.)  It would be impracticable for these class members to pursue individual actions against their sponsoring organizations.  Former *au pairs* reside internationally and are generally young people for whom English is a second language. (*Id*. at 13–14.)  It is also economically unreasonable to expect the *au pairs* to pursue their own claims against one or more Defendant, given the high cost of litigation.  *Cf. Torres-Vallejo v. Creativexteriors, Inc.*, 220 F. Supp. 3d 1074, 1085 (D. Colo. 2016)

("The class members are Mexican nationals with limited access to U.S. courts, and the value of any individual's claims is likely to small to make individual litigation cost effect. These factors suggest that individualized resolution of claims would be both unlikely and impractical.").  As Defendants concede, (Doc. # 610 at 12 n.19), Plaintiffs' proposed classes easily satisfy the numerosity requirement of Rule 23(a).

    **2.**    **Commonality**

Rule 23(a)(2) requires that "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  Not all questions of law and fact need be common to the class.  "[E]ven a single common question will do."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011) (internal quotations omitted).  However, this requirement is not met merely because the putative class members allegedly "all suffered a violation of the same provision of law."  *See id.* at 350.  Indeed, it is not just the presence of a common question that matters, but the ability of the class action device to "resolve an issue that is central to the validity of each one of the claims in one stroke."  *See id.*  "The district court retains discretion to determine commonality because it is 'in the best position to determine the facts of the case, to appreciate the consequences of alternative methods of resolving the issues of the case and . . . to select the most efficient method for their resolution.'"  *J.B. ex rel. Hart v. Valdez*, 186 F.3d 1280, 1289 (10th Cir. 1999) (internal citation omitted).

Numerous courts have determined that the commonality prerequisite of Rule 23(a) was satisfied in antitrust and RICO class actions.  In antitrust class actions, "the claimed existence of a conspiracy to fix prices . . . in violation of antitrust laws has been

found to present common questions in actions brought by plaintiffs who asserted that

they had been harmed by those activities." 7A Charles Alan Wright, et al., Federal

Practice & Procedure § 1763 (3d ed. 2017). *See, e.g.*, *In re High-Tech Employee*

*Antitrust Litigation*, 985 F. Supp. 2d 1167, 1180 (N.D. Cal. 2013) (in former employees'

class action alleging that employers conspired to suppress wages to artificially low

levels in violation of the Sherman Antitrust Act, finding that adjudication of the

employers' alleged antitrust violations would turn on "overwhelmingly common legal and

factual issues"); *In re Alcoholic Beverages Litigation*, 95 F.R.D. 321, 324 (E.D.N.Y.

1982) ("antitrust price-fixing conspiracy cases, by their nature, deal with common legal

and factual questions about the existence, scope and effect of the alleged conspiracy"

(internal quotation omitted)). The same is true of RICO class actions. As the Third

Circuit described, a RICO allegation "will often contain common issues because . . . a

RICO allegation is informed by the defendant's conduct as to all class members and

any resulting injuries common to all class members." *Reyes v. Netdeposit, LLC*, 802

F.3d 469, 487 (3d Cir. 2015) (internal quotations omitted). *See, e.g.*, *In re U.S.*

*Foodservice Inc. Pricing Litigation*, 729 F.3d 108, 120 (2d Cir. 2013) (finding common

issues of law and fact in customers' putative class action where customers alleged a

national food distributor violated RICO).

A multitude of common issues of law and fact exist in this matter. As the Court

observed when it conditionally certified classes for purposes of collective FLSA action,

Plaintiffs have adequately alleged an antitrust conspiracy that "represents [a] . . . 'single

decision, policy, or plan.'" (Doc. # 569 at 8–9.) The same is true of Plaintiffs' RICO and

state-law claims because those claims arise from the same alleged conduct that furthered the overall conspiracy.  The Court identified other common legal and factual questions in its Order Adopting and Affirming In Part the February 22, 2016 Recommendation of United States Magistrate Judge Tafoya, which concerned various Defendants' Motions to Dismiss.  *See* (Doc. # 258.)  Because these numerous class-wide questions of law and fact may be resolved with common answers drawn from common proof, Plaintiffs' proposed classes satisfy Rule 23(a)'s commonality requirement.[2]

### 3.    Typicality

The third prerequisite for class certification is that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  "[D]iffering fact situations of class members do not defeat typicality under Rule 23(a)(3) so long as the claims of the class representative and class members are based on the same legal or remedial theory."  *Adamson v. Bowen*, 855 F.2d 668, 676 (10th Cir. 1988); *see also DG ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1199 (10th Cir. 2010) ("typicality exists where . . . all class members are at risk of being subjected to the same harmful practices, regardless of any class member's individual circumstances.").

---

[2] Defendants do not explicitly argue that the commonality prerequisite of Rule 23(a)(2) is not satisfied.  (Doc. # 610.)  Rather, they argue that individualized issues will predominate over any purported common questions, an argument addressing Rule 23(b)(3).  (*Id.* at 13.)  Courts often discuss commonality and predominance together "because the commonality inquiry is subsumed into the predominance inquiry."  *Reyes*, 802 F.3d at 486.  However, in the interest of clarity, the Court addresses each requirement separately.  The Court addresses Defendants' predominance arguments below.  *See In re LifeUse Holding Inc.*, 242 F.3d 136, 145 (3d Cir. 2001) ("Because common questions (commonality) must be established before predominance can be found, we turn to that element.")

For nearly all of Plaintiffs' claims, each named Plaintiff is typical of the proposed classes. First, "typicality in the antitrust context will be established by plaintiffs and all class members alleging the same antitrust violations by the defendants." *In re Playmobil Antitrust Litigation*, 35 F. Supp. 2d 231, 241 (E.D.N.Y. 1998) (internal quotations omitted); *see also In re Rubber Chemicals Antitrust Litigation*, 232 F.R.D. 346, 351 (N.D. Cal. 2005). As this Court has previously stated, *see* (Doc. # 569 at 8–9), that is certainly true here. Plaintiffs and members of the proposed national Antitrust Class all allege a common agreement among Defendants to fix wages at an unlawfully low level. (Doc. # 395 at 104–05.)

Second, in the context of a RICO claim, "the proposed class representative's claims are generally held to be typical of the class members' claims if the allegations can be traced to the same overall fraud." *Robert v. C.R. England, Inc.*, 318 F.R.D. 457, 511 (D. Utah 2017) (quoting 1 William B. Rubenstein, Newberg on Class Actions § 3:36 (5th ed. 2012)). Here, Plaintiffs' and members of the proposed national RICO Class's RICO claim "arise[s] out of the same course of events," *id.*, and the same purported overall fraud. (Doc. # 395 at 105–06.)

With regard to most of Plaintiffs' state-law claims, the Court is satisfied that Plaintiffs' claims are typical of potential class members' claims. It appears to the Court that Plaintiffs have carefully crafted their Defendant-and-State-Specific Subclasses to "ensure that each defendant on those claims is aligned with a plaintiff who worked for that defendant in a particular state." (Doc. # 559 at 20.) Named Plaintiffs and class

members of each Subclass will invoke the same state statutes and common law doctrines.

Various Defendants attempt in their individual Responses to defeat the typicality requirement by arguing that each *au pairs*' pay and work conditions are "unique and individual."[3]  *E.g.*, (Doc. # 599 at 2; Doc. # 609 at 7–9.)  While *au pairs*' experiences may have varied, the core of each claim remains the same for all *au pairs* in the aforementioned classes—all that the typicality element requires.  *See DG ex rel. Stricklin*, 594 F.3d at 1195 ("Every member of the class need not be in a situation identical to that of the named plaintiff to meet Rule 23(a)'s . . . typicality requirement.").  The Court therefore concludes that Plaintiffs' proposed Antitrust Class, RICO Class, Training Classes, and Defendant-and-State-Specific Subclasses meet the third prerequisite of Rule 23(a).

### a.    The nationwide State-Claim Class

Plaintiffs' proposed nationwide State-Claim Class fails to meet the typicality requirement.  Plaintiffs state that this "overarching national class asserting state law claims" for breach of fiduciary duty (Claim III), negligent misrepresentation (Claim IV), constructive fraud or fraudulent concealment (Claim V), violation of consumer protection statutes (Claim VI), and violation of minimum wage statutes (Claim IX) will be represented by all named Plaintiffs.  (Doc. # 559 at 3 n.4; Doc. # 559-1 at 1.)  They propose that the nationwide State-Claim Class include:

---

[3] Defendants' joint Response does not discuss Rule 23(a)(3); it "directs the Court to [Defendants'] individual briefs."  (Doc. # 610 at 12 n.19.)

> **All persons** sponsored by any of the following Defendants to work as a standard *au pair* **in the United States** pursuant to a J-1 Visa: AuPairCare, Inc.; Au Pair in America (American Institute for Foreign Study); Cultural Care, Inc., Expert Group International, Inc.; Associates in Cultural Exchange (dba GoAuPair), or InterExchange, Inc.

(*Id.*) (emphasis added).  Plaintiffs do not identify **which states' laws** they assert these claims under.  Rather, in their Complaint, Plaintiffs merely reference "the laws of several states and the District of Columbia."  *See* (Doc. # 395 at 104–14.)  The Court therefore assumes that Plaintiffs do not intend to limit the states under which class members bring state claims.

Named Plaintiffs lack Article III standing to assert claims under the laws of states in which they did **not** work, live, or reside.  To the best of this Court's knowledge, named Plaintiffs were employed in or resided in **only** the following states: Colorado; California; Utah; Pennsylvania; Massachusetts; Maryland; Virginia; Texas; Michigan; and Illinois.  *See* (Doc. # 395 at 8–9; Doc. # 559-1 at 5–10.)  No named Plaintiffs worked in or lived in the remaining forty states or the District of Columbia during their employment as *au pairs*.  Thus, named Plaintiffs are without standing in regard to their nationwide State-Claim Class because that class is not limited to the states in which named Plaintiffs were employed or resided.

This Court previously explained this analysis at length in *Smith v. Pizza Hut, Inc.*, No. 09-cv-01632-CMA-BNB, 2011 WL 2791331, *1 (D. Colo. July 14, 2011), and *Avendano v. Averus, Inc.*, No. 14-cv-01614-CMA-MJW (D. Colo. Sept. 29, 2016)

(unpublished), *see* (Doc. # 610-52).[4]  Article III standing "focuses on whether the

plaintiff is the proper party to bring this suit," a determination informed by "the nature

and source of the claim asserted."  *Raines v. Byrd*, 5210 U.S. 811, 818 (1997) (quoting

*Warth v. Seldin*, 422 U.S. 490, 500 (1975)).  To meet the standing requirement, "a

plaintiff's complaint must establish that he has a 'personal stake' in the alleged dispute,

and that the alleged injury is particularized as to him."  *Id*.  This does not change in the

context of a class action.  "[E]ven named plaintiffs who represent a class 'must allege

and show that they personally have been injured, not that injury has been suffered by

other, unidentified members of the class to which they belong and which they purport to

represent.'"  *Simon v. E. Ky. Welfare Rights Org*., 426 U.S. 26, 40 n.20 (1976) (quoting

*Warth*, 422 U.S. at 502)).  Accordingly, named plaintiffs lack standing to bring claims

under the laws of states where the named plaintiffs have not worked or resided.  *See,*

*e.g*., *Griffin v. Dugger*, 823 F.2d 1476, 1483 (11th Cir. 1987) (holding that each claim

must be analyzed separately, and "a claim cannot be asserted on behalf of a class

unless at least one named plaintiff has suffered the injury that gives rise to the claim");

*In re Checking Account Overdraft Litigation*, 694 F. Supp. 2d 1302, 1325 (S.D. Fla.

2010) (holding that in a class action, the plaintiffs "may only assert a state statutory

claim if a named plaintiff resides in that state"); *Pizza Hut, Inc.*, 2011 WL 2791331 at *9

(collecting cases).  With regard to Plaintiffs' proposed nationwide State-Claim Class,

---

[4] Plaintiffs acknowledge that this Court twice previously rejected a proposed national class asserting state law claims in *Pizza Hut* and *Avendano*.  (Doc. # 559 at 3–4 n.4); *see also* (Doc. # 559 at 39 n.50).  Plaintiffs explain, "Notwithstanding that authority, [they] believe that an overarching national Class asserting state law claims is appropriate in this case, and [P]laintiffs seek certification of such a class, **particularly in the event of after-arising law or appeal**." (*Id.*) (emphasis added.)

named Plaintiffs in this case lack standing to bring claims under the state laws of the

forty states and the District of Columbia where named Plaintiffs did **not** work or live.

*See Pizza Hut, Inc.*, 2011 WL 2791331 at *10; *Avendano*, No. 14-cv-01614-CMA-MJW

at (Doc. # 610-52 at 15–16).

Though this Court sympathizes with low-wage, immigrant workers—including *au*

*pairs* employed pursuant to a J-1 Visa—who may face real risks in pursuing wage-and-

hour claims and, thus, may benefit from an opt-out action certified under Rule 23, *see*

*Avendano*, No. 14-cv-01614-CMA-MJW at (Doc. # 610-52 at 12–13 n.4), the Court is

bound by the Tenth Circuit's holding in *Rector v. City and County of Denver*, 348 F.3d

935 (10th Cir. 2003).  The Tenth Circuit held therein that "class representatives who do

not have Article III standing to pursue the class claims fail to meet the typicality

requirement of Rule 23."  *Id*. at 950.  Because named Plaintiffs do not have standing

and fail to satisfy the typicality requirement of Rule 23 for the nationwide State-Claim

Class, the Court denies Plaintiffs' Motion for Rule 23 Class Certification as to the State-

Claim Class.  *See Avendano*, No. 14-cv-01614-CMA-MJW at (Doc. # 610-52 at 15–16).

### 4.    Fair and Adequate Representation of the Class

The final requirement of Rule 23(a) is that "the representative parties will fairly

and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  "Resolution

of two questions determines legal adequacy: (1) do the named plaintiffs and their

counsel have any conflicts of interests with other class members and (2) will the named

plaintiffs and their counsel prosecute the action vigorously on behalf of the class?"

*Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1187–88 (10th Cir. 2002)

(quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)).  The plaintiffs

bear the initial burden of demonstrating facts to support a finding that they will

adequately protect the interests of the class.  *Decoteau v. Raemisch*, 304 F.R.D. 683,

689 (D. Colo. 2014).  If the plaintiffs make a *prima facie* case of adequate

representation, the burden shifts to the defendant.  *Id*.  Absent evidence to the contrary,

a presumption of adequacy applies.  *Id*.

Plaintiffs have alleged facts demonstrating that they will fairly and adequately

represent the proposed Classes and Subclasses.  First, Plaintiffs state that there are no

conflicts of interest among proposed representatives, counsel, and potential members.

(Doc. # 559 at 27.)  Second, Plaintiffs' counsel, BSF and Towards Justice, have

sufficient experience and expertise, and the Court trusts that they will prosecute the

action vigorously on behalf of all Classes and Subclasses.  *See* (*id*. at 26–27.)

Defendants fail to present evidence to the contrary.  Only two Defendants, APC

and Cultural Care, challenge Plaintiffs' satisfaction of Rule 23(a)(4).  (Doc. ## 609, 611.)

However, neither APC nor Cultural Care argues that: (1) there are conflicts of interest,

or (2) named Plaintiffs and their counsel will fail to prosecute the action vigorously.  (*Id*.)

Rather, they each take issue specific named Plaintiffs, asserting, for example, that one

Plaintiff "harbors racist views," (Doc. # 611 at 7), and two others are not "suited to the

task of representing the interests of Plaintiffs' proposed subclasses" (Doc. # 609 at 8).

These assertions are not substantiated with factual allegations or citations to the record,

and they therefore fail to persuade the Court.  The Court thus concludes that Plaintiffs

satisfy the adequacy element of Rule 23(a).

For these reasons, Plaintiffs fulfill all four prerequisites to class certification

pursuant to Rule 23(a) for all proposed classes and subclasses except their proposed

nationwide State-Claim Class.  The Court turns to whether Plaintiffs can also show that

the qualified classes and subclasses fall into one of the three categories of Rule 23(b).

*See Trevizo v. Adams*, 455 F.3d at 1161–62.

## B.    CERTIFICATION UNDER RULE 23(B)(3)

Plaintiffs seek certification primarily under Rule 12(b)(3), which allows for class

certification where: (1) "the court finds that the questions of law or fact common to class

members predominate over any questions affecting only individual members," and (2)

the court finds "that a class action is superior to other available methods for fairly and

efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

### 1.    <u>Predominance</u>

The predominance inquiry "tests whether proposed classes are sufficiently

cohesive to warrant adjudication by representation."  *Amchem Prod., Inc. v. Windsor*,

521 U.S. 591, 623 (1997).  Courts must give "careful scrutiny to the relation between

common and individual questions in a case."[5]  *Tyson Foods, Inc. v. Bouaphakeo*, 136 S.

Ct. 1036, 1046 (2016).  They must ask "whether the common, aggregation-enabling,

issues in the case are more prevalent or important than the non-common, aggregation-

---

[5] Issues are described as common or individual questions "primarily based on the nature of the evidence":

> If the members of a proposed class will need to present evidence that varies from member to member, then it is an individual question.  If the same evidence will suffice for each member to make a prima facie showing, or if the issue is susceptible to generalized, class-wide proof, then it is a common issue.

2 William B. Rubenstein, Newberg on Class Actions § 4:50 (5th ed. 2017) (internal quotations omitted).

defeating, individual issues." *Id*. (quoting 2 William B. Rubenstein, Newberg on Class

Actions § 4:49 (5th ed. 2012)).  If "one or more of the central issues in the action" are

common to the class and can be said to predominate, the class may be certified under

Rule 23(b)(3) "even though other important matters will have to be tried separately,

such as damages or some affirmative defenses peculiar to some individual class

members." *Id*. (quoting 7AA Charles Alan Wright, *et al*., Federal Practice & Procedure

§ 1778 (3d ed. 2005)).

Defendants argue that for all proposed Classes and Subclasses, individualized

issues will predominate over common questions.  (Doc. # 610 at 13.)  The Court

disagrees.

### a.     *The Antitrust Class*

Rule 23(b)(3) is frequently invoked in antitrust cases.  7A Charles Alan Wright, *et*

*al.*, Federal Practice & Procedure § 1781 (3d ed. 2017).  Generally, "whether a

conspiracy [in restraint of trade] exists is a common question that is thought to

predominate over the other issues in the case and has the effect of satisfying the first

prerequisite in Rule 23(b)(3)." *Id*. (citations omitted).  As the Tenth Circuit explained,

"[u]nder the prevailing view, price-fixing affects all market participants, creating an

inference of class-wide impact . . . The inference of class-wide impact is especially

strong where . . . there is evidence that the conspiracy artificially inflated the baseline for

price negotiations." *In re Urethane Antitrust Litigation*, 768 F.3d 1245, 1254 (10th Cir.

2014).  The same is presumably true where, as here, there is evidence that the

conspiracy artificially deflated the baseline for *au pairs*' wages.

The Court agrees with Plaintiffs that the alleged common agreement amongst Defendants is "the foundational liability issue" in Plaintiffs' Antitrust Claim.  (Doc. # 559 at 28.)  As it explained in a previous Order, the "**crucial question**" about a claim under Section 1 of the Sherman Antitrust Act is "**whether the challenged anticompetitive conduct stems from independent decision or from an agreement**."  (Doc. # 258 at 6) (quoting *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 553 (2007)) (emphasis in order).  This common issue—the existence of a conspiracy to suppress *au pairs*' wages— predominates over any individual issues.

Defendants do not respond to Plaintiffs' analysis and instead argue at length that the Antitrust Class cannot be certified under Rule 23(b)(3) because Plaintiffs have failed to show "common evidence" that Defendants inflicted an "antitrust impact," or common injury, on the class.[6]  (Doc. # 610 at 14–27.)  Defendants are correct that the second element of a price-fixing claim is that the proposed class "suffered injury from the antitrust violation—an element commonly called 'impact.'"  *In re Urethane Antitrust Litigation*, 251 F.R.D. 629, 634 (D. Kan. 2008).  The antitrust injury requirement "ensures that a plaintiff can recover only if the loss stems from a competition-**reducing** aspect or effect of the defendant's behavior."  *Elliott Indus. Ltd. P'ship v. BP America Prod. Co.*, 407 F.3d 1091, 1124–25 (10th Cir. 2005) (quoting *Atl. Richfield Co. v. USA*

---

[6] Defendants assert that "Plaintiffs cannot carry their burden of establishing common evidence of antitrust impact for four separate reasons": (1) because "an oversupply of au pairs exists at the stipend levels that Plaintiffs claim resulted from the conspiracy, . . . the stipend would not rise if the challenged conduct ceased;" (2) Plaintiffs do not identify an "economic model or analysis that could serve as common proof of impact;" (3) Plaintiffs' "attempt to substitute a wage-law damages model as common proof of an antitrust injury . . . fails as a matter of law;" and (4) assuming Plaintiffs have identified evidence of common impact, "unacceptable intra-class conflicts" would violate Rule 23(a)(4)."  (Doc. # 610 at 15–16.)

*Petroleum Co.*, 495 U.S. 328, 344 (1990)).  However, "[t]he existence of occasional outliers does not defeat predominance of common issues of antitrust impact."  *Castro v. Sanofi Pasteur Inc.*, 134 F. Supp. 3d 820, 847 (D.N.J. 2015) (citing *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2412 (2014) ("That the defendant might attempt to pick off the occasional class member here or there through individualized rebuttal does not cause individual questions to predominate.")).

The Court rejects Defendants' argument.  First, the "appropriate analysis" of Defendant's argument "begins with a recognition that defendants seeking to defeat class certification in horizontal price-fixing cases such as this one face an uphill battle," *In re Urethane Antitrust Litigation*, 251 F.R.D. at 635, because, as the Court just stated, proof of the conspiracy is a common question that predominates over the other issues of the case, 7AA Charles Alan Wright, *et al.*, Federal Practice & Procedure § 1781 (3d ed. 2005).

Second, with this recognition in mind, the Court concludes that common issues will dominate the issue of antitrust impact.  *See In re Urethane Antitrust Litigation*, 251 F.R.D. at 636.  The very nature of the alleged conspiracy implies common injury.  As the Tenth Court explained, the "prevailing view" is that "price-fixing **affects all market participants**, creating an **inference of class-wide impact**."  *In re Urethane Antitrust Litigation*, 768 F.3d at 1254.  There is no reason to reject that inference in this case.  If Plaintiffs' antitrust allegations are true, it logically follows that Plaintiffs were injured from the artificially-suppressed wages. *See id*. at 1255.   Moreover, Plaintiffs present record testimony by and the report of economist Dr. Kerr, who asserts that his analysis

demonstrates "harm to [Antitrust Class] members is common, and arises from [Defendants'] unitary course of conduct." (Doc. # 559 at 33–35). Accepting Plaintiffs' substantive allegations as true, *see Shook*, 386 F.3d at 968, the Court is not convinced otherwise by Defendants' four theories of common impact. (Doc. # 610 at 14–27.) For these reasons, the Court concludes that Plaintiffs' proposed Antitrust Class is "sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623.

### b.     The RICO Class

To prove a RICO violation, a plaintiff must show that the defendant violated the RICO statute and that the plaintiff was injured "by reason of" of that violation. 18 U.S.C. §§ 1962, 1964(c). In the Tenth Circuit, a plaintiff's reliance on the purported RICO violation, "**as a means of establishing causation** and beyond, takes on uncommon gravity when it arises in the context of establishing predominance under Rule 23." *CGC Holding Co., LLC*, 773 F.3d at 1089 (emphasis added). Class certification "is proper when 'causation can be established through an inference of reliance where the behavior of plaintiffs and the members of the case cannot be explained in any way other than reliance upon the defendant's conduct.'" *Id*. at 1089–90 (quoting *In re Countryside Fin. Corp. Mortg. Mktg. & Sales Practices Litigation*, 277 F.R.F. 586, 503 (S.D. Cal. 2011)).

Plaintiffs claim that Defendants collectively "operated through patterns of racketeering activity," including "multiple fraudulent acts intended to deprive *au pairs* . . . of wages, including by using electronic communications, such as internet publications, and . . . by using materially false statements." (Doc. # 395 at 48.) Such conduct,

Case No. 1:14-cv-03074-CMA-KMT   Document 882   Filed 02/02/18   USDC Colorado   Page 289 of 349
Case 1:14-cv-03074-CMA-KMT   Document 882   Filed 02/02/18   USDC Colorado   Page 289 of 349
of 49
Appellate Case: 18-703   Document: 01019947007   Date Filed: 02/20/2018   Page: 24

Plaintiffs allege, injured *au pairs* by causing them to "suffer loss of . . . wages."  (*Id*. at 49.)  At the heart of their RICO claim is the question—**common to all** Plaintiffs and potential class members—of whether Defendants "function[ed] together as one enterprise" to expose potential *au pairs* to "generally uniform" misrepresentations about wages through "advertisements, marketing materials, websites, and other 'generally uniform' misrepresentations."  (Doc. # 559 at 30.)  The Court concludes that this common question may predominate over any individual questions about reliance or damages.

The Court is not moved by Defendants' arguments that Plaintiffs' RICO Class cannot be certified "because individual questions of injury, reliance, and misrepresentation predominate."  (Doc. # 610 at 27.)  Defendants first assert that Plaintiffs "cannot prove with common evidence that all *au pairs* received an allegedly 'uniform' misrepresentation."  (*Id*. at 28.)  They rely on the Second Circuit's position that "each plaintiff must prove that he or she personally received a material misrepresentation, and that his or her reliance on this misrepresentation was the proximate cause of his or her loss" in order to recover for a defendant's fraudulent conduct.  (Doc. # 610 at 27–29) (quoting *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1253 (2d Cir. 2002)).  Defendants also selectively quote statements made by four named Plaintiffs to contend that that "*au pairs* did not uniformly consider allegedly deceptive materials," such as the advertisements contained in Plaintiffs' Complaint, *see* (Doc. # 295 at 23–30).  (Doc. # 610 at 27–29.)  However, Defendants did not cite, nor could this Court find, authority applying the Second Circuit's *Moore* rule in this Circuit,

and the Court observes that other circuits have expressly rejected *Moore*.  *See, e.g.*, *In re First Alliance Mortg. Co.*, 471 F.3d 977, 990 n.3 (9th Cir. 2006).  With regard to Defendants' selective quotation of named Plaintiffs' statements, Defendants seem to have forgotten that the predominance inquiry does **not** require that **all** issues are identical.  It requires only that "one or more of the central issues in the action are common to the class and can be said to predominate."  *Tyson Foods, Inc.*, 136 S. Ct. at 1045.  The quotations Defendants relied on, *see* (Doc. # 610 at 29) are, at this juncture, outweighed by the more numerous statements by named Plaintiffs presenting evidence of uniform misrepresentations.  *See* (Doc. # 643 at 24.)  The Court therefore rejects Defendants' first assertion that Plaintiffs do not provide common evidence that all *au pairs* received an allegedly uniform misrepresentation.

Second, Defendants assert that whether Plaintiffs were injured "by reason of" the alleged RICO violation is "an individualized inquiry that predominates."  (Doc. # 610 at 30.)  But as the Court stated above, the Tenth Circuit permits causation to be established "through an **inference of reliance** where the behavior of plaintiffs and the members of the class cannot be explained in any way other than reliance upon the defendant's conduct."  *CGC Holding Co., LLC*, 773 F.3d at 1089–90 (emphasis added).  Defendants attempt to argue that this inference is not appropriate because this case is not a "transactional situation," quoting the Tenth Circuit in *CGC Holding Co., LLC*, 773 F.3d at 1091 n.9, but Defendants fail to examine the entirety of the Tenth Circuit's opinion.  In explaining when inference of reliance is appropriate, the Tenth Circuit relied

on the "persuasive" logic of the Eleventh Circuit's decision in *Klay v. Humana, Inc.*, 382

F.3d 1241 (11th Cir. 2004):

> [T]he Eleventh Circuit in *Klay v. Humana* found that an inference of reliance was appropriate where "circumstantial evidence that can be used to show reliance is common to the whole class. That is, the same considerations could lead a reasonable factfinder to conclude beyond a preponderance of the evidence that each individual plaintiff relied on the defendants' representations." *Klay,* 382 F.3d at 1259. *Klay* involved class claims brought by doctors against health maintenance organizations (HMOs), **alleging a conspiracy to systematically underpay** physicians on reimbursements for their services. *Id.* at 1246. To rebut the HMOs' claims that this inference was inappropriate, the court commented that **"[i]t does not strain credulity to conclude that each plaintiff, in entering into contracts with the defendants, relied upon the defendants' representations and assumed they would be paid the amounts they were due."** *Id.* at 1259.

*CGC Holding Co., LLC*, 773 F.3d at 1090 (internal quotations and citations omitted).

The instant matter is analogous to *Klay* in that they both arise from a class action

brought by employees against their employers, alleging a conspiracy to systematically

underpay employees. As in *Klay*, it "does not strain credulity" in this case to conclude

that Plaintiffs, in entering into contracts with Defendants, relied upon Defendants'

representations and assumed they would be paid the represented wages. *Klay*, 382

F.3d at 1259.

For these reasons, the Court concludes that certification of the RICO Class is

appropriate under Rule 23(b)(3) because common questions predominate over any

individual issues and because an inference of reliance is warranted.

### c.    *The State-Specific Training Classes*

The three proposed state-specific (New Jersey, New York, and Florida) Training

Classes will represent *au pairs* allegedly required by certain Defendants to attend

unpaid training in one of these three states.  (Doc. # 559 at 3.)  The Training Classes assert (1) state wage-and-hour law claims (Counts IX–XI); and (2) state law claims "founded on fraud, misrepresentations, omissions, or deception" (Counts III–VI).  (*Id.* at 35.)

i.   <u>State wage-and-hour law claims of the Training Classes</u>

Plaintiffs clarify that the NJ, NY, and FL Training Classes bring state wage-and-hour claims to "compensate *au pairs* for the days that they spent in unpaid, standardized training."  (Doc. # 643 at 36–37.)  According to Plaintiffs, "[t]raining is work that must be compensated under the law of each of those states."  (*Id.*)

The Court concludes that common issues predominate in the resolution of the Training Classes' wage-and-hour claims.  Plaintiffs allege that named Defendants "employ a standard training protocol" and do not pay *au pairs* for the required training time.  (*Id.*)  Questions common to the Training Classes that bear on their claims, such as whether the states' wage-and-hour laws require employees to be paid for training time and, if so, the amount of class members' damages, will predominate.  Certification of the Training Classes as to their wage-and-hour claims is therefore appropriate under Rule 23(b)(3).

ii.   <u>State fraud and misrepresentation claims of the Training Classes</u>

With regard to the Training Classes' fraud-based claims, Plaintiffs explain that their claims "accrued when their damages became complete—*i.e.*, when the *au pairs* began working without pay in the mandatory training programs."  (*Id.* at 37.)  "The same

26

fraud," Plaintiffs contend, "foreseeably and directly caused all the subsequent harm, even though some of it occurred in another state." (*Id.*)

The Court is satisfied that common issues will be more prevalent than individual questions in adjudicating the Training Classes' fraud-based claims. All members of the proposed Training Classes were allegedly defrauded by the same misrepresentations of Defendants requiring the training programs, and all raise tort claims that accrued in the same state (New Jersey, New York, or Florida) under the same circumstance (required, unpaid training). The Training Classes are sufficiently cohesive as to their fraud-based claims as "to warrant adjudication by representation." *See Amchem Prod., Inc.,* 521 U.S. at 623.

Defendants characterize Plaintiffs' proposed Training Classes as "a wholly improper attempt to certify nationwide classes," in disregard of this Court's orders in *Avendano,* No. 14-cv-01614-CMA-MJW at (Doc. # 610-52), and *Pizza Hut, Inc.*, No. 09-2011 WL 2791331 at *1. (Doc. # 610 at 42.) In considering a motion for class certification of state wage-and-hour claims, this Court in *Pizza Hut* held that "a plaintiff does not have standing to allege claims on his own behalf under the laws of states where he has never lived or resided because he has not suffered an injury under those laws, nor is he protected by those laws." *Pizza Hut, Inc.*, 2011 WL 2791331 at *8. Applying that holding to this case, Defendants assert that because "[n]o named Plaintiff ever lived or resided in states where the training occurred," Plaintiffs "do not have standing to assert claims for *au pairs* who were placed with host families in states other than those which they [the named Plaintiffs] were placed." (Doc. # 610 at 42.)

Defendants argue that "Plaintiffs, like all of the putative class members, resided in their host family's state(s)," not New Jersey, New York, or Florida, and thus could only bring claims in their host family's states.  (*Id.*)

Defendants misunderstand this Court's reasoning in *Pizza Hut*.  Because the Pizza Hut plaintiff **had not worked**, lived, or resided in several states, the Court concluded that the plaintiff "ha[d] not suffered an injury under those laws, nor [was] he protected by those laws."  *Pizza Hut, Inc.*, 2011 WL 2791331 at *8.  That conclusion— that the plaintiff had no connection to a state—triggered this Court's holding.  *Id*. at *8– 9.  The case now before the Court is materially different.  Here, Plaintiffs of the Training Classes allegedly **did** work in a state (New Jersey, New York, or Florida) with wage- and-hour laws.  Plaintiffs of the Training Classes are therefore protected with New Jersey's, New York's, or Florida's labor laws and have standing to bring these claims.

### d.    The Defendant-and-State-Specific Subclasses

Finally, Plaintiffs seek to certify thirteen Defendant-and-State-Specific Subclasses:

1.    An "Au Pair in America California Subclass"
2.    An "Au Pair in America Illinois Subclass"
3.    An "AuPairCare Michigan Subclass"
4.    An "AuPairCare Pennsylvania Subclass"
5.    A "Cultural Care Maryland Subclass"
6.    A "Cultural Care Massachusetts Subclass"
7.    A "Cultural Care Pennsylvania Subclass"
8.    A "Cultural Care Texas Subclass"
9.    A "Cultural Care Utah Subclass"
10.    A "Cultural Care Virginia Subclass"
11.    An "Expert Au Pair Colorado Subclass"
12.    A "GoAuPair Maryland Subclass"
13.    An "InterExchange Colorado Subclass"

(Doc. # 559-1 at 5–10.)  At least one named Plaintiff represents each proposed

subclass.  (*Id.*)  Each subclass asserts (1) state wage-and-hour claims; (2) state

misrepresentation and fraud claims; and (3) state consumer protection claims.  (Doc.

# 559 at 39.)

      i.    <u>State wage-and-hour claims</u>

The Defendant-and-State-Specific Subclasses' wage-and-hour claims assert that

each Defendant for whom Plaintiffs propose a subclass has a policy or practice to

consistently set *au pair* wages unlawfully low, in violation of state law.  (*Id.* at 39–40.)

Plaintiffs' claims are supported by specific factual allegations.  (*Id.* at 40–41.)  For

example, Plaintiffs allege that Defendant Cultural Care consistently advertises that all of

its *au pairs* earn the same weekly stipend, an allegation supported by transcripts of a

Cultural Care's employee's deposition and by exhibits.  (*Id.* at 40.)

The determination of whether a particular Defendant has such a policy or

practice of underpayment is common to each subclass's members and can be achieved

through generalized proof.  *See, e.g.*, *Pliego v. Los Arcos Mexican Rest., Inc.*, 313

F.R.D. 117, 126–27 (D. Colo. 2016) (finding that common issues of law and fact

predominated over individual issues where the plaintiffs alleged they were "subject to

the same alleged company-wide policies of non-payment of overtime premiums");

*Perez-Benites v. Candy Brand, LLC*, 267 F.R.D. 242, 249 (W.D. Ark. 2010) (holding that

common issues predominated over individual questions in a class action brought by

guest workers employed on farms pursuant to H-2A temporary work visa, where the

plaintiffs alleged failure to pay a lawful hourly wage and overtime).

The Court is not persuaded by Defendants' argument that host families "solely control" the terms of *au pairs*' employment, including "the ultimate amount of . . . compensation." (Doc. # 610 at 34–35.) Defendants characterize host families as the "employer[s]-in-fact" for *au pairs* and rely on *Wal-Mart Stores, Inc.,* 564 U.S. at 355, to assert that a policy "of allowing discretion by local supervisors over employment matters . . . is just the opposite of a uniform employment practice that would provide the commonality needed for a class action." (Doc. # 610 at 34–35.) This Court already held that the employer(s)-employee relationship between Defendants, host families, and *au pairs* is a merits question common to all parties. (Doc. # 258 at 19–21.) Moreover, Defendants' reliance on *Wal-Mart* is inapposite. The *Wal-Mart* plaintiffs alleged that local stores' supervisors had too **much** discretion, which enabled supervisors to discriminate against employees. *Wal-Mart Stores, Inc.,* 564 U.S. at 343. Here, Plaintiffs allege the opposite: uniformity of employment practices—*i.e.*, that host families did not have **any** discretion over *au pairs*' compensation.

ii.     State misrepresentation and fraud claims

Plaintiffs' common law misrepresentation and fraud claims all arise from the same alleged misrepresentations Defendants communicated to prospective *au pairs* and host families, just as Plaintiffs' RICO claim does. *See* (Doc. # 395 at 106–09.) For the reasons this Court previously analyzed in the predominance inquiry for Plaintiffs' proposed RICO Class, *see supra*, the Court is also satisfied that common issues predominate over individual questions in resolving Plaintiffs' Defendant-and-State-Specific Subclasses' misrepresentation and fraud claims.

iii.     State consumer protection claims

The proposed subclasses' state consumer protection claims arise from the

uniform misrepresentations Defendants allegedly made.  *See* (Doc. # 395 at 109–10.)

The same common issues relevant to Plaintiffs' RICO claim and state-law

misrepresentation claims will determine resolution of Plaintiffs' state consumer

protection claims.[7]

For the aforementioned reasons, the Court concludes that Plaintiffs' proposed

classes and subclasses[8] raise questions of law or fact common among class members

that predominate over any individual considerations.  Plaintiffs' proposed classes and

subclasses thus meet the first element of Rule 23(b)(3).

**2.     Superiority**

The second requirement for certification under Rule 23(b)(3) is that "a class

action is superior to other available methods for fairly and efficiently adjudicating the

controversy."  Fed. R. Civ. P. 23(b)(3).  The Rule identifies four factors relevant to this

inquiry:

> (A) the class members' interests in individually controlling the prosecution or
> defense of separate actions;
> (B) the extent and nature of any litigation concerning the controversy already
> begun by or against class members;
> (C) the desirability or undesirability of concentrating the litigation of the claims in
> the particular forum; and
> (D) the likely difficulties in managing a class action.

---

[7] Defendants do not raise a specific argument about the subclasses' state consumer protection
claims in their joint discussion of predominance.  *See* (Doc. # 610.)
[8] Because the Court already concluded that Plaintiffs' proposed nationwide State-Claim Class
fails to meet the prerequisites of Rule 23(a) and therefore cannot be certified, the Court need
not address it here.

*Id*. In the Tenth Circuit, these factors are non-exhaustive. *Wilcox v. Commerce Bank of Kansas City*, 474 F.2d 336, 345 (10th Cir. 1973). Class treatment is superior in this jurisdiction if "it will 'achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or brining about other undesirable results.'" *CGC Holding Co., LLC*, 773 F.3d at 1089 (quoting *Amchem*, 521 U.S. at 615).

Plaintiffs have satisfactorily demonstrated the superiority of class action. To the Court's knowledge, absent class members have not shown any interest in controlling the litigation of separate actions, and no other litigation regarding Plaintiffs' claims has been commenced. *See Pliego*, 313 F.R.D. at 127. Concentrating litigation of Plaintiffs' claims in a class action will avoid identical efforts across multiple suits in a number of state and federal courts. Class action is also the superior method for adjudicating this controversy "because it involves the relatively small claims of low-wage workers," some with limited English proficiency or currently living abroad, "and most of whom" were allegedly paid below the minimum wage. *Pliego*, 313 F.R.D. at 127 (holding that class action was superior to other vehicles where plaintiffs were current and former restaurant employees alleging violation of FLSA and the state minimum wage order.)

The Court also agrees with Plaintiffs that it is equipped to address any manageability challenges that may arise.[9] *See* (Doc. # 559 at 47.) Manageability is a critical concern in determining whether a class action is the superior means of adjudication, but "courts deny class certification on manageability grounds relatively

---

[9] The Court has and will continue to address challenges like identification and notification of class members as it adjudicates Plaintiffs' FLSA collective action. *See* (Doc. # 569.)

infrequently."  2 William B. Rubenstein, Newberg on Class Actions § 4:72 (5th ed.

2017).  Defendants' argument that differences in state law render this case

unmanageable as a class action falls flat.  *See* (Doc. # 610 at 45–48.)

First, Plaintiffs' proposed classes and subclasses turn on a single course of alleged

conduct by Defendants.  Many factual and legal issues related to this course of conduct

can be resolved collectively.  Second, courts routinely certify subclasses specific to

different states' laws, as Plaintiffs observe, (Doc. # 643 at 35–36 (collecting cases)).

*See, e.g.*, *In re Checking Account Overdraft Litigation*, 281 F.R.D. 667, 680 (S.D. Fla.

2012) (certifying thirteen subclasses to address minor variations in state law).

For these reasons, the Court concludes that class treatment of Plaintiffs' claims

"will 'achieve economies of time, effort, and expense, and promote uniformity of

decision as to persons similarly situated, without sacrificing procedural fairness or

brining about other undesirable results,'" *CGC Holding Co., LLC*, 773 F.3d at 1089

(quoting *Amchem*, 521 U.S. at 615), and is superior to other methods of adjudication.

Plaintiffs' proposed classes and subclasses satisfy both elements of Rule

23(b)(3) and are certified accordingly.  The Court need not reach Plaintiffs' alternative

argument that certification is also warranted under Rule 23(b)(2).  *See* (Doc. # 559 at

48–49.)

## C.   APPOINTMENT OF CLASS COUNSEL AND ORDER FOR A JOINT PROPOSED NOTICE AND NOTICE PLAN

An order that certifies a class action must also appoint class counsel under Rule

23(g).  Fed. R. Civ. P. 23(c)(1)(B).  Rule 23(g) requires courts to consider the following

in appointing class counsel:

(i) the work counsel has done in identifying or investigating potential claims in the action;
(ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;
(iii) counsel's knowledge of the applicable law; and
(iv) the resources that counsel will commit to representing the class.

Fed. R. Civ. P. 23(g)(1)(A).  Plaintiffs move the Court to appoint BSF and Towards Justice as co-class counsel.  (Doc. # 559 at 49–50.)  The Court agrees that BSF and Towards Justice have already put in a great deal of work into this action, have extensive experience in handling complex class action suits, are knowledgeable about relevant law, and have ample resources to vigorously advocate for Plaintiffs.  Additionally, the Court has already determined that BSF and Towards Justice will "fairly and adequately represent the interests of the class[es]."  *See supra*.  The Court therefore appoints BSF and Towards Justice co-class counsel in this matter.

The Court also grants Plaintiffs' request for an order regarding proposed notices and notice procedure, as described in the Conclusion below.  *See* (Doc. # 559 at 50.)

## IV.   <u>CONCLUSION</u>

For the reasons detailed above, the Court GRANTS IN PART Plaintiffs' Motion for Rule 23 Class Certification and Appointment of Class Counsel (Doc. # 559).  Having found the requirements of Rule 23(a) and Rule 23(b)(3) satisfied, the following proposed classes and subclasses, as defined below, are certified under Federal Rule of Civil Procedure 23:

i.   **Antitrust Class**: All persons sponsored by any Defendant to work as a standard *au pair* in the United States pursuant to a J-1 Visa.

ii.  **RICO Class**: All persons sponsored by Defendants Au Pair in America (American Institute for Foreign Study), AuPairCare, Inc., Cultural Care, Inc., or InterExchange, Inc. to work as a standard *au pair* in the United States pursuant to a J-1 Visa.

iii.  **Florida Training Subclass**: All persons subjected to unpaid standard *au pair* training by Defendant Expert Group International, Inc. in Florida.

iv.  **New York Training Subclass**: All persons subjected to unpaid standard *au pair* training by Defendants Au Pair in America (American Institute for Foreign Study), Cultural Care, Inc. or InterExchange, Inc. in New York.

v.  **New Jersey Training Subclass**: All persons subjected to unpaid standard *au pair* training by Defendant AuPairCare in New Jersey.

vi.  **Au Pair in America California Subclass**: All persons sponsored by Defendant Au Pair in America (American Institute for Foreign Study) to work as a standard *au pair* in the State of California pursuant to a J-1 Visa.

vii.  **Au Pair in America Illinois Subclass**: All persons sponsored by Defendant Au Pair in America (American Institute for Foreign Study) to work as a standard *au pair* in the State of Illinois pursuant to a J-1 Visa.

viii.  **AuPairCare Michigan Subclass**: All persons sponsored by Defendant AuPairCare, Inc. to work as a standard *au pair* in the State of Michigan pursuant to a J-1 Visa.

ix. **AuPairCare Pennsylvania Subclass**: All persons sponsored by Defendant AuPairCare, Inc. to work as a standard *au pair* in the Commonwealth of Pennsylvania pursuant to a J-1 Visa.

x. **Cultural Care Maryland Subclass**: All persons sponsored by Defendant Cultural Care, Inc. to work as a standard *au pair* in the State of Maryland pursuant to a J-1 Visa.

xi. **Cultural Care Massachusetts Subclass**: All persons sponsored by Defendant Cultural Care, Inc. to work as a standard *au pair* in the Commonwealth of Massachusetts pursuant to a J-1 Visa.

xii. **Cultural Care Pennsylvania Subclass**: All persons sponsored by Defendant Cultural Care, Inc. to work as a standard *au pair* in the Commonwealth of Pennsylvania pursuant to a J-1 Visa.

xiii. **Cultural Care Texas Subclass**: All persons sponsored by Defendant Cultural Care, Inc. to work as a standard *au pair* in the State of Texas pursuant to a J-1 Visa.

xiv. **Cultural Care Utah Subclass**: All persons sponsored by Defendant Cultural Care, Inc. to work as a standard *au pair* in the State of Utah pursuant to a J-1 Visa.

xv. **Cultural Care Virginia Subclass**: All persons sponsored by Defendant Cultural Care, Inc. to work as a standard *au pair* in the Commonwealth of Virginia pursuant to a J-1 Visa.

xvi.   **Expert Au Pair Colorado Subclass**: All persons sponsored by Defendant

Expert Group International, Inc. to work as a standard *au pair* in the State of

Colorado pursuant to a J-1 Visa.

xvii.   **GoAuPair Maryland Subclass**: All persons sponsored by Defendant Associates

in Cultural Exchange (d/b/a GoAuPair) to work as a standard *au pair* in the State

of Maryland pursuant to a J-1 Visa.

xviii.   **InterExchange Colorado Subclass**: All persons sponsored by Defendant

InterExchange, Inc. to work as a standard *au pair* in the State of Colorado

pursuant to a J-1 Visa.

It is

FURTHER ORDERED that Plaintiffs' Motion for Rule 23 Class Certification and

Appointment of Class Counsel (Doc. # 559) is DENIED IN PART as to Plaintiffs'

proposed nationwide State-Claim Class.  It is

FURTHER ORDERED that Boies Schiller Flexner LLP and Towards Justice are

appointed co-class counsel.  It is

FURTHER ORDERED that the parties confer regarding class notice procedures.

The parties submit proposed notices and a proposed notification plan within ten (10)

days of this Order.  The parties are directed to reach agreement on as many issues as

possible and set forth their proposals and points of dispute in a concise joint filing.

DATED:  February 2, 2018

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge

# EXHIBIT 4

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1: 14-cv-03074-CMA-KMT

JOHANA PAOLA BELTRAN; et al.

        Plaintiffs,

v.

INTEREXCHANGE, INC.; et al.

        Defendants.

---

**DECLARATION OF NATALIE WEST**

---

    I, Natalie West, declare as follows:

    1.    I am over 21 years of age, of sound mind, and have personal knowledge of the matters set forth in this Declaration.

    2.    I am an attorney at Wheeler Trigg O'Donnell LLP, which represents Defendants American Cultural Exchange, LLC d/b/a Go Au Pair and Go Au Pair Operations LLC (collectively, "Go Au Pair") in the above-captioned case.

    3.    On or about June 26, 2017, Plaintiffs produced the results of a survey that was disseminated to host families for au pairs sponsored by Defendants ("Plaintiffs' Stipend Survey").[1] These results are contained in an Excel file, which was produced in

---

[1] For the reasons stated in Defendants' Motion to Exclude the Testimony of William O. Kerr Pursuant to F.R.E. 702 ("Defs.' Rule 702 Mot.") and Defendants' Response in Opposition to Plaintiffs' Motion for Rule 23 Class Certification ("Defs.' Joint Opp'n"), both filed July 17, 2017, Plaintiffs' Stipend Survey is flawed, unreliable, and inadmissible

native format as RFP000733. Due to its size, Go Au Pair has not converted and filed this Excel file as a PDF, but will provide it (or the relevant portions) to the Court if requested.

4.      Plaintiffs' Stipend Survey asked host families to identify the amount of the weekly stipend they paid their au pairs, as well as other related information. In particular, host families were asked to provide "the typical weekly stipend amount paid to the au pair" in a specific dollar amount. (Aff. of William O. Kerr, Ph.D. ("Kerr Aff.") ¶ 7 (attached as Exhibit 151 to the Decl. of Sean P. Rodriguez in Supp. of Pls.' Mot. for Rule 23 Class Cert.) [ECF No. 560-68].)

5.      Additionally, the raw survey results produced by Plaintiffs show that respondents were also given the opportunity to state that they did not recall the specific stipend amount and to identify an approximate amount. (*See* Defs.' Joint Opp'n, Ex. X.) Respondents using this field identified approximate stipend amounts in increments of $50 (i.e., $150, $200, $250, $300).

6.      Only 207 of the roughly 8,827 responses came from host families for au pairs sponsored by Go Au Pair ("Go Au Pair Host Families"). Of these 207 responses, 14 came from Go Au Pair Host Families for EduCare au pairs, a DOS-created category of au pairs that is not relevant to this litigation.

7.      Of the remaining 193 responses from Go Au Pair Host Families, 38 indicated that they paid their au pairs over $200 per week. These responses include

under Federal Rule of Evidence 702. (Defs.' Rule 702 Mot. 11-15; Defs.' Joint Opp'n 10.)

Appellate Case: 18-703    Document: 01019947010    Date Filed: 02/20/2018    Page: 5

those stating a specific stipend amount over $200 (25 responses) and those indicating

an approximate amount of $250 (11 responses) or $300 (two responses). In sum,

19.7% of responses from Go Au Pair Host Families indicated that they paid their au

pairs over $200 per week.

8.      I declare under penalty of perjury that the foregoing is true and correct.


Executed on July 17, 2017.

_Natalie West_

_____

Natalie West

# EXHIBIT 6

**EXHIBIT D**

8/28/2016

**REDACTED**

Go Au Pair Operation... Internal

Bill Kapler

💟 GO AU PAIR    Search..    Search    Go Au Pair Sales

Home | Knowledge | Campaigns | Leads | Accounts | Contacts | Opportunities | Cases | Reports | Dashboards | Products | Flights | Pardot | Surveys Au Pair

Surveys Au Pair
## SurvAP1403438

Customize Page | Edit Layout | Printable View | Help for this Page

Activity History [0]

### Surveys Au Pair Detail

Edit | Delete | Clone

#### Survey Name

| | | | |
|---|---|---|---|
| Survey Code | AP6Wk - FT | Record Type | AP6Wk [Change] |
| Survey Preview in Qualtrics | AP 6 Week | | |

#### Information

| | | | |
|---|---|---|---|
| Au Pair | Ivette Alexandra Gonzalez Cortes | Opportunity | Sanders, Monte & Patrice |
| Employee | Crystal Hardman | LAR | Amanda Gray |

#### Audit - Schedule

| | | | |
|---|---|---|---|
| AUD.SCH.005.Q | Did you work 45 hours or less per week (30 hours for EduCare)? | AUD.SCH.005.A | Yes |
| AUD.SCH.025.Q | Did you have at least 1.5 days of each week? | AUD.SCH.025.A | Yes |
| AUD.SCH.030.Q | Did you have at least 1 weekend off? | AUD.SCH.030.A | Yes |
| AUD.SCH.010.Q | How many hours per week, on average, did you work? | AUD.SCH.010.A | 40 |
| AUD.SCH.015.Q | How many hours per day, on average, did you work? | AUD.SCH.015.A | 8 |
| AUD.SCH.020.Q | How many days per week did you work more than 10 hours per day? | AUD.SCH.020.A | 0 |

#### Audit - Stipend

| | | | |
|---|---|---|---|
| AUD.STP.005.Q | Were you being paid a weekly stipend of at least $195.75 ($146.81 for EduCare Au Pairs)? | AUD.STP.005.A | Yes |
| AUD.STP.010.Q | How much was your weekly stipend? | AUD.STP.010.A | $195-$214 |
| AUD.STP.015.Q | How often were you being paid your weekly stipend? | AUD.STP.015.A | Every two weeks |

#### Audit - Room

| | | | |
|---|---|---|---|
| AUD.RO.005.Q | Did you have a private room with a door? | AUD.RO.005.A | Yes |

#### Regulations - Room

| | | | |
|---|---|---|---|
| REG.RO.010.Q | Please describe your room. | REG.RO.010.A | I love my room is comfortable, quiet, beautiful, big. I have wardrobe, tv, big bed , my private bathroom. And I have natural panoramic in my window. My room have a door that connexion with the yard and pool. I really I love my room. |

#### Regulations - Responsibilities

| | | | |
|---|---|---|---|
| REG.RSP.005.Q | Were your work responsibilities within the program regulations? | REG.RSP.005.A | Yes |
| REG.RSP.010.Q | If no, please explain (Were your work responsibilities within the program regulations?) | REG.RSP.010.A | |

#### Regulations - Education

| | | | |
|---|---|---|---|
| REG.EDU.005.Q | What is your status for the educational requirement? | REG.EDU.005.A | I have registered for class |
| REG.EDU.010.Q | What is your confidence level that you will complete the educational requirement? | REG.EDU.010.A | Excellent |
| REG.EDU.015.Q | Please explain any concerns you may have about completing the educational requirement | REG.EDU.015.A | If possible make to degree |

#### Audit - Training - First Time Au Pairs Only

| | | | |
|---|---|---|---|
| AUD.TRN.005.Q | Did you complete the Au Pair training program (32 hours) prior to arriving to your Host Family? | AUD.TRN.005.A | Yes |
| AUD.TRN.010.Q | Did your Au Pair training program include 8 hours of child safety and 24 hours of child development instruction? | AUD.TRN.010.A | Yes |

#### Satisfaction - Headquarters - First Time, Ext-Trans, Transition Au Pairs Only

| | | | |
|---|---|---|---|
| SAT.HQ.005.Q | Please describe the arrival processes supplied by Go Au Pair: Arrival details | SAT.HQ.005.A | 4 |
| SAT.HQ.010.Q | Please describe the arrival processes supplied by Go Au Pair: Flight / travel support | SAT.HQ.010.A | 4 |
| SAT.HQ.015.Q | Please describe the arrival processes supplied by Go Au Pair: Timeliness of response | SAT.HQ.015.A | 4 |
| SAT.HQ.020.Q | Please explain positive services and / or suggested improvements | SAT.HQ.020.A | Always the agency has taken special attention with me |

**REDACTED**

CONFIDENTIAL

Exhibit #: 109
Name: Gonzalez
Rptr: DV  Date: 9/28/16
Stevens-Koenig Reporting

GAP_00003919

1/3

8/28/2016

REDACTED

**Marketing - Local - First Time, Ext-Trans, Transition Au Pairs Only**

| | | Opportunity Location | Finksburg, MD (Baltimore) |
|---|---|---|---|
| MAR.LOC.005.Q | Please describe your adjustment to life in your local community in <<Location>>. | MAR.LOC.005.A | Good |
| MAR.LOC.010.Q | Please explain your ranking  (Please describe your adjustment to life in your local community in the U.S.) | MAR.LOC.010.A | I have few time here I need know more  But my family help me every day |

**Satisfaction - Host Family**

| | | | |
|---|---|---|---|
| SAT.HF.005.Q | Please describe your experience with your Host Family: Your relationship with the children | SAT.HF.005.A | 4 |
| SAT.HF.010.Q | Please describe your experience with your Host Family: Your relationship with the parents | SAT.HF.010.A | 4 |
| SAT.HF.015.Q | Please describe your experience with your Host Family: Your life in the Host Family's home | SAT.HF.015.A | 4 |
| SAT.HF.025.Q | Please describe your experience with your Host Family: Matched your expectations based on what you learned about the family before your arrival | SAT.HF.025.A | 4 |
| SAT.HF.020.Q | Please describe your experience with your Host Family: Overall | SAT.HF.020.A | 4 |
| SAT.HF.030.Q | Please explain positive experiences and / or suggested improvements. (Please describe your experience with your Host Family:) | SAT.HF.030.A | I love my family because help me every day, they Understand that is a program of culture exchange I love the baby girl is so quiet. Cute,beautiful, and I like that my family sanders try to learn my language and I like because I feel same that in Colombia house's Also the Sanders family bring me a lot opportunities for my personal growing |

**Audit - LAR**

| | | | |
|---|---|---|---|
| AUD.LAR.005.Q | Did your LAR contact you within 48 hours of your arrival to your Host Family? | AUD.LAR.005.A | Yes |
| AUD.LAR.010.Q | Did your LAR conduct the in-person Orientation with you and your Host Parents? | AUD.LAR.010.A | Yes |

**Regulations - LAR**

| | | | |
|---|---|---|---|
| REG.LAR.005.Q | How many cultural events arranged by your LAR have you attended? | REG.LAR.005.A | 1 |

**Satisfaction - LAR**

| | | | |
|---|---|---|---|
| SAT.LAR.040.Q | What cultural event would you like your LAR to hold? | SAT.LAR.040.A | Watching a good movie |
| SAT.LAR.005.Q | Please describe the quality of service you have received so far from your LAR: Helping you find local schools | SAT.LAR.005.A | 1 |
| SAT.LAR.010.Q | Please describe the quality of service you have received so far from your LAR: Helping you meet other Au Pairs or friends in the area | SAT.LAR.010.A | 4 |
| SAT.LAR.015.Q | Please describe the quality of service you have received so far from your LAR: Helping you learn more about your local area and the U.S. | SAT.LAR.015.A | 2 |
| SAT.LAR.020.Q | Please describe the quality of service you have received so far from your LAR: Helping you and your Host Family build a good relationship | SAT.LAR.020.A | 4 |
| SAT.LAR.025.Q | Please describe the quality of service you have received so far from your LAR: The in-person Orientation with your Host Family | SAT.LAR.025.A | 4 |
| SAT.LAR.030.Q | Please describe the quality of service you have received so far from your LAR: Overall | SAT.LAR.030.A | 4 |
| SAT.LAR.035.Q | Please explain positive services and / or suggested improvements  (Please describe the quality of service you have received so far from your LAR) | SAT.LAR.035.A | Maybe more accompanying |

**Satisfaction - IR - First Time Au Pairs Only**

| | | IR | Intercambios y Turismo Ltda |
|---|---|---|---|
| SAT.IR.005.Q | Please describe the quality of service you received from the agency in your home country: Personal attention and support | SAT.IR.005.A | 4 |
| SAT.IR.010.Q | Please describe the quality of service you received from the agency in your home country: Timeliness of response | SAT.IR.010.A | 4 |
| SAT.IR.015.Q | Please describe the quality of service you received from the agency in your home country: Knowledge of the Au Pair program | SAT.IR.015.A | 4 |
| SAT.IR.020.Q | Please describe the quality of service you received from the agency in your home country: Explaining the purpose of the Au Pair program to me | SAT.IR.020.A | 3 |
| SAT.IR.025.Q | Please describe the quality of service you received from the agency in your home country: Helping me achieve my goals as an Au Pair | SAT.IR.025.A | 2 |
| SAT.IR.030.Q | Please describe the quality of service you received from the agency in your home country: During the Mutual Match process | SAT.IR.030.A | 4 |
| SAT.IR.035.Q | Please describe the quality of service you received from the agency in your home country: During the embassy appointment and visa process | SAT.IR.035.A | 4 |
| SAT.IR.040.Q | Please describe the quality of service you received from the agency in your home country: Overall | SAT.IR.040.A | 4 |
| SAT.IR.045.Q | Please explain positive services and / or suggested | SAT.IR.045.A | the agency had a good service with me in Colombia, I am so |

REDACTED

2/3

CONFIDENTIAL

Case No. 1:14-cv-03074-CMA-KMT Document 661-7899-12 filed 07/17/17 filed 02/20/18 USDC Colorado pg 4 of 49
Case 1:14-cv-03074-CMA-KMT Document 661-7899-12 Filed 07/17/17 USDC Colorado Page 4 of 4
of 49
Appellate Case: 18-703    Document: 01019947012    Date Filed: 02/20/2018    Page: 5

8/28/2016

**REDACTED**

| | | |
|---|---|---|
| | Improvements (Please describe the quality of service you received from the agency in your home country:) | grateful with the quality service. But my advice is that the agency must be more clear with the status Visa J1 and make the warning about the possible prices that in the colleges exist per classes, also that the prices depend of the visa status |
| SAT.IR.050.Q | Would you recommend <IR NAME> to a friend? | SAT.IR.050.A Yes |

**Reviewed Information**

| | | | |
|---|---|---|---|
| ReviewedBy-DirIR | Meghan Ramirez | ReviewedBy-ExecDir | Devon Kapler |
| ReviewedDt-DirIR | 9/11/2014 6:48 PM | ReviewedDt-ExecDir | |
| ReviewedResult-DirIR | None | ReviewedResult-ExecDir | |
| | | | |
| ReviewedBy-EduCoord | Whitney Wilson | ReviewedBy-PC | |
| ReviewedDt-EduCoord | 10/8/2014 11:22 AM | ReviewedDt-PC | |
| ReviewedResult-EduCoord | No Action Taken | ReviewedResult-PC | |
| | | | |
| ReviewedBy-LARCoord | Erin Mortensen | | |
| ReviewedDt-LARCoord | 9/17/2015 1:50 PM | | |
| ReviewedResult-LARCoord | Tanna reviewed | | |
| | | | |
| ReviewedBy-Marketing | | | |
| ReviewedDate-Marketing | | | |
| ReviewedResult-Marketing | | | |
| InterviewRqstStat | | | |
| | | | |
| ReviewedBy-MngDir | Tanna Wilson | | |
| ReviewedDt-MngDir | | | |
| ReviewedResult-MngDir | | | |
| Created By | Sys Admin, 9/7/2014 12:06 PM | Last Modified By | Tanna Wilson, 9/17/2015 1:50 PM |
| | | Surveys Au Pair Name | SurvAP1403438 |

Edit | Delete | Clone

**Activity History**    Log a Call | Mail Merge | Send an Email    Activity History Help

No records to display

∧ Back To Top    Always show me    more records per related list

**REDACTED**

**REDACTED**

CONFIDENTIAL

3/3

GAP_00003921