# THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Case No. 14-cv-03074-CMA-KMT

JOHANA PAOLA BELTRAN, *ET AL.*

    Plaintiffs,

v.

INTEREXCHANGE, INC., *ET AL.*

    Defendants.

---

**PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTIONS TO JUDGE TAFOYA'S RULING ON *DAUBERT* MOTION [D.E. 813]**

---

i

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................................................... 1

FACT AND PROCEDURAL BACKGROUND................................................................... 2
    I.    The Allegations and How the Damages Models Fit Them.................................... 2
    II.    The Host Family Survey and Defendants' "Survey Design" Expert ................... 3
    III.    Judge Tafoya Held a One Hour, Thirty-Eight Minute Hearing Where She Challenged Both Sides ........................................................................................... 5

LEGAL STANDARD .............................................................................................................. 5

ARGUMENT............................................................................................................................ 5
    I.    Defendants Cannot Escape Antitrust Liability or Damages By Converting Their Conspiracy Into "Just" A Wage Law Violation ............................................. 5
        A.    Defendants' Theory Confuses Price Fixing Conduct with One of Its Results— Below-Minimum Wage Pay ............................................................................ 5
        B.    Antitrust Injury Exists When Price-Fixing Suppresses Wages ....................... 7
        C.    Defendants' Antitrust-Wage Law Dichotomy Violates Basic Principles of Causation and Damages................................................................................... 9
    II.    Judge Tafoya Correctly Ruled that the Competition Model is Reliable............. 10
    III.    Judge Tafoya Did Not Need To Find Any Further Facts Regarding Defendants' Survey Contentions—Which Are Baseless In Any Event.......................................... 13

CONCLUSION ...................................................................................................................... 15

## PRELIMINARY STATEMENT

Defendants underlying evidentiary motion (the "Motion") has metastasized into a challenge on the antitrust merits, joined to two *Daubert* arguments. Judge Tafoya correctly ruled on all three points. *See* D.E. 813 (the "Order").

*First*, Defendants try to revive an idea the Court has already rejected at this stage: The notion that Defendants can avoid antitrust liability or damages because their anticompetitive conduct (a conspiracy to fix prices) resulted in their violating additional, independent laws (wage-and-hour laws, among others). Just as two wrongs cannot make a right, antitrust law does not forgive a *per se* illegal conspiracy simply because the conspiracy's operation involved committing other wrongs. The reasons are equal parts commonsense and hornbook law on antitrust harm, causation, and damages.

*Second*, Defendants contend that a damages model must be able to quantify damages at the class certification, before discovery is complete. Here, as often, the class certification proceedings preceded the end of discovery. But Defendants obstructed discovery to a degree not often seen in federal court. When it came time for the certification stage Plaintiffs and their expert had incomplete data. So Plaintiffs and their experts did exactly what the law requires and everything they could do: Provide a sound damages model—the type regularly accepted by the Courts—identify all the inputs necessary, demonstrated its operation with the best data available before the close of discovery, and explained how the model would be calibrated, and how it would generate reliable, classwide results.

*Third*, Defendants challenge the "design" of a survey used in Dr. Kerr's damages model. At the certification stage, Plaintiffs offered preliminary results of a survey of host families: Across the country, over about 10 years, and across J-1 visa sponsors, there was only +/- 2.5% variation from a weekly stipend of $195.75. Thus, according to the host families themselves, they paid very nearly all their *au pairs* approximately the same

1

amount, precisely as Plaintiffs have claimed since the inception of this case. That result is nearly impossible in a market where competition exists.

For all those reasons Defendants did not want to talk about the survey issues at oral argument before Judge Tafoya. *See* Ex. 1, at 17:7-17. Instead Judge Tafoya engaged with the parties for almost one hour and thirty-eight minutes, almost entirely on Defendants' antitrust-wage law dichotomy. Ex. 1 at 1, 66. That was a remarkable indulgence: Defendants' Motion did not argue anything an antitrust-wage dichotomy. They invented it after Plaintiffs' Opposition was filed.

## FACT AND PROCEDURAL BACKGROUND

### I. The Allegations and How the Damages Models Fit Them

In its order on Defendants' motion to dismiss, this Court accurately summarized Plaintiffs' allegations that minimum wages create a "floor" beneath which wages could not fall in any but-for world. D.E. 258 at 4; *see also id*. at 32 (noting that the wage-floor concept was "undisputed," at least as to the fraud claims). As the Court correctly noted, the "wage floor" theory is a contention in the alternative. *Id*. at 32 n.25. First and foremost, Plaintiffs contend that, but for Defendants' conduct, *au pairs*' wages would have increased to levels more consistent with alternative childcare providers (such as nannies, who also provide live-in childcare, and who are paid above minimum wages, because people compete to attract the best quality employees when they invite a stranger into their home). In the event the factfinder should conclude otherwise (for example, by crediting the "oversupply" argument Defendants reference, Obj. at 6), then **but for** the conspiracy *au pairs*' wages would necessarily rise to the relevant state or federal minimum wage. After all, minimum wage law is a fact about the real world. And damages but-for worlds differ from the real world only by removing the challenged conduct and their proximate results.

Plaintiffs' competition, economics, and damages expert, Dr. William Kerr

2

constructed alternative damages models to fit either of those two merits determinations. The first, the so-called "Compliance" model, uses the relevant minimum wage as the measure of damages. The second (termed the "Competition" model) estimates what *au pair* wages would be, using data collected from market participants. Since Defendants' conspiracy broke the mechanism of price competition, there is no period or geography where U.S. *au pair* wage competition played out. Thus, it was necessary for Dr. Kerr to identify, obtain, assess—and ultimately use—the best available data with which to estimate *au pair* levels in a competitive market.

Class certification briefing in this case came, as is often the case, before the close of fact discovery. At the time Plaintiffs were preparing their class certification briefing, the only data Dr. Kerr had available to him was public data. Dr. Kerr and his team assessed data from the International Nanny Association, the federal Bureau of Labor Statistics, and other sources. Meanwhile, Defendants were litigating against Plaintiffs' counsel to keep them from obtaining data about Defendants' own finances—including their price and cost data over time.[1]

Thus, Dr. Kerr designed the damages models at the class stage, explained how they worked, and showed that his models would generate classwide answers on damages. D.E. 649-1 at §§ III-IV. He lacked the variables he ultimately used, since fact discovery was ongoing, and therefore could not calibrate the model so that it could generate quantitative answers. *Id*. at ¶¶ 11-12.

## II.     The Host Family Survey and Defendants' "Survey Design" Expert

Defendants themselves take surveys in the ordinary course to ensure that *au pairs* are being paid the fixed price. *See* D.E. 639-2 at Appx. B, p. 1-2. There is voluminous evidence that confirms the reality. Dr. Kerr intended to conduct surveys to

---

[1]     Indeed Defendants' production of financial information remains incomplete. On February 16, 2018, after finding that defendant "AIFS materially misrepresented the availability of its financial information", the Court ordered AIFS to produce the information by March 2, 2018. *See* D.E. 858 at 7, 12.

3

corroborate and confirm those facts, and to provide even more granular evidence of the efficacy of Defendants' conduct.  After Defendants finally produced the host family contact information, more than two years after Plaintiffs originally requested it (D.E. 465 at 1 & D.E. 467), Dr. Kerr and his team were finally able to execute one of those surveys—less than one month before the class certification motion was due.  *See* D.E. 649-3 at ¶ 8; D.E. 649-6 at 349:16-350:8.

The first, pre-class certification survey was of host families.  Every host family for which Defendants provided an email got a survey.  In other words, Defendants effectively chose the sample of survey recipients, and there was "no sampling involved at all" by Dr. Kerr.  D.E. 649-6 at 346:3-10.  The resulting data can be broken down by year, by state where the *au pair* worked, and by Defendant.  D.E. 649-8, Tables 1A, 1B, 2. Plaintiffs received responses from 8,806 families, of which 4,583 both (1) concerned an *au pair* within one of the alleged classes and (2) contained a specific response to the stipend question.  D.E. 649-3 at ¶ 8.  The responses covered every Defendant and almost every state.  D.E. 649-8, Table 1A-B.  They spanned 10 years.  *Id.* at 1-B.

Dr. Kerr's host family survey confirms and elaborates on what Defendants' own surveys, form contracts, business records, and other admissions showed:  there was only +/- 2.5% variation from a weekly stipend of $195.75.  D.E. 649-3 at ¶ 9. The results were consistent across the years, across Defendants, and in all the states.  D.E. 649-8 at Table 5A-B.

Defendants hired a putative expert, Dr. Lavrakas, to attack the survey's "design" in every way imaginable.  Most of the attacks were simply without basis, as Dr. Lavrakas did not review Dr. Kerr's actual affidavit before submitting his report.  D.E. 649-11 at 13:6-8.  Nor did he consider or review many volumes of data underlying the survey.  *See* D.E. at 649-10 at Ex. B; *see also* D.E. 649-11 at 123:14-124:11.

4

### III. Judge Tafoya Held a One Hour, Thirty-Eight Minute Hearing Where She Challenged Both Sides

Defendants filed their *Daubert* motion with their class opposition papers. D.E. 606, 613. It contained a small section arguing that the Compliance model was "nothing more than an unsupported legal conclusion." D.E. 606 at 9. Meanwhile, Defendants' principal class certification brief contained an argument that antitrust and minimum-wage laws are incompatible as a matter of law. D.E. 603 at 22-25. After Plaintiffs filed their reply on that, Defendants used their *Daubert* reply as something of a sur-reply on a supposed antitrust-wage law dichotomy. D.E. 701. This was the same theory the Plaintiffs addressed extensively in their class opposition. D.E. 603.

Judge Tafoya then heard the parties in a lengthy hearing. Defendants briefly mentioned the survey and "competition model," at the start of the hearing. Jan. 9, 2018 Hearing Tr. at 11:2-17:10 (Ex.1). Defendants then proceeded to convert the ostensibly evidentiary proceeding into a discourse on the merits of the antitrust claim—the nature of antitrust harm, causation principles, and damages doctrine. Judge Tafoya heard everything each side wanted. *Id*. at 63:21-64:4. She asked equally hard, and often skeptical, questions of both sides. *E.g.*, 27:21-34:24, 36:4-37:3; 39:7, 45:23-48:10

## LEGAL STANDARD

This Court recently reiterated the legal standard for review of a Magistrate Order. D.E. 843 at 6.

## ARGUMENT

### I. Defendants Cannot Escape Antitrust Liability or Damages By Converting Their Conspiracy Into "Just" A Wage Law Violation

#### A. Defendants' Theory Confuses Price Fixing Conduct with One of Its Results—Below-Minimum Wage Pay

Plaintiffs and Defendants agree that Judge Tafoya accurately identified the two ways that Defendants' anticompetitive conduct caused harm to the Plaintiffs:

5

> In this case, there is one theory of antitrust misconduct – that Defendants conspired to fix the weekly stipend payable to au pairs by their host family at $195.75. [ . . . ] Here, Plaintiffs identify two types of antitrust injury, the failure to pay au pairs at least a minimum wage as prescribed by law and the failure to pay au pairs comparable to other groups of childcare workers in the United States.

Order at 9 (quoted in part at Obj. 5.)

Judge Tafoya is right that there is "one theory of antitrust misconduct." As explained above, Defendants' single conspiracy consisted of two steps: *First*, agreeing to fix prices. That is *per se* illegal under antitrust law. *Second*, Defendants implemented and maintained the conspiracy by consistently lying about wages and using form contracts that made *au pairs* and host families agree to $195.75 per week. Order at 9. That uniform course of conduct was required because no reasonable *au pair* would agree to accept less pay than the law demands. Similarly, host families presumably do not want to break the law so they can get cheap labor. The second step is no less part of the conspiracy and violation than the first. It makes no difference that the object of the conspiracy was to fix wages so low they were below the minimum; or, put differently, in **addition** to antitrust harm the conspiracy's operation resulted in wage-and-hour law violations.

Judge Tafoya also correctly explained that the Compliance and Competition models are alternative damages measure, each for a different category of "antitrust injury"—that is, injury caused the one conspiracy. Order at 9. As Judge Tafoya noted, Dr. Kerr's approach is consistent with what *Comcast* teaches: he constructed two models of damages that correspond to two theories of antitrust injury. *Id.* at 9-10. In the Compliance Model, Plaintiffs prevail if they can show that but-for Defendants' conspiracy, *au pair* wages would have been at least the legal minimum wage. In the Competition Model, Plaintiffs prevail if they can show that wages would have risen above the minimum wage, but-for the conspiracy. In any event, "the existence of the

6

two separate damages models successfully remedies the problem the Supreme Court discussed in *Comcast*, *id.* at 10, and Defendants point to nothing in *Comcast* to the contrary.

### B.  Antitrust Injury Exists When Price-Fixing Suppresses Wages

Defendants challenge Judge Tafoya's findings principally by attempting to muddy the "antitrust injury" waters.  Obj. at 1-6.  Antitrust law protects consumers, competition, and the competitive process from certain categories of conduct (such as price fixing, which is *per se* illegal).  *Arizona v. Maricopa Cty. Med. Soc.*, 457 U.S. 332, 347-53 (1982); *see also United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 218, 221-22 (1940).  Persons harmed by that proscribed conduct suffer an antitrust injury.  *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1254-55 (10th Cir. 2014).  Persons paid a lower wage because of a price-fixing conspiracy suffer antitrust injury.  *Banks v. Nat'l Collegiate Athletic Ass'n*, 977 F.2d 1081, 1097 (7th Cir. 1992); *In re High-Tech Employee Antitrust Litig.*, 985 F. Supp. 2d 1167, 1180 (N.D. Cal. 2013) (Koh, J.).

After those correct premises, the Objections descend into pure sophistry:  They assert that because minimum-wage law is a form of economic regulation, it must be irreconcilable with a "freely competitive market" or what they called "competitive conditions."  Obj. at 1-2, 6.  Defendants disregard what antitrust law actually does (prohibits certain conduct that the law deems "agreements in restraint of trade" and "unreasonable restraints of trade") in order to "promote" competition among market actors.  15 U.S.C. §1.  Defendants replace the promotion of "competition" with a mandate for a particular kind of "freely competitive market" that excludes existing legal constraints (i.e., wage laws).

In Defendants' "free market" Randian utopia, any government intervention is inconsistent with a "market" economy, and so "competition" law cannot apply.  That violates basic precepts of antitrust law and decades of case law that confirms non-"free

market" government economic interventions are entirely compatible with antitrust law. *See, e.g., Nat'l Soc. of Prof'l Eng'rs v. U.S.*, 435 U.S. 679, 695 (1978); *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 595 (1976); *Otter Tail Power Co. v. U.S.*, 410 U.S. 366, 374 (1973). It is axiomatic that:

> merely because a particular practice might be actionable under tort law does not preclude an action under the antitrust laws as well. Anticompetitive conduct' can come in too many different forms, and is too dependent upon context, for any court or commentator ever to have enumerated all the varieties.

*Conwood Co., L.P., v. U.S. Tobacco Co.*, 290 F.3d 768, 784 (6th Cir. 2002) (internal quotations and citations omitted) (citing *Caribbean Broad. Sys. Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1087 (D.C.Cir.1998) (making misrepresentations to advertisers and the government in order to protect a monopoly can be anticompetitive)).

Employment law's and antitrust law's interactions in fact disprove Defendants' arguments. It took a series of federal statutes to exempt unions from the antitrust laws so that workers can make agreements that seek higher wages without violating the antitrust laws. *Los Angeles Meat & Provision Drivers Union, Local 626 v. United States*, 371 U.S. 94, 101-02 (1962) (citing Norris-LaGuardia Act). Even that exception is narrowly-tailored and one-sided (labor can engage in horizontal agreements, but employers remain subject to ordinary antitrust rules). *See id.* More recently, Congress passed a statute that exempts medical resident employment from some aspects of the antitrust law. 15 U.S.C. § 37b (2012). But price-fixing is so abhorrent to the law that the statute explains it must not "be construed to exempt from the antitrust laws any agreement . . . **to fix the amount of the stipend or other benefits** received by students" participating in the program. 15 U.S.C. § 37(b)(3) (emphases added).

As another example, "patent law" is in tension with antitrust in the sense that a patent secures a limited "monopoly" on an invention, and lets the patentee "exclude" competitors. *F.T.C. v. Actavis, Inc.*, 570 U.S. 136, 161 (2013). Patent law is therefore

8

equally incompatible with Defendants' anything-goes but-for world.  Nevertheless, patent law can be misused such that it constitutes a violation of "antitrust law"—and both antitrust and patent damages flow from that patent misconduct.  *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 116-25 (1969); *see also Actavis*, 570 U.S. at 148-150, 161 (quoting *United States v. Line Material Co.*, 333 U.S. 287, 311 (1948) (holding that patent settlement agreements are subject to antitrust scrutiny even if they do not exceed "the scope of the patent")).  In many such cases the damages are caused by a refusal to license patents for a "reasonable royalty," and damages may be measured by patent royalties. *See United States v. Glaxo Grp. Ltd.*, 410 U.S. 52, 59 (1973) (antitrust injunction mandating "reasonable-royalty licensing" is "well established"—"particularly where patents have provided the leverage for or have contributed to the antitrust violation adjudicated"); *Burlington Indus. v. Milliken & Co.*, 690 F.2d 380, 391 (4th Cir. 1982) ("royalties actually paid may serve as a prima facie estimate . . . of damages" and may be "ultimately adopted by the district court as the proper measure of damages").

Similarly, regulations can form barriers to market entry that can contribute to **antitrust** market power even though the regulator has nothing to do with "antitrust." *See United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 629 (1974) ("regulatory barriers to entry includ[ing] federal and state supervisory controls" over banks enhanced defendant's antitrust market power).  And "legal restrictions" are relevant to market definition, but they do not displace or control the traditional antitrust market definition analysis. *Bhan v. NME Hosps., Inc.*, 772 F.2d 1467, 1471 (9th Cir. 1985).  This is because antitrust law looks to market realities.

### C. Defendants' Antitrust-Wage Law Dichotomy Violates Basic Principles of Causation and Damages

Defendants construct a but-for world that deviates from the real world in ways not caused by the challenged conduct—namely, they argue (contra the motion to dismiss

9

order, D.E. 258 at 4, 32) that minimum wage law cannot be a damages "floor." First-year torts students can spot the mistake: Damages are assessed against a but-for world that differs from the real world only by excluding the wrongful conduct and events that it proximately caused. *See Los Angeles Memorial Coliseum Com'n v. Nat'l Football League*, 791 F.2d 1356, 1367 (9th Cir. 1986) ("an award of damages should put a plaintiff forward into the position it would have been 'but for' the defendant's violation of the law") (citing *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264 (1946) (antitrust damages measured by "comparison of profits, prices and values as affected by the conspiracy, with what they would have been in its absence under freely competitive conditions")). Antitrust (and RICO) follow those basic rules. *Id*.

Thus, to mirror the existing world 'but-for' the anticompetitive conduct, the but-for world must take into account whatever federal, state and local regulations, taxes, minimum wage laws, or other policies impact the relevant market and its prices. Minimum wage laws are a fact in the world. They were not caused by Defendants' wrongful conduct, and therefore must remain part of the but-for world. Just as in the real world, they set a "floor" on *au pair* pay. There is no rule of law that cuts off "antitrust" merely because it intersects with another area of law. The patent law cases discussed above confirm this.

## II.   Judge Tafoya Correctly Ruled that the Competition Model is Reliable

Defendants next argue that Judge Tafoya erred by not applying a "full and stringent application of *Daubert*" to Dr. Kerr's Competition model. Obj. at 8. Defendants claim that because the Tenth Circuit has not addressed the expert-evidence requirement at the class certification stage post-*Comcast*, under the standard from other courts in other circuits, "incomplete" expert opinions can never satisfy *Daubert*. *Id*. at 9.

Defendants misapprehend *Daubert*. The standard requires an expert must be qualified, and the proffered opinion must rest on reliable methods reliably applied. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 588, 592-94 (1993); *Norris v. Baxter Healthcare Corp.,* 397 F.3d 878, 881-84 (10th Cir. 2005). Provided the expert testimony rests on "'good grounds,' based on what is known," the *Daubert* test generally sends the dispute to the jury. See *Daubert*, 509 U.S. at 590-91.

*Daubert* is always applied in a manner cognizant of the facts that discovery may not be complete and that the Court may alter its certification decision if the facts change. See *In re Zurn Pex Plumbing Prod. Liab. Litig.*, 644 F.3d 604, 612 (8th Cir. 2011); *see also Daubert*, 509 U.S. at 590 (the *Daubert* inquiry searches for "good grounds, based on what is known"). The Supreme Court recently confirmed this commonsense and long-standing approach in the class certification context. *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036 (2016). A class damages model supports class certification even if "[r]easonable minds may differ as to whether the average" output by a model "is probative as to" the actual damages figure for each class member. *Tyson Foods,* 136 S. Ct. at 1049. "Resolving that question, however, is the near-exclusive province of the jury," and so a District Court can deny class certification for lack of an adequate classwide damages model "only if it conclude[s] that no reasonable juror could have believed" the model and its output. *Id.*

Moreover, none of the cases Defendants cite support their view. Defendants rely mainly on *In re Blood Reagents Antitrust Litigation*, 783 F.3d 183 (3d Cir. 2015), where the Third Circuit held that *Daubert* should be applied to expert opinions to determine whether Rules 23(a) and (b) have been satisfied. *Id.* at 187. The Court did not adopt the categorical approach Defendants seek (that expert discovery must be complete and expert models must be proven to establish classwide liability); it only said that the evidence must be reliable under *Daubert*, and remanded to the district court for

11

consideration of the reliability prong. *Id.* To be reliable does not necessarily mean that the expert's model is finished or complete, or that all discovery and data has been gathered and analyzed. The Third Circuit never said that. Indeed it expressly declined to weigh in on the question of how much *Daubert* analysis is required at the class certification stage. *Id.* at 188 n.3 ("We have no occasion to examine whether there might be some variation between" the *Daubert* formulations adopted by the Seventh and Eighth Circuits). Nor did the courts in the other cases Defendants cite. In each, the courts applied some version of *Daubert* to include or exclude class certification evidence. *See, e.g.*, *Navelski v. Int'l Paper Co.*, 244 F. Supp. 3d 1275, 1285 (N.D. Fla. 2017) (applying a "full" *Daubert* analysis to exclude one expert, and admit two others); *Hughes v. The Ester C Company*, 317 F.R.D. 333, 340 (E.D.N.Y. 2016) ("it is proper to apply the *Daubert* standard at the class certification stage…[b]ut the scope of the *Daubert* analysis is cabined by its purpose and the inquiry is limited to whether or not the expert reports are admissible to establish the requirements of Rule 23") (citations and quotation marks omitted); *see also In re Rail Freight Fuel Surcharge Antitrust Litigation*, 2017 WL 5311533, at *11 (D.D.C. 2017) (noting the *Daubert* requires expert opinions to be "reliable" not just "workable").

Most fundamentally, none of Defendants' attempts to create a new standard or sow confusion about the correct standard matter. No matter the standard, Dr. Kerr's pass muster. Judge Tafoya undertook a detailed reliability review under *Daubert*, as was befitting of the facts and circumstances of this litigation. Though they are dissatisfied with the outcome of her review, it is disingenuous to say that *Daubert* and related Rule 702 were not applied here "stringent[ly]". Judge Tafoya spent six pages of her Order analyzing the reliability of Dr. Kerr's opinions and model, and concluded that although all the facts had not been gathered and the data were incomplete (while discovery was ongoing at the time), the model was sound. Order at 16.

### III. Judge Tafoya Did Not Need To Find Any Further Facts Regarding Defendants' Survey Contentions—Which Are Baseless In Any Event

As for the survey, Defendants' first challenge is that Judge Tafoya erred because she considered "the merits,"[2] rather than "admissibility." Obj. at 15. The reason, as the Order explains, is that the Motion could be fully disposed of without ruling on the Motion's survey branch. Obj. at 11-12; Order at 6-7, 16-17.

Defendants' Motion sought to exclude all opinions Dr. Kerr offered at class certification—*i.e.*, the models and their appropriateness. See Mot. at 1, 9; Reply at 10. Defendants challenged both models. Mot. at 1-11. They said the ultimate opinions rested on inappropriate "assumptions," relied on "anecdotes" (Mot. at 3, 9), that the Compliance model was "a mere legal conclusion" (Mot. at 8-9), and that the Compensation model was "not a damages model." Mot. at 10. The Motion also included a section dedicated to one aspect of Dr. Kerr's models—a host family survey. Mot. at 11-25. The survey results at that time were preliminary because Defendants, after resisting for months, had only recently been ordered to produce the information necessary for it. Opp. at 4 (collecting history).

The survey was one component of the Compensation model, and the model worked regardless whether the survey or other data were the primary data.[3] Plaintiffs explained that in the *Daubert* proceedings. *E.g.*, Opp. at 2, 9-11; *see also* Rodr. Decl.

---

[2] It is unclear whether "merits" in this part of Defendants' brief refers to the substance of the class certification decision's "merits," the merits of the underlying claims, or both. Plaintiffs assume it means both for purposes of this filing.

[3] Defendants improperly cite one page from Dr. Kerr's merits deposition—which took place about 4 months after the class certification briefing, and after merits reports are complete. The Court should reject that attempt to expand the record beyond what was before Judge Tafoya. In the event the Court considers extra-record contentions, Plaintiffs request an opportunity to show the actual facts: Defendants fought for months before they were ordered to produce the financial produce data that Dr. Kerr ultimately combined with the final host family survey data, and cross checked against another survey (an au pair survey, another piece of evidence Defendants obstructed in discovery), as well as extensive other evidence. The result was an expanded, more robust version of the model offered at class certification. The exhibit Defendants improperly submitted explain exactly that. Obj., Ex. C at 14:9-15:5.

13

Exhibit 1 at 21:8-11.  So did this Court in its class certification order.  Judge Tafoya reviewed Dr. Kerr's model and the voluminous evidence supporting it—including **Defendants' own ordinary-course surveys** that reached the very same result.  *E.g.*, Order at 5 & 5-6, 14-15.  For those reasons, Judge Tafoya found that the model used reliable methods and reliable inputs, even regardless of whether the host family survey was used in it.  Order at 7, 17.  (It did.)  Judge Tafoya then answered the legal question Defendants posed—the admissibility of the entirety of Dr. Kerr's class certification opinion.  Order at 16-18.  Since Plaintiffs showed that the model passed muster under *Daubert* without the host family survey, she need not and did not address it.

In an especially muddled passage, Defendants appear to blame **Plaintiffs** for injecting the merits into their *Daubert* motion; and suggest that the Order be reversed because Judge Tafoya needed to address it since, they say, Plaintiffs never claimed the survey challenge was moot.[4]  Obj.  at 12.

But it was Defendants who argued the merits via their *Daubert* motion.  Mot. at 5, 9-11; *see also* Tr. at 45:24-26 (Tafoya, J., noting that defense counsel was arguing the antitrust merits); 58:3:6 (defense counsel stating that Judge Tafoya's job was "determining whether . . . Dr. Kerr's opinions, show common impact").  Defendants' tactics created an ever-shifting "*Daubert*" Motion that was a combination of class certification opposition, merits argument.  Any error was invited. *John Zink Co. v. Zink*, 241 F.3d 1256, 1259 (10th Cir. 2001).

And Plaintiffs are blameless:  At every turn Plaintiffs pointed out that Defendants were arguing merits in their *Daubert* motion.  Ex. 1 at 22:13-22; 23:2-25:8; 34:6-23; 61:23-62:5.

Defendants' final survey contentions are that Dr. Kerr is not qualified as a "survey design expert," Mot. at 11, and that an email survey to host families got a response rate

---

[4]  Defendants confusingly say that Judge Tafoya ruled on a "harmless" error, but it appears they mean mootness, not the appellate principle.  Obj. at 12.

14

equivalent to other email surveys.  Obj. at 15.  Defendants are bold to press these arguments after their proffered survey "design" expert's deposition.

Their survey design expert is a psychologist who believes statistical and quantitative rigor is overrated.  D.E. 649-11 (Lavrakas Dep. Tr). at 10:18-23; 33:21-36:3; 39:24-41:4; 97:22-100:4.  He deems himself a survey "design" expert.  But has no coherent explanation for supposed expertise in survey "design" or how one gains it (he suggested "study[ing] a lot of books" and "going to conferences."  *Id.* at 10:24-11:18; 20:7-14.

Worse, Defendants' proffered expert **admitted that every issue** he mentioned **either (i) could not apply** to the relevant survey question, **(ii) would—if anything—create bias in *Defendants'* favor** (*i.e.*, he admitted that Dr. Kerr's survey results are conservative and likely overstate the amount of variation; **or (ii) that he had no basis** on which to say whether any issue (if it existed) caused bias one way or the other. There were so many of these admissions that Plaintiffs' Opposition featured a multipage chart lining his deposition concessions with his written opinions.  Opp. at 12-13. Defendants' "survey" expert is an emperor with no clothes, and no legitimate criticism. *Id.* at 12-13, 24-27.

Defendants therefore end with one survey argument:  Dr. Kerr's survey response rate was too low.  In fact, the response rates were in line with comparable email surveys.  Opp. at 26 & n.14.  If response rate is the best criticism Defendants can levy, they have at most identified a weight-of-the-evidence question they can argue to the jury.

## CONCLUSION

For all of these reasons Defendants' Objections should be rejected.

Dated: February 21, 2018

    *s/Sean P. Rodriguez*
Matthew L. Schwartz
Peter M. Skinner
Randall W. Jackson
Dawn L. Smalls
Joshua J. Libling
Byron Pacheco
575 Lexington Avenue
New York, New York 10022
Tel: (212) 446-2300
Fax: (212) 446-2350
mlschwartz@bsfllp.com
pskinner@bsfllp.com
rjackson@bsfllp.com
dsmalls@bsfllp.com
jlibling@bsfllp.com
bpacheco@bsfllp.com

Sean P. Rodriguez
Juan P. Valdivieso
1999 Harrison Street, Suite 900
Oakland, CA 94612
Tel: (510) 874-1000
Fax: (510) 874-1460
srodriguez@bsfllp.com
jvaldivieso@bsfllp.com

Sigrid S. McCawley
Lauren Fleischer Louis
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, Florida  33301
Tel: (954) 356-0011
Fax: (954) 356-0022
smccawley@bsfllp.com
llouis@bsfllp.com

TOWARDS JUSTICE
Alexander Hood
1535 High Street, Suite 300
Denver, Colorado  80218
Tel: (720) 239-2606
Fax: (303) 957-2289
alex@towardsjustice.org

*Attorneys for Plaintiffs*

16

## CERTIFICATE OF SERVICE

      I hereby certify that on February 21, 2018, I electronically served the foregoing motion on all counsel of record.

*s/Sean P. Rodriguez*
Sean P. Rodriguez
