# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Case No. 14-cv-03074-CMA-KMT

JOHANA PAOLA BELTRAN, *ET AL.*

     Plaintiffs,

v.

INTEREXCHANGE, INC., *ET AL.*

     Defendants.

---

## PLAINTIFFS' MOTION FOR
## PARTIAL SUMMARY JUDGMENT

---

Case No. 1:14-cv-03074-CMA-KMT Document 886-12 Filed 03/01/18 USDC Colorado Page 2 of 3
Case 1:14-cv-03074-CMA-KMT Document 888 Filed 02/15/18 USDC Colorado Page 2 of 38
of 38

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................ 1

LEGAL STANDARD .................................................................................................... 2

ARGUMENT ................................................................................................................ 3

I.  AU PAIRS ARE ENTITLED TO MINIMUM WAGE & OVERTIME ....................... 3

II.  AU PAIRS ARE ENTITLED TO BE PAID FOR A 45 HOUR WEEK EVEN IF
     THEY WORK LESS THAN 45 HOURS ................................................................ 5

III.  SPONSORS ARE EMPLOYERS OF AU PAIRS .................................................. 6

IV.  PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON LIABILITY FOR
      THEIR WAGE AND HOUR CLAIMS ................................................................... 13

     A.  There Is Sufficient Uniformity In the Stipend for the Purposes of
          Liability ....................................................................................................... 13

     B.  Liability Summary Judgment Is Warranted for the FLSA Classes and
          Named Plaintiffs ......................................................................................... 20

     C.  Liability Summary Judgment Is Warranted for the Training Classes ........ 22

     D.  Liability Summary Judgment Is Warranted for the State Classes ............ 24

CONCLUSION ........................................................................................................... 30

## **TABLE OF AUTHORITIES**

**Cases**

*Armenta v. Osmose, Inc.*,
    135 Cal. App. 4th 314 (Cal. App. 2 Dist. 2005) ........................................................ 25

*Avalon Condominium Ass'n, Inc. v. Secura Ins.*,
    No. 14-CV-200, 2015 WL 5655528 (D. Colo. Sept. 25, 2015) .................................... 3

*Brock v. City of Cincinnati*,
    236 F.3d 793 (6th Cir. 2001) ...................................................................................... 5

*Bureerong v. Uvawas*,
    922 F. Supp. 1450 (C.D. Cal. 1996) .......................................................................... 13

*Cavallaro v. UMass Memorial Healthcare, Inc.*,
    678 F.3d 1 (1st Cir. 2012) ......................................................................................... 28

*Cultural Care, Inc. v. Office of the Attorney General of Massachusetts*,
    No. 16-cv-11777, 2017 WL 3272011 (D. Mass. 2017) .......................................... 6, 28

*Does v. Rodriguez*,
    No. 06-CV-805, 2007 WL 684117 (D. Colo. May 2, 2007) ....................................... 13

*Donovan v. Simmons Petroleum Corp.*,
    725 F.2d 83 (10th Cir.1983) ....................................................................................... 21

*Donovan v. Tavern Talent and Placements, Inc.*,
    No. 84-F-401, 1986 WL 32746 (D. Colo. Jan. 8, 1986) ............................................ 12

*Friolo v. Frankel*,
    819 A.2d 354 (Md. 2003) ........................................................................................... 27

*Home Care Ass'n of Am. v. Weil*,
    136 S. Ct. 2506 (2016) ................................................................................................ 4

*In re Cardizem CD Antitrust Litig.*,
    200 F.R.D. 326 (E.D. Mich. 2001) ............................................................................. 14

*In re Scrap Metal Antitrust Litig.*,
    527 F.3d 517 (6th Cir. 2008) ..................................................................................... 14

*In re Urethane Antitrust Litig.*,
    768 F.3d 1245 (10th Cir. 2014) ........................................................................... 13, 14

*Kennett v. Bayada Home Health Care, Inc.*,
   135 F.Supp.3d 1232 (D. Colo. 2015) ...................................................................... 25

*Kleen Products LLC v. International Paper*,
   306 F.R.D. 585 (N.D. Ill. 2015) ............................................................................... 14

*Lai Chan v. Chinese-American Planning Council Home Attendant Program, Inc.*,
   21 N.Y.S.3d 814 (N.Y. Cty. Sup. Ct. 2015) ............................................................ 23

*Leyva v. Medline Industries Inc.*,
   716 F.3d 510 (9th Cir. 2013) ................................................................................... 15

*Lugo v. Farmers Pride, Inc.*,
   967 A.2d 963 (Pa. Super. 2009) ............................................................................. 29

*Marshall v. Safeway, Inc.*,
   63 A.3d 672 (Md. Ct. Spec. App. 2013) .................................................................. 27

*Martinez v. Ford Midway Mall, Inc.*,
   59 So.3d 168 (Fla. App. 3 Dist. 2011) ..................................................................... 24

*Moreno v. Future Care Health Services*, Inc.,
   No. 500569/2013, 2014 WL 1236815 (Kings Cty. Sup. Ct. Jan. 16, 2014) ............... 23

*Mullally v. Waste Management of Massachusetts, Inc.*,
   895 N.E.2d 1277 (Mass. 2008) .............................................................................. 28

*Napert v. Government Employees Ins. Co.*,
   36 F. Supp. 3d 237 (D. Mass. 2014) ................................................................... 7, 28

*Ochoa v. McDonald's Corp.*,
   133 F.Supp.3d 1228 (N.D. Cal. 2015) ...................................................................... 6

*One Call Locators, Ltd. v. CenturyTel Serv. Grp., LLC*,
   No. 16-CV-844, 2017 WL 6017223 (D. Colo. Dec. 5, 2017) ....................................... 2

*Rayfield v. Sandbox Logistics*, LLC,
   217 F. Supp. 3d 1299 (D. Colo. 2016) ..................................................................... 20

*Solis v. Supporting Hands*, LLC,
   No. 11-cv-406, 2013 WL 1897822 (D.N.M. Apr. 30, 2013) ........................................ 21

*Tyson Foods, Inc. v. Bouphakeo*,
   136 S.Ct. 1036 (2016) ............................................................................................. 14

*Vaughan v. M-Entertainment Properties, LLC*,
  14-CV-914, 2016 WL 7365201 (N.D. Ga. Mar. 15, 2016) .......................................... 12

*Walker v. Service Corp. Intern.*,
  No. 4:1--CV-48, 2011 WL 1370575 (W.D. Va. Apr. 12, 2011) ............................... 7, 30

*Zachary v. ResCare Oklahoma, Inc.*,
  471 F. Supp. 2d 1175 (D. Colo. 2017) ....................................................................... 12

<u>**Statutes & Rules**</u>

29 U.S.C. § 203 ................................................................................................................. 6

29 U.S.C. § 207 ................................................................................................................. 4

43 P.S. § 333.104 ...................................................................................................... 29, 30

43 P.S. § 333.113 ........................................................................................................... 29

Article X, § 24(a), Fla. Const. ........................................................................................ 24

C.A. LABOR C. § 1194 ................................................................................................... 25

C.A. LABOR C. § 510 ..................................................................................................... 25

C.A. LABOR C. § 1182.12 .............................................................................................. 25

C.R.S. § 8-6-108.5 ......................................................................................................... 25

Fed. R. Civ. P. 56 ........................................................................................................ 2, 3

L.E. § 3–101 .................................................................................................................... 7

L.E. § 3–427 .................................................................................................................. 27

M.C.L.A. § 408.414 ....................................................................................................... 29

M.C.L.A. § 408.414a ..................................................................................................... 29

M.C.L.A. § 408.420 ....................................................................................................... 29

M.G.L.A. 149 § 190 ....................................................................................................... 28

M.G.L.A. 151 § 1 ........................................................................................................... 28
M.G.L.A. 151 § 1A ......................................................................................................... 28

MI ST § 408.412 ................................................................................................ 7

MWA § 448.110 ................................................................................................. 6

NY LABOR § 2 ................................................................................................... 7

NYLL 19 §§ 652 ................................................................................................ 23

PA ST 43 P.S. § 333.103 ................................................................................... 7

Section 448.110(3), Florida Statutes (2009) .................................................... 24

Virg. Min. Wage Act § 40.1-28.10 ................................................................... 30

Virg. Min. Wage Act § 40.1-28.12 ................................................................... 30

<u>**Regulations**</u>

7 C.C.R. 1103-1 ...................................................................................... 6, 25, 26

22 C.F.R. § 62.31 ................................................................................ 5, 6, 8, 9, 10

29 C.F.R. § 531.30 .............................................................................................. 5

29 C.F.R. § 552.109 ........................................................................................... 4

29 C.F.R. § 785.27 ............................................................................................ 24

29 C.F.R. § 785.28 ............................................................................................ 24

29 C.F.R. § 785.23 ............................................................................................. 5

## PRELIMINARY STATEMENT

The basic framework of this case has been clear for years. Defendants profit from sponsoring visas for young women from overseas who work as domestic childcare providers in American homes for low wages. Plaintiffs are those low-wage foreign workers, called "au pairs." It has been and remains the Defendants' position that the weekly wage is set by the Department of State ("DOS") at $195.75.[1] Defendants are wrong. As a result, au pairs have been paid illegally low wages over many years.

While there are a number of issues on which the parties disagree, there can be no material dispute that (i) Defendants dictated to both au pairs and host families the level of au pair wages; (ii) Defendants recruited, screened and assigned au pairs to homes; (iii) Defendants exercised significant control and supervision of au pairs; and (iv) Defendants retained the right to fire or reassign au pairs. All of this was essentially known at the motion to dismiss stage, and discovery has confirmed it many times over.

Partial summary judgment is therefore appropriate. This case has been on the Court's docket for well over three years, and there are legal and factual disputes that can be resolved now to significantly narrow the case for trial. Plaintiffs represent eleven Fair Labor Standards Act classes (the "FLSA Classes") and eighteen[2] Rule 23 classes and subclasses (the "Rule 23 Classes") (collectively, the "Classes").[3] On behalf of the

---

[1]     *See* ECF Nos. 127; 130 at 5; 131 at 2; 135 at 8 ("the State Department set the weekly au pair stipend at $195.75"); 132; 33; 136 at 8-9.

[2]     The Court's February 13, 2018 Order Denying Plaintiffs' Motion to Amend the Complaint (ECF No. 850) left three subclasses without class representatives (Au Pair in America Illinois Subclass, Cultural Care Pennsylvania Subclass and Cultural Care Texas Subclass). Accordingly, Plaintiffs includes them in this motion pending any clarification by the Court of whether these three classes have been decertified.

[3]     The claims brought by AuPairCare au pairs are stayed pending resolution of its appeal to the Tenth Circuit. ECF No. 756. Plaintiffs therefore seek no relief as to these

FLSA Classes, Plaintiffs seek summary judgment on FLSA liability.  On behalf of the

Training Classes[4] and the State Classes,[5] Plaintiffs seek summary judgment on wage-

and-hour claim liability (Counts IX, X, and XI in the Second Amended Complaint).

## **LEGAL STANDARD**

Summary judgment must be granted when "the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(a).  "A fact is material if it is essential to the proper

disposition of the claim under the relevant substantive law.  A dispute is genuine if the

evidence is such that it might lead a reasonable jury to return a verdict for the

nonmoving party.  When reviewing motions for summary judgment, a court must view

the evidence in the light most favorable to the non-moving party. However, conclusory

statements based merely on conjecture, speculation, or subjective belief do not

constitute competent summary judgment evidence."  *One Call Locators, Ltd. v.

CenturyTel Serv. Grp., LLC*, No. 16-CV-844, 2017 WL 6017223, at *1 (D. Colo. Dec. 5,

2017) (Arguello, J.) (internal citations and quotation marks omitted).

---

classes at this time.  AuPairCare remains an active litigant as to the non-AuPairCare au pairs, also movants here, who assert claims against it in the antitrust and RICO classes.

[4]      Using the terminology of the Order Granting in Part and Denying in Part Plaintiffs' Motion for Rule 23 Class Certification and Appointment of Class Counsel ("Rule 23 Order"), the  Florida Training Subclass, New York Training Subclass, and New Jersey Training Subclass

[5]      Using the terminology of the Rule 23 Order, the Au Pair in America California Subclass, Au Pair in America Illinois Subclass, Cultural Care Maryland Subclass, Cultural Care Massachusetts Subclass, Cultural Care Pennsylvania Subclass, Cultural Care Texas Subclass, Cultural Care Utah Subclass, Cultural Care Virginia Subclass, Expert Au Pair Colorado Subclass, GoAuPair Maryland Subclass, and InterExchange Colorado Subclass.

A party may move for summary judgment on individual claims, or on a "part of each claim." Fed. R. Civ. P. 56(a); *see id.* at Advisory Committee Notes, 2010 Amendment ("The first sentence is added to make clear at the beginning that summary judgment may be requested not only as to an entire case but also as to a claim, defense, or part of a claim or defense. The subdivision caption adopts the common phrase "partial summary judgment" to describe disposition of less than the whole action, whether or not the order grants all the relief requested by the motion."); *Avalon Condominium Ass'n, Inc. v. Secura Ins.*, No. 14-CV-200, 2015 WL 5655528, at *4 (D. Colo. Sept. 25, 2015) (Arguello, J.) (granting partial summary judgment and "find[ing], as a matter of law, that the deductible at issue must be calculated and applied separately for each of the eight buildings"). In addition, "If the court does not grant all the relief requested by the motion, it may enter an order stating any material fact-- including an item of damages or other relief--that is not genuinely in dispute and treating the fact as established in the case." Fed. R. Civ. P. 56(g).

## **ARGUMENT**

### I.    AU PAIRS ARE ENTITLED TO MINIMUM WAGE & OVERTIME

<u>Requested Holding</u>:        Au pairs are entitled to receive from their employers the minimum federal, state, or local wage, including overtime.[6]

The Court has held "that the FLSA applies to Plaintiffs' claims." APP. 25. "[T]he plain language of the regulation (explicitly requiring au pairs to be 'paid in conformance

---

[6]       Although the Court has already determined many of these issues in the Motion to Dismiss Order, at least one Defendant takes the position that even the Court's legal decisions "will be revisited" after discovery. *See Cultural Care, Inc. v. Office of the Attorney General of Massachusetts*, Civil Action No. 16-cv-11777, Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss" at 11 n.6. (D. Mass., filed Nov. 29, 2016) (APP. 139 n.6).

with' the requirements of the FLSA, 'as interpreted and implemented by the United States Department of Labor' – not 'as interpreted and implemented by' the DOS), as well as the DOL's explanation for the change ('to ensure that there is no future confusion regarding payment of the minimum wage')" lead to the Court's conclusion that au pairs are entitled to minimum wage protections. *Id.* at 24. The governing regulation, 22 C.F.R. § 62.31(j)(1), requires Sponsors to ensure that au pairs are "paid in conformance with the requirements of the Fair Labor Standards Act as interpreted and implemented by the United States Department of Labor."

The FLSA is similarly unambiguous that all employers must pay the minimum wage. 29 U.S.C. § 206(a). Where state or local law requires a higher minimum wage, the FLSA requires that higher wage. 29 U.S.C. § 218(a). "[T]he regulations implemented by the USIA expressly provided that the au pair program must conform with the FLSA, without exception; the FLSA, in turn, explicitly provides that, if a state sets a higher minimum wage than that mandated by the FLSA, employees within that state are entitled to receive that higher wage." APP. 29.

With regards to overtime, the Court has determined that after January 1, 2015, au pairs are entitled to compensation for overtime under the FLSA. APP. 28 (citing 29 C.F.R. § 552.109(c)).[7] The FLSA requires overtime for work in excess of 40 hours in a week. *See* 29 U.S.C. § 207(a)(1).

Finally, Defendants have argued that they may pay less than minimum wage because au pairs receive room and board from host families. The Court has already

---

[7] At the time of the motion to dismiss, the District of Columbia Circuit Court decision upholding 29 C.F.R. § 552.109(c) was the subject of a pending petition for certiorari to the Supreme Court of the United States. That petition was subsequently denied. *See Home Care Ass'n of Am. v. Weil*, 136 S. Ct. 2506 (2016).

determined that, "pursuant to 29 C.F.R. § 531.30, an employer may not credit the cost of facilities towards an employee's wages if the employer is required by law to provide the same," and 22 C.F.R. § 62.31(e)(6) is just such a legal requirement.  APP. 26; *see also* Opinion Letter, Department of Labor Wage and Hour Division, 1997 WL 998029 (Aug. 19, 1997) (determining that there could be no deduction for use of a car).  The Federal minimum wage is $7.25, and has been since July 24, 2009.[8]

## II.   AU PAIRS ARE ENTITLED TO BE PAID FOR A 45 HOUR WEEK EVEN IF THEY WORK LESS THAN 45 HOURS

<u>Requested Holding:</u>        Au pairs are entitled to be paid a "weekly rate" as if they worked 45 hours.

The State Department regulations provide that au pair wages are to be paid based on a 45-hour "weekly rate" regardless of the number of hours actually worked. The regulations are clear that (i) 45 hours is the maximum an au pair may work, 22 C.F.R. § 62.31(c)(2), (ii) au pairs may work less than 45 hours, 22 C.F.R. § 62.31(a) ("Au pair participants provide up to forty-five hours of child care services per week . . . ."), and (iii) au pairs nonetheless "[a]re compensated at a weekly rate based upon 45 hours of childcare services per week and paid in conformance with the requirements of the Fair Labor Standards Act as interpreted and implemented by the United Stated Department of Labor," 22 C.F.R. § 62.31(j)(1).

FLSA regulations also support this conclusion.  29 C.F.R. § 785.23 provides that for employees residing in a home, the "exact hours" worked is immaterial where there is otherwise some "reasonable agreement" in place that sets a framework for hours worked.  *See also Brock v. City of Cincinnati*, 236 F.3d 793, 805 (6th Cir. 2001) (noting

---

[8] History of Federal Minimum Wage Rates Under the Fair Labor Standards Act, 1938-2009, United States Dep. of Labor, https://www.dol.gov/whd/minwage/chart.htm.

that, as to hours worked, "any reasonable agreement of the parties which takes into account all of the pertinent facts will be accepted"). Here, 22 C.F.R. § 62.31(j)(1) provides that agreement.

This conclusion should not be controversial. Defendants agreed, that au pairs are "paid a weekly rate based upon 45 hours" paid in conformance with the FLSA. ECF No. 603 at 4. The record also reflects a 45-hour weekly rate.[9] The same conclusion was reached in the lawsuit filed by Cultural Care against the Massachusetts Attorney General. *See Cultural Care, Inc. v. Office of the Attorney General of Massachusetts*, No. 16-cv-11777, 2017 WL 3272011, at *7 (D. Mass. 2017) ("au pairs receive compensation for 45 hours, regardless of the actual number of hours worked in a particular week"). Indeed Cultural Care's own complaint in that case acknowledged that au pairs receive a "weekly stipend," "regardless of hours actually worked". *Id.*, "Complaint" at ¶ 2 (filed Aug. 31, 2016) (APP. 97).[10]

## III.   SPONSORS ARE EMPLOYERS OF AU PAIRS

<u>Requested Holding</u>:   Sponsors are joint employers of their au pairs.

FLSA defines the term "employ" as "to suffer or permit to work."[11] 29 U.S.C. § 203(g). The Supreme Court has described this definition as having "striking breadth"

---

[9]   *E.g.*, APP. 3284 (APIA Document: "Host families may ask if they can reduce the amount of the weekly stipend to the au pair if she works less than 45 hours per week…The answer is NO."); APP. 3288 (Cultural Care Document : "The stipend cannot be…pro-rated for any reason, including, but not limited to,…partially worked weeks").

[10]   Although Defendants privately acknowledge that au pairs perform "work" and receive a "wage", *see* APP. 3305, publicly they intentionally use the word "stipend" and avoid the word "wage" as part of their "messaging", *see* APP. 3295, 3298 ("Words to Use & Lose").

[11]   The relevant states either follow the FLSA or apply a similar test. *See, e.g.*, California: *Ochoa v. McDonald's Corp.*, 133 F.Supp.3d 1228, 1232-1233 (N.D. Cal. 2015); Colorado: 7 CCR § 1103–1:2; Florida: MWA § 448.110(3); Michigan: MI ST

such that it covers "some parties who might not qualify as such under a strict application of traditional agency law principles."  *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992).  The Tenth Circuit employs an "economic realities" test that "is not limited by any contractual terminology or by traditional common law concepts of employee or independent contractor."  *Baker v. Flint Eng'g & Const. Co.*, 137 F.3d 1436, 1440 (10th Cir. 1998) (internal quotation marks omitted).  The Court previously identified eight allegations that, accepted as true, satisfied Plaintiffs' burden.  APP. 20-21.  Discovery has now demonstrated that there can be no dispute as to the truth of each of these allegations and, therefore, summary judgment is warranted.

"Sponsors recruit, interview, and hire *au pairs* for host families."  APP. 20. Recruitment is inherent to the nature of a Sponsor agency.  Sponsors must "ensure" that au pairs are the right age, have the right education, speak English, have been personally interviewed by the Sponsor, and pass a background check.  22 C.F.R. § 62.31(d).  Similarly, Sponsors must "secure, prior to the au pair's departure from the home country, a host family placement for each participant."  22 C.F.R. § 62.31(e). Unsurprisingly, the factual record bears out that Sponsors recruit au pairs and place them with host families in accordance with their obligations.[12]

---

§ 408.412(b); Massachusetts: *Napert v. Government Employees Ins. Co.*, 36 F. Supp. 3d 237, 242 n.5 (D. Mass. 2014); Maryland: L.E. § 3–101(c)(1), (2)(i) and (ii); New York: NY LABOR § 2; Pennsylvania: PA ST 43 P.S. § 333.103(f); Virginia: *Walker v. Service Corp. Intern.*, 2011 WL 1370575, at *6 (W.D. Va. 2011).

[12]    *E.g.,* APP. 174, 177-79 (APEX-20/20 30(b)(6) Tr. 48:15-49:5; 61:1-67:4 (discussing recruiting and placement)); APP. 209 (Agent Au Pair Partnership Agreement (for recruitment)); APP. 291 (APIA 30(b)(6) Tr. 21:23-22:12 (APIA responsible for "recruitment, training, placement, and supervision of au pairs")); APP. 318 (AuPairCare 30(b)(6) Tr. 98:15-23 (discussing placement records)); APP. 436 (APF 30(b)(6) Tr. 69:21-23 (APF has a "matching specialist" on staff)); APP. 513 (API 30(b)(6) Tr. 43:8-44:9 (discussing "international partners" who "screen, identify potential

7

"Sponsors effectively dictate *au pair* wages." APP. 20. As Magistrate Judge Tafoya recently noted, the evidence that all, or a substantial majority, of *au pairs* were paid $195.75 is "overwhelming," "voluminous," and "extensive." APP. 43-33. Together with other evidence not before Judge Tafoya, the record on this point is described at Point IV.A below.

"Sponsors have a statutory obligation to ensure that au pairs are paid a stipend, do not provide more than 10 hours of child care per day or 45 hours of child care in any week, receive a minimum of one and one-half days off per week in addition to one complete weekend off each month, and receive two weeks of paid vacation." APP. 20. These obligations are regulatory. *See* 22 C.F.R. § 62.31(j). Sponsors acknowledge their obligation to actively monitor au pairs' hours and ensure that au pairs receive their weekly wage, as well as days off and vacation.[13]

---

candidates, explain the program…and sign up individuals")); APP. 643 (Cultural Care ICL Agreement (concerning "[r]ecruitment and preparation of participants")); APP. 670, 676 (CHI 30(b)(6) Tr. 31:18-32:1; 98:18-99:15 (CHI uses "partners" to recruit applicants" and monitors placements)); APP. 717-19 (EurAuPair 30(b)(6) Tr. 80:20-87:24 (discussing overseas recruiters)); APP. 950-51 (Expert Au Pair 30(b)(6) Tr. 37:5-38:18 (discussing the 11 recruiting organizations overseas)); APP. 978-79 (Go AuPair 30(b)(6) Tr. 13:17-14:1 (discussing placement supervisor duties)); APP. 1063 (Great AuPair: Brochure (advertising training, travel, insurance, and other assistance GreatAuPair provides to au pairs participating in its program)); APP. 1070 (Interexchange 30(b)(6) Tr. 64:8-65:7 (discussing recruitment and placement manager)); APP. 1176-77 (USA AuPair 30(b)(7) Tr. 27:20-30:20 (discussing foreign representatives who "recruit and vet au pair applicants")).

[13] *E.g.,* APP. 185 (APEX-20/20 30(b)(6) Tr. 136:1-137:12); APP. 200 (Agent Au Pair 30(b)(6) Tr. 100:7-11); APP. 3320 (APIA: 30(b)(6) Tr. 66:13-67:17); APP. 1716, 1719-20 (Biggs, VP of AuPairCare, Tr. 27:4-13, 217:21-218:7); APP. 445 (APF 30(b)(6) Tr. 228:1-6); APP. 510 (API 30(b)(6) Tr. 35:24-36:13); APP. 638 (Cultural Care 30(b)(6) Tr. 190:11-19); APP. 676 (CHI 30(b)(6) Tr. 99:6-15); APP. 722 (EurAuPair 30(b)(6) Tr. 175:6-11); APP. 957 (Expert Au Pair 30(b)(6) Tr. 142:5-15); APP. 982 (Go AuPair 30(b)(6) Tr. 111:1-16); APP. 1050 (Great Au Pair 30(b)(6) Tr. 95:6-14); APP. 1081 (Interexchange 30(b)(6) Tr. 218:20-219:12); APP. 1176 (USA Au Pair 30(b)(6) Tr. 26:20-27:17).

"Sponsors exert control over au pair working conditions." APP. 20. All Sponsors provide au pairs with training.[14] All Sponsors "fully monitor all au pair exchanges," which includes "monthly personal contact" with the au pairs, quarterly contact with host families, and reporting "unusual or serious situations." 22 C.F.R. § 62.31(l). All Sponsors go beyond the statutory requirements and have detailed internal requirements for their supervision and monitoring of au pairs.[15] All Sponsors enter into, or otherwise set the terms of, contracts that detail the precise kinds of work au pairs can and cannot be required to perform, including the kinds of childcare they are expected to provide.[16]

Go Au Pair's contract is representative:

> "Playing with child(ren)…Reading & enrichment…Helping with school homework…Driving/transport-to/from school… Preparing children meals… Cleaning up after child(ren)… Washing child(ren) dishes… Vacuuming/

---

[14] *E.g.*, APP. 272 (Agent Au Pair Document); APP. 315 (AuPairCare 30(b)(6) [McNamara] Tr. 68:12-69:6); APP. 188 (APEX-2020 30(b)(6) Tr. 147:6-149:7); APP. 439 (APF 30(b)(6) Tr. 119:13-21); APP. 548 (API Au Pair Agreement at ¶¶ 5, 7); APP. 291-92 (APIA 30(b)(6) Tr. 21:23-22:12); APP. 635 (Cultural Care 30(b)(6) Tr. 81:2-9); APP. 678 (CHI Partner Agency Training); APP. 725 (EurAuPair 30(b)(6) Tr. 211:8-11); APP. 954 (Expert AuPair 30(b)(6) Tr. 81:9-10); APP. 985-86 (GoAuPair 30(b)(6) Tr. 124:23-126:11); APP. 1063 (GreatAuPair Document); APP. 1076-78 (InterExchange 30(b)(6) Tr. 180:14–188:6); APP. 1175 (USAuPair 30(b)(6) Tr. 22:17-20).

[15] *E.g.*, APP. 240 (Agent Au Pair Document); APP. 388-89 (AuPairCare Au Pair Handbook); APP. 185 (APEX-2020 30(b)(6) Tr. 136:1-137:12); APP. 563-64 (API Au Pair Handbook); APP. 297 (APIA Community Counselor Letter of Agreement 2009); APP. 632 (Cultural Care 30(b)(6) Tr. 24:24–25:4); APP. 702 (CHI Au Pair Promise and Agreement); APP. 728 (EurAuPair 30(b)(6) Tr. 244:3-10); APP. 962-63 (Expert Au Pair 30(b)(6) Tr. 201:1–202:15); APP. 1144 (InterExchange Au Pair USA: Au Pair Agreement); APP. 1181, 1183 (USAuPair Au Pair Code of Conduct).

[16] *E.g.* APP. 320 (AuPairCare Au Pair Agreement) form contract); APP. 190 (APEX-2020 Au Pair Service Agreement); APP. 447 (APF Host Family – Au Pair Agreement); APP. 305 (APIA Host Family and Au Pair/Companion Agreement); APP. 656 (Cultural Care Au Pair Agreement); APP. 944 (EurAuPair Host Family/Au Pair Agreement); APP. 1035 (GoAuPair Child Care Services Agreement); APP. 1144 (InterExchange Au Pair Agreement); APP. 1185 (USAuPair Host Family Agreement).

> Dusting child(re) room…Bathing child(ren)…Changing infant diapers…
> Being home when children absent from school."

APP. 1038-39. All Sponsors ensure that au pairs are placed in a suitable home,

meaning that the au pair has a private bedroom, and that the child is not too young. 22

C.F.R. § 62.31(e). All Sponsors ensure that au pairs perform their educational

requirements and that host families permit au pairs to do so. 22 C.F.R. § 62.31(k).

Additional detailed requirements are found throughout 22 C.F.R. § 62.31, and were

summarized by Magistrate Judge Tafoya. ECF No. 240.

"Sponsors act as the final arbiters of any disputes between au pairs and host

families regarding wages and hours." APP. 21. In addition to Sponsors' obligation to

ensure that au pairs are paid their wages, perform only the right kinds of labor, and do

not perform too much labor, Sponsors further serve as the arbiter of personality

conflicts, and mediate all manner of disputes between host families and au pairs.[17]

---

[17] *E.g.*, APP. 182 (APEX-2020 30(b)(6) Tr. 86:13-16); APP. 203 (Agent Au Pair 2010 Host Family Agreement ¶ 2 ("If a dispute arises as to any of these limits or requirements, Agent Au Pair shall resolve said dispute, and its decision shall be final."); APP. 3317, 3320 (APIA 30(b)(6) Tr. 36:6-22; 66:13-67:17); APP. 322 (AuPairCare Au Pair Agreement ¶ 15 ("[AuPairCare] shall resolve [any] dispute" about "scope if the Au Pair's responsibilities" )); APP. 480 (APF Au Pair Handbook); APP. 553 (API Host Family Agreement ("API may make a reasonable attempt to mediate in the case of serious problems and differences"); APP. 657 (Cultural Care Au Pair Agreement ¶ 8 (requiring adherence to "CC's mediation guidelines")); APP. 704 (CHI Au Pair Promise & Agreement ("If a dispute arises concerning the scope of the au pair's responsibilities, CHI Au Pair USA shall resolve said dispute, and its decision shall be final.")); APP. 2309 (EurAuPair Au Pair Handbook (referring au pair to EurAuPair Community Counselor in case of a problem with her host family)); APP. 1097 (InterExchange Host Family Agreement ("Host agrees that InterExchange may reasonably attempt to mediate in the case of misunderstandings or serious problems for the au pair and/or host family")); APP. 1179 (USAuPair 30(b)(6) Tr. 46:13-15).

Indeed, some Sponsors admitted that if a host family refused to pay the au pair, then

the Sponsor would pay.[18]

"Sponsors can terminate au pairs without the consent of the host family and

cause their removal from the United States, and a host family cannot terminate an au

pair without approval from the Sponsor."  APP. 21 (footnote omitted).  Discovery has,

again, borne this out.[19]  Cultural Care's contract is demonstrative.  Its au pairs agree

that Cultural Care (not the host family) has the "exclusive right" to terminate the au pair

for "whatever reason," including if the au pair gets married or pregnant, or if the au pair's

"emotional or physical states does not make [her] suitable for providing quality

childcare."  APP. 657-58.

"Sponsors draft the contracts governing the relationships between *au pairs* and

their host families."  APP. 21.  All Sponsors provide the form contracts used to formalize

the host family-au pair relationship.[20]

"Sponsors provide *au pairs* with health insurance."  APP. 21.  Again, the

Sponsors' own documents establish this fact.[21]

---

[18]    *E.g.*, APP. 641 (Cultural Care 30(b)(6) Tr. 214:19-215:2); APP. 960 (Expert Au
Pair 30(b)(6) Tr. 155:23-156:2); APP. 1052 (Great Au Pair: 30(b)(6) Tr. 104:18-105:5);
APP. 1073 (Interexchange: 30(b)(6) Tr. 140:12-23).

[19]    *E.g*. App. 311-12 (AuPairCare 30(b)(6) [McNamara] Tr. at 48:23-49:25 & 50:24-
51:24); APP. 656 (Cultural Care Au Pair Agreement); APP. 712 (CHI Email ("If they go
ahead during their program a marry, we terminate (not end) their programs.")); APP.
965 (Expert Au Pair Au Pair Agreement); APP. 1059 (GreatAuPair Au Pair Agreement);
APP. 1083 (InterExchange 2010 Host Family Application).

[20]    *E.g*. APP. 320 (AuPairCare Au Pair Agreement); APP. 179-80 (APEX-2020
30(b)(6) Tr. 69-71); APP. 337 (APF Host Family – Au Pair Agreement); APP. 305 (APIA
Host Family and Au Pair/Companion Agreement); APP. 656 (Cultural Care Au Pair
Agreement); APP. 944 (EurAuPair Host Family/Au Pair Agreement); APP. 985
(GoAuPair 30(b)(6) Tr. 122:13-20); APP. 1083 (InterExchange 2010 Host Family
Application); APP. 1185 (USAuPair Host Family Agreement).

Sponsors recruit au pairs. Sponsors screen au pairs. Sponsors train au pairs.

Sponsors set the level of au pairs' salary. Sponsors contract with host families with

provisions directly or indirectly determining the maximum hours au pairs can work, the

kinds of work they can perform, and the wage they are paid. Sponsors are charged with

monitoring compliance with those obligations, and the other requirements of the au pair

program. Sponsors contract with au pairs to provide childcare services to host families.

Sponsors provide health insurance. Sponsors fire au pairs. Courts have found a joint

employer relationship on the basis of far less, including at summary judgment. *See*

*Donovan v. Tavern Talent and Placements, Inc.*, No. 84-F-401, 1986 WL 32746 (D.

Colo. Jan. 8, 1986) (finding, at summary judgment, that talent placement agency and

nightclub owners were both joint employers because the talent agency recruited the

dancers and the night club owners supervised their daily activities); *Vaughan v. M-

Entertainment Properties, LLC*, 14-CV-914, 2016 WL 7365201, at *17 (N.D. Ga. Mar.

15, 2016) (finding, at summary judgment, that strip club owner and entity that provided

consulting work to the strip club were joint employers because the consulting entity

provided ideas to the strip club about how to get more customers into the club, made

decisions about which entertainers could perform at the club, and made decisions about

whether or not entertainers should be suspended); *Zachary v. ResCare Oklahoma, Inc.*,

471 F. Supp. 2d 1175, 1180 (D. Colo. 2017) (finding, at summary judgment, that parent

---

[21]     *E.g.*, APP. 329 (AuPairCare Au Pair Handbook); APP. 181 (APEX-2020 30(b)(6)
Tr. 83:8-24); APP. 462 (APF Au Pair Handbook); APP. 534 (API International Sending
Agent Handbook); APP. 295 (APIA 30(b)(6) Tr. 146:7-8); APP. 3329 Cultural Care
30(b)(6) Tr. 86:1-3; APP. 673 (CHI 30(b)(6) [Reilly] Tr. 70:5-19); APP. 803 (EurAuPair
Community Counselor Manual); APP. 951 (Expert AuPair 30(b)(6) Tr. 38:3-5); APP.
1032 (GoAuPair Local Area Representative Manual); APP. 1065 (GreatAuPair
Document); APP. 3426(InterExchange Host Family Handbook); APP. 1176 (USAuPair
30(b)(6) Tr. 26:3-11).

company was joint-employer of plaintiffs employed by subsidiary company, because

parent company "made or assisted in making all FLSA decisions that are at issue"

including exercising "specific control of the determination of whether and to what extent

overtime would be paid to Plaintiffs—the specific issue presented in this lawsuit"); *see

also Does v. Rodriguez*, No. 06-CV-805, 2007 WL 684117, at *5 (D. Colo. May 2, 2007)

(finding that overall control of an enterprise combined with consultation and supervision

satisfy "the legal definitions of employer or joint employer"); *Bureerong v. Uvawas*, 922

F. Supp. 1450, 1468-69 (C.D. Cal. 1996) (manufacturers could be deemed joint

employers of garment workers even though there was no traditional employment

relationship between the garment workers and the manufacturers, and manufacturers

did not have the power to hire or fire).

## IV.   PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON LIABILITY FOR THEIR WAGE AND HOUR CLAIMS

Requested Holding:[22]   The FLSA classes have established liability.

The Training Subclasses have established liability on their wage-and-hour-claims.

The State Classes have established liability on their wage-and-hour claims.

### A.  There Is Sufficient Uniformity In the Stipend for the Purposes of Liability

For the purposes of summary judgment on liability, Plaintiffs need not establish

that every au pair was paid $195.75.  Instead, Plaintiffs must establish a class-wide

practice reducing the wages of the class and inconsistent with FLSA or minimum wage.

*See In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1254-55 (10th Cir. 2014) (class-wide

liability can be established where "there is evidence that the conspiracy artificially

---

[22] Plaintiffs do not hereby move for summary judgment on the issue of collusion.

inflated the baseline for price negotiations."); *Kleen Products LLC v. International Paper*, 306 F.R.D. 585, 600 (N.D. Ill. 2015) ("even for negotiated prices, the starting point for those negotiations would be higher if the marker price for the product was artificially inflated"); *In re Cardizem CD Antitrust Litig.,* 200 F.R.D. 326, 345–47 (E.D. Mich. 2001) ("Proof of a conspiracy to establish a 'base' price would establish at least the fact of damage, even if the extent of the actual damages suffered by the plaintiffs would vary.").

Where, as here, there is minor variation in the degree of the injury suffered by class members, liability can still be established on a class-wide basis, "even though other important matters will have to be tried separately, such as damages." APP. 75 (quoting 7AA Charles Alan Wright, *et al.*, Federal Practice & Procedure § 1778 (3d ed. 2005)). The Tenth Circuit has endorsed this approach, holding that class-wide liability can be established even where "some of the plaintiffs may have avoided damages." *In re Urethane Antitrust Litig.*, 768 F.3d at 1254; *see also In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 535 (6th Cir. 2008) ("[E]ven where there are individual variations in damages," class-wide liability may be appropriate if "plaintiffs can establish that the defendants conspired to interfere with the free-market pricing structure."). In the antitrust context, this is because "price-fixing affects all market participants, creating an inference of class-wide impact even when prices are individually negotiated." *In re Urethane Antitrust Litig.*, 768 F.3d at 1254. The rule is no different in the wage-and-hour context. *See Tyson Foods, Inc. v. Bouphakeo*, 136 S. Ct. 1036 (2016) (allowing statistical evidence of a sample of class-members to establish class-wide liability in wage-and-hour action); *Leyva v. Medline Industries Inc.*, 716 F.3d 510, 513-14 (9th Cir.

2013) (holding class-wide liability can be established despite highly individualized

damages calculations in wage-and-hour class action).

Here, there can be no question as to the existence of a common practice

directed towards the Classes and affecting the price of au pair wages in violation of the

minimum wage requirements.  Indeed, indisputable evidence comes from Sponsors'

own trade association, the Alliance for International Exchange (the "Alliance").  An

Alliance factsheet summarizing the "key elements" of the au pair program states that

"au pairs receive a weekly stipend from host families of $195.75."  APP. 1764; *see also*

APP. 1769 ( "Au pairs receive a weekly stipend of $195.75 from their host families, and

[sic] amount set by State Department after an extensive interagency process with the

Department of Labor.").  Uniformity of this practice is a common Alliance talking point.

As APIA's CEO, William Gertz, said on a conference call with other au pair agencies,

"50 different wages won't work…we cannot deviate from this."  APP. 1767; *see also*

1758-61 (McCarry Tr. at 34:16–35:11, 66:3-8 – describing au pair compensation as a

"national stipend"); APP. 1772 (discussing "the national stipend that has served the

program well for over 25 years"); APP. 1775 (discussing the "current uniform, national

stipend").

The evidence from Sponsors confirms the Alliance evidence.[23]  In connection

with class certification, Plaintiffs submitted what Magistrate Judge Tafoya characterized

as "overwhelming evidence" showing that "all, or a substantial majority of, au pairs were

offered and paid a weekly stipend of approximately $195.75."  APP. 43-44.  The

---

[23]    Cultural Care has sued in Massachusetts to block a "Domestic Worker Bill of Rights", and alleges in its complaint that compliance with the Bill would make the program "economically infeasible" because "the weekly stipend of $195.75 would be converted to hourly wages amounting to $445.50".  APP. 107.

Magistrate Judge found that there is "voluminous evidence supporting the conclusion that putative class member au pairs were almost uniformly paid $195.75 per week." *Id.* at 43.  That evidence consists of a "broad mix of evidentiary sources," including "direct and indirect, contemporaneous and retrospective" sources which all "show the same thing," that "[a]u pairs' wages were consistently fixed at or very near $195.75 per week." *Id.*  The Magistrate Judge made these findings upon review of Dr. Kerr's class certification opening report (dated January 13, 2017; APP. 1118-1276) and his rebuttal report (dated February 3, 2017; APP. 1415-62).

The past year's additional discovery has continued to support Dr. Kerr's conclusions.  Every Defendant has represented to au pairs in advertisements that they will be paid a uniform $195.75 weekly wage.[24]  Indeed, the biggest employer of au pairs, Cultural Care, distributed marketing materials saying "all au pairs make the same weekly stipend of $195.75." APP. 2124 (Cultural Care "Choosing the Right Childcare").  AuPairCare once sent a blast email warning *au pairs* that "[l]egitimate host families" would "not offer you a higher stipend than" $195.75 per week.  APP. 1970 (AuPairCare "Important Message from AuPairCare").  "Although some host families may consider" paying more than $195.75, APIA has a "policy" of discouraging from doing so.  APP. 1863 (APIA 30(b)(6) Tr. 254:4-7).  InterExchange told its *au pairs* that it was a "scam" if an *au pair* received "offers that sound amazing, like paying you more than the program amount of $195.75 per week."  APP. 3184 (InterExchange website).  Another defendant stated that "the amount we pay is the government regulated amount and not open to

---

[24]    *See* APP. 1277-1338 (screenshots from each Defendants' website advertising au pairs wages based on $195.75 per week).

negotiation!"  *E.g.*, APP. 2212 (CHI Email).[25]  Several defendants memorialized their

scheme (and each au pair's reliance on it) in form contracts that every au pair was

required to sign.  For instance, for years AuPairCare au pairs were required to sign form

contracts representing and confirming that the au pair "will receive a weekly stipend in

accordance with US Department of State Regulations in the amount of $195.75" – no

more, and no less.  APP. 323 (AuPairCare Au Pair Agreement ¶ 29); *see also* APP.

1971-2006 (same stipend language).[26]  Indeed, Sponsors use as a major selling point

for host families, the fact that all au pairs would be paid the exact same wages,

regardless of Sponsor.[27]

---

[25]      *See also, e.g.*, APP. 203 (Agent Au Pair Host Family Agreement (". . . weekly
stipend determined by the Department of State, currently 195.75 . . . .")); APP. 1783
(APEX-2020 "PROaupair Pre-Match Pricing" ("Weekly Stipend $195.75 paid directly to
the au pair"); APP. 2032 (APF Au Pair Application – Au Pair Pledge (au pair "will receive
a weekly stipend of $195.75"); APP. 520 (API International Sending Agent Handbook
("au pair receives weekly stipend of $195.75")); APP. 1866 (APIA "Competitive analysis
for au pair programs" (describing wage as "fixed cost" weekly and annually); APP. 2113
(Cultural Care "A Flexible, Affordable Childcare Solution" ("Salary negotiations are a
hassle.  All au pairs earn a weekly stipend of $195.75"); APP. 2212 (CHI Email ("…let
the Au Pairs know that with CHI they would just be making the $195.75.")); APP. 2300
(EurAuPair Au Pair Handbook ("provide the Au Pair with $195.75 weekly pocket
money")); APP. 2628 (InterExchange "Live-In Child Care for Less" ("Au Pair Stipend
$195.75 per week").

[26]      *E.g.*, APP. 2038 (APF Host Family Agreement ("Host Family will pay the Au Pair
a weekly stipend of $195.75 ($146.81) in accordance with U.S. State Department and
Fair Labor Standards Act guidelines.").  Some Sponsors' form contracts incorporate
other program materials, which specify $195.75 as a set weekly wage.  *See, e.g.*, APP.
306 (APIA Host Family and Au Pair/Companion Agreement); APP. 1866 (APIA
"Competitive analysis for au pair programs")); APP. 2292 (EurAuPair Au Pair
Handbook).

[27]      *E.g.,* APP. 1967 (AuPairCare 30(b)(6) [McNamara] Tr. 36:15-19 ("Q. In your
experience in the industry, have you ever found it to be the case that au pair sponsors
compete for au pairs by offering au pairs a higher stipend? A. No.")); APP. 1780 (APEX-
2020 30(b)(6) Tr. 226:6, 226:23-24 ("195.75 for regular au pairs"…"That's my view,
based on my history…managing au pair programs.")); APP. 2016 (APF Email Re "Au
Pair Questions" ("weekly stipend is 195.75, as with all agencies.")); APP 2098 (API
Email to Host Family ("Your fees next year will be as follows: Weekly Stipend:

Named Plaintiffs and au pairs who have opted-in to the FLSA Classes have

testified that they were told by Sponsors that the weekly wage would be $195.75,[28] with

some testifying that Sponsors told them that they could not vary from that amount.[29]

The evidence shows that host families and industry participants have the same

understanding.[30]

Every Sponsor markets to host families a $195.75 wage.[31] The Sponsors'

standard-form contracts with host families also uniformly provide for a weekly wage of

$195.75.[32] Sponsors' host family handbooks and form applications make the same

---

$195.75/wk")); APP. 1866 (APIA Competitive analysis for au pair programs (describing the $195.75 stipend as part of a "fixed cost" for all Sponsors listed)); 2113 (Cultural Care "A Flexible, Affordable Childcare Solution" ("Salary negotiations are a hassle. All au pairs earn a weekly stipend of $195.75")); APP. 2288 (EurAuPair 30(b)(6) Tr. 236:1-4 ("stipend" or "pocket money" will be "the same regardless which au pair program sponsor a family chooses to host with")); APP. 2400 (Expert Au Pair ("Sponsor Organizations Comparison" showing identical annualized stipend).

[28]  E.g., APP. 3512 (Deetlefs Tr. 42:5-8); APP. 3192 (Beltran Tr. 87:13-16); APP. 3201 (Hlatshameni Tr. 62:13-19); APP. 3209, 3212 (Eastridge Tr. 23:10 – 24:21, 36:19 – 37:22); APP. 3218 (Leon Tr. 27:20-28:10); APP. 3236 (Pavot Tr. 77:13–82:2).

[29]  E.g., APP. 3225 (Bobboni Tr. 162:18-163:7); APP. 3230 (Swartz Tr. 204:3-19); APP. 3244 (Kruschwitz Tr. 33:13-34:1); APP. 3251 (Di Marco 106:13-107:6); APP. 3256 (Sahin 110:12-111:2); APP. 3309 (Ligaretto Tr. 99:24-101:21).

[30]  E.g., APP. 1726 (Crompton Tr. at 71); APP. 1730 (Boehne Decl. ¶ 5); APP. 1737 (Jeffrey Tr. 182:5-13); APP. 1741-42 (Sullivan Decl. ¶¶ 5-7); APP. 1744 ("Au Pair Mom" blog: http://aupairmom.com/au-pair-pocket-money-do-you-pay-more-than-therequired-stipend poll/2011/02/15/celiaharquail/ (visited January 11, 2017)).

[31]  See APP. 1278-1338; 1342-1411 (each Defendants' website shows $195.75 marketed to host families).

[32]  E.g., APP. 1844 (APEX-20/20 Host Family Service Agreement); APP. 1789 (APEX Family Service Agreement); APP. 1852 (Agent Au Pair Host Family Agreement); APP. 2426 (Go Au Pair Host Family Placement Services Agreement); APP. 1871 (APIA 2014 Host Family Agreement); APP. 2045 (APF Host Family Agreement); APP. 552 (API Host Family Agreement); APP. 2163 (Cultural Care 2013 Host Family Agreement) ("in accordance with the Regulations" which Cultural Care elsewhere says require $195.75 (e.g., APP. 3337 (30(b)(6) Tr. 160:4-16))); APP. 2222 (CHI Host Family Agreement) ("in accordance with the Regulations", which CHI elsewhere says require

18

representation.[33]  Plaintiffs also commissioned a survey of host families to determine the wages they paid to class members.  The results showed that across the country, in rural, urban and suburban locations, over a 10-year period, across all Sponsors, over 90% of host families paid their au pairs $195.75 each week, or within $5 of that amount. Kerr Merits Report App. C, Ex. 6.  Indeed across the entire 4,577 survey responses, 90% of weekly wages were reported to be within +/- 2.5% of $195.75.  *Id.*  Dr. Kerr also found that responses to the questionnaire sent to FLSA opt-ins corroborated the results of the host family survey. APP. 1629 (Kerr Report ¶ 49 ("Of the responses reviewed to date covering 908 placements, 809 indicated a stipend amount between $195 and $200 per week.")).

Where available, Sponsors' audit reports and surveys also indicate a near uniform practice of paying $195.75.[34]  This evidence is supported by the Sponsors' competitive surveys, which show that all Sponsors charge $195.75.[35]  The Sponsors'

---

$195.75 (e.g., APP. 3420 (30(b)(6) Tr. 44:15-45:10))); APP. 2405 (Expert Au Pair Family Service Agreement); APP. 2611 (Great Au Pair Host Family Agreement); APP. 3148 (InterExchange Host Family Agreement).

[33]  *E.g.*, APP. 1837 (APEX-20/20 ProAuPair Host Family Service Agreement); APP. 203 (Agent Au Pair 2010 Agent Au Pair Host Family Agreement); APP. 3323 (APIA 30(b)(6) Tr. 243:16-244:8); APP. 2008 (AuPairCare 2010 Host Family Agreement); APP. 470 (APF Host Family Handbook); APP. 3339 (Cultural Care 2010 Host Family Handbook); APP. 2248 (CHI Host Family Handbook); APP. 2373 (EurAuPair 2014 Host Family Handbook); APP. 3422 (Interexchange Host Family Handbook); APP. 3465 (USAuPair 2009 Program Fees & Schedules).

[34]  *E.g.*, APP. 2166-98 ("Monthly Contact Report – Cultural Care); APP. 2163, 2643 (InterExchange 2012-2013 Survey).

[35]  *E.g.*, APP. 1866 (APIA "Competitive analysis for au pair programs"); APP. 2108 (Cultural Care "Competitor Guide 2014"); APP. 1741 (Sullivan Decl. ¶ 5 ("When I initially inquired about the au pair program four years ago, and at every point thereafter, I was told that the weekly stipend for au pairs was a set amount of $195.75 a week for up to 45 hours of work. I was also told that the amount was set by the federal government.")).

30(b)(6) representatives also provided testimony supporting the conclusion that all Sponsors paid $195.75.[36]

Finally, in other litigations, Cultural Care has acknowledged the class-wide practice suppressing au pair wages. In a putative class action filed by host families, Cultural Care defended as "true" its representations that the weekly wage for au pairs was $195.75. APP. 3521 (*Peretz v. Cultural Care, Inc.*, 14-cv-13579, "Motion to Dismiss" (D. Mass. 2014)). More recently, Cultural Care made similar representations in its bid to block a new Massachusetts' labor law. *See Cultural Care, Inc. v. Office of the Attorney General of Massachusetts*, No. 16-cv-11777, 2017 WL 3272011, at *2 (D. Mass. Aug. 1, 2017).

## B. Liability Summary Judgment Is Warranted for the FLSA Classes and Named Plaintiffs

The FLSA Classes and the named plaintiffs, assert four FLSA violations: (1) failure to pay them the minimum wage; (2) failure to pay them for their mandatory week-long training; (3) unlawful deduction of room and board from their wages; and (4) failure to pay overtime compensation after January 1, 2015.

Every point of law necessary to establish FLSA liability for each of the four FLSA claims is beyond dispute. The Court has already held that Plaintiffs have valid legal claims for the minimum wage (APP. 22-25), training (APP. 22 n.4), unlawful deduction (APP. 26-28), and overtime (APP. 28). In a case like this, "[t]he requirements to state a claim of a FLSA violation are quite straightforward, requiring plaintiff to show a failure to pay overtime compensation and/or minimum wages to covered employees'—no more." *Rayfield v. Sandbox Logistics*, LLC, 217 F. Supp. 3d 1299, 1300 (D. Colo. 2016)

---

[36]     *See* APP. 3544-66.

(internal quotations omitted).  Moreover, deductions from an employee's wages, "for whatever purpose," that result in that employee being paid below the minimum wage violates Section 6 of the FLSA.  *See Donovan v. Simmons Petroleum Corp.,* 725 F.2d 83, 84 (10th Cir.1983); *Solis v. Supporting Hands*, LLC, No. 11-cv-406, 2013 WL 1897822, at *7 (D.N.M. Apr. 30, 2013).

Likewise, all facts necessary to prove liability for these violations are beyond dispute.  As the Sections above demonstrate, the record establishes that Sponsors are joint employers of au pairs who cause au pairs to be paid less than minimum wage. Similarly, au pairs were not paid for training, *see* Part IV.C, and were not paid overtime. To the extent that Sponsors claim the room-and-board deduction as an excuse for underpayment, that deduction was improperly made.

By the same token, each named plaintiff was paid at or near $195.75 per week for up to 45 hours of work.[37]  None were paid for training.[38]  None were paid any overtime.[39]  And each was subject to an improper room and board credit.[40]

---

[37]   APP. 3265 (Beltran Decl. ¶¶ 12-15); APP. 3517 (Deetlefs Decl. ¶¶ 10-11); APP. 3268 (Hlatshaneni Decl. ¶¶ 9-10, 13-15); APP. 3260 (Gonzalez Decl. ¶¶ 7-8); APP. 3278 (Mapledoram Decl. ¶¶ 9-10); APP. 3467 (Azuela Rascon [March 3, 2017] Ex. 154 at 6-7, 13; 155); APP. 3282 (Jimenez Decl. ¶¶ 14-16); APP. 3274 (Harning Decl. ¶¶ 21-22).

[38]   *See* APP. 3265 (Beltran Decl. ¶¶ 8-9); APP. 3516 (Deetlefs Decl. ¶ 6); APP. 3268 (Hlatshaneni Decl. ¶¶ 6-7); APP. 3260 (Gonzalez Decl. ¶ 5); APP. 3277 (Mapledoram Decl. ¶ 5); APP. 3474-77 (Azuela Rascon Tr. 48:23-51:3); APP. 3281 (Decl. of Laura Mejia Jimenez ¶ 9); APP. 3273 (Harning Decl. ¶¶ 18-19).

[39]   *See* Note 37, supra.

[40]   *See* Note 37, supra.

Case 1:14-cv-03074-CMA-KMT Document 888 Filed 02/16/18 USDC Colorado Page 28 of 38

## C. Liability Summary Judgment Is Warranted for the Training Classes[41]

There is no dispute that each and every au pair in the training classes attended mandatory, unpaid training.[42]  Under the laws of the states where the training took place, the Sponsors were required to pay the au pairs for that training.  Accordingly, each training class is entitled to summary judgment for the Sponsors' failure to pay them for required training.[43]

### (1) New York Training Subclass

New York Training class au pairs were "subjected to unpaid standard *au pair training by*" Cultural Care, APIA, or InterExchange.  APP. 91 (Rule 23 Order v).

APIA's compulsory training program is a minimum of 32 hours spread over 5 days.  *See* APP. 3268 (Hlatshaneni Decl. ¶ 6); APP. 1874 (APIA Au Pair in America Orientation Guide for trainers); APP. 3325 (APIA Au Pair In America Fact Sheet ("all au pairs receive…child care training and comprehensive adaptation training")).

Cultural Care requires every *au pair* to undergo a standardized training in New York. "The training school is the required first stop for all au pairs coming to the U.S. to make sure that they have the mandatory orientation programing before they travel to their hosting family."  APP. 635 (Cultural Care 30(b)(6) Tr. at 81:2-9).  Cultural Care, like

---

[41]     Liability is also appropriate for the AuPairCare New Jersey Training Subclass for the same reasons discussed here.  However, because certain claims against AuPairCare are stayed, (*see* ECF No. 756), Plaintiffs reserve their right to adjudicate those claims once AuPairCare's appeal is resolved.

[42]     There is no dispute that au pairs' employment with host families has not begun at the time of training, so there can be no dispute that the Defendants are the employers for the purpose of the training weeks.

[43]     Since the state-wide minimum is the floor, and violating that minimum establishes liability, Plaintiffs have not addressed local laws (which are significantly higher in many metropolitan areas).  Plaintiffs expect to do so in the damages phase.

the others, pays nothing to the au pairs for this time. APP. 637 (Cultural Care 30(b)(6) Tr. 186:13-19.)

InterExchange requires each prospective *au pair* to come to New York City and attend an identical training. *See* APP. 1078 (InterExchange 30(b)(6) Tr. 187:17-21). InterExchange's representative explained that "everyone has to go through it" and that it is unpaid. APP. 1079 (InterExchange 30(b)(6) Tr. 190:11-16).

New York's Labor Law, Article 19 §§ 650 ("NYLL"), recognizes a private right of action for unpaid wages. *See Moreno v. Future Care Health Services*, Inc., No. 500569/2013, 2014 WL 1236815, at *16 (Kings Cty. Sup. Ct. Jan. 16, 2014); *Lai Chan v. Chinese-American Planning Council Home Attendant Program, Inc.*, 21 N.Y.S.3d 814, 829 (N.Y. Cty. Sup. Ct. 2015). NYLL 19 §§ 652 requires that "[e]very employer shall pay to each of its employees for each hour worked a wage of not less than" the state's minimum wage. Employers must compensate employees for time spent attending any training that is for the benefit of an employer. *See* APP. 3518 (N.Y.S. Dep't of Lab. Opn. Ltr., RO-08-0020 (Aug. 27, 2008)). Section 663 of the NYLL further provides that "[i]f any employee is paid by his or her employer less than the wage to which he or she is entitled under the provisions of this article, he or she may recover in a civil action the amount of any such underpayments, together with costs [and such] reasonable attorney's fees."

### (2) Florida Training Subclass

Class representative Nicole Mapledoram, along with all members of the Florida Training class, attended unpaid training in order to work as an au pair for Expert Au Pair. APP. 3277 (Mapledoram Decl. ¶ 5). The training takes place in St. Petersburg,

Florida. The training is mandatory, and au pairs are not compensated for the 30 hours Expert Au Pair requires. *See* APP. 2382 (Expert Au Pair 30(b)(6) Tr., May 31).

Florida's Constitution declares that all persons are "entitled to be paid a minimum wage that is sufficient to provide a decent and healthy life for them and their families." Article X, § 24(a), Fla. Const. The Florida Minimum Wage Act ("MWA") further states that "those individuals entitled to receive the federal minimum wage under the federal Fair Labor Standards Act and its implementing regulations shall be eligible to receive the state minimum wage." Section 448.110(3), Florida Statutes (2009). As courts have recognized, Florida's MWA "expressly adopt[s] the FLSA, as interpreted and implemented by federal law". *Martinez v. Ford Midway Mall, Inc.*, 59 So.3d 168, 173 (Fla. App. 3 Dist. 2011); *see also* MWA 448.110(3) ("the federal Fair Labor Standards Act, as interpreted by the applicable federal regulations and implemented by the Secretary of Labor, are incorporated herein"). Under the FLSA, training must be compensated unless four criteria are met, including that the training must be "voluntary." 29 C.F.R. § 785.27(b). "Attendance is not voluntary, of course, if it is required by the employer. It is not voluntary in fact if the employee is given to understand or led to believe that his present working conditions or the continuance of his employment would be adversely affected by nonattendance." 29 C.F.R. § 785.28.

### D. Liability Summary Judgment Is Warranted for the State Classes

Plaintiffs in each subclass assert that APIA, Cultural Care, Expert Au Pair, Go AuPair, or InterExchange failed to pay them the applicable minimum wage and overtime, as required by each of the seven states in which they worked as au pairs.

### (1) California: Au Pair in America Subclass

California Labor Code section 1182.12 requires employers to pay their employees a minimum wage.  Under section 1194(a) of the Code, "any employee receiving less than the legal minimum wage [ ] is entitled to recover in a civil action the unpaid balance of the full amount of this minimum wage or overtime compensation, including interest thereon, reasonable attorney's fees, and costs of suit. C.A. LABOR C. § 1194(a).  Further, an employee must be paid "one and one-half times the regular rate of pay" for any hours above eight in a workday, and 40 in a work week.  *Id.* § 510(a). Indeed, California's "labor statutes reveal[] a clear legislative intent to protect the minimum wage rights of California employees to a greater extent than" the FLSA. *Armenta v. Osmose, Inc.*, 135 Cal. App. 4th 314, 324 (Cal. App. 2 Dist. 2005).

All members of the Au Pair in America California Subclass were paid a weekly wage that was contrary to California law.  In 2009, California's minimum wage was $8 per hour; it moved to $9 per hour in 2014 and to $10 in 2016.  As of January 1, 2018, the minimum wage is $11 per hour.  The au pairs in this Subclass were paid wages well below even $8 per hour, and they were not paid for overtime.

### (2) Colorado: Expert AuPair and InterExchange Subclasses

Colorado's minimum wage and overtime laws are governed by regulatory enactments known as "Minimum Wage Orders" ("MWO") published by the Director of the Colorado Division of Labor.  C.R.S. § 8-6-108.5(3); 7 C.C.R. 1103–1:1; *see also Kennett v. Bayada Home Health Care, Inc.*, 135 F.Supp.3d 1232, 1238 (D. Colo. 2015) (Arguello, J.).  The current MWO, Number 34, explains that Colorado's minimum wage law applies where the FLSA would apply.  *See* 7 C.C.R. 1103-1.  It also explains that

hours above 40 each week are to be compensated at "time and one-half". *Id*. Although the current minimum wage is $10.20 per hour, between 2009 and the present, the MWO, and the minimum wage it sets, was superseded nine times: MWO 25 (Jan. 1, 2009 – $7.28); MWO 26 (Jan. 1, 2010 – $7.24); MWO 27 (Jan. 1, 2011 – $7.36); MWO 28 (Jan. 1, 2012 – $7.64); MWO 29 (Jan. 1, 2013 – $7.78); MWO 30 (Jan. 1, 2014 – $8.00); MWO 31 (Jan. 1, 2015 – $8.23); MWO 32 (Jan. 1, 2016 – $8.31); MWO 33 (Jan. 1, 2017 – $9.30).[44]

Directly beneath the 'either Colorado or FLSA criteria' in MWOs 25 through 32 there is language stating that "[s]ome restrictions and exemptions may apply; contact the Colorado Division of Labor for additional information." MWOs 33 and 34 removed this clause from the preamble. And of course, each MWO, including the current MWO 34, "shall supersede all previous Wage Orders." 7 C.C.R. 1103-1. In prior briefing, Defendants made much of the "may apply" language in the restrictions and exemptions clause, claiming it means that au pairs are excluded from the minimum wage because of a supposed "domestic exemption" that covers au pairs.[45] *See* ECF No. 247 at 11-12. That argument is a red herring. Even assuming a domestic exemption applies under Colorado law, the MWOs require a minimum wage where "either" the Colorado rules or the FLSA would apply. *See also* 7 C.C.R. 1103-1. Indeed, the MWOs state that

---

[44]     Each prior MWO (25-33) is available online at https://www.colorado.gov/pacific/cdle/wage-order-archive.

[45]     Plaintiffs dispute that the "domestic exemption" applies to Colorado au pairs. *See, e.g.*, *Kennett*, 135 F.Supp.3d at 1246 (finding no Colorado domestic exemption where company placed workers in third party homes); *Jordan v. Maxim Healthcare Services, Inc.*, No. 15-cv-1372, 2016 WL 1059540, at *6 (D. Colo. Mar. 17, 2016). Regardless, the FLSA has no "domestic exemption."

"[w]henever employers are subjected to both federal and Colorado law, the law
providing greater protection or setting the higher standard shall apply." *Id.*

### (3) Maryland: Cultural Care and Go AuPair Subclasses

"The Wage and Hour Law is the Maryland parallel to the Fair Labor Standards
Act." *Marshall v. Safeway, Inc.*, 63 A.3d 672, 678, n.5 (Md. Ct. Spec. App. 2013).  It
requires "that employers pay the applicable minimum wage to their employees and ...
that they pay an overtime wage of at least 1.5 times the usual hourly wage for each
hour over 40 that the employee works during one workweek." *Friolo v. Frankel,* 819
A.2d 354 (Md. 2003).  It further provides that "[i]f an employer pays an employee less
than the wage required under [the Wage and Hour Law], the employee may bring an
action against the employer to recover the difference between the wage paid to the
employee and the wage required under this subtitle."  L.E. § 3–427(a).

The minimum wage in Maryland is $9.25 per hour, which was set on July 1,
2017. *See* History of Minimum Wage in Maryland – Employment Standards Service,
Maryland Dep't of Labor, Licensing & Regulation,
https://www.dllr.state.md.us/labor/wages/minwagehistory.shtml.  At the beginning of the
class period in 2009 it was $7.25 per hour, increased to $8.00 on January 1, 2015,
$8.25 on July 1, 2016, and $8.75 on July 1, 2016.  *Id.* Cultural Care au pairs are not
paid in accordance with these laws.  *E.g.*, APP. 3467 (Azuela Rascon [March 3, 2017]).
*See* Part IV.A, supra.

### (4) Massachusetts: Cultural Care Subclass

Under the Massachusetts Fair Minimum Wage Act ("MFMWA"), it is "against
public policy for any employer to employ any person . . . at an oppressive and

unreasonable wage," which any wage below the minimum is "presumed" to be. M.G.L.A. 151 § 1.  The MFMWA "mandates overtime pay for hours worked over 40 per week at one and a half times the employee's regular rate of pay." *Cavallaro v. UMass Memorial Healthcare, Inc.,* 678 F.3d 1, 9 (1st Cir. 2012); *see also* M.G.L.A. 151 § 1A. "Massachusetts courts generally look to guidance from analogous federal statutes when interpreting state wage and overtime laws." *Napert v. Government Employees Ins. Co.*, 36 F. Supp. 3d 237, 242 n.5 (D. Mass. 2014).  Indeed, the MFMWA was "intended to be essentially identical" to the FLSA.  *Mullally v. Waste Management of Massachusetts, Inc.*, 895 N.E.2d 1277, 1281 (Mass. 2008) (citations and quotation marks omitted). Between 2009 and 2014, the minimum wage was $8.00 per hour; it was raised to $9.00 in 2015, $10.00 in 2016, and is now $11.00.  M.G.L.A. 151 § 1.

Massachusetts domestic workers, including au pairs, are also protected by the Commonwealth's Domestic Workers Bill of Rights.  M.G.L.A. 149 § 190.  Among other provisions, the law, "clarif[ies] that domestic workers who work more than 40 hours per week are entitled to overtime pay for those hours." *Cultural Care, Inc. v. Office of the Attorney General of Massachusetts*, No. 16-cv-11777, 2017 WL 3272011, at *2 (D. Mass. 2017).  Despite being headquartered in Massachusetts, Cultural Care has sued to block the Attorney General from enforcing the Domestic Bill of Rights claiming that increased wages and legal protections would scare off would-be au pairs.  *Id.*, at *10. Indeed, Cultural Care defended a $195.75 wage as essential because "the weekly stipend of $195.75 would become hourly wages up to $445.50" making it no longer "an

28

affordable childcare option".  *Id.*, APP. 149-50 (Opposition to Motion to Dismiss, at 21-22).  Cultural Care lost on every claim at the motion to dismiss.[46]

### (5) Michigan: Au Pair in America Subclass

Michigan's Workforce Opportunity Wage Act ("MWOWA") provides that employees are entitled to the greater of the federal or Michigan minimum wage. M.C.L.A. § 408.420.  The MWOWA also provides that "an employee shall receive compensation at not less than 1–1/2 times the regular rate at which the employee is employed for employment in a workweek in excess of 40 hours."  M.C.L.A. § 408.414a(1).  Michigan's minimum wage was $7.40 per hour from 2009 to September 1, 2014, when it increased to $8.15.  It increased again to $8.50 on January 1, 2016; again on January 1, 2017 to $8.90; and currently sits at $9.25 per hour, as of January 1, 2018.  M.C.L.A. § 408.414(1)(a)-(e).  As with APIA au pairs in other states, those in Michigan were paid far below the minimum hourly rates that apply to the class period. *E.g.* APP. 3274 (Harning Decl. ¶¶ 21-22).  *See* Part IV.A, supra.

### (6) Pennsylvania: Au Pair in America Subclasses

The Pennsylvania Minimum Wage Act ("PMWA") requires that the minimum wage be paid for all "hours worked."  43 P.S. § 333.104(a).  "Employees shall be paid for overtime not less than one and one-half times the employee's regular rate."  *Id.* § 333.104(c).  It "specifically grants employees the authority to enforce their right to statutorily defined minimum wages through civil actions."  *Lugo v. Farmers Pride, Inc.*, 967 A.2d 963, 968 (Pa. Super. 2009) (citing 43 P.S. § 333.113).

---

[46]     Cultural Care appealed the dismissal, and then sought a 6-month stay of its own appeal, claiming that the *Beltran* lawsuit has caused the State Department to re-think the au pair program regulations.  APP. 161 (Appellants' Motion for Extension).  The First Circuit denied Cultural Care's request.  APP. 169 (Order of Court).

Pennsylvania's minimum wage is currently $7.25 per hour, and has remained the same throughout the entire class period. *See* Minimum Wage Law Summary, Pennsylvania Dep't of Labor & Industry, http://www.dli.pa.gov/Individuals/Labor-Management-Relations/llc/minimum-wage/Documents/llc-1.pdf; *see also* 43 P.S. § 333.104(a.1) (state minimum same as federal).

**(7) Virginia: Cultural Care Subclasses**

The minimum wage in Virginia was the same as the federal minimum wage for the entire class period, $7.25 per hour.  *See* Virg. Min. Wage Act § 40.1-28.10.  Virginia also follows the FLSA in providing that overtime hours above 40 hours each week must be compensated at one and one-half times the regular rate.  *See Walker v. Service Corp. Intern.*, No. 4:10-CV-48, 2011 WL 1370575, at *6 (W.D. Va. Apr. 12, 2011) ("Virginia does not have state overtime laws and therefore defers to the FLSA on overtime.").  Virginia's Minimum Wage Act allows employees to sue for unpaid minimum wages, plus 8% interest.  Virg. Min. Wage Act § 40.1-28.12.  As noted above, Cultural Care au pairs around the country, including those in Virginia, are not paid even the federal minimum wage, nor are they paid for their overtime hours.

## <u>CONCLUSION</u>

For the reasons given herein, Plaintiffs respectfully request that the Court grant partial summary judgment and enter the holdings described above.

Dated: February 16, 2018

Respectfully Submitted,

BOIES SCHILLER FLEXNER LLP

  /s/ Joshua J. Libling
Matthew L. Schwartz
Peter M. Skinner
Randall W. Jackson
Dawn L. Smalls
Joshua J. Libling
Byron Pacheco
575 Lexington Avenue
New York, New York 10022
Tel: (212) 446-2300
Fax: (212) 446-2350
mlschwartz@bsfllp.com
pskinner@bsfllp.com
rjackson@bsfllp.com
dsmalls@bsfllp.com
jlibling@bsfllp.com
bpacheco@bsfllp.com

Sean P. Rodriguez
Juan P. Valdivieso
1999 Harrison Street, Suite 900
Oakland, CA 94612
Tel: (510) 874-1000
Fax: (510) 874-1460
srodriguez@bsfllp.com
jvaldivieso@bsfllp.com

TOWARDS JUSTICE
Alexander Hood
1535 High Street, Suite 300
Denver, Colorado  80218
Tel: (720) 239-2606
Fax: (303) 957-2289
alex@towardsjustice.org

*Attorneys for Plaintiffs*

Case No. 1:14-cv-03074-CMA-KMT Document 816-1 filed 08/01/18 USDC Colorado pg 38 of 38

## Certificate of Service

I hereby certify that on February 16, 2018, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.


 /s/ *Joshua J. Libling*
Joshua J. Libling