Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Case No. 14-cv-03074-CMA-KMT

_____

JOHANA PAOLA BELTRAN, ET AL.,

       Plaintiffs,

vs.

INTEREXCHANGE, INC., ET AL.,

       Defendants.

_____

VIDEOTAPED DEPOSITION OF

SHANNON PITTS

30(b)(6) REPRESENTATIVE FOR GREAT AU PAIR

MAY 31, 2017

DENVER, COLORADO

9:21 A.M.

Magna Legal Services
866-624-6221
www.magnals.com



Page 2

1        The videotaped deposition of
2   SHANNON PITTS, taken before Leeann Keenan, a Registered
3   Merit Reporter, Certified Realtime Reporter, and a
4   Notary Public in and for the County of Summit and the
5   State of Colorado, at 4643 South Ulster Street, Suite
6   800, Denver, Colorado, on Wednesday, May 31, 2017, at
7   the hour of 9:21 a m., pursuant to Notice.

Page 4

1   APPEARANCES CONTINUED:
2
3       GORDON & REES
        BY: HEATHER KELLY, ESQ
4         555 17th Street
          Suite 3400
5         Denver, Colorado  80202
          (303) 200-6888
6         hkelly@gordonrees com
          appeared by telephone on behalf of
7         AuPairCare, Inc

        NIXON, SHEFRIN, HENSEN, OGBURN
8       BY: LAWRENCE STONE, ESQ
          5619 DTC Parkway
9         Suite 1200
          Greenwood Village, Colorado  80111
10        (303) 773-3500
          lstone@nixonshefrin com
11        appeared by telephone on behalf of
          ProAuPair and International Au Pair
12        Exchange
13      CHOATE, HALL & STEWART
        BY: LYNDSEY KRUZER, ESQ
14        Two International Place
          Boston, Massachusetts  02110
15        (617) 248-5221
          lkruzer@choate com
16        appeared by telephone on behalf of
          Cultural Care
17
        FISHER & PHILLIPS
18      BY: SUSAN SCHAECHER, ESQ
          1801 California Street
19        Suite 2700
          Denver, Colorado  80202
20        (303) 218-3650
          sschaecher@fisherphillips com
21        appeared by telephone on behalf of
          AuPair Foundation and Au Pair in
22        America
23
24  ALSO PRESENT: Davis Baumunk, Videographer
25

Page 3

1   APPEARANCES:
2
        BOISE, SCHILLER, FLEXNER, L L P
3       BY: SEAN RODRIGUEZ, ESQ
          JUAN P  VALDIVIESO, ESQ
4         1999 Harrison Street
          Suite 900
5         Oakland, California  94612
          (510) 874-1010
6         srodriguez@bsfllp com
          jvaldivieso@bsfllp com
7         appeared on behalf of the Plaintiffs
        WHEELER, TRIGG, O'DONNELL
8       BY: KATHRYN REILLY, ESQ
          370 17th Street
9         Suite 4500
          Denver, Colorado  80202
10        (303) 244-1983
          reilly@wtotrial com
11        appeared on behalf of USAuPair, Inc ,
          GoAuPair, and Au Pair International
12
13      SHERMAN & HOWARD, L L C
        BY: ALYSSA LEVY, ESQ
14        633 17th Street
          Suite 3000
15        Denver, Colorado  80202
          (303) 299-8194
16        alevy@shermanhoward com
          appeared by telephone on behalf of
17        InterExchange, Inc
18      ARMSTRONG TEASDALE, L L P
        BY: VANCE KNAPP, ESQ
19        4643 South Ulster Street
          Suite 800
20        Denver, Colorado  80237
          vknapp@armstrongteasdale com
21        (303) 575-4004
          appeared on behalf of Great Au Pair
22
23
24
25

Page 5

1                I N D E X
2
    DEPOSITION WITNESS:                         PAGE
3   SHANNON PITTS
4   Examination by Mr  Valdivieso                10
5
    PLAINTIFFS' DEPOSITION EXHIBITS MARKED:
6   NO      DESCRIPTION                         PAGE
7   Exhibit 1   Plaintiffs' Second Revised Notice of   12
                30(b)(6) Deposition of Great Au Pair
8
    Exhibit 2   May 4 - May 5, 2009 e-mail chain       38
9               between Susie Crow and Kim at
                EuRaupair
10              GAP0000642 - 643
11  Exhibit 3   July 1, 2009 and December 16, 2009    41
                e-mails between Susie Crow and
12              Shannon Pitts
                GAP0008055 - 8056
13
    Exhibit 4   September 22 - 23, 2010 e-mail chain  44
14              between Jamie Pitts, Shannon Pits,
                and Susie Crow
15              GAP00017790 - 17792
16  Exhibit 5   January 10, 2011 e-mail chain between  56
                Susie Crow, Lisa at EuRaupair, and
17              Barry and Jody Levit
                GAP00028708 - 28709
18
    Exhibit 6   December 11, 2010 - April 11, 2011    62
19              e-mail chain between Susie Crow,
                Fallon Collins, and Annika Ingrid
20              GAP00028774 - 28776
21  Exhibit 7   July 24 - 28, 2011 e-mail chain       66
                between Jodie Pitts and Audrey
22              Valranges
                GAP00037144
23
    Exhibit 8   September 29 - 30, 2011 e-mail chain  74
24              between Shannon Pitts and Michael
                DiMauro
25              GAP0006858- 6860



2 (Pages 2 to 5)

| | |
|---|---|
| Page 150 | Page 152 |

Page 150

1 Increase, which had been posted on the Department's
2 website."
3     Did I read that correctly?
4   A.  Yes.
5     THE WITNESS: Can they mute?
6     MR. KNAPP: Yeah, we need to get
7 somebody to mute.
8     MR. VALDIVIESO: Could everyone on
9 the phone please mute their lines.
10   Q.  Was GreatAuPair among sponsors having
11 questions regarding the nature of the guidance
12 contained in the June 14, 2007 notice?
13   A.  I don't know what that specifically is
14 referring to. No, with regards to questions. I
15 had -- when we got served notice, I did send an
16 e-mail to the Department of State asking for
17 guidance on, you know, how to move forward with
18 this. But that wasn't in relation to this specific
19 federal minimum wage or the stipend.
20   Q.  What do you mean by when you got served
21 notice?
22   A.  When we were notified regarding this
23 lawsuit, I sent an e-mail to the Department of State
24 that it wasn't in relation to -- I mean, I don't
25 know specifically what they're asking or saying here

Page 151

1 with regards to which sponsors had questions
2 regarding the nature and guidance contained in the
3 June 14th, 20 -- I mean, I didn't send an e-mail on
4 that.
5     The only e-mail I sent to the
6 Department of State was with regards to the fact
7 that we've been served notice in this lawsuit, and
8 that was back in January of 2015.
9   Q.  When you -- I believe you testified that
10 this document gave notice that the Department of
11 State wanted sponsors to change the way in which
12 they communicated the stipend amount to au pairs; is
13 that right?
14   A.  Correct.
15   Q.  Where in this e-mail do you see direction
16 from the Department of State to change the way in
17 which you communicate?
18   A.  Well, the nature of the e-mail relates to
19 their guidance with regards to the -- the stipend.
20 So it says, "As sponsors are aware, the legal
21 requirements for compensating exchange visitors in
22 an au pair" -- "in au pair programs are set as forth
23 in the Department of State's" -- "or Department's
24 regulations governing the EVP at 22 CFR Part 62.
25 The Department wishes in particular to remind

Page 152

1 sponsors that their obligations with respect to
2 au pair wages are set forth in 22 CFR 62.31(j)(i).
3 Sponsors shall require that au pair participants are
4 compensated at a weekly rate based upon 45 hours of
5 childcare services per week and paid in conformance
6 with the requirements of the Fair Labor Standards
7 Act, as interpreted and implemented by the United
8 States Department of Labor."
9     And that's the guidance. What
10 they are saying above in the paragraph is that they
11 have removed the guidance that they had previously
12 listed on their website, which was the fed --
13 federal minimum wage increase, which had been posted
14 on the Department's website, that included very
15 specific information with regards to the au pair
16 stipends relative to the federal minimum wage.
17   Q.  And you're familiar with the language in
18 22 CFR Section 62.31(j)(1)?
19   A.  Yes.
20   Q.  Is the language you just quoted from, did
21 that language exist prior to March 13th, 2015 in the
22 regulations?
23   A.  Yes, it did. And just to clarify,
24 there's several different ways the Department of
25 State shares information with sponsors, and one way

Page 153

1 is through a bulletin or an e-mail like this, where
2 they're providing guidance. There are the
3 regulations that we follow and we are responsible to
4 uphold, and there are communications in person with
5 the Department of State.
6     So there are several different
7 ways the Department of State provides guidance.
8 Bulletins an e-mails and, you know, phone
9 communications or in-person communications are all a
10 part of how they provide directives and guidance to
11 sponsors.
12   Q.  The last sentence of the paragraph that
13 you were quoting from says, "This regulation sets
14 the minimum compensation that sponsors must ensure
15 that au pair participants are paid."
16     How does -- does GreatAuPair
17 ensure that au pair participants are paid that
18 minimum compensation?
19   A.  Again, we restate what the Department of
20 State has required us to say, which is that the
21 minimum stipend is just that. It's a minimum
22 stipend of 195.75.
23     So as they provide greater clarity
24 with regards to the implementation of their
25 regulations, we have followed suit and updated our

Page 154

1  information to ensure that the minimum stipend is
2  stated as a minimum, as opposed to just 195.75.
3      Q.  And the last paragraph says, "Finally,
4  sponsors should remember that - in addition to
5  requiring that au pairs be paid a stipend that, at a
6  minimum, meets the regulatory requirements noted
7  above - sponsors must operate their au pair programs
8  in conformance with all other applicable federal,
9  state, and local laws."
10          Do you see that?
11     A.  I do.
12     Q.  Did I read it correctly?
13     A.  You did, and I think that's -- that's an
14 important point.  Because we actually require our
15 host families to comply with all federal, state,
16 local laws as well.
17         So as a sponsor organization, we
18 pass on the regulations and the rules and the
19 guidance from the Department of State, as an agent
20 of the Department of State, to help families
21 facilitate -- or to facil -- facilitate the au pair
22 program to help them, you know, ensure compliance.
23         So the host families are
24 responsible as the employer for compliance with
25 their federal, state, local laws, including any

Page 155

1  labor laws, any, you know, workers' compensation
2  insurance, any payroll, anything like that.  That's
3  all the host family employer's responsibility, as it
4  is articulated in our agreement with the host
5  families.
6      Q.  Does the paragraph that I just read from
7  mention host families?
8      A.  No, it doesn't mention host families.
9  But as sponsors, we have participants in the
10 program.  So our participants are the host family
11 and the au pairs.
12         So as I was trying to explain
13 before, the host family is the employer of the
14 au pair, and they are the ones that are responsible
15 for determining their au pair's salary and, you
16 know, any other benefits that they may provide.  I
17 mean, that's -- that's their prerogative as an
18 employer and their responsibility as an employer.
19     Q.  But the directive in this paragraph is to
20 sponsors, right, to operate their au pair programs
21 in conformance with all other applicable federal,
22 state, and local laws; is that right?
23     A.  Yes.
24         And since we're not the employer,
25 we're not getting involved in employment labor law.

Page 156

1  We're simply following the Department of State
2  regulations and facilitating the program according
3  to their guidance.
4      Q.  So what does operating the au pair
5  program in conformance with other applicable
6  federal, state, and local laws mean to you?
7      A.  Well, I think as -- as a business, we
8  have to comply with federal laws.  We have to comply
9  with state laws.  We have our state -- you know,
10 our -- our state filings.  I mean, we, as a
11 business, operate within the laws of the federal
12 government and the state government.
13         As far as local laws, I mean,
14 whether or not you need a local business license,
15 that would be something that would be a local law.
16 That's the way I'd interpret that.
17         (Exhibit No. 22 was marked.)



19     Q.  In the e-mail below the e-mail from
20 Mr. Zherka from Designation Au Pair dated
21 February 19th, 2016, at the bottom of page 28121 do
22 you see where it starts, "The Department learned
23 recently that a number of sponsors designated in the
24 au pair category of the Exchange Visitor Program are
25 seeking further clarification on the requirements

Page 158

1  for calculating wages paid to au pairs by host
2  families" --
3     A.  I see that, yes.
4     Q.  -- "reflected in the governing
5  regulations at 22 CFR Section 62.31(j)(1)"?
6     A.  Uh-huh.
7     Q.  Was GreatAuPair among the sponsors
8  seeking further clarifications on the requirements
9  for calculating wages paid to au pairs by host
10 families?
11    A.  No.  And I don't believe anybody from
12 GreatAuPair attended this sponsor meeting held in
13 July 2015 either.
14    Q.  Why didn't anyone from GreatAuPair attend
15 the July 2015 meeting?
16    A.  I don't even know -- I mean, I don't
17 know.  I mean, it was probably not high in our --
18 our list of important priorities at the time, so we
19 didn't attend.
20        We don't attend all of the
21 functions of the Department of State.  I mean, we're
22 probably one of the smaller agencies in existence,
23 and we don't take an active role in -- in advocating
24 or anything with the Alliance or the Department of
25 State, and we have much more of a -- a back seat

Page 159

1  position with regards to what's going on with the
2  Department of State.
3         So, like I said, I've attended
4  three Alliance meetings, but I don't get involved
5  with a lot of the activities that Ilir sends out
6  from the Alliance.
7     Q.  Did you inquire with any of the other
8  sponsors who did attend the July 2015 meeting, as to
9  what occurred at the July 2015 Alliance meeting?
10    A.  No.
11    Q.  Do you know if anyone at GreatAuPair
12 received a report on what occurred at the July 2015
13 meeting?
14    A.  I would have heard about it, and I didn't
15 hear anything about that, no.  Nobody -- nobody
16 would have -- except for Jennifer would have been
17 the only one, and she would report directly to me if
18 she had.  And she didn't report anything to me about
19 this.
20    Q.  And the e-mail mentions a May 2nd, 2016
21 e-mail in the last -- or meeting in the last
22 paragraph.  Do you see that?
23    A.  I do.
24    Q.  Do you know if there was, in fact, a
25 May 2016 meeting?

Page 160

1     A.  I do not.  And if there was, we didn't
2  attend.
3     Q.  Have you had any interactions or
4  communications with the Department of Labor?
5     A.  No.
6     Q.  Or anyone at the Department of Labor?
7     A.  No.
8     Q.  Has anyone at GreatAuPair?
9     A.  No.  I think for good reason too.  I
10 mean, the Department of State provides the
11 information regarding the au pair program.  So we
12 don't get involved, as I mentioned, with anything
13 related to the Department of Labor since we're not
14 involved in calculating the stipend.
15    Q.  When did GreatAuPair join the Alliance?
16    A.  I think we covered this.  In 2013 is what
17 we talked about.  In, you know, end of the year
18 2013, early 2014 is probably when we got accepted.
19 Somewhere around there.
20        (Exhibit No. 23 was marked.)
21    Q.  I'm marking Exhibit 23.  It is a document
22 ending in 6636.
23        (Witness peruses document.)
24    A.  Okay.  I got it.
25    Q.  Are you familiar with Exhibit 23?

Page 161

1     A.  Yes, I am.
2     Q.  What is Exhibit 23?
3     A.  This is an e-mail threaded conversation
4  between myself and Ruth Ferry of Au Pair in America.
5  She's the vice president, senior vice president/
6  director.  And I was asking for a recommendation
7  from her for the Alliance.
8         And in that she basically said
9  that, you know, she has known Heidi for quite a
10 while and would be happy to provide a recommendation
11 for Heidi with regards to her experience in the
12 au pair industry and provide a recommendation to
13 Michael McCarry, who was then the director of the
14 Alliance.
15    Q.  Why did you reach out to Ms. Ferry for
16 the recommendation?
17    A.  You have to have recommendations from
18 other sponsor agencies to join the Alliance, so I
19 had to actually get a couple of letters of
20 recommendation from other sponsors in order to join.
21 And we wanted to join the Alliance, so that was a
22 requirement, so we reached out to Ruth Ferry for
23 that reason.
24    Q.  And how did you choose her, among all the
25 other sponsors that were available?



41 (Pages 158 to 161)

Page 162

1  A. Well, as I had mentioned, we had a
2 advertising relationship with Au Pair in America.
3 So since they -- there was, you know, some degree of
4 business relationship that had existed on an
5 advertising basis, we felt it would be okay to reach
6 out to them for a recommendation.
7      But the first attempt with regards
8 to -- actually, there's another letter I sent to --
9 to Bill Kapler, and he denied us. He said, "No, I
10 don't know anything about your ability to run a
11 program." So we were denied.
12      Heidi had a relationship with --
13 with Ruth from years past, I guess, and she said,
14 you know, "Just ask Ruth." And so I asked Ruth.
15  Q. On page 6636, the second e-mail, it's
16 from you to Ms. Ferry dated March 10th, 2014; is
17 that right?
18  A. It is.
19  Q. And it says, "I'm in the Caribbean this
20 week with my family and my Internet is not fast
21 enough for quality Skype calls."
22      Do you see that?
23  A. I do.
24  Q. Do you think you ever had any Skype calls
25 with Ms. Ferry?

Page 163

1  A. No, I didn't.
2  Q. And so Ms. Ferry, in fact, did provide a
3 letter of recommendation on behalf of GreatAuPair?
4  A. She did.
5  Q. So what were the -- what were the four
6 Alliance meetings that you recalled attending?
7  A. I'm sorry?
8  Q. What were the Alliance meetings, the
9 dates of the Alliance meetings that you recalled
10 attending?
11  A. October 2014, October 2015, and
12 October 2016.
13  Q. And Jamie attended which one?
14  A. The 2014 meeting.
15  Q. 2014?
16  A. Yeah.
17      In clarification to your -- your
18 previous question regarding when we got accepted
19 into the Alliance. It looks like it was 2014
20 because here we're still getting recommendation
21 letters as of February 27th, 2014.
22      So to correctly answer your
23 question, we would have been accepted into the
24 Alliance in 2014, okay?
25  Q. Do you recall what was discussed at the

Page 164

1 October 2014 Alliance meeting?
2  A. In general, they're talking about au pair
3 engagement, getting au pairs engaged in their local
4 communities, going to high schools and speaking, to
5 talk about their culture. They're looking for more
6 of a two-way cultural exchange.
7      You know, there were talks that,
8 you know, I -- I remember a number of different
9 conversations. I mean, I'm not going to be able to
10 give you all the agendas from 2014, 2015, and 2016,
11 but the -- the general themes center around au pair
12 engagement.
13      And there was one session that we
14 went to regarding au pair trafficking, you know,
15 concerns, you know, by, you know, some group that
16 spoke there with regards to human trafficking and
17 how to avoid human trafficking.
18      You know, breakout sessions with
19 the Department of State. They talk about
20 statistics. They talk about, you know, any issues
21 that they're seeing as a trend, number of au pairs
22 from the previous year. So they go through general
23 statistics and fairly general information.
24      (Exhibit No. 24 was marked.)
25  Q. I'm marking Exhibit 77 -- or 24, excuse

Page 165

1 me. It's a document ending in 28731.
2  A. Uh-huh.
3      (Witness peruses document.)
4  A. I've got the document and I'm familiar
5 with it.
6  Q. Does this document help refresh your
7 recollection as to what was discussed at the October
8 2014 meeting?
9  A. Yeah. It's a summary of what was
10 discussed in an operations call that Jamie has with
11 the staff, and in that is a recap by Susie with
12 regards to some of the topics that were covered on
13 that call.
14  Q. So one of the topics that was covered in
15 the meeting was slavery and trafficking?
16  A. Yeah. That's what I mentioned to you.
17 Right.
18  Q. And wages and hours exploitation was a
19 problem that au pairs had run into; is that right?
20  A. No. No. Actually, you're completely
21 mischaracterizing. That had nothing to do with
22 au pairs. Au pairs weren't a part of that
23 conversation with slavery and trafficking.
24      There was a -- a -- a -- a group
25 there that is, like, antislavery, anti-trafficking.

MAGNA LEGAL SERVICES