# Exhibit 6

**United States Government Accountability Office**

# GAO

Report to the Chairman, Subcommittee on Immigration, Border Security, and Claims, Committee on the Judiciary, House of Representatives

October 2005

# STATE DEPARTMENT

# Stronger Action Needed to Improve Oversight and Assess Risks of the Summer Work Travel and Trainee Categories of the Exchange Visitor Program



**G A O**
Accountability ★ Integrity ★ Reliability

COLVIN
DEPOSITION EXHIBIT
**17**
DATE:      7/25/17
CINDY SEBO, CERTIFIED MERIT
COURT REPORTER

GAO-06-106

**G A O**
Accountability · Integrity · Reliability

# Highlights

Highlights of GAO-06-106, a report to the Chairman, Subcommittee on Immigration, Border Security, and Claims, Committee on the Judiciary, House of Representatives

October 2005

## STATE DEPARTMENT

# Stronger Action Needed to Improve Oversight and Assess Risks of the Summer Work Travel and Trainee Categories of the Exchange Visitor Program

## Why GAO Did This Study

Exchange programs, which bring over 280,000 foreign visitors to the United States annually, are widely recognized as an effective way to expose citizens of other countries to the American people and culture. Past GAO and the Department of State (State) Office of Inspector General reviews have reported that some exchange visitors have participated in unauthorized activities and cited problems in the management and oversight of the programs. Strong management oversight is needed to ensure that the programs operate as intended and are not abused.

This report examines how State manages the Summer Work Travel and the Trainee programs to ensure that only authorized activities are carried out under the programs and identifies potential risks of the programs and the data available to assess these risks.

## What GAO Recommends

This report recommends that the Secretary of State take strong action to enhance the overall management and monitoring of the Summer Work Travel and Trainee programs, including fully implementing a compliance unit to monitor exchange activities; updating and amending regulations; and developing strategies to obtain data on overstays, program abuses, and other risks associated with the programs. State acknowledged weaknesses in the programs and described actions it is taking to address our recommendations.

www.gao.gov/cgi-bin/getrpt?GAO-06-106.

To view the full product, including the scope and methodology, click on the link above. For more information, contact Jess Ford (202) 512-4128 or fordj@gao.gov.

## What GAO Found

State has not exerted sufficient management oversight of the Summer Work Travel and the Trainee programs to guard against abuse of the programs and has been slow to address program deficiencies. State attempts to ensure compliance with program regulations through its processes of approving and annually reviewing the organizations that sponsor exchange visitors. These processes, however, are not sufficient to ensure that visitors participate only in authorized activities because the procedures consist primarily of document reviews, and State rarely visits the sponsors or host employers of the exchange visitors to make sure they are following the rules to investigate complaints. Moreover, some sponsors have asserted that the program regulations need updating. Further, State officials believe that the sanctions provided in the regulations are difficult to enforce. State acknowledged that it has been slow to address identified deficiencies and update the regulations, but had indicated that it is beginning to revise the regulations and is establishing a unit to monitor exchange activities. However funding of the unit has not been secured.

A number of potential risks are associated with the programs, including that exchange visitors might use it to remain in the United States beyond their authorized time. There is also the potential for the Trainee Program to be misused as an employment program. Further, negative experiences for exchange participants could undermine the purpose of the programs. However, State has little data to measure whether such risks to the program are significant. As a result, State cannot determine if additional management actions are needed to mitigate the risks.

**Summer Work Travel Participants and Trainee Participants, 2003 and 2004**

| Program | 2003 | 2004 |
|---|---|---|
| Summer Work Travel | 88,000 | 89,453[a] |
| Trainee | 31,084 | 27,475 |

Source: The Department of State.

[a]As of November 2004.

# Contents

**Letter** 1

Results in Brief 2
Background 4
State Has Maintained Limited Oversight of Exchange Programs 9
State Has Not Assessed Potential Risks 17
Conclusions 23
Recommendations for Executive Action 24
Agency Comments and Our Evaluation 24

**Appendixes**

Appendix I:    Scope and Methodology 26

Appendix II:   Comments from the Department of State 29

Appendix III:  GAO Contacts and Staff Acknowledgments 32

**Table**

Table 1:  Top-10 Countries Participating in the Summer Work Travel and the Trainee Programs in 2004 9

**Figures**

Figure 1:  J-1 Visas Issued Fiscal Years 1995-2004 5
Figure 2:  Roles and Responsibilities of Sponsoring Organizations 7

**Abbreviations**

| | |
|---|---|
| DHS | Department of Homeland Security |
| OMB | Office of Management and Budget |
| OIG | Office of Inspector General |
| SEVIS | Student and Exchange Visitor Information System |

This is a work of the U.S. government and is not subject to copyright protection in the United States. It may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.



**G A O**
Accountability · Integrity · Reliability

**United States Government Accountability Office**
**Washington, D.C. 20548**

October 14, 2005

The Honorable John N. Hostettler
Chairman, Subcommittee on Immigration,
  Border Security, and Claims
Committee on the Judiciary
House of Representatives

Dear Mr. Chairman:

Exchange programs are widely recognized as an effective way to expose citizens of other countries to the American people and culture. According to former Secretary of State Colin Powell, a good stay in this country is the best public diplomacy tool the United States has. The Department of State's (State) 2004 public diplomacy strategy calls for broader and deeper use of exchanges—people-to-people contacts—that, according to the strategy, can change hearts and minds. More than 280,000 foreign nationals travel to the United States annually using a J-1 visa[1] to participate in the Exchange Visitor Program. This program encompasses 13 categories of educational and cultural exchanges designed to enhance understanding between the people of the United States and those of other countries. Among the largest exchange programs are the Summer Work Travel Program, which allows bona fide foreign college and university students to learn about life in the United States through temporary work and travel, and the Trainee Program, which, through a structured training program, allows participants to enhance their skills in their chosen career field. State's Bureau of Educational and Cultural Affairs administers the Exchange Visitor Program through the Office of Exchange Coordination and Designation. Past GAO and State Office of Inspector General (OIG) reviews cited a few specific cases where J-1 visa holders participated in unauthorized activities and cited problems in program management. In particular, the OIG reported instances where companies were using exchange visitors to fill regular staff positions and not trainee positions as mandated by the Exchange Visitor Program regulations.[2]

---

[1] A J-1 visa is a nonimmigrant visa issued to foreign nationals to visit the United States temporarily to teach, instruct or lecture, study, observe, conduct research, consult, demonstrate special skills, or receive training.

[2] Office of Inspector General, *The Exchange Visitor Program Needs Improved Management and Oversight*, 00-CI-028 (Washington, D.C.: September 2000).

GAO-06-106 State Department

This report (1) examines how State manages the Summer Work Travel and the Trainee programs to ensure that only authorized activities are carried out under the programs and (2) identifies potential risks of the programs and the data available to State to assess these risks.

To accomplish our objectives, we reviewed previous GAO and OIG reports and examined current and proposed program regulations, State cables, sponsoring organizations' annual reports, agency databases, and other information pertaining to the Summer Work Travel and Trainee programs. We also met with representatives of nine sponsoring organizations of the Summer Work Travel Program that accounted for 75 percent of the participants in 2004 and representatives of 13 sponsors of the Trainee Program that accounted for 54 percent of the participants in 2004. Additionally, we visited three overseas posts—Minsk, Belarus; Warsaw, Poland; and Dublin, Ireland—where we discussed the programs with U.S. embassy officials, including consular officers, and the overseas partners of the U.S. sponsors of the exchanges. We selected these posts because they are among the top sending countries for the Summer Work Travel Program. We focused on the Summer Work Travel and the Trainee programs because they bring in nearly one-half of the Exchange Visitor Program participants. In addition, the Trainee Program was the subject of a 2000 OIG report. We conducted our review from November 2004 to August 2005 in accordance with generally accepted government auditing standards. Appendix I provides more information on our scope and methodology.

## Results in Brief

State has not exerted sufficient management oversight of the Summer Work Travel and the Trainee programs to ensure that only authorized activities are undertaken. Sponsoring organizations, employers, third-party organizations, and exchange visitors are required to comply with the Exchange Visitor Program regulations. These regulations require, for example, that sponsors monitor the exchange visitors to ensure that they engage only in activities consistent with the Exchange Visitor Program category listed on their certificate of eligibility. State attempts to ensure compliance with the regulations through its processes of designating and redesignating (every 2 years) organizations that sponsor J-1 exchange visitors. However, the process of redesignating sponsor organizations and the review of sponsors' annual reports are not sufficient to ensure that visitors participate only in authorized activities. State officials rarely visit the sponsors, host employers or third-party organizations of the exchange participants to ensure compliance with the rules or investigate complaints. For example, in the last 4 years, State officials made just eight visits to its

206 designated Summer Work Travel and/or Trainee sponsors. Moreover, some sponsors stated that the regulations need updating to clarify how the programs should be implemented. In addition, State officials in charge of the programs said the sanctions outlined in the regulations are difficult to enforce. State is currently establishing a compliance unit and revising the regulations, including developing new sanction regulations; but these changes have not been fully implemented.

There are a number of potential risks associated with the Summer Work Travel and the Trainee exchange programs. These include the potential risk of (1) foreign nationals using the program as a means of entering the United States and remaining illegally after their visa expires; (2) the Trainee Program being misused as a work program; and (3) exchange participants being exploited, resulting in negative experiences, which could undermine the purpose of the programs. State and Department of Homeland Security (DHS) officials and some sponsors that we met with provided evidence of such abuse. For example, DHS and the overseas posts provided data on potential overstays[3] that indicated that some exchange visitors had remained in the United States after their programs concluded. As an example of abuse of the Trainee Program, State and some of the sponsors described an incident in which 650 electrical engineers entered the United States to participate in training programs but were instead employed on construction projects as electricians, contrary to the program's intent. In another example, a State official described an incident in which about 45 current Summer Work Travel participants were placed in substandard housing, which was apparently leased by an employee of the sponsoring organization. GAO internal control standards instruct agencies to identify risks that could impede the efficient and effective achievement of program objectives and assess their impact. However, State has insufficient data to assess whether potential risks to the programs are significant. For example, due to weaknesses in the DHS' system for tracking visitors' arrivals and departures,[4] the full extent of the overstays is not known. Moreover, State does not systematically document program abuse. Furthermore the State and the Department of Labor (Labor) do not compile or analyze data concerning the potential impact of program abuse on the

---

[3]An overstay is a foreign national who was legally admitted to the United States as a nonimmigrant for a specific period but remained in the country after that period expired.

[4]Weaknesses include noncollection of many departure forms that visitors to the United States are required to submit when they leave the United States and an inability to match departure forms to data on arrivals.

GAO-06-106 State Department

U.S. labor market, although Labor officials said that it is not likely that the exchange programs will have any effect on U.S. employment opportunities because of the small number of J-1 exchange visitors relative to the U.S. workforce. Additionally, State does not know the extent to which participants have negative experiences because it does not systematically document and analyze reports of complaints made by program participants and serious problems submitted by the sponsors.

This report recommends that the Secretary of State take the following three actions to enhance the overall management and monitoring of the Summer Work Travel and the Trainee programs:

- fully implement a compliance unit to better monitor Exchange Visitor Program activities and address deficiencies;

- update and amend the regulations where necessary; and

- develop strategies to obtain data, such as information on overstays and labor market abuses, to assess the risks associated with the exchange program categories, and use the results of its assessment to focus its management and monitoring efforts.

In commenting on a draft of this report, State acknowledged weaknesses in its oversight and administration of the Exchange Visitor Program and reported that it has designated program oversight and administration as a weakness under the Federal Managers Financial Integrity Act.[5] State described a number of actions it is taking to implement each of our recommendations.

## Background

The Mutual Educational and Cultural Exchange Act of 1961[6] authorizes the J-1 Exchange Visitor Program. The program provides foreign nationals with opportunities to participate in exchange programs in the United States and return home to share their experiences, while also encouraging Americans to participate in educational and cultural programs in other countries.

---

[5]The Federal Managers Financial Integrity Act of 1982 (P. L. 97-255) requires agency heads to establish a continuous process for assessment and improvement of their agency's internal control and to annually report on the status of their efforts.

[6]P. L. 87-256, as amended, 22 U.S.C. §2451 et seq.

Foreign nationals who participate in the program enter the United States with a J-1 visa. The program has grown considerably over the years. Figure 1 shows the number of J-1 visas issued since 1995.



**Figure 1: J-1 Visas Issued Fiscal Years 1995-2004**

Source: GAO analysis of Department of State data.

The program is comprised of 13 categories of exchanges, which are grouped under private sector programs or academic and government programs. The private sector programs include the Alien Physician, Au Pair, Camp Counselor, Summer Work Travel, and Trainee categories. The academic and government programs include the Government Visitor, International Visitor, Professor and Research Scholar, Short-Term Scholar, Specialist, Student (Secondary School Student, College/University Student), and Teacher categories. The Exchange Visitor Program had about 282,000 exchange visitors in the 13 program categories for fiscal year 2004.

State's Bureau of Educational and Cultural Affairs administers the Exchange Visitor Program through the Office of Exchange Coordination and Designation. This office administers the program through the designation of United States organizations to conduct exchange programs in the various exchange categories.  There are 1,457 designated exchange

programs. Designated sponsors are responsible for screening and selecting qualified applicants for program eligibility. The office determines which organizations will be designated to administer the international exchange programs on the basis of information provided during the application process in accordance with regulatory requirements. The office also develops and administers policy and regulations for the exchange categories and oversees sponsoring organizations' compliance.

Sponsors may be for profit or nonprofit organizations; businesses; state, local, or federal government agencies; and education-related institutions. Sponsors sometimes contract with overseas organizations—such as student travel agencies—as local partners to help identify and screen exchange program applicants. Some sponsors serve as intermediaries between the exchange visitor and a third party, which engages the exchange visitor in the program activity for the category in which they are being sponsored. For example, for trainees, the third parties are the organizations where the exchange visitors will receive training. Third parties consist of a variety of organizations, which include—but are not limited to—hotels, law firms, restaurants, Internet companies, and other private and public sector businesses and organizations. Sponsors are responsible for overseeing the operations of their overseas partners,  and any third parties they work with.

Also chief among the sponsors' responsibilities is that of managing information on the exchange participant in DHS' Student and Exchange Visitor Information System (SEVIS), which has been in operation since January 2003. SEVIS, which is maintained and administered by DHS' U.S. Immigration and Customs Enforcement, is an Internet-based system that electronically collects information on all nonimmigrants that enter the United States with student visas and exchange visitor visas, and their dependents. Once a participant's data are entered into SEVIS by the sponsor, a Form DS-2019 is issued by the system in the applicant's name. This identifying information in SEVIS can be reviewed by a consular officer at the time of the visa interview and during the processing of the exchange visitor at the port of entry. Upon the arrival of the Exchange Visitor Program participant, the sponsor is required to document their participation in their program activity and record information on the location of the visitor's employment or training and U.S. residence address. Figure 2 describes the sponsoring organizations' roles and responsibilities.

**Figure 2:  Roles and Responsibilities of Sponsoring Organizations**



Source: GAO.

## Summary Work Travel and Trainee Programs

The Summer Work Travel Program is among the largest of the 13 categories of exchanges, with about 89,453[7] participants in 2004. This program is designed to achieve the educational objectives of international exchange by involving bona fide foreign college or university students directly in the daily lives of U.S. citizens through travel and temporary work opportunities. The Trainee Program, with about 27,475 participants in 2004, provides foreign nationals the opportunity to enhance their skills in their chosen career field through participation in a structured training program. Summer Work Travel sponsors help the participants obtain jobs[8] and provide pre-arrival information, an orientation to life in the United States, and contact information in the event of problems. Sponsors of trainees are also required to provide pre-arrival information to the trainees and are directly responsible for all aspects of the trainees' program, including the selection, orientation, training, supervision, and evaluation. About 52 Summer Work Travel and 170 Trainee sponsors operated programs in 2005.[9]

Thousands of employers participate in the Summer Work Travel and the Trainee programs. Typical Summer Work Travel employers include amusement parks, resorts, hotels, and restaurants. The jobs generally include ride operators, waiters, lifeguards, receptionists, and guides. The types of organizations that utilize trainees include corporations, architectural firms, hotels, restaurants, development organizations, airlines, investment and financial services entities, and manufacturing companies. The participants are placed in locations wherein they receive training in engineering, drafting and design, biomedical technology, agricultural technology, hospitality administration and management, marketing, agricultural and food products processing, culinary arts and chef training, financial management, and many other careers.

Throughout the existence of the Summer Work Travel Program, there has been a geographic shift in which countries provide the most program participants. In the past, Western Europe had the largest numbers of

---

[7] As of November 2004.

[8] Regulations require sponsors to ensure that at least half of their Summer Work Travel participants identify jobs before they leave their home country. The rest of the participants can look for jobs once they arrive in the United States.

[9] Some sponsors are designated to administer exchange programs in more than one exchange category. In 2005, there were 206 individual organizations that sponsored the Summer Work Travel and/or the Trainee programs.

participants. However, more recently, the largest numbers of Summer Work Travel participants have been citizens of Eastern European countries, including Poland, Bulgaria, Czech Republic, and Romania. Table 1 lists the 10 countries with the largest numbers of Summer Work Travel and Trainee participants.

**Table 1: Top-10 Countries Participating in the Summer Work Travel and the Trainee Programs in 2004**

| Summer Work Travel Program | | Trainee Program | |
|---|---|---|---|
| Country | Number of participants | Country | Number of participants |
| Poland | 18,691 | Germany | 3,021 |
| Russia | 9,962 | France | 1,748 |
| Bulgaria | 6,993 | United Kingdom | 1,023 |
| Slovakia | 5,581 | Canada | 660 |
| Brazil | 5,477 | China | 458 |
| Ireland | 4,309 | Netherlands | 408 |
| Czech Republic | 3,053 | Mexico | 403 |
| Peru | 2,978 | Japan | 371 |
| Romania | 2,901 | Ireland | 364 |
| Belarus | 2,607 | India | 344 |

Source: Department of State.

## State Has Maintained Limited Oversight of Exchange Programs

State has not exerted sufficient management oversight of the Summer Work Travel and the Trainee programs to guard against abuse of the programs. State primarily ensures compliance with program regulations through a paperwork review, and there is inconsistent monitoring by sponsors. Moreover, some sponsors believe that the program regulations need updating, and State officials have expressed concerns about the enforceability of the sanction/revocation process provided for in the Exchange Visitor Program regulations. Sponsors have also expressed concern about their communication with State. State has acknowledged problems, is establishing a compliance unit to monitor program activities, and is revising the regulations; however progress has been slow.

### State's Monitoring Efforts Are Minimal

State's monitoring efforts largely consist of reviewing written information provided by sponsors, with minimal efforts of verifying such information

through program visits. State relies on sponsors to provide written information, primarily through annual reports, which describe the number of individuals a sponsor has placed and a brief narrative on program activities, difficulties encountered, and their resolution. Exchange program regulations require that sponsors promptly notify State about any serious problem or controversy that could cause State or the sponsor's Exchange Visitor Program notoriety or disrepute. When a sponsor reports a problem, State officials follow-up by telephone, e-mail, fax or letter, according to sponsors and State officials. However, State rarely visits sponsors to observe program activities and verify the information that they provide, although such visits are a good internal control practice for ensuring that management's directives are being carried out. We found that in the past 4 years, State officials made visits to only 8 of its 206 Summer Work Travel and/or Trainee sponsors.

Additionally, information on problematic incidents provided by the sponsors and any notes or correspondence on the matter are filed as part of the material that is examined when the sponsor applies for redesignation, which is required every 2 years.[10] In their applications for redesignation to State, all sponsors are required to estimate the number of exchange visitors their organization would like to place and provide information on their legal, financial, and managerial resources to manage exchange programs in compliance with federal regulations. State reviews these applications along with the annual reports and other documentation collected over the 2-year period and determines whether it should grant a 2-year designation to a sponsor and the number of participants the sponsor will be authorized to include in their exchange program activity. The vast majority of sponsors who apply for redesignation are approved. State officials said that their staffing levels and lack of travel funds do not allow for intensive monitoring of the Exchange Visitor Program sponsors. The Office of Exchange Coordination and Designation has five Program Designation officers who serve as the point of contact and are responsible for the day-to-day administration and management of the 13 exchange programs.

---

[10]According to the program regulations, sponsors' designations are effective for 5 years, although State may designate a shorter period. The Enhanced Border Security and Visa Entry Reform Act of 2002 (P.L. 107-173) requires State to conduct a review every 2 years of the entities designated to sponsor exchange programs to determine if they are in compliance with certain recordkeeping and reporting requirements. State designated all sponsors for 2 years when they were entered in SEVIS in January 2003. State has drafted revisions to its regulations that will reflect the change in the period of designation from 5 to 2 years.

**Sponsors' Monitoring of Employers and Third Parties Is Limited**

Exchange Visitor Program regulations require sponsors to effectively administer and monitor their Exchange Visitor Program and ensure exchange participants engage in activities consistent with the appropriate exchange category. Nevertheless, recent discoveries by consular officers overseas suggest that some sponsors do not consistently carry out their oversight and monitoring responsibilities. For example:

- A trainee applicant submitted a training offer that included the name and organizational information of a legitimate financial services company, but listed as a contact an individual with a noncompany e-mail address. When the consular officer checked the contact information, he learned that the contact person was not affiliated with the financial services company. The sponsor admitted to only spot-checking the viability of third party organizations and training plans.

- When a consular officer at another post checked a company's Web site to verify the job offer of a foreign student applying for the Summer Work Travel Program, he discovered that the company was a topless bar.

- In another case, consular officers noticed a number of trainee applicants who said they were going to the United States to work as kitchen help and wait staff. When State contacted the U.S. sponsor about these applicants, the sponsor stated that it relied on another organization to help it select and place the trainees and admitted that it had not followed up directly with each trainee and employer to ensure that its standards were being satisfied.

Sponsors are required to take all reasonable steps to ensure that third parties know and comply with applicable provisions of the Exchange Visitor Program regulations. However, State does not offer any guidance on how the sponsors should carry out their monitoring and oversight responsibilities. Two of the sponsors we met with said that, after they discovered that trainees whom they had sponsored were not receiving any training, they established new practices to visit at least 10 percent of their exchange program participants and all employers and exchange participants where there were problems.

## Various Concerns Exist About Program Regulations

During our review, several sponsors we met with raised concerns about the clarity of the program regulations and also complained that varying interpretations of the regulations make it difficult for them to implement the program.  Moreover, State officials believed that the sanctions provided in the regulations are not adequate to control the activities of sponsors who incorrectly implemented the program. State has been revising the regulations but has not finalized the changes.

### Regulations Need Revising

Six of the 13 sponsors that we met with described a range of problems pertaining to the regulations, particularly regarding the Trainee Program. Their comments included the following:

- The Trainee regulations lack specificity and are open to differing interpretation by State and the sponsors.

- Dealing with State has become more complicated for sponsor organizations because State has at times changed rules outside of the formal regulation-setting process.

- The Trainee regulations are so cumbersome that it is unclear what should be included in a training plan.

- Training plans vary widely among sponsors, and there is no guidance on what constitutes a good plan.

- The regulations should include a separate category for interns.

A past OIG report also cited problems with the regulations and recommended in particular that, for the Trainee Program, the training regulations should more clearly define what is not considered training.[11]

Six of the sponsors we met with and the representative of an association of sponsors expressed concern with State's interpretation of certain provisions of the regulations, while seven sponsors and the association representative also said that State does not consistently disseminate its interpretations or guidance on the regulations to the sponsors. For example, the regulations state that the maximum period of the participation in the Exchange Visitor Program for a trainee, with the

---

[11]OIG OO-CI-028.

exception of flight training, shall not exceed 18 months. Some sponsors said they interpreted this provision to mean that an individual could come to the United States one or more times as a trainee as long as the combined duration of the visits did not exceed 18 months. In 2002, however, some sponsors said they were told that the Trainee Program was restricted to a one-time training session not to exceed 18 months. This clarification in regulations has surprised some sponsors, according to one of the sponsors who was notified about this change through a fax from State. A State official explained that all Trainee sponsors were sent a message through SEVIS in October 2003, explaining State's policy on this matter. According to the documentation, the message was to be addressed to all sponsors that conduct Trainee programs and all responsible officers and their alternates.

Moreover, a few sponsors said guidance or interpretations of various provisions of the regulations have been communicated inconsistently. For example, representatives of two sponsoring organizations said that State is no longer requiring that sponsors recruit no more than 10 percent of repeat Summer Work Travel participants, as specified in the regulations, but State did not make any formal effort to inform the sponsors of the change. One of the sponsors said that the organization learned about the change from the U.S. Embassy in Warsaw. A State official explained that policy changes are announced in the *Federal Register* or by written notice to all sponsors. According to the official, two cables were sent to all overseas posts clarifying the requirements of the Summer Work Travel Program and the removal of the 10 percent rule regarding repeat participants. In addition, copies of these cables were sent, by e-mail, to all Summer Work Travel sponsors, according to the official.

**State Officials Believe Regulations Lack Enforceable Sanctions**

State is also reviewing the sanctions provided in the regulations. State officials, including the Principal Deputy Assistant Secretary of the Bureau of Educational and Cultural Affairs, said the current sanction/revocation process that State may use to limit the activities of sponsors that do not comply with the regulations—or remove a sponsor from the program altogether—is difficult to enforce. The sanctions range in severity from a letter of reprimand to an action to revoke a sponsor's designation. One sanction that State uses is to deny the sponsor's request for certification forms until the compliance issue has been resolved. For example, State officials described a recent case in which State's attempt to revoke a sponsor's designation was challenged by the sponsor in district court. In this case, State received complaints from two trainees who alleged they were not receiving the training that they had expected and were displeased with their training assignments and compensation. The sponsor in this case

had placed individuals in positions in the hospitality industry.  State investigated the sponsor's operation, interviewed a number of program participants, and concluded that the sponsor was not placing participants in management training positions but was operating a work program, in violation of the regulations. State's in-house revocation board agreed and supported the sanction of revocation. However, in remanding the matter to the board for further proceedings, the district court concluded that State's investigation had been too limited and had not produced evidence adequate to support the severe punishment of revocation. After a second hearing, the board overturned the revocation, thereby enabling the sponsor to resume its program. State concluded that the sanctions' provisions needed streamlining and tightening for more effective and assured application.

**State Slow to Revise Regulations**

State has acknowledged that the regulations need revising; however, more than 3 years after revisions were suggested by the exchange industry they are still in draft form. According to the Acting Director of the Office of Exchange Coordination and Designation revisions are in process. For example, State is revising the Trainee regulations to create a separate Intern category to accommodate younger, less experienced applicants, such as students or recent university graduates seeking to gain practical work experience. The exchange community generally supports the creation of a new Intern category and, in November 2001, an association of organizations that sponsor exchange students submitted its proposals for revising the regulations to State. The Acting Director of the Office of Exchange Coordination and Designation said that the sections of the regulations on interns and trainees are still being reviewed at State and attributed the delay in completing the regulations to the review process. He also stated that State's Office of Legal Advisor was given the responsibility to develop new sanctions for the program 2 years ago. According to the Assistant Legal Advisor for Public Diplomacy and Public Affairs, revised sanctions regulations were drafted and shared with the Bureau of Educational and Cultural Affairs for review and comment. The Assistant Legal Advisor stated that recent guidance from the Bureau's Principal Deputy Assistant Secretary suggested that further revisions were warranted to best suit evolving program needs. Once State has completed its review, the Department of Justice will be consulted prior to publication of the revised regulations. She stated that while this process could take an additional 2 to 6 months to complete, the timing should fall well within the time lines and milestones set forth in a 24-month corrective action plan proposed by the Bureau in March 2005.

## Communication between State and Sponsors and with Posts Has Raised Concerns

According to GAO guidance on internal controls, managers should ensure that effective external communications occur with groups that impact its program, projects, operations, and other activities. According to seven of the sponsors we met with and the organization representing sponsors, communication with State is a problem. For example, one sponsor described State as reactive rather than proactive in its communication practices. Representatives of four of the sponsoring organizations complained that program officers were not always responsive to their inquiries or were difficult to reach. Some sponsors attributed the difficulties to an insufficient number of State staff.

Some sponsors also complained about a lack of feedback from a study commissioned by State on SEVIS compliance and other issues, which was completed in December 2003. The report concluded that in some cases the sponsors' staff was not adequately trained, that the sponsors did not maintain required records, and did not fully provide oversight of their foreign partners, employers, third-party organizations, or the exchange participants. The report made a number of recommendations on how State should further clarify the program regulations and help train the sponsors on both State regulations and their role in maintaining SEVIS data. We met with six sponsors that participated in the study, and none had received feedback from State on the results of the study. One said the Acting Director of the Office of Exchange Coordination and Designation made some general comments about the study at a meeting of an industry association.

Communication between the Office of Exchange Coordination and Designation and the overseas posts has also been cited as a concern. For example, one sponsor said there is no mechanism to ensure consistent interpretation of the regulations by the overseas posts, while another said the posts are the last to know about program changes. For example, a sponsor said that even though the office has told them that applicants can have only one trainee placement, one post was still telling applicants in 2004 that they can participate more than once. Further, a representative of an exchange industry organization stated that the Office of Exchange Coordination and Designation knows too little about what is really going on in the field. This situation may have been the reason ineligible students from at least one country, Ireland, were allowed to participate in the Summer Work Travel Program for over 30 years before an apparent misinterpretation of the regulations was discovered. In 2002, a consular officer in Dublin asked for clarification on the eligibility of students who had completed their course work but had not formally graduated,

according to an embassy official. In response, State instructed the posts not to change their selection procedures for the 2003 season. However, according to the Acting Director of Office of Exchange Coordination and Designation, State ultimately confirmed that such students were not eligible for the program, unless they could demonstrate enrollment in another degree program, and sent a cable to the posts with its decision in 2004. According to the local program representatives, such students had constituted up to a third of the participants from Ireland.

## Establishment of a Compliance Unit Not Fully Implemented

State has been slow to implement the OIG's 2000 recommendation that it devote the necessary resources to perform more rigorous oversight. The Principal Deputy Assistant Secretary of the Bureau of Educational and Cultural Affairs and the Acting Director of the Office of Exchange Coordination and Designation acknowledged that State has been slow to establish a compliance unit. The Acting Director of the Office of Exchange Coordination and Designation said funding to establish a compliance unit has been requested for several years without success. The Bureau requested funding in fiscal years 2002 and 2003 for five additional positions for the compliance unit, but State did not approve the request for submission to the Office of Management and Budget (OMB), according to a State official. The Principal Deputy Assistant Secretary of the Bureau of Educational and Cultural Affairs stated that the unit was not funded initially because of a lack of senior managerial support. State has since supported the request for funding because of congressional interest and the increased emphasis on strengthening program management, according to the Principal Deputy Assistant Secretary. Subsequent requests for funding for the unit for fiscal years 2004 to 2006 were approved by State but not approved by OMB. However, the officials told us they realized that the program regulations have been ignored by some exchange program sponsors, agreed that a compliance unit was needed, and are in the process of the establishing the unit by diverting existing positions.

According to State officials, the unit as it is currently conceived would initially consist of one Foreign Service officer and two program analysts and will report to the Principal Deputy Assistant Secretary. The officials stated that the compliance unit will rely on structured reviews conducted by contractors. They said State will utilize the system currently in place at DHS, which uses contractors for on-site reviews of schools to verify their eligibility to register foreign students into the SEVIS system. The contractors will verify the information that the sponsors submit as part of the redesignation process and may check the names of the responsible and

alternate responsible officers—and possibly board members—through law enforcement databases, according to the State officials. They said that as part of the new compliance effort, sponsors for all nonacademic exchanges will be required to contract for and submit annual audits of their activities. The compliance unit will develop a management template to guide the audits. Currently only sponsors of the Au Pair Program are required to submit such audits.[12]

It is too early to determine whether implementation of the planned compliance unit will resolve all of the issues identified by GAO and OIG. For example, using contractors to visit the sponsors will address OIG's criticism that State does not visit the sponsors. However, State has not determined what information the contractors need to review to assess how well the sponsors monitor employers and third parties. Moreover, State has not provided a written plan describing in detail how the compliance unit will operate. Funding also remains an issue. State initially plans to cover the cost of the new compliance unit by redirecting current appropriations and obtaining—as agreed upon by OMB—about $450,000 of the SEVIS fees collected from exchange program sponsors by DHS. Further, State will again request funding for the compliance unit in the 2007 budget request.

## State Has Not Assessed Potential Risks

GAO internal control standards instruct agencies to identify risks that could impede the efficient and effective achievement of its objectives and assess their impact. A number of potential risks are associated with the Summer Work Travel and the Trainee programs, including the risk of participants using the programs to remain in the United States beyond their authorized time. Exchange participants may also use the programs as a means to fraudulent immigration. There is also the potential for the Trainee Program being misused as an employment program, although State does not have data on the extent that such abuse occurs. The exchange participants could be exploited by employers or other third parties. While State investigates complaints, it does not know the extent to which participants have negative experiences because it does not systematically document and analyze complaints made by program participants and reports of serious problems reported by the sponsors.

---

[12]Compliance unit staff will analyze the results of the contractor reviews and the audits, although a regulatory change is needed to implement the audit requirement, according to the Acting Director of the Office of Exchange Designation and Coordination.

## Some Exchange Participants Have Used the Programs to Remain in the United States

Although exchange program participants are expected to return to their country following completion of their program, there is information indicating that some participants remain beyond the time that they were authorized to stay. Information on overstays is available from DHS's arrival and departure database and the results of returnee validation studies conducted by overseas posts. For example, we asked DHS to check the total number of J-1 visa recipients in all exchange categories who had completed their program since January 2003 against its arrival and departure database to determine which visa holders had departed the country. The results showed that about 362,000 exchange participants had concluded their program during this period. The data showed that about 36 percent of the participants had departed the United States by the end of their program and about 24 percent were potential overstays.[13] However, the full extent of overstays is uncertain because DHS could not find information on an additional 40 percent of the J-1 visa holders because they may have entered the United States before the current entry system was operational. DHS' primary method for estimating overstays is to match the arrival portion of a form collected by DHS when the visitor enters the United States to the departure portion of the form generally collected by the airlines when the visitor departs. One of the weaknesses in this system is that the departure portion of the form is not always submitted to airline staff. Further, data entry errors by DHS contractors also make it difficult to match the forms. The U.S. government is phasing in a more comprehensive entry-exit system, US-VISIT, to correct the weaknesses in its current system.

Some overseas posts periodically conduct validation studies to determine if visa applicants who received J-1 visas at their post have returned to that country. These studies generally consist of telephone inquiries to the visa recipient, while some posts have required J-1 visa recipients to report to the post upon their return. The results vary. For example, one post in the former Soviet Union conducted a study of its 2004 Summer Work Travel season that showed that, as of January 20, 2005, 26 percent of the 2004 participants from that country remained in the United States. This post reported overstay rates of 29 percent for 2003, 25.6 percent for 2002, and 27 percent for 2001. Other posts have reported lower overstay rates. For example, a post in a Western European country conducted a validation

---

[13]Some of these individuals may have changed their immigration status legally. DHS would need to analyze each individual record to determine if these individuals were actually overstays.

study of its 2004 Summer Work Travel Program that showed that all of the visa applicants in the sample who were issued J-1 visas returned home, as required. The posts can use the results of such studies to guide their decision making when they adjudicate visas. For example, the post with a 26 percent overstay rate in 2004 developed additional selection factors for the 2005 Summer Work Travel season to assess the potential for individuals to return to their country after their programs are completed. However, these studies are not always statistically valid. Moreover, the Acting Director of Exchange Coordination and Designation said the post validation studies are not useful to program officials because the posts do not follow a standardized methodology.

J-1 visitors who remain in the United States beyond their program do not necessarily stay for long periods of time, and not all of them remain in the United States illegally. According to consular officials we talked with at one post, some participants in the Summer Work Travel Program from their country who remain in the United States beyond their program date might typically overstay anywhere from a few days to no more than a few months. The consular officials said the participants sometimes remain in the United States longer if they have not earned sufficient money to cover their expenses. Others change their visa status to another nonimmigrant category. For example, the 2004 validation study by one post in the former Soviet Union country showed that 39 percent of those who had remained in the United States beyond the completion of the program had either changed their visa status, got married, or were seeking asylum. Changing status from a J-1 visa to another visa category is permitted under U.S. immigration laws in certain circumstances, but Bureau of Consular Affairs and other officials have stated that it is not the intent of the program.

## Potential Exists for Fraudulent Immigration Claims

DHS data show that a growing number of J-1 visa holders had applied for political asylum between 1995 and 2004, about 6,300 individuals who entered the United States with J-1 visas applied for asylum. According to DHS, the numbers of asylum applications from J-1 visa holders from former Soviet Union countries have more than doubled since 2000. These countries include Russia, Belarus, Armenia, and Ukraine. The officials are concerned that some of these claims are fraudulent, as they doubt that J-1 visa holders—who have to be students in good standing in their countries—are being persecuted. The recent increase in numbers of such claims and the similarities of the stories—which indicate coaching, are also indicators of fraud, according to DHS officials. DHS' Fraud Detection and National Security Unit and State's Bureau of Consular Affairs Office of

Consular Fraud Prevention are monitoring this issue. These units would turn over any suspected fraud to U.S. Immigration and Customs Enforcement for investigation. According to a DHS official, U.S. Immigration and Customs Enforcement is conducting asylum fraud investigations in Los Angeles and Cleveland. Among the targets of those investigations are individuals who were admitted with J-1 visas, as well as several other classes of nonimmigrants.

## Trainee Category Is Vulnerable to Misuse as Employment Program

The potential exists for the Trainee Program to be misused as an employment program. Regulations strictly prohibit the use of the trainee category for ordinary employment purposes, stating in particular that sponsors may not place trainee participants in positions that are filled or would be filled by full-time or part-time employees. State and the overseas posts provided some information describing Trainee Program abuses, but they did not have information on the extent of the problem.

- In one example, a sponsor learned that an organization it had contracted with to help select and place trainees had placed the participants with employers that had contracts to provide H-2B temporary workers.[14] The organization had participated in the Trainee Program because the H-2B visa category was at its limit and it was looking for an alternative way to receive foreign workers.

- In another example, a staffing agency recruited about 650 electrical engineers, primarily from Slovakia, Bulgaria, and Romania, to come to the United States as trainees. Ostensibly, the plan was to train the engineers in the United States because they would be working on projects in Europe that required knowledge of U.S. standards. However, the organization served as an electrical contractor, placing the trainees on U.S. construction projects as electricians. Because it was not designated to sponsor trainees, the staffing agency approached a few designated sponsors to issue the DS-2019 forms. State received complaints from the trainees and the electrician's union and investigated this case. To correct the situation, the sponsors and the union eventually found appropriate placements for some of the engineers. Others returned to their countries. According to a State

---

[14] An H-2B visa is a nonimmigrant visa issued to foreign nationals who are temporarily coming to the United States to perform nonagricultural services or labor, if an unemployed person capable of performing such work cannot be found in the United States.

official, the staffing agency went out of business, and the principal party was indicted on criminal charges.

The Acting Director of the Office of Exchange Coordination and Designation described agricultural training programs as problematic because of the potential for fraud. He said the abuses are not hidden and that there is not even an attempt to represent jobs as training, and that employers refer to the participants as employees rather than trainees. For example, a 2004 DHS investigation involved four Chinese nationals brought to the United States by an individual to participate in an agricultural program sponsored by a Florida university. The trainees were placed with a dairy farm that had an agreement with the university. DHS found that only one trainee had a firm grasp of English, which called into question the trainees' eligibility for a J-1 visa as well as whether the trainees were receiving training or simply employed at the farm. Upon further investigation DHS found that the individual had brought 17 trainees to the United States to participate in the university's training program. The trainees were placed at four participating dairies. DHS also found that only one of the dairies reported having a structured training plan. According to DHS, the university violated regulations concerning sponsoring organizations for exchange trainees by failing to ensure that the J-1 trainees were properly compensated and possessed the required language ability to participate in an English language-based training program. DHS further stated that the dairies were exploiting the J-1 trainees for cheap labor and in most cases were not concerned with actually training them beyond what was necessary to perform their work. The OIG's 2000 report also described abuse of the Trainee Program. In two of the cases that the OIG investigated, U.S. workers complained that they were replaced by trainees.

Despite such misuses, Labor officials stated that it is not likely that the exchange programs will have any effect on the U.S labor market because of the small number of J-1 exchange visitors (about 283,000 in fiscal year 2004) relative to the U.S. workforce.[15] However, the U.S. government does not collect data to assess any potential effect of exchange programs on the U.S. labor market. Labor officials said that a monthly household survey, the Current Population Survey, reviews a sample of households to compile labor statistics on foreign-born workers. However, the numbers of exchange program participants is so small that even if they were captured

---

[15]For example, the total civilian workforce in the United States was over 147 million as of September 2004.

by these surveys there is no way to separate out the effect of their labor participation from that of the other foreign-born workers. Also, it is possible that exchange participants would not be captured in the survey because of their housing arrangements. For instance, if they do not reside in traditional housing units and live in dormitories or resort-provided housing, they may not be included in the survey sample.

## Some Exchange Participants Could Be Exploited or Have Otherwise Negative Experiences

The Summer Work Travel and Trainee participants generally have positive experiences in the United States, according to the sponsors and participants we met with. Some sponsors and overseas representatives survey their participants on their experiences. One of the sponsors said its research showed that about 85 percent of its participants were satisfied with their placement. All of the Summer Work Travel and Trainee participants whom we met with described their overall experiences as positive.

When the participants do complain, the complaints are generally minor, usually involving disappointments with their placement, housing, or location. The Office of Exchange Coordination and Designation investigates all complaints that are brought to its attention, according to State officials. In addition, the regulations require the sponsors to inform State of any serious problems or controversy that could be expected to bring State or the sponsors' exchange programs into disrepute. However, we found that although State may follow up on such reports, it does not systematically document or analyze them. Such an analysis could be used to identify program weaknesses. State acknowledged that is does not have procedures for recording and maintaining all complaints in all categories and stated such procedures are currently being prepared and will be incorporated into the Foreign Affairs Manual.

Occasionally, the exchange participants have negative experiences as a result of exploitation by a third party. A State official described an incident in which about 45 current Summer Work Travel participants were placed in substandard housing. Apparently, the housing was leased by an employee of the sponsoring organization. The sponsor subsequently placed the students in better housing, and the OIG is investigating the incident at the Exchange Visitor Program office's request. State officials described another situation in which they fear a third party might have exploited the exchange participants. In this case, Bulgarian Summer Work Travel participants were approached by an employee of the local program representative while they were still in Bulgaria and told that the jobs arranged for them in New Jersey

by the U.S. sponsor were no longer viable and that they were instead to report to jobs in Florida. As a result, when the Bulgarians arrived in the United States, they refused to continue on to New Jersey with the sponsor's representative, who met them at the airport. Instead, they had tickets to Florida and went there to work for a third-party organization that provided cleaning services to hotels. State and DHS are currently investigating this case.

When such situations receive negative media attention, it can further undermine the purpose of the program. For example, a July 13, 2005, article in a New Hampshire newspaper reported on the plight of three students from Romania who arrived in the United States on July 5, 2005, to find that the jobs they were promised no longer existed. News of these situations may even reach the foreign media. For example, a June 2004 United Press International article concerning an incident affecting Russian students stated the incident was also reported by the Moscow Times. As a result of such situations at least one foreign government has discussed its concerns with U.S. embassy officials in their country, according to a Bureau of Consular Affairs official.

## Conclusions

The Summer Worker Travel and Trainee Exchange Visitor Program categories are important components of U.S. public diplomacy efforts. However, State has not exercised sufficient management oversight of the programs to ensure that they operate as intended and are not abused. State has taken some action to address identified deficiencies, such as beginning efforts to revise the regulations; but progress has been slow.  Also, State has been slow in establishing a compliance unit, which would bolster oversight efforts, despite recommendations from State's OIG to do so. GAO guidance on internal control standards instructs agencies to identify risks that could impede the efficient and effective achievement of program goals. Once these risks are identified, they should be analyzed for possible effect. For example, an analysis of complaints and problems that participants and sponsors report could uncover program weaknesses, and these results could be used to guide the efforts of the compliance unit. Assessing such risks is a necessary step to mitigating the risks. But State has not taken action to assess the risks associated with the Summer Work Travel and the Trainee programs, in part because limited data are available.

## Recommendations for Executive Action

This report recommends that the Secretary of State take the following three actions to enhance the overall management and monitoring of the Summer Work Travel and the Trainee programs:

- fully implement a compliance unit to better monitor exchange program activities and address deficiencies;

- update and amend the regulations where necessary; and

- develop strategies to obtain data, such as information on overstays and program abuses, to assess the risks associated with the program, and use the results of its assessment to focus its management and monitoring efforts.

## Agency Comments and Our Evaluation

State provided written comments on a draft of this report. These comments are reprinted in appendix II. State and DHS also provided technical comments, which we have incorporated into the report as appropriate.

In its comments, State acknowledged weaknesses in its oversight and administration of the Exchange Visitor Program and reported that it has designated program oversight and administration as a weakness under the Federal Managers Financial Integrity Act. State described a number of actions it is taking to implement each of our recommendations, including developing a corrective action plan, establishing a compliance unit, working to revise program regulations, and working with DHS to gather data related to the tracking of overstays.

As we agreed with your office, unless you publicly announce the contents of this report earlier, we plan no further distribution of it until 30 days from the date of this letter. We will then send copies of this report to interested congressional committees, and the Secretaries of State, DHS, and Labor. We will also make copies available to others upon request. In addition, the report will be available at http://www.gao.gov.

**GAO-06-106 State Department**

If you or your staff have any questions about this report, please contact me at (202) 512-4128 or fordj@gao.gov. Contact points for our Offices of Congressional Relations and Public Affairs may be found on the last page of this report. GAO staff who made major contributions to this report are listed in appendix III.

Sincerely yours,

Jess T. Ford
Director, International Affairs and Trade

Appendix I

# Scope and Methodology

To examine how State manages the Summer Work Travel and the Trainee programs to ensure that only authorized activities are carried out under the programs, we

- reviewed previous GAO and OIG reports, program regulations and guidance, cables, sponsors' annual reports, and other information pertaining to the programs;

- reviewed program files maintained by the Bureau of Educational and Cultural Affairs, Office of Exchange Coordination and Designation, for selected Summer Work Travel and Trainee sponsors to gain an understanding about the kinds of problems that the sponsors report to the Department of State (State) and how State has addressed them;

- interviewed State officials, including the Bureau of Educational and Cultural Affairs and the Bureau of Consular Affairs, and the Department of Homeland Security (DHS) to discuss how the U.S. government manages the programs;

- interviewed Department of Labor (Labor) officials about the impact of the programs on the U.S. labor market, and the Social Security Administration on issues related to Social Security cards for exchange visitors; and

- met with nine sponsors of the Summer Work Travel Program that accounted for 75 percent of the participants in 2004 and 13 sponsors of the Trainee Program that accounted for 54 percent of the participants in 2004,[1] as well as an official of an association of exchange program sponsors to discuss how sponsors carry out their monitoring and oversight responsibilities.

We relied on data from DHS' Student and Exchange Visitor Information System (SEVIS) to identify sponsors and the number of participants. The SEVIS database is used by exchange program managers, sponsors, and U.S. government agencies to keep track of individuals who enter the United States on exchange visitor and student visas. We reviewed SEVIS data and discussed its reliability with State and DHS officials and sponsors, based on the descriptions of the database, procedures for entering and managing the

---

[1] We visited 13 sponsors in all. Seven of the 13 managed both Summer Work Travel and Trainee programs.

**Appendix I
Scope and Methodology**

data, and the internal checks that are part of the system. We believe these data are sufficiently reliable for our purposes. We relied on data from the sponsors to identify their overseas representatives, exchange participants, employers, and host companies.

We met with 28 exchange participants to discuss their views of the programs. We reviewed data provided by the sponsors to identify exchange participants who were in their programs during our fieldwork and who were in nearby locations. We visited exchange participants in Boston, Massachusetts; Bolton Valley and Smugglers' Notch, Vermont; and Washington, D.C. We used the results of our interviews for illustrative purposes and not to generalize to all participants.

We also visited three overseas posts—Minsk, Belarus; Warsaw, Poland; and Dublin, Ireland—where we observed visa interviews of exchange program applicants, reviewed post validation studies and other exchange program guidance, and discussed the exchange programs with consular and embassy officials. We also met with the local representatives of the U.S. sponsors to discuss how they recruited and screened Summer Work Travel and Trainee applicants. We selected Belarus because of consular concerns about overstays and the integrity of the overseas partners. Belarus is also one of the top sending countries for the Summer Work Travel Program. We selected Poland because it was the number one sending country for Summer Work Travel participants and within the top-10 sending posts for trainees in 2004. We selected Ireland because it is also within the top-10 sending countries for both the Summer Work Travel and the Trainee programs and because of the decreased participation in the Summer Work Travel Program after State's ruling concerning the eligibility of certain students. We used the results of our fieldwork for illustrative purposes and not to generalize to all posts.

To examine the potential risks of the programs we reviewed past GAO and OIG reports, and examined post validation studies, cables, and other documents. We followed up on information we obtained in Belarus on asylum seekers with J-1 visas with (1) the Bureau of Consular Affairs' Office of Consular Fraud Prevention; (2) DHS' Citizenship and Immigration Services, Asylum Division; and (3) DHS' Fraud Detection National Security Unit. We also requested data on overstays from the National Security Investigations Division of DHS' Office of Investigation, U.S. Immigration and Customs Enforcement. The overstay data that DHS provided were primarily obtained from DHS' arrival and departure information system. Past GAO reports have discussed the weaknesses in the U.S. government's

**Appendix I
Scope and Methodology**

methods of collecting overstay data. However, despite the lack of precision of both the DHS and post data on overstays, these data are sufficiently reliable to indicate overstays are a cause for concern.

We conducted our review from November 2004 to August 2005 in accordance with generally accepted government auditing standards.

Appendix II

# Comments from the Department of State



**United States Department of State**

*Assistant Secretary and Chief Financial Officer*

*Washington, D.C. 20520*

OCT – 4 2005

Ms. Jacquelyn Williams-Bridgers
Managing Director
International Affairs and Trade
Government Accountability Office
441 G Street, N.W.
Washington, D.C. 20548-0001

Dear Ms. Williams-Bridgers:

    We appreciate the opportunity to review your draft report, "STATE DEPARTMENT: Stronger Action Needed to Improve Oversight and Assess Risks of the Summer Work Travel and Trainee Categories of the Summer Work Travel and Trainee Categories of the Exchange Visitor Program," GAO Job Code 320322.

    The enclosed Department of State comments are provided for incorporation with this letter as an appendix to the final report.

    If you have any questions concerning this response, please contact Stanley Colvin, Director, Bureau of Educational and Cultural Affairs, at (202) 203-7415.

    Sincerely,

    Sid Kaplan (Acting)

cc:    GAO – Maria Oliver
       ECA – Dina Powell
       State/OIG – Mark Duda

GAO-06-106 State Department

Department of State Comments on GAO Draft Report
STATE DEPARTMENT: Stronger Action Needed to Improve Oversight
and Assess Risks of the Summer Work Travel and Trainee
Categories of the Exchange Visitor Program
(GAO-06-106, GAO Code 320322)

Thank you for the opportunity to comment on your draft report entitled "State Department: Stronger Action Needed to Improve Oversight and Assess Risks of the Summer Work Travel and Trainee Categories of the Exchange Visitor Program." This Report recommends that the Department (1) fully implement a compliance unit; (2) update and amend program regulations; and, (3) develop strategies to obtain data, such as information on overstays and program abuses, to assess the risks associated with the program, and use the results of its assessment to focus its management and monitoring efforts.

The Department has reviewed the recommendations of this Report and offers the following comment thereon:

1. The Bureau of Educational and Cultural Affairs (ECA) brought various issues regarding the Department's oversight and administration of the Exchange Visitor Program (EVP) to the attention of the Department's Management Controls Steering Committee (MCSC) in February of 2005. The MCSC determined that the issues regarding oversight and administration merited the listing of EVP oversight as a reportable condition for the Federal Managers Financial Integrity Act purposes.

2. ECA has prepared and presented to the MCSC a corrective action plan regarding oversight and administration of the EVP. This corrective action plan identified the establishment and staffing of a compliance unit as a milestone toward correcting oversight deficiencies. The compliance unit has been administratively established and its chief appointed. Recruitment and selection efforts are underway at this time to staff two compliance officer positions.

3. ECA is working towards a revision of existing EVP regulations. Draft regulations addressing the revision of trainee regulations and the establishment of an intern category have been drafted and are in the

internal clearance process. Internal review will be completed in October, the Office of Management and Budget has 90 days to review and a 60-day public comment period is given. ECA has identified October of 2006 as the completion date for the revision of the trainee regulations.

4. The Department welcomes the recommendation regarding the development of strategies to obtain information on overstays and program abuses. As the GAO report "Overstay Tracking, A Key Component of Homeland Security and a Layered Defense, GAO-04-82," points out, overstay tracking is the responsibility of the Department of Homeland Security. The Department of State will work with DHS to gather data related to the tracking of EVP participant overstays. The Department has also established a law enforcement working group comprised of representatives from the Department's Office of Inspector General, Diplomatic Security, Consular Affairs, and Legal Adviser's Office. This working group is focused on the gathering of information and analysis thereof for enforcement purposes.

Appendix III

# GAO Contacts and Staff Acknowledgments

| | |
|---|---|
| **GAO Contact** | Jess T. Ford (202) 512-4128 |
| **Staff Acknowledgment** | In addition to the individual named above, John Brummet, Assistant Director; Joseph Brown; Joseph Carney; Maria Oliver; and La Verne Tharpes made key contributions to this report. |

| | |
|---|---|
| **GAO's Mission** | The Government Accountability Office, the audit, evaluation and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
| **Obtaining Copies of GAO Reports and Testimony** | The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's Web site (www.gao.gov). Each weekday, GAO posts newly released reports, testimony, and correspondence on its Web site. To have GAO e-mail you a list of newly posted products every afternoon, go to www.gao.gov and select "Subscribe to Updates." |
| **Order by Mail or Phone** | The first copy of each printed report is free. Additional copies are $2 each. A check or money order should be made out to the Superintendent of Documents. GAO also accepts VISA and Mastercard. Orders for 100 or more copies mailed to a single address are discounted 25 percent. Orders should be sent to: |
| | U.S. Government Accountability Office<br>441 G Street NW, Room LM<br>Washington, D.C. 20548 |
| | To order by Phone:  Voice: (202) 512-6000<br>TDD:  (202) 512-2537<br>Fax:  (202) 512-6061 |
| **To Report Fraud, Waste, and Abuse in Federal Programs** | Contact:<br>Web site: www.gao.gov/fraudnet/fraudnet.htm<br>E-mail: fraudnet@gao.gov<br>Automated answering system: (800) 424-5454 or (202) 512-7470 |
| **Congressional Relations** | Gloria Jarmon, Managing Director, JarmonG@gao.gov (202) 512-4400<br>U.S. Government Accountability Office, 441 G Street NW, Room 7125<br>Washington, D.C. 20548 |
| **Public Affairs** | Paul Anderson, Managing Director, AndersonP1@gao.gov (202) 512-4800<br>U.S. Government Accountability Office, 441 G Street NW, Room 7149<br>Washington, D.C. 20548 |



PRINTED ON RECYCLED PAPER