**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Case No. 14-cv-03074-CMA-KMT

JOHANA PAOLA BELTRAN, *ET AL.*

    Plaintiffs,
v.

INTEREXCHANGE, INC., *ET AL.*

    Defendants.

---

**PLAINTIFFS' MOTION FOR A PROTECTIVE ORDER REGARDING DEFENDANT**
**CULTURAL CARE'S DEPOSITIONS OF FLSA OPT-IN CLASS MEMBERS**

---

**CERTIFICATE OF CONFERRAL PURSUANT TO D.C. COLO. LCivR. 7.1(A)**

Plaintiffs and counsel for Cultural Care have discussed the issues concerning opt-in depositions extensively, including on a call with Judge Tafoya's Chambers seeking an informal discovery conference on February 1, 2018, and during a discussion with Judge Tafoya that took place in lieu of an informal discovery conference on February 12, 2018. On February 13, 2018, Plaintiffs informed all Defendants that they anticipated moving against all FLSA Defendants to set limits on opt-in depositions, and all parties held a final meet and confer by teleconference on February 19, 2018. On that February 19 call, Cultural Care stated that it might file its own motion on some of the same topics. On and following the February 19 call, Plaintiffs and most FLSA Defendants narrowed their disagreements, and were able to avoid motion practice. Without further discussion, on March 5, 2018, Cultural Care filed a motion limited to a subset of the issues discussed on February 19. Plaintiffs now make their own motion to resolve the main issues in dispute.

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ........................................................................................ 1

FACTUAL AND PROCEDURAL BACKGROUND ........................................................ 3

   I.  Cultural Care's Demands and Plaintiffs' Accommodations. ................................. 3

     A.  Scope of Depositions ................................................................................. 3

     B.  Travel for Depositions ................................................................................ 8

LEGAL STANDARD .................................................................................................... 8

ARGUMENT ................................................................................................................. 9

   I.  Depositions Should Be Limited To Relevant Questions. ..................................... 9

   II.  *Au Pairs* from Countries with Blocking Statutes Should Not be Required to Travel to be Deposed ................................................................................................. 14

CONCLUSION ........................................................................................................... 15

## **PRELIMINARY STATEMENT**

By this motion Plaintiffs seek to limit the scope and travel associated with Fair Labor Standards Act ("FLSA") opt-in depositions taken by Cultural Care.  To date Cultural Care has taken 33 FLSA depositions, and has noticed 12 others.  The depositions drag on for hours with irrelevant questions.  Every deposition includes questions the *au pairs* find threatening—like asking for details about the *au pair*'s past and current employers.  Often the questioning becomes invasive and accusatory.  To take an example of all three:  When an *au pair* testified that an ex-boyfriend harassed her while she was at a **non-*au pair* job**, Cultural Care's attorney immediately asked—in an accusatory tone—whether the *au pair* had ever reported the harassment.  Other times the depositions descend into the bizarre or obscene, with questioners asking about details of potty-training, or about the details of an *au pair*'s former job as a model.

FLSA is the rare exception to the principle that plaintiffs in representative actions are generally protected from discovery.  However, even FLSA opt-in discovery is meant to be limited and focused.  Cultural Care has used these depositions as an excuse to take discovery on non-FLSA issues, and on issues that are not relevant to the FLSA issues in dispute.  As a result, young deponents, who are unfamiliar with the U.S. legal system and have varying levels of English proficiency, have been subjected to hours of unnecessary, anxiety-provoking questions.  Plaintiffs, therefore, move to set reasonable limits as to the scope and travel associated with Cultural Care's opt-in depositions.[1]

***Scope***:  FLSA has no knowledge, intent, or causation element.  The only FLSA - relevant factual issues for discovery in this case are the wages paid, hours worked, and indicia concerning Defendants' joint employer status.

---

[1]   Cultural Care has also insisted on taking at least 88 opt-in depositions.  Plaintiffs believe this number is unnecessary and is not proportionate to the needs of the case.  Although Plaintiffs currently seek no relief regarding the appropriate number, Plaintiffs will do so should Cultural Care continue to insist on such a disproportionate number.

Cultural Care questioners have strayed well past these limits and intimidated witnesses by demanding names of current and past employers, past earnings, current salary, current mortgage payments, car payments, utility bills, and personal information about friend and family relationships.  Cultural Care's questions often appear to have no purpose other than to satisfy the questioner's idle curiosity—asking whether an *au pair* enjoyed a puppet show at which she tended her host family's children, inquiring into the particulars of chicken nuggets and frozen pizza a host family fed its children, or gathering details about an *au pair*'s own childhood.

The young deponents know only what they see on TV about the US legal system.  Most have only spent a brief period of their lives in the United States.  They are fearful and anxious, and the irrelevant and personal questions unreasonably and unnecessarily add to this anxiety provoking process.  One deponent was left sobbing.

***Travel***: Cultural Care has demanded in-person depositions throughout the United States and all over the globe.  In noticing these depositions, Cultural Care has insisted that opt-in plaintiffs are required to travel from their home country to Denver or a neighboring country if a local law does not allow them to be deposed in their home country.  This demand is unreasonable.  Plaintiffs request that no *au pair* be **forced** to cross international borders to be deposed.[2]  Requiring *au pairs* to travel to avoid their home country's laws is inappropriate: it is contrary to principles of international comity and undermines the sovereignty of countries that have chosen to place legal restrictions on deposition testimony taken within its borders.

---

[2]   Plaintiffs have been accommodating with regard to traveling for depositions, where such depositions could be taken **legally**.  Plaintiffs' attorneys have flown to Scotland, England, Mexico, Canada, and at least a dozen states for depositions.

## FACTUAL AND PROCEDURAL BACKGROUND

**I.    Cultural Care's Demands and Plaintiffs' Accommodations.**

**A. Scope of Depositions**

The first Cultural Care opt-in deposition took place on December 15, 2017, in Hammond, Indiana.  Cultural Care's inappropriate question occurred within minutes, when the following line of questioning about pre-*au pair* experiences ensued:

> **Q.** How did you hear about the opportunity to go study English in Ireland?… **Q.** And can you describe the program.…**Q.** And you lived in Ireland?… **Q.** For six months?… **Q.** Did you live in like a dormitory setting?... **Q.** You were in Ireland for six months? … **Q.** What was the course work like?... **Q.** What courses did you take?

Pacheco Decl. Ex. A at 17:19-19:20.  Those questions were far more disciplined than many to come.  Plaintiffs have raised this issue with Cultural Care repeatedly, including in deposition objections (*see e.g.*, Pacheco Decl. Ex. B at 87:4-15; Ex. C at 35:16-25; Ex. D at 17:15-23) and through the conferral process (*see e.g.*, Pacheco Decl. Exs. E & F).  Cultural Care has not relented.  Every single deposition has inquired into improper or irrelevant topics.  The attached **Appendix 1** contains a compilation of illustrative lines of questioning from each deposition.  Plaintiffs have also included three full transcripts as Exhibit G.  Some of the more egregious examples follow:

### *Harassment by Romantic Partner*

| | |
|---|---|
| Q. Why did you quit that [pre-*au pair*] job? | A. I'm going to give you the honest reason. I was being harassed by my ex-boyfriend. He was at my work every single day. He called every single day. He was at the house I lived, so I decided to quit my job and move back home. |
| Q. Did your ex-boyfriend work with you? | A. No. |

Q. Did you report the harassment to anyone?

A. No, because it didn't -- well, I reported it to my supervisor and to my -- to my boss basically and they said that they could ban him from Century City. Because I worked for Century City, they could ban him from there, but I chose not to do that because I'm not that kind of person that would make him lose his job because the stuff -- he was a rep, so he sold stuff in the area and I'm not the kind of person who would take away from somebody when I could just simply leave and go away where he can't bother me.

Q. Did you have a plan for a new job when you left that job?

A. No. I just wanted to get away and get myself sorted out because of what was going out.[3]

### *Embarrassing Details about Minor Children*

Q. What happened after the kids' teeth were brushed?

A. I would most likely change both of their diapers and get them to go to the toilet.

Q. The seven-year-old was still in diapers?

A. Yes.

Q. Did the seven-year-old have special needs?

A. No.

Q. Do you know why he was still in diapers at age seven?

A. Poor parenting.[4]

### *Witness Current Financial Obligations*

Q. Ms. …, do you pay rent for your current residence?

A. Yes.

Q. And what is your rent per month?

A. $1,700…

Q. How much do you pay for utilities?

A. I don't know exactly…

Q. About how much do you pay for food?

A. I don't know.…

Q. How much do you pay for your cell phone per month?

A. $150…

Q. Do you have a car?

A. Yes.

Q. And how much did you pay for the car?

A. You mean the financing?

Q. Sure.

**A. Can I ask you what it has to do with the Cultural Care *Au pair***

---

[3]    January 13, 2018, New York, New York, Ex. G-1 at 37:13-38:19.

[4]    February 10, 2018, Boston, Massachusetts, Ex. G-3 at 81:19-82:4.

| | lawsuit? |
|---|---|
| **Q. *You just have to answer the question.*** | A. All right. I don't know.[5] |

### Demanding Information About Post Au Pair Employment

| | |
|---|---|
| Q. What is your current salary at your present job? | A. It's an hourly wage of $18 |
| Q. How many hours a week do you work? | A. 40. |
| Q. Do you receive benefits? | A. Yes. Medical. |
| Q. Any others? | A. No. |
| Q. And what is the name of your supervisor? | A. Terri Rosko, T-E-R-R-I, R-O-S-K-O.[6] |

### Demanding Names of Friends and Associates

| | |
|---|---|
| Q. Did you ever talk to any friends about your time as an au pair? | A. Yes. |
| Q. Who would you talk to? | A. My friends. |
| Q. Do you remember their names? | A. No. |
| Q. You don't remember the names of your friends? | A. I said I don't remember the name of the friends that I talked to.[7] |

***

| | |
|---|---|
| Q. Did you make friends at training school? | A. Yes. |
| Q. Are you still in touch with any of those friends? | A. Yes. |
| Q. About how many friends? | A. Three or four. |
| Q. What are their names? | A. Dana, Nicole, Andreas, Laya. |
| Q. This is the same Dana and Nicole that you were part of a Facebook Messenger group with? | A. Yes. |
| Q. Have you discussed the lawsuit with Nicole? [Objection] | A. She's in the group chat so to that extent. |
| Q. So Dana, Nicole and Andreas are in the group chat? | A. Yes. [Objection] |
| Q. What was the name of the fourth au pair? | A. Laya. |
| Q. Have you spoken with Laya about the lawsuit? | A. No. |
| Q. Do you know whether she's joined? | A. I think she did. |

---

[5] February 11, 2018, Boston, Mass., Ex. H at 97:4-98:11(emphasis added).
[6] February 13, 2018, Phoenix, Arizona, Ex. I at 42:4-13.
[7] January 30, 2018, Glasgow, Scotland, Ex. J at 67:22-68:7.

| | |
|---|---|
| Q. Why do you think that she did? | A. One of my mutual friends mentioned it it to me. They also have a group chat which I'm not involved in. |
| Q. Which mutual friend? | A. Dana.[8] |

### Demanding information about non-au pair living arrangements

| | |
|---|---|
| Q. Yes. Who do you live with? | A. With my partner, Peter. |
| Q. Anyone else? | A. His kids. |
| Q. His kids. How many kids? | A. Two. |
| Q. Two. Where did you live before Stoneham Road? | A. I was living in my house in Italy, just keep going moving for working outside Italy, but I was living there. |
| Q. You were living in Italy before you came to Australia? | A. Yes, for two months. Because before, I was in Spain…. |
| Q. And before that? | A. I was in South America… |
| Q. And before that? | A. Before that, traveling a bit around South America, and before in United States when I was there for Arizona.[9] |

### Demanding Information about Marital Status & Spouses

| | |
|---|---|
| Q. And are you married? | A. No. I'm still waiting for the ring. |
| Q. You said you had a daughter. Do you have any other children? | A. No, but I am currently five months pregnant.[10] |
| | *** |
| Q. You said you met your husband during your time as an *au pair*? | A. Yes |
| Q. When did you meet him? | A. I first met him in February. |
| Q. And how did you meet? | A. The Rich family used to rent the basement downstairs for another family and this family was my husband's brother, his wife, my husband's stepsister – is that what it is – stepsister, yes.  And my husband's nephew.  So they introduce me to my husband. |
| Q. And when did you get married? | A. When? |
| Q. (Indicating.) | A. August 4, 2013.[11] |

---

[8]   February 27, 2018, Pensacola, Florida, Ex. K at 86:9-87:17.
[9]   January 23, 2018, Boston, Massachusetts, Ex. L at 14:16-15:17.
[10]   February 13, 2018, Boston Massachusetts, Ex. M at 10:14-19.
[11]   February 8, 2018, New York, New York, Ex. DD at 113:24-114:16.

### *Details of Non-Work, Free Time*

| | |
|---|---|
| Q. With whom did you go to Philadelphia? | A. With my South African friends who are au pairs. |
| Q. Did you stay overnight in Philadelphia? | A.  Yes. |
| Q. Where did you stay? | A. I don't know what the place's name was called. |
| Q. Was it a hotel? | A. I'd say a motel. |
| Q. Who paid for it? | A. We shared the cost. |
| Q. Who is "we"? | A. Sashika and Noncebo and Peter. |
| Q. When you went to Mystic did you go overnight? | A. Yes. |
| Q. With whom did you go? | A. Peter and Noncebo. |
| Q. Where did you stay? | A. In a tent. |
| Q. You went camping? | A. Yes. |
| Q. Whose tent was it? | A. My LCC's.[12] |

### *Motivations for Joining the Lawsuit*

| | |
|---|---|
| Q. Do you hope to recover anything from the lawsuit? [objection] | A. What do you mean by that? |
| Q. What do you hope to get out of the lawsuit? [objection] | A. Personally I don't hope to accomplish anything, but I joined the lawsuit because I don't think that the work hours are appropriate for the program as it's currently in place. |
| Q. And when did you come to that belief? | A. During my au pair time. |
| Q. Do you hope to recover any money from this lawsuit? [objection] | A. I don't know. What do you define as "hope"? |
| Q. Would you like to recover any money from this lawsuit? | A. I just don't know how to answer that. |
| Q. Why did you decide to join the lawsuit, Ms. …? | A. Because I think it violated the au pair laws in the U.S.[13] |

---

[12]    January 13, 2018, New York, New York, Ex. G-1 at 114:4-115:7.
[13]    February 27, 2018, Pensacola, Florida, Ex. K at 25:5-26:7

**B. Travel for Depositions**

Cultural Care continues to insist that *au pairs* that cannot be deposed in their country of residence due to local law may be required to travel to appear for them, including to Colorado, because they chose to opt-in to a lawsuit pending there. Pacheco Decl. Ex. N (February 5, 2018 email from M. Cahill to D. Smalls); *see also* Ex. O (January 23, 2018 email from J. Lukey to D. Smalls).  These *au pairs* are located in countries that place legal restrictions on the taking of testimony of its citizens within its borders.[14]  To avoid these laws, Cultural Care demanded that *au pairs* be required to travel to neighboring countries, or that they be required to travel thousands of miles to the United States.  These demands are particularly burdensome for *au pairs* who continue to be young low-wage workers, with inflexible job and schooling obligations. *See* Pacheco Decl. Ex. N (February 5, 2018 email from D. Smalls to M .Cahill).

## LEGAL STANDARD

The Court has authority under Federal Rules of Civil Procedure 26, 30(b)(4), 29 U.S.C. § 216(b), and its inherent power to manage litigation and protect the parties by setting appropriate limitations on discovery.  Rule 26(c)(1) reiterates the court's power to "issue an order to protect a party or person from annoyance, embarrassment,

---

[14]    Plaintiffs notified Cultural Care's counsel that international depositions must be conducted in accordance with applicable law.  Cultural Care nevertheless requested depositions in restrictive countries, and assured Plaintiffs that relevant law had been considered.  Plaintiffs did their own research and concluded that many of these depositions were likely unlawful under the laws of the relevant country.  Plaintiffs shared this information with Cultural Care and in response, Cultural Care's counsel revealed that it had actually done no research itself.  Instead, its counsel had outsourced this legal analysis to a non-lawyer vendor.  As Plaintiffs' counsel pointed out, French law, for example, would have made every participant in such a deposition a **criminal**.  Plaintiffs' counsel spent considerable time informing *au pairs* that they had been noticed, what that meant, and their need to appear, and coordinating logistics for multiple *au pairs* to appear in multiple countries, only to learn that Cultural Care had not, in fact, consulted the relevant law.  *See* Pacheco Decl. Ex. P (January 23, 2018 email from J. Lukey to D. Smalls ("Our vendor for the international depositions, Veritext, has just informed us that they were mistaken in telling us that we can conduct the depositions in France . . .").

oppression, or undue burden or expense, including" but not limited to, specifying terms for discovery, "prescribing a discovery method other than the one selected by the party seeking discovery," and "forbidding inquiry into certain matters, or limiting the scope of . . . discovery to certain matters." "In large or complex litigation, the Court may limit the scope of discovery to protect a party from unduly burdensome discovery requests." *Smith v. Lowe's Home Centers, Inc.*, 236 F.R.D. 354, 356 (S.D. Ohio 2006) (citing *Adkins v. Mid-America Growers, Inc.*, 141 F.R.D. 466 (N.D. Ill. 1992)).

Although "opt-in plaintiffs may be subject to some individualized discovery", *see Green v. Drake Beam Morin, Inc.*, No. 11-cv-01063-REB-CBS, 2011 WL 6046940, at *1 n.2 (D. Colo. Dec. 6, 2011), defendants are "not entitled to individualized discovery from each and every opt-in Plaintiff, but rather discovery from a certain number of Plaintiffs." *In re American Family Mut. Ins. Co. Overtime Pay Litig.*, No. 06-cv-17430-WYD-CBS, 2009 WL 1120293, at *2 (D. Colo. April 27, 2009). Extensive individualized discovery is contrary to FLSA's purpose, which is to promote the "efficient resolution" of claims— lowering the cost for individuals to vindicate their rights and promoting judicial economy. *See Hoffman-La Roche, Inc. v. Sperling*, 493 U.S. 165, 170 (1989). "Taken to its logical limits, individualized discovery would prevent [collective] actions from being litigated." *Adkins v. Mid-America Growers, Inc.,* 141 F.R.D. 466, 468 (N.D. Ill. 1992). Moreover, excessive FLSA discovery "would only serve to obfuscate the issues and drastically enhance the costs of litigation." *McGrath v. City of Philadelphia,* No. 92-4570, 1994 U.S. Dist. Lexis 1495, at *7-8 (E.D. Pa. Feb. 14, 1994).

## ARGUMENT

## I.     Depositions Should Be Limited To Relevant Questions.

 Plaintiffs do not dispute that an FLSA claimant's decision to "opt-in" can give rise to limited discovery obligations. *See Green*, 2011 WL 6046940, at *1 n.2. But any such discovery must be relevant, as a threshold matter. To date, Cultural Care's opt-in

depositions have centered on demonstrably irrelevant topics, or otherwise wasted countless hours of *au pair* and attorney time on issues that are not in dispute, or are beyond the scope of the FLSA claims and defenses at issue.

"The requirements to state a claim of a FLSA violation are quite straightforward, requiring plaintiff to show a failure to pay overtime compensation and/or minimum wages to covered employees—no more." *Rayfield v. Sandbox Logistics, LLC*, 217 F. Supp. 3d 1299, 1300 (D. Colo. 2016) (internal quotations and citation omitted). And there is no such thing as an equitable defense, such as unclean hands or equitable estoppel, for FLSA minimum wage and overtime claims like the ones here. *See Mencia v. Allred*, 808 F.3d 463, 470 (10th Cir. 2015) ("The right to the FLSA minimum wage cannot be waived."); *Campbell v. A.S.A.P. Assembly, Inc.*, No. CIV-13-0815-HE, 2013 WL 6332975, at *2 (W.D. Okla. Dec. 5, 2013) (unclean hands defense unavailable in FLSA claim seeking monetary damages).

Motivations of individual opt-in plaintiffs are "irrelevant to whether [a Defendant] violated the FLSA." *Haught v. U.S. Eng'g Contractors Corp.*, No. 07-80436-CIV, 2009 WL 36591, at *3 (S.D. Fla. Jan. 6, 2009); *see also Dole v. Int'l Ass'n Managers, Inc.*, No. 90-0219-PHX-RCB, 1991 WL 270194, at *4 (D. Ariz. Apr. 1, 1991) (motivation of complainants irrelevant to the merits of plaintiff's allegations).

Information about payments from other employers is also "irrelevant to whether the employer properly paid its employees and otherwise complied with the [FLSA's] requirements." *See Chao v. Westside Drywall, Inc.*, 254 F.R.D. 651, 660 (D. Or. 2009). Indeed, "all testimony of Plaintiff's current employers . . . is wholly irrelevant to the issue of whether or not Plaintiff received adequate compensation from [Defendants] under the FLSA" and evidence of any agreement by a "Plaintiff with either [Defendants] or any other of the Plaintiff's former or current employers to work for less than minimum wage or overtime wages is not . . . relevant to any permissible defense." *Campos v. Zopounidis*, No. 3:09-cv-1138 (VLB), 2011 WL 4852491, at *3 (D. Conn. Oct. 13, 2011).

As detailed above, and in Appendix 1, Cultural Care has strayed far from the bounds of relevance in each and every deposition.  Cultural Care has been unable to identify a legitimate reason for going beyond the topics relevant to FLSA claims, and its defenses—wages paid, hours worked, and factors relevant to joint employment issues.  Cultural Care cannot identify any because there is none.  As a matter of law, certain topics are irrelevant (other employers, motivations), and other topics serve only to harass or intimidate the witness, while offering nothing to support any FLSA claim or defense (personal relationships, financial status and obligations, intimate details of pre and post *au pair* life).

To justify its overreach Cultural Care argues that testimony from *au pair*s will help prove its "preemption" defense.  *See* Ex. Q at 89:21-91:18 (questioner requesting an *au pair*'s personal journals because "[t]hey're at least facially relevant" to Cultural Care's "cultural exchange preemption argument"); *see also* Pacheco Decl. Ex. R (January 10, 2018 email from J. Lukey to J. Libling ("The range of issues still open in this FLSA claim is substantial, and includes without limitation . . . preemption.")).  As explained in Plaintiffs' response to Cultural Care's related motion (ECF No. 951 at 3-7), this argument is wrong three times over:  (i) its preemption defense was denied as a matter of law at the pleading stage; *id.* at 3 (ii) preemption is a matter of law, not fact to be established by deposition testimony; *id.* at 3-5 and (iii) preemption considers legislative or regulatory intent, but the *au pairs* are neither legislators nor regulators, *id.*  In other words, *au pairs*' subjective feelings or experiences in the *au pair* program are entirely irrelevant to preemption – a "pure federal-law question."  *Allison v. UNUM Life Ins. Co. Of America*, 381 F.3d 1015, 1028 (10th Cir. 2004).

Nevertheless, Cultural Care has spent countless hours asking *au pairs* about the "cultural exchange" aspects of the *au pair* program, in order to somehow prove this (already dismissed) preemption defense.  This makes no sense.  Testimony about particular *au pairs'* individual experiences or motivations says nothing about whether or

not Congress intended to preempt state wage claims.  *See English v. General Elec. Co.,* 496 U.S. 72, 78-79 (1990) ("Pre-emption fundamentally is a question of congressional intent.").  Even assuming the Court never addressed this issue at the motion to dismiss stage, the legal analysis for preemption cannot turn on *au pair* testimony about the contents of the meals they eat with host families, the movies they saw, or how they spent their non-working hours among friends (and those friends' names).  *See United States v. Supreme Court of New Mexico*, 839 F.3d 888, 906 (10th Cir. 2016).  At best, Cultural Care's "cultural exchange" versus "labor program" dichotomy is a talking point used by all the sponsor agencies to deflect attention away from their labor law obligations.  *See* Pacheco Decl. Ex. S at ALLI-019045 (sponsor talking points about "Words to Use & Lose").  Plaintiffs should not be forced to spend tens of thousands of dollars to advance Cultural Care's legally irrelevant talking point.[15]

Cultural Care has also used FLSA opt-in depositions to conduct improper Rule 23 class discovery.  As detailed in Plaintiffs' opposition brief (ECF No. 951 at 7-8), although FLSA opt-ins are also "absent" members of the certified Rule 23 classes, the bounds of FLSA and Rule 23 discovery differ significantly.  Discovery from absent Rule 23 class members is the exception, not the rule, and as a result, requests for such discovery are "generally disfavored."  *Sibley v. Sprint Nextel Corp.*, No. 08-2063-KHV, 2009 WL 3244696, at *2 (D. Kan. Oct. 6, 2009).  This is because, unlike FLSA opt-ins, absent Rule 23 class members "are not considered parties for purposes of traditional

---

[15]    Of course, "cultural exchange" and work are not mutually exclusive.  The Department of State said as much when it explicitly subjected the *au pair* program's 45-hour per week labor component to the FLSA, "as interpreted by the Department of Labor."  22 C.F.R. § 62.31(j)(1).  So too did Cultural Care when it forced its *au pairs* to sign standard form contracts stating that they "understand that providing childcare is [their] primary obligation in this Program and that any personal plans or activities will take secondary priority to caring for [the] host children".  Pacheco Decl. Ex. T, at ¶ 4.

discovery measures". *Schwartz v. Celestial Seasonings, Inc.*, 185 F.R.D. 313, 319 (D. Colo. 1999). Indeed, members in a class action are "not required to do anything" and "may sit back and allow the litigation to run its course*." Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 810 (1985). Accordingly, FLSA opt-in depositions cannot be used as a backdoor into Rule 23 discovery that Cultural Care would not otherwise be entitled to. Their purpose is to address Plaintiffs' FLSA claims, and Cultural Care's defenses to those claims, nothing more.

The Federal Rules require proportionality and relevance, and the only FLSA-relevant issues are hours worked, wages paid, and joint employer indicia (the "Relevant Issues"). As shown above and in Appendix 1, many of the lines of questioning Cultural Care has pursued are probative of nothing – including a preemption defense that is no longer in the case, and would not depend on *au pairs*' subjective views of "cultural exchange" even if it was. With that in mind, Plaintiffs propose the following ground rules:

> **1.** All questions shall be limited to the period when the deponent was being recruited to participate in the *au pair* program, through the end of the time that the *au pair* was on a J-1 visa sponsored by Cultural Care ("Relevant Period"), except that Cultural Care may inquire into Relevant Issues outside the Relevant Period so long as the questions pertain solely to the Relevant Period.

> **2.** No questions about a deponent's personal life or subjective state of mind may be asked, except those concerning the deponent's present state of mind at the time of a statement or writing concerning a Relevant Issue, provided that the deponent's state of mind is probative either of the accuracy or reliability of that statement or writing, or of the accuracy or reliability of the *au pair*'s testimony at the time of the deposition.

> **3.** Questions about the *au pair*'s background shall be limited to name, age during the Relevant Period or at the time of the deposition, and country or city of origin. Questions about romantic relationships or marital status, immigration status, and the names, locations, and status of family and friends, or current and past employers (unless otherwise related to proper questioning during the Relevant Period) are improper.

II.    **Au Pairs from Countries with Blocking Statutes Should Not be Required to Travel to be Deposed**

Even after being informed by Plaintiffs' counsel that depositions could not be legally conducted in many of the countries where Cultural Care had noticed depositions, it refused to relent.  Cultural Care's counsel instead accused *au pairs* located in such countries of "hid[ing] behind their foreign nationality to thwart" discovery.  Pacheco Decl. Ex. N (February 5, 2018 email from M. Cahill to D. Smalls).  Of course, their foreign nationality was part of the reason Cultural Care recruited them to work in the United States in the first place.  And Cultural Care knew that after their jobs ended, they would return to those home countries.  Moreover, Plaintiffs' counsel did not choose to locate *au pairs* all over the world.  Nor did Plaintiffs' counsel pass the laws in these countries that make depositions restrictive.

Cultural Care would have *au pairs* living in countries with so-called "blocking statutes" cross international borders and/or travel hundreds or thousands of miles.  But the law does not require international and burdensome travel, let alone travel to avoid the law of the deponent's home country.[16]  For *au pairs* located in countries with

---

[16]    Courts routinely find that even interstate travel within the United States is unreasonable.  *E.g.*, *Geer v. Challenge Financial Investors Corp.*, No. 05-1109-JTM, 2007 WL 1341774, at *3-4 (D. Kan., May 4, 2007) (refusing to make opt-ins in Florida, Virginia, Texas, Ohio and California travel to Kansas for depositions because that would undermine the purpose of FLSA, to provide "efficient resolution" for worker claims); *see also Forauer v. Vermont Country Store, Inc.*, No. 5:12-cv-276, 2014 WL 2612044, at *6 (D. Vt. June 11, 2014) (opt-in travel to Vermont "would place a burden on them that would cancel much of the benefit gained by joining in the collective action") (citing cases); *Smith v. Family Video Movie Club, Inc.*, No. 11 C 1773, 2012 WL 4464887, at *3 (N.D. Ill. Sept. 27, 2012) (opt-in travel to judicial district in Illinois from Michigan and Iowa "would be burdensome and would undermine the benefits of the collective FLSA action").  Forcing an *au pair* to travel across national borders to avoid the laws of their home country is even less reasonable.

14

"blocking statutes", requiring international travel flies in the face of established foreign sovereignty and international comity principles. *See Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court for Southern Dist. of Iowa*, 482 U.S. 522, 543–44 (1987). To require such travel[17] would necessitate a "particularized analysis" that weighs the competing interests of the foreign nation, the requesting nation, and the "intrusive[ness]" of the discovery procedure at issue. *Id.* Given Cultural Care's inability to articulate a clear rationale for most of its questioning, it is doubtful that such a comity analysis would require *au pairs* to leave their home country to answer largely irrelevant questions.[18] Accordingly, Plaintiffs request that opt-ins residing in countries with blocking statues not be required to travel internationally to be deposed.

## CONCLUSION

For the foregoing reasons, Plaintiffs request an order placing reasonable limits on the scope and travel associated with Cultural Care's opt-in depositions.

---

[17]    This motion is limited to the requirement that an *au pair* travel for a deposition. If an *au pair* is able to travel and volunteers to do so, Plaintiffs have no objection. In fact, 3 *au pairs* have traveled from countries with blocking statutes per an agreement of the parties and an agreement by Cultural Care to bear the costs.

[18]    Cultural Care has previously argued that plaintiffs in this case must submit to the forum district for depositions because "district courts within the Tenth Circuit have ruled" as such. Pacheco Decl. Ex. N (February 5, 2018 email from M. Cahill to D. Smalls). But the cases Cultural Care cited involved *corporate* witnesses and parties, not FLSA opt-in class members. Surely the burden to FLSA opt-ins traveling internationally for a deposition in this case is vastly different from that of a corporate party.

Dated: March 26, 2018

Respectfully Submitted,

BOIES SCHILLER FLEXNER LLP

  /s/ Byron Pacheco
Matthew L. Schwartz
Peter M. Skinner
Randall W. Jackson
Dawn L. Smalls
Joshua J. Libling
Byron Pacheco
575 Lexington Avenue
New York, New York 10022
Tel: (212) 446-2300
Fax: (212) 446-2350
mlschwartz@bsfllp.com
pskinner@bsfllp.com
rjackson@bsfllp.com
dsmalls@bsfllp.com
jlibling@bsfllp.com
bpacheco@bsfllp.com

Sean P. Rodriguez
Juan P. Valdivieso
1999 Harrison Street, Suite 900
Oakland, CA 94612
Tel: (510) 874-1000
Fax: (510) 874-1460
srodriguez@bsfllp.com
jvaldivieso@bsfllp.com

Sigrid S. McCawley
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, Florida  33301
Tel: (954) 356-0011
Fax: (954) 356-0022
smccawley@bsfllp.com

TOWARDS JUSTICE
Alexander Hood
1535 High Street, Suite 300
Denver, Colorado  80218
Tel: (720) 239-2606
Fax: (303) 957-2289
alex@towardsjustice.org

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 26, 2018, I electronically served the foregoing motion on all counsel of record.

*/s/ Byron Pacheco*

Byron Pacheco
