# Exhibit B

(replacing ECF No. 935)

Case No. 1:14-cv-03074-CMA-KMT Document 859-3 filed 03/18/30 18 USDC Colorado pg 2 of 2
Case 1:14-cv-03074-CMA-KMT Document 958 Filed 03/16/18 USDC Colorado Page 1 of 28
of 29

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1: 14-cv-03074-CMA-KMT

JOHANA PAOLA BELTRAN; et al.

      Plaintiffs,

v.

INTEREXCHANGE, INC.; et al.

      Defendants.

---

**DEFENDANTS AMERICAN CULTURAL EXCHANGE, LLC D/B/A/ GO AU PAIR AND GO AU PAIR OPERATIONS LLC'S RESTRICTED APPENDIX IN SUPPORT OF RESPONSE TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Case No. 1:14-cv-03074-CMA-KMT Document 959-3 Filed 03/16/18 USDC Colorado Page 2 of 28

## TABLE OF CONTENTS OF RESTRICTED APPENDIX[1]

1.  Exhibit B to Kapler Declaration - 2015 Report of Independent Accountants (excerpt) ............................................................................................................... 38

2.  Exhibit C to Kapler Declaration - 2016 Report of Independent Accountants (excerpt) ............................................................................................................... 46

3.  Excerpts of M. Balta 03-05-18 Deposition ......................................................... 100

---

[1] Documents contained herein are paginated in accordance with the publicly filed appendix submitted by Go Au Pair in support of its response to plaintiffs' motion for partial summary judgement.

# EXHIBIT B

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY

**AMERICAN CULTURAL EXCHANGE, LLC**
**GOAUPAIR OPERATIONS, LLC**

**Report of Independent Accountants**
**On Applying Agreed-Upon Procedures**
**December 31, 2015**

GAP_00079116

Case No. 1:14-cv-03074-CMA-KMT   Document 938   filed 03/18/18   USDC Colorado   pg 5 of 6
Case 1:14-cv-03074-CMA-KMT   Document 1088-3   filed 08/30/18   USDC Colorado   Page 5 of 28
of 29
HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY



### Stayner Bates & Jensen P.C.

CERTIFIED PUBLIC ACCOUNTANTS & CONSULTANTS

**Report of Independent Accountants
On Applying Agreed-Upon Procedures**

Mr. A. William Kapler III
American Cultural Exchange, LLC
goAuPair Operations, LLC
Murray, UT 84107

We have performed the procedures included in the Au Pair Compliances Audit Procedures which were supplementally issued in connection with the Exchange Visitor Program Regulations (the "Regulations"), Au Pair "Final Rule" (CFR 22 62.31(m), dated February 15, 1995, as amended June 27, 1997 by the former United States Information Agency, now administered by the United States Department of State (the "Department of State"), and enumerated below, for American Cultural Exchange, LLC, dba goAuPair. These procedures were agreed to by the management of American Cultural Exchange, LLC, dba goAuPair, solely to assist you in your assertion of compliance with certain Department of State regulations during the year ended December 31, 2015. This agreed-upon procedures engagement was performed in accordance with standards established by the American Institute of Certified Public Accountants. The sufficiency of these procedures is solely the responsibility of the specified users of the report. Consequently, we make no representation regarding the sufficiency of the procedures described below either for the purpose for which this report has been requested or for any other purpose.

1. We requested confirmation from the Department of State that American Cultural Exchange, LLC, dba goAuPair (the Sponsor") is designated as a bona-fide program Sponsor authorized by the Department of State as of December 31, 2015. Stacey Gomelsky, Program Analyst, Private Sector Programs Division, Office of Designation, confirmed on June 7, 2016 that American Cultural Exchange, LLC, dba goAuPair was a Department of State designated program for the year ended December 31, 2015.

From the Sponsor's listing of Au Pair Participants who arrived in the United States during the year ended December 31, 2015, we randomly selected 64 of Program Participant files, as well as the associated Host Family files. In connection with those files:

510 South 200 West Suite 200 • Salt Lake City, Utah 84101 • 801.531.9100 • Fax 801.531.9147
Mail: P.O. Box 2995 • Salt Lake City, Utah • 84110-2995

GAP_00079117

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY

22.  We read the program literature to determine that the Sponsor's counselors are responsible for contacting the Au Pair Participant and the Host Family within 48 hours of the Au Pair Participant's arrival and must meet, in person, at the Host Family's home, with the Au Pair Participant and the Host Family within two weeks of the Au Pair's arrival. We read the local representative's Two-Week Placement Evaluation Report and the Host Family/Au Pair Status Reports to determine that compliance with these procedures was documented.

None of the Two-Week Placement Evaluation Reports and Host Family/Au Pair Status Reports could not be located. Of the 64 Two-Week Placement Evaluation Reports and Host Family/Au Pair Status Reports, 24 did not contain evidence of contact within 48 hours or a visit within two weeks of the Au Pair's arrival and 40 contained evidence of both contact and a visit.

14 Placement Evaluation Reports and Host Family/Au Pair Status Reports did not contain evidence of contact within 48 hours but did contain evidence of a visit within two weeks of the Au Pair's arrival.

9 Placement Evaluation Reports and Host Family/Au Pair Status Reports contained evidence of contact within 48 hours but did not contain evidence of a visit within two weeks. Of these, 5 contained evidence of a visit within three weeks, 2 contained evidence of a visit within one month and the remainder contained evidence of a visit beyond one month. We have confirmed directly with the Au Pair Participants and Host Families whether this requirement was adhered to (see results at number 28h and I and 29 a and b, respectively).

23.  We read the signed Host Family/Au Pair Agreements to determine that the Host Family has agreed that the Au Pair Participants will:
     a.  be compensated at a weekly rate based on 45 hours per week and paid in conformance with the requirements of the Fair Labor Standards Act. Compensation must be no less than $195.75 per week;
     b.  not provide more than ten hours of childcare on any given day;
     c.  receive a minimum of one and a half days off per week, in addition to one complete weekend off each month;
     d.  receive two weeks of paid vacation; and
     e.  receive up to $500 toward the costs of required academic course work.

GAP_00079124

None of the Host Family/Au Pair Agreements could not be located.  We have confirmed with the Au Pairs whether these provisions were adhered to (see results at number 28b, c, d, e and f).

24.   We read the program literature to determine that the Sponsor requires the Au Pair Participants to enroll in an accredited U.S. post-secondary institution for not less than six semester hours of academic credit or its equivalent.  We read Host Family/Au Pair Status Reports and sponsor documentation to confirm that this requirement is being met.  Of the 64 Au Pair Participants covered by the Host Family/Au Pair Status Reports, 12 returned home or left the program prior to the completion of one year and the educational requirement was not met. 13 of the Host Family/Au Pair Status reports contained evidence that the Au Pair Participants arrived at the Host Family's home in the last quarter of 2015 and have not yet enrolled in an accredited U.S. post-secondary institution.  Through our review of the Host Family/Au Pair Agreement, we noted that these Au Pair Participants have agreed that they will enroll in an accredited U.S. post-secondary institution.  Of the remaining Host Family/Au Pair Status Reports and sponsor documentation reviewed, 10 did not contain evidence of enrollment in or attendance at an accredited U.S. post-secondary institution or its equivalent.  The remaining 29 contained evidence that the Au Pair Participant has enrolled in or attended classes.

We also read the Host Family/Au Pair Agreement to determine that as a condition of program participation, the Host Family agrees to facilitate the enrollment and attendance of the Au Pair Participant and to reimburse or pay up to $500 toward the costs of required academic coursework incurred by the Au Pair in meeting this education requirement for the Au Pair Participant's year.  None of the Host Family/Au Pair Agreements could not be located.

25.   We read the Host Family/Au Pair Status Reports and actual contact records prepared by the local and regional counselors that document contact between the Au Pair Participants, Host Families and their local organizational representatives, to determine that the Sponsor requires monthly contact among them and quarterly contact between the Au Pair Participant, Host Families, and the regional counselors. None of the Host Family/Au Pair Status Reports and None of the actual contact records could not be located for a minimum of one quarter of the year.  As a result of applying this procedure to the remaining Host Family/Au Pair Status Reports and actual contact records, 62 of the Host Family/Au Pair

GAP_00079125

Case No. 1:14-cv-03074-CMA-KMT · Document 959-3 filed 03/18/18 · USDC Colorado · pg 9
of 29

Case 1:14-cv-03074-CMA-KMT · Document 938 · Filed 03/18/18 · USDC Colorado · Page 8 of 28
HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY

Status Reports and 62 of the actual contact records contained evidence that the Au Pair Participant/Host Family were contacted monthly. The remaining 2 Host Family/Au Pair Status Reports and 2 actual contact records did not contain evidence that the Au Pair Participant/Host Family were contacted on a monthly basis throughout the placement period. We noted that 64 of the four required regional quarterly contacts were documented.

26. We read the Host Family/Au Pair Status Reports, which counselors are required to prepare for unusual or serious situations, as defined in the Regulations, or incidents involving either the Au Pair of Host Family. Any incidents involving or alleging a crime of moral turpitude or violence, as defined in the Regulations, are to promptly be reported to the Department of State. None of the Host Family/Au Pair Status Reports could not be located for a minimum of one quarter of the year. See number 25 above for results of monthly contact testing on the remaining Host Family/Au Pair Status reports.

27a. We have reviewed all complaints submitted to the sponsor, including those initiated by Au Pair Participants and those initiated by the Host Family Participants for completeness. A summation each complaint setting forth the following details is appended.

    a. The name of the host family and the number of years participating in the program;

    b. The name of the au pair, and whether placement is first or subsequent (rematch);

    c. Who initiated complaint and date of complaint;

    d. Whether complaint was reported to the Department of State, and if so, date of report; and

    e. How complaint was resolved (action taken by Sponsor) and date of resolution.

27b. We have reviewed all reports of incidents involving or alleging a crime of moral turpitude or violence, including those committed by the Au Pair Participants and those committed by any member of the Host Family, for completeness and to determine if they were submitted by the Sponsor to the Department of State.

28. We sent confirmations to the 128 Au Pair Participants selected for testing. Of the 128 confirmations sent, 99 have responded. The following outlines the responses to the confirmation questions.

    a. 86 responded that they worked 45 hours or less per week;

GAP_00079126

    b.  64 responded that they were required to provide no more than 10 hours per day of childcare.  Of the remaining 35, 22 responded that they worked more than 10 hours per day at least once a week.  8.2 is the average number of hours per day the Au Pair Participants reported they were expected to provide childcare;

    c.  96 responded that they received at least $195.75 per week as compensation;

    d.  88 responded that they received at least one-and-a-half days off per week;

    e.  94 responded that they received one complete weekend off per month;

    f.  90 responded that they did, or will, receive two weeks paid vacation;

    g.  99 responded that they had a private room;

    h.  93 responded that their Local organizational representative contacted them within 48 hours of their arrival at the Host Family's home;

    i.  94 responded that they Local organizational representative met, in person, with them and their Host Family within two weeks of their arrival at the Host Family's home;

    j.  81 responded that they had monthly contact with their Local organizational representative;

    k.  81 responded that they had enrolled, or will enroll before the completion of the year, in a U.S. post-secondary institution of higher learning;

    l.  95 responded that the orientation program they attended included 8 hours of child safety and 24 hours of child development instruction; and

    m.  88 responded that they were reimbursed or paid up to $500 toward the costs of the required academic coursework.

29.  We sent confirmations to the 133 Host Families (including rematches) selected for testing. Of the 133 confirmations sent, 99 responded.  The following outlines the responses to the confirmation questions:

    a. 93 responded that their counselor contacted them within 48 hours of the Au Pair Participant's arrival at their home;

    b. 94 responded that their counselor met, in person, with them and their Au Pair Participant within two weeks of the Au Pair Participant's arrival at their home;

    c. 77 responded they had monthly contact with their counselor; and

    d. 86 responded that their Au Pair Participant had enrolled or will enroll before the completion of the year in a U.S. post-secondary institution of higher learning.

30.  We read a draft of the annual report to be filed by the Sponsor with the Department of State noting that the following requirements were included therein:

GAP_00079127

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY

    a.  A summation of the results of an annual survey of all Host Families and Au Pair Participants regarding their satisfaction with the Program, and its strengths and weaknesses, as defined in the Regulations;

    b.  A summation of all complaints involving Host Family or Au Pair Participants in the program. SEE TABLE D and new SUMMATION REPORT;

    c.  A summation of all situations which resulted in the placement of an Au Pair with more than one Host Family;

    d.  A Report detailing the name of the Au Pair Participant, his or her Host Family placement, location and names of the local and regional organizational representatives; and

    e.  A complete set of all promotional materials, brochures or pamphlets distributed to either Host Family or Au Pair Participants.

We were not engaged to, and did not perform an examination, the objective of which would be the expression of an opinion on management's assertions. Accordingly, we do not express such an opinion. Had we performed additional procedures, other matters might have come to our attention that would have been reported to you.

This report is intended solely for the use of the management of American Cultural Exchange, LLC, dba goAuPair, and the Department of State and should not be used by those who have not agreed to the procedures and taken responsibility for the sufficiency of the procedures for their purposes.

*Stayner, Bates & Jensen, PC*

Stayner, Bates & Jensen, P.C.
June 27, 2016

GAP_00079128

# EXHIBIT C

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY

**AMERICAN CULTURAL EXCHANGE, LLC**
**GOAUPAIR OPERATIONS, LLC**

**Report of Independent Accountants**
**On Applying Agreed-Upon Procedures**
**December 31, 2016**

GAP_00079164



Stayner Bates P.C.
510 S 200 W Suite 200
Salt Lake City, Utah 84101
801 531 9100
Fax: 801 531 9147
stayner.com

**Report of Independent Accountants**
**On Applying Agreed-Upon Procedures**

Mr. A. William Kapler III
American Cultural Exchange, LLC
goAuPair Operations, LLC
Murray, UT 84107

We have performed the procedures included in the Au Pair Compliances Audit Procedures
which were supplementally issued in connection with the Exchange Visitor Program Regulations
(the "Regulations"), Au Pair "Final Rule" (CFR 22 62.31(m), dated February 15, 1995, as
amended June 27, 1997 by the former United States Information Agency, now administered by
the United States Department of State (the "Department of State"), and enumerated below, for
American Cultural Exchange, LLC, dba goAuPair. These procedures were agreed to by the
management of American Cultural Exchange, LLC, dba goAuPair, solely to assist you in your
assertion of compliance with certain Department of State regulations during the year ended
December 31, 2016. This agreed-upon procedures engagement was performed in accordance
with standards established by the American Institute of Certified Public Accountants. The
sufficiency of these procedures is solely the responsibility of the specified users of the report.
Consequently, we make no representation regarding the sufficiency of the procedures described
below either for the purpose for which this report has been requested or for any other purpose.

1. We requested confirmation from the Department of State that American Cultural
   Exchange, LLC, dba goAuPair (the Sponsor") is designated as a bona-fide program
   Sponsor authorized by the Department of State as of December 31, 2016. Stacey
   Gomelsky, Program Analyst, Private Sector Programs Division, Office of Designation,
   confirmed on March 7, 2017 that American Cultural Exchange, LLC, dba goAuPair was a
   Department of State designated program for the year ended December 31, 2016.

From the Sponsor's listing of Au Pair Participants who arrived in the United States during the
year ended December 31, 2016, we randomly selected 45 of Program Participant files, as well
as the associated Host Family files. In connection with those files:



GAP_00079165

Case 1:14-cv-03074-CMA-KMT · Document 953-3 Filed 03/30/18 · USDC Colorado · Page 120 of 28

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY

22. We read the program literature to determine that the Sponsor's counselors are responsible for contacting the Au Pair Participant and the Host Family within 48 hours of the Au Pair Participant's arrival and must meet, in person, at the Host Family's home, with the Au Pair Participant and the Host Family within two weeks of the Au Pair's arrival. We read the local representative's Two-Week Placement Evaluation Report and the Host Family/Au Pair Status Reports to determine that compliance with these procedures was documented.

None of the Two-Week Placement Evaluation Reports and Host Family/Au Pair Status Reports could not be located. Of the 45 Two-Week Placement Evaluation Reports and Host Family/Au Pair Status Reports, 17 did not contain evidence of contact within 48 hours or a visit within two weeks of the Au Pair's arrival and 28 contained evidence of both contact and a visit.

9 Placement Evaluation Reports and Host Family/Au Pair Status Reports did not contain evidence of contact within 48 hours but did contain evidence of a visit within two weeks of the Au Pair's arrival.

5 Placement Evaluation Reports and Host Family/Au Pair Status Reports contained evidence of contact within 48 hours but did not contain evidence of a visit within two weeks. Of these, 4 contained evidence of a visit within three weeks, none contained evidence of a visit within one month and the remainder contained evidence of a visit beyond one month. We have confirmed directly with the Au Pair Participants and Host Families whether this requirement was adhered to (see results at number 28h and I and 29 a and b, respectively).

23. We read the signed Host Family/Au Pair Agreements to determine that the Host Family has agreed that the Au Pair Participants will:
    a. be compensated at a weekly rate based on 45 hours per week and paid in conformance with the requirements of the Fair Labor Standards Act. Compensation must be no less than $195.75 per week;
    b. not provide more than ten hours of childcare on any given day;
    c. receive a minimum of one and a half days off per week, in addition to one complete weekend off each month;
    d. receive two weeks of paid vacation; and
    e. receive up to $500 toward the costs of required academic course work.

GAP_00079172

None of the Host Family/Au Pair Agreements could not be located.  We have confirmed with the Au Pairs whether these provisions were adhered to (see results at number 28b, c, d, e and f).

24.  We read the program literature to determine that the Sponsor requires the Au Pair Participants to enroll in an accredited U.S. post-secondary institution for not less than six semester hours of academic credit or its equivalent.  We read Host Family/Au Pair Status Reports and sponsor documentation to confirm that this requirement is being met.  Of the 45 Au Pair Participants covered by the Host Family/Au Pair Status Reports, 5 returned home or left the program prior to the completion of one year and the educational requirement was not met. 11 of the Host Family/Au Pair Status reports contained evidence that the Au Pair Participants arrived at the Host Family's home in the last quarter of 2016 and have not yet enrolled in an accredited U.S. post-secondary institution.  Through our review of the Host Family/Au Pair Agreement, we noted that these Au Pair Participants have agreed that they will enroll in an accredited U.S. post-secondary institution.  Of the remaining Host Family/Au Pair Status Reports and sponsor documentation reviewed, 7 did not contain evidence of enrollment in or attendance at an accredited U.S. post-secondary institution or its equivalent.  The remaining 72 contained evidence that the Au Pair Participant has enrolled in or attended classes.

We also read the Host Family/Au Pair Agreement to determine that as a condition of program participation, the Host Family agrees to facilitate the enrollment and attendance of the Au Pair Participant and to reimburse or pay up to $500 toward the costs of required academic coursework incurred by the Au Pair in meeting this education requirement for the Au Pair Participant's year.   None of the Host Family/Au Pair Agreements could not be located.

25.  We read the Host Family/Au Pair Status Reports and actual contact records prepared by the local and regional counselors that document contact between the Au Pair Participants, Host Families and their local organizational representatives, to determine that the Sponsor requires monthly contact among them and quarterly contact between the Au Pair Participant, Host Families, and the regional counselors. None of the Host Family/Au Pair Status Reports and None of the actual contact records could not be located for a minimum of one quarter of the year.  As a result of applying this procedure to the remaining Host Family/Au Pair Status Reports and actual contact records, 39 of the Host Family/Au Pair

GAP_00079173

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY

Status Reports and 39 of the actual contact records contained evidence that the Au Pair Participant/Host Family were contacted monthly. The remaining 6 Host Family/Au Pair Status Reports and 6 actual contact records did not contain evidence that the Au Pair Participant/Host Family were contacted on a monthly basis throughout the placement period. We noted that 45 of the four required regional quarterly contacts were documented.

26. We read the Host Family/Au Pair Status Reports, which counselors are required to prepare for unusual or serious situations, as defined in the Regulations, or incidents involving either the Au Pair of Host Family. Any incidents involving or alleging a crime of moral turpitude or violence, as defined in the Regulations, are to promptly be reported to the Department of State. None of the Host Family/Au Pair Status Reports could not be located for a minimum of one quarter of the year. See number 25 above for results of monthly contact testing on the remaining Host Family/Au Pair Status reports.

27a. We have reviewed all complaints submitted to the sponsor, including those initiated by Au Pair Participants and those initiated by the Host Family Participants for completeness. A summation each complaint setting forth the following details is appended.

  a. The name of the host family and the number of years participating in the program;

  b. The name of the au pair, and whether placement is first or subsequent (rematch);

  c. Who initiated complaint and date of complaint;

  d. Whether complaint was reported to the Department of State, and if so, date of report; and

  e. How complaint was resolved (action taken by Sponsor) and date of resolution.

27b. We have reviewed all reports of incidents involving or alleging a crime of moral turpitude or violence, including those committed by the Au Pair Participants and those committed by any member of the Host Family, for completeness and to determine if they were submitted by the Sponsor to the Department of State.

28. We sent confirmations to the 90 Au Pair Participants selected for testing. Of the 90 confirmations sent, 49 have responded. The following outlines the responses to the confirmation questions.

  a. 43 responded that they worked 45 hours or less per week;

GAP_00079174

    b.  76 responded that they were required to provide no more than 10 hours per day of childcare.  Of the remaining 14, 14 responded that they worked more than 10 hours per day at least once a week.  8.5 is the average number of hours per day the Au Pair Participants reported they were expected to provide childcare;

    c.  49 responded that they received at least $195.75 per week as compensation;

    d.  48 responded that they received at least one-and-a-half days off per week;

    e.  47 responded that they received one complete weekend off per month;

    f.  47 responded that they did, or will, receive two weeks paid vacation;

    g.  48 responded that they had a private room;

    h.  47 responded that their Local organizational representative contacted them within 48 hours of their arrival at the Host Family's home;

    i.  43 responded that they Local organizational representative met, in person, with them and their Host Family within two weeks of their arrival at the Host Family's home;

    j.  35 responded that they had monthly contact with their Local organizational representative;

    k.  38 responded that they had enrolled, or will enroll before the completion of the year, in a U.S. post-secondary institution of higher learning;

    l.  45 responded that the orientation program they attended included 8 hours of child safety and 24 hours of child development instruction; and

    m.  44 responded that they were reimbursed or paid up to $500 toward the costs of the required academic coursework.

29.  We sent confirmations to the 93 Host Families (including rematches) selected for testing.  Of the 93 confirmations sent, 75 responded.  The following outlines the responses to the confirmation questions:

    a. 73 responded that their counselor contacted them within 48 hours of the Au Pair Participant's arrival at their home;

    b. 68 responded that their counselor met, in person, with them and their Au Pair Participant within two weeks of the Au Pair Participant's arrival at their home;

    c. 61 responded they had monthly contact with their counselor; and

    d. 66 responded that their Au Pair Participant had enrolled or will enroll before the completion of the year in a U.S. post-secondary institution of higher learning.

30.  We read a draft of the annual report to be filed by the Sponsor with the Department of State noting that the following requirements were included therein:

GAP_00079175

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY

a.   A summation of the results of an annual survey of all Host Families and Au Pair Participants regarding their satisfaction with the Program, and its strengths and weaknesses, as defined in the Regulations;

b.   A summation of all complaints involving Host Family or Au Pair Participants in the program.   SEE TABLE D and new SUMMATION REPORT;

c.   A summation of all situations which resulted in the placement of an Au Pair with more than one Host Family;

d.   A Report detailing the name of the Au Pair Participant, his or her Host Family placement, location and names of the local and regional organizational representatives; and

e.   A complete set of all promotional materials, brochures or pamphlets distributed to either Host Family or Au Pair Participants.

We were not engaged to, and did not perform an examination, the objective of which would be the expression of an opinion on management's assertions.   Accordingly, we do not express such an opinion.  Had we performed additional procedures, other matters might have come to our attention that would have been reported to you.

This report is intended solely for the use of the management of American Cultural Exchange, LLC, dba goAuPair, and the Department of State and should not be used by those who have not agreed to the procedures and taken responsibility for the sufficiency of the procedures for their purposes.

*Stayner Bates, P.C.*

Stayner Bates, P.C.

June 28, 2017

GAP_00079176

```
 1        UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF COLORADO
 2        -------------------------x

 3        JOHANA PAOLA BELTRAN; et al.

 4               Plaintiffs,
                              Civil Action No.
 5                            1:14-cv-03074-CMA-KMT
             -against-
 6

 7        INTEREXCHANGE, INC; et al.

 8               Defendants.

 9        -------------------------x
                              March 5, 2018
10                            9:29 a.m.

11

12

13           Deposition of MANON BALTA, the

14      Plaintiff, taken by the Defendant, pursuant

15      to Notice, held at the Offices of Boise

16      Schiller Flexner, 575 Lexington Avenue, 7th

17      Floor, New York, New York 10022, taken

18      before Albert Lada, a Shorthand Reporter and

19      Notary Public of the State of New York.

20

21

22

23

24

25
```

**H+G**

**Hunter + Geist, Inc.**

303.832.5966
800.525.8490

1900 Grant Street, Suite 1025
Denver, CO 80203

Your Partner in Making the Record

■ www.huntergeist.com
■ scheduling@huntergeist.com

**GAP App. 0100**

**MANON BALTA - 2/22/2018**

**Johana Paola Beltran, et al.  v. Interexchange, Inc., et al.**



45

1  Q.   And is it that you don't remember
2  or you remember and didn't discuss the
3  stipend amount?
4  A.   I think we did not because it's
5  something -- I'm not comfortable with
6  talking with money and so -- and, yeah, I
7  don't remember them talk about that.  It
8  was more about what I would do if I come.
9  Q.   Do you recall discussing the
10  number of hours you would work per week?
11  A.   I think yes -- I mean, I don't
12  recall precisely but yes, I remember they
13  were talking about -- like, I would work
14  maybe the weekdays and some weekends and --
15  yes.
16  Q.   And do you recall if you
17  discussed a specific number of hours per
18  week you were expected?
19  A.   It was 40, 45 hours maximum.
20  That was it.  Yeah.
21  Q.   I'm trying to figure out, was
22  ▮
23  something that you just knew from the
24  contract?
25  A.   I knew it from the contract and I

46

1  don't recall them to talk about that -- I
2  mean, yes, I recall they talked about how
3  much I would work but I can't tell you how
4  much -- how many hours they told me, like,
5  I don't recall that.  Yeah.
6  Q.   Okay.  Again, I know this was
7  years ago and I appreciate whatever you can
8  remember.  That's good enough for today.
9  A.   Okay, thank you.  So telling me
10  what you do and don't remember is helpful,
11  thank you.  How are we?
12  MR. LIBLING:  We're good.
13  Q.   Okay.  During any of the Skype or
14  phone conversations or e-mail exchanges
15  with any of the four host families, do you
16  recall discussing with anyone what stipend
17  amount you would receive?
18  A.   I don't recall.

47

48

12 (Pages 45 to 48)

**MANON BALTA - 2/22/2018**

**Johana Paola Beltran, et al.  v. Interexchange, Inc., et al.**



53

1    "work schedule?"
2        A.    Yes.
3        Q.    And you see there are certain
4    entries in that chart?
5        A.    Yes.

54

55

2        Q.    Okay.  We'll come back to that.
3        A.    Okay.
4        Q.    But it sounds like the actual
5    work schedule was pretty different than
6    what's described in the box; is that fair?
7        A.    Yeah, it was always different.
8        Q.    Okay.  And for how about house
9    rules, and let me know if you need help
10   reading anything, I know the text is quite
11   light.

56

14 (Pages 53 to 56)

**MANON BALTA - 2/22/2018**

**Johana Paola Beltran, et al. v. Interexchange, Inc., et al.**



**65**

1 bell?

25 THE VIDEOGRAPHER: I need to

**66**

1 change the DVD in another ten minutes.
2 Q. Are you good for another ten
3 minutes and we'll take a short break?
4 A. Yes.
5 (Whereupon, an Orientation: Host
6 Family & Au Pair document was marked as
7 Defendant's Exhibit 8 for
8 Identification.)
9 A. Thank you.
10 Q. Let me know when you're ready.
11 A. Okay. I'm ready.
12 Q. And do you recognize this
13 document?
14 A. Yes.
15 Q. And what is this?
16 A. It's what we talked about with
17 the family and Go Au Pair -- when Go Au
18 Pair came in their home.

**67**

10 Q. And it looks the date of this
11 document was March 9th, 2013?
12 A. Yes.
13 Q. Is that shortly after you arrived
14 in New York?
15 A. Yes.
16 Q. Do you recall what day you
17 arrived in New York? No worries if you
18 don't.
19 A. I think February 25.
20 Q. So this was within the first
21 couple weeks of you being in New York?
22 A. Yes.
23 Q. Now, looking through this
24 document and this is another one that can
25 be hard to read and I can help you if you

**68**

1 have any questions either which I'll ask
2 you, do you know whose handwriting this is
3 who filled in the blanks in pages 2 and 3
4 and 4 and 5?
5 A. I don't recall who filled this
6 document.
7 Q. Do you recall that the structure
8 of this meeting is that it was you,
9 Ms. Hayes, and Ms. Geiger?
10 A. Yes.
11 Q. And Ms. Geiger was facilitating a
12 conversation between you and Ms. Hayes?
13 A. Yes.
14 Q. As to how your placement would
15 work?
16 A. Yes.
17 MR. LIBLING: Objection to form.
18 Q. And do you recall if Ms. Geiger
19 was taking notes during the conversation?
20 A. I don't recall.

17 (Pages 65 to 68)

MANON BALTA - 2/22/2018
Johana Paola Beltran, et al.  v. Interexchange, Inc., et al.



69

71

11      MR. LIBLING:  Objection to form.
12      MS. REILLY:  So we're in a
13  transition point.  I know we're about
14  to run out of tape so let's take a 5 to
15  10-minute break, however long people
16  need.  So we'll just start again at 11.
17      THE VIDEOGRAPHER:  We are now
18  going off the record.  The time is
19  10:50.
20      (Whereupon, a discussion was held
21  off the record.)
22      THE VIDEOGRAPHER:  We're now
23  going back on the record.  The time is
24  11 o'clock.
25  EXAMINATION CONTINUED

70

72

1      BY MS. REILLY:

18 (Pages 69 to 72)

**MANON BALTA - 2/22/2018**
**Johana Paola Beltran, et al.  v. Interexchange, Inc., et al.**



77

1  home, it wasn't always clear when you were
2  working or not working?
3     A.   Yes.

79

24
25     Q.   Did you take any classes during
your first year?

78

80

1     A.   Yes.
2     Q.   What did you take, if you
3  remember?
4     A.   I remember where it was but I
5  don't remember the exact class.
6     Q.   That's fine.  Where was it?
7     A.   Actually, I think the first one I
8  remember.  The first one was American
9  history or something like that.  Yes, and
10 it was in -- I think it was in Long Island
11 but I'm not sure.
12    Q.   And did you take more than one
13 class --
14    A.   Um --
15    Q.   During your time with the Hayes?
16    A.   I think I took two but I don't
17 remember the second one so I don't
18 remember.
19    Q.   And did the Hayes family pay for
20 the first class?
21    A.   I don't remember.

20 (Pages 77 to 80)

**MANON BALTA - 2/22/2018**

**Johana Paola Beltran, et al.  v. Interexchange, Inc., et al.**



81

82

83

1  first year being placed with the Hayes
2  family?
3      A.   I think between three and five
4  times.
5      Q.   Total?
6      A.   Yes.
7      Q.   And do you recall if those
8  contacts were in person or otherwise?
9      A.   Sometimes by e-mail but I met
10  someone maybe three or four times.
11      Q.   And were those in-person meetings
12  other than the orientation meetings we
13  discussed, were the other meetings in the
14  context of the social events that were
15  supposed to be with other Au Pairs?
16      A.   Can you ask me again?
17      Q.   Yeah.  I'm trying to figure out
18  the content of these in-person meetings
19  with the Go Au Pair representatives.
20      Other than the orientation
21  meetings at the Hayes house, were the other
22  times that you meet in-person with the Go
23  Au Pair representative were for cultural
24  exchange events?
25      A.   Yeah.  It was to meet other Au

84

1  Pairs and know other Au Pairs because when
2  we come in as an Au Pair, we don't know
3  anybody except our family.

9      Q.   So, looking back, if you can pull
10  your survey responses again.  We're going
11  to go back to the tricky issues of hours.
12  If you can turn to page 5, let me know when
13  you're there.  I know it's way back.
14      Do you see at the bottom, the
15  question, it says "How many hours did you
16  work on average per week not including
17  vacation weeks?"
18      A.   Yes.
19      Q.   And it says 40?
20      A.   Yes.

22      Q.   And so not just limited to
23  Ms. Geiger but anyone from Go Au Pair, how
24  often did you communicate with any
25  representative from Go Au Pair with your

**MANON BALTA - 2/22/2018**

**Johana Paola Beltran, et al.  v. Interexchange, Inc., et al.**



85

7    Q.    Understood, and that was when you
8  were answering the survey responses though,
9  you were trying to give the most accurate
10  information possible, right?
11    A.    Yes.
12    Q.    During the first year, I believe
13  you testified that the Hayes family paid
14  you exactly $200 every Friday; is that
15  right?
16    A.    Yes.
17    Q.    Did they ever pay you more than
18  $200 during that first year?
19    A.    No. No.
20    Q.    Did they ever offer to pay you
21  more in exchange for you working more?
22    A.    No.

87

86

88

22 (Pages 85 to 88)

**MANON BALTA - 2/22/2018**

Johana Paola Beltran, et al.  v. Interexchange, Inc., et al.



93

94

95

1    Q.   You're ready?  Okay.  Do you
2  recognize this document?  And I'm not
3  actually going to ask you about the first
4  page.  I'm really only going to look at the
5  second and third page with you which is
6  what's called the Written Agreement.  Do
7  you see that?
8    A.   Yes.
9    Q.   And do you recognize it?
10   A.   Yes.
11   Q.   What is this document?
12   A.   It's for the second part of my Au
13  Pair time.  I had to resign this agreement.
14   Q.   And if you look at the second
15  page, is that your signature?
16   A.   I can't see --
17   Q.   I think it's not that page but
18  the next one.
19   A.   Yes.  Yes.
20   Q.   That is your signature?
21   A.   Yes.

96

14     MS. REILLY:  Mark this, please.
15     (Whereupon, Guarantee Activation
16  Form was marked as Defendant's Exhibit
17  9 for Identification.)
18     THE WITNESS:  Thank you.
19   Q.   Just let me know when you're
20  ready.
21   A.   Okay.
22   Q.   Take however much time you need.
23  We're only going to be looking at the first
24  three pages of this exhibit.
25   A.   I'm ready.

24 (Pages 93 to 96)

Case No. 1:14-cv-03074-CMA-KMT    Document 958-3    filed 03/30/18    USDC Colorado    pg 29 of 29

MANON BALTA - 2/22/2018
Johana Paola Beltran, et al.  v. Interexchange, Inc., et al.



97

15    Q.   And going down to compensation,
16  you see where it says "The host family
17  agrees to pay the Au Pair pocket money in
18  the amount of $215, minimum of 195.75
19  subject to The Department of State
20  Regulations and Department of Labor per
21  week.  The stipend would be paid every
22  Friday."
23        Do you see that?
24    A.   Yes.
25    Q.   And you see again that there are

99

98

1   two blanks that were filled in by someone,
2   one for the stipend amount and then the
3   other for the timing of the stipend
4   payment.
5         You see that?
6    A.   Yes.
7    Q.   And do you have an understanding
8   as to who filled in the content as to what
9   your stipend amount would be and when your
10  payment would be?
11   A.   Yes, the family.
12   Q.   Thank you.  So this work
13  schedule, is this accurate -- does this
14  accurately depict what your work schedule
15  was during your six-month extension period?
16   A.   During the weekday?
17   Q.   Uh-huh.

100

25 (Pages 97 to 100)