# **Exhibit J**

(replacing ECF No. 943-18)

Case No. 1:14-cv-03074-CMA-KMT Document 859-10 filed 02/30/18 USDC Colorado pg 2 of 174

# Exhibit 234

PLAINTIFFS' RESP. APP.0001897

Message

| | |
|---|---|
| **From:** | Linda Mori [chilinda@chinet.org] |
| **Sent:** | 11/10/2014 5:05:56 PM |
| **To:** | InterExchange/ Michael McHugh [mmchugh@interexchange.org] |
| **Subject:** | Templates |
| **Attachments:** | PreVist and OnSite Visit template 2013.pdf |

Hello Michael,

Hope your week is off to a great start.

A pleasure chatting with you both at WYSTC and the Alliance meeting.

As promised, attached are the "audit" templates. The doc labeled " PreVisit and OnSite Visit" was the template used during CHI's on-site review. The other doc labeled "AP Electronic Site Review" was the template Helene shared with me. Since the file is huge, I will send this template via a separate Google Drive link.

Hope they don't decide to conduct your on-site review before the Christmas holiday -- which they did last year with us -- as it was added stress. In any case, I think you'll find the attachments helpful for preparation.

Good luck!

Best regards,

Linda


--

Linda Mori

Compliance Officer

**Cultural Homestay International**

Direct Phone: 503-655-6350

Toll free in the U.S.: 877-655-6350

Skype: linda_mori

Web: www.chinet.org

Opening doors to the world for over 30 years!

EXHIBIT

33

HG&D 800-631-6989

CONFIDENTIAL

CHI0001461

PLAINTIFFS' RESP. APP.0001898

SENSITIVE BUT UNCLASSIFIED



**U.S. Department of State**
**Bureau of Educational and Cultural Affairs**

## PRE-VISIT DOCUMENT REQUEST

**Please Note:** Unless otherwise indicated, requested documents and/or information should coincide with the current calendar year (i.e., program start date between January 1st and December 31).

## KEY EMPLOYEES

We would like to interview employees responsible for certain areas of operation. Please provide the name and title of the persons responsible for the following matters, and indicate whether they will be available to meet with us during the on-site review. If they will not be available, please indicate who will be available, and their relation to the persons with primary responsibility in these areas:

- Organizational business operations and finances
- Hiring field staff (i.e., regional and local coordinators)
- Overseeing field staff (i.e., regional and local coordinators)
- Training field staff and preparing training materials
- Recruiting, screening, selecting, and orienting host families (including establishing selection criteria and approving prospective host families)
- Au Pair monitoring
- Au Pair educational component requirements
- Regulatory compliance
- Reporting to the Department of State (as required by 22 CFR 62.31(m) and 22 CFR 62.13(b))
- Maintaining SEVIS and au pair records

## SPONSOR STAFFING

Please provide current organizational chart(s) <u>and</u> complete the attached Excel spreadsheet ("Pre-Visit Document Request Worksheet"), noting that there are two tabs representing headquarters and field staff.

## ORGANIZATIONAL BUSINESS OPERATIONS AND FINANCES

Please provide copies of the following documents for both 2012 (as available) and for the most recent three fiscal years:
- Forms 990*
- Audited Financial Statements
- Board of Directors Meeting Minutes
- List of Directors, Officers, and Key Employees (include names, addresses, and citizenship)

PLAINTIFFS' RESP. APP.0001899      CONFIDENTIAL      CHI0001462

**SENSITIVE BUT UNCLASSIFIED**

\*For sponsors with lines of business in addition to the Au Pair program whose Forms 990 do not provide the following information, please separate the revenue and expense line items listed below for the Au Pair category for the most recent three fiscal years:

- Program Service Revenues
- Program Service Expenses
- Agent Commissions
- Placement Fees

-Sponsor's standard price list (au pair program fees) with a breakdown of all services and associated charges to the exchange visitor

## FOREIGN AND DOMESTIC THIRD PARTIES – *For 2012 through the current fiscal year*

- List of all foreign offices and foreign agents/partners (names and countries) assisting the sponsor in its au pair exchange visitor program.

- Copy of standard foreign agent/partner contract/agreement, if applicable.
  - In the alternative, copies of individual foreign agent/partner contracts/agreements or comprehensive narrative that explains deviations from standard contract.

- Copy of standard foreign agent/partner price lists (au pair program fees) with a breakdown of all services and associated charges to exchange visitor, if applicable.

- In the alternative, copies of all foreign agent/partner price lists (au pair program fees) with a breakdown of all services and associated charges to exchange visitor or comprehensive narrative that explains deviations from standard price lists.

- List of all domestic offices and domestic agents/partners (names and countries) assisting the sponsor in its au pair exchange visitor program.

- Copy of standard domestic agent/partner contract/agreement, if applicable.
  - In the alternative, copies of individual domestic agent/partner contracts/agreements or comprehensive narrative that explains deviations from standard contract.

- Copy of standard domestic agent/partner price lists (au pair program fees) for last three years with a breakdown of all services and associated charges to exchange visitor, if applicable.

- In the alternative, copies of all domestic agent/partner price lists (au pair program fees) for last three years with a breakdown of all services and associated charges to exchange visitor or comprehensive narrative that explains deviations from standard price lists.

PLAINTIFFS' RESP. APP.0001900     CONFIDENTIAL     CHI0001463



**U.S. Department of State**
**Bureau of Educational and Cultural Affairs**
**Private Sector Exchange**

## ON-SITE REVIEW DOCUMENT REQUEST
## AU PAIR PROGRAMS

The protocol of the on-site review requires that we obtain copies of various documents. To facilitate this process, we are providing you with a tabbed binder. Please gather the materials listed below while we are conducting the on-site review and populate the binder by the end of the review. Please date all documents or information to indicate when they were created and/or effective. If you are including an excerpt from a large document, please copy the title page and the relevant section(s) of the document. Please make double-sided copies of lengthy documents.

The following list corresponds with the tabbed binder and provides a description of the documentation we are requesting. Please ask the team lead if you require further clarification.

| TAB | DESCRIPTION OF REQUIRED MATERIALS |
|---|---|
| 1 | Standard operating procedures or materials for training and supervising Au Pair program staff (headquarters and field staff). |
| 2 | Copies of agendas from all training sessions for Au Pair program staff (headquarters and field staff) held during past year. Index of materials used for the training sessions. Copies of sign-in sheets or other proof of attendance. |
| 3 | Standard operating procedures for training domestic and foreign third parties. |
| 4 | Written materials provided to third parties providing Exchange Visitor Program overview, regulations, and other materials explaining the third parties' roles in the program. Copies of training materials for domestic and foreign third parties. |
| 5 | Standard brochures/marketing materials for the sponsor's Au Pair program. |
| 6 | Standard operating procedures for screening and selecting Au Pairs. |
| 7 | Standard interview questions for Au Pair program applicants. |
| 8 | Guidelines for verifying applicants' English language proficiency. |
| 9 | Standard operating procedures for screening and selecting host families. |
| 10 | Au Pair pre-arrival orientation materials. |
| 11 | Au Pair post-arrival orientation materials. |

PLAINTIFFS' RESP. APP.0001901          CONFIDENTIAL          CHI0001464

| 12 | Au Pair handbook. |
|----|-------------------|
| 13 | Host family handbook. |
| 14 | Standard operating procedures and materials for Au Pair training. |
| 15 | Standard operating procedures for monitoring exchange visitors. |
| 16 | Standard program evaluation forms. |
| 17 | Standard operating procedures for providing assistance in facilitation, counseling, and information resources to exchange visitors and host families. |
| 18 | Standard operating procedures for reviewing and resolving exchange visitor and host family complaints and incidents. |
| 19 | Organizational policy on ending an exchange visitor's program early or terminating the program. |
| 20 | Standard operating procedures on who/how/when to report complaints, controversies, or serious incidents to the Department of State. |

PLAINTIFFS' RESP. APP.0001902          CONFIDENTIAL          CHI0001465

# Exhibit 235

PLAINTIFFS' RESP. APP.0001903

Updated 8/23/2012

Website Information for the Au Pair USA Program

## Au Pair Requirements

You qualify to be an au pair if you:

- Are between 18 – 26 years old
- Have never married and have no children
- Speak conversational English
- Are available for at least 12 months
- Enjoy working with children and have at least 200 hours of child care experience
- Have a driving license and drive regularly
- Do not smoke
- Have completed secondary school and have a high school diploma
- Have no criminal record
- Are in both physically and mentally fit and have no restrictive health problems
- Desire to live abroad with an American host family

## Benefits

- On-going assistance from application to arrival in the United States
- Personal Interview with local agent
- 4 Orientation program in Manhattan, the heart of New York including an optional sight-seeing tour
- Flight from home country to New York, and then to your host family. Flight home upon successful program completion.
- Free room and board with your host family
- Weekly stipend of $195.75 paid by your host family
- Up to $500 for your education requirement of 6 credit hours at a college or university
- One and a half days off per week and one complete weekend off per month
- Two weeks paid vacation
- Optional 13th Month to travel the United States
- Au Pair USA Local Coordinator assistance and advice all year. Monthly cluster meetings with your local coordinator and other au pairs.
- Make life-long connections with people from all over the world
- Gain practical work experience while improving your English
- Experience American culture firsthand



EXHIBIT
Gates 5
7-28-17 LF
PENGAD 800-631-6989

InterExchange0010701

Case 1:14-cv-03074-CMA-KMT   Document 959-1   Filed 03/17/18   USDC Colorado   Page 9 of 178

# Exhibit 236

PLAINTIFFS' RESP. APP.0001905

**To:**
REDACTED
**Cc:**    Joy Valente[jvalente@lc.interexchange.org]; InterExchange/ Verona Benjamin[vbenjamin@interexchange.org]; InterExchange/ Amelia Mendizabal[amendizabal@interexchange.org]; Joanna Lehmann[jlehmann@interexchange.org]
**From:**    Michael Gates
**Sent:**    Fri 4/9/2010 6:07:25 PM
**Importance:**    Normal
**Subject:**    Regarding Payment
**Received:**    Fri 4/9/2010 6:07:24 PM

Good Afternoon,

I hope this message finds you all well. We are very sorry to hear about ▇▇▇▇ recent medical problems, and hope for her speedy recovery.

I am writing to clarify the State Department's policy on payment of the weekly stipend. I understand that both the ▇▇ family and the au pair ▇▇▇▇▇▇▇▇ have received conflicting reports from coordinators at InterExchange regarding the ▇▇▇▇ stipend this week. We apologize for the confusion.

The official policy is that au pairs receive a standard weekly stipend of $195.75 every week on a set day if they perform any childcare during that week. This information is repeated in the Host Family Agreement as well.

Given ▇▇▇▇ recent medical problem, we understand she has not been able to fulfill the complete scope of her au pair duties this week. Knowing this information and that ▇▇▇▇ no longer has any vacation days available to use for her recovery, we strongly hope that everyone will be able to reach  suitable compromise together that permits ▇▇▇▇ to receive her due compensation for the work she has performed, and that also keeps the family's current childcare needs in mind. We know that ▇▇▇▇ current recovery has put a strain on the host parents, and hope that both parties will be flexible and communicative in agreeing to a compromise for this situation.

Warm Regards,
Michael Gates



Michael Gates | Program Manager | Au Pair USA
TEL: 917.305.5461 | FAX: 212.924.8873 | EMAIL: mgates@interexchange.org
161 Sixth Avenue, New York, NY 10013



EXHIBIT
Gates 7
7-28-17 LF

InterExchange0021803

Case 1:14-cv-03074-CMA-KMT   Document 948-69-11   Filed 03/17/18   USDC Colorado   Page 11
of 173

# Exhibit 237

PLAINTIFFS' RESP. APP.0001907

**To:** REDACTED ; Portia Haynes[phaynes@interexchange.org]
**Cc:** jmyers@lc.interexchange.org[jmyers@lc.interexchange.org]
**From:** Kate Ferrin
**Sent:** Fri 1/28/2011 4:49:10 PM
**Importance:** Normal
**Subject:** Re: ▇
**Received:** Fri 1/28/2011 4:49:31 PM

Hi Melissa,

Happy Friday! I hope you're having a good week so far.
The current weekly stipend, which is set by the federal government, is $195.75. This is set for all au pair agencies. As a non-profit organization, we strive to provide our families and au pairs with a quality service while keeping our costs as low as possible.

Part of your fees would go towards the InterExchange Foundation. The InterExchange Foundation was established in 2007 to provide grants to motivated young Americans who want to contribute to worthy work or volunteer abroad opportunities. Many students study abroad every year, but far fewer take advantage of the opportunity to work, intern, or volunteer overseas. By providing financial assistance to talented candidates, we hope to encourage young Americans to discover the world and benefit from the unique and enriching insights one can only gain from living and working abroad.

You can read more about our grant programs here:
http://www.interexchange.org/content/329/en/InterExchange%20Foundation:%20Working%20%20%20Abroad%20Grants%20&%20 Financial%20Assistance.html

I'm pleased to hear that your interviews with ▇ are going well, and I hope that you will give us the opportunity to work with your family for the next program year. Your family would be part of a vibrant cluster under the supervision of a veteral Local Coordinator, Joanne Myers. If you have any questions, please feel free to contact us.

Have a great weekend!
Michael Gates
Program Manager
InterExchange Au Pair USA

On 1/27/11 6:11 PM, REDACTED > wrote:

Thanks so much. Can you tell me what the weekly stipend is? I'm just trying to compare to our current au pair costs.
Thank you ▇

Sent from my Verizon Wireless BlackBerry

**From:** Portia Haynes <phaynes@interexchange.org>
**Date:** Thu, 27 Jan 2011 18:06:56 -0500
**To:** ▇ REDACTED
**Cc:** <jmyers@lc.interexchange.org>; Kate Ferrin<kferrin@interexchange.org>
**Subject:** Re: ▇

Dear ▇

Your family would be responsible for the following costs to InterExchange:

$6990 Program Fee - $500 Switching Agency Discount = $6490
This is broken down into two separate payments:

$2500 program deposit due upon matching
$3990 due upon au pair's arrival  or due in six monthly payments using our easy payment plan option ($190 payment plan fee applies to cover interest).

Your family would also be responsible for ▇ domestic transportation to your home, her $500 educational stipend, weekly stipend, car insurance (if she will be driving) as well as room and board. I am copying our Client Relations

InterExchange0038313


EXHIBIT
Gates 8
7-28-17 LF
PENGAD 800-631-6989

PLAINTIFFS' RESP. APP.0001908

Manager on this message for verification. Feel free to call us with any other questions.

Best Regards,
Michael Gates

On 1/27/11 2:06 PM, "▮▮▮▮▮▮▮"  REDACTED  · wrote:

Hello
I just want to let you know that we have been in contact with ▮▮▮▮ We really like her and are going to continue to communicate back and forth. I have asked if she has Skype and hopefully we can speak in person this weekend.

Portia
Could you please send me the full list of expenses we'd have with InterExchange if we decide to go with an au pair from this company?

Thank you
▮▮▮▮ ▮▮▮

On Mon, Jan 24, 2011 at 6:02 PM, Portia Haynes <phaynes@interexchange.org> wrote:

Dear ▮▮▮ Family,

You will have exclusive access to the following application until January 26, 2011 at 3pm Eastern Standard Time. Please reply to this email and indicate whether you would like to contact the candidate or release this application and view additional applications. As always, any feedback you can provide about this candidate will help us find the right au pair for you.

Au Pair's name: ▮▮▮▮▮▮▮
Country: ▮▮▮▮▮
Age: ▮▮
Email Address:  REDACTED
Telephone:  REDACTED
Mobile:  REDACTED
On-view deadline: January 26, 2011 at 3pm Eastern Standard Time



Click the link below to view the application. If this does not open the file, copy and paste the URL into your web browser's navigation bar.
http://160.79.163.251/aupair_usa/16/A16458_kk2t03.pdf

Before confirming a match, you must interview the candidate twice by telephone. It is helpful to send an email to the au pair stating your intention to call on a particular day and time. It is also very helpful to have your family photos and essay available to email candidates.

*** Confirming a Match ***
When you and your au pair agree to match, please click the link below and fill-in the Confirmation Webpage. This will secure your au pair a spot for the orientation in NYC.
http://www.interexchange.org/content/325/en/Host%20Family%20Confirmation%20F

InterExchange0038314

PLAINTIFFS' RESP. APP.0001909

After we receive this information, we will send you a confirmation email and begin processing the visa
paperwork for your au pair.

Best Regards,

Portia

---

Portia Haynes | Placement Coordinator
TEL: 917.305.5464 | FAX: 212.924.8873 | EMAIL: phaynes@interexchange.org <http://phaynes@interexchange.org>
161 Sixth Avenue, New York, NY 10013

InterExchange0038315

PLAINTIFFS' RESP. APP.0001910

# Exhibit 238

PLAINTIFFS' RESP. APP.0001911

**To:** Jodi Laub[jlaub@interexchange.org]; Alida Van Almelo[avanalmelo@interexchange.org]; Joanna Lehmann[jlehmann@interexchange.org]; Cirocco Dunlap[cdunlap@interexchange.org]; Amelia Mendizabal[amendizabal@interexchange.org]; Katherine Alcazar[kalcazar@interexchange.org]; Sarah Ngakoutou[apdossier@interexchange.org]; Edwin Quintana[equintana@interexchange.org]; Verona Benjamin[vbenjamin@interexchange.org]; Michael Gates[mgates@interexchange.org]; Michael McHugh[mmchugh@interexchange.org]; LC IEX email addresses 1/27/10[jranden-fonseca@interexchange.org]
**From:** Jessica Randen-Fonseca
**Sent:** Mon 3/1/2010 11:40:29 PM
**Importance:** Normal
**Subject:** Monthly update 3/2010 - Competitor news and pricing
**Received:** Mon 3/1/2010 11:40:30 PM
Competitors 3-2010.doc

Hello everyone,
I hope you're all well and that your families and au pairs are happy!

I have attached the Word document that shows prices and current promotions for all of our competitors.

# Pricing

Our current pricing is listed below, this is the way that I send it to families that inquire with us. Please note, pricing below includes our current $300 discount, the application fee waiver and **a new program fee**:
* No application fee (a $300 saving)
* $6990 program fee
* $500 educational stipend for 12 months
* $195.75 weekly stipend as per Department of State
* Transportation cost from New York orientation/training to your home
* Car insurance if you'd like your au pair to drive

Your first bill would only arrive after you find a match.

You can choose to pay the program fee in either two payments:
1. $2500 when you match with your au pair
2. $3950 when your au pair arrives

Or you can pay using the payment plan:
1. $2500 when you match with your au pair
2. six monthly payments of $690 (this includes a one time processing fee of $190) after your au pair arrives

We will not be officially announcing the new pricing in a promotion as it is not significantly less, rather, we will be emailing families shortly about our program and the differences between us and our competitors. The prices on our website, as well as on our applications, will be changed to show the new program fee of $6990. Why change the program fee you might ask? Well, one of the first things we learn in sales is that $9.99 is much more appealing to a consumer than $10, and using this same ideology, we're changing our fees from $7050 to $6990 – it looks better doesn't it!

The banner on our website will be updated shortly to show the application fee waiver. A new promotion will begin late in March and I will let you know all about it when my first email to inquiries is ready.

# News

Go Au Pair have updated their site (countries of origin have been added here http://goaupair.com/AuPairCountries.html) and they have added "Au Pair Preview", a way for families to view brief bios of au pairs with no commitment – families can search by in or out of country and they are able to select search criteria such as Age, Nationality etc. This is a free resource and I would strongly suggest registering to try it out http://goaupair.com/apavailable.aspx?showid=3 – see what the competitors are up to!

Agent Au pair – who would have believed it! They have a new site! Not much has changed program wise, they have shuffled their fees around to make their application fee $50 higher and their program fee is now $50 lower.

Au Pair International are still updating their site slowly but surely but have made no changes to their costs or program.

EXHIBIT
Gates 16
7.28.17 LF
PENGAD 800-631-6989

ATTORNEY EYES ONLY

InterExchange0038006

CHI have increased their fees by $458 per year. They too have decreased their application fee by $200 but increased their program fee by $658.

EurAu Pair have made improvements to their site and clearly state that there are no program fees in 2010, that's because they increased their application fee by $50 instead.

## What has Jessica been up to...

This past month I have continued my efforts towards developing an HR information packet. The new folder is here!!! I have made some additions to the packet and those pages are being edited now. A pilot should begin shortly and following that, we can then contact HR departments successfully in all areas.

I have been working on changes to our phone system to find the best way to handle inquiries and to direct families and au pairs to the correct staff member efficiently, you should hear these changes in the phone tree toward the end of the month of March.

My search for affordable giveaways and tablecloths continues – the fancy new Au Pair USA bags are here and we love them! We have agreed to order balloons and new tablecloths all to be used at events. We should have all of these within the next few weeks.

Charity event calendar is on hold as I have other projects that take priority for the moment. Do still keep me informed of events that you attend as a cluster.

Coloring pages are done, if you would like to receive some samples in the mail to take along with you to host family interviews, let me know and I will mail some out to you.

I have been working on an email project which will automatically email au pairs and host families with updates throughout the program year eg. Reminders about registering for classes, reminders about when to extend etc. I am piloting this project using au pair emails. The first of these emails should go out later on this month. If all goes well, I will then add host family emails and this will all be automatic. This is a large project and has taken a great deal of time, but I see enormous benefits to this.

If anyone should have any questions or need any help, please don't hesitate to contact me. I look forward to receiving more requests for Facebook pages and to talking to you about your advertising ideas – we're on our way to the busy summer months and need to advertise as much as possible!

Don't forget, Mayumi is the IAPA au pair of the year but we are not able to publicize this just yet. When IAPA have made the official announcement, we will be able to blog, post and send press releaseas.

Thank you everyone and have a great month!

Jessica

 InterExchange

Jessica Randen-Fonseca | Client Relations Manager
TEL: 917.305.5465 | FAX: 212.924.0575 | EMAIL: hfsupport@interexchange.org
161 Sixth Avenue, New York, NY 10013

ATTORNEY EYES ONLY

# Exhibit 239

PLAINTIFFS' RESP. APP.0001914

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Case No. 14-cv-03074-CMA-KMT

JOHANA PAOLA BELTRAN, *ET AL.*

      Plaintiffs,

v.

INTEREXCHANGE, INC., *ET AL.*

      Defendants.

---

## DECLARATION OF LAUREN F. LOUIS IN SUPPORT OF PLAINTIFFS' MOTION FOR CONDITIONAL COLLECTIVE ACTION CERTIFICATION AND INCORPORATED MEMORANDUM OF LAW

---

      I, Lauren F. Louis, hereby declare as follows:

1.     I am an attorney duly licensed to practice law in the States of Florida and am Counsel with the law firm of Boies, Schiller & Flexner LLP, Co-Counsel for the Plaintiffs and for the Class. I am admitted in this case *pro hac vice*. The matters stated herein are based on my personal knowledge and, if called upon to testify, I could and would testify competently thereto.

2.     Attached hereto at Exhibit A is a true and correct copy of the Declaration of Ivette Alexandra Gonzalez Cortes, executed on June 2, 2016.

3.     Attached hereto at Exhibit B is a true and correct copy of the Declaration of Dayanna Paola Cardenas Caicedo, dated May 22, 2016.

4.     Attached hereto at Exhibit C is a true and correct copy of relevant excerpts from the transcript of the April 25, 2016 Scheduling Conference held in this action before The Hon. Kathleen M. Tafoya, United States Magistrate Judge for the District of Colorado.

5.      Attached hereto at Exhibit D is a true and correct copy of the Declaration of Johana Paola Beltran, executed on July 8, 2016.

6.      Attached hereto at Exhibit E is a true and correct copy of the Declaration of Beaudette Deetlefs, dated July 18, 2016.

7.      Attached hereto at Exhibit F is a true and correct copy of the Declaration of Lusapho Hlatshaneni, dated July 19, 2016.

8.      Attached hereto at Exhibit G is a true and correct copy of a blog entry from the website of Defendant InterExchange, Inc. entitled "'Saving and Spending: The Au Pair Stipend' – Interexchange", dated January 1, 2014, accessible at the following URL https://www.interexchange.org/articles/au-pair-usa/2014/01/22/saving-and-spending-the-au-pair-stipend/, (retrieved on May 24, 2016).

9.      Attached hereto at Exhibit H1 is a true and correct copy of a blog entry attached to InterExchange's website, entitled "'Protect Yourself From Au Pair Fraud' – InterExchange", which was captured on March 27, 2015. Since the filing of this lawsuit, the website has been revised. Exhibit H2 is a true and correct copy of a revised version of a blog entry from the website of Defendant InterExchange, Inc., entitled "'Protect Yourself From Au Pair Fraud' – InterExchange", dated February 19, 2016, accessible at the following URL https://www.interexchange.org/articles/protect-yourself-from-au-pair-fraud (retrieved on April 19, 2016).

10.     Attached hereto at Exhibit I is a true and correct copy of a blog entry from the website of Defendant Cultural Care, Inc., entitled "Top 5 differences between an au pair and a nanny | Cultural Care Au Pair", dated March 6, 2012, accessible at the following URL http://culturalcare.com/blog/top-5-differences-au-pair-vs-nanny/ (retrieved on July 12, 2016).

11.     Attached hereto at Exhibit J is a true and correct copy of a webpage from the website of

Defendant American Institute for Foreign Study (d/b/a Au Pair in America), entitled "Fees and

the cost of au pair services | Au Pair Cost", accessible at the following URL

http://www.aupairinamerica.com/fees/?campaign=sitelink&gclid=CJK_iOjymswCFYSAaQod-

jgKDg, (retrieved on April 19, 2016).

12.     Attached hereto at Exhibit K is a true and correct copy of a webpage from the website of

Defendant American Institute for Foreign Study (d/b/a Au Pair in America), entitled "Au Pair in

America -- Fees", as it appeared at the following URL on January 28, 2014,

http://www.aupairinamerica.com/fees/. This true and correct copy of this page as it appeared on

January 28, 2014 was accessed via the *Internet Archive Wayback Machine* and was retrieved on

May 31, 2016 via the following URL

https://web.archive.org/20140128032524/http://www.aupairinamerica.com/fees/.

13.     Attached hereto at Exhibit L is a true and correct copy of a webpage from the website of

Defendant American Cultural Exchange (d/b/a GoAuPair), entitled "What is the Au Pair stipend

and how is it determined? | Go Au Pair", as it appeared at the following URL on July 1, 2014,

http://www.goaupair.com/host-families/faq/during-your-au-pair-child-care-experience. This true

and correct copy of this page as it appeared on January 28, 2014 was accessed via the *Internet

Archive Wayback Machine* and was retrieved on May 31, 2016 via the following URL

https://web.archive.org/20140701163304/http:// www.goaupair.com/host-families/faq/during-

your-au-pair-child-care-experience /.

FURTHER DECLARANT SAYETH NOT.

I declare under penalty of perjury under the laws of the United States that the foregoing is

true and correct and that I executed this declaration on July 25, 2016 in Fort Lauderdale, Florida.

LAUREN F. LOUIS
*(admitted pro hac vice)*
BOIES, SCHILLER & FLEXNER LLP
401 E. Las Olas Blvd., Suite 1200
Ft. Lauderdale, FL 33301
Tel: (954) 356-0011
Fax: (954) 356-0022

PLAINTIFFS' RESP. APP.0001918

# Exhibit 240

PLAINTIFFS' RESP. APP.0001919

Case 1:14-cv-03074-CMA-KMT   Document 925-18   Filed 02/20/18   USDC Colorado   Page 25
of 173

# Exhibit A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Case No. 14-cv-03074-CMA-KMT

JOHANA PAOLA BELTRAN, *ET AL.*

     Plaintiffs,

v.

INTEREXCHANGE, INC., *ET AL.*

     Defendants.

---

## DECLARATION OF IVETTE ALEXANDRA GONZALEZ CORTES

---

I, Ivette Alexandra Gonzalez Cortes, being duly sworn, deposes and says:

1.     My name is Ivette Alexandra Gonzalez Cortes and I am over the age of 18.

2.     Beginning on or around October, 2013, I visited Intercambio E Tourismo LTDA ("Intercambio"), an agent of Go Au Pair and EurAuPair, and consulted with Intercambio about their J-1 au pair program. I was advised by the representative of Intercambio that as an au pair for either sponsor, I would be paid a $195.75 weekly stipend and would be expected to work for 45 hours per week.

3.     I paid $1,600 for out of pocket expenses, which I understood to be payment for administrative fees and costs related to my employment as an au pair.

4.     Soon thereafter, Go Au Pair matched me with a family in Maryland.

5.     Prior to meeting my new host family, Go Au Pair required me to attend mandatory childcare training for one week. I completed approximately 24 hours of online training. I was not paid for this time.

6.     In or around July 2014, I travelled to Baltimore, Maryland to begin working as an au pair with a host family.

7.     My host family paid me $200 per week, every week.

8.     During my employment, I always worked more than 40 hours per week. I always worked 45 hours per week.

9.      In addition to the 45 hours I worked each week, my family imposed a 9:00 pm curfew and required me to be in the home at that hour, even though I was not scheduled to be working during those hours.


I solemnly affirm under the penalties of perjury that the contents of this

Declaration are true and correct to the best of my knowledge.


_____

IVETTE ALEXANDRA GONZALEZ CORTES

PLAINTIFFS' RESP. APP.0001922

Case 1:14-cv-03074-CMA-KMT  Document 918-18  Filed 03/17/18  USDC Colorado  Page 27
of 173

# Exhibit 241

PLAINTIFFS' RESP. APP.0001923

# Exhibit F

PLAINTIFFS' RESP. APP.0001924

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Case No. 14-cv-03074-CMA-KMT

JOHANA PAOLA BELTRAN, *ET AL.*

　　Plaintiffs,

v.

INTEREXCHANGE, INC., *ET AL.*

　　Defendants.

---

### DECLARATION OF LUSAPHO HLATSHANENI

---

I, Lusapho Hlatshaneni, declare as follows:

1.　My name is Lusapho Hlatshaneni and I am over the age of 18.

2.　Beginning on or around 2012 during my third year of college, I submitted an application to African Ambassador's office in Cape Town, who is an agent of and recruits au pairs for Au Pair in America.

3.　I was told by African Ambassador that as an au pair in the United States, I could not be paid more than $195.75 per week and that if I accepted any additional wages, I would lose my visa.

4. I paid 9,500 South African Rand (approximately $800USD) for out of pocket expenses related to my employment with Au Pair in America, which I understood to be payment for administrative fees and costs related to my employment as an au pair.

5.　In February 2013, I travelled from South Africa to New York.

6.　Upon arrival in New York, Au Pair in America made arrangements for me to stay in a hotel with a number of other au pairs for one week, to attend mandatory childcare training provided by Au Pair in America. I attended 4 days of training for approximately 32 hours in total.  I was not paid during this week of training.

7.　Upon completion of the week-long training in Tarrytown, New York, I flew to Virginia to begin working as an au pair.

8.　My host family had two-year old twins. I worked with this family in Virginia for one year, until their children began school, and my services were no longer needed.

PLAINTIFFS' RESP. APP.0001925

9.     I worked five days a week, 8-10 hours a day, and generally worked in excess of 40 hours per week.

10.     My host family paid me $195.75 per week, regardless of the number of hours I actually worked. I was never compensated for my overtime hours.

11.     In February 2014, I was matched with a new family and travelled to California to begin working as the new family's au pair.

12.     My new family also had two young children.

13.     My new host family also paid me based on the stipend of $195.75 per week, regardless of the number of hours I actually worked, though when the family paid me in cash, they rounded it up to $200.

14.     During the summer months of 2014, I routinely worked well over 40 hours per week, even as much as 60 hours per week, while the children were not in school. I was still paid only $195.75 (or $200) per week for those weeks.

15.     Both families advised me that they paid me $195.75 because that is what they were told to pay by Au Pair in America, and Au Pair in America told them not to exceed the weekly stipend of $195.75.

16.     I am residing again in South Africa, where my internet accessibility is much less consistent than it was when I was working in the United States. I do not have the ability to check my emails on a daily basis because of this.

I solemnly affirm under the penalties of perjury that the contents of this

Declaration are true and correct to the best of my knowledge.

Dated this 19 day of July 2016.

LUSAPHO HLATSHANENI

2

PLAINTIFFS' RESP. APP.0001926

Case 1:14-cv-03074-CMA-KMT   Document 918-18   Filed 03/17/18   USDC Colorado   Page 31
of 173

# Exhibit 242

PLAINTIFFS' RESP. APP.0001927

# Exhibit G

PLAINTIFFS' RESP. APP.0001928



# The Au Pair Stipend'



All au pairs earn a weekly stipend of at least $195.75 per week – this is a number determined by the U.S. State Department. You may be wondering, "Why at least 195.75 per week?" It seems like a strange number, but there is a strict equation used to arrive at this amount. The stipend is calculated by multiplying the Federal Minimum Wage by the maximum number of hours worked per week, then subtracting 40% for room and board.

Here's how the stipend is calculated:

Federal Minimum Wage: **$7.25** x Maximum hours worked per week: **45** = $326.25 minus Room and board credit of **40%** ($130.50) = $195.75

According to U. S. State Department regulations, all au pairs must receive this weekly stipend, regardless of whether or not they have worked the maximum 45 hours during the week. Au pairs also receive this stipend during their two weeks of

PLAINTIFFS' RESP. APP.0001929

vacation!

Since your food and housing are covered, your stipend is considered your "discretionary income" or money you can spend on activities of your choosing – travel, eating out, and otherwise exploring your community. Over the course of 12 months, you'll earn nearly $10,000 in stipends. If you plan carefully, you can enjoy quite a few cultural and recreational activities with that amount of money!

Here at InterExchange, we encourage you to use their earnings to get the most out of your time in the United States. We want you to try new foods, buy keepsakes and souvenirs, enjoy social events with friends, and to see as many of the diverse and unique areas of our country as you can! Here are some suggestions to help you effectively manage your earnings:

# Keep an Emergency Fund

We recommend keeping the equivalent of two week's stipend (about $400) in an emergency fund. This is money that you never use for anything except an emergency. If you never end up needing the money, you can take it home with you to help you get re-settled.

# Set aside 10% for taxes



You will have to file taxes at the end of the calendar year. Depending on when you started the program and how much you earned, you might have to pay several hundred dollars toward U.S. taxes. We recommend putting aside 10% ($20) a week to be able to pay your income taxes at the end of the calendar year. In the end, this

PLAINTIFFS' RESP. APP.0001930

'Saving and Spending the Au Pair Stipend | InterExchange

should be more than enough. Whatever is left over after paying taxes is yours to keep!

## Pay yourself, too!

Experts recommend saving at least 10% of your income – for you, that's about $20 per week. Talk to your bank about opening a savings account, and consider scheduling an automatic transfer of $20 each payday – that way, you're saving without even thinking about it. By the end of the year, you'll end up with about $1,000 to travel, or to take home with you.

## Use Discount Sites Like LivingSocial or Groupon to Try Something New!

These sites (also available as apps) are a great way to find workout classes, haircuts, and even some restaurants in your area at discounted prices. If you're interested in trying a class such as Zumba, CrossFit, or Kickboxing, you're sure to find a deal through LivingSocial or Groupon!

## Shop at stores during sales and clearance periods

The United States has a deep discount culture – many consumers are not accustomed to paying full price for items such as clothes and shoes. Be on the lookout for sales! Any discount of 40% off or higher is generally considered to be a good deal.

## Ask around!

When you're new to a city or country, it's easy to spend more money than you would if you were home. When you find yourself in need of an adaptor, new coat, or guidebook, you might end up making a purchase at the first place you find – which may not be the best value!

Your host family, neighbors, LC, fellow students in your classes, and other au pairs

PLAINTIFFS' RESP. APP.0001931

who have been in the U.S. longer are great resources. They can tell you about your new city's best deals and hidden gems.

# Search Kayak, Priceline, and more!

When planning a trip, the internet is essential. If you're planning on flying, don't just search for flights once – try multiple times and dates on multiple sites to get the best value! Here are some places to get started:

Kayak
Priceline
Yahoo Travel
Skyscanner
CheapoAir

The same is true for hotels/hostels, car rentals, and other travel-related costs. Review the options online using InterExchange Cultural Compass to research the different options around the country and resources to improve your travel experience. Keep an open mind and be sure to Google things you're interested in – you never know what new bus company or travel app you may find!

We hope that these tips are helpful for understanding and making the most out of your weekly stipend. Managing money well can help reduce stress and increase your opportunities for cultural exchange. Finally, when trying to decide between taking that trip or buying a new bag, remember that experiences bring more happiness than things!

 **Stephanie Willhide**

Stephanie started her career working for a cultural exchange program that supports English language learning in Chilean public schools. She came to InterExchange's Au Pair USA program in 2013, and now works as the **Content Developer**.

PLAINTIFFS' RESP. APP.0001932

Case No. 1:14-cv-03074-CMA-KMT   Document 928-13   filed 03/30/18   USDC Colorado   page 33 of 173

Wednesday January 22, 2014



## Au Pair USA

Experience life in the U.S. while living with a welcoming American family.

### Sign Up

| ☐ Tweet | ☐ Share | ☐ Email |
|---|---|---|

**Au Pair USA**

**0 Comments**     **InterExchange**     ☐ **Login** ▾

☐ **Recommend**     ☐ **Share**     Sort by Best ▾



Start the discussion…

PLAINTIFFS' RESP. APP.0001933

Be the first to comment.

**ALSO ON INTEREXCHANGE**

### Adventure of a Lifetime in New Zealand

4 comments • 7 months ago•

> **James Bridge** — Hi Olivia, I'm glad to see you're finding the blogs here useful! :) As you look further into travel options for …

### Awesome Student Final Projects in Thailand

1 comment • 4 months ago•

### Staff Favorites: U.S. Foods

1 comment • 6 months ago•

> **James Bridge** — Healthy picks guys!!

### 4x4 Camp: The Best Way to Prepare for Camp USA in Bolivia!

1 comment • a month ago•

> **FABRICIO PICOLOMINY VILLAZON** — Hey everyone! My name is Fabricio I had been a counselor for Day Camp …



**School Teaching Assistant Italy Program Highlights**

**Working Abroad**   **Cultural Exchange**   **Travel**

**Europe**   **Italy**   **Teach English Abroad**



PLAINTIFFS' RESP. APP.0001934

**Forging Connections and Peace Through Basketball**

Foundation    Grants    Christianson Grant

Cultural Exchange    Israel    Volunteer Abroad

Stories from the Field



**What Is Leadership? A Recap From I-LEAD DC**

Career Training USA    Internships Abroad

Cultural Exchange    Education



**Top 10 Free Travel Apps**

PLAINTIFFS' RESP. APP.0001935

**Career Training USA** **Travel** **Tips**

**Technology**



## Venturing Into the Unknown in Australia

**Working Abroad** **Cultural Exchange**

**Gap Year Abroad** **Work Travel Abroad**

**Australia**

## Host Family Outings & Activities

**Working Abroad** **Cultural Exchange**

**Gap Year** **Travel** **Au Pair** **South of France**

## Looking for our classic website?
We're still moving everything over to the new look.

**Classic** ☐

### The Rainbow Nation
### Michael Gates Visits our

PLAINTIFFS' RESP. APP.0001936

**Partners in South Africa**

**InterExchange**

- Alumni
- Contact Us
- Foundation
- Leadership
- Mission
- Make a Payment
- Privacy
- SEVIS
- Terms

**Teaching in Thailand Final Reflection**

## Travel Abroad

- Au Pair
- Camp
- Career Training
- Learn Spanish
- Teach English
- Volunteer
- Work & Travel
- Foundation

**Going Home After Travel**

## Partner with Us

- GoAbroad
- Go Overseas

Alliance Exchange
IAPA
WYSE Travel

## Cultural Exchange

Compliance
Fulbright-Hays Act
U.S. Culture
Community Involvement
Travel Resources
Participant Rights
Online TEFL Course

Career Training USA Alumni Highlights

**Become a Host**
**Careers**
**Classic Website**

Case 1:14-cv-03074-CMA-KMT Document 928-59 Filed 09/17/18 USDC Colorado Page 43 of 173

# Exhibit 243

PLAINTIFFS' RESP. APP.0001939

# Exhibit H1



## Protect Yourself From Au Pair Fraud!

Like | 4 people like this. Sign Up to see what your friends like.

Like 4 | Tweet



Applying to be an au pair is very exciting, especially if you meet a family that would like to pre-match with you! However, don't let your excitement cloud your good judgement. It is important that you take the proper precautions and make sure the online family is not an internet scammer. All international au pairs visiting the U.S. on a J-1 Visa should only work with an official U.S. State Department sponsor such as InterExchange Au Pair USA.

Scams and frauds involve many different techniques. For example, a scammer may pretend to be a host family like InterExchange, or a host family that saw your profile online. They might contact you by email, telling you about their family and why they need someone to help them. They may make you offers that sound amazing, like paying you more than the program amount of $195.75 per week or saying that you won't be working very many hours. They will usually not speak with you over the phone or Skype. If you hesitate or respond slowly, their emails can become very demanding and urgent. They will often ask you to send them your personal identification (passport, driver's license) and/or payment for the agency, flights or other fees. Their emails often contain many grammar and spelling errors, and they may even use copies of au pair agency images and logos. If you doubt whether a family is real or not, you can email us at aupair@interexchange.org.

**Important Safety Reminders:**

- All international au pairs must apply with a U.S. Department of State designated sponsor. There is no other way to get a J-1 Visa for a U.S. au pair program.
- All international au pairs will work with a local agency in their home country. You must meet with this representative personally for a one on one interview and she or he will help you with the application process.
- All emails from InterExchange staff will end in @interexchange.org. International Cooperators also have institutional emails. Anyone claiming to be an au pair agency but emailing from a free service provider, such as Gmail or Yahoo, is most likely a scammer.
- Our application materials are all online in our protected portal. Families do not send these to you. Only our authorized agents in your home country can register you into the protected InterExchange Passport online system.
- Our families and au pairs communicate with each other using InterExchange Passport, our exclusive online portal. This is a closed online community, and a safe system for families and au pairs to meet and match with each other.

### CONNECT WITH US

  

### SUBSCRIBE

Receive email notifications when new content is posted.

Your email:
Enter email address...

Subscribe | Unsubscribe

### SEARCH THE AU PAIR USA BLOG

Search


InterExchange Au Pair U...

### INFORMATION FOR AU PAIRS

Become an Au Pair in the US
Life in the US for Au Pairs
Au Pair Responsibilities
Au Pair USA Benefits
Testimonials
Resources for Au Pairs

### INFORMATION FOR HOST FAMILIES

### CATEGORIES

Educational Info
Program Info
Activities and Crafts
Program News

### ARCHIVES

March 2015
January 2015
December 2014
November 2014
October 2014
September 2014
August 2014
July 2014
June 2014
May 2014
April 2014
March 2014
February 2014
January 2014

PLAINTIFFS' RESP. APP.0001941

- You only begin talking to our screened host families AFTER you have completed your application and interviewed with us.
- Au pairs only pay their local agency directly, not their host family and not third-party bankers.
- U.S. au pair agencies DO NOT use money transfer companies such as Western Union or MoneyGram for business transactions.
- Never give out your personal information via email to someone you do not know.
- Do not provide copies of your personal documents or send payment to third parties. Only give these things directly to your local agency in your home country.
- If you think that someone has tried to fraudulently contact you, please contact InterExchange immediately at aupair@interexchange.org or +1.212.924.0446 to report the incident.

We value your safety and are here to support you. If you are interested in becoming an au pair, please be sure to check out the au pair requirements.

To start the application process, please visit the following page to submit your information: http://www.interexchange.org/au-pair-usa/au-pair-program/ready-get-started

InterExchange Au Pair USA

Like    4 people like this. Sign Up to see what your friends like.

THIS ENTRY WAS WRITTEN BY ADMIN, POSTED ON MAY 21, 2014 AT 4:19 PM, FILED UNDER AU PAIR TIPS, CULTURAL EXCHANGE, PROGRAM INFO AND TAGGED AMERICAN CULTURE, AU PAIR, AU PAIR TIPS, AU PAIR USA, AU PAIRS IN USA, CHILD CARE, CULTURAL EXCHANGE, INTEREXCHANGE, INTEREXCHANGE AU PAIR USA, PROGRAM INFO, TIPS FOR AU PAIRS. BOOKMARK THE PERMALINK. FOLLOW ANY COMMENTS HERE WITH THE RSS FEED FOR THIS POST. TRACKBACKS ARE CLOSED, BUT YOU CAN POST A COMMENT.

## Leave a Reply

Your email address will not be published. Required fields are marked *

* Name

* Email

Comment

**HTML tags are not allowed.**

Post Comment

Current ye@r
*

1980

December 2013
November 2013
October 2013
September 2013
August 2013
July 2013
March 2013
February 2013
December 2012
August 2012
June 2012
May 2012
April 2012

PLAINTIFFS' RESP. APP.0001942

**InterExchange Au Pair USA** is a cultural exchange program that gives young people, ages 18-26, the opportunity to experience the U.S. by living with an American host family while providing child care. Host families enjoy the benefit of in-home care for their children that is flexible and affordable. In return, au pairs receive room, board, a weekly stipend, accident and sickness insurance, airfare and an educational allowance to use toward college-level courses.



© InterExchange        Privacy Policy | Terms of Use | International Cooperator Login

Get plugin http://www.fastemailsender.com

PLAINTIFFS' RESP. APP.0001943

Case 1:14-cv-03074-CMA-KMT   Document 948-18   Filed 03/17/18   USDC Colorado   Page 49
of 173

# Exhibit 244

PLAINTIFFS' RESP. APP.0001944

# Exhibit A

PLAINTIFFS' RESP. APP.0001945

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Case No. 14-cv-03074-CMA-KMT

JOHANA PAOLA BELTRAN, *ET AL.*

    Plaintiffs,

v.

INTEREXCHANGE, INC., *ET AL.*

    Defendants.

## DECLARATION OF JUILANE HARNING

I, Juliane Harning, declare as follows:

1    My name is Juliane Harning and I am over the age of 18.

2    In November of 2007, I decided to apply to be an au pair in the United States. I started investigating the varies agencies using the internet.

3    I decided to apply to Defendant Au Pair Care because it was the agency that advertised the lowest fees I would have to pay of all the sponsors I saw. Plus, at the time, Au Pair Care had a promotion advertising that it would give back half of the fees paid at the conclusion of the year.

4.    I did not base my selection on how much I could earn because the information that was publicly available from the sponsors told me that I would be paid the same amount no matter which one accepted my application.

5    I paid approximately $400 Euros to Au Pair Care to apply to the program, and I also paid $100 dollars to the embassy to apply for my visa.

6    In July 2008, I travelled from Germany to New Jersey. I participated in training presented by Au Pair Care over three days. I was not paid to attend the training, which covered all aspects of the duties I would be expected to perform as a standard au pair, but did not include the newborn-care training, for which the family would had to have paid more.

7    They told us at the training that we would be paid the same stipend and that it was an amount set by the Department of State. I recall that my stipend amount was also stated in my contract with Au Pair Care.

8.     Upon completion of the three-day training, I flew to Michigan to begin working as an au pair.

9.     My host family had two sets of twins, infants and two-year olds, a five-year old and a thirteen year old—six children in total. The family did not have any other child care help besides me.

10.     I worked five days a week, 8-10 hours a day, and generally worked in excess of 40 hours per week.

11.     My host family paid me $157.95 for the first week per week; the stipend amount changed and I was thereafter paid $176 per week. I was always paid the minimum stipend regardless of the number of hours I actually worked. I was never compensated for my overtime hours.

12.     In December 2008, tragically, my host father was hit by a car while he was on a bicycle. He was hospitalized for months following the accident. During that time, my host mom practically lived at the hospital with him. I was left as the primary care giver for the five youngest children during this time, with intermittent assistance from the neighbors and the grandparents. I worked seven days a week, literally around the clock.

13.     The family did not pay me for the extra hours I worked but asked me to extend for a second year and offered to buy me a plane ticket to Florida as a way of thanking me.

14.     In June 2009 I was involved in a car accident with the family vehicle. Though I paid the family $250 for the deductible, the family rescinded the offer to extend, terminated my year with them early, and backed out of the promise to fly me to Florida for vacation. I knew the family was financially struggling and I do not believe they asked me to leave because of the car accident, but because they could not afford to fly me as promised or otherwise pay me for all the extra time I worked for them.

15.     Because there were only two weeks left in my year, Au Pair Care did not attempt to rematch me with another family. Au Pair Care deemed my year unsuccessfully completed and thus did not refund half of the fees I had paid them.

16.     In 2013, I decided to try again to work as an au pair in the United States. I again applied to Au Pair Care. My best recollection is that I paid $350 Euros to apply in 2013, and again paid for my own visa.

17.     I was accepted to the program. In October 20123, I received an email from Au Pair Care addressed to "Dear Au Pair" that offered tips for protecting oneself against internet scams. The email states that "[l]egitimate host families will also not offer you a higher stipend than what is listed in the regulations published by the U.S. Department of State for the Au Pair Program."

18.     I matched with a family in Virginia. In February 2014, I again flew to Newark, New Jersey and attended the Au Pair Care training. This time I attended not

2

PLAINTIFFS' RESP. APP.0001947

just the three days that all au pair attend but the extra day dedicated to infant care. I was not paid for the training.

19.    At the training, the Au Pair Care representatives told us that we would be paid $195.75 per week.

20.    My host family had one infant girl and a full time nanny besides myself to care for her.

21.    My host family paid me $200 per week. My host mother told me they were only supposed to pay me $195.75, but told me not to worry about giving them back the few dollars "change." My host mother said the amount was set by the agency.

22.    I always worked forty five hours per week minimum. Occasionally, my host mom would run late returning to the house to relieve me, causing me to work more than the permitted amount of hours. She acknowledged that doing so violated the program rules and gave me extra money on these occasions. She recognized that was against the rules too.

I solemnly affirm under the penalties of perjury that the contents of this

Declaration are true and correct to the best of my knowledge.

Dated. August 12, 2016

JULIANE HARNING

3

Case 1:14-cv-03074-CMA-KMT    Document 948-19    Filed 03/17/18    USDC Colorado    Page 53
of 173

# Exhibit 245

PLAINTIFFS' RESP. APP.0001949

# Exhibit B

PLAINTIFFS' RESP. APP.0001950

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Case No. 14-cv-03074-CMA-KMT

JOHANA PAOLA BELTRAN, *ET AL.*

      Plaintiffs,

v.

INTEREXCHANGE, INC., *ET AL.*

      Defendants.

---

## DECLARATION OF NICOLE MAPLEDORAM

I, Nicole Mapledoram, declare as follows:

1.      My name is Nicole Mapledoram and I am over the age of 18.

2.      In January of 2014, I applied with Expert Au Pair to be an au pair. Expert Au Pair was one of three sponsors I applied to; all three advertised that my wages as an au pair would be $195.75. Thus I understood that my wages would be the same no matter which sponsor accepted me.

3.      I did not base my selection on how much I could earn because the information that was publicly available from the sponsors told me that I would be paid the same amount no matter which one accepted my application.

4.      I paid approximately $500 USD to Expert Au Pair to apply to the program. I also had to pay $500 USD for my airfare. I recall that I also paid $265 to the embassy for my visa.

5.      In April of 2014, I travelled from Australia to Florida. I participated in training presented by Expert Au Pair for five days, thirty-two hours in total. I was not paid to attend the training, which covered aspects of the duties I would be expected to perform as a standard au pair.

6.      They told us during training that we would all be paid the same weekly stipend and that it was an amount set by the Department of State. We were told all au pairs are paid the same, no matter where in the United States the au pair works, or how many children the au pair cares for, or how many hours the au pair works per week.

PLAINTIFFS' RESP. APP.0001951

7.      Upon completion of the training, I flew to Colorado to begin working as an au pair.

8.      My host family had two children when I arrived and a baby the month after I arrived.

9.      I worked five and a half days a week, up to 10 hours a day, for a minimum of 45 hours per week—never less, and often more.

10.     My host family generally paid me the minimum stipend amount of $195.75 per week. I was never compensated for my overtime hours.

11.     Additionally, my family did not always pay me the full stipend amount, but rather, deducted money from my pay if I was unable to work the full 45 hours per week. My host family calculated my hourly wage as 195.75 divided by 45, and would multiply that number by the number of hours I missed, for example if I took a sick day, and reduce my pay accordingly.

12.     In February 2015, I rematched with another family in Colorado.

13.     From February 2015 until April 2016, as with my first family, I worked five and a half days a week, up to 10 hours a day, for a total of 45 hours per week—never less.

14.     My second host family paid me $200 per week. My host family told me they were only supposed to pay me $195.75 per week, but they decided to round it to the even number of $200.

15.     I am acquainted with many other au pair who are or were recently working in the United States. I am not aware of one au pair earning more than $200 per week; our wages have all been based on the stipend of $195.75 advertised by all of the sponsor defendants.


I solemnly affirm under the penalties of perjury that the contents of this

Declaration are true and correct to the best of my knowledge.


Dated: August 15, 2016

NICOLE MAPLEDORAM

2

Case 1:14-cv-03074-CMA-KMT   Document 945-19   Filed 03/17/18   USDC Colorado   Page 57
of 173

# Exhibit 246

PLAINTIFFS' RESP. APP.0001953

# **Exhibit C**

PLAINTIFFS' RESP. APP.0001954

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Case No. 14-cv-03074-CMA-KMT

JOHANA PAOLA BELTRAN, *ET AL.*

      Plaintiffs,

v.

INTEREXCHANGE, INC., *ET AL.*

      Defendants.

---

### DECLARATION OF LAURA MEJIA JIMENEZ

---

I, Laura Mejia Jimenez, declare as follows:

1.    My name is Laura Mejia Jimenez and I am over the age of 18.

2.    Sometime in or about early 2014 I was hired to be an au pair by AuPairCare, Inc. ("AuPairCare") through its agent in Colombia.

3.    I looked into different au pair agencies before becoming an au pair in an attempt to select the best one. I looked at Cultural Care, Au Pair in America, and AuPairCare.

4.    I did not base my selection on how much I could earn because the information that was publicly available from the sponsors told me that I would be paid the same amount no matter which one accepted my application.

5.    Among other things, AuPairCare's Colombian agent told me that the "stipend" for working in the United States as an au pair was $195 and some amount of cents per week. I do not remember the amount of cents, but am certain about the number of dollars.

6.    That agent also told me the "stipend" was an amount set by the United States Government and so that is what I would be paid.

7.    That agent also told me that this would equal a lot of money in Colombia.

8.    In or about April 2014, I paid the agent of AuPairCare in Colombia approximately 3,800,000 COP. In or about June 2014, I paid approximately $150 USD to the United States embassy for my visa.

9.    In or about July 21, 2014, I flew to New York, New York and was driven to somewhere in New Jersey for approximately 4 days of training by AuPairCare. My

understanding is that all AuPairCare au pairs are trained in New Jersey and that none of them are paid for training.

10.     The training covered all aspects of the duties I would be expected to perform as an au pair.

11.     At the training, AuPairCare told me that the stipend was $195 and some amount of cents per week. I do not remember the amount of cents, but am certain about the number of dollars. We were also told that all au pairs were paid the same, no matter where they work and no matter how many children they care for.

12.     After training I was picked up by my host family and traveled to or near Philadelphia, Pennsylvania, where my host family lived, by car.

13.     My host family had two young girls that I cared for as an au pair.

14.     During the entirety of my time as an au pair, my host family paid me $200 for each 45 hour week of work.

15.     However, after the first month, my host family left me with the children in excess of 45 hours per week. When they did so, they gave me $10 per hour for hours worked in excess of 45 in a week.

16.     I am acquainted with many other au pair who were recently working in the United States. I am not aware of one au pair earning more than $200 per week (other than amounts paid for hours worked in excess of 45 in a week); our wages have all been based on the stipend of $195.75 advertised by all of the sponsor defendants.

I solemnly affirm under the penalties of perjury that the contents of this

Declaration are true and correct to the best of my knowledge.

Dated: August 15, 2016

LAURA MEJIA JIMENEZ

Case 1:14-cv-03074-CMA-KMT   Document 918-13   Filed 03/17/18   USDC Colorado   Page 61
of 173

# Exhibit 247

PLAINTIFFS' RESP. APP.0001957

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLORADO

---

JOHANA PAOLA BELTRAN; LUSAPHO
HLATSHANENI; BEAUDETTE DEETLEFS;
DAYANNA PAOLA CARDENAS CAICEDO;
ALEXANDRA IVETTE GONZÁLES; SARAH
CAROLINA AZUELA RASCON; LAURA MEJIA
JIMENEZ; JULIANE HARNING; NICOLE
MAPLEDORAM; and those similarly situated,

          Plaintiffs,

v.

INTEREXCHANGE, INC.; USAUPAIR, INC.;
GREATAUPAIR, LLC; EXPERT GROUP
INTERNATIONAL INC., DBA EXPERT AUPAIR;
EURAUPAIR INTERCULTURAL CHILD CARE
PROGRAMS; CULTURAL HOMESTAY
INTERNATIONAL; CULTURAL CARE, INC. D/B/A
CULTURAL CARE AU PAIR; AUPAIRCARE INC.;
AU PAIR INTERNATIONAL, INC.; APF GLOBAL
EXCHANGE, NFP, DBA AUPAIR FOUNDATION;
AMERICAN INSTITUTE FOR FOREIGN STUDY
DBA AU PAIR IN AMERICA; ASSOCIATES IN
CULTURAL EXCHANGE DBA GOAUPAIR;
AMERICAN CULTURAL EXCHANGE, LLC, DBA
GOAUPAIR; GOAUPAIR OPERATIONS, LLC, DBA
GOAUPAIR; AGENT AU PAIR;
A.P.EX. AMERICAN PROFESSIONAL EXCHANGE,
LLC DBA PROAUPAIR; and
20/20 CARE EXCHANGE, INC. DBA THE
INTERNATIONAL AU PAIR EXCHANGE,

          Defendants.

Civil Case No. 14-cv-03074-CMA-CBS

---

# Expert Rebuttal Report of Elizabeth H. Newlon, Ph.D.

**February 3, 2017**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

PLAINTIFFS' RESP. APP.0001958

# Contents

I.    INTRODUCTION    1
   A.   ASSIGNMENT    1
   B.   MATERIALS CONSIDERED    1
   C.   SUMMARY OF OPINIONS    1

II.    DR. KERR DOES NOT ESTABLISH THAT A COMMON IMPACT EXISTS WITHIN EACH RELEVANT CLASS AS A RESULT OF THE ALLEGED POLICY OF THE DEFENDANTS    3
   A.   DR. KERR DOES NOT ESTABLISH THAT AU PAIRS RECEIVED THE MINIMUM WEEKLY STIPEND CLASS-WIDE.    3
   B.   DR. KERR DOES NOT ESTABLISH THAT CLASS MEMBERS PROVIDED SIMILAR AMOUNTS OF CHILDCARE ASSISTANCE PER WEEK.    8
   C.   PLAINTIFFS HAVE NOT ESTABLISHED THAT AU PAIRS RECEIVED SIMILAR STIPENDS AND/OR HOURLY STIPENDS THAT VIOLATED FEDERAL AND STATE LABOR LAWS (IF THOSE LAWS APPLY).    13
   D.   DR. KERR DOES NOT ESTABLISH THAT ALL AU PAIRS IN THE RELEVANT CLASSES WERE RECRUITED AND HIRED FOR IDENTICAL POSITIONS OR PERFORMED SIMILAR DUTIES.    16
   E.   DR. KERR CONTRADICTS PLAINTIFFS' ALLEGATION THAT THERE IS A COMMON IMPACT IN CLASSES THAT CONTAIN BOTH "STANDARD" AND "PREMIUM" AU PAIRS    18

III.    DR. KERR DOES NOT ESTABLISH THAT HIS PROPOSED DAMAGE MODEL WOULD PROVIDE A COMMON METHOD FOR CALCULATING DAMAGES CLASS-WIDE    19
   A.   OVERVIEW OF DR. KERR'S WAGE AND HOUR LAW COMPLIANCE MODEL    19
   B.   DR. KERR FAILS TO ESTABLISH THAT HE CAN ACCURATELY CALCULATE DAMAGES CLASS-WIDE USING HIS WAGE AND HOUR LAW COMPLIANCE MODEL    20
   C.   DR. KERR DOES NOT ESTABLISH THAT ALL CLASS MEMBERS WOULD BENEFIT IF THE STIPEND WERE HIGHER IN THE BUT-FOR WORLD    24

i

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

## I.   INTRODUCTION

### A.   Assignment

1.   My name is Elizabeth Newlon.  I am an Associate Director at NERA Economic Consulting.  I previously prepared a report in this matter submitted on January 13, 2017 ("Newlon Initial Report").[1]

2.   I have been asked by Counsel for Au Pair in America, AuPair Care, Cultural Care, Inc. ("Cultural Care"), Expert AuPair, Go Au Pair Operations, LLC ("Go Au Pair"), and InterExchange, Inc. (the "Six Defendants") to comment on the theories and calculations presented in the Expert Report of William O. Kerr, served on January 13, 2017 ("Kerr Initial Report").[2]  In particular, I address conditional class certification arguments relevant to the proposed Wage Classes, 216(b) Classes, and Sub-216(b) Classes ( "Relevant Classes") as outlined in the Plaintiffs' Second Amended Complaint.[3]

### B.   Materials Considered

3.   In addition to the materials considered in my Initial Report, I, and economists working under my direction, have reviewed the Kerr Initial Report served on behalf of Plaintiffs, other documents and declarations produced in this matter by the named Plaintiffs and Defendants Cultural Care, Au Pair Foundation Inc., AuPair Foundation, InterExchange, Inc., Expert AuPair, Go Au Pair, and AuPairCare; examined publicly available information; and conducted interviews with representatives from the sponsor agencies. The opinions expressed in this report are based on my review of this information as well as my training and experience as an economist.  A list of the information sources and materials I considered in forming my opinions is presented in **Exhibit 1**.

### C.   Summary of Opinions

4.   Based on my analysis to date, I have reached the following opinions:

---

[1]   *See,* Expert Report of Elizabeth H. Newlon, Ph.D. on behalf of Defendants in connection with *Johana Paola Beltran, et al.; and those similarly situated, Plaintiffs, v. InterExchange, Inc., et al., Defendants,* United States District Court For the District of Colorado, Case No. 14-cv-03074-CMA-CBS, January 13, 2017, § I.A and Exhibit 1.

[2]   *See,* Expert Report of William O. Kerr, *Johana Paola Beltran, et al.; and those similarly situated, Plaintiffs, v. InterExchange, Inc., et al., Defendants,* United States District Court For the District of Colorado, Case No. 14-cv-03074-CMA-KMT, January 13, 2017 ("Kerr Initial Report").

[3]   Second Amended Complaint, *Johana Paola Beltran; Lusapho Hlatshaneni; Beaudette Deetlefs; Dayanna Paola Cardenas Caicedo; Alexandra Ivette González; Sarah Carolina Azuela Rascon; Laura Mejia Jimenez; Juliane Harning; Nicole Mapledoram; and those similarly situated, Plaintiffs, v. Interexchange, Inc.; USAuPair, Inc.; GreatAuPair, LLC; Expert Group International, Inc., DBA Expert AuPair; EurAupair Intercultural Child Care Programs; Cultural Homestay International; Cultural Care, Inc. D/B/A Cultural Care Au Pair; AuPairCare, Inc.; Au Pair International, Inc; APF Global Exchange, NFP, DBA AuPair Foundation; American Institute For Foreign Study DBA Au Pair in America; Associates in Cultural Exchange DBA GoAuPair; American Cultural Exchange, LLC, DBA GoAuPair; Go Au Pair Operations, LLC, d/b/a Go Au Pair; Agent Au Pair; A.P.EX. American Professional Exchange, LLC, DBA ProAuPair; and 20/20 Care Exchange, Inc. DBA The International Au Pair Exchange, Defendants,* in the United States District Court For the District of Colorado, Case No. 14-cv-03074-CMA-CBS, October 17, 2016 ("Second Amended Complaint").

1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

PLAINTIFFS' RESP. APP.0001960

i.) Dr. Kerr's conclusion that a common impact exists among individuals in the Relevant Classes from the alleged policy of the Six Defendants to set au pair stipends to the DOS minimum is without merit. In reaching this conclusion, Dr. Kerr ignores evidence in the record that shows that there is variation in the stipends received by au pairs, the childcare hours of au pairs, and au pair duties and instead relies on unsubstantiated assumptions and narrow interpretations of documents in the record.[4]

  a) Dr. Kerr fails to establish that a common impact existed for members of the proposed Sub-216(b) Classes. Evidence in the record shows that all au pairs did not spend greater than 40 hours per week assisting with childcare. This contradicts common impact with respect to overtime allegations at the core of the Sub-216(b) Classes.

  b) Dr. Kerr fails to establish that so-called "premium" au pairs, who are included in the proposed Relevant Classes, were harmed by the alleged common policy of the Six Defendants to set stipends to the DOS minimum. In fact, contrary to Plaintiffs' allegations, Dr. Kerr states that he has not seen any evidence of any collusion with respect to stipends for "premium" au pairs.

ii.) Dr. Kerr has not demonstrated that he has a working methodology to accurately calculate damages for members of the Relevant Classes. He assumes that he will have access to comprehensive data on childcare hours and stipends received for members of the Relevant Classes necessary to properly calculate damages using his Wage and Hour Law Compliance model. I understand that no such data exists. Dr. Kerr does not address or demonstrate how his proposed class-wide methodology will work without access to this data.

5. These opinions and the following analysis are based on my review of the documents and information made available to me to date. I reserve the right to update my opinions should additional information be provided to me. I also reserve the right to respond to any data analysis set forth by the Plaintiffs, if such an analysis is conducted, once it has been provided to me.

---

[4]   Dr. Kerr also makes several assumptions that are challenged by Defendants and not based on fact. For example, as I discussed in my initial report, Defendants assert that the DOS-sanctioned au pair program is a cultural exchange program, not a labor program. They contest Plaintiffs' assumption that the FLSA supersedes the DOS au pair program regulations. Defendants also deny that they are "joint employers" with each respective host family of au pairs. Defendants further deny that they pay au pairs or that they are responsible for paying wages to au pairs, and, therefore, that they have any legal obligation to au pairs regarding compensation over and above what is set forth in the DOS au pair regulations. Although I adopt some of Dr. Kerr's language regarding wages, employment, and labor for the purposes of clearly refuting them, neither I nor Defendants concede that his framework is the proper one for analyzing this case.

2

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

PLAINTIFFS' RESP. APP.0001961

## II.   DR. KERR DOES NOT ESTABLISH THAT A COMMON IMPACT EXISTS WITHIN EACH RELEVANT CLASS AS A RESULT OF THE ALLEGED POLICY OF THE DEFENDANTS[5]

6.      Dr. Kerr claims that he found sufficient commonality among the class members in terms of impact from the alleged illegal policy imposed by the Six Defendants, such that each of the Relevant Classes should be certified.[6]  The purported evidence that Dr. Kerr presents in support of this conclusion is not a sufficient basis for Dr. Kerr to establish common impact within each class as a result of the alleged policy.

7.      Dr. Kerr does not provide sufficient evidence to conclude that all or nearly all class members received a stipend of approximately $195.75 per week from their host families. But more essential to the Plaintiffs' claims, Dr. Kerr does not demonstrate that the stipends received by members of the class similarly violated federal and state labor laws (assuming they apply).  Under Plaintiffs' approach, the number of hours per week that au pairs provided childcare in relation to the stipend amounts would determine whether class members were commonly paid.  Dr. Kerr fails to properly account for the amount of hours that au pairs provide childcare when presenting evidence for a common impact class-wide.  Dr. Kerr, instead, focuses only on evidence in support of his assumption that au pairs received stipends of approximately $195.75 for 45 hours of childcare assistance per week.

8.      Dr. Kerr's assumptions and analytical approach ignore variation that establishes that there is no common impact across class members in each Relevant Class resulting from the Defendants' alleged policy.

### A.   Dr. Kerr Does Not Establish that Au Pairs Received the Minimum Weekly Stipend Class-wide.

9.      Dr. Kerr presents an "economic analysis of the facts in the record" that he claims demonstrates that "all, or nearly all, standard au pairs in the program received a weekly stipend of approximately $195.75 during the damages period."[7]  However, Dr. Kerr's purported evidence does not justify his conclusion that all class members received exactly (or approximately) $195.75 as the result of the alleged policy of the Defendants.

---

[5]   Some of the information provided in Section II is also in the Expert Rebuttal Report of Lauren J Stiroh, February 3, 2017. As discussed in more detail in Dr. Stiroh's report, there is no evidence of a common policy among the Defendants.  Contrary to Dr. Kerr's opinion, stipends at $195.75 may appear through competitive forces, particularly in light of the DOS notice, which appears to state that $195.75 reflects the federal minimum wage and is the minimum weekly stipend.

[6]   Kerr Initial Report, ¶¶ 8-9.

[7]   Kerr Initial Report, ¶ 39.  It is my understanding that Dr. Kerr uses the term "standard" au pair to refer to "individuals in their first or second year working in the United States as an au pair."  See, Kerr Initial Report, Footnote 4.  I do not believe the term "standard" as used by Dr. Kerr is accurate, because many of the Sponsor Agencies do not distinguish between au pairs based on their experience level.  Instead, I use the term "traditional" au pair to describe individuals who are not specifically designated as "premium" or "experienced" au pairs by the sponsoring agency.  In addition, I treat the terms "standard" au pairs and "traditional au pairs" interchangeably in this report.

3

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

PLAINTIFFS' RESP. APP.0001962

10.     The facts in the record that Dr. Kerr relies on for evidence of a common impact are (a) agreement templates produced by the Defendants, (b) a limited set of documents that contain reported stipend amounts, and (c) testimony by named Plaintiffs.  For the first category of evidence, Dr. Kerr summarizes in his Exhibit 8 the stipend information available in standard form agreements between au pairs and sponsor organizations.[8] However, Dr. Kerr's analysis of the agreements does not support his conclusion that au pairs received $195.75 per week class-wide.  A majority of the agreements summarized in his Exhibit 8 indicate that $195.75 is the *minimum* weekly stipend au pairs can receive, not the precise stipend amount au pairs must receive.  Other agreements do not even provide a number for the minimum stipend; listing no amount at all, they state only that the stipend paid needs to conform to program regulations.  Dr. Kerr concludes from a summary of host family agreement language cited in his Exhibit 10 that the agreements "show no variation in the stipend amount."[9]  However, Dr. Kerr ignores the fact that five out of 12 agreements only state that the host family will pay the au pair at least the minimum stipend.  In addition, two host family agreements in Dr. Kerr's Exhibit 10 only note that the weekly stipend paid to an au pair must comply with DOS regulations, without including any additional information on what the minimum amount is.  Taken in total, the evidence from the agreements presented by Dr. Kerr is consistent with Defendants informing host families and au pairs of the minimum stipend amount required by the DOS, not setting a specific stipend amount.  Therefore, the language used in these agreements is an insufficient basis to conclude that all au pairs received a similar stipend due to a common policy among the Defendants to set stipends to the DOS minimum.

11.     In addition, Dr. Kerr reviewed the InterExchange audit reports, but as Dr. Kerr himself states, these reports merely say that nearly all of the au pairs sponsored by InterExchange in 2012 and 2013 received *at least* $195.75.[10]  This is clearly not evidence that the Defendants had a policy to set a similar stipend nor that au pairs commonly received the DOS minimum stipend.

12.     For his second category of evidence, Dr. Kerr presents what he refers to as "surveys conducted by sponsors" and infers from these documents "that most standard au pairs were paid approximately $195.75 as the weekly stipend for au pairs employed from mid-2009 through today."[11]  Dr. Kerr has no basis to conclude from these documents that all or nearly all "standard" au pairs received a stipend amount of approximately $195.75 throughout the damages period.

13.     The only "survey" that Dr. Kerr cites to is in reality local childcare consultant ("LCC") documents produced by Cultural Care.  It is my understanding from Cultural Care that these documents are not comprehensive surveys administered at the request of Cultural

---

[8]   Kerr Initial Report, Exhibit 8.

[9]   Kerr Initial Report, Exhibit 10; Kerr Initial Report, ¶ 52.

[10]   Kerr Initial Report, ¶ 54.

[11]   Kerr Initial Report, ¶ 54.

4

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Care. Instead, these documents are anomalies in the protocol for reporting of monthly checks-ins with au pairs generated over a limited time period by certain of Cultural Care's LCCs.[12] I further understand that these records relate to only a small set out of the tens of thousands of au pairs who were sponsored by Cultural Care from mid-2009 through mid-2013. With such limited records on the stipends received by Cultural Care's sponsored au pairs, Dr. Kerr has insufficient evidence to conclude that most "standard" au pairs received approximately $195.75 in stipend. Indeed, to use a small set of non-comprehensive records from a single Defendant to "prove" the non-existence of an effect in all classes across all Six Defendants is unreasonable on the part of Dr. Kerr. More importantly, the limited documents cited by Dr. Kerr do not disprove the existence of variation in weekly stipends class-wide.

14. Contrary to Dr. Kerr's findings, class-wide variation in au pair weekly stipends is supported by the agreement data produced by Go Au Pair. I understand that Go Au Pair produced all au pair and host family agreements in its possession and that these agreements usually contain the agreed-upon stipend amounts and the host family's proposed weekly schedule for the au pair. In addition to the agreements, Go Au Pair produced a data set (the "Go Au Pair Data") containing the agreed upon stipends and the childcare hours per week proposed in the agreement schedules.[13] The Go Au Pair Data also identify whether the au pair was placed as a "standard" au pair or under one of Go Au Pair's "premium" au pair programs, which I understand is not written in the agreements.[14] The percent of stipend amounts over $200 for au pairs who were placed as a "standard" au pair are summarized in **Table 1**. Although the percent of stipend amounts over $200 varies from year to year, overall over 11 percent of the Go Au Pair agreements indicate the host family and au pair agreed to an amount over $200 per week.[15]

---

[12]  The documents, on their face, ask for "LCC Initials," not amounts of stipends or numbers of hours.

[13]  *See*, GAP_00035564_CONFIDENTIAL_AEO.xlsx.

[14]  "Go Au Pair offers two programs for au pairs with more experience: Au Pair Plus and Premiere Au Pair. Au Pairs participating in the Au Pair Plus program must have previous experience as an Au Pair in another country in addition to the basic Au Pair requirements for the Standard Au Pair program. In order to qualify for the Premiere program, au pairs must have a degree in a child care related field or at least 2 years of full-time child care experience. In addition, Premier au pairs must be at least 20 years old, have at least 6 months of driving experience, and strong English skills. Because of the additional experience, au pairs in the Plus and Premiere program receive higher weekly stipends than au pairs in the Standard program." *See,* Application: How to Apply now, Go Au Pair, available at http://www.goaupair.com/au-pairs/3-steps-to-become-an-au-pair/apply-now (accessed February 1, 2017); Significantly, au pairs with additional qualifications who are eligible to participate in the Plus and/or Premiere programs may elect to be placed as a traditional/"standard" au pair entitled to only the DOS minimum. *See,* GAP_00035564_CONFIDENTIAL_AEO.xlsx."

[15]  Based on my review of Expert Au Pair's agreements for "standard" au pairs, of the 884 agreements between 2010 and 2015 for which both hours worked and stipend amount were indicated, 71, or eight percent, proposed weekly stipend amounts of greater than $200. *See,* Expert Au Pair Contract Summary.

5

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

PLAINTIFFS' RESP. APP.0001964

**Table 1**

Count of Go Au Pair Agreements Indicating
Weekly Stipends Greater Than $200[16]

| Year | Total Count of Placements with Agreements Produced | Count of Au Pairs Contracted to Receive Weekly Stipend Greater than $200 | Au Pairs Contracted to Receive Weekly Stipend Greater than $200 as Percent of Total Count of Placements with Agreements Produced |
|---|---|---|---|
| | | | ------------(Percent)------------ |
| (a) | (b) | (c) | (d) |
| | | | (c)/(b) |
| 2010 | 340 | 35 | 10.29 % |
| 2011 | 532 | 44 | 8.27 |
| 2012 | 603 | 72 | 11.94 |
| 2013 | 658 | 92 | 13.98 |
| 2014 | 765 | 95 | 12.42 |
| 2015 | 252 | 24 | 9.52 |
| **Total:** | **3,150** | **362** | **11.49 %** |

Note: Data were limited to only "standard" au pairs identified using the field "Prog- Std AP Prog."

Source: GAP_00035564_CONFIDENTIAL_AEO.XLSX.

15.   Including the Go Au Pair agreements for both "standard" and "premium" au pairs, over 12
percent of the agreements indicate a stipend amount greater than $200, as shown in **Table
2** below.

---

[16]   Table includes data for au pairs who were placed in the "standard" au pair program.

6

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

PLAINTIFFS' RESP. APP.0001965

**Table 2**[17]
Count of Go Au Pair Agreements Indicating
Weekly Stipends Greater Than $200[18]

| Year | Total Count of Placements with Agreements Produced | Count of Au Pairs Contracted to Receive Weekly Stipend Greater than $200 | Au Pairs Contracted to Receive Weekly Stipend Greater than $200 as Percent of Total Count of Placements with Agreements Produced -----------(Percent)----------- |
|---|---|---|---|
| (a) | (b) | (c) | (d) |
| | | | (c)/(b) |
| 2010 | 347 | 40 | 11.53 % |
| 2011 | 541 | 51 | 9.43 |
| 2012 | 606 | 74 | 12.21 |
| 2013 | 669 | 98 | 14.65 |
| 2014 | 780 | 102 | 13.08 |
| 2015 | 256 | 26 | 10.16 |
| Total: | 3,199 | 391 | 12.22 % |

Source: GAP_00035564_CONFIDENTIAL_AEO.XLSX.

16.     Over half of the "standard" au pair agreements indicate that host families and au
pairs agreed to a stipend of $200 or more, as seen in **Table 3**.[19]

---

[17]    Stipend Hours Analysis, Go Au Pair, GAP_00033496-595 at 586-593.

[18]    Table includes data for "standard" as well as "premium" au pairs.

[19]    Based on my review of Expert Au Pair's agreements for "standard" au pairs, of the 884 agreements between 2010 and 2015 for which both hours worked and stipend amount were indicated, 438, or 50 percent, proposed weekly stipend amounts of $200 or greater.  *See,* Expert Au Pair Contract Summary.

7

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

PLAINTIFFS' RESP. APP.0001966

**Table 3**
Count of Go Au Pair Agreements Indicating
Weekly Stipends Greater Than or Equal to $200[20]

| Year | Total Count of Placements with Agreements Produced | Count of Au Pairs Contracted to Receive Weekly Stipend Greater Than or Equal to $200 | Au Pairs Contracted to Receive Weekly Stipend Greater than or Equal to $200 as Percent of Total Count of Placements with Agreements Produced -----------(Percent)----------- |
|---|---|---|---|
| (a) | (b) | (c) | (d) (c)/(b) |
| 2010 | 340 | 156 | 45.88 % |
| 2011 | 532 | 278 | 52.26 |
| 2012 | 603 | 334 | 55.39 |
| 2013 | 658 | 385 | 58.51 |
| 2014 | 765 | 447 | 58.43 |
| 2015 | 252 | 133 | 52.78 |
| Total, 2010-2015: | 3,150 | 1,733 | 55.02 % |

Note: Data were limited to only "standard" au pairs identified using the "Prog- Std AP Prog."

Source: GAP_00035564_CONFIDENTIAL_AEO_XLSX.

17. Moreover, 1,733, or 55 percent, of Go Au Pair's sponsored "standard" au pairs received a stipend higher than $195.75 per week, the amount Plaintiffs alleged was dictated by Defendants' policy.

18. Finally, the differences in the named Plaintiffs' stipends show that their host families agreed to give them a stipend that deviates from what the Plaintiffs allege is the Defendants' policy. Dr. Kerr includes these stipends as evidence for the alleged policy by simply asserting that the $200 stipend "appears to have been due to rounding the $195.75 weekly stipend."[21] However, he does not justify why rounding would be consistent with the alleged policy of paying au pairs exactly $195.75, nor does he say why this is not evidence in support of host families giving au pairs the stipend of their choosing.

**B.    Dr. Kerr Does Not Establish that Class Members Provided Similar Amounts of Childcare Assistance Per Week.**

19. In his initial report, Dr. Kerr states that "standard au pairs are expected to work 45 hours."[22] He also assumes 45 hours of childcare per week in all of his analyses and calculations.[23] Dr. Kerr's purported evidence, however, does not support his assertion

---

20    Table includes data for au pairs who were placed in the "standard" au pair program.

21    Kerr Initial Report, footnote 60.

22    Kerr Initial Report, Footnote 86.

23    *See for example,* Kerr Initial Report, Exhibits 18, 20, and 21.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

PLAINTIFFS' RESP. APP.0001967

that all – or even most – "standard" au pairs spent 45 hours per week providing childcare assistance. The closest Dr. Kerr comes to presenting evidence about the hours that au pairs provide childcare assistance is the purported evidence he cites in his Exhibit 7 to assert that au pairs receive "$195.75 per week for provision of 45 hours of childcare".[24] Dr. Kerr claims that his Exhibit 7 "summarizes marketing material including advertisements and web pages from Sponsors that contained representations about the amount of the stipend."[25] Only two entries out of 15 mention the number of hours used in the calculation of the $195.75 minimum stipend, and one of the two clearly states that the stipend is in return for *up to* 45 hours of childcare per week. These examples do not provide any information about the actual hours spent providing childcare per week by au pairs, because they only list the maximum hours that an au pair is permitted to provide childcare assistance per week pursuant to DOS regulations. Further, Dr. Kerr does not provide any explanation as to why he considers the information represented on marketing material of the sponsor organizations to be representative of the actual time spent providing childcare assistance by au pairs.

20. Agreements produced by Go Au Pair indicate that there is substantial variation among au pairs in the hours spent providing childcare assistance. I understand that in the Go Au Pair agreements, there is a form that allows host families to fill in a proposed schedule to give the au pair an expectation of what his or her schedule might be. While these schedules are simply a proposal, they suggest that host families anticipate needing varying amounts of childcare assistance, which may also reflect variation among au pairs in the actual childcare hours per week.[26] As shown below in **Table 4**, 1,127 of the 3,150 (or 35.8 percent) agreements produced include a proposed schedule indicating 40 hours or fewer spent assisting with childcare and 1,722 of the 3,150 (or 55 percent) agreements include a proposed schedule indicating fewer than 45 hours of childcare per week.[27]

---

[24]  Kerr Initial Report, ¶ 41.

[25]  Kerr Initial Report, ¶ 41.

[26]  I compared weekly childcare hours in the Go Au Pair schedules to the hours reported in the Cultural Care documents and found that the mean of the hours in the schedules is 40.9 hours per week, while the mean of the hours reported in the Cultural Care documents is 38.7 hours per week.

[27]  Based on my review of Expert Au Pair's agreements for traditional au pairs, of the 884 agreements between 2010 and 2015 for which both hours worked and stipend amount were indicated, 310, or 35 percent, proposed schedules of 40 hours per week or fewer and 468, or 53 percent, proposed schedules of fewer than 45 hours per week. *See,* Expert Au Pair Contract Summary.

9

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Table 4**

Share of Go Au Pair Agreements Indicating
Fewer than 45 Hours per Week in Proposed Schedule[28]

| Year | Total Count of Placements with Agreements Produced | Count of Au Pairs Proposed 40 Hours or Fewer per Week | Au Pairs Proposed 40 Hours or Fewer per Week as Percent of Total Count of Placements with Agreements Produced --------------(Percent)--------------- | Count of Au Pairs Proposed Fewer than 45 Hours per Week | Au Pairs Proposed Fewer than 45 Hours per Week as Percent of Total Count of Placements with Agreements Produced --------------(Percent)--------------- |
|---|---|---|---|---|---|
| (a) | (b) | (c) | (d) (c)/(b) | (e) | (f) (e)/(b) |
| 2010 | 339 | 122 | 35.99 % | 189 | 55.75 % |
| 2011 | 532 | 196 | 36.84 | 299 | 56.20 |
| 2012 | 603 | 202 | 33.50 | 312 | 51.74 |
| 2013 | 658 | 242 | 36.78 | 379 | 57.60 |
| 2014 | 765 | 301 | 39.35 | 442 | 57.78 |
| 2015 | 253 | 64 | 25.30 | 101 | 39.92 |
| Total: | 3,150 | 1,127 | 35.78 % | 1,722 | 54.67 % |

21.     **Figure 1** demonstrates that a majority of Go Au Pair host families expect their au pair to provide fewer than the 45 hours of childcare assistance per week that Dr. Kerr assumes to be common to the Relevant Classes.

---

[28]     Table includes data for au pairs who were placed in the "standard" au pair program.

10

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

PLAINTIFFS' RESP. APP.0001969

**Figure 1**
Childcare Hours per Week
Indicated by Go Au Pair Agreements[29]



22. Even the reported average childcare hours in Dr. Kerr's Exhibit 11 range from 30 to 45 per week. This represents a 50 percent range in hours even among the 12 au pairs for whom Dr. Kerr reported data. Variation is also reported in deposition testimony from named Plaintiffs. For example, as discussed in my initial report, I understand that testimony by the named Plaintiffs and a former named Plaintiff suggests that their childcare hours varied below 45 hours per week, both by au pair and by week. Former named Plaintiff Dayanna Paola Cardenas Caicedo reported that she worked over 40 hours some weeks but not all.[30] In addition, Laura Mejia-Jiminez produced a handwritten calendar of the hours she worked, including one week in which she worked 33 and a half hours.[31] Beaudette Deetlefs testified that she "usually worked only 2 or 3 days per week, but generally worked greater than 10 hours per day."[32]

---

[29]   Stipend Hours Analysis, Go Au Pair, GAP_00033496-595 at 586-593. Figure includes data for au pairs who were placed in the "standard" and "premium" au pair programs.

[30]   Declaration of Dayanna Paola Cardenas Caicedo, May 22, 2016, ¶ 14.

[31]   Deposition of Laura Meija-Jiminez, September 14, 2016, Volume I, 186:4-15. ("Q: It's got a calendar, I should say, for August 2014. A: Yes. Q: And there are a series of handwritten entries. Do you see that? A: Yes. Q: Whose writing is that? A: Mine. Q: Okay, You wrote all of those handwritten entries on the calendar for August 2014 that's part of this exhibit? A: Yes.") *See,* Email between Laura Mejia Jiminez and Lauren Louis and related attachments, September 13, 2016 (Exhibit 54 to the Deposition of Laura Meija-Jiminez, September 14, 2016, Volume I); Deposition of Laura Meija-Jiminez,

11

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

PLAINTIFFS' RESP. APP.0001970

23. Furthermore, the limited information available in Cultural Care's LCC documents, which were cited by Dr. Kerr, also suggests that there is variation in the number of hours provided by au pairs. As **Figure 2** below shows, for the 126 reported observations in the documents Dr. Kerr cites, average reported hours ranged from 22.5 per week to 45 per week. Moreover, the average reported hours for this limited sample is 38.7.

**Figure 2**

Variation in Reported Hours Per Week
Indicated by Cultural Care LCC Forms[33]



24. The above evidence of variation in au pairs' childcare hours per week also demonstrates that there is no basis to conclude that there was a common impact among class members of the Sub-216(b) Classes from Defendants' alleged failure to pay overtime for hours worked in excess of 40 in a week.[34] As seen in **Table 4** and **Figure 2** above, a third of the Go Au Pair schedules and over half of the average childcare hours per week reported

---

September 14, 2016, Volume I, 186:24-187:2. ("Q: And I note for the week ending September 27 of 2014, you indicate that you worked 33 and a half hours. Do you see that? A: Yes.")

[32] Declaration of Beaudette Deetlefs, July 18, 2016, ¶ 10.

[33] Data obtained from the sources listed in footnote 62 of Kerr Initial Report. *See,* CC00002868-69, 2933-35, 2941-44, 2958-59, 2971-74, 2982-85, 2992-93.

[34] Second Amended Complaint, ¶ 565.

12

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

PLAINTIFFS' RESP. APP.0001971

in Cultural Care's LCC documents indicate au pairs provided childcare 40 or fewer hours per week.[35]  I have not seen how Dr. Kerr will address the evidence against a common class-wide impact in the Sub-216(b) Classes.

## C.     Plaintiffs Have Not Established that Au Pairs Received Similar Stipends and/or Hourly Stipends that Violated Federal and State Labor Laws (if Those Laws Apply).

25.      Under Plaintiffs' approach, the amount of childcare provided by an au pair per week in combination with an au pair's stipend, once a room and board credit is applied, determines how much an au pair received per hour ("hourly stipend").  It is the hourly stipend that au pairs received that Plaintiffs allege was in violation of federal and state minimum wage laws.[36]  Even assuming the wage laws apply to the stipend, which I understand the Defendants dispute, Dr. Kerr's assumption that au pairs spend 45 hours per week assisting with childcare hides important individual differences among the class members' childcare hours per week that are critical in determining hourly stipends for each class and, therefore, whether there was common impact to each class from the alleged policy.  To demonstrate a common impact, Dr. Kerr must provide evidence that au pairs received similar hourly stipends class wide.  However, Dr. Kerr fails to address the variation in hourly stipends in his analyses of common impact.  Using the information that is available on au pairs' stipends and hours of childcare per week, I demonstrate that there is evidence of substantial variation in au pairs' hourly stipends. This variation suggests that there is no common impact class-wide from the alleged policy.

26.      From the information in the Go Au Pair agreements, I calculate the resulting hourly stipend from the agreed-upon stipend amount and proposed weekly childcare hours. **Figure 3** presents the resulting hourly stipends calculated from the Go Au Pair agreements for "standard" au pairs.  Hourly stipends, once a room and board credit is applied, range from $4.35 per hour to over $15 per hour, a variation of over 300% that spans all states' minimum wages.  Moreover, 78% of the hourly stipends calculated from the Go Au Pair agreements were over the $4.35 per hour that Plaintiffs allege the class received per hour.[37]  The Go Au Pair agreements also show 166 "standard" au pairs have an inferred hourly stipend of over $7.25 per hour.[38]

---

[35]   As noted above, this is consistent with my analysis of Expert Au Pair's agreements for "standard" au pairs, which indicate that 35 percent of agreements proposed schedules of 40 hours per week or fewer.

[36]   Plaintiffs Motion for Conditional Collective Action Certification, p. 1.  ("The FLSA Defendants have uniformly determined that *au pairs* shall be paid $195.75 per week for up to 45 hours of work.  In so mandating, the FLSA Defendants have a policy of paying the FLSA Plaintiffs less than the federal minimum wage, not to mention the laws of many states.")

[37]   Second Amended Complaint, ¶ 1.  Dr. Kerr also assumes that au pairs received $4.35 per hour.  *See,* Kerr Initial Report, ¶ 72.

[38]   Based on my review of Expert Au Pair's agreements for "standard" au pairs, of the 884 agreements between 2010 and 2015 for which both hours worked and stipend amount were indicated, 688, or 78 percent, were contracted to receive hours-adjusted stipends of over $4.35 per hour, and 31, or four percent, were contracted to receive hours-adjusted stipends that exceed $7.25 per hour.  In the same set of agreements, the hours-adjusted stipends ranged from $3.23 per hour to $53.42 per hour.  *See* Expert Au Pair Contract Summary.

13

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Figure 3**
Range of Hourly Stipends Indicated by Go Au Pair Agreements[39]



27. **Figure 4** below demonstrates the variation in the hourly stipends received by "standard" au pairs, based on the reported weekly stipends and childcare hours that Dr. Kerr relies upon in his report.[40] The range of the hourly stipends received by au pairs varies from $4.35 per hour to over $7.25 per hour, and this is when one does not take into account the value of room and board, or any other benefits, received by the au pair. All but 10 of the hourly stipends calculated using Dr. Kerr's example (92 percent) were over $4.35 per hour that named Plaintiffs allege the class received.[41] In addition, ten of the hourly stipends, 8 percent of the limited sample, were reported to be above $7.25 an hour.

---

[39] Data were limited to only "standard" au pairs identified using the field "Prog- Std AP Prog". Hourly Stipends were calculated by dividing Weekly Stipend Received by Weekly Hours Worked. Au pairs without Weekly Stipend Received or Weekly Hours Worked information listed were excluded from the dataset. *See*, GAP_00035564_CONFIDENTIAL_AEO.XLSX.

[40] Kerr Initial Report, FN 62.

[41] Second Amended Complaint, ¶ 1. Dr. Kerr also assumes that au pairs received $4.35 per hour. *See,* Kerr Initial Report, ¶ 72; Kerr Initial Report, FN 62.

14

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

PLAINTIFFS' RESP. APP.0001973

**Figure 4**
Range of Hourly Stipends Indicated by
Limited Set of Cultural Care LCC Forms[42]



28. **Figure 5** presents the hourly stipends received by the same "standard" au pairs considered in **Figure 4**; however, these hourly stipends include the value of the room and board credit. It is my understanding that the Court has not determined whether the deductions for room and board are illegal, as they are currently applied, despite Dr. Kerr's assumptions to the contrary.[43] As seen in **Figure 5**, when including the value of the room and board credit in the amount of weekly stipend earned by au pairs, the range of hourly stipends varies from $7.25 to $13.26 or above.[44]

---

[42]  Data were selected according to the sources listed in footnote 62 of the Expert Report of William O. Kerr. Hourly Stipends were calculated by dividing Weekly Stipend Received by Weekly Hours Worked. Any time a range of Weekly Hours Worked was provided for a given au pair, the Hourly Stipend was determined by finding the midpoint between the minimum and maximum hourly stipend. Au pairs without Weekly Stipend Received or Weekly Hours Worked were excluded from the dataset. Illegible entries in the source data were excluded as well. *See,* CC00002868-69, 2933-35, 2941-44, 2958-59, 2971-74, 2982-85, 2992-93.

[43]  Dr. Kerr assumes that the room and board deduction is illegal, but that assumption is contrary to guidance provided by the DOS and has yet to be decided as a matter of law in this case. He points to the Recommendation of United State Magistrate Judge, February 22, 2016, p. 24 for his assumption, but p. 26 of the same order states: "It may well be ultimately resolved that an exception exists for the au pair program that allows credit of room and board against an au pair's compensation."

[44]  Based on my review of Expert Au Pair's agreements for "standard" au pairs, of the 884 agreements between 2010 and 2015 for which both hours worked and stipend amount were indicated, the hours-adjusted stipends, including the value of the room and board credit, ranged from $5.38 per hour to $89.03 per hour. *See,* Expert Au Pair Contract Summary.

15

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

PLAINTIFFS' RESP. APP.0001974

**Figure 5**
Range of Hourly Stipends Indicated by
Limited Set of Cultural Care LCC Forms Including Room and Board Credit[45]



29.   Dr. Kerr fails to address variations in au pairs' stipends, childcare hours, or hourly stipends.  In light of the insufficient evidence for a common policy or a common class-wide impact, Dr. Kerr has not established that the Relevant Classes should be certified.

**D.    Dr. Kerr Does Not Establish that All Au Pairs in the Relevant Classes Were Recruited and Hired for Identical Positions or Performed Similar Duties.**

30.   In his summary of opinions, Dr. Kerr makes several unproven claims in an attempt to support his conclusion au pairs received similar stipend amounts for the same amount of childcare hours per week.[46]   In particular, Dr. Kerr claims that the duties of all au pairs were "virtually the same" and that au pairs held "identical positions," due to the language in au pair contracts and the DOS regulations.[47]   Dr. Kerr does not adequately explain how

---

[45]   Data were selected according to the sources listed in footnote 62 of the Expert Report of William O. Kerr.  Hourly Stipends were calculated by dividing Weekly Stipend Received by Weekly Hours Worked, and then dividing by 0.6 (to exclude the room and board deduction).  Any time a range of Weekly Hours Worked was provided for a given au pair, the Hourly Stipend was determined by finding the midpoint between the minimum and maximum. Au pairs without Weekly Stipend Received or Weekly Hours Worked listed were excluded from the dataset.  Illegible entries in the source data were excluded as well.  *See*, CC00002868-69, 2933-35, 2941-44, 2958-59, 2971-74, 2982-85, 2992-93.

[46]   Kerr Initial Report, ¶ 8. ("[Au pairs] were recruited for identical positions and treated as viable substitutes for each other in the recruitment and hiring process. When retained they worked and were compensated under very similar if not identical terms. Their duties as spelled out in the contracts and regulations were virtually the same across the class members.")

[47]   Kerr Initial Report, ¶ 8.

16

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

PLAINTIFFS' RESP. APP.0001975

he came to his conclusion that au pairs actually have identical positions. It is possible that insomuch as they are all called an "au pair" and with his own unfounded assertions that the au pairs have the same duties, Dr. Kerr may have concluded that he has proven that they all held identical positions. However, Dr. Kerr has provided insufficient evidence for such a conclusion.

31.     In fact, the au pair duties described in the contracts and regulations simply outline in high-level terms what are the appropriate activities for au pairs and the maximum amount of time an au pair can perform those duties – for example, to take care of children, to perform light housekeeping chores, and to provide no greater than 45 hours of childcare in a week.[48] The provisions in the contracts and regulations provide host families with flexibility to negotiate with their au pair the more specific tasks that would constitute taking care of children or performing light housekeeping chores, based on their family's needs. For instance, for one family, "taking care of children" could be driving older children to and from school and extracurricular events, whereas for another family, it is caring for a toddler at home. This example presents very different duties that both conform to the language in the contracts and the regulations. Dr. Kerr fails to explain why he expects every host family to have the same childcare needs or why host families would be constrained to requesting the same childcare duties from their au pairs class-wide.

32.     Dr. Kerr also ignores the fact that the actual duties of an au pair may be determined, at least in part, by the experiences and skillset of the au pair. This is supported by testimony from named Plaintiffs. For example, named Plaintiff Ivette Gonzalez testified that she was unable to match with a host family as she did not possess a U.S. driver's license.[49] This suggests that for at least some host families, an au pair with a U.S. driver's license is more desirable than an au pair without a U.S. driver's license. Moreover, named Plaintiff Johana Beltran testified that she was chosen by her host family, in part, because one of the host family's children was studying Spanish and needed help with homework.[50] Dr. Kerr does not explain why it would be reasonable to expect the duties of an au pair who did not possess Spanish language skills to be the same as those of named Plaintiff Johana Beltran.

33.     Testimony from named Plaintiffs indicates that au pairs have varying degrees of experience and skills. For example, before applying to the au pair program in the U.S., named Plaintiff Johana Beltran's childcare experience was limited to watching her

---

[48]    See for example, 2015 Au Pair Agreement, AuPairCare, APC000287-292 at 288.

[49]    Deposition of Ivette Alexandra Gonzalez, September 28, 2016, 152:3 – 153:14, 154:13 – 19. ("Q. So after you left the Sanders' house, did you try to rematch with another family? A. Yes, ma'am. Q. And what happened? A. The majority of them wouldn't accept me because I didn't have a driver's license. Q. Well, you had an international driver's license, right? A.Yes, ma'am. Q. And you had taken the driving class in Maryland? A. Yes, ma'am. Q. So what was it that you were missing that they wanted? A. The driver's license from here in the U.S. Q. Did anyone else -- any other host family express interest in you, but you decided it wasn't a good opportunity? A. No. For example, the family in Miami I thought they were great. But because I didn't have a driver's license, no, no, they didn't accept me, no.")

[50]    Deposition of Johana Paola Beltran, August 20, 2016 ("Beltran Deposition"), 95:1-9.

17

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

PLAINTIFFS' RESP. APP.0001976

nephews.[51]  By contrast, when named Plaintiff Juliane Harning first came to the U.S. as an au pair, she had experience volunteering at a preschool.[52]  When she returned to the U.S. Au Pair Program, she had approximately two years of direct experience living with families and caring for their children.[53]  Moreover, au pairs can also have varying levels of proficiency in reading and understanding English.  For example, while named Plaintiff Laura Jiminez did not feel comfortable speaking English, named Plaintiff Juliane Harning was fluent.[54]  If the experience level and the type of skills an au pair has determine the level of responsibility and tasks that an au pair can help with for his or her host family, I would expect to see the duties of au pairs to vary with their qualifications.[55]

34.    Despite evidence of variation in the types of tasks and responsibilities that au pairs perform for host families, Dr. Kerr relies on vague language in contracts and DOS regulations without taking into account that the actual duties of au pairs may be influenced by the differing skills and experiences they have as well as the differing childcare needs of host families.

### E.    Dr. Kerr Contradicts Plaintiffs' Allegation That There Is A Common Impact In Classes That Contain both "Standard" and "Premium" Au Pairs

35.    Throughout his initial report, Dr. Kerr disregards the fact that the Second Amended Complaint includes so-called "premium" au pairs in the Relevant Classes.[56]  Moreover, he provides evidence against the existence of a common impact from the alleged policy within a class containing both "premium" and "standard" au pairs.

36.    Dr. Kerr states that he has "not seen evidence of collusion with regard to stipends for "premium" au pairs (nor has collusion been alleged)."[57]  As Dr. Kerr describes in his report, the "premium" au pairs are expected to receive a minimum stipend that is over $200 per week.[58]  Dr. Kerr also asserts that "weekly stipends for "premium" au pairs are achieved through a more competitive process than weekly stipends for standard au pairs."[59]  Dr. Kerr's own statements suggest that "premium" and "standard" au pairs did

---

[51]    Beltran Deposition, 52:9 - 11.

[52]    Deposition of Juliane Harning, September 8, 2016 ("Harning Deposition"), 78: 8 – 9, 79:4 – 14.

[53]    Harning Deposition, 80:5 – 16, 82:9-15, 84:22 – 23.

[54]    Jiminez Deposition, 13:25-14:2; Harning Deposition, 12:24-13:6.

[55]    Au Pairs participating in one of the "Premium" programs differentiate themselves from "standard" au pairs based on their higher qualifications.  Dr. Kerr does not explain why "premium" au pairs should be assumed to have the same duties as those of the "standard" au pairs in the Au Pair in America and Go Au Pair classes.

[56]    Second Amended Complain, ¶¶ 551 – 564.

[57]    Kerr Initial Report, ¶ 70.

[58]    Kerr Initial Report, ¶¶ 67- 69.

[59]    Kerr Initial Report, ¶70.

18

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

PLAINTIFFS' RESP. APP.0001977

not have a similar impact from the alleged policy to set au pair stipends at $195.75.[60] Thus, Dr. Kerr establishes evidence against certification for the classes that contain "premium" au pairs, specifically the Wage Classes, 216(b) Classes, and Sub-216(b) Classes of Defendants Au Pair in America and Go Au Pair, the two Defendants that sponsor "premium" au pairs.

## III. DR. KERR DOES NOT ESTABLISH THAT HIS PROPOSED DAMAGE MODEL WOULD PROVIDE A COMMON METHOD FOR CALCULATING DAMAGES CLASS-WIDE[61]

### A. Overview of Dr. Kerr's Wage and Hour Law Compliance Model

37.   Dr. Kerr presents two models for calculating damages that he refers to as the Wage and Hour Law Compliance Model ("WHLC Model") and the Price Competition Model.[62]  Dr. Kerr puts forward the WHLC Model to calculate class-wide damages for the Relevant Classes based on the Plaintiffs' claims that the Defendants set au pairs' stipends to $195.75 in violation of federal and state labor laws.[63]  With his WHLC model, Dr. Kerr proposes to (a) calculate each class member's minimum stipend but for the Defendants' alleged policy of paying au pairs the DOS minimum stipend and (b) measure the damages owed to each member of the Relevant Classes by deducting the class member's actual stipend amount.

38.   After presenting two examples of individual au pair's hypothetical damages using his WHLC model, he concludes that this is "a workable model" that is "formulaic in nature, common for all members of the class, and based on common proof."[64]  Indeed, Dr. Kerr claims that "[c]omputing damages for individual class members will require specific calculations when information becomes available on such things as location of employment, number of weeks employed, divergence from the standard stipend and any adjustments of work hours" and that "the model will easily accommodate such calculations for individual members of the class."[65]

39.   As I will show, Dr. Kerr's conclusion is founded on three assumptions, all of which Defendants contest:

---

[60]   Kerr Initial Report, ¶ 70; "The FLSA Defendants have uniformly determined that *au pairs* shall be paid $195.75 per week for up to 45 hours of work.  In so mandating, the FLSA Defendants have a policy of paying the FLSA Plaintiffs less than the federal minimum wage, not to mention the laws of many states."  *See,* Plaintiffs Motion for Conditional Collective Action Certification, p. 1

[61]   Some of the information provided in Section III is also in the Expert Rebuttal Report of Lauren J Stiroh, February 3, 2017.

[62]   Kerr Initial Report, ¶ 88.  I do not address the Price Competition Model, because it appears that Dr. Kerr uses this model to address the antitrust claims and not the wage claims.

[63]   Kerr Initial Report, ¶ 91.

[64]   Kerr Initial Report, ¶ 98.

[65]   Kerr Initial Report, ¶ 90.

19

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

- Dr. Kerr assumes that he will have the data necessary to calculate damages for all class members.

- Dr. Kerr assumes that all class members would match with a host family in the but-for world.

- Dr. Kerr assumes that the Court will agree with Plaintiffs on all of the following legal questions:

  - State and Local minimum wages are applicable to au pairs.[66]

  - Room and Board deductions for au pairs are illegal.[67]

  - Au Pairs are eligible to receive overtime.[68]

40.     In addition to relying on these contested assumptions, Dr. Kerr's analysis fails because he has not shown he can accurately calculate damages class-wide under the various scenarios related to the applicable labor laws using his or any other common methodology.[69]   In the following section, I will demonstrate the existence of significant variation in possible class member damages that Dr. Kerr's WHLC model cannot calculate accurately for the members of each of the Relevant Classes.

**B.     Dr. Kerr Fails to Establish that He Can Accurately Calculate Damages Class-wide Using His Wage and Hour Law Compliance Model**

*a.     Dr. Kerr Does Not Prove That He Has the Information Necessary to Calculate Damages Class-wide Using His Wage and Hour Law Compliance Model*

41.     In his examples, Dr. Kerr simply assumes that the au pairs received the minimum stipend and performed 45 hours of childcare per week.[70]   As I demonstrated in the prior section, Dr. Kerr has no basis for these assumptions.  Assuming – unrealistically, but for the sake of argument – that all class members would not only match with a host family in the but-for world, but would match with the exact same host family, in order to accurately assess damages for individual class members with his WHLC model, Dr. Kerr must have accurate information (whether data or reliable estimates) on the actual stipends received, the value of benefits provided by the host family, and the hours of childcare assistance performed per week by each au pair.

---

[66]   Kerr Initial Report, ¶ 95c.

[67]   Kerr Initial Report, ¶ 95a.

[68]   Kerr Initial Report, ¶ 95b.

[69]   As I mentioned in Section II, contrary to what Dr. Kerr assumes, the Court has yet to decide whether au pairs are eligible under state or local minimum wage laws and federal overtime rules, as well as whether room and board deductions for au pairs is legal. *See* Kerr Initial Report, ¶¶ 93 and 95 b-c.

[70]   Kerr Initial Report, Exhibit 18.

20

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

PLAINTIFFS' RESP. APP.0001979

42.     First, to calculate but-for minimum stipends, Dr. Kerr must have accurate information on
au pairs' childcare hours per week.  Under Plaintiffs' approach, given an assumed wage
rate, the hours of childcare provided determine the total amount an au pair should receive
for regular time.  Moreover, the hours of childcare provided by au pairs also determine
whether overtime is applicable, depending on whether the Court decides that the FLSA
overtime rule applies for au pairs.  Therefore, information on au pairs' hours of childcare
is a fundamental component to accurately calculate but-for stipends and, ultimately,
measure damages.  As I discussed in **Section II**, this information is not available class-
wide and, further, for the limited information that does exist on the actual childcare hours
provided per week by au pairs, there is substantial variation in the reported childcare
hours per week.

43.     Second, to accurately calculate damages, Dr. Kerr must deduct from the but-for stipend
the actual amount of the stipend and the value of benefits that the au pair received from
his or her host family.  As discussed in **Section II**, information on actual stipends is not
available on a class-wide basis from the Defendants, although some Defendants have
information on the stipends that au pairs were contracted to receive.  As shown above in
**Table 1**, 11.5 percent of Go Au Pair's agreements report that au pairs and host families
agreed to weekly stipends of over $200.[71]  Thus, Go Au Pair's contracted stipends
suggest a non-trivial number of Defendants' sponsored "standard" au pairs could have
agreed with their host families to a stipend over $200 per week.

44.     In addition, Dr. Kerr does not acknowledge that au pairs received additional benefits
from their host families.  As I explained in my initial report, to properly determine actual
compensation, Dr. Kerr would need to include the value of benefits received.  Named
Plaintiff testimony indicates that the value of benefits received can be a substantial
percentage of an au pair's total compensation.  For example, named Plaintiff Nicole
Mapledoram received gifts and bonuses from her host family of approximately $871 in
2015, including a $300 cash bonus at Christmas, tickets to professional sports events
valued at $390, and additional gifts in such forms as clothing and gift certificates.[72]  Ms.
Mapledoram also received gifts and bonuses from her host family of approximately $276
in 2016.[73]  Moreover, in both 2015 and 2016, Mr. Mapledoram received payments from
her host family for her auto insurance coverage amounting to $803 in 2015 and $110 in
2016.[74]  Other named Plaintiffs also testified that they received benefits of value from
their host families, including clothing, gift cards, and E-readers, among others.[75]  If host

---

[71]     As noted above, this is consistent with my analysis of Expert Au Pair's agreements for "standard" au pairs, which indicate that
8 percent of agreements report proposed weekly stipend amounts of greater than $200.

[72]     *See,* MK000327-29 at 28 and 29.

[73]     *See,* MK000327-29 at 28 and 29.  This amount represents the value of gifts and bonuses through May 2016, just after Ms.
Mapledoram's au pair contract expired.  Deposition of Melanie Farrah Kellof, January 30, 2017, 25:8-12 (rough transcript).

[74]     See, MK000327-29 at 28 and 29.  Deposition of Melanie Farrah Kellof, January 30, 2017, 56:14-57:14 (rough transcript).

[75]     Deposition of Lusapho Hlatshaneni, September 7, 2016, 120:7-24. ("Q: Did Mr. or Mrs. Prime every buy you any gifts? A:
Yes. Q: What gifts did they purchase for you? A: I don't remember all the gifts that they bought for me, but I do remember a
few Christmas gifts. Q: What comes to mind? A: A Kindle, an E-reader, a cooking book, some fridge magnets, a watch,
watch set. Q: Did you say 'watch'? A: A watch set, yes. Q: What kind of a watch set was it? A: It was just a small, little

21

families were to cut back on the benefits they provide to their au pairs in the face of a
regulated stipend increase, Dr. Kerr would need to offset his estimated damages amount
to account for that. However, Dr. Kerr has provided no class-wide method for
determining the value of benefits given to au pairs. In fact, I understand that there is no
class-wide, comprehensive dataset available that would allow Dr. Kerr to do this. It
would be necessary for Dr. Kerr to engage in individualized inquiry to determine the
value of these benefits. By ignoring the benefits of value au pairs received from their
host families, Dr. Kerr's WHLC model would provide a litigation windfall to members of
the Relevant Classes, assuming that host families would have cut back on benefits in
response to a higher minimum stipend.

b.    *Examples Demonstrating How Dr. Kerr Will Incorrectly Calculate Damages Using His
Wage and Hour Law Compliance Model*

45.   In **Section II**, I demonstrated support for the existence of substantial variation in the
hourly stipends across au pairs. Moreover, variation in the hourly stipends also indicates
variation in impact. For illustration, I compared when the hourly stipends in one scenario
to $7.25, a single benchmark amount for the required minimum wage in the but-for world.
For instance, in **Figures 3** and **4**, the Go Au Pair data and the limited Cultural Care
records, respectively, indicate a basis to assume that there is a wide variance in au pairs'
hourly stipends such that some exceeded $7.25 an hour. These examples show that
without the au pairs' underlying stipend and hours of childcare, Dr. Kerr would not be
able to accurately calculate individual class members' hourly stipend amounts to identify
impact, and by logical extension, he would not be able to calculate injury.

46.   As further demonstration that Dr. Kerr has not established that his WHLC model is a
common method of proof, I apply his model, for the sake of argument, to the reported au
pair information in his Exhibit 11 and alternative assumptions about which federal and
state labor laws will be determined to be relevant for the au pairs. Alternative scenarios
without all of Dr. Kerr's legal assumptions demonstrate that injury can vary widely. In
**Table 4** below, I show that under the assumption that the deduction for room and board is
legal, over half of the au pairs for which Dr. Kerr presents hour and stipend information
in Exhibit 11 are uninjured.

---

watch with changeable belts and a wallet. Q: Anything else that comes to mind other than what you've testified to? A: A gift
card or two."); Deposition of Ivette Alexandra Gonzalez, September 28, 2016, 138:25-139:7. ("Q: Did the Sanders ever give
you any gifts? A: Yes, ma'am. Q: What did they give you? A: Mr. Sanders, when I initiated the program, he was really
happy as of how I worked with the girl. And he gave me $100 to give to my family back in Colombia. Mrs. Sanders gave me
some clothing, like sports, on my birthday.").

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

PLAINTIFFS' RESP. APP.0001981

**Table 4**[76]

Variation in Injury Under Dr. Kerr's WHLC Model
Assuming Room & Board Credit is Included and Overtime is Applicable

| Name of Au Pair[1] | Weekly Stipend Received[1] | Total Value of Weekly Stipend[2] | Reported Hours per Week[3] | But-For Weekly Stipend using Dr. Kerr's WHLC Model[4] | Alleged Underpayment using Dr. Kerr's WHLC Model | Impact Under Dr. Kerr's WHLC Model |
|---|---|---|---|---|---|---|
| (a) | (b) | (c) | (d) | (e) | (f) | (g) |
| | ----(Dollars)---- | | | ----(Dollars)---- | | |
| | | (b)/0.6 | | | (e) - (c) | |
| Caitlin Maree Webb | $ 195.75 | $ 326.25 | 45.00 | $ 344.38 | $ 18.13 | Yes |
| Carolina Salgueiro | 200.00 | 333.33 | 30.00 | 217.50 | (115.83) | No |
| Christy Jai Forrest | 195.75 | 326.25 | 45.00 | 344.38 | 18.13 | Yes |
| David Alvarez Tabares | 200.00 | 333.33 | 37.50 | 271.88 | (61.46) | No |
| Gabriela Leocadio Borges de Sousa | 195.75 | 326.25 | 30.00 | 217.50 | (108.75) | No |
| Jimmy Sven Bertil Nyberg | 200.00 | 333.33 | 35.00 | 253.75 | (79.58) | No |
| Katarzyna Aleksandra Modlinska | 197.75 | 329.58 | 35.00 | 253.75 | (75.83) | No |
| Lasse Oskari Eyring | 198.00 | 330.00 | 35.00 | 253.75 | (76.25) | No |
| Lisa Giesel | 200.00 | 333.33 | 45.00 | 344.38 | 11.04 | Yes |
| Marilia Das Neves Reis | 200.00 | 333.33 | 45.00 | 344.38 | 11.04 | Yes |
| Nicole Schweizer | 200.00 | 333.33 | 45.00 | 344.38 | 11.04 | Yes |
| Ludmila Goncalves | 200.00 | 333.33 | 30.00 | 217.50 | (115.83) | No |

47.    In **Table 5** below, I show that if I additionally assume that au pairs are not eligible for
overtime wages, no au pairs in Exhibit 11 would be injured according to Dr. Kerr's
WHLC Model.

---

[76]    (1) Example adapted from Dr. Kerr's Exhibit 11; (2) Figures represent the total value of an au pair's weekly stipend
including the room and board credit; (3) Equals the average (midpoint) of hours that au pairs provided childcare assistance
per week if an au pair reported a range of hours per week; (4) But-for weekly stipend under Dr. Kerr's WHLC Model is
calculated by applying the hourly wage of $7.25 per hour to the first 40 hours of childcare assistance, and time-and-one-half
hourly wage to all hours above 40 hours. All examples noted above are from a Host Family Monthly Contract Report for
August 2013 in New Jersey, where the minimum wage was $7.25 per hour in 2013. *See,* Kerr Initial Report, Exhibit 11;
Notice Federal Minimum Wage Increase, Department of State, June 14, 2007; New Jersey Minimum Wage 2016, available
at http://www.minimum-wage.org/states.asp?state=New%20Jersey (accessed January 28, 2017).

23

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Table 5**[77]

Variation in Injury Under Dr. Kerr's WHLC Model

Assuming Room & Board Credit is Legal and Overtime Does Not Apply

| Name of Au Pair[1] | Weekly Stipend Received[2] | Total Value of Weekly Stipend[2] | Reported Hours per Week[3] | But-For Weekly Stipend using Dr. Kerr's WHLC Model[4] | Alleged Underpayment using Dr. Kerr's WHLC Model | Impact Under Dr. Kerr's WHLC Model |
|---|---|---|---|---|---|---|
| | ------(Dollars)------ | | | ------(Dollars)------ | | |
| (a) | (b) | (c) (b)/0.6 | (d) | (e) | (f) (e) - (c) | (g) |
| Caitlin Maree Webb | $ 195.75 | $ 326.25 | 45.00 | $ 326.25 | $ 0.00 | No |
| Carolina Salgueiro | 200.00 | 333.33 | 30.00 | 217.50 | (115.83) | No |
| Christy Jai Forrest | 195.75 | 326.25 | 45.00 | 326.25 | 0.00 | No |
| David Alvarez Tabares | 200.00 | 333.33 | 37.50 | 271.88 | (61.46) | No |
| Gabriela Leocadio Borges de Sousa | 195.75 | 326.25 | 30.00 | 217.50 | (108.75) | No |
| Jimmy Sven Bertil Nyberg | 200.00 | 333.33 | 35.00 | 253.75 | (79.58) | No |
| Katarzyna Aleksandra Modlinska | 197.75 | 329.58 | 35.00 | 253.75 | (75.83) | No |
| Lasse Oskari Eyring | 198.00 | 330.00 | 35.00 | 253.75 | (76.25) | No |
| Lisa Giesel | 200.00 | 333.33 | 45.00 | 326.25 | (7.08) | No |
| Marilia Das Neves Reis | 200.00 | 333.33 | 45.00 | 326.25 | (7.08) | No |
| Nicole Schweizer | 200.00 | 333.33 | 45.00 | 326.25 | (7.08) | No |
| Ludmila Goncalves | 200.00 | 333.33 | 30.00 | 217.50 | (115.83) | No |

48.    **Tables 4** and **5** present examples of the various damage amounts that Dr. Kerr's model would fail to calculate accurately given the limited information that I understand to be available to him class wide.[78]  If, instead, Dr. Kerr intends to estimate the missing class-wide information on actual stipends, value of benefits, and hours of childcare, he has not made that clear, nor has he proposed a method for doing so.  Dr. Kerr has failed to demonstrate a common method for accurately calculating damages for all members of the Relevant Classes.

## C.    Dr. Kerr Does Not Establish that All Class Members Would Benefit if the Stipend Were Higher in the But-for World

49.    Finally, Dr. Kerr's scenarios incorrectly assume that all the class members would match with a host family in the but-for world.  This is an unsupported assumption made by Dr. Kerr.  As Dr. Stiroh demonstrated in her initial report, which I incorporated by reference in my own initial report, if there is an excess supply of au pairs at the actual stipends that were received, then a further increase in stipends would exacerbate the excess supply.[79]

---

[77]    (1) Example adapted from Dr. Kerr's Exhibit 11; (2) Figures represent the total value of an au pair's weekly stipend including the room and board credit; (3) Equals the average (midpoint) of hours that au pairs provided childcare assistance per week if an au pair reported a range of hours per week; (4) But-for weekly stipend under Dr. Kerr's WHLC Model is calculated by applying the hourly wage of $7.25 per hour to the hours of childcare assistance per week. All examples noted above are from a Host Family Monthly Contact Report for August 2013 in New Jersey, where the minimum wage was $7.25 per hour in 2013.  *See*, Dr. Kerr's Exhibit 11; Notice Federal Minimum Wage Increase, Department of State, June 14, 2007; New Jersey Minimum Wage 2016, 2017 available at http://www.minimum-wage.org/states.asp?state=New%20Jersey (accessed January 28, 2017).

[78]    The examples in Tables 4 and 5 also do not account for the value of benefits that the au pairs received from their host families, which should be deducted as mitigation from the total damages across all weeks that each au pair was in the program.  The value of benefits adds another layer of uncertainty about how Dr. Kerr would commonly apply his model to the class.

[79]    Newlon Initial Report, ¶ 18 v.

24

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

PLAINTIFFS' RESP. APP.0001983

This would lead to fewer host families (and therefore au pairs) participating in the program and may potentially lead to a more experienced set of au pairs entering the program. As a result, many proposed class members might not be able to participate in the program in the but-for world. Thus, if the required stipend had been significantly higher, many of the au pairs would have lost the opportunity to come to the United States on the J-1 exchange visitor program.

50. Tammy Gold states that in her experience as a childcare expert, the families that reject a nanny in favor of an au pair tend to be relatively cost conscious.[80] Dr. Kerr does not explain why cost conscious host families would have continued to participate in the au pair program in the but-for world if the required weekly stipend would have been as high as he proposes. Instead, Dr. Kerr assumes that host families would have behaved exactly the same in the but-for world, hiring the exact same au pairs but at higher prices. Such an assumption is in contradiction to well-established tenants of economics, specifically: economic substitution and downward sloping demand. By advancing his arguments as though these market forces would not exist in his but-for world without even a mention of supply-and-demand in his entire report, Dr. Kerr fails to provide reasonable economic evidence in support of his arguments for class certification.

Signed this 3rd day of February, 2017:

Elizabeth H. Newlon

---

[80] Expert Report of Tammy Gold, January 13, 2017 ¶ 11.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

PLAINTIFFS' RESP. APP.0001984

Exhibit 1

## Additional Materials Considered by Elizabeth H. Newlon, Ph.D

**Court Filings**

*Johana Paola Beltran, et al.; and those similarly situated, Plaintiffs, v. InterExchange, Inc., et al., Defendants*, United States District Court For the District of Colorado, Case No. 14-cv-03074:

Recommendation of United States Magistrate Judge, February 22, 2016

Declaration of Dayanna Paola Cardenas Caicedo, May 22, 2016

Declaration of Beaudette Deetlefs, July 18, 2016

Plaintiffs' Motion for Conditional Collective Action Certification and Incorporated Memorandum of Law, July 25, 2016

Second Amended Complaint, October 17, 2016

**Expert Reports**

Expert Report of William O. Kerr, January 13, 2017 and accompanying backup

Expert Report of Elizabeth H. Newlon, Ph.D., January 13, 2017 and accompanying backup

Expert Report of Lauren J. Stiroh, Ph.D., January 13, 2017 and accompanying backup

**Depositions**

Deposition of Johana Paola Beltran, August 30, 2016 and accompanying exhibits

Deposition of Ivette Alexandra Gonzalez, September 28, 2016 and accompanying exhibits

Deposition of Juliane Harning, September 8, 2016 and accompanying exhibits

Deposition of Lusapho Hlatshaneni, September 7, 2016 and accompanying exhibits

Deposition of Laura Mejia-Jiminez, September 14, 2016 and accompanying exhibits

Rough Deposition of Melanie Farrah Kellof, January 30, 2017

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Exhibit 1

## Bates Stamped Documents

| | |
|---|---|
| APC000287 – 292 | CC00002971 – 74 |
| CC00002868 – 69 | CC00002982 – 85 |
| CC00002882 – 87 | CC00002992 – 93 |
| CC00002933 – 35 | GAP00033496 – 595 |
| CC00002941 – 44 | MK000327 – 29 |
| CC00002958 – 59 | |

## Data

Expert AuPair Contracts Summary

GAP_00035564_CONFIDENTIAL_AEO.XLSX

## Publicly Available Information

"How to Apply to be an AuPair," *Go AUPair*, available at http://www.goaupair.com/au-pairs/3-steps-to-become-an-au-pair/apply-nowhttp://www.goaupair.com/au-pairs/3-steps-to-become-an-au-pair/apply-now, accessed February 1, 2017

"New Jersey Minimum Wage 2016, 2017," *Minimum-Wage.org*, available at http://www.minimum-wage.org/states.asp?state=New%20Jersey, accessed January 28, 2017

"Notice Federal Minimum Wage Increase," *Department of State*, June 14, 2007, available at https://iex-website2012.s3.amazonaws.com/files/au-pair-usa/pdfs/aupair_wageincrease.pdf, accessed November 9, 2016

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

PLAINTIFFS' RESP. APP.0001986

Case No. 1:14-cv-03074-CMA-KMT   Document 968-11   Filed 03/30/18   USDC Colorado   pg 92
of 174

# Exhibit 248

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

JOHANA PAOLA BELTRAN; LUSAPHO
HLATSHANENI; BEAUDETTE DEETLEFS;
DAYANNA PAOLA CARDENAS CAICEDO;
ALEXANDRA IVETTE GONZÁLES; SARAH
CAROLINA AZUELA RASCON; LAURA MEJIA
JIMENEZ; JULIANE HARNING; NICOLE
MAPLEDORAM; and those similarly situated,

                Plaintiffs,

v.

INTEREXCHANGE, INC.; USAUPAIR, INC.;
GREATAUPAIR, LLC; EXPERT GROUP
INTERNATIONAL INC., DBA EXPERT AUPAIR;
EURAUPAIR INTERCULTURAL CHILD CARE
PROGRAMS; CULTURAL HOMESTAY
INTERNATIONAL; CULTURAL CARE, INC. D/B/A
CULTURAL CARE AU PAIR; AUPAIRCARE INC.;
APF GLOBAL EXCHANGE, NFP, DBA AU PAIR IN
AMERICA; ASSOCIATES IN CULTURAL
EXCHANGE DBA GOAUPAIR; AMERICAN
CULTURAL EXCHANGE, LLC, DBA GOAUPAIR;
AGENT AU PAIR; A.P.EX. AMERICAN
PROFESSIONAL EXCHANGE, LLC DBA
PROAUPAIR; AND 20/20 CARE EXCHANGE, INC.
DBA THE INTERNATIONAL AU PAIR
EXCHANGE,

                Defendants.

Civil Case No. 14-cv-03074-CMA-CBS

# Expert Report of Lauren J. Stiroh, Ph.D.

**July 31, 2017**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

PLAINTIFFS' RESP. APP.0001988

## Table of Contents

| | | |
|---|---|---|
| I. | INTRODUCTION | 1 |
| | A. ASSIGNMENT | 1 |
| | B. MATERIALS CONSIDERED | 1 |
| | C. SUMMARY OF OPINIONS | 2 |
| | D. SUMMARY OF PLAINTIFFS' ALLEGATIONS | 3 |
| II. | EVALUATION OF PLAINTIFFS' ALLEGED ECONOMIC EVIDENCE OF A CARTEL | 6 |
| III. | THERE IS NO ECONOMIC BASIS TO INFER A CONSPIRACY AMONG DEFENDANTS | 8 |
| | A. ECONOMICS OF MONOPSONY AND BUYERS' CARTELS | 9 |
| | 1. MONOPSONY AND MONOPSONY POWER | 9 |
| | 2. LABOR MARKET CHARACTERISTICS THAT FACILITATE THE FORMATION OF EMPLOYER CARTELS | 10 |
| | B. THE STRUCTURE OF THE U.S. AU PAIR PROGRAM DOES NOT FACILITATE COLLUSION AMONG THE SPONSOR AGENCIES TO SET AU PAIR STIPENDS BELOW THE COMPETITIVE LEVEL | 11 |
| IV. | THERE IS NO EVIDENCE THAT THE CONSPIRACY, AS ALLEGED, IS ECONOMICALLY RATIONAL | 16 |
| | A. THE CONSPIRACY AS ALLEGED WOULD NOT BE PROFITABLE BECAUSE THERE IS NO MARKET MECHANISM THAT WOULD DRIVE AU PAIR STIPENDS HIGHER IN THE BUT-FOR WORLD | 16 |
| | B. THE NATURE OF THE ALLEGED CONSPIRACY DOES NOT MAKE ECONOMIC SENSE | 18 |
| V. | PLAINTIFFS CANNOT SHOW CAUSATION OR PROVE ANTITRUST DAMAGES | 19 |
| | A. AN EXCESS SUPPLY OF AU PAIR APPLICANTS AT THE ACTUAL STIPENDS RECEIVED BY THE CLASS UNDERMINES PLAINTIFFS' THEORY OF DAMAGES | 19 |
| | B. THERE IS NO BASIS TO EXPECT THAT STIPENDS RECEIVED IN THE BUT-FOR WORLD WOULD BE DIFFERENT FROM THOSE RECEIVED IN THE ACTUAL WORLD | 26 |
| | C. UNLESS ECONOMIC OUTCOMES WOULD BE DIFFERENT ABSENT THE CONSPIRACY, THERE ARE NO ANTITRUST DAMAGES | 27 |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

PLAINTIFFS' RESP. APP.0001989

# I.   INTRODUCTION

## A.   Assignment

1.   My name is Lauren J. Stiroh.  I am an economist and Managing Director of NERA Economic Consulting.  I previously prepared two reports in this matter submitted on January 13, 2017 ("Class Certification Report") and February 3, 2017 ("Class Certification Rebuttal Report") in connection with the class certification phase of this matter.[1]

2.   I have been asked by Counsel for Au Pair in America ("APIA"), Au Pair International, AuPair Care, Cultural Care, Inc. ("Cultural Care"), Cultural Homestay International, EurAupair, Expert AuPair, American Cultural Exchange, LLC (together with Go Au Pair Operations, LLC, "GoAuPair"), InterExchange, Inc., Agent Au Pair, AuPair Foundation, and USAuPair to opine on the economics underlying Plaintiffs' antitrust claims as expressed in the Second Amended Complaint in this matter.[2]  NERA is being compensated for my time at a rate of $950 per hour.  NERA's compensation does not depend on the outcome of this litigation.

## B.   Materials Considered

3.   In addition to the materials considered in my Class Certification reports, I, and economists working under my direction, have reviewed additional documents or data produced in the course of this litigation; the two expert reports on class certification submitted by Dr. Kerr;[3] the Affidavit of William O. Kerr submitted on June 2, 2017;[4] the

---

[1]   An updated version of my curriculum vitae, which includes a list of my prior testimony, is appended to this report as **Exhibit 1**.  *See,* Expert Report of Lauren J. Stiroh, Ph.D. on behalf of Defendants in connection with *Johana Paola Beltran, et al.; and those similarly situated, Plaintiffs, v. InterExchange, Inc., et al., Defendants,* United States District Court For the District of Colorado, Case No. 14-cv-03074-CMA-CBS, January 13, 2017, § I.A and Exhibit 1;  Expert Rebuttal Report of Lauren J. Stiroh, Ph.D. on behalf of Defendants in connection with *Johana Paola Beltran, et al.; and those similarly situated, Plaintiffs, v. InterExchange, Inc., et al., Defendants,* United States District Court For the District of Colorado, Case No. 14-cv-03074-CMA-CBS, February 3, 2017.

[2]   Second Amended Complaint, *Johana Paola Beltran; Lusapho Hlatshaneni; Beaudette Deetlefs; Dayanna Paola Cardenas Caicedo; Alexandra Ivette González; Sarah Carolina Azuela Rascon; Laura Mejia Jimenez; Juliane Harning; Nicole Mapledoram; and those similarly situated, Plaintiffs, v. InterExchange, Inc.; USAuPair, Inc.; GreatAuPair, LLC; Expert Group International, Inc., DBA Expert AuPair; EurAupair Intercultural Child Care Programs; Cultural Homestay International; Cultural Care, Inc. D/B/A Cultural Care Au Pair; AuPairCare Inc.; Au Pair International, Inc; APF Global Exchange, NFP, DBA AuPair Foundation; American Institute For Foreign Study DBA Au Pair in America; Associates in Cultural Exchange DBA GoAuPair; American Cultural Exchange, LLC, DBA GoAuPair; Go Au Pair Operations, LLC, d/b/a Go Au Pair; Agent Au Pair; A.P.EX. American Professional Exchange, LLC, DBA ProAuPair; and 20/20 Care Exchange, Inc. DBA The International Au Pair Exchange, Defendants,* in the United States District Court For the District of Colorado, Case No. 14-cv-03074-CMA-CBS, October 17, 2016 ("Second Amended Complaint").

[3]   Expert Report of William O. Kerr, January 13, 2017 ("Kerr Report, January 13, 2017"); Rebuttal Expert Report of William O. Kerr, February 3, 2017 ("Kerr Rebuttal Report, February 3, 2017").

[4]   Affidavit of William O. Kerr, Ph.D., June 2, 2017 ("Kerr Affidavit, June 2, 2017").

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

PLAINTIFFS' RESP. APP.0001990

two depositions of Dr. Kerr taken on May 4, 2017 and July 5, 2017;[5] as well as additional publicly available data and information. The opinions expressed in this report are based on my review of this information as well as my training and experience as an economist. A list of the sources of information and materials I considered in forming my opinions is presented in **Exhibit 2**.

## C.    Summary of Opinions

4.      Based on my analysis to date, I have reached the following opinions:

i.)    There is no economic basis to infer that an antitrust conspiracy existed among sponsor agencies, the effect of which was to suppress stipends below those which would occur under competitive conditions.

ii.)    Plaintiffs have not explained how they will establish that observed economic outcomes, including the fact that some stipends are clustered near the U.S. Department of State ("DOS") minimum, are a result of alleged collusion among the Defendants in this matter as opposed to sponsor agencies simply acting unilaterally in response to understood market conditions. That is, Plaintiffs have not explained how they will distinguish competitive behavior from allegedly conspiratorial behavior that yields the same outcomes.

iii.)    There is a rational and pro-competitive economic explanation for the fact that the majority of current stipends are at or close to $195.75, the minimum weekly stipend established by the DOS. If there are more au pairs who are willing to be placed with U.S. families than there are families willing to host au pairs at current stipend amounts, then the expected economic outcome is to observe a cluster of stipends at or near the DOS minimum stipend. This same outcome would be observed under competitive economic conditions absent the alleged conspiracy.

iv.)    When market conditions yield an outcome whereby many au pairs receive $195.75 as a weekly stipend, it is reasonable and rational that Defendants would inform au pairs that $195.75 is the stipend that au pairs should expect to be paid by their host families. The contemporaneous documents and evidence cited by Plaintiffs as indicative of Defendants informing au pairs that the stipend is $195.75 when that is the stipend that market conditions yield do not support an inference of conspiracy as opposed to unilateral conduct.

v.)    The nature of the conspiracy as alleged is economically implausible. There is no economic benefit to Defendants from colluding to fix the stipend at the DOS minimum stipend.

---

[5]    Deposition of William O. Kerr, Ph.D., May 4, 2017 ("Kerr Deposition, May 4, 2017"); Deposition of William O. Kerr, Ph.D., July 5, 2017 ("Kerr Deposition, July 5, 2017").

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

2

PLAINTIFFS' RESP. APP.0001991

     i.    The stipends would not increase absent the alleged conspiracy, making collusion to suppress the stipends unnecessary.

    ii.    It is illogical for the Defendants to collude only on the stipend and no other dimension of the program.

    iii.    Defendants would benefit if their competitors broke with the alleged conspiracy and raised the stipends they advertised.  All else equal, higher stipends would increase the cost of hosting an au pair and reduce the number of families willing to host.  If any individual sponsor agency raised stipend levels, competing sponsor agencies would benefit by being relatively more attractive to host families.  Thus, under prevailing market conditions, there would be no benefit to sponsors to colluding with their competitors.

    vi.)    The structure of the U.S. Au Pair Program, with a) many buyers and new entrants, b) stipends paid by host families and unobserved by sponsor agencies, c) hours set by host families and unobserved by sponsor agencies, and d) individualized additional benefits offered by host families and unobserved by sponsor agencies, would not facilitate an antitrust conspiracy among sponsor agencies to fix stipends directly or through a limitation on the number of au pairs participating in the program.

    vii.) There is no basis to establish antitrust damages flowing from the conduct as alleged.

5.      These opinions and the following analysis are based on my review of documents and information made available to me to date.  I reserve the right to update my opinions should additional information be provided to me.

## D.    Summary of Plaintiffs' Allegations

6.      The named Plaintiffs in this matter are former au pairs who were sponsored to participate in the U.S. Au Pair Program, a cultural exchange program administered and regulated by the DOS.[6]  The DOS designates companies to be sponsor agencies for the U.S. Au Pair Program, and as such, these companies facilitate the distribution of DOS-allocated J-1 visas to foreign nationals (such as the named Plaintiffs) who wish to live with a U.S. family for a period of one to two years, while assisting the family with childcare and performing light housework directly related to the care of the children.[7]  In return, U.S.

---

[6]    Parts of this background section are taken from the Class Certification Report and included here for context.  *See,* Class Certification Report, ¶¶ 6-10; Second Amended Complaint, ¶¶ 18-26; Code of Federal Regulations, Part 62-Exchange Visitor Program, Section 62.31, available at https://www.gpo.gov/fdsys/pkg/CFR-2016-title22-vol1/xml/CFR-2016-title22-vol1-part62.xml#seqnum62.31 (accessed October 6, 2016).

[7]    Program Sponsors, J-1 Visa Exchange Visitor Program, U.S. Department of State, Bureau of Educational and Cultural Affairs, available at https://j1visa.state.gov/programs/au-pair#program-sponsors (accessed January 12, 2017);  Code of Federal Regulations, Part 62-Exchange Visitor Program, Section 62.31, available at https://www.gpo.gov/fdsys/pkg/CFR-2016-title22-vol1/xml/CFR-2016-title22-vol1-part62.xml#seqnum62.31 (accessed October 6, 2016);  Costs, Working Hours, Time Off etc., AuPairWorld, available at https://www.aupairworld.com/en/au_pair_program/usa/family/pocket_money

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

PLAINTIFFS' RESP. APP.0001992

host families provide au pairs with a private bedroom, three meals per day, up to $500 towards educational expenses, and a weekly payment referred to as a stipend.[8]

7.   Plaintiffs' antitrust claims relate to the stipend paid by a U.S. host family to a foreign au pair staying in the family's home and providing childcare assistance to that family's children under the J-1 Exchange Visitor Program.[9]  Plaintiffs allege that the Defendants, sponsors of the J-1 Exchange Visitor Program for au pairs designated by the DOS, have "full control of the au pair labor market," which Plaintiffs assert is the relevant labor market for antitrust analysis in this case.[10]  Plaintiffs further allege that Defendants' control of the relevant market has allowed them to conspire successfully to fix the weekly stipend that host families paid to au pairs at the DOS minimum and to not compete for au pairs by offering stipends above the alleged fixed amount.[11]  Plaintiffs allege that they have suffered antitrust damages from this purported conspiracy in the form of stipends suppressed below the market rate for similar childcare workers.[12]

8.   Plaintiffs claim that Defendants successfully conspired to fix the stipend paid by host families to foreign au pairs in the U.S. at $195.75 a week for up to 45 hours of childcare, the stipend amount laid out by the DOS stipend notifications in 2007 and 2009.[13]  According to Plaintiffs, this weekly stipend amount is so low that it violates Federal and, in some instances, State minimum wage laws.[14]  Plaintiffs assert that, but for the conduct at issue, "Sponsors would compete for *au pairs* by offering, or facilitating, higher wages to *au pairs* than other Sponsor competitors."[15]  In addition, Plaintiffs claim that in a competitive market, "*au pairs* would be free to negotiate wages with multiple prospective sponsors and, upon preliminary acceptance in the program, would likewise be free to negotiate wages with multiple prospective family employers."[16]  Thus, Plaintiffs allege that but for the conduct at issue, (1) sponsor agencies would compete for au pairs by offering different weekly stipends, (2) au pairs would negotiate their weekly stipend with

---

[8]   (accessed December 9, 2016); Is an Au Pair Required to Help with Housework, AuPairWorld, available at https://www.aupairworld.com/en/au_pair/housework (accessed December 9, 2016).

[8]   Hosts/Employers, J-1 Visa Exchange Visitor Program, U.S. Department of State, Bureau of Educational and Cultural Affairs, available at https://j1visa.state.gov/programs/au-pair/#hostsemployers (accessed November 14, 2016).

[9]   Second Amended Complaint, ¶ 1.  It is my understanding that some of the other claims in the Second Amended Complaint rely on the same factual bases as the Plaintiffs' antitrust claims.

[10]   Second Amended Complaint, ¶¶ 2, 52, 75, and 137.

[11]   Second Amended Complaint, ¶¶ 2, 5, and 52.

[12]   Second Amended Complaint, ¶¶ 135 and 151.

[13]   Second Amended Complaint, ¶¶ 1, 5, and 148; Notice Federal Minimum Wage Increase, Department of State, June 14, 2007, available at https://iex-website2012.s3.amazonaws.com/files/au-pair-usa/pdfs/aupair_wageincrease.pdf (accessed November 9, 2016); Notice Federal Minimum Wage Increase, Department of State, June 24, 2009 (Exhibit 4 to the Kerr Deposition, May 4, 2017).

[14]   Second Amended Complaint, ¶ 1.

[15]   Second Amended Complaint, ¶ 150.

[16]   Second Amended Complaint, ¶ 150.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

PLAINTIFFS' RESP. APP.0001993

sponsor agencies and host families, and (3) due to these actions, weekly stipends to au pairs would be higher.[17]

9.    Plaintiffs allege that there is a relevant market limited to J-1 visa "standard *au pairs*" in the U.S.[18]  Plaintiffs assert that their relevant market definition is appropriate because, according to Plaintiffs, au pairs do not view opportunities in their home countries as interchangeable with participating in the J-1 visa program due to their dual interest in compensation and entry into the U.S.[19]  Plaintiffs allege that because all of the sponsor agencies who were permitted by the DOS to facilitate the J-1 visa au pair program in 2014 are Defendants in this litigation, Defendants jointly controlled 100 percent of the alleged relevant market for J-1 visa au pairs.[20]  Plaintiffs also assert that there are high barriers to entry to opening a sponsor agency to compete with Defendants.[21]  Based on market share and alleged barriers to entry, Plaintiffs claim that Defendants jointly have the market power necessary to fix au pair stipends below competitive and legal levels.[22]

10.    Plaintiffs argue that by allegedly conspiring to fix the weekly stipend paid to au pairs, Defendants have been able to increase both the number of "potential host families" and the fees they charge for their services.[23]  According to Plaintiffs, the ability to increase fees and host family participants provides a motive to engage in a stipend fixing

---

[17]    Second Amended Complaint, ¶¶ 150, 151 and 153.

[18]    I have not yet seen how Plaintiffs will support their assertions regarding the relevant market. Plaintiffs use the term "standard" au pairs to refer to au pairs not participating in the EduCare program or one of certain sponsors' "pro" au pair programs. I understand that sponsors may also refer to these au pairs as "traditional," "regular," or not specify a term for them at all. In this report, I adopt the use of the term "standard" for ease of exposition. Second Amended Complaint, ¶¶ 81 and 571.

[19]    Second Amended Complaint, ¶¶ 125-127.

[20]    Second Amended Complaint, ¶¶ 2, 75 and 137. I understand that an additional sponsor agency, Au Pair 4 Me, Inc., received designation between the time that Plaintiffs filed their first and second amended complaints. Plaintiffs have not altered the language in their Second Amended Complaint which stated that "the *au pair* program […] is managed through fifteen sponsor organizations," that these sponsors have been "[g]iven full control of the *au pair* labor market," and that they "comprise 100% of the relevant labor market." I understand that Au Pair 4 Me, Inc. is the 16th au pair sponsor agency that is permitted by the DOS to operate in the U.S. *See,* Au Pair 4 Me, Facebook, April 13, 2016, available at https://www.facebook.com/aupair4me/ (accessed November 17, 2016); First Amended Complaint, *Johana Paola Beltran; Lusapho Hlatshaneni; Beaudette Deetlefs; Dayanna Paola Cardenas Caicedo; Alexandra Ivette González; and those similarly situated, Plaintiffs, v. Pamela H Noonan, Thomas J Noonan; InterExchange, Inc.; USAuPair, Inc.; GreatAuPair, LLC; Expert Group International, Inc., DBA Expert AuPair; EurAuPair Intercultural Child Care Programs; Cultural Homestay International; Cultural Care, Inc. D/B/A Cultural Care Au Pair; AuPairCare Inc.; Au Pair International, Inc; APF Global Exchange, NFP, DBA AuPair Foundation; American Institute For Foreign Study DBA Au Pair in America; Associates in Cultural Exchange DBA GoAuPair; American Cultural Exchange, LLC, DBA GoAuPair; Agent Au Pair; A.P.EX. American Professional Exchange, LLC, DBA ProAuPair; and 20/20 Care Exchange, Inc. DBA The International Au Pair Exchange, Defendants,* in the United States District Court For the District of Colorado, Case No. 14-cv-03074-CMA-CBS, March 13, 2015.

[21]    Second Amended Complaint, ¶ 74.

[22]    Second Amended Complaint, ¶ 52.

[23]    Second Amended Complaint, ¶ 135.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

PLAINTIFFS' RESP. APP.0001994

conspiracy.[24]  Plaintiffs argue that in addition to having the motive to engage in the conduct at issue, Defendants have the ability to carry out a conspiracy.[25]

## II.  EVALUATION OF PLAINTIFFS' ALLEGED ECONOMIC EVIDENCE OF A CARTEL

11.    I am aware of communications from the sponsor agencies that refer to $195.75 as either the stipend or the minimum stipend and that Plaintiffs have alleged that these communications are evidence of a buyers' cartel among sponsor agencies.[26]  These communications, however, do not support the existence of a conspiracy because the same communications would be consistent with the Defendants acting unilaterally to carry out the DOS stipend regulation described in the notifications.[27]  Moreover, communications by sponsors do not universally say that weekly stipends paid by host families must be $195.75.  For example, seven of the 12 host family contracts presented in Exhibit 10 of Dr. Kerr's initial report and four of the 13 au pair contracts presented in Exhibit 8 of Dr. Kerr's initial report specify that $195.75 is the minimum stipend required by the DOS rather than the exact amount that must be paid.[28]

12.    Nor do Dr. Kerr's preliminary survey results establish that Defendants conspired to fix au pairs' weekly stipends.  Dr. Kerr conducted a survey of host families which asked about the weekly stipend amount host families paid to their au pairs.[29]  According to Dr. Kerr, preliminary survey results show that approximately 90 percent of au pairs received stipends within 2.5 percent of $195.75.[30]  I understand that Defense expert Paul Lavrakas has submitted an expert report that discusses the quality of Dr. Kerr's survey methodology and validity of his results.  But taken at face value, Dr. Kerr's preliminary

---

[24]    Second Amended Complaint, ¶¶ 134-135.

[25]    In particular, Plaintiffs argue that the "industry structure inherently facilitates collusion" and that "the Sponsors are able to easily and simply agree on prices and police against cheating."  *See,* Second Amended Complaint, ¶¶ 137-138.

[26]    *See, e.g.,* Regular & Par Expérience, EurAuPair Intercultural Child Care Programs, 2015, available at https://www.euraupair.com/host-family/in-home-child-care-programs/ (accessed January 6, 2017); Available Au Pair Programs, GoAuPair, available at http://www.goaupair.com/host-families/fees/fees-by-au-pair-type (accessed January 6, 2017); Second Amended Complaint, ¶¶ 98-117.

[27]    Both DOS notices state that the weekly au pair stipend amount is $195.75 and do not refer to that amount as a minimum stipend.  Notice Federal Minimum Wage Increase, Department of State, June 14, 2007, available at https://iex-website2012.s3.amazonaws.com/files/au-pair-usa/pdfs/aupair_wageincrease.pdf (accessed November 9, 2016); Notice Federal Minimum Wage Increase, Department of State, June 24, 2009 (Exhibit 4 to the Kerr Deposition, May 4, 2017).  I am also aware that that Plaintiffs claim they have obtained direct evidence of conspiracy.  I understand that Defendants question the validity of Plaintiffs' evidence.  Moreover, the economic analysis I conduct does not support an inference of conspiracy.  Second Amended Complaint, ¶¶ 95-97.

[28]    Kerr Report, January 13, 2017, Exhibits 8 and 10.

[29]    Kerr Affidavit, June 2, 2017.

[30]    Kerr Affidavit, June 2, 2017, ¶ 9.  Stipends within 2.5 percent of $195.75 are between $190.86 and $200.64.  I am not sure how Dr. Kerr will explain the survey results below $195.75, which may indicate an error in respondents' recollections.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

6

results show that eight percent of au pairs received a weekly stipend of greater than $200, as shown below in **Table 1**:[31]

**Table 1**

Percent of Host Families Surveyed by Plaintiffs
Showing Greater than $200 in Weekly Stipends[32]

| Year | Number of Stipends Reported | Number of Stipends above $200 Reported | Percent of Stipends Above $200 |
| --- | --- | --- | --- |
| | | | ----------(Percent)---------- |
| (a) | (b) | (c) | (d) |
| | | | (c)/(b) |
| 2009 | 249 | 28 | 11.24 % |
| 2010 | 463 | 45 | 9.72 |
| 2011 | 504 | 43 | 8.53 |
| 2012 | 632 | 55 | 8.70 |
| 2013 | 821 | 57 | 6.94 |
| 2014 | 911 | 52 | 5.71 |
| 2015 | 436 | 31 | 7.11 |
| 2016 | 301 | 20 | 6.64 |
| 2017 | 59 | 5 | 8.47 |
| **Total:** | **4,376** | **336** | **7.68 %** |

13.   If the survey was representative and could be taken as indicative of class-wide results, it would imply that a substantial number of au pairs in the proposed Class received a weekly stipend of over $200 from their host families.  Table 2 in the Class Certification Report shows that from 2009 to 2015, over 100,000 au pairs participated in the program.[33]  Assuming that 7.7 percent of all au pairs in the proposed Class received weekly stipends greater than $200 and that a similar number of au pairs participated in the program in 2016 as the other years, at least 8,000 au pairs in the proposed Classes received a weekly stipend greater than $200—results that are inconsistent with the conspiracy as alleged by Plaintiffs.[34]

---

[31]   As discussed in the Class Certification Rebuttal Report, 11 percent of GoAuPair agreements and 8 percent of Expert AuPair agreements indicated that the au pair would receive over $200 in weekly stipend.  *See,* Class Certification Rebuttal Report, footnote 15 and Table 2.

[32]   Survey results were only counted in column (b) if they contained an exact weekly stipend amount above $1 and below $1,000 and were listed as "Standard/Regular/Traditional" au pairs.  Survey results were only counted in column (c) if they contained an exact weekly stipend amount above $200 and below $1000 and were listed as "Standard/Regular/Traditional" au pairs.  Only survey results from after July 24, 2009, the day that the DOS minimum stipend increased to $195.75, are presented in this table.  *See;* RFP000677.csv; Affidavit of William O. Kerr, Ph.D., June 2, 2017, Table 1; Notice Federal Minimum Wage Increase, Department of State, June 24, 2009 (Exhibit 4 to the Kerr Deposition, May 4, 2017).

[33]   Class Certification Report, Table 2.

[34]   Dr. Kerr states that he will use the results of his survey of host families to determine economic harm and calculate damages to the class.  *See,* Kerr Affidavit, June 2, 2017, ¶ 10.  I have not yet seen how Dr. Kerr intends to perform his analysis but note that the survey data do not contain the number of hours spent providing childcare assistance per week.  Thus, it is not

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

7

14. Moreover, even if the survey had found that 100 percent of au pairs received stipends of exactly $195.75, that result on its own would not be evidence of the alleged conspiracy. A group of firms responding similarly to common economic conditions is not evidence of collusion. It is economically rational for similarly situated firms to reach similar business decisions. Parallelism is not evidence of collusion if there is an independent business rationale for each firm's individual business decisions. In fact, competitive markets are often characterized by commonality of price points.

15. Collusion on the part of the sponsor agencies would not be required to see the stipends cluster at or around $195.75 if the DOS weekly stipend is a binding price floor that holds au pair stipends at an artificially high level. As I discuss in **Section V.A**, all of the available evidence that I have seen indicates that there is an excess supply of au pairs at the DOS minimum, which would indicate that the current DOS minimum is a binding stipend floor that is above the amount that would be expected to prevail under free market conditions. Therefore, even if certain sponsors at times instructed host families that the DOS weekly stipend was $195.75, those actions would be consistent with unilateral action and are not evidence of a conspiracy. A statement that the stipend is $195.75 could be intended to inform host families and au pairs of what to expect under current market conditions, rather than a mandate that arises from an illegal conspiracy. I have not seen how Plaintiffs will seek to establish that the communications they cite reflect a mandate rather than informed market intelligence. As stated and explained throughout this report, economic analysis of the prevailing market factors does not support an inference of conspiracy.

16. Because pro-competitive, unilateral actions can lead to the same economic outcomes as the alleged conspiracy, it is necessary to evaluate other market factors to determine whether observed market outcomes are the outcome of a conspiracy. I have not yet had an opportunity to evaluate how Plaintiffs' expert will seek to establish that observed outcomes are the result of collusion rather than competition. However, based on what I understand to be the market facts prevailing in this case, there is no economic basis to infer a conspiracy among Defendants.

## III. THERE IS NO ECONOMIC BASIS TO INFER A CONSPIRACY AMONG DEFENDANTS

17. In this section, I first explain the fundamental economic concepts underlying Plaintiffs' antitrust claims. I then evaluate whether the market as alleged by Plaintiffs is susceptible to collusion by considering whether firms in the alleged market can be made better off by agreeing to fix the stipends paid by host families to au pairs and, if so, whether such an agreement is sustainable (through monitoring mechanisms and ability to suppress

---

clear how the survey can be used to determine whether and by what amount class members were underpaid on an hourly basis. It is my understanding that no comprehensive, class-wide data source exists for how many hours per week au pairs provided childcare assistance, and Dr. Kerr has not established how he will reliably calculate antitrust damages without such data.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

8

PLAINTIFFS' RESP. APP.0001997

competition).  I also evaluate whether there are alternative explanations for observed market outcomes.

## A. Economics of Monopsony and Buyers' Cartels

### 1. Monopsony and Monopsony Power

18.  As discussed above, Plaintiffs claim that the Defendants, in their position as au pair sponsors, have colluded to establish a buyers' cartel in what the Plaintiffs allege is the relevant labor market: J-1 visa standard au pair employment.[35]  In effect, Plaintiffs allege that the sponsors have conspired to instruct host families, the direct buyers of the Plaintiffs' childcare services, to pay a weekly stipend in the exact amount established by the DOS.  While not explicitly stated in their Complaint, Plaintiffs' claims are akin to asserting that Defendants are acting collusively and instructing host families to act as a monopsony.

19.  A monopsony is a market with a single buyer.  As the only buyer in a market, the amount of a good or service that a monopsonist purchases can affect the price of that good or service.[36]  In a labor market with a single employer and an upward sloping labor supply curve, a monopsony employer will have to offer a higher wage to attract more employees.  In contrast, if the monopsony employer wants to reduce wages, typically he would then also have to make do with fewer workers.[37]  A buyers' cartel in a labor market functions as a monopsony if the buyers (employers) collectively agree to suppress wages or reduce employment.[38]  In this matter, the au pairs are the sellers of their services, the host families are the direct buyers of those services, and the sponsor agencies are alleged to have set the payment made by the host families to the au pairs for the au pairs' services.

20.  Monopsony power is the name used to describe the ability of a buyer (or collusive cartel of buyers) to profitably set the price paid for a good or a service below competitive levels.[39]  Monopsony power depends, in part, on sellers having a limited ability to substitute to sell their services elsewhere or offer alternative services.[40]  The sellers' ability to substitute would be limited if the products they make or the services they provide are specialized to a few uses, or if they are geographically isolated and cannot

---

[35]  Second Amended Complaint, ¶¶ 73-74, and 571.

[36]  For a discussion on this topic, see for example, Dennis W. Carlton and Jeffrey M. Perloff, *Modern Industrial Organization* (4th Edition) (Boston, MA: Pearson/Addison Wesley, 2005), ("Carlton and Perloff, 2005"), pp. 107-108.

[37]  An upward sloping labor supply curve means that there are more workers willing to work at higher wages and fewer workers willing to work at lower wages.

[38]  Roger D. Blair and Jeffrey L. Harrison, *Monopsony in Law and Economics* (Cambridge: Cambridge University Press, 2010), ("Blair and Harrison, 2010"), p. 48.

[39]  Carlton and Perloff, 2005, pp. 93, 107-108.

[40]  Maurice E. Stucke, "Looking at the Monopsony in the Mirror," *Emory Law Journal*, Volume 62, 2013, p. 1535; Carlton and Perloff, 2005, pp. 108-109.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

9

PLAINTIFFS' RESP. APP.0001998

relocate easily to find another buyer. In monopsonized labor markets, this would mean that employees have specialized skills or qualifications that are not easily transferable to other occupations or the employees cannot easily move. In occupations where employee skills transfer easily to other positions, an employer will be unable to suppress wages without employees switching to those other positions or moving to another location to work for another employer. Thus, where employee skills transfer easily to other positions, suppressing wages may not be profitable even for a dominant employer.

21.     Finally, because the success of a buyers' cartel depends on the adherence of all members to the agreement to decrease purchases or the price paid for a good or service, members of a buyers' cartel must also be able to monitor their agreement and punish cheaters.[41] This is due to the fact that when a buyers' cartel artificially suppresses price below competitive levels, individual cartel members have an incentive to cheat on an agreement to restrict purchases or price. If all of the buyers in a market have agreed to hire fewer employees and pay them less, an individual member would find it profitable to undermine the agreement by purchasing as much of an input as they can at the lower price, or raising the price of the input to attract more sellers. If members of the cartel are unable to cost-effectively determine what prices other cartel members are paying or how much they are buying, they will not be able to effectively monitor their agreement. Even if members of the cartel are able to monitor whether others are abiding by the agreement, they will also need a mechanism by which to punish cheaters. Absent an enforcement mechanism, it is difficult for cartels to prevent members from cheating on an agreement.

22.     One critical implication of the economic theory of monopsony is that if there is an excess supply at the current price, there is no need to exercise monopsony power to decrease prices. In the labor market example, if the employer could hire additional employees without increasing the prevailing wage, or if workers are already competing for jobs at the current wage, then the employer has no incentive to reduce its hiring to manage its wage bill. Likewise, an employer does not have an incentive to form a buyers' cartel with other employers because the same labor market outcome can be achieved through competitive means by the employer acting unilaterally.

### *2.        Labor Market Characteristics That Facilitate the Formation of Employer Cartels*

23.     In traditional labor markets, there are particular characteristics that make certain markets more susceptible to a buyers' (or employers') cartel forming and persisting than others.[42] Examples of such characteristics include the following:

---

[41]    Carlton and Perloff, 2005, pp. 126-127.

[42]    The traditional language of describing a buyers' cartel as an employers' cartel in a labor market does not accurately fit the market facts as I understand them in this matter. I understand that it's Defendants' position that they are not employers. For ease of exposition, I have used both the terms "buyers' cartel" and "employers' cartel" interchangeably depending on which term I think provides more clarity to expressing my opinions.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

PLAINTIFFS' RESP. APP.0001999

     i.     Few employers (buyers). With fewer buyers, it is easier to negotiate an agreement and monitor whether co-conspirators are abiding by that agreement.[43]

     ii.    Homogeneous products or services. It is easier for a group of buyers to form a cartel if they are purchasing a homogeneous product or service.[44] If there are numerous differences among the products or services being purchased, it is more difficult for a group of buyers to agree on the price of each differentiated version of the product or service.

     iii.   Barriers to entry.[45] High barriers to entry are necessary to prevent a potential new entrant from offering a wage above the collusive wage and capturing a significant share of employment from the incumbents. If barriers to entry are low, new entrants can enter the market and outbid the buyers' cartel, driving prices and quantities back up to equilibrium levels and undermining the collusive agreement.

     iv.    The ability to monitor and enforce in agreement. If buyers cannot monitor the wages paid by other market participants and know that other market participants cannot monitor them, they will have less incentive to enter into and comply with a conspiracy.

## B.   The Structure of the U.S. Au Pair Program Does Not Facilitate Collusion among the Sponsor Agencies to Set Au Pair Stipends below the Competitive Level

24.    The characteristics of what Plaintiffs define as the alleged relevant labor market for J-1 visa "standard au pairs" in the U.S. suggest that it is unlikely that the Defendants would have been able to form a successful buyers' cartel. First, there are 15 sponsor agencies that Plaintiffs allege have formed an employers' cartel in this alleged market. That is a large number of companies to be involved in a successful conspiracy, particularly one that is alleged to have persisted for at least eight years.[46]

25.    In addition, au pairs do not enter the program offering homogeneous services. With a variety of backgrounds and places of origin, the au pairs have a wide range of attributes that make them individually more or less suited to individual host families. This affects the matching process as different host families may look for au pairs with the specific

---

[43]   Blair and Harrison, 2010, p. 49; Carlton and Perloff, 2005, p. 122.

[44]   Blair and Harrison, 2010, p. 50.

[45]   Carlton and Perloff, 2005, p. 131.

[46]   Moreover, because host families, not sponsors, pay au pairs their weekly stipend, to operate the alleged agreement successfully, sponsors would need to monitor and enforce the actions of thousands of host families. In addition, I have not seen how Plaintiffs or Plaintiffs' expert will explain how the typical economics of monopsony would apply to a situation in which a group of firms (sponsors) is alleged to have fixed the price that one set of their customers (host families) pays to another set (au pairs), when sponsors do not observe the stipend paid, the hours spent by au pairs assisting with childcare, or the value of any additional benefits offered by host families to au pairs.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

11

PLAINTIFFS' RESP. APP.0002000

attributes, skills or experience that meet their needs. Named Plaintiff Ivette Gonzalez did not match with a host family because she did not have a U.S. driver's license, suggesting that for particular host families, a U.S. driver's license makes an au pair relatively more desirable.[47] In addition, au pairs are differentiated by their native languages and cultures, and host families may prefer to match with an au pair who speaks a particular language or shares a particular culture. Named Plaintiff Nicole Mapledoram matched through a site that specializes in matching Christian host families with Christian au pairs.[48] Named Plaintiff Johana Beltran testified that one reason her host family decided to match with her was because she spoke Spanish.[49]

26.     There is no evidence that there are prohibitive barriers that prevent new entrants from participating in the au pair marketplace as sponsor agencies. While only DOS designated agencies can participate in the au pair program, obtaining DOS designation does not appear to be an insurmountable barrier. To be designated as a sponsor agency, prospective candidates must meet a number of DOS requirements including having staff with three years of international exchange experience, demonstrating an ability to comply with applicable requirements, and showing an ability to support financially the operation of the program.[50] These requirements have not posed sufficiently significant barriers to entry to preclude new sponsor agencies from entering the program. In fact, there have been new sponsor agencies designated by the DOS during the alleged conspiracy period.[51] GreatAuPair was designated as a sponsor agency in 2014 and has since sponsored approximately 600 au pairs.[52] Au Pair 4 Me, Inc. was designated in April of 2016. The number of au pairs sponsored by Au Pair 4 Me is not available as Au Pair 4 Me has not, to my knowledge, been named a Defendant in this litigation.[53] **Table 2** below indicates the year in which each sponsor agency was designated by the DOS.[54]

---

[47]     Deposition of Ivette Alexandra Gonzalez, September 28, 2016, 152:3-153:14 and 154:13-19.

[48]     Deposition of Nicole Mapledoram, October 3, 2016, 43:3-12; Christian Au Pairs, available at http://christianaupairs.com/ (accessed July 29, 2017).

[49]     Deposition of Johana Paola Beltran, August 30, 2016, 95:1-9.

[50]     *See,* Code of Federal Regulations, Part 62-Exchange Visitor Program, Section 62.3, available at https://www.gpo.gov/fdsys/pkg/CFR-2016-title22-vol1/xml/CFR-2016-title22-vol1-part62.xml#seqnum62 (accessed November 16, 2016).

[51]     While Plaintiffs claim that the alleged conspiracy began prior to 2009, I understand that discovery in this case has been limited to information post-dating January 1, 2009. *See,* Second Amended Complaint, ¶¶ 2-3; Class Certification Report, Table 1.

[52]     Deposition of Shannon Pitts, 30(b)(6) Representative for GreatAuPair, May 31, 2017, 84:1-13.

[53]     Au Pair 4 Me, Facebook, April 13, 2016, available at https://www.facebook.com/aupair4me/ (accessed November 17, 2016).

[54]     This table also appears as Table 2 in the Class Certification Report.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

12

PLAINTIFFS' RESP. APP.0002001

**Table 2**

Current Sponsor Agencies for U.S. Au Pair Program
By Year Designated as Sponsor Agency[55]

| Sponsor | Designation Year |
| --- | --- |
| American Institute For Foreign Study dba Au Pair in America | 1986 |
| EurAuPair Intercultural Child Care Programs | 1988 |
| Cultural Care, Inc. d/b/a Cultural Care Au Pair | 1989 |
| American Cultural Exchange, LLC, dba Go Au Pair | 1989 |
| AuPairCare Inc. | 1989 |
| InterExchange, Inc. | 1989 |
| USAuPair, Inc. | 1989 * |
| Agent Au Pair | 2003 |
| Au Pair International, Inc. | 2004 |
| Cultural Homestay International | 2004 * |
| Expert Group International Inc., dba Expert AuPair | 2006 |
| A.P.EX. American Professional Exchange, LLC dba ProAuPair | 2011 |
| 20/20 Care Exchange, Inc. dba TIAPE | 2013 |
| APF Global Exchange, NFP | 2013 |
| GreatAuPair, LLC | 2014 * |
| Au Pair 4 Me, Inc. | 2016 |

27.    While the above discussion focuses on whether the buyers' side of Plaintiffs' proposed labor market facilitates and shows signs of collusion, it is also instructive to examine whether the au pairs' side of the alleged labor market is vulnerable to buyer collusion. As described above, Plaintiffs allege that there is a relevant labor market consisting of au pairs participating in the U.S. au pair program.  As a preliminary matter, I have not yet seen how Plaintiffs' expert will establish that this alleged labor market is a properly defined relevant antitrust market.  Plaintiffs' expert would need to establish why

---

[55]    Information on the designation year for sponsor agencies is gleaned from a variety of sources and is accurate to the best of my understanding.  Asterisks indicate that date provided is approximate.  *See,* Designated Sponsor Organizations, J-1 Visa Exchange Visitor Program, U.S. Department of State, Bureau of Educational and Cultural Affairs, available at https://j1visa.state.gov/participants/how-to-apply/sponsor-search/?program=Au%20Pair (accessed December 13, 2016).  Au Pair in America, available at http://www.aupairinamerica.com/ (accessed November 16, 2016); About Us, EurAuPair, available at https://www.euraupair.com/about/ (accessed November 15, 2016); Why Cultural Care Au Pair, available at http://www.culturalcare.ie/why-cultural-care-au-pair/designated-by-the-us-state-department/ (accessed November 15, 2016); Why an Au Pair Agency?, Go AuPair, available at http://www.goaupair.com/au-pairs/who-are-au-pairs/why-use-an-au-pair-agency/ (accessed November 15, 2016); About Our Company, AuPairCare by Intrax, available at https://www.aupaircare.com/about-us (accessed November 15, 2016); Au Pair Handbook, InterExchange Au Pair USA, available at https://iex-website2012.s3.amazonaws.com/files/au-pair-usa/pdfs/au-pair-handbook.pdf (accessed November 16, 2016); USAuPair A Cultural Exchange Program, USAupair, Inc. available at http://www.usaupair.com/ (accessed December 10, 2016); Congressional Research Service Report 95-256, "The Au Pair Program" at http://congressionalresearch.com/95-256/document.php?study=The+Au+Pair+Program (accessed December 9, 2016); Agent Au Pair, available at http://www.agentaupair.com/about/agency/ (accessed November 15, 2016); Email from Katie Reilly Re: API, January 11, 2017; Featured Au Pair Agency – CHI AuPairUSA, Au Pair Clearing House, available at http://aupairclearinghouse.com/CHIAuPairUSA_Profile (accessed December 12, 2016); Defendant APF Global Exchange, NFP's Responses to Plaintiffs' First Set of Interrogatories, May 4, 2016, pp. 1 and 2; About Us, Expert AuPair, available at http://www.expertaupair.com/web/expert-aupair-about-us.php (accessed January 9, 2017); Interview with Heidi Mispagel, January 4, 2017; Great Au Pair Au Pair Agency Review - New Au Pair Program 2014, Au Pair Clearing House, available at http://aupairclearinghouse.com/Great_Au_Pair_USA_Program_Blog_Article (accessed January 9, 2017); Au Pair 4 Me, Facebook, April 13, 2016, available at https://www.facebook.com/aupair4me/ (accessed November 17, 2016).

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

13

alternatives available to au pairs, including au pair programs in other countries, other J-1 visa programs in the U.S., and employment or educational programs within their home or other countries would not also be included in a properly defined relevant antitrust market that includes au pairs participating in the U.S. au pair program.[56]

28. Nevertheless, the general characteristics of standard J-1 visa au pairs do not facilitate the monopsonization of their labor. As explained above, the ability to monopsonize a labor market is limited if employees and potential employees can easily sell their services to other employers. While I understand that there are qualifications and skills needed to participate in the au pair program, I am not aware of any qualifications or skills needed to be an au pair in the U.S. that would not translate to other opportunities. For instance, to participate in the program, au pairs must have graduated high school or an equivalent in their home countries.[57] These high school degrees are not specialized such that they would only allow potential au pairs to participate in specifically the U.S. au pair program; they would also allow potential au pairs to pursue other opportunities whether at home or abroad. Moreover, au pairs only need 200 hours of childcare experience before entering the program and receive as little as 32 hours of training from their sponsor agencies before providing childcare services to host families.[58] Furthermore, because au pairs initially agree to match for a period of one year and stay for a maximum of two years if they extend, au pairs do not gain job-specific skills that make them uniquely suited to future employment as an au pair.[59] In addition, au pairs participating in the U.S. au pair program come from all over the world and are thus not uniquely situated in a geographic area that would make them susceptible to a monopsony employer.[60]

---

[56] Other alternative J-1 visa programs include Camp Counselor, Summer Work Travel and Intern. Au pairs can also find jobs with similar cultural exchange components in other countries, as well as employment opportunities in their own countries. *See,* Intern Program, J-1 Visa Exchange Visitor Program, available at https://j1visa.state.gov/programs/intern (accessed July, 21, 2017); Camp Counselor Program, J-1 Visa Exchange Visitor Program, available at https://j1visa.state.gov/programs/camp-counselor (accessed July, 21, 2017); Summer Work Travel Program, J-1 Visa Exchange Visitor Program, available at https://j1visa.state.gov/programs/summer-work-travel (accessed July, 21, 2017); Deposition of Laura Mejia-Jimenez, September 14, 2016, 12:6-19; Deposition of Johana Beltran, August 30, 2016, 49:10-21; Deposition of Nicole Mapledoram, October 03, 2016, 26:8-28:9.

[57] Code of Federal Regulations, Part 62-Exchange Visitor Program, Section 62.31, available at https://www.gpo.gov/fdsys/pkg/CFR-2016-title22-vol1/xml/CFR-2016-title22-vol1-part62.xml#seqnum62.31 (accessed October 6, 2016).

[58] While the Federal Regulations do not specifically detail that au pairs must have 200 hours of experience before entering the program, sponsor agencies often have this requirement for the au pairs they endeavor to match and sponsor. To the extent that prospective au pairs can participate in the program with no experience, that would suggest that their labor is even less specialized. *See,* Code of Federal Regulations, Part 62-Exchange Visitor Program, Section 62.31, (g)(1)(2), (e)(3), available at https://www.gpo.gov/fdsys/pkg/CFR-2016-title22-vol1/xml/CFR-2016-title22-vol1-part62.xml#seqnum62.31 (accessed October 6, 2016); Au Pair Qualifications, *Cultural Care,* available at http://www.culturalcare.co.uk/being-an-au-pair/au-pair-qualifications/ (accessed July 22, 2017).

[59] *See,* Code of Federal Regulations, Part 62-Exchange Visitor Program, Section 62.31, available at https://www.gpo.gov/fdsys/pkg/CFR-2016-title22-vol1/xml/CFR-2016-title22-vol1-part62.xml#seqnum62.31 (accessed October 6, 2016).

[60] A common textbook monopsony example is that of a company town, in which a single employer controls the town's labor market. *See,* Carlton and Perloff, 2005, p. 108.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

14

29. Moreover, I have not seen how Plaintiffs' expert will explain how Defendants have implemented, monitored, or enforced their alleged agreement. As discussed in both the Class Certification Report and the Class Certification Rebuttal Report, I understand that sponsors do not collect data on the actual stipend amounts that are received each week.[61] Instead, they ensure that au pairs are being paid at least the DOS minimum stipend, as they are required to do by the DOS.[62] In addition, I understand that sponsors do not collect comprehensive, class-wide data on the number of weekly hours spent by au pairs providing childcare assistance nor information on any additional monetary or non-monetary benefits provided by host families to au pairs.[63] If Plaintiffs are correct that sponsors have suppressed weekly stipends paid to au pairs by host families, it is not clear why host families would not be able to offset the effects of that suppression by offering more benefits or fewer hours to entice potential au pairs to match thus undermining the supposed intention of any alleged agreement.[64]

30. Moreover, I am not aware of what enforcement mechanism Plaintiffs' expert will argue that Defendants have used or could have used to enforce their alleged agreement. This is a particularly salient question due to the existence of "pro" au pair programs. Defendants APIA, EurAuPair, Go Au Pair, Au Pair International, ProAuPair, and 20/20 Care Exchange have offered "pro" au pairs to host families and advertised a larger minimum weekly stipend amount than the DOS minimum.[65] If the Defendants had entered an agreement to fix standard au pair stipends at the DOS minimum, because the "standard" and "pro" designations are somewhat arbitrary, reallocating "standard" au pairs to the "pro" category would constitute a means of getting around the agreement without expressly cheating on it. The existence of "pro" au pair programs among some of the Defendants undermines the alleged goal of the alleged conspiracy to fix the weekly stipend to the DOS minimum, and is thus inconsistent with Plaintiffs' conspiracy allegations.

---

[61] Class Certification Report, ¶ 49; Class Certification Rebuttal Report, ¶ 46.

[62] Code of Federal Regulations, Part 62-Exchange Visitor Program, Section 62.31, available at https://www.gpo.gov/fdsys/pkg/CFR-2016-title22-vol1/xml/CFR-2016-title22-vol1-part62.xml#seqnum62.31 (accessed October 6, 2016); Audit Compliance Procedure Template, InterExchange0020863-95 at 89; Independent Public Accountant's Report on Applying Agreed-Upon Procedures, InterExchange, Inc., December 13, 2013, InterExchange0020936-74 at 48.

[63] Class Certification Rebuttal Report, ¶¶ 46, 48.

[64] In response to Dr. Kerr's survey, many host families reported paying cash bonuses or providing other benefits to au pairs. Plaintiffs have not alleged collusion with respect to fixing the value of such bonuses or benefits. *See,* RFP000747.

[65] Second Amended Complaint, ¶ 81; Program Options, Au Pair in America, available at http://www.aupairinamerica.com/options/ (accessed January 6, 2017); Regular & Par Expérience, EurAuPair Intercultural Child Care Programs, 2015, available at https://www.euraupair.com/host-family/in-home-child-care-programs/ (accessed January 6, 2017); Available Au Pair Programs, GoAuPair, available at http://www.goaupair.com/host-families/fees/fees-by-au-pair-type (accessed January 6, 2017); Professional Program, AuPairInternational, available at http://www.aupairint.com/index.php/programs/professional (accessed January 6, 2017); Learn About Professional Au Pairs, ProAuPair, 2017, available at https://proaupair.com/why-professional-aupair (accessed January 6, 2017); Program Options, The International Au Pair Exchange, 2012, available at http://tiape.org/host-families/program/ (accessed January 9, 2017).

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

15

## IV. THERE IS NO EVIDENCE THAT THE CONSPIRACY, AS ALLEGED, IS ECONOMICALLY RATIONAL

### A. The Conspiracy as Alleged Would Not Be Profitable Because There Is No Market Mechanism that Would Drive Au Pair Stipends Higher in the But-For World

31. For Plaintiffs' theory of antitrust harm to be correct, at a fundamental level it must be the case that Defendants have successfully conspired to decrease weekly stipends below the level that would prevail under competitive conditions and profited from doing so. This would mean that but for the alleged conspiracy, weekly stipends paid to au pairs by host families would have been driven higher by market forces. If but-for stipends would be higher, there should be evidence that market forces would push au pair stipends higher but are prevented from doing so by the alleged conduct.

32. I have not yet seen how Plaintiffs and Plaintiffs' expert will demonstrate that current stipends are below stipends that would prevail in a competitive but-for world. This is critical because at the current stipend levels, I understand that there are already enough au pairs willing to participate in the program to satisfy host family demand. In fact, all of the evidence that I have seen indicates that there are already more qualified au pairs willing to participate in the program at the current DOS minimum stipend than there are families willing to host them.[66] This suggests that the current DOS minimum stipend is a binding price floor and that market forces would push stipends downwards rather than upwards if that floor were removed, irrespective of any alleged conspiracy. Therefore, Defendants do not have an economic incentive to agree on a weekly stipend amount because they can achieve the same outcomes observed in the alleged market through independent, competitive action.

33. In addition, if at the current DOS minimum stipend level, sponsors can attract enough au pairs to the program to satisfy host family demand, then it is not clear what market forces would push stipends to be any higher in a but-for world. There is no incentive for any individual au pair sponsor to join a buyers' cartel. Nor is there an incentive for a sponsor to unilaterally deviate from the alleged agreement. In a typical cartel, while members can collectively earn higher profits from cooperating, individual cartel members would find it profitable to unilaterally deviate from the agreement.[67] But in this case, individual sponsors would not find it profitable to unilaterally raise stipends because it is possible to attract sufficient au pairs to meet host family demand at current stipend levels. I have not seen how Plaintiffs' expert will attempt to show that an individual sponsor can profit by unilaterally raising stipends. If there is no reason for individual sponsor agencies to

---

[66] I discuss the evidence for an excess supply of au pairs at the stipends that were received in **Section V.A.**

[67] This is the reason why functioning cartels typically need both an agreement mechanism and an enforcement mechanism. In a typical functioning cartel, members are better off collectively under the agreement, but would individually be better off by cheating on the agreement.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

16

PLAINTIFFS' RESP. APP.0002005

"cheat" on an alleged agreement and unilaterally raise stipends, there is also no economic reason for sponsor agencies to collectively agree that they will not do so.

34.     Moreover, unilaterally raising stipend levels for standard au pairs would make an au pair sponsor less attractive to host families. Given that there is already an excess of potential au pairs applying to the program at current stipend levels, sponsor agencies would benefit if a competing agency increased the stipend it told host families to pay. Ruth Ferry, Director of APIA, explained that "such a decision by a competitor could even benefit APIA if it made that competitor less attractive to the limited number of host families[.]"[68] Ms. Ferry also explained this in her deposition:[69]

> A: […] There's no value in […] raising the weekly stipend for an au pair if I have more au pairs anytime then are possibly going to possibly be placed. […] We're only able to place somewhere between 72 and 80 percent of the au pair applicants that we receive that are cleared to be accepted in the program. […]
>
> Q: What do you mean when you say there's no value?
>
> A: If […] you suggest that we're going to pay the au pair more, then I'm going to have more of a challenge […] to compete against competitors who are – why would a hosting family go with Au Pair in America when I tell them that the minimum stipend for the au pairs in our program are going to be greater?

35.     As explained above, in a true employers' cartel, members would need to monitor and enforce an agreement to restrict wages or hiring to ensure that other cartel members did not cheat on the agreement. One would anticipate that members of the cartel would be made worse off if another member cheated on the agreement. In what Plaintiffs allege is an employer cartel of sponsor agencies, sponsor agencies stand to benefit if another sponsor agency advertised higher stipends to au pairs. Higher stipends advertised by one sponsor agency would cause host families to gravitate toward other sponsor agencies advertising lower stipends. Because, as I understand the market facts, host families are harder to attract than au pairs, sponsor agencies would be better off if one of their competitors advertised higher stipends.

36.     Furthermore, as explained above, a typical employers' cartel would decrease the wages it pays and hire fewer workers than it otherwise would to earn supra-competitive profits. If the Plaintiffs' allegations that Defendants have formed an employers' cartel for au pair labor were true, then I would not expect to see evidence of a surplus of au pairs interested in participating in the program at the allegedly depressed stipend level. Nor would I expect to see evidence that Defendants can attract more au pairs to the program without increasing stipends. Yet, these are the market conditions observed in Plaintiffs' alleged

---

[68]   Declaration of Ruth Ferry, July 17, 2017, ¶ 8.

[69]   Deposition of Ruth Ferry, May 11, 2017, 109:18-112:7.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

17

PLAINTIFFS' RESP. APP.0002006

relevant labor market for au pairs. Given the above discussion, I am unaware of how Plaintiffs' expert will show that stipends have been suppressed and that market forces would drive stipends higher but for the alleged conduct.

37.   Plaintiffs seem to rely on statements by sponsors that describe the stipend as $195.75 as evidence implying a conspiracy or agreement.[70] Faced with market factors that would lead to the same market outcomes absent a conspiracy, it would seem that these statements may simply reflect the casual way that market participants may talk about observed outcomes in their market. If market forces drive the stipend to $195.75, then it would not be surprising for sponsor agencies to refer to the actual and observed stipend as "the" stipend that host families must pay. Such a statement is not misleading under the market conditions observed in the au pair market. Instead, it is merely a realistic description of what an au pair can, for the most part, be expected to receive for a stipend given the lack of economic pressure to offer more.

## B.   The Nature of the Alleged Conspiracy Does Not Make Economic Sense

38.   Plaintiffs allege that Defendants colluded to fix standard au pairs' stipends and to suppress competition for au pairs. Plaintiffs' allegations are limited to Defendants colluding only on the weekly stipend paid by host families to au pairs, not on any other way Defendants compete to recruit au pairs. In fact, Plaintiffs explicitly acknowledge that outside of the stipend amount, "[t]he revenue-seeking sponsor agencies fiercely compete for host families and au pairs[.]"[71] This is problematic for Plaintiffs' allegations from an economic standpoint. If Defendants had agreed to not compete by altering weekly stipends paid to au pairs, competition among other dimensions could undermine any anticipated economic benefit of such an agreement. Thus, it does not make economic sense for such an agreement to be narrowly focused on stipends, leaving the Defendants free to compete for more au pairs through other modes of competition.

39.   For example, the fees that sponsors charge host families vary. Dr. Kerr showed in Exhibit 6 of his initial report on Class Certification that in 2016 fees charged to host families by Defendants ranged from $6,750 to $9,100.[72] Competition in the amount of the fees charged to host families could potentially eliminate the economic benefit of the alleged conspiracy to set the amount of the weekly stipend. Neither Plaintiffs nor Plaintiffs' expert has established that it would be possible for sponsors to try and increase their profits indirectly by agreeing on the amount of the stipend to be paid by the host families, yet at the same time compete aggressively on the amount the host families pay directly to sponsors.

---

[70]   For instance, Plaintiffs claim that information on sponsor agency websites and sponsor agency publications indicates that the weekly stipend paid to au pairs is $195.75.  *See,* Second Amended Complaint, ¶¶ 98-117.

[71]   Second Amended Complaint, ¶ 9.

[72]   Kerr Report, January 13, 2017, Exhibit 6.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

PLAINTIFFS' RESP. APP.0002007

40. In addition, the type of price competition for au pairs advocated by the Plaintiffs already exists. Plaintiffs allege that, absent the conspiracy, sponsor agencies would "compete for au pairs by offering, or facilitating, higher stipends for au pairs."[73] As mentioned in the Class Certification Report and above, seven of the sponsor agencies sponsor different categories of au pairs, such as "professional" or "extraordinary," typically for au pairs with skills or experience beyond those of regular au pairs.[74] For these highly qualified or more experienced au pairs, sponsors compete by offering higher minimum weekly stipends. The competition that Plaintiffs say should be occurring absent the alleged conspiracy is in fact happening in the actual world. Moreover, as mentioned above, individual sponsors' advertisement of "pro" au pairs at higher minimum weekly stipends is inconsistent with the alleged agreement by Defendants to fix au pair stipends.

41. Furthermore, in a cartelized labor market, it would be expected that the reduced wages would lead to a reduced number of employees compared with employment levels under competitive conditions.[75] In Plaintiffs' alleged labor market for au pairs, Defendants have been sponsoring an increasing number of au pairs over time.[76] From 2010 to 2015, the number of au pairs participating in the program grew by 34 percent.[77] I have not seen how Plaintiffs will seek to establish that but for the conduct at issue, participation in the program would have grown by a greater amount.

## V.    PLAINTIFFS CANNOT SHOW CAUSATION OR PROVE ANTITRUST DAMAGES

### A.    An Excess Supply of Au Pair Applicants at the Actual Stipends Received by the Class Undermines Plaintiffs' Theory of Damages

42. Plaintiffs allege that the Class has suffered antitrust damages from weekly stipends received by Class members allegedly being suppressed below competitive levels.[78]

---

[73] Second Amended Complaint, ¶¶ 76-78.

[74] Second Amended Complaint, ¶ 81; Program Options, Au Pair in America, available at http://www.aupairinamerica.com/options/ (accessed January 6, 2017); Regular & Par Expérience, EurAuPair Intercultural Child Care Programs, 2015, available at https://www.euraupair.com/host-family/in-home-child-care-programs/ (accessed January 6, 2017); Available Au Pair Programs, GoAuPair, available at http://www.goaupair.com/host-families/fees/fees-by-au-pair-type (accessed January 6, 2017); Professional Program, AuPairInternational, available at http://www.aupairint.com/index.php/programs/professional (accessed January 6, 2017); Learn About Professional Au Pairs, ProAuPair, 2017, available at https://proaupair.com/why-professional-aupair (accessed January 6, 2017); Program Options, The International Au Pair Exchange, 2012, available at http://tiape.org/host-families/program/ (accessed January 9, 2017); Program Costs & Discounts, AuPair4me, 2017, available at http://www.aupair4me.com/host-family/program-cost-and-discounts (accessed January 6, 2017).

[75] Blair and Harrison, 2010, p. 48.

[76] Class Certification Report, Table 2.

[77] In 2010, 13,120 au pairs began the program and in 2015, 17,588 au pairs began the program. By comparison, the total number of nonfarm employees in the U.S. grew by 10 percent over the same time period. See, All Employees: Total Nonfarm Payrolls, Federal Reserve Economic Data, available at https://fred.stlouisfed.org/series/PAYEMS (accessed July 24, 2017).

[78] Second Amended Complaint, ¶¶ 581, 584, 593.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

PLAINTIFFS' RESP. APP.0002008

Plaintiffs' allegation is inconsistent with the excess supply of au pairs at current stipend levels. As noted, with an excess supply of au pairs, market forces would exert downward pressure on stipends, rather than upward pressure. Under market conditions, as I understand them to be, there is no basis to assert that alleged collusion has suppressed au pair stipends below those which would prevail under competitive conditions.

43. I understand that at the current level of weekly stipends, sponsors typically have more qualified au pair applicants than they need to satisfy host family demand. Natalie Jordan, Senior Vice President of Cultural Care, testified that "Cultural Care's supply of qualified au pairs always materially exceeds its demand for their services."[79] Ms. Jordan also stated that "the pool of qualified au pair candidates can be increased as necessary through increased advertising and other recruiting tools," and that "Cultural Care always maintains a pool of qualified au pair candidates that exceeds the total number of its host families."[80] Representatives from Expert AuPair, GreatAuPair, Au Pair Foundation, Cultural Homestay International, APIA, and Go Au Pair expressed similar views in their testimony. For instance, Mark Gaulter, CEO of Expert AuPair, testified that matching au pairs to hosts families is hard "because [Expert AuPair has] many more au pairs than host families."[81] Shannon Pitts, owner of GreatAuPair, testified that GreatAuPair tries to maintain a "ratio of three to one" of available au pairs to host families and that GreatAuPair does not "have a real problem with au pair supply."[82] Theresa Nelson, VP of Finance and Administration at AuPairFoundation, testified that AuPairFoundation has, since 2013, consistently received more au pair applications than they have families to host them.[83] Moreover, Christina Reilly, director of the au pair program for Cultural Homestay International, states that Cultural Homestay International has difficulty in fully utilizing their DS-2019 slots "based on finding and retaining host families" because "[i]t is easier to increase the number of qualified au pairs than the number of host families."[84] In addition, Ruth Ferry states that during her tenure, "the number of matches that [APIA] can make has always been constrained by the number of families who desire to host an au pair, rather than the number of qualified and available au pairs."[85] Furthermore, Bill Kapler, manager of Go Au Pair, states that "[t]he supply of qualified au pairs always exceeds, by substantial margins, host families' demand for au pairs."[86] In fact, Mr.

---

[79] Declaration of Natalie Jordan, March 10, 2017, ¶ 2, CC00008565-8568.

[80] Declaration of Natalie Jordan, March 10, 2017, ¶¶ 5, 9, CC00008565-8568.

[81] Deposition of Mark James Gaulter, May 9, 2017, 43:6-16.

[82] Deposition of Shannon Pitts, 30(b)(6) Representative for GreatAuPair, May 31, 2017, 84:14-24.

[83] Deposition of Theresa Nelson, 30(b)(6) Representative for Au Pair Foundation, May 9, 2017, 82:25-83:21.

[84] Declaration of Christina Reilly, July 17, 2017, ¶ 9.

[85] Declaration of Ruth Ferry, July 17, 2017, ¶ 6.

[86] Declaration of Bill Kapler in Support of GoAuPair's Opposition to Plaintiffs' Motion for Class Certification, July 17, 2017, ¶ 20.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

PLAINTIFFS' RESP. APP.0002009

Kapler testified that "over 39% of Available Au Pairs drop out of the program before ever finding a host-family match."[87]

44.  Available data from a selection of sponsor agencies supports the testimonial evidence discussed above.  As shown in data produced by APIA, the number of qualified individuals desiring to work as au pairs sponsored by APIA always exceeds the number of spots available.  This is true across all regions and time periods in the data and is shown below in **Tables 3 and 4**.

**Table 3**
APIA Application and Placement Statistics by Year[88]

| Year | Applicants | Placements | Placement Rate |
|------|-----------|-----------|----------------|
| | | | ----(Percent)---- |
| (a) | (b) | (c) | (d) |
| | | | (c)/(b) |
| 2009 | 4,243 | 3,047 | 71.81 % |
| 2010 | 4,217 | 3,100 | 73.51 |
| 2011 | 4,061 | 3,205 | 78.92 |
| 2012 | 4,504 | 3,539 | 78.57 |
| 2013 | 4,756 | 3,687 | 77.52 |
| 2014 | 5,032 | 4,068 | 80.84 |
| **Total:** | **26,813** | **20,646** | **77.00 %** |

---

[87]  Declaration of Bill Kapler in Support of GoAuPair's Opposition to Plaintiffs' Motion for Class Certification, July 17, 2017, ¶ 21.

[88]  I understand that these data on U.S. applications and placements were produced by APIA for this litigation and take it as given that the file produced is accurate.  *See,* PlacementRateAnalysis_09-14.xlsx.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

PLAINTIFFS' RESP. APP.0002010

**Table 4**
APIA Application and Placement Statistics by Region[89]

| Region of Applicants | Applicants | Placements | Placement Rate |
|---|---|---|---|
| | | | ----(Percent)---- |
| (a) | (b) | (c) | (d) |
| | | | (c)/(b) |
| Western Europe | 13,501 | 10,971 | 81.26 % |
| The Americas | 6,929 | 5,276 | 76.14 |
| Africa | 1,392 | 1,077 | 77.37 |
| South Pacific | 242 | 214 | 88.43 |
| Asia | 2,370 | 1,419 | 59.87 |
| Middle East | 489 | 340 | 69.53 |
| Eastern Europe | 1,890 | 1,349 | 71.38 |
| **Total:** | **26,813** | **20,646** | **77.00 %** |

45.    Similar data produced by AuPair Care also shows that AuPair Care receives more
       applications from qualified au pairs than it is able to place. As shown below, from 2009
       to 2016, AuPair Care was only able to place between 71 and 85 percent of the qualified
       au pairs from whom it received applications.

**Table 5**
AuPair Care Application and Placement Statistics[90]

| Year | Applicants | Placements | Placement Rate |
|---|---|---|---|
| | | | -----(Percent)----- |
| (a) | (b) | (c) | (d) |
| | | | (c)/(b) |
| 2009 | 3,630 | 2,762 | 76.09 % |
| 2010 | 3,721 | 2,785 | 74.85 |
| 2011 | 3,444 | 2,938 | 85.31 |
| 2012 | 3,939 | 2,925 | 74.26 |
| 2013 | 3,966 | 2,972 | 74.94 |
| 2014 | 4,176 | 3,195 | 76.51 |
| 2015 | 4,017 | 3,381 | 84.17 |
| 2016 | 4,813 | 3,415 | 70.95 |
| **Total:** | **31,706** | **24,373** | **77.13 %** |

---

[89]    I understand that these data on U.S. applications and placements were produced by APIA for this litigation and take it as
given that the file produced is accurate. *See,* PlacementRateAnalysis_09-14.xlsx.

[90]    I understand that these data on U.S. applications and placements were produced by AuPair Care for this litigation and take it
as given that the file produced is accurate. *See,* App Arrivals Analysis 2009-2016.xlsx.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

22

PLAINTIFFS' RESP. APP.0002011

46.   Data from Cultural Care also indicate that there is an excess number of au pair applicants under current conditions.  **Table 6** below shows the number of qualified au pair applications entering Cultural Care's matching pool in each year, the number that agree to a match with a host family, and the number that actually traveled to the U.S. and participated in the au pair program.  As shown in **Table 6**, only 69 to 82 percent of qualified au pairs in Cultural Care's matching pool went on to match with a host family and participate in the U.S. au pair program:

**Table 6**
Cultural Care Application, Matching, and Participation Statistics[91]

| Year | Applicants | Matches | Match Rate | Placements | Placement Rate |
|---|---|---|---|---|---|
| | | | --(Percent)-- | | --(Percent)-- |
| (a) | (b) | (c) | (d) | (e) | (f) |
| | | | (c)/(b) | | (e)/(b) |
| 2009 | 9,467 | 6,535 | 69.03 | 6,535 | 69.03 |
| 2010 | 8,174 | 5,793 | 70.87 | 5,792 | 70.86 |
| 2011 | 7,919 | 5,594 | 70.64 | 5,496 | 69.40 |
| 2012 | 8,441 | 5,908 | 69.99 | 5,264 | 62.36 |
| 2013 | 8,748 | 6,458 | 73.82 | 6,177 | 70.61 |
| 2014 | 8,913 | 7,281 | 81.69 | 7,280 | 81.68 |
| 2015 | 11,505 | 8,816 | 76.63 | 8,805 | 76.53 |
| 2016 | 12,859 | 9,734 | 75.70 | 8,947 | 69.58 |
| Total: | 76,026 | 56,119 | 73.82 % | 54,296 | 71.42 % |

47.   Dr. Kerr, Plaintiffs' expert on Class Certification, did not dispute in his deposition that there are more au pairs applying to the program than needed to fill the available positions:[92]

> Q: That there are an excess number of qualified candidates who wish to be au pairs at the stipend level that you say was suppressed – […]–is that right?
>
> A: At any point in time, I would believe that her conclusion is right, that for many reasons the – the sponsors have an incentive to have a much bigger pool of applicants than can possibly be placed.

48.   Dr. Kerr also stated that the testimony of Ms. Jordan (that Cultural Care has always had more than enough qualified au pair applicants to meet host family demand) did not surprise him.[93]  He also asserted that this condition would be true for all of the sponsors,

---

[91]   AP HF Volumes.xlsx.

[92]   Kerr Deposition, May 4, 2017, 117:22-118:5.

[93]   Kerr Deposition, May 4, 2017, 114:4-10.  ("Q: So you understand that, from the major player in the au pair market, Ms. Jordan has indicated that since her tenure with the company beginning in 1999, Cultural Care has had an excess of eligible au pairs available to place?  A: I – I'm not at all surprised at that at all.").

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

23

testifying that "I guarantee you that that's the truth, that everybody – that every one of them always has more on their website than they have positions to fill."[94]  In fact, he testified that it is a fact "that there is always an oversupply" because "that's how this business works."[95]

49.  However, in his deposition, Dr. Kerr also testified that there is an excess demand for au pair services by host families.[96]  As I understand his position, Dr. Kerr argues that there are two markets at issue, a recruitment market for au pairs, in which there is excess supply, and a separate market for au pair services, in which there is simultaneously excess demand.[97]  As an initial matter, Dr. Kerr's discussion of two markets is a red herring and largely irrelevant.  Even if Dr. Kerr were correct that there are two markets and that there is an excess supply in one while simultaneously an excess demand in the other, that would not change the fact that because there is an excess supply of au pairs, sponsor agencies would not need to instruct host families to increase stipends to entice additional qualified au pairs to enter the program.  Moreover, his description of market dynamics is flawed.  If Dr. Kerr is correct that there is an excess demand of host families due to a limited number of DS-2019 forms, au pairs would not have additional bargaining power.  Because each sponsor agency controls its DS-2019 forms, if Dr. Kerr is correct that otherwise willing host families are unable to match with qualified au pairs, market forces would not create pressure for higher au pair stipends.[98]  Rather, market forces would lead each sponsor agency to increase its host family fees until the number of host families aligned with the number of available visas.

50.  Putting this aside, Dr. Kerr's arguments fail because they originate with a false premise, that the demand curve for au pairs by host families is vertical (*i.e.*, it is unresponsive to price) because the "number of placements is given."[99]  Contrary to Dr. Kerr, it is my understanding that the number of host families interested in participating in the program determines the number of matches, that the allotment of DS-2019 forms each sponsor agency receives from the DOS is itself influenced by sponsor projections of host family interest, and that the allotments sponsor agencies receive are not binding.  While some DS-2019 forms may go unused, the DOS can and has allotted additional DS-2019 forms to sponsors who use up their initial allotment.[100]  Bill Kapler testified that "Go Au Pair has never been limited by the number of Forms DS-2019 it receives and issues.  Even if it

---

[94]  Kerr Deposition, May 4, 2017, 122:16-19.

[95]  Kerr Deposition, May 4, 2017, 123:11-18.

[96]  Kerr Deposition, May 4, 2017, 255:6-14.

[97]  Kerr Deposition, May 4, 2017. 258:5-262:9.

[98]  Declaration of Ruth Ferry, July 17, 2017, ¶ 14.

[99]  Kerr Deposition, May 4, 2017, 282:23-284:14.

[100]  Dr. Kerr was not aware that sponsors could request additional DS-2019 forms from the DOS at his deposition.  Kerr Deposition, May 4, 2017, 129:1-13.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

PLAINTIFFS' RESP. APP.0002013

had, the DOS has, and exercises, discretion to increase the number of Forms DS-2019 allotted given [*sic*] to any sponsor."[101] Ruth Ferry testified that:[102]

> In practice, however, the limited number of Forms DS-2019 does not limit the number of au pairs that APIA can place. Instead, the number of placements is routinely limited by the number of matches, which is in reality and practice limited by the number of available host families. During my tenure at APIA, our program has generally been unable to find sufficient host families to meet and/or surpass APIA's annual allotment of Forms DS-2019. If APIA were able to obtain matches in excess of its annual allotment, our program would simply apply for an increase, which I would expect to be granted based upon our program's experiences with DOS.

51. Christina Reilly, director of the au pair program for Cultural Homestay International, testified to the quantity of DS-2019 forms it has been allotted by the DOS but unable to fill. Her testimony shows that from 2009 to 2014, Cultural Homestay International was unable to use 264 of its allotted DS-2019 forms.[103] As Ms. Reilly explained, "DS-2019 slots go unfilled not because we lack qualified candidates to serve as au pairs. Instead, the difficulty in fully utilizing our allocation is based on finding and retaining host families."[104] As such, Dr. Kerr's assertions that there is excess demand by host families for au pairs or alternatively that host family demand is fixed irrespective of price are contradicted by market facts.

52. Moreover, Dr. Kerr has not explained how sponsors' ability to attract enough qualified au pairs to exceed the number of matches available is consistent with Plaintiffs' allegations that sponsor agencies are in a buyers' cartel that had antitrust impact. Absent any collusion or regulation, such an excess supply of au pairs would tend to put downward pressure on stipends. For example, if market conditions are such that there are regularly three comparable au pairs for every one host family position, then competition among those au pairs to win the placement would cause stipends to fall lower, absent regulation keeping the stipends at some specified level.

53. Markets with binding minimum wages typically experience an excess supply of labor. In such markets, absent regulation, market forces would act to reduce wages to lower, market clearing levels. Put another way, if market forces were to push wages even higher than a proposed minimum wage, regulation to impose the minimum wage would not be necessary because competitive forces would make the minimum wage irrelevant.

---

[101] Declaration of Bill Kapler in Support of Go Au Pair's Opposition to Plaintiffs' Motion for Class Certification, July 17, 2017, ¶ 19.

[102] Declaration of Ruth Ferry, July 17, 2017, ¶ 12.

[103] According to Ms. Reilly, Cultural Homestay International had 70 unused DS-2019 forms in 2009, 22 in 2010, 29 in 2011, 115 in 2012, 8 in 2013, and 20 in 2014. *See,* Declaration of Christina Reilly, July 17, 2017, ¶ 8.

[104] Declaration of Christina Reilly, July 17, 2017, ¶ 9.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

25

Evidence that there are more potential au pairs willing to participate in the au pair program at current stipend levels and the fact that weekly stipends cluster somewhat around the DOS minimum level are consistent with the DOS minimum acting as a binding price floor.[105] Without the DOS minimum, competitive forces would be expected to cause weekly stipends paid to au pairs to fall, rather than rise.

54. An excess supply of au pairs at current DOS minimum stipends also provides an explanation as to why the number of au pairs participating in the program has been increasing over time while reported weekly stipends have remained stable.[106] As reflected in the testimony cited above, sponsor agencies can increase the number of au pairs they sponsor without increasing the stipends host families pay because there is an excess supply of au pairs interested in participating in the program at current stipend levels. In a monopsonized labor market with upward sloping supply, this would not occur because the prevailing wage would have to increase in order for the supply of workers to increase. Thus, this market outcome is consistent with the alleged labor market not being cartelized, but rather being prevented from clearing due to the DOS minimum stipend.

## B. There is No Basis to Expect that Stipends Received in the But-For World Would Be Different from Those Received in the Actual World

55. As discussed above, observed stipend levels are consistent with a binding price floor at the DOS minimum, competition between Defendants, and unilateral actions by Defendants to conform to the DOS notices on au pair stipends. I have not yet had an opportunity to evaluate how Plaintiffs or Plaintiffs' expert will seek to show that outcomes in Plaintiffs' alleged relevant labor market are the result of collusion rather than a result of the factors I have described. Moreover, I have not yet had an opportunity to evaluate how Plaintiffs' expert will seek to describe any competitive, economic mechanism by which stipends would allegedly increase in the but-for world absent the alleged collusion, and it is not apparent that any such mechanism exists.

56. In the Second Amended Complaint, Plaintiffs describe a but-for world in which au pairs negotiate with sponsor agencies and host families for higher stipends.[107] Because there are more au pairs interested in participating in the program than there are host families, Plaintiffs' hypothetical of profitable negotiations by au pairs is misguided. First, some sponsor agencies already facilitate higher stipends for au pairs with more skills and experience.[108] Second, sponsor agencies already have a sufficient number of standard au

---

[105] Kerr Affidavit, June 2, 2017, ¶ 9.

[106] According to analysis submitted by Dr. Kerr, host family survey results show that the average and median weekly stipends have stayed relatively constant over time. *See*, RFP000747; Class Certification Report, Table 2.

[107] Second Amended Complaint, ¶¶ 150-151.

[108] *See, e.g.*, Program Options, Au Pair in America, available at http://www.aupairinamerica.com/options/ (accessed January 6, 2017).

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

26

pairs at the stipends that were offered. Given this excess supply of au pairs, potential au pairs that try to negotiate higher stipends will likely be undercut by other applicants seeking the same match.

57. Support for this competitive dynamic between au pairs is provided by testimony of Bill Kapler. Mr. Kapler testified that 64 percent of au pair applicants who were qualified to be placed in Go Au Pair's "Plus" or "Premiere" program accepted stipends of $200 or less.[109] Thus, while these au pairs were qualified for a program where they were eligible to receive a higher stipend for their services, they instead chose to accept the lower stipends offered under the standard au pair program to increase their chances of obtaining a placement. This contradicts the idea that stipends received in the but-for world would be higher than those received in the actual world, as there is already sufficient interest in the standard au pair program at existing stipend levels.

## C. Unless Economic Outcomes Would Be Different Absent the Conspiracy, There Are No Antitrust Damages

58. Even if the Plaintiffs could prove that the Defendants attempted to form a collusive monopsony, there would be no antitrust injury to the Class members if stipends would not have differed between the but-for world and the actual world.

59. I discussed in the Class Certification Report the possibility that Class members would not match in the but-for world if there were an increase in the stipends. If (as Plaintiffs claim) au pairs negotiated higher stipends or if stipends are forced by statute to increase, fewer au pairs and a different group of au pairs would have matched with families and participated in the program in the but-for world. A higher stipend, all else equal, would cause host families to substitute away from the au pair program and towards other childcare options. As Ruth Ferry asks when faced with a question about the value of raising the weekly stipend for an au pair, "why would a hosting family go with Au Pair in America when I tell them that the minimum stipend for the au pairs in our program are going to be greater?"[110] In addition, a higher stipend would give au pairs with more childcare experience an incentive to enter the program, effectively replacing au pairs with less experience. Thus, the composition of au pairs that match with host families would change between the but-for world and the actual world. Au pairs who matched in the actual world but would not have matched in the but-for world cannot be properly said to have suffered antitrust damages due to the alleged conduct.

---

[109] GoAuPair facilitates matches for four classifications of au pairs: (1) au pairs in the EduCare program who assist with childcare for a fewer maximum number of hours and take more college credits; (2) au pairs in the "Plus" or "Premiere" programs who have more experience or qualifications than typical au pair program participants; and (3) au pairs not participating in the EduCare, "Plus," or "Premiere" programs, which GoAuPair refers to as "standard" au pairs. *See,* 3 Steps to Become an Au Pair, GoAuPair, available at http://www.goaupair.com/au-pairs/3-steps-to-become-an-au-pair/apply-now (accessed July 21, 2017); Declaration of Bill Kapler in Support of GoAuPair's Opposition to Plaintiffs' Motion for Class Certification, July 17, 2017, ¶ 37.

[110] Deposition of Ruth Ferry, May 11, 2017, 109:18-112:7.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

PLAINTIFFS' RESP. APP.0002016

60.     I have not seen how Plaintiffs' expert will seek to establish that an allegedly competitive increase in stipends can be offset by a decrease in sponsor agency fees such that the quantity of matches would stay the same in the but-for world nor have I seen how Plaintiffs' expert will address whether matches occurring in the but-for world would differ from those occurring in the actual world.

61.     If, as Plaintiffs' allege and Dr. Kerr described in the class certification phase, a differing interpretation of labor laws would have led the DOS to set the minimum stipend at a higher level, this increase in stipends would not have been the result of competitive conditions.  Therefore, an increase in stipend due to differing legal interpretations of existing regulations cannot properly be said to lead to antitrust damages.


Signed this 31st day of July, 2017:


*Lauren Stiroh*

Lauren J. Stiroh

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

PLAINTIFFS' RESP. APP.0002017

Case 1:14-cv-03074-CMA-KMT Document 959-11 Filed 03/17/16 USDC Colorado Page 122 of 173

Exhibit 1



**Lauren J. Stiroh**
Managing Director

NERA Economic Consulting
360 Hamilton Avenue, 10th Floor
White Plains, New York 10601
Tel: +1 914 448 4143  Fax: +1 914 448 4040
lauren.stiroh@nera.com
www.nera.com

# LAUREN J. STIROH
## Managing Director
## Chair, Global Antitrust and Competition Practice

Dr. Stiroh specializes in the economics of antitrust, intellectual property, and commercial damages. She has conducted research, prepared expert reports, and testified in court on a variety of issues arising from antitrust allegations such as monopolization, exclusionary conduct, tying, vertical restrictions, price fixing, predatory pricing, price discrimination, and abuse of standard setting. Dr. Stiroh has analyzed the competitive effects of mergers, acquisitions, and joint ventures. She has also written expert reports and consulted on matters related to assessing impact and damages in class action litigation. She has performed or critiqued damage calculations in more than a dozen industrial settings.

Dr. Stiroh has also written and testified on the subject of intellectual property value and valuation. She has assessed and critiqued damages from patent, copyright, and trademark infringement in industries including semiconductors, biotechnology, pharmaceuticals, medical devices, and consumer products. Dr. Stiroh is co-editor and contributing author of *Economic Approaches to Intellectual Property Policy*, *Litigation and Management*, published in 2005.

Much of Dr. Stiroh's work and research focuses on the intersection of antitrust and intellectual property litigation. She has written articles and given speeches on this subject for the American Bar Association, Law Seminars International, the Practicing Law Institute, and the 2002 US Department of Justice and Federal Trade Commission joint hearings on "Competition and Intellectual Property Law and Policy in the Knowledge-Based Economy." She has analyzed market power in technology markets and evaluated the competitive implications of licensing arrangements, including tying and patent pooling provisions.  In 2010, she participated in the ABA Stanford Law School Symposium on Antitrust and Innovation.

Dr. Stiroh has presented her research before the FTC, the DOJ, the Canadian Competition Bureau, and in expert testimony.  In 2010, she was inducted into the YWCA-NYC Academy of Women Leaders.

Dr. Stiroh holds a Ph.D. in Economics from Harvard University, an M.A. in Economics from the University of British Columbia, and a B.A. in Economics from the University of Western Ontario.

 HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Exhibit 1**

## Education

**Harvard University**
Ph.D., Economics, August 1996

**University of British Columbia**
M.A., Economics, November 1991

**University of Western Ontario**
B.A., Economics, June 1990

## Professional Experience

**NERA Economic Consulting**

| | |
|---|---|
| July 2016 - | *Chair, Global Antitrust and Competition Practice* |
| 2005-2016 | *Managing Director/Senior Vice President* |
| 2002-2005 | *Vice President* |
| 1999-2002 | S*enior Consultant* |
| 1996-1999 | *Senior Analyst* |

**Unidad de Desarrollo Social**

March 1994
August 1994 — *Consultant.* Prepared two studies for the National Planning Department concerning the effect of the trade liberalization in Colombia on the distribution of income.

**Harvard University**

1994-1996 — *Research Assistant.* Research Assistant for Professor Dale Jorgenson. Estimated human capital and national income accounts.

**Harvard University**

1993-1996 — *Teaching Fellow in Economics.* Taught principles of economics, the introductory and core course in economics at Harvard College.

## Honors and Professional Activities

Adjunct member, NY City Bar Association, Antitrust and Trade Regulation Committee, September 2016 to Present.

YWCA-NYC Academy of Women Leaders, Class of 2010.

Member, American Economic Association.

Derek Bok Teaching Award, 1996.

PLAINTIFFS' RESP. APP. 002019 HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Exhibit 1
Lauren J. Stiroh

Harvard University Scholarship 1991-1994.

Social Sciences and Humanities Research Council of Canada Fellowship 1991-1994.

University Graduate Fellowship (University of British Columbia) 1990-1991.

Huron College Corporation Scholarship (University of Western Ontario) 1987-1989.

## Expert Testimony and Reports (2013-2017)

### *SourceOne Dental, Inc., v. Patterson Companies, Inc., Henry Schein, Inc., and Benco Dental Supply Company*

Deposition testimony, on behalf of Defendants, Patterson Companies, Inc., Henry Schein, Inc., and Benco Dental Supply Company, in connection with *SourceOne Dental, Inc., v. Patterson Companies, Inc., Henry Schein, Inc., and Benco Dental Supply Company,* July 21, 2017.

Expert Report, on behalf of Defendants, Patterson Companies, Inc., Henry Schein, Inc., and Benco Dental Supply Company, in connection with *SourceOne Dental, Inc., v. Patterson Companies, Inc., Henry Schein, Inc., and Benco Dental Supply Company,* April 28, 2017.

### *Johana Paola Beltran, et al., v. Interexchange, Inc., et al.*

Deposition testimony, on behalf of Defendants, Interexchange, Inc., et al., in connection with *Johana Paola Beltran, et al., v. Interexchange, Inc., et al.,* April 6, 2017.

Expert Rebuttal Report, on behalf of Defendants, Interexchange, Inc., et al., in connection with *Johana Paola Beltran, et al., v. Interexchange, Inc., et al.,* February 3, 2017.

Expert Report, on behalf of Defendants, Interexchange, Inc., et al., in connection with *Johana Paola Beltran, et al., v. Interexchange, Inc., et al.,* January 13, 2017.

### *Dino Rikos, et al., v. The Procter & Gamble Company*

Expert Reply Report, on behalf of Defendant, The Procter & Gamble Company, in connection with *Dino Rikos, et al., v. The Procter & Gamble Company,* February 17, 2017.

3

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Exhibit 1

**Lauren J. Stiroh**

***Insight Equity A.P.X., LP, d/b/a Vision-Ease Lens Worldwide v. Transitions Optical, Inc.***

Expert Reply Report, on behalf of Defendant, Transitions Optical, Inc., in connection with *Insight Equity A.P. X., LP, d/b/a Vision-Ease Lens Worldwide v. Transitions Optical, Inc.*, February 1, 2017.

Testimony, on behalf of Defendant, Transitions Optical, Inc., in the United States District Court, for the District of Delaware, in connection with *Insight Equity A.P. X., LP, d/b/a Vision-Ease Lens Worldwide v. Transitions Optical, Inc.*, November 4, 2016.

Deposition testimony, on behalf of Defendant, Transitions Optical, Inc., in connection with *Insight Equity A.P. X., LP, d/b/a Vision-Ease Lens Worldwide v. Transitions Optical, Inc.*, January 9, 2013.

***Solargenix Energy, LLC v. Acciona Solar Energy, LLC, et al.***

Testimony, on behalf of Defendants, Acciona Solar Energy, LLC, et al., in the Circuit Court of Cook County, Illinois, Law Division, in connection with *Solargenix Energy, LLC v. Acciona Solar Energy, LLC, et al.,* October 17-18, 2016.

Expert Rebuttal Report, on behalf of Defendants, Acciona Solar Energy, LLC, et al., in connection with *Solargenix Energy, LLC v. Acciona Solar Energy, LLC, et al.,* August 31, 2015.

Deposition testimony, on behalf of Defendants, Acciona Solar Energy, LLC, et al., in connection with *Solargenix Energy, LLC v. Acciona Solar Energy, LLC, et al.,* July 28, 2015.

Expert Damages Report, on behalf of Defendants, Acciona Solar Energy, LLC, et al., in connection with *Solargenix Energy, LLC v. Acciona Solar Energy, LLC, et al.,* June 3, 2015.

***Masimo Corporation v. Philips Electronics North America Corporation and Philips Medizin Systeme Böblingen GMBH***

Deposition testimony, on behalf of Defendants, Philips Electronics North America Corporation, and Philips Medizin Systeme Böblingen GMBH, in connection with *Masimo Corporation v. Philips Electronics North America Corporation and Philips Medizin Systeme Böblingen GMBH,* September 12, 2016.

Expert Reply Report, on behalf of Defendants, Philips Electronics North America Corporation, and Philips Medizin Systeme Böblingen GMBH, in connection with *Masimo Corporation v. Philips Electronics North America Corporation and Philips Medizin Systeme Böblingen GMBH,* August 29, 2016.

4

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Exhibit 1

**Lauren J. Stiroh**

Expert Report, on behalf of Defendants, Philips Electronics North America Corporation, and Philips Medizin Systeme Böblingen GMBH, in connection with *Masimo Corporation v. Philips Electronics North America Corporation and Philips Medizin Systeme Böblingen GMBH,* June 10, 2016.

### *John Rock, et al., v. National Collegiate Athletic Association*

Deposition testimony, on behalf of Defendant, National Collegiate Athletic Association, in connection with *John Rock, et al., v. National Collegiate Athletic Association*, January 6, 2016.

Expert Report, on behalf of Defendant, National Collegiate Athletic Association, in connection with *John Rock, et al., v. National Collegiate Athletic Association*, December 3, 2015.

### *Blue Ash Auto Body, Inc., et al., v. Progressive Casualty Insurance Company, et al.; Russell Westfall, et al., v. Progressive Casualty Insurance Company, et al.*

Deposition testimony, on behalf of Defendants, Progressive Casualty Insurance Company, et al., in connection with *Blue Ash Auto Body, Inc., et al., v. Progressive Casualty Insurance Company, et al.; Russell Westfall, et al., v. Progressive Casualty Insurance Company, et al.,* October 23, 2015.

Expert Report, on behalf of Defendants, Progressive Casualty Insurance Company, et al., in connection with *Blue Ash Auto Body, Inc., et al., v. Progressive Casualty Insurance Company, et al.; Russell Westfall, et al., v. Progressive Casualty Insurance Company, et al.,* September 30, 2015.

### *Federal Trade Commission v. Steris Corporation, et al.*

Expert Rebuttal Report, on behalf of Defendants, Steris Corporation, et al., in connection with *Federal Trade Commission v. Steris Corporation et al.,* September 24, 2015.

Deposition testimony, on behalf of Defendants, Steris Corporation, et al., in connection with *Federal Trade Commission v. Steris Corporation et al.,* August 11, 2015.

Expert Rebuttal Report, on behalf of Defendants, Steris Corporation, et al., in connection with *Federal Trade Commission v. Steris Corporation et al.,* August 3, 2015.

Expert Report, on behalf of Defendants, Steris Corporation, et al., in connection with *Federal Trade Commission v. Steris Corporation et al.,* July 22, 2015.

PLAINTIFFS' RESP. APP. 002022 HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Exhibit 1
Lauren J. Stiroh

***Mark Hale, et al., v. State Farm Mutual Automobile Insurance Company, et al.***

Deposition testimony, on behalf of Defendants, State Farm Mutual Automobile Insurance Company, et al., in connection with *Mark Hale, et al., v. State Farm Mutual Automobile Insurance Company, et al.,* June 16, 2015.

Expert Report, on behalf of Defendants, State Farm Mutual Automobile Insurance Company, et al., in connection with *Mark Hale, et al., v. State Farm Mutual Automobile Insurance Company, et al.,* June 2, 2015.

***Nunavut Tunngavik Incorporated v. The Attorney General of Canada***

Expert Reply Report, on behalf of Plaintiff, Nunavut Tunngavik Incorporated, in connection with *Nunavut Tunngavik Incorporated v. The Attorney General of Canada,* January 30, 2015.

Expert Report, on behalf of Plaintiff, Nunavut Tunngavik Incorporated, in connection with *Nunavut Tunngavik Incorporated v. The Attorney General of Canada,* January 31, 2014.

***Dang v. San Francisco Forty Niners, Ltd., et al.***

Deposition testimony, on behalf of the NFL Defendants, in connection with *Dang v. San Francisco Forty Niners, Ltd., et al.,* December 4, 2014.

Expert Report, on behalf of the NFL Defendants, in connection with *Dang v. San Francisco Forty Niners, Ltd., et al.,* November 25, 2014.

***Gary Marchese, et al., v. Cablevision Systems Corporation and CSC Holdings, LLC***

Deposition testimony, on behalf of Defendants, Cablevision Systems Corporation, and CSC Holdings, LLC, in connection with *Gary Marchese, et al., v. Cablevision Systems Corporation and CSC Holdings, LLC,* November 6, 2014.

Expert Report, on behalf of Defendants, Cablevision Systems Corporation, and CSC Holdings, LLC, in connection with *Gary Marchese, et al., v. Cablevision Systems Corporation and CSC Holdings, LLC,* October 10, 2014.

***Anderson News, L.L.C. and Lloyd Whitaker, as the Assignee for Anderson Services, L.L.C. vs. American Media, Inc., et al.***

Deposition testimony, on behalf of Defendants, American Media, Inc., et al., in connection with *Anderson News, L.L.C. and Lloyd Whitaker, as the Assignee for Anderson Services, L.L.C. vs. American Media, Inc., et al.*, October 8, 2014.

6

Exhibit 1

**Lauren J. Stiroh**

Expert Report, on behalf of Defendants, American Media, Inc., et al., in connection with *Anderson News, L.L.C. and Lloyd Whitaker, as the Assignee for Anderson Services, L.L.C. vs. American Media, Inc., et al.,* May 28, 2014.

***The Best Jewelry Manufacturing Company, Inc., individually, and on behalf of all others similarly situated vs. Fulton County, Georgia and Reed Elsevier, Inc. d/b/a LexisNexis Courtlink, Inc., et al.***

Expert Report, on behalf of Defendants, Fulton County, Georgia, and Reed Elsevier, Inc. d/b/a LexisNexis Courtlink, Inc., et al., in connection with *The Best Jewelry Manufacturing Company, Inc., individually, and on behalf of all others similarly situated vs. Fulton County, Georgia and Reed Elsevier, Inc., d/b/a LexisNexis Courtlink, Inc., et al.,* September 30, 2014.

***John Mosley, Individually, and Clinton Body Shop, Inc.; Daniel Mosley, Individually, and Clinton Body Shop of Richland, Inc. v. Geico Insurance Company; Progressive Insurance Company; Direct General Insurance Company, et al.***

Expert Report, on behalf of Defendant, Progressive Insurance Company, in connection with *John Mosley, Individually, and Clinton Body Shop, Inc.; Daniel Mosley, Individually, and Clinton Body Shop of Richland, Inc. v. Geico Insurance Company; Progressive Insurance Company; Direct General Insurance Company, et al.,* August 14, 2014.

***In Re NCAA Student-Athlete Name & Likeness Licensing Litigation***

Testimony, on behalf of Defendant, National Collegiate Athletic Association, in the United States District Court, Northern District of California, Oakland Division, in connection with *In Re: NCAA Student-Athlete Name & Likeness Licensing Litigation,* June 25-26, 2014.

Expert Rebuttal Report, on behalf of Defendant, National Collegiate Athletic Association, in connection with *In Re: NCAA Student-Athlete Name & Likeness Licensing Litigation,* November 6, 2013.

Deposition testimony, on behalf of Defendants, The Collegiate Licensing Company, Electronic Arts, Inc., and National Collegiate Athletic Association, in connection with *In Re: NCAA Student-Athlete Name & Likeness Licensing Litigation,* October 11, 2013.

Expert Merits Report, on behalf of Defendants, The Collegiate Licensing Company, Electronic Arts, Inc., and National Collegiate Athletic Association, in connection with *In Re: NCAA Student-Athlete Name & Likeness Licensing Litigation,* September 25, 2013.

Expert Reply Report, on behalf of Defendants, The Collegiate Licensing Company, Electronic Arts, Inc., and National Collegiate Athletic Association, in connection with *In Re: NCAA Student-Athlete Name & Likeness Licensing Litigation,* May 30, 2013.

7

 HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Exhibit 1

**Lauren J. Stiroh**

Reply Declaration in Support of Defendant, National Collegiate Athletic Association's Motion for Summary Judgement, in connection with *In Re: NCAA Student-Athlete Name & Likeness Licensing Litigation,* May 30, 2013 (with Dirk van Leeuwen).

Deposition testimony, on behalf of Defendants, The Collegiate Licensing Company, Electronic Arts, Inc., and National Collegiate Athletic Association, in connection with *In Re: NCAA Student-Athlete Name & Likeness Licensing Litigation,* April 3, 2013.

Expert Report, on behalf of Defendants, The Collegiate Licensing Company, Electronic Arts, Inc., and National Collegiate Athletic Association, in connection with *In Re: NCAA Student-Athlete Name & Likeness Licensing Litigation,* March 14, 2013.

Declaration in Support of Defendant, National Collegiate Athletic Association's Motion for Summary Judgement, in connection with *In Re: NCAA Student-Athlete Name & Likeness Licensing Litigation,* March 14, 2013 (with Dirk van Leeuwen).

### *Savant Systems, LLC v. Crestron Electronics, Inc.*

Deposition testimony, on behalf of Defendant, Crestron Electronics, Inc., in connection with *Savant Systems, LLC v. Crestron Electronics, Inc.,* June 6, 2014.

Expert Report, on behalf of Defendant, Crestron Electronics, Inc., in connection with *Savant Systems, LLC v. Crestron Electronics, Inc.,* May 2, 2014.

### *Nick's Garage, Inc. v. Progressive Casualty Insurance Company, et al.*

Expert Report, on behalf of Defendant, Progressive Casualty Insurance Company, in connection with *Nick's Garage, Inc. v. Progressive Casualty Insurance Company, et al.,* May 23, 2014.

### *In the matter of Karen McPeters and Byron Barclay vs. LexisNexis*

Testimony, on behalf of Defendant, LexisNexis, in a class certification hearing in the United States District Court for the Southern District of Texas, Houston Division, in connection with *Karen McPeters and Byron Barclay vs. LexisNexis,* February 6, 2014.

Amended Expert Report, on behalf of Defendant, LexisNexis, in connection with *Karen McPeters and Byron Barclay vs. LexisNexis,* September 17, 2013.

Expert Report, on behalf of Defendant, LexisNexis, in connection with *Karen McPeters and Byron Barclay vs. LexisNexis,* August 30, 2013.

PLAINTIFFS' RESP. APP. 002025   HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Exhibit 1
Lauren J. Stiroh

*In Re High-Tech Employee Antitrust Litigation*

Declaration in Support of Defendants' Motion, in connection with *In Re: High-Tech Employee Antitrust Litigation,* January 9, 2014.

Deposition testimony, on behalf of Defendants, Adobe Systems Incorporated, Apple, Inc., Google, Inc., and Intel Corporation, in connection with *In Re: High-Tech Employee Antitrust Litigation,* December 9, 2013.

Expert Report, on behalf of Defendants, Adobe Systems Incorporated, Apple, Inc., Google, Inc., and Intel Corporation, in connection with *In Re: High-Tech Employee Antitrust Litigation,* November 25, 2013.

*In Re Photochromic Lens Antitrust Litigation*

Deposition testimony, on behalf of Defendant, Transitions Optical, Inc., in connection with *In Re Photochromic Lens Antitrust Litigation-Achtman et al., Plaintiffs,* January 16, 2013.

Deposition testimony, on behalf of Defendants, Transitions Optical, Inc., and Essilor of America, Inc., in connection with *In Re Photochromic Lens Antitrust Litigation-Nouveau Vision, Inc. et al., Plaintiffs,* January 10, 2013.

## Presentations (2007-2017)

Panelist, "2015 Canadian Bar Association Roundtable: IP and Competition Law," presented by The Economics and Law Committee of the CBA National Competition Law Section, Borden Ladner Gervais, LLP, Toronto, ON, June 22, 2015.

Panelist and Expert Economist for Plaintiff at "Mock Trial," presented by *The Antitrust Law and Economics Institute*, Co-sponsored by American Bar Association Section on Antitrust, George Mason School of Law, Arlington, VA, October 9, 2013.

Panelist, "Fundamentals-Antitrust Economics," presented by *The Economics Committee of the American Bar Association's Section of Antitrust Law,* American Bar Association Spring Meeting, Washington, DC, April 10, 2013.

Panelist, "Presenting an Effective Damages Case in Light of Recent Federal Circuit Precedent," sponsored by *The Licensing Executives Society (U.S.A. and Canada), Inc. (LES Workshop),* San Diego, CA, October 19, 2011.

Panelist, "The Fundamentals of Working with Economic Experts Committee Program," co-sponsored by *The ABA Section of Antitrust Law,* Teleconference, April 29, 2011.

9

PLAINTIFFS' RESP. APP. 002026   HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Exhibit 1

**Lauren J. Stiroh**

Panelist, "Princo v. ITC" Telebriefing sponsored by *Law Seminars International*,
September 30, 2010.

Panelist, "Patent Hold Up: When Does the Abuse of a Private Standard Setting Process
Amount to Actionable Conduct Under Section 2 of the Sherman Act or Deception Under
Section Under Section 5 of the FTC Act?," presented by *The Philadelphia Bar
Association Antitrust Law Committee of the Business Law Section's CLE Program*,
Philadelphia, PA, September 21, 2010.

Panelist, "Antitrust and Innovation Symposium: Unilateral Conduct, Licensing and
Innovation," co-sponsored by *The ABA Section of Antitrust Law and Stanford Law
School,* Stanford, CA, May 21, 2010.

Panelist, "Taking and Defending Expert Deposition Testimony," co-sponsored by *The
ABA Section of Antitrust Law, Economics and Trial Practices Committees*, April 21,
2010.

Panelist, "Antitrust Economics for Attorneys: The Economics of Innovation and
Intellectual Property," presented by *The Economics and Intellectual Property
Committees of the American Bar Association's Section of Antitrust Law*, Washington,
D.C., July 23, 2008.

Panelist, "Comparables: The Use and Misuse of Benchmark Royalty Rates for Patent
Damages," Intellectual Property Seminar Series, *NERA Economic Consulting*,
New York, NY, January 2007.

## Publications (2007-2017)

"Demonstrating Faulty Predictions in Class Certification Analysis," co-authored with
Christine Siegwarth Meyer and Claire (Chunying) Xie, NERA Economic Consulting,
American Bar Association, Section of Antitrust Law, *Antitrust Magazine*, Vol. 30, No. 2,
Spring 2016.

Chapter 6: "Interpreting Regression Results," co-authored with G. Steven Olley, Adjunct
Assistant Professor of Economics at Columbia University in Econometrics: Legal,
Practical and Technical Issues, Second Edition, American Bar Association Section of
Antitrust Law, 2014.

"Considerations in Defining the Relevant Product Market for Antitrust Analysis,"
published as part of the course materials in connection with the 61st Spring Meeting of
the Section of Antitrust Law, American Bar Association, *Fundamentals-Antitrust
Economics*, April 10, 2013.

PLAINTIFFS' RESP. APP.0020271HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Case No. 1:14-cv-03074-CMA-KMT Document 959-13 filed 07/30/18 USDC Colorado pg
133 of 174

**Exhibit 1**

**Lauren J. Stiroh**

"FTC Requires Patentee to Fulfill Licensing Commitments To A Standard-Setting Organization to Prevent Consumer Harm," co-authored with Eugene L. Chang, Esq., William H. Rooney, Esq. and Heather M. Schneider, Esq., Willkie Farr & Gallagher, LLP, *The Metropolitan Corporate Counsel*, 2008.

Chapter 14: "Proving Causation in Damage Analyses" in <u>Economics of Antitrust, Complex Issues in a Dynamic Economy</u>, edited by Dr. Lawrence Wu, NERA Economic Consulting, 2007.

July 2017

11

PLAINTIFFS' RESP. APP. 002028 HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Case 1:14-cv-03074-CMA-KMT   Document 959-11   Filed 03/17/18   USDC Colorado   Page 133 of 173

Exhibit 2

## Materials Considered by Lauren J. Stiroh

**Court Filings**

*Johana Paola Beltran; Lusapho Hlatshaneni; Beaudette Deetlefs; Dayanna Paola Cardenas Caicedo; Alexandra Ivette González; Sarah Carolina Azuela Rascon; Laura Mejia Jimenez; Juliane Harning; Nicole Mapledoram; and those similarly situated, Plaintiffs, v. Interexchange, Inc.; USAuPair, Inc.; GreatAuPair, LLC; Expert Group International, Inc., DBA Expert AuPair; EurAupair Intercultural Child Care Programs; Cultural Homestay International; Cultural Care, Inc. D/B/A Cultural Care Au Pair; AuPairCare Inc.; Au Pair International, Inc; APF Global Exchange, NFP, DBA AuPair Foundation; American Institute For Foreign Study DBA Au Pair in America; Associates in Cultural Exchange DBA GoAuPair; American Cultural Exchange, LLC, DBA GoAuPair; Go Au Pair Operations, LLC, d/b/a Go Au Pair; Agent Au Pair; A.P.EX. American Professional Exchange, LLC, DBA ProAuPair; and 20/20 Care Exchange, Inc. DBA The International Au Pair Exchange, Defendants,* United States District Court For the District of Colorado, Case No. 14-cv-03074:

Defendants' Motion to Exclude Expert Testimony of William Kerr Pursuant to F.R.E. 702, July 17, 2017

Defendants' Response in Opposition to Plaintiffs' Motion for Rule 23 Class Certification and Appointment of Class Counsel, July 17, 2017 and accompanying exhibits

Response of Defendant Cultural Care, Inc. in Opposition to Plaintiffs' Motion for Rule 23 Class Certification, July 17, 2017

Affidavit of William O. Kerr, Ph.D., June 2, 2017 and accompanying appendices

Plaintiffs' Motion for Rule 23 Class Certification and Appointment of Class Counsel, June 2, 2017 and accompanying appendices

Plaintiffs' Motion to Amend and Incorporated Memorandum of Law, June 2, 2017

Defendant InterExchange, Inc.'s Responses to Plaintiffs' Fourth Request to All Defendants for the Production of Documents, May 19, 2017

Order Granting All Parties' Stipulated Motion Concerning Scheduling and Class Certification Page Limits, May 19, 2017

Defendants A.P.E.X. American Professional Exchange, LLC dba ProAuPair; and 20/20 Care Exchange, Inc. dba The International Au Pair Exchange's Eighth Supplemental Fed. R. Civ. P. 26(a)(1) Disclosures, April 27, 2017

Defendants A.P.E.X. American Professional Exchange, LLC dba ProAuPair; and 20/20 Care Exchange, Inc. dba The International Au Pair Exchange's Seventh Supplemental Fed. R. Civ. P. 26(a)(1) Disclosures, April 26, 2017

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY

Exhibit 2

Defendants A.P.E.X. American Professional Exchange, LLC dba ProAuPair; and 20/20 Care Exchange, Inc. dba The International Au Pair Exchange's Amended and Substituted Sixth Supplemental Fed. R. Civ. P. 26(a)(1) Disclosures, April 26, 2017

Defendant InterExchange, Inc.'s Second Supplemental Responses to Plaintiffs' First Request for the Production of Documents, February 23, 2017

Defendant InterExchange, Inc.'s Second Supplemental Responses to Plaintiffs' First Set of Interrogatories, February 23, 2017

Defendants AuPairCare, Inc.'s Responses and Objections to Plaintiffs' Second Set of Interrogatories, February 21, 2017

Plaintiffs' Notice of Deposition of Elizabeth H. Newlon, February 3, 2017

Plaintiffs' Notice of Deposition of Lauren J. Stiroh, February 3, 2017

Reply Brief in Support of Defendants' Motion to Dismiss, December 15, 2016

American Institute for Foreign Study dba Au Pair in America's Answer to Plaintiffs' Second Amended Complaint, December 2, 2016

APF Global Exchange, NFP's Answer to Second Amended Complaint, December 2, 2016

Cultural Homestay International's Answer to Second Amended Complaint, December 2, 2016

Defendant A.P.E.X. American Professional Exchange, LLC and 20/20 Care Exchange, Inc.'s Answer to Plaintiffs' Second Amended Complaint and Jury Demand, December 2, 2016

Defendant USAuPair's Answer to Plaintiffs' Second Amended Complaint and Jury Demand, December 2, 2016

Defendant Au Pair International, Inc.'s Answer to Second Amended Complaint [Doc. #395], December 2, 2016

Defendant Agent Au Pair's Answer to Second Amended Complaint [Doc. #395], December 2, 2016

Defendant Expert AuPair's Answer to Second Amended Complaint, December 2, 2016

Defendant EurAuPair Intercultural Child Care Programs' Answer to Plaintiffs' Second Amended Complaint, December 2, 2016

Defendant Go Au Pair's Answer to Second Amended Complaint [Doc. #395], December 2, 2016

Defendant GreatAuPair, LLC's Answer to Plaintiffs' Second Amended Complaint, December 2, 2016

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY

Exhibit 2

Defendant InterExchange, Inc.'s Answer to Second Amended Complaint, December 2, 2016

Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss, November 29, 2016

Defendants' Motion to Dismiss, November 8, 2016

Go AuPair's Motion for Leave to File Sur-Reply in Opposition to Plaintiffs' Motion for Conditional Collective Action Certification, October 25, 2016 and accompanying exhibits

Second Amended Complaint, October 17, 2016

Defendant Expert AuPair's Response in Opposition to Plaintiffs' Motion for Conditional Collective Action Certification and Incorporated Memorandum of Law [ECF 330], October 6, 2016 and accompanying exhibits

Defendant AuPairCare, Inc.'s Opposition to Plaintiffs' Second Motion for Conditional Collective Action Certification [Doc. No. 330], September 22, 2016 and accompanying exhibits

Defendant American Cultural Exchange, LLC d/b/a Go Au Pair's Opposition to Plaintiffs' Motion for Conditional Collective Action Certification [ECF No. 325], September 15, 2016 and accompanying exhibits

Defendant American Institute for Foreign Study d/b/a Au Pair in America's Joinder in Opposition to Motion for Conditional Certification, September 15, 2016

Defendant InterExchange, Inc.'s Response in Opposition to Plaintiffs' Motion for Conditional Collective Action Certification and Incorporated Memorandum of Law (Doc#325), September 15, 2016 and accompanying exhibits

Notice of Your Right to Join Lawsuit for Unpaid Wages, July 25, 2016

Order Adopting and Affirming in Part February 22, 2016 Recommendation of United States Magistrate Judge, March 31, 2016

Recommendation of United States Magistrate Judge, February 22, 2016

First Amended Complaint, March 13, 2015

**Expert Reports**

Expert Report of Tammy Gold, January 13, 2017 and accompanying backup

Expert Report of William O. Kerr, January 13, 2017 and accompanying backup

Expert Rebuttal Report of William O. Kerr, February 3, 2017 and accompanying backup

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY

Exhibit 2

Expert Report of Elizabeth H. Newlon, Ph.D., January 13, 2017 and accompanying backup

Expert Rebuttal Report of Elizabeth H. Newlon, Ph.D., February 3, 2017 and accompanying backup

Expert Report of Lauren J. Stiroh, Ph.D., January 13, 2017 and accompanying backup

Expert Rebuttal Report of Lauren J. Stiroh, Ph.D., February 3, 2017 and accompanying backup

**Declarations**

Declaration of Eileen Boehne, January 9, 2017

Declaration of Stanley Colvin, June 15, 2017 and accompanying exhibits

Declaration of Ruth Ferry, July 17, 2017

Declaration of Mark Gaulter, October 6, 2016 and accompanying exhibits

Declaration of Mark Jeffery, September 30, 2016

Declaration of Bill Kapler, September 15, 2016 and accompanying exhibits

Declaration of Bill Kapler in Support of Go Au Pair's Opposition to Plaintiffs' Motion for Class Certification, July 17, 2017

Declaration of Joshua J. Libling in Support of Plaintiffs' Motion to Amend, June 2, 2017 and accompanying exhibits

Declaration of Michael McHugh, September 13, 2016 and accompanying exhibits

Declaration of Christina Reilly, July 17, 2017

Declaration of Sean P. Rodriguez in Support of Plaintiffs' Motion for Rule 23 Class Certification and Appointment of Class Counsel, June 2, 2017 and accompanying exhibits

**Depositions**

Deposition of Thomas Areton, May 16, 2017 and accompanying exhibits

Deposition of Sarah Carolina Azuela, March 3, 2017

Deposition of Ruth Ferry, May 11, 2017 and accompanying exhibits

Deposition of Stacey Frank, May 12, 2017 and accompanying exhibits

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY

Case 1:14-cv-03074-CMA-KMT Document 1059-11 Filed 09/17/18 USDC Colorado Page 137 of 173

Exhibit 2

Deposition of Mark Gaulter, May 9, 2017 and accompanying exhibits

Deposition of Mark Gaulter, May 31, 2017 and accompanying exhibits

Deposition of Tammy Gold, May 3, 2017 and accompanying exhibits

Deposition of Mark Jeffery, December 5, 2016 and accompanying exhibits

Deposition of Natalie Jordan, April 14, 2017

Deposition of A. William Kapler, III, May 11, 2017 and accompanying exhibits

Rough Deposition Transcript of Melanie Farrah Kelloff, January 30, 2017

Deposition of William O. Kerr, Ph.D., May 4, 2017 and accompanying exhibits

Deposition of William O. Kerr, Ph.D., July 5, 2017 and accompanying exhibits

Deposition of Paul J. Lavrakas, Ph.D., July 25, 2017

Deposition of Steve Lehan, May 12, 2017 and accompanying exhibits

Deposition of Michael McHugh, April 6, 2017 and accompanying exhibits

Deposition of Sarah McNamara, May 4, 2017 and accompanying exhibits

Deposition of Heidi Mispagel, May 2, 2017 and accompanying exhibits

Deposition of Theresa Nelson, May 9, 2017 and accompanying exhibits

Deposition of Elizabeth Newlon, April 12, 2017

Deposition of Celia Parker, Volume I, April 30, 2017 and accompanying exhibits

Deposition of Shannon Pitts, May 31, 2017 and accompanying exhibits

Deposition of Christina Reilly, May 16, 2017 and accompanying exhibits

Deposition of Marcie Schneider, May 4, 2017and accompanying exhibits

Deposition of Lauren J. Stiroh, April 6, 2017

Deposition of Helene Young, May 1, 2017 and accompanying exhibits


**Bates Stamped Documents**


HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY

**Exhibit 2**

| | |
|---|---|
| AAP_00000267 – 315 | AIFS 0000198 |
| AAP0000739 – 40 | AIFS 0000451 – 52 |
| AAP_0000748 – 49 | AIFS 0000473 |
| AAP_0000752 | AIFS 0000598 – 621 |
| AAP_0000760 – 66 | AIFS 0000655 – 58 |
| AAP_0000861 – 63 | AIFS 0000668 – 717 |
| AAP_0000907 | AIFS 0000985 – 86 |
| AAP_0000925 – 28 | AIFS 0001062 – 84 |
| AAP_0001044 – 46 | AIFS 0001499 – 500 |
| AAP_0001158 – 78 | AIFS 0001957 |
| AAP0001256 – 59 | AIFS 0003044 |
| AAP0001265 – 66 | AIFS 0003072 |
| AAP_0001379 – 81 | APC000003 – 89 |
| AAP_0002107 – 14 | APC000090 – 253 |
| AAP_0002143 | APC000275 – 80 |
| AAP_0002177 – 79 | APC000281 – 86 |
| AAP_0003866 – 67 | APC000287 – 92 |
| AAP_0003968 – 71 | APC000299 – 305 |
| AAP_0004056 | APC000306 – 12 |
| AIFS 0000061 | APC000313 – 21 |
| AIFS 0000121 | APC000322 – 30 |
| AIFS 0000187 | APC000340 – 48 |
| AIFS 0000191 – 92 | APC000489 – 95 |
| AIFS 0000196 | APC000591 – 96 |

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY

**Exhibit 2**

| | |
|---|---|
| APC000736 – 1612 | API000833 – 36 |
| APC004626 – 32 | API000842 – 43 |
| APEX-20/20-4 – 8 | API00001248 – 49 |
| APEX-20/20-23 – 77 | API00001261 |
| APEX-20/20-244 – 56 | API00001293 |
| APEX-20/20-257 – 60 | API00001454 – 57 |
| APEX-20/20-292 – 98 | API00001590 |
| APEX-20/20-305 – 06 | API00002185 – 86 |
| APEX-20/20-437 – 46 | API00002508 – 10 |
| APEX-20/20-447 – 83 | API00002989 – 90 |
| APEX-20/20-493 – 99 | API00003146 – 53 |
| APEX-20/20-8994 – 9028 | API00003493 – 500 |
| APF000312 | API00003541 – 52 |
| APF000320 | API00004134 – 41 |
| APF000331 | API00004383 – 99 |
| APF000342 | API00004428 – 35 |
| APF000348 | API00004498 – 99 |
| APF000351 | API00004511 – 17 |
| APF000354 | API00004543 – 54 |
| APF000356 | API00004809 – 10 |
| APF000358 | API00004846 – 47 |
| API_36 – 37 | API00004861 – 72 |
| API_120 – 22 | API00004927 – 30 |
| API000336 | API00004932 – 34 |

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY

Case 1:14-cv-03074-CMA-KMT Document 959-11 filed 09/17/18 USDC Colorado Page 140 of 174
141 of 174

**Exhibit 2**

| | |
|---|---|
| API00004942 – 50 | API00006200 |
| API00004952 – 53 | CC00000142 – 143 |
| API00004970 – 76 | CC00000477 |
| API00004993 – 98 | CC00000490 – 92 |
| API00005054 – 59 | CC00000547 – 49 |
| API00005192 – 96 | CC00000698 – 99 |
| API00005207 | CC00000787 – 90 |
| API00005210 | CC00001310 – 5976 |
| API00005547 – 51 | CC00008823 – 25 |
| API00005556 – 61 | CC00008565 – 68 |
| API00005572 – 76 | CC00034504 – 81 |
| API00005612 – 14 | CHI0000001 – 530 |
| API00005638 – 44 | CHI0001113 – 18 |
| API00005646 – 55 | CHI0002302 – 05 |
| API00005715 – 22 | CHI0002524 – 33 |
| API00005897 – 902 | CHI0002954 – 59 |
| API00005983 – 85 | CHI0003128 – 34 |
| API00005987 – 89 | CHI0003138 – 45 |
| API00005992 – 6001 | CHI0003367 – 77 |
| API00006056 – 62 | CHI0003426 – 42 |
| API00006081 – 92 | CHI0004195 – 97 |
| API00006099 – 100 | CHI0005126 – 32 |
| API00006121 – 23 | CHI0007072 – 79 |
| API00006149 – 51 | CHI0007656 – 60 |

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY

Exhibit 2

| | |
|---|---|
| CHI0008123 – 31 | CHI0016493 – 95 |
| CHI0008320 – 24 | CHI0016576 – 81 |
| CHI0008597 – 606 | CHI0016711 – 15 |
| CHI0008736 – 38 | CHI0016819 – 21 |
| CHI0009178 – 79 | CHI0016969 – 70 |
| CHI0009304 – 05 | CHI0017006 – 11 |
| CHI0009830 – 34 | CHI0021467 |
| CHI0010087 – 91 | CHI0021678 – 79 |
| CHI0010770 – 72 | CHI0027768 – 8263 |
| CHI0011186 – 89 | CHI0028265 |
| CHI0012057 – 59 | CHI0028268 – 609 |
| CHI0012346 – 47 | ExpertAuPair000001 – 08 |
| CHI0012358 – 62 | ExpertAuPair000009 – 16 |
| CHI0012803 – 05 | ExpertAuPair000017 – 24 |
| CHI0013086 – 90 | ExpertAuPair000025 – 32 |
| CHI0013275 – 77 | ExpertAuPair000033 – 40 |
| CHI0013413 – 15 | ExpertAuPair000041 – 45 |
| CHI0013781 – 86 | ExpertAuPair000046 – 49 |
| CHI0014189 – 91 | ExpertAuPair000050 – 54 |
| CHI0014443 – 45 | ExpertAuPair000055 – 59 |
| CHI0014447 – 52 | ExpertAuPair000060 – 64 |
| CHI0014866 – 70 | ExpertAuPair000065 – 71 |
| CHI0015429 – 33 | ExpertAuPair000072 – 77 |
| CHI0016166 – 67 | ExpertAuPair000078 – 87 |

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY

**Exhibit 2**

ExpertAuPair000088 – 107

ExpertAuPair000108 – 147

ExpertAuPair000148 – 54

ExpertAuPair000155 – 56

ExpertAuPair000157 – 63

ExpertAuPair000164 – 68

ExpertAuPair000170 – 97

ExpertAuPair000198 – 205

ExpertAuPair000206 – 33

ExpertAuPair000273 – 279

ExpertAuPair000301 – 24

ExpertAuPair038155 – 67

GAP_00000005 – 09

GAP_00000336 – 42

GAP_00000785 – 88

GAP_00000940 – 43

GAP00001693

GAP00001761 – 69

GAP00006660 – 61

GAP00007284 – 86

GAP00007420 – 21

GAP00007682

GAP_00012959 – 61

GAP_00015318 – 24

GAP00019641 – 42

GAP00022046 – 54

GAP00024154 – 55

GAP_00024763

GAP00026839 – 42

GAP00026847 – 52

GAP_00028768 – 32060

GAP_00033496 – 595

InterExchange0000001 – 09

InterExchange0000014 – 65

InterExchange0000365 – 413

InterExchange0001713 – 15

InterExchange0002443 – 46

InterExchange00037596 – 97

InterExchange0004373 – 74

InterExchange0004463 – 64

InterExchange0005438 – 77

InterExchange0005666

InterExchange0007099 – 183

InterExchange0007546 – 56

InterExchange0007562 – 71

InterExchange0008023 – 29

InterExchange0008766 – 801

InterExchange0008820 – 28

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY

PLAINTIFFS' RESP. APP.0002038

Exhibit 2

| | |
|---|---|
| InterExchange0008958 – 60 | InterExchange0021015 – 54 |
| InterExchange0009260 – 75 | InterExchange0021055 – 56 |
| InterExchange0015239 – 41 | InterExchange0021057 |
| InterExchange0018226 – 28 | InterExchange0038158 – 59 |
| InterExchange0020673 | InterExchange0038859 – 9215 |
| InterExchange0020863 – 95 | InterExchange0039319 – 560 |
| InterExchange0020896 – 935 | InterExchange0039752 |
| InterExchange0020936 – 74 | InterExchange0039940 – 40047 |
| InterExchange0020975 – 1014 | MK000327 – 29 |

## Data

AIFS HF Contact List--ATTORNEY'S EYES ONLY--SUBJECT TO FIRST ADDENDUM TO....xlsx

AP-Host Family List - USAuPair

AP and HF 2011thru2016.XLSX

AP HF Volumes.xlsx

APEX-20/20 8973 – 8981; REVISED PROAuPair List (2011 - 2016).pdf

APEX-20/20 8982 – 8983; REVISED TIAPE 20-20 List (2013 - 2016).pdf

APEX-20/20 8984 – 8993; REVISED PROAuPair and Tiape 20-20 Au Pairs combined List (2011 - 2016).pdf

APEX-20/20 9029; PROAuPair and 20-20 Regular Au Pairs List (2011 - 2016).pdf

APEX-20/20 10349 – 10359; HF Application Data,protected.xls

APEX-20/20 10360 – 10380; AP Stipend Spreadsheet,protected.xls

Apps Arrivals Analysis 2009-2016.xlsx

AuPair_and_Host_Family_Identification-01.01.09-11.13.11.XLSX

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY

**Exhibit 2**

Au Pair Contact Information 5-12-17.xlsx

Aupair List 7.24.09 to 4.10.17.PDF

Beltran - APF APF host family list 4 18 2017.XLSX

Beltran - APF APF au pair list 6 2 2017 (final).XLSX

CHI0028264.XLSX

CHI0028610.xlsx

CONFIDENTIAL ATTORNEYS EYES ONLY APC 012955 AuPair List I-Data 5.12.2017....xlsx

CONFIDENTIAL ATTORNEYS EYES ONLY APC 012956 AuPair List II Data 5.12.201....xlsx

Discovery.xlsx

EAP0007052.xls

EurAupair Host Family and Au Pair Lists.xls

ExpertAuPair_contacts_041417.xlsx

ExpertAuPair Contracts Summary - Highly Confidential.xlsx

Expert AuPair Stipend Summary.xlsx

GAP_00046777 - HIGHLY CONFIDENTIAL - AEO.XLSX

GAP_00049680 - HIGHLY CONFIDENTIAL - AEO.XLSX

HF Data with Aupair Names 3.31.2017-Produced-ONLY TO PLAINTIFFS_ COUNSEL....xlsx

Host Families.PDF

PlacementRateAnalysis_09-14.xlsx

Report 1 - HF Information 2009-2015.xlsx

Report 2 - AP Information Pursuant to Conditional Cert Order.xlsx

Report 2a - RFP000733.xlsx

RFP000572.csv

<div style="text-align:center">HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY</div>

**Exhibit 2**

RFP000677.csv

RFP000734.tif

RFP000735.tif

RFP000736.tif

RFP000737.tif

RFP000738.tif

RFP000739.tif

RFP000740.tif

RFP000741.tif

RFP000742.tif

RFP000743.tif

RFP000744.tif

RFP000745.tif

RFP000746.tif

RFP000747.tif

RFP000748.tif

RFP000749.tif

RFP000750.tif

USA 01716 (HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY).xlsx


**Other**

2009 International Nanny Association Salary and Benefits Survey, based on the year 2008

2010 International Nanny Association Salary and Benefits Survey, based on the year 2009

2011 International Nanny Association Salary and Benefits Survey, based on the year 2010


HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY

**Exhibit 2**

2012 International Nanny Association Salary and Benefits Survey, based on the year 2011

2013 International Nanny Association Salary and Benefits Survey, based on the year 2012

2014 International Nanny Association Salary and Benefits Survey

Administrator's Interpretation No. 2016-1, U.S. Department of Labor, Wage and Hour Division, Issued by Administrator David Weil, January 20, 2016

"Au Pair Program Survey," available at https://aupairprogramsurvey.com/?i=3b65&a, accessed on May 9, 2017

"Fact Sheet #22: Hours Worked Under the Fair Labor Standards Act (FLSA)," U.S. Department of Labor, Wage and Hour Division

Form 990, Return of Organization Exempt From Income Tax, American Institute for Foreign Study Foundation, Inc., 2013

Form 990, Return of Organization Exempt From Income Tax, InterExchange, Inc., 2013

Form 990, Return of Organization Exempt From Income Tax, EurAuPair International, Inc., 2012

Form 990, Return of Organization Exempt From Income Tax, American Cultural Exchange Service, 2012

Form 990, Return of Organization Exempt From Income Tax, Cultural Homestay International, 2012

Information for Experts and Rule 23 Opposition.pdf

**Publicly Available Information**

"3 Steps to become an Au Pair," *Go Au Pair*, available at http://www.goaupair.com/au-pairs/3-steps-to-become-an-au-pair/apply-now, accessed July 21, 2017

"All Employees: Total Nonfarm Payrolls," *Federal Reserve Economic Data*, available at https://fred.stlouisfed.org/series/PAYEMS, accessed July 24, 2017

"Au Pair Qualifications," *Cultural Care*, available at http://www.culturalcare.co.uk/being-an-au-pair/au-pair-qualifications/, accessed July 22, 2017

Blair, Roger D. and Jeffrey L. Harrison. Monopsony in Law and Economics. New York: Cambridge University Press, 2010

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY

**Exhibit 2**

"Camp Counselor Program, J-1 Visa Exchange Visitor Program," available at https://j1visa.state.gov/programs/camp-counselor, accessed July, 21, 2017

Carlton, Dennis W. and Jeffrey M. Perloff. Modern Industrial Organization. New York: Pearson, Addison Wesley, 2005

"Christian Au Pairs," available at http://christianaupairs.com/, accessed July 29, 2017

"Intern Program, J-1 Visa Exchange Visitor Program," available at https://j1visa.state.gov/programs/intern, accessed July 21, 2017

"Part 62-Exchange Visitor Program," Code of Federal Regulations, Section 62, available at https://www.gpo.gov/fdsys/pkg/CFR-2016-title22-vol1/xml/CFR-2016-title22-vol1-part62.xml#seqnum62, accessed July 24, 2017

"Program Sponsors, J-1 Visa Exchange Visitor Program," *U.S. Department of State, Bureau of Educational and Cultural Affairs*, available at https://j1visa.state.gov/programs/au-pair#program-sponsors, accessed January 12, 2017

"Summer Work Travel Program, J-1 Visa Exchange Visitor Program," available at https://j1visa.state.gov/programs/summer-work-travel, accessed July, 21, 2017

Stucke, Maurice, E., "Looking at the Monopsony in the Mirror," *Emory Law Journal*, Volume 62, 2013

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY

Case No. 1:14-cv-03074-CMA-KMT Document 959-11 filed 03/30/18 USDC Colorado pg 149 of 174

# Exhibit 249

Message

| | |
|---|---|
| **From**: | Michael McCarry [/O=ALLIANCE-EXCHAN/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=MMCCARRY] |
| **Sent**: | 5/12/2011 2:31:11 PM |
| **To**: | 'Christopher Bogacki' [cbogacki@aifs.com] |
| **CC**: | Ruth Ferry [rferry@aifs.com] |
| **Subject**: | RE: Proposed AP education survey |

I made the format change. Is Ruth in today? I need to speak with her before I send out. Tks, M

--

**Michael McCarry**
Executive Director
Alliance for International Educational & Cultural Exchange
1828 L Street, NW, Suite 1150
Washington, DC 20036
(202) 293-6141
(202) 293-6144 (fax)
http://www.alliance-exchange.org

Follow us on Twitter

Like us on Facebook

*2011 International Exchange Locator available for order!*
*http://www.alliance-exchange.org/alliance-store*

---

**From:** Christopher Bogacki [mailto:cbogacki@aifs.com]
**Sent:** Wednesday, May 11, 2011 4:00 PM
**To:** Michael McCarry
**Cc:** Ruth Ferry
**Subject:** RE: Proposed AP education survey

Good catch – it was actually a change that was taken out... Word decided not to remove the bullet and line. So nothing is missing and there should not be anything in that space!

**Chris Bogacki**
**Executive Assistant | Au Pair in America**
t: 203.399.5502 | f: 203.399.5203
e: cbogacki@aifs.com

Au Pair
IN AMERICA
Trust the world's most experienced
live-in child care program
**(800) 928-7247**
*a division of the American Institute For Foreign Study® (AIFS)*

---

**From:** Michael McCarry [mailto:MMcCarry@alliance-exchange.org]
**Sent:** Wednesday, May 11, 2011 3:55 PM
**To:** Christopher Bogacki
**Cc:** Ruth Ferry
**Subject:** RE: Proposed AP education survey
**Importance:** High

PLAINTIFFS' RESP. APP.0002045

CONFIDENTIAL

ALLI-009630

Chris – I notice a blank bullet. Is something missing? Tks, M

--
**Michael McCarry**
Executive Director
Alliance for International Educational & Cultural Exchange
1828 L Street, NW, Suite 1150
Washington, DC 20036
(202) 293-6141
(202) 293-6144 (fax)
http://www.alliance-exchange.org

Follow us on Twitter

Like us on Facebook

*__2011 International Exchange Locator available for order!__*
*__http://www.alliance-exchange.org/alliance-store__*

---

**From:** Christopher Bogacki [mailto:cbogacki@aifs.com]
**Sent:** Wednesday, May 11, 2011 3:26 PM
**To:** Michael McCarry
**Cc:** Ruth Ferry
**Subject:** RE: Proposed AP education survey

Hi Mike,

As requested by Ruth, please find the education survey attached.

Thanks
Chris

**Chris Bogacki**
**Executive Assistant | Au Pair in America**
**t: 203.399.5502 | f: 203.399.5203**
**e: cbogacki@aifs.com**

Au Pair Trust the world's most experienced
IN AMERICA live-in child care program
(800) 928-7247
*a division of the American Institute for Foreign Study® [AIFS]*

---

**From**: Ruth Ferry
**To**: 'mmccarry@alliance-exchange.org'
**Sent**: Wed May 11 15:05:51 2011
**Subject**: Re: Proposed AP education survey

Hi Mike-
Unfortunately I am out attending to a brother who is undergoing a procedure today--unclear as wo when I can

PLAINTIFFS' RESP. APP.0002046

CONFIDENTIAL

ALLI-009631

get to a computer.

I will ask my assistant to send you a copy--unmarked-- would you send out asking sponsors to send the survey out to their au pairs and report results in report format to you next week. Suggest you ask for response rate as well.

Is that OK? Expect email from Chris Bogacki. Thanks
Ruth

---

**From**: Michael McCarry
**To**: Ruth Ferry
**Sent**: Wed May 11 13:16:21 2011
**Subject**: RE: Proposed AP education survey
Who's going to circulate this?  Do we have specific formats we want for the data?  (I'm hopeless at this stuff and Mark is out getting ready to get married, so will have to rely on someone else's expertise re the directions).  Tks, M

--
**Michael McCarry**
Executive Director
Alliance for International Educational & Cultural Exchange
1828 L Street, NW, Suite 1150
Washington, DC 20036
(202) 293-6141
(202) 293-6144 (fax)
http://www.alliance-exchange.org

Follow us on Twitter

Like us on Facebook



*2011 International Exchange Locator available for order!*
*http://www.alliance-exchange.org/alliance-store*

---

**From:** Ruth Ferry [mailto:rferry@aifs.com]
**Sent:** Wednesday, May 11, 2011 11:58 AM
**To:** Michael McCarry
**Subject:** RE: Proposed AP education survey

Getting consensus is tough sometimes!
Glad we are finally there – hope it sits well with the rest of the au pair community!
Ruth

Ruth Frizell Ferry
Sr Vice President and Director
Au Pair in America
203-399-5025
aupairinamerica.com

PLAINTIFFS' RESP. APP.0002047

CONFIDENTIAL

ALLI-009632

---

**From:** Michael McCarry [mailto:MMcCarry@alliance-exchange.org]
**Sent:** Wednesday, May 11, 2011 9:26 AM
**To:** Ruth Ferry
**Subject:** RE: Proposed AP education survey

Eager to get this going?

Thanks for pushing it along.  This looks fine to me – let's see what others say.  Best, M

--
**Michael McCarry**
Executive Director
Alliance for International Educational & Cultural Exchange
1828 L Street, NW, Suite 1150
Washington, DC 20036
(202) 293-6141
(202) 293-6144 (fax)
http://www.alliance-exchange.org

Follow us on Twitter

Like us on Facebook

*__2011 International Exchange Locator available for order!__*
*__http://www.alliance-exchange.org/alliance-store__*

---

**From:** Ruth Ferry [mailto:rferry@aifs.com]
**Sent:** Wednesday, May 11, 2011 9:02 AM
**To:** Michael McCarry
**Cc:** Heidi Woehl; smcnamara@aupaircare.com; natalie.jordan@ef.com
**Subject:** RE: Proposed AP education survey

Mike, Heidi, Sarah and Natalie –

Attached is the questionnaire that we plan to go with, incorporating several of Natalie's edits.

In particular to respond to your suggestions Natalie –

- We think question 1 is important as response to that will drive whether we present the au pair with question #4.  I edited #1 slightly as I believe the 3rd response choice should weed out recent arrivals who haven't been able to register for classes.
- Good options you added to question #3 and agree they should be able to check all that apply – I edited a couple to be relevant to what is likely a single course option that they were interested in as opposed to 'all courses'
- Question 6 – edited to reference educational opportunities rather than 'classes' as volunteer is referenced as an option and rephrased so the response range of very interested to no interest is appropriate.  I think we

PLAINTIFFS' RESP. APP.0002048

CONFIDENTIAL

ALLI-009633

should expect response with a range from very interested to not interested.  It will encourage response to each
option and based on past survey's we have sent to our au pairs the range will offer wider response.

 Is this agreeable to all of us?

Ruth

Ruth Frizell Ferry
Sr Vice President and Director
Au Pair in America
203-399-5025
aupairinamerica.com

---

**From:** Michael McCarry [mailto:MMcCarry@alliance-exchange.org]
**Sent:** Wednesday, May 11, 2011 5:27 AM
**To:** Ruth Ferry
**Cc:** Heidi Woehl; smcnamara@aupaircare.com
**Subject:** FW: Proposed AP education survey

Here are Natalie's suggestions.  M

--
**Michael McCarry**
Executive Director
Alliance for International Educational & Cultural Exchange
1828 L Street, NW, Suite 1150
Washington, DC 20036
(202) 293-6141
(202) 293-6144 (fax)
http://www.alliance-exchange.org

Follow us on Twitter

Like us on Facebook

*2011 International Exchange Locator available for order!*
*http://www.alliance-exchange.org/alliance-store*

---

**From:** Natalie Jordan [mailto:Natalie.Jordan@EF.com]
**Sent:** Tuesday, May 10, 2011 5:02 PM
**To:** Sarah McNamara; Michael McCarry
**Subject:** Proposed AP education survey

Good Afternoon,

I just received the latest version and attached are my edits.  I look forward to a finished version and next
steps.  I will be away next week but have my team ready here to launch the finalized version and will be able to
report in the results based upon the deadline that is set on this.

PLAINTIFFS' RESP. APP.0002049

CONFIDENTIAL
ALLI-009634

Thank you,
Natalie Jordan
Cultural Care Au Pair

This e-mail and any attachments may contain confidential and
privileged information. If you are not the intended recipient,
please notify the sender immediately by return e-mail, delete this
e-mail and destroy any copies. Any dissemination or use of this
information by a person other than the intended recipient is
unauthorized and may be illegal.

PLAINTIFFS' RESP. APP.0002050

CONFIDENTIAL

ALLI-009635

Case No. 1:14-cv-03074-CMA-KMT   Document 959-11   filed 03/30/18   USDC Colorado   pg 156 of 174

# Exhibit 250

## ARRIVAL NOTES & TIPS FOR AU PAIRS AND HOST FAMILIES

Redacted

### Pick up your Au Pair:

Using your HF ID, be sure to let Au Pair in America which of the following locations you'd like to pick up your Au Pair; please let her know as well.  E-mail  orientation@aifs.com

- **Pick up at Newark Airport- Terminal A American Airlines Departures Area –ETA  4:40 PM   or;**
- **Pick up at Sheraton Stamford Hotel:  700 Main Street  Stamford, CT  06901**
- **Call your Au Pair at Orientation to leave a welcome message:** Redacted
- **I will contact you within 48 hours of her arrival, but feel free to call or e-mail at any time.**

### The First Few Days:

- The US Department of State regulation requires that Au Pairs be supervised during their first 3 days of childcare. Please give the AP the **schedule** for the first week.  (Maximum 45 hours per week, minimum 1 ½ days off each week).
- Please give Au Pair the white/green envelope welcome packet that I send with cluster list and other pertinent info
- Most au pairs are given "family share" **cell phones** to use within the US.  Calls home should be done by international phone card, unless you have a different plan.
- Please let the au pair know which **computer** she may use to communicate with family/friends.
- Please review **safety and childcare** expectations
- Encourage your Au Pair to contact others on the cluster list.  The sooner she finds a friend, the happier everyone will be.

### The Car:

- Your Au Pair should have her **International Driver's Permit** and her country license.  She can drive with these while she works to get her NJ License—which is sometimes a big hassle, but should be done.
- Almost all Insurance companies now accept the IDP.
- In order to get a license, she must have her social security card, proof of NJ residence (harder than you think) and pass the written portion of the test.  Sometimes they must also take driving portion—it's pretty random.
- Once you are comfortable that Au Pair has the skills to drive locally, I suggest she go out on her own to begin to learn the local terrain.

### Social Security Card, Bank Account and other Documents:

- Your Au Pair should apply for a **social security card after she's been here at least 10 days.**  She simply takes her passport and visa and DS2019 to the Social Security Office in Montclair   (393 Bloomfield Avenue) and says she'd like to apply for a card.
- Your Au Pair should open a **bank account** (she really will need the statement to help prove her residence). Many local banks will permit them to open an account before they receive their Social Security card.  Most au pairs in Montclair use **Bank of America** branch on Valley Road in Upper Montclair.
- PLEASE MAKE SURE TO COPY HER PASSPORT, VISA, DS2019 AND INTERNATIONAL DRIVING PERMIT. Except for the DS, it's almost impossible to replace these here in the US.

### Basics on the Education Requirement and Taking Classes:

Au Pairs are required to attend 80 hours or 6 credits for standard au pair; 160 hours or 12 credits for Educare in a College or University.  As part of the program, the Host Family is required to contribute a minimum of $500 ($1,000 for Educare) towards the tuition. In most cases the courses will total more that the total cost will exceed this.

- In summary , here's the class options.  (Please consult Class Starts and Course Options list in welcome packet):
1. ESL at Montclair State  ( They do not permit non -matriculated students to take college courses)
2. ESL at Essex County College--though they may not offer a level high enough for her –Schedules vary.
3. Any college course at Essex County Community College---Caldwell Campus
4. She can elect to take a Saturday course in NYC at Parsons or the New School
5. CW Post Campus- Long Island University weekend program for au pairs 3 or 6 credits in one residential weekend.
6. Lastly, and this is an excellent option, schedule permitting: Seton Hall University will extend the option to audit classes if the Au Pair goes through their English as a Second Language Department.   I usually don't present this choice up front as not all HFs are comfortable with APs driving to South Orange.

**Health Insurance:** Almost everything you ever wanted to know about Au Pair Health Insurance is located on the Au Pair in America website.  As a matter of fact, almost everything you ever wanted to know about any aspect of the program is on this excellent website: www.aupairinamerica.com. Basically they are covered for illness or injury after $200 deductible.  They can go to any doctor, but will probably have to pay upfront and then be reimbursed.

**Au Pair Weekly Stipend**: As of July 24, 2009 Au Pairs receive a weekly stipend of $196; Educare $147 week.



Case No. 1:14-cv-03074-CMA-KMT   Document 959-11   filed 03/30/18   USDC Colorado   pg
158 of 174

# Exhibit 251

| | |
|---|---|
| **From:** | Redacted |
| **To:** | |
| **CC:** | |
| **BCC:** | |
| **Subject:** | RE: |
| **Sent:** | 05/15/2014 04:48:16 PM -0400 (EDT) |
| **Attachments:** | |

Thanks
Au pair care's fee is about $300 higher than Cultural care's cost.
Would you be able to match the Cultural care's fee?
It's not an insignificant amount so I figured it wouldn't hurt to ask.
Thanks

Redacted

**From:** Redacted
**Sent:** Thursday, May 15, 2014 4:47 PM
**To:** Redacted
**Subject:** RE:

Yes, you do to get started with a new search. You can reapply right on your site on the Home page. Click on the button that says "reapply". Now is a good time to start for Aug.

**From:** Redacted
**Sent:** Thursday, May 15, 2014 4:42 PM
**To:** Redacted
**Subject:** RE:

I need to submit a new application to host a new au pair, correct?

Redacted

**From:** Redacted
**Sent:** Thursday, May 15, 2014 4:40 PM
**To:** Redacted
**Subject:** RE:



EXHIBIT
Ferry 21
5/11/17
JEREMY RICHMAN

AIFS 0002665

Hi Linda,
The fee for a year placement beginning in 2014 would be $8045 for a Standard au pair. You would not be required to pay the $400 match fee. The $35 Sevis fee would still apply. The weekly stipend would be $195.75 per week. We ask that you pay $500 towards your Au pair's education for the year. You would need to pay for one way travel arrangements to get the au pair to you after she attends orientation. For repeat families, the discount is that there is no match fee.

Bet Regards,
Karen

Karen Paris-Beck, ext 5566
Placement Services Coordinator
Direct Line: 203-399-5566
Kbeck@aifs.com


Au Pair IN AMERICA
Trust the world's most experienced live-in child care program
(800) 928-7247
a division of the American Institute For Foreign Study® (AIFS)

****Our complete database of au pairs is accessible through our NEW AND IMPROVED ONLINE SEARCH FEATURES 24 hours per day, 7 days a week!

**to see au pairs available now please go to:http://www.aupairinamerica.com/aupairs/available.asp

*For more information on "Preparing to Drive in the US" our new driving course in partnership with AAA go to*
*http://www.aupairinamerica.com/pdf/AAA_APIA_Enrollment_Form.pdf*

---

**From:** Lee, Linda (US/Tysons Corner) [mailto:llee1@KPMG.com]
**Sent:** Tuesday, May 13, 2014 11:10 AM
**To:** Yuri Blen
**Subject:**

Can you please send me a fee breakdown to host an aupair from Aug 2014 to Aug 2015?
thanks

---

**Linda Lee** | KPMG LLP | Federal Tax Services | Senior Manager
1676 International Drive, Suite 1200 | McLean, Virginia 22102
Office: 703-286-6672 | Mobile: 646-662-4851 | Fax: 703-563-7484
Email: llee1@kpmg.com | www.KPMG.com

---

**From:** apaccounting@aifs.com [mailto:apaccounting@aifs.com]
**Sent:** Thursday, July 25, 2013 8:16 PM
**To:** Lee, Linda (US/Tysons Corner)
**Subject:** Your payment has been received.
**Importance:** High

**Host Family ID:**       91973

**Host Family Name:** Lee

**Payment ID:** 0000031651

Thank you for your payment of **$7,485.00** charged to the credit card ending in 6555. This amount will reflect on your account immediately.

If you have any questions, concerns or require clarification regarding this correspondence, please contact our accounting department.

**Contacts for Accounting Queries**

(800) 928-7247 followed by the appropriate extension:

- · 5035 Billing and Adjustments
- · 5550 Extended Payment Plan
- · 5055 Overdue and Collection Accounts
- · 5178 Year 2 Program Fee (for those families extending with their au pair for a second year)

---

The information in this email is confidential and may be legally privileged. It is intended solely for the addressee. Access to this email by anyone else is unauthorized. If you are not the intended recipient, any disclosure, copying, distribution or any action taken or omitted to be taken in reliance on it, is prohibited and may be unlawful. When addressed to our clients any opinions or advice contained in this email are subject to the terms and conditions expressed in the governing KPMG client engagement letter.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\* \* ANY TAX ADVICE IN THIS COMMUNICATION IS NOT INTENDED OR WRITTEN BY KPMG TO BE USED, AND CANNOT BE USED, BY A CLIENT OR ANY OTHER PERSON OR ENTITY FOR THE PURPOSE OF (I) AVOIDING PENALTIES THAT MAY BE IMPOSED ON ANY TAXPAYER OR (ii) PROMOTING, MARKETING OR RECOMMENDING TO ANOTHER PARTY ANY MATTERS ADDRESSED HEREIN. \*\*\*- Any advice in this communication is limited to the conclusions specifically set forth herein and is based on the completeness and accuracy of the stated facts, assumptions and/or representations included. In rendering our advice, we may consider tax authorities that are subject to change, retroactively and/or prospectively, and any such changes could affect the validity of our advice. We will not update our advice for subsequent changes or modifications to the laws and regulations, or to the judicial and administrative interpretations thereof. The advice or other information in this document was prepared for the sole benefit of KPMG's client and may not be relied upon by any other person or organization. KPMG accepts no responsibility or liability in respect of this document to any person or organization other than KPMG's client.

---

The information in this email is confidential and may be legally privileged. It is intended solely for the addressee. Access to this email by anyone else is unauthorized. If you are not the intended recipient, any disclosure, copying, distribution or any action taken or omitted to be taken in reliance on it, is prohibited and may be unlawful. When addressed to our clients any opinions or advice contained in this email are subject to

AIFS 0002667

the terms and conditions expressed in the governing KPMG client engagement letter.
**********************************************************************

* * ANY TAX ADVICE IN THIS COMMUNICATION IS NOT INTENDED OR WRITTEN BY KPMG TO BE USED, AND CANNOT BE USED, BY A CLIENT OR ANY OTHER PERSON OR ENTITY FOR THE PURPOSE OF (I) AVOIDING PENALTIES THAT MAY BE IMPOSED ON ANY TAXPAYER OR (ii) PROMOTING, MARKETING OR RECOMMENDING TO ANOTHER PARTY ANY MATTERS ADDRESSED HEREIN. ***- Any advice in this communication is limited to the conclusions specifically set forth herein and is based on the completeness and accuracy of the stated facts, assumptions and/or representations included. In rendering our advice, we may consider tax authorities that are subject to change, retroactively and/or prospectively, and any such changes could affect the validity of our advice. We will not update our advice for subsequent changes or modifications to the laws and regulations, or to the judicial and administrative interpretations thereof. The advice or other information in this document was prepared for the sole benefit of KPMG's client and may not be relied upon by any other person or organization. KPMG accepts no responsibility or liability in respect of this document to any person or organization other than KPMG's client.

The information in this email is confidential and may be legally privileged. It is intended solely for the addressee. Access to this email by anyone else is unauthorized. If you are not the intended recipient, any disclosure, copying, distribution or any action taken or omitted to be taken in reliance on it, is prohibited and may be unlawful. When addressed to our clients any opinions or advice contained in this email are subject to the terms and conditions expressed in the governing KPMG client engagement letter.
**********************************************************************

CONFIDENTIAL          PLAINTIFFS' RESP. APP.0002057                    AIFS 0002668

Case No. 1:14-cv-03074-CMA-KMT Document 959-11 filed 03/30/18 USDC Colorado pg
163 of 174

# Exhibit 252

Case 1:14-cv-03074-CMA-KMT   Document 943-19   Filed 03/17/18   USDC Colorado   Page 163 of 173

8/14



## Au Pair in America Extension Program

# <u>IMPORTANT!!!</u>

# <u>Educational Requirement Fulfillment</u>

The U.S. Department of State requires that during the au pair's initial period of program participation, she must complete not less than six semester hours (or its equivalent) of academic credit at an accredited U.S. post-secondary institution (12 semester hours for EduCare Companions). Before we can submit an extension request to the Department of State on behalf of you and your au pair, we must verify that your au pair has fulfilled her education requirement. The educational requirement must be completed no later than 45 days before the end of your au pair's first year.

In order to be considered for an extension of stay, your au pair must submit to your community counselor one or more of the following documentation to verify that she has completed her education:

1. Letter from the school on school letterhead stating that the au pair is taking a course
2. Completion certificate from the school
3. School transcript
4. Registration form (it must be on school letterhead and it should indicate the number of credits/hours the class is worth)

If your au pair is still in the process of completing her education, she must obtain a letter from her school, stating that the course will conclude before her first year ends and the number of credits/hours that she will earn.  We will also need final proof of course completion.

<u>*NOTE:*</u> If you and your au pair plan to request an extension, ***please make sure that proof of education is submitted to your community counselor as quickly as possible.*** Please do not submit any proof of education with your extension application. The extension request will not be processed unless your au pair submits her proof of education to her local community counselor. Once we receive the required documentation from your community counselor that the educational requirement has been completed, we will then submit the extension request to the U.S. Department of State.

Au Pair in America Extension Program ★ 1 High Ridge Park ★ Stamford, CT 06905 ★ (800) 928-7247 ★ extension@aifs.com

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

AIFS 0000052



Au Pair in America Extension Program

# **IMPORTANT TRAVEL INFORMATION**

## I. TRAVEL TO CANADA, MEXICO, AND ADJACENT ISLANDS

➢ Year2 au pairs may travel freely to Puerto Rico and the U.S. Virgin Islands.

➢ According to Federal Regulations (22 CFR 41.112) Year2 au pairs can travel to Canada, Mexico and the adjacent islands (Caribbean except Cuba) through a provision known as 'Automatic Revalidation' as long as the travel does not exceed 30 days and the au pair has not applied for another visa. *She would need the following documents: an extension DS 2019 form, a copy of the I-94 Arrival/Departure Card showing unexpired period of admission with 'J-1, D/S' endorsement and a valid passport.*

➢ Be aware that certain nationalities require a visitor's visa to enter Canada, Mexico or certain Caribbean Islands.

➢ Au Pair in America suggests that a Year2 au pair make photocopies of all of her documents, one to take with her and one to leave with her host family.

➢ Bring both the original and the extension DS-2019 form, which has been signed for travel validation along with the participation letter certifying the au pair's approved status on the program. This letter should be on program letterhead.

➢ Be aware that although the Department of State has informed us that au pairs with an expired visa may travel to Canada, Mexico and the adjacent islands through 'Automatic Revalidation', it is ultimately up to the Customs and Border Patrol agents at the POE (port of entry) to determine whether or not to admit someone into the U.S. and therefore there is always a risk of being denied reentry into the United States with an expired visa.

## II. OVERSEAS TRAVEL

➢ If a Year2 au pair wants to travel overseas, she would have to apply at the U.S. Embassy/Consulate in her home country for another visa in order to be readmitted into the U.S. Consular posts **may** issue a new J-1 visa to au pairs who have been approved for an extension, have their extension DS-2019 and a program participation letter with them. The application process for a second year J-1 visa would be the same as for a first time visa. Au pairs must make an embassy appointment in advance for a personal interview, pay a new visa application fee, and fill out the online visa application form (DS-160) just as they did when they first applied for a J-1 visa. Duplicate SEVIS fee receipts ($35) may be printed by going to www.fmjfee.com.

➢ Please note the U.S. Department of State travel website contains links to all the embassies/consulates overseas so that au pairs can make interview appointments online and complete the required visa application form. The website address is: http://usembassy.gov which will lists all of the US embassy and consulate locations in the world by region. Clicking the desired embassy link will take you to the website for that particular U.S. Embassy or consular section.

➢ An au pair's passport should be valid for the duration of her extension. If her passport will expire before the end of her extension, she should contact her country's consulate in the U. S. and apply for a passport renewal. We suggest that if an au pair applies for a second J1 visa, that she does it while her original J1 visa is still valid.

➢ Au Pair in America cannot guarantee that an au pair will be granted a second visa. If a Year2 au pair is denied a visa by the U.S. Embassy, she will be unable to return to the U.S. to complete her extension. It is important that au pairs and host families are aware that by leaving the U.S. with an expired visa, there is a risk that she may not be able to return.

➢ Au pairs from certain countries are at a greater risk of being denied a second visa than au pairs from other countries. Please contact Evelyn Blum at 1-800-928-7247, ext. 5027 or Sarah Friedman ext. 5178 if you have questions about this.

Au Pair in America Extension Program ★ 1 High Ridge Park ★ Stamford, CT 06905 ★ (800) 928-7247 ★ extension@aifs.com

PLAINTIFFS' RESP. APP.0002060

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

AIFS 0000053



Au Pair in America Extension Program

# FAQs

**Can we extend with our current au pair/companion if she is already 27 years old?** Yes, we have confirmed with the Department of State that au pair/companion who has turned 27 during her program year will be eligible for an extension.

**If our au pair is not infant qualified and we are planning to have or adopt a baby under age 2, can she still extend with us?** No, if your au pair is not infant qualified and you will have a child under the age of 2 in your home, she may not extend with you.

**Can my au pair/companion switch programs for her extension year (i.e. can an Au Pair au pair become an EduCare Companion)?** No, au pairs/companions must stay within the same program for their extension year.

**Can my au pair/companion extend for 12 months now and then decide to shorten her contract at a later time?** The au pair/companion must commit to her contract. However, if you and your au pair agree to end the extension program early and she gives you and Au Pair in America a minimum of 30 days notice, she will not forfeit her flight home.

**Does my au pair/companion need a state driver's license?** If your au pair/companion is going to be driving in her extension year, we strongly recommend that she obtain a state driver's license in her first year. Please check your au pair's license for the expiration date to ensure that it will be valid during your au pair's extension term. Check with your local office of motor vehicles to determine what is required to obtain a state driver's license. For more information please visit our website http://aupairinamerica.com/resources/life_in_the_us/driving.asp.

**Can my au pair/companion travel outside of the U.S. in her extension term?** Please refer to the *Important Travel Information* Sheet or visit our website: http://aupairinamerica.com/resources/travel_and_flights/travel_visa.asp.

**What is the difference between the visa in my au pair/companion's passport and her DS-2019?** An au pair/companion's J-1 visa is a full-page stamp in her passport that reads, "VISA United States of America" across the top and contains her photograph. The DS-2019 form is the white paper that says across the top, "*Certificate of Eligibility for Exchange Visitor (J-1) Status*. This is the form she took to the embassy/consulate when she applied for a visa to come to the U.S. The au pair/companion will receive an updated DS-2019 upon approval of her extension, reflecting her extended status in the U.S.

**If my au pair/companion extends her stay, will she receive a month for travel at the end of her first 12 months?** No, the au pair/companion will receive a 30-day grace period at the end of her extension term to be used for travel.

**Will my au pair receive a travel month if she leaves her program early?** No. The travel month is only for au pairs who complete their program. If an au pair leaves the program early, she must return home immediately. Au Pair in America will report her as being out of program status with the U.S. Department of State and Department of Homeland Security once she discontinues her program participation.

**Will my au pair/companion have to pay taxes in her extension term?** Au pair/companion wages are taxable. For more information, please visit our website: http://aupairinamerica.com/resources/host_family_tips/taxqa.asp or the IRS Website http://www.irs.gov/businesses/small/international/article/0,,id=96420,00.html. We suggest that you contact your tax advisor for further information.

**Is the program fee reduced if my au pair/companion stays with our family on an extension?** Au Pair in America has taken the fixed costs into account when setting the program fee discount for families keeping their current au pair/companion. The discount is approximately 20% off the 2015 Au Pair in America published program fee. Program fees are established in order to maintain the infrastructure needed to administer a safe, high quality program and to work within the standards and regulations set by the Department of State.

**What is the deadline and timeline to process a request an extension?** Due to strict Department of State deadlines for processing extensions, Au Pair in America requires extension requests be submitted to us by the deadline to allow adequate time to process and gain approval for an extension. A letter of confirmation will be sent to you to verify that the extension is in process. An approval packet will be mailed to you and your au pair/companion approximately 4-6 weeks after receiving this confirmation receipt.

**Could my au pair/companion be denied an extension request?** Au Pair in America will only allow au pairs/companions to extend if they are in good standing with the program and their request for extension is submitted on time. Au pairs/companions must fulfill their educational requirement and attend cluster meetings. If your au pair/companion is in good standing with the program and has not applied for a different type of visa (i.e. student visa), we do not anticipate any extension denials. However, the final decision for approval is made by the U.S. Department of State.

Au Pair in America Extension Program ★ 1 High Ridge Park ★ Stamford, CT 06905 ★ (800) 928-7247 ★ extension@aifs.com

PLAINTIFFS' RESP. APP.0002061

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

AIFS 0000054

Au Pair in America **Au Pair**

Au Pair in America Extension Program

# EXTENSION PROGRAM COSTS *(for host family retaining their au pair)*

| | **Au Pair in America** | **Au Pair Extraordinaire** | **EduCare** |
|---|---|---|---|
| ➢ 12 month extension program fee | $6,350 | $7,250 | $5,450 |
| ➢ 9 month extension program fee | $4,762 | $5,436 | $4,090 |
| ➢ 6 month extension program fee | $3,175 | $3,625 | $2,725 |
| Weekly Stipend* | $195.75** | $250 | $146.81** |
| Average weekly cost | $318 for 45 hrs. | $390 for 45 hrs. | $252 for 30 hrs. |

\* *\*The weekly stipend of $195.75 for Year2 au pairs on the Au Pair Program and $146.81 for Year2 au pairs on the EduCare Program is set by federal regulations. Au pair programs are governed by federal regulations that set the minimum weekly stipends for the Au Pair and EduCare programs using a formula that calculates wage less an allowance for room and board. As a result of the 2007 Federal Minimum Wage law, on July 24, 2009 the weekly stipend for Au Pair Year2 au pairs increased to $195.75 and the weekly stipend for Year2 EduCare companions is $146.81. The stipend of $250 for Extraordinaire au pairs is set by Au Pair in America.*

**Please Note:** *Fees do not include the educational allowance required of all host families: $500 for the Au Pair and Extraordinaire program for the 9 and 12 month extension; $250 for the 6 month extension. EduCare companions are to receive $1,000 for the 9 and 12 month extension; $500 for the 6 month extension. The Federal Government may change the minimum educational allowance and should that occur, you will be advised by the program.*

➢ Host families pay a $367.00 fee to Au Pair in America to cover the program extension filing fees required by the Department of State. This fee is due and payable with the request to extend.

➢ The extension program fee is due no later than 30 days prior to the start of the extension. Fees are payable by charging your Visa, MasterCard or American Express. Checks for Extension Filing Fee to be made payable to Au Pair in America.

## EXTENDED PAYMENT PLAN

The Extended Payment plan is a Special Financial Arrangement whereby payment of this Program Fee can be extended over a period of months. *The Extended Payment Plan is only offered to those families who choose to extend for nine or twelve months.* The total Service Charge for the 9-month extension is $150; for the 12 month extension is $250.

| INSTALLMENT | DUE DATE | PROGRAM PAYMENT* | | |
|---|---|---|---|---|
| | | **Au Pair in America** | **Au Pair Extraordinaire** | **EduCare** |
| First installment | One month prior to start of extension period | $3,174 | $3,622 | $2,730 |
| Second installment | One month after start of extension period | $794 | $907 | $680 |
| Third installment | Two months after start of extension period | $794 | $907 | $680 |
| Fourth installment | Three months after start of extension period | $794 | $907 | $680 |
| Fifth installment | Four months after start of extension period | $794 | $907 | $680 |

*In addition to this payment, there is an additional service charge of $50 per payment.*

**Note:** *Those selecting a full 12-month program contract submit all five installments; on 9-month extension submit installment one, two and three. The Installment plan is not available to host families selecting a 6-month extension.*

Au Pair in America requires Extended Payment Plan participants to give authorization to charge the payment installments for the extension term. Families who did not previously elect to make payments through the Extended Payment Plan will be subject to a plan activator fee of $75, in addition to the service charge of $50 per payment.

*Pricing is in effect for extensions beginning January 1, 2015*

|Au Pair in America Extension Program ★ 1 High Ridge Park ★ Stamford, CT 06905 ★ (800) 928-7247 ★ extension@aifs.com

PLAINTIFFS' RESP. APP.0002062

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

AIFS 0000055



8/14

## Au Pair in America Extension Program

# **IMPORTANT INFORMATION FOR HOST FAMILIES AND AU PAIRS**

### 1. Education Requirement

If you and your au pair plan to request an extension, *please make sure that proof of education is submitted to your community counselor as quickly as possible.* Please do not submit any proof of education with your extension application. Once we receive the required documentation from your community counselor, we will then submit the extension request to the U.S. Department of State.

One or more of the following documents are acceptable as proof of education:

- ✓ Letter from the school on school letterhead stating that the au pair is taking a course
- ✓ Completion certificate from the school
- ✓ School transcript
- ✓ Registration form with complete details about the class and name of the au pair

### 2. Application Checklist

- ❑ Host Family and Au Pair/Companion Extension Agreement <u>signed by au pair and host parent</u>
- ❑ Extension Program Financial Information Form <u>indicating form of payment for program fee</u>
- ❑ Payment of $367.00
- ❑ Host Family Record Update form
- ❑ Au Pair Insurance form and payment
- ❑ Au Pair in America – Sports Insurance form and payment

Kindly send the above documents to:

**Au Pair in America/Extension Program**
**1 High Ridge Park**
**Stamford, CT 06905**
**or**
**\* Fax to: 203-399-5257 \* Email to: extension@aifs.com**

- ❑ Au Pair has submitted Proof of Education to her **Community Counselor.**
- ❑ We have checked with our local office of motor vehicles to determine what is required for our state. <u>Note:</u> driver's license requirements may vary from state to state.

### 3. Applying for New J-1 Visa

If your au pair is planning to travel to her home country to apply for a new J-1 visa, please check this box so that we can expedite your application. ❑ Please provide travel dates: _____

### 4. Change of Status

If the au pair has filed for a change of visa status, do not complete the Extension Program Application. Contact Evelyn Blum, Compliance and Program Services Manager at 1-800-9AU-PAIR, extension 5027 for details on how to proceed.

PLAINTIFFS' RESP. APP.0002063

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

AIFS 0000056



### Au Pair in America Extension Program

## IMPORTANT EXTENSION TIMELINE INFORMATION

The timeline below indicates when application materials need to be received in the Stamford office.  Failure to submit paperwork before these deadlines can result in a denied extension.

| Current Contract End Date | Deadline for filing an extension |
|---|---|
| 1/8/15 | 10/22/14 |
| 1/13/15 | 10/22/14 |
| 1/27/15 | 10/22/14 |
| 2/10/15 | 11/12/14 |
| 2/24/15 | 11/12/14 |
| 3/10/15 | 1/8/15 |
| 3/24/15 | 1/8/15 |
| 4/7/15 | 1/28/15 |
| 4/14/15 | 1/28/15 |
| 5/1/15 | 2/25/15 |
| 5/19/15 | 2/25/15 |
| 6/2/15 | 3/25/15 |
| 6/16/15 | 3/25/15 |
| 7/7/15 | 4/22/15 |
| 7/14/15 | 4/22/15 |
| 7/21/15 | 4/22/15 |
| 7/28/15 | 4/22/15 |
| 8/4/15 | 5/20/15 |
| 8/11/15 | 5/20/15 |
| 8/18/15 | 5/20/15 |
| 8/25/15 | 5/20/15 |
| 9/8/15 | 6/17/15 |
| 9/15/15 | 6/17/15 |
| 9/22/15 | 6/17/15 |
| 10/6/15 | 7/22/15 |
| 10/20/15 | 7/22/15 |
| 11/3/15 | 8/19/15 |
| 11/17/15 | 8/19/15 |
| 12/1/15 | 9/16/15 |
| 12/8/15 | 9/16/15 |
| 12/27/15 | 9/16/15 |

Au Pair in America Extension Program ★ 1 High Ridge Park ★ Stamford, CT 06905 ★ (800) 928-7247 ★ extension@aifs.com

PLAINTIFFS' RESP. APP.0002064

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

AIFS 0000057

Case No. 1:14-cv-03074-CMA-KMT Document 1059-11 filed 07/30/18 USDC Colorado pg
170 of 174

## Financial Information Form



Au Pair in America Extension Program

**\* *Please indicate form of payment for both the extension filing fee and the extension program fee.***

✓ __EXTENSION FILING FEE__                    HF ID #_____

**We are including our non-refundable payment of $367.00 to cover the request for filing of extension with the U.S. Department of State. *This amount is to be charged upfront.***

Credit Card # _____ Expiration Date _____

*Note: Debit cards are not accepted.

☐ American Express                 ☐ MasterCard                   ☐ Visa

Name on card _____ Signature of cardholder _____ Date_____

☐ We authorize Au Pair in America to charge $367.00 to cover the filing charges for extension with the U.S. Department of State.

☐ We have enclosed a check for $367.00 made payable to Au Pair in America to cover the filing charges for extension with the U.S. Department of State.

✓ __EXTENSION PROGRAM FEE__

**In calculating the 2015 program fee, please check the appropriate box. The program fee is due one month prior to the start of the extension term.**

☐ I/We authorize Au Pair/EduCare in America to charge my **credit card** the full extension program fee due one month prior to the start of the extension term. We have provided our credit card information above. Au Pair/EduCare in America will charge according to the terms of the Extension Program Costs sheet attached.

☐ I/We elect the **Extended Payment Plan** and have provided our credit card information above. Please remember this option is not available to those extending their Au Pair for six months). Au Pair in America requires Extended Payment Plan participants give authorization to charge the payment installments for the extension term to a credit card. *There are service charges associated with this option: $250 for a 12-month extension, $150 for a 9-month extension. This plan also charges an activator fee of $75.*

Au Pair in America Extension Program ★ 1 High Ridge Park ★ Stamford, CT 06905 ★ (800) 928-7247 ★ extension@aifs.com

PLAINTIFFS' RESP. APP.0002065

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY                                    AIFS 0000058

8/14

## Insurance Information and Payment



### Au Pair in America Extension Program

As you are requesting an extension, we will also need to extend your Medical Upgrade Plan. The required coverage extension fees are as follows:

$365.00 for a 12-month extension
$315.00 for a 9-month extension
$260.00 for a 6-month extension

Your insurance coverage will end at the expiry of your policy term, or the date you leave the program, if you leave the program before the end of your extension program commitment.

Remember that the Medical Upgrade Insurance Plan provides you with up to $500,000 of medical coverage, up to $2,500 of insurance to protect your personal belongings, and emergency dental treatment reimbursement of up to $500.

**_Please note that we will be unable to process your extension request unless we receive the appropriate payment for your Medical Upgrade insurance and your Sports Insurance Form._**

------------------------------------------------------------------------------------------------------------------------



_**Cut along the dotted line and return with payment by money order \*(NO CASH) payable to Au Pair in America along with your extension request**_:

Au Pair/Companion ID Number:_____

Au Pair/Companion Name:_____

❑  I have enclosed a money order for the appropriate contribution amount ($365 for 12 months, $315 for 9 months and $260 for 6 months). You may add $80 for the Sports Insurance to this payment. You must also return the Au Pair in America - Sports Insurance form with your application.

_**\* Au Pair in America is not responsible for lost or stolen cash. Money orders can be purchased at the Post Office or your local Bank.**_

**Should your extension be denied or you leave the program prior to beginning your extension term, your Medical Upgrade Insurance payment is refundable.**

Au Pair in America Extension Program ★ 1 High Ridge Park ★ Stamford, CT 06905 ★ (800) 928-7247 ★ extension@aifs.com

PLAINTIFFS' RESP. APP.0002066

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

AIFS 0000059



## Au Pair in America Extension Program





## Important Insurance Information

There have been some changes to your insurance policy for 2015.

Since you are starting your extension program in 2015, the insurance changes for 2015 will affect you.

The insurance brochure for 2015 will be posted on the Au Pair in America website at:

http://www.aupairinamerica.com/pdf/2015APIAinsurance_booklet.pdf

Please review carefully "A Plan of Insurance designed for 2015 Au Pair in America."

## Sports Insurance

If you plan to participate in any of the sports listed below during your extension term, you should purchase Sports Insurance at a cost of $80. This insurance is valid as long as you are an active participant of Au Pair in America. Sports Insurance, as well as your regular medical coverage through CISI, will terminate at the end of your au pair program.

Endurance Horse Riding, Figure Skating, Football (American), Freestyle Skiing, Glacier Skiing, Gymkhana, HeliSkiing, Hurling, Ice Hockey, Ice Skating, Kitesailing, Kitesurfing, Land Luge, Luge, Monoskiing, Mountainboarding, Mounted Orienteering, Nordic Skiing, Parachuting, (solo or tandem but not base jumping), Paragliding (over land), Parapenting (over land), Power Kiting, Rock Climbing (organised tours only), Rollerblading, Rollerskating, Rugby Union/League, Sandboarding, Scuba Diving to 40 metres (PADI or equivalent Qualified or under supervision), Shinty, Show Jumping, Skateboarding, Skeleton, Ski Acrobatics, Ski Stunting, Ski Training/Racing, Ski Bob, Ski Doos (supervised), Skiing, Skydiving, Snow Biking, Snowboarding, Snowmobiles (supervised), Snowshoeing, Snowsurfing, Soaring, Speed Skating, Tobogganing, Vaulting, Wakeboarding, Watercross, Winter Triathlon, Zip Line.

Please return the CISI Sports Insurance form with your payment. **You must complete this form even if you do not want the Sports Insurance.**

MU

Au Pair in America Extension Program ★ 1 High Ridge Park ★ Stamford, CT 06905 ★ (800) 928-7247 ★ extension@aifs.com

PLAINTIFFS' RESP. APP.0002067

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

AIFS 0000060

Case No. 1:14-cv-03074-CMA-KMT   Document 959-11   filed 03/30/18   USDC Colorado   pg 173 of 174

# Exhibit 253

# African Ambassadors /
# South Africa (Pty) Ltd

*"bringing africa to the world"*



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

AIFS 0000063

PLAINTIFFS' RESP. APP.0002069