# **<u>Exhibit Q</u>**

(replacing ECF No. 943-30)

Case No. 1:14-cv-03074-CMA-KMT Document 859-12 filed 02/30/18 USDC Colorado pg 2 of 180

# Exhibit 315

# AU PAIR USA

## 2010 Host Family Application

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Parent 1:** | ☒ Mother ☐ Father | Prefix Dr. | Last Name: ▮▮▮ | | | First Name: ▮▮▮ | |
| **Parent 2:** | ☐ Mother ☐ Father | Prefix | Last Name: | | | First Name: | |

**We are:** ☒ New ☐ Ext ☐ Repeat

**We are pre-matched with an au pair applicant:** ☐ Yes ☒ No    If yes, their name:    Country:

**When would you like your au pair to arrive? (Month/Year)** 8 / 2011

**Home Address Line 1:** REDACTED

Line 2:

| San Francisco | CA | 94118 | Primary Phone: | REDACTED |
|---|---|---|---|---|
| City | State | Zip | | |

**Parent 1 Mobile Phone:** REDACTED                **Parent 2 Mobile Phone:**

**Email Primary:** REDACTED        **Email Alternate:** REDACTED

**Living Arrangements:** ☒ One-parent home ☐ Two-parent home

### CHILDREN

| Name | Gender | Date of Birth |
|---|---|---|
| REDACTED | G | REDACTED |
| | G | |
| | | |
| | | |
| | | |

**Are you expecting a baby?** ☐ Yes ☒ No    If yes, when is the baby due?

**Do you expect to adopt a child in the next 12 months?** ☐ Yes ☒ No

**Do any of your children have special needs?** ☐ Yes ☒ No

If yes, please describe:

**Do any other adults live in your home?** ☐ Yes ☒ No    If yes, please describe :

### FOR NEW FAMILIES

**How did you hear about InterExchange Au Pair USA?** ☐ Internet search ☐ Publication ☐ Referred by Someone ☐ Other

If other, please describe:

**If you were referred to us, who referred you?** ☐ Current Host Family ☒ Current Au Pair ☐ Local Coordinator

| Referred by: | | | |
|---|---|---|---|
| | NAME | CITY | STATE |

| OFFICE USE ONLY | Ref. No. | | LC Name: |
|---|---|---|---|

PLAINTIFFS' RESP. APP.0002827        InterExchange0004450

InterExchange AU PAIR USA Host Family Application

**FAMILY INFORMATION**

| PARENT 1 | PARENT 2 |
|---|---|
| Full Name: ████████ | Full Name: |
| Occupation: Neuropsychologist | Occupation: |
| Company: self-employed | Company: |
| Work Phone: REDACTED | Work Phone: |

Are host parents U.S. citizens or legal permanent residents (green card holders)?  ☒ Yes  ☐ No

Does either parent work from home?  ☐ Yes  ☒ No   If so, please describe the frequency etc.:

Do the work schedules of either parent require overnight travel?  ☐ Yes  ☒ No   If so, please describe the frequency and duration:

Does your family or anyone in your home follow a special diet?  ☐ Yes  ☒ No   If yes, please describe:

Do you have cats?  ☒ Yes  ☐ No      Do you have dogs?  ☐ Yes  ☒ No

Please describe all of your pets (indoor/outdoor, size, number, type)
2 indoor tabby cats.

Is English the primary language spoken in your home?  ☒ Yes  ☐ No

What languages, other than English, are spoken in your home?

Does anyone smoke inside your home?  ☐ Yes  ☒ No

Have any members of your family been convicted of a crime (excluding minor traffic violations)?  ☐ Yes  ☒ No   If so, please explain:

Please check all the areas that best describe you and your family's primary interests:

| | | | | | | |
|---|---|---|---|---|---|---|
| ☒ Handicrafts | ☐ Writing | ☒ Theater/Movies | ☐ Computers | ☒ Do-It-Yourself | ☐ Sailing | ☒ Bicycling |
| ☐ Cooking | ☒ Reading | ☐ Photography | ☐ Entertaining | ☐ Tennis | ☐ Baseball | ☐ Skiing |
| ☐ Gardening | ☒ Artwork | ☒ Travel | ☐ Dance | ☒ Swimming | ☒ Horseback Riding | ☐ Football |

Sporting Events: ___   Musical Instruments: piano   Other: ___

**COMMUNITY INFORMATION**

Which of these best describes your community?  ☒ Urban  ☐ Suburban  ☐ Rural

What is the nearest major city?  San Francisco

What is the nearest major airport?  SFO

Our home is a :  ☒ freestanding house  ☐ townhouse  ☐ apartment

Is there a private bedroom available for the au pair?  ☒ Yes  ☐ No

Will your au pair be expected to drive as part of his/her duties?  ☒ Yes  ☐ No

Will your au pair be allowed to use a car when off-duty?  ☐ Yes  ☒ No

PLAINTIFFS' RESP. APP.0002828    InterExchange0004451

**InterExchange**       **AU PAIR USA** Host Family Application

---

**WEEKLY SCHEDULE**

*Please provide your potential au pair with a sample typical weekly schedule. This will give the au pair an idea of what his/her responsibilities will be in your home. After your au pair arrives, you must provide an official weekly schedule at least one week in advance. Please note: U.S. Department of State regulations stipulate that the schedule may not exceed 10 hours per day or 45 hours per week. In addition, your au pair must receive at least one and a half consecutive days off per week.*

| | |
|---|---|
| **Monday Duties** | **Monday total hours** |
| get kids ready for school.  pick kids up from school. | 5 |
| **Tuesday Duties** | **Tuesday total hours** |
| Spend time with ▮▮ who will have just turned 3.  Parks, playdates, the zoo.  We live right next to Golden Gate Park, one of the largest urban parks in the United States, with many fun attractions, as well as close proximity to Ocean Beach, on the Pacific Ocean. | 8 |
| **Wednesday Duties** | **Wednesday total hours** |
| Get kids ready for school, pick them up. | 5 |
| **Thursday Duties** | **Thursday total hours** |
| Spend time with ▮▮ who will have just turned 3.  Parks, playdates, the zoo.  We live right next to Golden Gate Park, one of the largest urban parks in the United States, with many fun attractions, as well as close proximity to Ocean Beach, on the Pacific Ocean. | 8 |
| **Friday Duties** | **Friday total hours** |
| Get kids ready for school, pick them up. | 5 |
| **Saturday Duties** | **Saturday total hours** |
| Every other week, i like to go out on a Saturday night.  Often I won't though because I am resting after a busy week.  Au pair will always have either Friday or Saturday night off, sometimes both. | ? |
| **Sunday Duties** | **Sunday total hours** |
| au pair typically off unless special event. |  |

Total Hours per Week  **31**

PLAINTIFFS' RESP. APP.0002829

InterExchange0004452

██ Family Essay

Greetings!  My name is ███████ and I have lived in San Francisco on and off since 1989.  I grew up in New Jersey (on the East Coast of the United States).  I am a neuro-psychologist and work in a hospital and also a private practice office.  My daughter REDACTED was born REDACTED and is 7.  My daughter REDACTED is 2.5 years old. I am 44 years old and a single parent.  REDACTED REDACTED are healthy and happy.  We are looking for an au pair to arrive in mid-August of 2011.

We live 1.5 blocks from Golden Gate Park.  It is a huge urban park with lots of great playground places for children.  There are also museums, lakes, a carousel and so many great places for chilren in the park. We live in a two-story house with a large deck and back yard.  You will have a room overlooking the yard.  The house is all wood floors.  We have two very sweet tabby cats.

I am looking for an au pair who is friendly and loves to have fun with children, For whom taking care of children is not just a job, but something she enjoys.  Most importantly, we are a friendly family, and are looking for a compatible au pair for our household.

REDACTED loves music, art, science-she loves butterflies and animals. She is on the basketball team and has been playing piano for a year and a half.  You should be energetic and like to explore new things and places.  You should also like nature as ███████ loves to explore outdoors. ███████ likes to swim so please bring your bathing suit so that the two of you could go to the pool. ███████ wants to learn to ice skate this year as well. REDACTED goes to preschool on Mondays, Wednesdays and Fridays, and she loves the Golden Gate Park, there are many places, lakes, and she loves to go to the beach at Chrissy Field in the Presidio, and the library for books!

PLAINTIFFS' RESP. APP.0002830                                                    InterExchange0004453

You will have some childcare in the morning, helping to get ready for school on some mornings. You will have some child care time in the day for <sup>REDACTED</sup> on Tuesdays and Thursdays. You can explore the city on Mondays, Wednesdays and Fridays, after you help get them off to school. I only work part time so I will also be doing some child care. On some evenings, you will help with bath, reading books, and the kids are in bed by 8p and then you are off. We will eat as a family some, not all, nights, but at least once a week to maintain the family feeling.

I will absolutely help you with a list of cultural, social, outdoor activities in the San Francisco Bay Area so that you may truly have the wonderful experiences possible here. I will provide you with a computer for your personal use if you do not have your own.

I will help you find a good class at a local college, there are many options. I like to try to go out once a week in the evening. I like to go out either Friday or Saturday night but never both, and sometimes, I just stay in and relax after a long week, and enjoy my beautiful children. I try to give the majority of Sundays off. I use google calendar that we can both access on our computers for tracking activities, and I try to schedule well in advance so you can make plans for your free time.

We live a few blocks from 3-4 bus lines. Our home is in a great location for getting around the city of San Francisco easily.

You and I can meet weekly just to touch base. I want to help you feel good about being a member of our family for the year, and I will do what I can to make you feel successful in your job.

I try to travel to a warm climate twice a year, and of course, I will bring you with me so that you can have some travel opportunities. We love the islands of Hawaii and also Mexico. In Mexico this year, we had a wonderful time

**CONFIDENTIAL**

PLAINTIFFS' RESP. APP.0002831

snorkeling and sunbathing/swimming. We return to the Big Island in April this year. This summer we are spending a week camping in Yosemite, and then also renting a lovely estate in the Sonoma wine country. We are looking forward to speaking with and meeting you soon!

**CONFIDENTIAL**

InterExchange0004455



PLAINTIFFS' RESP. APP.0002833



PLAINTIFFS' RESP. APP.0002834

Case 1:14-cv-03074-CMA-KMT   Document 945-30   Filed 03/17/18   USDC Colorado   Page 10
of 180





PLAINTIFFS' RESP. APP.0002835

InterExchange

AU PAIR USA

# Host Family Interview Report

## INSTRUCTIONS TO LOCAL COORDINATOR

*Please act quickly to schedule a time when you can meet with the host family to interview them. Follow the template below and fill-in the answers as thoroughly as possible. If there is something that you find you cannot explain very well during the host family interview, please contact the New York Office of Au Pair USA afterwards so we can help clarify the topic for you and provide on-going support.*

**Telephone Interviews:** *Repeat families for whom an in-person Interview Report was submitted within the last 13 months may be interviewed over the phone upon their reapplication. If there is something that you find you cannot explain very well during the host family interview, please contact the New York Office of Au Pair USA and we will check our records.* *If a telephone interview was done last year, you must interview the family (including all adult family members) in-person. If you are unsure as to whether the interview was done in-person or over the phone, please contact the New York office of Au Pair USA and we will check our records.*

**Department of State (DOS) Regulations:** *Regulations require that all adult family members residing in the home are personally interviewed by an InterExchange's Local Coordinator.*

**Au Pair USA Expectations:** *We rely on these interviews to inform and educate the host family about the Au Pair USA program so they can more effectively take advantage of the benefits of hosting an au pair and to help prevent future problems. We also use these Interview Reports to determine the suitability of host family candidates. We cannot process a match confirmation between an au pair and host family without this document so we ask that you submit these to the Au Pair USA office as quickly as possible.*

Please submit this form by:

| MAIL: | FAX: | E-MAIL: |
|---|---|---|
| InterExchange Au Pair USA | 212-924-0575 | The Au Pair USA Compliance Coordinator |
| 161 Sixth Avenue | | compliance@interexchange.org |
| New York, NY 10013 | | |

---

Check one:    ☒ In-Person Interview    ☐ Telephone Interview

**Host Parents' Names:** ▮▮▮▮▮       ▮▮▮▮▮
FIRST NAME             LAST NAME

_____       _____
FIRST NAME             LAST NAME

**City & State of Family:** San Francisco       ca
CITY             STATE

**Local Coordinator:** Maureen       Hughes-Gress
FIRST NAME             LAST NAME

---

## › REGULATIONS AND POLICIES

Please check off after discussing each item with host family

☒ **Maximum Working Hours:** Department of State (DOS) regulations limit the number of hours an au pair may work to no more than 45 hours per week and 10 hours per single day.

☒ **Infants Under 3 Months:** DOS regulations require that a parent or other responsible adult must be present while an au pair is caring for an infant under the age of 3 months.

☒ **Weekly Stipend:** The DOS mandated weekly stipend is $195.75 per week and should be paid on the same day each week.

☒ **Scheduling Limits:** DOS regulations require that au pairs have at least 1.5 days off per week, 1 full weekend off per month (Fri P.M. to Mon A.M.) and 2 weeks (11 days) of vacation per year.

☒ **Family Day Events:** DOS regulations require that each family attend at least one of the two Local Coordinator organized Host Family Day events offered each year.

☒ **Cluster Meetings:** DOS regulations require that each au pair attend monthly cluster meetings and that the host family facilitates transportation to such events.

---

**CONFIDENTIAL**

PLAINTIFFS' RESP. APP.0002836

InterExchange0004459

☒ **Education Requirement**: DOS regulations require that each au pair complete 6 semester hours of credit at an accredited post-secondary academic institution. Host family is responsible for facilitating transportation so that this requirement can be met. Au pairs who do not complete this requirement before their 11th program month will not be able to extend their program.

☒ **In-Home Training**: Host families will receive an *In-Home Orientation Packet* to work through with their au pair. Experience tells us that the more time invested in the initial in-home training period, the more successful the relationship will be. They will also receive a *Communication Log* to help with scheduling and communicating expectations and responsibilities.

☒ **30 Day No Move Policy**: Au pairs and host families are expected to spend the first 30 days together working through any miscommunications or problems before asking to go into transition. In our experience, many problems can be worked through during this time.

☒ **Domestic Travel from NYC**: Au Pair USA will make all international travel arrangements for the au pair to arrive in New York for orientation. Rather than charge an expensive "set fee" for domestic travel from New York City to host family's home, Au Pair USA lets host families make the domestic travel arrangements for their au pair. It is extremely important that we receive the travel details before the au pair arrives so we can advise and assist them accordingly. Families should reimburse au pairs for baggage fees for the first 2 pieces of luggage.

---

### ⸥ GENERAL INFORMATION

Number of au pairs in cluster: __37__          How many minutes by car to the Local Coordinator home: __1__

Does any member of the family have special needs or medical problems?   ☐ Yes  ☒ No   If yes, please explain:

Host family is (check all that apply):

☐ At-home mom        ☐ At-home dad        ☒ Work-at-home mom    ☐ Work-at-home dad    ☐ Same sex couple

☐ Kosher             ☐ Vegetarian         ☒ Single mom          ☐ Single dad

Host family lives in an area where the au pair must drive:   ☒ Yes  ☐ No

---

### ⸥ CHILDCARE AND AU PAIR RESPONSIBILITIES

1. Is the au pair invited/expected to join the family for meals?
   always invited

2. What holidays does the family celebrate? Is the family willing to include the au pair in their holiday celebrations?
   ALL, christmas. new year, halloween,thanksgiving, easter, birthdays, 4th july

3. What types of activities/events does the family participate in on the weekends? Is the au pair welcome to join in?
   sports, meeting friends, chores, shopping, a-p always invited along

4. Does the family take an annual vacation?                              ☐ Yes  ☒ No
   Will the au pair be expected/invited to accompany the family?         ☐ Yes  ☒ No
   If yes, will the au pair be expected to help with childcare?          ☐ Yes  ☒ No
   Comments:

---

CONFIDENTIAL

InterExchange0004460

PLAINTIFFS' RESP. APP.0002837

5. Are there any family lifestyle habits or customs the au pair should know about?   ☐ Yes   ☒ No   If yes, please describe:

6. Do the family's house rules include a curfew?   ☒ Yes   ☐ No   If yes, please describe:
11pm on worknights

## TRANSPORTATION AND CAR USE

1. Au pair will drive for   ☒ Childcare duties   ☐ Personal activities   ☐ Neither
   ☒ **I have reviewed the car accident policy:** In the event of an accident, the au pair is liable for one-half of the damages up to $500, but cannot be held responsible for paying over $500 per accident. The au pair is not responsible for any damages when driving for work.

2. Can the nearest major city be reached by public transportation easily?   ☒ Yes   ☐ No
   Comments:
   Ap is in the city and a 24x7 bus runs 2 blocks from the house

3. What transportation will be available to the au pair for the following occasions?

   Cluster meetings: public transportation          Classes: public transportation

   Socializing, shopping, etc.: public transportation

   Please make sure the host family understands they must facilitate the au pair getting to classes and cluster meetings. This includes paying the cost to the closest educational institute which meets the educational requirements of the U.S. Department of State and that has classes available to the au pair during non-working hours as well as paying the cost to cluster meetings.

## FAMILY'S HOME & AU PAIR'S ROOM

1. Family lives in a:   4   bedroom house or _____ bedroom apartment (indicate number of bedrooms, including au pair's room)

2. Au pair's room is on the   ☐ Same   ☒ Different   floor as the family

3. The au pair's room contains the following (please check all that apply):

| | | | | |
|---|---|---|---|---|
| ☒ Bed | ☐ Desk | ☒ Lamp | ☒ Storage shelves | ☒ Attached bathroom |
| ☒ Dresser | ☐ Desk chair | ☒ TV | ☒ Closet | ☐ Attached half-bath |
| ☒ Window w/natural light | ☐ Telephone | ☐ Easy chair | ☒ Carpeting | |

   Comments:

4. The general condition of the house at the time of the interview can best be described as:

   ☐ Very neat and clean   ☒ A normal lived-in home with children   ☐ Extremely casual

5. How important is it to the family to have their home very neat?
   important

**CONFIDENTIAL**

PLAINTIFFS' RESP. APP.0002838

## FAMILY LIFE & EXPECTATIONS

1. Has the family ever lived or traveled abroad or moved to an entirely new area, and experienced cultural adjustment?

   travelled extensively.

2. How will the family promote cultural exchange in their house?

   celebrate the au-pairs customs

3. How will the family address homesickness with their au pair?

   talk

4. Why would the family encourage an au pair to spend a year living with their family?

   it will be fun

5. Please check all adjectives you feel describe this host family:

   | | | | | | |
   |---|---|---|---|---|---|
   | ☒ Active | ☒ Organized | ☐ Liberal | ☐ Reserved | ☐ Patient | ☒ Outgoing |
   | ☒ Creative | ☒ Easy-going | ☒ Flexible | ☐ Conservative | ☒ Athletic | ☐ Intellectual |
   | ☒ Direct | ☐ Other: | | | | |

6. Do you have any doubts or reservations as to the suitability of this family?  ☐ Yes  ☒ No

   If yes, please explain:

**In-Person Interview**

☒ I certify that I have interviewed the above mentioned host family in their home, including all adult family members currently residing in the home. The information contained in this report is as accurate as could be determined from this interview.

**Telephone Interview**

☐ I certify that I have interviewed the above mentioned host family over the phone.

| Local Coordinator: | Maureen hughes-Gress | maureen hughes-gress | Digitally signed by maureen hughes-gress DN: cn=maureen hughes-gress, o, ou, email=aapaisnte@aol.com, c=US Date: 2010.01.27 22:36:49 -07'00' | 03/27/2011 |
|---|---|---|---|---|
| | NAME | SIGNATURE | | DATE (MM/DD/YYYY) |

AP-HFA02-0110

CONFIDENTIAL

InterExchange0004462

PLAINTIFFS' RESP. APP.0002839

**InterExchange**  AU PAIR USA Host Family Application

**Host Family Agreement**

This InterExchange Au Pair USA Host Family Agreement is freely entered into by InterExchange, Inc. hereafter "InterExchange", a corporation having its principle place of business in New York City, NY and the named signatory hereafter "Host". For the purpose of this agreement, the Host is acting on behalf of all members of the Host's household including any other individuals residing in or frequently staying at the Host's residence.

1. Host warrants that responses in the Host Family Application are true and correct.

2. Host acknowledges and understands that all au pairs are participants in a cultural exchange program and agrees to comply with all of the regulations published by United States Department of State 22 CFR Part 514.31, which may be amended from time to time in the future. Host acknowledges receipt of a copy of 22 CFR Part 514.31 and the Department of State publication "The Au Pair Exchange Program" from InterExchange. Host agrees that the terms and conditions set forth herein and in the InterExchange Au Pair USA brochure and Host Family Handbook shall constitute part of this agreement with InterExchange.

3. Host agrees to ensure that the au pair shall:
- Be given board and lodging, and shall occupy a separate room which must be approved by InterExchange's Local Coordinator;
- Be given the appropriate U.S. State Department mandated stipend to be paid weekly on a set day;
- Not work more than 45 hours per week nor 10 hours per day spread over five and one half days and receive a written schedule at least one week in advance;
- Be given at least one and one half days off every week and one free weekend (Friday early evening to Monday morning) each month;
- Be given two weeks paid vacation to be taken at a mutually agreed upon time during the exchange;
- Be given adequate time to the complete the required six semester hours of academic courses at an accredited post-secondary institution during the 12 month stay and be given a maximum of $500 to use for such educational courses. Further, Host agrees to facilitate transportation to such classes.

4. Host agrees that InterExchange has the right to determine suitability of their family to participate in the program and that in determining suitability, InterExchange may make reasonable inquiries to third parties.

5. Host agrees that the au pair's duties will be restricted to childcare and responsibilities related to care of the children. This may include active duties such as general supervision of play, preparing children's meals, straightening their rooms, and doing the children's laundry as well as passive duties such as being present when the children are sleeping.

6. Host agrees:
- InterExchange cannot place an au pair in a family with a child under the age of two unless the au pair has at least 200 hours of documented experience working with children under the age of two. Host will promptly notify InterExchange if a child under the age of two years joins the household at any time during the program. If a child under the age of two joins the home, the previously placed au pair shall not be permitted to remain in the home without 200 hours of documented experience working with children under the age of two.
- If there are any children are under three months old living in the home there must be a responsible adult in the home at all times and the au pair cannot be left as the sole childcare provider, even for a limited amount of time, including sleeping hours.
- That during the first three days of an au pair's stay in the home, a parent or another responsible adult shall remain in the home to facilitate the adjustment of the au pair into the family, household and community.
- That the au pair shall not be responsible for the administration of any medicine or medical/therapeutic treatment to my/our children.

7. Host agree to notify InterExchange in writing in the event that our family situation changes in a way that may impact an au pair's well-being or living situation. Such changes include but are not limited to someone joining the household, change of address, divorce or other significant events that may occur during the program.

8. Host will facilitate attendance and provide time off and transportation for the au pair's monthly cluster meetings with InterExchange's Local Coordinator.

9. Host agrees to attend at least one of the two family day conferences organized by InterExchange's Local Coordinator during the program year and understand that failing to do so is grounds for possible termination of continued or future participation in the program.

10. Host agrees to provide the au pair with a one-way ticket or other transportation arrangements for the au pair to travel from New York to their community or request InterExchange to do so at their expense.

11. Host agrees that InterExchange shall have regular contact with the au pair and host family to ensure the success of the exchange, and to provide orientation, assistance, and counsel. Host agrees to cooperate fully with InterExchange and its representatives in their role of supervising and implementing the au pair program.

12. Host agrees that InterExchange may reasonably attempt to mediate in the case of misunderstandings or serious problems for the au pair and/or host family, and shall assist host family and the au pair if the placement cannot be continued. Such assistance may include placement of the au pair with another host family or repatriation, and/or placement of another au pair with host family.

13. Host agrees that after the initial adjustment time of one month following arrival, if there is a serious incompatibility problem that requires alternate placement, InterExchange will make reasonable attempts to locate another au pair. In this case the au pair remains in residence with host for a maximum of two weeks, continues to fulfill her/his childcare responsibilities if requested by Host and receives the appropriate weekly stipend until a new placement can be found.

14. Host agrees that when re-matching their original contract length is shortened or lengthened to match the new au pair's program length. When the contract is lengthened, Host agrees to pay $136 per week for each additional week of service beyond the original 52-week contract.

15. Host agrees that if InterExchange finds that the au pair is subject to exploitative or other unreasonable circumstances or conditions in my/our household (e.g. failure to pay the appropriate weekly stipend or to provide the appropriate free time or educational benefits), it may in its sole judgment withdraw the au pair from the household, and Host shall not be entitled to a replacement au pair or any refund.

16. Host agrees agree that if a problem arises when traveling with their au pair outside of their local community they will be responsible for making arrangements at their expense to promptly return the au pair to that community.

17. Host understands that travel with the au pair in excess of 30-days within the U.S. or outside of the U.S. must have prior written consent from InterExchange.

18. Host understands that au pairs are provided with accident and sickness insurance provided by a third-party insurance company and that this insurance policy contains limitations and exclusions. Host agrees that any disputes regarding coverage issues are strictly between au pair and the third-party insurance company and that InterExchange is not responsible for resolving any coverage issues and/or disputes.

19. Host agrees to be responsible for determining whether any additional types of employee insurance are required under federal, state and/or local laws. Host understands that InterExchange is not responsible for providing guidance as to such insurance matters.

20. Host agrees to be responsible for determining whether the au pair will be able to legally drive in their state of residence.

21. Host agrees to provide automobile insurance at the Host's sole cost if the au pair uses any of Host's vehicles. The insurance coverage shall not be less than the minimum mandatory insurance coverage required by law in the Host's state of residence.

22. Host acknowledges responsibility to conform to any and all state or local laws regarding the au pair's use of Host's automobile, including the au pair obtaining a local driver's license if required.

23. Host agrees not to hold InterExchange liable for any damage or loss resulting from the au pair's use of the vehicle.

24. Host agrees to pay for gas used by the au pair when performing her/his duties or when driving to/from meetings and/or classes that are requirements of the program. .

25. Host agrees that any decision regarding an au pair's program status, dismissal, or replacement will be made at the sole discretion of InterExchange and shall be considered final.

**CONFIDENTIAL**

PLAINTIFFS' RESP. APP.0002840

InterExchange0004463

InterExchange                               AU PAIR USA   Host Family Application

26. Host agrees that InterExchange shall not be liable for any personal bills incurred by the au pair while residing with his/our family. Host understand that the au pair will be responsible directly to the family for all personal debts including but not limited to phone calls, use of the Host Family car, gym memberships, and in case of damage to the car during non-working hours the au pair will be liable for one half the damages up to $500.00 per accident.

27. Host agrees to carefully choose an au pair from the candidate(s) presented, and that there is no warranty as to Host's satisfaction or to the compatibility of any particular candidate as an au pair in Host's family.

28. Host agree to undertake reasonable direct contact with any au pair candidate and contact a potential au pair a minimum of two times by telephone prior to an agreement to match.

29. Host agrees to notify InterExchange by telephone and in writing if a serious problem develops between Host and the au pair.

30. Host acknowledges that InterExchange is primarily a cultural exchange organization rather than a domestic services business and waives and releases InterExchange from any and all claims for contract damages such as, for example, cost of providing alternate child care arrangements if InterExchange is unable, for any reason, after reasonable efforts, to place an au pair with Host's family or to obtain a replacement au pair if one should be needed.

31. Host understands that InterExchange does not guarantee continuous childcare coverage in any circumstances, including but not limited to circumstances in which the au pair becomes ill or disabled by any circumstance or is otherwise unable or unwilling to fulfill their duties hereunder; and that InterExchange is not responsible for the costs of supplemental, replacement, or interim childcare. In addition, InterExchange is not responsible for delays in the au pair's arrival such as visa rejections, visa delays, flight delays, or situations otherwise beyond the direct control of InterExchange.

32. Host understands that in the event of an accident or serious illness that, in the judgment of InterExchange, prevents the au pair from continuing her/his duties, she or he will and the exchange early and return home. In such a circumstance InterExchange will use reasonable efforts to find a replacement au pair.

33. Host agrees that InterExchange shall not be liable for and does not guarantee acceptable performance by the au pair. Host agrees that the au pair is not an employee, servant or agent of InterExchange or any Local Coordinator, and that InterExchange and/or any Local Coordinator do not exercise dominion and control over the actions of the au pair. InterExchange and any Local Coordinator are not responsible for any act or omission on the part of the au pair.

34. Host agrees that InterExchange and/or its officers, employees and agents are neither responsible nor liable for any events beyond their control, including without limitation Acts of God or Government restrictions that may interfere with or preclude operation of the InterExchange program; nor, in the absence of their own gross or wilful negligence are InterExchange, its officers, employees, agents and/or any Local Coordinator liable for any events directly or indirectly caused by any intentional or negligent acts or omissions by an au pair placed in my/our household.

35. Host understands and agrees to the terms and schedule of payment as set forth in this document. Host agrees to pay the Application Fee of $300 when submitting our application. Further, Host agrees to make payment of the Program Fee Deposit of $2,500 upon matching with chosen au pair. Host also agrees to pay the Program Fee Balance of $4,490 upon the arrival of our au pair to our home or elect to join the Easy Payment Plan. Host agrees that these program fees may be subject to change or be modified by promotional offers/discounts.

36. Host understands that failure to pay InterExchange's program invoices by the due date will result in the assessment of interest charges calculated at a rate of 8% per annum, compounded monthly, of the past due balance. Additionally, InterExchange shall be entitled to reimbursement from the Host for all incurred costs of recovery of past due balances, which may include but may not be limited to, collection fees of 25% of the past due balance, attorney fees of 30% of the past due balance and/or court costs.

37. Host agrees to the following refund policy:
 • Application fee: the $300 application fee is non-refundable.
 • Refund before the au pair's arrival in the USA: If Host cancels prior to the au pair's arrival to the U.S., InterExchange will refund all monies paid less $500 cancellation fee.
 • Refund after the au pair's arrival to the U.S.: $100/week for each of the unused weeks remaining on my/our contract.
 • If during the final week of placement, the au pair was in the home for 3 days or less, the number of weeks used will be rounded down to the nearest whole week; if the au pair was in the home for 4 days or more, the number of weeks used will be rounded up to the nearest whole week.
 • After 26 weeks of placement no refunds will be given but the unused balance will be credited toward the next contract. Such credit will expire after on 12 months.
 • Any discounts that have been applied to the current contract will not be counted as payments and therefore will be deducted from the refund amount.

38. In the event of an au pair replacement, Host agrees:
 • The program term shall be adjusted to include the remainder of the replacement au pair's full program year.
 • Host shall be responsible for paying InterExchange $136 for each additional week of au pair service beyond my/our regular fifty-two (52) week program year, and such additional payment is due no later 30 days after the replacement au pair's arrival.
 • Host agrees and understands they may be responsible for additional tuition costs for the replacement au pair if the au pair has not completed the educational component with a previous Host Family (up to a maximum of $500.)
 • InterExchange agrees to contribute up to $300 toward our cost of the replacement au pair's transportation to my/our home.

39. Host agrees to assist InterExchange in ensuring that the au pair leaves the United States at the conclusion of the program year in compliance with the regulations.

40. Host agrees that any controversy, dispute, or claim arising between Host and/or any beneficiary of this agreement out of or in connection with this agreement, the relationship of the parties or its interpretation, performance or nonperformance, or any breach thereof shall be determined solely in arbitration conducted in New York City in accordance with the then existing rules of the American Arbitration Association.

41. This contract outlines the terms that should govern the InterExchange Au Pair USA program for standard 12-month programs, in-country placements, rematches and Extension Programs.

42. Host is hereby advised and understands that au pairs wishing to participate on the Extension Program must submit their application on or before InterExchange Au Pair USA's published deadline date, and InterExchange does not guarantee that the Department of State will approve any extension request.

43. Host is hereby advised and understands that au pairs participating on the Extension Program will receive an updated DS-2019 form that reflects the updated program dates. Although au pairs will have a valid DS-2019 form, the J-1 visa in his/her passport may have expired during the first 12-months of stay in the U.S. InterExchange discourages au pair travel outside of the U.S. after the J-1 visa expires as au pair may not be allowed re-entry to the U.S.

44. Host understands that although InterExchange will make its best efforts at screening and training all au pairs, childcare is an inherently risky business. Host therefore agree to assume the risks involved in the childcare provided by au pair, and hereby irrevocably, unconditionally, and fully waive, release and forever discharge InterExchange, its subsidiaries, officers, employees, and/or agents from any and all claims related to personal and/or property damage, injury, loss, delay or expense Host incurs.

45. Host is given the option of electronically accepting the terms and conditions of this Host Family Agreement, or Host Family may download, review, sign, and return to InterExchange. Should Host Family opt to download and return, this Host Family Agreement may be signed and delivered to InterExchange. An electronic or facsimile signature shall be considered the same as an original.

By clicking on "I/We Agree" below, Host Family accepts of the terms of this Host Family Agreement. No alteration of the terms of this Host Family Agreement will be valid unless approved by InterExchange in writing. Beyond what is expressly stated in this Agreement, I/we do not rely on any other promises, statements or representations. I/We have retained a copy of this Agreement for our files.

I/we have read and agree to the terms and conditions.     ☒

| Parent 1: | Last Name: | ███████████ | First Name: | ███████████ |

| Parent 2: | Last Name: | | First Name: | |

| Email Primary: | REDACTED |

Case No. 1:14-cv-03074-CMA-KMT Document 925-50-18 filed 03/17/18 USDC Colorado pg 18
of 180

InterExchange
**AU PAIR USA**

## Confidential Employment Verification

INSTRUCTIONS: The Host Parent's employer must complete this form.
Employers may use this form or write a similar letter on company letterhead.

This is to verify that ███████████████████████ is a current

(Host Family Applicant)

employee of _____

(Name of Company)

He/She has been with the company since _____

(starting date)

Social Security Number _____ **REDACTED**

**REDACTED**

Sincerely,

_____

(Supervisor or Personnel Signature)

Name and address of company:

_____

K E N T F I E L D
REHABILITATION & SPECIALTY HOSPITAL

**REDACTED**

Phone number: _____

*I am self employed. I
am on the medical staff
at Kentfield Hospital since
2003.*

13

PLAINTIFFS' RESP. APP.0002842                    InterExchange0004465

**InterExchange**

## Host Family Confidential Reference

**AU PAIR USA**

Host Family Last Name (s): ▓▓▓▓                            State: **CA**

Name of Reference: ▓▓▓▓▓▓▓▓▓    Email Address:    REDACTED        Date: 3/23/2011

How long have you known this family?:

Since 1984

Please describe the capacity in which you know them:

▓▓▓▓ has been a close friend for over 25 years.

Have you visited the applicant family in their home?  ☒ Yes  ☐ No

Please describe your view of the family, include your observations of the relationship of the parents to each other, to the children and vice versa:

The ▓▓ family is a warm and loving family that has had au pairs for several years successfully. ▓▓▓▓ is a very competent adult who can work out difficult situations and tries to help her au pairs have enjoyable years in America.

Please describe any special conditions including physical or mental handicaps or disorders that the children or parents may have:

None that I know of.

Are you aware of any alcoholism, drug abuse, domestic violence, sexual abuse, or other disorders in the family?  ☐ Yes  ☒ No
If yes, please describe:

Are you aware of any history of arrest or criminal charges involving any family member?  ☐ Yes  ☒ No    If yes, please describe:

In your opinion, do you feel that the applicants would provide a healthy, pleasant family experience for a young au pair?  ☒ Yes  ☐ No
Please feel free to make any further comments or observations in the space below:

A great family for an au pair!

PLAINTIFFS' RESP. APP.0002843

InterExchange0004466

InterExchange

## Host Family Confidential Reference

AU PAIR USA

Host Family Last Name (s): ███████                     State: CA

Name of Reference: ███████      Email Address:      REDACTED      Date: 1/19/2011

How long have you known this family?:

I've known ███████ since 2002 (8+ years)

Please describe the capacity in which you know them:

███ and I became good friends after meeting, and now our daughters are friends too.

Have you visited the applicant family in their home?   ☒ Yes  ☐ No

Please describe your view of the family, include your observations of the relationship of the parents to each other, to the children and vice versa:

███ is a wonderful mother. Her daughters are very sweet and good-natured. She has had au pairs before, and has always had good relationships with them.

Please describe any special conditions including physical or mental handicaps or disorders that the children or parents may have:

Are you aware of any alcoholism, drug abuse, domestic violence, sexual abuse, or other disorders in the family?  ☐ Yes  ☒ No

If yes, please describe:

Are you aware of any history of arrest or criminal charges involving any family member?  ☐ Yes  ☒ No   If yes, please describe:

In your opinion, do you feel that the applicants would provide a healthy, pleasant family experience for a young au pair?  ☒ Yes  ☐ No

Please feel free to make any further comments or observations in the space below:

███ is a great gal, and very fair-minded. I think that an au pair would be very happy and well cared-for in her home.

PLAINTIFFS' RESP. APP.0002844                InterExchange0004467

 

www.aupairinamerica.com

Send all remittances to:
**Au Pair in America**
24600 Network Place
Chicago, IL 60673-1246
*For Billing queries, please see reverse side for contact information*

| Date | Family ID# |
|------|-----------|
| 02-24-2011 | 43538  XA |

REDACTED
SAN FRANCISCO, CA 94118

## STATEMENT
**Tax ID# 31 0683821**

<10>

| DUE DATE | DESCRIPTION | AMOUNT |
|----------|-------------|--------|
| | ***** Au Pair Service Dates ***** | |
| | Katharina Kirst       08-23-2010    08-22-2011 | |
| | BALANCE BEFORE CURRENT AGREEMENT YEAR | $0.00 |
| 07-23-2010 | SEVIS Fee | $35.00 |
| 07-23-2010 | Program Fee | $8,850.00 |
| 08-09-2010 | Payment on Account — Thank You | -$8,850.00 |
| | BALANCE DUE | $35.00 |

*Here is a receipt showing my current participation w/ APIA Please apply $500 discount to my Interexchange bill. Thanks!*

*1.5% per month (18% per annum) finance charged will be assessed on outstanding balances at 31+ days.*

Checks should be made out to Au Pair in America and include your host family ID number. If charging payment to a credit card, please indicate which (**please note:** Debit cards not accepted): *Please see reverse side for fax information.*

☐ American Express  ☐ Visa  ☐ MasterCard   Amount to be charged $ _____
**Charge will appear on your bill as "American Institute For Foreign Study"**

Card number _____   Expiration date _____

Name (as it appears on the card) _____

Signature _____   Phone ( _____ ) _____
*Keep one copy for your records and return the other with payment.*

**CONFIDENTIAL**

PLAINTIFFS' RESP. APP.0002845

InterExchange0004468



AU PAIR USA     H-2B VISA USA

CAMP USA     WORKING ABROAD

CAREER TRAINING USA     WORK & TRAVEL USA

3/23/2011

███████Family
REDACTED
San Francisco CA 94118

Dear Host Family,

The information below outlines our orientation schedule and will assist you in contacting your new au pair at the hotel during his/her week in New York City.

**Au Pair Name-** ████████████████

**New York City Expected Arrival Date - 8/15/2011**

**Hotel Accommodation:**

New Yorker Hotel (Ramada Inn & Plaza)     Telephone: (212) 971-0101
8th Avenue (@34th Street)
New York, NY 10001

The hotel often has only one name per room in their directory and may tell you there is no guest registered under your au pair's name. If you have difficulty reaching your au pair, please call the Au Pair USA office at 1-800-AU-PAIRS. We will have all of the room numbers by Monday afternoon.

**Orientation Schedule:**

| | |
|---|---|
| Tuesday: | Rules and Regulations of the Program, Child Development of School-Age Children, and a Cultural Adaptation Class |
| | Optional Tour of NYC with Licensed Tour Guide |
| Wednesday: | Child Safety and Health Training by Lifesaving Enterprises |
| Thursday: | Child Development of Newborns through Five-Year Olds. |
| Friday: | Travel to Host Family (any time of day). |

**Domestic Travel Arrangements:**

**PLEASE BE AWARE THAT IT IS THE RESPONSIBILITY OF THE HOST FAMILY TO MAKE DOMESTIC ARRANGEMENTS FOR THEIR INCOMING AU PAIR.** We *strongly* encourage you to purchase refundable/transferrable tickets for your au pair. In the unlikely event that your au pair is not able to come to the US as scheduled, such tickets will be easy to change. Please call Globe Travel at 1-800-892-9385 to make travel arrangements. Globe Travel will then forward the tickets to us. If you prefer to use your own travel agent, or if you plan to pick up your au pair at the Hotel New Yorker, *please contact Joanna Lehmann*, the Orientation Manager in the New York office and send the ticket to her attention at the New York office. If you have an electronic ticket you can email it directly to: *logistics@interexchange.org*. You can also email any other travel information to the aforementioned email address. We will be happy to deliver any travel information necessary to your au pair on the Thursday afternoon of every arrival. If you are picking up your au pair at the Hotel New Yorker, please let us know!

**CONFIDENTIAL**     **InterExchange0004469**

PLAINTIFFS' RESP. APP.0002846

 **InterExchange**

# InterExchange/Au Pair USA
# Au Pair-Host Family Confirmation

**Au Pair Section**

*Au Pair First Name:* ▋ *Last Name* ▋      *Au Pair Reference* ▋

**International Cooperator Section**

*Cooperator:* STEP IN GmbH      *IC Reference #:* 10006

**Host Family Section**

*Family Name:* ▋      *Family Reference #:* ▋

*Parent 1 Name:* ▋    *Role* Mother    *Parent 2 Name:*    *Role*

*Complete application, including all references, was sent to host family on 3/16/2011 by Briana Danner.*

**Local Coordinator Section**

*Local Coordinator:* Maureen Hughes-Gress      *LC Reference #:* L269

*LC's Telephone #:* 415-750-9513      *LC's Email:* mhughes-gress@lc.interexchange.org

**Placement Information**

*Int'l Departure City:* Hannover      *Au Pair's Arrival to U.S.:* August 15, 2011

After a one week orientation and training program in New York City, you will travel to your host family!

*Host Family's Address:*      *Family's Phone #:* REDACTED
   REDACTED
     *Family's Email:* REDACTED
San Francisco, CA ,94118

*Your host family has described their area as:* urban

*Your host family has the following children:*
     B = Boy, G = Girl

| Gender: | G | G | | | | |
|---|---|---|---|---|---|---|
| Age: | 7.47159 | 2.65845 | | | | |

InterExchange •161 Sixth Avenue, New York, NY 10013 • Tel: (212) 924-0446
Fax: (212) 924-0575 • E-mail: info@interexchange.org • WWW: http://www.interexchange.org

IEX03/00NR      Au Pair-Host Family Confirmation



AU PAIR USA    H-2B VISA USA

CAMP USA    WORKING ABROAD

CAREER TRAINING USA    WORK & TRAVEL USA

RE: ████████████

Dear ████ Family,

Congratulations on matching with your new au pair. Your au pair will now begin the process of applying for the J-1 visa at a U.S. Consulate in her home country.

Due to increased security measures at U.S. Consulates around the world, all visa applications are now processed only through the mail and an in-person interview is required. It is the sole responsibility of the au pair to apply for and schedule her/his own visa interview appointment.

Most au pairs receive their visas in a reasonable amount of time and arrive on their scheduled orientation date, but sometimes there may be unforeseen delays or visa denials. As always, it is important for host families to have back-up childcare, should their incoming au pair experience any visa difficulties.

As the sponsoring organization, InterExchange/Au Pair USA provides each au pair with an official U.S. Department of State DS-2019 form. We also process the payment of the au pairs's SEVIS Fee and supply a copy of the I-901 receipt. When applying for their visa, au pairs must submit the DS-2019 form and I-901 form along with any other documents required by the U.S. Consulate in their country. *Only an overseas consular officer can process, grant, or deny an au pair's visa application.*

The best way for your family to stay informed of your au pair's visa results is to maintain contact with her/him throughout the visa process. Au Pair USA is informed in the case of a visa delay or denial, at which point we notify your Local Coordinator immediately.

Thank you and we wish you a wonderful year with your au pair!

Sincerely,

Au Pair USA

**CONFIDENTIAL**

**InterExchange0004471**

PLAINTIFFS' RESP. APP.0002848

# HOST FAMILY PLACEMENT SHEET

ID: F11683

| Fam Name | ███████ | | LC Name **Hughes-Gress, Maureen** |
|---|---|---|---|
| Parent | | Parent 2 | Phone **415-750-9513** |
| State **CA** | Zip **94118** | | Place. Coord **Margaret Terrero** |

Pre-match? ☐ Yes ☒ No If yes, their name: _____ Country: _____

## Children

| Name | Gender | | Age | DOB |
|---|---|---|---|---|
| REDACTED | ○ B ◉ G | | 7.3 | REDACTED |
| | ○ B ◉ G | | 2.5 | |
| | ○ B ○ G | | | |
| | ○ B ○ G | | | |
| | ○ B ○ G | | | |
| | ○ B ○ G | | | |

Desire Arr Date **08/08/2011**

Are you expecting a baby? ☐ Yes ☒ No
Baby due _____
Adopt a child in the next 12 months? ☐ Yes ☒ No
Other adults in home? ☐ Yes ☒ No
Other adults desc.

| | | | |
|---|---|---|---|
| AP's Sex | Female | | At Home Parent _____ |
| AP_Smoker | No | | CommunityDesc **urban** |
| Need Driver | Experienced Only | Rank **4** | |
| Need Swimmer | somewhat | Rank **4** | |
| Pref Age Range | 21-26 | Rank ___ | |
| Pref Child Care Exp | 2-6 | Rank **1** | |
| Pref Native Language | German | Rank **2** | |

Pref Additional Info

Pets_Cats **Yes**
Pets_Dogs **No**
Pets_Desc **2 indoor tabby cats.**

Spec.Need **No**    HF's Pets **cat**

Spec. describe

Matching Considerations          Best suited au pair comments

PLAINTIFFS' RESP. APP.0002849          InterExchange0004472

InterExchange

AU PAIR USA Host Family Application

## AU PAIR USA

## 2010 Host Family Application

| Parent 1: | ☒ Mother ☐ Father | Prefix Dr. | Last Name: ███ | First Name: ███ |

| Parent 2: | ☐ Mother ☐ Father | Prefix | Last Name: | First Name: |

**We are:** ☒ New ☐ Ext ☐ Repeat

**We are pre-matched with an au pair applicant:** ☐ Yes ☒ No     If yes, their name:     Country:

**When would you like your au pair to arrive? (Month/Year)**     8 / 2011

**Home Address Line 1:** REDACTED

Line 2:

| San Francisco | CA | 94118 | Primary Phone: REDACTED |
| City | State | Zip |

**Parent 1 Mobile Phone:** REDACTED     **Parent 2 Mobile Phone:**

**Email Primary:** REDACTED     **Email Alternate:** REDACTED

**Living Arrangements:** ☒ One-parent home ☐ Two-parent home

### CHILDREN

| Name | Gender | Date of Birth |
|------|--------|---------------|
| REDACTED | G | REDACTED |
|  | G |  |
|  |  |  |
|  |  |  |
|  |  |  |

**Are you expecting a baby?** ☐ Yes ☒ No     If yes, when is the baby due?

**Do you expect to adopt a child in the next 12 months?** ☐ Yes ☒ No

**Do any of your children have special needs?** ☐ Yes ☒ No

If yes, please describe:

**Do any other adults live in your home?** ☐ Yes ☒ No     If yes, please describe :

### FOR NEW FAMILIES

**How did you hear about InterExchange Au Pair USA?** ☐ Internet search ☐ Publication ☐ Referered by Someone ☐ Other

If other, please describe:

**If you were referred to us, who referred you?** ☐ Current Host Family ☒ Current Au Pair ☐ Local Coordinator

Referred by: _____     _____     _____
| NAME | CITY | STATE |

| OFFICE USE ONLY | Ref. No. | LC Name: |

CONFIDENTIAL

PLAINTIFFS' RESP. APP.0002850

InterExchange · AU PAIR USA Host Family Application

## ILY INFORMATION

**PARENT 1**

Full Name: [REDACTED]

Occupation: Neuropsychologist

Company: self-employed

Work Phone: REDACTED

**PARENT 2**

Full Name:

Occupation:

Company:

Work Phone:

Are host parents U.S. citizens or legal permanent residents (green card holders)? ☒ Yes ☐ No

Does either parent work from home? ☐ Yes ☒ No   If so, please describe the frequency etc.:

Do the work schedules of either parent require overnight travel? ☐ Yes ☒ No   If so, please describe the frequency and duration:

Does your family or anyone in your home follow a special diet? ☐ Yes ☒ No   If yes, please describe:

Do you have cats? ☒ Yes ☐ No   Do you have dogs? ☐ Yes ☒ No

Please describe all of your pets (indoor/outdoor, size, number, type)
Indoor tabby cats.

Is English the primary language spoken in your home? ☒ Yes ☐ No

What languages, other than English, are spoken in your home?

Does anyone smoke inside your home? ☐ Yes ☒ No

Have any members of your family been convicted of a crime (excluding minor traffic violations)? ☐ Yes ☒ No   If so, please explain:

Please check all the areas that best describe you and your family's primary interests:

☒ Handicrafts ☐ Writing ☒ Theater/Movies ☐ Computers ☒ Do-It-Yourself ☐ Sailing ☒ Bicycling

☐ Cooking ☒ Reading ☐ Photography ☐ Entertaining ☐ Tennis ☐ Baseball ☐ Skiing

☐ Gardening ☒ Artwork ☒ Travel ☐ Dance ☒ Swimming ☒ Horseback Riding ☐ Football

Sporting Events: ____   Musical Instruments: piano   Other: ____

## COMMUNITY INFORMATION

Which of these best describes your community? ☒ Urban ☐ Suburban ☐ Rural

What is the nearest major city? San Francisco

What is the nearest major airport? SFO

Our home is a: ☒ freestanding house ☐ townhouse ☐ apartment

re a private bedroom available for the au pair? ☒ Yes ☐ No

Will your au pair be expected to drive as part of his/her duties? ☒ Yes ☐ No

Will your au pair be allowed to use a car when off-duty? ☐ Yes ☒ No

CONFIDENTIAL

InterExchange     **AU PAIR USA** Host Family Application

**WEEKLY SCHEDULE**

…se provide your potential au pair with a sample typical weekly schedule. This will give the au pair an idea of what his/her responsibilities will be in your home. After your au pair arrives, you must provide an official weekly schedule at least one week in advance. Please note: U.S. Department of State regulations stipulate that the schedule may not exceed 10 hours per day or 45 hours per week. In addition, your au pair must receive at least one and a half consecutive days off per week.

**Monday Duties**

get kids ready for school.  pick kids up from school.

**Monday total hours** — 5

**Tuesday Duties**

Spend time with ███ who will have just turned 3.  Parks, playdates, the zoo.  We live right next to Golden Gate Park, one of the largest urban parks in the United States, with many fun attractions, as well as close proximity to Ocean Beach, on the Pacific Ocean.

**Tuesday total hours** — 8

**Wednesday Duties**

Get kids ready for school, pick them up.

**Wednesday total hours** — 5

**Thursday Duties**

…pend time with ███ who will have just turned 3.  Parks, playdates, the zoo.  We live right next to Golden Gate Park, one of the largest urban parks in the United States, with many fun attractions, as well as close proximity to Ocean Beach, on the Pacific Ocean.

**Thursday total hours** — 8

**Friday Duties**

Get kids ready for school, pick them up.

**Friday total hours** — 5

**Saturday Duties**

Every other week, i like to go out on a Saturday night.  Often I won't though because I am resting after a busy week.  Au pair will always have either Friday or Saturday night off, sometimes both.

**Saturday total hours** — ?

**Sunday Duties**

au pair typically off unless special event.

**Sunday total hours**

**Total Hours per Week** — 31

**CONFIDENTIAL**

InterExchange0004475

Case No. 1:14-cv-03074-CMA-KMT   Document 928-30   filed 03/30/18   USDC Colorado   pg 29 of 180

# Exhibit 316

**Host Family Agreement**

This InterExchange Au Pair USA Host Family Agreement is freely entered into by InterExchange, Inc. hereafter "InterExchange", a corporation having its principle place of business in New York City, NY and the named signatory hereafter "Host". For the purpose of this agreement, the Host is acting on behalf of all members of the Host's household including any other individuals residing in or frequently staying at the Host's residence.

1. Host warrants that responses in the Host Family Application are true and correct.

2. Host acknowledges and understands that all au pairs are participants in a cultural exchange program and agrees to comply with all of the regulations published by United States Department of State 22 CFR Part 514.31, which may be amended from time to time in the future. Host acknowledges receipt of a copy of 22 CFR Part 514.31 and the Department of State publication "The Au Pair Exchange Program" from InterExchange. Host agrees that the terms and conditions set forth herein and in the InterExchange Au Pair USA brochure and Host Family Handbook shall constitute part of this agreement with InterExchange.

3. Host agrees to ensure that the au pair shall:
• Be given board and lodging, and shall occupy a separate room which must be approved by InterExchange's Local Coordinator;
• Be given the appropriate U.S. State Department mandated stipend to be paid weekly on a set day;
• Not work more than 45 hours per week nor 10 hours per day spread over five and one half days and receive a written schedule at least one week in advance;
• Be given at least one and one half days off every week and one free weekend (Friday early evening to Monday morning) each month;
• Be given two weeks paid vacation to be taken at a mutually agreed upon time during the exchange;
• Be given adequate time to the complete the required six semester hours of academic courses at an accredited post-secondary institution during the 12 month stay and be given a maximum of $500 to use for such educational courses. Further, Host agrees to facilitate transportation to such classes.

4. Host agrees that InterExchange has the right to determine suitability of their family to participate in the program and that in determining suitability, InterExchange may make reasonable inquiries to third parties.

5. Host agrees that the au pair's duties will be restricted to childcare and responsibilities related to care of the children. This may include active duties such as general supervision of play, preparing children's meals, straightening their rooms, and doing the children's laundry as well as passive duties such as being present when the children are sleeping.

6. Host agrees:
• InterExchange cannot place an au pair in a family with a child under the age of two unless the au pair has at least 200 hours of documented experience working with children under the age of two. Host will promptly notify InterExchange if a child under the age of two years joins the household at any time during the program. If a child under the age of two joins the home, the previously placed au pair shall not be permitted to remain in the home without 200 hours of documented experience working with children under the age of two.
• If there are any children are under three months old living in the home there must be a responsible adult in the home at all times and the au pair cannot be left as the sole childcare provider, even for a limited amount of time, including sleeping hours.
• That during the first three days of an au pair's stay in the home, a parent or another responsible adult shall remain in the home to facilitate the adjustment of the au pair into the family, household and community.
• That the au pair shall not be responsible for the administration of any medicine or medical/therapeutic treatment to my/our children.

7. Host agree to notify InterExchange in writing in the event that our family situation changes in a way that may impact an au pair's well-being or living situation. Such changes include but are not limited to someone joining the household, change of address, divorce or other significant events that may occur during the program.

8. Host will facilitate attendance and provide time off and transportation for the au pair's monthly cluster meetings with InterExchange's Local Coordinator.

9. Host agrees to attend at least one of the two family day conferences organized by InterExchange's Local Coordinator during the program year and understand that failing to do so is grounds for possible termination of continued or future participation in the program.

10. Host agrees to provide the au pair with a one-way ticket or other transportation arrangements for the au pair to travel from New York to their community or request InterExchange to do so at their expense.

11. Host agrees that InterExchange shall have regular contact with the au pair and host family to ensure the success of the exchange, and to provide orientation, assistance, and counsel. Host agrees to cooperate fully with InterExchange and its representatives in their role of supervising and implementing the au pair program.

12. Host agrees that InterExchange may reasonably attempt to mediate in the case of misunderstandings or serious problems for the au pair and/or host family, and shall assist host family and the au pair if the placement cannot be continued. Such assistance may include placement of the au pair with another host family or repatriation, and/or placement of another au pair with host family.

13. Host agrees that after the initial adjustment time of one month following arrival, if there is a serious incompatibility problem that requires alternate placement, InterExchange will make reasonable attempts to locate another au pair. In this case the au pair remains in residence with host for a maximum of two weeks, continues to fulfill her/his childcare responsibilities if requested by Host and receives the appropriate weekly stipend until a new placement can be found.

14. Host agrees that when re-matching their original contract length is shortened or lengthened to match the new au pair's program length. When the contract is lengthened, Host agrees to pay $136 per week for each additional week of service beyond the original 52-week contract.

15. Host agrees that if InterExchange finds that the au pair is subject to exploitative or other unreasonable circumstances or conditions in my/our household (e.g. failure to pay the appropriate weekly stipend or to provide the agreed upon free time or educational benefits), it may in its sole judgment withdraw the au pair from the household, and Host shall not be entitled to a replacement au pair or any refund.

16. Host agrees agree that if a problem arises when traveling with their au pair outside of their local community they will be responsible for making arrangements at their expense to promptly return the au pair to that community.

17. Host understands that travel with the au pair in excess of 30-days within the U.S. or outside of the U.S. must have prior written consent from InterExchange.

18. Host understands that au pairs are provided with accident and sickness insurance provided by a third-party insurance company and that this insurance policy contains limitations and exclusions. Host agrees that any disputes regarding coverage issues are strictly between au pair and the third-party insurance company and that InterExchange is not responsible for resolving any coverage issues and/or disputes.

19. Host agrees to be responsible for determining whether any additional types of employee insurance are required under federal, state and/or local laws. Host understands that InterExchange is not responsible for providing guidance as to such insurance matters.

20. Host agrees to be responsible for determining whether the au pair will be able to legally drive in their state of residence.

21. Host agrees to provide automobile insurance at the Host's sole cost if the au pair uses any of Host's vehicles. The insurance coverage shall not be less than the minimum mandatory insurance coverage required by law in the Host's state of residence.

22. Host acknowledges responsibility to conform to any and all state or local laws regarding the au pair's use of Host's automobile, including the au pair obtaining a local driver's license if required.

23. Host agrees not to hold InterExchange liable for any damage or loss resulting from the au pair's use of the vehicle.

24. Host agrees to pay for gas used by the au pair when performing her/his duties or when driving to/from meetings and/or classes that are requirements of the program. .

25. Host agrees that any decision regarding an au pair's program status, dismissal, or replacement will be made at the sole discretion of InterExchange and shall be considered final.

PLAINTIFFS' RESP. APP.0002854

InterExchange0004463

**InterExchange**         **AU PAIR USA** Host Family Application

26. Host agrees that InterExchange shall not be liable for any personal bills incurred by the au pair while residing with my/our family. Host understand that the au pair will be responsible directly to the family for all personal debts including but not limited to phone calls, use of the Host Family car, gym memberships, and in case of damage to the car during non-working hours the au pair will be liable for one half the damages up to $500.00 per accident.

27. Host agrees to carefully choose an au pair from the candidate(s) presented, and that there is no warranty as to Host's satisfaction or to the compatibility of any particular candidate as an au pair in Host's family.

28. Host agree to undertake reasonable direct contact with any au pair candidate and contact a potential au pair a minimum of two times by telephone prior to an agreement to match.

29. Host agrees to notify InterExchange by telephone and in writing if a serious problem develops between Host and the au pair.

30. Host acknowledges that InterExchange is primarily a cultural exchange organization rather than a domestic services business and waives and releases InterExchange from any and all claims for contract damages such as, for example, cost of providing alternate child care arrangements if InterExchange is unable, for any reason, after reasonable efforts, to place an au pair with Host's family or to obtain a replacement au pair if one should be needed.

31. Host understands that InterExchange does not guarantee continuous childcare coverage in any circumstances, including but not limited to circumstances in which the au pair becomes ill or disabled by any circumstance or is otherwise unable or unwilling to fulfill their duties hereunder; and that InterExchange is not responsible for the costs of supplemental, replacement, or interim childcare. In addition, InterExchange is not responsible for delays in the au pair's arrival such as visa rejections, visa delays, flight delays, or situations otherwise beyond the direct control of InterExchange.

32. Host understands that in the event of an accident or serious illness that, in the judgment of InterExchange, prevents the au pair from continuing her/his duties, she or he will end the exchange early and return home. In such a circumstance InterExchange will use reasonable efforts to find a replacement au pair.

33. Host agrees that InterExchange shall not be liable for and does not guarantee acceptable performance by the au pair. Host agrees that the au pair is not an employee, servant or agent of InterExchange or any Local Coordinator, and that InterExchange and/or any Local Coordinator do not exercise dominion and control over the actions of the au pair. InterExchange and any Local Coordinator are not responsible for any act or omission on the part of the au pair.

34. Host agrees that InterExchange and/or its officers, employees and agents are neither responsible nor liable for any events beyond their control, including without limitation Acts of God or Government restrictions that may interfere with or preclude operation of the InterExchange program; nor, in the absence of their own gross or wilful negligence are InterExchange, its officers, employees, agents and/or any Local Coordinator liable for any events directly or indirectly caused by any intentional or negligent acts or omissions by an au pair placed in my/our household.

35. Host understands and agrees to the terms and schedule of payment as set forth in this document. Host agrees to pay the Application Fee of $300 when submitting our application. Further, Host agrees to make payment of the Program Fee Deposit of $2,500 upon matching with chosen au pair. Host also agrees to pay the Program Fee Balance of $4,490 upon the arrival of our au pair to our home or elect to join the Easy Payment Plan. Host agrees that these program fees may be subject to change or be modified by promotional offers/discounts.

36. Host understands that failure to pay InterExchange's program invoices by the due date will result in the assessment of interest charges calculated at a rate of 8% per annum, compounded monthly, of the past due balance. Additionally, InterExchange will be entitled to reimbursement from the Host for all incurred costs of recovery of past due balances, which may include but may not be limited to, collection fees of 25% of the past due balance, attorney fees of 30% of the past due balance and/or court costs.

37. Host agrees to the following refund policy:
- Application fee: the $300 application fee is non-refundable.
- Refund before the au pair's arrival in the USA: If Host cancels prior to the au pair's arrival to the U.S., InterExchange will refund all monies paid less $500 cancellation fee.
- Refund after the au pair's arrival to the U.S.: $100/week for each of the unused weeks remaining on my/our contract.
- If during the final week of placement, the au pair was in the home for 3 days or less, the number of weeks used will be rounded down to the nearest whole week; if the au pair was in the home for 4 days or more, the number of weeks used will be rounded up to the nearest whole week.
- After 26 weeks of placement no refunds will be given but the unused balance will be credited toward the next contract. Such credit will expire after on 12 months.
- Any discounts that have been applied to the current contract will not be counted as payments and therefore will be deducted from the refund amount.

38. In the event of an au pair replacement, Host agrees:
- The program term shall be adjusted to include the remainder of the replacement au pair's full program year.
- Host shall be responsible for paying InterExchange $136 for each additional week of au pair service beyond my/our regular fifty-two (52) week program year, and such additional payment is due no later 30 days after the replacement au pair's arrival.
- Host agrees and understands they may be responsible for additional tuition costs for the replacement au pair if the au pair has not completed the educational component with a previous Host Family (up to a maximum of $500.)
- InterExchange agrees to contribute up to $300 toward our cost of the replacement au pair's transportation to my/our home.

39. Host agrees to assist InterExchange in ensuring that the au pair leaves the United States at the conclusion of the program year in compliance with the regulations.

40. Host agrees that any controversy, dispute, or claim arising between Host and/or any beneficiary of this agreement out of or in connection with this agreement, the relationship of the parties or its interpretation, performance or nonperformance, or any breach thereof shall be determined solely in arbitration conducted in New York City in accordance with the then existing rules of the American Arbitration Association.

41. This program outlines the terms that apply to Host au pairs for standard 12-month programs, in-country placements, rematches and Extension Programs.

42. Host is hereby advised and understands that au pairs wishing to participate in the Extension Program must submit their application on or before InterExchange Au Pair USA's published deadline date, and InterExchange does not guarantee that the Department of State will approve any extension request.

43. Host is hereby advised and understands that au pairs participating on the Extension Program will receive an updated DS-2019 form that reflects the updated program dates. Although au pairs will have a valid DS-2019 form, the J-1 visa in his/her passport may have expired during the first 12-months of stay in the U.S. InterExchange discourages au pair travel outside of the U.S. after the J-1 visa expires as au pair may not be allowed re-entry to the U.S.

44. Host understands that although InterExchange will make its best efforts at screening and training all au pairs, childcare is an inherently risky business. Host therefore agree to assume the risks involved in the childcare provided by au pair, and hereby irrevocably, unconditionally, and fully waive, release and forever discharge InterExchange, its subsidiaries, officers, employees, and/or agents from any and all claims related to personal and/or property damage, injury, loss, delay or expense Host incurs.

45. Host is given the option of electronically accepting the terms and conditions of this Host Family Agreement, or Host Family may download, review, sign, and return to InterExchange. Should Host Family opt to download and return, this Host Family Agreement may be signed and delivered to InterExchange. An electronic or facsimile signature shall be considered the same as an original.

By clicking on "I/We Agree" below, Host Family accepts the terms of this Host Family Agreement. No alteration of the terms of this Host Family Agreement will be valid unless approved by InterExchange in writing. Beyond what is expressly stated in this Agreement, I/we do not rely on any other promises, statements or representations. I/We have retained a copy of this Agreement for our files.

I/we have read and agree to the terms and conditions.  ☒

| Parent 1: | Last Name: ▮▮▮▮ | First Name: ▮▮▮▮ |
|---|---|---|
| Parent 2: | Last Name: | First Name: |
| Email Primary: | REDACTED | |

**CONFIDENTIAL**

InterExchange0004464

# Exhibit 317

PLAINTIFFS' RESP. APP.0002856

| From: | Natalie Jordan <Natalie.Jordan@EF.com> |
|---|---|
| Sent: | Thursday, September 26, 2013 12:58 PM |
| To: | David Widerberg <david.widerberg@EF.com>; Goran Rannefors <Goran.Rannefors@culturalcare.com>; Melissa Fredette <Melissa.Fredette@EF.com>; Christina Sandberg <Christina.Wallstrom@EF.com>; Pehr Magnus Karlsson <Pehr.Magnus.Karlsson@EF.com> |
| Subject: | RE: DoS AP |

EXHIBIT
Rannefors
14
6/12/17 (ACM)

Hi,

Thanks so much for all the intel Goran, that's great!

A few questions I have based on what you have shared.

- Subpart A – Did Robin give any indication of what "soon" meant? I sure hope we do have a comment period, it's been years since it was first published.
- Finance meeting with Alliance – what was the reaction to the sixkiller issue and ending the funding of that? I suspect that others could privately fund if they wished to, any responses?
- Costs for lobbyists – we got our monthly fee down below the industry standard. If Interexchange is paying way more than $15k/month I'm concerned because their guy is not good at all.
  - Any sense of whether others, i.e. Au Pair Care are aware of what's going on with reform and doing anything independently?
- Thanks for bringing up the issue of cases being created for each report, much appreciated ☺
- Even though it seemed focused on HSY, I'm really concerned about the potential implications for us with regard to visa allotments vs usage levels and will this be a directive that will be applied across all J-1s and not just HSY?
- You stated that Robin does not like AP to be positioned as a cheap alternative, do you know why this issue was raised?

Thanks for any additional insight you can provide.

Nat

**From:** David Widerberg
**Sent:** Thursday, September 26, 2013 7:23 AM
**To:** Goran Rannefors; Natalie Jordan; Melissa Fredette; Christina Sandberg; Pehr Magnus Karlsson
**Subject:** RE: DoS AP

Hi Goran,

Great that you were able to meet with her! Thanks for all info and building this relationship.

Interesting on the Educational component. One for discussion in the Board meetings I guess.

I also interpret the "AP as a cheap alternative" and push of "cultural components" as signals in how they see the program that we need to be thoughtful of.

Best,
D.

**From:** Goran Rannefors
**Sent:** Thursday, September 26, 2013 11:20 AM

**HIGHLY CONFIDENTIAL -
ATTORNEYS' EYES ONLY**

**To:** Natalie Jordan; Melissa Fredette; Christina Sandberg; David Widerberg; Pehr Magnus Karlsson
**Subject:** DoS AP

Hi
I met with Robin Lerner at WYSTC / both privately and with other sponsors in Alliance setting.
Here are the highlights:
- Sub-part A to be published soon / she cannot (due to some regulation when it is in process) tell us what is in it or if there will be a new comment period (I have really pushed for a new comment period since this was so long ago and we have no idea what they listened to or not – but not at all certain we get it). Expect higher insurance – 200k?
- No new Au Pair regulations in the works / very surprising to everyone – we have been expecting new Educational component language for a long time. But she confirmed twice that nothing is moving on this reg right now. Probably a good sign that they are happy with AP.
- Re the Immigration reform there was a lot of talk of course.
- We not only ones unhappy with Alliance bad lobbying on this issue (ASSE very much with us)
- Where do we want lawsuits? DC not ok for most.
- Everyone happy about outcome in CA / agreed on finding better way of tracking local legislation / and Alliance now has the letter-writing system to legislators for all states (even though they are not set up to do advocacy locally).
- Robin not willing to help us get "federal exemption" from State laws
- I took the opportunity to badmouth SWT to Robin / she agrees – but also feels that the program can be good if better regulated
- Cost for lobbyists vary a lot / most seems to be 15k but Interexchange say they pay "a lot more"
- In a finance meeting with Alliance I recommended that they stop paying for Sixkiller / Alliance cannot afford it – and I think this would be better for our efforts (keep this very confidential pls) – needs full board approval.
- Discussed if there is a new protocol in directly contacting participants and local reps / she not aware / I said we are ok if they do – but only if we know in advance and they do not mess with sensitive situations. She agreed.
- Discussed whether it is good to report all incidents / she is aware that we report everything and much more than any other sponsor – and she likes this. I told her we can only continue if they do not start a new "case" for everything we welf-report. Seemed to be in agreement.
- Pushed "culture of consequences" / she agrees.
- Fees charged overseas becoming more of hot issue / they want info and to be able to control. However she also said "high fees does not necessarily mean exploitation"
- She like the fact that we have "our own" overseas network that we "control"
- On the HSY side she mentioned that she is unhappy that many sponsors have a lot higher visa allotments that they use and she wants to reduce the allotments to be in line with usage / even if this was for HSY it is a bit concerning for us.
- Trafficking big on agenda
- Knew about shark attack / I stressed how good it is to be big sponsor and be able to react well
- Cultural components also in focus
- Willing to share audit data with sponsors / but no timeline given
- Likes "no cost to tax-payers"
- Robin does not like AP to be sold as "a cheap alternative"
- She feels strongly that the participants English level is too low / I hope I convinced her that this does not apply to our girls
- Wants more focus on "ex-pax"
- Doubled her staff "to protect participants"
- Would like to have database to share bad host-families and reps" but also understands legal problem
- Likes that we started doing CBCs (but no plan for regs to mandate for now)
- Confirmed that the visits to our office and school had been successful

Overall very good meetings / she likes us / agreed that we have good cooperation.
Best
G

**HIGHLY CONFIDENTIAL -
ATTORNEYS' EYES ONLY**

**CC00009173**

PLAINTIFFS' RESP. APP.0002858

Case No. 1:14-cv-03074-CMA-KMT   Document 945-30   filed 03/30/18   USDC Colorado   pg 35 of 181

# Exhibit 318

PLAINTIFFS' RESP. APP.0002859

| From: | Ruth Ferry <rferry@aifs.com> |
| --- | --- |
| Sent: | Saturday, March 19, 2011 10:25 AM |
| To: | 'mmccarry@alliance-exchange.org' |
| Cc: | Goran Rannefors <Goran.Rannefors@culturalcare.com> |
| Subject: | Re: Meeting |

Hi Mike and Goran,

I think we invite them to our pre-meeting. Might be an opportunity for them to see how we work together and promote their involvement in Alliance.

Some of the issues may be stemming from how some of the smaller organizations are operating. Sally had called me recently for input on issues she was working out with one organization and issue of bonds.

Mike, I will call you next week.

Ruth

----- Original Message -----
From: Michael McCarry <MMcCarry@alliance-exchange.org>
To: Ruth Ferry
Cc: Goran Rannefors <Goran.Rannefors@culturalcare.com>
Sent: Sat Mar 19 06:12:46 2011
Subject: Meeting

Since ECA has turned this into all sponsor meeting, should we consider inviting outliers to our pre-meeting?

I'm with Goran at Wetm and he doesn't have strong feeling either way.

Tks M

Ps back at my desk Wednesday

Sent from my iPhone

**CONFIDENTIAL**

PLAINTIFFS' RESP. APP.0002860

# Exhibit 319

PLAINTIFFS' RESP. APP.0002861

## INTEREXCHANGE AU PAIR USA
## AU PAIR AGREEMENT

This agreement (herein the "Agreement" or "Main Agreement") describes the terms and conditions of my participation in InterExchange's Au Pair USA Cultural Exchange Program and its sponsorship of my J-1 Visa.

### Background

InterExchange is a designated sponsor of the Au Pair J-1 Visa Program administered by the U.S. Department of State's Bureau of Educational and Cultural Affairs (the "Program"). The Program allows foreign participants ("Participant" herein defined below) to enter the United States to work as Au Pairs so that the Participant may increase their understanding of American culture and society and enhances the American Host Family's knowledge of foreign cultures through an open interchange of ideas.

This J-1 Visa Program requires employment for Au Pair Participants as part of the Cultural Exchange Program so that cost and expenses incurred during the Participant's time in the U.S. may be offset by the Program Stipend paid by the Host Family.

Now having understood the background and nature of this Agreement and Program, InterExchange and I hereby agree to the following terms and conditions:

1. **Definitions**. I agree to the following definitions:

   a. "**Adjustment Period**" begins when an Au Pair (see definition) first arrives to live in a Host Family's (see definition) home and ends thirty (30) days after the Au Pair has been living in a Host Family's home. During this period, an Au Pair cannot Transition (see definition) to a Rematch (see definition) Host Family except, in rare cases, Au Pairs may be moved as required by InterExchange.

   b. An "**Applicant**" or "**Candidate**" is anyone who applies to the Au Pair USA Program about whom InterExchange has not yet determined his or her suitability for the Program.

   c. "**At-Will Employment**" means either the Host Family or the Au Pair may end the employment relationship between the two parties at any time.

   d. An "**Au Pair**" is a carefully screened Participant (see definition), who is between the ages of 18 and 26, is a secondary school graduate or the equivalent, and is proficient in spoken English. Au Pairs are Matched (see definition) with a Host Family for cultural exchange purposes. The Au Pair lives with and provides child care services to a Host Family for up to ten (10) hours a day and forty-five (45) hours per week over five and a half (5 ½) days per week per Program regulations. The Au Pair is provided numerous cross-cultural activities, including, without limitation, taking at least six (6) credit hours of educational course work at a U.S. educational institution while participating in the Au Pair USA Program.

   e. "**Culture Exchange Program**" is a non-immigrant program operated by the U.S. Department of State's Bureau of Education and Cultural Affairs that increases a Participant's understanding of American culture and society and enhances the Host Family's knowledge of foreign cultures through an open interchange of ideas between Au Pairs and Host Families and the communities in which they live.

PLAINTIFFS' RESP. APP.0002862

BELTRAN000518

f. **"Extension"** is a period of time in which the U.S Department of State allows a one-time extension of the Au Pair Program for six (6), nine (9), or twelve (12) additional months contingent upon successful completion of the initial 12-month Program and subject to certain limitations.

g. **"30-Day Travel/Grace Period"** is the 30-day cultural exchange travel or "grace" period to which Au Pairs are entitled upon successful completion of the requirements of the Au Pair USA Program. During this 30-day period, Au Pairs are not permitted to engage in any employment. Au Pairs are required to leave the U.S. before the end of this 30-day period.

h. **"Host Family"** is a carefully screened family of U.S. citizens or legal permanent residents who participate in the Au Pair USA Program by matching with an Au Pair to utilize the Au Pair's child care services for cultural exchange purposes.

i. **"In-Country"** means an Au Pair is already in the U.S. An In-Country Au Pair may be in the U.S. due to an Extension or Transition.

j. **"Insurance"** is accident and sickness coverage from an insurance company authorized by InterExchange (or, in rare cases, an International Cooperator (see definition below)) that meets or exceeds U.S. Department of State requirements.

k. **"International Cooperator"** or **"IC"** is an independent contractor that performs services for InterExchange including, without limitation, recruiting Au Pairs for the Program, assisting the Candidates and InterExchange with the application process and providing additional pre-arrival support after an Au Pair is matched with a Host Family.

l. **"J-1 Visa Sponsorship"** means a non-immigrant cultural exchange visa issued pursuant to 8 U.S.C. 1101(a)(15)(J).

m. **"Local Coordinator"** is the InterExchange independent contractor or representative who liaises with the Au Pair and Host Family in the Host Family community. The Local Coordinator provides information in compliance with InterExchange Au Pair USA rules and requirements and coordinates monthly gatherings for InterExchange Au Pairs in the cluster area.

n. **"Match"** is the process by which the Host Family chooses to host the Au Pair, who as a result of being matched receives sponsorship for cultural exchange purposes under a J-1 visa sponsored by InterExchange.

o. **"Orientation"** is the period of time during which Participants visit New York City to be trained by InterExchange and are provided detailed information about the Program before the Participants start employment as an Au Pair for Host Families.

p. **"Participant"** is a suitable and qualified Candidate who matches with a Host Family and takes part in the InterExchange Au Pair USA Program under the U.S. Department of State regulations and InterExchange's requirements.

q. **"Program"** or **"Au Pair USA Program"** or **"Au Pair USA"** means the Cultural Exchange Program as administered by InterExchange. The Program includes the initial twelve (12) month program, Transitions and Extensions.

r. **"Rematch"** is the process by which an in-country Au Pair is Matched to a Host Family other than the one to which he or she was originally Matched. Please see the definition of "Match."

PLAINTIFFS' RESP. APP.0002863                                      BELTRAN000519

s.  "**Replacement**" is an Au Pair who replaces another Au Pair after a Host Family enters Transition.

t.  "**Social Media**" means a wide range of new and evolving communication tools including, without limitation, multi-media and social networking websites s uch as MySpace, Facebook, Yahoo! Groups, Linkedin, Flickr and YouTube and other media or video sharing sites; Blogs; Wikis such as Wikipedia and any other site where text or photos can be posted; Sites and/or apps like Twitter on smart devices such as cell phones, digital tablets and similar communication devices.

u.  "**Special Needs Child** " is a Host Family child with emotional, physical or psychological needs, as identified by the Host Family , that require additional child care services from an Au Pair other than child care services generally provided to Host Families .

v.  "**Sponsor**" is a legal entity designated by the U.S. Department of State to conduct Cultural Exchange Programs under the J -1 Visa.

w.  The "**Stipend**" is the minimum amount that the Host Family is r equired to pay the Au Pair pursuant to U.S. Department of State regulations and employment and labor laws of the U.S. The current minimum required weekly amount is one hundred ninety -five dollars and seventy -five cents ($195.75).

x.  "**Suitable Candidate** " means a candidate who meets the Program requirements of the both the U.S. Department of State regulations and InterExchange guidelines .

y.  "**Transition**" is the process by which a Host Family or Au Pair may either leave the Program or be Rematched with a new plac ement.

z.  "**Withdrawal**" means that a Host Family or Au Pair voluntarily ends its relationship with InterExchange.

aa.  "**3-Point Meeting**" is an optional meeting facilitated by a Local Coordinator or InterExchange to mediate differences between a Host Family and an Au Pair.

2.  **Program Overview** . I understand and agree that InterExchange operates Au Pair USA solely as a Cultural Exchange Program. I acknowledge receipt of a copy of 22 CFR Part 62.31, the Wilberforce Brochure (see below, "Dispute Process") and the Dep artment of State publication "The Au Pair Exchange Program" from InterExchange. I further understand and agree that any conflict between the cultural exchange purposes of the Au Pair USA Program and the child care services offered by me as an Au Pair shall be decided in favor of the cultural exchange purposes and regulations of the Program.

3.  **Certification, Application, Interview & Selection** .

a.  **Certification.** I certify that I have not previously participated in an Au Pair program based in the U.S. within the last twenty -four (24) months.

b.  **Application** . I agree that I must submit a complete application to be considered as an Au Pair Candidate by InterExchange and a Host Family. I agree that the application process and information requested on the application are responsibilities that I must fulfill under my Agreement with InterExchange. I further understand and agree that all information submitted under this application and Agreement is for the sole purpose of determining my suitability for the Au Pair USA Program.

c.  **Background Investigation.** I understand and agree that I must successfully pass a background investigation that includes, without limitation, verification of school or high

3

BELTRAN000520

school diploma (minimally a secondary school or the equivalent); three, non-family related child care references; a criminal background check or its recognized equivalent; health screening report; and a psychometric personality test.

d. **Additional Information**. I agree that InterExchange may request, and I agree to supply, additional information other than the originally requested information for the purpose of making a final decision about my suitability for the Program.

e. **Read All Materials.** I certify that I have read and understood all application materials sent to me by InterExchange, including, without limitation, the InterExchange and U.S. Department of State rules and regulations required for me to participate in the Program.

f. **Interview**. I understand that an in-person interview conducted in English is a requirement that must be fulfilled as a condition of my application to the Au Pair USA Program. Further, I must be contacted by a potential Host Family by telephone prior to an agreement to a Match. As explained under Sections on Extensions and Transitions, I understand and agree that the requirements regarding Host Family interviews also apply to Extensions and Transitions for any potential Rematch Host Family.

g. **InterExchange Decision**. I agree that InterExchange makes the final decision about my participation in the Au Pair USA Program. I agree that InterExchange makes the final decision about approving my Match or Rematch with a Host Family. I understand and agree that all decisions are based on InterExchange's role as the Sponsor of my Cultural Exchange Program as set forth under this Agreement.

4. **Program**.

a. **Orientation**. I must attend the Orientation provided by InterExchange in New York City. I must not arrive before my scheduled arrival date for my Orientation.

b. **Training**. I agree to attend and engage in child development and child safety instructions provided by InterExchange to the best of my abilities. I understand and agree that I must successfully complete my training in the U.S. prior to starting my child care duties with the Host Family.

c. **Nature of Au Pair Work Performed.**

   (i) **Host Family/Au Pair Agreement.** Prior to departure from my home country, I must enter into a signed written agreement with the Host Family. I understand the Host Family will provide an outline of my duties and schedule in the Host Family application, which may be amended from time to time, but shall in no way conflict with Program rules, regulations and the terms and conditions of this Agreement. I agree to read and understand the obligations expected of me by the Host Family as detailed through the Host Family application and the Host Family/Au Pair Agreement. I understand that the Host Family/Au Pair Agreement shall include, without limitation, the terms of this Agreement and that the Host Family must conform to the Fair Labor Standards Act. I understand that the agreement between the Host Family and me must be signed only after my Match or Rematch with the Host Family. I understand that InterExchange does not offer, nor am I a Participant in, an Educare program, and, therefore, I am not subject to any Educare requirements regarding the Host Family/Au Pair Agreement.

   (ii) **Duties**. I understand that my duties shall only include child care and activities related to care of the children of my Host Family. I agree that I cannot be

4

PLAINTIFFS' RESP. APP.0002865

BELTRAN000521

directly responsible for the car e of any non -Host Family children. Child care may include, without limitation, active duties such as taking care of children as they play, preparing children's meals, driving children to school   and activities , light cleaning of their rooms, assisting child ren with school assignments and doing the children's laundry as well as passive duties such as being present when the children are sleeping.

   **(iii)**   **Permissible Duties** . I am not obligated to perform heavy chores, including, without limitation, yard work, taking   care of pets, window washing or scrubbing floors.  If I choose to engage in heavy chores, I must follow the safety standards  under Section 7 of  this Agreement.

   **(iv)**   **Medication** . I must not administer any medicine or medical/therapeutic treatment to children.

   **(v)**   **Disciplining Children** . I agree that I am not permitted under any circumstances to physically discipline children in any way (e.g., hitting children or withholding food as punishment). The terms of this Agreement are to be enforced even if the Host Family   requests that I discipline the children. If I have questions over appropriate behavior, I shall ask my Local Coordinator for guidance.

d.   **Local Coordinator** . While I should seek general direction and advice about the Program from the Local Coordinator, I und erstand that InterExchange makes all final decisions.  I agree that statements by the Local Coordinator are not binding on InterExchange unless confirmed in written policy and under the terms and conditions of this Agreement.  If I have any questions or con cerns regarding my Local Coordinator, I must contact  an InterExchange  manager directly.

e.   **Au Pair's Age** . I can only begin the Program between the   ages of eighteen (18) and twenty-six (26).

f.   **Age of Children** .

   (i)   I agree that InterExchange cannot place or all  ow me to remain as an Au Pair in a Host Family home with a child under the age of two (2) unless I have at least two hundred (200) hours of documented experience working with children under the age of two (2). I must promptly notify InterExchange if a chil  d under the age of two  (2) years is a member of or joins the household at any time during the   Program .

   **(ii)**   **I agree that if there are any children under three   (3) months old living in the home there must be a responsible adult (e.g.,   baby nurse, grandparents ) in the home at all times and I cannot be left as the sole child care provider, even for a limited amount of time, including sleeping hours.**

g.   **Special Needs Children** . I must inform InterExchange and the Local Coordinator about the new arrival or request for   me to take care of a special needs child, which may include, without limitation, children with physical or mental disabilities. I understand that I must identify my prior experience, skills or training   and willingness to care for special needs children if  the circumstances arise in which I am to provide child care to special needs children.

h.   **3-Day Settling In Period** . I understand that during the first three (3) days of my stay with the Host Family, a parent or another responsible adult (e.g., grandparents   ) must remain in the home to facilitate my adjustment into the Host Family, household and community. Failure of this condition by the Host Family must be immediately reported to InterExchange and the Local Coordinator.

PLAINTIFFS' RESP. APP.0002866

BELTRAN000522

i. **45-Hour Work Week.** I cannot provid e more than ten (10) hours of child care services on any given day or more than forty -five (45) hours of child care in any one (1) week. Generally, I understand that the Host Family must arrange a consistent schedule of work hours per week to conform to Pr ogram requirements (e.g., if  the Host Family schedules my hours f rom Monday through Saturday, this means I must  work Monday through Saturday throughout the duration of my employment with the Host Family without variation) , provided, however, that the Host  Family and I may negotiate a mutually agreed upon  change of  schedule that does not violate this Agreement, U.S. Department of State regulations or employment and labor laws  . I must be compensated at a weekly rate based on forty -five (45) hours per week and  paid in conformance with the requirements of the Fair Labor Standards Act. I must notify InterExchange if the Host Family requires or ask s me to work over forty -five (45) hours a week or more than ten (10) hour a day.

j. **Room and Board.** I understand that t he Host Family must provide me with board and lodging.  I further understand that lodging shall be limited to a private room set aside by the Host Family for the purpose of my lodging rather than a room used for other purposes (e.g., sharing the room with  another Au Pair is not permitted and a Host Family cannot require me to sleep in a room that is used for laundry or family entertainment).

k. **Stipend** . I understand that my  Stipend from the Host Family must meet the minimum requirement set by U.S. Departmen t of State regulation , which may be  amended from time to time . I agree to notify InterExchange if there is any problem with receiving my weekly Stipend. If paid by check, I  agree to deposit or cash my  Stipend within four (4) weeks of receiving the  Stipend from the Host Family.

l. **Weekly Time Off** . I must receive a minimum of one and a half (  1½) days off per week, in addition to one  (1) complete weekend (Friday evening until Monday morning) off each month. I must notify InterExchange if the Host Family fails    to provide me with time off.

m. **Vacation.** The Host Family must provide me two (2) weeks of paid vacation during the Program to be taken at a time mutually agreed upon between the Host Family and me. I must contact InterExchange if the Host Family fails to p  rovide me with paid vacation. If joining the Host Family on vacation, I agree not to share lodging with any adult member of the Host Family or share a bed with anyone, including, without limitation, children.

n. **Education.**

   (i) **Required Educational Courses** . I agree to follow the applicable U.S. Department of State education regulations for Au Pairs participating in the initial twelve (12) month  Program.  Specifically, I must enroll in and complete classes or programs offered by an accredited, post  -secondary institution for at least six (6) semester hours of academic credit or its equivalent. I understand that the Host Family must facilitate my enrollment and attendance and pay the cost of such academic course work in an amount not less than five hundred dollars  ($500) for a twelve (12) month Au Pair Program. The Host Family is not obligated to pay an amount greater than the five hundred  dollars ($500). I understand that the Host Family is responsible for facilitating my transportation to such classes or programs.

   (ii) **Educational Requirements After Transition** . If I am placed in Transition (See Transition below) before completing the educational requirements, I agree to complete the requirements with the new Host Family to whom I am

6

BELTRAN000523

Rematched as described in the secti ons on Required Educational Courses and Transition, including, without limitation, restarting the six   (6) semester hours in the manner required by the U.S. Department of State.  I understand that my new Host Family is only required to pay a pro rated amount of the five hundred dollars ($500) based on my remaining time in the Program, which shall mean a pro rated  value equaling nine dollars and sixty-two cents ($9.62) per week in  a standard fifty two (52) week Program (e.g., if Transition to a  Remation Host Family after twenty -five (25) weeks, then the Remation Host Family will be required to pay two hundred   fifty-nine dollars and seventy -four cents ($259.74) towards my educational courses).

**(iii)**   **Additional Cost of Courses** . I understand and agree that all additi onal costs of meeting the educational requirements of the Program are my responsibility.

**(iv)**   **Optional Educational Courses** . If I complete the required number of credit hours in the manner required by InterExchange and U.S. State Department regulations, and the re is an amount left over from the five hundred dollars ($500) contribution required of the Host Family, I, at my sole discretion, may elect to use the remaining balance to cover the cost of taking additional courses, provided, however, that the courses me  et the academic requirements as set forth by InterExchange and the U.S. State Department. I understand that the Host Family is responsible for facilitating my transportation to  and from the courses.

**(v)**   **Driver's Education** . If required by the Host Family,  I understand that I  shall be responsible for taking a driver 's education course, provided, however, that the Host Family pays for the cost of the driver  's education course. If not required by the Host Family,  I shall be responsibl e for the cost of the course if I elect to take a driver's education course.

o.   **Cluster Meetings** . I agree to attend  all monthly  Cluster Meetings with the Local Coordinator.  I understand that the  Host Family must facilitate attendance and provide time off and transportation for the meet ings.

p.   **Insurance.**

(i)    **Insurance** . I agree to the terms and conditions of the Insurance policy provided by the vendor authorized by InterExchange or the International Cooperator.   I understand that InterExchange requires me to hold the Insurance policy through t   he authorized vendor solely for the purpose of ensuring the policy's compliance with U.S. Department of State regulations. I understand that neither InterExchange nor the International Cooperator are sellers or resellers of the Insurance.   I understand that  the Insurance arranged by InterExchange or the International Cooperator meets or exceeds Program regulation requirements, but is not comprehensive  . For additional information about the Insurance policy from InterExchange, I agree to read the terms and con ditions of the policy in the brochure and literature sent to me by InterExchange and by visiting InterExchange's web site. Except for the 30  -Day Travel Period/ Grace Period Insurance, I understand that cost of the insurance policy is included in fees paid by the Host Family.

(ii)   **30-Day Travel Period/Grace Period Insurance**  . I agree to request and pay for the Insurance policy that covers the 30  -Day Travel/Grace Period before the sta rt of the 30-Day Travel/Grace Period.

(iii)   **Supplemental Insurance** . I understand tha t the Insurance policy is limited to accident and medical sickness  coverage and may have  exclusions or limitations that

PLAINTIFFS' RESP. APP.0002868

BELTRAN000524

may cause me to incur out of pocket expenses if I seek treatment for such ex   clusions
or limitations . I agree to investigate and InterExc hange strongly recommends that I
obtain supplemental insurance to meet my medical and travel insurance needs above
those covered by the InterExchange authorized  Insurance policy fo r the duration of
the Program.

(iv)   **Automobile Insurance** . I understand that the  Host Family must provide
automobile insurance at the Host Family's sole cost if I use any of the Host Family's
vehicles for work or personal use. I further understand that the insurance coverage
shall not be less than the minimum mandatory insurance covera  ge required by law in
the Host Family's state of resi dence. I agree that I am responsible for understanding
the limitations of any insurance policy and the costs related to the policies.

q.   **Passport.** I understand that I am responsible for obtaining a valid   passport.  I must
keep my passport valid at least  thirteen (13) months longer than the Program end
date found on the DS -2019 form. If I lose my passport, I am responsible for replacing
it at my own expense.  I am solely responsible for safeguarding my pass  port and
agree not to surrender it to any  unauthorized person or entity. If I am in doubt about
whether an organization should possess my passport, it is my duty to investigate.

r.   **Visa.** I must complete all visa requirements in accordance with instructions p   rovided
by InterExchange and  the U.S. government.

s.   **Tax ID/Social Security Number** . I understand that I may need to secure either a tax
payer id or social security number.  I further understand that I  must safeguard  my
personal information.  If I am in doubt a bout whether an  entity should possess my
personal information, it is my duty to investigate.

t.   **English** . I agree that my English language skills must be sufficient to communicate
with the Host Family and during emergencies. I understand insufficient language    skills
may be a reason for  my visa denial and/or  my Program to end early.

u.   **Failure to Return to the United States  during Program Dates** . I understand that if I
leave the U.S. at any time during my  Program for any reason I must provide notice to
InterExchange.  Furthermore, I agree that my sponsorship will end if I fail to return to
the U.S. or the  Program within thirty (30) days.

v.   **30-Day Travel/Grace Period** . I understand that upon successful  completion of the
Program I am permitted a 30 -Day Travel/Grace Period during which I am allowed to
travel within the United States.  I understand that it is a violation of immigration law and
Program regulations to conduct any form of employment (including working for my
Host Family) during the 30 -day Travel/Grace Peri od.

w.   **Leaving Program Early or Overstaying 30 -Day Travel/Grace Period.**  If I leave the
Program before the  Program end dates or over -stay the 30-Day Travel or Grace
Period, I forfeit my return flight, vacation time  and unearned Stipend, and my Insurance
will be cancelled.  I understand that InterExchange will report any circumstances of the
Program ending early and/or violation of immigration laws to the U.S. Department of
State and/or the Department of Homeland Security.

x.   **Leave U.S. At End Of Program. I wil l return to my home country or leave the U.S.
at the end of my Program, which is defined by the end date of my DS   -2019 form
plus my 30 -Day Travel/Grace Period  or, if the Program ends early , the date that I
am required to leave the U.S. under immigration   law and InterExchange
requirements .**

PLAINTIFFS' RESP. APP.0002869

BELTRAN000525

     y.  **Visa Requirements of Other Countries** . During the Program, I agree that it is my obligation to research and meet any visa requirements for countries to which I plan to travel.

5.  **Employment & Sponsorship** .

     a.  **Notice of At Will Employment** . I understand that my position as an Au Pair is At -Will Employment as defined under the Definitions Section.

     b.  **No outside employment.** I must not work in any additional position, including, without limitation, volunteer or paid employment or int ernships, during the Program. I must only work with the Host Family that has been approved by InterExchange.

     c.  **InterExchange is not an Employer or Employment Agency.** I agree that InterExchange is not my employer or an employment or staffing agency.

     d.  **Sponsorship**. I agree that InterExchange solely functions as my J -1 Visa sponsor.

     e.  **Best of Abilities** . I understand that keeping my J -1 Visa sponsorship is based on remaining in good status throughout the duration of the Program. To increase the chances of keeping my sponsorship, I have investigated the duties and functions of an Au Pair. I am willing and able to function as an Au Pair in every way, including physical and mental stamina. To further promote the cultural exchange idea ls of the Program and act as an ambassador of my home country to the Host Family and Host Family's children, I agree to carry out my child care duties and other responsibilities to the best of the abilities and with due respect.

6.  **Air Travel & Transportation** .

     a.  **Travel**.

       **(i)**  I agree to allow Int erExchange, its officers, affiliates, independent contractors, vendors, agents and employees to act on my behalf in arranging transportation to and from InterExchange designated locations.

       **(ii)**  I must be present in enough time for all flights or other transpor tation provided or arranged by InterExchange. I understand and agree that InterExchange is not responsible for providing alternative transportation. I agree to bear the cost of any fees or charges incurred as a result of any failure to follow these instructions.

       **(iii)**  I understand that flights will depart from and return to assigned airports, and that I am responsible for any flight or other supplemental transportation to reach the designated points of departure .

       **(iv)**  I agree to notify InterExchange of any deviatio n from the arrangements that InterExchange made on my behalf.

     b.  **Transportation - Motor Vehicle** . If I am required to drive and given access to a motor vehicle, I understand that the Host Family must pay for gas used by me and maintain the motor vehicle in go od working order when performing my duties or when driving to/from meetings and/or classes in fulfillment of Program requirements. I agree to report any concerns about the working condition of the motor vehicle to my Host Family immediately. I further unde rstand that a motor vehicle may or may not be available.

PLAINTIFFS' RESP. APP.0002870

BELTRAN000526

7.  **Safety, Problems & Emergen cies.**

    a.  **Precautions** .

        **(i)**    I am responsible for my personal health and safety needs while participating in the Au Pair USA  Program . If I suffer from any health or other conditi on that would create a risk to others or me, I should not apply or participate.

        **(ii)**    I must take reasonable precautions to prevent injury or harm to myself or a third party or damage to the property of a third party or myself.

    b.  I agree to the following:

        **(i)**    I must notify InterExchange in the manner required under Communications and Notification Section if I experience any serious medical, psychological or criminal incident.

        **(ii)**    **I must contact InterExchange immediately if the Host Family endangers my safety or the  safety of others or acts in a manner that raises questions about my safety or those of others.**

        **(iii)**    **I must remain available and/or stay in contact (if contacted) by my Local Coordinator during any natural disaster or emergency. If I am unable to contact the L ocal Coordinator after my Local Coordinator contacts me, I must reach authorized staff at InterExchange to confirm my circumstances as soon as it is reasonably feasible to do so.**

        **(iv)**    **Emergency Messaging.**  In addition to following any emergency plan available to me from local authorities or the Host Family, if I supplied my mobile number,  I agree to follow suggestions as may be sent through InterExchange emergency messaging, including, without limitation, emergency texts from InterExchange. If local authorities   or the Host Family recommends actions that conflict with any messages sent via InterExchange emergency messaging, I shall follow the direction of the Host Family or local authorities as they may be better aware of local circumstances. I understand and agr ee that InterExchange is not obligated to provide me emergency messaging  and that this is an additional service that InterExchange may provide to me as circumstances may permit  .

        **(v)**    I must immediately contact  InterExchange  if the Host Family requests that I engage in any illegal activities (e.g., illegal drugs).

    c.  **InterExchange** .

        **(i)**    In circumstances involving my health and safety, I agree that InterExchange may discuss my circumstances with my family (e.g., my Host Family and actual family), emergency contacts, t he International Cooperator, my insurance company, healthcare officials , law enforcement , the U.S. Department of State  or any other critical party  with a need-to-know.

        **(ii)**    I agree that InterExchange, its officers, employees, independent contractors, vendors affiliates and agents or any Local Coordinator may, without liability, or expense to themselves (as explained in further detail under the Liability section), take whatever action they deem appropriate with regard to my health and safety and may place me in  a hospital or health -related facility for medical services and treatment or, if no hospital or health  -related facility

PLAINTIFFS' RESP. APP.0002871

BELTRAN000527

is readily available, may place me in the care of a local medical doctor or health provider for treatment or service.

**d. InterExchange Hea lth, Safety or Exploitation .**

**(i)** I understand that in the event of an accident or serious illness that, in the judgment of InterExchange, prevents me from continuing my duties, I will end the exchange early and return home at my own expense.

**(ii)** If InterExchange finds that I am subject to exploitative or other unreasonable circumstances or conditions in Host's household (e.g. failure to pay the appropriate weekly Stipend or to provide the agreed upon free time or educational benefits), InterExchange, at InterExch ange's sole judgment, may immediately withdraw me from the household.

**(iii)** I agree that any decision regarding my status as an Au Pair, dismissal, or replacement will be made at the sole discretion of InterExchange and shall be considered final.

**e. Emergency P lan.**

**(i)** I must become aware of emergency plans set up by the Host Family and as issued by local authorities.

**(ii)** In case of emergencies (e.g., hurricanes, earthquakes, fires, terrorist attacks), I agree to follow the emergency plan, if any, issued to me by Int erExchange, the Host Family and local authorities. I agree that InterExchange is no t obligated to provide an emergency plan and that this is an additional service that InterExchange may provide as circumstances may permit. I understand that the instruction s provided to me from the Host Family and local authorities take priority over InterExchange instructions.

**8. Extensions & Transitions .**

a. **Extensions** . Extensions are explained in greater detail in the Extension Term Sheet found in Exhibit A and the clauses be low. I understand that I must be eligible for the Extension upon submitting my application and that I must meet the requirements of the Program as follows:

**(i)** If I wish to participate in the Extension Program, I must submit my application on or before Inter Exchange Au Pair USA's published Extension application deadline date which is found on InterExchange's website. I understand and agree that InterExchange cannot guarantee that the U.S. Department of State will approve my Extension request and that failure to meet the application deadline is an automatic disqualification .

**(ii)** I understand that if my Extension is approved I will receive an updated DS - 2019 form for participating in the Extension Program that reflects the updated Program dates. Although I will ha ve a valid DS-2019 form, I understand that the J -1 Visa in my passport may have expired during the first 12-months of stay in the U.S. Therefore, I understand that InterExchange discourages me from traveling outside of the U.S. after the J-1 Visa expires b ecause I may not be allowed re -entry into the U.S. , and InterExchange has no jurisdi ction over U.S. immigration personnel or their decisions.

11

PLAINTIFFS' RESP. APP.0002872

BELTRAN000528

(iii) By signing this Agreement, I agree to the terms of the Extension Agreement if the following terms and conditions are met:

    (a) Timely submission of my Extension application .

    (b) U.S. Department of State approval of my application .

    (c) My meeting the terms of this Agreement (including educational requirements) .

    (d) The Host Family has paid all money owed and adhered to Program regulations including, without limitation, attendance at Host Family Day.

    (e) InterExchange's approval of the Host Family .

Except as set forth in the attached Extension Agreement, the general terms of this Agreement shall remain in effect and control.

(iv) **Approval. I understand and agree that completion of the terms and conditions described in this section of the Agreement or in the Extension Term Sheet does not guarantee an Extension. I further understand that nothing in this Agreement implies or requires me to participate in an Extension. The terms and conditions described are effective only if I participate in an Extension Program .**

b. **Transitions** . After the initial adjustment time of one month following arrival, InterExchange has set up a Transition procedure rega rding a possible breakdown in the relationship between the Host Family and me.

(i) **Transitions -General Procedur** e. I agree to following:

a. The Host Family or I must communicate to InterExchange that there is a breakdown in the relationship between the Host Fami ly and myself.

b. Upon becoming aware of a breakdown in the relationship, the Local Coordinator , at his or her discretion , may decide to mediate a meeting between the Host Family and myself.

c. If there is not a resolution of the problem(s) raised, the Host Fami ly and I shall be placed into Transition, which shall mean for me either a Rematch or Withdrawal (see below) from the Program. During Transition, I may remain in residence with the Host Family for several weeks or be moved, if reasonably feasible, into te mporary housing arranged by the Local Coordinator and authorized and approved by InterExchange . If I remain in residence with the Host Family, I may be asked to continue to fulfill my child care responsibilities. If I am asked to continue child care dutie s, I must receive the appropriate weekly Stipend and follow Program requirements and regulations until a new placement can be found. I understand InterExchange will make best efforts to move me from the Host Family as quickly as is reasonably possible so that I may continue, if possible, my Cultural Exchange Program. I understand that I may not arrange my own temporary accommodations and doing so may endanger my continued sponsorship.

PLAINTIFFS' RESP. APP.0002873

BELTRAN000529

d. I agree to fully cooperate with InterExchange during the Transition and not to involve outside parties.

**(ii)** There are three outcomes that define the status of my continued involvement or lack therefore in the Au Pair USA Program:

    a. <u>Transitions - Rematch.</u>

        (i) InterExchange will make reasonable attempts to locate a Rematch Host Family for me for up to two weeks during the Transition process. If after two (2) weeks, InterExchange cannot find a suitable Host Family for me, InterExchange may require me to return to my home country under the terms and conditions set forth in this Agreement. I understand and agree that any decision regarding my Program status shall be made at the sole discretion of InterExchange and shall be considered final.

        (ii) I agree to carefully consider the potential Rematch Host Family with whom I may be Rematched. I understand that my Rematch will possibly take me out outside of the area in which my existing Host Family resides.

        (iii) My Rematching shall comply with the remaining length of my original Program (e.g., If I have five (5) months left in the Program, then the Rematch contract length for me would be five (5) months).

        (iv) I agree that if a Rematch takes place, travel details will be organized by InterExchange and Local Coordinator working with the Host Family and me.

    b.    **Transitions – Withdrawal.** I may elect to withdraw from t he Program. I understand that this Agreement must automatically terminate under the terms and conditions set forth in the Termination section of the Agreement. As explained in Sections 9 and 16, I agree that I am responsible for the cost of my airfare hom e and other costs incurred in the Program.

    c.    **Transitions – Unsuitable or Lack of Suitable Placement** . InterExchange, at its sole discretion, may determine that I am unsuitable to remain in the Au Pair USA Program and/or no suitable plac ement is available after a reasonable time period has passed . I agree that I am responsible for the cost incurred in the Program.

**9. Fees, Expenses, Costs and Payment .**

    a.   **Costs, Fees & Expenses** . I understand and agree that I am responsible for, without limitation, any educational cost and expenses above the amount that the Host Family is required to disburse; federal, state and local income taxes; withholding taxes; copayments and deductibles on the Insurance from the authorized vendor (Please see terms and conditions of Insurance policy coverage) ; the fee for my Insurance coverage during the 30 -Day Travel/Grace Period ; the cost of my return air flight (if applicable) under the conditions as described in this Agreement ; all additional expenses of the Transitions including the educat ion requirement as defined in this Agreement; damage to Host Family's car with the limitations as set forth in this Agreement; any driver's education course costs pursuant to the terms and conditions defined in this Agreement; any costs incurred by the Hos t Family or InterExchange regarding a change of sponsor as described below; any other costs related to me returning home early from the Program ; any damages as described in this Agreement ;

13

BELTRAN000530

the cost of any translations o f application and background check co sts; and any fees, costs and expenses not expressly covered under this Agreement.

b. **Emergency Messaging Fee** . If I provide my mobile number for emergency contact (e.g., emergency texting) from InterExchange, I agree to assume all necessary charges per carr ier fees for usage that may arise if InterExchange sends emergency messaging to me.

c. **Payment** . I agree that the Credit Card Approval Form that I may sign for the purpose of paying any costs, fees and expenses described in Section 9 is incorporated into this Agreement in **Exhibit C** .

**10. Notice & Communications .**

a. I must contact InterExchange by means of the contact information provided by InterExchange (e.g., telephone number or e -mail address) . I must include InterExchange contact information in my address bo ok to ensure receipt of communications from InterExchange. In the case of an emergency , safety or health issues, I agree to contact InterExchange immediately or as soon as it is reasonable under the circumstances. I n addition, I agree to contact the Local Coordinator and InterExchange via the emergency contact information provided by InterExchange.

b. InterExchange will contact me through the contact information that I provide to InterExchange, the Local Coordinator or Host Family. I agree to respond to communications from InterExchange in a timely manner. I understand that a f ailure to communicate with InterExchange may be a reason for withdrawal of InterExchange 's Program sponsorship.

c. **Emergency Messaging** . For the purpose of emergency messaging, I agree t hat InterExchange may contact me via text message and/or voice services through my mobile phone and/or by email .

d. **Contact with Local Coordinator.** I understand that InterExchange's Local Coordinator will contact me and my Host Family within forty -eight (48) hours of my arrival to my Host Family. I also understand that InterExchange's Local Coordinator will visit my Host Family within two (2) weeks of my arrival. I understand that my Local Coordinator will call me twice monthly for the first two (2) months f ollowing a placement other than the initial placement for which I entered the U.S. I understand that my Host Family will also attend at least one of two Family Day Conferences sponsored by the Local Coordinator during the Program year . As stated in the Agreement above, I understand that I must also attend monthly cluster meetings with the Local Coordinator.

e. **Student & Exchange Visitor Information System** (**SEVIS) Reporting** . I agree to provide notice to InterExchange about where I reside for the duration of the Program to ensure SEVIS and Au Pair status reporting requirements are met. I further agree to provide all relevant personal data for the purpose of InterExchange maintaining my record with SEVIS.

11. **Release, Intellectual Property, Social Media & Disrep ute**

a. **Release**

**(i)** I give permission to InterExchange to (i) take and retain any photographs (including group or Host Family photos), copies of images from passports, videos, audio recordings and other depictions of me (collectively, the "Reproductions") during

PLAINTIFFS' RESP. APP.0002875

BELTRAN000531

activities associated with InterExchange; (ii) retain any Reproductions that Host Family submits to InterExchange, or that Host Family post s on any InterExchange -branded or InterExchange -affiliated media site, social networking site or video upload site o r "channel" or blog, including, without limitation, Facebook, Linked -In, YouTube, Twitter, or any other electronic site; and (iii) publish, distribute and display, either in whole or in part, any Reproductions in any and all media throughout the world, inc luding, without limitation, media sites, social networking sites, video upload sites or "channels," blogs, electronic postings, calendars, brochures, advertisements and other promotional materials.

**(ii)** I hereby waive compensation and any right to inspect or approve any such uses and Reproductions. I shall not submit any Reproduction unless I first obtained permission from each person whose name, image, voice, or likeness is included in the Reproduction, and each such person has granted me and InterExchange a ll copyright and other intellectual property rights, including renewal rights, necessary to use the Reproduction and his or her name, image, voice and likeness in it. I hereby release, discharge and agree to hold InterExchange harmless from any liability arising out of InterExchange's use of the Reproductions, including any blurring, distortion, alteration, optical illusion or use in composite form with other works. I hereby assign all copyright and other intellectual property rights, including renewal rights, to InterExchange, in any materials produced that are the subject of this Release.

b. **Use of InterExchange Intellectual Property** . If I desire to use InterExchange Intellectual Property for any reason, I shall contact InterExchange's Marketing Departm ent to request permission. I shall not use InterExchange's Intellectual Property without having obtained prior written permission. InterExchange Intellectual Property shall mean, without limitation, InterExchange copyrights, trademarks and trade secrets, patents, online content appearing on InterExchange's website, Facebook and other Social Media content and marketing tools, marketing material and the application and other materials that I submitted to InterExchange.

c. **Disrepute.** I must not act in a manner that brings InterExchange, the Exchange Visitor Program, me, my country or the U.S. Department of State into notoriety or disrepute.

12. **Social Media Policy** . I understand and agree to the following terms when using Social Media:

a. I must respect privacy by no t disclosing any information that could reasonably be considered identif ying information, including, without limitation , social security numbers, tax payer identification numbers, full names, addresses (beyond web site or business addresses) and financial account information of anyone involved with the InterExchange Cultural Exchange Program.

b. I must not post any images of anyone without written documentation of their knowledge. I must also not post images of children without the permission and knowledge o f their parents . I understand that posting these images may subject me to violation of not only privacy law, but also other international or U.S. federal, state and local laws .

c. I agree that my time and effort spent using Social Media should not interfere with meeting my requirements under my contract with InterExchange or duties or work commitments to my Host Family .

d. **I must not use Social Media in a way that will subject anyone to liability (criminal or civil) such as by posting obscene or illegal materia l or services or harassment of others. I must not engage in any activity that may result in legal action against InterExchange or those in a contractual or business relationship with InterExchange.**

PLAINTIFFS' RESP. APP.0002876

BELTRAN000532

e.  I agree to use my common sense in all communications, pa rticularly when using publically accessible  Social Media platforms in a manner that may lead to disrepute. I understand that what I say or display online could potentially be harmful to InterExchange, others and myself.

f.  If I have any questions about this  policy, I must contact InterExchange for guidance.

### 13.  Privacy & Background Check .

a.  **Privacy** .

(i)  **InterExchange Privacy Policy.**  By signing below, I accept and agree to be bound by InterExchange 's Privacy Policy pursuant to InterExchange's Terms of Use located  at www.InterExchange.org/ terms-use, its Privacy Policy located at  www.InterExchange.org/privacy -policy, my application  and the terms and co nditions set forth  in this Agreement.  I agree that I  have read each of these documents , which (if applicable) are incorporated herein by this reference , as they form a legal agreement between InterExchange and myself regarding  the Privacy Policy of  the Program. I understand that in the event of any co nflict between th e application, this Agreement  and those of the Terms of Use  and Privacy Policy, the Terms of Use and Privacy Policy shall supersede  with regard to the Privacy Policy .

(ii)  **Au Pair duty to provide p rivacy** . In addition to the specific requirement for Social Media listed under this Agreement, I understand and agree that I must protect the privacy of the Host Family. In addition, I agree to protect the privacy of any party in a relationship with InterEx  change and/or Au Pair USA, including, without limitation, InterExchange staff and Local Coordinators. If I have questions about my duties under this clause of the Agreement, I shall contact the Local Coordinator and/or authorized InterExchange managers for  guidance.

b.  **Background Check** .

(i)  **InterExchange** . I agree that the **Background Information  Usage Notice** is incorporated into this Agreement  in **Exhibit B** . The Background Information Usage Notice authorizes InterExchange to obtain and use background information (e.g., police reports  and child care  references  obtained by me ) for the purpose of determining my suitability for  the Au Pair USA Program . By signing this Agreement, I certify that I understand and agree to the purpose for which InterExchange procures the  background i nformation from me. By signing this Agreement, I further certify that I agree to the methods by which InterExchange  procures the  background  information.

(ii)  **Host Family** . I understand and agree that the Host Family may request additional screening  of me at the Host Family 's own expense. I understand that the Host Family must conduct such investigation pursuant to the laws of the U.S. and state and local laws in which the Host Family resides  .

### 14.  Additional Agreement Terms .

a.  **Entire Agreement.** I understand and agree that this Agreement contains the entire understanding of the parties with respect to the matters contained herein and supersedes any previous agreements (oral, written or otherwise) and may be altered or amended only by a written instrument duly executed by both parties hereto.

PLAINTIFFS' RESP. APP.0002877   BELTRAN000533

b. **Documents Incorporated into Agreement.** I understand and agree that 22 CFR Part 62, the Wilberforce Brochure (see below, "Dispute Process"), the Extension Agreement (if applicable and as described in the Agreement ), the Au Pair Handbook, and the Department of State publication "The Au Pair Exchange Program" from InterExchange are incorporated into this Agreement . With regard to the use of InterExchange's website located at www.InterExchange.org ("Site"), I understand and agree that I must follow terms and conditions of www.InterExchange.org/terms -use and www.InterExchange.org/privacy -policy, which are incorporated into this Agreement for the purpose of Privacy Policy and site use only rather than for the general terms and conditions of the Program. Unless required by law or regulation (e.g., required 22 CFR Part 62, Wilberforce, the Department of State or federal, state or foreign law) or involving InterExchange 's Privacy Policy, if there is a conflict between this Agreement and other documents incorporated into this Agreement, the Agreement shall be controllin g.

c. **Agreement in English** . This Agreement and correspondence between InterExchange and myself shall be written in English. In the case of any disputes between InterExchange and myself, the language that shall govern interpreting this Agreement or any issue arising out of communications, including, but not limited to correspondence, shall be English. I am responsible for any cost associated with translation if any language other than English is required by me for any reason.

d. **Assignment** . This Agreement is restricted solely to myself and shall not be assigned, transferred, encumbered, or subject to any third party agreement without the written consent of InterExchange. Any attempted assignment will be void and of no effect. InterExchange may assign this Agr eement to a successor (whether by merger, a sale of all or a significant portion of its assets, a sale of a controlling interest of the company or otherwise), which agrees in writing to assume InterExchange's obligations under this Agreement.

e. **Amendments** . I agree that InterExchange , at its sole discretion, may amend this Agreement, provided, however, that the amendment is in writing and InterExchange gives me thirty (30) days notice . I agree that any changes required by the U.S. Department of State or any other government entity with legal authority over InterExchange must be adhered to immediately without 30 -days notice. I understand and agree that I can not amend th e Agreement.

f. **Third Parties and Third Party Beneficiaries** . I understand and agree that t he terms and conditions of this Agreement, express ed or implied, exist only for the benefit of the parties to this Agreement. No other person or entity will be deemed to be a third party beneficiary of this Agreement.

g. **Waiver** . I agree that InterExchange's fai lure to enforce any provision of this Agreement shall not be construed as a waiver or limitation of InterExchange's right to subsequently enforce and compel strict compliance with each and every provision of this Agreement.

h. **Void Provision** . I agree that i f any provision of this Agreement is held to be void or contrary to law, such provision shall be construed as nearly as possible to reflect the intention of the parties, with the other provisions remaining in full force and effect.

i. **Headings** . I agree that all headings are for purposes of convenience only and are not to be used in interpretation or enforcement of this Agreement.

j. **Change of Sponsor** . I understand and agree that InterExchange is not required to facilitate a request to change sponsors during the Program. I understand and agree that if I terminate this Agreement or otherwise end my Program that I am to return to my home country rather

PLAINTIFFS' RESP. APP.0002878

BELTRAN000534

than stay in the U.S. I agree that I shall owe InterExchange or Host Family for any costs and/or expenses incurred by either InterExchange or the Host Family due to a change of sponsor.

15. **Laws, Regulations & Culture**

    a. **U.S. State Department Regulations** . I acknowledge and agree that I am participating in a Cultural Exchange Program and agree to comply with all of the   regulations published by United States Department of State   under 22 CFR Sec. 62 , which may be amended from time to time in the future.

    b. **Federal, state and local laws.** I must comply  with federal, state and l ocal laws of the U.S., including income tax filin g requirements  (see below), licensing for use of motor vehicles  (and other motor vehicle requires described in this Agreement)   and laws regarding alcohol and drug use  (see below for further details) . I am responsible for reading and carefully considering a ll materials made available to me that relate to safety, health, legal, environmental, political, cultural and religious customs and conditions in the U.S. I take full responsibility in the event that laws, regulations or customs are broken and for obtaini ng actual knowledge of these laws, regulation or customs.

    c. **Taxes**. I am hereby given notice that I may be considered, under most circumstances, a non -resident alien who is not subject to Social Security (FICA), Medicare, or federal unemployment (FUTA) with holding taxes.   Under rare circumstances involving Participants who previously entered the U.S. under a J Visa program or as a student under the F Visa, I understand that I may be considered a resident immigrant for tax purposes and subject to paying Socia l Security (FICA), Medicare, or federal unemployment (FUTA) withholding taxes. I understand it is my responsibility to contact a tax professional to determine the extent (if any) of any taxes that I may owe. For more information, I  understand that I  should visit the IRS website and search for "Au Pair." Under all circumstances, I am subject to paying federal, state (if applicable) and local (if applicable) income taxes on my Stipend. This information is provided for notice purposes only , "as is"  and is subj ect to change.

    d. **Driving**. I agree to be responsible for determining whether I will be able to legally drive in the Host Family's state of residence. I acknowledge responsibility to conform to any and all state or local laws regarding my use of Host Family'  s automobile (if one is made available) , including obtaining a local driver's license   (if required ) and any car insurance requirements . I agree to comply with requests made by Host Family for additional driving related education and instructions   in complia nce to the terms and conditions of this Agreement .

    e. **Drugs and Alcohol** . I understand that the drug and alcohol laws of t he U.S. may differ significantly from those of my home country even in the case of over the counter drugs and herbal remedies. I agree  to investigate and follow a ll U.S. federal, state and local laws regarding drugs and alcohol.

    f. **Cooperation with InterExchange** . I will cooperate fully with those supervising the Program on behalf of and in cooperation with InterExchange. I agree to abide b  y any reasonable instructions they may give me.

16. **Warranties, Liability, Indemnification & Act of God**

    a. **No Guarantee of Match or Participation** .  I agree that InterExchange neither guarantees a Match ( or Rematch) nor participation in the Program.

PLAINTIFFS' RESP. APP.0002879

BELTRAN000535

b.  **No Guarantee of Satisfaction or Suitability** . I agree that InterExchange neither guarantees satisfaction nor suitability with the Program or a Host Family.

c.  **Information Provided "As Is" Without Warranty or Guarantees** . I agree that any information (e.g., tax and labor law requirements and emergency information and plans) communicated by InterExchange to me is provided "as is" without warranties or guarantees either expressed or implied that information is "up to date", correct and/or accurate.

d.  **Participant General Liability**. I waive and release InterExchange from any and all claims for contract damages, torts arising out of or concerning my employment with the Host Family and any liability that I incur that arise out of or concern ing my participation in the Program, inc luding, without limitation, any lost, stolen or damaged property and/or any bodily injuries that harms a third party or me.

e.  **Limitation of Liability** . If a court, government agency or legal authority finds that InterExchange has a duty under foreign or U.S. federal, state or local law, I understand and agree that InterExchange's liability (if any) shall be no greater than its role as a nonprofit Sponsor under the U.S Department of State regulations . I agree that nothing herein described in this paragraph or in the Agreement creates a duty or obligation under the law , and that the language written herein is provided solely for the purpose of limiting liability to InterExchange's role as my Sponsor. I further agree that InterExchange's liability is subject to t he limitations set forth in separate paragraphs described in Section 16.

\*

f.  **Change of Sponsorship Costs** . In compliance with Section 14(j), I agree that I shall owe InterExchange for any costs and expenses that arise from a change of sponsor.

g.  **Specific Liability**.

(i)  **Motor Vehicle** . If I have an accident while driving the Host Family's motor vehicle during work hours, I understand that I will not be liable and responsible for any cost and/or damages arising out of or concerning the repair of the motor vehicle, p rovided, however, that I did not violate any drug and/or alcohol laws while using the motor vehicle. If I violated any drug and/or alcohol laws while driving the motor vehicle, I am liable and responsible for damages and/or costs arising out of or concerni ng the accident. If there is damage to the Host Family motor vehicle during non -working hours, I am liable and responsible for one half (½) the costs and/or damages up to five hundred dollars ($500) per accident, provided, however, that I did not violate a ny drug and/or alcohol laws while driving the motor vehicle. If I violated drug and/or alcohol laws while driving the motor vehicle, I am liable and responsible for costs and/or damages arising out of or concerning any accidents involving drug and/or alcoh ol use by me. I understand that the five hundred dollars ($500) shall only be payable upon Host Family presenting proof of repair that shall include, without limitation, photos of the damaged and repaired vehicle. I agree that InterExchange is not liable f or any damages or loses resulting from my use of the Host Family's or any other party's motor vehicle or transportation during my participation in the Program.

(ii)  **Expenses** . I am responsible for all my personal debts, including, without limitation, phone call s, gym memberships, and medical insurance co -pay. I agree that InterExchange shall not be liable for any personal bills incurred by me during the Program. I agree that I am responsible directly to the Host Family for all personal debts including without li mitation, phone calls and gym memberships.

(iii)  **Transportation** . I agree not to hold InterExchange, its officers, affiliates, independent contractors, agents and employees liable for arranging

19

BELTRAN000536

transportation in the Program, and I agree not  to hold any of them  liable in
connection with any loss, damage, personal injury, delay or expense suffered or
incurred by me, resulting from any act or omission of any carrier, any member of
the host family or any other body, corporate or non  -corporate entity, in relation to
transportation to and from and within the United States, my duties as an Au Pair
or any other facility or service organized on my behalf.

(iv)   **Specific Liabilities** .  I agree that I am responsible, and that I shall hold
InterExchange as not liable or responsib le for any claims, liability, damages or
costs incurred by reason of any  breach, act, error, negligence  or omission that
arises out of or concerns, without  limitation, the following :

a. My performance of child care duties
b. My disciplining children
c. Decisions a nd actions carried out by the Host Family
d. Section 7(c)(i) and (ii) , which respectively address  InterExchange  discussing
   health and safety circumstances with third parties and taking action in case of
   health or safety emergencies . Although InterExchange may  elect to act as set
   forth in Section 7(c)(i) and (ii), I agree that InterExchange is not liable if
   InterExchange fails to act. I agree that neither  Section 7(c)(i) and (ii)  nor any
   other term under the Agreement creates an affirmative duty, either express  ed
   or implied, for InterExchange to act.  In compliance with Section 7(c)(i) and (ii),
   I agree that  InterExchange is not liable for acting on my behalf under the
   circumstances described in Section 7(c)(i) and (ii).
e. Insurance (including car insurance for veh icles) or medical , dental and health
   care needs that I may have during the Program
f.  Alternative flights to and from the U.S.
g. My failure to meet immigration status requirements while in Program (e.g  .,
   travel outside of U.S. with expired J -1 Visa )
h. My failure to follow emergency, safety and problem s rules suggested  or
   required by InterExchange , the Host Family or local authorities
i. My disclosure of information and/or document s to unauthorized  parties (e.g.,
   tax payer id number or passport )
j. My failure to apply for and obtain necessary documentation and information
   as described in this  Agreement
k. Leaving the Program. If  I leave the Program for any reason before my
   commitment is finished or over -stay my visa, I forfeit my return flight and any
   vacation time, unearned Stipend and my Insurance will be cancelled (and
   therefore I agree that I will  be responsible for any medical costs or damages
   caused by my lack of  Insurance coverage). I also  agree that I will be liable for
   all costs and damages that are incurred or  arise out of InterExchange acting
   to address my actions.
l. Inadvertent disclosure to third parties in the course of conducting an
   investigation involving my well -being or suitability  for the Program .
m. Breaching any other term of this Agreement (e.g., failure to follow laws of the U.S. or
   guidance from states and local authorities).
n. Violations of U.S. federal, state and local laws, regulations and customs

h.  **Act of God** . I agree that InterExchange and/or its officers, employees, independent
contractors, Local Coor dinators and agents are neither responsible nor liable for any
events beyond their control, including, without limitation, Government restrictions that
may interfere with or preclude operation of the Program; any events directly or
indirectly caused by any  intentional or negligent acts or omissions by the Host Family
or those with whom Au Pair comes into contact as a consequence of participating in
the Program;  the necessity of returning me to my home country early or ending my
program early due to health r easons, transportation (e.g., air travel);  terrorism; wars;

20

PLAINTIFFS' RESP. APP.0002881                                    BELTRAN000537

and natural disasters.

i. **Indemnification** . I shall indemnify, without limitation, InterExchange, its officers, employees, agents, Local Coordinators, independent contractors, and organizations affiliated with InterExchange, against any loss or damage suffered by any of them , or any claims made against any of them as a result of any breach, act, error, omission or negligence by me during my participation in the Program and for the duration of my stay in the U.S .

### 17. Dispute Process.

a. **Complaints Procedure** . I have the right to contact the U.S. Department of State regarding any serious allegation arising under the Wilberforce Anti -trafficking requirement as set forth in the Wilberforce brochure that I rec eived from InterExchange or upon refusal of InterExchange to address claims. I also understand that allegations by third parties about my progress, well-being and suitabilit in the Program will be investigated by InterExchange. I understand that InterEx change will not divulge any background information about me other than the information required to conduct the investigation.

b. In the event that I wish to lodge a complaint about any services provided by InterExchange, its suppliers, agent, representative s, independent contractors, ve ndors and/or affiliates (e.g., I nsurance vendor, Host Family, Local Coordinators, International Cooperator, hotel or anyone in a relationship with InterExchange), I must first notify both my Local Coordinator and an authorized InterExchange manager in writing in order to give InterExchange the chance to rectify the problem.

c. I understand and agree this Agreement is governed by laws of the state of New York.

d. I agree that a ny controversy, dispute or claim arising out of or in connection with this Agreement, the relationship of the parties, or its interpretation, performance or nonperformance, or any breach thereof shall be determined solely in arbitration conducted in New York City in accordance with the then existing rules of the American Arbitration Association .

e. **Cost of Arbitration** . In the event of arbitration as described in 17(d) , I understand and agree that the non-prevailing party must reimburse the prevailing party for all reasonable attorneys' fees and costs resulting therefrom.

f. **Cost of Litigation** . In the event that a court or legal authority fails to enforce the arbitration clause se forth in 17(d) , I understand and agree that the non-prevailing party shall reimburse the prevailing party for all reasonable attorney s' fees and costs resulting from the cost of the litigation, including, but not limited to any trial and/or appeals.

### 18. Terms, Termination and Survivorship

a. **Start Date** . I agree that this Agreement shall be effective as of the date of my submitting an application to the International Cooperator for the purpose of participating in the InterExchange Au Pair USA Program (the "Effective Date").

b. **End Date** . I agree that this Agreement shall automatically terminate at the end of the Au Pair USA Program for standard 12-month Programs , in-country placements, rematches or Extension Programs, whichever is latest, plus my 30-Day Travel/Grace Period. I understand and agree that the Agreement may automatically terminate once my Program with InterExchange ends, which may en d at the end of my 30-Day Travel/Grace Period in the Program, or earlier sub ject to the terms and conditions of termination of the Agreement , whichever occurs first.

c. **Termination** . This Agreement may be terminated by InterExchange at any time and will termin ate automatically if InterExchange ends its sponsorship of my J -1 Visa. Provided that I meet my obligations under this Agreement , I may terminate this

PLAINTIFFS' RESP. APP.0002882

BELTRAN000538

Agreement by withdrawing from the Program and leaving the U.S., provided, however that I provide InterExc hange with 2 -weeks notice prior to termination .

    d.   **Survivorship** . I agree that any terms and conditions regarding definitions, l iability, fees, privacy, releases, intellectual property , Social Media, reputation , confidentiality and expenses /costs shall surviv e the termination of this Agreement.

19. **Full Disclosure** . I am solely responsible for the full disclosure and accuracy of any information provided by me , my agent or a legal guardian. I confirm that the information I have provided is true, complete and accur ate, and upon request I will provide any additional documentation necessary to participate in this Program. I agree to keep all information complete, fully accurate and up to date.

20. **Signature** . This Agreement must be signed by electronic signature under the procedures set forth in InterExchange's online Passport system.

PLAINTIFFS' RESP. APP.0002883

BELTRAN000539

**Exhibit A**

**Au Pair**
**Extension Term Sheet**

The following terms apply if and when my Cultural Exchange Program as an Au Pair is extended under the terms and conditions described in the Extens ions section of the Main Agreement. I understand that neither InterExchange nor I shall be obligated to follow these additional terms and conditions unless and until the Extension is approved (e.g., by both InterExchange and the U.S. Department of State) and I accept the Extension pursuant to the terms and conditions set forth in the Main Agreement:

1. **Extension**. I agree to all terms and conditions of the InterExchange Au Pair USA Extension Program as mandated by the United States Department of State, other U .S. regulatory agencies and InterExchange.

2. **Extension Request Final Once Submitted** . I understand and agree that Extension requests are final and cannot be changed once submitted to the U.S. Department of State, but I understand that I may decide to withdraw my participation in the Program for any reason and at any time.

3. **U.S. State Department Determines Approval** . I agree that the Extension is at the sole discretion of the U.S. Department of State. I understand and agree that InterExchange cannot be held accountable for any delay or denial of the Extension by the U.S. Department of State.

4. **Au Pair Agreement Remains In Effect** . Unless expressly modified in this Extension Term Sheet, I agree to comply with the terms and conditions of the Main Agreement, which shall remain in effect for the duration of the Extension.

5. **Educational Requirement.** I agree to complete the required academic courses as follows during my Extension and, except for the number of credit hours, meet the requirements of Section 4(n) of the Main Agreement:

   a. I shall take the following credit hours:

      (i) Three (3) semester hours for a six (6)-month extension

      (ii) Six (6) semester hours for nine (9) and twelve (12)-month extensions.

   b. I will receive from the Host Family, if applicable, transportation to and from t he place of instruction, and the Host Family shall make a tuition payment for the me as follows :

      (i) Up to a maximum of two hundred fifty dollars ( $250) for six (6) month extensions

      (ii) Up to a maximum of five hundred dollars ($500) for nine (9) and twelve (12) m onth extensions.

   c. If a remaining balance is left from the tuition payment after I complete the requisite semester hours, I, at my sole election, may use the balance to take additional course work that meets the academic requirements of U.S. State Departmen t regulations. I understand that the Host Family must provide me adequate time to attend courses at an accredited post secondary institution.

   d. **Failure To Meet Educational Requirement** . If I fail to meet the educational requirements as set forth by U.S. Sta te Department regulations and InterExchange policy, I agree that I must pay for my return ticket to my home country.

6. **Paid Vacation**. I understand that I must receive the following paid vacation time from my Host

PLAINTIFFS' RESP. APP.0002884

BELTRAN000540

Family:

    a.   Six (6) Month Extension receives one (1) week paid vacation

    b.   Nine (9) Month Extension receives one and a half (1½) weeks paid vacation

    c.   Twelve (12) Month Extension receives two (2) weeks paid vacation

7.  **Travel**.

    a.   **Domestic Travel**. I understand and agree that my optional 30-Day Travel/Grace Period is a one-time component of this Cultural Exchange Program and can only be taken at the end of my Extension period.

    b.   **Travel Abroad**. I understand that InterExchange recommends that I only return home or travel abroad during the time of my Extension with a visa that has not expired. Additionally, I agree that I am responsible for obtaining any necessary visas for each country that I intend to travel.

8.  **J-1 Visa**. I understand I may not leave and re-enter the United States after the expiration date on my J-1 Visa without acquiring a new visa. I understand it is my responsibility to acquire this J-1 Visa at an American Embassy or Consulate outside the USA, and I cannot hold InterExchange liable if a new visa is not issued. There is no guarantee that I will receive a visa.

PLAINTIFFS' RESP. APP.0002885        BELTRAN000541

**Exhibit B**

**Background Information  Usage Notice**

1.  I understand that the purpose of this Background Information Usage   Notice is to provide additional communication to  me to ensure my awareness  of why and how b ackground information  is provided to  InterExchange .

2.  As explained in the Main Agreement between InterExchange and myself, I understand that criminal records, child care references, school records and health information forms gathered by me and delivered to InterExchange via the Internationa  l Cooperator are for the sole purpose of determining my suitability for the Program.

3.  By signing the Main Agreement, I confirm that I agreed to assist   InterExchange by providing the background i nformation as requested. I hereby release InterExchange and any and all persons, business entities (e.g., International Cooperators) and governmental agencies (e.g., U.S. Department of State), whether public or private, from any and all liability, claims and/or demands, by me, my heirs or others making such claims or demands on my behalf, for gathering Background Information and/or providing an investigative report based on background i  nformation.

4.  I understand that this  Notice shall remain in effect for the duration of my association with InterExchange.

5.  If I have questions about the background i nformation an d any reports derived from the background i nformation, I must contact InterExchange  management . I am entitled to a complete and accurate disclosure  of the nature and scope of any investigation into my background  of which I am the subject upon my written request to InterExchange, provided, however, requests are made in writing before the completion of    the Program , or not longer than 12 months after, the background i  nformation is requested, whichever is shorter.

PLAINTIFFS' RESP. APP.0002886

BELTRAN000542

**Exhibit C**

**Credit Card Approval Form**

PLAINTIFFS' RESP. APP.0002887

BELTRAN000543

Case 1:14-cv-03074-CMA-KMT   Document 948-30   Filed 03/17/18   USDC Colorado   Page 63
of 180

# Exhibit 320

PLAINTIFFS' RESP. APP.0002888

# Exhibit D

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Case No. 14-cv-03074-CMA-KMT

JOHANA PAOLA BELTRAN, *ET AL.*

      Plaintiffs,

v.

INTEREXCHANGE, INC., *ET AL.*

      Defendants.

## DECLARATION OF JOHANA PAOLA BELTRAN

I, Johana Paola Beltran, being duly sworn, deposes and says:

1.      My name is Johana Paola Beltran and I am over the age of 18.

2.      Beginning on or around early 2011, I visited the office of InterExchange, located in downtown Bogota, Colombia. I submitted an application to InterExchange.

3.      A representative for InterExchange contacted me to provide me with the J-1 visa requirements in order to become an au pair. The agent explained that I would have to take English classes, obtain a driver's license, receive training in first aid, and take swimming lessons. I was also instructed to take two semesters at a post-secondary school. I took one class per semester, from 2011 until early 2012, at my own expense.

4.      In early 2012, InterExchange contacted me to conduct a formal interview, including questions regarding my ability to provide childcare. InterExchange arranged for me to interview with a few families, to be conducted via Skype and/or telephone. I interviewed with the Noonan family. InterExchange later advised me that I would be working for the Noonan family and that InterExchange would facilitate a J-1 visa interview for me at the United States embassy in Bogota.

5.      I paid $5,000,000 pesos ($2,500 USD) to InterExchange.

6.      In May, 2012, I received my J-1 Visa.

7.      In August, 2012, InterExchange made arrangements for me to travel from Bogota to New York.

8. Upon arrival in New York, InterExchange made arrangements for me to stay in a hotel with approximately 50 other au pairs for one week, to attend mandatory childcare training provided by InterExchange. I was not paid during this week of training.

9. Upon completion of the week-long training in New York, I flew to Denver, Colorado to begin working for the Noonan family as their au pair.

10. After my arrival in Denver, I was contacted by an InterExchange representative. I also attend one meeting with other au pairs and an agent of InterExchange.

11. In the Noonan family home, my job responsibilities were not limited to childcare services but included house work. I was responsible for cleaning the home, preparing dinner Monday through Saturday, laundry, packing and unpacking for the family before and after trips, cleaning the family vehicle daily, bringing in the groceries from the car, gardening, and tending to the family's outdoor pets (such as chickens, including the chicken coop).

12. The family did not provide me with three meals per day every day. I was not allowed to eat with the family. I was only allowed leftovers if any were available.

13. During my employment, I often worked more than 8 hours, sometimes 9-10 hours per day. I sometimes worked on Sunday, my day off. Ms. Noonan kept a schedule for me, but she did not keep track of the hours.

14. I often worked more than 40 hours per week. I was not paid any additional money for overtime or wages exceeding 40 hours in a work week.

15. I was paid $195.75 per week for each week that I worked in the Noonan home, even if I worked in excess of 40 hours that week.

16. I ceased working with the Noonan family in November, 2012. Ms. Noonan contacted InterExchange about me, and InterExchange then sent a representative to the family home and had me sign documents that I did not understand. I was not provided with an explanation or copy of what I signed.

I solemnly affirm under the penalties of perjury that the contents of this

Declaration are true and correct to the best of my knowledge.

*Johana Paola Beltran*

JOHANA PAOLA BELTRAN

2

Case No. 1:14-cv-03074-CMA-KMT   Document 948-59   Filed 03/30/18   USDC Colorado   pg 68 of 180

# Exhibit 321

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Case No. 14-cv-03074-CMA-KMT

JOHANA PAOLA BELTRAN, *ET AL.*

      Plaintiffs,

v.

INTEREXCHANGE, INC., *ET AL.*

      Defendants.

---

### DECLARATION OF BEAUDETTE DEETLEFS

---

I, Beaudette Deetlefs, being duly sworn, deposes and says:

1.     My name is Beaudette Deetlefs and I am over the age of 18.

2.     Beginning on or around June 2014, in response to an advertisement in the paper from Cultural Care, I travelled to Cape Town, for an information session on their au pair program.

3.     At the end of the information session, I secured a formal interview and was later accepted by Cultural Care.

4.     I paid $900 for out of pocket expenses related to my employment with Cultural Care, which I understood to be payment for administrative fees and basic health insurance.

5.     On or around August 18, 2014, I travelled from Cape Town to New York.

6.     Upon arrival in New York, Cultural Care required me to attend mandatory childcare training for three full days.  I was not paid during this week of training.

7.     At training, a Cultural Care representative informed me and the other au pairs that we would be paid precisely $195.75 per week, no more.

8.     Upon completion of the week-long training in New York, I flew to Utah to begin working as an au pair.  I lived in the basement of the host family's home.

9.     My host family had three children, ranging in ages from 11 months to 9 years old.

PLAINTIFFS' RESP. APP.0002893

10.     I usually worked only 2 or 3 days per week, but generally worked more than 10 hours per day.

11.     My host family paid me $195.75 every week that I worked. My family told me they paid me that amount because that was what Cultural Care told them to pay me.

I solemnly affirm under the penalties of perjury that the contents of this

Declaration are true and correct to the best of my knowledge.

Dated this 12 day of 7 , 2016

_____

BEAUDETTE DEETLEFS

2

Case No. 1:14-cv-03074-CMA-KMT Document 918-30 Filed 03/30/18 USDC Colorado Page 71 of 181

# Exhibit 322

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 14-cv-03074-CMA-KMT

JOHANA PAOLA BELTRAN,
LUSAPHO HLATSHANENI,
BEAUDETTE DEETLEFS,
DAYANNA PAOLA CARDENAS CAICEDO, and
ALEXANDRA IVETTE GONZÁLEZ,
on behalf of themselves and others similarly situated,

       Plaintiffs,

v.

INTEREXCHANGE, INC.,
USAUPAIR, INC.,
GREATAUPAIR, LLC,
EXPERT GROUP INTERNATIONAL INC., d/b/a EXPERT AUPAIR,
EURAUPAIR INTERCULTURAL CHILD CARE PROGRAMS,
CULTURAL HOMESTAY INTERNATIONAL,
CULTURAL CARE, INC., d/b/a CULTURAL CARE AU PAIR,
AUPAIRCARE INC.,
AU PAIR INTERNATIONAL, INC.,
APF GLOBAL EXCHANGE, NFP, d/b/a AUPAIR FOUNDATION,
AMERICAN INSTITUTE FOR FOREIGN STUDY, d/b/a AU PAIR IN AMERICA,
AMERICAN CULTURAL EXCHANGE, LLC, d/b/a GOAUPAIR,
AGENT AU PAIR,
A.P.EX. AMERICAN PROFESSIONAL EXCHANGE, LLC, d/b/a PROAUPAIR,
20/20 CARE EXCHANGE, INC., d/b/a THE INTERNATIONAL AU PAIR EXCHANGE, and
ASSOCIATES IN CULTURAL EXCHANGE, d/b/a GOAUPAIR,

       Defendants.

---

**ORDER ADOPTING AND AFFIRMING IN PART FEBRUARY 22, 2016
RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**

---

This matter is before the Court on the February 22, 2016 Recommendation of United States Magistrate Judge Kathleen M. Tafoya (Doc. # 240) on a handful of motions to dismiss in the instant case.

## I.  BACKGROUND

In her Recommendation, Magistrate Judge Tafoya analyzed five separate motions to dismiss brought by some combination of the fifteen Defendants named in this matter: Defendant Cultural Care, Inc.'s Motion to Dismiss All Claims in First Amended Complaint (Doc. # 127), Motion to Dismiss the First Amended Complaint by Defendant Interexchange, Inc. (Doc # 130), Defendant American Cultural Exchange, LLC, D/B/A Go Au Pair's Motion to Dismiss Counts I, III, IV, V, VI, VII, VIII, IX and X of the First Amended Complaint (Doc. # 131), Joint Motion by Certain Sponsor Defendants to Dismiss the First Amended Complaint (Doc. # 135), and Defendant American Institute for Foreign Study's Motion to Dismiss Amended Complaint (Doc. # 136).  She recommended the Joint Motion by Certain Defendants to Dismiss the First Amended Complaint (Doc. # 135) be denied.  (Doc. # 240 at 43.)  Additionally, she recommended that the remaining motions (Doc. ## 127, 130, 131, and 136) should be granted in part and denied in part; specifically, that Plaintiffs' claim under the Utah Minimum Wage Act and Plaintiffs' claim for breach of contract should be dismissed,[1] but that Plaintiffs' remaining claims should proceed.  (*Id.*)[2]

---

[1] Plaintiffs did not object to this aspect of the Recommendation.  (*See* Doc. # 256 at 1 n.1.)

[2] Judge Tafoya also ordered that certain motions to strike relating to the motions to dismiss – specifically, Defendant Cultural Care, Inc.'s Motion to Strike Material in Plaintiffs' Consolidated Opposition to Defendants' Motions to Dismiss (Doc. # 206) and Plaintiffs' Cross-Motion to Strike

PLAINTIFFS' RESP. APP.0002897

On March 14, 2016, Defendants filed two timely, consolidated objections to Judge Tafoya's Recommendation; one relates to her recommendation regarding Plaintiffs' antitrust claims (Doc. # 248), and the other relates to her recommendation regarding Plaintiffs' remaining claims (Doc. # 247). Plaintiffs also filed a Response to Defendants' Objections. (Doc. # 256.)

The Recommendation is incorporated herein by reference. *See* 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b). As such, the Recommendation's thorough recitation of the factual background of this case will be reiterated only to the extent necessary to resolve Defendants' objections.

## II. ANALYSIS

### A. Legal Standard

When a magistrate judge issues a recommendation on a dispositive matter, Fed. R. Civ. P. 72(b)(3) requires that the district judge "determine *de novo* any part of the magistrate judge's [recommended] disposition that has been properly objected to." In conducting its review, "[t]he district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." *Id.*

### B. Application

#### 1. Plaintiffs' Sherman Act Claims

Plaintiffs sue fifteen so-called "Sponsor" organizations (Sponsors), a mix of for-profit and non-profit organizations that are formally designated by the U.S. Department

---

Certain Exhibits Submitted by the Defendants" (Doc. # 221) – were denied as moot. The parties did not object to this ruling. (*See* Doc. ## 247, 248, 256.)

PLAINTIFFS' RESP. APP.0002898

of State (DOS) as the exclusive entities permitted to recruit and place *au pairs*[3] with host families in the United States under the J-1 Visa program.[4]  (Doc. # 110, ¶¶ 45–47, 72.)  Judge Tafoya's Recommendation found that Plaintiffs' allegations were sufficient to state a claim for price fixing under Section 1 of the Sherman Act (Doc. # 240 at 13), which provides, in relevant part, that "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."  15 U.S.C. § 1 (Section 1).

Plaintiffs' Amended Complaint alleges that the Sponsors, who have "100% of the market power within the relevant market, including the power jointly to set *au pair* compensation below competitive and legal levels," have violated Section 1 by engaging in a conspiracy not to compete with one another with respect to *au pair* wages.  (Doc. # 110, ¶¶ 2, 72.)  In other words, Plaintiffs allege that the Sponsors have agreed among themselves to create an artificially low, anticompetitive "wage floor" for *au pairs* – that is, to "fix" the price of *au pair* wages.  Plaintiffs allege that such an agreement is to the Sponsors' economic advantage, as wages are one of several components of the overall "price" of providing an *au pair* to a host family, and the Sponsors must compete both for *au pairs* and for host families.  In particular, they allege that this so-called "wage-fixing"

---

[3] Under the DOS' *au pair* program, young, foreign nationals (between the age of 18 and 26), with some secondary school education and English proficiency, are permitted to obtain a so-called "J-1" visa and stay in United States for one or two years.  *Au pairs* live with an American host family, for whom they provide live-in child care services for 45 hours per week (as well as, in some cases, housekeeping and cooking).  In exchange for these services, they are provided with, among other things, (1) a weekly stipend (which the Plaintiffs allege violates the FLSA's minimum wage and overtime regulations); and (2) up to $500 in an "education credit" to cover tuition (per year).  (Doc. # 101, ¶¶ 44, 99, 108.)

[4] The J-1 visa *au pair* program is one of several official J-1 visa "cultural exchange" programs overseen and administered by the DOS.  (Doc. # 101, ¶ 43.)

4

agreement benefits the Sponsors in at least two ways: first, it allows them to effectively increase the portion of the overall costs to host families that are comprised of Sponsors' fees without increasing overall costs to host families for employing an *au pair*;[5] second, it allows the Sponsors to expand the number of potential host families they can attract (i.e., customers), by increasing the affordability of *au pair* child care child arrangements for host families vis-à-vis other kinds of child care arrangements.  (*Id.*, ¶ 132.)  "Both of these results increase Sponsors' profits, at the expense of *au pairs*."  (*Id.*)

As a preliminary matter, Defendants' objection to the legal standard employed by Judge Tafoya is without merit.  Defendants assert that Judge Tafoya erred because her Recommendation

> failed to address the fact that Plaintiffs fail to allege facts in their Amended Complaint **sufficient to exclude the possibility of independent action**, even where parallel conduct is present, **as required by *Monsanto Co. v. Spray Rite Serv. Corp.*, 484 U.S. 752 (1984)** (cited by the Court in *Twombly* for that proposition at 550 U.S. 557, 556).

(Doc. # 238 at 8) (emphasis added).  In making this argument, Defendants conflate the summary judgment standard (i.e., the standard applicable in *Monsanto*) and the motion to dismiss standard (i.e., the standard applicable here).  As Plaintiffs explained long ago in their Response brief to Defendants' Consolidated Motion to Dismiss (Doc. # 199 at 18), in *Monsanto*, the United States Supreme Court held that, in order to survive **a motion for a directed verdict** (which is analogous to the standard applied to a summary judgment motion), "there must be evidence that tends to exclude the

---

[5] Sponsors generate revenue at least in part from "placement" or "program" fees paid by host families in order to participate in the *au pair* program.  For example, Au Pair in America's website indicates that it charges a host family an annual $8,245 "Program Fee" plus a $400 "Match Fee."  (Doc. # 101, ¶ 99.)

PLAINTIFFS' RESP. APP.0002900

possibility of independent action." *Id.* at 769. Obviously, Judge Tafoya's decision to apply the correct standard for the 12(b)(5) Motions before her, rather than the directed verdict/summary judgment standard, was not erroneous.[6]

In *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), the seminal case outlining the pleading standard for Section 1 under the Sherman Act, plaintiffs brought a class action suit against several telephone companies, alleging that the companies had conspired to stay in their own markets and to keep other companies out of those markets in violation of Section 1. The United States Supreme Court explained that because Section 1 does not prohibit all unreasonable restraints of trade, but only those restraints "effected by a contract, combination, or conspiracy, **the crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement**." *Id.* at 553 (emphasis added). Accordingly, that Court held that, to survive a Motion to Dismiss, a complaint must present "enough factual matter (taken as true) to suggest that an agreement was made . . . [and] to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.* at 556. An agreement, however, need not be in writing or be explicit, and may be established by either direct or circumstantial evidence. *See id.* at 553 (stating that the agreement may be "tacit or express"); *Cayman Expl. Corp. v. United Gas Pipe Line Co.*, 873 F.2d 1357, 1361 (10th Cir. 1989) ("In the absence of an explicit agreement, conspiratorial conduct may be established by circumstantial evidence.").

---

[6] Plaintiffs' assertion that *Monsanto* simply does not apply to this stage of the dispute is easily verifiable with a simple Westlaw or LexisNexis search. Thus, the Court is puzzled as to why this argument appeared **yet again** in Defendants' Objection to the Magistrate Judge's Recommendation.

6

"Direct evidence [of] a Section 1 conspiracy must be evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted." *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1083 (10th Cir. 2006) (citing *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 118 (3d Cir. 1999)).  However, because direct evidence of concerted action is "so rare," the antitrust law has "granted fact finders some latitude to find collusion or conspiracy from parallel conduct and inferences drawn from the circumstances."  *Oltz v. St. Peter's Cmty. Hosp.*, 861 F.2d 1440, 1450-51 (9th Cir. 1988).  Specifically, if a complaint does not contain direct evidence of an agreement, but instead makes only allegations of so-called "parallel conduct,"[7] e.g., allegations of similar pricing behavior, etc., such allegations "must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action."  *Twombly*, 550 U.S. at

---

[7] In *White v. R.M. Packer Co.*, the First Circuit Court of Appeals provided the following helpful explanation of the difference between a tacit agreement, which is prohibited under the Sherman Act, and parallel conduct (otherwise known as "conscious parallelism"), which is not:

> Conscious parallelism is a phenomenon of oligopolistic markets in which firms "might in effect share monopoly power, setting their prices at a profit-maximizing, supracompetitive level by recognizing their shared economic interests and their interdependence with respect to price and output decisions."  Each producer may independently decide that it can maximize its profits by matching one or more other producers' price, on the hope that the market will be able to maintain high prices if the producers do not undercut one another.
> A tacit agreement—one in which only the conspirators' actions, and not any express communications, indicate the existence of an agreement—is distinguished from mere conscious parallelism by "uniform behavior among competitors, preceded by conversations implying that later uniformity might prove desirable or accompanied by other conduct that in context suggests that each competitor failed to make an independent decision."

635 F.3d 571, 575–76 (1st Cir. 2011) (citations omitted).

PLAINTIFFS' RESP. APP.0002902

557.  That is, the complaint must contain "allegations **plausibly suggesting** (not merely

consistent with) agreement."  *Id.* (emphasis added); *see also Mitchael v. Intracorp, Inc.,*

179 F.3d 847, 859 (10th Cir.1999) ("While consciously parallel behavior may contribute

to a finding of antitrust conspiracy, it is insufficient, standing alone, to prove

conspiracy").  In considering whether a Plaintiff has alleged sufficient circumstantial

evidence of conspiracy, the Court considers the allegations as a whole.  *Evergreen*

*Partnering Group, Inc. v. Pactiv Corp*., 720 F.3d 33, 47 (1st Cir. 2013) ("While each of

[the plaintiff's] allegations of circumstantial agreement standing alone may not be

sufficient to imply agreement, taken together, they provide a sufficient basis to plausibly

contextualize the agreement necessary for pleading a [Section] 1 claim.")

At bottom, Defendants' Objection is rooted in the proposition that Judge Tafoya

"stray[ed] from the law by **failing to recognize the impermissibility of inferring**

**anticompetitive conspiracy from parallel conduct** where there is independent

business rationale for the behavior."  (Doc. # 248 at 2) (emphasis added).  Defendants'

argument, however, fails to properly consider Plaintiffs' allegations of a direct

agreement, that is, the fact that Plaintiffs allege that there was **more than** mere parallel

conduct indicative of an agreement among the Sponsors.

Although the Sponsors filed a Motion to Strike sections 90 through 94 of

Plaintiffs' Complaint at an earlier juncture in this case – i.e., those sections of the

Complaint in which Plaintiffs allege that several of the Sponsors' employees (the

"Directors") **explicitly admitted** to Plaintiffs' investigator that the Sponsors had

**expressly agreed among themselves** to keep *au pair* wages at the lowest possible

8

level – Judge Tafoya denied their Motion and Defendants did not appeal her ruling. (Doc. # 235.) As such, in resolving Defendants' Motions to Dismiss, Judge Tafoya properly considered these allegations and took them to be true, and this Court must do the same. Although Judge Tafoya did not discuss these allegations in great detail, the Court finds it worth doing so here, as they amount to what Judge Richard Posner has termed the "the smoking gun in a price-fixing case" – namely, "direct evidence, . . . [in] the form of an admission by an employee of one of the conspirators, that officials of the defendants had met and agreed explicitly on the terms of a conspiracy to raise prices." *See In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010) (Posner, J.); *see also Gen. Chemicals, Inc. v. Exxon Chem. Co., USA*, 625 F.2d 1231, 1233 (5th Cir. 1980) (quotation omitted) (noting that "Rarely, if ever, can a plaintiff point to a 'smoking gun'" of "direct evidence of a specific agreement between defendants" in a Sherman Act case).

Specifically, in the instant case, Plaintiffs allege as follows:

- In a telephone conversation on November 20, 2014, a representative of one Sponsor Defendant, with the title of "Director," admitted that there was an understanding between all of the Sponsors to pay standard *au pairs* the same amount. **The sponsor explained that the government sets a minimum amount, but that all of the Sponsors then agreed among themselves to pay exactly that minimum amount**. This Sponsor thus characterized the "stipend paid to the *au pairs*" as a "fixed expense." The Sponsor explained that the stipend "is

9

where pricing becomes standard across all agencies," and that "there is no difference in prices, as far as the stipend goes, between all of the agencies."

- In a telephone conversation on November 21, 2014, a representative of another Sponsor, also with the title of "Director," admitted that all of the Sponsors agreed to set *au pair* wages at $195.75 per week. Specifically, **the Sponsor acknowledged that each and every Sponsor got together and agreed to pay *au pairs* a stipend of no more than $195.75 a week. As the representative added, the Sponsors "all agreed to pay that amount, no more."**

- In yet another telephone conversation on November 21, 2014, a representative of yet another Sponsor, again with a "Director" title, explained why "the stipend is identical across all companies." The representative admitted that **the Sponsors all agreed to pay that exact same minimum rate.** As the Sponsor noted, "[e]verybody agrees" to pay *au pairs* no more than the minimum weekly wage.

(Doc. # 101, ¶¶ 92–94) (emphasis added).

Defendants argue that the statements quoted above are not sufficiently specific to infer that there was an agreement among the Sponsors, because Plaintiffs (1) did not identify the specific individuals involved in the alleged agreement or the time or place where the agreement was made, and (2) provide "no information to suggest the individuals actually had authority to speak for one, much less all, of sponsor

10

Defendants." (Doc. # 248 at 14).[8]  In support of this proposition, they cite a footnote

from *Twombly,* in which the Supreme Court stated

> Apart from identifying a 7-year span in which the [Section] 1 violations
> were supposed to have occurred . . . **the pleadings mentioned no
> specific time, place, or person involved in the alleged conspiracies**
> . . . . [A] defendant seeking to respond to plaintiffs' **conclusory
> allegations** in the § 1 context would have little idea where to begin.

550 U.S. at 565 n. 10 (emphasis added).  There are a variety of reasons why *Twombly*

offers very little guidance in this case.  First, the above-quoted allegations of direct

evidence in the form of admissions by the Sponsors are well-plead, not "conclusory,"

because they supply "a factual narrative" supporting their legal conclusions, in providing

details like the specific dates of the admissions, that they were made by the Sponsor's

employees, and exact quotes about the admissions themselves.  *See Arapahoe*

*Surgery Ctr., LLC v. Cigna Healthcare, Inc.*, 80 F. Supp. 3d 1257, 1263-64 (D. Colo.

2015) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009) (explaining that "[a]llegations

are deemed 'conclusory' where they state a legal conclusion without supplying a factual

narrative for that conclusion, such that they 'amount to nothing more than a 'formulaic

recitation of the elements of a . . . claim.'  For example, a conclusory allegation [of] a

---

[8] Defendants also assert that the Directors' statements are analogous to the statements made
by the former CEO of Qwest in *Twombly*, to the effect that encroaching on another defendant's
territory "[m]ight be a good way to turn a quick dollar but that doesn't make it right."  550 U.S. at
568 n. 13.  However, *Twombly*'s pleading standard offers little guidance as to the necessary
level of specificity in the pleading of an **explicit agreement**, and in any case, this citation is in
no way supportive of Defendants' argument.  Although Defendants assert that the Supreme
Court held in *Twombly* that "a comment by the chief executive of one of the seven defendant
entities [was] insufficient to adequately plead a plausible conspiracy" (Doc. # 238 at 11), in fact,
the Supreme Court noted that the district court (correctly) did not consider the CEO's
statements because "[t]his was only part of what he reportedly said," and after it took "notice of
the full contents of the published articles referenced in the complaint, from which the truncated
quotations were drawn," the full context effectively neutralized the statements.  *See* 550 U.S. at
568 n. 13.

PLAINTIFFS' RESP. APP.0002906

[Section] 1 claim would state little more than that the defendant joined a conspiracy to unreasonably restrain trade")).  Additionally, *Twombly* offers no guidance regarding the specificity required in a well-pleaded allegation of an **explicit/direct agreement**, because plaintiffs' complaint in that case was based solely on circumstantial evidence of an agreement.  *See Twombly*, 550 U.S. at 564 (noting that "the complaint leaves no doubt that plaintiffs rest their [Section] 1 claim on descriptions of parallel conduct and **not on any independent allegation of actual agreement**").  However, a Tenth Circuit case – *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1084 (10th Cir. 2006) – is particularly instructive in analyzing the instant case, which, as described above, involves well-plead allegations of a direct agreement along with allegations of circumstantial evidence of such an agreement.

In *Champagne Metals v. Ken-Mac Metals, Inc*., 458 F.3d 1073, 1084 (10th Cir. 2006), a smaller, newer entrant to the aluminum distribution business brought suit under Section 1 against seven larger, more established aluminum distributors, alleging that those established distributors had agreed among themselves to exclude new competitors. The Tenth Circuit characterized the following statement as "weak" direct evidence in support of the plaintiff's Section 1 claim:

> [Wiley, an employee of an established aluminum distributor, said that he] felt . . . that **himself and other potential customers [distributors] within the industry** would find that Commonwealth [a mill] selling to Champagne [Metals] [a distributor], they — they would find that as, again, not in the best interest of the industry, **and would cause other distributors** in that area of the country **to source their metals from other mill sources,** and that by developing a relationship with Champagne Metals, we would be putting other business with potential customers [distributors] at risk.

12

PLAINTIFFS' RESP. APP.0002907

*Id.* at 1083.  The Tenth Circuit explained that this evidence was "direct" because it was explicit – that is, the agent of the established distributor claimed that "'himself and other potential customers [distributors] . . . would cause other service centers [distributors] to remove their business from Commonwealth [a mill] if [that mill] continued selling to Champagne Metals [a distributor]."  *Id.*  The court also specifically held that "viewed in the light most favorable to [the distributor], this statement indicates an agreement . . . to take collective action."  *Id.*  (emphasis added).  However, it also explained that this evidence, **standing alone**, was too weak to allow the distributor to withstand summary judgment, because, **"**[f]or example, [the statement] does not indicate **which, if any, of the Established Distributors were among the 'other customers' which were part of the agreement."**  *Id.* at 1084 (emphasis added).

In the instant case, the statements of the Sponsors' Directors are, if anything, far **more** explicit about the existence of an agreement among "all" of the Sponsors than the statement involved in *Champagne Metals*.  In *Champagne Metals*, the plaintiff sued his "day-to-day competitors," but did not sue not every distributor in the market (as such, there was some justifiable doubt about which, "if any" of the "customers" were included in the alleged agreement).  *Id.* at 1077, 1084.  In contrast, Plaintiffs have sued every single Sponsor in the relevant *au pair* market, and they also specifically allege that every single Sponsor was in agreement: one Director admitted that "**every Sponsor got together and agreed** to pay *au pairs* a stipend of no more than $195.75 a week," and another admitted that "**all [Sponsors] agreed** to pay that amount, no more." (Doc. # 101, ¶¶ 92, 93) (emphasis added).  Particularly when such statements are viewed in the

13

light most favorable to Plaintiffs, they are certainly sufficient to indicate there may have been a direct agreement to take collective action among Defendant-Sponsors. *See Champagne Metals*, 458 F.3d at 1083; *see also Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 468–72 (3d Cir. 1998) (finding the plaintiff's testimony that he was told by one of his competitors that "if [he] went into business that [the competitor] and [another competitor] would do anything they could, stop supplies, cut the prices, whatever they had to do they were going to do to keep me out of business" to be direct evidence of concerted action).

At the same time, the Court **does** recognize that this evidence – at least as it is currently pled – is "weak" direct evidence, insofar as it does not provide critical details, such as the individuals with whom the investigator spoke, and whether such individuals (who allegedly identified themselves as "Directors") had the "authority to speak for one, much less all, of sponsor Defendants."  (Doc. # 248 at 14).  *Compare Champagne Metals*, 458 F.3d at 1084 (emphasis added) (stating that statement of employee of a distributor constituted "weak" direct evidence of agreement because, **"**[f]or example, [the statement] does not indicate **which, if any, of the Established Distributors** were among the 'other customers' which were part of the agreement."); *Heartland Surgical Specialty Hosp., LLC v. Midwest Div., Inc.*, 527 F. Supp. 2d 1257, 1301 (D. Kan. 2007) (emphasis added) (citing *Champagne Metals*, 458 F.3d at 1084, and characterizing testimony regarding an alleged agreement between managed care organizations as "weak" direct evidence because the testimony did not "identify **who was included** in the unwritten understanding amongst the 'managed care organizations'").  However, the

14

PLAINTIFFS' RESP. APP.0002909

relative weakness of Plaintiffs' allegation of direct evidence is not the end of the analysis; per *Champagne Metals*, 458 F.3d at 1085, a plaintiff can survive **summary judgment** if he or she presents a combination of direct evidence and circumstantial evidence positing an economically rational theory of an agreement; by definition, then, such a plaintiff can withstand a 12(b)(6) Motion.[9]  *See Champagne Metals*, 458 F.3d at 1085.[10]

In the instant case, in addition to providing evidence of a direct agreement among Sponsors, for purposes of withstanding a motion to dismiss, Plaintiffs also provide circumstantial evidence of an agreement that is at least as strong as that which was presented in *Champagne Metals*.[11]  Specifically, in *Champagne Metals*, the Tenth Circuit first noted that "when a plaintiff makes out a case **based only on circumstantial evidence**," then "the more economically rational a conspiracy is in a given situation, the

---

[9] This is because a plaintiff must withstand a relatively higher burden to survive a defendant's summary judgment motion than a motion to dismiss, especially in the antitrust context, which limits the range of permissible inferences from ambiguous evidence. Specifically, "a plaintiff seeking damages for a violation of [Section] 1 must present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently. . . . [I]n other words, [a plaintiff] must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed [plaintiff]."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986); *accord Abraham v. Intermountain Health Care Inc.*, 461 F.3d 1249, 1262 (10th Cir. 2006).

[10] In *Champagne Metals*, the Tenth Circuit specifically reserved what it called the "more difficult question" of whether, on summary judgment, "when **direct** evidence has been introduced, we must still evaluate the economic rationality of the alleged conspiracy when considering the accompanying **circumstantial** evidence."  458 F.3d at 1085.

[11] In stating this conclusion, the Court emphasizes that it is **not** finding that Plaintiffs have, in fact, presented sufficient evidence to withstand summary judgment (nor could it do so at this juncture); for example, for whatever reason, Plaintiffs may ultimately fail to uncover evidence in discovery to shore up their allegations of a direct agreement, in which case the summary judgment calculus could shift significantly.

PLAINTIFFS' RESP. APP.0002910

broader the range of inferences that can be drawn from the evidence" at summary

judgment. *Id.* at 1084 (emphasis added). The court then found that the plaintiff's theory

that established distributors "acted together to attempt to keep a new, aggressive

entrant out of the market" was economically rational based on fears of new competitors

eroding profit margins or fears of losing market share. *Id.* at 1084–86. Similarly, here,

Judge Tafoya determined that Plaintiffs' circumstantial evidence presented sufficient

circumstantial evidence of a viable economic theory of collusion,[12] citing the following

allegations:

> (1) At least one Sponsor, Cultural Care, has informed prospective *au pairs*, in writing, that the weekly stipend arranged by Cultural Care would be "the same regardless of which *au pair* agency you use." (Am. Comp. at 20; Resp. at 14);
> (2) Sponsors informed *au pairs* and host families that $195.75/week plus room and board is the **only** permitted compensation for *au pairs* (Am. Comp. at 73-74, 76-77);
> (3) As the exclusive entities authorized to recruit, provide training, place and supervise *au pairs* with host families in the United States, Defendants control *au pair* opportunities within the United States (Am. Comp. at 10-11, Resp. at 14);
> (4) The Sponsors' industry structure facilitates collusion as they are a relatively small group, 15 agencies, with 100% market share (Am. Comp. at 32);
> (5) In addition to industry structure, many Sponsors are members of the Alliance for International Education and Cultural Exchange and the International *Au Pair* Association ("IAPA"), individuals from certain Sponsors sit on IAPA's Board, and the featured speaker at a recent IAPA conference published an article arguing for strict maintenance of the fixed $195.75 weekly wage for standard *au pairs*, stating that "host families do

---

[12] Specifically, Judge Tafoya found that "[t]he Amended Complaint alleges a mixture of 'parallel behaviors, details of industry structure, and industry practices, that facilitate collusion.'" (Doc. # 240 at 13) (quoting *In re Text Messaging Litig.*, 630 F.3d 622, 627 (7th Cir. 2010)).

16

each other a disservice when they start to compete with each other (or try to stand out as a 'better family') by offering more pocket money. We don't want *au pairs* shopping for a higher stipend."  (Am. Comp. at 30-31);

(6) The Sponsors uniformly advertise *au pair* wages at an identical amount even though the federal government does not require that *au pairs* only receive minimum wage (Am. Comp. at 13-15, 20, 22-29; Resp. at 15, see also supra);[13]

(7) There are no adjustments to advertised compensation with relation to geographic differences, varying state laws and/or the number of children in the home (Am. Comp. at 29-30; Resp. at 15);

(8) By depressing wages for *au pair* services, the Sponsors reap artificially high profits because if the host family's direct cost for an *au pair* does not increase, then any increase, while still costing the family less than a full-time nanny on the open market, goes to the Sponsor in the form of fees, and keeping the cost down will theoretically increase the number of potential host families (Am. Comp. at 32);

. . . [and][14]

(10) Defendants advertise that their labor costs are set lower than the cost of a comparable child-care worker in the free market. (Am. Comp. at 5, 54, 55; Resp. at 23-24.)  Plaintiffs also contend that in a competitive marketplace, at least some Defendants would either offer higher salaries to potential *au pairs*, thereby attracting more and higher quality *au pairs* and charging higher fees to families, or the Sponsors might have to compete with agencies that place other domestic workers, such as nannies, or react to market forces, including location or higher salaries

---

[13] With regard to this allegation, Defendants assert that Magistrate Judge Tafoya's Recommendation "disregard[ed] the admission that over a third of the Defendant sponsors advertised stipends above $195.75" for so-called non-standard *au pairs* (i.e., *au pairs* with additional training and education in child care), asserting that this amounts to the Court "ignor[ing] inconvenient evidence."  (Doc. # 247 at 3–4.)  To the contrary, Magistrate Judge Tafoya's Recommendation addressed this evidence, and she **specifically explained** that she considered this argument to be "disingenuous" because Plaintiffs, and those they seek to represent in a class action, are "standard" *au pairs,* and "[t]he only instance in which Defendants advertise a higher compensation rate is for non-standard positions. . . . [T]herefore, the only issues relevant to the current inquiry[] pertain to Defendants' practices with regard to standard *au pairs*."  (Doc. # 220 at 14.)

[14] Item number nine in Judge Tafoya's list was Plaintiffs' allegation that three of the Sponsors expressly admitted that they had agreed to keep au pair wages at $195.75 per week.  (Doc. # 240 at 12.)

17

based on unique childcare responsibilities, such as the number of
children.  (Resp. at 23.)  None of these natural consequences have
occurred.

(Doc. # 240 at 11–12.)

Thus, although Defendants' Objection asserts that Judge Tafoya mis-applied

*Twombly* and improperly disregarded the "common-sense and independent business

rationale[s]" for Plaintiffs' allegations of circumstantial evidence, unlike *Twombly*,

Plaintiffs' complaint does not rely exclusively on parallel conduct, but contains well-pled

allegations of a direct agreement among the Sponsors as well circumstantial evidence

to establish a setting that would make such an agreement plausible.  *See Twombly*, 550

U.S. at 557.  Because the Court must take Plaintiffs' factual allegations as true, consider

them as a whole, and view them in the light most favorable to Plaintiffs in evaluating a

motion to dismiss, the Court finds Defendants' arguments unpersuasive at this stage,

particularly in light of Plaintiffs' well-plead allegations of direct agreement.  *See*

*Arapahoe Surgery Ctr., LLC v. Cigna Healthcare, Inc.*, 80 F. Supp. 3d 1257, 1265 (D.

Colo. 2015) (citing *Twombly*, 550 U.S. at 556) (noting that a defendant's arguments

about an alleged conspiracy's remote plausibility "suggest that the alleged conspiracy is

less likely," but because the plaintiffs sufficiently pled an overt agreement, such

arguments "do not render Plaintiffs' allegations implausible, and thus do not mandate

dismissal"); *Heartland Surgical Specialty Hosp., LLC v. Midwest Div., Inc.*, 527 F. Supp.

2d 1257, 1309 (D. Kan. 2007) (citing *Champagne Metals* and finding that plaintiff's

"weak" direct evidence plus circumstantial evidence outlining a plausible economic

theory were sufficient to survive summary judgment).

18

PLAINTIFFS' RESP. APP.0002913

For the foregoing reasons, the Court determines that, although Judge Tafoya did not apply the framework from *Champagne Metals*, she still correctly concluded that Plaintiffs have adequately stated a Section 1 Claim; accordingly, this claim remains.

## 2. Defendants' Status as "Joint Employers" of Plaintiffs

In her Recommendation, Judge Tafoya applied the Tenth Circuit's "economic realities" test[15] to Plaintiffs' allegations and determined that Plaintiffs stated a plausible claim that the Sponsors are "joint employers" of *au pairs* (along with the *au pairs*' host families). (Doc. # 240 at 23.) Specifically, she noted that Plaintiffs make the following allegations: (1) the Sponsors recruit, interview, and hire *au pairs* for host families; (2) the Sponsors effectively dictate *au pair* wages (as described in their antitrust allegations); (3) the Sponsors have a statutory obligation to ensure that *au pairs* are paid a stipend, do not provide more than 10 hours of child care per day or 45 hours of child care in any week, receive a minimum of one and one-half days off per week in addition to one complete weekend off each month, and receive two weeks of paid vacation; (4) the Sponsors exert control over *au pair* working conditions, including providing *au pairs* with training, visiting *au pairs* on a monthly basis (and twice-monthly visits in the first two months of *au pair* placement), making quarterly contact with host

---

[15] This test "includes inquiries into whether the alleged employer has the power to hire and fire employees, supervises and controls employee work schedules or conditions of employment, determines the rate and method of payment, and maintains employment records." *Baker v. Flint Eng'g & Constr. Co.*, 137 F.3d 1436, 1439 (10th Cir. 1998) (citing *Watson v. Graves*, 909 F.2d 1549, 1553 (5th Cir.1990)). In applying the economic realities test, courts consider the following factors: "(1) the degree of control exerted by the alleged employer over the worker; (2) the worker's opportunity for profit or loss; (3) the worker's investment in the business; (4) the permanence of the working relationship; (5) the degree of skill required to perform the work; and (6) the extent to which the work is an integral part of the alleged employer's business." *Baker*, 137 F.3d at 1440.

PLAINTIFFS' RESP. APP.0002914

families, and even providing specific employment tasks;[16] (4) the Sponsors act as the

final arbiters of any disputes between *au pairs* and host families regarding wages and

hours; (5) the Sponsors can terminate *au pairs* without the consent of the host family

and cause their removal from the United States,[17] and a host family cannot terminate an

*au pair* without approval from the Sponsor; (6) the Sponsors draft the contracts

governing the relationships between *au pairs* and their host families; and (7) the

Sponsors provide *au pairs* with health insurance.  (Doc. # 240 at 18–23.)  She also

noted that, "as 'a general rule, determining whether an entity qualifies as an employer is

a fact issue for the jury.'"  (*Id.* at 17, 18) (citing *Bristol v. Bd. of Cnty. Comm'rs of Clear

Creek*, 312 F.3d 1213, 1221 (10th Cir. 2012)).

Defendants contend that Judge Tafoya erred because she essentially "confuse[d]

the host family's status as employer of an *au pair* with the sponsor's role as a visa

sponsor," citing to federal regulations that generally describe the *au pair* program as an

"exchange program," rather than an employment program.  (Doc. # 247 at 7.)  That the

*au pair* program has been generally described an "exchange program" is in no way

probative of the Sponsors' status as a joint employer.  Indeed, the doctrine of "joint

---

[16] Indeed, Defendant Go Au Pair's contract with its *au pairs* sets out an *au pair's* daily employment responsibilities, including "daily maintenance of the children, including meal preparation, doing the children's laundry, transporting the children to various activities, assisting with homework, playing, teaching and caring for the children. [] Minor housekeeping, including but not limited to, washing the children's dishes, tidying up the children's rooms and making their beds, vacuuming and dusting the children's rooms and cleaning their bathrooms. [] pick up after the children in any room in which they have played."  (Doc. # 101 at 66-67.)

[17] Defendant Cultural Care's employment contract provides that the *au pair* must agree that Cultural Care (not the host family) will terminate the *au pair* if it determines that her emotional or physical state makes her unsuitable for providing childcare, **if she gets married or pregnant**, **engages in behavior Cultural Care determines to be unsuitable, or Cultural Care deems her performance unsatisfactory "for whatever reason."**  (Doc. # 101 at 63.)

PLAINTIFFS' RESP. APP.0002915

employment" exists to recognize that an apparently-independent entity can still "employ" an individual for purposes of the FLSA, and Defendants point to no legal authority, either from the joint employment case law or otherwise, indicating that a "visa sponsor" cannot be considered a joint employer.  The Court also determines that Judge Tafoya properly distinguished *Ivanov v. Sunset Pools Mgmt., Inc.*, 567 F. Supp. 2d 189 (D.D.C. 2008).  As such, the Court adopts this aspect of her Recommendation.

### 3. **Plaintiffs' FLSA Claims**

Plaintiffs' FLSA claims are based upon four purported violations of the FLSA: (1) the Sponsors' failure to pay them minimum wage; (2) the Sponsors' failure to compensate them for their mandatory week-long training; (3) the Sponsors' unlawful deduction of room and board from their compensation (including but not limited to during vacations when they are not provided room and board), and (4) the Sponsors' failure to pay them overtime compensation when they worked in excess of 40 hours per week.[18]

### a. **Whether the FLSA Applies to Plaintiffs' Wage Claims**

The Sponsors' objections to Judge Tafoya's Recommendation are that:

1. *Au pair* wages have **never** been governed by the FLSA, but rather, by a so-called separate "DOS formula" – a term of their own invention – that purportedly "governs calculations of the weekly stipend."  (Doc. # 247 at 2.)

---

[18] As Magistrate Judge Tafoya noted, "Defendants do not request dismissal of Plaintiffs' FLSA claims based upon Defendants' failure to pay them for the one-week mandatory training, nor Plaintiffs' claims that room and board is unlawfully deducted from their weekly stipends during vacations."  (Doc. # 240 at 16, n. 7.)

PLAINTIFFS' RESP. APP.0002916

2. "Nothing in the language of the 1997 regulation or the accompanying commentary reflects any intent to depart from th[e] 1995 [DOS] formula." (*Id.* at 4).

3. A DOS Notice issued to Sponsors in 2007, for example, is an indication that the FLSA does not apply to Plaintiffs' claims, because the DOS issued such notices after 1997 that purportedly continued to use "the stipend formula adopted in 1995 to calculate the weekly stipend." (*Id.* at 5).

Specifically, the Sponsors point to the fact the DOS' predecessor, the United States Information Agency (USIA), promulgated an interim rule in 1995 providing that *au pairs* should receive a weekly stipend of "not less than $115 per week," which was calculated by multiplying the federal minimum wage rate at that time by 45 hours (i.e., the maximum number of hours an au pair could work under the regulations) and subtracting $36 per week for room and board. *See* 60 Fed. Reg. 8547-02 at 8443. In 1997, however, the USIA implemented **amended regulations**, which contain **no mention** of a "formula," much less a stipend of "not less than $115 per week." *See* 62 Fed. Reg. 34632 (June 27, 1997). The amended regulations, however, specifically provided that the Sponsors "shall require that *au pair* participants" are "compensated at a weekly rate based upon 45 hours per week and paid in conformance with the requirements of the Fair Labor Standards Act as interpreted and implemented by the United States Department of Labor." *Id.* at 34634 (codified at 22 C.F.R. § 62.31(j)(1)). Additionally, the interim final rule specifically explained that such a change was necessary because "[t]he United States Department of Labor has determined that *au*

22

*pair* participants are covered under the provisions of the Fair Labor Standards Act and therefore must receive federal minimum wage.  The [USIA] is amending this regulation to ensure that there is no future confusion regarding the payment of minimum wage." 62 Fed. Reg. 34632, 34633.

Accordingly, both the plain language of the regulation (explicitly requiring *au pairs* to be "paid in conformance with" the requirements of the FLSA, **"as interpreted and implemented by the United States Department of Labor"** – not "as interpreted and implemented by" the DOS), as well as the DOL's explanation for the change ("to ensure that there is no future confusion regarding payment of the minimum wage), belies both of the Sponsors' assertions that (1) "[t]he 1997 stipend provision simply codifies the [prior DOS] formula on which the previous fixed-sum stipend of $115 was based, while referencing the FLSA in a way that incorporates adjustments in the [wage] rate" and (2) "Nothing in the language of the 1997 regulation or the accompanying commentary reflects any intent to depart from th[e] 1995 formula."  (*See* Doc. # 247 at 4).

Although the Sponsors acknowledge the 1997 amendment to the *au pair* regulations as well as the amendment's explanatory language (that *au pairs* are "covered under the provisions of the Fair Labor Standards Act" and that the amendment was necessary to "ensure that there is no future confusion regarding the payment of minimum wage"), they conclusorily characterize this language as simply "repeat[ing] [the] conclusions that USIA reached in 1995."  (Doc. # 247 at 4.)  In 1995, however, the USIA did not opine broadly regarding whether *au pairs* should be "paid in conformance with the requirements of the Fair Labor Standards Act as interpreted and implemented

PLAINTIFFS' RESP. APP.0002918

by the United States Department of Labor," but rather, concluded that *au pairs* were "employees" of host families. *See* 60 Fed. Reg. at 8550-51 (noting that "the Agency has been obligated to examine the question of whether *au pairs* are employees [of host families] subject to the provisions of the Fair Labor Standards Act. . . . The Department of Labor has specifically advised the Agency that an employment relationship is established").

Moreover, with regard to the DOS' conduct in continuing to issue Notices to Sponsors, the Sponsors have cited no legal authority for the notion that the conduct of an agency like the DOS can somehow trump the plain language of a regulation. Regardless, these Notices in no way support Defendants' theory that an entirely separate, DOS regime governs *au pair* wages. Rather, the 2007 Notice simply advises "[a]ll *Au Pair* sponsors" of an increase to the federal minimum wage, correctly notes that "[t]he weekly stipends for the standard *Au Pair* Program and EduCare Program **are directly connected to the federal minimum wage**," and indicates that *au pair* stipends, given this increase in the minimum wage, will be $195.75 per week as of July 24, 2009. (Doc. # 127-1 at 2) (emphasis added).[19] As such, the Court agrees with Judge Tafoya's conclusion that the FLSA applies to Plaintiffs' claims.

---

[19] Defendants' arguments that the terms of the so-called "DOS formula" are "irreconcilable" with the FLSA are also unavailing. (Doc. # 187 at 3.) Specifically, the Sponsors note that the FLSA has no cap on weekly hours, but that *au pairs* are only permitted to work 45 hours a week; this presents no conflict whatsoever, and simply indicates that the *au pair* regulations are more restrictive in terms of work hours than the FLSA – **not that the FLSA does not apply.** They also cite a 1997 Opinion Letter issued by the DOL, in which it stated that it did not have the authority to **lower** the amount of the stipend if an *au pair* works fewer than 45 hours. Again, this says nothing about whether the *au pair* stipend must conform with the FLSA generally, because paying an *au pair* for 45 hours of week when that *au pair* actually worked fewer hours would result in a higher wage.

PLAINTIFFS' RESP. APP.0002919

### b.  Whether Sponsors May Lawfully Deduct Room and Board

The Sponsors first argue that the Recommendation's determination that the

Sponsors may not deduct the costs for room and board against *au pairs*' wages is

erroneous because it is "premised on the incorrect conclusion that the FLSA, rather

than the DOS's stipend formula, governs credit of the stipend."  (Doc. # 247 at 6.)  This

argument necessarily fails because, as discussed above, the Court believes that the

FLSA does, in fact, apply to Plaintiffs' claims here.

Judge Tafoya's Recommendation also noted that pursuant to 29 C.F.R.

§ 531.27(a), an employer may include the reasonable cost or fair value of furnishing an

employee board, lodging or other facilities in the employee's wages.  However, pursuant

to 29 C.F.R. § 531.30,[20] an employer may not credit the cost of facilities toward an

employee's wages if the employer is required by law to provide the same.  22 C.F.R. §

62.31(e)(6) provides that "Sponsors shall secure . . . a host family placement for each

participant.  Sponsors shall not . . . place the *au pair* with a family who cannot provide

the *au pair* with a suitable private bedroom.'"  Additionally, the DOL issued a Wage and

Hour Opinion Letter in 1997, cited by Judge Tafoya, stating that with regard to the hiring

of an employee on an *au pair* visa, "an employer may not take credit for facilities which

the employer is required by law or regulation to provide," and specifically noting that a

host family could not deduct the use of the family automobile to meet the minimum

---

[20] 29 C.F.R. § 531.30 provides that "The reasonable cost of board, lodging, or other facilities
may be considered as part of the wage paid an employee only where customarily 'furnished' to
the employee.  **Not only must the employee receive the benefits of the facility** for which he
is charged, **but it is essential that his [or her] acceptance of the facility be voluntary and
uncoerced**."  (Emphasis added).

PLAINTIFFS' RESP. APP.0002920

wage requirement.  1997 WL 998029.  Judge Tafoya concluded that the Sponsors and host families were accordingly prohibited from deducting the cost of room and board because

> There is no question that pursuant to 22 C.F.R. § 62.31(e)(6) host families are required to provide room and board to their *au pairs*.  Defendants do not cite to any FLSA provision providing an exception from 29 C.F.R. § 531.30's requirement for the *au pair* program that otherwise prohibits an employer from crediting the cost of room and board from an employee's wages if the employer is required by law to provide the same.

(Doc. # 240 at 25.)

Defendants' Objection obliquely addresses Judge Tafoya's argument about Defendant's failure to cite an exception to 29 C.F.R. § 531.30, in citing generalized language about the benefits to the *au pair* from the immersion of the home life of the host family, and asserting that "provision of room and board, thus, benefits **both** the host family and the *au pair*."  (Doc. # 247 at 7.)  The Sponsors also (unironically) cite another regulation interpreting the FLSA, which provides that acceptance of lodging must be "voluntary and uncoerced," but that "[i]n the case of lodging furnished to live-in domestic service employees, the Administrator will accept a credit taken by the employer of up to seven and one-half times the statutory minimum hourly wage for each week lodging is furnished."  29 C.F.R. § 552.100(a), (c).  These arguments represent, at best, red herrings, as neither the statutory provisions cited nor the Sponsors' generalized assertions that *au pairs* also benefit from housing trump the far more specific provision at 29 C.F.R. § 531.30, nor do they indicate, in any way, that the *au pair* program is exempt from 29 C.F.R. § 531.30.  Accordingly, Judge Tafoya did not err

PLAINTIFFS' RESP. APP.0002921

in determining that Plaintiffs have stated a plausible claim that the Sponsors' unlawfully deducted the cost of room and board from their wages.

### c. Whether Sponsors Must Pay Overtime Compensation Under the FLSA

Defendants' Objections did not challenge Judge Tafoya's analysis regarding Plaintiffs' entitlement to federal overtime provisions.  (*See* Doc. # 247.)  Nevertheless, the Court agrees with Judge Tafoya's conclusion that Plaintiffs have stated a viable claim for overtime for any work performed after January 1, 2015, due to a new DOL regulation, recently upheld by the District of Columbia Circuit Court of Appeals,[21] providing that "[T]hird party employers of employees engaged in live-in domestic service employment [] may not avail themselves of the overtime exemption provided by [29 U.S.C. § 213(b)(21)], even if the employee is jointly employed by the individual or member of the family or household using the services."  29 C.F.R. § 552.109(c).

### 4. Plaintiffs' State Wage Law Claims

### a. Preemption

Defendants assert that Plaintiffs' state wage law claims are preempted by virtue of the "regulatory framework designed by USIA, which embodies the government's policy judgments regarding *au pair* compensation.  USIA expressly recognized 'the programmatic need for a uniform wage' and adopted a compensation structure that would 'ensure that all au pair participants receive uniform wage compensation' . . . Application of state minimum wage laws presents an obstacle to the accomplishment of this objective because it eliminates any uniformity in the wage calculation," as some

---

[21] *Home Care Ass'n of Am. v. Weil*, 799 F.3d 1084 (D.C.  Cir. 2015).

PLAINTIFFS' RESP. APP.0002922

states have higher minimum wages than those required by the FLSA.  (Doc. # 247 at

10) (citing 60 Fed. Reg. at 8551; 49 Fed. Reg. at 64298.)  The Sponsors also assert

that the "regulatory framework" establishing a uniform wage "reflects a careful balance

of policy objectives concerning the government's interest in furthering cultural

exchange, affording adequate protection to *au pair* participants and their American host

programs, and safeguarding the continuing viability of *au pair* program."  (*Id.* at 9–10.)

Although Defendants have slightly recast their arguments from those that appeared

before Judge Tafoya (which focused on the immigration aspects of the *au pair*

program),[22] the Court nevertheless agrees that Judge Tafoya properly decided that

state wage laws are not preempted.  First, as has already been discussed, the

regulations implemented by the USIA expressly provided that the *au pair* program **must**

conform with the FLSA, **without exception**; the FLSA, in turn, explicitly provides that, if

a state sets a higher minimum wage than that mandated by the FLSA, employees within

that state are entitled to receive that higher wage.  *See*  22 C.F.R. § 62.31(j)(1); 29

U.S.C. § 218(a).  Additionally, the Court agrees with Judge Tafoya's analysis of the

Sponsors' arguments regarding uniformity in wage calculation:

> Defendants cite to 60 Fed. Reg. 8547 (1995) as indicating that the federal
> government "identified a programmatic need for a uniform wage."
> Defendants' characterization of this statement is misleading. In the
> Supplementary Information section preceding the Final Rule, the USIA
> discussed the appropriate amount of credit a host family could use with
> regard to the room and board provided to an au pair and considered the
> options of crediting actual cost or a fixed cost. *Id.* at 8551.  The USIA
> weighed the preference for crediting actual cost against the need for the

---

[22] To the extent that the Sponsors are presenting "new" arguments before the Court in their
Objection, "issues raised for the first time in objections to the magistrate judge's
recommendation are deemed waived."  *Marshall v. Chater*, 75 F.3d 1421, 1426 (10th Cir. 1996).

PLAINTIFFS' RESP. APP.0002923

credit to be uniform so that host families would not have to maintain
individualized records.  *Id.*

(Doc. # 240 at 30–31 n. 10.)  Accordingly, the Court agrees that Plaintiffs' claims under

state wage laws are not, in fact, preempted by some kind of amorphous "federal

framework."

### b. Plaintiffs' Claims Under Colorado Minimum Wage Law

Colorado Minimum Wage Order Number 31 provides that "domestic employees

employed by households or family members to perform duties in private residences,"

are not entitled to overtime compensation under Colorado state law ("Domestic

Employee Exemption").  7 Colo. Code Regs. § 1103-1:5.  The "preamble" to the

Minimum Wage Order, however, provides as follows:

> [I]f either of the following two situations applies to an employee, then the
> employee is entitled to the $8.31 state minimum wage . . .
>
> [1] The employee is covered by the minimum wage provisions of Colorado
> Minimum Wage Order Number 32.2.
> [2] **The employee is covered by the minimum wage provisions of the
> Fair Labor Standards Act.**
>
> **Some restrictions and exemptions may apply; contact the Colorado
> Division of Labor for additional information.**

7 Colo. Code Regs. § T.1100 (emphasis added).  Noting that *au pairs* are covered by

the FLSA's minimum wage provisions, see 22 C.F.R. § 62.31(j)(1), Judge Tafoya

concluded that Plaintiffs fall within the second of the two categories enumerated above,

and thus, that the Domestic Employees Exemption did not apply.  (Doc. # 240 at 33.)

Defendants, however, note that the last sentence of the preamble states that "[s]ome

restrictions and **exemptions <u>may</u> apply**."  (Doc. # 247 at 11) (emphasis added).  Judge

PLAINTIFFS' RESP. APP.0002924

Tafoya apparently did not consider this language, and the existing briefing on this matter does not allow the Court to make a determination at this juncture as to whether *au pairs* do, in fact, qualify for the Domestic Employees Exemption. Accordingly, the Court neither adopts nor rejects Judge Tafoya's determination on this issue, and Defendants' Motion to Dismiss is denied without prejudice with respect to Plaintiffs' wage claims under Colorado state law.

### c. Plaintiffs' Claims Under New York Minimum Wage Law

Defendants merely reiterate their arguments about how a "Fact Sheet for Employers," disseminated by the New York Department of Labor, indicated that *au pairs* are exempted from New York state labor law coverage. Specifically, that "Fact Sheet" stated that that New York State labor laws "cover ALL workers. Their Immigration status does not matter," but that there was one exception, namely, "*au pairs* hired through the federal *au pair* program and admitted into he United States under a J-1 visa . . . [who] are subject to special federal rules." (Doc. # 127-4 at 4; Doc. # 247 at 12.) Judge Tafoya's analysis on this point is well-taken:

> The Fact Sheet upon which Defendants rely does not cite to any state law that exempts au pairs from minimum wage and/or overtime exemptions, nor do Defendants. The Fact Sheet is most analogous to an opinion letter and therefore, may be entitled to a certain amount of deference with regard to the interpretation of New York's wage and hour laws, but it does not displace or supersede a court's own interpretation and judgment. *See Salazar v. Butterball, LLC*, No. 08-cv-02071-MSK-CBS, 2009 WL 6048979, at *8 (D. Colo. Dec. 3, 2009) (finding that [DOL's] opinion letters are entitled to deference, but the level of deference accorded depends upon the "thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.") (citing *McGraw v. Barnhart*, 450 F.3d 493, 501 (10th Cir. 2006) ("Under *Skidmore*, the degree of deference given informal agency interpretations

30

PLAINTIFFS' RESP. APP.0002925

will vary with circumstances, and courts have looked to the degree of the
agency's care, its consistency, formality, and relative expertness, and to
the persuasiveness of the agency's position.")). While the New York
DOL's opinion with regard to whether its state labor laws applies to au
pairs may be persuasive depending upon the above mentioned factors, it
is not determinative of whether Plaintiffs have stated a viable claim. As
that is the only authority upon which Defendants have relied, the court
finds their request for dismissal should be denied.

(Doc. # 240 at 33–34.)  Accordingly, the Court will adopt the Recommendation

with respect to New York wage laws.[23]

5.  **Plaintiffs' Fraud Claims**

Defendants claim that Plaintiffs fail to plead fraud with the particularity required

by Rule 9(b) of the Colorado Rules of Civil Procedure, in alleging that the Sponsors

falsely informed them, other *au pairs*, and host families that $195.75 was a "set" or

"fixed" salary and that they could not receive higher wages.  Specifically, they assert

that Judge Tafoya "simply concluded" that Plaintiffs met their burden "without analysis."

(Doc. # 247 at 13.)  To the contrary, Judge Tafoya specifically noted that Plaintiffs

provided the following specific examples of fraudulent statements,[24] including the fact

that

Plaintiffs . . . allege that through a blog entry on its website, Defendant
InterExchange informed *au pairs* that if they received offers for higher
salaries, they should consider such offers bogus and/or the product of a

---

[23] The Sponsors did not object to Judge Tafoya's recommendations regarding the applicability
of the state wage laws of Pennsylvania or California.  (*See* Doc. # 47.)

[24] The Sponsors note that Judge Tafoya improperly referenced Plaintiffs' assertion, made in
their Response to Defendants' Motion to Dismiss, that Defendant InterExchange's website
informed *au pairs* that they can make "**almost** $10,000 per year," in considering whether
Plaintiffs pled their fraud allegations with sufficient particularity, as this allegation did not appear
in Plaintiff's Complaint.  (Doc. # 247 at 14 n. 5.)  The Court reviewed the Complaint and
determined that this allegation was not, in fact, included (see Doc. # 101); as such, the Court did
not consider that particular assertion here.

31

scam. . . . Defendant InterExchange informed *au pairs* through another blog post that the salary of $195.75 per week was the product of a "strict equation." Plaintiffs allege that Defendant AIFS has informed *au pairs* that if they received more than $195.75/week, they could be subject to deportation and that its website listed the weekly stipend as simply $195.75 and instructed host families that they "needed to 'pay th[at] published fee.'" Similarly, Plaintiffs allege that Defendant American Cultural Exchange LLC d/b/a GoAuPair created a handbook entitled, "GoAuPair *Au Pair* Household Handbook," that instructs GoAuPair host families that au pair wages are set by the federal government at $195.75. . . . **Finally, Defendant Cultural Care again argues (alone) that the $195.75 is the maximum amount *au pairs* are permitted to receive.** As an alternative argument, it argues that if its position in that regard is inaccurate, "Plaintiffs have failed to plead facts sufficient to show that Cultural Care was aware of this . . . . and therefore acted to mislead *au pairs*." **The fact that $195.75/week does not represent a fixed wage is well established. With regard to its alternative argument, Defendant Cultural Care has essentially conceded they informed *au pairs* that $195.75 was a fixed rate, which aligns with Plaintiffs' allegations.**

(Doc. # 240 at 36–37) (internal citations omitted, emphasis added). The Court agrees with Judge Tafoya that these allegations are sufficient to satisfy Rule 9(b). Additionally, even though Defendants' objection to Judge Tafoya's analysis of Plaintiffs' fraud claims was limited to the claims' purported lack of particularity, the Court notes that it is undisputed that the $195.75 represented, at best, a "wage floor," such that families **could** pay *au pairs* more if they wished[25] – but Plaintiffs' allegations indicate that the Sponsors led both *au pairs* and host families to believe otherwise. As such, Plaintiffs' fraud claims will not be dismissed.

---

[25] Of course, Plaintiffs also allege that the Sponsors should have ensured the host families did, **in fact**, pay more than $195.75 per week, because they allege that the *au pairs* were entitled to additional wages under the FLSA and/or state wage law.

32

6. **Plaintiffs' Fiduciary Duty Claims**

The Sponsors' arguments regarding Magistrate Judge Tafoya's conclusions about Plaintiffs' fiduciary duty claim are cursory, conclusory, and difficult to follow, but as far as the Court can surmise from an examination of the Defendants' Motions to Dismiss, the Sponsors apparently are attempting to argue that Judge Tafoya erred in finding that Plaintiffs stated a plausible claim for breach of fiduciary duty because she entirely "failed to address" issues relating to contracts between the *au pairs* and the Sponsors and how such contracts essentially preclude a fiduciary duty claim. (Doc. # 147 at 14.) In fact, she discussed these issues in depth, including an extensive analysis of *DerKevorkian v. Lionbridge Techs., Inc.*, 316 F. App'x 727 (10th Cir. 2008), a case which specifically addressed a breach of fiduciary duty under Colorado law in the context of an employment contract and employer-employee relationship, and noted that "[a] confidential relationship exists when one party justifiably reposes confidence in another such that the parties drop their guard and assume that each side is acting fairly. Colorado does not recognize a separate tort founded upon breach of a confidential relationship. However, a confidential relationship may serve as an indication of fiduciary status." *Id.* at 737.

Defendants ignore Judge Tafoya's treatment of *DerKevorkian*, much less attempt to distinguish it, and the Court agrees with her conclusion that, taking Plaintiffs' allegations as true, they present "a stronger basis to find a confidential relationship than that described in *DerKevorkian*." (Doc. # 240 at 40.) As such, the Court agrees with

33

Judge Tafoya's analysis and adopts her Recommendation as to Plaintiffs' Fiduciary Duty Claims.

### 7. **Plaintiffs' Quasi-Contract and Unjust Enrichment Claims**

Finally, Defendants note that the Recommendation properly dismissed Plaintiffs' breach of contract claim because "Plaintiffs do not allege that Defendants violated a provision within their respective contracts with the *au pairs*." (Doc. # 240 at 41–42.) Nevertheless, they object that she did not also dismiss Plaintiffs' quasi-contract or unjust enrichment claims. (Doc. # 247 at 15.) However, she correctly noted that "Defendants have not requested dismissal" of either of those claims in any of their Motions to Dismiss, and Defendants do not disagree with this conclusion. (*Id.* at 42.) "Issues raised for the first time in objections to the magistrate judge's recommendation are deemed waived." *Marshall v. Chater*, 75 F.3d 1421, 1426 (10th Cir. 1996). Accordingly, both of these claims will stand.

### III. <u>CONCLUSION</u>

The Court has conducted a full *de novo* review of this matter, including reviewing all relevant pleadings, the Recommendation, Defendants' Objections thereto, and the Plaintiffs' Response to Defendants' Objections. Based on this *de novo* review, the Court concludes that Judge Tafoya's thorough and thoughtful Recommendation is correct and is not called into question by Defendants' Objections, except as discussed above.

Accordingly, it is hereby ORDERED that Defendants' Objections (Doc. ## 247, 248) are OVERRULED IN PART. It is

34

FURTHER ORDERED that the Recommendation of United States Magistrate Judge Kathleen Tafoya (Doc. # 240) is ACCEPTED IN PART AND REJECTED IN PART; specifically, the Court adopts Judge Tafoya's conclusions regarding the dismissal of Plaintiffs' claim under the Utah Minimum Wage Act and Plaintiffs' claim for breach of contract; neither accepts nor rejects Judge Tafoya's conclusions regarding Plaintiffs' Colorado wage claim; and adopts her conclusions regarding the remainder of Plaintiffs' claims.  Accordingly, it is

FURTHER ORDERED that Defendants' Motions to Dismiss (Doc. ## 127, 130, 131, and 136) are GRANTED IN PART (with respect to Plaintiffs' claim under the Utah Minimum Wage Act and Plaintiffs' claim for breach of contract), denied without prejudice with respect to the Colorado wage claim, and denied as to the remainder.  It is

FURTHER ORDERED that the Joint Motion by Certain Defendants to Dismiss the First Amended Complaint (Doc. # 135) is DENIED in its entirety.  Finally, it is

FURTHER ORDERED that Defendants' Unopposed Motion for Oral Argument Regarding Recommendation of United States Magistrate Judge (Doc. # 257) is hereby DENIED AS MOOT.

Dated: March 31, 2016

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge

35

Case No. 1:14-cv-03074-CMA-KMT   Document 959-18   filed 03/30/18   USDC Colorado   pg
107 of 181

# Exhibit 323

PLAINTIFFS' RESP. APP.0002931

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Magistrate Judge Kathleen M. Tafoya**

Civil Action No. 14–cv–03074–CMA–KMT

JOHANA PAOLA BELTRAN,
LUSAPHO HLATSHANENI,
BEAUDETTE DEETLEFS,
DAYANNA PAOLA CARDENAS CAICEDO,
ALEXANDRA IVETTE GONZALEZ,
SARAH CAROLINA AZUELA RASCON,
LAURA MEJIA JIMENEZ,
JULIANE HARNING,
NICOLE MAPLEDORAM, and those similarly situated,

      Plaintiffs,

v.

INTEREXCHANGE, INC,
USAUPAIR, INC.,
GREAT AUPAIR, LLC,
EXPERT GROUP INTERNATIONAL INC., d/b/a Expert AuPair,
EURAUPAIR INTERCULTURAL CHILD CARE PROGRAMS,
CULTURAL HOMSTAY INTERNATIONAL,
CULTURAL CARE, INC. d/b/a Cultural Care Au Pair,
AUPAIRCARE INC.,
AU PAIR INTERNATIONAL, INC.,
APF GLOBAL EXCHANGE, NFP, d/b/a AuPair Foundation,
AMERICAN INSTITUTE FOR FOREIGN STUDY d/b/a Au Pair in America,
AMERICAN CULTURAL EXCHANGE, LLC, d/b/a GoAuPair,
GOAUPAIR OPERATIONS, LLC, d/b/a GoAuPair,
AGENT AU PAIR,
A.P.EX. AMERICAN PROFESSIONAL EXCHANGE, LLC d/b/a/ ProAuPair, and
20/20 CARE EXCHANGE, INC. d/b/a The International Au Pair Exchange,

      Defendants.

---

## ORDER

---

PLAINTIFFS' RESP. APP.0002932

This matter is before the court on "Defendants' Motion to Exclude Expert Testimony of William Kerr Pursuant to F.R.E. 702" [Doc. No. 606]. *"Plaintiffs' Opposition to Defendants' Daubert Motion as to Class Certification Opinions"* [Doc. No. 650] was filed on August 8, 2017 and Defendants' Reply in Support of Defendants' Motion to Exclude Expert Testimony of William Kerr Pursuant to F.R.E. 702 (ECF No. 606)" [Doc. No. 666] was filed on August 21, 2017. A hearing was conducted on January 9, 2018.

A detailed and lengthy motion for Fed. R. Civ. P. 23 class certification has been filed by the Plaintiffs.[1] [Doc. No. 562/559.] Defendants vigorously oppose such certification. The class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Califano v. Yamasaki,* 442 U.S. 682, 700–701 (1979). To come within the exception, a party seeking to maintain a class action "must affirmatively demonstrate his compliance" with Rule 23. *Wal–Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 350 (2011). The Rule "does not set forth a mere pleading standard." *Id.* Rather, a party must not only be prepared to prove that there are, in fact, sufficiently numerous parties, common questions of law or fact, typicality of claims or defenses, and adequacy of representation, as required by Rule 23(a), but also satisfy through evidentiary proof at least one of the provisions of Rule 23(b). Rule 23(b)(3) requires a court to find that "the questions of law or fact common to class members predominate over any questions affecting only individual members." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). As stated by the dissent in *Comcast,* "it remains the 'black letter rule' that a class may obtain certification under Rule 23(b)(3) when liability questions common to the class predominate over damages questions unique to class members." *Id.* at 42–43.

---

[1] Preliminary certification of an FLSA collective action was entered on June 9, 2017. [Doc. No. 569.]

2

PLAINTIFFS' RESP. APP.0002933

In attempting to meet the burden to show treatment as a class action is justified in this case, the plaintiffs presented two expert reports from William O. Kerr. (See "Expert Report of William O. Kerr" ("Kerr Rpt.") [Doc. No. 560-65] and "Rebuttal Expert Report of William O. Kerr" ("Kerr Rebut. Rpt.") [Doc. No. 560-66].) As it relates to Dr. Kerr's reports and expert testimony, the District Court will be required to consider the common impact on the members of the proposed class from the complained-of activities. The activity is allegedly conspiring to fix the stipend paid to au pairs at an artificially and illegally low $195.75 per week. Dr. Kerr, an economist, presents two models which address the harm (or damages) to the au pair class(es) caused by Defendants' alleged anti-competitive behavior. Both models utilize the so-called "but-for" comparative analysis, meaning that the expert looks to the economic circumstances that would likely have transpired absent the wrongdoing by Defendants.

Dr. Kerr concludes that "but-for the actions of the defendants, standard au pairs would have been paid *at least* the legally required amount of weekly stipend."[2] (Kerr Rebut. Rpt. at 11, ¶ 20, emphasis added.) Given this conclusion, Dr. Kerr presents the court with a model for calculation of damages for the proposed classes at the floor – to wit: *at least* the legally required amount of stipend pursuant to federal and state minimum wage laws – and another model applicable to the competitive ceiling – to wit: comparing the au pair class in this case against benchmark groups of workers operating in the free market of the United States, which includes within it, the market's legislative restrictions such as minimum wage laws.

---

[2] What dollar figure actually represents the "legally required amount" is also in dispute. *See* Second Amended Complaint [Doc. No. 395], Count VIII, violations of the Fair Labor Standards Act.

3

Defendants assert Dr. Kerr's opinions should be disallowed because he lacks any workable methodology for calculating damages on a class-wide basis. As a preliminary challenge, Defendants claim that a survey Dr. Kerr relied upon in determining that all the au pair classes nearly uniformly received $195.75 per week as a stipend did not comply with professional standards that govern survey research. Second, Defendants claim Dr. Kerr's "Wage and Hour Law Compliance Model" for computing damages for the classes is a mere restatement of Plaintiffs' legal position concerning labor law violations and is therefore inapplicable to an antitrust class. Third, Defendants claim Dr. Kerr's "Price Competition Model" lacks a reliable basis for calculating damages because the benchmark comparative groups chosen by Dr. Kerr are flawed and the Price Competition Model does not live up to the standards set by *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) for the admissibility of expert opinion testimony. Defendants therefore urge that Dr. Kerr's reports and testimony should be stricken and not considered for any purpose in the court's determination regarding Rule 23 class certification.

### A. Dr. Kerr's Survey Results

Commonality requires the plaintiffs to demonstrate that the class members have suffered the same injury. *Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 157 (1982). This does not mean merely that they have all suffered a violation of the same provision of law. *Dukes*, 564 U.S. at 349–50. In considering the applicability of class treatment, the District Court's analysis will likely entail "overlap with the merits of the plaintiff[s'] underlying claim[s]." *Id.* That is so because the "'class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'" *Falcon*, 457 U.S. at 160

4

(internal quotations omitted); *Comcast,* 569 U.S. at 33-34. Dr. Kerr opines that the proposed

classes suffered common harm from the complained-of actions of Defendant because the au pairs

"were paid for employment at amounts below what they would have been paid had Defendants'

complied with the law[.]" (Kerr Rebut. Rpt. at p. 5, ¶ 4.)

Obviously, the amount of money the putative class members were paid is the first step in

any analysis which seeks to prove that the payment was insufficient. To determine that amount,

Dr. Kerr reviewed the extensive evidence of Defendants' business practices, which show that

every one of the defendants consistently represented the stipend as "fixed," "set," or that it

simply "is" $195.75. (Kerr Rep. at 16.) The evidence relied upon by Dr. Kerr included:

contemporaneous business records of the actual stipend amount, including statements

Defendants made about the stipend in their marketing materials, policies and guidelines (Kerr.

Rebut. Rpt. at ¶ 14); Defendants' standard form contracts, which attempt to legally bind the *au

pairs* to the represented stipend (*id.* at 17-18, 20); Defendants' own ordinary-course surveys,

showing that host families uniformly adhere to Defendants' fixed wages (*id.* at 22); and the

parties' depositions, which also support the proposition that au pairs were paid a fixed wage (*id.*

at 17, 19-22). (*See also* Kerr Rep. ¶¶ 39-55 & Exs. 7-10.)

Dr. Kerr also gathered information to support his findings from sponsor announcements

to au pair candidates and potential host families, sponsor organization marketing material

directed toward host families, a declaration from a host parent, deposition testimony of a foreign

au pair agency director who worked with U.S. sponsors to place au pairs, monthly contact reports

administered by certain sponsors and audit reports submitted to the Department of State. (Kerr

Rebut. Rpt. at 7-8.) In paragraph 18, *id.*, Kerr lists at least five other sources evidencing that au

PLAINTIFFS' RESP. APP.0002936

pairs were paid $195.75 per week by host families at the direction of all the sponsor

organizations. All those sources—direct and indirect, contemporaneous and retrospective—

show the same thing. Au pairs' wages were consistently fixed at or very near $195.75 per week.

*Id.*; *see also* Rule 23 Mot. at 33 n.43 (Rodr. Decl. Ex. 30); Kerr Rep. ¶ 51. Into this broad mix of

evidentiary sources comes the survey about which Defendants complain.

      Dr. Kerr's survey was provided to every host family for which Defendants provided an

email. There was "no sampling involved at all." (Resp. at 10.) A total of 8,806 families

responded, of which 4,583 both (1) concerned an au pair within one of the alleged classes and (2)

contained a specific response to the question "what was the typical weekly stipend amount

paid?" (*Id.*) The only other question on the survey was the year the au pair worked and the type

of au pair the host family employed. While the numbers of responses were in the thousands, as a

percentage of the whole, the number of responding host families represented only an 18%

response rate from the total number of surveys sent out. (Mot. at 13.)

      If the survey were the only evidence supporting the base finding that au pairs were paid

$195.75 per week, such a low response rate would have to be carefully considered, even though

it reached a very broad spectrum of host families in the au pair group.[3] But such is not the case

here. The survey in question was merely some confirmation of all the other voluminous

evidence supporting the conclusion that putative class member au pairs were almost uniformly

paid $195.75 per week as a stipend by the host families.

      The court finds that even if the survey and its results were discounted entirely, Dr. Kerr's

conclusion that "all, or a substantial majority of, au pairs were offered and paid a weekly stipend

---

[3] The responses covered every Defendant and almost every state, spanning a period of 10 years.
(Resp. at 10.)

PLAINTIFFS' RESP. APP.0002937

of approximately $195.75" (Kerr Rpt. ¶ 39) is amply supported by the other overwhelming evidence he considered. For class certification purposes, Dr. Kerr's expert opinion that the record demonstrates commonality with regard to the weekly stipend amount is based on sufficient facts, data and testimony to render it reliable. *See* Fed. R. Evid. 702.

### B.    *Wage and Hour Law Compliance Model*

The general principles governing antitrust damages are settled. A plaintiff must prove there is a causal connection between an antitrust violation and an injury sufficient to establish the violation as a substantial factor in the occurrence of damage. *Sharp v. United Airlines, Inc.*, 967 F.2d 404, 407 (10th Cir. 1992). In other words, there must be some element of actual damages caused by the defendant's violation of the antitrust laws. *Eleven Line, Inc. v. N. Texas State Soccer Ass'n, Inc.*, 213 F.3d 198, 206 (5th Cir. 2000). If some damages attributable to the antitrust activities are shown, a more relaxed burden of proof applies for the amount of damages than would justify an award in other civil cases. *Id.*

Relying upon the Supreme Court reasoning in *Comcast Corp. v. Behrend*, Defendants argue that when a plaintiff asserts an antitrust injury, presenting a damages model pertinent to a wage law claim is not adequate to support commonality of damages in an antitrust class certification. Defendants broadly advance the holding of *Comcast* as "Plaintiff cannot utilize a damages theory for one claim (i.e. labor) to obtain certification for another (i.e. antitrust)." Reply at 3. This court disagrees with Defendants' reading of *Comcast*.

In *Comcast*, the Respondents[4] claimed that they, and other Comcast subscribers in the Philadelphia area, were harmed by Comcast's behavior of 'clustering' which they claimed

---

[4] Respondents were the named plaintiffs in the underlying class-action antitrust suit.

7

PLAINTIFFS' RESP. APP.0002938

resulted in four different kinds of antitrust injury which lessened area competition and led to

supra-competitive prices.  The Respondents' theories of antitrust injury were that: (1) Comcast's

clustering made it profitable for Comcast to withhold local sports programming from its

competitors, resulting in decreased market penetration by direct broadcast satellite providers; (2)

Comcast's clustering reduced the level of competition from "overbuilders," companies that build

competing cable networks in areas where an incumbent cable company already operates; (3)

Comcast's clustering reduced the level of "benchmark" competition on which cable customers

could rely to compare prices, and; (4) Comcast's clustering increased its bargaining power

relative to other content providers.  Each of these forms of impact, Respondents alleged,

increased Comcast's cable subscription rates throughout the Philadelphia area.  *Comcast*, 569

U.S. at 31.  The District Court accepted only one of Respondent's theories of antitrust injury −

that Comcast's clustering intentionally lessened competition from "overbuilders."  *Id.*

Accordingly, in its certification order, the District Court limited Respondents' "proof of antitrust

impact" to "the theory that Comcast engaged in anticompetitive clustering conduct, the effect of

which was to deter the entry of overbuilders in the Philadelphia DMA."  *Id.*  Given that ruling, if

the Respondents were to prevail on their claim, the Supreme Court held they would be entitled

only to damages resulting from reduced overbuilder competition, since that is the only theory of

antitrust impact accepted for class-action treatment by the District Court, stating,

> It follows that a model purporting to serve as evidence of damages in this class
> action must measure only those damages attributable to that theory. If the model
> does not even attempt to do that, it cannot possibly establish that damages are
> susceptible of measurement across the entire class for purposes of Rule 23(b)(3).

*Id.* at 35.  Simply put, the Supreme Court held

8

> at the class-certification stage (as at trial), any model supporting a "plaintiff's damages case must be consistent with its liability case, particularly with respect to the alleged anticompetitive effect of the violation."

*Id*. (quoting ABA Section of Antitrust Law, Proving Antitrust Damages: Legal and Economic Issues 57, 62 (2d ed. 2010).

Unfortunately for Respondents in *Comcast*, their expert put forth a model for damages which considered all four liability injury theories together, without a provision for calculating injury arising just from the overbuilders behavior. In fact, at a hearing before the lower court, Respondents' expert admitted that his model calculated damages resulting from "the alleged anticompetitive conduct as a whole" and did not attribute damages to any one particular theory of anticompetitive impact. *Id*. at 36-37. The court found it improper to consider a methodology in support of commonality that identifies damages that are not the result of the specific antitrust damage alleged. *Id*. at 37-38.

In this case, there is one theory of antitrust misconduct – that Defendants conspired to fix the weekly stipend payable to au pairs by their host family at $195.75. So far this is similar to *Comcast*. There, the antitrust misconduct was alleged to be 'clustering.' In *Comcast*, the Respondents identified four distinct types of antitrust injury arising from the misconduct. Here, Plaintiffs identify two types of antitrust injury, the failure to pay au pairs at least a minimum wage as prescribed by law and the failure to pay au pairs comparable to other groups of childcare workers in the United States. In *Comcast*, there was one model of damages which the court held impermissibly conflated all four injury theories and which was, thus, not supportive of the commonality prong pertaining to class-wide injury. In this case, Dr. Kerr presents two models of damages corresponding to the two theories of antitrust injury. Both models, together and

9

separately, apply to the class as a whole. If the case ultimately moves forward on both injury theories, the models work together to show both the floor of damages accounting for minimum wage laws and also the ceiling supported by a competitive model. If one of the theories of antitrust injury were to not go forward, the expert has presented separate models each aimed at the specific antitrust injury alleged. Each model would separately address the but-for calculation showing wages au pairs should have expected to receive absent a conspiracy to fix the amount of stipend paid to au pairs. The existence of the two separate damages models successfully remedies the problem the Supreme Court discussed in *Comcast*.

The court finds that *Comcast* does not bar a model of damage calculation based on au pairs' entitlement to at least the federal, state and local minimum wage laws, simply because a similar method would be used to calculate damages for the labor law claims involving the same classes of au pairs also brought in the case. The antitrust laws' underlying policy is to assure that anticompetitive conduct does not go unpunished for mere uncertainty in the amount of loss inflicted. *Eleven Line, Inc.,* 213 F.3d at 209. This is precisely the reason behind inclusion of the Wage Loss Model of damages proposed by Dr. Kerr. His models provide that in no event, should the Plaintiffs prevail on their wage loss and antitrust claims, should the stipend payable to au pairs have been less that that prescribed by the federal, state and local minimum wage laws. In the antitrust context, the damages are based on a but-for scenario, to wit: but for the defendants' antitrust conduct, i.e. the conspiracy to fix the weekly stipend payable to all au pairs at $195.75, the au pairs' weekly pay rate would have been at least the minimum wage set by federal, state and/or local authorities.

10

This court finds the Wage and Hour Compliance model set forth by Dr. Kerr is appropriate under the holding of *Comcast* and supports one theory of antitrust injury derived from Defendants' alleged antitrust behavior.

### C. Scientific Methodology – Reliability and Fit

The proponent of an expert's opinion testimony on the issue of class certification as well as other litigation issues bears the burden of establishing that the expert is qualified, that the methodology he or she uses to support his or her opinions is reliable, and that his or her opinion fits the facts of the case and thus will be helpful to the tribunal. *Norris v. Baxter Healthcare Corp.,* 397 F.3d 878, 881 (10th Cir. 2005). *See Ralston v. Smith & Nephew Richards, Inc.,* 275 F.3d 965, 970 n.4 (10th Cir. 2001); *Mitchell v. Gencorp Inc.,* 165 F.3d 778, 781–82 (10th Cir. 1999); *Cook v. Rockwell Int'l Corp.*, 580 F. Supp. 2d 1071, 1083 (D. Colo. 2006) (the proponent of an expert witness must demonstrate the expert's proffered testimony meets Rule 702's requirements—relevance/fit, qualifications, and reliability—before the expert's testimony will be admitted.) The qualification standard is expressed in the Rule itself and is not, alone, the thrust of Defendants' motion.[5] Rule 702 allows expert testimony if the witness is "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702.

In addition to the expert's qualifications, however, expert testimony must be based on a reliable methodology to be admissible. *See, e.g., Bitler v. A.O. Smith Corp.,* 400 F.3d 1227, 1232 (10th Cir. 2005). The "reliability" prong requires that "the expert's opinion must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported

---

[5] Defendants have not attacked Dr. Kerr's credentials other than his qualification to design and administer a survey. (*See* Section A herein.) Given the court's findings concerning the survey's impact, it is unnecessary to address Dr. Kerr's expertise in survey drafting.

PLAINTIFFS' RESP. APP.0002942

speculation'; the expert must have 'good grounds' for his or her belief." *Magdaleno v. Burlington N. R. Co.*, 5 F. Supp. 2d 899, 902 (D. Colo. 1998) (quoting *Daubert*, 509 U.S. at 592-93.) An assessment of "the reliability of scientific evidence under Rule 702 requires a determination as to its scientific validity." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 (3d Cir. 1994) Where the expert's "factual basis, data, principles, methods, or their application are called sufficiently into question, . . . the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999) (internal quotations omitted).

Reliability does not mean, however, that the offering party must prove "that the expert is indisputably correct" for the expert evidence to be admissible. *Cook*, 580 F. Supp. 2d at 1085 (internal quotations omitted). Rather, the party need only prove that "the method employed by the expert in reaching the conclusion is scientifically sound and that the opinion is based on facts which sufficiently satisfy Rule 702's reliability requirements." *Id.* (internal quotations omitted). "The evidentiary requirement of reliability is lower than the merits standard of correctness." *In re Paoli*, 35 F.3d at 744 (quoted with approval in Fed. R. Evid. 702, 2000 advisory committee's note), and gaps or inconsistencies in an expert's reasoning may go to the weight of the expert evidence, not its admissibility. *Cook*, 580 F. Supp. 2d at 1085. *See, e.g., Campbell v. Metro. Prop. & Cas. Ins. Co.,* 239 F.3d 179, 186 (2d Cir.2001). As the Supreme Court acknowledged in *Daubert,* expert evidence can be "shaky" and yet still admissible, and may be attacked through the traditional means of "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof . . . ." *Daubert,* 509 U.S. at 596. Maintaining this distinction between the evidentiary requirement of reliability and the higher standard of whether

PLAINTIFFS' RESP. APP.0002943

the expert's conclusions are correct or sufficient to prove the merits "is indeed significant as it

preserves the fact finding role of the jury." *In re TMI Litig.,* 193 F.3d 613, 665 n.90 (3d Cir.

1999); *Cook, id.* A key component of the analysis here is that the expert testimony is offered to

assist the court, not the jury, in making a decision concerning certification of a Rule 23 class.

If the two prongs of reliability and qualification are satisfied, the court must then decide

whether the expert testimony "fits." "The Supreme Court has described the consideration of

relevant evidence as one of 'fit.'" *Bitler,* 400 F.3d at 1234 (quoting *Daubert,* 509 U.S. at 591).

In other words, the court must also look to relevance. "It is the specific relationship between an

expert's method, the proffered conclusions, and the particular factual circumstances of the

dispute that renders testimony both reliable and relevant." *Basanti v. Metcalf,* 35 F. Supp. 3d

1337, 1342 (D. Colo. 2014), *aff'd sub nom. Basanti v. United States,* 666 F. App'x 730 (10th Cir.

2016). Even if an expert's proffered evidence is scientifically valid and follows appropriately

reliable methodologies, it might not have sufficient bearing on the issue at hand to warrant a

determination that it has relevant fit.

The two most common methods of quantifying antitrust damages are the "before and

after" and "yardstick" measures of lost profits. *See Lehrman v. Gulf Oil Corp.,* 500 F.2d 659,

668 (5th Cir. 1974). In the business profits context, the before and after theory compares the

plaintiff's profit record prior to the violation with that subsequent to it. The yardstick test

consists of a study of the profits of entities or businesses that are closely comparable to the

plaintiff's and who have not engaged in the complained of antitrust behavior. Although

allowances can be made for differences between the business to which the subject is compared,

the business used as a standard must be as nearly identical to the plaintiff's as possible. *Lehrman*

PLAINTIFFS' RESP. APP.0002944

at 667. In terms of considering an expert's opinion, "Rule 702 and *Daubert* do not require an expert to use the best method available, they only require that the evidence be relevant and reliable." *Bullock v. Daimler Trucks N. Am., LLC*, No. 08-CV-00491-PAB-MEH, 2010 WL 3922084, at *4 (D. Colo. Sept. 30, 2010) (internal quotations omitted).

Dr. Kerr's Price Competition Model of antitrust damages is of the yardstick variety and examines whether an au pair would have been paid <u>more</u> than the stipend they were actually paid under Defendants' regime (including whether an au pair would be paid more than the minimum wage) under competitive conditions. (Kerr Rep. at ¶ 88.) This requires more inputs than the Wage Compliance Model because two primary drivers of competitive wages are the local cost of living in the area of the country where the au pair is employed, over a period of time, and the relevant level of competition – the labor supply and demand across geographies. (Kerr. Rep. at ¶¶ 73, 97, 103.) The other key axis for labor markets according to Dr. Kerr is the qualification and quality of workers in a given field and in a given location. (*Id.* at ¶¶ 70, 101.) A yardstick comparison model therefore needs to predict the direction and degree of variation over time and across geographies. It also needs to estimate the amount of a premium, if any, that buyers of labor put on experience and qualifications. The process is known as "calibrating" the model, and the first step is finding market-priced benchmarks. (Resp. at 7.)

The benchmarks proposed by Dr. Kerr are "childcare workers" as defined by the U.S. Bureau of Labor Statistics ("BLS") (Kerr Rpt. At ¶ 71) and "nannies" as described by the International Nanny Association ("INA") surveys. (Kerr Rpt. At ¶ 74.) The BLS explains that "Childcare Workers" (Standard Occupational Classification 39-9011) tend "children at schools, businesses, private households, and childcare institutions" and perform "a variety of tasks, such

14

PLAINTIFFS' RESP. APP.0002945

as dressing, feeding, bathing, and overseeing play." Bureau of Labor Statistics, Standard Occupational Classification 39-9011, *available at* https://www.bls.gov/soc/2010/soc399011.htm. The defendants object to this group as a benchmark for its au pairs because they claim that although the BLS definition encompasses *some* workers in private households, Dr. Kerr does not account for what proportion of the workers underlying the index work in private households - or whether childcare workers in the other settings earned more or less than those in private households.

The INA conducts surveys to estimate prevailing wages in various locales. Dr. Kerr obtained survey results for 2009, 2011, 2012, 2013, and 2014. (Kerr Rep. ¶ 75.) The data available as of the date of the class certification report already demonstrated that variables such as experience levels could be estimated using the INA data. (*Id.* at ¶¶ 78-84.) The defendants object to the use of the INA surveys as benchmarks because Kerr did not account for the specialty types of nannies included in the survey, such as household managers, newborn care specialists, or specialty nurses, did not analyze the differences in education levels and college degrees, and did not analyze whether living with the family affects compensation. (Mot. at 6-7.) Further, Defendants argue Dr. Kerr did not undertake any analysis to determine whether nanny wages and au pair stipends had a predictable economic relationship during periods in which Plaintiffs do not allege a conspiracy. (Mot. at 7.)

While there are differences between any group of workers, in order to be a benchmark the group has to be similar but cannot be the same. A full analysis and proper calibration could account for variables in the groups. Dr. Kerr's model explains the presence of explicit differentials and does not rely on national averages. *See In re Pharmacy Benefit Managers*

15

PLAINTIFFS' RESP. APP.0002946

*Antitrust Litig.*, No. CV 03-4730, 2017 WL 275398, at *21 (E.D. Pa. Jan. 18, 2017),

*reconsideration denied,* No. CV 03-4730, 2017 WL 1493029 (E.D. Pa. Apr. 26, 2017) (noting

that numerous courts have rejected the use of average price differentials to show evidence of

antitrust impact that is common to the class.)  Dr. Kerr explains that the data and analysis he used

in his report are preliminary and that "additional factual development would allow for the full

specification of a mode."  (Kerr Rpt. at ¶ 103.)  Dr. Kerr states that to complete an estimate

based on his Price Comparison Model he would look to obtain information of greater specificity

on various demographic, geographic, and economic factors that might explain the observed

differences in the earnings of the worker groups.  Dr. Kerr acknowledges that a mere comparison

of au pairs to nannies, for instance, without accounting for numerous other factors would be

insufficient to attribute any difference in pay between the groups to the antitrust conduct

allegedly engaged in by the defendants.  This does not render the Model insufficient or

unscientific at this stage, however.  Instead, it is merely incomplete.  Only if the defendants were

able to show that the differentials could not be analyzed and accounted for would the Model

itself be unfit.

      If a model presented by an expert is workable, a District Court can only deny class

certification on the basis of this portion of the test "if it conclude[s] that no reasonable juror

could have believed" the model and its output.  *Tyson Food v. Bouaphakeos,*\_\_\_ U.S. \_\_\_, 136

S. Ct. 1036, 1049 (2016).  *Daubert* must be carefully applied and "tailored" to the importance of

the expert opinion to the class certification decision.  *In re Zurn Pex Plumbing Prod. Liab. Litig.*,

644 F.3d 604, 612 (8th Cir. 2011).  The district court's "gatekeeping function" under *Daubert*

ensures that expert evidence "submitted *to the jury* " is sufficiently relevant and reliable, *Bonner*

16

PLAINTIFFS' RESP. APP.0002947

*v. ISP Technologies, Inc.,* 259 F.3d 924, 929 (8th Cir.2001) (emphasis added), but "[t]here is less

need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for

himself." *United States v. Brown,* 415 F.3d 1257, 1269 (11th Cir. 2005).  A full and stringent

application of *Daubert* to this preliminary finding process can be both prejudicial or impractical

where (as in this case), the class certification and expert phases take place before the close of

discovery and therefore before the parties have the chance to fully develop the facts.  Class

certification does not make final judgments or determinations, but looks forward to how the case

is likely to unfold and whether it will be practical, superior, and manageable to litigate on a class

basis.  *Id.*

     This court finds that, in this case, Dr. Kerr's Report and Rebuttal Report meet the criteria

for consideration by the District Court at this stage of the class certification analysis and that

striking them on an over-technical application of *Daubert* is inappropriate at this time.  *See also*

*In re Urethane Antitrust Litig.*, 251 F.R.D. 629, 637 (D. Kan. 2008) (refusing to "disregard" the

plaintiffs' expert's opinion "[a]t this procedural juncture" because the court was "satisfied that

[plaintiffs' expert's] opinions are grounded in a sufficiently accurate understanding" of the

relevant industry), *aff'd*, 768 F.3d 1245, 1256 (10th Cir. 2014) (observing that the district court

certified the class despite the fact that "the court did not even have [plaintiffs' expert's] models

or any other sort of extrapolation evidence"); *Johnson v. Arizona Hosp. & Healthcare Ass'n*, No.

CV07-1292-PHX-SRB, 2009 WL 5031334, at *10 (D. Ariz. July 14, 2009) ("While the

benchmark model is not fully fleshed out in [the expert's] report, the Court is satisfied that it

could be used to provide an estimate," which "the Court can revisit . . . if it becomes clear at a

later point in the litigation that the benchmark method is flawed.").

PLAINTIFFS' RESP. APP.0002948

Accordingly, it is

**ORDERED** that "Defendants' Motion to Exclude Expert Testimony of William Kerr

Pursuant to F.R.E. 702" [Doc. No. 606] is **DENIED**.

Dated January 24, 2018.

BY THE COURT:

Kathleen M. Tafoya
United States Magistrate Judge

PLAINTIFFS' RESP. APP.0002949

Case No. 1:14-cv-03074-CMA-KMT   Document 859-18   filed 03/30/18   USDC Colorado   pg
126 of 181

# Exhibit 324

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| CULTURAL CARE, INC.<br>d/b/a CULTURAL CARE AU PAIR,  ERIN<br>CAPRON, and JEFFREY PENEDO,<br><br>Plaintiffs,<br><br>v.<br><br>OFFICE OF THE ATTORNEY GENERAL<br>OF THE COMMONWEALTH OF<br>MASSACHUSETTS, and<br>MAURA T. HEALEY, IN HER CAPACITY<br>AS ATTORNEY GENERAL OF THE<br>COMMONWEALTH OF MASSACHUSETTS,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)   CIVIL ACTION NO. _____<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## **COMPLAINT**

This is an action in equity seeking injunctive and declaratory relief relating to the

Massachusetts Domestic Workers Bill of Rights (the "MA Act"), M.G.L. c. 149, § 190, and the

accompanying Regulations propounded by the Office of the Attorney General of the

Commonwealth of Massachusetts, 940 CMR 32.00 et seq. (the "MA Regulations"), which

together form part of Massachusetts' labor laws.  Plaintiff Cultural Care, Inc. d/b/a Cultural Care

Au Pair, and *au pair* Host Family members Jeffrey Penedo and Erin Capron, seek an injunction

against application of these labor laws to the federal cultural exchange program established

under the Fulbright-Hays Act pursuant to which *au pairs* become cultural exchange visitors on

J-1 exchange visas to the Commonwealth of Massachusetts ("Massachusetts") and nationwide.

Plaintiffs further seek a declaratory judgment that any interpretation of the MA Act and MA

Regulations that applies them to a federal cultural exchange program conflicts with, and is

preempted by, federal law as a matter of both conflict and field preemption.

**The Parties**

1.    Plaintiff Cultural Care, Inc. d/b/a Cultural Care Au Pair ("CCAP") is incorporated

in Massachusetts and has its principal place of business in Cambridge, Massachusetts.  CCAP is

one of sixteen private entities designated nationwide by the United States Department of State

("DOS") as a "Sponsor" of a cultural exchange program (the "*Au Pair* Cultural Exchange

Program" or the "Program") pursuant to which young foreign nationals come to the United

States for a period of one to two years for the purpose of residing with an American Host Family

and participating directly in their home life, while providing limited childcare services, and

fulfilling an educational requirement.  *See* 22 CFR § 62.4(h)(4).  In exchange for room and

board, and the cultural experience of living in the United States and participating in the home life

of the Host Families, the *au pairs* assist with childcare and receive a stipend as directed by the

DOS.  CCAP functions across state lines in interstate commerce, subject to regulation and

oversight by the DOS, in order to help effectuate the Program.  The Program could not function

without the existence of private commercial entities like CCAP.

2.    CCAP contracts with qualified Host Families across the United States to match

them with appropriate *au pair* applicants; provides *au pairs* with child development and child

safety instruction before they join their Host Families as required by the DOS Regulations;

requires Host Families to enter into contracts with the *au pairs* and to provide them with a

weekly stipend (regardless of hours actually worked, up to a maximum of 45 hours per week and

10 hours per day) in an amount set by the DOS; monitors the *au pair*'s experience and well-

being through personal contact at frequent intervals throughout the Program; and reports to the

PLAINTIFFS' RESP. APP.0002952

Case 1:14-cv-03074-CMA-KMT   Document 1059-18   filed 08/17/18   USDC Colorado   Page 128
129 of 181
Case 1:16-cv-11777-IT   Document 80   Filed 08/31/16   Page 3 of 23

DOS regarding Host Families' and *au pairs'* satisfaction with the Program, and any problems

that developed during the Program.  22 CFR § 62.31.  CCAP, like other Sponsors, performs

these services pursuant to contracts with, and for a fee charged to, the Host Families.

3.      Plaintiffs Jeffrey Penedo and Erin Capron (together the "Host Family Plaintiffs")

each reside in eastern Massachusetts and host in their respective homes an *au pair* placed by

CCAP.  (Collectively, CCAP and the Host Family Plaintiffs are referred to hereafter as

"Plaintiffs.")  The *Au Pair* Cultural Exchange Program provides cultural benefits to the Host

Families as well as to the *au pairs*, by providing the families with the opportunity to interact in a

multicultural home environment with young guests from other countries.  Individuals such as

Ms. Capron and Mr. Penedo are sometimes referred to in the DOS Regulations as "Host

Parents," *see, e.g.*, 22 CFR § 62.31(h)(1)-(2).  The Host Families pay the stipends to the *au pairs*

and determine the *au pairs'* childcare schedules within the weekly and hourly limits specified by

the DOS.

4.      Defendants, the Office of the Attorney General of the Commonwealth of

Massachusetts and incumbent Attorney General Maura T. Healey named in her official capacity

(together, the "MA OAG"), have their principal office in Boston, Massachusetts.  The MA OAG

has enforcement authority over Massachusetts wage and hour laws, including the MA Act, and

propounded the MA Regulations "to interpret, enforce, and effectuate the purposes of" the MA

Act.  The MA OAG does not have authority to administer or set requirements for federal cultural

exchange programs established by Congress under the Fulbright-Hays Act.

**Jurisdiction and Venue**

5.      Jurisdiction vests in the federal courts pursuant to 28 U.S.C. § 1331 because this

case, which alleges federal preemption by virtue of the Mutual Educational and Cultural

PLAINTIFFS' RESP. APP.0002953

Exchange Act of 1961, 22 U.S.C. § 2451 et seq. (the "Fulbright-Hays Act"), and the Commerce

Clause, Article 1, Section 8, Clause 3 of the United States Constitution, arises under the

Supremacy Clause, Article VI, Clause 2 of the United States Constitution.  To the extent any

Count is deemed not to present a federal question, this Court has supplemental jurisdiction

pursuant to 28 U.S.C. § 1367(a).

6.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) because

Defendants reside here.

### Federal Legislation and Legislative History

7.      In 1961, during the administration of President John F. Kennedy, the United

States Congress enacted the Fulbright-Hays Act, 22 U.S.C. § 2451 et seq.  The Statement of

Congressional Purpose for the Fulbright-Hays Act is as follows:

> The purpose of this chapter is to enable the Government of the United
> States to increase mutual understanding between the people of the United States and
> the people of other countries by means of educational and cultural exchange; to
> strengthen the ties which unite us with other nations by demonstrating the
> educational and cultural interests, developments, and achievements of the people of
> the United States and other nations, and the contributions being made toward a
> peaceful and more fruitful life for people throughout the world; to promote
> international cooperation for educational and cultural advancement; and thus to assist
> in the development of friendly, sympathetic, and peaceful relations between the
> United States and the other countries of the world.

22 U.S.C. § 2451.  Congress was thus clear that exchange visitors would enter the United

States, not as immigrants or employees, but as visitors in furtherance of mutual

understanding and the development of better relations between the United States and other

countries.  Further evidence of this intent is that exchange visitors receive J-1

nonimmigrant *exchange visitor* visas, as opposed to nonimmigrant *worker* visas, such as

H-1B visas.

- 4 -

PLAINTIFFS' RESP. APP.0002954

8.      The Fulbright-Hays Act was designed to provide the legislative authority

necessary for establishment of educational and cultural exchanges.  In the words of  Assistant

Secretary of State Brooks Hays in a letter to Congress:

> The Department has long had the conviction that educational and cultural
> exchange is one of the most important and effective means available to this
> Nation in our continuing struggle to build a peaceful world in which freedom and
> justice under law will be the lot of all mankind. This conviction is shared by the
> President and his administration. In order to carry out these programs effectively
> and to achieve the maximum impact, the executive branch must have a sound base
> of legislative authority from which to operate.

House Report No. 1094 at 2775 (August 31, 1961).

9.      In ensuing years, various educational and cultural exchange programs were

authorized by Congress in furtherance of the Congressional objectives of strengthening the ties

that unite the United States with other nations and increasing mutual understanding between the

people of the United States and the people of other countries through educational and cultural

exchanges.  Although the exchanges clearly are not work programs, participants are to receive

some income in the form of stipends or grants; and such income, like all earned income in the

United States, is subject to taxes.  With regard to the *Au Pair* Cultural Exchange Program, the

payments are made pursuant to contracts between Host Families and the *au pairs*, which are not

contracts of employment.  These small payments will not necessarily be sufficient to cover all

personal expenses; and Program recruitment information and materials are required to make it

clear to prospective exchange visitors that their stipend might not cover all of their expenses and

that they should bring additional personal funds.  *See* 22 CFR § 62.9(d)(3).

10.      In 1986, Congress authorized a pilot *au pair* program under the Fulbright-Hays

Act pursuant to which young foreign men and women, in a defined age category, could come to

the United States to continue their educations, immerse themselves as members of U.S. families,

and serve as "*au pairs*," or persons "on a par" with family members.  The pilot program

PLAINTIFFS' RESP. APP.0002955

furthered the missions and objectives of the Fulbright-Hays Act, and, at the same time, met a

growing need for affordable childcare precipitated by the entry of more women into the work

force.  The program is designed such that, "foreign nationals are afforded the opportunity to live

with an American Host Family and participate directly in the home life of the Host Family,"

while providing childcare services and pursuing "not less than six semester hours of academic

credit or its equivalent."  22 CFR § 62.31(a).

11.     In 1997, Congress extended the pilot program into a permanently authorized *au

pair* cultural exchange program.  *See* P.L. 105-48 of the 105th Congress.

12.     Initially, the United States Information Agency ("USIA"), a federal agency

devoted to public diplomacy, was charged with administering the *Au Pair* Cultural Exchange

Program.  Upon the dissolution of the USIA in 1999, the cultural exchange programs, including

the *Au Pair* Cultural Exchange Program, were transferred to the DOS and were administered by

a newly created Under Secretary of State for Public Diplomacy and Public Affairs.

13.     The DOS promulgated regulations regarding such programs, including the *Au

Pair* Cultural Exchange Program (the "DOS Regulations"), which regulate the roles and

obligations of both the Host Families and the Sponsors.  *See* 22 CFR Part 62, "Exchange Visitor

Program."  In describing the purpose of the DOS Regulations, the DOS reiterated the

Congressional intent underlying the Fulbright-Hays Act:  "The purpose of the Fulbright-Hays

Act is to increase mutual understanding between the people of the United States and the people

of other countries by means of educational and cultural exchanges . . . to assist the Department of

State in furthering the foreign policy objectives of the United States."  *See* 22 CFR § 62.1

PLAINTIFFS' RESP. APP.0002956

14. Pursuant to 22 CFR § 62.1(b), the Secretary of State "facilitates activities specified in the Fulbright-Hays Act, in part, by designating public and private entities to act as sponsors" for the Exchange Visitor Program, including the *Au Pair* Cultural Exchange Program.

15. As noted above, *au pairs*, who travel to the United States on a J-1 visa or otherwise obtain J status, are foreign nationals who come to the United States for the purpose of residing with an American Host Family, such as the Host Family Plaintiffs, and participating directly in their home life, while providing limited childcare services, and fulfilling an educational requirement. *See id*. at § 62.4. To qualify for J status in the *Au Pair* Cultural Exchange Program, the visitor must have a residence in a foreign country which s/he has no intention of abandoning and must be a "bona fide student" or similar person "who is coming temporarily to the United States as a participant in a program designated by the Director of the United States Information Agency" for such enumerated purposes as "studying" and "observing." *See id*. at § 62.2, incorporating 8 U.S.C. § 1101(a)(15)(J). *Au pairs* are welcomed to the United States by a DOS letter informing them that they are "among many young adult exchange visitors serving as [their] country's citizen ambassador in the United States." *See* Exhibit A.

16. In accord with the Congressional mandate in the Fulbright-Hays Act, the DOS has administered the *au pair* program as a cultural exchange program, not a work program, notwithstanding that the Department of Labor – which is not the agency charged with administering the program – has proclaimed that the program includes an employment component as between the *au pair* and the Host Family. For example, in July of 2013, then Deputy Assistant Secretary for Private Sector Exchange Robin Lerner wrote the following to the

PLAINTIFFS' RESP. APP.0002957

Sponsors of the various Exchange Visitor Programs, including the *Au Pair* Cultural Exchange

Program:

> As our newest improvements take hold, we must all remain mindful of the
> true purpose of the Exchange Visitor Program.  In accordance with the Fulbright-
> Hays Act of 1961, these cultural, educational and professional exchanges are
> intended to build mutual understanding between Americans and people of other
> countries. … By bringing people together to share perspectives and experiences, we
> enable them to break down barriers, and our national security and prosperity are
> strengthened – at home and abroad.
>       …Through Exchange Visitor Program sponsor designation, you are
> entrusted to implement a cultural exchange program.  Success in advancing U.S.
> public diplomacy goals, as all programs in the Exchange Visitor Program are
> intended to do, is best achieved through careful planning and execution of the
> cultural component of your exchange.

*See* Exhibit B hereto.

17.     Were the DOS as the sole agency responsible for overseeing Fulbright-Hays Act

programs ever to treat the *Au Pair* Cultural Exchange Program as a work program, or to abrogate

its responsibility to other federal or state agencies, which it has not done, such action would be

beyond the DOS' authority under the Fulbright-Hays Act.  Only Congress can modify the

purpose of the Fulbright-Hays Act programs and convert the *Au Pair* Cultural Exchange

Program from an exchange visitor program into a work program subject to state labor laws.

18.     "Domestic Workers" under the MA Act and MA Regulations are hourly

employees.  Participants in the *Au Pair* Cultural Exchange Program are not hourly employees.

Rather, Host Families, such as the Host Family Plaintiffs, are required to compensate the *au

pairs* "at a weekly rate" designated by the DOS.  Regardless of the number of hours worked in a

week, from zero to the Program maximum of 45, the DOS-designated stipend must be paid.

While the weekly stipend is computed by multiplying 45 hours times the federal minimum wage,

and deducting a 40% room and board credit as set by the Department of Labor (*see* DOS-

disseminated "Fact Sheet: Au Pair Stipend, 3/14/97," a true and accurate copy of which is

PLAINTIFFS' RESP. APP.0002958

appended hereto as Exhibit C), that computational method has not converted the *au pairs* into hourly workers.  They are entitled to the stipend regardless of the number of hours worked, if any, below the 45 hour program maximum.  Further evidence that the *au pairs* are not hourly workers is this:  The more education-intense "EduCare" subset of the *Au Pair* Cultural Exchange Program sets the participants' maximum childcare hours at two-thirds the level of other *au pairs*, *i.e.*, 30 as compared with 45, but sets the EduCare stipend at three-quarters, not two-thirds, the level of other *au pairs*.  22 CFR § 62.31(j).

19.      The method of calculating the weekly stipend, which was determined by the DOS, has remained constant throughout the history of the *Au Pair* Cultural Exchange Program.  Because the DOS chose to tie the amount of the stipend to the Fair Labor Standards Act ("FLSA") (*see* 22 CFR § 62.31(j)(1)), which provides both nationwide consistency for the Program and convenience for the DOS, the DOS changes the amount of the stipend whenever Congress increases the minimum wage.  On each such occasion, the DOS has issued Notices to the Sponsors to be passed on to the Host Families, stating the new stipend amount.  *See, e.g.,* Exhibit D hereto, June 14, 2007 "Notice: Federal Minimum Wage Increase."   Exhibit D is the most recent such Notice.  Were the federal minimum wage at any point to be inconsistent with the Congressional intent of a cultural exchange program, the use of the federal minimum wage would be beyond DOS's authority under the Fulbright-Hays Act and would be unlawful.  Notwithstanding that the FLSA requires that employers pay workers the higher of federal and state minimum wages, at no time has the DOS issued a Notice indicating that state labor provisions apply to the *Au Pair* Cultural Exchange Program, which involves Host Families as contrasted with "employers" and visitors as contrasted with "workers."  Were it to do so, the DOS would be exceeding its authority under the Fulbright-Hays Act, which contemplates a

- 9 -

uniform national cultural exchange program that is not a work program and that provides Host

Families with an opportunity to open their homes to young cultural exchange visitors.

20.    Further evidence that the DOS does not treat the *Au Pair* Cultural Exchange

Program as a work program can be found in the DOS-imposed *au pair* eligibility requirements.

Several such requirements, while permissible for cultural exchange visitors, would likely be

impermissible for workers under federal and state labor laws.  For example, the DOS requires

Sponsors to ensure that all *au pair* participants (i) are between the ages of 18 and 26; (ii) are

capable of participating in the program as evidenced by the satisfactory completion of a physical

without regard to reasonable accommodation, and (iii) have undergone a background

investigation that includes a personality profile based upon a psychometric test designed to

measure differences in characteristics among applicants against those characteristics considered

most important to successfully participate in the *au pair* program.  *See* 22 CFR § 62.9(d)(4), and

(6).

21.    Similarly, Host Families are subjected to requirements that would be suspect or

impermissible for imposition on employers, but are permissible for cultural exchange hosts.  For

example, Host Parents must either be U.S. citizens or permanent legal residents, and must be

fluent in spoken English.  22 CFR § 62.31(h)(1)-(2).

22.    In addition, the DOS imposes obligations on both the Sponsors and the Host

Families that are unrelated to work requirements, *e.g.*, the Host Families must facilitate the

enrollment and attendance of *au pairs* in accredited U.S. post-secondary institutions and pay the

cost of such academic course work up to a specified amount, *id.* at § 62.31(k)(1), and the

Sponsors, who are materially regulated by the DOS, must provide local counselors to monitor

each *au pair* and Host Family at least monthly via personal contact and to report unusual or

- 10 -

serious situations. *Id*. at § 62.31(l). Further, Sponsors are not required to instruct Host Families relating to maintenance of time sheets or similar records, and Host Families are not required to maintain hourly time records, or to report time actually worked. Among other reporting requirements, the Sponsors' reporting requirements to the DOS relate to the Program's cultural exchange objective, including a summation of the results of annual satisfaction of all Host Families and *au pairs*. *Id*. at § 62.31(m).

23.     At no time has Congress suggested that it intended for the labor laws of individual states to interfere with a consistent national cultural exchange program, nor has it abrogated its initial principle that "a positive U.S. Government program promoting educational and cultural cooperation is essential to the welfare of the American people." House Report No. 1094 at 2760 (August 31, 1961). The Fulbright-Hays Act and the authorizing statute for the permanent *Au Pair* Cultural Exchange Program remain good and valid law. Only Congress has the power to alter the Fulbright-Hays Act and the authorizing statute. Even the DOS cannot lawfully implement changes that are contrary to the Congressional intent behind the Fulbright-Hays Act and the *Au Pair* Cultural Exchange Program.

24.     Since the inception of the *Au Pair* Cultural Exchange Program, the Program has provided cultural benefits for both *au pairs* and Host Families, and has offered Host Families nationwide a more affordable childcare option as an additional benefit to encourage participation in a program that requires a significant investment in time and resources to deliver a meaningful cultural experience for both the *au pairs* and the Host Families themselves.

25.     In addition to the impropriety of applying labor laws to a cultural exchange program, the imposition of different, conflicting, and burdensome requirements by individual states would severely undermine and indeed destroy all or a substantial part of the *Au Pair*

PLAINTIFFS' RESP. APP.0002961

Cultural Exchange Program.  Were Host Families required to bear the costs of delivering a

meaningful cultural experience to a visitor living as a member of their family and at the same

time meet all of the labor code requirements of state laws like the MA Act and MA Regulations,

such that the weekly stipend of $195.75 would be converted to hourly wages amounting to

$445.50 for a 45 hour week, the Program would be economically infeasible for the Host Family

Plaintiffs and for many, and probably most, Host Families.  This is especially the case when the

Host Family considers that it is generally not even receiving a trained and experienced childcare

provider and when the Host Family factors in the $500 educational payment requirement to the

*au pairs* and the additional fee to Sponsors.  Thus, the Host Families who most need an

affordable childcare option to consider taking on the cultural exchange costs and duties of the

program would be denied that option, as well as being denied the benefits to their family from

the cultural exchange nature of the Program.  In addition, a state-by-state program would likely

(i) lead to "forum shopping" by prospective *au pairs*, which is contrary to Congressional intent,

depriving prospective Host Families in states with less generous labor codes of the cultural,

screening and economic benefits of the *Au Pair* Cultural Exchange Program; and (ii)

discriminate against or excessively burden interstate commerce.  Further, the cultural and

educational opportunities for *au pairs* in higher minimum wage states like Massachusetts will

become far more limited.

26.     If the Host Family Plaintiffs were to be required to abide by Massachusetts state

labor code requirements including the MA Act and the MA Regulations, they would be

economically compelled to leave the *Au Pair* Cultural Exchange Program in favor of affordable

options.  The model for the *Au Pair* Cultural Exchange Program would cease to be viable.  Host

PLAINTIFFS' RESP. APP.0002962

Families would lose both the cultural exchange benefits of the Program and an affordable

childcare option.

27.      Because many, and probably most, Host Families will be unable or unwilling to

pay a fee to the Sponsor in addition to the wage and education requirements and substantially

higher State-imposed payments under state labor codes, CCAP and other State Department-

designated Sponsors will suffer material economic injury and in some instances will not be able

to survive as on-going commercial enterprises.

### Massachusetts Statutory and Regulatory History

28.      The Massachusetts legislature enacted the MA Act, M.G.L. c. 149, § 190, as part

of the Commonwealth's labor code, and directed that the Massachusetts Attorney General

"enforce this section and . . . promulgate rules and regulations necessary for enforcement."

M.G.L. c. 149, § 190(o).  In accordance with that directive, in the summer of 2015 the OAG

propounded the MA Regulations, 940 CMR § 32.  The MA Act and MA Regulations relate

exclusively to the labor code and "domestic workers" and have nothing to do with cultural

exchanges or exchange visitors.  Host Families, including the Host Family Plaintiffs, invest time

and effort in treating their au pairs like family members who are guests in their home.  They do

so in order to enhance the cultural aspect of the exchange for both the families and the *au pairs*,

but little incentive exists for investing such emotional capital if the *au pairs* hold the status and

involve the cost of laborers.

29.      Because CCAP has never considered participants in the *Au Pair* Cultural

Exchange Program to be "domestic workers," CCAP has also never considered the MA Act to

apply to *au pairs*.  However, in or about the Spring of 2015, before the issuance of the final MA

Regulations, the MA OAG called in CCAP for the first of two meetings to discuss the

PLAINTIFFS' RESP. APP.0002963

Case 1:14-cv-03074-CMA-KMT   Document 305-18   filed 09/17/18   USDC Colorado   pg 139
149 of 181
Case 1:16-cv-11777-IT   Document 80   Filed 08/31/16   Page 14 of 23

implementation of the MA Act and the MA Regulations.  In the first meeting, the MA OAG

suggested to CCAP for the first time that the participants in the *Au Pair* Cultural Exchange

Program could be considered "domestic workers," which would suggest that Host Families are

employers.  The MA OAG further suggested that Sponsors should be considered non-exempt

"placement agencies" – and therefore potentially also employers – under the MA Act and the

MA Regulations.  The meeting terminated without clarity as to whether the MA OAG ultimately

would, or would not, interpret the MA Act as applying to CCAP.

30.     The interpretation suggested by the MA OAG in the Spring of 2015, would

interfere with the Congressional intent to implement a viable cultural exchange program,

consistent in its operations across all state lines.  By treating *au pairs* as "domestic workers"

rather than exchange visitors, the MA OAG's interpretation of the MA Act and MA Regulations

would purport to turn a cultural exchange program into a Massachusetts-specific work program,

and in so doing would impose obligations on the Host Families and the Sponsors that would be

contrary to the Fulbright-Hays Act, the authorizing act for the *Au Pair* Cultural Exchange

Program, and the DOS Regulations.  For example, instead of serving as their *au pair*'s quasi-

familial "Host Parents," the Host Family Plaintiffs would become their *au pair*'s employer, an

entirely different and less gratifying relationship, subject to far higher and less predictable

weekly compensation obligations and onerous recordkeeping and reporting requirements (*see*

940 CMR § 32.04).  Instead of functioning as the liaisons between prospective *au pairs* and Host

Families with consistent requirements across all state lines, Sponsors would be deemed

unlicensed "placement agencies" and therefore potentially "employers." This would be so even

though the DOS created the category of Sponsors as one separate and distinct from the category

PLAINTIFFS' RESP. APP.0002964

Case 1:14-cv-03074-CMA-KMT Document 1059-18 filed 09/17/18 USDC Colorado pg 140
141 of 181
Case 1:16-cv-11777-IT Document 80 Filed 08/31/16 Page 15 of 23

of "staffing/employment agencies" (*see* 22 CFR Part 62, § 62.2) and even though the Department

of Labor has limited the "employment relationship" with *au pairs* to the Host Families.

      31.    In several material respects, the MA OAG's proposed interpretation of the MA

Act's requirements contradicts existing DOS requirements, including without limitation:

      (a)    Under the MA Act "an individual who performs services [of a
domestic nature in a household] for an employer for … compensation" is a
"domestic worker" (*see* 940 CMR § 32.02*)*, whereas *au pairs* in the *Au
Pair* Cultural Exchange Program are "exchange visitors" (*see* 22 CFR
§ 62.2);

      (b)    a "domestic worker" shall be compensated under the MA Act at
overtime rates for all hours over 40 hours per week (*see* 940 CMR
§ 32.03(3)), whereas *au pairs*, who are not hourly workers, are limited to
45 hours of work per week, and do not receive overtime for the hours
beyond 40 (*see* 22 CRF § 62.31 (a), and Exhibit C);

      (c)    *au pairs* would be compensated under the MA Act for all time that
they are required to be on premises or to be on duty, absent a contrary
written agreement (*see* 940 CMR § 32.03), whereas under the DOS
Regulations *au pairs* receive a guaranteed weekly stipend without regard
to hours actually worked (see 22 CFR § 62.31(j));

      (d)    an employer under the MA Act is entitled to a credit for food and
beverages actually provided against the established wage in the amount of
$1.25 for breakfast, $2.25 for lunch and $2.25 for dinner  (*see* 940 CMR
32.03((5)(b), and a credit for lodging of $35 per week for a single
occupancy room (*id.* at (5)(c)), whereas a Host Family is entitled under the
DOS Regulations to a room and board credit of 40% of the stipend paid
(*see* Exhibits C and D, and DOL Field Assistance Bulletin No. 2015-1,
appended as Exhibit E);

      (e)    the Massachusetts minimum wage, which applies under the MA
Act, is $10 per hour as of January 1, 2016 and will increase in 2017 to $11
per hour, whereas the federal minimum wage, which DOS has chosen to
use in calculating the amount of the weekly stipend, has been $7.25 per
hour since July 24, 2009; and

      (f)    the MA Act imposes strict recordkeeping requirements on the
"employer" – which would include the Host Family and may include a
non-exempt "placement agency" – including records of wages and hours
to be maintained for three years, time sheets completed, and provision of
notice of all applicable state and federal laws relating to "domestic
workers" (*see* 940 CMR § 32.04), whereas under the DOS Regulations

- 15 -

PLAINTIFFS' RESP. APP.0002965

Case 1:14-cv-03074-CMA-KMT   Document 293-18   filed 09/17/18   USDC Colorado   pg 141
142 of 181
Case 1:16-cv-11777-IT   Document 80   Filed 08/31/16   Page 16 of 23

neither the Host Family nor the Sponsor has timekeeping reporting requirements. Rather, the Sponsor is responsible for reporting to the DOS information confirming that the program is meeting its cultural and educational objectives, including annual reports summarizing "activities in which exchange visitors were engaged" and "a description of the cross-cultural activities the sponsor provided for its exchange visitors during the reporting year." *See* 22 CFR § 62.15(a).

32.     The most recent DOS Notification to Sponsors sets the weekly stipend rate for participants in the *Au Pair* Cultural Exchange Program working any number of hours, from zero to the 45 hour Program maximum, at $195.75. The MA Regulations set the "wage" for a live-in "domestic worker" working a 40 hour week with a single occupancy room at $445.40 per week.

33.     In August of 2015, the MA OAG held a second meeting with CCAP representatives relating to the OAG's intended application of the MA Act and MA Regulations to CCAP as, in the words of the MA OAG, a "placement agency." In so doing, the MA OAG confirmed its intention to apply the MA Act and MA Regulations to CCAP's *Au Pair* Cultural Exchange Program, thereby converting the Host Families, including the Host Family Plaintiffs, into "employers" within the meaning of the MA Act and MA Regulations, and the *au pairs* into "domestic workers." In a written communication thereafter, the MA OAG stated that it would "offer a transition period until September 1, 2017," while CCAP attempted to work with the DOS and the Massachusetts legislature to "clarify the rules governing cultural exchange programs and participants."

34.     CCAP has not been successful in its efforts to obtain clarification from the Massachusetts legislature. The DOS has declined to engage in any substantive discussion with a single Sponsor regarding the *Au Pair* Cultural Exchange Program

35.     Host Families enter into one year contracts with their *au pairs* several months in advance of the start date. Contracts relating to the period beginning in September of 2016, which have already been executed, will be affected by the MA OAG's intention to apply the MA Act

- 16 -

and the MA Regulations to the *Au Pair* Cultural Exchange Program, the Host Families, and CCAP beginning in September of 2017. With contracts now being signed that will extend beyond the date of the MA OAG's stated intention to commence enforcement, Plaintiffs must seek relief through the courts to avoid the injuries described herein.

## Count I: Preemption (Fulbright-Hayes Act)

## (Injunctive Relief)

36. Plaintiffs incorporate all allegations in this Complaint as if set forth in their entirety in this Count.

37. Insofar as they relate to the *Au Pair* Cultural Exchange Program, the MA Act and MA Regulations are preempted by the Fulbright-Hays Act, the permanent authorization act for the *Au Pair* Cultural Exchange Program, and the current DOS Regulations, all pursuant to the Supremacy Clause of the United States Constitution, Article VI, Clause 2.

38. The MA Act and MA Regulations are in conflict with, and/or stand as an obstacle to the accomplishment and execution of, the full purposes and objectives of Congress as set forth in the Fulbright-Hays Act and in the permanent authorization act for the *Au Pair* Cultural Exchange Program. Further, the goals and objectives of the *Au Pair* Cultural Exchange Program, as set forth above, are inconsistent with the MA OAG's goals and objectives in seeking to extend state labor legislation to a federal cultural exchange program. Hence, conflict preemption precludes application of the MA Act and the MA Regulations to CCAP and its Host Families including to the Host Family Plaintiffs.

39. In addition, Congress intended in enacting the permanent authorization act for the *Au Pair* Cultural Exchange Program to occupy the field with regard to the terms and conditions of that Program. The federal interest embodied in the Fulbright-Hays Act and the programs

- 17 -

enacted pursuant to it, *i.e.*, in fostering "a peaceful world in which freedom and justice under law will be the lot of all mankind," precludes enforcement of state labor laws that defeat Congressional intent.  Hence, field preemption separately and additionally precludes application of the MA Act and the MA Regulations to CCAP and to the Host Family Plaintiffs.

40.     Plaintiffs will suffer irreparable harm if the MA Act and the MA Regulations are applied to them and to the *au pairs* residing with the Host Family Plaintiffs.  The balance of harms favors Plaintiffs, particularly given that cultural exchange visitors to the United States are not domestic workers.  Plaintiffs are entitled to an order enjoining the MA OAG from enforcing the MA Act and the MA Regulations against, or applying them to, CCAP and its Host Families including the Host Family Plaintiffs.

## Count II: Preemption (Fulbright-Hays Act)

## (Declaratory Relief)

41.     Plaintiffs incorporate all allegations in this Complaint as if set forth in their entirety in this Count.

42.     As noted above, the MA Act and the MA Regulations are in conflict with, and/or stand as an obstacle to the accomplishment and execution of, the full purposes and objectives of Congress as set forth in the Fulbright-Hays Act and in the permanent authorization act for the *Au Pair* Cultural Exchange Program.  Further, the goals and objectives of the *Au Pair* Cultural Exchange Program, as set forth above, are inconsistent with the MA OAG's goals and objectives in seeking to extend state labor legislation to a federal cultural exchange program.

43.     In addition, as noted above Congress intended in enacting the permanent authorization act for the *Au Pair* Cultural Exchange Program to occupy the field with regard to the terms and conditions of that Program.  The federal interest embodied in the Fulbright-Hays

PLAINTIFFS' RESP. APP.0002968

Case 1:14-cv-03074-CMA-KMT   Document 993-305-18   filed 09/17/18   USDC Colorado   Page 144
Case 1:16-cv-11777-IT   Document 80   Filed 08/31/16   Page 19 of 23
145 of 181

Act and the programs enacted pursuant to it, *i.e.*, in fostering "a peaceful world in which freedom and justice under law will be the lot of all mankind," precludes enforcement of state labor laws that defeat Congressional intent.  Hence, field preemption separately and additionally precludes application of the MA Act and the MA Regulations to CCAP and its Host Families including the Host Family Plaintiffs.

44.     Because the MA Act and the MA Regulations are already in effect and the MA OAG has stated its intention to commence enforcement at a date certain within the current *au pair* contract period, an actual controversy exists between Plaintiffs and the MA OAG, such that this matter is now justiciable pursuant to 28 U.S.C. § 2201.  CCAP and the Host Family Plaintiffs are entitled to a declaration that the Fulbright-Hays Act and the permanent authorization act preempt the application of the MA Act and the MA Regulations to CCAP and its Host Families including the Host Family Plaintiffs.

## Count III:   Preemption (Commerce Clause)

### (Injunctive Relief – CCAP)

45.     CCAP incorporates all  allegations in this Complaint as if set forth in their entirety in this Count.

46.     As a private entity Sponsor, CCAP places *au pairs* with Host Families and maintains a network of Local Childcare Consultants in states geographically distributed across the United States.  As such, CCAP participates in the *Au Pair* Cultural Exchange Program as a commercial business engaged in interstate commerce.

47.     The Commerce Clause of the United States Constitution, Article I, Section 8, Clause 3, protects the right to engage in interstate and foreign commerce free of undue burden, interference, or discrimination by state governments.

- 19 -

48.     The MA Act and the MA Regulations impose undue burdens on interstate and
foreign commerce, and discriminate against CCAP as a Massachusetts-based Program Sponsor
with significant business in Massachusetts, by (1) interfering with CCAP's ability to conduct
business in Massachusetts in full compliance with the DOS Regulations because of inconsistent
Massachusetts requirements; (2) imposing additional and excessive costs for administering the
Program in Massachusetts; and (3) adversely impacting, if not eliminating, CCAP's ability to
conduct business in Massachusetts because of the excessive costs imposed on potential Host
Families.

49.     The MA Act and the MA Regulations impose a clearly excessive burden on the
*Au Pair* Cultural Exchange Program in Massachusetts, relative to the putative local benefit.
Indeed, the MA Act and the MA Regulations are likely to lead to the unintended consequence of
fewer, if any, positions being available in Massachusetts for young foreign nationals who had
hoped to participate in the Program within the Commonwealth.

50.     The MA Act and the MA Regulations establish requirements that will unlawfully
compel prospective CCAP Host Families, against their preferences, to turn instead to the
employment of actual domestic workers, rather than cultural exchange *au pairs*.  This will
materially adversely affect CCAP's business.

51.     CCAP will suffer irreparable harm if the MA Act and the MA Regulations are
applied to it and to its Host Families.  The balance of harms favors Plaintiffs, particularly given
that cultural exchange visitors to the United States are not domestic workers.  CCAP is therefore
entitled to an order enjoining the MA OAG from enforcing the MA Act and the MA Regulations
against it and its Host Families including the Host Family Plaintiffs.

PLAINTIFFS' RESP. APP.0002970

## Count IV:   Preemption (Commerce Clause)

## (Declaratory Relief – CCAP)

52.     CCAP incorporates all allegations in this Complaint as if set forth in their entirety in this Count.

53.     The MA Act and the MA Regulations are in conflict with, and/or stand as an obstacle to the accomplishment and execution of, the Commerce Clause.  Further, the MA OAG's goals and objectives in seeking to extend state labor legislation to commercial Sponsors of a federal cultural exchange program are inconsistent with the Commerce Clause.

54.     The MA Act and the MA Regulations impose undue burdens on interstate and foreign commerce, and discriminate against CCAP as a Massachusetts-based Program Sponsor with significant business in Massachusetts, by (1) interfering with CCAP's ability to conduct business in Massachusetts in full compliance with the DOS Regulations because of inconsistent Massachusetts requirements; (2) imposing additional and excessive costs for administering the Program in Massachusetts; and (3) adversely impacting, if not eliminating, CCAP's ability to conduct business in Massachusetts because of the excessive costs imposed on potential Host Families.

55.     The MA Act and the MA Regulations impose a clearly excessive burden on the *Au Pair* Cultural Exchange Program in Massachusetts, relative to the putative local benefit. Indeed, the MA Act and the MA Regulations are likely to lead to the unintended consequence of fewer, if any, positions being available in Massachusetts for young foreign nationals who had hoped to participate in the Program within the Commonwealth.

56.     Because the MA Act and the MA Regulations are already in effect and the MA OAG has stated its intention to commence enforcement at a date certain within the current *au*

- 21 -

PLAINTIFFS' RESP. APP.0002971

*pair* contract period, an actual controversy exists between CCAP and the MA OAG, such that this matter is justiciable now pursuant to 28 U.S.C. § 2201. CCAP is entitled to a declaration that application of the MA Act and the MA Regulations to CCAP and its Host Families including the Host Family Plaintiffs is preempted by the Commerce Clause.

### Prayers for Relief

In reliance upon all of the foregoing, Plaintiffs pray:

1.      For an order enjoining the MA OAG from seeking to apply, and from enforcing, the Massachusetts Domestic Workers Bill of Rights and the supporting MA OAG Regulations, against CCAP and CCAP's Host Families, including the Host Family Plaintiffs, on the ground that the Fulbright-Hays Act and the permanent authorization act preempt any such application or enforcement;

2.      For a declaratory judgment that the Massachusetts Domestic Workers Bill of Rights and the supporting MA OAG Regulations are preempted by the Fulbright-Hays Act and the permanent authorization act insofar as there is any attempt to apply them to, or enforce them against CCAP and CCAP's Host Families, including the Host Family Plaintiffs;

3.      For an order enjoining the MA OAG from seeking to apply, and from enforcing, the Massachusetts Domestic Workers Bill of Rights and the supporting MA OAG Regulations, against, CCAP and CCAP's Host Families, including the Host Family Plaintiffs, on the ground that the Commerce Clause preempts any such application or enforcement;

4.      For a declaratory judgment that the Massachusetts Domestic Workers Bill of Rights and the supporting MA OAG Regulations are preempted by the Commerce Clause insofar as there is any attempt to apply them to, or enforce them against, CCAP and CCAP's Host Families, including the Host Family Plaintiffs; and

PLAINTIFFS' RESP. APP.0002972

5.      For such other and further relief as this court deems appropriate.

Dated:  August 31, 2016                 Respectfully submitted,

                                        /s/ *Joan A. Lukey*
                                        Joan A. Lukey
                                        joan.lukey@choate.com
                                        Justin J. Wolosz
                                        jwolosz@choate.com
                                        CHOATE HALL & STEWART LLP
                                        Two International Place
                                        Boston, Massachusetts  02110
                                        Telephone:  (617) 248-5000
                                        Fax:  (617) 248-4000


                                        *Attorneys for Plaintiff Cultural Care, Inc.*
                                        *d/b/a Cultural Care Au Pair*

Case No. 1:14-cv-03074-CMA-KMT   Document 935-30   filed 03/30/18   USDC Colorado   pg
150 of 181

# Exhibit 325

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| NEIL PERETZ and THAO LE, on behalf of themselves and all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | CASE NO. 1:14-cv-13579-LTS |
| v. | ) ) | |
| CULTURAL CARE, INC. d/b/a CULTURAL CARE AU PAIR, | ) ) ) | |
| Defendant. | ) ) ) | |

## DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS[1]

### I. PRELIMINARY STATEMENT

This Court should dismiss this case, pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), because Plaintiffs have wrongly filed a class action complaint in this Court (instead of an individual case in small claims court) in an inappropriate attempt to create expense and bully Cultural Care into issuing an additional refund, to which Plaintiffs are not entitled under the plain terms of the refund policy in the contracts they signed. The contracts on which this case is based are the Host Family Agreement and Host Family Financial Responsibility Agreement (collectively, the "Contracts"), attached to the Complaint as Exhibits D and E.[2] Plaintiffs have filed this case seeking $3,181.23 on a frivolous breach of contract theory. This Court has no jurisdiction over the case and, in any event, the Plaintiffs' claims fail based on the allegations in the Complaint and the documents attached thereto.

---

[1] All capitalized terms in this Memorandum, unless otherwise defined, shall have the meanings ascribed to them in the Motion to Dismiss filed contemporaneously herewith.

[2] *See, e.g., Giragosian v. Bettencourt*, 614 F.3d 25, 27-28 (1st Cir. Mass.2010) (court may consider documents attached to complaint in assessing motion to dismiss).

PLAINTIFFS' RESP. APP.0002975

Cultural Care is a United States Government-designated exchange visitor program sponsor governed by U.S. Department of State regulations under which foreign au pair candidates are afforded the opportunity to live in the United States and participate in the home life of an American host family.  The au pairs are between eighteen and twenty-six years old, are high school graduates, are proficient in English, and in addition to providing au pair services, complete an educational requirement while in the program.  Au pairs are participants in the exchange program, not employees of Cultural Care.  According to the Complaint, Plaintiffs are a husband and wife who participated as hosts in this cultural exchange program in 2013.  Plaintiffs signed the Contracts, which fully disclosed the program rules, fees and costs, and the refund policy.  Plaintiffs went through the selection process and an au pair was placed in their home in September 2013.  Approximately one month later, the au pair decided to leave her placement, which she was entitled to do.  Cultural Care had no control over her decision.  In the event an au pair elects to leave the program, Cultural Care will use reasonable efforts to locate a replacement au pair for no additional program fee.  Rather than pursue this option, Plaintiffs elected to terminate their participation in the program.  In accordance with the refund policy in the parties' Contracts, Cultural Care promptly issued Plaintiffs a contractual refund of $4,508.00.  Plaintiffs then demanded yet additional payments to which they were not entitled under the Contracts, Cultural Care declined their demand, and Plaintiffs filed this frivolous purported "class-action" lawsuit.

Although Plaintiffs have filed a convoluted 23-page complaint, Plaintiffs essentially have three simple theories of recovery:

2

PLAINTIFFS' RESP. APP.0002976

1) a garden-variety contract claim: that Cultural Care allegedly failed to comply with the refund policy contained in the parties' signed contracts;[3]

2) Cultural Care engaged in deceptive advertising in violation of G.L. 93A by allegedly posting "false, deceptive and/or misleading" weekly and hourly rates for the program on its website;[4] and

3) another simple contract claim brought individually: that Cultural Care allegedly breached the parties' Contracts by i) failing to stop the au pair from leaving Plaintiffs' home; and ii) failing to provide a substitute au pair.[5]

This Court should dismiss all claims asserted against Cultural Care in the Complaint for the following independent reasons:

1) This Court lacks subject matter jurisdiction over Plaintiffs' claims because, according to the Complaint, the amount in controversy requirements of this Court are not satisfied. This is a small claims case with alleged damages of $3,181.23 and Plaintiffs have knowingly disregarded the rules of this Court by filing it here. Plaintiffs allege unique facts that have no application to the putative Class (of *every* Host Family that participated in the exchange program for the past four years) or the putative Subclass (of every Host Family that received some portion of a refund, regardless of timing or cause). Moreover, Plaintiffs offer nothing more than conclusory assertions that either the Class or Subclass experienced the same unique

---

[3] Count I (G.L. 93A by Class) ¶ 88(h); Count II (Breach of Contract by Subclass) ¶¶ 92-95; Count III (G.L. 93A by Subclass) ¶ 97(h)-(i); Count IV (Declaratory/Injunctive Relief) ¶ 104; Count V (Individual Breach of Contract) ¶ 113(c).
[4] Count I (G.L. 93A by Class) ¶ 88(a)-(g); Count III (G.L. 93A by Subclass) ¶ 97(a)-(g); Count IV (Declaratory/Injunctive Relief) ¶ 103; Count V (Individual Breach of Contract) ¶ 113(c).
[5] Count V (Individual Breach of Contract) ¶ 113(a)-(b).

3

facts and circumstances as Plaintiffs sufficient to establish that at least 100 members exist or that members' damages exceed $5,000,000.

2) Plaintiffs' false and deceptive advertising claims fail because Cultural Care provided a simple, common-sense, and accurate calculation of fees on its website and prominently disclosed all assumptions (calculation depicted at Exhibit C, page 2 of the Complaint). The advertised fees were the sum of the application fee ($75), match fee ($300), program fee ($7,995), and weekly stipend ($195.75 x 51), divided by the total by 51 program weeks, which is the standard length of the program. It was clear from the face of the calculation that it was based on 51 program weeks and it was specifically disclosed on the website (see Exhibit B, pages 2 and 3 of the Complaint) that "[t]he yearly cost is calculated based on 51 program weeks from au pair's first week in the U.S. . . . [and] [t]he hourly cost is calculated based on 45 hours per week, the maximum number of childcare hours an au pair can provide according to the U.S. Department of State regulations." Thus, Cultural Care's weekly and hourly rates for the au pair program were true. If Plaintiffs had continued in the program for 51 weeks instead of terminating their participation, they would have experienced the weekly price in the 51-week calculation.

3) Plaintiffs' claims based on the refund policy fail because they cannot identify any contractual provision that Cultural Care allegedly breached. Instead, Cultural Care followed the refund policy in the Host Family Financial Responsibility Agreement, a contract that Plaintiffs not only concede they signed, but attach and rely on as part of the Complaint. Cultural Care issued Plaintiffs the required contractual refund of $4,508.00. Thus, all claims based on the refund must be dismissed.

PLAINTIFFS' RESP. APP.0002978

4) Plaintiffs' claim that Cultural Care breached the Contracts by not forcing the au pair to stay in Plaintiffs' home or providing replacement childcare also fails under the Complaint.  Cultural Care obviously had no legal right to force the au pair to stay in Plaintiffs' home and Plaintiffs agreed in the Host Family Agreement that Cultural Care "does not guarantee continuous childcare coverage . . . including . . . when the au pair becomes ill or otherwise unable or unwilling to fulfill her or his duties [and Cultural Care] is not responsible for the costs of supplemental, replacement, or interim childcare."  According to the Complaint, Cultural Care complied with the Host Family Agreement and sought to provide Plaintiffs a replacement au pair as part of the Program, but Plaintiffs denied and terminated their participation.

5) It is clear from the face of the Complaint that this case lacks sufficient questions of law or fact common to the Class or Subclass to satisfy Fed. R. Civ. P. 23(a)(2) because, assuming *arguendo* that Plaintiffs can show that a class exists, each case of "early termination" (where an au pair leaves at some point prior to 51 weeks) will involve a wholly different set of circumstances and level of alleged deception.  The class claims also fail under Fed. R. Civ. P. 23(b)(3) because, given the absence of common questions on the face of the Complaint, it is clear that common questions do not predominate over questions affecting only individual class members.

## II.  FACTUAL ALLEGATIONS IN COMPLAINT

### A.  Plaintiffs Signed Two Contracts with Cultural Care on March 26, 2013.

Plaintiffs allege that they are a married couple who participated in the au pair program in 2013.  *Complaint* ¶ 14, Section V.  Plaintiffs admit that they "signed the host family agreement . . ." and attached a copy to the Complaint as Exhibit D.  *Id.* ¶ 46-49.  Plaintiffs also attach a "true

5

and correct copy" of their signed Host Family Financial Responsibility Agreement to the Complaint as Exhibit E. *Id.* at 50.

**B.  The Host Family Agreement.**

       1.    *The Host Family Agreement Governed Plaintiffs' Relationship with Cultural Care and Superseded any Prior Agreements.*

The Host Family Agreement provided that "[t]his agreement shall govern in all respects (except financial obligations which are set forth in the Host Family Responsibility Agreement) the relationship between CC and the Host Family unless modified by a subsequent written agreement signed by the parties." *Id.* at Exhibit D ¶ 1.[6]  It further stated that "[t]he Host Family has reviewed and understands the financial obligations of participating in the Au Pair program as set forth in the Host Family Financial Responsibility Agreement [and] [t]he Host Family agrees to execute said document as a condition of acceptance into the Au Pair program." *Id.*

       2.    *The Host Family Agreement Provided A Process For Au Pair Replacement and Set Forth Host Family Termination Policies.*

The Host Family Agreement stated that "Host Family understands and acknowledges that it is the Host Family's responsibility to thoroughly interview and carefully choose an au pair . . . and that there is no guarantee as to the Host Family's satisfaction or to the compatibility of any particular candidate as an au pair in the Host Family." *Complaint, Exhibit D* ¶ 5.  It further provided that "Host Family acknowledges and understands that the au pair is not an employee or agent of CC, and as such CC does not exercise dominion or control over the actions of the au pair.  CC is not responsible for any act or omission . . . of the au pair." *Id.*  It further stated:

---

[6] Above the signature line the Host Family Agreement also stated "My (our) signature(s) below indicates acceptance of the terms of this agreement, and is legally binding and we agree to follow these terms and conditions if accepted into the program by CC.  No alterations to the terms of this agreement will be valid unless approved in writing by CC." *Id.* at page 2.  It further provided that "[t]his agreement can only be modified by a writing signed by both parties and any purported oral agreements or statements shall be without any force or effect." *Id.*

PLAINTIFFS' RESP. APP.0002980

> **Host Family understands that CC does not guarantee continuous childcare coverage during the program year under any circumstances, including, but not limited to, circumstances in which the au pair becomes ill or otherwise unable or unwilling to fulfill her or his duties hereunder; and that CC is not responsible for the costs of supplemental, replacement, or interim childcare.**

*Id.* ¶ 6 (emphasis supplied).

The Host Family Agreement stated that "Host Family agrees to inform CC in writing in the event Host Family wishes to withdraw from the program before completion of the program term [and] [i]n the event of such withdrawal, Host Family **shall be subject to the refund policy set forth in the Host Financial Responsibility Document executed by the Host Family**." *Id.* ¶ 23 (emphasis supplied) (the refund policy that appears in the Host Family Financial Responsibility Agreement is discussed in detail in Section II(C)(2) below). In addition to the provisions specifically discussed above, the Host Family Agreement also provided, among other things, details regarding the other aspects of the au pair program and a release provision.[7]

### C. The Host Family Financial Responsibility Agreement.

1. *The Host Family Financial Responsibility Agreement Set Forth Plaintiffs' Program Fees to Cultural Care.*

The Host Family Financial Responsibility Agreement, attached to Plaintiffs' Complaint as Exhibit E, provided that "[t]his agreement sets forth all financial obligations of those participating in the Cultural Care Au Pair program. The obligations herein are in addition to those set forth in the Host Family Agreement and nothing contained herein modifies or alters in any way the Host Family Agreement." *Complaint, Exhibit E* at 1. It stated that "Host Family agrees to pay a selection fee to CC at the time in which their final decision for choosing an au

---

[7] The Host Family Agreement also explained many other aspects of the program and provided that "Host Family acknowledges that CC is not responsible for any expenses incurred by the au pair or by the Host Family, including, but not limited to, telephone bills, automobile expenses, property damage, travel expenses, and health expenses not covered by insurance." *Id.* ¶ 22. The Host Family Agreement also included a Massachusetts choice-of-law provision and a provision in which the Host Family releases Cultural Care from all claims based on ordinary negligence, and Cultural Care reserves all rights under said provision. *Id.* ¶ 25, 27.

7

PLAINTIFFS' RESP. APP.0002981

pair is communicated to CC." *Id.* ¶ 1.  It provided that "Host Family is responsible for paying

the program fee plus the domestic transportation fee thirty (30) days prior to the au pair's arrival.

Arrival date is defined as a) arrival to the au pair training school for an au pair who is a new

arrival from overseas, b) arrival date to Host's home if au pair is currently in United States." *Id.*

¶ 2.  The Regular Payment Plan that Plaintiffs used was depicted as follows in a table:

| 2013 Cultural Care Program Fee | | | |
|---|---|---|---|
| Regular Payment Plan | | | |
| Amount | Type | Due | Weekly Rate |
| $175.00 | Selection Fee | At time of choosing au pair | |
| $7,795.00 | Program Fee | 30 days prior to au pair's arrival | $149.90 |
| Varies | Domestic Transportation Fee | 30 days prior to au pair's arrival | |

*Id.* at Exhibit E page 2.

### 2. *The Host Family Financial Responsibility Agreement Set Forth the Refund Policy Which Cultural Care Complied With.*

As noted in Section II(B)(2) above, the Host Family Agreement stated that "Host Family

shall be subject to the refund policy set forth in the Host Financial Responsibility Document

executed by the Host Family."  *Id.* at Exhibit D ¶ 23.  The Host Family Financial Responsibility

Agreement included the following refund policy:

**Refunds:**  Host Family agrees to the following refund policy:

> a.) If Host cancels four (4) weeks or less prior to the au pair's arrival to the
> school, CC will refund all monies paid less application fee and selection fee and
> charge the Host Family an $850.00 cancellation fee plus the cost of all non-
> refundable airline tickets or airline penalties, if applicable.
> b.)  If Host cancels after the au pair's arrival to the training school or in the event
> of an in-country placement after the au pair's arrival to the Host Family, refunds
> will be determined as follows (**Please see appendix B1**):
> - Calculate the total amount paid to CC towards the program fee
>   (program fee = all monies paid less any non-refundable fees and
>   discounts applied)
> - Divide total amounts by the corresponding weekly rate to determine
>   the number of childcare weeks paid for

8

PLAINTIFFS' RESP. APP.0002982

- Subtract the number of childcare weeks received from the number of childcare weeks paid for to determine the number of refundable weeks
- Multiply the number of refundable weeks by the corresponding refund rate **(Please See appendix B2)**

### Appendix B1:  Refund Calculation

| | | |
|---|---|---|
| Program fee weeks paid for | _____ | All funds paid to CC for the current program year less any non-refundable fees and discounts applied, divided by the corresponding weekly rate |
| Less program weeks received | _____ | Total number for all au pairs places [sic] with Host including week(s) at the training school |
| Total refundable weeks | _____ | Program fee weeks paid less number of weeks received |
| Multiple [sic] by | _____ | Refund per week based on program weeks received (table below) |
| Equals refund due | _____ | |

### Appendix B2:  Refund Per Week

| Program Weeks Received | 1 to 10 | 11 to 20 | 21 to 30 | 31 or more |
|---|---|---|---|---|
| Refund Per Week | $98.00 | $69.00 | $45.00 | NA |

[ ]

**Please note:   the application fee, selection fee, domestic transportation fee, Extended Payment Plan fees, and any late payment or penalty charges are non-refundable.  All refunds are calculated based on total funds Host has paid to CC, minus all non-refundable fees.  Any special discounts or credits will not be considered as funds paid to CC.

*Id.* at Exhibit E ¶ 5, page 3.

### D.  Plaintiffs' Allegations Regarding Au Pair Placement.

Plaintiffs claim in the Complaint that, after they signed the Host Family Agreement and Host Family Financial Responsibility Agreement, they paid Cultural Care a total of $8,330.00 (including a $175.00 selection fee, program fee of $7,995, and other charges).  *Id.* ¶¶ 55, 64, 66. Plaintiffs allege that, on September 20, 2013, the family's au pair, Ms. Salzmann, arrived at their home in California and began serving as their au pair three days later.  *Id.* ¶ 56.  Plaintiffs allege

9

PLAINTIFFS' RESP. APP.0002983

that, approximately one month later, on October 18, 2013, Ms. Salzmann left her placement as

their au pair "at the election of Ms. Salzmann and Cultural Care and not by Plaintiffs." *Id.* at ¶

58-59, 62. Plaintiffs concede that Cultural Care sought to afford Plaintiffs a replacement au pair

as part of the program, but Plaintiffs instead sought and received a refund from Cultural Care.

*Id.* ¶ 63, 64. Plaintiffs allege that they received a refund of $4,508.00. *Id.* ¶ 64. Ignoring the

refund policy in the parties' contract, Plaintiffs claim that they are entitled to a "pro-rated refund

of Cultural Care's $8,330 in program fees based on four weeks of service out of 52 [,which]

would be $7,689.23." *Id.* ¶ 66. In other words, Plaintiffs claim they are owed $3,181.23. *Id.*

### E. Plaintiffs' Allegations Regarding Alleged Deceptive Advertisement.

Plaintiffs allege that "[p]rior to signing the Host Family Agreement with Cultural Care,

the Plaintiffs reviewed the pricing information on Cultural Care's website, including both the

hourly and weekly price representations and Cultural Care's price comparison with alternative

forms of childcare." *Id.* ¶ 46. Plaintiffs allege that three pages on Cultural Care's website (each

discussed in Sections II(E)(1)-(3) below include "deceptive" pricing: 1) "Program Costs"

webpage; 2) home page; and 3) "Our Advantage" webpage. *Id.* ¶¶ 19-28. Plaintiffs attached

copies of these webpages to the Complaint as Exhibits A through C. Plaintiffs claim that the

following portions of the above webpages are "false" and "deceptive":

### 1. *"Our Advantage" Webpage*

Plaintiffs allege that the following weekly breakdown of fees is deceptive, but in making

this allegation they simply ignore the terms of the Contracts they signed with Cultural Care and

the prominent disclosures that 1) the standard length of the program is 51 weeks; and 2) that

there are additional fees and costs associated with the program:

10

Case No. 1:14-cv-03074-CMA-KMT   Document 943-30   filed 03/17/18   USDC Colorado   pg 160
of 181
Case 1:14-cv-13579-ADB   Document 61   Filed 11/12/14   Page 11 of 21

**HOW DOES IT ALL ADD UP?**

+ $75 application fee

+ $300 match fee

+ $7,995 program fee

+ $195.75 stipend x 51 weeks

÷ 51 program weeks

**= $360 PER WEEK**

*Id.* ¶¶ 27-35, Exhibit C at page 2; Exhibit B at page 2.

2. *"Program Costs" Webpage*

Although Cultural Care provided a complete and exhaustive explanation of costs on the

"Program Costs" page, Plaintiffs allege that the following calculations are deceptive:

## Total annual cost: $18,353.25

| Annual Cost: | Monthly Cost: | Weekly Cost: | Hourly Cost: |
|---|---|---|---|
| $18,353.25 | $1,529.44 | $359.87[1] | $8.00[2] |

[1] **The weekly cost is calculated based on 51 program weeks (an au pair's first week in the U.S. is spent at the Cultural Care Au Pair Training School).**
[2] **The hourly cost is calculated based on 45 hours per week, the maximum number of childcare hours an au pair can provide according to the U.S. Department of State regulations.**

*Id.* ¶¶ 21-23, Exhibit B at page 2.

## *Cost comparison*

One of the biggest misconceptions about the au pair program is that it is expensive. Many families are surprised to learn that not only is au pair childcare one of the most flexible forms of childcare available, but also the most affordable. Take a look at how the average weekly cost of Cultural Care Au Pair compares to other forms of childcare, including other au pair agencies who often charge extra for additional qualifications.

11



**¹ Based on the 2013 Cost of Care report by Child Care Aware of America for families living in major metro regions of the U.S. with two children (one 0 to 2-year-old and one 3 to 5-year-old).² Based on a 2012 salary and benefits survey distributed by the International Nanny Association.**

*Id.* ¶¶ 21-23, Exhibit B at page 2.  Plaintiffs also allege that "Cultural Care's price advertisement does not include costs of room and board[,] costs of domestic transportation, fulfillment of the au pair's educational requirement . . ., and other required host family expenses" (*Id.* ¶ 24) although the "Program Costs" webpage states as follows:

> **Additional fees and costs**
>
> Depending on your family's individual needs and the area in which you live, you should take the following variable costs into consideration:
>
> - Domestic transportation fee: varies. Click here for a full list of domestic transportation fees.
> - Educational Component: up to $500. U.S. Department of State regulations require au pairs to take 6 credits at an accredited institution during this year. As a host family, you are required to pay up to $500 towards the cost of these classes.
> - Driver's insurance: varies. If you require your au pair to drive, you must pay to have her insured under your family's existing policy.
> - Room and board: varies. As families expected to provide their au pair with a separate bedroom and include her in family meals, additional costs are incurred.

*Id.* Exhibit B at page 2.

### 3. *Home Page*

Plaintiffs further allege that the following statement on Cultural Care's homepage, which is based on and links to the "Program Costs" page, is deceptive:

PLAINTIFFS' RESP. APP.0002986

**AFFORDABLE**
Average cost is just $8/hour for 45 hours of coverage (per family, not per child). How does it add
up? [Link to "Program Costs" webpage]

*Id.* ¶¶ 19-20, Exhibit A.

## III. <u>LEGAL ARGUMENT</u>

### A. Plaintiffs' Claim Fail Because this Court Lacks Subject Matter Jurisdiction.

Plaintiffs' claims should be dismissed pursuant to Fed. R. Civ. P. 12(b)(1) on the grounds
that this Court lacks subject matter jurisdiction over Plaintiffs' claims because Plaintiffs have
failed to adequately plead that the amount in controversy requirements of this Court ($75,000 for
individual claims and $5,000,000 for class claims) have been met.

This Court has jurisdiction over civil actions between citizens of different states "where
the matter in controversy exceeds the sum or value of $75,000." 28 U.S.C. § 1332(a). In
addition, CAFA provides federal courts with jurisdiction over class actions in which: 1) the
aggregate value of the claims exceeds $5,000,000, exclusive of interest and costs; 2) there are at
least 100 class members; and 3) there is diversity of citizenship between at least one class
member and at least one defendant. 28 U.S.C. § 1332(d). A defendant may mount a challenge
to subject matter jurisdiction by challenging the sufficiency of the jurisdictionally-significant
facts pleaded in the complaint. *Valentin v. Hosp. Bella Vista,* 254 F.3d 358, 363 (1st Cir. 2001).
"The court must then assess whether the plaintiff has propounded an adequate basis for subject-
matter jurisdiction." *Id.* (citing *Ohio Nat'l. Life Ins. Co. v. U.S.,* 922 F.2d 320, 325 (6th Cir.
1990)); *Menchaca v. Chrysler Credit Corp.,* 613 F.2d 507, 511 (5th Cir. 1990). A federal court
must "presume [ ] that a [case] lies outside this limited jurisdiction." *Kokkonen v. Guardian Life
Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Amorphous and/or conclusory allegations that federal
jurisdiction exists is not sufficient to survive a motion to dismiss. *See, e.g., Murphy v. United*

PLAINTIFFS' RESP. APP.0002987

*States*, 45 F.3d 520, 522 (1st Cir. 1995); Fed. R. Civ. P. 12(h)(3) (A federal court must dismiss a lawsuit whenever it appears that the Court lacks subject matter jurisdiction).

Here, there is no basis to conclude that Plaintiffs' pleaded amount in controversy exceeds $75,000.00; rather, Plaintiffs admit in the Complaint that their damages are $3,181.23 and therefore this Court inarguably lacks jurisdiction over Plaintiffs' individual breach of contract claim in Count V.[8]   *Complaint* ¶¶ 64, 66.  With respect to the class claims, Plaintiffs base their case on a unique, individual experience:  their au pair chose to leave her placement after four weeks instead of staying for the duration of the 51-week program for specific reasons unique to Plaintiffs' family, Plaintiffs refused a replacement au pair and instead decided to terminate their participation in the program, and Cultural Care issued Plaintiffs a contractual refund based on the specific timing of Plaintiffs' termination.  These facts do not apply to the unduly broad putative Subclass, let alone the even broader still putative Class.   Instead, Plaintiffs' allegations are specific to the Plaintiffs and not generally applicable to a class.  Plaintiffs have alleged that the Class "consist[s] of all individuals nationwide who have hired a Cultural Care au pair . . . beginning four years prior to the date of the Complaint."  *Complaint* ¶ 71.  Plaintiffs allege that the Subclass consists of individuals who have been subject to Cultural Care's "partial refund policy" due to "an au pair who chose to terminate the engagement prior to one year from the date of commencement."  *Id.* ¶ 72.  With respect to the Class, there is absolutely no basis to suggest, and it is in conflict with all logic and reason, that every individual who has participated in the au pair program in the last four years has experienced Plaintiffs' unique situation.  This is mere speculation by Plaintiffs in the absence of any factual or logical basis.  Plaintiffs' allegation in paragraph 75 of the Complaint that "[a]ll members of the Class have been subject to and affected by the same conduct" is wholly conclusory and not sufficient to survive a motion to dismiss.

---

[8] Plaintiffs' alleged damages would only increase to $9,543.69 if trebled under G.L. 93A.

PLAINTIFFS' RESP. APP.0002988

Case 1:14-cv-03074-CMA-KMT Document 943-18 filed 03/17/18 USDC Colorado pg 164
of 181
Case 1:14-cv-13579-ADB Document 60-1 Filed 11/12/14 Page 15 of 21

With respect to the Subclass, Plaintiffs intentionally misconstrue the program, ignore the terms

of the Contracts explaining that the au pair program is a cultural exchange program (not a nanny-

for-hire service), and ignore the numerous disclosures that there is no guarantee as to au pair

compatibility and that Cultural Care does not guarantee continuous childcare coverage when the

au pair is unwilling to fulfill her duties. *Id. Exhibit D* ¶¶ 5, 6. Plaintiffs have also failed to

validly plead any facts supporting that the Class or Subclass members number 100 or that their

damages exceed $5,000,000. Plaintiffs merely state the conclusion that "the matter in

controversy exceeds the sum or value of $5,000,000 . . . and there are 100 or more members in

the proposed classes" but plead no facts supporting this baseless conclusion. *Id.* ¶ 11. Plaintiffs

have disregarded the rules and applicable law by filing what is actually a small claims case in

this Court in an attempt to bully Cultural Care into issuing an additional refund. It is completely

improper, this Court lacks subject matter jurisdiction over this small claims case, and the

Plaintiffs' claims should be dismissed.

> **B. Plaintiffs' Claims For Deceptive Advertising Based on Cultural Care Allegedly Posting Inaccurate Weekly and Hourly Rates on Its Website Should Be Dismissed Because the Posted Rates Were True.**

Cultural Care provided a simple, common-sense, and accurate calculation of fees on its

website to arrive at accurate weekly and hourly rates, thus the following claims based on the

advertisement of inaccurate rates on the website should be dismissed: Count I (G.L. 93A by

Class) ¶ 88(a)-(g); Count III (G.L. 93A by Subclass) ¶ 97(a)-(g); Count IV

(Declaratory/Injunctive Relief) ¶ 103; Count V (Individual Breach of Contract) ¶ 113(c).

Under settled Massachusetts law, "[t]he facts underlying common law misrepresentation .

. . are identical to those which underlie a G.L. c. 93A claim founded on misrepresentation."

*Acushnet Federal Credit Union v. Roderick*, 26 Mass. App. Ct. 604, 608, (1988); *Admiral Metals*

15

*Servicenter Co., Inc. v. Micromatic Products Co., Inc.*, 2003 WL 369709, *7; No. 014740C

(Mass. App. Ct. Jan. 24, 2003) (Lauriat, J.). To prove a common law claim of intentional or

negligent misrepresentation, a plaintiff must show that the defendant, in the course of his

business, supplied **false information** for the guidance of another. *See, e.g., Cole v. New England*

*Mut. Life Ins.* Co., 49 Mass. App. Ct. 296, 300 (2000). In addition, the regulations cited in the

Complaint[9] prohibit deceptive claims, not truthful statements.

As can be seen on the "Program Costs" webpage at Exhibit B to the Complaint, Cultural

Care provided a complete and exhaustive explanation of costs. On the "Our Advantage"

webpage, Cultural Care provided an accurate calculation of fees (calculation depicted at Exhibit

C, page 2 of the Complaint) by adding the application fee ($75), match fee ($300), program fee

($7,995), and weekly stipend ($195.75 x 51) and dividing the total by 51 program weeks, which

is the expected length of the program. The face of the calculation reflected that it was based on a

full program of 51 weeks. It was specifically disclosed on the "Program Costs" webpage that

"[t]he yearly cost is calculated based on 51 program weeks from au pair's first week in the U.S. .

. . [and] [t]he hourly cost is calculated based on 45 hours per week, the maximum number of

childcare hours an au pair can provide according to the U.S. Department of State regulations."

*Complaint,* Exhibit B, page 2. Thus, Cultural Care's weekly and hourly rates for the au pair

program were true. Plaintiffs would have experienced the 51-week calculated rate if they did not

cancel and participated in the program for 51 weeks. In turn, Cultural Care's annual, monthly,

and hourly cost calculations on the "Program Costs" webpage are merely multiples of the weekly

calculation and are therefore true. *Id.* Exhibit B, page 3. Finally, the statement on the homepage

that the "Average cost is just $8/hour for 45 hours of coverage (per family, not per child). How

---

[9] G.L. 940 C.M.R. § 3.02 (False Advertising); § 3.04 (Deceptive Pricing); 940 C.M.R. § 3.05 (General Misrepresentations); 940 C.M.R. § 3.16 (General); and 940 C.M.R. § 6.05 (Price Comparison and Savings Claims).

16

PLAINTIFFS' RESP. APP.0002990

does it add up?" with a link to the "Program Costs" webpage is also accurate based on the calculations. *Id.* Exhibit A.

Plaintiffs' claim that "Cultural Care's price advertisement does not include costs of room and board[,] costs of domestic transportation, fulfillment of the au pair's educational requirement . . ., and other required host family expenses" (*Id.* ¶ 24) is flatly wrong according to the "Program Costs" webpage, which specifically discloses these costs in detail. *Id.* Exhibit B, page 2. Furthermore, Cultural Care clearly and conspicuously described the basis for the price comparison with daycare centers and nannies by citing the 2013 Cost of Care report by Child Care Aware of America and 2012 salary and benefits survey distributed by the International Nanny Association. *Id.* Exhibit B, page 2. It is therefore clear from the pleaded facts that the alleged "deceptive" calculations about which Plaintiffs complain are true.

### C. Plaintiffs' Individual Breach of Contract Claim Fails Under the Terms of the Contracts.

Plaintiffs' individual claim for breach of contract in Count V (Individual Breach of Contract) ¶ 113(a)-(b)[10] should be dismissed because, under the Contracts, Cultural Care had no obligation to force the au pair to live with Plaintiffs' family, provide a substitute au pair, or otherwise bear responsibility for the costs of supplemental, replacement, or interim childcare.

As discussed above, Plaintiffs' au pair decided to leave her placement through no fault of Cultural Care, which was obviously her right. Au Pairs are participating in a cultural exchange, they are not Cultural Care employees as reflected in the Host Family Agreement, and they certainly cannot be held against their will.[12] Plaintiffs agreed in the Host Family Agreement that there is no guarantee as to the host family's compatibility with a particular candidate, that the au

---

[10] Plaintiffs admit in the Complaint that their damages are $3,181.23 and Plaintiffs make no attempt to explain how this claim meets federal amount in controversy requirements. *Complaint* ¶ 64, 66.

[12] Plaintiffs' themselves acknowledge in their Complaint the obvious fact that au pairs are human beings who leave placements for myriad reasons including homesickness, cultural isolation, and poor fit with the families. *Id.* ¶ 4.

17

pair is not an employee of Cultural Care, that Cultural Care does not exercise dominion and control over the au pair, and that Cultural Care is not responsible for an act or omission of the au pair. *Id. Exhibit D* ¶ 5. Plaintiffs specifically agreed that Cultural Care "does not guarantee continuous childcare coverage during the program year under any circumstances, including [when an au pair is] unwilling to fulfill her or his duties hereunder and that CC is not responsible for the costs of supplemental, replacement, or interim childcare. *Id. Exhibit D* ¶ 6. Thus, Plaintiffs' individual claim for breach of contract in Count V should be dismissed.

### D. Plaintiffs' Claims Based on the Refund Should Be Dismissed Because Plaintiffs Fail to Identify a Provision in the Refund Policy that Cultural Care Breached.

Plaintiffs' claims based on the refund policy fail because they cannot identify any contractual provision that Cultural Care allegedly breached. Thus, the following claims based on the refund policy should be dismissed: Count I (G.L. 93A by Class) ¶ 88(h); Count II (Breach of Contract by Subclass) ¶¶ 92-95; Count III (G.L. 93A by Subclass) ¶ 97(h)-(i); Count IV (Declaratory/Injunctive Relief) ¶ 104; Count V (Individual Breach of Contract) ¶ 113(c).

To state a claim for a breach of contract under Massachusetts law, the complaint must identify the contractual term or provision that creates the obligation that was allegedly violated. *See Harvard Law School Coalition for Civil Rights v. President and Fellows of Harvard College*, 595 N.E.2d 316, 320 (Mass. 1992) (affirming the dismissal of a breach of contract claim where the plaintiffs failed to set out the provisions of the contract allegedly breached); *695 Atlantic Ave. Co., LLC v. Commercial Construction Consulting, Inc.*, No. 04-P-1129, 2005 WL 2291192, at *2 (Mass. App. Ct. Sept. 20, 2005) (dismissing a breach of contract claim where the complaint failed to assert specific breaches of express contractual provisions). Here, Plaintiffs fail to cite a provision of the parties' Contracts that Cultural Care allegedly breached. Instead, according to the facts pleaded in the Complaint, Cultural Care complied with the refund policy in the Host

PLAINTIFFS' RESP. APP.0002992

Family Financial Responsibility Agreement Plaintiffs acknowledge that they entered into the Contracts with Cultural Care and Plaintiffs attached copies of the Contracts to the Complaint.  As explained above, the Host Family Financial Responsibility Agreement included the refund policy in paragraph 5.  The Complaint and attachments allege that the au pair left after five weeks in the program (four weeks at the Plaintiffs' home and one week at the au pair training school). *Complaint* ¶ 62, Exhibit B at page 2 ("an au pair's first week in the U.S. is spent at the Cultural Care Au Pair Training School"), Exhibit D ¶ 21 (arrival date is defined as arrival to the au pair training school), Exhibit E ¶ 2, Appendix B1 (same).  Plaintiffs' refund calculated as follows under the Host Family Financial Responsibility Agreement and Appendix B1 thereto:

| | |
|---|---|
| Total paid to Cultural Care: | $8330.00 |
| Less Nonrefundable Selection Fee: | (175.00) |
| Less Nonrefundable Domestic Transportation Fee: | (560.00) |
| Total paid towards program fee: | 7,595.00 |
| | |
| $7,595/weekly program fee of $149.90: | 51 weeks paid |
| 51 weeks paid - 5 weeks received: | 46 refundable weeks |
| 46 refundable weeks x $98.00 per week: | **$4,508.00 total refund due** |

The claims based on the refund policy should therefore be dismissed because Plaintiffs admit that that they received a contractual refund of $4,508.00 and it is clear from the Complaint that Cultural Care complied with the contractual refund policy.

### E.  Plaintiffs' Class Claims Fail Under Fed. R. Civ. P. 23(a)(2) and 23(b)(3).

Plaintiffs' class claims should be dismissed because, according to the facts pleaded, this case lacks sufficient questions of law or fact common to the Class and Subclass to satisfy Fed. R. Civ. P. 23(a)(2), and the "predominance" requirements of Fed. R. Civ. P. 23(b)(3) are similarly not met.  To establish commonality, a plaintiff must prove "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  The "raising of common 'questions' alone is not sufficient to establish commonality," rather Plaintiffs' claims must depend upon a common contention that

PLAINTIFFS' RESP. APP.0002993

is "capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011). In addition, the first prong of Fed. R. Civ. P. 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members," and the predominance requirement is more demanding than the commonality requirement because there must be a "sufficient constellation of common issues bind[ing] class members together . . . ." Fed R. Civ. P. 23(b)(3); *Donovan v. Philip Morris USA, Inc.*, 268 F.R.D. 1, 23 (D. Mass. 2010); *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 296 (1st Cir. 2000).

Here the supposed Class and Subclass members will lack common questions capable of class wide resolution given the unique and individualized nature of the events pleaded in the Complaint. Each alleged case of "early termination" (where an au pair leaves a host family at some point prior to 51 weeks) will involve a wholly different set of circumstances and level of alleged deception. For these same reasons, it is also clear that common questions do not predominate over questions affecting only individual members of the supposed "class" under Fed. R. Civ. P. 23(b)(3). Thus, the class claims should be dismissed under Fed. R. Civ. P. 23(a)(2) and 23(b)(3).

## IV. CONCLUSION

This Court should dismiss all Plaintiffs' claims against Cultural Care pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) because, according to the pleaded facts, this is a $3,181.23 case over which this Court has no jurisdiction, Plaintiffs' claims are belied by the plain terms of the Contracts they admittedly signed with Cultural Care, and Plaintiffs' class claims fail to comply with Fed. R. Civ. P. 23(a)(2) and 23(b)(3).

PLAINTIFFS' RESP. APP.0002994

Case No. 1-14-cv-03074-CMA-KMT   Document 943-305   filed 09/17/18   USDC Colorado   pg 170
171 of 181
Case 1:14-cv-03074-CMA-KMT   Document 401   Filed 09/17/18   USDC Colorado   Page 170
Case 1:14-cv-13579-ADB   Document 401   Filed 11/12/14   Page 21 of 21

Respectfully Submitted,
CULTURAL CARE, INC.,
By its counsel,


_____ /s/ Jeffrey P. Allen _____
Jeffrey P. Allen BBO #015500
E-mail: jallen@lawson-weitzen.com
Donald J. Gentile BBO #672657
E-mail: dgentile@lawson-weitzen.com
LAWSON & WEITZEN, LLP
88 Black Falcon Avenue
Boston, MA 02210
Telephone: (617) 439-4990
Facsimile:  (617) 439-3987

## CERTIFICATE OF SERVICE

    I, Donald J. Gentile, attorney for the Defendant, hereby certify that a true and accurate copy of the foregoing Defendant's Memorandum in Support of Motion to Dismiss filed through the Electronic Case Filing System will be sent electronically to the registered participants on November 12, 2014.


_____ /s/ Donald J. Gentile _____
Donald J. Gentile

PLAINTIFFS' RESP. APP.0002995

Case No. 1:14-cv-03074-CMA-KMT Document 959-18 filed 03/30/18 USDC Colorado pg 172 of 181

# Exhibit 326




415-376-0202

**Apply Now!**

| Become a Host Family | Become an Au Pair | About Us | Contact Us | Local Community Counselor |

Au Pair Duties
Why Agent Au Pair
The Program Year
Au Pair Education and Training
How to Apply

### Why Agent Au Pair

The agency provides educational and cultural exchange among nations through its inter cultural au pair program that provides live-in childcare for American families. Agent Au Pair carefully screens the host families and verifies that they are enthusiastic about cultural exchange and will operate in the spirit of the program which includes treating the au pair as a member of their family and ensuring that the au pair can take advantage of the cultural experiences available.



**Agent Au Pair is based in California**

The United States government Department of State has designated certain organizations to participate in the Au Pair Cultural Exchange Program. The regulations are set forth by the government and must be enforced by each sponsoring organization and the rules and regulations are the same for all Au Pair Programs in the United States. You live and work with your host family for 12 months on a legal J-1 visa. As a part of the program you have the ability to utilize a 30-day grace period granted by the INS for the purpose of personal travel within the United States after you have finished the 12-month program.

What are the Benefits Agent Au Pair Offers?

- Sponsorship of a legal 12-month J-1 visa
- Round-trip airfare to the U.S. from your home country
- Hotel, meals, Orientation and Au Pair School training with qualified instructors in San Francisco, CA prior to going to your host family home.
- Pocket money of $195.75 per week
- Up to $500 tuition for enrollment in an accredited post-secondary institution for 6 units of academic credit or its equivalent
- Room and board in a private bedroom with a pre-screened host family
- Two weeks paid vacation & one full weekend off per month (for travel)
- A direct telephone number to call in case of an emergency
- Health and accident insurance
- Introductions to other au pairs in the area and monthly meetings with your local community counselor
- Maximum work of 45 hours per week/ 10 hours per day

Copyright ©2017 Agent Au Pair, Inc. All rights reserved.

PLAINTIFFS' RESP. APP.0002997

# Program costs

Home (https://apex-social.org/)  »  Services & Costs (https://apex-social.org/leistungen-kosten)  "  *program costs*

## The program fee for apex social

The low program fee of apex social covers all essential expenses and guarantees you the constant support and advice from an expert team, which ensures a safe adventure abroad. Our program for social workers is the best and easiest way to live and work legally in the US or Australia. Your application is free of charge and without obligation, until a guest family makes you - only then will you be asked to pay the program fee below.

### Contact free of charge!

📞 **0800 91 91 555**
Mon - Fri 10:00 to 20:00
Sat 9:00 to 18:00

✉ Info@apex-social.org (mailto:info@apex-social.org)

✓ | Apply now >  (https://apex-social.org/anmelden)

## Program costs and included services

  Home (https://apex-social.org/)

0800 91 91 555   Mon – Fri 10:00 to 20:00   🇩🇪 German ⌄   [log in]
                 Sat 9:00 to 18:00

**USA 12-month program:**
€ 495, - €

Search for jobs   (https://apex-social.org/familien/stellsuam   Professional Benefits & Remuneration   This is how it works   Services & costs (https://apex-social.org/leistungen-kosten/vorteile-verguetung)   Life in the program   About us   Blog (https://apex-social.org/blog)   M (https://apex-...in...social.org/)...   No

➡ **Program costs**

**Australia 12-month program:**
**1.495, - €**

Accompanying on site   (https://apex-social.org/leistungen-kosten/begleitung-vor-ort)

Training opportunities (https://apex-social.org/leistungen-kosten/weiterbildung)

Support by programs   (https://apex-social.org/leistungen-kosten/betreuung-nach-programmende)

## The apex social program offers an all-round service and includes the following services:

✓ **Assistance in the application and placement of a carefully checked family of guests**

› Your apex social coach will lead you through the application process

› Your personal matching expert will help you find the right host family

### TIPS & HELPFUL TRICKS
**RUND UM DAS APEX SOCIAL-PROGRAMM UND DEINE BEWERBUNG**

✓ **Apex Academy -**

› Full-day training at the apex Academy

PLAINTIFFS' RESP. APP.0002998

| | **Training program** | › Comprehensive consulting, support and preparation by our team of experienced consultants |
| --- | --- | --- |



| ✓ | **Online course at the American Education Institute** | › You take part in a 38-hour comprehensive online training course on child development and early childhood education |
| --- | --- | --- |
| | | › After completing the course, you will receive a certificate |

(https://apex-social.org/blog/tipps-hilfreiche-infos/teamgefluester/wer-ist-eigentlich)

**Who is actually ...?** (https://apex-social.org/blog/tipps-hilfreiche-infos/teamgefluester/wer-ist-eigentlich)

More articles from the category Tips & Helpful Info (https://apex-social.org/blog/category/tipps-hilfreiche-infos)

| ✓ | **Remuneration** | Weekly salary *(is paid in US dollars or Australian dollars)* |
| --- | --- | --- |
| | | › In the US $ 250, - USD weekly salary |
| | | › In Australia $ 300, - AUD weekly salary |

| ✓ | **Visa Support Services** | › Approved visa services and mandatory assignment form *(DS 2019)* |
| --- | --- | --- |
| | | › SEVIS fee *(US directory for certain visitors)* |

| ✓ | **Insurance** | › Basic medical and liability insurance for your entire stay abroad *(Travel month not included)* |
| --- | --- | --- |
| | | › Extended insurance benefits can be booked on request |

| ✓ | **Flights** | Free return flights from certain airports to the USA or Australia |
| --- | --- | --- |

Free phone number ☎ **0800 91 91 555**   Mon - Fri 10:00 to 20:00   Sat 9:00 to 18:00   German ⌄   log in

 apex social helfen hilft weltweit (https://apex-social.org/)   Search for jobs   (https://apex-social.org/familien/pflegefam)Professional program   This is how it works   Services & costs   Life in the program   About us   Blog (https://apex-social.org/blog/)   M in No

| ✓ | **Food & Logis** | › Emergency service with 24-hour case of emergency |
| --- | --- | --- |
| | | › In the US, an Area Director will assist you with you once a month and meet you regularly to ensure you have a great time in the US |
| | | › In Australia, an Area Director will assist you and contact you once a month. In some areas, no Area Director can be nearby. In this case, our country director, who lives in Sydney, will look after you. |

| ✓ | **Final Certificate** | An official certificate proving the successful stay abroad as a social specialist |
| --- | --- | --- |

| ✓ | **Extension possibility** | **Applies only to the United States:** option to extend the program for a further six, nine or twelve months |
| --- | --- | --- |

| ✓ | **Repeatability** | **Applies only to the United States:** return as Professional au pair in the United States. Contact us for the details of this program. |
| --- | --- | --- |

PLAINTIFFS' RESP. APP.0002999

Case 1:14-cv-03074-CMA-KMT Document 943-59 Filed 03/17/18 USDC Colorado Page 175 of 180

## Additional charges that are not included

**Transparency is important to us! The following costs are not included in the apex social program fee.**

› Travel expenses for full-time training at the apex Academy
  *(place in different cities in Germany and Austria instead)*

› Costs to obtain a police certificate

› Travel expenses to the airport in Germany

› Cost of a medical certificate

› International driving Licence

### USA program

› Travel expenses for the compulsory interview for the J-1 visa at the US embassy

› J-1 visa fee (currently $ 160, – USD - see also: ↗ www.us-botschaft.de (http://www.us-botschaft.de) )

### Australia program

› Australian working holiday visa (currently about $ 420 – AUD - see also ↗ www.border.gov.au (http://www.border.gov.au) )

# Put your degree in another country!
# Apply now!



✓   **Apply now >**     **(https://apex-social.org/anmelden)**

Free phone number  📞 **0800 91 91 555**   Mon - Fri from 9 o'clock
                                            Sat 9:00 to 18:00


German ⌄   log in

apexsocial (https://apex-social.org/)   Search for JOBS (https://apex-social.org/familien/stellen)   (https://apex-social.org/familien/stellen) Professional program   This is how it works   Services & costs   Life in the program   About us   Blog (https://apex-social.org/blog)   M in No

➜ **SEARCH FOR JOBS (HTTPS://APEX-SOCIAL.ORG/FAMILIEN/STELLEN)**

➜ **PROFESSIONAL PROGRAM**
   Overview of the program (https://apex-social.org/programm/ueberblick)
   Occupational therapists (https://apex-social.org/programm/ergotherapeuten)
   Physiotherapists (https://apex-social.org/programm/physiotherapeuten)
   Health and pediatric nurses (https://apex-social.org/programm/krankenschwestern)
   Educators and educators (https://apex-social.org/programm/lehrer-erzieher)
   Other social workers (https://apex-social.org/programm/andere-soziale-fachkraefte)
   Why are families host families? (https://apex-social.org/familien/warum-gastfamilie-werden)
   Review of the host families (https://apex-social.org/familien/screening)
   Working Hours & Duties (https://apex-social.org/familien/arbeitszeiten-aufgaben)
➜ **THIS IS HOW IT WORKS**
   Information meetings & online events (https://apex-social.org/ablauf/infotreffen)
   The application process (https://apex-social.org/ablauf/bewerbungsprozess)
   Apex applicant training (https://apex-social.org/ablauf/bewerber-training)
   Qualifications (https://apex-social.org/ablauf/qualifikationen)
   The way to the suitable guest family (https://apex-social.org/ablauf/matching)
   Training program before departure (https://apex-social.org/ablauf/training)
   Flights, visas & insurance (https://apex-social.org/ablauf/visum-flug)
   Information for parents (https://apex-social.org/ablauf/infos-eltern)
   Personality test (https://apex-social.org/ablauf/color-code)
   Frequently asked questions (FAQ) (https://apex-social.org/ablauf/faq)

➜ **SERVICES & COSTS**
   Benefits & Remuneration (https://apex-social.org/leistungen-kosten/vorteile-verguetung)
   Costs (https://apex-social.org/leistungen-kosten/kosten)

PLAINTIFFS' RESP. APP. 0003000



(http://www.aupairfoundation.org)

MEET OUR
TEAM (HTTP://WWW.AUPAIRFOUNDATION.ORG/MEET-OUR-TEAM/)
FIND AN
AU PAIR (HTTP://WWW.AUPAIRFOUNDATION.ORG/FIND-AN-AU-PAIR/)
BECOME A
HOST FAMILY (HTTP://WWW.AUPAIRFOUNDATION.ORG/BECOME-A-HOST-FAMILY/)
**LEARN MORE (HTTP://WWW.AUPAIRFOUNDATION.ORG/ABOUT-US/)**
BLOG
APF EXCHANGE (HTTP://BLOG.AUPAIRFOUNDATION.ORG)

CALL US ON:
**1 866 428 7247**

Call us on: 1866 428 7247



# Frequently Asked Questions

Do you have questions?  Well, we have answers to some of the most frequently asked questions.  Do you have an additional question?  Please contact us to speak directly with a member of the Au Pair Foundation team who can help you get the answers you need.

### What is the difference between a nanny and an Au Pair?

Nannies are child-care providers who are paid for their expertise and experience and they are employees of the family for whom they work. Nannies are private providers who are typically costly and ask for many benefits such as health insurance and Social Security from the family. Au Pairs, on the other hand, are participants in a Department of State cultural exchange program. Au Pairs provide up to 45 hours of childcare per week as part of their responsibility to their Host Family and are considered members of the family, NOT domestic servants.

### What is the Educational Component of the Au Pair program?

Au Pairs are required to attend an accredited, post-secondary institution, such as a Community College, college or university, to earn at least six credits or 72 classroom hours of education. Host Families contribute up to $500 towards the cost of the education.

### How is Au Pair Foundation's program regulated by the Department of State?

Au Pair Foundation is audited annually to ensure compliance with the procedures and reporting requirements set forth in the Department of State's Regulations. Additionally, on an annual basis, Au Pair Foundation must submit the following to the Department of State: copies of our advertisement and recruitment materials, a summary of the annual survey we conduct of Host Families and Au Pairs, which includes a summation of all complaints received and their resolutions, and all situations which resulted in the placement of an Au Pair with more than one Host Family.

## REQUEST MORE INFORMATION

First Name*

Last Name*

Email*

Phone Number*

Zip Code*

Contact Me

## HEADQUARTERS OFFICE

AU PAIR FOUNDATION
205 Keller Street, Ste 204
Petaluma, CA 94952 USA

TOLL-FREE TELEPHONE
**1-866-428-7247** OR
**1-866-4AUPAIR**
FAX: **707-658-2393**

**Ellen Hoggard**
President
ellen@aupairfoundation.org (mailto:
ellen@aupairfoundation.org)

**Theresa Nelson**
VP of Finance and Administration
theresa@aupairfoundation.org (mailto:
theresa@aupairfoundation.org)

(https://www.facebook.com/pages
/Au-Pair-Foundation/128021980706326)

## ONCE THE AU PAIR IS WITH THE HOST FAMILY

PLAINTIFFS' RESP. APP.0003001

### Can the Au Pairs drive?

How long can an Au Pair stay with a Host Family, and can the arrangement be extended?

What responsibilities do Host Families and Au Pairs have?

What are Host Families entitled to?

What are Au Pairs entitled to?

Au Pairs are entitled to a private bedroom, meals, a weekly stipend of $195.75 (the weekly stipend will increase if the federal minimum wage increases), a full weekend off each month, two weeks of paid vacation, and up to $500 towards fulfilling the mandatory education requirement at an accredited, post-secondary institution.

What can you expect as an Au Pair Foundation Au Pair?

## QUESTIONS OR PROBLEMS

If I am not happy with the match, can I back out?

What do we do if there's an emergency?

What if I have questions after the initial selection and match have been made, or what if a problem arises?

## SELECTION AND SCREENING PROCESS

Do you offer male Au Pairs as well as females?

Can we get an Au Pair at any time of the year?

How do we select our Au Pair?

How soon after we complete the Host Family Application can we expect to review Au Pair applications?

What Host Family costs are involved?

What kind of training and experience is required to be an Au Pair?

## TAX QUESTIONS

What effect do the IRS reporting requirements have on the Au Pair program?

Do the program fees paid by the Host Family to Au Pair Foundation qualify as a child care expense?

Does the weekly stipend payment to the Au Pair represent a qualifying child care expense to the Host Family?

Are the weekly stipend payments to the Au Pair taxable to them and is Federal withholding required?

Is withholding of Social Security tax required on the weekly stipend paid to the Au Pair?

APF Global Exchange NFP (http://www.aupairfoundation.org/about-us/)  |  Privacy & Security (http://www.aupairfoundation.org/about-us/privacy-policy/)  |  Mission (http://www.aupairfoundation.org/about-us/mission/)  |  Department of State Regulations (http://www.aupairfoundation.org/about-us/dos-regulation/)  |  Login (http://www.aupairfoundation.org/login/)

PLAINTIFFS' RESP. APP.0003002

1/4/2017 4:29 PM

**QUESTIONS? CALL US ON: 1 866 428 7247**

f (https://www.facebook.com/aupairfoundation/)

**ABOUT US (HTTP://WWW.AUPAIRFOUNDATION.ORG/MEET-OUR-TEAM/)**

Regional Directors (http://www.aupairfoundation.org/meet-our-team/regional-directors/)

Local Community Representatives (http://www.aupairfoundation.org/meet-our-team/local-community-representatives/)

LCR Earning Potential (http://www.aupairfoundation.org/meet-our-team/local-community-representatives/lcr-fees/)

Become a Local Community Representative (http://www.aupairfoundation.org/meet-our-team/become-a-local-community-representative/)

LCR Application (http://www.aupairfoundation.org/meet-our-team/become-a-local-community-representative/lcr-application/)

Job Opportunities – Open Positions Available (http://www.aupairfoundation.org/meet-our-team/job-opportunities-open-positions-available/)

**FIND AN AU PAIR (HTTP://WWW.AUPAIRFOUNDATION.ORG/FIND-AN-AU-PAIR/)**

Au Pair Requirements (http://www.aupairfoundation.org/find-an-au-pair/become-an-au-pair/)

Interested in Becoming an Au Pair (http://www.aupairfoundation.org/find-an-au-pair/show-your-interest/)

Au Pair Testimonials (http://www.aupairfoundation.org/find-an-au-pair/au-pair-testimonials/)

Security Alert – Fraudulent Au Pair Offers (http://www.aupairfoundation.org/find-an-au-pair/security-alert-fraudulent-au-pair-offers/)

Cultural Exchange Component (http://www.aupairfoundation.org/find-an-au-pair/cross-cultural-component/)

**BECOME A HOST FAMILY (HTTP://WWW.AUPAIRFOUNDATION.ORG/BECOME-A-HOST-FAMILY/)**

Benefits of Hosting an Au Pair (http://www.aupairfoundation.org/become-a-host-family/benefits-with-an-au-pair/)

Host Family Requirements (http://www.aupairfoundation.org/become-a-host-family/host-family-requirements/)

Au Pair Programs (http://www.aupairfoundation.org/become-a-host-family/au-pair-programs/)

Matching Process (http://www.aupairfoundation.org/become-a-host-family/match-process/)

Host Family Program Fees (http://www.aupairfoundation.org/become-a-host-family/program-fees/)

Host Family Testimonials (http://www.aupairfoundation.org/become-a-host-family/host-family-testimonials/)

**HOST FAMILY APPLICATION (HTTP://WWW.AUPAIRFOUNDATION.ORG/HOST-FAMILY-APPLICATION/)**

**LEARN MORE (HTTP://WWW.AUPAIRFOUNDATION.ORG/ABOUT-US/)**

Mission (http://www.aupairfoundation.org/about-us/mission/)

Privacy Policy (http://www.aupairfoundation.org/about-us/privacy-policy/)

Department of State Regulations (http://www.aupairfoundation.org/about-us/dos-regulation/)

Overseas Partners (http://www.aupairfoundation.org/about-us/overseas-partners/)

Frequently Asked Questions (http://www.aupairfoundation.org/about-us/faq/)

2015 Au Pair Agency of the Year (http://www.aupairfoundation.org/about-us/2014-au-pair-agency-of-the-year/)

 (http://www.alliance-exchange.org/)

 (http://www.iapa.org/)

 (http://www.bbb.org/greater-san-francisco/business-reviews/child-care-referral/apf-global-exchange-in-petaluma-ca-372955)

 (http://j1visa.state.gov/programs/au-pair/)

PLAINTIFFS' RESP. APP.0003003



# Benefits

Au Pair 4 Me offers a unique cultural exchange program for young, adventurous, and curious people from different countries. It gives you a great opportunity to experience American life while providing a legal, affordable alternative to traditional child care for American host families. The participants have a chance to experience the culture and diversity that the United States has to offer as well as to study, travel, and make new friends from all over the world. Throughout the year, while living with an American family and caring for their children, you will experience new adventures and English language will become a matter of course.

Through this program, exchange visitors and host families take part in a mutually rewarding, unique, intercultural opportunity. Being an au pair can be your best and most exciting life experience. You can impact positively on the lives of your host family and children by sharing with them your knowledge, experience, culture, and your language. If you want to experience the adventure of your life and make your dreams come true, this program is for you!

# Financial Benefits



Earn a weekly stipend of $195.75 ($10,000 + a year!) as a Standard Au Pair, $146.81 as an EduCare Au Pair or $250 as a Plus Au Pair

Receive up to $500 ($1,000 for EduCare) of the educational stipend

Earn two weeks of paid vacation

PLAINTIFFS' RESP. APP.0003004

Benefits and Salary | Au Pair 4 Me | au pair stipend - au pair benefits-salary



1 (800) 748-8414 (tel:1800748-8414)     REGISTER (HTTPS://WWW.AUPAIR4ME.C...

(http://www.aupair4me.co...

Extend your stay as an au pair for up to 12 months and earn another $10,000 a year!

# Au Pair 4 Me Guarantees You:

- $0 program fee for our new au pairs;
- Placement with a carefully screened host family;
- Round-trip airfare from your home country to the United States;
- Health insurance;
- Free private room and full board provided by your host family;
- Sponsorship of your J-1 au pair visa;

- Online courses and in-person training at Orientation and Training Program;
- The opportunity to travel for 30 days at the end of your program;
- Full support from Au Pair 4 Me during your stay;
- Monthly contact with your Local Coordinator and monthly meetings with other au pairs in your area;
- Opportunity to extend for another 6, 9 or 12 months.

# **Interested** in becoming an Au Pair?

(/au-pair/requirements)

**AU PAIR.**

## Meet the Requirements

(/au-pair/matching-process)

**AU PAIR.**



Chat now

1/4/2017 4:37 PM