# Exhibit V

(replacing ECF No. 943-46)

Case No. 1:14-cv-03074-CMA-KMT Document 859-22 filed 02/30/18 USDC Colorado pg 2 of 310

# Exhibit 382

PLAINTIFFS' RESP. APP.0004210



"I wasn't aware of this background"

context of 1995: very few state / local wages that were higher
→ context changed over last 20 years

→ Since lawsuit, DoS + lawyers looked back at all of this

— we try not to take a position that is difficult for sponsors

we like ~~you~~ believe that this needs to be done through a rulemaking process

• DoL supplement to 1995 reg
• Sept. meeting: hour w/ DoL + sponsors re: FLSA

— sounds like we're talking about the same thing

→ prospectively
→ rulemaking
→ organize meeting w/ sponsors

→ we support this

(Evan)

— we'd love to work w/ you on the agenda
— everyone can say what's on their minds
— we'll be there to listen

this is nothing about changing policy — we'll just clarify the guidance

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

ALLI-000000

REPLACEMENT PAGE

Case No. 1:14-cv-03074-CMA-KMT Document 859-22 filed 02/80/18 USDC Colorado pg 4 of 309

# Exhibit 383

PLAINTIFFS' RESP. APP.0004212

Meeting re Au Pair Program Discussion

AGENDA

1.  Current Stipend

    • Benefits of current uniform, national stipend
    • Current challenges

2.  Ideas for adjusting the au pair stipend

    • Reducing the deduction
    • Embracing a new formula
    • Providing new guidance to families

3.  Maintaining cultural and educational exchange as central to Au Pair Program

    • Keeping federal regulation as controlling
    • Increasing education stipend

PLAINTIFFS' RESP. APP.0004213

CONFIDENTIAL                                                                              ALLI-021700

Case No. 1:14-cv-03074-CMA-KMT Document 859-22 filed 02/30/18 USDC Colorado pg 6 of 310

# Exhibit 384

PLAINTIFFS' RESP. APP.0004214



## Au Pair in America Extension Program

Dear Au Pair,

Good news! You can apply to remain in the United States for up to an additional 12 months through the Au Pair in America extension program!

You should have already received an email about the extension program. If you and your host family want to stay together, please discuss this opportunity with them. They have already received information on the steps to follow and an application for the extension program. **You will not need to fill out anything in this packet**, only speak with your host family and fill out the documents **they** have. If you are staying with your host family, those documents must be received by (please refer to timeline).

Included in this packet is information to extend with a **new host family only**. If you decide to join a new host family, please follow the steps below:

- ✓ Read, complete, and sign the *Au Pair Extension Agreement*.
- ✓ Complete the *Documented Child Care Experience Addendum* form for each host family you have been with.
- ✓ Complete the *Extension Program Au Pair/Companion Record Update* and make a copy of your driver's license.
- ✓ Your current host family will need to complete a confidential childcare reference form for you.
- ✓ You must complete the Au Pair in America- Sports Insurance Form

If you plan to extend with a new host family, your documents must be returned to Au Pair in America by (please refer to timeline). Please note that you may only extend one time. For example, if you request a six or nine month extension, you will not be allowed to extend further at a later time.

If you have questions about your application for the extension program, please contact Sarah Friedman at 1-800-928-7247, extension 5178 or at sfriedman@aifs.com.

We hope that you will take advantage of this wonderful opportunity to extend your stay and enjoy some more time in the United States.

Sincerely,

*Sarah Friedman*

Sarah Friedman
Compliance and Extension Program Coordinator

EXHIBIT 15
Ferry
5/11/17
JEREMY RICHMAN

PLAINTIFFS' RESP. APP.0004215

AIFS0067245



Au Pair in America Extension Program

# IMPORTANT!!!

## Notification of Education Verification

The U.S. Department of State requires that during the au pair's initial period of program participation, she must complete not less than six semester hours (or its equivalent) of academic credit at an accredited U.S. post-secondary institution (12 semester hours for EduCare Companions). Before we can submit an extension request on your behalf, we must now verify that you have fulfilled your education requirement.

In order to be considered for an extension of stay, you must submit to your community counselor one or more of the following documentation to verify that you have completed your education:

1. Letter from the school on school letterhead stating that you are taking a course
2. Completion certificate from the school
3. School transcript
4. Registration form (it must be on school letterhead and it should indicate the number of credits/hours the class is worth)

If you are still in the process of completing your education, you must obtain a letter from your school, stating that the course will conclude before your first year ends and the number of credits/hours that you will earn. We will also need final proof of course completion.

**_NOTE:_** If you plan to request an extension, **_please make sure that proof of education is submitted to your community counselor as quickly as possible._** Please do not submit any proof of education with your extension application. The extension request will not be processed unless you submit your proof of education to your local community counselor. Once we receive the required documentation from your community counselor, we will then submit the extension request to the U.S. Department of State.

Au Pair in America Extension Program ★ 9 West Broad Street ★ Stamford, CT 06902-3788 ★ (800) 928-7247 ★ extension@aifs.com

3/11

PLAINTIFFS' RESP. APP.0004216

AIFS0067246



Au Pair in America Extension Program

## IMPORTANT TRAVEL INFORMATION

### I. TRAVEL TO CANADA, MEXICO, AND ADJACENT ISLANDS

➢ Year2 au pairs may travel freely to Puerto Rico and the U.S. Virgin Islands.

➢ According to Federal Regulations (22 CFR 41.112) Year2 au pairs can travel to Canada, Mexico and the adjacent islands (Caribbean except Cuba) through a provision known as 'automatic revalidation' as long as the travel does not exceed 30 days and the au pair has not applied for another visa. *She would need the following documents: an extension DS 2019 form, a valid I-94 Arrival/Departure Card showing unexpired period of admission with 'J-1, D/S' endorsement and a valid passport.*

➢ Be aware that certain nationalities require a visitor's visa to enter Canada, Mexico or certain Caribbean Islands.

➢ Au Pair in America suggests that a Year2 au pair make a copy of her original I-94 card showing valid duration of status D/S). Sometimes the I-94 card is taken by the airline at check-in, so at least having a copy of the original card shows a valid status. IF POSSIBLE DO NOT SURRENDER THE I-94 CARD TO THE AIRLINE. In any event, bring along a photocopy of both the front and back of this card.

➢ Bring the extension DS-2019 form, which has been signed for travel validation along with a participation letter certifying the au pair's approved status on the program. This letter should be on program letterhead.

➢ Be aware that although the Department of State has informed us that au pairs with an expired visa may travel to Canada, Mexico and the adjacent islands through 'Automatic Revalidation', it is ultimately up to the Customs and Border Patrol agents at the POE (port of entry) to determine whether or not to admit someone into the U.S. and therefore there is always a risk of being denied reentry into the United States with an expired visa.

### II. OVERSEAS TRAVEL

➢ If a Year2 au pair wants to travel overseas, she would have to apply at the U.S. Embassy/Consulate in her home country for another visa in order to be readmitted into the U.S. Consular posts **may** issue a new J-1 visa to au pairs who have been approved for an extension, have their extension DS-2019 and a program participation letter with them. The application process for a second year J-1 visa would be the same as for a first time visa. Au pairs must make an embassy appointment in advance for a personal interview, pay a new visa application fee, and fill out all visa application forms (DS-160, etc) just as they did when they first applied for a J-1 visa. An additional $35 SEVIS fee may be required.

➢ Please note the U.S. Department of State travel website contains links to all the embassies/consulates overseas so that au pairs can make interview appointments online and download the required visa application forms. The website address is: http://travel.state.gov. Click on 'visas', then go to 'visa wait times' which will bring you to a link for embassy and consulate websites, which will then allow you to click on a particular U.S. Embassy or consular section.

➢ An au pair's passport should be valid for the duration of her extension. If her passport will expire before the end of her extension, she should contact her country's consulate in the U. S. and apply for a passport renewal. We suggest that if an au pair applies for a second J1 visa, that she does it while her original J1 visa is still valid.

➢ Au Pair in America cannot guarantee that an au pair will be granted a second visa. If a Year2 au pair is denied a visa by the U.S. Embassy, she will be unable to return to the U.S. to complete her extension. It is important that au pairs and host families are aware that by leaving the U.S. with an expired visa, there is a risk that she may not be able to return.

➢ Au pairs from certain countries are at a greater risk of being denied a second visa than au pairs from Western European countries. Contact Evelyn Blum at 1-800-928-7247, ext. 5027 or Sarah Friedman ext. 5178 if you have questions about this.

Au Pair in America Extension Program ★ 9 West Broad Street ★ Stamford, CT 06902-3788 ★ (800) 928-7247 ★ extension@aifs.com

3/11

PLAINTIFFS' RESP. APP.0004217

AIFS0067247



## Au Pair in America Extension Program

### FREQUENTLY ASKED QUESTIONS

**Can I extend further after applying for a 6 or 9-month extension?** No. The U.S. Department of State allows sponsors to file for a <u>one-time extension</u> of program for <u>6, 9 or 12 months</u>. It is important that you think about how long you want to extend as you may only extend once.

**Will I get a flight home if I successfully complete my extension term?** Au Pair in America will provide a free flight (including domestic and international surcharges) to au pairs who successfully complete their 12-month extension. If you only extend for 6 or 9 months, Au Pair in America will provide a flight home, but you are responsible for any gateway charges that apply.

**Will I receive my completion payment?** With the exception of au pairs who joined the program on a promotion and those on the EduCare program, you will receive your completion bonus 2-3 weeks prior to the start of your extension term as long as your education requirement has been met. *Note: You will not receive a completion payment at the end of your extension term.*

**Will my weekly stipend increase?** The weekly stipend amounts for the extension year are $195.75 for Au Pairs, $250 for Au Pair Extraordinaire and $146.81 for EduCare companions. This stipend increased on July 24, 2009 per the 2007 Minimum Wage Law.

**Will I still get a month to travel?** The travel month is a 30-day grace period that must be taken at the end of your program. If you extend, you will take your travel month at the end of your extension term. **Will I receive a travel month if I leave my program early?** No. The 30-day grace period is only for au pairs who complete their program. If you leave the program early, you must exit the U.S., and return home immediately. Au Pair in America will report you as being out of program status with the U.S. Department of State and Department of Homeland Security once you discontinue your program participation.

**Can I travel outside of the United States during my extension term?** Please refer to the *Travel Information Sheet.*

**What is the difference between my J1 visa and my DS-2019?** Your J-1 visa is a full-page stamp in your passport that reads, "VISA United States of America" across the top and contains your photograph. The DS-2019 form is the white paper that says across the top, *"Certificate of Eligibility for Exchange Visitor (J-1) Status.* This is the form you took to the embassy/consulate when you applied for a visa to come to the U.S. You will receive an updated DS-2019 upon approval of your extension, reflecting your extended status in the U.S.

**Will I have insurance coverage during my extension term?** Yes, your insurance coverage will be extended. If you have basic insurance, no additional payment is required. If you have the comprehensive coverage you will need to pay a supplemental fee of $350 for a 12-month extension, $280 for a 9 months or $210 for 6 months. If you have the medical upgrade coverage you will need to pay a supplemental fee of $235 for a 12-month extension, $190 for 9 months or $145 for 6 months.

**Will I still take educational courses?** Yes. Au pairs extending for six months will be required to take a minimum of 3 credits or the equivalent and the host family must provide up to $250. Au pairs extending for nine or 12 months will be required to take a minimum of six credits or the equivalent and their host families must provide up to $500. EduCare companions extending for six months must take a minimum of six credits or the equivalent and the host family must provide an educational allowance of up to $500. EduCare companions extending for nine or 12 months must complete 12 credits or the equivalent and their host family must provide up to $1,000.

**Could I be denied an extension request?** We do not anticipate any extension denials as long as you are in good standing with the program, complete your education, and submit your extension request on time, but the U.S. Department of State makes the final decision.

**What do I do if my driver's license expires at the end of my first year?** If your host family needs you to drive, it is your responsibility to ensure that you will have a valid license. We strongly recommend that you obtain a state driver's license. If you cannot obtain a state license, you will need to renew your international permit. As it is not possible to renew your international driver's permit in the U.S., you should have a friend or family member in your home country assist you with the renewal.

**What happens if I am not placed with a new host family?** We will send your application to host families until approximately 5 weeks before your year ends. If at that point, you are not placed with a new host family, you must submit your flight request forms in to our office.

**If I am placed with a new host family, when will I start?** You must first complete your year with your current host family. You will then start with your new host family on the first day of your second year. You must start on that date – not earlier or later.

**Will I be able to rematch during my extension term?** Our standard policy is that au pairs/companions cannot have more than 2 host families while on the program. Each situation will be evaluated individually, but we cannot guarantee that you will be allowed to rematch.

Au Pair in America Extension Program ★ 9 West Broad Street ★ Stamford, CT 06902-3788 ★ (800) 928-7247 ★ extension@aifs.com

3/11

PLAINTIFFS' RESP. APP.0004218

AIFS0067248



Au Pair in America Extension Program

## PAPERWORK CHECKLIST

If you wish to extend with a ***new host family***, please make sure you have enclosed the following documents:

### *IMPORTANT:*

- ➢ *Incomplete applications will not be processed*
- ➢ *The sooner you send your extension application in to us, the more time you will have to match with a new host family.*
- ➢ *If you are extending <u>with your current host family</u>, please make sure you send the materials your host family received. You do not need to complete the materials enclosed in this packet.*

1. ***Signed Au Pair Extension Agreement***

2. ***Documented Child Care Experience Addendum*** *(one for each host family you worked for)*

3. ***Extension Program Au Pair/Companion Record Update*** *<u>(please complete all four sections of the form).</u> <u>Your application will not be processed if any information is missing.</u>*

4. ***Comprehensive Insurance form and payment*** *(if applicable)*

5. ***Host Family reference*** *(Please ask your current family to complete and submit this reference on your behalf. Your host family can send this form in a separate envelope or by fax to 203-399-5378).*

6. ***Copy of your driver's license***

7. ***Au Pair in America – Sports Insurance form***

Please send the above documents to:

**Au Pair in America/Extension Program**
**River Plaza**
**9 West Broad Street**
**Stamford, CT. 06902**

8. ***Submitted proof of education to your community counselor:*** *Please make sure to submit proof of education to your community counselor as quickly as possible. **We will be unable to allocate your application to new host families unless we have complete and acceptable documentation.***

Au Pair in America Extension Program ★ 9 West Broad Street ★ Stamford, CT 06902-3788 ★ (800) 928-7247 ★ extension@aifs.com

3/11

PLAINTIFFS' RESP. APP.0004219

AIFS0067249



Au Pair in America Extension Program

## IMPORTANT EXTENSION TIMELINE INFORMATION

The timeline below indicates when application materials need to be received in the Stamford office. Failure to submit paperwork before these deadlines can result in a denied extension.

| Current Contract End Date | Deadline for filing an extension |
|---|---|
| 1/5/11 | 10/13/10 |
| 1/10/11 | 10/13/10 |
| 1/17/11 | 10/13/10 |
| 2/31/11 | 11/17/10 |
| 2/7/11 | 11/17/10 |
| 2/21/11 | 11/17/10 |
| 3/7/11 | 1/5/11 |
| 3/21/11 | 1/5/11 |
| 4/4/11 | 1/26/11 |
| 4/18/11 | 1/26/11 |
| 5/9/11 | 2/23/11 |
| 5/30/11 | 2/23/11 |
| 6/13/11 | 3/23/11 |
| 6/20/11 | 3/23/11 |
| 7/5/11 | 4/27/11 |
| 7/18/11 | 4/27/11 |
| 7/25/11 | 4/27/11 |
| 8/1/11 | 5/18/11 |
| 8/8/11 | 5/18/11 |
| 8/15/11 | 5/18/11 |
| 8/22/11 | 5/18/11 |
| 9/6/11 | 6/22/11 |
| 9/12/11 | 6/22/11 |
| 9/19/11 | 6/22/11 |
| 9/26/11 | 6/22/11 |
| 10/10/11 | 7/20/11 |
| 10/24/11 | 7/20/11 |
| 10/31/11 | 8/17/11 |
| 11/14/11 | 8/17/11 |
| 11/28/11 | 8/17/11 |
| 12/5/11 | 9/21/11 |
| 12/26/11 | 9/21/11 |

Au Pair in America Extension Program ★ 9 West Broad Street ★ Stamford, CT 06902-3788 ★ (800) 928-7247 ★ extension@aifs.com

3/11

PLAINTIFFS' RESP. APP.0004220

AIFS0067250



## Au Pair in America Extension Program

## Au Pair Extension Agreement
### Deadline for filing: **REFER TO TIMELINE SCHEDULE**

**Au Pair/Companion: Adriana Carolina Da Costa Souza**          **Membership # E9049**

Host Family: Weese          ID# 35860

Program term currently scheduled to end: 7/5/2011

I wish to extend with a **new placement:**
☐ 6 Months to 1/5/2012          ☐ 9 Months to 4/5/2012          ☐ 12 months to 7/5/2012
I, the undersigned, apply to extend my au pair program for the above noted length of extension term and agree to all terms and conditions of the Au Pair in America extension program as mandated by the U.S. Department of State and Au Pair in America.

I, the undersigned, understand that all the terms and conditions from my original contract with Au Pair in America apply for the term of my extension. Vacation, education money and weekly pocket money will be pro-rated as follows:

| Weekly Stipend | 6 month Extension | 9 and 12 month extension |
|---|---|---|
| Au Pair $195.75 | 1 wk paid vacation/3 credit hours/$250 education | 2 wks paid vacation/6 credit hours/$500 education |
| Extraordinare $250 | 1 wk paid vacation/3 credit hours/$250 education | 2 wks paid vacation/6 credit hours/$500 education |
| EduCare $146.81 | 1 wk paid vacation/6 credit hours/$500 education | 2 wks paid vacation/12 credit hours//$1000 education |

The weekly stipend of $195.75 for Year2 au pairs on the Au Pair Program and $146.81 for Year2 au pairs on the EduCare Program is set by federal regulations. Au pair programs are governed by federal regulations that set the minimum weekly stipends for the Au Pair and EduCare programs using a formula that calculates wage less an allowance for room and board. As a result of the 2007 Federal Minimum Wage law, on July 24, 2009 the weekly stipend for Year2 Au Pairs increased to $195.75 and the weekly stipend for Year2 EduCare companions to $146.81. The stipend of $250 for Extraordanaire au pairs is set by Au Pair in America.

I understand that I am making a commitment to remain on the program for the length of my extension term. If I leave the program early, I will forfeit any outstanding vacation time or educational allowance. If I notify my host family and Au Pair in America at least 30 days in advance, I will still receive a return flight home subject to supplement fees.

I understand that my 30-day 'travel month' will be deferred until the end of my extension program and that I will return home no later than 30 days after the end of my program.

I understand that although I will receive a new DS 2019 form with my extension program dates, my J-1 visa in my passport will expire and it is my responsibility to obtain a new visa if I want to travel to certain countries outside the U.S. I understand that any travel outside the United States during my extension term is at my own risk and I understand that Au Pair in America will not be able to assist me with any visa problems I may experience.

I understand that if I am not approved for an extension or if I cannot find a placement with a new host family, I must return to my home country no later than the end of my 13th month.

I certify that the information provided in this application is true and that all the terms and conditions of my original agreement with Au Pair in America will remain in effect for the duration of my extension term. This agreement shall serve as an addendum to the previous Au Pair Agreement on file with Au Pair in America.

| | | |
|---|---|---|
| Print Au Pair/Companion's Name | Signature of Au Pair/Companion | Date |

**Au Pair in America Extension Program ★ 9 West Broad Street ★ Stamford, CT 06902-3788 ★ (800) 928-7247 ★ extension@aifs.com**

3/11

PLAINTIFFS' RESP. APP.0004221          AIFS0067251



Au Pair in America Extension Program

## DOCUMENTED CHILD CARE EXPERIENCE ADDENDUM

Name of Au Pair/Companion:_____ Membership #:_____

Country of Origin:_____

*Following is a summary of care provided by the au pair during her 12-month program term with Au Pair in America:.*

Total Number of Host Families:_____ this form is for Host Family Number:_____

Names of Host Parents:_____

Gender and ages of children provided care to:

_____

_____

_____

Average number of hours per week scheduled to provide care to children:_____

Describe the responsibilities you had for the care of your host family's children:

_____

_____

_____

_____

_____

_____

_____

I confirm that this information is true and a correct record of my experience.


Au Pair's signature_____ Date:_____

### YOU MUST COMPLETE A SEPARATE FORM FOR EACH HOST FAMILY YOU PROVIDED CARE TO DURING YOUR 12-MONTH PROGRAM.

Au Pair in America Extension Program ★ 9 West Broad Street ★ Stamford, CT 06902-3788 ★ (800) 928-7247 ★ extension@aifs.com

3/11

PLAINTIFFS' RESP. APP.0004222

AIFS0067252



## Au Pair in America Extension Program

### AU PAIR/COMPANION RECORD UPDATE

Name: _____  Membership Number: _____

**1.CONTACT INFORMATION:** please indicate the best way for Au Pair in America and potential host families to contact you regarding your extension request and new placement:

Telephone Number: _____  Email address: _____

Best Day/Time to Contact You: _____

**2. CHILD CARE UPDATE:** please write Yes or No.

Are you willing to care for 0–2 year olds? *   _____
*Please note: you will only be able to care for children in this age group if our records indicate that you are Infant Qualified.

Are you willing to care for 2-6 year olds?   _____

Are you willing to care for 6 + year olds?   _____

Are you willing to care for more than one child?   _____

Are you willing to care for a child with special needs?   _____

**3. PERSONAL INFORMATION:** (this information will be posted on your profile)

❏ Why do you want to extend with a different family: _____

❏ What do you do in your spare time? : _____

❏ Do you smoke: (Y/N)_____

❏ What languages do you speak: _____

❏ List some of the strengths that make you a good extension candidate _____

**4. DRIVER'S LICENSE DETAILS:  Please attach a photocopy of your current valid driver's license.**

I understand that *it is my responsibility to obtain an international or state driver's license before the start of my extension term,* therefore I plan to: (please check the appropriate box)

❏ Renew my state driver's license prior to the start of my extension term

❏ Renew my international driver's license prior to the start of my extension term

❏ Obtain a state driver's license prior to the start of my extension term

❏ I have a valid state driver's license from _____ that will be valid through (MM/DD/YY)_____

*Please complete all four sections of this form before signing. Your application will not be processed if there is missing information.*

Au Pair's signature_____  Date:_____

Au Pair in America Extension Program ★ 9 West Broad Street ★ Stamford, CT 06902-3788 ★ (800) 928-7247 ★ extension@aifs.com

3/11

PLAINTIFFS' RESP. APP.0004223

AIFS0067253



## Au Pair in America Extension Program

# EXTENSION PROGRAM HOST FAMILY CHILD CARE REFERENCE

**To be completed by the host family - please use black ink.**
Please note that references are checked and falsifying a reference may result in the applicant being withdrawn from the program.

❖ Au Pair/Companion's Name: _____ Au Pair Membership #: _____

❖ How long has the applicant been your au pair/companion? _____

❖ For how many children does the applicant care? _____ Ages of children _____

❖ Please give full account of the applicant's duties _____
_____

❖ Describe any special skills and abilities the applicant showed _____
_____

❖ To the best of your knowledge, was the applicant convicted of or charged with a criminal offense during her stay with you. ☐ Yes ☐ No
If yes, give details _____

❖ Has the applicant had any health problems during the year? ☐ Yes ☐ No
If yes, give details _____

❖ Please give your opinion of the applicant's ability to handle situations that may be stressful or adapt to new circumstances.
_____
_____

❖ Did the applicant drive a vehicle for: ☐ children ☐ self How Often: _____

❖ Did the applicant have any driving accidents? ☐ Yes ☐ No
If yes, please describe _____

❖ Would you employ this au pair/companion again? ☐ Yes ☐ No

**Please rate the applicant's qualities in the following areas, 1=poor, 2=below average, 3=satisfactory, 4=good, 5=excellent**

Love of children _____ Understanding the children's needs _____ Responsibility/Maturity _____ Warmth/Compassion _____

Ability to work with Adults _____ Ability to carry out instructions _____ Shows Initiative _____ Family Oriented _____

❖ Would you recommend the applicant for placement as an au pair/companion for a second year? **Please state your reasons.**
_____
_____
_____

Name of host parent (please print)
_____

Telephone Day _____ Evening _____ Cell _____

**An Au Pair in America staff person or American Host Family may telephone you to discuss this reference. This reference will be posted to the au pair's application and accessible to host families.**

Are there any dates in the near future when you will not be contactable? (e.g. holidays) _____

Signature of Host Parent _____ Date _____

Au Pair in America Extension Program ★ 9 West Broad Street ★ Stamford, CT 06902-3788 ★ (800) 928-7247 ★ extension@aifs.com

3/11

PLAINTIFFS' RESP. APP.0004224

AIFS0067254

Case 1:14-cv-03074-CMA-KMT   Document 945-30   Filed 03/17/18   USDC Colorado   Page 16
of 300

# Exhibit 385



Au Pair Snapshot

| Name: | | AP ID: | |
|---|---|---|---|
| Country: | | Age: | 26 |
| Status: | Active | Arrival Date: | 20 Jul 2009 |

**Program Information:**

| | |
|---|---|
| Program: | AP |
| Weekly Stipend: | The current weekly stipend is $195.75. |
| Program Year: | 1 |
| Additional Information: | |

**Child Care Information:**

| Infant Qualified: | Yes | | |
|---|---|---|---|
| Experience (3 mos – 1 yr): | ☑ | Willing (3 mos - 1 yr) | ☑ |
| Experience (1 - 2 yrs): | ☑ | Willing (1 - 2 yrs): | ☑ |
| Experience (2-6yrs): | ☑ | Willing (2-6 yrs): | ☑ |
| Experience (6+yrs): | ☑ | Willing (6+ yrs): | ☑ |
| Experience (more than 2): | ☑ | Willing (more than 2): | ☑ |
| Special Needs Experience: | ☐ | Special Needs Willing: | ☐ |

**Education and Current Occupation:**

| | |
|---|---|
| Occupation: | EMPLOYEE OF PRIVATE BUSINESS |
| Education: | Advanced Degree |

**Interests, Hobbies and Driving Skills:**

| | |
|---|---|
| Interests and hobbies | Swimming, Reading, Piano, Computer, Dance, Arts and Crafts, Photography, Community Service |
| Swimmer: | Yes |
| Driver: | Yes |
| Drives Frequently: | Yes |

**Personal Information**

| | |
|---|---|
| Date of Birth: | |
| # of Siblings: | 1 |
| Native Language: | Portuguese |
| Lived Away From Home: | No |
| Smoker: | No |
| Religion: | Catholic |
| Dietary Restrictions: | None |
| Primary Phone: | |
| Primary Phone Times: | 7:00AM to 11:00PM |
| Alternate Phone: | |
| Alternate Phone Times | any time |

EXHIBIT
32
5/11/17
JEREMY RICHMAN

PLAINTIFFS' RESP. APP.0004226

AIFS0059462

Documents
https://aupair.aifs.com/Share/HFCCUsers/DisplayHtmlDoc.aspx?ViewT...

Address:

Email Address:

Au Pair
IN AMERICA

## Personal Details

**Applicant name**
**Preferred name**

## Host Family Letter

Dear Host Family,

Hi, my name is ▮ I am ▮ years old. I live in a city called ▮ in ▮ Here, there are museums, history center and beaches. The people are very receptive and helpful.
I live with my family – my mother ▮ (54 years old) – my father ▮ (55 years old), my youngest sister ▮ (21 years old). I usually help my mother with the housework and cooking. I have a wonderful family and we have a great relationship.

I am graduated in Tourism course at ▮, this course was very important for me, because I learned many things about Leisure and Recreation and organization. I work in a travel agency as a travel consultant; I sell cruises to all over the world.

Every weekend my cousins ▮ (11 years old), ▮ (3 years old) and ▮ (1 year old), spend a time with me in my house and I love when they come.

I am responsible, positive, dedicated, friendly, patient, good-humored, honest and funny person. I am also a very active person, I love all outdoors activities and I have a lot of hobbies. In my free time I like to walk on the beach, camp with my friends, dance, read books, photograph, swim, go to the club and stay at swimming pool with my little cousins. I also enjoy manual works; I think this is very important for the development of children. I am very creative I have many projects with children.

I have a driving license and I am an experienced driver, I drive my own car for since 2001. I don't mind driving with children inside the car, because I am very careful.

I have a great experience with children, I love take care and play with them. I took care of one baby named Caique, he is 1 year and eight months now.
I used played with him with his plush toys, give bath, prepare baby's bottle, change diapers and put him to sleep. He is a lovely baby!
I also helped to took care of 67 children (aged 2 years to 5 years), at a day nursery, as a volunteer work. I used to help do their lessons, give the bath, change diapers, teach educative games, play at playground, do arts and crafts activities, read books and help to feed them at lunch.

I wish to be an Au Pair, because I want to improve my English, learn about American culture, have experience

PLAINTIFFS' RESP. APP.0004227
AIFS0059463

abroad and meet new people. Learning more about other cultures is very important nowadays and It will help me a lot when I come back to Brazil. I believe that is a unique experience!!!

I really expect that during the period of program, I will be able to aggregate not only for me, but also for my Host Family. I believe this experience teaches me a lot, because it will teach something that I will take for rest of my life. I will do my best to guarantee the children will be happy and secure.

The Au Pair program is perfect for me, because it links two things that I really love: American culture and take care of children.
I want to be a part of your family, and I would like to know about your kids and your family. I'm available to answer any questions you need. I hope to talk to you soon!!!

Best regards



PLAINTIFFS' RESP. APP.0004228

AIFS0059464

Documents

https://aupair.aifs.com/Share/HFCCUsers/DisplayHtmlDoc.aspx?ViewT...



137321 / MARCELA DE ABREU FERNANDES



## Childcare Experience Form

**Applicant name**

**Preferred name**

**Program**        Au Pair

| Nanny | ✗ | Babysitting | ✗ | Day care centre for children | ✓ | Caring for younger family member | ✓ |
| Au Pair | ✗ | Tutoring children | ✗ | Summer activity camps | ✗ | Youth or church group/club | ✗ |
| Teacher | ✗ | Practical training in childcare and related subjects | | ✗ | Other | | ✓ |

| Areas of experience | Dates | Names & ages of children | Outline experience | Frequency of care | Referee name | Total number of hours |
|---|---|---|---|---|---|---|
| Caring for younger family member | Jan-2007 to present | ███ - Female - 09 years old ███ - Male - 01 year | I used to go to the club and stay at swimming pool with my little cousins, teach educative games, play at playground and do arts and crafts activities. | 7 hours one day per week. | | 670 |
| Other | Jul-2007 to Jan-2009 | ███ - Male - 2 months | I used to play with him with his toys, give bath, prepare baby's bottle, meals and feed him, change diapers and put him to sleep. | four hours three times per week | ███ | 864 |
| Day care centre for children | Jan-2008 to Jul-2008 | aged 2 years to 5 years | I used to help do their lessons, give the bath, change diapers, teach educative games, play at playground, do arts and crafts activities, read books and help to feed them at lunch | four hours twice per week | ███ | 200 |
| | | | | | Total Hours | 1734 |

4 of 28

10/22/2009 10:49 AM

PLAINTIFFS' RESP. APP.0004229

AIFS0059465

Documents
https://aupair.aifs.com/Share/HFCCUsers/DisplayHtmlDoc.aspx?ViewT...

## Special Needs Experience

**Experience with special needs children**

|  | Experience with |
|---|---|
| **Autism** | ✗ |
| **Learning difficulties** | ✗ |
| **Physical disability** | ✗ |

Please describe your experience with children with special needs

## Child Care Skills

**Infant skills  How often do you...**

| Prepare a baby's bottle | Always | Feed a baby with a bottle | Always |
|---|---|---|---|
| Feed a baby with a spoon/fork | Always | Burp a baby | Sometimes |
| Bath an infant (9 - 12 months old) | Always | Change a diaper (nappy) | Always |
| Put a baby to bed | Always | | |

**Toddler and older children skills  How often do you...**

| Prepare children's meals (1+ years) | Always | Put children to bed (1+ years) | Always |
|---|---|---|---|
| Bath a toddler (1 - 2 years) | Always | Bath an older child (2+ years) | Always |

| Have you ever helped potty-train a child | Yes |
|---|---|
| Have you ever cared for a sick child | Sometimes |

## Family Background

| Religion | CATHOLIC |
|---|---|

Please enter any additional information regarding your religious orientation

| Native language | Portuguese | Number of siblings | 1 |
|---|---|---|---|

Languages you can speak other than English and your native language

| Ever lived away from home | No |
|---|---|

## Driving History

| Do you have a driving license | | Yes |
|---|---|---|

PLAINTIFFS' RESP. APP.0004230

AIFS0059466

| | |
|---|---|
| **What type of driving license do you hold** | Full |
| **When did you pass your test** | 23-Nov-2001 |
| **If you do not have a full license, please confirm when you expect to receive it** | |
| **When did you first start learning to drive** | 9 / 2001 |
| **Did you take lessons with a qualified instructor** | Yes |
| **How many hours of instruction did you have** | 30 |
| **What steps were involved in getting your driving license in your country** | Eye test, First aid, Physical exam, Written test, Practical test |
| **What type of car do you usually drive** | Manual |
| **In your home country, do cars travel on the left hand or right hand side of the road** | Right |
| **Do you have your own car** | Yes |
| **How often do you drive** | 4 or more times per week |
| **What kinds of roads do you drive on** | City, Highway |
| **Are you used to driving with passengers** | Yes |
| **Please explain (e.g., do you drive with children in the car, or your friends)** | |
| I usually drive with my family, friends and children in the car. | |
| **Have you ever had a driving accident** | No |
| **Have you ever been penalised for any driving offenses** | No |

## Education

Please enter your educational history, including your current program of study

| Educational Level | Dates | Name of Qualification | Subjects Studied |
|---|---|---|---|
| High School | From 1998 to 2000 | Colégio do Carmo | Art Education, History, Geography, Mathematics, Physical Education, English language, Physics, Chemistry, Biology, Portuguese Language and Ecology. |
| University | From 2001 to 2004 | Centro Universitário Monte Serrat | Geography, Tourism Legislation, Entrepreneurship, English language, Administration, Leisure and Recreation, Ecotourism and People Management. |

PLAINTIFFS' RESP. APP.0004231

AIFS0059467

| Educational Level | Dates | Name of Qualification | Subjects Studied |
|---|---|---|---|
| University | From 2001 to 2004 | Centro Universitário Monte Serrat | Geography, Tourism Legislation, Entrepreneurship, English language, Administration, Leisure and Recreation, Ecotourism and People Management. |
| High School | From 1998 to 2000 | Colégio do Carmo | Art Education, History, Geography, Mathematics, Physical Education, English language, Physics, Chemistry, Biology, Portuguese Language and Ecology. |
| University | From 2001 to 2004 | Centro Universitário Monte Serrat | Geography, Tourism Legislation, Entrepreneurship, English language, Administration, Leisure and Recreation, Ecotourism and People Management. |

## Work Experience

Please enter your work history, including any current employment

| Job Title | Dates | Duties |
|---|---|---|
| Travel Consultant | From 2008 to 2009 | Selling national and international cruises with all companies as: MSC Cruises, Costa Crociere, Royal Caribbean, Island Cruises, Disney Cruise Line, Princess Cruises, Celebrity Cruises, Norwegian Cruise Line, Carnival Cruise Line and others. |
| Operation Assistant | From 2004 to 2008 | I used to make hotel and Eco Resorts reservations, national and international flight ticket issue, travel insurance issue and vouchers. |
| Travel Consultant | | I used to make hotel and resorts reservations. I also used to sell travel packages, national and international flight ticket issue, car rental and cruises. |
| Travel Consultant | | Selling national and international cruises with all companies as: MSC Cruises, Costa Crociere, Royal Caribbean, Island Cruises, Disney Cruise Line, Princess Cruises, Celebrity Cruises, Norwegian Cruise Line, Carnival Cruise Line and others. |
| Operation Assistant | | I used to make hotel and Eco Resorts reservations, national and international flight ticket issue, travel insurance issue and vouchers. |

## Goals, Motivation and Travel

**When you return to your home country at the end of the program, what do you intend to do**

I hope to work in a travel agency, in a incoming department, to plan trips to Brazil for foreign travelers, and take up a post graduation course in Administration, and afterwards, work in a multinational company.

**What are your long-term plans**

I wish to find a job in an excellent multinational company, which has a plan career, and I will do my best to reach a good position there.

PLAINTIFFS' RESP. APP.0004232

AIFS0059468

Documents                                                    https://aupair.aifs.com/Share/HFCCUsers/DisplayHtmlDoc.aspx?ViewT...

**What do you expect to gain from the program**

I would like to improve my english, learn about a new culture , deal with different situations and learn with them, meet new people and with that I will certainly have a personal value enrichment, and besides I'll be doing something that I love: Staying with children!

**Have you travelled to the United States before**                      No

**Have you travelled outside your home country for two or more months? If so, list locations, dates and reasons**

No

**What are your favourite things do in your spare time**

In my spare time, I enjoy to be in contact with nature, go to places like parks, mountains and waterfalls. I usually walk on the beach. I also love to swim because I think it is important for health. Another thing that I always do, is to photograph special moments and landscapes. I like to go out with my friends, do community services, specially when it involves children, because there are no money which pays their smile and happiness. I like to read, listen to music, go to the theater, museums and create bijouterie.

## Swimming

**Do you know how to swim**              Yes

**How well do you swim**   Intermediate

## Smoking

**Do you smoke cigarettes**                      No

## Criminal Record

**Have you ever been convicted, charged or cautioned in connection with a criminal offence**                      No

## Medical and Health

**Have you ever been a victim of sexual, emotional or physical abuse**                      No

**Do you suffer from any chronic or recurring health problems such as asthma or diabetes**    No
**Do you suffer from any allergies to household pets**    No
**Do you have any food allergies**    No

**Do you suffer from any allergies not listed above**

PLAINTIFFS' RESP. APP.0004233                                    AIFS0059469

Documents

| | |
|---|---|
| **Do you follow a special diet** | No |
| **Do you take daily medication for health reasons** | No |
| **Have you been hospitalised or in the care of a doctor within the last twelve months** | No |
| **Have you ever suffered from or received counselling or treatment for a nervous or emotional problem, such as any kind of depression or eating disorder** | No |

137321 / MARCELA DE ABREU FERNANDES



## Interview Report

**Applicant name**  ███ ██ ███████
**Preferred name**  ███

**Program**  Au Pair In America

## About the Interview

| | | | |
|---|---|---|---|
| **Interviewer** | Claudia Santos | **Interviewer number** | 10722 |
| **Agency** | Experimento do Brasil (Exp) | **Country** | Brazil |
| **Interview date** | 26-Feb-2009 | | |

**Length of time spent with applicant (including CPI and previous meetings)**
3 hours 30 minutes

## Childcare Experience & Skills

**Please provide details of your discussion on the applicant's practical childcare experience**

███ has a great experience with children and she started to take care of children in 2007 when she started to take care of her cousins ████████████. They are so lovely children and very special for ████ They also are smart and energetic children and ███ learned many things with them. She take care of them yet and for ████ this is a very important experience. Her other experience also started in 2007 when she took care of ████ who was 2 months and for ████ ████ is a very special boy because she could learn things about baby. She loves him so much. ████ also has one more experience in a volunteer work with children from 2 to 5 years old. She developed a lot of activities with them and she really enjoyed herself while she was doing this experience. ████ told me she feels very confident to take care of children and she believes she has all the qualities to be a great Au Pair.

PLAINTIFFS' RESP. APP.0004234

AIFS0059470

**List the type of activities the applicant likes to do with children**

She developed many activities with the children like dancing, singing, playing games, going to the park, feeding, bathing and helping them with the homework. She enjoys spend her time with them and she's very creative girl.

**What does the applicant think are the most important qualities for being an au pair**

For ▇▇▇▇, to be a good Au Pair is very important be patient, honest and do the best for the children. She also thinks is very important building a good relationship with all the family.

**Special skills / training / interests / experience (not just childcare related)**

▇▇▇▇ has a special skill for swimming because she can swim very well. She also likes photograph, listen music, reading and going out with her friends. ▇▇▇▇ is a very communicative girl and she always likes to do something.

**How does the applicant manage the challenges of looking after children**

For ▇▇▇▇ she thinks be patient is the most important quality to deal with the challenges of looking after children. She also wants important talk with the children and shares her culture with them.


## Motivation / Expectations

**Why does the applicant want to become an au pair / companion in the United States**

First of all, ▇▇▇▇ wants to be Au Pair because she wants to improve her English skill. She also thinks this program will affect her future in a positive way. ▇▇▇▇ wants to study and know about a new culture. Besides, the Au Pair program is the great opportunity for making new friends and gains a new family.

**What does the applicant think a host family will expect of an au pair / companion**

▇▇▇▇ thinks the host family expects a careful, honest and helpful girl. She also thinks the host family expects a girl who enjoys live with them and lives as a member of the family.

**What does she expect to gain from being on the program**

▇▇▇▇ expects to gain a new experience for her professional and personal life. She also expects to gain more mature for the rest of her life.

**In what way(s) does she think being an au pair / companion in an American host family will be different from her current childcare experiences**

▇▇▇▇ thinks the culture and costumes will be different but she´s ready to live this experience and deal with all kind of situation.

**What is the applicant's academic status**

Graduate

**What concerns (if any) does the applicant express about driving in the United States**


## Family Background

**Comment on the applicant's family history/background and relationships with family members**

▇▇▇▇ ives with her parents and her sister. They have a wonderful relationship and they use to do many things together. All her family is supporting her in this decision because they think will be very important for ▇▇▇▇ life.

**Detail any household responsibilities the applicant has in her home**

PLAINTIFFS' RESP. APP.0004235                               AIFS0059471

She helps her mother in many things like washing the dishes, cooking and driving for her mother.

## Medical and Health

| | |
|---|---|
| **Is there any history of abuse / depression / counselling etc in the applicants background** | ■ |
| **Has the applicant ever been convicted, charged or cautioned in connection with a criminal offence** | ■ |
| **Are there any health or emotional issues that a host family should be aware of** | ■ |
| **Does the applicant need any daily medication for any condition relating to her health** | ■ |

## English Skills and Communication

| | |
|---|---|
| **Is English the applicant's first language** | No |
| **How long has the applicant been studying English** | 7 years |
| **Did the applicant understand your questions in English** | All of the time |
| **Does the applicant understand your questions when asked** | Asked once |
| **Does the applicant answer questions in English using** | Good Standard English |
| **How long did you spend speaking English with the applicant during the interview** | 45 minutes |
| **How relaxed / comfortable was the applicant when speaking in English** | She was relaxed and she didn´t problems to speak in English |

**What did you talk about in English with the applicant**

We talked about her family, friend, study and her day by day. She also told me about her experience with children, why she wants to be an Au Pair, what she expects from the program and the family and also about her future plans.

**Describe her general communication skills in her native language**

███ is very communicative, friendly, calm and polite girl. She has a good communication in her native language.

## Personality & Appearance

**Would you describe the applicant as**

PLAINTIFFS' RESP. APP.0004236                                          AIFS0059472

Friendly, Caring, Flexible, Hardworking, Outgoing, Open-minded

**Comment on the applicant's appearance (smart, neat, physical limitations, scars, visible body piercings or tattoos)**

███ is a discreet girl and she likes to wear comfortable and sporting clothes. She does not have any physical limitations, visible body, piercings or tattoos.

## Evaluation

**After spending time with the applicant before and during the interview, plus any additional phone conversations you have had, please provide an assessment of the applicant**

| | |
|---|---|
| **Responsibility** | Excellent |
| **Maturity** | Excellent |
| **Ability to follow instructions** | Excellent |
| **Flexibility** | Excellent |
| **Enthusiasm** | Excellent |

**What are the applicant's greatest strengths and weaknesses**

███ is very patient and responsible girl and she also has a great experience with children. I believe these qualities are very important for the person who wants to be an Au Pair and take care of children. She also loves children and she for her is a pleasure spend her time with them.

**Why would you recommend this applicant to be an au pair/companion in the United States**

I´d like to recommend ███ for the Au Pair program because she has a great experience with children and she really is very excited with the opportunity to take care of children and study as well. She believes this program will be very important for her personal life to become more mature and independent girl and also for her professional life to find a good job when she comes back to Brazil. ███ also wants to know more about the American culture make new friends and live as an American girl. She's ready to do her best for the children and also for the family.

**Has the Applicant been referred by an Au Pair in America Ambassador**

No

**I declare that I have conducted this interview in person and that the interview report is a true and correct reflection of the interview**

Yes

## Additional Comments

137321 / MARCELA   DE ABREU FERNANDES

Au Pair
IN AMERICA

10/22/2009 10:49 AM

PLAINTIFFS' RESP. APP.0004237

AIFS0059473

Documents

https://aupair.aifs.com/Share/HFCCUsers/DisplayHtmlDoc.aspx?ViewT...



## Reference Checks

**Applicant name** ██████ █ ██████ ▮
**Preferred name** ████

**Program**          Au Pair

## Reference Summary

| Type | Referee | Checked on |
|------|---------|-----------|
| **Childcare Reference** | ████ ███ | 06-Mar-2009 |
| **Character Reference** | ████ ████ | 02-Mar-2009 |
| **Character Reference** | ████ ███ | 09-Mar-2009 |

## Childcare Reference

**Date checked:**     06-Mar-2009                    **Referee:**     █████████ ███

**Telephone number:**     ██████

**Dates cared for children:**     jul/2007 to jan/2009

**Summary of duties/course:**     She used to play, bathing, prepare the baby´s bottle and meals, change diapers and put the child to sleep.

**Any special skills/strengths:**
For ███ ███ is very attentive and responsible girl and theses qualities were very important for her let her son with ████ ▮

**Comment on the applicant's ability to adapt to new situations, possible stress, culture shock, etc:**
███ thinks ████ will be adapt very well and she won´t have problem to deal in different situation, places or with different people.

**How would the referee describe the applicant's communication skills?**
███ told ████ is very friendly, polite and communicative girl and she´s able to talk with everybody around her about different subjects.

**Would the referee be willing to use/employ the applicant again in the future?**
Yes

**Summary of comments / additional comments:**
███ told me just good things about ████ She told me ████ is a dedicated, attentive and responsible girl and she trust in ████ so much. ████ son also loves ████ because she always was nice with them.

PLAINTIFFS' RESP. APP.0004238

AIFS0059474

Documents                                      https://aupair.aifs.com/Share/HFCCUsers/DisplayHtmlDoc.aspx?ViewT...



## Character Reference

**Date checked:**        02-Mar-2009                    **Referee:**        ████ ██ ██████

**Telephone number:**    ████████

**Comment on the applicant's ability to adapt to new situations, possible stress, culture shock, etc:**
████ told █ is very flexible and communicative girl and she also is an open mind girl.

**How would the referee describe the applicant's communication skills?**
████ thinks ████ very friendly and communicative girl and she told ████ doesn't have
any problem about communication.

**Would the referee be willing to use/employ the applicant again in the future?**
Unknown

**Summary of comments / additional comments:**
████ has known ████ for 5 years and she told ████ loves staying with children and
she´s very kind with them. She told me ████ will be a good Au Pair and she recommends
████ for the program.

## Character Reference

**Date checked:**        09-Mar-2009                    **Referee:**        ████████ ██

**Telephone number:**    ██████

**Comment on the applicant's ability to adapt to new situations, possible stress, culture shock, etc:**
████ told me ████ is very communicative, flexible and mature girl and he thinks she´s
ready to adapt in new situations.

**How would the referee describe the applicant's communication skills?**
████ is very communicative and friendly girl and she can communicate with everybody.

**Would the referee be willing to use/employ the applicant again in the future?**
Unknown

**Summary of comments / additional comments:**
████ told me ████ is very friendly, polite, responsible, calm and flexible girl and she knows
how to deal in different situations. He recommends ████ for the Au Pair program and for him
████ is prepared to be an excellent au pair.

Aline Medeiro de Souza

PLAINTIFFS' RESP. APP.0004239                                          AIFS0059475



**Childcare Reference —**

**from an employer**

NOME DA PARTICIPANTE – COMO CONSTA NO PASSAPORTE

DE ALBANIS | MARCELA |

Deve ser completado pela referência de empregador – use caneta preta.

Nome: _Maria Mariana de Souza_   Profissão: _Estudante_

_Rua Duarte Leopoldo e Silva, ... ap 35 – Centro – SP_

Telefone: _(11) 3237-9789_   _(11) 3237-9789_   _(11) 9281-3501_

Assinatura: _Maria Meneze_   Data: _12/12/2009_

POR FAVOR DEVOLVA PARA A CANDIDATA ASSIM QUE ESTIVER COMPLETO

PLAINTIFFS' RESP. APP.0004240

AIFS0059476

Maria Clara Florindo

PLAINTIFFS' RESP. APP.0004241

AIFS0059477

Case 1:14-cv-03074-CMA-KMT Document 943-46 Filed 03/17/18 USDC Colorado Page 33 of 309

Documents https://aupair.aifs.com/Share/HFCCUsers/DisplayHtmlDoc.aspx?ViewT...

Au Pair IN AMERICA

# Childcare Reference – from an employer

NOME DA PARTICIPANTE - COMO CONSTA NO PASSAPORTE

[redacted]

Deve ser completado pela referência de empregador – use caneta preta.

Nome: [illegible] MARIA CARLA [illegible] Profissão: PRESIDENTE DA CRECHE

[illegible] (11) 3461[illegible] (11) 3464[illegible] (11) [illegible]5183[illegible]

[illegible] X [illegible] A NOITE

[illegible] NÃO

[illegible] Não X [illegible]

[illegible]

[illegible] 2 ANOS [illegible] NA CRECHE

[illegible] 04/2008 [illegible] 03/2009

[illegible] 2X POR SEMANA

[illegible] 65 CRIANÇAS

[illegible] ELA AJUDAVA A CUIDAR DAS [illegible], DAVA BANHO, [illegible] ATIVIDADES DE RECORTAR E COLAR, ARTESANATO E AJUDAVA NA [illegible] DA HORA DO ALMOÇO.

[illegible] NÃO

[illegible] 2 A 5 ANOS [illegible] 2 A 5 ANOS

[illegible] ELA [illegible] AS NECESSIDADES DE CADA CRIANÇA, PERCEBENDO QUE TODAS TEM UMA PERSONALIDADE DIFERENTE.

[illegible] X

[illegible]

[illegible] Não X [illegible]

[illegible]

EMBORA A CULTURA SEJA UM POUCO DIFERENTE, DEVIDO A SUA FLEXIBILIDADE TENHO CERTEZA QUE ISSO NÃO SERÁ UM OBSTÁCULO.

[illegible] 5 [illegible] 5 [illegible] 5 [illegible] 5

[illegible] 5 [illegible] 5 [illegible] 5 [illegible] 5

[illegible] SIM [illegible] PORQUE ELA DESEJA BASTANTE SER AU PAIR [illegible], TENHO CERTEZA QUE ELA DESEMPENHARÁ [illegible] COM RESPONSABILIDADE E CARINHO COM AS CRIANÇAS.

[illegible] ELA ESTÁ SEMPRE SORRINDO E [illegible] AJUDAR A TODOS QUE PODE. ELA É MUITO DEDICADA EM TUDO QUE FAZ, SEMPRE TENTANDO [illegible] CRIATIVOS PARA SOLUCIONAR QUALQUER PROBLEMA.

Assinatura [signature] Data 16/[illegible]/2009

POR FAVOR DEVOLVA PARA A CANDIDATA ASSIM QUE ESTIVER COMPLETO

17 of 28 10/22/2009 10:49 AM

PLAINTIFFS' RESP. APP.0004242

AIFS0059478

Documents

https://aupair.aifs.com/Share/HFCCUsers/DisplayHtmlDoc.aspx?ViewT...

Aline Medeiro de Souza

10/22/2009 10:49 AM

PLAINTIFFS' RESP. APP.0004243

AIFS0059479

Documents
https://aupair.aifs.com/Share/HFCCUsers/DisplayHtmlDoc.aspx?ViewT...



Childcare Reference –
from an employer

10/22/2009 10:49 AM

PLAINTIFFS' RESP. APP.0004244

AIFS0059480

Maria Clara Florindo

PLAINTIFFS' RESP. APP.0004245                                        AIFS0059481

Documents                                    https://aupair.aifs.com/Share/HFCCUsers/DisplayHtmlDoc.aspx?ViewT...



Childcare Reference –
from an employer

NAME OF APPLICANT - AS IT APPEARS IN PASSPORT!

███████████████████

To be completed by childcare referee (employer) - use black ink

Name and address ... *Maria Clara Ferrando*   Profession DAY NURSERY President

... *Rue Speranto Riambavolanka, 26 - São V. ank 150*

Telephone ... (33) 396 142 89      Evening (33) 396 14289     ... (33)9 1518327

... ☒ ... AT NIGHT

... NO

... ☒ ...

Please note ...

... *2 YEARS* ... AT DAY NURSERY

... *JAN 2006* ... JUL 2008

... *6 + CHILDREN*

... She used to help on the lessons, played playground, ... Indan education games, bath, cleanliness, read aloud, desks, and crafts activities and help to feed at lunch time ... NO

... *2-5 years* ... *2-5 years* ... She could understand what the children ... needed, realizing that each child has a different personality

... ☒ ...

... Yes ☒ No ☒ Don't know. Although her culture is a little different, because of her personality, I am positive this won't be an obstacle

...    5          5          5          5
...    5          5          5          5

... Yes, first of all, because she really wants to be an Au Pair, so I am ... sure that she will mind all her duties with much responsibility and naturas with children ... She is always ... smiling and trying to help whoever she can. She is very dedicated to everything she does, ... always trying to find creative ways to solve any kind of problems

PLAINTIFFS' RESP. APP.0004246                                    AIFS0059482

Thiago Guedes Pinto

PLAINTIFFS' RESP. APP.0004247

AIFS0059483

Documents

https://aupair.aifs.com/Share/HFCCUsers/DisplayHtmlDoc.aspx?ViewT...

 Pair

**Character Reference**

NAME OF APPLICANT - AS IT APPEARS IN PASSPORT

To be completed by character referee - use black ink

Name of referee: THIAGO GUEDES PINTO    Profession: STUDENT

ADDRESS: RUA BALCUL 16 APT 21 - MARACINA - SAMUSISP

Telephone number: +55/13/3 3234234   Evening: +55/13/3 3234234   Mobile: +55/13 3417833397

How long have you known the applicant? 3 YEARS    How is the applicant known to you? FRIENDS IN COMMON

SHE IS VERY RESPONSIBLE AND LOVEABLE PERSON, FURTHERMORE, THE APPLICANT CAN BE CONSIDERED A VERY SWEET, HONEST, CREATIVE AND HAPPY PERSON

I BELIEVE SHE WONT HAVE PROBLEMS TO HANDLE NEW SITUATIONS AS I CONSIDER HER A VERY CURIOUS PERSON. BY BEING VERY SELF-CENTERED, SHE MIGHT NOT GET STRESSED OUT

| Honesty | 5 | Sense of Humour | 5 | Responsibility/Maturity | 5 | Independence | 5 |
| Punctuality | 5 | Flexibility | 5 | Communication skills | 5 | Patience | 5 |

I WOULD CERTAINLY RECOMMEND THIS PERSON BECAUSE SHE IS VERY DEDICATED TO EVERYTHING SHE DECIDES TO DO AND THEREFORE, I'M CONVINCED SHE WOULD BE A VERY GOOD AU PAIR. BESIDES, SHE IS VERY HARD WORKING AND COMMUNICATIVE.

WELL, SHE IS A VERY NICE PERSON WHOSE PERSONAL VALUES ARE VERY HONEST AND PURE. SHE IS A PERSON WHO CARES ABOUT THE ENVIRONMENT, ABOUT SOCIETY AND ITS DWELLERS. SHE IS A VERY HONEST AND GOOD HUMORED WOMAN WHO LOOKS FOR AN OPPORTUNITY TO SHARE HER EXPERIENCES. FURTHERMORE, THE APPLICANT IS A VERY KIND PERSON WHOSE SKILLS WITH CHILDREN ARE EVIDENT. I GUESS BEING PURE, BUT NOT NAIVE IS ONE OF THE BEST QUALITIES SHE HAS. SHE IS, FOR SURE, ONE OF THE BEST PEOPLE I'VE KNOWN.

Signature    Date 12/12/01

PLEASE RETURN TO THE APPLICANT ONCE COMPLETED

PLAINTIFFS' RESP. APP.0004248                           AIFS0059484

Carolina Santos

PLAINTIFFS' RESP. APP.0004249    AIFS0059485



## Character Reference

**NOME DA PARTICIPANTE – COMO CONSTA NO PASSAPORTE**

Deve ser completado pela referência de caráter – use caneta preta.

Nome _Caroline Jacob dos Santos_ Profissão: _Estudante_

Endereço _Rua Mercedes de Magalhães, 50 - Parque Taquaral - Campinas/SP_

Telefone: ( ) _334 8134_ _(19) 334 2 8134_ _(19) 9135 8634_

Há quanto tempo conhece a participante? _5 anos_ Como você a descreveria? _Trabalha..._

Como você a descreveria a personalidade e caráter da candidata? _Paciente, carinhosa, honesta, esforçada, criativa e bem humorada._

Sabe se a candidata teve envolvimento em algum tipo de crime? Sim ☐ Não ☒

A candidata possui algum problema de saúde ou física? Sim ☐ Não ☒

_Por favor, dê a sua opinião sobre a capacidade da candidata cuidar dos filhos (incluindo crianças e adolescentes com necessidades especiais). Ela terá capacidade de lidar com as novas situações com muita calma, tentando sempre colocar-se no lugar da criança, pois é a mais perfeita..._

Como a classificaria em cada um dos seguintes critérios? 1 = Fraco 2 = abaixo da média, 3 = satisfatório, 4 = bom, 5 = excelente

| | | | | | |
|---|---|---|---|---|---|
| Amadurecida | 5 | Amor pelas crianças | 5 | Responsabilidade / Maturidade | 5 | Inteligência | 5 |
| Pontualidade | 5 | Flexibilidade | 5 | Comunicação | 5 | Paciência | 5 |

_5 m, pois é uma pessoa batalhadora, honesta, alegre, divertida e criativa. Tem a mal informa experiência com crianças e com certeza terá ótimos momentos com sua família e com as crianças._

_E uma pessoa de pura experiência, que preza principalmente pelo cuidado e bem estar das crianças._

Assinatura _Caroline Santos_ Data _14/07/2009_

PLAINTIFFS' RESP. APP.0004250

AIFS0059486

Carolina Santos

PLAINTIFFS' RESP. APP.0004251

AIFS0059487

Documents                                                    https://aupair.aifs.com/Share/HFCCUsers/DisplayHtmlDoc.aspx?ViewT...



PLAINTIFFS' RESP. APP.0004252                                    AIFS0059488

PLAINTIFFS' RESP. APP.0004253

AIFS0059489

Case 1:14-cv-03074-CMA-KMT   Document 945-23   Filed 03/17/18   USDC Colorado   Page 45
of 309

# Exhibit 386

PLAINTIFFS' RESP. APP.0004254

# 2011 Host Family Agreement

apa-hfag-1/11



River Plaza, 9 West Broad Street, Stamford, CT 06902-3788
(800) 928-7247 ★ www.AuPairinAmerica.com

We, the undersigned, have applied to be a host family with the Au Pair in America or EduCare in America program which is sponsored by the American Institute For Foreign Study, Inc. and referred to as "the Program" in this agreement. The Program agrees to recruit and to offer au pair/companion candidates for our consideration and to provide reasonable support concerning problems that may arise during the exchange. In consideration for these services, we hereby agree:

- **Selection of au pair/companion.** We understand that it is our sole responsibility to carefully choose from among the candidates presented to us, and that there is no warranty as to our satisfaction or to the compatibility of any particular candidate as an au pair/companion in our family. It is also our responsibility to monitor the performance of the candidate in our home, and to promptly notify the Community Counselor of any problems.

- **Obligations of au pair/companion and host family.** We understand that the au pair/companion we select will assist our family with day-to-day child care duties [which do not include housework unrelated to the children], for a period not to exceed 10 hours per day for a maximum of 45 hours per week (30 hours per week for EduCare in America), as outlined under "au pair responsibilities" defined in the current program brochure. In exchange, we agree to provide the au pair/companion with:
  - board and lodging [consisting of a separate room, which shall be approved by the local Community Counselor].
  - a minimum weekly stipend established by Au Pair/EduCare in America.
  - at least one full free day and one half free day per week plus one free weekend (Friday evening to Monday morning) each month.
  - two weeks off to be taken at a mutually agreed-upon time during each 12 months of the exchange, two weeks for a nine-month extension, one-week for an extension term of six months, with the minimum weekly stipend as established by Au Pair/EduCare in America.
  - educational costs (to a maximum of $500 for the year for the standard and Extraordinaire program, $1,000 for the EduCare program). Adequate time to attend a course(s) for cultural or professional enrichment (six hours of academic credit or its equivalent for au pairs or 12 hours of academic credit or its equivalent for EduCare Companions); transportation to and from the place of instruction. [Note: The educational component is currently under review by The Department of State and the sum for the educational allowance may increase in 2011.]

We acknowledge that we have read the current program brochure, Program Support and Policies insert and supplemental information received from the Program and agree that the terms and conditions set forth therein shall constitute part of this agreement.

- **Program goals.** We recognize that the goal of the Program is for the au pair/companion to learn about America, and agree to give the au pair/companion ample opportunity and encouragement to take advantage of cluster activities and educational, cultural and community opportunities available in our area.

- **Fees and other obligations.** We agree to pay the required fees in accordance with the schedule set forth in the brochure and web communications, including excess airline fees imposed by air carriers for increased fuel surcharges or new taxes levied after January 1, 2011 and SEVIS fees as required. We understand that any outstanding balance more than 15 days past due will be subject to a finance charge of 1.5% per month, 18% per annum on the outstanding balance. Accounts which require outside collection services will incur additional fees associated with the collection agency. We will provide the au pair/companion, at our expense, with a one-way ticket or other transportation arrangement for travel from the orientation site in Connecticut to our community. We understand the Program will arrange a return flight home at the end of the program exchange from select U.S. cities and any additional flight surcharge will be paid by the au pair/companion.

- **Background information and monitoring of placement.** We warrant that our answers on the host family application are true and complete. For the purpose of facilitating the selection and placement of an au pair/companion with our family, we authorize the Program to make reasonable inquiries of any third party or governmental agency regarding our family, and grant permission for any such party or entity to disclose the requested information, which will be treated as confidential. After placement, we agree to maintain regular contact and communication with the Community Counselor in order to monitor the appropriateness of the placement and to take advantage of the Program's resources.

- **United States government rules.** We understand that we will be provided with a copy of the rules governing Au Pair/EduCare programs, and we agree to comply with these rules which are subject to change at the discretion of The Department of State.
  - We agree to interview, by telephone, the au pair/companion we select for placement with our family.
  - We agree to have at least one parent/guardian or a responsible adult to remain at home during a minimum three days following the au pair's arrival to train, observe and acclimate her to to her child care responsibilities.
  - We understand that an au pair/companion cannot be placed with a host family having a child under three months of age unless a parent or other responsible adult will be present at all times.
  - If applicable, we acknowledge our responsibility to review the prior experience, skills and training of the au pair/companion regarding the care of special needs children. If we have children in the home younger than school age we will not participate in the EduCare program, unless we have provided written confirmation of the full-time alternative care arrangements in place for our pre-school age children and those arrangements have been approved by the Program.
  - Upon arrival of the au pair/companion in our home we agree to sign a written agreement with our au pair/companion that further affirms our joint commitment to adhere to U.S. government and Program guidelines. We will provide the Program with a copy of this agreement.

*(sign on reverse side...)*

If we do not afford the participant the benefits and protections set forth in this agreement [or in government regulations], or otherwise violate the terms of this agreement, we understand that the Program may withdraw the participant from our household, in which case we shall not be entitled to a replacement au pair/companion or to any refund.

We understand that extending an au pair/companion's J visa to remain in the U.S. beyond the term granted under the terms of the visa is not possible. We will abide by the Program regulations, relieving the au pair/companion of her duties at the end of the term and encouraging her to return to her home country. We will not support or sponsor her for a change of visa status before or during the travel-month time frame that she is considered in valid program status with Au Pair in America. We understand that by doing so we may risk our continued participation in the program and that doing so is not in the spirit of the program.

- **Problem resolution.** The Program will make reasonable attempts to resolve any difficulties regarding the placement. If the Program determines that the placement cannot be continued, it will provide assistance that may include, in its discretion, placement of another au pair/companion with our family. Host families are responsible for hosting a participant for up to two weeks until a new placement is arranged. We agree to the terms of the replacement and refund policy set forth in the program materials.

- **Legal relationship of au pair/companion to the Program.** We understand and agree that the au pair/companion is not an employee or agent of the Program. The Program is not, under any circumstances, responsible for any bills incurred by the au pair/companion or for any damages or losses caused to anyone by any act or omission of the au pair/companion. We understand that the au pair may only provide childcare for our children and agree to indemnify and hold the Program harmless from any claims resulting from the au pair's care of other children. In addition, all agreements and guidelines provided in this agreement pertain only to the au pair duties while caring for our children and no others.

- **Release of claims against the Program.** We unconditionally release the Program from any claims for damage, injury, loss, or expense of any sort incurred in connection with the participation of our family in the Program and our selection of an au pair/companion to stay in our home. This release includes, but is not limited to, liability for any intentional or negligent acts or omissions by the au pair/companion.

- **Insurance.** We understand it is our responsibility to consult an insurance agent regarding the insurance coverage that may be either required by state law or advisable for our situation. The Host family MUST assess the driving ability of the au pair/companion before granting permission to operate a vehicle, and adequate automobile insurance coverage must be in place if the au pair/companion operates a motor vehicle. We agree to limit any claim against the au pair/companion for uninsured damages resulting from operation of a motor vehicle to a maximum of $500. We also agree to maintain liability and casualty insurance to cover any reasonably foreseeable damages that may be sustained by the au pair/companion while in our household, and we agree to hold the program harmless and indemnify it from any liablity claim by the au pair/companion, including court costs and legal fees.

- **Agreement to arbitrate.** We agree that any claims against the Program that cannot be settled informally will be resolved in binding arbitration if the amount in controversy exceeds $5000. The location of the arbitration and identity of the arbitrator will be decided by mutual agreement, with the costs to be shared equally between the parties. The decision of the arbitrator shall be final. By signing this agreement, we are waiving our right to have any claim against the Program decided in Court before a judge or jury, although each party retains the right to have a Court confirm the arbitration award in accordance with the law.

- **Applications.** We certify that the information contained in our host family application and any supplemental application documents is true and correct. We understand that you may request reports from credit reporting agencies. If we inquire about whether a credit report was requested, you will tell me; if you receive a report, you will give me the name and contact information of the agency that furnished it.

- **Entire agreement.** We acknowledge that this document (and documents referenced herein) sets forth our entire agreement with the Program, and that we have not relied on any warranties or representations other than set forth above.

- **Severability.** A ruling invalidating a portion of this contract shall not affect the validity of the remainder.

- **Applicable law.** This agreement shall be governed by the laws of the state of Connecticut.

We understand that this document is a legal contract and that we have been advised to seek legal advice if we do not understand its terms. By signing the document, we acknowledge that we have read and understand the provisions of this agreement and accept and agree to abide by the terms as set forth.

| | |
|---|---|
| _Signature of parent/guardian 1_     _Date_ | _Signature of parent/guardian 2_     _Date_ |

| | |
|---|---|
| _Print name_ | _Print name_ |

| | |
|---|---|
| _Signed by authorized official_     December 2010 _Date_ | |

# 2012 Host Family Agreement

We, the undersigned, have applied to be a host family with the Au Pair in America or EduCare in America program which is sponsored by the American Institute For Foreign Study, Inc. and referred to as "the Program" in this agreement. The Program agrees to recruit and to offer au pair/companion candidates for our consideration and to provide reasonable support concerning problems that may arise during the exchange. In consideration for these services, we hereby agree:

- **Selection of au pair/companion.** We understand that it is our sole responsibility to carefully choose from among the candidates presented to us, and that there is no warranty as to our satisfaction or to the compatibility of any particular candidate as an au pair/companion in our family. It is also our responsibility to monitor the performance of the candidate in our home, and to promptly notify the Community Counselor of any problems.
- **Obligations of au pair/companion and host family.** We understand that the au pair/companion we select will assist our family with day-to-day child care duties [which do not include housework unrelated to the children], for a period not to exceed 10 hours per day for a maximum of 45 hours per week (30 hours per week for EduCare in America), as outlined under "au pair responsibilities" defined in the current program brochure. In exchange, we agree to provide the au pair/companion with:
  - board and lodging [consisting of a separate room, which shall be approved by the local Community Counselor].
  - a minimum weekly stipend established by Au Pair/EduCare in America.
  - at least one full free day and one half free day per week plus one free weekend (Friday evening to Monday morning) each month.
  - two weeks off to be taken at a mutually agreed-upon time during each 12 months of the exchange, two weeks for a nine-month extension, one-week for an extension term of six months, with the minimum weekly stipend as established by Au Pair/EduCare in America.
  - educational costs (to a maximum of $500 for the year for the standard and Extraordinaire program, $1,000 for the EduCare program). Adequate time to attend a course(s) for cultural or professional enrichment (six hours of academic credit or its equivalent for au pairs or 12 hours of academic credit or its equivalent for EduCare Companions); transportation to and from the place of instruction. [Note: The educational component is currently under review by The Department of State and the sum for the educational allowance may increase in 2012.]

We acknowledge that we have read the current program brochure, Program Support and Policies insert and supplemental information received from the Program and agree that the terms and conditions set forth therein shall constitute part of this agreement.

- **Program goals.** We recognize that the goal of the Program is for the au pair/companion to learn about America, and agree to give the au pair/companion ample opportunity and encouragement to take advantage of cluster activities and educational, cultural and community opportunities available in our area.

- **Fees and other obligations.** We agree to pay the required fees in accordance with the schedule set forth in the brochure and web communications, including excess airline fees imposed by air carriers for increased fuel surcharges or new taxes levied after January 1, 2012 and SEVIS fees as required. We understand that any outstanding balance more than 15 days past due will be subject to a finance charge of 1.5% per month, 18% per annum on the outstanding balance. Accounts which require outside collection services will incur additional fees associated with the collection agency. We will provide the au pair/companion, at our expense, with a one-way ticket or other transportation arrangement for travel from the orientation site in Connecticut to our community. We understand the Program will arrange a return flight home at the end of the program exchange from select U.S. cities and any additional flight surcharge will be paid by the au pair/companion.

- **Background information and monitoring of placement.** We warrant that our answers on the host family application are true and complete. For the purpose of facilitating the selection and placement of an au pair/companion with our family, we authorize the Program to make reasonable inquiries of any third party or governmental agency regarding our family, and grant permission for any such party or entity to disclose the requested information, which will be treated as confidential. After placement, we agree to maintain regular contact and communication with the Community Counselor in order to monitor the appropriateness of the placement and to take advantage of the Program's resources.

- **United States government rules.** We understand that we will be provided with a copy of the rules governing Au Pair/EduCare programs, and we agree to comply with these rules which are subject to change at the discretion of The Department of State.
  - We agree to interview, by telephone, the au pair/companion we select for placement with our family.
  - We agree to have at least one parent/guardian or a responsible adult to remain at home during a minimum three days following the au pair's arrival to train, observe and acclimate her to to her child care responsibilities.
  - We understand that an au pair/companion cannot be placed with a host family having a child under three months of age unless a parent or other responsible adult will be present at all times.
  - If applicable, we acknowledge our responsibility to review the prior experience, skills and training of the au pair/companion regarding the care of special needs children. If we have children in the home younger than school age we will not participate in the EduCare program, unless we have provided written confirmation of the full-time alternative care arrangements in place for our pre-school age children and those arrangements have been approved by the Program.
  - Upon arrival of the au pair/companion in our home we agree to sign a written agreement with our au pair/companion that further affirms our joint commitment to adhere to U.S. government and Program guidelines. We will provide the Program with a copy of this agreement.

*(sign on reverse side...)*

apa-hfa-1/12

If we do not afford the participant the benefits and protections set forth in this agreement [or in government regulations], or otherwise violate the terms of this agreement, we understand that the Program may withdraw the participant from our household, in which case we shall not be entitled to a replacement au pair/companion or to any refund.

We understand that extending an au pair/companion's J visa to remain in the U.S. beyond the term granted under the terms of the visa is not possible. We will abide by the Program regulations, relieving the au pair/companion of her duties at the end of the term and encouraging her to return to her home country. We will not support or sponsor her for a change of visa status before or during the travel-month time frame that she is considered in valid program status with Au Pair in America. We understand that by doing so we may risk our continued participation in the program and that doing so is not in the spirit of the program.

- **Problem resolution.** The Program will make reasonable attempts to resolve any difficulties regarding the placement. If the Program determines that the placement cannot be continued, it will provide assistance that may include, in its discretion, placement of another au pair/companion with our family. Host families are responsible for hosting a participant for up to two weeks until a new placement is arranged. We agree to the terms of the replacement and refund policy set forth in the program materials.

- **Legal relationship of au pair/companion to the Program.** We understand and agree that the au pair/companion is not an employee or agent of the Program. The Program is not, under any circumstances, responsible for any bills incurred by the au pair/companion or for any damages or losses caused to anyone by any act or omission of the au pair/companion. We understand that the au pair may only provide childcare for our children and agree to indemnify and hold the Program harmless from any claims resulting from the au pair's care of other children.  In addition, all agreements and guidelines provided in this agreement pertain only to the au pair duties while caring for our children and no others.

- **Release of claims against the Program.** We unconditionally release the Program from any claims for damage, injury, loss, or expense of any sort incurred in connection with the participation of our family in the Program and our selection of an au pair/companion to stay in our home. This release includes, but is not limited to, liability for any intentional or negligent acts or omissions by the au pair/companion.

- **Insurance.** We understand it is our responsibility to consult an insurance agent regarding the insurance coverage that may be either required by state law or advisable for our situation. The Host family MUST assess the driving ability of the au pair/companion before granting permission to operate a vehicle, and adequate automobile insurance coverage must be in place if the au pair/companion operates a motor vehicle. We agree to limit any claim against the au pair/companion for uninsured damages resulting from operation of a motor vehicle to a maximum of $500. We also agree to maintain liability and casualty insurance to cover any reasonably foreseeable damages that may be sustained by the au pair/companion while in our household, and we agree to hold the program harmless and indemnify it from any liablity claim by the au pair/companion, including court costs and legal fees.

- **Agreement to arbitrate.** We agree that any claims against the Program that cannot be settled informally will be resolved in binding arbitration if the amount in controversy exceeds $5000. The location of the arbitration and identity of the arbitrator will be decided by mutual agreement, with the costs to be shared equally between the parties. The decision of the arbitrator shall be final. By signing this agreement, we are waiving our right to have any claim against the Program decided in Court before a judge or jury, although each party retains the right to have a Court confirm the arbitration award in accordance with the law.

- **Applications.** We certify that the information contained in our host family application and any supplemental application documents is true and correct. We understand that you may request reports from credit reporting agencies. If we inquire about whether a credit report was requested, you will tell me; if you receive a report, you will give me the name and contact information of the agency that furnished it.

- **Entire agreement.** We acknowledge that this document (and documents referenced herein) sets forth our entire agreement with the Program, and that we have not relied on any warranties or representations other than set forth above.

- **Severability**.  A ruling invalidating a portion of this contract shall not affect the validity of the remainder.

- **Applicable law.** This agreement shall be governed by the laws of the state of Connecticut.

We understand that this document is a legal contract and that we have been advised to seek legal advice if we do not understand its terms. By signing the document, we acknowledge that we have read and understand the provisions of this agreement and accept and agree to abide by the terms as set forth.

| | | |
|---|---|---|
| Signature of parent/guardian 1 | Date | Signature of parent/guardian 2 | Date |

| | | |
|---|---|---|
| Print name | | Print name |

_____   January 2012

Signed by authorized official        Date

PLAINTIFFS' RESP. APP.0004258

2012

# 2013 Host Family Agreement

We, the undersigned, have applied to be a host family with the Au Pair in America or EduCare in America program which is sponsored by the American Institute For Foreign Study, Inc. and referred to as "the Program" in this agreement. The Program agrees to recruit and to offer au pair/companion candidates for our consideration and to provide reasonable support concerning problems that may arise during the exchange. In consideration for these services, we hereby agree:

- **Selection of au pair/companion.** We understand that it is our sole responsibility to carefully choose from among the candidates presented to us, and that there is no warranty as to our satisfaction or to the compatibility of any particular candidate as an au pair/companion in our family. It is also our responsibility to monitor the performance of the candidate in our home, and to promptly notify the Community Counselor of any problems.

- **Obligations of au pair/companion and host family.** We understand that the au pair/companion we select will assist our family with day-to-day child care duties [which do not include housework unrelated to the children], for a period not to exceed 10 hours per day for a maximum of 45 hours per week (30 hours per week for EduCare in America), as outlined under "au pair responsibilities" defined in the current program brochure. In exchange, we agree to provide the au pair/companion with:
  - board and lodging [consisting of a separate room, which shall be approved by the local Community Counselor].
  - a minimum weekly stipend established by Au Pair/EduCare in America.
  - at least one full free day and one half free day per week plus one free weekend (Friday evening to Monday morning) each month.
  - two weeks off to be taken at a mutually agreed-upon time during each 12 months of the exchange, two weeks for a nine-month extension, one-week for an extension term of six months, with the minimum weekly stipend as established by Au Pair/EduCare in America.
  - educational costs (to a maximum of $500 for the year for the standard and Extraordinaire program, $1,000 for the EduCare program). Adequate time to attend a course(s) for cultural or professional enrichment (six hours of academic credit or its equivalent for au pairs or 12 hours of academic credit or its equivalent for EduCare Companions); transportation to and from the place of instruction. [Note: The educational component is currently under review by The Department of State and the sum for the educational allowance may increase in 2013.]

We acknowledge that we have read the current program brochure, Program Support and Policies insert and supplemental information received from the Program and agree that the terms and conditions set forth therein shall constitute part of this agreement.

- **Program goals.** We recognize that the goal of the Program is for the au pair/companion to learn about America, and agree to give the au pair/companion ample opportunity and encouragement to take advantage of cluster activities and educational, cultural and community opportunities available in our area.

- **Fees and other obligations.** We agree to pay the required fees in accordance with the schedule set forth in the brochure and web communications, including excess airline fees imposed by air carriers for increased fuel surcharges or new taxes levied after January 1, 2013 and SEVIS fees as required. We understand that any outstanding balance more than 15 days past due will be subject to a finance charge of 1.5% per month, 18% per annum on the outstanding balance. Accounts which require outside collection services will incur additional fees associated with the collection agency. We will provide the au pair/companion, at our expense, with a one-way ticket or other transportation arrangement for travel from the orientation site in Connecticut to our community. We understand the Program will arrange a return flight home at the end of the program exchange from select U.S. cities and any additional flight surcharge will be paid by the au pair/companion.

- **Background information and monitoring of placement.** We warrant that our answers on the host family application are true and complete. For the purpose of facilitating the selection and placement of an au pair/companion with our family, we authorize the Program to make reasonable inquiries of any third party or governmental agency regarding our family, and grant permission for any such party or entity to disclose the requested information, which will be treated as confidential. After placement, we agree to maintain regular contact and communication with the Community Counselor in order to monitor the appropriateness of the placement and to take advantage of the Program's resources.

- **United States government rules.** We understand that we will be provided with a copy of the rules governing Au Pair/EduCare programs, and we agree to comply with these rules which are subject to change at the discretion of The Department of State.
  - We agree to interview, by telephone, the au pair/companion we select for placement with our family.
  - We agree to have at least one parent/guardian or a responsible adult to remain at home during a minimum three days following the au pair's arrival to train, observe and acclimate her to to her child care responsibilities.
  - We understand that an au pair/companion cannot be placed with a host family having a child under three months of age unless a parent or other responsible adult will be present at all times.
  - If applicable, we acknowledge our responsibility to review the prior experience, skills and training of the au pair/companion regarding the care of special needs children. If we have children in the home younger than school age we will not participate in the EduCare program, unless we have provided written confirmation of the full-time alternative care arrangements in place for our pre-school age children and those arrangements have been approved by the Program.
  - Upon arrival of the au pair/companion in our home we agree to sign a written agreement with our au pair/companion that further affirms our joint commitment to adhere to U.S. government and Program guidelines. We will provide the Program with a copy of this agreement.

PLAINTIFFS' RESP. APP.0004259

*(sign on reverse side...)*

If we do not afford the participant the benefits and protections set forth in this agreement [or in government regulations], or otherwise violate the terms of this agreement, we understand that the Program may withdraw the participant from our household, in which case we shall not be entitled to a replacement au pair/companion or to any refund.

We understand that extending an au pair/companion's J visa to remain in the U.S. beyond the term granted under the terms of the visa is not possible. We will abide by the Program regulations, relieving the au pair/companion of her duties at the end of the term and encouraging her to return to her home country. We will not support or sponsor her for a change of visa status before or during the travel-month time frame that she is considered in valid program status with Au Pair in America. We understand that by doing so we may risk our continued participation in the program and that doing so is not in the spirit of the program.

- **Problem resolution.** The Program will make reasonable attempts to resolve any difficulties regarding the placement. If the Program determines that the placement cannot be continued, it will provide assistance that may include, in its discretion, placement of another au pair/companion with our family. Host families are responsible for hosting a participant for up to two weeks until a new placement is arranged. We agree to the terms of the replacement and refund policy set forth in the program materials.

- **Legal relationship of au pair/companion to the Program.** We understand and agree that the au pair/companion is not an employee or agent of the Program. The Program is not, under any circumstances, responsible for any bills incurred by the au pair/companion or for any damages or losses caused to anyone by any act or omission of the au pair/companion. We understand that the au pair may only provide childcare for our children and agree to indemnify and hold the Program harmless from any claims resulting from the au pair's care of other children. In addition, all agreements and guidelines provided in this agreement pertain only to the au pair duties while caring for our children and no others.

- **Release of claims against the Program.** We unconditionally release the Program from any claims for damage, injury, loss, or expense of any sort incurred in connection with the participation of our family in the Program and our selection of an au pair/companion to stay in our home. This release includes, but is not limited to, liability for any intentional or negligent acts or omissions by the au pair/companion.

- **Insurance.** We understand it is our responsibility to consult an insurance agent regarding the insurance coverage that may be either required by state law or advisable for our situation. The Host family MUST assess the driving ability of the au pair/companion before granting permission to operate a vehicle, and adequate automobile insurance coverage must be in place if the au pair/companion operates a motor vehicle. We agree to limit any claim against the au pair/companion for uninsured damages resulting from operation of a motor vehicle to a maximum of $500. We also agree to maintain liability and casualty insurance to cover any reasonably foreseeable damages that may be sustained by the au pair/companion while in our household, and we agree to hold the program harmless and indemnify it from any liablity claim by the au pair/companion, including court costs and legal fees.

- **Agreement to arbitrate.** We agree that any claims against the Program that cannot be settled informally will be resolved in binding arbitration if the amount in controversy exceeds $5000. The location of the arbitration and identity of the arbitrator will be decided by mutual agreement, with the costs to be shared equally between the parties. The decision of the arbitrator shall be final. By signing this agreement, we are waiving our right to have any claim against the Program decided in Court before a judge or jury, although each party retains the right to have a Court confirm the arbitration award in accordance with the law.

- **Applications.** We certify that the information contained in our host family application and any supplemental application documents is true and correct. We understand that you may request reports from credit reporting agencies. If we inquire about whether a credit report was requested, you will tell me; if you receive a report, you will give me the name and contact information of the agency that furnished it.

- **Entire agreement.** We acknowledge that this document (and documents referenced herein) sets forth our entire agreement with the Program, and that we have not relied on any warranties or representations other than set forth above.

- **Severability**. A ruling invalidating a portion of this contract shall not affect the validity of the remainder.

- **Applicable law.** This agreement shall be governed by the laws of the state of Connecticut.

We understand that this document is a legal contract and that we have been advised to seek legal advice if we do not understand its terms. By signing the document, we acknowledge that we have read and understand the provisions of this agreement and accept and agree to abide by the terms as set forth.

| Signature of parent/guardian 1 | Date | Signature of parent/guardian 2 | Date |

| Print name | | Print name | |

January 2013

| Signed by authorized official | Date |

PLAINTIFFS' RESP. APP.0004260

2013

# 2014 Host Family Agreement

We, the undersigned, have applied to be a host family with the Au Pair in America or EduCare in America program which is sponsored by the American Institute For Foreign Study, Inc. and referred to as "the Program" in this agreement. The Program agrees to recruit and to offer au pair/companion candidates for our consideration and to provide reasonable support concerning problems that may arise during the exchange. In consideration for these services, we hereby agree:

- **Selection of au pair/companion.** We understand that it is our sole responsibility to carefully choose from among the candidates presented to us, and that there is no warranty as to our satisfaction or to the compatibility of any particular candidate as an au pair/companion in our family. It is also our responsibility to monitor the performance of the candidate in our home, and to promptly notify the Community Counselor of any problems.
- **Obligations of au pair/companion and host family.** We understand that the au pair/companion we select will assist our family with day-to-day child care duties [which do not include housework unrelated to the children], for a period not to exceed 10 hours per day for a maximum of 45 hours per week (30 hours per week for EduCare in America), as outlined under "au pair responsibilities" defined in the current program brochure. In exchange, we agree to provide the au pair/companion with:
  - board and lodging [consisting of a separate, private room, which shall be approved by the local Community Counselor].
  - a minimum weekly stipend established by Au Pair/EduCare in America.
  - at least one full free day and one half free day per week plus one free weekend (Friday evening to Monday morning) each month.
  - two weeks off to be taken at a mutually agreed-upon time during each 12 months of the exchange, two weeks for a nine-month extension, one-week for an extension term of six months, with the minimum weekly stipend as established by Au Pair/EduCare in America.
  - educational costs (to a maximum of $500 for the year for the standard and Extraordinaire program, $1,000 for the EduCare program). Adequate time to attend a course(s) for cultural or professional enrichment (six hours of academic credit or its equivalent for au pairs or 12 hours of academic credit or its equivalent for EduCare Companions); transportation to and from the place of instruction. [Note: The educational component is currently under review by The Department of State and the sum for the educational allowance may increase in 2014.]

We acknowledge that we have read the current program brochure, Program Support and Policies insert and supplemental information received from the Program and agree that the terms and conditions set forth therein shall constitute part of this agreement.

- **Program goals.** We recognize that the goal of the Program is for the au pair/companion to learn about America, and agree to give the au pair/companion ample opportunity and encouragement to take advantage of cluster activities and educational, cultural and community opportunities available in our area.

- **Fees and other obligations.** We agree to pay the required fees in accordance with the schedule set forth in the brochure and web communications, including excess airline fees imposed by air carriers for increased fuel surcharges or new taxes levied after January 1, 2014 and SEVIS fees as required. We understand that any outstanding balance more than 15 days past due will be subject to a finance charge of 1.5% per month, 18% per annum on the outstanding balance. Accounts which require outside collection services will incur additional fees associated with the collection agency. We will provide the au pair/companion, at our expense, with a one-way ticket or other transportation arrangement for travel from the orientation site in Connecticut to our community. We understand the Program will arrange a return flight home at the end of the program exchange from select U.S. cities and any additional flight surcharge will be paid by the au pair/companion.

- **Background information and monitoring of placement.** We warrant that our answers on the host family application are true and complete. For the purpose of facilitating the selection and placement of an au pair/companion with our family, we authorize the Program to make reasonable inquiries of any third party or governmental agency regarding our family, and grant permission for any such party or entity to disclose the requested information, which will be treated as confidential. After placement, we agree to maintain regular contact and communication with the Community Counselor in order to monitor the appropriateness of the placement and to take advantage of the Program's resources.

- **United States government rules.** We understand that we will be provided with a copy of the rules governing Au Pair/EduCare programs, and we agree to comply with these rules which are subject to change at the discretion of The Department of State.
  - We agree to interview, by telephone or Skype, the au pair/companion we select for placement with our family.
  - We agree to have at least one parent/guardian or a responsible adult to remain at home during a minimum three days following the au pair's arrival to train, observe and acclimate her to her child care responsibilities.
  - We understand that an au pair/companion cannot be placed with a host family having a child under three months of age unless a parent or other responsible adult will be present at all times.
  - If applicable, we acknowledge our responsibility to review the prior experience, skills and training of the au pair/companion regarding the care of special needs children. If we have children in the home younger than school age we will not participate in the EduCare program full-time.
  - Upon arrival of the au pair/companion in our home we agree to sign a written agreement with our au pair/companion that further affirms our joint commitment to adhere to U.S. government and Program guidelines. We will provide the Program with a copy of this agreement.

*(sign on reverse side...)*

PLAINTIFF'S RESP. APP.0004261

apa-hfa-1/14

If we do not afford the participant the benefits and protections set forth in this agreement [or in government regulations], or otherwise violate the terms of this agreement, we understand that the Program may withdraw the participant from our household, in which case we shall not be entitled to a replacement au pair/companion or to any refund.

We understand that extending an au pair/companion's J visa to remain in the U.S. beyond the term granted under the terms of the visa is not possible. We will abide by the Program regulations, relieving the au pair/companion of her duties at the end of the term and encouraging her to return to her home country. We will not support or sponsor her for a change of visa status before or during the travel-month time frame that she is considered in valid program status with Au Pair in America. We understand that by doing so we may risk our continued participation in the program and that doing so is not in the spirit of the program.

- **Problem resolution.** The Program will make reasonable attempts to resolve any difficulties regarding the placement. If the Program determines that the placement cannot be continued, it will provide assistance that may include, in its discretion, placement of another au pair/companion with our family. Host families are responsible for hosting a participant for up to two weeks until a new placement is arranged. We agree to the terms of the replacement and refund policy set forth in the program materials.

- **Legal relationship of au pair/companion to the Program.** We understand and agree that the au pair/companion is not an employee or agent of the Program. The Program is not, under any circumstances, responsible for any bills incurred by the au pair/companion or for any damages or losses caused to anyone by any act or omission of the au pair/companion. We understand that the au pair may only provide childcare for our children and agree to indemnify and hold the Program harmless from any claims resulting from the au pair's care of other children. In addition, all agreements and guidelines provided in this agreement pertain only to the au pair duties while caring for our children and no others.

- **Release of claims against the Program.** We unconditionally release the Program from any claims for damage, injury, loss, or expense of any sort incurred in connection with the participation of our family in the Program and our selection of an au pair/companion to stay in our home. This release includes, but is not limited to, liability for any intentional or negligent acts or omissions by the au pair/companion.

- **Insurance.** We understand it is our responsibility to consult an insurance agent regarding the insurance coverage that may be either required by state law or advisable for our situation. The Host family MUST assess the driving ability of the au pair/companion before granting permission to operate a vehicle, and adequate automobile insurance coverage must be in place if the au pair/companion operates a motor vehicle. We agree to limit any claim against the au pair/companion for uninsured damages resulting from operation of a motor vehicle to a maximum of $500. We also agree to maintain liability and casualty insurance to cover any reasonably foreseeable damages that may be sustained by the au pair/companion while in our household, and we agree to hold the program harmless and indemnify it from any liablity claim by the au pair/companion, including court costs and legal fees.

- **Agreement to arbitrate.** We agree that any claims against the Program that cannot be settled informally will be resolved in binding arbitration if the amount in controversy exceeds $5000. The location of the arbitration and identity of the arbitrator will be decided by mutual agreement, with the costs to be shared equally between the parties. The decision of the arbitrator shall be final. By signing this agreement, we are waiving our right to have any claim against the Program decided in Court before a judge or jury, although each party retains the right to have a Court confirm the arbitration award in accordance with the law.

- **Applications.** We certify that the information contained in our host family application and any supplemental application documents is true and correct. We understand that you may request reports from credit reporting agencies. If we inquire about whether a credit report was requested, you will tell me; if you receive a report, you will give me the name and contact information of the agency that furnished it.

- **Entire agreement.** We acknowledge that this document (and documents referenced herein) sets forth our entire agreement with the Program, and that we have not relied on any warranties or representations other than set forth above.

- **Severability.** A ruling invalidating a portion of this contract shall not affect the validity of the remainder.

- **Applicable law.** This agreement shall be governed by the laws of the state of Connecticut.

We understand that this document is a legal contract and that we have been advised to seek legal advice if we do not understand its terms. By signing the document, we acknowledge that we have read and understand the provisions of this agreement and accept and agree to abide by the terms as set forth.

| Signature of parent/guardian 1 | Date | Signature of parent/guardian 2 | Date |

| Print name | | Print name | |

January 2014

| Signed by authorized official | Date |

2014

# 2015 Host Family Agreement

We, the undersigned, have applied to be a host family with the Au Pair in America or EduCare in America program which is sponsored by the American Institute For Foreign Study, Inc. and referred to as "the Program" in this agreement. The Program agrees to recruit and to offer au pair/companion candidates for our consideration and to provide reasonable support concerning problems that may arise during the exchange. In consideration for these services, we hereby agree:

- **Selection of au pair/companion.** We understand that it is our sole responsibility to carefully choose from among the candidates presented to us, and that there is no warranty as to our satisfaction or to the compatibility of any particular candidate as an au pair/companion in our family. It is also our responsibility to monitor the performance of the candidate in our home, and to promptly notify the Community Counselor of any problems.
- **Obligations of au pair/companion and host family.** We understand that the au pair/companion we select will assist our family with day-to-day child care duties [which do not include housework unrelated to the children], for a period not to exceed 10 hours per day for a maximum of 45 hours per week (30 hours per week for EduCare in America), as outlined under "au pair responsibilities" defined in the current program brochure. In exchange, we agree to provide the au pair/companion with:
  - board and lodging [consisting of a separate, private room, which shall be approved by the local Community Counselor].
  - a minimum weekly stipend established by Au Pair/EduCare in America.
  - at least one full free day and one half free day per week plus one free weekend (Friday evening to Monday morning) each month.
  - two weeks off to be taken at a mutually agreed-upon time during each 12 months of the exchange, two weeks for a nine-month extension, one-week for an extension term of six months, with the minimum weekly stipend as established by Au Pair/EduCare in America.
  - educational costs (to a maximum of $500 for the year for the standard and Extraordinaire program, $1,000 for the EduCare program). Adequate time to attend a course(s) for cultural or professional enrichment (six hours of academic credit or its equivalent for au pairs or 12 hours of academic credit or its equivalent for EduCare Companions); transportation to and from the place of instruction. [Note: The educational component is currently under review by The Department of State and the sum for the educational allowance may increase in 2015.]

We acknowledge that we have read the current program brochure, Program Support and Policies insert and supplemental information received from the Program and agree that the terms and conditions set forth therein shall constitute part of this agreement.

- **Program goals.** We recognize that the goal of the Program is for the au pair/companion to learn about America, and agree to give the au pair/companion ample opportunity and encouragement to take advantage of cluster activities and educational, cultural and community opportunities available in our area.
- **Fees and other obligations.** We agree to pay the required fees in accordance with the schedule set forth in the brochure and web communications, including excess airline fees imposed by air carriers for increased fuel surcharges or new taxes levied after January 1, 2014 and SEVIS fees as required. We understand that any outstanding balance more than 15 days past due will be subject to a finance charge of 1.5% per month, 18% per annum on the outstanding balance. Accounts which require outside collection services will incur additional fees associated with the collection agency. We will provide the au pair/companion, at our expense, with a one-way ticket or other transportation arrangement for travel from the orientation site in Connecticut to our community. We understand the Program will arrange a return flight home at the end of the program exchange from select U.S. cities and any additional flight surcharge will be paid by the au pair/companion.
- **Background information and monitoring of placement.** We warrant that our answers on the host family application are true and complete. For the purpose of facilitating the selection and placement of an au pair/companion with our family, we authorize the Program to make reasonable inquiries of any third party or governmental agency regarding our family, and grant permission for any such party or entity to disclose the requested information, which will be treated as confidential. After placement, we agree to maintain regular contact and communication with the Community Counselor in order to monitor the appropriateness of the placement and to take advantage of the Program's resources.
- **United States government rules.** We understand that we will be provided with a copy of the rules governing Au Pair/EduCare programs, and we agree to comply with these rules which are subject to change at the discretion of The Department of State.
  - We agree to interview, by telephone or Skype, the au pair/companion we select for placement with our family.
  - We agree to have at least one parent/guardian or a responsible adult to remain at home during a minimum three days following the au pair's arrival to train, observe and acclimate her to her child care responsibilities.
  - We understand that an au pair/companion cannot be placed with a host family having a child under three months of age unless a parent or other responsible adult will be present at all times.
  - If applicable, we acknowledge our responsibility to review the prior experience, skills and training of the au pair/companion regarding the care of special needs children. If we have children in the home younger than school age we will not participate in the EduCare program full-time.
  - Upon arrival of the au pair/companion in our home we agree to sign a written agreement with our au pair/companion that further affirms our joint commitment to adhere to U.S. government and Program guidelines. We will provide the Program with a copy of this agreement.

*(sign on reverse side...)*

PLAINTIFFS' RESP. APP.0004263

apa-hfa-1/15

If we do not afford the participant the benefits and protections set forth in this agreement [or in government regulations], or otherwise violate the terms of this agreement, we understand that the Program may withdraw the participant from our household, in which case we shall not be entitled to a replacement au pair/companion or to any refund.

We understand that extending an au pair/companion's J visa to remain in the U.S. beyond the term granted under the terms of the visa is not possible. We will abide by the Program regulations, relieving the au pair/companion of her duties at the end of the term and encouraging her to return to her home country. We will not support or sponsor her for a change of visa status before or during the travel-month time frame that she is considered in valid program status with Au Pair in America. We understand that by doing so we may risk our continued participation in the program and that doing so is not in the spirit of the program.

- **Problem resolution.** The Program will make reasonable attempts to resolve any difficulties regarding the placement. If the Program determines that the placement cannot be continued, it will provide assistance that may include, in its discretion, placement of another au pair/companion with our family. Host families are responsible for hosting a participant for up to two weeks until a new placement is arranged. We agree to the terms of the replacement and refund policy set forth in the program materials.

- **Legal relationship of au pair/companion to the Program.** We understand and agree that the au pair/companion is not an employee or agent of the Program. The Program is not, under any circumstances, responsible for any bills incurred by the au pair/companion or for any damages or losses caused to anyone by any act or omission of the au pair/companion. We understand that the au pair may only provide childcare for our children and agree to indemnify and hold the Program harmless from any claims resulting from the au pair's care of other children. In addition, all agreements and guidelines provided in this agreement pertain only to the au pair duties while caring for our children and no others.

- **Release of claims against the Program.** We unconditionally release the Program from any claims for damage, injury, loss, or expense of any sort incurred in connection with the participation of our family in the Program and our selection of an au pair/companion to stay in our home. This release includes, but is not limited to, liability for any intentional or negligent acts or omissions by the au pair/companion.

- **Insurance.** We understand it is our responsibility to consult an insurance agent regarding the insurance coverage that may be either required by state law or advisable for our situation. The Host family MUST assess the driving ability of the au pair/companion before granting permission to operate a vehicle, and adequate automobile insurance coverage must be in place if the au pair/companion operates a motor vehicle. We agree to limit any claim against the au pair/companion for uninsured damages resulting from operation of a motor vehicle to a maximum of $500. We also agree to maintain liability and casualty insurance to cover any reasonably foreseeable damages that may be sustained by the au pair/companion while in our household, and we agree to hold the program harmless and indemnify it from any liablity claim by the au pair/companion, including court costs and legal fees.

- **Agreement to arbitrate.** We agree that any claims against the Program that cannot be settled informally will be resolved in binding arbitration if the amount in controversy exceeds $5000. The location of the arbitration and identity of the arbitrator will be decided by mutual agreement, with the costs to be shared equally between the parties. The decision of the arbitrator shall be final. By signing this agreement, we are waiving our right to have any claim against the Program decided in Court before a judge or jury, although each party retains the right to have a Court confirm the arbitration award in accordance with the law.

- **Applications.** We certify that the information contained in our host family application and any supplemental application documents is true and correct. We understand that you may request reports from credit reporting agencies. If we inquire about whether a credit report was requested, you will tell me; if you receive a report, you will give me the name and contact information of the agency that furnished it.

- **Entire agreement.** We acknowledge that this document (and documents referenced herein) sets forth our entire agreement with the Program, and that we have not relied on any warranties or representations other than set forth above.

- **Severability**. A ruling invalidating a portion of this contract shall not affect the validity of the remainder.

- **Applicable law.** This agreement shall be governed by the laws of the state of Connecticut.

We understand that this document is a legal contract and that we have been advised to seek legal advice if we do not understand its terms. By signing the document, we acknowledge that we have read and understand the provisions of this agreement and accept and agree to abide by the terms as set forth.

| Signature of parent/guardian 1 | Date | Signature of parent/guardian 2 | Date |
|---|---|---|---|

| Print name | | Print name | |
|---|---|---|---|

January 2015

Signed by authorized official | Date

PLAINTIFFS' RESP. APP.0004264

# 2016 Host Family Agreement

We, the undersigned, have applied to be a host family with the Au Pair in America or EduCare in America program, which is sponsored by the American Institute For Foreign Study, Inc., and referred to as "the Program" in this Agreement. The Program agrees to recruit and to offer au pair/companion candidates for our consideration and to be a resource for support in the event that problems arise during the exchange. In consideration for these services, we hereby agree:

- **Selection of au pair/companion:** We understand that it is our sole responsibility to carefully choose from among the candidates presented to us, and that there is no warranty as to our satisfaction or to the compatibility of any particular candidate as an au pair/companion in our family. We agree to interview, by telephone or Skype, the au pair/companion desired for placement with our family. We agree to view the pictures and video only for the purposes of verifying the identity of our au pair and will not share, forward repost, republish or reprint those images. After placement, it is our responsibility to monitor the performance of the candidate in our home, and to promptly notify the Program's Community Counselor of any problems. We agree to maintain regular monthly contact and communication with the Program's Community Counselor in order to monitor the appropriateness of the placement and to take advantage of the Program's resources.
- **Obligations of au pair/companion and host family.** We understand that the au pair/companion we select will assist our family with day-to-day child care (which does not include housework or other domestic duties unrelated to our child[ren]), for a period that will not exceed 10 hours in any day or 45 hours in any week (30 hours per week for EduCare in America). Au pair responsibilities are more fully explained and defined in the current program brochure and the *U.S. Department of State Regulations governing au pair programs (22CFR 62.31)*. We confirm that we have read, understand and will comply fully with the host family requirements within those guidelines and regulations. In exchange, we agree to provide our au pair/companion with the following:
  - Full weekly board [consisting of 3 meals per day and 21 meals per week] and full weekly lodging [consisting of a separate, private room, which shall be approved by the Program's local Community Counselor].
  - A weekly stipend of at least $195.75, which along with credits for weekly room and board is compensation for up to 45 weekly hours of childcare services, (for EduCare, a weekly stipend of at least $146.81 for up to 30 weekly hours). This amount conforms with the requirements of the Fair Labor Standards Act. We further agree to compensate an applicant defined as an Extraordinaire by the program with a weekly stipend of at least $250, in addition to full weekly room and board.
  - An on duty schedule that provides at least one full free day and one-half free day per week, as well as one free weekend (Friday evening through Monday morning) each month.
  - Payment of the weekly stipend during two weeks of vacation, during which the au pair will have no child care responsibilities and which will be taken at a mutually agreed-upon time during the 12 months of the exchange. In the event the placement term is extended, we will pay the weekly stipend during two additional weeks of vacation in the event of a 12 or nine-month extension and for one additional week in the event of a six-month extension.
  - We will have at least one parent/guardian, or another responsible adult, remain at our home for a minimum of three days following the au pair's initial arrival in order to train, observe and acclimate her to our home and child[ren], during which time the au pair will not have sole charge care of the children. If necessary thereafter, we will continue this arrangement until such time that we are comfortable with the au pair assuming sole charge responsibilities.
  - We will reimburse our au pair for up to a maximum of $500 for educational courses ($1,000 for the EduCare companion). We further agree to provide adequate time for the au pair to attend a course(s) for cultural or professional enrichment (six hours of academic credit or its equivalent for au pairs or 12 hours of academic credit or its equivalent for EduCare Companions); and transportation to and from the place of instruction.
  - We understand that the au pair will have, at a minimum, $100,000 per accident and sickness medical insurance coverage that, in part, is provided through the fees we pay to the Program.

We acknowledge that we have read, understand and will comply with all requirements explained in Program materials provided to us, including the *Program Support and Policies*, *federal regulations governing au pair programs (22CFR 62.31)*, and supplemental information received from the Program. We agree that the terms and conditions set forth within those materials and documents shall be incorporated within the terms of this Agreement. We understand the Program policies, including requirements related to room, board, weekly stipend and the educational component, are subject to change by the Department of State through a regulatory process; we agree to abide by any applicable revisions after notification by the Program.

- **Program goals:** We recognize that the purpose and goal of the Program is for the au pair/companion to learn about America, and agree to provide the au pair/companion ample opportunity and encouragement to take advantage of cluster activities and educational, cultural and community opportunities available in our area.

- **Fees and other obligations:** We agree to pay the required fees in accordance with the schedule set forth in the brochure and web communications, as well as SEVIS fees as required. We understand that any outstanding balance more than 15 days past due will be subject to a finance charge of 1.5% per month, 18% per annum, on the outstanding balance. Delinquent accounts that require outside collection services will incur additional fees associated with third party collection costs. We will provide the au pair/companion, at our expense, with a one-way ticket or other transportation arrangement for travel from the orientation site to our community. We understand that the Program will arrange a return flight home upon successful completion of the Program exchange from select U.S. cities.

- **Background information and monitoring of placement:** We warrant that our answers on the host family application are true and complete. For the purpose of facilitating the selection and placement of an au pair/companion with our family, we authorize the Program to make reasonable inquiries of any third party or governmental agency regarding our family, and we expressly permit and authorize any such party or entity to disclose the requested information to the Program, which will be utilized with respect to confidentiality and only for Program purposes.

- **United States government rules:** We have read and understand the rules governing Au Pair/EduCare programs; we agree to comply with those rules, as well as any revisions to those rules, which may be changed at the discretion of The Department of State. We further agree to comply with any applicable state and local laws, including those related to the provision of domestic child care services by a residential au pair.
  We understand that an au pair/companion cannot be placed with a host family that has a child under three months of age, unless a parent or other responsible adult will be present at all times.

If applicable, we acknowledge our responsibility to review the prior experience, skills and training of the au pair/companion regarding the care of spe-

*(sign on reverse side…)*

PLAINTIFFS' RESP. APP.0004265

apa-hfa-1/16

cial needs children. If we have both school age and pre-school age children in the home, we agree to not participate in the EduCare Program, unless we can confirm other, full-time child-care plans have been made for the pre-school age children.

Upon selection or within two weeks of placement of the au pair/companion in our home, we agree to sign a written agreement with our au pair/companion that further affirms our joint commitment to adhere to Department of State and Program guidelines. We will provide the Program with a copy of that agreement.

If we do not afford the participant the benefits and protections set forth in this agreement [or in State Department regulations], or otherwise violate the terms of this Agreement, we understand that the Program may withdraw the participant from our household, in which case we shall not be entitled to a replacement au pair/companion or to any refund.

We understand that extending an au pair/companion's time in the U.S. beyond the term granted under the terms of the J Visa is not possible. We will abide by the Program regulations, will relieve the au pair/companion of her duties at the end of the term, and will encourage her to return to her home country. We will not support or sponsor her for a change of visa status before or during the travel-month time frame that she is considered in valid Program status with Au Pair in America. We understand that doing so is inconsistent with the spirit of the Program and may risk our continued participation in the Program.

- **Problem resolution:** The Program will make reasonable attempts to resolve any difficulties regarding the placement. If the Program determines that the placement cannot be continued, it will provide assistance that may include, in its discretion, placement of another au pair/companion with our family. Host families remain responsible for hosting a participant for up to two weeks until a new placement is arranged. We agree to the terms of the replacement and refund policy set forth in the Program materials.

- **Legal relationship of au pair/companion to the Program:** We understand and agree that the au pair/companion is not an employee or agent of the Program for any and all purposes, including, but not limited to, the application of the Fair Labor Standards Act, as well as any federal, state or local law concerning labor and/or employment, workers' compensation or unemployment insurance. Nothing within, or pursuant to, this Agreement creates, or shall be construed so as to create, an employer/employee relationship between the Program and the au pair/companion. The Program is not, under any circumstances, responsible for any bills or expenses incurred by the au pair/companion or for any damages or losses caused to anyone by any act or omission of the au pair/companion.

- **Indemnification:** We agree to hold harmless and indemnify the Program, its officers, officials, employees and volunteers from any and all claims, injuries, damages, losses or suits, including attorneys' fees, arising out of or resulting from our acts, errors, omissions or nonperformance of our responsibilities under this Agreement.

- **Insurance:** We understand it is our responsibility to consult an insurance agent regarding the insurance coverage that may be either required by state/local law or advisable for our family and household situation. We understand that we MUST assess the ability of the au pair/companion to lawfully and safely operate a motor vehicle in our local jurisdiction before granting her permission to operate one of our vehicles or to operate a vehicle on our behalf. We further agree to secure and maintain adequate automobile insurance coverage for the au pair/companion, if the au pair/companion operates a motor vehicle. We agree to limit any claim against the au pair/companion for uninsured damages resulting from operation of a motor vehicle to a maximum of $500. We also agree to maintain liability and casualty insurance to cover any reasonably foreseeable damages that may be sustained by the au pair/companion while in our household. Finally, we agree to hold the Program harmless and to indemnify it from any liability, claim or loss caused by the au pair/companion, including court costs and legal fees.

- **Agreement to arbitrate:** We agree that any dispute with or claim against the Program, its staff, agents and all affiliated organizations, including those arising under this Agreement or our participation in the Program, which exceed $5000 and cannot be settled informally, must be submitted to and resolved exclusively by final and binding arbitration, to be conducted in accordance with the commercial arbitration rules of the American Arbitration Association. The location of the arbitration and identity of the arbitrator will be decided by mutual agreement, with the costs to be shared equally between the parties. The decision of the arbitrator shall be final and binding on all parties. By accepting the terms of this Agreement, we agree that the U.S. Federal Arbitration Act governs the interpretation and enforcement of the this Agreement and that we, the Program, as well as the American Institute for Foreign Study, Inc., are each waiving the right to judicial and administrative agency or tribunal resolution of disputes, a trial by jury, or as well as the right to bring and resolve any claims, either in an individual capacity or as a member of any class action, by any means and in any forum other than arbitration conducted by the American Arbitration Association.

- **Entire agreement.** We acknowledge that this document (and documents referenced herein which are incorporated by specific reference) sets forth our entire agreement with the Program, and that we have not relied on any warranties or representations other than those set forth herein.

- **Severability.** A ruling invalidating a portion of this Agreement shall not affect the validity of the remainder of this Agreement.

- **Applicable law.** This Agreement shall be governed by the laws of the State of Connecticut.

We understand that this Agreement is a legal contract and that we have been advised to seek legal advice before signing this Agreement. By signing the Agreement, we acknowledge that we have read and understand the provisions of this Agreement and accept and agree to abide by the terms as set forth herein above.

| | | | |
|---|---|---|---|
| *Signature of parent/guardian 1* | *Date* | *Signature of parent/guardian 2* | *Date* |
| *Print name* | | *Print name* | |
| | January 2016 | | |
| *Signed by authorized official* | *Date* | | |

2016

# 2017 Host Family Agreement

apa-hfa-10/16

We, the undersigned, have applied to be a host family with the Au Pair in America or EduCare in America program, which is sponsored by the American Institute For Foreign Study, Inc., and referred to as "the Program" in this Agreement. The Program agrees to recruit and to offer au pair/companion candidates for our consideration and to be a resource for support in the event that problems arise during the exchange. In consideration for these services, we hereby agree:

- **Selection of au pair/companion:** We understand that it is our sole responsibility to carefully choose from among the candidates presented to us, and that there is no warranty as to our satisfaction or to the compatibility of any particular candidate as an au pair/companion in our family. We agree to interview, by telephone or Skype, the au pair/companion desired for placement with our family. We agree to view the pictures and video only for the purposes of verifying the identity of our au pair and will not share, forward repost, republish or reprint those images. After placement, it is our responsibility to monitor the performance of the candidate in our home, and to promptly notify the Program's Community Counselor of any problems. We agree to maintain regular monthly contact and communication with the Program's Community Counselor in order to monitor the appropriateness of the placement and to take advantage of the Program's resources.

- **Obligations of au pair/companion and host family:** We understand that the au pair/companion we select will assist our family with day-to-day child care (which does not include housework or other domestic duties unrelated to our child[ren]), for a period that will not exceed 10 hours in any day or 45 hours in any week (30 hours per week for EduCare in America). Au pair responsibilities are more fully explained and defined in the current program brochure and the *U.S. Department of State Regulations governing au pair programs (22CFR 62.31)*. We confirm that we have read, understand and will comply fully with the host family requirements within those guidelines and regulations. In exchange, we agree to provide our au pair/companion with the following:
  - Full weekly board [consisting of 3 meals per day and 21 meals per week] and full weekly lodging [consisting of a separate, private room, which shall be approved by the Program's local Community Counselor].
  - A weekly stipend of at least $195.75, which along with credits for weekly room and board is compensation for up to 45 weekly hours of childcare services, (for EduCare, a weekly stipend of at least $146.81 for up to 30 weekly hours). This amount conforms with the requirements of the Fair Labor Standards Act. We further agree to compensate an applicant defined as an Extraordinaire by the program with a weekly stipend of at least $250, in addition to full weekly room and board.
  - An on duty schedule that provides at least one full free day and one-half free day per week, as well as one free weekend (Friday evening through Monday morning) each month.
  - Payment of the weekly stipend during two weeks of vacation, during which the au pair will have no child care responsibilities and which will be taken at a mutually agreed-upon time during the 12 months of the exchange. In the event the placement term is extended, we will pay the weekly stipend during two additional weeks of vacation in the event of a 12 or nine-month extension and for one additional week in the event of a six-month extension.
  - We will have at least one parent/guardian, or another responsible adult, remain at our home for a minimum of three days following the au pair's initial arrival in order to train, observe and acclimate her to our home and child[ren], during which time the au pair will not have sole charge care of the children. If necessary thereafter, we will continue this arrangement until such time that we are comfortable with the au pair assuming sole charge responsibilities.
  - We will reimburse our au pair for up to a maximum of $500 for educational courses ($1,000 for the EduCare companion). We further agree to provide adequate time for the au pair to attend a course(s) for cultural or professional enrichment (six hours of academic credit or its equivalent for au pairs or 12 hours of academic credit or its equivalent for EduCare Companions); and transportation to and from the place of instruction.
  - We understand that the au pair will have, at a minimum, $100,000 per accident and sickness medical insurance coverage that, in part, is provided through the fees we pay to the Program.

We acknowledge that we have read, understand and will comply with all requirements explained in Program materials provided to us, including the *Program Support and Policies*, federal *regulations governing au pair programs (22CFR 62.31)*, and supplemental information received from the Program. We agree that the terms and conditions set forth within those materials and documents shall be incorporated within the terms of this Agreement. We understand the Program policies, including requirements related to room, board, weekly stipend and the educational component, are subject to change by the Department of State through a regulatory process; we agree to abide by any applicable revisions after notification by the Program.

- **Program goals:** We recognize that the purpose and goal of the Program is for the au pair/companion to learn about America, and agree to provide the au pair/companion ample opportunity and encouragement to take advantage of cluster activities and educational, cultural and community opportunities available in our area.

- **Fees and other obligations:** We agree to pay the required fees in accordance with the schedule set forth in the brochure and web communications, as well as SEVIS fees as required. We understand that any outstanding balance more than 15 days past due will be subject to a finance charge of 1.5% per month, 18% per annum, on the outstanding balance. Delinquent accounts that require outside collection services will incur additional fees associated with third party collection costs. We will provide the au pair/companion, at our expense, with a one-way ticket or other transportation arrangement for travel from the orientation site to our community. We understand that the Program will arrange a return flight home upon successful completion of the Program exchange from select U.S. cities.

- **Background information and monitoring of placement:** We warrant that our answers on the host family application are true and complete. For the purpose of facilitating the selection and placement of an au pair/companion with our family, we authorize the Program to make reasonable inquiries of any third party or governmental agency regarding our family, and we expressly permit and authorize any such party or entity to disclose the requested information to the Program, which will be utilized with respect for confidentiality and only for Program purposes.

- **United States and local government rules:** We have read and understand the rules governing Au Pair/EduCare programs; we agree to comply with those rules, as well as any revisions to those rules, which may be changed at the discretion of The Department of State. We further agree to comply with any applicable state and local laws, including those related to the provision of domestic child care services by a residential au pair. We understand that an au pair/companion cannot be placed with a host family that has a child under three months of age, unless a parent or other responsible adult will be present at all times.

  If applicable, we acknowledge our responsibility to review the prior experience, skills and training of the au pair/companion regarding the care of spe-

*(sign on reverse side...)*

PLAINTIFF'S RESP. APP.0004267

apa-hfa-10/16

cial needs children. If we have both school age and pre-school age children in the home, we agree to not participate in the EduCare Program, unless we can confirm other, full-time child-care plans have been made for the pre-school age children.

Upon selection or within two weeks of placement of the au pair/companion in our home, we agree to sign a written agreement with our au pair/companion that further affirms our joint commitment to adhere to Department of State and Program guidelines. We will provide the Program with a copy of that agreement.

If we do not afford the participant the benefits and protections set forth in this agreement [or in State Department regulations], or otherwise violate the terms of this Agreement, we understand that the Program may withdraw the participant from our household, in which case we shall not be entitled to a replacement au pair/companion or to any refund.

We understand that extending an au pair/companion's time in the U.S. beyond the term granted under the terms of the J Visa is not possible. We will abide by the Program regulations, will relieve the au pair/companion of her duties at the end of the term, and will encourage her to return to her home country. We will not support or sponsor her for a change of visa status before or during the travel-month time frame that she is considered in valid Program status with Au Pair in America. We understand that doing so is inconsistent with the spirit of the Program and may risk our continued participation in the Program.

- **Problem resolution:** The Program will make reasonable attempts to resolve any difficulties regarding the placement. If the Program determines that the placement cannot be continued, it will provide assistance that may include, in its discretion, placement of another au pair/companion with our family. Host families remain responsible for hosting a participant for up to two weeks until a new placement is arranged. We agree to the terms of the replacement and refund policy set forth in the Program materials.
- **Legal relationship of au pair/companion to the Program:** We understand and agree that the au pair/companion is not an employee or agent of the Program for any and all purposes, including, but not limited to, the application of the Fair Labor Standards Act, as well as any federal, state or local law concerning labor and/or employment, workers' compensation or unemployment insurance.  Nothing within, or pursuant to, this Agreement creates, or shall be construed so as to create, an employer/employee relationship between the Program and the au pair/companion. The Program is not, under any circumstances, responsible for any bills or expenses incurred by the au pair/companion or for any damages or losses caused to anyone by any act or omission of the au pair/companion.
- **Indemnification:** We agree to hold harmless and indemnify the Program, its officers, officials, employees and volunteers from any and all claims, injuries, damages, losses or suits, including attorneys' fees, arising out of or resulting from our acts, errors, omissions or nonperformance of our responsibilities under this Agreement.
- **Insurance:** We understand it is our responsibility to consult an insurance agent regarding the insurance coverage that may be either required by state/local law or advisable for our family and household situation.  We understand that we MUST assess the ability of the au pair/companion to lawfully and safely operate a motor vehicle in our local jurisdiction before granting her permission to operate one of our vehicles or to operate a vehicle on our behalf. We further agree to secure and maintain adequate automobile insurance coverage for the au pair/companion, if the au pair/companion operates a motor vehicle. We agree to limit any claim against the au pair/companion for uninsured damages resulting from operation of a motor vehicle to a maximum of $500. We also agree to maintain liability and casualty insurance to cover any reasonably foreseeable damages that may be sustained by the au pair/companion while in our household. Finally, we agree to hold the Program harmless and to indemnify it from any liability, claim or loss caused by the au pair/companion, including court costs and legal fees.
- **Agreement to arbitrate:** We agree that any dispute with or claim against the Program, its staff, agents and all affiliated organizations, including those arising under this Agreement or our participation in the Program, which exceed $5000 and cannot be settled informally, must be submitted to and resolved exclusively by final and binding arbitration, to be conducted in accordance with the commercial arbitration rules of the American Arbitration Association. The location of the arbitration and identity of the arbitrator will be decided by mutual agreement, with the costs to be shared equally between the parties. The decision of the arbitrator shall be final and binding on all parties. By accepting the terms of this Agreement, we agree that the U.S. Federal Arbitration Act governs the interpretation and enforcement of the this Agreement and that we, the Program, as well as the American Institute for Foreign Study, Inc., are each waiving the right to judicial and administrative agency or tribunal resolution of disputes, a trial by jury, or as well as the right to bring and resolve any claims, either in an individual capacity or as a member of any class action, by any means and in any forum other than arbitration conducted by the American Arbitration Association.
- **Entire agreement:** We acknowledge that this document (and documents referenced herein which are incorporated by specific reference) sets forth our entire agreement with the Program, and that we have not relied on any warranties or representations other than those set forth herein.
- **Severability:** A ruling invalidating a portion of this Agreement shall not affect the validity of the remainder of this Agreement.
- **Applicable law:** This Agreement shall be governed by the laws of the State of Connecticut.

We understand that this Agreement is a legal contract and that we have been advised to seek legal advice before signing this Agreement.  By signing the Agreement, we acknowledge that we have read and understand the provisions of this Agreement and accept and agree to abide by the terms as set forth herein above.

_____            _____
*Signature of parent/guardian 1*                    *Date*        *Signature of parent/guardian 2*                    *Date*

_____            _____
*Print name*                                                              *Print name*

December 2016

_____
*Signed by authorized official*             *Date*

PLAINTIFFS' RESP. APP.0004268

2016

In consideration of you, the American Institute for Foreign Study Inc., herein after referred to as 'AIFS', accepting me for their Au Pair in America, Au Pair Extraordinaire or EduCare in America program, I hereby undertake and agree as follows:

## I.

a) I will complete all visa and screening requirements in accordance with the instructions given and will be responsible for obtaining a valid passport and complying with all vaccinations and immunization requirements.

b) I will only accept a placement with a host family whom I have interviewed with personally by telephone. I will review all Pre-departure Training materials and attend all sessions during the Orientation program.

c) I will be present in good time for all flights or other transportation provided or arranged by AIFS. AIFS will not provide or be responsible for alternative transportation except in the case of illness or accident in accordance with its group insurance policy.

d) I will abide by all appropriate regulations and instructions of the US Government and obey all applicable laws.

## II.

a) As a participant on the Au Pair in America or Au Pair Extraordinaire program, I will provide childcare up to 45 hours per week and not more than 10 hours per day, for a period not exceeding the 12 months granted under the terms of my visa. As a participant on the EduCare in America program, I will provide childcare up to 30 hours per week and not more than 10 hours per day, for a period not exceeding the 12 months granted under the terms of my visa.

b) I will carry out my childcare and other responsibilities to the host family to the best of my ability and with due respect and will take full advantage of the cultural opportunities and will fulfil the educational requirements in accordance with the rules set out in the brochure and applicants' handbooks.

c) At the end of my stay I will return to my home country on or before the expiry of my 'duration of stay' as determined by US Immigration and will not attempt to return subsequently to the United States without a valid and current US visa.

d) I understand that program flights will depart from and return to designated airports, so I am responsible for any costs prior to departure and upon my return. I must also make my own way to my designated US return airport at the end of the program in time for my return flight and pay any transportation costs from my family to the airport. AIFS is not responsible for airline baggage costs, airport taxes or airline fuel surcharges.

e) I understand the support system provided by the London and Connecticut offices, and affiliated offices if appropriate, and Community Counselors network. I will maintain monthly contact with my Community Counselor. I will co-operate fully with those supervising the program on my behalf for AIFS and I agree to abide by any reasonable instructions they may give me.

f) I will not accept any form of paid employment in the USA during my stay other than within my duties as a program participant with my host family.

g) While living with my host family I will be responsible for all personal debts, such as telephone calls. In the event of an automobile accident, I may be liable for up to, but no more than, US$500 of the insurance deductible.

h) As detailed on my application, I certify that I have successfully completed my secondary school studies/training.

i) I declare that I have never been charged with or convicted of a criminal offence.

j) I understand that my application and contents herein cannot be returned to me at any time.

PLAINTIFF'S RESP. APP.0004269

## III.

a) I understand that failing to provide full and accurate responses to the questions asked in this application, on the medical report form, at interview and on all ancillary documents, may result in the rejection of my application or termination from the program. I hereby warrant that the information I have given in the application form completed by me is accurate. I also declare that all qualifications gained and certificates and references provided, including photocopies are genuine.

b) I understand that after my acceptance my application may be withdrawn from the program at any time, should AIFS become aware of any new information which may have affected my initial acceptance for the program.

## IV.

I agree that I will perform my duties as an au pair to the best of my ability and indemnify AIFS, its staff, agents and all affiliated organisations from any damages, losses or claims resulting from my participation in the program.

## V.

I agree that AIFS may take such actions as it considers necessary regarding my health and safety during my time on the program, including securing medical treatment for me and transporting me to my home country. I release AIFS from any liability relating to the medical care received, and agree to pay for any medical or transportation expenses that are not covered by insurance.

## VI.

I understand that, in the event of late cancellation from the program (after the visa application form has been issued) Au Pair in America and AIFS reserves the right to charge a US$200 cancellation fee.

## VII.

a) I understand that as a participant on the Au Pair in America or Au Pair Extraordinaire program, if for any reason I do not complete the full 12 month term of the program, I will not be entitled to any refund of the Au Pair in America Program Fee, insurance costs or any other supplementary payments for any ancillary services, and will be responsible for the full cost of my airfare to my home country.

b) I understand that as a participant on the EduCare in America program, if for any reason I do not complete the full 12 month term of the program, I will not be entitled to any refund of the EduCare in America Program Fee, insurance costs or any other supplementary payments for any ancillary services and will be responsible for the full cost of my airfare to my home country.

c) I understand that if, for any reason, I do not complete the required educational hours, I will not be eligible to extend beyond my first year on the program and that Au Pair in America will not issue me a Completion Certificate.

## VIII.

I have read (or will read) and understand the Au Pair in America online and/or paper brochure and handbooks and agree that their terms are deemed incorporated in this agreement.

## IX.

This agreement shall be governed by the laws of the State of Connecticut. I agree that any dispute with AIFS, its staff, agents and all affiliated organizations that is not settled informally will be submitted to binding arbitration, to be conducted in substantial accordance with the rules of the American Arbitration Association. The location of the arbitration and identity of the arbitrator will be decided by mutual agreement, with the costs to be shared equally between the parties, and the decision of the arbitrator shall be final. By signing this agreement, I understand that I am

PLAINTIFFS' RESP. APP.0004270

CONFIDENTIAL

2011-11-15 to 2013-07-01

giving up my right to have any claim against AIFS, Inc. and its affiliated organizations decided in Court before a judge or jury.

## X.

I agree to abide by the above conditions should I legally extend my stay on the Au Pair in America, Au Pair Extraordinaire or EduCare in America program beyond the initial 12 month term.

**Privacy Consent**

I understand that the application to the Au Pair in America program requires me to disclose sensitive and private personal information. I understand that this application will be sent to the American Institute for Foreign Study [AIFS] office located in London and/or Bonn, and then to the American office which is located at 9 West Broad Street, Stamford, CT 06902. AIFS will then provide my application to its network of Community Counselors [who are not employees of AIFS] and to prospective Host Families in an effort to obtain a placement for me in the Au Pair in America program.

In the unlikely event of a legal claim, lawsuit or arrest in connection with my participation in the Au Pair in America program, it may be necessary to provide my application to attorneys, insurers, or the United States Department of State [which regulates the program] and, if AIFS receives a valid Court order or subpoena, to whatever entity is determined to have a legal right to obtain this information. The AIFS Privacy Policy provides that my personal information will not be disclosed to any other parties unless I am given notice and an opportunity to object. AIFS takes reasonable precautions to protect personal information from loss, misuse and unauthorized access, disclosure, alteration and destruction.

By completing and submitting the application, I am authorizing AIFS to disseminate the information that is contained in my application in the manner and for the purposes set forth above. I understand that I may revoke this consent at any time and I can request access to my personal information by sending a written request to the American Institute for Foreign Study, Inc., Attention: Privacy Officer, 9 West Broad Street, Stamford, CT 06902

PLAINTIFFS' RESP. APP.0004271

In consideration of you, the American Institute for Foreign Study Inc., herein after referred to as 'AIFS', accepting me for their Au Pair in America, Au Pair Extraordinaire or EduCare in America program, I hereby undertake and agree as follows:

## I.

a) I will complete all visa and screening requirements in accordance with the instructions given and will be responsible for obtaining a valid passport and complying with all vaccinations and immunization requirements.

b) I will only accept a placement with a host family whom I have interviewed with personally by telephone or Skype. I will review all Pre-departure Training materials and attend all sessions during the Orientation program.

c) I will be present in good time for all flights or other transportation provided or arranged by AIFS. AIFS will not provide or be responsible for alternative transportation except in the case of illness or accident in accordance with its group insurance policy.

d) I will abide by all appropriate regulations and instructions of the US Government and obey all applicable laws.

## II.

a) As a participant on the Au Pair in America or Au Pair Extraordinaire program, I will provide childcare up to 45 hours per week and not more than 10 hours per day, for a period not exceeding the 12 months granted under the terms of my visa. As a participant on the EduCare in America program, I will provide childcare up to 30 hours per week and not more than 10 hours per day, for a period not exceeding the 12 months granted under the terms of my visa.

b) I will carry out my childcare and other responsibilities to the host family to the best of my ability and with due respect and will take full advantage of the cultural opportunities and will fulfil the educational requirements in accordance with the rules set out in the brochure, website and applicants' handbooks.

c) At the end of my stay I will return to my home country on or before the expiry of my 'duration of stay' as determined by US Immigration and will not attempt to return subsequently to the United States without a valid and current US visa.

d) I understand that program flights will depart from and return to designated airports, so I am responsible for any costs prior to departure and upon my return. I must also make my own way to my designated US return airport at the end of the program in time for my return flight and pay any transportation costs from my family to the airport. AIFS is not responsible for airline baggage costs, airport taxes or airline fuel surcharges.

e) I understand the support system provided by the London and Connecticut offices, and affiliated offices if appropriate, and Community Counselors network. I will maintain monthly contact with my Community Counselor. I will co-operate fully with those supervising the program on my behalf for AIFS and I agree to abide by any reasonable instructions they may give me.

f) I will not accept any form of paid employment in the USA during my stay other than within my duties as a program participant with my host family.

g) While living with my host family I will be responsible for all personal debts, such as telephone calls. In the event of an automobile accident, I may be liable for up to, but no more than, US$500 of the insurance deductible.

h) As detailed on my application, I certify that I have successfully completed my secondary school studies/training.

i) I declare that I have never been convicted of a criminal offence.

j) I understand that my application and contents herein cannot be returned to me at any time.

PLAINTIFF'S RESP. APP.0004272

2013-07-01    to    2013-10-03

## III.

a) I understand that failing to provide full and accurate responses to the questions asked in this application, on the medical report form, at interview and on all ancillary documents, may result in the rejection of my application or termination from the program. I hereby warrant that the information I have given in the application form completed by me is accurate. I also declare that all qualifications gained and certificates and references provided, including photocopies are genuine.

b) I understand that after my acceptance my application may be withdrawn from the program at any time, should AIFS become aware of any new information which may have affected my initial acceptance for the program.

## IV.

I agree that I will perform my duties as an au pair to the best of my ability and indemnify AIFS, its staff, agents and all affiliated organisations from any damages, losses or claims resulting from my participation in the program.

## V.

I agree that AIFS may take such actions as it considers necessary regarding my health and safety during my time on the program, including securing medical treatment for me and transporting me to my home country. I release AIFS from any liability relating to the medical care received, and agree to pay for any medical or transportation expenses that are not covered by insurance.

## VI.

I understand that, in the event of late cancellation from the program (after the visa application form has been issued) Au Pair in America and AIFS reserves the right to charge a US$200 cancellation fee.

## VII.

a) I understand that as a participant on the Au Pair in America or Au Pair Extraordinaire program, if for any reason I do not complete the full 12 month term of the program, I will not be entitled to any refund of the Au Pair in America Program Fee, insurance costs or any other supplementary payments for any ancillary services, and will be responsible for the full cost of my airfare to my home country.

b) I understand that as a participant on the EduCare in America program, if for any reason I do not complete the full 12 month term of the program, I will not be entitled to any refund of the EduCare in America Program Fee, insurance costs or any other supplementary payments for any ancillary services and will be responsible for the full cost of my airfare to my home country.

c) I understand that if, for any reason, I do not complete the required educational hours, I will not be eligible to extend beyond my first year on the program and that Au Pair in America will not issue me a Completion Certificate.

## VIII.

I have read (or will read) and understand the Au Pair in America online and/or paper brochure and handbooks and agree that their terms are deemed incorporated in this agreement.

## IX.

This agreement shall be governed by the laws of the State of Connecticut. I agree that any dispute with AIFS, its staff, agents and all affiliated organizations that is not settled informally will be submitted to binding arbitration, to be conducted in substantial accordance with the rules of the American Arbitration Association. The location of the arbitration and identity of the arbitrator will be decided by mutual agreement, with the costs to be shared equally between the parties, and the decision of the arbitrator shall be final. By signing this agreement, I understand that I am

PLAINTIFFS' RESP. APP.0004273

CONFIDENTIAL   /2013-07-01   to   2013-10-03

giving up my right to have any claim against AIFS, Inc. and its affiliated organizations decided in Court before a judge or jury.

**X.**

I agree to abide by the above conditions should I legally extend my stay on the Au Pair in America, Au Pair Extraordinaire or EduCare in America program beyond the initial 12 month term.

**Privacy Consent**

I understand that the application to the Au Pair in America program requires me to disclose sensitive and private personal information. I understand that this application will be sent to the American Institute for Foreign Study [AIFS] office located in London and/or Bonn, and then to the American office which is located in Stamford, Connecticut. AIFS will then share my application with its network of Community Counselors [who are not employees of AIFS] and to prospective Host Families in an effort to obtain a placement for me in the Au Pair in America program.

In the unlikely event of a legal claim, lawsuit or arrest in connection with my participation in the Au Pair in America program, it may be necessary to provide my application to attorneys, insurers, or the United States Department of State [which regulates the program] and, if AIFS receives a valid Court order or subpoena, to whatever entity is determined to have a legal right to obtain this information. The AIFS Privacy Policy provides that my personal information will not be disclosed to any other parties unless I am given notice and an opportunity to object. AIFS takes reasonable precautions to protect personal information from loss, misuse and unauthorized access, disclosure, alteration and destruction.

By completing and submitting the application, I am authorizing AIFS to disseminate the information that is contained in my application in the manner and for the purposes set forth above. I understand that I may revoke this consent at any time and I can request access to my personal information by sending a written request to the American Institute for Foreign Study, Inc., Attention: Privacy Officer, 9 West Broad Street, Stamford, CT 06902

In consideration of you, the American Institute for Foreign Study Inc., herein after referred to as 'AIFS', accepting me for their Au Pair in America, Au Pair Extraordinaire or EduCare in America program, I hereby undertake and agree as follows:

**I.**

a) I will complete all visa and screening requirements in accordance with the instructions given and will be responsible for obtaining a valid passport and complying with all vaccinations and immunization requirements.

b) I will only accept a placement with a host family whom I have interviewed with personally by telephone or Skype. I will review all Pre-departure Training materials and attend all sessions during the Orientation program.

c) I will be present in good time for all flights or other transportation provided or arranged by AIFS. AIFS will not provide or be responsible for alternative transportation except in the case of illness or accident in accordance with its group insurance policy.

d) I will abide by all appropriate regulations and instructions of the US Government and obey all applicable laws.

**II.**

a) As a participant on the Au Pair in America or Au Pair Extraordinaire program, I will provide childcare up to 45 hours per week and not more than 10 hours per day, for a period not exceeding the 12 months granted under the terms of my visa. As a participant on the EduCare in America program, I will provide childcare up to 30 hours per week and not more than 10 hours per day, for a period not exceeding the 12 months granted under the terms of my visa.

b) I will carry out my childcare and other responsibilities to the host family to the best of my ability and with due respect and will take full advantage of the cultural opportunities and will fulfil the educational requirements in accordance with the rules set out in the brochure, website and applicants' handbooks.

c) At the end of my stay I will return to my home country on or before the expiry of my 'duration of stay' as determined by US Immigration and will not attempt to return subsequently to the United States without a valid and current US visa.

d) I understand that program flights will depart from and return to designated airports, so I am responsible for any costs prior to departure and upon my return. I must also make my own way to my designated US return airport at the end of the program in time for my return flight and pay any transportation costs from my family to the airport. AIFS is not responsible for airline baggage costs, airport taxes or airline fuel surcharges.

e) I understand the support system provided by the London and Connecticut offices, and affiliated offices if appropriate, and Community Counselors network. I will maintain monthly contact with my Community Counselor. I will co-operate fully with those supervising the program on my behalf for AIFS and I agree to abide by any reasonable instructions they may give me.

f) I will not accept any form of paid employment in the USA during my stay other than within my duties as a program participant with my host family.

g) While living with my host family I will be responsible for all personal debts, such as telephone calls. In the event of an automobile accident, I may be liable for up to, but no more than, US$500 of the insurance deductible.

h) As detailed on my application, I certify that I have successfully completed my secondary school studies/training.

i) I declare that I have never been convicted of a criminal offence.

j) I understand that my application and contents herein cannot be returned to me at any time.

PLAINTIFFS' RESP. APP.0004275

## III.

a) I understand that failing to provide full and accurate responses to the questions asked in this application, on the medical report form, at interview and on all ancillary documents, may result in the rejection of my application or termination from the program. I hereby warrant that the information I have given in the application form completed by me is accurate. I also declare that all qualifications gained and certificates and references provided, including photocopies are genuine.

b) I understand that after my acceptance my application may be withdrawn from the program at any time, should AIFS become aware of any new information which may have affected my initial acceptance for the program.

## IV.

I agree that I will perform my duties as an au pair to the best of my ability and indemnify AIFS, its staff, agents and all affiliated organisations from any damages, losses or claims resulting from my participation in the program.

## V.

I agree that AIFS may take such actions as it considers necessary regarding my health and safety during my time on the program, including securing medical treatment for me and transporting me to my home country. I release AIFS from any liability relating to the medical care received, and agree to pay for any medical or transportation expenses that are not covered by insurance.

## VI.

I understand that, in the event of late cancellation from the program (after the visa application form has been issued) Au Pair in America and AIFS reserves the right to charge a US$200 cancellation fee.

## VII.

a) I understand that as a participant on the Au Pair in America or Au Pair Extraordinaire program, if for any reason I do not complete the full 12 month term of the program, I will not be entitled to any refund of the Au Pair in America Program Fee, insurance costs or any other supplementary payments for any ancillary services, and will be responsible for the full cost of my airfare to my home country.

b) I understand that as a participant on the EduCare in America program, if for any reason I do not complete the full 12 month term of the program, I will not be entitled to any refund of the EduCare in America Program Fee, insurance costs or any other supplementary payments for any ancillary services and will be responsible for the full cost of my airfare to my home country.

c) I understand that if, for any reason, I do not complete the required educational hours, I will not be eligible to extend beyond my first year on the program and that Au Pair in America will not issue me a Completion Certificate.

## VIII.

I have read (or will read) and understand the Au Pair in America online and/or paper brochure and handbooks and agree that their terms are deemed incorporated in this agreement.

## IX.

This agreement shall be governed by the laws of the State of Connecticut. I agree that any dispute with AIFS, its staff, agents and all affiliated organizations that is not settled informally will be submitted to binding arbitration, to be conducted in substantial accordance with the rules of the American Arbitration Association. The location of the arbitration and identity of the arbitrator will be decided by mutual agreement, with the costs to be shared equally between the parties, and the decision of the arbitrator shall be final. By signing this agreement, I understand that I am

PLAINTIFF'S RESP. APP.0004276

giving up my right to have any claim against AIFS, Inc. and its affiliated organizations decided in Court before a judge or jury.

**X.**

I agree to abide by the above conditions should I legally extend my stay on the Au Pair in America, Au Pair Extraordinaire or EduCare in America program beyond the initial 12 month term.

**Privacy Consent**

I understand that the application to the Au Pair in America program requires me to disclose sensitive and private personal information. I understand that this application will be sent to the American Institute for Foreign Study [AIFS] office located in London and/or Bonn, and then to the American office which is located in Stamford, Connecticut. AIFS will then share my application with its network of Community Counselors [who are not employees of AIFS] and to prospective Host Families in an effort to obtain a placement for me in the Au Pair in America program.

In the unlikely event of a legal claim, lawsuit or arrest in connection with my participation in the Au Pair in America program, it may be necessary to provide my application to attorneys, insurers, or the United States Department of State [which regulates the program] and, if AIFS receives a valid Court order or subpoena, to whatever entity is determined to have a legal right to obtain this information. The AIFS Privacy Policy provides that my personal information will not be disclosed to any other parties unless I am given notice and an opportunity to object. AIFS takes reasonable precautions to protect personal information from loss, misuse and unauthorized access, disclosure, alteration and destruction.

By completing and submitting the application, I am authorizing AIFS to disseminate the information that is contained in my application in the manner and for the purposes set forth above. I understand that I may revoke this consent at any time and I can request access to my personal information by sending a written request to the American Institute for Foreign Study, Inc., Attention: Privacy Officer, 1 High Ridge Park, Stamford, CT 06905

In consideration of you, the American Institute for Foreign Study Inc., herein after referred to as 'AIFS', accepting me for their Au Pair in America, Au Pair Extraordinaire or eduCare in America program, I hereby undertake and agree as follows:

## I.

a) I understand that failing to provide full and accurate responses to the questions asked in this application, on the medical report form, at interview and on all ancillary documents, may result in the rejection of my application or termination from the program. I hereby warrant that the information I will give in the completed application form will be accurate. I also declare that all qualifications gained and certificates and references provided, including photocopies will be genuine.

b) I understand that after my acceptance my application may be withdrawn from the program at any time, should AIFS become aware of any new information which may have affected my initial acceptance for the program.

c) I certify that I have successfully completed my secondary school studies/training.

d) I declare that I have never been convicted of a criminal offence.

e) I declare that I am currently not married nor do I have any dependents.

f) I understand that my application and contents herein cannot be returned to me at any time.

## II.

a) I will complete all visa and screening requirements in accordance with the instructions given and will be responsible for obtaining a valid passport and complying with all vaccinations and immunization requirements.

b) I will only accept a placement with a host family whom I have interviewed with personally by telephone or Skype. I will review all Pre-departure Training materials and attend all sessions during the Orientation program.

c) I will be present in good time for all flights or other transportation provided or arranged by AIFS. AIFS will not provide or be responsible for alternative transportation except in the case of illness or accident in accordance with its group insurance policy.

d) I will abide by all appropriate regulations and instructions of the US Government and obey all applicable laws.

## III.

I understand that, in the event of late cancellation from the program (after the visa application form has been issued) Au Pair in America and AIFS reserves the right to charge a US$200 cancellation fee.

## IV.

a) As a participant on the Au Pair in America or Au Pair Extraordinaire program, I will provide childcare up to 45 hours per week and not more than 10 hours per day, for a period not exceeding the 12 months granted under the terms of my visa. As a participant on the eduCare in America program, I will provide childcare up to 30 hours per week and not more than 10 hours per day, for a period not exceeding the 12 months granted under the terms of my visa. However, I understand that I have a right to extend my participation as an au pair on the program for a further period of up to12 months if I successfully complete my first year of the program.

b) I agree that I will perform my duties as an au pair to the best of my ability and indemnify AIFS, its staff, agents and all affiliated organisations from any damages, losses or claims resulting from my participation in the program.

c) I will carry out my childcare and other responsibilities to the host family to the best of my ability and with due

PLAINTIFF'S RESP. APP.0004278

respect and will take full advantage of the cultural opportunities and will fulfil the educational requirements in accordance with the rules set out in the brochure, website  and applicants' handbooks.

d) I understand that due to visa regulations I cannot change type of au pair program once I am in the US.

e) I understand the support system provided by the London and Connecticut offices, and affiliated offices if appropriate, and Community Counselors network. I will maintain monthly contact with my Community Counselor. I will co-operate fully with those supervising the program on my behalf for AIFS and I agree to abide by any reasonable instructions they may give me.

f) I understand that should a problem arise with my host family, depending on the circumstances APIA would consider re-matching me with another family but do not guarantee a second placement.

g) I understand that should I fall pregnant prior to departing for the USA or during my participation on the Au Pair in America, Au Pair Extraordinaire or eduCare in America programs, that I will no longer be eligible to participate on any of the Au Pair in America programs.

h) I understand that should I be convicted of driving under the influence of alcohol and/or drugs, or any other illegal activity,  during my participation, that I will no longer be able to participate on any of the Au Pair in America programs.

i) I will not accept any form of paid employment in the USA during my stay other than within my duties as a program participant with my host family.  I accept that I will be liable to file and pay taxes based on the US law.

j) While living with my host family I will be responsible for all personal debts, such as telephone calls. In the event of an automobile accident, I may be liable for up to, but no more than, US$500 of the insurance deductible.

k) I agree that AIFS may take such actions as it considers necessary regarding my health and safety during my time on the program, including securing medical treatment for me and transporting me to my home country. I release AIFS from any liability relating to the medical care received, and agree to pay for any medical or transportation expenses that are not covered by insurance.

l) I understand that as a participant on the Au Pair in America, Au Pair Extraordinaire or eduCare in America program, if for any reason I do not complete the full 12 month term of the program, I will not be entitled to any refund of the Au Pair in America Program Fee, insurance costs or any other supplementary payments for any ancillary services, and will be responsible for the full cost of my airfare to my home country.

m) I understand that if, for any reason, I do not complete the required educational hours, I will not be eligible to extend beyond my first year on the program and that Au Pair in America will not issue me a Completion Certificate.

n) I understand that program flights will depart from and return to designated airports, so I am responsible for any costs prior to departure and upon my return. I must also make my own way to my designated US return airport at the end of the program in time for my return flight and pay any transportation costs from my family to the airport. AIFS is not responsible for airline baggage costs, airport taxes or airline fuel surcharges.

o) At the end of my stay I will return to my home country on or before the expiry of my 'duration of stay' as determined by US Immigration and will not attempt to return subsequently to the United States without a valid and current US visa.

**V.**

I have read (or will read) the Au Pair in America information provided in the online resources and agree that their terms are deemed incorporated in this agreement.

**VI.**

PLAINTIFFS' RESP. APP.0004279

/2014-01-01   to   2014-12-31

This agreement shall be governed by the laws of the State of Connecticut. I agree that any dispute with AIFS, its staff, agents and all affiliated organizations that is not settled informally will be submitted to binding arbitration, to be conducted in substantial accordance with the rules of the American Arbitration Association. The location of the arbitration and identity of the arbitrator will be decided by mutual agreement, with the costs to be shared equally between the parties, and the decision of the arbitrator shall be final. By accepting this agreement, I understand that I am giving up my right to have any claim against AIFS, Inc. and its affiliated organizations decided in Court before a judge or jury.

## VII.

I agree to abide by the above conditions should I legally extend my stay on the Au Pair in America, Au Pair Extraordinaire or eduCare in America program beyond the initial 12 month term.

**Privacy Consent**

I understand that the application to the Au Pair in America program(s) requires me to disclose sensitive and private personal information. I understand that this application will be sent to the American Institute for Foreign Study [AIFS] office located in London and/or Bonn, and then to the American office which is located in Stamford, Connecticut. AIFS will then share my application with its network of Community Counselors [who are not employees of AIFS] and to prospective Host Families in an effort to obtain a placement for me in one of the Au Pair in America programs.

I understand that during the matching process, my time spent on any of the Au Pair in America programs, and subsequently, that I will have access to personal and confidential information about my (and other) host families. I agree not to share or disclose this information to any other parties.

In the unlikely event of a legal claim, lawsuit or arrest in connection with my participation in the Au Pair in America program, it may be necessary to provide my application to attorneys, insurers, or the United States Department of State [which regulates the program] and, if AIFS receives a valid Court order or subpoena, to whatever entity is determined to have a legal right to obtain this information. I understand that AIFS will not disclose my personal information to any other parties unless I am given notice and an opportunity to object. AIFS takes reasonable precautions to protect personal information from loss, misuse and unauthorized access, disclosure, alteration and destruction.

I hereby grant to AIFS the right to use, re-use, publish and re-publish my comments, images, video footage, photographic portraits or pictures of me or in which I may be included in, whether provided directly to AIFS or posted on official Au Pair in America social media platforms, in the original or edited version, for marketing purposes.

By completing and submitting the application, I am authorizing AIFS to disseminate the information that is contained in my application in the manner and for the purposes set forth above. I understand that I may revoke this consent at any time and I can request access to my personal information by sending a written request to the American Institute for Foreign Study, Inc., Attention: Privacy Officer, 1 High Ridge Park, Stamford, CT06905.

(V1/2014)

In consideration of you, the American Institute for Foreign Study Inc., herein after referred to as 'AIFS', accepting me for their Au Pair in America, Au Pair Extraordinaire or eduCare in America program, I hereby undertake and agree as follows:

## I.

a) I understand that failing to provide full and accurate responses to the questions asked in this application, on the medical form, at interview and on all ancillary documents, may result in the rejection of my application or termination from the program. I hereby warrant that the information I will give in the completed application will be accurate. I also declare that all qualifications gained and certificates and references provided, including photocopies will be genuine.

b) I understand that after my acceptance my application may be withdrawn from the program at any time, should AIFS become aware of any new information which may have affected my initial acceptance for the program.

c) I understand that certain medical information contained within my application will be shared with my prospective host family, and that if required I will arrange my own medical coverage for any pre-existing ongoing medical condition upon consultation with Au Pair in America.

d) I certify that I have successfully completed my secondary school studies/training.

e) I declare that I have never been convicted of a criminal offence.

f) I declare that I am currently not married nor do I have any dependants.

g) I understand that my application and contents herein cannot be returned to me at any time.

## II.

a) I understand that US law requires that all au pair sponsors ensure that all candidates are interviewed in person. I understand that I will meet with an official Au Pair in America representative in my home country who will interview me in person and NOT over the phone, Skype or internet.

b) I will complete all visa and screening requirements in accordance with the instructions given and will be responsible for obtaining a valid passport, international driving permit (or equivalent) and complying with all vaccinations and immunization requirements.

c) I will only accept a placement with a host family who I have interviewed with personally by telephone or Skype. I will review all pre-departure training materials and attend all sessions during the Orientation program.

d) I understand that I will receive an invoice for my Au Pair in America Program Fee only when I have officially placed with an Au Pair in America host family. I understand that I will only be able to pay the Au Pair in America Program Fee via my secure, password-protected Au Pair in America Participant Site using the payment methods described. I understand that neither Au Pair in America, nor any of its registered US host families, will ever ask me to wire or transfer money using a money transfer company, cashier's checks or money orders.

e) I understand that my locally appointed Au Pair in America representative may charge me a local agency fee and that this is separate from the Au Pair in America Program Fee and governed by the local representative's terms and conditions.

f) I will be present in good time for all flights or other transportation provided or arranged by AIFS. AIFS will not provide or be responsible for alternative transportation except in the case of illness or accident in accordance with its group insurance policy.

g) I will abide by all appropriate regulations and instructions of the US Government and obey all applicable laws.

## III.

I understand that, in the event of late cancellation from the program (after the visa application form has been issued) Au Pair in America and AIFS reserve the right to charge a US$200 cancellation fee.

## IV.

a) As a participant on the Au Pair in America or Au Pair Extraordinaire program, I will provide childcare up to 45 hours per week and not more than 10 hours per day, for a period not exceeding the 12 months granted under the terms of my visa. As a participant on the eduCare in America program, I will provide childcare up to 30 hours per week and not more than 10 hours per day, for a period not exceeding the 12 months granted under the terms of my visa. However, I understand that I have a right to apply to extend my participation as an au pair on the program for a further mutually agreed period of 6, 9 or 12 months if I successfully complete my first year of the program.

b) I agree that I will perform my duties as an au pair to the best of my ability and indemnify AIFS, its staff, agents and all affiliated organisations from any damages, losses or claims resulting from my participation in the program.

c) I will carry out my childcare and other responsibilities to the host family to the best of my ability and with due respect and will take full advantage of the cultural opportunities and will fulfil the educational requirements in accordance with the rules set out in the brochure, website and online resources.

d) I understand that due to visa regulations I cannot change between the Au Pair in America or Au Pair Extraordinaire programs and the eduCare program once I am in the USA.

e) I understand the support system provided by the London and Connecticut offices, and affiliated offices if appropriate, and Community Counselor network. I will maintain monthly contact with my Community Counselor. I will co-operate fully with those supervising the program on my behalf for AIFS and I agree to abide by any reasonable instructions they may give me.

f) I understand that should a problem arise with my host family, depending on the circumstances Au Pair in America would consider re-matching me with another family but does not guarantee a second placement.

g) I understand that should my medical condition limit my ability to perform my duties as an au pair or if I become pregnant prior to departing for the USA or during my participation on the Au Pair in America, Au Pair Extraordinaire or eduCare in America programs, that I will no longer be eligible to participate on any of the Au Pair in America programs.

h) I understand that should I be convicted of driving under the influence of alcohol and/or drugs, or any other illegal activity, during my participation, that I will no longer be able to participate on any of the Au Pair in America programs.

i) I will not accept any form of paid employment in the USA during my stay other than within my duties as a program participant with my host family. I accept that I will be liable to file and pay taxes based on the US law.

j) While living with my host family I will be responsible for all personal debts, such as telephone calls. In the event of an automobile accident, I may be liable for up to, but no more than, US$500 of the insurance deductible.

k) I agree that AIFS may take such actions as it considers necessary regarding my health and safety during my time on the program, including securing medical treatment for me and transporting me to my home country. I release AIFS from any liability relating to the medical care received, and agree to pay for any medical or transportation expenses that are not covered by insurance.

l) I understand that as a participant on the Au Pair in America, Au Pair Extraordinaire or eduCare in America program, if for any reason I do not complete the full 12 month term of the program, I will not be entitled to any refund of the Program Fee, insurance costs or any other supplementary payments for any ancillary services, and will be responsible

PLAINTIFFS' RESP. APP.0004282

for the full cost of my airfare to my home country, unless otherwise agreed by Au Pair in America and/or its local representatives at their discretion.

m) I understand that if, for any reason, I do not complete the required educational hours, I will not be eligible to extend beyond my first year on the program and that Au Pair in America will not issue me a Completion Certificate.

n) I understand that program flights will depart from and return to designated airports, so I am responsible for any costs prior to departure and upon my return. I must also make my own way to my designated US return airport at the end of the program in time for my return flight and pay any transportation costs from my host family to the airport. AIFS is not responsible for airline baggage costs, airport taxes or airline fuel surcharges.

o) At the end of my stay I will return to my home country on or before the expiry of my 'duration of stay' as determined by US Immigration and will not attempt to return subsequently to the United States without a valid and current US visa if applicable to my home country.

p) I understand that my weekly pocket money will cover 51 weeks because I will not receive pocket money for my first week in the USA. I understand that during these 51 weeks I am entitled to 2 weeks' paid vacation, and one full weekend off per month (comprising Friday evening to Monday morning). I understand that any time off will be subject to mutual agreement with my host family.

**V.**

I have read (or will read) the Au Pair in America information provided in the online resources and agree that their terms are deemed incorporated in this agreement.

**VI.**

This agreement shall be governed by the laws of the State of Connecticut. I agree that any dispute with AIFS, its staff, agents and all affiliated organizations that is not settled informally will be submitted to binding arbitration, to be conducted in substantial accordance with the rules of the American Arbitration Association. The location of the arbitration and identity of the arbitrator will be decided by mutual agreement, with the costs to be shared equally between the parties, and the decision of the arbitrator shall be final. By accepting this agreement, I understand that I am giving up my right to have any claim against AIFS, and its affiliated organizations decided in Court before a judge or jury.

**VII.**

I agree to abide by the above conditions should I legally extend my stay on the Au Pair in America, Au Pair Extraordinaire or eduCare in America program beyond the initial 12 month term.

**Privacy Consent**

I understand that the application process for the Au Pair in America program(s) requires me to disclose sensitive and private personal information. I understand that this application will be sent to the AIFS office located in London and/or Bonn, and then to its American office which is located in Stamford, Connecticut. AIFS will then share my application with its network of Community Counselors [who are not employees of AIFS] ,prospective host families, and with designated third party matching sites in an effort to obtain a placement for me on one of the Au Pair in America programs.

I understand that during the matching process, my time spent on any of the Au Pair in America programs, and subsequently, that I will have access to personal and confidential information, including photographs and videos, about my (and other) host families. I agree not to share or disclose this information to any other parties, including on social media sites and blogs.

I understand and agree that I am responsible for controlling visibility of my presence in any media forums once I

PLAINTIFF'S RESP. APP.0004283

arrive in the US and that AIFS and its appointed representatives/partners cannot be held liable should I choose to participate in AIFS cluster photographs, publicity or materials produced by other au pairs, or AIFS employees, as part of my participation on the program.

In the unlikely event of a legal claim, lawsuit or arrest in connection with my participation in the Au Pair in America program, it may be necessary to provide my application to attorneys, insurers, or the United States Department of State [which regulates the program] and, if AIFS receives a valid court order or subpoena, to whatever entity is determined to have a legal right to obtain this information. I understand that AIFS will not disclose my personal information to any other parties unless I am given notice and an opportunity to object. AIFS takes reasonable precautions to protect personal information from loss, misuse and unauthorized access, disclosure, alteration and destruction.

By completing and submitting the application, I am authorizing AIFS to disseminate the information that is contained in my application in the manner and for the purposes set forth above. I understand that I may revoke this consent at any time and I can request access to my personal information by sending a written request to the American Institute for Foreign Study, Inc., Attention: Privacy Officer, Au Pair in America, 1 High Ridge Park, Stamford, CT, 06905, USA.

(V1/2015)

Case No. 1:14-cv-03074-CMA-KMT   Document 959-23   filed 03/30/18   USDC Colorado   pg 77
of 300

# Exhibit 387



Program:
**Extension Program:**
Standard AP: **X**                                                    ES (Same HF) ☐
Extraordinaire: ☐                                                    EN (New HF) ☐
EduCare: ☐

## QUARTERLY STATUS REPORT

Quarter:    **X** 1st        ☐  2nd        ☐  3rd        ☐  4th        Year: __2013__
            (Jan 1 – Mar 31)    (Apr 1 – June 30)    (July 1 – Sep 30)    (Oct 1 – Dec 31)

Community Counselor: _____                Cluster: _____

Host Family: _____                ID#: _____

Au Pair: _____                          ID#: _____

Au Pair Arrival Dates :* In United States _____ *To Host Family_____
* DOS regulations require community counselors to contact rematch au pairs and their host families twice monthly during the first two months of a rematch. Please be sure to include any such contacts clearly below in part III of this form.

### 1. Cluster Activity for this Quarter
Indicate dates that au pair/host family attended activities, including Host Family Workshop Day/Culture Fair:

Aupair:... . . . . . . . . .

### 2. Education
List institution and course(s) that the au pair was registered in this quarter:

            University/College                        Course

### 3. Other Contacts
Date            Contact            Type        Issues and/or Problems Discussed
                (Circle Appropriate Responses)            (Please use reverse side of form if necessary to provide additional information on        issues
                                        and/or problems.)
        AP  HMo  HFa  Tel  Visit    Other_____

        AP  HMo  HFa  Tel  Visit    Other _____

        AP  HMo  HFa  Tel  Visit    Other_____

### 4. Community Counselor's Assessment of Host Family/Au Pair Relationship:

☐      Excellent        ■    Good            ☐    Fair        ☐    Poor

If poor, please use reverse side of this form to explain necessary actions

Community Counselor Signature:_____        Date: __

**Return this form to your regional program manager 30 days after the end of the quarter**

PLAINTIFFS' RESPONSIVE – HIGHLY CONFIDENTIAL ATTORNEY EYES ONLY        AIFS0003979
AIFS00042780



**Program:**
**Extension Program:**

| | |
|---|---|
| **Standard AP:** X | **ES (Same HF)** ☐ |
| **Extraordinaire:** ☐ | **EN (New HF)** ☐ |
| **EduCare:** ☐ | |

## QUARTERLY STATUS REPORT

Quarter: **X 1st** ☐ 2nd ☐ 3rd ☐ 4th Year: __2013__
(Jan 1 – Mar 31)   (Apr 1 – June 30)   (July 1 – Sep 30)   (Oct 1 – Dec 31)

Community Counselor: _____   Cluster: _____

Host Family: _____   ID#: _____

Au Pair: _____   ID#: _____

Au Pair Arrival Dates :* In United States _____   *To Host Family_____
* DOS regulations require community counselors to contact rematch au pairs and their host families twice monthly during the first two months of a rematch. Please be sure to include any such contacts clearly below in part III of this form.

### 1. Cluster Activity for this Quarter
Indicate dates that au pair/host family attended activities, including Host Family Workshop Day/Culture Fair:

Aupair:... . . . . . . . . .

### 2. Education
List institution and course(s) that the au pair was registered in this quarter:

University/College                          Course

### 3. Other Contacts

| Date | Contact (Circle Appropriate Responses) | Type | Issues and/or Problems Discussed (Please use reverse side of form if necessary to provide additional information on issues and/or problems.) |
|---|---|---|---|
| | AP HMo HFa Tel Visit | Other_____ | |
| | AP HMo HFa Tel Visit | Other_____ | |
| | AP HMo HFa Tel Visit | Other_____ | |

### 4. Community Counselor's Assessment of Host Family/Au Pair Relationship:

☐   Excellent        ✖ **Good**        ☐   Fair        ☐   Poor

If poor, please use reverse side of this form to explain necessary actions

Community Counselor Signature: _____   Date: __

## Return this form to your regional program manager 30 days after the end of the quarter

PLAINTIFFS' RESPONDENT'S A000-4289RNEY EYES ONLY          AIFS0003980



**Program:**

**Extension Program:**

Standard AP:   **X**                                               **ES (Same HF)** ☐

Extraordinaire:  ☐                                          **EN (New HF)** ☐

EduCare:       ☐

## QUARTERLY STATUS REPORT

Quarter:    **X 1st**       ☐   2nd       ☐   3rd        ☐   4th     Year: __2013__

         (Jan 1 – Mar 31)   (Apr 1 – June 30)   (July 1 – Sep 30)   (Oct 1 – Dec 31)

Community Counselor: _____           Cluster:_____

Host Family: _____         ID#: _____

Au Pair: _____               ID#: _____

Au Pair Arrival Dates :* In United States _____ *To Host Family_____

* DOS regulations require community counselors to contact rematch au pairs and their host families twice monthly during the first two months of a rematch. Please be sure to include any such contacts clearly below in part III of this form.

### 1. Cluster Activity for this Quarter

Indicate dates that au pair/host family attended activities, including Host Family Workshop Day/Culture Fair:

Aupair:.... . . . . . . . . .

### 2. Education

List institution and course(s) that the au pair was registered in this quarter:

        University/College                        Course

### 3. Other Contacts

| Date | Contact (Circle Appropriate Responses) | Type | Issues and/or Problems Discussed (Please use reverse side of form if necessary to provide additional information on issues and/or problems.) |
|------|------|------|------|
| | AP  HMo  HFa  Tel  Visit | Other | _____ |
| | AP  HMo  HFa  Tel  Visit | Other | _____ |
| | AP  HMo  HFa  Tel  Visit | Other | _____ |

### 4. Community Counselor's Assessment of Host Family/Au Pair Relationship:

☐   Excellent           ✖    **Good**          ☐   **Fair**        ☐   **Poor**

If poor, please use reverse side of this form to explain necessary actions

Community Counselor Signature:_____     Date: __

## Return this form to your regional program manager 30 days after the end of the quarter

PLAINTIFFS' RESPONSE / AIF000 4289 / ATTORNEY EYES ONLY             AIFS0003981



**Program:**
**Extension Program:**
Standard AP: **X**                                         ES (Same HF) ☐
Extraordinaire: ☐                                          EN (New HF) ☐
EduCare: ☐

## QUARTERLY STATUS REPORT

Quarter:  **X** 1st          ☐ 2nd          ☐ 3rd          ☐ 4th          Year: __2013__
         (Jan 1 – Mar 31)   (Apr 1 – June 30)   (July 1 – Sep 30)   (Oct 1 – Dec 31)

Community Counselor: _____          Cluster: _____

Host Family: _____          ID#: _____

Au Pair: _____          ID#: _____

Au Pair Arrival Dates :* In United States _____  *To Host Family_____
* DOS regulations require community counselors to contact rematch au pairs and their host families twice monthly during the first two months of a rematch. Please be sure to include any such contacts clearly below in part III of this form.

### 1. Cluster Activity for this Quarter
Indicate dates that au pair/host family attended activities, including Host Family Workshop Day/Culture Fair:

Aupair:... . . . . . . . . .

### 2. Education
List institution and course(s) that the au pair was registered in this quarter:

         University/College                              Course

### 3. Other Contacts
Date          Contact                Type          Issues and/or Problems Discussed
              (Circle Appropriate Responses)        (Please use reverse side of form if necessary to provide additional information on          issues
                                     and/or problems.)

     AP  HMo  HFa  Tel  Visit     Other_____

     AP  HMo  HFa  Tel  Visit     Other_____

     AP  HMo  HFa  Tel  Visit     Other_____

### 4. Community Counselor's Assessment of Host Family/Au Pair Relationship:

☐     Excellent          ■  Good          ☐  Fair          ☐  Poor

If poor, please use reverse side of this form to explain necessary actions

Community Counselor Signature:_____          Date: __

## Return this form to your regional program manager 30 days after the end of the quarter

PLAINTIFFS' RESPONSE/HIGHLY CONFIDENTIAL A000 4280 ATTORNEY EYES ONLY          AIFS0003982



**Program:**
**Extension Program:**
Standard AP:    X
Extraordinaire:  ☐
EduCare:        ☐

ES (Same HF)☐
EN (New HF) ☐

## QUARTERLY STATUS REPORT

Quarter:    X 1st          ☐  2nd          ☐  3rd          ☐  4th          Year: __2013__
            (Jan 1 – Mar 31)   (Apr 1 – June 30)   (July 1 – Sep 30)   (Oct 1 – Dec 31)

Community Counselor: _____          Cluster: _____

Host Family:  _____          ID#: _____

Au Pair:  _____          ID#: _____

Au Pair Arrival Dates :* In United States _____   *To Host Family_____
* DOS regulations require community counselors to contact rematch au pairs and their host families twice monthly during the first two months of a rematch. Please be sure to include any such contacts clearly below in part III of this form.

### 1. Cluster Activity for this Quarter
Indicate dates that au pair/host family attended activities, including Host Family Workshop Day/Culture Fair:

Aupair:.. . . . . . . . .

### 2. Education
List institution and course(s) that the au pair was registered in this quarter:

University/College                                    Course

### 3. Other Contacts
Date        Contact                Type        Issues and/or Problems Discussed
            (Circle Appropriate Responses)          (Please use reverse side of form if necessary to provide additional information on          issues
                                    and/or problems.)
     AP  HMo  HFa Tel  Visit      Other_____

     AP  HMo  HFa Tel  Visit      Other _____

     AP  HMo  HFa Tel  Visit      Other_____

### 4. Community Counselor's Assessment of Host Family/Au Pair Relationship:

☐    Excellent          ■  Good          ☐  Fair          ☐  Poor

If poor, please use reverse side of this form to explain necessary actions

Community Counselor Signature:_____          Date: __

## Return this form to your regional program manager 30 days after the end of the quarter

PLAINTIFFS' RESPONSE - HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY          AIFS0003983
AIFS0003983



**Program:**

**Extension Program:**

Standard AP:     **X**

Extraordinaire:  ☐

EduCare:         ☐

ES (Same HF) ☐
EN (New HF) ☐

## QUARTERLY STATUS REPORT

Quarter:     **X** 1st          ☐  2nd          ☐  3rd          ☐  4th      Year: __2013__

(Jan 1 – Mar 31)   (Apr 1 – June 30)   (July 1 – Sep 30)   (Oct 1 – Dec 31)

Community Counselor: _____          Cluster: _____

Host Family:  _____          ID#:  _____

Au Pair:  _____          ID#:  _____

Au Pair Arrival Dates :* In United States _____   *To Host Family_____

\* DOS regulations require community counselors to contact rematch au pairs and their host families twice monthly during the first two months of a rematch. Please be sure to include any such contacts clearly below in part III of this form.

### 1. Cluster Activity for this Quarter

Indicate dates that au pair/host family attended activities, including Host Family Workshop Day/Culture Fair:

Aupair:... . . . . . . . . .

### 2. Education

List institution and course(s) that the au pair was registered in this quarter:

University/College          Course

### 3. Other Contacts

| Date | Contact (Circle Appropriate Responses) | Type | Issues and/or Problems Discussed (Please use reverse side of form if necessary to provide additional information on issues and/or problems.) |
|---|---|---|---|
| | AP  HMo  HFa  Tel  Visit | Other_____ | |
| | AP  HMo  HFa  Tel  Visit | Other_____ | |
| | AP  HMo  HFa  Tel  Visit | Other_____ | |

### 4. Community Counselor's Assessment of Host Family/Au Pair Relationship:

☐  Excellent          ✖  Good          ☐  Fair          ☐  Poor

If poor, please use reverse side of this form to explain necessary actions

Community Counselor Signature:_____          Date: __

## Return this form to your regional program manager 30 days after the end of the quarter

PLAINTIFFS' RESPONSIVE — ATTORNEY EYES ONLY          AIFS0003984
HIGHLY CONFIDENTIAL AIFS00042790



**Program:**

**Extension Program:**

Standard AP: **X**         ES (Same HF) ☐
Extraordinaire: ☐        EN (New HF) ☐
EduCare: ☐

## QUARTERLY STATUS REPORT

Quarter:    **X** 1st     ☐ 2nd     ☐ 3rd     ☐ 4th    Year: ___2013___

(Jan 1 – Mar 31)    (Apr 1 – June 30)    (July 1 – Sep 30)    (Oct 1 – Dec 31)

Community Counselor: _____       Cluster:_____

Host Family: _____      ID#: _____

Au Pair: _____      ID#: _____

Au Pair Arrival Dates :* In United States _____ *To Host Family_____

* DOS regulations require community counselors to contact rematch au pairs and their host families twice monthly during the first two months of a rematch. Please be sure to include any such contacts clearly below in part III of this form.

### 1. Cluster Activity for this Quarter

Indicate dates that au pair/host family attended activities, including Host Family Workshop Day/Culture Fair:

Aupair:... . . . . . . . . .

### 2. Education

List institution and course(s) that the au pair was registered in this quarter:

       University/College                   Course

### 3. Other Contacts

| Date | Contact (Circle Appropriate Responses) | Type | Issues and/or Problems Discussed (Please use reverse side of form if necessary to provide additional information on issues and/or problems.) |
|---|---|---|---|
| | AP  HMo  HFa  Tel  Visit | Other_____ |
| | AP  HMo  HFa  Tel  Visit | Other_____ |
| | AP  HMo  HFa  Tel  Visit | Other_____ |

### 4. Community Counselor's Assessment of Host Family/Au Pair Relationship:

☐    Excellent      ✖    Good      ☐   Fair      ☐   Poor

If poor, please use reverse side of this form to explain necessary actions

Community Counselor Signature:_____     Date: __

## Return this form to your regional program manager 30 days after the end of the quarter

PLAINTIFFS' RESPONDENT A004292 ORNEY EYES ONLY       AIFS0003985



Program:
**Extension Program:**
Standard AP:     **X**
Extraordinaire:  ☐
EduCare:         ☐

ES (Same HF) ☐
EN (New HF) ☐

## QUARTERLY STATUS REPORT

Quarter:    **X 1st**          ☐ 2nd          ☐ 3rd          ☐ 4th       Year: __2013__
            (Jan 1 – Mar 31)   (Apr 1 – June 30)   (July 1 – Sep 30)   (Oct 1 – Dec 31)

Community Counselor: _____          Cluster: _____

Host Family: _____          ID#: _____

Au Pair: _____          ID#: _____

Au Pair Arrival Dates :* In United States _____ *To Host Family_____
* DOS regulations require community counselors to contact rematch au pairs and their host families twice monthly during the first two months of a rematch. Please be sure to include any such contacts clearly below in part III of this form.

### 1. Cluster Activity for this Quarter
Indicate dates that au pair/host family attended activities, including Host Family Workshop Day/Culture Fair:

Aupair:... . . . . . . . . .

### 2. Education
List institution and course(s) that the au pair was registered in this quarter:

University/College                                  Course

### 3. Other Contacts
Date          Contact                 Type        Issues and/or Problems Discussed
              (Circle Appropriate Responses)        (Please use reverse side of form if necessary to provide additional information on        issues
                                          and/or problems.)

    AP  HMo  HFa Tel  Visit      Other_____

    AP  HMo  HFa Tel  Visit      Other _____

    AP  HMo  HFa Tel  Visit      Other_____

### 4. Community Counselor's Assessment of Host Family/Au Pair Relationship:

☐    Excellent          ☒ Good          ☐ Fair          ☐ Poor

If poor, please use reverse side of this form to explain necessary actions

Community Counselor Signature:_____          Date: __

## Return this form to your regional program manager 30 days after the end of the quarter

PLAINTIFFS' RESPONSE HIGHLY CONFIDENTIAL AIFS0004299 ATTORNEY EYES ONLY          AIFS0003986



**Program:**
**Extension Program:**
Standard AP: **X**                                                                                    ES (Same HF) ☐
Extraordinaire: ☐                                                                                   EN (New HF) ☐
EduCare: ☐

## QUARTERLY STATUS REPORT

Quarter:     **X 1st**          ☐   2nd          ☐   3rd          ☐   4th          Year: __2013__
             (Jan 1 – Mar 31)   (Apr 1 – June 30)   (July 1 – Sep 30)   (Oct 1 – Dec 31)

Community Counselor: _____                    Cluster: _____

Host Family: _____                ID#: _____

Au Pair: _____                           ID#: _____

Au Pair Arrival Dates :* In United States _____    *To Host Family_____
* DOS regulations require community counselors to contact rematch au pairs and their host families twice monthly during the first two months
of a rematch. Please be sure to include any such contacts clearly below in part III of this form.

### 1. Cluster Activity for this Quarter
Indicate dates that au pair/host family attended activities, including Host Family Workshop Day/Culture Fair:

Aupair:... . . . . . . . . .

### 2. Education
List institution and course(s) that the au pair was registered in this quarter:

        University/College                              Course




### 3. Other Contacts
Date            Contact               Type          Issues and/or Problems Discussed
            (Circle Appropriate Responses)   (Please use reverse side of form if necessary to provide additional information on          issues
                                             and/or problems.)
      AP  HMo  HFa  Tel  Visit    Other_____

      AP  HMo  HFa  Tel  Visit    Other _____

      AP  HMo  HFa  Tel  Visit    Other_____

### 4. Community Counselor's Assessment of Host Family/Au Pair Relationship:

☐    Excellent          ☒    Good          ☐    Fair          ☐    Poor

If poor, please use reverse side of this form to explain necessary actions

Community Counselor Signature:_____          Date: __

## Return this form to your regional program manager 30 days after the end of the quarter

PLAINTIFFS' RESPONSE - HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY          AIFS0003987



**Program:**

**Extension Program:**

Standard AP:    **X**                                    ES (Same HF) ☐
Extraordinaire:  ☐                                       EN (New HF) ☐
EduCare:         ☐

## QUARTERLY STATUS REPORT

Quarter:    **X** 1st          ☐  2nd          ☐  3rd          ☐  4th        Year: ___2013___
            (Jan 1 – Mar 31)  (Apr 1 – June 30)  (July 1 – Sep 30)  (Oct 1 – Dec 31)

Community Counselor: _____              Cluster:_____

Host Family: _____          ID#:      _____

Au Pair:     _____              ID#:           _____

Au Pair Arrival Dates :* In United States _____  *To Host Family_____
* DOS regulations require community counselors to contact rematch au pairs and their host families twice monthly during the first two months
of a rematch. Please be sure to include any such contacts clearly below in part III of this form.

**1. Cluster Activity for this Quarter**
Indicate dates that au pair/host family attended activities, including Host Family Workshop Day/Culture Fair:

Aupair:.. . . . . . . . .

**2. Education**
List institution and course(s) that the au pair was registered in this quarter:

        University/College                              Course

**3. Other Contacts**
Date            Contact            Type        Issues and/or Problems Discussed
            (Circle Appropriate Responses)          (Please use reverse side of form if necessary to provide additional information on        issues
                                        and/or problems.)

    AP  HMo  HFa Tel  Visit    Other_____

    AP  HMo  HFa Tel  Visit    Other _____

    AP  HMo  HFa Tel  Visit    Other_____

**4. Community Counselor's Assessment of Host Family/Au Pair Relationship:**

☐    Excellent        ✖  **Good**            ☐   Fair        ☐   Poor

If poor, please use reverse side of this form to explain necessary actions

Community Counselor Signature:_____        Date: __

**Return this form to your regional program manager 30 days after the end of the quarter**

PLAINTIFFS' RESPONSE ATTORNEY EYES ONLY          AIFS0003988
HIGHLY CONFIDENTIAL AIFS00042790

Case No. 1:14-cv-03074-CMA-KMT Document 958-25 filed 03/17/18 USDC Colorado pg 88 of 300
Case 1:14-cv-03074-CMA-KMT Document 915-69 23 filed 09/17/18 USDC Colorado pg 87
of 309



**Program:**

**Extension Program:**

Standard AP: **X**            ES (Same HF) ☐
Extraordinaire: ☐           EN (New HF) ☐
EduCare: ☐

## QUARTERLY STATUS REPORT

Quarter:    **X** 1st      ☐ 2nd      ☐ 3rd      ☐ 4th     Year: ___2013_____
       (Jan 1 – Mar 31)    (Apr 1 – June 30)    (July 1 – Sep 30)    (Oct 1 – Dec 31)

Community Counselor: _____       Cluster: _____

Host Family: _____          ID#: _____

Au Pair: _____             ID#: _____

Au Pair Arrival Dates :* In United States _____ *To Host Family_____
* DOS regulations require community counselors to contact rematch au pairs and their host families twice monthly during the first two months of a rematch. Please be sure to include any such contacts clearly below in part III of this form.

### 1. Cluster Activity for this Quarter
Indicate dates that au pair/host family attended activities, including Host Family Workshop Day/Culture Fair:

Aupair:... . . . . . . . . .

### 2. Education
List institution and course(s) that the au pair was registered in this quarter:

       University/College                      Course

### 3. Other Contacts

| Date | Contact (Circle Appropriate Responses) | Type | Issues and/or Problems Discussed (Please use reverse side of form if necessary to provide additional information on issues and/or problems.) |
|------|------|------|------|
| | AP  HMo  HFa  Tel  Visit | Other_____ | |
| | AP  HMo  HFa  Tel  Visit | Other_____ | |
| | AP  HMo  HFa  Tel  Visit | Other_____ | |

### 4. Community Counselor's Assessment of Host Family/Au Pair Relationship:

☐    Excellent      ■    **Good**      ☐   **Fair**      ☐   **Poor**

If poor, please use reverse side of this form to explain necessary actions

Community Counselor Signature:_____      Date: __

## Return this form to your regional program manager 30 days after the end of the quarter

PLAINTIFFS' RESPONSE ATTORNEY EYES ONLY           AIFS0003989
HIGHLY CONFIDENTIAL - AIFS00042796



**Program:**

**Extension Program:**
Standard AP:  **X**
Extraordinaire:  ☐
EduCare:  ☐

ES (Same HF)☐
EN (New HF) ☐

## QUARTERLY STATUS REPORT

Quarter:  **X 1st**    ☐  2nd    ☐  3rd    ☐  4th    Year: __2013__

(Jan 1 – Mar 31)    (Apr 1 – June 30)    (July 1 – Sep 30)    (Oct 1 – Dec 31)

Community Counselor: _____    Cluster:_____

Host Family: _____    ID#: _____

Au Pair: _____    ID#: _____

Au Pair Arrival Dates :* In United States _____  *To Host Family_____
* DOS regulations require community counselors to contact rematch au pairs and their host families twice monthly during the first two months of a rematch. Please be sure to include any such contacts clearly below in part III of this form.

### 1. Cluster Activity for this Quarter
Indicate dates that au pair/host family attended activities, including Host Family Workshop Day/Culture Fair:

Aupair:.............

### 2. Education
List institution and course(s) that the au pair was registered in this quarter:

University/College               Course

### 3. Other Contacts

| Date | Contact<br>(Circle Appropriate Responses) | Type | Issues and/or Problems Discussed<br>(Please use reverse side of form if necessary to provide additional information on   issues<br>and/or problems.) |
|---|---|---|---|
| | AP  HMo  HFa Tel  Visit | Other | _____ |
| | AP  HMo  HFa Tel  Visit | Other | _____ |
| | AP  HMo  HFa Tel  Visit | Other | _____ |

### 4. Community Counselor's Assessment of Host Family/Au Pair Relationship:

☐  Excellent    ■**Good**    ☐  Fair    ☐  Poor

If poor, please use reverse side of this form to explain necessary actions

Community Counselor Signature:_____    Date: __

## Return this form to your regional program manager 30 days after the end of the quarter

PLAINTIFFS' RESPONSE – HIGHLY CONFIDENTIAL – ATTORNEY EYES ONLY    AIFS0003990<br>AIFS00042790



**Program:**

**Extension Program:**

Standard AP:  **X**                                                    ES (Same HF) ☐
Extraordinaire:  ☐                                                  EN (New HF) ☐
EduCare:  ☐

## QUARTERLY STATUS REPORT

Quarter:  **X** 1st          ☐ 2nd          ☐ 3rd          ☐ 4th          Year: __2013__

(Jan 1 – Mar 31)   (Apr 1 – June 30)   (July 1 – Sep 30)   (Oct 1 – Dec 31)

Community Counselor: _____          Cluster: _____

Host Family: _____          ID#: _____

Au Pair: _____          ID#: _____

Au Pair Arrival Dates :* In United States _____  *To Host Family_____
* DOS regulations require community counselors to contact rematch au pairs and their host families twice monthly during the first two months of a rematch. Please be sure to include any such contacts clearly below in part III of this form.

### 1. Cluster Activity for this Quarter
Indicate dates that au pair/host family attended activities, including Host Family Workshop Day/Culture Fair:

Aupair:... . . . . . . . . .

### 2. Education
List institution and course(s) that the au pair was registered in this quarter:

University/College                                        Course

### 3. Other Contacts

| Date | Contact (Circle Appropriate Responses) | Type | Issues and/or Problems Discussed (Please use reverse side of form if necessary to provide additional information on issues and/or problems.) |
|------|------|------|------|
| | AP  HMo  HFa  Tel  Visit | Other_____ | |
| | AP  HMo  HFa  Tel  Visit | Other_____ | |
| | AP  HMo  HFa  Tel  Visit | Other_____ | |

### 4. Community Counselor's Assessment of Host Family/Au Pair Relationship:

☐   Excellent          ■ Good          ☐   Fair          ☐   Poor

If poor, please use reverse side of this form to explain necessary actions

Community Counselor Signature:_____          Date: __

## Return this form to your regional program manager 30 days after the end of the quarter

PLAINTIFFS' RESPONDENTIA00042199 ATTORNEY EYES ONLY          AIFS0003991

Case 1:14-cv-03074-CMA-KMT  Document 948-46  Filed 03/17/18  USDC Colorado  Page 90
of 300

# Exhibit 388

PLAINTIFFS' RESP. APP.0004299



## 2015 GENERAL TAX INFORMATION FOR AU PAIRS

Au Pair in America realizes that the issue of taxes can be confusing for you. For general tax questions, please review the information below.

Au Pair in America cannot be held responsible for the interpretation of the information within this document, or any changes to IRS rules or forms that may occur. Neither Au Pair in America, nor its Community Counselors, can provide any official tax advice. We recommend that you contact a tax professional if you have any specific questions regarding your own tax situation.

This document is intended to address federal taxes and does not address au pair status under other laws such as the Fair Labor Standards Act.

**Will I owe taxes on my weekly stipends?**

The IRS* (Internal Revenue Service) considers you, as an au pair, to be an <u>employee</u> of the host family. The weekly stipend you receive from your host family(ies) is considered by the IRS to be taxable as earned income and requires you to file U.S. individual income tax returns. You will owe taxes if the total stipend earned is more than $4,000. The $4,000 is the personal allowable exemption in 2015.

**Why do I need to file taxes?**

United States law requires individuals to file a tax return and to report income during a calendar year. If you choose not to file a return and pay taxes, it could prevent you from obtaining a visa in the future. If you are planning to apply for a U.S. visa in the future, or for a change of status, you may be required to pay any unpaid taxes plus penalties and interest charges. If your host family(ies) report or claims payments to you as their au pair, then you must file your own tax return.

**When do I need to file a tax return?**

A federal U.S. tax return for the total amount of stipend earned in 2015 should be filed with the IRS no later than April 18th, 2016 .This should be submitted to the IRS along with payment for any taxes owed. (For example: on April 18th, 2016, tax returns are due for stipends (wages) earned between January 1, and December 31, 2015). If you do not file by the deadline of April 18, 2016 you may be subject to a penalty as well as interest on the tax owed.

**How will I know how much money I made in a calendar year?**

You should keep a record of the weekly stipend payments you receive from your host family(ies) during the year. We have prepared a "stipend payment form' which you can use, or you can create your own form for keeping track of the stipend amounts you receive.
http://www.aupairinamerica.com/pdf/stipend-tracking-sheet.pdf

Taxes 2015
Earnings – Au Pair in America

PLAINTIFFS' RESP. APP.0004300

**How much will I owe for taxes?**

The amount of income tax you may owe depends on when you arrived in the U.S.

Most au pairs who have been in the U.S. for at least 21 weeks in a calendar year will meet the minimum requirement to pay taxes (16 weeks for au pair Extraordinares). The exemption deduction is $4,000 for 2015 (per the 2015 IRS 1040NR-EZ instruction book, page 8). You are **not required to file** a U.S. federal individual income tax return if your U.S. source of earnings (total stipend amount) is an **amount less than the personal exemption amount ($4,000 for 2015)** (Refer to Publication 501).

**How do I file taxes? –Step by Step Guide.** *This guide is intended to give general instructions, and should not substitute for the advice or instructions given by the IRS or a certified accountant.*

**Step 1: Get a Social Security number or Tax ID number**. The purpose of the social security card is for employment authorization under the terms of the au pair regulations. If you do not already have one, please consult the information below and make sure to apply for a social security card.

**Information on securing a Social Security Number:**

http://www.aupairinamerica.com/resources/life_in_the_us/procedure_4.asp

http://www.irs.gov/Individuals/International-Taxpayers/Au-Pairs

**Step 2: Calculate the total stipend amounts you received during the previous calendar year**. Ideally you have kept track of your stipends using the Au Pair in America stipend form. If not, please calculate your stipend amounts using the number of weeks you worked as an au pair in the United States the previous calendar year and multiply that by the stipend amount you received. Remember that you begin receiving your stipend one week after your arrival in the U.S.

**An example** – see sample form.

You were here for 31 weeks in 2015 and received a weekly stipend of $195.75* for those 31 weeks. Your total would be 31 x $195.75 = $6,068.25 = $6,068 (always round to the nearest dollar amount). This rate will vary based upon when you arrived in 2015 and what program you were participating in when you earned the stipend – Au Pair, EduCare, Extraordinaire. You would then subtract the personal exemption amount for 2015, ($4,000) from your total stipend amount and would get a total of $2,068. This is your taxable amount.

Once you determine your taxable income, you should then check the 2015 instruction booklet https://www.irs.gov/pub/irs-pdf/i1040nre.pdf (see link, starting on page 22 to see how much tax you owe based on your taxable amount). For the amount in the sample above, the tax would be $206.

Taxes 2015
Earnings – Au Pair in America

PLAINTIFFS' RESP. APP.0004301

**Step 3: Fill out 1040NR-EZ** form for calendar year 2015

https://www.irs.gov/pub/irs-pdf/f1040nre.pdf

This is a link to instruction booklet:  https://www.irs.gov/pub/irs-pdf/i1040nre.pdf

Below are some helpful tips for filling out the 2015 tax form.

1. Enter the total stipend amount you received in 2015 on line 3, line 7, line 10 and line 12. This would be the number of weeks you were in the U.S. in 2015 multiplied by the amount of weekly stipend received each week, keeping in mind you may not have received a stipend in the week you arrived to the U.S.
2. You should not have any itemized deductions, so the amount entered on line 11 would be '0'.
3. Enter the 2015 exemption amount of $4,000 on line 13.
4. Subtract the exemption amount ($4,000) from your income reported on line 12 and put on line 14. This is your taxable total amount.
5. Look up the taxable income amount in the tax tables which are included in the instructions (starting on page 22) to see the amount you will owe in taxes.  Put this amount on line 15, line 17 and line 25 of form 1040NR-EZ.  This would be the amount that you will pay to the IRS.
6. **Don't forget to sign the form at the bottom – the form is not valid without your signature!**
7. You must fill out the other side of the form (page 2)
8. Put your home country on line A
9. Put your home country on line B
10. Lines C, D, and F should all say 'no'
11. For section E  put 'J-1'
12. In section G, you should start with your arrival date in the U.S. (in 2015) and list any dates that you left the country for any trips (either your own vacation or your host family's vacation).  Then add up all the days that you were in the U.S. during 2015 and enter this number in section H.
13. If you filed a tax return in the previous year, answer 'yes' on line I and put the form number you filed (probably 1040-NR-EZ 2014).

(See sample 1040NR-EZ form)

If you are outside the United States and have tax questions you can call the International Taxpayer Service Center at (1)267.941.1000 (not a toll-free number).  They are helpful and can provide numbers to make a tax payment by phone.

**Filing a tax return and payments**: Whether you are filing your taxes from the U.S. or back in your home country, all tax returns and checks should be mailed to:

> Internal Revenue Service
> P.O. Box 1303
> Charlotte, NC 28201 – 1303
> U.S.A.

Taxes 2015
Earnings – Au Pair in America

PLAINTIFFS' RESP. APP.0004302

**Note: If you make an online payment by credit card or pay by phone, then you must mail your tax return to:**

> Department of the Treasury
> Internal Revenue Service
> Austin, TX 73301-0215
> U.S.A

**DO NOT FORGET TO SIGN YOUR INCOME TAX RETURN**
**MAKE A COPY OF YOUR TAX RETURN AND PAYMENT**

If you are in the United States, taxes can be paid by personal check (please ensure your bank account is open if you have returned home) or via money order in US dollars. Make your check or money order payable to "United States Treasury". Write 2015 Form 1040NR-EZ and your name, address and social security number on your check or money order.

Taxes can also be paid online. To pay your taxes online or for more information go to www.irs.gov/payments. You can pay using either one of the following methods:
- IRS Direct Pay for online transfers from your checking or savings account at a US bank or other financial institution in the United States. There is no extra cost to do this.
- By credit or debit card. Click on "pay by card". To pay using a debit or credit card you have to call one of the service providers listed below. There is a small fee charged for this convenience that varies by provider, type of card and payment amount.
   - Official Payments Corporation (1-888-872-9829) or www.officialpayments.com
   - Link2Gov Corporation (1-888-729-10400 or www.PAY104.com
   - WorldPay (1-844-729-8298) or www.payUSAtax.com

If you have returned to your home country before tax filing is due, you can submit them from home. For assistance with paying taxes from home, you can contact the International Taxpayer Service Center at (1) 267-941-1000. They are helpful and can even assist with making tax payments by phone or online by credit card.

Additional Resources

IRS information for au pairs:

   http://www.irs.gov/Individuals/International-Taxpayers/Au-Pairs

For au pairs submitting a tax return, the following services may be helpful. Please note that Au Pair in America is not recommending and cannot guarantee these services.
- www.HRBlock.com
- www.CompleteTax.com
- http://www.rttax.com or http://www.taxback.com
- https://www.taxact.com

We hope that this information is useful for your tax planning purposes. If you have questions, please consult the resources listed in this information sheet for their specific situations.

Taxes 2015
Earnings – Au Pair in America

PLAINTIFFS' RESP. APP.0004303

- Please note:  While federal income tax is required, you may also be required to pay state income tax depending upon what state you lived in when you received your weekly stipend.  As each state has different regulations, it will be important for you or your host family to check on your state's tax revenue website for specifics.  Some online tax services have a combined service for Federal and State tax filing - https://www.taxact.com – is an example of this.

*IRS (Internal Revenue Service) – Government agency responsible for tax collection and tax law enforcement.

u:\taxes\2015 general tax information sheet .docx

Taxes 2015
Earnings – Au Pair in America

PLAINTIFFS' RESP. APP.0004304

Case 1:14-cv-03074-CMA-KMT   Document 948-46   Filed 03/17/18   USDC Colorado   Page 96
of 309

# Exhibit 389

# Au Pair & Host Family Agreement

Au pair and host parents, please discuss each point of this agreement completely. If there are points that you would like included and do not see on the form, please add them at the end. By doing this, everyone will fully understand what is to be expected.

## I. Au Pair Responsibilities

☐ Looking after, feeding, bathing, and playing with the children.

☐ Being home while the children sleep if a parent is not home.

☐ Being home as necessary while children are absent from school due to illness, weather or holidays.

☐ Driving children to and from school appointments, outings or errands if required by the family.

☐ Assisting with light housework in shared areas of the house.

☐ Preparing some meals for the children (state which ones) _____

_____

☐ Putting away their belongings (for example, toys, books, etc.)

☐ Making the children's beds each day.

☐ Doing some of the children's laundry (state when) _____

☐ Straightening the children's rooms (state to what extent) _____

_____

☐ Cleaning up after children's meals and snacks.

☐ Keeping her/his own room tidy and her/his own laundry done.

## Important!

☐ The au pair's responsibilities do not include heavy housework, gardening, lawn mowing, caring for pets, the elderly or handicapped adults.

☐ The au pair's responsibilities do not include running an entire household when parents are absent regularly for business or personal travel.

☐ As long as we have a child under the age of three months, a parent or other responsible adult will be in the home when the au pair is expected to provide childcare.

Please give a copy of this to your field staff representative.

**EXHIBIT**
**APC**
**MCNAMARA 20**
5/4/17    HB

PLAINTIFFS' RESP. APP.0004306
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY    APC 001268

## II. Au Pair's Weekly Schedule (subject to change)

|  Mon. | Tue. | Wed. | Thurs. | Fri. | Sat. | Sun. |

_____

_____

_____

Curfew: Sun.-Thurs. _____ Fri. & Sat. _____

### Important!

☐ The au pair has at least one full day and one half day off per week.

☐ Hours will not exceed 45 hours/week over 5 1/2 days or 10 hours/day.

☐ The au pair has one complete weekend (Fri. PM to Mon. AM) off per month.

☐ The au pair is entitled to two weeks of paid vacation during her/his stay with the host family.

☐ Vacation time and long weekends will be scheduled at a time convenient to au pair and host family.

☐ The au pair will be given time to attend classes for at least six semester hours at an accredited post-secondary educational institution.

## III. Financial Issues

☐ The au pair will receive the government-mandated pocket money each week. The money will be given to the au pair on _____ (day of the week). The au pair will be paid ☐ in cash ☐ by check.

☐ The host family will pay up to $500 per year in school tuition and fees. If the au pair cannot use the family car, the family will pay for transportation to and from classes.

☐ The au pair will be responsible for no more than $250 for car damage caused while he/she drives the family's car(s).

☐ The host family will pay for all gas/oil/routine maintenance on the car(s) used by the au pair for transporting the children or running family errands. The au pair will pay for all gas costs incurred when he/she drives the family car(s) for personal use.

☐ The au pair should plan to purchase his/her own personal toiletries and unique food items.

☐ The au pair will receive the regular weekly stipend even if he/she is unable to work on any given day due to illness.

PLAINTIFFS' RESP. APP.0004307
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY    APC 001269

## IV. Transportation

☐ The au pair will drive the following car(s) when transporting the child(ren) or running errands for the host family:

Make & Model _____   Lic. Plate # _____

Ins. Co. _____   Phone_____

☐ The au pair will drive the following car(s) for his/her personal use:

Make & Model _____   Lic. Plate # _____

Ins. Co. _____   Phone_____

☐ The au pair is covered by host family's automobile insurance policy, and we have at least $10,000 medical coverage on the policy.

☐ The following restrictions apply when the au pair is driving the family car for personal use (e.g., mileage limits, distance limits, time limits) _____

_____

☐ Host parents have instructed au pair on proper use of children's car seat & seat belts.

☐ Host parents have instructed au pair on emergency procedures in case of break-downs, accidents or any other car emergency.

☐ We have attached the *Car Insurance Contract* and *Contract for Drivers.*

## V. Health and Emergency Issues

☐ Emergency phone numbers have been posted (where?): _____

_____

☐ The medical consent form has been signed and photocopies of health insurance cards attached.

☐ The host parents have explained to the au pair our emergency escape plan in the event of a fire or other disaster.

☐ Children's doctor _____   Tel _____

Address _____

Directions_____

_____

☐ Hospital of preference _____   Tel _____

Directions_____

_____

PLAINTIFFS' RESP. APP.0004308

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY   APC 001270

☐ The host family has shown the au pair the location of first aid supplies.

☐ The host family has shown the au pair where we keep emergency supplies (e.g., flashlights, candles).

☐ The host family has shown the au pair the location of smoke detectors and fire extinguishers and how they work.

☐ The host family has explained the procedures to follow if the au pair is locked out of the house or car.

☐ The host family has explained the procedure to release locked bedroom/bathroom doors.

☐ The host family has explained all security/alarm systems in our home and all unique electrical features (e.g., dimmers, intercoms).

☐ The host family has shown the au pair all emergency switches (e.g., fuel oil, fuse box, water valves).

☐ The host family has shown the au pair all dangerous/off-limits areas in house/yard (e.g., poisonous shrubs, cellar doors, garage tools, cleaning products).

☐ The au pair agrees to notify host parent at work of any/all injuries/illnesses suffered by a child within (time): _____ .

☐ The au pair is allowed to take child's temperature. The method preferred by host parents is: - _____ .

## VI. Childcare Issues

☐ The host family has clearly explained to the au pair which forms of discipline are **allowed**.

☐ The host family has explained what the au pair should do if a child misbehaves and does not respond to the allowed forms of discipline.

☐ The host family has completed and reviewed the *Childcare Guidelines* with the au pair.

☐ The au pair has notified host family of any personal health concerns and/or medication usage.

☐ The au pair has been informed of children's special health and physical needs.

☐ When the au pair is too ill to provide childcare on a given day, we have made the following back-up plan: _____

PLAINTIFFS' RESP. APP.0004309
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY   APC 001271

## VII. House Rules & Schedules

☐ The au pair (and her/his guests) ☐may / ☐may NOT smoke in the house.

☐ The au pair (and her/his guests) ☐may / ☐may NOT drink alcohol in the house.

☐ The au pair's private room is equipped with:

☐television        ☐cable service                    ☐radio

☐stereo/CD player ☐computer                    ☐air conditioner

☐phone extension ☐private phone_____

☐ The au pair is responsible for the proper use of and any additional costs involved with the above (e.g., 900 phone calls, Internet charges, Pay-Per-View movies).

☐ The host parents would like the au pair to use the following phone greeting when they are not at home:_____

☐ The au pair may schedule his/her:

. ☐ Personal laundry? _____

. ☐ Personal phone calls? _____

. ☐ Visitors during work time? _____

. ☐ Visitors after work time?_____

☐ We have discussed the following regarding the au pair's private room:

Displaying personal items on walls: _____

Rearranging furniture: _____

Lock on au pair's door: _____

Bathroom assigned: _____

Overnight visitors: _____

Visitors: _____

☐ The au pair's room is private; host parents and children will not intrude unless invited or in the event of an emergency.

☐ The host parents have explained which special foods/beverages are off-limits to au pair, visitors and/or children.

☐ The host parents have explained any special religious or dietary customs/rules that the host family follows.

☐ The following maintenance/delivery people can be expected on:

Cleaning service_____

Yard maintenance _____

Others

PLAINTIFFS' RESP. APP.0004310
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY    APC 001272

# VIII. Additional Comments and Issues

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

☐   We have discussed and understand all aspects of this agreement.

☐   We will review this agreement in 30 days (or whenever necessary) and will make adjustments if necessary.

_____
Au Pair Name

_____
Au Pair Signature

_____
Date

_____
Host Mother Name

_____
Host Mother Signature

_____
Date

_____
Host Father Name

_____
Host Father Signature

_____
Date

PLAINTIFFS' RESP. APP.0004311
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY    APC 001273

# Car Insurance Contract

In the event that our au pair is involved in a car accident, we agree to the following:

☐ Amount of deductible au pair must pay if the accident happens while on duty is $_____ (no more than $250).

☐ Amount of deductible au pair must pay if the accident happens while off duty is $_____ (no more than $250).

☐ Our au pair will not be held responsible for more than the deductible agreed upon above.

☐ As outlined in the AuPairCare Host Family Agreement we have placed our au pair on our car insurance policy, and have the required $10,000 minimum medical coverage required to be eligible for the secondary medical coverage provided by AuPairCare.

_____
Host Family Signature

_____
Date

_____
Au Pair Signature

_____
Date

**Please give a copy of this to your field staff representative.**

PLAINTIFFS' RESP. APP.0004312
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY   APC 001274

# Childcare Guidelines

**Meals** (times when eaten, preferred foods, routines) _____

_____

_____

**Snacks** (were, when, what, what not) _____

_____

_____

**Nap, Bed & Quiet Time** (times of day, routines) _____

_____

_____

**Methods of Discipline** _____

_____

_____

**Chores** (things children are expected to do themselves, when) _____

_____

_____

**Playtime** (outdoors, alone or not, inside activities, toys) _____

_____

_____

**"Playdates" & Having Friends Over** (whose home, when, special instructions) _____

_____

_____

**TV Watching** (times, programs allowed) _____

_____

_____

**Always Off Limits** _____

_____

PLAINTIFFS' RESP. APP.0004313
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY    APC 001275

# Consent for Emergency Medical Care

**Complete this form and attach photocopies of health insurance cards and prescription plan cards. Be sure to update the form regularly.**

**Not all medical facilities will accept this form; some hospitals/doctors require that their own release be completed. If a parent or legal guardian cannot be contacted personally, some hospitals will not treat a minor, even with a consent form, unless the problem is considered life-threatening. Check the policy where your child(ren) would be treated.**

I, _____ (Mother/Father/Legal guardian)

hereby give my consent to _____ (Au Pair)

who will be caring for my child(ren):

| **Name** | **M/F** | **DOB** | **SS#** | **Allergies/Medication** |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

for the period of _____ to _____ to arrange for emergency medical / surgical / dental care and treatment (including diagnostic procedures) necessary to preserve the health of my child(ren). I acknowledge that I am responsible for all charges in connection with any care and treatment rendered.

Print name _____ SS# _____

Address _____

Home phone _____ Work Phone _____

Emergency contact _____ (Name/Relationship/Phone)

**Medical contacts: (Name/Phone)**

Pediatrician _____     Dentist _____
Pharmacy _____     Other _____

## Insurance:

Insurer's Name _____     Phone _____

Address _____     Group No _____

_____     Agreement No _____

_____
Mother/Father/Legal Guardian Signature

_____
Date

PLAINTIFFS' RESP. APP.0004314
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY     APC 001276

# Contract for Drivers

**This was originally written for American teenagers but is relevant to au pairs. You may want to revise it to make it more applicable to your circumstances.**

It is understood and agreed that having a driver's license and driving a motor vehicle are privileges. Any privilege has to be earned, and it must be earned on a continuing basis. This means that driving privileges may be revoked due to an infraction of the following rules:

☐ Breaking the driving laws or abusing a motor vehicle can result in the loss of driving privileges, even if we learn about it from a source other than the police.

☐ No one else should be allowed to drive a vehicle entrusted to you. This means you may not lend your vehicle to friends

☐ If you are ever in a condition that might render you less that 100% competent behind the wheel of a car, phone us. We will come get you. This will NOT result in the loss of driving privileges.

☐ You are never to be a passenger in a car in which the driver should not be driving. A call to come get you will NOT result in the loss of driving privileges. If you cannot reach us, hire a taxi.

Additional Comments: _____

_____

_____

_____
Host Family Signature

_____
Date

_____
Au Pair Signature

_____
Date

**Please give a copy of this to your field staff representative.**

PLAINTIFFS' RESP. APP.0004315
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY    APC 001277

# Emergency Telephone List

Address & Tel. _____          Directions to house _____

_____          _____

_____          _____

## Emergency contacts:

Police _____          Poison center _____

Fire _____          Other _____

## Medical contacts: (Name/Phone)

Pediatrician_____          Dentist _____

Hospital _____          Veterinarian _____

Pharmacy _____          Other _____

## Personal contacts:

Mother's work # _____          Mother's cell # _____

Father's work #_____          Father's cell # _____

Neighbor's name _____          Neighbor's # _____

Relative's name _____          Relative's # _____

Field staff name _____          Field staff # _____

## Schools:          School/Grade/Teacher          Main #          Nurse's #

Child/DOB _____

Child/DOB _____

Child/DOB _____

School Closings/Weather Emergencies (Phone #/Radio Station) _____

## Home Maintenance:

Plumber _____          Electrician _____

Garage/Towing_____          Heating _____

Gas/Fuel Co:_____          Phone repair _____

## Au Pair Emergency Contact:

Au Pair Family Name_____          Au Pair Family # _____

PLAINTIFFS' RESP. APP.0004316
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY   APC 001278



# List of Approved Educational Institutions

**Area Director Name** <u>Janell Fielding</u>          **Region** <u>Eastern Seaboard</u>     **Last Updated** <u>12/1/2012</u>

The Department of State requires that au pairs complete coursework at an <u>accredited</u> <u>post-secondary</u> educational institution as part of the au pair experience. You should select courses to meet your academic credit requirements from the schools listed here. Courses from other institutions <u>may not count</u> towards your educational requirement. Please contact your Area Director for approval before enrolling in a course at a school that is not listed here. Courses must be academic in nature.

| Institution Name | Address | Website | Comments |
|---|---|---|---|
| Northern Virginia Community College  (Nvcc) (All Campuses) | Varies According To Campus | www.nvcc.edu | Many au pairs attend the Alexandria and Annnandale campuses. |
| Marymount College | 2807 N. Glebe Road Arlington, Va  22207 703-522-5600 | www.marymount.edu | Smaller school.  Offers both undergrad & grad programs. |
| American University | Upper Nw Washington, Dc | www.american.edu | Large University. Expensive. |
| George Mason University | Fairfax, Va | www.gmu.edu | Good school in local area.  Expensive. |
| Strayer University | 2121 15th Street North Arlington, VA  22201 | www.strayer.edu | Offers numerous evening classes. |
| George Washington Univ. | 2121 I Street Nw Washington, Dc  20037 | www.gwu.edu | Large University in downtown DC. Expensive. |
| Georgetown University | 37th & O Street NW Washington, DC  20057 | www.georgetown.edu | Large, prestigious University in DC. Very expensive. |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY          APC 001279

PLAINTIFFS' RESP. APP.0004317

| Institution Name | Address | Website | Comments |
|---|---|---|---|
| Lado International School | Campuses In Arlington, VA And Washington, DC | www.lado.com | English language school both for those trying to learn English and for those seeking TEFL teaching certificate.  Affordable. |
| Sojourner Douglass College | Baltimore, Maryland | www.aupairweekend.org | For Au Pair Specific Weekend Courses, call Angela Garnett, Program Coordinator at 301-213-2404.  Affordable. |
| Inlingua | 1901 N. Moore Street, Ste LI01, Arlington, Va  22209 | www.inlingua.com | English language school both for those trying to learn English and for those seeking TEFL teaching certificate.  Affordable. |
| University Of Richmond | Richmond, Va | www.richmond.edu | Has Au Pair specific weekend courses.  Affordable. |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

APC 001280

# AuPairCare

Au Pair ID: _____

# My Coursework Completion

To move to next field use the "tab" not the "enter" key

**My Name** Last _____ First _____ Host Family Name _____ Program End Date _____

## My Deadline is _____

You should submit this form to your Area Director at least **45 days** prior to your program end date. If you have any questions, please contact your Area Director **PRIOR** to registering for any class(es). Pay close attention to your deadline as late or incomplete forms may make you ineligible to apply for the Extension Program. Please remember that if you do not submit proof that you completed your coursework, you will not receive a program completion certificate. This form cannot be submitted after your program end date.

## My Contact Information:

U.S. mailing address: Street _____ City _____ State _____ Zip _____ Last date at this address: _____

Overseas mailing address: Street _____ City _____ Country _____ Postal Code _____

## My Educational Requirement:

- [ ] 6 credits or 60 credit hours (first year, 9 or 12 month extension)
- [ ] 3 credits or 30 credit hours (6 month extension)

***Did you complete all of the required hours?***

## Certifications

- *I certify that the information on this form is correct.* Au Pair Signature (required): _____ Date _____

- *I have verified that this au pair has completed the required credits at an **accredited post-secondary institution**.*

  Area Director Signature _____ Name (print) _____ Date _____

Coursework Completion Pg. 1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY          APC 001281

# AuPairCare

Au Pair ID: _____

Au Pair Name _____ Area Director Name _____

## My Completed Coursework

Fill out one row for each course you complete. As you complete each class, you must ask your instructor or a school administrator to fill out and sign this Coursework Completion form. If your instructor/school administrator is unavailable, a registrar can sign instead. You must use this form and it cannot be replaced by other paperwork from the school; however, you may submit school paperwork along with this form. Please keep a copy of all Coursework Completion paperwork for your records.

| Educational Institution Name, City, State Phone | Course Title | Start & End Dates | Number of weeks | Class hours per week | Student has completed... | | Signature of instructor OR school administrator | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | Hours in class =number of weeks * hours per week | Academic Credits as listed in course description | Signature | Print Name | Date |
| | | ___ to ___ | | | | | | | |
| | | ___ to ___ | | | | | | | |
| | | ___ to ___ | | | | | | | |
| | | ___ to ___ | | | | | | | |
| | | | | | Total hours = ___ | Total credits = ___ | | | |

Coursework Completion Pg. 2

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY          APC 001282

**AuPairCare**
**LIVE-IN CHILDCARE** ———————————————— *Connecting People and Cultures*

Dear Au Pair Program Participant,

This letter is to provide you additional information on the United States Department of State (DOS) required J1 visa au pair program educational component. All au pairs are required by the Department of State and as term of program completion to enroll in six credit hours of educational courses during your 12 month program.

Please review the questions and answers below.

<u>What is the Department of State Educational Requirement?</u>

Educational requirement and understanding the American Post Secondary Educational System. The Department of State "requires that each Au Pair participant register and attend classes offered by an accredited U.S. post secondary institution for not less than 6 semester hours of academic credit, or the equivalent" during her/his year in America.

<u>What is an accredited institution?</u>

An accredited institution is one that has been granted accreditation by a regional or national accrediting commission of schools and colleges. Both public and private institutions need accreditation to survive. Public Institutions receive the majority of their funding from the local County and/or State taxes and from student tuition and fees. States can require a student to be a resident of the state to receive the "in state" tuition. If a student is not a resident, the tuition rates can vary greatly. Private Institutions, most private institutions are more expensive for the student than most public institutions as they do not receive much money from taxes.

<u>What is meant by postsecondary?</u>

Postsecondary means an institution that offers at least a one year program of college level studies. Post secondary literally means "after secondary". In America, secondary school ends after grade 12, (grades 9-12 is often referred to as high school). The traditional student will graduate high school around the age of 18. At this point or later, a person may apply for admission to one or several post secondary institutions in America.

Most Au Pairs will attend a two year community, technical, or junior college or a four year college or university. The Two Year College may offer a broad range of courses in the arts and social sciences as well as technology. Many of them offer Certificate programs, (generally a one year program) Associate Degree programs, (generally a two year program) or credits that may transfer to a 4 year postsecondary institution (college or university).

<u>What is meant by an "academic credit?"</u>

Academic credit generally, a class which meets for 3 hours a week for approximately 10 weeks would be the equivalent of a 3 credit course.

Equivalent has been interpreted to mean the trimester or quarter hour system which is used by some colleges and universities. Note: Auditing of classes is possible in some areas. (Auditing allows students to attend a class with limited participation and with no grade given) If auditing is available to the Au Pair, the cost may be less. The individual institution decides if it will allow auditing. Noncredit courses are offered at some accredited schools. They are acceptable towards the requirement if they are considered to be equivalent to a credit course. Please note that distant learning courses (i.e. online courses), volunteer work, or study travel courses will not meet the Department of State Educational Requirement.

<u>How can I locate a postsecondary accredited institution in the area that I live in?</u>

Your local field staff representative will provide you information on the local institutions that meet the Department of State's standards. In addition, below is a website which will help you locate a postsecondary accredited institution in you area.

http://ope.ed.gov/accreditation/index.aspx

Please contact your local field staff representative if you have additional questions.

Sincerely,

AuPairCare

**Intrax** | **AuPairCare** | **AYUSA**

World Headquarters 600 California Street Fl 10, San Francisco, CA 94108 | Phone: 415.434.8788 Fax:415.434.5415 www.aupaircare.com

PLAINTIFFS' RESP. APP.0004321
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY    APC 001283

# AuPairCare


Newsletter





There are 2 Au Pair Meetings in February (Snow Tubing in Mercersburg, PA, and Indoor Rock Climbing in
Alexandria, VA). Au pairs have the choice which event they want to make optional, or if they choose, they
are welcome to attend both!



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY   APC 001284

Case 1:14-cv-03074-CMA-KMT   Document 943-5   Filed 05/17/18   USDC Colorado   Page 114 of 309

**AuPairCare**                    ## Upcoming Au Pair Meetings 2014

| EVENT | DATE | TIME | ADDRESS | COST |
|---|---|---|---|---|
| **Snow Tubing**<br>Northern Virginia Regional AuPairCare Event | Saturday, February 8th | 3:00 p.m. | Whitetail Resort<br>13805 Blairs Valley Road<br>Mercersburg, PA  17236<br>717-328-9400<br>(Meet at the snow tubing cabin to purchase tickets) | $25.00 for 1 hour, or $28.00 for 2 hours |
| **Iceskating**<br>Au Pair Event | Thursday, March 13th | 7:00 p.m. | Kettler Capitals Iceplex<br>627 North Glebe Road<br>Arlington, VA  22203<br>571-224-0555 | $8.00 per person plus your cost for snacks |
| **Munch and Mingle**<br>Au Pair Event | Wednesday, April 9th | 7:30 p.m. | Noodles and Company<br>5900 Kingstowne Blvd.<br>Alexandria, VA  22315 | Your cost for dinner or a snack |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY          APC 001285

| | | | 703-971-0179 | |
|---|---|---|---|---|
| | | | | |
| **Country Line Dancing**<br>Au Pair Group event with Fairfax and Washington, D.C. Clusters<br><br> | Saturday, May 17th | 7:00 p.m. | Nick's<br>642 South Pickett Street<br>Alexandria, VA 22304<br>703-751-8900<br><br> | Entrance is free, and dance lesson is $5.00<br><br>You will also want to bring money if you'd like to buy dinner or a snack |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY            APC 001286

PLAINTIFFS' RESP. APP.0004324

Case No. 1:14-cv-03074-CMA-KMT Document 859-23 filed 03/30/18 USDC Colorado pg 117 of 310

# Exhibit 390

PLAINTIFFS' RESP. APP.0004325



Au Pair relevance number

**ZAF 10942**

## Agreement

*Cultural Care (registered business name of International Care, Ltd.), with registration number CH-1003.023.491-6, having its registered address at Haldenstrasse 4, 6006 Lucerne, Switzerland, together with its successors and assignees ("CC"), and the undersigned au pair.*

**Beaudette Elizabeth Deetlefs**

*(Please print full name)*

*with date of birth:* **16/5/91** *(Hereafter referred to as "I", "me" or "my"), for good and valuable consideration, understand and agree to the following terms and conditions (the "Agreement") relating to the au pair's participation in Cultural Care Au Pair au pair program (the "Program")*

1. In addition to the terms of this Agreement, I agree to abide by additional reasonable terms and conditions stipulated by CC during the Program, including the Extension program. If there is any confusion between this Agreement and the terms of any other contracts, agreements, or materials of any kind, the terms of this Agreement shall prevail.

2. I acknowledge that any materials I submit to Cultural Care will be used to make a suitable host family match for me and therefore agree that any submitted materials may be disclosed to prospective host families during the selection process, including my submitted medical forms.

3. I agree to comply with the Program regulations issued by the United States Department of State (22 CFR Part 62) ("Regulations"). I acknowledge receipt of a copy of the Regulations as they apply to me. I also understand that I must comply with CC's rules as outlined in this Agreement, the Au Pair Handbooks and other materials that CC has supplied to me. This includes staying within the legal number of working hours per day and week without exception. This also includes participation in all child safety and child development training and orientation sessions sponsored by CC. I will inform my Local Childcare Coordinator or CC if I encounter anything that does not comply with the Program regulations as outlined by the U.S. Department of State Regulations.

4. I agree to perform the child care responsibilities as outlined by CC and my host family to the best of my ability. I understand that providing childcare is my primary obligation in this Program and that any personal plans or activities will take secondary priority to caring for my host children. Should I be found to act in a way that puts my host children at risk or is inappropriate in any way, I understand that I will be removed from the Program immediately. I understand that my host family may ask me to respect a curfew and/or assign other reasonable restrictions designed to protect the safety and well-being of my host children. I agree to abide by such reasonable restrictions. I also understand that I may not post photos or personal information about my host family, host children, or host home on any web site, blog or the like without the express written consent of my host parents.

5. During my participation in the Program I will abide by all local, state and federal laws and other regulations. I understand that breaking these laws (such as shoplifting, driving under the influence of alcohol, drinking alcohol under the age of 21, possession, or use of illegal substances, etc.) shall be grounds for my immediate dismissal from the program and my return flight will be forfeited.

6. I understand that I may not use the family's automobile(s) for any reason without express permission from the host family and that any agreement to use the host family's automobile is strictly between the host family and me. I will not use the automobile unless the host family has obtained all of the mandatory automobile insurance coverage required under the laws of the state where the host family resides. I understand that if I have a car accident while using the car for personal use not related to my child care duties that I will be required to pay a deductible up to $500 US.

7. I agree to pay any personal expenses I incur while participating in the Program, including but not limited to, health expenses not covered by insurance, phone bills and/or car damages. CC is not responsible for any financial disputes I have with my host family such as outstanding money for educational component, weekly stipend, etc. I understand that I must settle all disputes directly with my host family prior to my departure from their home.

8. I understand that my Local Childcare Coordinator and the Cultural Care staff in the U.S. are my primary contacts during the Program, and are responsible for ensuring a positive and successful program year for me and my host family. I will notify the staff of CC in the U.S. in case of disagreement, misunderstanding or serious problems including but not limited to my health, safety, welfare, adjustment to my host family, school, culture or language, or misunderstandings or problems with my host family. I acknowledge that CC is solely responsible for choosing appropriate host families for me and I will not make attempts to obtain placements on my own after my arrival in the U.S. In situations where I am having problems with my host family, I agree to consult with and meet with my Local Childcare Coordinator and to follow CC's mediation guidelines as outlined in the Au Pair Handbook. I understand that it is CC's policy to try to resolve issues in the existing placement if possible before considering a new placement.

9. If CC determines that my placement within the host family will not continue, CC shall determine whether or not to pursue a new host family match for me. I understand that CC may not pursue a new host family for me due to safety concerns, a lack of positive recommendations or for other reasons relating to my suitability on the Program. I understand that CC has sole discretion to pursue a new placement or not. Should CC decide to pursue a new placement, I understand that CC will use reasonable efforts for two weeks to find another host family for me. During such time, I shall continue to live with my current host family who, in its discretion, may request me to provide, or not to provide, any childcare services and I shall remain reachable by phone/email with CC at all times. If I do not perform childcare duties during the transition period (even if I am staying with a host family) I understand that I will not receive the weekly stipend. CC will make every effort to match me with appropriate host families. Should I reject these host families for reasons of geographical region, car/computer use or other non-essential reasons I understand that CC may opt to discontinue a search for replacement. I understand that CC cannot guarantee a new family placement for me within the two-week transition period and inability to be replaced will result in my early return to my home country. Notwithstanding the above, I further understand that the first month of any placement is a period of adjustment and therefore CC will not process any non-emergency transitions during this period.

10. I understand that CC has the exclusive right to determine my suitability for acceptance and for my continued participation in the Program. I understand that if CC determines that my emotional or physical state does not make me suitable for providing quality childcare, I will be removed from the Program. I also

Au Pair's signature for this page:

Date: **14/5/14**

Version SY13. Last updated August 2012

**Ex. 63**

DEETLEFS000467

PLAINTIFFS' RESP. APP.0004326

understand that should I marry or become pregnant while on the Program I will also be removed from the Program. If my performance as an au pair and/or participation in the program is deemed unsatisfactory by CC for whatever reason, CC will reassess my suitability for future placement. I understand that I may be terminated from the Program if I do not successfully complete the Program requirements and uphold Program expectations for reasons including, but not limited to, the following: leaving the host family without prior consent from CC; engaging in behavior that CC deems inappropriate during the Program duration, performance reasons including but not limited to breaking host family rules, neglectful or inappropriate behavior towards the children, etc.; non-participation in training, not fulfilling educational credit, non-attendance at monthly meetings, or if I in any way violate this Agreement. I further understand that should it be discovered that I have falsified or withheld critical information from my application materials including, but not limited to, health conditions, criminal history, educational documentation, childcare experience, etc. I may be terminated from the Program. Should I be terminated from the Program because of my actions including, but not limited to, those outlined above, I forfeit my return to my home country and must pay for this flight on my own.

11. I understand that the Program is designated as a full year program with the possibility to extend for a further six (6), nine (9) or twelve (12) months. I confirm receiving information about the optional Extended Insurance coverage, including a copy of the general conditions booklet. If I extend after my first program year, I will be contacted regarding the activation of Extended Insurance coverage for my extension term under a new policy. Should I voluntarily decide to return home before the regular end date of my program (extension period) I understand that my flight will not be paid for by CC. The exception to this will be in cases of my own extreme illness or the extreme illness or a death in my immediate family. Should I terminate or be terminated from the Program for any reason as outlined in this agreement, such termination will result in the following:

a) I will forfeit the return ticket and I will be required to make my own arrangements to return to my home country at my own expense; and b) My CC insurance coverage will no longer be valid and no part of it refunded other than the additional month optional insurance; and c) My status will be reported to U.S. Immigration and my participation in the au pair program will be canceled. d) CC will not provide me with housing in the USA.

12. CC will arrange my flights from and to my home country, from a CC approved gateway. I am responsible for my own transportation and the cost involved to the specified departure gateway in my home country. My departure date to the US (Group Arrival Date), will be determined by my availability and my host family's request. Should I cancel either of the included flights once the ticket has been issued, I understand that I will then be held responsible for any penalties and costs relating to this cancellation. CC will determine my return date based on the end date of my program and my host family gateway will be my return gateway. Special requests may be considered, however additional fees may apply and these costs will be my responsibility. I agree to provide proof of medical insurance coverage, either purchased as additional month optional insurance through CC or as a comparable policy from a third party, in order for CC to book my return flight for a date later than the completion of my Program. I understand that CC cannot book my return flight for a date later than thirty (30) days after completion of my Program. I understand that CC will not arrange for my return flight in case that I do not successfully complete the Program (including completion of required educational component). In this case I will be responsible for my own flight home.

13. This agreement is made between me and CC. In regards to confidentiality, CC agrees not to divulge medical or confidential information (with the exception of my submitted medical forms, and any accompanying documents) about me or my Program experience to any third party except in case of medical emergency, or in the event I am incapacitated for any reason. As a person of the age of majority I understand that this also includes my parents or family members as well as any partner or friends. Any disputes will be settled between me and CC or any legal entity bound to represent us and no other third party.

14. I agree to irrevocably, unconditionally, and fully remise, release and forever discharge CC and its affiliates; and said persons' respective officers, directors, successors, assigns, attorneys, insurance companies, agents, employees and affiliates, or others to the extent acting or purporting to act on the afore mentioned persons' behalf (all of said persons hereinafter, in the aggregate, being referred to as "Released Parties"), from any and all claims or causes of action which I have or may hereafter have, which arise out of illness, injury, damage or loss of any other kind to me or my property resulting from or during participation in the Program. This includes, without limitation, my performance of services for and involvement with the host family, regardless of how such illness, injury, damage or loss may arise. I further agree to indemnify and hold harmless the Released Parties from and against any losses, claims, damages or liabilities related to or arising out of my participation in the Program, including (without limitation) any illness, injury or damage to me, that my host family causes, that any third party causes, that I cause or to which I contribute, and any illness, injury or damage to my host family which I cause or to which I contribute.

15. This Agreement shall take effect as a sealed instrument under and shall be governed by the laws of Switzerland. In the event of any claim, dispute, or proceeding arising out of the relationship of me and CC, or any claim which in contract, tort, or otherwise at law or in equity arises between the parties, whether or not related to this Agreement, the parties submit and consent to the exclusive jurisdiction and venue of the arbitrational tribunals of Switzerland.

16. My signature on this agreement indicates acceptance of this Agreement and is legally binding. No alterations to the terms of this agreement will be valid unless approved in writing by CC. If any provision of this agreement shall be deemed unenforceable, such paragraph shall be omitted and the remainder of the agreement shall be valid and enforceable to the fullest extent allowed by law.

| _Au pair signature_ | 14/5/14 _Date_ |
| --- | --- |
| Beaudette Elizabeth Deetlefs | |
| _Au pair name printed_ | |

*If au pair will not be of the legal age of majority in his/her home country at the time of anticipated departure to the USA please include below signature of parent or legal guardian.*

| | |
| --- | --- |
| _Legal guardian signature_ | _Date_ |
| | |
| _Legal guardian name printed_ | |

Version SY13, Last updated August 2013

PLAINTIFFS' RESP. APP.0004327

DEETLEFS000468

Case No. 1:14-cv-03074-CMA-KMT Document 959-23 filed 03/30/18 USDC Colorado pg
120 of 310

# Exhibit 391

PLAINTIFFS' RESP. APP.0004328

Case 1:14-cv-03074-CMA-KMT   Document 943-05   Filed 05/17/18   USDC Colorado   Page 120 of 309

<u>Demonstrative 1</u>
<u>$195.75 Testimony from 30(b)(6) Representatives</u>

| **Agent Au Pair/Stacey Frank** |
|---|
| **Agent Au Pair Dep. Tr. 33:24-34:1** <br> Q. What did the 195.75 represent? <br> A. That's the stipend from the Department of State that the -- the stipend the au pairs received. |
| **Agent Au Pair Dep. Tr. 148:8-22** <br> Q. Do you know if this is the -- the form agreement was the -- the type of agreement that was -- was it the -- the form that was in effect during program year 2010? <br> A. Yes. <br> Q. And I'd like to bring your attention to paragraph 3, the first sentence in paragraph 3. It says, "Host agrees to pay au pair the weekly stipend determined by the U.S. Department of State, currently 195.75, on a weekly basis and acknowledges that this payment cannot be withheld for any reason, including but not limited to, outstanding phone bills, auto accidents, or lost time due to illness." Did I read that correctly? <br> A. Yes. |

| **Au Pair in America/Ruth Ferry** |
|---|
| **Au Pair in America Dep. Tr. 96:7-13** <br> Q. Okay. And has there ever been a point, to your knowledge, where the organization instructed any community counselors that that stipend could be the appropriate full payment? <br> A. As long as it's not less than that. |
| **Au Pair in America Dep. Tr. 105:11-16** <br> A. You have the 195.75. <br> Q. Now, the 195.75 is an amount that's set by the State Department, correct? <br> A. Yes. And then the EduCare program is 146.81, I think, also set by the State Department. |

PLAINTIFFS' RESP. APP.0004329

| Au Pair in America/Ruth Ferry |
|---|
| **Au Pair in America Dep. Tr. 108:9-24** |
| Q. Did you ever discuss raising the minimum for all of your au pairs in an attempt to recruit more au pairs? <br> A. No. <br> Q. Why not? <br> A. Because it was -- the amount was set by the Department of State. And just like I wouldn't make a decision that I wouldn't interview a prospective family face-to-face in their home, I wouldn't make a decision to do it differently, cheaper, slyer, via Skype, because I would not be adhering to the Department of State regulations. |
| **Au Pair in America Dep. Tr. 109:18-111:14** |
| Q. And if that didn't run afoul, why would raising the minimum for all of your au pairs potentially run afoul of Department of State regulations? <br> MR. MACRI:  Objection to form. <br> A. There's no -- here's another way to put it.  There's no value in raising the -- raising the weekly stipend for an au pair if I have more au pairs anytime than are possibly going to be placed. <br> Q. What do you mean -- <br> A. We're only able to place somewhere between 72 and 80 percent of the au pair applicants that we receive that are cleared to be accepted into the program. So you lose many in the process, but at the end of the day, I want a relatively high placement rate. <br> Q. What do you mean when you say there's no value? <br> A. If the -- if you suggest that we're going to pay the au pair more, then I'm going to have more of a challenge -- more than the state minimum, then I will have more of a challenge to compete against competitors who are -- why would a hosting family go with Au Pair in America when I tell them that the minimum stipend for the au pairs in our program are going to be greater? The -- there's no -- when I also want to have -- ensure that the high volume of applicants that are coming into the program will be pretty secure to have a placement. Otherwise, I'm going to be the known entity on the block. Don't apply to them.  Don't apply to this organization, because they're not able to secure a placement for you. |
| **Au Pair in America Dep. Tr. 116:24-117:13** |
| Q. Okay.  And in terms of the ability to recruit au pairs, it's your testimony that you don't think there would be any value to being able to communicate to au pairs what they could actually expect to be paid? <br> MR. MACRI:  Objection as to form. <br> A. I do communicate to them exactly what they can expect to be paid at a minimum. <br> Q. You communicate the minimum, right? <br> A. That's right. |

2

PLAINTIFFS' RESP. APP.0004330

| Au Pair in America/Ruth Ferry |
| --- |
| **Au Pair in America Dep. Tr. 120:22-121:4** <br> A. I kind of want to ask a question. <br> Q. Please. Ask a question. Anything I can help to clarify. <br> A. What is the value for a hosting family to pay substantially more to the au pair in pocket money? |
| **Au Pair in America Dep. Tr. 122:2-4** <br> [Representative Ruth Ferry] <br> Then the pocket money is to give some extra spending money. It was never intended as a living wage. |
| **Au Pair in America Dep. Tr. 126:16-127:5** <br> Q. I want to unpack all that, but just to go back to my core question, it is conceivable that a family that believed its au pair was providing excellent childcare in a competitive market would be willing to pay a premium for that, correct? <br> A. And -- yes. And I would suggest that those very often come in gifts in kind. <br> Q. But the answer is yes, it is conceivable that they would be willing to pay a premium for that? <br> A. Yes. |
| **Au Pair in America Dep. Tr. 145:24-146:6** <br> A. I think of the weekly stipend or the pocket money. I use those terms sort of interchangeably. They were intended to be part of the compensation package that an au pair would receive while she is in the United States. |
| **Au Pair in America Dep. Tr. 152:17-153:22** <br> A. Okay. <br> Q. Now, the fifth -- I'm sorry. The sixth bullet here says, "Earn $195.75/$250 weekly pocket money"? <br> A. That's correct. It does. <br> Q. And when you were -- this is the same pocket money that you were referring to earlier sort of interchangeably with the stipend? <br> A. That's correct. <br> Q. Nowhere in this document, am I correct, does it indicate that that amount is a minimum, right? <br> A. That's correct. <br> Q. Can we go to the page that ends in 0071? And you see in the third bullet there, it says, "Earn 195.75 weekly pocket money." And then it has in parentheses, "$250 per week for Au Pair Extraordinaire"? <br> A. Correct. <br> Q. That's referring to the expected payment that the au pair will receive, right? <br> MR. MACRI: Objection as to form. <br> A. Yes. <br> Q. And it doesn't indicate here that that's referring to a minimum, right? <br> A. No, it does not. |

3

| Au Pair in America/Ruth Ferry |
|---|
| **Au Pair in America Dep. Tr. 156:5-18**<br>Q. It says, "You will earn slightly less pocket money," correct?<br>A. It does state that, yes.<br>Q. And the reason that your organization is able to say that is because you have an understanding of how much pocket money a person is going to get in EduCare and in the au pair program, right?<br>A. Yes.<br>Q. And that's reflected in the documents, the amount that you expect them to earn, right?<br>A. Yes. |
| **Au Pair in America Dep. Tr. 158:2-6**<br>Q. The second bullet point on that page is, "Only $347 per week. That's per family, not per child," with an exclamation point, correct?<br>A. That's correct. |
| **Au Pair in America Dep. Tr. 180:20-181:6**<br>Q. Thank you. What in this document, on this page, would allow a person to infer that this is a reflection of the minimum and not the complete stipend?<br>A. There is no particular statement.<br>Q. Is there any information at all that would allow that inference, apart from statements?<br>A. No, there is not. |
| **Au Pair in America Dep. Tr. 196:22-197:12**<br>Q. And one of the things that you have identified here in this letter is that effective July 24, 2009, the weekly stipend will increase from 176.85 to 195.75, correct?<br>A. That's correct.<br>Q. Who is this letter directed towards?<br>A. Au pairs.<br>Q. Is there anywhere in this letter that you communicate to the au pairs that the weekly stipend is negotiable?<br>A. Well, I don't know what the -- no. |

4

PLAINTIFFS' RESP. APP.0004332

| Au Pair in America/Ruth Ferry |
|---|
| **Au Pair in America Dep. Tr. 213:15-24**<br>Q. My question, though, is, it is reflected in this document as a fixed price, correct?<br>A. It appears to be a fixed price here.<br>Q. Right. And there's nothing here that indicates that these are just minimums for the weekly stipend, correct?<br>A. That's correct.<br><br>**Au Pair in America Dep. Tr. 214:6-20**<br>Q. And the text beneath this in italics, next to the asterisk, says, "Weekly stipend established by the U.S. government and paid directly to au pair.  All programs also include a 400 match fee," correct?<br>A. Correct.<br>Q. The indication is that the weekly stipend is set by the U.S. government, correct?<br>A. Correct.<br>Q. Now, in fact, the host families have discretion to pay more than this amount, correct?<br>A. Correct. |
| **Au Pair in America Dep. Tr. 233:3-23**<br>Q. Okay.  But many of the program materials are misleading on their face as to whether or not the stipend amount is a fixed fee or a minimum?<br>MR. MACRI: Objection as to form and foundation.<br>A. I don't -- in forms where you're not using the term minimum, which has been missed from some documents, but we have not used the term minimum, nor have we said maximum, nor have we said fixed.<br>Q. Right.  But you do agree with me that where a document says the weekly stipend amount is X, the reasonable implication of that is that it's a fixed fee?<br>MR. MACRI: Objection as to form.<br>A. Okay. Agreed. |

5

PLAINTIFFS' RESP. APP.0004333

| Au Pair in America/Ruth Ferry |
|---|
| **Au Pair in America Dep. Tr. 253:15-254:25** |
| Q. And the fifth bullet point here states in the first sentence, "Although some families may consider increasing their au pair stipend, Au Pair in America discourages this practice," correct? |
| A. Correct. |
| Q. Then there's some discussion about the idea that they can pay a bonus at the end of the year as opposed to paying more than the stipend, correct? |
| A. Correct. |
| Q. Now, this is a document that's reflecting the policy of Au Pair in America? |
| A. That's correct. |
| Q. And the policy, you would agree with me, is to discourage families from paying more than the minimum stipend, right? |
| A. And as I explained to you earlier, the whys. |
| Q. I understand the whys, but I'm just asking, just to be clear, because I think earlier you stated you weren't aware of a policy, but looking at this document, would you agree with me that it is, in fact, the policy of Au Pair in America to actively discourage families from paying more than the minimum? |
| MR. MACRI:  Objection as to form. |
| A. Yes. |


| AuPairCare/Sarah McNamara |
|---|
| **AuPairCare Dep. Tr. 16:17-22** |
| Q. What is AuPairCare's understanding with respect to the Department of State's requirements concerning the stipend? |
| A. AuPairCare's understanding is that the stipend is based on federal minimum wage to be paid to the au pair by the host family on a weekly basis. |
| **AuPairCare Dep Tr. 17:9-15** |
| Q. Now, I note the passive voice in the phrase you just used "is to pay."  Do you have an understanding as to whether the host family is required to pay $195.75 and no more? |
| A. The guidance that we understand from the Department of State is the host family is to pay $195.75. |
| **AuPairCare Dep. Tr. 33:14-16** |
| Q. But 45 hours a week is the equivalent of full-time employment; correct? |
| A. Correct. |

PLAINTIFFS' RESP. APP.0004334

| AuPairCare/Sarah McNamara |
|---|
| **AuPairCare Dep Tr. 35:8-21** |
| Q. Why not? |
| A. Our process is that the host family and au pair, if there is a dispute or if there is a concern, that we always try to mediate and have both parties come together to try and resolve that. And in the case that it can't be resolved, then either/or both parties can re-match. |
| Q. Okay. |
| A. But if we make a determination that one or both parties is not fit for the program because they are not following the rules and regulations of the program, then this sentence applies. |
| Q. Does AuPairCare facilitate the mediation you just referenced? |
| A.  Yes. |
| **AuPairCare Dep. Tr. 36:13-37:6** |
| Q. Isn't it the case that the last sentence of paragraph 16 gives AuPairCare the right to make the final decision if a dispute arises between the au pair and the au pair's host family concerning the au pair's working conditions? |
| MR. QUINN: Object to form. |
| THE WITNESS: Or a designated au pair sponsor. And we need to ensure that both host families and au pairs are following the guidelines set forth in the Department of State regulations. So if one or both parties is not doing that as it relates to au pairs' duties and responsibilities, then, yes, that would be a decision that we would make. |
| BY MR. RODRIGUEZ: |
| Q. And AuPairCare reserves the right itself to make the final decision as to those issues; correct? |
| A.  As it relates to the abiding by the regulations. |
| |
| **AuPairCare Dep. Tr. 42:11-17** |
| Q. So the situation you were just discussing is in fact a dispute concerning host family rules; correct? |
| A. Mm-hmm. |
| Q. And AuPairCare has the right to make the final decision as to that dispute; is that right? |
| A. Yes. |
| **AuPairCare Dep. Tr. 48:23-49:1** |
| Q. Do you agree with me that AuPairCare has a right to terminate the au pair's participation in the program? |
| A. As a last resort, yes. |
| |
| **AuPairCare Dep. Tr. 50:24-51:1** |
| Q. But AuPairCare has the right in its sole discretion to make a decision regarding an au pair's program status or dismissal -- |
| A. Yes. |

7

PLAINTIFFS' RESP. APP.0004335

| **AuPairCare/Sarah McNamara** |
|---|
| **AuPairCare Dep. Tr. 68:12-22**<br>Q. Now moving two bullets down, it says, "All AuPairCare au pairs must attend our rigorous Safety Care program to receive training in important child driving, and household safety measures." Did I get that right?<br>A. Yes.<br>Q. What is the Safety Care program?<br>A. Sure. It's a marketing term that we use for the training and orientation that's mandated by the Department of State for an au pair to be on the au pair program. |
| **AuPairCare Dep. Tr. 100:2-5**<br>BY MR. RODRIGUEZ:<br>Q. Has DoS ever sent APC anything in writing that says any of the marketing materials we reviewed today are okay?<br>A. No, I don't believe so. |
| **AuPairCare Dep. Tr. 104:24-106:2**<br>Q. Under "Program Guidelines," the second paragraph begins, "As an au pair you can trust that your host family has agreed to follow these guidelines." And then the fourth to last bullet says, "Pay a weekly stipend of $195.75." Now, does anything in the language I just read convey that $195.75 is a minimum?<br>A. No.<br>Q. Please turn to internal page 41, Bates ending 536. Actually, let's take a look at internal page 40, Bates ending 535 first. Under "Your Financial Life," it says, "The weekly stipend." It says, "The weekly stipend your host family has agreed to pay you is determined by the United States Department of State." Ms. McNamara, does anything in that sentence suggest that the stipend is a minimum or could vary from $195.75?<br>A. No.<br>Q. The next sentence says, "Your weekly stipend will be $195.75." Did I read that right?<br>A. Yes.<br>Q. Do you think an au pair would interpret that to mean that their stipend could be higher than $195.75?<br>MR. QUINN: Objection; form.<br>THE WITNESS: I think their understanding is that they will be paid $195.75 per week. |

PLAINTIFFS' RESP. APP.0004336

| AuPairCare/Sarah McNamara |
|---|
| **AuPairCare Dep. Tr. 107:3-108:16** |
| Q. You think that someone who's paid a wage based on a 45-hour per workweek should be buying used instead of new items? |
| MR. QUINN:  Object to form. |
| THE WITNESS:  Repeat the question? |
| BY MR. RODRIGUEZ: |
| Q. Do you think someone who is paid a wage based on a 45-hour workweek -- |
| A. Absolutely. |
| Q. Okay. |
| A. Yes. |
| Q. Why? |
| A. Because I buy off of Craigslist and -- |
| Q. Let's go down to the next bullet then. Well, what do you buy off Craigslist? |
| A. I bought my car -- I bought a car off of Craigslist.  Um -- |
| Q. Do you think au pairs are buying cars off Craigslist? |
| A. You just asked me what I buy. So we have bought concert tickets.  Um -- yeah. |
| Q. Let's go down to the next bullet.  It says, "Find the local Dollar Store."  Why would APC be advising au pairs to find the local Dollar Store? |
| A. Because it's a fun shop to get chotskis at a cheap price. |
| Q. But this falls under the words, "With a little effort you can stretch your spending money." |
| A. Yes. |
| Q. Okay.  What is that spending money? |
| A. It's money that they brought in and it's also the stipend that they get paid. |
| Q. Well, so you think it's appropriate that au pairs should shop at The Dollar Store with their stipend? |
| A. This doesn't say you can only shop at The Dollar Store.  It's giving suggestions of fun things that you can buy for just a dollar. |

9

PLAINTIFFS' RESP. APP.0004337

| AuPairCare/Sarah McNamara |
|---|
| **AuPairCare Dep. Tr. 126:2-127:16** |
| MR. RODRIGUEZ:  We've marked Exhibit 26, which is a document beginning at Bates APC 000299. |
| Q. Ms. McNamara, do you recognize Exhibit 26? |
| A. Yes. |
| Q. What is Exhibit 26? |
| A. It's AuPairCare's 2010 host family agreement. |
| Q. Is it fair to say this is the counterpart to the au pair agreements we looked at earlier? |
| A. Yes. |
| Q. All right.  And is this updated on roughly the same timeline, that is once a year? |
| A. Typically, yes. |
| Q. Let's go ahead and turn to internal page 3 at Bates ending 342. |
| A. I have 301. |
| MR. QUINN:  We don't go that far. |
| BY MR. RODRIGUEZ: |
| Q. You know what?  299.  My mistake.  I'm getting far ahead of myself in my binder here. All right.  So this is on -- on page 2, Bates ending 300.  And I'm looking at paragraph 16. The second sentence is, "The Department of State has set the current weekly stipend amount at $195.75 as of July 23, 2009." Did I read that correctly? |
| A. Yes. |
| Q. Okay.  Does anything in that sentence indicate to host families that they can pay an au pair more than $195.75? |
| A. No. |
| Q. Have you ever had an au pair? |
| A. Yes. |
| Q. Was that before or after you became involved with the industry? |
| A. During. |
| Q. Are you aware of anything else in this contract that suggests that host families might pay more than $195.75 in stipend? |
| A. No, to my knowledge. |

10

| Au Pair Foundation/Theresa Nelson |
|---|
| **Au Pair Foundation Dep. Tr. 118:24-119:3** |
| Q. In the second column under "Host Family Program Fees," do you see the words, "Weekly stipend to au pair"? |
| A. Yes, I do. |
| Q. And what follows the words, "Weekly stipend to au pair"? |
| A. "195.75 per week." |
| Q. Does anything on this brochure indicate that 195.75 per week is a minimum amount? |
| A. No, there -- it does not.  There's many -- much information that is not on this brochure. |
| **Au Pair Foundation Dep. Tr. 119:4-21** |
| Q. At the bottom of the second column, staying on the same page, 153, there's a sentence that starts, "Once the visa is issued, international flights are purchased and the au pair completes her training." I have a couple of questions relating to that sentence.  But, first, did I read that sentence accurately? |
| A. Yes, you read it accurately. |
| Q. Who purchases the international flights referred to in that sentence? |
| A. APF Global Exchange, in coordination with families. |
| Q. And then it's -- the last part of the sentence says, "The au pair completes her training." Who provides the training referenced in that sentence? |
| A. Au Pair -- APF Global Exchange. |
| **Au Pair Foundation Dep. Tr. 121:9-12** |
| Q. As part of the au pair program, does APF purchase insurance for au pairs? |
| A. Yes, we do, in accordance with the Department of State regulations. |

PLAINTIFFS' RESP. APP.0004339

| Au Pair International/Steve Lehan |
|---|
| **Au Pair International Dep. Tr. 22:16-23:2** |
| Q. Have you ever raised wage and hour issues proactively with the Department of State? |
| A. No. |
| Q. Why not? |
| A. It's clear what the wage and hour issues are.  I mean, they -- there are no questions.  They tell us what the -- what the stipends are. |
| Q. Can you please articulate to me your understanding of the stipends? |
| A. It's what the Department of State provides us, which is the -- currently the 195.75 minimum stipend. |
| **Au Pair International Dep. Tr. 27:5-14** |
| Q. Is it API's understanding that a host may pay less than that host's state or local minimum wage? |
| MS. REILLY: Objection to form. |
| A. It's API's understanding that the host families are allowed to compensate the au pairs at the amount specified by the Department of State, which is the 195.75. |
| Q. Irrespective of state and local law? |
| A. Correct. |
| **Au Pair International Dep. Tr. 61:6-25** |
| Q. Do you recall, approximately, when the website was updated? |
| A. In 2016, 2015. |
| Q. I believe the last Internet archive that we looked at was from 2014; is that right? |
| A. Yeah. |
| Q. Okay.  Do you recall when this case was filed? |
| A. December of 2014.  Is that right? |
| Q. Does the change from "weekly stipend" to "minimum stipend" have anything at all to do with this case's filing? |
| A. It's possible that there's -- that given that when the case was filed that we talked about, internally about the stipend, and, of course, it's a minimum stipend.  And I think probably -- it's possible from those discussions that when this was typed up, that on the redesign that -- that they wrote "minimum weekly stipend."  But not specifically. |

PLAINTIFFS' RESP. APP.0004340

| Cultural Care/Natalie Jordan |
|---|
| **Cultural Care Dep. Tr. 108:25-109:8**<br>A. "The weekly stipend is determined by the U.S. Department of Labor using a formula based on the federal minimum page."<br>Q. Is that accurate?<br>A. I don't believe so, no.<br>Q. But this was included in your Host Family Handbook that was distributed to host families in 2010?<br>A. That's correct. |
| **Cultural Care Dep. Tr. 123:20-124:24**<br>Q. Okay. Thank you.<br>A. "The weekly stipend you give your au pair is a living stipend of $195.75. The stipend is based on a formula that includes the federal minimum wage and a housing credit." Did you say to read the whole paragraph?<br>Q. No.<br>A. Okay.<br>Q. Is that guidance consistent with the guidance that you give to host families regarding the stipend?<br>A. Yes.<br>Q. And that guidance is, that the stipend is $195.75 on a weekly basis?<br>A. We would take the position it's a minimum stipend, but we do provide that number as it's been issued by the Department of State.<br>Q. Can you read that first sentence again?<br>A. Sure. "The weekly stipend you give your au pair is a living stipend of $195.75."<br>Q. Is there anything about that guidance -- and you can read and reference the entire paragraph -- but is there anything in that paragraph that suggests that the $195.75 is a minimum?<br>A. There is no reference to either a minimum nor a maximum. |
| **Cultural Care Dep. Tr. 141:21-142:4**<br>Q. Does stipend distinguish you from other sponsors?<br>A. Not to my knowledge.<br>Q. Is stipend a distinguishing characteristic for Cultural Care from other sponsors?<br>MR. STONE: Objection; form foundation<br>A. No. |

13

PLAINTIFFS' RESP. APP.0004341

| Cultural Care/Natalie Jordan |
|---|
| **Cultural Care Dep. Tr. 145:19-146:8**<br>A. Yes.<br>Q. Can you read the last entry under "Nannies" out loud?<br>A. Sure. "'Salary negotiations are a hassle.' All au pairs earn with weekly stipend of $195.75."<br>Q. Does that communicate a minimum of $195.75?<br>A. We understand the stipend to be a minimum.<br>Q. Where does it say that?  I'm sorry.<br>A. Well, I'm stating that's our position, that's our understanding.  The sentence itself says "All au pairs can earn" -- sorry.  "All au pairs earn a weekly stipend of $195.75." |
| **Cultural Care Dep. Tr. 160:4-16**<br>Q. The salary negotiations, and then because it is encompassed by the footnote, you can also read the footnote.<br>A. Okay.  "'Salary negotiations are a hassle.' All au pairs earn a weekly stipend of $195.75 which is determined by the U.S. Department of State." And the footnote reads, "The weekly stipend is determined by the U.S. Department of State using a formula based on the federal minimum wage.  Any change in the federal minimum wage will result in increase in the stipend." |

| Cultural Homestay International/Christina Reilly |
|---|
| **Cultural Homestay International Dep. Tr. 21:1-20**<br>Q. So do you communicate anything specifically regarding state-level min – minimum wage to host families?<br>MR. BENDER:  Object to the form.<br>A. No, we do not.<br>Q. Do you communicate anything regarding state-level minimum wage to au pairs?<br>A. Again, we are not required to do so. We -- we abide -- we -- we follow the regulations, and that's what expressed to our -- what is expressed to our participants and host families, so no.<br>Q. So just so the -- I just want to make sure the record's clear.<br>A. Yeah.<br>Q. So you -- you do not tell au pairs about state-level minimum wages; is that correct?<br>MR. BENDER:  Object to the form. Go ahead.<br>A. We do not. |

14

PLAINTIFFS' RESP. APP.0004342

| Cultural Homestay International/Christina Reilly |
|---|
| **Cultural Homestay International Tr. 44:25-45:10**<br>A. "In addition to the program fee, additional costs required by the U.S. Department of State and CHI Au Pair USA include the au pair's<br>domestic airfare to host family city, weekly stipend of 195.75, educational component, tuition of up to $500, automobile insurance coverage, private room and board."<br>Q. Okay. Thank you. So does it say "minimum" anywhere there?<br>A. It does not. |
| **Cultural Homestay International Dep Tr. 77:11-78:4**<br>Q. So this is your way of informing the partner agencies about how to interpret the regulations?<br>A. Yes.<br>Q. Okay. And then next it says, "Au pairs receive," and the first bullet point --<br>A. Uh-huh.<br>Q. -- says, "A direct weekly payment from the host family of $195.75." Is that right?<br>A. Yes.<br>Q. And it also mentions the $500 educational allowance, two weeks paid vacation, one full weekend off per month, private room and full board, medical insurance, paid round international flight and domestic transfer to the host family's community, et cetera.<br>A. Uh-huh. Yes.<br>Q. The word "minimum" is not present on this page; is that right?<br>A. That is correct.<br><br>**Cultural Homestay International Dep. Tr. 79:11-14**<br>A. Yeah.<br>Q. So in this partner agency PowerPoint, there's no indication that it's a minimum; is that right?<br>A. Not in this. |
| **Cultural Homestay International Dep. Tr. 85:9-14**<br>Q. But you don't tell them that they can negotiate for a higher wage; is that right?<br>MR. BENDER: Object to the form.<br>A. We do not specifically state that they can negotiate. They certainly are allowed to do that. |

PLAINTIFFS' RESP. APP.0004343

| EurAuPair/Celia Parker |
|---|
| **EurAuPair Dep. Tr. 100:2-3** |
| Q. And do the host families pay the au pairs any amount? |
| A. Host families provide pocket money to au pairs, yes, according to federal regulation. |
| **EurAuPair Dep. Tr. 103:20-104:2** |
| Q. And if you look to page 2 of the website printout, do you see a section that says, "What it's like to be a EurAuPair au pair in the USA"? |
| A. Yes. |
| Q. And could you read the third bullet into the record, please. |
| A. "Receive 195.75 U.S. dollars weekly pocket money." |
| **EurAuPair Dep. Tr. 118:2-15** |
| Q. What is it? |
| A. It is the au pair recruiter mini manual. |
| Q. For which year? |
| A. Seem -- appears to be 2012. |
| Q. And I'd like to direct your attention to page 1168 under "Families must," fifth bullet from the bottom. Could you read that into the record, please? |
| A. (Reading.) "Provide the au pair with $195.75 pocket money per week for the regular program and $250 per week for the par experience program.  This is per family, not per child. Four children maximum. |
| **EurAuPair Dep. Tr. 164:18-165:2** |
| Q. Then turning over to the next page, page 5, ending in Bates stamp 1742, five bullets up from the bottom of that list, it starts with "Provide." Could you read that sentence into the record, please. |
| A. (Reading.) "Provide the au pair with $195.75 weekly pocket money," parenthetically speaking, "($250 for au pair par experience program participants.)" |
| **EurAuPair Dep. Tr. 180:2-10** |
| Q. Do you have any understanding, sitting here today, why it says it is not a stipend? |
| A. I believe what was intended to be conveyed was the relationship between an au pair and her host family is more of a family relationship.  And the pocket money was always likened to being -- like an allowance that you would provide to a member of your family or a walking-around money, as opposed to a wage. |

16

PLAINTIFFS' RESP. APP.0004344

| EurAuPair/Celia Parker |
|---|
| **EurAuPair Dep. Tr. 184:5-185:5**<br>Q. Now I'd like to turn your attention to page 60 of the Community Counselor Manual.  That's on Bates stamp 3672. Are you there?<br>A. 3672, yes.<br>Q. On No. 10, it says, "au pair work schedule."<br>A. Wait, wait.<br>Q. The -- could you read the third bullet into the record, please.<br>A. Third bullet from the top?<br>Q. From the bottom. It's actually equidistant from the top and the bottom on No. 10.<br>A. Oh, on No. 10.  I'm sorry.<br>Q. Yeah.<br>A. Okay. "Weekly pocket money is not tied to the hours worked, paid also when the au pair is ill, for example?"<br>Q. What does that sentence mean to you?<br>A. I wanna look and see the context of it. But what that means to me is that the au pair's pocket money is provided to the au pair consistently on a weekly basis regardless of whether or not the au pair provides any child care assistance at all. |

PLAINTIFFS' RESP. APP.0004345

| Expert Au Pair/Mark Gaulter |
| --- |
| **Expert Au Pair Dep. Tr. 165:3-166:21**<br>BY MS. SMALLS:<br>Q. For those on the phone, this is Expert AuPair document 25157. (witness perusing document) Are you familiar with this document?<br>A. Again it's historic, but yes, I believe I have seen it before.<br>Q. Okay. And can you tell me on the left side of the page, under "Why" -- it says, "Why Expert AuPair?" what the chart that is in that section is describing?<br>A. It is showing the difference between daycare, nannies, and Expert AuPair.<br>Q. And when you say "differences," do you mean the different, the different options or benefits that are offered under each program or each option?<br>A. I think it's a comparison between different types of childcare.<br>Q. Would this be representative of the different options in the childcare market?<br>MR. ENICA: Object to form.<br>A. These are commonly -- or these are, these are words that have been mentioned, you know, informally as options to me when I had children. Well, I mean, I do have children but they're bigger now.<br>BY MS. SMALLS:<br>Q. But I'm referring to this chart that Expert AuPair put together. Why was this chart put together and included on this document? What purpose does it serve?<br>A. I think we could conclude that this is advertising, and whenever you advertise something, you want it to look good.<br>Q. My question is, in the scope of this advertising, why would Expert AuPair compare itself with or use as a comparison point daycares and nannies?<br>A. I think each of these is a form of childcare. And anybody who's worked and has young children realizes that you can't sort of leave them at home. So these are three commonly used options in St. Petersburg. |
| **Expert Au Pair Dep. Tr. 167:18-168:13**<br>Q. When you talk to families, have they always already -- have they always already have decided on using an au pair?<br>A. No, I would say there are cases where they haven't decided what they want to do. There are cases in which the children haven't been born yet, and they want to work out what they're going to do.<br>Q. And in those cases where the families have not already decided on an au pair, what are the other alternatives that they are considering?<br>A. Some have decided to stay at home with their children. Some will look at paying for either daycare or the small institutional home that I mentioned as a sort of almost co-operative. Some will want to hire -- or some will be thinking of hiring somebody full-time, who lives in or who lives wherever, you know, whatever the arrangement, depending on the size of their house. Some are looking at au pairs. Some are looking at different au pair agencies as well. |

18

Case 1:14-cv-03074-CMA-KMT Document 943-16 Filed 05/17/18 USDC Colorado Page 138 of 310

| Go Au Pair/A. William Kapler |
| --- |
| **Go Au Pair Dep. Tr. 85:14-86:2**<br>Q. What do you understand what follows that heading to mean? Is it fair to say that this section compares au pairs to nannies and daycares?<br>A. It says that, "The au pair provides a unique cultural exchange experience," and then it does go and compare some of the specific differences related to nannies, au pair, and daycare along the five sections across the top, which is skills, regulations, and stuff like that.<br>Q. Do you know why GoAuPair chose to compare au pairs to nannies, baby-sitters, and daycares?<br>A. Yes. Those are potential options that a family could use if they wanted to have childcare services. |
| **Go Au Pair Dep. Tr. 95:21-97:1**<br>MR. VALDIVIESO: For the people on the phone, this video is from the current website at www.GoAuPair.com/hostfamilies/program costs, and it's currently available. We're actually accessing it via WiFi live right now.<br>(Whereupon, a video played.)<br>Q. I'm going to pause for a second right there. The video just described the stipend. Is that fair to say?<br>A. Yes. As an --<br>Q. Did it --<br>A. As an example, yes.<br>Q. Did it mention anything about the stipend being a minimum?<br>A. No, it did not.<br>Q. I'm going to continue playing the video.<br>(Whereupon, a video played.)<br>Q. I'm going to pause it for a second there. The last slide showed the stipend, did it not?<br>A. Yes, it did.<br>Q. Did it describe the stipend as a minimum?<br>A. No, it did not.<br>Q. Did it suggest that it was anything other than 195.75?<br>A. Did it -- it didn't suggest anything. It's an example.<br>Q. But the example that it gave was 195.75; is that right?<br>A. That is correct. |

PLAINTIFFS' RESP. APP.0004347

| Great Au Pair/Shannon Pitts |
|---|
| **Great Au Pair Dep. Tr. 61:15-62:15** |
| Q.  And skipping down, this is on the response from Lisa at the bottom of page 2808. It's the second-to-last paragraph. The second-to-last sentence, it says, "The weekly stipend that the family is required to pay the au pair is 195.75 for 40 to 45 hours of childcare and help with light housekeeping." Do you see that? <br> A. I do. <br> Q. Did I read that correctly? <br> A. You read that correctly. <br> Q. Do you believe that -- that statement to be accurate? <br> A. Not -- it's not complete.  At the time the Department of State had provided information with regards to the au pair stipend, as it being 195.75, and/or the minimum weekly stipend 195.75, depending on what you were reading from the Department of State.  There were different documents that were available on the Department of State website at the time that articulated the au pair stipend in different ways. So at that time, 2011, Susie was simply looking at the information that was available from the Department of State and characterizing that in this e-mail. |
| **Great Au Pair Dep. Tr. 113:19-114:2** |
| Q. And at the very top of page 13193, Ms. Marsh writes that candidate, "The weekly stipend is always the same for all au pair, and it is 195.75 a week." Did I read that correctly? <br> A. You did. <br> Q. Do you believe Ms. Marsh's statement to be accurate? <br> A. No, I do not. |

PLAINTIFFS' RESP. APP.0004348

| Great Au Pair/Shannon Pitts |
| --- |
| **Great Au Pair Dep. Tr. 121:17-123:7**<br>Q. In the second-to-last sentence of that paragraph it starts, "You receive full-time live-in childcare for a low average weekly rate of $348, which includes the au pair's stipend, regardless of how many children you have. Because this is a cultural exchange program, you are able to pay a cost lower than the average minimum wage and lower than the cost you'd pay for daycare." Did I read that correctly?<br>A. You did.<br>Q. Do you believe that statement to be accurate?<br>A. No. I would definitely phrase it differently. Again, I would draw your attention to the fact that this was sent out back in 2014, so at the time we were going off information provided by the Department of State that included the stipend as 195.75. When we refer to the cost you'd pay for daycare, when you pay for daycare you have to pay per child. And we're trying to articulate the difference between a -- a cultural exchange au pair program, where the au pair is here for a cultural exchange purposes. And if the family has three children, the family doesn't pay three stipends, like you would for daycare. So there's a difference between a cultural exchange program and a daycare program, so we're articulating that point. So if you were to take three children and multiply that times the cost of what you would pay for daycare, and then you do the same thing, you know, if you were to take three children and then divide that into the minimum stipend, it would be less than the cost of -- or less than the price of minimum wage. So I think if -- if you're looking at it the way we're doing it, we're trying to compare it to daycare. And if you have to pay for daycare for each child, and you do the same thing for a cultural exchange program, this would be much more cost advantageous. |
| **Great Au Pair Dep. Tr. 139:6-13**<br>Q. There's no mention of the weekly stipend being a minimum in this sentence, is there?<br>A. No. Back in 2014 we didn't use the word "minimum" because that wasn't what the Department of State had listed on their website. They actually said the stipend was 195.75. And that's what we had relied on, was the Department of State's information provided on their website. |

21

| InterExchange/Michael McHugh |
|---|
| **InterExchange Dep. Tr. 54:8-25** |
| Q. What is the U.S. State Department mandated stipend? |
| A. The U.S. State Department mandated stipend is $195.75 at a minimum for 45 hours of childcare per week. |
| Q. Does the stipend vary based upon the number of hours that an Au Pair works? |
| A. No. |
| Q. Do you tell host families what the U.S. State Department mandated stipend is? |
| A. In this document? |
| Q. Does InterExchange convey that information to the host families, whether in this document or otherwise? |
| A. Yes. |
| **InterExchange Dep. Tr. 123:3-124:12** |
| Q. Does InterExchange tell host families that the weekly payment of 195.75 is determined by the U.S. Department of State? |
| A. Currently InterExchange tells host families that the minimum payment of 195.75 per week is determined by the Department of State. |
| Q. You used the word currently, when did that start to be the message that was conveyed? |
| A. Well, it hadn't always been one or the other, the lawsuit brought to our attention that we could do a better job of consistently describing |
| it as a minimum, similar to the way the State Department documents occasionally refer to it as the stipend is 195.75, and occasionally they refer to it as the minimum of 195.75.  Unfortunately we followed their -- we could have been more accurate about it. |
| Q. So prior to the lawsuit, this lawsuit, did you tell host families that the 195.75 stipend was set by the U.S. Department of State |
| A. Prior to the lawsuit there were occasions where documents may have said the stipend is 195.75, and may have been documents where the stipend said at least 195.75, but that it was set by the Department of State. |
| **InterExchange Dep. Tr. 153:2-24** |
| Q. And the response is, your salary will be the mandatory 195.75 each week as determined by the U.S. State Department. All the regulations of the program are determined by the State Department of the U.S.  Do you believe that was an accurate statement? |
| A. I don't know if Nina Kryzak had discussed with the family that that is what they agreed that they were going to offer the Au Pair. That's what it sounds like to me. She seems to know that the stipend will be 195.75, so it appears correct to me. |
| Q. Do you think that it is accurate to describe the 195.75 as mandatory? |
| A. It is certainly mandatory that Au Pairs get at least 195.75 per week.  They cannot receive less than that, which appeared to be Ms. Krot's concern. |

22

PLAINTIFFS' RESP. APP.0004350

| InterExchange/Michael McHugh |
| --- |
| **InterExchange Dep. Tr. 171:5-18** |

Q. Have you ever personally told an InterExchange employee that the Au Pair is entitled to negotiate the stipend?
A. I believe so.
Q. When?
A. I can't remember.
Q. Before the lawsuit was filed?
A. I believe so.
Q. Can you think of a specific instance?
A. No, it really wasn't a major topic of discussion at the time.

| USAuPair/Helene Young |
| --- |
| **USAuPair Dep. Tr. 57:6-16** |

Q. Sure.  But -- can I take you over to the part that says, "In-Home Care With Flexibility," on the right.
A. Correct.
Q. And it says, "The au pair program is a wonderful childcare alternative."
A. Uh-huh.
Q. "Au pairs live in your home and provide personal care in exchange for room, board, and a small weekly wage."
A. Uh-huh.

**USAuPair Dep. Tr. 78:25-79:9**

Q. Okay.  So do you tell host families that they can pay more to au pairs?
A. No.  I tell them exactly what the State Department provided me.
Q. So you've never told a host family that the stipend is a minimum stipend?
A. I've told the families this is what the State Department provided me as the weekly stipend for the au pair.  This is -- this is it.  This is fact.  This is it.

PLAINTIFFS' RESP. APP.0004351

Case No. 1:14-cv-03074-CMA-KMT   Document 959-23   filed 03/17/18   USDC Colorado   pg 144 of 310

# Exhibit 392

1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLORADO
2
     Civil Action No. 14-cv-03074-CMA-KMT
3    _____

4    VIDEOTAPE DEPOSITION OF:  DAVID KEIL - July 21, 2016
     _____
5
     JOHANA PAOLA BELTRAN; LUSAPHO HLATSHANENI; BEAUDETTE
6    DEEELEFS; DAYANNA PAOLA CARDENA CAICEDO; ALEXANDRA
     IVETTE GONZALEZ; on behalf of themselves and others
7    similarly situated,

8    Plaintiffs,

9    v.

10   INTEREXCHANGE, INC.; USAUPAIR, INC.; GREATAUPAIR, LLC;
     EXPERT GROUP INTERNATIONAL INC., d/b/a EXPERT AUPAIR;
11   EURAUPAIR INTERCULTURAL CHILD CARE PROGRAMS; CULTURAL
     HOMESTAY INTERNATIONAL; CULTURAL CARE, INC. d/b/a
12   CULTURAL CARE AU PAIR; AUPAIRCARE INC.; AU PAIR
     INTERNATIONAL, INC.; APF GLOBAL EXCHANGE, NFP d/b/a
13   AUPAIR FOUNDATION; AMERICAN INSTITUTE FOR FOREIGN STUDY
     d/b/a AU PAIR IN AMERICA; AMERICAN CULTURAL EXCHANGE,
14   LLC, d/b/a GOAUPAIR; AGENT AU PAIR, INC.; A.P.EX.
     AMERICAN PROFESSIONAL EXCHANGE, LLC d/b/a PROAUPAIR;
15   and 20/20 CARE EXCHANGE, INC. d/b/a THE INTERNATIONAL
     AU PAIR EXCHANGE, and ASSOCIATES IN CULTURAL EXCHANGE,
16   d/b/a GOAUPAIR,

17   Defendants.
     _____

18

19

20

21

22

23   **H+G**

24

25   Hunter + Geist, Inc.

303.832.5966    1900 Grant Street, Suite 1025    ▪ www.huntergeist.com
800.525.8490    Denver, CO 80203                 ▪ scheduling@huntergeist.com

Your Partner in Making the Record

PLAINTIFFS' RESP. APP.0004353

Court Reporting, Legal Videography, and Videoconferencing

## 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-03074-CMA-KMT

_____

VIDEOTAPE DEPOSITION OF: DAVID KEIL - July 21, 2016

_____

JOHANA PAOLA BELTRAN; LUSAPHO HLATSHANENI; BEAUDETTE
DEEELEFS; DAYANNA PAOLA CARDENA CAICEDO; ALEXANDRA
IVETTE GONZALEZ; on behalf of themselves and others
similarly situated,
Plaintiffs,
v.
INTEREXCHANGE, INC.; USAUPAIR, INC.; GREATAUPAIR, LLC;
EXPERT GROUP INTERNATIONAL INC., d/b/a EXPERT AUPAIR;
EURAUPAIR INTERCULTURAL CHILD CARE PROGRAMS; CULTURAL
HOMESTAY INTERNATIONAL; CULTURAL CARE, INC. d/b/a
CULTURAL CARE AU PAIR; AUPAIRCARE INC.; AU PAIR
INTERNATIONAL, INC.; APF GLOBAL EXCHANGE, NFP d/b/a
AUPAIR FOUNDATION; AMERICAN INSTITUTE FOR FOREIGN STUDY
d/b/a AU PAIR IN AMERICA; AMERICAN CULTURAL EXCHANGE,
LLC, d/b/a GOAUPAIR; AGENT AU PAIR, INC.; A.P.EX.
AMERICAN PROFESSIONAL EXCHANGE, LLC d/b/a PROAUPAIR;
and 20/20 CARE EXCHANGE, INC. d/b/a THE INTERNATIONAL
AU PAIR EXCHANGE, and ASSOCIATES IN CULTURAL EXCHANGE,
d/b/a GOAUPAIR,
Defendants.

_____

## 2

PURSUANT TO NOTICE AND SUBPOENA, the
videotape deposition of DAVID KEIL was taken on behalf
of the Defendant Cultural Care, Inc. d/b/a Cultural
Care Au Pair at 1200 17th Street, Suite 3000, Denver,
Colorado 80202, on July 21, 2016, at 9:05 a.m., before
Carol M. Bazzanella, Registered Professional Reporter,
Certified Realtime Reporter, and Notary Public within
Colorado.

A P P E A R A N C E S

For the Plaintiffs:

LAUREN FLEISCHER LOUIS, ESQ.
Boies, Schiller & Flexner LLP
401 East Las Olas Boulevard, Suite 1200
Fort Lauderdale, Florida 33301
ALEXANDER HOOD, ESQ.
Towards Justice
1535 High Street, Suite 300
Denver, Colorado 80218

For the Defendant InterExchange, Inc.:
BROOKE A. COLAIZZI, ESQ.
Sherman & Howard L.L.C.
633 17th Street, Suite 3000
Denver, Colorado 80202

For the Defendant Expert Group International Inc. d/b/a
Expert AuPair:

BOGDAN ENICA, ESQ.
Law Office of Bogdan Enica
111 2nd Avenue NE, Suite 213
St. Petersburg, Florida 33701

For the Defendant EurAuPair Intercultural Child Care
Programs:
MARTHA L. FITZGERALD, ESQ.
DAVID B. MESCHKE, ESQ.
Brownstein Hyatt Farber Schreck, LLC
410 17th Street, Suite 2200
Denver, Colorado 80202

## 3

For the Defendant Cultural Homestay International:
JONATHAN S. BENDER, ESQ.
Holland & Hart LLP
555 17th Street, Suite 3200
Denver, Colorado 80202

For the Defendant Cultural Care, Inc. d/b/a Cultural
Care Au Pair:

JOAN A. LUKEY, ESQ.
Choate Hall & Stewart LLP
Two International Place
Boston, Massachusetts 02110
JAMES M. LYONS, ESQ.
Lewis Roca Rothgerber Christie LLP
1200 17th Street, Suite 3000
Denver, Colorado 80202

For the Defendant AuPairCare, Inc.:
PEGGY E. KOZAL, ESQ.
Gordon Rees Scully Mansukhani
555 17th Street, Suite 3400
Denver, Colorado 80202

For the Defendant APF Global Exchange, NFP:
SUSAN M. SCHAECHER, ESQ.
Fisher & Phillips LLP
1801 California Street, Suite 2700
Denver, Colorado 80202

For the Defendants Agent Au Pair, American Cultural
Exchange, LLC d/b/a GoAupair and Associates in Cultural
Exchange, d/b/a GoAupair:
KATHRYN A. REILLY, ESQ.
Wheeler Trigg O'Donnell LLP
370 17th Street, Suite 4500
Denver, Colorado 80202

## 4

For the Defendant A.P.EX. American Professional
Exchange, LLC d/b/a ProAuPair and 20/20 Care Exchange,
Inc., d/b/a The International Au Pair Exchange:

KATHLEEN CRAIGMILE, ESQ.
Nixon Shefrin Hensen Ogburn, P.C.
5619 DTC Parkway, Suite 1200
Greenwood Village, Colorado 80111

Also Present:
John Jensen, Videographer

PLAINTIFFS' RESP. APP. 0004354

133

regard to all three of the companies you have identified as the companies with whom you had substantive conversations about the subject matters at issue here, you cannot from memory, without looking at other materials, tell us anything that you said or that any of the individuals at any of the three companies said; is that right?

A. I think that's a mischaracterization of what I said.

Q. Can you tell us from your memory anything that anyone at EurAuPair said to you?

A. If I know the -- if I have some way of understanding what person we're discussing, then, yes, I have specific memories of those conversations. I am hesitant to give information that's erroneously attached to the wrong person, and based on the name of the companies, I'm having -- I'm struggling to make those connections.

Q. All right. Just tell us the name of the people, then, and you can give us the answers that way and we'll match it to the companies. With what individual do you recall speaking substantively?

A. Okay. I re -- I recall speaking with one woman named Carrie Crompton. I do not recall which company she was. I recall that she was a director.

134

All of the people that I ultimately had substantive conversations with I believe gave me their title as director of something. So I recall a conversation with Ms. Crompton. I'm sorry, can you repeat the question?

Q. The question is take it by name of individual rather than company, and we'll do the matching later.

A. Okay.

Q. Did you have one conversation with Ms. Crompton or more than one?

A. I had -- actually, I may have had two with her. I can't recall, but I believe she -- I may have had one that was for some reason cut short and then a follow-up.

Q. Would you give us your best memory of what you said and what she said in the first conversation?

A. Without -- I'm not going to give you verbatim answers, 'cause I don't have that kind of recall. I recall speaking and, again, asking for information about the company, about the services they provided, about what the pricing structure was. Although I do recall in the case of Ms. Crompton, she was unwilling or unable to give me specific numbers other than she stated that her -- her company fell -- their pricing scale fell somewhere in the middle of the

135

industry norm. They weren't the most expensive, they weren't the least expensive. So I recall that.

I recall that we got into the conversation -- into a conversation about how much of the fees that a prospective family might pay were received by a potential person acting as an au pair. Ms. Crompton explained to me that, in fact, the au pairs were paid directly by the family, that there was a fee, I can't recall what it was designated as, but there was a fee, I believe it was $500, that the au pair received, and then she explained that the au pair would receive directly from the family an amount that she referred to as a stipend, and that the stipend was $195.75 per week. That that would be paid directly by the family, and that to her knowledge, all of the au pairs received the same amount.

Q. I'm sorry. Could you keep your voice up.

A. I'm trying. To the best of her knowledge, all of the au pairs in their employ would receive the same amount of stipend.

Q. And "their employ" referring to her company, whichever one it is?

A. Yes, ma'am.

Q. Okay. What else did she say or you say in that conversation?

136

A. In that conversation I asked Ms. Crompton how was the -- that number derived.

Q. The stipend number?

A. The stipend number. And she explained that it was a number that was designated by the U.S. Government. I believe she said the Department -- I'm sorry, I'm drawing a blank. Department of Commerce? But that there was a government agency whom set that amount as the minimum and that all of the companies that I might be calling that day, because I had explained to Ms. Crompton that I was calling multiple companies, she said, "You will find that everyone charges the same."

Q. The same as the amount that the government agency sets?

A. Everybody pays the set government agency amount for a stipend.

Q. Okay.

A. I then followed up with the question, "If a family was very happy with their au pair, if the relationship was better than normal, would the family have the ability to pay a larger stipend?" And I believe Ms. Crompton said that the family may have that ability, but it was very unlikely. I believe it was Ms. Crompton that stated that there -- that she was

34 (Pages 133 to 136)

Beltran v. Interexchange, Inc.                    DAVID KEIL                              7/21/2016

---

### 177

13:58:59  1   that information, but because I was asking very generic
13:59:03  2   questions, I was receiving very generic answers back
13:59:07  3   about fees.
13:59:08  4       Q.  Did you get information -- other than
13:59:09  5   Ms. Crompton's general statement that her sponsor
13:59:15  6   agency was in the middle price wise, did you get
13:59:18  7   information from any of them regarding how and in what
13:59:22  8   amount they were compensated?
13:59:24  9       A.  Again, I don't recall anybody giving me
13:59:28 10   specific amounts about how they were compensated.  And,
13:59:32 11   frankly, if those conversations did occur, I don't
13:59:36 12   recall them.  But I don't recall anyone giving me
13:59:40 13   specific numbers.
13:59:42 14       Q.  Were you asking for specific numbers?
13:59:44 15       A.  No.  I was asking more generic questions,
13:59:47 16   as I've said.  How does this program work?  How
13:59:52 17   are -- you know, how are au pairs compensated?  How are
13:59:56 18   you guys compensated?  What type of expenses could a
13:59:59 19   family expect?  I was asking very general questions,
14:00:02 20   and I was receiving back pretty general answers on a
14:00:06 21   lot of those topics.
14:00:07 22       Q.  So you did not hear anything that you
14:00:11 23   considered important to note with regard to the
14:00:15 24   compensation of sponsors other than Ms. Crompton's
14:00:18 25   reference to being in the middle of the pack; is that

### 178

14:00:21  1   right?
14:00:21  2       A.  I didn't note anything beyond what's
14:00:24  3   currently in my statement.
14:00:25  4       Q.  Okay.  And you did not find any agreement
14:00:28  5   among sponsors as to the amount that they're paid,
14:00:31  6   correct?
14:00:32  7       A.  I didn't obtain enough information to know
14:00:34  8   that, no.
14:00:35  9       Q.  Okay.  So looking at what you did inquire
14:00:39 10   of with Irina Gussev.  Again, the questions relate to
14:00:47 11   the amount of the stipends paid to the au pairs,
14:00:51 12   correct?
14:00:52 13       A.  That appears to be the case.
14:00:53 14       Q.  Okay.  In this instance you say -- you
14:01:00 15   quote your own question, "Are you saying that each and
14:01:04 16   every one of the 15 companies have gotten together and
14:01:08 17   they made an agreement to pay all au pairs a stipend
14:01:12 18   that is no more than" 120 -- I'm sorry -- "$195.75 per
14:01:18 19   week?"  That was your question?
14:01:20 20       A.  That was my question.
14:01:21 21       Q.  Okay.  And her answer was initially, "Yes,
14:01:26 22   they all agreed to pay that amount, no more."  But then
14:01:30 23   she added, "We have" a -- "one family who pays a little
14:01:35 24   bit more, so I guess you could pay more if you wanted
14:01:37 25   to . . ."  She said that to you, right?

### 179

14:01:40  1       A.  Yes.
14:01:40  2       Q.  Okay.  Did you ask her whether there was
14:01:45  3   an agreement among the companies to pay the same
14:01:50  4   amount?
14:01:52  5       A.  I -- if you look again at paragraph 2, she
14:01:59  6   discussed -- and this is the flow of the conversation.
14:02:02  7   She discussed the $500 educational fee and that all 15
14:02:07  8   companies agreed to require that same amount.  She
14:02:11  9   answered yes.  I then asked what I thought was the
14:02:14 10   logical follow-up question, "What about the amount paid
14:02:17 11   directly to the au pair?"  She answered, "Yes, it's
14:02:21 12   called a stipend," and quoted the amount of 195.75.
14:02:25 13   And then I asked again what I thought was just a
14:02:28 14   logical follow-up question, and she answered, "Yes,
14:02:33 15   it's exactly the same amount, equal in all programs."
14:02:36 16   I didn't prompt that question.  That was her response
14:02:39 17   to a more broad question.
14:02:42 18       Q.  Except she added that you could pay more
14:02:43 19   if you wanted to?
14:02:47 20       A.  Yes.
14:02:47 21       Q.  Was it of any significance to you in
14:02:51 22   conducting your interviews what the Department of State
14:02:53 23   directive or notification says?
14:02:56 24       A.  I -- I'm sorry?  Ask --
14:02:59 25       Q.  Was it of any importance to you whether,

### 180

14:03:01  1   in fact, there is a directive or notification from the
14:03:04  2   Department of State that sets forth elements of the
14:03:10  3   compensation of au pairs?
14:03:12  4       A.  The individuals I spoke to in these
14:03:15  5   conversations plus others that are not documented here
14:03:17  6   led me to believe it was a minimum amount set by law
14:03:22  7   and that everyone in the industry followed that minimum
14:03:27  8   amount, and I didn't see a need to research that
14:03:30  9   further.  It seemed to be a consensus, and I took it at
14:03:33 10   face value.
14:03:41 11       Q.  Did you obtain information from anyone
14:03:46 12   regarding any purported agreement, that is,
14:03:50 13   communications among sponsors, to use the stipend
14:04:01 14   included in the Department of State guidance and
14:04:01 15   notification?
14:04:02 16       MS. LOUIS:  Object to form.
14:04:03 17       A.  And, I'm sorry, I'm not understanding the
14:04:05 18   question.
14:04:06 19       Q.  (BY MS. LUKEY)  Agreement, sir.  Like I
14:04:10 20   say to you, "Let's do this.  Let's pay $190 a week."
14:04:15 21       A.  I -- I think --
14:04:16 22       MS. LOUIS:  There's no question.
14:04:18 23       THE DEPONENT:  Oh.  Yes.
14:04:19 24       Q.  (BY MS. LUKEY)  I haven't gotten there
14:04:20 25   yet.

---

45 (Pages 177 to 180)

Case No. 1:14-cv-03074-CMA-KMT Document 1059-23 filed 07/30/18 USDC Colorado pg 149 of 310

# Exhibit 393

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-03074-CMA-KMT
_____

VIDEOTAPE DEPOSITION OF:   JOHANA PAOLA BELTRAN
                           August 30, 2016
_____

JOHANA PAOLA BELTRAN; LUSAPHO HLATSHANENI; BEAUDETTE
DEEELEFS; DAYANNA PAOLA CARDENA CAICEDO; ALEXANDRA
IVETTE GONZALEZ; on behalf of themselves and others
similarly situated,

Plaintiffs,

v.

INTEREXCHANGE, INC.; USAUPAIR, INC.; GREATAUPAIR, LLC;
EXPERT GROUP INTERNATIONAL INC., d/b/a EXPERT AUPAIR;
EURAUPAIR INTERCULTURAL CHILD CARE PROGRAMS; CULTURAL
HOMESTAY INTERNATIONAL; CULTURAL CARE, INC. d/b/a
CULTURAL CARE AU PAIR; AUPAIRCARE INC.; AU PAIR
INTERNATIONAL, INC.; APF GLOBAL EXCHANGE, NFP d/b/a
AUPAIR FOUNDATION; AMERICAN INSTITUTE FOR FOREIGN STUDY
d/b/a AU PAIR IN AMERICA; AMERICAN CULTURAL EXCHANGE,
LLC, d/b/a GOAUPAIR; AGENT AU PAIR, INC.; A.P.EX.
AMERICAN PROFESSIONAL EXCHANGE, LLC d/b/a PROAUPAIR;
and 20/20 CARE EXCHANGE, INC. d/b/a THE INTERNATIONAL
AU PAIR EXCHANGE, and ASSOCIATES IN CULTURAL EXCHANGE,
d/b/a GOAUPAIR,

Defendants.
_____

Hunter + Geist, Inc.

303.832.5966      1900 Grant Street, Suite 1025      ■ www.huntergeist.com
800.525.8490      Denver, CO 80203                    ■ scheduling@huntergeist.com

Your Partner in Making the Record

PLAINTIFFS' RESP. APP.0004358

Court Reporting, Legal Videography, and Videoconferencing

JOHANA PAOLA BELTRAN - 8/30/2016
Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.

**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-03074-CMA-KMT
_____

VIDEOTAPE DEPOSITION OF:  JOHANA PAOLA BELTRAN
August 30, 2016
_____

JOHANA PAOLA BELTRAN; LUSAPHO HLATSHANENI; BEAUDETTE
DEEELEFS; DAYANNA PAOLA CARDENA CAICEDO; ALEXANDRA
IVETTE GONZALEZ; on behalf of themselves and others
similarly situated,

Plaintiffs,

v.

INTEREXCHANGE, INC.; USAUPAIR, INC.; GREATAUPAIR, LLC;
EXPERT GROUP INTERNATIONAL INC., d/b/a EXPERT AUPAIR;
EURAUPAIR INTERCULTURAL CHILD CARE PROGRAMS; CULTURAL
HOMESTAY INTERNATIONAL; CULTURAL CARE, INC. d/b/a
CULTURAL CARE AU PAIR; AUPAIRCARE INC.; AU PAIR
INTERNATIONAL, INC.; APF GLOBAL EXCHANGE, NFP d/b/a
AUPAIR FOUNDATION; AMERICAN INSTITUTE FOR FOREIGN STUDY
d/b/a AU PAIR IN AMERICA; AMERICAN CULTURAL EXCHANGE,
LLC, d/b/a GOAUPAIR; AGENT AU PAIR, INC.; A.P.EX.
AMERICAN PROFESSIONAL EXCHANGE, LLC d/b/a PROAUPAIR;
and 20/20 CARE EXCHANGE, INC. d/b/a THE INTERNATIONAL
AU PAIR EXCHANGE, and ASSOCIATES IN CULTURAL EXCHANGE,
d/b/a GOAUPAIR,

Defendants.
_____

**2**

PURSUANT TO NOTICE, the videotape
deposition of JOHANA PAOLA BELTRAN was taken on behalf
of the Defendant InterExchange, Inc., at 633 17th
Street, Suite 3000, Denver, Colorado 80202, on
August 30, 2016, at 9:13 a.m., before Carol M.
Bazzanella, Registered Professional Reporter, Certified
Realtime Reporter, and Notary Public within Colorado.

A P P E A R A N C E S

For the Plaintiffs:

ALEXANDER HOOD, ESQ.
DAVID SELIGMAN, ESQ.
Towards Justice
1535 High Street, Suite 300
Denver, Colorado 80218

For the Defendant InterExchange, Inc.:
BROOKE A. COLAIZZI, ESQ.
ERICA L. HERRERA, ESQ.
Sherman & Howard L.L.C.
633 17th Street, Suite 3000
Denver, Colorado 80202

For the Defendant Expert Group International Inc. d/b/a
Expert AuPair:
BOGDAN ENICA, ESQ.
Law Office of Bogdan Enica
111 2nd Avenue NE, Suite 213
St. Petersburg, Florida 33701
(Appearing Telephonically)

For the Defendant EurAuPair Intercultural Child Care
Programs:
MARTHA L. FITZGERALD, ESQ.
Brownstein Hyatt Farber Schreck, LLC
410 17th Street, Suite 2200
Denver, Colorado 80202

**3**

For the Defendant Cultural Homestay International:
ADAM A. HUBBARD, ESQ.
Holland & Hart LLP
555 17th Street, Suite 3200
Denver, Colorado 80202

For the Defendant Cultural Care, Inc. d/b/a Cultural
Care Au Pair:

JUSTIN WOLOSZ, ESQ.
Choate Hall & Stewart LLP
Two International Place
Boston, Massachusetts 02110
(Appearing Telephonically)

DIANE HAZEL, ESQ.
Lewis Roca Rothgerber Christie LLP
1200 17th Street, Suite 3000
Denver, Colorado 80202

For the Defendant AuPairCare, Inc.:

BRIAN P. MASCHLER, ESQ.
Gordon Rees Scully Mansukhani LLP
555 17th Street, Suite 3400
Denver, Colorado 80202
(Appearing Telephonically)

For the Defendant APF Global Exchange, NFP:
LAWRENCE LEE, ESQ.
Fisher & Phillips LLP
1801 California Street, Suite 2700
Denver, Colorado 80202

For the Defendants Agent Au Pair, American Cultural
Exchange, LLC d/b/a GoAupair and Associates in Cultural
Exchange, d/b/a GoAupair:
KATHRYN A. REILLY, ESQ.
Wheeler Trigg O'Donnell LLP
370 17th Street, Suite 4500
Denver, Colorado 80202

**4**

For the Defendant A.P.EX. American Professional
Exchange, LLC d/b/a ProAuPair and 20/20 Care Exchange,
Inc., d/b/a The International Au Pair Exchange:
KATHLEEN CRAIGMILE, ESQ.
Nixon Shefrin Hensen Ogburn, P.C.
5619 DTC Parkway, Suite 1200
Greenwood Village, Colorado 80111
(Appearing Telephonically)

Also Present:

Justin Grant
John Jensen, Videographer
Christine LaMonica-Lunn
Michael McHugh
Jack Mudry, Interpreter

1 (Pages 1 to 4)

PLAINTIFFS' RESP. APP 0004359

Case No. 1:14-cv-03074-CMA-KMT Document 1059-23 filed 09/17/18 USDC Colorado pg 151 of 310

JOHANA PAOLA BELTRAN - 8/30/2016
Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.

85

12:21:40 1 application process that you found to be confusing or
12:21:43 2 difficult to understand other than what we've just
12:21:45 3 talked about?
12:22:02 4     A.  It could be, but that was quite some time
12:22:05 5 ago, so I can't recall.
12:22:06 6     Q.  Okay.  So there's nothing else you
12:22:08 7 remember about that as you sit here today other than
12:22:10 8 what we've discussed?
12:22:21 9     A.  No.  No, I don't think so.
12:22:24 10     Q.  Can you turn back to Exhibit 15, please.
12:22:32 11     MR. HOOD:  I don't know if she has it in
12:22:34 12 front of her.  Oh, it's underneath.
12:22:40 13     Q.  (BY MS. COLAIZZI)  And I want to talk
12:22:41 14 about Interrogatory 2, which is on pages 2 and 3 of
12:22:46 15 Exhibit 15.  Why don't you -- let me ask you this.  I'd
12:23:00 16 like to refresh your recollection about the
12:23:04 17 question in Interrogatory 2 and the answer.  Are you
12:23:14 18 able to do that by reading, or do you want the
12:23:17 19 interpreter to translate it for you?
12:23:25 20     A.  Yes, can he help me, please.
12:23:27 21     Q.  Okay.
12:23:32 22     THE INTERPRETER:  Okay.  The interpreter
12:23:33 23 is looking at Interrogatory No. 2 and will then site
12:23:37 24 translate it into Spanish.
12:23:38 25     MS. COLAIZZI:  Thank you.

86

12:23:39 1     THE INTERPRETER:  You're welcome.
12:24:35 2     MS. COLAIZZI:  Thank you.  And then if you
12:24:38 3 could do the same with respect to Ms. Beltran's
12:24:39 4 response.
12:24:50 5     THE INTERPRETER:  The response begins at
12:24:52 6 the bottom of page 2.
12:26:35 7     MR. HOOD:  I'm going to object to the
12:26:38 8 translation only to the extent that "interchange" and
12:26:40 9 "InterExchange" were being used interchangeably, and my
12:26:45 10 understanding is all of those meant InterExchange.
12:26:48 11     MS. COLAIZZI:  I would agree with respect
12:26:49 12 to the second; however, the first one, there's a typo
12:26:53 13 in Ms. Beltran's response, so he did, in fact,
12:26:55 14 interpret it correctly.
12:26:57 15     MR. HOOD:  Okay.  Well --
12:26:57 16     MS. COLAIZZI:  But that's fine.
12:26:58 17     MR. HOOD:  Okay.  I apologize.
12:27:06 18     Q.  (BY MS. COLAIZZI)  I'd like to refer you
12:27:09 19 to the sentence towards the end of your response that
12:27:12 20 begins, "During her au pair interview . . ."  Are you
12:27:30 21 referring to the interview that you've already
12:27:33 22 described as having taken place during your third visit
12:27:55 23 to the office in downtown Bogota?
12:27:55 24     A.  Can you repeat the question?
12:27:57 25     MS. COLAIZZI:  Can you read it back,

87

12:27:59 1 please.
12:27:07 2     (The last question was read back as
12:27:07 3 follows:  "I'd like to refer you to the sentence
12:27:10 4 towards the end of your response that begins, 'During
12:27:12 5 her au pair interview . . .'  Are you referring to the
12:27:33 6 interview that you've already described as having taken
12:27:33 7 place during your third visit to the office in downtown
12:27:38 8 Bogota?")
12:28:39 9     A.  Yeah, that was the only interview.
12:28:40 10     Q.  (BY MS. COLAIZZI)  Okay.  And is that
12:28:44 11 sentence a true statement?
12:28:52 12     A.  Yes.
12:28:53 13     Q.  I want to describe for me the
12:28:55 14 conversation you had with the InterExchange
12:28:57 15 representative about what you would be paid per week.
12:29:15 16     A.  195 and 75 cents.
12:29:19 17     Q.  How did that conversation about the amount
12:29:21 18 come about?
12:29:28 19     A.  That was a long time ago, and I can't
12:29:31 20 remember very well.
12:29:32 21     Q.  Do you recall if the representative made
12:29:33 22 that statement to you on her -- on her or his own, or
12:29:38 23 did you ask about the weekly pay?
12:29:54 24     A.  It was within one of the agreements that I
12:29:56 25 signed with them.

88

12:29:57 1     Q.  Okay.  Did you discuss the amount with
12:29:59 2 anyone?
12:30:05 3     A.  No.
12:30:06 4     Q.  Did you ask any questions about the weekly
12:30:08 5 amount?
12:30:13 6     A.  No.
12:30:15 7     Q.  At the time of that interview was there
12:30:16 8 anything about the amount of 195.75 per week that
12:30:21 9 concerned you in any way?
12:30:36 10     A.  I don't understand the question.
12:30:38 11     Q.  When you heard during that interview that
12:30:40 12 you would be paid 195.75 per week, were you okay with
12:30:45 13 that?
12:31:04 14     A.  I didn't understand it very well, because
12:31:05 15 they told me in dollars.
12:31:07 16     Q.  Did you ask what that translated to in
12:31:10 17 pesos?
12:31:14 18     A.  No, they didn't tell me.
12:31:16 19     Q.  Did you ask?
12:31:18 20     A.  Yes.
12:31:18 21     Q.  And what did they tell you in response to
12:31:21 22 your question?
12:31:26 23     A.  No, they didn't explain it to me, and I
12:31:29 24 don't remember.
12:31:29 25     Q.  You don't remember what?

22 (Pages 85 to 88)

Case No. 1:14-cv-03074-CMA-KMT   Document 959-23   filed 03/30/18   USDC Colorado   pg
153 of 310

# Exhibit 394

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:14-cv-03074-CMA-KMT

_____

JOHANA PAOLA BELTRAN; et al.,

     Plaintiffs,

v.

INTEREXCHANGE, INC.; et al.,

     Defendants.

_____


VIDEO DEPOSITION OF LUSAPHO HLATSHANENI

SEPTEMBER 7, 2016

_____


     PURSUANT TO NOTICE and the Colorado
Rules of Civil Procedure, the video deposition of
LUSAPHO HLATSHANENI was taken on behalf of the
Defendant American Institute for Foreign Study,
Inc., Au Pair In America, Au Pair Foundation at
1801 California Street, Toronto Room, Denver,
Colorado, on September 7, 2016, at 9:11 a.m., before
Renee S. Wilson, Certified Shorthand Reporter and
Notary Public within the State of Colorado.

PLAINTIFFS' RESP. APP.0004362

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 2

```
 1            A P P E A R A N C E S
 2   For the Plaintiff:
 3   LAUREN FLEISHER LOUIS, ESQ.
     Boies, Schiller & Flexner, LLP
 4   401 East Las Olas Boulevard
     Suite 1200
 5   Ft. Lauderdale, Florida  33301
     (Appearing telephonically)
 6
               and
 7
     ALEXANDER NEVILLE HOOD, ESQ.
 8   Towards Justice
     1535 High Street
 9   Suite 300
     Denver, Colorado  80218
10
11   For the Defendant Interexchange, Inc.:
12   BROOK A. COLAIZZI, ESQ.
     Sherman & Howard, LLC
13   633 17th Street
     Suite 3000
14   Denver, Colorado  80202
     (Appearing telephonically)
15
16   For the Defendant Expert Group International, Inc.,
     doing business as Expert AuPair:
17
     BOGDAN ENICA, ESQ.
18   111 Second Avenue NE
     Suite 213
19   St. Petersburg, Florida  33701
     (Appearing telephonically)
20
21   For the Defendant Cultural Homestay International:
22   JONATHAN S. BENDER, ESQ.
     Holland & Hart, LLP
23   555 17th Street
     Suite 3200
24   Denver, Colorado  80202
25
```

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0004363

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 63

1    A.    No.

2        Q.    **When did this conversation take place?**

3    A.    I don't remember exactly.  But it was in the

4    year 2012, all conversations that I've had with

5    Ms. Natalie.

6        Q.    **What did you understand her statement as**

7    **reflected in your declaration, Paragraph 3, to mean**

8    **for you?**

9    A.    That if I accepted any amount paid by my

10   host family that was more than the stipulated

11   amount, I would be sent off the program and then

12   sent home.

13       Q.    **Did you confirm the truth or veracity of**

14   **that statement during the time that this statement**

15   **was allegedly made by Ms. James to you?**

16   A.    Can you explain your question, please?

17       Q.    **Yes.**

18            **Did you actually do any research, outside or**

19   **independent of what Ms. James allegedly told you as**

20   **reflected in Paragraph 3, to confirm whether it was**

21   **true or not?**

22   A.    No, not that I remember.

23       Q.    **Did you understand that to be the rule?**

24   A.    Yes.  That's what I understood.

25       Q.    **And you understood the rule to be that you**

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0004364

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 64

1  were not to accept any additional wages outside of

2  what you would be earning from the host family,

3  $195.75 per week; is that correct?

4      A.   Yes.  That is what I understood.

5      Q.   And if you did, you potentially could lose

6  your visa; is that right?

7      A.   Yes.

8      Q.   And the visa is a temporary visa for

9  purposes of you being in the United States so you

10  could be part of the Au Pair Program; is that your

11  understanding?

12      A.   Yes.

13          MR. HOOD:  Larry, could I clarify one more

14  thing just on the record?

15          It occurs to me that the last page of her

16  interrogatories are actually entitled a declaration.

17  So there are two declarations, but the last -- she's

18  thinking -- I think -- that the last page of her

19  interrogatory is the second declaration.

20          So to clarify, there are two declarations,

21  but this is the only declaration that was signed for

22  the motion to certify, and the other declaration was

23  for the interrogatory responses.

24          MR. LEE:  Okay.  I can only take you for

25  your word for now.  I'll double-check at lunch.

PLAINTIFFS' RESP. APP.0004365

Case No. 1:14-cv-03074-CMA-KMT  Document 959-23  filed 03/30/18  USDC Colorado  pg
158 of 310

# Exhibit 395

Case No. 1-cv-03074-CMA-KMT Document 243-23 filed 05/17/18 USDC Colorado pg 158
Case 1:14-cv-03074-CMA-KMT Document 243-23 filed 05/17/18 USDC Colorado Page 158
159 of 310
of 309

# D E P O S I T I O N

## HELD AT CAPE TOWN, SOUTH AFRICA

DATE:                                               21 SEPTEMBER 2016

In:

JOHANA PAOLA BELTRAN

and

INTEREXCHANGE

BEFORE:

(TRANSPERFECT DEPOSITION SERVICES)

COMMISSIONER OF OATHS:

ON BEHALF OF PLAINTIFF:          MR DANIEL SCHWARTZ

ON BEHALF OF DEFENDANT:          MR JUSTIN WOLOSZ

VERITAS A DIVISION OF EOH LEGAL SERVICES (PTY) LIMITED

PLAINTIFFS' RESP. APP.0004367

2

.                         D E P O S I T I O N

             HELD AT CAPE TOWN, SOUTH AFRICA

        CASE NUMBER:

        DATE:                              21 SEPTEMBER 2016

5       In:

        JOHANA PAOLA BELTRAN

        And

        INTEREXCHANGE

_____

10      ON COMMENCEMENT ON 21 SEPTEMBER 2016: (at 10:00)

        MR WOLOSZ:  This is the deposition of Beaudette Deetlefs –

        did I say that correctly?

        MS DEETLEFS:  Yes.

        MR WOLOSZ:  We are proceeding here in Cape Town, South

15      Africa.  It is 10 o'clock a.m. local Cape Town time.

        MS (??):  (Inaudible).

        MR WOLOSZ:  We're just beginning.  We'll – I'll give an

        opportunity for everyone to note their appearance on the

        record in just one moment.  We're proceeding here with this

20      deposition in Cape Town, South Africa.  This is in the matter of

        Johana Paola Beltran versus InterExchange pending in the

        United States District Court for the District of Colorado.  This

        is Justin Wolosz speaking I'm counsel for defendant Cultural

        Care.  Can I ask that the attorneys all note their appearance

25      for the record starting with Mr Schwartz here in the room with

        21.09.16                                          /...

PLAINTIFFS' RESP. APP.0004368

MR WOLOSZ                                    42                        B DEETLEFS

MR WOLOSZ:  Were you au fait with the exchange rate at the time?

MS DEETLEFS:  I googled it but it was fluctuating a lot so it was very hard to tell what the amount would be.

5   MR WOLOSZ:  Do you remember the ladies presenting telling you that exact number 195 dollars and 75 cents?

MS DEETLEFS:  They were talking about a few numbers but yes I do remember that number.

MR WOLOSZ:  Did they say why that number was given and 10  not any other one?

MS DEETLEFS:  When you say "did they say that" is it basically that they explained why?  What do you … (intervention)?

MR WOLOSZ:  Yes.  Did they explain where the number 195 15  dollars and 75 cents derived?

MS DEETLEFS:  No.

MR WOLOSZ:  Did anyone ask?

MS DEETLEFS:  This was quite a few years back, two years, I cannot remember if anyone asked.  They did – some of the au 20  pairs did ask is that the only amount and they said no.

MR WOLOSZ:  What did they say?

MS DEETLEFS:  They said that the 195.75 is the minimum amount that we can earn depending on the State and the family you could earn more and you could earn overtime.

25   MR WOLOSZ:  So setting aside overtime before we get there

21.09.16                                                              /...

PLAINTIFFS' RESP. APP.0004369

Case No. 1:14-cv-03074-CMA-KMT Document 959-23 filed 03/30/18 USDC Colorado pg
162 of 310

# Exhibit 396

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO


JOHANA PAOLA BELTRAN, et al.,


                    Plaintiffs,


vs.                          No. 14-cv-03074-CMA-KMT


INTEREXCHANGE, INC., et al.,


                    Defendants.


        Deposition of CARRIE CROMPTON, taken on behalf
of the Plaintiffs, at the offices of GorePerry
Reporting & Video, 515 Olive Street, Suite 300, in
the City of St. Louis, State of Missouri, on the
22nd day of September, 2016, before Kristine A.
Toennies, RMR, CRR, CBC, MO-CCR #769, CSR (IL
#084-004388 & IA), and Notary Public.

PLAINTIFFS' RESP. APP.0004371

|  | Page 2 |
|---|---|
| 1 | APPEARANCES OF COUNSEL: |
| 2 |  |
| 3 | FOR THE PLAINTIFFS: |
| 4 | Ms. Sabria A. McElroy |
| 5 | Boies, Schiller & Flexner LLP |
| 6 | 401 East Las Olas Boulevard, Suite 1200 |
| 7 | Fort Lauderdale, FL 33301-2211 |
| 8 | (954) 356-0011 |
| 9 | smcelroy@bsfllp.com |
| 10 |  |
| 11 | FOR THE DEFENDANT AU PAIR FOUNDATION: |
| 12 | Ms. Susan M. Schaecher |
| 13 | Fisher & Phillips LLP |
| 14 | 1801 California Street, Suite 2700 |
| 15 | Denver, CO 80202 |
| 16 | (303) 218-3650 |
| 17 | sschaecher@fisherphillips.com |
| 18 |  |
| 19 | FOR THE DEFENDANT CULTURAL HOMESTAY INTERNATIONAL: |
| 20 | Mr. Jonathan S. Bender |
| 21 | Holland & Hart LLP |
| 22 | 555 17th Street, Suite 3200 |
| 23 | Denver, CO 80202 |
| 24 | (303) 295-8456 |
| 25 | jsbender@hollandhart.com |

|  | Page 4 |
|---|---|
| 1 | APPEARANCES CONTINUED: |
| 2 |  |
| 3 | FOR THE DEFENDANT INTEREXCHANGE: |
| 4 | Ms. Brooke A. Colaizzi (By telephone) |
| 5 | Sherman & Howard LLC |
| 6 | 633 17th Street, Suite 3000 |
| 7 | Denver, CO 80202 |
| 8 | (303) 297-2900 |
| 9 | bcolaizzi@shermanhoward.com |
| 10 |  |
| 11 | FOR THE DEFENDANT EXPERT AUPAIR: |
| 12 | Mr. Bogdan Enica (By telephone) |
| 13 | Expert AuPair |
| 14 | 100 2nd Avenue S., Suite 3025 |
| 15 | St. Petersburg, FL 33701 |
| 16 | (727) 225-2649 |
| 17 | bogdan@expertaupair.com |
| 18 |  |
| 19 |  |
| 20 |  |
| 21 |  |
| 22 |  |
| 23 |  |
| 24 |  |
| 25 |  |

|  | Page 3 |
|---|---|
| 1 | APPEARANCES CONTINUED: |
| 2 | FOR THE DEFENDANT CULTURAL CARE: |
| 3 | Ms. Lyndsey M. Kruzer (By telephone) |
| 4 | Choate, Hall & Stewart |
| 5 | Two International Place |
| 6 | Boston, MA 02110 |
| 7 | (617) 248-5000 |
| 8 | lkruzer@choate.com |
| 9 |  |
| 10 | FOR THE DEFENDANT AUPAIRCARE: |
| 11 | Ms. Peggy E. Kozal (By telephone) |
| 12 | Gordon & Rees |
| 13 | 555 17th Street, Suite 3400 |
| 14 | Denver, CO 80202 |
| 15 | (303) 534-5160 |
| 16 | pkozal@gordonrees.com |
| 17 |  |
| 18 | FOR THE DEFENDANTS PROAUPAIR AND |
| 19 | INTERNATIONAL AUPAIR EXCHANGE: |
| 20 | Mr. Lawrence D. Stone (By telephone) |
| 21 | Nixon Shefrin Hensen Ogburn P.C. |
| 22 | 5619 DTC Parkway, Suite 1200 |
| 23 | Greenwood Village, CO 80111 |
| 24 | (303) 773-3500 |
| 25 | lstone@nixonshefrin.com |

|  | Page 5 |
|---|---|
| 1 | INDEX |
| 2 | PAGE |
| 3 | Examination by Ms. McElroy            6 |
| 4 | Examination by Ms. Schaecher       111 |
| 5 | Examination by Mr. Bender           113 |
| 6 | Examination by Mr. Stone            116 |
| 7 | Examination cont'd by Mr. Stone     120 |
| 8 | Examination cont'd by Ms. McElroy   122 |
| 9 | Examination cont'd by Mr. Stone     127 |
| 10 |  |
| 11 | EXHIBITS |
| 12 |  |
| 13 | Exhibit 79                            44 |
| 14 | Exhibit 80                            49 |
| 15 | Exhibit 81                            55 |
| 16 | Exhibit 82                            67 |
| 17 | Exhibit 83                            75 |
| 18 | Exhibit 84                            77 |
| 19 | Exhibit 85                            83 |
| 20 | Exhibit 86                            85 |
| 21 | Exhibit 87                            91 |
| 22 | Exhibit 88                            93 |
| 23 | Exhibit 89                            96 |
| 24 | Exhibit 90                            98 |
| 25 |  |

PLAINTIFFS' RESP. APP.0004372

MAGNA
LEGAL SERVICES

---

**Page 10**

1  Q   You said your current employer is Cultural
2  Homestay International?
3  A   Yes.
4  Q   If I use CHI, will you understand what I
5  mean?
6  A   Perfect.
7  Q   How long have you been employed with CHI?
8  A   Since November 2015.
9  Q   Do you know about how many employees CHI
10  has?
11  A   Well, they have several different programs,
12  so as a company I don't know, but au pair, I think
13  there's five or six.
14  Q   So when you say they have several different
15  programs, what do you mean by that?
16  A   Well, in addition to the au pair program,
17  they have work and travel, they have academic year
18  program, which is kind of like a high school
19  exchange program.
20  Q   So those other programs are unrelated to the
21  au pair program?
22  A   They are.
23  Q   So you said there's only five to six
24  employees for the -- or around five to six for the
25  au pair?

---

**Page 11**

1  A   Yeah, full-time staff.
2  MR. BENDER:  Carrie, just make sure she gets
3  her question out before you answer so we have a
4  clean record.
5  THE WITNESS:  Okay.
6  Q   (By Ms. McElroy) Does Cultural Homestay use
7  independent contractors as part of their au pair
8  program?
9  A   They do.
10  Q   And you said -- are there also part-time
11  employees, or are all part-time workers independent
12  contractors, if you know?
13  MR. BENDER:  Object to the form.
14  A   CHI has, like I said, five to six full-time
15  staff.  The field staff are all independent
16  contractors.
17  Q   (By Ms. McElroy) Do they have any part-time
18  employees?
19  A   I do believe that CHI does use interns.  I
20  am not aware of their employment status.
21  Q   What is your current position with CHI?
22  A   I am the regional administrator for the
23  western U.S.
24  Q   What are your duties as regional
25  administrator?

---

**Page 12**

1  A   I manage my field staff, so the independent
2  contractors in the region.  I am responsible for
3  customer service in the region.  I am responsible
4  for sales and growth in the region, and I work
5  closely with the field staff in the main office on
6  Department of State required forms and paperwork.
7  Q   When you say that you manage field staff,
8  what are the positions of the people that you
9  manage?
10  A   They are what's called a community
11  administrator.
12  Q   Are they the ones that interact directly
13  with au pairs?
14  A   Yes.
15  Q   Do they also interact directly with the host
16  families?
17  A   Yes.
18  Q   Do you have direct interactions in your
19  position with au pairs?
20  A   Phone and e-mail only.
21  Q   So no in-person contact with au pairs --
22  A   No.
23  Q   -- in this position?  Do you have direct
24  contact with host families?
25  A   Phone and e-mail.

---

**Page 13**

1  Q   So no in-person contact with phone -- I'm
2  sorry -- with host families?
3  A   No in-person.
4  Q   When you say customer service, could you
5  explain what you mean by that, what your role is
6  with customer service?
7  A   Sure.  Being an added layer of support for
8  both the host families and the au pairs, also for
9  the community administrators.  If any questions come
10  up, you know, helping them find the answers,
11  providing the answers if there's any issues that
12  come up.  We are a business trying to make people
13  happy.
14  Q   So you provide customer service for both
15  host families as well as for au pairs; is that fair
16  to say?
17  A   Yes.
18  Q   Do you ever speak to host families about the
19  stipend that au pairs receive for their work?
20  A   Yes.
21  Q   Do you ever speak to au pairs about the
22  stipend that they receive for their work?
23  A   Yes.
24  Q   You said you're also responsible for the
25  Department of State forms.  Could you explain what

---

**MAGNA**
LEGAL SERVICES

Page 46

1  you and ask you to sign it?
2      MS. SCHAECHER: Objection. Attorney-client
3  privilege and instruct you not to answer.
4      MS. McELROY: Did someone -- I'm not asking
5  about the content or the back and forth in creating
6  the document. I'm asking merely if someone sent the
7  document to her to establish how she first received
8  it.
9      MS. SCHAECHER: You may answer that
10 question.
11     A  Yes, I did receive a draft.
12     Q  (By Ms. McElroy) And did you receive it by
13 e-mail?
14     A  Yes.
15     Q  Did you read this document before signing
16 it?
17     A  Yes.
18     Q  And again, I'm not asking about any back and
19 forth, just a yes or no question. Did you make any
20 changes to this document after you first received
21 it?
22     A  Actually, I do think I had some edits. I
23 don't remember what.
24     Q  Do you recall whether you discussed this
25 document with any other employees at APF outside the

Page 47

1  presence of your counsel?
2      A  I don't believe so.
3      Q  In paragraph six this document indicates
4  that you have been provided admissions or statements
5  purportedly made by a representative of APF Global
6  Foundation NFP.
7      And then you state, Without context, I
8  cannot be certain whether I might have made any of
9  those statements. However, I can state -- actually,
10 let me stop there. Sitting -- was that a true
11 statement when you made it in 2014?
12     A  Which one?
13     Q  The first two sentences that I just read: I
14 have been provided the admissions or statements
15 purportedly made by a representative of APF Global
16 Foundation NFP. Without context, I cannot be
17 certain whether I have made any of those statements.
18     A  Yes, that's true.
19     Q  Sitting here today, are you now aware of
20 whether or not you are the person who plaintiff's
21 investigator says he spoke with at APF?
22     A  I apologize. Could you repeat that?
23     Q  Yes. As we sit here today, are you now
24 aware of whether or not you are the person that
25 plaintiff's investigator states that he spoke with

Page 48

1  at APF?
2      MR. BENDER: Objection to the form.
3      A  I am not aware that I was that person.
4      Q  (By Ms. McElroy) Around the time that you
5  drafted this declaration -- I'm sorry. Let me
6  rephrase that.
7      Around the time that you signed this
8  declaration, did you search APF's call notes or logs
9  for a record of the call described in the
10 declaration?
11     A  No.
12     Q  Is it fair to say sitting here today you
13 have no independent memory of the call described in
14 this declaration?
15     A  I do not.
16     Q  In your role as national director of field
17 operations at APF, you testified earlier that you
18 were responsible for answering the telephones;
19 correct?
20     A  At APF, the not-for-profit, yes.
21     Q  Were there any policies to help -- let me
22 rephrase that. Were there any policies in place
23 that you relied on to help you respond to phone
24 inquiries?
25     A  No.

Page 49

1      Q  Were you instructed to respond to phone
2  inquiries regarding the weekly stipend in a certain
3  way?
4      A  No.
5      (Deposition Exhibit Number
6  80 marked for identification.)
7      MS. McELROY: I'd like to mark this as
8  Exhibit 80.
9      Q  (By Ms. McElroy) Do you recognize the --
10     MS. McELROY: For counsel on the phone, I've
11 just shown her the document Bates labeled APF
12 000274.
13     Q  (By Ms. McElroy) Do you recognize this
14 document?
15     A  Give me just a minute.
16     Q  Sure.
17     A  Yes, I do.
18     Q  Did you write this e-mail?
19     A  I did.
20     Q  Did you write this e-mail in your
21 professional capacity as an employee at APF?
22     A  Yes.
23     Q  What was your role at APF at the time that
24 you wrote this e-mail?
25     A  I was the national director of field

PLAINTIFFS' RESP. APP.0004374

MAGNA
LEGAL SERVICES

Page 50

1   operations.
2       Q   Do you see the sentence approximately
3   halfway down the page that says, quote, "The weekly
4   stipend is $195.75 as with all agencies"?
5       A   I see it.
6       Q   Was this a true statement at the time that
7   you made it in this e-mail?
8       A   Yes.
9           MR. STONE:  Objection.  Form; foundation.
10      Q   (By Ms. McElroy) Is this statement
11  consistent with what you were trained to communicate
12  about the stipend while an APF employee?
13          MS. SCHAECHER:  Objection to form and
14  foundation.
15      A   The weekly stipend at that time was $195.75.
16      Q   (By Ms. McElroy) And you state the weekly
17  stipend is 195.75 as with all agencies.  Is this
18  statement consistent with what you were trained to
19  communicate about the stipend while an APF employee?
20          MS. SCHAECHER:  Same objection.
21          MR. STONE:  Objection.  Foundation.
22      A   I wasn't trained on that.
23      Q   (By Ms. McElroy) Is this statement
24  consistent with what you told other host families
25  while working at APF?

Page 51

1           MR. STONE:  Objection.  Foundation.
2       A   Yes.
3       Q   (By Ms. McElroy) Are you familiar with the
4   acronym IAPA?
5       A   I am.
6       Q   Can you tell us what that stands for?
7       A   It is the International Au Pair Association.
8       Q   And what is your understanding of the
9   purpose of that organization?
10      A   It is a nonprofit organization based out of
11  Europe to promote the au pair program worldwide.
12      Q   Is CHI a member of the IAPA?
13      A   Yes, they are.
14      Q   Is APF a member of the IAPA?
15      A   APF NFP is a member of IAPA.
16      Q   When you say APF NFP, is that different than
17  APF?
18      A   Than APF, Inc., yes.
19      Q   Okay.  Do you know whether APF, Inc. was a
20  member of IAPA?
21      A   They were not.
22      Q   Are you aware of whether Cultural Care was a
23  member of the IAPA while you worked there?
24      A   I'm not aware.
25      Q   Are you aware of whether or not GreatAuPair

Page 52

1   was a member while you worked there?
2       A   I'm not aware.
3       Q   And are you aware of whether or not
4   AuPairCare was a member while you worked there?
5       A   I am not.
6       Q   Have you ever attended an IAPA event in your
7   capacity as an employee for any sponsor agency?
8       A   I have not.
9       Q   Does CHI send any employees to IAPA events?
10      A   Yes.
11      Q   Do you know the names of those employees?
12      A   Christina Reilly.
13      Q   Do they send any other employees?
14      A   Not that I'm aware of.
15      Q   Did APF send any employees -- Au Pair
16  Foundation send any employees to IAPA events?
17      A   While I worked there?
18      Q   Yes, while you worked there.
19      A   Not that I'm aware of.
20      Q   Did you ever receive regular e-mails from
21  the IAPA in your professional capacity while working
22  for any sponsor agency?
23      A   I believe that while I worked for APF NFP I
24  did subscribe to their e-mail distribution list or
25  newsletters and whatnot.

Page 53

1       Q   So you received them because you signed up
2   for a LISTSERV of some sort?
3       A   Yes.
4       Q   Do you recall how regularly you received
5   these newsletters?
6       A   I don't.
7       Q   Are you familiar with the organization
8   Alliance for International Exchange?
9       A   I am.
10      Q   Is CHI a member of the Alliance for
11  International Exchange?
12      A   They are.
13      Q   What do you understand to be the purpose of
14  that organization?
15      A   My understanding is the Alliance is an
16  organization out of Washington, D.C. that works with
17  au pair programs and exchange programs to help
18  improve those programs both here in the U.S. and for
19  au pairs that come here from overseas.
20      Q   Have you ever attended an Alliance event in
21  your capacity as an employee for any sponsor agency?
22      A   I have not.  Oh, excuse me.  I apologize.
23  No, I did.  I'm sorry.  While I was working for APF
24  NFP I attended an anti-human trafficking seminar up
25  in Chicago that was put on by the Alliance.

MAGNA
LEGAL SERVICES

Case No. 1:14-cv-03074-CMA-KMT Document 859-23 filed 03/30/18 USDC Colorado pg 168 of 310

# Exhibit 397

*Johana Paola Beltran, et al. vs.*

*Interexchange, Inc., et al.*

---

*Confidential Video Deposition of Ivette Alexandra Gonzalez*

*September 28, 2016*

---



700 17th Street, Suite 1750
Denver, CO 80202
303-988-8470 (Office)   303-988-8478 (Fax)
SKReporting.com

# Stevens-Koenig
## Reporting

PLAINTIFFS' RESP. APP.0004377

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

---

```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLORADO
 2

    Civil Action No. 1:14-cv-03074-CMA-KMT
 3    _____

 4  JOHANA PAOLA BELTRAN, et al.,

 5       Plaintiffs,

 6  vs.

 7  INTEREXCHANGE, INC.; et al.,

 8       Defendants.
    _____
 9

          CONFIDENTIAL VIDEO DEPOSITION OF
10             IVETTE ALEXANDRA GONZALEZ

11             September 28, 2016
    _____

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**Page 2**

```
 1  APPEARANCES:
 2  ON BEHALF OF THE PLAINTIFFS:
        SABRIA McELROY, ESQ.
 3      LAUREN E. LOUIS, ESQ. (appearing by phone)
        Boies Schiller & Flexner, LLP
 4      401 East Las Olas Boulevard, Suite 1200
        Fort Lauderdale, Florida 33301
 5      Phone:  954-356-0011
        Emails: smcelroy@bsfllp.com
 6              llouis@bsfllp.com
 7  ON BEHALF OF AU PAIR INTERNATIONAL, INC., AMERICAN
    CULTURAL EXCHANGE, AND AGENT AU PAIR:
 8      KATHRYN A. REILLY, ESQ.
        Wheeler Trigg O'Donnell, LLP
 9      370 17th Street, Suite 4500
        Denver, Colorado 80202
10      Phone:  303-244-1800
        Email:  reilly@wtotrial.com
11
    ON BEHALF OF AUPAIRCARE, INC.:
12      PEGGY E. KOZAL, ESQ.
        Gordon Rees Scully Mansukhani, LLP
13      555 17th Street, Suite 3400
        Denver, Colorado 80202
14      Phone:  303-534-5160
        Email:  pkozal@gordonrees.com
15
    ON BEHALF OF APF GLOBAL EXCHANGE, NFP,
16  AND AMERICAN INSTITUTE FOR FOREIGN STUDY:
        LAWRENCE L. LEE, ESQ.
17      Fisher & Phillips, LLP
        1801 California Street, Suite 2700
18      Denver, Colorado 80202
        Phone:  303-218-3663
19      Email:  llee@laborlawyers.com
20  ON BEHALF OF A.P.EX. AMERICAN PROFESSIONAL
    EXCHANGE AND 20/20 CARE EXCHANGE, INC.:
21      MICHAEL DREW, ESQ. (appearing by phone)
        Nixon Shefrin Hensen Ogburn, P.C.
22      5619 DTC Parkway, Suite 1200
        Greenwood Village, Colorado 80111
23      Phone:  303-773-3500
        Email:  mdrew@nixonshefrin.com
24
25
```

**Page 3**

```
 1  APPEARANCES (CONTINUED):
 2  ON BEHALF OF EXPERT GROUP INTERNATIONAL:
        BOGDAN ENICA, ESQ. (appearing by phone)
 3      Bogdan Enica, Attorney at Law
        111 2nd Avenue NE, Suite 900
 4      St. Petersburg, Florida 33701
        Phone:  727-225-2649
 5      Email:  bogdane@hotmail.com
 6  ON BEHALF OF EURAUPAIR INTERCULTURAL CHILD CARE:
        MARTHA L. FITZGERALD, ESQ. (appearing by phone)
 7      Brownstein Hyatt Farber Schreck
        410 17th Street, 22nd Floor
 8      Denver, Colorado 80202
        Phone:  303-223-1100
 9      Email:  mfitzgerald@bhfs.com
10  ON BEHALF OF CULTURAL CARE, INC.:
        LYNDSEY M. KRUZER, ESQ. (appearing by phone)
11      Choate Hall & Stewart, LLP
        Two International Place
12      Boston, Massachusetts 02110
        Phone:  617-248-5000
13      Email:  lkruzer@choate.com
14      and
15      JAMES E. LYONS, ESQ.
        Lewis Roca Rothgerber Christie, LLP
16      1200 17th Street, Suite 3000
        Denver, Colorado 80202
17      Phone:  303-628-9545
        Email:  jlyons@lrrc.com
18
    Also Present:  Jerry DeBoer, Videographer
19                 Anabel Cuadros Yeiser, Interpreter
                   Marcela Salazar
20                 Bill Kapler
21
22
23
24
25
```

**Page 4**

```
 1        PURSUANT TO WRITTEN NOTICE and the appropriate
 2  rules of Civil Procedure, the confidential video
 3  deposition of IVETTE ALEXANDRA GONZALEZ, called for
 4  examination by Defendant GoAuPair, was taken at the
 5  offices of Wheeler Trigg O'Donnell, LLP, 370 17th Street,
 6  Suite 4500, Denver, Colorado, commencing at 9:09 a.m. on
 7  Wednesday, September 28, 2016, before Deborah A.
 8  VanDemark, RPR, CRCR, and Notary Public in and for the
 9  State of Colorado.
10                    I N D E X
11  EXAMINATION:                              PAGE
12    By Ms. Reilly                             7
13
                                            INITIAL
14  EXHIBITS:                               REFERENCE
15    100   Declaration of Ivette Alexandra    36
              Gonzalez Cortes
16
      101   Au Pair Payment Verification Form  46
17            signed by Ms. Gonzalez on 9/6/14
18    102   GoAuPair Au Pair Agreement,        51
              GAP_00000940-943
19
      103   Department of State Au Pair Exchange  52
20            Program Regulations, GAP_00000916-918
21    104   Letter from Ms. Gonzalez to Host    56
              Family, GONZALEZ000572-573
22
      105   GoAuPair Written Agreement,        77
23            GONZALEZ000972-973
24    106   GoAuPair Written Agreement Signed by 78
              Ms. Gonzalez, GONZALEZ000645-646
25
```

PLAINTIFFS' RESP. APP.0004378

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

| | | Page 5 |
|---|---|---|
| 1 | EXHIBITS: | INITIAL REFERENCE |
| 2 | | |
| 3 | 107 GoAuPair Orientation Packet, GONZALEZ000482-488 | 101 |
| 4 | 108 GoAuPair Grievance Policy, GONZALEZ001214-1215 | 107 |
| 5 | | |
| 6 | 109 GoAuPair Survey completed by Ms. Gonzalez, GAP_00003919-3921 | 118 |
| 7 | 110 Notes made by Amanda Gray, GAP_00003925-3926 | 148 |
| 8 | | |
| 9 | 111 Email chain between Ms. Gonzalez and Ms. Hardman with attached text messages from Ms. Sanders, GONZALEZ000728-733 | 159 |
| 10 | | |
| 11 | 112 Email chain between Ms. Gonzales and Ms. Hardman regarding rematch, GONZALEZ001221-1223 | 160 |
| 12 | | |
| 13 | 113 Email to Ms. Zapata from Ms. Gonzalez dated 2/2/15, GONZALEZ000743 | 161 |
| 14 | | |
| 15 | 114 Email to Ms. Gonzalez from Ms. Gray dated 2/17/15, GONZALEZ001254 | 162 |
| 16 | 115 Email chain between Ms. Gonzalez and Ms. Hardman with attached letter from Ms. Sanders, GONZALEZ001266-1268 | 169 |
| 17 | | |
| 18 | 116 GoAuPair Survey completed by Ms. Gonzalez, GAP_00003922-3924 | 175 |
| 19 | | |
| 20 | 117 Email chain between Ms. Gonzalez and Ms. Moore, GONZALEZ000759-760 | 180 |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

Page 6

1  P R O C E E D I N G S
2  THE VIDEOGRAPHER: We are on the record at
3  9:09 on September 28, 2016. Will the reporter please
4  swear in the interpreter.
5  ANABEL CUADROS YEISER,
6  having been first duly sworn, testifies to translate the
7  questions asked and the answers given to the best of
8  their ability:
9  THE VIDEOGRAPHER: We are at 370
10  17th Street, Suite 4500, Denver, Colorado. We are here
11  for the video deposition of Ivette Alexandra Gonzalez in
12  the matter of Johana Paola Beltran, et al. versus
13  InterExchange, Inc., et al. in the United States District
14  Court for the District of Colorado, Case Number
15  1:14-cv-03074-CMA-KMT. The videographer is Jerry DeBoer,
16  and the court reporter is Debbie VanDemark from
17  Stevens-Koenig Reporting.
18  Will counsel please state their
19  appearances beginning with plaintiffs' counsel.
20  MS. McELROY: Sabria McElroy from Boies
21  Schiller & Flexner for the plaintiff.
22  MS. REILLY: Katie Reilly on behalf of
23  GoAuPair, Agent Au Pair, and Au Pair International.
24  MS. KOZAL: Peggy Kozal on behalf of
25  AuPairCare.

Page 7

1  MR. LEE: Larry Lee here on behalf of AIFS
2  for APF.
3  THE VIDEOGRAPHER: And counsel on the
4  phone?
5  MR. DREW: This is Mike Drew. I represent
6  A.P.EX and 20/20 Care Exchange.
7  MS. KRUZER: This is Lyndsey Kruzer. I
8  represent Cultural Care.
9  MS. LOUIS: Lauren Louis with Boies
10  Schiller on behalf of plaintiff.
11  MR. ENICA: And Bogdan Enica on behalf of
12  Expert Group International doing business as Expert
13  AuPair.
14  MS. FITZGERALD: Martha Fitzgerald on
15  behalf of EurAupair.
16  MS. REILLY: Also let the record reflect
17  with me today is Bill Kapler from GoAuPair.
18  THE VIDEOGRAPHER: Will the reporter
19  please swear in the witness.
20  IVETTE ALEXANDRA GONZALEZ,
21  having been first duly sworn, was examined and testified
22  as follows:
23  EXAMINATION
24  BY MS. REILLY:
25  Q. Good morning, Ms. Gonzalez. I'm Katie

Page 8

1  Reilly, and I represent GoAuPair, Agent Au Pair, and
2  Au Pair International in the lawsuit. Ms. Gonzalez, why
3  did you join this lawsuit?
4  A. Because I thought that the salary was not
5  fair.
6  Q. And what was not fair about it?
7  A. It was not fair to work 9 hours a day and
8  receive that salary having personal needs.
9  Q. Did you know what the salary would be
10  before you entered the au pair program?
11  A. Yes, of course, but in Colombia that's a
12  lot of money.
13  Q. What do you think GoAuPair did wrong?
14  A. I think introducing the girls to the
15  United States without knowing how is the life here, how
16  it is, how the money is here, and if that money really
17  works here for our personal needs.
18  Q. The salary you received was paid by your
19  host family, right?
20  A. Yes.
21  Q. And it was your host family who decided
22  how much to pay you?
23  A. I'm not sure I understand the question
24  because there's two parts here. GoAuPair in Colombia
25  told me the salary, and they told me that the family

PLAINTIFFS' RESP. APP.0004379

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

---

Page 9

1  already know -- or already knew the salary, but here --
2  and nonetheless here in the U.S. the services were
3  ratified at $200 with Amanda that was here.
4      Q.  **What do you mean ratified?**
5      A.  Amanda accepted the $200.
6      Q.  ████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████

12     Q.  **(By Ms. Reilly)  Did GoAuPair ever lie to**
13 **you about anything?**
14     MS. McELROY:  Objection, foundation.
15     A.  I'm not sure that I have to answer that
16 question.
17     Q.  **(By Ms. Reilly)  You do have to answer that**
18 **question.**
19     A.  No, they didn't lie because in reality
20 they told me the salary that it was going to be, no more
21 or less.  It was what it was.
22     Q.  **Have you ever been deposed before?**
23     A.  No, never.
24     Q.  **Okay.  So I'm going to go over just some**
25 **ground rules for today's deposition.**

---

Page 10

1      A.  Thank you very much.
2      Q.  **So first you have to give verbal answers,**
3  **which you've been doing a good job of so far.  Verbal**
4  **answers means with words and not just by shaking the head**
5  **or making hand gestures, so using words so that the court**
6  **reporter can make a record.  And if you don't understand**
7  **a question that I'm asking, just let me know.  And I'm**
8  **happy to rephrase it.**
9      A.  Yes.  Thank you.
10     Q.  **And if you do not ask me to rephrase it, I**
11 **will assume that you understood my question, okay?  If**
12 **you need a break at any point, just let us know.  As long**
13 **as a question isn't pending, we can take a break.**
14     A.  Thank you.
15     Q.  **Other than today -- or other than this**
16 **case, have you ever given sworn testimony in the form of**
17 **an affidavit or in court?**
18     A.  No, not in court.
19     Q.  **And have you taken any medication within**
20 **the last 24 to 48 hours that would impair your ability to**
21 **remember things today or give testimony?**
22     A.  No, no.
23     Q.  **Did you prepare for today's deposition?**
24     A.  No.
25     Q.  **Did you meet with your lawyer in advance**

---

Page 11

1  of the deposition to talk about the deposition?
2      (Mr. Lyons joined the proceedings.)
3      A.  Yes, I did talk to my lawyer obviously
4  about this deposition in the terms -- obviously very
5  general terms about what was going to happen.
6      Q.  **And I'm not going to ask you today about**
7  **anything you've discussed with your lawyer, okay?  Did**
8  **you meet with your lawyer in person?**
9      A.  Yes.
10     Q.  **And when was that?**
11     A.  On Monday.
12     Q.  **And who was that that you met with,**
13 **Sabria?**
14     A.  Yes.
15     Q.  **If you could give a louder answer.**
16     A.  (In English)  Yes, yes.
17     Q.  **Any other lawyer?**
18     A.  Lauren.
19     Q.  **Lauren Louis?**
20     A.  Yes, ma'am.
21     Q.  **And was Lauren on the phone?**
22     A.  No, in person.
23     Q.  **And where did you meet?**
24     A.  In Miami.
25     Q.  **Was any other lawyer present?**

---

Page 12

1      A.  No, ma'am.
2      Q.  **Okay.  And did you review any documents to**
3  **prepare for today's deposition?**
4      A.  Yes, of course.
5      Q.  **Which ones?**
6      A.  The statements that I have given them.
7      Q.  **You mean your declaration?**
8      A.  Yes.
9      Q.  **Your discovery responses?**
10     A.  Uh-huh.
11     Q.  **The complaint that's been filed in this**
12 **case?**
13     A.  Yes, ma'am.
14     Q.  **Anything else?**
15     A.  No, ma'am.
16     MS. McELROY:  Can we take a short break?
17     THE VIDEOGRAPHER:  Going off the record.
18 The time is 9:23.
19     (Recess taken from 9:23 a.m. to 9:33 a.m.)
20     THE VIDEOGRAPHER:  We are back on the
21 record.  The time is 9:33.
22     Q.  **(By Ms. Reilly)  Ms. Gonzalez, do you have**
23 **any corrections you'd like to make to your testimony?**
24     A.  Yes.
25     Q.  **What is that?**

---

PLAINTIFFS' RESP. APP.0004380

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 13

1    A.  In the question where you asked me if --
2 about the life.
3    Q.  Okay.  What's the correction?
4    A.  What I wanted to say is that in general
5 terms sometimes I feel it was a lie.
6    MR. LYONS:  I'm sorry.  Sometimes I what?
7    THE INTERPRETER:  I feel it was a lie.
8    MR. LYONS:  All right.  Thank you.
9    Q.  (By Ms. Reilly)  And what caused you to
10 change your testimony from 20 minutes ago during the
11 break to now?
12    A.  Because I was nervous.  And I was thinking
13 about the cash, the cash alone.  I wasn't thinking on the
14 entire experience.
15    Q.  But after the break you have other things
16 on your mind?
17    MS. McELROY:  Objection, form.
18    A.  I'm not sure if I have to answer that
19 question, but --
20    Q.  (By Ms. Reilly)  I'll strike that question.
21 So what -- what's your new answer to the lie question?
22    MS. McELROY:  Objection, form.
23    A.  Then change the question.
24    Q.  (By Ms. Reilly)  How did GoAuPair lie to
25 you?

Page 14

1    A.  They should have told me that in Colombia
2 that they were going to leave me alone, alone when I was
3 here.  When I was here, I was in a cultural exchange.
4    THE DEPONENT:  (In English)  I don't
5 believe you are very good.
6    MS. McELROY:  Object to translation.
7    MS. KOZAL:  Why don't we have the witness
8 repeat her answer, and then we have it translated again
9 because I'm sure you don't recall exactly what she just
10 said, fair?
11    MS. SALAZAR:  I do recall what she just
12 said.
13    MS. REILLY:  Good.
14    MS. SALAZAR:  She said that when she was
15 in Colombia they never told her that she would be left
16 here alone.  She felt very alone here.  She came here to
17 work.  She was here working.  She didn't come here on a
18 cultural exchange.
19    Q.  (By Ms. Reilly)  Any other lies that
20 GoAuPair told you?
21    A.  In Colombia they told me I would be
22 accompanied by a local, a local person.  But just being
23 here I didn't feel that real company.  I felt -- I felt
24 with the family that I was alone.  I was in a job.  And
25 they have told me that I was in a cultural exchange, and

Page 15

1 it was not a job.
2    THE DEPONENT:  (In English)  I don't know
3 if that is good.
4    MS. McELROY:  Object to translation.
5    MS. SALAZAR:  When I was in Colombia, they
6 told me that there would be a local coordinator here, but
7 once I arrived here I didn't have that local coordinator.
8 I was alone.
9    THE DEPONENT:  (In English)  No.  I have.
10    A.  I did have coordinator, but I didn't feel
11 that the agency was accompanying me during this whole
12 process in the United States.
13    Q.  (By Ms. Reilly)  Is that accurate?
14    MS. McELROY:  Object.
15    A.  No, no, not really.  What you're saying is
16 not what I'm trying to say.
17    MS. REILLY:  Let's go off the record for
18 one second.
19    MR. LEE:  Good idea.
20    THE VIDEOGRAPHER:  Going off the record.
21 The time is 9:39.
22    (Recess taken from 9:39 a.m. to 9:48 a.m.)
23    THE VIDEOGRAPHER:  We are back on the
24 record.  The time is 9:48.
25    Q.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Page 16



PLAINTIFFS' RESP. APP.0004381

# Exhibit 398

PLAINTIFFS' RESP. APP.0004382

*Johana Paola Beltran, et al. vs.*

*Interexchange, Inc., et al.*

*Confidential Video Deposition of Nicole Renee Mapledoram*

*October 03, 2016*



700 17th Street, Suite 1750
Denver, CO 80202
303-988-8470 (Office)   303-988-8478 (Fax)
SKReporting.com

Stevens-Koenig
Reporting

PLAINTIFFS' RESP. APP.0004383

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Nicole Renee Mapledoram
October 03, 2016

---

**Page 1**

```
 1            IN THE UNITED STATES DISTRICT COURT

               FOR THE DISTRICT OF COLORADO
 2

      Civil Action No. 1:14-cv-03074-CMA-KMT
 3    _____

 4    JOHANA PAOLA BELTRAN, et al.,

 5          Plaintiffs,

 6    vs.

 7    INTEREXCHANGE, INC., et al.,

 8          Defendants.
      _____

 9

      CONFIDENTIAL VIDEO DEPOSITION OF NICOLE RENEE MAPLEDORAM
10                   October 3, 2016
      _____

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**Page 2**

```
 1    APPEARANCES:
 2    ON BEHALF OF THE PLAINTIFFS:
           NINA E. DiSALVO, ESQ.
 3         Towards Justice
           1535 High Street, Suite 300
 4         Denver, Colorado 80218
           Phone:  720-239-2606
 5         Email:  nina@towardsjustice.org
 6         and
 7         LAUREN E. LOUIS, ESQ. (appearing by phone)
           Boies Schiller & Flexner, LLP
 8         401 East Las Olas Boulevard, Suite 1200
           Fort Lauderdale, Florida 33301
 9         Phone:  954-356-0011
           Email:  llouis@bsfllp.com
10
      ON BEHALF OF EXPERT GROUP INTERNATIONAL:
11         BOGDAN ENICA, ESQ.
           Bogdan Enica, Attorney at Law
12         111 2nd Avenue NE, Suite 204
           St. Petersburg, Florida 33701
13         Phone:  727-388-3472
           Email:  bogdane@hotmail.com
14
      ON BEHALF OF AU PAIR INTERNATIONAL, INC., AMERICAN
15    CULTURAL EXCHANGE, AND AGENT AU PAIR:
           KATHRYN A. REILLY, ESQ.
16         Wheeler Trigg O'Donnell, LLP
           370 17th Street, Suite 4500
17         Denver, Colorado 80202
           Phone:  303-244-1800
18         Email:  reilly@wtotrial.com
19    ON BEHALF OF APF GLOBAL EXCHANGE, NFP,
      AND AMERICAN INSTITUTE FOR FOREIGN STUDY:
20         SUSAN M. SCHAECHER, ESQ.
           Fisher & Phillips, LLP
21         1801 California Street, Suite 2700
           Denver, Colorado 80202
22         Phone:  303-218-3663
           Email:  sschaecher@laborlawyers.com
23
24
25
```

**Page 3**

```
 1    APPEARANCES CONTINUED:
 2    ON BEHALF OF INTEREXCHANGE, INC.:
           BROOKE A. COLAIZZI, ESQ.
 3         Sherman & Howard, LLC
           633 17th Street, Suite 3000
 4         Denver, Colorado 80202
           Phone:  303-297-2900
 5         Email:  bcolaizzi@shermanhoward.com
 6    ON BEHALF OF CULTURAL HOMESTAY INTERNATIONAL:
           ADAM A. HUBBARD, ESQ.
 7         Holland & Hart LLP
           555 17th Street, Suite 3200
 8         Denver, Colorado 80202
           Phone:  303-295-8000
 9         Email:  aahubbard@hollandhart.com
10    ON BEHALF OF CULTURAL CARE, INC.:
           DIANE R. HAZEL, ESQ.
11         Lewis Roca Rothgerber Christie, LLP
           1200 17th Street, Suite 3000
12         Denver, Colorado 80202
           Phone:  303-628-9545
13         Email:  dhazel@lrrc.com
14         and
15         LYNDSEY M. KRUZER, ESQ. (appearing by phone)
           Choate Hall & Stewart, LLP
16         Two International Place
           Boston, Massachusetts 02110
17         Phone:  617-248-5000
           Email:  lkruzer@choate.com
18
      ON BEHALF OF A.P.EX. AMERICAN PROFESSIONAL
19    EXCHANGE AND 20/20 CARE EXCHANGE, INC.:
           MICHAEL DREW, ESQ. (appearing by phone)
20         Nixon Shefrin Hensen Ogburn, P.C.
           5619 DTC Parkway, Suite 1200
21         Greenwood Village, Colorado 80111
           Phone:  303-773-3500
22         Email:  mdrew@nixonshefrin.com
23    Also Present:  Davis Baumunk, Videographer
                      Mark Gaulter (appearing by phone)
24
25
```

**Page 4**

```
 1            PURSUANT TO WRITTEN NOTICE and the appropriate

 2    rules of Civil Procedure, the confidential video

 3    deposition of NICOLE RENEE MAPLEDORAM, called for

 4    examination by Defendant Expert AuPair, was taken at the

 5    offices of Wheeler Trigg O'Donnell, LLP, 370 17th Street,

 6    Suite 4500, Denver, Colorado, commencing at 9:34 a.m. on

 7    Monday, October 3, 2016, before Deborah A. VanDemark,

 8    RPR, CRCR, and Notary Public in and for the State of

 9    Colorado.

10                   I N D E X

11    EXAMINATION:                              PAGE

12       By Mr. Enica                          7, 274

13       By Ms. Reilly                           266

14       By Ms. Kruzer                           268

15       By Ms. Schaecher                        271

16    Testimony Requested to be Marked:

17       Page              Line

18       122               17

19

20

21

22

23

24

25
```

PLAINTIFFS' RESP. APP.0004384

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Nicole Renee Mapledoram
October 03, 2016

**Page 61**

1 that but not exactly that.

2     Q. Did Expert AuPair dictate the wages that

3 you agreed upon with the ███ family?

4     A. As far as I know, yes.

5     Q. But you just told me that you matched

6 prior to even contacting Expert AuPair. I'm putting

7 Expert AuPair and CHI separate, right?

8     A. Sure.

9     Q. So I'm asking about Expert AuPair. Did

10 they dictate the wages that you agreed upon with the

11 Bryant family?

12     A. To my knowledge, they did.

13     Q. How come? You -- you talk -- you just

14 testified that you talked to the Bryant family and you

15 interviewed and you matched --

16     A. Yes.

17     Q. -- prior to even contacting Expert AuPair.

18     A. That's correct. But we didn't discuss, as

19 far as I can remember, the amount that I would be paid

20 because the amount that I knew about was the same from

21 every agency that I had researched.

22     Q. Okay. So what's the amount that you knew?

23     A. 195.75.

24     Q. So you knew already this amount when you

25 talked to the ███████

**Page 62**

1     A. I did.

2     Q. And still you're testifying here today

3 that this amount was imposed on you by Expert AuPair, not

4 by anybody else but by Expert AuPair?

5     A. Expert AuPair told us during our training

6 that that's the amount we'd get paid no matter like who

7 we're with, what family or what state or how many hours.

8     Q. I'm not at the training stage yet. I'm

9 still when you are in Australia and you're matching with

10 the ██████

11     A. Sure.

12     Q. ███████████████████

███████████████████████

███████████████████████

███████████████████████

███████████████████

███████████████████

███████████████████████

████████████████████

███████████████████

█████████

**Page 63**

1 ████████████████████████

████████

3     MS. DiSALVO: Objection.

4     A. I didn't decide the amount.

5     Q. (By Mr. Enica) So before coming to the

6 United States, you had no idea how much you're going to

7 be paid?

8     A. Yes, I believed the amount was 195.75.

9     Q. Okay. So before coming to the United

10 States you believed or you knew that your stipend is

11 going to be 195.75?

12     A. I don't know whether -- I don't know the

13 difference, whether I believed it or I knew it. Yeah, I

14 believed that's how much the amount was based on that's

15 what I had seen everywhere that I had researched.

16     Q. Okay. So --

17     A. And what I was given by Expert AuPair.

18     Q. Okay. So based on your research, you

19 either believed or knew that the amount is going to be

20 195.75 prior to you coming to the United States to be an

21 au pair, correct?

22     A. Okay, yes.

23     Q. How then Expert AuPair dictated the amount

24 should be 195.75 when you were told by Expert AuPair only

25 at the training phase, which is after you arrived --

**Page 64**

1 you're telling me today, you're testifying under oath

2 that Expert AuPair dictated that this is the amount. And

3 I'm telling you -- and you're telling me at the training

4 they told you this. And I'm asking: How did they

5 dictate the amount when you knew the amount prior to even

6 meeting them?

7     MS. DiSALVO: Objection.

8     A. Can you please ask the question in a

9 different way?

10     Q. (By Mr. Enica) Okay. Did Expert AuPair

11 dictate 195.75 as being the amount you're going to be

12 paid?

13     A. I believe so on their website and on their

14 documents with the family and on my contract with the

15 family based on what Expert AuPair said it will be.

16     Q. Okay. So before you saw the amount on the

17 website and because the amount was filled in in your

18 agreement with the family, you believe they are dictating

19 the amount?

20     A. Yes.

21     Q. Okay. Let's do some exhibits. Let's mark

22 it as 120.

23     (Exhibit 120 was marked.)

24     Q. And I want you to take a look at the

25 document and look at me when you're done reading it.

Case No. 1:14-cv-03074-CMA-KMT   Document 859-23   filed 03/30/18   USDC Colorado   pg 178 of 310

# Exhibit 399

```
 1

 2                  IN THE UNITED STATES COURT
                    FOR THE DISTRICT OF COLORADO
 3
     ----------------------------
 4   JOHANA PAOLA BELTRAN;           )
     LUSAPHO HLATSHANENI;            )
 5   BEAUDETTE DEETLEFS;             )
     DAYANNA PAOLA CARDENAS          )Civil Case No:
 6   CAICEDO;                        )14-cv-03074-CMA-CBS
     ALEXANDRA IVETTE GONZÁLEZ;      )
 7   SARAH CAROLINA AZUELA           )
     RASCON;                         )
 8   LAURA MEJIA JIMENEZ;            )
     JULIANE HARNING;                )
 9   NICOLE MAPLEDORAM;              )
     and those similarly situated)
10                      Plaintiffs,)
     v.                             )
11                                  )
     INTEREXCHANGE, INC.;           )
12   USAUPAIR, INC.;                )
     GREATAUPAIR, LLC;              )
13   EXPERT GROUP INTERNATIONAL,    )
     INC., D/B/A EXPERT AUPAIR;     )
14   EURAUPAIR INTERCULTURAL        )
     CHILD CARE PROGRAMS;           )
15   CULTURAL HOMESTAY              )
     INTERNATIONAL;                 )
16   CULTURAL CARE, INC., D/B/A     )
     CULTURAL CARE AU PAIR;         )
17   AUPAIRCARE, INC.;              )
     AU PAIR INTERNATIONAL, INC.;)
18   APF GLOBAL EXCHANGE, NFP,      )
     D/B/A AUPAIR FOUNDATION;       )
19   AMERICAN INSTITUTE FOR         )
     FOREIGN STUDY D/B/A AU PAIR    )
20   IN AMERICA;                    )
     ASSOCIATES IN CULTURAL         )
21   EXCHANGE D/B/A GOAUPAIR;       )
     AMERICAN CULTURAL EXCHANGE,    )
22   LLC, D/B/A GOAUPAIR;           )
     GOAUPAIR OPERATIONS, LLC,      )
23   D/B/A GOAUPAIR;                )
     AGENT AU PAIR;                 )
24   A.P.EX. AMERICAN               )
     PROFESSIONAL EXCHANGE, LLC,    )
25   D/B/A PROAUPAIR; and           )
     20/20 CARE EXCHANGE, INC.,     )
```

                    LONDON, ENGLAND
        Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
            (Out-of-hours tel. 01144 (0) 7833 467869)
                    www.depositioncenter.com

PLAINTIFFS' RESP. APP.0004387

2..5

## Page 2

```
1
2   D/B/A THE INTERNATIONAL AU  )
    PAIR EXCHANGE,            )
3                Defendants.)
    ----------------------------
4
5       VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION
6                       of
7                  MARK JEFFERY
8         on Monday, December 5th 2016
9           Commencing at 10:42 a.m.
10            Taken at:
11              LONDON MARRIOTT HOTEL,
                KENSINGTON
12              147C Cromwell Road
                London SW5 0TH
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
1
2                A P P E A R A N C E S
3
    On behalf of the Plaintiffs:
4
                    BOIES, SCHILLER & FLEXNER, LLP
5                   575 Lexington Avenue
                    7th Floor
6                   New York, NY 10022
7                   BY: MR. MATTHEW L. SCHWARTZ
                        MS. LAUREN F. LOUIS
8                        (by telephone)
9
    On behalf of the Defendant Expert Group
10  International:
11                  EXPERT GROUP, LLP
                    111 2nd Ave NE Ste.900
12                  St. Petersburg, FL 33701
13                  BY: MR. BOGDAN ENICA
14
    Also present:     MR. MARK GAULTER
15                    (CEO, EXPERT AUPAIR)
                      (by telephone)
16
17  On behalf of the Defendant Cultural Care:
18                  CHOATE, HALL & STEWART, LLP
                    Two International Place
19                  Boston, MA 02110
20                  BY: MS. LYNDSEY M. KRUZER
                        (by telephone)
21
22
23
24
25
```

## Page 4

```
1
2   On behalf of the Defendants Au Pair International
    and American Cultural Exchange:
3
4                   WHEELER TRIGG O'DONNELL, LLP
                    370 Seventeenth Street,
                    Suite 4500
5                   Denver, Colorado 80202-5647
6                   BY: MS. KATHRYN A. REILLY
                        (by telephone)
7
8   On behalf of the Defendants A.P.EX American
9   Professional Exchange and 20/20 Care Exchange:
10                  NIXON SHEFRIN HENSEN OGBURN, LLP
                    5619 DTC Parkway, Suite 1200
11                  Greenwood Village, CO, 80111
12                  BY: MR. MICHAEL S. DREW
                        (by telephone)
13
14
    Court Reporter:
15
                    MR. LEON MILEHAM, MBIVR
16                  Optima Juris,
                    15615 Alton Parkway
17                  Suite 450
                    Irvine, CA 92618
18
    Videographer:
19                  MR. PAT KIRK
                    Optima Juris,
20                  15615 Alton Parkway
                    Suite 450
21                  Irvine, CA 92618
22
23
24
25
```

## Page 5

```
1
2                 I N D E X
3   DEPONENT:
4   MARK JEFFERY, Sworn
5   Examination:                        Page No:
6   Direct examination by MR. ENICA        7
    Cross-examination by MS. KATHRYN     132
7   Re-direct examination by MR. ENICA   207
    Further cross-examination by MR. SCHWARTZ  215
8   Further re-direct examination by MR. ENICA  218
9
10               EXHIBIT INDEX
11  Exhibit Number:      Page:
12  128                  111
    129                  111
13  130                  174
    131                  178
14  132                  200
    133                  203
15  134                  207
    135                  215
16
17
18
19
20
21
22
23
24
25
```

PLAINTIFFS' RESP. APP.0004388

## Page 178

1       MARK JEFFERY - MATTHEW SCHWARTZ
2 because you know that if it is from their own
3 website it is what they are going to offer, true?
4            MR. ENICA:  Objection.
5            THE WITNESS:  I would expect that
6 if that is what they are saying, that is what
7 I would be offering to Nicole.
8 BY MR. SCHWARTZ:
9       Q.    Let's mark this as 131.
10            MR. ENICA:  I will have the same
11 objection to including this in the exhibit if it
12 was responsive and not disclosed.
13            MR. SCHWARTZ:  You should read it
14 first.
15     (Exhibit 131 was marked for identification)
16            MR. ENICA:  I maintain it.
17 BY MR. SCHWARTZ:
18       Q.    Take a moment and look at that.
19 This is an e-mail, for the record, from Mark
20 Jeffery to Ewa Nunno cc-ing Nicole Mapledoram,
21 dated November 6th 2013 at 6:30:53 p.m., so about
22 4 hours 20 minutes after the previous e-mail.
23 This is an e-mail from you, true?
24     A.    Yeah.
25       Q.    And it begins: "I have now had

## Page 179

1       MARK JEFFERY - MATTHEW SCHWARTZ
2 feedback from Deborah at CHI".
3     A.    Yes.
4       Q.    CHI is Cultural Homestay
5 International, true?
6     A.    That's true.
7       Q.    And you write that "educate" -- and
8 again that should be EduCare, right?
9     A.    Yeah.
10       Q.    So: "The educate program is less
11 expensive for you, Ewa.  It is about $500 less.
12 Not a great deal".  So there you are talking about
13 the fees to the host family, true?
14     A.    Let me just check this a moment.
15 Yes, from CHI to the host family.
16       Q.    From the host family to CHI?
17     A.    Yes.
18       Q.    And then 2: "Nicole will receive
19 less money - $146.81 per week".  Did I read that
20 right?
21     A.    Yeah, I wasn't far off my guess.
22       Q.    And in fact if you do the math, you
23 will find out that $146.81 is precisely 75% of
24 $197.75, true?
25            MR. ENICA:  Objection.

## Page 180

1       MARK JEFFERY - MATTHEW SCHWARTZ
2            THE WITNESS:  Okay.
3 BY SCHWARTZ:
4       Q.    So you got this information from
5 Deborah at CHI, true?
6     A.    Yeah, and then it goes on to say
7 that Ewa will contribute $1,000 instead of $500 to
8 education and I have offered to say that we do not
9 receive any commission from CHI for the EduCare
10 program, spelled correctly, so our intention was
11 to make the best arrangement that would suit both
12 the family and Nicole, whatever they would choose
13 between them, what they were looking for.  Were
14 they looking for money or were they looking for
15 time?  It is a balance between having time to do
16 what you want to do or having money for what you
17 need.  So the idea was to give them the best
18 option for both of them, so it was a win-win for
19 Ewa and Nicole.
20       Q.    You testified earlier that you have
21 never heard of a US au pair who was paid
22 substantially more than the $195.75 per week,
23 true?
24     A.    I believe so.
25            MS. REILLY:  Objection.

## Page 181

1       MARK JEFFERY - MATTHEW SCHWARTZ
2 BY SCHWARTZ:
3       Q.    You believe you had not heard of
4 that, true?
5     A.    Yes, that is what I believe.
6       Q.    What is the highest salary that you
7 can recall a US au pair receiving?
8            MR. ENICA:  Objection.
9            MR. SCHWARTZ:  What is the basis
10 for the objection?
11            MR. ENICA:  The salary definition.
12 BY SCHWARTZ:
13       Q.    What is the highest remuneration
14 that you can recall a US au pair receiving?
15            MR. ENICA:  I would object to
16 "remuneration" as well.
17            MR. SCHWARTZ:  What word would you
18 like?
19            MR. ENICA:  Stipend.
20 BY SCHWARTZ:
21       Q.    What is the highest stipend you can
22 recall a US au pair receiving?
23     A.    Well, I don't recall any au pair
24 receiving more than what is on the paper.  That
25 is, 275 for a standard au pair -- 200 and whatever

PLAINTIFFS' RESP. APP.0004389

Page 182

```
 1            MARK JEFFERY - MATTHEW SCHWARTZ
 2   it was.
 3        Q.      $195.75?
 4        A.      Yes.
 5        Q.      So, just so the record is clear,
 6   the most you ever recall an au pair being paid was
 7   $195.75 per week?
 8            A.   Yes, I have no recollection unless
 9   you have got something that I don't know about,
10   but because generally that's not been
11   a discussion, if it was, if there is something
12   I have missed, then I certainly don't recollect
13   it.
14        Q.      And that's the very first
15   information that you send to au pairs includes
16   that number, true?
17            MR. ENICA:  Objection.
18            THE WITNESS:  Yes.
19   BY SCHWARTZ:
20        Q.      That was Exhibit 128 that we looked
21   at before.
22       A.   Yeah.
23        Q.      So that sort of said at the outset
24   and not a subject of discussion?
25            MR. ENICA:  I maintain my
```

Page 183

```
 1            MARK JEFFERY - MATTHEW SCHWARTZ
 2   objection.
 3            THE WITNESS:  That is what we send
 4   them at the outset.  We don't talk about it, we
 5   haven't had any questions about it.  That is
 6   generally what happens.  In terms of the EduCare
 7   program, we are probably, I do not know if we have
 8   had one or two au pairs on the EduCare program.
 9   I don't even know if we have had any, to be
10   honest; certainly in the last three years we
11   haven't had any.
12   BY SCHWARTZ:
13        Q.      You said a US au pair has never
14   asked for more money, true?
15            A.   From me?  Sorry, from Christian
16   Aupairs.
17        Q.      Well, let's be clear: you don't
18   give any money to au pairs?
19       A.   No.
20        Q.      So you testified earlier that an au
21   pair placed through Christian Aupairs in the
22   United States has never asked for more money,
23   true?
24            A.   I have never heard that they have
25   asked for more money.  They haven't ever expressed
```

Page 184

```
 1            MARK JEFFERY - MATTHEW SCHWARTZ
 2   to me that they want more money.  No family has
 3   said to me they want more money.  No agency has
 4   said they want more money.  So I have never heard
 5   that any au pair has asked for more money.
 6        Q.      Now, you testified in the UK, for
 7   example, an au pair placed in London might receive
 8   more money because of the cost of living, true?
 9            A.   The family might choose to give
10   them more; that is true.
11        Q.      Have you ever heard of a similar
12   thing happening in New York or San Francisco or
13   another expensive US city?
14            A.   Do you mean hearing an au pair
15   asking because of that?
16        Q.      Or an au pair actually getting paid
17   because of that?
18            A.   No, I haven't come across that, but
19   I am aware that New York is probably more
20   expensive than Nashville.
21        Q.      And in London an au pair might get
22   paid more if they are taking care of more children
23   or if the children are smaller and therefore
24   higher maintenance, true?
25            MR. ENICA:  Objection.
```

Page 185

```
 1            MARK JEFFERY - MATTHEW SCHWARTZ
 2            THE WITNESS:  No.
 3   BY MR. SCHWARTZ:
 4        Q.      Not true?
 5        A.      That is not true, no.
 6   BY SCHWARTZ:
 7        Q.      Not true?
 8            A.   No, ultimately the au pair is doing
 9   this not adding up the figures of children, not
10   adding up the figures of whether I am in Central
11   London or Outer London; it is not like the
12   teaching profession.  They don't want more money
13   because we have five children.  We had six
14   children of our own.  Basically we only had au
15   pairs who were good au pairs who were happy to
16   look after six children.  But they didn't get paid
17   any more because we had six children.
18        Q.      By the way, you are familiar with
19   the concept of a nanny, right?
20        A.      A what?
21        Q.      A nanny.
22        A.      Yes.
23        Q.      A nanny, meaning someone who takes
24   care of someone else's children as their job,
25   true?
```

PLAINTIFFS' RESP. APP.0004390

Page 186

1        MARK JEFFERY - MATTHEW SCHWARTZ
2        A.    Professionally, yeah.
3        Q.    Have you ever had experience
4  working with or placing nannies?
5        A.    We don't place nannies.
6        Q.    Are you aware generally how that
7  market works?
8        A.    I have some knowledge of it.
9        Q.    So a nanny might expect to get paid
10 more depending on where they were asked to work,
11 true?
12             MR. ENICA:  Objection.
13             THE WITNESS:  What happens in the
14 UK is, we have another new group called Christian
15 Nannies.com.
16 BY MR. SCHWARTZ:
17       Q.    I don't mean to interrupt, when you
18 say "we", do you mean you personally?
19       A.    No, I don't mean me personally.
20 I mean "we" -- English people.
21       Q.    Go on.
22       A.    So there is a new group, a new
23 agency, probably similar to ourselves, called
24 Christian Nannies.  They have been in contact with
25 us and said, can we work together because we are

Page 187

1        MARK JEFFERY - MATTHEW SCHWARTZ
2  doing different things.  I said, well, we don't
3  place in England au pairs with any families who
4  have children under 18 months.  They need a nanny
5  in the UK.  So we give any girl or any family who
6  needs a baby looking after in the UK, for a baby
7  they will have a nanny.  But the au pairs that
8  come to the UK don't have 200 hours of experience.
9  They don't come with training in the same way.  We
10 give them training, but that is not obligatory;
11 it's what we do.  So the definition of nanny tends
12 to be a little bit nationally-based; it means
13 something slightly different in each country.  So
14 what "nanny" means for you in America, you would
15 have to tell me.
16       Q.    Okay, so you don't have any basis
17 to talk about nannies in America?
18       A.    Not really.
19       Q.    Okay, so we won't.
20       A.    Okay.
21       Q.    So you talked a little bit when my
22 colleague was asking questions about how an au
23 pair may get placed with one sponsor versus
24 another.
25       A.    Yeah.  Not "versus" sounds -- you

Page 188

1        MARK JEFFERY - MATTHEW SCHWARTZ
2  know, "or another".
3        Q.    "Or another", but I think you
4  said ----
5        A.    Because it sounds a bit
6  competitive, you know?
7        Q.    It's not though, right?
8        A.    No.
9              MR. ENICA:  I would object to the
10 last question.
11             MR. SCHWARTZ:  Why?
12             MR. ENICA:  I object to the form of
13 the question.
14 BY SCHWARTZ:
15       Q.    One reason why an au pair may be
16 placed through a particular sponsor is geographic,
17 true?
18       A.    It is an element, yes.
19       Q.    Because the sponsor has to have
20 a physical presence within a certain distance to
21 the host family, true?
22       A.    Yes.
23       Q.    So, for example, you testified
24 earlier, there have been instances, two instances,
25 where there was a match with a really remote

Page 189

1        MARK JEFFERY - MATTHEW SCHWARTZ
2  location that could not be serviced by either CHI
3  or Expert, which were the agencies you worked with
4  mostly, so you found another one, true?
5        A.    That's right.
6        Q.    In addition to geography you said
7  another reason why an au pair may be placed
8  through a particular sponsor agency is cost,
9  right?  You say, cost to the host family.  In
10 fact, you testified that in the last year or last
11 few years it has been more towards Expert Aupair
12 because it's more economical for the host family,
13 true?
14       A.    It's actually not quite 100% true
15 because every agency has a slightly different cost
16 and you could argue that Au Pair International are
17 probably cheaper than either of the other two.  So
18 there is an element in the whole thing?
19       Q.    But you don't work with Au Pair
20 International when either CHI or Expert are
21 available, true?
22       A.    Basically that is true because we
23 don't really want to spread out.  It is not very
24 helpful to have au pairs with different agencies
25 all over country, so it would be silly to say, we

PLAINTIFFS' RESP. APP.0004391

Case No. 1:14-cv-03074-CMA-KMT   Document 859-23   filed 03/30/18   USDC Colorado   pg
184 of 310

# Exhibit 400

*Johana Paola Beltran, et al. vs.*

*Interexchange, Inc., et al.*

*Video Teleconferenced Deposition of Sarah Carolina Azuela*

*March 03, 2017*



700 17th Street, Suite 1750
Denver, CO 80202
303-988-8470 (Office)   303-988-8478 (Fax)
SKReporting.com

Stevens-Koenig
Reporting

PLAINTIFFS' RESP. APP.0004393

**Johana Paola Beltran, et al. vs.**
**Interexchange, Inc., et al.**

**Video Teleconferenced Deposition of Sarah Carolina Azuela**
**March 03, 2017**

---

Page 1

```
1    UNITED STATES DISTRICT COURT
     DISTRICT OF COLORADO
2    -----------------------------------------X
     JOHANA PAOLA BELTRAN, et al.,
3
                         PLAINTIFFS,
4
5        -against-        Case No.:
                          1:14-cv-03074-CMA-KMT
6
     INTEREXCHANGE, INC., et al.,
7
                         DEFENDANTS.
8    -----------------------------------------X
9
10            DATE: March 3, 2017
11            TIME: 9:04 A.M
12
13
14            VIDEO TELECONFERENCED DEPOSITION of
15   the Plaintiff, SARAH CAROLINA AZUELA, taken by the
16   Defendants, pursuant to a Notice and to the Federal
17   Rules of Civil Procedure, held at the offices of
18   Boies, Schiller & Flexner, LLP, 575 Lexington Avenue,
19   New York, New York 10022, before Suzanne Pastor, a
20   Notary Public of the State of New York.
21
22
23
24
25
```

Page 2

```
1    A P P E A R A N C E S:
2
3    BOIES SCHILLER & FLEXNER, LLP
         Attorneys for the Plaintiffs
4        575 Lexington Avenue
         New York, New York 10022
5        BY:  JOSHUA LIBLING, ESQ.
         212.446.2381
6        jlibling@bsfllp.com
7
     CHOATE HALL & STEWART, LLP
8        Attorneys for the Defendant
         CULTURAL CARE, INC., d/b/a CULTURAL CARE AU PAIR
9        Two International Place
         Boston, Massachusetts 02110
10       BY:  JUSTIN J. WOLOSZ, ESQ.
              617.248.5221
11            jwolosz@choate.com
                  -and-
12            LYNDSEY M. KRUZER, ESQ.
              617.248.4790
13            lkruzer@choate.com
14
     GORDON & REES
15       Attorneys for the Defendant
         AU PAIR CARE
16       555 Seventeenth Street, Suite 3400
         Denver, Colorado 80202
17       BY:  PEGGY E. KOZAL, ESQ.
         303.200.6888
18       pkozal@gordonrees.com
         (Via Teleconference)
19
20   SHERMAN & HOWARD LLC
         Attorneys for the Defendant
21       INTEREXCHANGE, INC.
         633 Seventeenth Street, Suite 3000
22       Denver, Colorado 80202
         BY:  BROOKE A. COLAIZZI, ESQ.
23       303.299.8471
         bcolaizzi@shermanhoward.com
24       (Via Teleconference)
25   (Continued on next page.)
```

Page 3

```
1    A P P E A R A N C E S: (Continued)
2
3    FISHER & PHILLIPS, LLP
         Attorneys for Defendant
4        APF GLOBAL NFP
         1801 California Street, Suite 2700
5        Denver, Colorado 80202
         BY:  SUSAN SCHAECHER, ESQ.
6        303.218.3676
         sschaecher@fisherphillips.com
7        (Via Teleconference)
8
9    LEWIS ROCA ROTHGERBER CHRISTIE, LLP
         Attorneys for Defendant
10       CULTURAL CARE, INC.
         1200 Seventeenth Street, Suite 3000
11       Denver, Colorado 80202
         BY:  JESSICA L. FULLER, ESQ.
12       303.628.9527
         jfuller@lrrc.com
13       (Via Teleconference)
14
15   BOGDAN ENICA, ESQ.
         Attorney for Defendant
16       EXPERT GROUP INTERNATIONAL, INC., d/b/a
         EXPERT AU PAIR
17       111 Second Avenue, N.E., Suite 204
         St. Petersburg, Florida 33701
18       BY:  BOGDAN ENICA, ESQ.
         727.388.3472
19       bogdane@hotmail.com
         (Via Teleconference)
20
21
22   (Continued on next page.)
23
24
25
```

Page 4

```
1    A P P E A R A N C E S: (Continued)
2
3    NIXON SHEFRIN HENSEN OGBURN, P.C.
         Attorneys for Defendants
4        20/20 CARE EXCHANGE, INC., d/b/a
         THE INTERNATIONAL AU PAIR EXCHANGE, and APEX
5        AMERICAN PROFESSIONAL EXCHANGE, LLC d/b/a
         PRO AU PAIR
6        5619 DTC Parkway, Suite 1200
         Greenwood Village, Colorado 80111
7        BY:  MICHAEL S. DREW, ESQ.
         303.874.3410
8        mdrew@nixonshefrin.com
         (Via Teleconference)
9
10
11
12   ALSO PRESENT:
         ROBERT HORGAN, Videographer
13
14
15
16
17            *      *      *
18
19
20
21
22
23
24
25
```

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Video Teleconferenced Deposition of Sarah Carolina Azuela
March 03, 2017



Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Video Teleconferenced Deposition of Sarah Carolina Azuela
March 03, 2017



**Page 25**

1

**Page 26**

1

22   Q.   How did you first learn about the au pair
23   program?
24   A.   I saw an advertisement when I was walking
25   out the school.  It was in the -- in a board, an

**Page 27**

1   advertisement, pink, that said the best years of your
2   life, you can have the best years of your life.  So
3   that's what I remembered.  It came with a number so I
4   call it.
5   Q.   You said it was at your school?
6   A.   Yes.
7   Q.   And it was like a poster?
8   A.   Yes.
9   Q.   Did you know anyone else at that point
10   who had participated in the au pair program?
11   A.   No.
12   Q.   So describe what happened when you called
13   the number.  Just describe the conversation.
14   A.   Well, I remember that I asked what is it
15   about, they told me basically child care and that we
16   can set up a meeting to tell me more about it.
17   Q.   Okay, so not much detail in that first
18   phone conversation?
19   A.   No, not much detail.
20   Q.   And what did you do next?
21   A.   Set up the appointment.
22   Q.   Where did the appointment take place?
23   A.   In the house of this lady.
24   Q.   Who is the lady?
25   A.   Sandra.

**Page 28**

1   Q.   Sandra, do you remember her last name?
2   A.   Santos.
3   Q.   And where did Ms. Santos live?
4   A.   In Hermosillo.
5   Q.   Do you know anything about Ms. Santos'
6   background?
7   A.   Before I met her?
8   Q.   Was she an au pair herself?  Do you know?
9   A.   Yes.
10   Q.   Did she tell you about that?
11   A.   Generally speaking.
12   Q.   So just describe to me what happened when
13   you met with her.  You set up an appointment and then
14   you said you went to her house?
15   A.   Yes.
16   Q.   How long did you meet with her about?
17   A.   I don't remember.
18   Q.   Any idea at all?
19   A.   Around an hour, two hours.
20   Q.   And did she describe the au pair program
21   to you?
22   A.   Yes.
23   Q.   What do you recall her saying about the
24   au pair program?
25   A.   I remember that she said that it wasn't

PLAINTIFFS' RESP. APP.0004396

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Video Teleconferenced Deposition of Sarah Carolina Azuela
March 03, 2017



**Page 29**

1 that hard, that it's just taking care of kids. And if
2 you have done it before, you probably already know how
3 to do it. That you have to take care of the kids'
4 stuff, and like clean after themself. Everything
5 related to the children.
6 Q. Do you recall any discussion of the
7 stipend that you would receive for being an au pair?
8 A. I don't know what is the stipend.
9 Q. The money that you would receive for
10 being an au pair.
11 A. Oh. Can you repeat the question again,
12 please.
13 Q. Yes. Do you recall whether in that
14 conversation with Ms. Santos there was any discussion
15 about how much money you would receive in connection
16 with the au pair program?
17 A. Yes.
18 Q. What do you remember about that
19 discussion?
20 A. I remember that she said I gonna earn
21 196.
22 Q. Anything else?
23 A. She told me the hours that I was
24 working -- that I needed to work.
25 Q. And what did she say about that?

**Page 30**

1 A. That I have to work around 40 hours and
2 sometimes less.
3 Q. The amount which you said was $196, did
4 she say that was the most you could earn or did she
5 say that that was the minimum you could earn?
6 MR. LIBLING: Objection to form.
7 A. She just said this number.
8 Q. But she didn't say that there was no
9 chance of earning more.
10 A. She said that she sometimes earned more.
11 Q. That she sometimes was paid more in her
12 own experience?
13 A. Yes, in her own experience.
14 Q. Was there discussion with her of the
15 cultural benefits of the program?
16 A. I don't really understand the question.
17 Like, I need something more.
18 Q. The phrase "cultural benefits," is that
19 the part that you don't understand?
20 A. Yeah.
21 Q. Was there discussion about the new
22 experiences you would have if you took part in the
23 program?
24 A. She told me that you can meet new
25 friends, new people from all over the world.

**Page 31**

1

**Page 32**

1

9 Q. And it says you did not accept the offer
10 because you wanted to travel to and experience life in
11 the United States, is that right?
12 A. Yes.
13 Q. Now, this interrogatory answer says that
14 you also were offered a scholarship.
15 A. Yes.
16
24 Q. It says here that you did not accept the
25 scholarship because you wanted to travel and practice

PLAINTIFFS' RESP. APP.0004397

# Exhibit 401

PLAINTIFFS' RESP. APP.0004398

Page 1

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
----------------------------x

JOHANA PAOLA BELTRAN, et al.,

        Plaintiffs,

    v.               Civil Case No.
                     14-cv-03074-CMA-KMT

INTEREXCHANGE, INC., et al.,

        Defendants.

----------------------------x


VIDEOTAPED DEPOSITION OF MICHAEL MCHUGH
NEW YORK, NEW YORK
Thursday, April 6, 2017


HIGHLY CONFIDENTIAL PAGES: 300-301


Reported by:

JEREMY RICHMAN

JOB NO:  308029


MAGNA LEGAL SERVICES

320 West 37th Street, 12th Floor

New York, New York 10018

(866) 624-6221

PLAINTIFFS' RESP. APP.0004399

MAGNA
LEGAL SERVICES

| | Page 2 |
|---|---|
| 1 | |
| 2 | |
| 3 | |
| 4 | April 6, 2017 |
| 5 | 9:04 a.m. |
| 6 | |
| 7 | VIDEOTAPED DEPOSITION of MICHAEL MCHUGH, |
| 8 | held at the offices of Boies Schiller & |
| 9 | Flexner, 575 Lexington Avenue, New York, New |
| 10 | York, before JEREMY RICHMAN, a Shorthand |
| 11 | Reporter and Notary Public of the State of New |
| 12 | York |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

| | Page 4 |
|---|---|
| 1 | |
| 2 | APPEARANCES (Continued): |
| 3 | |
| 4 | PUTNEY, TWOMBLY, HALL & HIRSON, LLP |
| 5 | Attorneys for defendant American Institute for |
| 6 | Foreign Study d/b/a Au Pair in America |
| 7 | 521 Fifth Avenue |
| 8 | New York, NY 10175 |
| 9 | BY:  JOHN B. FULFREE, ESQ., via teleconference |
| 10 | (jfulfree@putneylaw.com) |
| 11 | |
| 12 | |
| 13 | GORDON & REES, LLP |
| 14 | Attorneys for Au Pair Care |
| 15 | 555 17th Street, Suite 3400 |
| 16 | Denver, CO 80202 |
| 17 | BY:  NATHAN HUEY, ESQ., via teleconference |
| 18 | (nhuey@gordonrees.com) |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

| | Page 3 |
|---|---|
| 1 | |
| 2 | APPEARANCES: |
| 3 | |
| 4 | BOIES SCHILLER & FLEXNER |
| 5 | Attorneys for plaintiffs |
| 6 | 575 Lexington Avenue |
| 7 | New York, NY 10022 |
| 8 | BY:  JOSHUA J. LIBLING, ESQ. |
| 9 | DANIEL R. SCHWARTZ, ESQ. |
| 10 | (jlibling@bsfllp.com) |
| 11 | (dschwartz@bsfllp.com) |
| 12 | |
| 13 | SHERMAN & HOWARD |
| 14 | Attorneys for defendant Interexchange |
| 15 | 633 Seventeenth Street, Suite 3000 |
| 16 | Denver, CO 80202 |
| 17 | BY:  HEATHER FOX VICKLES, ESQ. |
| 18 | (hvickles@shermanhoward.com) |
| 19 | |
| 20 | NIXON SHEFRIN HENSEN OGBURN, P.C. |
| 21 | Attorneys for 20/20, APEX |
| 22 | 5619 DTC Parkway, Suite 1200 |
| 23 | Greenwood Village, CO 80111 |
| 24 | BY:  MIKE DREW, ESQ., via teleconference |
| 25 | (mdrew@nixonshefrin.com) |

| | Page 5 |
|---|---|
| 1 | |
| 2 | APPEARANCES (Continued): |
| 3 | |
| 4 | LEWIS ROCA ROTHBERGER CHRISTIE, LLP |
| 5 | Attorneys for Cultural Care |
| 6 | One Tabor Center, Suite 3000 |
| 7 | 1200 Seventeenth Street |
| 8 | Denver, CO 80202 |
| 9 | BY:  JESSICA FULLER, ESQ., via teleconference |
| 10 | (jfuller@lrrc.com) |
| 11 | |
| 12 | |
| 13 | CHOATE HALL & STUART |
| 14 | Attorneys for Cultural Care |
| 15 | 2 International Place |
| 16 | Boston, MA 02110 |
| 17 | BY:  JUSTIN J. WOLOSZ, ESQ., via |
| 18 | teleconference |
| 19 | (jwolosz@choate.com) |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | PRESENT: |
| 25 | ROBERT STEINKOPF, Videographer |

MAGNA ▶
LEGAL SERVICES

Page 62

```
 1           M. MCHUGH
 2  local coordinator, having done the
 3  interview report, interviewed the
 4  family, met all of the adult members
 5  of the family, felt that the family's
 6  understanding of the program did not
 7  meet the cultural exchange objectives
 8  of the program, then that would be a
 9  reason.  But I say that, but that
10  might actually be called out in the
11  regulations as well.
12     Q.   So is there an example that
13  is outside the regulation?
14     A.   I can't think of one.
15     Q.   Are there family
16  arrangements or personal situations of
17  the host families not specifically
18  prescribed by State Department
19  regulations, but that InterExchange
20  would not accept?
21     A.   So at times we have
22  discussed certain sensitive situations
23  with the State Department about a
24  family who may be going through an
25  illness, may be reaching the end of
```

Page 64

```
 1           M. MCHUGH
 2  those discussions?
 3     A.   Pressing matters, incidents,
 4  complaints, questionable, or families
 5  that we have a question about, Au
 6  Pairs that we could have a question
 7  about.
 8     Q.   Is there a specific person
 9  who is tasked with having these
10  conversations with the State
11  Department?
12     A.   Well, you have to be
13  designated as an alternate responsible
14  officer to have those conversations.
15  In most cases it's myself or our
16  participant services manager or our
17  international recruitment and
18  placement manager.
19     Q.   Who is your participant
20  services manager?
21     A.   Her name is Kate Ferrin,
22  F-E-R-R-I-N.
23     Q.   And who is your
24  international recruitment and
25  placement manager?
```

Page 63

```
 1           M. MCHUGH
 2  their life, and discussed whether that
 3  would be a suitable placement for an
 4  Au Pair.  That's an example.
 5     Q.   You say you discussed it
 6  with the State Department; is that
 7  right?
 8     A.   Yes.
 9     Q.   Did the State Department
10  make the ultimate decision about
11  whether it was a suitable placement
12  for an Au Pair, or did InterExchange?
13     A.   It was a discussion.  I
14  can't think, I can't say it was one or
15  the other each time.
16     Q.   Do you frequently have
17  discussions with the State Department?
18     A.   What would you consider
19  frequently?
20     Q.   How frequently do you have
21  discussions with the State Department?
22     A.   Within, within a year,
23  probably at least a dozen times.
24     Q.   What are the, in
25  generalities, what are the topics of
```

Page 65

```
 1           M. MCHUGH
 2     A.   His name is Michael Gates.
 3     Q.   Is there anyone else who is
 4  designated as an ultimate responsible
 5  officer?
 6     A.   Yes, Katie Gray is an
 7  ultimate responsible officer.
 8     Q.   Anyone else?
 9     A.   On the Au Pair, in the Au
10  Pair department, I don't believe so
11  currently.
12     Q.   Does the restriction to the
13  Au Pair department mean that anyone
14  else who is so designated would not be
15  discussing Au Pair related issues?
16     A.   Except for the CEO, who is
17  the RO.
18     Q.   What does RO stand for?
19     A.   Responsible officer.
20     Q.   Alternate, got it.  And what
21  is Ms. Gray's title?
22     A.   Logistics manager.
23     Q.   Okay.  And do you have a
24  consistent contact at the State
25  Department?
```

PLAINTIFFS' RESP. APP.0004401

MAGNA
LEGAL SERVICES

Page 122

```
 1            M. MCHUGH
 2     A.   It does not.
 3     Q.   What makes you say that?
 4     A.   The first document that you
 5  gave me appears to be directed towards
 6  potential Au Pair candidates.  The
 7  second document that you gave me
 8  appears to be directed towards host
 9  families.
10     Q.   Okay.  So you think this is
11  the frequently asked questions page
12  directed at host families?
13     A.   The version that says
14  Wayback Machine at the top?
15     Q.   Yes.
16     A.   It sounds as if the
17  questions are written to the host
18  family.
19     Q.   Okay.  Would you have
20  approved the language in this
21  document?
22     A.   Yes.
23     Q.   Do you tell host families
24  that the weekly payment of about
25  195.75 is based on -- sorry, not based
```

Page 123

```
 1            M. MCHUGH
 2  on, I'm going to start again.
 3        Does InterExchange tell host
 4  families that the weekly payment of
 5  195.75 is determined by the U.S.
 6  Department of State?
 7     A.   Currently InterExchange
 8  tells host families that the minimum
 9  payment of 195.75 per week is
10  determined by the Department of State.
11     Q.   You used the word currently,
12  when did that start to be the message
13  that was conveyed?
14     A.   Well, it hadn't always been
15  one or the other, the lawsuit brought
16  to our attention that we could do a
17  better job of consistently describing
18  it as a minimum, similar to the way
19  the State Department documents
20  occasionally refer to it as the
21  stipend is 195.75, and occasionally
22  they refer to it as the minimum of
23  195.75.  Unfortunately we followed
24  their -- we could have been more
25  accurate about it.
```

Page 124

```
 1            M. MCHUGH
 2     Q.   So prior to the lawsuit,
 3  this lawsuit, did you tell host
 4  families that the 195.75 stipend was
 5  set by the U.S. Department of State?
 6     A.   Prior to the lawsuit there
 7  were occasions where documents may
 8  have said the stipend is 195.75, and
 9  there may have been documents where
10  the stipend said at least 195.75, but
11  that it was set by the Department of
12  State.
13     Q.   Okay.  I want to ask you a
14  couple of questions about the produced
15  version of the website.  And on the
16  second page of the document --
17     A.   This is exhibit, this one,
18  15?
19     Q.   Yes, it should be
20  Exhibit 15.  Under life as an Au Pair,
21  question, how much will I be paid --
22  actually, before I ask you about this,
23  do you know when this version went
24  into effect?
25     A.   I do not.
```

Page 125

```
 1            M. MCHUGH
 2     Q.   Was it after the lawsuit?
 3     A.   I am not sure.  There's
 4  nothing on here that can tell me that.
 5     Q.   Okay.  It says currently Au
 6  Pairs must receive a weekly stipend of
 7  at least 195.75.  This amount is set
 8  by the Department of State and
 9  Department of Labor.  The amount is
10  based on the federal minimum wage of
11  7.25 per hour times 45 hours, but also
12  reflects a credit of 40 percent for
13  the room and board provided by the
14  host family.
15        So does the stipend vary by
16  state or local minimum wages?
17     MS. VICKLES:  Object to
18  form.
19     A.   We have never received any
20  information from the Department of
21  State that says the stipend varies by
22  state or local minimum wages.  It's
23  always been based off of the federal
24  minimum wage.
25     Q.   Do you tell host families or
```

Page 130

```
 1              M. MCHUGH
 2   This is an email from Michael McHugh,
 3   is that you?
 4       A.   Yes.
 5       Q.   To
 6   amaralespadas@hotmail.com.  Despite
 7   the Hotmail address it's dated from
 8   2014.  Is this, do you recognize this
 9   document?
10       A.   I do.
11       Q.   Is this an email that you
12   wrote?
13       A.   Yes.
14       Q.   Do you remember the
15   circumstances under which you wrote
16   this email?
17       A.   I do.
18       Q.   Can you please describe
19   those circumstances?
20       A.   I believe Ms. Desiree had
21   written a complaint, letter of
22   complaint to us and a number of other,
23   she also sent it to a number of other
24   sources.  Or a number of other
25   recipients, including the New York
```

Page 131

```
 1              M. MCHUGH
 2   Times, the White House and such.
 3       Q.   Okay.  And when you and the
 4   New York Times and the White House
 5   received this email, what did you do?
 6   I won't ask you what the White House
 7   did.
 8       A.   We responded.
 9       Q.   And before you responded,
10   did you have any discussion with
11   anybody else about how you should
12   respond?
13       A.   Yeah, I believe we sent it
14   to the Department of State first of
15   all to alert them to the issue.  We
16   explained that we would respond, and
17   then I discussed with my supervisor,
18   our CEO, Christine La Monica-Lunn,
19   L-A, capital M Monica, hyphen, Lunn,
20   L-U-N-N.  We discussed a suitable
21   response for such an extraordinary
22   letter.
23       Q.   Did Ms. La Monica-Lunn
24   approve the content of this email?
25       A.   She did.
```

Page 132

```
 1              M. MCHUGH
 2       Q.   Did she approve the precise
 3   language, or just the substance?
 4       A.   I believe she approved the
 5   letter in its entirety.
 6       Q.   In the bottom paragraph on
 7   the first page, it says, your local
 8   coordinators are available to help you
 9   any time of day, it's in the second
10   non-bolded line.
11       Has that always been an
12   accurate statement about local
13   coordinators?
14       A.   Yes.
15       Q.   Okay.  Were they available
16   just to help the Au Pair, or also the
17   host family at any time of day?
18       A.   They would be available to
19   both.
20       Q.   Okay.  On the next page --
21   my understanding of this email, and
22   please tell me if this is accurate, is
23   that the part in bold perhaps
24   paraphrases, but reflects questions or
25   concerns that you're responding to; is
```

Page 133

```
 1              M. MCHUGH
 2   that correct?
 3       A.   Yes, that's correct.
 4       Q.   Okay.  Do you know whether
 5   they are direct quotes from the letter
 6   you received or whether they are your
 7   paraphrase?
 8       A.   At this point in time I do
 9   not.
10       Q.   Okay.  And then the parts
11   under the bold are your response to
12   the concerns or questions?
13       A.   Yes.
14       Q.   So in the first response,
15   but the second paragraph of that
16   response, you wrote, I can tell you
17   that our local coordinators often
18   remove families from the program if
19   they break the rules or do not treat
20   the Au Pair fairly.
21       Is that an accurate
22   statement?
23       A.   Upon reviewing it now, I may
24   word it differently.
25       Q.   How would you word it now?
```

MAGNA
LEGAL SERVICES

| Page 182 |
| --- |

M. MCHUGH

1 number of materials. They receive a
2 childcare training handbook, a
3 childcare training workbook. The Au
4 Pair handbook, directions to the
5 orientation and training in New York
6 City, that portion of it. A flow
7 chart of who to call if they have a
8 problem. Instructions on how to apply
9 for their Visa. Yeah, a number of
10 documents.
11 Q. Okay.
12 (McHugh Exhibit 28, Bates
13 stamped InterExchange 005191
14 through 5220, was marked for
15 identification.)
16 Q. I put before you an exhibit
17 which is Bates numbered InterExchange
18 005191 through 5220, and it's an email
19 and an attachment. The attachment is
20 called the online tutorial outline.
21 My question is whether you
22 know whether this outline was ever
23 actually put up onto the website.
24 A. Your question is whether

| Page 183 |
| --- |

M. MCHUGH

1 this paper document, or this written
2 document, was put onto the website?
3 Q. The way you asked that
4 suggests I have a misunderstanding
5 about what this document is. So what
6 is this document?
7 A. So -- give me a minute.
8 Right, so this is a document that was
9 used in designing and building the
10 online orientation tutorial, which is
11 a website, a module website.
12 Q. Is it the module website you
13 were discussing a moment ago?
14 A. It's one of them.
15 Q. It's one of them. How many
16 are there?
17 A. Two different systems, this
18 is one system. And then there's a
19 second system that involves four
20 sections, multiple chapters each
21 section.
22 Q. Okay. Do the two systems
23 serve different purposes?
24 A. Yes.

| Page 184 |
| --- |

M. MCHUGH

1 Q. What system, what purpose
2 does, let's start with this system,
3 serve?
4 A. So this is more of a general
5 overview. This is not child
6 development training as much as it is
7 how to prepare for your arrival to the
8 United States. Program regulations,
9 information like that. Cultural
10 information. How to get to the
11 orientation in New York. Be prepared
12 for the weather in your host
13 community, researching climate, and
14 then you can see scripts of cartoon
15 characters that would appear on the --
16 on the system, speaking.
17 Q. So scripts of cartoon
18 characters?
19 A. So if you've done an online
20 training before, you know, they'll
21 have animated characters come in from
22 the side and say, hi, I'm Anna, I'm an
23 Au Pair.
24 Q. Oh, I see. What page are

| Page 185 |
| --- |

M. MCHUGH

1 you looking at, just so the record is
2 clear? Or were you not looking at a
3 specific page then?
4 A. I'm looking at this page,
5 5196.
6 Q. 5196. I see, I see.
7 A. So that would be Anna
8 saying, when you arrive to the U.S.
9 you'll need to go through Customs.
10 And then there will be an animation of
11 an immigration officer, and then some
12 quiz questions.
13 Q. Okay.
14 A. Online training.
15 Q. All right, so this document
16 would not itself be uploaded anywhere?
17 A. No.
18 Q. But this document describes
19 what the -- what those online -- the
20 content of those online modules?
21 A. Yes. And acts as a script.
22 Q. And acts as a script, got
23 it. That's helpful, thank you.
24 And you said there was a

PLAINTIFFS' RESP. APP.0004404

MAGNA
LEGAL SERVICES

Page 186

1          M. MCHUGH
2 second system?
3     A.   Yes.
4     Q.   What is the purpose of the
5 second system?
6     A.   The second system is
7 specifically focused on child
8 development training.
9     Q.   Anything more specific than
10 that, or --
11     A.   It's, it came after this
12 system.
13     Q.   Okay. Do all Au Pairs use
14 both systems?
15     A.   Yes.
16     Q.   How do you ensure that all
17 Au Pairs have used both systems?
18     A.   Before the Au Pair arrives,
19 we can see within our system whether
20 the modules have been checked off as
21 complete or incomplete.
22     Q.   Got it. And so once the Au
23 Pairs have completed these in their
24 home countries, is there anything else
25 they do in their home countries before

Page 187

1          M. MCHUGH
2 they come to the U.S.?
3     A.   Well, they apply for their
4 Visa, they go to their Visa interview.
5 They may meet with their local or
6 international cooperator to go through
7 any last-minute details or questions
8 they may have.
9     Q.   Okay.
10     A.   Like I said, they'll have
11 the Au Pair handbook, so they're meant
12 to read through all of the materials
13 that we provide.
14     Q.   And is the next step that
15 they come to the U.S. for a training
16 in New York?
17     A.   Once they've secured their
18 Visa, so they would have a scheduled
19 arrival date that they've agreed on
20 with their family, and then they would
21 arrive to New York for that training.
22     Q.   How regularly are these New
23 York trainings conducted?
24     A.   These days we have it's, you
25 know, two a month, but sometimes

Page 188

1          M. MCHUGH
2 they're back to back in busier
3 seasons, but, yeah, 24 to 26 per year.
4     Q.   And are they always in New
5 York?
6     A.   Yes.
7      (McHugh Exhibit 29, Bates
8     stamped INTEREXCHANGE 0028522
9     through 8544, was marked for
10     identification.)
11     Q.   You should now have in front
12 of you a document marked InterExchange
13 0028522 through 544. Is this a
14 document that's used during that New
15 York City training?
16     A.   This is not the most
17 up-to-date version, but this is one
18 version that we may have used in the
19 past.
20     Q.   Do you know when the most
21 up-to-date version was adopted?
22     A.   I believe it would be at the
23 beginning of 2016.
24     Q.   At the beginning of 2016.
25 So is this, could this be the version

Page 189

1          M. MCHUGH
2 that was in use prior to the 2016
3 version?
4     A.   I'm not sure.
5     Q.   Okay. How frequently are
6 these materials updated?
7     A.   They could be modified
8 slightly each year.
9     Q.   Okay. On page eight of this
10 document, that's not going by the
11 Bates numbers, but the native numbers.
12     A.   Mm-hmm.
13     Q.   It describes an orientation,
14 one of the orientation workshops is
15 the program rules, regulations, and
16 culture shock.
17     A.   Mm-hmm.
18     Q.   Are there handouts or
19 materials provided for these
20 workshops?
21     A.   To be honest, I don't know.
22 For this, I know there is an
23 orientation workbook that they work
24 through, but as I said, I think this
25 is an older version of that document.

PLAINTIFFS' RESP. APP.0004405

MAGNA
LEGAL SERVICES

| Page 190 |
|---|

```
1              M. MCHUGH
2        So the classes, the
3   trainings may have changed since then,
4   but I believe there is a --
5   supplementary material that they fill
6   in as they go along.
7        Q.   That the Au Pair fills in?
8        A.   That the Au Pair fills in.
9        Q.   Do all Au Pairs have to go
10   through the New York City training?
11        A.   Yes.  It's a State
12   Department requirement that the Au
13   Pairs go through a certain number of
14   hours before reaching the host family
15   home, so everyone has to go through
16   it.
17        Q.   Is there any information
18   that is required to be conveyed during
19   this training period?
20        A.   Well, the State Department
21   regulations are that they have to have
22   a certain number of hours of child
23   safety training, I believe it's four
24   hours, and they have to have a certain
25   number of child development training
```

| Page 192 |
|---|

```
1              M. MCHUGH
2   the local coordinator to make up the
3   missed session with the Au Pair.
4        The local coordinators will
5   be sent a missed orientation training
6   form that states everything that needs
7   to be reviewed with the Au Pair.  The
8   form needs to be signed by both the
9   local coordinator and the Au Pair, and
10   then mailed back to InterExchange.
11        Does that sound like a
12   process InterExchange has used, are
13   you familiar this process?
14        A.   It sounds like -- I do not
15   believe InterExchange has ever used
16   that process.  If somebody missed a
17   portion of the orientation, our policy
18   is to cover that outside of the
19   orientation hours or to not have them
20   arrive to the orientation, so to -- to
21   move to the next arrival.
22        No, it, in my memory I
23   cannot remember a time when local
24   coordinators were tasked with training
25   the Au Pairs.
```

| Page 191 |
|---|

```
1              M. MCHUGH
2   hours, so that's 20 hours.
3        Q.   Is there anything else that
4   has to be covered as part of this
5   training?
6        A.   That must be covered?  Per
7   the regulations, not that I can think
8   of.
9        Q.   Okay.  If we turn to page
10   20, it describes a missed orientation
11   training form.  It seems to be, it
12   says that -- do you know what the
13   missed orientation training form is?
14        A.   I don't.
15        Q.   So this says Au Pairs
16   normally arrive on Monday of
17   orientation week in time for their
18   first class on Tuesday morning.
19   However, occasionally an Au Pair will
20   arrive late to orientation due to
21   flight issues.  Due to strict
22   government regulations, we need to
23   make sure all of our Au Pairs receive
24   the correct information from our
25   agency.  When this occurs, we require
```

| Page 193 |
|---|

```
1              M. MCHUGH
2        Q.   Okay.  So I take it you
3   don't have any explanation as to why
4   this is here in this document?
5        A.   That sounds like it may have
6   been a process that was thought of and
7   written down, but never implemented.
8        Q.   Okay.
9        A.   Again, I don't know what
10   year this document is from, but that
11   hasn't happened while -- in my memory.
12        Q.   When will an Au Pair first
13   learn what their stipend will be?
14        MS. VICKLES:  Object to
15   form.
16        A.   It could be when they see
17   our website, when they speak to an
18   international cooperator.  But
19   officially, they're all given a
20   document that's called the
21   pre-application information document
22   that spells out clearly what the --
23   what the stipend is, what the fees
24   are, what the refund policies are.
25   And they review and sign that, and
```

PLAINTIFFS' RESP. APP.0004406

MAGNA
LEGAL SERVICES

Page 218

1              M. MCHUGH
2      Q.   Does vacation -- is there a
3  distinction between me talking about
4  the vacation and talking about the
5  weekends that an Au Pair is entitled
6  to, are those separate concepts?
7      A.   Yes.
8      Q.   Let me not start with
9  vacation.  Let me ask about the
10  weekends, then.  Am I at an
11  understanding that an Au Pair needs
12  one and a half days off a week and a
13  full weekend each month?
14     A.   Yes.
15     Q.   Is that discussed at this
16  check-in?
17     A.   Yes, while discussing the
18  program regulations, that's all
19  covered.
20     Q.   That's all covered, okay.
21  So after the two-week check-in, are
22  there additional check-ins for which
23  there are checklists or similar lists
24  of required topics to cover?
25     A.   Well, there's monthly

Page 219

1              M. MCHUGH
2  contact that happens between the Au
3  Pair and the -- the Au Pair and the
4  local coordinator.  The local
5  coordinators are instructed to ask
6  whether they are working towards
7  completing their educational
8  component, whether they're receiving
9  their appropriate time off, and
10  stipend.  And I think -- is there
11  anything else you want to talk about,
12  just sort of a checkbox for that.
13     Q.   And that's for the local
14  coordinator and the Au Pair, correct?
15     A.   Yes.
16     Q.   And is there -- is there
17  regular contact between the local
18  coordinator and host family as well?
19     A.   Yes.
20     Q.   And is there a checkmark,
21  checkboxes or checklist for those
22  communications?
23     A.   No, there isn't.  Their
24  instructions are that they have to
25  establish how the relationship is

Page 220

1              M. MCHUGH
2  working, whether there are any
3  problems, and then report back in
4  their monthly contact logs saying,
5  spoke to host mom, she reports that,
6  X, Y, z, so there's a reporting
7  format.
8      Q.   And less formally than the
9  specific sort of check-ins that are
10  every month, I think you said, right?
11     A.   Mm-hmm.
12     Q.   Is there weekly contact
13  between the local coordinator and the
14  Au Pairs?
15     A.   It's not a requirement that
16  there be weekly contact.  Some local
17  coordinators have weekly open hours at
18  a Starbucks or something, but it's not
19  a requirement.
20     Q.   Okay.  When do the local
21  coordinators discuss the Au Pair's
22  schedule with the, by which I mean the
23  schedule of assignments with the host
24  family and Au Pair?
25     A.   Well, the local coordinator

Page 221

1              M. MCHUGH
2  doesn't see the schedule unless it's
3  brought to their attention.
4      Q.   Do local coordinators keep a
5  communications log?
6      A.   Not necessarily, no.  It's
7  not required.  Some of them may, but
8  it's not through anything that we've
9  provided.
10     Q.   Okay.  Let's see, this was
11  Exhibit 3, I think.  Take a look back
12  at Exhibit 3, which I think is the
13  host family handbook.  And on page 16,
14  which I mean the native page numbers
15  at the bottom.  Page 16.
16     A.   Mm-hmm.
17     Q.   Are these communication logs
18  and weekly meeting topics, are these
19  for the host families to have with the
20  Au Pairs?
21     A.   The communication log was a
22  tool that we used in the past that we
23  no longer use.  But yeah, it was
24  communication between the Au Pair and
25  the host family.

MAGNA ▶
LEGAL SERVICES

| Page 270 |
|---|

1          M. MCHUGH
2    standardizing the calculation of the
3    deduction for room and board?
4        A.    So let's see if there's a
5    hint of it in here.  So the agency
6    concludes that this approach, which
7    isn't included in here, but I
8    mentioned earlier was they looked at
9    the fixed deduction of $36.  They
10   found that that was outdated.  They
11   did a survey unrelated to Bill
12   Kapler's survey, they did a survey of
13   the real cost to house and provide
14   room and board to an Au Pair.  They
15   came back with a number like 65.  They
16   found that to be more reasonable than
17   the $46, and they went through a
18   discussion, well, we would like to
19   have a fixed amount for the room and
20   board to keep, to -- because of the
21   programatic need for a uniform
22   stipend.  So when I'm saying to
23   standardize the deduction, I'm talking
24   about their need and the discussion
25   they engaged in in this document to

| Page 271 |
|---|

1          M. MCHUGH
2    work towards a uniform or programatic
3    need for a uniform stipend, which
4    includes, starts with the federal
5    minimum wage and includes a standard
6    deduction for room and board, which
7    they followed up with, with every
8    single notice that they sent in a
9    similar way.  So that's what we're
10   talking about here.
11       Q.    Okay.  So do you understand
12   there to be a programatic need for a
13   uniform stipend?
14       A.    Yes.
15       Q.    Do you know whether the
16   other sponsors share that
17   understanding?
18           MR. LIBLING:  Object to
19   form.
20       A.    I can't say.  I'm sure
21   they've read the same materials I
22   have.
23       Q.    Have you ever discussed a
24   programatic need for a uniform stipend
25   with the other sponsors?

| Page 272 |
|---|

1          M. MCHUGH
2        A.    I don't think so.
3        Q.    Has it ever come up in
4    conversation, even if it wasn't the
5    topic?
6        A.    No.  This is really since
7    the lawsuit came up, we've gone
8    backwards to find out how we arrived
9    where we are, and that has been
10   illuminating.  But the stipend is
11   really one topic that never had to be
12   discussed among the sponsors, because
13   it was so clear what the stipend was
14   and is.
15       Q.    How has this -- when you
16   say, we've gone backwards to find out
17   how we arrived where we are, what have
18   you done to do that?
19       A.    I mean, I'm saying that
20   personally.
21       Q.    What have you done to do
22   that?
23       A.    We reviewed all the
24   regulations, the discussion around the
25   regulation that's spelled out in the

| Page 273 |
|---|

1          M. MCHUGH
2    PDF here, the notices sent since then.
3        Q.    And you said it was
4    illuminating, how is it illuminating?
5        A.    Oh, I think especially the
6    1995 regs provide a really thorough
7    explanation and analysis of what the
8    intention of the State Department was,
9    starting with the need for -- starting
10   with their approval of the program,
11   their desire to house the program, the
12   fact that the educational component
13   provided the link to the
14   Fulbright–Hays Act and gave them the
15   ability to operate the program.  The
16   fact that it fits into their foreign
17   policy objectives.
18           They go into a discussion of
19   the challenges to the program and
20   explain why they believe the program
21   is valuable through the stipend and,
22   yeah, it's just a really thorough
23   analysis, and I think provides a great
24   backbone and explanation for the
25   regulations that have followed from

PLAINTIFFS' RESP. APP.0004408

**MAGNA**
LEGAL SERVICES

Case No. 1:14-cv-03074-CMA-KMT   Document 859-23   filed 03/30/18   USDC Colorado   pg
201 of 310

# Exhibit 402

PLAINTIFFS' RESP. APP.0004409

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Case No. 14-cv-03074-CMA-CBS

_____

JOHANA PAOLA BELTRAN, ET AL.,

            Plaintiffs,

vs.

INTEREXCHANGE, INC., ET AL.,

            Defendants.

_____

VIDEOTAPED DEPOSITION OF

ELIZABETH H. NEWLON, Ph.D.

APRIL 12, 2017

DENVER, COLORADO

9:11 A.M.

Magna Legal Services
866-624-6221
www.magnals.com

PLAINTIFFS' RESP. APP.0004410

MAGNA
LEGAL SERVICES

## Page 2

```
 1            The videotaped deposition of
 2   ELIZABETH H. NEWLON, Ph.D., taken before Leeann Keenan,
 3   a Registered Merit Reporter, Certified Realtime
 4   Reporter, and a Notary Public in and for the County of
 5   Summit and the State of Colorado, at 1200 Seventeenth
 6   Street, Suite 3000, Denver, Colorado, on Wednesday,
 7   April 12, 2017, at the hour of 9:11 a.m., pursuant to
 8   Notice.
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1   APPEARANCES:
 2
 3     BOISE, SCHILLER, FLEXNER, L.L.P.
       BY: PETER M. SKINNER, ESQ.
 4         575 Lexington Avenue
           New York, New York  10022
 5         (212) 303-3654
           pskinner@bsfllp.com
 6         appeared on behalf of the Plaintiffs
 7     BOISE, SCHILLER, FLEXNER, L.L.P.
       BY: JUAN P. VALDIVIESO, ESQ.
 8         1999 Harrison Street
           Suite 900
           Oakland, California  94612
 9         (510) 874-1010
           appeared on behalf of the Plaintiffs
10
11     CHOATE, HALL & STEWART
       BY: JUSTIN WOLOSZ, ESQ.
12         LYNDSEY KRUZER, ESQ.
           Two International Place
           Boston, Massachusetts  02110
13         (617) 248-5221
           jwolosz@choate.com
14         lkruze@choate.com
           appeared on behalf of Cultural Care
15
16     LEWIS, ROCA, ROTHGERBER, CHRISTIE
       BY: JESSICA FULLER, ESQ.
17         1200 17th Street
           Suite 3000
18         Denver, Colorado  80202
           (303) 628-9527
19         appeared on behalf of Cultural Care
20     GORDON & REES
       BY: PEGGY KOZAL, ESQ.
21         555 17th Street
           Suite 3400
22         Denver, Colorado  80202
           (303) 200-6888
23         pkozal@gordonrees.com
           appeared on behalf of AuPairCare,
24         Inc.
25
```

## Page 4

```
 1   APPEARANCES CONTINUED:
 2
 3     SHERMAN & HOWARD, L.L.C.
       BY: ALYSSA LEVY, ESQ.
 4         BROOKE A. COLAIZZI, ESQ.
           633 17th Street
 5         Suite 3000
           Denver, Colorado  80202
 6         (303) 299-8194
           alevy@shermanhoward.com
 7         bcolaizzi@shermanhoward.com
           appeared by telephone on behalf of
 8         InterExchange, Inc.
 9     WHEELER, TRIGG, O'DONNELL
       BY: KATHRYN REILLY, ESQ.
10         370 17th Street
           Suite 4500
11         Denver, Colorado  80202
           (303) 244-1983
12         reilly@wtotrial.com
           appeared on behalf of USAuPair, Inc.,
13         GoAuPair, and Au Pair International
14     EXPERT AUPAIR
       BY: BOGDAN ENICA, ESQ.
15         100 2nd Avenue S.
           Suite 3025
16         St. Petersburg, Florida  33701
           (727) 225-2649
17         bogdan@expertaupair.
           appeared by telephone on behalf of
18         Expert AuPair
19     PUTNEY, TWOMBLY, HALL & HIRSON, L.L.P.
       BY: STEPHEN MACRI, ESQ.
20         ROBERT M. TUCKER, ESQ.
           521 Fifth Avenue
21         New York, New York  10175
           (212) 682-0020
22         smacri@putneylaw.com
           rtucker@putneylaw.com
23         appeared on behalf of American
           Institute of Foreign Study
24
25   ALSO PRESENT: Davis Baumunk, Videographer
```

## Page 5

```
 1                 I N D E X
 2
     DEPOSITION WITNESS:                       PAGE
 3   ELIZABETH H. NEWLON, Ph.D.
 4   Examination by Mr. Skinner           8
 5
 6   PLAINTIFFS' DEPOSITION EXHIBITS MARKED:
     NO.     DESCRIPTION              PAGE
 7
     Exhibit 1   January 13, 2017 Expert Report of   10
 8              Elizabeth Newlon, Ph.D.
 9   Exhibit 2   February 3, 2017 Expert Rebuttal    10
                Report of Elizabeth Newlon, Ph.D.
10
11   Exhibit 3   January 13, 2017 Expert Report of   148
                Lauren Stiroh, Ph.D.
12   Exhibit 4   February 3, 2017 Expert Rebuttal    148
                Report of Lauren Stiroh, Ph.D.
13
14   Exhibit 5   December 31, 2010 Report of David   155
                Rodrigues on Independent Accountants
15              on Applying Agreed-Upon Procedures
                ExpertAuPair000461 - 000549
16   Exhibit 6   Reference Manual on Scientific      183
                Evidence, Second Edition
17
     Exhibit 7   August 12, 2016 Declaration of      200
18              Juilane Harning
19   Exhibit 8   July 19, 2016 Declaration of        206
                Lusapho Hlatshaneni
20
21   Exhibit 9   Go Au Pair Stipend Hours Analysis   228
                GAP_00035640 - 00035646
22   Exhibit 10  July 21, 2008 22 C.F.R. 62.31       242
23
24
25
```

PLAINTIFFS' RESP. APP.0004411

**MAGNA**
LEGAL SERVICES

Page 218

1 that?
2    A.   Yes.
3    Q.   And why do you believe that you can't
4 assume that the host families would pay the au pairs
5 consistent with their contractual obligations?
6        MR. WOLOSZ:  Objection.  That
7 mischaracterizes the footnote.
8    A.   I would not simply assume that a contract
9 would reflect accurately what they -- what the
10 au pair actually received.
11        So, for example, the contract may
12 say $200 stipend a week.  The host family, over the
13 course of the year they're together, increases that,
14 changes how much they provide.
15        I do believe, though -- I can't
16 remember which one -- there was a named plaintiff
17 that had that kind of experience, where there was
18 variation -- it may have been Rascon -- changes over
19 time, sometimes month to month, week to week how
20 much she was receiving.
21    Q.   So I -- so you're basing the statement
22 that you make in paragraph 81 on evidence from one
23 named plaintiff, that there was some variation in
24 what she received vis-à-vis what was in the
25 contract; is that correct?

Page 219

1    A.   No.
2    Q.   Okay.  So I -- I'm trying to understand
3 why you can't simply assume that the proposed
4 stipend in a contract is the same as the actual
5 amount paid?
6    A.   Because I believe that you can't just
7 assume that one thing equals the other.
8    Q.   Why is the evidence from the contract
9 not -- why is the contract itself not evidence of
10 the policy as -- as it was applied, and any
11 variation in respect to how the amount was actually
12 paid, not something that just gets worked out as
13 damages?
14    A.   Because it -- the contract says, "This is
15 how much we agree to pay you per week."  But they
16 could have paid them more than that and still been
17 within the contract.  And there's evidence, at least
18 at this point from one named plaintiff, I believe
19 that that -- there wasn't -- that they didn't
20 conform to paying at most what was in that contract,
21 that they did pay them more.
22    Q.   But I'm -- I'm -- I'm focusing now solely
23 on impact to the class.
24        If there is a contract common to
25 the class that sets wages at a certain amount --

Page 220

1    A.   There's a contract.  I'm sorry, I don't
2 understand a contract in the con --
3    Q.   If there's a standard form contract --
4    A.   Okay.
5    Q.   -- for a class --
6    A.   All right.
7    Q.   -- that sets wages at $195.75 a week, and
8 we, therefore, know that every au pair in that class
9 and every host family in that class agreed that the
10 weekly stipend was going to be $195.75, is it your
11 opinion that there is not a common impact of a
12 policy to set wages at $195.75 in that hypothetical?
13    A.   I would need to know what they actually
14 received.
15    Q.   Why is what they actually received
16 relevant to a determination of whether there was a
17 common impact of the policy and not something that
18 is relevant solely to damages?
19    A.   Because the impact has to be in real
20 life.  It can't be in a -- in a contract without any
21 real connection to what they genuinely receive, what
22 compensation they actually received.
23    Q.   But the policy impacted them all in the
24 form of a -- of a contract, stating what they were
25 going to get paid, correct?

Page 221

1    A.   That -- that they all had the same
2 contract in hand and -- and they all signed it?  I
3 would say that's about the only common impact that I
4 see there, that they all signed the same contract.
5 I don't see that they actually received the same
6 amount.
7    Q.   So to your mind, as an economist, the --
8 the -- the contracts are -- are irrelevant?
9        MR. WOLOSZ:  Is this still a
10 hypothetical, where they're all the same?
11        MR. SKINNER:  Yes.  Thank you.
12    A.   They're only irrelevant if they are
13 inconsistent with what actually was experienced by
14 each of the au pairs, in terms of the compensation
15 they received per week.
16    Q.   Okay.  There -- withdrawn.
17        THE WITNESS:  Oops, sorry.  I just
18 moved the whole table.  Could I -- could I grab some
19 water?
20        MR. WOLOSZ:  Sure.
21        MR. SKINNER:  Absolutely.
22        THE WITNESS:  I don't know where we
23 are on timing.
24        MR. WOLOSZ:  Can we take a break?
25        MR. SKINNER:  Sure.  We can take a

MAGNA
LEGAL SERVICES

Page 222

1    break.
2         THE VIDEOGRAPHER:  Going off the
3    record at 3:38.  This marks the end of media 4.
4              (Break from 3:38 p.m. to
5              3:56 p.m.)
6         THE VIDEOGRAPHER:  This marks the
7    start of media 5 of the video deposition of
8    Dr. Elizabeth Newlon.  We're back on the record.
9    The time is 3:56.
10   BY MR. SKINNER:
11        Q.   One moment, Dr. Newlon.  Sorry.
12        A.   No problem.
13        Q.   So can we turn to your rebuttal report.
14        A.   Sure.
15        Q.   And page 5, Footnote 15.  And it says
16   that based on your review of Expert Au Pairs'
17   agreements for standard au pairs, 8 percent propose
18   weekly stipend amounts of greater than $200,
19   correct?
20        A.   8 percent of the agreements with both
21   hours worked and stipend amounts that were
22   indicated.  8 percent of them had a stipend amount
23   of greater than $200 per week, yes.
24        Q.   Okay.  So that means then that 92 percent
25   of those agreements proposed stipends from 195.75 to

Page 223

1    $200, correct?
2         A.   Correct.
3         Q.   And is that not evidence, to you, of a
4    common impact with respect to the Expert Au Pair
5    au pairs of a policy to set the stipend at $195.75?
6         A.   No, it's not evidence for that.
7         Q.   Why not?
8         A.   Because 8 percent received an amount
9    above that, of above 200.  Additionally, we have
10   people that receive 200 instead of 195.75.
11        Q.   If you turn to page 13 and look at
12   page -- look at Footnote 38.
13        A.   Okay.
14        Q.   Again, we're talking about the Expert
15   Au Pair agreements here, correct?
16        A.   In the -- in this foot -- in this
17   footnote, yes.
18        Q.   And it says that 4 percent were
19   contracted to receive hours adjusted stipends that
20   exceed -- that exceeded 7 -- $7.25 an hour.  Is
21   that -- am I understanding that correct?
22        A.   Correct.
23        Q.   Okay.  So does this not mean that
24   96 percent of these au pairs receive less than
25   minimum wage, assuming that the room and board

Page 224

1    credit does not apply?
2         MR. WOLOSZ:  Objection.
3         A.   If you're -- if you are assuming, as you
4    just said, that the room and board credit does not
5    apply, they did receive less than the federal
6    minimum wage of 7 -- $7.25 per hour.
7         Q.   And does that not, to you, show a common
8    impact as a result of a policy to set the wage at an
9    amount lower than the minimum wage, if room and
10   board credit does not apply?
11        A.   No, it does not.  Because that's also not
12   the policy, as I understood it to be from the
13   complaint.
14        Q.   Well, I'm just looking at the -- the
15   numbers that apply from the -- from the contractual
16   analysis that you've done.
17             If the plaintiffs are correct,
18   that the room and board credit does not apply, do
19   not the -- does not the contractual evidence from
20   Expert Au Pair support the conclusion that
21   96 percent of the Expert Au Pair au pairs were paid
22   less than the minimum wage?
23        MR. BOGDAN:  Objection.
24        A.   It -- it does imply that -- that they
25   were contracted to earn less.  But as I've said

Page 225

1    before, we don't know what they actually received.
2         Q.   All right.  And you believe we would know
3    what -- we would need to know what they actually
4    received in order to conclude that they were all --
5    that they all suffered a common impact here?
6         A.   In this case, yes, because there's such
7    variance in what individual au pairs were contracted
8    to receive in terms of the hourly stipend and how
9    many hours of childcare they were going to provide
10   based on the schedule that was provided by the host
11   family.
12        Q.   But there -- there would not be
13   significant -- significant variance with respect to
14   the contractually agreed weekly stipend amounts,
15   would there be?
16        MR. WOLOSZ:  Objection.
17        A.   Here, as it states here, there's a range.
18   There's a range from $4.35 per hour contractually
19   all the way up to $7 -- over $7.25 per hour.  So
20   there is a lot of variance there that I see.
21             I -- I'm not -- I don't have the
22   underlying data, and we used tables received from
23   Expert Au Pair to do this.  So I haven't analyzed,
24   say, with a histogram, if you will, to see the --
25   the distribution of hourly stipend amounts.  But

MAGNA
LEGAL SERVICES

Page 226

1  that just gives you a -- a wide range right there of
2  from the minimum to the maximum.
3      Q.   Okay.  But I -- again, my question is if
4  we're -- we're just asking:  Is there common impact
5  from a policy across a class?
6      A.   Correct.
7      Q.   And if the policy is that you apply a
8  credit for room and board, and it is determined that
9  that policy was wrong and that they should not have
10  been applying a credit for room and board, wouldn't
11  you agree with me that that policy impacted 96
12  percent of the class, at least as indicated by the
13  contractual agreements for Expert Au Pair?
14      A.   I would agree that it did impact a large
15  share of the class, if you're just looking at the
16  contracted amounts.  But we don't know what they
17  actually received or how many hours they actually
18  worked, so we really don't know what percent of the
19  class was actually impacted by that policy.
20      Q.   And the actual -- okay.  Withdrawn.
21          And I just -- I wasn't sure.  When
22  you -- you referred a couple times in your report to
23  the Expert Au Pair contract summary.  What is that,
24  that you're referring to?
25      A.   It was a document we received from Expert

Page 227

1  Au Pair's counsel that had a summary of the
2  contracts, and it -- based on the data that had been
3  coded up from the -- you know, the original
4  contracts that they -- they had in --
5      Q.   Okay.
6      A.   -- in their records.  So it was a summary
7  that they gave us, based on the data that they had
8  coded up from their own contracts.
9      Q.   All right.  And I -- I see now in your --
10  in your exhibit list on your rebuttal report, you
11  make reference to the Expert Au Pair contract
12  summary.
13      A.   Yes.
14      Q.   So I'm correct then that this is a
15  document that -- that Expert Au Pair, the sponsor,
16  provided to you, and not a summary that you prepared
17  based upon your review of the contracts?
18      A.   Correct.
19      Q.   All right.  And you didn't have this
20  Expert Au Pair contract summary when you did your
21  opening report?
22      A.   No, I did not.
23      Q.   And do you know why you didn't receive it
24  until after you filed your opening report?
25      A.   No, I -- I don't.  I mean, I know

Page 228

1  discovery was ongoing, so I don't understand what
2  was happening on that side.
3      Q.   Okay.
4      A.   On the legal side of it.
5      Q.   Fair enough.
6          But -- but you didn't have it when
7  you did the opening report, but you did have it when
8  you did your rebuttal report; and, therefore, you
9  rely upon it in your rebuttal report, right?
10      A.   Correct.
11      Q.   All right.
12          MR. SKINNER:  Can we mark this
13  GoAuPair data?  Do we have -- do we have this Expert
14  Au Pair summary with us or not?
15          Okay.  Can we mark this one as
16  Plaintiffs' Exhibit 8?  Oh, it's 9?  I'm sorry.
17  Plaintiffs' Exhibit 9.
18          (Exhibit No. 9 was marked.)
19          THE WITNESS:  Thank you.
20          MR. SKINNER:  I'm sorry, Juan.  Do
21  you mind if I grab a copy of that?  Thanks.
22          Did you guys get copies?
23          MR. WOLOSZ:  Yeah.
24          MR. SKINNER:  Okay.  Great.  Sorry
25  about that.

Page 229

1      Q.   So looking at what we've marked as
2  Plaintiffs' Exhibit 9, do you recognize this data?
3      A.   Yes, I do.
4      Q.   All right.  And is this data that was
5  produced by GoAuPair?
6      A.   Yes, it was.
7      Q.   All right.  And if we look at the first
8  page of this, it -- it purports to show, would you
9  agree with me, a summary of the total number -- if
10  we're looking at the very top row, the total number
11  of standard au pair placements and then how many of
12  those standard au pairs were paid within certain --
13  within certain amounts?
14      A.   It actually shows both standard and
15  premiere, but it doesn't differentiate how the
16  au pair -- explicitly differentiate how the au pair
17  was placed.
18      Q.   Okay.  There's a row for standard only,
19  correct?
20      A.   So that is what the au pair selected to
21  be listed as.
22      Q.   Okay.  And how do you know -- how --
23  explain to me, if you can, what you know about these
24  different categories and what they mean.
25      A.   So my understanding is an au pair can

PLAINTIFFS' RESP. APP.0004414

MAGNA ▶
LEGAL SERVICES

# Exhibit 403

PLAINTIFFS' RESP. APP.0004415

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

-------------------------------x

JOHANA PAOLA BELTRAN, et al.,

      Plaintiffs,     Civil Action No.

vs.                14-cv-03074-CMA-KMT

INTEREXCHANGE, INC., et al.,

      Defendants.

-------------------------------x

VIDEOTAPED DEPOSITION of CULTURAL CARE,

INC., pursuant to Rule 30(b)(6), designee

NATALIE JORDAN

      April 14, 2017

      Boston, Massachusetts

Magna Legal Services Reported By:

(866) 624-6221     MaryJo O'Connor, RMR/CSR

www.MagnaLS.com    Job No: 308025

PLAINTIFFS' RESP. APP.0004416

Case 1:14-cv-03074-CMA-KMT   Document 1059-23   filed 05/17/18   USDC Colorado   Page 208

```
                                            Page 2
 1
 2
 3
 4
 5
 6              April 14, 2017
 7               9:11 a.m.
 8
 9
10         VIDEOTAPED DEPOSITION of CULTURAL
11    CARE, INC., pursuant to Rule 30(b)(6),
12    designee NATALIE JORDAN, held at Choate, Hall
13    & Stewart, LLP, Two International Place,
14    Boston, Massachusetts, pursuant to notice,
15    before MaryJo O'Connor, Registered Merit
16    Reporter, Certified Court Reporter, and
17    Notary Public in and for the Commonwealth of
18    Massachusetts.
19
20
21
22
23
24
25
```

```
                                            Page 4
 1   A P P E A R A N C E S, Continued:
 2
 3   COUNSEL FOR THE CULTURAL CARE:
 4      CHOATE, HALL & STEWART LLP
 5      Two International Place
 6      Boston, Massachusetts 02110
 7      (617) 248-5000
 8      BY:  JOAN LUKEY, ESQ.
 9         jlukey@choate.com
10         KEVIN O'KEEFE, ESQ.
11         kokeefe@choate.com
12
13   (Via telephone)
14   COUNSEL FOR AUPAIRCARE:
15      GORDON & REES
16      555 17th Street, Suite 3400
17      Denver, Colorado 80202
18      (303) 534-5160
19      BY:  PEGGY E. KOZAL, ESQ.
20         pkozal@gordonrees.com
21
22
23
24
25
```

```
                                            Page 3
 1   A P P E A R A N C E S:
 2
 3   COUNSEL FOR THE PLAINTIFFS:
 4      BOIES, SCHILLER & FLEXNER LLP
 5      575 Lexington Avenue, 7th Floor
 6      New York, New York 10022
 7      (212) 446-2300
 8      BY:  DAWN L. SMALLS, ESQ.
 9         dsmall@bsfllp.com
10         DANIEL R. SCHWARTZ, ESQ.
11         dschwartz@bsfllp.com
12
13   (Via telephone)
14   COUNSEL FOR APF GLOBAL FOUNDATION:
15      FISHER & PHILLIPS LLP
16      1801 California Street, Suite 2700
17      Denver, Colorado 80202
18      (303) 218-3650
19      BY:  SUSAN M. SCHAECHER, ESQ.
20         sschaecher@fisherphillips.com
21
22
23
24
25
```

```
                                            Page 5
 1   A P P E A R A N C E S, Continued:
 2
 3   (Via telephone)
 4   COUNSEL FOR PROAUPAIR, APEX PROFESSIONAL
 5   EXCHANGE and 20/20 CARE EXCHANGE D/B/A
 6   INTERNATIONAL AUPAIR EXCHANGE:
 7      NIXON SHEFRIN HENSEN OGBURN P.C.
 8      5619 DTC Parkway, Suite 1200
 9      Greenwood Village, Colorado 80111
10      (303) 773-3500
11      BY:  LAWRENCE D. STONE, ESQ.
12         lstone@nixonshefrin.com
13
14
15   (Via telephone)
16   COUNSEL FOR EXPERT AUPAIR:
17      EXPERT AUPAIR
18      100 2nd Avenue S., Suite 3025
19      St. Petersburg, Florida 33701
20      (727) 225-2649
21      BY:  BOGDAN ENICA, ESQ.
22         bogdan@expertaupair.com
23
24
25
```

PLAINTIFFS' RESP. APP.0004417

MAGNA
LEGAL SERVICES

| Page 6 | Page 8 |
|---|---|

**Page 6**

1  A P P E A R A N C E S, Continued:
2
3  (Via telephone)
4  COUNSEL FOR AU PAIR INTERNATIONAL, INC.,
5  AMERICAN CULTURAL EXCHANGE LLC, D/B/A
6  GOAUPAIR AND AGENT AU PAIR:
7    WHEELER TRIGG O'DONNELL LLP
8    370 Seventh Street, Suite 4500
9    Denver, Colorado 80202
10   (303) 244-1983
11   BY:  KATHRYN A. REILLY, ESQ.
12     reilly@wtotrial.com
13
14  (Via telephone)
15  COUNSEL FOR INTEREXCHANGE:
16   SHERMAN HOWARD LLC
17   633 Seventeenth Street, Suite 3000,
18   Denver, Colorado 80202
19   (303) 299-8302
20   BY:  JOE H. HUNT, ESQ.
21     jhunt@shermanhoward.com |
22
23
24
25

**Page 8**

1  A P P E A R A N C E S, Continued:
2
3  (Via telephone)
4  COUNSEL FOR AMERICAN INSTITUTE FOR FOREIGN
5  STUDY D/B/A AU PAIR IN AMERICA:
6    PUTNEY, TWOMBLY, HALL & HIRSON LLP
7    521 Fifth Avenue
8    New York, NY 10175
9    (212) 682-0020
10   BY:  JOHN B. FULFREE,  ESQ.
11     Jfulfree@putneylaw.com
12
13
14  ALSO PRESENT:
15   William Dunn, Cultural Care, Inc.
16   Luc-Bernard Val, video technician
17
18
19
20
21
22
23
24
25

**Page 7**

1  A P P E A R A N C E S, Continued:
2
3  (Via telephone)
4  COUNSEL FOR CULTURAL CARE:
5   LEWIS ROCA ROTHGERBER CHRISTIE LLP
6   1200 17th Street, Suite 3000
7   Denver, Colorado 80202
8   (303) 628.9527
9   BY:  JESSICA L. FULLER, ESQ.
10    jfuller@lrrc.com
11
12
13  COUNSEL FOR EXPERT GROUP INTERNATIONAL INC.
14  D/B/A EXPERT AUPAIR:
15   BOGDAN ENICA, ESQ.
16   111 Second Avenue NE, Suite 204
17   St Petersburg, Florida 33701
18   (727)388-3472
19   BY:  BOGDAN ENICA, ESQ.
20    bogdane@hotmail.com
21
22
23
24
25

**Page 9**

1  P R O C E E D I N G S
2
3     VIDEO TECHNICIAN:  We are now on
4  the record.  This begins DVD number one
5  in the deposition of Cultural Care, Inc,
6  with designee Natalie Jordan
7  representative in the matter of Johana
8  Paola Beltran versus InterExchange
9  Incorporated, et al in the U.S. District
10 Court for the District of Colorado Civil
11 number 14-cv-03074-CMA-KMT.
12    Today is Friday, April 14, 2017,
13 and the time is 9:11 a.m.
14    This deposition is being taken at
15 the law offices of Choate Hall and
16 Stewart LLP, located in Boston,
17 Massachusetts.  It is being done at the
18 request of the law offices of Boies
19 Schiller & Flexner LLP.
20    The videographer is Luc-Bernard Val
21 of Magna Legal Services, and the court
22 reporter is MaryJo O'Connor of Magna
23 Legal Services.
24    Will counsel and parties all
25 present please state their appearances

**MAGNA**
LEGAL SERVICES

| Page 10 | Page 12 |
|---------|---------|
| 1 and whom they represent. | 1 MS. SCHAECHER: Susan Schaecher |
| 2 MS. SMALLS: Dawn Smalls from | 2 Fisher & Phillips on behalf of APF |
| 3 Boies, Schiller & Flexner for the | 3 Global. |
| 4 Plaintiffs. | 4 MS. LUKEY: American Institute For |
| 5 MR. SCHWARTZ: Daniel Schwartz from | 5 Foreign Study d/b/a Au Pair in America. |
| 6 Boies, Schiller & Flexner for the | 6 MR. FULLFREE: John Fullfree from |
| 7 Plaintiffs. | 7 Putney, Twombly, Hall & Hirson on behalf |
| 8 MS. LUKEY: For the Defendants, | 8 of Au Pair in America. |
| 9 this is Joan Lukey, with me is Kevin | 9 MS. LUKEY: The next one I think |
| 10 O'Keefe and in-house counsel Bill Dunn | 10 may be one that Katie indicated she was |
| 11 for Cultural Care, Incorporated. | 11 doing, but I'll read them anyway. |
| 12 In order to keep this organized, as | 12 American Cultural Exchange LLC doing |
| 13 we discussed before we went online, I'm | 13 business as GoAuPair and Agent Au Pair. |
| 14 now going to read the names of each | 14 Katie Reilly, are those two yours? |
| 15 sponsor Defendant in the order in which | 15 MS. REILLY: Yes, and Katie Reilly |
| 16 they appear in the Amended Complaint. | 16 from Wheeler Trigg O'Donnell on both of |
| 17 And ask as I read your name, if you can | 17 those. |
| 18 identify yourself to make your | 18 MS. LUKEY: Thank you. |
| 19 appearance. | 19 Apex American Professional Exchange |
| 20 InterExchange, Inc. | 20 d/b/a PROaupair. |
| 21 MR. HUNT: This is Joe Hunt from | 21 MR. STONE: Larry Stone with the |
| 22 Sherman and Howard on behalf of | 22 firm of Nixon Shefrin Hensen Ogburn |
| 23 InterExchange. | 23 appearing on behalf of that entity. |
| 24 MS. LUKEY: USAuPair, Inc. No one | 24 MS. LUKEY: And I believe you also |
| 25 identifies himself other herself. | 25 have 20/20 Care Exchange, Inc, d/b/a, |

| Page 11 | Page 13 |
|---------|---------|
| 1 GreatAuPair, LLC. No counsel. | 1 the International Au Pair Exchange; is |
| 2 Expert Group International, Inc | 2 that right? |
| 3 d/b/a Expert Au Pair. | 3 MR. STONE: That's correct. Thank |
| 4 MR. ENICA: Bogdan Enica on behalf | 4 you. |
| 5 of Expert International doing business | 5 MS. LUKEY: Thank you all. That's |
| 6 as Expert Au Pair. | 6 the complete list of Defendant sponsors. |
| 7 MS. LUKEY: EurAuPair InterCulteral | 7 VIDEO TECHNICIAN: Thank you very |
| 8 Childcare Programs. No response. | 8 much. |
| 9 Cultural Homestay International. | 9 MS. FULLER: And excuse me, Joan. |
| 10 AuPairCare, Inc. No answer. | 10 Just for the record, this is Jessica |
| 11 MS. KOZAL: Good morning. This is | 11 Fuller from Lewis Roca Rothgerber |
| 12 Peggy Kozal on behalf of AuPairCare, | 12 Christie also for Cultural Care. |
| 13 Inc. Thank you. | 13 MS. LUKEY: Sorry, Jessica. Yes, |
| 14 MS. LUKEY: Thank you. Au Pair | 14 our co-counsel in Colorado. |
| 15 International, Inc. | 15 Have we got everybody? Okay, thank |
| 16 MS. REILLY: Good morning. This is | 16 you. |
| 17 Katie Reilly on behalf of Au Pair | 17 VIDEO TECHNICIAN: Thank you very |
| 18 International, Inc., and also the | 18 much. Will the court reporter now |
| 19 GoAuPair Defendants and Agent Au Pair. | 19 please swear in the witness. |
| 20 MS. LUKEY: Okay. I may read you | 20 |
| 21 again Peggy, because I'm not sure I can | 21 |
| 22 remember. | 22 |
| 23 Au Pair -- oh, that's one I just | 23 |
| 24 did I think. | 24 |
| 25 APF Global Exchange NFP. | 25 |

PLAINTIFFS' RESP. APP.0004419

MAGNA
LEGAL SERVICES

Page 14

```
 1            NATALIE JORDAN,
 2   having been satisfactorily identified by a
 3   Massachusetts drivers license and duly sworn
 4   by the Notary Public, was examined and
 5   testified as follows:
 6   EXAMINATION
 7   BY MS. SMALLS:
 8        Q.  Good morning.
 9        A.  Good morning.
10        Q.  You understand today -- well, let
11   me -- please state your name for the record?
12        A.  Natalie Jordan.
13        Q.  And who are you testifying for
14   today?
15        A.  Cultural Care, Inc.
16        Q.  Okay.  You understand that your
17   testimony today is under oath and you are
18   offering testimony in this lawsuit?
19        A.  Yes.
20        Q.  Just a few ground rules.  I'm going
21   to ask you a series of questions.  I'm going
22   to -- please wait until my question is
23   finished, and then I'll allow you an
24   opportunity to answer.
25            I won't interrupt you; and if you
```

Page 15

```
 1   need to take a break, just allow me to finish
 2   the question.  You cannot take -- I would ask
 3   you not to take a break in the middle of a
 4   question, but just indicate when you want to
 5   take a break and we'll make sure to do that
 6   immediately after.
 7            Counsel has indicated that you may
 8   have some trouble hearing.  So if there is
 9   anything that you don't hear or if you would
10   like me to speak louder, please let me know
11   that.  I'm happy to accommodate that, but I
12   won't know if you can't hear me.  And so
13   please let me know if you can't -- if for
14   some reason you don't understand the question
15   or if you can't hear me.
16        MS. LUKEY:  I'm sorry, Dawn, before
17   you of begin, are you going to put the
18   standard stipulation on?
19        MS. SMALLS:  Yes.
20        MS. LUKEY:  Okay, thank you.
21        Q.  And just generally, your counsel
22   may object, and that's their right to do so.
23   Unless the matter is privileged, you should
24   go ahead and answer the question.
25        A.  Okay.
```

Page 16

```
 1        Q.  Can you tell me what you have done
 2   to prepare for this deposition?
 3        MS. LUKEY:  I'm sorry, we have to
 4   state the stipulation.  Do you want me
 5   to recite the Massachusetts stipulation?
 6        MS. SMALLS:  Sure.
 7        MS. LUKEY:  We're reserving all
 8   objections, except as to form, and
 9   reserving motions to strike until time
10   of trial.  The witness will read,
11   correct, and sign in the presence of a
12   notary within 30 days or it will be
13   deemed signed; and we would agree to
14   waive the necessity of the signature
15   being in the presence of a notary.
16            Is that all right with everybody?
17        MS. SMALLS:  Yes.
18        MS. LUKEY:  Is that okay with
19   everybody on the phone I assume?  Say no
20   if it isn't.
21            Thank you.
22   BY MS. SMALLS:
23        Q.  Can you tell me what you have done
24   to prepare for today's deposition?
25        A.  I've met with legal counsel.
```

Page 17

```
 1        Q.  Were any documents shown to you in
 2   advance of today's deposition?
 3        A.  Yes.
 4        Q.  How many?
 5        A.  I don't know the number.
 6        Q.  Do you have a general sense of the
 7   nature or subject or categories of the
 8   documents that you reviewed?
 9        A.  Documents that were produced to
10   Plaintiffs counsel in discovery.
11        Q.  Did those include any contracts?
12        A.  Yes.
13        Q.  Did they include financial
14   statements?
15        A.  Yes.
16        Q.  Did they include au pair
17   agreements?
18        A.  Yes.
19        Q.  Did they include host family
20   handbooks?
21        A.  Yes.
22        Q.  Did they include au pair handbooks?
23        A.  Yes.
24        Q.  Have you ever testified in a
25   deposition before?
```

PLAINTIFFS' RESP. APP.0004420

MAGNA ▶
LEGAL SERVICES

Page 18

1      A. Yes.
2      Q. And where did you testify?
3      A. In Massachusetts.
4      Q. What was the legal action that you
5  testified for?
6      A. It was a civil matter.
7      Q. What was the action?
8      A. It was a former hosting family who
9  was disputing the refund that they had
10  received.
11      Q. Okay. So you were testifying on
12  behalf of Cultural Care?
13      A. Yes.
14      Q. In your capacity as an employee or
15  officer of Cultural Care?
16      A. Yes.
17      Q. In a dispute with a host family?
18      A. Yes.
19      Q. About their refund?
20      A. Yes.
21      Q. Is there any other action in which
22  you have been deposed or offered testimony in
23  a deposition?
24      A. No.
25      Q. I'm going to review with you -- if

Page 19

1  you want to mark this as Exhibit 1 -- the
2  30(b)(6) notice.
3      (Document marked for
4      identification as Jordan Exhibit 1)
5      Q. Do you recognize this document?
6      A. I recall the document that I had
7  there was a signature page.
8      Q. With the exception of the signature
9  page, do you recognize that document?
10      A. No.
11      Q. Can you read the title of the
12  document?
13      A. "Plaintiffs' Agreed Notice of
14  30(b)(6) Deposition of Defendant Cultural
15  Care, Inc. d/b/a Cultural Care Au Pair."
16      Q. And you understand that you are
17  here today as the corporate designee of
18  Cultural Care, Inc.?
19      A. Yes.
20      Q. So if we can go through, this is
21  the notice of deposition for this deposition,
22  we're going to go through each of the topics
23  and just confirm that you feel comfortable
24  testifying on each of these topics.
25      So if you can go to Page 5. If you

Page 20

1  can read item number 1.
2      A. "Your corporate structure,
3  including your legal and/or beneficial
4  ownership."
5      Q. Okay. Do you feel equipped to
6  answer questions about your corporate
7  structure?
8      A. Yes.
9      Q. Can you review topic number 2?
10      A. "Your finances, including but not
11  limited to your financial records, revenue
12  and expense streams, major sources of revenue
13  or funding, profits and losses, and overall
14  financial position."
15      Q. Okay. Do you feel qualified to
16  testify to topic number 2?
17      A. Yes.
18      Q. And what is -- and I'm just going
19  to refer back to question number 1 for a
20  second.
21      What is your basis for competence
22  on topic number 1?
23      A. My experience with the organization
24  as well as education through legal counsel.
25      Q. And with respect to topic number 2,

Page 21

1  what is your competence to testify with
2  respect to finances?
3      A. My experience with the organization
4  and education through legal counsel.
5      Q. Okay. If we can go to topic number
6  3, if you can review that. I don't think we
7  need to read the whole thing for the record,
8  but it relates to your recruitment, training,
9  placement and supervision of au pairs as a
10  topic.
11      Can you review topic number 3 and
12  let me know if you feel qualified to testify
13  to topic number 3?
14      MS. LUKEY: I would note there is
15      going to be some categories where she'll
16      respond that they are beyond the scope
17      of Cultural Care and, therefore, beyond
18      her own scope.
19      So I think if you would allow her
20      to answer subject to the fact that she
21      will tell you when she reaches such a
22      category.
23      MS. SMALLS: That's fine.
24      A. Yes.
25      Q. Thank you. Topic with number 4

MAGNA ▶
LEGAL SERVICES

| Page 22 |
|---|

1 relates to your relationship and
2 communications with the State Department and
3 the Department of Labor.
4     Can you review topic number 4 and
5 let me know when you're done?
6     A. (Document review.) I would feel
7 comfortable with the topics with the
8 exception of anything relating to the
9 Department of Labor, as I've had no
10 communications with them.
11     Q. Okay. And what is the basis for
12 your competence testifying to topic number 4?
13     A. With respect to the State
14 Department in the role that I have and my
15 experience with the organization, I think
16 that is why I feel competent.
17     Q. Okay. And does Cultural Care have
18 any communications with the Department of
19 Labor?
20     A. No.
21     Q. Not at all?
22     A. No.
23     Q. Okay. If you can read topic number
24 5.
25     A. "Your relationship and

| Page 23 |
|---|

1 communications with other Sponsors, including
2 Your member in association with other
3 Sponsors, including but not limited to the
4 Alliance for International Education and the
5 International Au Pair Association."
6     Q. Do you feel qualified to testify to
7 topic number 5?
8     A. Yes.
9     Q. Can you state what your competence
10 is to testify to topic number 5?
11     A. My experience with the organization
12 and the role that I have allows me to feel
13 that I'm competent to do so.
14     Q. If you can read topic number 6?
15     A. "Your analysis and identification
16 of the market(s) in which you operate,
17 including any analysis of the compensation
18 paid to childcare professionals other than
19 au pairs."
20     Q. Do you feel qualified to testify to
21 topic number 6?
22     A. Yes.
23     Q. And what's the basis of your
24 competence to testify to topic number 6?
25     A. My experience with the organization

| Page 24 |
|---|

1 and years of service allow me to feel
2 comfortable, more competent, to do so.
3     Q. Topic number 7 relates to your
4 document retention and your document -- the
5 maintenance of your documents.
6     Do you feel comfortable testifying
7 to topic number 7?
8     A. I feel comfortable and competent to
9 testify to part of it, though I'm certainly
10 not a technology expert. And so my ability
11 specifically in Item 7(b) would be limited.
12     Q. Okay, thank you.
13     Can you tell me what is Cultural
14 Care?
15     A. Well, Cultural Care Au Pair, for
16 whom I represent, is a U.S.-based designated
17 sponsor of the au pair program.
18     Q. And do you represent Cultural
19 Care -- you represent Cultural Care Au Pair?
20     A. Cultural Care, Inc.
21     Q. Okay. And it is a designated
22 sponsor for au pairs. And in your role as
23 sponsor, what functions do you conduct?
24     A. We are responsible for ensuring
25 compliance with State Department regulations

| Page 25 |
|---|

1 as a sponsor, but also for the monitoring of
2 placements of au pairs with hosting families
3 and the support, continued monitoring, during
4 their term together in the United States.
5     Q. So ensuring compliance is the
6 stated functions -- again, I'm just starting
7 very generally -- for Cultural Care is
8 ensuring compliance with State Department
9 regulations and the monitoring and placement
10 of au pairs?
11     A. Correct.
12     Q. Does it have any other functions?
13     A. Well, within that, the ongoing
14 support of au pairs and hosting families, the
15 recruiting of hosting families, the
16 operations of the training school program.
17     Q. What is EF?
18     A. EF is a -- there are a number of
19 legal entities that make up the EF Education
20 First group.
21     Q. Well, when Cultural Care refers to
22 "EF," what is it referring to?
23     A. It is referring to -- so Cultural
24 Care, Inc., is a separate legal entity, and
25 EF is comprised of a group of other legal

PLAINTIFFS' RESP. APP.0004422

**MAGNA**
LEGAL SERVICES

---

**Page 26**

1      entities and we are affiliated with some of
2      those.
3          Q. So is Cultural Care a division of
4      EF?
5          A. No. Cultural Care is a separate
6      legal entity.
7          Q. Is Cultural Care affiliated with
8      EF?
9          A. Cultural Care is affiliated with
10     the legal entities that, as a group, make up,
11     or are part of the EF Educational --
12     Education First.
13          Q. Okay. Do you have a position at
14     EF?
15          A. No.
16          Q. Do you have an e-mail, an EF e-mail
17     address?
18          A. That's not my primary e-mail
19     address.
20          Q. Okay.
21          A. I believe that there is an EF
22     e-mail address that exists, but it's not the
23     one that I use.
24          Q. Why would you have an e-mail
25     address at a separate legal entity?

**Page 27**

1          A. I don't know.
2          Q. Okay. Have you ever used the EF,
3     the Natalie.Jordan@EF e-mail address?
4          A. Yes. When I began with the
5     organization and our name at that time was EF
6     Au Pair, that's a time when my e-mail address
7     was -- had EF in it. And so at that time I
8     did.
9          Q. And what year would that have been?
10          A. I started in 1999.
11          Q. And when would you have
12     transitioned from an EF e-mail address to a
13     Cultural Care e-mail address?
14          A. In 2004.
15          Q. So that's the date where EF became
16     Cultural Care?
17          A. That is when it transitioned from
18     EF Au Pair, Inc., to Cultural Care, Inc.
19     That's the year.
20          Q. Cultural Care, okay. Who is the
21     head of EF?
22          A. I don't know.
23          Q. Do you have a formal relationship
24     or an agreement?
25          You said you were affiliated. So

**Page 28**

1     how does that affiliation come about with EF?
2          MS. LUKEY: Objection. She said
3     they were not affiliated with EF but
4     with some of the affiliate -- some of
5     the component entities that form EF or
6     Education First. So she did not say
7     they had an affiliation with EF.
8          MS. SMALLS: Okay, thank you. We
9     may have to take a lot of clarifications
10     as we go through this.
11          Q. So you have an affiliation with
12     companies that are part of the EF family?
13          A. We have an affiliation with a group
14     of legal entities that together make up the
15     EF Education First group. So we are
16     affiliated with some of those.
17          Q. What are the legal entities within
18     the EF family are you affiliated with?
19          A. I don't know.
20          Q. You just stated that Cultural Care
21     is affiliated with legal entities that
22     make -- that are a part of the EF network,
23     correct?
24          A. Yes.
25          Q. And you understand that today

**Page 29**

1     you're testifying as Cultural Care?
2          A. Yes.
3          Q. So what are the companies -- I'll
4     ask again.
5          What are the companies that you are
6     affiliated within the EF network?
7          A. I don't know.
8          Q. What is "ICL"?
9          A. ICL is International Care Limited.
10          Q. What is your relationship with ICL?
11          A. ICL is an international affiliate
12     and we have a contractual relationship with
13     them.
14          Q. An international affiliate of what?
15          A. I'm not sure I understand.
16          Q. Well, can you explain what you mean
17     by "international affiliate"?
18          A. They are an international -- well,
19     they are a company outside of the U.S. with
20     whom we have an affiliation. And,
21     specifically, we have a contractual
22     relationship with them.
23          MS. SMALLS: You can mark this as
24     Exhibit 2.
25

PLAINTIFFS' RESP. APP.0004423

**MAGNA**
LEGAL SERVICES

| Page 30 | Page 32 |
|---|---|

**Page 30**

```
 1        (Document marked for
 2   identification as Jordan Exhibit 2)
 3      Q.  Do you recognize this document?
 4      A.  Yes, I do.
 5      Q.  Can you tell me what it is?
 6      A.  This is an agreement between
 7   Cultural Care, Inc., and International Care
 8   Limited.
 9      Q.  And what does it say?
10        MS. LUKEY:  Objection.  The
11   document speaks for itself.  Can you be
12   more specific as to what you want her to
13   answer?
14        MR. ENICA:  I do -- I hate to
15   interrupt.  This is Bogdan Enica, but do
16   we have Bates numbers for the document?
17        MS. SMALLS:  Yeah.  I mean, I'll
18   try to give you the starting Bates
19   numbers when I hand something over.
20        MS. LUKEY:  This particular one is
21   CC00034585 through 96.
22        MS. SMALLS:  And if we can limit
23   objections to form, but I understand
24   your point.
25        MS. LUKEY:  I just don't think it
```

**Page 31**

```
 1   was one she could answer it that form.
 2   What does it say; she would have to read
 3   it into the record.
 4   BY MS. SMALLS:
 5      Q.  Let's just talk through this
 6   document.
 7        In paragraph let's go to paragraph
 8   -- let's go to Paragraph D, can you read that
 9   for the record?
10      A.  Paragraph D, as in David?
11      Q.  D, as in David.  Thank you.
12      A.  And, I'm sorry, you've asked me to
13   read that out loud --
14      Q.  Yes.
15      A.  -- or to myself?
16      Q.  To read it out loud, please.
17      A.  "Inc wishes to devote itself
18   exclusively to its chartered purposes.  It
19   therefore desires to deliver its exchange
20   program services to ICL, as ICL is an
21   organization which is experienced in
22   organizing and promoting cultural and
23   educational programs abroad and which has
24   vast international experience and is familiar
25   with the legal regulations governing such
```

**Page 32**

```
 1   programs."
 2      Q.  If you can go to Page 2 of the
 3   document and under point 1, under "General
 4   Statement," the second paragraph, can you
 5   read that paragraph out loud?
 6      A.  "Inc shall deliver all services
 7   required to be performed by the designated
 8   entity under the Regulation and ICL shall
 9   recruit participants and provide the other
10   services needed for organizing the program as
11   set forth in this Agreement."
12      Q.  Okay.  So is it correct to say that
13   this agreement establishes that ICL shall --
14   is designated as the primary recruitment
15   partner for au pairs?
16      A.  Could you repeat the question?
17      Q.  Sure.  Actually, strike that.
18        Let's go to Page 3 under "Duties of
19   ICL."  Can you just read number 3?
20      A.  "Duties of ICL"?
21      Q.  Yes.
22        MS. LUKEY:  I'm sorry, you want her
23   to read all the subparagraphs --
24        MS. SMALLS:  Yes.
25        MS. LUKEY:  -- out loud or to
```

**Page 33**

```
 1   herself?
 2        MS. SMALLS:  Yes, out loud.
 3        MS. LUKEY:  Objection.
 4      A.  "a, Organization and Promotion.
 5   ICL will promote the Cultural Care name and
 6   program worldwide.
 7        "b, Recruitment and preparation of
 8   participants.  ICL will identify, recruit and
 9   prepare prospective Participants to the
10   Program directly or through its agents in
11   countries designated by the U.S.D.S. (each
12   respectively a 'country of origin').
13        "c, Selection of Participants.  ICL
14   will be responsible for the selection and
15   screening of Participants, and will present
16   the agreed number of Participants to Inc.
17        "d, Qualifications.  Qualification
18   requirements of Participant are thoroughly
19   described in the Regulations.  Applicants
20   will be screened by ICL for demonstrated
21   maturity, good character, sufficient skills
22   in English and ability to derive maximum
23   benefit from the Program experience and shall
24   meet other such requirements and procedures
25   which are required under the Regulation,
```

PLAINTIFFS' RESP. APP.0004424

**MAGNA**
**LEGAL SERVICES**

| Page 34 | Page 36 |
|---|---|

**Page 34**

1     adopted or modified from time to time by the
2     U.S.D.S. and as the parties deem appropriate
3     in connection with the Program.
4         "f, Screening.  In screening
5     applicants, ICL shall perform a personal
6     interview, a careful evaluation of the
7     application information, school reports,
8     references, and medical forms concerning
9     physical and mental health.  ICL shall also
10    conclude a background investigation that
11    includes verification of school, three
12    non-family related personal and employment
13    references, a personality profile and
14    criminal record check for its recognized
15    equivalent."
16        It looks like it's another f:
17    "Preparation of Application.  ICL will ensure
18    all applications have required documents in a
19    format as from time to time required by
20    Regulations and Inc. such as health forms,
21    insurance certificates, participant and
22    parental releases, and all other documents
23    deemed necessary or advisable.  ICL will
24    verify all documents and supply to Inc. a
25    complete application package.

**Page 36**

1     of the participants in the home country of
2     the Participant.  Prior to the start of the
3     Program, ICL will arrange pre-departure
4     orientation meetings to familiarize the
5     Participant with orientation materials to
6     acquaint the Participant with the host
7     country, its people, and its family and
8     cultural life.
9         "i, Visa.  ICL shall inform each
10    Participant that he or she is responsible for
11    arranging and obtaining all necessary visas
12    and other immigration requirements for his or
13    her travel to and from the host country
14    sufficiently in advance of his or her
15    departure.  ICL shall do its best in actively
16    supporting the Participant in the application
17    process.
18        "j, Notification of Qualification.
19    As each applicant is deemed qualified, ICL
20    shall notify such applicant and provide Inc
21    with the name and address and all application
22    documents of the applicant.
23        "k, Liaison.  ICL shall serve as a
24    liaison between Inc., the Participant, and
25    the Participant's home country family through

| Page 35 | Page 37 |
|---|---|

**Page 35**

1        "g, Promotional materials.
2     Depending upon the number of participants Inc
3     and ICL agree to accommodate, ICL will
4     develop promotional activities, material and
5     plans.  Inc will supply ICL with Program
6     information deemed necessary in promoting the
7     Program.  ICL translates promotional
8     materials to all relevant markets, ensuring
9     compliance with all requirements in the
10    Regulations.  All promotional material shall
11    name Inc as the sponsor of the Program in the
12    United States.  Annually ICL will provide Inc
13    with a complete set of all promotional
14    materials, brochures or pamphlets distributed
15    to either Participants or host families for
16    further deliverance to U.S.D.S. according to
17    the Regulations.  All promotional and
18    orientation materials developed hereunder
19    shall remain the property of ICL.  The rights
20    of ICL regarding the assignment of
21    promotional materials contained in this 3.
22    shall survive the termination of this
23    Agreement.
24        "h, Preparation of participants.
25    ICL will arrange for training and education

**Page 37**

1     the duration of the program.  ICL shall be
2     prepared to arrange for emergency contacts,
3     translation services and other services
4     needed to fulfill the Program's intention of
5     a successful cultural exchange experience.
6         "l, Travel.  ICL is responsible for
7     providing international and domestic air
8     travel.
9         "m, Insurance.  ICL will secure
10    participant health and accident insurance
11    meeting the requirements of U.S.D.S."
12       Q.  Thank you.  So under the "Duties of
13    ICL," would it be fair to say that ICL is
14    responsible for under this arrangement the
15    recruitment and screening of au pairs?
16       A.  That ICL is responsible for that?
17       Q.  That ICL is responsible -- under
18    this agreement --
19       A.  Yes.
20       Q.  -- would it be fair to say that ICL
21    is responsible for the recruitment and
22    screening of au pairs?
23       A.  Yes.
24       Q.  Where is ICL based?
25       A.  They are based in Switzerland.

PLAINTIFFS' RESP. APP.0004425

MAGNA ►
LEGAL SERVICES

Page 38

1    Q. Okay. I'm not going to ask you to
2 read it, but if you can generally tell me the
3 responsibilities of Cultural Care, Inc.,
4 referred to as "Inc" in this agreement.
5    A. You said you weren't going to have
6 me read it. But do you mean as its outlined?
7    Q. Under this agreement -- you're
8 welcome to read it, but you're testifying on
9 behalf of Cultural Care. So you can either
10 answer the question or you can use this as a
11 reference point.
12       But I'm just asking generally what
13 are your -- if ICL is responsible for the
14 recruitment and screening of au pairs, what
15 are Cultural Care, Inc.'s responsibilities
16 under this agreement?
17    A. Can you identify the section that
18 you're referring to?
19    Q. Sure. It's Section 4, Page 4, and
20 it says "Duties of Inc." It's immediately
21 under the piece -- the Section 3 that you
22 just read.
23    A. If you're asking me to clarify, or
24 to state what the duties are of Cultural
25 Care, Inc., as it pertains to this agreement,

Page 39

1 then I would refer to exactly how it's
2 outlined in this agreement. I don't have
3 testimony that would be different from this.
4    Q. Okay. If you can just read (a) and
5 (b) of 4, Section 4 of this agreement?
6    A. Sure. Section 4, "Duties of Inc.,"
7    "a, Selection, Screening and
8 supervision of host families. Inc arranges
9 for the selection, screening and supervision
10 of host families. Inc ensures that the host
11 families are fully aware of their
12 responsibilities and obligations set forth in
13 the Regulations, as such Regulations may be
14 modified and amended from time to time.
15    "b, Compliance. Inc has the
16 procedures and systems in place to secure
17 compliance with the Regulations. Inc also
18 provides such other services as may be
19 required to assist in the orderly
20 administration of the program and the needs
21 and welfare of the Participants during their
22 stay in the United States."
23    Q. And can you also read (d)?
24    A. "d, Final selection of Participant.
25 Inc is responsible for the presentation of

Page 40

1 the applicant to the selecting host family
2 and has the right to reject any potential
3 Participant for any reason it deems
4 advisable."
5    Q. So Inc is responsible under the
6 terms of this agreement for the presentation
7 of the applicant to the selecting host
8 family; is that correct?
9    A. Cultural Care, Inc., is responsible
10 for presenting access to applicants for the
11 hosting family to then choose from.
12    Q. I'm just reading directly from the
13 agreement.
14    A. Okay.
15    Q. So it says, "Cultural Care, Inc.,
16 is responsible for the presentation of the
17 applicant to the selecting host family and
18 has the right to reject any potential
19 Participant for any reason it deems
20 advisable."
21       So I'm asking you if that is
22 correct.
23    A. That is correct.
24    Q. The duties of ICL and duties of Inc
25 as reflected in -- as written in this

Page 41

1 agreement, is it reflective of your
2 relationship, your working relationship, in
3 the recruitment, screening and placement of
4 au pairs?
5    A. Yes.
6    Q. Okay. How is communication -- if
7 ICL is responsible for the recruitment and
8 screening of au pairs and Cultural Care,
9 Inc. -- well, strike that.
10       Is ICL known by any other names?
11    A. I don't know.
12    Q. Is it known by Cultural Care
13 Limited?
14    A. I don't know.
15    Q. I'll continue to call it ICL for
16 now.
17       If ICL is responsible for the
18 recruitment and screening of au pairs and Inc
19 is -- Cultural Care, Inc., is responsible for
20 the presentation of au pairs to the selecting
21 host family, there has to be a transition at
22 some point between the two entities. Can you
23 tell me how that's accomplished?
24    A. So Cultural Care, Inc. has,
25 obviously, a contractual relationship with

MAGNA
LEGAL SERVICES

1    ICL. ICL performs their functions. And so,
2    as a result of that, there are a population
3    of au pair applicants who are seeking to
4    participate in the program.
5         Cultural Care, Inc. has a system in
6    which a preliminary status is assigned to
7    these interested au pairs. We conduct a
8    final review in order to determine whether we
9    find them to be -- to meet the needs of our
10   program participants and also the
11   regulations.
12        Once that determination is made,
13   their status is updated such that they can
14   then be released into a matching database
15   that we utilize in order to present these
16   files and the information regarding au pairs
17   to interested hosting families.
18   Q. Does that transition happen
19   exclusively online or via this system?
20   A. At this time, yes. It's over time
21   it has evolved. It was once a paper process
22   and is now an online process.
23   Q. Do you communicate with ICL about
24   anything else, other than your interaction
25   via the online program, the status updates

1    and the transition from, I guess, applicant
2    to however you mark them as ready for a host
3    family, other than that interchange between
4    ICL and Cultural Care, Inc., do you interact
5    with ICL in any other ways?
6    A. Do you mean something specific or?
7    Q. No. I mean do you communicate by
8    e-mail? Do you have weekly meetings? I
9    mean, how do you -- other than having a
10   shared platform in which they load au pairs,
11   as I understand it, and you review or
12   designate, and we'll get to that later about
13   what that process is.
14        Other than that process that you
15   just outlined, do you have other
16   interactions, this is other than that shared
17   platform and the process you just outlined,
18   do you have other interactions with ICL?
19        And my question is: Do you and
20   what are they?
21        MS. LUKEY: Objection. Go ahead.
22        THE WITNESS: I'm sorry?
23   Q. Well, do you have other --
24        MS. LUKEY: Oh, you are just going
25        to restate it?

1         MS. SMALLS: I'm going to restate
2    it.
3    Q. Do you have other intersections
4    with ICL other than that shared platform?
5    A. Yes.
6    Q. Okay. What are they?
7    A. In conducting a cultural exchange
8    program, there are a number of areas of
9    responsibility that we have in not only the
10   initial placement of the au pair, but the
11   continued monitoring of the au pairs
12   throughout the course of their year.
13        So if there is an issue, question
14   that emerges during the course of the
15   au pair's experience, that would be an
16   occasion where we would be speaking with
17   someone at ICL.
18        If there was a change or update to
19   the regulations, that would be something we
20   would talk about.
21        But the overall maintenance, and in
22   the furtherance of providing a high quality
23   cultural exchange program and experience,
24   then, of course, we would be speaking with
25   the people who are on the side of things

1    where they're educating and recruiting
2    au pairs.
3    Q. Do you have weekly meetings?
4    A. No.
5    Q. How often do you talk?
6    A. Are you asking me personally or --
7    Q. Cultural Care. How often -- in an
8    official manner, how often do you communicate
9    with ICL regarding the shared duties that are
10   outlined in this agreement?
11        MS. LUKEY: Objection. You may
12        answer.
13   A. We're a rather extensive
14   organization, so it would be impossible for
15   me to be able to testify to how often or on
16   what occasions people would be having
17   conversations of which I'm not a part or
18   would be generally unaware of.
19   Q. So it's not the case of -- well, is
20   it the case. Are certain staff designated to
21   liaison with ICL?
22   A. No.
23   Q. Are all cultural staff able and
24   designated to interact with ICL?
25   A. There is no designation that's

PLAINTIFFS' RESP. APP.0004427

MAGNA
LEGAL SERVICES

Page 46

```
 1   required for that interaction, so any member
 2   of our organization certainly could reach
 3   out.
 4        Q.  Okay.  And ICL could also just --
 5   could also reach out to any Cultural Care
 6   staff member if they had a question or a
 7   concern?
 8        A.  Yes.
 9        Q.  If we can just go to Page 11 of
10   this agreement for a minute.  There are two
11   signatories here.  Do you recognize the
12   signature of the signatories of this
13   agreement between ICL and Cultural Care,
14   Inc.?
15        A.  Yes, in that I've seen them before.
16        Q.  Do you know who they are?
17        A.  I do not.
18        Q.  Do you recognize the signature for
19   Cultural Care?
20        A.  I'm not sure that I do, so I have
21   to answer no.
22        Q.  This is a valid agreement, is it
23   not?
24        A.  I don't know that I could --
25            MS. LUKEY:  Objection.
```

Page 47

```
 1        Q.  Let me -- I'll strike that.
 2            There is a line that says Cultural
 3   Care, Inc.; is that correct?
 4        A.  Yes.
 5        Q.  And there is another line that says
 6   "By," and there is a signature?
 7        A.  Yes.
 8        Q.  Do you know who that signature is
 9   by the "By" line for Cultural Care, Inc.?
10        A.  I do not.
11        Q.  Do you know who in 2010 would have
12   signed this agreement?
13        A.  I do not.
14        Q.  Do you know who is primarily
15   responsible for your relationship with ICL
16   within Cultural Care?  Again, testifying as
17   Cultural Care.  Who within Cultural Care is
18   the primary liaison, since we can't get any
19   information about who actually signed this
20   agreement?
21            As of today, who is your, or your
22   understanding, who would be the primary
23   liaison with ICL?
24            MS. LUKEY:  So today, not 2010?
25        Q.  We'll start with today.
```

Page 48

```
 1        A.  I don't know that I could confirm
 2   who the primary liaison would be.
 3        Q.  If you needed to sign this
 4   agreement in 2017 on behalf of Cultural Care,
 5   who would have signed it?  Who would sign it?
 6        A.  I'm not exactly sure who would be
 7   the appropriate person to do it.  I would
 8   imagine that our CEO could certainly serve in
 9   that capacity, but.
10        Q.  Okay.  And then on this page -- and
11   do you have any knowledge, just to finish for
12   2017, if someone was going to sign on behalf
13   of ICL, do you know who that would be on
14   behalf of ICL?
15            MS. LUKEY:  Objection.
16        A.  I do not.
17        Q.  So let's go back to 2010.  Were you
18   with the organization in 2010?
19        A.  Yes.
20        Q.  And what position did you have in
21   2010?
22        A.  Senior vice president.
23        Q.  Is that your current title?
24        A.  Yes, it is.
25        Q.  Were your duties and
```

Page 49

```
 1   responsibilities generally similar to what
 2   your responsibilities are today?
 3        A.  No, they're a bit different.
 4        Q.  In 2010 were you in the leadership
 5   within the organization?
 6        A.  I was part of the leadership, yeah.
 7   Yes.
 8        Q.  Could you tell me who the
 9   leadership of the organization was in 2010?
10        A.  The CEO would be Goran Rannefors.
11        Q.  Anyone else?
12        A.  In 2010, I would have to look at a
13   staffing list to make sure that I was
14   accurate in my testimony.
15        Q.  And just on this page of
16   International Care Limited, it looks like
17   someone scrawled, tried to print the name of
18   the signatory below the agreement.
19            Can you read that, or do you
20   recognize that name?
21        A.  I don't know that person.
22        Q.  Have you or other Cultural Care
23   staff communicated with ICL regarding this
24   lawsuit?
25        A.  About the existence of the lawsuit,
```

13 (Pages 46 to 49)

PLAINTIFFS' RESP. APP.0004428

MAGNA
LEGAL SERVICES

Page 50

1    yes.
2         Q.  Anything beyond the existence of
3    the lawsuit?
4         MS. LUKEY:  She's not going to be
5         able to address, obviously,
6         communications by counsel to them to
7         obtain documents, for example.
8         Q.  Not including communications by
9    your counsel, but Cultural Care staff that
10   are -- yes, Cultural Care staff.  Have any
11   Cultural Care staff communicated with ICL
12   regarding the claims in this lawsuit beyond
13   just the existence?
14        A.  Not beyond the existence.  Anything
15   that's public information, that certainly
16   could have been discussed.
17        But, again, I couldn't testify as
18   to any number of staff having separate
19   communications that I'm not aware of.
20        Q.  Does the communication happen
21   regularly between ICL and Cultural Care
22   staff?
23        A.  Yes.  As I stated before, in the
24   daily operations of our program, we would be
25   communicating with members of the ICL

Page 51

1    organization in order to provide updates and
2    information on placements, or any number of
3    issues that could be of importance to make
4    sure that we share with them.
5         So the frequency of that, I can't
6    necessarily speak to.  But I would say
7    regularly enough, given the nature of what we
8    do.
9         Q.  Would it be fair to say that
10   communication among ICL and Cultural Care is
11   fairly fluid?
12        MS. LUKEY:  Objection.
13        A.  I'm not sure what you mean by
14   "fluid."  Can you clarify?
15        Q.  Would it be fair to say that the
16   communication between ICL and Cultural Care
17   is unstructured and regular?
18        MS. LUKEY:  Objection.  You may
19        answer.
20        A.  I would say that the communication
21   is not difficult to engage in.  I want to
22   make sure I understand what you're asking --
23        Q.  No, that's fair.
24        A.  -- so I can answer.
25        Q.  So any Cultural Care employee can

Page 52

1    talk to any ICL employee; is that correct?
2         A.  Yes.
3         Q.  Do they need to get prior
4    permission to do so?
5         A.  No.
6         Q.  Do they need to wait for a weekly
7    meeting to do so?
8         A.  No.
9         Q.  Do they need to document their
10   conversations with ICL?
11        A.  No.
12        Q.  Is ICL able -- does the
13   communication happen both ways?  Is
14   communication initiated both ways?
15        A.  It can be, yes.
16        Q.  If I can direct you to Section 14.
17   It's on Page 7 of this agreement.
18        Can you just take a moment to
19   review.
20        A.  To myself?
21        Q.  To yourself, thank you.
22        A.  (Document review.)
23        Q.  Are you done?
24        A.  Yes.
25        Q.  This is an indemnity clause,

Page 53

1    correct?
2         A.  Yes.
3         Q.  And it provides for -- well, let me
4    just ask.  Are you being indemnified in this
5    lawsuit?
6         A.  I don't know.  I don't know the
7    answer to that.
8         Q.  This agreement has a -- it's signed
9    on October 1, 2010?
10        A.  I believe so.
11        (Document review.) Yes.
12        Q.  And this is the agreement that
13   controls the agreement today -- controls the
14   relationship between the two parties today?
15        A.  I believe so.
16        Q.  Was there an agreement between ICL
17   and Inc prior to 2010?
18        A.  Yes.
19        Q.  When did the relationship between
20   ICL and Cultural Care, Inc. begin?
21        A.  In 2004, as I indicated before,
22   there was a change from the previous name to
23   Cultural Care, Inc.  And so it's my
24   understanding that that is when that
25   relationship between those two entities was

PLAINTIFFS' RESP. APP.0004429

MAGNA ▶
LEGAL SERVICES

Page 54

1 entered into.
2 Q. Is there an agreement for, since
3 this agreement is dated and starts on October
4 1, 2010, is there an agreement that governs
5 the relationship from 2004 to 2010?
6 A. I believe so.
7 Q. Do you have that document?
8 A. I don't have any documents with me
9 at the moment.
10 Q. No, does Cultural Care have a copy
11 of the agreement that controls the
12 relationship between ICL and Cultural Care,
13 Inc. from 2004 to 2010?
14 MS. LUKEY: I'm not sure the
15 witness is going to know this. This is
16 the one that I e-mailed you about
17 yesterday or the day before. Cultural
18 Care has not been able to locate its own
19 copy and has requested one from ICL who
20 basically said they'll get it to us as
21 soon as they can, but the person who
22 would know where it is is traveling.
23 Q. So is your answer no? Or, I mean,
24 the question still stands.
25 MS. SMALLS: Can you repeat the

Page 55

1 question?
2 (Record read as requested.)
3 A. At this time I think it's being
4 looked for to produce when it's available.
5 But I think at this time it's under request
6 with ICL to provide a copy.
7 Q. So Cultural Care does not have
8 possession, current possession, of the
9 agreement that controlled the relationship
10 between 2004 and 2010?
11 A. I don't believe at this time, no.
12 Q. Since we don't have a copy of that
13 agreement, can you describe your relationship
14 with ICL prior to 2010, and how that
15 relationship -- we've reviewed the duties for
16 ICL and Inc under this 2010 agreement, and so
17 we've reviewed how this relationship works
18 from 2010 to 2017.
19 How did the relationship and what
20 were the duties between the parties prior to
21 2010?
22 A. I think in order to provide
23 specifics on that, then I would need to refer
24 to a document that, as we've discussed, is
25 not in front of us at this moment.

Page 56

1 So I wouldn't feel comfortable
2 going into the detail that, obviously, we
3 went through pretty exhaustive detail of this
4 information. And without that in front of
5 me, I don't feel that there is any
6 information I can provide.
7 Q. Let's start generally. We don't
8 need to go -- we went through a detailed
9 provision by provision, and then we talked
10 about generally how the relationship worked.
11 Generally, how did the relationship
12 work between ICL and Cultural Care, Inc.
13 between 2004 and 2010?
14 MS. LUKEY: Just for the record,
15 I'm going to note an objection to the
16 time period earlier than the start date
17 that we've been using in 2009, but I
18 will permit the witness to answer as
19 long as it's understood that we're
20 preserving that position.
21 MS. SMALLS: Yes.
22 A. I don't know that there is a
23 significant difference in the duties and
24 responsibilities as described in this
25 document as would have applied to the time

Page 57

1 frame you're referencing.
2 Q. So it would be similarly the same
3 as the duties and division of
4 responsibilities as outlined in this document
5 that we went through in detail --
6 A. Yes.
7 Q. -- to the best of your knowledge?
8 A. Yes.
9 Could I request a break?
10 Q. Sure.
11 VIDEO TECHNICIAN: We're off the
12 record at 10:13.
13 (Proceedings recessed at
14 10:13 a.m., and reconvened at 10:23
15 a.m.)
16 VIDEO TECHNICIAN: We are back on
17 the record at 10:23 a.m.
18 BY MS. SMALLS:
19 Q. What is Cultural Care Au Pair?
20 A. Cultural Care Au Pair is the name
21 of the -- it's the name that is used by
22 Cultural Care, Inc. for the program in the
23 U.S., and it is the name that is used by --
24 in the overseas areas, markets, as well to
25 represent the program.

---

Page 58

```
 1        Q.  So Cultural Care Au Pair includes
 2   ICL?
 3            MS. LUKEY:  Objection.
 4        A.  ICL owns the name and licenses it
 5   to Cultural Care, Inc. for use in the
 6   United States.
 7        Q.  When you talk about Cultural Care
 8   Au Pair, both internally and externally, what
 9   are you referring to?
10        A.  Well, that would depend on who
11   we're speaking to.  So if we're speaking to
12   someone in the United States, it would be
13   Cultural Care Au Pair, the U.S. part of the
14   program.  So the program that's in place.
15   Au pairs are placed with the host families
16   and we are -- they would know us basically as
17   the designated sponsor.
18            If you are referring to an
19   au pair's home country and Cultural Care
20   Au Pair, then you would be referring to the
21   team that they worked with there in the
22   screening and preparation prior to their
23   arrival.
24        Q.  So if you are using the term
25   "Cultural Care Au Pair" in the United States
```

---

Page 59

```
 1   directed to host families or other people in
 2   the United States, what entity are you
 3   referring to when you say "Cultural Care
 4   Au Pair"?
 5        A.  I would say it depends on the
 6   conversation again.  But if we are talking
 7   about things that pertain to Cultural Care,
 8   Inc., then Cultural Care Au Pair would mean
 9   Cultural Care, Inc. here in the
10   United States.
11        Q.  Well, but the average person hasn't
12   been versed on this agreement.  So when you
13   represent and you talk about Cultural Care
14   Au Pair publicly in United States, what are
15   you referring to?
16        A.  Again, the specifics of the
17   conversation are important in this question,
18   right?  Because if you're talking to -- if
19   I'm -- generally when I'm speaking about
20   Cultural Care, I'm referencing Cultural Care,
21   Inc.  But if I'm answering a question about
22   the recruitment or screening of an au pair,
23   and I use the term "Cultural Care Au Pair,"
24   then technically I'm actually referring to
25   the international affiliate.
```

---

Page 60

```
 1        Q.  But when you're speaking to that
 2   host family, you'll use the term Cultural
 3   Care Au Pair to refer to both entities?
 4        A.  When I'm speaking to the family and
 5   I'm talking about the program and I'm talking
 6   about Cultural Care Au Pair, then I am
 7   representing Cultural Care, Inc. in that
 8   conversation.
 9        Q.  I didn't ask you who you were
10   representing.
11            When you are communicating to a
12   host family or anyone else in the
13   United States and you say you are
14   representing, or you are, yeah, representing
15   Cultural Care Au Pair, what are you referring
16   to?
17            You're talking about the program.
18   The program includes several facets.  What
19   are you referring to?  It's a U.S.-facing
20   audience.  What are you referring to when you
21   say "Cultural Care Au Pair"?
22            MS. LUKEY:  Objection.
23        A.  Again, if I'm talking to a family
24   about the program, and I'm talking to them
25   about the program all tolled, right,
```

---

Page 61

```
 1   generally speaking, it's about Cultural Care,
 2   Inc.
 3            But if there are parts of that
 4   conversation that relate to the recruitment
 5   process, then, technically speaking, that
 6   "Cultural Care Au Pair" reference is -- has
 7   to do with International Care Limited.
 8            But for a family that we're having
 9   a conversation with, we're talking about the
10   program overall.
11            Does that answer your question?
12        Q.  So that Cultural Care Au Pair can
13   include both references to both entities?
14            MS. LUKEY:  Objection.
15        A.  A conversation that we're having
16   may in part reference the U.S. entity and in
17   part may reference the international -- may
18   reference ICL, based on the topic that we're
19   covering at that particular time.
20        Q.  And do you distinguish when you're
21   having a conversation that you're discussing
22   two different entities?
23        A.  No.
24        Q.  Would a reasonable person hearing
25   you discuss Cultural Care Au Pair think that
```

MAGNA
LEGAL SERVICES

---

Page 62

1 you're talking about the same entity?
2  MS. LUKEY: Objection.
3  A. Yeah, I can't testify to what
4 someone else is thinking.
5  Q. But you don't distinguish when
6 you're talking about Cultural Care Au Pair
7 when you're talking about Cultural Care, Inc.
8 versus ICL?
9  A. We may use more layman terms in
10 order to clarify or distinguish between the
11 two in that we would be speaking about things
12 that pertain to the U.S. placement process
13 after the au pair has arrived primarily.
14  We may refer to, you know, the
15 staff overseas or the team that was involved
16 with. We might use language like that. So
17 we wouldn't use the kind of legal terminology
18 that we're using here, but we would certainly
19 at times make the distinction between the
20 U.S. organization and the ICL organization.
21 But using just more common place terminology
22 or language with our customers.
23  Q. What is "staff" to you?
24  A. Well, a staff comprises an office
25 at a given location.

Page 63

1  Q. Is it an employee?
2  A. I mean, depending -- in general,
3 the term "staff," I'm sure it could apply to
4 a number of different classifications.
5  In the way that I'm referring to it
6 or as I just referred to it, what I mean to
7 say is that the group of people that
8 operate -- when I say the term "staff" or
9 "team," it's a group of people that operate
10 out of a certain location.
11  So for if we're talking about -- if
12 I'm talking to a family and they're asking
13 about a German au pair, I might refer to the
14 team that that au pair has been working with
15 as they prepare to be a part of the program.
16  Q. And would you ever refer to
17 Cultural Care staff in Germany? Excuse me.
18 Strike that.
19  Would you ever refer to Cultural
20 Care Au Pair staff in Germany?
21  A. Would I ever? I'm sure at some
22 point, yes.
23  Q. Can you review with us what your
24 position is in the company and what your
25 duties are?

Page 64

1  A. So I'm the senior vice president at
2 Cultural Care Au Pair, and the main area of
3 responsibility that I have is the management
4 and oversight of the government relations
5 department.
6  I'm not sure what -- if you have a
7 follow-up to that, or that's the main...
8  Q. Your primary responsibilities are
9 government relations?
10  A. Yes.
11  Q. Do you have any supervision over
12 the recruitment of host families and the
13 monitoring of au pairs while they're in the
14 United States?
15  A. Not directly. But as a member of
16 the management team of Cultural Care
17 Au Pair -- or Cultural Care, Inc., I
18 certainly am involved in those matters, yes.
19  Q. And you testified earlier -- well,
20 let me ask you, what was the date -- you said
21 that EF transitioned into Cultural Care, Inc.
22  MS. LUKEY: Objection.
23  A. It was not EF, but it was EF
24 Au Pair, Inc., transitioned to -- or changed
25 to Cultural Care, Inc. in 2004.

Page 65

1  Q. Okay. And you started with the
2 company when?
3  A. In June of 1999.
4  Q. June 1999. And can you review with
5 us just your former positions with the --
6 since you started in June of 1999 and have
7 been with the company through your current
8 role, just your various positions with the
9 company since you started in 1999?
10  A. Sure. I began as a regional
11 manager in 1999.
12  I'll go through the positions. I
13 don't have the exact memory of the year at
14 which these things changed.
15  But I then became a regional
16 director. I then became a director of
17 customer service. I then became the national
18 director of customer service, and then
19 transitioned to vice president of customer
20 service, and then transitioned to senior vice
21 president. And that's the title I maintain
22 today.
23  Q. And it's senior vice president for
24 something. What is --
25  A. Actually, no.

**MAGNA** ▶
**LEGAL SERVICES**

Page 66

```
 1        Q.  It's just --
 2        A.  It's senior vice president.
 3        Q.  -- senior vice president.
 4        Okay.  And so you said that your
 5   primary responsibility is government
 6   relations; is that correct?
 7        A.  Yes.
 8        Q.  And you said you have
 9   responsibility for the other functions in the
10   organization to the extent that you're part
11   of the management team?
12        MS. LUKEY:  Objection.
13        A.  Yes.
14        Q.  Can you tell me who else is part of
15   the management team, as you define it?
16        A.  Sure.  Well, we have a number of
17   staff within Cultural Care, Inc. that I
18   collaborate with on a daily basis.
19        Could you be more specific about
20   how, kind of senior you're looking for, or
21   what exactly you're...
22        Q.  Sure.  Strike that question.
23        So in 2004, EF Au Pair became
24   Cultural Care, Inc.; is that correct?
25        A.  In 2004 EF Au Pair, Inc., changed
```

Page 67

```
 1   to Cultural Care, Inc.
 2        Q.  Okay.  Thank you.  And you
 3   testified that prior to 2004, because it was
 4   EF Au Pair, you would have had an EF e-mail
 5   address?
 6        A.  Correct.
 7        Q.  But once EF Au Pair had
 8   transitioned to Cultural Care, Inc., you had
 9   a Cultural Care e-mail address?
10        A.  That's correct.
11        Q.  And you no longer had or used an EF
12   e-mail address?
13        A.  I no longer used one, that's
14   correct.
15        Q.  Is there an EF, a Natalie Jordan EF
16   e-mail address that exists?
17        A.  I believe it still exists today,
18   yes.
19        Q.  Is it in use?
20        A.  No.
21        Q.  But you ceased using it, an EF
22   e-mail address, in 2004?  You ceased to --
23   yeah, you ceased to use an EF e-mail address
24   in 2004?
25        A.  The default changed to the new name
```

Page 68

```
 1   as of 2004.
 2        MS. SMALLS:  Can you mark this as
 3   Exhibit 3, please.
 4        (Document marked for
 5   identification as Jordan Exhibit 3)
 6        Q.  Do you recognize this document?
 7        A.  I don't recognize it.
 8        Q.  Do you remember receiving it?
 9        A.  I don't have a specific memory of
10   receiving it.
11        Q.  Under the "To" line, can you tell
12   me who it's addressed to?
13        A.  Natalie Jordan.
14        Q.  And what is the e-mail address
15   associated with Natalie Jordan?
16        A.  It says Natalie.Jordan@EF.com.
17        Q.  And what is the date of this
18   e-mail?
19        A.  Tuesday, January 8, 2013.
20        Q.  And under the subject it says "RE:
21   Attorney General case?"
22        MS. LUKEY:  Can I just give the
23   Bates numbers for those on the phone,
24   CC00007373 through 7374.
25        Q.  When you see a RE colon in the
```

Page 69

```
 1   subject of the e-mail, what does that
 2   generally signify to you?
 3        A.  Generally, it signifies to me it is
 4   regarding whatever the following language
 5   says.
 6        Q.  Does it also mean that it is a
 7   reply to an initial e-mail?
 8        A.  It can be.
 9        Q.  If you go to the second page.  Can
10   you tell me who the e-mail is from and who
11   the e-mail is to?
12        A.  The e-mail is from Natalie Jordan.
13   The e-mail is to Katie Reed, Robin Jones and
14   Delaney Tyre.
15        Q.  And what is the subject of that
16   e-mail?
17        A.  "Attorney General case?"
18        Q.  Okay, let's go back to Page 1.  And
19   can you tell me who the e-mail is from and to
20   and also what it says under subject?
21        A.  It is from Katie Reed.  It is to
22   Natalie Jordan, Robin Jones, Delaney Tyre.
23   And I'm sorry, what was the...
24        Q.  Subject.  What does the subject
25   say?
```

MAGNA
LEGAL SERVICES

Page 70

1      A. It says, "RE: Attorney General
2  case?"
3      Q. Is it fair to say that Katie Reed's
4  e-mail is a reply to your e-mail on the
5  second page?
6      A. I think it's fair to say that.
7      Q. And the Natalie Jordan e-mail
8  address in use on this e-mail chain is
9  Natalie.Jordan@EF.com?
10     A. That's correct.
11     Q. And can you again say the date of
12 this e-mail?
13     A. Tuesday, January 8, 2013.
14     Q. So you testified that you didn't
15 use an EF e-mail address after 2004. Can you
16 explain the use of a Natalie Jordan e-mail
17 address in 2013?
18     A. Sure. Well, as I also testified,
19 the default changed over to the
20 @CulturalCare.com, so I didn't actively
21 choose to use the EF.com e-mail address in
22 sending or replying.
23        I don't know e-mail address this
24 came from, as it's not broken down in the
25 sending e-mail. So I'm not sure if Ms. Reed

Page 71

1  in sending this had taken me on -- put me
2  back on. I don't know if she used that
3  e-mail address in replying back to me. So it
4  was certainly not commonplace for me to
5  choose to use it, but if it defaulted and
6  someone picked it, or it came in, it was
7  certainly not an active -- an active
8  communication source.
9      Q. Generally when you reply, it uses
10 the e-mail addresses that were already in the
11 e-mail chain, correct?
12     A. Well, as I indicated when we first
13 spoke, my expertise is certainly not in
14 technology. So it's also possible that
15 someone can decide whether they want to
16 include all the recipients on a given e-mail.
17 They could change their mind on that; they
18 could put your name in and take it out.
19        So whether this was a straight
20 reply or not, I couldn't confirm.
21     Q. Are the people that were included
22 on your initial e-mail the same as the people
23 that were included on the second e-mail
24 that's on the first page?
25     A. It appears so, yes.

Page 72

1      Q. Is there anyone additional added?
2      A. Not that I can see in the open "To"
3  field.
4      Q. Okay. And if you could just note
5  the time of the initial e-mail and then the
6  time of the follow-up e-mail?
7      A. The first e-mail is at 4:09 p.m.,
8  and the follow-up e-mail is from 4:39 p.m.
9      Q. Thank you.
10        MS. SMALLS: Can you mark this as
11     Exhibit 4.
12        (Document marked for
13     identification as Jordan Exhibit 4)
14     Q. Do you recognize this document?
15     A. Yes, I do.
16     Q. Can you read the title?
17     A. "Cultural Care Au Pair Staffing
18 Patterns."
19     Q. And when you refer to "Cultural
20 Care Au Pair" and "staffing patterns," what
21 are we referring to here?
22     A. The U.S. organization, so Cultural
23 Care, Inc.
24     Q. Okay. Let's -- I don't think we
25 need to do both, but if you can -- I'm going

Page 73

1  to ask you to walk me through each role and
2  tell me what that person does. But let's
3  focus on the 2014 column.
4      A. Okay.
5      Q. From this list, can you tell me who
6  would be part of the management team, as you
7  define it?
8      A. So you would have -- I just want to
9  double-check something.
10        (Document review.) At that time,
11 anyone with a vice president title and the
12 CEO.
13     Q. Why don't we start with CEO.
14     A. Okay.
15     Q. Who is the current CEO of Cultural
16 Care, Inc.?
17     A. Goran Rannefors.
18     Q. And what are his responsibilities?
19     A. His responsibilities are the, I
20 think, most senior-level oversight of the
21 program.
22     Q. And I don't know if all of these
23 people are still here, but it lists -- this
24 is the most current that we have, so we're
25 going to use 2014 as a basis.

PLAINTIFFS' RESP. APP.0004434

MAGNA ▶
LEGAL SERVICES

---

Page 74

1           It then lists Melissa Fredette as
2   an executive vice president.  Is Ms. Fredette
3   still with the organization?
4           A.  No, she is not.
5           Q.  Is there a replacement for her in
6   that role?
7           A.  Not in that role specifically.
8           Q.  The next name is yours as senior
9   vice president?
10          A.  Yes.
11          Q.  And that's your current title?
12          A.  That's correct, yes.
13          Q.  Is there anybody above -- well, let
14  me.  If you can review, what are your duties
15  as senior vice president, again?
16          A.  So my primary responsibility is the
17  management and supervision of the government
18  relations department, and then also in
19  collaboration with the other managers of
20  Cultural Care, Inc., the senior-level
21  oversight of more of the daily operations.
22          Q.  Okay.  And who do you report to?
23          A.  I report to Dan Sodervall.
24          Q.  And what is his title?
25          A.  His title is president.

---

Page 75

1           Q.  And what are his duties?
2           A.  As president, he is a person to
3   whom the leadership of the organization, as I
4   indicated before, report to.  And so he also
5   is involved ultimately in the decisions that
6   impact the daily operations of the
7   organization.
8           Q.  In the 2014 employee list it lists
9   Lauren, and I'm going to butcher that last
10  name, but is she still with the organization?
11          A.  Yes, she is.
12          Q.  And is this reflective of her
13  current role, it says Director of Government
14  Relations?
15          A.  Yes, it is.
16          Q.  And who does she report to?
17          A.  To me.
18          Q.  And then it lists a Rikki Tracy?
19          A.  Yes.
20          Q.  As Government Relations and
21  Compliance Manager?
22          A.  Yes.
23          Q.  Is Rikki still with the
24  organization?
25          A.  Yes.

---

Page 76

1           Q.  Is this her current title?
2           A.  Yes.
3           Q.  And who does she report to?
4           A.  Me.
5           Q.  Is there anyone else in the senior
6   management, as you would define it, that
7   isn't -- hasn't already been mentioned?
8           A.  Well, as I mentioned, anybody with
9   a vice president in their title.  So
10  inclusive of them, there is no one else I can
11  think of outside of that.
12          Q.  Who are the other vice presidents?
13          A.  As detailed on this list, Samantha
14  Janney, Vice President of U.S. Operations;
15  Katie Reed, Vice President of U.S.
16  Operations; Adam Kellner, Vice President of
17  Placement and Inside Sales; Jessica Szubart,
18  Vice President of Sales and Marketing.
19          Q.  Are those people still with the
20  organization that you just listed?
21          A.  Not all of them, no.
22          Q.  Okay.  Can you tell me who is -- or
23  who is not still with the organization?
24          A.  Jessica Szubart -- oh, I'm sorry.
25  Sean McGonagle was also -- had a vice

---

Page 77

1   president title.
2           So the only one of those people who
3   is no longer part of the organization is
4   Jessica.
5           Q.  So this piece of paper says Account
6   Services has 17 total staff.
7           Can you tell me what account
8   services does and is responsible for?
9           A.  So Account Services is basically a
10  customer service team, and so they would be
11  the people who if someone were to call the
12  800 number in the U.S., they would be the
13  ones receiving that call.  So they do a lot
14  of general answering of questions and
15  fielding customer outreach.
16          They also handle the -- or manage
17  the specific accounts of each hosting family;
18  payments, credits.  They also do the intake
19  on compliance paperwork that's submitted to
20  the organization by the LCCs, local childcare
21  consultant, but we call them LCCs.
22          Q.  And then the next category here is
23  "Customer Service & Program Development."
24          A.  Yes.
25          Q.  With 41 total staff.  Can you tell

---

PLAINTIFFS' RESP. APP.0004435

MAGNA ▶
LEGAL SERVICES

## Page 78

1  me what that department is responsible for?
2      A. Sure. So that department basically
3  includes the monitoring responsibilities of
4  the placed au pairs with the families, and so
5  all the customer support that could be
6  required throughout the course of the year.
7          They also maintain ongoing and
8  regular contact with the LCCs, as they
9  locally are engaging with the program
10 participants and providing feedback and
11 information.
12         It's also inclusive of the
13 recruitment of those LCCs, and so expanding
14 the network of regional representatives that
15 help to support the program.
16         Also included in this grouping is
17 the team that is focused on expanding the
18 program. And by that, I mean working to
19 increase the number of, or finding host
20 families who are interested in participating
21 in hosting an au pair.
22     Q. Are LCCs employees?
23     A. No.
24     Q. What are they?
25     A. They are independent contractors.

## Page 79

1      Q. Is there a separate agreement by
2  which you bring on LCCs?
3      A. Yes.
4      Q. Do you know if that agreement has
5  been produced?
6      A. I don't know.
7      Q. The next department says "Placement
8  and Inside Sales." Can you tell me what that
9  department does?
10     A. Sure. The Placement and Inside
11 Sales group, so this is the part of the
12 organization that focuses on the placement
13 support. So working with hosting families or
14 families interested in hosting on the process
15 of selecting an au pair they would like to
16 welcome to their home.
17         So orienting them to the program
18 overall, but also that process, and working
19 with them until they have invited an au pair
20 to join their family.
21         It's also inclusive of a sales team
22 that focuses on the internal efforts to
23 follow up on inquiries that come in to the
24 program where people are expressing interest
25 in hosting an au pair. So the follow-up

## Page 80

1  process of that, they're doing that directly.
2          And then, lastly, a position which
3  focuses on the extension program. So
4  outreach to au pairs to confirm whether they
5  have any interest in extending their program,
6  and then walking them through and supporting
7  them through the steps they need to take in
8  order to make that happen.
9      Q. The next category is "Operations &
10 Au Pair Training School." Can you explain to
11 me what that department does?
12     A. Sure. So the Operations team is
13 the final sort of screening, official
14 screening point for us where they're looking
15 at those files that have been put into that
16 preliminary status and accepting them and
17 determining that we're going to in fact move
18 forward with making them available for host
19 families to look at.
20         That team is also responsible for a
21 number of the, as the name suggests,
22 operational responsibilities of the program
23 with respect to the status changes in CVIS,
24 the database that's used to track the status
25 of all au pairs that are in the country

## Page 81

1  through the Department of Homeland Security.
2          The training school is the required
3  first stop for all au pairs coming to the
4  U.S. to make sure that they have the
5  mandatory orientation programing before they
6  travel to their hosting family. And so that
7  school located in New York has a manager and,
8  of course, on-site residential staff that
9  support its operations.
10     Q. Okay. The next department is
11 "Finance."
12     A. So --
13     Q. What does finance do?
14     A. They oversee the accounts payable
15 and the general finance needs of Cultural
16 Care, Inc.
17     Q. And the next category is "Business
18 Solutions." Can you tell me what Business
19 Solutions does?
20     A. This was -- this team is basically
21 focused on internal technical support.
22     Q. And then the last department listed
23 here is "Marketing." What does marketing do?
24     A. So Marketing basically works on the
25 information that goes out to participants in

PLAINTIFFS' RESP. APP.0004436

MAGNA
LEGAL SERVICES

Page 82

```
 1    the U.S., and also the creative team helps on
 2    event planning and various support services
 3    to Cultural Care, Inc., in order to host
 4    various events; meetings, workshops, and,
 5    again, on those materials that are in the
 6    U.S.
 7         Q.  When you say "marketing to
 8    participants," are you referring to host
 9    families, au pairs, or both?
10         A.  Not marketing participants, but
11    providing information to participants,
12    meaning the unit of host family and au pair
13    that are together for the program term.
14         MS. SMALLS:  Exhibit 5.
15         (Document marked for
16     identification as Jordan Exhibit 5)
17         Q.  Are you familiar with this
18    document?
19         A.  Yes.
20         Q.  If you can turn your attention to
21    Page 3, Bates numbers 34508.
22         MS. LUKEY:  For those on the phone,
23     this is the one that begins at
24     CC00034504.  It's the Cultural Care
25     financial statements '09 and '10.
```

Page 84

```
 1    Sorry.
 2         A.  $11,653,533.
 3         Q.  It says "Payroll and related."
 4    What is "and related"?
 5         A.  I don't know.
 6         Q.  Under the next line it says
 7    "Travel."  Can you tell me what that number
 8    is?
 9         A.  That would be travel for --
10         Q.  2010, directly under "Payroll and
11    Related," it says "Travel."
12         A.  And so you want me to say the
13    number?
14         Q.  Yes.
15         A.  $9,008,156.
16         Q.  What travel is included in that
17    number?
18         A.  That's au pair travel.
19         Q.  So that would be, when you say
20    "au pair travel," does that mean au pair
21    travel to the United States?
22         A.  Yes.
23         Q.  Does that also include au pair
24    travel within the United States?
25         A.  I don't know.
```

Page 83

```
 1         Q.  Can you tell me what the first line
 2    of this statement says and what it
 3    represents?
 4         A.  "Cultural Care, Inc. Statements of
 5    Income."
 6         Q.  I'm sorry, not the heading, but
 7    under "Program Revenue."
 8         A.  Where do you want me to?
 9         Q.  "Program Revenue," the section that
10    says "Program Revenue."  What is that number
11    for program --
12         A.  Which one?
13         Q.  For "Program Revenue" for 2010.
14         A.  For 2010, $42,136,119.
15         Q.  And what does it say under "Program
16    Revenue"?
17         A.  "Less commissions to affiliate."
18         Q.  Do you know what affiliate you're
19    referring to there?
20         A.  International Care Limited.
21         Q.  Let's go down to "Operating
22    Expenses."  It says "Payroll and related."
23    Can you tell me what that number is?
24         A.  For which year?
25         Q.  2010.  We're looking at 2010.
```

Page 85

```
 1         Q.  I'm going to refer you back to
 2    Exhibit 2.  This is the ICL-Inc agreement.
 3         A.  Mm-hmm.
 4         Q.  If you can go to Page 4, 3(l).  Can
 5    you read what 3(l) says?
 6         A.  "Travel.  ICL is responsible for
 7    providing international and domestic air
 8    travel."
 9         Q.  So I will refer you back to the
10    financial statement under "Travel."
11         And you said this represented
12    au pair travel to the U.S.; is that correct?
13         A.  Yes.
14         Q.  So is this money being paid to ICL?
15         A.  I believe so, yes.
16         Q.  Can you read the next line under
17    "Travel," under the -- on the financial
18    statement under "Travel," what that says?
19         A.  "Participant insurance."
20         Q.  And who are you referring to there
21    when you say "participant"?
22         A.  That would be the au pairs.
23         Q.  Referring you back to the Inc-ICL
24    agreement under section 3(m).  Can you read
25    section 3(m)?
```

PLAINTIFFS' RESP. APP.0004437

MAGNA
LEGAL SERVICES

Page 86

1    A. "Insurance. ICL will secure
2  participant health and accident insurance
3  meeting the requirements of U.S.D.S."
4    Q. Okay. When you say "participant
5  insurance here," and just for clarity sake,
6  can you read the number that's associated for
7  2010 for participant insurance?
8    A. $5,275,692.
9    Q. Is that money being paid to ICL?
10    A. I'm not sure.
11    Q. Let's go to the next line.
12    A. I believe --
13    Q. I'm sorry.
14    A. I believe at this time this was
15  when in 2010 and prior, that Cultural Care,
16  Inc., was purchasing the insurance directly,
17  and then it transitioned over so that we
18  were -- then ICL took that.
19      So there was a shift, which
20  explains why I'm not exactly sure, but I
21  believe it's reflective of when Cultural
22  Care, Inc., was doing that directly.
23    Q. And can you --
24    MS. LUKEY: Sorry, but I think
25  there is some confusion because of the

Page 87

1    dates, because they are fiscal years,
2    not a calendar year.
3      So just for your benefit, Dawn,
4    Exhibit 2 begins in fiscal year 2011.
5    That's the first year it covers. And
6    the financial statement, Exhibit 5, is
7    for fiscal year 2010. Their fiscal year
8    ends on September 30.
9    Q. Okay. Let's go to the next, what
10  does it say, under "Participant insurance"?
11    A. "Sales."
12    Q. And what does that refer to?
13    A. $2,606,637.
14    Q. Thank you. What is that expense
15  for?
16      When you say "Sales," what does it
17  mean that you spent $2,606,637 on sales?
18  What does that mean? What were those
19  expenses for?
20    A. That is inclusive of the incentive
21  system in place for the LCCs. And so in
22  recognizing their efforts in recruiting host
23  families, that there are payments that are
24  made to them based on that. So I believe
25  that's what that number is representative of.

Page 88

1    Q. Okay. And "Placement and
2  supervision," can you cite that number?
3    A. $1,735,997.
4    Q. What is expenses related to
5  placement and supervision, what are those
6  for?
7    A. Those expenses would be inclusive
8  of -- well, a number of things. But
9  including if a LCC, for example, provided
10  housing at any time, it would be inclusive of
11  the reimbursement that would go towards them.
12      I believe it's also inclusive of
13  the monthly monitoring payments that are made
14  to the LCCs and their ongoing support of the
15  placements as well.
16    Q. Okay. Can you just read through
17  the other categories?
18    A. "Office and administrative,"
19  "Rent," "Other costs," "Professional fees,"
20  and "Depreciation."
21    Q. Do you know what "Other costs"
22  referred to?
23    A. I do not know specifically, no.
24    Q. Under "Operating expenses," what
25  are the two largest expenses on this

Page 89

1  financial statement?
2    A. "Payroll and Related," and
3  "Travel."
4    Q. And travel is paid to ICL to pay
5  for au pair travel?
6    A. I'm not sure. I would want to
7  review the other income statements to make
8  sure that I'm properly remembering it to give
9  you the correct testimony.
10    Q. Thank you. Is the only affiliate
11  referred to in this financial statement ICL,
12  or are there other affiliates that are
13  referenced in this financial statement?
14    A. I don't know offhand, so I'd have
15  to review the entire document to confirm.
16    Q. You can take your time.
17    A. Okay. (Document review.)
18      MS. LUKEY: I won't do this unless
19  you want me to, but I can refer her to a
20  place in the document that probably
21  would be of assistance to her. It's in
22  the notes.
23      MS. SMALLS: Sure.
24      MS. LUKEY: If you want to take a
25  look at the notes in the document, in

MAGNA
LEGAL SERVICES

Page 90

```
 1      particular under Section 3 called
 2  "Related Party Transactions."
 3      Q.  Why don't we just go to that
 4  section that your counsel just referred you
 5  to, which says "Related Party Transactions."
 6          Can you read that first paragraph
 7  out loud?
 8      A.  "Related Party Transactions.
 9  Affiliated companies assist the Company with
10  certain aspects of its operations.  All such
11  operations are governed by contractual
12  agreements.  Under agreements with the
13  Company, an affiliated company promotes the
14  au pair program.  The affiliated company
15  received a commission for promotional
16  services of $8,339,325 and $9,710,000 for the
17  years ended September 30, 2010 and 2009,
18  respectively."
19      Q.  It says, "Affiliated companies
20  assist the Company with certain aspects of
21  its operations."
22          Can you tell me what "affiliated
23  companies," plural, is referred to in that
24  paragraph?
25      A.  I don't know who the affiliated
```

Page 91

```
 1  companies are.
 2      Q.  The third sentence says, "The
 3  affiliated company received a commission for
 4  promotional services of" -- approximately --
 5  "$8.3 million and $9.7 million for the years
 6  ended September 30, 2010 and 2009."
 7          Do you know what is being referred
 8  to there when it says "The affiliated
 9  company"?
10      A.  I believe that that's ICL.
11      Q.  Can you read the next paragraph
12  under "Related Party Transactions"?
13      A.  I'm sorry?
14      Q.  The next paragraph, can you read
15  the next paragraph under "Related Party
16  Transactions"?
17      A.  Starting with "During the years?
18      Q.  That's right.
19      A.  "During the years ended September
20  30, 2010 and 2009, the Company purchased
21  flight tickets from an affiliated company
22  totaling $7,626,251 and $6,055,468,
23  respectively."
24      Q.  Okay.  It says, "an affiliated
25  company" in that sentence.  Do you know what
```

Page 92

```
 1  affiliated company you were referring to
 2  there?
 3      A.  I do not.
 4      Q.  Can you read the third paragraph?
 5      A.  "The Company rents office space in
 6  Cambridge, Massachusetts from an affiliate
 7  under a lease agreement that expires on
 8  September 30, 2012.  The Company is required
 9  to pay $435,700 annually under the terms of
10  the agreement plus additional common area
11  expenses.  The lease allows for an adjustment
12  to the annual rent based on occupied square
13  footage.  Rent expense, including common area
14  expenses, to the affiliate totaled $449,652,
15  and $778,171 for the years ended September
16  30, 2010 and 2009, respectively."
17      Q.  So do you know what affiliate is
18  being referred to in that paragraph?
19      A.  It's an affiliate by the name of
20  Efekta, E-f-e-k-t-a.
21      Q.  Can you read the next line?
22      A.  "Receivables due from affiliated
23  companies consisted of the following at
24  September 30, 2010 and 2009."
25      Q.  And do you know what "affiliated
```

Page 93

```
 1  companies" refers to there?
 2      A.  As listed, International Care
 3  Limited.
 4      Q.  Okay, thank you.
 5          MS. SMALLS:  I think we need to
 6  take a break to change the video.
 7          VIDEO TECHNICIAN:  We're off the
 8  record at 11:15 a.m.
 9          (Proceedings recessed at
10  11:15 a.m., and reconvened at 11:23
11  a.m.)
12          VIDEO TECHNICIAN:  We're back on
13  the record at 11:23 a.m.
14  BY MS. SMALLS:
15      Q.  When we broke, we were talking
16  about the portion of the "Related Party
17  Transactions" section of the financial
18  statement that talked about receivables due
19  from affiliated companies.
20          You stated that International, ICL,
21  was the affiliated company referred to there.
22          Can you tell me the amount for 2010
23  that was receivables due for 2010?
24      A.  $5,122,992.
25      Q.  Do you know what that's for?
```

24 (Pages 90 to 93)

PLAINTIFFS' RESP. APP.0004439

MAGNA ▶
LEGAL SERVICES

Page 94

1    A.  That is a reconciling at the end of
2  the year for the difference in what had been
3  projected at the beginning of the year by
4  ICL, and so it's a payment from ICL to
5  account for the difference.
6    Q.  Projected for what?
7    A.  So the projected number of program
8  participants, and then the reconciled at the
9  end of the year, whether that actually took
10  place or not in terms of au pairs recruited
11  and placed, and the difference represents a
12  dollar figure to be reimbursed to Cultural
13  Care, Inc., and this is the number that that
14  represents.
15    Q.  So you make a payment to ICL at the
16  beginning of the year, whether that be a
17  calendar year or fiscal year on the projected
18  number of au pairs that you expect to place?
19    A.  That's correct.
20    Q.  And then if the actual number of
21  au pairs that you place is less than that,
22  ICL reimburses you --
23    A.  Yes.
24    Q.  -- for the amount that you paid
25  them at the beginning of the year?

Page 95

1    A.  Yes.
2    Q.  And this receivables due, the
3  approximately 5.1 figure that you just read
4  is reflective of the amount that was
5  reimbursed in 2010 for au pairs that were not
6  placed; is that correct?
7    A.  Yes.
8    Q.  Immediately above Section 4, can
9  you read that sentence?
10    A.  "The Company participates in a
11  retirement plan administered by an affiliate.
12  Please see Note 6 for further details."
13    Q.  Do you know, what affiliate are you
14  referring to there?
15    A.  I do not know the specific
16  affiliate.
17    Q.  Do you know if the company still
18  participates in a retirement plan
19  administered by an affiliate?
20    A.  I know that the company still
21  participates in a retirement plan, but I
22  would be unable to confirm who administers
23  that.
24    Q.  Okay, thank you.
25

Page 96

1    (Document marked for
2  identification as Jordan Exhibit 6)
3    Q.  Are you familiar with this
4  document?
5    MS. SMALLS:  I'm sorry.  This is
6  Exhibit 6 and it starts with Bates
7  numbers 329, Cultural Care 329.
8    A.  I'm sorry, you asked if I'm
9  familiar with it?
10    Q.  Yes.
11    A.  Yes.
12    Q.  What is it?
13    A.  Just one moment.
14    (Document review.) This is the Host
15  Family Handbook.
16    Q.  Is it limited by a year, or is this
17  a fairly standard handbook that you use on an
18  annual basis?
19    A.  It would be limited by year.
20    Q.  Are you able to determine what year
21  this is?
22    A.  According to the copyright date, it
23  says 2010.
24    Q.  And what is the Host Family
25  Handbook?  Who do you give it to and for what

Page 97

1  purpose?
2    A.  This is provided to a host family
3  to help assist them in being supported
4  through the cultural exchange program
5  experience.
6    Q.  Okay.  Is this an official document
7  that you give to host families as
8  participants in the program?
9    MS. LUKEY:  Objection.
10    A.  It's -- I don't know the
11  distinction of it being official or not, but
12  it is a material that we provided to host
13  families.
14    Q.  You provided it to all host
15  families --
16    A.  Yes.
17    Q.  -- that participate in the program?
18    A.  Yes.
19    Q.  A Host Family Handbook, this is the
20  2010 version of it.  But do you provide a
21  Host Family Handbook to all host families?
22    A.  We provide support materials to all
23  families.  This exact version of it, you
24  know, it's modified over time, which is why I
25  said it's different year to year.

PLAINTIFFS' RESP. APP.0004440

MAGNA
LEGAL SERVICES

Page 98

```
 1        Q.  Okay.
 2        A.  But a family is always provided
 3   with materials in this area, right, so things
 4   that will help them to understand how to
 5   participate in the program throughout the
 6   year.
 7        Q.  Is it your intent that a host
 8   family rely and reference this handbook?
 9        A.  It's our intent that they would use
10   this in combination with direct support from
11   the local childcare consultant in their area
12   as well as our staff at Cultural Care, Inc.
13        Q.  But this is a primary reference
14   point and resource for host families that
15   participate in your program?
16        MS. LUKEY:  Objection.
17        A.  How a family utilizes it, meaning
18   whether they use it as a primary resource or
19   not, I couldn't testify to.  But it is
20   certainly one resource that is provided to
21   families.
22        Q.  Do you intend it as a primary
23   resource and reference point for host
24   families?
25        MS. LUKEY:  Objection.
```

Page 99

```
 1        A.  We intend it to be a helpful tool
 2   for them to be able to use throughout their
 3   program term.
 4        Q.  What is the process that goes into
 5   creating the handbook?
 6        A.  I don't know the exact process that
 7   this goes through from creation to
 8   publication.  But based on the content, it is
 9   a combination of State Department guidelines,
10   or regulations I should say, as well as
11   Cultural Care policy-specific information.
12        And so the gathering of that
13   information and putting it into one resource
14   document is certainly part of that process.
15   But all tolled, I can't speak to every step
16   along the way.
17        Q.  Who does that?  Who is responsible
18   for creating the handbook?
19        A.  I don't know who created this
20   particular handbook.
21        Q.  In general, by title or just within
22   the organization, who is responsible for
23   creating the Host Family Handbook?
24        A.  I don't know who was responsible
25   for creating this Host Family Handbook.
```

Page 100

```
 1        Q.  Any Host Family Handbook, who is
 2   responsible -- I'm not asking, to be clear,
 3   I'm not asking specifically with respect to
 4   the 2010 handbook.
 5        Cultural Care provides a Host
 6   Family Handbook to host families.  Who within
 7   the organization of Cultural Care is
 8   responsible for the creation and content of
 9   the Host Family Handbook?
10        A.  The information comes from a number
11   of different sources, but I'm not exactly
12   sure who has the responsibility of creating
13   this.
14        Q.  Where does it come from?
15        A.  It comes from -- well, it comes
16   from the marketing team, and I believe the
17   bulk of the content originates within ICL
18   with contributions or feedback as it's
19   developed.
20        Q.  So ICL is responsible for the
21   production of the Host Family Handbook?
22        MS. LUKEY:  Objection.
23        A.  I stated I believe that it
24   originates there with contributions coming
25   from elsewhere, as it's developed into its
```

Page 101

```
 1   final stage.
 2        Q.  So the content for the Host Family
 3   Handbook originates at ICL?
 4        A.  Without being 100 percent certain,
 5   I'll say I don't know.
 6        Q.  Okay.  I don't know what exhibit is
 7   the employee list.  I'm going to refer you
 8   back to the employee list, Exhibit 4.
 9        So we reviewed the senior
10   management team and we reviewed each of the
11   departments within Cultural Care.
12        Who on this employee list, if any,
13   would be responsible for the production of
14   the Host Family Handbook?
15        A.  Again, I can't confirm knowledge of
16   who is responsible for the production of it,
17   but there could be collaboration from any
18   number of staff members on this list in
19   providing the content that makes it up.
20        Q.  Who on this list reviews the Host
21   Family Handbook before it's published?
22        A.  I can't speak to who specifically
23   would have seen it, reviewed it, and provided
24   feedback other than myself.  I certainly have
25   been a part of that process in the past.
```

PLAINTIFFS' RESP. APP.0004441

**MAGNA**
**LEGAL SERVICES**

| Page 102 | Page 104 |
|---|---|
| 1    Q. What is the process for reviewing<br>2 and approving the Host Family Handbook?<br>3    A. I would receive a copy of it, and I<br>4 would be asked for feedback or updates or<br>5 corrections based on my particular area of<br>6 expertise.<br>7    Q. Who would you receive it from?<br>8    A. I would receive it, most likely,<br>9 from a member of the marketing team.<br>10    Q. Is there anybody else in senior<br>11 management that receives a copy of the Host<br>12 Family Handbook for review before it's<br>13 published?<br>14    A. I don't know specifically who does<br>15 or does not.<br>16    Q. Okay. And then you said that it<br>17 originates at ICL; is that correct?<br>18    MS. LUKEY: Objection.<br>19    MS. SMALLS: Well, can you read it<br>20 back?<br>21    MS. LUKEY: I think she actually<br>22 corrected her answer.<br>23    MS. SMALLS: Okay. I just asked<br>24 for it to be read back, so we can have<br>25 no dispute about what was said. | 1    Q. And do you provide feedback on the<br>2 entire document, or do you provide feedback<br>3 on just certain sections?<br>4    A. Sometimes in its entirety, and<br>5 sometimes just relevant sections.<br>6    Q. For the 2010 handbook, do you<br>7 recall whether you reviewed the whole<br>8 handbook, or just specific sections?<br>9    A. I don't recall seven years ago<br>10 which one it was.<br>11    Q. Okay. Can you identify the logo on<br>12 top of the Host Family Handbook?<br>13    A. The blue heart?<br>14    Q. Yes. What the name of the<br>15 organization is.<br>16    A. "Cultural Care Au Pair."<br>17    Q. Okay, thank you.<br>18    I'm going to direct you to Page 9.<br>19 Can you read the first paragraph that starts<br>20 "In 1988"?<br>21    A. "In 1988, our organization was<br>22 designated by the U.S. Department of State.<br>23 Our first group of au pairs arrived in June<br>24 of 1989 to the Boston, Chicago, Los Angeles,<br>25 New York, San Francisco and Washington, D.C. |

| Page 103 | Page 105 |
|---|---|
| 1    (Record read as follows:<br>2    "QUESTION: So ICL is responsible<br>3 for the production of the Host Family<br>4 Handbook.<br>5    "MS. LUKEY: Objection.<br>6    "ANSWER: I stated I believe that<br>7 it originates there with contributions<br>8 coming from elsewhere, as it's developed<br>9 into its final stage.")<br>10    MS. LUKEY: I'm going to request<br>11 the next question and answer, because<br>12 she said something to correct her<br>13 earlier answer.<br>14    (Record read as follows:<br>15    "QUESTION: So the content for the<br>16 Host Family Handbook originates at ICL?<br>17    "ANSWER: Without being 100 percent<br>18 certain, I'll say I don't know.")<br>19 BY MS. SMALLS:<br>20    Q. So other than yourself, who else at<br>21 Cultural Care, Inc., reviews the Host Family<br>22 Handbook before it goes out?<br>23    A. I don't know. When I provide my<br>24 feedback, I don't have a listing of who else<br>25 has gone through the same process. | 1 areas. Now we have thousands of au pairs<br>2 across the United States and a network of<br>3 more than 600 field staff."<br>4    Q. Okay. What entity are we referring<br>5 to in that paragraph?<br>6    A. Cultural Care, Inc.<br>7    Q. When you refer to "a network of<br>8 more than 600 field staff," what does that<br>9 refer to?<br>10    A. The LCC community.<br>11    Q. If you go to the bottom of that<br>12 page, it says, "Cultural Care Au Pair Staff."<br>13 Can you read the first two sentences under<br>14 that section?<br>15    A. "Cultural Care Au Pair's main<br>16 office is located in Boston, MA. We also<br>17 have satellite offices across the country to<br>18 ensure that support is available in every<br>19 U.S. time zone."<br>20    Q. Okay.<br>21    A. Oh, you wanted the second sentence.<br>22    "The full-time staff consists of<br>23 customer service staff (including the Account<br>24 Services Department, Program Directors and<br>25 Placement Managers), sales and |

PLAINTIFFS' RESP. APP.0004442

MAGNA
LEGAL SERVICES

Page 106

```
 1   development (Development Directors),
 2   marketing, au pair services, government
 3   compliance, finance, and administrative
 4   staff.  We also work with an extensive
 5   national network of field staff called Local
 6   Childcare Coordinators."
 7        Q.  It says, "Cultural Care Au Pair's
 8   main office is located in Boston, Mass."
 9        What entity are you referring to
10   here?
11        A.  Cultural Care, Inc.
12        Q.  If you can go to Page 10, and read
13   the first two sentences under "Overseas
14   Staff."
15        A.  "Cultural Care Au Pair's affiliate,
16   Cultural Care Limited, has trained staff in
17   all of the countries from which au pairs are
18   recruited for the program.  These offices
19   work to recruit and screen qualified au pair
20   candidates.  The staff is very familiar with
21   the childcare needs of American host families
22   and screens for au pair candidates who meet
23   those requirements."
24        I'm sorry, did you ask for me to
25   read the whole thing?
```

Page 107

```
 1        Q.  That's fine.
 2        A.  Okay.
 3        Q.  And what entity are we referring to
 4   here?
 5        A.  International Care Limited, or ICL.
 6        Q.  Okay, this is ICL.  Is it fair to
 7   say that ICL is also referred to as Cultural
 8   Care Limited?
 9        A.  Do you mean -- in this context,
10   it's referring to ICL.
11        Q.  In any context.  The language says
12   "Cultural Care Au Pair -- "Au Pair's
13   affiliate, Cultural Care Limited," and then
14   it explains a staff in various countries.  It
15   doesn't say ICL.  It says Cultural Care
16   Limited.
17        So I asked you what entity are you
18   referring to here.  You told me ICL.  So what
19   I'm asking is:  Is Cultural Care Limited the
20   same as ICL?
21        A.  It is referring to -- it is
22   intended to refer to ICL.  I don't know of
23   Cultural Care as ICL being known as a
24   different legal name such as Cultural Care
25   Limited.  But what is intended in this
```

Page 108

```
 1   statement is a reference to ICL.  That's what
 2   it's intended to refer to.
 3        Q.  Let's go to Page 11.  Second
 4   paragraph, can you just read that first
 5   sentence?
 6        A.  "As participants in the program,
 7   Cultural Care Au Pair, our local
 8   representatives, au pairs and host families
 9   are all required to comply with these
10   regulations."
11        Q.  What entity are we referring to
12   here?
13        A.  Cultural Care, Inc.
14        Q.  And then if you can just note the
15   asterisk, what does that say?
16        A.  Note the?
17        Q.  The asterisked little note on the
18   bottom.
19        A.  Oh, on the bottom of the page here?
20   This one?
21        Q.  Yes.
22        A.  I'm sorry, are you asking me to
23   read it?
24        Q.  Yes.
25        A.  "The weekly stipend is determined
```

Page 109

```
 1   by the U.S. Department of Labor using a
 2   formula based on the federal minimum page."
 3        Q.  Is that accurate?
 4        A.  I don't believe so, no.
 5        Q.  But this was included in your Host
 6   Family Handbook that was distributed to host
 7   families in 2010?
 8        A.  That's correct.
 9        Q.  Okay, thank you.  If we can go to
10   Page 14.  If you can read the section
11   "Cultural Care Au Pair Overseas," that first
12   paragraph?
13        A.  Out loud?
14        Q.  Yes, out loud.  Thank you.  Sorry.
15        A.  "In 2010 Cultural Care Au Pair
16   became the only au pair agency designated by
17   the U.S. State Department to recruit all of
18   our au pairs through our own offices
19   worldwide.  Unlike other au pair agencies who
20   use independent agents, our au pairs are
21   recruited and screened by Cultural Care staff
22   in one of our 20 offices around the world.
23   This unique recruitment structure reflects
24   our belief that investing in a quality
25   recruitment organization is the best way to
```

PLAINTIFFS' RESP. APP.0004443

MAGNA
LEGAL SERVICES

Case 1:14-cv-03074-CMA-KMT   Document 1059-23   Filed 03/17/18   USDC Colorado   Page 235 of 310

Page 110

1   ensure that our au pairs are rigorously
2   screened and well prepared for their year as
3   an au pair with an American host family."
4       Q.  Can you tell me what entity you
5   were referring to here?
6       A.  There is two different references
7   here.
8       Q.  Okay.  Let's start with the first
9   reference, "Cultural Care Au Pair became the
10  only au pair agency designated by the U.S.
11  State Department to recruit all of our
12  au pairs through our own offices worldwide."
13      What does that refer to?
14      A.  So when we talk about being a
15  designated au pair agency, that's Cultural
16  Care, Inc.
17      Q.  Okay.  And when you refer to
18  "recruit all of our au pairs through your own
19  offices worldwide," what are you referring
20  to?
21      A.  Again, as I stated earlier, the
22  Cultural Care Au Pair name is a name that's
23  licensed to Cultural Care, Inc. that's owned
24  by International Care, or ICL.
25      So the experience for a customer is

Page 111

1   a consistent one of being able to identify
2   Cultural Care Au Pair.  So for them it's a
3   very seamless process from recruitment in
4   their home country to placement in the
5   United States and the support that they would
6   receive from the organization all tolled.
7       Q.  So in this sentence there are two
8   organizations being referenced in the
9   reference of Cultural Care Au Pair, one word,
10  if I understanding it correctly, there are
11  two references included -- encompassed by the
12  reference of "Cultural Care Au Pair" in this
13  sentence, Cultural Care, Inc. and ICL.
14      Are both included in the reference
15  to the statement that "Cultural Care Au Pair
16  became the only agency designated by the U.S.
17  State Department to recruit all of our
18  au pairs through our own offices worldwide";
19  is that correct?
20      A.  The statement is referencing --
21  it's pulling together two separate entities
22  for the purpose of the seamless customer
23  experience that they have as a participant as
24  an au pair and for a host family; that they
25  would be working with Cultural Care from the

Page 112

1   beginning all the way to the end of their
2   program term.  That's what's being expressed
3   in this particular material.
4       Technically, what is actually
5   happening legally is that you have two
6   different entities that are in a contractual
7   relationship, but the experience for the
8   program participant is intended to be a
9   seamless one throughout the process.
10      Q.  So one entity?
11      MS. LUKEY:  Objection.
12      A.  No, not one entity.  It's two
13  separate entities, but the Cultural Care
14  Au Pair name is consistent for the program
15  participant from the beginning to the end of
16  their term.
17      Q.  When you made this statement to a
18  host family in the Host Family Handbook that
19  "Cultural Care Au Pair became the only
20  au pair agency designated by the State
21  Department to recruit all of our au pairs
22  through our own offices worldwide," it was
23  your intent -- actually, strike that.
24      I'm going to refer you back to the
25  ICL agreement, Section 3(b).

Page 113

1       A.  Exhibit 2?  I just want to make
2   sure.
3       Q.  Exhibit 2, Section 3(b).  Can you
4   read section 2(b) out loud?
5       MS. LUKEY:  2(b) or 3(b)?
6       MS. SMALLS:  I'm sorry.  3(b).
7   Thank you.
8       A.  "Recruitment and preparation of
9   participants.  ICL will identify, recruit and
10  prepare prospective Participants to the
11  Program directly or through its agents in
12  countries designated by the U.S.D.S. (each
13  respectively a 'country of origin')."
14      Q.  Is that provision in the agreement
15  consistent with the second sentence in the
16  au pair handbook?  So under the sentence that
17  reads -- directly after the sentence we just
18  read several times starting with "Unlike."
19      Well, why don't you read "Unlike,"
20  starting at "Unlike," why don't you reread
21  that sentence again.
22      A.  "Unlike other au pair agencies who
23  use independent agents, our au pairs are
24  recruited and screened by Cultural Care staff
25  in one of our 20 offices around the world."

PLAINTIFFS' RESP. APP.0004444

MAGNA

LEGAL SERVICES

Page 114

1    Q. So in this sentence you're
2 representing that you don't use independent
3 agents, and that's one of the things that
4 distinguishes you from other au pair
5 agencies; is that correct?
6    A. Correct.
7    Q. And what does it say in 3(b)
8 regarding the use of independent agents?
9        MS. LUKEY: Objection.
10    A. It doesn't say anything in 3(b)
11 about independent agents.
12    Q. Agents, excuse me. What does it
13 say about the use of agents in Section 3(b)?
14    A. Do you want me to just reread it?
15    Q. Well, does the provision, Section
16 3(b), provide that recruitment, au pair
17 recruitment, will happen potentially through
18 agents?
19        MS. LUKEY: Objection.
20    A. We have a contractual relationship
21 with ICL. I don't have knowledge of who
22 they're or if they're contracting anything on
23 their side.
24    Q. Is this your Host Family Handbook?
25    A. Yes.

Page 115

1    Q. Okay. So you are affirmatively
2 making the representation that you do not use
3 agents, you only screen au pairs through
4 staff; is that correct?
5        MS. LUKEY: Objection.
6    A. What we're saying here is we're
7 trying to make a distinction between Cultural
8 Care Au Pair and other programs. And in
9 other programs, they would have multiple
10 agents under multiple names without any sort
11 of cohesive or similarity between them. It's
12 literally two different experiences.
13        And what we're asserting here is
14 that the experience with Cultural Care
15 Au Pair is a much more seamless one where the
16 Cultural Care name is one that is consistent
17 across that experience and that there is a
18 more streamline process as compared to other
19 program sponsors.
20    Q. Okay. If we can go to the next
21 paragraph. If you can read the first two
22 sentences only out loud.
23    A. "Each of our Cultural Care offices
24 is managed by a Country Program Manager
25 (CPM). The CPM and their staff in the office

Page 116

1 in turn manage a group of recruitment leaders
2 based around their country to help screen and
3 interview au pairs in their local area."
4    Q. What entity are we referring to
5 there?
6    A. ICL.
7    Q. Okay, thank you. If we can move to
8 Page 15.
9    A. Of the?
10    Q. Of the Host Family Handbook.
11        Under "Screening and Orientation,"
12 do you know where this content came from?
13    A. I do not.
14    Q. If you can read, again, only the
15 first two sentences out loud, please?
16    A. Of?
17    Q. "Screening and Orientation."
18    A. The paragraph that is below that,
19 the first two sentences of that paragraph?
20    Q. That's correct.
21    A. "All au pair candidates who apply
22 to Cultural Care Au Pair are initially
23 screened by Cultural Care trained staff in
24 their home country to ensure a fit into the
25 Cultural Care Au Pair profile."

Page 117

1    Q. So it first refers to Cultural Care
2 Au Pair. What entity is being referred to
3 there?
4    A. ICL.
5    Q. And then it switches to Cultural
6 Care and says "initially screened by Cultural
7 Care trained staff."
8        What entity is being referred to
9 there?
10    A. ICL.
11    Q. Okay. Are you familiar with the
12 screening and orientation process for
13 au pairs before they come to the U.S.?
14    A. In part. But as it's a function of
15 ICL, my knowledge is limited.
16    Q. As part of the screening and
17 orientation of au pairs, are materials
18 produced?
19    A. In the screening and orientation --
20    Q. Of au pairs in their home country,
21 are materials produced?
22    A. Yes.
23    Q. Do you have copies of those
24 materials?
25    A. I don't have copies of them, no.

PLAINTIFFS' RESP. APP.0004445

MAGNA
LEGAL SERVICES

Page 118

1   Q.  Cultural Care does not have copies
2   of the materials that are produced and shared
3   with au pairs in their home country?
4   A.  We have very easy access to them.
5   But do we maintain copies of the recruitment
6   materials from overseas in foreign languages?
7   It's unlikely to me that we have them on hand
8   at all times.
9   Q.  But they are shared with you; is
10  that correct?
11      MS. LUKEY:  Objection.
12  Q.  Are they shared with you?
13  A.  They can be from time to time.
14  Q.  Let's move to Page 16.  Under
15  "Pre-departure," it refers to two handbooks
16  that are given to au pairs.
17      Are copies of those handbooks
18  provided to Cultural Care, Inc.?
19  A.  Similar to my last response,
20  they -- information that's given to them, we
21  have easy access to, but I don't know that we
22  keep active copies of all of them on hand at
23  all times.
24  Q.  Can we go to Page 29 of the Host
25  Family Handbook.

Page 119

1   A.  2-9?
2   Q.  Yes.
3       Under this section, "What does
4   Cultural Care Au Pair expect from the host
5   family," can you read the last bullet under
6   that section?
7   A.  The last bullet, it goes over to
8   the second column?
9   Q.  Yes, in the second column.
10  A.  "To abide by all Cultural Care
11  Au Pair program and U.S. Department of State
12  regulations and all laws."
13  Q.  Okay.  What entity are we referring
14  to here when you say "Cultural Care Au Pair"?
15  A.  Cultural Care, Inc.
16  Q.  Okay.  What are Cultural Care, Inc.
17  program regulations?  It says -- it doesn't
18  have a good noun that follows "program."  But
19  what are you referring to when you say "all
20  Cultural Care Au Pair program," that portion
21  of that bullet?
22  A.  Any rules that are specific to
23  Cultural Care Au Pair policy.
24  Q.  And what are those rules that are
25  specific to Cultural Care Au Pair that are

Page 120

1   not included in the State Department regs?
2   A.  Well, for example, in order to be
3   an au pair that's in good standing on our
4   program, you would need to participate in the
5   monthly personal contact.
6       The monthly personal contact is a
7   regulatory requirement.  We have made it a
8   program policy that that happens by way of
9   monthly meetings.  And so their attendance at
10  those meetings are mandatory.
11      So that would be an example of
12  something that is Cultural Care Au Pair-
13  specific, but not mandated by the
14  regulations.
15  Q.  Can you tell me what else is
16  Cultural Care-specific but not mandated by
17  regulation?
18  A.  The -- just think through.
19      There could be a host family house
20  rule that the au pair would need to be
21  respectful of.  And if they refuse to do
22  that, then that would be, obviously, of
23  concern.  But that would be a
24  program-specific area as opposed to something
25  that's covered by the Department of State

Page 121

1   regulations.
2   Q.  Okay.  Is there anything else you
3   can think of that's Cultural Care
4   program-specific that is not mandated by the
5   Department of State?
6   A.  I'm sure there are a number of
7   things.  I'm feeling a bit on the spot at the
8   moment.
9       Being available to, you know, raise
10  concerns or issues to the attention of
11  Cultural Care to let us know if something has
12  happened to report, if they may have an issue
13  of concern or a question, to make themselves
14  available for outreach by Cultural Care, if
15  at any point we need to get in touch with
16  them and talk to them about any number of
17  things.
18      I mean, off the top of my head,
19  that's what I can offer at this moment.
20  Q.  What about pets?
21  A.  What about pets?
22  Q.  Are pets included, a policy on pets
23  included in the regulation?
24  A.  There's not a regulation
25  specifically that has the word "pets" in it.

MAGNA
LEGAL SERVICES

Case 1:14-cv-03074-CMA-KMT    Document 859-23    filed 03/17/18    USDC Colorado    Page 238 of 310

Page 122

1    Q. Okay. Does Cultural Care have a
2 policy on whether au pairs can take care of
3 pets?
4    A. We have a policy that's consistent
5 with the regulations that states that the
6 au pair's duties have to be childcare
7 related.
8    Q. Do you provide specific guidance
9 with respect to the care of pets?
10    A. I can't recall if in this document,
11 for example, there is a reference or a
12 frequently asked question that we address on
13 that. I'd have to review the full materials
14 to be able to confirm that.
15    Q. In any document. I mean, just a
16 Cultural Care policy.
17    A. We don't have a pet policy, no.
18 What we have is a policy that's reflective of
19 the regulations with regard to the scope of
20 duties for the au pair. So we simply
21 reiterate that, and that excludes things that
22 are not appropriate for their
23 responsibilities.
24    Q. Can we go to Page 31 of the
25 handbook.

Page 123

1    A. (Complies.)
2    Q. Under "General Au Pair
3 Responsibilities," it references a weekly
4 schedule towards the end of the second
5 paragraph.
6    A. (Document review.)
7    Q. Sorry, strike that.
8       Okay, let's go to Page 32.
9    A. (Complies.)
10    Q. Can you read the first three
11 sentences of the paragraph under "Weekly
12 Stipend"?
13    A. Out loud?
14    Q. Yes, out loud. Thank you.
15    A. Can I just request when you ask me
16 a question, it's really helpful if you look
17 at me, because I read your lips as you're
18 talking.
19    Q. Okay. Thank you.
20    A. "The weekly stipend you give your
21 au pair is a living stipend of $195.75. The
22 stipend is based on a formula that includes
23 the federal minimum wage and a housing
24 credit."
25       Did you say to read the whole

Page 124

1 paragraph?
2    Q. No.
3    A. Okay.
4    Q. Is that guidance consistent with
5 the guidance that you give to host families
6 regarding the stipend?
7    A. Yes.
8    Q. And that guidance is, that the
9 stipend is $195.75 on a weekly basis?
10    A. We would take the position it's a
11 minimum stipend, but we do provide that
12 number as it's been issued by the Department
13 of State.
14    Q. Can you read that first sentence
15 again?
16    A. Sure. "The weekly stipend you give
17 your au pair is a living stipend of $195.75."
18    Q. Is there anything about that
19 guidance -- and you can read and reference
20 the entire paragraph -- but is there anything
21 in that paragraph that suggests that the
22 $195.75 is a minimum?
23    A. There is no reference to either a
24 minimum nor a maximum.
25    Q. So the guidance to host families is

Page 125

1 that the weekly stipend is $195.75?
2       MS. LUKEY: Objection.
3    A. The sentence here says "The weekly
4 stipend you give your au pair is a living
5 stipend of $195.75."
6    Q. Is the guidance that you provide
7 host families in this document that the
8 weekly stipend is $195.75?
9       MS. LUKEY: Objection.
10    A. This sentence says that. I can't
11 speak to every reference throughout the
12 entire --
13    Q. Okay, but this particular section
14 says "Weekly Stipend." In this section where
15 you are -- this section entitled "Weekly
16 Stipend," is the guidance that you are giving
17 host families the weekly stipend is $195.75?
18    A. The sentence that is written in
19       MS. LUKEY: Objection.
20    A. The sentence that is written in
21 this document is that "The weekly stipend you
22 give your au pair is a living stipend of
23 $195.75."
24    Q. Can you go down to the asterisk and
25 read that as well?

PLAINTIFFS' RESP. APP.0004447

MAGNA ►
LEGAL SERVICES

Page 126

1    A. "The weekly stipend is determined
2  by the U.S. Department of Labor using a
3  formula based on the federal minimum wage."
4    Q. Is that correct?
5    A. No.
6    Q. Thank you. If I can direct you to
7  Page 37.
8    A. (Complies.)
9    Q. Under "Travel Insurance," can you
10  read the first paragraph?
11    A. "Travel Insurance. Policy types.
12  All Cultural Care au pairs are covered for 12
13  months by basic travel insurance provided by
14  Erika Travel Insurance. The basic travel
15  insurance provides limited coverage for
16  medical expenses, emergency home evacuation
17  or home repatriation."
18    Q. Who obtains the coverage referenced
19  in this paragraph?
20    A. It depends on the year as previous
21  to 2010, Cultural Care, Inc., purchased that
22  directly, after which point ICL was
23  contracted to include that.
24    Q. Let's go to Page 38. There is a
25  reference to -- at the last line of the first

Page 127

1  paragraph "Cultural Care Au Pair Services."
2    Do you see that right before the
3  number?
4    A. Yes.
5    Q. What is Cultural Care Au Pair
6  Services?
7    A. It's a phone -- at this time it was
8  a dedicated phone line for the au pairs to be
9  able to call in directly. It was prior to
10  what I believe was a change in the phone
11  system for a phone tree to be able to say:
12  Press 1 if you're an au pair, press 2 if
13  you're a host family.
14    And so this number was for them to
15  call up to ask any questions about something
16  that is au pair-specific that they needed
17  assistance with.
18    Q. Pre-placement or post-placement?
19    A. This is post-placement.
20    Q. Okay. And who maintained this
21  phone line?
22    A. That phone line would have been
23  answered within the Account Services team.
24    Q. At Cultural Care, Inc.?
25    A. Yes.

Page 128

1    Q. Thank you. If you can read the
2  last sentence of the second paragraph?
3    A. Out loud?
4    Q. Out loud, thank you.
5    A. "Additional insurance must be
6  purchased by the end of her/his program term
7  through Cultural Care Au Pair if your au pair
8  is planning on using her/his travel month and
9  desires coverage."
10    Q. The reference to Cultural Care --
11  insurance being purchased through Cultural
12  Care Au Pair, who is being referenced there?
13    Who are we talking about when we
14  talk about Cultural Care Au Pair in that
15  sentence?
16    A. I don't know which one.
17    Q. Okay, thank you.
18    If you go to Page 45, the last
19  paragraph on that page talks about "If your
20  au pair experiences a problem."
21    A. Okay.
22    Q. If you can just read that first
23  sentence?
24    A. "If your au pair experiences a
25  problem when applying for a Social Security

Page 129

1  number, please contact Cultural Care Au Pair
2  and we will try to assist you. Please be
3  sure to provide the address of the office at
4  which your au pair is applying. You will
5  also need to fax a copy of your au pair's
6  I-94 card to Au Pair Services at
7  617-619-2102. While we can not speed up the
8  process of obtaining a Social Security
9  number, we may be able to help in cases where
10  the Social Security office has incorrect
11  information in their database."
12    Q. In the first sentence it refers to
13  Cultural Care Au Pair. Do you know what
14  entity is being referred to there?
15    A. Cultural Care, Inc.
16    Q. Great. Thank you.
17    I'm going to refer you back to
18  Exhibit Number 2, the Inc-ICL agreement.
19  Section 3(g), on the second page, on Page 4,
20  the last two, I guess, the sentence starting
21  "Annually," can you read that towards the end
22  of that section?
23    A. Out loud?
24    Q. Out loud, thank you.
25    A. "Annually ICL will provide Inc with

MAGNA ▶
LEGAL SERVICES

Page 130

1 a complete set of all promotional materials,
2 brochures or pamphlets distributed to either
3 Participants or host families for further
4 deliverance to U.S.D.S. according to the
5 Regulations. All promotional and orientation
6 materials developed hereunder shall remain
7 the property of ICL. The rights of ICL
8 regarding the assignment of promotional
9 materials contained in this 3. shall survive
10 the termination of this Agreement."
11     Q. So I'll ask again whether you
12 received copies of the promotional materials,
13 brochures or pamphlets distributed to either
14 participants or host families annually?
15     A. We would receive some annually.
16     Q. And do you have some in your
17 possession? Some promotional materials,
18 brochures or pamphlets in your possession?
19     A. I don't know what we have in-house
20 at any given time. But certainly anything
21 that had been produced to the State
22 Department would be something that we would
23 have a record of.
24     THE WITNESS: Is there a specific
25 time for lunch?

Page 131

1     MS. LUKEY: Is it here?
2     MR. O'KEEFE: It's here.
3     MS. LUKEY: It's here. All right,
4 then I just defer to you folks.
5     THE WITNESS: What time is it now?
6     MS. LUKEY: It is -- I got 12:17 or
7 thereabouts.
8     MS. SMALLS: We can break for
9 lunch.
10     MS. LUKEY: So everything is set up
11 in A, and then you can either come back
12 here or we have a conference room for
13 you one flight down right at the lobby
14 area, separate breakout room.
15     You folks are also welcome to come
16 in grab some food, probably bring it
17 back here while the attorney teams
18 split.
19     VIDEO TECHNICIAN: So are we going
20 off the record?
21     MS. SMALLS: Yes, we are going off
22 the record and breaking for lunch.
23     VIDEO TECHNICIAN: The time is
24 12:17. We are off the record.
25

Page 132

1     (Proceedings recessed for lunch at
2 12:17 p.m.)
3         *     *     *
4
5
6     A F T E R N O O N   S E S S I O N
7
8     (Whereupon proceedings resume at
9 1:03 p.m.; appearances noted as noted.)
10     VIDEO TECHNICIAN: We're back on
11 the record at 1:03 p.m.
12 BY MS. SMALLS:
13     Q. What is currently the stipend for
14 au pairs?
15     A. The minimum stipend is $195.75.
16     Q. How long has that been the stipend?
17     A. That has been the minimum stipend
18 since 2009.
19     Q. And that was the last time that the
20 stipend changed?
21     A. Yes.
22     Q. And was that change an increase?
23     A. That was based on the increase to
24 the federal minimum wage.
25     Q. Do you know why the stipend is tied

Page 133

1 to the federal minimum wage?
2     A. I do not know why.
3     Q. Your responsibilities at Cultural
4 Care are primarily government relations; is
5 that correct?
6     A. Yes.
7     Q. And I'll ask again. Do you know
8 why the stipend is tied to minimum wage?
9     MS. LUKEY: Objection.
10     A. As I said before, I don't know why.
11     Q. Okay, thank you.
12     I'm going to give you...
13     (Document marked for
14 identification as Jordan Exhibit 7)
15     Q. Do you recognize this document?
16     A. Yes.
17     Q. Can you tell me what it is?
18     A. It is a -- it's entitled
19 "Competitor Guide 2014."
20     Q. And what is the document?
21     A. I believe that this was created in
22 order to have an understanding of the
23 breakdown of programing fees across the
24 different program sponsors.
25     Q. Can you go to the portion that's

PLAINTIFFS' RESP. APP.0004449

**MAGNA** ▸
LEGAL SERVICES

| Page 134 | Page 136 |
|---|---|

**Page 134**

1  designated "Stipend," and start with Cultural
2  Care.
3      What does it say is the stipend for
4  Cultural Care Au Pair?
5      A. The number in this column is
6  $195.75.
7      Q. Let's go to the next entity listed
8  in this, Au Pair in America. Can you read
9  what it says under stipend?
10     A. It says, "$195.75 (standard), $250
11  (extraordinaire)."
12     Q. The next sponsor listed on this
13  chart is AuPairCare. Can you list what it
14  says under stipend?
15     A. $195.75.
16     Q. Okay. The next sponsor is
17  InterExchange, but there is -- well, I'll ask
18  you what does it say under InterExchange?
19     A. There is nothing in that box.
20     Q. Under the next sponsor is GoAuPair.
21  What does it say for stipend?
22     A. "$195.75, 215 plus, $255 premier."
23     Q. And do you understand -- what is
24  your understanding of what those three
25  different numbers represent?

**Page 135**

1      A. My understanding is that they have
2  differences in their programing that results
3  in a different -- in different costs.
4      Q. The next sponsor is EurAuPair. Can
5  you tell me what it says for stipend under
6  EurAuPair?
7      A. "$195.75, $250 for Par Experience."
8      Q. Can you tell me what your
9  understanding of that information in the
10  stipend box for EurAuPair is?
11     A. I'm not sure exactly what that
12  means, but it seems another --
13     Q. Well, let me rephrase it. If you
14  don't understand what it means, let me
15  rephrase it.
16     MR. STONE: Counsel, this is Larry
17  Stone. What document are you referring
18  to?
19     MS. SMALLS: It is CC3114.
20     MR. STONE: Okay, what is it,
21  though?
22     MS. LUKEY: Competitor Guide 2014.
23     MR. STONE: Is this a document
24  prepared by Cultural Care?
25     MR. SCHWARTZ: Yes.

**Page 136**

1      MS. SMALLS: It is.
2      MR. STONE: Okay. All right, thank
3  you for clarifying. I appreciate it.
4  BY MS. SMALLS:
5      Q. So with the exception of
6  InterExchange, is the stipend amount
7  consistent among sponsors?
8      MS. LUKEY: Objection.
9      MR. STONE: Objection; form and
10  foundation.
11     Q. You can answer.
12     A. Could you repeat the question,
13  actually?
14     Q. We just reviewed what this document
15  says. It has an entry for stipend amount,
16  and we reviewed what the entries were in this
17  document. My question to you was: Is the
18  stipend amount consistent among the sponsors?
19     MS. LUKEY: Objection.
20     MR. STONE: Form and foundation.
21     A. There are a number of differences
22  throughout this document.
23     Q. Okay. For each sponsor that has a
24  stipend listed, do they each have $195.75
25  listed under the stipend entry or box on this

**Page 137**

1  chart?
2      A. Yes, though some have other amounts
3  listed as well.
4      Q. And let's go to those other
5  amounts. So for Au Pair in America, what is
6  the other amount that you're referring to?
7      A. $250, as referenced -- in reference
8  to the extraordinaire program.
9      Q. Okay. So the $250 entry is for
10  the, as you read this document, for the
11  extraordinaire program?
12     A. That's correct.
13     Q. And for a standard au pair, the
14  weekly stipend as listed here is $195.75?
15     A. That's correct.
16     Q. Okay. There are two other -- well,
17  why don't you read what's in the stipend box
18  again?
19     A. "$195.75, $215 plus, $255
20  premiere."
21     Q. Okay. What is your understanding
22  of the plus. What does that refer to?
23     A. I don't have any knowledge or
24  information to feel comfortable testifying on
25  anything outside of the programs that we work

PLAINTIFFS' RESP. APP.0004450

**MAGNA**
LEGAL SERVICES

| Page 138 | Page 140 |
|---|---|

**Page 138**

1  with.
2  Q. That's fair. But the first stipend
3  amount listed here is $195.75; is that
4  correct?
5  A. Yes.
6  Q. And then just to complete it for
7  EurAuPair, it says, if you can read what's in
8  that second box?
9  A. "$195.75, $250 for Par Experience."
10  Q. And do you have any knowledge of
11  what "par experience" is?
12  A. No, I do not.
13  Q. You've testified that you've worked
14  at Cultural Care since September 1999; is
15  that correct?
16  A. That's correct.
17  Q. And you are well versed in the
18  au pair industry; is that correct?
19  A. Yes.
20  Q. Is there variation among sponsors
21  with respect to the weekly stipend for
22  standard au pairs?
23  MS. LUKEY: If you know.
24  Objection.
25  MS. KOZAL: Objection.

**Page 139**

1  MR. STONE: Objection; form and
2  foundation.
3  A. I can see that there are variations
4  that are listed on this document that reflect
5  different stipend amounts.
6  Q. I'm not referring to the document
7  now. I'm referring to your experience.
8  You've been trying to do the math since 1999,
9  so that's 18 --
10  A. Almost 18.
11  Q. 18 years?
12  A. Hm-mm.
13  Q. -- experience at Cultural Care.
14  In your experience is there
15  variation among sponsors with respect to
16  stipend for standard au pairs?
17  MS. LUKEY: Objection.
18  A. I can only testify to my
19  knowledge --
20  MR. STONE: Objection; form and
21  foundation.
22  Q. You can answer.
23  A. I can only testify to my knowledge
24  of Cultural Care Au Pair and our
25  understanding and the information that we

**Page 140**

1  have. I don't -- I can't do the same for
2  other programs.
3  Q. You don't do market analysis as
4  part of your function in Cultural Care --
5  I'll rephrase.
6  Do you do market analysis at
7  Cultural Care?
8  A. Yes.
9  Q. Do you do analysis with respect to
10  your competitors?
11  A. Yes.
12  Q. And what do you -- what does that
13  analysis constitute?
14  A. I think this document is reflective
15  of that analysis, that information that is
16  publicly available. We gather it and put it
17  in one place like this as an internal
18  reference so that we can have an
19  understanding of the basic information.
20  Having said that, I can't comment
21  on things that I don't know, the individual
22  operations, or communications on behalf of
23  other designated sponsors.
24  Q. To be clear, I'm not asking about
25  the operations or communications of other

**Page 141**

1  sponsors.
2  You can reference this document or
3  you can testify from your own experience, but
4  my understanding is you do market analysis of
5  your competitors; is that correct?
6  A. Yes.
7  Q. Does that market analysis include
8  distinguishing characteristics among sponsor
9  agencies?
10  A. Yes.
11  Q. What do you understand as -- what
12  distinguishes Cultural Care from your
13  competitors?
14  A. Well, there is a number of
15  different things. I think it's detailed, for
16  example, in this document when it comes to
17  programatic fees, the local support, payment
18  plans, discounting, a number of different
19  things would distinguish us based on an
20  analysis.
21  Q. Does stipend distinguish you from
22  other sponsors?
23  A. Not to my knowledge.
24  Q. Is stipend a distinguishing
25  characteristic for Cultural Care from other

PLAINTIFFS' RESP. APP.0004451

MAGNA
LEGAL SERVICES

Page 142

1  sponsors?
2       MR. STONE:  Objection; form
3  foundation.
4       A.  No.
5       Q.  Can I refer you to the second page
6  of this document under the column for
7  EurAuPair?
8       A.  Okay.
9       Q.  And I'm specifically looking under
10 the column of "Why is Cultural Care better
11 than this competitor?"
12      Can you read what is entered into
13 that box for EurAuPair?
14      A.  Out loud?
15      Q.  Out loud.  Thank you.
16      A.  "They charge significantly more for
17 au pairs with 'professional experience.'"
18      Q.  What is meant here when this
19 document refers to charging more for
20 au pairs?
21      A.  I believe that this refers to
22 different kinds of programs that they offer
23 where there is a subsection of what they
24 would define as having more experienced
25 au pairs that they charge differently than

Page 143

1  they would for someone who did not have that,
2  quote, professional experience.
3       Q.  Does "charge" here relate to the --
4  refer to the weekly stipend?
5       A.  I don't know.
6       Q.  Is the stipend something within the
7  sponsor's control?  The amount of the
8  stipend, is that something you understand to
9  be within the sponsor's control?
10      A.  No.
11          (Document marked for
12      identification as Jordan Exhibit 8)
13      Q.  Are you familiar with this
14 document?
15      A.  I've seen it before, yes.
16      Q.  Can you just go to the first page
17 and tell me what the logo says on the top
18 page?
19      A.  It says, "Celebrating over 25
20 years, Cultural Care Au Pair is proud to have
21 placed over 100,000 au pairs in American
22 homes for over 25 years."
23      Q.  Sorry, I meant on the cover page.
24      A.  Oh.
25      Q.  That's my mistake.  On the cover

Page 144

1  page if you can tell me what the logo is.
2       A.  Are you referring to this in
3  particular?
4       Q.  I am.
5       A.  "Cultural Care Au Pair."
6       Q.  And do you know what entity or
7  entities we're referring to when we refer to
8  a Cultural Care Au Pair document?
9       A.  This document in particular is in
10 relation to Cultural Care, Inc.
11      Q.  Okay, thank you.  And what year is
12 this document?
13      A.  In the top right corner it says
14 "2015."
15      Q.  And then on the bottom of the cover
16 page on the bottom right, can you read what
17 that says?
18      A.  There are two things here.  Which
19 in particular?
20      Q.  On the bottom right in the blue.
21      A.  In the blue.  "Part of the EF
22 Education First family."
23      Q.  Can you tell me what you mean by
24 "Part of the EF Education First family"?
25      A.  Well, as I indicated earlier today,

Page 145

1  we have an affiliation with some of the legal
2  entities that make up the EF Education First
3  group.
4       Q.  But you don't know what those legal
5  entities are?
6       A.  No.
7       Q.  If you could go to the Bates number
8  is 968.  I don't see this document otherwise
9  numbered, but in the blue -- well, tell me
10 what is this page?
11          It says -- well, read the title of
12 this page.
13      A.  "Why families choose au pair
14 childcare over..."
15      Q.  And there is a column here for
16 "Daycare" and there is a column here for
17 "Nannies"; is that correct?
18      A.  Yes.
19      Q.  Can you read the last entry under
20 "Nannies" out loud?
21      A.  Sure.  "'Salary negotiations are a
22 hassle.'  All au pairs earn with weekly
23 stipend of $195.75."
24      Q.  Does that communicate a minimum of
25 $195.75?

PLAINTIFFS' RESP. APP.0004452

**MAGNA**
LEGAL SERVICES

Case 1:14-cv-03074-CMA-KMT Document 932-69 filed 03/30/18 USDC Colorado Page 244 of 310

Page 146

1      A.  We understand the stipend to be a
2  minimum.
3      Q.  Where does it say that?  I'm sorry.
4      A.  Well, I'm stating that's our
5  position, that's our understanding.  The
6  sentence itself says "All au pairs can
7  earn" -- sorry.  "All au pairs earn a weekly
8  stipend of $195.75."
9      Q.  And let me just back up for a
10 minute.
11      Who is this document intended for?
12      A.  This is a document intended for
13 prospective host families.
14      Q.  And if you could read that sentence
15 again?
16      A.  The one I just read?
17      Q.  Under "'Salary negotiations are a
18 hassle.'"
19      A.  "All au pairs earn a weekly stipend
20 of $195.75."
21      Q.  Okay, thank you.
22      (Document marked for
23  identification as Jordan Exhibit 9)
24      Q.  What is this document?  Well, are
25 you familiar with this document?

Page 147

1      A.  I may have seen it before, but I'm
2  not extensively familiar with it.
3      Q.  Do you know what it is?
4      A.  Yes.
5      Q.  What is it?
6      A.  Well, it's entitled "Choosing the
7  Right Childcare."  I believe it's a document
8  that was created in order to -- intended for
9  host families, prospective host families, to
10 discuss the program and how it might be a fit
11 for them.
12      Q.  Okay, thank you.  Can you go to
13 Page 3 of this document.  And under
14 "Au pair," if you can read the first two
15 sentences.
16      A.  Out loud?
17      Q.  Out loud.  Thanks you.
18      A.  "The cost of an au pair is the
19 easiest to calculate because it is largely a
20 fixed amount."
21      Sorry, did you say to read the
22 first two sentences?
23      Q.  Mm-hmm.
24      A.  "The au pair program is regulated
25 by the U.S. Department of State, so all

Page 148

1  au pairs make the same weekly stipend of
2  $195.75."
3      Q.  And then just to be comprehensive,
4  can you -- there is a footnote next to that,
5  so -- although I think there is a mistake on
6  the numbering.  But could you read the
7  footnote, the first sentence on the footnote?
8      A.  "According to U.S. Department of
9  State regulations and Cultural Care Au Pair."
10      Q.  So according to this statement, the
11 stipend is determined by the Department of
12 State and Cultural Care Au Pair?
13      MS. LUKEY:  You didn't read the
14  whole thing.
15      Q.  Well, let's read the entire, if you
16 can read --
17      MS. LUKEY:  Oh, okay.  He just
18  pointed out it is two different
19  footnotes.  The print is so small.  You
20  were saying that you thought the
21  numbering was wrong.  3 and 4 run
22  together in the footnote.  So the first
23  part is 3 and the second part is 4.
24      MS. SMALLS:  Yup.  Got it.
25      Q.  So if you can read footnote number

Page 149

1  4, since that's attached to that statement I
2  just asked you to read?
3      A.  "The weekly stipend is determined
4  by the U.S. Department of State using a
5  formula based on the federal minimum wage.
6  Any change in the federal minimum wage will
7  result in an increase in the stipend."
8      Q.  Is that correct?
9      A.  Yes.
10      Q.  The stipend is determined -- the
11 weekly stipend is determined by the U.S.
12 Department of State?
13      A.  Yes.
14      Q.  I'm going to refer you back to
15 Exhibit Number 6, and that's the au pair Host
16 Family Handbook.  But in the back of that
17 handbook, you provide a copy of State
18 Department regulations, and that is on page
19 CC401?
20      A.  Okay.
21      Q.  If you can read section (j)(1) out
22 loud.
23      A.  "Are compensated at a weekly rate
24 based upon 45 hours of child care services
25 per week and paid in conformance with the

MAGNA ▶
LEGAL SERVICES

Page 150

```
 1  requirements of the Fair Labor Standards Act
 2  as interpreted and implemented by the
 3  United States Department of Labor."
 4      Q. I'm going to ask you to reread that
 5  sentence starting with "Sponsor shall,"
 6  rather than the "Are."
 7      A. "Sponsors shall require that
 8  au pair participants: Are compensated at a
 9  weekly rate based upon 45 hours of child care
10  services per week and paid in conformance
11  with the requirements of the Fair Labor
12  Standards Act as interpreted and implemented
13  by the United States Department of Labor.
14  EduCare participants shall be compensated at
15  a weekly rate that is 75 percent of the
16  weekly rate paid to non-EduCare
17  participants."
18      Q. Thank you. So let's go back to
19  Exhibit Number 9, that footnote. Footnote
20  Number 4.
21      A. Okay.
22      Q. And if you could read that again.
23      A. "The weekly stipend is determined
24  by the U.S. Department of State using a
25  formula based on the federal minimum wage.
```

Page 151

```
 1  Any change in the federal minimum wage will
 2  result in an increase in the stipend."
 3      Q. Is that statement correct?
 4      A. Yes.
 5      Q. Well, let's look at the Department
 6  of State regulations. From your
 7  understanding -- again, of your
 8  responsibilities, you have primary
 9  responsibility for government relations,
10  correct?
11      A. That's correct.
12      Q. And is one of those
13  responsibilities compliance with State
14  Department regulations?
15      A. Yes.
16      Q. And program compliance with State
17  Department program requirements?
18      A. Yes.
19      Q. What is your understanding of the
20  requirements for au pair sponsor agencies?
21      MS. LUKEY: I'm sorry, the
22  requirement or the requirements?
23      Q. The requirements for sponsor
24  agencies imposed for a designated sponsor by
25  the State Department, what are the
```

Page 152

```
 1  requirements of you, Cultural Care, as a
 2  designated sponsor of the State Department?
 3      A. I think they are detailed in
 4  CFR 62.31. And so is there a specific area
 5  in particular that you're looking for an
 6  answer on? I mean, otherwise, we could read
 7  through the regulations, because they're
 8  extensive when it comes to the
 9  responsibilities of the program sponsor.
10      Q. Okay. Well, let's talk about
11  "Program Eligibility," so that would be
12  section (c), and "Au Pair Selection."
13      Can you talk about what the
14  requirements are? And if you need to
15  reference the document, that's fine. But
16  what are the requirements for sponsors under
17  the regulations?
18      MS. LUKEY: Specifically, with
19  regard to subsection (c)?
20      MS. SMALLS: Yes.
21      A. Again, given how extensive and
22  specific they are, there is nothing that I
23  would testify to that would be different than
24  what would be included here.
25      So if you want me to recite this,
```

Page 153

```
 1  I'm happy to read through it. But my
 2  knowledge is consistent with exactly what's
 3  written here.
 4      Q. Is it your understanding that these
 5  regulations mandate or provide certain
 6  requirements for au pair recruitment and
 7  screening?
 8      A. It's my understanding that these
 9  regulations provide provisions for au pair
10  selection and au pair placement.
11      Q. Okay. Well, let's go to (d)(5),
12  just by example. Can you either read out
13  loud or state what that requirement provides?
14      A. We're at (d)(5)?
15      Q. Yes.
16      A. "In addition to satisfying the
17  requirement of 62.10(a), sponsors shall
18  ensure that all participants in a designated
19  au pair exchange program: Have been
20  personally interviewed, in English, by an
21  organizational representative who shall
22  prepare a report of the interview which shall
23  be provided to the host family."
24      Q. Okay. Who is the organizational
25  representative of Cultural Care, Inc. that
```

MAGNA
LEGAL SERVICES

---

**Page 154**

1　ensures that the au pairs have been
2　personally interviewed in English?
3　　　A. This is conducted by ICL.
4　　　Q. And ICL is a Swiss entity?
5　　　A. Yes.
6　　　Q. Is a requirement of being
7　designated a sponsor that you be a U.S.
8　organization?
9　　　A. I believe so, yes.
10　　　Q. And if we go back to the beginning
11　of "Au Pair Selection," it states here that
12　"sponsors shall ensure that all participants
13　in a designated au pair exchange program,"
14　going to section (5), "have been personally
15　interviewed, in English, by an organizational
16　representative."
17　　　　　Is Cultural Care, Inc. the
18　designated sponsor by the Department of
19　State?
20　　　A. Yes.
21　　　Q. Is ICL or Cultural Care Limited the
22　designated sponsor --
23　　　A. No.
24　　　Q. -- by the Department of State?
25　　　　　Who at Cultural Care, Inc. ensures

---

**Page 155**

1　that all participants have been all
2　interviewed in English by an organizational
3　representative?
4　　　A. As I testified to earlier, we have
5　an operations team that reviews the
6　applicant's file once they have been
7　preliminarily accepted by ICL. And upon that
8　final review, it's determined that they are
9　accepted for presentation to host families.
10　　　　　So at that point there would be a
11　review of the application to ensure that all
12　of these requirements have been met,
13　included, but not limited to, (d)(5).
14　　　Q. In (d)(5) when it refers to
15　"organizational representatives," what
16　organization do you think it's referring to
17　there? Or how do you read "organization"
18　there?
19　　　　MS. LUKEY: Objection.
20　　　A. Who do I think that refers to?
21　　　Q. What organization -- sorry.
22　　　　What organization is the regulation
23　referring to when it says that au pairs are
24　to be interviewed by an organizational
25　representative?

---

**Page 156**

1　　　　MS. LUKEY: Objection.
2　　　A. We would take the position that
3　it's not referring to any specific
4　organization but more to the requirement on
5　the part of the sponsor in ensuring that the
6　au pair applicants meet these requirements.
7　　　Q. So your interpretation of this
8　regulation is that this regulation is
9　requiring that the sponsor ensure that the
10　au pair was interviewed in English but not
11　personally undertake it themselves?
12　　　A. It's my understanding that in
13　reading this part of the regulations that the
14　requirement is that the sponsor must ensure
15　that the candidate meets these screening
16　criteria. That the organization is not
17　specifically spelled out in terms of who has
18　to conduct that interview, but that the
19　personal interview in English must be
20　conducted.
21　　　　And as a program sponsor, we need
22　to ensure that that has taken place, and
23　we're held responsible that the au pairs that
24　we make available to families have fulfilled
25　all of these requirements.

---

**Page 157**

1　　　Q. So I'm going to ask you to read
2　that sentence again. So (d)(5)?
3　　　A. "Have been personally interviewed,
4　in English, by an organizational
5　representative who shall prepare a report of
6　the interview which shall be provided to the
7　host family."
8　　　Q. Okay, "by an organizational
9　representative," does that modify "personally
10　interviewed"?
11　　　　MS. LUKEY: Objection.
12　　　A. I'm not sure I understand the
13　question.
14　　　Q. What does "ensuring that an au pair
15　has been personally interviewed by an
16　organizational representative" mean to you?
17　　　　MS. LUKEY: Objection.
18　　　A. That we're able to see verification
19　that interview has taken place for each
20　applicant.
21　　　Q. Notwithstanding the fact that it
22　says "personally interviewed," you take the
23　position that that means you seek
24　verification that an interview occurred in
25　English?

---

| Page 158 | Page 160 |
|---|---|
| 1     MS. LUKEY: Objection.<br>2    A. Can you repeat your question?<br>3    Q. What is the organization referred<br>4 to in by "organizational representative"?<br>5    MS. LUKEY: Objection. I realize<br>6    we've reserved, but the asked and<br>7    answered is getting a little bit<br>8    repetitive here. There is a finite<br>9    period; at seven hours we will stop.<br>10    It's up to you how you use it, but she's<br>11    answered that already.<br>12    Q. Who is the Cultural Care<br>13 representative that does the interviewing of<br>14 the au pair in English?<br>15    MS. LUKEY: Objection.<br>16    A. The interviewing takes place by<br>17 International Care Limited.<br>18    Q. And International Care Limited is a<br>19 Swiss company, correct?<br>20    A. Yes.<br>21    Q. Is International Care Limited a<br>22 designated sponsor by the U.S. Department of<br>23 State?<br>24    MS. LUKEY: Objection.<br>25    A. No. | 1 read that last entry under "Nannies."<br>2    A. The footnote or the section<br>3 preceding that?<br>4    Q. The salary negotiations, and then<br>5 because it is encompassed by the footnote,<br>6 you can also read the footnote.<br>7    A. Okay. "'Salary negotiations are a<br>8 hassle.' All au pairs earn a weekly stipend<br>9 of $195.75 which is determined by the U.S.<br>10 Department of State."<br>11    And the footnote reads, "The weekly<br>12 stipend is determined by the U.S. Department<br>13 of State using a formula based on the federal<br>14 minimum wage. Any change in the federal<br>15 minimum wage will result in increase in the<br>16 stipend."<br>17    Q. Okay. It states here that "All<br>18 au pairs earn a weekly stipend of $195.75."<br>19    It does not state that it is<br>20 subject to a minimum; is that correct?<br>21    MS. LUKEY: Objection.<br>22    A. It neither states a minimum nor a<br>23 maximum. So it's a factual statement that at<br>24 a minimum all au pairs would receive a weekly<br>25 stipend in that amount. |

| Page 159 | Page 161 |
|---|---|
| 1    Q. Thank you.<br>2    (Document marked for<br>3    identification as Jordan Exhibit 10)<br>4    Q. Are you familiar with this<br>5 document?<br>6    A. I can't say that I'm well versed in<br>7 this document in particular, but it certainly<br>8 looks familiar, though the pixilated images,<br>9 seem -- I'm not quite sure what version of<br>10 something I'm looking at, or if that's a<br>11 result of how things are printing out.<br>12    But due to that, I can't quite<br>13 confirm that I'm familiar with this.<br>14    Q. It is similar -- what is this<br>15 document? Upon reviewing it, what does it<br>16 appear to be?<br>17    A. It appears to be a piece that is<br>18 for prospective hosting families to consider<br>19 whether the program may be a fit for them.<br>20    Q. So this is a prospectus for<br>21 prospective host families?<br>22    A. That's what I understand it to be,<br>23 yes.<br>24    Q. I'll direct you to it's Page 4, but<br>25 Cultural Care 818 in the corner, if you can | 1    Q. This document is meant for<br>2 prospective host families, correct?<br>3    A. Yes.<br>4    Q. Is there anything in this<br>5 discussion of stipend that suggests that<br>6 there is a minimum or a maximum?<br>7    A. It neither states a minimum nor a<br>8 maximum. Though, again, it's a factual<br>9 statement that because it's a minimum, all<br>10 au pairs would receive $195.75.<br>11    Q. What does "minimum" mean to you?<br>12    A. At least.<br>13    Q. Can you read that sentence again,<br>14 "All au pairs?<br>15    MS. LUKEY: Objection.<br>16    A. "All au pairs earn a weekly stipend<br>17 of $195.75 which is determined by the U.S.<br>18 Department of State."<br>19    Q. Can you tell me what part of that<br>20 sentence suggests that there is a minimum and<br>21 a maximum that people can pay at least<br>22 $195.75, or that there is any variation with<br>23 a set stipend of $195.75?<br>24    MS. LUKEY: Objection.<br>25    A. It's a fairly short sentence that |

PLAINTIFFS' RESP. APP.0004456

MAGNA
LEGAL SERVICES

| Page 162 | Page 164 |
|---|---|

**Page 162**

1  says exactly what it says.  It doesn't go on
2  to any additional information at that point.
3       Q.  Okay, thank you.
4            (Document marked for
5       identification as Jordan Exhibit 11)
6       Q.  Are you familiar with this
7  document?
8       A.  Yes.
9       Q.  What is this?
10      A.  This is a host family brochure from
11  2011.
12           MS. SMALLS:  For those on the
13      phone, it's Cultural Care 501.
14      Q.  And if you can just note the logo
15  on the top left of the document?
16      A.  It is "Cultural Care Au Pair."
17      Q.  And the year?
18      A.  2011.
19      Q.  I'm going to direct you to page --
20  it's Page 10 of the document and Bates number
21  CC510.
22      A.  (Complies.)
23      Q.  The second paragraph under "Host
24  Families" -- "Host Family Responsibilities."
25           First, can you tell me what the

**Page 163**

1  title of the page is?
2       A.  The title of the page is "Becoming
3  a host family."
4       Q.  And then can you read what it says
5  under that?
6       A.  "We ensure families know their
7  responsibilities for the exchange year."
8       Q.  Under "Host Family
9  Responsibilities," there is a sentence that
10  begins with "Au pairs."  Can you read that?
11      A.  Is it in the first paragraph under
12  "Host Family Responsibilities" or the second?
13      Q.  Yes.  The first paragraph under
14  "Host Family Responsibilities."  It's I
15  believe the third sentence, and it begins
16  with "Au pairs."
17      A.  "Au pairs currently receive a
18  weekly stipend of $195.75 from the host
19  family."
20      Q.  Is there a footnote associated with
21  that note regarding stipend?
22      A.  No.
23      Q.  Is there any additional information
24  about a minimum or a maximum associated with
25  that note about stipend?

**Page 164**

1       A.  I don't see any note.
2            (Document marked for
3       identification as Jordan Exhibit 12)
4       Q.  Are you familiar with this
5  document?
6       A.  Yes.
7       Q.  What is it?
8       A.  This was a smaller brochure.
9       Q.  And on the bottom, there is a blue
10  bar.
11           MS. SMALLS:  And for those on the
12      phone, we're at Cultural Care 640.
13      Q.  The last box, it appears that this
14  box is a breakdown of costs for the host
15  family; is that correct?
16      A.  Yes, that's correct.
17      Q.  What does the last box say?
18      A.  It says, "$195.75 stipend
19  multiplied by 51 weeks."  Under that, "The
20  stipend is paid directly to your au pair each
21  week."
22      Q.  Is there anything about a minimum
23  or a maximum here in the recitation or the
24  accounting of the stipend?
25      A.  There is not.  But it's important

**Page 165**

1  to note that this is a section trying to
2  share the average cost of the program.  And
3  so using the minimum here as a baseline for
4  that helps to come up with a number that a
5  family can then use to determine whether this
6  is something to consider from that
7  perspective.
8            (Document marked for
9       identification as Jordan Exhibit 13)
10      Q.  Are you familiar with this
11  document?
12      A.  I don't believe that this is a
13  document.
14      Q.  What is it?
15      A.  I believe this is information
16  pulled from an online site.
17      Q.  Do you know what site?
18      A.  I believe this is from the
19  CulturalCare.com website.
20      Q.  There is a date stamp on the bottom
21  right of this document that shows when this
22  document was printed from your website.
23           Can you read what that date was?
24      A.  Bottom right on the front?
25      Q.  Yes, right on the front.  Thank

PLAINTIFFS' RESP. APP.0004457

MAGNA
LEGAL SERVICES

| Page 166 | Page 168 |
|---|---|

**Page 166**

1   you.
2       A. 4/12/2017.
3       Q. And then if we can turn to Page 3.
4       A. (Complies.)
5       Q. Can you read what it says with
6   respect to the "Au Pair Weekly Stipend"?
7       A. It reads, "The weekly stipend is
8   paid by you directly to your au pair for 51
9   weeks, including two weeks of paid vacation."
10      Q. And what does it say under that?
11      A. "Weekly $195.75."
12      Q. Is there any indication about the
13  $195.75 being a minimum or a maximum?
14      A. No.
15      Q. Okay, thank you.
16          (Document marked for
17      identification as Jordan Exhibit 14)
18      Q. Do you recognize this document?
19      A. Yes.
20      Q. And what is it?
21      A. Well, it's not a document, but
22  rather it is taken from the website.
23  Specifically, it looks like it's taken from a
24  recruitment website overseas.
25      Q. Well, is the website overseas?

**Page 167**

1       A. It's my understanding that this
2   website would be an overseas website. It's a
3   recruitment page.
4       Q. So this website was printed from
5   the Cultural Care Au Pair website?
6       A. You can access, if you're
7   interested -- if you find yourself on the
8   CulturalCare.com website, you could navigate
9   on the bottom it would say "Interested in
10  becoming an au pair," and it would take you,
11  then, to the recruitment website in that
12  native country -- or in the native language
13  of that country.
14      Q. Is it your site?
15      A. No.
16          MS. LUKEY: I'm sorry, is which?
17      Q. As I understand it, you're saying
18  if you go to CulturalCare.com and there is a
19  link that says "Interested in becoming an
20  au pair." If you click the link on
21  "Interested in becoming an au pair," it leads
22  to this page; is that correct?
23      A. It leads to this website.
24      Q. It leads to this website?
25      A. Yes.

**Page 168**

1       Q. Okay. So this is a completely
2   different website than the CulturalCare.com
3   website?
4       A. Yes.
5       Q. But they're linked?
6       A. You can access one from the other,
7   but they are two different websites.
8       Q. Okay, thank you.
9          (Document marked for
10      identification as Jordan Exhibit 15)
11      Q. Are you familiar with this
12  document?
13      A. I'm not familiar with this
14  particular au pair's file, so I want to be
15  clear on what you're asking.
16      Q. Is this a standard au pair
17  agreement?
18          I'm not asking any specific
19  questions with respect to this specific
20  au pair. I'm asking -- my questions are
21  going to be related to this agreement.
22          So I'm asking, is this a
23  representative agreement that is signed by an
24  au pair?
25      A. I believe so, yes.

**Page 169**

1       Q. And who is -- again, if you can go
2   to the top logo on the top left, what appears
3   there on the top left of the au pair
4   contract?
5       A. On the top of the agreement it says
6   "Cultural Care Au Pair."
7       Q. Okay, thank you. And then under
8   "Agreement," this is an agreement between
9   Cultural Care Au Pair and the au pair; is
10  that correct?
11          MS. LUKEY: Objection.
12      A. It appears to be an agreement
13  between ICL and the au pair.
14      Q. Okay. If you can read that first,
15  before the name, the language of the
16  agreement before the name of the au pair?
17      A. Out loud?
18      Q. Out loud, thank you.
19      A. "Cultural Care (registered business
20  name of International Care Limited), with
21  registration number CH-1003.023.491-6, having
22  its registered address at Haldenstrasse 4,
23  6006 Lucerne, Switzerland, together with its
24  successors and assignees ('CC') and the
25  undersigned au pair."

PLAINTIFFS' RESP. APP.0004458

MAGNA
LEGAL SERVICES

| Page 170 | Page 172 |
|---|---|
| 1  Q. Can you tell me what "Successors<br>2  and assignees" in this document refers to?<br>3  A. I don't know.  As a designee for<br>4  Cultural Care, Inc., I can't speak to that<br>5  kinds of things within this agreement.<br>6  Q. If you can go to section 3, the<br>7  last sentence, if you can read out loud that<br>8  last sentence of the au pair agreement out<br>9  loud.<br>10  A. "I will inform my Local Childcare<br>11  Coordinator or CC if I encounter anything<br>12  that does not comply with the Program<br>13  regulations as outlined by the U.S.<br>14  Department of State regulations."<br>15  Q. Does ICL have local childcare<br>16  coordinators?<br>17  A. No.<br>18  Q. What entity has local childcare<br>19  coordinators?<br>20  A. Cultural Care, Inc.<br>21  Q. Now, let's go down to Section<br>22  Number 8, and if you can read out loud --<br>23  well, it might be easier just to read all of<br>24  Section 8 out loud.<br>25  A. "I understand that my Local | 1  paragraph?<br>2  A. Cultural Care, Inc.<br>3  Q. Can you go back up to the top of<br>4  the agreement and read the definition for<br>5  "CC"?  Prior to the quotation marks.<br>6  How does the agreement define "CC"?<br>7  A. It comes after the term<br>8  "assignees."  It comes after the term<br>9  "successors and assignees."<br>10  Q. Is Cultural Care, Inc., a successor<br>11  and assignee of this au pair agreement?<br>12  MS. LUKEY:  Objection.<br>13  A. I don't know.<br>14  (Document marked for<br>15  identification as Jordan Exhibit 16)<br>16  MS. LUKEY:  Dawn, at a convenient<br>17  moment for you, perhaps we can take a<br>18  break.  It's been about an hour and ten<br>19  minutes.  I'm guessing that folks might<br>20  want to take a break.  In fact, our<br>21  reporter could use me turning down the<br>22  air condition -- the temperature.<br>23  MS. SMALLS:  I'll be quick with<br>24  this and then we can take a break.<br>25  MS. LUKEY:  Thanks. |

| Page 171 | Page 173 |
|---|---|
| 1  Childcare Coordinator and the Cultural Care<br>2  staff in the U.S. are my primary contacts<br>3  during the Program, and are responsible for<br>4  ensuring a positive and successful program<br>5  year for me and my host family.  I will<br>6  notify the staff of CC in the U.S. in case of<br>7  disagreement, misunderstanding or serious<br>8  problems including but not limited to my<br>9  health, safety, welfare, adjustment to my<br>10  host family, school, culture or language, or<br>11  misunderstandings or problems with my host<br>12  family.  I acknowledge that CC is solely<br>13  responsible for choosing appropriate host<br>14  families for me and I will not make attempts<br>15  to obtain placements on my own after my<br>16  arrival in the United States.  In situations<br>17  where I am having problems with my host<br>18  family, I agree to consult with and meet with<br>19  my Local Childcare Coordinator and to follow<br>20  CC's mediation guidelines as outlined in the<br>21  Au Pair Handbook.  I understand that it is<br>22  CC's policy to try to resolve issues in the<br>23  existing placement if possible before<br>24  considering a new placement."<br>25  Q. Who is the "CC" referred to in that | 1  BY MS. SMALLS:<br>2  Q. Are you familiar with this<br>3  document?<br>4  A. I'm not sure what this is.<br>5  Q. You've never seen it before?<br>6  A. It doesn't look familiar to me.<br>7  Q. Okay.  On the second page, can<br>8  you -- there is a section that says "Weekly<br>9  Stipend."  Can you read what that says out<br>10  loud?<br>11  A. I'm trying to find it.<br>12  Q. It's right under "Transition," and<br>13  CC1651 under "2016 Finances," there is a<br>14  section that says "Weekly Stipend."<br>15  MS. LUKEY:  Can you point to it?<br>16  I'm not finding it, either.<br>17  A. It says, "Weekly stipend:  $195.75<br>18  paid directly from the host family to the<br>19  au pair each week."<br>20  Q. Does this document say anything<br>21  about a minimum or a maximum?<br>22  A. No, it does not.<br>23  Q. Okay, thank you.<br>24  MS. SMALLS:  We can take a break.<br>25  MS. LUKEY:  Thank you.  We can keep |

MAGNA
LEGAL SERVICES

| Page 174 | Page 176 |
|---|---|

**Page 174**

```
 1      it short.  I just thought we'd try to
 2   adjust the temperature.
 3          VIDEO TECHNICIAN:  Off the record
 4   at 2:16.
 5          (Proceedings recessed at 2:16 p.m.,
 6      and reconvened at 2:28 p.m.)
 7          VIDEO TECHNICIAN:  We're back on
 8   the record at 2:28 p.m.
 9   BY MS. SMALLS:
10      Q.  I'm going to refer you to
11   Exhibit 6.  And ask you to turn to Page 13.
12          MS. SMALLS:  For those on the
13   phone, this is Cultural Care 341.
14      A.  I'm sorry, what page again?
15      Q.  13.
16          Can you tell me what this document
17   is, this page, what it represents?
18      A.  This is an overview of the
19   screening and matching process.
20      Q.  Okay.  I'm going to use this
21   document as just a map to kind of walk
22   through the process.
23      A.  Okay.
24      Q.  So -- well, let me ask you first,
25   is this representative of the process for
```

**Page 175**

```
 1   both an au pair and a host family?  Is there
 2   anything you want to amend or add to this
 3   chart?
 4      A.  Yeah, I think in general it
 5   accurately reflects the process.
 6      Q.  So the first box says
 7   "Pre-Application."  Can you tell me what
 8   occurs in the pre-application phase?
 9      A.  So this process all happens through
10   ICL, so I could tell you to the best of my
11   knowledge.
12      Q.  Well, if you can indicate for --
13   again, we're referring to Page 13, CC341.
14   The document is entitled "The Screening and
15   Matching Process."
16          If you can just specifically out
17   loud indicate which pieces of this that you
18   just indicated are handled by ICL?
19      A.  Well, the pre-application, and then
20   screening and orientation meeting, and then
21   the application submission.
22      Q.  Okay.
23      A.  They continue to provide support
24   throughout the placement process for the
25   au pair, meaning that they remain available
```

**Page 176**

```
 1   and they may still be corresponding with
 2   them.  But the distinction, primarily, is in
 3   these first three boxes.
 4      Q.  So, I'm sorry, you said there was
 5   continued support for the au pair during what
 6   process?
 7      A.  So there is the first three boxes
 8   are all preliminary, right?  And then once
 9   they're engaged in the matching process, ICL
10   remains in contact with the au pair to make
11   sure that they are supported, answering
12   questions, because they haven't secured a
13   confirmed placement necessarily as of yet.
14   So until they leave the country, there may be
15   considerable involvement.
16      Q.  Once they leave the country, is ICL
17   still involved with the au pair?
18      A.  Minimally, but yes.  They remain
19   available for outreach if the au pair chooses
20   to contact them.  But their primary contacts
21   then shift over to the U.S.-based support
22   network.
23      Q.  Thank you.  So on this chart where
24   it says "Host family and au pair
25   pre-matched," is this Cultural Care, Inc.?
```

**Page 177**

```
 1   Is that the entity that is primarily
 2   responsible for host family and au pair
 3   pre-match?
 4      A.  Yes, in part.  The host family is
 5   engaging in the placement process at this
 6   point.  A placement manager is working with
 7   the host family during this process.
 8          The au pair, again, is still in
 9   their home country, and so it doesn't live
10   alone in one entity versus the other.
11          This is why I wanted to clarify
12   before that it's not that ICL drops off at
13   this point and CCI just takes over, but this
14   is a situation where we're supporting and
15   talking to the family.  ICL is supporting and
16   talking to the au pair throughout this
17   process until it's confirmed.
18      Q.  Okay.
19      A.  Does that make sense?
20      Q.  It does.
21          So just to clarify, under this box
22   "Host family and au pair pre-match," that
23   includes activities by -- or actions by
24   Cultural Care, Inc. and ICL?
25      A.  Yes.
```

PLAINTIFFS' RESP. APP.0004460

**MAGNA ►**
**LEGAL SERVICES**

Page 178

1    Q.  And if you can just break down,
2  because I'm seeing the next box says "Host
3  family reviews application." Can you talk a
4  little bit more in detail about that process,
5  the loading of the application on the website
6  and whatever -- once ICL completes its
7  portion of the process, where do you -- where
8  does Cultural Care, Inc. begin the process
9  with an au pair, and what do you do?
10    A.  I want to make sure I'm answering
11  the question you're asking, because it kind
12  of started --
13    Q.  Okay.  Where does Cultural Care,
14  Inc. engage with an au pair in this process?
15    A.  In this process, once the au pair's
16  application has been put into a preliminary
17  status which indicates that it has passed
18  through the ICL screening process and they
19  are presenting to Cultural Care for final
20  acceptance, once that au pair is finally
21  accepted as an appropriate applicant or
22  potential au pair for us to present to
23  families, that au pair's file, the status
24  changed to allow it to be visible in the
25  system that the family can access in order to

Page 179

1  review au pair files.
2    Q.  So what does Cultural Care, Inc. do
3  between -- with that file between when that
4  au pair is pending and approved?
5    A.  What do we do with that file
6  between when it's in that -- the status in
7  between ICL saying we think this candidate is
8  acceptable and when we agree to the same?
9    Q.  What are the considerations?  What
10  are you reviewing?  What is the process you
11  are undertaking to take an au pair from its
12  preliminary process, preliminary status by
13  ICL to approved status by Cultural Care,
14  Inc.?
15       MS. LUKEY:  Objection.
16    A.  Cultural Care, Inc. staff would do
17  a final review of the application materials
18  to make sure that they are consistent with
19  the State Department regulatory requirements.
20    Q.  And what does that review consist
21  of?
22    A.  Reading through the application.
23    Q.  Is there anything additional
24  besides reviewing -- reading the application
25  that has been provided by ICL that occurs

Page 180

1  by -- that is conducted by Cultural Care,
2  Inc. staff?
3    A.  No.  It's a review of the
4  materials.
5    Q.  And what are they looking for when
6  they're reviewing the materials?
7    A.  They're looking for a number of
8  factors.  There is the regulatory compliance
9  double-check, but also to make sure that
10  information is clear, that there is not
11  information in there that would naturally
12  lead to a question or concern on the part of
13  the family that we can have clarified, or if
14  there is information for which we feel there
15  could be further disclosure information in
16  the letter, for example, to expand on a
17  particular thing that we think might be
18  helpful for a family to better understand.
19  Those would be the kind of non-regulatory
20  things that we would look at.
21    Q.  Is the primary purpose of that
22  review to ensure compliance of the
23  regulations, or is the primary purpose of
24  that review to make the package presentable
25  for host families?

Page 181

1    A.  It's both.
2    Q.  So once Cultural Care approves an
3  au pair application in the system, what
4  happens?
5    A.  So once that au pair is approved,
6  they are changed to a status that makes them
7  then available in the matching system that
8  the family would utilize to search for
9  potential au pairs to review and to consider
10  welcoming to their family.
11    Q.  And then once an au pair is matched
12  with a host family, what occurs then?
13    A.  So when a -- in general, when a
14  family and an au pair are matched together,
15  the family is reviewing the au pair
16  materials.  The au pair can see information
17  about the family as well, and they will
18  engage in -- hopefully, if the family is
19  interested in the au pair, they'll reach out
20  to the au pair to schedule a time to speak
21  with them.
22       Sometimes it is -- they always have
23  to have, of course, a conversation, a live
24  conversation before a placement can move
25  forward, but we find oftentimes people are

Case 1:14-cv-03074-CMA-KMT   Document 859-23   Filed 03/17/18   USDC Colorado   Page 253 of 310

Page 182

1  using Skype video, face time video to get to
2  know each other and to start an introduction.
3      Q.  So after the telephone or face time
4  interview or discussion, there is two boxes
5  here, one, there is an accepted match or one
6  the host family or the au pair reject each
7  other.  Can you walk me through the process
8  for each of those scenarios?
9      A.  Yeah, so this is a process that can
10 be repeated and is commonly repeated over and
11 over until both the family and au pair feel
12 that it's the right placement for each other.
13      So if an au pair says this is not
14 the family for me, or this isn't the region
15 for me, or there is something about this
16 placement that I'm not interested in, then
17 she can express that and then she would be
18 removed from the host family's account, or
19 the family would let us know that they're not
20 interested in pursuing this particular
21 candidate and the watch would be removed from
22 their account and the process would repeat
23 itself.
24      Q.  So assuming that this process will
25 continue until both a host family and an

Page 183

1  au pair accept each other, what happens once
2  a host family and an au pair both decide that
3  there is a match?
4      A.  So then the match is confirmed.
5  And what that means is that the status for
6  both the au pair and host family is updated
7  to reflect that they have mutually agreed to
8  the placement.  Then the process would begin
9  for the au pair to obtain her visa and for
10 the flight arrangements to start being made,
11 and for the -- a determination is made on the
12 time frame of when the au pair would travel.
13      So it's not only confirmed that,
14 yes, this is a good match for each other, but
15 also what's the right time for this match to
16 actually take place.  So they confirm that.
17 And then all of the details that go into
18 ensuring that start to go into place.
19      So including sending the form so
20 that she can make an appointment at the
21 embassy in her home country, and also
22 confirming that there will be a spot for that
23 au pair at the school and starting to plan
24 out the schedule of events that will take
25 place with the family in terms of the

Page 184

1  understanding that there will be a two-week
2  orientation done within 14 days of the
3  au pair's arrival, a phone call within 48
4  hours of the au pair's arrival.
5      All of those things start to be
6  formalized and put into place so people know
7  what to expect as the arrival of that au pair
8  comes closer.
9      Q.  And what do you mean those things
10 are formalized as you get closer to the
11 arrival date of the au pair?
12      A.  So if I know that an au pair is
13 arriving to my home December 1, then I know
14 that within 14 days of that I'm going to have
15 a meeting with my LCC and my au pair in my
16 home to fulfill the regulatory requirement
17 for that meeting, but also in order to
18 hopefully be set up for a successful
19 experience now that the au pair has arrived
20 in my home from there.
21      So that's what I mean.  The
22 schedule starts to become formalized.  The
23 au pair is going to fly to the U.S. on this
24 date, go to the school on these dates, go to
25 my family's home on this date, and there are

Page 185

1  going to be meetings that happen as a result
2  of that.
3      Q.  So can you walk me through what
4  happens with a -- once the au pair arrives in
5  the United States, what is her schedule, his
6  or her schedule?  You mentioned a two-week
7  check-in.  There were a number of other
8  things that were included in your last
9  answer.
10      Can you walk through what are the
11 programatic steps that happen for both
12 au pair and family once she arrives in the
13 United States?
14      A.  So all of the au pairs on the
15 Cultural Care program fly into New York.
16 They're then transported from the airport to
17 the au pair training school location.  And
18 depending on what their country of origin is,
19 most au pairs arrive on Monday, some arrive
20 on Sunday if they are from a bit further
21 away.  And they spend Monday through Friday
22 at the training facility where they go
23 through the required child safety and
24 development curriculum.  Then they depart to
25 go to their host family on that Friday.

PLAINTIFFS' RESP. APP.0004462

MAGNA
LEGAL SERVICES

Page 186

```
 1          Within 48 hours of the au pair's
 2  arrival to the host family home, they receive
 3  a phone call from the LCC to check in.  And
 4  then within 14 days of their arrival, they
 5  will have an orientation meeting with that
 6  LCC, the family, and the au pair.
 7          Q.  I'm sorry.  It was 48 hours for a
 8  check-in call, and then what was the time
 9  frame for the meeting?
10          A.  And then within 14 days of the
11  au pair's arrival, there will be an in-person
12  meeting.
13          Q.  For the au pair training that's
14  Monday through Friday, are the au pairs paid
15  for that training?
16          A.  No.
17          Q.  Do they receive a stipend or any
18  other compensation for that training?
19          A.  No.
20          (Document marked for
21  identification as Jordan Exhibit 17)
22          Q.  Are you familiar with this
23  document?
24          A.  Yes.
25          Q.  Can you tell me what the
```

Page 187

```
 1  designation on the top left is for this
 2  document, the logo?
 3          A.  "Cultural Care Au Pair."
 4          Q.  And then when it says "Mail to,"
 5  can you read that address?
 6          A.  "Cultural Care Au Pair, One
 7  Education Street, Cambridge, Massachusetts
 8  02141."
 9          Q.  Are you familiar with that address?
10          A.  Yes.
11          Q.  Whose address is that?
12          A.  For Cultural Care, Inc.
13          Q.  Can you tell me what this document
14  is?
15          A.  Sure.  This is the two-week
16  orientation form.
17          Q.  And what is it used for?
18          A.  It is used for that meeting that I
19  indicated takes place within 14 days of the
20  au pair's arrival.  It's also used to confirm
21  the 48-hour call that was made to check in
22  with the au pair.
23          Q.  And this is a form that is filled
24  by the LCC?
25          A.  Yes.  It's filled out by the LCC,
```

Page 188

```
 1  but it's signed by the host parents, the
 2  au pair, and the LCC.
 3          Q.  And under Section Number II under
 4  "Schedule," what is the LCC's function under
 5  Section Number II?
 6          A.  Well, the form itself says, "Review
 7  weekly schedule and look at vacation
 8  schedule; discuss sick days and holidays."
 9          And then there are a series of
10  questions to be reviewed by the LCC.
11          Q.  And she is reviewing these
12  questions with the au pair and the host
13  family on behalf of Cultural Care Au Pair?
14          A.  The two-week orientation meeting is
15  conducted pursuant to the regulatory
16  requirement.  These questions, quite frankly,
17  are to the benefit of the family and the
18  au pair to make sure there is clarity on
19  these important issues to help them have a
20  successful experience together.
21          Q.  Is this form required by the
22  regulation?
23          A.  The meeting itself is required by
24  the regulations.  The format and the content
25  is not directed by the State Department.
```

Page 189

```
 1          Q.  So the second question under
 2  "Schedule," says "Does AP have copy of
 3  schedule - does HF make this available?"
 4          Who is that question directed to?
 5          A.  "AP" is au pair, and "HF" is host
 6  family.
 7          Q.  And then it says, "Will the
 8  schedule change frequently or at last
 9  minute?"
10          Who is that question directed to?
11          A.  These are questions intended to
12  spark discussion and confirmation amongst all
13  the parties present on these issues.
14          So "Will the schedule change
15  frequently or at the last minute," that's
16  directed to the family.  And the au pair may
17  have questions in response to whatever answer
18  they give.
19          So this is a meeting that takes
20  considerable time to go through because there
21  is a lot of material, and it's really
22  important that these issues are clear from
23  the start so that expectations are not
24  different from one another.
25          Q.  Can you read the last, out loud,
```

**MAGNA** ▶
LEGAL SERVICES

Page 190

1 the last line under "Schedule"?
2     A. "APs must be able to attend monthly
3 meetings with LCC - schedule must accommodate
4 these meetings and transportation must be
5 provided."
6     Q. Is that a requirement in the
7 regulation?
8     A. I believe that the regulations
9 spell out -- I don't believe the regulations
10 spell it out in this way.
11         Again, the monthly meetings are
12 required by Cultural Care Au Pair, not of --
13 CCI, not of the State Department. The State
14 Department requires monthly personal contact.
15 We require it be in the form of a meeting.
16     Q. Okay. So the monthly meetings with
17 the LCC are a Cultural Care Au Pair program
18 requirement?
19     A. Yes.
20     Q. And the requirement that the host
21 families must accommodate the monthly
22 meetings and that transportation must be
23 provided is a Cultural Care program
24 requirement?
25     A. Yes. As a participant on our

Page 191

1 program, au pairs you have to come to the
2 meetings; and families, you have to make sure
3 that the au pairs can get to the meetings.
4 You've got to modify your schedules and
5 you've got to make sure that they can get
6 there.
7     Q. Section III relates to car use. It
8 outlines some specific guidelines for the car
9 for both au pairs and host families.
10         Are these guidelines from the State
11 Department regulation, or are these
12 guidelines provided by Cultural Care Au Pair?
13     A. These are guidelines provided by
14 CCI.
15     Q. Okay. So these are Cultural Care,
16 Inc. program guidelines?
17     A. Correct.
18     Q. They are not included in the
19 regulation?
20     A. I don't believe the regulations say
21 anything with respect to car use.
22     Q. And then Section V relates to
23 health insurance. Who provides the insurance
24 for the au pairs?
25     A. Can you clarify? Do you mean

Page 192

1 between -- can you just clarify your
2 question?
3     Q. Who provides health insurance
4 coverage for their term as a participant in
5 the program?
6     A. I guess what I'm trying to clarify
7 is are you looking for the administrator of
8 the insurance program or --
9     Q. Okay. I'm looking for the entity
10 that is responsible for providing au pair's
11 basic insurance coverage.
12         MS. LUKEY: You're not looking for
13     the name of the insurance company,
14     you're looking for the --
15         MS. SMALLS: I'm not looking for
16     the name of the insurance company.
17         MS. LUKEY: Okay.
18     A. It depends on the year.
19     Q. Okay.
20     A. So as I had testified to earlier,
21 there was a point at which the insurance was
22 purchased by Cultural Care, Inc., and then it
23 was changed such that we contracted ICL for
24 the purchase of the insurance.
25     Q. So prior to 2010, it would have

Page 193

1 been Cultural Care, Inc. that would have
2 provided health insurance for au pairs?
3         MS. LUKEY: Objection.
4     A. No. Prior to 2010, Cultural Care,
5 Inc. would have purchased the insurance, but
6 it would have been provided by the insurance
7 company itself.
8     Q. Thank you. That's an important
9 distinction.
10         It would have been purchased by,
11 prior to 2010, the insurance would have been
12 purchased by Cultural Care, Inc. on behalf of
13 au pairs; is that correct?
14         MS. LUKEY: Objection.
15     Q. Let me rephrase.
16         Did Cultural Care, Inc. purchase
17 health insurance for au pairs at one point in
18 time?
19     A. Prior to 2010, Cultural Care, Inc.
20 purchased an insurance -- purchased insurance
21 that would be provided to au pairs on our
22 program.
23     Q. So Cultural Care, Inc. purchased
24 insurance on behalf of the au pairs during
25 the time frame that you referenced?

PLAINTIFFS' RESP. APP.0004464

MAGNA
LEGAL SERVICES

---

Page 194

1    MS. LUKEY:  Objection.
2    A.  Prior to 2010, Cultural Care
3  Au Pair purchased -- Cultural Care, Inc.
4  purchased the insurance that was utilized by
5  the au pairs on the program.
6    Q.  Okay, thank you.  And what about --
7    MS. LUKEY:  I just want to remind
8    you that the calendar year and the
9    fiscal year don't match, and it actually
10   means that the answer she's given is
11   correct for -- I think it's fiscal year
12   2011 that the change was made according
13   to the documents that you introduced
14   this morning, but that would have been
15   signed October of 2010.
16   MS. SMALLS:  Okay.
17   MS. LUKEY:  That's why I was
18   objecting.
19   MS. SMALLS:  Okay.
20  BY MS. SMALLS:
21   Q.  Notwithstanding the fiscal years,
22  there was a point in time when Cultural Care,
23  Inc. purchased insurance on behalf of
24  au pairs; is that correct?
25   A.  Yes.

---

Page 195

1    Q.  Okay.  And after that point in time
2  in 2010, or fiscal year 2011, whatever the
3  appropriate time frame is, who purchased
4  health insurance on behalf of au pairs?
5    A.  I'm sorry.  I missed the very last
6  part of that question.
7    Q.  Who purchased -- after that point
8  in time, 2010 slash -- I'm not sure what time
9  frame we're talking about -- fiscal year
10  2011, what Cultural Care entity purchased
11  insurance on behalf of au pairs?
12   A.  ICL.
13   Q.  Do you provide money or
14  compensation to ICL to provide health
15  insurance to au pairs?
16   A.  As part of the contracts, yes,
17  there is a provision for the cost or the
18  charge for the purchase of the insurance from
19  ICL.
20   Q.  Do au pairs also pay fees?
21   A.  Yes.
22   Q.  Do you know what those fees are
23  for?
24   A.  They are for a variety of things.
25  But for their program participation, there

---

Page 196

1  may be some services that are offered in
2  certain countries that they may have
3  additional fees associated with but for their
4  program participation and the support of the
5  local office.
6    Q.  Do the au pairs -- au pair fees,
7  include travel?
8    A.  When an au pair pays their program
9  fee, it's inclusive of a program that
10  provides travel for them.
11   So, meaning, they're paying a
12  program fee.  And for that program fee,
13  they're participating in a program that is
14  going to provide them with round trip
15  international airfare.
16   Q.  And for host family fees, do host
17  family fees also pay for travel?
18   A.  The host family fees are, again, a
19  combination of program services and benefits
20  that they receive over the course of a year,
21  and included in that is that they have an
22  au pair whose round trip international travel
23  is taken care of.
24   Q.  So going back to -- you talked
25  about the two-week check-in.  And then what

---

Page 197

1  happens after the two-week check-in?
2    A.  In what respect?
3    Q.  The schedule or the programatic
4  milestones for the au pair.  Let's just use
5  one year as a benchmark.  So 48 hours,
6  check-in call by LCC, two-week in-person
7  meeting with LCC.  What are the programatic
8  kind of benchmarks for an au pair for a host
9  family after that point?
10   A.  So there continues to be, then,
11  monthly check-ins.  And those, again, come in
12  the form of a monthly meeting.
13   If an au pair is not able to attend
14  a monthly meeting, then the LCC and the
15  au pair will connect separately in order for
16  the au pair -- for the LCCs to check-in.  The
17  same thing for the family.
18   So it's a separate check-in to make
19  sure that each program participant is okay
20  and to answer any questions that they may
21  have at that time.  And that continues on for
22  the course of the year.
23   The families are invited to
24  participate in a host family day conference.
25  Typically there are two that are offered per

---

PLAINTIFFS' RESP. APP.0004465

Page 198

1  year, and they are required to attend at
2  least one of them.
3         As the program goes, for everyone
4  there are unique experiences that every
5  program participant has. So there may be
6  times where they have a question or they need
7  support of some kind. They would reach out
8  to the LCC, or they would reach out to
9  someone at Cultural Care, Inc., and we would
10 address whatever their issue or concern is.
11        At some point through the year, the
12 au pair is going to take her vacation, and
13 there's just such a large scope of exactly
14 what happens throughout the course of a year.
15 I want to make sure that I'm staying focused
16 and --
17        Q. That's helpful.
18        A. -- and in the areas that are
19 relevant.
20        Q. Yes, thank you. So the monthly
21 check-in, you mentioned there is a monthly
22 check-in for the host family in addition to
23 the au pair.
24        A. That's correct.
25        Q. And the au pair check-in is

Page 199

1  mandated by the regulations; is that correct?
2         A. Yes, monthly personal contact for
3  both the family and the au pair is required
4  by the regulation.
5         Q. So the monthly check-in is required
6  for both host families and au pairs --
7         A. That's correct.
8         Q. -- by the regulation.
9         A. Mm-hmm.
10        Q. And then you mentioned two host
11 family days. Is that a Cultural Care Au Pair
12 requirement, or is that also required under
13 the regulation?
14        A. That's in the regulations.
15        Q. When the au pairs come to the
16 United States, you mentioned the Monday
17 through Friday training. Who conducts that?
18        A. Meaning the curriculum itself?
19        Q. Yes.
20        A. The instruction is provided by a
21 combination of people. We have residential
22 full-time Cultural Care, Inc. staff who
23 provide an overview and general support to
24 the au pairs during the week that they're
25 there.

Page 200

1         We have dedicated teachers who do
2  the instruction of the material itself, and
3  then we also have additional third parties
4  who come in. So the American Heart
5  Association comes in and provides CPR --
6  first aid and CPR certification for every
7  au pair who comes through the training
8  program.
9         Q. Are you familiar with the
10 curriculum for the training program?
11        A. Yeah, I have familiarity with it.
12        Q. Do you know if the stipend is
13 reviewed with the au pairs at the training
14 institute?
15        A. I don't know.
16            (Document marked for
17        identification as Jordan Exhibit 18)
18        Q. Are you familiar with this
19 document?
20        A. I'm not particularly familiar with
21 it, no. I can't say I recall having seen it,
22 but.
23        Q. Do you know what it is?
24        A. I do not. Some sort of a
25 presentation, I imagine.

Page 201

1         Q. Can you tell who it is directed to?
2  If you look on the first page it says
3  "Household Chores." And then it gives a
4  scenario "You are working 35 hours/week an
5  have lots of household chores besides your
6  childcare responsibilities."
7         A. I'm going to assume it's intended
8  for an au pair audience.
9         Q. Can you turn to page -- it's
10 Cultural Care 1466. Can you read that slide,
11 please?
12        A. Out loud?
13        Q. Out loud. Thank you.
14        A. "Au pair stipend. Scenario: Your
15 host family pays your weekly stipend of
16 $195.75 via check. Sometimes they forget to
17 pay you on time. You know your host family
18 is also super busy, but it is very
19 embarrassing to remind them. Discussion:
20 How would you talk to your host family about
21 your stipend payments?"
22        Q. Is there anything in this document
23 that indicates that the $195.75 is a minimum
24 or a maximum?
25        A. No.

MAGNA
LEGAL SERVICES

Page 202

1    Q.  And can you just affirm what the
2  logo is on the bottom left on this document?
3    A.  I think I missed a word there.
4    Q.  Sorry.
5    A.  The logo?
6    Q.  The logo on the bottom left, can
7  you confirm what that is?
8    A.  "Cultural Care Au Pair."
9    (Document marked for
10   identification as Jordan Exhibit 19)
11   Q.  Are you familiar with this
12  document?
13   A.  It is a series of three documents.
14  And, yes, I'm familiar.
15   Q.  And can you tell me what those,
16  since they are all stapled together, I'm only
17  going to refer to the first one.  But can you
18  just identify what those three documents are?
19   A.  The first document is a "6 month
20  extension host family agreement."
21   The second document is a "9 month
22  extension host family agreement."
23   The third document is a "12 month
24  extension host family agreement."
25   Q.  Can you go down to Section Number

Page 203

1  10 and read allowed Section Number 10?
2    A.  "Host agrees that the au pair's
3  duties are not to include heavy chores,
4  including, but not limited to, yard work,
5  window washing, or scrubbing floors.  The
6  au pair's duties shall be restricted to
7  childcare and responsibilities related to
8  care of the children, including light
9  housekeeping.  This may include active
10  duties, including, but not limited to,
11  general supervision of play, preparing
12  children's meals, straightening their rooms,
13  and doing the children's laundry; and passive
14  duties, such as being present when the
15  children are sleeping, which are considered
16  working hours."
17   Q.  Are these guidelines to host
18  families mandated by the regulation, or are
19  they Cultural Care Au Pair program
20  guidelines?
21   A.  They are a further clarification of
22  the State Department regulations with regard
23  to the scope of duties for au pairs.
24   MS. LUKEY:  I think we need to
25  change the tape, so why don't we take a

Page 204

1  break.
2    VIDEO TECHNICIAN:  We're off the
3  record at 3:12 p.m.
4    (Proceedings recessed at 3:12 p.m.,
5  and reconvened at 3:23 p.m.)
6    (Document marked for
7  identification as Jordan Exhibit 20)
8    VIDEO TECHNICIAN:  We're back on
9  the record at 3:23 p.m.
10  BY MS. SMALLS:
11   Q.  Are you familiar with this
12  document?
13   A.  Not particularly, no.
14   Q.  Can you just read the title of the
15  document?
16   A.  "Host Family Interview (New Host
17  Family)."
18   Q.  If you go to number 7, can you read
19  that first sentence.
20   A.  Out loud?
21   Q.  Out loud.
22   A.  "Au pairs must receive their weekly
23  stipend of $195.75 each week without
24  exception.  Families and au pairs should
25  clarify which day of the week is to be

Page 205

1  payday.  Families should either pay by check
2  or if using cash, have the au pair sign a
3  receipt, to ensure that the family can keep
4  records of payment.  An au pair's stipend
5  cannot be withheld for any reason, nor can a
6  family deduct other monies owed from the
7  stipend."
8    Q.  Is there anything about that
9  language that suggests that the $195.75 is a
10  minimum or a maximum?
11   A.  There is no reference to minimum or
12  maximum in this language.
13   Q.  Can you read section number 8,
14  please, out loud?
15   A.  "Au pairs can be responsible for
16  childcare and child-related household duties
17  such as tidying the playroom, doing the
18  children's laundry and preparing meals.
19  Au pairs may not do general cleaning or
20  housework or be given the care of pets or
21  other adults in the home as part of their
22  duties."
23   Q.  So the section about care of pets,
24  is that in the regulation or would that be
25  specific to Cultural Care?

## Page 206

1 A. There is no reference to pets in
2 any of the regulations, but the regulations
3 do speak to the scope of duties.
4 Q. Let's get back to the au pair that
5 is placed in a host family home.
6 A. Okay.
7 Q. Assuming they've been matched,
8 they've started with a family, what happens
9 if there is an issue either on behalf of the
10 au pair or the host family?
11 A. So if there is an issue or concern,
12 either the host family or the au pair would
13 typically reach out to the LCC as a first
14 contact, and to raise the concern based on
15 the nature of the concern, then the
16 appropriate steps would be put into place in
17 order to address it.
18 Q. What if it can't be resolved by the
19 LCC? What occurs after that?
20 A. Well, it depends. Do you mean that
21 it's an issue that it can't be resolved sort
22 of full stop, or that at the LCC level it's
23 not able to be addressed?
24 Q. If it ends up not being the match
25 that the au pair and the host family thought

## Page 207

1 it would be and there needs to be some sort
2 of separation, what occurs then?
3 A. So as a cultural exchange program,
4 there is a natural adjustment period for any
5 family and au pair. And in that time, there
6 may be issues or concerns that either one
7 express. And our hope is that we can,
8 through a process of communication, be able
9 to handle and address those situations.
10 Should there be an expression that,
11 you know what, I'm not sure this is going to
12 work for me by either the au pair or the host
13 family, we would initiate what we call the
14 mediation process. And that mediation
15 process involves a sit-down discussion with
16 the LCC, the family, and the au pair in the
17 host family home to talk about and put out in
18 the open what's the dispute here, what's the
19 concern, is there a way to address this.
20 We find oftentimes that by having
21 an open discussion about it, they actually
22 while having perhaps walked in thinking this
23 isn't going to work, after that may actually
24 be able to find a way to work with each
25 other, which, again, is at the core of

## Page 208

1 cultural exchange is understanding each
2 other.
3 But should you reach a point that
4 either party says this isn't going to work
5 for me long-term, then we would initiate the
6 transition process, which is a process by
7 which we would evaluate what has transpired,
8 determine whether we feel comfortable moving
9 forward with either or both parties, try to
10 address any outstanding concerns so that we
11 can provide closure to that relationship, and
12 then move forward with a -- if everyone is
13 going to be moving forward, move forward with
14 the replacement process for each party.
15 Q. Is the decision to separate solely
16 within the purview of the au pairs and the
17 host family?
18 A. Yeah, I mean it's a very, very
19 personal program. So if an au pair says
20 she's not comfortable and she doesn't want to
21 stay, we're not going to force her to remain
22 in that placement.
23 If a host family feels that this is
24 not the right situation for their family,
25 we're certainly not going to force them to

## Page 209

1 continue with a relationship they're not
2 comfortable with.
3 So absolutely it's up to the family
4 and au pair to let us know if that's not
5 working, and also to let us know that it is
6 working, which is why that monthly contact is
7 so important.
8 Q. Can Cultural Care pull an au pair
9 from a home, notwithstanding the wishes of an
10 au pair, and a host family?
11 A. Meaning that the au pair has not
12 requested to be removed?
13 Q. That's correct.
14 A. Yes. Under some circumstances, we
15 can and have done that.
16 (Document marked for
17 identification as Jordan Exhibit 21)
18 Q. Are you familiar with this
19 document?
20 A. It's a document from 2013, so I
21 think I need a minute to read through to
22 familiarize myself.
23 Q. Take your time.
24 A. (Document review.) It's very
25 difficult to remember a case from four years

MAGNA
LEGAL SERVICES

Page 210

1    ago, but certainly this is my name on the
2    e-mail correspondence, and...
3        Q.  Is the effect of this e-mail a
4    decision by Cultural Care, Inc. to send an
5    au pair home?
6        A.  It appears to be, yes.
7        Q.  Was this a decision by the host
8    family?
9        A.  The decision was not by the host
10   family.  It looks like the decision
11   ultimately was made by Cultural Care, Inc.
12       Q.  I'd also ask you to identify who
13   the e-mail is from and to?
14       A.  It is from Katie Reed, and it is to
15   myself, Natalie Jordan.
16       Q.  And what is the e-mail address for
17   Natalie Jordan?
18       A.  @EF.com.
19       Q.  And what's the date on the e-mail?
20       A.  June 21, 2013.
21       Q.  Okay, thank you.
22           (Document marked for
23       identification as Jordan Exhibit 22)
24       Q.  Who is Katie Reed?
25       A.  Pardon?

Page 211

1        Q.  Katie Reed, who is Katie Reed?
2        A.  She's a staff member of Cultural
3    Care, Inc.
4        Q.  Responsible for what?
5        A.  She's a vice president of U.S.
6    operations.
7        Q.  And what does U.S. operations do
8    again?
9        A.  So her area of responsibility is
10   with a region of the United States where the
11   monitoring and case management would take
12   place for placements of au pairs and
13   families.
14       Q.  I'll allow you to review the rest
15   of the document.
16       A.  (Document review.)  Okay.
17       Q.  Is this another example of Cultural
18   Care pulling an au pair out or sending an
19   au pair home?
20       MS. LUKEY:  Objection.
21       A.  I don't think that the entirety of
22   this case is represented in this e-mail, so I
23   can't say definitively what this is an
24   example of without knowing all of the
25   details.

Page 212

1        Q.  Okay.
2            (Document marked for
3        identification as Jordan Exhibit 23)
4        A.  (Document review.)  Okay.
5        Q.  Is this an example of Cultural Care
6    pulling an au pair out of a host family?
7            MS. LUKEY:  Objection.
8        A.  Again, it doesn't tell the complete
9    story, but it would indicate that it appeared
10   to have moved in that direction based on this
11   information.
12       Q.  Okay.
13           (Document marked for
14       identification as Jordan Exhibit 24)
15       A.  (Document review.)  Okay.
16       Q.  If you can go to the second page of
17   the portion that you wrote, it says "From:
18   Natalie Jordan."
19           Can you describe what you're
20   referencing there?
21       A.  There was some concern about the,
22   it appears, the payments that the host family
23   made on their account.  There was a question
24   regarding an outstanding stipend for the
25   au pair.

Page 213

1            The question is that if we were to
2    apply this as a nonrefundable charge on their
3    account, that it would not be using any
4    credit cards in question in order to provide
5    closure potentially to this situation, which
6    is not confirmed by the end that that's in
7    fact what happened here.
8        Q.  So in this case, there was a
9    situation where the au pair was not paid her
10   weekly stipend by the host family?
11       A.  There is an allegation that the
12   au pair makes that there is outstanding
13   stipend.
14       Q.  Okay.  And what was your proposed
15   solution to the allegation that she was not
16   paid her weekly stipend?
17       A.  I'm not sure that I'm introducing a
18   solution in so much as an answer to a
19   question that if we were to provide closure
20   to the situation by way of making the au pair
21   whole for the outstanding amount, how we
22   could do that so as to avoid a concern with
23   respect to the credit card that was used for
24   the host family payments.
25       Q.  Okay.  Let me ask a more general

MAGNA
LEGAL SERVICES

Page 214

1  question.
2       If the host family does not pay the
3  stipend amount, will Cultural Care pay the
4  stipend to the au pair?
5       A.  Not necessarily.  I mean, you have
6  to look at every case individually, and there
7  are cases where there may be an allegation
8  that a stipend has not been paid, but then
9  the family can provide proof that it had in
10  fact been paid and there was a
11  misunderstanding.
12      It can be that after the fact even
13  though the family may dispute it, they'll
14  still make payment regardless.
15      So it's not a situation that just
16  because an au pair says that she hasn't been
17  paid that as an organization we step in and
18  make any sort of financial offer.
19      Q.  But if you find that the au pair
20  has not actually been paid in fact, will you
21  pay the stipend?
22      A.  There have been very rare occasions
23  where we have provided disclosure to a
24  situation by making the au pair whole for the
25  alleged outstanding stipend, if everything

Page 215

1  else has been exhausted and the situation
2  warrants that.
3       (Document marked for
4       identification as Jordan Exhibit 25)
5       A.  (Document review.)  Okay.
6       Q.  Is this another example of Cultural
7  Care paying the stipend where the host family
8  did not?
9       A.  I think it's an example of a
10  discussion about that as a possible solution.
11  But based on the most recent part of the
12  e-mail thread, it doesn't seem that that is a
13  conclusion that's confirmed in this document.
14      Q.  Okay.  But you confirmed that that
15  is -- that that does happen on occasion --
16      A.  Very, very rare occasions.
17      Q.  -- that Cultural Care will pay the
18  stipend if the host family does not pay the
19  stipend according to State Department
20  regulations and their host family agreement?
21      A.  We're not paying the stipend, but
22  we're making the au pair whole for the
23  allegation of being out financially, or not
24  having been -- not having received what she
25  feel was due.

Page 216

1       Q.  In a case of making the au pair
2  whole for a missing stipend payment, would
3  that payment be for $195.75, or some other
4  amount?
5       A.  It depends on the situation or the
6  scenario.  You could have an au pair who
7  alleged a missing stipend and there may be a
8  dispute about something else, and perhaps
9  closure is inclusive of a financial payment
10  in order to address that as well.
11      Q.  I'd like to ask you about your
12  communication with other sponsors.  Is that
13  something you regularly do as part of your
14  role as senior vice president?
15      A.  No.
16      Q.  How often would you say you speak
17  with other sponsors?
18      A.  I speak with other sponsors at the
19  annual Alliance member meeting.
20      Q.  At any other times?
21      A.  If at the invitation of the State
22  Department I was to attend a meeting, I would
23  have social conversation with them, but we
24  would be at the presence of a meeting
25  together.

Page 217

1       Q.  And are you -- and when you say
2  "the Alliance meeting," are you referring to
3  the Alliance for International Education?
4       A.  Yes.  I think they updated their
5  name at some point over the course of the
6  past two years, and I believe we're talking
7  about the same organization.  So, yes.
8       Q.  And are you also a member of the
9  International Au Pair Association?
10      A.  Yes.
11      Q.  Do you have opportunity to speak
12  and meet with other sponsors in the course of
13  your participation in the International
14  Au Pair Association?
15      A.  Socially, yes.
16      Q.  Is there any other membership or
17  other associations in which you are a member
18  with another sponsor?
19      A.  Not that I'm aware of.
20      Q.  I didn't state my question as
21  clearly as I could.
22      Are you a member of any association
23  in which the staff or leadership of another
24  sponsor is also a member?
25      A.  Outside of what we've just talked

MAGNA
LEGAL SERVICES

Page 218

1    about?
2        Q.  Yes.
3        A.  Not that I'm aware of.
4        Q.  Are you one of the founding members
5    of the Alliance For Cultural Exchange?
6        A.  I believe that Cultural Care was an
7    early member of it.  I'm not sure if we were
8    considered a founding member, but I know that
9    we've been a part of it for quite some time.
10       Q.  And what is the stated purpose of
11   the Alliance For Cultural Exchange?
12       A.  My understanding of the purpose for
13   the Alliance is that they represent all of
14   the J-1 exchange programs in terms of --
15   they're basically -- they're a membership
16   organization that seeks to provide advocacy
17   for the J-1 exchange community.
18       Q.  And what happens at the annual
19   meeting?
20       A.  There are keynote speakers who come
21   in.  Typically members of the State
22   Department will come and talk about the
23   importance of cultural exchange, the global
24   impact of exchange programs, the recognition
25   of world events or the sort of the state of

Page 219

1    the world and how the J programs can have a
2    really positive impact on particularly young
3    men and women from around the world.
4           There are also updates that are
5    provided by the State Department in smaller
6    panels where they would speak to
7    category-specific J sponsors in order to
8    provide them with updates and information
9    that pertains to areas of interest for the
10   State Department at that particular time.
11       Q.  And has the subject of the au pair
12   stipend ever come up at the -- at the
13   Alliance meetings?
14       A.  The only time I believe that it
15   ever came up was following the increase based
16   on the federal minimum wage changes and
17   reiterating the information that they had
18   previously provided with respect to the
19   impact on the au pair stipend.
20       Q.  I'm sorry.  I lost the last part of
21   what you said.
22       A.  So the only time that I could
23   recall would be after the change in the
24   federal minimum wage, and State Department
25   reiterating what they had already indicated

Page 220

1    to the sponsor community with respect to how
2    that change would impact the au pair stipend.
3        Q.  Got it.  And since you've been at
4    Cultural Care, how many of these meetings
5    have you attended?
6           MS. LUKEY:  You're talking about
7        the annual meetings of the Alliance?
8        Q.  The annual meetings of the Alliance
9    For International Education, how many of
10   these meetings have you attended?
11       A.  I'd say approximately five.
12       Q.  So you've worked at Cultural Care
13   for almost 18 years.
14       A.  Yes.
15       Q.  And you've been to five annual
16   meetings of the Alliance For International
17   Education?
18       A.  Yes.
19       Q.  Does Cultural Care have a presence
20   at this meeting every year?
21       A.  Yes.
22       Q.  Who else would have attended an
23   Alliance For International Education meeting
24   from Cultural Care?
25       A.  Our CEO, Goran Rannefors.

Page 221

1        Q.  Anyone else?
2        A.  Representing Cultural Care,
3    potentially our former president David
4    Fougere.
5        Q.  Do you keep agendas or other
6    meetings notes for programs from the Alliance
7    For International Education meetings?
8        A.  I have some of them, but not all of
9    them.
10       Q.  Do you know if they've been
11   produced?
12       A.  I don't know.
13       Q.  But to your recollection, the only
14   time that an au pair stipend came up was when
15   the stipend changed -- the minimum wage
16   amount changed and the stipend amount changed
17   in 2009?
18       A.  To my knowledge, yes.
19       Q.  And what was the discussion in
20   2009?
21       A.  I don't believe it was a
22   discussion.  I believe it was just
23   reiterating what they had previously told the
24   sponsor community with respect to the
25   increase to the stipend over the course --

**MAGNA**
LEGAL SERVICES

| Page 222 | Page 224 |
|---|---|

**Page 222**

1     MS. LUKEY: I'm sorry, who was
2  reiterating? You didn't say.
3     A. The State Department. So the State
4  Department was simply reiterating to the
5  sponsor community I believe an annual
6  membership meeting for the Alliance, they
7  were reiterating the information that they
8  had already provided to the sponsor community
9  that the federal minimum wage was increasing;
10  and at each of the three increased steps,
11  there would be an impact on the au pair
12  stipend.
13     So it wasn't a discussion. It was
14  more of a statement of fact.
15     Q. And did you discuss with sponsors
16  after the State Department presentation about
17  the increase in au pair stipend, did you
18  discuss with sponsors -- have any discussion
19  with sponsors about the change?
20     A. No.
21     Q. What time of year do the meetings
22  usually occur?
23     A. Typically in the fall.
24     Q. Is there a specific month, or it
25  varies?

**Page 223**

1     A. I think it's typically in October.
2     Q. And that year when the au pair wage
3  had increased, was this to your recollection
4  something that had recently occurred, or was
5  it breaking news? Was it a recent
6  development in terms of the timing of this
7  meeting and the increase in weekly stipend?
8     A. To my knowledge, the increase
9  occurred in July of each of the three years.
10  And so the meeting taking place in October, I
11  wouldn't necessarily describe that as
12  breaking news at that point, but certainly
13  somewhat recent and certainly relevant to the
14  sponsor community.
15     Q. And is your -- is the annual
16  meeting your primary means of communicating
17  with other sponsors?
18     MS. LUKEY: Objection.
19     A. It's not really communicating with
20  other sponsors in so much as it's attendance
21  at a meeting that -- or for an organization
22  of which we're all members.
23     And I should clarify, not all
24  members. It's a subset of the community that
25  are members.

**Page 224**

1     (Document marked for
2  identification as Jordan Exhibit 26)
3     A. (Document review.) Okay.
4     Q. Can you read the e-mail from --
5  well, who is Michael McHugh?
6     A. He is a staff member at
7  InterExchange.
8     Q. And this is an e-mail from Michael
9  McHugh to you, the first e-mail. CC17602 for
10  people that are on the phone.
11     This is an e-mail from Michael to
12  you?
13     A. Yes.
14     Q. Can you read his e-mail to you?
15     A. Which one?
16     Q. The entire thing. It's not that
17  long.
18     MS. LUKEY: The earliest one?
19     A. The first one?
20     Q. The earliest one dated October 11,
21  2013.
22     A. Okay. Out loud?
23     Q. Out loud.
24     MS. LUKEY: We can probably assume
25  that, I think, unless she tells you to

**Page 225**

1  read to yourself.
2     THE WITNESS: Sometimes I'm asked
3  to review it myself, to be clear.
4     MS. LUKEY: Okay. Just for time
5  sake.
6     A. "Hi Natalie, I hope this e-mail
7  finds you well! I expect I'll see you in
8  D.C. soon for another Alliance Meeting and I
9  look forward to catching up. We have always
10  appreciated the relationship InterExchange
11  has with Cultural Care and thank you in
12  advance for your candor. With that in mind,
13  I am writing today to ask about your policy
14  towards the Weekend Classes. Over the years
15  we have heard conflicting information about
16  this topic. I believe that conflicting
17  messaging from ECA might have went out to
18  individual sponsors. I am aware that Au Pair
19  in America, AuPairCare, and Cultural Care all
20  accept the 3 credit weekend classes. Can I
21  ask exactly what lead to Cultural Care making
22  that decision. Was there a message from ECA
23  that seemed to provide a green light? I also
24  know that InterExchange and GoAuPair do not
25  accept those classes based on messaging we

MAGNA
LEGAL SERVICES

Page 226

1  had received a few years ago.  Thanks in
2  advance and hope to see you in Washington!"
3       Q.  So when he refers to the
4  relationship InterExchange has with Cultural
5  Care, what does that mean?
6       A.  The relationship we have is
7  certainly a friendly one.  And when I would
8  see him in person at those meetings or when
9  he would engage with, for example, Goran, I
10  think it has always been a very friendly
11  rapport.
12       Q.  Are you as individuals friendly, or
13  are your organizations friendly?
14       A.  I think that personally we're
15  friendly with each other.
16       Q.  But this e-mail says that he has
17  always appreciated the relationship
18  InterExchange has had with Cultural Care; is
19  that correct?
20       A.  That's correct.  But in no way
21  would I have developed any friendly rapport
22  with him if I didn't work with Cultural Care
23  and he didn't work with InterExchange and we
24  had had the opportunity to meet at, for
25  example, the Alliance annual membership

Page 227

1  meeting.
2       Q.  But that's Natalie and Michael.
3       A.  Yes.
4       Q.  This e-mail specifically refers to
5  the relationship InterExchange has with
6  Cultural Care, correct?
7       A.  That's certainly what he's saying,
8  but I don't take this to mean anything beyond
9  I work for him -- I, Michael, work for
10  InterExchange; you, Natalie, work with
11  Cultural Care.
12          We've always had a good
13  relationship.  I don't think it's intended to
14  mean anything binding or bigger than that.
15       Q.  Okay, let's go to the next
16  paragraph.  What is he referring to in terms
17  of messaging around "3 credit weekend
18  classes"?
19       A.  You mean the topic itself you're
20  talking about?
21       Q.  The topic, yes.
22       A.  So he's talking about our weekend
23  classes which are basically an opportunity
24  for students to be able to earn credits
25  during a shorter period of time.  It's an

Page 228

1  intensive program to allow for completion of
2  the educational component required by the
3  program.
4       Q.  Is he in this paragraph trying to
5  coordinate InterExchange policy on 3 credit
6  weekend classes and Cultural Care's 3
7  weekend -- 3 credit weekend classes?
8       A.  I don't know that I can speak to
9  his intention in terms of what he's trying to
10  get and what he's trying to do, but it seems
11  that he's looking for some clarification.
12       Q.  Okay.  When he says "Can I ask
13  exactly what lead to Cultural Care making
14  that decision," is that for general
15  clarification or is that in pursuit of
16  coordination?
17          MS. LUKEY:  Objection.
18       A.  I can't speak to what he's in
19  pursuit of.
20       Q.  Okay.  Let's move to your portion
21  of the e-mail --
22       A.  Okay.
23       Q.  -- that you wrote, that portion
24  that is dated October 11, 2013.  Can you read
25  that out loud?

Page 229

1       A.  "Hi Michael, Unfortunately, I won't
2  be able to attend the meeting in D.C. in a
3  couple of weeks as I will be having surgery.
4  But I shouldn't be down for long and then I
5  hope to be back in D.C. soon thereafter, lots
6  going on in our nation's capital these days!
7  In terms of the weekend classes, there was an
8  Alliance meeting several years ago where
9  Julia Findlay stated 'we don't love them, but
10  we know that they are a necessary evil at the
11  moment.'  Now, this was all going to be made
12  better with the new educational regulations
13  which would allow more flexibility, but we
14  know how that story has gone...  We know that
15  they do not meet the traditional course
16  schedule over an entire semester but we have
17  not been informed that they do not count.
18  There have been some programs which we no
19  longer endorse or support based on their
20  feedback but they've not ever sent out a
21  message (to my knowledge) banning these for
22  programs at large.  Again, they don't love
23  them so I don't like to discuss them because
24  I agree that they are necessary but not
25  always ideal.  I'm hopeful that you will not

PLAINTIFFS' RESP. APP.0004473

MAGNA
LEGAL SERVICES

Page 230

1  be seeking a ban on these as I believe they
2  are important to allow as the existing
3  (though clearly outdated) regulations are so
4  restrictive already.  Particularly for
5  au pairs who transition or who do not live in
6  an area with a large number of options,
7  sometimes a weekend course helps them to
8  complete what they need in order to extend
9  and to meet the regulatory requirements.  I
10 hope this is helpful and I would be happy to
11 discuss further with you on the phone if
12 you'd like to catch up.  Take care, Natalie."
13     Q.  So when you say "I'm hopeful you
14 will not be seeking a ban on these," are you
15 seeking coordination on your respective
16 policies with respect to the 3 credit weekend
17 classes?
18     MS. LUKEY:  Objection.
19     A.  I don't know that I'm in pursuit of
20 anything when I say that.  It's more to say
21 that these are a necessary part of the
22 program.
23     Q.  When you say the words "I'm hopeful
24 that you will not be seeking a ban on these,"
25 referring to the 3 credit weekend classes,

Page 231

1  are you hopeful that he will not be taking a
2  certain action?
3     A.  I think what I'm trying to
4  reiterate is the importance of this being an
5  option in an otherwise restrictive space,
6  because the educational component is an
7  important part of the au pair experience and
8  the weekend courses allow them to complete
9  that, and so I believe it's an important part
10 of the program.  So I'm trying to express
11 that.
12     Q.  Okay.  So in your expression that
13 it's an important part of the program, you're
14 also communicating to Michael McHugh that you
15 hope that he also thinks it's an important
16 part of the program and keeps that option
17 open; is that correct?
18     MS. LUKEY:  Objection.
19     A.  I think what I said is what's
20 written in the e-mail.
21     Q.  Okay, let's go to Michael's
22 response to you, if you can read that out
23 loud.
24     A.  "Hi Natalie, Thanks for getting
25 back to me so quickly.  No, we have no

Page 232

1  intention of trying to get these banned.  On
2  the contrary, we would love to receive
3  messaging that would allow us to join the
4  group and permit them.  We receive a message
5  from Julia saying that the classes do not
6  meet the requirements so I'm glad to hear
7  that you heard something different.  Do you
8  know whether that comment was minuted?"
9     Q.  So you said to Michael, "I'm
10 hopeful that you will not be seeking a ban on
11 these as I believe they are important to
12 allow as the existing (though clearly
13 outdated) regulations are so restrictive
14 already."
15     And then he replies and says, "No,
16 we have no intention of trying to get these
17 banned."
18     Are you coordinating policy?
19     MS. LUKEY:  Objection.
20     A.  No.
21     Q.  Is he answering a question that you
22 posed?
23     MS. LUKEY:  Objection.
24     A.  I don't think I asked a question in
25 my e-mail.

Page 233

1     (Document marked for
2  identification as Jordan Exhibit 27)
3     A.  (Document review.)
4     Q.  Can you tell me -- let's start with
5  the originating e-mail.  Who is it from and
6  who is it to?
7     A.  It's hard to say.  There is two
8  different names on the bottom of this, so I'm
9  not sure who.
10    Q.  Well, if you can just read the
11 "From" and "To" when it begins "Forwarded
12 message."
13    A.  Are you talking about on the front
14 page?
15    Q.  Right here.
16    A.  Ah-ha.  So it says it's from
17 USAuPair, and it's to info@USA -- sorry.
18 It's from USAuPair, admin@usaupair.com to
19 info@@usaupair.com.
20    Q.  And can you recite the subject and
21 read the substance of that e-mail?
22    A.  The subject is "Lawsuit - All
23 Au Pair Agencies Named."  And the content is
24 "Hello Colleagues - On Friday afternoon our
25 office received a Press Request from Global

MAGNA
LEGAL SERVICES

Page 234

```
 1   Competition Review, an antitrust publication
 2   in Washington, D.C.  The press request was
 3   about a Colorado lawsuit alleging au pair
 4   sponsor antitrust law violations.  I asked
 5   our legal counsel to obtain a copy of the
 6   filing - see attached.  The Colorado lawsuit
 7   filed November 13, 2014 lists all J-1 au pair
 8   sponsors as defendants along with a host
 9   family.  USAuPair did not respond to the
10   Press Request but the lawsuit will be in a
11   Monday morning news briefing.  Calls were
12   made to DoS and voicemail messages left.
13   There has been no reply.  Helene."
14        Q.  Are you familiar with Helene?
15        A.  I believe I've probably met her
16   before, but she's part of the USAuPair
17   organization.
18        Q.  And then what's -- that message was
19   forwarded.  Can you say who the next message
20   was from and to and what the substance of
21   that message was?
22        A.  The message is from Goran
23   Rannefors.  I don't know who it's to, but
24   there is a copy line to Christine
25   La Monica-Lunn from InterExchange and Michael
```

Page 235

```
 1   McHugh from InterExchange.
 2        And the message content is, "Hi
 3   Christine and Michael, Any more info or
 4   background you can give?  Best, G."
 5        Q.  And can you remind us who Goran
 6   Rannefors is?
 7        A.  He is the CEO of Cultural Care,
 8   Inc.
 9        Q.  And do you know who Christine
10   La Monica-Lunn is?
11        A.  According to this e-mail, she's the
12   president and CEO of InterExchange.
13        Q.  And then Michael McHugh?
14        A.  Michael McHugh, according to this
15   e-mail, is the program director at
16   InterExchange.
17        Q.  Okay.  So is it correct that the
18   CEO of Cultural Care was corresponding with
19   other sponsor agencies about the filing of
20   this lawsuit?
21        MS. LUKEY:  Objection.
22        A.  It looks like Goran sent an e-mail
23   to Christine and Michael.
24        Q.  If you can go to the top, the most
25   recent e-mail in this chain, and if you can
```

Page 236

```
 1   say who it's from and to and the substance of
 2   that message.
 3        A.  Sure.  It's from Michael McHugh.
 4   It's to Goran Rannefors.  And the message is:
 5   "Hi Goran, We are very surprised by these
 6   allegations.  Please give me a call when you
 7   get a chance.  MM."
 8        Q.  Thank you.  Does Cultural Care
 9   engage in lobbying?
10        A.  Yes.
11        Q.  What kind of lobbying does Cultural
12   Care engage in?
13        A.  Well, the Alliance For -- the
14   Alliance, is an advocacy group, of course,
15   but we also engage with a very small firm in
16   D.C. to ensure that we have awareness of any
17   policies or legislation which may have an
18   impact on our program.
19        Q.  What is the name of the firm?
20        A.  Thorsen French Advocacy.
21        Q.  And what are the issues that you
22   ask Thorsen French Advocacy to either watch
23   or advocate on your behalf?
24        A.  Well, anything that could have an
25   impact on exchange programs has the potential
```

Page 237

```
 1   to, therefore, have an impact on the au pair
 2   program specifically.
 3        So policies with respect to changes
 4   or updates in immigration legislation,
 5   anything involving visas, or anything of the
 6   like.
 7        Q.  Do you engage or have you engaged
 8   in any lobbying with respect to the au pair
 9   stipend?
10        A.  Not with respect to the au pair
11   stipend, no.
12        (Document marked for
13   identification as Jordan Exhibit 28)
14        A.  (Document review.)
15        Q.  Can you say who this e-mail is from
16   and who the e-mail is to and CC'd to and read
17   the e-mail?
18        MS. SMALLS:  For those on the
19   phone, I'm looking at CC9209.
20        A.  There are three e-mails on this
21   document so which one in particular?
22        Q.  The beginning e-mail.
23        A.  So it's from Goran Rannefors.  It
24   is to Christina Sandberg, Melissa Fredette,
25   Pehr Magnus Karlsson, David Widerberg, and
```

**MAGNA ▶**
LEGAL SERVICES

Page 238

1  myself. The subject is "Minimum Wage."
2      Q. Can you read the e-mail?
3      A. "Hi all, A lot of rumblings in D.C.
4  about increasing the minimum wage. Has been
5  $7.25 per hour for a few years / might now go
6  up to $10.10. That would bring the weekly
7  stipend from $195.75 to $272.70. A lot of
8  extra cost to HF without us making a nickel
9  more. If it goes ahead it will probably be
10 implemented in stages. Even if not much hope
11 of success I believe we should again see if
12 au pair Stipend could be taken out of its tie
13 to minimum wage. That would also be good for
14 our argument that we are not a labor program
15 / but, again, probably a very hard argument
16 to win. Natalie and I will discuss with our
17 lobbyists. Happy New Year! G."
18     Q. Did you discuss with your lobbyists
19 Goran's suggestion about seeing, again seeing
20 if the au pair stipend could be taken out
21 being tied to the minimum wage?
22     A. I don't recall a discussion at that
23 time on that topic. I remember asking the
24 lobbyist's opinion as to the likelihood of
25 any changes to the minimum wage.

Page 239

1      Q. You didn't discuss an approach with
2  your lobbyist at that time to see if the
3  au pair stipend could be taken out of its tie
4  to minimum wage?
5      A. I don't recall a specific
6  conversation with them at that time on that
7  specific point.
8      Q. And in your scope of duties, you're
9  responsible for government relations?
10     A. Yes.
11     Q. And generally if a suggestion is
12 made by the CEO, do you follow it?
13     A. I don't think that this is a
14 direction from him. He's representing that
15 that's a discussion that he intends to
16 initiate. But whether it happens or not,
17 this is not a binding statement here in that
18 respect.
19     Q. Well, it ends with "Natalie and I
20 will discuss with our lobbyists."
21     A. That's correct.
22     Q. Is it fair to take that statement
23 that you would then after he wrote this
24 e-mail to Christina Sandberg, Melissa
25 Fredette, Pehr Karlsson and David Widerberg,

Page 240

1  that you would then discuss with your
2  lobbyists?
3      MS. LUKEY: Objection.
4      A. It's clear that it was his
5  intention to do that, but whether it took
6  place or not, I can't say.
7      Q. Even though you're CC'd on this
8  e-mail, you can't say whether that
9  conversation took place?
10     MS. LUKEY: Objection.
11     A. I think I've answered that. I
12 can't recall the conversation ever having
13 taken place despite his indication that it
14 would.
15     Q. Who is David Widerberg?
16     A. He is the CEO of ICL.
17     Q. And can you just recite his e-mail
18 address at the top of that e-mail?
19     A. At the top of the document?
20     Q. Yeah.
21     A. David.Widerberg@EF.com.
22     Q. Okay, thank you. And David
23 Widerberg replied to Goran's e-mail
24 suggesting if you "again see if au pair
25 stipend can be taken out of its tie to

Page 241

1  minimum wage." And what did he say in reply
2  to Goran's e-mail?
3      A. Well, it's not as long as what you
4  had just said. He simply says, "Thanks for
5  the update. Agree with the approach."
6      Q. The first e-mail is an e-mail from
7  Goran to Christina, Melissa, Pehr and David;
8  is that correct?
9      A. Yes.
10     Q. With you CC'd?
11     A. Yes.
12     Q. In that e-mail, it says, "I believe
13 we should again see if Au Pair stipend could
14 be taken out of its tie to minimum wage"; is
15 that correct?
16     A. It says, "I believe we should again
17 see if Au Pair stipend could be taken out of
18 its tie to minimum wage."
19     Q. Okay. The next e-mail is from
20 David to all the people that were included in
21 Goran's prior e-mail as a reply; is that
22 correct?
23     A. Yes.
24     Q. And he is responding to the content
25 in Goran's original e-mail; is that correct?

PLAINTIFFS' RESP. APP.0004476

MAGNA
LEGAL SERVICES

Page 242

```
 1        A.  It would appear so, yes.
 2        Q.  Okay.  And what does David
 3   Widerberg say in his reply?
 4        A.  As I read before, he says "Thanks
 5   for update.  Agree with the approach.
 6   Cheers, D."
 7             (Document marked for
 8        identification as Jordan Exhibit 29)
 9        Q.  I don't know how to do this.  I
10   think two documents were mistakenly attached.
11             (Court reporter removed two pages
12        for corrected Exhibit 29.)
13        A.  (Document review.)
14        Q.  I'm not going to redo it, it looks
15   like these are two different documents, but
16   we'll go through each set of e-mails.
17             Let's go through the one at the
18   top, and the e-mail on the bottom of 8974
19   with a timestamp of 10:56 a.m.
20             Can you tell me who that is from
21   and who that is to and what that e-mail says?
22        A.  It's from Goran Rannefors.  It's to
23   Carl Thorsen and Alec French with a copy to
24   me.  The subject is "Minimum Wage."
25             Sorry, did you ask me to read it?
```

Page 243

```
 1        Q.  Yes.
 2        A.  Okay.  "Hi Carl and Alec, I hope
 3   Santa was good to you!  I hear more and more
 4   about an increase in minimum wage / since
 5   this directly impacts the Au Pair weekly
 6   stipend it would be great to hear your take
 7   on this legislation?  Has legs?  Timing?
 8   Would also be good to discuss next time we
 9   meet if there is any possibility to exclude
10   Au Pairs from the minimum wage tie (I do not
11   think so - but it would move us further from
12   a labor program).  Happy New Year! G."
13        Q.  Can you note the date and timestamp
14   of this e-mail?
15        A.  The date is Thursday, December 26,
16   2013, at 10:56 a.m.
17        Q.  I'm going to refer you back to
18   Exhibit 28, that was the prior e-mail.  And
19   this is the e-mail where he states, Goran
20   states, "I believe we should again see if
21   Au Pair stipend could be taken out of its tie
22   to minimum wage."
23             And then later in that e-mail it
24   says "Natalie and I will discuss with our
25   lobbyists."
```

Page 244

```
 1             Can you note the date and timestamp
 2   on that e-mail?
 3        A.  The date is Thursday, December 26,
 4   2013, at 10:55 a.m.
 5        Q.  So is the e-mail in Exhibit 29 at
 6   10:56 a.m. sent one minute after the e-mail
 7   where he says "Natalie and I will discuss
 8   with our lobbyists"?
 9        A.  It appears that that is correct.
10        Q.  And who is Carl Thorsen and Alec
11   French?
12        A.  They are the lobbyists representing
13   the firm Thorsen French Advocacy.
14        Q.  So, in fact, Goran did discuss the
15   issue with your lobbyists?
16             MS. LUKEY:  Objection.
17        A.  I don't think that this serves as a
18   discussion.  He sent an e-mail a minute
19   later.
20        Q.  Okay.  Can you just read the "From"
21   and "To" the reply to Goran's e-mail at 10:56
22   a.m.?  This is document 29 from Carl to
23   Goran.
24        A.  It's from Carl Thorsen.  It is to
25   Goran Rannefors and Alec French with a copy
```

Page 245

```
 1   to me, Natalie Jordan.  The date and time is
 2   Thursday, January 2, 2014, at 10:54 a.m.
 3        Q.  Can you note the e-mail address
 4   that is used for you?
 5        A.  Natalie.Jordan@EF.com.
 6        Q.  And can you, again, repeat the date
 7   of that e-mail?
 8        A.  Thursday, January 2, 2014.
 9        Q.  Great.  Can you read the content of
10   that e-mail?
11        A.  "Goran, Sorry for the delay in
12   response!  Santa was still creating chaos in
13   my house on the 26th and this slipped.  I
14   will be all over the potential minimum wage
15   increase with your interests in mind.  I am
16   doubtful it has much of a chance in a
17   Republican House, but you never know for
18   sure.  Will keep you advised.  Happy New Year
19   to you both! C.
20             "P.S., The Thorsen family just
21   registered for our 2014 CC au pair!"
22        Q.  So did Cultural Care lobby on the
23   au pair stipend?
24        A.  Well, this e-mail confirms that
25   Carl Thorsen will look into the potential
```

PLAINTIFFS' RESP. APP.0004477

MAGNA
LEGAL SERVICES

Page 246

```
 1    minimum wage increase with our interests in
 2    mind.
 3        Q.  What does a lobbyist do?
 4        A.  What a lobbyist does is that
 5    they're certainly looking out for issues of
 6    concern, but actively; that they're engaging
 7    in meetings and conversations to educate
 8    members of Congress about an issue that
 9    relates to you as their client.
10        Q.  And so lobbying, it only
11    constitutes lobbying if you're proactively
12    meeting with a member of Congress?
13        MS. LUKEY:  Objection.
14        A.  I'm certainly not an expert on all
15    of the aspects of lobbying.  But when you ask
16    me what lobbying means to me, that is my
17    answer.
18        Q.  Let's go to the second e-mail that
19    was attached to Exhibit 29.
20        MS. LUKEY:  Can we just be clear,
21        given the dates, that this would not
22        have been an earlier e-mail in the same
23        chain because the e-mail is later than
24        the earliest e-mail on the page before
25        it by a little bit?  In other words, it
```

Page 247

```
 1        is two separate e-mail chains.
 2        MS. SMALLS:  Yes, two separate
 3        e-mail chains.  This is a new e-mail.
 4    BY MS. SMALLS:
 5        Q.  Can you go through who the e-mail
 6    is from, who it's to, who is CC'd, and then
 7    read the content of the e-mail?
 8        A.  The e-mail is from Michael McCarry.
 9    It is to --
10        Q.  Sorry, I'm talking about the first
11    e-mail.
12        A.  It is from Goran Rannefors.  It is
13    to Michael McCarry with a copy to my, Natalie
14    Jordan.  The subject is "Minimum Wage?"
15        And then you wanted me to read it?
16        Q.  And if you can -- who is Michael
17    McCarry?
18        A.  Michael McCarry was the executive
19    director at the Alliance.
20        Q.  And just for the record, can you
21    note the date and time?  We've already
22    established it's a separate e-mail chain, but
23    if you can just note the date and time.
24        A.  Thursday, December 26, 2013, at
25    11:07 a.m.
```

Page 248

```
 1        Q.  Can you read the content of that
 2    e-mail?
 3        A.  "Hi Michael, Could you please do us
 4    a favor and stop the legislation increasing
 5    minimum wage?  Or at least make sure we take
 6    out the tie to Au Pair stipend?  The first
 7    one will take some effort - but the second
 8    one might be possible?  Happy New Year!  G."
 9        Q.  Thank you.  And then if you can go
10    through the reply; who it's from, who it's
11    to, and the time and date stamp?
12        A.  Michael McCarry to Goran Rannefors
13    and a copy to me, Natalie Jordan, on
14    Thursday, December 26, 2013, at 11:12 a.m.
15        Q.  And what does the e-mail say?
16        A.  I'm sorry?
17        Q.  What does the e-mail say?
18        A.  The e-mail says, "Maybe the second
19    one is possible, but I think the political
20    optics would be all wrong.  M."
21        Q.  Okay.  And so the initiating
22    e-mails for both the e-mails for Exhibit 28
23    and 29 are from Goran; is that correct?
24        A.  That's correct.
25        Q.  And if you can just review,
```

Page 249

```
 1    without -- I mean, if you need to refer to
 2    the content to refer to the e-mail, but just
 3    review for each of these three e-mails from
 4    Goran, who did Goran write to, the time, the
 5    date and time, and just generally the content
 6    of each of these three e-mails?
 7        MS. LUKEY:  Objection.
 8        Q.  Okay, let's start.  The first
 9    e-mail is from Goran to Christina, Melissa,
10    Pehr and David Widerberg.  And that e-mail is
11    dated at 10:55 a.m.; is that correct?
12        A.  That is correct.
13        Q.  And that is the e-mail that states,
14    "I believe we should again see if Au Pair
15    stipend could be taken out of its tie to
16    minimum wage"; is that correct?
17        A.  It states that, yes.
18        Q.  Okay.  And David Widerberg is the
19    CEO of EF, or president of EF?
20        MS. LUKEY:  Objection.
21        A.  No.  David Widerberg --
22        Q.  I'm sorry, of ICL.  David Widerberg
23    is the CEO of ICL?
24        A.  Correct.
25        Q.  And who is Pehr Karlsson?
```

PLAINTIFFS' RESP. APP.0004478

MAGNA
LEGAL SERVICES

| Page 250 | Page 252 |
|---|---|

**Page 250**

1    A.  He is the CFO.
2    Q.  Of ICL?
3    A.  At ICL.
4    Q.  And who is Melissa?
5    A.  Melissa Fredette was the executive
6  vice president at that time at Cultural Care,
7  Inc.
8    Q.  And who is or was Christina
9  Sandberg?
10    A.  I believe her title was executive
11  vice president of au pair recruitment, ICL.
12    Q.  At ICL?
13    A.  Yes.
14    Q.  Okay.  So this is -- the e-mail
15  dated December 26th at 10:55 a.m. is an
16  e-mail from Goran to Cultural Care staff and
17  various staff at ICL; is that correct?
18    A.  Yes.
19    Q.  And that e-mail says, "I believe we
20  should again see if Au Pair stipend could be
21  taken out of its tie to minimum wage"; is
22  that correct?
23    A.  Yes, it does.
24    Q.  The next initiating e-mail from
25  Goran is directed to Goran and Carl and Alec

**Page 251**

1  with a CC to you.
2      The date and time -- that e-mail
3  says, "I hear more and more about an increase
4  in minimum wage / since this directly impacts
5  the Au Pair weekly stipend it would be great
6  to hear from" -- "hear your take on this
7  legislation?  Has legs?  Timing?"
8      This e-mail was sent to Carl
9  Thorsen and Alec French, who we've
10  established work for your lobbying firm at
11  10:56 a.m. on December 26th; is that correct?
12    A.  That's correct.
13    Q.  So that e-mail was sent one minute
14  after the initial e-mail that Goran sent to
15  Cultural Care staff and ICL staff; is that
16  correct?
17    A.  Correct.
18    Q.  Okay, the third e-mail is Goran to
19  Michael McCarry, who is the executive, is or
20  was, the executive director of the Alliance;
21  is that correct?
22    A.  That's correct.
23    Q.  And the timestamp for that is on
24  the same day, December 26th at 11:07 a.m.; is
25  that correct?

**Page 252**

1    A.  That's correct.
2    Q.  So that is eight minutes after the
3  last e-mail that we just reviewed from Goran
4  to Carl Thorsen and Alec French; is that
5  correct?
6    A.  That's correct.
7    Q.  And that e-mail where he states,
8  "Please do us a favor and stop the
9  legislation increasing the minimum wage," was
10  sent to the Alliance executive director eight
11  minutes after the last e-mail to the lobbying
12  firm; is that correct?
13    A.  I believe so, yes.
14    Q.  So in the course of 17 minutes,
15  Goran reached out to the leadership of ICL,
16  your lobbying team, and then the leadership
17  of the Alliance about lobbying for regarding
18  the weekly stipend; is that correct?
19      MS. LUKEY:  Objection.
20    A.  No.  He sent a series of e-mails
21  where he is inquiring about potential changes
22  to the minimum wage.
23    Q.  I'll refer you to the first e-mail
24  that says, "I believe we should again see if
25  the Au Pair stipend could be taken out of its

**Page 253**

1  tie to the minimum wage."
2      Does that e-mail refer to the
3  au pair stipend?
4    A.  Can you repeat the question?
5    Q.  Does that e-mail refer to the
6  au pair stipend where it says "I believe we
7  should again see if Au Pair stipend could be
8  taken out of its tie to minimum wage"?
9    A.  The question is does it say
10  "au pair stipend"?
11    Q.  Does it relate to the au pair
12  stipend, yes.
13    A.  If you're saying "au pair stipend,"
14  then, yes, it relates to the au pair stipend.
15    Q.  The Goran e-mail says, "I hear more
16  and more about an increase in minimum wage /
17  since this directly impacts the Au Pair
18  weekly stipend it would be great to hear your
19  take on this legislation?"
20      Does this e-mail relate to the
21  au pair stipend?
22    A.  It relates indirectly in that the
23  main focus is on the minimum wage and it
24  would have an impact, of course, on the
25  au pair weekly stipend.

PLAINTIFFS' RESP. APP.0004479

MAGNA

LEGAL SERVICES

Page 254

1      Q.  Does he use the word "directly"?
2          MS. LUKEY:  Objection.
3      A.  He says, "since this directly
4   impacts the weekly au pair stipend."
5      Q.  So is it directly or indirectly?
6          MS. LUKEY:  She said "directly"
7   both times.
8          MS. SMALLS:  No, she said
9   "indirectly."
10     A.  The message itself, the question
11  you had asked me, my answer was that what he
12  is seeking out is information on an increase
13  to the minimum wage, referencing that an
14  increase there would have an impact on the
15  au pair stipend.
16     Q.  Okay, let's go to the last e-mail,
17  the one dated 11/07 directed to Michael
18  McCarry.  He says, "Could you please do us a
19  favor and stop the legislation increasing
20  minimum wage?  Or at least make sure we take
21  out the tie to Au Pair stipend?"
22         Does this e-mail relate to the
23  au pair stipend?
24     A.  It relates to the au pair stipend,
25  yes.

Page 255

1      Q.  And does it encourage lobbying with
2   respect to the au pair stipend?
3          MS. LUKEY:  Objection.
4      A.  I mean, I read this and I have to
5   believe that there is a, you know, him asking
6   one person to stop legislation increasing the
7   minimum wage is not a formal request, nor
8   something that would be within Michael
9   McCarry's power to do.
10     Q.  But the Alliance is -- you conduct
11  lobbying through the Alliance; is that
12  correct?
13     A.  It is an advocacy group, yes.  But
14  to suggest that one person could alone stop
15  the minimum wage.  I think this is an
16  outreach effort on the part of Goran to bring
17  this concern to the attention of Michael
18  McCarry.
19     Q.  And what did he seek in terms of
20  follow-up by raising this to Michael McCarry,
21  by reading this e-mail?
22         MS. LUKEY:  Objection.
23     A.  I can't -- I can't confirm what he
24  was seeking out.  But as I read this, I see
25  this as more of a bringing this to his

Page 256

1   attention and starting a conversation with
2   him about it.
3          MS. SMALLS:  Let's take a break.  I
4   think we have about 30 minutes
5   remaining.  I would suggest maybe a
6   15-minute break.  We can regroup and
7   hopefully get through whatever we have
8   remaining.
9          MS. LUKEY:  Okay.
10         VIDEO TECHNICIAN:  We're off the
11  record at 4:41 p.m.
12         (Proceedings recessed at 4:41 p.m.,
13  and reconvened at 5:11 p.m.)
14         (Document marked for
15  identification as Jordan Exhibit 30)
16         VIDEO TECHNICIAN:  We're back on
17  the record at 5:11.
18         MS. SMALLS:  Great.  Thank you.
19     For counsel on the phone we're on
20  Exhibit 30, and it is Cultural Care
21  2192.
22  BY MS. SMALLS:
23     Q.  Are you familiar with this
24  document?
25     A.  I don't know that I'm familiar with

Page 257

1   it in this formatting, but it appears to be
2   some sort of a training resource for LCCs.
3      Q.  Is that something that's produced
4   by Cultural Care, Inc.?
5      A.  I believe so.
6      Q.  Thank you.
7          (Document marked for
8   identification as Jordan Exhibit 31)
9      A.  (Document review.)
10     Q.  Are you ready?
11     A.  (Nods.)
12     Q.  What is this document?
13     A.  This document is an incident report
14  that was submitted to the State Department.
15     Q.  By whom?
16     A.  It looks to be submitted by me.
17     Q.  Okay.  And who completes the
18  portion of the incident report that says
19  "Detailed Timeline of Events"?
20     A.  I did.
21     Q.  And then the section that says
22  "Sponsor Review Findings," who completes that
23  portion?
24     A.  I did.
25     Q.  Can you read starting -- it's

Page 258

```
 1    the -- starting from "This monthly," it's
 2    four lines down, until you talk about
 3    "bringing closure to this unfortunate
 4    situation."  Can you read that out loud?
 5          MS. LUKEY:  Where is the closure
 6       one?
 7          A.  I'd just like to borrow a pen so I
 8    can mark.
 9          And, I'm sorry, you wanted it to
10    start where?
11          Q.  "This monthly reporting process,"
12    four lines down.
13          A.  And then end where?
14          Q.  "This unfortunate situation."  It's
15    about eight lines up from the bottom.
16          A.  "This monthly reporting process
17    includes an e-mail directly to each au pair
18    confirming the answers they have provided in
19    our team.  In addition, we have robust
20    support resources for both au pairs and host
21    families including a 24-hour support line,
22    and staff support both in the U.S. and in the
23    au pair's home country.  Despite the monthly
24    check-in and additional support resources,
25    the allegation that program rules were not
```

Page 259

```
 1    followed is deeply concerning.  It is our
 2    goal to create an environment where au pairs
 3    are comfortable bringing forth any concerns
 4    and questions they have without delay.  The
 5    Cultural Care team in Sweden has reached out
 6    to Malin to review her experiences once again
 7    and to discuss what may be done to bring
 8    closure to this unfortunate situation."
 9          Q.  So where you say "We have robust
10    support resources for both au pairs and host
11    families including a 24-hour support line,
12    and staff support both in the U.S. and in the
13    au pair's home country," who is the "we"?
14          A.  Well, I'm communicating on behalf
15    of Cultural Care, Inc. to the State
16    Department, and what I'm referencing are the
17    support resources available to the au pair.
18          Q.  Right.  But you say "We have robust
19    support in the U.S. and in the au pair's home
20    country."
21          A.  Yes.
22          Q.  And so does Cultural Care, Inc.
23    have staff support in the au pair's home
24    country, in this case Sweden?
25          A.  What I'm referring to here is an
```

Page 260

```
 1    explanation to the State Department that
 2    outlines the various types of support that
 3    are available to the au pair.  So that as a
 4    participant on the program, she has access to
 5    these things.  That as a program, these
 6    things are provided to her or available to
 7    her.
 8          Q.  It says, "We have robust support
 9    resources both in the U.S. and in the
10    au pair's home country."  Who is "we"?
11          A.  We, Cultural Care, have robust
12    resources for both program participants.
13          Q.  So Cultural Care -- what does
14    Cultural Care mean in that sentence?
15          A.  Well, again, as I said earlier
16    today, for the family and the au pair, we
17    want to provide a consistent and seamless
18    experience in terms of support.
19          So for them if they're -- for the
20    au pair, she knew Cultural Care when she was
21    working with them in Sweden, and she
22    understands that she's part of a Cultural
23    Care program here in the United States.  So
24    it's important for the au pair to know that
25    they are supported regardless of whether
```

Page 261

```
 1    they're in their home country or here in the
 2    U.S.
 3          So I'm simply relaying that message
 4    to the State Department that there are a
 5    number of ways that this au pair receives
 6    support.  There are a number of resources
 7    that are available to her, not only during
 8    her time here but even now that she has
 9    returned home that that support continues.
10          Q.  Okay.  So the "we" in that
11    sentence, does it include ICL?
12          A.  The resources available are
13    inclusive of both CCI, Inc. and ICL
14    resources.
15          Q.  Thank you.  You then go on to say,
16    "The Cultural Care team in Sweden has reached
17    out to Malin to review her experiences."
18          Does Cultural Care, Inc. have a
19    team in Sweden?
20          A.  No.
21          Q.  Okay, what are you referring to
22    when you refer to the Cultural Care team in
23    Sweden?
24          A.  I am referring to the office in
25    Sweden that has the name Cultural Care.
```

PLAINTIFFS' RESP. APP.0004481

MAGNA
LEGAL SERVICES

Page 262

```
 1        Q.  Is that Cultural Care, Inc.?
 2        A.  No.
 3        Q.  What entity has a Cultural Care
 4   team in Sweden?
 5        A.  An entity overseas that is -- that
 6   ICL has given license to utilize the name.
 7        Q.  Is it ICL, or it's another -- I
 8   don't -- I'm sorry, I don't understand your
 9   answer.
10        Is it ICL, the Cultural Care team
11   in Sweden?  Is that what you're referencing?
12        A.  I don't know technically if it is
13   legally ICL or what the exact legal entity
14   name is.  But what I know is that the
15   licensed name of Cultural Care Au Pair is
16   being applied to this location in Sweden, and
17   that location has a support team that is
18   available for this au pair to support her.
19        Q.  Okay.  And that designee of the
20   Cultural Care name in Sweden, are they a
21   designated sponsor by the U.S. Department of
22   State?
23        A.  No.
24        Q.  And just for clarification
25   purposes, is ICL a designated sponsor by the
```

Page 264

```
 1   reference is being made to ICL.
 2        Q.  Is ICL in a position to make
 3   representations to the U.S. Embassy in any
 4   country?
 5        MS. LUKEY:  Objection.
 6        A.  I don't know what they're in a
 7   position to make representations to at any --
 8   at any point.
 9        Q.  That sentence refers to Cultural
10   Care Au Pair.  And you've testified that that
11   reference to Cultural Care Au Pair refers to
12   ICL.
13        Cultural Care Au Pair is, again,
14   referenced in the second main paragraph where
15   it says, "As you well know, Cultural Care
16   Au Pair is officially designated by the U.S.
17   Department of State's Cultural Exchange
18   Bureau."
19        That's the same designation of the
20   previous Cultural Care Au Pair.  What is Lily
21   referring to when she says "Cultural Care
22   Au Pair" -- the same entity we were just
23   discussing -- "is officially designated by
24   the U.S. Department of State's Cultural
25   Exchange Bureau"?
```

Page 263

```
 1   U.S. Department of State?
 2        A.  No.
 3        Q.  Okay, thank you.
 4        (Document marked for
 5   identification as Jordan Exhibit 32)
 6        A.  (Document review.)
 7        Q.  What is this document?
 8        A.  This appears to be a letter to the
 9   U.S. Embassy in Bogota, Columbia, on behalf
10   of an au pair applicant.
11        Q.  Who is Lily Voss?
12        A.  Lily Voss was a staff member.
13        Q.  For whom?
14        A.  For Cultural Care, Inc.
15        Q.  The letter in the second sentence
16   says, "Cultural Care Au Pair is proud to have
17   recruited, screened, and oriented this young
18   women to become an au pair in the
19   United States."
20        Who is Lily Voss referring to when
21   she says, "Cultural Care Au Pair is proud to
22   have recruited, screened, and oriented this
23   young woman"?
24        MS. LUKEY:  Objection.
25        A.  It's my understanding that this
```

Page 265

```
 1        MS. LUKEY:  Objection.  You added a
 2   phrase there, but I guess you didn't
 3   intend to read literally.
 4        A.  Yeah, she didn't say that the --
 5   that ICL was the designated program by the
 6   U.S. Department of State.
 7        Q.  Who is being referred to in the
 8   sentence that starts "As you well know,
 9   Cultural Care Au Pair is officially
10   designated by the U.S. Department of State's
11   Cultural Exchange Bureau"?
12        A.  Who was she referring to in terms
13   of?
14        Q.  Well, it refers to Cultural Care
15   Au Pair.
16        A.  Right.
17        Q.  What is being referenced in that
18   sentence when it says "Cultural Care Au Pair
19   is officially designated by the U.S.
20   Department of State's Cultural Exchange
21   Bureau"?
22        MS. LUKEY:  Objection.
23        A.  What is being referenced here is
24   she's describing or confirming that Cultural
25   Care Au Pair is an officially designated
```

**MAGNA**
LEGAL SERVICES

| Page 266 | Page 268 |
|---|---|

**Page 266**

1  program sponsor by the State Department.
2      Q.  Is that the same Cultural Care
3  Au Pair that is proud to have recruited,
4  screened, and oriented this young woman to
5  become an au pair in the United States?
6      A.  Those are different.
7      Q.  Okay.  Is the name the same that is
8  used in the sentence that is used to describe
9  the entity that recruited, screened and
10  oriented this young woman and the entity that
11  is officially designated by the U.S.
12  Department of State?  Is the name the same?
13      A.  The name is the same, but the
14  reference is different.
15      Q.  And then the letter says, "Ana
16  Karina presented herself to Cultural Care
17  Au Pair as an exemplary candidate with strong
18  family ties and sufficient family resources,
19  and we do not understand why her application
20  for the J-1 visa was rejected."
21          In that sentence it makes another
22  reference to Cultural Care Au Pair.
23          Can you tell me who is being --
24  what entity is being referenced there when
25  Lily refers to "Cultural Care Au Pair"?

**Page 267**

1          MS. LUKEY:  Objection.
2      A.  It would be my understanding that
3  the reference here is to ICL.
4      Q.  So of the three references in this
5  one letter to Cultural Care Au Pair, the
6  first refers to ICL, the second refers to
7  Cultural Care, Inc., and the third refers to
8  ICL?
9      A.  The intention of this letter is to,
10  on behalf of this au pair, make sure that --
11  we're advocating on behalf of this au pair,
12  again, in this statement here, that we don't
13  understand why she has not been granted a J-1
14  visa to participate.
15          And in order to provide appropriate
16  background on the strength of this candidate
17  and information that would be important for
18  an embassy official to consider in making
19  this decision, we've provided an overview of
20  her recruitment, additional personal
21  information, in the hopes that with this
22  added perspective that they may consider a
23  reversal of this rejection decision.
24      Q.  Okay, I'm going to ask my question
25  again, and it's a "yes" or "no" question.

**Page 268**

1          MS. LUKEY:  If you're capable of
2  answering it "yes" or "no."
3      Q.  In this one letter, there are three
4  references to Cultural Care Au Pair; is that
5  correct?
6      A.  Cultural Care Au Pair is stated
7  three different times in this letter.
8      Q.  Okay.  The three different
9  references to Cultural Care Au Pair in this
10  letter, the first refers to ICL, the second
11  refers to Cultural Care, Inc., and the third
12  refers to ICL; is that correct?
13          MS. LUKEY:  Objection.
14      A.  I believe so, yes.
15      Q.  And this letter is signed by a Lily
16  Voss, and she was a Cultural Care, Inc.
17  employee?
18      A.  Yes, she was.
19          (Document marked for
20      identification as Jordan Exhibit 33)
21      Q.  I'll give you a moment to review
22  it, but do you recognize this document?
23      A.  (Document review.)
24      Q.  Do you recognize this document?
25      A.  I recognize that this comes from

**Page 269**

1  our website.
2      Q.  Okay.  When you say "our website,"
3  whose website is this from?
4      A.  CulturalCare.com, which is part of
5  Cultural Care, Inc. in the U.S.
6      Q.  If you turn to, and it's a --
7  what's the heading on this page from the
8  website?
9      A.  "Careers with Cultural Care."
10      Q.  And you testified that this is a
11  page from Cultural Care, Inc.'s website?
12      A.  Yes.  I believe it's Cultural Care,
13  Inc.  It's a U.S.-based website is my
14  understanding.
15      Q.  If we can turn to the third page,
16  the first position listed on the third page,
17  can you read the title of that position and
18  location?
19      A.  "Country Product Manager, Prague -
20  Vodickova."
21      Q.  And then if you can read that first
22  sentence under the title and location?
23      A.  "Cultural Care Au Pair is looking
24  for a Country Product Manager to lead the
25  Czech team out of our Prague office.  We are

**MAGNA**
LEGAL SERVICES

---

Page 270

1 looking for an ambitious, organized and
2 results-driven professional who will be
3 responsible for recruiting Czech Au Pairs for
4 the..." and then the sentence cuts off.
5     Q.  These aren't numbered, so it's four
6 from the back.
7     A.  Four from --
8     Q.  It's the fourth page from the back.
9 It starts with "Program" -- well, it starts
10 with "Placement Manager."
11    A.  I'm on a different.  Four pages
12 from the --
13    Q.  The top of the page says "Placement
14 Manager - Cambridge Office."
15    A.  I'm not...
16        MS. LUKEY:  Yeah, it's more than
17    four pages from the back.
18        MS. SMALLS:  Is it?
19        MS. LUKEY:  Yes.
20    Q.  It's five pages from the back,
21 sorry.  I think.  Yeah.
22    A.  And you said it starts with
23 "Placement Manager"?
24        MS. LUKEY:  Six.  Six pages.
25    Q.  Six pages from the back.

---

Page 271

1         Can you cite the job title and the
2 location and the first sentence for that job
3 posting?
4     A.  "Placement Manager - Cambridge
5 Office.  Cambridge - 1 Education Street."
6     Q.  And then the first sentence?
7     A.  "Placement Manager Cultural Care
8 Au Pair Cambridge, Massachusetts.  Please
9 include a Cover Letter with your application.
10 About Cultural Care:  We help young adults
11 from around the world make the impressive
12 commitment to spend a year living away from
13 family and..."  The sentence cuts off.
14    Q.  And can you read the position after
15 that?
16    A.  "Program Consultant - Denver,
17 Colorado.  Denver - Work From Home.  Program
18 Consultant Cultural Care Au Pair Denver,
19 Colorado.  Description: Do you want to work
20 in a fun, high-energy environment where you
21 can make a difference in people's lives each
22 day and help open the world through education
23 and cultural exchange?"
24    Q.  So on Cultural Care, Inc.'s
25 website, you list positions overseas and

---

Page 272

1 within the U.S.; is that correct?
2     A.  There are listings for programs
3 that are both based in the U.S. and
4 opportunities outside of the U.S., yes.
5     Q.  And you testified that this is
6 Cultural Care, Inc.'s website?
7     A.  I believe it to be Cultural Care,
8 Inc.'s website.
9     Q.  Okay, thank you.
10        MS. SMALLS:  We're done.
11        MS. LUKEY:  Okay, great.  Thank
12    you.
13        VIDEO TECHNICIAN:  Anyone else on
14    the phone have any other comments before
15    we end -- we formally end the
16    deposition?
17        MS. KOZAL:  None from AuPairCare.
18    Thank you.
19        VIDEO TECHNICIAN:  All right.  The
20    time is now 5:38 p.m.  We are concluding
21    today's deposition.  We are off the
22    record.
23        (Time Noted: 5:38 p.m.)
24
25

---

Page 273

1 ----------------I N D E X-------------------
2 WITNESS       EXAMINATION BY      PAGE
3 NATALIE JORDAN     MS. SMALLS        14
4
5
6 ----------------EXHIBITS-------------------
7 JORDAN EXHIBIT                 PAGE
8 Exhibit 1
9 Document entitled, "Plaintiffs' Agreed
10 Notice of 30(b)(6) Deposition of
11 Defendant Cultural Care, Inc.
12 d/b/a Cultural Care Au Pair.".............  19
13 Exhibit 2
14 Agreement, Bates CC00034585 to
15 CC00034596...............................   30
16 Exhibit 3
17 E-mail from Katie Reed to Natalie
18 Jordan, dated January 8, 2013, Bates
19 CC00007373 to CC00007374.................  68
20 Exhibit 4
21 Document entitled " Cultural Care
22 Au Pair Staffing Patterns," Bates
23 CC00008564...............................  72
24
25

---

PLAINTIFFS' RESP. APP.0004484

MAGNA
LEGAL SERVICES

| Page 274 | |
|---|---|
| 1 | ----------EXHIBITS, Continued ------------- |
| 2 | JORDAN EXHIBIT                    PAGE |
| 3 | Exhibit 5 |
| 4 | Cultural Care, Inc., Financial |
| 5 | Statements (Reviewed), Years ended |
| 6 | September 30, 2010, and 2009, Bates |
| 7 | CC00034504 to CC00034516................. 82 |
| 8 | Exhibit 6 |
| 9 | Host Family Handbook, Bates CC00000329 |
| 10 | to CC00000404............................ 96 |
| 11 | Exhibit 7 |
| 12 | Document entitled " Competitor Guide |
| 13 | 2014," Bates CC00003114 to CC00003115.... 133 |
| 14 | Exhibit 8 |
| 15 | Document entitled "Cultural Care |
| 16 | Au Pair, A Flexible, Affordable |
| 17 | Childcare Solution," Bates CC00000966 |
| 18 | to CC00000976............................ 143 |
| 19 | Exhibit 9 |
| 20 | Document entitled, entitled "Choosing |
| 21 | the Right Childcare," Bates CC00000934 |
| 22 | to CC00000943............................ 146 |
| 23 | |
| 24 | |
| 25 | |

| Page 276 | |
|---|---|
| 1 | ----------EXHIBITS, Continued ------------- |
| 2 | JORDAN EXHIBIT                    PAGE |
| 3 | Exhibit 17 |
| 4 | Document entitled "Host Family and |
| 5 | Au Pair Orientation Form - Two Week," |
| 6 | Bates CC00011865 to CC00011867.......... 186 |
| 7 | Exhibit 18 |
| 8 | Document entitled "Household Chores," |
| 9 | Bates CC00001462 to CC00001489.......... 200 |
| 10 | Exhibit 19 |
| 11 | "6 month extension host family |
| 12 | Agreement," "9 month extension host |
| 13 | family agreement," "12 month extension |
| 14 | host family agreement," Bates CC00000121 |
| 15 | to CC00000129............................ 202 |
| 16 | Exhibit 20 |
| 17 | Document entitled "Host Family |
| 18 | Interview (New Host Family)," Bates |
| 19 | CC00009787 to CC00009791................. 204 |
| 20 | Exhibit 21 |
| 21 | E-mail chain; from Katie Reed to |
| 22 | Natalie Jordan, dated June 21, 2013, |
| 23 | Bates CC00008224 to CC00008227.......... 209 |
| 24 | |
| 25 | |

| Page 275 | |
|---|---|
| 1 | ----------EXHIBITS, Continued ------------- |
| 2 | JORDAN EXHIBIT                    PAGE |
| 3 | Exhibit 10 |
| 4 | Document entitled "Cultural Care |
| 5 | Au Pair, A Flexible, Affordable |
| 6 | Childcare Solution," Bates CC00000815 |
| 7 | to CC00000834............................ 159 |
| 8 | Exhibit 11 |
| 9 | Document entitled "Cultural Care |
| 10 | Au Pair, A Flexible, Affordable |
| 11 | Childcare Solution," Bates CC00000501 |
| 12 | to CC00000520............................ 162 |
| 13 | Exhibit 12 |
| 14 | Brochure, Bates CC00000640 to CC00000641. 164 |
| 15 | Exhibit 13 |
| 16 | CulturalCare.com website printout........ 165 |
| 17 | Exhibit 14 |
| 18 | Online printout, "Being an Au Pair"...... 166 |
| 19 | Exhibit 15 |
| 20 | Document entitled "Agreement," Bates |
| 21 | CC00033089 to CC00033097................. 168 |
| 22 | Exhibit 16 |
| 23 | Document entitled "Host Family Call |
| 24 | Structure," Bates CC00001650 to |
| 25 | CC00001651............................... 172 |

| Page 277 | |
|---|---|
| 1 | ----------EXHIBITS, Continued ------------- |
| 2 | JORDAN EXHIBIT                    PAGE |
| 3 | Exhibit 22 |
| 4 | E-mail chain; from Katie Reed to |
| 5 | Tina Mercurio, dated September 9, 2013, |
| 6 | Bates CC00007272 to CC00007275.......... 210 |
| 7 | Exhibit 23 |
| 8 | E-mail chain; from Natalie Jordan to |
| 9 | Sabine Campbell, dated December 12, |
| 10 | 2013, Bates CC00010503 to CC00010505..... 212 |
| 11 | Exhibit 24 |
| 12 | E-mail chain; from Samantha Janney to |
| 13 | Judith DeKort, dated April 10, |
| 14 | 2013, Bates CC00019041 to CC00019042..... 212 |
| 15 | Exhibit 25 |
| 16 | E-mail chain; from Katie Reed to |
| 17 | Tina Mercurio, dated June 21, |
| 18 | 2013, Bates CC00008228 to CC00008231..... 215 |
| 19 | Exhibit 26 |
| 20 | E-mail chain; from Natalie Jordan to |
| 21 | Michael McHugh, dated October 11, 2013, |
| 22 | Bates CC00017601 to CC00017602.......... 224 |
| 23 | |
| 24 | |
| 25 | |

PLAINTIFFS' RESP. APP.0004485

**MAGNA** ▶
LEGAL SERVICES

Page 278

```
 1   -----------EXHIBITS, Continued --------------
 2   JORDAN EXHIBIT                    PAGE
 3   Exhibit 27
 4   E-mail chain; from Michael McHugh to Goran
 5   Rannefors, dated November 17, 2014,
 6   Bates CC00008863 to CC00008864........... 233
 7   Exhibit 28
 8   E-mail chain; from Goran Rannefors to
 9   David Widerberg, dated December 27,
10   2013, Bates CC00009209................... 237
11   Exhibit 29
12   Two e-mails; first page from Carl
13   Thorsen to Goran Rennefors, dated
14   January 2, 2014, Bates CC00008974 to
15   CC00008975............................... 242
16   Exhibit 30
17   Welcome Letter, Bates CC00002192 to
18   CC00002272............................... 256
19   Exhibit 31
20   Au Pair Incident/Complaint Report,
21   Bates CC00003001 to CC00003002........... 257
22   Exhibit 32
23   Letter to NIV Section, United States
24   Embassy, Bogata, Columbia from
25   Lily Voss, Bates CC00006408.............. 263
```

Page 279

```
 1   -----------EXHIBITS, Continued --------------
 2   JORDAN EXHIBIT                    PAGE
 3   Exhibit 33
 4   CulturalCare.com website content
 5   entitled "Careers with Cultural Care"... 268
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 280

```
 1           C E R T I F I C A T E
 2        I, NATALIE JORDAN, do hereby certify
 3   that I have read the foregoing transcript of
 4   my testimony, and further certify that it is
 5   a true and accurate record of my testimony
 6   (with the exception of the corrections listed
 7   below):
 8   Page   Line            Correction
 9
10
11
12
13
14
15
16
17
18
19        Signed under the pains and penalties of
20   perjury this        day of           ,
21   2017.
22
23           NATALIE JORDAN
24
25
```

Page 281

```
 1           C E R T I F I C A T E
 2
 3   COMMONWEALTH OF MASSACHUSETTS
 4   SUFFOLK, SS.
 5        I, MaryJo O'Connor, a Notary Public
 6   in and for the Commonwealth of Massachusetts,
 7   do hereby certify:
 8        That NATALIE JORDAN, the witness
 9   whose testimony is hereinbefore set forth,
10   was duly sworn by me and that such testimony
11   is a true and accurate record of my stenotype
12   notes taken in the foregoing matter to the
13   best of my knowledge, skill and ability.
14        IN WITNESS WHEREOF, I have hereunto
15   set my hand and Notarial Seal this 19th day
16   of April 2017.
17
18
19
          MARYJO O'CONNOR, RMR/CSR
20             Notary Public
21
     My Commission expires:
22   September 28, 2018
23
24
25
```

PLAINTIFFS' RESP. APP.0004486

MAGNA ▶
LEGAL SERVICES

# Exhibit 404

PLAINTIFFS' RESP. APP.0004487

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO


JOHANA PAOLA BELTRAN, et al.,

        Plaintiffs,

      vs.              No. 14-cv-03074-CMA-KMT

INTEREXCHANGE, INC., et al.,

        Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~


VIDEOTAPED DEPOSITION OF 30(b)(6) EXPERT OF EURAUPAIR

CELIA PARKER

Volume I


Sunday, April 30, 2017

10:21 a.m. - 7:25 p.m.


686 Anton Boulevard
Costa Mesa, California  92626


Magna Legal Services
866-624-6221
www.MagnaLS.com


Reported by:  Marceline F. Noble, CSR No. 3024

PLAINTIFFS' RESP. APP.0004488

## Page 2

```
 1            APPEARANCES OF COUNSEL
 2
 3   For Plaintiffs:
 4      BOIES SCHILLER FLEXNER LLP
        SEAN PHILLIPS RODRIQUEZ, ESQ.
 5      JUAN P. VALDIVIESO, ESQ.
        1999 Harrison Street, Suite 900
 6      Oakland, California  94612
        510.874.1000
 7      srodriguez@bsfllp.com
        jvaldivieso@bsfllp.com
 8
 9   For EurAuPair Intercultural Child Care Programs:
10      BROWNSTEIN HYATT FARBER SCHRECK
        MARTHA L. FITZGERALD, ESQ.
11      DAVID B. MESCHKE, ESQ.
        410 17th Street, Suite 2200
12      Denver, Colorado  80202
        303.223.1100
13      mfitzgerald@bhfs.com
        dmeschke@bhfs.com
14
15   For Defendant Cultural Care Au Pair:
16      CHOATE, HALL & STEWART
        LYNDSEY M. KRUZER, ESQ. (By Telephone)
17      Two Internation Place
        Boston, Massachusetts  02110
18      617.248.5000
        lkruzer@choate.com
19
20       - and -
21      LEWIS, ROCA, ROTHGERBER, CHRISTIE
        JESSICA L. FULLER, ESQ. (By Telephone)
22      1200 17the Street, Suite 3000
        Denver, Colorado  80202
        303.628.9527
23      jfuller@lrrc.com
24
25
```

## Page 3

```
 1          APPEARANCES OF COUNSEL (continued)
 2
 3   For Defendant AuPairCare, Inc.:
 4      GORDON & REES
        NATHAN HUEY, ESQ. (By Telephone)
 5      555 17th Street, Suite 3400
        Denver, Colorado  80202
 6      303.534.5160
        nhuey@gordonrees.com
 7
 8   For Defendants ProAuPair, Apex Professional Exchange,
     Inc., and 20/20 Care Exchange dba The International
 9   AuPair Exchange:
10      NIXON SHEFRIN HENSEN OGBURN P.C.
        LAWRENCE D. STONE, ESQ. (By Telephone)
11      5619 DTC Parkway, Suite 1200
        Greenwood Village, Colorado  80111
12      303.773.3500
        lstone@nixonshefrin.com
13
14   For Defendant InterExchange, Inc.:
15
        SHERMAN & HOWARD, L.L.C.
16      ALYSSA LEVY, ESQ. (By Telephone)
        633 17th Street, Suite 3000
17      Denver, Colorado  80202
        303.299.8194
18      alevy@shermanhoward.com
19
20   For Defendant Expert AuPair:
21      BOGDAN ENICA, ESQ. (By Telephone)
        100 2nd Avenue S., Suite 3025
22      St. Petersburg, Florida  33701
        727.225.2649
23      bogdan@expertaupair.com
24
25
```

## Page 4

```
 1          APPEARANCES OF COUNSEL (continued)
 2
 3   For Defendant USAuPair, LLC:
 4      KELLY & WALKER, LLC
        WILLIAM J. KELLY, III, ESQ.
 5      1512 Larimer Street, Suite 200
        Denver, Colorado  80202
 6      720.236.1800
        wkelly@kellywalkerlaw.com
 7
 8   Also Present:
 9      JOSH MINYARD, VIDEOGRAPHER
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 5

```
 1             INDEX OF EXAMINATION
 2
 3   WITNESS:  CELIA PARKER
 4      EXAMINATION                    PAGE
 5      By Mr. Valdivieso              13
 6
 7
 8
 9          INFORMATION REQUESTED
10             (None)
11
12
13       WITNESS INSTRUCT NOT TO ANSWER
14             (None)
15
16
17
18
19
20
21
22
23
24
25
```

PLAINTIFFS' RESP. APP.0004489

MAGNA
LEGAL SERVICES

Page 126

1    Q.  Do they have contracts in which they've
2  entered into with EurAuPair?
3    A.  No.
4      Area coordinat- -- okay.
5    Q.  Do area coordinators enter into contracts
6  with EurAuPair?
7    A.  An area coordinator does, yes.
8      I believe this is developed by a community
9  counselor, who does not.  So...
10   Q.  How do you know that this was developed by a
11 community counselor?
12   A.  I don't.  I'm sorry.  It's supposition and I
13 shouldn't suppose it.
14     I don't know who -- who developed this.
15 I -- it -- I can only say that it was not developed
16 by EurAuPair --
17   Q.  And why do you think --
18   A.  -- direct- --
19   Q.  -- it was not developed by EurAuPair?
20   A.  Because the language is not appropriate.
21   Q.  I would like to show you what we'll be
22 marking as Exhibit 13.  It's a document ending in
23 Bates No. 1399.
24     (Deposition Exhibit 13 was marked for
25     identification by the court reporter.)

Page 127

1      THE WITNESS:  Okay.
2    Q.  (By Mr. Valdivieso) Are you familiar with
3  this document?
4    A.  I am.
5    Q.  What is Exhibit 13?
6    A.  Is the EurAuPair Host Family brochure.
7    Q.  What year is this post [sic] family brochure
8  from?
9    A.  2012.
10   Q.  Is this a document -- scratch that.
11     What is the intended audience of this
12 document?
13   A.  Prospective host families.
14   Q.  Do you know who drafted it?
15   A.  No.  Would have been if...
16   Q.  Do you know if a particular team would have
17 had a role in drafting it?
18   A.  A particular team, no.
19   Q.  Was this document approved by EurAuPair?
20   A.  Yes.
21   Q.  Who approved it?
22   A.  Susan Hayes.
23   Q.  Did you play any role in the approval of
24 this document?
25   A.  No.

Page 128

1    Q.  Like to direct your attention to page 2,
2  Bates number ending in 1401.  And above the little
3  boy's shoe, there's a sentence that starts, "The
4  approximate."
5      Could you read that sentence into the
6  record, please.
7    A.  (Reading.)
8      "The approximate 338 weekly cost,"
9      parenthetically, "(including the 195.75
10     U.S. government-required weekly au pair pocket
11     money and excluding any educational or domestic
12     flight fees,)" end paren, "is an exceptional
13     value for such flexible and loving in-home
14     care."
15   Q.  Thank you.
16     Do you know how the approximate weekly cost
17 was calculated?
18   A.  Yes.
19   Q.  And how is that?
20   A.  By anecdotal, I guess is the way I would
21 research, by the brochure designers.
22   Q.  What components go into the approximate
23 week- -- weekly cost?
24   A.  The 338 --
25     Your -- I was waiting for the rest of the

Page 129

1  question.  Sorry.  I didn't understand.
2      That would be the program fees, the pocket
3  money.  And since our program fees are all inclusive,
4  that would be what would be calculated in.
5    Q.  So --
6    A.  Can I use my calculator?
7    Q.  You may use the calculator -- on -- on
8  your -- on your phone?
9      Is that where you have a calculator?
10   A.  That's the only place --
11   Q.  Is that the only place you have --
12   A.  -- I have a calculator.  Yeah.
13   Q.  You may use your calculator, yes.
14   A.  Oh, okay.
15     MR. VALDIVIESO:  If the record could reflect
16 that witness is using her calculator.
17     THE WITNESS:  I'll even use it right here.
18     I just want to make sure I'm not forgetting
19 anything.
20     So this is 2012?
21   Q.  (By Mr. Valdivieso) That's right.
22   A.  Yeah.
23     Okay.  So it would be the program fee and
24 the weekly pocket money over the course of the
25 12-month program, is what that's...

MAGNA ▶
LEGAL SERVICES

33 (Pages 126 to 129)

| Page 130 | Page 132 |
|---|---|

**Page 130**

1    Q. And then you'd -- that -- that will give you
2  the amount of fees in a year.
3    And how do you calculate the amount
4  per week?
5    A. Divide it by 52 weeks.
6    Q. And if you divide the approximate $338
7  weekly cost -- withdrawn.
8    On page 5, it's Bates number ending in
9  14004. Under "Security and Stability," could you
10  read that sentence into the record, please.
11    A. (Reading.)
12      "Your EurAuPair au pair will live in your
13      home and will be available to easily assist
14      with the care of your children for up to 45
15      hours per week."
16      Keep going?
17      "You'll quickly -- "
18    Q. No, no. That's enough. Thank you.
19    A. That's enough? Okay.
20      MS. FITZGERALD: I'm sorry. What page were
21  we on there?
22      MR. VALDIVIESO: That was page Bates
23  No. 1404.
24      MS. FITZGERALD: 04. Okay. Thank you.
25      MR. VALDIVIESO: Page 5 of the document.

**Page 132**

1      Going back to the -- page 2, 1401.
2      What -- you were doing some arithmetic on
3  your calculator earlier.
4      What -- when you divide the $338 in
5  weekly -- approximate weekly cost by 45 hours that
6  were listed in page 5, what do you get on a
7  per-hourly basis?
8    A. It -- I present- -- are you asking on the
9  basis of 45 hours?
10    Q. Correct.
11    A. Are you asking me to do the math?
12      (Witness complies.)
13      $7.51.
14    Q. So in the flier that we were just looking
15  at, where it talked about $7.50 hourly cost, is that
16  inconsistent with the hourly cost that one would
17  calculate by looking at Exhibit No. 13?
18    A. Is it inconsistent?
19      Okay. I'm not -- ask me a different way.
20    Q. So you believe that $7.51 is close to $7.50?
21    A. It is.
22    Q. Looking at the same page, page 2, Bates
23  No. 1401, on the bottom left, there's a chart of
24  sorts, a bar chart.
25      Do you see that?

| Page 131 | Page 133 |
|---|---|

**Page 131**

1      MS. FITZGERALD: Thank you.
2    Q. (By Mr. Valdivieso) And why -- why does it
3  say, "for up to 45 hours per week"?
4    A. Because the maximum number of hours an
5  au pair is permitted to provide child care assistance
6  under the federal regulation is 45.
7      There is no minimum requirement.
8    Q. Is it a benefit to the host family that the
9  au pair lives in their home and is available to
10  easily assist with the care of the children?
11    A. You're asking me if that is a benefit to --
12    Q. Host families.
13    A. -- a prospective host family or an
14  individual host family?
15    Q. Yes.
16    A. We've had families tell us that it is an
17  advantage, yes.
18    Q. Do you believe -- do you, Ce Parker, believe
19  that it is an advantage?
20    A. Yes.
21    Q. Does EurAuPair believe that it's an
22  advantage to the host families?
23    A. To have the au pair living in -- with them
24  in their home, yes, very much.
25    Q. And sorry.

**Page 133**

1    A. I do.
2    Q. Could you read what the three categories
3  that are being compared in that chart are, please,
4  starting with "EurAuPair."
5    A. First EurAuPair. Then "Nanny Service."
6  Then "Day Care."
7    Q. And -- and what does it say below that?
8    A. "Average cost per week for up to four
9  children."
10    Q. And is it fair to say that the EurAuPair bar
11  seems to go to approximately $338 per week?
12    A. I think that's what the artist intended.
13      Yes, the designer, brochure designer, I'm
14  sure.
15    Q. And what does it say -- where -- where does
16  the nanny service bar, approximately, seem to go?
17    A. It appears to be over the $400 mark yet
18  under the 600 mark.
19    Q. Thank you.
20      And under the Day Care bar, where does the
21  bar appear to go?
22    A. Over the 800 mark and below the one thousand
23  mark.
24    Q. Is it fair to say that the bar appears to
25  represent that nanny service costs somewhere between

**MAGNA** ▶
LEGAL SERVICES

---

Page 134

```
 1    400 and $600 per week for up to four children?
 2        A.  Yes.
 3        Q.  And it's fair to say that the daycare
 4    cost -- the average cost per week for up to four
 5    children appears to be between eight hundred and a
 6    thousand dollars?
 7        A.  Yes.
 8        Q.  Do you know how these two other categories
 9    of child care service were selected?
10        A.  No.
11        Q.  Why is EurAuPair comparing the costs -- the
12    average weekly cost of an au pair to the originally
13    the cost of a nanny service in the average weekly
14    cost of daycare?
15        A.  Why compare costs of different forms of
16    child care for a prospective host family who's
17    selecting an au pair?
18        Q.  Is it a benefit to the host families that
19    the cost -- average cost per week of hosting an
20    au pair is less than the cost of hosting a -- or
21    employing a nanny service or a daycare?
22        A.  For some host families, it would be
23    considered a benefit, yes.
24        Q.  So nanny services and daycare are different
25    forms of child care?
```

Page 135

```
 1        A.  Yes.
 2        Q.  And au pairs are a form of child care?
 3        A.  Yes.
 4        Q.  Does EurAuPair consider the time that an
 5    au pair is on standby or on call, compensable time?
 6        A.  Compensable time.
 7            I'd -- maybe rephrase the question for me?
 8        Q.  Sure.
 9            So you said that the regulations say that 45
10    hours per week is the maximum amount of time that an
11    au pair is permitted to work; is that correct?
12        A.  No.  I said 45 hours a week is a maximum
13    amount of time that an au pair can be asked to
14    provide child care assistance.
15        Q.  And is the amount of time that an au pair is
16    on standby or on call, does that amount of time count
17    towards that 45-hour maximum?
18        A.  Could you explain what you mean by standby
19    or on call?  Just give me an example.
20        Q.  Well, the document that we just looked at,
21    it said -- you read earlier that the au pair will
22    live in your home and will be available to easily
23    assist with the care of your children.
24        A.  But that's not all it says.
25        Q.  For up to 45 hours per week.
```

Page 136

```
 1            Withdrawn.  We'll -- we'll get to this
 2    later.
 3            On page 15 of this document -- it's Bates
 4    number ending in 1414 -- do you see "Host family
 5    qualifications"?
 6        A.  Let me get in there.
 7            On 14- -- oh, I'm on the wrong page.
 8            Yes.
 9        Q.  And again it says, "Families must."
10            Do you see that?
11        A.  I do.
12        Q.  And do you see No. 9 on that list of things
13    that a family must do?
14        A.  Yes.
15        Q.  Could you read that sentence into the
16    record, please.
17        A.  "Provide the au pair with their 195.75
18    asterisk, pocket money," comma, "per week."
19            Keep going?
20        Q.  Please.  Please keep going.
21        A.  Looks like there's an extra period.
22            "The EurAuPair au pair weekly pocket money
23        is per family," comma, "not per child.  Pocket
24        money is provided on a weekly basis and may not
25        be prorate- -- prorated, depending upon the
```

Page 137

```
 1        number of hours of child care provided."
 2        Q.  Thank you.
 3            And you mentioned there was an asterisk
 4    there.
 5            Could you please read what follows the
 6    asterisk below?
 7        A.  You seriously think I can read that small?
 8            The asterisk is:
 9            "The au pair weekly pocket money amount is
10        established by regulations promulgated by the
11        U.S. -- United States Department of State in
12        compliance with the Fair Labor Standards Act
13        and is subject to change."
14        Q.  Is it accurate to state that the regulations
15    require that the amount paid to the au pair on a
16    weekly basis be exactly 195.75?
17            MS. FITZGERALD:  Object to the form.
18            THE WITNESS:  I'm sorry.  Ask me again.
19            And maybe it's getting time for a break.
20    I'm sorry.  I'm -- I'm making you repeat yourself.
21        Q.  (By Mr. Valdivieso)  Sure.
22            Let's -- let's answer this question and we
23    can --
24        A.  Okay.
25        Q.  -- take a break.
```

PLAINTIFFS' RESP. APP.0004492

MAGNA ▶
LEGAL SERVICES

---

Page 234

1    that -- when you say "keep track of," that seems like
2    it's a -- it doesn't seem like that intensive a need.
3        Q.  Do you think it's more likely for EurAuPair
4    to retain an existing family if it's repeat family
5    discount is larger than other sponsors?
6        MS. FITZGERALD:  Object to the form.
7        THE WITNESS:  I can't speak for every
8    family.  Price would have to matter to them.
9        Q.  (By Mr. Valdivieso) In your years of
10   experience in the au pair program, do you find that
11   most families take price into account in their
12   decision-making process in choosing an au pair
13   sponsor?
14       MS. FITZGERALD:  Same objection.
15       THE WITNESS:  It would be different from one
16   family to the next.
17       Q.  (By Mr. Valdivieso) You can't say, one way
18   or another, for most families, whether they
19   take this -- the amount of the family discount into
20   account?
21       MS. FITZGERALD:  Same objection.
22       THE WITNESS:  This family reportedly cared.
23   That's the only one I can speak to.
24       Q.  (By Mr. Valdivieso) Are EurAuPair's fees
25   competitive in the market?

---

Page 235

1        A.  I would have to believe so.
2        Q.  Why do you believe that?
3        A.  Because we have a population of host
4    families hosting with us, and because we do look from
5    time to time to see how other au pair program
6    sponsors are setting their fees.
7        Q.  Is it fair to say that EurAuPair --
8    withdrawn.
9        Does EurAuPair compete with other sponsors
10   with respect to the au pair stipend?
11       A.  Would you repeat the question?
12       Q.  Does EurAuPair compete with other sponsors
13   with respect to the au pair stipend?
14       MS. FITZGERALD:  Object.  Foundation and
15   form.
16       THE WITNESS:  I -- I find that a puzzling
17   question.  So I'll say no.
18       Q.  (By Mr. Valdivieso) Your answer is no?
19       A.  I'm sorry.
20       Yes.
21       MS. FITZGERALD:  Yes, your answer is "no"?
22       THE WITNESS:  Well, I'm sorry.  I was
23   thinking it felt like I was on a game show.  "Is that
24   your final answer?"
25       Sorry.

---

Page 236

1        My answer is no.  The minimum stipend amount
2    or pocket money amount, as you choose, is the same
3    regardless which au pair program sponsor a family
4    chooses to host with.
5        Q.  (By Mr. Valdivieso) If the stipend amount
6    that EurAuPair host families were required to pay
7    au pairs on a weekly basis increased from 195.75 by,
8    hypothetically speaking, $20, would you expect fewer
9    host families to apply to be -- to host au pairs?
10       MS. FITZGERALD:  Object to the form and lack
11   of foundation.
12       THE WITNESS:  It's speculation.  So I really
13   can't -- can't know.
14       As of 2008 and no one has employment, I --
15   I -- there's too many factors.  I'm -- I -- I
16   couldn't -- couldn't answer.
17       Q.  (By Mr. Valdivieso) All -- all other things
18   being equal, if the price -- if the weekly stipend
19   were to increase from 195.75, do you, based on your
20   many years of experience in the au pair program,
21   expect that fewer host families would apply to host
22   au pairs?
23       MS. FITZGERALD:  Form and foundation.
24       THE WITNESS:  And given your objection, I'm
25   to respond anyway?

---

Page 237

1        MS. FITZGERALD:  Yes.  If you can.
2        THE WITNESS:  So you're asking me to
3    speculate in the future behavior of potential host
4    families.  I -- I don't think it would be material.
5    I -- I don't think it would be a problem.
6        Q.  (By Mr. Valdivieso) You don't think a
7    20-dollar increase in the weekly stipend would be --
8    would deter families from applying to host au pairs?
9        MS. FITZGERALD:  Same objection.
10       THE WITNESS:  It's a case by case.  Every
11   family is different.  And what their price
12   sensitivity point is I -- I can't respond to.  I
13   really can't.
14       If you're asking for me to speculate and
15   make a guess out of the whole population of the USA,
16   I don't think it would be deemed significant, no.
17       I know I'm not the one asking a question,
18   but I'm probably gonna need to soon let some people
19   know time frames to expect.
20       MR. RODRIGUEZ:  It's a good time for a quick
21   break.
22       THE WITNESS:  Does anybody have a flight?
23   Please?
24       Sorry.
25       MR. RODRIGUEZ:  Why don't we take a break

---

# Exhibit 405

PLAINTIFFS' RESP. APP.0004494

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Case No. 14-cv-03074-CMA-KMT

_____

JOHANA PAOLA BELTRAN, ET AL.,

        Plaintiffs,

vs.

INTEREXCHANGE, INC., ET AL.,

        Defendants.

_____

VIDEOTAPED DEPOSITION OF

HELENE YOUNG

30(b)(6) REPRESENTATIVE FOR USAUPAIR, INC.

MAY 1, 2017

DENVER, COLORADO

11:08 A.M.

Magna Legal Services
866-624-6221
www.magnals.com

PLAINTIFFS' RESP. APP.0004495

**Page 2**

1       The videotaped deposition of
2 HELENE YOUNG, taken before Leeann Keenan, a Registered
3 Merit Reporter, Certified Realtime Reporter, and a
4 Notary Public in and for the County of Summit and the
5 State of Colorado, at 1512 Larimer Street, Suite 200,
6 Denver, Colorado, on Monday, May 1, 2017, at the hour
7 of 11:08 a.m., pursuant to Notice.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 3**

1 APPEARANCES:
2
3    BOISE, SCHILLER, FLEXNER, L.L.P.
   BY: DANIEL SCHWARTZ, ESQ.
4     575 Lexington Avenue
    New York, New York 10022
5     (212) 303-3537
    dschwartz@bafllp.com
6     appeared on behalf of the Plaintiffs
7    TOWARDS JUSTICE
   BY: ALEXANDER HOOD, ESQ.
8     1535 High Street
    Suite 300
9     Denver, Colorado 80218
    (720) 441-2236
10     alex@towardsjustice.org
    appeared on behalf of the Plaintiffs
11 KELLY & WALKER, L.L.C.
   BY: WILLIAM J. KELLY, III, ESQ.
12     1512 Larimer Street
    Suite 200
13     Denver, Colorado 80202
    (720) 236-1801
14     wkelly@kellywalkerlaw.com
    appeared on behalf of USAuPair Inc.
15
   CHOATE, HALL & STEWART
16    BY: LYNDSEY KRUZER, ESQ.
    Two International Place
17     Boston, Massachusetts 02110
    (617) 248-5221
18     lkruze@choate.com
    appeared by telephone on behalf of
19     Cultural Care
20 LEWIS, ROCA, ROTHGERBER, CHRISTIE
   BY: JESSICA FULLER, ESQ.
21     1200 17th Street
    Suite 3000
22     Denver, Colorado 80202
    (303) 628-9527
23     appeared by telephone on behalf of
    Cultural Care
24
25

**Page 4**

1 APPEARANCES CONTINUED:
2
3    GORDON & REES
   BY: NATHAN HUEY, ESQ.
4     555 17th Street
    Suite 3400
5     Denver, Colorado 80202
    (303) 200-6888
6     nhuey@gordonrees.com
    appeared by telephone on behalf of
7     AuPairCare, Inc.
8    SHERMAN & HOWARD, L.L.C.
   BY: ALYSSA LEVY, ESQ.
9     633 17th Street
    Suite 3000
10     Denver, Colorado 80202
    (303) 299-8194
11     alevy@shermanhoward.com
    appeared by telephone on behalf of
12     InterExchange, Inc.
13    FISHER & PHILLIPS
   BY: SUSAN SCHAECHER, ESQ.
14     1801 California Street
    Suite 2700
15     Denver, Colorado 80202
    (303) 218-3650
16     sschaecher@fisherphillips.com
    appeared by telephone on behalf of
17     AuPair Foundation and Au Pair in
    America
18 EXPERT AUPAIR
   BY: BOGDAN ENICA, ESQ.
19     100 2nd Avenue S.
    Suite 3025
20     St. Petersburg, Florida 33701
    (727) 225-2649
21     bogdan@expertaupair.com
    appeared by telephone on behalf of
22     Expert AuPair
23
24
25

**Page 5**

1 APPEARANCES CONTINUED:
2
3    NIXON, SHEFRIN, HENSEN, OGBURN
   BY: LAWRENCE STONE, ESQ.
4     5619 DTC Parkway
    Suite 1200
5     Greenwood Village, Colorado 80111
    (303) 773-3500
6     lstone@nixonshefrin.com
    appeared by telephone on behalf of
7     ProAuPair and International Au Pair
    Exchange
8
9 ALSO PRESENT: Davis Baumunk, Videographer
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

MAGNA ▶
LEGAL SERVICES

Page 130

1   14 years ago, so around ten; is that right?
2       A.   Maybe.  With whom?
3       Q.   Oh, thank you.
4            The -- the meetings with the State
5   Department that you were describing.
6       A.   Maybe ten meetings at the State
7   Department, maybe more.  I don't -- I couldn't tell
8   you exactly.
9       Q.   Okay.
10      A.   I mean, I don't go through my calender.
11  I didn't --
12      Q.   Okay.
13      A.   -- count before this.
14      Q.   When you attend those meetings at the
15  State Department, do you normally take notes?
16      A.   Sometimes.
17      Q.   Sometimes.  Okay.
18           Have you produced those notes at
19  this -- in this litigation?
20      A.   No.
21      Q.   Okay.  What gets discussed at these
22  meetings at the State Department?
23      A.   General topics; where they would like us
24  to recruit au pairs from, stats in the program.
25      Q.   Stats in the program?

Page 131

1       A.   Yeah.  How many au pairs came every year.
2       Q.   Have you discussed this litigation with
3   the State Department?
4       A.   No, not specifically.  Not -- I don't
5   know.
6       Q.   Not specifically?
7       A.   No.  There are -- there was a meeting,
8   and it was curtailed in the --
9       Q.   Curtailed?
10      A.   Yeah.
11      Q.   How -- how do you mean?
12      A.   When any -- when any -- when -- when the
13  subject came up, any subject came up, it was just we
14  didn't talk about it.
15      Q.   "We" being the sponsors?
16      A.   The sponsors and the State Department.
17      Q.   Do you recall how this subject came up at
18  these meetings?
19      A.   There was one meeting, and -- I can only
20  recall one meeting that it came up really.
21      Q.   Do you remember when that meeting was?
22      A.   No, I don't remember when it was.  It was
23  after -- obviously after the complaint was filed.
24      Q.   So what other -- I'm trying to understand
25  how the -- something like that gets curtailed.  So

Page 132

1   it begins, the -- the meeting begins.  What sort of
2   things were you talking about at that meeting?
3       A.   It was just curtailed.  There was
4   something on the agenda, and it was seen on the
5   agenda.  And it was inappropriate, shouldn't be on
6   the agenda, so it wasn't...
7       Q.   Who determined it was inappropriate?
8       A.   Sponsors and their legal counsel.
9       Q.   Okay.  So the State Department had an
10  agenda for a meeting with the sponsors.  Well, let
11  me -- let me back up.
12           Are these meetings called by the
13  State Department?
14      A.   Yes.
15      Q.   So a meeting called by the State
16  Department had a number of different subject
17  matters --
18      A.   Yes.
19      Q.   -- correct?
20      A.   Uh-huh.
21      Q.   And one of the subject matters at this
22  meeting --
23      A.   Yes.
24      Q.   -- involved the lawsuit?
25      A.   Indirectly.

Page 133

1       Q.   How -- how indirectly?
2       A.   It was a presentation by the Department
3   of Labor.
4       Q.   Okay.  It was a presentation by the
5   Department of Labor regarding what?
6       A.   I don't know.  It never got that far.
7       Q.   But you didn't want to attend a
8   presentation by the Department of Labor because it
9   had some potential impact on this lawsuit?
10           MR. KELLY:  Object to form.
11      A.   I don't know.  It -- it was just -- it
12  was just on the agenda.
13      Q.   What is your understanding of what the
14  Department of Labor, of how -- of how the Department
15  of Labor is involved in the au pair -- in -- in
16  the -- in the au pair universe?  You know what, I'll
17  rephrase that.
18           What role, based on your
19  understanding, does the Department of Labor play in
20  the -- in regulating the au pair program?
21      A.   That the -- the Department of State
22  regulates the au pair program.  The only thing I
23  know is that they are in communication with the
24  Department of Labor.  That's what I know.
25      Q.   So you said the only thing you know is

MAGNA ▶
LEGAL SERVICES

Case 1:14-cv-03074-CMA-KMT    Document 1059-23    Filed 03/17/18    USDC Colorado    Page 289

| Page 178 | Page 180 |
|---|---|

**Page 178**

1  families change and they come to us, they switch to
2  us, and they tell us something.
3        Or somebody has worked with
4  another agency, and they apply with our agency.
5     Q.  And you'll -- you'll confirm that the
6  other agencies or agency does some -- has some
7  policy?  Such as here --
8     A.  Yes.
9     Q.  -- you're confirming that the other
10 agency does not have a different refund policy for
11 host families who are pre-matched?
12    A.  Yeah.  This is -- a question like this is
13 usually predicated on a host family contacting me
14 and asking me -- asking me that exact question.
15    Q.  Okay.  So a host family could contact
16 you, say, "Do you have a different refund policy for
17 host families who are pre-matched?"  And you'll
18 reach out?
19    A.  Well, it could have been a --
20    Q.  It could have --
21    A.  -- CHI family.
22    Q.  I see.
23        So do you ever talk about the
24 general au pair market with other sponsor agencies?
25        MR. KELLY:  Object to form.

**Page 179**

1        You can answer.
2     A.  I talk to other sponsors about the
3  general environment of legislation --
4     Q.  Uh-huh.
5     A.  -- administration, how it would impact
6  our industry.
7     Q.  And do you talk to other sponsors about
8  how allotments of au pairs are distributed within
9  the industry?
10        MR. KELLY:  Object to form.
11        You can answer.
12    A.  I don't know what they get.  I only know
13 what I get.
14    Q.  Oh, you don't -- you don't know what
15 anyone else has or --
16    A.  No.
17    Q.  You've never talked to anyone about those
18 sorts of things?
19    A.  Well, I may have talked, but I don't -- I
20 mean, I may have made statements, but I have no
21 idea.
22        Actually, I -- I do recall one.
23 And that was at a State Department meeting --
24    Q.  Uh-huh.
25    A.  -- when a State Department official

**Page 180**

1  passed out a chart that showed -- they didn't put
2  the names, but you could figure out who had what on
3  the chart.
4     Q.  Okay.  So how do you -- how do -- how do
5  you compete with the other sponsors?
6     A.  I don't really.  I mean, I'm so small.  I
7  just do referrals and from the State Department,
8  from host families, and through the website.
9        MR. SCHWARTZ:  Let's take about five
10 minutes.
11        MR. KELLY:  Fine.
12        THE VIDEOGRAPHER:  Going off the
13 record at 4:24.
14        (Break from 4:24 p.m. to
15         4:43 p.m.)
16        THE VIDEOGRAPHER:  Back on the record
17 at 4:43.
18 BY MR. SCHWARTZ:
19    Q.  You testified about receiving a bulletin
20 from the State Department regarding the federal
21 minimum wage increase?
22    A.  Yes.
23    Q.  And that's where you said you got the
24 195.75?
25    A.  Yes.

**Page 181**

1     Q.  Why did you keep the 195.75 on your
2  website and on your materials after the State
3  Department withdrew that notice?
4     A.  What do you mean they withdrew the
5  notice?
6     Q.  So it's no longer on the State Department
7  website.
8     A.  I don't know what they did on the
9  website.  I just followed the guidelines that I
10 received.
11        (Exhibit No. 29 was marked.)
12    Q.  Okay.  I am handing you a document that's
13 been marked Exhibit 29.
14    A.  Uh-huh.
15    Q.  And it is Bates stamped USA 728.
16        Do you recognize that document?
17    A.  Yes.
18        MR. KELLY:  Sorry.  For those of you
19 on the phone it's 728 through 759.
20    Q.  So what is this document?
21    A.  This is the Host Family Handbook and
22 Guide.
23    Q.  Okay.  So this is what you hand host
24 families when they -- when?  When do you hand this
25 to host families?

**MAGNA**
**LEGAL SERVICES**

# Exhibit 406

PLAINTIFFS' RESP. APP.0004499

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Case No. 14-cv-03074-CMA-KMT

_____

JOHANA PAOLA BELTRAN, ET AL.,

             Plaintiffs,

vs.

INTEREXCHANGE, INC., ET AL.,

             Defendants.

_____

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VIDEOTAPED DEPOSITION OF

HEIDI MISPAGEL

30(b)(6) REPRESENTATIVE FOR A.P.E.X. and 20/20

MAY 2, 2017

DENVER, COLORADO

9:05 A.M.

Magna Legal Services
866-624-6221
www.magnals.com

MAGNA
LEGAL SERVICES

## Page 2

```
 1            The videotaped deposition of
 2   HEIDI MISPAGEL, taken before Leeann Keenan, a
 3   Registered Merit Reporter, Certified Realtime Reporter,
 4   and a Notary Public in and for the County of Summit and
 5   the State of Colorado, at 5619 DTC Parkway, Greenwood
 6   Village, Colorado, on Monday, May 2, 2017, at the hour
 7   of 9:05 a.m., pursuant to Notice.
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1   APPEARANCES CONTINUED:
 2
 3      NIXON, SHEFRIN, HENSEN, OGBURN
        BY: LAWRENCE STONE, ESQ.
 4         5619 DTC Parkway
           Suite 1200
 5         Greenwood Village, Colorado  80111
           (303) 773-3500
 6         lstone@nixonshefrin.com
           appeared by telephone on behalf of
 7         ProAuPair and International Au Pair
           Exchange
 8
 9      FISHER & PHILLIPS
        BY: SUSAN SCHAECHER, ESQ.
10         1801 California Street
           Suite 2700
11         Denver, Colorado  80202
           (303) 218-3650
11         sschaecher@fisherphillips.com
12         appeared by telephone on behalf of
           AuPair Foundation and Au Pair in
13         America
14
15   ALSO PRESENT: Davis Baumunk, Videographer
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1   APPEARANCES:
 2
     BOISE, SCHILLER, FLEXNER, L.L.P.
 3   BY: JOSHUA LIBLING, ESQ.
        DANIEL SCHWARTZ, ESQ.
 4      575 Lexington Avenue
        New York, New York  10022
 5      (212) 303-3537
        jlibling@bsfllp.com
 6      dschwartz@bsfllp.com
        appeared on behalf of the Plaintiffs
 7
     GORDON & REES
 8   BY: NATHAN HUEY, ESQ.
        555 17th Street
 9      Suite 3400
        Denver, Colorado  80202
10      (303) 200-6888
        nhuey@gordonrees.com
11      appeared on behalf of AuPairCare,
        Inc.
12
     CHOATE, HALL & STEWART
13   BY: JUSTIN WOLOSZ, ESQ.
        Two International Place
14      Boston, Massachusetts  02110
        (617) 248-5221
15      jwolosz@choate.com
        appeared by telephone on behalf of
16      Cultural Care
17   LEWIS, ROCA, ROTHGERBER, CHRISTIE
     BY: JESSICA FULLER, ESQ.
18      1200 17th Street
        Suite 3000
19      Denver, Colorado  80202
        (303) 628-9527
20      appeared on behalf of Cultural Care
21   EXPERT AUPAIR
     BY: BOGDAN ENICA, ESQ.
22      100 2nd Avenue S.
        Suite 3025
23      St. Petersburg, Florida  33701
        (727) 225-2649
24      bogdan@expertaupair.com
        appeared by telephone on behalf of
25      Expert AuPair
```

## Page 5

```
 1            I N D E X
 2
 3   DEPOSITION WITNESS:              PAGE
     HEIDI MISPAGEL
 4   Examination by Mr. Libling        10
 5
 6   PLAINTIFFS' DEPOSITION EXHIBITS MARKED:
     NO.      DESCRIPTION            PAGE
 7   Exhibit 1   Plaintiffs' Notice of 30(b)(6)   11
                 Deposition of A.P.E.X. and 20/20
 8               d/b/a The International Au Pair
                 Exchange
 9
     Exhibit 2   January 2016ProAuPair Organizational  20
10               Chart
                 APEX-20/20 500
11
     Exhibit 3   Plaintiffs' Second Set of      26
12               Interrogatories
13   Exhibit 4   A.P.E.X. "9 Mistakes Parents Make  71
                 When Hiring and Au Pair...and How to
14               Avoid Them
                 Apex-20/20 117 - 125
15
     Exhibit 5   ProAuPair Pre-Match Pricing    89
16               APEX-20/20 261 - 264
17   Exhibit 6   Family Service Agreement      109
                 APEX-20/20 244 - 256
18
     Exhibit 7   ProAuPair Host Family Service    116
19               Agreement
                 APEX-20/20 219 - 224
20
     Exhibit 8   Au Pair Service Agreement     119
21               APEX-20/20 4 - 8
22   Exhibit 9   Au Pair Financial Terms & Conditions  125
                 APEX-20/20
23
     Exhibit 10  ProAuPair Service Agreement    126
24               APEX-20/20 10 - 15
25
```

PLAINTIFFS' RESP. APP.0004501

MAGNA
LEGAL SERVICES

| | |
|---|---|
| **Page 6** | **Page 8** |

**Page 6**

1   PLAINTIFFS' DEPOSITION EXHIBITS MARKED:
    NO.      DESCRIPTION              PAGE
2
    Exhibit 11  HIGHLY CONFIDENTIAL - ATTORNEY EYES   128
3            ONLY
             October 2014, International Au Pair
4            Exchange Childcare Agreement
             APEX-20/20 007523 - 007524
5
    Exhibit 12  HIGHLY CONFIDENTIAL - ATTORNEY EYES   129
6            ONLY
             February 2016, International Au Pair
7            Exchange Childcare Agreement
             APEX-20/20 007516 - 007517
8
    Exhibit 13  Au Pair Handbook "Guide to a      153
9            Successful Year in the United States"
             APEX-20/20 23 - 77
10
    Exhibit 14  Training and Information Notification  156
11           Form
             APEX-20/20 3
12
    Exhibit 15  ProAuPair Host Family Handbook     157
13           APEX-20/20 143 - 176
    Exhibit 16  ProAuPair Host Family Handbook, Your  159
14           Successful Hosting Guide
15           APEX-20/20 177 - 218
    Exhibit 17  HIGHLY CONFIDENTIAL - ATTORNEY EYES   160
16           ONLY
             ProAuPair Match with Host Families
17           document prepared for litigation
             APEX-20/20 8994 - 9028
18
    Exhibit 18  November 24, 2014 e-mail chain     173
19           between Heidi Mispagel and Michael
             McHugh
20           APEX-20/20 316
21
    Exhibit 19  November 24, 2014 e-mail chain     174
22           between Heidi Mispagel and Michael
             McHugh
23           January 21, 2015 e-mail chain between
             Susan Asay and Heidi Mispagel
24           APEX-20/20 319 - 320
25

**Page 8**

1            P R O C E E D I N G S
2            THE VIDEOGRAPHER:  We are now on
3   the record.  This begins videotape No. 1 in
4   the deposition of Heidi Mispagel, 30(b)(6)
5   representative for A.P.E.X. and 20/20, in the matter
6   of Johana Paola Beltran, et al. versus
7   InterExchange, Inc., et al. in the United States
8   District Court for the District of Colorado, Case
9   No. 14-cv-03074-CMA-KMT.
10           Today is May 2nd, 2017 and the
11  time is 9:05.  This deposition is being taken at
12  5619 DTC Parkway, Greenwood Village, Colorado at
13  request of counsel for plaintiffs.  The videographer
14  is Davis Baumunk of Magna Legal Services, and the
15  court reporter is Leeann Keenan of Magna Legal
16  Services.
17           Will counsel and all parties
18  present state their appearances and whom they
19  represent.
20           MR. LIBLING:  Good morning.  Joshua
21  Libling, Boies, Schiller & Flexner for the -- for
22  the plaintiffs.
23           MR. SCHWARTZ:  Daniel Schwartz,
24  Boies, Schiller, Flexner for the plaintiffs.
25           MR. STONE:  Lawrence C. Stone

| | |
|---|---|
| **Page 7** | **Page 9** |

**Page 7**

1   PLAINTIFFS' DEPOSITION EXHIBITS MARKED:
    NO.      DESCRIPTION              PAGE
2
    Exhibit 20  July 15, 2015 e-mail chain between   180
3            Heidi Mispagel and Michael McHugh
             APEX-20/20 322
4
    Exhibit 21  February 25 - 26, 2015 e-mail chain  193
5            between Sarah McNamara, Ruth Ferry,
             Marcie Schneider, Heidi Mispagel and
6            Susan Asay
             APEX-20/20 310
7
    Exhibit 22  October 13, 2015 e-mail to Heidi    199
8            Mispagel from Ruth Ferry
             APEX-20/20 311
9
    Exhibit 23  October 20, 2015 Alliance Meeting,   200
10           Notes from Au Pair Sponsor Meeting
             APEX-20/20 496 - 498
11
    Exhibit 24  December 22, 2015 e-mail from Michael  205
12           McCarry to multiple recipients
             APEX-20/20 495
13
    Exhibit 25  January 29, 2016 e-mail from Ilir    212
14           Zherka to multiple recipients
             APEX-20/20 494
15
    Exhibit 26  February 23, 2016 e-mail from Ilir   223
16           Zherka to Robert Lerner, Kevin Saba,
             Mark Overmann, and Lisa Heyn
17           APEX-20/20 493
18
19
20
21
22
23
24
25

**Page 9**

1   appearing on behalf of A.P.E.X. and 20/20.
2            MS. FULLER:  Jessica Fuller appearing
3   on behalf of Defendant Cultural Care.  And with
4   me by phone is my co-counsel, Justin Wolosz.
5            MR. HUEY:  Nathan Huey appearing on
6   behalf of AuPairCare.
7            MR. STONE:  And those of you on the
8   phone, do you want to state your names and who you
9   represent, please?  Do we have them on?
10           MR. LIBLING:  Yeah.
11           Bogdan, are you still on?
12           MR. ENICA:  Yeah.  Bogdan Enica on
13  behalf of Expert Group International, doing business
14  as Expert Au Pair.
15           MS. SCHAECHER:  Susan Schaecher on
16  behalf of APS Global.
17           MR. LIBLING:  Is anyone else on the
18  phone?  I thought there was.
19           MR. WOLOSZ:  Yeah.  This is Justin
20  Wolosz, but my co-counsel already introduced me.
21           MR. LIBLING:  Yeah.  Okay.  Good
22  morning.
23           THE WITNESS:  Good morning.
24           (Witness duly sworn.)
25

MAGNA
LEGAL SERVICES

---

Page 10

```
 1              HEIDI MISPAGEL,
 2  having been first duly sworn, was examined and
 3  testified as follows:
 4                EXAMINATION
 5  BY MR. LIBLING:
 6      Q.   Hi.  Good morning.
 7      A.   Good morning.
 8           MR. STONE:  Joshua, before we get
 9  started, just a brief comment for the record that
10  this deposition is being taken pursuant to your
11  notice of deposition and subject to the objections
12  that we previously forwarded to you.
13           MR. LIBLING:  Okay.  Thank you,
14  Larry.
15           MR. STONE:  Uh-huh.
16      Q.   So before we start, I'll just go over
17  some very basic ground rules.  Have you ever been
18  deposed before?
19      A.   No.
20      Q.   Okay.  So if anything I say is not clear
21  or you don't understand it or for any reason at all
22  you need clarification, please don't hesitate to
23  tell me.  I want to get as clean and comprehensible
24  a record as possible, so just let me know.
25           I will endeavor not to talk over
```

Page 11

```
 1  you.  If you could do the same for me, just let me
 2  finish the questions, so that the record is clear
 3  precisely what you're answering.
 4           Your counsel, of course, may state
 5  objections from time to time.  That's fine.  And
 6  other than that, if you want to take a break at any
 7  point, other than when a question is pending, then
 8  just let me know and we can do so.
 9      A.   Okay.
10           (Exhibit No. 1 was marked.)
11      Q.   So let's -- I'm going to hand you now
12  what's been marked as Exhibit 1.
13           Do you recognize this document?
14      A.   Yes.
15      Q.   And I believe Larry's already referred to
16  this.  But is this the subpoena, or the notice of
17  deposition I should say, pursuant to which you are
18  appearing here today?
19      A.   Yes.
20           MR. LIBLING:  And, Larry, we have
21  your objections.  We can mark them if you want to.
22  I wasn't going to, unless you want me to.
23           MR. STONE:  I don't think it's
24  necessary.
25           MR. LIBLING:  Okay.
```

Page 12

```
 1           MR. STONE:  Thank you.
 2      Q.   All right.  So the first thing I want to
 3  talk about is this notice was sent to both A.P.E.X.
 4  and 20/20.  My understanding is that you are here on
 5  behalf of both parties; is that correct?
 6      A.   That's correct.
 7      Q.   So why don't we start by talking about
 8  the relationship between those companies so that the
 9  record is clear.
10           So what is the relationship
11  between A.P.E.X. and 20/20?
12      A.   So A.P.E.X. and 20/20 are both solely
13  owned by Susan Asay.
14      Q.   Are they -- other than having common
15  ownership, are they entirely separate companies
16  or --
17      A.   Yes, they are separate.
18      Q.   And what is your position, first, with
19  A.P.E.X.?
20      A.   I'm the executive vice president.
21      Q.   And do you have a position with 20/20?
22      A.   No.
23      Q.   But you are here speaking on behalf of
24  both?
25      A.   Yes, that's true.  I am representing
```

Page 13

```
 1  20/20 and A.P.E.X.
 2      Q.   Did Ms. Apus give you -- did Ms. Apus
 3  instruct you to do that?
 4           MR. STONE:  It's Asay.
 5           MR. LIBLING:  Oh, I'm sorry.
 6           MR. STONE:  A-s-a-y.
 7      Q.   Asay.  Let me write it down so I don't
 8  get it wrong here.
 9      A.   So in my position I oversee both
10  programs, but I am an employee of A.P.E.X.
11      Q.   Okay.  So what is -- what are your duties
12  with respect to, I'll start with, A.P.E.X.?
13      A.   So with A.P.E.X. I'm the responsible
14  officer with the Department of State, and also with
15  20/20.
16      Q.   Do you have -- do your duties differ
17  vis-a-vis A.P.E.X. or 20/20?
18      A.   No.
19      Q.   Okay.  In your regular course of
20  business, do you draw distinctions between A.P.E.X.
21  and 20/20?
22      A.   Yes, we do.
23      Q.   What sort of distinctions do you draw?
24      A.   We -- there are separate designations,
25  and so we are responsible for tracking the
```

| Page 14 | Page 16 |
|---|---|

**Page 14**

1 participants separately by which program they are
2 under. So that would be one example.
3    Q. Do your policies and procedures vary
4 between the two companies?
5    A. No, they don't.
6    Q. Do you use different -- well, I'm trying
7 not to make it a compound question.
8      Do the -- do you use different
9 form documents for the two companies, or do you use
10 the same documents?
11    A. We use different documents in some cases
12 and then the same documents in other cases.
13    Q. Okay. All right. So as we go through
14 this deposition, I will ask questions. And can we
15 have an understanding that if the answer is
16 different for A.P.E.X. or for 20/20, you will let me
17 know; but otherwise, I'll just assume I'm asking for
18 both?
19    A. That's fine.
20    Q. Thank you. All right. That will make
21 things easier, I think.
22    A. Okay.
23    Q. So how long have you been working for
24 A.P.E.X.?
25    A. I started in May of 2014.

**Page 15**

1    Q. And what was your position when you
2 started?
3    A. Executive vice president.
4    Q. Have you held that same position until
5 today?
6    A. Yes.
7    Q. Have your duties changed between when you
8 started in May of 2014 and today?
9    A. No.
10    Q. And what was your position before you
11 joined A.P.E.X.?
12    A. Prior to that I was the president at
13 GreatAuPair.
14    Q. And what were your duties at GreatAuPair?
15    A. My duties at GreatAuPair were to help
16 them launch their J-1 au pair program.
17    Q. What was the time frame of your
18 employment at GreatAuPair?
19    A. I was employed there from the middle of
20 October until the beginning of February.
21    Q. Of which years?
22    A. I'm -- I'm sorry, 2014.
23    Q. Of 2014. Okay.
24      So October 2013 to February --
25    A. Yes.

**Page 16**

1    Q. -- 2014?
2    A. Yes.
3    Q. Okay. Okay. And -- and you left
4 GreatAuPair to come to A.P.E.X.?
5    A. No. I -- I left GreatAuPair, and then I
6 later found employment with A.P.E.X.
7    Q. Okay. What was your position before
8 GreatAuPair?
9    A. Prior to that I was the executive vice
10 president for Au Pair Care and Intrax.
11    Q. And what were your duties at Au Pair
12 Care?
13    A. My duties were to oversee the program.
14    Q. For what period of time did you hold that
15 position?
16    A. As executive vice president?
17    Q. Let's start with for what period of time
18 were you employed by Au Pair Care?
19    A. So I'll make a distinction. So I was
20 employed by Intrax from, I believe, May of 1993, and
21 then I worked on several programs within the Intrax
22 group. And then I moved to Au Pair Care in 1998.
23    Q. Prior to moving to Au Pair Care in 1998,
24 had you had any professional interactions with the
25 au pair program in the United States?

**Page 17**

1    A. Only with Au Pair Care in our office. I
2 didn't have any interactions with any industry.
3    Q. Did you have any substantive
4 responsibilities for the au pair program prior to
5 1998?
6    A. No.
7    Q. And what was your position at Au Pair
8 Care when you started in -- in 1998, understanding
9 you were employed by Intrax before then?
10    A. I believe -- I don't remember my exact
11 title. I was director. I was a director.
12    Q. Do you remember when you were promoted?
13    A. I was promoted actually several times
14 during, throughout my career at Au Pair Care.
15    Q. Did each promotion have a change in
16 substantive responsibilities associated with it?
17    A. Certain ones did, yes.
18    Q. Would you mind taking us through the --
19    A. Sure.
20    Q. -- dates of your -- and titles that you
21 held?
22    MR. STONE: Counsel, just I want to
23 make a note here.
24      I'll permit some brief
25 questioning, but this is a 30(b)(6) deposition of

PLAINTIFFS' RESP. APP.0004504

**MAGNA** ▶
**LEGAL SERVICES**

1  A.P.E.X. and 20/20.  You're getting into this
2  witness' personal background.  I'll permit some
3  basic questions in that regard, but --
4         MR. LIBLING:  I think so far they've
5  been pretty basic questions.  If there's --
6         MR. STONE:  Yeah.  Well, like I
7  said, I'll --
8         MR. LIBLING:  -- a problem, I'm sure
9  you'll let me know.
10         MR. STONE:  -- permit them.  But this
11  is a -- a deposition of the corporate entities, and
12  you're asking about this witness' personal history,
13  so --
14         MR. LIBLING:  I think some small
15  questioning about background is permissible, but I'm
16  sure you'll let me know if there's a problem.
17         MR. STONE:  Thank you.
18  Q.  So if you wouldn't mind.
19  A.  Sure.  So, honestly, I don't know the
20  dates of my --
21  Q.  Just the --
22  A.  -- title changes because I was there for
23  so long.  But when I was initially joined I was -- I
24  was a director and I had a supervisor within
25  AuPairCare.  And then she left and I assumed her

1  position, and so I was overseeing the program.  And
2  then over time I went from a director -- I don't
3  know if I became a senior director at some point,
4  but I was promoted to vice president and then
5  executive vice president.
6  Q.  Okay.  So you started working at A.P.E.X.
7  in May 2014.  Did I write that down correctly?
8  A.  Correct.  Yes.
9  Q.  All right.  And do you know when A.P.E.X.
10  and 20/20 started their au pair program?
11  A.  Yes.  A.P.E.X. was designated by the
12  Department of State in 2011, and 20/20 was
13  designated in 2013.
14  Q.  Do you know why a -- do you know why
15  Ms. Asay chose to start a second company when she
16  already had A.P.E.X. running?
17  A.  I do.
18  Q.  What is the basis for that knowledge?
19  A.  So Susan, prior to her designation as an
20  au pair sponsor, was a recruiter of professional
21  au pairs.  And she had placed au pairs through what
22  was known at the time as The International Au Pair
23  Exchange, what we called TIAPE.
24         And so she had au pairs that she
25  had recruited sponsored by TIAPE.  And TIAPE, I

1  think, run into difficulties continuing their
2  sponsorship, and so Susan applied for designation
3  and was approved by the Department of State to run
4  20/20 as a designated au pair sponsor.
5  Q.  Do you know what those problems were?
6  A.  I believe they ran into financial
7  difficulties.
8  Q.  Is one of the two entities dominant over
9  the other today?
10  A.  Yes.  A.P.E.X. is dominant over 20/20.
11  Q.  For how long has that been true?
12  A.  It's always been true.
13  Q.  Okay.  But both -- both companies are
14  active, correct?
15  A.  Yes, both companies are active.
16  Q.  Okay.  Does 20/20 have its own employees,
17  or does it use A.P.E.X.'s employees?
18  A.  It uses A.P.E.X.'s employees.
19  Q.  Does 20/20 have any employees of its own?
20  A.  No.
21         MR. LIBLING:  Let's go to tab --
22  yeah.  Let's go to tab 29.
23         (Exhibit No. 2 was marked.)
24         MR. LIBLING:  Thanks.
25  Q.  May I show you what's been marked as

1  Exhibit 2.
2  A.  Uh-huh.
3  Q.  My first question is do you recognize
4  this document?
5  A.  Yes.
6  Q.  And you'll see at the top it's -- it says
7  "Organizational Chart as of January 2016."
8         So my first question is does this
9  appear to you to have been accurate as of January
10  2016?
11  A.  Yes.
12  Q.  Do you know whether it is still accurate
13  today?
14  A.  Yes.
15  Q.  Yes, you know or, yes, it is still
16  active?
17  A.  Yes, I know and, no, it is not accurate.
18         MR. STONE:  For those of you on the
19  phone, this is APEX-20/20 Bates No. 500.
20  Q.  Can you please tell me what the changes
21  are today?
22  A.  Sure.  So today we have -- we have about
23  10 staff members working for us and one part-time
24  employee, so our staff has increased in size since
25  2016.

**MAGNA**
LEGAL SERVICES

| | |
|---|---|
| Page 22 | Page 24 |

**Page 22**

1  Q.  Are there any individuals listed on
2  APEX-20/20 500 that are no longer with A.P.E.X.?
3      A.  Yes.
4      Q.  Who?
5      A.  Dina Tackett and Kelly Bernard.
6      Q.  Have their -- are there new employees in
7  their roles?
8      A.  Yes.
9      Q.  Who?
10     A.  So Dina Tackett was replaced by Patti
11 Rubel and Julie Stern.
12     Q.  Both of those individuals replaced
13 Ms. Tackett?
14     A.  Yes.  I mean, they're both doing the same
15 position.
16     Q.  I see.  Is that because Ms. Tackett's --
17 what used to be Ms. Tackett's responsibilities have
18 been split up, or is it simply necessitated by
19 having a bigger program?
20     A.  It's necessitated by a bigger program.
21     Q.  And what about Ms. Bernard?
22     A.  Ms. Bernard has been replaced by Kristen
23 Tidwall.
24     Q.  And is there anyone on this document
25 whose title has changed, other than, of course,

**Page 23**

1  Ms. Tackett and Ms. Bernard?
2      A.  Steven Courtney's title is vice
3  president, operations west.
4      Q.  Do I take it from that that there are now
5  vice presidents of operations in other regions?
6      A.  There is a vice president of operations
7  east.
8      Q.  Who is that?
9      A.  Actually, excuse me, her title is not
10 vice president.  She's director of operations east.
11     Q.  And what is her name?
12     A.  Theresa Edwards.
13     Q.  And what are your day-to-day
14 responsibilities at A.P.E.X. and 20/20?
15     A.  My day-to-day responsibilities are to
16 oversee our U.S. based staff, all of our admissions,
17 professional au pair admissions processes,
18 compliance with regulations.  I maintain the primary
19 relationship with the Department of State.  I am
20 working on marketing activities, just everything
21 that pertains to running both A.P.E.X. and 20/20.
22     Q.  So it sounds like you have your hand in
23 pretty much everything that --
24     A.  Yes.
25     Q.  -- they do?  Okay.  Great.

**Page 24**

1      So since -- since you joined in
2  2014 have A.P.E.X. and 20/20 experienced growth,
3  stayed about the same, or not?
4      A.  We've experienced growth.
5      Q.  Can you -- do you know the magnitude of
6  that growth?
7      A.  Yes, I do.  The program has -- well,
8  A.P.E.X. has gone from -- I believe we've, like,
9  tripled in size.  And 20/20 has just started
10 growing, and, yeah, so it's still relatively small.
11     MR. STONE:  Joshua, one comment for
12 the record.  And that is that pursuant to the
13 protective order, now that you're starting to get
14 into details about the businesses, we're going to
15 designate the deposition as being subject to the
16 protective order.
17     So, Ms. Court Reporter, if you
18 would please note that perhaps on the cover page,
19 that this deposition, according to the defendants
20 A.P.E.X. and 20/20, are contending that the
21 deposition is subject to the protective order.
22     MR. LIBLING:  I think the way we've
23 done it with some depositions in the past was that
24 we started with that as sort of a blanket
25 designation, and then later on the defendant would

**Page 25**

1  specify specific passages.  Do you intend to do
2  that?
3      MR. STONE:  I don't because that's --
4  in my opinion, that's just unnecessary work.  If --
5  if there's something that you need to use that you
6  don't think is subject to the protective order, just
7  give us a call and we'll work with you on it.
8      MR. LIBLING:  All right.  We don't
9  need to discuss this now.
10     MR. STONE:  Okay.
11     MR. LIBLING:  We can talk about that
12 later.  Okay.
13     Q.  Okay.  I think you had just said that
14 20/20 was starting to grow and A.P.E.X. had
15 experienced -- had -- had tripled the number of
16 au pairs it sponsors since 2014; is that right?
17     A.  No, that's -- that's not right.
18     So the program has grown in size
19 since I joined, but it's probably not just -- that's
20 just my approximation, tripled in size.
21     Q.  May I ask you, it looks like you are
22 looking at a document?
23     A.  Yes.
24     Q.  What document are you looking at?
25     A.  This is our interrogatory -- I don't know

PLAINTIFFS' RESP. APP.0004506

MAGNA
LEGAL SERVICES

1 the name of this document.
2     Q.   Can we mark that as an exhibit, please?
3     A.   Uh-huh.
4         (Exhibit No. 3 was marked.)
5     Q.   And just for the record, this is a
6 document that you've brought with you to the
7 deposition?
8     A.   That's correct.
9     Q.   I didn't give it to you?
10     A.   True.
11     Q.   And were you using that document to
12 answer the question that I just asked?
13     A.   Just to refer to numbers.
14     Q.   Can you just -- for the record, can you
15 just tell me what you were referring to?
16     A.   Sure. I was referring to the numbers
17 listed on this document for both A.P.E.X. and 20/20.
18     Q.   On page 3?
19     A.   On page 3.
20     Q.   Okay. Thank you. All right.
21         So have you -- you have overseen
22 A.P.E.X. during this period of growth, correct?
23     A.   Yes.
24     Q.   And did you implement some strategies
25 over this period of time that helped create that

1 growth?
2     A.   Yes.
3     Q.   What sort of strategies did you
4 implement?
5     A.   I have implemented streamlining of
6 operations, so improving our processes and operating
7 the program. I have been in -- involved in
8 streamlining our marketing to both host families and
9 professional au pairs, hiring, training, organizing
10 the local representatives that work for us in the
11 field, on-boarding experienced staff members to help
12 me run the program, those types of things.
13     Q.   I want to ask you about a couple of
14 those.
15     A.   Uh-huh.
16     Q.   You said one of the things you've been
17 doing is streamlining marketing? Did I hear that --
18     A.   Yes.
19     Q.   What do you mean by "streamlining
20 marketing"?
21     A.   So by streamlining marketing,
22 specifically referring to our websites. So
23 revamping our websites, making them better, more
24 up-to-date technology-wise, making sure that we're
25 educating potential host families about the program

1 and what we do and that sort of thing.
2     Q.   So when you say "marketing," do you mean
3 marketing to host families, or to au pairs, or to
4 both?
5     A.   To both.
6     Q.   Is the website aimed specifically at host
7 families?
8     A.   We have several different websites, so we
9 do have a website directed specifically to U.S. host
10 families.
11     Q.   In streamlining the marketing and making
12 changes to the websites -- well, actually, I'll
13 withdraw that.
14         In making changes to the websites,
15 did you change the substance of what you place on
16 the websites or merely the form of what you --
17     A.   Both the substance and the form.
18     Q.   And when you changed the form -- I'm
19 sorry, when you changed the substance, who made the
20 decision as to whether the new messaging would be
21 approved?
22     A.   What do you mean by "would be approved"?
23     Q.   Fair question. Let me take it a step
24 back.
25         Before you changed the -- before

1 you changed the substance, did whatever you were now
2 going to say need to be approved by anybody?
3     A.   No.
4     Q.   Did you decide what the new messaging
5 would be?
6     A.   Myself and Susan Asay.
7     Q.   So you decided those things together?
8     A.   Some things I just made my own decisions
9 on, and other things I may have consulted with her
10 or other members of our team on.
11     Q.   Okay. Do you know the topics on which
12 you changed the substantive messages on your
13 website?
14     A.   I do.
15     Q.   What topics?
16     A.   So -- and I'm referring specifically to
17 the A.P.E.X. site for host families. ProAuPair.com
18 is the URL.
19         So A.P.E.X. is -- you know, the
20 bulk of our business is dedicated to families that
21 have children with special needs and professional
22 au pairs. So one of the things that we did on the
23 website was further educate those families with
24 special needs about what type of care our
25 professional au pairs can provide.

PLAINTIFFS' RESP. APP.0004507

**MAGNA**
LEGAL SERVICES

---

Page 30

1   So an example would -- of that
2   would be, you know, more defining what special needs
3   skills our professional au pairs have.  So au pairs
4   that work with kids with autism, au pairs that work
5   with kids with cerebral palsy.  Just further trying
6   to speak to those types of special needs and -- and
7   give families an understanding of what a
8   professional au pair can do and how their skills and
9   background would allow them to provide that care
10  level.
11      Q.   Have you heard the phrase "the only
12  au pair agency specializing in professional
13  childcare"?
14      A.   I have heard that phrase.
15      Q.   I thought you might have.
16      A.   Yes.
17      Q.   What is -- in what context have you heard
18  that phrase?
19      A.   So -- well, I haven't heard it.  I -- I
20  don't know if I created that or Susan and I created
21  that together.  But -- so A.P.E.X. is -- we call it
22  ProAuPair in the U.S. as sort of, like, how I
23  usually speak about it.
24      So ProAuPair is -- is the only J-1
25  au pair sponsor that is specifically dedicated to

Page 31

1   families with special needs, and that's why we say
2   that.  Because other au pair agencies, based on my
3   experience, don't specifically cater their business
4   to families with special needs, and we do, and we
5   make that distinction when we are talking to host
6   families.
7       Q.   So is this a way of differentiating
8   yourself when marketing to host families?
9       A.   It is a way of differentiating --
10  differentiating ourselves and also educating host
11  families that there is this cultural exchange
12  program that can meet their needs from a care
13  perspective.
14      Q.   You made a distinction between
15  professional au pairs and, I think you used the
16  phrase, standard au pairs; is that right?
17      MR. STONE:  Objection.  Form.
18      A.   We use the term regular au pairs, or
19  traditional au pairs was -- A.P.E.X. originally
20  called them regular au pairs, and we started
21  referring to them later as traditional au pairs.
22      Q.   Is there a phrase you'd prefer that I
23  use?
24      A.   We use regular as our --
25      Q.   Okay.  What do you understand the

Page 32

1   distinction to be between professional --
2   professional and regular au pairs?
3       A.   So our definition of a professional
4   au pair is an individual that has a professional
5   background or training in a specific social care
6   profession.
7       Q.   Did A.P.E.X. create or did A.P.E.X. and
8   20/20 create that definition, or did you look that
9   definition up somewhere?
10      A.   I don't know the answer to that question.
11  I would assume that we felt like it was a term that
12  made sense based on an individual's professional
13  background.  And it could distinguish between
14  somebody's qualifications that they have
15  professional training, versus a regular au pair who
16  may or may not have a professional background.
17      Q.   Let me -- let me ask it slightly
18  differently then.
19      Are there criteria that you
20  require before you will market somebody as a
21  professional au pair?
22      A.   Yes, there are.
23      Q.   And we will get back to what those
24  criteria are --
25      A.   Okay.

Page 33

1       Q.   -- in a second.
2       But for now I just want to ask
3   you:  Does A.P.E.X. create those criteria, or do you
4   receive those criteria from some outside source?
5       A.   We create that criteria.
6       Q.   And for a regular au pair, are there
7   criteria that regular au pair must meet as well?
8       A.   There are the Department of State
9   requirements for a J-1 au pair participant, and then
10  A.P.E.X. and 20/20 also apply our own criteria on
11  top of that.
12      Q.   What are the criteria that A.P.E.X. and
13  20/20 apply on top of the Department of State
14  regulations for regular au pairs?
15      A.   So I believe since 2014 or early in '15
16  we require that au pairs have 400 hours of childcare
17  experience in order to qualify for the program.
18      Q.   Why did you decide to create that
19  requirement?
20      A.   Because we feel that it's important that
21  au pairs come to the program with childcare
22  experience that will support them during their time
23  here, and we felt that that was, you know, a minimum
24  that we were comfortable with.
25      Q.   And is that -- does that also contribute

PLAINTIFFS' RESP. APP.0004508

MAGNA
LEGAL SERVICES

| Page 34 | Page 36 |
|---|---|

**Page 34**

1     to your brand as a provider of more professional
2     au pair services?
3        A.   I don't think I understand.
4        Q.   Does one -- is one of the reasons that
5     you have -- let me start with a different question
6     then.
7            Is that a more stringent
8     requirement than the Department of State
9     requirements?
10       A.   Yes.
11       Q.   And is one of the reasons that you have
12     more stringent requirements than the Department of
13     State requirements because it fits with your firm
14     marketing as specializing in professional childcare?
15           MR. STONE:  Objection.  Form.
16       A.   So the regular au pairs and their
17     qualifications, they don't play a role in our
18     positioning as, you know, a sponsor that focuses on
19     professional au pair placements.
20           I would say it's more a
21     requirement that we put in place to make sure that
22     individuals are qualified to come and care for
23     children 45 hours a week for 12 months.  And it was
24     sort of in that -- that's the reasoning behind it.
25     I mean, 400 hours is not a good marketing message.

**Page 35**

1       Q.   Okay.
2       A.   In my mind.
3       Q.   All right.  Are there additional
4     requirements that you impose on regular au pairs
5     above what the State Department requires?
6       A.   We require that they complete 38 hours of
7     training before they depart for the U.S.
8       Q.   What sort of training do you require that
9     they complete before they depart for the U.S.?
10       A.   So we have a 38-hour online training
11     course, and we have an in-person orientation academy
12     that takes place before they depart their home
13     country, in most cases.
14       Q.   What does that orientation academy
15     involve?
16       A.   The orientation academy involves -- it's
17     a six-hour meeting that we have in person with --
18     with the candidates, and it's really to orient them
19     about what to expect when they're on the program,
20     different things about living in the U.S., what to
21     expect from a cultural standpoint, the type of
22     support that they'll receive from us when they're
23     here, and just different tips and things to help
24     them, you know, be successful once they land in the
25     U.S.

**Page 36**

1       Q.   Do you convey the -- any of the
2     Department of State's regulations during that
3     in-person orientation?
4       A.   We convey some of them.
5       Q.   Which ones?
6       A.   So we convey things like limits on
7     au pairs' working hours.  We convey the meeting
8     requirements, that they'll be contacted by their --
9     their, we call them, area directors.  But it's the
10     local representatives.  What to expect when they
11     arrive in terms of contact and support from us.  I
12     think we talk about how we screen host families and
13     how they meet the Department of State requirements,
14     those sorts of things.
15       Q.   Do you discuss what an au pair would
16     expect to be paid?
17       A.   We -- yes, we do.
18       Q.   And what do you tell an au pair about
19     what they would expect to be paid?
20       A.   So we tell the professional au pairs that
21     they can expect to receive at least $250 a week.
22       Q.   And what do you tell the regular
23     au pairs?
24       A.   We don't have any regular au pairs on our
25     program at this time.

**Page 37**

1       Q.   You have had regular au pairs at one
2     point in time; is that right?
3       A.   We have had regular au pairs, yes.
4       Q.   And when you have had regular au pairs,
5     do they also go through this in-person orientation?
6       A.   Yes.
7       Q.   And when they go through the orientation,
8     or have gone through the orientation, what do you
9     tell them about what they should expect to be paid?
10       A.   I -- I don't know exactly.  I'm -- I'm
11     assuming -- and I could verify this information by
12     just looking at our slides that we present.  So I
13     believe we're telling them it's $250 a week.  I
14     don't know if we make the distinction about the
15     minimum regular au pair stipend, but I can check
16     that out for you.
17       Q.   I may actually come back to something you
18     said there.  But before I do that, where did the
19     $250 a week number come from for professional
20     au pairs?
21       A.   That number came from Susan Asay.
22       Q.   How did she communicate that number to
23     you?
24       A.   She told me.
25       Q.   She just told you.

PLAINTIFFS' RESP. APP.0004509

MAGNA
LEGAL SERVICES

| Page 38 | Page 40 |
|---|---|

**Page 38**

1   Do you know how she generated that
2 number?
3   A.   I don't know specifically how she came to
4 that number, but I do know that her intent was to
5 recognize that the social care professionals coming
6 from Germany have higher qualifications and they
7 should be paid a higher rate than a regular au pair.
8   Q.   Let's -- actually, one thing -- no, I
9 think I'm going to come back to that.
10   All right.  So I think since we're
11 talking about this now, it makes sense to start at
12 the beginning and -- and --
13   A.   Uh-huh.
14   Q.   -- and go through this process.
15   So can we talk first about your
16 recruitment of host families specific --
17 specifically, and then we'll get to au pairs.
18   A.   Uh-huh.
19   Q.   How do you go about finding host
20 families?
21   A.   So many families find us through our
22 website, ProAuPair.com, and we also have existing
23 host families refer other families to us.  We
24 advertise with Care.com, which is an online platform
25 for host families and caregivers.  We do social

**Page 39**

1 media on Facebook.  We have some advertisements, not
2 a lot, but with, for example, mother's groups in the
3 east -- in the Bay area specifically.  So we have
4 some areas where we advertise.
5   Q.   And before those advertisements go out,
6 does the content need to be approved by anybody?
7   A.   Yes.
8   Q.   Who approves the content?
9   A.   Either myself or Susan Asay would approve
10 the content.
11   Q.   Okay.  Do you keep records of these ads
12 and their contents?
13   A.   We do.
14   Q.   Do you know whether those ads were
15 collected and produced in this litigation?
16   MR. STONE:  Objection.  Form.
17   A.   Yes.
18   Q.   Actually, that's a -- sorry.
19   So let's -- that was a good
20 objection, so let's start with do you know whether
21 the -- do you know whether those documents were
22 collected?  Did you collect them in this litigation?
23   A.   Yes.
24   Q.   And were they?
25   A.   Yes.

**Page 40**

1   Q.   Okay.  All right.  How far back do your
2 records go for -- specifically for this collection
3 of advertisements?
4   A.   For as far back -- I mean, everything we
5 had we produced.
6   Q.   But I -- so I was asking, is there a
7 cut-off date after which you -- you throw out the
8 doc -- throw out the records, or do you just keep
9 them?
10   A.   We just keep them.
11   Q.   One of the benefits of electronic files?
12   A.   Yes.
13   Q.   All right.  All right.  So once a -- once
14 a -- a host family has been exposed to your -- or
15 potential host family --
16   A.   Uh-huh.
17   Q.   -- I should say, has been exposed to your
18 advertising, how do they contact you or you contact
19 them?
20   A.   So they contact us, and the majority of
21 families will inquire with us via our website.  They
22 fill out a web form on our website that then flows
23 into our database.
24   Q.   And what is the next step?  Well,
25 actually, let me take a step back.  Sorry.

**Page 41**

1   What information do they provide
2 through that website?
3   A.   The minimum that they need to provide is
4 an e-mail address.  And so some individuals just do
5 their e-mail address, and then other -- others might
6 choose to give us more information, like their name
7 and if they have infants or if they require special
8 needs.  Those would be the initial things we
9 might -- that we have available for families to fill
10 out, and their phone number.
11   Q.   And what do -- what is the next step?
12   A.   So the next step is somebody on our team
13 would attempt to reach out to the family to follow
14 up with them and hopefully connect with them and
15 find out what they're looking for.
16   Q.   And if you are able to connect with them,
17 what is the -- what is that employee trying to do in
18 that initial phone call?
19   A.   Well, the main thing the employee is
20 trying to do is educate the family on who we are and
21 the services that we provide.
22   Q.   So what -- what information would you
23 convey in order to educate host fam -- potential
24 host families as to what services you provide?
25   A.   Uh-huh.  Well, we ask them questions

PLAINTIFFS' RESP. APP.0004510

**MAGNA**
LEGAL SERVICES

---

**Page 42**

1  about their childcare needs, so ages -- you know,
2  we're trying to first find out information about
3  them, what their children's ages are, where they
4  live, to see if we can even service them.
5     Q.  So you -- you ask them questions about
6  their childcare needs.  Do -- do you also provide
7  information about what services you provide?
8     A.  We do.  We do.
9     Q.  What information do you provide?
10     A.  So we -- we tell them about our program.
11  We explain that we place professional au pairs in
12  specific areas around the U.S., in markets that we
13  serve.  We might speak to the professional's
14  qualifications.
15      A lot of times families have a lot
16  of questions about where our candidates come from,
17  what they can do.  So we're educating them on how
18  the program works in terms of what they can expect
19  in terms of childcare, working requirements, things
20  they can do, cannot do, that sort of thing, and also
21  program pricing.
22     Q.  Do you convey information about what they
23  should pay to au pairs during that first call?
24     A.  We do.
25     Q.  And what do you tell them?

---

**Page 43**

1     A.  We tell them that au pairs, professional
2  au pairs are to be paid a minimum of $250 a week.
3     Q.  Do you know what you tell -- what you
4  tell host families that are seeking regular
5  au pairs, when that has come up?
6     MR. STONE:  Objection.  Form.
7  Foundation.
8      Go ahead.
9     A.  Well, we tell them right now we don't
10  have regular au pairs, that that's not a type of
11  au pair that we provide.
12     Q.  So is the fact that you don't have
13  regular au pairs right now a matter of happenstance,
14  or is it a programatic decision?
15     A.  It's a pro -- programatic decision.
16     Q.  When was that decision made?
17     A.  That decision was made towards the end of
18  20 -- well, it was made in 2015 for A.P.E.X.
19     Q.  And when was it --
20     A.  Specifically.
21     Q.  -- made for 20/20?
22      Well, let's start, has the same
23  decision been made for 20/20?
24     A.  Yeah.  Yeah.  I guess it's fair to say
25  for both, yeah.

---

**Page 44**

1     Q.  For both, okay.
2      Who made that decision in 2015?
3     A.  Susan and I did.
4     Q.  And what -- do you know why that decision
5  was made?
6     A.  I do know why.
7     Q.  Why did you reach that decision?
8     A.  Well, first of all, we're the only agency
9  specializing in professional live-in childcare.  And
10  offering regular au pairs, first of all, we didn't
11  ever have that many, and we were focused on
12  professionals.  And so we had a handful of
13  candidates that had applied for the professional
14  program but didn't meet our criteria, but we thought
15  they were great candidates with the right
16  motivations, so we might have accepted them as a
17  regular au pair.
18      But in the end it's just that's
19  not what we do, and it just was more trouble than
20  it's worth.  So we decided we're going to just focus
21  exclusively on what we do best, which is
22  professional au pairs servicing special needs
23  families.
24     Q.  Why was it more trouble than it's worth?
25     A.  Well, first of all, financially it

---

**Page 45**

1  doesn't make any sense for us because a professional
2  au pair program fee is almost twice as what we would
3  charge for our regular program fee.  And all of our
4  program materials are geared towards speaking to
5  professionals, professional au pairs.
6      And we just found that it just --
7  it just didn't make sense to have a few regulars
8  because they -- it just didn't make -- it just
9  didn't fit in with what we were doing.
10     Q.  Have you had any regular au pairs since
11  that decision was made in 2015?
12     A.  No.
13     Q.  Were there regular au pairs that you had
14  placed before the decision was made -- was made that
15  finished their time as au pairs after the decision
16  was made?
17     A.  Yes.
18     Q.  But no new au pairs, no new regular
19  au pairs since then?
20     A.  Yes.
21     Q.  And can you be more specific about when
22  that decision was made, other than just 2015?
23     A.  I'm just thinking of timing.  So I think
24  our last regular au pair came at the beginning of
25  2016 and completed early in 2017, at the beginning

---

PLAINTIFFS' RESP. APP.0004511

**MAGNA**
LEGAL SERVICES

---

Page 46

1 of the year, I believe.
2    Q.  Okay. Okay. So what -- back when you
3 were still placing regular au pairs.
4    A.  Uh-huh.
5    Q.  What would you have told the host family
6 during the initial phone call, that we were
7 discussing earlier, about pricing for regular
8 au pairs?
9        MR. STONE: Objection. Form.
10       Go ahead.
11    A.  So what we would have told them about
12 pricing is that the program fee was in the
13 neighborhood of almost $8,000, and that the minimum
14 stipend to the au pair was 9 -- 195.75 a week.
15    Q.  Okay. Is there anything else that you
16 discuss in that initial phone call with host
17 families that we haven't talked about?
18    A.  I can't think of anything.
19    Q.  Okay. After that initial phone call,
20 what is the next step?
21    A.  In terms of?
22    Q.  In terms of your process of, I don't
23 know, would you say on-boarding? Recruiting? How
24 would you refer to your process of turning your
25 family from a potential host family into a --

Page 47

1    A.  Uh-huh.
2    Q.  -- host family?
3    A.  Uh-huh. So if a family is interested in
4 a program, the next step for them would be to
5 complete our host family application, and they can
6 do that online. So they need to complete that, pay
7 an application fee, and then at that point they can
8 begin interviewing candidates.
9    Q.  What information do they provide during
10 the au pair application -- I'm sorry, the host
11 family application?
12    A.  So the host family application is -- is
13 asking a variety of questions, first of all, about
14 the family's contact information, how we can reach
15 them, their children, their care requirements.
16       As I said, a lot of our families
17 have children with special needs, and so we have
18 quite a few questions designed to better understand
19 the -- the -- the child's need, their childcare
20 requirements relating to that need. They fill out
21 a -- a -- a dear au pair letter or welcome letter
22 that explains, you know, their family's lifestyle,
23 what they're looking for, describing their
24 community, where they live.
25       We ask them to answer questions

Page 48

1 about the -- the job requirements, so what's the
2 ideal schedule, what would be typical duties that
3 they would be working in, that sort of thing.
4       We also ask for references, so
5 they provide reference information for us. We have
6 a host family agreement that they sign. Those are,
7 like, the basic things I can think of.
8    Q.  Okay. And the next step after what you
9 just discussed is interviewing au pairs; is that
10 right?
11    A.  Uh-huh.
12    Q.  And so maybe, actually, it makes sense
13 now to talk about recruitment of au pairs so we can
14 bring them up to the same point in time.
15       So how do you recruit au pairs?
16    A.  So we recruit professional au pairs
17 through our website. Apexsocial.org is the URL for
18 that website. So a lot of social care professionals
19 find us from our website.
20       We also have relationships -- the
21 majority of au pairs are coming from Germany, and
22 so within Germany we are -- we network with
23 vocational training schools that train social care
24 professionals. We have a partnership with the
25 German Red Cross, and they refer candidates to us.

Page 49

1       We go to job fairs in Germany.
2 For example, they might have -- they do have an
3 occupational therapy professional conference, and we
4 might be there representing A.P.E.X. and recruiting
5 au pairs through -- through those channels.
6    Q.  So for either the affairs that you
7 mentioned or the relationships with certain entities
8 that you mentioned, do you have standard materials
9 that you provide to those com -- to those entities
10 or fairs?
11    A.  We do.
12    Q.  Do they differ between the different
13 entities and fairs?
14    A.  They do.
15    Q.  They do. Okay.
16    A.  They do.
17    Q.  What sort of -- are there general topics
18 that they all tend to cover or that are in a lot of
19 them?
20    A.  Can you be more specific?
21    Q.  Let's start with -- let's start with an
22 organization --
23    A.  Uh-huh.
24    Q.  -- that you may have a partnership with
25 to -- whereby they refer au pairs, potential

13 (Pages 46 to 49)

**MAGNA ▶**
LEGAL SERVICES

Case 1:14-cv-03074-CMA-KMT   Document 1059-23   Filed 05/17/18   USDC Colorado   Page 304 of 309

Page 50

1   au pairs to you.
2           What sort of information is it
3   important that that -- that that partner has in
4   order to refer au pairs to you?
5       A.   What information does the partner need to
6   have to refer?
7       Q.   What information does the partner need to
8   have, yes.
9           MR. STONE:  Objection.  Form.
10          Go ahead.
11      A.   Well, the partnerships that we have are
12  often based on relationships that Susan Asay has.
13  She's German.  She was raised in Germany, and so she
14  has a huge network of companies and institutions and
15  schools that she's aware of.
16          So first off, it's really based on
17  the relationship that Susan may have with the
18  individual organization.
19          The second thing I would say is
20  that we are a designated J-1 au pair sponsor, and
21  that's important to relay that.  So we're a legal
22  program for people to come to the U.S. as on a J-1
23  au pair visa.
24          And then we would speak
25  specifically to -- for example, if we were at or

Page 51

1   targeting a -- a occupational therapy school, we
2   might be referring to this is a program for
3   occupational therapists, specifically.
4       Q.   Do these partners provide information to
5   the au pairs, or do they refer the potential
6   au pairs to you and -- or both?
7       A.   It depends.  It depends.  So in some
8   cases they may have our materials in their office.
9   They might have a brochure from A.P.E.X. that they
10  might make available.  There's posters.  Sometimes
11  we do information sessions, the vocational schools,
12  so we would go in at the invitation of a teacher and
13  present our program or something.
14      Q.   Do you have standard materials you use
15  for those presentations?
16      A.   I'm hesitating because we're constantly
17  creating new materials all the time, so -- but we do
18  have general photos that we use and, yeah, we kind
19  of fine tune our -- what we say, depending on the
20  material that we're creating, but...
21      Q.   And those -- are those presentations kept
22  after they're used, or are they discarded?
23      A.   The presentations?  It depends.  It might
24  be a verbal presentation that one of our staff
25  members are giving, so --

Page 52

1       Q.   When they're doing a verbal presentation,
2   would they be working from any kind of document,
3   like a slide deck, notes?
4       A.   In some cases we do have presentations
5   about the program, and -- and in other cases it
6   might just be an experience share.  So it -- it just
7   depends.
8       Q.   Okay.  So job fairs, do you have standard
9   materials that you provide at job fairs?
10      A.   We -- we do.  We do have some standard
11  materials, our program brochure, uh-huh.
12      Q.   Okay.  Is that in German?
13      A.   It is.
14      Q.   So once an au pair, potential au pair,
15  has been exposed to this, how do they indicate that
16  they might be interested?
17      A.   So typically what they do is they would
18  provide us with their information either via our
19  website -- they would fill out a web form and give
20  us their contact information -- or call our office
21  and provide that information to us and inquire about
22  the program.
23      Q.   And would that lead to -- so when they --
24  actually, when they call to inquire --
25      A.   Uh-huh.

Page 53

1       Q.   -- or contact you to inquire --
2       A.   Uh-huh.
3       Q.   -- what information do you request from
4   them at that stage?
5       A.   When they're inquiring about the program,
6   the first thing -- well, not the first thing
7   necessarily, but we would be asking them their
8   qualifications to participate, like do they meet the
9   Department of State requirements, things like their
10  age, you know, can they pass a criminal background
11  check, those sorts of things.  And then we're also
12  inquiring about their professional background and
13  whether or not they'd meet our admissions criteria.
14      Q.   And do you provide any specific
15  information to them during the initial call or
16  contact?
17      A.   We do.
18      Q.   What information do you provide?
19      A.   We provide them information about how the
20  program works, so what the application process is
21  like, what the placement process is like, what they
22  can expect when they're on the program in terms of
23  support.
24          We might tell them how we screen
25  host families.  We talk about the compensation that

PLAINTIFFS' RESP. APP.0004513

MAGNA
LEGAL SERVICES

Page 54

1  they could receive, the program price.  Everything
2  they need to be educated about who we are and what
3  we do and what the program's like.
4      Q.   And what do you tell them about their
5  compensation?
6      A.   So we tell them that their compensation
7  is a minimum of $250 a week.
8      Q.   And what do you tell them about the
9  duties, about what sort of duties they might have?
10  What do you tell them about what sort of work they
11  might be expected to perform?
12      A.   Well, we tell them the basics; you know,
13  that it's not more than 45 hours a week, not more
14  than 10 hours a day.  That their duties must be
15  related to the care of children and tasks related to
16  the children.
17          If we are speaking to -- depending
18  on the au pair's profession, we might be providing
19  additional information about how their training and
20  background could be applicable to a host family
21  seeking care of an occupational therapist or a
22  speech therapist or a physical therapist.  So we
23  also try and kind of relate how their training and
24  experience can be utilized once they're working for
25  an American host family.

Page 55

1      Q.   And do you provide that same information
2  about the 45 hours a week, 10 hours a day to host
3  families?
4      A.   Yes, we do.
5      Q.   At what stage in the process do you
6  provide that information to host families?
7      A.   Well, it's on our website, so it's in our
8  program materials.  It's also in our application
9  process.  And then it's discussed during the host
10  family interview and followed up after the candidate
11  arrives, and it's -- it's, like, discussed multiple
12  times.
13      Q.   Okay.  So after the initial contact with
14  the potential au pair --
15      A.   Uh-huh.
16      Q.   -- if this person is interested, what is
17  the next step?
18      A.   The next step would be for them --
19  there's a couple next steps.  It depends.
20          Germans plan one to two to three
21  years ahead of time, so they might attend an
22  information session in person about the program to
23  learn more.  They might start -- move forward and
24  start completing their application, that sort of
25  thing.  It just depends on their timing.

Page 56

1      Q.   Do they have to meet the requirements
2  that you set at the time of this initial
3  conversation or at the time when they anticipate
4  becoming an au pair?
5      A.   They have to meet the requirements at the
6  time they anticipate become an au pair.
7      Q.   So just to -- as an example, you used the
8  400 hours number of experience.
9      A.   Uh-huh.
10      Q.   If they're planning three years ahead,
11  they could be an -- anticipating accumulating those
12  400 hours over the course of those three years.
13      A.   That would be for regular au pairs.
14      Q.   I'm sorry.  Well, for regular au pairs
15  then --
16      A.   Uh-huh.
17      Q.   -- is that accurate?
18      A.   It would have been accurate.
19      Q.   And --
20      A.   In the past, right.
21      Q.   And for -- and for professional au pairs,
22  they also have criteria that they have to meet?
23      A.   Yes.
24      Q.   And, again, for them, they have to meet
25  that criteria at the time they would be becoming an

Page 57

1  au pair; is that right?
2      A.   Correct.
3      Q.   Okay.  So -- and all right.  So if
4  they're planning -- so they -- they're planning
5  three -- three years ahead, which is impressive, I
6  think.  That's --
7      A.   It's German.
8      Q.   Yeah.  I mean, other than, you know,
9  college, which is more than three years, I guess,
10  but --
11          All right.  So they're planning
12  suitably far ahead.  And what occurs during that
13  planning period, if anything, in terms of your
14  contacts with potential au pairs?
15      A.   Can you rephrase the question?
16      Q.   Sure.
17          In this period between when they
18  express interest --
19      A.   Uh-huh.
20      Q.   -- and when they ultimately want --
21      A.   Uh-huh.
22      Q.   -- to become an au pair, do you -- are
23  you in contact --
24      A.   Uh-huh.
25      Q.   -- with the potential au pairs?

PLAINTIFFS' RESP. APP.0004514

MAGNA
LEGAL SERVICES

Case 1:14-cv-03074-CMA-KMT    Document 983-59    Filed 03/17/18    USDC Colorado    Page 306 of 309

| Page 58 | Page 60 |
|---|---|

**Page 58**

1  A.  It depends.  So at various -- well, we --
2  we are in contact for some.  So it depends on, like,
3  the -- it depends on the timing.
4       So usually if the candidate is
5  available in a more, you know -- if they're
6  available sooner rather than later, we're more
7  proactively following up with them because -- just
8  because they're interested now versus two or --
9  Q.  Right.
10  A.  -- or three years from now.  So we might
11  be more intermittently keeping in touch with people
12  that have a long -- longer, you know, ideal start
13  date.
14       And people, you know, we invite
15  them to follow us on social media.  So they might --
16  may be passively keeping in touch with us.  If they
17  are following our Facebook page or whatnot, they can
18  see our updates and that sort of thing.  But we do
19  make an effort to follow up with them, but it's --
20  it varies.
21  Q.  And how does -- how does an au pair go
22  from this kind of an expression-of-interest stage to
23  being ready to talk to a host family?
24  A.  So in order to talk to a host family, the
25  candidate needs to complete the application.  It's

**Page 59**

1  similar to the host family application, but more
2  detailed.  It's asking questions about their
3  background, their -- their professional background,
4  their childcare experience.  They're providing us
5  with references.  They're taking our personality
6  assessment test.  They're meeting with us in person
7  for an in-person meeting.
8       We have an English evaluation.
9  They're going -- they have to go through the entire
10  application and screening process before we will
11  allow them to -- introduce them to a host family to
12  interview.
13  Q.  And what does that screening process
14  involve?
15  A.  Well, it involves multiple things.  So
16  we're looking to make sure that we comply with all
17  the Department of State requirements regarding
18  admitting -- admitting somebody into the program.
19  So that speaks specifically to the regulations,
20  where we're collecting professional and personal
21  child -- you know, references, making sure they meet
22  the age requirement, that they've passed a criminal
23  background check.  We're doing that type of
24  screening.
25       And then we're also, you know,

**Page 60**

1  screening for how they interact with us and what
2  their motivations are to go in the program and what
3  are they looking to get out of their year in the
4  U.S.  And, you know, screening them from that
5  standpoint to make sure that they meet our
6  professional criteria and that we're confident that
7  when they come on the program that they will be
8  successful.
9  Q.  And is -- do you provide them with
10  information about the program during those
11  screenings?
12  A.  They -- yes.  I mean, they have that
13  information available to them because it's on our
14  website.  And, you know, if they -- a lot of times
15  they have questions for our staff during the
16  application process.  We also have different
17  Webinars that our team does in Germany for people
18  who are applying to the program, to answer any
19  questions that they have.
20       So really trying to partner with
21  them and make sure that -- everybody has different
22  questions about the program, so we're just staying
23  in touch with them and trying to make sure that
24  they're educated about what we do and what the
25  program is.

**Page 61**

1  Q.  And once they've completed the
2  application, are they ready to talk to potential
3  host families?
4  A.  Yes.
5  Q.  How does that matching process work?
6  A.  So once a candidate has completed their
7  application and gone through our admissions process,
8  we then have them speak to one of our U.S. matching
9  specialists who will meet them, talk to them, learn
10  more about what they're looking for specifically so
11  the matcher can be on the lookout for families that
12  could be a good match.
13       So we also make the candidates
14  available online to host families.  So once host
15  families have been approved to look for matches,
16  they can see those profiles on our website -- on our
17  website, our internal website that families can use
18  for seeing profiles.  So candidates and host
19  families, they can see each other in our matching
20  system.
21  Q.  And how does -- how does a match happen?
22  I mean, I --
23  A.  Uh-huh.
24  Q.  Actually, let me ask a different
25  question.

PLAINTIFFS' RESP. APP.0004515

MAGNA
LEGAL SERVICES

Page 62

1    You said you have matching
2    specialists?
3        A.   Yes.
4        Q.   So will they suggest matches?
5        A.   They -- they -- typically they do.  We're
6    very hands on and personalize what we do because of
7    the nature of our host families' needs.
8        So the matching specialist, once
9    they've applied, they're speaking to the host --
10   once the family has applied, they're speaking to the
11   match specialist.  And the match specialist's job is
12   to figure out what type of candidate is going to be
13   best.
14       So, for example, it could be
15   there's a child that has cerebral palsy and, you
16   know, requires somebody that has feeding tube
17   experience or has worked with somebody in a
18   wheelchair before.
19       So the -- the matching specialist,
20   once she knows that Family A has those requirements,
21   she also is aware of the pool of candidates that we
22   have at any given time based on the family's timing
23   or the au pair's timing.  And so she may -- usually
24   what she will do is make recommendations to both
25   parties, that Family A, hey, Au Pair B, you could be

Page 63

1    a good match.  So she may make an introduction that
2    way.
3        Or the family may indicate
4    interest, or the candidate too could indicate
5    interest via our website, that they are interested
6    in either party.
7        Q.   So I think you said the host families can
8    see potential au pairs through your -- through your
9    website?
10       A.   Matching system, right.
11       Q.   Through your matching system.
12       A.   It's online, right.
13       Q.   Through your matching system, host
14   families can see potential au pairs?
15       A.   Uh-huh.
16       Q.   And can potential au pairs see potential
17   host families as well?
18       A.   Yes.
19       Q.   And can either group suggest or request a
20   match?
21       A.   I wouldn't say at that point they can
22   request a match.
23       Q.   Okay.
24       A.   They usually request to speak with each
25   other.  And that's the next step in the matching

Page 64

1    process, is for the family and the candidate to
2    speak and -- speak to each other and learn about
3    each other's needs and personalities and...
4        Q.   But either au pairs or host families can
5    make that request to --
6        A.   Usually the host family takes the lead.
7    Yeah, usually the host family takes the lead on
8    that.
9        Q.   Okay.  So usually the host family does
10   it, but sometimes the au pair does it?
11       A.   Uh-huh.  The au pair could, uh-huh,
12   express interest in a family.
13       Q.   Okay.  So whether -- however you reach
14   this stage --
15       A.   Right.
16       Q.   -- at some point a potential host family
17   and a potential au pair are going to talk to each
18   other --
19       A.   Yes.
20       Q.   -- is that right?
21       A.   Correct.
22       Q.   And do they do that in person?  Skype?
23   On the phone?
24       A.   They usually do it via Skype.
25       Q.   Via Skype?

Page 65

1        A.   Via Skype.
2        Q.   And what is -- and what is the purpose of
3    that conversation?
4        A.   Well, the purpose of that conversation is
5    we want to make sure that the host family and the
6    candidate have had an opportunity to meet each other
7    and determine whether or not it's a good fit for
8    both or either party.  We don't -- we don't decide
9    matches for families and au pairs.  They decide by
10   themselves together that this is a match.
11       Q.   Are there -- do you participate on these
12   calls?
13       A.   I -- I do not participate on those calls.
14       Q.   Does A.P.E.X., or do -- do either
15   A.P.E.X. or 20/20 have a representative
16   participating in these calls?
17       A.   Only very rarely, I think.  It may be
18   that an A.P.E.X. -- you know, our matching
19   specialist might do some screening for the family
20   and speak to the au pair.  Sometimes the families
21   like the opinion of -- like our opinion on, like,
22   who would be the best fit for my needs.  So we might
23   have our matching specialist do some interviews with
24   the candidates, knowing what the host family's
25   personality and needs are.  So we can make

PLAINTIFFS' RESP. APP.0004516

MAGNA ▶
LEGAL SERVICES

Page 66

```
 1   recommendations.
 2       Q.   Do you provide suggestions to either the
 3   au pairs or the host families about what they should
 4   discuss on this -- on this call?
 5       A.   We do.
 6       Q.   And what do you suggest to the au pairs
 7   that they should discuss?
 8       A.   We suggest to the au pairs that they
 9   should discuss their professional background and
10   training and their qualifications to participate in
11   the program and care for a family's children.  We
12   ask them to ask -- guide them to ask questions so
13   they can make sure that they're asking the right
14   questions, because they're interviewing the family
15   too.  So making sure that they are -- you know,
16   asking -- asking questions that they need to know
17   about the family's lifestyle, their personality,
18   what the specific job requirements might entail.
19           And once again, you know, the
20   majority are special needs focused, and so they
21   might want to know, for example, if a child has
22   autism, what types of therapy is your child
23   currently doing.  Oh, they're doing ABA therapy?
24   Oh, I have experience with ABA therapy so
25           So we encourage that dialogue so
```

Page 67

```
 1   by the time families choose -- they choose each
 2   other, it's -- it's as much of -- they've discussed
 3   as much as possible to make an educated decision
 4   about a good match for -- for them.
 5       Q.   Is there anything else you encourage
 6   au pairs to talk about on these phone calls or Skype
 7   calls?
 8       A.   I mean, that's -- I mean, they can talk
 9   about anything they want.
10       Q.   Right.  But I'm asking whether there's
11   anything that you specifically suggest to them that
12   they should discuss?
13       A.   I can't think of anything more than what
14   I've already described.
15       Q.   Is there anything that you suggest to
16   host families that they should -- other -- let me --
17           Was the answer you just gave, was
18   that something that you suggest to just au pairs, or
19   is that something you suggest to both?
20       A.   We suggest it to both.
21       Q.   Is there anything that you suggest to one
22   of, host families or au pairs, that you don't
23   suggest to the other one?
24       A.   I can't think of anything specifically.
25       Q.   Okay.  So it's fair to say that you can't
```

Page 68

```
 1   think of -- beyond what you've already testified to,
 2   you can't think of anything else right now that you
 3   ask the par -- or you suggest to the participants
 4   that they talk about in this call?
 5       A.   I'm sorry, can you repeat that?
 6       Q.   It was bit of a jumbled question.  Yes, I
 7   will repeat it, but I'll rephrase it.
 8           Can you think of anything else
 9   that you would suggest to host families or au pairs
10   that they discuss during their initial interview,
11   for lack of a better word?
12       A.   I can't think of anything specific off
13   the top of my head.
14       Q.   Okay.  And what happens after this -- can
15   I call it an interview?
16       A.   Sure.
17       Q.   Okay.
18       A.   It's an interview.
19       Q.   What happens after this interview?
20       A.   Well, if the family and candidate decide
21   it's a -- a match and they like each other, then
22   they let us know.  And from there we would collect
23   information like what day they would arrive, what
24   airport they would fly into, kind of speak to the --
25   more about the logistics and timing to confirm the
```

Page 69

```
 1   placement.
 2       Q.   Okay.  And is this the point in time
 3   when -- well, actually, let me ask a different
 4   question.
 5           Do you have contracts between
 6   yourself and host families?
 7       A.   Yes.
 8       Q.   At what point in time are those contracts
 9   entered into?
10       A.   At the time of application.
11       Q.   And do you have contracts between
12   yourself and au pairs?
13       A.   Yes.
14       Q.   At what point in time are those contracts
15   entered into?
16       A.   At the time of application, yeah.
17       Q.   And are there also contracts between host
18   families and au pairs?
19       A.   Yes.
20       Q.   And do you provide those contracts to the
21   host families and au pairs?
22       A.   Yes.
23       Q.   At what point in time are those contracts
24   entered into?
25       A.   I'd like to make a distinction.
```

PLAINTIFFS' RESP. APP.0004517

**MAGNA** ►
LEGAL SERVICES

---

Page 70

1      So we don't call them contracts.
2  We call them agreements. And we refer to that
3  document as the Childcare Agreement, and it's part
4  of compliance with the Department of State's
5  regulations.
6      Q.   What is the distinction you're drawing
7  between an agreement and a contract?
8      A.   Just that we use the term "agreement."
9      Q.   So is it just your practice is to use the
10  word "agreement" --
11      A.   Uh-huh.
12      Q.   -- or is there some --
13      A.   That's -- yes.
14      Q.   -- meaningful distinction -- or is it, I
15  mean -- let me rephrase it.
16          Is it just that it's your practice
17  to call it an agreement --
18      A.   Uh-huh.
19      Q.   -- or is there a substantive distinction
20  you're trying to draw between an agreement and a
21  contract?
22      A.   I'm just making a distinction of the
23  terminology that we use.
24      Q.   Okay. So I'll refer to -- do you refer
25  to all three as agreements?

---

Page 71

1      A.   We do.
2      Q.   Okay. So at what point in time is the
3  agreement between host families and au pairs entered
4  into?
5      A.   That is after they match and before they
6  arrive.
7      Q.   Okay. So after that initial interview,
8  if both parties --
9      A.   Uh-huh.
10      Q.   -- want to go forward, is that the point
11  in time in which you would provide the Childcare
12  Agreement?
13      A.   Yes.
14      Q.   Okay. And after that the process for
15  determining logistics and then the au pair arriving
16  enters into?
17      A.   All that happens after the match, right.
18      Q.   Okay. We'll talk about that later.
19          MR. LIBLING: Let's do tab 4.
20          (Exhibit No. 4 was marked.)
21      Q.   So I'm handing you a document marked as
22  Exhibit 4. It's also Bates numbered APEX-20/20 117
23  through 125.
24          And my first question is do you
25  recognize this document?

---

Page 72

1      A.   I do.
2      Q.   And what is this document?
3      A.   This is called "The Nine Mistakes"
4  report, and it's provided to families interested in
5  the program. Or it used to be provided to families
6  interested in the program.
7      Q.   Is it no longer provided to families?
8      A.   It's no longer provided.
9      Q.   When did that change occur?
10      A.   We stopped using this, I believe, early
11  in 2015, I want to say.
12      Q.   Why did you stop using this document in
13  early 2015?
14      A.   We created "The Ten Tips Guide," and we
15  just reworked the entire document to change it.
16      Q.   At what point in the process -- actually,
17  before I ask that.
18          So this document stopped being
19  used in early 2015. Do you know when it started
20  being used?
21      A.   I believe this document was used sometime
22  in 2012, may have been when it was introduced, but
23  I'm not totally sure on the dates.
24      Q.   And it was replaced by The Ten Tips
25  Guide?

---

Page 73

1      A.   Uh-huh. Yes.
2      Q.   Okay. At what point in the process is
3  this document provided to host parents?
4      A.   This -- this document?
5      Q.   Yes.
6      A.   Families could request this document or
7  The Ten Tips Guide on our website. So it's a
8  download that they can request.
9      Q.   I see. So it's available to -- this or
10  The Ten Tips Guide is available to host families,
11  but is not proactively sent to them?
12      A.   Right. It's available to anybody.
13      Q.   It's available to --
14      A.   Yeah.
15      Q.   Okay.
16      A.   Because it's on the website.
17      Q.   Okay. Would you characterize this
18  document as part of your advertising materials?
19      A.   Yes.
20      Q.   Okay. So this document is available to
21  au pairs, because it's available to everybody, but
22  it's targeted towards host parents; is that fair?
23      A.   Yes. Anybody could find it.
24      Q.   Right. Okay.
25          So if you would turn to page --

---

PLAINTIFFS' RESP. APP.0004518

MAGNA
LEGAL SERVICES