# **Exhibit W**

(replacing ECF No. 943-47)

## Page 74

1    I'm going to use the native numbers rather than the
2    Bates numbers.
3        A.    Okay.  Sure.  That's fine.
4        Q.    So if you could turn to page 4, please.
5        A.    Uh-huh.
6        Q.    And you see "Mistake 1."  Do you see that
7    heading in the first column, "Underestimating the
8    power of risk management in childcare."
9        A.    I'm sorry, which page?
10       Q.    Sorry, I'm on page 4.
11       A.    Page 4.  Okay.
12       Q.    Do you see the heading, "Mistake 1 -
13   underestimating" --
14       A.    Uh-huh.
15       Q.    -- "the power of risk management in
16   childcare."
17       A.    Uh-huh.
18       Q.    What was meant by "risk management in
19   childcare"?
20       A.    Susan Asay wrote this, and prior to her
21   founding ProAuPair she was a financial advisor.  And
22   I think "risk management" is a term that financial
23   people use, and that's probably why she's using the
24   term "risk management."
25       Q.    Okay.  What does it mean in this context?

## Page 75

1        A.    It means -- well, this is my
2    interpretation.  It means as a parent you -- I'm
3    just reading here real quick.
4                Yeah, as a parent, when you go to
5    work, you want to make sure that your -- you have
6    the best care possible, that the person caring for
7    your child is qualified and is going to do a good
8    job.  And that's risk management, make sure you get
9    the right person to care for your children.
10               And that -- that's kind of -- when
11   Susan created this document, it was really her
12   experience shining through as, like, her role as a
13   busy working mom and making sure you have the -- the
14   right person, a professional.
15       Q.    So the -- the risk management is about
16   the risk of having the wrong person looking after
17   your children?
18       A.    Yes, I believe so.
19           MR. STONE:  Objection.  Form.
20           THE WITNESS:  Oops.  Sorry.
21           MR. STONE:  Go ahead.
22       Q.    And in the example -- so at the bottom of
23   the first column it says in bold, "On the first
24   day."  I take it this is an example meant to
25   illustrate the point; is that fair?

## Page 76

1        A.    I would say that's fair.
2        Q.    And it says, "The woman called her sitter
3    to check in on the baby," and then it gives the
4    story, and second day with different sitter.
5                So is one of the things that's
6    being discussed here the risk of using a baby-sitter
7    rather than a professional childcare -- rather than
8    a professional childcare?
9        A.    Can you repeat that question?
10       Q.    Sure.
11               So is -- one of the -- the
12   risks that's being discussed in this Mistake 1
13   section related to the differences between a
14   professional childcare provider and, for example, a
15   baby-sitter who may not be a professional?
16       A.    I don't think it's specifically saying
17   that.  I think it's saying -- well, it's saying what
18   it says.
19               When you're looking for an
20   au pair, don't hire anyone until you can feel 100
21   percent confident leaving your child in their hands.
22   That's what, I think, really the point of this
23   mistake is.
24       Q.    So you think the reference to a sitter
25   here is a reference to an -- an au pair?

## Page 77

1        A.    I think it's a reference to somebody you
2    leave your child with.
3        Q.    But there are different kinds of people
4    you could leave your child with; is that right?
5        A.    Yes.  But Susan is not an native English
6    speaker, and so she may have just used the word
7    "sitter" as the word sitter, meaning somebody you
8    leave your child with.  I don't know specifically
9    what she meant by using that word.
10       Q.    Okay.  Can you turn to the next page
11   then, please.  So Mistake 3 is, "Not understanding
12   the difference between regular au pair, professional
13   au pair, and a nanny."
14       A.    Uh-huh.
15       Q.    Do you see that?
16               And what is -- what is the message
17   being conveyed by this Mistake 3, as you understand
18   it?
19       A.    Well, the message is -- is -- is making a
20   distinction that a regular au pair is not likely to
21   have a professional background and training in a
22   specific care field, and a professional au pair will
23   have a specific background and training.
24       Q.    And what is the reference to a nanny?
25   Why is there a reference to a nanny then?

**MAGNA**
**LEGAL SERVICES**

Page 78

```
1        MR. STONE:  Objection.  Form.
2        Go ahead and answer.
3     A.  Well, it's not specifically discussing a
4  nanny, so...
5     Q.  So if you look under -- so Mistake 3 is
6  the heading, and then one, two, three paragraphs in.
7     A.  Uh-huh.
8     Q.  Do you see where I am?
9     A.  Oh, sorry.  Okay.  Yeah.
10     Q.  So it says, "A nanny, a full-time" --
11     A.  Uh-huh.
12     Q.  -- "childcare provider who's typically
13  from the same country" --
14     A.  Uh-huh.
15     Q.  -- "location as their employer."
16     A.  Uh-huh.
17     Q.  "They can live with the family they work
18  for or maintain their own home."
19     A.  Uh-huh.
20     Q.  "They typically make more money than
21  au pairs and are more independent."
22        So is this -- is this section of
23  the document trying to compare professional au pairs
24  to nannies, among other things?
25     A.  I think it's just -- well, I think it's
```

Page 79

```
1  stating what a nanny is versus a regular au pair
2  versus a professional au pair.
3     Q.  And why is it making that comparison?
4     A.  To educate a host family on the different
5  types of childcare providers there are within these
6  three categories.
7     Q.  So it's important that host families
8  understand what the benefits of a professional
9  au pair might be compared to the other childcare
10  options that they have?
11     A.  Yes.  And also a lot of host families
12  don't know to make a distinction between the word
13  "au pair" and the word "nanny."  A lot of times
14  people just think, oh, you have a somebody that's a
15  live-in childcare provider.  It's a nanny.
16        But an au pair is specifically
17  somebody on a -- on a J-1 au pair visa.  And so part
18  of that is to educate people that it's not a nanny.
19  It's -- it's an au pair.
20     Q.  What are the important distinctions
21  between an au pair and a nanny?
22     A.  Well, that an au pair is here on a J-1
23  cultural exchange program, and within that there are
24  regulations regarding the -- the screening of -- for
25  families, like, basically the program requirements
```

Page 80

```
1  and the -- yeah, the program requirements and
2  regulations.  Where "nanny" is a broad term.
3     Q.  Specifically, which regulations or
4  requirements do you think differentiate professional
5  au pairs from nannies?
6     A.  Well, nannies are on a cultural J-1
7  au pair visa, and so their stay is limited to not
8  more than 24 months.  Their working hours are
9  limited.  The tasks that they can perform are
10  limited.  Their obligation to have a relationship
11  with a sponsor is -- is required.  The age limit of
12  the children is they're 18, you know, is the max for
13  an au pair.
14        So nannies can be anybody with --
15  that can do anything.
16     Q.  So those all sounded like advantages of
17  nannies over professional au pairs.  Are there
18  advantages that professional au pairs have over
19  nannies?
20        MR. STONE:  Objection.  Form.
21     A.  Can you repeat --
22        MR. STONE:  Do you want to read.
23     A.  -- that questions?
24        MR. STONE:  That question back,
25  Ms. Court Reporter.
```

Page 81

```
1        I think you misspoke, but...
2        MR. LIBLING:  I don't think so.  Let
3  me -- let me ask the question differently.
4     Q.  In your -- in your prior answer you
5  mentioned that an au pair is limited to a stay of
6  not more than 24 months, au pairs have limited
7  working hours, au pairs can only perform certain
8  tasks, au pairs have obligations to sponsors that
9  nannies don't have, au pairs have age limit
10  restrictions that nannies don't have.  And then you
11  said so nannies can be anybody with -- that can do
12  anything.
13        So I was asking you whether --
14  those all sounded to me, and this is my
15  characterization, like advantages that nannies have
16  over au pairs.  And so I'm asking you whether there
17  are advantages that professional au pairs have over
18  nannies when a host family is choosing between the
19  two?
20        MR. STONE:  Objection.  Form.
21     A.  I think it depends on the host family and
22  what their needs are.
23        Okay.  I'm sorry, I don't mean to
24  ask again.  So you're -- you're asking me what are
25  the advantages of a professional au pair over a
```

MAGNA ▶
LEGAL SERVICES

Page 82

1  nanny?
2      Q.   Yes.
3      A.   Well, one thing I think that's, you know,
4  interesting for the program is it's a cultural
5  exchange program. So you've got somebody coming
6  from another country to care for your children, and,
7  you know, that's -- that's an advantage for some
8  families. For other families it's -- it's not. It
9  just depends on what the family is looking for.
10     Q.   Are there other advantages?
11     A.   It's live-in, and -- and especially in
12 the special needs space that's hugely advantageous
13 for a family that may need an occupational therapist
14 or a physical therapist or somebody that can live
15 in. That's -- that's a -- that's a big advantage.
16     Q.   Are there other advantages?
17     A.   I think the duration of stay is an
18 advantage, so that continuity of -- of care.
19 There's an agreement, you know, that when the
20 au pair comes, that she's coming for a 12-month
21 period of time. And I think that that's an
22 advantage over a nanny, where that you may or may not
23 have a guarantee of timing.
24     Q.   Are there other advantages?
25     A.   I think one of the advantages is that

Page 83

1  we're handling all the screening of the candidates.
2  So we handle making sure that they pass their
3  background checks, their references are checked.
4  We've met them. We've qualified them for the
5  program. You know, so that's an advantage, I think,
6  that families rely on us for.
7      Q.   Are there any other advantages?
8      A.   We take care of the logistics so they
9  don't have to worry about things like does their
10 childcare provider have insurance. I mean, we're
11 handling making sure that the au pair arrives to
12 their doorstep, that they've got insurance. They
13 don't have to withhold taxes from the stipend that's
14 paid to the professional, whereas a nanny there's
15 withholding and household employee type of things.
16     Q.   You said they have insurance. Who
17 provides the insurance?
18     A.   We provide the insurance. Well, we have
19 a third party that provides the insurance.
20     Q.   So A.P.E.X. has a relationship with an
21 insurance provider who provides health insurance for
22 au pairs?
23     A.   Yes. It's a requirement of the
24 Department of State.
25     Q.   And you also mentioned -- sorry. Let's

Page 84

1  see. You also mentioned they don't have to withhold
2  taxes from the stipend. Why do they not have to
3  withhold taxes from the stipend?
4      A.   Because they're not a domestic employee.
5      Q.   Does A.P.E.X., 20/20 do anything related
6  to the taxes of -- that au pairs are required to
7  pay?
8      A.   What do you mean by "related to"?
9      Q.   That was a vague question. Let me
10 rephrase.
11          Does A.P.E.X. or 20/20 provide tax
12 advice to either au pairs or host families?
13     A.   We do not provide tax advice,
14 specifically in telling them what to do, but we
15 inform them -- specifically we inform au pairs of
16 their obligation to file a tax return, if they are
17 required to file a tax return. And we provide them
18 with information about how to go about doing that.
19          And then we also provide
20 information to host families about the au pair's
21 obligation to file a tax return.
22     Q.   Where do you get -- do you -- did you
23 write the documents that provide the -- not you
24 personally. Let me start this whole question again.
25     A.   Okay.

Page 85

1      Q.   Do -- did A.P.E.X. and 20/20 generate the
2  documents that provide the information about tax
3  requirements and responsibilities that you just
4  testified to?
5      A.   Yes.
6      Q.   And in generating those documents -- and
7  this is a yes-or-no question. I'm specifying that
8  because I don't want to -- now -- it's a yes-or-no
9  question.
10     A.   Okay.
11     Q.   In generating those documents, did you
12 seek legal advice?
13          MR. STONE: Objection. Form.
14          Go ahead.
15     A.   No.
16     Q.   Did you get the information that's in
17 those documents from any specific source?
18     A.   Yes.
19     Q.   What source?
20     A.   From the IRS website.
21     Q.   Okay. All right. So before you piqued
22 my -- my interest. You were telling me the
23 advantages of au pairs, professional au pairs over
24 nannies.
25     A.   Uh-huh.

PLAINTIFFS' RESP. APP.0004521

MAGNA
LEGAL SERVICES

1    Q.   Were there any other advantages?
2    A.   Can you read off what I've said so far?
3    Q.   I can try.  Let's see.  So I will do my
4  best here.  The advantages you've listed so far are
5  cultural exchange program, the fact that it's a
6  live-in, the duration of stay, the fact that you
7  handle the screening of candidates, the fact that
8  you take care of logistics, and that included things
9  like insurance and -- and the tax information.
10  That's it.
11    A.   The other thing I can think of is that
12  we're providing support during the time the
13  placement's taking place.  So if there are any
14  things that come up between a family and the
15  professional au pair, we're there to help either
16  mediate them or help them problem solve.  So both
17  parties have a resource if they need it.
18    Q.   Are there any other advantages?  Are
19  there any other advantages?
20    A.   I can't think of anything else off the
21  top of my head.
22    Q.   So in looking back at the document in
23  front of you.
24    A.   Uh-huh.
25    Q.   And I'm still on page 5.  At the end --

1  the last sentence in this nanny paragraph --
2    A.   Uh-huh.
3    Q.   -- is that -- let's see.  "Nannies
4  typically make" -- the word is "they," but I
5  believe --
6    A.   Uh-huh.
7    Q.   -- it's referring to nannies, "typically
8  make more money than au pairs and are more
9  independent."
10        Would you say that those are both
11  advantages of professional au pairs over nannies as
12  well?
13        MR. STONE:  Objection.  Form.
14    A.   "They typically make more money than
15  au pairs and are more independent."
16        That is an advantage.
17    Q.   Okay.  Can I ask you to turn to page 8 of
18  this document.
19    A.   Uh-huh.
20    Q.   So it's not on this page, but we're in a
21  section at the beginning of this document -- at the
22  beginning of this page we're in a section called
23  "Mistake 8 - not considering the emotional needs of
24  their au pair."
25    A.   Uh-huh.

1    Q.   And the paragraph that I'm looking at is,
2  I guess, third from the bottom, if you count the
3  single line at the very bottom.  So it's the
4  paragraph that begins, "At ProAuPair."  Do you see
5  where I am?
6    A.   Right here (indicating)?  Page 8?
7    Q.   Page 8.  Right there (indicating).
8    A.   Uh-huh.
9    Q.   So this paragraph reads, "At ProAuPair we
10  create guidelines and advice like," and then it --
11  the example it gives is, "No visitors for at least
12  the first four months while the au pair makes
13  friends."  And then it goes on.
14    A.   Uh-huh.
15    Q.   Is that a Department of State requirement
16  or is that a A.P.E.X., 20/20 requirement?
17    A.   I -- this is actually not a requirement
18  of the program.  Reading this, I think this is
19  advice that Susan, as a German, knowing how
20  Americans are, we give to German au pairs; that
21  don't ask the host family if your family can come
22  stay for a month.  Because Germans have a lot of
23  vacation, and they're used to traveling for long
24  periods of time.
25        And so that's just advice.  It's

1  not a program guideline or a requirement.  And this
2  is a very old document, but I understand why Susan
3  put that in there.
4    Q.   Okay.  I think you can put that document
5  aside for now.
6    A.   Okay.
7        MR. LIBLING:  I'm happy to go on to
8  the next topic, or if you want to take a break now,
9  we can take a break now.
10        MR. STONE:  I think it's a good --
11  good idea to take a break.
12        MR. LIBLING:  Okay.  Go off the
13  record, please.
14        THE VIDEOGRAPHER:  Going off the
15  record at 10:47.  This marks the end of media 1.
16        (Break from 10:47 a.m. to
17        11:03 a.m.)
18        (Exhibit No. 5 was marked.)
19        THE VIDEOGRAPHER:  This marks the
20  start of media 2 of the video deposition of Heidi
21  Mispagel, 30(b)(6) representative for A.P.E.X. and
22  20/20.  We're back on the record.  The time is
23  11:03.
24  BY MR. LIBLING:
25    Q.   So the first thing I'm going to show you

PLAINTIFFS' RESP. APP.0004522

MAGNA
LEGAL SERVICES

| Page 90 | Page 92 |
|---|---|
| 1 is marked Exhibit 5, and my -- this is APEX-20/20<br>2 261 through 264.<br>3      And my question is whether you<br>4 recognize this document?<br>5    A.   I do recognize this document.<br>6    Q.   What is it?<br>7    A.   This is the Pre-Match Pricing sheet for<br>8 ProAuPair.<br>9    Q.   How is the Pre-Match Pricing sheet for<br>10 ProAuPair used?<br>11    A.   It's not used anymore, but it -- it was<br>12 for families that had come to A.P.E.X. and who had<br>13 already identified an au pair that they wanted to<br>14 match with, and this was the pricing sheet that we<br>15 had for them.<br>16    Q.   What period of time was it used?<br>17    A.   This document was created in 2014, and I<br>18 think we stopped using it when we phased out the<br>19 regular program.<br>20    Q.   So was this document related to the<br>21 regular au pair program?<br>22    A.   Yes.<br>23    Q.   How is it related to the regular au pair<br>24 program?<br>25    A.   Pre-matches were always regular au pairs. | 1 how it was produced to us, but what is the<br>2 distinction between the first page and all of the<br>3 subsequent pages?<br>4    A.   So the distinction, the first page is<br>5 referencing the pre-match, pre-match pricing.<br>6      The second page is referencing<br>7 professional pricing.<br>8      The third page is referencing the<br>9 regular program, but this is referring to it as<br>10 traditional.<br>11      And the last page is a page that<br>12 was created around 2012, and it's -- it's<br>13 referencing the professional au pair pricing.<br>14    Q.   Do you know why these pages are all<br>15 together in this document?<br>16    A.   Because these were the price sheets that<br>17 we were using for host families.<br>18    Q.   Okay. All right. Well, I'm going to --<br>19 for now I'm going to ask you about the first page,<br>20 and then we'll go through it.<br>21    A.   Okay.<br>22    Q.   But for now at least all of my questions<br>23 about the first page.<br>24    A.   Okay.<br>25    Q.   All right. So let's see. Okay. When -- |

| Page 91 | Page 93 |
|---|---|
| 1      MR. STONE: Counsel, were you just<br>2 referring to the top page of Exhibit 5?<br>3      MR. LIBLING: I've been asking about<br>4 the entirety of Exhibit 5.<br>5      MR. STONE: Okay.<br>6    A.   The entirety?<br>7    Q.   Well, let's clean up the record.<br>8      Do your answers change if we're --<br>9      MR. STONE: Thank you.<br>10    Q.   -- talking about the entirety of the --<br>11    A.   Yes.<br>12    Q.   Let's go back.<br>13    A.   They do.<br>14    Q.   Okay. So -- well, let me just ask you,<br>15 maybe we can do it quickly.<br>16      Does all of the testimony you've<br>17 given so far about Exhibit 5 apply to the first<br>18 page?<br>19    A.   Yes.<br>20    Q.   Does it apply to the second page?<br>21    A.   No.<br>22    Q.   Does it apply to any of the subsequent<br>23 pages?<br>24    A.   No.<br>25    Q.   Okay. What -- I can represent this is | 1 when was this -- so am I correct in understanding<br>2 that this sheet was provided to host families that<br>3 were in a pre-match situation?<br>4    A.   Yes.<br>5    Q.   Was it also provided to au pairs who were<br>6 in a pre-match situation?<br>7    A.   No.<br>8    Q.   Okay. When was it provided -- and I'm<br>9 not asking for the time period 2014 to the end of --<br>10    A.   Uh-huh.<br>11    Q.   -- regular au pair program. I'm asking<br>12 when in the process of applying --<br>13    A.   Uh-huh.<br>14    Q.   -- to be an au pair or to have an au pair<br>15 was this document provided to host families?<br>16    A.   When a family called and was inquiring<br>17 about whether or not we do pre-matches and they're<br>18 interested in our pricing, we provide them with this<br>19 pricing sheet.<br>20    Q.   And just so the record is clear, what is<br>21 a pre-match?<br>22    A.   A pre-match is when a host family has<br>23 identified a candidate that they're interested in<br>24 having work for them as an au pair.<br>25    Q.   Okay. So however it happened, the |

PLAINTIFFS' RESP. APP.0004523

**MAGNA**
**LEGAL SERVICES**

---

Page 94

1  au pair and the host family already have a
2  relationship?
3      A.   Uh-huh.
4      Q.   And now they're coming to you to be the
5  sponsor?
6      A.   Yes.
7      Q.   Okay.  All right.  And does this page
8  accurately reflect the pricing applicable to the
9  pre-match program?
10     A.   Yes.
11     Q.   All right.  So my next questions are
12 about the second page.
13          So what is the second page?
14     A.   So the second page is our professional
15 pricing sheet that we used from 2014 and 2015, I
16 believe.  And this outlines the program fees for a
17 professional au pair.
18     Q.   Okay.  And who is this document provided
19 to?
20     A.   This document is provided to host
21 families.
22     Q.   And when in the process of applying is
23 this document provided to host families?
24     A.   This is usually provided at the time of
25 inquiry or right after we would have spoken to them,

---

Page 95

1  if they were interested in more information about
2  the program.
3      Q.   Okay.  And is the information contained
4  on this page accurate?  Let me start with a
5  different question, sorry.
6          Was the in -- is the information
7  that is in this page, was it accurate when this
8  sheet was used in 2014 and 2015?
9      A.   Yes.
10     Q.   Would it still be accurate today?
11     A.   No.
12     Q.   What has changed?
13     A.   Today in terms of, like, now today?
14     Q.   In terms of, like, now today.
15     A.   Now today, okay.  So the placement fee is
16 now 3,995, I believe.  The weekly stipend is a
17 minimum of 277.  I think everything else is the
18 same, except that the "for about $12 an hour" has
19 changed.
20     Q.   So --
21     A.   At the very top of the document, that --
22     Q.   Oh, I see.
23     A.   -- that number has been adjusted.  I
24 don't know if it's $13 or 14.  I don't recall.
25     Q.   The adjustment to that number, is that

---

Page 96

1  just a result of the changes to the placement fee
2  and the weekly stipend?
3      A.   Yes.
4      Q.   And why do you provide the hourly figure?
5      A.   Because it's helpful for families to --
6  it's a -- it's a number that people can relate to
7  when they're calculating their childcare expenses.
8  People are either usually using an hourly or a
9  weekly or a monthly wage, and it's helpful for them
10 to kind of see the breakdown.
11     Q.   Why do you think that an -- an hourly
12 rate -- an hourly rate is the rate host families are
13 thinking in terms of?
14          MR. STONE:  Objection.  Form.
15     A.   Well, I'm a parent, and I know how much I
16 pay my baby-sitter or -- and so I think it's helpful
17 to have that comparison by the hour.
18     Q.   Okay.  You said that the weekly stipend
19 is now a minimum of 277?
20     A.   Uh-huh.
21     Q.   The word "minimum" is not in this
22 document.
23     A.   Uh-huh.
24     Q.   Has the word "minimum" been added to
25 whatever the updated version of this document is?

---

Page 97

1      A.   We have a different version of this price
2  sheet, and it does say "minimum."
3      Q.   When was the word "minimum" added?
4      A.   When we created the most recent pricing
5  sheet.
6      Q.   And when was that?
7      A.   We have created one in the beginning of
8  2017, and also I believe our price sheet for 2016.
9      Q.   So the 2016 price sheet would be the
10 first one that used the word "minimum"?
11     A.   I believe so.
12     Q.   Okay.  All right.  So third page, and you
13 can probably predict my question by now.
14     A.   Uh-huh.
15     Q.   But what is the third page of this
16 document?  And just so the record's clear, this is
17 APEX-20/20 263.
18     A.   This is the 12-month traditional au pair
19 pricing sheet.
20     Q.   What is the -- what is a 12-month
21 traditional au pair as -- as opposed to the
22 pre-match, which also related to the regular or
23 traditional au pair program?
24     A.   Well, a pre-match, as I said, is when the
25 host family and the au pair have previously met and

PLAINTIFFS' RESP. APP.0004524

MAGNA ▶
LEGAL SERVICES

Page 98

1 they want to match.
2         The traditional au pair program is
3 when the family wants to match with a regular
4 au pair that's been recruited by A.P.E.X.
5     Q.   Okay.  And when was this document in
6 effect?
7     A.   This was in effect in 2014 and 2015.
8     Q.   Would I be correct in assuming that there
9 is no updated version of this document after 2015?
10    A.   I'm not sure about that answer.
11    Q.   Not sure.
12    A.   I could check.
13    Q.   So you may have created a version of this
14 document in 2016, even though you stopped doing
15 regular au pairs?
16    A.   So we had our designer create a whole new
17 format and layout for our pricing sheets.
18    Q.   Okay.
19    A.   And so I believe we had a pricing sheet,
20 that had a new look and feel to it, created after
21 this version.
22    Q.   I see.  What -- do you know approximately
23 when that occurred?
24    A.   Probably in either -- at the end of 2015,
25 I think.

Page 99

1     Q.   Okay.
2     A.   I can find out.
3     Q.   That would be appreciated.
4         But is that before or after the
5 decision was made to stop matching regular au pairs?
6     A.   It would have been before.
7     Q.   Do you know whether the -- you said that
8 the format had changed --
9     A.   Uh-huh.
10    Q.   -- because you had your designer change
11 it?
12    A.   Yeah.
13    Q.   Did the substance also change?
14    A.   The -- we added "minimum" to the stipend.
15 I know that.  And, yeah, I don't know if
16 specifically we changed any of the wording down
17 below.
18    Q.   Okay.
19    A.   There may have been a few fine -- I'm not
20 sure without looking at the document.
21    Q.   Other than the addition of the word
22 "minimum," did the amount of the stipend change?
23    A.   No.
24    Q.   And -- okay.
25         And is the information on this

Page 100

1 sheet accurate for the period when this sheet was
2 used?
3     A.   The pricing was accurate, yes.
4     Q.   Is there any information on this sheet
5 that's not accurate?
6     A.   No.  I believe it's all accurate.
7     Q.   And at the very top it says, "High
8 quality live-in childcare" --
9     A.   Uh-huh.
10    Q.   -- "for about $8 an hour."
11    A.   Uh-huh.
12    Q.   So do you think it's accurate to describe
13 your regular au pairs, during the period that you
14 had them --
15    A.   Uh-huh.
16    Q.   -- as quality live-in childcare?
17    A.   Absolutely.
18    Q.   And is the reason you provide the hourly
19 figure here the same as the reason we discussed for
20 the prior sheet?
21    A.   Yes.
22    Q.   I think that's it on that one.
23         All right.  Next sheet.  And this
24 is the last page of this document.
25    A.   Uh-huh.

Page 101

1     Q.   What is -- this one looks a little
2 different from the others.  What is this?
3     A.   So this was one of the earliest documents
4 that was created by Susan, that she used -- that she
5 provided to families to educate them about the
6 program.
7     Q.   And, I'm sorry, I've just realized that I
8 forgot to ask a question about the prior sheet.  I'm
9 sorry, if you could flip back to 263.
10    A.   Uh-huh.
11    Q.   When in the process was this sheet
12 provided to host families?
13    A.   That sheet was provided to host families
14 at the -- when they're inquiring about the program
15 and we're providing them with additional
16 information.
17    Q.   And is -- was this sheet provided to
18 au pairs as well?
19    A.   No.
20    Q.   Okay.  Sorry.  Back to 264.
21    A.   Okay.
22    Q.   All right.  So you said -- okay.
23         So this document is another that
24 was provided to host families, but not to au pairs?
25    A.   I believe so.

PLAINTIFFS' RESP. APP.0004525

MAGNA
LEGAL SERVICES

Page 102

1    Q.    And when in the process was this document
2  provided to host families?
3    A.    I actually don't know the answer to that
4  question because it predates my time with the
5  company, but I would -- I believe at the time
6  they're inquiring about the program.
7    Q.    Okay.  Do you know the period of time
8  that this sheet was used?
9    A.    I believe this sheet was used in 2012 and
10  possibly 2013.
11    Q.    Okay.  Was this sheet replaced by
12  anything?
13    A.    Yes.  It was replaced by the previous
14  documents that we were just discussing.
15    Q.    So it was -- okay.  Now, does this sheet
16  refer to both the traditional and the professional
17  au pair programs, or just one of them?
18    A.    It's referring to the professional
19  program.
20    Q.    So does that mean it was replaced by the
21  second page in this document, which is APEX-20/20
22  262?
23    A.    Yes.
24    Q.    Okay.  Do you know where the information
25  in the far right column came from?

Page 103

1    A.    The far right column?
2    Q.    Yes, the one that's headed "Domestic
3  Nanny."
4    A.    I -- I do not know.
5    Q.    Okay.  Do you know where the information
6  in the middle column came from, the one that's
7  headed "Professional Au Pair Programs (Infant, SNAP,
8  2+)"?
9    A.    I believe that was the program fee at the
10  time.
11    Q.    Do you know what the words in the
12  parentheses mean?
13    A.    I do.
14    Q.    What do they -- what do they refer to?
15    A.    So they refer to the professional
16  programs for infants, for special needs au pair,
17  SNAP, and then children over the age -- 2 or older.
18    Q.    Okay.  So these are the fees for all
19  three -- those are three separate programs?
20    A.    They were at the time.  That's sort of
21  how the professional program was broken down by
22  Susan, so -- but they were all professionals.
23    Q.    Is it still broken down that way?
24    A.    No.  We just call it the professional
25  program.

Page 104

1    Q.    Okay.  Do you know when that change
2  happened?
3    A.    That change happened when we launched our
4  new website in 2015, I think, because it was
5  confusing.  You can have a special needs child
6  that's an infant, or a special needs child that's
7  over 2, or you have infants and over 2 and special
8  needs.  So it -- it was too confusing.
9    Q.    That makes sense.  I have an infant and a
10  child over 2.
11    A.    Yes.  Exactly.  So that's why we just
12  call it the professional program now.  It's more
13  clear.
14    Q.    Do you know whether the numbers in this
15  middle column were accurate at the time that they
16  were presented to host families?
17    A.    I -- yes, I believe so.
18    Q.    And do you know why the comparison is
19  being made here between a professional au pair and a
20  domestic nanny?
21    A.    It's just to create a distinction between
22  the two types of -- well, one, there's
23  qualifications, you know, things at the bottom that
24  are talking about what's included in the
25  professional au pair program, which might not be

Page 105

1  included in the domestic nanny.  And then also just
2  a general overview of costs.
3    Q.    And why was that information -- why do
4  you believe that information was of value to host
5  families?
6    A.    Because Susan -- this is my
7  understanding, based on my conversations with Susan,
8  is that she's never wanted the program to be
9  considered as an au pair program.  She believes that
10  we are competing in the nanny space, and so this is
11  why she's making a comparison between a domestic
12  nanny and a professional au pair, is my
13  understanding.
14    Q.    Are you also competing with the other
15  sponsor agencies?
16    A.    I would say we're a sponsor along with
17  other au pair agencies, but we don't view ourselves
18  as competitors with other au pair agencies because
19  we are the only agency specializing in professional
20  live-in childcare and catering to that special needs
21  market.
22         And so, you know, I don't view
23  that as competition.  I view that as us filling a
24  need within the childcare space for families that
25  have kids with special needs to have access to a

PLAINTIFFS' RESP. APP.0004526

MAGNA
LEGAL SERVICES

Page 106

1    cultural exchange program and live-in childcare.
2        Q.   Would it be fair to say that you, in your
3    advertising, then differentiate yourself from the
4    other au pair sponsors?
5        A.   Yes.
6        Q.   And -- and is that -- and that's because
7    you see yourself as occupying a niche market as
8    compared to the broader market for au pairs?
9        A.   Yes.
10       Q.   Okay.  Do you -- do you ever find
11   yourself talking to host families who are deciding
12   between another sponsor's au pair program and
13   yourself?
14       A.   All the time.
15       Q.   And what do you say to those host
16   families?
17       A.   Well, every conversation's different.
18   So, you know, families are savvy shoppers, right?
19   So once they might -- may find out about the au pair
20   program, for example, on the Department of State's
21   website, and so they might be calling around and
22   talking to multiple sponsors.  So that's one way
23   they might be comparison shopping and trying to find
24   out who's -- what makes people different.
25           It's also common that we have

Page 107

1    families come to us from competitors, and a lot of
2    times it happens because the family has a special
3    need, that the -- that the other agencies can no
4    longer meet that need.
5            So, for example, a child with
6    autism is getting older and just has more care
7    requirements.  And a regular au pair isn't going to
8    be able to handle that situation, so you can get an
9    occupational therapist from our -- from, you know,
10   via A.P.E.X.
11           So families come to us maybe after
12   they've kind of aged out of another sponsor, or
13   sometimes they're simply looking for the best price.
14       Q.   Is price important to host families?
15       A.   Absolutely.
16       Q.   Is au pair care, generally speaking --
17   and let me know if this question can't be answered
18   generally.  But generally speaking, is au pair care
19   more or less expensive than the other sponsors?
20           MR. STONE:  Objection.  By "au pair
21   care," do you -- you don't mean the entity, you mean
22   the -- the care being provided.  Is that correct?
23           MR. LIBLING:  Yeah, let me rephrase
24   the question.
25           MR. STONE:  All right.  Thank you.

Page 108

1        Q.   Let me rephrase it by reference to your
2    document, which is page 262.  This is the --
3        A.   Uh-huh.
4        Q.   -- current one -- no, not the current
5    one.  I'm sorry.  Page 262, though, is easier for me
6    to read, so look at page 262.
7            In this you provide information
8    about -- well, at the top it says, "For about $12 an
9    hour."
10       A.   Uh-huh.
11       Q.   Is that -- what does that number include?
12       A.   That number includes program fees plus
13   the minimum stipend.
14       Q.   Okay.  So --
15       A.   Divided by 12.  You know, doing the whole
16   formula to come up with the hourly rate.
17       Q.   So using whatever inputs go into --
18       A.   Uh-huh.
19       Q.   -- into that number, would you describe
20   A.P.E.X. and 20/20 as more expensive, less
21   expensive, or about the same as the other sponsors?
22       A.   They're more expensive.
23       Q.   And is that because you provide a
24   specialized service?
25       A.   Yes.

Page 109

1        Q.   But you're cheaper than other options
2    like nannies, for example; is that right?
3        A.   Depending on the nanny or a professional
4    care provider, like occupational therapist or speech
5    therapist or a teacher.
6        Q.   So understanding there is a some
7    variability, as a general matter you would say
8    you're cheaper than those options you've just
9    listed?
10       A.   I believe so, in most markets.
11       Q.   In most markets.  Do you know which
12   markets you're not cheaper?
13       A.   No, I don't.
14       Q.   Were there any specific markets you had
15   in mind when you said "in most markets"?
16       A.   Well, the markets where -- in which we
17   operate.
18       Q.   Which markets are those?
19       A.   They tend to be in suburbs and larger
20   cities in the U.S.  So the Bay area, for example,
21   California, where we're headquartered.
22       Q.   Okay.
23           (Exhibit No. 6 was marked.)
24       Q.   I'm handing you what's been marked as
25   Exhibit 6, which, for the record, is a document

PLAINTIFFS' RESP. APP.0004527

**MAGNA**
LEGAL SERVICES

Case 1:14-cv-03074-CMA-KMT   Document 959-21   Filed 03/17/18   USDC Colorado   Page 11 of 310

Page 110

1  Bates numbered APEX-20/20 244 through 256.
2          Do you recognize this document?
3      A.   Yes.
4      Q.   During the -- the prior session you
5  talked about an agreement, or you mentioned an
6  agreement between the sponsor, yourself, and host
7  families.  Is this an example of one such agreement?
8      A.   Yes.
9      Q.   And when was this -- when was this
10  document in effect?
11      A.   I believe this document was in -- in
12  effect from 2012 to 20 -- like, sometime in 2014.
13      Q.   Okay.  And was this document provided to
14  all host families during that period?
15      A.   Yes, I believe so.
16      Q.   And all host families who joined the --
17  the program, your program, had to sign this document
18  during that period?
19      A.   Yes.
20      Q.   In paragraph 1.2.
21      A.   Uh-huh.
22      Q.   If you could just read paragraph 1.2,
23  which is called "Role of ProAuPair."
24      A.   Sure.  Well --
25      Q.   You can -- I'm sorry, you can just read

Page 111

1  it to yourself.  I didn't mean --
2      A.   Oh, okay.
3      Q.   -- you had to read it into the record.
4      A.   Out loud.  Okay.  Good.
5          (Witness peruses document.)
6      A.   Okay.
7      Q.   At the time that document was used, is
8  this paragraph 1.2 accurate about the role of
9  ProAuPair?
10      A.   I believe it to be accurate.
11      Q.   Do you believe that it is still accurate?
12      A.   Yes.
13      Q.   Okay.  Going to the -- the next page, and
14  paragraph 1.5 is "Au Pair Stipend."
15      A.   Uh-huh.
16      Q.   During the period this document was in
17  effect, does this accurately reflect the host
18  family's agreements as with respect to what they
19  will pay to -- to au pairs?
20      A.   Yes.
21      Q.   Okay.  And paragraph 1.6, it says, "The
22  host family understands that ProAuPair will remove
23  the au pair from the host family home if payment is
24  late more than two weeks."
25          So does ProAuPair -- at the time

Page 112

1  of this document --
2      A.   Uh-huh.
3      Q.   -- did ProAuPair have the authority to
4  remove au pairs from host families, for the
5  relationships you sponsored?
6      A.   Yes, we do.
7      Q.   Do you still have that authority?
8      A.   We do have that authority.
9      Q.   Do you only do it for failure of payment,
10  or are there other reasons as well?
11      A.   Well, it's -- I can only think of -- I'm
12  sorry, can you repeat the question?
13      Q.   Do you only remove au pairs from host
14  families for failure of the host family to pay an
15  au pair, or are there other reasons as well?
16      A.   There could be other reasons.
17      Q.   What other reasons could there be?
18      A.   So as a sponsor we're required to ensure
19  the au pair's health, safety, and welfare, as -- as
20  a sponsor.  And so if the au pair is in a
21  environment that we feel isn't regarding her health,
22  safety -- or his health, safety, and welfare, we --
23  we may remove the au pair in an extreme
24  circumstance.
25      Q.   Who makes the judgment as to whether the

Page 113

1  circumstances warrants that?
2      A.   I'm just thinking.  It doesn't really
3  happen that often, to be honest.  But if -- if an
4  au pair asked us to, we absolutely would facilitate
5  her removal.  If a family asked us to, we facilitate
6  the removal, so...
7      Q.   Are there times when, based on A.P.E.X.,
8  20/20's independent judgment, you would remove the
9  au pair from the host family?
10      A.   I'm not aware of any instances in which
11  that's happened.
12      Q.   Without a request from one or the other?
13      A.   Without a request, yeah.
14      Q.   Okay.
15      A.   Yeah.  We would rely on the Department of
16  State's guidance if a certain situation came up.
17  They could guide us into advising us to remove an
18  au pair from a situation.  So we would seek their
19  guidance if there was an extreme circumstance we
20  were concerned about, or if there was a legal matter
21  involving either the host family or au pair that
22  might eliminate their ability to participate in the
23  program.
24      Q.   Okay.  In the event that the host family
25  did fail to make a payment to the au pairs, other

MAGNA
LEGAL SERVICES

1   than removing from the -- the au pairs from that
2   situation, what would happen?
3       A.   Well, like I said, it's not -- it's not
4   common that we ever remove an au pair from a host
5   family's home for nonpayment.  I think that's in
6   there to underscore the importance of au pairs and
7   ProAuPair receiving our program fees, as agreed to
8   in the agreement.
9            If there are issues regarding
10  payment, we go back and inform all parties of their
11  obligations.  Specifically if a family's not paying
12  the au pairs they've agreed to, we inform them that
13  they need to be in compliance as a condition of
14  their program participation.
15      Q.   And if they simply refused to pay the
16  au pair, what happens?
17      A.   Well, the au pair doesn't want to stay
18  there working for them.
19      Q.   A reasonable response.
20      A.   It's usually -- if the au pair is not
21  getting paid, they contact us nine times out of
22  10 --
23      Q.   Right.
24      A.   -- for support in that.
25      Q.   And in that kind of a situation, if the

1   host family is just recalcitrant, would the
2   au -- au pair just be out the money and --
3           MR. STONE:  Objection.  Form.
4       Q.   -- that would be that?
5       A.   We would always request that the family
6   pay the au pair the amount that she's owed.  In some
7   instances if the family's owed a refund, we may
8   deduct what's owed to the au pair from the family's
9   refund, or we may decide to reimburse the au pair
10  ourselves because we feel that that's the right
11  thing to do.
12      Q.   Okay.  Turn to Section H, which is on
13  page 4 of 13.  So what does it mean -- what is your
14  understanding of what it means that, "A host
15  family's eligibility for participating in a
16  placement change is at the sole discretion of
17  ProAuPair"?
18      A.   Uh-huh.  What does it mean?
19      Q.   Yes.
20      A.   It means that their -- their ability to
21  participate in our program is at our discretion.
22      Q.   So you make the final decision?
23      A.   Yes.
24      Q.   Okay.  Okay.  Other -- for the period
25  that this agreement was in place, are there terms

1   and conditions that a host family agrees to in an
2   agreement with the sponsor, you, that are not
3   contained in this document?
4       A.   Not to my knowledge.
5           MR. LIBLING:  Let's do the next one,
6   B.
7           (Exhibit No. 7 was marked.)
8       Q.   I'm now showing you Exhibit 7, which is
9   APEX-20/20 219 through 224.
10          Is this another example of an
11  agreement between the sponsor and host family?
12      A.   Yes.
13      Q.   I believe you said the prior version was
14  in effect 2012 to 2014, approximately?
15      A.   Uh-huh.
16      Q.   What time frame was this agreement in
17  effect?
18      A.   This was introduced probably in the
19  latter part of 2014.
20      Q.   Okay.  And is this still in effect?
21      A.   No.
22      Q.   When did it cease being in effect?
23      A.   It ceased being in effect when we created
24  the 2015 agreement version.  We make little
25  adjustments here and there to the agreement,

1   along -- I mean, at any given time.  It's not always
2   on an annual basis.  So there may have been little
3   tweaks to this one before the 2015 one was in -- put
4   in place.
5       Q.   Other than those little tweaks, are you
6   aware of any significant changes between, I guess,
7   when this was introduced in 2014 and today?
8       A.   The agreement -- the 2017 agreement
9   contains new program pricing, the new minimum.  It
10  outlines that professional au pairs receive four
11  holidays from the host family.  And then I think
12  there are some adjustments to the extension program
13  too, the extension section in this agreement.
14      Q.   Okay.  So there's a heading on the first
15  page of this agreement called "Department of State
16  Program Requirements."
17      A.   Uh-huh.
18      Q.   And paragraph 6 has subpoints.  I'm
19  particularly interested in subpoint (b).
20      A.   Uh-huh.
21      Q.   So the -- the lead-in sentence to all of
22  the subpoints is, "We understand our obligation to
23  provide our au pair with the following benefits" --
24      A.   Uh-huh.
25      Q.   -- "as mandated by the Department of

MAGNA
LEGAL SERVICES

Page 118

1    State."
2        A.    Uh-huh.
3        Q.    And then in (b), one of the -- one -- the
4    last sentence says, "Stipend amounts are as follows:
5    ProAuPair professional au pairs currently receive
6    250 per week," then it goes on.
7        A.    Uh-huh.
8        Q.    Is the 250 per week a benefit mandated by
9    the Department of State?
10        A.    No.
11        Q.    So why is that in this section, do you
12    know?
13        A.    The -- it's in there because we want to
14    make sure that host families are aware that if they
15    match with a professional au pair, that the minimum
16    stipend is 250 a week.
17        Q.    Okay.  But this is not intended to
18    convey -- this last sentence about stipend amounts
19    is not intended to convey that those amounts are set
20    by the Department of State?
21        A.    I -- I would say that it's not a
22    requirement, and it probably shouldn't have been
23    viewed -- portrayed as a requirement of the
24    Department of State.
25        Q.    Okay.  Thank you.

Page 119

1            During the period that this
2    document was in effect, was it -- did all host
3    families have to sign it to participate in your
4    program?
5        A.    Yes.  There is a different version of
6    this agreement for families that paid a lower
7    program fee, some of our original families.  It's
8    pretty much the same terms and conditions, with the
9    exception of the fees paid to ProAuPair and the
10    refund policy.
11        Q.    This is for, I don't know, lack of a --
12    legacy families?
13        A.    Legacy families, right.
14        Q.    Okay.
15        A.    Right.
16        Q.    Okay.  And, generally, for these host
17    family service agreements, which I understand there
18    are different editions of.
19        A.    Right.
20        Q.    For the periods that those agreements are
21    in effect, all host families must sign them?
22        A.    Yes.
23        Q.    Okay.
24            MR. LIBLING:  Let's go to 13A.
25            (Exhibit No. 8 was marked.)

Page 120

1        Q.    This is Exhibit 8.  It has APEX-20/20 4
2    through 8.
3            Is this a -- an agreement -- is
4    this the agreement that you referenced earlier today
5    between sponsor -- between yourself and au pairs?
6        A.    This is one version of that agreement,
7    yes.
8        Q.    For what period of time was this version
9    in effect?
10        A.    I believe this version was in effect from
11    2012 to around 2 -- in 2014.
12        Q.    Okay.  And during the period that this
13    agreement was in effect, did all au pairs
14    participating in the program have to sign it?
15        A.    Yes.
16        Q.    And --
17        A.    With --
18        Q.    -- general -- sorry?
19        A.    With the exception of the 20/20 au pairs.
20    They sign the 20/20 agreement.
21        Q.    Okay.  So this is an example when
22    A.P.E.X. and 20/20 differ?
23        A.    Yes.
24        Q.    Okay.  So during the period -- okay.
25        A.    I just wanted to make that distinction.

Page 121

1    And the same applies to host families in the
2    agreements that we were referring to.  Those are
3    specific to ProAuPair's host families, and the 20/20
4    ones sign a different agreement, different but
5    similar agreement.
6        Q.    Let me make sure the record is clear on a
7    couple of questions.
8            For both A.P.E.X. and 20/20, is it
9    true that all host families must sign the applicable
10    version of the agreement?
11        A.    Yes.
12        Q.    For both A.P.E.X. and 20/20, is it true
13    that all au pairs must sign the applicable version
14    of the agreement?
15        A.    Yes.
16        Q.    Okay.  Section 1.3 in this agreement is
17    called "Compliance with Regulations."  If you could
18    just read it to yourself, please.
19            (Witness peruses document.)
20        A.    Uh-huh.
21        Q.    Does Section 1.3 accurately reflect your
22    understanding of one of A.P.E.X. or 20/20's rights
23    with respect to the host family and au pair
24    relationship?
25        A.    Yes.

Page 122

1    Q.   Is there ever a time when that was
2    different?
3    A.   Not that I'm aware of.
4    Q.   The -- I'm going to ask you the same
5    questions about 1.6, so if you could just read that
6    to yourself.
7         (Witness peruses document.)
8    Q.   Does that accurately reflect one aspect
9    of the relationship between A.P.E.X. and 20/20 on
10   the one hand and au pairs and host families on the
11   other?
12   A.   Yes.
13   Q.   And has that always been true?
14   A.   Yes.
15   Q.   Looking at Section 2.2 on the next page,
16   "Forbidden Activities." My question is there are
17   five, it looks like, specific activities that are
18   forbidden under any circumstances.
19   A.   Uh-huh.
20   Q.   Are these activities that are forbidden
21   by government regulation, or are these activities
22   that A.P.E.X. -- I guess in this case A.P.E.X.
23   decided to impose?
24   A.   Some of these are government. So, for
25   example, au pairs are not allowed to take employment

Page 123

1    outside of their arrangement with the host family.
2    So they couldn't, you know, start working at
3    7-Eleven in addition to their host family. So
4    that's -- that's prohibited.
5         Illegal drugs are -- you know,
6    obviously you're not allowed to consume illegal
7    drugs. I guess you could consume excessive amounts
8    of alcohol legally, but it's -- it's -- it's not a
9    practice we want professionals taking care of
10   children to engage in.
11   Q.   So some of these are government
12   regulations and some of these are imposed by
13   A.P.E.X.?
14   A.   Yes.
15   Q.   Does 20/20 impose the same obligations?
16   A.   Actually, so the newer versions of the
17   agreements aren't detailing out forbidden activities
18   like this --
19   Q.   Uh-huh.
20   A.   -- I believe, and so I don't believe this
21   service agreement ever existed for the 20/20
22   au pairs. It was a different version, paper
23   version. Well, this is paper too, but -- so what am
24   I trying to say here?
25        So -- so newer -- so basically --

Page 124

1    can you re -- I'm sorry, can you restate the
2    question? I want to make sure I answer it.
3    Q.   I asked whether 20/20 imposed the same
4    obligations?
5    A.   I don't know.
6    Q.   Okay.
7    A.   Relating to this document.
8    Q.   Okay. As a general matter outside --
9    A.   Uh-huh.
10   Q.   -- of the specific wordings of any --
11   A.   Right.
12   Q.   -- particular agreement, do A.P.E.X. and
13   20/20 impose the same obligations on professional
14   au pairs and their behavior?
15   A.   We -- right. We -- yes, we do.
16   Q.   Okay. Has that always been the case?
17   A.   I believe so.
18   Q.   So on page -- on the next page, which is
19   page 3 of 5, or APEX-20/20 26, there is a section
20   4.2. And -- and the first sentence of this document
21   represents the Au Pair Financial Terms & Conditions
22   document.
23   A.   Uh-huh.
24   Q.   Is that a document that was in effect --
25   or when was the -- for what period of time was the

Page 125

1    Au Pair Financial Terms & Conditions document in
2    effect?
3    A.   I believe that document was in effect --
4    it went along as -- it went along with this
5    agreement. It was a extra document that went with
6    this agreement.
7    Q.   Okay. So it would have been in effect at
8    the same period of time --
9    A.   Yes.
10   Q.   -- as this agreement?
11   A.   Uh-huh.
12   Q.   All right. Let me...
13        (Exhibit No. 9 was marked.)
14   Q.   So I'm going to hand you Exhibit 9, but
15   please don't put away Exhibit 8 yet.
16   A.   Okay.
17   Q.   So Exhibit 9 is APEX-20/20 1. I don't
18   know -- so my first question is: Is this the
19   Au Pair Financial Terms & Conditions document
20   referenced in Exhibit 8?
21   A.   I believe it is, yes.
22   Q.   Has this document been updated? Is
23   there, like, an updated version of this document?
24   A.   These two documents were replaced by the
25   later version of the au pair agreement -- Au Pair

PLAINTIFFS' RESP. APP.0004531

MAGNA
LEGAL SERVICES

Page 126

1  Service Agreement.
2      Q.   Okay.  And in the later versions of the
3  Au Pair Service Agreement, is there a -- a -- a
4  separate document called something like Au Pair
5  Financial Terms & Conditions?
6      A.   No.
7      Q.   Okay.  So the later agreements are
8  collapsed into one document?
9      A.   Yes.
10     Q.   Okay.  And so for the period that this
11 agreement was in effect -- by "this agreement" I'm
12 referring to Exhibit 8 -- does Exhibit 9 accurately
13 reflect the financial terms and conditions that
14 au pairs agreed to?
15     A.   Yes.
16     Q.   Okay.  Okay.  I think that's it for
17 Exhibit 9.  Let me see if I have anything further on
18 Exhibit 8.
19          MR. LIBLING:  Let's go to this one,
20 13B.
21          (Exhibit No. 10 was marked.)
22     Q.   I'm going to show you what's been marked
23 abs Exhibit 10.
24     A.   Uh-huh.
25     Q.   APEX-20/20 10 through 15.

Page 127

1          Is this another example of the
2  agreements between A.P.E.X. on the one hand and
3  au pairs on the other hand?
4      A.   Yes.
5      Q.   For what period of time was this
6  agreement in effect?
7      A.   This was in effect in 2015.
8      Q.   Okay.  So this is an example of a version
9  where the Exhibits 8 and 9 have been merged into
10 just one agreement now?
11     A.   Yes.
12     Q.   Okay.  And are those terms reflected
13 in -- actually, I've already asked about that.
14          Actually, I have some questions
15 about --
16     A.   Uh-huh.
17     Q.   -- paragraph 4 on page 2 of this
18 document.
19     A.   Uh-huh.
20     Q.   Specifically (e), (f), and (g).  For each
21 of (e), (f), and (g), are those requirements that
22 are imposed by government regulation, or are those
23 requirements that are imposed by A.P.E.X.?
24     A.   Those are government require --
25 requirements.

Page 128

1      Q.   Okay.  Do you know whether those
2  requirements have changed at all during the period
3  when A.P.E.X. and 20/20 were sponsor agencies?
4      A.   Not to my knowledge.
5      Q.   Okay.
6          (Exhibit No. 11 was marked.)
7      Q.   So this is Exhibit 11.  It is APEX-20/20
8  007523 versus 7 -- through 7524.  I'll represent to
9  you that the black boxes on the second page are how
10 it was produced to us.  They're not --
11     A.   Uh-huh.
12     Q.   -- alternations that we made.
13          Is this -- is this an example of
14 an agreement between the au pairs and host families
15 that is provided to those parties by A.P.E.X.?
16     A.   I want to make a distinction.  It's
17 20/20.  This is a 20/20 document.
18     Q.   This is a 20/20 one.  Okay.
19     A.   That is 20/20.  But, yes, this is an
20 example of an agreement that was provided by 20/20
21 to host families and au pairs.
22     Q.   Got it.
23          And there is a corresponding
24 version of this agreement for A.P.E.X.?
25     A.   Yes.

Page 129

1      Q.   And for both A.P.E.X. and 20/20, must all
2  au pairs and host families participating in one of
3  your programs sign the applicable version of the
4  agreement?
5      A.   Yes.
6      Q.   For what version of time was this draft
7  in effect?
8      A.   This draft went into effect in October of
9  2014.
10     Q.   Okay.
11          MR. STONE:  One moment, Joshua.
12          Just for the court reporter's
13 benefit, this is an Attorney's Eyes Only document,
14 Exhibit 11.  So if you would handle it in the same
15 way as what -- what was agreed to yesterday, I
16 believe putting it in an envelope when you attach
17 the exhibits to the transcript, please.  Thank you.
18          (Exhibit No. 12 was marked.)
19     Q.   The same will be true for the next
20 exhibit, which I am handing to you now.  This is
21 Exhibit 12, which is APEX-20/20 007516 through 7517.
22          For what period of time was in
23 agreement in effect?  Well, let me -- let me ask the
24 foundational questions.
25          Is this another example of an

| Page 130 | Page 132 |
|---|---|
| 1   agreement, this one would be from 20/20, provided by<br>2   20/20 to au pairs and host families for them to<br>3   execute?<br>4     A.  Yes.<br>5     Q.  And for what period of time was this<br>6   version of the agreement in effect?<br>7     A.  This version went into effect in February<br>8   of 2016.<br>9     Q.  Is it still in effect?<br>10     A.  No.<br>11     Q.  When did it stop being in effect?<br>12     A.  At the beginning of 2017.<br>13     Q.  Okay. And just -- I'm pretty sure I know<br>14   the answer to this question, but just so the record<br>15   is clear. When it says "The International Au Pair<br>16   Exchange" at the top of a document, does that mean<br>17   it's a 20/20 document?<br>18     A.  Yes, it does.<br>19     Q.  And when it says -- I think they say it.<br>20   Let me check. Yes. When it says "ProAuPair" at the<br>21   top of the document, that means it's an A.P.E.X.<br>22   document?<br>23     A.  Correct.<br>24     Q.  So we were talking about this morning the<br>25   process that led to a match between au pairs and | 1   they actually meet and start, you know, actively<br>2   having a host family --<br>3     A.  Uh-huh.<br>4     Q.  -- au pair relationship?<br>5     A.  Uh-huh. Yes, there are.<br>6     Q.  What are those requirements?<br>7     A.  So on the host family side we -- the<br>8   families undergo a criminal background check, so we<br>9   complete the background check. We ensure that the<br>10   family's references have been verified.<br>11        We have our area director meet in<br>12   person with the host family to do the in-home<br>13   interview. We make sure our files are complete with<br>14   all the documents in order that we need on -- for a<br>15   host family. And then we receive their payment.<br>16     Q.  Anything on the au pair -- sorry, was<br>17   that everything on the host family side?<br>18     A.  I believe so. On the host family side<br>19   that was everything.<br>20        On the au pair side we are issuing<br>21   the DS-2019 form, which allows them to apply for<br>22   their J-1 visa. We are ensuring that all the<br>23   references are checked, all the required documents<br>24   are in the file and in order. We ensure that their<br>25   training is completed. We make sure that they've |

| Page 131 | Page 133 |
|---|---|
| 1   host families, and now I think we've gone through<br>2   the agreements that were executed during those --<br>3   those periods.<br>4        And so my first question is: Are<br>5   there any additional types of agreements executed by<br>6   au pairs, host families, or sponsor that we haven't<br>7   looked at yet?<br>8     A.  Not to my knowledge, no.<br>9     Q.  Okay. Do you think would you know if<br>10   there were another type of agreement?<br>11     A.  I would.<br>12     Q.  Okay. So now all the agreements are<br>13   signed. What happens next?<br>14     A.  Well, that's kind of a vague question.<br>15   What -- what would you -- can you rephrase that?<br>16     Q.  I certainly can.<br>17        I believe this morning you talked<br>18   about there being a logistical phase --<br>19     A.  Uh-huh.<br>20     Q.  -- on exactly when everybody is going to<br>21   show up?<br>22     A.  Uh-huh.<br>23     Q.  But are there any requirements that<br>24   either the host family or the au pair have to<br>25   satisfy after the agreements are signed, but before | 1   attended our A.P.E.X. Academy in-person seminar. We<br>2   make sure they have their flight ticket and that<br>3   they're ready to -- to travel.<br>4     Q.  Let's start with host families.<br>5        You said that the area director<br>6   will do an in-home interview?<br>7     A.  Uh-huh.<br>8     Q.  What does that involve?<br>9     A.  It involves the area director meeting<br>10   with the host family in their home to do an<br>11   interview.<br>12     Q.  And what is the purpose of that<br>13   interview?<br>14     A.  The purpose of -- well, the purpose of<br>15   the interview, there's several purposes. One is to<br>16   satisfy the Department of State requirement that an<br>17   in-home interview has been performed.<br>18        The second aspect is to educate<br>19   and ensure that the host family understands the<br>20   program and what their obligations are, what our<br>21   obligations are. We talk about how, you know, to<br>22   welcome their au pair, things that they should be<br>23   thinking about in terms of getting their bedroom<br>24   ready.<br>25        We look at the bedroom, make sure |

PLAINTIFFS' RESP. APP.0004533

MAGNA
LEGAL SERVICES

| Page 134 | Page 136 |

**Page 134**

1  it's what we deem is a suitable environment for
2  somebody to come and live. And we're making sure
3  that the family understands and is ready to host
4  somebody from another culture in their home.
5      Q. So one of the things you said was that
6  you make sure a host family understands their
7  obligations?
8      A. Yes.
9      Q. Which obligations were you referring to?
10     A. Well, there's Department of State
11  obligations, which we --
12     Q. Which obligations do you tell host
13  families about in this interview?
14     A. Well, off the top of my head, we're
15  telling them about their obligation to speak English
16  in their home as the primary language, to not
17  schedule the au pair for more than 10 hours a day or
18  45 hours a week. We inform them about their
19  obligation to provide a $500 educational allowance
20  to the au pair, to pay the stipend on a weekly
21  basis, to provide, you know, a suitable private
22  bedroom. I think we already covered that.
23         Those are the ones that are coming
24  to mind. There might be a few more I'm forgetting.
25     Q. But you can't think of anymore right now?

**Page 135**

1      A. I -- can you read off what I told you?
2      Q. I wrote down speaking English, the
3  schedule, educational allowance, stipend paid
4  weekly, and the bedroom.
5      A. Uh-huh. I believe those are the main
6  Department of State requirements that we're
7  covering.
8      Q. And so are there any obligations you
9  inform host families of, other than those Department
10  of State obligations?
11     A. Oh, excuse me. I -- we also inform them
12  about the area director's role and the contact
13  obligations that the area director's required to
14  have with the family.
15     Q. Any others?
16     A. We inform them, and it's also in the
17  agreement, about the family's responsibility to
18  main -- assure the au pair's health, safety, and
19  welfare; and that should any issues arise regarding
20  that, that they contact us immediately.
21     Q. Anything else?
22     A. I can't think of anything else.
23     Q. One of the things you mentioned was the
24  area director's role. What is the area director's
25  role?

**Page 136**

1      A. The area director's role is to live
2  within an hour of the host family. Their role is to
3  provide support to host families and au pairs during
4  the program. They do the in-home interview with the
5  host family. They perform a two-week arrival
6  orientation meeting with the host family and
7  au pair. They contact both the host family and the
8  au pair within 48 hours of the au pair's arrival.
9         They maintain monthly contact with
10  the au pair and host family and document that
11  contact. They help orient the au pair to her local
12  community and give her any advice and support and
13  guidance that she might need to have in acclimating
14  herself to the host community.
15         They arrange monthly activities,
16  usually monthly activities for the au pairs. They
17  provide support when there are problems in the
18  placement. They provide housing for au pairs when
19  there's a placement change or an au pair is in need
20  of housing.
21         Those are their main
22  responsibilities.
23     Q. Does an area director have a role in
24  ensuring that the agreements that the host families
25  and au pairs have entered into are adhered to?

**Page 137**

1      A. Yes.
2      Q. What is their role in that regard?
3      A. Their role is to -- well, during the
4  interview, the orientation, and the monthly contacts
5  they're reconfirming working hours, that the
6  stipend's paid, that the au pair will receive her
7  vacation, that the au pair started her classes.
8  They're there to ask questions and keep reiterating
9  and learn about information that confirms that all
10  parties are in compliance or confirms that there's
11  somebody's not in compliance, and then alerts us to
12  that noncompliance.
13     Q. Are area directors employees of A.P.E.X.
14  and 20/20?
15     A. No.
16     Q. What is their relationship?
17     A. They're independent contractors.
18     Q. Are area directors empowered to make any
19  decisions about whether the terms of the agreements
20  are being adhered to?
21         MR. STONE: Objection. Form.
22     A. Are -- I'm sorry, can you repeat the
23  question?
24     Q. Sure.
25         Are area directors empowered by

**MAGNA**
LEGAL SERVICES

| Page 138 | Page 140 |
|---|---|

**Page 138**

1 A.P.E.X. and 20/20 to make decisions about whether
2 the situation they see through their supervision
3 is -- is in compliance with the regulations and
4 agreements that the parties have entered into?
5    A.   They are empowered to make decisions
6 based on -- to assess whether or not somebody's in
7 compliance or not, and when there's a question they
8 can raise it to one of our staff.
9    Q.   And so when they make that -- assuming
10 they make a determination --
11    A.   Uh-huh.
12    Q.   -- that everything's okay?
13    A.   Uh-huh.
14    Q.   There's nothing they need to do?
15    A.   Correct.
16    Q.   If they make the other determination,
17 that something is not okay, what is it they then do?
18    A.   Their role is to alert the person
19 that's designated to -- to work with them if there's
20 a challenge.
21    Q.   What is the title of the people?  Is
22 there more than one person who's --
23    A.   There are.
24    Q.   -- designated to work with the --
25    A.   Yes.

**Page 139**

1    Q.   What is the title of people who are
2 designated to work with area directors?
3    A.   So it's the vice president of operations
4 west and the director of operations east.
5    Q.   Where is the boundary between west and
6 east?
7    A.   It's somewhere along the Mississippi.  I
8 mean, we -- we actually look at -- we try and keep
9 it regionally, but we also look at the number of
10 placements in any given region to try and make it
11 equitable.  So -- so it's designated by state.
12    Q.   So if there is a problem -- is there ever
13 a problem that requires immediate on-the-ground
14 decisions by the area directors, or do they --
15    A.   Yes, there are.
16    Q.   And what kind of problem requires an
17 immediate decision by the area director?
18    A.   If an au pair or host family contacts
19 them and is requesting immediate removal.
20    Q.   Are there any other situations?
21    A.   Yes.  I mean, if -- if the area director
22 had a concern about the health, safety, or welfare
23 of an au pair, she could make a decision to -- to
24 act.
25    Q.   If she decided that it was necessary, she

**Page 140**

1 could make that decision without first contacting
2 the heads of east and west?
3    A.   Yes.  I -- I mean, ideally they would
4 con -- they would go through our -- our protocols to
5 contact the, you know, the manager on call or
6 whatnot.  But in a -- in a pinch and they can't in
7 that moment, yes, we would want them to look out for
8 the au pair's best interests and make a decision.
9    Q.   Okay.  And if -- if it does get
10 elevated --
11    A.   Uh-huh.
12    Q.   -- then does the -- did you use the
13 phrase "on-call manager" or "manager on call"?
14    A.   Yeah.  We -- we have a -- well, if it's
15 during business hours, we have a management
16 hierarchy.  And then there -- and then if it's after
17 hours, there's always a manager on call.
18    Q.   Okay.  So when it gets elevated to
19 whichever manager is --
20    A.   Yeah.
21    Q.   -- responsible at that period in time,
22 does that person resolve the issue or does that
23 personnel elevate the issue further?
24    A.   It depends on the issue.
25    Q.   So what sort of issue can that person

**Page 141**

1 resolve on their own?
2    A.   They can resolve matters where it's a --
3 if there's matters regarding, like, compliance
4 questions or, you know, the au pair and host family
5 have a complaint about each other, or there's --
6 there's something that's not -- that's not directly
7 impacting the health, safety, or welfare of an
8 au pair, or that it's not a compliance issue between
9 the host family or an au pair and there may a
10 concern about their suitability to continue in the
11 program.
12    Q.   Okay.  So if it is a compliance issue or
13 a health, safety, welfare issue, then they would be
14 expected to elevate the issue further?
15    A.   Yes.
16    Q.   Who would they elevate it to?
17    A.   To their manager.
18    Q.   And what's the title of their manager?
19    A.   She's senior vice president.
20    Q.   And does she report to you?
21    A.   Yes, she does.
22    Q.   And what's her name?
23    A.   Diane DuToit.
24    Q.   Diane DuToit.
25       And is Ms. DuToit empowered to

MAGNA
LEGAL SERVICES

Page 142

1  resolve compliance and health, safety, welfare
2  issues, or would she also elevate it further?
3      A.   She is -- she is empowered to make those
4  decisions, but quite often we collaborate together
5  and discuss issues that are more elevated in nature.
6  We usually discuss them together.
7      Q.   Are there categories of issues that would
8  get elevated to you, or is it really Ms. DuToit's
9  judgment as to what you should weigh in on?
10     A.   There are categories of issues in which I
11  am always alerted in that, when it -- when it
12  becomes a -- an issue that should be reported to the
13  Department of State per their reporting -- reporting
14  requirements.  I'm always aware of those.
15          Or if it's a -- a matter where we
16  have concerns, you know, regarding -- just if it
17  could be -- we think there's, like, a risk regarding
18  legal concern that could come up or a PR concern,
19  those are things we are -- I am required to be aware
20  of.
21     Q.   What sort of issue would need to be
22  reported to the Department of State?
23     A.   Instances where an au pair's health is
24  compromised, so hospitalizations, accidents
25  requiring hospitalizations.  Any instance that could

Page 143

1  have social -- you know, like a media or legal
2  repercussions, things of those nature, the
3  Department of State wants to be informed.  Legal
4  matters such as an au pair being arrested, those
5  types of things we're required to report.
6          And also just using our judgment.
7  When it's a situation that we feel like the
8  Department of State, we want them to be aware of it,
9  then we self-report inc -- incidents to them.
10     Q.   What sort of -- what would be an example
11  of that kind of situation?
12     A.   Like, an au pair that's been diagnosed
13  with, like, an illness of some sort.  Not
14  necessarily hospitalized, but an illness that may,
15  you know, affect their ability to participate in the
16  program, or we're not sure how it's going to end up
17  for the au pair.  It could be that they broke their
18  leg, or something like that.
19     Q.   And the -- let's see.  You also said that
20  issues with legal concerns would be elevated to you?
21     A.   Uh-huh.
22     Q.   What did you mean?
23     A.   Just if there's a family, like,
24  threatening to sue you or, you know, making
25  allegations that we think are inflammatory or not

Page 144

1  true, those sorts of things.
2      Q.   What if you think the allegations are
3  true?  Or does that not happen?
4          MR. STONE:  Objection.  Form.  Same
5  objection.
6      A.   What do I think if they are true?  Well,
7  our -- our role as the sponsor is to see,
8  investigate as to the best of our ability the host
9  family's version, the au pair's version, the -- the
10  area director's version.  We're trying to collect
11  all the information that we can to assess.
12          If there's a regulatory -- if --
13  if we've somehow failed in our agreement with the
14  family, if the family has failed in their agreement
15  to us.  I mean, we're looking at it from a trying to
16  get a wholistic approach.  Our goal is to always
17  resolve situations amicably and fairly.  But every
18  situation is different, and sometimes individuals,
19  you know, have a different version of opinions.
20     Q.   Okay.  And the last category you said
21  would be elevated to you is PR concerns?
22     A.   Uh-huh.
23     Q.   What did you mean by that?
24     A.   Any instance that could have PR concerns.
25     Q.   Like what?

Page 145

1      A.   Accidents.  I'm just trying to think of
2  things.  You know, where, like, say that a family
3  that's mad about something is threatening to, you
4  know, call their local news channel and say how
5  horrible we are.
6      Q.   Got it.
7      A.   Those sorts of things.
8      Q.   Okay.  So going back to the area
9  director's role.  Does the area director have any
10  role in keeping track of time sheets or time records
11  of the au pair's work?
12     A.   No.
13     Q.   Okay.  Okay.  Does the area director
14  ensure that the au pair is not working more than the
15  10 hours a day and 45 hours a week?
16          MR. STONE:  Objection.  Form.
17     A.   She is asked to confirm with either party
18  that that requirement's being met.
19     Q.   All right.  So this all started because
20  you -- you said that the area director in the
21  in-home interview explains the host family's
22  obligations, but you also said that it explains your
23  obligations?
24     A.   Yes.
25     Q.   So what are your obligations that would

MAGNA
LEGAL SERVICES

Page 146

1    be explained during the in-home interview?
2        A.   Uh-huh.
3        Q.   Between the area director and the host
4    family?
5        A.   My obligations?
6        Q.   A.P.E.X., 20/20's obligations.
7        A.   Can you repeat the question?
8        Q.   During the in-home interview between the
9    area director and --
10       A.   Uh-huh.
11       Q.   -- the host family --
12       A.   Uh-huh.
13       Q.   What obligations of A.P.E.X., 20/20 would
14   be explained to the host family?
15       A.   Our obligations would be really for host
16   families around, you know, the services that the
17   area director will provide to them, that monthly
18   contact that we just talked about.  We might talk
19   about if there is a -- oftentimes families want to
20   know, like, what happens if it doesn't work out.
21   Then we explain to them what our replacement policy
22   is, those types of things.
23       Q.   Okay.  And for the au pair, you mentioned
24   training and the A.P.E.X. Academy.
25       A.   Uh-huh.

Page 147

1        Q.   Are those separate or are those the same?
2        A.   They're separate.
3        Q.   Separate.  All right.  So let's start
4    with training then.
5        A.   Uh-huh.
6        Q.   What training do you require of an
7    au pair before they start their placement?
8        A.   So au pairs complete a 38-hour online
9    training course.
10       Q.   Can they do that in their home country?
11       A.   They do do that in their home country,
12   yes.
13       Q.   Okay.  What's covered in the 38-hour
14   online training?
15       A.   The 38-hour training meets the Department
16   of State's requirements regarding the -- the
17   training that an au pair must have before she
18   arrives to the host family's home.  But it's -- it's
19   addressing, well, all sorts of things related to
20   childcare.  How to care -- you know -- it's a
21   pretty -- it's a pretty -- there's -- there's
22   different modules within the training, that each
23   have a different topic.  So it could be, like, you
24   know, caring for toddlers, safety, maybe healthy
25   eating, those types of things related to -- to

Page 148

1    children, infants, and toddlers.
2        Q.   Do any of the modules in that training
3    relate to the type of duties au pairs can be
4    expected to perform?
5        A.   No.
6        Q.   Do any of the modules relate to the
7    number of hours an au pair can be expected to work?
8        A.   No.
9        Q.   Do any of the modules relate to how much
10   an au pair will be paid?
11       A.   No.
12       Q.   Now let's talk about the A.P.E.X.
13   Academy.
14       A.   Uh-huh.
15       Q.   What is the A.P.E.X. Academy?
16       A.   So the A.P.E.X. Academy is an in-person
17   training session that we have with almost every
18   au pair.  We require that they go.  But in some
19   instances, if they live in Austria or whatnot, they
20   might not be able to make it.
21            So it's a -- it's an opportunity
22   to have them, a group of au pairs, get together in
23   person.  And -- and that's where we're re-enforcing,
24   you know, who we are, the hours, the -- the things
25   specific to the J-1 program.

Page 149

1            The online training is not
2    specific to au pairs or the J-1 program.  It's
3    childcare.  It's a professional childcare training
4    program.  So the Academy, we call it "the Academy,"
5    is designed to really be very specific to the
6    professional au pair program regulations and
7    whatnot.
8        Q.   Got it.
9            Where does the A.P.E.X. Academy
10   occur?
11       A.   It occurs at various locations throughout
12   Germany.
13       Q.   Okay.  Are any of them in the United
14   States?
15       A.   No.
16       Q.   And so at the A.P.E.X. Academy, what
17   would be discussed about the kinds of duties that an
18   au pair can perform?
19       A.   We -- we emphasize that the duties must
20   be, like, related to childcare in nature.  So we
21   talk about acceptable duties and unacceptable
22   duties, so the au pair is aware of that.  We talk
23   about how her professional background and training
24   may be applicable in terms of duties the family
25   might ask her to do, or him, sorts of things.

MAGNA ▶
LEGAL SERVICES

Page 150

1    Q.   One question I had about that, actually.
2  You mentioned that because of the particular skills
3  that some of your au pairs have, it's a benefit to
4  have them living with the -- with the family?
5    A.   Uh-huh.
6    Q.   How are the -- how -- how are hours
7  calculated, like, if you're on call in case
8  something goes wrong.  Does that count towards your
9  hours?
10        MR. STONE:  Objection.  Form.
11 Foundation.
12   A.   A -- a -- a professional au pair should
13 not be on-call.  We want a host family to provide
14 the au pair with a -- a weekly schedule of when
15 she's on-duty and off-duty so she can plan her life.
16 So there's not really an on-call arrangement unless
17 it's an -- like, an -- an emergency.
18   Q.   Got it.  Okay.  All right.  So we were
19 talking about what is discussed at the A.P.E.X.
20 Academy.
21        Do you discuss how much an au pair
22 would be expected to be -- should expect to be paid,
23 at the Academy?
24   A.   Yes.
25   Q.   And what do you tell au pairs?

Page 151

1    A.   That the -- well, we tell them now that
2  the stipend they can expect to receive is 277 a week
3  for the 2017 au pairs, but before that it was 250 a
4  week.
5    Q.   And for the regular au pairs, when they
6  went through the system, what did you tell them?
7    A.   We discussed this earlier.  I don't
8  recall whether or not we specifically told them
9  about the minimum stipend.
10   Q.   Do you discuss the maximum number of
11 hours that au pairs can be expected to work?
12   A.   Yes.
13   Q.   So once the in-home interview has
14 happened with the host family, and once the au pair
15 has gone through the online training and the
16 A.P.E.X. Academy, are there any more requirements
17 that either the host family or the au pair must meet
18 before they can start the placement?
19   A.   She has to obtain a J-1 visa.
20   Q.   That's a good one.  All right.
21        And what's your role in, if any,
22 in facilitating that?
23   A.   Well, we issue the DS-2019 form here in
24 the United States, and then our German staff in
25 Aus -- our German staff then provides that document

Page 152

1  to the candidate.  And we do give them advice on how
2  to fill out the forms they need to in order to get
3  their -- their visa, so we -- we guide them along
4  through that process.
5    Q.   So once the host family's had the in-home
6  interview and the au pair -- the au pair has had its
7  38-hour online training, the A.P.E.X. Academy, and
8  has received a visa, are there any more requirements
9  that the host family or the au pair must meet before
10 the placement can start?
11   A.   The au pair would need to make sure that
12 we've received all of her application documents and
13 that she's paid the program fee.
14   Q.   Anything else?
15   A.   I can't think of anything else.
16   Q.   So are there -- at that point does the
17 au pair fly here and start the placement, or is
18 there something else?
19   A.   On -- on the -- on the date she's
20 supposed to arrive, she'll fly out and hopefully
21 make it in time to her host family.
22   Q.   Okay.  And -- all right.  We talked about
23 this a little bit already.  But the -- the area
24 director, is the area director available to the host
25 families and the au pairs outside of the monthly

Page 153

1  contacts?
2    A.   Yes.
3    Q.   Is the au pair -- are they always
4  available, or are there set hours?
5    A.   It -- it depends.  So they -- they are
6  usually working -- they're usually available on a
7  regular basis.  So they're not our employee, so they
8  don't work, like, set office hours.  But we do
9  request that they get back to a host family or an
10 au pair within, you know, the same business day, if
11 possible.
12   Q.   Okay.  And are they available throughout
13 the whole period of the placement?
14   A.   Yes.
15        MR. LIBLING:  I think I promised
16 everyone lunch at 12:30, and it's 12:30.
17        MR. STONE:  Sounds good.  Hopefully
18 it's here.
19        THE WITNESS:  Okay.
20        THE VIDEOGRAPHER:  Going off the
21 record at 12:28.  This marks the end of media 2.
22        (Whereupon, a lunch break was had
23        from 12:28 p.m. to 1:08 p.m.)
24        (Exhibit No. 13 was marked.)
25        THE VIDEOGRAPHER:  This marks the

**MAGNA**
LEGAL SERVICES

Page 154

1   start of media 2 of -- excuse me, media 3 of the
2   video deposition of Heidi Mispagel, 30(b)(6)
3   representative for A.P.E.X. and 20/20. We're back
4   on the record. The time is 1:08.
5           EXAMINATION (CONTINUED)
6   BY MR. LIBLING:
7       Q.   All right. Good afternoon.
8       A.   Thank you.
9       Q.   So I'm going to hand you Exhibit 13.
10  Which is APEX-20/20 23 through, I think that's, 77.
11          Do you recognize this document?
12      A.   Yes.
13      Q.   What is this document?
14      A.   This is our Au Pair Handbook.
15      Q.   And I -- I don't have many questions
16  about this.
17      A.   Uh-huh.
18      Q.   The first one I have is what period of
19  time was this document in effect?
20      A.   This document was in effect from, I
21  believe, 2011 until -- I'm just thinking of when we
22  released a new one, and I believe it's to the end of
23  2016.
24      Q.   Okay. And is this document provided to
25  the au pairs?

Page 155

1       A.   Yes.
2       Q.   At what stage is this document provided
3   to au pairs?
4       A.   It's provided to them before they depart
5   to the United States after they match.
6       Q.   After they match.
7           Have they signed the au pair
8   agreement at that stage? Sorry. Have they signed
9   -- let
10  me -- I'm sorry. Let me start that all again.
11          At the point when they're given
12  this document, have they signed their agreement with
13  A.P.E.X., 20/20?
14      A.   Yes.
15      Q.   And have they signed their agreement with
16  the host family?
17      A.   They may or may not have signed the
18  agreement with their host family.
19      Q.   Okay. Do all au pairs -- during the time
20  when this document was used, did all au pairs
21  receive a copy of this document?
22      A.   I believe so.
23      Q.   And for the updated version, do all
24  au pairs receive that document now?
25      A.   Yes.

Page 156

1       Q.   All right. And in creating this
2   document, did you -- do you make an effort to ensure
3   that everything in this document is accurate?
4       A.   I did not create this document. But yes,
5   we, the company, made sure everything in here was
6   accurate.
7       Q.   Okay. I think that's fine. Actually,
8   one more question about this.
9           This is the -- it says
10  "ProAuPair," so I assume this is an A.P.E.X.
11  document; is that right?
12      A.   Yes.
13      Q.   Is there a -- is there a 20/20 version of
14  this?
15      A.   No.
16      Q.   So 20/20 au pairs would not receive a
17  handbook?
18      A.   They received the A.P.E.X. handbook.
19      Q.   Okay. All right.
20          (Exhibit No. 14 was marked.)
21      Q.   Exhibit 14, which is APEX-20/20 3.
22          Do you recognize this document?
23      A.   Yes.
24      Q.   It says -- at the top it's a Training and
25  Information Notification Form. Does that mean that

Page 157

1   this is provided to au pairs?
2       A.   This is actually an old version of a
3   form, but this form we collect to confirm that we've
4   met our Department of State obligations regarding
5   preparing au pairs before they come to the United
6   States.
7       Q.   So understanding that this version of the
8   form --
9       A.   Uh-huh.
10      Q.   -- was not always in effect, do all
11  au pairs sign some version of this form?
12      A.   Yes.
13      Q.   And that's true for A.P.E.X. and 20/20?
14      A.   Yes.
15          (Exhibit No. 15 was marked.)
16      Q.   I'm handing you Exhibit 15, which is
17  APEX-20/20 143 through 176.
18          Do you recognize this document?
19      A.   Yes.
20      Q.   And what is this document?
21      A.   This document is our -- an old version of
22  a Host Family Agree -- Host Family Handbook.
23      Q.   Do -- so at what point in the process
24  would host families receive this document?
25      A.   Host families receive this document after

PLAINTIFFS' RESP. APP.0004539

MAGNA

LEGAL SERVICES

Page 158

```
 1    they have matched, and they also -- well, they have
 2    the ability to download it within our system for
 3    host families, so they have access to it at any
 4    time.  But it is pushed to them, I believe, after
 5    they have matched.
 6        Q.   So at that point in time would they have
 7    signed their agreement with A.P.E.X., 20/20?
 8        A.   Yes.
 9        Q.   Would they have signed their agreement
10    with the au pair?
11        A.   Yes or no.  It depends.
12        Q.   Okay.  What period in time was -- was
13    this document in effect?
14        A.   This document was, I think, put into
15    place at the beginning of A.P.E.X.'s designation in
16    2011.  And then we created a new Host Family
17    Handbook that I think we published in -- at the
18    early -- early 2016 maybe, or maybe at the -- in
19    2015.  I don't recall.
20        Q.   Does 20/20 have its own version of this
21    handbook?
22        A.   No.
23        Q.   Do 20/20 host families receive this
24    handbook?
25        A.   Yes.
```

Page 159

```
 1        Q.   So, again, I'll just ask the broad
 2    question.
 3        A.   Uh-huh.
 4        Q.   Understanding that this version was not
 5    always in effect --
 6        A.   Uh-huh.
 7        Q.   -- do all host families -- it's the host
 8    family are, right?  Yes.  Do all host families
 9    receive a copy of the -- of the Host Family
10    Handbook?
11        A.   Yes.
12        Q.   Okay.  And like with the Au Pair
13    Handbook, did A.P.E.X. make an effort to ensure that
14    everything in this document was accurate?
15        A.   Yes.
16        Q.   Okay.
17              (Exhibit No. 16 was marked.)
18        Q.   All right.  I'll hand you Exhibit 16.
19        A.   Uh-huh.
20        Q.   This is APEX-20/20 177 through 218.
21        A.   Uh-huh.
22        Q.   Is this a -- another version of the Host
23    Family Handbook?
24        A.   Yes.  This is the updated version.
25        Q.   So this version would have come into
```

Page 160

```
 1    effect the end of 2015 or beginning of 2016?
 2        A.   Around there.
 3        Q.   Is it still in effect?
 4        A.   Yes.
 5        Q.   Okay.  Were you involved in creating this
 6    handbook?
 7        A.   Yes.
 8        Q.   So did you make an effort to ensure that
 9    everything in this document was accurate?
10        A.   Yes.
11        Q.   And when the -- I guess it would be the
12    previous exhibit.  When that was first drafted, do
13    you know whether the -- do you know whether other
14    sponsors' versions of the Host Family Handbook
15    was con -- were consulted?
16        A.   I do not know the answer to that
17    question.
18        Q.   When you -- you were involved in creating
19    the updated version, correct?
20        A.   Uh-huh.
21        Q.   Did you consult other sponsors' handbooks
22    in doing that?
23        A.   No.
24              MR. LIBLING:  All right.  Tab 7.
25              (Exhibit No. 17 was marked.)
```

Page 161

```
 1        Q.   All right.  I'm handing you Exhibit 17,
 2    which is APEX-20/20 8994 through 9028.
 3              Do you recognize this document?
 4        A.   Yes.
 5        Q.   What is this document?
 6        A.   This is a document that I worked on, or
 7    Mr. Stone created, to outline how -- of the regular
 8    au pairs that participated between A.P.E.X. and
 9    20/20, how they came to us as regular au pairs.
10        Q.   So -- okay.  So this document was created
11    for this litigation?
12        A.   Yes.
13        Q.   And it seems like there are, what I'll
14    call, narrative sections?
15        A.   Uh-huh.
16        Q.   And then there are inserts, for lack of a
17    better word?
18        A.   Yes.
19        Q.   So who drafted the narrative inserts?
20    No, that was confusing.
21              Who drafted the narrative
22    sections?
23        A.   So I -- one of my staff members drafted
24    the original version, and Larry and I reviewed it.
25        Q.   Okay.  So did you sign off on the final
```

**Page 162**

1 version of the narratives?
2    A.  Yes.
3    Q.  Okay. And for the inserts, I kind of
4 want to ask what they are --
5    A.  Uh-huh.
6    Q.  -- but they're obviously different for
7 each --
8    A.  Right.
9    Q.  -- for each one.
10    A.  Sure.
11    Q.  Is there some commonality to what they
12 are, or do we have to go on the -- I'm not going to
13 go through all of them, but do you have to go one by
14 one?
15    A.  I'm happy to explain.
16    Q.  Please. That's a great idea.
17    A.  Sure.
18    Q.  Why don't you explain the creation of
19 this document.
20    A.  So we -- as we've discussed, over time
21 agreements and documents have been changed and
22 updated and there have been various versions of the
23 agreements.
24       So in -- for the purposes of this
25 lawsuit, identifying the standard au pairs, to use

**Page 163**

1 your term, or the regular ones as we had them, we
2 wanted to establish how we know they are regular
3 au pairs and how we can prove that they are regular
4 au pairs based on our documentation either via pdf's
5 that we had of documents or from data that we had in
6 our database.
7       So -- and then we created the
8 narrative to try and explain what it is you're
9 looking at, and then add in some evidence when we
10 had it as to why we believe this person is a
11 regular. So each one's different because, for
12 example, DORA, this dates back to 2011, we just had
13 different documents at that time and so they're all
14 slightly different.
15    Q.  So the -- the inserts, those are taken
16 from other documents within your --
17    A.  Yes.
18    Q.  -- systems?
19    A.  Yes.
20    Q.  Do you know whether all of the -- do you
21 know whether all of the documents from which these
22 inserts were taken have been separately produced?
23    A.  Yes, they have.
24    Q.  And -- okay. So let me look at an
25 example. Like, on page, using the Bates numbers,

**Page 164**

1 8996 and 8997.
2    A.  I don't have Bates numbers on mine.
3    Q.  Oh, sorry.
4    A.  Oh, I'm sorry, I do. Sorry. Which
5 number?
6    Q.  8996 and 997.
7    A.  Okay.
8    Q.  It appears to be --
9    A.  Uh-huh.
10    Q.  -- Annika -- Annika --
11    A.  Uh-huh.
12    Q.  -- Fetkenheuer?
13    A.  Pretty good. Yeah, I guess.
14    Q.  So some of them it's -- it's -- some of
15 these, it was clear to me that they were contracts
16 or something.
17    A.  Yes.
18    Q.  But for this one, for example, it was
19 not --
20    A.  Uh-huh.
21    Q.  -- clear to me.
22    A.  Uh-huh.
23    Q.  Can you tell me what these -- what
24 documents these inserts are from?
25    A.  Yes. So in Annika's case, every -- every

**Page 165**

1 applicant to our program, we create a profile, and
2 usually the data -- the profile is created from
3 fields extracted from the database to create a
4 profile based on the information that the au pair
5 provided to us.
6       And on the profiles it -- if the
7 au pair was designated as a professional, the
8 profile said "Professional Au Pair Suzy."
9    Q.  Uh-huh.
10    A.  If it just said "Au Pair Annika," that
11 meant that she was a regular au pair.
12    Q.  Okay.
13    A.  You wouldn't know that, looking from the
14 document, but that is how we differentiated them
15 looking at profiles.
16       I also know, based on her age and
17 the fact that she -- her qualification was that she
18 was a student. Usually if they have a professional
19 background, it's listing them as an occupational
20 therapist, physical therapist, and so on. So she
21 was not a professional au pair.
22    Q.  Okay. Now, you said you wouldn't know
23 that looking at the documents. I take it you meant
24 that somebody like me --
25    A.  Yes.

PLAINTIFFS' RESP. APP.0004541

**MAGNA**
LEGAL SERVICES

Page 166

1    Q.   -- I wouldn't know that.
2    A.   Yes.
3    Q.   But you knew, looking at the documents?
4    A.   Yes.
5    Q.   Okay.  And the -- are all three of the
6  excerpts relating to -- I'll try again,
7  Ms. Fetkenheuer, are they all -- are all three of
8  them from the same profile document that you
9  referenced?
10    A.   No.  So the -- the first snippet, so to
11  speak --
12    Q.   Uh-huh.
13    A.   -- is from Annika's profile.
14    Q.   Okay.
15    A.   The second one is taken from the host
16  family's profile, and then the third snippet is
17  taken from the agreement signed between the host
18  family and the au pair.
19    Q.   Okay.
20         MR. STONE:  Ms. Court reporter, just
21  so you know, this document is Attorneys' Eyes Only
22  also.  So Exhibit 17 would need to be included in an
23  envelope along with the transcript.  Thank you.
24    Q.   All right.  Thank you.  That was helpful.
25  So I'm going to shift gears slightly and talk about

Page 167

1  your relationship with the State Department and the
2  Department of Labor.
3         Are you the person at A.P.E.X.,
4  20/20 that interacts with the, we'll start with the
5  State Department?
6    A.   I am, and then other staff members are
7  designated as alternate responsible officers.
8    Q.   Who are the other staff members
9  designated as alternate responsible officers?
10    A.   Susan Asay, Diane DuToit, Steven
11  Courtney, Petra Crew, Cornelia Thuerbach.
12    Q.   And are you the responsible officer?
13    A.   Yes.
14    Q.   And do the topics on which you personally
15  communicate with the State Department differ from
16  the topics in which the other people you mentioned
17  communicate with the --
18    A.   Yes.
19    Q.   -- state Department?
20         How do they differ?
21    A.   So, well, I'm -- I'm usually
22  communicating with the Department of State when it
23  comes to I'm submitting the audit, requesting
24  allocations for visas or DS-2019 forms.  Anything
25  escal -- escalated, clarification of program

Page 168

1  requirements, those -- those types of things.
2         Whereas, another staff person,
3  like Diane DuToit, would be responsible for
4  reporting incidents or things that relate to
5  specific host family or au pair, would be the types
6  of things that she would communicate with the
7  Department of State on.
8    Q.   And what about Ms. Asay?
9    A.   Susan does communicate with them from
10  time to time on -- I'm trying to think of what she
11  would -- you know, if there were any clarifications
12  that Susan wanted, she might go to them.  But I'm --
13  I'm really the primary contact with them.
14    Q.   And I think the topics you mentioned, so
15  you -- you submit an annual audit; is that correct?
16    A.   Yes.
17    Q.   And how often do you request allocations
18  for visas?
19    A.   Once a year.
20    Q.   And have you ever asked for an increase
21  in your allocation?
22    A.   Yes.
23    Q.   Do you regularly ask for the -- for an
24  increase, or is this an occasional event?
25    A.   A.P.E.X., since I've been with the

Page 169

1  company, has requested an increase.  Actually, I
2  believe Susan, before me, had requested an increase
3  for A.P.E.X. every year.  And 20/20 requested its
4  first increase at the end of 2016.
5    Q.   How frequently do you talk to the
6  Department of State on one issue or another?
7    A.   It's really on an as-needed basis, every
8  other month or once a month maybe.
9    Q.   Okay.  Is there a specific person at the
10  State Department that you most frequently contact?
11    A.   Yes.
12    Q.   Who's that?
13    A.   I -- I tend to communicate with Stacey
14  Gomelsky in the Office of Designation?
15    Q.   Do you know what Ms. Gomelsky's title is?
16    A.   I'm not sure.
17    Q.   Do you discuss State Department
18  regulations with the -- with the State Department?
19    A.   Yes.
20    Q.   Do you -- what is the context in which
21  you discuss State Department regulations with the
22  State Department?
23         MR. STONE:  Objection.  Objection.
24  Form.
25         Go ahead.

PLAINTIFFS' RESP. APP.0004542

MAGNA
LEGAL SERVICES

Page 170

1    A.   So I might ask for clarification on
2 something.  If a regulation is not explicit in what
3 it says, I might ask for guidance.
4    Q.   Do you have an understanding of the legal
5 effect of guidance you are given?  And just right
6 now, I'm just asking if you have an understanding?
7          MR. STONE: Objection.  Foundation.
8          You can answer.
9    A.   Can you repeat the question?
10    Q.   Yeah.
11          Do you have an understanding of
12 the -- the legal consequences of your discussions
13 with the State Department, seeking guidance on
14 regulations?
15          MR. STONE: Objection.  Foundation.
16    A.   My understanding would be that it's
17 guidance that they always refer -- well, I don't
18 want to say always, but they're usually referring
19 back to the regulations.  So that's really what
20 supersedes.
21          So they may answer and give their
22 interpretation of what a regulation says, but
23 they're always deferring back to what the actual
24 regulations say.  And they may say it's not clear,
25 or sometimes it is clear.

Page 171

1    Q.   What do you do when it's not clear?
2    A.   I wish it was clear.
3          So if it's not clear, I usually --
4 it just depends on what -- what -- what -- what it
5 is I'm asking about.  So it -- my answer depends on
6 what it is.
7    Q.   Has there been a recent example, where
8 something wasn't clear?
9    A.   There has.  I -- the last time I was in
10 communication with the Department of State, I was
11 asking -- because we have a host family who has a
12 son with special needs who is turning 18.  And the
13 question was can the au pair continue working for
14 the family if the child turns 18 while the au pair's
15 there?  And that came back with a definitive answer.
16    Q.   So in that case there was a definitive
17 answer --
18    A.   Uh-huh.
19    Q.   -- from the State Department?
20          Has there been a recent example
21 where the State Department said that it wasn't clear
22 what the answer was on a regulation?
23    A.   I'm trying to think of an example where
24 it wasn't totally clear.  I had one, and I can't
25 remember what it was, so...

Page 172

1    Q.   Well, if you remember, let me know.
2    A.   Yeah, I will.
3    Q.   Are there any documents that you provide
4 to the State Department for approval before they are
5 released to the public or used in your business?
6    A.   During the designation process the
7 Department of State requires you to submit various
8 documents, handbooks, things of that nature.  So
9 they initially approve documents when you're going
10 through the designation process.
11    Q.   But not on an ongoing basis?
12    A.   No.
13    Q.   Okay.
14    A.   We -- we do supply them with various
15 documents every year at the annual audit, so they
16 have access to program documents.
17    Q.   As part of the annual audit, I know there
18 is a paper submission, or maybe it's electronic.
19 But there are documents that are submitted?
20    A.   Uh-huh.
21    Q.   Is there a nondocumentary portion;
22 telephone call, a meeting, something like that?
23    A.   No.
24    Q.   Do you -- does A.P.E.X., 20/20 have
25 communications with the Department of Labor?

Page 173

1    A.   No.
2          (Exhibit No. 18 was marked.)
3    Q.   I'm handing you --
4    A.   Uh-huh.
5    Q.   -- Exhibit 18.  Exhibit 18 is APEX-20/20
6 316, and this appears to be an e-mail chain where
7 the bottom e-mail, I think, is date -- is dated
8 November 24 and the top e-mail December 9, both from
9 2014.
10    A.   Uh-huh.
11    Q.   I take it that you sent the bottom
12 e-mail?
13    A.   Yes.
14    Q.   And who is Michael McHugh?
15    A.   Michael McHugh works at InterExchange.
16    Q.   And what is his role at InterExchange?
17    A.   He manages their au pair program.
18    Q.   And why are you communicating with
19 Mr. McHugh in this e-mail?
20    A.   I was communicating with Mike McHugh in
21 this e-mail because there was a document I believe
22 that came out from the Alliance meeting in 2014 that
23 was speaking to expansion requests.
24          No, it's from a meeting that the
25 Alliance had with au pair -- the Depart -- or

| Page 174 | Page 176 |
|---|---|

**Page 174**

1  between -- at an Alliance meeting where the
2  Department of State was presenting on the au pair
3  program. And we weren't an Alliance member at that
4  point, but I had gotten a copy of the document. And
5  so I went to Mike to ask him for clarification on
6  what his understanding of the allocation process was
7  and whether or not a cap was in place.
8      Q.   And why did you go to Mr. McHugh for that
9  clarification?
10     A.   Because I know Mike McHugh and I know he
11 was at the meeting.
12     Q.   How do you know Mr. McHugh?
13     A.   I had met him over the years at various
14 industry events.
15     Q.   Do you often talk to Mr. McHugh about
16 State Department or regulatory issues?
17     A.   No.
18     Q.   About how frequently do you think you
19 talk to Mr. McHugh about that?
20     A.   Once a year, when I see him at the
21 Alliance meeting.
22         MR. LIBLING:  Let's go to tab 21.
23         (Exhibit No. 19 was marked.)
24     Q.   I'm handing you Exhibit 19.
25     A.   Uh-huh.

**Page 175**

1      Q.   Which is APEX-20/20 319, 320.
2          Do you recognize this document?
3      A.   Yes.
4      Q.   And the bottom e-mail appears to be --
5  which is on page 320, appears to be another e-mail
6  from you to Mr. McHugh I think actually dated the
7  same day as the -- in fact, dated five minutes
8  before the e-mail we just looked at --
9      A.   Uh-huh.
10     Q.   -- is that right?
11     A.   I don't know.
12     Q.   You can check, if you want, but I think
13 that's right.
14     A.   I'm sorry, so you're referring to this
15 document here?
16     Q.   Yeah.
17     A.   319. Okay.
18     Q.   So in the bottom e-mail, which is on
19 320 --
20     A.   Uh-huh.
21     Q.   -- you write, "Thank you so much. I
22 really appreciate it."
23         I don't know what that refers to
24 because it looks like there was an e-mail below
25 this. But for whatever reason, I don't think it was

**Page 176**

1  produced.
2          And then it says, "We haven't
3  received any papers yet."
4      A.   Uh-huh.
5      Q.   "Wondering if you have?"
6      A.   Yes.
7      Q.   What papers are you referring to?
8      A.   The papers regarding the lawsuit.
9      Q.   Oh, the papers regarding the lawsuit.
10 Okay. Might also help explain why the e-mail below
11 this is not here. Okay.
12         And then -- so why were you
13 e-mailing Mr. McHugh about this lawsuit?
14     A.   So -- so I e-mailed him on -- so I -- I'm
15 just trying to, like, look at the dates here and
16 make sure that -- I don't know if this was all
17 connected in one e-mail chain or not. So -- but the
18 question was why was I asking Michael McHugh if --
19 if he had received any papers about the lawsuit?
20     Q.   Yes.
21     A.   Because I was curious if he had received
22 any papers about the lawsuit.
23     Q.   Is there any particular reason why you
24 reached out to Mr. McHugh as opposed to somebody
25 else?

**Page 177**

1      A.   Because I know Mike, and he's a friendly
2  guy and...
3      Q.   All right. And then as it's been
4  produced, it appears that there's a reply to
5  Mr. McHugh's e-mail sometime later on January 21st
6  from Stacey Frank. Who is Stacey Frank?
7      A.   Which -- are you referring to an e-mail
8  that I have a copy of here?
9      Q.   Yes. It's on page 20/20. I'm sorry,
10 it's on page 319. It's the bottom e-mail on that
11 page.
12     A.   So I don't -- I don't think these two are
13 connected as pieces of correspondence.
14     Q.   Well --
15     A.   Because the top is from Stacey Frank
16 saying -- and Stacey Frank is the owner of -- what's
17 the name of her agency? She's in San Francisco.
18     Q.   Is it Agent Au Pair?
19     A.   Agent Au -- Agent Au Pair. Stacey owns
20 Agent Au Pair, and was reaching out to -- it doesn't
21 say where the e-mail went to, but was trying to
22 reach either Susan or I.
23         And then Sus -- Susan replied
24 saying, "Hi, Stacey, how are you," and copied me on
25 it. I don't think it's related to correspondence

**MAGNA** LEGAL SERVICES

Page 178

1  with Mike McHugh.
2     Q.   Okay.  Okay.  It's entirely possible
3  there's some production error --
4     A.   Okay.
5     Q.   -- linking this two documents.
6           So -- all right.  So let's ask
7  about -- I want to ask about 20/20 then.  So --
8     A.   Uh-huh.
9     Q.   -- Ms. Frank reached out to yourself and
10 Ms. Asay?
11    A.   Uh-huh.
12    Q.   Did you end up talking to Ms. Frank?
13    A.   I believe I did.
14    Q.   What was the -- what was the topic of the
15 conversation?
16    A.   The lawsuit.
17    Q.   What did you discuss with Ms. Frank?
18    A.   I think Stacey was calling because she
19 wanted to know what we were doing regarding legal
20 representation.
21    Q.   And what did you tell her?
22    A.   I told her I was in conversations with
23 our insurance carrier about legal coverage, and that
24 that was -- we were working on a plan for it.
25    Q.   Did you discuss any of the substantive

Page 179

1  allegations in the lawsuit?
2     A.   Not that I can remember specifically, no.
3     Q.   Do you remember discussing anything else
4  on that telephone call?
5     A.   No.
6     Q.   Did Ms. Frank say anything about her
7  reaction to the lawsuit?
8     A.   I think she was trying to come up with a
9  plan for legal coverage because she did not have
10 insurance and was trying to figure out a plan.
11    Q.   Do you know whether Ms. -- whether
12 Ms. Asay ended up talking to Ms. Frank?
13    A.   I don't think so.  I think I spoke to
14 Stacey.
15    Q.   Why was Ms. Frank reaching out to -- to
16 the two of you, as opposed to anyone else, regarding
17 this issue?
18    A.   She may have reached out to other people,
19 but we -- we know Stacey, just like we know Mike
20 McHugh.  They're people that run other au pair
21 agencies, so...
22    Q.   Do you generally know the people who run
23 the other au pair agencies?
24    A.   I do.
25    Q.   Would you say that you have occasional

Page 180

1  friendly communications like this with most of the
2  other agencies?
3           MR. STONE:  Objection.  Form.
4     A.   Well, I don't have, like, friendly
5  conversations with them.  There are conversations
6  that might be pertaining to a specific question.
7     Q.   And would you simply contact whichever
8  other sponsor agency that question makes relevant?
9     A.   Yes, or they'd contact me.
10    Q.   Are there any specific people at other
11 agencies that you have more frequent contact with
12 than others?
13    A.   No, I wouldn't say so.
14         (Exhibit No. 20 was marked.)
15    Q.   I'm handing you Exhibit 20.
16    A.   Uh-huh.
17    Q.   Which is APEX-20/20 322.
18    A.   Uh-huh.
19    Q.   Do you recognize this document?
20    A.   I do.
21    Q.   What is this document?
22    A.   This document is -- the blue part is --
23 well, actually all of it is from a LinkedIn message,
24 a communication that I had between Mike McHugh and
25 myself.

Page 181

1     Q.   Okay.  Okay.  So the -- so the bottom --
2  it looks like the bottom message is from July 15 --
3     A.   Uh-huh.
4     Q.   -- 2015.  Do you know the dates of the --
5  the later messages?
6     A.   Probably within a couple of days because
7  this -- this communication was specific to a meeting
8  that the Department of State was having in D.C.
9     Q.   Do you know the date of the -- the
10 Department of State's D.C. meeting?
11    A.   I don't.  Off the top of my head, I do
12 not.
13    Q.   What was the topic of the D.C. meeting?
14    A.   That was the meeting that the Department
15 of State called and invited au pair sponsors to to
16 talk about -- to do a program review, to talk about
17 the results of their meetings that they had had
18 around the country, inviting different au pairs to
19 come and attend.
20         And they were talking about the
21 strengths and the weaknesses and sort of providing a
22 dialogue -- an opportunity for dialogue with the
23 sponsors about what the feedback was.
24    Q.   And what sort of -- what sort of topics
25 did they cover at the meeting?

**MAGNA**
LEGAL SERVICES

Page 182

1    A.   They covered -- I'm trying to remember.
2  They covered -- they talked about their -- their
3  organizational structure and the different
4  departments and what the different departments
5  within the ECA do and who the -- they had different
6  staff members speaking about the role of their
7  department as it pertains to the private sector
8  designation and au pair programs.
9         They talked, like I said, about
10  the surveys that they had done and the meetings that
11  they had had with au pairs.  They kind of came back
12  and spoke about the strengths and weaknesses.  They
13  had somebody from the Department of -- of Labor come
14  and presented there.  They -- I'm trying to think of
15  what else.  Those were kind of the main things.
16    Q.   This question's just for the record.  Can
17  you just says what "ECA" stands for?
18    A.   Oh, the Bureau of Educational and
19  Cultural Affairs, I believe.
20    Q.   And that is a bureau within the
21  Department of State?
22    A.   Yes.
23    Q.   Is that the bureau that oversees the --
24  the au pair program?
25    A.   Yes, they do.

Page 183

1    Q.   What is your understanding of the role of
2  the ECA?
3    A.   My understanding -- so -- so ECA is -- is
4  the arm of the Department of State that is
5  overseeing the J-1 cultural exchange programs in
6  their -- the various J-1 visa types.  They're
7  ensuring -- or they are selecting, vetting,
8  monitoring sponsors.  They are fulfilling the
9  mission set forth by, you know, the Fulbright Act,
10  when the -- the -- the J-1 programs were created to
11  facilitate cultural exchange.  And those are kind of
12  the main things.
13    Q.   You mentioned that one of the topics
14  covered at this meeting was the strengths and
15  weaknesses of the au pair program?
16    A.   Uh-huh.
17    Q.   What were some of the strengths?
18    A.   I'm trying to remember.  It's in a
19  PowerPoint presentation, you probably have in your
20  binder.
21         But I think they talked about the
22  strengths were that an overwhelming majority of
23  au pairs reported that they had a positive
24  experience, that their English improved, you know,
25  that they met Americans, that they gained confidence

Page 184

1  traveling internationally and could live abroad by
2  themselves, those sort of things.
3    Q.   And what about the weaknesses?
4    A.   So the weaknesses that I recall are
5  au pairs' concerns about what happens when there's
6  a -- a -- their match -- there's a match break and
7  what's going to happen to them, duties beyond
8  regulations or beyond what would be acceptable.  I'm
9  trying to think of what else.  Placement changes.
10  You know, when their program ends and they go home
11  early, kind of concerns about that.
12    Q.   Were there any action items that came out
13  of this meeting?
14    A.   I don't recall.  I mean, there weren't as
15  far as sponsors were concerned.
16         Well, one thing that they -- they
17  did cover at the meeting was they had an updated
18  incident reporting document that the Department of
19  State provides to au pair sponsors, so we can report
20  incidents to them and kind of further clarify what
21  in -- incidents constitute needing to be reported
22  to the Department of State.  That was one action
23  item, that we received that new document.
24    Q.   Were all of the sponsors at this meeting?
25         MS. FULLER:  Objection.  Form.

Page 185

1  Foundation.
2    A.   I don't know.
3    Q.   Were -- was it --
4    A.   Actually, I -- I do know.  Not all of
5  them were there.
6    Q.   Do you know which ones were there?
7    A.   I can probably list the people I remember
8  seeing there.
9    Q.   Sure.
10    A.   So I believe that AuPairCare was there,
11  Au Pair in America, InterExchange, Cultural Care,
12  Expert Au Pair.  There was a representative from the
13  organization based in Petaluma.  I don't recall
14  their name.  Au -- Au Pair Foundation, I think.
15  Those are the people I remember specifically at that
16  meeting.
17    Q.   How frequently do multiple sponsors get
18  together for a meeting with the Department of State?
19    A.   It's -- it's kind of random.  It's
20  whenever the Department of State decides to hold a
21  meeting.  There have been, I think, two meetings
22  specifically called for sponsors in D.C. since I've
23  been at A.P.E.X.  And then we usually see the
24  Department of State at the annual Alliance meetings.
25  They tend to -- to go to those as well.

MAGNA
LEGAL SERVICES

Page 186

1    Q.   You said the Department of Labor was
2 there.  What was the Department of Labor's
3 representative there to do?
4    A.   Honestly, it was very muddy to me.  So
5 she was presenting on FSLA [sic].
6    Q.   What did she say about the FLSA?
7    A.   I don't remember specifically, to be
8 honest.
9    Q.   Do you remember generally?
10    A.   It was very weird at that meeting because
11 the Department of Labor showed up, and a bunch of
12 sponsors walked out because people were -- felt it
13 was related to the lawsuit, and it was inappropriate
14 that the Department of Labor would come in and be
15 speaking to things that were related to the lawsuit.
16        And so it was just a really weird
17 session.  And I don't remember the specifics of what
18 all she covered, but it was -- yeah.
19    Q.   Did you walk out?
20    A.   No, I did not.
21    Q.   Is there any -- is there a sponsor you
22 specifically remember seeing walk out, or you just
23 know that some did?
24    A.   I recall that Expert Au Pair and Cultural
25 Care walked out of the room.

Page 187

1    Q.   Do you have any recollection of the
2 substance of the Department of Labor's
3 communication?
4        MR. STONE:  Objection.  Form.
5    A.   I mean, it was around wages, you know,
6 wages and payments and that sort of thing.
7    Q.   Did -- did they say anything about the
8 minimum wage?
9    A.   I don't recall, to be honest.
10    Q.   You don't recall whether the topic of
11 minimum wage came up at all?
12    A.   I -- I -- can you rephrase your last
13 question?
14    Q.   Do you recall whether the -- whether
15 during this discussion with the Department of Labor
16 the topic of the minimum wage came up at all?
17    A.   Yes, I believe the topic of the minimum
18 wage came up.
19    Q.   What was said about the minimum wage?
20    A.   Well, I believe -- and, like I said, it
21 was a really weird session because people were upset
22 and kind of, you know, half the room walked out.
23        So I believe what they were trying
24 to convey is that minimum wage varies by state.
25 There was a federal requirement and -- you know,

Page 188

1 what I heard was very counter to what my
2 understanding of the au pair stipend is.
3        And because of the lawsuit and
4 because -- it felt very inappropriate that they had
5 showed up, where the Department of Labor had never
6 been to any other Department of State-sponsored
7 meeting.  You know, it def -- it wasn't the time and
8 the place to start talking to sponsors about what
9 they perceived to be a regulatory thing that is
10 completely different than what our understanding was
11 from the Department of State.
12    Q.   But the Department of Labor conveyed that
13 its understanding was that state minimum wages
14 applied to au pairs?
15        MR. STONE:  Objection.  Form.
16 Foundation.
17    A.   I don't know if they specifically said
18 that, to be honest.
19    Q.   My understanding is that you testified
20 that the Department of Labor said that minimum wage
21 varies by state?
22    A.   Uh-huh.
23    Q.   How does the minimum wage vary by state,
24 if it doesn't vary based on state minimum wages?
25        MR. STONE:  Objection.  Form.

Page 189

1 Foundation.
2    A.   So it's -- so they did say that minimum
3 wage varies by state.  Whether or not that applies
4 to au pairs is -- was unclear.
5    Q.   Was the topic of this meeting anything
6 other than au pairs and the au pair program?
7    A.   It was specific to au pairs.
8    Q.   Okay.  At this meeting between some
9 sponsors and the Department of Labor, was the topic
10 of a deduction or credit for room and board
11 discussed?
12    A.   I believe so.
13    Q.   And what was said about that?
14    A.   Honestly, I don't remember what it
15 specifically said, what they specifically said about
16 room and board deductions.
17    Q.   Do you remember generally what they said?
18    A.   I don't remember generally.  I do know
19 that the topic of room and board comes up in the
20 conversation around FSLA [sic], and that it can vary
21 by state.
22    Q.   Did the Department of Labor express an
23 opinion as to whether the deduction or credit for
24 room and board was appropriate?
25    A.   I honestly don't recall if they had a

MAGNA
LEGAL SERVICES

1  specific opinion about it.
2      Q.   Did they provide any guidance, short of a
3  specific opinion?
4      A.   They did provide a handout to sponsors.
5      Q.   Do you know whether that handout has been
6  produced?
7      A.   I actually don't think we have produced
8  that document.
9          MR. LIBLING:  Larry, we would request
10 production of that.
11         THE WITNESS:  Okay.
12         MR. KELLY:  I don't know that I have
13 it.
14         THE WITNESS:  Yeah, I don't think you
15 do.
16         MR. STONE:  Okay.
17         THE WITNESS:  Because I have it as a
18 handout, a paper copy.  I -- we can definitely
19 produce that document.  I -- I still have it.
20         MR. LIBLING:  Okay.  Well, we would
21 request that it be collected and produced.
22         THE WITNESS:  Okay.
23     Q.   Do you -- do you recall whether topics
24 were discussed that are not covered in whatever that
25 handout says?

1      A.   Honestly, I don't really remember the
2  specifics of the handout, so I can't really answer
3  that question very -- I can't answer that question.
4      Q.   Are there any topics that were discussed
5  during this meeting between some sponsors and the
6  Department of Labor that we have not covered?
7      A.   Can you repeat the question?
8      Q.   Are there any topics that were covered
9  during this conversation between the Department of
10 Labor and some sponsors that we've -- that you've
11 not already testified about?
12     A.   Not that I can recall.
13     Q.   Do you have any recollection of whether
14 every topic that is in this handout was covered in
15 that meeting?
16     A.   I -- I can't answer that specifically.
17     Q.   Okay.  Did you end up meeting Mr. McHugh
18 at this -- at this event?
19     A.   I believe he was there.
20     Q.   Did you talk to him about the litigation?
21     A.   No.
22     Q.   Did you talk to him about anything to do
23 with the au pair stipend or -- or minimum wage?
24     A.   No.  I mean, he was at the meeting, but I
25 didn't meet with him.

1      Q.   Did you discuss the -- the meeting you
2  had with the Department of Labor with anyone?
3      A.   I probably discussed it with Susan.
4      Q.   Did you discuss it with anybody else?
5      A.   I discussed it with Larry.
6      Q.   Put that one aside.
7          Did you discuss it with anyone
8  else?
9      A.   No.
10     Q.   What was the content of your discussion
11 with Susan?
12     A.   I mean, I went there representing
13 A.P.E.X. and 20/20, so I was filling her in on --
14 you know, I shared the PowerPoint that they
15 distributed and just gave her a general update about
16 the meeting and what was covered.
17     Q.   Is the -- is the PowerPoint the same
18 document as the handout you were just referencing?
19     A.   No.  The PowerPoint was a document that
20 the -- the Department of State had distributed to
21 sponsors.
22     Q.   Do you know whether the PowerPoint has
23 been produced?
24     A.   It has been produced.
25     Q.   Okay.  Okay.  Do you remember anything

1  beyond what you've already testified to today that
2  you said to Susan about -- about this meeting?
3      A.   No.  I -- I mean, I can't remember
4  anything specific.
5      Q.   Do you remember anything that she said to
6  you in this conversation?
7      A.   I can't remember anything specific.
8      Q.   And you don't recall any other
9  conversations with anyone else other than your
10 counsel about this meeting at any time?
11     A.   No.
12         (Exhibit No. 21 was marked.)
13     Q.   I'm now handing you Exhibit 21.
14     A.   Uh-huh.
15     Q.   Exhibit 21 is Bates numbered APEX-20/20
16 310.
17     A.   Uh-huh.
18     Q.   Do you recognize this document?
19     A.   I do.
20     Q.   And first I'm going to start by asking
21 you who the various people on this document are.
22     A.   Uh-huh.
23     Q.   So who is Sarah McNamara?
24     A.   Sarah McNamara is the vice president at
25 AuPairCare.

**MAGNA**
LEGAL SERVICES

Page 194

1  Q.  And who is Ruth Ferry?
2  A.  She is with Au Pair in America.
3  Q.  Marcie Schenider?
4  A.  She is the president of Intrax.
5  Q.  Mispagel is you?
6  A.  Yes.
7  Q.  And Ms. Asay is your CEO?
8  A.  Yes.
9  Q.  Is there anyone else?  Okay.
10      So the bottom e-mail says --
11  A.  Uh-huh.
12  Q.  -- "Nice lunch.  Good conversation."
13  A.  Uh-huh.
14  Q.  I take it you all had lunch?
15  A.  We had lunch.
16  Q.  And was this lunch part of a -- an
17  Alliance meeting?
18  A.  No.
19  Q.  What led to your meeting up to have
20  lunch?
21  A.  This lunch was Ruth Ferry was in town
22  from Connecticut, and she asked if we'd be
23  interested in getting together for lunch.  And I
24  used to work at AuPairCare, and Sarah used to report
25  to me, and I hadn't met Marcie before, and so we

Page 195

1  decided that would be a good opportunity to get
2  together for lunch.
3  Q.  What did you discuss at this meeting?
4  Well, did you discuss anything related to the
5  au pair program at this lunch?
6  A.  We did.
7  Q.  What topics related to the au pair
8  program did you discuss at this lunch?
9  A.  Oh, I'm sure we talked about the
10  Department of State and how -- I mean, who was
11  their -- the Department of State has a lot of
12  staffing changes, so it's always interesting to
13  hear, like, who's -- have you met so and so yet or
14  whatnot.  So probably the Department of State.
15      I'm trying to remember what else
16  we discussed specifically.  I don't recall.  It was
17  just small talk.
18  Q.  Did you discuss -- did you discuss the
19  litigation?
20  A.  No, we did not.
21  Q.  Did you discuss the au pair stipend?
22  A.  I -- I don't believe so because we
23  weren't talking about the lawsuit, but I --
24  honestly, I don't recall.
25  Q.  So was there a deliberate decision, like,

Page 196

1  not to --
2  A.  Yeah.
3  Q.  -- touch issues around --
4  A.  Yes.
5  Q.  -- the lawsuit?
6  A.  Totally.
7  Q.  So had the -- had the meeting occurred --
8  have you had meetings like this, prior to the
9  lawsuit being filed, during which you would have
10  discussed topics like the stipend?
11  A.  Honestly, I mean, I'm trying to think of
12  examples when A.P.E.X. got together socially with
13  people.
14      I mean, any conversations I've had
15  with sponsors, they haven't been around the stipend,
16  per se.  Because remember, A.P.E.X. has a different
17  stipend.  And so it's usually more, hey, what do you
18  do about -- what's your process for, you know,
19  collecting documents?  Or how do you -- it's more
20  like operational questions that we're asking each
21  other about so we can glean, like, best practices
22  from people.
23  Q.  So this is best practices to comply with
24  Department of State regulations?
25  A.  Yes.

Page 197

1  Q.  Or best practices outside of Department
2  of State regulations, just as business practices?
3  A.  Uh-huh.  Uh-huh.
4  Q.  And -- okay.
5  A.  And sometimes things aren't always clear,
6  so you're, like, wondering how another sponsor might
7  do it.
8  Q.  Is that true for general business
9  practices and compliance with regulations?
10  A.  Uh-huh.  Yes.
11  Q.  In this e-mail, the bottom e-mail --
12  A.  Uh-huh.
13  Q.  -- it says, "After our lunch broke up, I
14  thought of all kinds of subpart (a) questions" --
15  A.  Uh-huh.
16  Q.  -- "to ask?"  Do you know what that's a
17  reference to?
18  A.  I do.
19  Q.  What is -- what does that mean?
20  A.  So during this time the -- the Department
21  of State was considering new regulations for subpart
22  (a), and those -- it's my understanding that subpart
23  (a) are regulations that pertain to different J-1 --
24  different J-1 categories.  And they were looking at
25  re-regulating subpart (a) and things about insurance

MAGNA
LEGAL SERVICES

## Page 198

1  and stuff like that, so...
2      Q.   Did that impact the au pair program?
3      A.   It did.  Yeah, there were changes to
4  subpart (a).  Which actually is one of the other
5  things that they discussed at that Department of
6  State meeting, was what the changes to subpart (a),
7  what that meant for sponsors.
8      Q.   Okay.  This lunch meeting, I'm getting
9  the chronology mixed up.
10     A.   Yeah.
11     Q.   This lunch meeting was before or after
12  that Department of State meeting?
13     A.   I -- I don't know, to be honest.  I would
14  have to look at the dates.
15     Q.   Okay.
16     A.   I'm not sure.
17     Q.   The top e-mail says, "Dinner in" -- "in
18  October at Alliance?"
19     A.   Uh-huh.
20     Q.   Did that happen?
21     A.   I think we had lunch with Ruth Ferry and
22  Marcie Schmidt -- or Schneider, excuse me, at the
23  Alliance meeting.  As we were waiting to go to the
24  airport, we had lunch at the hotel before we left.
25     Q.   Okay.  What did you discuss at that

## Page 199

1  meeting?
2          MR. STONE:  Objection.  Form.
3      A.   I don't remember.  I don't remember
4  specifically.  I mean, it was at the tail end of the
5  Alliance meeting, and I don't recall.
6      Q.   Okay.
7          (Exhibit No. 22 was marked.)
8      Q.   I'm handing you Exhibit 22.
9      A.   Uh-huh.
10     Q.   Which is Bates numbered APEX-20/20 311.
11         This subject of this e-mail --
12     A.   Uh-huh.
13     Q.   -- chain is "Alliance Meeting"?
14     A.   Uh-huh.
15     Q.   And the date is October 13 --
16     A.   Uh-huh.
17     Q.   -- 2015?
18         Is this the -- a reference to the
19  same Alliance meeting that was referred to in the
20  e-mail we --
21     A.   Uh-huh.
22     Q.   -- just saw?
23     A.   Yes.  It is.
24     Q.   And do you recognize this document?
25     A.   Yes.

## Page 200

1      Q.   It sounds like Ms. Ferry is asking you to
2  take notes for the au pair breakout session?
3      A.   Yes.
4      Q.   What was the au pair breakout session?
5      A.   So the au pair breakout session is a
6  meeting at the Alliance -- meeting within the
7  Alliance meeting, where Department of State
8  representatives come in and present to au pair
9  sponsors.
10     Q.   Okay.  Do you know why Ms. Ferry thought
11  it was best if a different organization, from the
12  one she's associated with, took the notes?
13     A.   Yes.  Because she was the facilitator
14  asking the questions, sort of like a Q and A with
15  the Department of State.  And so she presents the
16  questions, and then usually she always asks another
17  sponsor to be the note taker.
18     Q.   Did you take notes?
19     A.   I did.
20         (Exhibit No. 23 was marked.)
21     Q.   I'll hand you Exhibit 23.
22     A.   Uh-huh.
23     Q.   Which is Bates numbered APEX-20/20 496
24  through 499.
25     A.   Uh-huh.

## Page 201

1      Q.   Are these the notes you took?
2      A.   Yes.
3      Q.   Okay.  So the ECA representatives at the
4  top, those are representatives from the Department
5  of State, correct?
6      A.   Yes.
7      Q.   Specifically from the ECA?
8      A.   Uh-huh.  Yes.
9      Q.   And the format of this discussion was
10  that Ms. Ferry moderated, and they had a -- a
11  discussion back and forth?
12     A.   Yes.
13     Q.   Okay.  These headings, like, "Allotments
14  for 2016," "Expansion Requests" --
15     A.   Uh-huh.
16     Q.   -- and so on, are they headings that you
17  created, or were there distinct sections to the
18  conversation?
19     A.   They were distinct sections to the
20  conversation with the Department of State.
21     Q.   And did you do your best to make these
22  notes as accurate as you could?
23     A.   I did.
24         MR. STONE:  Objection.  Form.
25     Q.   Do you believe these notes are

**MAGNA** ►
**LEGAL SERVICES**

Page 202

1   accurate -- or an accurate record of what was
2   discussed at that meeting?
3       A.   Yes.
4       Q.   On page 498 one of the topics is "Common
5   Trends."
6       A.   Uh-huh.
7       Q.   And my -- so, for example, when it says,
8   "Growing demand by both host families and au pairs."
9   When I read this document, should I understand that
10  to be something Ms. Gomelsky said, or should I
11  understand that to be your position?
12      A.   So --
13           MR. STONE: Objection. Form.
14      A.   So one of the things that Stacey Gomelsky
15  did during this meeting was she was providing
16  sponsors with highlights or things that she saw
17  across sponsors from their annual reports about the
18  au pair program. Like, trends that she could glean
19  from all the sponsors' reports about what was
20  happening.
21           So sponsors told the Department of
22  State that there's a growing demand and these other
23  things, these common trends. So she's just re --
24  restating what she found back to sponsors.
25      Q.   Thank you. Okay.

Page 203

1            So the examples of "Sponsor Best
2   Practices," are these also going through that same
3   funneling up to the Department of State and then
4   down process, or were these generated in some other
5   fashion?
6       A.   These may be -- I -- I believe these
7   are -- these are examples that -- that Stacey
8   Gomelsky gave about sponsor best -- best practices.
9       Q.   Do you agree that these are best
10  practices?
11      A.   I do.
12      Q.   Do you impose weekly timekeeping
13  requirements?
14      A.   No, I don't. I mean, A.P.E.X. does not.
15      Q.   But you think it would be best practice
16  to do that?
17      A.   It could be a best practice for host
18  families and au pairs to.
19      Q.   Do you require host families and au pairs
20  to do that?
21      A.   No. But we want to make sure au pairs
22  don't work more than 45 hours a week, so it is a
23  good best practice.
24      Q.   Do you think it would be a best practice
25  for a sponsor agency to either do it themselves or

Page 204

1   require the host families and au pairs to keep
2   weekly timekeeping?
3            MR. STONE: Objection. Form.
4       A.   I'm sorry, do you mind restating the
5   question?
6       Q.   No, I don't mind.
7            Do you think it would be a best
8   practice for a sponsor agency to require that there
9   is weekly timekeeping of an au pair's working hours,
10  putting aside the question of --
11      A.   Uh-huh.
12      Q.   -- who keeps that record?
13           MR. STONE: Objection. Form.
14           MS. FULLER: Objection. Join.
15           MR. STONE: You can answer.
16      Q.   You can answer.
17      A.   Okay. I -- we -- I do. And we have that
18  guidance in our handbooks, that there's a schedule
19  and you're tracking time and...
20      Q.   Are those schedules used by the local
21  area directors?
22      A.   No.
23      Q.   Okay. Would those schedules sometimes be
24  shown to a local area director for the local area
25  director to -- if there's a -- an issue or somebody

Page 205

1   has a question about whether what the au pair is
2   doing is appropriate?
3            MR. STONE: Objection. Form.
4       A.   They might.
5            (Exhibit No. 24 was marked.)
6       Q.   I'm handing you --
7       A.   Uh-huh.
8       Q.   -- Exhibit 24.
9       A.   Uh-huh.
10      Q.   Which is APEX-20/20 495.
11      A.   Uh-huh.
12      Q.   Do you recognize this e-mail?
13      A.   I do.
14      Q.   Who is Michael McCarry?
15      A.   Michael McCarry used to be the head of
16  the Alliance.
17      Q.   When did he stop being the head of the
18  Alliance?
19      A.   I believe he retired last year in 2016,
20  maybe at the end of 2015.
21      Q.   Was he the head of the Alliance on
22  December 22nd, 2015?
23      A.   I believe so, yes.
24      Q.   And at the top, the first sentence after
25  "1" --

| Page 206 | Page 208 |
|---|---|
| 1    A.  Uh-huh. | 1    Q.  Did you have any discussions with the |
| 2    Q.  -- references Bill Gertz and then Ilir | 2 Alliance or -- did you have any discussion with the |
| 3 Zherka.  Is Mr. Zherka the incoming director? | 3 Alliance or Alliance members regarding the issue of |
| 4    A.  Yes, he is. | 4 a national stipend versus state and local minimum |
| 5    Q.  Okay.  So Mr. Zherka replaced | 5 wages? |
| 6 Mr. McCarry? | 6    A.  No. |
| 7    A.  Yes. | 7    Q.  This document indicates that it -- it has |
| 8    Q.  Okay.  Do you know who ECA assistant | 8 an attachment, but I don't think the attachment was |
| 9 secretary Evan Ryan is? | 9 produced.  Do you know whether you still have a copy |
| 10    A.  Yes. | 10 of the -- the letter that was attached to this? |
| 11    Q.  Who is Mr. Ryan? | 11    A.  I can go back and look. |
| 12    A.  Ms. Ryan is -- | 12    Q.  I'd appreciate it. |
| 13    Q.  Sorry. | 13    A.  Uh-huh. |
| 14    A.  -- the ECA assistant secretary. | 14    Q.  Thank you. |
| 15    Q.  And what is her role? | 15    At the bottom it says, "We are |
| 16    A.  I can't really speak to her role, to be | 16 now" -- "we" -- sorry. |
| 17 honest.  She, I believe, works under the Secretary | 17    It says, "We are at work now on an |
| 18 of State and is responsible for overseeing various | 18 advocacy strategy for 2016, about which you will be |
| 19 aspects of the Department of State.  I -- I honestly | 19 hearing more in January." |
| 20 can't truly speak to... | 20    A.  Uh-huh. |
| 21    Q.  Do you know whether she runs the ECA? | 21    Q.  Did you hear more about an advocacy |
| 22    A.  I believe she does, yes. | 22 strategy? |
| 23    Q.  Okay.  Then it says, "The assistant | 23    A.  I don't know. |
| 24 secretary agreed to meet with us to discuss the | 24    Q.  Okay.  Do you keep yourself informed |
| 25 issues facing the problem" -- "program," sorry. | 25 about what the Alliance is doing in its discussions |

| Page 207 | Page 209 |
|---|---|
| 1    A.  Uh-huh. | 1 with Congress or federal agencies? |
| 2    Q.  "And we are now trying to confirm that | 2    A.  The Alliance, such as this document we're |
| 3 meeting for early next year." | 3 looking at, sends out periodic updates about what |
| 4    Do you know what issues facing the | 4 they're doing as an organization. |
| 5 program Mr. McCarry was referring to? | 5    Q.  Do you generally read those updates? |
| 6    A.  Well, there has been proposed rulemaking | 6    A.  I do.  I mean, if I -- they send out, I |
| 7 happening at ECA for a really long time.  And so, I | 7 think, a weekly one or a monthly one.  I don't |
| 8 mean, he's referencing it below here, "A new | 8 always reed that one.  But ones like these I usually |
| 9 rulemaking finally appears to be in the works." | 9 review and... |
| 10    Trying to gain a better | 10    Q.  Is there anyone else within A.P.E.X. or |
| 11 understanding from the Department of State about | 11 20/20 who would have responsibility for reviewing |
| 12 what's -- what's in that rulemaking.  Congressional | 12 and keeping on top of these sorts of communications? |
| 13 funding.  I mean, the Alliance is working on all | 13    A.  No. |
| 14 different types of topics with the Department of | 14    Q.  Specific -- sorry. |
| 15 State. | 15    A.  I was just going to say, you know, |
| 16    Q.  Then part 3(b) of this e-mail -- | 16 there -- there's a lot of things that the Alliance |
| 17    A.  Uh-huh. | 17 does that don't pertain to the au pair program, so I |
| 18    Q.  -- says that, "Congress requested that | 18 kind of just look for what pertains to what we're |
| 19 ECA provide the State-Foreign Operations | 19 doing and what I need to know. |
| 20 Subcommittee with its perspective on the issue of a | 20    Q.  Did Congress' request to the ECA raise |
| 21 national stipend versus state and local minimum | 21 any concerns for you? |
| 22 wages." | 22    A.  No. |
| 23    Do you -- do you know whether ECA | 23    Q.  Did you think that the Alliance needed a |
| 24 did provide its perspective on that issue? | 24 strategy for dealing with Congress' request to the |
| 25    A.  I don't. | 25 ECA that's referenced in that e-mail? |

**MAGNA**
LEGAL SERVICES

| Page 210 | Page 212 |
|---|---|

**Page 210**

1   A.   Can you repeat the question?  I just want
2  to...
3   Q.   Did you think that the Alliance needed a
4  strategy for dealing with Congress' request to the
5  ECA to provide the State-Foreign Operations
6  Subcommittee with its perspective on the issue of a
7  national stipend versus state and local minimum
8  wages?
9   A.   I think anybody needs a strategy dealing
10  with Congress, to be honest.  So -- so, I mean, the
11  Alliance -- I mean, just to be totally frank, right?
12      So Evan Ryan, as sort of the
13  overseeing ECA, and she had people under her that
14  were managing the program on a day-to-day basis.
15  And I'm -- and I'm pretty sure that Michael
16  McCarry's reference here to a meeting with Secretary
17  Ryan -- Evan Ryan, excuse me, was to, you know,
18  bring her up to date on the Alliance's perspective
19  about this issue.
20   Q.   Do you know what the Alliance's
21  perspective was?
22   A.   I don't really want to speak for what the
23  Alliance's --
24   Q.   Did the Alliance communicate to you what
25  their perspective was?

**Page 211**

1   A.   Not in a specific way, but I -- I believe
2  that it's the same as sponsors, is that it's always
3  been mandated by federal wage, federal minimum wage.
4   Q.   That what has already -- always been
5  mandated?
6   A.   That the au pair stipend is based on
7  federal minimum wage.
8   Q.   And so that there is a national stipend?
9  Is that your perspective?
10   A.   There's a stipend that's provided -- that
11  governs the J-1 au pair program.
12   Q.   And that stipend is a national stipend?
13   A.   It's based on federal minimum wage.
14   Q.   So is it a national stipend?
15   A.   I don't know if that means national or --
16   Q.   Does it vary state by state?
17   A.   No.
18   Q.   What is the basis for your understanding
19  that that is the Alliance's perspective?
20   A.   Well, that's my assumption that would be
21  their understanding.  I -- I don't know
22  specifically.
23   Q.   How does the Alliance generate
24  perspectives like that?  How does it decide?  Do you
25  have an understanding of how the Alliance decides

**Page 212**

1  what positions to take on issues such as this?
2   A.   Not specifically, no.
3   Q.   Do you ever receive a request for your
4  perspective from the Alliance so that they can help
5  generate their perspective?
6   A.   I don't remember specific requests to
7  A.P.E.X. or 20/20 about our perspective on this
8  topic.
9   Q.   Did you participate in any discussion in
10  which you provided your perspective on this topic?
11   A.   No.
12   Q.   Did you participate in any discussion in
13  which anyone else provided their perspective on this
14  topic?
15   A.   No.
16   Q.   So you have no knowledge of how the
17  Alliance would have generated its perspective on
18  this topic?
19   A.   No.
20   Q.   Okay.  Did you discuss Congress' request
21  to the ECA with anyone?
22   A.   No.
23      (Exhibit No. 25 was marked.)
24   Q.   Let's look at Exhibit 25, which is
25  APEX-20/20 494.

**Page 213**

1   A.   Uh-huh.
2   Q.   And this is a -- do you recognize this
3  document?
4   A.   Yes, I do.
5   Q.   And this is an e-mail from Mr. Zherka?
6   A.   Uh-huh.
7   Q.   By this point in time was Mr. Zherka the
8  Alliance executive director?
9   A.   I believe so.
10   Q.   It says, "We" -- "Greetings, we have some
11  very good news to share.  The appropriations
12  subcommittee staff jointly asked ECA for a verbal
13  briefing on the stipend question rather than a
14  written report."
15      Why was this good news?
16      MR. STONE:  Objection.  Form.
17   Q.   Actually, that's a good objection.  Let
18  me ask a different question.
19      Did you agree that that was good
20  news?
21   A.   I didn't really have an opinion on
22  whether that was good news or not.
23   Q.   Did you have an understanding as to why
24  Mr. Zherka was saying it was good news?
25   A.   He probably thought it was good news.

Case 1:14-cv-03074-CMA-KMT   Document 945-22   Filed 03/17/18   USDC Colorado   Page 36
of 310

| Page 214 | Page 216 |
|---|---|

**Page 214**

1  I -- I don't have a specific -- I don't have a basis
2  for why he would have specifically said that, except
3  that it's -- he alludes to he thinks a verbal
4  briefing is better than a written report.  But I
5  don't know why one would be better than the other.
6      Q.   Is it better because it doesn't generate
7  any documents that will be preserved?
8      MR. STONE:  Objection.  Form.
9  Foundation.
10     A.   I don't know.
11     Q.   Okay.  It says, "Additionally, the
12 majority staff communicated to ECA that they believe
13 it would be inappropriate to make new policy through
14 a report to their committee."
15         And it says, "Those are both
16 things we wanted and got.  So two big wins thus far,
17 with the caveat that unexpected things can still
18 happen.  We'll remain vigilant."
19         Did you agree that -- well, I'll
20 take them in turn.
21         Did you agree that the verbal
22 briefing rather than written report was a big win?
23     MR. STONE:  Objection.  Form.
24 Foundation.
25     A.   You know, like I said, I don't -- I don't

**Page 215**

1  really -- this is all in-depth government Congress
2  stuff.  I -- I don't -- I don't have -- I don't -- I
3  don't know if that was a big win or not.
4      Q.   Did you agree that the majority staff
5  communicating to ECA that they believed it would be
6  inappropriate to make new policy through a report to
7  their committee was a big win?
8      MR. STONE:  Objection.  Form.  Asked
9  and answered.
10     A.   A.P.E.X. didn't participate in that, nor
11 did 20/20, so...
12     Q.   But did you -- do you have an opinion as
13 to whether that was a big win?
14     MR. STONE:  Objection.  Form.  Asked
15 and answered.
16     MR. LIBLING:  I haven't actually
17 asked about the second one yet.
18     MR. STONE:  You know what the answer
19 is.  It's been asked and answered.
20         Go ahead and answer again.
21     A.   I don't know what "big win" means.
22     Q.   Okay.  Did you think it was better that
23 the majority staff communicated to ECA that they
24 believed it would be inappropriate to make new
25 policy through a report to their committee than them

**Page 216**

1  not having made that communication?
2      A.   I'm sorry, can you repeat the question?
3  Did I?
4      Q.   Did you think that it was preferable that
5  the majority staff communicated to ECA that they
6  believe it would be inappropriate to make new policy
7  through a report to their committee than the
8  majority staff not having made that communication?
9      A.   Honestly, I didn't really have an opinion
10 on it.  And, you know, I produced this e-mail
11 because it was part of the discovery.  But I
12 don't -- I don't recall, like, reading this document
13 and being like good news, big win.  I -- I just
14 don't really have a recollection of having a
15 reaction to this -- this e-mail.
16     Q.   The next paragraph says, "We'll be
17 providing information in support to both sets of
18 staffers and will try to thoroughly brief the
19 majority of staff beforehand."
20         Do you have any knowledge as to
21 whether that happened?
22     A.   I don't -- I don't know.
23     Q.   Do you recall -- do you recall any
24 discussions with the Alliance or with other sponsors
25 about -- about that briefing, whether or not it

**Page 217**

1  occurred?
2      A.   I -- no, I don't have any recollection of
3  that.
4          Actually, to clarify.  No, I don't
5  recall any of those -- it's not that I don't have a
6  recollection.  The answer is no.
7      Q.   So the record's clear, the answer is no,
8  you did not have those conversations?
9      A.   Yes.
10     Q.   Okay.  The next paragraph says,
11 "Additionally, we will keep pushing forward on the
12 larger Congressional engagement strategy because we
13 know that Robin hopes to change the stipend
14 calculation at some point."
15         Who is Robin?
16     A.   That's referring to Robin Lerner.
17     Q.   Who is Robin Lerner?
18     A.   She was the deputy assistant secretary at
19 the time of this e-mail.
20     Q.   Did you have -- do you know why Robin
21 hoped to change the stipend calculation?
22     A.   I have --
23     MR. STONE:  Objection.  Form.
24     A.   I don't know.
25     Q.   Did you have any discussions with --

PLAINTIFFS' RESP. APP.0004554

MAGNA
LEGAL SERVICES

---

Page 218

1  let's start with Robin. Did you have any
2  discussions with Robin on this topic?
3       A.  No.
4       Q.  Did you have any discussions with other
5  sponsors on this topic?
6       A.  No.
7       Q.  Did you have any discussions with
8  Alliance on this topic?
9       A.  No.
10      Q.  Did you have any discussions with anyone
11 on this topic?
12      A.  With my staff on this topic.
13      Q.  What were your discussions -- who -- who
14 on your staff did you discuss this with?
15      A.  With Susan.
16      Q.  And what was the subject?  Well, sorry.
17          What did you say to Susan?
18      A.  I don't remember what I specifically said
19 to Susan, but at this time there's a lawsuit in play
20 regarding the au pair stipend. And so, you know,
21 obviously, you know, we're discussing the basis --
22 not -- not the basis for the lawsuit, but it does
23 come up from time to time about why is there this
24 lawsuit.
25      Q.  Do you remember anything more specific

Page 219

1  about your discussion?
2       A.  Just that it's A.P.E.X.'s belief, and it
3  always has been, that there's a minimum stipend for
4  au pairs based on federal minimum wage, and that our
5  professionals have always gotten paid more, and
6  that's been the company's understanding.
7       Q.  And just to be clear, that minimum that
8  you referred to is 195.75?
9       A.  Yes.
10      Q.  But you don't have -- do you have any
11 recollections of any specific conversations with
12 Susan about Robin hoping to change the stipend
13 calculation?
14      A.  No.
15      Q.  About anybody trying in any way to change
16 the stipend calculation?
17      A.  No. But I hesitate because we've been
18 waiting for the Department of State to re-regulate
19 the program for years and years and years on things
20 that do need regulating, like the education
21 component and things like that. And so, you know...
22      Q.  So?
23      A.  So, you know, that's what I would be more
24 interested in. I mean, I don't know.
25      Q.  Next sentence says, "So next Thursday we

Page 220

1  are meeting with some of the officers we identified
2  last week. EF and AIFS have helped set up those
3  meet" -- "have helped set those meetings up and will
4  be attending them with us."
5          Do you know what "EF" refers to?
6       A.  Education Foundation.
7       Q.  And do you know what "AIFS" refers?
8       A.  American Institute of Field Studies or
9  Foreign Studies.
10      Q.  Foreign, okay.
11          Were you involved in any way in
12 helping to set those meetings up or in attending?
13      A.  No.
14      Q.  Do you have any knowledge about what was
15 discussed at those meetings?
16      A.  No.
17      Q.  And the last sentence says, "We are
18 putting our heads together with the other lobbyists
19 next week to decide on messages and requests for
20 each office."
21          Do you have any knowledge about
22 these discussions with lobbyists?
23      A.  No.
24      Q.  Do you have any knowledge about any
25 decisions on messages or requests for each office?

Page 221

1       A.  No, I don't.
2       Q.  And the last sentence says, "We'll set up
3  a conference call on either February 5 or 8 to share
4  reports from the various meetings and to discuss
5  next steps."
6          Do you know whether that
7  conference call occurred?
8       A.  I don't.
9       Q.  Do you know that it did not occur, or you
10 just don't know one way or another?
11      A.  I just don't know one way or the other.
12      Q.  If it did occur -- you don't know whether
13 it occurred?
14      A.  Uh-huh.
15      Q.  I don't know. I'm sorry, struggling to
16 phrase this question.
17          Is it possible that you attended
18 that conference call and have forgotten? Or is it
19 the case that if the call occurred, you weren't on
20 it?
21      A.  Either one's possible. I honestly
22 don't -- I mean, I am on Alliance calls from time to
23 time, but I don't remember that, if I was on that
24 specific call. I don't recall.
25      Q.  How frequently are you on Alliance calls?

MAGNA
LEGAL SERVICES

Page 222

1    A.   The -- the Alliance holds different calls
2  on different topics.  I don't know how often they
3  have them, maybe, like, once a quarter.  And I may
4  or may not attend, depending on my schedule or the
5  topic.
6    Q.   Approximately, how often do you think you
7  do attend?
8    A.   Maybe, like -- well, it's hard to say.
9  There have been more calls because of Donald Trump's
10  election, and just advocacy around the cultural
11  exchange industry in general in light of an
12  administration change.  But maybe, like, once a
13  quarter at the most.
14    Q.   Okay.
15       MR. HUEY:  Sorry, Josh.  I think we
16  promised the court reporter to take a break every
17  hour and a half or so so she can --
18       MR. LIBLING:  Oh, right.  I'm happy
19  to take a break now.  I probably only have one more
20  document before I'm done.
21       It's up to you guys.  If you want
22  that take a break now, we can take a break.  You do?
23  Okay.  Let's take a short break.
24       THE VIDEOGRAPHER:  Going off the
25  record at 2:40.  This marks the end of media 3.

Page 223

1       (Break from 2:40 p.m. to
2            2:49 p.m.)
3       THE VIDEOGRAPHER:  This marks the
4  start of media 4 of the video deposition of Heidi
5  Mispagel, 30(b)(6) representative for A.P.E.X. and
6  20/20.  We're back on the record.  The time is 2:49.
7       MR. LIBLING:  All right.  So would
8  you mind reading back the last question and answer.
9       (Record read.)
10  BY MR. LIBLING:
11    Q.   So have you attended any Alliance calls
12  related to this litigation?
13    A.   There haven't been any calls related to
14  this litigation.
15    Q.   So no?
16    A.   No.
17    Q.   And have you attended any Alliance calls
18  where the stipend was discussed?
19    A.   No.
20    Q.   Have you attended any calls where a
21  credit or deduction for room and board was
22  discussed?
23    A.   No.
24       (Exhibit No. 26 was marked.)
25    Q.   I'm handing you Exhibit 26, which is

Page 224

1  APEX-20/20 493.
2       Do you recognize this document?
3    A.   Yes.
4    Q.   What is this document?
5    A.   So this document -- so I -- if I remember
6  correctly, the Department of State had extending --
7  extended an invitation to au pair sponsors to come
8  to D.C. to have a meeting with them.
9       And I believe what this e-mail is
10  is Ilir's response to Robin Lerner's -- to Robin
11  Lerner, letting them know that -- yeah, but
12  basically we -- we did not want to go to the
13  Department of State and have a conversation with
14  them about the history of au pair stipends.  That if
15  sponsors were to go to the Department of State, we
16  would be happy to engage -- this is Ilir's words --
17  in a conversation about the stipend going forward.
18    Q.   Why were you -- why did you draw that
19  distinction between the stipend going forward versus
20  the history of the stipend?
21    A.   In light of the lawsuit.
22    Q.   What about the lawsuit made you think
23  that that distinction was important?
24    A.   Because the lawsuit precedences the
25  stipend and what the -- basically, we didn't want to

Page 225

1  go back to -- let me -- let me restart answering
2  this question.
3       That sponsors -- well, I can speak
4  on behalf of A.P.E.X.  I can't say sponsors in
5  general because I don't know what other sponsors
6  think.
7       But A.P.E.X.'s understanding has
8  always been that the stipend has been a minimum
9  stipend based on federal minimum wage.  And, you
10  know, we would not be interested in going to an
11  Alliance -- or a meeting at the Department of State
12  and hearing otherwise, to have them go back and try
13  and tell us something that's different than what has
14  always been our understanding for the stipend.
15       And in light of the lawsuit, you
16  know, we felt that the Alliance felt that that was
17  not a conversation we were willing to engage in.
18  But if it's about future regulation and to have
19  sponsors come and participate in rulemaking around
20  the wage issue for the future, we would be happy to
21  participate in that effort.
22    Q.   Did you -- in forming the opinion you
23  just explained, did you have any conversations with
24  anybody else?
25    A.   No.

Page 226

```
 1      Q.  So you haven't discussed that opinion
 2  internally at A.P.E.X., 20/20 with anyone else?
 3      A.  Well, I've discussed it with Susan
 4  because that's always been our understanding, that
 5  that's -- and with the staff too, that that's the
 6  minimum wage, that 195.75 for regular au pairs.
 7      Q.  But specifically not wanting to talk to
 8  the Department of State about the history of the
 9  stipend?
10      A.  Oh.
11      Q.  Is that something that you've
12  discussed --
13      A.  No, I --
14      Q.  -- internally at A.P.E.X.?
15      A.  No.
16      Q.  Is it something you discussed with the
17  Alliance?
18      A.  No.
19      Q.  Is it something you discussed with any
20  sponsors?
21      A.  No.
22      Q.  So that's just -- that's your view?
23      A.  That's my view, based on my history in
24  the -- managing au pair programs.
25      Q.  Do you have any understanding of the
```

Page 227

```
 1  Alliance's view?
 2      A.  I think the Alliance's view -- I don't
 3  have a firm confirmation of this, but I think that
 4  their view is similar to my view.
 5      Q.  Do you know whether a conversation about
 6  the stipend perspectively ever occurred with the
 7  Department of State?
 8      A.  No, I don't believe so.
 9      Q.  You don't believe it occurred, or you
10  don't -- or you don't know?
11      A.  I -- I don't -- I don't know.
12      Q.  You don't know, okay.
13          Do you know whether a conversation
14  about the history of the stipend occurred between
15  the Alliance and the Department of State?
16      A.  I don't know.
17      Q.  Do you know whether the Alliance attended
18  the May 2nd meeting?
19      A.  I'm trying to think if there was a
20  May 2nd meeting, to be honest.  So I don't know.
21      Q.  Do you know whether there was a May 2nd
22  meeting?
23      A.  I don't believe -- I don't believe that
24  there was a May 2nd meeting.  I -- I'm not sure.
25      Q.  Was there a meeting on this topic at some
```

Page 228

```
 1  other time?
 2      A.  Not to my knowledge.
 3      Q.  This e-mail says, "I am attaching a draft
 4  of suggested discussion items and welcome your
 5  thoughts."
 6          Do you know whether you received
 7  that draft?
 8      A.  I don't, but I can check my e-mails and
 9  see if there was a draft attached.
10      Q.  I -- I don't believe the -- I -- I don't
11  believe a draft was -- was produced attached to
12  this -- to this e-mail anyway.
13      A.  Okay.
14      Q.  So if you could check, we would
15  appreciate it.
16      A.  Okay.
17      Q.  Were you involved in the -- were you
18  involved in the au pair program in 2009 with any
19  sponsor?
20      A.  Me personally?
21      Q.  Yeah, you personally.
22      A.  Yes, I was.
23      Q.  Remind me, who were you --
24      A.  AuPairCare.
25      Q.  AuPairCare.
```

Page 229

```
 1          Are you aware of a 2009 meeting
 2  between sponsors and the Department of State
 3  concerning increases in the minimum wage?
 4      A.  No, I'm not aware of a meeting about the
 5  wages for au pairs.
 6      Q.  In your position at AuPairCare at that
 7  time, if there had been such a meeting would you
 8  have been the one to attend?
 9      A.  Well, I was pregnant at the time, so I
10  probably wouldn't have attended.  It may have been
11  that the president of Intrax might have attended or
12  another staff member.  But I don't recall a meeting
13  specific to stipend ever held by the Department of
14  State, but I'm -- I'm not sure.
15      Q.  Okay.  Are you aware of notices issued by
16  the Department of State around the time of the
17  increase in the minimum wage around 2009?
18      A.  Yes.
19      Q.  Have you ever sought legal advice as to
20  whether those notices have -- are legally binding?
21  And I just want a yes-or-no answer that question.
22          MR. STONE:  In what time frame?
23          MR. LIBLING:  Ever.  No, let's make
24  it before the litigation commenced.
25          MR. STONE:  Okay.  And then
```

## Page 230

1 presumably after the designation of the A.P.E.X.
2 sponsorship in 2011?
3 MR. LIBLING: This is a 30(b)(6)
4 deposition. That's an appropriate qualification.
5 MR. STONE: Okay.
6 You can answer.
7 A. Can you repeat the question? I'm sorry.
8 Q. I can try. Let's see. All right. The
9 time frame for this question is since A.P.E.X.,
10 20/20 was designated -- A.P.E.X. or 20/20 --
11 A. Uh-huh.
12 Q. -- was designated as a sponsor to the
13 commencement of litigation.
14 A. Uh-huh.
15 Q. This litigation.
16 And the question is: Have you
17 ever sought legal advice as to whether the notices
18 from 2009 that we were discussing are legally
19 binding?
20 A. Well, A.P.E.X. and 20/20 didn't receive
21 those notices.
22 Q. But do you -- but you are aware of those
23 notices as part of your work for A.P.E.X., 20/20?
24 A. Yeah. I'm aware of those notices based
25 on my time at AuPairCare, but --

## Page 231

1 Q. Do you -- sorry.
2 A. We never sought legal -- we -- we have
3 not sought legal advice on stipends, outside of what
4 the Department of State has informed us.
5 Q. Okay.
6 MR. LIBLING: I don't have any
7 further questions. Thank you for your time.
8 THE WITNESS: Thank you.
9 MR. STONE: Thank you.
10 THE VIDEOGRAPHER: Going off the
11 record at 3:01. This marks the end of media 4 of 4.
12 (Whereupon, the deposition concluded at
13 3:01 p.m., May 2, 2017.)

## Page 232

SIGNATURE OF WITNESS

I, HEIDI MISPAGEL, the witness in the above deposition, have read the within transcript of my testimony. I have made _____ changes in said testimony and have stated such changes (if any) and the reason for each change on a separate sheet attached to this transcript. My testimony as given herein is true and correct, to the best of my knowledge and belief.

_____
HEIDI MISPAGEL

Subscribed and sworn to before me this _____ day of _____, 2017.

_____
Notary Public

My commission expires _____.

## Page 233

- AMENDMENT SHEET -
Deposition of HEIDI MISPAGEL
taken on May 2, 2017
The deponent wishes to make the following changes in the testimony as originally given:
PAGE/LINE     SHOULD READ     REASON FOR CHANGE
_____ _____
_____ _____
_____ _____
_____ _____
_____ _____
_____ _____
_____ _____
_____ _____
_____ _____
_____ _____
_____ _____
_____ _____
_____ _____
_____ _____
_____ _____

Subscribed and sworn to before me this _____ day of _____, 2017.

_____
Notary Public
My commission expires _____.

Page 234

```
 1              REPORTER'S CERTIFICATE
 2         I, LEEANN L. KEENAN, Registered Merit
 3    Reporter and Certified Realtime Reporter within
 4    Colorado, appointed to take the videotaped 30(b)(6)
 5    deposition of HEIDI MISPAGEL, do hereby certify that
 6    before the deposition she was duly sworn by me to
 7    testify to the truth; that the deposition was taken by
 8    me at 5619 DTC Parkway, Greenwood Village, Colorado;
 9    then reduced to typewritten form herein; that the
10    foregoing is a true transcript of the questions asked,
11    testimony given and proceedings had.
12
13         I further certify that I am not related to
14    any party herein or their Counsel, and have no interest
15    in the result of this litigation.
16
17         In witness hereof I have hereunto set my
18    hand this 15th day of May, 2017.
19
20         _____
           Leeann L. Keenan
21         Registered Merit Reporter
           Certified Realtime Reporter
22         and Notary Public
23
24    My commission expires June 8, 2020
25
```

PLAINTIFFS' RESP. APP.0004559

MAGNA
LEGAL SERVICES

Case No. 1:14-cv-03074-CMA-KMT Document 959-24 filed 03/30/18 USDC Colorado pg 43 of 311

# Exhibit 407

PLAINTIFFS' RESP. APP.0004560

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE STATE OF COLORADO


JOHANA PAOLA BELTRAN, et )
al.,                      )
          Plaintiffs,     )
vs.                       ) Case No.:  14-cv-03074
                          )            CMA-KMT
                          )
INTEREXCHANGE, INC., et   )
al.,                      )
          Defendants.     )
_____ )




VIDEOTAPED DEPOSITION of AUPAIRCARE, INC.,

pursuant to Rule 30(b)(6), designee

SARAH MCNAMARA

Thursday, May 4, 2017




MAGNA LEGAL SERVICES

866-624-6221

www.MagnaLS.com




Taken before:
HEIDI BELTON, CSR, RPR, CRR, CCRR, CLR
CSR No. 12885

PLAINTIFFS' RESP. APP.0004561

MAGNA
LEGAL SERVICES

**Page 2**

1      Thursday, May 4, 2017
2
3
4          Videotaped deposition of SARAH MCNAMARA,
5      held at the offices of GORDON & REES,
6      275 Battery Street, Suite 2000, San
7      Francisco, California, before Heidi
8      Belton, a Certified Shorthand Reporter,
9      Registered Professional Reporter,
10     Certified Realtime Reporter, California
11     Certified Realtime Reporter, Certified
12     LiveNote Reporter, and NCRA Realtime
13     Systems Administrator.
14
15
16
17
18
19
20
21
22
23
24
25

**Page 4**

1      APPEARANCES (Continued):
2
      For APF Global Foundation:
3           FISHER & PHILLIPS LLP
            BY: SUSAN M. SCHAECHER, ESQ.  (via phone)
4           1801 California Street, Suite 2700
            Denver, Colorado 80202
5           (303) 218-3650
            sschaecher@fisherphillips.com
6
7      For ProAuPair, APEX Professional Exchange and 20/20
      Care Exchange d/b/a International Aupair Exchange:
8           NIXON SHEFRIN HENSEN OGBURN P.C.
            BY: MICHAEL S. DREW, ESQ.  (via phone)
9           5619 DTC Parkway, Suite 1200
            Greenwood Village, Colorado 80111
10          (303) 773-3500
            mdrew@nixonshefrin.com
11
12     Also Present:  Marcie Schneider; Daniel Stroud,
      videographer
13
14                  ---oOo---
15
16
17
18
19
20
21
22
23
24
25

**Page 3**

1      APPEARANCES:
2      For the Plaintiffs:
            BOISE, SCHILLER, FLEXNER, LLP
3           BY: SEAN PHILLIPS RODRIGUEZ, ESQ.
            JUAN P. VALDIVIESO, ESQ.
4           1999 Harrison Street, Suite 900
            Oakland, California 94612
5           (510) 874-1010
            srodriguez@bsfllp.com
6           jvaldivieso@bsfllp.com
7
      For Cultural Care:
8           CHOATE, HALL & STEWART
            BY: LYNDSEY KRUZER, ESQ.  (via phone)
9           Two International Place
            Boston, Massachusetts 02110
10          (617) 248-5221
            lkruzer@choate.com
11     and
            LEWIS, ROCA, ROTHGERBER, CHRISTIE
12          BY: JESSICA FULLER, ESQ.  (via phone)
            1200 17th Street, Suite 3000
13          Denver, Colorado 80202
            (303) 628-9527
14
15     For AuPairCare, Inc.:
            GORDON & REES
16          BY: THOMAS B. QUINN, ESQ.
            555 17th Street, Suite 3400
17          Denver, Colorado 80202
            (303) 200-6888
18          tquinn@gordonrees.com
19
      For InterExchange, Inc.:
20          SHERMAN & HOWARD, LLC
            BY: JOSEPH H. HUNT, ESQ.  (via phone)
21          633 17th Street, Suite 3000
            Denver, Colorado 80202
22          (303) 299-8302
            jhunt@shermanhoward.com
23
24
25

**Page 5**

1      THURSDAY, MAY 4, 2017             11:47 A.M.
2             P R O C E E D I N G S
3          THE VIDEOGRAPHER:  Good morning, ladies
4      and gentlemen.  We're on video record.
5          The time is 11:47 a.m.  Today's date is
6      May 4, 2017.  This begins video 1, Volume I in the
7      30(b)(6) deposition of Sarah McNamara.  In the case
8      JP Beltran versus InterExchange, Incorporated,
9      et al., appearing before the United States District
10     Court, District of Colorado.  Case number
11     14-CV-03074.
12         We're located today at 275 Battery Street,
13     San Francisco, California.  My name is Daniel
14     Stroud; I'm your video specialist.  Our court
15     reporter is Ms. Heidi Belton.  We're with Magna
16     Legal Services.
17         Would all counsel please identify
18     themselves for the record.
19         MR. RODRIGUEZ:  Sean Rodriguez; Boise,
20     Schiller, Flexner, for the plaintiffs.
21         MR. VALDIVIESO:  Juan Valdivieso; Boise,
22     Schiller, Flexner, for the plaintiffs.
23         MR. QUINN:  Tom Quinn, on behalf of the
24     defendant AuPairCare and Ms. McNamara.
25         MR. RODRIGUEZ:  And if no one on the phone

MAGNA ▶
LEGAL SERVICES

| | Page 18 |
|---|---|
| 1 | $195.75 per week. So our role is to make sure that |
| 2 | she's paid that amount. And if host families feel |
| 3 | that they want to pay more, they can, but we need to |
| 4 | ensure that at least they were paid the $195.75. |
| 5 | Q. So the phrase "at least" modified your |
| 6 | last sentence. And now I'm very confused. |
| 7 | Is it in fact AuPairCare's position that |
| 8 | au pairs must be paid at least $195.75? |
| 9 | A. They need to be paid $195.75. |
| 10 | Q. Okay. So if a host family chooses to pay |
| 11 | more than $195.75, is it AuPairCare's position that |
| 12 | the host family is violating the Department of |
| 13 | State's requirements? |
| 14 | A. No. |
| 15 | Q. Why? |
| 16 | A. Because they're -- they're paying $195.75, |
| 17 | and that's what we need to ensure that they're paid. |
| 18 | Q. Is it fair to characterize what you just |
| 19 | said as treating $195.75 as a minimum stipend? |
| 20 | MR. QUINN: Object to form. |
| 21 | BY MR. RODRIGUEZ: |
| 22 | Q. Is there anything unclear about my |
| 23 | question? |
| 24 | A. Can you repeat it? |
| 25 | Q. Yeah. I believe you testified that |

| | Page 19 |
|---|---|
| 1 | AuPairCare does not believe a host family is |
| 2 | violating the Department of State's requirements if |
| 3 | they choose to pay more than $195.75; is that fair? |
| 4 | A. Yes. |
| 5 | Q. Okay. Now I asked is it fair to |
| 6 | characterize that position as treating $195.75 as a |
| 7 | minimum stipend? |
| 8 | MR. QUINN: Object to form. Go ahead. |
| 9 | (Telephonic interruption.) |
| 10 | THE WITNESS: Repeat it again? Sorry. |
| 11 | BY MR. RODRIGUEZ: |
| 12 | Q. I'll ask it a different way. |
| 13 | MR. QUINN: Hang on. |
| 14 | Whoever just joined, would you please put |
| 15 | your mute on? |
| 16 | Sorry. |
| 17 | MR. RODRIGUEZ: That's okay. |
| 18 | MR. QUINN: Let's get this cleared up. |
| 19 | MR. RODRIGUEZ: Thank you. |
| 20 | Q. May I call AuPairCare APC? |
| 21 | A. Sure. |
| 22 | Q. True or false: APC is responsible for |
| 23 | ensuring that host families follow Department of |
| 24 | State directives? |
| 25 | A. True. |

| | Page 20 |
|---|---|
| 1 | Q. True or false: APC understands DoS has |
| 2 | issued a directive stating that the stipend must |
| 3 | equal $195.75? |
| 4 | A. APC's understanding of the Department of |
| 5 | State guidelines is, yes, the au pair should receive |
| 6 | $195.75 weekly stipend. |
| 7 | Q. My question was about a directive stating |
| 8 | that the stipend must equal. And I believe you |
| 9 | answered in terms of "should receive." So I'm going |
| 10 | to ask again. |
| 11 | Is it APC's understanding that DoS has |
| 12 | issued a directive stating that the stipend must |
| 13 | equal $195.75? |
| 14 | A. No. |
| 15 | Q. Can you articulate what APC understands |
| 16 | DoS to require concerning the stipend? |
| 17 | A. Sure. I'll repeat what I just said. |
| 18 | Our understanding is that per the |
| 19 | Department of State, that host families should pay |
| 20 | the au pair $195.75 per week. |
| 21 | Q. "Should pay." That means that DoS does |
| 22 | not have a requirement of $195.75 a week; is that |
| 23 | right? |
| 24 | MR. QUINN: Object to form. |
| 25 | THE WITNESS: The guidance that we |

| | Page 21 |
|---|---|
| 1 | received is that the au pair needs to be paid $195. |
| 2 | So it needs, should, yeah. |
| 3 | BY MR. RODRIGUEZ: |
| 4 | Q. So your testimony is that needs to be paid |
| 5 | and should pay are synonymous? |
| 6 | A. If they want to participate in the |
| 7 | program, yes. |
| 8 | Q. So -- so your testimony is "should pay" |
| 9 | and "needs to be paid" are synonymous; correct? |
| 10 | A. Yes. |
| 11 | Q. However, it is also your testimony that |
| 12 | "must be paid" has a different meaning than "needs |
| 13 | to be paid"; is that accurate? |
| 14 | A. Sure. |
| 15 | Q. What's the difference? |
| 16 | A. I -- I think we're going back to semantics |
| 17 | here. My -- my -- our main goal as an agency is |
| 18 | that the au pair -- 195 is what the host family |
| 19 | needs to pay the au pair per week, $195.75. |
| 20 | Q. How would you describe a situation where a |
| 21 | host family chooses to pay an au pair more than |
| 22 | $195.75? |
| 23 | A. So our role per the Department of State is |
| 24 | to monitor placements. So we monitor placements in |
| 25 | that we're talking to both the au pair and the host |

MAGNA ▶
LEGAL SERVICES

Case 1:14-cv-03074-CMA-KMT   Document 918-59   Filed 03/17/18   USDC Colorado   Page 46 of 310

Page 22

1  family to -- per regulations to see how their
2  placement is going and we would be alerted if an
3  au pair was not receiving the $195.75, but he would
4  not be informed an au pair was receiving more than
5  that.  So that's -- that's how we would be --
6      Q.  But -- okay.  So if I'm understanding your
7  testimony correctly, "needs to be paid $195.75" is
8  the same as "needs to be paid a minimum of $195.75";
9  is that accurate?
10     A.  Yes.
11     Q.  So it would be contrary to AuPairCare's
12  understanding of the Department of State's position
13  if AuPairCare had ever represented that the stipend
14  must be $195.75, no more, no less; is that right?
15         MR. QUINN:  Object to form.
16         THE WITNESS:  No.
17  BY MR. RODRIGUEZ:
18     Q.  Why?
19     A.  Because our understanding -- that's a --
20  we have to put a -- a number out there for host
21  families to -- to -- to base this decision on, to
22  participate in the au pair program.  So that's the
23  weekly stipend that the --
24         (Telephonic interruption.)
25         -- department of State gave to us and

Page 23

1  that's what we informed the host family to the best
2  of our -- to the best of our knowledge.
3      Q.  Okay.  So if AuPairCare required host
4  families to pay $195.75 to au pairs, no more, no
5  less, would that accurately reflect AuPairCare's
6  understanding of the Department of State's position?
7      A.  No, because we -- our role is to ensure
8  that the au pair is paid $195.75.
9      Q.  No more, no less; right?
10     A.  Our role as a designated sponsor is to
11  ensure that she's paid $195.75.  And we're not -- if
12  au pairs are paid more than that, there's -- we're
13  not monitoring that.  But we need to ensure that
14  she's paid $195.75 a week per -- per the Department
15  of State.
16     Q.  Now ensuring someone is paid $195 a week,
17  does that mean that the au pair must be paid at
18  least $195.75 a week but could be paid more?
19     A.  Yes.
20     Q.  So when you say that APC ensures that
21  au pairs are paid $195.75 a week what you actually
22  mean is ensuring that au pairs are paid at least
23  $195.75 a week --
24         MR. QUINN:  Object --
25  BY MR. RODRIGUEZ:

Page 24

1      Q.  -- fair?
2          MR. QUINN:  Object to form.
3          MR. RODRIGUEZ:  I take that objection.
4  Let me try it again.
5      Q.  Is it accurate to say that ensuring
6  au pairs are paid $195.75 a week is the very same as
7  ensuring au pairs are paid at least $195.75 a week?
8      A.  Yes.
9          MR. RODRIGUEZ:  I am marking what's going
10  to be Exhibit 8.  Bears the Bates number APC 000489.
11             (Exhibit 8 marked.)
12  BY MR. RODRIGUEZ:
13     Q.  Ms. McNamara, do you recognize the
14  document marked as Exhibit 8?
15     A.  Yes.
16     Q.  What is the document marked as Exhibit 8?
17     A.  It's an e-mail communication to au pairs.
18     Q.  Where have you seen Exhibit 8 before?
19     A.  Where have I seen it?  Um -- can you -- in
20  what context.
21     Q.  Have you seen Exhibit 8 before in any
22  context?
23     A.  Yes.
24     Q.  Okay.  What was the context?
25     A.  In my capacity working for AuPairCare.

Page 25

1      Q.  And did you have any role in the drafting
2  of Exhibit 8?
3      A.  I don't believe I had a role in drafting
4  it, but -- I don't believe I -- I maybe gave
5  feedback on the content.
6      Q.  Did you approve the content of Exhibit 8?
7      A.  I don't recall.
8      Q.  Fair to say that Exhibit 8 reflects APC's
9  position as of the date of Exhibit 8; no?
10         MR. QUINN:  Object to form.
11         THE WITNESS:  Can you repeat the question,
12  please?
13  BY MR. RODRIGUEZ:
14     Q.  I'll phrase it a little differently.
15         Is it fair to say that Exhibit 8 reflects
16  APC's position as of the date of Exhibit 8?
17         MR. QUINN:  Object to form.
18         THE WITNESS:  Our position of ensuring the
19  health, safety, and welfare of au pairs?  Yes.
20  BY MR. RODRIGUEZ:
21     Q.  Okay.  Now I'd like you to read the
22  sentence following the bullets on Exhibit 8.
23     A.  "Legitimate host families will also not
24  offer you a higher stipend than what is listed in
25  the regulations published by the US Department of

PLAINTIFFS' RESP. APP.0004564

MAGNA
LEGAL SERVICES

---

Page 26

1  state for the au pair program."
2      Q.  As of the date of Exhibit 8, what was the
3  stipend that was published in the regulations by the
4  US Department of state for the au pair program?
5      A.  I believe at the time it was $195.75.
6      Q.  Is it a true statement that at the time of
7  Exhibit 8, legitimate host families would not offer
8  au pairs a higher stipend than $195.75?
9      A.  Repeat the question?
10     Q.  Is it a true statement that as of the time
11 of Exhibit 8, legitimate host families would not
12 offer au pairs a stipend higher than $195.75?
13     A.  No.
14     Q.  So I believe you testified that Exhibit 8
15 was sent to -- sent by e-mail to au pairs; correct?
16     A.  Yeah.
17     Q.  So in light of your testimony, is it
18 accurate to say that AuPairCare sent a false
19 statement by e-mail to au pairs?
20     MR. QUINN:  Objection.
21     THE WITNESS:  I think the statement of
22 this e-mail was sent in the spirit of protecting
23 au pairs from being taken advantage of and losing
24 money by going with scam artists who were not
25 US-designated au pair agencies.

---

Page 27

1  BY MR. RODRIGUEZ:
2      Q.  I have a few questions about that.
3      A.  Sure.
4      Q.  Number 1, does the spirit of Exhibit 8
5  have anything to do with whether the sentence
6  following the bullets is true or false?
7      A.  Yes.  In that we wanted to paint the
8  picture for au pairs that families typically would
9  be paying $195.75.  And someone that's offering you
10 $300 per week or $400 per week, that that's not part
11 of this program.  So that was the spirit of the
12 communication, to provide au pairs context around
13 what was happening in the industry at the time.
14 That these phishing scams came out.
15     Q.  So you just said that -- I believe you
16 said in sum and substance that paying more than
17 $195.75 per week was not part of the program; is
18 that right?
19     A.  What I was conveying is that there were at
20 the time probably 2013 legitimate host families that
21 were paying more than $195.75.  But we were painting
22 the context for these au pairs regarding a scam that
23 was taking advantage of them.
24     Q.  So what about the sentence following the
25 bullets on Exhibit 8 says that there are legitimate

---

Page 28

1  host families paying more than $195.75 at the time
2  of Exhibit 8?
3      A.  Repeat the question, please?
4      Q.  What about the sentence following the
5  bullets on Exhibit 8?
6      A.  The sentence, yes.
7      Q.  -- conveys that there were in fact
8  legitimate host families offering more than $195.75
9  per week at the time of Exhibit 8?
10     A.  Is that a question?
11     Q.  It is.  What about it?  Where from the
12 text following the bullets on Exhibit 8 do you
13 infer -- let me start again.
14     From reading Exhibit 8, how would an
15 au pair come to the conclusion that there were in
16 fact legitimate host families paying more than
17 $195.75 at the time of Exhibit 8?
18     A.  She wouldn't.
19     Q.  She wouldn't.  So fair to say, then, that
20 Exhibit 8 contains a falsehood?
21     MR. QUINN:  Object to form.
22 Argumentative.
23     THE WITNESS:  No.
24 BY MR. RODRIGUEZ:
25     Q.  Okay.  But the statement legitimate host

---

Page 29

1  families will also not offer you a higher stipend
2  than what is listed in the regulations --
3      A.  Right.
4      Q.  -- that is false?
5      A.  So -- majority.  So maybe it was a -- we
6  could have put in "majority."  But for the majority
7  legitimate host families wouldn't be offering the
8  au pair $300 or $400 stipend a week.
9      Q.  Now you said a moment ago that the spirit
10 of Exhibit 8 was to protect au pairs from losing
11 money; is that right?
12     A.  Protect au pairs from people that were
13 taking -- trying to take advantage of them, yes.
14     Q.  Do you believe that an au pair is taken
15 advantage from if host families compete for her by
16 paying her more than $195.75?
17     A.  No.
18     Q.  In fact, an au pair would gain money if
19 host families competed for her by offering higher
20 stipends?
21     A.  Well, it's a cultural exchange program.
22 So what goes into the experience is more than just
23 the weekly stipend.  It's living with a host family,
24 it's being part of that host family.  "On par" means
25 equal to that host family.  So there's a lot more

---

MAGNA ▶
LEGAL SERVICES

**Page 42**

1    the au pair's very unhappy with the host family
2    rules and feels they were switched up on her, then
3    she -- she can request to break the match and she
4    can -- if we feel that she's following, you know,
5    the spirit of the program and she's -- she's offered
6    the opportunity to re-match.
7         (Telephonic interruption.)
8         (Reporter asks for repetition.)
9         She's offered the opportunity to re-match,
10   to find a new placement.
11       Q.   So the situation you were just discussing
12   is in fact a dispute concerning host family rules;
13   correct?
14       A.   Mm-hmm.
15       Q.   And AuPairCare has the right to make the
16   final decision as to that dispute; is that right?
17       A.   Yes.
18       Q.   Please turn your attention down to
19   paragraph 29.  I'll go ahead and save you reading it
20   and read it in myself.
21        29 says, "Au pair will receive a weekly
22   stipend in accordance with the US Department of
23   State Regulations in the amount of $195.75."
24        Did I get that first sentence of paragraph
25   29 right?

**Page 43**

1        A.   Yes.
2        Q.   Now does -- what does this paragraph mean?
3        A.   It's AuPairCare's understanding of the
4    Department of State regulations for the weekly
5    stipend that the host family would pay to the
6    au pair.
7        Q.   Okay.  The amount of $195.75; correct?
8        A.   Yes.
9        Q.   Does that mean that the host family may
10   pay more?
11       A.   It doesn't preclude them.
12       Q.   Why not?
13       A.   Because it doesn't say that they cannot;
14   it says that they need -- it says "In accordance --
15   in the amount of $195.75."
16       Q.   Okay.  But if I say that someone may do
17   something and in fact they do something slightly
18   different, um -- let me ask the -- strike that.
19        If I say that someone will do something
20   and they do something slightly different than what I
21   say they will do, isn't it the case they violated my
22   direction?
23        MR. QUINN:  Object to form.
24   BY MR. RODRIGUEZ:
25       Q.   Hypothetically?

**Page 44**

1        A.   Hypothetically if I told you to bake me 12
2    cookies and you baked me 13, I would not feel that
3    you were violating my direction.
4        Q.   Well, because they happened to be cookies;
5    right?
6        A.   (No response.)
7        Q.   I mean --
8        A.   We all love cookies.
9        Q.   Exactly.  If I tell someone that they will
10   go to the store and buy 2 percent milk and they in
11   fact go to a farm and get whole milk, have they
12   violated my direction?
13        MR. QUINN:  Object to form.
14        THE WITNESS:  The last part?  Have they
15   violated?  Can you repeat that?
16   BY MR. RODRIGUEZ:
17       Q.   That's right.  Have they violated my
18   direction?
19       A.   I don't know that they violated the
20   direction.
21       Q.   But they did not do what I told them to
22   do?
23       A.   Yes.  The 1 or 2 percent.
24       Q.   And the reason why they did not do what I
25   told them to do is because I said you will do

**Page 45**

1    something and yet they did something different than
2    what followed what they will do; correct?
3        A.   Yes.
4        Q.   All right.  Let's turn to the next
5    payment -- actually, let's not.  Let's turn to
6    page -- internal page 6, Bates ending 259.  And this
7    time would you read into the record paragraph 61.
8        A.   "Au pair agrees that any decision
9    regarding an au pair's program's status, dismissal,
10   or replacement will be made at the sole discretion
11   of AuPairCare and said decision shall be considered
12   final."
13       Q.   Now does that not give AuPairCare final
14   say as to whether an au pair will remain in the
15   program?
16       A.   Yes.
17       Q.   And isn't it a necessary consequence of a
18   determination that an au pair will no longer be in
19   the program that an au pair's employment will
20   terminate?
21        MR. QUINN:  Object to form.
22        THE WITNESS:  If the au pair's no longer
23   in the program, then she's no longer a cultural
24   exchange participant on the J-1 visa program.  So
25   her -- her status as a J-1 participant would be

**MAGNA ▶**
LEGAL SERVICES

Page 90

1    Q.  What is Exhibit 19?
2    A.  It looks to be an e-mail from Ilir of the
3  Alliance to au pair industry executives.
4    Q.  Including you; correct?
5    A.  Yes.
6    Q.  Do you recall receiving Exhibit 19 in your
7  e-mail?
8    A.  Yes.
9    Q.  Do you recall the context of Exhibit 19?
10    A.  I'll take a moment to read it.
11    Q.  Of course.
12    A.  (Witness reviews document.)
13      Yes.
14    Q.  What was the context of Exhibit 19?
15    A.  The context is the Department of State
16  reaching out to seek a meeting to get further
17  clarification on questions that the sponsor
18  community had.
19    Q.  Well, is it DoS that wants further
20  clarification?
21    A.  No, that they would provide sponsors.
22    Q.  Now who is Mr. Zherka?
23    A.  He's the director of the Alliance for
24  International Exchange.
25    Q.  Mr. Zherka writes in his second paragraph,

Page 91

1  "As we have agreed, our collective interest in this
2  meeting is only" -- "only" is in bold italics -- "to
3  talk prospectively with DoS about how the stipend
4  might change going forward."
5      Ms. McNamara, do you recall the agreement
6  that Mr. Zherka references in the phrase "as we have
7  agreed"?
8    A.  No.
9    Q.  Have the members of the Alliance ever made
10  an agreement concerning wages and hours?
11    A.  Not to my knowledge.
12    Q.  Have they ever discussed wages and hours?
13    A.  As it relates -- hmm.  Have they ever
14  discussed wages and hours.  Yes.
15    Q.  Okay.  Have they ever discussed the
16  communications they make to prospective host
17  families about wages and hours for au pairs?
18    A.  Not to my knowledge.
19    Q.  Have they ever discussed the
20  communications they make to prospective au pairs
21  about wages and hours for au pairs?
22    A.  I don't know if I can speak for the entire
23  community so --
24    Q.  I'm not asking you to speak for the entire
25  community; I'm only asking you to speak on behalf of

Page 92

1  APC and yourself.
2    A.  Okay.
3    Q.  To your knowledge have members of the
4  Alliance ever discussed the communications they make
5  to prospective au pairs about wages and hours for
6  au pairs?
7    A.  I don't believe AuPairCare has, no.
8    Q.  You don't believe that AuPairCare has.  Do
9  you believe that other members of the Alliance have?
10      MR. QUINN:  Objection; form.
11      THE WITNESS:  I -- I don't know.
12  BY MR. RODRIGUEZ:
13    Q.  Mr. Zherka's second paragraph continues.
14  "Our collective interest in this meeting is only to
15  talk prospectively with DoS."
16      Do you understand why it would be in the
17  Alliance members' collective interest only to talk
18  prospectively with DoS about au pair wages and
19  hours?
20    A.  Yes.
21    Q.  Why?
22    A.  Because there was ongoing litigation, I
23  believe, at this time.
24    Q.  So then fair to say that the Alliance has
25  agreed among itself that it is best to remain

Page 93

1  willfully ignorant of DoS' position --
2      MR. QUINN:  Objection; form.
3  BY MR. RODRIGUEZ:
4    Q.  -- concerning wages and hours?
5      MR. QUINN:  Object to form; argumentative.
6      THE WITNESS:  No.
7  BY MR. RODRIGUEZ:
8    Q.  Why not?
9    A.  Can you repeat the question?
10    Q.  Yeah.  Is it fair to say that the Alliance
11  members have agreed among themselves that it is best
12  to remain willfully ignorant of Department of
13  State's position of au pair wages and hours?
14      MR. QUINN:  Object to form.
15      THE WITNESS:  No.
16  BY MR. RODRIGUEZ:
17    Q.  Why not?
18    A.  Because the sponsors' understanding of --
19  of the Department of State regulations was the
20  $195.75 weekly stipend for the au pairs.
21    Q.  Well, then why would it be in the
22  sponsors' collective interest not to know if
23  Department of State agreed with that interpretation?
24      MR. QUINN:  Object to form.
25      THE WITNESS:  Well, from my understanding,

PLAINTIFFS' RESP. APP.0004567

MAGNA
LEGAL SERVICES

Case 1:14-cv-03074-CMA-KMT   Document 948-27   Filed 03/17/18   USDC Colorado   Page 50
of 310

# Exhibit 408

PLAINTIFFS' RESP. APP.0004568

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE STATE OF COLORADO


JOHANA PAOLA BELTRAN, et )
al.,                     )
         Plaintiffs,     )
vs.                      ) Case No.:  14-cv-03074
                         )                CMA-KMT
                         )
INTEREXCHANGE, INC., et  )
al.,                     )
         Defendants.     )
_____)




VIDEOTAPED DEPOSITION of AUPAIRCARE, INC.,

pursuant to Rule 30(b)(6), designee

MARCIE SCHNEIDER

Thursday, May 4, 2017




MAGNA LEGAL SERVICES

866-624-6221

www.MagnaLS.com




Taken before:
HEIDI BELTON, CSR, RPR, CRR, CCRR, CLR
CSR No. 12885

**Page 2**

```
 1            Thursday, May 4, 2017
 2
 3
 4        Videotaped deposition of MARCIE
 5    SCHNEIDER, held at the offices of GORDON
 6    & REES, 275 Battery Street, Suite 2000,
 7    San Francisco, California, before Heidi
 8    Belton, a Certified Shorthand Reporter,
 9    Registered Professional Reporter,
10    Certified Realtime Reporter, California
11    Certified Realtime Reporter, Certified
12    LiveNote Reporter, and NCRA Realtime
13    Systems Administrator.
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1   APPEARANCES:
 2   For the Plaintiffs:
         BOISE, SCHILLER, FLEXNER, LLP
 3       BY: SEAN PHILLIPS RODRIGUEZ, ESQ.
             JUAN P. VALDIVIESO, ESQ.
 4       1999 Harrison Street, Suite 900
         Oakland, California 94612
 5       (510) 874-1010
         srodriguez@bsfllp.com
 6       jvaldivieso@bsfllp.com
 7
     For Cultural Care:
 8       CHOATE, HALL & STEWART
         BY: LYNDSEY M. KRUZER, ESQ.  (via phone)
 9       Two International Place
         Boston, Massachusetts 02110
10       (617) 248-5221
         lkruzer@choate.com
11   and
         LEWIS, ROCA, ROTHGERBER, CHRISTIE
12       BY: JESSICA FULLER, ESQ.  (via phone)
         1200 17th Street, Suite 3000
13       Denver, Colorado 80202
         (303) 628-9527
14
15   For AuPairCare, Inc.:
         GORDON & REES
16       BY: THOMAS B. QUINN, ESQ.
         555 17th Street, Suite 3400
17       Denver, Colorado 80202
         (303) 200-6888
18       tquinn@gordonrees.com
19
     For InterExchange, Inc.:
20       SHERMAN & HOWARD, LLC
         BY: JOSEPH H. HUNT, ESQ.  (via phone)
21       633 17th Street, Suite 3000
         Denver, Colorado 80202
22       (303) 299-8302
         jhunt@shermanhoward.com
23
24
25
```

**Page 4**

```
 1   APPEARANCES (Continued):
 2
     For APF Global Foundation:
 3       FISHER & PHILLIPS LLP
         BY: SUSAN M. SCHAECHER, ESQ.  (via phone)
 4       1801 California Street, Suite 2700
         Denver, Colorado 80202
 5       (303) 218-3650
         sschaecher@fisherphillips.com
 6
 7   For ProAuPair, APEX Professional Exchange and 20/20
     Care Exchange d/b/a International Aupair Exchange:
 8       NIXON SHEFRIN HENSEN OGBURN P.C.
         BY: MICHAEL S. DREW, ESQ.  (via phone)
 9       5619 DTC Parkway, Suite 1200
         Greenwood Village, Colorado 80111
10       (303) 773-3500
         mdrew@nixonshefrin.com
11
12   Also Present:  Sarah McNamara; Daniel Stroud,
     videographer
13
14            ---oOo---
15
16
17
18
19
20
21
22
23
24
25
```

**Page 5**

```
 1          INDEX OF EXAMINATION
 2   WITNESS:  MARCIE SCHNEIDER
 3
 4   EXAMINATION                    PAGE
 5   BY MR. RODRIGUEZ              8, 85
 6   BY MR. QUINN                     82
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

| Page 22 | Page 24 |
|---|---|

**Page 22**

1     Q. When did you become directly involved in
2 the childcare industry?
3     A. Directly in holding a position in the
4 childcare industry, in 1996.
5     Q. What position was that?
6     A. Was director of -- and I don't -- I don't
7 recall the exact title, but I was a director in --
8 at Au Pair In America.
9     Q. For how long were you director at Au Pair
10 In America?
11     A. I was in the organization from 1996 until
12 2011. However, I progressed through the
13 organization, so I had a number of different titles,
14 but I was directly involved in the childcare Au Pair
15 America -- Au Pair In America program during all of
16 those years.
17     Q. And who was your employer after -- in or
18 after 2011?
19     A. Was CEA Study Abroad in Phoenix, Arizona.
20     Q. Did --
21     A. From 2011 until 2014.
22     Q. Does CEA participate in the markets for
23 childcare services?
24     A. No.
25     Q. And following your employment at CEA, who

**Page 23**

1 was your employer?
2     A. Intrax.
3     Q. Okay. Have you been employed continuously
4 with Intrax until today?
5     A. Yes.
6             (Exhibit 3 marked.)
7 BY MR. RODRIGUEZ:
8     Q. I'm marking and handing to the witness
9 Exhibit 3.
10     For those on the phone, Exhibit 3 is a
11 printout from Intrax's website,
12 "intraxinc.com/affiliations."
13     Ms. Schneider, do you recognize Exhibit 3?
14     A. No.
15     Q. In the top left at the set of logos on
16 Exhibit 3 there's a logo and the name ACCET. Do you
17 have an understanding what ACCET is?
18     A. No.
19     Q. Moving two over. There's a logo and the
20 name "Alliance." Do you have an understanding what
21 the Alliance is?
22     A. Yes.
23     Q. What's the Alliance?
24     A. The Alliance is an organization in
25 Washington, DC that is a -- an association for

**Page 24**

1 organizations such as Intrax that are in the
2 international education and cultural exchange space.
3     Q. In addition to the international and
4 cultural exchange space, organizations that are
5 members of the Alliance are also in the childcare
6 industry; are they not?
7     MR. QUINN: Object to form.
8     THE WITNESS: Some.
9 BY MR. RODRIGUEZ:
10     Q. And such organizations include AuPairCare;
11 correct?
12     A. Correct.
13     Q. Does AuPairCare communicate with those
14 members of the Alliance that are in the childcare
15 industry?
16     A. Can you repeat your question?
17     Q. Does AuPairCare communicate with those
18 members of the Alliance that are in the childcare
19 industry?
20     A. AuPairCare communicates with members of
21 the Alliance overall, some of whom are in the
22 childcare industry.
23     Q. Does Intrax communicate with members of
24 the Alliance who are in the childcare industry?
25     A. The same answer. Intrax communicates with

**Page 25**

1 members of the Alliance who are in the childcare
2 industry as well as other industries.
3     Q. What's the nature of AuPairCare's
4 communications with members of the Alliance who are
5 in the childcare industry?
6     MR. QUINN: Object to form.
7     THE WITNESS: The -- I'm sorry. Can you
8 repeat the question?
9 BY MR. RODRIGUEZ:
10     Q. What are the nature -- strike that.
11     What is the nature of AuPairCare's
12 communications with members of the Alliance that are
13 in the childcare industry?
14     A. Periodic meetings. Once a year the
15 Alliance holds a conference where all of the
16 organizations come together and meet and listen to
17 speakers and discuss pertinent issues in both the
18 political climate and the industry as a whole.
19     Q. What are the -- what are some examples of
20 pertinent -- pardon me.
21     What are some examples of pertinent issues
22 in the industry as a whole that Alliance members
23 might discuss?
24     A. Issues such as presidential elections and
25 their impact on people perhaps being nervous about

| Page 26 | Page 28 |
|---|---|

**Page 26**

1 coming into the United States. Changes in rules and
2 regulations that affect an industry as a whole.
3 Economic conditions in -- in the world and -- that
4 might impact cultural exchange. Many -- many
5 topics.
6     Q. What about as concerns au pair wage and
7 hours? Do members of the Alliance that are in the
8 childcare industry communicate with one another
9 concerning au pairs' wages and hours?
10     A. Only as possibly relating to wages and
11 hours being determined by State Department rules and
12 regulations and if they -- if they change, then --
13 then perhaps yes.
14     Q. Have the State Department rules and
15 regulations concerning au pairs' wages and hours
16 ever changed?
17     A. Back in 2007, when the federal minimum
18 wage changed, then the au pairs' wage and hours
19 changed accordingly. And I don't recall if that was
20 an Alliance meeting, but there was certainly an
21 industry meeting with the Department of State that
22 discussed that change in federal minimum wage and
23 how it affected wage and hours.
24     Q. Do you recall -- let me start again.
25     Did you participate in any of those

**Page 27**

1 meetings concerning the federal minimum wage change
2 in or around 2007?
3     A. Yes, I did.
4     Q. What specifically do you recall at those
5 meetings?
6     A. I don't recall the location of the
7 meeting. And -- but I do recall that Stanley
8 Colvin, who was the deputy assistant Secretary of
9 State and our primary contact in -- from the State
10 Department, speaking to a number of organizations
11 that were sponsors on the au pair program about what
12 the impact in the change in the federal minimum wage
13 would have on the au pair stipend and how the room
14 and board calculation would -- would impact that,
15 and that all of the organizations were at that point
16 to move up to a $7.75 per hour minimum wage which
17 resulted in a stipend of $195.75 a week. And he
18 presented to us -- I believe at the time there was a
19 document that was handed out that -- that exhibited
20 that change. And -- yeah, I mean, there were a
21 number of organizations present. I don't remember
22 exactly which ones.
23     Q. A moment ago you said that Mr. Colvin
24 communicated that, quote, "all of the organizations
25 were at that point to move up to a 70" -- pardon me

**Page 28**

1 -- a "7.75 per hour minimum wage."
2     Did I get that right?
3     A. Yes, I believe so.
4     Q. I want to focus on the phrase "minimum
5 wage" there. Was that part of Mr. Colvin's
6 communication?
7     MR. QUINN: Object to form.
8 BY MR. RODRIGUEZ:
9     Q. Do you understand my question?
10     A. Yes, I understand.
11     Q. Okay. So was minimum wage in fact part of
12 what Mr. Colvin communicated to all the
13 organizations?
14     A. That the federal minimum wage had changed.
15     Q. Okay. "That the federal minimum wage had
16 changed."
17     And what is the relationship between the
18 federal minimum wage -- strike that.
19     According to Mr. Colvin at that meeting
20 what was the relationship between the federal
21 minimum wage and the au pair stipend?
22     A. The au pair program was and is governed,
23 managed, regulated by the Department of State. And
24 the federal minimum wage was the way that through
25 the years the au pair stipend had changed

**Page 29**

1 periodically when the federal minimum wage changed.
2 And that's what -- that's what was articulated in
3 that meeting.
4     Q. Now, from your answer a moment ago I'm a
5 little bit unclear whether AuPairCare, as you put
6 it, "through the years," has considered the federal
7 minimum wage to set a floor on the stipend.
8     MR. QUINN: Object to form.
9     MR. RODRIGUEZ: Let me start again.
10     Q. From your answer a moment ago, it's not
11 clear to me whether, quote, "through the years the
12 federal minimum wage has set a minimum stipend for
13 au pairs." Is it in fact the case that AuPairCare
14 believes that through the years the federal minimum
15 wage has set a minimum stipend for au pairs?
16     A. I'm not sure I understand your question.
17     Q. Okay. Do you understand what I mean when
18 I say "minimum stipend"?
19     A. Yes.
20     Q. Okay. What do you understand minimum
21 stipend to mean?
22     A. Exactly as you're saying, minimum stipend.
23 So minimum being the lowest level that the stipend
24 could be set at.
25     Q. But it could be set higher; correct?

**MAGNA** ▶
**LEGAL SERVICES**

---

**Page 34**

1 do you believe that there are situations where a
2 required stipend could be the same as a fixed
3 stipend?
4      MR. QUINN: Object to form; asked and
5 answered.
6      THE WITNESS: Possibly.
7 BY MR. RODRIGUEZ:
8   Q. Turning back to Exhibit 3. Ms. Schneider,
9 immediately below Alliance there is the logo and the
10 letter is IAPA.
11   A. Yes.
12   Q. What is IAPA?
13   A. IAPA -- IAPA -- is an International
14 Au Pair Association and it's primarily an
15 organization where partners who recruit au pairs
16 that choose to come on the program to the
17 United States and sponsors who would like to have
18 those au pairs come on their program to the
19 United States meet and -- it's -- it's primarily
20 a -- what -- you know, what would be called a
21 networking and a sales conference that's held by
22 that organization.
23   Q. So help me understand. IAPA is primarily
24 for au pair recruiters; is that fair?
25   A. Au pair recruiters and au pair sponsors

---

**Page 35**

1 that attend to meet with those recruiters.
2   Q. Okay. Now au pair recruiters compete with
3 one another for au pairs; do they not?
4   A. They do.
5   Q. Okay. And au pair sponsors also compete
6 with one another for au pairs; do they not?
7   A. Yes.
8   Q. Now, why would there be a networking
9 meeting between such competitors?
10   A. Because it's an opportunity for partners
11 who you're calling recruiters -- partners -- from
12 all over the world to come together in one place and
13 meet organizations that would like to meet with
14 them. Very similar to many other trade
15 organizations around the world that have events very
16 similar to that.
17   Q. Okay. But if I'm correct, the common
18 denominator among all those members is that they
19 compete for au pairs; is that right?
20   A. That would be one of the common
21 denominators.
22   Q. Okay. Now have you been to IAPA meetings?
23   A. I have.
24   Q. And are you familiar generally with
25 communications among IAPA members?

---

**Page 36**

1   A. Generally, yes.
2   Q. Have IAPA members ever discussed au pair
3 wage and hours?
4      MR. QUINN: Object to form.
5      THE WITNESS: I have never been in an IAPA
6 meeting where members discussed wage and hours, no.
7 BY MR. RODRIGUEZ:
8   Q. But you cannot say it has never happened;
9 is that right?
10   A. Correct.
11      MR. QUINN: Object to the form of the last
12 question.
13      Go ahead. I apologize.
14 BY MR. RODRIGUEZ:
15   Q. In your experience in the industry, have
16 you ever found it to be the case that au pair
17 sponsors compete for au pairs by offering au pairs a
18 higher stipend?
19   A. No.
20   Q. In your experience in the industry, has it
21 ever been the case that sponsors have competed for
22 host families by offering host families competitive
23 discounts?
24   A. Yes.
25   Q. Can you think of any reason why au pair

---

**Page 37**

1 sponsors would compete for host families on price
2 but not au pairs?
3   A. Yes.
4   Q. What?
5   A. Department of State regulation stipulating
6 what au pairs are to be paid and many other factors
7 that the Department of State puts out that are
8 requirements for au pairs.
9   Q. Well, now if the Department of State --
10 well, let me back up a second.
11      What is AuPairCare's position with respect
12 to the Department of State's position on $195.75
13 today?
14      MR. QUINN: Can I just -- do you
15 understand the question?
16      THE WITNESS: Yeah, I understand the
17 question.
18      MR. QUINN: Go ahead. I'm sorry.
19      THE WITNESS: I wasn't sure if you were
20 asking me to wait for something.
21      MR. QUINN: No, I just --
22      THE WITNESS: Just ask me the question
23 again, please.
24 BY MR. RODRIGUEZ:
25   Q. Sure. What is AuPairCare's position with

---

**MAGNA**
LEGAL SERVICES

Case 1:14-cv-03074-CMA-KMT   Document 945-27   Filed 03/17/16   USDC Colorado   Page 56 of 310

# Exhibit 409

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Case No. 14-cv-03074-CMA-KMT

_____

JOHANA PAOLA BELTRAN, ET AL.,

       Plaintiffs,

vs.

INTEREXCHANGE, INC., ET AL.,

       Defendants.

_____

VIDEOTAPED DEPOSITION OF

THERESA NELSON

30(b)(6) REPRESENTATIVE FOR AU PAIR FOUNDATION

MAY 9, 2017

DENVER, COLORADO

9:06 A.M.

Magna Legal Services
866-624-6221
www.magnals.com

PLAINTIFFS' RESP. APP.0004575

**Page 2**

```
 1              The videotaped deposition of THERESA
 2   NELSON, taken before Leeann Keenan, a Registered Merit
 3   Reporter, Certified Realtime Reporter, and a Notary
 4   Public in and for the County of Summit and the State of
 5   Colorado, at 1801 California Street, Suite 2700,
 6   Denver, Colorado, on Tuesday, May 9, 2017, at the hour
 7   of 9:06 a.m., pursuant to Notice.
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1   APPEARANCES:
 2
 3     BOISE, SCHILLER, FLEXNER, L.L.P.
       BY: JUAN P. VALDIVIESO, ESQ.
 4         1999 Harrison Street
           Suite 900
 5         Oakland, California  94612
           (510) 874-1010
           appeared on behalf of the Plaintiffs
 6
 7     TOWARDS JUSTICE
       BY: ALEXANDER HOOD, ESQ.
 8         1535 High Street
           Suite 300
 9         Denver, Colorado 80218
           (720) 441-2236
10         alex@towardsjustice.org
           appeared on behalf of the Plaintiffs
11     CHOATE, HALL & STEWART
       BY: JUSTIN WOLOSZ, ESQ.
12         Two International Place
           Boston, Massachusetts  02110
13         (617) 248-5221
           jwolosz@choate.com
14         appeared by telephone on behalf of
           Cultural Care
15
       LEWIS, ROCA, ROTHGERBER, CHRISTIE
16     BY: JESSICA FULLER, ESQ.
           1200 17th Street
17         Suite 3000
           Denver, Colorado  80202
18         (303) 628-9527
           appeared on behalf of Cultural Care
19
       FISHER & PHILLIPS
20     BY: SUSAN SCHAECHER, ESQ.
           1801 California Street
21         Suite 2700
           Denver, Colorado  80202
22         (303) 218-3650
           sschaecher@fisherphillips.com
23         appeared on behalf of AuPair
           Foundation and Au Pair in America
24
25
```

**Page 4**

```
 1   APPEARANCES CONTINUED:
 2
       GORDON & REES
 3     BY: NATHAN HUEY, ESQ.
           555 17th Street
 4         Suite 3400
           Denver, Colorado  80202
 5         (303) 200-6888
           nhuey@gordonrees.com
 6         appeared by telephone on behalf of
           AuPairCare, Inc.
 7
       SHERMAN & HOWARD, L.L.C.
 8     BY: JOSEPH HUNT, ESQ.
           633 17th Street
 9         Suite 3000
           Denver, Colorado  80202
10         (303) 299-8194
           jhunt@shermanhoward.com
11         appeared by telephone on behalf of
           InterExchange, Inc.
12
       NIXON, SHEFRIN, HENSEN, OGBURN
13     BY: MICHAEL DREW, ESQ.
           5619 DTC Parkway
14         Suite 1200
           Greenwood Village, Colorado  80111
15         (303) 773-3500
           michaeldrew@nixonshefrin.com
16         appeared by telephone on behalf of
           ProAuPair and International Au Pair
17         Exchange
18     GORDON & REES
       BY: PEGGY KOZAL, ESQ.
19         555 17th Street
           Suite 3400
20         Denver, Colorado  80202
           (303) 200-6888
21         pkozal@gordonrees.com
           appeared by telephone on behalf of
22         AuPairCare, Inc.
23
24
25
```

**Page 5**

```
 1   APPEARANCES CONTINUED:
 2
       BROWNSTEIN, HYATT, FARBER, SCHRECK
 3     BY: MARTHA FITZGERALD, ESQ.
           410 17th Street
 4         Suite 2200
           Denver, Colorado  80202
 5         (303) 223-1472
           mfitzgerald@bhfs.com.com
 6         appeared by telephone on behalf of
           EuRaupair InterCultural Child Care
 7         Programs
 8
 9   ALSO PRESENT: Jerry DeBoer, Videographer
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**MAGNA ▶**
**LEGAL SERVICES**

| Page 158 | Page 160 |
|---|---|

**Page 158**

1  circumstances under which Ms. Crompton left Au Pair
2  Foundation?
3      A.   Yes, I do.  I think I'm fairly familiar
4  with them, yes.
5      Q.   What were the circumstances?
6      A.   Carrie had told us that she wished to no
7  longer be working because she was going to be having
8  her third child.
9      Q.   Looking at page 267, is there anything
10  here that indicates to you the date of the document?
11      A.   Yes.  I would guess that it would have
12  been published sometime around October -- it does
13  indicate a date of October 15th, 2015.
14      Q.   You can set that exhibit aside,
15  Ms. Nelson.
16          MR. VALDIVIESO:  And we're going to
17  go off the record briefly.
18          THE VIDEOGRAPHER:  This is the end of
19  media No. 2 in the 30(b)(6) deposition of Au Pair
20  Foundation through their designee, Theresa Nelson.
21  Going off the record.  The time is 2:09.
22          (Break from 2:09 p.m. to
23          2:18 p.m.)
24          (Exhibit No. 12 was marked.)
25          THE VIDEOGRAPHER:  We are back on the

**Page 159**

1  record.  The time is 2:18.  This is the beginning of
2  media No. 3 in the 30(b)(6) deposition of Au Pair
3  Foundation through their designee, Theresa Nelson.
4  BY MR. VALDIVIESO:
5      Q.   Ms. Nelson, I'm handing what's been
6  marked as Exhibit 12.
7          THE VIDEOGRAPHER:  Counsel, I believe
8  we're still on mute for the phone.
9          MR. VALDIVIESO:  I apologize for
10  those on the phone.  I -- we forgot to take the
11  phone off of mute.
12          To catch you up on what's
13  occurred, I've handed Ms. Nelson what's been marked
14  Exhibit 12.  It's a document ending in 274, and the
15  witness has perused the documents.
16      Q.   Ms. Nelson, do you recognize Exhibit 12?
17      A.   There are a few pages out of the exhibit
18  that I recognize.
19      Q.   Which pages are those?
20      A.   I recognize pages 276, 277.  And pages
21  279 through 288 look familiar, as though they
22  perhaps were copies of -- from our website.
23      Q.   And as --
24      A.   But I have not seen them before in this
25  format.

**Page 160**

1      Q.   Thank you.
2          And as AFP Global Exchange NFP's
3  corporate representative sitting here today, what
4  does the document at pages 274 to 275 appear to be
5  to you?
6      A.   This appears to be an e-mail between a
7  Tom Sullivan and Carrie Crompton.
8      Q.   Do you know who Tom Sullivan is?
9      A.   No, I do not.
10      Q.   Does it appear to you, reading this
11  e-mail, that Tom Sullivan was a prospective host
12  family?
13      A.   Yes.
14      Q.   And at the time that this e-mail was
15  sent, was Ms. Crompton authorized to communicate
16  with host families on behalf of APF Global Exchange
17  NFP?
18      A.   Yes.
19      Q.   Towards the middle of the page -- let me
20  start again.
21          Towards the middle of the page
22  there's a Roman numeral, a small Roman numeral (i)
23  following a letter (a).  Do you see that section?  I
24  can just read it for you, and you can tell me if
25  I've read it correctly.

**Page 161**

1          After romanette (i) it says, "The
2  weekly stipend is 195.75, as with all agencies."
3          Do you see that?
4      A.   Yes, I do.
5      Q.   Do you believe that sentence is accurate?
6      A.   I think -- I don't -- I don't know how to
7  answer that, since I was not the author.  I am not
8  sure how she intended this.
9      Q.   You, sitting here today reading those
10  words, do they convey an accurate meaning to you as
11  you read them?
12      A.   They convey a meaning to me that the
13  weekly stipend is a minimum of 195.75 that was set
14  forth by the Department of State.
15      Q.   Does the word "minimum" appear in that
16  sentence?
17      A.   No, it does not.
18      Q.   Is it your understanding that all
19  agencies have a weekly stipend of 195.75?
20      A.   I can't speak on behalf of other
21  agencies.
22      Q.   It appears that Ms. Crompton spoke with
23  respect to other agencies in this sentence; is that
24  right?
25      A.   Yes, it does.

**MAGNA**
LEGAL SERVICES

---

Page 162

1    Q.   Was she authorized to speak as to other
2  agencies?
3    A.   No, she was not.
4        MS. KOZAL:  Objection to foundation.
5    A.   It's my understanding she would not have
6  been.
7    Q.   Do you understand what the basis for the
8  part of the sentence that says, "As with all
9  agencies," is?
10       MS. SCHAECHER:  Objection.  Form and
11  foundation.
12   A.   Can you restate the question, please?
13   Q.   Do you understand what the basis for
14  Ms. Crompton's statement that, "The weekly stipend
15  is 195.75, as with all agencies," is?
16       MS. SCHAECHER:  Same objection.
17   A.   Can I restate the question?
18   Q.   If you understand the question as I
19  phrased it, I would like for you to answer the
20  question as I phrased it.
21   A.   What I understood you to ask me is do I
22  know what Carrie intended to say in this sentence.
23   Q.   What is your basis for knowing what
24  Carrie intended with the sentence?
25   A.   That she would have -- that her knowledge

---

Page 163

1  was based on the Department of State regulations.
2    Q.   Is Ms. Crompton a lawyer?
3    A.   I'm not sure.  Not in this capacity,
4  certainly not.
5    Q.   Has Ms. Crompton attended law school?
6    A.   I believe she has some law -- attended
7  law school or has some law experience in her
8  background, yes.
9    Q.   During her time at APF Global Exchange
10  NFP, did Ms. Crompton ever serve in a legal
11  capacity?
12   A.   No, she did not.
13   Q.   Does APF Global Exchange NFP have a
14  general counsel?
15   A.   Do we have a general counsel?
16       MS. SCHAECHER:  I'm going to object
17  to the form.
18   Q.   Do you know if APF Global Exchange NFP
19  has a general counsel?
20       MS. SCHAECHER:  Same objection.
21   A.   Do we have an ongoing contract?  I don't
22  understand the question.  I'm sorry.
23   Q.   Is there a person --
24   A.   Do we have one on retainer?
25   Q.   Is there someone at APF Global Exchange

---

Page 164

1  NFP that has the title "general counsel"?
2    A.   No.
3    Q.   Going down three lines, it's -- I'm going
4  to read to you and ask you if I've read it
5  correctly.  "The weekly stipend and education remain
6  the same for the extension year."
7        Did I read that correctly?
8    A.   Yes, you did.
9    Q.   What is meant by "extension year"?
10   A.   Extension year would be the time period
11  after the first 12 months.
12   Q.   Is it the case that the weekly stipend
13  remains the same for an extension year?
14   A.   That would be up to the host family to
15  make that determination.
16   Q.   Is it your testimony that the sentence,
17  as read, is inaccurate?
18   A.   I believe it is a recommendation.
19   Q.   What word in that sentence to you
20  indicates that it's a recommendation?
21   A.   It's my interpretation in reading the
22  sentence.
23       (Exhibit No. 13 was marked.)
24   Q.   Ms. Nelson, I'm handing you what's been
25  marked Exhibit 13.

---

Page 165

1    A.   Thank you.
2    Q.   Are you familiar with Exhibit 13?
3    A.   Yes, I am familiar with this exhibit.
4    Q.   What is Exhibit 13?
5    A.   Exhibit 13 is our Au Pair Pledge, which
6  is a document within our au pair application.
7    Q.   Are you able to determine the date of
8  this document by looking at it, Ms. Nelson?
9    A.   I'm able to determine it was created, or
10  rather revised, 7-19-2013.
11   Q.   Has an au pair --
12       MR. HUEY:  Excuse me, I'm sorry for
13  interrupting.  But, Juan, do you have a Bates number
14  for this document?
15       MR. VALDIVIESO:  I'm sorry.  This
16  ends in 126.
17       MR. HUEY:  Thank you.
18   Q.   Ms. Nelson, has an Au Pair Pledge been
19  part of the au pair application since the inception
20  of APF Global Exchange NFP?
21   A.   Yes, it has.
22   Q.   Was the Au Pair Pledge part of the
23  au pair program of Au Pair Foundation, Inc., if you
24  know?
25   A.   I believe so, but I'm not sure as to what

PLAINTIFFS' RESP. APP.0004578

MAGNA
LEGAL SERVICES

| Page 166 | Page 168 |
|---|---|
| 1  extent or when it was put in place. | 1  A.   "Accept any form of employment offer" -- |
| 2      Q.   Was this document intended to be signed | 2  excuse me. |
| 3  prior to departing the home country or after? | 3          "Accept any form of paid |
| 4      A.   Prior to. | 4  employment, other than for my duties as an au pair |
| 5      Q.   And is an Au Pair Pledge still part of | 5  with my host family, from whom I will receive a |
| 6  the au pair application? | 6  weekly stipend of 195.75 (146.81 for EduCare |
| 7      A.   Yes. | 7  participants) according to U.S. Government |
| 8      Q.   Does Au Pair Foundation Global Exchange | 8  regulations." |
| 9  NFP collect signed copies of the agreements? | 9          I -- I believe it reads, |
| 10     A.   Yes. | 10 "According to current U.S. Government regulations." |
| 11     Q.   Sorry.  Strike that. | 11 I'm sorry if I -- |
| 12          Does Au Pair Global -- Au Pair | 12     Q.   Thank you, Ms. Nelson. |
| 13 Foundation Global Exchange NFP collect signed copies | 13     A.   -- can't recall if I said "current." |
| 14 of the Au Pair Pledge? | 14     Q.   And accepting any form of paid |
| 15     A.   Yes. | 15 employment, other than for her duties as an au pair |
| 16     Q.   And does it store copies of the signed | 16 with her host family from whom she will receive a |
| 17 Au Pair Pledge? | 17 weekly stipend of 195.75, would be a forbidden |
| 18     A.   Yes. | 18 activity; is that correct? |
| 19     Q.   Where does it store them? | 19     A.   According to the -- the policy on this |
| 20     A.   On the server. | 20 pledge, yes. |
| 21     Q.   Do you know if the server also contains | 21     Q.   Do you believe that's also a forbidden |
| 22 signed copies of the Au Pair Pledge that were signed | 22 activity according to current U.S. Government |
| 23 as part of the Au Pair Foundation, Inc. au pair | 23 regulations? |
| 24 program? | 24     A.   I believe that the Department of State |
| 25          MS. SCHAECHER: Objection.  Form and | 25 indicates that au pairs cannot have any other form |

| Page 167 | Page 169 |
|---|---|
| 1  foundation. | 1  of employment. |
| 2      A.   No, I don't. | 2      Q.   So the only permitted form of employment |
| 3      Q.   The signed copies of the Au Pair Pledge | 3  is as an au pair? |
| 4  that you do maintain, are those maintained in pdf | 4      A.   Yes, on this J-1 visa that they have |
| 5  form? | 5  entered the country into. |
| 6      A.   Yes, they are. | 6      Q.   Turning to page 127, please.  And, sorry, |
| 7      Q.   And you said they're kept on the server. | 7  I guess I should let you read, that the next section |
| 8  Are they also kept on your personal computer? | 8  after "Forbidden Activities" is "Basic Duties." |
| 9      A.   Yes.  I would believe, yes. | 9          Do you see that? |
| 10     Q.   Do you know if your personal computer | 10     A.   Yes. |
| 11 contains copies of the signed Au Pair Pledge that | 11     Q.   And we're going to turn the page to 127, |
| 12 were signed as part of the Au Pair Foundation, Inc. | 12 No. 3 under "Duties."  Could you read that into the |
| 13 au pair program? | 13 record, please. |
| 14          MS. SCHAECHER: Objection.  Form and | 14     A.   "Remaining in the home with the |
| 15 foundation. | 15 child/children should the parents be away during the |
| 16     A.   No. | 16 evening hours or overnight." |
| 17     Q.   No, you do not know? | 17     Q.   And is it fair to say that that is one of |
| 18     A.   No, I don't know from memory if there are | 18 the duties, one of the basic duties of an au pair? |
| 19 or are not. | 19     A.   No, I would not say that that is fair to |
| 20     Q.   On page 126 there's a section called, "B. | 20 say. |
| 21 Forbidden Activities." | 21     Q.   Why not? |
| 22          Do you see that? | 22     A.   Given the context of this sentence. |
| 23     A.   Yes, I do. | 23     Q.   What about the context of the sentence |
| 24     Q.   Could you please read the first paragraph | 24 makes that an unfair statement? |
| 25 and No. 1 and the text following No. 1? | 25          MS. SCHAECHER: Object to form. |

PLAINTIFFS' RESP. APP.0004579

MAGNA
LEGAL SERVICES

---

Page 174

1  page 129 there's a No. 5. I'll just read it for
2  you, and you can tell me if I've messed something
3  up.
4      A.  Uh-huh.
5      Q.  "I understand that I am responsible for
6  paying $65 for AVI medical insurance coverage for
7  the 13th month if I choose to remain in the United
8  States for the 30-day grace period. STS
9  participants are excluded."
10          Did I read that correctly?
11     A.  Yes, I believe so.
12     Q.  What does it mean, the second sentence in
13  that section, that, "STS participants are excluded"?
14     A.  STS was a particular overseas partner,
15  and they provided insurance for their participants
16  through the 13th month.
17     Q.  Turning to the last page, page 130.
18  Under, "J. Program Termination." Could you read
19  what follows Section No. 2, starting with, "APF
20  reserves the right."
21     A.  APF reserves the right to terminate my
22  participation in this program if I should violate
23  any program rules and/or if my mental and/or
24  physical health, as determined solely by Au Pair
25  Foundation, is in jeopardy."

---

Page 175

1      Q.  Do you believe that sentence to be an
2  accurate representation of APF Global Exchange NFP's
3  policy as of 2013?
4      A.  I believe as they're the sponsor of the
5  J-1 visa that the student has entered in the
6  country, we have the obligation and -- to end their
7  visa if they violate any of the program rules.
8      Q.  That is a current obligation; is that
9  right?
10     A.  Yes.
11     Q.  And was that the obligation as of
12  July 2013?
13     A.  Yes.
14     Q.  Do you know whether Exhibit 13 is --
15  strike that.
16          Do you know if there was a prior
17  version between the time that A -- APF Global
18  Exchange NFP, since its inception and since July 19,
19  2013, was there a prior version of this document
20  that you're aware of?
21     A.  No, I don't know. I don't have any
22  memory.
23          (Exhibit No. 14 was marked.)
24     Q.  I'm handing you what has been marked
25  Exhibit 14.

---

Page 176

1          MR. VALDIVIESO:  On the phone, this
2  is APF 131.
3          Oh, sorry. Thanks.
4      Q.  Are you familiar with this document,
5  Ms. Nelson?
6      A.  Yes, I am.
7      Q.  What is it?
8      A.  This is the Au Pair Pledge from the
9  au pair application, and this -- this version is
10  dated 8-19-2013.
11     Q.  Do you know if this document has been
12  revised since?
13     A.  No, not from memory.
14     Q.  You've referred to a server and you've
15  referred to your personal computer. Do you know if
16  on either of those locations the blank versions of
17  the Au Pair Pledge are stored?
18     A.  Can you repeat the question?
19     Q.  Yes. You've referred to a server and
20  you've referred to your personal computer. Do you
21  know if on either of those locations the blank
22  versions of the Au Pair Pledge are stored?
23     A.  Yes.
24     Q.  On which one?
25     A.  Could be either.

---

Page 177

1          MR. VALDIVIESO:  Counsel, I don't
2  think I've seen any version after the August 19th,
3  2013 Au Pair Pledge. So to the extent that there
4  are any subsequent versions that have not been
5  produced, I'm just noting for the record that we're
6  requesting those.
7          (Exhibit No. 15 was marked.)
8      Q.  I'm handing you what we're -- we have
9  marked as Exhibit 15.
10          MR. VALDIVIESO:  For those of you on
11  the phone, it's an APF document ending in 95.
12     Q.  Do you recognize this document,
13  Ms. Nelson?
14     A.  Yes, I do.
15     Q.  What is it?
16     A.  This is the Host Family Agreement. At
17  this particular time it was part of, a piece of the
18  Host Family Application.
19     Q.  And are you able to tell, by looking at
20  Exhibit 15, what the date of this document is?
21     A.  It indicates a revised date of 4-24-2013.
22     Q.  What is the address listed on the bottom
23  of this document?
24     A.  205 Keller Street, Suite 204, Petaluma,
25  California.

---

MAGNA
LEGAL SERVICES

Case 1:14-cv-03074-CMA-KMT    Document 918-59-1    Filed 03/17/18    USDC Colorado    Page 63 of 310

## Page 178

1    Q.   And Au Pair Foundation, Inc. has not been
2  housed at that address, to your knowledge, has it?
3    A.   I think I've explained that before, but I
4  can restate it.
5    Q.   Sure.
6    A.   So define "housed."
7    Q.   Was Au Pair Foundation, Inc. ever located
8  at 20 -- 20 -- 205 Keller Street?
9    A.   Yes, they -- yes, they would have been.
10  They would have been located there, as I was an
11  independent contractor working for them.
12    Q.   And the logo on the top of this document,
13  I believe you had earlier described this logo
14  bearing -- showing a globe in between the words
15  "Au Pair" and "Foundation" with a swoosh and a
16  star --
17    A.   Uh-huh.
18    Q.   -- as being Au Pair Foundation, Inc.'s
19  logo; is that right?
20    A.   Yes.  Correct.
21    Q.   Is this an Au Pair Foundation, Inc.
22  document or is it an Au Pair Foundation Global
23  Exchange NPF -- NFP document?
24    A.   I -- I couldn't say which -- whose
25  document this was.

## Page 179

1    Q.   Why is that?
2    A.   Because the documents from Au Pair
3  Foundation, Inc. were adopted or merged into APF
4  Global Exchange.
5    Q.   Does APF Global Exchange NFP currently
6  use a Host Family Agreement?
7    A.   Yes, we do.
8    Q.   Does APF Global Exchange NFP collect the
9  executed copies of the Host Family Agreement?
10    A.   Yes.
11    Q.   And has it been a practice since APF
12  Global Exchange NFP's inception?
13    A.   Yes.
14    Q.   Do you know whether Au Pair Foundation,
15  Inc. collected executed copies of the Host Family
16  Agreement?
17    A.   No.
18    Q.   No, you do not know?
19    A.   No, I do not have that direct knowledge
20  as of my role working with APF, Inc.  Sorry.
21  Au Pair Foundation, Inc.
22    Q.   I was just about to suggest something,
23  but -- I was about to suggest that we --
24    A.   Even --
25    Q.   -- refer to --

## Page 180

1    A.   -- I am getting --
2    Q.   I was going to suggest that we refer to
3  Inc. as Au Pair Foundation, Inc. --
4    A.   Inc., uh-huh.
5    Q.   -- and N -- NPF as AFP --
6    A.   Yes.
7    Q.   -- Global.  Because I -- it's a bit of a
8  mouthful every time.  Would that be okay with you
9  and your counsel?
10        MS. SCHAECHER:  I'm not sure I heard
11  all of that.
12        MR. VALDIVIESO:  If I refer to Inc.
13  as Au Pair Foundation, Inc.
14        MS. SCHAECHER:  Uh-huh.
15        MR. VALDIVIESO:  And I refer to NFP
16  as Au Pair Foundation Global Exchange NFP.
17        MS. SCHAECHER:  Do you mean the
18  reverse of that?  Are you looking for a shorthand
19  method?
20        MR. VALDIVIESO:  I -- I -- I was
21  suggesting that we refer to Inc. as Au Pair
22  Foundation, Inc.
23        MS. SCHAECHER:  That's fine.
24        MR. VALDIVIESO:  And NFP as the
25  shorthand for Au Pair Foundation Global Exchange --

## Page 181

1        MS. SCHAECHER:  That's fine.
2        MR. VALDIVIESO:  -- NFP.
3        So we're all on the same page?
4        MS. SCHAECHER:  Yes.
5        MR. VALDIVIESO:  I will try to be
6  consistent.  I apologize if I've already adopted a
7  habit.
8    Q.   So starting on page 95, it's on the third
9  line down, the first full sentence starting -- oh, I
10  apologize.  Under Section A, "Host Family
11  Obligations," the third line down.  It's the
12  sentence that starts with, "Host family."
13        Do you see that?
14    A.   Yes, I do.
15    Q.   Could you please read that sentence into
16  the record.
17    A.   "Host family agrees to attend at least
18  one family day conference" --
19    Q.   I apologize.  I don't think we're on the
20  same page.
21    A.   Oh, sorry.
22    Q.   What -- I'm on page 95.
23    A.   Yes.
24    Q.   Under "Host Family Obligations."
25    A.   Yes.

MAGNA
LEGAL SERVICES

Page 182

1    Q.   The third line down.
2    A.   Oh, I'm sorry.  I went from the bottom.
3    Q.   It's the sentence that starts with, "Host
4   family will."
5    A.   "Host family will pay the au pair a
6   weekly stipend of 195.75 (146.81) in accordance with
7   U.S. Department of State Fair Labor Standards Act
8   guidelines."
9    Q.   Thank you.
10       The 146.81 here, that refers to
11  the EduCare category; is that right?
12   A.   Yes, that's correct.
13   Q.   And 195.75 refers to infant and standard?
14   A.   Yes.
15   Q.   Does the word "minimum" appear in the
16  sentence that you just read?
17   A.   No, it does not.  It is implied as a
18  starting point.
19   Q.   Turning to the next page ending in 96.
20  In the first paragraph, the last sentence, do you
21  see where it starts, "APF may immediately"?
22   A.   Yes.
23   Q.   Could you read that sentence into the
24  record, please.
25   A.   "APF may immediately terminate host

Page 183

1   family's participation in the program and remove the
2   au pair from the host family's home."
3    Q.   Is it fair to say that as of April 24th,
4   2013 APF had the authority to immediately terminate
5   the host family's participation in the program and
6   remove the au pair from the host family's home?
7    A.   As a J-1 visa sponsor, that particular
8   language is also indicated in the Department of
9   State regulations.
10   Q.   Is that still -- is the ability to -- to
11  immediately terminate a host family's participation
12  and remove the au pair from the host family's home,
13  is -- is that something that APF is authorized to
14  do?
15   A.   Only if there is a violation of the
16  regulations or the policies that the Department of
17  State has ensured -- has tasked us with.
18   Q.   On page 98, and the section that I'd like
19  you -- for you to focus on actually continues on to
20  page 99.  The very last full sentence of 98,
21  starting with, "We understand and agree that to the
22  extent."
23       Do you see that?
24   A.   No, I'm sorry, I don't.  Oh, yes.  Sorry.
25   Q.   Could you read that sentence into the

Page 184

1   record, please.
2    A.   Beginning with, "We understand"?
3    Q.   Yes.
4    A.   "We understand and agree to the extent
5   any of our home state labor laws (for example,
6   minimum wage and overtime rules) or federal, state,
7   and income tax laws may apply to the performance of
8   services by an au pair in our home.  We are solely
9   responsible for complying with such laws."
10   Q.   Had you seen this language before today?
11   A.   Yes.
12   Q.   Do you recall any discussion -- and here
13  we're focusing on the time of April 2013 -- well,
14  strike that.
15       Focusing on the time period
16  between NFP's inception and the time of this
17  document, April 24th, 2013, do you recall any
18  discussion between anyone at NFP regarding the
19  extent to which home state labor laws applied to the
20  performance of services by an au pair?
21   A.   No, I do not.
22   Q.   Do you recall any discussions between
23  NFP's inception and the date of this document,
24  April 24th, 2013, regarding the extent to which
25  federal income tax laws apply to the performance of

Page 185

1   services by an au pair?
2    A.   Only in the context of this litigation.
3    Q.   And I'm not asking you to disclose any
4   attorney/client privileged materials.
5    A.   Uh-huh.
6    Q.   But to the extent that you recall any of
7   those discussions with anyone who is not a lawyer,
8   and to the extent you are not relaying information
9   that you had received from your lawyer --
10   A.   Uh-huh.
11   Q.   -- do you recall any discussions on that
12  topic?
13   A.   No.
14   Q.   Do you know why this sentence was
15  included in this agreement?
16   A.   No, I do not.
17   Q.   Do you know whether this sentence was
18  included in Inc.'s Host Family Agreements?
19   A.   No, not from memory.
20   Q.   Right after "General Provisions" in
21  Section K, could you read the first sentence there.
22   A.   "It is agreed that the U.S. labor law
23  shall apply to this agreement, and I agree to submit
24  to the jurisdiction of the state of California
25  courts."

Page 202

1    Q.   And it's guidance from the Department of
2  State --
3    A.   Yes.
4    Q.   -- is that right?
5         Having read this e-mail, does this
6  e-mail indicate to you whether the Department -- the
7  state of Illinois takes a position on whether
8  workers' compensation insurance in the state of
9  Illinois applies to au pairs?
10        MS. SCHAECHER:  Objection to form.
11  Foundation.
12    A.   Yes, I would infer that the -- based on
13  having no legal knowledge, that that's what this is
14  intended to -- to communicate from the -- from the
15  state of Illinois.
16    Q.   And the -- the last sentence on page 9,
17  2942, starting with "However."  Could you read that
18  into the record, please.
19    A.   "However, the Department of State
20  expects" -- "expects sponsors, host families, and
21  exchange visitors alike to comply with all
22  applicable state and local laws during the exchange
23  visitors program."
24    Q.   I just want to be clear on one thing that
25  I think -- I don't want to mischaracterize your

Page 203

1  testimony, so please correct me if I'm wrong.
2    A.   Uh-huh.
3    Q.   But I believe you -- you had testified
4  that you don't recall ever discussing state minimum
5  wage laws' application to services provided by
6  au pairs.  Is that an accurate representation?
7    A.   Yes, I don't recall that.
8    Q.   You don't recall having discussed that
9  with any of your colleagues at NFP?
10    A.   Not -- not -- I don't recall a specific
11  conversation, no.
12    Q.   Do you recall generally discussing the
13  issue?
14    A.   As to whether -- would you restate it?  I
15  mean, to me it was a broad question.  I'm so sorry.
16    Q.   Do you ever --
17    A.   I don't --
18    Q.   Do -- do you recall ever having discussed
19  generally the topic of the application of state
20  minimum wage laws to services provided by an
21  au pair?
22    A.   No, I -- I don't.
23         MR. VALDIVIESO:  We're marking what's
24  APF 000110 as Exhibit 17.
25         (Exhibit No. 17 was marked.)

Page 204

1    Q.   You can take as much time as you need.
2  But my question, I think you probably know what it
3  is by now, is do you recognize Exhibit 17,
4  Ms. Nelson?
5    A.   Yes, I do recognize this exhibit.
6    Q.   What is Exhibit 17?
7    A.   It is the Host Family Agreement with a
8  revision date of 5-28-2013.
9    Q.   Thank you, Ms. Nelson.  You can set that
10  agreement, that exhibit aside.
11        MR. VALDIVIESO:  We are marking
12  APF 000075 as Exhibit 18.
13         (Exhibit No. 18 was marked.)
14    Q.   I'm sorry, just one -- one detail from --
15  I hate to do this to you, but could you pull
16  Exhibit 17 back out.
17    A.   Yes.
18    Q.   Just for the record, on the top of the
19  first page of that document, is that Inc.'s logo on
20  the top?
21    A.   Yes, it is.
22    Q.   Now going back to Exhibit 18.  What is
23  Exhibit 18, Ms. Nelson?
24    A.   Exhibit 18 is the Host Family Agreement,
25  and it has a revised date of 8-2-2015.

Page 205

1    Q.   Are you aware of any revisions between
2  the time of Exhibit 17's publication and August of
3  2015?
4    A.   Not from memory.
5    Q.   Do you know if the Host Family Agreement
6  has been revised subsequent to August 2015?
7    A.   Not in looking at this, no.
8    Q.   Who at NFP would have an idea as to the
9  revision history of Host Family Agreements?
10    A.   I would.
11    Q.   You can't think of anyone better suited
12  than yourself for knowing the revision history of --
13    A.   No, I don't --
14    Q.   -- Host Family --
15    A.   I don't have the revision dates of all
16  the documents memorized, no.
17    Q.   Sorry, that wasn't my question.
18        My question was:  You -- you can't
19  think of anyone, other than yourself, who would have
20  a better knowledge as to the revision history of the
21  Host Family Agreement?
22    A.   No.  I would be.
23    Q.   Looking at the third line after
24  Section A, "Host Family Obligations," could you just
25  read the sentence that begins, "Host family will

MAGNA
LEGAL SERVICES

| Page 206 | Page 208 |
|---|---|

**Page 206**

1   pay," into the record, please.
2          MS. FULLER: Counsel, which exhibit
3   are you on now, 17 or 18?
4          MR. VALDIVIESO: 18.
5          MS. FULLER: Thank you.
6       A.   "Host family" -- let's see. I'm sorry.
7   I've lost my place.
8          "Host family will pay the au pair
9   a weekly stipend of 195.75 (146.81) in accordance
10  with U.S. State Department and Fair Labor Standards
11  Act guidelines."
12      Q.   In comparing that sentence to the
13  sentence that you read for me, which appears almost
14  in exactly the same space, is it fair to say that
15  those are identical.
16      A.   Yes, that -- yes, that sentence appears
17  identical.
18      Q.   And neither sentence includes the word
19  "minimum," modifying the number 195.75; is that
20  correct?
21      A.   I'm sorry, include -- repeat the
22  sentence.
23      Q.   Neither sentence uses the word "minimum"
24  to modify the number 195.75; is that correct?
25      A.   I'm not sure what you mean to modify, but

**Page 207**

1   the word "minimum" is not shown.
2       Q.   Other than as a pdf, are those signed
3   Host Family Agreements stored in any other format?
4       A.   There may be copies of particular host
5   family files in hard copy as well.
6       Q.   And in electronic copy, are any of them
7   kept on a database?
8       A.   No.
9          (Exhibit No. 19 was marked.)
10      Q.   I'm handing --
11      A.   And you were referring specifically to
12  the agreement?
13      Q.   To the Host Fam -- to the signed Host
14  Family Agreements.
15      A.   Okay.
16      Q.   Which I believe you testified, you said,
17  NFP does collect --
18      A.   Yes.
19      Q.   -- and store?
20      A.   Yes.
21      Q.   I'm handing you what's been marked
22  Exhibit 19.
23      A.   Uh-huh.
24      Q.   Whenever you're ready, my question is do
25  you recognize --

**Page 208**

1       A.   Yes.
2       Q.   What is Exhibit 19?
3       A.   Exhibit 19 is the Host Family - Au Pair
4   Agreement.
5       Q.   What is the purpose of the Host Family -
6   Au Pair Agreement?
7       A.   The purpose of this agreement is to
8   identify responsibilities and guidelines,
9   expectations between the host family and the
10  au pair.
11      Q.   By looking at this document, sitting here
12  today, are you able to identify the date of the
13  document?
14      A.   Yes. It has a date of July 2013.
15      Q.   Has NFP used Host Family - Au Pair
16  Agreements since the inception of the au pair --
17  since the inception of NFP?
18      A.   Yes, we have.
19      Q.   Are you aware if Inc. also had a practice
20  of using Host Family - Au Pair Agreements?
21      A.   Yes, I believe they have, some version.
22      Q.   Does NFP collect and maintain signed
23  copies of the Host Family - Au Pair Agreement?
24      A.   Yes.
25      Q.   Where are such agreements kept?

**Page 209**

1       A.   On the server.
2       Q.   Are they also kept on your personal
3   computer?
4       A.   Perhaps.
5       Q.   Do you know if Inc.'s signed Host Family
6   and Au Pair Agreements are kept on either NFP's
7   server or your personal computer?
8       A.   I'm sorry, I got distracted by the light
9   flashing and --
10      Q.   I can repeat the question.
11      A.   -- and dozed off.
12          Repeat it, please.
13      Q.   Do you know if Inc.'s signed Host Family
14  - Au Pair Agreements are kept on either NFP's server
15  or your personal computer?
16      A.   No, I do not.
17      Q.   Do you think it's more likely than not
18  that they are?
19      A.   I think it's less likely.
20      Q.   Why is that?
21      A.   We weren't tasked with maintaining those
22  documents.
23      Q.   But you did testify earlier that you
24  believed that the Au Pair Pledge, dating back to the
25  period of Au Pair, Inc. -- APF, Inc., were, in fact,

PLAINTIFFS' RESP. APP.0004584

**MAGNA**
LEGAL SERVICES

Page 214

1        My question following that was,
2   "Which ones?"
3        A.   All three mentioned.
4        Q.   And what publications?
5        A.   The -- all of them are provided a copy of
6   the Department of State regulations, as well as a
7   document whose name has fluidly changed.  I will
8   refer to it as "The Program Guide."  And we also
9   have a handbook, and that title has also fluidly
10  changed over the years.
11       Q.   Who was the intended audience of what you
12  have described as The Program Guide?
13       A.   Initially, The Program Guide, I believe,
14  was entitled "Handbook."  And I -- from memory, I
15  believe there was a Host Family Handbook, an Au Pair
16  Handbook, and a Local Coordinator Handbook and/or
17  Guide.  We'll use that term loosely.
18            That then evolved into a document
19  where it is now, I believe, called The Program
20  Guide, intended for all three audiences.  Then
21  there's an additional section intended specifically
22  for host families.  And when I say "section," I mean
23  a separate document for host families, local
24  coordinators, and au pairs.
25       Q.   Do you know if NFP has kept the various

Page 215

1   versions of each of the documents that you just
2   described?
3        A.   Yes.  To the best of my ability, yes.
4        Q.   Where have those documents been kept?
5        A.   At the office there on the server and/or
6   my personal computer.
7            THE VIDEOGRAPHER:  Counsel, your
8   microphone is in contact with your documents.
9            MR. VALDIVIESO:  Thank you.
10           THE VIDEOGRAPHER:  Thanks.
11       Q.   Who at NFP had the responsibility for
12  drafting these various documents?
13           MS. SCHAECHER:  Object to the form.
14       A.   I would need to know which specific
15  document.
16       Q.   We can go one --
17       A.   And then it would also depend on the time
18  that the document was written and/or revised.
19       Q.   Did you play a role in drafting or
20  revising any of these documents at any time?
21       A.   Yes.
22       Q.   Which documents and for which time period
23  did you play a role in revising the document?
24       A.   I -- I don't recall.
25       Q.   Did you play a role in drafting or

Page 216

1   revising any of those documents at the time of NFP's
2   inception?
3            MS. SCHAECHER:  Object to form.
4        A.   The documents that are in use for the
5   program, I would say some.  Again, I'd have to see
6   the document to be able to identify if I
7   participated on it.
8        Q.   Do you know if NFP used any publications
9   or materials from Inc. in creating the first version
10  of any of the documents that you described?
11       A.   Yes.
12           MR. VALDIVIESO:  I'm marking what's
13  Bates stamped APF 000160 as Exhibit 20.
14           (Exhibit No. 20 was marked.)
15       Q.   Are you familiar with Exhibit 20,
16  Ms. Nelson?
17       A.   Yes, I am.
18       Q.   What is Exhibit 20?
19       A.   Exhibit 20 is the Au Pair Handbook, and
20  this particular document is dated revised 1-12-2013.
21       Q.   Is this an NFP document or an Inc.
22  document?
23       A.   Let's see.  I would base that off of
24  our -- the date of our designation if -- and I'm
25  going blank on that.  I believe that was in 2012,

Page 217

1   2013.  I'm sorry, I'm going blank on the date that
2   APF became a designated sponsor.  That would
3   determine whose document this is.
4        Q.   The address on the bottom of page 161
5   doesn't help you, does it?
6        A.   Oh, yes.  I'm sorry.  That would be
7   Peta -- the Petaluma one.  That would be an APF
8   document.
9        Q.   And by an A -- APF you mean --
10       A.   N -- NFP.
11       Q.   Understood.
12            But the logo on this document is
13  the logo that you told us belonged to Inc.; is that
14  right?
15       A.   Correct.  The non-for-profit had -- had
16  the legal right to use this logo.
17       Q.   I see.
18            Does it still have the legal right
19  to use that logo?
20       A.   Yes, I would say so.
21       Q.   How do you know that NFP has a legal
22  right -- and I'm not asking for you to disclose any
23  attorney/client communications here.
24            But what is the basis for your
25  understanding that NFP has a legal right to use

## Page 218

1   Inc.'s logo?
2           MS. SCHAECHER:  Objection to form and
3   foundation.
4       A.   So I don't understand the legal aspects
5   or reasonings behind -- the mechanics behind how we
6   use it.  But through the, I will use the word
7   "transfer," for lack of better definition, not using
8   that as a definition.  When the documents -- we
9   had -- we had -- APF Global Exchange had the right
10  to use their name, their logo, and their documents.
11      Q.   Does NFP today still use a document
12  titled Au Pair Handbook?
13      A.   I believe we've changed it to Au Pair
14  Program Guide, my best rec -- recollection.
15      Q.   Would anyone at NFP have had the
16  responsibility for approving the content of the
17  Au Pair Handbook?
18      A.   I would say that would be my
19  responsibility.
20      Q.   Did you share that responsibility with
21  anyone else?
22      A.   No.
23      Q.   I think you referred to something called
24  a Program Guide; is that right?
25      A.   Yes, I believe so.

## Page 219

1       Q.   Is it your responsibility to approve the
2   content of the Program Guide?
3       A.   Yes.
4       Q.   Do you share that responsibility with
5   anyone else?
6       A.   No.
7       Q.   On page 163, where the heading "Standard
8   Care Au Pair."
9           Do you see that?
10      A.   Yes.
11      Q.   And under the bullet that states, "Up to
12  45 hours per week of childcare for children over two
13  years of age," what follows?
14      A.   The next bullet reads, "Weekly stipend of
15  195.75."
16      Q.   Does the word "minimum" appear in that
17  bullet?
18      A.   No, it does not.
19      Q.   Under the heading "Infant Care Au Pair"
20  in the third bullet, what does it say?
21      A.   "Weekly stipend of 195.75."
22      Q.   Does the word "minimum" appear in that
23  sentence?
24      A.   No.
25      Q.   On page 166, on the second bullet at the

## Page 220

1   top, could you please read that bullet into the
2   record starting with, "Commit to."
3       A.   "Commit to exclusively working with your
4   host family for a minimum of 12 months.  No
5   additional employment allowed."
6       Q.   You testified earlier something about NFP
7   not being an employer of the au pair; is that right?
8       A.   That's correct.
9       Q.   Is the host --
10      A.   Wait.  Wait.  Can you re -- repeat the
11  question?  I think I really got tired on that one.
12      Q.   You testified earlier -- earlier
13  something about NFP not being an employer of the
14  au pair?
15      A.   Correct.
16      Q.   Is that right?
17      A.   Yes.
18      Q.   Do you have a position on whether the
19  host family is the employer of the au pair?
20      A.   Yes.
21      Q.   What is your position?
22      A.   My --
23      Q.   N -- NFP's position?
24      A.   NFP's position is the host family is the
25  employer of the au pair.

## Page 221

1       Q.   So an employer/employee relationship
2   exists between the host family and the au pair; is
3   that fair?
4       A.   I don't know that I have the legal
5   back -- background to make that distinction.  I use
6   that term loosely in accordance with the Department
7   of State guidelines.
8       Q.   Looking at the last bullet in that family
9   of bullets that contained the language you just
10  read, do you see the bullet starting with, "Submit
11  required paperwork," just above, "Additional APF
12  Rules"?
13      A.   Yes.
14      Q.   It says, "Submit required paperwork,
15  including a weekly report of working hours and time
16  off and monthly check-ins to your CR and APF."
17          Did I read that correctly?
18      A.   Yes.
19      Q.   What does "required paperwork" refer to?
20      A.   That would refer to any paperwork that we
21  require of the au pair.
22      Q.   Did you require a weekly report of the
23  au pair?
24      A.   To my knowledge, the weekly survey was
25  not in existence in 2013, but I don't recall.  I'd

**MAGNA** ▶
**LEGAL SERVICES**

Page 222

1  have to look at my records.
2      Q.   Does this document, dated January 2013,
3  state a weekly report among the required paperwork
4  required of an au pair?
5          MS. SCHAECHER: Objection. Form.
6      A.   It states, "Submit required paperwork."
7      Q.   And the very next part of that states,
8  "Including." Is that right?
9      A.   Yes.
10     Q.   So is a weekly report included among the
11 required paperwork?
12     A.   Not always. Only if required. The
13 language was intended to be if we asked for it, you
14 submit it. If we require it, you submit it.
15     Q.   Turning to page 167, under "Host Family
16 Responsibilities."
17         Do you see that?
18     A.   Yes, I do.
19     Q.   And then it says, "Host families who host
20 an APF au pair participant are expected to,"
21 followed by a colon.
22         Do you see that?
23     A.   Yes.
24     Q.   Could you please read the second bullet?
25     A.   "Limit your working" --

Page 223

1          (Telephone interruption.)
2      A.   The second bullet --
3      Q.   Yes.
4      A.   -- is that correct?
5          "Limit your working hours to a
6  maximum of 45 hours per week, 30 hours per week for
7  EduCare participants, and 10 hours per day."
8      Q.   Thank you.
9          And the word "maximum" is
10 underlined; is that right?
11     A.   Yes, it is.
12     Q.   Why is that second bullet included in
13 this document, if you know?
14     A.   It is to indicate the Department of State
15 regulations regarding the number of hours that an
16 au pair can work in a week and a day.
17     Q.   Thank you.
18         And the bullet immediately
19 following that bullet, what does it state, please?
20     A.   "Pay a weekly stipend of 195.75 (146.81
21 for EduCare participants)."
22     Q.   Thank you.
23         The word "minimum" doesn't appear
24 in that sentence; is that right?
25     A.   Correct, nor does "maximum."

Page 224

1      Q.   But the word "maximum" appeared in the
2  bullet above and it was underlined, that's right?
3      A.   Yes.
4      Q.   Why does APF include the word "maximum"
5  underlined in the second bullet, but doesn't include
6  the word "minimum" in the third bullet?
7      A.   It's not necessary.
8      Q.   Why is it not necessary?
9      A.   A starting point of 195 means you begin
10 here. Maximum means that's the ceiling, that's the
11 maximum.
12         You'll notice there's also not a
13 starting point of zero hours or one hour.
14     Q.   What word in the third bullet conveys
15 that 195.75 is a minimum?
16     A.   "Pay a weekly stipend of 195.75."
17     Q.   Which of those words conveys that 195.75
18 is a minimum?
19         MS. SCHAECHER: Objection. Form.
20     A.   This is a starting point, so families
21 must pay a minimum of 195.75.
22     Q.   Which of those words indicate that 195.75
23 is a starting point?
24         MS. SCHAECHER: Objection. Form.
25     A.   We, Au Pair Foundation, does not in --

Page 225

1  dictate the pay that the host families provide to
2  the au pair, other than the starting point of
3  195.75.
4          THE VIDEOGRAPHER: Counsel, five
5  minutes until media change.
6          MR. VALDIVIESO: Okay.
7      Q.   Does NFP dictate the number of hours per
8  week?
9      A.   No, NFP does not. The Department of
10 State does. They also dictate the minimum starting
11 wage of 195.75.
12     Q.   Does the Department of State dictate that
13 45 hours per week is a maximum?
14     A.   Yes, that is a regulation within the
15 Department of State regulations for this program.
16     Q.   And the word "maximum" does appear in the
17 second bullet; is that right?
18         MS. SCHAECHER: Objection to form.
19     A.   I -- I believe I've answered that. Yes,
20 it does.
21     Q.   You mentioned weekly surveys. And if you
22 want to use a different word to describe what you
23 were describing, please correct me.
24     A.   That's fine.
25     Q.   But -- and I believe you said they were

MAGNA
LEGAL SERVICES

Case No. 1:14-cv-03074-CMA-KMT   Document 959-24   filed 03/30/18   USDC Colorado   pg 71
of 311

# Exhibit 410

PLAINTIFFS' RESP. APP.0004588

Highly Confidential - Attorney's Eyes Only

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

_____

JOHANA PAOLA BELTRAN, ET AL.,   )

        Plaintiffs,,       ) Case No.

v.                    ) 14-cv-03074-CMA-CBS

                     )

INTEREXCHANGE, INC., ET AL.,   )

        Defendants.     )

_____   )


HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY


    Videotaped oral deposition of MARK JAMES
GAULTER, called by the Plaintiffs herein, held
before a stenographic court reporter at the offices
of Hilman Law Chambers, 197 Spadina Avenue, Suite
402, Toronto, Ontario, on Tuesday, the 9th day of
May, 2017, at 9:00 a.m.

MAGNA
LEGAL SERVICES

Highly Confidential - Attorney's Eyes Only

## Page 2

1  A P P E A R A N C E S:
2  For Plaintiffs:
3  BOIES SCHILLER FLEXNER LLP
   BY:  Dawn L. Smalls, Esq.
4      Daniel R. Schwartz, Esq.
       575 Lexington Avenue
5      New York, NY 10022
       (212) 446-2300
6      dsmall@bsfllp.com
       dschwartz@bsfllp.com
7
8  For Defendant Expert International Group d/b/a
9  Expert AuPair and witness:
   BY:  BOGDAN ENICA, ESQ.
10        100 2nd Avenue S.
          Suite 302-S
11     St. Petersburg, FL 33701
       (727) 225-2649
12     bogdan@expertaupair.com
13
   For Defendant American Institute For Foreign
14 Study d/b/a Au Pair In America:
15 PUTNEY, TWOMBLY, HALL & HIRSON LLP
   BY: JOHN B. FULFREE, ESQ.     (telephone)
16     521 Fifth Avenue
       New York, NY 10175
17     (212) 682-0020
       jfulfree@putneylaw.com
18
19 For Defendant InterExchange, Inc.:
20 SHERMAN & HOWARD, L.L.C.
   BY: ALYSSA LEVY, ESQ.        (telephone)
21     633 17th Street
       Suite 3000
22     Denver, Colorado 80202
       (303) 299-8194
23     alevy@shermanhoward.com
24
   For Defendant Au Pair Care:
25

## Page 3

1  BY: NATHAN HUEY, ESQ.       (telephone)
       555 17th Street, Suite 3400
2      Denver, CO 80202
       (303) 600-6842
3      nhuey@gordonrees.com
4
   For Defendants USAuPair, Inc., GoAuPair,
5  and Au Pair International:
6  WHEELER, TRIGG, O'DONNELL
   BY: NATALIE WEST, ESQ.       (telephone)
7      370 17th Street
       Suite 4500
8      Denver, Colorado 80202
       (303) 244-1918
9      west@wtotrial.com
10
   For Defendant Cultural Care
11
   CHOATE, HALL & STEWART
12 BY:  LYNDSEY KRUZER, ESQ.     (telephone)
       Two International Place
13     Boston, Massachusetts 02110
       (617) 248-5221
14     lkruze@choate.com
15
16
17 ALSO PRESENT:
18 Ronald Eckstein, CIM, CCVS (Certified Legal
19 Videographer and Commissioner for Taking Affidavits)
20
21
22
23
24
25

## Page 4

1            INDEX OF PROCEEDINGS
2
3  WITNESS:  MARK JAMES GAULTER:  SWORN
4  EXAMINATION                    PAGE
5    By Ms. Smalls              10
6    By Mr. Enica               206
7
8
9  QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER: N/a
10 INFORMATION TO BE SUPPLIED: 42, 205
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 5

1            INDEX OF EXHIBITS
2  NO./ DESCRIPTION                    PAGE
3  EXHIBIT 1 marked for identification:    14
4      Revised notice of 30(b)(6)
5      deposition of Defendant Expert
6      Group International d/b/a Expert
7      AuPair.
8  EXHIBIT 2 marked for identification:    26
9      Organization chart, Bates
10     ExpertAuPair000203
11 EXHIBIT 3 marked for identification:    39
12     Organization chart,  Bates
13     ExpertAuPair000202
14 EXHIBIT 4 marked for identification:    49
15     Host Family Application, Bates
16     ExpertAuPair000055-59
17 EXHIBIT 5 marked for identification:    67
18     International Representation and
19     Interviewer Agreement, Bates
20     ExpertAuPair000050-54
21 EXHIBIT 6 marked for identification:    78
22     Expert AuPair flyer, Bates
23     ExpertAuPair000151
24 EXHIBIT 7 marked for identification:    101
25     Depreciation and Amortization,

MAGNA ▶
LEGAL SERVICES

Highly Confidential - Attorney's Eyes Only

|  | Page 126 |
|---|---|

1  A. I believe 2011 or 2012.
2  Q. And why did you join?
3  A. I think, I think we were invited to
4 join. And I saw some benefits to joining.
5  Q. What sort of benefits?
6  A. I think... knowing -- I think there's
7 some advantage to having some liaison with people,
8 with au pairs to -- you know, that the natural
9 reaction is to join an industry group. I mean, just
10 that's, that's a normal thing that business do.
11  Q. And you mentioned specific benefits
12 that you foresaw by joining the Alliance. What
13 would be some of those benefits?
14  A. Conferences. Things like that.
15  Q. When you joined the Alliance in
16 2011 --
17  A. Or '12, yeah.
18  Q. -- or 2012, did you begin attending
19 Alliance meetings on a regular basis?
20  A. I wouldn't necessarily use the word
21 "regular basis" but to give you an indication, I
22 believe I've been to less than ten total meetings,
23 and probably only about five or six.
24  Q. At less than ten but more accurately,
25 you think?

|  | Page 127 |
|---|---|

1  A. Probably five or six.
2  Q. Probably five or six.
3  A. Right.
4  Q. Okay. And how often are the meetings
5 held?
6  A. There is an annual meeting which I
7 believe is always in October. I have not been to
8 them all. There are -- there have in the past been
9 occasional meetings when people are in D.C. to meet
10 the State Department. So it's a convenient way, you
11 know, for people to gather because they're all in
12 the same city.
13  Q. And at the Alliance meetings, do you
14 convene with other sponsors?
15  MR. ENICA: Object to form. Please
16  answer.
17  A. Other sponsors not just of the au
18 pair program but other J-1 exchange programs.
19  BY MS. SMALLS:
20  Q. And you mentioned that there are
21 often State Department meetings that are close in
22 time to the Alliance meetings.
23  Have you attended those State Department
24 meetings as well?
25  A. Yes. And I would object slightly to

|  | Page 128 |
|---|---|

1 the word "often." I don't believe that there have
2 been that many meetings in the State Department. I
3 would again characterize it as maybe five, that I've
4 been to.
5  Q. And at those five or six meetings
6 hosted or in which the State Department gave a
7 presentation, what were the topics?
8  A. A common topic was the, the
9 educational component. And I believe the Department
10 was looking at making changes there.
11  Q. Was the stipend ever discussed?
12  A. There was, in the State Department,
13 there was a presentation which I left the room for
14 because I thought it was inappropriate.
15  Q. What was that meeting?
16  A. That was -- I couldn't tell you the
17 date of that meeting. But there was a meeting when
18 the -- there was a presentation that was about the
19 stipend as part of that meeting. And that was not
20 something, out of due respect for the judicial
21 process, that I was willing to stay for.
22  Q. Who was giving the presentation?
23  A. I couldn't tell you a name.
24  Q. Okay. Do you have a general time
25 frame in terms of year that that --

|  | Page 129 |
|---|---|

1  A. I put it as 2015, maybe.
2  Q. Okay. Was it before or after the
3 lawsuit was filed?
4  A. That would have been after.
5  Q. Okay.
6  A. And again, that was my reason for
7 leaving.
8  Q. And so, at the presentation the
9 stipend was discussed, and that was your reason for
10 leaving?
11  MR. ENICA: Object to form.
12  MS. SMALLS: Well, strike that.
13  Q. You said that the stipend was
14 discussed at this meeting. What was specifically
15 being discussed with respect to the stipend?
16  A. I was not there. So I can't tell
17 you. What I can tell you is that I thought that
18 the -- that the conversation was inappropriate.
19  Q. Okay. Well, what did you hear that
20 lead you to believe that the discussion of the
21 stipend was inappropriate?
22  A. This was based on my, my reading of
23 the Complaint.
24  Q. Did you attend the meeting and then
25 walk out?

MAGNA ▶
LEGAL SERVICES

Highly Confidential - Attorney's Eyes Only

Page 130

1    A.  Yes, I did.  But -- oh, sorry.
2  Sorry.
3    Q.  Go ahead.  Go ahead.
4    A.  But that's not to say I attended
5  the -- the meeting had different topics.
6    Q.  Okay.  You attended a meeting, and
7  then someone said something that lead you to walk
8  out; is that correct?
9    A.  Yes.  And I, I left for the duration
10  of the conversation about the stipend.
11    Q.  Right.  So what I am asking you is,
12  what was said that lead you to believe that the
13  topic or the presentation was inappropriate and that
14  lead you to walk out?
15    A.  I don't.  I know that was -- that
16  that section of the meeting said, I know it said
17  something like stipend or Department of --
18  something.  Something.  There was something on the
19  agenda.  And I just think that the presence of all
20  the sponsors wasn't appropriate.
21    Q.  Has the stipend ever been discussed
22  before at an Alliance meeting?
23    A.  I want to clarify that this is not
24  the Alliance meeting, this is a Department of State
25  meeting which was open to sponsors whether they were

Page 131

1  members of the Alliance or not.
2    Q.  Okay.  Thank you for that
3  clarification.
4    A.  I will say that I have never seen the
5  stipend discussed at an Alliance meeting.
6    Q.  Has the stipend ever been discussed
7  at a State Department meeting that you have
8  attended?
9    A.  Again, I -- well, as described, it
10  was clear that this was about, about the minimum
11  stipend.  And so I was not there.
12    I don't believe I have attended any
13  meeting, either at the Alliance or at the Department
14  of State, and remained there while the stipend was,
15  the minimum stipend was, under any discussion.
16    Q.  So I just want to make sure I
17  understand your answer.
18    A.  Mm.  Yes.
19    Q.  I'm just going to ask, rather than me
20  trying to rephrase what I understand your answer to
21  be.
22    Prior to 2015, or the filing of this
23  Complaint, have there been any State Department
24  briefings or conversations in which the minimum
25  stipend has been discussed?

Page 132

1    A.  My strong impression is that that was
2  the discussion that I left the room for.  And I
3  recall one occasion.
4    Q.  So --
5    A.  So --
6    Q.  In your recollection, other than the
7  discussion that you walked out on...
8    A.  Mm-hm.
9    Q.  There has not been another meeting
10  with the State Department in which the minimum
11  stipend was discussed, or part of the agenda?
12    A.  There has -- so, again, I'm trying to
13  be as faithful as I can.  The answer is, there have
14  been other meetings.  I recall somebody, somebody
15  asked a question about the minimum stipend which an
16  attorney present in the room said was inappropriate.
17  That was as far as that part went.
18    Q.  That's a separate meeting?
19    A.  That's a separate meeting in which
20  somebody on a call-in line was asking a question
21  that the attorney present felt was inappropriate.
22  And had that conversation gone on, I would have
23  again left the room.  But it was not addressed.
24    Q.  And why are these discussions of the
25  minimum stipend inappropriate?

Page 133

1    A.  I think the concern I have is that
2  the -- this is a judicial process.  And there are
3  two major causes for my concern.  The first one is,
4  you are all doing a job and the process will work
5  this out somehow.  That's my first position.  The
6  second thing is that the Complaint addresses an
7  alleged -- and again, I'm summarizing as a layperson
8  would -- it addresses whether there was in some
9  sense an agreement to do something, which I have
10  never been a part of and would not support.
11    So I think being in a room in which there
12  is discussion of the minimum stipend I did not see
13  as being in Expert AuPair's best interest.
14    Q.  Have you ever represented that the
15  minimum stipend was determined by the Department of
16  State?
17    A.  We certainly have circulated the
18  Department of State's minimum stipend document that
19  has their seal at the top.
20    Q.  Have you ever in your documents
21  affirmatively said that the minimum stipend is
22  determined by the Department of State and/or the
23  Department of Labour?
24    A.  I could not tell you that.
25    Q.  Okay.  You mentioned the prior

MAGNA ▶
LEGAL SERVICES

Highly Confidential - Attorney's Eyes Only

Page 170

```
 1              insurance for the au pair, detailed
 2              pre-screening of the au pair, Skype
 3              interview with the au pair prior to
 4              their arrival, embassy scheduling
 5              and visa [terms]" -- I think.
 6           I think the sentence stops there.
 7      Can you tell me what the "detailed
 8   pre-screening of the au pair" is?
 9           MR. ENICA:  I would have to object to the
10      fact that you mentioned the sentence stops
11      there, but the sentence continues on the
12      next line.
13           And I also want for the record to
14      make clear we are talking about Exhibit
15      13.  The Bate number of the document is
16      different.
17      MS. SMALLS:  Okay.  Exhibit 13, I think I
18      already said the Bates number.
19      MR. ENICA:  Correct.
20      MS. SMALLS:  Which is zero --
21      MR. ENICA:  You mentioned document number
22      13, so I just want to make sure for the
23      record that it's Exhibit 13.
24      MS. SMALLS:  Okay, but let me just read
25      the whole sentence because I --
```

Page 171

```
 1           (Query by reporter)
 2      MR. ENICA:  You referred to Exhibit 13.
 3      BY MS. SMALLS:
 4      Q.  Exhibit 13:
 5           "When you become a host family
 6           your program fees cover everything
 7           including the following:  Health
 8           insurance for the au pair, detailed
 9           pre-screening of the au pair, Skype
10           interview with the au pair prior to
11           their arrival, embassy scheduling
12           and visa terms [sic], support
13           network through the local and
14           regional representatives,
15           orientation, airfare, child
16           development training, and CPR and
17           First Aid training."
18      That sentence refers to "detailed
19   pre-screening of the au pair."
20      Can you tell me what is referred to there
21   or what constitutes the "detailed pre-screening of
22   the au pair" referred to in that sentence?
23      A.  I can certainly try.  I would like to
24   correct, I believe it says visa forms, not visa
25   terms.  That's what I'm reading.  But again, the
```

Page 172

```
 1   copy is -- this isn't --
 2      Q.  We can change that to "visa forms."
 3      A.  Yeah, it's --
 4      Q.  I was reading it the best I could.
 5      A.  Yes, I'm not sure that must was done
 6   with this advertisement.  I don't think it was -- as
 7   I say, I don't really like the way it's written, so
 8   I -- you know, I'm -- and I would like again to
 9   emphasize it's historic.
10      The pre-screening would involve collecting
11   references, the medical check that we're required to
12   do by law, a personality profile, a criminal record
13   check in home country and in any country they've
14   spent more than a year in, because some people will
15   move, become au pairs in the UK and come over, for
16   example.  And it's what's required by law.  A test
17   of English proficiency as well.
18      I may be missing something, but those are
19   the things that I can think of.
20      Q.  But that screening, the elements that
21   you've just or the components that you just outlined
22   are conducted by the in-- the recruiting companies,
23   as we've been referring to them; is that correct?
24      A.  In almost all cases, the
25   pre-screening will be done by us.  Now, sometimes
```

Page 173

```
 1   the -- sometimes people will collect documents and
 2   send them.  But we have all of those documents in
 3   head office and review them all.  So that -- that
 4   isn't -- that is not done by recruiting -- well, to
 5   the extent it is done by the recruiting
 6   organizations, it is stuff that we also look at.
 7      And so, to the extent the -- you know, to
 8   all extents, I think, we can say we do that.
 9      Q.  Okay.  The sentence also refers to
10   health insurance for the au pair.
11      Who -- how does health insurance for the
12   au pair work?  And how did the fees, the program
13   fees by the host family, pay for them?
14      MR. ENICA:  Object to form.
15      A.  The medical cover we buy from a
16   company I've mentioned before, Global Secutive.  We
17   pay the amount, and we will enroll them before their
18   arrival.  And clearly, I mean, we are -- the family
19   pays a fee.  So that would be where the money
20   comes from.
21      BY MS. SMALLS:
22      Q.  Okay.  And so the health insurance
23   that the au pair has while they are in United
24   States, is arranged and done by Expert AuPair?
25      MR. ENICA:  Object to form.
```

Highly Confidential - Attorney's Eyes Only

Page 182

1  is that correct?
2  A. Yes, that's my, that's my reading of
3  it, yes.
4  Q. Okay. And under "Fees and costs,"
5  can you read -- well, can you read that whole
6  section under "Fees and costs"?
7  A. Yes. (As read)
8  "At Expert AuPair, we have a
9  strict no-hidden-fee policy.
10  Here's what you can expect to pay:
11  Program fee: 6,400.
12  Domestic transfer: 0-350.
13  Tuition allowance" --
14  And my copy is not clear but I believe
15  that would say "500."
16  "Weekly stipend: 195.75."
17  Total is approximately $330 a week for one
18  year.
19  Q. So understanding that these are,
20  Exhibit 6 and Exhibit 13 are, just two
21  advertisements, based on these two advertisements,
22  can you tell me anything that would attract families
23  that are interested in paying their au pair more
24  than the minimum stipend of 195.75?
25  MR. ENICA: I object to form. And may I

Page 183

1  request a clarification or you want him to
2  answer?
3  BY MS. SMALLS:
4  Q. I want him to answer.
5  A. I believe it is accurate to say that
6  both of these advertisements -- and again, I find
7  this one sloppy and I've mentioned that -- I believe
8  that both of these advertisements were aimed at
9  people who had not heard of the au pair program more
10  than more than for people who were currently housing
11  an au pair or had heard of the au pair program.
12  Q. What percentage of the families that
13  participate in your program have never heard of the
14  au pair program, versus families that already house
15  an au pair or are already versed in the program?
16  A. It's very hard for me to say that
17  because I don't -- I haven't collected all that
18  data, at least not -- it's not something we've done.
19  The probable answer to your question is,
20  about 50 percent, probably, and again, this is
21  conjecture, about 50 percent have not heard of an au
22  pair or at least thought it was not something that
23  they -- that would be something that they would --
24  an avenue they would pursue.
25  Q. I only ask that question because you

Page 184

1  drew a distinction between families, I guess,
2  advertising that would be geared towards families
3  that had never heard of the au pair program versus
4  families that were already housing an au pair or
5  were already versed in the program?
6  A. Yeah.
7  Q. So for families that had never heard
8  of the au pair program, is there anything in either
9  of these advertisements that would attract or
10  indicate to them that they should come to Expert
11  AuPair or that it would be geared to pay their au
12  pair more if they came through Expert AuPair versus
13  another sponsor agency?
14  MR. ENICA: I object to form. If you
15  understood, you can answer.
16  A. I don't think that this, these
17  advertisements were written for that purpose. And
18  while I understand you asked the question -- I
19  think, I think what I would add to my previous
20  answer is that these are printouts, and we probably
21  have produced this maybe a, maybe a copy of -- maybe
22  a thousand of them and put them on doors in
23  St.~Petersburg, where the au pair program is perhaps
24  not as well known as it may be elsewhere.
25  But once more, the first question that --

Page 185

1  the first thing we have to do is let people know
2  about the au pair program. The second part is once
3  they do know, they can decide, you know, I want to
4  do this, I want to do that for my au pair.
5  Some families will buy a new car for the
6  au pair. Some will -- lots, lots of things can
7  happen. But it's certainly, it's certainly fair to
8  say these are for -- these are to tell people about
9  the au pair program rather than really necessarily
10  looking at us.
11  Q. Are there other advertisements that
12  target families that already have an au pair or are
13  already versed in au pairs that tell them that, as
14  you said it, because your fees are lower, they can
15  pay their au pair more?
16  A. I believe it says something to that
17  effect on the website or on the historic version of
18  the website, which is available still or archived, I
19  expect, at Expert AuPair.com.
20  MS. SMALLS: For folks on the phone...
21  THE REPORTER: This is 14, sorry.
22  MS. SMALLS: We're now marking as Exhibit
23  14, Expert AuPair number 1.
24  EXHIBIT 14 marked for identification: AuPair
25  Agreement, Bates ExpertAuPair000001-8

PLAINTIFFS' RESP. APP.0004594

MAGNA
LEGAL SERVICES

Case No. 1:14-cv-03074-CMA-KMT Document 959-24 filed 03/30/18 USDC Colorado pg 78 of 311

# Exhibit 411

Page 1

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
----------------------------x

JOHANA PAOLA BELTRAN, ET AL,

                Plaintiffs,

      v.                Civil Case No.
                        14-cv-03074-CMA-KMT

INTEREXCHANGE, INC., ET AL.,

                Defendants.

----------------------------x


CONFIDENTIAL VIDEOTAPED DEPOSITION
OF RUTH FERRY
NEW YORK, NEW YORK
Thursday, May 11, 2017




Reported by:

JEREMY RICHMAN

JOB NO:   314334


MAGNA LEGAL SERVICES

320 West 37th Street, 12th Floor

New York, New York 10018

(866) 624-6221

PLAINTIFFS' RESP. APP.0004596

| | |
|---|---|
| Page 2 | Page 4 |

**Page 2**

```
1
2
3
4              May 11, 2017
5              9:11 a.m.
6
7        CONFIDENTIAL VIDEOTAPED DEPOSITION
8   of RUTH FERRY, held at the offices of Boies
9   Schiller & Flexner, 575 Lexington Avenue, New
10  York, New York, before JEREMY RICHMAN, a
11  Shorthand Reporter and Notary Public of the
12  State of New York
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
1
2   APPEARANCES (Continued):
3
4   GIBSON DUNN
5   Attorneys for American Institute For Foreign
6   Study, Inc., d/b/a  Au Pair in America
7        200 Park Avenue
8        New York, NY 10166-0193
9   BY:  ERIC J. STOCK, ESQ.
10       (estock@gibsondunn.com)
11
12  SHERMAN & HOWARD
13  Attorneys for defendant InterExchange
14       633 Seventeenth Street, Suite 3000
15       Denver, CO 80202
16  BY:  JOSEPH H. HUNT, ESQ., via teleconference
17       ALYSSA LEVY, ESQ., via teleconference
18       (jhunt@shermanhoward.com)
19       (alevy@shermanhoward.com)
20
21
22
23
24
25
```

**Page 3**

```
1
2   APPEARANCES:
3
4   BOIES SCHILLER & FLEXNER
5   Attorneys for plaintiffs
6        575 Lexington Avenue
7        New York, NY 10022
8   BY:  RANDALL JACKSON, ESQ.
9        BYRON D.M. PACHECO, ESQ.
10       (rjackson@bsfllp.com)
11       (bpacheco@bsfllp.com)
12
13  PUTNEY, TWOMBLY, HALL & HIRSON, LLP
14  Attorneys for American Institute For Foreign
15  Study, Inc., d/b/a  Au Pair in America
16       521 Fifth Avenue
17       New York, NY 10175
18  BY:  STEPHEN J. MACRI, ESQ.
19       (smacri@putneylaw.com)
20
21
22
23
24
25
```

**Page 5**

```
1
2   APPEARANCES (Continued):
3
4   NIXON SHEFRIN HENSEN OGBURN, P.C.
5   Attorneys for 20/20, A.P.E.X.
6        5619 DTC Parkway, Suite 1200
7        Greenwood Village, CO 80111
8   BY:  KATHLEEN E. CRAIGMILE, via teleconference
9        (kcraigmile@nixonshefrin.com)
10
11  BOGDAN ENICA, ESQ.
12  Attorneys for defendant Expert Group
13  International dba Expert AuPair
14       111 Second Avenue NE, Suite 204
15       St Petersburg, FL 33701
16  BY:  BOGDAN ENICA, ESQ.
17       (bogdane@hotmail.com)
18
19
20
21
22
23
24
25
```

PLAINTIFFS' RESP. APP.0004597

MAGNA ▶
LEGAL SERVICES

Page 110

1
2   way to put it. There's no value in
3   raising the -- raising the weekly
4   stipend for an au pair if I have more
5   au pairs anytime than are possibly
6   going to be placed.
7       Q.   What do you mean --
8       A.   We're only able to place
9   somewhere between 72 and 80 percent of
10  the au pair applicants that we receive
11  that are cleared to be accepted into
12  the program.
13      So you lose many in the
14  process, but at the end of the day, I
15  want a relatively high placement rate.
16      Q.   What do you mean when you
17  say there's no value?
18      A.   If the -- if you suggest
19  that we're going to pay the au pair
20  more, then I'm going to have more of a
21  challenge -- more than the state
22  minimum, then I will have more of a
23  challenge to compete against
24  competitors who are -- why would a
25  hosting family go with   Au Pair in

Page 111

1
2   America when I tell them that the
3   minimum stipend for the au pairs in
4   our program are going to be greater?
5       The -- there's no -- when I
6   also want to have -- ensure that the
7   high volume of applicants that are
8   coming into the program will be pretty
9   secure to have a placement.
10      Otherwise, I'm going to be
11  the known entity on the block. Don't
12  apply to them. Don't apply to this
13  organization, because they're not able
14  to secure a placement for you.
15      Q.   Isn't it the case, though,
16  that there are -- if you were able to
17  recruit a higher percentage of the
18  available au pairs, that you would
19  have the potential to edge out some of
20  your competitors, in terms of the
21  ability to actually place au pairs
22  with host families?
23          MR. MACRI: Objection, form
24      and foundation.
25      A.   I think that is very

Page 112

1
2   unknown, you know. I think the
3   limitation is on the volume of
4   families that are willing and wanting
5   and able to participate in this
6   program in the U.S. That is the
7   limitation.
8       Q.   What is the average amount
9   of money that host families associated
10  with your organization are paying the
11  au pairs?
12          MR. MACRI: Objection, form
13      and foundation.
14      A.   I can't tell you that,
15  because that's between the au pair and
16  the hosting family.
17      Q.   At no point --
18      A.   I don't know what their
19  compensation package makes up.
20      Q.   Is that something that you
21  could survey the au pairs about?
22          MR. MACRI: Objection to
23      form.
24      A.   I believe you already do
25  that.

Page 113

1
2       Q.   Right. I'm just asking, is
3   that something that your organization
4   could ask the au pairs about?
5       A.   Certainly, we could ask the
6   au pairs that.
7       Q.   Okay. Is there a reason
8   that you haven't?
9       A.   I've seen no reason to do
10  so.
11      Q.   So in terms of trying to
12  understand the market for host
13  families, at no point did the
14  organization want to try to get a
15  handle on how much the host families
16  were actually paying the au pairs?
17          MR. MACRI: Objection, form.
18      A.   No.
19      Q.   Why?
20      A.   Because it's not just a
21  question of a weekly payment. It's an
22  entire -- what is the compensation --
23  you know, what is the difference
24  between the family that's -- you know,
25  the au pair that's going to have a

PLAINTIFFS' RESP. APP.0004598

**MAGNA**
LEGAL SERVICES

Page 150

```
1
2          mark Exhibit 7, 8, and 9.
3              (Exhibit 7, marked for
4          identification, Bates stamped
5          AIFS0063180.)
6              (Exhibit 8, marked for
7          identification, Bates stamped
8          AIFS0000063.)
9              (Exhibit 9, marked for
10         identification, Bates stamped
11         AIFS0062581.)
12         Q.   Can you take a look at
13     Exhibit 8, the Africa ambassadors
14     document, which is AIFS0000063?
15         Do you recognize this
16     document, Ms. Ferry?
17         A.   I don't.  I recognize
18     pictures in it.
19         Q.   Are you familiar with the
20     African ambassadors program?
21         A.   It is the partner
22     organization based in Cape Town, South
23     Africa, that recruits and screens
24     Africans from South Africa, Namibia,
25     and Malawi.
```

Page 151

```
1
2          Q.   Can we go to page -- about
3      the fifth page, I belive, the one that
4      ends in Bates number 0000068?
5          A.   68?
6          Q.   Yes, ma'am.  It says, What
7      is an     au pair?  And do you see on
8      that document where it says study up
9      to three hours per week?
10         A.   Yes.
11         Q.   Okay.  What does that refer
12     to?
13         A.   The educational component to
14     the program.  Each au pair is expected
15     to register and participate in
16     educational courses during their year.
17         Q.   And the understanding is, it
18     shouldn't exceed more than three hours
19     per week?
20         A.   Well, that's the implication
21     here.  I think it's to give sort of a
22     concept of, you know, so you can
23     expect to study up to about three
24     hours per week.  I think that was the
25     intent.
```

Page 152

```
1
2          Q.   Just above that, it says,
3      "Provides up to 45 hours childcare per
4      week."  And that refers to the
5      expectation that the au pair will
6      provide up to 45 hours of childcare
7      per week, correct?
8              MR. MACRI:  Objection as to
9          form and foundation.
10         A.   They will provide up to
11     45 hours of childcare per week for the
12     children in the home -- that is in
13     their host family's home.  Let's make
14     that clear.
15         Q.   Sure.
16         A.   Okay.
17         Q.   Now, the fifth -- I'm sorry.
18     The sixth bullet here says, "Earn
19     $195.75/$250 weekly pocket money"?
20         A.   That's correct.  It does.
21         Q.   And when you were -- this is
22     the same pocket money that you were
23     referring to earlier sort of
24     interchangeably with the stipend?
25         A.   That's correct.
```

Page 153

```
1
2          Q.   Nowhere in this document, am
3      I correct, does it indicate that that
4      amount is a minimum, right?
5          A.   That's correct.
6          Q.   Can we go to the page that
7      ends in 0071?  And you see in the
8      third bullet there, it says, "Earn
9      195.75 weekly pocket money."  And then
10     it has in parentheses, "$250 per week
11     for Au Pair Extraordinaire"?
12         A.   Correct.
13         Q.   That's referring to the
14     expected payment that the au pair will
15     receive, right?
16             MR. MACRI:  Objection as to
17         form.
18         A.   Yes.
19         Q.   And it doesn't indicate here
20     that that's referring to a minimum,
21     right?
22         A.   No, it does not.
23         Q.   Can we go to the next page,
24     which is ending in 0000072?
25         A.   Yes.
```

PLAINTIFFS' RESP. APP.0004599

**MAGNA**
LEGAL SERVICES

Case No. 1:14-cv-03074-CMA-KMT Document 958-22 filed 03/17/18 USDC Colorado pg 83
of 310
Case 1:14-cv-03074-CMA-KMT Document 925-59-21 Filed 03/30/18 USDC Colorado Page 82 of 310

Page 154

```
 1
 2      Q.   This one refers to EduCare
 3   in America.  And EduCare in America is
 4   another program, right?
 5      A.   It's under the same Visa as
 6   the Au Pair in America program.  So
 7   it's -- the au pair program and the
 8   EduCare program is just the -- the
 9   regulations for the EduCare component
10   are written differently in the federal
11   regulations.
12      Q.   And the primary difference
13   between those two programs is what you
14   spell out in the first bullet point,
15   right, where it says, "This program is
16   for someone who prefers to spend more
17   time studying and less time caring for
18   the host family's children"?
19      A.   That's correct.
20      Q.   The second bullet point
21   says, "With EduCare, you will work up
22   to 30 hours a week instead of
23   45 hours.  You will earn slightly less
24   pocket money.  However, your U.S.
25   1,000 study allowance allows you to
```

Page 155

```
 1
 2   take courses for six hours a week,"
 3   correct?
 4      A.   Yes.
 5      Q.   The reason that you're able
 6   to say you will earn slightly less
 7   pocket money is because your
 8   organization understands exactly how
 9   much the au pair is expected to earn
10   in each of these programs, correct?
11      MR. MACRI:  Objection as to
12   form and foundation.
13      A.   Well, they need to
14   understand that the minimum pocket
15   money that they earn will be less than
16   the 195.75.
17      Q.   Right.  But you just said
18   the minimum.
19      A.   Yes.
20      Q.   It doesn't say minimum in
21   the document, right?
22      A.   Well, this is a marketing
23   and sales document.
24      Q.   Right.  But my question is
25   just, it doesn't say minimum in the
```

Page 156

```
 1
 2   document, right?
 3      A.   No.  It does not say minimum
 4   in the document.
 5      Q.   It says, "You will earn
 6   slightly less pocket money," correct?
 7      A.   It does state that, yes.
 8      Q.   And the reason that your
 9   organization is able to say that is
10   because you have an understanding of
11   how much pocket money a person is
12   going to get in EduCare and in the au
13   pair program, right?
14      A.   Yes.
15      Q.   And that's reflected in the
16   documents, the amount that you expect
17   them to earn, right?
18      A.   Yes.
19      Q.   Now, let's take a look at
20   what we're going to mark as
21   Exhibit 10.
22      (Exhibit 10, marked for
23   identification, Bates stamped
24   AIFS0058479.)
25      Q.   Do you recognize this
```

Page 157

```
 1
 2   document, Ms. Ferry?
 3      MR. JACKSON:  And just for
 4   the record, this is a document
 5   that was produced in native
 6   format.  The Bates number that
 7   corresponds with this document is
 8   AIFS0058479.
 9      Q.   Ms. Ferry, what is this
10   document?
11      A.   I believe this document is a
12   PowerPoint presentation that can be
13   used by a community counselor to use
14   in doing a presentation in front of, I
15   would presume, a group of interested
16   families to give an overview of the
17   program and as a way to educate them
18   about the possibility of joining the
19   Au Pair in America program.
20      Q.   Right.  Can we go to the
21   fourth page of this document, the one
22   that starts with, "Added benefits of
23   live-in childcare with   Au Pair in
24   America"?
25      A.   Mm-hmm.
```

PLAINTIFFS' RESP. APP.0004600

MAGNA
LEGAL SERVICES

Page 158

1
2      Q.   The second bullet point on
3   that page is, "Only $347 per week.
4   That's per family, not per child,"
5   with an exclamation point, correct?
6      A.   That's correct.
7      Q.   How was that $347
8   calculated?
9      A.   I would presume that would
10  have been calculated based on the --
11  what year this is -- the program fee
12  prorated, plus the weekly pocket money
13  prorated, to establish a per week
14  average rate.
15     Q.   Right.  And the
16  reasonable -- what your organization
17  is attempting to communicate in this
18  particular bullet point is that the
19  host family can expect to only pay
20  $347 per week when you add the stipend
21  that they'd be expected to pay and the
22  prorated amount?
23        MR. MACRI:  Objection as to
24  form.
25     A.   Well, that's the hook.

Page 159

1
2      Q.   What do you mean when you
3   say that's the hook?
4      A.   Well, you're trying to get
5   the lead in the door.  You're trying
6   to get the customer interested.
7      Q.   Okay.
8      A.   Once you have the lead in
9   the door, then you have to start
10  educating them about the program, you
11  know, the room and board, the private
12  room, the transportation, the
13  educational benefit, the limitation on
14  hours, the -- whatever it is, the
15  support services.  There's a whole
16  litany of stuff.
17     Q.   But you would agree --
18     A.   And then you would -- then
19  you would give them the program fee.
20  We would -- we would hand out
21  brochures.
22        Every brochure would have a
23  program fee insert that would describe
24  the program fees, the minimum stipend
25  amounts, how they're described and

Page 160

1
2   established by the Department of
3   State.
4        This is not giving them all
5   those details.  These are a few
6   highlights.
7      Q.   Okay.  But you would agree
8   that that's a -- that's a pretty
9   important detail, the amount of money
10  that they can expect to pay?
11        MR. MACRI:  Objection as to
12  form.
13     A.   Repeat the question.
14     Q.   You would agree with me that
15  one of the most important details is
16  be communicated to the host families
17  is the amount of money that they can
18  expect to pay, right?
19     A.   I think there are many other
20  details that need to be communicated
21  as well, but I would agree with you
22  that before a family -- and this is
23  not -- this is an introductory piece.
24        Before a family is even
25  thinking about applying to the

Page 161

1
2   program, they're going to know -- need
3   to know many more details about the
4   fees and the full investment of their
5   financial investment in the program.
6      Q.   Right.  But you'd agree with
7   me, correct, that one of the most
8   important details is the amount of
9   money they can expect to pay?
10     A.   That will be one of the most
11  important details.
12     Q.   And the implication from
13  this part of the slide is that they
14  can expect to pay only $347 per week,
15  right?
16        MR. MACRI:  Objection as to
17  form.  Counsel is stating
18  argument, not posing questions.
19        You need to ask questions.
20  That's how I understand a
21  deposition to work.
22        MR. JACKSON:  Your objection
23  is fully noted.
24     Q.   Now, could you please answer
25  the question, ma'am?

PLAINTIFFS' RESP. APP.0004601

MAGNA
LEGAL SERVICES

Page 162

```
1
2       A.   I don't know what question
3   I'm answering.
4       Q.   The question is, the
5   implication from this part of the
6   slide is that the host families can
7   expect to pay only $347 per week,
8   correct?
9       A.   That is an implication
10  stated here.
11      Q.   Okay.
12      A.   Long before they join the
13  program, they're going to learn
14  differently.
15      Q.   Okay.  But that's the
16  implication from this part of this
17  slide, correct?
18      A.   Yes.
19          MR. JACKSON:  Now, can we go
20  to -- let's mark Exhibit 11,
21  which is a document with Bates
22  number AIFS0059062.
23          (Exhibit 11, marked for
24  identification, Bates stamped
25  AIFS0059062.)
```

Page 163

```
1
2       Q.   Do you recognize this
3   document?
4       A.   I do.  I haven't seen a CQ
5   in a long time.
6       Q.   What is a CQ?
7       A.   It's a communication
8   newsletter that we used to prepare and
9   distribute to community counselors.
10  It was a form of communicating
11  information out.  It was a monthly
12  newsletter.
13      Q.   And this particular CQ has
14  the heading, Germany, Our Number One
15  Recruiting Country?
16      A.   Yes, it does.
17      Q.   What is that a reference to?
18      A.   Germany is our number one
19  country that we recruit au pairs from,
20  meaning we recruit more au pairs from
21  Germany.
22      Q.   Is that still the case?
23      A.   It is still the case, but
24  not for much longer.  Birth rate is
25  going down.
```

Page 164

```
1
2       Q.   Let me ask you about that.
3   So, first, why is it the number one
4   country that you recruit from?
5       A.   Oh, Germans -- Germans --
6   born and bred in their culture is gap
7   year.  Finish high school.  Go away.
8   Do something for a year.  Come back
9   and start university.  That's what
10  they do.
11      Q.   And you said that it's not
12  going to be the number one country for
13  long.  Why is that?
14      A.   Birth rate is declining.
15      Q.   Does the organization do
16  advertising in Germany?
17      A.   Yes.  We have a subsidiary
18  office in Germany.
19      Q.   What kind of advertising do
20  you do for potential au pairs there?
21  And by that, just to be a little bit
22  more clear, I mean, are you utilizing
23  newspapers, internet, word of mouth?
24  What are the forms of --
25      A.   Well, most of it is now
```

Page 165

```
1
2   internet rather than print or paper
3   advertising.  So most of it is
4   internet advertising, referral,
5   information sessions.
6          So going out to -- in
7   Germany, it's not uncommon to go into
8   schools to -- a year or two before
9   students are graduating to educate
10  them about.
11          Like schools will hold fairs
12  so that students can find out what
13  they could possibly consider doing in
14  their gap year.
15      Q.   You said most of it is
16  internet now.  Does that include your
17  website?
18      A.   I'm not sure what you mean.
19  Does that include my website?
20      Q.   Well, I mean, is the website
21  one of the internet tools that you
22  utilize, I guess, as part of your
23  marketing efforts or your recruitment
24  efforts?
25      A.   Yes.
```

PLAINTIFFS' RESP. APP.0004602

MAGNA
LEGAL SERVICES

Page 202

1
2     A.   Right.
3     Q.   And so wouldn't it be more
4  clear, in terms of what the
5  affordability is, if you made some
6  allowance in this document, in this
7  enticement portion, for the fact that
8  it's not a fixed fee?
9         MR. MACRI:  Objection as to
10  form.
11    A.   Well, I'm not the marketing
12  expert, but I think our organization
13  looks at advertising trends, if you
14  will, and advertising techniques, not
15  only across the au pair program, but
16  other types of programs.  And this is
17  a competitive piece.
18        What's going to attract you
19  to get in touch with me so Au Pair in
20  America can tell you more about this
21  program?
22    Q.   What other -- you just
23  mentioned advertising techniques that
24  you look at, not only across the au
25  pair program, but other types of

Page 203

1
2  programs.
3         What other types of programs
4  have you looked at, where there was an
5  indication of a fixed cost in the
6  advertisement, but later on, it was
7  going to be revealed that it was not a
8  fixed cost?
9         MR. MACRI:  Objection as to
10  form and foundation.
11    A.   I'm not particularly
12  familiar with any in particular,
13  because I probably wouldn't have
14  continued to find out what the other
15  costs would be if I wasn't shopping
16  myself.
17    Q.   Okay.  But what I'm asking
18  is, a moment ago, you said that your
19  organization looks at advertising
20  trends, not only across the au pair
21  program, but other types of programs,
22  and that that was the reason that you
23  had decided to indicate in the
24  advertisements that there would be a
25  fixed fee, when, in reality, the fee

Page 204

1
2  was flexible.
3         What I'm asking is what you
4  looked at.
5     A.   Well, this -- the fee being
6  flexible is -- this doesn't even
7  include all of the fees.  This doesn't
8  include the educational monies.  This
9  doesn't include the room and board.
10  This doesn't include the private room.
11  This doesn't include the
12  transportation costs.  This doesn't
13  include -- there are many things that
14  this doesn't include.
15    Q.   I understand that, ma'am.
16  I'm only asking, what are the other
17  types of advertising that you looked
18  at?
19    A.   It would be likely that we
20  would look at other au pair programs.
21  It would be likely that we would look
22  at nanny programs, maybe not so much
23  programs, but nanny advertising.
24        Those would be the two
25  bigger components.  So it's sort of

Page 205

1
2  the one-on-one childcare.  Possibly,
3  childcare centers or in-home
4  childcare.  It's being awareness of
5  your broad spectrum of childcare.
6     Q.   All right.  And to the
7  extent this is just a hook, you're
8  aware that the person who is going to
9  be hooked by this is going to have a
10  misimpression about whether or not
11  this is a fixed fee at this point,
12  right?
13    A.   At this point.  Absolutely.
14    Q.   Now, can I ask you to take a
15  look at Exhibit 13, which we already
16  marked?
17        Now, this is a document
18  ending in Bates stamp number 2079.
19  Are you familiar with this document,
20  ma'am?
21    A.   I don't know that I'm
22  familiar with this specific document.
23  I'm certainly familiar with the
24  content of the document.
25    Q.   This is a fact sheet that

PLAINTIFFS' RESP. APP.0004603

MAGNA
LEGAL SERVICES

Page 222

1
2    because sometimes you think Ms.
3    Ferry has stopped, but if we
4    could allow her to speak through
5    her entire answer and then get
6    your questions.  Thank you.
7        MR. JACKSON:  I will take
8    that under advisement, Counsel.
9    I apologize if at any point I've
10   stepped on Ms. Ferry's answers.
11       I'm certainly eager to have
12   her complete every answer, and I
13   will take an additional --
14       And, Ms. Ferry, I would
15   encourage you.  If I do start to
16   answer a question and you think
17   that -- that would be great.  If
18   you could put up your hand.
19       If I start to answer a
20   question -- start to ask you a
21   new question and you haven't
22   actually completed it, if you put
23   your hand up, I will let you
24   finish.
25       MR. MACRI:  Thank you very

Page 223

1
2    much.  I realize there are
3    different styles.  Thank you very
4    much.
5        MR. JACKSON:  Thank you.
6    Q.   Now, I want to go back to
7    one of the -- one of the things that
8    you were sharing with us a moment ago
9    is that even though in the hook
10   materials, there will -- there are
11   suggestions that the stipend amount is
12   fixed, it's your expectation that,
13   later in the process, host families
14   are educated about the fact --
15       MR. MACRI:  Objection as to
16   form.
17       Sorry.  I didn't realize you
18   weren't finished.  I'm sorry.
19       MR. JACKSON:  That's fine.
20       MR. MACRI:  See, I did it.
21       MR. JACKSON:  That's fine.
22   Q.   -- are educated about the
23   fact that the amount is actually
24   flexible, correct?
25       MR. MACRI:  Now I'm going to

Page 224

1
2    state my objection.  Thank you.
3    A.   Yes.  There are points
4    within the process that a family and
5    an au pair would understand that the
6    stipend amount is a minimum.
7    Q.   Okay.  Is there a policy in
8    your organization as to at what point
9    the family is to be educated about
10   this?
11   A.   When the family is -- when
12   the family and the au pair are
13   selecting one another, there is an
14   agreement that is specific between the
15   hosting family and the au pair.
16       When you're recruiting the
17   au pair, when the organization is
18   recruiting the    au pair, the au
19   pair understands that she's going to
20   be getting 195.75.
21       The family understands
22   they're going   to have to pay a
23   minimum of 195.75 to the    au pair,
24   irrespective of the number of hours
25   per week that that au pair is going to

Page 225

1
2    provide care to their children.
3        Whether it's 20 hours,
4    45 hours, she's sick all week, she
5    can't take care of the children, they
6    have to hire somebody else on the
7    outside to come in, they still need to
8    pay the au pair.
9        There is then an agreement
10   between the hosting family and the au
11   pair.  And in that agreement, it
12   stipulates that this is the minimum,
13   195.75 or 146.81, if it's the EduCare
14   program.
15       And there's minimums of a
16   minimum, you know, two-week vacation.
17   And they must have a day and a half
18   off per week.  And they must have a
19   full weekend off per weekend.
20       So there's an agreement
21   between those two parties.
22   Q.   And this is a written
23   agreement?
24   A.   Yes, it is.
25   Q.   Prior to the execution of

MAGNA
LEGAL SERVICES

Page 230

1
2  the weekly stipend.
3     Q.   And the reason it does is
4  because without that information,
5  there would be a real risk of that
6  information slipping through the
7  cracks, right?
8        MR. MACRI:  Objection as to
9     form and foundation.
10    A.   Well, I'm not sure what you
11 mean by falling through the cracks.
12    Q.   Well, there would be a risk,
13 if that information -- if that dollar
14 amount was not specified in the
15 agreement, at a minimum, there would
16 be a risk that the au pairs never
17 learned that this is just the minimum
18 and what the minimum was supposed to
19 be?
20    A.   I think it would -- well,
21 the directive would have gone back to
22 the program materials, which state the
23 dollar amount.
24       So in some of the
25 agreements, there may be a reference

Page 231

1
2  to, you know, according to the
3  Department of State, you know, stipend
4  levels, as, you know, it appears in
5  program materials.
6        It was probably something
7  along those lines, because there --
8  they would be -- could any -- if
9  they're in mid contract with a host
10 family and an au pair and the
11 Department of State or the government
12 increases the wage levels, then the
13 stipend is going to shift and change.
14    Q.   So what you're saying is,
15 there are some agreements that Au Pair
16 in America has that doesn't -- that
17 don't have a specific dollar amount in
18 them?
19    A.   Yes.  That's the answer.
20    Q.   And with regard to those,
21 it's your expectation that an au pair
22 can figure out what the specific
23 dollar amount minimum is by going back
24 and finding certain program materials?
25       MR. MACRI:  Objection as to

Page 232

1
2     form and foundation.
3     A.   Or they could ask the
4  question.
5     Q.   Or they could ask the
6  question?
7     A.   Or they could ask the
8  organization.
9     Q.   Who in the organization?
10    A.   They could ask the community
11 counselor.  They could ask any of our
12 staff.  They could ask any of our
13 London staff.  They could ask our
14 staff.
15    Q.   Now --
16    A.   We also do a regulatory
17 check.  We check with the family and
18 the au pair that the stipend is being
19 received when we go in for the
20 two-week assessment.
21    Q.   What you mentioned a moment
22 ago is that to the extent that there's
23 any ambiguity in the agreement, they
24 can go back and look at the program
25 materials, right?

Page 233

1
2     A.   They can.
3     Q.   Okay.  But many of the
4  program materials are misleading on
5  their face as to whether or not the
6  stipend amount is a fixed fee or a
7  minimum?
8        MR. MACRI:  Objection as to
9     form and foundation.
10    A.   I don't -- in forms where
11 you're not using the term minimum,
12 which has been missed from some
13 documents, but we have not used the
14 term minimum, nor have we said
15 maximum, nor have we said fixed.
16    Q.   Right.  But you do agree
17 with me that where a document says the
18 weekly stipend amount is X, the
19 reasonable implication of that is that
20 it's a fixed fee?
21       MR. MACRI:  Objection as to
22    form.
23    A.   Okay.  Agreed.
24    Q.   Now, I want to show you a
25 document that's been marked as

PLAINTIFFS' RESP. APP.0004605

MAGNA
LEGAL SERVICES

Page 246

```
 1
 2   case, but give me a minute here. It's
 3   all been redacted.
 4        Okay. It appears it's a
 5   communication from a hosting family
 6   who is looking to reapply to the
 7   program, is asking for a breakdown of
 8   fees, and receives a response from the
 9   placement service coordinator and then
10   goes on to say that what she really
11   wants is a deeper discount, because if
12   she goes with the competition, they
13   would -- she would get a different
14   price break.
15        Q.   And the person who is
16   communicating with this former host
17   family that's attempting to renew is a
18   woman named Karen Paris-Beck?
19        A.   That's correct.
20        Q.   She's an Au Pair in America
21   employee?
22        A.   Yes.
23        Q.   So this is a family that's
24   well past, again, the initial hook
25   part, because they've actually had an
```

Page 247

```
 1
 2   au pair before?
 3        MR. MACRI: I will object as
 4   to form and foundation.
 5        A.   Yes.
 6        Q.   And what Karen communicates
 7   to the person who is contacting her
 8   is, the fee for a year placement
 9   beginning in 2014 would be 8,045 for a
10   standard au pair, correct?
11        A.   Correct.
12        Q.   And she's referring to the
13   fee that has to be paid to Au Pair in
14   America for the standard program,
15   right?
16        A.   Correct.
17        Q.   Then she says, you would not
18   be required to pay the $400 match fee.
19   The 35 service fee would still apply,
20   correct?
21        A.   SEVIS fee.
22        Q.   SEVIS fee. I'm sorry.
23   Correct?
24        A.   Correct.
25        Q.   And then she communicates,
```

Page 248

```
 1
 2   the weekly stipend would be 195.75 per
 3   week, right?
 4        A.   Correct.
 5        Q.   Again, here, there's no
 6   discussion from Karen to the host
 7   family that is attempting to re-up
 8   that that is a minimum, right?
 9        MR. MACRI: Objection as to
10   form.
11        A.   Nor does it say it's a
12   maximum.
13        Q.   Right. There's no
14   discussion here about the idea that
15   that is a minimum?
16        A.   Correct.
17        Q.   What she communicates is a
18   fixed amount for the weekly stipend?
19        MR. MACRI: Objection as to
20   form.
21        A.   I don't think that she
22   indicates it's a minimum, and I don't
23   think she indicates it's a maximum.
24        Q.   Right. But you agree that
25   the reasonable inference from what's
```

Page 249

```
 1
 2   communicated here is that the fixed
 3   amount of the weekly stipend is
 4   195.75?
 5        MR. MACRI: Objection as to
 6   form.
 7        A.   I do state -- she does state
 8   here that the weekly stipend would be
 9   195.75.
10        Q.   Right. So you agree with
11   me?
12        A.   I agree with you.
13        Q.   One of the other aspects of
14   Au Pair in America's interaction with
15   families regarding the stipend is that
16   to the extent that a family did reach
17   out about potentially paying more than
18   the stipend, Au Pair in America would
19   actively disencourage those families
20   from paying more than the minimum,
21   right?
22        MR. MACRI: Objection as to
23   form and foundation.
24        A.   Repeat the question.
25        Q.   Sure. To the extent that a
```

Case 1:14-cv-03074-CMA-KMT   Document 918-59   Filed 03/17/18   USDC Colorado   Page 89 of 310

Page 250

1
2      family reached out about paying more
3      than the minimum, Au Pair in America
4      had a practice of disencouraging
5      families from paying more than the
6      minimum stipend, right?
7          A.   If a hosting family asked if
8      they can pay more than the minimum
9      stipend, Au Pair in America could not
10     prevent them from paying more.
11             It would not be our first
12     recommendation to have someone enter
13     their home.  And they want to be
14     extremely generous.  They want to
15     offer more than the required minimum
16     right up front.
17             They don't know this
18     individual.  They don't know what her
19     care abilities are for the children.
20     They don't even know how she's going
21     to fit into their home and their home
22     lifestyle yet.
23             I would address the question
24     the same way I would address a
25     question which is much more commonly

Page 251

1
2      asked.  And that is, Should I
3      introduce a curfew for my au pair?
4              And I always suggest,
5      Introduce the curfew first or pay the
6      minimum first and see how things are
7      going before you then be so generous
8      with the car usage or the fact that
9      she could stay out all night and take
10     free reign.  And you're thinking, I
11     didn't expect her to do that.
12             You have to have your
13     framework first.  And then once you
14     know and trust this individual and you
15     want to be more generous, you can do
16     that in many different ways, in many
17     different compensatory ways, including
18     increasing the weekly stipend.
19         Q.   Right.  So I understand
20     those reasons behind the policy
21     decision, but what I'm asking first
22     is, yes or no?
23             You had a policy of
24     disencouraging families from paying
25     more than the minimum?

Page 252

1
2              MR. MACRI:  Objection as to
3      form and foundation.
4          A.   I don't know that we had a
5      clear policy of disencouraging them.
6          Q.   You're not aware of any
7      policy that you had on that?
8          A.   No.  We may have suggested
9      it in some training documents or
10     whatever that, you know, they might
11     suggest that you don't necessarily
12     increase the stipend at this time,
13     but, certainly, in training, that is
14     the way I would describe why you would
15     not want to encourage them, Oh, of
16     course.  Offer your   au pair more
17     money right up front.
18         Q.   Can we take a look at a
19     document we'll mark as Exhibit 21?
20             MR. MACRI:  I think we're up
21     to 22.
22             MR. JACKSON:  I'm sorry.
23     22.
24             (Exhibit 22, marked for
25     identification, Bates stamped

Page 253

1
2      AIFS 0058845.)
3          Q.   This is a document with
4      Bates number 0058845, with the
5      heading, 31, Au Pair Stipend and Other
6      Financial Considerations, correct?
7          A.   Correct.
8          Q.   And this is an Au Pair in
9      America document, correct?
10         A.   Correct.
11         Q.   The second box here starts
12     out with the heading, Au Pair in
13     America Policy/Procedure, correct?
14         A.   Correct.
15         Q.   And the fifth bullet point
16     here states in the first sentence,
17     "Although some families may consider
18     increasing their    au pair stipend,
19     Au Pair in America discourages this
20     practice," correct?
21         A.   Correct.
22         Q.   Then there's some discussion
23     about the idea that they can pay a
24     bonus at the end of the year as
25     opposed to paying more than the

Page 254

1
2    stipend, correct?
3        A.   Correct.
4        Q.   Now, this is a document
5    that's reflecting the policy of Au
6    Pair in America?
7        A.   That's correct.
8        Q.   And the policy, you would
9    agree with me, is to discourage
10   families from paying more than the
11   minimum stipend, right?
12       A.   And as I explained to you
13   earlier, the whys.
14       Q.   I understand the whys, but
15   I'm just asking, just to be clear,
16   because I think earlier you stated you
17   weren't aware of a policy, but looking
18   at this document, would you agree with
19   me that it is, in fact, the policy of
20   Au Pair in America to actively
21   discourage families from paying more
22   than the minimum?
23           MR. MACRI:  Objection as to
24       form.
25       A.   Yes.

Page 255

1
2        Q.   I'd like to turn to -- can
3    you take a look at --
4            MR. JACKSON:  Can we mark
5        AIFS0001523 as Exhibit 23?
6            (Exhibit 23, marked for
7        identification, Bates stamped
8        AIFS0001523.)
9        Q.   Ma'am, this is a capture of
10   an earlier version of your website,
11   correct?
12       A.   No.  This is not our U.S.
13   based Au Pair in America website.
14       Q.   Okay.  What website is this?
15       A.   This appears to be the
16   dollars in Australia dollars.  I
17   presume it to be Sydney.  It's AIFS
18   Australia website.
19       Q.   And AIFS Australia is
20   connected to you, correct?
21       A.   It's a subsidiary office,
22   yes.
23       Q.   And they're recruiting au
24   pairs who ultimately come to work in
25   the United States under the umbrella

Page 256

1
2    of your organization, correct?
3        A.   That's correct.
4        Q.   Now, this particular aspect
5    of the website is directed towards
6    potential     au pairs, correct?
7        A.   Yes, that's correct.
8        Q.   And it says, "As an Au Pair
9    in America participant, you will
10   receive weekly payment of 195.75 U.S.
11   for working up to 45 hours per week,"
12   right?
13       A.   That's correct.
14       Q.   And it neglects to describe
15   that as a minimum, right?
16           MR. MACRI:  Objection as to
17       form.
18       A.   It does not describe it as a
19   minimum or a maximum.
20       Q.   It does not describe it as a
21   minimum, correct?
22           MR. MACRI:  Your question
23       was answered, Mr. Jackson.  I
24       don't know why you keep repeating
25       your questions after the witness

Page 257

1
2    has answered your question.
3            MR. JACKSON:  I'm allowed to
4        ask the questions I'd like to
5        ask.  So I'm going to repeat my
6        question.
7        A.   My answer is, it is not
8    described as a minimum or a maximum.
9        Q.   I'm not asking about the
10   maximum.  I'm asking you --
11       A.   It is not described as a
12   minimum.
13       Q.   Thank you.
14           Now, the fact of the matter
15   is, in more recent times, your web
16   sites, the web sites that are
17   associated with Au Pair in America,
18   have been updated to reflect that this
19   is a minimum amount, right?
20       A.   I know that some of the web
21   sites are.  I don't know if they all
22   are.
23       Q.   Some of them have been
24   updated to reflect that, right?
25       A.   That's correct.

PLAINTIFFS' RESP. APP.0004608

MAGNA
LEGAL SERVICES

Page 278

```
 1
 2        Q.   Have you ever spoken with
 3   Patricia Davidson?
 4        A.   Directly, no.
 5        Q.   Am I correct that there was
 6   an agenda for one of these meetings
 7   that included a presentation from the
 8   Department of Labor?
 9        A.   That was conducted by
10   Patricia Davidson.
11        Q.   Okay.  Did you attend that
12   presentation?
13        A.   Yes, I did.
14        Q.   Okay.  Did any other
15   sponsors attend that presentation?
16        A.   There were other sponsors in
17   the room.
18        Q.   Did you talk with any other
19   sponsors about whether they were going
20   to attend that meeting?
21        A.   All sponsors had been
22   invited to the meeting by the
23   Department of State.  I don't have any
24   recollection of contacting them in
25   advance of the meeting to say, Are you
```

Page 279

```
 1
 2   attending?
 3        I think the expectation is,
 4   if you're a program sponsor and you've
 5   been called in by the Department of
 6   State, you're going to make an effort
 7   to be present.
 8        Q.   And you're not aware of any
 9   other sponsors communicating to you
10   that they specifically were not going
11   to attend that meeting?
12        A.   Not that I'm aware of.
13        Q.   Is it the case that,
14   typically, the sponsor organization
15   will have sort of an organizational
16   meeting among one another in advance
17   of the State Department meetings?
18        MR. MACRI:  Objection as to
19   form and foundation.
20        A.   Well, typically, if we're
21   coming in, we're all coming into
22   Washington.  Most of us reside outside
23   Washington.  For those of us that are
24   members of the Alliance, we may take
25   that opportunity to meet as a group
```

Page 280

```
 1
 2   with the Alliance in advance.
 3        Typically, a member or two
 4   of the Alliance, like the executive
 5   director, are invited to attend the
 6   Department of State meetings as well.
 7        Typically, we've been asked
 8   to submit any agenda items that we
 9   would like to have on the Department
10   of State docket.  So -- but it's
11   usually for an hour or more.
12        We get a sandwich.  Alliance
13   will order in a group of sandwiches
14   and feed us before we head over to the
15   State Department.
16        Q.   What is the Alliance?
17        A.   The Alliance for
18   International Exchange is an advocacy
19   lobbying group, an opportunity for the
20   members or all companies or
21   organizations that are involved in
22   cultural exchange programs.
23        I'd hesitate to say that --
24   there are probably others.  I know
25   that there are a lot of J program
```

Page 281

```
 1
 2   participants.
 3        So this could have to do
 4   with research programs, physician
 5   programs, short-term visitor stay.
 6        You'll find a lot of Chamber
 7   of Commerce that run program
 8   internship and visitor stay programs
 9   into the U.S. will be members, summer
10   work travel programs, Camp America
11   type programs, many.
12        And there is an annual
13   meeting that is held for all members.
14        Q.   Where is the annual meeting?
15        A.   Typically, in Washington.
16        Q.   Apart from the annual
17   meeting, how do members of the
18   Alliance communicate?
19        A.   As part of our membership,
20   we benefit from getting sort of weekly
21   updates from Washington, what's going
22   on on the Hill this week that's going
23   to be of interest to exchange
24   programs.
25        And they'll -- we'll ask
```

MAGNA
LEGAL SERVICES

Page 290

1
2  directives of the Department of State.
3      Q.   Understood.  But my question
4  is just that it was always your
5  understanding, correct, that you were
6  required, with regard to the stipend,
7  to conform with all applicable
8  federal, state, and local laws?
9          MR. MACRI:  Objection.
10     A.   Yes.
11     Q.   Okay.
12     A.   And believe that the
13 guidance directives that I was
14 following achieved that.
15     Q.   Understood.  Now --
16         MR. JACKSON:  Sorry.  Did
17     you want to --
18         MR. STOCK:  I just -- I
19     wasn't sure she was done with her
20     answer, but okay.
21         MR. JACKSON:  It's always
22     good to have a sergeant in arms.
23     Q.   Now, the -- let me just ask
24 you -- now, how often do you -- well,
25 let me just ask you this.

Page 291

1
2          You frequently exchange
3  emails with some of the employees at
4  the other sponsor agencies, correct?
5          MR. MACRI:  Objection, form
6      and foundation.
7      A.   I certainly had email
8  communications over 25 plus years with
9  employees from other au pair
10 organizations, yes.
11         MR. JACKSON:  Can I just ask
12     for a slight bit of clarity on
13     what the objection is there?
14         MR. MACRI:  I don't need to
15     do that, sir.  The purpose --
16         MR. JACKSON:  As a courtesy.
17         MR. MACRI:  Okay.  The
18     purpose of stating objections on
19     form on the record is to give you
20     the opportunity to revise or
21     change your question at this
22     point.
23         MR. JACKSON:  No.  I
24     understand.  I understand.  What
25     I'm asking as a courtesy, I'm

Page 292

1
2      trying to understand what the
3      nature of your form objection is.
4          MR. MACRI:  Everything else
5      needs to be reserved until trial.
6      It is to just create an accurate
7      record and preserve my
8      objections.
9          MR. JACKSON:  Oh, no, no.  I
10     know.  If you don't want to
11     answer, that's fine.
12         MR. MACRI:  I don't need to.
13         MR. JACKSON:  I know you
14     don't need to.  I'm just asking
15     as a courtesy.
16         Is it possible you would
17     tell me what the form problem was
18     there so that I might be able to
19     cure it?
20         MR. MACRI:  You use adverbs
21     and adjectives.  You surmise
22     things that are not in testimony.
23     You surmise things that the
24     witness hasn't said.  And that's
25     how you pose your questions.

Page 293

1
2          You also create compound
3      questions frequently.  You create
4      questions which contradict
5      themselves frequently.
6          And that's what I'm
7      objecting to.  I don't want to go
8      through every one of them, but
9      when I'm doing it, that's what
10     I'm doing.
11         MR. JACKSON:  I understand.
12     I was only asking about my last
13     question, which is, you
14     frequently exchange emails with
15     some of the employees at the
16     other sponsor agencies, correct?
17         MR. MACRI:  You used the
18     word frequently without defining
19     what you mean.
20         MR. JACKSON:  I see.
21         MR. MACRI:  Okay.
22         MR. JACKSON:  That's fine.
23         MR. MACRI:  Okay.
24         MR. JACKSON:  Thank you.
25         MR. MACRI:  You're welcome.

Page 294

1
2          MR. JACKSON:  I appreciate
3     that.  I appreciate the
4     indulgence.
5     Q.    So just returning to my
6     question, you frequently exchange
7     emails with some of the employees at
8     other sponsor organizations, right?
9     A.    I have certainly had emails
10    with other sponsors -- with employees
11    at other sponsor organizations.  And
12    over the course of 25 years, I would
13    say it's more infrequent than
14    frequent.
15    Q.    About how often in a typical
16    month do you have email exchanges with
17    employees at other sponsor
18    organizations?
19    A.    That would be difficult to
20    say.  There may be some months where I
21    don't have any communication with
22    anyone, and there may be other months
23    that I might have a few communications
24    within the same month.
25    Q.    Can you give me an estimate

Page 295

1
2     for a typical year?
3     A.    Oh, I don't know.  16
4     sponsors.  Once a year, twice a year.
5     I mean, 25 or 30 communications over
6     the course of a year, 16 sponsors.
7     Q.    What about phone calls?
8     A.    Typically not.  Certainly
9     not any more in phone calls.  Probably
10    less.
11    Q.    Have you ever been involved
12    in any conference calls with employees
13    at the other sponsor organizations?
14    A.    Have I been involved in any
15    phone calls?
16    Q.    Any conference calls where
17    there --
18    A.    Oh, conference calls.
19    Q.    -- where there are more than
20    two participants from sponsor
21    organizations on the calls?
22    A.    Not unless it was in line
23    with like a conference call with the
24    Department of State or a conference
25    call with other members of the

Page 296

1
2     Alliance.
3     Q.    Can we take a look at --
4          MR. JACKSON:  We'll mark
5     this as Exhibit 25.  This is a
6     document with Bates AIFS0003691.
7          (Exhibit 25, marked for
8     identification, Bates stamped
9     AIFS0003691.)
10    Q.    So this is an email sent by
11    an individual named Michael McCarry to
12    several different parties, including
13    yourself, on April 14, 2011, correct?
14    A.    That's correct.
15    Q.    Who is Michael McCarry?
16    A.    Michael McCarry was the
17    executive director for the Alliance
18    for International Exchange.
19    Q.    There are several other
20    individuals identified in the to line
21    of this email, including Anna Fass,
22    William Gertz, and Bill Kapler.
23          Who are those individuals?
24    A.    I'm not sure who Anna Fass
25    is.  Bill Gertz is president of AIFS.

Page 297

1
2     Bill Kapler is -- I don't know what
3     his title is, but he's with GoAuPair.
4     Q.    And there are also employees
5     on this email from InterExchange and
6     some other sponsor organizations,
7     correct?
8          MR. MACRI:  Objection as to
9     form and foundation.
10    A.    That's correct.
11    Q.    Now, the actual text of this
12    email says, "Colleagues, Attached,
13    courtesy of our au pair task force
14    chair, Ruth Ferry, is the agenda for
15    our meeting on Tuesday, April 19th,"
16    correct?
17    A.    That's correct.
18    Q.    That refers to you, right?
19    A.    Yes, it does.
20    Q.    What is the au pair task
21    force that is being discussed in this?
22    A.    Well, when the Alliance
23    holds a meeting of the various program
24    sponsors, we usually conduct a
25    breakout meeting session with members

MAGNA
LEGAL SERVICES

Page 302

```
1
2   such things as online courses.
3         And to prove a point to the
4   Department of State, we approached --
5   Au Pair in America approached the
6   Department of State and said, We would
7   be willing to put together a pilot
8   program with UCLA to design a really
9   rich American history course for --
10  online course for au pairs if you will
11  allow us to introduce this course to
12  au pairs.  You test it.
13        They provided the survey
14  questions.  We did a review year after
15  year to demonstrate that online
16  learning is a really good way for --
17  one way for au pairs, especially if
18  it's coupled with a community based
19  volunteer program.
20        So, personally, at Au Pair
21  in America, that is the direction I
22  would like to see it in.  I'm sure
23  maybe the other -- some of the other
24  program sponsors might have some other
25  different ways, means, but -- is that
```

Page 303

```
1
2   enough?
3         MR. MACRI:  Can I just --
4         THE WITNESS:  My soapbox.
5         MR. MACRI:  -- pause you
6   once more for this 3214 non mat
7   regulating, and private should be
8   pilot.
9
10  Q.   What you were saying is,
11  that's the only regulation that's been
12  the subject of discussion between
13  sponsors?
14  A.   That has been the deep one.
15  Q.   Has there been discussion of
16  any of the regulations that relate to
17  the stipend amount?
18  A.   Only to the effect of, Well,
19  now we're faced with this litigation.
20  What do we do?
21  Q.   Prior to the litigation, do
22  you remember any discussion between
23  sponsors about the regulations that
24  relate to the stipend amount?
25  A.   Absolutely not.
```

Page 304

```
1
2   Q.   Never?
3   A.   Never.
4   Q.   Now --
5   A.   I want to quantify that --
6   qualify that.
7   Q.   Okay.
8   A.   When the three-year tier
9   increase went into effect -- that
10  would be 2007, '8, and '9 -- I think
11  there were probably some concerns
12  raised that that increase over a short
13  three-year period of time -- what did
14  we surmise?
15        Would there be an impact on
16  the size of the program?  Would that
17  deter families from having -- choosing
18  au pairs?  Would it increase the
19  number of au pairs that would want to
20  apply?  In effect, it all became a
21  wash.
22  Q.   And so what you're saying
23  when you say that there were probably
24  some concerns raised is that that was
25  a subject of some discussion amongst
```

Page 305

```
1
2   the sponsor organizations?
3   A.   Not in an organized way.
4   Q.   Informal discussions?
5   A.   Not let's get around the
6   table and, you know, discuss this, but
7   we certainly had, within AIFS, some
8   concerns at that time.  And that was
9   what it was related to.
10  Q.   Did you have informal
11  discussions with people outside of
12  AIFS about those who were in the
13  industry?
14  A.   Not that I recall directly,
15  but given the amount of documents you
16  have, you might come across one.
17  Q.   Okay.  So one of the other
18  questions that I have is, did you ever
19  have discussions with other members,
20  informal discussions with other
21  employees of sponsor organizations
22  about market conditions affecting the
23  industry?
24        MR. MACRI:  Objection as to
25  form.
```

PLAINTIFFS' RESP. APP.0004612

MAGNA
LEGAL SERVICES

Case 1:14-cv-03074-CMA-KMT   Document 948-27   Filed 03/17/18   USDC Colorado   Page 95 of 310

# Exhibit 412

PLAINTIFFS' RESP. APP.0004613

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Case No. 14-cv-03074-CMA-KMT

_____

JOHANA PAOLA BELTRAN, ET AL.,

          Plaintiffs,

vs.

INTEREXCHANGE, INC., ET AL.,

          Defendants.

_____

VIDEOTAPED DEPOSITION OF

A. WILLIAM KAPLER, III

30(b)(6) REPRESENTATIVE FOR GOAUPAIR

MAY 11, 2017

DENVER, COLORADO

10:11 A.M.

Magna Legal Services
866-624-6221
www.magnals.com

PLAINTIFFS' RESP. APP.0004614

## Page 2

1           The videotaped deposition of
2  A. WILLIAM KAPLER, III, taken before Leeann Keenan, a
3  Registered Merit Reporter, Certified Realtime Reporter,
4  and a Notary Public in and for the County of Summit and
5  the State of Colorado, at 370 17th Street, Suite 4500,
6  Denver, Colorado, on Thursday, May 11, 2017, at the
7  hour of 10:11 a.m., pursuant to Notice.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 4

1     APPEARANCES CONTINUED:
2
3       GORDON & REES
     BY: JENNIFER W. VEDRA, ESQ.
4         555 17th Street
       Suite 3400
5         Denver, Colorado  80202
       (303) 200-6888
6         jverda@gordonrees.com
       appeared on behalf of
7         AuPairCare, Inc.
8       BROWNSTEIN, HYATT, FARBER, SCHRECK
     BY: MARTHA FITZGERALD, ESQ.
9         410 17th Street
       Suite 2200
10         Denver, Colorado  80202
       (303) 223-1100
11         mfitzgerald@bhfs.com
       appeared by telephone on behalf of
12         EurRaupair InterCultural Child Care
       Programs
13       NIXON, SHEFRIN, HENSEN, OGBURN
     BY: MICHAEL DREW, ESQ.
14         5619 DTC Parkway
       Suite 1200
15         Greenwood Village, Colorado  80111
       (303) 773-3500
16         mdrew@nixonshefrin.com
       appeared by telephone on behalf of
17         ProAuPair and International Au Pair
       Exchange
18
19
20     ALSO PRESENT: Davis Baumunk, Videographer
21
22
23
24
25

## Page 3

1     APPEARANCES:
2
3       BOISE, SCHILLER, FLEXNER, L.L.P.
     BY: JUAN P. VALDIVIESO, ESQ.
4         1999 Harrison Street
       Suite 900
       Oakland, California  94612
5         (510) 874-1010
       appeared on behalf of the Plaintiffs
6
     WHEELER, TRIGG, O'DONNELL
7       BY: KATHRYN REILLY, ESQ.
       370 17th Street
8         Suite 4500
       Denver, Colorado  80202
9         (303) 244-1983
       reilly@wtotrial.com
10         appeared on behalf of USAuPair, Inc.,
       GoAuPair, and Au Pair International
11
     SHERMAN & HOWARD, L.L.C.
12       BY: JOSEPH HUNT, ESQ.
       633 17th Street
13         Suite 3000
       Denver, Colorado  80202
14         (303) 299-8194
       jhunt@shermanhoward.com
15         appeared by telephone on behalf of
       InterExchange, Inc.
16
     HOLLAND & HART
17       BY: JONATHAN BENDER, ESQ.
       555 17th Street
18         Suite 3200
       Denver, Colorado  80202
19         (303) 295-8456
       jsbender@hollandhart.com
20         appeared on behalf of Cultural
       Homestay International
21
     LEWIS, ROCA, ROTHGERBER, CHRISTIE
22       BY: JESSICA FULLER, ESQ.
       1200 17th Street
23         Suite 3000
       Denver, Colorado  80202
24         (303) 628-9527
       appeared on behalf of Cultural Care
25

## Page 5

1        I N D E X
2
3  DEPOSITION WITNESS:          PAGE
A. WILLIAM KAPLER, III
4  Examination by Mr. Schwartz         7
5
PLAINTIFFS' DEPOSITION EXHIBITS MARKED:
6  NO.     DESCRIPTION         PAGE
7  Exhibit 1    Notice of 30(b)(6) Deposition of    10
      GoAuPair Operations, LLC d/b/a
8        GoAuPair
9  Exhibit 2    July 23 through 24, 2009 e-mail chain  41
      between Cara Stewart, Devon Kapler,
10        and others
      GAP_00000924 - 9925
11
Exhibit 3    "About Us" section of GoAuPair     51
12        website
13  Exhibit 4    June 3 through August 4, 2009 e-mail  75
      chain between Tyillere Hansen and
14        Edina Stone and Devon Kapler
      GAP_00009902 - 9904
15
Exhibit 5    "Apply Now" 2012 section of GoAuPair  79
16        website
      GAP_00046733 - 46734
17
Exhibit 6    "What is AuPair Child Care?"     83
18
Exhibit 7    "Steps to Become and AuPair"     101
19
Exhibit 8    September 3 through September 5,    107
20        2014 e-mail string between Tessa Dean
      and Dena Loveless
21        GAP_00009109 - 9119
22  Exhibit 9    Local Area Representative Manual    126
      GAP_00015599 - 15644
23
Exhibit 10    2012 International Representative    128
24         Manual
       GAP_00006982 - 7017
25

PLAINTIFFS' RESP. APP.0004615

MAGNA ►
LEGAL SERVICES

---

Page 26

1      THE WITNESS: Okay. Okay.
2      A.   This is confidential. So I paid,
3  roughly, 2 -- 2.2 million.
4          That is highly confidential. So
5  all you lawyers out there, I don't want to hear
6  numbers like that heard by anybody. Thank you.
7      Q.   Where was the old GoAuPair incorporated?
8      A.   I don't know exactly where it was
9  locate -- headquartered. I mean, legally I don't
10 know where it was, but it was resided in
11 Salt Lake City, Utah.
12     Q.   Does the current GoAuPair reside in the
13 same location as the old GoAuPair?
14     A.   Same city, different physical location.
15     Q.   Did you have any experience in the
16 au pair industry before purchasing GoAuPair?
17     A.   No, I did not.
18     Q.   Did the nature of the business change
19 after the purchase?
20     A.   What do you mean by that? I'm not sure I
21 understand.
22     Q.   Did you make any changes to the way the
23 old GoAuPair was operating when you -- after you
24 purchased it?
25     A.   Initially, no. But obviously as part of

---

Page 27

1  any business or owner, you're going to make
2  continual improvements and stuff. So we've
3  continually made changes since then. But the
4  employees, the processes, and everything came from
5  the old one to the new one.
6      Q.   Did you keep any of the employees from
7  the old one?
8      A.   Yes.
9      Q.   Which employees did you keep, if you
10 remember?
11     A.   All of them, except for the owner.
12 Obviously that person was not involved, prior owner.
13     Q.   Who was the prior owner?
14     A.   Jacque -- Jacque Bray. J-a-c-q-u-e, I
15 think.
16     Q.   At the time that you purchased GoAuPair,
17 were you an employee of a company?
18     A.   Was I an employee of a company?
19     Q.   Of any company.
20     A.   No, I would not have been then.
21     Q.   Did you ever work for Accenture?
22     A.   Yes, I did.
23     Q.   When did you work for Accenture?
24     A.   June 16th, 1973.
25     Q.   Until when?

---

Page 28

1      A.   Until the end of August in 2003.
2      Q.   You were no longer working for Accen --
3      A.   What date -- what did I -- what date did
4  I say for a start date?
5      Q.   You said you worked at Accenture from
6  1973 until 2003.
7      A.   Yeah. Okay.
8      Q.   Is that correct?
9      A.   Yeah. That part's correct, yeah.
10     Q.   Did Accent --
11     A.   I gave -- when I gave you the dates, I
12 just needed to make sure I had the date right, but I
13 -- 2003 is good enough.
14     Q.   Did you maintain any affiliation with
15 Accenture after 2003?
16     A.   No.
17     Q.   Did Accenture provide any services to
18 GoAuPair?
19     A.   No, they have not.
20     Q.   Does GoAuPair belong to any organizations
21 or groups related to the childcare industry?
22     A.   Childcare industry, no. They used to own
23 two -- they used to be involved with the INA, but we
24 got rid of that.
25     Q.   What is INA?

---

Page 29

1      A.   International Nanny Association.
2      Q.   When did you get rid of your association
3  with INA?
4      A.   I don't know exactly when, but it was
5  early on. It provided no value for us.
6      Q.   Was GoAuPair ever in the nanny business?
7      A.   Yes.
8      Q.   Let's back up.
9          What is the nanny business?
10     A.   I'm not that familiar with it, but it's
11 the business where an agency basically does vetting
12 of -- of nannies and then potential families,
13 basically use the -- what do you want to call it --
14 the vetting process to the agency, and then they
15 have the nanny paid directly with the -- between the
16 family and the nannies.
17     Q.   And that was a business that GoAuPair was
18 in when you purchased it, and you continued doing
19 that business for a period of time; is that right?
20     A.   Yes. When I -- when I -- when I bought
21 the company, there were maybe two or three nannies
22 that we were using. And we basically wound up not
23 involving that at all, so it was a very quick --
24 there weren't many to start when I bought the
25 company, and we basically got out of that business.

PLAINTIFFS' RESP. APP.0004616

MAGNA
LEGAL SERVICES

Page 30

1    Q.   Why did you get out of the business?
2    A.   Too hard to work with.
3    Q.   What was --
4    A.   Too --
5    Q.   -- hard about it?
6    A.   Too -- too competitive.
7    Q.   Other than the nanny business and the
8    au pair program, has GoAuPair participated in any
9    other aspect of childcare?
10   A.   I would call -- I would not -- I would
11   not say so.
12   Q.   During your time that you've owned the
13   company?
14   A.   Correct.  That's correct.
15   Q.   Does GoAuPair belong to any organizations
16   or groups having to do with the work travel
17   industry?
18   A.   What was it?
19   Q.   Work travel.
20   A.   What about it?
21   Q.   Are you familiar with the term --
22   A.   Yes, I am.
23   Q.   -- work travel?
24   A.   Yes, I am.
25   Q.   Does GoAuPair belong to any organizations

Page 31

1    or groups related to work travel?
2    A.   No, we do not.
3    Q.   Does GoAuPair belong to any organizations
4    or groups related to cultural exchange?
5    A.   Yes, we do.
6    Q.   Which groups?
7    A.   IAPA.
8    Q.   Any others?
9    A.   I guess you would call -- what -- what --
10   I guess you'd call it the Alliance.  I mean, I don't
11   know the answer you wanted me to get, so -- as well
12   as with cultural exchange, we involve the Alliance
13   and IAPA.
14   Q.   What is your understanding of IAPA,
15   IAPA's mission, if any?
16   A.   IAPA is this intergalactic international
17   association that has a lot of members from all over
18   the world.  And their mission, I guess -- I'd have
19   to read the website, so just -- but if you ask me
20   personally, I would say it's their goal to make sure
21   that there's high standards.  And using au pairs
22   going across borders, to make sure that they're
23   safe.
24   Q.   And do you have any understanding of what
25   the Alliance's mission is?

Page 32

1    A.   Yes.  The Alliance was one, that I
2    actually signed up with that after the original
3    owner did not.  Stanley Colvin, who is the director,
4    suggested to me that I should be a member of it
5    because they talk to the Department of State.  So I
6    went and signed up.
7    Q.   Stanley Colvin, who -- who is Stanley
8    Colvin?
9    A.   He was the -- one of the -- I guess the
10   guy in charge of Department of State at that point
11   in time.
12   Q.   Other than the Alliance and IAPA, is
13   GoAuPair currently a member of any other
14   associations or groups?
15   A.   I -- I -- not that I'm aware of.  I don't
16   think so.
17   Q.   Do you know if IAPA has regular meetings?
18   A.   I know they have annual meetings.  Beyond
19   that, I don't think we're really that involved in
20   doing anything other than that.
21        It does -- does get confusing
22   between them and this Whistic thing, and I
23   peripherally can -- I cannot tell you the difference
24   between those entities.  But we're not involved with
25   Whistic, or whatever they call that other thing.

Page 33

1    Q.   Have you attended any IAPA annual
2    meetings?
3    A.   Yes, I have.  I have been to maybe four.
4    Q.   When you attended, were you attending on
5    behalf of GoAuPair?
6    A.   Yes.
7    Q.   Has anyone else attended IAPA meetings on
8    behalf of GoAuPair, that you know?
9    A.   Yes.
10   Q.   Who else?
11   A.   A lot of people.  We would typically have
12   either Tanna or Megan would go there or Devon, and
13   sometimes we would use as a -- a -- I want to call
14   it a -- not a personal bonus, but a -- a benefit to
15   have somebody, lower-level staff people to go to the
16   meetings, for the annual meetings.
17   Q.   What benefit did you see in having the
18   lower-level people attend?
19   A.   They got to wherever it is in
20   America, into Europe they've never been to before.
21   It's usually in Europe.  Although when they -- two
22   years ago it was in Atlanta.
23   Q.   Do you see any benefit in your
24   attendance?
25   A.   Yes.

PLAINTIFFS' RESP. APP.0004617

MAGNA
LEGAL SERVICES

| Page 34 | Page 36 |
|---|---|

**Page 34**

1  Q.  What benefit do you see in your
2  attendance?
3  A.  We get a chance to meet with our existing
4  international reps and potentially build -- identify
5  new ones.
6  Q.  And the Alliance, do they meet with any
7  regularity?
8  A.  They have an annual meeting that's,
9  roughly, in the fall.  That's their annual meeting.
10  And then there's occasional meetings that they
11  arrange for something other -- you know, other dates
12  and times.  Usually it's with the Department of
13  State.
14  Q.  Do you know why it's usually with the
15  Department of State?
16  A.  That's the main, probably main reason of
17  the Alliance, is to basically -- I don't know.  I
18  guess I -- I don't know whether the term's right
19  because I'm not in -- in the government, but I would
20  call it a lobbying group that basically focuses on
21  trying to build relationships with the right people
22  in Congress and the people in Department of State.
23  Q.  Have you attended any of the Alliance
24  meetings?
25  A.  Yes, I have.

**Page 35**

1  Q.  Do you have an idea as to how many
2  meetings you have attended?
3  A.  Probably all of them.  I probably missed
4  one somewhere, but probably all the annual meetings.
5  I have not been to the -- to all the other ones.
6  Q.  Is it fair to say that when you attended
7  these meetings, that you were attending on behalf of
8  GoAuPair?
9  A.  Absolutely.  Yes.
10  Q.  Has anyone else attended Alliance
11  meetings on behalf of GoAuPair?
12  A.  I don't believe they have.
13  Q.  Do you enjoy attending the Alliance
14  meetings?
15  A.  It's a meeting.
16  Q.  Are you a recipient of any LISTSERV or
17  e-mail distribution lists from the Alliance?
18  A.  I'm sorry, what was that?
19  Q.  Do you receive any e-mails from the
20  Alliance?
21  A.  Yes, I do.  I get -- I know I get e-mails
22  from them, but I'm not sure exactly how they do it.
23  But, yes, I get e-mails from them.
24  Q.  Do you -- do you know -- do you recall
25  whether you receive those as an individual or as a

**Page 36**

1  part of a large list of recipients?
2  A.  I'm -- I want to assume it's a long list
3  because they don't send me too much.  There are a
4  couple where we have a dialogue back and forth with
5  one of the individuals on maybe one or two
6  questions.
7  But all the standard stuff, I'm
8  assuming it's on a -- a big list because they're all
9  c -- what is it, bcc'ed.  So I have no idea what's
10  on the list.  So exactly how they do it, you
11  should -- you'll need to ask them.
12  Q.  And do you receive e-mails from IAPA or
13  representatives of IAPA?
14  A.  Yes, we do get some stuff from them, but
15  I can't tell you the regular.  I have no idea what
16  the list is, and it does seem to be more involved
17  with all this other Whistic stuff that we're not
18  relevant -- that's not relevant to us.
19  Q.  But it's fair to say you -- you believe
20  you have received an e-mail from IAPA in the past?
21  A.  Yes.
22  Q.  On the topic of e-mails, what -- what is
23  your e-mail address?
24  A.  BKapler@GoAuPair.com.
25  Q.  Is that your only e-mail address at

**Page 37**

1  GoAuPair.com?
2  A.  Yes, it is.
3  Q.  Do you have any other e-mail addresses
4  that you use for your work for GoAuPair?
5  A.  No, I do not.
6  Q.  So the e-mails that you receive from
7  either the Alliance or IAPA, those would have been
8  to your BKapler@GoAuPair.com?
9  A.  Yes.
10  Q.  Does GoAuPair have a social media
11  presence?
12  A.  What do you mean by "a social media
13  presence"?
14  Q.  Do you under -- are you familiar with the
15  word "social media"?
16  A.  Roughly.
17  Q.  What does that mean to you?
18  A.  I'll assume it's something like Facebook.
19  And I don't know what else you'd refer it to.  But,
20  I mean, that's why I want to know what you -- what
21  you're looking for.
22  Q.  Sure.
23  Does -- does GoAuPair have a
24  Facebook account?
25  A.  Yes, we do.

PLAINTIFFS' RESP. APP.0004618

**MAGNA**
LEGAL SERVICES

Page 78

```
 1    month of August.  We are waiving our $250
 2    application fee" --
 3         A.   Uh-huh.
 4         Q.   -- "and also discounting the program fees
 5    by $400, for a total discount of $650."
 6              Do you see that?
 7         A.   Yes, I do.
 8         Q.   Is it fair to say that Mr. Hansen was
 9    providing information about the fees and discounts
10    to Ms. Stone in this e-mail?
11         A.   Yes, absolutely looks like that.  It was
12    a standard discount we would give for anybody.  I
13    mean, there are some cases where we offer -- like
14    for Care.com, we'll offer $100 for somebody that
15    comes from that site.  But -- but, yeah, that's what
16    this looks like, site standard discounting.
17         Q.   Do you know if Ms. Stone provided
18    information about any of GoAuPair's competitors to
19    Mr. Hansen or anyone else at GoAuPair?
20         A.   Not that I'm aware of.  It's my
21    understanding that a lot of that information is
22    available on -- on their website, so you can just go
23    to it and they -- because I've seen it personally.
24         Q.   If you look on page 2, which ends --
25         A.   Sure.
```

Page 79

```
 1         Q.   -- in 9903.
 2         A.   Uh-huh.  Page 2.  Okay.
 3         Q.   In the second paragraph of the e-mail at
 4    the top, do you see --
 5         A.   Uh-huh.
 6         Q.   -- where it says, "In response to your
 7    question, we are still receiving and accepting
 8    Russian applicants, and they are obtaining their
 9    visas."
10         A.   Correct.
11         Q.   Is the countries from which GoAuPair
12    recruits also publicly available information?
13         A.   At that time, probably they were.
14         Q.   Now is that publicly available
15    information?
16         A.   If you're registering, you can.  If
17    you're registering, you can see all the au pairs
18    that are available.  Obviously you'll be able to
19    understand which countries they're coming from.
20         Q.   I'm marking Exhibit 5.
21              (Exhibit No. 5 was marked.)
22         MR. VALDIVIESO:  For counsel on the
23    phone, it's a document ending in 46733.
24         Q.   Please take a look at Exhibit 5,
25    Mr. Kapler.
```

Page 80

```
 1         A.   Okay.
 2         Q.   When you've had a chance to review it, if
 3    you can let me know if you recognize it.
 4         A.   Okay.
 5              (Witness peruses document.)
 6         A.   Oh, boy.
 7              (Witness peruses document.)
 8         A.   Okay.
 9         Q.   What is Exhibit 5, Mr. Kapler?
10         A.   This is a page from our website, and it
11    looks like it's dated 2012, I guess.  It's a page
12    that talks about "Apply Now."
13         Q.   And you mentioned a little earlier that
14    you use your website to promote GoAuPair to au pairs
15    indirectly.  Is that a correct --
16         A.   That is correct.
17         Q.   Is this an instance of indirect
18    promotions to au pairs?
19         A.   Yes.
20         Q.   And how do you know that?
21         A.   Because it's in our track under "Be An
22    Au Pair."  So it describes all the steps you follow,
23    the regulations, and things like that.
24         Q.   Is it fair to say that au -- potential
25    au pairs are the intended audience of this website,
```

Page 81

```
 1    this portion of the website?
 2         A.   Absolutely.  Yes.
 3         Q.   And if you look at the bottom of 46733,
 4    under "Available Programs."
 5              Do you see that?
 6         A.   Yes, I do.
 7         Q.   And there's a table?
 8         A.   Yes, there is.
 9         Q.   And under "Program Type," do you see that
10    column?
11         A.   I'm sorry, which one?
12         Q.   The first column on the left.
13         A.   Yes, "Program Type."  Yes, sir.
14         Q.   And I'm just going to read these to you.
15    It says, "Standard au pair, au pair plus, premiere
16    au pair, EduCare au pair, au pair again."
17              You had earlier testified that the
18    Department of State had two categories, and that you
19    made some arbitrary distinctions that had nothing to
20    do with the Department of State --
21         A.   Correct.
22         Q.   -- categories.
23              Are these representative of the
24    categories that existed as of 2012 in the --
25         A.   Yes, that's correct.  And the first three
```

PLAINTIFFS' RESP. APP.0004619

MAGNA
LEGAL SERVICES

Page 82

```
 1   would be standard au pairs, and -- and the category
 2   of standard EduCare is the other official one.  And
 3   au pair again I think is one where it's -- I think
 4   that's where an au pair who was in the United States
 5   went back home for their two years and then came
 6   back.  So they probably are standard -- you never
 7   know whether they're going to be standard or
 8   EduCare, so...
 9       Q.   Is it true that as of this time the
10   standard au pair program was by far GoAuPair's most
11   popular program?
12       A.   Definitely correct.
13       Q.   And then under the "Stipend Amount" in
14   the row that follows "Standard Au Pair."
15       A.   Uh-huh.
16       Q.   Do you see a number under the column
17   "Week"?
18       A.   Under "Week."  Yes, I do.
19       Q.   What number do you see?
20       A.   195.75.
21       Q.   Is there any mention of the word
22   "minimum" with respect to that number that you see
23   in -- in that cell?
24       A.   I don't see it on that.
25       Q.   And do you have an understanding as to
```

Page 83

```
 1   why the number 195.75 appears in that cell?
 2       A.   Yes.  That's the stipend amount that the
 3   Department of State has dictated as the one that's
 4   the minimum wage, as based upon federal minimum
 5   wage.
 6       Q.   And when you say "dictated," what do you
 7   mean by that?
 8       A.   And they sent us two or three e-mails
 9   right from the very beginning on -- I guess they've
10   sent the Fact Sheet, and there's another one that's
11   the weekly something or other, and then there's the
12   more recent one that talked about the increases in
13   the federal minimum wage.
14           THE VIDEOGRAPHER:  Do you want me to
15   change the media sometime in the next five minutes?
16           MS. REILLY:  Yeah, we have been -- I
17   think it's about time for a break.  So whenever
18   you're ready, Juan.
19           MR. VALDIVIESO:  We can take a break
20   right now and change the media.
21           THE VIDEOGRAPHER:  Going off the
22   record at 12:06.  This marks the end of media 1.
23           (Whereupon, a lunch break was had
24             from 12:06 p.m. to 12:54 p.m.)
25           (Exhibit No. 6 was marked.)
```

Page 84

```
 1           THE VIDEOGRAPHER:  This marks the
 2   start of media 2 of the video deposition of William
 3   A. Kapler III, 30(b)(6) representative for GoAuPair.
 4   We're back on the record.  The time is 12:54.
 5           EXAMINATION (CONTINUED)
 6   BY MR. VALDIVIESO:
 7       Q.   Welcome back, Mr. Kapler.
 8       A.   Hello.
 9       Q.   I'm handing you what I have marked
10   Exhibit 6.
11           MR. VALDIVIESO:  For counsel on the
12   phone, this is a printout from the website from
13   May 10th, 2017.  The URL is
14   http://www.GoAuPair.com/host-families/overview.
15       A.   Okay.
16           MS. FULLER:  Do you have one?
17           MR. VALDIVIESO:  I need one, sorry.
18           MS. FULLER:  Oh, okay.
19       Q.   Are you familiar with Exhibit 6,
20   Mr. Kapler?
21       A.   I am looking at it as we go through here.
22       Q.   Okay.
23           (Witness peruses document.)
24       A.   Okay.
25       Q.   What is Exhibit 6, Mr. Kapler?
```

Page 85

```
 1       A.   It looks like it's a page of our website.
 2   It looks like it's under the "Find An Au Pair"
 3   track, which is for host families under the section
 4   called "Overview."
 5       Q.   And have you seen this part of your
 6   website before?
 7       A.   Not familiarly, but I'm sure it's
 8   probably there.
 9       Q.   On the second page of the printout.
10       A.   Uh-huh.  Second page.  Okay.
11       Q.   Do you see where it says, "Au pair versus
12   nannies, baby-sitters, and daycares"?
13       A.   Yes, I do.
14       Q.   What do you understand what follows that
15   heading to mean?  Is it fair to say that this
16   section compares au pairs to nannies and daycares?
17       A.   It says that, "The au pair provides a
18   unique cultural exchange experience," and then it
19   does go and compare some of the specific differences
20   related to nannies, au pair, and daycare along the
21   five sections across the top, which is skills,
22   regulations, and stuff like that.
23       Q.   Do you know why GoAuPair chose to compare
24   au pairs to nannies, baby-sitters, and daycares?
25       A.   Yes.  Those are potential options that a
```

PLAINTIFFS' RESP. APP.0004620

MAGNA
LEGAL SERVICES

**Page 94**

1    A.   No, it does not.
2    Q.   And in the regulations section in the
3  daycare portion, what is the intended meaning of
4  "Regulations vary by state"?
5    A.   It's my understanding that various states
6  have various regulations on how they control and
7  supervise daycare, and I really have no idea what
8  they would be.
9    Q.   Do you have any understanding as to
10 whether various states have various regulations that
11 control and supervise au pairs?
12   A.   I'm not aware of any states that have
13 specific criteria for au pairs, that it's the
14 au pairs by -- under the U.S. Department of State
15 regulations.
16          MR. VALDIVIESO:  Can we take a brief
17 break, please.
18          THE VIDEOGRAPHER:  Going off the
19 record at 1:12.
20          (Break from 1:12 p.m. to
21          1:16 p.m.)
22          THE VIDEOGRAPHER:  Back on the record
23 at 1:16.
24 BY MR. VALDIVIESO:
25   Q.   Mr. Kapler, do you know if your website

**Page 95**

1  uses video?
2    A.   Yes, we do.
3    Q.   Why do you use video?
4    A.   It's a good way to communicate to people.
5  Also we use it -- well, you said on the -- on the
6  website.
7          Yeah.  It's a good way to kind of
8  sum -- summarize information easily to people on the
9  site.
10   Q.   And when you say "people on the site,"
11 what type of people generally visit your website?
12   A.   Most of them are families, some au pairs.
13   Q.   Who approves the videos that go on
14 GoAuPair's website?
15   A.   Probably the person in charge of
16 marketing.  And maybe Devon's reviewed some of them,
17 but it would probably be by either Brian Alexander,
18 is probably who -- I don't know what -- what year
19 this is because...
20   Q.   So I'm going to show you a video that --
21          MR. VALDIVIESO:  For the people on
22 the phone, this video is from the current website at
23 www.GoAuPair.com/hostfamilies/program costs, and
24 it's currently available.  We're actually accessing
25 it via WiFi live right now.

**Page 96**

1          (Whereupon, a video played.)
2    Q.   I'm going to pause for a second right
3  there.
4          The video just described the
5  stipend.  Is that fair to say?
6    A.   Yes.  As an --
7    Q.   Did it --
8    A.   As an example, yes.
9    Q.   Did it mention anything about the stipend
10 being a minimum?
11   A.   No, it did not.
12   Q.   I'm going to continue playing the video.
13          (Whereupon, a video played.)
14   Q.   I'm going to pause it for a second there.
15          The last slide showed the stipend,
16 did it not?
17   A.   Yes, it did.
18   Q.   Did it describe the stipend as a minimum?
19   A.   No, it did not.
20   Q.   Did it suggest that it was anything other
21 than 195.75?
22   A.   Did it -- it didn't suggest anything.
23 It's an example.
24   Q.   But the example that it gave was 195.75;
25 is that right?

**Page 97**

1    A.   That is correct.
2          (Whereupon, a video played.)
3    Q.   In the last slide we just saw, is the
4  affordability of the au pair program something that
5  this video promotes?
6    A.   Correct.  Yes.
7    Q.   And is the 195.75 stipend a component
8  that goes into making the program affordable?
9    A.   Say -- say it again.
10   Q.   Is the 195.75 stipend described in this
11 video a component that goes towards making the
12 program affordable?
13   A.   It includes part of what the total cost
14 is.  The individual can determine whether it's
15 affordable or not.
16   Q.   Does GoAuPair present the total cost as
17 affordable?
18   A.   We believe it is affordable.
19          (Whereupon, a video played.)
20          MS. REILLY:  Are we watching it
21 again?
22          MR. VALDIVIESO:  I think -- I
23 think -- I apologize.
24          THE WITNESS:  I think we went to
25 the --

PLAINTIFFS' RESP. APP.0004621

**MAGNA**
LEGAL SERVICES

Page 142

1   somebody to say, "Well, I've been working for these
2   hours," whatever, "and I didn't get" -- you know,
3   let's -- let's show it on a contemporaneous basis
4   because people have a habit of historical -- what's
5   the right term? Changing the stories over time.
6          We did provide you a log of this
7   thing, if you want to actually look at it. I don't
8   know what the Bates number is, but it is there,
9   somewhere between before -- I don't know if it's
10  before or under the 11,000, but -- but it is in
11  there. It's a two-page thing. It's on both -- you
12  know, same thing on both sides.
13     Q.   Are you familiar with the term
14  "responsible officer"?
15     A.   Yes, I am.
16     Q.   What is the responsible officer?
17     A.   That is the person who's the primary
18  person at the Department of State that is
19  responsible for the relationship and stuff, and
20  basically improving whether there's going to be a --
21  what is it, AROs, which is the alternate --
22     Q.   Who --
23     A.   -- responsible officer.
24     Q.   Who is the responsible officer at
25  GoAuPair?

Page 143

1      A.   That is me.
2      Q.   Does GoAuPair have any AROs?
3      A.   Yes, we do.
4      Q.   Who -- who is an ARO?
5      A.   Right now I think I'm missing one. I
6   know two that definitely are. I know that Tanna
7   Wilson is. I know that Megan Ramirez is. And there
8   may be a third, but I don't know for sure. I'd have
9   to look on the website.
10     Q.   What is your duty as the responsible
11  officer?
12     A.   I don't do much because I have all those
13  other people do all the details, which is basically
14  recording information into the SEVIS. My role, what
15  I do, is I authorize them once a year, and that's --
16  you know, I have them do most of the work.
17     Q.   Do you attend any meetings with the
18  Department of State on behalf of GoAuPair?
19     A.   Yes, I have.
20     Q.   How many meetings have you attended with
21  the Department of State?
22     A.   Oh, wow. I'm going to say that almost
23  once a year with the Alliance annual meeting. The
24  Alliance has a -- what's the right term? A -- they
25  have a bunch of side conferences and stuff.

Page 144

1          So they'll have one for summer
2   work travel, they'll have one for camps, and they'll
3   have one for Go -- for the au pairs, and so I would
4   definitely go to those. And there always --
5   generally, I would say the vast majority, there's
6   always one for the au pair track, and somebody from
7   the Department of State is there. And the whole
8   purpose is to talk about whatever's happening with
9   the Department of State.
10     Q.   Besides you, has anyone else at GoAuPair
11  attended meetings with the Department of State?
12     A.   I don't believe there has been. I --
13  I -- I don't think -- I think it is just me. I
14  don't believe anybody else has actually gone to the
15  meeting. Yeah, I don't -- I don't think so.
16     Q.   Do you recall attending any meetings with
17  the -- with the Department of State, where the issue
18  of wage and hours was discussed?
19     A.   We have not -- to the best of my
20  knowledge, we haven't really discussed any material
21  discussion about wage and hours with the Department
22  of State.
23     Q.   Do you recall attending any meetings with
24  the Department of State where the weekly stipend was
25  discussed?

Page 145

1      A.   No, I do not recall anything related to
2   that.
3      Q.   I'm marking what's --
4          MR. VALDIVIESO: Do we have counsel
5   for Agent Au Pair on the line?
6          MS. REILLY: (Indicating.)
7          MR. VALDIVIESO: Could we go off the
8   record for a second.
9          THE VIDEOGRAPHER: Going off the
10  record at 2:52. This marks the end of media No. 2.
11         (Break from 2:52 p.m. to
12          2:57 p.m.)
13         THE VIDEOGRAPHER: This marks the
14  start of media 3 of the video deposition of
15  A. William Kapler III, 30(b)(6) representative for
16  GoAuPair. We're back on the record. The time is
17  2:57.
18         (Exhibit No. 12 was marked.)
19         MR. VALDIVIESO: I've marked an
20  exhibit. It's an Agent Au Pair Exhibit 938. It was
21  previously designated Highly Confidential,
22  Attorneys' Eyes Only.
23         Counsel for Agent Au Pair has
24  withdrawn the Attorneys' Eyes Only portion of the
25  designation, leaving it designated as Highly

**MAGNA**
LEGAL SERVICES

Page 146

```
 1   Confidential.
 2          MS. REILLY:  Just Confidential.
 3          MR. VALDIVIESO:  Just Confidential.
 4   Thank you, Katie.
 5          And so having withdrawn the
 6   Attorneys' Eyes Only con --
 7          THE WITNESS:  Okay.
 8          MR. VALDIVIESO:  -- designation, I'm
 9   handing it to the witness.
10          THE WITNESS:  Okay.
11          MR. VALDIVIESO:  With a copy for
12   counsel.
13          Actually, I apologize.  I needed
14   one of those for myself.
15     Q.   I'm going to focus starting on page 2.
16          Do you know who Mark Overmann
17   is --
18     A.   Yes.
19     Q.   -- Mr. Kapler?
20          Who's Mark Overmann?
21     A.   At the time Mark was a -- I guess, one of
22   the employees at the Alliance.
23     Q.   And do you recall having received any
24   e-mails from Mark Overmann addressed to au pair
25   colleagues?
```

Page 147

```
 1     A.   I don't think we have a list of who all
 2   the people are, but they do periodically send us
 3   e-mails and stuff.
 4     Q.   And if you look at the list --
 5     A.   Uh-huh.
 6     Q.   -- of e-mail addresses.
 7     A.   Uh-huh.
 8     Q.   10 names down --
 9     A.   Uh-huh.
10     Q.   -- do you see a Bill Kapler,
11   BKapler3@yahoo.com?
12     A.   Yes, I do.
13     Q.   And that would be you?
14     A.   That would be me.
15     Q.   And then a few lines down do you see
16   BKapler@Alumni.Princeton.edu?
17     A.   Yes, I do.
18     Q.   And that would be you as well?
19     A.   That is correct.
20     Q.   And then at the very last name on the
21   list, which is actually on the top of page 2.
22     A.   Yes.
23     Q.   Do you see A. Kapler, III?
24     A.   Yes.
25     Q.   BKapler@GoAuPair.com?
```

Page 148

```
 1     A.   That is correct.
 2     Q.   That would be also you?
 3     A.   Yeah.
 4     Q.   So --
 5     A.   They got that one covered.
 6     Q.   And if this e-mail was sent to the list
 7   of recipients above, do you think you would have
 8   received it?
 9     A.   Yes.
10     Q.   The e-mail is dated October 28th, 2012.
11   I'm looking at the e-mail, the --
12     A.   Which one are we at now?
13     Q.   -- e-mail that -- I apologize.
14          The -- the e-mail that starts, "Hi
15   au pair colleagues" --
16     A.   Okay.
17     Q.   -- on the second page.
18     A.   Okay.
19     Q.   Do you see that one?
20     A.   Yes.  Okay.
21     Q.   That one appears to be dated -- dated
22   October 25th, 2012.
23     A.   Correct.
24     Q.   Do you agree?
25     A.   Yes.
```

Page 149

```
 1     Q.   It says, "Many thanks to those of you who
 2   participated in this morning's meeting at the
 3   Department of State."
 4          Do you see that?
 5     A.   Yes.
 6     Q.   Do you recall attending a meeting in
 7   October of 2012 at the Department of State?
 8     A.   No, specifically, unless I have more
 9   information about what -- what was discussed and
10   where and see...
11     Q.   Do you want to look at this e-mail and
12   the --
13     A.   Yeah, let me -- let me look at it and
14   see where I --
15     Q.   See if it refreshes your memory?
16     A.   They're having a meeting, and there's a
17   lot of meetings, so...
18          (Witness peruses document.)
19     Q.   And I'm going to direct your attention to
20   Item No. 9 on that list.
21     A.   Okay.
22     Q.   But you're free to read the entire list
23   on the page.
24     A.   Sure.  I might.
25          (Witness peruses document.)
```

PLAINTIFFS' RESP. APP.0004623

MAGNA
LEGAL SERVICES

Page 150

1      A.   Okay.
2      Q.   Does this document offer -- help
3  refresh -- refresh your recollection as to whether
4  the issue of wages and hours was discussed at a
5  Department of State meeting in October of 2012?
6      A.   It looks like this was a topic for
7  wanting to have input.  I don't know whether there
8  was actually much discussed in the details on hours
9  as part of this meeting.
10      I recall what you asked me was
11  stuff on wages as opposed to hours.  This refers
12  more to hours.  Even if you said that, I probably
13  wouldn't be able to tell you whether it was
14  discussed in detail or not.
15      But clearly it looks like, from
16  this list, there's a list of -- I'm not sure why
17  there's 13.  I thought there was 12.  But anyway, it
18  looks like there's 13 things that the Department of
19  State was asking for input on from the sponsors to
20  them.
21      I do not know, and without seeing
22  more specifics about what was actually in the
23  meeting, where they actually discuss details of
24  these things.  They're just saying that, you know,
25  hey, here's where we're -- here's issues we have, or

Page 151

1  whatever it is, that we have to have feedback on,
2  whatever it is.
3      So I'm not trying to be evasive.
4  I'm just saying that this does not mean that there
5  was a three-page PowerPoint saying here's -- here's
6  what we're doing about it, though, because the
7  Department of State is not necessarily that rigid,
8  shall I say, as far as what the -- the point list
9  was.
10      But, yeah, clearly it was
11  something there.  They were looking for input on
12  wages.  It looks like it's mostly hours.  It looks
13  like it's related to overnight details, is what the
14  specific area they're looking for.
15      Q.   So --
16      A.   And I can clearly understand that would
17  be an issue for clarification because, you know, we
18  do have questions like that all the time, so...
19      Q.   And just to read Item No. 9 into the
20  record.
21      A.   Sure.
22      Q.   "Wages and hours based on Department of
23  Labor requirements; au pairs to receive weekly
24  compensation, 1.5 days off weekly, and 2 weeks of
25  vacation - ECA requests suggested language about

Page 152

1  hours as related to," quote, "overnight duties," end
2  quote.
3      Did I read that correctly?
4      A.   Yes, you did.
5      Q.   Do you remember anything about the issue
6  of, quote, overnight duties?
7      A.   Not specifically in this meeting, but
8  I'm -- I'm sure I know what the issue is.
9      Q.   What is the issue?
10      A.   The issues are -- and I'll clarify it as
11  if somebody's on-duty, an au pair is on-duty, what
12  does that relate to what counts as being working
13  hours.  Because we've seen this before without --
14  before this.  This is not a -- a -- a new news type
15  of thing.
16      Q.   Do you recall whether prior to the
17  October 2012 meeting, GoAuPair had a position as to
18  whether overnight duties counted towards hours
19  worked?
20      A.   I don't know what our exact policy was at
21  that point because now you're asking specific times.
22  But I would say that as soon as we recognized this
23  was an issue, we always took the point of view that
24  if somebody's on-duty, they get paid those hours.
25      So if somebody was for some

Page 153

1  reason -- you know, they had to be -- that the kids
2  were at -- at -- at school, but the au pair had to
3  be home waiting for something, whether they -- you
4  know, the kid might be sick or whatever it is.  Then
5  if she's on duty, then that -- those hours count.
6      So that -- whatever we defined --
7  whenever we determined that policy, that's the way
8  it always was.  There was never anything before.  So
9  if we didn't clarify it before, obviously as soon as
10  we found out there was an issue we -- we -- we
11  employed that -- that policy.  Because I think it's
12  valid and absolutely right.
13      Q.   And so you say your policy is if she's on
14  duty -- sorry.
15      A.   If she's --
16      Q.   If she's on duty, those hours count.  If
17  someone's on duty, they get paid those hours.
18      In the au pair program if someone
19  works five hours per week and if someone works 45
20  hours in one week, they get the same stipend; is
21  that right?
22      A.   I'm sorry, say it again.  If?
23      Q.   Under the au pair program if someone
24  works five hours --
25      A.   Five hours.

PLAINTIFFS' RESP. APP.0004624

MAGNA
LEGAL SERVICES

Page 162

1    after, you're saying, or before we talked about
2    we --
3        Q.   I'm sorry, that was confusing.
4        A.   Okay.
5        Q.   I'll break it down for you.
6        A.   I want to make sure it's right.
7        Q.   Prior to 2014, before this lawsuit was
8    filed, do you recall discussing the issue of wages
9    and hours with any of the people listed on this
10   list?
11       A.   I probably either listened, or as part of
12   the standard meeting that the Department of State
13   had and the Alliance, Michael McHugh probably made
14   comments about what they were doing on -- on hours
15   logs type of stuff.
16       Q.   What do you recall Mr. McHugh saying
17   about the logs?
18       A.   The Department of State basically -- this
19   is in -- this was in a -- an Alliance meeting where
20   all the sponsors were there, and the Department of
21   State was describing stuff people are doing.
22            InterExchange was highlighted
23   as -- you know, a handful of things they were doing.
24   They talked about their bracelet they used for their
25   800 -- 40 -- or 24-hour thing.  It had a phone

Page 163

1    number on it.  And then they did talk about what
2    they were doing in the way of their hours log thing
3    they were doing.  But that was just in the context
4    of recording hours.  That's why I wanted to know
5    whether you were asking -- specifically what you
6    were asking for.
7        Q.   I'm being -- I'm being somewhat general
8    about the term.  I'm not limiting it to --
9        A.   Yeah.
10       Q.   -- to logs.
11       A.   Yeah, that was -- okay.  Well, that
12   was -- it was logs, I mean.
13       Q.   And if you -- if you recall any
14   conversations beyond the topic of logs that's still
15   relevant to the issue of wages and hours, that would
16   be relevant --
17       A.   Yeah.
18       Q.   -- to the question I asked.
19       A.   Yeah.  No.  I'm trying to understand.  I
20   -- I -- yeah, I can't think of any.
21       Q.   Okay.
22       A.   I mean.
23       Q.   Do you recall when that conversation with
24   Mr. McHugh occurred?
25       A.   On logs, no, I don't.

Page 164

1        Q.   Do you recall whether it was before or
2    after the audit report that we looked at, when
3    you -- you told the Department of State that you
4    were considering implementing --
5        A.   I -- I -- I don't know.
6        Q.   -- changes?
7        A.   I mean, I really can't -- I -- I -- I
8    don't know.  I mean, it wasn't that big of a deal,
9    so...
10       Q.   Do you recall --
11       A.   I didn't like what they were doing, so --
12   so...
13       Q.   Why didn't you like what they were doing?
14       A.   I just thought it was way too detailed,
15   onerous.
16       Q.   Was that your only concern?
17       A.   Yeah.
18       Q.   Do you recall anyone ever voicing a
19   concern that being too involved in logging hours
20   would result in the sponsor being determined to be
21   an employer?
22       A.   No, that was never discussed.
23       Q.   Do you recall sharing with Mr. McHugh
24   what GoAuPair did with respect to logging hours?
25       A.   No, we did not.

Page 165

1        Q.   So your testimony -- is it fair to say
2    that your testimony is in that conversation you were
3    just a listener?
4        A.   That is correct.
5        Q.   Even though you didn't like what he was
6    doing, is it fair to say that eventually you did
7    something similar?
8        A.   Conceptually, yes, but very different
9    than what they actually did.
10       Q.   What do you understand the differences to
11   be?
12       A.   Sure.
13            They had a -- a whole little
14   binder where they were recording, you know, starts
15   and times every day, what somebody was doing, and
16   then calculating what the hours were for each --
17   each day.  And it just seemed to be overkill,
18   especially given the objectives we had anyway.
19       Q.   Did you consider what InterExchange was
20   doing when crafting the changes to policies that you
21   made?
22       A.   I -- I mean, obviously it's in the
23   general area, so you look at input and then you
24   decide what you want to do.  So in a general basis,
25   yeah, their input was -- something was input of, but

Page 166

1    it wasn't output.  It wasn't -- it didn't create the
2    output.
3        Q.   Are you aware of any other sponsors that
4    took steps to log hours?
5        A.   No, I am not.  I have no idea.  We never
6    talked about other people.  The only thing we talked
7    about was in the context of we're in a meeting with
8    the Department of State and, you know, 10 people.
9    And the comment came up, "Well, hey, here's
10   companies that are doing great things."  The
11   Department of State sort of shows these things.  So
12   I'm just saying what the context was.  This was not
13   that -- not a --
14       Q.   It's not unusual at a Department of State
15   meetings for sponsors to share what they're doing?
16          MS. REILLY:  Objection.  That
17   mischaracterizes what he just said.  He said
18   Department of State shared that.
19       Q.   Is your testimony that you're --
20   you're -- in the context of you're in a meeting with
21   the Department of State with 10 people, and the
22   comment came up, "Here's companies that are doing
23   great things"?
24       A.   Correct.
25       Q.   Who was the comment coming from in the --

Page 167

1    the description that you gave?
2        A.   Oh, who was having good things, was the
3    Department of State people were saying, "Here's" --
4    "here's" -- they're big on continual improvement,
5    and they have a better term.  But anyway, I'll just
6    call it my term, continual improvement.
7           So oftentimes they will go through
8    and say, okay, here's some things we're finding
9    other sponsors doing that are best practices, and
10   they'll talk about it in an anonymous basis.  In
11   this case they didn't.
12       Q.   In this case they didn't what?
13       A.   They -- they -- they didn't do it on an
14   anonymous basis.  They actually notified -- they
15   said that, you know, "InterExchange is doing this
16   and this and this."
17       Q.   I'm -- I'm confused.
18       A.   Okay.
19       Q.   I -- I thought -- I thought you told us
20   that Mr. McHugh told you what InterExchange was
21   doing with respect to its logs?
22       A.   Oh, okay.  Okay.  I'm sorry.
23           So the context is is that we're at
24   a meeting.  Department of State is at the top, and
25   one of the topics they had was here's some best

Page 168

1    practices we're doing over the course of the year.
2           They talked specifically about
3    InterExchange was doing, in one case was the -- the
4    wristband in order to get the 800 number, their 8 --
5    24-hour number.  And they also said about whatever
6    they're doing in this area of recording logs and
7    hours and stuff like that, and they showed the stuff
8    like this (indicating).  So that's what was said.
9           And then Michael was there, and I
10   said, "Well, what -- what -- what was that?"
11          And he said, "Oh, it's this."  And
12   he -- he showed exactly what she had shown, but
13   obviously she was going like this (indicating) and
14   I -- I wasn't right in front of it.  So that's --
15   that's what the context was.
16       Q.   So you learned that information both from
17   the Department of State and from Mr. McHugh?
18       A.   Correct.  Yes.
19       Q.   Thank you for clarifying that.
20       A.   No, no problem.  My wife tells me I'm not
21   too clear on some of these things too, so you're not
22   the first person to say that.
23       Q.   I'm going to apologize to the court
24   reporter for handing a stapled document to the
25   witness, but I don't have one with a paperclip,

Page 169

1    unfortunately.
2           (Exhibit No. 13 was marked.)
3        Q.   I'm marking what's Bates stamped EAP1552.
4    This document does not bear any confidentiality
5    designation.  And that includes a -- an attachment.
6           MR. VALDIVIESO:  I apologize to
7    counsel, but it is stapled in the wrong order, so
8    I've folded it into the appropriate order.
9           MS. FULLER:  Got it.
10          MR. VALDIVIESO:  Oh, and I need one
11   of those.  I'm sorry.
12          (Witness peruses document.)
13       A.   The 19th.  Okay.  This looks like it's
14   the same thing.  Is that -- am I looking at this
15   right, or -- okay.  These looks like these are the
16   same, just in a different sequence.  Okay.
17       Q.   Yeah, I think I might have included two
18   copies of the --
19       A.   Yes.  Yes.
20       Q.   -- attachment?
21       A.   Do you want one back?  There you go.
22       Q.   Sure.
23       A.   Okay.
24       Q.   Do you recognize Exhibit 13, Mr. Kapler?
25       A.   Specifically, no, I do not.  But

Case No. 1:14-cv-03074-CMA-KMT Document 259-24 filed 03/30/18 USDC Colorado pg 110 of 311

# Exhibit 413

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Case No. 14-cv-03074-CMA-KMT

_____

JOHANA PAOLA BELTRAN, ET AL.,

       Plaintiffs,

vs.

INTEREXCHANGE, INC., ET AL.,

       Defendants.

_____

VIDEOTAPED DEPOSITION OF

STACEY FRANK

30(b)(6) REPRESENTATIVE FOR AGENT AU PAIR

MAY 12, 2017

DENVER, COLORADO

8:28 A.M.

Magna Legal Services
866-624-6221
www.magnals.com

PLAINTIFFS' RESP. APP.0004628

MAGNA ▶
LEGAL SERVICES

## Page 2

```
 1              The videotaped deposition of
 2  STACEY FRANK, taken before Leeann Keenan, a Registered
 3  Merit Reporter, Certified Realtime Reporter, and a
 4  Notary Public in and for the County of Summit and the
 5  State of Colorado, at 370 17th Street, Suite 4500,
 6  Denver, Colorado, on Friday, May 12, 2017, at the hour
 7  of 8:28 a.m., pursuant to Notice.
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1
 2  APPEARANCES CONTINUED:
 3      EXPERT AUPAIR
        BY: BOGDAN ENICA, ESQ.
 4          100 2nd Avenue S.
            Suite 3025
 5          St. Petersburg, Florida  33701
            (727) 225-2649
 6          bogdan@expertaupair.com
            appeared by telephone on behalf of
 7          Expert AuPair
 8      GORDON & REES
        BY: JENNIFER W. VEDRA, ESQ.
 9          555 17th Street
            Suite 3400
10          Denver, Colorado  80202
            (303) 200-6888
11          jverda@gordonrees.com
            appeared by telephone on behalf of
12          AuPairCare, Inc.
13      NIXON, SHEFRIN, HENSEN, OGBURN
        BY: KATHLEEN CRAIGMILE, ESQ.
14          5619 DTC Parkway
            Suite 1200
15          Greenwood Village, Colorado  80111
            (303) 773-3500
16          kcraigmile@nixonshefrin.com
            appeared by telephone on behalf of
17          ProAuPair and International Au Pair
            Exchange
18
19  ALSO PRESENT: Davis Baumunk, Videographer
20
21
22
23
24
25
```

## Page 3

```
 1  APPEARANCES:
 2
 3      BOISE, SCHILLER, FLEXNER, L.L.P.
        BY: JUAN P. VALDIVIESO, ESQ.
 4          SEAN RODRIGUEZ, ESQ.
            1999 Harrison Street
 5          Suite 900
            Oakland, California  94612
 6          (510) 874-1010
            jvaldivieso@bsfllp.com
 7          srodriguez@bsfllp.com
            appeared on behalf of the Plaintiffs
 8  WHEELER, TRIGG, O'DONNELL
        BY: KATHRYN REILLY, ESQ.
 9          370 17th Street
            Suite 4500
10          Denver, Colorado  80202
            (303) 244-1983
11          reilly@wtotrial.com
            appeared by telephone on behalf of USAuPair, Inc.,
12          GoAuPair, and Au Pair International
13  SHERMAN & HOWARD, L.L.C.
        BY: ALYSSA LEVY, ESQ.
14          633 17th Street
            Suite 3000
15          Denver, Colorado  80202
            (303) 299-8194
16          alevy@shermanhoward.com
            appeared by telephone on behalf of
17          InterExchange, Inc.
18  LEWIS, ROCA, ROTHGERBER, CHRISTIE
        BY: JESSICA FULLER, ESQ.
19          1200 17th Street
            Suite 3000
20          Denver, Colorado  80202
            jfuller@lrrc.com
21          (303) 628-9527
            appeared on behalf of Cultural Care
22
23
24
25
```

## Page 5

```
 1          I N D E X
 2
 3  DEPOSITION WITNESS:                          PAGE
    STACEY FRANK
 4
    Examination by Mr. Valvidieso            8
 5
 6  PLAINTIFFS' DEPOSITION EXHIBITS MARKED:
    NO.     DESCRIPTION                      PAGE
 7
 8  Exhibit 1   Notice of Deposition of 30(b)(6)    9
            Deposition of Agent Au Pair
 9  Exhibit 2   "How Can and Au Pair Benefit Your   19
            Family?" From Agent Au Pair's website
10
11  Exhibit 3   April 2, 2009 e-mail from Michael    45
            McCarry to Stacey Frank and Ruth
12          Ferry with attached Membership
            Application Checklist
13          AAP_0000848 - 855
14  Exhibit 4   April 27, 2009 e-mail string between 51
            Stacey Frank to Helen Young
15          AAP_0000767 - 768
16  Exhibit 5   January 25, 2012 e-mail from Maha    62
            Ammar to multiple recipients with
17          attached April 19, 2011 Au Pair
            Sponsor Meeting with ECA
18          AAP_0000739 - 744
19  Exhibit 6   February 9, 2012 Annual Au Pair      78
            Program Meeting Minutes
20          AAP_1 - 11
21  Exhibit 7   February 6 - 12, 2009 e-mail string  80
            between Heidi Woehl and Stacey Frank
22          AAP_0001265
23  Exhibit 8   November 11, 2010 e-mail string      84
            between Stacey Frank and Helene Young
24          AAP_0000799 - 800
25
```

MAGNA
LEGAL SERVICES

Page 14

1    A.   I formed a corporation in 2001.
2    Q.   Before forming a corporation, did you
3   have any involvement in the au pair program?
4    A.   I was an LCC for another sponsor.
5    Q.   For which sponsor were you an LCC?
6    A.   I have to think about it for a second.
7   EuRaupair.
8    Q.   And during what period of time were you
9   an LCC at EuRaupair?
10    A.   That was probably around 1998.
11    Q.   So you were an LCC at EuRaupair from 1998
12   until 2001; is that right?
13    A.   No.  I was -- I -- it was around 1998,
14   1999 for about a year.
15    Q.   And between your approximate year at
16   EuRaupair and the time that you formed the Agent
17   Au Pair corporation, did you have any other
18   involvement in the au pair program?
19    A.   I mean, not -- other than communicating
20   via fax with Department of State regarding an
21   upcoming application I was going to submit, no.
22    Q.   And the fax that you had with the
23   Department of State regarding an upcoming
24   application, was that in regard to an application
25   with respect to Agent Au Pair?

Page 15

1    A.   Yes.
2    Q.   Other than your work as a consultant now
3   for Agent Au Pair, do you currently have any other
4   employment?
5    A.   No.
6    Q.   And you provide consulting services to
7   Agent Au Pair.  Do you provide consulting services
8   to any other entity?
9    A.   No.
10    Q.   And prior to your time as an LCC with
11   EuRaupair, did you have any involvement with the
12   au pair program?
13    A.   No.
14    Q.   Are you familiar with the name ICEP
15   World?
16    A.   Yes.
17    Q.   What is ICEP World?
18    A.   ICEP World was a work and travel company
19   that I owned, which I don't own anymore.
20    Q.   During what period of time did you own
21   ICEP World?
22    A.   Maybe I should clarify.  Work and travel
23   is another J-1 sponsoring category.
24         So that was 2 -- when did I get
25   designated -- 2008 to 2016.

Page 16

1    Q.   What happened in 2016 to ICEP World?
2    A.   I sold that company as well.
3    Q.   And to whom did you sell ICEP World?
4    A.   To a company called Southwestern.
5    Q.   Did ICEP World have any involvement in
6   the au pair J-1 visa program?
7    A.   No.  I -- I should actually clarify.
8         They didn't actually buy ICEP
9   World.  They bought my Department of State
10   sponsorship, if -- if you want a little
11   clarification.
12    Q.   That's helpful.
13    A.   It's very different than my sale of Agent
14   Au Pair.
15    Q.   Could you explain how -- how that's
16   different from your sale -- sale of Agent Au Pair?
17    A.   Mike DiMauro bought 100 percent of Agent
18   Au Pair stock and is keeping it as an ongoing
19   concern.
20         And ICEP World sold the Department
21   of State forms, essentially, to Southwestern, and
22   ICEP World is no longer operating in business.
23    Q.   Okay.
24    A.   It was closed.
25    Q.   I see.

Page 17

1         Was Agent Au Pair a for-profit
2   corporation?
3    A.   Yes.
4    Q.   Does it continue to be a for-profit
5   corporation, if you know?
6    A.   Yes.
7    Q.   How would you describe Agent Au Pair's
8   business today?
9    A.   It's -- it's a cultural exchange
10   organization, Department of State sponsor, that
11   brings au pairs from other countries to live and
12   work with American host families.
13    Q.   Is that how you've always described Agent
14   Au Pair's business?
15    A.   Yes.
16    Q.   Is Agent Au Pair a childcare provider?
17    A.   No.
18    Q.   Does Agent Au Pair have a website?
19    A.   Yes.
20    Q.   What does Agent Au Pair use a website
21   for?
22    A.   I'm sorry, I didn't --
23    Q.   Well --
24    A.   What do they use it for?
25    Q.   Yes.

PLAINTIFFS' RESP. APP.0004630

MAGNA
LEGAL SERVICES

Page 54

1    And so we -- you know, that's what
2  we provide the families. We don't -- we don't
3  collect the au pair's Social Security number. We --
4  we just tell the families that, you know, here's
5  what you paid the agency. Here's our tax ID number.
6  Because they use it for the dependent care tax,
7  apparently. And then, you know, that's about it.
8    They -- they -- I know that the
9  big agencies, Au Pair in America and -- and
10  AuPairCare, they have, I think, a pdf or some tax
11  advice on their website which tells the families
12  that -- essentially, that we have a tax ID number.
13  I think they list their tax ID numbers on their
14  websites.
15    And we just get tons and tons of
16  questions, but we can't answer them because we're
17  not -- we're not tax advisors.
18  Q.  So do you recall around this time in 2009
19  having discussions with any other sponsors as to
20  what they do with respect to the tax thing?
21  A.  I mean, you know, I've -- in the past
22  I -- I visited their websites because they did have
23  a lot -- a lot of the large agencies have a lot of
24  resources on their websites for host families, and I
25  would look at that. But I don't -- I don't recall

Page 55

1  exactly discussing that with anyone.
2    I'm sorry, I must -- I missed your
3  question. Did I answer it?
4  Q.  My question was: Do you recall around
5  this time in 2009 having discussions with any other
6  sponsors as to what they do with respect to the tax
7  thing?
8  A.  Oh, yeah.
9    I mean, just -- I just recall this
10  exchange, now that you've shown it to me, with
11  Helene Young. And, again, I would visit their
12  websites to see what they advised host families.
13  But, no, I don't recall having any conversations
14  about taxes with other agencies.
15  Q.  Do you see in Ms. Young's e-mail that we
16  were looking at, in the next sentence it says, "I
17  talked to Ruth at APIA [sic], and she basically said
18  they instruct families they are not authorized to
19  give out any tax advice to families or au pairs."
20    Do you see that?
21  A.  Yes.
22  Q.  Is it fair to say that Ms. Young was
23  relaying to you information that she had learned in
24  talking with Ruth at APIA?
25  A.  It looks that way, from the sentence.

Page 56

1  Q.  At the very bottom of that e-mail from
2  Ms. Young, it says, "Oh, and FYI, Cultural Care is
3  giving families deep discounts to match our program
4  fees, plus guaranteeing a full refund if host
5  families experience a job loss. Have you heard
6  about this?"
7    Do you see that?
8  A.  Yes.
9  Q.  What do you think, sitting here today --
10  do you have an understanding as to -- strike that.
11    Sitting here today reading that
12  sentence, do you have an understanding as to what
13  Ms. Young meant by "Cultural Care is giving families
14  deep discounts to match our program fees"?
15    MS. FULLER: Objection. Form.
16  Foundation.
17    MS. REILLY: You can go ahead and
18  answer.
19  A.  Yeah. The only thing I can say is that
20  this e-mail is from 2009, and that is after the 2008
21  crash. And as an au pair agency, I experienced a --
22  a deep, deep, deep reduction in business, as did
23  everyone in the whole entire economy.
24    So it was -- it was drastically --
25  the world was drastically different in late 2008.

Page 57

1  So I think all businesses were trying to get
2  customers in any way they could.
3    If you look at the Department of
4  State records, clearly the au pair participation and
5  host family participation went down by 30, at least
6  30 to 40 percent from 2 -- 2008, 2009 time period.
7  So I think we were just discussing, you know, how we
8  can all, you know -- any -- any business can weather
9  the storm.
10  Q.  What did you understand "our program
11  fees" to mean, specifically the word "our"? Who
12  does the word "our" refer to?
13  A.  Well, Helene -- Helene -- Helene's a
14  small sponsor like I am, so we have -- you know, we
15  don't have a lot of fat. We have very limited
16  staff, and we're kind of a one-man show. So we
17  don't have a lot of big expenses, so we -- and --
18  and I just -- she's actually a -- a lot less than I
19  was, her fees were a lot less than mine.
20    But both of us were considerably
21  less than the other larger agencies. So we were new
22  to the market and I guess you could say
23  inexperienced. And we charged lower fees, like I
24  said, because we didn't have the expense overhead
25  that we had to pay.

Page 58

```
 1      Q.   Were you aware of what Ms. Young's fees
 2   were?
 3      A.   At that time I think I was, yes.
 4      Q.   How were you aware of what Ms. Fee's
 5   were -- Ms. Young's fees were?
 6      A.   I probably visited her website.
 7      Q.   Do you recall having any conversations
 8   about her fee structure?
 9      A.   No.
10      Q.   Do you understand the word "our" to refer
11   to both -- strike that.
12           Let's go back to the sentence that
13   you -- or the e-mail that you wrote in response to
14   Ms. Young's e-mail, the very top e-mail.  Do you see
15   that one?
16      A.   Yes.
17      Q.   And going down four lines, it says, "Plus
18   I think (our) lower fees are starting to get
19   noticed."
20           Do you see that?
21      A.   Yes.
22      Q.   Do you know if the word "our" in that
23   sentence, if you meant to refer to both Agent
24   Au Pair and USAuPair?
25      A.   I don't recall, but I probably meant
```

Page 59

```
 1   new -- new sponsoring agencies that were smaller and
 2   charged lower fees and not only -- not only
 3   USAuPair.  There -- there are others.
 4      Q.   What others would you put in that
 5   category.
 6      A.   Expert Au Pair.
 7      Q.   Anyone else?
 8      A.   There's one more.  Who is it, off the top
 9   of my head?  There's one or two more.  Expert
10   Au Pair.  They were more newer to the market,
11   recently designated sponsors.  I -- I could think of
12   it in a minute.  It's -- it's escaping me right now.
13      Q.   Prior to April 2009 did Agent Au Pair
14   have a policy with respect to providing information
15   about filing taxes, to inquiries from au pairs?
16      A.   I don't recall.
17      Q.   Do you recall if you took the information
18   you learned from Ms. Young, with respect to the tax
19   thing, into consideration when setting your policies
20   with respect to providing information about filing
21   taxes?
22      A.   I don't recall.
23      Q.   Other than this communication with
24   Ms. Young, do you recall having -- would it be fair
25   to characterize this communication with Ms. Young as
```

Page 60

```
 1   a one-on-one communication over e-mail?
 2      A.   Yes.
 3      Q.   Other than this communication, do you
 4   recall having other one-on-one communications with
 5   other sponsors over e-mail?
 6      A.   Probably.
 7      Q.   And other than e-mail, would you
 8   communicate with Ms. Young by any other means?
 9      A.   Yes, by telephone.
10      Q.   And "by telephone," do you mean a
11   landline or do you mean a cell phone?
12      A.   Probably -- well, my cell phone.
13   Probably -- probably either my cell phone or my
14   landline.
15      Q.   On her end, what -- what --
16      A.   Probably either her cell phone or her
17   landline.
18      Q.   Do you know if Ms. Young has a cell
19   phone?
20      A.   Yes.
21      Q.   And you have a cell phone?
22      A.   Yes.
23      Q.   Do you know if Ms. Young's cell phone
24   number is entered into your contacts?
25      A.   Yes, it is.
```

Page 61

```
 1      Q.   And you communicated with Ms. Young from
 2   your Agent -- in this instance, in -- from your
 3   AgentAuPair.com e-mail address; is that right?
 4      A.   Yes.
 5      Q.   Do you use any other e-mail addresses --
 6   or strike that.
 7           During your time at Agent Au Pair,
 8   did you use any other e-mail addresses for business
 9   purposes?
10      A.   Yes.
11      Q.   Which other e-mails did you use?
12      A.   I used -- well, for business purposes?  I
13   mean, I had staff that came and went.  We had
14   various Agent Au Pair e-mail addresses.  And if my
15   staff was out, that person was out for the day or
16   out for the week, I would check her e-mail and reply
17   to clients, for example.
18           So it would be
19   Placement@AgentAuPair, Program@AgentAuPair.  There's
20   Info@AgentAuPair.  There was AccountingAgentAuPair,
21   advisor@AgentAuPair.  I can't think of any other
22   right now.
23      Q.   It's fair to say those are all at the
24   AgentAuPair.com domains?
25      A.   Yes.
```

PLAINTIFFS' RESP. APP.0004632

MAGNA ●
LEGAL SERVICES

---

Page 82

1  out in this case because I smelled something that
2  didn't pass the smell test.  But it's not always a
3  red flag if a host family, you know, signs up with a
4  different agency, so I must have had a feeling
5  before I reached out.
6       So yes, other host families had
7  been with agents, other agencies previously.  But it
8  must -- it -- I can't recall ever reaching out about
9  it, other than this one.
10      THE VIDEOGRAPHER:  We have about five
11  minutes left on the media.
12      MR. VALDIVIESO:  Okay.
13      Q.   And Ms. Woehl and Ms. Ferry work at other
14  sponsor agencies; is that right?
15      A.   Right.
16      Q.   Does -- and can you remind me, do you
17  recall who Ms. -- which agency Ms. Woehl worked for
18  at the time?
19      A.   She worked at AuPairCare.
20      Q.   Do you consider AuPairCare and AIFS your
21  competitors?
22      A.   I mean, I guess, in the sense that
23  they're offering, you know, a similar program, yeah.
24      Q.   And do you compete with AuPairCare --
25  well, when you say -- you -- you -- you've

---

Page 83

1  acknowledged that you consider AuPairCare and AIFS
2  your competitors.  Does that mean that you compete
3  with them on anything?
4      A.   I mean --
5          MS. REILLY:  Objection to form.
6      A.   Yeah.  "Competition's" a strong word.  I
7  mean, you know, I -- I wouldn't -- I -- I wouldn't
8  consider competing with them as far as, you know,
9  trying to keep up, in a way of trying to keep up.
10  But, I mean, yes, a host family can sign up with
11  Agent Au Pair or they can sign up with another
12  agency.
13          I -- I never really considered
14  myself competing with them.  They're too -- they're
15  too big to compete with, if that makes any sense.  I
16  mean, com -- competing to me means that you're sort
17  of fighting for -- you know, to get ahead, to get
18  someone else's customers or something.  I mean, I
19  don't think I ever did that.  I just would operate
20  my business, and people would come to me, clients
21  would come to me.
22          MR. VALDIVIESO:  We can change the
23  media.
24          THE VIDEOGRAPHER:  Going off the
25  record at 10:58.  This mark the end of media 1.

---

Page 84

1          (Break from 10:58 a.m. to
2          11:10 a.m.)
3          THE VIDEOGRAPHER:  This marks the
4  start of media 2 of the video deposition of Stacey
5  Frank, 30(b)(6) representative for Agent Au Pair.
6  We're back on the record.  The time is 11:10.
7  BY MR. VALDIVIESO:
8      Q.   I'm marking Exhibit 8.  It's a document
9  that ends in 799.
10          (Exhibit No. 8 was marked.)
11      Q.   Again, when you've had a chance to look
12  it over, let me know if you recognize this document.
13  Ms. Frank.
14          (Witness peruses document.)
15      A.   Okay.  I am familiar with this document.
16      Q.   What is Exhibit 8?
17      A.   It's an e-mail from myself to Helene
18  Young.
19      Q.   And what is the e-mail to Helene Young
20  regarding?
21      A.   It -- it looks like an e-mail regarding
22  an au pair who -- one of her au pairs who asked her
23  to go abroad with a family for an extended period of
24  time.  And the Department of State, it appears -- I
25  don't -- it appears that the Department of State

---

Page 85

1  doesn't have any policy on that.
2      Q.   Do you recall this -- the -- the context
3  of this e-mail, do you have a recollection of --
4  of -- strike that.
5          Do you recall Ms. Young reaching
6  out to you about this issue?
7      A.   Yes.
8      Q.   Do you recall, sitting here today,
9  whether at the time in 2010, whether Agent Au Pair
10  had a policy as to au pairs' vacationing with their
11  host family?
12      A.   I don't recall that we had a policy.
13      Q.   Sitting here today, do you understand --
14  strike that.
15          Looking at the second e-mail on
16  the chain, where it says "Helene Young Wrote," and
17  then there's her e-mail starts, "To have the DS-2019
18  signed after the DOS overruled our policy."
19          Do you have any understanding as
20  to what that sentence means?
21      A.   I think, I mean, she must be talking
22  about, you know, each -- each sponsor's policy
23  regarding international travel.  I think she might
24  be meaning "our," as far as sponsors go.
25      Q.   That's what you understand that sentence

PLAINTIFFS' RESP. APP.0004633

MAGNA
LEGAL SERVICES

| Page 98 | Page 100 |
|---|---|

**Page 98**

1  think I -- I remember not finding out that there
2  even was a category review until halfway through,
3  and I -- I remember wondering whether I was going to
4  be selected.
5          And I don't re -- I don't -- I
6  don't think they formally announced there was going
7  to be one. And I remember kind of knowing about it
8  while it was going on, and then it suddenly ended
9  and I wasn't selected. It was kind of there was
10  no -- there were no official notices going out from
11  the Department of State about it.
12     Q.   You said "halfway through." Does halfway
13  through refer to a certain period of time?
14     A.   I -- I remember at a -- at one of the
15  meet -- the Alliance meetings that someone from the
16  Department of State said, "We're undergoing a
17  category review with the au pair agencies." And I
18  was you are? I didn't know that. And -- and she
19  said, "We've done several sponsors. We're going to
20  do several more sponsors, and, you know, you'll find
21  out when you get the letter."
22          And I was surprised to find out
23  they were doing that, and I was hoping I wasn't
24  going to get a letter.
25     Q.   You never --

**Page 99**

1     A.   And then -- and then in a subsequent
2  meeting they said, "The category review for au pair
3  is done" and, you know, in a meeting. So that -- it
4  was -- I was very uninformed, actually. And I --
5  and I think it was about a period of about maybe 18
6  months or to -- to two years.
7          (Exhibit No. 11 was marked.)
8     Q.   I'm marking Exhibit 11. It ends in 1257.
9          When you've had a chance to take a
10  look at Exhibit 11, could you please let me know if
11  it looks familiar to you, Ms. Frank?
12     A.   Yes, it looks familiar.
13     Q.   What is Exhibit 11?
14     A.   It's an e-mail exchange between me and
15  Susan Hayes of EurAuPair.
16     Q.   What is this e-mail exchange regarding?
17     A.   I reached out to her because I had a
18  lawsuit where an au -- an au pair sued her host
19  family for overtime wages, and she's claiming she
20  worked a lot of hours. And that I was -- I was
21  wondering if, you know, I -- if there was any
22  information that she had that could help me figure
23  out what to do.
24     Q.   Do you know why you reached out to
25  Ms. Hayes specifically?

**Page 100**

1     A.   I -- I don't recall why I would have
2  reached out to her specifically.
3     Q.   You wrote, "I have a situation with an
4  au pair in California."
5          Is that right?
6     A.   Yes.
7     Q.   Were you concerned about the situation
8  with an au pair in California?
9     A.   I was concerned because the host mother
10  who was being sued was an LCC of mine at Agent
11  Au Pair, and she was asking me for help.
12     Q.   Are your LCCs employees of Agent Au Pair?
13     A.   No. No, they -- they're contractors.
14     Q.   Were you surprised when you learned of
15  the situation with the au pair in California?
16     A.   Yes.
17     Q.   Why were you surprised?
18     A.   Just because I -- I never thought about
19  an au pair suing her family before.
20     Q.   Was Agent Au Pair sued --
21     A.   No.
22     Q.   -- by that au pair?
23     A.   No.
24     Q.   Do you know when the host family was sued
25  by the au pair?

**Page 101**

1     A.   Well, it must have been right before
2  October 2014. I think it was actually January 2014.
3  I'm -- I've had -- I had three lawsuits in a very
4  short amount of time.
5          So I -- I -- I don't know. It
6  must have been -- it couldn't have been January
7  2014. It must have been right before October 2014.
8     Q.   When you say that you had three lawsuits
9  in a very short amount of time, do you consider this
10  lawsuit described in the e-mail in Exhibit 11 one of
11  those lawsuits?
12     A.   I -- I -- I was referring to that as one
13  of the three, yes. But I should have -- I should
14  clarify that I wasn't in a lawsuit, but my host
15  family and LCC were in a lawsuit, so I had to be
16  involved. So I guess I just meant I was involved in
17  three -- three lawsuits.
18     Q.   Is one of the other three lawsuits the
19  lawsuit for which you are presenting testimony
20  today?
21     A.   Yes.
22     Q.   What is the third lawsuit?
23     A.   The third lawsuit is that I had a former
24  employee sue me for -- an employee who worked in the
25  office sue me for a list of things.

PLAINTIFFS' RESP. APP.0004634

MAGNA
LEGAL SERVICES

Case No. 1:14-cv-03074-CMA-KMT   Document 959-24   filed 03/30/18   USDC Colorado   pg
118 of 311

# Exhibit 414

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Case No. 14-cv-03074-CMA-KMT

_____

JOHANA PAOLA BELTRAN, ET AL.,

        Plaintiffs,

vs.

INTEREXCHANGE, INC., ET AL.,

        Defendants.

_____

VIDEOTAPED DEPOSITION OF

STEVE LEHAN

30(b)(6) REPRESENTATIVE FOR AU PAIR INTERNATIONAL

MAY 12, 2017

DENVER, COLORADO

1:59 P.M.

Magna Legal Services
866-624-6221
www.magnals.com

PLAINTIFFS' RESP. APP.0004636

MAGNA
LEGAL SERVICES

**Page 2**

```
 1           The videotaped deposition of
 2   STEVE LEHAN, taken before Leeann Keenan, a Registered
 3   Merit Reporter, Certified Realtime Reporter, and a
 4   Notary Public in and for the County of Summit and the
 5   State of Colorado, at 370 17th Street, Suite 4500,
 6   Denver, Colorado, on Friday, May 12, 2017, at the hour
 7   of 1:59 p.m., pursuant to Notice.
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1   APPEARANCES CONTINUED:
 2
         GORDON & REES
 3       BY: HEATHER KELLY, ESQ.
         555 17th Street
 4       Suite 3400
         Denver, Colorado  80202
 5       (303) 200-6888
         hkelly@gordonrees.com
 6       appeared by telephone on behalf of
         AuPairCare, Inc.
 7
         NIXON, SHEFRIN, HENSEN, OGBURN
 8       BY: KATHLEEN CRAIGMILE, ESQ.
         5619 DTC Parkway
 9       Suite 1200
         Greenwood Village, Colorado  80111
10       (303) 773-3500
         kcraigmile@nixonshefrin.com
11       appeared by telephone on behalf of
         ProAuPair and International Au Pair
12       Exchange
13
14   ALSO PRESENT: Davis Baumunk, Videographer
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1   APPEARANCES:
 2
         BOISE, SCHILLER, FLEXNER, L.L.P.
 3       BY: SEAN RODRIGUEZ, ESQ.
             JUAN P. VALDIVIESO, ESQ.
 4       1999 Harrison Street
         Suite 900
 5       Oakland, California  94612
         (510) 874-1010
 6       srodriguez@bsfllp.com
         jvaldivieso@bsfllp.com
 7       appeared on behalf of the Plaintiffs
 8   WHEELER, TRIGG, O'DONNELL
         BY: KATHRYN REILLY, ESQ.
 9       370 17th Street
         Suite 4500
10       Denver, Colorado  80202
         (303) 244-1983
11       reilly@wtotrial.com
         appeared by telephone on behalf of USAuPair, Inc.,
12       GoAuPair, and Au Pair International
13   SHERMAN & HOWARD, L.L.C.
         BY: ALYSSA LEVY, ESQ.
14       633 17th Street
         Suite 3000
15       Denver, Colorado  80202
         (303) 299-8194
16       alevy@shermanhoward.com
         appeared by telephone on behalf of
17       InterExchange, Inc.
18   LEWIS, ROCA, ROTHGERBER, CHRISTIE
         BY: JESSICA FULLER, ESQ.
19       1200 17th Street
         Suite 3000
20       Denver, Colorado  80202
         jfuller@lrrc.com
21       (303) 628-9527
         appeared on behalf of Cultural Care
22
23
24
25
```

**Page 5**

```
 1              I N D E X
 2
     DEPOSITION WITNESS:                 PAGE
 3   STEVE LEHAN
 4   Examination by Mr. Rodriguez         9
 5
     PLAINTIFFS' DEPOSITION EXHIBITS MARKED:
 6   NO.      DESCRIPTION          PAGE
 7   Exhibit 1   Notice of 30(b)(6) Deposition of    10
                 GoAuPair Operations, LLC d/b/a
 8               GoAuPair
 9   Exhibit 2   "Au Pair Prospect Interview Guide"  36
                 API00001203 - 1217
10
11   Exhibit 3   November 28 and December 14, 2014   39
                 e-mails between Katrina Vanderhulst
12               and Arthasit Sirirattanaanan with
                 attached International Sending Agent
13               Handbook
                 API00002066 - 2095
14   Exhibit 4   May 10, 2017 March 3rd 2017 IRS Fax  45
                 Sheet
15
16   Exhibit 5   July 13, 2009 e-mail from Lisa       51
                 Kempton to Michelle Sayre with
17               attached "Au Pair International Child
                 Care Program;
18               APE00004894 - 4900
19   Exhibit 6   Au Pair International Web page from   54
                 April 5th, 2010
20
21   Exhibit 7   Au Pair International Web page from   55
                 July 11, 2011
22
23   Exhibit 8   Au Pair International Web Page from   56
                 March 1st, 2012
24
25
```

**MAGNA**
LEGAL SERVICES

Page 18

```
 1      A.   Yeah.
 2      Q.   -- you to recollect what you reasonably
 3 can.
 4      A.   Okay.  Good.  I'm just afraid of making a
 5 statement and kind of overstating my -- the --
 6 the com -- you know, the complete nature of my
 7 knowledge of the subject.
 8      Q.   Under -- understood.
 9           All right.  So apart from IAPA --
10      A.   Uh-huh.
11      Q.   -- are there any industry organizations
12 in which API or its personnel participate?
13      A.   No.
14      Q.   Has API ever had direct communications
15 with the Department of State?
16      A.   Yes.
17      Q.   In what context?
18      A.   Oversight of the program.
19           And are you talking about inbound
20 contact or outbound contact?
21      Q.   Well, I -- I -- I meant it broadly.  Why
22 don't we -- why don't we try something narrower
23 first.
24      A.   Uh-huh.
25      Q.   Can you tell me the first time that you
```

Page 19

```
 1 had direct contact with the Department of State?
 2      A.   The first time we ever had direct contact
 3 with the Department of State.
 4      Q.   Yes.
 5      A.   2002.
 6      Q.   And is that around the time of the API's
 7 founding?
 8      A.   That was when we were going -- going
 9 through the designation process.
10      Q.   Okay.  Subsequent to the designation
11 process, has API had direct discussions with DOS?
12      A.   Yes.
13      Q.   Okay.  Are you -- setting aside periodic
14 reports such as audits.
15      A.   Uh-huh.
16      Q.   Have there been any written
17 communications with DOS, between DOS and API?
18      A.   Yes.
19      Q.   Okay.  Can you tell me the nature of
20 those communications?
21      A.   Those would be primarily related to
22 specific incidents.  If there's an issue with a host
23 family or any program participant, whether it's an
24 au pair or host family, that Department of State
25 wants to follow up on, they'll communicate with us
```

Page 20

```
 1 on that.
 2           We also proactively contact them
 3 if we have issues that reach a level that -- that we
 4 feel like we'd like to make a report to the
 5 Department of State.  If there's a -- a complaint or
 6 unusual situation that we're dealing with, we -- we
 7 proactively will send them a notice and let them
 8 know what's happening and what -- what we're working
 9 on to resolve the situation.
10      Q.   Has API ever discussed in writing or
11 orally wage and hour issues with the Department of
12 State?
13      A.   No.
14      Q.   Has API ever had a representative at an
15 in-person meeting with the Department of State?
16      A.   Yes.
17      Q.   How many?  How many meetings?
18      A.   Four meetings, approximately.
19      Q.   Can you give me the approximate time
20 period?
21      A.   I would say 20 -- 2012, '13, '14, '15.
22      Q.   Nothing around 2009?
23      A.   It's possible.
24      Q.   At any of those in-person meetings, has
25 the Department of State ever discussed wage and hour
```

Page 21

```
 1 issues?
 2      A.   No.  Well, I'll take that back.
 3           They -- they have discussed them
 4 in the context of program compliance, and oftentimes
 5 the meetings will -- you know, we'll -- we'll talk
 6 about the particular items that we're supposed to be
 7 monitoring within the program.  And so, you know, of
 8 course the -- ensuring that the au pairs are getting
 9 their stipend is a part of our monitoring
10 obligation.  So it will come up in that context.
11      Q.   What specifically do you recall the
12 Department of State saying about au pair stipends in
13 any of those meetings?
14      A.   At one of the meetings they went through
15 a review of survey documents, where the au pairs are
16 asked -- it's a -- it's a compilation of the -- of
17 the annual audits that are done.  And a component of
18 that is a survey of au pairs, asking them if they
19 have received their minimum stipend payments.
20           And so they were presenting
21 compiled data overall to give everybody an idea of
22 how we stood collectively in terms of the reported
23 compliance with these various factors for the
24 program.  So the stipend is one of those questions.
25      Q.   And how would you characterize the
```

MAGNA ▶
LEGAL SERVICES

Case No. 1:14-cv-03074-CMA-KMT Document 259-24 filed 03/30/18 USDC Colorado pg 122 of 311

# Exhibit 415

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Case No. 14-cv-03074-CMA-KMT

_____

JOHANA PAOLA BELTRAN, ET AL.,

            Plaintiffs,

vs.

INTEREXCHANGE, INC., ET AL.,

            Defendants.

_____


VIDEOTAPED DEPOSITION OF

CHRISTINA REILLY

30(b)(6) REPRESENTATIVE FOR CULTURAL HOMESTAY

MAY 16, 2017

DENVER, COLORADO

11:16 A.M.


Magna Legal Services
866-624-6221
www.magnals.com

PLAINTIFFS' RESP. APP.0004640

MAGNA
LEGAL SERVICES

## Page 2

```
 1              The videotaped deposition of
 2   CHRISTINA REILLY, taken before Leeann Keenan, a
 3   Registered Merit Reporter, Certified Realtime Reporter,
 4   and a Notary Public in and for the County of Summit and
 5   the State of Colorado, at 370 17th Street, Suite 4500,
 6   Denver, Colorado, on Tuesday, May 16, 2017, at the hour
 7   of 11:16 a.m., pursuant to Notice.
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1   APPEARANCES:
 2
 3     BOISE, SCHILLER, FLEXNER, L.L.P.
       BY: DANIEL SCHWARTZ, ESQ.
 4        1999 Harrison Street
          Suite 900
 5        Oakland, California  94612
          dschwartz@bsfllp.com
 6        (510) 874-1010
          appeared on behalf of the Plaintiffs
 7     WHEELER, TRIGG, O'DONNELL
       BY: NATALIE WEST, ESQ.
 8        370 17th Street
          Suite 4500
 9        Denver, Colorado  80202
          (303) 244-1983
10        nwest@wtotrial.com
          appeared by telephone on behalf of
11        USAuPair, Inc., GoAuPair, and Au Pair
          International
12
       LEWIS, ROCA, ROTHGERBER, CHRISTIE
13     BY: JESSICA FULLER, ESQ.
          1200 17th Street
14        Suite 3000
          Denver, Colorado  80202
15        (303) 628-9527
          jfuller@lrrc.com
16        appeared on behalf of Cultural Care
17     HOLLAND & HART
       BY: JONATHAN BENDER, ESQ.
18        ADAM HUBBARD, ESQ.
          555 17th Street
19        Suite 3200
          Denver, Colorado  80202
20        (303) 295-8456
          jsbender@hollandhart.com
21        ahubbard@hollandhart.com
          appeared on behalf of Cultural
22        Homestay International
23
24
25
```

## Page 4

```
 1   APPEARANCES CONTINUED:
 2
 3     GORDON & REES
       BY: HEATHER KELLY, ESQ.
 4        555 17th Street
          Suite 3400
 5        Denver, Colorado  80202
          (303) 200-6888
 6        jverda@gordonrees.com
          appeared by on behalf of AuPairCare,
          Inc.
 7
       NIXON, SHEFRIN, HENSEN, OGBURN
 8     BY: KATHLEEN CRAIGMILE, ESQ.
          5619 DTC Parkway
 9        Suite 1200
          Greenwood Village, Colorado  80111
10        (303) 773-3500
          kcraigmile@nixonshefrin.com
11        appeared by telephone on behalf of
          ProAuPair and International Au Pair
12        Exchange
13     SHERMAN & HOWARD, L.L.C.
       BY: ALYSSA LEVY, ESQ.
14        633 17th Street
          Suite 3000
15        Denver, Colorado  80202
          (303) 299-8194
16        alevy@shermanhoward.com
          appeared by telephone on behalf of
17        InterExchange, Inc.
18     EXPERT AUPAIR
       BY: BOGDAN ENICA, ESQ.
19        100 2nd Avenue S.
          Suite 3025
20        St. Petersburg, Florida  33701
          (727) 225-2649
21        bogdan@expertaupair.com
          appeared by telephone on behalf of
22        Expert AuPair
23
       ALSO PRESENT: Thomas Harriman, Cultural Homestay
24        International In-House Counsel
          Thomas Areton
25        Davis Baumunk, Videographer
```

## Page 5

```
 1              I N D E X
 2
 3   DEPOSITION WITNESS:             PAGE
     CHRISTINA REILLY
 4   Examination by Mr. Schwartz        11
 5
     PLAINTIFFS' DEPOSITION EXHIBITS MARKED:
 6   NO.        DESCRIPTION          PAGE
 7   Exhibit 8   ATTORNEYS' EYES ONLY     40
        October 7 - 10, 2011 e-mail string
 8      between Kristin Chasan and Pukar
        Bhattarai and others
 9      CHI0007033 - 7050
10   Exhibit 9   The Au Pair Program website page from  49
        April 23rd, 2012
11
     Exhibit 10  May 14, 2017 "CHI Affordable Prices  54
12      That Fit Your Budget"
13   Exhibit 11  ATTORNEYS' EYES ONLY     62
        CHI Au Pair USA Application Form
14      CHI0000110 - 124
15   Exhibit 12  ATTORNEYS' EYES ONLY     68
        November 6, 2012 e-mail from Chiara
16      Carpenito to Deborah Herlocker
        CHI0026900 - 26901
17
     Exhibit 13  ATTORNEYS' EYES ONLY     71
18      November 26, 2012 e-mail string
        between Deborah Herlocker and Riitta
19      Tiainen
        CHI0015587
20
     Exhibit 14  ATTORNEYS' EYES ONLY     75
21      "Welcome to CHI Au Pair USA! Partner
        Agency Training"
22      CHI0002546 - 2468
23   Exhibit 15  ATTORNEYS' EYES ONLY     80
        Partner Agent Manual
24      CHI0002454 - 2490
25
```

MAGNA
LEGAL SERVICES

1  Alliance?
2      A.   As the Alliance is -- is broad and works
3  with all J programs --
4      Q.   Uh-huh.
5      A.   -- Linda Mori also communicates with the
6  Alliance.
7      Q.   Okay.
8      A.   And that would be it.
9      Q.   And that, Linda Mori, is the chief
10 compliance officer?
11     A.   Yes.
12     Q.   Okay.
13     A.   Yes.
14     Q.   Are you -- "you" meaning CHI, have been a
15 member of the Alliance for some time, right?
16     A.   Uh-huh.  Yes.
17     Q.   Do you recall when CHI joined the
18 Alliance?
19     A.   I don't, actually.
20     Q.   Do you have a ball -- can you ballpark
21 it?
22          MR. BENDER:  Object to the form.
23     Q.   I -- I -- I'm just trying to get as close
24 a sense as you can give.  And if the answer is I
25 have no idea, then that is your answer.

1      A.   I have no idea.
2      Q.   You don't know if it was prior to 2009 or
3  post 2009?
4      A.   I couldn't guess.
5      Q.   Okay.  That's fine.
6           And then the next topic is your
7  analysis and identification of markets in which you
8  operate, including any analysis of the compensation
9  paid to childcare professionals other than au pairs.
10          Are you the best person to talk
11 to --
12     A.   Yes.
13     Q.   -- about that?
14          And that's because you're the
15 program director?
16     A.   Yes.
17     Q.   Okay.  Thank you.
18          So how does CHI go about
19 recruiting au pairs?
20     A.   Well, we work with our international
21 partners.  We specifically do not recruit the
22 au pairs.
23     Q.   Uh-huh.
24     A.   Again, we train and educate our -- our
25 partners on the requirements of the program, and we

1  rely on them to recruit applicants.
2      Q.   Okay.  So what is CHI's allotment for
3  au pairs each year from the State Department?
4      A.   The DS-2019 allocation?
5      Q.   Yes.
6      A.   We're currently at 400.
7      Q.   You're at 400?
8      A.   Uh-huh.
9      Q.   Now, of that annual allotment, how many
10 au pairs --
11     A.   Do we have?
12     Q.   -- do you actually have in -- in country?
13          MR. BENDER:  Right now, or --
14     Q.   Let's start with right now.
15     A.   Right now, 158.
16     Q.   Okay.  So I'm -- I'm trying to understand
17 how the allotment system works.
18     A.   Okay.
19     Q.   So if you could have 2 -- so -- so
20 there's room for 242 more au pairs, based on your
21 allotment?
22     A.   Within the program period.  So that's --
23 it's -- it's per program year, our -- our
24 allocation.
25          I'm not quite understanding your

1  question, so if you want to...
2      Q.   Okay.  Sure.
3      A.   Yeah.
4      Q.   I -- I -- I think my math was correct.
5           So you said that right now there's
6  158 au pairs who are CHI au pairs --
7      A.   Right.
8      Q.   -- who are in the country right now?
9      A.   Yes.
10     Q.   So over the course of 2017, is it that
11 you can have a total of 400 au pairs at any given
12 time?
13     A.   I -- I understand your question.
14          So the 158 refers to all
15 in-country au pairs.  So those au pairs could have
16 entered the United States in 2016.
17     Q.   Uh-huh.
18     A.   The DS Form 2019 allocation is, like I
19 said, specific to one program year.  So at this
20 point what we've issued in 2017 is different than
21 the number of actual in-country au pairs.
22     Q.   Okay.  So it's -- it's almost a
23 forward-looking number?
24     A.   So every time we issue a DS form --
25     Q.   Uh-huh.

MAGNA
LEGAL SERVICES

Page 70

1      MR. BENDER:  Sounds good.
2      THE WITNESS:  Sounds good.
3      THE VIDEOGRAPHER:  Going off the
4  record at 12:22.
5          (Whereupon, a lunch break was had
6          from 12:22 p.m. to
7          1:05 p.m.)
8      (Exhibit No. 13 was marked.)
9      THE VIDEOGRAPHER:  Back on record at
10  1:05.
11          EXAMINATION (CONTINUED)
12  BY MR. SCHWARTZ:
13    Q.   So we're back.  Just a reminder, you're
14  still under oath.  Everything that we talked about
15  before is still the same.
16    A.   Yes.
17    Q.   Great.  Thank you.
18          So I'm handing you a document
19  marked Exhibit 13.  Please feel free to take a
20  moment to familiarize yourself with it.  It's an
21  e-mail correspondence between a person named Riitta
22  Tiainen and Deborah Herlocker.
23          And Deborah Herlocker, just so
24  that the record is clear, used to be the operations
25  manager?

Page 71

1    A.   Yes.
2    Q.   And in 2013, I believe when this
3  e-mail -- or, excuse me, November of 2012, when this
4  e-mail was sent, she was at that time the operations
5  manager; is that right?
6    A.   Yes.
7    Q.   Okay.  So do you have -- based on the
8  context of this e-mail, can you tell who Riitta
9  Tiainen is?
10    A.   It seems it's a partner.
11    Q.   "A partner" meaning?
12    A.   A partner, one of our partners,
13  international partners.
14    Q.   Okay.  People you've referred to as
15  partner agencies --
16    A.   Yes.
17    Q.   -- at other times during the deposition?
18    A.   Yes.
19    Q.   All right.
20      MR. SCHWARTZ:  Oh, for the record at
21  home, this is document 15587.
22    Q.   So in this e-mail Ms. Tiainen asked the
23  question, "Do you accept au pair candidates with
24  diabetes?  I do not have details, but would be good
25  to know before she starts the project."

Page 72

1    A.   Uh-huh.
2    Q.   "What about psychology tests, do you
3  require it?  And I" -- I believe that's a typo --
4  "if I remember correctly, you now have a system
5  where application forms are scanned."
6          And the reply for Ms. Herlocker
7  is, "Thanks for your e-mail.  It would depend upon a
8  few factors.  Is she insulin dependent?  Would she
9  need to take insulin while here?"  It then goes on.
10          Why would Ms. Herlocker ask a
11  question about insulin dependence?
12      MR. BENDER:  Objection.  Lack of
13  foundation.
14    A.   It's hard for me to -- to -- the partner
15  asked about --
16    Q.   Oh, excuse me.  Thank you.
17    A.   Yeah.
18    Q.   What -- well, she asked about diabetes,
19  whether you would accept someone with diabetes.
20  Does -- sorry.  Please.
21      MR. BENDER:  Well, what's the
22  question?  Is there a question pending?
23    Q.   Does she -- does CHI have any policy with
24  respect to the medical condition of au pairs?
25    A.   The -- the -- we do not have a specific

Page 73

1  policy.  The regulations require that -- that the
2  au pairs, you know, be healthy enough to -- to
3  experience the program.  That's one aspect of it.
4          The second aspect of it is the
5  medical insurance.  For example, in this case if she
6  requires insulin and she's insulin dependent, that's
7  not covered on the -- the insurance provided.  She
8  would need to bring all of her insulin for the
9  period of time she'd be on program.
10    Q.   So this is insurance that CHI provides
11  to --
12    A.   The medical insurance, yes.
13    Q.   -- to its au pairs?
14    A.   Yes.
15    Q.   And so one reason this would be a
16  problem, potentially, is that insulin's not covered
17  by that medical insurance; is that right?
18    A.   It could possibly --
19      MR. BENDER:  Objection.  Lack of
20  foundation.
21          Go ahead.
22    A.   It could possibly be an additional cost
23  to the au pair, yeah.  It could possibly not be
24  covered.
25    Q.   Okay.  So are questions -- questions

19 (Pages 70 to 73)

MAGNA ▶
LEGAL SERVICES

Page 74

1  related to the suitability of au pairs come to CHI
2  from partners agencies on occasion; is that right?
3      A.    At times.
4      Q.    And I believe both you and Mr. Areton
5  testified earlier that CHI trains the partner
6  agencies with respect to compliance with --
7      A.    Yes.
8      Q.    -- with the program?
9      A.    Yes.
10     Q.    Okay.  Thank you.
11           (Exhibit No. 14 was marked.)
12     Q.    So I'm marking for you now Exhibit 14.
13           Have you seen this document
14  before?
15     A.    I understand it to be the -- the Partner
16  Agency Training.  I'm -- as I've not been able to
17  fully review it, I -- I don't know which year this
18  relates to.
19     Q.    Okay.  Well, why don't we do this.
20           MR. SCHWARTZ:  First, I'll let
21  everyone listening, that this is CHI0002546.
22     Q.    And why don't you take a moment to
23  familiarize yourself with it.
24           (Witness peruses document.)
25     A.    Okay.

Page 75

1      Q.    So having familiarized yourself with it,
2  do you have a sense of what year this is from?
3      A.    No.
4      Q.    Okay.
5      A.    I understand it to be our -- our agency
6  training, our Partner Agency Training, but I still
7  would not know which year this -- yeah.
8      Q.    Okay.  Would -- would this -- is it --
9  would this training guide change a lot from year to
10  year?
11           MR. BENDER:  Object to the form.
12     A.    That's hard to speak to prior to my time
13  with CHI.  But it would change if there are any
14  changes in regulations, policies, requirements of
15  the program.
16     Q.    Okay.  To your knowledge, have there been
17  any changes to regulations, or to your policies, or
18  to requirements of the program from 2009 onward that
19  would have necessitated a change to this document?
20           MR. BENDER:  Object to the form.
21     A.    The only change in our operations would
22  be our change in orientation, and that would have
23  been indicated in our partner training.
24     Q.    So change in orientation?
25     A.    Yes.  We -- prior to 2016 our au pairs

Page 76

1  went to Washington, D.C. for a four-day orientation.
2  We then switched to an online orientation module
3  effective January 1, 2016.
4      Q.    Okay.  So other than that change in
5  orientation that you described, are there any other
6  changes that would have been reflected in this
7  partner training document?
8      A.    Not that I can recall.
9      Q.    Okay.  Thank you.
10           So turning to what is Bates
11  stamped page 2551.  I believe it's the fourth or
12  fifth, but I -- I think sixth page, actually, if you
13  include the backs of pages.  It should say "Au Pair
14  Benefits and Duties" at the top.  Do you see where I
15  am?
16     A.    Yes.
17     Q.    Okay.  Starting with "Au Pair Duties" or
18  "Au Pair's Duties," would you begin reading those
19  for me, please.
20     A.    "Work up to 45 hours per week, flexible
21  schedule, assist with light housekeeping (related to
22  children, e.g. cooking, cleaning, laundry).  Drive
23  children to or from school appointments and
24  activities.  Introduce her language and culture of
25  her home country to the host family."

Page 77

1      Q.    Okay.  That's -- that's fine.  Thank you.
2           So it says here, "Light
3  housekeeping (related to children, e.g. cooking,
4  cleaning, laundry)."
5           Are the words "cooking,"
6  "cleaning," and "laundry" anywhere in the Department
7  of State regulations?
8      A.    No.  "Light housekeeping" is.
9      Q.    That's the term?
10     A.    Yes.
11     Q.    So this is your way of informing the
12  partner agencies about how to interpret the
13  regulations?
14     A.    Yes.
15     Q.    Okay.  And then next it says, "Au pairs
16  receive," and the first bullet point --
17     A.    Uh-huh.
18     Q.    -- says, "A direct weekly payment from
19  the host family of $195.75."  Is that right?
20     A.    Yes.
21     Q.    And it also mentions the $500 educational
22  allowance, two weeks paid vacation, one full weekend
23  off per month, private room and full board, medical
24  insurance, paid round international flight and
25  domestic transfer to the host family's community,

PLAINTIFFS' RESP. APP.0004644

MAGNA
LEGAL SERVICES

Page 98

1    Q.   Okay.  So in your -- in this Promise and
2  Agreement in paragraph B, "Prohibited Activities."
3    A.   Yes.
4    Q.   No. 5, "Smoke in the host family home
5  without permission."
6    A.   Yes.
7    Q.   Okay.  That's -- is that a Department of
8  State or Department of -- is that a Department of
9  State regulation?
10    A.   It's not.
11    Q.   Okay.  But that's part of your policy; is
12  that right?
13    A.   If there's an agreement between the
14  au pair and host family that -- that the au pair
15  will not smoke in their home, I think it's just kind
16  of a mutual agreement.  That's -- my assumption is
17  that's why that's there.
18    Q.   Okay.  If you turn to the next page,
19  paragraph 9.  Actually, let me go ahead to paragraph
20  17.  It says, "Agree to attend au pair
21  meetings/gatherings/activities arranged by CHI
22  Au Pair USA."
23    A.   Yes.
24    Q.   Now, what kind of -- what are those --
25  what is that paragraph referring to?

Page 99

1    A.   It's -- it's referring to the monthly
2  contact that is part of our monitoring of the
3  placement.  So it's CHI policy and regulations that
4  there's contact between the local coordinator and
5  the au pair, and so that is what it's referencing.
6    Q.   How often are the CHI and the local
7  coord -- excuse me.
8         How often are the au pair and the
9  local coordinator in contact?
10    A.   Department of State regulations require
11  contact on a monthly basis.
12    Q.   And CHI requirements?
13    A.   It could be more than that, you know.  I
14  mean, they can -- they can communicate whenever --
15  they're free to communicate whenever they want.
16    Q.   What do you see as the role of the local
17  coordinator, or I -- I believe I've seen it referred
18  to in your literature as APC.  Are those the same
19  thing?
20    A.   It is.  We actually refer to it as a
21  community administrator.
22    Q.   Oh, okay.
23    A.   But we understand ref -- I understand the
24  reference, yeah.
25    Q.   So then, just so that we're clear, what

Page 100

1  do community -- what do you see the role of the
2  community administrator as?
3    A.   Primarily to support the au pairs and the
4  host families in order for both to enjoy the program
5  and have a successful -- successful placement.
6    Q.   How do they help make sure that a
7  placement is successful?
8    A.   Well, supporting both parties.  If there
9  are any issues that arise, they're there to mediate.
10  They -- they're there to, just like I said, provide
11  support 24/7.  Anything really that the au pair
12  needs or host family needs, they're there really to
13  support.
14    Q.   So when you say "support," that could be
15  what, exactly?
16    A.   Again, it could be taking them to go get
17  the driver's license.  It could be assisting them
18  with the Social Security process.  It could be
19  assisting them with enrolling in their school, which
20  is also a Department of State regulation.
21         Like I said, if there are any
22  issues in the placement, we -- we do all we can to
23  step in and mediate the problem in order to ensure a
24  successful placement, as I said.
25    Q.   The paragraph 18 says that au pairs,

Page 101

1  "Agree not to enter into" -- "into any kind of
2  contractual agreement, such as employment, marital,
3  or religious during the year" -- or, excuse me, it
4  says, "During my year in the U.S."
5    A.   Yeah.  Yes, I see that.
6    Q.   Okay.  So a -- an au pair is not allowed
7  to get married?
8    A.   No, that's not what that's saying.  In
9  terms of the J-1 visa and -- and just the whole idea
10  of the exchange, visitor visa, the whole point is
11  the exchange.  And they are actually required at the
12  end of their program to return to their country of
13  origin.
14         And so it is our understanding
15  that if their intention is to get married, that they
16  can certainly do so.  They just would need to do it
17  properly, by returning to their country of origin
18  and applying, reapplying to enter the United States.
19    Q.   But is there any -- any part of the
20  Department of State regulations that specifically
21  prohibits an au pair from getting married?
22    A.   No.
23    Q.   Okay.  What do you mean by a religious
24  contract?
25    A.   I'm not sure what that's referencing.

PLAINTIFFS' RESP. APP.0004645

**MAGNA**
**LEGAL SERVICES**

# Exhibit 416

PLAINTIFFS' RESP. APP.0004646

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Case No. 14-cv-03074-CMA-KMT

_____

JOHANA PAOLA BELTRAN, ET AL.,

            Plaintiffs,

vs.

INTEREXCHANGE, INC., ET AL.,

            Defendants.

_____

VIDEOTAPED DEPOSITION OF

SHANNON PITTS

30(b)(6) REPRESENTATIVE FOR GREAT AU PAIR

MAY 31, 2017

DENVER, COLORADO

9:21 A.M.

Magna Legal Services
866-624-6221
www.magnals.com

PLAINTIFFS' RESP. APP.0004647

## Page 2

1   The videotaped deposition of
2   SHANNON PITTS, taken before Leeann Keenan, a Registered
3   Merit Reporter, Certified Realtime Reporter, and a
4   Notary Public in and for the County of Summit and the
5   State of Colorado, at 4643 South Ulster Street, Suite
6   800, Denver, Colorado, on Wednesday, May 31, 2017, at
7   the hour of 9:21 a.m., pursuant to Notice.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 4

1   APPEARANCES CONTINUED:
2
3   GORDON & REES
    BY: HEATHER KELLY, ESQ.
4       555 17th Street
        Suite 3400
        Denver, Colorado  80202
5       (303) 200-6888
        hkelly@gordonrees.com
6       appeared by telephone on behalf of
        AuPairCare, Inc.
7
8   NIXON, SHEFRIN, HENSEN, OGBURN
    BY: LAWRENCE STONE, ESQ.
9       5619 DTC Parkway
        Suite 1200
10      Greenwood Village, Colorado  80111
        (303) 773-3500
11      lstone@nixonshefrin.com
        appeared by telephone on behalf of
12      ProAuPair and International Au Pair
        Exchange
13  CHOATE, HALL & STEWART
    BY: LYNDSEY KRUZER, ESQ.
14      Two International Place
        Boston, Massachusetts  02110
15      (617) 248-5221
        lkruzer@choate.com
16      appeared by telephone on behalf of
        Cultural Care
17
18  FISHER & PHILLIPS
    BY: SUSAN SCHAECHER, ESQ.
19      1801 California Street
        Suite 2700
20      Denver, Colorado  80202
        (303) 218-3650
21      sschaecher@fisherphillips.com
        appeared by telephone on behalf of
22      AuPair Foundation and Au Pair in
        America
23
24  ALSO PRESENT: Davis Baumunk, Videographer
25

## Page 3

1   APPEARANCES:
2
3   BOISE, SCHILLER, FLEXNER, L.L.P.
    BY: SEAN RODRIGUEZ, ESQ.
4       JUAN P. VALDIVIESO, ESQ.
        1999 Harrison Street
        Suite 900
5       Oakland, California  94612
        (510) 874-1010
6       srodriguez@bsfllp.com
        jvaldivieso@bsfllp.com
7       appeared on behalf of the Plaintiffs
8   WHEELER, TRIGG, O'DONNELL
    BY: KATHRYN REILLY, ESQ.
9       370 17th Street
        Suite 4500
10      Denver, Colorado  80202
        (303) 244-1983
11      reilly@wtotrial.com
        appeared on behalf of USAuPair, Inc.,
12      GoAuPair, and Au Pair International
13  SHERMAN & HOWARD, L.L.C.
    BY: ALYSSA LEVY, ESQ.
14      633 17th Street
        Suite 3000
15      Denver, Colorado  80202
        (303) 299-8194
16      alevy@shermanhoward.com
        appeared on behalf of
17      InterExchange, Inc.
18  ARMSTRONG TEASDALE, L.L.P.
    BY: VANCE KNAPP, ESQ.
19      4643 South Ulster Street
        Suite 800
20      Denver, Colorado  80237
        vknapp@armstrongteasdale.com
21      (303) 575-4004
        appeared on behalf of Great Au Pair
22
23
24
25

## Page 5

1               I N D E X
2
3   DEPOSITION WITNESS:                    PAGE
    SHANNON PITTS
4   Examination by Mr. Valdivieso          10
5
    PLAINTIFFS' DEPOSITION EXHIBITS MARKED:
6   NO.       DESCRIPTION                  PAGE
7   Exhibit 1   Plaintiffs' Second Revised Notice of  12
                30(b)(6) Deposition of Great Au Pair
8
9   Exhibit 2   May 4 - May 5, 2009 e-mail chain   38
                between Susie Crow and Kim at
10              EuRaupair
                GAP0000642 - 643
11  Exhibit 3   July 1, 2009 and December 16, 2009  41
                e-mails between Susie Crow and
12              Shannon Pitts
                GAP0008055 - 8056
13
    Exhibit 4   September 22 - 23, 2010 e-mail chain  44
14              between Jamie Pitts, Shannon Pits,
                and Susie Crow
15              GAP00017790 - 17792
16  Exhibit 5   January 10, 2011 e-mail chain between  56
                Susie Crow, Lisa at EuRaupair, and
17              Barry and Jody Levit
                GAP00028708 - 28709
18
    Exhibit 6   December 11, 2010 - April 11, 2011   62
19              e-mail chain between Susie Crow,
                Fallon Collins, and Annika Ingrid
20              GAP00028774 - 28776
21  Exhibit 7   July 24 - 28, 2011 e-mail chain      66
                between Jodie Pitts and Audrey
22              Valranges
                GAP00037144
23
    Exhibit 8   September 29 - 30, 2011 e-mail chain  74
24              between Shannon Pitts and Michael
                DiMauro
25              GAP0006858- 6860

PLAINTIFFS' RESP. APP.0004648

MAGNA
LEGAL SERVICES

Page 94

```
 1    that away to our competitors.
 2          But the Department of State vetted
 3    us in-person and looked at all of our materials,
 4    including our training program, and validated that
 5    it met their requirements for the 32-hour training
 6    program.
 7          And if you -- you know, with
 8    English as a second language, or even as a first
 9    language -- go through this training program,
10    there's enough material, video and audio and
11    questions and answers, that it actually takes you at
12    least 32 hours to complete.  And the Department of
13    State signed off on that and felt it was really a
14    model program for the industry.
15     Q.   When you said that they signed off on it,
16    did they do so in writing?
17     A.   No.  Verbally.
18     Q.   Who signed off on it?
19     A.   Diane Culkin, division chief.
20     Q.   Do you know when this signing off
21    occurred?
22     A.   That would have been in 2013, prior to
23    our -- our -- the designation approval or
24    conditional approval.
25     Q.   Are you familiar with the Department of
```

Page 95

```
 1    State regulations governing the au pair program?
 2     A.   I am.
 3     Q.   Once the au pair has arrived in the
 4    United States, how does GreatAuPair monitor
 5    compliance with the Department of State regulations?
 6     A.   GreatAuPair is required by the U.S.
 7    Department of State to monitor the relationship
 8    between the host family and the au pair, and we have
 9    local childcare coordinators that actually check in,
10    you know, according to the Department of State
11    regulations.  There's an arrival orientation.
12    There's a 48-hour call.  There's a two-week meeting,
13    and there's a monthly check-in that the local
14    childcare coordinators perform.
15          And they ask the questions as
16    required by the Department of State with regards to
17    whether or not the au pair has worked more than or
18    less than 45 hours per week or 10 hours per day
19    or -- and did you receive your weekly stipend this
20    week, and, you know, basically going through all of
21    the questions that the LCCs are required to ask to
22    ensure that the host family and the au pair are
23    complying with the Department of State regulations.
24     Q.   In the process of monitoring compliance
25    with the Department of State regulations, you
```

Page 96

```
 1    mentioned that the LCCs ask whether the au pair
 2    received the weekly stipend this week; is that
 3    right?
 4     A.   Correct.
 5     Q.   So that's a weekly check-in?
 6     A.   No, it's a monthly check-in.  But they
 7    ask them for each week during this month, "Did you
 8    receive your weekly stipend?"
 9     Q.   Do they ask what amount of stipend was
10    received?
11     A.   No.
12          MR. VALDIVIESO:  Could we go off the
13    record, please.
14          THE VIDEOGRAPHER:  Going off the
15    record at 11:58.
16          (Whereupon, a lunch break was had
17           from 11:58 a.m. to 12:37 p.m.)
18          THE VIDEOGRAPHER:  Back on the record
19    at 12:37.
20          EXAMINATION (CONTINUED)
21    BY MR. VALDIVIESO:
22     Q.   So before the lunch break, Mr. Pitts, we
23    were discussing just on a very -- at a very high
24    level the GreatAuPair USA's management of the J-1
25    au pair program.  I just wanted to ask some general
```

Page 97

```
 1    questions about some of the components of -- of --
 2    of that year.
 3          How does GreatAuPair USA handle
 4    rematch for au pairs whose stay with their host
 5    family doesn't work out?
 6     A.   How do we handle the rematch process?
 7     Q.   Yes.
 8     A.   Well, the au pairs are allowed to remain
 9    in the country for two weeks while we help to find
10    them a new host family.  The au pairs, meanwhile,
11    are looking for host families through our website
12    and communicating with the host families in search
13    of a new placement.
14          Host families are made aware -- if
15    they're looking for an au pair.  They're made aware
16    of the fact that there's an in-country au pair
17    available immediately.  There are some families that
18    are looking for au pairs, you know, at various
19    times.  Some people want their au pair to come in
20    the summer.  Some people need immediate care.
21          So if the families are interested
22    in a current au pair that's in-country, that would
23    cut their time down.  So we'd let they know, and
24    then they would have the opportunity to interview
25    the au pair.
```

PLAINTIFFS' RESP. APP.0004649

MAGNA

LEGAL SERVICES

| Page 214 | Page 216 |
|---|---|

**Page 214**

1    Q.  We can put this aside. Thank you.
2      Actually, we have an exhibit.
3 Let's -- I'm marking Exhibit 35.
4      (Exhibit No. 35 was marked.)
5      MR. VALDIVIESO: August 6th, 2016.
6 Yeah. The next date.
7    Q.  I'm handing you what I've marked as
8 Exhibit 35, and this is a printout of the screen
9 shot from August 6th, 2016.
10      And so we have a -- an exhibit to
11 actually introduce, if you could confirm that the
12 information on Exhibit 36 [sic] does, in fact, match
13 the information from August 6th, 2016?
14    A.  Yes, it does.
15    Q.  Okay.
16      MR. VALDIVIESO: So for counsel
17 online, you'll get a copy of the exhibits. But
18 Exhibit 35 is a printout of the Wayback Machine
19 capture from August 6th, 2016 of the "Au Pair Costs"
20 section of the GreatAuPair USA.com website.
21    Q.  Is that fair to say, Mr. Pitts?
22    A.  Uh-huh.
23      MR. VALDIVIESO: And this is
24 Exhibit 34 I'm marking.
25      (Exhibit No. 34 was marked.)

**Page 215**

1      MR. VALDIVIESO: And this is
2 perfectly anticipated by our court reporter, the
3 last sticker that I have and the last document that
4 I have, Exhibit No. 36. It's a document ending in
5 5122.
6      (Exhibit No. 36 was marked.)
7      (Witness peruses document.)
8    A.  Okay. I see the document 36.
9    Q.  Are you familiar with this document?
10    A.  Vaguely, yeah.
11    Q.  What is this document?
12    A.  This is a -- just a competitive overview
13 of how GreatAuPair stacks up against the competition
14 in -- as of, it looks like, early 26 -- 2014,
15 rather. So this was, at the time, publicly
16 available information from the websites of
17 AuPairCare, Au Pair in America, Cultural Care,
18 GoAuPair, and EuRaupair, and in comparison to what
19 we were offering at the time at GreatAuPair.
20    Q.  The title of the document is "AuPairCare
21 Cost Comparison."
22      Is that right?
23    A.  That's the title of the document, but it
24 looks like it as misnamed. Or maybe, you know what,
25 you're right. This is -- this is their document,

**Page 216**

1 not mine. So it looks like they put this together.
2    Q.  And on top left-hand corner, do you see
3 where it says "For Internal AuPairCare Use Only - Do
4 Not Distribute"?
5    A.  I do, yeah.
6    Q.  Do you have any explanation for why this
7 document was in GreatAuPair's possession?
8    A.  No, I can't tell you why. I don't know
9 where it came from. First looking, I thought it was
10 something we had put together. But it's something
11 they put together. So somebody from AuPairCare put
12 this together, and I don't have any comment on that.
13 I don't know where it came from.
14      MR. VALDIVIESO: I have no further
15 questions.
16      Counsel, do you have any
17 questions?
18      MR. KNAPP: Let's go off the record,
19 and I'll take -- take five minutes.
20      THE VIDEOGRAPHER: Going off the
21 record at 4:58.
22      (Break from 4:58 p.m. to
23      5:04 p.m.)
24      THE VIDEOGRAPHER: Back on the record
25 at 5:03.

**Page 217**

1      MR. KNAPP: GreatAuPair has no
2 follow-up questions.
3      Does anybody on the line have any
4 questions?
5      MS. KELLY: No. I don't have any.
6      MR. VALDIVIESO: Was that a no?
7      MR. KNAPP: Anyone else? Going once.
8 Going twice.
9      MR. VALDIVIESO: This deposition has
10 ended.
11      THE VIDEOGRAPHER: Going off the
12 record at 5:04. This marks the end of media 4 of 4.
13      (Whereupon, the deposition concluded at
14      5:04 p.m., May 31, 2017.)

PLAINTIFFS' RESP. APP.0004650

**MAGNA**
LEGAL SERVICES

Case No. 1:14-cv-03074-CMA-KMT Document 959-24 filed 03/30/18 USDC Colorado pg 134 of 311

# Exhibit 417

Page 1

IN THE UNITED STATES DISTRICT COURT

      FOR THE DISTRICT OF COLORADO

-------------------------------x

JOHANA PAOLA BELTRAN, et al.,

        Plaintiffs,      Civil Action No.

vs.                14-cv-03074-CMA-KMT

INTEREXCHANGE, INC., et al.,

        Defendants.

-------------------------------x


      SUBJECT TO PROTECTIVE ORDER

   VIDEOTAPED DEPOSITION of GORAN RANNEFORS

        June 12, 2017

       Boston, Massachusetts


Magna Legal Services Reported By:

(866) 624-6221     MaryJo O'Connor, RMR/CSR

www.MagnaLS.com     Job No:  323433

PLAINTIFFS' RESP. APP.0004652

**MAGNA ▶**
LEGAL SERVICES

Page 2

```
1
2
3
4
5            June 12, 2017
6            9:13 a.m.
7
8
9         VIDEOTAPED DEPOSITION of GORAN
10   RANNEFORS, held at Choate, Hall & Stewart,
11   LLP, Two International Place, Boston,
12   Massachusetts, pursuant to notice, before
13   MaryJo O'Connor, Registered Merit Reporter,
14   Certified Court Reporter, and Notary Public
15   in and for the Commonwealth of
16   Massachusetts.
17
18
19
20
21
22
23
24
25
```

Page 4

```
1    A P P E A R A N C E S, Continued:
2
3    (Via telephone)
4    COUNSEL FOR AUPAIRCARE:
5      GORDON & REES
6      555 17th Street, Suite 3400
7      Denver, Colorado 80202
8      (303) 534-5160
9      BY:  THOMAS QUINN, ESQ.
10        tquinn@gordonrees.com
11
12
13   (Via telephone)
14   COUNSEL FOR PROAUPAIR, APEX PROFESSIONAL
15   EXCHANGE and 20/20 CARE EXCHANGE D/B/A
16   INTERNATIONAL AUPAIR EXCHANGE:
17     NIXON SHEFRIN HENSEN OGBURN P.C.
18     5619 DTC Parkway, Suite 1200
19     Greenwood Village, Colorado 80111
20     (303) 773-3500
21     BY:  LAWRENCE D. STONE, ESQ.
22        lstone@nixonshefrin.com
23
24
25
```

Page 3

```
1    A P P E A R A N C E S:
2
3    COUNSEL FOR THE PLAINTIFFS:
4      BOIES, SCHILLER & FLEXNER LLP
5      575 Lexington Avenue, 7th Floor
6      New York, New York 10022
7      (212) 446-2300
8      BY:  DAWN L. SMALLS, ESQ.
9        dsmall@bsfllp.com
10       BYRON D.M. PACHECO, ESQ.
11       bpacheco@bsfllp.com
12
13   COUNSEL FOR THE CULTURAL CARE:
14     CHOATE, HALL & STEWART LLP
15     Two International Place
16     Boston, Massachusetts 02110
17     (617) 248-5000
18     BY:  JOAN LUKEY, ESQ.
19       jlukey@choate.com
20       KEVIN O'KEEFE, ESQ.
21       kokeefe@choate.com
22       MICHAEL GASS, ESQ. (Via telepone)
23       mgass@choate.com
24
25
```

Page 5

```
1    A P P E A R A N C E S, Continued:
2
3    COUNSEL FOR EXPERT GROUP INTERNATIONAL INC.
4    D/B/A EXPERT AUPAIR:
5      EXPERT AUPAIR
6      100 2nd Avenue S., Suite 3025
7      St. Petersburg, Florida 33701
8      (727) 225-2649
9      BY:  BOGDAN ENICA, ESQ.
10        bogdan@expertaupair.com
11
12
13   (Via telephone)
14   COUNSEL FOR AU PAIR INTERNATIONAL, INC.,
15   AMERICAN CULTURAL EXCHANGE LLC, D/B/A
16   GOAUPAIR AND AGENT AU PAIR:
17     WHEELER TRIGG O'DONNELL LLP
18     370 Seventh Street, Suite 4500
19     Denver, Colorado 80202
20     (303) 244-1983
21     BY:  KATHRYN A. REILLY, ESQ.
22        reilly@wtotrial.com
23
24
25
```

Page 6

```
 1   A P P E A R A N C E S, Continued:
 2
 3   (Via telephone)
 4   COUNSEL FOR INTEREXCHANGE:
 5     SHERMAN HOWARD LLC
 6     633 Seventeenth Street, Suite 3000,
 7     Denver, Colorado 80202
 8     (303) 299-8302
 9     BY:  BROOK COLAIZZI, ESQ.
10        bcolaizzi@shermanhoward.com
11        ALYSSA LEVY, ESQ.
12        alevy@shermanhoward.com
13
14
15
16
17   ALSO PRESENT:
18     William Dunn, Esq., Cultural Care, Inc.
19     Luc-Bernard Val, video technician
20
21
22
23
24
25
```

Page 7

```
 1          P R O C E E D I N G S
 2       VIDEO TECHNICIAN:  We are now on
 3   the record.  This begins DVD number
 4   one in the deposition of Goran
 5   Rannefors in the matter of Johana
 6   Paola Beltran versus InterExchange
 7   Incorporated, et al., in the U.S.
 8   District Court for the District of
 9   Colorado, Civil Case Number
10   14-cv-03074-CMA-KMT.
11       Today is Monday, June 12, 2017,
12   and the time is approximately 9:13
13   a.m.
14       This deposition is being taken at
15   the law offices of Choate Hall &
16   Stewart LLP located at Two
17   International Place, Boston,
18   Massachusetts.  It is being done at
19   the request of the offices of Boies,
20   Schiller & Flexner LLP located at 575
21   Lexington Avenue, New York, New York.
22       The videographer is Luc-Bernard
23   Val of Magna Legal Services, and the
24   court reporter is MaryJo O'Connor of
25   Magna Legal Services.
```

Page 8

```
 1       Will counsel and all parties
 2   present state their appearances and
 3   whom they represent.
 4       MS. SMALLS:  Dawn Smalls, Boies
 5   Schiller & Flexner for the
 6   Plaintiffs.
 7       MR. PACHECO:  Byron Pacheco,
 8   Boies Schiller & Flexner, also for
 9   the Plaintiffs.
10       MS. LUKEY:  Joan Lukey, with me
11   is Kevin O'Keefe and in-house counsel
12   Bill Dunn from Cultural Care
13   appearing for Cultural Care.
14       MR. ENICA:  Bogdan Enica
15   appearing for Defendant Expert
16   International Inc., doing business as
17   Expert Au Pair.
18       MS. LUKEY:  I should add that
19   also on for Choate Hall for Cultural
20   Care is Michael Gass on the line.
21       I'm not sure who just joined.
22       Why don't we take the online
23   folks in alphabetical order if you
24   could just state your name, firm, and
25   affiliation of the parties starting
```

Page 9

```
 1   with Brook.
 2       MS. COLAIZZI:  Brook Colaizzi of
 3   Sherman Howard on behalf of Defendant
 4   InterExchange.
 5       MS. LUKEY:  I think, Larry, that
 6   you may be next.  I don't know who
 7   came on, but let's go through you
 8   three first.
 9       MR. STONE:  Larry Stone appearing
10   on behalf of Apex and 20/20.
11       MS. LUKEY:  And Tom Quinn, do you
12   want to go ahead?  Tom, are you on
13   mute?
14       All right, is Tom Quinn still on?
15       MR. QUINN:  Yeah, I just joined
16   again, Joan.  Sorry, I got kicked
17   off.
18       MS. LUKEY:  Okay, that's fine.
19   Is there anybody else here besides
20   Brook and Larry and Tom, apart from
21   my colleague, Mike Gass, on the line?
22       MS. REILLY:  Yes.  This is Katie
23   Reilly with Wheeler Trigg O'Donnell
24   on behalf of GoAuPair, Agent Au Pair,
25   and Au Pair International.
```

**MAGNA**
LEGAL SERVICES

1        MS. LUKEY:  I did.  However,
2    since he seems to have forgotten the
3    instruction, I am not going to have
4    guesses on the record.
5    BY MS. SMALLS:
6        Q.  So EF Foundation, you don't know
7    how many employees are employed by the
8    EF Foundation; is that correct?
9        A.  Not the exact number.
10       Q.  Okay.  Can you give me an
11   approximate number?
12       A.  About 150.
13       Q.  And are all of those employees
14   located at the address you said -- I
15   don't -- the Cambridge address that you
16   cited earlier?
17       A.  No.  There is also a small office
18   in Denver.
19       Q.  So the EF Foundation has 150
20   employees split -- approximately 150
21   employees between Boston and Denver?
22       A.  Correct.
23       Q.  Is the position -- well, is the
24   position of CEO of Cultural Care, Inc., a
25   full-time position?

1        A.  Yes.
2        Q.  And how many employees does
3    Cultural Care, Inc., have?
4        A.  Again, I don't know the exact
5    number.
6        Q.  Can you give me an approximate
7    number?
8        A.  Approximately 200.
9        Q.  Okay.  Are all of those employees
10   located at the address that you just cited
11   in Cambridge?
12       A.  The majority in Cambridge.  Also
13   a small office in Denver.
14       Q.  Okay.  Is your position as
15   chairman of the EF Foundation a full-time
16   position?
17       A.  No.
18       Q.  About how much of your time do
19   you spend as chairman of the EF Foundation?
20       A.  Approximately one month a year.
21       Q.  And when you say "one month a
22   year," do you step out of your role as CEO
23   of Cultural Care for one month and serve as
24   chairman of the EF Foundation for that one
25   month?

1        A.  No.
2        Q.  How did you estimate the one
3    month in terms of the amount of time that
4    you spend in your role as chairman of the
5    EF Foundation?
6        A.  EF Foundation for Foreign Study
7    has four or five board meetings every year,
8    which with preparation and the board
9    meetings take time.  And then I try to
10   attend some meetings with the local
11   representatives that the Foundation has
12   around the country.
13       Q.  So you're chairman of the
14   board --
15       A.  Yes.
16       Q.  -- of the EF Foundation.  Got it.
17       A.  Yes.
18       Q.  And you said that you're chairman
19   of the Kids First Foundation?
20       A.  Yes.
21       Q.  Where is the Kids First
22   Foundation located?
23       A.  It has one person working for it,
24   same address.
25       Q.  The same address you --

1        A.  One Education Street, yeah.
2        Q.  One Education Street, that's the
3    same address as Cultural Care, Inc.?
4        A.  Yes.
5        Q.  And then you're also treasurer of
6    the International Au Pair Association; is
7    that correct?
8        A.  Yes.
9        Q.  And where is the International
10   Au Pair Association located?
11       A.  In Munich, Germany.
12       Q.  And how long have you served in
13   that role?
14       A.  Three years.
15       Q.  And how many staff does the
16   International Au Pair Association have?
17       A.  One.
18       Q.  And what is that person's name?
19       A.  Ms. Patricia Brunner,
20   B-r-u-n-n-e-r.
21       Q.  And then you said you're a board
22   member of the Alliance.  How long have you
23   been a board member of the Alliance?
24       A.  Three years.  But I have been on
25   that board before, and that actually goes

MAGNA ▶
LEGAL SERVICES

Case 1:14-cv-03074-CMA-KMT  Document 1259-24  Filed 03/17/18  USDC Colorado  Page 138 of 311

Page 22

1   for the International Au Pair Association
2   also, but in the present term.
3        Q.  So for the current tenure --
4        A.  Current tenure, yes.
5        Q.  -- it's been three years, but you
6   had served at both the Alliance and the
7   International Au Pair Association on the
8   board previously?
9        A.  Yes.
10       Q.  Okay, thank you for that
11  clarification.
12       How long have you been CEO of
13  Cultural Care, Inc.?
14       A.  Since the company was founded.
15       Q.  And when was that?
16       A.  I cannot remember.
17       Q.  Can you give me an approximate
18  date?
19       A.  2004, 2005.
20       Q.  And before you served, or took on
21  the role of CEO of Cultural Care, Inc., in
22  2004/2005, what was your position?
23       A.  I worked at the EF Foundation for
24  Foreign Study.
25       Q.  In what capacity did you work at

Page 23

1   EF Foundation for Foreign Study?
2        A.  Chairman and president.
3        Q.  And how long did you serve as
4   chairman and president of the EF Foundation
5   for Foreign Study?
6        A.  As chairman ever since '95, but
7   there was an interruption; a couple of
8   years I was not chairman and not involved.
9   I cannot remember which dates.
10       Q.  Okay.  So taking off the chairman
11  title which you hold today --
12       A.  Yes.
13       Q.  -- as chairman of the EF
14  Foundation for Foreign Study, how long were
15  you president of the EF Foundation?
16       And just so you understand, I'm
17  trying to walk through your employment
18  history.
19       A.  Yeah.
20       Q.  So prior to your position as CEO
21  of Cultural Care, what was your employment?
22       A.  President of EF Foundation for
23  Foreign Study.  I think we have to explain
24  that that foundation had both a high school
25  program and an au pair program in those

Page 24

1   days.
2        Then when the au pair program was
3   separated, I went with the au pair program.
4        Q.  Understanding that, but before
5   you took on the role, that split occurred
6   as you just outlined in 2004 and 2005, what
7   was your employment prior to, whether it be
8   your position or your title, prior to being
9   CEO of Cultural Care, Inc.?
10       A.  President of EF Foundation for
11  Foreign Study.
12       Q.  When did you assume that role as
13  president of EF Foundation for Foreign
14  Study?
15       A.  1st of January 1995.
16       Q.  So from 1995 to 2004 or 2005 when
17  the au pair program split off as a separate
18  entity, you served as president of the EF
19  Foundation; is that correct?
20       A.  Yes.
21       Q.  And at that time from 1995 to
22  2004, the EF Foundation for Foreign Study
23  had a program for high school students and
24  a program for au pairs?
25       A.  Yes.

Page 25

1        Q.  Prior to 1995 when you took on
2   the role as president of the EF Foundation
3   For Foreign Study, what was your employment
4   or position?
5        A.  I was a Swedish diplomat.  I was
6   the Swedish Trade Commissioner first to the
7   United States to both the United
8   States -- I was the regional manager for
9   Canada, Mexico, and the United States for
10  something called Swedish Trade Council.
11       Q.  Who are your direct reports at
12  Cultural Care?
13       A.  Dan Sodervall.
14       Q.  Is that it?
15       A.  Yes.
16       Q.  Who do you report to?
17       A.  To the board.
18       Q.  Who is on the board?
19       A.  Me and Jens Appelkvist; J-e-n-s,
20  last name A-p-p-e-l-k-v-i-s-t.
21       Q.  And when you said "board," the
22  board of what?
23       A.  Cultural Care, Inc.
24       Q.  Okay.  So when you say you report
25  to the board, there is only one other

MAGNA
LEGAL SERVICES

| Page 26 | Page 28 |
|---|---|

**Page 26**

1  individual on the board?
2      A. Correct.
3      Q. And I don't know how to pronounce
4  his name. Jens [Yon]?
5      A. Jens [Yens].
6      Q. Jens [Yens.] I'm not going to try
7  to pronounce his last name.
8      So do you report to Jens?
9      A. We both are directors.
10     Q. I understand. What I'm trying to
11 understand is who do you report to.
12     A. Jens in that case.
13     Q. Would Jens have the ability --
14 does Jens evaluate your performance in the
15 course of his duties as a director?
16     A. Yes.
17     Q. Would Jens have the ability to
18 fire you?
19     A. I really don't know.
20     Q. Who determines your compensation?
21     A. Jens does.
22     Q. Does Jens individually by himself
23 determine his compensation, or does he
24 receive feedback from anyone else?
25     MS. LUKEY: Objection. You may

**Page 27**

1      answer.
2      A. I don't know.
3      Q. Do you know how your compensation
4  is determined?
5      A. Yes. By him, then.
6      Q. Does Jens have any other roles
7  other than serving as director of the
8  Cultural Care, Inc., board?
9      A. Yes.
10     Q. What are those roles?
11     A. I don't know, but he has other
12 jobs.
13     Q. How did Jens come to serve on the
14 Cultural Care, Inc., board?
15     A. He used to live in the
16 United States. And how he came on, again,
17 I don't know. He was there when I came.
18     Q. Did you ask him to participate on
19 the Cultural Care, Inc., board?
20     A. No.
21     Q. Do you know who asked him to
22 serve on the Cultural Care, Inc., board?
23     A. No.
24     Q. If Jens was on the Cultural Care,
25 Inc., board when you arrived, who could

**Page 28**

1  have put him there?
2      MS. LUKEY: Objection; form and
3  foundation.
4      A. I don't know.
5      Q. You said that Jens determined
6  your compensation as CEO of Cultural Care.
7  Do you receive compensation for any of your
8  other positions?
9      A. From the Foundation for Foreign
10 Study, I get $1,000 per board meeting.
11     Q. What are the main functions or
12 main purposes of Cultural Care, Inc.?
13     A. To bring young people to America,
14 to be au pairs. So it's a cultural
15 exchange program governed by the
16 United States government, the State
17 Department.
18     So the idea is to bring these
19 young people as a part of U.S. public
20 diplomacy. So we want them to come as
21 ambassadors for their country, and then
22 leave a year or two later as ambassadors
23 for the United States.
24     Q. And as part of the administration
25 of that program, what functions does

**Page 29**

1  Cultural Care, Inc., what portions of that
2  are Cultural Care, Inc., responsible for?
3      A. So Cultural Care, Inc., is the
4  sponsor designated by the U.S. State
5  Department, and, therefore, following all
6  the regulations that the State Department
7  has promulgated. And the main thing is to
8  find host families, make sure that they are
9  great host families, screen them, make sure
10 that the au pairs have a great year. That
11 may be the most important part, really
12 check in with them all the time and do all
13 the things that we have to do and make sure
14 that they have a fantastic year.
15     Q. Does Cultural Care, Inc., have
16 any offices outside of the U.S.?
17     A. No.
18     Q. In your role as CEO of Cultural
19 Care, Inc., would you have cause to
20 interact or manage -- strike that.
21     As CEO of Cultural Care, Inc.,
22 would you have cause to manage any offices
23 overseas?
24     MS. LUKEY: Objection to form.
25     A. No.

**MAGNA**
LEGAL SERVICES

Page 58

```
1        Q.  Has there always been a separate
2   position for president of Cultural Care,
3   Inc.?
4        A.  There was a time when I had two
5   people reporting to me.  I can't remember
6   if they were -- they were probably called
7   vice presidents.
8        Q.  Did you ever assume the role of
9   CEO and president of Cultural Care, Inc.?
10       A.  In the beginning I think I was,
11  yes.
12       Q.  Who is -- I'm sorry if I butcher
13  these names -- but Pehr Magnus Karlsson?
14       A.  He is the financial person at
15  International Care Limited in Switzerland.
16       Q.  Does he also have a role at EF?
17       MS. LUKEY:  Objection;
18  foundation.
19       A.  I don't know, but I don't think
20  so.
21       Q.  Is ICL part of EF?
22       MS. LUKEY:  Objection; form.
23       A.  EF is a group of companies,
24  non-profits and for-profits, that are
25  affiliated with a common mission, and in
```

Page 59

```
1   that way I would say they are a part of the
2   family.
3        Q.  Is EF Foundation one of the
4   non-profits in the EF family of companies
5   and organizations?
6        A.  Yes.
7        Q.  How many other companies and
8   non-profits form the EF family of
9   corporations and non-profits?
10       A.  I don't know.
11       Q.  How does EF Foundation -- well,
12  as chairman of the EF Foundation, who is
13  your board?
14       A.  I'm the chairman, Beth Jacobs
15  from New York, Jennifer Brown from Boston,
16  Jeffrey Allen from Boston, Jens Appelkvist
17  from Lucerne, Switzerland, Dan Sodervall
18  from Boston, and that's the whole board.
19       Q.  And is EF Foundation a division
20  of EF?
21       A.  No.
22       MS. LUKEY:  Objection.
23       A.  It's a non-profit Massachusetts
24  foundation.
25       Q.  Does the EF Foundation have a
```

Page 60

```
1   formal affiliation agreement with EF?
2        MS. LUKEY:  Objection;
3   foundation.
4        A.  No.
5        Q.  How does EF Foundation constitute
6   part of the EF family?
7        A.  It works with some other
8   affiliated companies.
9        Q.  How is it affiliated with EF?
10       A.  Through its name and --
11       Q.  Is that it?
12       MS. LUKEY:  He wasn't finished I
13  don't think.
14       MS. SMALLS:  I thought he was.
15  Sorry.
16       A.  Through its name and it rents
17  space in Cambridge from an affiliated EF
18  company.
19       Q.  So the primary means of
20  affiliation for the EF Foundation and
21  Education First, as the broad umbrella, is
22  the name and leasing or sharing of space?
23       A.  Yes.
24       Q.  Who is Lauren Kostoulakos?
25       A.  She's one of our alternate
```

Page 61

```
1   responsible officers.
2        Q.  When you say "our," who are you
3   referring to?
4        A.  Cultural Care, Inc.
5        Q.  And what about Kristin Barker?
6        A.  She works with Cultural Care,
7   Inc.  I can't remember what her position
8   is.
9        Q.  What about Robin Jones?
10       A.  She's another alternate
11  responsible officer.
12       Q.  Is she an alternate
13  responsibility officer at Cultural Care,
14  Inc.?
15       A.  Yes.
16       Q.  What about Katie Reed?
17       A.  She is, Katie Reed, is a vice
18  president at Cultural Care, Inc.
19       Q.  What about Lombardo Medeiros?
20       A.  Kate Lombardo Medeiros, she used
21  to work with Cultural Care, Inc., but she
22  does not - many years ago.
23       Q.  And Pernilla Sumner?
24       A.  Used to be a local childcare
25  coordinator.  Is not with the company
```

PLAINTIFFS' RESP. APP.0004658

MAGNA
LEGAL SERVICES

Page 62

1  anymore.
2      Q.  And I think you mentioned this,
3  but Alberto Radaelli.
4      A.  Mm-hmm.
5      Q.  Who is he and what is his
6  position?
7      A.  He's a board member of
8  International Care Limited in Switzerland.
9      Q.  And also Charlotta Björnsson?
10     A.  She's also a board member of
11 International Care Limited.
12     Q.  And what about Melissa Fredette?
13     A.  She used to be a vice president
14 of Cultural Care, Inc.  No longer with us.
15     Q.  Is that the only role that she
16 had?
17     A.  No.  She worked for International
18 Care Limited in Switzerland for a while.
19     Q.  And what about Judd Liebman?
20     A.  Judd used to work for
21 International Care Limited in Lucerne.
22 He's no longer with that company.
23     Q.  And what about Martin Asp?
24     A.  Martin Asp used to be the finance
25 person for International Care Limited.  No

Page 63

1  longer with that company.
2      Q.  Earlier you testified that
3  Education First Foundation had about 150
4  employees, and Cultural Care, Inc., had
5  about 200 employees; is that correct?
6      A.  I said it was guestimates.
7      Q.  About?
8      A.  About, yeah.
9      Q.  Are any of those employees -- do
10 any of those employees work for both
11 organizations?
12     A.  "Both organizations" being?
13     Q.  Cultural Care, Inc., and EF
14 Foundation.
15     A.  No.
16     Q.  Is there any reason that anyone
17 at Cultural Care, Inc., would have a role
18 at Education First?
19     MS. LUKEY:  Objection to form and
20 foundation.
21     A.  I'm not sure I know what
22 Education First would be.
23     Q.  Sure.  Is there any reason that
24 anyone at Cultural Care, Inc., other than
25 yourself, would have reason to have an

Page 64

1  Education First, or EF, e-mail address?
2      MS. LUKEY:  Objection; form and
3  foundation.
4      A.  Dan Sodervall is also on the
5  board of EF Foundation for Foreign Study.
6  I am by no means an expert on IT, so I
7  don't know.
8      Q.  Well, to take it away from the
9  technical aspect, is there anyone at -- you
10 just reviewed the fact that you are
11 chairman of EF Foundation and then Dan
12 Sodervall [Cer-der-val] -- Sodervall
13 [Sode-er-val]?
14     A.  Yeah, Sodervall [Sode-er-val].
15     Q.  -- is on the board of EF
16 Foundation.
17     Is there anyone else at Cultural
18 Care, Inc., that has a formal or informal
19 role at an Education First entity?
20     MS. LUKEY:  Objection; form.
21     A.  No.
22     Q.  So other than yourself and Dan
23 Sodervall, there is no one else at Cultural
24 Care, Inc., that has a position, a title,
25 or otherwise a formal affiliation, with

Page 65

1  Education First Foundation; is that
2  correct?
3      A.  Correct.
4      Q.  Would any of the employees at
5  Cultural Care, Inc., have a formal role or
6  position or title at other Education
7  First-affiliated companies?
8      A.  No.
9      (Document marked for
10 identification as Rannefors
11 Exhibit 4)
12     Q.  I'll give you a minute to review
13 this document.
14     A.  (Document review.)
15     Q.  You ready?
16     A.  I'm ready.
17     Q.  If you can go to I think it's
18 Page 9 of the document, and the Bates
19 number is CC34579.
20     A.  Yes.
21     Q.  Where it says "Related Party
22 Transactions."
23     A.  Yes.
24     Q.  And if you can just review the
25 second paragraph.  I'm going to ask you a

MAGNA
LEGAL SERVICES

Page 66

1  couple of questions about that.
2        Well, actually, if you can just
3  read -- review that entire section, I'm
4  going to ask you a series of questions
5  about the information there.
6        A. (Document review.) Yes.
7        Q. So in the section under "Related
8  Party Transactions," it says that over
9  $26 million in 2015 and over $21 million in
10 2014 was paid to an affiliate; is that
11 correct?
12       A. Yes.
13       Q. And do you know what that
14 affiliate is?
15       A. International Care Limited in
16 Switzerland.
17       Q. Okay, thank you.
18       And do you know what that
19 compensation is for?
20       A. For recruitment and screening of
21 au pairs.
22       Q. Okay.  And then later in that
23 paragraph it says that the company
24 purchased flight tickets from an affiliated
25 company totaling over $9 million in 2015

Page 67

1  and over $8.3 million in 2014; is that
2  correct?
3        A. Correct.
4        Q. Do you know what the affiliated
5  company is being referred to there?
6        A. I don't know the exact name of
7  it, but it is an EF travel company.  But I
8  don't know the name.
9        Q. Then in the next paragraph it
10 says that the company rents office space
11 from an affiliate under a lease agreement.
12       And this year it says, "The lease
13 calls for an annual rent totaling [a little
14 over $1.2 million]"; is that correct?
15       A. Correct.
16       Q. Do you know what affiliate you
17 lease your office space from?
18       A. Yes, I do.
19       Q. And what affiliate is that?
20       A. It's called Efekta.
21       Q. Efekta?
22       A. Efekta.
23       Q. And what does Efekta do?
24       A. They are a real estate company.
25       Q. Are they part of EF?

Page 68

1        MS. LUKEY:  Objection to form.
2        A. I don't know the legal structure.
3        Q. How are they an affiliate --
4        A. We rent --
5        Q. -- to Cultural Care, Inc.?
6        MS. LUKEY:  Objection.
7        Q. How is Efekta -- it says, "The
8  Company rents office space in Cambridge,
9  Mass from an affiliate."
10       How is Efekta affiliated with
11 Cultural Care, Inc.?
12       MS. LUKEY:  Objection;
13       foundation.
14       A. Only because we rent space from
15 them.
16       Q. Does renting space from someone
17 create an affiliate relationship?
18       MS. LUKEY:  Objection; foundation
19       and form.
20       A. This is what our auditor wrote.
21       Q. It then in the fourth paragraph
22 says that "Payables due to affiliated
23 companies totaled" three hundred -- a
24 little over 314,000 in 2015, and then a
25 little over 274,000 in 2014.

Page 69

1        MS. LUKEY:  Objection.
2        Q. Again, it says "Payables due to
3  affiliated companies" in that paragraph.
4        Do you know what affiliated
5  companies are being referred to there?
6        A. I don't.  But I would guess it's
7  to the ones described above.
8        Q. The next paragraph refers to
9  interest expense relating to a balance due
10 to one of the affiliates.
11       Do you know what affiliate that
12 refers to?
13       A. The same as before, the ones
14 mentioned above.
15       Q. And then the last paragraph of
16 that section says that "The Company
17 participates in a retirement plan
18 administered by an affiliate."
19       Do you know what affiliate is
20 referred to there?
21       A. I know we use another company,
22 but I don't know the name of them.  Note 6?
23       (Document review.) No.
24
25

PLAINTIFFS' RESP. APP.0004660

18  (Pages 66 to 69)

**MAGNA ▶**
LEGAL SERVICES

Page 70

```
1        (Document marked for
2    identification as Rannefors
3    Exhibit 5)
4    Q. This is Cultural Care Bates
5    number 34582.
6    A. (Document review.)
7    Q. Let me know when you're ready.
8    A. I'm ready.
9    Q. Let's just go to the signatories.
10   And can you tell me who the signatory is
11   for Cultural Care, Inc.?
12   A. Yes. Jens Appel -- Inc, me.
13   Q. And then for Cultural Care
14   Limited, who is that signatory?
15   A. The Swiss entity, Jens
16   Appelkvist.
17   Q. And is this -- what does this
18   agreement represent?
19   A. This is an agreement for the air
20   tickets, flight tickets.
21   Q. And it is an agreement for air
22   travel between Cultural Care, Inc., and
23   Cultural Care Limited; is that correct?
24   A. Air travel -- the agreement is
25   between the U.S. entity and the Swiss
```

Page 71

```
1    entity covering air travel for the
2    au pairs.
3    Q. I'm just using the agreement is
4    between Cultural Care, Inc., and Cultural
5    Care Limited --
6    A. Yes.
7    Q. -- the Swiss entity.
8    A. Correct.
9    Q. And this agreement is for the air
10   travel for the au pairs?
11   A. Correct.
12   Q. So I want to turn your attention
13   back to the financial statement and the
14   related party transactions at the end of
15   Paragraph 2 where it refers to the company,
16   Cultural Care, Inc., purchasing flight
17   tickets from an affiliated company.
18        Do you have an understanding of
19   what affiliated company you were purchasing
20   flight tickets from in that instance?
21   A. I believe we used to purchase the
22   tickets from International Care Limited. I
23   believe we now purchase it from another
24   company.
25   Q. Another company within the EF
```

Page 72

```
1    family?
2    A. I'm not sure what EF family is,
3    but another affiliated company, yes.
4    Q. Another EF-affiliated company --
5    A. Correct.
6    Q. -- is that correct?
7    A. Correct.
8    Q. Thank you.
9        And if we can go to Page 4 of the
10   financial statement. The top of the page
11   says "Statements of Income."
12        If you can just review -- we'll
13   look just at the 2015 numbers.
14   A. Mm-hmm.
15   Q. What numbers are paid out to
16   affiliated companies?
17   A. I think, as the auditor said, the
18   compensation on the service agreement
19   $26 million and travel $11 million, rent
20   $1 million.
21   Q. Is there anything else there
22   that's paid out to affiliates?
23   A. I don't think so.
24   Q. Based on these numbers, is it
25   fair to say that the majority of the
```

Page 73

```
1    program revenue is paid out to affiliates
2    of Cultural Care, Inc.?
3        MS. LUKEY: Objection; form and
4    foundation.
5    A. I'm not sure I understand the
6    question. The majority of the revenue --
7    the revenue comes in, and there is costs to
8    operate the program.
9    Q. Yes. So can you tell me what the
10   number is for program revenue for 2015?
11   A. 66, almost $67 million.
12   Q. Okay. The next section appears
13   to be a section focused on the operating
14   expenses that I assume are expenses
15   associated with running the program; is
16   that correct?
17   A. Correct.
18   Q. And then at the end, or in the
19   middle of the page, there is an entry that
20   says "Net Income From Operations"; is that
21   correct?
22   A. Correct.
23   Q. And the number for net income is
24   the number arrived at by subtracting
25   operating expenses from program revenue; is
```

PLAINTIFFS' RESP. APP.0004661

MAGNA ►
LEGAL SERVICES

Page 78

1    year.
2        Q.  So if you make a profit in a
3    given year after you pay your taxes, that
4    amount is added to your balance sheet in
5    terms of your net assets --
6        A.  Correct.
7        Q.  -- is that correct?
8        MS. LUKEY:  Objection;
9    foundation.
10       A.  Correct.
11       MS. LUKEY:  You got to slow down.
12       THE WITNESS:  Okay.
13       Q.  Do you know what Cultural Care's
14   approximate net assets are today?
15       MS. LUKEY:  Objection;
16   foundation.
17       A.  Do my competitors find out about
18   this?
19       MS. LUKEY:  Hold on a second.  I
20       cannot recall how we're handling
21       this.  Those on the phone, if you
22       recall, this is strictly Attorneys'
23       Eyes Only if he's able to respond to
24       this question.
25       Your competitors should not find

Page 79

1    out.  Their attorneys are going to
2    hear the number, but they will not
3    repeat it.
4        A.  Today we have approximately
5    $10 million.
6        Q.  Okay.  When a host family pays a
7    fee to Cultural Care, where does that money
8    go?
9        A.  To a bank account owned by
10   Cultural Care, Inc.
11       Q.  Does that money, a host family's
12   fee, does that make up the program revenue
13   that's listed on the financial statement
14   that we were just reviewing in 2015?
15       A.  Yes.
16       Q.  Is there anything else other than
17   host family fees that make up program
18   revenue?
19       A.  No.
20       Q.  So program revenue solely
21   consists of funds obtained from host family
22   fees; is that correct?
23       MS. LUKEY:  Objection;
24   foundation.
25       A.  Materially, at least.  There

Page 80

1    might be smaller income streams, but the
2    main thing is the host family program fee.
3        Q.  Okay.  And then those revenues
4    are held in a Cultural Care, Inc., bank
5    account?
6        A.  Yes.
7        Q.  And those funds are used by
8    Cultural Care, Inc., to pay operating
9    expenses for running the program --
10       A.  Yes.
11       Q.  -- is that correct?
12       A.  Yes.
13       Q.  Are you aware that au pairs often
14   pay fees?
15       MS. LUKEY:  Objection; form and
16   foundation.
17       A.  From my work in IAPA, yes.
18       Q.  Do you know how much those fees
19   generally are?
20       A.  They differ substantially by
21   country and by overseas companies.
22       Q.  What's the highest you've ever
23   heard of for an au pair paying to
24   participate in the program prior to
25   arriving in the United States?

Page 81

1        MS. LUKEY:  Objection;
2    foundation.
3        A.  From my IAPA work, there has been
4    horror stories in some countries where
5    au pairs have been asked to pay a lot of
6    money, even $10,000.  That's in countries
7    like China, and some other countries.
8        Q.  Does Cultural Care Au Pair charge
9    au pairs fees to participate in the
10   program?
11       A.  Which entity are we talking
12   about?
13       Q.  The entity to which au pairs pay
14   fees.
15       MS. LUKEY:  Objection to form.
16       Your use of the name "Cultural Care."
17       As you know, there are two entities
18       that have that as part of their name.
19       You just said Cultural Care.
20       MS. SMALLS:  I do.  I also know
21       that in Cultural Care, Inc.'s,
22       deposition we established that both
23       ICL and Cultural Care, Inc., use the
24       name Cultural Care Au Pair.
25       MS. LUKEY:  You just said

PLAINTIFFS' RESP. APP.0004662

**MAGNA**
LEGAL SERVICES

Page 82

```
 1        Cultural Care, but that's why he
 2   asked you which entity.  That's all
 3   I'm saying.
 4        MS. SMALLS:  Okay.
 5        MS. LUKEY:  There is confusion as
 6   to the entity.
 7        Q.  Okay.  Let's back off of that
 8   question.  I just want to establish, have
 9   you reviewed the testimony of Natalie
10   Jordan?
11        A.  I have.
12        Q.  Does Cultural Care, Inc., ever
13   use other names or other designations other
14   than Cultural Care, Inc.?
15        A.  Yeah, Cultural Care Au Pair.
16        Q.  So Cultural Care, Inc., also does
17   business as Cultural Care Au Pair?
18        A.  We use that name in our
19   marketing, yes.
20        Q.  As it presents -- as Cultural
21   Care, Inc., presents itself to host
22   families and the world, does it use the
23   name Cultural Care Au Pair?
24        MS. LUKEY:  Objection; form.
25        A.  Cultural Care, Inc., doesn't
```

Page 83

```
 1   present itself to the world, but Cultural
 2   Care, Inc., in marketing to host families
 3   in the U.S. presents itself as Cultural
 4   Care Au Pair.
 5        Q.  Does Cultural Care, Inc.,
 6   publicly represent itself as doing business
 7   as Cultural Care Au Pair?
 8        MS. LUKEY:  Objection; form.
 9        A.  In our marketing material, we say
10   Cultural Care Au Pair.
11        Q.  What is the distinction you're
12   making with marketing materials versus
13   other materials?
14        A.  Legally, I'm sure we are Cultural
15   Care, Inc., in what we do.
16        Q.  Is there any other entities that
17   do business as Cultural Care Au Pair?
18        A.  International Care Limited in
19   Switzerland use Cultural Care Au Pair when
20   they market themselves to au pairs.
21        Q.  Is marketing materials to host
22   family the only place where you refer --
23   where Cultural Care, Inc., refers to itself
24   as Cultural Care Au Pair?
25        A.  There might be other material.
```

Page 84

```
 1        Q.  So as you just testified, both
 2   Cultural Care, Inc., and ICL do business as
 3   Cultural Care Au Pair; is that correct?
 4        MS. LUKEY:  Objection; form and
 5   foundation.
 6        A.  I'm not sure what "doing business
 7   as" means, but they use the name.
 8        Q.  Both Cultural Care, Inc., and ICL
 9   both use the name Cultural Care Au Pair
10   with respect to their respective audiences;
11   is that correct?
12        A.  Yes, that's correct.
13        Q.  And when I say "respective
14   audiences," Cultural Care, Inc., as you
15   testified, their primary audience is to
16   host families; is that correct?
17        A.  Correct.
18        Q.  And so they use the name Cultural
19   Care Au Pair in their marketing for
20   discussions with the name Cultural Care
21   Au Pair with host families; is that
22   correct?
23        A.  Correct.
24        Q.  And ICL uses the name in its
25   interfaces or communications with au pairs;
```

Page 85

```
 1   is that correct?
 2        A.  Correct.
 3        Q.  Is there any way that anyone
 4   would know, without reviewing these legal
 5   documents from 2004 and 2010, that Cultural
 6   Care Au Pair, as we've just reviewed it, is
 7   actually two separate entities?
 8        A.  I think people would understand
 9   that from their dealings with the different
10   offices, yes.
11        Q.  How would people understand that
12   they are dealing with two different legal
13   entities that are both using the name
14   Cultural Care Au Pair?
15        A.  First of all --
16        MS. LUKEY:  Objection;
17   foundation.
18        A.  -- they are in completely
19   different countries.
20        The whole au pair industry in
21   America is set up with sponsors designated
22   by the U.S. State Department, and all of
23   those sponsors work with overseas
24   recruitment agents.  I think that's a
25   well-known fact in the industry and,
```

PLAINTIFFS' RESP. APP.0004663

MAGNA
LEGAL SERVICES

| Page 86 |
|---|
| 1 therefore, by the host families. |
| 2     Q.  Doesn't Cultural Care distinguish |
| 3 itself in the market by saying that it is |
| 4 the only, or one of the only, sponsor |
| 5 agencies that recruits au pairs in its own |
| 6 offices? |
| 7     MS. LUKEY:  Objection; form. |
| 8     A.  I don't think we have a say in |
| 9 its own offices.  We are only -- well, we |
| 10 may not be the only one, but we are the |
| 11 only one that exclusively works with one |
| 12 agent overseas. |
| 13     Q.  And do you think host families |
| 14 understand the distinction that you're |
| 15 making right now? |
| 16     MS. LUKEY:  Objection; |
| 17 foundation. |
| 18     A.  I think so. |
| 19     Q.  So your testimony is when |
| 20 Cultural Care says it's the only sponsor |
| 21 agency that recruits its own au pairs, that |
| 22 that communicates that you're doing it only |
| 23 through one agent? |
| 24     MS. LUKEY:  Objection to form. |
| 25 That's not what he said. |

| Page 87 |
|---|
| 1     A.  I'm not sure we say it in the way |
| 2 you portrayed it. |
| 3     MS. SMALLS:  Let's take a short |
| 4 break. |
| 5     VIDEO TECHNICIAN:  We're off the |
| 6 record at 11:17 a.m. |
| 7     (Proceedings recessed at |
| 8 11:17 a.m., and reconvened at 11:28 |
| 9 a.m.) |
| 10     VIDEO TECHNICIAN:  We are back on |
| 11 the record at 11:28 a.m. |
| 12     (Jordan Exhibit 6 presented to |
| 13 the witness.) |
| 14 BY MS. SMALLS: |
| 15     Q.  So this is Exhibit 6 in the |
| 16 Jordan deposition, which you said you |
| 17 reviewed, correct? |
| 18     A.  Yes, I did. |
| 19     Q.  Do you know what this document |
| 20 is? |
| 21     A.  It is a Host Family Handbook. |
| 22     Q.  And when do host families receive |
| 23 the Host Family Handbook? |
| 24     A.  I believe when they become a host |
| 25 family.  It could be when they are looking |

| Page 88 |
|---|
| 1 at an au pair. |
| 2     Q.  Would you describe this as a |
| 3 piece of marketing material? |
| 4     A.  Marketing and operational, yes. |
| 5     Q.  I want to direct you to Page 14 |
| 6 of the Host Family Handbook.  It's Cultural |
| 7 Care production 342. |
| 8     A.  Yes. |
| 9     Q.  And if you can just review the |
| 10 section under "Cultural Care Au Pair |
| 11 Overseas," and then I'm going to ask you to |
| 12 read that first paragraph out loud once |
| 13 you're done. |
| 14     A.  (Document review.) I'm done. |
| 15     Q.  Can you read out loud that first |
| 16 paragraph? |
| 17     A.  "In 2010 Cultural Care Au Pair |
| 18 became the only au pair agency designated |
| 19 by the U.S. State Department to recruit all |
| 20 of our au pairs through our own offices |
| 21 worldwide.  Unlike other au pair agencies |
| 22 who use independent agents, our au pairs |
| 23 are recruited and screened by Cultural Care |
| 24 staff in one of our 20 offices around the |
| 25 world.  This unique recruitment structure |

| Page 89 |
|---|
| 1 reflects our belief that investing in a |
| 2 quality recruitment organization is the |
| 3 best way to ensure that our au pairs are |
| 4 rigorously screened and well prepared for |
| 5 the year as an au pair with an American |
| 6 host family." |
| 7     Q.  So in that first sentence when it |
| 8 refers to "recruiting all of our au pairs |
| 9 through our own offices worldwide," what |
| 10 does it refer to? |
| 11     A.  I think it's incorrect. |
| 12     Q.  The sentence says that "In 2010 |
| 13 Cultural Care Au Pair became the only |
| 14 au pair agency ... to recruit all of our |
| 15 au pairs through our own offices |
| 16 worldwide." |
| 17     What does that refer to when it |
| 18 says "our au pairs" and "our offices"? |
| 19     A.  To me, it sounds like an |
| 20 incorrect statement. |
| 21     Q.  Why is it incorrect? |
| 22     A.  Because we, Cultural Care, Inc., |
| 23 do not recruit from our -- we do not have |
| 24 our own offices worldwide. |
| 25     Q.  And who receives the Host Family |

PLAINTIFFS' RESP. APP.0004664

MAGNA

LEGAL SERVICES

Page 150

1    your foundation issue?
2        MS. LUKEY:  As long as you ask
3    him what he has heard them say as
4    opposed to asking what their
5    considerations are in the abstract,
6    because he can't know unless they're
7    telling him.
8    Q.  Okay.  In your experience, in
9    your conversations with -- I actually don't
10   even think that's fair.  I mean, he gets
11   all kinds of -- just, I'm sorry, just...
12       MS. LUKEY:  Dawn, I can't help it
13   if you ask him what somebody else is
14   thinking or what they meant --
15       MS. SMALLS:  I know.  I know.
16       MS. LUKEY:  -- then he can't
17   answer that question.  You don't have
18   a foundation established for what
19   somebody else is thinking or what
20   they meant when they wrote words.
21   You need to establish how he would
22   know what they're thinking.
23       MS. SMALLS:  Joan, he is the CEO
24   of an organization that interacts
25   with host families in more ways than

Page 151

1    one.  Beyond host family conferences,
2    there are e-mails, there is calls,
3    there are many ways of interacting.
4    And so the basis of -- just it's
5    fine.  I'm getting --
6        MS. LUKEY:  I will have to keep
7    making my objections as long as you
8    ask him --
9        MS. SMALL:  Yes, you will.
10       MS. LUKEY:  -- what somebody else
11   thinks.
12       MS. SMALL:  Yes, you will.
13       MS. LUKEY:  I have no choice.
14   BY MS. SMALLS:
15   Q.  In your thirteen years as CEO of
16   Cultural Care, Inc., have you had occasion
17   to speak with host families about why they
18   are interested in participating in the
19   au pair program?
20   A.  Yes, I have.
21   Q.  Okay.  And are you -- what do
22   they generally tell you?  What are the
23   primary considerations that are told to you
24   as considerations of why a host family
25   would like to participate in the au pair

Page 152

1    program?
2    A.  What I've heard most often is
3    that they want to be part of a cultural
4    exchange program, they want to bring the
5    peace of the world to their family, they
6    want their children to interact with a
7    foreign person, in some instances to learn
8    another language, and to have somebody
9    living at their house to take care of their
10   children also.
11       Q.  Is childcare a primary driver, or
12   the need for childcare the primary -- a
13   primary driver in host families
14   participating in the program?
15       MS. LUKEY:  Objection; form and
16   foundation.
17       A.  The childcare component is
18   definitely a big part of it.
19       Q.  Okay.  So childcare is a big
20   component.  The need for childcare is a big
21   component of a host family's decision to
22   participate in the au pair program; is that
23   correct?
24       MS. LUKEY:  Objection to form and
25   foundation.

Page 153

1        A.  Your family is not allowed to be
2    on the program unless they have children.
3        Q.  But you can have children and not
4    have a need for childcare; is that correct?
5        A.  I guess so.
6        Q.  Okay.  So in your experience for
7    host families that are interested in
8    participating in the au pair program, is
9    the need for childcare a big component of
10   why they are seeking to participate in the
11   au pair program?
12       MS. LUKEY:  Objection to form and
13   foundation.
14       A.  Yes.
15       Q.  In those conversations, or in
16   your experience where you are interacting
17   with -- and when I say "you," I mean
18   Cultural Care, rather than you specifically
19   as an individual -- but when you are
20   interacting with a prospective host family,
21   is it your experience that they are already
22   set on obtaining an au pair, or are they
23   also considering other alternatives?
24       A.  I would say that differs.
25   Some come to us because they have decided

MAGNA
LEGAL SERVICES

Page 154

```
 1    they want an au pair and are looking at a
 2    few different sponsors.  Some are still in
 3    search for what they want to do for their
 4    childcare.  So it differs.
 5        Q.  And when you say some are
 6    searching for what they want to do in terms
 7    of childcare, what does that mean?
 8        A.  That there are other options than
 9    the au pair program for childcare.
10        Q.  Okay.  What are those other
11    options for childcare that you were
12    referring to in your last answer?
13        A.  A parent being home with the
14    children, a grandparent being home with the
15    children, a daycare facility.  Those would
16    be the most obvious ones I think.
17        Q.  Would a nanny be also an option
18    that host families would be considering as
19    a childcare alternative?
20        A.  Some families would do that I
21    would think.
22        Q.  Are there any other options that
23    host families in your experience regularly
24    consider in terms of childcare options?
25            MS. LUKEY:  Objection to form and
```

Page 155

```
 1    foundation.
 2        A.  I don't know.  Those are the ones
 3    I can think of.
 4        Q.  And so those options are a
 5    relative, either a mother or a grandparent,
 6    staying home with the child --
 7        A.  It could be a father.
 8        Q.  Or a father.
 9        A.  I'm from Sweden.
10        Q.  -- a relative, a mother -- I was
11    just going based on the answer that you
12    gave -- a mother, father, or grandparent
13    staying home with the children, daycare, or
14    a nanny --
15            MS. LUKEY:  Objection to form.
16        Q.  -- is that correct?
17        A.  That's what I believe.
18        Q.  Two of those three options are
19    alternatives that involve someone other
20    than a relative taking care of the
21    children; is that correct?
22        A.  Correct.
23        Q.  And those are daycare and a
24    nanny; is that correct?
25        A.  Correct.
```

Page 156

```
 1        Q.  Does Cultural Care ever do market
 2    analyses of the pluses and minuses of
 3    different childcare options in relation to
 4    the au pair program?
 5        A.  I think our local childcare
 6    coordinators when they are talking to
 7    families discuss different alternatives.
 8        Q.  Would it just be your local
 9    childcare coordinators, or would Cultural
10    Care, Inc., staff also do a market analysis
11    of the au pair program in relation to other
12    childcare options, including daycare and a
13    nanny?
14        A.  We probably have something in our
15    marketing material - I think.
16        Q.  And how does, in your
17    experience -- well, let me ask you.  I
18    mean, as Cultural Care, a CEO of Cultural
19    Care, is part of your job to understand the
20    market in which you operate?
21        A.  Yes.
22        Q.  Is part of the market for --
23    well, is part of the market other au pair
24    agencies?
25        A.  Yes.
```

Page 157

```
 1        Q.  Is part of the market other
 2    childcare alternatives, including daycare
 3    and nannies?
 4        A.  The main market is the cultural
 5    exchange world, so the other sponsors.
 6    But, of course, the childcare market is
 7    also a part of it.
 8        Q.  So as CEO of Cultural Care, do
 9    you keep an eye on the market, and that
10    would mean both other sponsor agencies and
11    then also other childcare options,
12    including daycares and nannies?
13        A.  I mainly keep track of the other
14    sponsors.
15        Q.  As part of your job, do you also
16    keep attention to other alternative
17    childcare options, including daycare and a
18    nanny?
19            MS. LUKEY:  Objection to form.
20        A.  To a lesser extent, yes.
21        Q.  How does the au pair program, the
22    total cost of the au pair program, compare
23    with the total cost of daycare and a nanny
24    for host families that are looking at those
25    options?
```

MAGNA ▶
LEGAL SERVICES

Page 158

1    A.  My belief is that it's very
2 different in different parts of the
3 United States.
4    Q.  What's the area of the
5 United States that you are most familiar,
6 in terms of the market and the costs
7 associated with childcare?
8    A.  I think in all the big cities
9 childcare is very expensive, upscale
10 childcare I should say.  Rather than in
11 small cities, there is childcare that is a
12 lot cheaper.
13    No, I think in the big cities,
14 like Boston, New York, Washington, there
15 are expensive childcare options; and in
16 smaller cities, there may be less expensive
17 ones.  I think it's a very fragmented
18 market.
19    Q.  I understand.  I'm just trying to
20 get a frame of reference with which you are
21 most familiar.
22    A.  Okay.
23    Q.  I'm asking the question; so we
24 can pick a big city, we can pick a smaller
25 market.

Page 159

1    With what childcare market are
2 you most personally familiar?  Because I'm
3 going to ask you a question about it.
4    A.  Well, again, what I'm mostly
5 familiar with is the other sponsors.  So
6 the au pair, which is not necessarily the
7 only childcare, the cultural exchange field
8 is what I'm most familiar with.
9    Q.  You talked about upscale
10 childcare options, I think specifically in
11 big cities.  And you also talked about how
12 the cost of childcare varies according to
13 region in the United States; is that
14 correct?
15    A.  Correct.
16    Q.  Do your fees vary according to
17 the part of the country that the host
18 family is coming from?
19    A.  No, they do not.
20    Q.  Thank you.
21    (Document marked for
22 identification as Rannefors
23 Exhibit 14)
24    Q.  I'll give you a moment to review
25 this document.

Page 160

1    A.  (Document review.)
2    MS. SMALLS:  For people on the
3 phone, this document is Cultural Care
4 9172.
5    A.  (Document review.)  Okay.
6    Q.  This is Exhibit Number 14.  I'm
7 going to start with the initial e-mail,
8 which is from you dated September 26, 2013;
9 is that correct?
10    A.  I don't see a date.
11    Q.  It's on the --
12    A.  Yes.
13    Q.  -- bottom.
14    MS. LUKEY:  On the bottom.
15    A.  Yes.  Yes.
16    Q.  And then this e-mail, which has
17 the subject "DoS AP," it is addressed to
18 Natalie Jordan, Melissa Fredette, Christina
19 Sandberg, David Widerberg, and Pehr
20 Karlsson; is that correct?
21    A.  Correct.
22    Q.  And of the five recipients of
23 this e-mail, three are from ICL, and two
24 are from Cultural, the U.S. entity; is that
25 correct?

Page 161

1    A.  Correct.
2    Q.  And I'll just refer you back to
3 Jordan 28 to ask if these are the same --
4    A.  Sorry.
5    (Short pause.)
6    A.  Yes.
7    Q.  Are these the same individuals
8 that you addressed your thoughts about
9 rumblings in D.C.?
10    A.  Correct.
11    Q.  And what is the substance of this
12 e-mail dated September 26, 2013?
13    A.  Conversations with Department of
14 State at an annual conference called WYSTC,
15 World Youth Student Travel Conference.
16    Q.  What is it?
17    A.  "WYSTC" stands for World Youth
18 Student Travel Conference.
19    Q.  Okay.
20    A.  It's an annual conference that
21 moves around the world.
22    Q.  And this e-mail is a recount of
23 your conversation with, and it says "both
24 privately and with other sponsors in
25 Alliance setting" to the recipients of this

PLAINTIFFS' RESP. APP.0004667

MAGNA
LEGAL SERVICES

Page 166

1    that "She like the fact that we have 'our
2    own' overseas network that we 'control.'"
3            What does that refer to?
4        A. I think that's our thing. She,
5    Robin Lerner, when she was the deputy
6    assistant secretary started meeting with
7    overseas agents at these conferences. And
8    I think she realized that it's very, very
9    hard to have these hundreds of different
10   agents. And I think she liked the fact
11   that we had one overseas partner which had
12   its own people in different countries.
13       Q. Why did you put "our own" in
14   quotation marks?
15       A. Because that's what she said. I
16   mean, they are not our own. They are
17   belonging to an overseas partner; that
18   that's what she expressed.
19       Q. You put it in quotations because
20   that was her words or because she put it in
21   quotations?
22       A. Don't know.
23       Q. But she used the words "your own
24   overseas network," in reference to Cultural
25   Care?

Page 167

1        A. I can only refer to what I wrote
2    here. It's four years ago. That's what I
3    believe.
4        Q. What is it that you believe?
5        A. That she used the words.
6        Q. "Our own"?
7        A. "Your own."
8        Q. Is it your understanding when you
9    spoke with her that she was under the
10   impression that you had an independent
11   overseas affiliate that managed the
12   overseas offices under the cultural au pair
13   umbrella?
14           MS. LUKEY: Objection;
15       foundation.
16       A. That's my understanding, yes.
17       Q. You think she understood that
18   Cultural Care Au Pair offices abroad were a
19   separate entity from the Cultural Care
20   Au Pair offices in the United States?
21       A. Absolutely.
22       Q. A little further down it says,
23   "Robin does not like AP to be sold as 'a
24   cheap alternative.'"
25           What are you referring to there?

Page 168

1        A cheap alternative to what?
2        A. She, and the rest of the
3    Department of State are regulators, of
4    course want this to be sold mainly as a
5    cultural exchange program.
6            We are a part of U.S. foreign
7    diplomacy. Like I said before, these
8    au pairs come as ambassadors; and, in
9    particular, they are supposed to leave
10   America as very happy ambassadors for the
11   U.S.
12           So they do not want us to market
13   this as a cheap alternative to childcare
14   only.
15       Q. So when you reference "Robin does
16   not like AP to be sold as 'a cheap
17   alternative,'" you're referring to a cheap
18   alternative to childcare?
19       A. Absolutely.
20       Q. Does Cultural Care market the
21   au pair program as a cheap alternative to
22   childcare?
23       A. No, we don't.
24       Q. Do other sponsor agencies market
25   the au pair program as a cheap alternative

Page 169

1    to childcare?
2        A. I can't talk for them, but I
3    don't think so.
4        Q. Second-to-last line it says,
5    "Likes that we started doing CBCs (but no
6    plan for regs to mandate for now)."
7            What are CBCs?
8        A. Criminal background checks.
9        Q. In response to your e-mail, David
10   Widerberg replies to the same group, and
11   why don't you read the substance of his
12   e-mail.
13       A. "Hi Goran, Great that you were
14   able to meet with her! Thanks for all
15   information and building this relationship.
16   Interesting on the Educational component.
17   One for discussion in the Board meetings I
18   guess. I also interpret the 'au pair as a
19   cheap alternative' and push of 'cultural
20   components' as signals on how they see the
21   program that we need to be thoughtful of."
22       Q. When he refers to "One for
23   discussion in the Board meetings," do you
24   know which board meetings he is referring
25   to in which you would discuss the substance

MAGNA
LEGAL SERVICES

Page 170

1  of your e-mail?
2      A.  He must be referring to his board
3  meeting back in Lucerne, Switzerland.
4      Q.  Are there board meetings in which
5  both you and David Widerberg participate?
6      A.  No.
7      Q.  How focused would you say you are
8  about changes to the minimum wage?
9          MS. LUKEY:  Objection to form.
10     A.  How focused I am?  Sorry.
11     Q.  Is that a primary -- is that
12 something that you focus on as CEO of
13 Cultural Care?
14     A.  Yeah.  She's really interested in
15 it because if the federal minimum wage
16 changes, the stipend to the au pair will
17 change.
18         (Document marked for
19         identification as Rannefors
20         Exhibit 15)
21     A.  (Document review.)  Okay.
22     Q.  Let's start with your original
23 e-mail.  This is February 2013, and who is
24 this e-mail addressed to?
25     A.  David Widerberg, Christina

Page 171

1  Sandberg, and Pehr Magnus Karlsson, copy
2  Melissa Fredette, Natalie Jordan, and
3  Martin Asp.
4      Q.  And so the three recipients of
5  this e-mail are all at ICL --
6      A.  Correct.
7      Q.  -- is that correct?
8          And then the CC contains two
9  Cultural Care employees and one ICL
10 employee --
11     A.  Correct.
12     Q.  -- is that correct?
13         And the substance of the e-mail
14 is about a possible raise of the minimum
15 wage; is that right?
16     A.  Right.
17     Q.  And then Martin Asp, who is at
18 ICL, replies to that same group.  And,
19 again, four individuals at ICL and two
20 individuals at Cultural Care, Inc.; is that
21 correct?
22     A.  Correct.
23     Q.  And on that chain, the only
24 person that does not have an EF e-mail
25 address is you; is that correct?

Page 172

1      A.  Correct.
2      Q.  And then Martin Asp, why don't
3  you read his reply.
4      A.  "I think Obama mentioned 9+ USD
5  something per hour?  What is it today and
6  how much do we believe the weekly $196 USD
7  stipend would be impacted?"
8      Q.  And why is the man in charge of
9  finances at ICL engaging on the discussions
10 of a possible increase in minimum wage in
11 the United States?
12     A.  Again, I think all of them
13 overseas are interested in what happens in
14 the U.S., not necessarily as much into it
15 as we are, but they want to know what's
16 going on and they are interested in what
17 the stipend would become for the au pairs.
18     Q.  Would an increase in au pair
19 stipend make it -- make the program less
20 appealing to host families?
21     A.  It would clearly make it more
22 costly for them.
23     Q.  Would the increase in au pair
24 stipend make it less appealing to American
25 host families?

Page 173

1          MS. LUKEY:  Objection;
2  foundation.
3      A.  Yeah, being more costly would
4  probably make it less appealing.
5      Q.  And then if we can go up to the
6  most recent message in this chain, which is
7  from Martin Asp to Melissa Fredette,
8  Natalie Jordan, and you, with a CC to Pehr
9  Karlsson, David Widerberg, and Christina
10 Sandberg.
11         Can you read the substance of
12 that message?
13     A.  "I guess the good news is that by
14 2015 we have over 10,000 host families and
15 this will help Christina to recruit more
16 au pairs (happy face emoji).  So this could
17 be looked at two ways...cost for
18 alternative childcare would also increase
19 if this goes through."
20     Q.  When you read this, why do you
21 think he's referencing the cost for
22 alternative childcare in an increase in
23 minimum wage -- wait, strike that.
24         Martin Asp is the CFO of ICL; is
25 that correct?

PLAINTIFFS' RESP. APP.0004669

MAGNA

LEGAL SERVICES

Page 174

```
1        A.  Correct.
2        Q.  And ICL's responsibilities
3   include the recruitment and screening of
4   au pairs in overseas offices; is that
5   correct?
6        A.  Correct.
7        Q.  Does it also include the analysis
8   of the relevant market for childcare in the
9   United States?
10       A.  No, it does not.
11       Q.  As you read this e-mail, because
12  it is addressed to you, how did you
13  interpret Martin's e-mail?  What was the
14  intent --
15       MS. LUKEY:  Objection --
16       Q.  -- as you read it as a recipient,
17  original recipient, of the e-mail?
18       MS. LUKEY:  Objection;
19       foundation.  Go ahead.
20       A.  My reading of it is that
21  Martin Asp is all in favor of an increase
22  in the federal minimum wage, and he's
23  saying that:  Don't be afraid of that; it
24  will also make it easier to find more
25  au pairs.
```

Page 175

```
1        Q.  But then he also says, when he's
2   saying "Don't worry about it," he's
3   referencing that the cost for alternative
4   childcare would also increase; is that
5   correct?
6        A.  That's correct.
7        Q.  And why would that be relevant to
8   somebody interested in -- focused on
9   administering the au pair program?
10       MS. LUKEY:  Objection; form and
11       foundation.
12       A.  I think he's just having an
13  intellectual discussion here and saying
14  that, of course, if the costs for the
15  au pair stipend goes up because of the
16  minimum wage going up, the minimum wage
17  also impacts most childcare facilities.
18       Q.  And is the meaning of that, that
19  you would not lose competitive advantage
20  because the cost for you would go up, but
21  the cost for other alternative childcare
22  options would also go up?
23       MS. LUKEY:  Objection;
24       foundation.
25       A.  I don't know if he's thought it
```

Page 176

```
1   through that much.  Could be.
2        Q.  Thank you.
3        (Jordan Exhibit 8 presented to
4        the witness)
5        A.  (Document review.)  Okay.
6        Q.  Are you familiar, or are you
7   familiar with this document?
8        A.  Not necessarily.
9        Q.  What does it appear to be?
10       A.  It's a marketing piece, but I
11  can't find the year of it.
12       Q.  I don't think it's legible --
13       A.  No.
14       Q.  -- on this version.
15       A.  But it's clearly a marketing
16  piece.
17       Q.  At the top of the marketing
18  piece, what is the logo up in the upper
19  left-hand corner?
20       A.  Cultural Care Au Pair with a
21  heart.
22       Q.  And by that logo, do you know who
23  produced this document?
24       A.  It seems to be for host families,
25  so it was produced by the U.S. entity I
```

Page 177

```
1   want to guess.
2        Q.  And who on your staff would
3   have -- of the staff of the U.S. entity
4   would have prepared a marketing material
5   like this?
6        A.  The marketing manager.  But,
7   again, I don't know which year it is.  I
8   don't know any of the names.
9        Q.  Okay.  And at the end of this --
10  at the bottom of this document, it says --
11  at the top it says, "Cultural Care
12  Au Pair," and then on the bottom it says
13  "Part of the EF Education First family"; is
14  that correct?
15       A.  Correct.
16       Q.  Is Cultural Care -- is the U.S.
17  entity part of the EF Education First
18  family?
19       A.  Affiliated with the broader group
20  of companies of Education First, yes.
21       Q.  Is the U.S. entity, quote, "Part
22  of the EF Education First family"?
23       MS. LUKEY:  Objection;
24       foundation.
25       A.  Affiliated, as we said before, to
```

PLAINTIFFS' RESP. APP.0004670

MAGNA
LEGAL SERVICES

**Page 198**

```
1    group would be the ones that are conducted
2    by the Department of State.
3        Q.  And how long are those meetings
4    with the Department of State?
5        A.  Two or three hours.
6        Q.  And how long are the meetings in
7    general, the yearly meetings?
8        A.  A day or a day and a half.
9        Q.  Okay.  So out of a day or a
10   day-and-a-half meeting, the vast majority
11   of it is focused on things of interest to
12   all 80 members?
13       A.  Yes, it is.
14       Q.  And then a smaller portion of two
15   to three hours will be focused on the
16   specific component, or a portion of the
17   J visa program in which you operate?
18       A.  Correct.
19       Q.  And that happens on a yearly
20   basis?
21       A.  Correct.
22       Q.  Are the Alliance or the IAPA
23   meetings your primary means of interacting
24   with other sponsors?
25       A.  Those are the only places where I
```

**Page 199**

```
1    meet other sponsors, yes.
2        WYSTC also.  I mentioned before
3    the World Youth Student Travel Conference
4    that we talked about, that's also a yearly
5    conference.  The Alliance always comes to
6    that one with staff, and they try to have
7    an Alliance-members-only little session
8    there.  So that's another place where we
9    meet.
10       Q.  Okay, thank you.  Do you only
11   interact with other sponsors in the context
12   of these yearly meetings that you just
13   outlined?
14       A.  Yes.
15       Q.  Do you have more informal
16   interactions with other sponsors?
17       A.  I mean, at these conferences we
18   may go out for dinner with people, but they
19   are not the same sponsors.  They are for
20   different categories, people that you just
21   happen to meet.
22       Q.  But even those that you just
23   referenced tend to happen around those
24   meetings?
25       A.  Yes.
```

**Page 200**

```
1        Q.  Are you friends with the
2    leadership of any other sponsor agency?
3        A.  Not friends, no.  I mean, I know
4    them.
5        Q.  Do you regularly communicate with
6    any of the other au pair sponsors?
7        A.  In the way that they are part of
8    the Alliance or IAPA, I talk to them every
9    now and then, yes.
10       Q.  And what do you talk to them
11   about?
12       A.  Not much.  New things in the
13   industry.  Things happening.
14       Q.  And that's in the context of your
15   work at the Alliance or --
16       A.  And IAPA.
17       Q.  -- and IAPA?
18       If something is happening in the
19   industry, do you often pick up the phone to
20   call another sponsor?
21       A.  No.  Very seldom.
22       Q.  How often would you say you do
23   so.
24       A.  I can't even remember when I did
25   it last.
```

**Page 201**

```
1        Q.  And do you see -- do you
2    generally share best practices with other
3    sponsors?
4        A.  No, we don't.
5        Q.  Well, when you talk about things
6    that are happening in the industry, how do
7    you distinguish things that are happening
8    in the industry versus best practices?
9        A.  Well, since we are competitors,
10   and I happen to believe that we are the
11   highest quality, I don't necessarily want
12   to share our best practices.  If we pick
13   something up that somebody is doing, of
14   course we try to use that.
15       Q.  So you'll try to pick up the
16   practices of other competitors to the other
17   sponsor agencies, excuse me, to the extent
18   that you think that that's something that
19   you should incorporate in the Cultural Care
20   Au Pair program, but you're not inclined to
21   share Cultural Care's best practices with
22   other --
23       A.  That's correct.
24       Q.  -- sponsor agencies?
25       A.  Correct.
```

PLAINTIFFS' RESP. APP.0004671

MAGNA
LEGAL SERVICES

Page 202

```
 1        Q.  Thank you.  Which sponsor agency
 2   do you think you talk to the most?
 3        A.  You mean in the au pair --
 4        Q.  In the au pair sponsor --
 5        A.  -- field?
 6        Bill Gertz, G-e-r-t-z, from AIFS
 7   Au Pair in America is presently the chair
 8   of the Alliance.  So I would say that he's
 9   the one I talk to most often.
10        Partly also Ellen Hoggard, who is
11   the treasurer.  Since she replaced me as
12   the treasurer, we had a hand-over, so I
13   talked a lot to her.  She runs STS AuPair
14   Foundation.
15        Q.  Anyone else?
16        A.  Yes, one more.  Michael McHugh
17   from InterExchange au pair USA.  He and I
18   used to serve together on the IAPA board.
19        Q.  And on what occasions do you most
20   often speak with, or for what purpose, do
21   you most often speak with Bill Gertz at
22   AIFS?
23        A.  To discuss Alliance matters.
24        Q.  And when you say "Alliance
25   matters," what do you mean?
```

Page 203

```
 1        A.  Advocacy.
 2        Q.  And would that be advocacy on
 3   items of importance to the au pair
 4   industry?
 5        A.  The big thing right now is the
 6   educational component.  Every au pair has
 7   to take six credit hours, or its
 8   equivalent, of university studies.  And for
 9   several years now, we've been talking to a
10   regulator at the Department of State on
11   these regs that are pretty stringent.
12        They are stringent in one way,
13   that they do not allow any online, which
14   has become such a big thing in studies now
15   days.  And they are also so vague that
16   different sponsors in the au pair agency
17   allows different things for these credit
18   hours, and we would like to see it more
19   streamline; that it would be more online
20   and more clear.
21        So that has been a big discussion
22   with the Department of State and different
23   sponsors.
24        Q.  And on what occasions or on what
25   topics would you most often have occasion
```

Page 204

```
 1   to speak with Ellen Hoggard?
 2        A.  Mainly on handing over the
 3   treasury and the finances of the Alliance
 4   to her.
 5        Q.  And on what occasions and on what
 6   topics would you most often have occasion
 7   to talk to Michael McHugh?
 8        A.  Nowadays, not much.  But when he
 9   was on the board of IAPA, we met twice a
10   year, and we conducted workshops for
11   au pair agencies in a few countries
12   together.  Not he and I, but the board of
13   IAPA did it together.
14        Q.  If you have a question about a
15   new practice that the Department of State
16   is doing or implementing, will you pick up
17   the phone to another sponsor agency to ask
18   their opinion or what's going on?
19        A.  No.  I would call the Department
20   of State.
21        Q.  Do you mind if I see your exhibit
22   list for a second?
23        A.  (Witness complies.)
24
25
```

Page 205

```
 1        (Document marked for
 2        identification as Rannefors
 3        Exhibit 16)
 4        Q.  I'll give you a moment to review
 5   this e-mail.
 6        A.  (Document review.)
 7        Q.  Are you ready?
 8        A.  Okay.
 9        Q.  This is an e-mail dated Monday,
10   or at least the initial e-mail is an e-mail
11   from David Widerberg to you, Melissa
12   Fredette, Natalie Jordan, with a CC to Pehr
13   Magnus Karlsson; is that correct?
14        A.  Correct.
15        Q.  And you, Melissa and Natalie are
16   all employees of the U.S. entity --
17        A.  Correct.
18        Q.  -- is that correct?
19        And in this e-mail David
20   Widerberg is recounting a conversation that
21   he had with Michael from Care.com, correct?
22        A.  Correct.
23        Q.  Do you know which Michael he is
24   referring to there?
25        A.  No, I don't.
```

MAGNA ▶
LEGAL SERVICES

Page 206

1    Q.  Do you know what the substance of
2  David Widerberg's conversation with
3  Care.com was at that time?
4    A.  Yes.  I was also part of that
5  correspondence -- that discussion.
6    Q.  Okay, what was the discussion
7  with Care.com?
8    A.  Care.com was, and is, a website
9  for all kind of care; dog-sitting, elder
10  care, all kinds of things.  NASDAQ listed.
11    We had been working with them as
12  Cultural Care the U.S. entity to get leads,
13  and I believe that International Care had
14  worked with them to get leads for au pairs
15  also from their website.
16    In the meeting we had with them
17  regarding continuing our discussions --
18  continuing our agreement with them, they
19  all of a sudden told us that they were
20  applying to be a sponsor with the U.S.
21  State Department, which, of course, would
22  mean that they would be a direct competitor
23  of our U.S. company.
24    So that's the background for
25  this.  We decided to, at least on the U.S.

Page 207

1  side, completely pull out of the agreement
2  with them.
3    Q.  From this e-mail it appears that
4  David Widerberg is making the decision to
5  not continue a relationship with Care.com?
6    A.  For his part, yes.
7    Q.  For his part?
8    A.  For the recruitment of au pairs,
9  yes.
10    Q.  For ICL.
11    When he says "Goran - When do you
12  think that you could call APIA and
13  EurAuPair," why is he asking you to call
14  APIA and EurAuPair to let them know --
15  well, I don't know why you would call them.
16    A.  Yeah, all of these four
17  competitor sponsors that are mentioned here
18  were also working with Care.com.  So
19  inappropriate or not, but we felt that we
20  should let them know that Care.com was
21  applying to be a sponsor.  I'm not sure how
22  appropriate that was, but we felt we should
23  let them know.
24    Q.  So when we were referring to the
25  four, I hadn't gotten to that portion yet,

Page 208

1  the only two sponsors mentioned here are
2  APIA and EurAuPair, and then you respond
3  to David's e-mail about his e-mail
4  outlining the decision to not continue in a
5  relationship with Care.com.  And you say --
6  can you just read your portion of the
7  e-mail?
8    A.  "Hey, David.  Just let me know
9  when you have talked to him and how it went
10  - and then I will call Au Pair in America
11  and EurAuPair directly."
12    Q.  Is there a reason you had to wait
13  until David spoke with Michael from
14  Care.com to call APIA and EurAuPair to let
15  them know of Care.com's indication that
16  they were going to apply as a sponsor?
17    A.  I can't recall what I meant here.
18  But I would guess if his discussion, if
19  they pulled back on that and said it wasn't
20  true, but.
21    Q.  And then Natalie Jordan then
22  replies to your e-mail and says that "[She]
23  will let InterExchange and GoAuPair know as
24  well once we get the green light."
25    Do you know what green light

Page 209

1  she's referring to?
2    A.  No, I think it's from David's
3  call with this person at Care.com that he
4  confirms that they are already starting to
5  apply for a sponsorship.
6    Q.  And why would David's call to
7  Michael at Care.com be a green light for
8  Natalie to call InterExchange and GoAuPair?
9    A.  I think we just wanted to know
10  how that discussion went when he was
11  pulling back from Care.com before we called
12  anyone.
13    Q.  How do you commonly understand
14  the phrase "green light"?
15    A.  Okay.
16    Q.  And so in this context when
17  Natalie Jordan says, "once we get" -- "I
18  will let InterExchange and GoAuPair know as
19  well once we get the green light," how do
20  you -- what does that mean to you as an
21  original recipient of this e-mail?
22    A.  To me it means that how did
23  David's final discussion with Care.com go.
24  I'm kind of hoping that it could have meant
25  that we were checking with a lawyer also,

PLAINTIFFS' RESP. APP.0004673

MAGNA
LEGAL SERVICES

Page 210

1    but I'm not sure about that.
2        Q.  Okay, thank you.
3        A.  If it was okay to contact the
4    competitors.  I hope we did, but.
5        (Document marked for
6        identification as Rannefors
7        Exhibit 17)
8        A.  (Document review.)  Okay.
9        Q.  Can you tell me what this e-mail
10   is?
11       A.  It's from Michael McCarry, who
12   was then the managing director of the
13   Alliance to several au pair sponsors.
14       Q.  And what is the substance of the
15   e-mail?
16       A.  Questions for an au pair
17   education survey.  I don't recall this.  I
18   would think it's about the educational
19   component, but I don't know if it's a
20   survey for us, the sponsors, or for
21   au pairs or for host families.
22       Q.  Are surveys like this sent out
23   often?
24       A.  No.  I don't even know what the
25   survey was, but since it says "education

Page 211

1    survey," I would guess it's got to do with
2    the education component.
3        Q.  And the date of the e-mail is
4    Thursday, April 28, 2011.  Has the
5    educational component been an item of
6    discussion since 2011?
7        A.  Yes, it has.
8        Q.  Thank you.
9        (Document marked for
10       identification as Rannefors
11       Exhibit 18)
12       A.  (Document review.)  Okay.
13       Q.  What is -- this is an e-mail from
14   a Jackie Sant-Myerhoff, who appears to be
15   employed at CHI, to you individually; is
16   that correct?
17       A.  Correct.
18       Q.  And the subject of it is
19   "Educational Component For Au Pairs"; is
20   that correct?
21       A.  Correct.
22       Q.  And the date of it is Tuesday,
23   March 30, 2010; is that correct?
24       A.  Correct.
25       Q.  And what is the substance of this

Page 212

1    e-mail?
2        A.  She is inquiring what we do for
3    educational component and if we think that
4    au pair weekend courses are okay.
5        Q.  And do you often get inquiries
6    like this from other sponsors about your
7    pattern and practice?
8        A.  No.
9        Q.  Thank you.
10       (Document marked for
11       identification as Rannefors
12       Exhibit 19)
13       A.  (Document review.)  Okay.
14       Q.  The first message appears to be a
15   message from William Gertz to you dated
16   Wednesday; September 21, 2011; is that
17   correct?
18       A.  Correct.
19       Q.  What is the substance of that
20   message?
21       A.  He's saying that "We received a
22   message saying au pairs should fill out
23   time sheets each week and send them to the
24   home office.  Crazy!"
25       Q.  And it's just William Gertz from

Page 213

1    AIFS corresponding with you at Cultural
2    Care on this particular e-mail; is that
3    correct?
4        A.  Correct.
5        Q.  And that relates to an inquiry
6    that he received from the Department of
7    State; is that correct?
8        A.  Correct.
9        Q.  And then what was your action
10   after you received this e-mail from Bill
11   Gertz at AIFS?
12       A.  I sent it to Natalie to find out
13   if we had received anything like it.
14       Q.  Okay, thank you.
15       (Document marked for
16       identification as Rannefors
17       Exhibit 20)
18       A.  (Document review.)  Okay.
19       Q.  The original message is a message
20   from Michael McCarry to Bill Gertz, Ruth
21   Ferry, you, Natalie Jordan, and Heidi Woehl
22   with a CC to Mark Overmann; is that
23   correct?
24       A.  Correct.
25       Q.  And Bill Gertz is with AIFS?

PLAINTIFFS' RESP. APP.0004674

MAGNA
LEGAL SERVICES

Page 214

1    A. Correct.
2    Q. And Ruth Ferry is associated with
3 what organization?
4    A. Same one as Bill Gertz. I don't
5 know the legal structure, but they are AIFS
6 and Au Pair in America.
7    Q. And then you and Natalie are with
8 the U.S. entity?
9    A. Yes.
10   Q. And then Heidi Woehl --
11   A. Was in these days with
12 AuPairCare. So this is to the three
13 biggest sponsors.
14   Q. Got it. And who is Mark
15 Overmann?
16   A. He was the associate director,
17 the second in command, at the Alliance. He
18 is now working with InterExchange Au Pair
19 USA.
20   Q. And in June of 2013, do these
21 three agencies represent the board for the
22 leadership of the Alliance?
23   A. Don't know. But they represent
24 the three largest au pair agencies. What I'm
25   Q. I understand that. What I'm

Page 215

1 trying to understand is the makeup; why
2 Michael McCarry would have chosen to e-mail
3 the top three au pair sponsors versus --
4 and what I'm trying to determine is whether
5 the three au pair sponsors on this e-mail
6 chain constitute the officers of the
7 Alliance at the time of the sending of this
8 e-mail, or if there might be another reason
9 that he sent it to the top three au pair
10 agencies.
11   A. I cannot recall what the board of
12 the Alliance looked like in 2013. I don't
13 even remember if I was on the board. I
14 would think he just wanted a quick
15 turnaround and sent it to the three largest
16 sponsors, or members of the Alliance. But
17 that's my opinion. You have to ask him.
18   Q. Do you ever recall a time when
19 you served on the board of the Alliance
20 where Bill Gertz and/or Ruth Ferry and
21 Heidi Woehl also served with you on the
22 board at the same time?
23   A. Bill Gertz is the chair right now
24 and I'm on the board.
25   Q. And is there a time that in

Page 216

1 addition to Bill Gertz - all three - that
2 you served on the board with Bill Gertz,
3 yourself, and Heidi Woehl?
4    A. I cannot remember Heidi Woehl
5 having been on the board.
6    Q. Okay.
7    A. I'm not sure about that, but I
8 can't remember it.
9    Q. Thank you. Can you tell me the
10 substance of the exchange after Michael
11 writes his initial e-mail to the group that
12 we just reviewed a few minutes ago?
13      MS. LUKEY: Objection to form.
14   A. Yes. And I think that Natalie is
15 giving her input to a lot of questions on
16 what to do with this, and then Bill Gertz
17 sent some ideas of his on what could be
18 done to talk to these anti-trafficking
19 groups.
20   Q. And what are some of the ideas
21 that Bill Gertz at AIFS proposes to deal
22 with the concerns raised by the
23 anti-trafficking groups?
24      MS. LUKEY: Objection to form.
25   A. Well, I can only -- I don't know

Page 217

1 what he meant, but he's after a standard
2 recruitment fee, or a maximum, overseas.
3 "Better enforcement of 45 hour rule," which
4 I don't understand, because I think we do
5 that quite substantially.
6      And then "More education that
7 working more than 45 hours is illegal for
8 family and au pair." Again, we already do
9 that.
10      "Civil penalties for families and
11 agencies and families breaking the rules."
12   Q. And this was him sharing his
13 thoughts with the other two biggest
14 agencies -- au pair -- the other two
15 biggest au pair sponsor agencies?
16   A. Or sharing them with the
17 Alliance, I would say, and we are copied.
18      (Document marked for
19 identification as Rannefors
20 Exhibit 21)
21   A. (Document review.) Okay.
22   Q. The initial e-mail is from a
23 Helene [Hel-len] or Helene [Hel-leen] Young
24 to Michael McCarry at the Alliance to
25 discuss a call that she had at the

MAGNA
LEGAL SERVICES

Page 218

1    Department of State about the, quote, "lack
2    of sponsor oversight on au pair work hours,
3    schedules and wages"; is that correct?
4        A.  That's right.
5        Q.  And then Michael McCarry forwards
6    this e-mail to you individually and says
7    "To discuss."
8        A.  Correct.
9        Q.  Did you discuss after you
10   received this e-mail?
11       A.  I can't remember, but I would
12   think so.
13       Q.  Were you on the board in 2011?
14       A.  Again, I don't remember the
15   dates.
16       Q.  Is there a reason that he would
17   have sent it to you individually versus the
18   au pair sponsors in general?
19       A.  I think you have to ask him, but
20   I would think he wanted to discuss it with
21   someone before he answered.
22       Q.  Thank you.
23       (Document marked for
24       identification as Rannefors
25       Exhibit 22)

Page 219

1        A.  (Document review.)  Okay.
2        Q.  And this is an e-mail from
3    Michael McCarry at the Alliance to a number
4    of sponsors.  And the subject of the e-mail
5    is "Draft paper re educational component,"
6    and it's dated Friday, March 13, 2009; is
7    that correct?
8        A.  Correct.
9        Q.  And in the e-mail he refers to a
10   February meeting at InterExchange; is that
11   correct?
12       A.  Correct.
13       Q.  Did you attend that meeting?
14       A.  Yes, I did.
15       Q.  And what was the substance of
16   that February meeting at InterExchange?
17       A.  To discuss the education
18   component.  I believe the Department of
19   State had asked the Alliance to put
20   together a paper on how the sponsors felt
21   that the educational component should be
22   redrafted.
23       Q.  So this February meeting at
24   InterExchange was an Alliance meeting?
25       A.  Yes.  Well, Alliance meeting --

Page 220

1    only the au pair sponsors it seems like.
2        Q.  So the February meeting at
3    InterExchange was a meeting of only the
4    au pair sponsors to discuss the educational
5    component?
6        A.  The au pair sponsors being
7    members of the Alliance.
8        Q.  Does the educational component
9    affect members of the Alliance beyond the
10   au pair sponsors?
11       A.  No.
12       Q.  So the February meeting at
13   InterExchange was a meeting of au pair
14   sponsors to discuss the educational
15   component to give feedback of the industry
16   to the Department of State regarding the
17   educational component?
18       A.  Correct.
19       Q.  Okay, thank you.
20       (Document marked for
21       identification as Rannefors
22       Exhibit 23)
23       A.  (Document review.)  Okay.
24       Q.  In this document, it refers to an
25   au pair task force meeting.  Can you tell

Page 221

1    me what the au pair task force was or is?
2        A.  It doesn't exist today.  I can't
3    remember, but it seems to have been a task
4    force where I was part together with some
5    other au pair organizations.
6        Q.  And you don't recall your
7    participation in the au pair task force?
8        A.  Not really.
9        Q.  Okay.  And in the meeting report,
10   it says that you provided a brief history
11   and current update on a bill before the
12   Massachusetts legislature to govern au pair
13   and nanny programs?
14       A.  Correct.
15       Q.  Is that something you usually do
16   at Alliance meetings or task force
17   meetings?
18       A.  If there is a need for it, I
19   would do it.  This one was a particular law
20   that was introduced by a local politician,
21   Marie Parente, where we were advocating
22   that some of the things that were in the
23   proposal were pretty good, but they should
24   be federal rather than state.  And it
25   was -- it's actually been reintroduced

Page 222

1  every year and never passed.
2      Q.  And what is the substance of the
3  law?
4      A.  To strengthen, in particular, the
5  host family side of the au pair experience.
6      Q.  It says that the "bill before the
7  Massachusetts legislature to govern au pair
8  and nanny programs."
9      A.  That's correct.
10     Q.  So nannies don't have host
11 families.  So what would --
12     A.  No.
13     Q.  -- be the substance of the bill
14 as it relates --
15     A.  I can't remember.  I only know
16 what it implied for the au pairs.
17     Q.  Okay.  And then it says, "For
18 over 10 years, EF and AIFS have met with
19 legislators and submitted testimony
20 supporting federal regulations and opposing
21 state regulations which, if passed, would
22 set a precedent for other states to
23 regulate at the state level and make it
24 cumbersome if not impossible to administer
25 the program."

Page 223

1      A.  Correct.
2      Q.  And who within, or who does it
3  refer to when it says "EF have met with" --
4  "EF and AIFS have met with legislators and
5  submitted testimony"?
6      A.  I think that's a mistake riding
7  over from when we were EF Au Pair.  It
8  should be Cultural Care Au Pair in these
9  days.
10     Q.  But you stopped being EF Au Pair
11 around 2004/2005?
12     A.  Yeah, but we didn't write this.
13 The Alliance did.
14     Q.  Okay.  So but EF here in this
15 reference refers to --
16     A.  Cultural Care, Inc.
17     Q.  -- Cultural Care, the U.S.
18 entity?
19         And so just speaking on behalf of
20 the U.S. entity, how often had you met with
21 legislators and submitted testimony
22 supporting Federal regulations and opposing
23 state regulations?
24     A.  In Massachusetts?  I think this
25 law has been refiled every year since this

Page 224

1  time.
2      Q.  Have you done it beyond the State
3  of Massachusetts?
4      A.  There was one bill in California
5  a long time ago also.
6      Q.  Have you met with legislators and
7  submitted testimony in any other states
8  beyond Massachusetts and California?
9      A.  I don't think so.
10     Q.  And when it says "EF," and then
11 in this case that would be either you or
12 Natalie, "have met with legislators and
13 submitted testimony supporting federal
14 regulations," what does that refer to?
15     A.  That we are saying that this is a
16 federal cultural exchange program and,
17 therefore, all suggestions that local
18 lawmakers have would be better if they
19 became federal regulations rather than
20 state regulations.
21     Q.  Do you often meet with and submit
22 testimony to federal, supporting federal
23 regulations?
24     A.  Not often, but it happens.
25     Q.  What legislators have you met in

Page 225

1  the past on the state or federal level?
2      A.  Natalie Jordan is doing that, so
3  we have to ask her.
4      Q.  And then at the end of that
5  paragraph it says "Sponsors who have
6  questions are welcome to contact [you] or
7  Ruth Ferry"; is that correct?
8      A.  Correct.
9      Q.  And then at the end of Alliance
10 meetings, our sponsors generally are free
11 to reach out to you if they have questions
12 about what's going on in the industry?
13     A.  I think this was about this
14 particular Massachusetts law.
15     Q.  On the second page in the section
16 "Beyond immediate issues," can you just
17 read that paragraph, the first paragraph
18 under "Beyond immediate issues"?
19     A.  "We are concerned that several
20 newer au pair sponsors are not members of
21 the Alliance and do not benefit from
22 sharing best practices and gaining insight
23 into the regulatory aspects of the program.
24 We view it an important mission to
25 encourage their membership in 2010."

Page 226

```
1        Q. I asked you earlier if it was
2   your practice to share best practices with
3   other members of the Alliance or other
4   sponsor agencies.
5            This document says that the
6   purpose of the Alliance, in part, is to
7   share best practices; is that correct?
8        A. That's correct.
9        Q. Is it correct that one of the
10  purposes of the Alliance is to share best
11  practices in the industry?
12       A. I would say that that's correct.
13       Q. Okay, thank you.
14           (Document marked for
15       identification as Rannefors
16       Exhibit 24)
17       A. (Document review.) Yes.
18       Q. The first e-mail appears to be an
19  e-mail from Michael McCarry at the Alliance
20  to Ruth Ferry in which you are CC'd, and
21  that message is dated March 19, 2011; is
22  that correct?
23       A. Correct.
24       Q. If you could just read the
25  substance of that message from Michael to
```

Page 227

```
1   Ruth in which you are CC'd?
2        A. "Since ECA has turned this into
3   all sponsor meeting, should we consider
4   inviting outliers to our pre-meeting? I'm
5   with Goran at WETM and he doesn't have
6   strong feeling either way. Thanks,
7   Michael. P.S. Back at my desk Wednesday."
8        Q. What is "WETM"?
9        A. That is the annual IAPA meeting,
10  because it's a combination of work abroad
11  and au pairing. "WETM" stands for Work and
12  Educational Travel Market, or something. I
13  don't think I know what it's called, but
14  it's called WETM IEC the meeting that is
15  held once a year with IAPA.
16       Q. And in Michael's message to Ruth
17  in which you are CC'd, he refers to a
18  pre-meeting.
19       A. Yes.
20       Q. Is that pattern and practice that
21  you would have a pre-meeting before larger
22  Alliance meetings with the subset of
23  sponsors?
24           MS. LUKEY: Objection to form.
25       A. I think this is the Alliance
```

Page 228

```
1   having asked the State Department for a
2   meeting to discuss au pair. And if I
3   understand this correctly, the State
4   Department came back saying that they will
5   invite all sponsors, not only the Alliance
6   members. And Michael is there for
7   wondering if we should have a pre-meeting
8   with all the sponsors before we go to the
9   State Department.
10       Q. Do you often have smaller
11  conversations with sponsors before you have
12  an all-sponsor meeting?
13           MS. LUKEY: Objection to form.
14       A. If the Alliance have asked for a
15  meeting with State Department, we have at
16  times met with the Alliance before we go
17  over to State Department to coordinate what
18  we think.
19       Q. My question is not whether the
20  sponsors meet before you go to the State
21  Department, but before you have your annual
22  meeting in which all sponsors are invited,
23  do you ever have a pre-meeting of a smaller
24  group of sponsors than the full suite of --
25  the full number of 16 sponsors before the
```

Page 229

```
1   broader Alliance meeting?
2        A. All sponsors are not invited to
3   the Alliance meeting, only the ones being
4   members of the Alliance.
5            Whether there has been
6   pre-meetings, I don't think so. I know
7   that Ruth Ferry lately has been sharing the
8   session with the State Department at the
9   Alliance meeting, and maybe she has talked
10  to a few before. I think she has sent out
11  e-mails asking what questions we would like
12  to pose.
13       Q. You mentioned that AuPairCare,
14  AIFS and Cultural Care were the three
15  largest sponsors?
16       A. Correct.
17       Q. Do you have occasion to have
18  conversations among the three of you in
19  which the other au pair agencies do not
20  participate?
21       A. No.
22       Q. Who attends the Alliance meetings
23  generally from Cultural Care?
24       A. I always go, Bob Fredette from
25  Foundation for Foreign Study, Kate Garrett
```

| Page 230 | Page 232 |
|---|---|

**Page 230**

1 from Foundation for Foreign Study, Natalie
2 Jordan from Cultural Care, Inc., and Dan
3 Sodervall from Cultural Care, Inc.
4 Occasionally somebody else.
5     Q.  But generally those four
6 individuals are the individuals that are --
7     A.  Yes.
8     Q.  -- attending the Alliance
9 meeting --
10     A.  Correct.
11     Q.  -- on behalf of Cultural Care?
12     A.  And me, so five.
13        MS. LUKEY:  He mentioned himself,
14     too.
15     A.  Yeah.  Five.
16     Q.  Sorry.  And who is Bob Fredette?
17 That's a new name for me.
18     A.  Yes, he is the president of EF
19 Foundation for Foreign Study.
20     Q.  The EF for Foreign Study in which
21 you are the chairman?
22     A.  Correct.
23     Q.  Is he related to Melissa
24 Fredette?
25     A.  They actually didn't know it when

**Page 231**

1 they found each other in the company, or
2 some meetings there, but I realize that
3 they are second cousins or something.  But
4 they didn't know that when they first met.
5     Q.  In 2015 I believe the Alliance
6 meeting occurred in July?
7     A.  2015?  I hardly believe so,
8 because they normally happen later in the
9 year.
10     Q.  When do they usually occur?
11     A.  October, September.
12     Q.  Okay.  In the 2015 meeting,
13 whenever it occurred, did the Department of
14 Labor come to speak with you as Alliance?
15 And when I say "you," I mean the group of
16 au pair sponsors.
17     A.  You are talking about an Alliance
18 meeting?
19     Q.  Yes.
20     A.  No, I don't think they ever
21 attended an Alliance meeting.
22     Q.  Was there ever a meeting of
23 au pair sponsors, whether it be an Alliance
24 meeting or another meeting, was there ever
25 a meeting of au pair sponsors in which the

**Page 232**

1 Department of Labor gave a presentation
2 about the au pair stipend and its relation
3 to the minimum wage laws?
4     A.  There was a meeting at State
5 Department for au pair sponsors, nothing to
6 do with the Alliance, where there was a
7 presentation from the Department of Labor.
8     Q.  And do you know when that meeting
9 occurred?
10     A.  I can't remember.
11     Q.  And can you tell me what the
12 substance of the Department of Labor
13 presentation was at that meeting at the
14 State Department?
15     A.  I actually did not attend that
16 particular part of the meeting.
17     Q.  Were you at the meeting?
18     A.  Yes, I was.
19     Q.  And why did you not attend that
20 portion of the meeting?
21     A.  Because the Department of State
22 had told us that they would not like to
23 discuss anything that had to do with
24 stipend or anything to do with the lawsuit.
25     They even started that meeting

**Page 233**

1 with saying that nothing would be discussed
2 about that.  And when Department of Labor
3 came, it seemed from some questions that
4 were posed that it would be discussing the
5 lawsuit.
6     Q.  And so what did you do?
7     A.  I and Natalie Jordan and two
8 other people left the room for that
9 presentation.
10     Q.  And who were the other two people
11 that left the room?
12     A.  One was this gentleman and his
13 client (gesturing).
14     Q.  Can you indicate who you pointed
15 to?
16     A.  The lawyer for Expert Au Pair.
17        MS. SMALLS:  And for the record,
18     let it reflect that that's Bogdan
19     Enica.
20     Q.  And who was the other gentleman
21 who walked out of the room?
22     A.  The other person from Expert
23 Au Pair, Mark.
24     Q.  Mark Jeffrey?
25        THE WITNESS:  What's his last

MAGNA
LEGAL SERVICES

# Exhibit 418

PLAINTIFFS' RESP. APP.0004680

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

------------------------------X

JOHANA PAOLA BELTRAN, et al., )

              Plaintiffs, ) Civil Case No.

      v. ) 14-cv-03074-CMA-KMT

INTEREXCHANGE INC., et al., )

             Defendants. )

------------------------------X

VIDEOTAPED DEPOSITION OF SARAH COURTNEY BIGGS

Thursday, June 29, 2017; 8:35 a.m.

Job No.:   326545

Pgs.   1 - 271

Reported by:  Cindy L. Sebo, RMR, CRR, RPR, CSR,
CCR, CLR, RSA, LiveDeposition Authorized Reporter

MAGNA LEGAL SERVICES
(866) 624-6221
www.MagnaLS.com

PLAINTIFFS' RESP. APP.0004681

MAGNA
LEGAL SERVICES

| Page 2 | Page 4 |
|---|---|

**Page 2**

1  Videotaped deposition of SARAH
2  COURTNEY BIGGS taken by Counsel for Plaintiffs,
3  held at the law offices of Gordon & Rees LLP,
4  1300 I Street, Northwest, Suite 825, Washington,
5  D.C. 20005, before Cindy L. Sebo, Registered Merit
6  Reporter, Certified Real-Time Reporter, Registered
7  Professional Reporter, Certified Court Reporter,
8  Certified Shorthand Reporter, Real-Time Systems
9  Administrator, LiveDeposition Authorized Reporter
10 and Notary Public in and for the District of
11 Columbia, beginning at approximately 8:35 a.m.,
12 when were present on behalf of the respective
13 parties:
14
15
16
17
18
19
20
21
22

**Page 4**

1      A P P E A R A N C E S (Continued):
2  Attorney for Defendant American Cultural Exchange,
   LLC, Go Au Pair Operations LLC, Agent Au Pair, and
3  Au Pair International:
4      WHEELER TRIGG O'DONNELL LLP
5      KATHRYN A. REILLY, ESQUIRE (Via telephone)
6      370 Seventeenth Street, Suite 4500
7      Denver, Colorado 80202-5647
8      303.244.1983
9      reilly@wtotrial.com
10
11 Attorney for Defendant Expert Group International
   Inc. d/b/a Expert AuPair:
12
   GORDON REES SCULLY MANSUKHANI, LLP
13
   BOGDAN ENICA, ESQUIRE (Via telephone)
14
   111 Second Avenue, Northeast
15
   Suite 204
16
   St Petersburg, Florida 33701
17
   727.388.3472
18
   bogdane@hotmail.com
19
20
21
22

**Page 3**

1      A P P E A R A N C E S :
2  Attorney for Plaintiffs:
3      BOIES SCHILLER FLEXNER LLP
4      JOSHUA JAMES LIBLING, ESQUIRE
5      575 Lexington Avenue
6      7th Floor
7      New York, New York 10022
8      212.446.2381
9      jlibling@bsfllp.com
10
11 Attorney for Defendant AuPairCare Inc.:
12     GORDON REES SCULLY MANSUKHANI, LLP
13     THOMAS B. QUINN, ESQUIRE
14     555 Seventeenth Street
15     Suite 3400
16     Denver, Colorado 80202
17     303.534.5154
18     tquinn@grsm.com
19
20
21
22

**Page 5**

1      A P P E A R A N C E S (Continued):
2  Attorney for Defendant Cultural Care, Inc.:
3      CHOATE, HALL & STEWART LLP
4      LYNDSEY M. KRUZER, ESQUIRE (Via telephone)
5      Two International Place
6      Boston, Massachusetts 02110
7      617.248.4790
8      lkruzer@choate.com
9
10 Attorney for Defendants Apex and 20/20:
11     NIXON SHEFRIN HENSEN OGBURN
12     LAWRENCE D. STONE, ESQUIRE (Via telephone)
13     5619 DTC Parkway, Suite 1200
14     Greenwood Village, Colorado 80111
15     303.874.3408
16     LStone@nixonshefrin.com
17
18
19
20
21
22

PLAINTIFFS' RESP. APP.0004682

MAGNA ▶
LEGAL SERVICES

Page 6

1     A P P E A R A N C E S (Continued):
2     Attorney for Defendant Cultural Homestay
      International:
3
      HOLLAND & HART LLP
4
      JONATHAN S. BENDER, ESQUIRE (Via telephone)
5
      555 17th Street, Suite 3200
6
      Denver, Colorado 80202
7
      303.295.8456
8
      jsbender@hollandhart.com
9
10
11    ALSO PRESENT:
12    FRANKLIN SEARS, Videographer
13
14
15
16
17
18
19
20
21
22

Page 8

1                    - - -
2          INDEX TO EXHIBITS
3                    - - -
4     BIGGS
      EXHIBIT
5     NUMBER      DESCRIPTION           PAGE
6     Number 4    E-mail, McNamara to Biggs, cc:
7          Eaton and Dutoit, June 9, 2010,
8          Bates stamped APC 004917
9          through APC 004918          66
10
      Number 5    E-mail with attachment, Biggs to
11
           Danial, bcc: Biggs, January 15,
12
      2012, Bates stamped APC 006352
13
           through APC 006373          78
14
15    Number 6    PowerPoint presentation, Au Pair
16         Sponsor Meeting, July 17, 2015,
17         Bates stamped EAP0000480 through
18         EAP0000540                  124
19
20
21
22

Page 7

1          INDEX OF EXAMINATION
2
3     SARAH COURTNEY BIGGS
4     EXAMINATION BY               PAGE
5     Mr. Libling          12, 232, 265
6     Mr. Quinn                  254
7                    - - -
8          INDEX TO EXHIBITS
9                    - - -
10    (Exhibits Attached to the Original Transcript.)
11    BIGGS
      EXHIBIT
12    NUMBER      DESCRIPTION           PAGE
13    Number 1    AuPairCare Annual Report to the
14         United States Department of
15         State, Bates stamped APC_004075
16         APC_004084                  38
17
      Number 2    AuPairCare Org Chart, February
18
           2016, Bates stamped APC 000253    45
19
20    Number 3    E-mail string, Bates stamped
21         APC 004902 through APC 004907     53
22

Page 9

1                    - - -
2          INDEX TO EXHIBITS
3                    - - -
4     BIGGS
      EXHIBIT
5     NUMBER      DESCRIPTION           PAGE
6     Number 7    Fact Sheet Number 79C:
7          Recordkeeping Requirements for
8          Individuals, Families, or
9          Households Who Employ Domestic
10         Service Workers Under the Fair
11         Labor Standards Act (FLSA)     188
12
      Number 8    Fact Sheet Number 22: Hours
13
           Worked Under the Fair Labor
14
           Standards Act (FLSA)
15
      Number 9    July 17, 2015 — Au Pair Sponsor
16         Meeting, Bates stamped EAP000477
17         through EAP000479          224
18
19
20
21
22

PLAINTIFFS' RESP. APP.0004683

MAGNA
LEGAL SERVICES

3 (Pages 6 to 9)

**Page 22**

1  help them with their homework; however, anything
2  that is outside of that, more a household task,
3  such as mowing the lawn or pet care or anything
4  that had to do with more the family support,
5  that was outside her realm of responsibilities.
6      Q.    And were you asked, sometimes,
7  questions about how much au pairs should be
8  compensated?
9      A.    Yes. Um-hum.
10      Q.    And what would you tell host
11  families in response to that inquiry?
12      A.    That the minimum amount that they
13  must pay the au pair would be whatever it was at
14  that time.  And at that time, it could have
15  been -- I believe it was around 139.05.
16      Q.    Did you tell host families that they
17  could pay more than 139.05, or whatever the
18  minimum was at the appropriate time?
19      A.    I would not tell the family that.
20  If I were asked, then I would respond; it is
21  their prerogative.
22      Q.    And is that -- has that been your

**Page 23**

1  understanding, that the stipend was a minimum?
2      A.    Yes.  And as a host family, I paid
3  my au pair more.  I had four sons.  It's a tough
4  job.  So it was something that I think a lot of
5  families can make that choice and determination
6  with their au pair.
7      Q.    I have two children.  I can't
8  imagine how much four is.
9      A.    Uh-huh.
10      Q.    How much did you pay your au pair?
11      A.    I can go back, but I know when it
12  was a minimum of a hundred, we were paying maybe
13  150 for that one.  And throughout the years, we
14  would typically pay 25-plus extra a week, had
15  bonuses at the end of the year.
16          A lot of families will do that as
17  well.
18      Q.    Other than answering questions that
19  the host families might have about the program,
20  what were your responsibilities as a placement
21  director?
22      A.    Mainly helping them maneuver through

**Page 24**

1  the process, the first-time family, very nervous
2  with a concept of having someone from another
3  culture come and live in their home; and helping
4  them to qualify what was the most important
5  criteria, qualifications that would help set
6  them up for a successful placement.
7      Q.    Okay.  What was your position after
8  placement director?
9      A.    Regional manager.
10      Q.    And when did you become regional
11  manager?
12      A.    2003.
13      Q.    What were your responsibilities as a
14  regional manager?
15      A.    I would oversee the area directors
16  within my region; and the responsibility of
17  working, again, to support the host family and
18  au pair in a different capacity; ensuring the
19  compliance was adhered to from monthly contacts,
20  welcome calls, arrival orientations within two
21  weeks; the proper training of staff; and
22  resolution of escalated concerns.

**Page 25**

1      Q.    So when you say working to support
2  the host family and au pair in a different
3  capacity, do you mean that your responsibilities
4  shifted from ensuring compliance directly with
5  the host families and au pairs to ensuring that
6  your area directors were doing what they had to
7  do?
8      A.    Correct.
9      Q.    You mentioned monthly contacts,
10  welcome calls, arrival orientations within two
11  weeks, proper training, resolution of escalated
12  concerns.
13          Were there any other requirements
14  that you had of your area directors?
15      A.    They were to perform a range -- a
16  cluster event monthly; they arrange a family day
17  for the host -- all the host families to attend,
18  and au pairs, once a year; training
19  responsibilities; compliance.
20      Q.    Anything else you can think of?
21      A.    No.
22      Q.    When you say "compliance," what do

Page 26

1   you mean?
2       A.    Compliance is the crux of their job,
3   ensuring that the host family adheres to the
4   program guidelines, the au pair adheres to the
5   program guidelines.  And if an au pair is asked
6   to work extra hours, she would come to that area
7   director, and then there would have to be
8   resolution with the family and mediation and, at
9   times, an exit interview if a family can't work
10  within the guidelines.
11      Q.    Do host families have obligations to
12  AuPairCare to work within the guidelines?
13      A.    Yes, through their host family
14  agreement, they -- they say that they will abide
15  by all the Department of State guidelines.
16      Q.    And the same question for au pairs:
17  Do they have obligations to AuPairCare to work
18  within the guidelines?
19      A.    Correct, in their au pair agreement.
20      Q.    And you said that there would be
21  exit interviews if a family can't work within
22  the guidelines.

Page 27

1       Can you give me an example of what
2   would be sufficiently not working within the
3   guidelines to warrant an exit interview?
4       A.    Surely.  It can happen where a host
5   mom is late in traffic and the au pair may go
6   over the 10 hours, and that would be a concern.
7   So if the au pair alerts their area director,
8   then it would be a discussion.  Sometimes it's a
9   mediation, and sometimes it's what is -- trying
10  to help them problem-solve -- what is a backup
11  plan if that were to happen in the future; what
12  can you put into place to ensure that this does
13  not happen on a regular basis?
14      And if it's a situation where there
15  is no support, additional support, and a family
16  is -- again, we're getting into the complaint
17  that she's worked over the amount of hours
18  required, then we'll have to look at the
19  next -- the next step would be that the au pair
20  cannot be in a placement that's not suitable.
21      Q.    It sounds like -- is it -- let me
22  ask it differently.

Page 28

1       Is it fair to say there's a certain
2   amount of discretion and judgment involved in
3   working out whether a host family has made a
4   mistake or whether there's a more systemic
5   problem?
6       MR. QUINN:  Object to form.
7   BY MR. LIBLING:
8       Q.    When -- your counsel may object,
9   which he's entirely entitled to do, but you can
10  answer --
11      MR. QUINN:  Yeah.
12  BY MR. LIBLING:
13      Q.    -- unless he instructs you not to.
14      A.    Can you reframe the question?
15      Q.    Absolutely.
16      I take it that not every violation
17  of the rules requires an immediate exit
18  interview --
19      A.    Correct.
20      Q.    -- is that correct?
21      A.    Correct.  Um-hum.
22      Q.    So, for example, if somebody's late

Page 29

1   in traffic one day and they get home 15 minutes
2   later, it doesn't automatically follow --
3   15 minutes beyond the 10 hours, it doesn't
4   automatically follow that the au pair has to be
5   removed from their placement?
6       A.    Correct.
7       Q.    So -- but there are situations, you
8   said, where now the au pair does have to be
9   removed; is that right?
10      A.    Correct.
11      Q.    So my question was, Is it fair to
12  say that a certain amount of judgment is
13  required to determine when you're in a situation
14  where maybe it's an innocent mistake or when
15  you're in a situation where there's a -- a
16  larger problem requiring an exit?
17      A.    I think there has to be a pattern,
18  and there has to be the intent on a -- on behalf
19  of whether it's the au pair or the host family.
20  The au pair could miss -- forget to wake up one
21  morning or not come in to begin working with the
22  children, or she could miss curfew.

MAGNA
LEGAL SERVICES

Page 30

1        There could be a host of issues that
2    arise. We're dealing with humans. It's messy.
3    So the best thing that we can do, not living in
4    the home, is, when an issue arises, is to go
5    into the home, conduct a mediation and
6    facilitate their communication to see the
7    resolutions that we can -- that we can come up
8    with to ensure that it's within the guidelines,
9    and -- and basically that they -- they can move
10   forward.
11       Things that are outside the
12   guidelines, that they're doing everything within
13   the guidelines but they're unhappy because they
14   don't like the 10:00 curfew or there's things
15   outside of that, is also something that we're --
16   we're working to enforce -- or to facilitate,
17   rather.
18       Q.    Are you drawing a distinction
19   between "facilitate" and "enforce"?
20       A.    Yes.
21       Q.    What distinction are you drawing?
22       A.    The intent is to facilitate the

Page 31

1    conversation, the communication between the
2    family and the host family to resolve, say that
3    I can't be here every day to help you with that.
4    So you have to -- you have to create your
5    communication -- line of communication with one
6    another to be able to handle anything that comes
7    up in the placement.
8        Enforce --
9        Q.    And, ultimately -- I'm sorry.
10       A.    Go ahead.
11       Q.    Go ahead.
12       A.    Enforce would be more of once they
13   cannot or it's outside of it, then that would be
14   a different role that we would play.
15       Q.    What role would you play in that
16   circumstance?
17       A.    In determining the suitability of
18   the applicant, whether the host family or the
19   cultural exchange participant, and that could be
20   that we don't find that that would be a suitable
21   placement for either and would move forward with
22   the exit.

Page 32

1        Q.    A few answers ago, you said that
2    there needs to be a pattern and an intent.
3        I'm not -- what did you mean by --
4    let me read you what you said --
5        A.    Um-hum.
6        Q.    -- "there has to be a pattern, and
7    there has to be the intent on behalf of whether
8    it's the au pair or the host family." And then
9    your answer continued for some time.
10       What did you mean by an "intent"?
11       Do you remember the question?
12       A.    Right.
13       As far as the host mom that's coming
14   home late in traffic, and intent would be more
15   that that -- it is a pattern, that it's
16   happening more than once; and that there is no
17   backup, there's no support to prevent that from
18   happening in the future.
19       Q.    Okay. Thank you. That's helpful.
20       And who makes the determination that
21   there has been a -- a pattern and what you
22   called an intent?

Page 33

1        A.    Our documentations. The au pair has
2    called us again and said, You know, the host mom
3    was late again, and I missed getting to my
4    class, then that become -- becomes a pattern.
5        Q.    And who makes the judgment that
6    there is now a pattern?
7        A.    We document anything that's outside
8    the guidelines, and the area director would then
9    work with regional manager to determine what
10   the next steps could be.
11       Q.    When you were describing your
12   responsibilities as a regional manager, you
13   mentioned resolution of escalated concerns.
14       Is that different from what we've
15   just been discussing, or is that the same?
16       A.    It's -- it's the same; it's the
17   added level of support and working as a team
18   with the area director.
19       Q.    I take it there are concerns that
20   get resolved outside of the question of whether
21   there needs to be an exit interview.
22       A.    Correct. Um-hum.

PLAINTIFFS' RESP. APP.0004686

MAGNA
LEGAL SERVICES

Page 210

1　discrepancy between the -- or friction.  This is
2　one area that does cause some concern, because
3　when you're looking at these discussion groups
4　and you're getting this information that we're
5　going through, we have no idea if any of our own
6　au pairs are there from each sponsor.
7　　　We're not -- so getting this
8　information is a relatively small subset, and it
9　may not have even included au pairs within our
10　agency.
11　　　So getting the data and how that
12　pertains to our particular program, our
13　particular agency, is a challenge.
14　　Q.　What have you done to try and
15　address that challenge?
16　　A.　Well, definitely, we're always
17　looking to improve the predeparture as well as
18　our -- our orientation when they first arrive.
19　And that's keeping current with changing from
20　texting while driving, to reinforcing the
21　standard, drinking and driving, anything that
22　seems to be -- definitely social media is a huge

Page 211

1　impact in change in the au pair population, as
2　well as the whole population, and how we can
3　help them to understand when it's appropriate to
4　use, when it's not.
5　　　Just any changes that -- that we
6　feel we're seeing problems within the field or
7　we see as a change in just the culture, and
8　we're incorporating to help set the au pairs up
9　for success before arriving to the host family.
10　　Q.　And you mentioned "friction."
11　　　Was that friction with the
12　Department of State or between -- or amongst the
13　sponsors?
14　　A.　Well, I think it was more toward the
15　Department of State, that -- you know, we -- we
16　get a lot of information, and yet we don't know
17　how many au pairs were there; were there only
18　two au pairs and we're getting, you know, this,
19　or how many -- or were any from our agency; were
20　they the Swedish au pairs that came and we're
21　getting that; or was it a cross-section of
22　really the different demographics that we have

Page 212

1　throughout the world that attended.
2　　　So that is a bit skewed.
3　　Q.　So there's a concern that these
4　suggestions might be based on an unreliable
5　sample?
6　　A.　Not a adequate sample.
7　　Q.　An inadequate sample.  Okay.
8　　　Did sponsors express that view to
9　the Department of State during this meeting?
10　　A.　Yes, that was brought up, and I
11　don't recall who said it.  But it was a
12　discussion of how many -- can we find out, you
13　know, how many of ours attended and -- but they
14　protect the privacy of those that attended and
15　tell them that their feedback is not going to be
16　shared with their -- their sponsor, because
17　that's a concern.
18　　　So we are unable to get that
19　information.
20　　Q.　Was there discussion among the
21　sponsors -- not among the sponsors.
22　　　Let me change that.

Page 213

1　　　Was there discussion at that meeting
2　about what best practices should be?
3　　A.　In terms of what, specifically?
4　　Q.　In terms of predeparture
5　orientation.
6　　A.　And I think that's what it's
7　bulleted, was discussed to . . .
8　　Q.　And the sponsors contributed to that
9　discussion of what best practices for
10　predeparture orientation would be?
11　　A.　There may have been some discussion.
12　I -- I can't recall any specifics to that
13　discussion.
14　　Q.　Go to 534.  534's heading is
15　Concerns about money and work conditions.  And
16　the first bullet point is Stipend is too low;
17　195.75 doesn't pay for much.
18　　　Was there a discussion of this
19　bullet at the meeting?
20　　A.　Not to my recollection.
21　　Q.　Do you recall anybody saying
22　anything about this bullet?

MAGNA
LEGAL SERVICES

Page 214

1    A.    I do not recall any discussion on
2 that -- on that particular bullet.
3    Q.    Do you have any understanding of why
4 this bullet was included, if it wasn't
5 discussed?
6    A.    Well, it was discussed by the
7 Department. I mean, they brought this up as one
8 of the concerns that was voiced with the
9 au pairs in one of their -- their discussions
10 groups.
11    Q.    I see.
12          Well, what did the Department say
13 about this bullet, "this" being -- I think we
14 both know which Department we mean, but just for
15 the record, what did the Department of State say
16 about this bullet?
17    A.    I think they just reviewed it.
18 And -- and it's very surprising because that's
19 not the feedback that we get in our surveys, but
20 that was a discussion. So it was in a different
21 forum, different format, so the Department of
22 State is just relaying that that was a concern

Page 215

1 that came from one of these meetings.
2    Q.    What did they suggest the remedy was
3 for this concern?
4    A.    They didn't. They're just -- they
5 bulleted out the different concerns.
6    Q.    Did the fact that they raised this
7 as a -- as a concern suggest to you that they
8 thought au pairs could be paid more than 195.75?
9    A.    My perception of any of these is
10 that the Department is ask -- Department of
11 State is asking for the feedback with -- our
12 hopeful intent would be that there could be a
13 change in the directives that would give
14 and there were guidelines; we go back to
15 education or any of the concerns that au pairs
16 are having, that the -- the Department of State
17 is going to take this into consideration when
18 they update their guidelines.
19    Q.    I see.
20          Have you been involved in any
21 conversations either with the Department of
22 State or with -- actually, have you been

Page 216

1 involved in any discussion -- conversations with
2 anybody, other than counsel, as to whether the
3 stipend should be increased?
4    A.    No.
5    Q.    Are you aware of any such
6 conversations that you've not been involved
7 with?
8    A.    No. It's never been up to us. It's
9 always been something that we've had the
10 information provided by the Department of State
11 and we've adhered to throughout the years. It's
12 never been a discussion amongst sponsors.
13    Q.    What about with the Department of
14 State? If the Department of State is -- what
15 about with the Department of State? Did you --
16 have you -- are you aware of any discussions
17 with the Department of State about whether the
18 stipend should be increased?
19    A.    No.
20    Q.    What does -- what does it mean, Need
21 more money for food or the board should be
22 guaranteed?

Page 217

1          I don't understand that bullet.
2    A.    I don't either. And there was
3 actually a few things that I recall having a
4 question, because I think they were just taking
5 these bullet points and putting it down.
6          My interpretation is that a lot of
7 au pairs say that there's no food in the house
8 because it doesn't look like anything they've
9 eaten back home. Our diet is very different
10 here, processed food, and what they're --
11 they're used to.
12          So I think there's -- just
13 generally, that's a complaint that au pairs
14 have, and they struggle with, when transitioning
15 into American homes, is the diet.
16          So I think when they're asking for
17 more food, it's for the foods that they are
18 accustomed to and used to eating back home.
19    Q.    What about the next bullet, Using
20 part of stipend to help feed children?
21    A.    Going back to your previous
22 question, it's -- well, that would be an issue;

MAGNA
LEGAL SERVICES

Page 218

```
1    that would be a problem; that would be
2    something -- if an au pair was saying, I'm
3    having to use my stipend to go get a Happy Meal
4    for the child, then that would be a discussion
5    they should be having with the family, with
6    the -- with the area director, and it would
7    be -- that -- that's not expected.
8          So it goes back to the sampling.  I
9    don't know, is it one au pair from this one
10   obscure agency?  I -- I don't have any clue
11   where this information comes from; unlike in the
12   Department of State survey, we can say
13   Au Pair Sally Smith said this, and we can follow
14   up on it and work for resolution.
15         In something like this, it just
16   seems very odd, because that's not an
17   expectation, that's not something that we would
18   approve and encourage.  But, obviously, if this
19   was a concern brought to us, that we would -- we
20   would help them to correct, because that's
21   obviously not part of the program.
22     Q.    If you could go to 538, please.
```

Page 219

```
1          Do you know what SWOT/C means at the
2    top of the page?
3      A.    I do now.  Strengths, weaknesses,
4    opportunities and threats and challenges, just
5    in looking at the -- at the document.
6      Q.    That seems a reasonable assumption.
7          Do you recall any discussion about
8    this slide?
9      A.    I really can't even read the
10   threats.
11         I -- I recognize this, and I do
12   remember this being presented, but I don't
13   remember a discussion that ensued with this
14   particular slide.
15     Q.    Was this about the SWOT, the
16   strengths, weaknesses, opportunities and
17   threats, facing sponsors or facing au pairs or
18   facing the Department of State?
19         What's the subject of the analysis?
20     A.    Have we switched?  Hang on a second.
21   Let's see.
22         All right.  All right.  So this
```

Page 220

```
1    looks like it would be the same presenter that
2    is now taking the information gathered at these
3    meetings, at these discussions, and looking at
4    the strengths of the information with our
5    program, our opportunities, filling in the
6    information discussed into these four
7    categories.
8      Q.    So it's very difficult to read, but
9    under, Threats, challenges --
10     A.    Yeah.
11     Q.    -- so the third bullet down is,
12   Competitors doing anything different.
13         Do you recall any discussion about
14   that?
15     A.    I don't, but I'm trying to
16   understand the context of this.
17         One second.
18         (Whereupon, the witness reviews the
19          material provided.)
20         (The witness mumbles under her
21          breath while reviewing the material
22          provided.)
```

Page 221

```
1          THE WITNESS:  It does seem like
2    this changed -- like this is the end, and
3    this would be a new -- if this was
4    what -- what was in closing, it looks
5    like what the Department of State is
6    doing, is just looking at -- this is not
7    so much specific to the discussions as I
8    always thought, but in looking at the
9    threats, here is more of a discussion of
10   all this taken in, and all the
11   information that we have.
12         It's more of thinking points, in
13   my opinion, because there was no
14   resolution.  Nothing was presented as an
15   answer to any of these question marks.
16   It was presented as a question.
17         And in terms of the one you're
18   saying for competitors doing anything
19   different, I don't recall any discussion
20   on that.  I'm not really sure as to what
21   that would -- if that's to be helpful,
22   there are -- any of the competitors doing
```

MAGNA
LEGAL SERVICES

Case No. 1:14-cv-03074-CMA-KMT Document 959-24 filed 03/30/18 USDC Colorado pg 172 of 311

# Exhibit 419

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

--------------------------------X

JOHANA PAOLA BELTRAN, et al.,        )

        Plaintiffs,        ) Civil Case No.

  v.        ) 14-cv-03074-CMA-KMT

INTEREXCHANGE INC., et al.,        )

        Defendants.        )

--------------------------------X


VIDEOTAPED DEPOSITION OF STANLEY S. COLVIN

Tuesday, July 25, 2017; 9:27 a.m.


Job No.:   328379

Pgs.   1 - 235

Reported by:  Cindy L. Sebo, RMR, CRR, RPR, CSR,

CCR, CLR, RSA, LiveDeposition Authorized Reporter


MAGNA LEGAL SERVICES
(866) 624-6221
www.MagnaLS.com

PLAINTIFFS' RESP. APP.0004691

MAGNA
LEGAL SERVICES

**Page 2**

1          Videotaped deposition of STANLEY
2    S. COLVIN taken by Counsel for Plaintiffs, held
3    at the law offices of Boies Schiller Flexner LLP,
4    1401 New York Avenue, Northwest, Washington, D.C.
5    20005, before Cindy L. Sebo, Registered Merit
6    Reporter, Certified Real-Time Reporter,
7    Registered Professional Reporter, Certified
8    Court Reporter, Certified Shorthand Reporter,
9    Real-Time Systems Administrator, LiveDeposition
10   Authorized Reporter, and Notary Public in and
11   for the District of Columbia, beginning at
12   approximately 9:27 a.m., when were present on
13   behalf of the respective parties:
14
15
16
17
18
19
20
21
22

**Page 3**

1        A P P E A R A N C E S:
2
3    Attorney for Plaintiffs:
4      BOIES SCHILLER FLEXNER LLP
5      DAWN L. SMALLS, ESQUIRE
6      575 Lexington Avenue
7      New York, New York 10022
8      212.446.2300
9      dsmalls@bsfllp.com
10
11   Attorney for Defendant Cultural Care, Inc.:
       CHOATE, HALL & STEWART LLP
12
       JOAN A. LUKEY, ESQUIRE
13
       Two International Place
14
       Boston, Massachusetts 02110
15
       617.248.4949
16
       joan.lukey@choate.com
17
18
19
20
21
22

**Page 4**

1      A P P E A R A N C E S (Continued):
2
3    Attorney for Defendant AuPairCare Inc.:
4      GORDON REES SCULLY MANSUKHANI, LLP
5      THOMAS B. QUINN, ESQUIRE
6      555 Seventeenth Street
7      Suite 3400
8      Denver, Colorado 80202
9      303.534.5154
10     tquinn@grsm.com
11
12   Attorney for Defendant InterExchange, Inc.:
13     SHERMAN & HOWARD L.L.C
14     BROOKE A. COLAIZZI, ESQUIRE (Via telephone)
15     633 Seventeenth Street, Suite 3000
16     Denver, Colorado 80202
17     303.299.8471
18     bcolaizzi@shermanhoward.com
19
20
21
22

**Page 5**

1      A P P E A R A N C E S (Continued):
2
3    Attorney for Defendant GreatAuPair, LLC:
4      ARMSTRONG TEASDALE LLP
5      MARTIN ESTEVAO, ESQUIRE (Via telephone)
6      4643 South Ulster Street, Suite 800
7      Denver, Colorado 80237
8      720.722.7196
9      mestevao@armstrongteasdale.com
10
11
12   Attorney for Defendants Go Au Pair, Agent Au Pair,
13   Au Pair International:
14     WHEELER TRIGG O'DONNELL LLP
15     KATHRYN A. REILLY, ESQUIRE (Via telephone)
16     370 Seventeenth Street, Suite 4500
17     Denver, Colorado 80202
18     303.244.1800
19     reilly@wtotrial.com
20
21
22

**MAGNA** ▶
**LEGAL SERVICES**

| Page 6 | |
|---|---|
| 1 | A P P E A R A N C E S (Continued): |
| 2 | |
| 3 | Attorney for Defendants APEX and 20/20: |
| 4 | NIXON SHEFRIN HENSEN OGBURN, P.C. |
| 5 | LAWRENCE D. STONE, ESQUIRE (Via telephone) |
| 6 | 5619 DTC Parkway, Suite 1200 |
| 7 | Greenwood Village, Colorado 80111 |
| 8 | 303.874.3408 |
| 9 | lstone@nixonshefrin.com |
| 10 | |
| 11 | Attorney for Defendant Au Pair Foundation: |
| 12 | FISHER & PHILLIPS LLP |
| 13 | SUSAN SCHAECHER, ESQUIRE (Via telephone) |
| 14 | 1801 California Street, Suite 2700 |
| 15 | Denver, Colorado 80202 |
| 16 | 303.218.3676 |
| 17 | sschaecher@fisherphillips.com |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |

| Page 7 | |
|---|---|
| 1 | A P P E A R A N C E S (Continued): |
| 2 | |
| 3 | Attorney for Defendant Expert Group International |
| 4 | Inc.  d/b/a Expert AuPair: |
| 5 | LAW OFFICES OF BOGDAN ENICA |
| 6 | BOGDAN ENICA, ESQUIRE (Via telephone) |
| 7 | 111 Second Avenue, Northeast, Suite 204 |
| 8 | Saint Petersburg, Florida 33701 |
| 9 | 727.388.3472 |
| 10 | bogdane@hotmail.com |
| 11 | |
| 12 | Attorney for Defendant American Institute for |
| 13 | Foreign Study-Au Pair in America: |
| 14 | PUTNEY, TWOMBLY, HALL & HIRSON LLP |
| 15 | STEPHEN J. MACRI, ESQUIRE (Via telephone) |
| 16 | 521 Fifth Avenue |
| 17 | New York, New York 10175 |
| 18 | 212.682.5435 |
| 19 | smacri@putneylaw.com |
| 20 | |
| 21 | |
| 22 | ALSO PRESENT: |

| Page 8 | |
|---|---|
| 1 | INDEX OF EXAMINATION |
| 2 | |
| 3 | STANLEY S. COLVIN |
| 4 | EXAMINATION  BY                        PAGE |
| 5 | Ms. Smalls                    15, 148 |
| 6 | |
| 7 | - - - |
| 8 | INDEX TO EXHIBITS |
| 9 | - - - |
| 10 | (Exhibits Attached to the Original Transcript) |
| 11 | COLVIN |
| | EXHIBIT NUMBER        DESCRIPTION        PAGE |
| 12 | |
| | Number 1        Declaration of Stanley Colvin, |
| 13 | |
| | Bates stamped COLVIN_00374 |
| 14 | |
| | through COLVIN_00390        17 |
| 15 | |
| 16 | Number 2        22 CFR, Section 62.3, Sponsor |
| 17 | eligibility        28 |
| 18 | |
| | Number 3        22 CFR, Section 62.31, Au pairs  37 |
| 19 | |
| 20 | Number 4        LinkedIn profile of Stanley Colvin, |
| 21 | Bates stamped COLVIN_00260 through |
| 22 | COLVIN_00264        41 |

| Page 9 | |
|---|---|
| 1 | - - - |
| 2 | INDEX TO EXHIBITS |
| 3 | - - - |
| 4 | COLVIN |
| | EXHIBIT NUMBER        DESCRIPTION        PAGE |
| 5 | |
| 6 | Number 5        22 CFR, Section 62.5, Designation |
| 7 | application procedure        97 |
| 8 | |
| 9 | Number 6        22 CFR, Section 62.6, Designation 99 |
| 10 | |
| | Number 7        22 CFR, Section 62.9, General |
| 11 | |
| | obligations of sponsors        99 |
| 12 | |
| 13 | Number 8        22 CFR, Section 62.12, Control |
| 14 | of Forms DS-2019        99 |
| 15 | |
| 16 | Number 9        22 CFR, Section 62.15, Reporting |
| 17 | requirements        100 |
| 18 | |
| | Number 10        E-mail, McCarry to multiple |
| 19 | |
| | recipients, March 4, 2009, Bates |
| 20 | |
| | stamped InterExchange0036619 |
| 21 | |
| | through InterExchange0036620        102 |
| 22 | - - - |

PLAINTIFFS' RESP. APP.0004693

MAGNA
LEGAL SERVICES

| | |
|---|---|
| **Page 98** | **Page 100** |

**Page 98**

1    Right?  And 8 now?
2        THE WITNESS:  I have a 4.  I'm
3    sorry.
4        MS. LUKEY:  Could you be sure to
5    tell him which numbers you want him to
6    look at?  Because I'm not sure he's got
7    the ones you just handed --
8        MS. SMALLS:  I'm making sure -- so
9    he said that he needed Subpart A, so I'm
10   giving all the components of Subpart A.
11   And so he can refer to them -- we should
12   mark them all as exhibits, but I want to
13   make sure that he has an opportunity to
14   review each of these so he feels he has
15   the information necessary to answer the
16   question that I'm asking him.
17       So have you marked each of
18   these -- this is how -- 62.5 is Number 5;
19   I have 62.6 as 6; 62.9 as 7; 62.12 as 8.
20       (Sotto voce comments by counsel.)
21
22

**Page 99**

1        - - -
2        (Colvin Deposition Exhibit Number 6,
3        22 CFR, Section 62.6, Designation,
4        marked for identification, as of
5        this date.)
6        - - -
7        (Sotto voce comments by counsel.)
8        MS. SMALLS:  Seven.
9        - - -
10       (Colvin Deposition Exhibit Number 7,
11       22 CFR, Section 62.9, General
12       obligations of sponsors, marked for
13       identification, as of this date.)
14       - - -
15       MS. SMALLS:  Eight.
16       - - -
17       (Colvin Deposition Exhibit Number 8,
18       22 CFR, Section 62.12, Control of
19       Forms DS-2019, marked for
20       identification, as of this date.)
21       - - -
22       MS. SMALLS:  This is 9.

**Page 100**

1        - - -
2        (Colvin Deposition Exhibit Number 9,
3        22 CFR, Section 62.15, Reporting
4        requirements, marked for
5        identification, as of this date.)
6        - - -
7        MS. LUKEY:  Dawn, I don't think
8    you gave us 62.1(b), which, I believe,
9    has the section that you're asking him
10   about.
11   BY MS. SMALLS:
12       Q.    Have you reviewed --
13       A.    Do you have Section 62.2?
14       Q.    62.2?
15       A.    That's the Definitions section.
16       Q.    All right.  Let's pause on that.  I
17   will get you -- is it 62.2(b)?  Is that the
18   relevant section that you need?
19       A.    I -- I don't know, because the --
20       Q.    But it's the Definitions section?
21       A.    It's the -- it's the Definitions
22   section --

**Page 101**

1        Q.    Okay.
2        A.    -- and the -- as I recall, Subpart A
3    has 16 or so subparagraphs.
4        MS. LUKEY:  And I had asked you
5    about 62.1(b).  Unfortunately, my laptop
6    is not working, so I can't pull anything
7    up.
8        THE WITNESS:  And this is -- I'm
9    trying to recall --
10   BY MS. SMALLS:
11       Q.    Well, let's pause on this --
12       A.    -- yeah, If I recall --
13       Q.    -- we'll -- we'll get the full --
14       A.    -- yeah, if I recall correctly --
15       Q.    -- just so we --
16       A.    -- 62.1 is a statement of purpose,
17   and 62.2 is a definitional section.
18       Q.    Well, when we break for lunch,
19   we'll --
20       A.    Okay.
21       Q.    -- get the full section so that
22   we're not dealing with it in a piecemeal way.

PLAINTIFFS' RESP. APP.0004694

**MAGNA** ▶
**LEGAL SERVICES**

| Page 102 |
| --- |

1      MS. SMALLS:  I think this is 10?
2      MS. LUKEY:  I have an 8.  I don't
3  think I have a 9.
4      THE WITNESS:  I have an 8 and 9.
5      MS. LUKEY:  Maybe --
6      MS. SMALLS:  62.15 is 9.
7      MS. LUKEY:  Okay.  I just hadn't
8  marked it.  Thank you.
9                  - - -
10      (Colvin Deposition Exhibit Number
11      10, E-mail, Bates stamped
12      InterExchange0036619 through
13      InterExchange0036620, marked for
14      identification, as of this date.)
15                  - - -
16  BY MS. SMALLS:
17      Q.   Can you take a moment to review this
18  document?
19      A.   Which one?
20      Q.   Ten.
21      A.   Ten.
22      (Whereupon, the witness reviews the

| Page 103 |
| --- |

1      material provided.)
2      THE WITNESS:  Yes, ma'am.
3  BY MS. SMALLS:
4      Q.   Can you refer to the section where
5  it says, Deputy Assistant Secretary Colvin?
6      In that paragraph -- and this is an
7  e-mail from Michael McCarry at the Alliance, it
8  looks like, to a number of visa sponsors, and he
9  is accounting a meeting with you in which he
10  says that you said that you urged sponsors to,
11  quote, reign in their foreign partners.
12      Do you have any recollection of that
13  conversation or saying that?
14      A.   First, I would correct your
15  characterization of the document --
16      Q.   Okay.
17      A.   -- it is a -- purports to be an
18  e-mail from Mike McCarry, who would have been
19  the Executive Director of the Alliance, to what
20  appears to be his membership.  Okay?
21      It is a summary of a meeting held by
22  the State Department for designated program

| Page 104 |
| --- |

1  sponsors, not all, only Summer Work Travel --
2  Summer Work Travel Program participants.
3  Present at the meeting is the Deputy Assistant
4  Secretary for Consular Affairs; also Abby Rupp
5  from Consular Affairs; myself; Ida Abell, who is
6  the program officer for Summer Work Travel
7  programs.
8      And the -- I have no immediate
9  recollection of the meeting at all, but, you
10  know, it -- it is what -- it is what it is.  I
11  have no basis to contest the authenticity of the
12  document, but I can certainly point out that it
13  has nothing do with the Au Pair Program.
14                  - - -
15      (Colvin Deposition Exhibit Number
16      11, Consultant Agreement, Bates
17      stamped DEF-COLVIN000001 through
18      DEF-COLVIN000012, marked for
19      identification, as of this date.)
20                  - - -
21  BY MS. SMALLS:
22      Q.   Do you recognize this document?

| Page 105 |
| --- |

1      A.   It appears to be my consulting
2  agreement.
3      Q.   Do you want to take a moment to
4  review it?
5      A.   I believe it's mine, yes, ma'am.
6      Q.   Okay.  In the consultant agreement,
7  it provides that you will be paid $375 an hour;
8  is that correct?
9      A.   Yes, ma'am.
10      Q.   Is that the standard rate that you
11  charge your other clients?
12      A.   Yes, ma'am, it is.
13      Q.   Do you have a uniform or fixed rate
14  that you charge your other clients?
15      A.   I charge between 375 and $500 an
16  hour.
17      Q.   Okay.  But not less than 375?
18      A.   Never.
19      Q.   Okay.  This consultant agreement is
20  a consultant agreement for investigation,
21  document review, studies and research; is that
22  correct?

PLAINTIFFS' RESP. APP.0004695

MAGNA
LEGAL SERVICES

| Page 106 | Page 108 |
|---|---|

**Page 106**

1   A.   Yes, ma'am.

2   Q.   And it also provides for the

3 preparation of a written report; is that

4 correct?

5   A.   Yes, ma'am.

6   Q.   Is the declaration that you prepared

7 encompassed by this consulting agreement?

8   A.   I believe it is, yes, ma'am.

9   Q.   Is it the written report that's

10 referenced here?

11   A.   I've never given a written report.

12   THE VIDEOGRAPHER:  Sir, I think

13 your mic -- can you do me a favor and put

14 it toward your lapel instead?

15   Maybe your left one is better.

16 Your left.

17   MS. LUKEY:  I don't think it will

18 clip that way.  It will be upside down.

19   THE WITNESS:  Can you hear me now?

20   THE VIDEOGRAPHER:  Okay, that's

21 fine.  We're done.

22   THE WITNESS:  I'm sorry --

**Page 108**

1 specifically for AuPairCare separate from

2 this.

3 BY MS. SMALLS:

4   Q.   Have you ever heard of AuPairCare?

5   A.   Yes, I have.

6   Q.   But you're -- you haven't done any

7 individual work for --

8   A.   No --

9   Q.   -- AuPairCare?

10   A.   -- no, I have not.

11   Q.   Okay.  But you have heard of

12 AuPairCare?

13   A.   Yes, I have.

14   Q.   Okay.  And for this individual

15 sponsor, have you done advocacy on their behalf?

16   A.   No.

17   Q.   What -- what was the substance of

18 that work that you did for the unnamed --

19   A.   I -- I sent --

20   Q.   -- au pair sponsor?

21   A.   -- I sent a letter to the New York

22 Department of Labor.

**Page 107**

1   THE VIDEOGRAPHER:  No problem.

2   THE WITNESS:  -- I'm sorry.

3 BY MS. SMALLS:

4   Q.   In addition to your work as a

5 consultant in the Beltran matter, do you do any

6 work for any of the sponsors individually?

7   A.   Any au pair sponsors?

8   Q.   Any au pair sponsors, individually.

9   A.   I have done work for one au pair

10 sponsor.

11   Q.   Just one?

12   A.   Yes.

13   Q.   Okay.  When did you first begin your

14 work for AuPairCare?

15   A.   For AuPairCare?

16   EurAupair?

17   Q.   No; AuPairCare.

18   A.   Which one is that?

19   Q.   I mean, they're called AuPairCare.

20   MS. LUKEY:  Well, I suppose I have

21 to object on foundation.  He apparently

22 doesn't believe that he's done work

**Page 109**

1   Q.   Okay.

2   - - -

3   (Colvin Deposition Exhibit Number

4   12, Letter, Colvin to Alvarado,

5   March 28, 2017, Bates stamped

6   COLVIN_00370 through COLVIN_00373,

7   marked for identification, as of

8   this date.)

9   - - -

10 BY MS. SMALLS:

11   Q.   Is this the letter that you're

12 referring to?

13   A.   Yes.

14   Q.   For the individual unnamed au pair

15 sponsor --

16   A.   Yes.

17   Q.   -- well, let me ask, is -- is that

18 au pair sponsor a Defendant in this lawsuit?

19   A.   Yes.

20   Q.   Okay.  So did your work for the

21 individual au pair sponsor come before, after or

22 during you began your consultancy under the --

**MAGNA**
**LEGAL SERVICES**

Case No. 1:14-cv-03074-CMA-KMT Document 959-24 filed 03/30/18 USDC Colorado pg
180 of 310

# Exhibit 420

Case 1:14-cv-03074-CMA-KMT Document 959-24 filed 03/30/18 USDC Colorado pg 1
Case No. 1:14-cv-03074-CMA-KMT Document 1259-24 filed 03/30/18 USDC Colorado pg
181 of 311

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

- - - - - - - - - - - - - - - - - - - - - - x

JOHANA PAOLA BELTRAN, et al.,

              Plaintiffs,

   V.             Civil Case No. 14-cv-03074-CMA-KMT

INTEREXCHANGE, INC., et al.,

              Defendants.

- - - - - - - - - - - - - - - - - - - - - - x

VIDEOTAPED DEPOSITION OF

ELLEN B. HOGGARD


August 10, 2017

9:35 a.m.


Fisher & Phillips LLP

200 State Street

Boston, Massachusetts

Reporter:  Rosemary F. Grogan, RPR, CSR No. 112993


www.MagnaLS.com

PLAINTIFFS' RESP. APP.0004698

MAGNA
LEGAL SERVICES

| | Page 2 |
|---|---|
| 1 | APPEARANCES |
| 2 | On Behalf of the Plaintiffs: |
| 3 | By: Juan P. Valdivieso, Esquire |
| 4 | BOIES SCHILLER FLEXNER LLP |
| 5 | 1999 Harrison Street, Suite 900 |
| 6 | Oakland, CA 94612 |
| 7 | 510-874-1000 |
| 8 | jvaldivieso@bsfllp.com |
| 9 | |
| 10 | On Behalf of the Defendant - CULTURAL CARE: |
| 11 | By: Lyndsey M. Kruzer, Esquire |
| 12 | CHOATE, HALL & STEWART LLP |
| 13 | Two International Place |
| 14 | Boston, MA 02110 |
| 15 | 617-248-5000 |
| 16 | lkruzer@choate.com |
| 17 | |
| 18 | On Behalf of the Deponent - HOGGARD: |
| 19 | By: Susan M. Schaecher, Esquire |
| 20 | FISHER & PHILLIPS LLP |
| 21 | 200 State Street |
| 22 | Boston, MA 02109 |
| 23 | 617-722-0044 |
| 24 | sschaecher@fisherphillips.com |
| 25 | |

| | Page 4 |
|---|---|
| 1 | INDEX OF EXAMINATION |
| 2 | WITNESS: ELLEN B. HOGGARD |
| 3 | EXAMINATION          PAGE NO. |
| 4 | By Mr. Valdivieso          7/189 |
| 5 | By Ms. Schaecher          188 |
| 6 | |
| 7 | INDEX TO EXHIBITS |
| 8 | NUMBER          DESCRIPTION          PAGE NO. |
| 9 | Exhibit 1    Exclusive Interview with Ellen    47 |
| 10 | Hoggard Au Pair Clearinghouse |
| 11 | Exhibit 2    Web Pages from Au Pair Foundation  55 |
| 12 | Exhibit 3    E-mail String 10/31/13          60 |
| 13 | Bates APF000289 - 291 |
| 14 | Exhibit 4    E-mail 2/3/14          68 |
| 15 | Bates APC 003252 |
| 16 | Exhibit 5    State of Illinois Office of     81 |
| 17 | Secretary of State File Records |
| 18 | Exhibit 6    Ellen Hoggard, President STS    91 |
| 19 | Foundation Pages from LinkedIn |
| 20 | Exhibit 7    E-mail String 6/8/11          96 |
| 21 | Bates InterExchange0033912 |
| 22 | Exhibit 8    Alliance Board Meeting 7/28/12   99 |
| 23 | Bates InterExchange0005155 - 162 |
| 24 | Exhibit 9    E-mail 10/15/14          106 |
| 25 | Bates EAP0003223 - 24 |

| | Page 3 |
|---|---|
| 1 | APPEARANCES (Cont.) |
| 2 | On Behalf of AUPAIRCARE: |
| | By: Peggy E. Kozal, Esquire (Via phone) |
| 3 | GORDON & REES |
| | 555 17th Street, Suite 3400 |
| 4 | Denver, CO 80202 |
| | 303-534-5160 |
| 5 | pkozal@gordonrees.com |
| 6 | |
| 7 | On Behalf of PROAUPAIR, APEX PROFESSIONAL EXCHANGE |
| | and 20/20 CARE EXCHANGE d/b/a |
| 8 | INTERNATIONAL AUPAIR EXCHANGE: |
| | By: Kathleen E. Craigmile, Esquire (Via phone) |
| 9 | NIXON SHEFRIN HENSEN OGBURN P.C. |
| | 5619 DTC Parkway, Suite 1200 |
| 10 | Greenwood Village, CO 80111 |
| | 303-773-3500 |
| 11 | kcraigmile@nixonshefrin.com |
| 12 | |
| 13 | On Behalf of INTEREXCHANGE: |
| | By: Alyssa L. Levy, Esquire (Via phone) |
| 14 | SHERMAN & HOWARD LLC |
| | 633 Seventeenth Street, Suite 3000 |
| 15 | Denver, CO 80202 |
| | 303-299-8302 |
| 16 | alevy@shermanhoward.com |
| 17 | |
| 18 | Also present: |
| 19 | Luc-Bernard Val, Videographer |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

| | Page 5 |
|---|---|
| 1 | INDEX TO EXHIBITS |
| 2 | NUMBER          DESCRIPTION          PAGE NO. |
| 3 | Exhibit 10    Alliance Memorandum 10/10/14    109 |
| 4 | Bates InterExchange0003040 - 41 |
| 5 | Exhibit 11    E-mail 10/27/14          114 |
| 6 | Bates InterExchange0002949 |
| 7 | Exhibit 12    E-mail 4/22/15 and Attachment    118 |
| 8 | APEX-20/20 10273 - 75 |
| 9 | Exhibit 13    E-mail String 12/22/15          143 |
| 10 | APF000390 - 93 |
| 11 | Exhibit 14    E-mail String 1/20/16          150 |
| 12 | Bates GAP00001446 - 48 |
| 13 | Exhibit 15    E-mail String 1/29/16          156 |
| 14 | Bates APEX-20/20 10084 - 85 |
| 15 | Exhibit 16    E-mail String 2/5/16          161 |
| 16 | Bates GAP00001449 - 50 |
| 17 | Exhibit 17    E-mail String 2/19/16          163 |
| 18 | Bates ExpertAuPair028121 - 22 |
| 19 | Exhibit 18    E-mail String 3/21/13          177 |
| 20 | Bates APF000268 - 70 |
| 21 | Exhibit 19    E-mail 5/13/15 and Attachment    183 |
| 22 | APF000408 - (Cut off) |
| 23 | |
| 24 | (Original exhibits attached to original transcript and |
| 25 | retained by Boies Schiller & Flexner) |

**Page 50**

1  by Au Pair Clearinghouse?
2  A. Yes.
3  Q. Do you see where it says "Au Pair Industry
4  Trends"?
5  A. Au Pair Industry Trends?
6  (Witness reviewing)
7  Q. It's towards the -- to the -- almost at the
8  halfway point?
9  A. Yep, I see it. Mm-hmm.
10  Q. And there's a question from Edina asking you
11  how the au pair program changed over the past 5 to 10
12  years.
13  Do you see that?
14  A. Mm-hmm.
15  Q. And then your response, it says in the third
16  sentence: "There has been a huge demand in American
17  families' need for flexible, affordable childcare."
18  A. Mm-hmm.
19  Q. Do you see that?
20  A. Yes.
21  Q. Do you believe that that statement accurately
22  reflected what you told Ms. Stone during your interview?
23  A. Yes.
24  Q. What is your basis -- what was your basis for
25  making that statement at the time?

**Page 51**

1  A. My basis at the time is I'm a mother of two
2  daughters and I knew many women -- families that were
3  really struggling with the costs of childcare options.
4  Q. Does Au Pair Foundation help fill the need for
5  flexible, affordable childcare?
6  A. Yes.
7  Q. According to this Web site, you went on to
8  say: "On the au pair side of things, we have seen an
9  increase in participation, especially from new au pair
10  recruitment countries."
11  Do you see that?
12  A. I'm sorry. Where is that?
13  Q. The very next sentence.
14  (Witness reviewing)
15  A. Yes, I see it.
16  Q. And you continue: "APF is now working with
17  Spain, Moldova and Argentina - when just two years ago,
18  those were not au pair recruitment countries on our
19  radar."
20  A. Mm-hmm.
21  Q. Do you see that?
22  A. Mm-hmm.
23  Q. Are those two sentences, do they accurately
24  reflect what you stated in that interview?
25  A. Yes.

**Page 52**

1  Q. What do you mean by "au pair recruitment
2  countries"?
3  A. I believe what I meant was we were so happy to
4  see more countries were interested in sending us
5  au pairs on our cultural exchange program.
6  Q. Why were you happy to see that?
7  A. Because the more young people that can come to
8  the United States from as many countries as possible
9  will help promote world peace and understanding among
10  the U.S. and all nations of the world.
11  So any opportunity that arises to promote
12  that activity is thrilling to us --
13  Q. Is it --
14  A. -- to me.
15  Q. Is it fair to say that attracting a more
16  diverse population of au pairs is beneficial to the
17  organization?
18  A. I would say that's fair to say for any
19  organization.
20  Q. In the next paragraph --
21  A. Mm-hmm.
22  Q. -- you state: "APF is proud to have a large
23  number of well-qualified au pairs from all over the
24  world who are older - between 22 and 25 years old" --
25  A. Mm-hmm.

**Page 53**

1  Q. -- "(strong drivers, predominant --
2  predominantly Infant Qualified and with extensive
3  childcare experience)."
4  A. Mm-hmm.
5  Q. "You should see some of the au pair
6  applications - their childcare experience blows us
7  away!"
8  A. Mm-hmm.
9  Q. Do you think that's an accurate representation
10  of what you stated in that interview?
11  A. Mm-hmm. Yes.
12  Q. And are the attributes that you listed there,
13  well-qualified, older, strong drivers, infant-qualified,
14  extensive childcare experience, are those all positive
15  attributes --
16  A. Yes.
17  Q. -- for au pairs?
18  And do you consider those attributes a
19  selling point for Au Pair Foundation?
20  A. Yes.
21  Q. Do they differentiate Au Pair Foundation from
22  other sponsor agencies?
23  A. I don't know.
24  Q. Do you believe you have the best pool of
25  au pairs out of all the sponsor agencies?

Case 1:14-cv-03074-CMA-KMT Document 1259-24 Filed 05/17/18 USDC Colorado Page 183 of 311

| Page 58 |
|---|
| 1   saw? |
| 2     A.   Yes. |
| 3     Q.   And if you do feel more comfortable looking at |
| 4   the Web site, I'm happy to leave the computer with you. |
| 5   As you prefer. |
| 6        Do you have a preference? |
| 7     A.   I would love to have it -- |
| 8     Q.   Okay. |
| 9     A.   -- if it's okay. |
| 10     Q.   That's fine. |
| 11     A.   Thank you, Juan.   Thank you so much. |
| 12     MS. SCHAECHER:   You need to stay there. |
| 13     THE WITNESS:   Oh, sorry.   Okay. |
| 14     A.   Okay. |
| 15     Q.   So you're still on the Web site with -- |
| 16     A.   Mm-hmm. |
| 17     Q.   -- that starts with "ACT NOW:   Limited Time |
| 18   Offer"? |
| 19     A.   Yes. |
| 20     Q.   Okay.   And it describes the cost of au pair |
| 21   programs; is that right? |
| 22     A.   Yes. |
| 23     Q.   And there's a chart with -- the first column, |
| 24   the heading on that -- the first column with data says: |
| 25   "Standard Care (45 hours)"? |

| Page 59 |
|---|
| 1     A.   Yes. |
| 2     Q.   Is that right? |
| 3        And the second column says:   "Educare (30 |
| 4   hours)"? |
| 5     A.   Yes. |
| 6     Q.   Do you see where it says on the left-hand |
| 7   side: "Paid to your Au Pair"? |
| 8     A.   Yes. |
| 9     Q.   And it says weekly stipend of 195.75? |
| 10     A.   Yes. |
| 11     Q.   And then do you see where it says:   "Hourly |
| 12   cost(per family, not per child) $8.00"? |
| 13     A.   Yes. |
| 14     Q.   Does anything in this portion of the Web site |
| 15   suggest that host families should pay older, |
| 16   well-qualified au pairs more than 195.75? |
| 17     A.   No. |
| 18     Q.   I'm done with this exhibit, so -- |
| 19     A.   Thank you. |
| 20     Q.   -- I'll take back my laptop. |
| 21     A.   Sure. |
| 22     Q.   Thank you. |
| 23     A.   You're welcome. |
| 24     Q.   Sorry.   One more question with respect to |
| 25   that. |

| Page 60 |
|---|
| 1     A.   Okay.   Thank you. |
| 2     Q.   And nothing in this Web site -- in this Web |
| 3   page suggests that the amounts that a host family ought |
| 4   to pay an au pair varies by state, does it? |
| 5     A.   Let me look. |
| 6        (Witness reviewing) |
| 7     A.   No.   No. |
| 8     Q.   Okay.   Thank you. |
| 9     A.   Yes. |
| 10     (Exhibit 3 marked for identification) |
| 11   BY MR. VALDIVIESO: |
| 12     Q.   I'm handing you what I'm marking as Exhibit 3. |
| 13     A.   Thank you. |
| 14     MR. VALDIVIESO:   For those of you on the |
| 15   phone, this is a document ending in -- this is APF |
| 16   ending in 289. |
| 17   BY MR. VALDIVIESO: |
| 18     Q.   After you've had a chance to review this |
| 19   document, Ms. Hoggard, if you'd let me know if you are |
| 20   familiar with it. |
| 21        (Witness reviewing) |
| 22     A.   I am not familiar with this document. |
| 23     Q.   Do you see in the second page -- or, I'm |
| 24   sorry, the second e-mail down from the top -- |
| 25     A.   Mm-hmm. |

| Page 61 |
|---|
| 1     Q.   -- it says: "From: Ellen Hoggard," and then |
| 2   it says: "Mailto: ellen.hoggard@sts-education.com"? |
| 3     A.   Oh, I see now.   I'm sorry.   Yes. |
| 4     Q.   Is that your e-mail address? |
| 5     A.   That is my Global Studies e-mail address. |
| 6     Q.   And reading down from there, are you familiar |
| 7   with the e-mail that you sent? |
| 8        (Witness reviewing) |
| 9     A.   I don't recall this, but I'm reading it now, |
| 10   yes. |
| 11     Q.   Do you have any reason to believe that you did |
| 12   not -- that you did not send this e-mail? |
| 13     A.   No. |
| 14     Q.   What is this e-mail about, from what you can |
| 15   tell? |
| 16     A.   The Web site, feedback. |
| 17     Q.   In other words, fair to say that you were |
| 18   reviewing a draft of the Web site and offering |
| 19   suggestions? |
| 20        (Witness reviewing) |
| 21     A.   Yes. |
| 22     Q.   Do you recall having, in fact, reviewed a |
| 23   draft version of the Web site and offered suggestions to |
| 24   it? |
| 25     A.   Let me think.   I did not review the entire |

PLAINTIFFS' RESP. APP.0004701

MAGNA

LEGAL SERVICES

**Page 74**

1  of the Alliance?
2      A.  Yes.
3      Q.  Do you know when STS Foundation became a
4  member of the Alliance?
5      A.  I don't recall.
6      Q.  Were you involved in the application process
7  for STS Foundation to become a member of the Alliance?
8      A.  I believe so, yes.
9      Q.  Do you recall who served as a recommendation
10  for STS Foundation?
11      A.  I don't recall.
12      Q.  And is -- is STS Global Studies a member of
13  the Alliance?
14      A.  Yes.
15      Q.  Do you know when STS Global Studies became a
16  member of the Alliance?
17      A.  I don't recall.
18      Q.  Were you involved in STS Global Studies'
19  application to become a member of the Alliance?
20      A.  Yes.
21      Q.  And do you recall who submitted a
22  recommendation on behalf of STS Global Studies?
23      A.  I don't recall.
24      Q.  Have you ever had a leadership position at the
25  Alliance?

**Page 75**

1      A.  Yes.
2      Q.  Do you currently?
3      A.  Yes.
4      Q.  What position do you currently hold?
5      A.  Treasurer.
6      Q.  Since when have you been treasurer?
7      A.  I believe it's -- I believe it's been three
8  years, but I -- I could be wrong on the number.
9      Q.  And have you had any other leadership
10  positions at the Alliance at any time?
11      A.  I believe I was chairman of a committee.
12      Q.  Do you recall when that was?
13      A.  No, I do not.
14      Q.  Do you know if it was in the '90s?
15      A.  It could have been in the -- it could have
16  been in the '90s, but honestly, I don't recall.
17      Q.  Do you recall what company or what
18  organization you were representing at the time?
19      A.  No.
20      Q.  Besides your chair -- chairperson position on
21  the executive committee, do you have any other
22  leadership positions?
23      A.  I -- I'm not -- chairperson?
24      Q.  Chair -- you said chairman of a -- of a
25  committee?

**Page 76**

1      A.  Oh, chairman of a committee.
2      Q.  Yes.  I was just making it general --
3      A.  Oh, no, no, no.  No, it's okay.  I thought you
4  meant chairman of the Alliance.  No.
5      Q.  Chairman of -- you mentioned being chairman of
6  a committee?
7      A.  Chairing a committee, yes, I believe -- yes.
8      Q.  Besides that position and besides being
9  treasurer --
10      A.  Mm-hmm.
11      Q.  -- have you had any other leadership positions
12  at the Alliance?
13      A.  Not that I recall.  I don't recall.
14      Q.  And the committee was executive committee?
15      A.  I don't remember.  I don't know.
16      Q.  Are you -- are you a member of the board of
17  the Alliance?
18      A.  Yes.
19      Q.  And since when have you been a member of the
20  board of the Alliance?
21      A.  I believe I've been a member -- I think it's
22  for the past five years, as far as I recall.
23      Q.  And do you receive e-mail communications from
24  the Alliance?
25      A.  Yes.

**Page 77**

1      Q.  Do you receive e-mail communications from the
2  Alliance to your -- I mean -- strike that.
3          To which of the e-mail addresses that you
4  described earlier do you receive your communications
5  from the Alliance?
6      A.  Which organization are you referring to?
7      Q.  You mentioned you had e-mail addresses at
8  Au Pair Foundation --
9      A.  Mm-hmm.
10      Q.  -- STS Foundation --
11      A.  Mm-hmm.
12      Q.  -- and STS Global Studies?
13      A.  Mm-hmm.
14      Q.  And you mentioned that those three
15  organizations are all members of the Alliance?
16      A.  Correct.
17      Q.  When you receive communications from the
18  Alliance, do you receive them to all three e-mails or to
19  one in particular?
20      A.  It varies, honestly, depending on the issue.
21      Q.  Do you know if you receive communications --
22  strike that.
23          Have you received communications from the
24  Alliance relating to the au pair program to any e-mail
25  address that is not your Au Pair Foundation e-mail

PLAINTIFFS' RESP. APP.0004702

MAGNA
LEGAL SERVICES

Page 126

1      Q.  Do you recall having any discussions with
2  Heidi regarding the au pair stipend?
3      A.  No discussions regarding the au pair stipend.
4  I had one discussion with Heidi once to ask her if
5  she -- if she knew of any good people in the field that
6  might be looking for opportunities, and she said no.  If
7  it's the Heidi I'm thinking it is.
8      Q.  And do you recall where you had that
9  conversation with Heidi?
10      A.  No, I don't recall.
11      Q.  The next name on that list,
12  ruthferry@aifs.com (sic), do you know Ruth Ferry?
13      A.  Yes.
14      Q.  And who is Ruth Ferry?
15      A.  Ruth Ferry is the person who is in charge of
16  Au Pair in America, which is at -- yes, Ruth Ferry's in
17  charge of Au Pair in America.
18      Q.  And how do you know Ms. Ferry?
19      A.  Ruth is usually the person who is the
20  moderator at the au pair breakout sessions at the
21  Alliance.
22      Q.  Do you know when you met Ms. Ferry?
23      A.  I don't recall.
24      Q.  Do you think it was before or after APF Global
25  Exchange, NFP was formed?

Page 127

1      A.  I -- I -- I don't recall.
2      Q.  Do you recall having any discussions with
3  Ms. Ferry regarding the au pair program?
4      A.  Yes.
5      Q.  What do you recall about your discussions
6  relating to the au pair program with Ms. Ferry?
7      A.  She was not at all pleased that I stood up at
8  the Department of State meeting and stated my opinion
9  that all au pair programs -- that it should be a
10  regulation for all host families with au pair programs
11  undergo a criminal background check.  It is not a
12  regulation currently.
13      Q.  Do you recall when you stood up and made that
14  comment?
15      A.  I don't recall which meeting.  It's been a few
16  years ago.
17      Q.  Do you think it was before or after APF Global
18  Exchange, NFP was formed?
19      A.  After.
20      Q.  Did any other sponsors approach you and make a
21  comment --
22      A.  No.
23      Q.  -- in response to your comment?
24      A.  No.
25      Q.  Did you say anything in response to Ms. Ferry?

Page 128

1      A.  I'm paraphrasing, but I said it is a very
2  valuable and worthwhile tool to utilize to protect the
3  safety and well-being of the au pairs.
4      Q.  Did Ms. Ferry explain why she did not think
5  that was a good idea?
6      A.  No.
7      Q.  Were you upset that she approached you?
8      A.  I was not upset that she approached me.  I was
9  upset at the manner in which she approached me.
10      Q.  Did you change your behavior in response to
11  Ms. Ferry's comments at future meetings?
12      A.  Could you be more specific?
13      Q.  Sure.
14          Were you more hesitant to make comments
15  in future meetings as a response to Ms. --
16      A.  No.
17      Q.  -- Ferry's comments?
18      A.  No.
19      Q.  So you're an active participant at Alliance
20  meetings?
21      A.  When I feel it's warranted, yes.
22      Q.  Do you recall any other situations where you
23  felt it warranted to make a comment at an Alliance
24  meeting?
25      A.  I have a lot of years to review in my head, so

Page 129

1  bear with me.
2          Yes, there was a time many years ago when
3  the Alliance only allowed, as I recall, not-for-profit
4  members and there was a very, shall we say, heated
5  discussion.  This was, I think, in the '90s.
6          And I shared my view that it's far better
7  to bring associations into the Alliance and all those
8  rise with the tide.  And if we all work together to work
9  on best practices together, that increases the overall
10  safety and well-being of all participants.
11          So that is the other major moment in the
12  Alliance when I spoke up.
13      Q.  Other than that time in the '90s and the
14  instance regarding the criminal background checks, do
15  you recall taking a stand on any other issues?
16          It is a mouthful.  You can limit my
17  question to the period of 2013 to the present.
18      A.  Okay.  Thank you.  Not with that veracity.
19  Not with such -- no, not that I recall.
20      Q.  On page 10274, which is the attachment, in the
21  paragraph that starts the "Third."  Do you see that?
22      A.  Yes.
23      Q.  "The Department of State must enforce
24  compliance of all state and federal labor laws for
25  au pair organizations.  These organizations must ensure

# Exhibit 421

PLAINTIFFS' RESP. APP.0004704

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Case No. 14-cv-03074-CMA-KMT

_____

JOHANA PAOLA BELTRAN, ET AL.,

          Plaintiffs,

vs.

INTEREXCHANGE, INC., ET AL.,

          Defendants.

_____

VIDEOTAPED DEPOSITION OF

LINDA MORI

August 17, 2017

DENVER, COLORADO

9:11 A.M.

Magna Legal Services
866-624-6221
www.magnals.com

PLAINTIFFS' RESP. APP.0004705

## Page 2

```
 1            The videotaped deposition of
 2   LINDA MORI, taken before Leeann Keenan, a Registered
 3   Merit Reporter, Certified Realtime Reporter, and a
 4   Notary Public in and for the County of Summit and the
 5   State of Colorado, at 555 17th Street, Suite 3200,
 6   Denver, Colorado, on Thursday, August 17, 2017, at the
 7   hour of 9:11 a.m., pursuant to Notice.
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1   APPEARANCES CONTINUED:
 2       GORDON & REES
         BY: NATHAN HUEY, ESQ.
 3          555 17th Street
            Suite 3400
 4          Denver, Colorado 80202
            (303) 200-6888
 5          nhuey@gordeonrees.com
            appeared by telephone on behalf of
 6          AuPairCare, Inc.
 7   NIXON, SHEFRIN, HENSEN, OGBURN
         BY: LAWRENCE STONE, ESQ.
 8          5619 DTC Parkway
            Suite 1200
 9          Greenwood Village, Colorado 80111
            (303) 773-3500
10          lstone@nixonshefrin.com
            appeared by telephone on behalf of
11          ProAuPair and International Au Pair
            Exchange
12
13   ALSO PRESENT: Davis Baumunk, Videographer
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1   APPEARANCES:
 2
     BOISE, SCHILLER, FLEXNER, L.L.P.
 3       BY: JUAN P. VALDIVIESO, ESQ.
            1999 Harrison Street
 4          Suite 900
            Oakland, California 94612
 5          (510) 874-1010
            jvaldivieso@bsfllp.com
 6          appeared on behalf of the Plaintiffs
 7   HOLLAND & HART
         BY: JONATHAN BENDER, ESQ.
 8          555 17th Street
            Suite 3200
 9          Denver, Colorado 80202
            (303) 295-8456
10          jsbender@hollandhart.com
            appeared on behalf of Cultural
11          Homestay International and the
            deponent
12
     LEWIS, ROCA, ROTHGERBER, CHRISTIE
13       BY: JESSICA FULLER, ESQ.
            1200 17th Street
14          Suite 3000
            Denver, Colorado 80202
15          (303) 628-9527
            jfuller@lrrc.com
16          appeared on behalf of Cultural Care
17   BROWNSTEIN, HYATT, FARBER, SCHRECK
         BY: MARTHA FITZGERALD, ESQ.
18          410 17th Street
            Suite 2200
19          Denver, Colorado 80202
            (303) 223-1472
20          mfitzgerald@bhfs.com
            appeared by telephone on behalf of
21          EuRaupair InterCultural Child Care
            Programs
22
23
24
25
```

## Page 5

```
 1              I N D E X
 2
     DEPOSITION WITNESS:                    PAGE
 3   LINDA MORI
 4   Examination by Mr. Valdivieso          10
 5
     PLAINTIFFS' DEPOSITION EXHIBITS MARKED:
 6   NO.      DESCRIPTION              PAGE
 7   Exhibit 1   September 16, 2014 e-mail chain    24
                 between Elizaveta Georgieva, Linda
 8               Mori, and Christina Reilly, with
                 attachment
 9               CHI0002508 - 2523
10   Exhibit 2   June 29 - August 11, 2011 e-mail    47
                 chain between Linda Mori, Deborah
11               Herlocker, and others
                 CHI0002997 - 3007
12
     Exhibit 3   July 7 - 8, 2009 e-mail chain between  59
13               Linda Mori, Jackie Sant-Myerhoff, and
                 others
14               CHI23253 - 23258
15   Exhibit 4   March 19 - 22, 2010 e-mails between    71
                 Linda Mori and Michael McHugh
16               CHI0002055 - 2056
17   Exhibit 5   March 3 - 25, 2011 e-mails between    78
                 Linda Mori and Michael McHugh
18               CHI0001992 - 1993
19   Exhibit 6   April 1, 2011 group e-mail from    86
                 Michael McCarry
20               AIFS0003687
21   Exhibit 7   April 14, 2011 group e-mail from    99
                 Michael McCarry
22               CHI0028619 - 28620
23   Exhibit 8   January 25, 2012 e-mail from Maha   103
                 Ammar to Au Pair Sponsors
24               AAP_0000739 - 744
25
```

MAGNA
LEGAL SERVICES

Page 14

1  same objection and reminder for Ms. Mori with
2  respect to any communications with Mr. Areton that
3  would have involved counsel as well.
4          With that said, please continue.
5      A.  Once again, just the -- what his
6  experience was going through a deposition and, once
7  again, his -- how he was feeling through the
8  deposition.
9      Q.  And did you discuss anything with
10 Mr. Areton regarding the au pair stipend?
11     A.  No.  No.
12     Q.  Did you discuss anything with Ms. Reilly
13 or with Mr. Areton regarding conversations you had
14 had with other sponsor agencies?
15     A.  No.
16     Q.  Did you contact anybody employed by any
17 of the other sponsor agencies, prior to today's
18 deposition, to prepare for today's deposition?
19     A.  No.
20     Q.  Did you review any documents that were
21 not selected by your -- your counsel in preparation
22 for today's deposition?
23     A.  I'm sorry, ask --
24     Q.  Did you review any documents that were
25 not selected by your counsel in preparation for

Page 15

1  today's deposition?
2      A.  I -- I don't believe so.  I don't believe
3  so.
4      Q.  Are you currently employed by CHI?
5      A.  Yes, I am.
6      Q.  And what is your position there?
7      A.  I receive -- I'm -- I receive the
8  compliance, program compliance for seven of CHI's
9  J-1 programs.
10     Q.  And within those seven programs, is the
11 au pair program among them?
12     A.  Yes.
13     Q.  And how long have you had that title?
14     A.  As far as my work with compliance,
15 about -- about 10 years.
16     Q.  And how long have you been at CHI?
17     A.  28 to 29 years.
18     Q.  Is that when CHI was founded, or was
19 it -- did it already exist when you joined?
20     A.  Just about, yeah.  I -- CHI was
21 established in 1980.  I came to work with them about
22 19 -- 1984, '85.  1985.
23     Q.  Was --
24     A.  Excuse me.
25     Q.  And were you working with the au pair

Page 16

1  program --
2      A.  No.
3      Q.  -- at the beginning?
4      A.  No.
5      Q.  When did you become involved with the
6  au pair program?
7      A.  About -- well, in around 2000, 2001 I --
8  there was talk -- talk with Mr. Areton.  And at the
9  time one of our director, program directors, they
10 wanted to expand the cultural opportunities, program
11 opportunities in our -- within our organization.  So
12 I was asked -- asked to help draft the proposal
13 for -- for the au pair -- au pair program
14 designation.
15     Q.  Did you have any experience, even outside
16 of CHI, with the au pair program before you were
17 asked to prepare the program designation materials?
18     A.  Specific to au pair, experience with
19 au pair, no.
20     Q.  Had you ever hosted an au pair?
21     A.  No.
22     Q.  Had you been an au pair?
23     A.  No.
24     Q.  And you said CHI wanted to expand
25 cultural program opportunities.  Can you describe

Page 17

1  any -- strike that.
2          Were that -- were -- were that --
3  was that the only reason that they provided, when
4  they asked you to -- to provide the designation
5  material?  Did they provide any other reasons for
6  entering that market?
7      A.  No.  You know, we -- we really -- as an
8  organization we really believed in, you know,
9  the -- the aspect -- the benefits of -- of cultural
10 exchange, and we just wanted to expand the
11 opportunities to other sectors and communities of --
12 of the U.S.
13     Q.  And did you think it was a good idea for
14 CHI to enter the au pair program?
15     A.  Abs -- absolutely.
16     Q.  Did you talk to people at any of the
17 other sponsor organizations to find out information
18 about what the au pair program was like?
19     A.  I -- I did not, no.
20     Q.  And when did CHI obtain its au pair
21 designation?
22     A.  I -- I believe in 2004.
23     Q.  And CHI's a member of the Alliance for
24 International Exchange; is that right?
25     A.  Correct.  Yes.

Page 74

```
 1      A.    -- on occasion -- occasion.  On occasion.
 2      Q.    And when you attend, you attend as a
 3  representative of CHI?
 4      A.    With CHI, with the -- the WETM portion.
 5      Q.    And the IAPA portion?
 6      A.    The -- the program director would attend
 7  the IAPA portion.
 8      Q.    Have you attended the IAPA portion of the
 9  WETM/IAPA conference?
10      A.    I think just once, I believe.
11      Q.    Do you recall when that was?
12      A.    Oh, dear.  You know, I -- I -- I really
13  don't know, you know.  I mean --
14      Q.    That's okay.  We might see some documents
15  that might help you remember.  If you do remember
16  later on, just let me know.
17      A.    Yes.
18      Q.    Do you remember where that was, the
19  IAPA -- the IAPA conference that you attended?
20      A.    I want to say in Prague, Czech Republic.
21      Q.    Now, in this e-mail you asked Mr. McHugh
22  if the producers of a certain program had contacted
23  him; is that fair?
24      A.    Yes.
25      Q.    And then he replied, "No, we" -- "we
```

Page 75

```
 1  haven't been contact" -- "contacted, as far as I
 2  know."
 3            That's at the bottom of 2055; is
 4  that right?
 5      A.    Correct.
 6      Q.    And then you -- you informed him that --
 7  that CHI had declined an invitation by those --
 8  those producers; is that right?
 9      A.    Correct.
10      Q.    Because you suspected that what they were
11  proposing was a scam, right?
12      A.    Yes.
13      Q.    Now, Mr. McHugh wrote you, this is the
14  second to -- the second e-mail from the top.
15      A.    Yes.
16      Q.    It's dated March 23rd, 2010 at 11:34 a.m.
17  He writes, "By the" -- "BTW, I spoke with Goran from
18  Cultural Care and Tanna from GoAuPair at the WETM
19  event in Miami, and we are trying to schedule an
20  au pair sponsor's meeting in D.C. for the fall.  Of
21  course we want to discuss the education component
22  and try to figure out how to move things forward.  I
23  will keep you updated on that if it looks like it
24  will happen."
25            Did I read that right?
```

Page 76

```
 1      A.    Yes.
 2      Q.    Do you know who Goran from Cultural Care
 3  is?
 4      A.    I -- I do know who Goran is, yes.
 5      Q.    And who -- you pronounce it Goran?
 6      A.    Yes.
 7      Q.    And -- and who is Goran?
 8      A.    I believe he's the vice president of
 9  Cultural Care.
10      Q.    And how do you know Goran?
11      A.    Through attending industry events.
12      Q.    And do you know who Tanna from GoAuPair
13  is?
14      A.    I know the name.  I -- I recognize the
15  name, but I -- I don't have a recollection of ever
16  meeting her.
17      Q.    And you respond, "Thanks, Michael.
18  Please keep us in the loop."
19            Did I read that right?
20      A.    Correct.
21      Q.    Did -- did Michael McHugh keep you in the
22  loop with respect to this proposed sponsors' meeting
23  in D.C. for the fall?
24      A.    I -- I'm not too sure.  This is -- I
25  don't -- I'm not too sure if he -- he specifically
```

Page 77

```
 1  kept me in the loop, if there was any follow-up.
 2      Q.    Is keeping you in the loop something that
 3  Michael McHugh did on other occasions?
 4            MR. BENDER:  Object to the form.
 5      A.    Sometimes.
 6      Q.    And with -- with respect to what did
 7  Mr. McHugh keep you in the loop?
 8      A.    At the time Mr. McHugh was, I believe he
 9  was the chair of the IAPA, and so he -- he would
10  sometimes inform not only myself, but other
11  sponsors, I believe, of a possible -- possible
12  meetings at the Alliance or with the Alliance or
13  with the Department of State.
14      Q.    Was Mr. McHugh a source for you for
15  information about the au pair industry?
16      A.    He was one of many sources.
17      Q.    And you mentioned Ms. Young earlier.  Was
18  she another source?
19      A.    I'm sorry, who?
20      Q.    You mentioned Ms. Young earlier?
21      A.    Yes.
22      Q.    Was she another source of information for
23  you?
24      A.    Yes.
25      Q.    And you said he was -- he was one of many
```

PLAINTIFFS' RESP. APP.0004708

MAGNA ▶
LEGAL SERVICES

Case No. 1:14-cv-03074-CMA-KMT Document 959-24 filed 03/30/18 USDC Colorado pg 192 of 311

# Exhibit 422

Confidential - Attorneys' Eyes Only

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO


| | |
|---|---|
| JOHANA PAOLA BELTRAN, et ) | |
| ) | |
| al., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Civil Case No. |
| ) | 14-cv-03074-CMA-KMT |
| INTEREXCHANGE INC., et ) | |
| al., ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |


HIGHLY CONFIDENTIAL EXCERPT

ATTORNEYS' EYES ONLY


Videotaped Deposition of SUSAN HAYES, taken

on behalf of the Plaintiff, at 686 Anton

Boulevard, Costa Mesa, California, commencing

at 8:38 A.M. on Thursday, August 24, 2017,

before SHANNA GRAY, Certified Shorthand

Reporter, Certificate No. 13690.


-   -   -

MAGNA LEGAL SERVICES

(866) 624-6221

www.magnaLS.com

PLAINTIFFS' RESP. APP.0004710

**MAGNA** ▶

**LEGAL SERVICES**

Confidential - Attorneys' Eyes Only

| Page 2 | | Page 4 | |
|---|---|---|---|

**Page 2**

1        A P P E A R A N C E S
2
3    For the Plaintiff:
4      BOIES SCHILLER & FLEXNER
     BY: JUAN P. VALDIVIESO, ESQ.
5      1999 Harrison Street
     Suite 900
6      Oakland, California 94612
     (510) 874-1010
7      (510) 874-1460 (Fax)
     jvaldivieso@bsfllp.com
8
9    For Defendant EurAupair International, Inc.:
10      BROWNSTEIN, HYATT, FARBER, SCHRECK
     BY: MARTHA L. FITZGERALD, ESQ.
11      410 Seventeenth Street
     Suite 2200
12      Denver, Colorado 80202
     (303) 223-1472
13      (303) 223-8072 (Fax)
     mfitzgerald@bhfs.com
14
15    For the Defendant AuPairCare, Inc.:
16      GORDON & REES
     BY: JENNIFER ARNETT-ROEHRICH, ESQ.
17      (Telephonic appearance)
     555 Seventeenth Street
18      Suite 3400
     Denver, Colorado 80202
19      (303) 200-6865
     jarnett-roehrich@gordonrees.com
20
21
22
23
24
25

**Page 3**

1   APPEARANCES (CONTINUED):
2
3    For the Defendant Cultural Care, Inc.:
4      CHOATE, HALL & STEWART
     BY: KEVIN P. O'KEEFE, ESQ.
5      (Telephonic appearance)
     Two International Place
6      Boston, Massachusetts 02110
     (617) 248-4025
7      (617) 502-4025 (Fax)
     kokeefe@choate.com
8
9
   For the Defendant Apex and 20/20:
10
     NIXON, SHEFRIN, HENSEN, OGBURN
11      BY: LAWRENCE D. STONE, ESQ.
     (Telephonic appearance)
12      5619 DTC Parkway
     Suite 1200
13      Greenwood Village, Colorado 80111
     (303) 773-3500
14      lstone@nixonshefrin.com
15
16   Also Present:
17    ARIAN SAVAR, Videographer
18
19
20
21
22
23
24
25

**Page 4**

1        I N D E X
2
3   DEPONENT     EXAMINATION BY     PAGE
4   SUSAN HAYES
5      BY MR. VALDIVIESO    13
6      BY MS. FITZGERALD    196
7
8
9     EXHIBITS FOR IDENTIFICATION
10
11   MARKED     DESCRIPTION       PAGE
12   Exhibit 1   E-mail dated 9/28/2011, Subject:    25
13      Translation of the 2011-2012
14      brochure with attachment, Bates
15      labeled EAP0004287-4295
16   Exhibit 2   E-mail dated 7/6/2012 with    30
17      attachment, Bates labeled
18      EAP0001162-1170
19   Exhibit 3   EurAupair brochure 2012, Bates    33
20      labeled EAP0001399-1426
21   Exhibit 4   E-mail chain dated 9/2011,    37
22      Subject Au Pair Handbook with
23      attachment, Bates labeled
24      EAP0001733, 1773-1811
25

**Page 5**

1     EXHIBITS FOR IDENTIFICATION
2        (CONTINUED)
3
4   MARKED     DESCRIPTION       PAGE
5   Exhibit 5   E-mail dated 6/23/2014 with    41
6      attachment, Bates labeled
7      EAP0001236-1280
8   Exhibit 6   E-mail dated 7/16/2014 with    47
9      attachment, Bates labeled
10      EAP0003291-3339
11   Exhibit 7   2015 EurAupair Host Family    51
12      Handbook, EAP0000764-812
13   Exhibit 8*   E-mail dated 2/4/2009, Subject:    58
14      Au Pair mtg next week, with
15      attachment, Bates labeled
16      GAP_00003771-3775
17   Exhibit 9   E-mail dated 8/11/2009, Subject:    66
18      Alliance WYSTC in Manchester,
19      Bates labeled InterExchange
20      0036149
21   Exhibit 10*   E-mail chain dated 10/2009,    67
22      Subject: Re: Alliance Au Pair
23      Task Force Meeting - October
24      21st, Bates labeled AIFS
25      0003537-3538

Confidential - Attorneys' Eyes Only

1  Bill Gertz, and Ruth Ferry.  Do you see that?
2      A.  I do.
3      Q.  Do you know who Mark refers to?
4      A.  I can't tell you for sure.  I didn't make these
5  notes.  I would assume Mark Overmann.
6      Q.  What about Lisa?  Do you know who that refers to?
7      A.  Again, I can't say Lisa.  I was not there.  These
8  were in person, obviously.  The rest of us were not in
9  person.
10     Q.  And turning to the last page, do you see there's
11  a to-do list at the bottom?
12     A.  Okay.
13     Q.  And this is a --
14     A.  Okay.
15     Q.  Above the to-do list it says "group to work on
16  talking points" --
17     A.  Okay.
18     Q.  -- "and ask:  Natalie, Ruth, Michael."
19     A.  Correct.
20     Q.  You see that?
21     A.  I do.
22     Q.  Is this group of people -- do you recall this
23  group convening other conferences -- on conference calls
24  other than on January 8, 2016?
25     A.  No.  Truly.  And I didn't --

1      Q.  And then on the to-do list it says "Ilir to call
2  Kit" in the first line.
3      A.  Mm-hm.
4      Q.  Do you know what Kit might refer to?
5      A.  I have no idea who Kit is.
6      Q.  And then it says "Next call January 12 at
7  3:30 p.m."  Do you see that?
8      A.  "Next call January 12th."
9      Q.  Do you recall whether you participated on a call
10  on January 12, 2016?
11     A.  I do not.  I honestly do not.
12     Q.  And I'm going to hand you Exhibit 42.  It is
13  another extract from the production from the Alliance
14  received on August 23rd.  When you've had a chance to
15  review Exhibit 42, could you please let me know,
16  Ms. Hayes.
17     A.  Okay.
18     Q.  Do you recall participating on a conference call
19  with au pair members on --
20     A.  I do not.
21     Q.  -- February 8, 2016?
22     A.  I do not.  I mean, I really do not.  Is that
23  Susan me?  It doesn't say Susan Hayes.  I don't know.
24     Q.  And taking Exhibit 40 back out of your pile, does
25  that document help refresh your recollection as to what

1  was meant by "as we have agreed, our collective interests
2  in this meeting is only to talk prospectively with DOS
3  about how the stipend might change going forward"?
4      A.  It doesn't help me.  No.
5      Q.  Do you recall being on a call where Ms. Jordan
6  stated something to the effect of "we can't sit there and
7  discuss retroactive policy"?
8      A.  I don't recall that.
9          MR. O'KEEFE:  This is Kevin O'Keefe for Cultural
10  Care.  Objection to form.
11  BY MR. VALDIVIESO:
12     Q.  Do you recall ever being on a call where a
13  sponsor indicated that they didn't want to have Department
14  of State put anything in writing?
15     A.  No, I do not recall that.
16         MR. VALDIVIESO:  Can we go off the record for a
17  second?
18         THE VIDEOGRAPHER:  We're going off the record at
19  3:31 p.m.
20         (Recess taken.)
21         THE VIDEOGRAPHER:  We are back on the record at
22  3:33 p.m.
23  BY MR. VALDIVIESO:
24     Q.  Ms. Hayes, do you recall participating in any
25  conference calls in 2016 where you expressed any position

1  with respect to the au pair stipend?
2      A.  No.  Honestly, no.
3          MR. VALDIVIESO:  I have no further questions.
4  Does -- Ms. Fitzgerald, do you have any questions?
5          EXAMINATION
6  BY MS. FITZGERALD:
7      Q.  Ms. Hayes, before you were presented with
8  Exhibits 41 and 42 today at the end of this deposition,
9  did you have any independent recollection of any
10  conference call among and between sponsors relating to the
11  discussion of the au pair stipend?
12     A.  No.
13     Q.  Or relating to discussions regarding
14  applicability of regulations to the au pair stipend
15  whether DOL or DOS?
16     A.  No.
17         (End of confidential testimony.)
18
19
20
21
22
23
24
25

MAGNA
LEGAL SERVICES

# Exhibit 423

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

------------------------------X

JOHANA PAOLA BELTRAN, et al.,    )

        Plaintiffs,              ) Civil Case No.

        v.                       ) 14-cv-03074-CMA-KMT

INTEREXCHANGE INC., et al.,      )

        Defendants.              )

------------------------------X

VIDEOTAPED DEPOSITION OF HOLLY HAWTHORNE BROWN

Thursday, August 24, 2017; 9:07 a.m.

Job No.:   328846

Pgs.   1 - 186

Reported by:  Cindy L. Sebo, RMR, CRR, RPR, CSR,

CCR, CLR, RSA, LiveDeposition Authorized Reporter

MAGNA LEGAL SERVICES
(866) 624-6221
www.MagnaLS.com

PLAINTIFFS' RESP. APP.0004714

MAGNA
LEGAL SERVICES

| Page 2 | |
|---|---|
| 1 | Videotaped deposition of |
| 2 | HOLLY HAWTHORNE BROWN taken by Counsel for |
| 3 | Plaintiffs, held at the law offices of Boies |
| 4 | Schiller Flexner LLP, 1401 New York Avenue, |
| 5 | Northwest, Washington, D.C. 20005, before Cindy L. |
| 6 | Sebo, Registered Merit Reporter, Certified Real-Time |
| 7 | Reporter, Registered Professional Reporter, |
| 8 | Certified Court Reporter, Certified Shorthand |
| 9 | Reporter, Real-Time Systems Administrator, |
| 10 | LiveDeposition Authorized Reporter and Notary Public |
| 11 | in and for the District of Columbia, beginning at |
| 12 | approximately 9:07 a.m., when were present on |
| 13 | behalf of the respective parties: |

**Page 4**

1  A P P E A R A N C E S (Continued):
2
3  Attorney for Defendant Cultural Care, Inc.:
4      CHOATE, HALL & STEWART LLP
5      SAMUEL N. RUDMAN, ESQUIRE (Via telephone)
6      Two International Place
7      Boston, Massachusetts 02110
8      617.248.4034
9      srudman@choate.com
10
11  Attorney for Defendants Apex and 20/20:
12      NIXON SHEFRIN HENSEN OGBURN
13      AUBREY J. MARKSON, ESQUIRE (Via telephone)
14      5619 DTC Parkway, Suite 1200
15      Greenwood Village, Colorado 80111
16      303.773.3500
17      amarkson@nixonshefrin.com
18
19
20
21
22

**Page 3**

1      A P P E A R A N C E S:
2  Attorney for Plaintiffs:
3      BOIES SCHILLER FLEXNER LLP
4      JOSHUA JAMES LIBLING, ESQUIRE
5      575 Lexington Avenue
6      7th Floor
7      New York, New York 10022
8      212.446.2381
9      jlibling@bsfllp.com
10
11  Attorney for Defendant EurAupair:
12      BROWNSTEIN HYATT FARBER SCHRECK, LLP
13      DAVID B. MESCHKE, ESQUIRE
14      410 Seventeenth Street
15      Denver, Colorado 80202-4432
16      303.223.1219
17      dmeschke@bhfs.com
18
19
20
21
22

**Page 5**

1      A P P E A R A N C E S (Continued):
2  Attorney for Witness:
3      LAW OFFICE OF PAULA M. POTOCZAK
4      PAULA M. POTOCZAK, ESQUIRE
5      218 North Lee Street
6      Alexandria, Virginia 22314
7      703.519.3827
8      pmplaw@earthlink.net
9
10
11  ALSO PRESENT:
12      DANIEL HOLMSTOCK, Videographer
13
14
15
16
17
18
19
20
21
22

Page 130

1  As far as the introduction, I don't remember
2  those details two years ago.
3  Q.  Was there a handout associated with
4  the PowerPoint?
5  A.  I don't remember getting a handout.
6  I believe the handout, they said, they were
7  going to send afterwards.  But I could be wrong.
8  (Sotto voce discussion with court
9  reporter.)
10  MS. POTOCZAK:  So this is 5?
11  We're going to 5?
12  MR. LIBLING:  Yep.
13  (Sotto voce discussion with court
14  reporter.)
15  - - -
16  (Brown Deposition Exhibit Number 5,
17  PowerPoint presentation, Bates
18  stamped EAP0000480 through
19  EAP0000540, marked for
20  identification, as of this date.)
21  - - -
22

Page 131

1  BY MR. LIBLING:
2  Q.  I'm handing you a document Bates
3  stamped EAP0000480 through -540.  It's also an
4  exhibit at Ms. Biggs' deposition.
5  Does this appear to be the
6  PowerPoint that was presented at that meeting?
7  A.  It could be.  I -- I don't have a
8  reason to believe it's not, but I -- I don't
9  remember details.  This . . .
10  Q.  Then I said earlier I'd give you a
11  document with the date on the first page --
12  A.  Um-hum.
13  Q.  -- in the bottom right, you'll see
14  the -- the date I mentioned.
15  A.  This says the 17th.  You said the
16  15th.
17  Q.  Did I?
18  A.  Yes.
19  MS. POTOCZAK:  Um-hum.
20  BY MR. LIBLING:
21  Q.  Then I misspoke.
22  Okay.  So the -- after the cover

Page 132

1  page, the first page talks about opening remarks
2  and introductions.
3  Do you have any memory of what was
4  said in those opening remarks?
5  A.  No.
6  Q.  If you can just quickly look through
7  the -- the first couple of pages here and see
8  whether that jogs your memory about anything
9  that was said at the meeting.  And if not, we'll
10  move on to something more specific.
11  A.  All right.
12  Q.  Does looking through the first few
13  pages help you remember what was said at the
14  beginning of the meeting?
15  A.  No.
16  Q.  Okay.  If you turn to the page
17  ending in 493, it has a 14 at the -- in the top
18  right as well, if that helps, but the page
19  numbers kind of jump around, so it's easier to
20  go by the Bates number.
21  There it is.  You've got it.
22  A.  This one (indicating) --

Page 133

1  Q.  Yeah, the one that --
2  A.  -- Regulatory Matters?
3  Q.  -- says Regulatory Matters --
4  A.  Okay.
5  Q.  -- Rules and Regulations.
6  A.  Um-hum.
7  Q.  Do you recall any discussion about
8  rules and regulations at this meeting?
9  A.  From this, no.  No, I -- I don't
10  remember many -- I don't remember, no.
11  Q.  Okay.  Do you remember whether
12  sponsors were -- were -- were talking to the
13  State Department, or was this just pure
14  presentation from the State Department with no
15  participation for the sponsors?
16  A.  I -- there was some input involved.
17  Q.  Okay.  Do you remember anything that
18  was learned by the sponsors about regulatory
19  matters?
20  A.  No.
21  Q.  Do you remember anything that was
22  said by the sponsors about any matters to the

Page 134

```
 1   Department of State?
 2       A.   If you asked me a specific question,
 3   maybe I would, but, in general terms, I have --
 4   nothing jumps into my memory, no.
 5       Q.   Do you remember a discussion about
 6   the educational requirements?
 7       A.   I remember one comment by a
 8   participant talking about limiting au pairs in
 9   certain areas because they couldn't find
10   education -- good educational facilities for
11   them to take the classes.  I don't remember who
12   it was.
13       Q.   Okay.  Were you taking notes during
14   this -- during this meeting?
15       A.   I did, yes.
16       Q.   Do you remember whether they were
17   handwritten notes or on a computer?
18       A.   They were handwritten.
19       Q.   Handwritten notes.
20           Did you ever type up your notes
21   afterwards?
22       A.   I did.
```

Page 135

```
 1       Q.   Okay.
 2            - - -
 3            (Brown Deposition Exhibit Number 6,
 4        State Department Meeting with Au
 5        Pair Program Sponsors, July 17,
 6        2015, Bates stamped EAP0000612
 7        through EAP0000617, marked for
 8        identification, as of this date.)
 9            - - -
10       THE WITNESS:  Thank you.
11   BY MR. LIBLING:
12       Q.   So I've handed you a document the
13   court reporter -- well, actually, the court
14   reporter has handed you a document marked
15   Exhibit 6, which is Bates stamped EAP0000612
16   through -617.
17           Does this appear to be the notes
18   that you ultimately typed up in that meeting?
19       A.   Yes.
20       Q.   Okay.  Did you make an effort to be
21   accurate in writing -- in writing your notes?
22       A.   Yes.
```

Page 136

```
 1       Q.   All right.  Did the -- did there
 2   come a time when the Department of Labor joined
 3   the meeting?
 4       A.   Yes.
 5       Q.   And how did that happen?
 6       A.   The meeting was broken down into
 7   different segments, and that was part of the
 8   agenda, so at one point when it was on the
 9   agenda, somebody from the Department of Labor
10   came in.
11       Q.   So if you look at -- in Exhibit 5,
12   which is the PowerPoint, at the Bates numbered
13   page ending in 504.
14           So it looks like the Department of
15   Labor came in after lunch.
16           Does that sound right to you?
17       A.   Um-hum.  Yes.
18       Q.   And this page says "Patricia
19   Davidson" on it.
20           Did -- do you remember whether
21   Patricia Davidson came to the meeting?
22       A.   No.
```

Page 137

```
 1       Q.   Do you remember whether it was one
 2   person or multiple people from the Department of
 3   Labor?
 4       A.   No.
 5       Q.   Did you know the Department of Labor
 6   was going to be there before they came in?
 7       A.   No.
 8       Q.   Were they there before the lunch
 9   break?
10       A.   Not that I'm aware of.
11       Q.   All right.  When the Department of
12   Labor arrived or announced their presence, did
13   any of the sponsors react in any way?
14       MR. MESCHKE:  Object to form.
15       THE WITNESS:  I -- I don't
16   remember a reaction -- a reaction, no.  I
17   do remember, at one point, a couple of
18   people left the room.
19   BY MR. LIBLING:
20       Q.   Do you remember whether -- do you
21   remember who left the room?
22       A.   It was the people from
```

PLAINTIFFS' RESP. APP.0004717

MAGNA

LEGAL SERVICES

Case 1:14-cv-03074-CMA-KMT Document 1259-24 Filed 03/17/18 USDC Colorado Page 200 of 311

| | |
|---|---|
| Page 138 | Page 140 |

**Page 138**

1   Cultural Care, and it was some -- a couple other
2   people, and I don't remember what group they
3   were from. I didn't -- I didn't know any of
4   these people.
5        Q.   Do you remember whether either
6   Cultural Care or the other people said anything
7   when they left?
8        A.   No, I don't.
9        Q.   Do you remember whether they left at
10  the beginning of the session or -- with the
11  Department of Labor or some time into it?
12       A.   I do not remember that detail.
13       Q.   Okay. At the time that they left,
14  did you know why -- did you have an
15  understanding of why they left?
16       A.   Somebody had an attorney with them,
17  and so I -- I assumed their attorney told them
18  to do that, but I don't -- again, I don't
19  remember if it was both -- I don't remember the
20  details.
21       Q.   Were you about to say "Bogan"?
22       A.   What's that?

**Page 139**

1        Q.   Were you about to say "Bogan"?
2        A.   I said -- oh, I said it could have
3   been both of them or one attorney. I remember
4   an attorney. I don't remember how many were
5   there, but I think somebody had an attorney.
6        Q.   So in Exhibit 7, which is your
7   notes --
8        A.   Um-hum.
9        Q.   -- if you look at Session 6, which
10  is on the page ending in 616.
11            Are these your notes on that
12  session?
13       A.   Yes.
14       Q.   And the first thing it says is,
15  Packet supplied for review.
16            Do you see that?
17       A.   Uh-huh.
18       Q.   Is that a -- a handout that was
19  given out at the meeting?
20       A.   I don't remember.
21       Q.   Do you remember whether the
22  Department of Labor had a PowerPoint

**Page 140**

1   presentation?
2        A.   I do not remember.
3        Q.   Does the fact that it says here,
4   Packet supplied for review, suggest to you that
5   the Department of Labor distributed some
6   materials?
7        A.   It does, yes.
8        Q.   I'm going to ask the court reporter
9   to hand you two different documents.
10           (Soto voce discussion with court
11  reporter.)
12                - - -
13           (Brown Deposition Exhibit Number 7,
14           Fact Sheet Number 22: Hours Worked
15           Under the Fair Labor Standards Act
16           (FLSA), marked for identification,
17           as of this date.)
18                - - -
19                - - -
20           (Brown Deposition Exhibit Number 8,
21           Fact Sheet Number 79C:
22           Recordkeeping Requirements for

**Page 141**

1            Individuals, Families, or
2            Households Who Employ Domestic
3            Service Workers Under the Fair
4            Labor Standards Act (FLSA), marked
5            for identification, as of this
6            date.)
7                - - -
8        THE WITNESS: Thank you.
9        MS. POTOCZAK: Which is what?
10  BY MR. LIBLING:
11       Q.   So I -- I think the -- the
12  smaller -- the smaller document is Exhibit 7 --
13  neither of them have Bates Numbers,
14  unfortunately -- the larger one is Exhibit 8.
15  And I'll represent -- if you turn the page in
16  Exhibit 8, you will see that it contains the
17  fact sheet 79C that's in Exhibit 7.
18           Do you see that?
19       MS. POTOCZAK: Okay. Just so I
20  get it straight, Exhibit 7 is
21  Fact Sheet 79C and Exhibit 8 is
22  Fact Sheet Number 22, but it also

**MAGNA**
LEGAL SERVICES

---

Page 142

1  contains 79C?
2      Do I got it?
3      MR. LIBLING:  So you have the
4  right documents --
5      MS. POTOCZAK:  Okay.
6      MR. LIBLING:  -- but Exhibit 8 is
7  a collection of fact sheets.
8      MS. POTOCZAK:  Okay.
9      MR. LIBLING:  This is how it
10 was -- this is how it was produced to
11 us --
12     MS. POTOCZAK:  Okay.
13     MR. LIBLING:  -- but -- so
14 Exhibit 8 has --
15     MS. POTOCZAK:  A bunch of --
16     MR. LIBLING:  -- starts with 22,
17 but it also has 79C --
18     MS. POTOCZAK:  Okay.
19     MR. LIBLING:  -- and a few --
20     MS. POTOCZAK:  -- but the first --
21     MR. LIBLING:  -- others.
22     MS. POTOCZAK:  Just so that I know

---

Page 143

1  what the first page is.  Okay.  Thank
2  you.
3      MR. LIBLING:  Yeah.
4  BY MR. LIBLING:
5      Q.   So my question is whether you know
6  whether either of these exhibits is the packet
7  that was supplied by the Department of Labor.
8      A.   No, I don't know.
9      Q.   Do you have any recollection about
10 the size of the packet that was supplied --
11 supplied by the Department of Labor?
12     A.   No.
13     Q.   So do you have any way of estimating
14 which of these two documents is the right one?
15     A.   No.
16     Q.   Okay.  Do you -- do you recognize
17 Fact Sheet 79C?
18     A.   No.
19     Q.   If you can take a -- just a quick
20 leaf through Exhibit 8 and tell me whether you
21 recognize any of the fact sheets in Exhibit 8.
22

---

Page 144

1      (Whereupon, the witness reviews the
2      material provided.)
3      THE WITNESS:  No.
4  BY MR. LIBLING:
5      Q.   So the first bullet in your -- in
6  your notes, your typed-up notes, the first
7  bullet under Session 6 says, 7.25 minimum wage
8  requirement.
9      A.   Um-hum.
10     Q.   Do you recall what the Department of
11 Labor said about that?
12     A.   No.
13     Q.   Do you recall whether the Department
14 of Labor said that au pairs are required to
15 receive a minimum wage of $7.25?
16     A.   No.
17     Q.   What does -- reading it now, what
18 does the first bullet mean to you?
19     A.   7.25 minimum wage, 7.25 an hour, is
20 the Federal minimum wage.
21     Q.   And do you have any knowledge of
22 what the Department of Labor -- why the

---

Page 145

1  Department of Labor was referencing the 7.25
2  Federal minimum wage?
3      A.   I don't remember.
4      Q.   The next bullet is, Employees are
5  required to keep records of hours worked, no
6  requirement as to how the records are kept.
7      And there are a couple of
8  subbullets --
9      A.   Um-hum.
10     Q.   -- do you recall anything the
11 Department of Labor said about this topic?
12     A.   No.  Not really, no.
13     Q.   Do you recall why they were bringing
14 up this topic at all?
15     A.   No.  Anything I'd give you, I'd be
16 speculating.
17     Q.   If you look at Exhibit 7, Exhibit 7
18 is a Fact Sheet 79C about recordkeeping
19 requirements --
20     A.   Um-hum.
21     Q.   -- for certain people, under certain
22 circumstances.

---

PLAINTIFFS' RESP. APP.0004719

**MAGNA ▶**
LEGAL SERVICES

Case No. 1:14-cv-03074-CMA-KMT Document 959-24 filed 03/30/18 USDC Colorado pg 203 of 311

# Exhibit 424

PLAINTIFFS' RESP. APP.0004720

Case 1:14-cv-03074-CMA-KMT   Document 959-24   Filed 05/17/18   USDC Colorado   Page 203
of 311

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

- - - - - - - - - - - - - - - - - - - - x

JOHANA PAOLA BELTRAN, et al.,

                Plaintiffs,

                          Civil Case No.
  -against-         14-cv-03074-CMA-CBS


INTEREXCHANGE INC., et al.,

                Defendants.
- - - - - - - - - - - - - - - - - - - - x


        Videotaped oral deposition of
WILLIAM L. GERTZ, taken pursuant to
Notice, was held at the law offices of
BOIES SCHILLER & FLEXNER LLP, 575
Lexington Avenue, New York, New York,
commencing September 14, 2017, 10:10
a.m., on the above date, before Leslie
Fagin, a Registered Professional
Reporter and Notary Public in the State
of New York.


            MAGNA LEGAL SERVICES
    320 West 37th Street, 12th Floor
      New York, New York 10018
        (866) 624-6221

PLAINTIFFS' RESP. APP.0004721

| Page 2 | Page 4 |
|---|---|

**Page 2**

```
 1
 2   APPEARANCES:
 3
     BOIES SCHILLER FLEXNER LLP
 4   Attorneys for Plaintiffs
         575 Lexington Avenue
 5       New York, New York 10022
     BY:   BYRON D.M. PACHECO, ESQUIRE
 6         DAWN SMALLS, ESQUIRE
 7
 8   CHOATE HALL & STEWART LLP
     Attorneys for the Witness
 9       Two International Place
         Boston, Massachusetts 02110
10   BY:   KEVIN O'KEEFE, ESQUIRE
11
12   GIBSON DUNN & CRUTCHER LLP
     Attorneys for AIFS
13       200 Park Avenue
         New York, New York 10166-0193
14   BY:   ERIC STOCK, ESQ.
15
16   WHEELER TRIGG O'DONNELL
     Attorneys for USAuPair, Inc. and GoAuPair and
17   Au Pair International
         370 17th Street, Suite 4500
18       Denver, Colorado 80202
     BY:   KATHRYN REILLY, ESQUIRE
19         (Appearing via telephone.)
20
     NIXON SHEFRIN HENSEN OGBURN
21   Attorneys for ProAuPair and International Au
     Pair Exchange
22       5619 DTC Parkway #1200
         Greenwood Village, Colorado 80111
23   BY:   KATHLEEN CRAIGMILE, ESQUIRE
           (Appearing via telephone.)
24
25
```

**Page 3**

```
 1
 2   APPEARANCES:
 3
 4   SHERMAN & HOWARD LLC
     Attorneys for InterExchange, Inc.
 5       633 17th Street, Suite 3000
         Denver, Colorado 80202
 6   BY:   ALYSSA LEVY, ESQUIRE
           (Appearing via telephone.)
 7
 8
     GORDON & REES
 9   Attorneys for AuPairCare, Inc.
         555 17th Street #3400
10       Denver, Colorado 80202
     BY:   PEGGY KOZAL, ESQUIRE
11         (Appearing via telephone.)
12
13   PUTNEY, TWOMBLY, HALL & HIRON LLP
     Attorneys for AIFS
14       521 Fifth Avenue
         New York, New York 10175
15   BY:   STEPHEN J. MACRI, ESQUIRE
           ROBERT TUCKER, ESQUIRE
16
17   ALSO PRESENT:
18
           ROBERT STEINKOPF, Videographer
19
20
21
22
23
24
25
```

**Page 4**

```
 1
 2        THE VIDEOGRAPHER:  We are now on
 3   the record.
 4        This begins media No. 1 in the
 5   deposition of William Gertz in the
 6   matter of Joan Paola Beltran, et al.,
 7   via InterExchange, Inc., et al., in the
 8   United States District Court for the
 9   District of Columbia.
10        Today is Thursday, September 14,
11   2017.  Time is 10:10 a.m.
12        This deposition is being taken at
13   575 Lexington Avenue, New York, New York
14   at the request of Boies Schiller &
15   Flexner LLP.
16        The videographer is Robert
17   Steinkopf of Magna Legal Services and
18   the court reporter is Leslie Fagin of
19   Magna Legal Services.
20        Will counsel and all parties
21   present state their appearance and who
22   they represent.
23        MS. SMALLS:  Dawn Smalls from Boies
24   Schiller & Flexner on behalf of the
25   plaintiffs.
```

**Page 5**

```
 1        W. Gertz
 2        MR. PACHECO:  Byron Pacheco from
 3   Boies Schiller & Flexner, also on behalf
 4   of the plaintiffs.
 5        MR. MACRI:  Steven Macri and Robert
 6   Tucker from Putney, Twombly, Hall &
 7   Hiron on behalf of American Institute
 8   For Foreign Study, Inc.
 9        MR. O'KEEFE:  Kevin O'Keefe of
10   Choate Hall & Stewart on behalf of
11   Cultural Care, Inc.
12   W I L L I A M  L.  G E R T Z, called as a
13   witness, having been duly sworn by a
14   Notary Public, was examined and testified
15   as follows:
16   EXAMINATION BY
17   MS. SMALLS:
18        Q.  Good morning.  Could you please
19   state your full name, your employer and your
20   title for the record?
21        A.  William L. Gertz, president and CEO
22   of AIFS.
23        Q.  Have you ever been deposed before?
24        A.  I have not.
25        Q.  A few ground rules for the
```

**MAGNA** ▶
LEGAL SERVICES

Page 162

```
1              W. Gertz
2      A.   Yes.
3      Q.   How long have you had that role?
4      A.   Two years.
5      Q.   When did you assume that role?
6      A.   A couple of years ago, I can't give
7  you a date, I really don't know.
8      Q.   Do you remember, was it before the
9  initiation of this litigation or after the
10 initiation of this litigation?
11     A.   I'm pretty sure it was after, but I
12 couldn't tell you directly.
13     Q.   What is the role of the chair of
14 the Alliance?
15     A.   Keep the peace, frankly, the
16 Alliance is 75 organizations, so, you know,
17 ranking from quasi governmental organizations
18 to organizations that have J-1 programs or
19 F-1 programs, so the role there is to really
20 make sure it's operating the way it should be
21 operating and to make sure all the members
22 are kind of happy with the direction, so that
23 we don't spend too much time on any one
24 topic.  That's the hot topic now, we have
25 that -- we need to be cognizant, the Alliance
```

Page 163

```
1              W. Gertz
2  needs to be cognizant that everybody is
3  getting -- because it's a dues-paying
4  organization, so everybody is getting
5  something out of it and the activities are
6  all kinds of stuff, lobbying, dealing with
7  Congress, State Department regulations, but I
8  think it's more to tie everything together,
9  so the 75 organizations would get together
10 with the Department of State, say, every
11 October, there is a big meeting and they
12 brainstorm things.  The Department of State
13 goes through regulations sometimes or just
14 any issues that the Alliance has for all the
15 programs, government funded programs and the
16 Alliance also tries to advocate for increased
17 appropriations for cultural exchange programs
18 and educational programs, both in public and
19 private sectors.  That's, in a nutshell, what
20 my role is.
21     Q.   Who did you succeed as chair of the
22 Alliance?
23     A.   Let's see, what's her name?  A
24 woman that was responsible for center for
25 immigration, but really -- some really smart
```

Page 164

```
1              W. Gertz
2  people there, really very dedicated, I was
3  happy to do it.
4      Q.   How were you chosen to be chair?
5      A.   Just like, how about you, Bill,
6  because it's a job nobody wants, a lot of
7  work, meetings and phone calls and that, so
8  there was not -- I guess there was a vote, I
9  don't remember, but it was the -- Michael
10 McCarry who was the chair, I think it was
11 Michael, I'm not sure, he said, how about
12 you, Bill.  I think it was Michael, and I
13 said, sure, I will do it, it was important,
14 so I will do it.  It's a little more work
15 than I thought it would be, but I'm happy to
16 do it.
17     Q.   What is the governing structure for
18 the Alliance?
19     A.   There is an executive committee,
20 executive committee, then there is a board of
21 directors, then there are members.
22     Q.   Who is on the executive committee?
23     A.   If I knew you were going to ask me
24 that, I would have brought the list.  There
25 is Lara Rose, who runs a high school program;
```

Page 165

```
1              W. Gertz
2  myself; Ellen, who runs an au pair and a high
3  school exchange program and then there is a
4  world learning, the director, who kind of
5  gets a lot of government grants and that's
6  all I remember right now.  There is another
7  guy from another organization, Meridian is, I
8  think on the executive committee, so five or
9  six people; and Ilir Zherka is the executive
10 director.
11     Q.   Who is on the board of directors?
12     A.   Sixteen people from CIEEIIE, IIE is
13 also, I think on the executive committee now.
14 All these organizations that have a common
15 purpose and theme with AIFS, so they would be
16 all organizations interested in increasing
17 international understanding and in
18 facilitating exchanges, so Alliance is the
19 international exchange's kind of all
20 different types, all different types, no real
21 focus on one specific program, just
22 multiplicity of organizations and programs.
23     Q.   How big is the membership overall?
24     A.   Seventy-five I think, 75 members.
25     Q.   So 75 total members?
```

PLAINTIFFS' RESP. APP.0004723

MAGNA
LEGAL SERVICES

Page 174

W. Gertz

1     mentioned working with -- they have access to
2     the State Department, so they can get people
3     to come to the meeting, so, say, our October
4     meeting, we could have 50, 75 people from the
5     State Department coming to the meeting, which
6     is a tremendous asset, which makes people
7     want to join the Alliance because they have
8     access to the program people. The way the
9     State Department is run, if there is a
10    program person in charge of the au pair
11    program or whatever, so they get access and
12    we make sure they're happy with what we are
13    doing and we're happy with what they're
14    doing.
15        So that's pretty much the Alliance.
16    It's a high quality organization. People
17    work really hard. It's been a lot of fun for
18    me, but it's sometimes more work than I want
19    it to because I'm spread out in a lot of
20    different directions.
21        Q.   You said one of the things the
22    Alliance does is discuss best practices?
23        A.   Yeah. I mean, I would say that's a
24    pretty minor role. That would be more State

Page 175

W. Gertz

1     Department than the Alliance best practices.
2     The State Department discusses best
3     practices, the Alliance, there is not a lot
4     of best practices there, so it would be State
5     Department.
6         Q.   How often do you talk to other
7     sponsors?
8         MR. TUCKER:  Object to form,
9     foundation.
10        Q.   Do you talk to other sponsors?
11        A.   On occasion, but not very often.
12        Q.   How often do you talk to other
13    sponsors?
14        A.   If I see them at a conference,
15    sure, but I don't have close relationships.
16    Ellen was on the board, the Alliance, so was
17    Marcie Schneider is on the board. Marci I
18    know from our time at AIFS, so we talk about
19    family stuff a lot, a lot of family talk.
20    The other people, I'm known to say hello.
21    The guy, Yaren, I know to say hello. I've
22    been doing this a long time. The other
23    people, I know some of them, some of them I
24    don't know.

Page 176

W. Gertz

1         Q.   Do you ever talk about --
2         A.   Sorry, I just got a fly in my head.
3         Q.   Do you ever talk about issues
4     relating to the au pair industry with other
5     sponsors?
6         A.   What issues?
7         Q.   Do you ever talk about the au pair
8     stipend?
9         A.   No.
10        Q.   Have you ever talked about the au
11    pair stipend with other sponsors?
12        A.   I will say we have talked at --
13    after the litigation, there was certainly --
14    must have been talk about -- it was not --
15    there would be no specific talk about the
16    stipend in terms of the case, we try not to
17    talk about the case. Can I say we never
18    said, oh, boy, we are nervous, why did this
19    happen, whatever? No, I can't say that, but,
20    in general, it's not something we talk about.
21    We don't talk about the industry much. Other
22    than if we are having an issue on lobbying or
23    legislation, we might get into some of it a
24    little bit because those kinds of issues

Page 177

W. Gertz

1     are -- impact the survival of the program, so
2     if there is legislation, right now, we are
3     talking about the survival of the program, so
4     there has been some talk. I haven't done
5     much of it. I do know the people, I run into
6     them a lot, it's a pretty small industry,
7     it's not huge, so we run into the au pair
8     sponsors occasionally, but we don't have a
9     lot of interplay.
10        Q.   Do you talk about --
11        MS. KOZAL:  I'm sorry to do this
12    again, I know other people on the phone
13    are also having problems, we've got to
14    get this problem fixed. I can hear Dawn
15    Smalls asking the question, I cannot
16    hear the witness. I can hear bits and
17    pieces of what he is saying. Oftentimes
18    the words are getting eaten, so if we
19    need to go off the record, let's go off
20    the record, but let's get the problem
21    fixed.
22        THE WITNESS:  Can I go to the
23    bathroom now.
24        THE VIDEOGRAPHER:  We are now off

PLAINTIFFS' RESP. APP.0004724

MAGNA
LEGAL SERVICES

Page 178

```
1              W. Gertz
2    the record.  The time is 3:31 p.m.
3         (Recess.)
4         THE VIDEOGRAPHER:  We are now on
5    the record.  The time is 3:49 p.m.
6         Q.  Before the break, I was getting
7    ready to ask you --
8         MS. SMALLS:  Before we start, can
9    you just do a check?
10        THE WITNESS:  Check, check.
11        MS. SMALLS:  Can you guys hear him?
12        MS. KOZAL:  Yes, we can.  Thank you
13    very much.
14        Q.   Before the break, I was getting
15    ready to ask you whether you ever talked
16    about, at the Alliance, whether you wanted
17    the au pair stipend to be tied to the minimum
18    wage?
19        A.  I don't remember having a
20    conversation like that at the Alliance
21    meeting.
22        Q.  Or anywhere?
23        A.  I don't recall.
24        Q.  Have you ever discussed with
25    anybody the connection between the au pair
```

Page 179

```
1              W. Gertz
2    stipend and minimum wage?
3         A.  In the context of lobbying or
4    regulations, it's possible.
5         Q.  Would that person have been at AIFS
6    or would that person have been at another
7    sponsor?
8         MR. TUCKER:  Objection as to form.
9         A.  I think it would be more, I mean,
10   it could be -- maybe Ruth, but maybe another
11   sponsor at an Alliance meeting, it's
12   possible.
13        Q.  Has the au pair stipend ever been
14   on the agenda of an Alliance meeting?
15        A.  I don't think so, but I don't
16   recall if it was, but I don't think so, but,
17   again, it's possible.
18        Q.  You testified that you have board
19   meetings of the Alliance and then you have
20   general membership meetings, then you also
21   testified you have general committee meetings
22   which are done in tangent with board
23   meetings, is that correct?
24        A.  Yes.
25        Q.  Are those meetings generally in
```

Page 180

```
1              W. Gertz
2    person or by phone?
3         A.  They could be either.
4         Q.  What are they most often?
5         A.  I would say more likely by phone on
6    executive committee meetings, recently
7    because, you know, last year or so, Ilir has
8    had many more meetings, phone meetings.
9    Prior to him, I would say more just a couple
10   of in-person meetings.
11        Q.  Why have there been more meetings
12   in the last year?
13        A.  Ilir, he is into advocacy and he is
14   a real go-getter and a different kind of
15   person than the last executive director, just
16   more engaged in lobbying in congressional
17   work and work with the State Department and
18   plus the program with the Trump
19   administration is in much more trouble, so he
20   is out there having meetings and with all
21   different sponsors, not au pair sponsors, all
22   sponsors.  It seems to be ratcheting up.
23        Q.  And how often does the membership
24   meet?
25        A.  Let's see, once a year is the big
```

Page 181

```
1              W. Gertz
2    membership meeting in October.
3         Q.  Is that in person or by phone?
4         A.  It's in person.
5         Q.  Does the membership get together by
6    phone, in addition to the in-person meetings?
7         A.  There could be, there could be
8    subgroups sometimes, but normally not.
9    Normally, it's just the in person, with the
10   total 75 organizations, it's once a year in
11   October.
12        Q.  And how was the agenda for the
13   membership meeting created?
14        A.  The Alliance creates it.
15        Q.  Who is the Alliance, when you say,
16   the Alliance creates it?
17        A.  It's Ilir, it's Laine now.  It was
18   somebody else before.  There has always been
19   two or three people at the Alliance
20   responsible for things.
21        Q.  And does anyone take notes of any
22   of those meetings in the regular course?
23        A.  The -- yes, there is minutes, there
24   is minutes to the board meetings, correct.
25        Q.  Are there minutes or notes of the
```

MAGNA
LEGAL SERVICES

46 (Pages 178 to 181)

Case 1:14-cv-03074-CMA-KMT   Document 943-47   Filed 05/17/18   USDC Colorado   Page 208 of 310

# Exhibit 425

PLAINTIFFS' RESP. APP.0004726

Case 1:14-cv-03074-CMA-KMT   Document 918-17   Filed 03/17/18   USDC Colorado   Page 209
of 310

**In the Matter Of:**

JOHANA PAOLA BELTRAN

vs

INTEREXCHANGE, INC.

---

**RAQUEL EASTRIDGE**

*December 15, 2017*

---



203 WEST WAYNE STREET, SUITE 406
FORT WAYNE INDIANA 46802
260.486.3954 | 800.977.3376
WWW.SUMMITCITYREPORTING.COM

PLAINTIFFS' RESP. APP.0004727

JOHANA PAOLA BELTRAN vs INTEREXCHANGE, INC.
Eastridge, Raquel on 12/15/2017

                IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO


  JOHANA PAOLA BELTRAN; et        )
  al.,                            )
                                  )
          Plaintiffs,             )
                                  )   Civil Action No.
          -v-                     )   1:14-cv-03074-CMA-KMT
                                  )
  INTEREXCHANGE, INC.; et         )
  al.,                            )
                                  )
          Defendants.             )   **COPY**

          The videotaped deposition upon oral

  examination of RAQUEL EASTRIDGE, a witness produced

  and sworn before me, Drea Sasse, CSR, RPR, Notary

  Public in and for the County of Porter, State of

  Indiana, taken on behalf of the Defendant, Cultural

  Care, Inc., d/b/a Cultural Care Au Pair, at

  Eichorn & Eichorn, 200 Russell Street, Hammond,

  Indiana, on Friday, December 15, 2017, at 8:52 a.m.,

  pursuant to the Federal Rules of Civil Procedure.

PLAINTIFFS' RESP. APP.0004728

JOHANA PAOLA BELTRAN vs INTEREXCHANGE, INC.
Eastridge, Raquel on 12/15/2017                                                    Pages 2..5

---

Page 2

```
 1                    APPEARANCES
 2   FOR THE PLAINTIFFS:
 3        DAWN L. SMALLS, ESQ.
          BOIES SCHILLER & FLEXNER, LLP
 4        575 Lexington Avenue
          7th Floor
 5        New York, New York  10022
 6
 7   FOR THE DEFENDANT, CULTURAL CARE, INC., D/B/A CULTURAL
     CARE AU PAIR:
 8
          JUSTIN J. WOLOSZ, ESQ.
 9        CHOATE HALL & STEWART, LLP
          Two International Place
10        Boston, Massachusetts  02110
11
12   ALSO PRESENT:
13        MR. JOSEPH CARLIN, Videographer
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1                INDEX OF EXAMINATION
 2   EXAMINATION                                   PAGE
 3   BY MR. WOLOSZ:                                   5
     BY MS. SMALLS:                                 112
 4   BY MR. WOLOSZ:                                 133
 5
 6                 INDEX OF EXHIBITS
 7      NUM.        DESCRIPTION                     PAGE
 8   Exhibit 1    Notice of Deposition                7
 9   Exhibit 2    Consent to Join                    14
10   Exhibit 3    Questionnaire Responses from       25
                  Maria Raquel Franco Mendes
11
     Exhibit 4    Verification                       25
12
     Exhibit 5    Au Pair Application                27
13                Bates Nos. CC00034996-CC00035007
14   Exhibit 6    Cultural Care Au Pair Host Family  52
                  & Au Pair Acknowledgement
15                Bates No. CC00034958
16   Exhibit 7    Cultural Care Au Pair Host Family  85
                  Application
17                Bates Nos. CC000034983-CC00034988
18   Exhibit 8    LCC Notes                         108
                  Bates No. CC00034949
19
20
21
22
23
24
25
```

Page 4

```
 1        THE VIDEOGRAPHER:  Okay.  We're going on the
 2   record at 8:52 a.m.  Today's date is December 15th,
 3   2017.  This deposition is being held at 200 Russell
 4   Street, Hammond, Indiana.  Here begins the
 5   videotape deposition of Maria Raquel Franco Mendes
 6   taken by the Defendant.  This case is filed in the
 7   United States District Court for the District of
 8   Colorado, Civil Action No. 1:14-cv-03074-CMA-KMT in
 9   the matter of Johana Paola Beltran, et al.,
10   Defendant [sic], versus Interexchange, Inc.,
11   Defendant.
12        My name is Joseph Carlin, in association with
13   Summit City Reporting, located in Fort Wayne,
14   Indiana.  The court reporter is Drea Sasse, also in
15   association with Summit City Reporting.
16        Counsel may now state their appearances for
17   the record, and the reporter will swear in the
18   witness.
19        MR. WOLOSZ:  Justin Wolosz from Choate Hall &
20   Stewart on behalf of Cultural Care.
21        MS. SMALLS:  Dawn Smalls from Boies Schiller &
22   Flexner on behalf of plaintiffs.
23
24
25
```

Page 5

```
 1                  RAQUEL EASTRIDGE,
 2        called as a witness by the Defendant, Cultural
 3        Care, Inc., d/b/a Cultural Care Au Pair, having
 4        been first duly sworn, was examined and testified
 5        as follows:
 6   DIRECT EXAMINATION
 7   BY MR. WOLOSZ:
 8   Q.   Good morning again.
 9   A.   Good morning.
10   Q.   Can you state your full name for the record.
11   A.   My name is Raquel Eastridge.
12   ████████████████████████████████████████████████
     █████████████████████████████████████████████
     ██████████████████████████████████████████
     ████████████████████████████████████████
17   Q.   Okay.  And I understand you asked before the
18        deposition that I refer to you as Raquel, so I will
19        do that from this point forward; okay?
20   A.   Okay.
21   Q.   Have you ever been deposed before?
22   A.   No.
23   Q.   So just a couple basics about the way a deposition
24        works, although you probably know this.  I'll ask
25        questions; you give answers.  The -- what you say
```

PLAINTIFFS' RESP. APP.0004729

Case No. 1:14-cv-03074-CMA-KMT   Document 959-24   filed 03/17/18   USDC Colorado   pg 212
of 310
Case 1:14-cv-03074-CMA-KMT   Document 459-24   Filed 03/17/18   USDC Colorado   Page 213 of 311

JOHANA PAOLA BELTRAN vs INTEREXCHANGE, INC.
Eastridge, Raquel on 12/15/2017                                          Pages 18..21



Page 18

13        MS. SMALLS:  Objection.  None of this has to
14    do with the Fair Labor Standards Act claims, which
15    is why we're here today, which is the hours that
16    she worked and the terms of her employment.  Where
17    she went to school, where she studied abroad has
18    nothing to do with the claims in this action.  So I
19    don't want to interrupt with an objection for every
20    question, but I'd just like to put on the record
21    that we are wholesale objecting to any questions
22    that do not have to do with her hours or terms of
23    employment while she was an au pair.  So objection.
24        MR. WOLOSZ:  And we don't have to resolve this
25    now, but I'll also put on the record that the FLSA

Page 19

1    claims in this case raise questions of joint
2    employer, raise questions of preemption, and more
3    specifically, paragraph 600 of the Plaintiffs'
4    Second Amended Complaint, which is the FLSA count,
5    says, and I quote, "Sponsors controlled their
6    recruitment, had the ability to terminate
7    participation in the program, trained them,
8    maintained their records, controlled where they
9    worked, the dates of employment, set the terms of
10   their employment contracts, and set their wage
11   rates."  And I think the combination of issues
12   easily makes questions about background and
13   knowledge, education relevant to the FLSA claims as
14   well.
15        MS. SMALLS:  Okay.
16        MR. WOLOSZ:
17

Page 20

Page 21

1    How did you first learn about the au pair program?
2    A.  When I did the course in Ireland, the same agency,
3        they do -- they have the au pair program.  That's
4        how I found out.
5    Q.  Did you know at that point when you were in Ireland
6        anyone else who had participated in the au pair
7        program in the United States?
8    A.  No.
9    Q.  So tell me how you first sort of inquired about or
10       learned about more detail about the program?
11   A.  When I went back home, I wanted to still have -- I
12       didn't think my English was good enough, and I
13       decided to come to a different country to improve
14       it.  And so I was looking for options where I could
15       work and have money and still learn.  And that's
16       how I found it.
17   Q.  Were you hoping at that point that this might lead
18       to an opportunity to stay in the United States long
19       term?
20   A.  No.
21        MS. SMALLS:  Objection.
22        MR. WOLOSZ:
23   Q.  So how did you first learn about Cultural Care as a
24       sponsor of au pairs?
25   A.  Through the agency, the same agency I applied to

24   Q.  All right.  So let's talk about your decision to
25       apply to the au pair program in the United States.

PLAINTIFFS' RESP. APP.0004730

Page 22

1  learn English in Ireland was the same agency, just
2  a different program.
3  Q.  Do you understand that there are more than one
4  sponsor of the au pair -- of au pairs in the United
5  States?
6  A.  Do you mean more agencies?
7  Q.  Yes.
8  A.  Yes.
9  Q.  Did you ever explore possibly going through a
10  different agency other than Cultural Care?
11  A.  I looked at some websites, but I was already
12  decided to go with Cultural Care.
13  Q.  So once you got back in Brazil, who did you contact
14  to try to start the process?
15  A.  The same person who helped me with the studies
16  in -- in Ireland.
17  Q.  Who is that?
18  A.  Her name is Amanda.  She's the owner of the agency.
19  Q.  Is that -- when you say the agency, where is that
20  agency?
21  A.  Botucatu, São Paulo, same place I started, same
22  place I went to school.
23  Q.  Do you know what the agency is called?
24  A.  No, I don't recall the name.
25  Q.  Can you describe for us the process by which you

Page 23

1  ultimately applied to become an au pair?
2  A.  Yes.  We got together.  She went through the
3  program.  She said how long it was to be contract
4  for, and she said I had to take an English test; I
5  did.  And she said if I pass the test, then I could
6  pay for it and pay the fee and apply for the visa.
7  If I had the visa approved, then I would go through
8  the profile online.  I would wait until some family
9  contacted me, and then I would be able to go.
10  Q.  Do you recall approximately when you started that
11  process?
12  A.  It was in the beginning of the year.  I would say
13  maybe January or February of 2011.  And then the
14  family first contacted me in October, maybe a few
15  months before, because October, that's when I came,
16  so...
17  Q.  And in connection with the application process, did
18  you only work with this -- I'm sorry, I forgot her
19  name.
20  A.  Amanda.
21  Q.  Did you only work with Amanda, or did you work with
22  others as well?
23  A.  Only her.
24  Q.  What did Amanda tell you about the child care
25  responsibilities you would have as an au pair in

Page 24

1  the United States?
2  A.  The basics, because it really depends what the
3  family is going to ask us to do, but basically care
4  for the children and take them to school, play with
5  them, and all the obligations that an au pair would
6  have.
7  Q.  And what, if anything, did she tell you about the
8  stipend that you would be paid as an au pair in the
9  United States?
10  A.  That it was in the contract.  She showed me.  It
11  was like 195.75, something --
12  Q.  Did Amanda --
13  A.  -- like that.
14  Q.  I'm sorry.  I didn't mean to cut you off.
15  A.  No.  I said something like that.  Go ahead.
16  Q.  Did Amanda say that it could never be more than
17  that?
18  A.  No.
19  Q.  Was there discussion with Amanda about the cultural
20  benefits of the program?
21  A.  I don't recall.
22  Q.  Was there discussion with Amanda about the ability
23  to improve your English by participating in the
24  program?
25  A.  No, I don't think she mentioned that.  She just

Page 25

1  really wanted to know if my English was good enough
2  to come.
3  Q.  All right.  So at some point you prepared an
4  application; correct?
5  A.  Yes.
6  Q.  And actually before we get there, maybe I'll do
7  this now.
8  Could we mark this as Exhibit 3, and I have 4
9  as well.
10  (Exhibit 3 and Exhibit 4 marked for
11  identification.)
12  THE WITNESS:  Thank you.
13  MR. WOLOSZ:
14  Q.  Now, Raquel, could you take a look at what has been
15  marked as Exhibit 3 and tell me if you recognize
16  that.
17  A.  Yes.
18  Q.  What is that?
19  A.  This is a survey I answered.
20  Q.  And to the best of your knowledge, does it appear
21  to be complete?
22  A.  Yes.
23  Q.  So this is probably obvious, but just so it's clear
24  for the record, the questions on here were given to
25  you, and then the bold wording, that's your

PLAINTIFFS' RESP. APP.0004731

Case 1:14-cv-03074-CMA-KMT Document 1259-24 filed 03/17/18 USDC Colorado pg 214 of 311

Page 26

1   responses; is that right?
2   A.   Yes.  I think a few of them is not in bold, but
3        they all have answers.
4   Q.   Okay.  Fair enough.  And then can I ask you to look
5        at Exhibit 4.
6   A.   Yes.
7   Q.   And is that a Verification that you signed?
8   A.   Yes.
9   Q.   Does Exhibit 4 verify the responsibilities that
10       appear in Exhibit 3?
11  A.   Yes.
12  Q.   Thank you.  Now, I apologize in advance.  I got
13       these last night, otherwise I would have
14       assimilated them into my outline.  There will be a
15       little bit of duplication with some answers that
16       you have here.  But if any point I ask a question
17       and you'd like to refer to this, please feel free
18       and let me know; okay?
19  A.   Okay.
20  Q.   All right.  So at some point you filled out
21       application materials to take part in the au pair
22       program; correct?
23  A.   Yes.
24           MR. WOLOSZ:  Could we mark this as Exhibit 5.
25

Page 27

1           (Exhibit 5 marked for identification.)
2           THE WITNESS:  Thank you.
3           MR. WOLOSZ:
4   Q.   I'm going to ask you to take a look at this
5        document.  My question is going to be do you
6        recognize it, but just to give you a heads-up, I
7        know that the format, I believe, looks a little
8        different.  I can just represent to you that I
9        understand this to be your application, but I know
10       that in the real world, this gets viewed on a
11       computer terminal, and it may just be set up a
12       little bit differently.
13           But I'd ask you to please take a look at it
14       and tell me if this appears to be your application
15       to participate in the au pair program.
16  A.   Yes, this looks like my application.
17  Q.   Okay.  Can I direct your attention to the first
18       page -- sorry.  When you're ready.
19  A.   Mm-hmm.
20  Q.   Can I direct your direction to the first page at
21       the top where it says "Why I want to be an au
22       pair."  Do you see that?
23  A.   Yes.
24  Q.   And this is your opportunity to list reasons that
25       you want to be an au pair in the United States;

Page 28

1   correct?
2   A.   Mm-hmm.
3   Q.   And the answers you gave are "Because I love
4        children and new cultures."  Do you see that?
5   A.   Yes.
6   Q.   And then you say "And I think this is the best way
7        to improve my English skills," what we were just
8        talking about a moment ago; correct?
9   A.   Yes.
10  Q.   And then you say "Also I can teach you about my
11       culture and language."  Do you see that?
12  A.   Yes.
13  Q.   And here "you" is referring to a possible host
14       family that might be considering matching with you;
15       correct?
16  A.   Yes.
17  Q.   So the -- in other words, the participation in the
18       program was intended to be sort of -- go both ways;
19       right?  And by that I mean you were hoping you
20       would learn more about American culture and
21       English; correct?
22  A.   Yes.
23  Q.   And you were hoping you could help teach a family
24       more about your culture; correct?
25  A.   Yes.

Page 29

1   Q.   Okay.  By the way, there's nothing in this section
2        that says "Why I want to be an au pair" about
3        money; correct?
4   A.   No, because when they sell the program, they sell
5        as an exchange culture.
6   Q.   Okay.  But so the answer is no, there's nothing
7        in -- there's nothing in this paragraph that says
8        "Why I want to be an au pair" about money; correct?
9   A.   No.
10  Q.   Okay.  Let's talk a little bit about your
11       expectations of the program.  You knew that you
12       would be living with a family; correct?
13  A.   Yes.
14  Q.   And that was part of the cultural exchange
15       experience; correct?
16  A.   Yes.
17  Q.   Did you know that the host family would be
18       providing you meals?
19  A.   Yes.
20  Q.   Did you consider the housing and food to be one of
21       the benefits of the program?
22  A.   I wouldn't say -- yeah, it could be a benefit, yes,
23       but I was also working for it.
24  Q.   Oh, absolutely.  But it's one of the benefits in
25       exchange for your participation in the program?

PLAINTIFFS' RESP. APP.0004732

Case No. 1:14-cv-03074-CMA-KMT    Document 1059-21    filed 07/13/18    USDC Colorado    pg 216 of 311
Case 1:14-cv-03074-CMA-KMT    Document 1059-21    Filed 07/17/18    USDC Colorado    Page 215

Page 30

1  A.  I would say it was presented to me as a role, not
2      as a benefit, one of the roles is I would have to
3      live with the family.
4  Q.  But it would have been -- you'll agree with me it
5      would have been more difficult for you to take part
6      in the program if you had to find your own housing
7      and provide all your own meals; correct?
8  A.  I didn't think about that at the time, but I would
9      say I would have to then talk more about how much
10     money I would make.
11 Q.  But separate and apart from the money, it would
12     require more work on your part to have to find a
13     place to live and have to get food and make all
14     your own meals; correct?
15 A.  I don't know if it would be more difficult.  I
16     could do it on my own if I wanted to.
17 Q.  Okay.  Well, at least you knew coming into the
18     program that you weren't going to have to
19     arrange for your own housing and food --
20 A.  Yes --
21 Q.  -- because it was provided?
22 A.  -- I knew because that was to be part of the
23     program, yes.
24 Q.  And by the way, and I do this all the time, as
25     well, but we should be careful not to talk over

Page 31

1      each other because it makes it impossible for the
2      reporter to --
3  A.  Oh, okay.
4  Q.  So I will do my best to wait until you finish
5      speaking to talk, and I will ask you to do the
6      same.
7  A.  Okay.
8  Q.  How much did the stipend amount impact your
9      decision to take part in the program?
10 A.  I would say it was -- it was important to me
11     because I wanted to make sure I would be able to
12     survive with that money.  So, yeah, it was
13     important to me.
14 Q.  And did you bring other funds with you when you
15     came to the United States?
16 A.  Yes.
17 ████████████████████████████████████████
   ████████████████████████████
   ████████████████████████████████████
   ████████████████████████████████████████
   ████████████████
   ████████████████████████████████████████
   ████████████████

Page 32

1  Q.  I hope we don't impact that decision with this
2      deposition today.
3  A.  No, I'm sure you won't.
4  Q.  If I could ask you in Exhibit 5 to flip to the page
5      that has numbers at the bottom that say CC00035005.
6          MS. SMALLS:  What's the number?
7          MR. WOLOSZ:
8      It ends in 005.
9  A.  005.  Okay.
10 Q.  Now, here we see it says "Why do you want to be an
11     au pair," and I think it repeats the same thing on
12     the first page.
13 A.  Mm-hmm.
14 Q.  It also just to the right of that says "What would
15     you like to accomplish during your time as an au
16     pair."  Do you see that?
17 A.  Yes.
18 Q.  And this is a form question that was asked that you
19     filled in an answer to as part of the -- the
20     application that would be shown to prospective host
21     families; correct?
22 A.  Yes.
23 Q.  And the answer you provided is "I want to get more
24     experience in my life, living far away from home,
25     studying and learning with all of that."  Do you

Page 33

1      see that?
2  A.  Yes.
3  Q.  Again, nothing in response to that question about
4      money; correct?
5  A.  No.
6  Q.  So once you prepared the application form, what
7      happened next in the application process?
8  A.  You just have to wait until a family contacts you.
9  Q.  And can you explain to us how that works.  You get
10     notification?
11 A.  You get an email, yes.
12 Q.  Do you recall how many families contacted you
13     before you matched with your first family?
14 A.  I required, I think, maybe two of them.
15 Q.  And obviously the first one you did not ultimately
16     match with; correct?
17 A.  Right.  Right.
18 Q.  What do you remember about the interaction in
19     connection with that?
20 A.  It was always phone calls and Skype.
21 Q.  Do you remember the name of the family?
22 A.  No.
23 Q.  Do you recall if you spoke to them?
24 A.  Yes.
25 Q.  And what do you remember, if anything, about the

PLAINTIFFS' RESP. APP.0004733

Case No. 1:14-cv-03074-CMA-KMT    Document 1059-24    filed 03/17/18    USDC Colorado    pg 216
of 311

JOHANA PAOLA BELTRAN vs INTEREXCHANGE, INC.
Eastridge, Raquel on 12/15/2017



Page 34

1        conversation?
2

Page 36

1

19   Q.  Did you ever ask how much you would be paid during
20       that conversation?
21   A.  Not for her because I already knew because it's --
22       the price is fixed, so it wouldn't change from
23       family to family.
24   Q.  Well, but you said earlier that you were not told
25       that a family was prevented from paying more;

Page 35

1

Page 37

1        correct?
2    A.  I was not told, no, nobody told me that, but it's
3        not something that came in my mind to ask for more
4        money at that time.
5    Q.  So you didn't ask?
6    A.  No, because I already knew.
7    Q.  I'm sorry.  What do you mean you already knew?
8    A.  I already knew how much I was going to get paid
9        when I signed up for the program.
10   Q.  I thought you testified earlier that when you
11       signed up for the program, you were told a stipend
12       amount of 195.75, but you were never told that a
13       family was prohibited from paying more than that?
14   A.  That was not mentioned to me, but as I signed --
15       the papers I signed, it pretty much says the amount
16       of money that I was going to make.
17   Q.  Okay.  But you were not told that a family was
18       prohibited from paying more?
19   A.  No.  I was told that I was prohibited to work more.
20   Q.  Mm-hmm.  Okay.  And obviously prohibited to pay
21       less?
22   A.  Yes.
23   Q.  Did you ask -- in that Skype call, did you ask the
24       family about what other benefits you might
25       receive if you were to match with them?

PLAINTIFFS' RESP. APP.0004734

JOHANA PAOLA BELTRAN vs INTEREXCHANGE, INC.
Eastridge, Raquel on 12/15/2017                                                    Pages 38..41



Page 38

1   A.   No.
2   Q.   About how much time passed between when you started
3        interacting with the ███ family and then when you
4        actually left for the United States?
5   A.   I would say a month, about a month or less.
6   Q.   And who handled the preparation of your visa?
7   A.   Me, myself.
8   Q.   Did you also pay the costs that were associated
9        with it?
10  A.   Yes.
11  Q.   When did you leave to travel to the United States?
12  A.   October 9th, 2011.
13  Q.   And who made the arrangements for that travel?
14  A.   Cultural Care.
15  Q.   Who paid for that travel?
16  A.   I did.
17  Q.   And how did that work, did Cultural Care --
18  A.   I paid Cultural Care; they booked the flight.
19  Q.   So you paid the actual amount for the flight?
20  A.   I paid the fee at that time for Cultural Care which
21       they said it would include the -- the flight.
22  Q.   Where did you fly to in the United States?
23  A.   New York.
24  Q.   Where did you stay -- well, did you stay in New
25       York for a period of time?

Page 39

1   A.   Yes.
2   Q.   Where did you stay?
3   A.   I don't remember the name of the city, but it was
4        a -- it was a school that we stayed at for the
5        training.
6   Q.   Who paid for your lodging or your room while you
7        were in the school?
8   A.   The price was included with Cultural Care, so
9        Cultural Care -- I mean I paid Cultural Care and
10       that was included.
11  Q.   So -- so let's back up.  What did you pay Cultural
12       Care in connection with your initial participation
13       in the au pair program, how much?
14  A.   I don't recall.
15  Q.   Okay.  But it's your understanding that you were
16       paying for specific items?
17  A.   I don't recall.  I remember I paid the fee, and
18       they told me what would be included.  That would be
19       the flight was one of them.  The visa I had to pay
20       myself, separately.  And then I believe the school,
21       the training would be Cultural Care provided.
22  Q.   I'm just trying to figure out, did somebody tell
23       you that you were paying for your training?
24  A.   No.
25  Q.   Okay.  While you were in -- first of all, how long

Page 40

1        did the training go?
2   A.   Like five days that I recall.
3   Q.   Who provided your meals during that time?
4   A.   The school we were at.
5   Q.   And can you describe to us the type of training
6        that took place during that five days?
7   A.   Safety, emergencies, and activities for kids.
8   Q.   Were they full days --
9   A.   Yes.
10  Q.   -- of training?  So did the training have a
11       specific focus on Cultural Care, or was it more on
12       general child care skills like you just said?
13  A.   It was focused in child care.
14  Q.   Was there also CPR and first aid?  You may have
15       said that.
16  A.   Yes.
17  Q.   Was there self-defense?
18  A.   No.
19

Page 41

1

Case No. 1:14-cv-03074-CMA-KMT Document 959-24 filed 03/30/18 USDC Colorado pg 218 of 311

# Exhibit 426

Page 1

1           IN THE UNITED STATES DISTRICT COURT

              FOR THE DISTRICT OF COLORADO

2    _____

3    JOHANA PAOLA BELTRAN,        )

     et al.,                      )

4                                 )

                                  )

5         Plaintiffs,             )

                                  )Case No.:

6    VS.                          )1:14-cv-03074-CMA-KMT

                                  )

7    INTEREXCHANGE, INC.,         )

     et al.,                      )

8                                 )

                                  )

9         Defendants.             )

     _____

10

11              VIDEOTAPED DEPOSITION

12                     OF

13         ERIKA JOHANA ESGUERRA LEON

14              December 21, 2017

15

16

17

18

19

20

21

22

23

24

25

PLAINTIFFS' RESP. APP.0004737

Page 2

1        The videotaped deposition of ERIKA
2   JOHANA ESGUERRA LEON is taken on this, the 21st
3   day of December 2017, on behalf of the Defendant,
4   pursuant to notice and consent of counsel,
5   beginning at approximately 10:00 a.m. in the
6   offices of Alpha Reporting Corporation, 236 Adams
7   Avenue, Memphis, Tennessee.
8        This deposition is taken pursuant to the
9   terms and provisions of the Federal Rules of
10  Civil Procedure.
11       All forms and formalities are waived.
12  Objections are reserved, except as to form of the
13  question, to be disposed of at or before the
14  hearing.
15       The signature of the witness is not
16  waived.
17
18
19
20
21
22
23
24
25

Page 4

1              I N D E X
2
3        EXAMINATION INDEX
4
    ERIKA JOHANA ESGUERRA LEON
5     BY MR. O'KEEFE . . . . . . . . . . . .  7
      BY MR. PACHECO . . . . . . . . . .  85
6     BY MR. O'KEEFE . . . . . . . . . . . .  96
7
8        EXHIBIT INDEX
9   EXHIBIT NO.      DESCRIPTION       PAGE
    EXHIBIT NO. 1 Notice of Deposition       9
10
    EXHIBIT NO. 2 ECF Number 640-3, Page 84 of   13
11                                     233
12  EXHIBIT NO. 3 CC00034868, 34869       28
13  EXHIBIT NO. 4 CC00034908 through 34922   31
14  EXHIBIT NO. 5 CC00034881 through 34890   44
15  EXHIBIT NO. 6 Questionnaire       76
16  EXHIBIT NO. 7 Verification       77
17  EXHIBIT NO. 8 CC00034897       83
18
19        OBJECTION INDEX
20    BY MR. PACHECO . . . . . . . . . . . . 15
      BY MR. PACHECO . . . . . . . . . . . . 17
21    BY MR. PACHECO . . . . . . . . . . . . 23
      BY MR. PACHECO . . . . . . . . . . . . 23
22    BY MR. PACHECO . . . . . . . . . . . . 23
      BY MR. PACHECO . . . . . . . . . . . . 24
23    BY MR. PACHECO . . . . . . . . . . . . 24
      BY MR. PACHECO . . . . . . . . . . . . 28
24    BY MR. PACHECO . . . . . . . . . . . . 28
      BY MR. PACHECO . . . . . . . . . . . . 30
25    BY MR. PACHECO . . . . . . . . . . . . 32
      BY MR. PACHECO . . . . . . . . . . . . 33

Page 3

1        A P P E A R A N C E S
2
3   FOR THE PLAINTIFFS:
4        BYRON D.M. PACHECO, ESQ.
         Boies Schiller Flexner, LLP
5        575 Lexington Avenue
         New York, New York 10022
6        212-446-2300
7
8   FOR THE DEFENDANT CULTURAL CARE, INC.:
9        KEVIN O'KEEFE, ESQ.
         Choate Hall & Stewart
10       Two International Place
         Boston, Massachusetts 02110
11       617-248-5000
12  INTERPRETER:
13       HERNAN SILVA-ZETINA
14
15
16
17  THE VIDEOGRAPHER:
18       BLAINE COLEMAN
19
20
21  COURT REPORTING FIRM:
22       Valerie Hall Gilliam, LCR
23
24
25

Page 5

1        INDEX CONTINUED
2     BY MR. PACHECO . . . . . . . . . . . . 34
      BY MR. PACHECO . . . . . . . . . . . . 34
3     BY MR. PACHECO . . . . . . . . . . . . 36
      BY MR. PACHECO . . . . . . . . . . . . 41
4     BY MR. PACHECO . . . . . . . . . . . . 53
      BY MR. PACHECO . . . . . . . . . . . . 53
5     BY MR. PACHECO . . . . . . . . . . . . 54
      BY MR. PACHECO . . . . . . . . . . . . 54
6     BY MR. PACHECO . . . . . . . . . . . . 56
      BY MR. PACHECO . . . . . . . . . . . . 56
7     BY MR. PACHECO . . . . . . . . . . . . 59
      BY MR. PACHECO . . . . . . . . . . . . 68
8     BY MR. PACHECO . . . . . . . . . . . . 68
      BY MR. PACHECO . . . . . . . . . . . . 69
9     BY MR. PACHECO . . . . . . . . . . . . 78
      BY MR. PACHECO . . . . . . . . . . . . 82
10    BY MR. PACHECO . . . . . . . . . . . . 82
      BY MR. O'KEEFE . . . . . . . . . . . . 87
11    BY MR. O'KEEFE . . . . . . . . . . . . 87
      BY MR. O'KEEFE . . . . . . . . . . . . 88
12    BY MR. O'KEEFE . . . . . . . . . . . . 88
      BY MR. O'KEEFE . . . . . . . . . . . . 90
13    BY MR. O'KEEFE . . . . . . . . . . . . 91
      BY MR. O'KEEFE . . . . . . . . . . . . 95
14    BY MR. PACHECO . . . . . . . . . . . . 98
15
16
17
18
19
20
21
22
23
24
25

2 (Pages 2 - 5)

Page 22

1 program in the United States?
2    A.  Yes, sir.
3    Q.  Was it -- was your friend male or
4 female?  Was he or she sponsored by Cultural
5 Care?
6    A.  Yes, sir.
7    Q.  Do you know where she lived when she was
8 in the program?
9    A.  Boston.
10   Q.  And do you know when she was in the
11 program?
12   A.  No, sir.
13   Q.  But she had completed the program when
14 you had spoken with her?
15   A.  Yes.
16   Q.  And when did you have this conversation?
17   A.  In the beginning of 2015.
18   Q.  What did she tell you about the program?
19   A.  That I have to take care of the
20 children, take care of their needs, help them in
21 their daily activities, fix their meals, clean
22 their rooms.  And she told me that she could
23 travel and that she got a fixed income that was
24 given to her every Friday.
25   Q.  Did she recommend that you apply for the

Page 23

1 program?
2    A.  Yes.
3    Q.  What did she tell you was the most
4 beneficial part of the program?
5       MR. PACHECO:  Objection, form.
6       You may answer.
7       THE WITNESS:  To improve your English.
8 BY MR. O'KEEFE:
9    Q.  Why did you decide to look into the
10 program?
11   A.  It was the cheapest option to travel
12 from Colombia to the U.S.
13   Q.  So travel was your primary concern?
14      MR. PACHECO:  Objection.
15      THE WITNESS:  Travel and learn English.
16 BY MR. O'KEEFE:
17   Q.  What about learning about the U.S.
18 culture?
19      MR. PACHECO:  Objection.
20      You may answer.
21      THE WITNESS:  I do not understand.
22 BY MR. O'KEEFE:
23   Q.  Let me rephrase.  Why did you want to
24 travel to the United States?
25   A.  To improve my English.

Page 24

1    Q.  Nothing else?
2    A.  Travel.
3    Q.  You wanted to see different cultures?
4       MR. PACHECO:  Objection.
5       THE WITNESS:  Yes, sir.
6 BY MR. O'KEEFE:
7    Q.  You wanted to see -- you know,
8 experience different lifestyles?
9       MR. PACHECO:  Objection.
10      THE WITNESS:  Yes, sir.
11 BY MR. O'KEEFE:
12   Q.  After university, were you looking at
13 any other programs, any other job opportunities
14 apart from the au pair program?
15   A.  No, sir.
16   Q.  Did you -- did you look at any other au
17 pair program sponsors besides Cultural Care?
18   A.  No, sir.  I only saw that one.
19   Q.  And when did you first apply to Cultural
20 Care?
21   A.  I don't remember, but I think it was in
22 March.
23   Q.  2015?
24   A.  Yes, sir.
25   Q.  Can you describe the application

Page 25

1 process?
2    A.  I was interviewed by a psychologist.  I
3 had to pay for the interview.  I don't remember
4 how much.  I didn't pass the interview because of
5 my level of English.  I was given a month to
6 practice with one of the coordinators from
7 Cultural Care.  Then I was given an interview
8 once again, and I passed it.  Once I pass it, I
9 was given a set of documents that I had to fill
10 out.  There were medical questions, information
11 about the children I took care of in Colombia.  I
12 had to do a video for the family, a letter for
13 the family.  Once I completed application and all
14 the documents, I will be given the access to
15 search for families.
16   Q.  So when did you complete the documents?
17   A.  At the end of May.
18   Q.  And that is when you started looking at
19 families?
20   A.  Yes, sir.
21

7 (Pages 22 - 25)



Page 26

Page 28

1 Friday.

2    Q.  Did they tell you that you could not be

3 paid more than that?

4        MR. PACHECO:  Objection.  Foundation.

5        THE WITNESS:  No, sir.

6 BY MR. O'KEEFE:

7    Q.  Did they talk about any other benefits

8 of the program?

9    A.  That I could travel, see another

10 culture, be part of a family.  That was it.

11    Q.  Did you have any questions during the

12 application process?

13        MR. PACHECO:  Objection.

14        THE WITNESS:  I don't remember.

15 BY MR. O'KEEFE:

16    Q.  Do you remember asking any questions?

17    A.  I believe so, yes, but I don't remember.

18    Q.  Okay.

19        (WHEREUPON, THE DOCUMENT WAS MARKED AS

20 EXHIBIT NO. 3 TO THE TESTIMONY OF THE WITNESS AND

21 IS HERETO ATTACHED.)

22        MR. O'KEEFE:  I am just going to note

23 for the record that Exhibit 3 is a document

24 bearing Bates label CC 34868 through 69.

25 BY MR. O'KEEFE:

Page 27

Page 29

1    Q.  Just please take a look and look up when

2 you're ready to discuss.

3        MR. PACHECO:  Kevin, can I just note for

4 the record that the document is in English.  And

5 that if the witness has any questions about the

6 English that she can ask the interpreter.

7        THE WITNESS:  Did Ingrid Blanco write

8 this?

9 BY MR. O'KEEFE:

10    Q.  Yes.

11    A.  (in English) Okay.

12    Q.  Have you seen Exhibit 3 before?

13    A.  I haven't seen it before.

14    Q.  Did you speak with Ingrid Blanco during

15 the application process?

16    A.  Yes.

17    Q.  Do these statements reflect -- or

18 actually, do the -- does this document reflect

19 statements that you made to Ingrid?

20    A.  Yes.

21    Q.  So it's fair to say that this is a

22 summary of discussions that you had with her?

23    A.  Yes, sir.

24    Q.  Okay.  Do you disagree with anything in

25 this document?

20    Q.  When you were going through the

21 application process with Cultural Care, did you

22 discuss the stipend amount?

23    A.  Yes.

24    Q.  Okay.  What did they tell you?

25    A.  That I would be paid 195.75 every

8 (Pages 26 - 29)

PLAINTIFFS' RESP. APP.0004740

Page 30

1    A.   No, sir.
2    Q.   So under Expectations, it states that --
3  I have an extra copy.  Sorry.
4         It states, she will use her credits to
5  study something that enriches her career.  She
6  would also like to travel and learn.
7    A.   Yes.
8    Q.   Is that why you wanted to join the au
9  pair program?
10        MR. PACHECO:  Objection.
11        THE WITNESS:  Yes, sir.
12  BY MR. O'KEEFE:
13    Q.   Did you study in the U.S. -- let me
14  rephrase.
15        Did you take classes in the United
16  States?
17    A.   Yes.
18    Q.   Do you think those classes will enrich
19  your future career?
20    A.   I don't know.
21    Q.   Okay.  What classes did you take?
22    A.   English class.
23    Q.   Has your English improved over your time
24  here?
25    A.   From one to ten, four.

Page 31

1         (WHEREUPON, THE DOCUMENT WAS MARKED AS
2  EXHIBIT NO. 4 TO THE TESTIMONY OF THE WITNESS AND
3  IS HERETO ATTACHED.)
4  BY MR. O'KEEFE:
5    Q.   Please take a look and let me know when
6  you're ready to discuss.
7         MR. O'KEEFE:  And I will note for the
8  record is Exhibit 4 is Bates label CC 34908
9  through 34922.
10        MR. PACHECO:  And can I also just note
11  for the record, again, that this document is in
12  English, and that the witness should ask the
13  interpreter if there are any questions about the
14  language.
15  BY MR. O'KEEFE:
16    Q.   Have you seen Exhibit 4 before?
17    A.   Yes, sir.
18    Q.   Did you -- I guess we'll start at the
19  beginning.  So pages one -- so up through page --
20  the middle of page ending in 34912.
21    Q.   What page?
22    Q.   34912.
23        MR. PACHECO:  In the bottom right corner
24  of the page is the page number.
25        THE WITNESS:  Okay.

Page 32

1  BY MR. O'KEEFE:
2    Q.   So these pages -- so from 34908 through
3  12, did you write all of this?
4    A.   Yes, sir.
5    Q.   Can you turn to the Page 34919.  So
6  under the section, "What would you like to
7  accomplish during your time as an au pair?"
8    A.   (No interpretation given.)
9    Q.   Do you -- is this an accurate summary of
10  why you wanted to join the au pair program?
11        MR. PACHECO:  Objection.
12        THE WITNESS:  At the time.
13  BY MR. O'KEEFE:
14    Q.   Did you accomplish all these?
15    A.   Partially, yes.
16    Q.   Okay.  Any specific aspect that's
17  partial?
18    A.   Yes.
19    Q.   Which one?
20    A.   My English.
21    Q.   Any others?
22    A.   No, sir.
23    Q.   If you could actually turn back to
24  34909.  It's the second page.  Yeah.  It's the
25  second page of the document.

Page 33

1         Do you think living in the United States
2  has improved your potential to get a job in
3  Colombia?
4    A.   Yes.
5    Q.   And specifically with respect to the --
6  like the restaurant industry?
7    A.   Yes.
8    Q.   And hospitality and other food
9  related --
10    A.   Yes, sir.
11    Q.   When you applied for the program, you
12  knew that you would be living with a family in
13  the U.S., correct?
14    A.   Yes, sir.
15    Q.   And did you consider that a benefit of
16  the program?
17    A.   Yes, sir.
18    Q.   Did you think living with a family was
19  part of the overall experience?
20    A.   Can you please repeat the question?
21    Q.   Did you consider living with a U.S.
22  family to be part of the cultural experience?
23        MR. PACHECO:  Objection.
24        THE WITNESS:  Yes.
25  BY MR. O'KEEFE:

9 (Pages 30 - 33)

Case No. 1:14-cv-03074-CMA-KMT Document 959-24 filed 03/30/18 USDC Colorado pg
225 of 311

# Exhibit 427

PLAINTIFFS' RESP. APP.0004742

CONFIDENTIAL

Page 1

 1           IN THE UNITED STATES DISTRICT COURT

              FOR THE DISTRICT OF COLORADO

 2        CIVIL ACTION NO. 1:14-cv-03074-CMA-KMT

      -----------------------------------------X

 3    JOHANA PAOLA BELTRAN,

      et al.,

 4            Plaintiffs,

 5            v.

 6    INTEREXCHANGE, INC.,

      et al.,

 7            Defendants.

      -----------------------------------------X

 8

 9              *** CONFIDENTIAL ***

10

11           Friday, December 29, 2017

12

13       Videotaped deposition of MARIEL ANDREA

14    BOBBONI, held at the law offices of GORDON &

15    REES, One Commerce Square, 2005 Market Street,

16    Suite 2900, Philadelphia, Pennsylvania 19103,

17    beginning at 9:56 a.m., on the above date,

18    before Victoria A. Bramnick, a Professional

19    Court Reporter and Notary Public in

20    Pennsylvania, New Jersey and Delaware.

21

22

23

24

25

PLAINTIFFS' RESP. APP.0004743

CONFIDENTIAL

Page 2

1  APPEARANCES:
2
3  BOIES SCHILLER FLEXNER LLP
   BY: SEAN PHILLIPS RODRIGUEZ, ESQUIRE
4  1999 Harrison Street, Suite 900
   Oakland, California 94612
5  (510) 874-1000
   srodriguez@bsfllp.com
6  --Representing the Plaintiffs
7
   CHOATE HALL & STEWART LLP
8  BY: LYNDSEY M. KRUZER, ESQUIRE
   Two International Place
9  Boston, Massachusetts 02110
   (617) 248-4790
10 lkruzer@choate.com
   --Representing the Defendant
11 Cultural Care, Inc.
12
13
14
15 ALSO PRESENT:
16   R. ADAM LAZAROFF, CLVS
17
18
19
20
21
22
23
24
25

Page 4

1      DEPOSITION SUPPORT INDEX
2
   Direction to Witness Not to Answer
3
      Page        Line
4
   None
5
6
7
8  Request for Production of Documents
9     Page        Line
10  104        9
11
12
   Stipulations
13
      Page        Line
14
   (Reading and Signing waived)
15
16
17
   Questions Marked
18
      Page        Line
19
   None
20
21
22
23
24
25

Page 3

1      I N D E X
2  WITNESS              PAGE
3  MARIEL ANDREA BOBBONI
4  BY MS. KRUZER             7
   BY MR. RODRIGUEZ          153
5  BY MS. KRUZER             159
   BY MR. RODRIGUEZ          164
6
7      E X H I B I T S
8  MARKED     DESCRIPTION     PAGE
9  Bobboni-1  Notice of Deposition      9
10 Bobboni-2  Consent to Join          14
11 Bobboni-3  NOTICE OF YOUR RIGHT TO   16
              JOIN LAWSUIT FOR UNPAID
12             WAGES
13 Bobboni-4  Profile, CC00034852      40
              through 34863
14
   Bobboni-5  Document titled Au Pair:  93
15             Marie Andrea Bobboni
16
17
18
19
20
21
22
23
24
25

Page 5

1          THE VIDEOGRAPHER: Good morning.
2       We are now going on the record
3  at 9:56 a.m. on December 29th, 2017.
4       Please note that the microphones
5  are sensitive and may pick up
6  whispering and private conversations
7  and cellular interference.
8          Please turn off all cell phones
9  or place them away from the microphones
10 as they can interfere with the
11 deposition audio.
12       Audio and video recording will
13 continue to take place unless all
14 parties agree to go off the video
15 record.
16       This is media unit one of the
17 video-recorded deposition of Mariel
18 Andrea Bobboni, in the matter of Johana
19 Paola Beltran, et al., versus
20 Interexchange, Incorporated, et al.,
21 filed with the United States District
22 Court for the District of Colorado,
23 Case Number 1:14-cv-03074-CMA-KMT.
24       This deposition is being held at
25 Gordon & Rees located at 2006 Market

2 (Pages 2 - 5)

Veritext Legal Solutions
www.veritext.com
212-490-3430

CONFIDENTIAL



**Page 154**

1   Q.   Ms. Bobboni, earlier I believe
2   you testified that you were once paid $2,060
3   in a week.  Do you recall that?
4   A.   No.  No, it was 200.
5   Q.   It was $260?
6   A.   Yes.  Yes.
7   Q.   Just to be clear, you were never
8   paid $2,060 per week?
9   A.   No.
10   Q.   No, you were never paid that
11   amount?
12   A.   No.
13   Q.   Could you state that in a full
14   sentence for me?
15   A.   Sorry.  I didn't get paid 2,060
16   for a week or month or week.
17   Q.   What was the most you were ever
18   paid in a week by your host family?
19   A.   I get paid once $260.
20   Q.   When did you first hear 195.75
21   in connection with au pair work?
22   A.   When I received the information
23   about the program.
24   Q.   From whom did you receive that
25   information?

**Page 155**

1   A.   Cultural Care.
2   Q.   Did Cultural Care at any time
3   indicate that 195.75 was negotiable?
4   A.   No.
5   Q.   So, to your understanding, was
6   it -- did Cultural Care -- let me strike that.
7   Earlier you testified that there
8   were so-called LCC meetings periodically.
9   Do you recall that?
10   A.   Yes.
11   Q.   Okay.  Did there come a time
12   when those LCC meetings ended?
13   A.   The second year.
14   Q.   Can you explain how they ended?
15   A.   Because the LCC we had the first
16   year didn't work anymore for the -- for
17   Cultural Care.  And we had -- the second year
18   we have about three LCCs.  And they change --
19   like they change a lot.  And we weren't able
20   to meet or get the e-mails or the information
21   about the meetings because we didn't know, and
22   she didn't have the full list.  I don't know.
23   Q.   Now, did you have any
24   understanding as to what would happen if you
25   admitted to Cultural Care that you were

**Page 156**

1   working more than 45 hours some weeks?
2   A.   Yes.  They will tell the family
3   and -- and ask for a meeting with the au pair
4   and the family and ask about it.
5   Q.   And did you want that to happen?
6   A.   No.
7   [redacted]
17   MS. KRUZER:  Objection to form.
18   BY MR. RODRIGUEZ:
19   [redacted]

**Page 157**

1   MR. RODRIGUEZ:  Would the court
2   reporter, please, read it back.
3   (Pertinent portion of the record
4   was read.)
5   [redacted]
6   BY MR. RODRIGUEZ:
7   Q.   [redacted]

40 (Pages 154 - 157)

CONFIDENTIAL



Page 158

1

Page 159

1

11          MR. RODRIGUEZ:  Pending further
12     questions from counsel, I have nothing
13     more.
14               - - -
15          EXAMINATION
16               - - -
17  BY MS. KRUZER:
18     Q.    Ms. Bobboni, you testified
19  earlier that when you worked more than 45
20  hours per week the family would ask you if you
21  wanted additional hours for additional pay,
22  correct?
23     A.    Yes.
24     Q.    And you wanted to work those
25  additional hours for additional pay, correct?

Page 160

1     A.    Yes.
2     Q.    And sometimes if you didn't want
3  to you said no, correct?
4     A.    I -- didn't say no.
5     Q.    Was one of the reasons you
6  didn't report to your LCC that you were
7  working more than 45 hours because you wanted
8  to continue to work the extra hours for more
9  pay?
10     A.    Yes, but I also didn't want
11  to -- I didn't want to get involved the family
12  with the agency.
13

Page 161

1

41 (Pages 158 - 161)

CONFIDENTIAL



Page 162

```
1
```

18    Q.    Did anyone from Cultural Care
19  ever tell you that the 195.75 was not
20  negotiable?
21    A.    Yes.
22    Q.    Who?
23    A.    The -- when I started the
24  application and it says, like, you're going to
25  get paid 195.75 per week.

Page 163

1    Q.    Does it say that that's not
2  negotiable?
3    A.    That's what it said.
4    Q.    Okay.  So, did anyone at
5  Cultural Care ever tell you that the 195.75
6  was not negotiable?
7    A.    No.
8

Page 164

```
1
```

2         MS. KRUZER:  No further
3  questions.
4         -  -  -
5         EXAMINATION
6         -  -  -
7  BY MR. RODRIGUEZ:
8

Page 165

```
1
```

6         MR. RODRIGUEZ:  I have nothing
7  further.
8         MS. KRUZER:  I have nothing
9  further.
10         THE VIDEOGRAPHER:  We are now
11  off the record at 1427.  This concludes
12  the videotaped testimony given by
13  Mariel Andrea Bobboni.
14         Total number of media units used
15  was two and will be retained by
16  Veritext Legal Solutions.
17         (Witness excused.)
18         (Videotaped deposition concluded
19  at approximately 2:47 p.m.)
20
21
22
23
24
25

42 (Pages 162 - 165)

Case 1:14-cv-03074-CMA-KMT   Document 943-47   Filed 03/17/18   USDC Colorado   Page 230 of 310

# Exhibit 428

PLAINTIFFS' RESP. APP.0004748

Page 1

1

2    IN THE UNITED STATES DISTRICT COURT

     FOR THE DISTRICT OF COLORADO

3    Civil Action No. 14-cv-03074-CMA-KMT

4    ------------------------------------x

     JOHANA PAOLA BELTRAN, LUSAPHO

5    HLATSHANENI, BEAUDETTE DEETLEFS,

     DAYANNA PAOLA CARDENAS CAICEDO and

6    ALEXANDRA IVETTE GONZALEZ, on behalf

     of themselves and others similarly

7    situated,

8                        Plaintiffs,

9

10             -against-

11   INTEREXCHANGE, INC., et al.,

12                       Defendants.

     ------------------------------------x

13

                     January 13, 2018

14                   9:07 a.m.

15

16      EXAMINATION BEFORE TRIAL of YENTL ROSE

17   PAGAN SWARTZ, one of the Plaintiffs

18   herein, taken by one of the Defendants,

19   pursuant to Notice, held at the office of

20   Boies Schiller Flexner, LLP, 575

21   Lexington Avenue, New York, New York,

22   before Lisa H. MacDonald, RPR, and Notary

23   Public of the State of New York.

24

25

Page 2

```
1
2  A P P E A R A N C E S :
3
4  BOIES SCHILLER & FLEXNER
     575 Lexington Avenue
5  New York, New York 10022
         Attorneys for Plaintiffs
6  BY:    BYRON D.M. PACHECO, ESQ.
         TARA SCHWARTZ, ESQ.
7
8
9  CHOATE HALL & STEWART, LLP
     Two International Place
10 Boston, Massachusetts 02110
         Attorneys for Defendant
11      CULTURAL CARE, INC.
     BY:    LYNDSEY M. KRUZER, ESQ.
12      VIRGINIA SELDEN, ESQ.
13
14 ALSO PRESENT:
15 George Libbares, Videographer
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1
2      S T I P U L A T I O N S
3
4      IT IS HEREBY STIPULATED AND AGREED
5  by and between the attorneys for the
6  respective parties hereto that the filing
7  and sealing be and the same are hereby
8  waived.
9      IT IS FURTHER STIPULATED AND AGREED
10 that all objections except as to the form
11 of the question, shall be reserved to the
12 time of the trial.
13     IT IS FURTHER STIPULATED AND AGREED
14 that the within deposition may be signed
15 and sworn to before any notary public
16 with the same force and effect as though
17 signed and sworn to before this Court.
18
19
20
21
22
23
24
25
```

Page 4

```
1
2      MR. VIDEOGRAPHER:  Good
3  morning.  We are now recording and on
4  the record at 9:07 a.m. on
5  January 13, 2018.
6      Please note that the
7  microphones are sensitive and may
8  pick up whispering, private
9  conversations and cellular
10 interference.  Please turn off all
11 cellphones or place them away from
12 the microphones as they can interfere
13 with the deposition audio.
14     Recording will continue
15 until all parties agree to go off the
16 record.
17     This is video one of the
18 deposition of Yentl Rose Pagan Swartz
19 in the matter of Johana Paola
20 Beltran, et al, versus Interexchange,
21 Inc., et al, filed in the U.S.
22 District Court, District of Colorado,
23 Case Number 14-cv-03074-CMA-KMT.
24     This deposition is being
25 held at Boies Schiller & Flexner,
```

Page 5

```
1
2  located at 575 Lexington Avenue, New
3  York, New York.
4      My name is George Libbares,
5  the court reporter is Lisa MacDonald
6  and we are here from Veritext New
7  York.
8      Counsel will now state their
9  appearances and the reporter will
10 administer the oath.
11     MR. PACHECO:  Byron Pacheco
12 from Boies Schiller & Flexner on
13 behalf of the plaintiffs and the
14 witness.
15     MS. SCHWARTZ:  Tara
16 Schwartz, Boies Schiller & Flexner.
17     MS. KRUZER:  Lyndsey Kruzer
18 from Choate Hall & Stewart on behalf
19 of defendant Culture Care, Inc.
20     MS. SELDEN:  Virginia Selden
21 from Choate Hall & Stewart on behalf
22 of Culture Care.
23 Y E N T L  R O S E  P A G A N
24 S W A R T Z , after having first been
25 duly sworn by a Notary Public of the
```

2 (Pages 2 - 5)

Page 198

1          Y.R. Pagan Swartz
2     A     Yes.
3     Q     What prompted you to redo
4 the survey the following day?
5     A     I didn't want to do it the
6 same day because I was annoyed by the
7 fact that I got kicked off, so then I did
8 it the next day.
9     Q     Did anyone reach out to you
10 and ask you to complete the survey?
11    A     No.  I completed it on my
12 own.
13    Q     Before you completed your
14 consent to join form, which we looked at
15 earlier in today's deposition, and other
16 than the e-mail you mentioned receiving
17 in September --
18    A     Yes.
19    Q     -- did anyone reach out to
20 you about joining the lawsuit?
21    A     No.
22    Q     Have you heard of any other
23 au pairs learning about the lawsuit in a
24 different manner, besides the e-mail you
25 received?

Page 199

1          Y.R. Pagan Swartz
2     A     On Facebook.  As soon as I
3 received the e-mail, I saw Facebook posts
4 about -- not from au pairs, but just a
5 general group for the wage action that
6 started popping up on my feed even though
7 I did not search for anything of it, so
8 that's how some au pairs found out about
9 it.
10    Q     Okay.  So there was a --
11 would it be fair to say there was an
12 advertisement on your Facebook feed?
13    A     It was just a group that you
14 could join.
15    Q     Were you invited to join the
16 group?
17    A     No.
18    Q     Could you just tell me a
19 little bit more about what you mean when
20 you say it showed up.
21    A     Like on your Facebook news
22 feed whenever you -- like I open up in my
23 e-mails somehow comes up on my Facebook
24 as an advert.
25    Q     So this was an advert?

Page 200

1          Y.R. Pagan Swartz
2     A     It's like an advert or this
3 is something you might like situation.
4 So I was just like I don't know what's
5 going on --
6     Q     Okay.
7     A     -- but obviously I received
8 the e-mail before that.
9     Q     Okay.
10    A     But then everybody else
11 might have seen it on Facebook.
12    Q     Okay.  So I asked earlier if
13 it was fair to say it was an
14 advertisement on Facebook and you said
15 no.
16          Would you like to change
17 that answer?
18    A     Well, I don't know if it is
19 an advertisement or if it's just
20 something that pops up.  I wasn't asked
21 to join it.  I just scrolled past it.
22 They didn't specifically send it to me
23 or --
24    Q     Did it appear in your
25 Facebook feed in the center or in a side

Page 201

1          Y.R. Pagan Swartz
2 column?
3     A     I'm on my phone.
4     Q     So it's just all in the
5 center?
6     A     Yes.
7     Q     Got it.
8          Did you ever click on that
9 link?
10    A     Yes.
11    Q     What did it take you to?
12    A     The questionnaire or to join
13 the -- to join the action, the lawsuit.
14    Q     Did it take you to the
15 questionnaire?
16    A     If you joined the lawsuit,
17 it would have.
18    Q     I just want to unpack this a
19 little bit.  When you clicked on the
20 advertisement --
21    A     Yes.
22    Q     -- what appeared?
23    A     It's just a page that said
24 the lawsuit and then it's like
25 information about the lawsuit, which is

51 (Pages 198 - 201)

| Page 202 | |
|---|---|

Y.R. Pagan Swartz

1        Y.R. Pagan Swartz
2 the same as the e-mail information --
3    Q    Got it.
4    A    -- where you could join it
5 or you don't have to.
6    Q    And then once you submitted
7 a consent to join form, I just want to be
8 sure I'm clear on your testimony here,
9 were you then automatically prompted to
10 fill out a questionnaire or did you at
11 some later point receive a communication
12 about a questionnaire?
13    A    I received an e-mail about
14 the questionnaire asking for more
15 information.
16    Q    Okay.  All right.  Now we
17 are going to focus on question -- I'm
18 sorry -- on Exhibit 6, question 61.
19    A    Yes.
20    Q    And I just want to walk
21 through your answer on this and ask you
22 some questions.  The question is, "If
23 there's additional information you would
24 like to provide regarding your
25 experiences in the au pair program,

| Page 203 | |
|---|---|

1        Y.R. Pagan Swartz
2 please do so here."
3    The first sentence says, "My
4 host family is amazing and I love them
5 dearly."  Is that accurate?
6    A    Yes.
7    Q    You then state, "I believe
8 that they have also been lied to by the
9 agency and they would not agree to pay
10 anyone less than they deserve."
11    Do you believe that that is
12 accurate?
13    A    Yes.
14    Q    Have you ever asked your
15 family if they -- strike that.
16    Has either of your host
17 parents ever stated they were lied to --
18    A    No.
19    Q    -- by the agency?
20    A    No.
21    Q    When you state "the agency,"
22 are you referring to Cultural Care?
23    A    Yes.
24    Q    Have you ever asked your
25 host family to pay you more?

| Page 204 | |
|---|---|

1        Y.R. Pagan Swartz
2    A    No.
3    Q    Have you ever discussed the
4 stipend with your host family?
5    A    No.  I was told at the
6 second week meeting by our LCC that I'm
7 not allowed to get paid more and my host
8 parents were there at that meeting, so
9 why would I discuss something that I'm
10 not allowed to have and they wouldn't
11 discuss it either because my host dad is
12 by the book.
13    Q    Since you learned about this
14 lawsuit, have you asked your LCC if
15 you're allowed to make more than 195.75?
16    A    No.
17    Q    Do you know any au pairs who
18 are paid more than 195.75 per week?
19    A    No.
20    Q    With approximately how many
21 au pairs have you discussed the stipend?
22    MR. PACHECO:  Objection.
23 Foundation.
24    A    My friends, I don't speak to
25 a lot of au pairs, so the ones that are

| Page 205 | |
|---|---|

1        Y.R. Pagan Swartz
2 my friends.
3    Q    So the What's App group we
4 talked about earlier?
5    A    Yes.
6    Q    Besides that What's App
7 group, have you spoken with any other au
8 pairs about the stipend?
9    A    No.
10    Q    Did you receive any
11 information regarding the application for
12 a second year as an au pair?
13    A    Sorry.  Just repeat that.
14    Q    We've established today that
15 you chose to extend for a second year as
16 an au pair --
17    A    Yes.
18    Q    -- is that correct?
19    A    Yes.
20    Q    Did you receive any
21 information from Cultural Care about
22 applying for an extension year?
23    A    Yes.  They sent an e-mail
24 saying that your year is almost up, would
25 you like to extend and that's what the

52 (Pages 202 - 205)



Page 206

1         Y.R. Pagan Swartz
2    e-mail says.
3        Q     Do you know if your host
4    parents received information about an
5    extension year?
6        A     No.
7        Q     You don't know or they did
8    not?
9        A     I don't know.
10       Q     Did you discuss the
11   extension year with your host parents?
12       A     Yes.
13       Q     Could you tell me about that
14   discussion?
15       A     I told my host mom that I
16   will be extending and if they want me, I
17   will stay with them.
18       Q     Okay.  And what did they
19   say?
20       A     She said she wanted to ask
21   me before I asked her to extend and that
22   she wants me to stay with them.
23       Q     Okay.  So did you consider
24   going to any other family for your
25   extension year?

Page 208

1         Y.R. Pagan Swartz
2    from the coursework you've taken?
3        A     No.
4        Q     Do you anticipate you'll
5    derive any value from the coursework
6    you've signed up for at Long Island?
7        A     Hopefully.
8        Q     Skipping a sentence, the
9    next sentence says, "We literally give up
10   our lives to come and help out another
11   family and some au pairs get treated as
12   though they are the help."  Is that
13   accurate?
14       A     Yes.
15       Q     Do you feel like you're
16   treated as the help?
17       A     No.
18

Page 207

1         Y.R. Pagan Swartz
2        A     No.
3        Q     Is there anything that would
4    have convinced you to go to another
5    family for your extension year?
6        A     No.
7        Q     Would you have gone to
8    another family if you learned that family
9    was paying their au pair $300 per week?
10       A     No.
11       Q     Your next sentence says, "I
12   thought the agency was great until I
13   discovered that by law we should be paid
14   more."  Is that accurate?
15       A     Yes.
16       Q     So other than this lawsuit,
17   you've been pleased with Cultural Care?
18       A     Yes.
19       Q     You next stated, "I also
20   don't appreciate the fact that they said
21   you would receive an education that would
22   be of value as most of the courses are to
23   improve your English."  Is that accurate?
24       A     Yes.
25       Q     Have you derived any value

Page 209

1         Y.R. Pagan Swartz
2
23       Q     You said "I signed the
24   petition because I feel the agency is
25   unfair and to save future au pairs from

53 (Pages 206 - 209)

Case No. 1:14-cv-03074-CMA-KMT Document 959-24 filed 03/30/18 USDC Colorado pg 237 of 311

# Exhibit 429

Page 1

1          IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF COLORADO

2
   ------------------------------------

3  JOHANA PAOLA BELTRAN, et al.,     : Civil Action
                                      No. 1:14-cv-03074

4          Plaintiffs,               :

5      v.                            : VIDEOTAPED
                                      DEPOSITION OF:

6  INTEREXCHANGE, INC., et al.,      : CECILE PAVOT

7          Defendants.               :
   ------------------------------------

8

9              TRANSCRIPT of the stenographic notes of

10  the proceedings in the above-entitled matter, as taken

11  by and before TERESA M. CATULLO, a Certified Court

12  Reporter, Registered Professional Reporter and Notary

13  Public of the State of New Jersey, held at the

14  SPRINGHILL SUITES BY MARRIOTT, 1000 Charles Ewing

15  Boulevard, Ewing, New Jersey, on Friday, January 19,

16  2018, commencing at 8:06 in the forenoon.

17

18

19

20

21

22

23

24

25

Page 2

1 A P P E A R A N C E S :

2     BOIES SCHILLER FLEXNER, LLP
      BY: BYRON D.M. PACHECO, ESQ.
3     575 Lexington Avenue
      New York, New York 10022
4     212-446-2300
      bpacheco@bsfllp.com
5     Attorneys for Plaintiffs
6
      CHOATE, HALL & STEWART, LLP
7     BY: PATRICK S. BOYD, ESQ.
      Two International Plaza
8     Boston, Massachusetts 02110
      617-248-5000
9     pboyd@choate.com
      Attorneys for Defendant
10    Cultural Care, Inc.
11
12 ALSO PRESENT:
13    Marc Friedman, Videographer
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1            INDEX
2 WITNESS:             PAGE
3 CECILE PAVOT
4 EXAMINATION BY:
5   MR. BOYD           5
                  106
6
   MR. PACHECO       101
7
8           - - -
9      E X H I B I T S
10 NO.    DESCRIPTION        PAGE
11 Exhibit 1  Notice of Deposition     7
12 Exhibit 2  Consent to Join form     10
13 Exhibit 3  Notice of Your Right to Join Lawsuit  12
14        for Unpaid Wages
15 Exhibit 4  Profile           20
16 Exhibit 5  Answers to Survey      22
17 Exhibit 6  Corrected Answers to Survey    45
18 Exhibit 7  "The Family"        53
19 Exhibit 8  LCC Notes         62
20
21
22
23
24
25

Page 4

1      THE VIDEOGRAPHER: Good morning. We are
2 going on the record at 8:06 a.m. on Friday, January
3 19th, 2018. Please note the microphones are sensitive
4 and may pick up whisperings, private conversations,
5 and cellular interference. Please turn off all cell
6 phones or place them away from the microphones as they
7 can interfere with deposition audio. Audio and video
8 recording will continue to take place unless all
9 parties agree to go off the record.
10     This is media unit number one of the video
11 recorded deposition of Cecile Pavot in the matter of
12 Johana Paola Beltran, et al. versus Interexchange,
13 Incorporated, et al.
14     This case is filed in the United States
15 District Court for the District of Colorado, Civil
16 Action No. 1:14-cv-03074. This deposition is being
17 held at the Springfield Suites located in Ewing,
18 Princeton, New Jersey on 1000 Charles Ewing Boulevard
19 in Ewing.
20     My name is Marc Friedman. I am a
21 certified legal specialist. Your court reporter today
22 is Terry Catullo, and we are both from the firm of
23 Veritext Legal Solutions. I am not authorized to
24 administer the oath; I am not related to any parties
25 in this action, nor am I financially interested in the

Page 5

1 outcome.
2     Counsel and all present will now state
3 their appearances and affiliations for the record. If
4 there are any objections to the proceedings, please
5 state them at the time of your appearance, beginning
6 with the noticing attorney.
7     MR. BOYD: Patrick Boyd for Cultural
8 Care.
9     MR. PACHECO: Byron Pacheco of Boies
10 Schiller Flexner on behalf of the witness and the
11 plaintiffs.
12     THE VIDEOGRAPHER: Will the court reporter
13 please swear in the witness and we can proceed.
14     CECILE PAVOT, having been duly sworn,
15 testifies as follows:
16 EXAMINATION BY MR. BOYD:
17  Q.  Good morning, Ms. Pavot.
18  A.  Good morning.
19  Q.  Have you ever been deposed before?
20  A.  No.
21  Q.  So I'll go over a couple of basics, some
22 ground rules just to help things go smoothly. So the
23 first is, you'll see the court reporter is sitting to
24 my left. She is going to be transcribing everything
25 that happens today, and that means that you need to

2 (Pages 2 - 5)



Page 70

1   Q.  I know you said it was an older flip
2   phone.  Like, did it have, like, WhatsApp, or any of
3   those types of things on it?
4   A.  No.
5   Q.  Were you able to call home?
6   A.  You mean France?
7   Q.  Were you able to call back to family and
8   friends in France?
9   A.  Yes, a little.
10  Q.  Using the phone or --
11  A.  Yeah.  Just calling.  I mean, it was a
12  flip-flop, so I couldn't, like --
13  Q.  Were you able to text?
14  A.  Yes.
15  Q.  Did you -- did they give you a computer to
16  use?
17  A.  No.
18  Q.  But they did have Internet access?
19  A.  Yes.
20  Q.  And a TV?
21  A.  Yes.
22  Q.  Did you pay for the Internet access?
23  A.  No.
24  Q.  Did you pay for the TV?
25  A.  No.

Page 72

1

4       MR. PACHECO:  Objection.  I'm not sure
5   which question she's answering.
6       MR. BOYD:  Sure.  Let's strike that.
7   BY MR. BOYD:
8

Page 71

1   Q.  Did they ever give you any gifts?
2   A.  Yes.
3

Page 73

PLAINTIFFS' RESP. APP.0004757
212-279-9424

Veritext Legal Solutions
www.veritext.com

212-490-3430



Page 74

Page 75

Page 76

Page 77

16      MR. PACHECO:  Objection.  You can
17 answer.
18
19 BY MR. BOYD:
20

13      Q.  What stipend amount did the ███ family
14 pay you?
15      A.  Around 195 per week.
16      Q.  And your stipend was paid by your host
17 family; right?
18      A.  Yes.
19      Q.  Were you ever paid by Cultural Care?
20      A.  No.
21      Q.  Did you ever ask for more money?
22      A.  No.
23      Q.  Why not?
24      A.  It was like that.  It was, like, required
25 by Cultural Care, we would get paid 195 per week, so I

20 (Pages 74 - 77)

---

Page 78

1 never, like, talk about it.
2     Q.  You said it was required by Cultural Care.
3 What do you mean by that?
4     A.  It was, like, in the -- all the
5 documentation, the presentation I had the first time
6 in September.  So for me, it was, like, almost like a
7 rule, like, like a law.  I don't know.  So I didn't
8 know we could, like, get paid more.
9     Q.  Did anybody ever tell you that you
10 couldn't get paid more?
11     A.  No.
12     Q.  Did you ever read somewhere that you
13 couldn't get paid more?
14     A.  No.
15     Q.  But you just thought that from what you
16 had read?
17     A.  Yeah.  I didn't know we could get paid
18 more.
19     Q.  Did you think that you couldn't get paid
20 more?
21     A.  Yes.
22     Q.  So your belief was that 195.75 was the
23 most you could get paid?
24     A.  Yeah.
25     Q.  What was the basis of that belief?

Page 79

1     A.  It was Cultural Care documentation.
2     Q.  What specifically in the documentation --
3     A.  Like --
4     Q.  -- formed that belief?
5     A.  The PowerPoint, the -- the PowerPoint, the
6 presentation.
7     Q.  What PowerPoint is that?
8     A.  The first meeting you had to go to in
9 September, I mean, I went in September of 2013, and
10 then the documentation you received by mail when you
11 sign up for the program.  And, yeah, then at the
12 training school, they tell you, too, so...
13     Q.  But you had said that the documentation
14 didn't say you couldn't make more than that; right?
15     MR. PACHECO:  Object to form.
16     THE WITNESS:  Yeah.
17     MR. PACHECO:  You can answer.
18     THE WITNESS:  Yes.
19 BY MR. BOYD:
20     Q.  So let me ask a different question.  Had
21 you read anywhere in the documentation that you
22 couldn't make more than 195.75?
23     A.  No.
24     Q.  In the presentation, did it say you
25 couldn't make more than 195.75?

Page 80

1     A.  No.
2     Q.  At the training school, did they tell you
3 you couldn't make more than 195.75?
4     A.  No.
5     Q.  So why did you think from the
6 documentation you couldn't make more than 195.75?
7     A.  Because they -- they wrote the number 195
8 per week.
9     Q.  Same question about the presentation, what
10 part of the presentation made you think that you
11 couldn't make more than 195.75?
12     A.  Because they wrote the number.
13     Q.  And same question about the training
14 school?
15     A.  Same thing, they wrote the number.  Yeah.
16     Q.  Did you ever discuss your stipend amount
17 with the ███████ family?
18     A.  No.
19     Q.  Why not?
20     A.  Because it was like that.
21     Q.  Did you ever receive more than 195.75 from
22 the ███████ family?
23     A.  No.
24     Q.  Do you think that the host family paid you
25 all of the money that you were owed?

Page 81

1     MR. PACHECO:  Objection.
2     THE WITNESS:  Yes.
3 BY MR. BOYD:
4     Q.  Do you think Cultural Care owes you any
5 money?
6     A.  Yes.
7     Q.  Why?
8     A.  Because they set the rule.  I mean, they
9 told us the rule was you would get paid 195 per week.
10     Q.  But so why do you think that Cultural Care
11 owes you money?
12     MR. PACHECO:  Asked and answered.
13 Objection.
14 BY MR. BOYD:
15     Q.  What do you mean by, "they set the rule"?
16     A.  They put it in every documentation and
17 make it sounds like it's the law, like, it's like an
18 agreement.  I don't know, like, how they term that,
19 but --
20     Q.  What specifically in the documentation
21 made you think that it was a law?
22     A.  Like, I don't remember specifically the
23 sentence, but, I mean, they wrote, like, you will get
24 paid 195.75 per week.  So...
25     Q.  Do you still have the documentation that

21 (Pages 78 - 81)

Page 82

1 you looked at when applying to be an au pair?
2    A.  No.
3    Q.  Did Cultural Care ever pay you anything?
4    A.  No.
5    Q.  Were you ever an employee of Cultural
6 Care?
7    A.  No.
8    Q.  Do you believe you were paid unfairly?
9    A.  Yes.
10    Q.  Why is that?
11    A.  Because when you come here and live here
12 and you know what the, like, the life -- the cost of
13 the life is, you're seeing, like, 195 is not enough to
14 enjoy yourself in this country.
15    Q.  So did you not enjoy yourself when you
16 were in America?
17    A.  No.
18    Q.  No?
19    A.  Yes, I mean.  Yes, I did.
20    Q.  Okay.  Even though you were making 195.75
21 a week?
22    A.  Yes.
23    Q.  When did you come to the belief that you
24 were being paid unfairly?
25    A.  I think I would say when I had to pay

Page 83

1 taxes.
2    Q.  When you went to pay tax?
3    A.  Yeah, when I had to.
4    Q.  Did you discuss it with anybody then?
5    A.  No.
6    Q.  Do you have any documents reflecting what
7 you were paid?
8    A.  No.
9    Q.  Did you take any classes when you were an
10 au pair?
11    A.  Yes.
12    Q.  And what kind of classes were those?
13    A.  Audit classes.  Audit.  Yeah.
14    Q.  Can you look at question 39 of your
15 responses?
16    A.  Yes.
17    Q.  What does that question say?
18    A.  "Identify the university, college, or
19 other educational institution(s) at which you took
20 your courses."
21    Q.  Did you answer that question?
22    A.  I guess not.
23    Q.  Did you answer that question when you
24 corrected your responses earlier this morning?
25    A.  No.

Page 84

1    Q.  But you did, in fact, take classes?
2    A.  Yes.
3    Q.  And where were they?
4    A.  Princeton.
5    Q.  Only at Princeton?
6    A.  Yes.
7    Q.  And what classes did you take at
8 Princeton?
9    A.  I don't remember exactly.  It was an
10 economy, macroeconomic classes.
11    Q.  And did you pay for the classes?
12    A.  Yes.  Not -- not the whole amount.
13    Q.  How much did you pay for the classes?
14    A.  Maybe it was, like, hundred extra I had to
15 pay.
16    Q.  Do you remember how much -- so who else
17 paid for your classes?
18    A.  The host family.
19    Q.  And do you know how much they paid?
20    A.  I think 500.
21    Q.  And have these -- have the classes that
22 you have taken been useful to you --
23    A.  No.
24    Q.  -- in your current job?
25    A.  No.

Page 85

1    Q.  What about the classes that you took at
2 the training school, have those been helpful at all?
3        MR. PACHECO:  Objection to form.
4        THE WITNESS:  No.
5 BY MR. BOYD:
6    Q.  Do you think you achieved the goals that
7 you set out in your application?
8    A.  Yes.
9    Q.  Do you think you have a better sense of
10 American culture now?
11    A.  Yes.
12    Q.  Do you think your English is better now?
13    A.  Yes.
14    Q.  Were you able to spend time with children?
15    A.  Yes, a lot.
16    Q.  Let's talk quickly about your LCCs again.
17 So you said you had two LCCs?
18    A.  Yes.
19    Q.  And what were their names again?
20    A.  I don't remember the first one, but the
21 second one was Penny.
22    Q.  And you had mentioned that the
23 availability of an LCC was a benefit to the program.
24    A.  Yes.
25    Q.  Do you think that the LCC was helpful to

22 (Pages 82 - 85)



Page 86

1 you during your time as an au pair?
2     A.  Not really.  I mean, I knew she was here
3 in case of something happened.  I didn't have problem,
4 so I didn't need her so much.  It was helpful to know
5 she was there.
6     Q.  So you said you didn't have problems, so
7 you didn't --
8     A.  Yeah.
9     Q.  -- need her?  Okay.  And you said you
10 spoke with her once a month?
11     A.  Yes.
12     Q.  And you never had any issues that you
13 needed to report to her?
14     A.  No.
15     Q.  Did you ever have any problems with your
16 host family?
17     A.  No.
18     Q.  Did you ever have any problems with
19 Cultural Care during the program?
20     A.  No.
21     Q.  Did the host family ever complain to you
22 about anything?
23     A.  No.
24     Q.  Did you ever raise any complaints with the
25 ████ family about your stipend?

Page 87

1     A.  No.
2     Q.  What about your hours?
3     A.  No.
4     Q.  Did you ever raise any complaints to
5 Cultural Care about your stipend?
6     A.  No.
7     Q.  Or about your hours?
8     A.  No.
9     Q.  So your initial term as an au pair was for
10 one year; right?
11     A.  Yes.
12     Q.  And what -- what happened at the end of
13 that year?
14     A.  I extended it.
21     Q.  Okay.  Do you think your English got
22 better during the additional six months?
23     A.  Yes.
24     Q.  Were you paid the same your second year?
25     A.  Yes.

Page 88

1     Q.  Were your hours the same?
2     A.  Yes.
22     Q.  Still?
23     A.  Yes.
24     Q.  When did your extension term end?
25     A.  August 2015.

Page 89

1     Q.  Did you write about your experience as an
2 au pair in any way?  Like, do you have a blog, for
3 instance?
4     A.  Yes.
5     Q.  You do have a blog?
6     A.  Yeah.
7     Q.  Did you write about your time as an au
8 pair on it?
9     A.  I think so.
10     Q.  Do you still have that blog?
11     A.  It's still online, but I don't write
12 anything since, like, two years.
13     Q.  But those posts would still be there?
14     A.  Yes.
15     Q.  And what about a Facebook page, do you
16 have a Facebook page?
17     A.  Yes.
18     Q.  Did you ever write about the au pair
19 program and your experience on your Facebook?
20     A.  No.
21     Q.  Do you keep a journal?
22     A.  Yes.
23     Q.  Did you write about the au pair program in
24 your journal?
25     A.  Yes.

23 (Pages 86 - 89)

Case No. 1:14-cv-03074-CMA-KMT   Document 43-47   filed 03/30/18   USDC Colorado   pg 245 of 311

# Exhibit 430

```
                                               Page 1

 1            IN THE UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF COLORADO

 3   * * * * * * * * * * * * *

 4   JOHANA PAOLA BELTRAN,    *

 5   et al.,                  * Civil Action No.

 6         Plaintiffs,    * 1:14-cv-03074-CMA-KMT

 7   v.                       *

 8   INTEREXCHANGE, INC.,    *

 9   et al.,                  *

10         Defendants.    *

11   * * * * * * * * * * * * *

12

13            Deposition of DAFNE DiMARCO

14              Tuesday, January 23, 2018

15                   6:15 a.m.

16              VIA VIDEOCONFERENCE

17            Choate Hall & Stewart LLP

18       Two International Place - 5th Floor

19           Boston, Massachusetts 02110

20

21

22

23

24   ----------  J. Edward Varallo, RMR, CRR  ----------

25          Registered Professional Reporter
```

PLAINTIFFS' RESP. APP.0004763

Page 2

1  PRESENT VIA VIDEOCONFERENCE FROM PERTH, AUSTRALIA

2  The Deponent:

3    Dafne DiMarco

4

5  PRESENT VIA VIDEOCONFERENCE FROM NEW YORK

6

7  Attorneys for Plaintiffs:

8    Joshua Libling, Esq.

9    Boies Schiller Flexner LLP

10    575 Lexington Avenue - 7th Floor

11    New York, New York 10022

12    212.446.2300 ~ Fax 212.446.2350

13    jlibling@bsfllp.com

14

15  PRESENT AT CHOATE HALL & STEWART IN BOSTON

16

17  Attorneys for Defendant Cultural Care, Inc.

18  d/b/a Cultural Care Au Pair:

19    Virginia I. Selden, Esq.

20    Kevin O'Keefe, Esq.

21    Choate Hall & Stewart LLP

22    Two International Place - 34th Floor

23    Boston, Massachusetts 02110

24    617.248.5000 ~ Fax 617.248.4000

25    vselden@choate.com; kokeefe@choate.com

Page 4

1  -------------------------------------------------

2  DiMARCO EXHIBITS    FOR IDENTIFICATION    PAGE

3  -------------------------------------------------

4  Exhibit 3              25

5  Document headed Notice of Your Right to Join

6  Lawsuit for Unpaid Wages

7  Exhibit 4              55

8  Profile of Dafne DiMarco on Cultural Care

9  website (Bates CC00035908 - 922)

10  Exhibit 5              58

11  Participation form headed Au Pair:  Dafne

12  DiMarco (six pages)

13

14  ORIGINAL EXHIBITS RETAINED BY THE COURT REPORTER

15      AND RETURNED TO CHOATE HALL & STEWART LLP

16

17

18

19

20

21

22

23

24

25

Page 3

1  Court Reporter:

2    J. Edward Varallo, RPR, RMR, CRR

3

4  Videographer:

5    Patrick Blaskopf, CLVS, Video Specialist

6

7

8

9

10

11           I N D E X

12  -------------------------------------------------

13  DEPONENT                      PAGE

14  -------------------------------------------------

15  Dafne DiMarco

16    by Ms. Selden..................   7, 108

17    by Mr. Libling.................. 106

18

19  -------------------------------------------------

20  DiMARCO EXHIBITS    FOR IDENTIFICATION    PAGE

21  -------------------------------------------------

22  Exhibit 1              10

23  Notice of Deposition

24  Exhibit 2              20

25  Consent to Join, Page 82 of 220

Page 5

1  -------------------------------------------------

2           MORNING SESSION

3             6:15 a.m.

4  -------------------------------------------------

5        THE VIDEOGRAPHER:  We are now on the

6  record.  The time is approximately 6:16 a.m. and the

7  date is January 23, 2018.

8        Please note that the microphones are

9  sensitive and may pick up whispering, private

10  conversations, and cellular interference.  Please

11  turn off all cell phones or place them away from the

12  microphones, as they can interfere with the

13  deposition audio.  Audio and video recording will

14  continue to take place until all parties agree to go

15  off the record.

16        This is media unit number 1 of the

17  video-recorded deposition of Dafne DiMarco taken by

18  counsel for defendants in the matter of Joanna P.

19  Beltran et al. versus Interexchange, Inc., et al.

20  filed in the U.S. District Court, District of

21  Colorado.  The deposition is being held at Choate

22  Hall located at Two International Place, Boston,

23  Massachusetts.

24        My name is Patrick Blaskopf from the

25  firm Veritext and I am the videographer.  The court

PLAINTIFFS' RESP. APP.0004764
212-279-9424

Veritext Legal Solutions
www.veritext.com

212-490-3430

---

Page 98

1 from work.
2    Q.    Ms. DiMarco, you said he gave you a
3 T-shirt as a gift?
4    A.    Yes.
5    Q.    And he gave you headphones as well?
6    A.    Yes.
7    Q.    Did you say a stereo?
8    A.    I really don't remember.  It happen
9 years ago and I don't remember it.  I remember some
10 gift for Christmas, as I give them Christmas gifts,
11 and birthday gift.
12    Q.    Okay.  Do you recall what you received
13 for Christmas or on your birthday?
14    A.    As I said before, I remember I'm sure
15 about a pair of headphones and I remember once he
16 went shopping for Christmas with the kid and got me
17 a T-shirt.
18    Q.    Do you have any documents reflecting the
19 weekly stipend that you were paid?
20    A.    No, as I said before.
21    Q.    What about the other benefits that you
22 received?
23         MR. LIBLING:  Objection to form.
24    A.    No.  I said before, it happened years
25 ago.

Page 99

1         It's night.  I really want to go home,
2 so if you have serious question, five minutes, and
3 it's finish.
4    Q.    Who was your LCC?
5    A.    I said before I don't remember her name.
6 I remember ███████████████
7 I think.  But I don't remember her name.
8    Q.    ███████
9    A.    It's almost 10:00.
10    Q.    What was his last name?
11    A.    It's 10:00 in the night here.  ███████
12    Q.    How often --
13    A.    I'm sure you know who she is.
14    Q.    How often did you speak with her?
15    A.    We have meetings, I think was once a
16 month.
17    Q.    And did you feel comfortable reporting
18 issues to her?
19    A.    Yes.  But she didn't help me too much
20 and I don't -- I don't think it was her fault.  She
21 just say to me, I'm sorry the agency can't help us,
22 can't help you; I don't know what to do.
23    Q.    Did you record your experience as an
24 au pair in any way?
25    A.    Yes.  When I was there I was

Page 100

1 experimenting travel with the family and she answer
2 to me the agency couldn't do nothing.  She actually
3 say to me she would like to help me but her hands
4 were tied from the agency and she knew it wasn't one
5 of the best agencies, especially because of the
6 salary we be paid, the situation the families,
7 because it was better to lose an au pair instead of
8 lose the family.
9         I did found a link on Facebook, I think;
10 it was interview two au pairs from a lawyer firm --
11 I don't remember -- and posted that on Facebook
12 comment page probably with a picture or something
13 about my schedule time, say that if we actually work
14 40 hours a week with less than 200 a week we get,
15 it's like we're working for $4.00 an hour.  And she
16 say to me "I totally agree with you, but it's better
17 if you take it off from your page."
18    Q.    You previously testified that you lived
19 in your host father's house.  Correct?
20    A.    Yes.
21    Q.    And that he provided you a hundred
22 dollars a week as a family for food.  Correct?
23    A.    Yes, as I said before.
24         MR. LIBLING:  Objection to form.
25 BY MS. SELDEN:

Page 101

1    Q.    Did you have access to a cell phone in
2 the United States?
3    A.    To who?  Sorry.
4    Q.    To a cell phone.
5    A.    A cell phone?
6    Q.    Mm-hmm.
7    A.    Yeah, I had my own cell phone and the
8 family was paying to me SIM card.
9    Q.    The host family paid for your SIM card?
10    A.    Yes.
11    Q.    Do you have any idea how much per month
12 that would have been?
13    A.    It was 35.  And after, we switch for a
14 plan that was cheaper.
15    Q.    And did you use the phone for personal
16 reasons?
17    A.    For everything.  It was my phone.  They
18 supposed to give me a telephone.  They never give me
19 a telephone, they just give me the SIM card.
20    Q.    But you came to the United States with
21 the telephone.  Correct?
22    A.    Yes, obviously I had my telephone.  But
23 Cultural Care say to me the family supposed to give
24 me a SIM card, then a new telephone.  They just give
25 me the SIM card.

26 (Pages 98 - 101)



Page 102

1

25 Q. And were you paid weekly during those

Page 103

1 times?
2 A. Yes, as the contract states.
3 Q. Did the family pay for you to take
4 classes?
5 A. No.
6 Q. Did you take any classes when you were
7 in the United States?
8 A. Yeah. Cultural Care said to us we had
9 to reach six credits, I think. We had to attend
10 weekend classes. It actually was really, really
11 expensive. I went with my own money to New Orleans.
12 I paid the weekend cost with my own money, the
13 ticket fly going and coming back. It was really
14 expensive. They gave me I think two credits; I'm
15 not sure. And during the year I was having trouble
16 to reach the credits; I actually didn't want to
17 spend a thousand dollar for flying to the weekend
18 classes. And at the end when we were running out of
19 time, that's when the agency say to me I'm sorry,
20 you can attend the community college. Just you
21 didn't have to say to them you're an au pair, you
22 don't have to show them your passport, you need to
23 show them your American driving license because
24 au pairs can't go to the community college.
25 And when I -- After the community

Page 104

1 college, I actually found out if you are an au pair,
2 you can attend. You can pay $50 for the semester,
3 you can attend. And I went to use another community
4 college and I finish to reach my credits there with
5 an English class. And then the agency didn't want
6 us to have community college because they were not
7 getting paid in that way; they were taking money
8 from the weekend classes. And the community college
9 said to me they were more than welcome to have
10 au pairs to study there; it was not a problem if you
11 were or not an au pair.
12 Q. Ms. DiMarco, have you recommended the
13 au pair program to anyone else?
14 A. With Cultural Care? No.
15 Q. Did you consider coming back to the
16 program?
17 A. No. I wanted to talk about my
18 experience. They send me invitation to go there,
19 talk about my experience. I talked with some of
20 them, probably still was Natasha, I think her last
21 name is [UNINTELLIGIBLE], I don't remember, to talk
22 about my experience. And after, they say to me, no,
23 it's fine. They knew I had problems. I said to
24 them I wanted to talk about my problems with other
25 au pairs; they said to me no.

Page 105

1 Q. You didn't serve as an ambassador for
2 Cultural Care?
3 A. I received emails and stuff like that,
4 you know. I don't even reply to the emails because
5 after I say to them I wanted to share my experience,
6 as they say, welcome back to Italy, you can
7 experience talking with other au pairs, those who
8 want to be au pairs and talking about your
9 experience, they say to me no.
10 MS. SELDEN: Can we take a quick minute,
11 please?
12 THE VIDEOGRAPHER: The time is --
13 THE WITNESS: No, it's actually 10:00.
14 For me, it's finish.
15 MS. SELDEN: I want to make sure that
16 there's nothing else, but I think we're wrapping up.
17 Just one moment, please.
18 THE VIDEOGRAPHER: The time is
19 approximately 8:50 and we are off the record.
20 (Short recess taken.)
21 THE VIDEOGRAPHER: The time is
22 approximately 8:53 and we are back on the record.
23 MS. SELDEN: Thank you for waiting,
24 Ms. DiMarco. I'll be very brief.
25 THE WITNESS: Thank you.

27 (Pages 102 - 105)



Page 106

1 BY MS. SELDEN:

2    Q.   Did you ever consider applying to be an

3 au pair in the United States again?

4    A.   Actually, after my experience, no. When

5 I was there, I was thinking to extend maybe with

6 another family, but after, I just decide it's my way

7 is what I want, instead of having these problems.

8       MS. SELDEN: Okay, I think that's all

9 for me. Joshua, if you have anything.

10      MR. LIBLING: Very, very quickly. Just

11 a couple of things.

12       EXAMINATION

13 BY MR. LIBLING:

14    Q.   Ms. DiMarco, you testified that you had

15 a conversation or at least one conversation with

16 Cultural Care about the stipend. Did Cultural Care

17 ever tell you anything about whether you were

18 permitted to receive more than $200 a week?

19    A.   They said it was illegal for us to

20 receive less or more. They said with my type of

21 visa I couldn't work, actually, so the pay was not

22 for working, it was for study and couldn't do

23 nothing else. And they say to me if I had problems

24 and they couldn't solve it, change family in two

25 weeks, find maybe another family if you can find,

Page 107

1 you have to go back to your country. So pretty much

2 we have to stay there in the situation with the

3 amount of money. And when I actually received

4 sometimes more money, they say to me that was

5 illegally, because of the type of visa. And I think

6 that's it.

7    Q.   All right, thank you. And last question

8 then. Did the host family, either the host dad or

9 host mom, ever say anything to you about why they

10 chose to hire an au pair?

11    A.   Ah, yes. They say they were paying a

12 lot for the agency but in any case was cheaper than

13 have a babysitter from there or a nanny because our

14 salary was, if you consider at the time working, was

15 like $3.00 an hour, $4.00 an hour, and for them it

16 was cheaper. So they just decide to hire au pair

17 because in this way they could have someone at home

18 the entire time helping you with cleaning, do

19 plenty, do little bit of everything, and they had to

20 spend much less money than that. So some of them

21 actually prefer to have an au pair; this way they

22 save money.

23      MR. LIBLING: All right, thank you.

24 That's it for me.

25      THE WITNESS: Thank you.

Page 108

1       FURTHER EXAMINATION

2 BY MS. SELDEN:

3

4      MS. SELDEN: I think that's all for me.

5      THE WITNESS: Thank you.

6      MR. LIBLING: That's all. Thank you.

7      MS. SELDEN: Thank you for your time.

8 Thank you, Ms. DiMarco.

9      MR. LIBLING: Thank you.

10      THE WITNESS: Thank you. Have a good

11 day.

12      MS. SELDEN: Thank you. You too.

13      THE VIDEOGRAPHER: The time is

14 approximately 8:58 and this is the end of media

15 number 2.

16      (Deposition concluded at 8:58 a.m.)

17

18

19

20

21

22

23

24

25

28 (Pages 106 - 109)

Case No. 1:14-cv-03074-CMA-KMT Document 959-24 filed 03/30/18 USDC Colorado pg 251 of 311

# Exhibit 431

PLAINTIFFS' RESP. APP.0004768

Page 1

1          THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF COLORADO

2

    ------------------------------:

3   JOHANA PAOLA BELTRAN, et al., :
                                  :
4            Plaintiffs,          :
                                  :
5        vs.                      : Civil Action No.
                                  : 1:14-cv-03074
6   INTEREXCHANGE, INC., et al.,  :
                                  :
7            Defendants.          :
    ------------------------------:

8

9

10    VIDEOTAPED DEPOSITION OF ANNIKA KRUSCHWITZ

11

12  DATE:              Tuesday, January 23, 2018

13  TIME:              12:57 p.m.

14  LOCATION:          Boies Schiller Flexner, LLP
                       1401 New York Avenue, NW
15                     Washington, D.C. 20005

16

17  REPORTED BY:    Shari R. Broussard, RPR, CSR
                    Reporter, Notary

18

19

20

21

22

PLAINTIFFS' RESP. APP.0004769

Page 2

```
1          A P P E A R A N C E S
2  On behalf of Plaintiffs:
3     BYRON D.M. PACHECO, ESQUIRE
      Boies Schiller Flexner, LLP
4     575 Lexington Avenue
      New York, New York 10022
5     (212) 446-2300
      bpacheco@bsfllp.com
6
7  On behalf of Defendant CULTURAL CARE, INC:
8     LYNDSEY M. KRUZER, ESQUIRE
      Choate, Hall & Stewart, LLP
9     Two International Place
      Boston, Massachusetts 02110
10    (617) 248-4790
      lkruzer@choate.com
11
12 ALSO PRESENT:
13    Dan Reidy, Video Technician
14
15
16
17
18
19
20
21
22
```

Page 3

```
1          C O N T E N T S
2  EXAMINATION BY:                    PAGE
3     Counsel for Defendant Cultural Care    6, 115
4     Counsel for Plaintiffs          102
5
6  KRUSCHWITZ EXHIBITS:    *          PAGE
7  Exhibit 1  Consent to Join              8
8  Exhibit 2  Letter to Future Host Family    28
9  Exhibit 3  Questionnaire, 10/18/17      57
10 Exhibit 4  Questionnaire, 10/31/17      57
11 Exhibit 5  Apply to be a Cultural Care
             Ambassador Buddy             95
12
13
14 (*Exhibits attached to transcript.)
15
16
17
18
19
20
21
22
```

Page 4

```
1          P R O C E E D I N G S
2       VIDEO TECHNICIAN:  Good afternoon.  We
3  are going on the record at 1 o'clock p.m. --
4  excuse me -- 12:57 p.m., on Tuesday, January 23rd,
5  2018.
6       Please note that the microphones are
7  sensitive and may pick up whispering, private
8  conversations and cellular interference.  Please
9  turn off all cell phones or place them away from
10 the microphones, as they can interfere with the
11 deposition audio.  Audio and video recording will
12 continue to take place unless all parties agree to
13 go off the record.
14      This is Media Unit Number 1 of the video
15 recorded deposition of Annika Kruschwitz taken by
16 counsel for the Defendant in the matter of
17 Beltran, et al., versus Interexchange,
18 Incorporated, et al.  This case is filed in the
19 United States District Court for the District of
20 Colorado.  This deposition is being held at the
21 law offices of Boies Schiller, located at 1401 New
22 York Avenue, Northwest, Washington, D.C. 20005.
```

Page 5

```
1       My name is Dan Reidy, from the firm
2  Veritext Legal Solutions, and I'm the
3  videographer.  The court reporter is Shari
4  Broussard from the firm Veritext Legal Solutions.
5  I'm not authorized to administer an oath; I'm not
6  related to any party in this action, nor am I
7  financially interested in the outcome.
8       Counsel and all present in the room will
9  now state their appearance and affiliation for the
10 record.  If there are any objections to
11 proceeding, please state them at the time of your
12 appearance beginning with the noticing attorney.
13      MS. KRUZER:  I'm Lindsey Kruzer, from
14 the firm of Choate Hall & Stewart, representing
15 Defendant, Cultural Care, Inc.
16      MR. PACHECO:  Byron Pacheco, of Boies,
17 Schiller & Flexner, on behalf of the witness and
18 the Plaintiffs.
19      VIDEO TECHNICIAN:  Will the court
20 reporter please swear in the witness.
21 WHEREUPON,
22          ANNIKA KRUSCHWITZ
```

2 (Pages 2 - 5)



Page 26

Page 27

Page 28

10    Q    You testified earlier that you applied
11  to the au pair program at some point, but you
12  don't remember when.
13    A    Uh-huh.
14    Q    Correct?
15    A    Yes.
16       MS. KRUZER:  Would you please mark this
17  as Exhibit 2.
18       (Kruschwitz Exhibit Number 2 was
19       marked for identification.)
20  BY MS. KRUZER:
21    Q    Ms. Kruschwitz, do you recognize this
22  document?

Page 29

1    A    Yes.
2    Q    Could you please turn to the page that
3  at the bottom is marked with the number ending
4  980.
5    A    Yes.
6    Q    Do you see the first box at the top, the
7  Emergency Release Waiver?
8    A    Yes.
9    Q    And at the bottom of that box it states,
10  "Annika Kruschwitz has agreed to this waiver on
11  2/28/2012 at 12:14 p.m."?
12    A    I see that.
13    Q    Do you remember if you applied around
14  that time to become an au pair?
15    A    I don't recall.  It could be.  It's
16  possible.
17    Q    So you have no recollection of
18  completing this application?
19    A    No, I don't.
20    Q    Let's turn back to the first page.
21  Under the section "Why I want to be an Au Pair,"
22  could you take a second and read that to yourself?

8 (Pages 26 - 29)

Page 30

1    A   (Complying.)  Yes.

2    Q   Do you remember writing that statement?

3    A   Yes.

4    Q   Is everything in that statement

5 accurate?

6    A   Yes.

7    Q   Were there any other reasons why you

8 wanted to become an au pair?

9    A   No.

10    Q   How important was the stipend to you in

11 your decision to become an au pair?

12       MR. PACHECO:  Objection.  Foundation.

13       THE WITNESS:  I think it -- all the

14 reasons I mentioned there are important.

15 BY MS. KRUZER:

16    Q   So was the stipend important to you in

17 your decision in becoming --

18    A   As well as the other reasons as well.

19    Q   -- an au pair?

20       MR. PACHECO:  Let her finish her

21 question before you answer.  She can't type both.

22 BY MS. KRUZER:

Page 31

1    Q   Was the stipend important to you in your

2 decision to become an au pair?

3    A   As well as all the other reasons as

4 well.

5    Q   So, yes, it was important to you?

6    A   Yes.

7    Q   At what point did you first learn about

8 the stipend?

9    A   At the recruitment meeting.

10    Q   At what recruitment meeting?

11    A   The meeting I mentioned before.  I -- I

12 went to those too.  So I had a meeting where a

13 leader would tell me about the program.

14    Q   Do you remember that meeting?

15    A   I went to several, so I -- yes, but I

16 can't tell which one was what.

17    Q   Were all of the recruitment meetings

18 Cultural Care recruitment meetings?

19    A   Yes.

20    Q   Do you remember approximately how many

21 you attended?

22    A   Three, maybe four or five.

Page 32

1    Q   Do you remember where they took place?

2    A   In Düsseldorf.

3    Q   Do you remember why you chose to attend

4 multiple meetings?

5    A   I had to.  Because I was interested that

6 early, so I went to one meeting.  And I know that

7 like somehow they expire -- at least that's what

8 I've -- I've been told -- so I had to attend

9 multiple meetings.

10    Q   So I just want to make sure that I

11 understand what you're testifying to.

12       When you were first interested in the au

13 pair program, you were too young to apply to

14 become an au pair; is that right?

15       MR. PACHECO:  Objection.

16       THE WITNESS:  No, I wasn't too young.

17 It was just too early for me to -- I think they

18 said it's valid for like a year.  But apparently

19 I -- I was interested before I even finished

20 school.  So by the time when I finished school it

21 expired, so I had to redo it.  And then -- I

22 postponed it because of some family issues and

Page 33

1 then by the time it expired again, so I had to

2 redo it again.

3 BY MS. KRUZER:

4    Q   So when you attended the first meeting,

5 you were still in high school?

6    A   Yes.

7    Q   And it was more than a year from the

8 time you were graduating?

9    A   Yes.

10    Q   And you have to graduate high school

11 before coming to the U.S. as an au pair, correct?

12    A   Yes.

13    Q   Do you remember if the stipend was

14 discussed at that first meeting?

15    A   Yes.

16    Q   What was said?

17    A   They just told us that it is set as

18 $195.75 a week.

19    Q   Were those the exact words they used?

20    A   Yes.  It's on slides and a presentation.

21    Q   It's on slides and a presentation that

22 says what?

9 (Pages 30 - 33)



Page 34

1    A    It said at $195.75.
2    Q    Do you remember anything else about the
3 meeting?
4    A    They were just talking about insurance
5 and that there isn't a typical family, that we
6 shouldn't focus on areas, all those things.
7    Q    Back to the application.  On the first
8 page it says that the application was updated on
9 November 5th, 2013?
10   A    Uh-huh.
11   Q    Is this around the time you were looking
12 to match with a host family?
13   A    Yes.
14   Q    Did you interview with any host
15 families?
16   A    One.
17   Q    And is that the family you ultimately
18 ended up matching with?
19   A    Yes.
20   Q    Did any other host families reach out to
21 you --
22   A    No.

Page 35

Page 36

Page 37

PLAINTIFFS' RESP. APP.0004773

Case No. 1:14-cv-03074-CMA-KMT Document 959-24 filed 03/30/18 USDC Colorado pg 257 of 311

# Exhibit 432

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No. 1:14-cv-03074-CMA-KMT

------------------------------------x

JOHANA PAOLA BELTRAN, LUSAPHO

HLATSHANENI, BEAUDETTE DEETLEFS,

DAYANNA PAOLA CARDENAS CAICEDO and

ALEXANDRA IVETTE GONZALEZ, on behalf of

themselves and others similarly situated,

        Plaintiffs,


    - against -


INTEREXCHANGE, INC., et al.,

        Defendants.

------------------------------------x

                    January 26, 2018

                    9:05 a.m.


    Videotaped Deposition of KUBRA SAHIN,

taken by Defendants, pursuant to Notice,

held at the offices of Boies Schiller &

Flexner LLP, 575 Lexington Avenue, New

York, New York, before Todd DeSimone, a

Registered Professional Reporter and Notary

Public of the State of New York.

PLAINTIFFS' RESP. APP.0004775

**Page 2**

1
2 A P P E A R A N C E S :
3 BOIES SCHILLER & FLEXNER LLP
    575 Lexington Avenue
4 New York, New York 10022
        Attorneys for Plaintiffs
5 BY:   BYRON D.M. PACHECO, ESQ.
        bpacheco@bsfllp.com
6
7
8 CHOATE HALL & STEWART, LLP
    Two International Place
9 Boston, Massachusetts 02110
        Attorneys for Defendant
10    Cultural Care, Inc.
    BY:   VIRGINIA I. SELDEN, ESQ.
11        vselden@choate.com
        TIMOTHY McLAUGHLIN, ESQ.
12        tmclaughlin@choate.com
13
14
15
16
17 ALSO PRESENT:
        DEVERELL WRITE, Videographer
18
19
20
21
22
23
24
25

**Page 3**

1
2        THE VIDEOGRAPHER:  We are going
3 on the record at 9:05 a.m. on January 26th,
4 2018.  Please note that the microphones are
5 sensitive and may pick up whispering and
6 private conversation.
7        This is media unit one of the
8 video-recorded deposition of Kubra Sahin.
9 The caption of this case is Beltran, et
10 al., versus InterExchange, Inc., et al.
11 This case is filed in the U.S. District
12 Court for the District of Colorado.  We are
13 here at the offices of Boies Schiller
14 located 575 Lexington Avenue, New York, New
15 York.  My name is Deverell Write
16 representing Veritext Legal Solutions.
17        At this time will counsel
18 please state their appearances.
19        MS. SELDEN:  Virginia Selden
20 from Choate, Hall & Stewart on behalf of
21 Cultural Care, Inc.
22        MR. McLAUGHLIN:  Tim McLaughlin
23 also on behalf of Cultural Care, Inc.
24        MR. PACHECO:  Byron Pacheco of
25 Boies, Schiller & Flexner on behalf of

**Page 4**

1 plaintiffs and the witness.
2
3                *   *   *
4 K U B R A  S A H I N,
5 called as a witness, having been first duly
6 sworn, was examined and testified
7 as follows:
8 EXAMINATION BY MS. SELDEN:
9    Q.    Good morning.
10    A.    Good morning.
11    Q.    Could you please state your
12 full name for the record.
13    A.    Kubra Sahin.
14    Q.    Sahin?
15    A.    Yeah.
16    Q.    Ms. Sahin, have you ever been
17 deposed before?
18    A.    No.
19    Q.    I will start with a few basic
20 ground rules.
21        So please respond to my
22 questions with verbal answers rather than
23 nods or head shakes so that the court
24 reporter can make a record.
25    A.    Okay.

**Page 5**

1            SAHIN
2    Q.    Please listen to each question
3 before answering.  It is important for the
4 court reporter that we don't talk over each
5 other.
6    A.    Okay.
7    Q.    If you don't understand a
8 question, please let me know and I would be
9 happy to rephrase it or, if you don't hear
10 it, we can ask the court reporter to read
11 it back.
12    A.    Okay, thank you.
13    Q.    But if you don't ask for
14 clarification, I will assume that you did
15 understand the question.
16    A.    Okay.
17    Q.    And last but not least, if you
18 need to take a break, please just let us
19 know, we are happy to do that, but I just
20 ask if there is a question pending that you
21 answer it before we take a break.
22    A.    Okay.
23

2 (Pages 2 - 5)



Page 106

1        SAHIN

Page 108

1        SAHIN

Page 107

1        SAHIN
2        MR. PACHECO:  Objection to
3  form.
4

Page 109

1        SAHIN
5      Q.    What did you do when you were
6  home?
7      A.    Applied for a new visa and then
8  spent time with family and friends.
9      Q.    Any other travel?
10     A.    No.
11     Q.    And you were paid for those
12  weeks, correct?
13     A.    Yes.  They were my vacation
14  weeks.
15     Q.    Did you use all of your
16  vacation?
17     A.    Yes.
18     Q.    You previously testified that
19  your host family paid you $195.75 every
20  week?
21     A.    Yes.
22     Q.    Did they ever miss a week?
23     A.    Can I say that -- reply to
24  that?  I want to correct that.  It is $200
25  in a week, sorry.

PLAINTIFFS' RESP. APP.0004777
212-279-9424

Veritext Legal Solutions
www.veritext.com

212-490-3430



Page 110

1            SAHIN
2      Q.    That's okay.  They paid you
3   $200 every week?
4      A.    Yes.
5      Q.    Did that ever vary?
6      A.    No, it would always be $200.
7      Q.    Did they ever miss a payment?
8      A.    Never.
9      Q.    Cultural Care never paid you
10  your stipend, did it?
11     A.    No.
12     Q.    Did you ever ask for more
13  money?
14     A.    No.
15     Q.    Why not?
16     A.    I thought it wasn't allowed.
17     Q.    Who told you that you weren't
18  allowed to ask for more?
19          MR. PACHECO:  Objection.
20     A.    First in the information
21  evening -- they never said I couldn't ask
22  for more, but they just always promoted the
23  $195.75, and we knew that every agency had
24  the same amount for the au pairs, so we
25  automatically understood that it was

Page 111

1            SAHIN
2   $195.75 for every au pair.
3      Q.    Did you ever discuss with the
4   family why you were paid $200 a week?
5      A.    They rounded it up.
6      Q.    Did you ever discuss the
7   stipend with them more generally?
8      A.    No.
9      Q.    But the host family decided to
10  round up, right?
11     A.    Yes.  So they first paid me in
12  cash, because I didn't -- well, yeah, I
13  didn't have the card.  They paid in me in
14  cash, and it would be too hard to pay
15  $195.75 in cash, so they rounded it up.
16     Q.    Were you paid in cash the
17  entire year and a half?
18     A.    No.
19

Page 112

1            SAHIN
2

Page 113

1            SAHIN
2

23          MS. SELDEN:  Just so you know,
24  Byron, we will probably request those
25  records.

29 (Pages 110 - 113)

Page 114

1              SAHIN
2       MR. PACHECO:  Okay.  Are you
3  requesting them now or do you want to talk
4  offline about it?
5       MS. SELDEN:  We can talk
6  offline about it.
7       MR. PACHECO:  Okay.
8    Q.    And other than the birthday
9  gifts, did your parents ever -- host
10 parents ever give you additional money?
11   A.    No.
12   Q.    Do you believe that the family
13 paid you everything that you were promised?
14   A.    Yes.
15   Q.    Do you believe that they paid
16 you what you were owed?
17      MR. PACHECO:  Objection.
18   A.    Can you clarify that?
19   Q.    Sure.  Do you claim that the
20 host family owes you money?
21   A.    No.
22   Q.    Do you think that they paid you
23 unfairly?
24   A.    I don't think they paid me
25 unfairly.

Page 115

1              SAHIN
2    Q.    But you testified that they
3  paid you, correct?
4    A.    Yes.
5    Q.    Do you believe that they owe
6  you money?
7    A.    No.
8    Q.    Do you believe that you are
9  owed money for your time working as an au
10 pair by Cultural Care?
11   A.    Yes.
12   Q.    Were you ever an employee of
13 Cultural Care?
14      MR. PACHECO:  Objection.
15   A.    When I signed up, I signed up
16 with Cultural Care, not with the family, so
17 I believe that they are the head sponsors,
18 they are the one sponsoring me.
19   Q.    Did you work for them?
20      MR. PACHECO:  Objection.
21   A.    I think I did.
22   Q.    Did you have any duties for
23 Cultural Care?
24   A.    No.
25   Q.    And they never paid you?

Page 116

1              SAHIN
2    A.    No.
3    Q.    But you believe that you were
4  paid unfairly?
5       MR. PACHECO:  Objection, asked
6  and answered.  You can answer.
7    A.    What was the question?
8       MS. SELDEN:  Could you read
9  that back, please.
10      (The record was read.)
11   A.    Yes, but not by the family.
12   Q.    When did you come to this
13 belief?
14   A.    Well, as soon as we -- as soon
15 as I came here, I mean, in the beginning, I
16 thought $195.75 would be okay for a week
17 until I had like -- until you figure out
18 how much things actually cost in the City,
19 and you don't keep -- like you spend your
20 money within the first few days and you
21 don't have to wait for your next stipend,
22 that's when I was like this is not enough
23 for an au pair.
24   Q.    How much do you think you
25 should be paid?

Page 117

1              SAHIN
2    A.    Whatever the minimum wage is.
3  I have no idea.
4    Q.    Do you know what the minimum
5  wage is?
6    A.    Not in America, no.
7    Q.    So how much money do you feel
8  that you are owed?
9    A.    I have no idea.
10   Q.    Would you have come to the
11 United States if the stipend had been
12 lower?
13   A.    No.
14
21   Q.    Where is Silver Bay?
22   A.    In Albany.
23   Q.    What classes did you take at
24 Niagara Falls?
25   A.    They weren't class we could

30 (Pages 114 - 117)

# Exhibit 433

PLAINTIFFS' RESP. APP.0004780

Page 1

1

2    IN THE UNITED STATES DISTRICT COURT

     FOR THE DISTRICT OF COLORADO

3

     Civil Action No. 1:14-cv-03074-CMA-KMT

4    - - - - - - - - - - - - - - - - - - - - x

5    JOHANA PAOLA BELTRAN, et al.,

6                        Plaintiffs,

7            - against -

8    INTEREXCHANGE INC., et al.,

9                        Defendants.

     - - - - - - - - - - - - - - - - - - - - x

10

11                       January 26, 2018

                         8:15 a.m.

12

                         575 Lexington Avenue

13                       New York, New York

14

15       VIDEOTAPED DEPOSITION upon oral examination of

16   LAURA JULIANA CANO LIGARRETO, held at the above time

17   and place, taken before Brittany Saline, a

18   Professional Shorthand Reporter and Notary Public

19   of the State of New York, pursuant to the Federal

20   Rules of Civil Procedure, with written notice as

21   to time and place thereof.

22

23

24

25

PLAINTIFFS' RESP. APP.0004781

Page 2

1
2 A P P E A R A N C E S :
3 BOIES SCHILLER & FLEXNER, LLP
    Attorneys for Plaintiffs and Witness
4 575 Lexington Avenue, 7th Floor
    New York, New York 10022
5
    BY: JOSHUA J. LIBLING, ESQ.
6       jlibling@bsfllp.com
7
8
9 CHOATE HALL & STEWART, LLP
    Attorneys for Defendant CULTURAL CARE, INC.
10 Two International Place
    Boston, Massachusetts 02110
11
    BY: KEVIN O'KEEFE, ESQ.
12      kokeefe@choate.com
    NATALIA SMYCHKOVICH, ESQ.
13      nsmychkovich@choate.com
14
15
16 ALSO PRESENT:
17 GEORGE LIBBARES, Videographer
18
19
20
21
22
23
24
25

Page 4

1
2        THE VIDEOGRAPHER:  Good morning.
3  We are now recording and on the record
4  at 8:15 a.m. on January 26th, 2018.
5  Please note that the microphones are
6  sensitive and may pick up whispering
7  and private conversations and cellular
8  interference.  Please turn off all
9  cell phones or place them away from
10 the microphones, as they can interfere
11 with the deposition audio.  Recording
12 will continue until all parties agree
13 to go off the record.
14       This is Video 1 in the deposition
15 of Laura Juliana Cano Ligaretto, taken
16 by counsel for the defendant --
17 defendants, in the matter of Johana
18 Paola Beltran versus InterExchange
19 Inc., et al., filed in the U.S.
20 District Court, District of Colorado,
21 case number 1:14-CV-03074-CMA-KMT.
22       This deposition is being held at
23 Boies Schiller & Flexner, located at
24 575 Lexington Avenue, New York, New
25 York.

Page 3

1
2        S T I P U L A T I O N S
3        IT IS HEREBY STIPULATED AND
4  AGREED TO, by and among counsel for
5  the respective parties hereto, that
6  the sealing and certification of the
7  deposition shall be and the same are
8  hereby waived;
9        IT IS FURTHER STIPULATED AND
10 AGREED that all objections, except as
11 to the form of the question, shall be
12 reserved to the time of the trial;
13       IT IS FURTHER STIPULATED AND
14 AGREED that the within deposition may
15 be signed before any Notary Public
16 with the same force and effect as if
17 signed and sworn to before the Court.
18
19
20
21
22
23
24
25

Page 5

1
2        My name is George Libbares.  The
3  court reporter is Brittany Saline.
4  And we are here from Veritext New
5  York.
6        Counsel will now state their
7  appearances and the court reporter
8  will administer the oath.
9        MR. O'KEEFE:  Kevin O'Keefe and
10 Natalia Smychkovich, on behalf
11 defendant Cultural Care, Inc.
12       MR. LIBLING:  Joshua Libling on
13 behalf of plaintiffs and the witness.
14 L A U R A   J U L I A N A
15 C A N O   L I G A R R E T O, the witness herein,
16 having been duly sworn to tell the truth, the
17 whole truth, and nothing but the truth relating to
18 said matter, was examined and testified as
19 follows:
20 BY MR. O'KEEFE:
21     Q    Good morning.  Thank you for
22 coming in today.
23       MR. O'KEEFE:  Before we get
24 started, should we stipulate that
25 objections, except as to form and

2 (Pages 2 - 5)

Case 1:14-cv-03074-CMA-KMT Document 213-4 Filed 03/17/16 USDC Colorado Page 265 of 310



Page 94

1    Laura Juliana Cano Ligarreto

24        MR. LIBLING:  Objection to form.
25

Page 96

1    Laura Juliana Cano Ligarreto
2

8        MR. LIBLING:  Objection to form.
9

12    Q    Do you have schedules and
13 calendar records for the entire time that
14 you were with the ██████ family?
15    A    Not the entire time.
16    Q    Do you know when?  Are there any
17 periods that are missing that you know of?
18    A    No, I don't really remember.
19    Q    Would you say you have records
20 for most of the time you were with the
21 ██████ family?
22    A    Yes.
23    Q    And those were only in Colombia?
24    A    Yes.
25

Page 95

1    Laura Juliana Cano Ligarreto
2

24        MR. LIBLING:  Objection to form.
25

Page 97

1    Laura Juliana Cano Ligarreto
2

25 (Pages 94 - 97)



Page 98

Laura Juliana Cano Ligarreto

Page 99

Laura Juliana Cano Ligarreto

Q Did you -- do you recall -- turning back to Exhibit 3. If you turn to the second-to-last page, under "Final Questions"?
A (Perusing.)
Q Do you recall seeing this question before, "Your sponsor agency has also asked whether you have any documents relating to amounts paid to you and hours that you worked"?
A Can you repeat the -- the question?
Q Do you recall seeing this question?
A Oh, I don't remember.
Q And when you completed this survey that was November and you were still in Colombia at that time?
A Yes.
Q Did Cultural Care pay you any money when you were with the family?

Page 100

Laura Juliana Cano Ligarreto

A No.
Q Did they set the amount that the family paid?
MR. LIBLING: Objection to form.
A Yes.
Q They did set the amount?
A Yes.
Q Okay. How did they set it?
A Well, they always told me that I was going to get paid 195.75 and couldn't get paid more than that.
Q Okay. So maybe you misunderstood the question. The --
MR. LIBLING: Objection to form.
Q So Cultural Care did not set the amount --
MR. LIBLING: Objection to form.
Q -- that the paid -- the family paid you?
A No.
Q Okay. When did Cultural Care tell you that you could not be paid more than 195.75?
A The first meetings when I was

Page 101

Laura Juliana Cano Ligarreto

applying.
Q Okay. Did they tell you why?
A No.
Q Just that you couldn't?
A (Indicating.) Yes.
Q Okay. Did you think it was problematic that the family paid you more?
A Yes.
Q Why?
A Because in the agency they told me that I couldn't get more than that.
Q Okay. So why was it a problem?
MR. LIBLING: Objection to form.
A I don't really know. I just thought that it was going to be a problem because they were paying me more than the stipend.
Q A problem with whom?
A With the agency.
Q Did Cultural Care ever say to you, "Please tell us if you're being paid more than this amount"?
A No.

Page 102

```
 1      Laura Juliana Cano Ligarreto
 2    Q   Did Cultural Care ever say -- did
 3 they explain that there would be negative
 4 consequences if you were paid more than
 5 195.75?
 6    A   No.
 7    Q   Okay.  But Cultural Care did
 8 explain to you that based on your visa,
 9 that the specific visa that you would be
10 traveling, you couldn't take any other
11 jobs?
12    A   Yes.
13    Q   So, in that sense, you couldn't
14 be paid separately for different work; is
15 that correct?
16    A   Yes.
17    Q   But, if I understand your
18 testimony correctly, Cultural Care told you
19 that you could not receive more than
20 195.75?
21    A   Yes.
22    Q   And did they say why not?
23    A   No.
24    Q   Did you ask why?
25    A   No.
```

Page 103

```
 1      Laura Juliana Cano Ligarreto
 2    Q   Did you try and figure out why
 3 that was a -- a requirement when the ████
 4 family paid you more?
 5      MR. LIBLING:  Objection to form.
 6    A   Can you explain it?
 7    Q   So Cultural Care told you that
 8 you should not be paid more than 195.75 or
 9 that it was -- or -- what did they say
10 exactly?
11    A   They say that I was going to work
12 45 hours and I was going to get paid 195,
13 not more and -- or less than that, even if
14 I wasn't working the 45 hours.
15    Q   So when the ████ family started
16 paying you more, did you report that to
17 your LCC?
18    A   No.
19    Q   Okay.  Did you tell your LCC that
20 you were being paid this amount?
21    A   No.
22    Q   Did you tell anyone else?
23    A   No.
24    Q   Were you concerned that you were
25 being paid more than this amount, more than
```

Page 104

```
 1      Laura Juliana Cano Ligarreto
 2 the 195.75?
 3    A   Yes.
 4    Q   Okay.  Why were you concerned?
 5      MR. LIBLING:  Objection to form.
 6    A   Because I thought the rules for
 7 the agency was that I had to get paid 195.
 8    Q   Did you see that written down
 9 anywhere?
10    A   Excuse me?
11    Q   Did you see that -- that rule
12 written down anywhere?
13    A   Well, that -- that was what all
14 the documents said, so I assumed that.
15    Q   Do you recall what documents said
16 that?
17    A   I had a contract.
18    Q   And the contract said you could
19 not be made more than 195.75?
20    A   No, the contract said I was going
21 to get paid exactly 195.75.
22    Q   Did it say those words exactly,
23 195.75?
24    A   Yes.
25      MR. LIBLING:  Objection to form.
```

Page 105

```
 1      Laura Juliana Cano Ligarreto
 2    Q   What other documents?
 3    A   I don't really remember.  I have
 4 all the documents they give me with all the
 5 information for the program.
 6    Q   Okay.  And just so I understand
 7 this correctly, all the documents you have
 8 say you will be paid exactly 195.75?
 9      MR. LIBLING:  Objection to form.
10    A   Not all the documents, only the
11 contract.
12    Q   And what did the contract say
13 would happen if you were paid more than
14 that amount?
15    A   It didn't say anything about it.
16    Q   Okay.  And to be clear, the
17 contract didn't say you could not be paid
18 more than --
19      MR. LIBLING:  Objection to form.
20    Q   -- 195?
21    A   No, it didn't say that.
22    Q   It just said you will be paid
23 exactly 195.75.
24    A   Yes.
25    Q   When's the last time you looked
```

27 (Pages 102 - 105)

Case No. 1:14-cv-03074-CMA-KMT Document 959-24 filed 03/30/18 USDC Colorado pg 269 of 311

# Exhibit 434

Confidential

Page 1

                    IN THE UNITED STATES DISTRICT COURT

                      FOR THE DISTRICT OF COLORADO


JOHANA PAOLA BELTRAN, ET AL.,   :

              Plaintiffs,        :   Case No.:

              VS.                :   14-CV-03074-CMA-KMT

INTEREXCHANGE, INC., ET AL.,    :

              Defendants         :   Page 1-209


                        HIGHLY CONFIDENTIAL

                             - - -
                    Friday, January 26, 2018
                             - - -


        Videotaped Deposition of MICHAEL MCCARRY

taken at Boies, Schiller & Flexner, 1401 New York

Avenue, NW, Washington, DC 20005 commencing at 9:34

a.m. before Sherry L. Brooks, Certified LiveNote

Reporter and Notary Public, in and for the District

of Columbia.

                             - - -


                    MAGNA LEGAL SERVICES

                     WWW.MAGNALS.COM

PLAINTIFFS' RESP. APP.0004787

Confidential

---

**Page 2**

1   A P P E A R A N C E S :
2
3   BOIES, SCHILLER & FLEXNER, LLP
     BY:  JUAN P. VALDIVIESO, ESQUIRE
4        DAWN SMALLS, ESQUIRE
     1999 Harrison Street
5    Suite 900
     Oakland, CA  94612
6    (510) 874-1010
     E-mail: Jvaldivieso@bsfllp.com
7    Representing the Plaintiffs
8
     CHOATE, HALL & STEWART, LLP
9    BY:  LYNDSEY KRUZER, ESQUIRE
         JOAN A. LUKEY, ESQUIRE        (via telephone)
10   Two International Place
     Boston, MA  02110
11   (617) 248-4790
     (617) 248-4949
12   E-mail: Lkruzer@choate.com
     E-mail: Joan.Lukey@choate.com
13   Representing Defendant Cultural Care, Inc.
14
     SHERMAN & HOWARD, LLC
15   BY:  ALYSSA L. LEVY, ESQUIRE        (via telephone)
     633 Seventeenth Street
16   Suite 3000
     Denver, CO  80202
17   (303) 299-8256
     (303) 298-0940 (Fax)
18   E-mail: Alevy@shermanhoward.com
     Representing Defendant InterExchange, Inc.
19
20
21
22

---

**Page 4**

1   APPEARANCES CONTINUED:
2
3   JUSTIA LAWYERS
     BY:  BOGDAN ENICA, ESQUIRE        (via telephone)
4    111 Second Avenue NE
     Suite 204
5    St. Petersburg, FL  33701
     (727) 388-3472
6    E-mail: Bogdane@hotmail.com
     Representing Defendant Expert Group International,
7    Inc. d/b/a Expert AuPair
8
     WHEELER TRIGG O'DONNELL, LLP
9    BY:  KATE A. REILLY, ESQUIRE        (via telephone)
     370 17th Street
10   Suite 4500
     Denver, CO  80202
11   (303) 244-1983
     (303) 244-1879 (Fax)
12   E-mail: Reilly@wtotrial.com
     Representing Defendant American Cultural Exchange,
13   LLC, d/b/a Go Au Pair and Go Au Pair Operations, LLC
     (together "Go Au Pair"), Agent Au Pair, Au Pair
14   International
15
     GORDON & REES, LLP
16   BY:  THOMAS B. QUINN, ESQUIRE
         PEGGY E. KOZAL, ESQUIRE        (via telephone)
17   555 Seventeenth Street
     Suite 3400
18   Denver, CO  80202
     (303) 200-6888
19   E-mail: Tquinn@gordonrees.com
     E-mail: Pkozal@grsm.com
20   Representing Defendant AuPairCare
21
22

---

**Page 3**

1   APPEARANCES CONTINUED:
2
3   PUTNEY, TWOMBLY, HALL & HIRSON, LLP
     BY:  JOHN B. FULFREE, ESQUIRE        (via telephone)
4    521 Fifth Avenue
     New York, NY  10175
5    (212) 682-0020
     (212) 682-9380 (Fax)
6    E-mail: Jfulfree@putneylaw.com
     Representing Defendant American Institute for Foreign
7    Study d/b/a Au Pair in America
8
     FISHER & PHILLIPS, LLP
9    BY:  SUSAN SCHAECHER, ESQUIRE        (via telephone)
     1801 California Street
10   Suite 2700
     Denver, CO  80202
11   (303) 218-3676
     E-mail: Sschaecher@fisherphillips.com
12   Representing Defendant APF Global Foundation d/b/a Au
     Pair Foundation
13
14   NIXON SHEFRIN HENSEN OGBURN
     BY:  KATHLEEN E. CRAIGMILE, ESQUIRE   (via telephone)
15   5619 DTC Parkway
     Suite 1200
16   Greenwood Village, CO  80111
     (303) 874-3435
17   (303) 779-0740 (Fax)
     E-mail: Kcraigmile@nixonshefrin.com
18   Representing Defendant APEX, LLC and 20/20 Care
     Exchange, Inc.
19
20
21
22

---

**Page 5**

1   APPEARANCES CONTINUED:
2
3   VERDI & OGLETREE, PLLC
     BY:  FAITH KALMAN REYES, ESQUIRE
4        BENJAMIN R. OGLETREE, ESQUIRE
     1325 G Street, NW
5    Suite 500
     Washington, DC  20005
6    (202) 449-7703
     E-mail:  Bogletree@verdiogletree.com
7    Representing Michael McCarry
8    ALSO PRESENT:
9        Nancy Holmstock, Videographer
10
11
12
13
14
15
16
17
18
19
20
21
22

---

MAGNA ▶
LEGAL SERVICES

Confidential

<table>
<tr><td>

**Page 26**

1  organization.  What we discussed was policy matters,
2  not operational matters, what we wanted to raise with
3  the state department as a group.
4     Q.   When I asked earlier about information,
5  you were describing information from the Alliance to
6  the sponsors.  And I asked if the information flowed
7  from sponsor-to-sponsor.  So in the process of
8  comparing notes, is that a way that information
9  passed from one sponsor to another?
10    A.   The only information that would have
11 passed from one sponsor to another in this discussion
12 involved policy.  But yes, they would share their
13 perspectives on, again, the main example, the
14 educational component and ways it might be improved.
15    Q.   And you mentioned the educational
16 component as one example.  Can you think of other
17 kind of headline policy issues that the Au Pair
18 Program faced during the time at the Alliance?
19    A.   I can't.  That was really what -- we had
20 -- I'm guessing at least four of our meetings with
21 the state department were focused primarily on the
22 educational component.

</td><td>

**Page 28**

1  pair and many of the other J-1 Exchange Visitor
2  Program categories.
3     Q.   And how would the immigration reform in
4  2013 have affected the Au Pair Program in your view?
5     A.   I think the immigration reform that was
6  introduced in the Senate in 2013, had it become law,
7  probably would have eliminated all of those J-1
8  programs that ever were a component.
9     Q.   And why do you believe that?
10    A.   Because -- I'm trying to remember how the
11 legislation was phrased or how it was written, and
12 I'm struggling.  I'm sure what I said was right.  I
13 can't remember why.  It was five years ago.
14    Q.   Other than the educational component and
15 the immigration reform in 2013, can you think of any
16 other policy priorities of the au pair sponsor
17 agencies during your time at the Alliance?
18    A.   The only other one -- and the Alliance
19 wasn't directly involved in this -- at least this
20 happened shortly after I arrived, but the Au Pair
21 Program got separate authorizing legislation.
22    Q.   And was that in the '90s?

</td></tr>
<tr><td>

**Page 27**

1        MS. REYES:  Let me just remind you not to
2  guess.
3        THE WITNESS:  Okay.
4        MS. REYES:  Thank you.
5     A.   Most of our meetings with the state
6  department in this time period were about the
7  educational component.
8        BY MR. VALDIVIESO:
9     Q.   And you were at the Alliance from 1994 to
10 2015; is that right?
11    A.   That's correct.
12    Q.   And the main policy issue that you can
13 think of is the educational component during that
14 period?
15    A.   That was -- that was the one -- I'm just
16 thinking back here.  Yeah.  Yes.  I would say that's
17 right.
18    Q.   And you can't think of other policy
19 priorities for the Au Pair --
20    A.   Well, another policy priority was the
21 immigration reform -- attempted immigration reform
22 legislation in 2013, which would have affected au

</td><td>

**Page 29**

1     A.   Yeah.
2     Q.   And part of your advocacy work, would that
3  involve interactions with members of Congress and
4  their staff?
5     A.   Yes.
6     Q.   And how would you go about advocating on
7  behalf of the au pair community in front of members
8  of Congress and their staff?
9     A.   Well, it would depend on the issue.  But
10 usually what we do is have -- I'd often bring au pair
11 sponsors with me who could talk about it in more
12 depth than I could.
13       We would try to give members of Congress
14 or their staffs, more often their staffs, some
15 picture of what the program was, some examples of why
16 the program works, and why the program is popular and
17 successful.
18    Q.   And in advocating before members of
19 Congress and their staff, was your goal to develop
20 policies that would keep the program popular and
21 successful?
22       MS. KRUZER:  Objection.  Form.

</td></tr>
</table>

MAGNA ▶
LEGAL SERVICES

Confidential

| Page 30 |
| --- |

1    A.   Ask me again, please.
2       BY MR. VALDIVIESO:
3    Q.   In advocating before members of Congress
4 and their staff, was your goal to develop policies
5 that would keep the program popular and successful?
6    A.   In the case -- yes. But in 2013, we
7 wanted to keep all the programs, not just au pair.
8 Our focus wasn't au pair. Wanted to keep all the
9 programs alive because we believe they are
10 successful.
11    Q.   And you said you would sometimes bring au
12 pair sponsor members with you to meetings in advocacy
13 meetings?
14    A.   Yes.
15    Q.   And was your practice to have discussions
16 with those au pair sponsor members before the meeting
17 to decide what your goals and objectives would be for
18 the meeting?
19    A.   Not every meeting because sometimes there
20 were many, but yes. In general, yes.
21    Q.   Okay. And were there particular sponsors
22 that were kind of your go-to sponsors to go with you

| Page 31 |
| --- |

1 to those meetings
2    A.   Mostly the -- I think most of the major
3 sponsors at some point participated in some meetings
4 over the span of my career at the Alliance. But I
5 would say if you look at the geography, the ones who
6 are closer to Washington perhaps participated more
7 just because it was easier.
8    Q.   And which of the au pair sponsor members
9 were closer to Washington?
10    A.   Well, let's see, InterExchange, AIFS,
11 Cultural Care.
12    Q.   What was the goal of the au pair sponsor
13 members with respect to the advocacy before Congress?
14    A.   To raise the profile and understanding of
15 the program among members of Congress and their
16 staffs.
17    Q.   Did you take the au pair sponsor members'
18 business interests into account when determining the
19 goals?
20    A.   No.
21    Q.   Why not?
22    A.   We were a policy organization. We weren't

| Page 32 |
| --- |

1 about -- we weren't about the business. We were
2 about the exchange. So what we -- you know, we're
3 advocating policies that promote exchange, mutual
4 understanding, and respect. That's what we were
5 about.
6    Q.   Can certain policies sometimes benefit
7 businesses?
8       MS. REYES: Objection as to form.
9    A.   Can policies -- please ask me again.
10       BY MR. VALDIVIESO:
11    Q.   Can certain policies benefit businesses?
12       MS. REYES: Same objection.
13       MR. QUINN: Object to form.
14    A.   I'm not a businessperson. I don't know.
15       BY MR. VALDIVIESO:
16    Q.   And as executive director of a membership
17 organization that advocates on behalf of its members,
18 would you want to advocate for policies that would
19 have a detrimental impact on your members'
20 businesses?
21    A.   We often -- we advocated for the policies
22 that were best for the exchange programs. In some

| Page 33 |
| --- |

1 cases -- in some cases, there were members who felt
2 we shouldn't have been advocating for elements of
3 those policies. So it was always -- the distinction
4 was always about the programs.
5       That's how we made our decisions on what
6 we did.
7    Q.   And were some of the programs businesses?
8    A.   What were their businesses?
9    Q.   Were some of the programs businesses?
10    A.   Some of them were organized as for-profit
11 and some as not-for-profit, if that's what you're
12 getting at.
13    Q.   Do you recall towards the end of your
14 tenure language in an appropriations bill that would
15 have affected the au pair sponsors?
16    A.   There was some kind of an amendment and
17 Senate bill, but I don't recall it.
18    Q.   What do you recall about that?
19    A.   Only its existence.
20    Q.   Anything else?
21    A.   Nothing. That was -- my memory is that
22 that was very much at the end of my tenure and I

PLAINTIFFS' RESP. APP.0004790

MAGNA ▶
LEGAL SERVICES

---

Page 34

1  wasn't focused on it.
2    Q.   Would certain documents help refresh your
3  recollection on that?
4    A.  I don't know.
5    Q.  Do you remember what the policy climate
6  for the Au Pair Program was towards the end of your
7  tenure?
8    A.  I'm trying to think how to characterize
9  this. Well, it was -- yes, I do.
10    Q.  What was it?
11    A.  There was a dispute between the -- kind of
12  -- a little bit of amorphous dispute between the
13  Alliance and the state department earlier that year
14  about some vague language the state department put
15  out.
16    Q.  Can you expand a little bit what you
17  understood that dispute to be about?
18    A.  The state department issued -- my memory
19  is that the state department issued a memo to
20  sponsors that had -- had some very confusing language
21  about -- that seemed to call into question that the
22  way that the stipend had been assessed all those --

---

Page 35

1  you know, decided on all of those and administered
2  for the life of the program.
3    Q.  So the dispute focused on the au pair
4  stipend?
5    A.  I believe the memo that was issued was to
6  au pair sponsors. I'm not 100 percent sure of that.
7  I shouldn't speculate.
8    Q.  And did the Alliance take a position in
9  that dispute?
10    A.  Our understanding of the issue was that
11  there's a national stipend, it's a national program.
12  And because it's a national program, then the federal
13  regulations preempt.
14    Q.  What do you mean by, "national stipend"?
15    A.  Back up. The program was authorized by
16  Congress. The state department was given the
17  exclusive authority to administer the program. The
18  state department in the '90s, I think -- but, again
19  -- the state department established a national
20  stipend.
21       We believe that was -- that served the
22  program well. It was important for it to be a

---

Page 36

1  national stipend. Only the state department had
2  authority to oversee and manage the program, nobody
3  else.
4       So we felt by suggesting that other --
5  that other jurisdictions may have a role in this was
6  going to confuse the program and ultimately damage
7  it.
8    Q.  And why did you believe that that would be
9  damaging?
10    A.  Well, we think it's important to have --
11  it's a -- Congress gave state authority to run a
12  national program. We wanted -- we believed it's
13  important for families -- for students or young
14  people who are coming on the Au Pair Program to have
15  an opportunity to go anywhere in the United States.
16      We felt like it was important for families
17  across the United States to have the opportunity to
18  bring au pairs into their household for the benefit
19  of their families and their children.
20      And so having a balkanized Au Pair Program
21  seemed to us to be a very bad idea.
22    Q.  What does "balkanized" mean?

---

Page 37

1    A.  Well, if you have to -- if you had to --
2  if state laws had to be applied, there wouldn't be
3  consistency in the state law, so you'd have a
4  different program in different states.
5    Q.  I see. So is a national stipend -- it
6  means that the stipend is the same across the
7  country?
8    A.  Right.
9    Q.  And did you -- was your belief that a
10  national stipend was good for the au pair industry?
11  Was that based at all on input from au pair sponsors
12  themselves?
13      MS. REYES:  Objection as to the form of
14  the question.
15    A.  Ask it again, please.
16      MS. REYES:  He didn't testify about the
17  precursor of that statement. If you're going to do
18  that sort of thing, you need to break it down. Don't
19  put facts into the record that he hasn't said.
20      MS. SMALLS:  We got the objection.
21      MS. REYES:  My understanding is that it's
22  Mr. Valdivieso who is taking the deposition. So I

PLAINTIFFS' RESP. APP.0004791

MAGNA
LEGAL SERVICES

Confidential

**Page 38**

1 don't really quite understand why you're going on the
2 record.
3         MR. VALDIVIESO:  If we could leave the
4 objections to form, we'd appreciate it.
5         MS. REYES:  Well, that's fine, but, you
6 know, ask a question that's not a trick.
7         MS. SMALLS:  Okay.  I'm speaking, I've
8 appeared, and I'm saying you just gave like a
9 three-minute objection.  I'm sure it felt good to get
10 all of that out, but if we can limit objections to
11 form, that would help move this along.
12        MS. REYES:  If we ask questions ethically,
13 that would be fine.
14        MR. VALDIVIESO:  Okay.
15 BY MR. VALDIVIESO:
16    Q.   You testified that you believed that
17 having a balkanized stipend would be damaging to the
18 Au Pair Program; is that right?
19    A.   Yes.  That's right.
20    Q.   Okay.  And what is the basis for your
21 belief?
22    A.   The basis for my belief is what I said

**Page 39**

1 before, about it needs to be a national program so
2 there's equal opportunities for young people to go to
3 different places and for all families to be
4 participating.
5    Q.   And you testified earlier about how you
6 received input from au pair sponsor members in
7 setting the agenda?
8    A.   Right.
9    Q.   Was that belief based at all in part on
10 having received input from the au pair sponsor
11 agencies?
12    A.   Yes.
13    Q.   And what input in particular did you
14 receive with respect to a need for a national stipend
15 from au pair sponsor agencies?
16    A.   I had phone conversations with a number of
17 sponsors, all of whom shared my view.
18    Q.   And did they sometimes share that view in
19 phone conversations when there was more than one
20 sponsor on the line?
21    A.   I don't recall that.
22        MR. VALDIVIESO:  I'm going to hand you

**Page 40**

1 what the court reporter will please mark as Exhibit
2 No. 2.  It's an Alliance document ending in 26611 and
3 it's marked confidential.
4         (Exhibit Number 2 was marked for
5 identification and was attached to the deposition.)
6 BY MR. VALDIVIESO:
7    Q.   Are you ready?
8    A.   Yes.
9    Q.   Okay.  Mr. McCarry, what is Exhibit 2?
10    A.   It's a series of emails mostly from -- an
11 email chain in which I included mostly -- and the
12 other participants are various lobbyists who are
13 working on exchange issues.
14    Q.   What is the context of Exhibit 2?
15    A.   The context is -- again, this is towards
16 the end of my tenure.  This is -- we have Kate
17 Eltrich's report about the Senate approps (sic)
18 amendment.  And that's what it's primarily about.
19    Q.   And is the Senate approps (sic)
20 amendment -- was that the amendment that you were
21 thinking about earlier?
22    A.   Yes.  It's the same one.

**Page 41**

1    Q.   Okay.  And you believe that you did
2 receive this email --
3    A.   Yes.
4    Q.   -- and you participated in this email
5 chain?
6    A.   Yes.
7    Q.   If we look on page 26613, there's an email
8 from you to Bob Dotchin, Susan Glucksman, Alec
9 French, Carl Thorsen, copying Kate Eltrich and Mark
10 Overmann.
11        Do you see that?
12    A.   Yes, I do.
13    Q.   It's dated July 10th, 2015.  And it says:
14 "Here is how it came out."
15        Do you see that??
16    A.   I do.
17    Q.   Okay.  What is the language that follows
18 after that?
19    A.   That's the language.  It's the Senate
20 report -- Senate approps (sic) report.
21    Q.   Okay.  And did you have an -- did you have
22 a belief as to how that language would affect the Au

PLAINTIFFS' RESP. APP.0004792

MAGNA
LEGAL SERVICES

Confidential

| Page 42 | Page 44 |
|---|---|

**Page 42**

1  Pair Program?
2      A.   Let me just reread the language.
3      Q.   Can you read the language out loud,
4  please?
5      A.   Sure.  "Au Pair Program - the committee
6  is" -- hang on.
7          MS. REYES:  I want to remind you to speak
8  a little bit slowly because the court reporter is
9  jotting things down.
10     A.   "Au Pair Program:  The committee is aware
11  of reports that participants in the Au Pair Program
12  have been compensated at the federal minimum wage
13  level, which in some instances is below state and
14  local minimum wage levels.
15          "The committee directs the Secretary of
16  State to report to the committee not later than 45
17  days after enactment of the act on whether state and
18  local minimum wage levels apply to the Au Pair
19  Program, and, if so, the Department of State
20  guidelines for applying such wage levels."
21          BY MR. VALDIVIESO:
22     Q.   And that language that you just read, do

**Page 43**

1  you believe that you had an understanding as to what
2  those words meant when you were transmitting them to
3  email recipients?
4      A.   Yes.
5      Q.   And what did you understand that language
6  to mean?
7      A.   I understand that language to mean that
8  the Senate appropriations committee is asking the
9  state department how it views this issue and is
10  asking for specific information on how -- if it's
11  going to implement a change how it would do it.
12          It's a request for clarification, I
13  believe.
14     Q.   And why were you sending that language to
15  these particular individuals?
16     A.   Because it was in a Senate appropriations
17  committee report and they had an interest in knowing
18  about it.
19     Q.   And did you know what their interest in
20  knowing about it was?
21     A.   Yes.
22     Q.   What was their interest in knowing about

**Page 44**

1  it?
2      A.   They -- they were lobbyists working for --
3  in this case, Cultural Care and Au Pair in America.
4      Q.   I see.  And could you identify which of
5  the lobbyists are for Cultural Care and which ones
6  are for Au Pair in America?
7      A.   Alec French and Carl Thorsen are Cultural
8  Care.  Bob Dotchin and Suzy Glucksman are Au Pair in
9  America.
10     Q.   Okay.  And there's a person named Kate
11  Eltrich.  Who is that?
12     A.   Kate Eltrich at the time was working as a
13  lobbyist and consultant for the Alliance.
14     Q.   And why did the Alliance have a lobbyist?
15     A.   To expand our capacity.
16     Q.   Do you know when you hired a lobbyist?
17     A.   Do I remember when?  2013.
18     Q.   Was there something that happened in 2013
19  that required additional capacity?
20     A.   Immigration reform.
21     Q.   Okay.  And was there still immigration
22  reform efforts -- strike that.

**Page 45**

1          And was the purpose of their engagement in
2  2015 still immigration reform?
3      A.   No.  They helped us on a variety of
4  issues, appropriations and Exchange Visitor Program
5  related.
6      Q.   Okay.  Was there anything more specific
7  about what the purpose of their engagement was?
8      A.   Overall, it was simply to expand our
9  capacity.  You have to remember, the Alliance had a
10  staff of me plus three others -- myself and three
11  others and a very big agenda.
12          Once we worked with them, we found we
13  liked the extra capacity.
14     Q.   And did the Alliance take a position on --
15  strike that.
16          Did the Alliance react to this language in
17  a positive or negative way?
18     A.   Neither.  We didn't react.
19     Q.   So you said that the recipients of this
20  email had an interest in the language?
21     A.   Right.
22     Q.   Right.  Was that interest -- did you have

**MAGNA ▶**
**LEGAL SERVICES**

Confidential

| Page 46 |
|---|

1  an understanding of whether they wanted to do
2  something about it?
3      A.   To be honest, I don't remember this well
4  at all, as I said before.  It seems to me what the
5  language is asking for is clarity from the state
6  department.  I think everybody would want that.
7      Q.   Okay.  But going to the next email above,
8  Mr. Thorsen writes -- could you read the second
9  paragraph, please, that starts, "In the wake of the
10 Confederate flag"?
11     A.   Yes.
12         MS. REYES:  Do you want him to read it out
13 loud or to himself?
14         MR. VALDIVIESO:  Read it out loud.
15     A.   "In the wake of the Confederate flag
16 debacle and other Senate issues, the prospect of
17 standalone approps (sic) bills is basically gone,
18 right?  If there is an Omni end of the year as
19 opposed to a CR, what does that mean for this
20 language?  Is it conferenceable?  We want this
21 stripped, right?"
22         BY MR. VALDIVIESO:

| Page 47 |
|---|

1      Q.   Do you understand what the words in that
2  paragraph mean?
3      A.   I don't.  I don't understand this email.
4  I love Carl, but I don't understand this.
5      Q.   So when you asked, "we want this
6  stripped," sitting here today, you don't have any
7  understanding as to what that might mean?
8      A.   Well, I understand what it means.  I don't
9  understand -- I don't recall the Confederate flag
10 debacle.  I don't remember -- I assume there was an
11 Omnibus, but I don't recall.  I don't know what
12 happened to the language.
13     Q.   Do you understand this to refer to the
14 language that you read below?
15     A.   Yes -- yeah.
16     Q.   And "stripped," what did you understand
17 that to mean?
18     A.   I think he's saying we want this language
19 out, which perhaps means I misunderstood the
20 language.  I don't know.
21     Q.   And did you -- did the Alliance want that
22 language out?

| Page 48 |
|---|

1      A.   I don't recall.
2         MS. REYES:  I just want to remind the
3  witness to wait for the question to finish before you
4  start answering.
5         THE WITNESS:  Okay.
6         BY MR. VALDIVIESO:
7      Q.   Okay.  And falling to the next email from
8  Kate Eltrich to the same group of people, including
9  yourself, could you read the first paragraph out
10 loud, please?
11     A.   "Hi all.  This is a good outcome
12 considering the political situation.  Leahy staff was
13 convinced that the state minimum wage was already the
14 rule.  Graham staff was helpful to giving Leahy staff
15 what they wanted - a statement examining au pair -
16 but not taking a positive position endorsing state
17 minimum wages.
18         "Granted, folks can read what they want
19 out of this.  Asking 'whether state minimum wage
20 applies' is a better place to be, there where this
21 started."
22     Q.   And Ms. Eltrich, you said, was the

| Page 49 |
|---|

1  lobbyist that was lobbying on behalf of the Alliance?
2      A.   Right.
3      Q.   And is it fair to say that as a policy
4  matter the Alliance did not want the state minimum
5  wage to be the rule?
6      A.   I don't recall this issue at all.  I
7  believe I misspoke about the utility of the language
8  in the amendment, but I don't -- I truly don't recall
9  this.
10     Q.   Did you -- did you provide direction to
11 Ms. Eltrich in her lobbying efforts?
12     A.   Yes.
13         MS. REYES:  If you're going to turn to a
14 different exhibit, can we -- let's just take a quick
15 break.  It's been about an hour.
16         MR. VALDIVIESO:  Do you need a break, Mr.
17 McCarry.
18         THE WITNESS:  That would be fine.
19         MS. REYES:  We're going to take a break.
20         THE VIDEOGRAPHER:  The time is now 10:33.
21 Going off the record.
22         (A break was taken.)

PLAINTIFFS' RESP. APP.0004794

MAGNA
LEGAL SERVICES

Confidential

1    A.   I wrote to Ms. Ryan to thank her for the
2  very good meeting we had.  My successor Ilir Zherka,
3  Bill Gertz, who was chairman of the Alliance board,
4  and I met with her.  It was sort of a farewell for me
5  and to introduce her to Ilir and pledge our ongoing
6  cooperation and support.
7    Q.   And were you discussing any policy issues
8  that affected the au pair sector?
9    A.   Yes.  As you can see from the letter, we
10 brought up our concern about their remaining a
11 national program.
12   Q.   And in your third paragraph, could you
13 read that one out loud, please?
14       MS. REYES:  Slowly.
15   A.   "Recent comments:  Recent comments from
16 the Bureau appear to suggest that a new rule may
17 mandate that au pair weekly stipends be set in
18 accordance with state and local laws, rather than the
19 national stipend that has served the program well for
20 25 years.
21       "We strongly believe that a change like
22 this would be very damaging to the Au Pair Program,

1  and, realistically could bring it to an end."
2        BY MR. VALDIVIESO:
3    Q.   Do you know why you believe that a change
4  like that could be very damaging to the Au Pair
5  Program and realistically could bring it to an end?
6    A.   Yes.
7    Q.   And what was the basis for that belief?
8    A.   I think if you -- as I've stated already,
9  I think if you had a different au pair -- different
10 rules to the Au Pair Program in every state it would
11 -- it would mean that you would limit au pair
12 placement to only certainly states to make the
13 program smaller and thus have less impact because
14 you'd have different rules in every state.
15       It would make it much more complex to
16 administer.
17   Q.   And did the comments that you referred to
18 suggest that the Department of State had taken a
19 position on whether state and local wages applied to
20 the Au Pair Program?
21       MR. QUINN:  Object to the form.
22   A.   I don't believe that the Department had

1  taken a position.  There was no -- to me, the
2  Department's comments were just -- were confusing.
3        I don't think the Department had taken a
4  full out clear position, and we were seeking clarity
5  and maintenance of a national program.
6        BY MR. VALDIVIESO:
7    Q.   And is there any relation to the comments
8  and the content of the paragraph that you just read
9  out loud and the language in the appropriation bill
10 that you read out loud earlier?
11   A.   Again, I don't recall anything about the
12 language in the appropriation bill, so I can't
13 respond to that.
14   Q.   I believe you read that language out loud,
15 and --
16   A.   I did, but I don't recall the genesis of
17 that language or the motivations behind it.
18   Q.   I see.  But you understood that language?
19   A.   Right.
20   Q.   And are you able to compare -- are you
21 able to read this paragraph and read that language
22 and draw if there's any connection between the two in

1  your mind?
2        MS. KRUZER:  Objection.  Form.
3    A.   No.
4        BY MR. VALDIVIESO:
5    Q.   Is it fair to say that the language deals
6  with the same issue?
7    A.   Yes.
8    Q.   And what issue is that?
9    A.   State -- the applicability of state laws
10 and the preserving a national stipend.
11   Q.   Okay.  So if they deal with the same issue
12 -- and you've worked in the policy field for over two
13 decades -- you're telling me that you can't -- you
14 don't see any connection between the two?
15   A.   What I'm telling you is I don't understand
16 -- I don't recall the genesis or the motivation
17 behind the amendment.  They address the same issue.
18 That's all I can tell you.  So I don't want to
19 speculate and draw conclusions that might be wrong.
20   Q.   The concern that you had with respect to
21 both -- with the issue at large is -- what was your
22 concern?

PLAINTIFFS' RESP. APP.0004795

MAGNA
LEGAL SERVICES

Confidential

| Page 66 | Page 68 |
|---|---|
| 1    A.   The Alliance position was and I believe<br>2  still is, but somebody else can speak to that -- the<br>3  Alliance position was that maintaining the national<br>4  stipend was the most desirable outcome for the Au<br>5  Pair Program.<br>6    Q.   And that was part of the common agenda of<br>7  the Alliance?<br>8    A.   Yes.<br>9    Q.   I think you said earlier that if there had<br>10 been state and local wages applied to the Au Pair<br>11 Program that would make the program hard to<br>12 administer?<br>13   A.   Yes.<br>14   Q.   Why would it make it hard to administer?<br>15   A.   We would have a different set of rules for<br>16 every state potentially.<br>17   Q.   And are you aware of how au pairs are<br>18 compensated?<br>19   A.   In broad general terms, yeah.<br>20   Q.   What is your general broad understanding<br>21 of how they are compensated?<br>22   A.   They receive a weekly stipend. | 1    They have a 45-hour per week cap, as I'm<br>2  sure you're aware, that would be superseded by the<br>3  law in Massachusetts if it were applied to au pairs.<br>4    They could find other jobs in families<br>5  that are not vetted, which would pose a risk just --<br>6  you know, to their participant safety and, again,<br>7  diminish the cultural exchange aspects.<br>8    We wanted to preserve this as a cultural<br>9  exchange program.  This approach would turn it more<br>10 toward a work program.<br>11   Q.   And when you say, "we," are you referring<br>12 to the Alliance and the au pair sponsors?<br>13   A.   I am.<br>14   Q.   And does having a fixed national stipend<br>15 help promote cultural exchange?<br>16   A.   In the sense that it provides -- in the<br>17 sense that it provides an affordable predictable<br>18 environment, it allows, I believe, for a larger<br>19 program and more broad participation both of families<br>20 and exchange participants.<br>21   So in that sense, yes.  It's part of the<br>22 infrastructure that makes the program successful. |

| Page 67 | Page 69 |
|---|---|
| 1    Q.   And from whom do they receive --<br>2    A.   The host family.<br>3    Q.   So why would having state and local wages<br>4  be hard to administer if it's the host families that<br>5  pay?<br>6    A.   Well, you'd have potentially more than 50<br>7  different jurisdictions and different -- and<br>8  different stipends.  I mean, if you have one national<br>9  stipend, then everybody knows.<br>10   But if you have 50 plus, because some<br>11 cities, I believe, have minimum wages, then that<br>12 becomes pretty complex.  You have -- let's make up a<br>13 number -- 56 sets of rules.<br>14   Q.   And was that understanding about the<br>15 difficulty of administering more than 50 different<br>16 sets of rules, was that based in part on input from<br>17 au pair sponsors?<br>18   A.   Yes, but also just my impression that it<br>19 would be.  I mean, the other things are you have<br>20 other rules.  If the state allows a domestic worker<br>21 to work overtime, that would diminish the cultural<br>22 exchange opportunities for an au pair. | 1    Q.   And do you have an understanding as to why<br>2  an affordable predictable environment was beneficial<br>3  for au pair sponsors?<br>4    MR. QUINN:  Objection to the form.<br>5    A.   Again, it's a much easier program to<br>6  administer if you have -- it's a challenging program<br>7  to administer in any event.  But it's simpler with<br>8  one set of rules than 56 sets of rules.<br>9    BY MR. VALDIVIESO:<br>10   Q.   And you mentioned a work program earlier.<br>11 What do you mean by, "work program"?<br>12   A.   The United States has a variety of --<br>13 there are a variety of ways to come to the United<br>14 States, varied categories of these, as I'm sure<br>15 you're all aware.<br>16   And there are Visas, H, L, Q, examples,<br>17 where people come particular -- the purpose of their<br>18 coming to the United States is to work.  The exchange<br>19 visitor visa, the J visa, the purpose is cultural<br>20 exchange.<br>21   And the work -- the work element was<br>22 injected by Congress in 1961, the Mutual Educational |

**MAGNA**
LEGAL SERVICES

Confidential

<table>
<tr><td colspan="2">

**Page 70**

1 and Cultural Affairs (sic) Act, the Fulbright Hays
2 Act, in support of broader mutual understanding
3 between the people of the United States and the
4 people of the world.
5      And to me, it has at least two elements of
6 genius -- legislative genius in it. By allowing for
7 a work component, they allow large numbers of young
8 people to come to the United States, various forms of
9 activity: Internships, summer work travel, au pair,
10 and cover the costs of their program.
11      These are typically, but not always -- and
12 there's no means test for these programs. But these
13 are typically people who wouldn't be able to afford
14 to come to the United States otherwise, for vacation
15 or to attend an American university.
16      But they get a chance to come here, meet
17 Americans, live with American families, at virtually
18 no cost to the taxpayer because there's no
19 appropriate funds that go into these programs.
20      The students support themselves and that's
21 what the work component is about, but the purpose is
22 cultural exchange. That's why there are things like

</td></tr>
</table>

Confidential

| Page 94 |
| --- |

1  at?

2    A    Well, I think in programs like these where

3  there's a host family or in the case of work and

4  travel and an employer, I think you'd want the host

5  to also to be satisfied and happy with the program.

6    Q.   And --

7    A.   You want to have -- you want to have --

8  you'd like to have an impact on the person.  You'd

9  like it to be a life-changing experience or at least

10  a broadening of their views, creating the mutual

11  understanding that Senator Fulbright talked about so

12  frequently.

13      Those would all be attitudinal changes.  I

14  suppose you could say it would be a measure of

15  success, assuming it was the right sort of

16  attitudinal change.

17    Q.   Is there anything else you take into

18  account in evaluating program success?

19    A.   Well, certainly participants' health,

20  safety, and welfare.  You want to make sure the

21  participants are well taken care of.  You want to

22  make sure they're in safe environments.

| Page 95 |
| --- |

1      You want to make sure that -- there's all

2  of that -- all of that is attended to and the

3  regulations are -- you're in compliance with

4  regulations.

5    Q.   So you mentioned benefits to the

6  participants, benefits to the host families.

7  Anything that relates to the sponsors themselves that

8  you take into account when evaluating program

9  success?

10    A.   Well, I think sponsors are in the business

11  of providing successful programs, so they're

12  achieving their mission if they do that.  They

13  wouldn't be -- they wouldn't be working in the

14  exchange field if that isn't what they wanted to

15  accomplish.

16      There's also a benefit -- and this goes

17  back to Senator Fulbright -- there's a benefit to the

18  whole country.

19      If the program (sic), in the simplest

20  terms, make friends with the United States and those

21  new friends of the United States go home and talk

22  about their experiences with their friends and their

| Page 96 |
| --- |

1  family, that's a multiplier effect for the United

2  States that's meaningful.

3      MR. VALDIVIESO:  I'm going to hand you

4  Exhibit 6.  It's an InterExchange -- it's an Alliance

5  document ending in 29616.  It's marked confidential.

6      (Exhibit Number 6 was marked for

7  identification and was attached to the deposition.)

8      (Whereupon, Mr. Quinn exited the

9  deposition.)

10      BY MR. VALDIVIESO:

11    Q.   Mr. McCarry, are you familiar with Exhibit

12  6?

13    A.   Am I familiar with --

14    Q.   Exhibit 6.

15    A.   Yes.

16    Q.   What is Exhibit 6?

17    A.   Exhibit 6 is a message from Lisa Heyn to

18  me about reporting on what Exchanges.State.Gov, which

19  is the state department website, says about host

20  family -- what's required of au pair host families.

21    Q.   And do those requirements listed below --

22  are you familiar with those requirements?

| Page 97 |
| --- |

1    A.   In a general way, yes.

2    Q.   The first requirement says, "pay up to

3  $500 towards the cost of the au pair's required

4  academic coursework;" is that right?

5    A.   Yes.  That's what it says.

6    Q.   Is that what you've been referring to as

7  the educational component?

8    A.   Yes.

9    Q.   And there it's formulated in the way that

10  you were advocating for it to be formulated in the

11  letter using the words "up to," rather than the words

12  "minimum;" is that right?

13    A.   That's right.

14    Q.   And you said that that had the benefit of

15  providing clarity into the program, correct?

16    A.   That's what I said.

17    Q.   And not that the words "minimum" would

18  have led to confusion?

19    A.   Yes.

20      MS. KRUZER:  Objection.  Form.

21      BY MR. VALDIVIESO:

22    Q.   And then in the fourth bullet, you say --

MAGNA ▶

LEGAL SERVICES

Confidential

---

Page 98

1    there's a text that says, "pay a weekly minimum
2    stipend based on the program option selected."
3         Do you see that?
4    A.   I do see that.
5    Q.   And do you have an understanding of what
6    that requirement refers to?
7    A.   That means -- that requirement means that
8    the family had to pay, depending on whether they were
9    Educare or regular au pairs -- pay the specified
10   weekly stipend to the au pair.
11   Q.   And this requirement includes the words,
12   "minimum;" is that right?
13   A.   It does.
14   Q.   And what does that mean with respect to
15   the stipend that host families are required to pay
16   the au pair?
17   A.   Well, that's confusing to me because what
18   the state department website used to say was, "the
19   weekly stipend is." But that's not what this says,
20   so I don't know why that change was made.
21   Q.   And Ms. Heyn was reporting to you what the
22   state department website said in August of 2012?

---

Page 99

1    A.   That appears to be what she was doing.
2    And what I believe -- I believe in August 2012 the
3    state department website said "is," "the stipend is."
4    Q.   Do you believe you asked Ms. Heyn to
5    obtain this information for you?
6    A.   I suspect I did from the tone of the
7    message, yes. I don't recall.
8    Q.   In the materials that the Alliance --
9    strike that.
10        Does the Alliance have a website?
11   A.   Yes.
12   Q.   And does it prepare any materials for the
13   purpose of -- strike that.
14        Does the Alliance prepare materials that
15   it uses in its advocacy efforts in educating
16   Congress?
17   A.   Yes.
18   Q.   And as executive director, what was your
19   role in preparing such materials?
20   A.   Well, I oversaw that process. Typically,
21   they were position papers or background papers.
22   Q.   And were there certain materials that you

---

Page 100

1    prepared that described -- strike that.
2         Do some of the materials that you prepared
3    describe what the programs are?
4    A.   Yes.
5    Q.   And do some of your materials advocate on
6    what the policies should be?
7    A.   Yes.
8    Q.   Okay. And you're able to distinguish
9    between the two?
10   A.   Usually.
11   Q.   Okay. How would you describe the first
12   set of materials that describe what programs are?
13   A.   Other than saying the descriptions of what
14   programs are? I mean, sometimes -- we have an
15   Alliance advocacy day every year just to give you an
16   example. That was fundamentally about
17   appropriations.
18        It happened in the spring. That was when
19   the appropriations season happened. So we would have
20   a policy paper that advocated for a specific number,
21   $600 million, let's say, for exchanges. And we'd
22   have a rationale for why that was a good number of

---

Page 101

1    what you could get for $600 million.
2         The Exchange Visitor Program members, who
3    also wanted to go up to the hill, they were mostly
4    building relationships and sharing information.
5         So typically what we would have is a paper
6    that wasn't advocating for anything, but was
7    explaining what the Exchange Visitor Program was, the
8    authorization reminding the congressional staffer of
9    the legislative authority, and the purposes the
10   program served and describing the programs in broad
11   strokes.
12   Q.   Would it be fair to call one set of
13   materials informational pieces and another set of
14   materials advocacy pieces?
15   A.   Yes, although I think it's also fair to
16   say that information is part of advocacy.
17   Q.   Fair enough. And the materials you
18   prepared in either set, was it your goal as executive
19   director that they be accurate?
20   A.   Yes.
21   Q.   And you took steps to ensure the accuracy
22   of the materials that bore the Alliance name?

---

MAGNA
LEGAL SERVICES

Confidential

<table>
<tr><td>Page 102</td><td>Page 104</td></tr>
</table>

**Page 102**

1    A.   I can't tell you they were always 100
2  percent accurate, but, yes, that was our goal.
3    Q.   The Alliance changed its name at some
4  point; is that right?
5    A.   Yes.  We used to be the Alliance for
6  International Educational and Cultural Exchange.  And
7  that was -- we decided that was way too many
8  syllables, so we took out "educational" and
9  "cultural."
10   Q.   And did that change happen under your
11 watch?
12   A.   At the very end of my watch.
13   Q.   And the Alliance has been around since
14 1994; is that right?
15   A.   '92.
16   Q.   '92.
17   A.   I was there starting in '94.
18       MR. VALDIVIESO:   I'm going to hand you
19 Exhibit No. 7.  It's an Alliance document ending in
20 20888.
21       (Exhibit Number 7 was marked for
22 identification and was attached to the deposition.)

**Page 103**

1       BY MR. VALDIVIESO:
2    Q.   I'm going to focus on the second page, but
3  feel free to review the first page for context.
4    A.   Okay.
5    Q.   And are you familiar with Exhibit No. 7,
6  Mr. McCarry?
7    A.   Yes.
8    Q.   What is Exhibit No. 7?
9    A.   It is an -- a background paper on the au
10 pair exchange program describing the Au Pair Program.
11   Q.   And would you describe a background paper
12 as an informational piece or as an advocacy piece?
13   A.   Informational piece.
14   Q.   Do you know if you drafted this document?
15   A.   I know I did not.
16   Q.   But you've seen it before?
17   A.   I have seen it before, yes.
18   Q.   And you believe you saw it while you were
19 executive director of the Alliance?
20   A.   I suspect I did, yes.
21   Q.   And do you see the second page?
22   A.   Yes.

**Page 104**

1    Q.   It says, "Protect the interests of au
2  pairs and host families."
3       Do you see that?
4    A.   Yes.
5    Q.   And what information are you providing on
6  the second page of that document?
7    A.   It's a basic -- it's a summation of the
8  program regulations.
9    Q.   And the summation is consistent with your
10 understanding of the regulations?
11   A.   I'm sorry?
12   Q.   The information that you provide here is
13 consistent with your understanding of the au pair
14 regulations?
15   A.   Yes.  Based on a quick read, yes.
16   Q.   And do you see the sixth bullet there, it
17 says:  "Au pairs receive up to $500 from their host
18 families toward the completion of their educational
19 requirement"?
20   A.   Yes.
21   Q.   And that bullet is providing information
22 on the educational component of the Au Pair Program

**Page 105**

1  that you were describing earlier?
2    A.   Yes.
3    Q.   And it uses the words, "up to" that you
4  were advocating for in your letter that we reviewed
5  earlier?
6    A.   Right.  That's right.
7    Q.   And then you see on the third bullet, it
8  contains language -- can you read that language out
9  loud, please?
10   A.   The third bullet?
11   Q.   Yeah, which starts, "Au pairs receive."
12   A.   "Au pairs receive a weekly stipend from
13 host families of $195.75, as mandated by the
14 Department of State, in consultation with the
15 Department of Labor and the IRS."
16   Q.   And that statement doesn't include the
17 word "minimum" in it, does it?
18   A.   It does not.
19   Q.   Do you know why that is?
20   A.   I don't believe we thought that was the
21 case.  I refer you back to my comment about what was
22 on the state department website.  My memory is it

Confidential

| Page 134 |
|---|

1    A.   Yes, at least that was the Department's
2  opinion in 1995.
3    Q.   Based on your familiarity with the
4  regulations that governed the Au Pair Program, do you
5  think that that requirement changed throughout your
6  tenure at the Alliance?
7    A.   No.
8    Q.   Does this document help refresh your
9  recollection as to whether the Fair Labor Standards
10  Act governs the federal minimum wage?
11    A.   I don't know if it does.  I don't know.  I
12  really know nothing about the Fair Labor Standards
13  Act, very little.
14    Q.   I understand.  Shifting gears a little
15  bit, could you tell me a little bit about the
16  leadership structure at the Alliance and the
17  governance of the organization as a whole?
18    A.   Sure.  There's a governing board of 15, 12
19  board members -- 12 board members and three officers,
20  chair, vice chair, and treasurer.
21        The board members are set up like the
22  Senate.  So it's a rotating membership with -- there

| Page 135 |
|---|

1  are three-year terms on the board, and every year
2  four new board members are chosen.  So the board is a
3  continuing body, if you will.
4        There's a nominations committee that pulls
5  together slates of candidates and identifies people
6  who might make good board members.  There's a strong
7  interest within the Alliance -- and I believe this is
8  reflected in our bylaws -- that the board should have
9  a balanced representation of the membership.
10        So you want some representatives of the
11  community organizations that do appropriated
12  programs, high school exchange, the various J-1
13  categories -- high school, au pair, summer work
14  travel, and so forth.
15        And that's how it works.  I mean, that's
16  how it's created.  The board meets three times a
17  year.  There's an executive committee of the board.
18  That structure is different now than it was when I
19  was there, so you may want to save that for your next
20  deposition.
21    Q.   I'm focusing today on your personal
22  knowledge.

| Page 136 |
|---|

1    A.   Okay.
2    Q.   I understand that what you were testifying
3  to applied to the time that you were executive
4  director at the Alliance; is that right?
5    A.   Yes.
6    Q.   I just want to leave a clear record.
7    A.   Thank you.
8    Q.   And so you said that you wanted -- I don't
9  remember if you said fair representation, but
10  something like --
11    A.   I think I said balanced representation.
12    Q.   Balanced representation from the various
13  sectors --
14    A.   Right.
15    Q.   -- the au pair sponsor -- the au pair
16  sector being among them; is that right?
17    A.   Correct.
18    Q.   Okay.  And do you recall during the time
19  that you were in office as executive director which
20  sponsors were represented in the leadership with the
21  Alliance?
22    A.   Yes.  I think I do.

| Page 137 |
|---|

1    Q.   And who do you recall?
2    A.   Chairs?
3    Q.   You can start with chairs.
4    A.   Chairs of the board?  When I was hired,
5  the chair of the board was Jody Olson, J-O-D-Y,
6  O-L-S-O-N, who was the head at the time of the
7  Council for the International Exchange of Scholars.
8    Q.   Was that an Au Pair Program?
9    A.   No, it wasn't an Au Pair Program.  It was
10  a Fulbright program.
11    Q.   Oh, I'm sorry.  Maybe that question wasn't
12  clear.  I was asking, among the au pair sponsors.
13  Which au pair sponsors had leadership roles during
14  your tenure at --
15    A.   By leadership roles, do you mean have been
16  officers or have been on the board?
17    Q.   We can start with officers.
18    A.   Give me a minute just to assess this out.
19    Q.   Sure.
20    A.   Can I write on this?
21        MS. REYES:  Why don't you just tell him as
22  you remember?

**MAGNA**
LEGAL SERVICES

Confidential

| Page 138 |
|---|
| 1   A.   Okay. Alright. The organization serves |
| 2 on the board, an organization under our structure, |
| 3 because the organization is the member. |
| 4      BY MR. VALDIVIESO: |
| 5   Q.   I see. |
| 6   A.   So we don't come to an organization and |
| 7 say we'd like this particular person to be on the |
| 8 board. We're inviting the organization to join the |
| 9 board, and then the organization designates its |
| 10 representative from its senior staff. |
| 11      Right now Bill Gertz is the chair and he |
| 12 -- of the Alliance, and he works for AIFS. Ellen |
| 13 Hoggard is treasurer, and she works for Au Pair |
| 14 Foundation. Both these organizations have other |
| 15 programs as well, as I'm sure you know. |
| 16      There was a time when John Wilhelm of |
| 17 Intrax was the treasurer. That's AuPairCare. He |
| 18 didn't finish his term and Craig Brown from Intrax |
| 19 finished the term. That might be it on officers. |
| 20   Q.   Was Goran Rannefors -- |
| 21   A.   Oh, Goran Rannefors was our treasurer, yes |
| 22 -- I'm sorry -- from Cultural Care -- EF. |

| Page 139 |
|---|
| 1   Q.   And I apologize if you answered this in |
| 2 your explanation. But how was the -- did the |
| 3 officers apply for a position on the board or did the |
| 4 board go out and seek them out? |
| 5   A.   What typically happened was -- the |
| 6 Alliance is a one-party state, so we don't have |
| 7 competitive elections. |
| 8      So what I would do is talk to members of |
| 9 the board and other leaders who might not be on the |
| 10 board, get their sense of who might make a good chair |
| 11 -- this is sort of a diplomatic mission -- sort that |
| 12 all out over time, and narrow it down and finally |
| 13 find a consensus candidate. |
| 14      So it was a pretty -- a fairly broad |
| 15 consultive process, but it's something that I just |
| 16 managed through conversations and then checking back |
| 17 with people and so forth. |
| 18   Q.   I want to use the right terminology. Are |
| 19 people appointed to the board or -- |
| 20   A.   They're elected by the membership. For |
| 21 the regular board members, the nominations committee |
| 22 comes up with a slate -- actually, the nominations |

| Page 140 |
|---|
| 1 committee does that as well. |
| 2      After I've done my due diligence about the |
| 3 officers, I would present that list to the |
| 4 nominations committee for endorsement, and then there |
| 5 would be a slate that we approved at the annual |
| 6 business meeting. |
| 7      THE VIDEOGRAPHER: You have five minutes |
| 8 for a video change. |
| 9      BY MR. VALDIVIESO: |
| 10   Q.   And do you remember in your due diligence |
| 11 process over certain officers -- let's start with Mr. |
| 12 Rannefors. |
| 13      Do you remember the qualities that you |
| 14 thought in your due diligence made him a good |
| 15 candidate to be an officer? |
| 16   A.   Yes. He was the treasurer. He's |
| 17 extremely good at finances, very committed to the |
| 18 Alliance. You have to be interested to do a good |
| 19 job. |
| 20      And we also wanted to make sure that we |
| 21 had -- that larger organizations were represented not |
| 22 continually because you're not allowed to have |

| Page 141 |
|---|
| 1 consecutive terms, but having EF on the board we all |
| 2 judged to be a good thing at that point because in a |
| 3 sense, it was their turn. |
| 4      You know, if they hadn't been on the |
| 5 board, then they could join the board. CIEE, IIE, |
| 6 other large organizations, we always want to be |
| 7 circling some of those -- cycling some of those |
| 8 through the board just because they're such big |
| 9 players on the field. |
| 10   Q.   I see. And so EF was a large player on |
| 11 the field? |
| 12   A.   Yes. |
| 13   Q.   And EF has an au pair component? |
| 14   A.   Yes, they do. |
| 15   Q.   And what about Mr. Gertz? Do you recall |
| 16 what qualities -- was Mr. Gertz elevated to the -- |
| 17 sorry -- I want to use the right term again. I |
| 18 forgot what -- |
| 19   A.   Elected, I think. |
| 20   Q.   Elected. In your due diligence process as |
| 21 executive director, do you remember what qualities |
| 22 made Mr. Gertz an appropriate candidate? |

MAGNA
LEGAL SERVICES

Confidential

| Page 142 | Page 144 |
|---|---|

**Page 142**

1     A.   Sure.  Again, he was dedicated to the
2 Alliance, hardworking and diligent.  AIFS was a good
3 choice because it covers -- it has a big umbrella.
4 So it's got several J-1 programs.
5       It's got camp counselor.  It's got summer
6 work travel.  It's got au pair.  I'm not sure if
7 there's another.  It's a big study abroad provider
8 for American students.
9       It has a high school -- a significant high
10 school exchange program.  So he touched a lot of
11 bases in the memberships, apart from being a talented
12 guy.
13     Q.   And I think you mentioned Ellen Hoggard?
14     A.   Ellen Hoggard, yes.
15     Q.   Do you remember what qualities made Ellen
16 Hoggard an appropriate candidate for the board?
17     A.   Ellen spent most of her life on the high
18 school exchange.  She's the most committed person to
19 program quality I think I've ever met and almost all
20 the time I've known her -- all the time I've known
21 her, she's been involved in high school exchange.
22       She came to au pair relatively recently.

**Page 143**

1 I mean, her organization started an Au Pair Program
2 very recently.  I think just her diligence, her
3 passion, her commitment to program quality were the
4 things that attracted us to her as a board member.
5     Q.   And I can't remember if you mentioned this
6 individual.  But was Ruth -- do you know who Ruth
7 Ferry is?
8     A.   I do know who Ruth Ferry is, yes.
9     Q.   Was Ruth Ferry ever on the board with the
10 Alliance?
11     A.   No.  She occasionally attended a board
12 meeting substituting for Bill if Bill wasn't
13 available, but she never served on the board.
14     Q.   Are you familiar with the concept of -- I
15 think -- correct me if I'm wrong -- if you know what
16 I'm referring to -- the concept of a task force?
17     A.   Yes.
18     Q.   Okay.  And what is a task force?
19     A.   A task force is in the Alliance context.
20     Q.   Yes.
21     A.   We established task forces around
22 particular sets of issues or programs.  So we had an

**Page 144**

1 appropriations task force.  We had a large J-1 task
2 force.  We had separate work and travel au pair camp
3 counselor groups, and they were open to any member
4 who wanted to attend.
5       So you didn't have to be selected to come
6 to a task force meeting.  We put out a notice and
7 said there's going to be an appropriations task force
8 meeting; anybody -- come one, come all; we're going
9 to talk about our agenda for the next appropriation
10 cycle.
11       And 40 people would show up from 12
12 organizations or something like that.  And of course,
13 nobody would go -- well, that's the way we would
14 work.
15     Q.   And I think you mentioned that the board
16 was -- you would select the organization and then
17 they would name who the individual was?
18     A.   That's right.
19       THE VIDEOGRAPHER:  Counsel, we have to
20 change the tape.
21       MR. VALDIVIESO:  Okay.  We can take a
22 quick break.

**Page 145**

1       THE VIDEOGRAPHER:  Okay.  The time is now
2 2:25.  Going off the record.
3       (A break was taken.)
4       THE VIDEOGRAPHER:  It is January 26th,
5 2018.  The time is now 2:37 with video number 3.
6       BY MR. VALDIVIESO:
7     Q.   I think before we took a break we were
8 discussing the concept of a task force in the context
9 of the Alliance; is that right?
10     A.   Yes.  That's right.
11     Q.   And I think I asked -- but if I didn't, it
12 was on my mind.  I think I asked if the selection --
13 sorry.
14       I think I asked if the representation on
15 the task force was done in the same way as the
16 representation of the board, insofar as it was an
17 organization that was selected, rather than the
18 individual.
19       Was that how the leadership on the task
20 forces worked?
21     A.   No.  The task forces were just -- there
22 was virtually no structure except the focus --

MAGNA
LEGAL SERVICES

Confidential

| Page 178 | Page 180 |
|---|---|

**Page 178**

```
1        BY MR. VALDIVIESO:
2    Q.   Have you had a chance to look at Exhibit
3  13, Mr. McCarry?
4    A.   I have.
5    Q.   And do you recognize Exhibit 13?
6    A.   I don't recognize it.  Funny what you
7  forget, but I don't recall it.
8    Q.   Do you think you've seen it before?
9    A.   I'm sure I have.  I don't recall seeing it
10 before, but I'm sure I have.
11   Q.   Why are you sure that you've seen it?
12   A.   Well, it looks like a genuine document to
13 me, and I can't imagine I wouldn't have seen it.
14   Q.   Do you think you had any role in creating
15 this document?
16   A.   I must have, at least -- at least looking
17 it over after somebody else prepared it.
18   Q.   Okay.  And do you see that the first
19 heading says, "Policy Issues"?
20   A.   Yes.
21   Q.   And sitting here today and reading the
22 text that follows Number 1 under, "Policy Issues," do
```

**Page 180**

```
1  him of the lawsuit.
2        And also we talked about our -- again, we
3  had this discussion earlier -- talked about our
4  consideration of engaging a PR firm, but which, in
5  the end, we decided not to do.
6    Q.   Do you remember, in fact, speaking with
7  Mr. Zherka regarding the lawsuit referenced here in
8  this document?
9    A.   I don't.  Sorry.
10   Q.   Do you recall speaking with him about your
11 search or an eventual decision not to hire a PR firm?
12   A.   I don't.
13   Q.   Do you sit -- strike that.
14        Do you believe, sitting here today, that
15 the three bullets there were important policy issues
16 for the incoming executive director to be aware of?
17   A.   Yes.
18   Q.   When was your last day at the Alliance?
19   A.   December 31st.
20   Q.   And do you --
21   A.   2015.
22   Q.   And you mentioned some lunches.  Did those
```

| Page 179 | Page 181 |
|---|---|

**Page 179**

```
1  those words have any meaning to you, sitting here
2  today?
3    A.   A meaning to me?
4    Q.   Yes.
5    A.   Yes.  I understand what they mean.
6    Q.   Okay.  And you understand what they mean
7  in the context of your work as executive director?
8    A.   Yes, I do.
9    Q.   And what do they mean to you, sitting here
10 today?  What does each of those bullets mean -- can
11 you explain what they mean to you?
12   A.   Under Number 1?
13   Q.   Yes.
14   A.   Okay.  Well, we've discussed the Hershey
15 strike here today, which had an impact on the summer
16 work travel program.  So I wanted to give him -- that
17 was really a watershed event in exchange for his new
18 program.  So I wanted to make sure he understood
19 that.
20        I wanted to make sure he understood the
21 issues that were faced in immigration reform, which
22 was a major, major event.  And obviously, I informed
```

**Page 181**

```
1  lunches take place -- do you recall if they took
2  place in December of 2015?
3    A.   I don't recall.  I don't recall.  I
4  remember the last time I had lunch with him was
5  probably last summer.
6    Q.   Okay.  But before you handed over -- you
7  had -- you testified you had --
8    A.   I don't recall, specifically.  I'm sorry.
9        MR. VALDIVIESO:  Okay.  I'm going to hand
10 you Exhibit 14.  It's a document ending in 19195
11 produced by the Alliance.
12        (Exhibit Number 14 was marked for
13 identification and was attached to the deposition.)
14        BY MR. VALDIVIESO:
15   Q.   Have you had a chance to review Exhibit
16 14, Mr. McCarry?
17   A.   Yes.
18   Q.   Are you familiar with Exhibit 14?
19   A.   I am.
20   Q.   What is Exhibit 14?
21   A.   It is a PowerPoint presentation I gave at
22 the Cultural Exchange Network in December of 2015, an
```

Confidential

---

**Page 182**

1   overview of the J program in particular, with
2   emphasis on summer work and travel because that's
3   their biggest program.
4       Q.   And this is during the last month of your
5   tenure as executive director, correct?
6       A.   Yes.
7       Q.   And it's fair to say that you presented an
8   update on political challenges and expected
9   regulatory changes affecting J-1 sponsor programs; is
10  that correct?
11      A.   Correct.
12      Q.   And among those sponsor programs is the Au
13  Pair Program?
14      A.   The Au Pair Program wouldn't have been --
15  gotten much business (sic) presentation because they
16  don't do the Au Pair Program.
17      Q.   I see.
18      A.   You see most of it is about summer work
19  and travel if you look at the slides.
20      Q.   I see.  If you can turn to page 19206 --
21      A.   19206 -- where is that? -- right.
22      Q.   -- there is a slide on the Au Pair

**Page 183**

1   Program?
2       A.   Right.
3       Q.   Okay.  And does this slide provide
4   information on political challenges and expected
5   regulatory changes?
6       A.   It was just a way of flagging a couple --
7   well, the issue that was out there about local wage
8   versus -- local minimum wage versus a federal
9   stipend.
10      Q.   And what was the issue?
11      A.   The one we've been discussing today.
12      Q.   Okay.  And do you recall how you presented
13  this issue in this presentation?
14      A.   I don't.  But again, I think it would have
15  been very briefly because this was -- this is not a
16  direct interest to them.
17      Q.   Do you know why you included the Fair
18  Labor Standards Act in a slide discussing the au pair
19  stipend?
20      A.   Well, the Fair Labor Standards Act had
21  been invoked by the state department and that's
22  probably why.

**Page 184**

1           MS. REYES:  I need to take a break.
2           THE VIDEOGRAPHER:  The time is now 4:05.
3   Going off the record.
4           (A break was taken.)
5           THE VIDEOGRAPHER:  We're back on the
6   record.  The time is now 4:14.
7           MR. VALDIVIESO:  Mr. McCarry, I'm going to
8   hand you Exhibit 15.  It's an AIFS document ending in
9   3685.  It is marked highly confidential attorneys'
10  eyes only.  Under the protective order, it's
11  appropriate for me to show this witness because he's
12  a recipient.
13          (Exhibit Number 15 was marked for
14  identification and was attached to the deposition.)
15          BY MR. VALDIVIESO:
16      Q.   Have you had a chance to review Exhibit
17  No. 15, Mr. McCarry?
18      A.   Yes.
19      Q.   And are you familiar with Exhibit No. 15?
20      A.   Yes.
21      Q.   What is Exhibit No. 15?
22      A.   It's an email exchange between myself and

**Page 185**

1   Ruth Ferry with Goran Rannefors copied in about an
2   Alliance meeting of au pair sponsors and who should
3   be invited.
4       Q.   Do you recall why you were consulting
5   those particular individuals in deciding who should
6   be invited?
7       A.   I was at a conference with Goran and we
8   discussed it, about whether we should invite
9   non-Alliance members to our meeting.  And I asked
10  Ruth as -- after I talked to Goran and that talk was
11  inconclusive, I asked Ruth for her opinion.  And as
12  you see she said, let's invite them.
13      Q.   And you referred to certain outliers.  You
14  said: "Since ECA has turned this into an all sponsor
15  meeting, should we consider inviting outliers to our
16  premeeting"?
17      A.   Right.
18      Q.   What did you mean by "outliers"?
19      A.   Nonmembers.  The sequence of events here
20  was we had -- the Alliance asked for a meeting and
21  then ECA agreed but said there was going to be an all
22  sponsor meeting, not just an Alliance meeting.

**MAGNA** ▶
**LEGAL SERVICES**

Confidential

| Page 186 |
|---|

1    Q.    And Ms. Ferry said in her email that it
2  was a good idea to -- strike that.
3    A.    Yes.
4    Q.    Okay.  And Ms. Ferry expressed in her
5  email that she thought that the Alliance should
6  invite the nonmember sponsors to the meeting; is that
7  right?
8    A.    Right.
9    Q.    And did you agree with her that it would
10  be an opportunity to see how the -- well, she wrote:
11  "Might be an opportunity for them to see how we work
12  together and promote their involvement in the
13  Alliance"?
14    A.    Yes.
15    Q.    Did you agree with her?
16    A.    Yes.
17    Q.    And so ultimately, you invited all the
18  sponsors?
19    A.    Yes, um-hum.  Yeah.  We made the judgment
20  it was an opportunity to perhaps promote membership
21  in the Alliance, which we always think is a good
22  thing.

| Page 187 |
|---|

1      MR. VALDIVIESO:  I'm going to hand you
2  Exhibit 16.  It's a Cultural Care document ending in
3  9191.  It is also marked highly confidential,
4  attorneys' eyes only.  Again under the protective
5  order, it's proper to show this witness because he is
6  a recipient of the document.
7      (Exhibit Number 16 was marked for
8  identification and was attached to the deposition.)
9      MR. VALDIVIESO:  And it was also marked as
10  Exhibit 21 in the Rannefors deposition.
11      BY MR. VALDIVIESO:
12    Q.    Have you had a chance to review Exhibit
13  No. 16, Mr. McCarry?
14    A.    Yes.
15    Q.    Are you familiar with Exhibit 16?
16    A.    Yes.
17    Q.    What is Exhibit 16?
18    A.    Helene Young, again, an Alliance member,
19  reported to me via email about a phone conversation
20  she had with Maha, M-A-H-A -- I assume a phone
21  conversation -- at the state department.
22    Q.    And then you forwarded that information to

| Page 188 |
|---|

1  Mr. Rannefors; is that correct?
2    A.    I did.
3    Q.    Why did you forward that information to
4  Mr. Rannefors?
5    A.    Judging from the date in her message, we
6  were at a conference together and I wanted to get his
7  views on it.
8    Q.    Do you believe that you, in fact,
9  discussed the information that Ms. Young forwarded to
10  you with Mr. Rannefors?
11    A.    Yes.
12    Q.    And do you recall what you discussed?
13    A.    No.
14    Q.    And is this an example of your receiving
15  information from one sponsor and transmitting it to
16  another sponsor?
17      MS. REYES:  Objection as to form.
18    A.    Yes.
19      MS. REYES:  I just want the record to
20  reflect the witness had already testified that it was
21  not from a sponsor.
22    A.    Not from an Alliance member.

| Page 189 |
|---|

1      MS. REYES:  My apologies.
2      MR. VALDIVIESO:  I'm sorry.  Let's make
3  the record clear.
4      First of all, I move to strike.  Let's
5  keep the objections to form, and the person who is
6  testifying here is Mr. McCarry.  But in any event,
7  I'd like to clarify the record.
8      BY MR. VALDIVIESO:
9    Q.    Are you aware of if USAuPair is an au pair
10  sponsor agency?
11    A.    They are an au pair sponsor.
12    Q.    And is your testimony still, as you've
13  said, in response to the answer, which is was this an
14  example of you receiving information from one sponsor
15  agency and transferring it to another sponsor?
16    A.    I received information from one sponsor
17  about the state department and shared that with
18  another sponsor, yes.
19      MR. VALDIVIESO:  I'm handing you Exhibit
20  17.  It's an Au Pair Foundation document ending in
21  408.  It does not bear any confidentiality
22  designation.  It was also marked as Exhibit 19 in the

MAGNA
LEGAL SERVICES

Confidential

| | |
|---|---|
| Page 190 | Page 192 |

Page 190

1 Hoggard deposition.
2        (Exhibit Number 17 was marked for
3 identification and was attached to the deposition.)
4        BY MR. VALDIVIESO:
5    Q.   Have you had a chance to review Exhibit 18
6 (sic), Mr. McCarry?
7    A.   Yes.
8    Q.   Are you familiar with Exhibit 18 (sic)?
9    A.   Yes.
10    Q.   What is Exhibit 18 (sic)?
11    A.   Exhibit 18 (sic) is a letter that I wrote
12 on behalf of the Alliance to the Assistant Attorney
13 General of Massachusetts about their domestic workers
14 legislation.
15    Q.   And I believe you referenced this
16 legislation earlier in the testimony; is that right?
17    A.   Yes.
18        MS. REYES:  I'm just -- you're talking
19 about Exhibit 18, and I'm trying to figure out what
20 I'm missing.
21        THE WITNESS:  Mine says 17.
22        MR. VALDIVIESO:  Oh, I'm sorry.  Are we on

Page 191

1 Exhibit 17?  We're on Exhibit 17.
2        MS. REYES:  I thought -- okay.
3        MR. VALDIVIESO:  I'm very sorry.
4        MS. REYES:  No.  That's okay.
5        MR. VALDIVIESO:  Thank you.
6        BY MR. VALDIVIESO:
7    Q.   Exhibit 17, Mr. McCarry.
8    A.   Yes.  That's what I have.
9    Q.   Are you familiar with Exhibit 17?
10    A.   Yes.
11    Q.   And what is Exhibit 17?
12    A.   Again, it's a comment letter I wrote to
13 the Assistant Attorney General of Massachusetts
14 concerning the Domestic Workers Bill.
15    Q.   And you referenced this Domestic Workers
16 Bill earlier in your testimony; is that right?
17    A.   That's right.
18    Q.   Why were you writing the Attorney General
19 -- the Massachusetts Attorney General's office with
20 respect to this issue?
21    A.   Because the Attorney General's office was
22 considering including the Au Pair Program under the

Page 192

1 provisions -- seemed about to determine that the Au
2 Pair Program belonged under the subject of the
3 provisions of the state Domestic Workers Bill, which
4 we felt was inappropriate.
5    Q.   And did you feel that was inappropriate
6 based on the input you had received from au pair
7 sponsors?
8    A.   Yes.
9    Q.   If you turn to the third page of the
10 letter -- and I apologize that it appears that, at
11 least on my copy, the Bates numbers are cut off.
12        MS. KRUZER:  They are.
13        BY MR. VALDIVIESO:
14    Q.   I believe it should read:  APF ending in
15 411.
16        MS. REYES:  Is it this page that says,
17 "Turning Cultural Exchange into Work"?
18        MR. VALDIVIESO:  Yes.  There's a heading
19 that says, "Turning Cultural Exchange into Work."
20        BY MR. VALDIVIESO:
21    Q.   Do you see that, Mr. McCarry?
22    A.   I have that, yes.

Page 193

1    Q.   And in the third paragraph of that
2 sentence -- can you read that paragraph out loud,
3 please?  It starts, "by imposing."
4    A.   "By imposing myriad new and complex
5 requirements (e.g., keeping records of meals and
6 overnight stays and adjusting stipends accordingly)"
7 -- oh, a typographical error there.  "Many of these"
8 -- that ends not in a complete sentence -- I'm sorry.
9        "Many of these requirements, as noted,
10 directly conflict with the state department's Au Pair
11 Program regulations.  The Domestic Workers Bill of
12 Rights would transform the Au Pair Program from a
13 vibrant cultural and educational exchange experience
14 for all concerned to a work program.
15        "Host families would become employers and
16 au pairs their employees, rather than enjoying the
17 close personal relationships that now animate the
18 program."
19    Q.   Were you taking a position in that
20 paragraph on whether au pairs ought to be classified
21 as employees?
22    A.   No, I wasn't.

PLAINTIFFS' RESP. APP.0004807

MAGNA
LEGAL SERVICES

Case No. 1:14-cv-03074-CMA-KMT Document 259-24 filed 03/30/18 USDC Colorado pg 291 of 311

# Exhibit 435

Highly Confidential - Attorneys' Eyes Only

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

JOHANA PAOLA BELTRAN, ET AL.,    :

          Plaintiffs,        :    Case No.:

          VS.            :    14-CV-03074-CMA-KMT

INTEREXCHANGE, INC., ET AL.,    :

          Defendants       :    Page 1-208

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

- - -

Monday, January 29, 2018

- - -

      Videotaped Deposition of ILIR ZHERKA taken

at Boies, Schiller & Flexner, 1401 New York Avenue,

NW, Washington, DC 20005 commencing at 10:05 a.m.

before Sherry L. Brooks, Certified LiveNote Reporter

and Notary Public, in and for the District of

Columbia.

- - -

MAGNA LEGAL SERVICES

WWW.MAGNALS.COM

PLAINTIFFS' RESP. APP.0004809

MAGNA ▶
LEGAL SERVICES

Highly Confidential - Attorneys' Eyes Only

| | Page 2 |
|---|---|
| 1 | A P P E A R A N C E S : |
| 2 | |
| 3 | BOIES, SCHILLER & FLEXNER, LLP |
| | BY: DAWN SMALLS, ESQUIRE |
| 4 | JUAN P. VALDIVIESO, ESQUIRE |
| | 1999 Harrison Street |
| 5 | Suite 900 |
| | Oakland, CA 94612 |
| 6 | (510) 874-1010 |
| | E-mail: Jvaldivieso@bsfllp.com |
| 7 | Representing the Plaintiffs |
| 8 | |
| | CHOATE, HALL & STEWART, LLP |
| 9 | BY: JOAN LUKEY, ESQUIRE |
| | Two International Place |
| 10 | Boston, MA 02110 |
| | (617) 248-4949 |
| 11 | E-mail: Joan.Lukey@choate.com |
| | Representing Defendant Cultural Care, Inc. |
| 12 | |
| 13 | SHERMAN & HOWARD, LLC |
| | BY: BROOKE A. COLAIZZI, ESQUIRE (via telephone) |
| 14 | 633 Seventeenth Street |
| | Suite 3000 |
| 15 | Denver, CO 80202 |
| | (303) 299-8271 |
| 16 | (303) 298-0940 (Fax) |
| | E-mail: Bcolaizzi@shermanhoward.com |
| 17 | Representing Defendant InterExchange, Inc. |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |

| | Page 4 |
|---|---|
| 1 | APPEARANCES CONTINUED: |
| 2 | |
| 3 | GORDON & REES, LLP |
| | BY: THOMAS B. QUINN, ESQUIRE (via telephone) |
| 4 | 555 Seventeenth Street |
| | Suite 3400 |
| 5 | Denver, CO 80202 |
| | (303) 200-6888 |
| 6 | E-mail: Tquinn@gordonrees.com |
| | E-mail: Pkozal@grsm.com |
| 7 | Representing Defendant AuPairCare |
| 8 | |
| | VERDI & OGLETREE, PLLC |
| 9 | BY: FAITH KALMAN REYES, ESQUIRE |
| | BENJAMIN R. OGLETREE, ESQUIRE |
| 10 | 1325 G Street, NW |
| | Suite 500 |
| 11 | Washington, DC 20005 |
| | (202) 449-7703 |
| 12 | E-mail: Bogletree@verdiogletree.com |
| | Representing Ilir Zherka |
| 13 | |
| | ALSO PRESENT: |
| 14 | |
| | Nancy Holmstock, Videographer |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |

| | Page 3 |
|---|---|
| 1 | APPEARANCES CONTINUED: |
| 2 | |
| 3 | PUTNEY, TWOMBLY, HALL & HIRSON, LLP |
| | BY: ANDREW C. KARTER, ESQUIRE (via telephone) |
| 4 | 521 Fifth Avenue |
| | New York, NY 10175 |
| 5 | (212) 682-0020 |
| | (212) 682-9380 (Fax) |
| 6 | E-mail: Akarter@putneylaw.com |
| | Representing Defendant American Institute for Foreign |
| 7 | Study d/b/a Au Pair in America |
| 8 | |
| | FISHER & PHILLIPS, LLP |
| 9 | BY: SUSAN SCHAECHER, ESQUIRE (via telephone) |
| | 1801 California Street |
| 10 | Suite 2700 |
| | Denver, CO 80202 |
| 11 | (303) 218-3676 |
| | E-mail: Sschaecher@fisherphillips.com |
| 12 | Representing Defendant APF Global Foundation d/b/a Au |
| | Pair Foundation |
| 13 | |
| 14 | NIXON SHEFRIN HENSEN OGBURN |
| | BY: KATHLEEN E. CRAIGMILE, ESQUIRE (via telephone) |
| 15 | 5619 DTC Parkway |
| | Suite 1200 |
| 16 | Greenwood Village, CO 80111 |
| | (303) 874-3435 |
| 17 | (303) 779-0740 (Fax) |
| | E-mail: Kcraigmile@nixonshefrin.com |
| 18 | Representing Defendant APEX, LLC and 20/20 Care |
| | Exchange, Inc. |
| 19 | |
| 20 | |
| 21 | |
| 22 | |

| | Page 5 |
|---|---|
| 1 | I N D E X |
| 2 | - - - |
| 3 | TESTIMONY OF: Ilir Zherka |
| 4 | By Ms. Smalls 10 |
| 5 | By Ms. Lukey 201 |
| 6 | |
| 7 | |
| 8 | E X H I B I T S |
| 9 | EXHIBIT NUMBER DESCRIPTION PAGE MARKED |
| 10 | Exhibit 1 2016 Report/Alliance Membership 23 |
| 11 | Exhibit 2 Memorandum Dated 2/23/16 26 |
| 12 | Exhibit 3 Memorandum: Alliance Bkgd. Info. 26 |
| 13 | Exhibit 4 Memorandum Dated 2/19/16 41 |
| 14 | Exhibit 5 Memorandum Dated 1/29/16 72 |
| 15 | Exhibit 6 Alliance Issues/Mbrshp Briefing 91 |
| 16 | Exhibit 7 Memorandum Dated 12/22/15 92 |
| 17 | Exhibit 8 Alliance Letter Dated 1/22/16 114 |
| 18 | Exhibit 9 Memorandum Dated 3/3/16 124 |
| 19 | Exhibit 10 Memorandum Dated 3/13/15 129 |
| 20 | Exhibit 11 Memorandum Dated 2/2/16 157 |
| 21 | Exhibit 12 Handwritten Notes - (HC-AEO) 164 |
| 22 | Exhibit 13 Handwritten Notes - (HC-AEO) 171 |

MAGNA ▶
LEGAL SERVICES

Highly Confidential - Attorneys' Eyes Only

1   meeting with the state department in May of 2016.
2     Q.   Okay.  Are there any other common goals or
3   common strategies that you have developed or advanced
4   on behalf of au pair sponsors?
5     A.   In 2017 in response to the Buy American,
6   Hire American executive order, we talked about the Au
7   Pair Program on occasion with respect to that
8   executive order.
9     Q.   You also testified that on occasion you
10   make clear the collective view of au pair sponsors;
11   is that correct?
12     A.   Yes.
13     Q.   What are some occasions when you have
14   advanced the collective view of the Alliance or its
15   members on behalf of au pair sponsors?
16     A.   We shared the collective view of our
17   members with respect to a meeting invitation by the
18   -- by ECA, the state department, for a meeting on
19   May, I believe, 2nd of 2016.
20     Q.   Are there any other examples where you
21   made clear the collective view of au pair sponsors?
22     A.   I would say we have made our view as the

1   Alliance known to various people at different times
2   with respect to the Au Pair Program.
3     MS. REYES:  We've been going about an
4   hour.  Let's take a break.
5     MS. SMALLS:  I'm not done.
6     MS. REYES:  Mr. Zherka, do you want to
7   take a break?
8     THE WITNESS:  I was actually thinking
9   about that.  That would be great.
10     MS. SMALLS:  I'm not done with my
11   question.  Our agreement was I'd finish with my
12   question and then we could take a break.  He didn't
13   ask for a break.  You asked for a break.  I want to
14   finish my question, and then we can take a break.
15     Okay.  Let the record show that counsel
16   has unilaterally asked for a break and directed their
17   witness to leave the room.
18     THE VIDEOGRAPHER:  It is 11:06.  Going off
19   the record.
20     (Discussion held off the record.)
21     THE VIDEOGRAPHER:  We're back on the
22   record.  The time is now 11:25.

1     BY MS. SMALLS:
2     Q.   Mr. Zherka, before your counsel pulled you
3   out of the room --
4     A.   I believe I asked for a break.
5     Q.   -- I was -- I was asking you about
6   instances in which you had made the collective view
7   of sponsors clear.
8     You testified that you had made the
9   collective view of sponsors clear at a May 2nd
10   meeting at ECA; is that correct?
11     MS. REYES:  Objection.
12     A.   That's incorrect.
13     BY MS. SMALLS:
14     Q.   Okay.  Can you tell me when you have made
15   the collective view of sponsors clear?
16     A.   Let me say, first of all, when I say,
17   "collective view," we're talking about collective
18   view regarding policy that ECA administers.  ECA
19   asked for a -- or suggested a meeting for May 2nd.
20     We made our views -- we, the Alliance,
21   made our views clear to ECA regarding that meeting,
22   that May 2nd meeting.

1     Q.   Okay.  Are there any other instances in
2   which you in your role as executive director of the
3   Alliance made the view of the au pair sponsors clear?
4     MS. LUKEY:  Objection to form.
5     A.   We represent our members, including
6   members who have au pair programs.  And when we
7   discuss policy issues, we are making our views clear
8   to people we're talking to, ours being the Alliance,
9   and, thereby, representing our members.
10     BY MS. SMALLS:
11     Q.   Are there some topics that are appropriate
12   for the common strategy of the Alliance and some that
13   are not?
14     MS. LUKEY:  Objection to form.
15     A.   Our focus is on public policy, and that's
16   what we focus on.
17     BY MS. SMALLS:
18     Q.   Was one of the common strategies of the au
19   pair sponsor group to keep a uniform national
20   stipend?
21     MS. LUKEY:  Objection to form.
22     A.   I'm sorry.  Restate your question.

Highly Confidential - Attorneys' Eyes Only

Page 38

1      BY MS. SMALLS:
2    Q.  Was one of the common strategies of the au
3 pair sponsor group to keep a uniform national
4 stipend?
5      MS. LUKEY: Objection. Form.
6    A.  Our strategy at the Alliance is to support
7 a national federal exchange policy. And in that
8 respect, we support uniformity across regulations for
9 the Au Pair Program, as is the case for other
10 programs as well that are exchange programs.
11      BY MS. SMALLS:
12    Q.  Has the Alliance ever taken a position
13 with respect to the au pair stipend?
14      MS. REYES: Objection as to form.
15    A.  You have to be more specific than that.
16      BY MS. SMALLS:
17    Q.  Has the Alliance ever taken a position on
18 the au pair stipend?
19      MS. REYES: Objection as to form.
20    A.  Our -- since I've been at the Alliance
21 since 2016, our view regarding the stipend has been
22 that the stipend should be uniform to reflect the

Page 39

1 exchange nature of the Au Pair Program and to ensure
2 that as much as possible that au pair opportunities
3 are available for host families throughout the United
4 States, which I believe is a view reflected in the
5 1996 regulation regarding uniformity.
6      BY MS. SMALLS:
7    Q.  And you said "our" view --
8    A.  Meaning the Alliance.
9    Q.  -- meaning the Alliance. Okay.
10    Was it the collective view of au pair
11 sponsors that the stipend should be uniform to
12 reflect the exchange nature of the program?
13      MS. LUKEY: Objection to form.
14    A.  I don't know if you're asking me a
15 specific question. The policy of the Alliance since
16 I've been at the Alliance is to support uniformity
17 across all the regulations to ensure that the program
18 is an exchange program and that it's available to
19 host families and communities throughout the United
20 States.
21      BY MS. SMALLS:
22    Q.  You're making a distinction between

Page 40

1 speaking on behalf of the Alliance and au pair
2 sponsors; is that correct?
3    A.  I'm speaking about the Alliance and what
4 our views are, yes. When I used the word, "our,"
5 it's in reference to the Alliance.
6    Q.  But you've testified that you have -- in
7 your role at the Alliance, you advance the collective
8 view of au pair sponsors; is that correct?
9      MS. LUKEY: Objection to form.
10      MS. REYES: Object to the form.
11    A.  That is not correct.
12      BY MS. SMALLS:
13    Q.  Okay.
14    A.  That is not correct. We advance our --
15 the Alliance's views on public policy. In advancing
16 the Alliance's views on public policy, we do talk to
17 members of the Alliance.
18    Q.  Do you ever organize au pair sponsors
19 towards collective action?
20      MS. LUKEY: Objection to form.
21    A.  We do ask Alliance sponsors to do certain
22 things that we ask of all of them.

Page 41

1      BY MS. SMALLS:
2    Q.  Do you ever tell au pair sponsors to take
3 one position over another?
4    A.  We -- in interacting with our members, we
5 do share with them what our positions are.
6    Q.  Was a common goal of the Alliance to
7 maintain a uniform national stipend?
8      MS. LUKEY: Objection to form.
9    A.  The goal of the Alliance, since I've been
10 at the Alliance, is to have uniformity in the au pair
11 programming, including the stipend.
12      MS. SMALLS: Could you mark this as 4,
13 please?
14      (Exhibit Number 4 was marked for
15 identification and was attached to the deposition.)
16      MS. LUKEY: And for those on the phone,
17 Exhibit 4 is ExpertAuPair 028121.
18      MS. REYES: And before you start asking
19 questions on this regard, I see that this is produced
20 by ExpertAuPair.
21      I know in our production we've redacted
22 the first part of this pursuant to the privilege and

PLAINTIFFS' RESP. APP.0004812

MAGNA ▶
LEGAL SERVICES

Highly Confidential - Attorneys' Eyes Only

| | Page 42 |
|---|---|
| 1 | the Common Interest Doctrine. |
| 2 | So I'm a little alarmed that we're using |
| 3 | the version that came from ExpertAuPair when our |
| 4 | version was redacted.  I don't think this is an |
| 5 | appropriate document to be questioning this witness |
| 6 | about.  I don't know what the defendants' perspective |
| 7 | is. |
| 8 | MS. LUKEY:  Well, if this has been |
| 9 | redacted by the Alliance, then the defendants' |
| 10 | position is that we have to claw it back because it |
| 11 | contains privilege.  But I haven't even had a chance |
| 12 | to read it yet. |
| 13 | MS. SMALLS:  You can't claw back on behalf |
| 14 | of ExpertAuPair. |
| 15 | MS. LUKEY:  I can claw back on behalf of |
| 16 | other sponsors whose privilege is impacted.  That's |
| 17 | why I have to read it, Dawn, because I have to see |
| 18 | whether it relates to my client or potentially the |
| 19 | other clients on the phone who may have issues with |
| 20 | this.  And they probably don't have the document in |
| 21 | front of them. |
| 22 | MS. REYES:  It may be easier -- |

| | Page 43 |
|---|---|
| 1 | MS. LUKEY:  I'm clawing it back on behalf |
| 2 | of Cultural Care. |
| 3 | MS. REYES:  And it says at the bottom |
| 4 | Exhibit 40 as Hayes 8/24/2017, if that helps identify |
| 5 | the document. |
| 6 | MS. SMALLS:  I'd like to note for the |
| 7 | record that this document was an exhibit in the |
| 8 | deposition.  It was not subject to a previous |
| 9 | clawback.  And now that we are using it as -- it's a |
| 10 | perfectly produced document, and we're using it as an |
| 11 | exhibit at this deposition. |
| 12 | MS. LUKEY:  Well, I can tell you there's |
| 13 | one other document which you may come to which I am |
| 14 | aware of that is similar in nature to this. |
| 15 | MS. SMALLS:  Well, let's get to that when |
| 16 | we get to that. |
| 17 | MS. LUKEY:  Well, no, because I'm going to |
| 18 | state the principle here because it applies.  If |
| 19 | there is a redacted version of this document, and my |
| 20 | guess is that if Cultural Care produced it, it also |
| 21 | produced it redacted. |
| 22 | But the Alliance produced it redacted, and |

| | Page 44 |
|---|---|
| 1 | there's a reason for that.  When you've got one |
| 2 | document redacted, that is a claim of privilege on |
| 3 | behalf of a party. |
| 4 | If somebody else has the document but it's |
| 5 | not their privilege and they produce it, they can't |
| 6 | waive for the party to whom the privilege belongs. |
| 7 | And I am looking at this -- I need to |
| 8 | check it out.  But I believe, because this very often |
| 9 | is the case, that this is very likely a product of |
| 10 | both the attorney/client privilege of Cultural Care |
| 11 | and work product related to it. |
| 12 | So if this has been produced in redacted |
| 13 | form, I think it is improper to take advantage of the |
| 14 | fact that someone else produced the document. |
| 15 | This is Cultural Care's privilege and it |
| 16 | is the privilege of other sponsors on the phone, I am |
| 17 | betting, and not on the phone.  The fact that |
| 18 | ExpertAuPair produced it does not waive my client's |
| 19 | privilege. |
| 20 | MS. SMALLS:  And I'm sorry.  Can you |
| 21 | identify the attorney that is on this document? |
| 22 | MS. LUKEY:  It isn't on the document. |

| | Page 45 |
|---|---|
| 1 | It's the same principles that Magistrate Judge Tafoya |
| 2 | has already dealt with.  You have an appeal pending |
| 3 | to Judge Arguello, but that order stands, as you know |
| 4 | from the argument -- well, I don't remember if you |
| 5 | were present for the argument. |
| 6 | You probably read the transcript, because |
| 7 | you know, from our argument, my predecessor counsel |
| 8 | was regularly giving advice to Cultural Care |
| 9 | representatives who were conveying it as part of the |
| 10 | joint defense in this case. |
| 11 | That's the problem with these |
| 12 | interrogations that relate to the period after the |
| 13 | filing of the litigation. |
| 14 | As I said to Magistrate Judge Tafoya at |
| 15 | that hearing, the joint defense was a matter of |
| 16 | necessity because the court ordered us to proceed in |
| 17 | concert with regard to discovery. |
| 18 | So in a joint defense agreement with |
| 19 | common interest among the sponsors, and the court |
| 20 | found also with regard to the Alliance, there are |
| 21 | various situations in which privilege advice from my |
| 22 | client's counsel was conveyed to other sponsors. |

PLAINTIFFS' RESP. APP.0004813

MAGNA
LEGAL SERVICES

# Exhibit 436

PLAINTIFFS' RESP. APP.0004814

Page 1

1            IN THE UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF COLORADO

3                       ---oOo---

4

   JOHANA PAOLA BELTRAN,

5    at al.,

6              Plaintiffs,

7    vs.                          No. 1:14-cv-03074-CMA-KMT

8    INTEREXCHANGE, INC., ex rel.,

9              Defendants.

     _____/

10

11

12              VIDEOTAPED DEPOSITION OF

13          ANAIS MARINE PATIENCE ZANGA TAYIDA

14              OAKLAND, CALIFORNIA 94607

15              FRIDAY, FEBRUARY 2, 2018

16

17

18

19

20

21

22   BY:  ANDREA M. IGNACIO, CSR, RPR, CRR, CCRR, CLR ~

23        CSR LICENSE NO. 9830

24

25

PLAINTIFFS' RESP. APP.0004815

Page 2

```
 1        IN THE UNITED STATES DISTRICT COURT
 2          FOR THE DISTRICT OF COLORADO
 3                  ---oOo---
 4  JOHANA PAOLA BELTRAN,
    at al.,
 5
          Plaintiffs,
 6
    vs.           No. 1:14-cv-03074-CMA-KMT
 7
    INTEREXCHANGE, INC., ex rel.,
 8
          Defendants.
 9  _____/
10
11
12      Videotaped Deposition of Anais Marine
13  Patience Zanga Tayida, taken on behalf of the
14  Defendants, on Friday, February 2, 2018, at
15  Boies Schiller & Flexner LLP, 1999 Harrison Street,
16  Suite 900, Oakland, California, beginning
17  10:03 a.m., and commencing at 3:00 p.m., Pursuant
18  to Notice, and before me, ANDREA M. IGNACIO, CSR,
19  RPR, CRR, CLR ~ License No. 9830.
20
21
22
23
24
25
```

Page 3

```
 1  A P P E A R A N C E S :
 2
 3    FOR THE PLAINTIFFS:
 4      BOIES SCHILLER FLEXNER LLP
 5      By:  SEAN PHILLIPS RODRIGUEZ, Esq.
 6      1999 Harrison Street, Suite 900
 7      Oakland, California 94612
 8      Phone:  520.874.1000
 9      srodriguez@bsfllp.com
10
11    FOR THE DEFENDANTS:
12      CHOATE HALL & STEWART LLP
13      By:  VIRGINIA I. SELDEN, Esq.
14      Two International Place
15      Boston, Maryland 02110
16      Phone:  617.248.5000
17      vselden@choate.com
18
19    ALSO PRESENT:  Cassia Leet, Videographer
20                  ---oOo---
21
22
23
24
25
```

Page 4

```
 1              I N D E X
 2
 3  WITNESS:  Anais Marine Patience Zanga Tayida
 4
 5
 6  EXAMINATION                    PAGE
 7  By Ms. Selden              6, 183
 8  By Mr. Rodriguez                173
 9
10          E X H I B I T S
11  EXHIBIT                      PAGE
12  Exhibit 1   Notice of Deposition          8
13  Exhibit 2   Consent to Join              21
14  Exhibit 3   Notice of Your Right to Join    24
15              Lawsuit for Unpaid Wages
16  Exhibit 4   Anais Zanga, Why I want to be an  60
17              au pair, Bates CC00036539 - '55
18  Exhibit 5   Calendar Bates ZANGA TAYIDA_000001  91
19              - '53
20  Exhibit 6   Survey                      102
21  Exhibit 7   Printout, Bates CC00036560 - '61   171
22  Exhibit 8   Alarm, Bates ZANGA TAYIDA_0000062  180
23
24              ---oOo---
25
```

Page 5

```
 1              OAKLAND, CALIFORNIA
 2            FRIDAY, FEBRUARY 2, 2018
 3                10:03 A.M.
 4
 5      THE VIDEOGRAPHER:  Good morning.  We are
 6  going on the record at 10:03 a.m. on February 2nd,
 7  2018.
 8      Please note that the microphones are
 9  sensitive and may pick up whispering, private
10  conversations, and cell phone interference.
11      Audio and video recording will continue to
12  take place, unless all parties agree to go off the
13  record.
14      This is Media Unit 1 of the video recorded
15  deposition of Anais Marine Patience Zanga Tayida.
16  Taken by counsel for defendant.
17      In the matter of Johana Paola Beltran,
18  et al., versus InterExchange, Inc., et al.  Filed in
19  the United States District Court for the District of
20  Colorado.  Case No. 114-CV-03074-CMA-KMT.
21      This deposition is being taken at Boies
22  Schiller & Flexner, located at 1999 Harrison Street,
23  Suite 900, Oakland, California 94612.
24      My name is Cassia Leet, and I am the
25  videographer, here with the court reporter, Andrea
```

2 (Pages 2 - 5)



Page 146

16   Q   So certainly fewer than 40 hours; correct?
17   A   Oh, yeah, of course.
18   Q   And you were paid for that week; right?
19   A   Yes, I was paid.
20

Page 148

1   Q   Did you ever ask the ▮▮▮ family for more?
2   A   No.  But they know that my last house family
3   paid me more.
4   Q   How do they know?
5   A   They know when we discussed about taxes with
6   the LCC.
7   THE REPORTER:  With the --
8   THE WITNESS:  LCC, the responsible from
9   Cultural Care.
10   MS. SELDEN:  It's LCC.
11   Q   What did they say?
12   MR. RODRIGUEZ:  Objection to form.
13   THE WITNESS:  The -- this -- this question --
14   this -- this conversation happened because they were
15   asking about taxes with the LCC.  And she told me, You
16   will not -- you will not -- you would not have to pay
17   taxes.
18   And I said, Yes, I did.
19   And she asked, Why?
20   And I said, Because my last house family paid
21   me more, so I have to pay taxes.
22   MS. SELDEN:  Q.  Did your host mom ask you
23   why your -- your former host family paid you more?
24   A   Yes, they did.
25

Page 147

1

you.  I was confused.
21   What stipend amount did the ▮▮▮ family
22   pay you?
23   A   200.
24   Q   Did Cultural Care ever pay you the stipend?
25   A   No.

Page 149

1

8    Q   Do you think that they ask you too much?
9    A   No.  But I still think I should have been
10   paid more.
11   Q   Other than that conversation that you just
12   described, have you ever asked them for a higher
13   stipend?
14   A   No.
15   Q   Okay.  Why not?
16   A   Probably because the -- that's the wages in
17   the contract that I signed for.
18   Q   The contract says that you should make $200 a
19   week?
20   A   190 -- 95 and $0.95 that Cultural Care
21   decided.
22   Q   Have you received $200 a week from the
23   ▮▮▮ family every week?
24   A   Yes.
25   Q   Have they ever paid you less?

38 (Pages 146 - 149)

| | Page 150 |
|---|---|
| 1 | A  No, never. |
| 2 | Q  Have they ever paid you more? |
| 3 | A  The week when I worked 55. |
| 4 | Q  When did you work 55 hours for the ▮▮▮ |
| 5 | family? |
| 6 | A  That was the -- the week just before the |
| 7 | holiday vacation. |
| 8 | Q  Thanksgiving or Christmas? |
| 9 | A  Christmas. |
| 10 | Q  How much did they pay you that week? |
| 11 | A  In total? |
| 12 | Q  (Counsel nods head.) |
| 13 | A  300, I think. |
| 14 |    Sorry. |
| 15 | Q  That's okay. |
| 16 |    Do you believe that the ▮▮▮ family owes |
| 17 | you money? |
| 18 | A  I will not say they owe me money.  But the |
| 19 | fact -- I think au pairs are underpaid, so I think |
| 20 | that means they should have paid me more. |
| 21 | Q  But -- |
| 22 | A  But I will not say they owe me money. |
| 23 | Q  Do you think that you're owed money for your |
| 24 | time working as an au pair by Cultural Care? |
| 25 | A  Excuse me? |

| | Page 151 |
|---|---|
| 1 | Q  Do you believe that you're owed money for |
| 2 | your time as an au pair by Cultural Care? |
| 3 | A  I guess so, because that's -- they -- they |
| 4 | choose the wages. |
| 5 | Q  Who told you that they choose the wages? |
| 6 | A  The former au pair from Cultural Care. |
| 7 | Q  What did she say? |
| 8 | A  They say, like, it's not -- she said, like, |
| 9 | it's not useful to look for other agencies, because |
| 10 | all of agencies, au pairs in America, they make, |
| 11 | like -- I'll call to say all family going to pay au |
| 12 | pair one -- 155, 155. |
| 13 | Q  195? |
| 14 | A  Yes.  Sorry. |
| 15 | Q  Did she say that Cultural Care had picked the |
| 16 | amount of money that all agencies pay? |
| 17 | A  I didn't understand. |
| 18 | Q  You testified that a former au pair -- |
| 19 | A  Yes. |
| 20 | Q  -- told you that it was not useful to look at |
| 21 | other agencies because you would make the same amount |
| 22 | of money? |
| 23 | A  Exactly. |
| 24 | Q  You also testified that she told you that |
| 25 | Cultural Care set the amount of money? |

| | Page 152 |
|---|---|
| 1 | A  Yeah, with others -- American agencies, |
| 2 | au pairs. |
| 3 | Q  So did Cultural Care set the stipend for |
| 4 | other agencies? |
| 5 | A  Yes.  Like, they will agree. |
| 6 | Q  Did anyone else say that to you? |
| 7 | A  No. |
| 8 | Q  Did Cultural Care ever pay you -- |
| 9 | A  No. |
| 10 | Q  -- anything? |
| 11 | A  No. |
| 12 | Q  Were you ever an employee of Cultural Care? |
| 13 | A  No. |
| 14 | Q  Do you believe that you were paid unfairly? |
| 15 | A  Yes, I do. |
| 16 | Q  When did you come to this belief? |
| 17 | A  With my first family.  But it get -- it's -- |
| 18 | it is getting stronger with that family because I -- |
| 19 | I'm paid less. |
| 20 | Q  Do you think that it was unfair for the Rose |
| 21 | family to pay you $250? |
| 22 | A  I will not say that, because rare families |
| 23 | are paying au pair 250 hundred.  So because of that, I |
| 24 | was -- I'm lucky.  So I would not say. |
| 25 | ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ |

| | Page 153 |
|---|---|
| 1 | ▮▮▮▮▮▮▮▮ |
| | ▮▮▮▮▮▮▮▮▮▮▮▮ |
| | ▮▮▮▮▮▮▮▮▮▮▮▮▮ |
| | ▮▮▮▮▮▮▮▮▮▮▮ |
| | ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ |
| | ▮▮▮▮▮ |
| | ▮▮▮▮ |
| | ▮▮▮▮▮▮▮▮ |
| | ▮▮▮▮▮▮▮▮▮▮▮▮ |
| | ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ |
| | ▮▮▮▮▮ |
| | ▮▮▮▮▮▮▮▮▮▮▮ |
| | ▮▮▮▮▮▮ |
| | ▮▮▮▮▮▮▮▮▮▮▮▮▮ |
| | ▮▮▮▮. |
| 19 | Q  Who is your LCC? |
| 20 | A  Where? |
| 21 | Q  Who was your LCC in Chicago? |
| 22 | A  Samantha Rudolph. |
| 23 | Q  How often did you meet with Samantha? |
| 24 | A  A lot, because we have to go to a meeting, |
| 25 | au pair, every month, and that's mandatory.  And the |

39 (Pages 150 - 153)

Page 154

1 former from Cultural Care said, If you miss, Cultural
2 Care won't pay for the flight back to the country.
3    Q   Who told you that?
4    A   The former from Cultural Care.
5    Q   The one who you met with in France?
6    A   Yeah.
7        And -- oh, she also said we have to go there
8 if we want to extend.
9    Q   To go to the LCC meetings?
10   A   Yeah, every month if you want to extend.
11   Q   Okay.  Did you report any issues to her?
12   A   To Samantha?
13   Q   (Counsel nods head.)
14   A   No.
15   Q   You testified earlier that you had to work
16 more than 45 hours a week on occasion with the ███
17 family?
18   A   Yeah.
19   Q   Is that correct?
20   A   Yes.
21   Q   Why didn't you tell your LCC about that?
22   A   I guess maybe because I was paid more.
23   Q   Did you ever tell her when you had to work
24 more than ten hours a day?
25   A   No, never.

Page 155

1    Q   Did you tell anyone from Cultural Care?
2    A   No.
3    Q   Did you ever tell her that you felt you were
4 being paid unfairly?
5    A   No, never.
6    Q   Are you still in touch with Samantha?
7    A   I was at the beginning of my -- in August and
8 September and recently, because I have the issues with
9 taxes.
10   Q   You have a new LCC in California; right?
11   A   Yes, recently.
12   Q   What is her name?
13   A   Anita.
14   Q   Do you attend monthly meetings with Anita?
15   A   I didn't see her yet.  She's new.  The
16 first -- the last one quit.  No, that's -- she old.
17 She -- she doesn't have to work anymore.  But then I
18 didn't have LCC.  So she's new.
19   Q   What was the first woman's name?
20   A   I don't know.  I met her one time.  I don't
21 remember.
22   Q   So you've attended one monthly check-in since
23 you've been in California?
24   A   Exactly.
25   Q   Have you reported any issues to Anita?

Page 156

1    A   Except my issues with taxes?
2    Q   Uh-huh.
3    A   No.
4    Q   And what about the former LCC in California?
5    A   Sorry.  The what?
6    Q   You said that before Anita, you had a
7 different LCC --
8    A   Yeah.
9    Q   -- in California?
10   A   No.
11   Q   You haven't reported anything?
12   A   Anything -- no.
13   Q   Okay.  Did you ever tell Anita or Anita's
14 predecessor that you thought you were being paid
15 unfairly?
16   A   No, I didn't.
17   Q   Did the ███ family pay for you to take
18 classes?
19   A   Yes, they did.
20   Q   Do you know how much they paid?
21   A   I took a weekend class.  The holdback was, I
22 think, 700.
23   Q   Did they pay the whole thing?
24   A   Yes.
25   Q   What sort of class was it?

Page 157

1    A   Being au pair and American culture.  Boring.
2    Q   Did you pick it?
3    A   Sorry?
4    Q   Did you choose what classes you took?
5    A   We cannot choose the -- we can choose the
6 weekend class, like, the destination.  But the weekend
7 class, the -- the subjects, no.
8    Q   But you chose that weekend destination?
9    A   Yes, because it was in Chicago, and I didn't
10 have to pay flight or rent.  That's why I choose this
11 one in Chicago.
12   Q   Was it associated with a particular
13 university?
14   A   I don't remember.
15   Q   Okay.  Do you think it was the only weekend
16 class in Chicago?
17   A   No.  There was weekend class -- no.  There
18 was one in Los Angeles.  There is in New York, Boston,
19 San Francisco.
20   Q   But in Chicago, was that the only class
21 available?
22   A   Oh, I don't know.  I finded [sic] the weekend
23 class.  I have to took a weekend class because of my
24 schedule.  I cannot go to classes, like, during the
25 week or -- and I didn't want to go to evening classes

40 (Pages 154 - 157)

| | |
|---|---|
| Page 170 | Page 172 |

**Page 170**

1 Q Is there anything else that you think should
2 be changed about the program?
3 A The wages.
4 Q Okay. And how much do you think that should
5 change?
6 A I think au pair should be paid at least 2,000
7 per month.
8 Q What is the basis for your belief that
9 au pairs should be paid 2,000 a month?
10 A Because nannies are paid at least 3,000.
11 Q Do you think that your host families owe you
12 the difference?
13 A If the law say it, yes.
14 MS. SELDEN: Could we go off the record for a
15 moment.
16 THE VIDEOGRAPHER: This marks the end of
17 Volume I, Media No. 2, of the deposition of Anais
18 Marine Patience Zanga Tayida.
19 The time is 2:14 p.m. We are off the record.
20 (Recess taken.)
21 THE VIDEOGRAPHER: We are back on the record
22 at 2:18 p.m.
23 This marks the beginning of Volume I, Media
24 No. 3, of the deposition of Anais Marine Patience
25 Zanga Tayida.

**Page 172**

1 your LCC?
2 A Yes.
3 Q Okay. If you could please go to the entry
4 that says 8/25/17. It's a little more than halfway
5 down.
6 A Yes.
7 Q Do you see where it says:
8 "Hours worked and stipend pay are in
9 compliance."
10 A Nope.
11 Q It's the second sentence.
12 A And -- yeah.
13 Q Okay. Is that something that your LCCs ask
14 you?
15 A Yes, by mail -- e-mail.
16 Q So, when you say that you think that Cultural
17 Care should do a better job monitoring au pairs, what
18 would you have them do?
19 A I don't know.
20 MS. SELDEN: Okay. That's all I have for
21 now.
22 MR. RODRIGUEZ: Okay. Off the record,
23 please.
24 THE VIDEOGRAPHER: Going off the record. The
25 time is 2:20.

| | |
|---|---|
| Page 171 | Page 173 |

**Page 171**

1 Please continue.
2 (Document marked Exhibit 7
3 for identification.)
4 MS. SELDEN: Q. Ms. Zanga Tayida, have you
5 seen this document before?
6 A No.
7 Q Okay. Do you see -- do you see your name on
8 this document?
9 A Yeah, it's my name --
10 Q Okay.
11 A -- and house family name.
12 Q Okay. And do you see the column with the
13 dates in them?
14 A Yes.
15 Q And are these roughly the dates that you've
16 participated in the program?
17 A Yes.
18 Q Yes. Okay.
19 If you look in the column on the far right,
20 it says "Comments." And I apologize. I know the
21 print is very small. You'll see that these are notes
22 taken by your LCC?
23 A Uh-huh, yes.
24 Q Do you recall having these conversations with
25 your -- or do you recall having conversations with

**Page 173**

1 (Recess taken.)
2 THE VIDEOGRAPHER: Back on the record. The
3 time is 2:39.
4
5 EXAMINATION
6 BY MR. RODRIGUEZ:
7 ████████████████████
████████████████████████
█ ██████
█ ███████████████████
█ ████████████████
█ █████████████
█ ████████████████████
█ █████████████████
█ ████████████████████████
█ ████████████
█ ██████████████
█ ███████████
█ ████████████
█ ███████
█ █████████████████

PLAINTIFFS' RESP. APP.0004820
212-279-9424

Veritext Legal Solutions
www.veritext.com
212-490-3430

| Page 174 | Page 176 |
|---|---|

**Page 174**

█████████████████████████

███████████████

█ ██████████████████

██ ████████████████████████

████████████████████████████

██████

8     MS. SELDEN: Object to form.

9    ████████████████████

10     MR. RODRIGUEZ: Q. We've talked today about,
11  I believe, three former au pairs you spoke with in
12  France; is that correct?
13   A  Yes.
14   Q  Let's go through them one by one.
15     The first former au pair you spoke with in
16  France, how did you first meet her?
17   A  She contact me by e-mail and told me the date
18  for the physical meeting in Paris.
19   Q  Do you have an understanding of who that
20  former au pair worked for?
21   A  She worked for Cultural Care.
22   Q  And the next former au pair you met in
23  France, when did you first meet her?
24   A  When?
25   Q  Yes.

**Page 175**

1   A  2016.
2   Q  And how did you meet her?
3   A  By e-mail, and then they call me.
4   Q  And that second former au pair, did she also
5  work for Cultural Care?
6   A  Yes.
7   Q  The third Cultural Care -- my -- my mistake.
8     The third former au pair you met in France,
9  did she also work for Cultural Care?
10   A  Yes.
11   Q  And when did you meet her?
12   A  2016.
13   Q  Which one, if any, of those former au pairs,
14  is the one that told you that Cultural Care had an
15  agreement with other au pair sponsors?
16   A  The one I met physically.
17   Q  The first one?
18   A  The first one, yes.
19   Q  Have you ever heard of an organization called
20  ICL?
21   A  No.
22   Q  To your knowledge, were you always
23  interacting with Cultural Care when you were in
24  France?
25   A  Could you repeat, please.

**Page 176**

1   Q  To your knowledge --
2   A  Yes.
3   Q  -- when you were talking to an au pair
4  sponsor representative in France --
5   A  Yeah.
6   Q  -- were you always talking to someone who
7  worked for Cultural Care?
8   A  Always.
9   Q  I believe you said that someone you spoke
10  with in France said that the host family contract
11  specifies 195.75; is that right?
12   A  Correct.
13   Q  And was that one of the former au pairs who
14  worked for Cultural Care?
15   A  She said that. But she also said usually,
16  the families paid au pairs 200.
17   Q  Now, I believe you used the word "mandatory"
18  earlier to characterize some insurance that was
19  offered.
20     Do you recall that?
21   A  Yes.
22   Q  And who said it was mandatory?
23   A  The first former from Cultural Care.
24   Q  And do you understand which company was
25  offering that mandatory insurance?

**Page 177**

1   A  I have to pay Cultural Care, and the -- the
2  insurance is Erica.
3   Q  The insurance is through Cultural Care?
4   A  Exactly.
5   Q  Thinking practically about your day-to-day
6  work, do you feel like you work for Cultural Care?
7   A  Yes, I do.
8   Q  Why?
9   A  Because they making rules. They -- they work
10  with the host families. They are always away
11  together. So I feel like Cultural Care is also my
12  employer. I just don't have the physical relationship
13  with them.
14   Q  In your experience, if an au pair and a host
15  family have a dispute, and Cultural Care gets
16  involved, whose side is Cultural Care on?
17   A  Always the family's.
18   Q  If you were explaining the monthly -- my
19  mistake.
20     How often are ICC meetings held?
21   A  A Month -- one -- once per month.
22   Q  If you were explaining an ICC meeting to a
23  friend --
24     MS. SELDEN: Excuse me. Objection. LCC?
25     MR. RODRIGUEZ: Oh, thank you.

45 (Pages 174 - 177)

Page 178

1  Q  Do you know what an LCC meeting is?
2  A  LCC?
3  Q  Yes.
4  A  That's the name of the responsible for
5  au pairs.
6  Q  From Cultural Care; right?
7  A  From Cultural Care, yeah.
8  Q  And how often are LCC meetings held?
9  A  Once per month.
10  Q  If you were to describe an LCC meeting to a
11  friend, how would you describe it?
12  A  Usually, we -- we going out drinking coffee,
13  hot chocolate.  It's like an alcohol -- Alcoholic
14  Anonymous.
15  Q  Why do you say it's like Alcoholics
16  Anonymous?
17  A  Because everybody there is complaining about
18  au pair's life, but they just -- they talk about
19  between au pairs, but they don't talk about it with
20  the house families.
21  Q  And is Cultural Care aware of this sort
22  of -- the -- the -- let me try this a different way.
23  A  Cultural Care --
24  Q  Please let me -- let me ask a question first,
25  if you would.

Page 179

1  And is a -- is a Cultural Care representative
2  present for this complaining by au pairs?
3  A  I don't understand.
4  Q  Is there a Cultural Care representative at
5  the LCC meetings?
6  A  Yes, by the LCC.
7  Q  And is the LCC representative from Cultural
8  Care -- are they aware of the complaining by au pairs
9  that makes you call it Alcoholics Anonymous?
10  A  Yes.
11  Q  What's their reaction?
12  A  Oh, you should talk about this with your host
13  family nicely, calmly, and then you will see.
14  Q  Do you feel like Cultural Care ever sides
15  with au pairs in disputes?
16  A  No, never.
17  Q  Do you feel like Cultural Care encourages
18  au pairs to be assertive in disputes?
19  MS. SELDEN:  Objection.
20  MR. RODRIGUEZ:  Q.  You may answer.
21  A  Yes.
22  Q  Do you see housing as a benefit for the host
23  family or for you?
24  A  For the host family.
25  Q  Why do you say that?

Page 180

1  A  Because we living with them 24 hours.  They
2  can -- they taking advantage of this.  They ask for --
3  from us to work more, even when they are at home --
4  the host family are home.
5  MR. RODRIGUEZ:  I'd like to put before you
6  the document marked as Exhibit 8.
7  (Document marked Exhibit 8
8  for identification.)
9  THE WITNESS:  Thank you.
10  MS. SELDEN:  Q.  Ms. Zenga, do you recognize
11  the document marked as Exhibit 8?
12  A  Yes, I do.
13  
14  .
16  Q  Has Exhibit 8 been referenced at all today?
17  A  No.
18  Q  Not during this deposition today?
19  A  Excuse me?
20  Q  Have you referenced exhibit -- have you
21  referenced this document at any time --
22  A  Before?
23  Q  -- today?
24  A  No.
25  Q  Okay.  And just explain to me what this

Page 181

1  document is.
2  

PLAINTIFFS' RESP. APP.0004822
212-279-9424

Veritext Legal Solutions
www.veritext.com

212-490-3430

Case No. 1:14-cv-03074-CMA-KMT   Document 959-24   filed 03/30/18   USDC Colorado   pg
306 of 311

# Exhibit 437

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Case No. 14-cv-03074-CMA-CBS

_____

JOHANA PAOLA BELTRAN, ET AL.,

       Plaintiffs,

vs.

INTEREXCHANGE, INC., ET AL.,

       Defendants.

_____

VOLUME II

VIDEOTAPED DEPOSITION OF

ELIZABETH H. NEWLON, Ph.D.

March 9, 2018

DENVER, COLORADO

9:08 A.M.

Magna Legal Services
866-624-6221
www.magnals.com

PLAINTIFFS' RESP. APP.0004824

## Page 293

1         The videotaped deposition of
2    ELIZABETH H. NEWLON, Ph.D., taken before Leeann
3    Stellor, a Registered Merit Reporter, Certified
4    Realtime Reporter, and a Notary Public in and for the
5    County of Summit and the State of Colorado, at 1200
6    Seventeenth Street, Suite 3000, Denver, Colorado, on
7    Friday, March 9, 2018, at the hour of 9:08 a.m.,
8    pursuant to Notice.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 294

1    APPEARANCES:
2
3      BOISE, SCHILLER, FLEXNER, L.L.P.
       BY: SEAN P. RODRIGUEZ, ESQ.
4          1999 Harrison Street
           Suite 900
5          Oakland, California  94612
           (510) 874-1000
6          sordriguez@bsfllp.com
           appeared on behalf of the Plaintiffs
7      BOISE, SCHILLER, FLEXNER, L.L.P.
       BY: BYRON D.M. PACHECO, ESQ.
8          575 Lexington Avenue
           New York, New York  10022
9          (212) 446-2300
           appeared on behalf of the Plaintiffs
10
       CHOATE, HALL & STEWART, LLP
11     BY: LYNDSEY KRUZER, ESQ.
           SAMUEL RUDMAN, ESQ.
12         Two International Place
           Boston, Massachusetts  02110
13         (617) 248-5221
           lkruze@choate.com
14         srudman@choate.com
           appeared on behalf of Cultural Care
15
       CHOATE, HALL & STEWART, LLP
16     BY: MICHAEL GASS, ESQ.
           Two International Place
17         Boston, Massachusetts  02110
           (617) 248-5000
18         pgass@choate.com
           appeared by telephone on behalf of
19         AuPairCare, Inc.
20     LEWIS, ROCA, ROTHGERBER, CHRISTIE
       BY: DIANE HAZEL, ESQ.
21         1200 17th Street
           Suite 3000
22         Denver, Colorado  80202
           (303) 628-9527
23         dhazel@lrrc.com
           appeared by on behalf of Cultural
24         Care
25

## Page 295

1    APPEARANCES CONTINUED:
2
3      SHERMAN & HOWARD, L.L.C.
       BY: BROOKE A. COLAIZZI, ESQ.
4          633 17th Street
           Suite 3000
5          Denver, Colorado  80202
           (303) 299-8194
6          bcolaizzi@shermanhoward.com
           appeared by telephone on behalf of
7          InterExchange, Inc.
8      WHEELER, TRIGG, O'DONNELL
       BY: NATALIE WEST, ESQ.
9          370 17th Street
           Suite 4500
10         Denver, Colorado  80202
           (303) 244-1983
11         west@wtotrial.com
           appeared by telephone on behalf of
12         USAuPair, Inc., GoAuPair, and Au Pair
           International
13     EXPERT AUPAIR
       BY: BOGDAN ENICA, ESQ.
14         100 2nd Avenue S.
           Suite 3025
15         St. Petersburg, Florida  33701
           (727) 225-2649
16         bogdan@expertaupair.com
           appeared by telephone on behalf of
17         Expert AuPair
18     PUTNEY, TWOMBLY, HALL & HIRSON, L.L.P.
       BY: ROBERT M. TUCKER, ESQ.
19         521 Fifth Avenue
           New York, New York  10175
20         (212) 682-0020
           rtucker@putneylaw.com
21         appeared by telephone on behalf of
           American Institute of Foreign Study
22
23
24   ALSO PRESENT: Michael Wickham, Videographer
25

## Page 296

1              I N D E X
2
     DEPOSITION WITNESS:                 PAGE
3    ELIZABETH H. NEWLON, Ph.D.
4    Examination by Mr. RODRIGUEZ          298
5
     PLAINTIFFS' DEPOSITION EXHIBITS MARKED:
6    NO.       DESCRIPTION            PAGE
7    Exhibit 11  July 31, 2017 Expert Report of    312
                 Elizabeth H. Newlon, Ph.D.
8
     Exhibit 12  Thousand Oaks Residential Care Home  421
9                I, Inc. versus Commissioner of
                 Internal Revenue - Decision
10
     Exhibit 13  Cultural Care Au Pair Agreement with  440
11               Camilla Macchiavelli September 26,
                 2017
12               CC00033089 -33090
13
     PLAINTIFFS' DEPOSITION EXHIBITS PREVIOUSLY MARKED:
14   NO.       DESCRIPTION            PAGE
15
     Jordan     December 26 - 27, 2013 e-mails from  435
16   Exhibit 28  Goran Rannefors to David Widerberg
                 and others
17
18
19
20
21
22
23
24
25

MAGNA
LEGAL SERVICES

Page 453

1   consider Ms. Gold's beliefs about herself to be
2   relevant to joint employment?
3      A.   I think it supports the argument that
4   when you are an intermediary, essentially, like a
5   recruiting agency looking for -- a headhunter, say,
6   looking for an executive, they match firms that need
7   a new CEO with an executive or a high-level manager.
8          There's relationships that deal
9   with employment that aren't employer -- employer
10  versus employee, or -- or that connection doesn't
11  really exist.  And nanny placement agencies are one
12  example.
13         And I'm not opining about
14  necessarily that they are or aren't joint employers,
15  but in that I see them very similar just on the
16  matching piece, that that piece does not correspond
17  for the sponsor agencies with employment either,
18  that it's a -- it's a similar business model in
19  part.
20     Q.   Did you see in your review of any
21  materials in connection with what joint employment
22  factors are or are not, anything about what a
23  defendant purports to believe about them self?
24     A.   No, I have not seen any real testimony
25  about that.

Page 454

1     Q.   And do you believe that a firm's own
2   testimony about what it believes about itself is
3   reliable evidence in forming an economic opinion?
4     A.   It can be.
5     Q.   How --
6     A.   I mean, in terms of if you feel that
7   there's an economic reason to believe that as well,
8   it may be informative of that.
9     Q.   Help me understand what -- if you believe
10  that there's an economic reason, in your answer,
11  means.
12     A.   So I -- I -- what I'm saying is you have
13  a -- an economic argument to say this is why they
14  don't control the employees in terms of the terms
15  and conditions of their employment, and here are
16  parallel services or industries in which that kind
17  of behavior is done.
18         As a footnote, I believe in my
19  report I said Tammy Gold does not see herself as
20  that either.  So it's not that I'm using that to
21  make -- prove my conclusion, but it is supportive of
22  that in the sense of saying even plaintiffs' witness
23  does not see this kind of relationship to be an
24  employment relationship.
25     Q.   And so you credit Ms. Gold's testimony?

Page 455

1     A.   In a footnote, yeah.
2     Q.   Let's move down to paragraph 4.
3   Paragraph 4 on Exhibit 13 says, "I agree to perform
4   the childcare responsibilities as outlined by CC and
5   my host family up to" -- "to the best of my
6   ability."
7         To you, does that indicate that an
8   au pair is agreeing to be supervised by both
9   Cultural Care and the host family?
10     A.   I can't say one way or another.  I -- to
11  interpret this contract that way.  I -- I could see
12  this just being a way of making sure they understand
13  that is part of the participation.
14     Q.   Do economists, when -- strike that.
15         Next sentence, "I understand that
16  providing childcare is my primary obligation in this
17  program, and that any personal plans or activities
18  will take secondary priority to caring for my host
19  children."
20         Now, is that statement consistent
21  with your report?
22     A.   I think it is, yes.
23     Q.   Okay.  So you think it is not relevant
24  one way or another whether childcare is the primary
25  obligation of the au pair program; is that right?

Page 456

1     A.   I'm saying in the program, their
2   obligation as part of that program is to provide
3   childcare and -- and to not put them -- their own
4   needs over the -- the kids and the family.
5     Q.   And a contract between Cultural Care --
6   Cultural Care and the au pair is spelling that out,
7   right?
8     A.   It is.  But, again, you know, I would
9   point back to the regulations.  Defining their
10  duties, their expectations is required of Cultural
11  Care as a sponsor.
12     Q.   So, again, can you give me any examples
13  of a duty that might appear in a contract, that
14  could not be interpreted as somehow connected to
15  something in the regs?
16     A.   Not off the top of my head.  But if one
17  comes along...
18     Q.   Let's move down to paragraph 8, please.
19  The very end of that sentence -- that paragraph, my
20  mistake, the second-to-last sentence refers to an
21  Au Pair Handbook.  Do you see that?
22     A.   Yes.
23     Q.   Okay.  And then the next sentence talks
24  about CC'S policy.  Do you see that?
25     A.   Uh-huh.

**MAGNA**
LEGAL SERVICES

Page 457

1    Q.   Now, is imposing policies via a handbook
2 created by CC a factor that weighs in favor of
3 against finding CC a joint employer?
4    A.   And it would depend on the policy.
5    Q.   So you would need to see that Au Pair
6 Handbook?
7    A.   And look policy by policy.
8    Q.   Have you ever seen any of the defendants'
9 handbooks?
10    A.   I -- I've seen some of them, yes.
11    Q.   But you did not look policy by policy; is
12 that right?
13    A.   I did look at quite a few policies.  But
14 this was last summer, so I -- I would need a little
15 bit of a refresher on that.
16    Q.   Paragraph 10, "I understand that CC has
17 the exclusive right to determine my suitability for
18 acceptance and for my continued participation in the
19 program."
20         Is that statement consistent with
21 Cultural Care being a joint employer?
22    A.   No.
23    Q.   It's not consistent?
24    A.   No.
25    Q.   Why not?

Page 458

1    A.   Because Cultural Care is required to
2 screen all au pairs that participate in its program,
3 per the regulations that the Department of State has
4 given them, as well as that, you know, participation
5 in Cultural Care's program is dependent on Cultural
6 Care deciding that this person is meeting the
7 requirements of the Department of State.
8    Q.   Do you recall anything in the regs that
9 says that the sponsor needs to have the exclusive
10 right to determine suitability for acceptance and
11 for continued participation?
12    A.   I've seen things that imply that.  The
13 list of screening requirements that go into deciding
14 whether somebody's an acceptable au pair
15 candidate --
16    Q.   And so --
17    A.   -- for example.
18    Q.   So requirements handed down by the DOS
19 for screening are entrusted to CC exclusively?
20    A.   Or a -- or an entity that CC contracts
21 with.
22    Q.   Let's continue in paragraph 10 onto the
23 next page.  I'll go ahead and read the rest -- I
24 will -- I'll read the next sentence into the record.
25 "I understand that if CC determines that my

Page 459

1 emotional or physical state does not make me
2 suitable for providing quality childcare, I will be
3 removed from the program."
4         Dr. Newlon, didn't you testify
5 earlier that sponsors don't really care about the
6 quality of childcare?
7    A.   On a -- I said on a -- a day-to-day,
8 week-to-week basis.  But if somebody is having a
9 mental breakdown or becomes physically disabled,
10 that's what this seems to imply, is that on extreme
11 circumstances that they may be able to remove
12 somebody from the program who can't meet their
13 obligations.
14    Q.   Is it your testimony that the defendants
15 have no incentive to provide quality day-to-day
16 childcare?
17    A.   I think one -- there's an extreme, right?
18 There's -- there's basic levels of being able to do
19 a job of childcare that they are, as it says here,
20 obligated to do to be in the program, that they need
21 to meet those minimum requirements.
22         Whether they are defining quality
23 for the host families in terms of day-to-day
24 performance, that's not what I see here.
25    Q.   As a matter of economics, in a

Page 460

1 competitive, well-functioning market, isn't it true
2 that firms will compete on quality?
3    A.   Most products or -- or services, they
4 would compete on aspects of the good, and it can
5 include quality of the good.  They may compete just
6 on price, though.
7    Q.   But more likely than not in a
8 competitive, well-functioning market, firms will
9 differentiate from one another on quality, price,
10 and other axes; isn't that right?
11    A.   Yeah, they can.  Or -- or you could have
12 a situation, like, with vitamins, where basically
13 they seem all the same.
14    Q.   Like a commodity?
15    A.   Yeah.
16    Q.   And tell me how commodity pricing works.
17    A.   You know, I -- that's not something I --
18 I want to sit and discuss right now, about how
19 commodity -- commodity prices are determined in the
20 market and -- and bidding and -- and -- and
21 purchasing of them.
22    Q.   Okay.  I would like you to accept for
23 just a moment plaintiffs' contention that defendants
24 have, independent of the Department of State,
25 created something standardized called a standard

PLAINTIFFS' RESP. APP.0004827

MAGNA

LEGAL SERVICES

Page 461

1    au pair and that they have attempted to price it
2    uniformly.
3            Do you view that as an attempt to
4    commoditize a market?
5            MS. KRUZER:  Objection.  Outside the
6    scope.
7    A.    That's not something that I have thought
8    of, so I -- I can't give an opinion on that.  I'd
9    need to think more about the process that's involved
10   and the hypothetical that you've set up.
11   Q.    In a well-functioning market, as a
12   general matter, do firms have an incentive to
13   commoditize a product?
14   A.    Not necessarily, if they can be able to
15   price their commodity or their -- their product, I'm
16   going to say, differently by differentiating it.
17   They could make -- they can have a little bit of
18   monopoly power and -- and price above their marginal
19   costs.  So there's incentive to also differentiate
20   your product as different.
21   Q.    So in a well-functioning market you would
22   expect differentiation as to quality and price,
23   correct?
24   A.    You can have that on -- on aspects of the
25   product that aren't necessarily quality.

Page 462

1            (Telephone interruption.)
2    A.    So, for example, Coke versus Pepsi.  It's
3    subjective as to the quality difference, though I'm
4    sure everybody has an opinion about that.  But it's
5    just a different product, but definitely quality can
6    come into play.
7    Q.    And -- strike that.
8            So I'd like to move to near the
9    middle of paragraph 10 at the top of the page ending
10   Bates CC00033090.  And I'm going to start with
11   the -- well, actually, you know what, I'm going to
12   start with the first new sentence on the carryover,
13   paragraph 10.
14           "If my performance as an au pair
15   and/or participation in the program is deemed
16   unsats" -- "unsatisfactory by CC for whatever
17   reason, CC will reassess my suitability for future
18   placement."
19           Did I get that right?
20   A.    Yes.
21   Q.    Okay.  And is that a requirement imposed
22   by DOS?
23   A.    I could see it relating to the ability to
24   control their program.  In particular I think it is
25   really referring to the issue about future placement

Page 463

1    and saying that if it -- if this person didn't seem
2    to fit well in the program, they will choose not
3    to -- to automatically accept them into, say, an
4    extension or if they come back in two years.  And --
5    and that has to do with control of their program.
6    Q.    It also entails control over the
7    au pairs' employment, does it not?
8    A.    Not necessarily because they could go
9    and -- and be placed by another sponsor agency.
10   Q.    So you don't think it has anything to do
11   with an au pair's employment?
12   A.    I don't see how -- it doesn't -- I mean,
13   this particular sentence doesn't say they're going
14   to be removing them from the host family that
15   they're placed with.  It just says future placement.
16   So it just says they -- they choose not to include
17   them in their program again.
18   Q.    And it's your testimony that that does
19   not -- that has nothing to do with whether Cultural
20   Care acts as an employer?
21   A.    I think -- my interpretation is that it's
22   consistent with my argument that Cultural Care is
23   worried about their program, they're worried about
24   placements, and they're worried about the quality of
25   placements, not necessarily the work.

Page 464

1            So, for example, if the person
2    wasn't particularly suited to a cultural exchange.
3    Because that's something that they focus on, is
4    trying -- for example, the -- the personality tests
5    that are required.  It's the expectation is to try
6    and find people that are particularly well suited
7    for a cultural exchange.
8            And I could see this as falling
9    under that rubric in the sense that they have now
10   more information about this person because they've
11   been in the program, and they're reserving the right
12   to say we don't want you to be in the program in the
13   future if we figure out that you really weren't
14   suited.
15   Q.    That relates to the suitability -- or
16   strike that.
17           Isn't what you just said about the
18   quality of the -- what you contend is the au pair's
19   employment with the host family?
20   A.    I -- what I had just said relates to the
21   program as a cultural exchange and having a certain
22   dimension to it.  If -- that could have overlap with
23   the services which the au pairs provide to the host
24   families.
25           But that, again, isn't going to be

MAGNA
LEGAL SERVICES