# Exhibit X

(replacing ECF No. 943-48)

Case No. 1:14-cv-03074-CMA-KMT Document 859-25 filed 02/30/18 USDC Colorado pg 2 of 700

# Exhibit 438

PLAINTIFFS' RESP. APP.0004829

1          IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLORADO
2
    Civil Action No. 14-cv-03074-CMA-KMT
3    _____

4    VIDEOTAPE DEPOSITION OF:   JOHANA PAOLA BELTRAN
                                August 30, 2016
5    _____

6    JOHANA PAOLA BELTRAN; LUSAPHO HLATSHANENI; BEAUDETTE
     DEEELEFS; DAYANNA PAOLA CARDENA CAICEDO; ALEXANDRA
7    IVETTE GONZALEZ; on behalf of themselves and others
     similarly situated,
8
     Plaintiffs,
9
     v.
10
     INTEREXCHANGE, INC.; USAUPAIR, INC.; GREATAUPAIR, LLC;
11   EXPERT GROUP INTERNATIONAL INC., d/b/a EXPERT AUPAIR;
     EURAUPAIR INTERCULTURAL CHILD CARE PROGRAMS; CULTURAL
12   HOMESTAY INTERNATIONAL; CULTURAL CARE, INC. d/b/a
     CULTURAL CARE AU PAIR; AUPAIRCARE INC.; AU PAIR
13   INTERNATIONAL, INC.; APF GLOBAL EXCHANGE, NFP d/b/a
     AUPAIR FOUNDATION; AMERICAN INSTITUTE FOR FOREIGN STUDY
14   d/b/a AU PAIR IN AMERICA; AMERICAN CULTURAL EXCHANGE,
     LLC, d/b/a GOAUPAIR; AGENT AU PAIR, INC.; A.P.EX.
15   AMERICAN PROFESSIONAL EXCHANGE, LLC d/b/a PROAUPAIR;
     and 20/20 CARE EXCHANGE, INC. d/b/a THE INTERNATIONAL
16   AU PAIR EXCHANGE, and ASSOCIATES IN CULTURAL EXCHANGE,
     d/b/a GOAUPAIR,
17
     Defendants.
18   _____

19

20

21

22   H+G

23

24   Hunter + Geist, Inc.

25

303.832.5966        1900 Grant Street, Suite 1025        ■ www.huntergeist.com
800.525.8490        Denver, CO 80203                     ■ scheduling@huntergeist.com

Your Partner in Making the Record

Court Reporting, Legal Videography, and Videoconferencing

PLAINTIFFS' RESP. APP.0004830

**JOHANA PAOLA BELTRAN - 8/30/2016**
**Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.**

---

**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-03074-CMA-KMT
_____

VIDEOTAPE DEPOSITION OF:  JOHANA PAOLA BELTRAN
August 30, 2016
_____

JOHANA PAOLA BELTRAN; LUSAPHO HLATSHANENI; BEAUDETTE
DEEELEFS; DAYANNA PAOLA CARDENA CAICEDO; ALEXANDRA
IVETTE GONZALEZ; on behalf of themselves and others
similarly situated,

Plaintiffs,

v.

INTEREXCHANGE, INC.; USAUPAIR, INC.; GREATAUPAIR, LLC;
EXPERT GROUP INTERNATIONAL INC., d/b/a EXPERT AUPAIR;
EURAUPAIR INTERCULTURAL CHILD CARE PROGRAMS; CULTURAL
HOMESTAY INTERNATIONAL; CULTURAL CARE, INC. d/b/a
CULTURAL CARE AU PAIR; AUPAIRCARE INC.; AU PAIR
INTERNATIONAL, INC.; APF GLOBAL EXCHANGE, NFP d/b/a
AUPAIR FOUNDATION; AMERICAN INSTITUTE FOR FOREIGN STUDY
d/b/a AU PAIR IN AMERICA; AMERICAN CULTURAL EXCHANGE,
LLC, d/b/a GOAUPAIR; AGENT AU PAIR, INC.; A.P.EX.
AMERICAN PROFESSIONAL EXCHANGE, LLC d/b/a PROAUPAIR;
and 20/20 CARE EXCHANGE, INC. d/b/a THE INTERNATIONAL
AU PAIR EXCHANGE, and ASSOCIATES IN CULTURAL EXCHANGE,
d/b/a GOAUPAIR,

Defendants.
_____

---

**2**

PURSUANT TO NOTICE, the videotape
deposition of JOHANA PAOLA BELTRAN was taken on behalf
of the Defendant InterExchange, Inc., at 633 17th
Street, Suite 3000, Denver, Colorado 80202, on
August 30, 2016, at 9:13 a.m., before Carol M.
Bazzanella, Registered Professional Reporter, Certified
Realtime Reporter, and Notary Public within Colorado.

A P P E A R A N C E S

For the Plaintiffs:

ALEXANDER HOOD, ESQ.
DAVID SELIGMAN, ESQ.
Towards Justice
1535 High Street, Suite 300
Denver, Colorado 80218

For the Defendant InterExchange, Inc.:
BROOKE A. COLAIZZI, ESQ.
ERICA L. HERRERA, ESQ.
Sherman & Howard L.L.C.
633 17th Street, Suite 3000
Denver, Colorado 80202

For the Defendant Expert Group International Inc. d/b/a
Expert AuPair:
BOGDAN ENICA, ESQ.
Law Office of Bogdan Enica
111 2nd Avenue NE, Suite 213
St. Petersburg, Florida 33701
(Appearing Telephonically)

For the Defendant EurAuPair Intercultural Child Care
Programs:
MARTHA L. FITZGERALD, ESQ.
Brownstein Hyatt Farber Schreck, LLC
410 17th Street, Suite 2200
Denver, Colorado 80202

---

**3**

For the Defendant Cultural Homestay International:
ADAM H. HUBBARD, ESQ.
Holland & Hart LLP
555 17th Street, Suite 3200
Denver, Colorado 80202

For the Defendant Cultural Care, Inc. d/b/a Cultural
Care Au Pair:

JUSTIN WOLOSZ, ESQ.
Choate Hall & Stewart LLP
Two International Place
Boston, Massachusetts 02110
(Appearing Telephonically)

DIANE HAZEL, ESQ.
Lewis Roca Rothgerber Christie LLP
1200 17th Street, Suite 3000
Denver, Colorado 80202

For the Defendant AuPairCare, Inc.:

BRIAN P. MASCHLER, ESQ.
Gordon Rees Scully Mansukhani LLP
555 17th Street, Suite 3400
Denver, Colorado 80202
(Appearing Telephonically)

For the Defendant APF Global Exchange, NFP:
LAWRENCE LEE, ESQ.
Fisher & Phillips LLP
1801 California Street, Suite 2700
Denver, Colorado 80202

For the Defendants Agent Au Pair, American Cultural
Exchange, LLC d/b/a GoAupair and Associates in Cultural
Exchange, d/b/a GoAupair:
KATHRYN A. REILLY, ESQ.
Wheeler Trigg O'Donnell LLP
370 17th Street, Suite 4500
Denver, Colorado 80202

---

**4**

For the Defendant A.P.EX. American Professional
Exchange, LLC d/b/a ProAuPair and 20/20 Care Exchange,
Inc., d/b/a The International Au Pair Exchange:

KATHLEEN CRAIGMILE, ESQ.
Nixon Shefrin Hensen Ogburn, P.C.
5619 DTC Parkway, Suite 1200
Greenwood Village, Colorado 80111
(Appearing Telephonically)

Also Present:

Justin Grant
John Jensen, Videographer
Christine LaMonica-Lunn
Michael McHugh
Jack Mudry, Interpreter

---

PLAINTIFFS' RESP. APP 0004831

**Hunter + Geist, Inc.**
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

JOHANA PAOLA BELTRAN - 8/30/2016
Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.

---

**5**

                I N D E X
EXAMINATION OF JOHANA PAOLA BELTRAN:          PAGE
August 30, 2016

By Ms. Colaizzi                              9, 209

By Ms. Reilly                                   200

By Mr. Hood                                      201

                                            INITIAL
DEPOSITION EXHIBITS:                        REFERENCE
Exhibit 15  Plaintiff's, Johana Paola Beltran,   17
            Answers to Defendant's First Set
            of Interrogatories
Exhibit 16  First Amended Complaint              75
Exhibit 17  The Au Pair Exchange Program Brochure 109
Exhibit 18  InterExchange Au Pair USA Au Pair   109
            Agreement

Exhibit 19  Blank InterExchange Au Pair USA     129
            Record of Hours Worked and Payment
            Received

Exhibit 20  22 C.F.R. 62.31 Au pairs            143
            Effective:  July 21, 2008
Exhibit 21  Brochure, Know Your Rights          146
Exhibit 22  Email to Hughes from Ung,           162
            11/21/12, Subject: FW: Re-matching,
            with email attached
Exhibit 23  Email to Ung from Beltran,          169
            12/5/12, no subject, with two
            emails attached
Exhibit 24  Email to Beltran from Ung, 1/2/13,  171
            Subject: Re: Important: Immediate
            Response Needed, with two emails
            attached

**6**

Exhibit 25  United States General Accounting    191
            Office Report to Congressional
            Committees, U.S. Information Agency
            Inappropriate Uses of Educational
            and Cultural Exchange Visas,
            February 1990

Invoking of Protective Order:

Page,  Line

33      16
34       5
35      22
45      10
47       4
47      16
105     17
119     15
127     13
172     16
181     19

**7**

08:15:26   1        WHEREUPON, the following proceedings were
08:15:26   2   taken pursuant to the Federal Rules of Civil Procedure.
08:15:26   3        *     *     *     *     *
08:15:26   4        (At this time Mr. Maschler was not
08:15:26   5   present.)
09:13:47   6        THE VIDEOGRAPHER:  Good morning.  We are
09:13:48   7   on the record.  The time is 9:13 a.m. on August 30,
09:13:53   8   2016.  This is the beginning of Media Unit No. 1.  We
09:13:57   9   are here for the videotaped deposition of Johana Paola
09:14:01  10   Beltran in the matter of Johana Paola Beltran, et al.,
09:14:07  11   versus InterExchange, Inc., et al., in the United
09:14:11  12   States District Court for the District of Colorado,
09:14:13  13   Civil Action No. 14-cv-30 -- excuse me --
09:14:19  14   03074-CMA-KMT.
09:14:23  15        The deposition is being held at 633 17th
09:14:26  16   Street, Suite 3000, Denver, Colorado.  The videographer
09:14:31  17   is John Jensen and the court reporter is Carol
09:14:34  18   Bazzanella with Hunter + Geist, Inc., of Denver,
09:14:37  19   Colorado.
09:14:38  20        Please note that audio and video recording
09:14:40  21   will take place until all parties have agreed to go off
09:14:42  22   the record.  Microphones are sensitive and may pick up
09:14:46  23   whispers, private conversations, and cellular
09:14:48  24   interference.
09:14:49  25        Will counsel please state their

**8**

09:14:51   1   appearances, beginning with the plaintiffs' counsel.
09:14:53   2        MR. HOOD:  Alexander Hood and David
09:14:55   3   Seligman for the plaintiffs.
09:14:58   4        MS. COLAIZZI:  Brooke Colaizzi and Erica
09:14:59   5   Herrera of Sherman & Howard on behalf of Defendant
09:14:59   6   InterExchange.  Also present are Michael McHugh and
09:15:05   7   Christine LaMonica-Lunn, representatives of
09:15:08   8   InterExchange.
09:15:08   9        MR. HUBBARD:  Adam Hubbard on behalf of
09:15:12  10   Cultural Homestay International.
09:15:14  11        MR. LEE:  Lawrence Lee on behalf of AIFS
09:15:17  12   and APF.
09:15:19  13        MS. HAZEL:  Diane Hazel on behalf of
09:15:20  14   Cultural Care.
09:15:21  15        MS. REILLY:  Katie Reilly on behalf of
09:15:21  16   GoAupair, Agent Aupair, and Au Pair International.
09:15:26  17        MS. FITZGERALD:  Martha Fitzgerald on
09:15:28  18   behalf of EurAuPair.
09:15:30  19        MS. COLAIZZI:  If we could have
09:15:32  20   appearances on the phone, please.
09:15:35  21        MS. CRAIGMILE:  Kathleen Craigmile on
09:15:37  22   behalf of A.P.EX, American Professional Exchange, and
09:15:39  23   20/20 Care Exchange.
09:15:44  24        MR. ENICA:  And Bogden Enica on behalf of
09:15:47  25   Expert Au Pair.

PLAINTIFFS' RESP. APP 0004832

JOHANA PAOLA BELTRAN - 8/30/2016
**Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.**

---

9

09:15:49 1      MR. WOLOSZ:  And also Justin Wolosz on
09:15:50 2  behalf of Cultural Care.
09:16:09 3      THE REPORTER:  I'm going to swear in
09:16:09 4  the depo -- or the interpreter first.
09:16:09 5      JACK MUDRY,
09:16:09 6  having been duly sworn to interpret verbatim Spanish
09:16:09 7  into English and English into Spanish.
09:16:10 8      THE INTERPRETER:  Jack Mudry, M-u-d-r-y.
09:16:10 9  I will state for the record I'm an interpreter for the
09:16:15 10  State of Colorado and a federally certified interpreter
09:16:17 11  since 2003.  I do not know the parties in this matter,
09:16:22 12  either organizations or individually, and I have no
09:16:26 13  interest in the outcome of the matter.
09:16:51 14      THE REPORTER:  I'm going to swear in the
09:16:51 15  deponent.
09:16:51 16      JOHANA PAOLA BELTRAN,
09:16:51 17  having been first duly sworn to state the whole truth,
09:16:51 18  testified as follows:
09:16:51 19      EXAMINATION
09:16:51 20  BY MS. COLAIZZI:
09:16:51 21      Q.  Good morning, Ms. Beltran.
09:16:55 22      A.  Good morning.
09:16:56 23      Q.  We have an interpreter here at the request
09:16:59 24  of your counsel.  My understanding is you wish to
09:17:09 25  proceed in Spanish; is that correct?

---

10

09:17:14 1      A.  Yes.
09:17:15 2      Q.  If that's the case, I'll ask that all
09:17:17 3  questions be translated into Spanish before you give an
09:17:21 4  answer.  Is that acceptable?
09:17:31 5      A.  That's fine.
09:17:33 6      Q.  Please state and spell your name for the
09:17:35 7  record.
09:17:41 8      A.  My name is Johana Paola Beltran.
09:17:47 9      Q.  Can you spell your name, please.
09:17:50 10      A.  J-o-h-a-n-a.  P-a-o-l-a.  My last name is
09:18:14 11  B-e-l-t-r-a-n.
09:18:17 12      Q.  Ms. Beltran, a moment ago you were placed
09:18:20 13  under oath.  Did you understand that oath?
09:18:33 14      A.  Yes.
09:18:33 15      Q.  And do you have a general understanding of
09:18:35 16  what will happen here today?
09:18:44 17      A.  Yes.
09:18:44 18      Q.  Have you ever given a deposition before?
09:18:53 19      A.  No.
09:18:59 20      Q.  I would like to go over a few rules just
09:19:02 21  to make today go as smoothly as possible for everyone.
09:19:14 22  As I said before, I'm going to ask that all questions
09:19:16 23  be translated before you respond so that we have a
09:19:19 24  clear record.  Is that acceptable?
09:19:30 25      A.  Yes.

---

11

09:19:31 1      Q.  It's very important that only one person
09:19:33 2  talk at a time whenever possible, so please allow the
09:19:43 3  interpreter to finish the translation before you begin
09:19:45 4  your answer.
09:19:53 5      A.  That's fine.
09:19:53 6      Q.  Okay.  We also need audible answers from
09:19:56 7  you so that the court reporter can accurately record
09:19:58 8  your response.  So if I ask you to verbalize your
09:20:09 9  answer, that's why I'm asking.  I'm not trying to be
09:20:12 10  rude, I just want to make sure we have a clear record.
09:20:27 11      THE DEPONENT:  (In English)  Uh-huh.
09:20:27 12      Q.  (BY MS. COLAIZZI)  Can you give me a
09:20:28 13  verbal answer?
09:20:30 14      A.  Yes.
09:20:31 15      Q.  Gracias.
09:20:33 16      THE DEPONENT:  Gracias.
09:20:33 17      Q.  (BY MS. COLAIZZI)  If you do not
09:20:35 18  understand a question, please tell me so that I can ask
09:20:39 19  it again or rephrase it.
09:20:45 20      A.  Thank you.
09:20:46 21      Q.  If you don't ask me to rephrase, I'm going
09:20:49 22  to assume that you understand.  Is that fair?
09:21:00 23      A.  Yes.
09:21:03 24      Q.  We have people listening in on the
09:21:06 25  telephone this morning.

---

12

09:21:08 1      THE DEPONENT:  (In English)  Uh-huh.
09:21:12 2      Q.  (BY MS. COLAIZZI)  So although I know it
09:21:14 3  can be difficult, please try to keep your voice up
09:21:17 4  today so that everybody can hear.
09:21:24 5      A.  That's fine.
09:21:26 6      Q.  We'll take breaks periodically, but if you
09:21:29 7  need one before we take a formal break, please let me
09:21:33 8  know.
09:21:43 9      A.  Thank you.
09:21:45 10      Q.  My next question is designed only to make
09:21:49 11  sure that we can proceed today.  Are you under the
09:21:58 12  influence of drugs, alcohol, or any medication or other
09:22:04 13  substances that might affect your ability to understand
09:22:09 14  or answer my questions today?
09:22:11 15      A.  No.
09:22:22 16      Q.  Are there any other circumstances you're
09:22:24 17  aware of that might affect your ability to understand
09:22:29 18  or answer my questions today?
09:22:35 19      A.  No.
09:22:40 20      Q.  Did you review any documents in
09:22:42 21  preparation for your deposition?
09:22:50 22      A.  No.
09:22:53 23      Q.  Did you speak with anyone other than your
09:22:55 24  attorneys in preparation for your deposition?
09:23:03 25      A.  No.

---

3 (Pages 9 to 12)

**JOHANA PAOLA BELTRAN - 8/30/2016**
**Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.**



Page 13

09:23:06  1    Q.  Did you watch any videos or listen to any
09:23:11  2    audio recordings of any kind in preparation for your
09:23:14  3    deposition?
09:23:20  4    A.  No.
09:23:24  5    Q.  At any other time have you reviewed
09:23:27  6    documents that have been exchanged back and forth
09:23:30  7    between the parties in this case?
09:23:40  8    A.  No.
09:23:44  9    Q.  To your knowledge, have any documents in
09:23:46  10   this case been translated into Spanish for your
09:23:50  11   benefit?
09:23:59  12   A.  No.
09:24:03  13   Q.  Ms. Beltran, what is your date of birth?
09:24:11  14   A.
09:24:15  15   Q.  And what is your current address?
09:24:23  16   A.  What does that mean?
09:24:25  17

Page 14

09:25:24  1

Page 15

09:26:58

Page 16

09:29:07

4 (Pages 13 to 16)

PLAINTIFFS' RESP. APP 0004834

**JOHANA PAOLA BELTRAN - 8/30/2016**
**Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.**



**17**

09:30:45    (redacted)

(Deposition Exhibit 15 was marked.)

09:32:15  15   MS. COLAIZZI: We have one copy for your
09:32:15  16  side. If you need more, let me know, we'll see what we
09:32:17  17  can do.
09:32:18  18   THE DEPONENT: Thank you.
09:32:18  19   Q. (BY MS. COLAIZZI) Ms. Beltran, you've
09:32:19  20  been handed what's been marked as Exhibit 1 -- oh, I'm
09:32:24  21  sorry. 15. My apologies.
09:32:36  22   THE DEPONENT: (In English) Uh-huh.
09:32:36  23   Q. (BY MS. COLAIZZI) The title of the
09:32:37  24  document is Plaintiff's, Johana Paola Beltran, Answers
09:32:45  25  to Defendant's (sic) First Set of Interrogatories. Do

**18**

09:32:56   1  you recognize this document?
09:33:02   2   A. One moment for me to look at it, please.
09:33:04   3   Q. Of course.
09:33:06   4   (The deponent perused the exhibit.)
09:33:30   5   A. Yes.
09:33:30   6   Q. You have seen this document before. Have
09:33:32   7  you read this document before today?
09:33:42   8   A. Can you repeat the question?
09:33:45   9   Q. I believe you said a moment ago you've
09:33:47  10  seen this document before. Have you read this document
09:33:48  11  before today?
09:34:01  12   A. Not very long ago.
09:34:02  13   Q. Okay. Do you remember how long ago?
09:34:06  14   A. No.
09:34:08  15   Q. Can you please turn to page 8 of
09:34:09  16  Exhibit 15.
09:34:37  17   A. Yeah.
09:34:38  18   Q. Is that your signature at the bottom of
09:34:39  19  page 8?
09:34:45  20   A. It is.
09:34:47  21   Q. And would you agree with me that the date
09:34:49  22  on page 8 is August 11, 2016?
09:35:05  23   A. I'm reading it. Yes.
09:35:19  24   THE INTERPRETER: The interpreter
09:35:20  25  corrects. The interpreter said page 15. It should be

**19**

09:35:24   1  page 8.
09:35:25   2   Q. (BY MS. COLAIZZI) Did you read Exhibit 15
09:35:27   3  prior to signing Exhibit 15?
09:35:39   4   A. Yes.
09:35:40   5   Q. Could you please turn to page 5 of
09:35:41   6  Exhibit 15. Do you see Interrogatory 7 in the middle
09:35:59   7  of the page on page 5 of Exhibit 15?
09:36:16   8   A. You mean to say this part here or the one
09:36:19   9  below?
09:36:20  10   Q. The part that's labeled Interrogatory 7.
09:36:27  11   A. I'm looking at it.
09:36:30  12   Q. Okay. The third line from the bottom of
09:36:35  13  your response refers to a partner. The sentence
09:36:49  14  states, "Beltran states that she has communicated with
09:36:51  15  her partner regarding this lawsuit." Do you see that?
09:37:14  16   A. The third line?
09:37:17  17   Q. From the bottom of your answer, yes.
09:37:23  18   A. Right here?
09:37:25  19   Q. Where it references partner.
09:37:29  20   THE INTERPRETER: The interpreter would
09:37:29  21  like to clarify. The interpreter is using one word for
09:37:33  22  the word "partner," but partner in Spanish can also be
09:37:36  23  a business partner, which would be a different word.
09:37:43  24   MS. COLAIZZI: The only word we have is
09:37:44  25  partner.

**20**

09:37:47   1   MR. HOOD: Perhaps we could use both
09:37:48   2  words, since there are two words that could mean the
09:37:50   3  same thing.
09:38:01   4   THE DEPONENT: (In English) Okay.
09:38:02   5   A. Okay. Well, so what -- what those mean,
09:38:13   6  partner, socio, or a companion, which is the other one
09:38:18   7  for partner in English.
09:38:20   8    (redacted)

09:39:39  23   Q. In what circumstances have you asked him
09:39:41  24  for help?
09:39:48  25   A. What does that mean?

5 (Pages 17 to 20)

PLAINTIFFS' RESP. APP 0004835

**Hunter + Geist, Inc.**
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

JOHANA PAOLA BELTRAN - 8/30/2016
Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.

---

**21**

```
09:39:49   1        Q.  Were you looking at documents?  Were you
09:39:51   2    communicating with someone else when he was helping
09:39:54   3    you?  Under what circumstances was he helping you
09:39:56   4    understand?
09:40:00   5        A.  He was helping me to communicate with the
09:40:14   6    attorneys.
09:40:21   7        Q.  Has Mr. Salazar been present for all of
09:40:24   8    your communications with your attorneys?
09:40:32   9        A.  No.
09:40:37  10        Q.  Are you able to communicate with your
09:40:39  11    attorneys without Mr. Salazar's presence?
09:40:48  12        A.  Yes.
09:40:48  13        Q.  Are you able to communicate with your
09:40:51  14    attorneys without an interpreter of some sort?
09:41:03  15        A.  No.
09:41:23  16        Q.  Have you discussed anything about the
09:41:24  17    lawsuit with Mr. Salazar outside the presence of your
09:41:28  18    attorneys?
09:41:29  19        MR. HOOD:  I'm going to object.  To the
09:41:31  20    extent any communication with Mr. Salazar was merely
09:41:35  21    for him to translate for the purposes of communicating
09:41:38  22    with your attorney, I instruct the witness not to
09:41:40  23    answer.  To the extent any communications with
09:41:44  24    Mr. Salazar were for anything else, the witness may
09:41:46  25    answer.
```

**22**

```
09:42:11   1        A.  It was for the translation to English.
09:42:15   2        Q.  (BY MS. COLAIZZI)  What?  Translation of
09:42:15   3    what to English?
09:42:17   4        MR. HOOD:  I'm going to object again and
09:42:19   5    instruct the witness that to the extent any
09:42:22   6    communication with Mr. Salazar was for the purposes of
09:42:25   7    translation to communicate with her attorney, that she
09:42:27   8    should not answer the question on attorney-client
09:42:30   9    privilege grounds.  To the extent -- I'm sorry.  Why
09:42:33  10    don't we do it in pieces.
09:42:53  11        To the extent any communications with
09:42:55  12    Mr. Salazar were for the purposes of doing anything
09:42:59  13    other than communicating with her attorney, I instruct
09:43:05  14    the witness that she may answer.
09:43:17  15        Q.  (BY MS. COLAIZZI)  Let me ask it this way.
09:43:18  16    I understand you to say that Mr. Salazar has served as
09:43:21  17    an interpreter for you when you are communicating with
09:43:24  18    your attorneys; is that correct?
09:43:42  19        A.  Can you repeat that question, please.
09:43:45  20        Q.  I understand that Mr. Salazar has served
09:43:48  21    as an interpreter for you when you are communicating
09:43:51  22    with your attorneys.  Is that correct?
09:44:05  23        A.  I don't understand the question.
09:44:06  24        MR. HOOD:  I'm going to ask for a break so
09:44:08  25    that I may instruct my witness as to how she may invoke
```

**23**

```
09:44:12   1    privilege and to which questions she should answer.
09:44:15   2        MS. COLAIZZI:  I'm fine.  That's fine.
09:44:16   3        MR. HOOD:  All right.  Five minutes.
09:44:30   4        THE DEPONENT:  Thank you.
09:44:31   5        THE VIDEOGRAPHER:  Going off the record.
09:44:33   6    The time is 9:44 a.m.
09:44:41   7        (Recess taken, 9:44 a.m. to 9:59 a.m.)
09:59:34   8        THE VIDEOGRAPHER:  We are back on the
09:59:35   9    record.  The time is 9:59 a.m.
09:59:40  10        Q.  (BY MS. COLAIZZI)  Ms. Beltran, has
09:59:42  11    Mr. Salazar served as an interpreter for you during
09:59:47  12    communications with your attorneys?
09:59:51  13        A.  Can you repeat the question?
10:00:06  14        Q.  Has Mr. Salazar served as an interpreter
10:00:10  15    for you while you've been communicating with your
10:00:12  16    attorneys?
10:00:17  17        A.  No.
10:00:18  18        Q.  Has Mr. Salazar ever translated any
10:00:25  19    documents related to this lawsuit for you from English
10:00:29  20    into Spanish?
10:00:40  21        A.  No.
10:00:43  22
```

**24**

```
10:01:08   1
```

**JOHANA PAOLA BELTRAN - 8/30/2016**
**Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.**



---

**25**

```
10:02:54

                                              look, please,
10:04:53  22   at Exhibit 15.
10:05:02  23       A.   This one?
10:05:05  24       Q.   Sí.  Page 5.
10:05:08  25            MR. HOOD:  Brooke, do you have another
```

---

**26**

```
10:05:11   1   copy of the exhibit?
10:05:17   2            MS. COLAIZZI:  We'll see.
10:05:18   3            MR. HOOD:  If we could just have two
10:05:20   4   copies of the exhibits just so that David could have a
10:05:23   5   copy too.
10:05:25   6            MR. SELIGMAN:  Thank you.
10:05:26   7            THE INTERPRETER:  And the interpreter
10:05:28   8   would request, if we're going to go over large segments
10:05:32   9   of that document, it would be helpful for the
10:05:35  10   interpreter to have a copy as well to be able to look
10:05:36  11   at it to make sure the rendition is correct of what's
10:05:37  12   being asked.
10:05:38  13            MS. COLAIZZI:  Erica, let's just do
10:05:40  14   document by document, please.
10:05:41  15            MS. HERRERA:  Okay.
10:05:41  16            MR. HOOD:  The priority can obviously be
10:05:44  17   the interpreter.
10:05:45  18            MS. COLAIZZI:  Sure.  Hang on.  We've just
10:05:47  19   got to figure it out.
10:05:53  20            MS. HERRERA:  It's the answers to the
10:05:54  21   first set of interrogatories?
10:05:58  22            MS. COLAIZZI:  Yes.
10:06:00  23            MS. HERRERA:  Here.
10:06:01  24            MS. COLAIZZI:  That's all right.  He can
10:06:01  25   give it to --
```

---

**27**

```
10:06:03   1            MR. LEE:  It's right here.
10:06:05   2            MS. COLAIZZI:  That's fine.  Good.
10:06:06   3            MR. HOOD:  You could give a copy to David.
10:06:08   4   Thank you.  Oh, I have one.  Thank you.
10:06:19   5            MS. COLAIZZI:  Okay.  Are we good?
10:06:20   6            MR. HOOD:  We're good.
10:06:21   7            MS. COLAIZZI:  Okay.
10:06:23   8       Q.   (BY MS. COLAIZZI)  Ms. Beltran, you state
10:06:24   9   in response to Interrogatory 7 that you communicated
10:06:27  10   with your partner, whom you've identified as
10:06:30  11   Mr. Orlando Salazar, regarding the lawsuit.  What have
10:06:50  12   you discussed with Mr. Salazar about the lawsuit?
10:06:54  13            MR. HOOD:  I'm going to instruct --
10:06:54  14   objection; attorney-client privilege.  I understand she
10:06:57  15   said previously that she had not -- that he had not
10:07:00  16   acted as a translator, but I know that he has.  And to
10:07:04  17   the extent that Mr. Salazar has acted as a translator
10:07:07  18   for Ms. Beltran to her attorneys, I instruct her not to
10:07:11  19   answer the question.  To the extent -- sorry.  We'll go
10:07:14  20   in two parts.
10:07:36  21            To the extent that the question calls for
10:07:39  22   conversations with Mr. Salazar where he was not acting
10:07:40  23   as an interpreter with -- for your attorneys, between
10:07:44  24   you and your attorneys, I instruct the witness to
10:07:46  25   answer the questions.
```

---

**28**

```
10:08:11   1       Q.   (BY MS. COLAIZZI)  Let's go back.  Has --
10:08:16   2   has Mr. Salazar interpreted for you during
10:08:19   3   communications with your attorneys?
10:08:33   4       A.   I don't want to talk about that because of
10:08:36   5   my privilege.
10:08:38   6       Q.   You have to answer that question.  There
10:08:39   7   was no communication involved in that question.
10:08:41   8            MR. HOOD:  I instruct the witness to
10:08:42   9   answer yes or no to that question.
10:08:49  10       A.   Can you repeat the question, please.
10:08:52  11       Q.   (BY MS. COLAIZZI)  Has Mr. Salazar
10:08:53  12   interpreted for you during communications with your
10:08:55  13   attorneys?
10:09:03  14       A.   Yes.
10:09:03  15       Q.   How many times?
10:09:06  16       A.   I don't remember.
10:09:07  17       Q.   Does he interpret for you every time you
10:09:11  18   communicate with your attorneys?
10:09:17  19       A.   No.
10:09:20  20       Q.   Does somebody else interpret -- interpret
10:09:22  21   for you when you communicate with your attorneys if
10:09:25  22   Mr. Salazar is not present?
10:09:33  23            MR. HOOD:  Objection.  I instruct the
10:09:34  24   witness that she may identify the names of people who
10:09:37  25   translated for her, but that she may not reveal the
```

---

**7 (Pages 25 to 28)**

**JOHANA PAOLA BELTRAN - 8/30/2016**
**Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.**

---

### Page 29

10:09:42 1 contents of the communications.

10:10:00 2 THE DEPONENT: That's fine.

10:10:03 3 Q. (BY MS. COLAIZZI) Who interprets for you

10:10:04 4 when you speak with your attorneys if Mr. Salazar is

10:10:06 5 not present?

10:10:17 6 A. Justin.

10:10:20 7 Q. Does Justin have a last name?

10:10:24 8 A. Yes, but I don't remember it. I don't

10:10:28 9 know how to pronounce it.

10:10:29 10 Q. And who is Justin?

10:10:35 11 A. He works with Alex. The interpreter.

10:10:38 12 Q. Okay. Other than Mr. Orlando Salazar and

10:10:42 13 Justin, who works with Mr. Hood, has anyone served as

10:10:46 14 an interpreter for you during communications with your

10:10:49 15 attorneys?

10:11:00 16 A. No.

10:11:02 17 Q. Other than times when Mr. Salazar has been

10:11:05 18 interpreting for you during communications with your

10:11:07 19 attorneys, have you had communications with Mr. Orlando

10:11:21 20 Salazar about this lawsuit?

10:11:30 21 A. Can you repeat the question, please.

10:11:32 22 Q. Other than situations in which Mr. Salazar

10:11:35 23 is interpreting for you for purposes of communicating

10:11:38 24 with your attorneys, have you talked to Mr. Salazar

10:11:51 25 about this lawsuit in any way?

### Page 30

10:12:00 1 A. No.

10:12:00 2 Q. So why did you identify him in response to

10:12:04 3 Interrogatory No. 7?

10:12:15 4 A. Because he helped me to translate into

10:12:17 5 English.

10:12:18 6 Q. Any other reason?

10:12:21 7 A. No.

10:12:26 8 Q. Are there any other individuals other than

10:12:29 9 your lawyers that you've talked to about this lawsuit

10:12:32 10 in any way?

10:12:39 11 A. No.

10:12:41 12 Q. Prior to signing Exhibit 15 you read it,

10:12:44 13 correct?

10:12:52 14 A. Yes.

10:12:53 15 Q. Did you read it in English?

10:12:57 16 A. Yes.

10:12:57 17 Q. Were you able to understand it?

10:13:02 18 A. Yes.

10:13:02 19 Q. Was there any part of Exhibit 15 you did

10:13:05 20 not understand when you read it?

10:13:14 21 A. No. I don't think so.

10:13:20 22 Q. Are you currently taking education classes

10:13:23 23 of some sort?

10:13:33 24 A. Yes.

10:13:33 25 Q. Through what school?

### Page 31

10:13:39 1 A. Union County College.

10:13:43 2 Q. How many classes are you taking currently?

10:13:56 3 A. A full-time student.

10:13:58 4 Q. So how many classes?

10:14:06 5 A. Three.

10:14:09 6 Q. Are you pursuing a degree of some sort?

10:14:17 7 A. Yes.

10:14:18 8 Q. What is the degree that you're seeking?

10:14:22 9 A. Biology.

10:14:27 10 Q. And how long have you been attending Union

10:14:32 11 County College?

10:14:38 12 A. Around two-and-a-half years.

10:14:42 13 Q. And how much -- how many more classes do

10:14:45 14 you need to take to complete your degree in biology?

10:15:00 15 A. I don't know how many classes, but it's

10:15:02 16 two-and-a-half years more.

10:15:06 17 Q. Since November of 2012, when you ended

10:15:11 18 your participation in the au pair program, have you

10:15:24 19 attended any schools other than Union County College?

10:15:33 20 A. Yes.

10:15:34 21 Q. What other schools have you attended?

10:15:40 22 A. UCA.

10:15:42 23 Q. What is UCA? Can you . . .

10:15:48 24 A. English classes.

10:15:49 25 Q. And where were you taking the English

### Page 32

10:15:52 1 classes?

10:15:56 2 A. In New Jersey.

10:15:59 3 Q. How many English classes did you take?

10:16:04 4 A. I don't remember.

10:16:05 5 Q. When did you take them?

10:16:09 6 A. I don't remember.

10:16:11 7 Q. Do you remember the year?

10:16:14 8 A. No.

10:16:15 9 Q. Was it 2012?

10:16:21 10 A. I don't know.

10:16:22 11 Q. Was it before or after you got your

10:16:25 12 student visa?

10:16:33 13 A. It was there that I got my student visa.

10:16:36 14 Q. What do you mean, it was there that you

10:16:38 15 got your student visa?

10:16:43 16 A. I presented my documents to be able to

10:16:45 17 study.

10:16:46 18 Q. Okay. So you took the English classes

10:16:48 19 after getting your student visa; is that correct?

10:16:56 20 A. Yes.

10:16:56 21 Q. Okay. Other than your biology degree at

10:17:02 22 Union County College and your English classes, have you

10:17:05 23 attended any other schools since November of 2012?

10:17:22 24 A. No.

10:17:29 25 Q. Have you been back to Colombia at all

---

8 (Pages 29 to 32)

PLAINTIFFS' RESP. APP 0004838

JOHANA PAOLA BELTRAN - 8/30/2016
Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.



33

10:17:32  1   since November of 2012?
10:17:38  2       A.  Yes.
10:17:38  3       Q.  When?
10:17:45  4       A.  I went a year and a half ago.
10:17:49  5       Q.  So 2014?
10:17:53  6       A.  Around there.
10:17:53  7       Q.  Okay.  Have you been back more than once?
10:18:01  8       A.  Yes.
10:18:02  9       Q.  So you went in 2014.  When else have you
10:18:05  10  returned to Colombia?
10:18:21  11      A.  I don't remember, but after I got my
10:18:23  12  student visa I went to Colombia.
10:18:28  13      Q.  Were you in the United States continuously
10:18:31  14  between November 2012 and when you got your student
10:18:34  15  visa?
10:18:43  16      MR. HOOD:  I'm going to mark the answer to
10:18:45  17  this question as confidential under the protective
10:18:49  18  order.  But I instruct the witness to answer.
10:18:57  19      A.  Can you repeat the question, please.
10:18:59  20      Q.  (BY MS. COLAIZZI)  Were you in the United
10:19:01  21  States continuously between November 2012 and when you
10:19:04  22  got your student visa?
10:19:17  23      A.  Yes.
10:19:17  24      Q.  After completing your biology degree, do
10:19:20  25  you intend to remain in the United States or return to

34

10:19:23  1   Colombia?
10:19:33  2       A.  To return to Colombia.
10:19:36  3

35

10:21:38  1

36

10:23:54  1

9 (Pages 33 to 36)

PLAINTIFFS' RESP. APP 0004839

JOHANA PAOLA BELTRAN - 8/30/2016
Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.



37

10:25:47
[redacted]

10:27:05  15    Q.  How did you first learn about the au pair
10:27:09  16  program?
10:27:17  17    A.  A friend.
10:27:18  18

[redacted]

38

10:27:47
[redacted]

10:29:14  21    Q.  Did she tell you anything about the hours
10:29:16  22  you would work?
10:29:23  23    A.  No.
10:29:23  24    Q.  Did she tell you anything about the
10:29:25  25  stipend?

39

10:29:31   1    A.  What's the stipend?
10:29:33   2    Q.  The stipend is the amount you made per
10:29:36   3  week as an au pair.
10:29:42   4    A.  No.
10:29:45   5    Q.  Did Ms. [redacted] tell you anything about
10:29:47   6  the job -- or about the duties you would perform for
10:29:50   7  the host family as an au pair?
10:30:06   8    A.  What family?  My family?
10:30:09   9    Q.  Any host family.  Did she generally
10:30:11  10  describe the job duties she expected to perform for the
10:30:16  11  host family?
10:30:17  12    A.  Yes.
10:30:24  13    Q.  And what did she tell you?
10:30:30  14    A.  Play with the kids, take them to school,
10:30:36  15  and helping them to organize their rooms.
10:30:42  16    Q.  Anything else that she told you?
10:30:47  17    A.  Helping them to do their homework.
10:30:51  18    Q.  Anything else?
10:30:53  19    A.  No.
10:30:57  20    Q.  Do you recall Ms. [redacted] telling you
10:30:59  21  anything else about the au pair program other than what
10:31:01  22  we've just discussed?
10:31:10  23    A.  No.
10:31:14  24    Q.  Prior to you, yourself applying for the
10:31:17  25  program, other than Ms. [redacted] did you speak with

40

10:31:22   1  anyone about the au pair program?
10:31:34   2    A.  No.
10:31:36   3    Q.  Did you do any research about the program
10:31:38   4  on your own before applying?
10:31:48   5    A.  Not really.
10:31:51   6    Q.  "Not really" suggests that maybe you did.
10:31:53   7  Did you or did you not do any research on your own
10:31:56   8  prior to applying?
10:32:10   9    A.  I just looked at their link.
10:32:12  10    Q.  What do you mean by "their link"?
10:32:18  11    A.  Their web page.
10:32:20  12    Q.  Whose web page?
10:32:23  13    A.  InterExchange.
10:32:26  14    Q.  Why did you look at InterExchange's
10:32:30  15  website as opposed to any other sponsor?
10:32:32  16    A.  'Cause my friend recommended it to me.
10:32:40  17    Q.  Was that friend Ms. [redacted]
10:32:44  18    A.  It is.
10:32:45  19    Q.  Was she being sponsored by InterExchange?
10:32:52  20    A.  I think so.
10:32:54  21    Q.  Other than InterExchange, did Ms. [redacted]
10:32:58  22  recommend any other sponsors to you?
10:33:06  23    A.  No.
10:33:09  24    Q.  You said you looked at InterExchange's
10:33:12  25  website.  What specific information did you look at on

10 (Pages 37 to 40)

PLAINTIFFS' RESP. APP 0004840

## 41

```
10:33:16   1   their website?
10:33:36   2      A.  Well, it was going to offer an opportunity
10:33:39   3   to go abroad to study and also to have a family with
10:33:44   4   which to share things.
10:33:50   5      Q.  What else did you look at or read on
10:33:53   6   InterExchange's website prior to applying for the
10:33:56   7   au pair program?
10:34:13   8      A.  In exchange for the work doing -- with the
10:34:15   9   kids and helping them, that they would give us a tip to
10:34:23  10   be able to study.
10:34:24  11      Q.  Did you read on InterExchange's website
10:34:27  12   how much you would receive for your education as part
10:34:30  13   of the au pair program?
10:34:31  14      A.  Nowhere.
10:34:47  15      Q.  When you were looking at the InterExchange
10:34:50  16   website, did you read anything about job duties that
10:34:53  17   you might be expected to perform for the host family?
10:35:15  18      A.  No.  It just said that we would help --
10:35:19  19   specifically we'd help the children, help them with the
10:35:23  20   children.
10:35:23  21      Q.  When you were looking on the InterExchange
10:35:26  22   website, did you read anything about the hours you
10:35:29  23   might be asked to work as part of the au pair program?
10:35:39  24      A.  No.
10:35:40  25      Q.  When you were looking at the InterExchange
```

## 42

```
10:35:42   1   website, did you read anything about how much money you
10:35:46   2   might make from the host families as part of the
10:35:50   3   au pair program?
10:36:00   4      A.  No.
10:36:03   5      Q.  Is there anything else that you recall
10:36:06   6   reading or looking at on the InterExchange website
10:36:08   7   before you applied for the au pair program?
10:36:20   8      A.  No.
10:36:27   9      Q.  Other than InterExchange, did you look
10:36:30  10   into any of the other sponsors of the
10:36:34  11   au pair program?
10:36:45  12      A.  No.
10:36:47  13      Q.  Other than what you were told by your
10:36:50  14   friend Ms. ███████ and the research you did on the
10:36:55  15   InterExchange website, did you look at anything or read
10:36:57  16   anything about the au pair program before you applied?
10:37:14  17      A.  No.
10:37:18  18      Q.  At any time prior to applying for the au
10:37:21  19   pair program, did you look at the -- at the U.S.
10:37:24  20   Department of State's website?
10:37:25  21      A.  No.
10:37:39  22      Q.  At any -- have you ever been on the
10:37:41  23   Department of State's website?
10:37:48  24      A.  What is that?
10:37:50  25      Q.  Do you know what the U.S. Department of
```

## 43

```
10:37:52   1   State is?
10:38:03   2      A.  I don't understand.
10:38:05   3      Q.  Do you know what the -- I'm just asking if
10:38:07   4   you know what the Department of State is?  The
10:38:09   5   U.S. -- United States Department of State.
10:38:17   6      A.  No.
10:38:20   7      Q.  Do you understand that the au pair program
10:38:22   8   is run by the U.S. Government?
10:38:35   9      A.  Yes.
10:38:35  10      Q.  What is your understanding of the U.S.
10:38:37  11   Government's involvement in the au pair program?
10:38:52  12      A.  They are the ones that approve the visas.
10:38:56  13      Q.  Other than approving visas, do you have
10:38:58  14   any belief as to the U.S. Government's involvement in
10:39:02  15   the au pair program?
10:39:05  16      A.  No.
10:39:22  17      Q.  Before you decided to apply to become an
10:39:24  18   au pair, did you discuss your decision with anyone,
10:39:28  19   your family, friends, anybody like that?
10:39:41  20      A.  Family.
10:39:42  21      Q.  Who in your family did you talk to?
10:39:47  22      A.  With my mom.
10:39:49  23      Q.  Anyone else?
10:39:51  24      A.  Sisters.
10:39:55  25      Q.  Anyone else?
```

## 44

```
10:39:57   1      A.  No.
10:40:00   2      Q.  Did they support your decision to apply to
10:40:02   3   become an au pair?
10:40:13   4      A.  Yes.
10:40:13   5      Q.  So you spoke with your family.  Any
10:40:15   6   friends that you spoke to other than Ms. ███████ prior
10:40:18   7   to applying?
10:40:28   8      A.  No.
10:40:30   9      Q.  Other than Ms. ███████ who I understand
10:40:34  10   was applying for the program, did you speak with
10:40:41  11   any -- anybody who had been an au pair before?  Prior
10:40:45  12   to applying.
10:41:03  13      A.  No.
10:41:08  14      Q.  Prior to actually arriving in Colorado to
10:41:13  15   live with the ███████ did you talk to any au pairs or
10:41:18  16   previous au pairs about their experience?
10:41:33  17      A.  No.
10:41:48  18      Q.  What did you hope to get from the au pair
10:41:51  19   program?  What experiences or benefit did you hope to
10:41:56  20   get?
10:42:05  21      A.  To learn a new language.
10:42:09  22      Q.  Anything else?
10:42:12  23      A.  And a new culture.
10:42:17  24      Q.  Anything else?
10:42:20  25      A.  New friends.
```

11 (Pages 41 to 44)

PLAINTIFFS' RESP. APP 0004841

**JOHANA PAOLA BELTRAN - 8/30/2016**
**Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.**



45

| | | |
|---|---|---|
| 10:42:24 | 1 | Q. Anything else? |
| 10:42:26 | 2 | A. No. |
| 10:42:28 | 3 | Q. Had you ever been to the United States |
| 10:42:29 | 4 | before you arrived to work and live with the ████ |
| 10:42:40 | 5 | A. No. |
| 10:42:44 | 6 | Q. How much English -- strike that. |
| 10:42:48 | 7 | |
| | | |
| | | |
| 10:43:02 | 10 | MR. HOOD: I'm going to mark the answer to |
| 10:43:03 | 11 | this question as confidential, but instruct the witness |
| 10:43:05 | 12 | to answer. |
| 10:43:07 | 13 | MS. COLAIZZI: Just -- |
| 10:43:08 | 14 | MR. HOOD: Under the protective order. I |
| 10:43:09 | 15 | apologize. |
| 10:43:17 | 16 | MS. COLAIZZI: Just -- just so I'm clear, |
| 10:43:20 | 17 | what's the grounds for the confidentiality reservation? |
| 10:43:24 | 18 | MR. HOOD: I don't think we have to |
| 10:43:26 | 19 | present our grounds now. |
| 10:43:27 | 20 | MS. COLAIZZI: Well, it's for purposes of |
| 10:43:28 | 21 | protecting confidential information. I'm just trying |
| 10:43:30 | 22 | to understand why you think it's confidential. |
| 10:43:33 | 23 | MR. HOOD: Well, you have the grounds to |
| 10:43:35 | 24 | challenge any markings under the protective order. |
| 10:43:38 | 25 | MS. COLAIZZI: Right. But I have to have |

46

| | | |
|---|---|---|
| 10:43:39 | 1 | a reason. So . . . |
| 10:43:41 | 2 | MR. HOOD: Well, we can -- that's for |
| 10:43:42 | 3 | motion practice. Right now I'd just like to mark |
| 10:43:44 | 4 | things as confidential, and if you disagree, we can |
| 10:43:47 | 5 | have that disagreement later. |
| 10:43:48 | 6 | MS. COLAIZZI: So you're not willing to |
| 10:43:50 | 7 | provide a reason for confidentiality designations? |
| 10:43:51 | 8 | MR. HOOD: I'm not going to provide a |
| 10:43:53 | 9 | reason each time I mark something as confidential, nor |
| 10:43:54 | 10 | do people provide a reason each time they mark a |
| 10:43:56 | 11 | document as confidential. I'd be happy to talk about a |
| 10:44:00 | 12 | way to do this more efficiently so it doesn't interrupt |
| 10:44:03 | 13 | your questions. |
| 10:44:04 | 14 | MS. COLAIZZI: No, I just -- I understand |
| 10:44:04 | 15 | before your issues. I'm just wondering now why this is |
| 10:44:09 | 16 | confidential. |
| 10:44:09 | 17 | MR. HOOD: I -- I think -- we have the |
| 10:44:09 | 18 | right to mark things as confidential, and you have the |
| 10:44:10 | 19 | ability to challenge it under the protective order. |
| 10:44:12 | 20 | But I would be happy to discuss ways to do this more |
| 10:44:15 | 21 | efficiently if you feel like it's interrupting your |
| 10:44:17 | 22 | questions. |
| 10:44:18 | 23 | MS. COLAIZZI: It's not interrupting. |
| 10:44:19 | 24 | I -- I just don't get it, frankly. |
| 10:44:21 | 25 | MR. HOOD: Okay. |

47

| | | |
|---|---|---|
| 10:44:24 | 1 | Q. |
| | | |
| 10:44:38 | 4 | MR. HOOD: And I mark the answer to this |
| 10:44:41 | 5 | question as confidential, but -- under the protective |
| 10:44:45 | 6 | order, but instruct the witness to answer the question. |
| 10:44:53 | 7 | |

48

| | | |
|---|---|---|
| 10:46:23 | 1 | |

12 (Pages 45 to 48)

PLAINTIFFS' RESP. APP 0004842

**Hunter + Geist, Inc.**
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

JOHANA PAOLA BELTRAN - 8/30/2016
Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.



13 (Pages 49 to 52)

PLAINTIFFS' RESP. APP 0004843

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

**JOHANA PAOLA BELTRAN - 8/30/2016**
**Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.**

---

53

```
10:56:06   1
           2
10:56:20   3            Q.  Have you ever heard the term "cultural
10:56:24   4   exchange" in connection with the au pair program?
10:56:36   5            MR. HOOD:  Objection as to the
10:56:38   6   translation.  I don't understand.
10:56:45   7            MR. GRANT:  He translated the name of
10:56:47   8   Cultural Exchange.
10:56:48   9            MR. HOOD:  What's wrong with that?
10:56:51  10            MR. GRANT:  Okay.  Excuse me.
10:56:53  11            MR. HOOD:  Okay.  Oh.  I withdraw the
10:56:55  12   objection.  I apologize.
10:56:58  13            THE DEPONENT:  I want to take a break.
10:56:59  14   Yeah?  Now?  Can I?
10:57:00  15            MS. COLAIZZI:  Let's finish -- let's
10:57:00  16   answer this question, and then we can take a break.
10:57:03  17            THE DEPONENT:  (In English)  Okay.
10:57:03  18            MS. COLAIZZI:  Can you read the question
10:57:04  19   back, please.
10:56:20  20            (The last question was read back as
10:56:20  21   follows:  "Have you ever heard the term 'cultural
10:56:24  22   exchange' in connection with the au pair program?")
10:57:22  23       A.  In Colombia or in the United States?
10:57:27  24       Q.  (BY MS. COLAIZZI)  At any time.
10:57:38  25       A.  Well, what I understand is that there --
```

54

```
10:57:39   1   when au pairs come here as an exchange to work and to
10:57:44   2   work as nannies, that that's a cultural exchange.
10:57:49   3       Q.  Does the term "culture exchange" have any
10:57:51   4   other meaning for you other than what you just
10:57:54   5   described?
10:57:57   6       A.  No.
10:58:01   7            MS. COLAIZZI:  Okay.  We can take a
10:58:03   8   ten-minute break.
10:58:08   9            THE VIDEOGRAPHER:  Going off the record.
10:58:09  10   This is the end of Media Unit No. 1 in the videotaped
10:58:12  11   deposition of Johana Paola Beltran.  The time is
10:58:17  12   10:58 a.m.  We are off the record.
10:58:22  13            (Recess taken, 10:58 a.m. to 11:14 a.m.)
11:14:54  14            THE VIDEOGRAPHER:  We are back on the
11:14:55  15   record.  This is the beginning of Media Unit No. 2 in
11:14:59  16   the videotaped deposition of Johana Paola Beltran.  The
11:15:03  17   time is 11:14 a.m.
11:15:06  18       Q.  (BY MS. COLAIZZI)  Ms. Beltran, a moment
11:15:08  19   ago off the record your counsel indicated that you
11:15:11  20   believe you were confused with respect to the questions
11:15:13  21   about the website that you looked at, so I'm going to
11:15:29  22   ask you some of the questions that we discussed before
11:15:34  23   so that we can have a clear record.
11:15:43  24            Prior to applying to become an au pair,
11:15:45  25   did you look at any websites as research for your
```

55

```
11:15:50   1   decision to apply to become an au pair?
11:16:04   2       A.  Yes.
11:16:04   3       Q.  How many?
11:16:08   4       A.  One.
11:16:09   5       Q.  Okay.  What was the entity or the agency
11:16:11   6   that hosted that website?
11:16:22   7       A.  I don't know.
11:16:23   8       Q.  Do you know the name of the company whose
11:16:25   9   website it was?
11:16:37  10       A.  I can show it to you.  It's on my
11:16:39  11   telephone, the one that I saw.
11:16:41  12       Q.  Okay.
11:16:54  13            MS. COLAIZZI:  Counsel, with your
11:16:55  14   permission, I would like to move it close to the video
11:16:58  15   camera so that we can have a record of it.
11:17:00  16            MR. HOOD:  Yeah, that would be fine.
11:17:04  17            THE VIDEOGRAPHER:  I -- I can't reach that
11:17:05  18   far.
11:17:06  19            MS. COLAIZZI:  Can you do that?  Can
11:17:06  20   anyone do it?  I mean, can you do it anyway?
11:17:07  21            THE VIDEOGRAPHER:  If you can bring the
11:17:07  22   phone closer to me.
11:17:07  23            MS. COLAIZZI:  Right.  Right.  That's what
11:17:08  24   I'm going to do.
11:17:09  25            MR. HOOD:  Oh.
```

56

```
11:17:09   1            MS. COLAIZZI:  Sorry.  That's what I
11:17:10   2   meant.
11:17:13   3            MR. HOOD:  Depositions in the digital era.
11:17:16   4            MS. COLAIZZI:  I'm going to take it to him
11:17:17   5   so he can get a picture.  Is that okay?
11:17:27   6            MR. HOOD:  Okay.  Yeah.  And, Brooke,
11:17:36   7   maybe it would make sense to read the URL into the
11:17:40   8   record.
11:17:40   9            MS. COLAIZZI:  I will.
11:18:03  10            THE DEPONENT:  You want me to go over
11:18:06  11   there and --
11:18:06  12            MS. COLAIZZI:  Is it fine if she comes
11:18:06  13   down?
11:18:09  14            MR. HOOD:  Absolutely.  Yeah.  Yeah.  You
11:18:11  15   could just -- yeah.  I could also take a picture of it
11:18:20  16   and email it to you, Brooke, if you'd like to just have
11:18:23  17   a paper . . .
11:18:27  18            MS. COLAIZZI:  We might do that.  I'd like
11:18:29  19   to -- if we could get a video of it, that makes more
11:18:33  20   sense.
11:18:35  21            MR. HOOD:  Okay.
11:19:06  22            THE VIDEOGRAPHER:  I think that's as good
11:19:08  23   as I'm going to get it.
11:19:10  24            MS. COLAIZZI:  I'm going to read it into
11:19:11  25   the record, if I may.  For the record, we have taken a
```

14 (Pages 53 to 56)

**Hunter + Geist, Inc.**
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

JOHANA PAOLA BELTRAN - 8/30/2016
Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.

---

57

11:19:23  1    video of Ms. Beltran's cell phone that has the website
11:19:26  2    pulled up. At the top it says, "Au Pair Exchange,"
11:19:30  3    www.aupaircol, c-o-l, .com. In the upper left-hand
11:19:37  4    corner there is a logo, Global Exchange.
11:19:41  5        Q. (BY MS. COLAIZZI) Ms. Beltran, thank you
11:19:54  6    for pulling the website up on your phone.
11:20:03  7        A. My pleasure.
11:20:05  8        Q. When you were looking at that website
11:20:06  9    prior to applying for an au pair, what prompted
11:20:10  10   you to go to that specific website?
11:20:32  11       A. Karina gave it to me to be able to look
11:20:34  12   for the address of their offices.
11:20:36  13       Q. When you say, "their offices," who are you
11:20:38  14   referring to?
11:20:42  15       A. Where you would go to apply for the
11:20:44  16   program.
11:20:47  17       Q. And were you specifically looking for the
11:20:49  18   office where you could apply to be sponsored by
11:20:54  19   InterExchange?
11:21:05  20       A. Yes.
11:21:05  21       Q. Have you ever at any point in time visited
11:21:11  22   InterExchange's website?
11:21:20  23       A. No.
11:21:22  24       Q. Other than Global Exchange, have you ever
11:21:26  25   visited any other website related to the au pair

---

58

11:21:29  1    program in any way?
11:21:40  2        A. No.
11:21:43  3        Q. Other than looking at the Global Exchange
11:21:45  4    website, did you do any other research or investigation
11:21:49  5    on your own prior to applying to become an au pair?
11:22:11  6        A. No.
11:22:14  7        Q. Thank you for allowing us to clarify.
11:22:20  8        A. No need to thank me.
11:22:26  9        Q. Where did you go to apply to become an
11:22:28  10   au pair?
11:22:36  11       A. Bogota.
11:22:39  12       Q. What specific location in Bogota?
11:22:48  13       A. Downtown Bogota.
11:22:50  14       Q. And how did you -- how did you learn that
11:22:54  15   that was the place you needed to go in order to apply?
11:23:05  16       A. Karina told me, and then I saw that it was
11:23:09  17   on the page.
11:23:09  18       Q. And by "page," are you referring to the
11:23:12  19   Global Exchange website that we just discussed a moment
11:23:14  20   ago?
11:23:22  21       A. Yes.
11:23:22  22       Q. Was anyone with you when you went to
11:23:24  23   apply?
11:23:31  24       A. No one.
11:23:33  25       Q. Did you fill out an application when you

---

59

11:23:36  1    visited the office in downtown Bogota?
11:23:45  2        A. The first day.
11:23:51  3           THE DEPONENT: (In English) No.
11:23:53  4        A. Not the first day.
11:23:53  5        Q. (BY MS. COLAIZZI) Okay. What happened
11:23:54  6    the first day you visited the office in downtown
11:23:57  7    Bogota?
11:24:06  8        A. They told me the price, the cost, and what
11:24:08  9    I'd have to do in terms of requirements.
11:24:13  10       Q. Do you recall what name was on the
11:24:15  11   building or the office that you visited in downtown
11:24:18  12   Bogota?
11:24:27  13       A. I don't remember.
11:24:29  14       Q. How many people did you speak with at the
11:24:31  15   office that first time you visited?
11:24:41  16       A. I think it was two.
11:24:43  17       Q. Do you remember their names?
11:24:45  18       A. No.
11:24:46  19       Q. Were they men or women?
11:24:50  20       A. One man and one woman.
11:24:57  21       Q. And what did they tell you about the
11:24:59  22   price?
11:25:07  23       A. That it did -- it didn't have to be paid
11:25:11  24   all the same day, that it could be done by payments.
11:25:14  25       Q. And what was the total amount that they

---

60

11:25:15  1    gave you that day?
11:25:26  2        A. I don't remember exactly, but I think that
11:25:30  3    they said it was about 5 million pesos.
11:25:35  4        Q. Do you know how much that was in U.S.
11:25:37  5    dollars?
11:25:42  6        A. No.
11:25:53  7        Q. And you also indicated that they talked to
11:25:57  8    you about what you would have to do, or the
11:25:57  9    requirements; is that correct?
11:26:06  10       A. Yes.
11:26:06  11       Q. What did they tell you about the
11:26:08  12   requirements?
11:26:13  13       A. I would have to take English classes.
11:26:19  14       Q. What else?
11:26:22  15       A. Swimming.
11:26:27  16       Q. What else?
11:26:29  17       A. First aid.
11:26:34  18       Q. And what else?
11:26:38  19       A. Driving classes.
11:26:43  20       Q. What else?
11:26:55  21       A. I would have to be enrolled in a school
11:26:57  22   like -- well, not a secondary school, but some sort of
11:27:01  23   university course.
11:27:03  24       Q. Was that university course something you
11:27:05  25   would take in Colombia?

---

15 (Pages 57 to 60)

PLAINTIFFS' RESP. APP 0004845

JOHANA PAOLA BELTRAN - 8/30/2016
Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.

---

61

```
11:27:13   1        A.  What do you mean by that?
11:27:14   2        Q.  When they talked about the university
11:27:18   3    course, were they talking about courses in Colombia or
11:27:23   4    courses in the United States?
11:27:29   5        A.  In Colombia.
11:27:32   6        Q.  And what was your understanding of why you
11:27:35   7    needed to take university classes in Colombia?
11:27:46   8        A.  Can you repeat the question?
11:27:48   9        Q.  What was your understanding of why you
11:27:50  10    needed to take university classes in Colombia before
11:27:54  11    becoming an au pair?
11:28:16  12        A.  That I had to be enrolled in an
11:28:18  13    institution there so that the American Embassy would
11:28:22  14    know that I was tied to there and that when I left, I
11:28:26  15    was going to come back and I wasn't going to remain
11:28:29  16    here.
11:28:30  17        Q.  You mentioned English classes, swimming,
11:28:33  18    first aid, driving, and university classes.
11:28:51  19        A.  Yes.
11:28:51  20        Q.  Did the two individuals that you spoke
11:28:54  21    with that first day give you any other requirements for
11:28:55  22    the au pair program?
11:29:06  23        A.  I don't remember.
11:29:08  24        Q.  When you visited the office that first
11:29:10  25    time did you know how to swim?
```

62

```
11:29:23   1        A.  Not very much.
11:29:24   2        Q.  Okay.  Had you ever taken a first aid
11:29:27   3    course before?
11:29:29   4        A.  Never.
11:29:32   5        Q.  And were you able to drive?
11:29:35   6        A.  No.
11:29:45   7        Q.  So did you take all of the classes that
11:29:47   8    the individuals told you you needed to in order to
11:29:51   9    become an au pair?
11:30:04  10        A.  Yes.
11:30:05  11        Q.  Did those -- did anybody in that office
11:30:06  12    that you visited help you in signing up for those
11:30:10  13    classes, or did you do that by yourself?
11:30:22  14        A.  They told us that we were the ones that
11:30:27  15    had to do everything.
11:30:29  16        Q.  Did anything else happen or did you talk
11:30:32  17    about anything else on that first visit to that office
11:30:35  18    in downtown Bogota?
11:30:44  19        A.  I don't -- I don't remember.
11:30:48  20        Q.  At that point did you know that there were
11:30:52  21    other J-1 visa sponsors other than InterExchange?
11:31:04  22        A.  No.
11:31:06  23        Q.  During that first visit to the office in
11:31:09  24    downtown Bogota did they give you any papers to take
11:31:11  25    with you?
```

63

```
11:31:22   1        A.  No.
11:31:28   2        Q.  And did you visit that office again?
11:31:35   3        A.  Yes.
11:31:36   4        Q.  What was -- how much -- or how long after
11:31:38   5    the first visit did you go back?
11:31:45   6        A.  I don't remember.
11:31:47   7        Q.  Did you do anything to meet the
11:31:50   8    requirements for the au pair program between that first
11:31:53   9    visit and the second visit?
11:32:00  10        A.  No.
11:32:05  11        Q.  And what happened during your second visit
11:32:06  12    to the office?
11:32:14  13        A.  I asked them how much the first payment
11:32:16  14    would be.
11:32:18  15        Q.  What did they tell you?
11:32:26  16        A.  What I remember was they told me it was --
11:32:29  17    that it was 500,000 pesos.
11:32:36  18        Q.  Did anybody from the office tell you what
11:32:38  19    the money that you were paying was for?
11:32:54  20        A.  No.
11:32:55  21        Q.  Did you ask?
11:32:59  22        A.  About the program.
11:33:01  23        Q.  You asked questions about the program?
11:33:05  24        A.  No.
11:33:08  25        Q.  What did you ask about?
```

64

```
11:33:12   1        A.  That day?
11:33:13   2        Q.  Yes, on the second visit.
11:33:18   3        A.  How much was the first payment that I
11:33:20   4    would need to pay.
11:33:21   5        Q.  Okay.  Did you understand what the payment
11:33:23   6    was for?
11:33:29   7        A.  The value of the program.
11:33:32   8        Q.  And you recall them telling you 500,000
11:33:40   9    pesos was the first payment?
11:33:45  10        A.  Yes.
11:33:45  11        Q.  Did anything else happen during that
11:33:47  12    second visit to the office?
11:33:53  13        A.  I don't remember.
11:33:55  14        Q.  Did you make a first payment of 500,000
11:33:59  15    pesos?
11:34:03  16        A.  Yes.
11:34:03  17        Q.  When did you make that first payment?
11:34:09  18        A.  I'm not sure.
11:34:11  19        Q.  Do you recall at all year, month,
11:34:12  20    anything?
11:34:20  21        A.  I think, but I'm not sure that it was in
11:34:23  22    2011.
11:34:24  23        Q.  Did you keep any records of the payments
11:34:26  24    that you made prior to becoming an au pair?
11:34:40  25        A.  Before?
```

16 (Pages 61 to 64)

PLAINTIFFS' RESP. APP 0004846

**JOHANA PAOLA BELTRAN - 8/30/2016**
**Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.**

---

65

```
11:34:41   1        Q.  At any time.  Did you keep any records of
11:34:43   2    what you paid?
11:34:49   3        A.  No.
11:34:50   4            MR. HOOD:  I'm going to object as to a
11:34:52   5    translation earlier in the record.  I'm sorry, I had my
11:34:57   6    microphone covered.  I'm going to object as to a
11:34:59   7    translation earlier in the record.  She used the word
11:35:02   8    "valor," which means value or cost.  It was translated
11:35:06   9    as value, but it could mean either.
11:35:10  10            MS. COLAIZZI:  Okay.
11:35:14  11            THE INTERPRETER:  Yes, the interpreter
11:35:16  12    agrees that it could mean either.  No problem if we
11:35:19  13    want to clarify that one.
11:35:21  14        Q.  (BY MS. COLAIZZI)  So you've talked about
11:35:28  15    two visits to the office in Bogota.
11:35:37  16        A.  Up until this moment, yes.
11:35:40  17        Q.  Did you visit again?
11:35:42  18        A.  Yes.
11:35:42  19        Q.  And do you recall when that third visit
11:35:44  20    was?
11:35:48  21        A.  No.
11:35:50  22        Q.  What was the purpose of the third visit?
11:35:55  23        A.  An interview.
11:35:59  24        Q.  At the time that you visited the office
11:36:00  25    the third time, had you already applied for the au pair
```

---

66

```
11:36:04   1    program?
11:36:13   2        A.  Yes.
11:36:14   3        Q.  When did you apply for the au pair
11:36:15   4    program?
11:36:22   5        A.  I don't remember very well, but I think it
11:36:24   6    was in 2011.
11:36:25   7        Q.  And did you fill out an application?
11:36:30   8        A.  I don't remember.
11:36:32   9        Q.  You don't recall filling out any kind of
11:36:35  10    paperwork to apply for the program?
11:36:44  11        A.  Yes.
11:36:44  12        Q.  Okay.  When -- where were you when you
11:36:47  13    filled out the paperwork for the program?
11:36:57  14        A.  Where was I?  Did you ask me that?
11:37:00  15        Q.  Yes.
11:37:03  16        A.  In Bogota.
11:37:03  17        Q.  Were you at home, were you at the office?
11:37:06  18    Where were you?
11:37:11  19        A.  When I filled out the application?
11:37:13  20        Q.  Correct.
11:37:14  21        A.  The office.
11:37:15  22        Q.  Okay.  We've talked so far about three
11:37:18  23    visits.  Did you fill out an application during one of
11:37:20  24    those visits?
11:37:29  25        A.  Yes.
```

---

67

```
11:37:29   1        Q.  Okay.  Did you fill out the application
11:37:30   2    before you made the first payment of 500,000 pesos?
11:37:39   3        A.  No.
11:37:41   4        Q.  Okay.  Did you make more than one payment
11:37:43   5    before you filled out the application?
11:37:52   6        A.  Can you repeat the question?
11:37:54   7        Q.  You've talked about one payment of 500,000
11:37:58   8    pesos.  Did you make --
11:38:00   9            MS. COLAIZZI:  Sorry.  Go ahead.
11:38:02  10        Q.  (BY MS. COLAIZZI)  Did you make more
11:38:03  11    payments before you filled out the application?
11:38:09  12        A.  No.
11:38:10  13        Q.  Okay.  So which visit was it, first,
11:38:13  14    second, or third, to the office during which you filled
11:38:16  15    out the application?
11:38:29  16        A.  I think it was the first one, because when
11:38:32  17    you pay, then that's when you become an au pair.
11:38:35  18        Q.  Okay.  So it was the first visit to the
11:38:37  19    office and after your first payment of 500,000 pesos?
11:38:46  20        A.  I think so.
11:38:47  21        Q.  Did you make any other payments?
11:38:53  22        A.  After.
11:38:53  23        Q.  Okay.  When you filled out the
11:38:56  24    application, did you do it on the computer or on paper?
11:39:06  25        A.  I don't remember.
```

---

68

```
11:39:08   1        Q.  Was anybody with you when you filled out
11:39:09   2    the application?
11:39:14   3        A.  No.
11:39:14   4        Q.  Was the application in English or in
11:39:17   5    Spanish?
11:39:20   6        A.  English.
11:39:21   7        Q.  Were you able to understand it?
11:39:26   8        A.  No.
11:39:26   9        Q.  Did you ask anyone for assistance?
11:39:32  10        A.  In the office.
11:39:33  11        Q.  Did they help you?
11:39:36  12        A.  Not a lot.
11:39:38  13        Q.  Did you seek out any other help to fill
11:39:41  14    out the application other than the individuals in that
11:39:42  15    office in downtown Bogota?
11:39:47  16        A.  No.
11:40:03  17
```

---

17 (Pages 65 to 68)

PLAINTIFFS' RESP. APP 0004847

JOHANA PAOLA BELTRAN - 8/30/2016
**Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.**

---

69

11:40:45   1



11:41:40  16      Q.  We've talked about three visits to the
11:41:42  17  office in downtown Bogota.  During any of these visits
11:41:51  18  did you talk about the money you would make from the
11:41:54  19  host family for being an au pair?
11:42:10  20      A.  No.
11:42:17  21      Q.  We've talked about three visits.  Did you
11:42:19  22  visit the office a fourth time?
11:42:27  23      A.  I don't remember.
11:42:29  24      Q.  You mentioned an interview occurred on the
11:42:32  25  third visit; is that correct?

---

70

11:42:40   1      A.  What's that?
11:42:43   2      MS. COLAIZZI:  Can you read the question
11:42:44   3  back, please.
11:42:29   4      (The last question was read back as
11:42:29   5  follows: "You mentioned an interview occurred on the
11:42:32   6  third visit; is that correct?")
11:42:57   7      A.  Yes.
11:42:59   8      Q.  (BY MS. COLAIZZI)  Was the interview in
11:43:00   9  English or in Spanish?
11:43:05  10      A.  Both of them.
11:43:07  11      Q.  At that point in time had you taken
11:43:09  12  English classes?
11:43:17  13      A.  Yes.
11:43:17  14      Q.  Who interviewed you?
11:43:22  15      A.  I don't remember.
11:43:23  16      Q.  Was it somebody who worked in that office
11:43:25  17  in downtown Bogota?
11:43:31  18      A.  Yes.
11:43:31  19      Q.  And was it just one person or more than
11:43:34  20  one person?
11:43:38  21      A.  One.
11:43:40  22      Q.  What do you recall about the questions
11:43:42  23  that were asked of you?
11:44:03  24      THE INTERPRETER:  Allow the interpreter to
11:44:05  25  clarify.

---

71

11:44:06   1      A.  Okay.  We talked about questions related
11:44:17   2  to what the consul might ask me about the au pair
11:44:24   3  program, and there were questions about babysitting.
11:44:28   4      Q.  (BY MS. COLAIZZI)  When you say questions
11:44:29   5  about the consul, what do you mean?
11:44:35   6      A.  The embassy.
11:44:38   7      Q.  Okay.  Do you recall any of the specific
11:44:40   8  questions that were presented to you that you might get
11:44:44   9  asked at the embassy?
11:44:58  10      A.  If I was studying in Colombia.
11:45:03  11      Q.  What else?
11:45:07  12      A.  And where I was going.
11:45:11  13      Q.  Meaning where you were traveling to?
11:45:14  14      A.  Yes.
11:45:15  15      Q.  What else?
11:45:19  16      A.  There were other questions that I don't
11:45:23  17  remember exactly.
11:45:24  18      Q.  Did the part of the interview related to
11:45:26  19  the embassy questions, was it in English or Spanish?
11:45:35  20      A.  In English.
11:45:36  21      Q.  Were you able to understand?
11:45:42  22      A.  Yes.  I had practiced with the agency.
11:45:47  23      Q.  Before the interview you had practiced
11:45:49  24  with the agency?
11:45:53  25      A.  Yes.

---

72

11:45:54   1      Q.  Okay.  And you also indicated that they
11:45:58   2  asked you questions about babysitting?
11:46:10   3      A.  Well, no.
11:46:12   4      Q.  At the interview at the office in downtown
11:46:15   5  Bogota on the third visit were you asked questions
11:46:18   6  about babysitting?
11:46:33   7      A.  Can you repeat the question?
11:46:36   8      Q.  Make sure we understand.  We're talking
11:46:37   9  about the interview that occurred on your third visit
11:46:40  10  to the office in downtown Bogota.  Okay?
11:46:52  11      A.  Yeah.
11:46:53  12      Q.  Okay.  You said a moment ago you were
11:46:55  13  asked questions that you might get asked at the embassy
11:46:59  14  and questions about babysitting; is that correct?
11:47:20  15      A.  No.
11:47:21  16      Q.  Okay.  What were you asked during that
11:47:24  17  interview on the third visit to the office in downtown
11:47:28  18  Bogota?
11:47:39  19      A.  About practicing for the interview with
11:47:41  20  the embassy.  Things about the kids, babysitting, if
11:47:56  21  they had a fight or something wasn't done right with
11:48:00  22  them, what had to be done to be able to handle the
11:48:04  23  situation.
11:48:05  24      Q.  Okay.  Other than a question about how you
11:48:09  25  would handle a fight between children, were there other

---

18 (Pages 69 to 72)

Case 1:14-cv-03074-CMA-KMT Document 948-25 Filed 03/17/18 USDC Colorado Page 21 of 700

JOHANA PAOLA BELTRAN - 8/30/2016
Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.

---

**73**

11:48:12   1   questions that you were asked about caring for children
11:48:16   2   during that interview at the office in downtown Bogota?
11:48:36   3       A.   I don't understand the question.
11:48:39   4       Q.   You said a moment ago that you were asked
11:48:41   5   a question about how you might handle a situation where
11:48:45   6   children were fighting; is that correct?
11:48:59   7       A.   Yes.
11:48:59   8       Q.   Were you asked other questions about
11:49:00   9   taking care of children during that interview?
11:49:11   10       A.   Yes.
11:49:11   11       Q.   What were you asked?
11:49:15   12       A.   If I had baby-sat for children before.
11:49:19   13       Q.   And how did you respond?
11:49:23   14       A.   That I had with my nephews.
11:49:28   15       Q.   Anything else in response to the question
11:49:29   16   about whether you had cared for children before?
11:49:38   17       A.   No.
11:49:39   18       Q.   Were you asked any other questions about
11:49:41   19   taking care of children during that interview at the
11:49:44   20   office in downtown Bogota?
11:49:53   21       A.   No.
11:49:55   22       Q.   Were you asked questions about anything
11:49:56   23   else during that interview at the office in downtown
11:49:59   24   Bogota?
11:50:07   25       A.   I don't remember.

---

**74**

11:50:12   1       Q.   Other than the interview, did anything
11:50:14   2   else happen or did you talk about anything else during
11:50:16   3   that third visit to the office in downtown Bogota?
11:50:34   4       A.   Or anything else? I don't know what you
11:50:35   5   mean by "anything else."
11:50:37   6       Q.   Did you talk to the people at the office
11:50:40   7   about anything else aside from having that interview
11:50:43   8   that day?
11:50:53   9       A.   No.
11:50:54   10       Q.   Did you visit the office in downtown
11:50:57   11   Bogota a fourth time?
11:51:05   12       A.   The truth is, to be truthful, I don't
11:51:08   13   remember.
11:51:08   14       Q.   Okay. Do you remember any visits to that
11:51:10   15   office in downtown Bogota after the third visit where
11:51:14   16   you had your interview?
11:51:16   17       A.   I don't remember.
11:51:33   18       Q.   At some point did you, in fact, have an
11:51:35   19   interview at the U.S. Embassy in Bogota?
11:51:45   20       A.   Yes.
11:51:45   21       Q.   Was the interview in English or in
11:51:47   22   Spanish?
11:51:51   23       A.   It was in English.
11:51:52   24       Q.   Did you have any problems responding to
11:51:54   25   the questions in English?

---

**75**

11:52:00   1       A.   No.
11:52:01   2       Q.   Did you have any problems understanding
11:52:03   3   the questions?
11:52:08   4       A.   No. I practiced beforehand.
11:52:13   5       Q.   Did anybody go with you to the embassy for
11:52:16   6   the interview?
11:52:20   7       A.   No.
11:52:23   8       Q.   When you practiced, did you practice with
11:52:24   9   someone?
11:52:31   10       A.   Yes.
11:52:32   11       Q.   Who did you practice with?
11:52:37   12       A.   With a person from the office where I
11:52:39   13   filled out my application.
11:52:41   14       Q.   How many times did you go to the office to
11:52:43   15   practice for the embassy interview?
11:52:53   16       A.   Once.
11:53:37   17       MS. COLAIZZI: Exhibit 16.
11:53:45   18       (Deposition Exhibit 16 was marked.)
11:53:45   19       THE DEPONENT: Thank you.
11:53:45   20       MS. HERRERA: First amended complaint?
11:53:48   21       MS. COLAIZZI: Yes.
11:53:49   22       Q.   (BY MS. COLAIZZI) Ms. Beltran, you've
11:53:55   23   been handed what's been marked as Exhibit 16. It's a
11:54:05   24   long document, so feel free to look at it, but I would
11:54:08   25   like to know if you've ever seen this before?

---

**76**

11:54:19   1       A.   Can I look at it?
11:54:21   2       Q.   Yes.
11:54:25   3       A.   Yes.
11:54:26   4       Q.   Have you read it before?
11:54:30   5       A.   Yes.
11:54:30   6       Q.   Have you read all of it?
11:54:35   7       A.   Yes.
11:54:36   8       Q.   Did you read it in English?
11:54:39   9       A.   Yes.
11:54:39   10       Q.   Were you able to understand it in English?
11:54:44   11       A.   Yes.
11:54:45   12       MR. HOOD: I'm going to object. To the
11:54:47   13   extent that your understanding of the -- on
11:54:49   14   attorney-client privilege grounds. To the extent that
11:54:51   15   your understanding of the document has anything to do
11:54:54   16   with conversations you had with an attorney -- would
11:54:57   17   you like me to break this into parts?
11:55:00   18       THE INTERPRETER: Yeah.
11:55:01   19       MR. HOOD: Can we start with that?
11:55:02   20       MS. COLAIZZI: Counsel, I just asked if
11:55:04   21   she understood it. I didn't ask about any
11:55:06   22   communications. So what's the objection?
11:55:07   23       MR. HOOD: If she were to follow up -- so
11:55:11   24   I'll instruct the witness that she can -- she can
11:55:13   25   respond yes or no, but not to respond as to the basis

---

19 (Pages 73 to 76)

**JOHANA PAOLA BELTRAN - 8/30/2016**
**Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.**

---

77

11:55:15   1   of her understanding.
11:55:30   2   Q. (BY MS. COLAIZZI) You indicated that you
11:55:32   3   did understand it, correct?
11:55:38   4   A. Yes.
11:55:38   5   Q. Okay. Can you please turn to page 68 of
11:55:42   6   Exhibit 16. And I would like you to look at paragraph
11:56:03   7   324. The last sentence of that paragraph reads:
11:56:16   8   "Ms. Beltran found the web of subcontractors, agents,
11:56:22   9   employees, and other entities affiliated with
11:56:25   10  InterExchange difficult to understand."
11:56:41   11  THE INTERPRETER: Okay. The interpreter
11:56:41   12  would like to clarify. The sentence "found the web of
11:56:45   13  subcontractors, agents, employees, and other entities
11:56:50   14  with InterExchange difficult to understand," is that
11:56:53   15  the connection web or is that the -- anything related
11:56:56   16  to website or -- the interpreter's not clear on the
11:57:01   17  meaning of that.
11:57:02   18  MS. COLAIZZI: It's not my complaint, but
11:57:03   19  my understanding is that it refers to an intermingling
11:57:08   20  of people, nothing connected to the Internet.
11:57:12   21  MR. HOOD: I think we can stipulate that
11:57:14   22  it means the connecting.
11:57:14   23  MS. COLAIZZI: Okay. Does that clarify?
11:57:17   24  THE INTERPRETER: Thank you.
11:57:18   25  MS. COLAIZZI: Okay.

---

78

11:57:18   1   THE INTERPRETER: The interpreter
11:57:20   2   thanks -- thanks you for that clarification.
11:57:37   3   Q. (BY MS. COLAIZZI) Is that a true
11:57:38   4   sentence?
11:57:42   5   MR. HOOD: The -- the -- I'm going to
11:57:44   6   instruct the witness on attorney-client privileged
11:57:47   7   grounds not to answer. She can answer yes or no to the
11:57:51   8   fact that it's true, but not to answer the basis for
11:57:55   9   that paragraph appearing in the complaint.
11:58:15   10  Q. (BY MS. COLAIZZI) Do you remember the
11:58:16   11  question?
11:58:19   12  A. Can you repeat it, please.
11:58:20   13  Q. Is that a true sentence?
11:58:26   14  A. Yes.
11:58:26   15  Q. Okay. What was confusing or difficult to
11:58:30   16  understand for you?
11:58:33   17  MR. HOOD: I'm going to object to the
11:58:35   18  question on attorney-client privileged grounds.
11:58:38   19  The -- the -- I will instruct my client not to respond
11:58:43   20  with respect to any discussions she had with her
11:58:47   21  attorney, but to the extent she -- she can respond to
11:58:51   22  the question without revealing any discussions she had
11:58:54   23  with her attorney, she may.
11:59:20   24  A. Can you repeat the question, please.
11:59:21   25  Q. (BY MS. COLAIZZI) What was difficult for

---

79

11:59:22   1   you to understand?
11:59:28   2   A. The documents that I filled out.
11:59:30   3   Q. Okay. Anything else?
11:59:33   4   A. No.
11:59:34   5   Q. Okay. This sentence refers to people,
11:59:37   6   subcontractors, agents, and employees. Was there
11:59:49   7   something confusing or difficult to understand about
11:59:51   8   the people that you interacted with?
12:00:05   9   A. I don't understand the question.
12:00:07   10  Q. Do you understand the sentence?
12:00:11   11  MR. HOOD: I'm going to object on
12:00:13   12  attorney-client privilege grounds. To the extent that
12:00:15   13  her understanding or lack of understanding of this
12:00:17   14  sentence requires her to reveal any discussions she's
12:00:20   15  had with her attorney, I'm going to instruct the
12:00:24   16  client -- my client not to respond. To the extent she
12:00:27   17  can respond without revealing any conversations she had
12:00:30   18  with her attorney, she may respond.
12:01:04   19  A. I can't answer that.
12:01:06   20  Q. (BY MS. COLAIZZI) Why not?
12:01:08   21  A. It's confidential.
12:01:09   22  Q. I'm not asking you to talk about anything
12:01:12   23  you talked about with your lawyer. I want to know if
12:01:14   24  you -- sitting here today you understand the sentence,
12:01:17   25  what it means?

---

80

12:01:33   1   MR. HOOD: I'm going to object on
12:01:35   2   attorney-client privilege grounds --
12:01:36   3   MS. COLAIZZI: Counsel --
12:01:37   4   MR. HOOD: -- and I'm going to ask for a
12:01:38   5   break to discuss with my client how she can respond to
12:01:41   6   questions about the complaint without violating client
12:01:45   7   confidences.
12:01:45   8   MS. COLAIZZI: I'm not asking about
12:01:46   9   communications. I want to know if she understands the
12:01:48   10  sentence.
12:01:50   11  MR. HOOD: Brooke, this is a ridiculous
12:01:51   12  line of questioning. She did not write the complaint.
12:01:54   13  She came to us, we had a confidential conversation, and
12:01:57   14  her attorneys assisted her in drafting the complaint.
12:02:01   15  To ask her if she understands sentences that were
12:02:03   16  drafted by attorneys after discussions with her that
12:02:05   17  are -- that are legal claims is a very tricky line of
12:02:08   18  questions. I'm happy to talk with her about how she
12:02:12   19  can talk about the facts in the complaint without --
12:02:15   20  without revealing attorney-client confidences.
12:02:16   21  MS. COLAIZZI: Well, we need to, because
12:02:17   22  if you're going to make representations about her
12:02:20   23  beliefs in the complaint, I'm entitled to examine her
12:02:22   24  about those. So --
12:02:22   25  MR. HOOD: Well, you can ask her about

---

20 (Pages 77 to 80)

PLAINTIFFS' RESP. APP 0004850

JOHANA PAOLA BELTRAN - 8/30/2016
Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.

---

81

```
12:02:23  1   those beliefs.
12:02:24  2        MS. COLAIZZI:  I did.  I asked her if she
12:02:27  3   understood what that sentence meant, if she agreed with
12:02:29  4   it.
12:02:31  5        MR. HOOD:  Well, but then she can say she
12:02:32  6   didn't --
12:02:32  7        MS. COLAIZZI:  She hasn't said anything
12:02:33  8   'cause you keep objecting and confusing the situation.
12:02:34  9   I'm not asking about any communications.  There's no
12:02:37 10   objection -- there's no question -- there's no
12:02:38 11   objectionable question.
12:02:38 12        MR. HOOD:  Well, why don't you give me
12:02:39 13   five minutes to talk to my client about how she can
12:02:42 14   respond to questions about the complaint without
12:02:45 15   revealing -- I mean, we had lengthy conversations that
12:02:48 16   are privileged that were the basis for drafting this
12:02:50 17   complaint, and it's a sticky situation for her, and
12:02:52 18   she's having difficulty understanding how to respond.
12:02:55 19   So we can -- I can go talk to her about how to do that
12:02:56 20   without violating privilege, and we'll be back in five
12:03:00 21   minutes.
12:03:00 22        MS. COLAIZZI:  Let's try to do it in five,
12:03:02 23   please.  We'll go off the record briefly.
12:03:07 24        THE VIDEOGRAPHER:  We're going off the
12:03:08 25   record.  The time is 12:02 p.m.
```

---

82

```
12:03:13  1        (Recess taken, 12:02 p.m. to 12:15 p.m.)
12:15:24  2        THE VIDEOGRAPHER:  We are back on the
12:15:25  3   record.  The time is 12:15 p.m.
12:15:29  4        MR. HOOD:  I've instructed my client off
12:15:31  5   the record that she may answer questions about the
12:15:35  6   complaint to the extent she can understand the
12:15:36  7   complaint with the help of her attorney, but that
12:15:39  8   she may not respond to questions regarding the
12:15:42  9   complaint to the extent they require her to reveal
12:15:49 10   attorney-client confidences.
12:16:20 11        For example, I instruct her not to answer
12:16:23 12   questions regarding why a particular paragraph or piece
12:16:26 13   of the complaint is in the complaint.
12:16:44 14        Q.  (BY MS. COLAIZZI)  And with my questions,
12:16:45 15   I'm not asking you about communications with your
12:16:47 16   counsel.  Please take another look at paragraph 324 on
12:16:57 17   page 68 of Exhibit 16, the last sentence that starts,
12:17:14 18   "Ms. Beltran found . . ."  As you sit here today, is
12:17:26 19   that sentence a true statement?
12:17:45 20        A.  Let me read it, please.
12:17:47 21        Q.  Sure.
12:17:55 22        A.  It is.
12:17:56 23        Q.  Okay.  What was -- explain to me what was
12:18:02 24   difficult to understand about subcontractors, agents,
12:18:08 25   and employees that you interacted with during the
```

---

83

```
12:18:11  1   application process for the au pair program.
12:18:26  2        A.  Can you repeat the question, please.
12:18:29  3        MS. COLAIZZI:  Can you read it back,
12:18:29  4   please.
12:18:00  5        (The last question was read back as
12:18:00  6   follows:  "Explain to me what was difficult to
12:18:03  7   understand about subcontractors, agents, and employees
12:18:09  8   that you interacted with during the application process
12:18:12  9   for the au pair program.")
12:19:03 10        A.  The documents, that all of them were in
12:19:06 11   English.
12:19:08 12        Q.  (BY MS. COLAIZZI)  Okay.  What else was
12:19:09 13   difficult to understand about the process?
12:19:19 14        A.  They weren't clear about the information.
12:19:23 15        Q.  Who is "they"?
12:19:30 16        A.  The people that were there attending to me
12:19:34 17   when I was filling out the application.
12:19:36 18        Q.  And the people were at the office in
12:19:38 19   downtown Bogota; is that correct?
12:19:44 20        A.  Yes.
12:19:44 21        Q.  When you say they weren't clear about the
12:19:47 22   information, explain to me what you mean.
12:19:59 23        A.  They never explained -- they never
12:20:00 24   explained to me, really, what the program was all
12:20:02 25   about.
```

---

84

```
12:20:03  1        Q.  Did you ask them questions?
12:20:06  2        A.  Yes.
12:20:07  3        Q.  What kind of questions did you ask them?
12:20:16  4        A.  Who would help me to comply with the
12:20:18  5   requirements for the program.
12:20:19  6        Q.  And when you say, "requirements," what
12:20:21  7   specifically are you referring to?
12:20:28  8        A.  About all the classes that I was supposed
12:20:30  9   to take.
12:20:31 10        Q.  Okay.  What else were they not clear about
12:20:33 11   in terms of the information about the program?
12:20:45 12        A.  At this time I can't recall.
12:20:48 13        Q.  During the application process, other than
12:20:50 14   the individuals who were at that office in downtown
12:20:53 15   Bogota, was there anybody else that you interacted with
12:20:56 16   or communicated with during that process about the
12:20:59 17   au pair program?
12:21:12 18        A.  When I was in Colombia?
12:21:16 19        Q.  Correct.
12:21:16 20        A.  No.  Just with them.
12:21:17 21        Q.  Okay.  How many different people at that
12:21:21 22   office did you communicate with during the application
12:21:21 23   process?
12:21:33 24        A.  That I can recall, two.
12:21:35 25        Q.  Okay.  Is there anything else about the
```

---

21 (Pages 81 to 84)

PLAINTIFFS' RESP. APP 0004851

**JOHANA PAOLA BELTRAN - 8/30/2016**
**Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.**

---

85

```
12:21:40  1    application process that you found to be confusing or
12:21:43  2    difficult to understand other than what we've just
12:21:45  3    talked about?
12:22:02  4         A.  It could be, but that was quite some time
12:22:05  5    ago, so I can't recall.
12:22:06  6         Q.  Okay.  So there's nothing else you
12:22:08  7    remember about that as you sit here today other than
12:22:10  8    what we've discussed?
12:22:21  9         A.  No.  No, I don't think so.
12:22:24 10         Q.  Can you turn back to Exhibit 15, please.
12:22:32 11         MR. HOOD:  I don't know if she has it in
12:22:34 12    front of her.  Oh, it's underneath.
12:22:40 13         Q.  (BY MS. COLAIZZI)  And I want to talk
12:22:41 14    about Interrogatory 2, which is on pages 2 and 3 of
12:22:46 15    Exhibit 15.  Why don't you -- let me ask you this.  I'd
12:23:00 16    like to refresh your recollection about the
12:23:04 17    question in Interrogatory 2 and the answer.  Are you
12:23:14 18    able to do that by reading, or do you want the
12:23:17 19    interpreter to translate it for you?
12:23:25 20         A.  Yes, can he help me, please.
12:23:27 21         Q.  Okay.
12:23:32 22         THE INTERPRETER:  Okay.  The interpreter
12:23:33 23    is looking at Interrogatory No. 2 and will then site
12:23:37 24    translate it into Spanish.
12:23:38 25         MS. COLAIZZI:  Thank you.
```

---

86

```
12:23:39  1         THE INTERPRETER:  You're welcome.
12:24:35  2         MS. COLAIZZI:  Thank you.  And then if you
12:24:38  3    could do the same with respect to Ms. Beltran's
12:24:39  4    response.
12:24:50  5         THE INTERPRETER:  The response begins at
12:24:52  6    the bottom of page 2.
12:26:35  7         MR. HOOD:  I'm going to object to the
12:26:38  8    translation only to the extent that "interchange" and
12:26:40  9    "InterExchange" were being used interchangeably, and my
12:26:45 10    understanding is all of those meant InterExchange.
12:26:48 11         MS. COLAIZZI:  I would agree with respect
12:26:49 12    to the second; however, the first one, there's a typo
12:26:53 13    in Ms. Beltran's response, so he did, in fact,
12:26:55 14    interpret it correctly.
12:26:57 15         MR. HOOD:  Okay.  Well --
12:26:57 16         MS. COLAIZZI:  But that's fine.
12:26:58 17         MR. HOOD:  Okay.  I apologize.
12:27:06 18         Q.  (BY MS. COLAIZZI)  I'd like to refer you
12:27:09 19    to the sentence towards the end of your response that
12:27:12 20    begins, "During her au pair interview . . ."  Are you
12:27:30 21    referring to the interview that you've already
12:27:33 22    described as having taken place during your third visit
12:27:55 23    to the office in downtown Bogota?
12:27:55 24         A.  Can you repeat the question?
12:27:57 25         MS. COLAIZZI:  Can you read it back,
```

---

87

```
12:27:59  1    please.
12:27:07  2         (The last question was read back as
12:27:07  3    follows:  "I'd like to refer you to the sentence
12:27:10  4    towards the end of your response that begins, 'During
12:27:12  5    her au pair interview . . .'  Are you referring to the
12:27:33  6    interview that you've already described as having taken
12:27:33  7    place during your third visit to the office in downtown
12:27:38  8    Bogota?")
12:28:39  9         A.  Yeah, that was the only interview.
12:28:40 10         Q.  (BY MS. COLAIZZI)  Okay.  And is that
12:28:44 11    sentence a true statement?
12:28:52 12         A.  Yes.
12:28:53 13         Q.  I want to describe for me the
12:28:55 14    conversation you had with the InterExchange
12:28:57 15    representative about what you would be paid per week.
12:29:15 16         A.  195 and 75 cents.
12:29:15 17         Q.  How did that conversation about the amount
12:29:21 18    come about?
12:29:28 19         A.  That was a long time ago, and I can't
12:29:31 20    remember very well.
12:29:32 21         Q.  Do you recall if the representative made
12:29:33 22    that statement to you on her -- on her or his own, or
12:29:38 23    did you ask about the weekly pay?
12:29:54 24         A.  It was within one of the agreements that I
12:29:56 25    signed with them.
```

---

88

```
12:29:57  1         Q.  Okay.  Did you discuss the amount with
12:29:59  2    anyone?
12:30:05  3         A.  No.
12:30:06  4         Q.  Did you ask any questions about the weekly
12:30:08  5    amount?
12:30:13  6         A.  No.
12:30:15  7         Q.  At the time of that interview was there
12:30:16  8    anything about the amount of 195.75 per week that
12:30:21  9    concerned you in any way?
12:30:36 10         A.  I don't understand the question.
12:30:38 11         Q.  When you heard during that interview that
12:30:40 12    you would be paid 195.75 per week, were you okay with
12:30:45 13    that?
12:31:04 14         A.  I didn't understand it very well, because
12:31:05 15    they told me in dollars.
12:31:07 16         Q.  Did you ask what that translated to in
12:31:10 17    pesos?
12:31:14 18         A.  No, they didn't tell me.
12:31:16 19         Q.  Did you ask?
12:31:18 20         A.  Yes.
12:31:18 21         Q.  And what did they tell you in response to
12:31:26 22    your question?
12:31:26 23         A.  No, they didn't explain it to me, and I
12:31:29 24    don't remember.
12:31:29 25         Q.  You don't remember what?
```

---

22 (Pages 85 to 88)

PLAINTIFFS' RESP. APP 0004852

**JOHANA PAOLA BELTRAN - 8/30/2016**
**Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.**

---

89

```
12:31:36  1        A.  I don't know why they didn't explain it to
12:31:39  2   me well.
12:31:40  3        Q.  Did you attempt to find out from any other
12:31:41  4   source what 195.75 per week meant in terms of pesos?
12:31:56  5        A.  No.
12:31:59  6        MS. COLAIZZI:  Why don't we take an hour
12:31:59  7   for lunch.
12:32:05  8        THE DEPONENT:  Thank you.
12:32:05  9        THE COURT:  Going off the record.  The
12:32:06 10   time is 12:31 p.m.
12:32:09 11        (Recess taken, 12:31 p.m. to 1:34 p.m.,
12:34:49 12   after which time Mr. Maschler was present via
12:34:49 13   telephone.)
12:35:01 14        THE VIDEOGRAPHER:  We are back on the
12:35:02 15   record.  The time is 1:34 p.m.
12:35:06 16        Q.  (BY MS. COLAIZZI)  Good afternoon,
12:35:06 17   Ms. Beltran.
12:35:09 18        A.  Good afternoon.
12:35:12 19        Q.  Do you remember that before we broke for
12:35:14 20   lunch we talked about the conversation you had in
12:35:18 21   Colombia about the weekly stipend of 195.75?  Do you
12:35:24 22   remember that?
12:35:39 23        A.  Yes, ma'am.
12:35:41 24        Q.  Do you -- did you have any other
12:35:43 25   conversations while you were in Colombia with anyone
```

---

90

```
13:35:46  1   about the weekly pay you would receive as an au pair?
13:36:01  2        A.  No.
13:36:04  3        Q.  Could you take another look at Exhibit 15,
13:36:06  4   please.  Page 2.  I want to ask you a question about
13:36:28  5   Interrogatory 1.  Do you need the interpreter to
13:36:36  6   translate the question and answer of Interrogatory
13:36:44  7   No. 1 for you?
13:36:47  8        A.  Please.
13:36:51  9        THE INTERPRETER:  The interpreter's
13:36:53 10   looking at Interrogatory 1.
13:39:08 11        MS. COLAIZZI:  Thank you.
13:39:12 12        Q.  (BY MS. COLAIZZI)  Ms. Beltran, your
13:39:15 13   response to Interrogatory 1 refers to payments, as in
13:39:21 14   more than one payment.  How many total payments did you
13:39:26 15   make in order to participate in the au pair program?
13:39:44 16        A.  Two.
13:39:45 17        Q.  Okay.  I think you said before that the
13:39:48 18   first one was 500,000 pesos; is that correct?
13:39:55 19        A.  Yes.
13:39:55 20        Q.  How much was the second payment?
13:40:03 21        A.  I'm sorry.  I think I made more than two
13:40:08 22   payments for the program, but I don't remember.
13:40:11 23        Q.  Do you remember the amounts of any of the
13:40:13 24   other payments?
13:40:22 25        A.  I believe, but I'm not sure, that one was
```

---

91

```
13:40:25  1   for 2 million pesos.
13:40:27  2        Q.  And you believe there may have been more
13:40:30  3   than those two?
13:40:36  4        A.  Yes.
13:40:36  5        Q.  And in your response to Interrogatory 1
13:40:40  6   you indicated that you paid approximately $11,000 to
13:40:43  7   take the various classes you needed to become an
13:40:47  8   au pair.  Is the 11,000 figure correct, as far as you
13:41:05  9   know sitting here?
13:41:11 10        A.  Yes.
13:41:11 11        Q.  Okay.  Do you remember what that was in
13:41:13 12   pesos?
13:41:19 13        A.  Around 20 or 22 million pesos.
13:41:24 14        Q.  How many post-high school classes did you
13:41:27 15   need to take in order to meet the requirements for the
13:41:29 16   au pair program?
13:41:45 17        A.  I think it was one or two.
13:41:47 18        Q.  And what were the subject matters of those
13:41:50 19   classes?
13:41:58 20        A.  Systems.
13:42:02 21        Q.  Anything else?
13:42:04 22        A.  No.
13:42:04 23        Q.  What is systems?
13:42:10 24        A.  Like computers, computer systems.
13:42:21 25        Q.  Ms. Beltran, I believe in the complaint it
```

---

92

```
13:42:25  1   indicates that you had communications with three or
13:42:29  2   four potential host families; is that correct?
13:42:47  3        A.  Yes.
13:42:47  4        Q.  Did you select those three or four
13:42:48  5   families or did they select you?
13:43:00  6        A.  Those families selected me.
13:43:07  7        Q.  And was one of those families the ████
13:43:15  8        A.  Yes.
13:43:15  9        Q.
```

---

23 (Pages 89 to 92)

PLAINTIFFS' RESP. APP 0004853

JOHANA PAOLA BELTRAN - 8/30/2016
Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.



**93**

13:44:19  1    Q.  Okay.  And how did you -- how was it
13:44:22  2  communicated to you that a family was or was not
13:44:25  3  interested in having you as an au pair?
13:44:42  4    A.  They would open a page where they could
13:44:44  5  see my profile, and through that page we were able to
13:44:47  6  have communication.
13:44:53  7

**94**

13:46:04  1

**95**

13:47:24  1

**96**

13:49:09  1

24 (Pages 93 to 96)

PLAINTIFFS' RESP. APP 0004854

JOHANA PAOLA BELTRAN - 8/30/2016
Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.



97

13:50:37    1

13:51:11   10          Q.  Okay.
13:51:12   11          MR. HOOD:  I'm just going to object to the
13:51:13   12   translation insofar as it -- it wasn't clear that --
13:51:17   13   that the question was directed to knowing when she was
13:51:20   14   in Colombia versus knowing ever the other au pairs.
13:51:27   15          MS. COLAIZZI:  I don't understand.
13:51:29   16          MR. HOOD:  When you asked whether she knew
13:51:31   17   any of the other Noonan au pairs, you asked it when she
13:51:36   18   was talking to Mrs. Noonan in Colombia.
13:51:38   19          MS. COLAIZZI:  Okay.
13:51:39   20          MR. HOOD:  Set in that point in time.  The
13:51:41   21   translation made it sound like if she'd ever came to
13:51:44   22   know.  I just want it clear --
13:51:44   23          MS. COLAIZZI:  Okay.
13:51:45   24          MR. HOOD:  -- that she may not have known
13:51:47   25   when she was talking in Colombia.

98

13:51:49    1          MS. COLAIZZI:  That's fine.
13:51:51    2

13:53:22   24          THE INTERPRETER:  The chickens?
13:53:25   25

99

13:53:29    1

100

13:55:02    1

13:56:27   19          MR. HOOD:  I'm going to object as to
13:56:28   20   translation.  There -- there was a point where -- can
13:56:33   21   you explain?
13:56:34   22          MR. GRANT:  Yeah.  So I thought I heard a
13:56:36   23   point where in translation the interpreter translated
13:56:41   24   it as the word "she" regarding Paola, but I think you
13:56:48   25   may have understood it as she, as Mrs. Noonan.

25 (Pages 97 to 100)

PLAINTIFFS' RESP. APP 0004855

Case No. 1:14-cv-03074-CMA-KMT   Document 915-25   filed 03/17/18   USDC Colorado   pg 29 of 701

JOHANA PAOLA BELTRAN - 8/30/2016
Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.



101

13:56:52  1          MS. COLAIZZI:  That doesn't help me at
13:56:54  2   all.  Can you be more specific about what the question
13:56:56  3   was?
13:56:58  4          MR. HOOD:  Do you remember what the
13:56:58  5   question was?
13:56:58  6          MR. GRANT:  I believe -- I believe the
13:56:58  7   question was --
          9          MS. COLAIZZI:  We're not talking about
13:57:03  9
13:57:04 10   Mrs. Noonan, we're talking about Priscilla.
13:57:15 11          MR. GRANT:  Or Priscilla.  I'm sorry.  I
13:57:17 12   think it was Priscilla.  But I think -- but I think
13:57:20 13   there was a misinterpretation between -- I think you
13:57:22 14   may have understood it as Priscilla when in actuality
13:57:26 15   it may have Paola.
13:57:31 16          MS. COLAIZZI:  Okay.  I'm still not sure I
13:57:32 17   understand what the exact correction is.
13:57:35 18          MR. HOOD:  Was it in the question or the
13:57:36 19   translation?
13:57:37 20          MR. GRANT:  It was in the translation.
13:57:39 21          MR. HOOD:  Of her response?
13:57:41 22          MR. GRANT:  Yes.
13:57:42 23          MR. HOOD:

102

13:58:00  1          I'm going to withdraw the objection.  I
13:58:02  2   don't think it matters, so let's just carry on.  I
13:58:04  3   apologize.
13:58:05  4          THE INTERPRETER:  That's fine.  The
13:58:07  5   interpreter would just comment that if Paola was
13:58:09  6   talking about herself, she would not be using third-
13:58:12  7   person pronoun, she'd be using the first person, and
13:58:16  8   that would be yo.  But if she wasn't talking about
13:58:18  9   herself and she was talking about somebody else, she
13:58:21 10   wouldn't be using that.
13:58:22 11          MR. HOOD:  Okay.
13:58:24 12          THE INTERPRETER:  And that's just for
13:58:25 13   clarification.
13:58:25 14          MR. HOOD:  All right.  We apologize.
13:58:26 15          THE INTERPRETER:  No problem.
13:58:28 16          Q.  (BY MS. COLAIZZI)  And just for
13:58:28 17

103

13:59:11

104

14:01:10

14:02:22 20          Q.  At any point did you talk to Mrs.
14:02:25 21   about what you would be paid?
14:02:34 22          A.  Yes.
14:02:34 23          Q.  What did you talk about?
14:02:41 24          A.  Why they were paying me that.
14:02:43 25          Q.  And what did she say -- okay.  Let me back

26 (Pages 101 to 104)

PLAINTIFFS' RESP. APP 0004856

JOHANA PAOLA BELTRAN - 8/30/2016
**Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.**

---

105

| | |
|---|---|
| 14:02:46 1 | up. When you say, "that," what are you referring to? |
| 14:02:52 2 | A. The first week that I received a check. |
| 14:02:54 3 | Q. Okay. I want to stick for just a minute |
| 14:02:57 4 | with the conversations you had while you were still in |
| 14:03:00 5 | Colombia. Okay? |
| 14:03:07 6 | A. Okay. |
| 14:03:08 7 | Q. While you were still in Colombia did you |
| 14:03:10 8 | have any conversations with Mrs. ▆▆▆▆ about what you |
| 14:03:14 9 | would be paid? |
| 14:03:22 10 | A. No. |
| 14:03:24 11 | Q. Did you have any conversations with |
| 14:03:26 12 | Mrs. ▆▆▆▆ while you were still in Colombia about how |
| 14:03:29 13 | many hours they would ask you to work in a week? |
| 14:03:43 14 | A. I think so. |
| 14:03:44 15 | Q. What do you recall about those |
| 14:03:45 16 | conversations? |
| 14:03:50 17 | MR. HOOD: I'm going to mark the response |
| 14:03:51 18 | to this question and any line of questions about the |
| 14:03:54 19 | number of hours worked as confidential under the |
| 14:03:56 20 | protective order, but I instruct the witness -- I'm |
| 14:03:59 21 | sorry. But I instruct the witness to respond to the |
| 14:04:13 22 | question. |
| 14:04:22 23 | A. Can you repeat the question, please. |
| 14:04:24 24 | MS. COLAIZZI: Can you read it back, |
| 14:04:25 25 | please. |

---

106

| | |
|---|---|
| 14:03:44 1 | (The last question was read back as |
| 14:03:44 2 | follows: "What do you recall about those |
| 14:03:45 3 | conversations?") |
| 14:04:38 4 | Q. (BY MS. COLAIZZI) And just for |
| 14:04:39 5 | clarification, it was the conversations about the |
| 14:04:41 6 | number of hours they would have you work in a week. |
| 14:04:55 7 | A. 45. |
| 14:05:15 8 | Q. Prior to going to live with the ▆▆▆▆ |
| 14:05:17 9 | you spent some time in New York, correct? |
| 14:05:26 10 | A. That's true. |
| 14:05:27 11 | Q. Okay. And you flew to New York from |
| 14:05:30 12 | Bogota, correct? |
| 14:05:35 13 | A. Yes. |
| 14:05:36 14 | Q. When you flew to New York did you |
| 14:05:37 15 | understand what you would be doing during that time in |
| 14:05:40 16 | New York? |
| 14:05:51 17 | A. Yes. |
| 14:05:51 18 | Q. What was your understanding of what you |
| 14:05:53 19 | would be doing in New York? |
| 14:06:01 20 | A. It was a training with other au pairs. |
| 14:06:04 21 | Q. Did you know ahead of time what the |
| 14:06:07 22 | subject matter of that training would be? |
| 14:06:16 23 | A. No. |
| 14:06:18 24 | Q. Did you ask anyone? Meaning before you |
| 14:06:23 25 | left for New York from Colombia. |

---

107

| | |
|---|---|
| 14:06:27 1 | A. No. |
| 14:06:29 2 | Q. How many days did you spend in New York |
| 14:06:32 3 | prior to going to live with the ▆▆▆▆ |
| 14:06:39 4 | A. Around a week. |
| 14:06:42 5 | Q. And you received training during that |
| 14:06:44 6 | week; is that correct? |
| 14:06:50 7 | A. That's true. |
| 14:06:51 8 | Q. Okay. What types of things did you |
| 14:06:53 9 | receive training about during that week? |
| 14:07:08 10 | A. I don't remember everything, but I can say |
| 14:07:15 11 | that they were showing us how to change diapers, they |
| 14:07:17 12 | would have a doll that we would practice on on how to |
| 14:07:21 13 | do it. And in case of an accident with the children, |
| 14:07:32 14 | what things we were -- we were to do. And so we also |
| 14:07:47 15 | learned what would happen -- what to do if one of the |
| 14:07:49 16 | children were eating and started to get choking on food |
| 14:07:53 17 | and how to use first aid to -- to resolve that. |
| 14:08:01 18 | Q. Do you recall receiving any training |
| 14:08:03 19 | during your week in New York that was not related in |
| 14:08:05 20 | some way to taking care of children? |
| 14:08:17 21 | A. No. |
| 14:08:27 22 | Q. When you left Colombia to travel to New |
| 14:08:30 23 | York, did you expect to be paid for your time in New |
| 14:08:33 24 | York? |
| 14:08:42 25 | A. Yes. |

---

108

| | |
|---|---|
| 14:08:42 1 | Q. And why did you expect to be paid? |
| 14:08:50 2 | A. That was part of what happens when you |
| 14:08:53 3 | were becoming an au pair. |
| 14:08:54 4 | Q. What do you mean, that's part of what -- I |
| 14:08:56 5 | don't understand your answer. Can you explain? |
| 14:09:09 6 | A. Well, when you get to the United States, |
| 14:09:11 7 | that's part of when you're becoming an au pair. |
| 14:09:16 8 | Q. Did anybody specifically tell you that you |
| 14:09:18 9 | would be paid for any part of your time in New York? |
| 14:09:29 10 | A. No. |
| 14:09:31 11 | Q. Did you ask anyone that question, whether |
| 14:09:33 12 | you would be paid? |
| 14:09:40 13 | A. No. |
| 14:09:42 14 | Q. Did you stay in a hotel while you were in |
| 14:09:45 15 | New York? |
| 14:09:49 16 | A. Yes. |
| 14:09:50 17 | Q. Who paid for your hotel? |
| 14:09:56 18 | A. I don't know very well. |
| 14:09:57 19 | Q. Did you pay for it? |
| 14:09:59 20 | A. No. |
| 14:10:00 21 | Q. Did you receive any money for meals during |
| 14:10:03 22 | your time in New York? |
| 14:10:07 23 | A. No. |
| 14:10:17 24 | Q. Did -- during your time in New York were |
| 14:10:19 25 | you given any papers or documents to keep and take with |

---

27 (Pages 105 to 108)

PLAINTIFFS' RESP. APP 0004857

Case No. 1:14-cv-03074-CMA-KMT   Document 958-25   filed 03/17/18   USDC Colorado   pg 31
of 701

### 109

```
14:10:22   1   you?
14:10:32   2        A. I don't remember.
14:10:44   3        MS. COLAIZZI: This is 17.
14:11:04   4        (Deposition Exhibit 17 was marked.)
14:11:04   5        MS. COLAIZZI: She'll get you another
14:11:06   6   copy.
14:11:06   7        MR. HOOD: Okay. Thanks.
14:11:06   8        Q. (BY MS. COLAIZZI) Ms. Beltran, you've
14:11:08   9   been handed what's been marked as Exhibit 17. In
14:11:18  10   looking at this, and it comes in a variety of formats,
14:11:22  11   so are you able to tell by looking at it whether or not
14:11:25  12   you've ever seen this information before?
14:11:39  13        A. Can I look at it?
14:11:41  14        Q. Sure. Absolutely. Yeah.
14:12:05  15        (The deponent perused the exhibit.)
14:12:10  16        A. I don't remember.
14:12:18  17        MS. COLAIZZI: This is 18.
14:12:59  18        (Deposition Exhibit 18 was marked.)
14:12:59  19        Q. (BY MS. COLAIZZI) Ms. Beltran, you've
14:13:07  20   been hand -- sorry.
14:13:07  21        MS. COLAIZZI: You may not have that one.
14:13:07  22        THE INTERPRETER: Oh. Okay.
14:13:07  23        Q. (BY MS. COLAIZZI) So let me . . . Okay.
14:13:07  24   Ms. Beltran, you've been handed what's been marked as
14:13:10  25   Exhibit 18. For the record, I'll state that we
```

### 110

```
14:13:16   1   received this from your counsel at approximately 7:15
14:13:20   2   last night. Do you know what this document is?
14:13:35   3        A. Yes.
14:13:36   4        Q. And what is it, as far as you know?
14:13:42   5        MS. FITZGERALD: I'm sorry, I need to
14:13:44   6   interrupt. Which -- I don't know what you're looking
14:13:46   7   at.
14:13:47   8        MS. COLAIZZI: Oh, I'm sorry. It's
14:13:48   9   Beltran 518 through 543. It may not have been in the
14:13:55  10   packet because it was a late production. I'm sorry,
14:13:59  11   Martha.
14:14:01  12        MS. FITZGERALD: That's all right.
14:14:03  13        A. What page? 43?
14:14:05  14        Q. (BY MS. COLAIZZI) No, I'm sorry. What is
14:14:06  15   Exhibit 18, as far as you know?
14:14:14  16        A. I think something like this is what they
14:14:16  17   gave us.
14:14:17  18        Q. Have you read this document before?
14:14:24  19        A. It was in English.
14:14:25  20        Q. Okay. When did you receive it?
14:14:29  21        A. I don't remember.
14:14:30  22        Q. But this was in your possession and was
14:14:33  23   turned over to your counsel at some point; is that
14:14:35  24   correct?
14:14:46  25        A. Can you ask me that question again?
```

### 111

```
14:14:48   1        Q. Yes. This was a document that you had and
14:14:51   2   then gave to your counsel; is that correct?
14:14:59   3        A. Yes.
14:15:00   4        Q. Okay. And I want to make sure I
14:15:05   5   understand your answer. Have you read this
14:15:06   6   agreement -- or this document before?
14:15:15   7        A. Yes.
14:15:15   8        Q. Okay. Do you recall when you received it
14:15:17   9   the first time?
14:15:23  10        A. I don't remember.
14:15:25  11        Q. Do you recall if you read it when you
14:15:27  12   first received it?
14:15:35  13        A. I tried to.
14:15:37  14        Q. Okay. Did you sign a document that looks
14:15:40  15   like this?
14:15:46  16        A. I think so.
14:15:47  17        Q. Did you attempt to get any assistance in
14:15:50  18   understanding this document before you signed it?
14:15:58  19        A. No.
14:16:00  20        Q. Do you recall if you received this
14:16:02  21   agreement for the first time while you were in Colombia
14:16:04  22   or while you were in the United States?
14:16:16  23        A. I don't remember, but I think it was in
14:16:19  24   Colombia.
14:16:20  25        Q. Why did you not try to find some
```

### 112

```
14:16:22   1   assistance in understanding the document before you
14:16:25   2   signed it?
14:16:34   3        A. Because it was necessary to pay for
14:16:36   4   something like that.
14:16:41   5        THE DEPONENT: (In English) No.
14:16:44   6        THE INTERPRETER: Oh, okay.
14:16:46   7        Q. (BY MS. COLAIZZI) Why don't you repeat
14:16:47   8   your answer, and we'll try again.
14:16:49   9        THE INTERPRETER: The interpreter would
14:16:50  10   ask for a clarification.
14:16:57  11        A. Because I had to pay for that.
14:17:02  12        Q. (BY MS. COLAIZZI) Meaning you had to pay
14:17:03  13   for someone to help you understand the document?
14:17:08  14        A. Yes.
14:17:09  15        Q. While you were living in Colombia did you
14:17:12  16   know anybody who spoke English?
14:17:17  17        A. No.
14:17:18  18        Q. Did anyone at the office in downtown
14:17:21  19   Bogota speak English?
14:17:27  20        A. I don't know.
14:17:29  21        Q. Did the people who gave you the training
14:17:32  22   in New York speak English or Spanish?
14:17:39  23        A. English.
14:17:41  24        Q. At any point during your week in New York
14:17:43  25   did you ask anybody who was helping with your training
```

28 (Pages 109 to 112)

PLAINTIFFS' RESP. APP 0004858

### 113

| | |
|---|---|
| 14:17:45 1 | if they could help you understand any document? |
| 14:17:58 2 | A. No. |
| 14:17:59 3 | Q. Why not? |
| 14:18:04 4 | A. Because I thought everybody there spoke |
| 14:18:06 5 | English. |
| 14:18:09 6 | Q. But if somebody speaks English, they could |
| 14:18:12 7 | help you; isn't that right? |
| 14:18:18 8 | A. Well, my English wasn't so good to be able |
| 14:18:20 9 | to understand it. |
| 14:18:21 10 | Q. So you didn't think you would be able to |
| 14:18:23 11 | understand their help; is that what I'm hearing? |
| 14:18:37 12 | A. Well, for the document, if they were to |
| 14:18:41 13 | explain it to me in English, no. |
| 14:18:42 14 | Q. Okay. So you believed in order to get any |
| 14:18:46 15 | assistance with the document, you needed somebody who |
| 14:18:49 16 | was bilingual in both English and Spanish; is that |
| 14:18:53 17 | correct? |
| 14:19:09 18 | A. Yes. |
| 14:19:09 19 | Q. When you agreed to become an au pair, did |
| 14:19:13 20 | you have any understanding of the circumstances under |
| 14:19:18 21 | which your participation in the program could end |
| 14:19:21 22 | early? |
| 14:19:38 23 | A. What does that mean? |
| 14:19:41 24 | Q. When you decided to become an au pair, did |
| 14:19:42 25 | you think that you could leave the program at any time? |

### 114

| | |
|---|---|
| 14:19:55 1 | A. Yes. |
| 14:19:55 2 | Q. Okay. Did you believe that your host |
| 14:19:57 3 | family could decide not to have you live with them |
| 14:20:02 4 | anymore at any time? |
| 14:20:17 5 | A. Yes. |
| 14:20:17 6 | Q. Did you have any understanding as to |
| 14:20:19 7 | whether or not InterExchange could end your |
| 14:20:22 8 | participation in the program? |
| 14:20:34 9 | A. No. |
| 14:20:52 10 | Q. Prior to arriving in the United States to |
| 14:20:59 11 | begin living with the ▅▅▅ did you have any |
| 14:21:02 12 | understanding of why your weekly pay would be 195.75? |
| 14:21:28 13 | A. More or less. |
| 14:21:28 14 | Q. What was your understanding? |
| 14:21:35 15 | A. That it was a tip for helping the family |
| 14:21:37 16 | with the kids. |
| 14:21:38 17 | Q. But do you know why the number was 195.75 |
| 14:21:43 18 | as opposed to something else? |
| 14:21:52 19 | A. No. |
| 14:21:53 20 | Q. At any point during your participation in |
| 14:21:55 21 | the au pair program did you come to an understanding of |
| 14:21:59 22 | why the figure was 195.75 as opposed to something else? |
| 14:22:17 23 | A. Yes. |
| 14:22:17 24 | Q. When did you come to an understanding of |
| 14:22:20 25 | that? |

### 115

| | |
|---|---|
| 14:22:24 1 | A. After a week of work. |
| 14:22:25 2 | Q. Okay. And how did you come to that |
| 14:22:28 3 | understanding? |
| 14:22:39 4 | A. The family said that InterExchange said |
| 14:22:42 5 | that that was going to be my weekly pay. |
| 14:22:45 6 | Q. When did the family say that? |
| 14:22:50 7 | A. When they gave me the first check. |
| 14:22:52 8 | Q. How much was your first check? |
| 14:23:00 9 | A. 195 and 75 cents. |
| 14:23:03 10 | Q. Okay. Is that what you were expecting for |
| 14:23:05 11 | your first week of work? |
| 14:23:11 12 | A. No. |
| 14:23:11 13 | Q. Why not? |
| 14:23:14 14 | A. 'Cause I didn't know. |
| 14:23:16 15 | Q. Well, weren't you told in Colombia that it |
| 14:23:19 16 | would be 195.75? |
| 14:23:27 17 | A. Yeah, I saw that it was in a contract |
| 14:23:29 18 | there. |
| 14:23:30 19 | Q. Okay. So if it -- if you didn't expect to |
| 14:23:33 20 | get 195.75, what did you expect to get? |
| 14:23:47 21 | A. I didn't understand exactly the value of |
| 14:23:50 22 | it and how much it was. |
| 14:23:53 23 | Q. What do you mean by you didn't understand |
| 14:23:54 24 | the value of it? |
| 14:24:00 25 | A. It was all in dollars, and it was new to |

### 116

| | |
|---|---|
| 14:24:03 1 | me. |
| 14:24:04 2 | MR. HOOD: I'd just like to object to the |
| 14:24:06 3 | translation again, and "valor" can mean either value or |
| 14:24:10 4 | cost in English. |
| 14:24:12 5 | MS. COLAIZZI: Okay. |
| 14:24:13 6 | Q. (BY MS. COLAIZZI) When you were in |
| 14:24:15 7 | Colombia, I believe it was during the interview at your |
| 14:24:18 8 | third meeting at the office in downtown Bogota you were |
| 14:24:28 9 | told that you would be paid 195.75 a week, correct? |
| 14:24:44 10 | A. Yes, because I asked them. |
| 14:24:46 11 | Q. Okay. And that's what -- and you were, in |
| 14:24:48 12 | fact, paid 195.75 for your first week of work with the |
| 14:24:53 13 | Noonans, correct? |
| 14:25:03 14 | A. Yes. |
| 14:25:03 15 | Q. Okay. |
| 14:25:05 16 | THE VIDEOGRAPHER: Counsel, five minutes |
| 14:25:05 17 | to media change. |
| 14:25:06 18 | MS. COLAIZZI: Okay. Why don't we go |
| 14:25:08 19 | ahead and change. |
| 14:25:11 20 | THE DEPONENT: Can I have a break? |
| 14:25:13 21 | THE VIDEOGRAPHER: Going off the record. |
| 14:25:14 22 | This is the end of Media Unit No. 2 in the videotape |
| 14:25:16 23 | deposition of Johana Paola Beltran. The time is |
| 14:25:20 24 | 2:25 p.m. We are off the record. |
| 14:25:24 25 | (Recess taken, 2:25 p.m. to 2:39 p.m.) |

29 (Pages 113 to 116)

**JOHANA PAOLA BELTRAN - 8/30/2016**
**Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.**



**117**

14:39:52 1     THE VIDEOGRAPHER: We are back on the
14:39:53 2 record. This is the beginning of Media Unit No. 3 in
14:39:57 3 the videotaped deposition of Johana Paola Beltran. The
14:40:01 4 time is 2:39 p.m.
14:40:05 5     Q. (BY MS. COLAIZZI) Ms. Beltran, before we
14:40:06 6 went on break we were talking about what you received
14:40:08 7 for pay your first week with the ███ And you did,
14:40:20 8 in fact, receive $195.75 for the first week, correct?
14:40:33 9     A. Yes.
14:40:33 10     Q. Is that what you expected to receive for
14:40:35 11 your first check?
14:40:43 12     A. Yes.
14:40:43 13     Q. Did you have any conversations with the
14:40:45 14 ███ about the amount of the check that first week
14:40:48 15 when you received it?
14:40:58 16     A. Yes.
14:40:58 17     Q. Okay. And who started that conversation?
14:41:04 18     A. Well, it really wasn't a conversation.
14:41:06 19     Q. Okay. Then tell me what you -- what you
14:41:08 20 and the ███ talked about with respect to the check
14:41:11 21 when you received it that first week.
14:41:25 22     A. That that was what they were going to pay
14:41:27 23 me every week because InterExchange told them that that
14:41:30 24 was the amount to pay me.
14:41:31 25     Q. Did you have any concerns at that point

**118**

14:41:34 1 about receiving $195.75 a week?
14:41:46 2     A. No.
14:41:55 3     Q. Did any -- during your -- let me back up.
14:41:59 4     While you were in New York, did you meet
14:42:02 5 other individuals who were going to be au pairs in the
14:42:06 6 United States?
14:42:13 7     A. Yes.
14:42:13 8

**119**

14:43:21 1

14:44:25 15     MR. HOOD: I'm going to mark as
14:44:26 16 confidential any questions regarding Ms. Beltran's time
14:44:32 17 with the Noonans and her treatment by the ███ under
14:44:35 18 the protective order.
14:44:54 19     Q. (BY MS. COLAIZZI) Do you remember the
14:44:54 20 question?
14:44:58 21     A. Yes.
14:44:58 22     Q. Okay.
14:45:02 23     A. I wasn't able to use it during work hours.
14:45:05 24     Q. And what were your work hours?
14:45:13 25     A. I don't remember it well. You could say

**120**

14:45:23 1 that I worked some hours in the morning, some hours in
14:45:26 2 the afternoon, and some hours at night.
14:45:31 3

**Hunter + Geist, Inc.**
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

PLAINTIFFS' RESP. APP 0004860

JOHANA PAOLA BELTRAN - 8/30/2016
Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.



121

14:47:00  1

14:47:38  9          THE INTERPRETER:  Allow the interpreter to
14:47:40  10   clarify.
14:47:41  11

14:48:02  14         Q.  (BY MS. COLAIZZI)  Anything else that he
14:48:03  15   shared with you about his au pair experience?
14:48:14  16         A.  And he was getting paid the same thing.
14:48:17  17         Q.  Meaning 195.75?
14:48:23  18         A.  Yes.
14:48:25  19         Q.  Anything else that he shared with you
14:48:26  20   about his au pair experience?
14:48:35  21         A.  I don't remember.
14:48:39  22         Q.  And all of these communications were by
14:48:41  23   Facebook or Skype?
14:48:48  24         A.  Yes.
14:48:49  25         Q.  How many times do you think you

122

14:48:50  1    communicated with him during the time you lived with
14:48:52  2    the
14:49:03  3          A.  I don't remember.
14:49:08  4          Q.  How many times do you think you
14:49:09  5

123

14:50:36  1

14:52:31  25         THE INTERPRETER:

124

14:52:31  1          THE DEPONENT:  (In English)  Uh-huh.
14:52:32  2

14:52:45  6          Q.  During the time you lived with the
14:52:47  7    how many au pair meetings did you attend?
14:52:49  8          A.  One.
14:52:59  9          Q.  Do you recall when it was?
14:53:06  10         A.  I'm not sure, but I think it was after I
14:53:10  11   was there for a month.
14:53:12  12         Q.  Do you remember where that meeting took
14:53:15  13   place?
14:53:21  14         A.  I don't remember, but it was close there
14:53:24  15   to where I was living.
14:53:25  16         Q.  Was it in a home or some other sort of
14:53:29  17   venue?
14:53:33  18         A.  It was in a home.
14:53:34  19         Q.  Do you know whose home it was?
14:53:39  20         A.  Yes.
14:53:40  21         Q.  Whose home was it?
14:53:44  22         A.  It was a person who was a representative
14:53:46  23   of InterExchange.
14:53:48  24         Q.  Do you remember her name?
14:53:56  25         A.  I don't really remember, but I think it

31 (Pages 121 to 124)

Case No. 1:14-cv-03074-CMA-KMT   Document 948-25   filed 03/30/18   USDC Colorado   pg 35 of 701

JOHANA PAOLA BELTRAN - 8/30/2016
Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.



125

14:53:58  1   was something like Patti or something like that.
14:54:01  2   That's what I understood.
14:54:03  3
14:54:09  4       THE DEPONENT:  (In English) I don't --
14:54:09  5       A.  I don't know.
14:54:15  6

127

14:57:30  1

14:58:32  13      MR. HOOD:  I'm going to mark any
14:58:36  14   descriptions of Ms. Beltran's time with the
                as confidential under the
14:58:43  16   protective order.
14:58:54  17      Q.  (BY MS. COLAIZZI)  Did the          make a
14:58:56  18   schedule for you every week?
14:59:04  19      A.  Not always.
14:59:07  20      Q.  Did they at any time create a schedule for
14:59:10  21   you?
14:59:16  22      A.  Somewhat.
14:59:20  23      Q.  Do you how many -- do you have any idea,
14:59:22  24   out of the, you know, few weeks that you were there,
14:59:24  25   how many weeks you had a schedule prepared for you?

126

14:55:49  1

128

14:59:40  1       A.  I don't remember.
14:59:42  2       Q.  Were you given copies of the schedules
14:59:44  3    when they were prepared?
14:59:54  4       A.  No.  Because she would make it, and then
14:59:57  5    she would change it again every -- frequently.
15:00:00  6       Q.  Was it posted somewhere in the house so
15:00:02  7    you knew what you were supposed to be doing?
15:00:17  8       A.  Yes, it was posted in the kitchen.
15:00:20  9       MR. HOOD:  I'm going to object as to the
15:00:21  10   translation of "frequently."  The meaning of what
15:00:24  11   Ms. Beltran said in Spanish was once in a while.
15:00:31  12      THE INTERPRETER:  Could the interpreter
15:00:32  13   ask to have that question repeated where that was?
14:59:42  14      (The question beginning on page 128,
14:59:42  15   line 2 was read back as follows:  "Were you given
14:59:42  16   copies of the schedules when they were prepared?")
15:00:50  17      A.  No.
15:00:58  18      Q.  (BY MS. COLAIZZI)  So you weren't given a
15:00:59  19   copy, but it was posted in the kitchen; is that
15:01:01  20   correct?
15:01:07  21      A.  The first time.
15:01:11  22      Q.  What happened with the schedule after the
15:01:12  23   first time?
15:01:23  24      A.  Well, she said that she would have to make
15:01:26  25   changes, and then she would forget and wouldn't put it

32 (Pages 125 to 128)

PLAINTIFFS' RESP. APP 0004862

Case No. 1:14-cv-03074-CMA-KMT   Document 968-25   filed 03/17/18   USDC Colorado   pg 36 of 701

JOHANA PAOLA BELTRAN - 8/30/2016
Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.



129

15:01:28   1    up anymore.
15:01:29   2

15:02:26   16        Q.  Did you make any effort to keep a record
15:02:29   17   of the hours that you worked or the things that the
15:02:33   18   _____ asked you to do on a daily basis?
15:02:47   19        A.  No.
15:03:07   20        MS. COLAIZZI:  19.
15:03:07   21        THE DEPONENT:  Thank you.
15:03:07   22        (Deposition Exhibit 19 was marked.)
15:03:07   23        Q.  (BY MS. COLAIZZI) Ms. Beltran, you've
15:03:11   24   been handed what's been marked as Exhibit 19.  Do you
15:03:14   25   recognize this document at all?

130

15:03:26   1        A.  I'm looking at it.  No.
15:03:34   2        Q.  Do you recall if you received anything
15:03:36   3   like this during your training in New York?
15:03:50   4        A.  I'm not sure, but I don't think so.
15:03:58   5

131

15:05:47

132

15:07:37

33 (Pages 129 to 132)

PLAINTIFFS' RESP. APP 0004863



PLAINTIFFS' RESP. APP 0004864

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

JOHANA PAOLA BELTRAN - 8/30/2016
Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.



PLAINTIFFS' RESP. APP 0004865

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

JOHANA PAOLA BELTRAN - 8/30/2016
Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.



141

142

143

15:27:00   1   The time is 3:26 p.m.
15:27:04   2   (Discussion off the record.)
15:28:04   3   MS. COLAIZZI:  20.
15:28:05   4   THE VIDEOGRAPHER:  We are back on the
15:28:06   5   record.  The time is 3:27 p.m.
15:28:09   6   MS. COLAIZZI:  I apologize.  I jumped the
15:28:11   7   gun.  Exhibit 20.
15:28:27   8   (Deposition Exhibit 20 was marked.)
15:28:27   9   Q.  (BY MS. COLAIZZI)  Ms. Beltran, you've
15:28:28   10   been handed what's been marked as Exhibit 20.  And,
15:28:37   11   again, you may or may not have seen this information in
15:28:40   12   a different format, but feel free to look at it, and
15:28:43   13   then I'd like to know if you've ever seen this
15:28:47   14   information before?
15:28:58   15   MS. COLAIZZI:  For the record, it's a copy
15:28:59   16   of 22 C.F.R. 62.31.  I apologize.  If you don't have
15:29:06   17   it, we can get you a copy.
15:29:12   18   MS. HAZEL:  We do.
15:29:17   19   MR. HOOD:  Brooke, can you just clarify
15:29:19   20   whether this is the -- the current reg?  This says
15:29:22   21   current as of 2008.  I don't know if that's . . .
15:29:27   22   MS. COLAIZZI:  Yeah, it should be.
15:29:28   23   MR. HOOD:  Okay.
15:29:32   24   MS. COLAIZZI:  I'll double check.  It
15:29:34   25   should be.  If not, we'll substitute the current --

144

15:29:37   1   current version.
15:29:38   2   Q.  (BY MS. COLAIZZI)  Have you had a chance,
15:30:35   3   Ms. Beltran, to look at Exhibit 20?
15:30:42   4   A.  Read?  Yes, I looked at it just now.
15:30:45   5   Q.  Do you know if you have seen this
15:30:47   6   information before today?
15:30:55   7   A.  I don't remember.
15:30:57   8   Q.  I'll represent to you that it is a copy of
15:31:01   9   22 C.F.R. 62.31, the U.S. Department of State
15:31:16   10   regulations regarding the au pair program.  Are you
15:31:26   11   aware today that the U.S. Government has regulations
15:31:29   12   regarding the au pair program?
15:31:40   13   A.  Yes.
15:31:40   14   Q.  Before you arrived in Colorado to work
15:31:42   15   with the Noonans, were you aware that the U.S.
15:31:46   16   Government had regulations regarding the au pair
15:31:48   17   program?
15:31:59   18   A.  No.
15:32:01   19   Q.  At any time during your participation in
15:32:02   20   the program were you aware that the federal government
15:32:05   21   had regulations regarding the au pair program?
15:32:20   22   A.  Excuse me, could you repeat the question?
15:32:23   23   MS. COLAIZZI:  Can you read it back.
15:32:01   24   (The last question was read back as
15:32:01   25   follows:  "At any time during your participation in the

THE INTERPRETER:  I'm sorry, the
interpreter's having trouble understanding the . . .
A.  She said that she was disappointed.

MR. HOOD:  Brooke, when you're at a good
stopping point, could we go off the record for a
minute?
MS. COLAIZZI:  Yeah.  This is fine.  We
can take a break.
THE VIDEOGRAPHER:  Going off the record.

PLAINTIFFS' RESP. APP 0004866

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

**JOHANA PAOLA BELTRAN - 8/30/2016**

**Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.**

---

145

program, were you aware that the federal government had
regulations regarding the au pair program?")

    A.  No.

    Q.  (BY MS. COLAIZZI)  Do you recall a time
frame after you left the program at which you became
aware that there were U.S. Government regulations
regarding the au pair program?

    MR. HOOD:  I'm going to object as to
privilege and instruct her -- Ms. Beltran not to
respond to the extent that she had any conversations
with counsel, with her attorney, about the regulations,
but to otherwise respond to the question.

    Q.  (BY MS. COLAIZZI)  And for clarification,
I don't want to know how you learned, I want to know
when you learned.

    A.  I don't remember.

    Q.  Have you ever read the U.S. Government
regulations regarding the au pair program?

    A.  I don't remember.

    Q.  Did anyone give you a copy of them at any
point during your participation in the au pair program?

    A.  I don't remember.

    Q.  If you were given documents by anyone
during the course of your application and participation
in the program, did you keep those documents?

---

146

    A.  What does that mean?

    Q.  If you were given any documents during
your application process or during your participation
in the program, did you keep them?

    A.  Perhaps.

    Q.  Do you currently have in your possession
any documents related to your application for or
participation in the au pair program that you have not
given your lawyers?

    A.  No.

    MS. COLAIZZI:  21.

    (Deposition Exhibit 21 was marked.)

    Q.  (BY MS. COLAIZZI)  Ms. Beltran, you've
been handed what's been marked as Exhibit 21.  Feel
free to look at it.

    (The deponent perused the exhibit.)

    Q.  Ms. Beltran, have you seen Exhibit 21
before?

    A.  No.

    Q.  Can you please turn back to Exhibit 15.
I'd like to turn your attention to page 4 and 5,
Interrogatory 6.  Would you like the interpreter to
read the question and answer to you?

    A.  Please.

    MS. COLAIZZI:  Please go ahead.

---

147

    THE INTERPRETER:  The interpreter is
reading Interrogatory No. 6.

    The interpreter's finished reading the
Interrogatory No. 6.  And then the response.

    MR. HOOD:  We're going to object to the
translation, because the -- the interpreter used the
word for mistreat instead -- for abuse when translating
the response.

    MS. COLAIZZI:  What word do you think
should be used?

    MR. GRANT:  Abuse.  You could use the verb
abuso.

    THE INTERPRETER:  The interpreter
disagrees.  The abuse that's most common in Spanish
actually has to do with something that's sexual, and
the -- the corresponding term in English "abuse" I
think should be more akin to mistreatment or malos
tratos in Spanish.  So I will stick by what I used
there.

    Q.  (BY MS. COLAIZZI)  Ms. Beltran, is your
response to Interrogatory No. 6 accurate?

    A.  Yes.

    Q.  Who was it that you contacted in November
2012?

    A.  When I was working with the Noonans?

---

148

    Q.  Well, I'm referring specifically to your
response to Interrogatory 6, where you indicate that --

    THE DEPONENT:  (In English.)  Oh.

    Q.  (BY MS. COLAIZZI)  -- you contacted a
representative of InterExchange in November 2012.

    A.  Okay.

    Q.  Who did you contact?

    A.  With InterExchange in New York.

    Q.  And how did you contact them?  Phone,
email?  By what method?

    A.  By phone.

    Q.  And where did you find the phone number to
call?

    A.  Nowhere.

    Q.  Did you have the number with you when you
were living with the ████?

    A.  They called me.

    Q.  InterExchange called you?

    A.  Yes.

    Q.  Okay.  Who called you from InterExchange?

    A.  What's that?

    Q.  Who contacted you from InterExchange?

    A.  I don't know.

    Q.  Was it a male or female?

    A.  A woman.

---

PLAINTIFFS' RESP. APP 0004867

Hunter + Geist, Inc.

scheduling@huntergeist.com * 303-832-5966 * 800-525-8490



149

15:44:25  1    **Q.  And why was she calling you?**
15:44:32  2    A.  Because she knew that I wanted to leave
the house.
15:44:35  3
15:44:36  4    **Q.  And how did she know that?**
15:44:44  5    A.  I don't know, but I think the Colorado
representative told them.
15:44:46  6
15:44:47  7    **Q.  Had you told the Colorado representative
that you wanted to leave?**
15:44:49  8
15:44:55  9    A.  No.
15:44:56  10

151

15:47:26

150

15:45:53  1

152

15:49:02  1

38 (Pages 149 to 152)

PLAINTIFFS' RESP. APP 0004868

JOHANA PAOLA BELTRAN - 8/30/2016
Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.



153

15:50:23

15:51:02  14        MS. COLAIZZI:  Can you read it back,
15:51:04  15  please.
15:50:43  16        (The testimony beginning on page 153,
15:50:43  17  line 9 was read back as follows:
15:50:43  18        Question:  So other than that time and the
15:50:46  19  meeting at her house, had you had any contact with
15:50:48  20  Patti?
15:50:57  21        Answer:  Yes.
15:51:25  22        Question:  When?)
15:51:25  23    A.  No.
15:51:29  24    Q.  (BY MS. COLAIZZI)  Had you ever seen Patti
15:51:29  25  visit the ▇▇▇ home at any point during your time

154

15:51:34  1   there?
15:51:38  2     A.  Never.
15:51:41  3     Q.  During your training in New York were you
15:51:43  4   given any documents that had InterExchange contact
15:51:46  5   information on them?
15:51:59  6     A.  I don't remember.
15:52:00  7     Q.  Do you remember if you brought any papers
15:52:03  8   with you to the ▇▇▇ from your training in New York?
15:52:17  9     A.  I don't remember.  That's been a long
15:52:19  10  time.
15:52:20  11    Q.  In November 2012, when the InterExchange
15:52:24  12  employee called you, what did you say?
15:52:36  13    A.  Can you repeat the question, please.
15:52:39  14        MS. COLAIZZI:  Can you read it back,
15:52:40  15  please.
15:52:20  16        (The last question was read back as
15:52:20  17  follows:  "In November 2012, when the InterExchange
15:52:24  18  employee called you, what did you say?")
15:52:58  19    I told them everything that was happening
15:53:01  20  in the house of the ▇▇▇
15:53:02  21

155

15:53:28

156

15:55:12  1     Q.  Did you make any effort to tell
15:55:15  2   InterExchange that she was not helping you register for
15:55:17  3   school?
15:55:24  4     A.  No.
15:55:27  5     Q.  When you spoke with the InterExchange
15:55:29  6   representative in November of 2012 did you use the word
15:55:33  7   "abuse"?
15:55:42  8     A.  I don't remember.
15:55:47  9     Q.  Do you recall telling her anything other
15:55:49  10  than what you've told me today?
15:55:58  11    A.  I don't know if I already said about the
15:55:59  12  school.
15:56:02  13    Q.  You did.  Anything else?
15:56:07  14    A.  No.  No.  I don't remember.
15:56:09  15    Q.  What did the InterExchange representative
15:56:12  16  say when you told her these things?
15:56:25  17    A.  That they were going to be back in contact
15:56:29  18  quickly.
15:56:32  19    Q.  And you don't remember when in November
15:56:34  20  this conversation took place?
15:56:40  21    A.  No.
15:56:43  22    Q.  Did anyone from InterExchange contact you
15:56:46  23  again?
15:56:51  24    A.  No one.
15:56:54  25

PLAINTIFFS' RESP. APP 0004869

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

Case No. 1-14-cv-03074-CMA-KMT Document 948-25 filed 03/30/18 USDC Colorado pg 43 of 701

JOHANA PAOLA BELTRAN - 8/30/2016
Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.



157

15:56:58 1

15:57:13 6     Q. Did InterExchange know you were leaving?
15:57:19 7     A. Yes. I'm sorry. Can I use the bathroom?
15:57:26 8     Q. Yeah. Let's just finish this question, if
9 you can.
15:57:28 10     A. Uh-huh.
15:57:30 11     Q. Did InterExchange know you were leaving?
15:57:33 12     A. Yes.
15:57:34 13     Q. Okay. Who told them?
15:57:41 14     A. I think it was their representative. I'm
15 not sure.
15:57:43 16     Q. The one who called you in November 2012?
15:57:52 17     A. No.
15:57:55 18     Q. Patti?
15:57:57 19     A. I think so.
15:57:58 20     Q. But you never spoke with Patti about your
15:58:00 21 desire to leave the ▮▮▮▮ correct?
15:58:05 22     A. No.
15:58:07 23     MS. COLAIZZI: We can go ahead and take a
15:58:08 24 break.
15:58:12 25     THE DEPONENT: Thank you.

158

15:58:13 1     THE VIDEOGRAPHER: Going off the record.
15:58:14 2 The time is 3:58 p.m.
15:58:16 3     (Recess taken, 3:58 p.m. to 4:13 p.m.)
16:13:36 4     THE VIDEOGRAPHER: We are back on the
16:13:37 5 record. The time is 4:13 p.m.
16:13:41 6     Q. (BY MS. COLAIZZI) Ms. Beltran, do you
16:13:42 7 know how many hours you worked each week that you were
16:13:50 8 living with the ▮▮▮▮
16:13:58 9     A. I'm not sure, but it wasn't less than 45.
16:14:04 10     Q. Do you know for certain that it was more
16:14:05 11 than 45?
16:14:10 12     A. I'm not sure.
16:14:12 13     THE VIDEOGRAPHER: I'm sorry, Ms. Beltran,
16:14:15 14 can you keep your voice up?
16:14:18 15     MR. HOOD: She doesn't have her microphone
16:14:20 16 on. Is that okay?
16:14:22 17     THE DEPONENT: Sorry. I forgot about it.
16:14:24 18     MR. HOOD: Was that all on the record?
16:14:30 19     THE VIDEOGRAPHER: I did pick it up,
16:14:32 20 yes.
16:14:32 21     MR. HOOD: Oh, okay.
16:14:33 22     MS. COLAIZZI: Thank you.
16:14:35 23     Q. (BY MS. COLAIZZI) And you did not keep
16:14:36 24 any records of the hours you worked on a weekly basis,
16:14:39 25 correct?

159

16:14:46 1     A. No, I didn't.
16:14:51 2     Q. To your knowledge, did InterExchange have
16:14:55 3 any input into how many hours a week you worked when
16:14:58 4 you lived with the ▮▮▮▮
16:15:15 5     A. What do you mean, that they would -- they
16:15:18 6 would track them?
16:15:19 7     Q. Yes. Do you have any knowledge that they
16:15:22 8 tracked your hours?
16:15:28 9     A. Not that I'm aware of.
16:15:31 10     Q. Do you have any knowledge that they told
16:15:32 11 the ▮▮▮▮ how many hours you should work a week?
16:15:44 12     A. I don't know.
16:15:46 13     Q. Do you have any information that anyone
16:15:48 14 from InterExchange told the ▮▮▮▮ what duties to have
16:15:52 15 you perform?
16:16:05 16     A. No, I don't know.
16:16:07 17     Q. Are you aware of any communications
16:16:10 18 between the Noonans and InterExchange at all during
16:16:18 19 your time living with the ▮▮▮▮
16:16:27 20     A. Can you repeat the question?
16:16:29 21     Q. Let me try it this way. Were you present
16:16:32 22 for any conversation between anyone in the ▮▮▮▮
16:16:36 23 family and anyone from InterExchange during the time
16:16:39 24 you lived with the ▮▮▮▮
16:16:51 25     A. No.

160

16:16:58 1     (Interruption occurred in the
16:16:58 2 proceedings.)
16:16:58 3     MS. COLAIZZI: Can someone press 1,
16:17:00 4 please.
16:17:01 5     MR. HOOD: Someone press 1.
16:17:01 6     MS. COLAIZZI: Thank you. Boss me around.
16:17:10 7

PLAINTIFFS' RESP. APP 0004870

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

**JOHANA PAOLA BELTRAN - 8/30/2016**
**Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.**



161

16:18:32 1   Q. Were there any email communications that
16:18:34 2   you recall between yourself and InterExchange regarding
16:18:37 3   your desire to find another host family?
16:18:52 4   A. I don't recall.
16:18:58 5

16:19:34 13   Q. How did you find that family?
16:19:40 14   A. On the same page.
16:19:41 15   Q. On the InterExchange website?
16:19:47 16   A. It was on the profile that they did of me.
16:19:50 17

16:20:19 23   Q. Okay. And eventually, after you left,
16:20:29 24   InterExchange informed you that they could not
16:20:31 25   recommend you to another family, correct?

162

16:20:34 1   A. Yes.
16:20:45 2

16:21:37 12   Q. Hold on for just a moment, please.
16:22:02 13   MS. COLAIZZI: Are we at 22?
16:22:05 14   THE REPORTER: Yep.
16:22:06 15   MS. COLAIZZI: We're getting copies. Hold
16:22:07 16   on just a moment.
16:22:25 17   (Deposition Exhibit 22 was marked.)
16:22:26 18   MS. HERRERA: How many copies do you need?
16:22:28 19   MS. COLAIZZI: Two for them. And then --
16:22:29 20   if they don't have it. For the record, it's Bates No.
16:22:34 21   InterExchange 435.
16:22:59 22   MS. HERRERA: Here are two.
16:23:01 23   MR. HOOD: Thank you.
16:23:10 24   MS. COLAIZZI: I've got an extra if
16:23:10 25   anybody needs it. Sorry.

163

16:23:10 1   MR. HOOD: We can go with just one if
16:23:11 2   you're really short.
16:23:13 3   MS. COLAIZZI: We've got it, we just
16:23:14 4   need to dig them out.
16:23:17 5   MR. HOOD: Oh, okay. Thank you.
16:23:17 6   MS. HERRERA: Everybody here all good?
16:23:17 7   MR. HOOD: What number did you say?
16:23:19 8   THE REPORTER: 22.
16:23:20 9   MR. HOOD: 22. Great.
16:23:21 10   Q. (BY MS. COLAIZZI) Ms. Beltran, you have
16:23:41 11   in front of you a document that's been marked
16:23:44 12   Exhibit 22. Do you recognize this document?
16:23:56 13   A. Yes.
16:23:56 14   Q. And _____ an email
16:24:07 15   address that was yours?
16:24:10 16   A. Yes.
16:24:19 17   Q. Okay. Is that still an email address that
16:24:22 18   you use?
16:24:27 19   A. Yes.
16:24:28 20   Q. Do you still have on your email account
16:24:30 21   today any emails related to your au pair experience?
16:24:43 22   A. I don't believe so.
16:24:43 23   Q. Have you looked?
16:24:46 24   A. I think so.
16:24:52 25

164

16:24:55 1

PLAINTIFFS' RESP. APP 0004871

**Hunter + Geist, Inc.**
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

Case No. 1:14-cv-03074-CMA-KMT Document 928-25 filed 03/17/18 USDC Colorado pg 45 of 701

JOHANA PAOLA BELTRAN - 8/30/2016
Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.



Q. And during that time you were looking for another family to match with; is that correct?

A. Yes. But not the whole time.

Q. Because InterExchange at some point informed you that they couldn't rematch you, correct?

A. I think it was just a few weeks after the -- I left the house of the ▇▇▇▇

Q. Meaning that they informed you that they couldn't rematch you?

A. Yes.

PLAINTIFFS' RESP. APP 0004872

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

**JOHANA PAOLA BELTRAN - 8/30/2016**
**Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.**

---

### 169

```
16:33:11   1          MS. COLAIZZI:  This is 23.
16:33:24   2          (Deposition Exhibit 23 was marked.)
16:33:36   3          MS. COLAIZZI:  The Bates number is
16:33:37   4   InterExchange 438 to 39.
16:33:40   5          MR. HOOD:  Thank you.
16:33:59   6          MS. COLAIZZI:  23, correct?
16:34:02   7          MR. HOOD:  Yep.
16:34:02   8       Q.  (BY MS. COLAIZZI)  Ms. Beltran, you've
16:34:02   9   been handed what's been marked as Exhibit 23.  Do you
16:34:13  10   recognize these emails?
16:34:17  11       A.  Can I read it?
16:34:19  12       Q.  Absolutely.
16:34:20  13          (The deponent perused the exhibit.)
16:35:13  14       A.  Yes.  I'm sorry, yes.
16:35:17  15       Q.  You read Exhibit 23?
16:35:22  16       A.  Yeah.
16:35:22  17       Q.  Did you understand it, or do you need the
16:35:25  18   interpreter to read it?
16:35:29  19       A.  The second one, please.
16:35:33  20          MS. COLAIZZI:  Go ahead.
16:35:35  21          THE INTERPRETER:  The interpreter is
16:35:37  22   looking at the second email here in the middle of the
16:35:41  23   page with the date of Thursday, December 8, 2012.
16:35:46  24          MS. COLAIZZI:  December 8 or December 6?
16:35:48  25   Excuse me.
```

### 170

```
16:35:50   1          THE INTERPRETER:  My old eyes again.  I
16:35:52   2   think it's December 6.
16:35:53   3          MS. COLAIZZI:  Thank you.
16:35:54   4          MR. HOOD:  We'll stipulate that it's
16:35:55   5   December 6.
16:35:56   6          MS. COLAIZZI:  Thank you, Counsel.
16:37:13   7          THE DEPONENT:  Thank you.
16:37:14   8          MS. COLAIZZI:  Thank you.
16:37:14   9       Q.  (BY MS. COLAIZZI)  Ms. Beltran, do you
16:37:17  10   recall these email exchanges reflected in Exhibit 23?
16:37:31  11       A.  I don't remember the second one, but the
16:37:33  12   first one, I do remember it well.
16:37:35  13       Q.  Okay.  On the second email, is that your
16:37:37  14   email address listed in the "To" line?
16:37:48  15       A.  Yes.
16:37:48  16       Q.  Do you have any reason to believe that you
16:37:50  17   did not at some point receive the second email
16:37:53  18   reflected in Exhibit 23?
16:38:05  19       A.  No.
16:38:09  20       Q.  The date on that second email is
16:38:10  21   December 6, 2012.  Did -- sorry.  Is that the date on
16:38:20  22   which InterExchange informed you that they could not
16:38:23  23   rematch you with another family?
16:38:37  24       A.  I think so, but I don't remember the date
16:38:39  25   exactly.
```

### 171

```
16:38:40   1       Q.  Okay.  After InterExchange informed you
16:38:42   2   that they couldn't match you -- let me back up.
16:38:47   3   [REDACTED]
           4   [REDACTED]
           5   [REDACTED]
           6   [REDACTED]
16:39:06   7       Q.  Did you understand that when you left the
16:39:08   8   program, InterExchange would have to cancel your J-1
16:39:17   9   visa?
16:39:22  10       A.  Yes.
16:39:22  11       Q.  Okay.
16:39:49  12          MS. COLAIZZI:  24.
16:39:51  13          (Deposition Exhibit 24 was marked.)
16:39:51  14       Q.  (BY MS. COLAIZZI)  Looking at document
16:39:52  15   with Bates No. InterExchange 421.
16:39:54  16       A.  Can I say something related to this?
16:40:19  17       Q.  Just a minute, please.  Sorry, bear with
16:40:25  18   us for just a moment.  Okay.  Ms. Beltran, you've been
16:40:46  19   handed what's been marked as Exhibit 24.  Have you seen
16:40:55  20   this document before?
16:40:57  21          MR. HOOD:  Could I ask you to stop the
16:40:59  22   questioning until we get a copy of the exhibit?  Thank
16:41:06  23   you.
16:41:07  24          MS. COLAIZZI:  Sorry, I didn't -- sorry,
16:41:09  25   Alex.
```

### 172

```
16:41:09   1          MR. HOOD:  No.  No.  That's okay.
16:41:11   2          MS. COLAIZZI:  Do we need an extra one?
16:41:14   3   I've got an extra.
16:41:15   4          MR. HOOD:  No.  I think we can make -- we
16:41:16   5   can make do with this.
16:41:18   6          MS. COLAIZZI:  No, I got it.
16:41:19   7          MR. HOOD:  Are you sure?  Okay.  Thank
16:41:19   8   you, Brooke.
16:41:21   9          MS. COLAIZZI:  Sorry.
16:41:22  10       Q.  (BY MS. COLAIZZI)  Ms. Beltran, you've
16:41:23  11   been handed what's been marked as Exhibit 24.  Do you
16:41:28  12   recognize these emails at all?
16:41:36  13       A.  Yes.
16:41:36  14   [REDACTED]
           15  [REDACTED]
           16  [REDACTED]
           17  [REDACTED]
           18  [REDACTED]
           19  [REDACTED]
16:42:18  20       Q.  (BY MS. COLAIZZI)  Do you remember the
16:42:19  21   question?
16:42:23  22       A.  Can you repeat it, please.
16:42:25  23       Q.  I think I just asked you if you would
16:42:26  24   agree with me that the bottom email is dated
16:42:30  25   December 28, 2012?
```

43 (Pages 169 to 172)

Case No. 1:14-cv-03074-CMA-KMT   Document 958-25   Filed 03/17/18   USDC Colorado   pg 47 of 701

JOHANA PAOLA BELTRAN - 8/30/2016
Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.



**173**

16:42:47  1    A.  It says the date there, but I'm not good
16:42:50  2  at remembering dates.
16:42:50  3    Q.  Okay.  Do you have any reason to believe
16:42:52  4  it was not sent to you on December 28, 2012?
16:43:02  5    A.  No.
16:43:02  6    Q.  Okay.  And would you agree with me that

16:43:23  10    Q.  Okay.  And there's an email in the middle
16:43:27  11  of the page from you to Natalie, correct?
16:43:31  12    A.  Where?  Here?
16:43:40  13    Q.  In the middle.  It starts, "Hi, Natalie."
16:43:52  14    A.  Yes.
16:43:52  15    Q.  And do you recognize that as an email that
16:43:55  16  you sent to Natalie from InterExchange?
16:44:05  17    A.  Yes.
16:44:05  18    Q.  And you would agree with me that the top
16:44:07  19  email is addressed to your email account, correct?
16:44:21  20    A.  Yes.
16:44:21  21    Q.  And do you recall receiving this top email
16:44:23  22  on Exhibit 24?
16:44:26  23    THE INTERPRETER:  I'm sorry, the last part
16:44:28  24  of that question, ma'am?
16:44:31  25    MS. COLAIZZI:  The top exhibit on -- I'm

**174**

16:44:31  1  sorry.  Do you recall receiving the email on the top of
16:44:34  2  Exhibit 24?
16:44:43  3    A.  Yes.
16:44:43  4    Q.  (BY MS. COLAIZZI)  Did you respond at all
16:44:45  5  to Natalie's email, the top email in Exhibit 24 dated
16:44:51  6  January 2, 2013?
16:45:10  7    A.  Yes.
16:45:10  8    Q.  And do you recall what that response was?
16:45:16  9    A.  Was it this one?  This is the electronic
16:45:25  10  mail, the email that they sent to me, and this is my
16:45:29  11  response.
16:45:29  12    Q.  I believe that your response is to the
16:45:32  13  email on the bottom.  Do you disagree with that?
16:45:42  14    A.  This one?  This part?
16:45:48  15    Q.  Is the email in the middle from you your
16:45:51  16  response to the email on the bottom?
16:46:07  17    A.  This one is the one -- the response to
16:46:10  18  this one, I think.
16:46:13  19    MR. HOOD:  Brooke, can we go off the
16:46:14  20  record for a second?
16:46:15  21    MS. COLAIZZI:  Yeah.
16:46:16  22    THE VIDEOGRAPHER:  Going off the record.
16:46:17  23  This is the end of Media Unit No. 3 in the videotape
16:46:20  24  deposition of Johana Paola Beltran.  The time is
16:46:25  25  4:46 p.m.  We are off the record.

**175**

16:46:29  1    MR. HOOD:  I knew that.
16:46:31  2    (Discussion off the record.)
16:48:28  3    (Recess taken, 4:48 p.m. to 4:55 p.m.)
16:55:22  4    THE VIDEOGRAPHER:  We are back on the
16:55:23  5  record.  This is the beginning of Media Unit No. 4 in
16:55:27  6  the videotaped deposition of Johana Paola Beltran.  The
16:55:31  7  time is 4:55 p.m.
16:55:36  8

**176**

16:56:37  1    Q.  Okay.  To your knowledge, had she
16:56:40  2

PLAINTIFFS' RESP. APP 0004874



PLAINTIFFS' RESP. APP 0004875

**Hunter + Geist, Inc.**
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

**JOHANA PAOLA BELTRAN - 8/30/2016**
**Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.**



181

17:04:22
17:04:31 3    Q. Do you currently have a Facebook account?
17:04:37 4    A. Yes.
17:04:37 5    Q. Was it the same Facebook account you had
17:04:40 6 when you lived with the Noonans?
17:04:47 7    A. Yes.
17:04:47 8    Q. Are there any materials or postings on
17:04:50 9 your Facebook account related to your experience with
17:04:52 10 the au pair program or this lawsuit?
17:05:06 11    A. No.
17:05:10 12    Q. During your time with the Noonans did you
17:05:13 13 ever post anything on your Facebook account about your
17:05:16 14 au pair experience?
17:05:22 15    A. No.
17:05:33 16

17:06:22 25      MS. COLAIZZI: Read it back, please.

182

17:05:33 1      (The last question was read back as
17:05:33 2 follows:

17:07:53 21    A. Can you repeat that for me?
17:07:55 22      MS. COLAIZZI: Can you read it back,
17:07:56 23 please.
17:07:38 24      (The last question was read back as
17:07:38 25 follows:

183

17:07:41 1

184

17:09:48 1

17:10:04 5    Q. Did you attempt to talk to InterExchange
17:10:07 6 at any point about your belief that you were not being
17:10:09 7 paid enough money?
17:10:17 8    A. No.
17:10:19 9    Q. Why not?
17:10:27 10    A. Because I called them on the phone and I
17:10:29 11 explained to them what I was doing.
17:10:31 12    Q. You called who on the phone?
17:10:37 13    A. When the -- I talked to them when the
17:10:39 14 person from InterExchange called me.
17:10:42 15    Q. When the person from InterExchange called
17:10:45 16 you. And you're referring to the phone call in
17:10:47 17 November of 2012, correct?
17:10:57 18    A. Around there.
17:10:58 19    Q. Okay. You're telling me that during that
17:11:00 20 conversation you indicated you did not believe you were
17:11:02 21 being paid enough; is that correct?
17:11:16 22    A. No.
17:11:17 23    Q. So when you said that they knew what you
17:11:19 24 were doing, what are you talking about?
17:11:30 25    A. The work that I was doing that was not as

PLAINTIFFS' RESP. APP 0004876

**Hunter + Geist, Inc.**
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

JOHANA PAOLA BELTRAN - 8/30/2016

**Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.**



185

```
17:11:33  1   an au pair.
17:11:34  2        Q.  Okay.  So if I understand you correctly,
17:11:37  3   you're saying that because InterExchange knew about the
17:11:40  4   work you were doing, they should have known you weren't
17:11:44  5   being paid enough; is that accurate?
17:12:03  6        A.  I suppose so.
17:12:06  7        Q.  Is there anything inaccurate about that?
17:12:13  8        A.  I don't know.
17:12:16  9        Q.  Well, you indicated to me -- let me back
17:12:18  10  up.
17:12:19  11       I asked you if you ever attempted to talk
17:12:21  12  to InterExchange about the fact that you believed you
17:12:23  13  weren't being paid enough.  Do you remember that
17:12:25  14  question?
17:12:38  15       A.  Yes.
17:12:38  16       Q.  Did you ever attempt to talk to someone
17:12:40  17  from InterExchange about the belief that you had that
17:12:43  18  you were not being paid enough?
17:12:54  19       A.  No.
17:12:58  20       Q.  Did you understand that during your
17:13:01  21  participation in the au pair program you were entitled
17:13:04  22  to time off on a weekly basis?
17:13:21  23       A.  Yes.
17:13:21  24       Q.  Were there any weeks in which you did not
17:13:23  25  get the time off that you were entitled to?
```

186

```
17:13:37  1        A.  Yes.
17:13:37  2        Q.  How many weeks?
17:13:40  3        A.  I'm sorry, I didn't understand the
17:13:42  4   question well.
17:13:44  5        Q.  Did you understand that during your
17:13:46  6   participation in the program you were entitled to
17:13:47  7   one-and-a-half days off a week?
17:13:59  8        A.  Yes.
17:13:59  9        Q.  Did you get that time off every week?
17:14:07  10       A.  Yes.
17:14:07  11       Q.  Did you also understand you were entitled
17:14:09  12  to a weekend off every month?
17:14:20  13       A.  I'm not sure.
17:14:22  14       Q.  Meaning you don't know for sure if that
17:14:25  15  was something you were entitled to?
17:14:32  16       A.  Yes, I'm not sure of that.
17:14:34  17       Q.  Okay.  Did you understand that as a
17:14:37  18  participant in the program, you were entitled to
17:14:40  19  vacation time?
17:14:49  20       A.  Yes.
17:14:50  21       Q.  Okay.  Did you ask the ▓▓▓▓ for any
17:14:53  22  vacation time during the time you lived with them?
17:15:03  23       A.  I don't remember.
17:15:06  24
```

187

```
17:15:26  1
```

188

```
17:17:11  1
17:18:02  12       A.  Can you repeat the question, please.
17:18:04  13       MS. COLAIZZI:  Can you read it back,
17:18:05  14  please.
17:17:42  15       (The last question was read back as
17:17:42  16  follows:
```

47 (Pages 185 to 188)

PLAINTIFFS' RESP. APP 0004877

Case No. 1:14-cv-03074-CMA-KMT   Document 968-25   filed 09/17/18   USDC Colorado   pg 51
of 701

JOHANA PAOLA BELTRAN - 8/30/2016
Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.



**189**

17:19:00

**191**

```
17:22:22    1
17:22:23    2          Q.  Okay.  Thank you.
17:22:56    3          MS. COLAIZZI:  25.
17:23:00    4          (Deposition Exhibit 25 was marked.)
17:23:01    5          MS. COLAIZZI:  For the record,
17:23:01    6   Exhibit -- well, we're not marking it.  For the record,
17:23:09    7   Exhibit 25 are documents Bates labeled Beltran 22
17:23:13    8   through 56.
17:23:23    9          A.  This -- this says 25.
17:23:28   10          Q.  (BY MS. COLAIZZI)  Right.  Exhibit 25 is
17:23:32   11   Bates Nos. Beltran 22 through 56.
17:23:41   12          MR. HOOD:  I don't think she knows what
17:23:42   13   the Bates number is.
17:23:43   14          MS. COLAIZZI:  Well, I was just saying it
17:23:45   15   for the record.
17:23:46   16          MR. HOOD:  Okay.
17:23:47   17          MS. COLAIZZI:  So they know.
17:23:49   18          MR. HOOD:  It's bueno.
17:23:51   19          Q.  (BY MS. COLAIZZI)  Ms. Beltran, do you
17:23:52   20   recognize Exhibit 25?
17:23:59   21          A.  Can I look at it?
17:24:01   22          Q.  Sure.
17:24:05   23          (The deponent perused the exhibit.)
17:25:22   24          Q.  Ms. Beltran, have you had a chance to look
17:25:26   25   at Exhibit 25?
```

**190**

17:20:49

**192**

```
17:25:31    1          A.  Yes.
17:25:31    2          Q.  Do you recognize it?
17:25:34    3          A.  Not really.
17:25:36    4          Q.  I'll represent to you that this was a
17:25:37    5   document that was produced to us in response to
17:25:43    6   your -- the request for production that we sent to you.
17:25:46    7   Are you aware of that?
17:26:01    8          A.  I -- I don't understand the question.
17:26:05    9          Q.  Has this document been in your possession
17:26:06   10   at any point in time?
17:26:13   11          A.  I don't believe so.  I don't remember.
17:26:16   12          Q.  Okay.  So you would have no reason to know
17:26:18   13   why it was produced to us with your discovery
17:26:22   14   responses?
17:26:31   15          MR. HOOD:  I'm going to object as to
17:26:33   16   privilege.  To the extent the question calls for her to
17:26:35   17   respond in any way that would make her reveal a
17:26:39   18   conversation with counsel, I would instruct my client
17:26:42   19   not to answer.  Otherwise I would instruct her to
17:26:47   20   answer.
17:26:52   21          MS. COLAIZZI:  Let me do this, Counsel.
17:26:53   22   I'm happy to go through each of these, but these were
17:26:56   23   the only documents produced with her discovery
17:26:59   24   responses.  If they didn't come from her, are you
17:27:03   25   willing to stipulate to that so that we can avoid it?
```

48 (Pages 189 to 192)

JOHANA PAOLA BELTRAN - 8/30/2016
Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.



193

17:27:05 1  Because there was no --
17:27:07 2          MR. HOOD:  Can we just go off the record
17:27:08 3  for a second?
17:27:10 4          MS. COLAIZZI:  Go off the record.
17:27:11 5          THE VIDEOGRAPHER:  Going off the record.
17:27:16 6  The time is 5:27 p.m.
17:27:20 7          (Discussion off the record, after which
17:27:22 8  time Ms. Hazel was no longer present.)
17:36:39 9          THE VIDEOGRAPHER:  We are back on the
17:36:40 10  record.  The time is 5:36 p.m.
17:36:44 11          MS. COLAIZZI:  The parties have reached a
17:36:46 12  stipulation with respect to certain documents.  First
17:36:49 13  Exhibit 25, which bears Bates Nos. Beltran 22 through
17:36:55 14  56.  Bates Nos. Beltran 57 to Beltran 91.  Beltran 107
17:37:04 15  to 142.  Beltran 143 to 184.  Beltran 185 to 228.
17:37:19 16  Beltran 229 to 286.  Beltran 287 to 464.  And Beltran
17:37:34 17  465 to 466.  And I believe counsel's ready to stipulate
17:37:46 18  that none of those documents were ever in the
17:37:47 19  possession of Ms. Beltran; is that correct?
17:37:49 20          MR. HOOD:  So stipulated.
17:37:57 21

194

17:38:18 1

195

17:39:45 1          Q.  Do you know someone named Michael Hill?
17:39:56 2

17:41:05 25          Q.  Ms. Beltran, are you aware that there's a

196

17:41:09 1  claim in this case that all of the J-1 visa sponsors
17:41:14 2  conspired to set the au pair stipend at 195.75?
17:41:49 3          A.  Can you ask me the question again?
17:42:52 4          MS. COLAIZZI:  Can you read it back,
17:41:53 5  please.
17:41:56 6          THE DEPONENT:  I'm sorry.
17:41:57 7          MS. COLAIZZI:  That's all right.
17:41:07 8          (The last question was read back as
17:41:07 9  follows:  "Ms. Beltran, are you aware that there's a
17:41:09 10  claim in this case that all of the J-1 visa sponsors
17:41:14 11  conspired to set the au pair stipend at 195.75?")
17:42:35 12          A.  Yes.
17:42:37 13          Q.  (BY MS. COLAIZZI)  With respect to this
17:42:38 14  next question I don't want to know about any
17:42:40 15  communications with your lawyers.  Do you have any
17:42:50 16  personal knowledge of any communications between
17:42:54 17  sponsors related to setting the stipend at 195.75?
17:43:17 18          A.  I don't understand the question.
17:43:22 19          MS. COLAIZZI:  Let's try reading it one
17:43:24 20  more time.
17:42:37 21          (The last question was read back as
17:42:37 22  follows:  "With respect to this next question I don't
17:42:39 23  want to know about any communications with your
17:42:41 24  lawyers.  Do you have any personal knowledge of any
17:42:53 25  communications between sponsors related to setting the

49 (Pages 193 to 196)

Case No. 1:14-cv-03074-CMA-KMT   Document 948-25   filed 03/30/18   USDC Colorado   pg 53 of 701

JOHANA PAOLA BELTRAN - 8/30/2016
Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.



197

17:42:57  1    stipend at 195.75?")
17:44:14  2        A.  No.
17:44:18  3

17:44:59  12       Q.  And you indicated a few moments ago that
17:45:02  13   you still have an active Facebook account; is that
17:45:05  14   correct?
17:45:11  15       A.  Yes.
17:45:12  16       Q.  Do you have any other social media sites
17:45:14  17   or handles of any kind?
17:45:28  18       A.  Yes.
17:45:29  19       Q.  What do you have?
17:45:32  20       A.  All of them.
17:45:35  21       Q.  You're going to have to list them for me.
17:45:37  22   I'm sorry.
17:45:41  23       A.  Instagram.  Snapshot.
17:45:50  24       MR. HOOD:  Snapchat.
17:45:52  25       A.  Snapchat.  Skype.  Facebook.  Gmail.

199

17:55:09  1        Q.  (BY MS. COLAIZZI)  Ms. Beltran, I just
17:55:10  2    have three last-minute questions for you.  Okay?
17:55:19  3        A.  Yes, that's fine.
17:55:19  4

198

17:46:01  1    Hotmail.
17:46:07  2        Q.  (BY MS. COLAIZZI)  Any others?
17:46:09  3        A.  Yes.  With the school, Canvas.  It's new.
17:46:22  4        Q.  What does it do?
17:46:33  5        A.  The professors send us emails with our
17:46:37  6    homework or they send us class notes.
17:46:40  7        Q.  Okay.  Anything else?
17:46:45  8        A.  I don't believe so.
17:46:45  9        Q.  Okay.  You had -- we've looked today at
17:46:49  10   some emails that were sent to you at a Hotmail email
17:46:52  11   address.  Is that the only Hotmail email address that
17:46:55  12   you have?
17:47:10  13       A.  I have Gmail.  But that was more for doing
17:47:16  14   work related to school.
17:47:18  15       Q.  So you only have the one Hotmail account;
17:47:21  16   is that correct?
17:47:27  17       A.  Yes.
17:47:27  18       MS. COLAIZZI:  Okay.  Let's take five.  I
17:47:28  19   think I'm done, or very close to it.
17:47:31  20       MR. HOOD:  Great.
17:47:32  21       THE VIDEOGRAPHER:  Going off the record.
17:47:34  22   The time is 5:47 p.m.
17:47:39  23       (Recess taken, 5:47 p.m. to 5:54 p.m.)
17:55:04  24       THE VIDEOGRAPHER:  We are back on the
17:55:05  25   record.  The time is 5:54 p.m.

200

17:56:46  1
17:56:48  2        MS. COLAIZZI:  Okay.  I don't have any
17:56:49  3    further questions.  I will turn it over to any other
17:56:53  4    defendant attorneys who may have questions.
17:57:04  5        MS. REILLY:  Just one quick question.
17:57:07  6        MR. HOOD:  Does she -- does she need to be
17:57:08  7    mic'd up to --
17:57:11  8        MS. COLAIZZI:  How about you just switch
17:57:12  9    with me?
17:57:14  10       MS. REILLY:  I'll go over here.
17:57:16  11       MR. HOOD:  Okay.
17:57:16  12       THE DEPONENT:  You can come up here and
17:57:17  13   sit down.
17:57:26  14       EXAMINATION
17:57:26  15   BY MS. REILLY:
17:57:26  16       Q.  Hi.  I'm Katie Reilly.  I represent
17:57:31  17   GoAuPair, Agent Au Pair, and Au Pair in America.  Not
17:57:40  18   Au Pair in America, Au Pair International.  I'm sorry.
17:57:44  19   Long day.

17:58:13  24       MS. REILLY:  Okay.  Nothing further.
17:58:14  25   Thank you.

PLAINTIFFS' RESP. APP 0004880

**JOHANA PAOLA BELTRAN - 8/30/2016**
**Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.**

---

201

```
17:58:30  1        MS. COLAIZZI:  Any other defendant
17:58:31  2    questions?  Counsel.
17:58:38  3               EXAMINATION
17:58:38  4    BY MR. HOOD:
17:58:38  5        Q.  Ms. Beltran, I'm just going to ask you
17:58:39  6    very few questions, and then you can be on your way to
17:58:42  7    the airport.  Okay?
17:58:43  8        A.  Yes.  That's fine.
17:58:51  9        Q.  Do you remember the questions earlier
17:58:53 10    about completing an au pair application with -- I think
17:58:56 11    you called it Global Exchange in Colombia?
17:59:11 12        MS. COLAIZZI:  Object to form.
17:59:16 13        A.  Some of them.
17:59:20 14
```

202

```
18:00:25  1
18:00:41  6        Q.  Did you include these families in your
18:00:44  7    au pair application that you completed with Global
18:00:56  8    Exchange as references?
18:01:01  9        A.  I had to use references.
18:01:03 10        Q.  Why did you include them as references?
18:01:16 11        A.  In the office, they -- they asked me in
18:01:22 12    the office for references that I had to give them.
18:01:26 13        Q.  Did they know when you included those
18:01:31 14    names that you did not babysit for those families?
18:01:34 15        MS. REILLY:  Objection; foundation.
18:01:37 16        MS. COLAIZZI:  Objection; form.
18:01:39 17        MR. HOOD:  Excuse me.  I think there's
18:01:40 18    only one attorney defending right now, so I'd ask that
18:01:44 19    only Brooke offer objections.
18:01:49 20        MS. COLAIZZI:  Objection; form and
18:01:50 21    foundation.
18:01:55 22        Q.  (BY MR. HOOD)  I'll ask the question
18:01:58 23    again.  When you completed the application and included
18:02:00 24    those names, did the people at the agency know that you
18:02:05 25    didn't babysit for those families?
```

203

```
18:02:07  1        MS. COLAIZZI:  Objection; form and
18:02:08  2    foundation.
18:02:14  3        MR. HOOD:  I'm going to ask the same
18:02:15  4    question.  We need to figure out some way that you can
18:02:18  5    do objections and then still have the question
18:02:22  6    translated.  So I don't -- I don't think you need to
18:02:25  7    translate the objection.
18:02:27  8        THE INTERPRETER:  Okay.
18:02:28  9        MR. HOOD:  Would you just -- just
18:02:30 10    translate -- maybe let him translate the question, make
18:02:34 11    your objection, and then let her respond.
18:02:37 12        MS. COLAIZZI:  If she'll stop responding
18:02:39 13    long enough for me to object --
18:02:42 14        MR. HOOD:  Okay.
18:02:43 15        MS. COLAIZZI:  -- I'm happy to do that.
18:02:44 16        Q.  (BY MR. HOOD)  Did you babysit for any of
18:02:46 17    those families that you included as references in your
18:02:50 18    au pair application?
18:03:05 19        A.  No.
18:03:07 20        Q.  Did the people at Global Exchange know
18:03:09 21    that when you included the names in your au pair
18:03:13 22    application?
18:03:21 23        MS. COLAIZZI:  Objection; form and
18:03:23 24    foundation.
18:03:24 25        A.  Of course.
```

204

```
18:03:26  1        Q.  (BY MR. HOOD)  Did they tell you to
18:03:27  2    include those names anyway?
18:03:35  3        A.  Yes.
18:03:35  4        Q.  Why did they tell you to include the names
18:03:38  5    anyway?
18:03:45  6        MS. COLAIZZI:  Objection; foundation.
18:03:49  7        A.  Can I respond?
18:03:50  8
18:04:07 12        Q.  So when they found out that that was your
18:04:09 13    only experience, they asked you to include other names?
18:04:23 14        MS. REILLY:  Objection; form.
18:04:26 15        MR. HOOD:  Excuse me.
18:04:26 16        MS. REILLY:  Yes.
18:04:26 17        MR. HOOD:  If we're going to have
18:04:27 18    objections, it needs to come from the one attorney
18:04:29 19    who's defending.  Okay?  We can't have 20 -- we can't
18:04:31 20    have --
18:04:31 21        MS. REILLY:  She's not defending this
18:04:33 22    deposition; she's taking the deposition.  We all have a
18:04:35 23    right to be here, and --
18:04:36 24        MR. HOOD:  You all have a right to be
18:04:37 25    here, but there's only one attorney who should be
```

51 (Pages 201 to 204)

PLAINTIFFS' RESP. APP 0004881

JOHANA PAOLA BELTRAN - 8/30/2016
Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.

---

**205**

```
18:04:40   1
```
objecting. We can't have 20 attorneys objecting at a
```
18:04:42   2
```
time. Okay?
```
18:04:42   3
```
MS. COLAIZZI: Well, Counsel, I --
```
18:04:43   4
```
MS. REILLY: That's simply wrong. That's
```
18:04:45   5
```
wrong.
```
18:04:46   6
```
MS. COLAIZZI: Look, I -- Mr. Hood, I
```
18:04:47   7
```
understand that we don't want 18 people talking at
```
18:04:49   8
```
once, but I don't think you can exclude the other
```
18:04:51   9
```
defendants' attorneys from objecting to your
```
18:04:54   10
```
questions.
```
18:04:54   11
```
MR. HOOD: I think I absolutely can.
```
18:04:56   12
```
MS. COLAIZZI: On what grounds? They are
```
18:04:57   13
```
defendants in this lawsuit.
```
18:04:59   14
```
MR. HOOD: They are defendants in this
```
18:05:00   15
```
lawsuit, but there is only one attorney that should be
```
18:05:03   16
```
defending while I'm asking questions.
```
18:05:03   17
```
MS. COLAIZZI: I can't defend on behalf of
```
18:05:04   18
```
the other 14 defendants in this case. They're not my
```
18:05:08   19
```
clients.
```
18:05:08   20
```
MS. REILLY: That's wrong.
```
18:05:08   21
```
MR. HOOD: Well, then do we need -- do we
```
18:05:10   22
```
need to get everyone microphones and get them all on
```
18:05:11   23
```
the record? I'm not -- can we go off the record for a
```
18:05:13   24
```
second?
```
18:05:14   25
```
MS. COLAIZZI: My thing is if the

---

**206**

```
18:05:16   1
```
videographer is having difficulty hearing people, then
```
18:05:17   2
```
we can make logistical arrangements so that people can
```
18:05:18   3
```
object. But I cannot object on behalf of all of the
```
18:05:21   4
```
defendants. I don't have that authority, and it's not
```
18:05:23   5
```
my place to do so. And I don't believe you can exclude
```
18:05:26   6
```
any of them from objecting if they feel it's necessary
```
18:05:28   7
```
on behalf of their client.
```
18:05:30   8
```
MR. HOOD: Well, I would just ask that we
```
18:05:31   9
```
figure out some -- some efficient means here, because
```
18:05:34   10
```
if we have 15 attorneys objecting, I can't ask any
```
18:05:38   11
```
questions.
```
18:05:40   12
```
MS. COLAIZZI: Well, she objected.
```
18:05:40   13
```
MS. REILLY: What's not efficient is this
```
18:05:41   14
```
conversation. I just made a simple form objection.
```
18:05:44   15
```
The court reporter got it.
```
18:05:46   16
```
MR. HOOD: All right. Could we read --
```
18:05:47   17
```
could we read back the last question, please.
```
18:04:07   18
```
(The last question was read back as
```
18:04:07   19
```
follows: "So when they found out that that was your
```
18:04:09   20
```
only experience, they asked you to include other
```
18:04:11   21
```
names?")
```
18:06:10   22
```
A. Yes.
```
18:06:12   23
```
Q. (BY MR. HOOD) And did they know when you
```
18:06:13   24
```
included those other names that you did not babysit for
```
18:06:16   25
```
those families?

---

**207**

```
18:06:18   1
```
MS. COLAIZZI: Object to foundation.
Sorry.
```
18:06:20   2
```

```
18:06:21   3
```
MR. HOOD: That's okay.
```
18:06:27   4
```
A. Of course.
```
18:06:28   5
```
MS. COLAIZZI: Object to foundation.
```
18:06:30   6
```
Q. (BY MR. HOOD) How did they know?
```
18:06:33   7
```
MS. REILLY: Objection to foundation.
```
18:06:36   8
```
Q. (BY MR. HOOD) You can answer.
```
18:06:49   9
```
▮▮▮▮    ▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮    ▮▮▮▮▮▮▮
▮▮▮▮▮    ▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮    ▮▮▮▮▮▮▮▮▮
```
18:07:02   14
```
Q. And they told you to include those names
```
18:07:04   15
```
even though you did not, in fact, babysit for them?
```
18:07:12   16
```
MS. COLAIZZI: Object. Object to form.
```
18:07:17   17
```
A. Yes.
```
18:07:17   18
```
Q. (BY MR. HOOD) Did they have you prepare
```
18:07:21   19
```
any other materials for your au pair application?
```
18:07:41   20
```
A. I don't remember. Like what?
```
18:07:43   21
```
Q. Were there any other materials that you
```
18:07:46   22
```
had to prepare to show to families as part of your
```
18:07:46   23
```
au pair application?
```
18:07:46   24
```
A. Yes.
```
18:07:58   25
```
Q. Like what?

---

**208**

```
18:08:00   1
```
A. A video with kids.
```
18:08:03   2
```
Q. What kids?
```
18:08:06   3
```
THE DEPONENT: (In English) From the
```
18:08:07   4
```
school.
```
18:08:10   5
```
A. From the school.
```
18:08:11   6
```
Q. (BY MR. HOOD) And why did you include
```
18:08:13   7
```
kids from a school in your video that you prepared for
```
18:08:17   8
```
your au pair application?
```
18:08:28   9
```
A. Because the agency told me that's -- those
```
18:08:32   10
```
are things that the families would want to see.
```
18:08:34   11
```
Q. Did they -- did the agency instruct you to
```
18:08:37   12
```
go to the school and take a video with the children?
```
18:08:46   13
```
A. Yes.
```
18:08:47   14
```
Q. Did the agency know when they instructed
```
18:08:49   15
```
you that you had no other relationship with those
```
18:08:52   16
```
children?
```
18:09:01   17
```
MS. COLAIZZI: Object to foundation.
```
18:09:04   18
```
MR. WOLOSZ: Objection.
```
18:09:04   19
```
A. Of course they did.
```
18:09:06   20
```
Q. (BY MR. HOOD) Of course they did. How
```
18:09:07   21
```
did they know?
```
18:09:12   22
```
MS. FITZGERALD: Foundation.
```
18:09:12   23
```
A. They told me how to do it.
```
18:09:14   24
```
Q. (BY MR. HOOD) So they instructed you to
```
18:09:15   25
```
go to the school and prepare a video with children at

---

52 (Pages 205 to 208)

PLAINTIFFS' RESP. APP 0004882

**JOHANA PAOLA BELTRAN - 8/30/2016**
**Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.**

---

### 209

| | |
|---|---|
| 18:09:19 1 | the school to include in your au pair application? |
| 18:09:30 2 | MS. COLAIZZI: Object to form. |
| 18:09:30 3 | A. Yes. |
| 18:09:32 4 | MR. WOLOSZ: Objection. |
| 18:09:33 5 | Q. (BY MR. HOOD) Did you -- did you request |
| 18:09:34 6 | permission at the school to take the video? |
| 18:09:37 7 | A. Of course. |
| 18:09:40 8 | Q. And were you given permission? |
| 18:09:43 9 | A. Yes. |
| 18:09:46 10 | MR. HOOD: That's all my questions. |
| 18:09:52 11 | EXAMINATION |
| 18:09:52 12 | BY MS. COLAIZZI: |
| 18:09:52 13 | Q. Ms. Beltran, your counsel asked you about |
| 18:09:55 14 | your application, and he asked you about the three |
| 18:10:01 15 | families that you listed, correct? |
| 18:10:09 16 | A. Yes. |
| 18:10:09 17 | Q. And do you recall that along with listing |
| 18:10:11 18 | those families, you also had to indicate the specific |
| 18:10:15 19 | child care duties you performed for them? |
| 18:10:29 20 | A. Of course. |
| 18:10:30 21 | Q. Okay. So you're telling us essentially |
| 18:10:32 22 | today that all of that information was false, correct? |
| 18:10:41 23 | A. Yes. |
| 18:10:42 24 | Q. Did you make it up or did somebody else? |
| 18:10:50 25 | A. No. I did what the agency told me to do. |

### 210

| | |
|---|---|
| 18:10:53 1 | Q. Did the agency tell you what to write down |
| 18:10:55 2 | as far as the child care duties that you performed for |
| 18:10:57 3 | each of those families? |
| 18:11:10 4 | A. Yes. |
| 18:11:10 5 | Q. Did they write it out for you or did you |
| 18:11:12 6 | actually fill it in on the application? |
| 18:11:25 7 | A. I don't remember, but I think I did it |
| 18:11:26 8 | according to their instructions. |
| 18:11:27 9 | Q. Did you ever reveal to the ████ that |
| 18:11:29 10 | the information they had received about you was false? |
| 18:11:43 11 | A. She never asked anything about it. |
| 18:11:45 12 | Q. And you certainly didn't tell her, |
| 18:11:47 13 | correct? |
| 18:11:49 14 | A. No, I didn't. |
| 18:11:52 15 | |
| | ████ |
| | |
| 18:12:12 19 | Q. Well, but you didn't know when you started |
| 18:12:14 20 | with the ████ that that's what you were going to be |
| 18:12:17 21 | doing, right? |
| 18:12:21 22 | A. No. |
| 18:12:22 23 | Q. So when you were filling out your |
| 18:12:23 24 | application in Colombia, did it not bother you that you |
| 18:12:26 25 | were lying on your application? |

### 211

| | |
|---|---|
| 18:12:40 1 | A. I followed instruction, and I thought that |
| 18:12:43 2 | they were professionals in what they were doing. |
| 18:12:45 3 | Q. So you thought it was okay to lie? |
| 18:12:53 4 | A. Like -- like I said, I only follow their |
| 18:12:55 5 | instructions. |
| 18:12:56 6 | Q. Why did you continue with your application |
| 18:12:56 7 | if it became clear to you you weren't qualified for the |
| 18:12:58 8 | program? |
| 18:13:01 9 | |
| 18:13:11 | ████ |
| | |
| 18:13:36 15 | Q. What do you mean, "for them"? |
| 18:13:41 16 | A. With the people that I filled out the |
| 18:13:43 17 | application with. |
| 18:13:44 18 | Q. Well, obviously not, because you had to |
| 18:13:46 19 | lie on the application, correct? |
| 18:13:52 20 | A. I told them the truth. |
| 18:13:54 21 | Q. And you put your name on an application |
| 18:13:56 22 | that was false, correct? |
| 18:14:03 23 | A. I don't understand. |
| 18:14:05 24 | Q. You signed an application for an au pair |
| 18:14:08 25 | position that you knew was false in terms of your |

### 212

| | |
|---|---|
| 18:14:11 1 | babysitting experience, correct? |
| 18:14:21 2 | A. Yes. |
| 18:14:22 3 | MS. COLAIZZI: Okay. I don't have any |
| 18:14:23 4 | further questions. Anyone else? |
| 18:14:31 5 | MR. HOOD: I believe she's got a car |
| 18:14:32 6 | waiting downstairs. Can you take her downstairs? |
| 18:14:33 7 | MS. COLAIZZI: Thank you for your time. |
| 18:14:36 8 | THE VIDEOGRAPHER: Going off the record. |
| 18:14:37 9 | This concludes the videotape deposition of Johana Paola |
| 18:14:44 10 | Beltran. The total number of media units used is four. |
| 18:14:48 11 | The time is 6:14 p.m. We are off the record. |
| 12 | WHEREUPON, the within proceedings were |
| 13 | concluded at the approximate hour of 6:14 p.m. on the |
| 14 | 30th day of August, 2016. |
| 15 | * * * * * |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

PLAINTIFFS' RESP. APP 0004883

**Hunter + Geist, Inc.**
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

Case 1:14-cv-03074-CMA-KMT Document 948-25 Filed 03/17/18 USDC Colorado Page 56 of 70
JOHANA PAOLA BELTRAN - 8/30/2016
Beltran, Johana Paola, et al. v. InterExchange, Inc., et al.

213

I, JOHANA PAOLA BELTRAN, do hereby certify that I have read the above and foregoing deposition and that the same is a true and accurate transcription of my testimony, except for attached amendments, if any.

Amendments attached    (  ) Yes    (  ) No

_____

JOHANA PAOLA BELTRAN

The signature above of JOHANA PAOLA BELTRAN was subscribed and sworn to before me in the county of _____, state of Colorado, this _____ day of _____, 2016.

_____

Notary Public

My commission expires

Johana Paola Beltran 8/30/16 (cb)

214

REPORTER'S CERTIFICATE

STATE OF COLORADO          )
                           )  ss.
CITY AND COUNTY OF DENVER )

I, CAROL M. BAZZANELLA, Registered Professional Reporter, Certified Realtime Reporter, and Notary Public ID 19964000498, State of Colorado, do hereby certify that previous to the commencement of the examination, the said JOHANA PAOLA BELTRAN was duly sworn by me to testify to the truth in relation to the matters in controversy between the parties hereto; that the said deposition was taken in machine shorthand by me at the time and place aforesaid and was thereafter reduced to typewritten form; that the foregoing is a true transcript of the questions asked, testimony given, and proceedings had.

I further certify that I am not employed by, related to, nor of counsel for any of the parties herein, nor otherwise interested in the outcome of this litigation.

IN WITNESS WHEREOF, I have affixed my signature this 6th day of September, 2016.

My commission expires February 10, 2020.

__X__ Reading and Signing was requested.

_____ Reading and Signing was waived.

_____ Reading and Signing is not required.

PLAINTIFFS' RESP. APP 0004884

Hunter + Geist, Inc.

scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

Case 1:14-cv-03074-CMA-KMT   Document 948-69   Filed 03/17/18   USDC Colorado   Page 57
JOHANA PAOLA BELTRAN

214

REPORTER'S CERTIFICATE

STATE OF COLORADO          )
                           )  ss.
CITY AND COUNTY OF DENVER  )

       I, CAROL M. BAZZANELLA, Registered
Professional Reporter, Certified Realtime Reporter, and
Notary Public ID 19964000498, State of Colorado, do
hereby certify that previous to the commencement of the
examination, the said JOHANA PAOLA BELTRAN was duly
sworn by me to testify to the truth in relation to the
matters in controversy between the parties hereto; that
the said deposition was taken in machine shorthand by
me at the time and place aforesaid and was thereafter
reduced to typewritten form; that the foregoing is a
true transcript of the questions asked, testimony
given, and proceedings had.

       I further certify that I am not employed
by, related to, nor of counsel for any of the parties
herein, nor otherwise interested in the outcome of this
litigation.

       IN WITNESS WHEREOF, I have affixed my
signature this 6th day of September, 2016.

       My commission expires February 10, 2020.

__X__ Reading and Signing was requested.

_____ Reading and Signing was waived.

_____ Reading and Signing is not required.

Carol M. Bazzanella
Certified Realtime Reporter
Registered Professional Reporter

Case 1:14-cv-03074-CMA-KMT   Document 948-25   Filed 03/17/18   USDC Colorado   Page 59
of 700

# Exhibit 439

PLAINTIFFS' RESP. APP.0004886

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:14-cv-03074-CMA-KMT
_____

JOHANA PAOLA BELTRAN; et al.,

      Plaintiffs,
v.

INTEREXCHANGE, INC.; et al.,

      Defendants.

_____


VIDEO DEPOSITION OF LUSAPHO HLATSHANENI

SEPTEMBER 7, 2016

_____


        PURSUANT TO NOTICE and the Colorado
Rules of Civil Procedure, the video deposition of
LUSAPHO HLATSHANENI was taken on behalf of the
Defendant American Institute for Foreign Study,
Inc., Au Pair In America, Au Pair Foundation at
1801 California Street, Toronto Room, Denver,
Colorado, on September 7, 2016, at 9:11 a.m., before
Renee S. Wilson, Certified Shorthand Reporter and
Notary Public within the State of Colorado.

PLAINTIFFS' RESP. APP.0004887

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 2

```
 1            A P P E A R A N C E S
 2   For the Plaintiff:
 3   LAUREN FLEISHER LOUIS, ESQ.
     Boies, Schiller & Flexner, LLP
 4   401 East Las Olas Boulevard
     Suite 1200
 5   Ft. Lauderdale, Florida  33301
     (Appearing telephonically)
 6
                 and
 7
     ALEXANDER NEVILLE HOOD, ESQ.
 8   Towards Justice
     1535 High Street
 9   Suite 300
     Denver, Colorado  80218
10
11   For the Defendant Interexchange, Inc.:
12   BROOK A. COLAIZZI, ESQ.
     Sherman & Howard, LLC
13   633 17th Street
     Suite 3000
14   Denver, Colorado  80202
     (Appearing telephonically)
15
16   For the Defendant Expert Group International, Inc.,
     doing business as Expert AuPair:
17
     BOGDAN ENICA, ESQ.
18   111 Second Avenue NE
     Suite 213
19   St. Petersburg, Florida  33701
     (Appearing telephonically)
20
21   For the Defendant Cultural Homestay International:
22   JONATHAN S. BENDER, ESQ.
     Holland & Hart, LLP
23   555 17th Street
     Suite 3200
24   Denver, Colorado  80202
25
```

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0004888

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 3

```
 1              A P P E A R A N C E S
                   (Continued)
 2
 3   For the Defendant Cultural Care, Inc., doing
     business as Cultural Care Au Pair:
 4
     DIANE HAZEL, ESQ.
 5   Lewis Roca Rothgerber Christie, LLP
     One Tabor Center
 6   1200 17th Street
     Suite 3000
 7   Denver, Colorado  80202
 8
     For the Defendant AuPairCare, Inc.:
 9
     THOMAS BAKER QUINN, ESQ.
10   Gordon & Reese, LLP
     555 17th Street
11   Suite 3400
     Denver, Colorado  80202
12   (Appearing telephonically)
13
     For the Defendant Au Pair International Inc., Agent
14   Au Pair, and Go Au Pair:
15   KATHRYN A. REILLY, ESQ.
     Wheeler Trigg O'Donnell, LLP
16   370 17th Street
     Suite 4500
17   Denver, Colorado  80202
18
     For the Defendant EurAupair:
19
     MARTHA L. FITZGERALD, ESQ.
20   Brownstein Hyatt Farber Schreck, LLP
     410 17th Street
21   Suite 2200
     Denver, Colorado  80202-4432
22
23
24
25
```

PLAINTIFFS' RESP. APP.0004889

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 4

```
 1              A P P E A R A N C E S
                    (Continued)
 2
    For the Defendant Pro Au Pair and Au Pair Exchange:
 3
    MICHAEL S. DREW, ESQ.
 4  Nixon Shefrin Hensen Ogburn, PC
    5619 DTC Parkway
 5  Suite 1200
    Greenwood Village, Colorado  80111
 6
 7  For the Defendant U.S. Au Pair:
 8  WILLIAM J. KELLY, III
    Kelly & Walker, LLC
 9  1512 Larimer Street
    Suite 200
10  Denver, Colorado  80202
    (Appearing telephonically)
11
12  For the Defendant Cultural Care Au Pair:
13  LYNDSEY M. KRUZER, ESQ.
    Choate Hall & Stewart
14  Two International Place
    Boston, Massachusetts 02110
15  (Appearing telephonically)
16
    For the Defendant American Institute for Foreign
17  Study, Inc., Au Pair In America, Au Pair Foundation:
18  LAWRENCE LEE, ESQ.
    Fisher & Phillips, LLP
19  1801 California Street
    Suite 2700
20  Denver, Colorado  80202
21           and
22  STEPHEN MACRI, ESQ.
    JOHN FULFREE, ESQ.
23  Putney Twombly Hall & Hirson
    521 5th Avenue
24  New York, New York  10175
    (Appearing telephonically)
25
```

PLAINTIFFS' RESP. APP.0004890

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 5

1               A P P E A R A N C E S
                    (Continued)
2

3   Also Present:  Videographer Dennis Clayton

4

5

6                   I N D E X

7

8   EXAMINATION OF LUSAPHO HLATSHANENI        PAGE

9   By Mr. Lee                                 10

10

11
                                        INITIAL
12  DEPOSITION EXHIBITS:                REFERENCE

13  (Previously marked)

14  16    First Amended Complaint            161

15  17    The Au Pair Exchange Program        52
          Brochure
16
    20    Code of Federal Regulations         54
17        22 C.F.R. 62.31

18
                                        INITIAL
19  DEPOSITION EXHIBITS:                REFERENCE

20  26    Au Pair In America Application Form   28

21  27    Au Pair In America Interview Report   52
          Form
22
    28    Standard Bank deposit slip dated     57
23        11/20/12

24  29    Declaration of Lusapho Hlatshaneni   58

25  30    Au Pair Your Application             69

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0004891

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 6

```
 1                    I N D E X
                     (Continued)
 2
                                          INITIAL
 3   DEPOSITION EXHIBITS:                  REFERENCE
 4   31   E-mail chain sent 11/19/2012 to        89
          Karen Paris-Beck from Allison Kruk
 5
     32   Check dated 6/21/13 to Lusapho        105
 6        Hlatshaneni
 7   33   E-mail dated 6/3/13 to ██████████     121
          ███████ from Lusapho Hlatshaneni
 8
     34   E-mail dated 1/27/14 to Lusapho       125
 9        Hlatshaneni from ████████████ ██████
10   35   Plaintiff, Lusapho Hlatshaneni's      151
          Responses to Defendant's First
11        Requests for Production
12   36   Plaintiff, Lusapho Hlatshaneni's      152
          Answers to Defendant American
13        Institute for Foreign Study, Inc.,
          d/b/a Au Pair in America's First Set
14        of Interrogatories to Plaintiff Lusapho
          Hlatshaneni
15
     37   Au Pair Your Application             160
16
     38   E-mail dated 5-5-15 to Cloete        193
17        from Lusapho Hlatshaneni
18   39   Letter dated 9-7-16 to All Counsel   204
          of Record from Lauren Louis
19
20   (Attached to the original and copy transcripts.)
21
22
23
24
25
```

PLAINTIFFS' RESP. APP.0004892

Deposition of Lusapho Hlatshaneni
September 7, 2016

```
 1                    I N D E X
                     (Continued)
 2

 3    INFORMATION TO BE SUPPLIED:

 4    Page 108, Line 2

 5    Page 110, Line 6

 6    Page 124, Line 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

PLAINTIFFS' RESP. APP.0004893

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 8

1    WHEREUPON, the following proceedings were taken

2    pursuant to the Colorado Rules of Civil Procedure:

3            (Mr. Kelly and Ms. Reilly were not present

4             at the commencement of the deposition.)

5            THE VIDEOGRAPHER:  We are on the record at

6    9:11 on September 7th, 2016, at 1801 California

7    Street, Denver, Colorado.

8            We're here for the video deposition of

9    Lusapho Hlatshaneni in the matter of Johana Paola

10   Beltran, et al., versus Interexchange, Inc., et al.,

11   to be heard in the United States District Court,

12   District of Colorado, Case No. 1:14-cv-03074-

13   CMA-KMT.

14           The videographer is Dennis Clayton.  The

15   court reporter is Renee Wilson from Wilson &

16   Associates.

17           Will counsel please state their appearances,

18   beginning with the taking attorney.

19           MR. LEE:  Larry Lee from Fisher Phillips.

20           MR. HOOD:  Alexander Hood for the

21   plaintiffs.

22           MS. FITZGERALD:  Martha Fitzgerald for

23   EurAuPair.

24           MS. HAZEL:  Diane Hazel for Cultural Care.

25           MR. DREW:  Michael Drew for Pro Au Pair and

PLAINTIFFS' RESP. APP.0004894

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 9

1    Au Pair Exchange.

2              MR. BENDER:  Jonathan Bender for Cultural

3    Homestay International.

4              MR. LEE:  For those on the phone, could you

5    please give your appearance, and do it one at a

6    time, the best that you can.

7              MS. LOUIS:  Sure.  This is Lauren Louis of

8    Boies Schiller & Flexner, also appearing on behalf

9    of plaintiff.

10             MS. KRUZER:  This is Lyndsey Kruzer from

11   Choate Hall & Stewart, appearing on behalf of the

12   Defendant Cultural Care Au Pair.

13             MR. MACRI:  Stephen Macri of the law firm

14   Putney Twombly Hall & Hirson, appearing on behalf of

15   Defendant AIFS.

16             MS. COLAIZZI:  Brook Colaizzi from Sherman &

17   Howard on behalf the Defendant Interexchange.

18             MR. FULFREE:  Jon Fulfree from Putney

19   Twombly Hall & Hirson on behalf of AIFS.

20             MR. ENICA:  Bogdan Enica on behalf of Expert

21   Au Pair.

22             MR. QUINN:  Tom Quinn on behalf of Au Pair

23   Care.

24             THE VIDEOGRAPHER:  Will the reporter please

25   swear the witness.

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0004895

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 10

1             LUSAPHO HLATSHANENI,

2    having been sworn to tell the truth, testified as

3    follows:

4                    EXAMINATION

5    BY MR. LEE:

6       Q.   Good morning, Ms. Hlatshaneni.  My name is

7    Larry Lee, and I am part of the law firm of Fisher

8    and Phillips, and we represent Au Pair In America.

9    We also represent a separate organization, Au Pair

10   Foundation.

11          Do you understand so far my legal

12   representation?

13      A.   Yes.

14      Q.   What is your full name?

15      A.   Lusapho Hlatshaneni.

16      ██   ████████████████████

██   ██   █ ██ ██ ██ ██ ██ ██ ████████

██   ██████ ███ ███ ███ ██ ██ ████

██   ██ ████ ████ ███ ███

██   ██   ████████████████

██   ████████████████████

██   ██  ███

██   ██   ████████████████████

██   ██████████████

██   ██  ████

PLAINTIFFS' RESP. APP.0004896

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 11

1      Q.    Have you ever testified in a deposition or

2  in court before?

3      A.    No.

4      Q.    I'm going to give you some very simple rules

5  for a deposition.  Please acknowledge by saying

6  "yes" or "no" if you understand those rules, and if

7  you don't understand them, I will clarify them the

8  best that I can.

9           First of all, I get to ask a question and

10  then you get to answer.  If your attorney objects,

11  unless it's something specific where he is

12  instructing you not to answer, then he and I will

13  have a discussion, but in the meantime, you're not

14  to answer.

15          However, if I do ask a question and he does

16  not instruct you to answer, please give your

17  fullest, thorough, and truthful answer.

18          Do you understand that first rule?

19          MR. HOOD:  I'm just going to object, Larry,

20  because I think you just said that backwards.  So if

21  I don't -- if I don't instruct her to answer, she

22  should not answer.

23          MR. LEE:  No.  I said it, actually,

24  correctly.  If he objects, he will tell you what to

25  do and what not to do.  If he doesn't tell you what

PLAINTIFFS' RESP. APP.0004897

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 12

1    to do, please give a full answer.

2              THE DEPONENT:  Okay.

3              MR. LEE:  Okay.  Mr. Hood, are you good with

4    that?

5              MR. HOOD:  Yeah.  If I ask you not to

6    answer, just don't answer.

7         Q.   (BY MR. LEE)  Do you understand you are

8    under oath and you are to testify truthfully and to

9    the best of your knowledge?

10        A.   Yes, I do.

11        Q.   If you have any questions about the question

12   I asked you, answer the question to the best of your

13   ability, or please clarify if you don't understand.

14             Does that make sense?

15        A.   Yes, it does.

16        Q.   And do you understand Au Pair In America and

17   my firm are going to rely upon the answers you're

18   giving today under oath to those questions that I'm

19   asking?

20        A.   Yes.

21        Q.   Did you have a chance to review any

22   documents in preparation for this deposition?

23        A.   Yes.

24             (Ms. Reilly entered the room.)

25        Q.   (BY MR. LEE)  What are those documents?

PLAINTIFFS' RESP. APP.0004898

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 13

1      A.   I looked at the Complaint, my declaration,

2   and the response to discovery documents.

3      Q.   And when you say "Complaint," were you

4   referring to the First Amended Complaint, which was

5   the title on the first page, or did it just say

6   "Complaint"?

7      A.   Yes, it is the first amended.

8      Q.   And you also testified about interrogation.

9   Did you mean interrogatories?

10     A.   Yes.

11     Q.   Did you take a look at the request for

12  interrogatories that were sent by my firm to your

13  attorney, Boies Schiller, as well as Alex Hood?

14     A.   Yes.

15     Q.   And you looked at the responses to those

16  interrogatories as well?

17     A.   Yes.

18     Q.   How many times did you look at both of those

19  documents, which are the requests and the responses?

20     A.   I don't remember exactly how many times, but

21  it was a couple of times over the period since I

22  received them.

23     Q.   When did you first receive them?

24     A.   I don't remember the date exactly, but it

25  was in August.

PLAINTIFFS' RESP. APP.0004899

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 14

1      Q.    Beginning of August?

2      A.    I don't remember exactly.

3      Q.    Was it towards the middle or end of August?

4            Go ahead and answer.

5      A.    As I said, I don't remember exactly, but it

6    was more in the beginning of August.

7            MR. LEE:   Just a brief interruption.   It

8    sounds like we have someone else on the phone.   Can

9    you please make your appearance?

10           Okay.   That was, for the record, a tone

11   which sounded like either someone entered on the

12   phone or someone hung up.

13           MS. REILLY:   Larry, I'll enter my

14   appearance.

15           So Katie Reilly on behalf of Au Pair

16   International, Agent Au Pair and Go Au Pair.

17     Q.    (BY MR. LEE)  Did you also take a look at

18   any request for production of documents as well as

19   your responses?

20     A.    Yes.

21     Q.    And would that have been around the same

22   time that you had reviewed the interrogatory request

23   and responses?

24     A.    Yes.

25     Q.    How many times did you review the production

PLAINTIFFS' RESP. APP.0004900

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 15

1    of documents as well as the responses?

2        A.   I don't remember exactly, but it was more

3    than two times.

4        Q.   **Were there any other documents you reviewed**

5    **in preparation for your deposition, Ms. Hlatshaneni?**

6        A.   No.



PLAINTIFFS' RESP. APP.0004901

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 16

1 ▮▮▮ ▮▮▮▮▮▮▮▮

▮ ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮

▮ ▮▮▮ ▮▮▮▮

4        Q.    So my understanding is you were in the

5    United States of America, for purposes of the

6    relevant time period in this deposition so far, from

7    February 2013 to around March 2015.

8              Does that sound generally correct?

9        A.    Yes.

10       Q.    Now, before we get into some of the relevant

11   facts, I have a few other preliminary questions

12   about your work history.

13             MR. LEE:  It sounds like someone else has

14   appeared on the phone.

15             Please make your appearance.

16             MR. QUINN:  Larry, it's Tom Quinn.  I got

17   kicked off for some reason.

18             MR. LEE:  Oh, good.  Thanks, Tom.  I think

19   you've confirmed that you were the person who got

20   kicked off and now you're back on.

21             Thank you for telling me that.

22             MR. QUINN:  Yep.

23 ▮▮▮ ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮

▮ ▮▮▮▮▮▮

▮ ▮▮▮ ▮▮▮▮▮▮▮▮▮▮

PLAINTIFFS' RESP. APP.0004902

Deposition of Lusapho Hlatshaneni
September 7, 2016



PLAINTIFFS' RESP. APP.0004903

Deposition of Lusapho Hlatshaneni
September 7, 2016



PLAINTIFFS' RESP. APP.0004904

Deposition of Lusapho Hlatshaneni
September 7, 2016



PLAINTIFFS' RESP. APP.0004905

Deposition of Lusapho Hlatshaneni
September 7, 2016



Page 20

1    Q.    Strike that, and I'm corrected.

PLAINTIFFS' RESP. APP.0004906

Deposition of Lusapho Hlatshaneni
September 7, 2016



PLAINTIFFS' RESP. APP.0004907

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 22

1

5      Q.   And I'll get into that a little bit later.

6           For purposes of your recollection, you came

7      to the United States to be part of the Au Pair

8      Program in between February 2013 and March 2015,

9      generally speaking.

10     A.   Yes.

11     Q.   And that remains fair and accurate for

12     purposes of this deposition; is that correct?

13     A.   Yes.

14

25     A.   Can you repeat the question?

PLAINTIFFS' RESP. APP.0004908

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 23



1      Q.   Sure.

PLAINTIFFS' RESP. APP.0004909

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 24



PLAINTIFFS' RESP. APP.0004910

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 25



20      Q.   And just so you know, I didn't tell you this

21   and no one else probably did, but we need to capture

22   your answer also through your voice.

23      A.   Okay.

24      Q.   So nodding your head or shaking your head

25   will not show up on the transcript.

PLAINTIFFS' RESP. APP.0004911

Deposition of Lusapho Hlatshaneni
September 7, 2016



PLAINTIFFS' RESP. APP.0004912

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 27

1 ████████████████████████████████████████

█ ████████████████████████████████████

█    ███    ████

4       Q.   So how did you first become interested

5   in being part of the Au Pair Program in the

6   United States?

7       A.   I can't really remember, but since I was a

8   young girl, I came across an article where I read

9   about au pairs, so I've always wanted to be an

10  au pair.

11      Q.   Approximately how old were you when you

12  first saw that article?

13      A.   It's been so many years, I don't actually

14  remember.

15      Q.   What interested you in being an au pair?

16      A.   I love working with children.

17      Q.   Did you want to be an au pair in South

18  Africa, outside of South Africa, or specifically the

19  United States?

20      A.   I wanted to be an au pair.

21      Q.   Anywhere?

22      A.   Yes.

23      Q.   Have you always been fluent in English?

24      A.   Yes.

25      Q.   My understanding is you speak other

PLAINTIFFS' RESP. APP.0004913

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 28

1    languages; is that correct?

2        A.    That's correct.

3        Q.    What languages are you fluent in other than

4    English?

5        A.    Afrikaans, Xhosa, and Zulu, and I also speak

6    Sutu.

7              MR. LEE:    I'm going to hand you what is

8    marked Exhibit 26.

9              (Exhibit 26 marked.)

10       Q.    (BY MR. LEE)  Starting with the first page

11   that is titled "Application Form," do you recognize

12   this document?

13       A.    Yes.

14       Q.    Did you receive a copy of at least this

15   first page?

16       A.    Yes.

17       Q.    Did you receive it from Au Pair In America?

18       A.    Yes.

19       Q.    Do you recall approximately when you

20   received a copy of this application form?

21       A.    I don't remember.

22       Q.    And then if you go ahead and turn the page

23   and just generally -- generally review this

24   document, does this look familiar in its entirety?

25             And you can answer after you've had a chance

PLAINTIFFS' RESP. APP.0004914

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 29

1    to review it.

2              MR. HOOD:  Larry, is this 26?  I'm sorry.

3              MR. LEE:  Yes.

4              MR. HOOD:  Thank you.

5              MR. LEE:  You're welcome.

6              I'm sorry, did someone join us on the phone?

7    And if so, can you please make your appearance?

8              MR. KELLY:  Good morning, Larry.  This is

9    William Kelly for U.S. Au Pair.

10             MR. LEE:  Thank you, Mr. Kelly.

11        Q.   (BY MR. LEE)  Ms. H, you've had a chance to

12   at least thoroughly look to see if this is a true

13   and accurate copy of what you received from Au Pair

14   In America, starting with application form, ending

15   with interview report form, which is listed as

16   Exhibit 26; is that correct?

17        A.   Yes.

18        Q.   Is there anything in there that you did not

19   receive from Au Pair In America, or does this look

20   like a thorough and complete copy?

21        A.   I -- the interview, the interview report,

22   that one I didn't receive.

23        Q.   Okay.  Please turn to Page 3 of 4 at the top

24   right-hand corner, Bates No. AIFS 1887.

25             Do you see that?

PLAINTIFFS' RESP. APP.0004915

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 30



1    A.    Yes.

2    Q.    Look at the top, the question, "What job or

3    career do you hope to have in the future?"

4    A.    Yes.

23    Q.    Do you recall when you made this statement

24    to Au Pair In America?

25    A.    I don't recall, but around the year 2012.

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0004916

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 31

1      Q.   So were there any other reasons you wanted
2   to be an au pair other than what you've testified
3   to?
4      A.   Not that I remember, but, yes.
5      Q.   There were other reasons or there were no
6   other reasons other than what you testified to?
7      A.   There were.
8      Q.   Now you can answer.
9      A.   Okay.  There were.
10      Q.   What were the other reasons?
11      A.   It was working outside of the country.
12      Q.   Did you do any research about the Au Pair
13   Program here in the United States before you
14   applied?
15      A.   Yes.
16      Q.   What kind of research?
17      A.   I searched the Internet and asked other
18   people that had been au pairs prior about their
19   experiences.
20      Q.   Would this be around 2012?
21      A.   Yes.
22      Q.   What were the websites that you were looking
23   at during that time period?
24      A.   I don't remember.  There were a lot of
25   websites that would pop up if you said "au pair."

PLAINTIFFS' RESP. APP.0004917

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 32

1    Q.   Did you see anything from the U.S.
2   Government as it applied to the Au Pair Program here
3   in the United States?
4    A.   I don't remember.
5    Q.   How extensive was your research about the
6   Au Pair Program here in the United States when you
7   were checking the Internet during 2012?
8    A.   I'd say it was pretty extensive.
9    Q.   So, for example, in 2012 were you aware of
10   the stipend or pay for au pairs in the United
11   States?
12    A.   No.
13    Q.   When did you first become aware of the
14   stipend or monetary amount for being an au pair in
15   the United States?
16    A.   Around 2012.
17    Q.   Around 2012?
18    A.   Yes.
19    Q.   Was that before or after you made an
20   application with the African ambassadors?
21    A.   It was before.
22    Q.   And how did you find out about the stipend
23   paid in the United States for the Au Pair Program?
24    A.   It was in conversation with a previous
25   au pair.

PLAINTIFFS' RESP. APP.0004918

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 33

1      ▮       ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮      ▮       ▮▮▮

▮      ▮       ▮▮▮▮▮▮▮▮▮▮▮▮▮

▮      ▮       ▮▮▮ ▮▮▮ ▮▮▮ ▮▮▮▮

5          Q.   And we will need a spelling during a break

6      for the court reporter.

7          A.   Okay.

8      ▮       ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮      ▮▮▮▮▮▮▮   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮      ▮       ▮▮▮▮▮▮▮▮▮▮▮▮▮

▮      ▮       ▮▮▮ ▮ ▮▮▮

▮      ▮       ▮▮▮▮▮▮▮▮▮▮▮   ▮▮▮▮▮▮

▮      ▮▮▮▮▮▮

▮      ▮       ▮▮▮ ▮▮▮ ▮▮▮ ▮▮▮ ▮▮▮ ▮▮▮

▮      ▮       ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮      ▮       ▮▮▮

▮      ▮       ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮      ▮       ▮▮▮

19         Q.   What did she tell you was the stipend pay

20     for the U.S. Au Pair Program during your

21     conversation with her in 2012?

22         A.   I don't remember her words correctly, but

23     she had said that it was between the range of 200

24     and $250.

25         Q.   Per week?

PLAINTIFFS' RESP. APP.0004919

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 34

1     A.    Per week.

2     Q.    Did the number 195.75 ever come up in the

3  conversation?

4     A.    No.

5     Q.    Did you verify those numbers on your own to

6  make sure that they were accurate?

7     A.    No.

8     Q.    From 2012 through 2015, did you ever verify

9  that those numbers were accurate?

10    A.    No.

11    Q.    Did your conversation with this particular

12 person include who set the wage amount of, as you've

13 testified to, approximately $200 per week for the

14 au pairs in the U.S. Au Pair Program?

15    A.    With that particular person, no.

16    Q.    Did you find out on your own?

17    A.    Yes.

18    Q.    Tell us what you found out.

19    A.    Natalie James, the agent, told me that

20 Au Pair In America would set how much I got paid.

21    Q.    And for purposes of this record that we're

22 establishing today, when did you first speak with

23 Natalie James?

24    A.    I don't remember exactly the time, but it

25 was in the year 2012.

PLAINTIFFS' RESP. APP.0004920

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 35

1     Q.    On your own, did you confirm who was

2   actually setting the wage or stipend for the U.S.

3   Au Pair Program?

4     A.    As I said, yes, through Natalie James.

5     Q.    Independently of what you've testified to as

6   to your conversation allegedly with Natalie James,

7   did you on your own confirm who was setting the

8   stipend amount for the U.S. Au Pair Program?

9     A.    Yes.

10    Q.    When did you confirm or when did you do your

11  own independent research?

12    A.    It was not research, but based on what I

13  actually earned.

14    Q.    Did you find out who was setting the stipend

15  amount?

16    A.    Yes.

17    Q.    What source did you use to find that out

18  independent of your alleged conversation with

19  Ms. James?

20    A.    I was told by Jody.

21    Q.    Who is Jody?

22    A.    She is a trainer at the Au Pair In America

23  orientation program.

24    Q.    Did you do your own independent research to

25  find out whether or not the U.S. or Federal

PLAINTIFFS' RESP. APP.0004921

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 36

1    Government was the one who set up the stipend amount

2    that you would be receiving per week as one of the

3    au pairs in the U.S. Au Pair Program?

4        A.   No.

5        Q.   Did you attempt to contact anyone, either

6    through the Federal Government, the Department of

7    State, any -- Department of Immigration, to find out

8    who was going to be overseeing the stipend amount

9    that you would be earning as an au pair in the U.S.

10   Au Pair Program?

11       A.   No.

12       Q.   Did you attempt to search, either using

13   Google or other similar methods, who would be

14   overseeing, whether it's the federal government or

15   it's a sponsor, an au pair sponsor, on the actual

16   stipend amount in the United States?

17       A.   No.

18       Q.   What was your understanding -- what was

19   your -- the first time you realized the number of

20   hours you would be working as an au pair in the

21   United States Au Pair Program?

22       A.   In conversation with Natalie James.

23       Q.   Anyone else?

24       A.   The next time I would hear from that would

25   be at orientation.

PLAINTIFFS' RESP. APP.0004922

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 37

1      Q.   With Jody?

2      A.   With Jody.

3      Q.   Did you independently confirm how many

4  number of hours that you were allowed to work

5  through the U.S. Au Pair Program?

6      A.   No.

7      Q.   Why not?

8      A.   Because I was told that I was going to work

9  for 45 hours a week by Jody.

10     Q.   Why didn't you find out who the governmental

11  agency that was overseeing the Au Pair Program here

12  in the United States on your own?

13     A.   I don't know.

14     Q.   In 2012 did you tell anyone, any third

15  party -- it could be any human being -- that you

16  thought the stipend for the U.S. Au Pair Program was

17  unfair?

18     A.   No.

19     Q.   In 2014 did you tell any third person that

20  you thought the stipend amount was unfair?

21     A.   Yes.

22     Q.   Who?

23     A.   My family.

24    ■■    ■■■■■■■■■■■■■■■

■■    ■■    ■■■■■■■■■■■■■■■■■■■

PLAINTIFFS' RESP. APP.0004923

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 38

1

2    Q.   And this was in 2014?

3    A.   This was in 2014.

4    Q.   Did you report that you thought the stipend

5    amount was unfair to anyone other than your family?

6    A.   Yes.

7    Q.   Who?

8    A.   I had conversations with other nannies who

9    had expressed how much they earned.

10   Q.   What were the names of the other nannies who

11   come to mind that you had a conversation with

12   expressing the unfairness of the stipend in the U.S.

13   Au Pair Program?

14   A.   I don't remember her name exactly, because I

15   had met her at -- at the park, so. . .

16   Q.   You said "at the park"?

17   A.   Yes.

18   Q.   Would it have been located here in the

19   United States or in South Africa?

20   A.   In the United States.

21   Q.   And this would have been in 2014?

22   A.   Yes.

23   Q.   Other than the au pair that you met in the

24   park in the United States, who else did you report

25   that you thought the stipend of the U.S. Au Pair

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0004924

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 39

1    Program here was unfair in 2014?

2        A.    In 2014.  I don't remember exactly, but I

3    had a few conversations with individuals.

4        Q.    And these are individuals who did or did not

5    work for Au Pair In America?

6        A.    Some worked for Au Pair In America and some

7    didn't.

8        Q.    So it's your testimony today while under

9    oath that you reported the unfairness of the stipend

10   to someone in Au Pair In America in 2014?

11       A.    Yes, people who worked for -- who worked

12   for Au Pair In America as au pairs.

13       Q.    Who were those people?

14       A.    Au pairs that were my friends.

15       Q.    How about anyone who actually worked for

16   Au Pair In America not as an au pair, but as part of

17   their staff?

18       A.    No, I didn't.

19       Q.    Were there any type of texts or e-mails in

20   which you had a conversation with other au pairs

21   stating your belief that the stipend here in the

22   United States for au pairs was unfair?

23       A.    I don't remember.

24       Q.    Is it possible that you would e-mail or text

25   someone on that particular topic?

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0004925

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 40

1      A.   I don't know.

2      Q.   **Why don't you know?**

3      A.   Because we had a lot of conversations.  I

4  had conversations with people.  And I don't know if

5  that would be in a text or an e-mail or not.

6      Q.   **Did you tell anyone in 2015, other than your**

7  **attorneys -- any conversation with -- if you've had**

8  **with your attorneys is off limits.  Just anyone**

9  **outside of your conversations with attorneys -- that**

10  **you indicated that you thought the stipend for the**

11  **U.S. Au Pair Program was unfair?**

12     A.   Yes.

13     Q.   **Who?**

14     A.   Other au pairs.

15     Q.   **Any staff with Au Pair In America?**

16     A.   No.

17     Q.   **Other than your attorneys in 2016, did you**

18  **express your belief that the stipend for the U.S.**

19  **Au Pair Program was unfair?**

20     A.   Yes.

21     Q.   **Who?**

22     A.   My family.

23     Q.   **Anyone else?**

24     A.   Other au pairs.

25     Q.   ██████████████████████████

PLAINTIFFS' RESP. APP.0004926

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 41



1

4    Q.    Do you know what sponsor or au pair sponsor

5    that they were with?

6    A.    Yes.

7    Q.    Why don't you start with your first name and

8    then let us know which au pair sponsored these

9    particular people, or were with?

10   A.    My name is Lusapho Hlatshaneni --

11

PLAINTIFFS' RESP. APP.0004927

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 42

1      Q.   So by my count, you've listed four so far.

2      A.   Yes.

3      Q.   Was there anyone else?

4      A.   Yes, I believe so.

5      Q.   Who?

6      A.   I don't recall exactly.  There are many

7  other people I've had the conversation with.

8      Q.   These were all verbal conversations?

9      A.   Verbal conversations.

10     Q.   None of them were in writing, either by text

11  or e-mail or even written letter?

12     A.   Not that I remember.

13     Q.   What were these conversations about as to

14  the unfairness of the stipend that was part of the

15  U.S. Au Pair Program?

16     A.   Can you repeat the question?

17     Q.   Sure.

18         What were these conversations about as it

19  applied to the alleged unfairness of the stipend

20  within the U.S. Au Pair Program?

21     A.   About my experience in the U.S. in the

22  Au Pair Program.

23     Q.   And I'm sorry, I didn't understand.  About

24  your experience?

25     A.   My experience.  So it would be a

PLAINTIFFS' RESP. APP.0004928

Case No. 1:14-cv-03074-CMA-KMT   Document 859-25   filed 03/17/18   USDC Colorado   pg 102 of 701

Page 43

1   conversation about my experience.

2       Q.   As it applied to the unfairness of the

3   stipend or with other aspects of being an au pair

4   here in the United States?

5       A.   The stipend would come up.

6       Q.   So what was normally discussed when you

7   talked about the stipend as it came up?

8       A.   How is working in the United States?  How

9   much do you get paid?  Was it enough?  What did you

10  do with the money?

11      Q.   What was their response?

12      A.   Pardon?

13      Q.   You just gave us some questions.

14      A.   Yes.

15      Q.   What was the response or what was the other

16  part of those conversations?

17      A.   So I would respond as to how much I got paid

18  as an au pair and what I did with the money while I

19  was an au pair.

20      Q.   Did you ever inform any of these other

21  au pairs that you spoke with that you had been part

22  or you joined a lawsuit?

23      A.   Yes, I did.

24      Q.   When did you tell them this?  This year?

25      A.   Yes.

PLAINTIFFS' RESP. APP.0004929

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 44

1     Q.   Last year?

2     A.   Yes.

3     ████   █████████████████████████████

   ██   ████████   █████████████

   ██   ████   █████████████████

6     Q.   Who else?

7     A.   And my family.

8     Q.   Any other au pairs?

9     A.   Yes.

10    Q.   Who?

11    ████   █████████████████████████

   ██   █████████████

13    Q.   Out of the group of au pairs that you had

14    earlier testified to and identified, from 2012 to

15    2016, did you ever have any discussions about the

16    unfairness of the hours that you worked?

17    A.   Can you repeat the question?

18    Q.   In those discussions about the unfairness of

19    the stipend, did you also discuss with any of the

20    folks that you have testified to having a

21    conversation with anything concerning the number of

22    hours that you had to work?

23    A.   Yes.

24    Q.   Was it all the folks that you've already

25    testified to that you had those conversations with?

PLAINTIFFS' RESP. APP.0004930

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 45

1      A.    Yes.

2      Q.    What was discussed about the number of hours

3   you had to work?

4      A.    How many hours each person worked a week and

5   the fact that the hours were too long.

6      Q.    Did you ever report to anyone outside of

7   your family or the other au pairs in Au Pair In

8   America that you thought the hours were too long?

9      A.    Yes.

10     Q.    Who did you report that to?

11     A.    Kena Anderson.

12     Q.    And Kena Anderson was the community liaison

13   for Au Pair In America?

14     A.    Yes.

15     Q.    When did you report that to her?

16     A.    I don't remember exactly, but it was in the

17   year 2014.

18     Q.    What means of communication did you use?

19   Was it in writing or verbal?

20     A.    It was verbal.

21     Q.    Was it through a phone call or in person?

22     A.    In person.

23     Q.    What did you tell Ms. Anderson?

24     A.    I had told Ms. Anderson that I was working

25   longer hours than the 45 hours stipulated for me to

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0004931

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 46

1   work.

2       Q.   What was her response?

3       A.   She said she would speak to my host family,

4   and she was sorry that I had to work long hours.

5       Q.   Did you contact your host family or did you

6   ever report to them that you were working too many

7   hours?

8       A.   I had had a conversation with my host

9   father, yes.

10      Q.   Was that before or after you spoke with

11  Ms. Anderson?

12      A.   I don't remember.

13  ██   █████████████████████████████████████

    ██  ██████████████████████

    ██   ██   ███████████████████████████

    ██   ██   █████████████████████████████████

    ██  ████████████████████████████████████████

    ██  ████████████████████████████████████████

    ██  █████████████████████████

    ██       ██   ██████

21      Q.   What was his response when you told him you

22  were working too many hours?

23      A.   I don't remember, but what I do remember is

24  that it didn't seem like much would change.  But he

25  said he would look at getting the children

PLAINTIFFS' RESP. APP.0004932

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 47

1    alternative care.

2        Q.    What did that mean to you?

3        A.    That meant to me that I would be working

4    less hours than I was kind of working at the time,

5    and he would find somebody else.

6        Q.    Did you believe him when he told you that?

7        A.    Yes.

8        Q.    Did you trust him at the time?

9        A.    Yes.

10       Q.    Did he follow through with his statement

11   that he would be seeking alternative care to help

12   you with your hours worked?

13       A.    No, because -- no.

14       Q.    You were going to say something.  Because?

15       A.    It took a very long time before I stopped

16   working long hours.

17       Q.    When you say "very long time," give us a

18   time reference.  What are you referring to?

19       A.    The whole summer.

20       Q.    That would have been 2014?

21       A.    2014.

22       Q.    And then the whole summer occurred.  Then

23   what happened?

24       A.    I expressed to Mr. ████ again that I had

25   been working long hours, and I was going to take my

PLAINTIFFS' RESP. APP.0004933

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 48

1    vacation, and he would have to find alternative

2    child care at that time.

3            And I did go on vacation and assisted him in

4    finding somebody else.

5        **Q.   So what was his response when you told him**

6    **that you would be taking a vacation and he would**

7    **have to find someone else in the meantime?**

8        A.   He agreed.

9        **Q.   Did he give you any push-back or tell you,**

10    **"No, you can't do that"?**

11        A.   There was some resistance.

12        **Q.   During that conversation?**

13        A.   During that conversation.

14    ████   ██████████████████████

██   ████   ██████████████████████████████████

██   ████████████████████████████████████

██   ██████████   ████████████████████   ████

██   ██████████████████████████████████████

██   ██████████████

██   ████   ████████████████████

██   ████   ██████████████

22        **Q.   Did you report this conversation to**

23    **Ms. Anderson of Au Pair In America?**

24        A.   I had mentioned the conversation to

25    Ms. Anderson.

PLAINTIFFS' RESP. APP.0004934

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 49

1      Q.    What is a cluster meeting?

2      A.    A cluster meeting is when au pairs meet with

3  their counselors.

4      Q.    ████████████████████████████████

   ██  █████████████████████████████████████████████

   ██  ███████████████████████████

   ██    ██████    ████████

8      Q.    How often do these cluster meetings take

9  place?

10     A.    I don't remember exactly, but what I do

11  remember, it would be about once a month.  But

12  sometimes they'd get canceled.

13     Q.    Did you attend every single cluster meeting

14  that was not canceled?

15     A.    No.

16     Q.    In fact, you hardly attended the cluster

17  meetings; isn't that correct?

18     A.    Yes.

19     Q.    How many cluster meetings, to the best of

20  your knowledge, did you actually attend through

21  Au Pair In America during your time with the Chapin

22  family?

23     A.    I don't remember exactly, but it was more

24  than three times.

25     Q.    Within a one-year period?

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0004935

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 50

1      A.    Within a one-year period.

2      Q.    Four times?

3      A.    I don't remember.

4      Q.    Was it more than five?

5      A.    I don't remember.

6      Q.    Was it less than five?

7      A.    I don't remember.

8      Q.    Getting back to your earlier testimony that

9      you did some Internet research on the au pair

10     cultural exchange program in the United States, do

11     you know what the phrase "cultural exchange" means,

12     or did you know at the time what it meant?

13     A.    Yes.

14     Q.    What did it mean to you, based on your own

15     research?

16     A.    It meant that I would get to experience a

17     different culture of people way of doing things in

18     their own country of where I was going.

19     Q.    And doesn't the term "cultural exchange"

20     also mean some sort of benefit for the host family?

21     A.    Yes, it does.

22     Q.    What was that benefit, based on what you

23     knew at the time?

24     A.    They would have an au pair from a different

25     country who spoke different languages, had different

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0004936

Case No. 1:14-cv-03074-CMA-KMT Document 959-25 filed 03/10/18 USDC Colorado pg 110 of 701
Case 1:14-cv-03074-CMA-KMT Document 934-59 filed 01/03/18 USDC Colorado Page 109 of 001

Deposition of Lusapho Hlatshaneni
September 7, 2016

 1    experiences, and could. . .

 2        Q.    Were you aware at the time you were doing

 3    research on the Au Pair Program in the United States

 4    that the U.S. or United States Department of State

 5    had designed this program so that countries could

 6    have a cultural exchange with each other through an

 7    Au Pair Program?

 8        A.    Yes.

 9        Q.    How were you aware?

10        A.    On my documentation, it had stated that it

11    was a cultural exchange program acknowledged by the

12    Department of State.

13        Q.    Did you know why the U.S. Government

14    provided this opportunity to citizens of other

15    countries to apply and become part of the Au Pair

16    Program in this country?

17        A.    No.

18        Q.    Sitting here today, thinking about your

19    experiences with two different host families in the

20    United States as an au pair, what kind of cultural

21    exchange benefits did you receive from that program?

22        A.    Can you please repeat the question?

23        Q.    What were the benefits -- what were the

24    cultural exchange benefits that you received,

25    sitting here today, from your prior experiences as

PLAINTIFFS' RESP. APP.0004937

Deposition of Lusapho Hlatshaneni
September 7, 2016

                                                        Page 52

1    **an au pair for two different families in this**

2    **country?**

3        A.    From what I remember is living in two

4    different states, learning how football works, to

5    some extent, watching baseball games, the actual

6    celebration of Thanksgiving and Christmas and the

7    whole other things, like Labor Day, what it means.

8        **Q.    How about the parents and children that you**

9    **had the pleasure of working for?  Did you see any**

10   **benefit of that type of cultural exchange?**

11       A.    Yes.

12       **Q.    What were they?**

13   ████  ████████████████████████████████████████

     ██  ████████████████████████████████████████

     ██  ████████████████████████

     ██    ████████████████████████████████████

     ██  ██████████████████

18               MR. LEE:  I'm going to hand you what will be

19   marked as Exhibit 27.  And I've just been informed

20   that this was used in a prior deposition, so for

21   those keeping track, it's Exhibit 17.

22               MR. HOOD:  Larry, when you're at a good

23   stopping point, can we have a five-minute break?

24               MR. LEE:  Sure.

25               (Exhibit 27 marked.)

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0004938

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 53

1      Q.    (BY MR. LEE)  Do you recognize this six-page
2   document, or have you ever seen it before?
3      A.    Can I have a look at the document?
4      Q.    Sure.
5            And the moment you realize whether you have
6   or have not seen it before, please look up.
7      A.    Okay.
8      Q.    Ms. Hlatshaneni, have you ever seen this
9   document or a copy of this document before?
10     A.    Yes.
11     Q.    When did you first see it?
12     A.    I don't remember when exactly, but around
13   2012.
14     Q.    Who gave it to you?
15     A.    It came in a package.
16     Q.    From?
17     A.    From Au Pair In America.
18     Q.    Prior to 2013, did you ever look at the
19   U.S. Department of State's website or page as it
20   applies to visa rules as well as the visa process in
21   the United States?
22     A.    No.
23     Q.    Did you ever look at the actual regulation
24   that sets the rules for the U.S. Government over the
25   Au Pair Program here in this country?

PLAINTIFFS' RESP. APP.0004939

Case No. 1:14-cv-03074-CMA-KMT   Document 1059-25   filed 07/13/18   USDC Colorado   pg 112 of 701

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 54

1      A.   Not that I remember.

2           MR. LEE:  I want to hand you what will be

3    marked as previously Exhibit 20.

4      **Q.   (BY MR. LEE)  I just need to know, have you**

5    **ever seen this first page before, or a copy of it?**

6    **Does it look familiar to you?**

7      A.   I don't know.  I have to. . .

8           It looks familiar.

9      **Q.   How does it look familiar?**

10     A.   Well, it looks familiar to the previous

11   exhibit, 27.

12     **Q.   When did you first -- did you actually see**

13   **this -- a copy of this 22 CFR 62.31 as it relates to**

14   **au pairs prior to today?**

15     A.   This exact one?

16     **Q.   Yes.**

17     A.   I don't remember.

18     **Q.   You don't recall ever seeing this before?**

19     A.   I don't remember if I saw it or not.

20          MR. HOOD:  Larry, I would again ask for a

21   break whenever you're at a good stopping point.

22          MR. LEE:  Yeah.  I'm almost finished.

23          MR. HOOD:  Great.  Thanks.

24          THE DEPONENT:  Can I also get a toilet

25   break, please?

PLAINTIFFS' RESP. APP.0004940

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 55

1          MR. LEE:  Let's take a break.

2          MR. HOOD:  Okay.

3          THE VIDEOGRAPHER:  Going off the record.

4    The time is 10:22.

5          (Recess from 10:22 a.m. to 10:39 a.m.)

6          THE VIDEOGRAPHER:  We're back on the record.

7    This is the beginning of Media No. 2 in the

8    deposition of Lusapho Hlatshaneni.  The time is

9    10:39.

10         Q.   (BY MR. LEE)  Ms. Hlatshaneni, do you recall

11   in 2012 submitting an application to become an au

12   pair in the United States with African Ambassadors,

13   which is located in South Africa?

14         A.   Yes.

15         Q.   Do you recall who you submitted your

16   application to at African Ambassadors?

17         A.   Yes.

18         Q.   Who?

19         A.   Natalie James.

20         Q.   Where was she located?

21         A.   At the African Ambassadors offices in Cape

22   Town.

23         Q.   Were you interviewed by Ms. James?

24         A.   Yes.

25         Q.   Were you interviewed by anyone else?

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0004941

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 56

```
 1        A.   Yes.

 2        Q.   Who were you interviewed by other than

 3   Ms. James?

 4        A.   Melissa.

 5        Q.   What was her last name?

 6        A.   I don't remember her last name.

 7        Q.   You earlier testified to not seeing the

 8   interview report form that was part of the

 9   application exhibits that I showed you earlier in

10   the deposition.

11             Do you remember testifying to that?

12        A.   Yes.

13             MR. LEE:  I'm going to hand you what is

14   marked as Exhibit 27, which is a separate interview

15   report form from Au Pair In America.

16             (Brief discussion off the record.)

17             MR. LEE:  I stand corrected.  I believe

18   we're on Exhibit 29, because the court reporter is

19   just using the -- even the previous exhibits as --

20   sequentially for the -- for this deposition.

21             Why don't we go off the record.  I would

22   like to clean this up.

23             MS. FITZGERALD:  Yeah.  We should not be

24   remarking previously --

25             THE VIDEOGRAPHER:  Going off the record.
```

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0004942

Case No. 1:14-cv-03074-CMA-KMT   Document 959-25   filed 03/17/18   USDC Colorado   pg 116 of 701

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 57

1    The time is 10:42.

2              (Recess from 10:42 a.m. to 10:44 a.m.)

3              THE VIDEOGRAPHER:  We're back on the

4    record.  The time is 10:44.

5        Q.    (BY MR. LEE)  Now that we have the exhibit

6    numbers all squared away, you earlier testified,

7    Ms. Hlatshaneni, that you did not ever have a chance

8    to see this interview report form; isn't that

9    correct?

10       A.    Yes.

11       Q.    Fair and accurate to -- to state that you

12   had extensive child caring and experience in South

13   Africa before you made your application with Au Pair

14   In America?

15       A.    Yes.

16       Q.    And you indicated also that you liked being

17   a caretaker over kids?

18       A.    Yes.

19       Q.    Do you recall the fees that you had to

20   initially pay for the U.S. Au Pair Program in 2012?

21       A.    Yes.

22             MR. LEE:  Let me hand you what will be

23   marked as Exhibit 28.

24             (Exhibit 28 marked.)

25       Q.    (BY MR. LEE)  Do you recognize this deposit

PLAINTIFFS' RESP. APP.0004943

Case No. 1-14-cv-03074-CMA-KMT Document 295-25 filed 03/17/18 USDC Colorado page 116
Case 1:14-cv-03074-CMA-KMT Document 231859-25 filed 03/17/18 USDC Colorado Page 116
117 of 701

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 58

1    slip that was made with Standard Bank?

2         A.    Yes.

3         Q.    Is Standard Bank your bank?

4         A.    No.

5         Q.    Whose bank is it?

6         A.    African Ambassadors'.

7         Q.    And does this exhibit represent a copy of

8    the fees that you deposited of 1750 rand in a bank

9    account for African Ambassadors?

10        A.    Yes.

11        Q.    Was this for part or all of the application

12   fee?

13        A.    I was told that was the administrative fee.

14        Q.    Who told you that?

15        A.    Natalie James.

16        Q.    Did she tell you anything else as to what

17   that fee would cover?

18        A.    No.

19        Q.    Did you have to pay any other amount over

20   the 1750 rand as part of the administrative or

21   application fee?

22        A.    Not that I remember.

23             MR. LEE:  Let me show you what will be

24   marked as Exhibit 29.

25             (Exhibit 29 marked.)

PLAINTIFFS' RESP. APP.0004944

Case No. 1:14-cv-03074-CMA-KMT   Document 959-25   filed 03/17/18   USDC Colorado   pg 118 of 701

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 59

1      Q.   (BY MR. LEE)  Do you recognize this document

2  as a true and accurate and thorough copy of your

3  declaration that was filed with the court in July of

4  this year?

5      A.   I -- yes.

6      Q.   Is that your signature on the second page,

7  Page 2, as well as your handwriting of 19 and July?

8      A.   Yes.

9      Q.   If you look on Paragraph 4, it indicates you

10 paid 9500 South African Rand, approximately $800,

11 for out-of-pocket expenses related to your

12 employment with Au Pair In America.

13          Do you see that?

14     A.   Yes, I do.

15     Q.   And you also state, "I understand that to be

16 payment for administrative fees and costs related to

17 my employment as an au pair."

18     A.   Yes.

19     Q.   So is it accurate to state that you actually

20 paid 9500 and not 1750 rand?

21          What is the correct answer?

22     A.   No.  No.  There's another copy of this.

23     Q.   There's another copy of what?

24     A.   Of the declaration.

25     Q.   And when you say there's another copy, does

PLAINTIFFS' RESP. APP.0004945

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 60

1     it reflect a different number as indicated in

2     Paragraph 4 of 9500 rand?

3          A.    Yes.

4          Q.    Is that copy in your possession?

5          A.    It's in the possession of my attorney.

6          Q.    Is 9500 accurate or not accurate?

7          A.    It's accurate in terms of the whole amount

8     that I spent for coming to America as -- to

9     participate as an au pair in the Au Pair In America

10    program, but it does not reflect the payments -- not

11    all the payments that I made to Au Pair In America.

12         Q.    All the payments that you made to Au Pair In

13    America, was it higher or lower than 9500?

14         A.    Slightly lower.

15         Q.    What was the amount, from your recollection?

16         A.    From my recollection, it was 7450 rand.

17         Q.    Looking at this declaration, is there

18    anything else that you see as inaccurate other than

19    Paragraph 4?

20         A.    No.

21         Q.    How many declarations have you signed?

22         A.    Two.

23         Q.    When did you sign the other one?

24         A.    In August sometime.

25         Q.    Of this year?

PLAINTIFFS' RESP. APP.0004946

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 61

1    A.    Yes.

2    Q.    So look at Paragraph 3 of this declaration

3    that is part of Exhibit 29.  And look up when you're

4    finished.

5         MR. HOOD:  Larry, can we go off the record

6    for a second?

7         MR. LEE:  For what purpose?

8         MR. HOOD:  I think we're going to go down a

9    rabbit hole here that we can clean up in about one

10   minute.

11        MR. LEE:  Concerning the two declarations?

12        MR. HOOD:  Yeah.  There aren't two

13   declarations.  I think she's just confused.

14        MR. LEE:  Are or are not?

15        MR. HOOD:  Are not.

16        MR. LEE:  Sure.  We can go off the record.

17        THE VIDEOGRAPHER:  Going off the record.

18   The time is 10:51.

19        (Discussion off the record.)

20        THE VIDEOGRAPHER:  Back on the record.  The

21   time is 10:52.

22        MR. LEE:  Mr. Hood has confirmed, while off

23   the record, that he believes that there are not two

24   declarations, but there's actually an interrogatory

25   response pleading that Ms. Hlatshaneni has

PLAINTIFFS' RESP. APP.0004947

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 62

1    previously signed.

2        Q.    So let me pose a question to you,

3    Ms. Hlatshaneni.  Is that your understanding as

4    well?

5        A.    Yes.

6        Q.    So testifying under oath, there is no other

7    declaration with your name on it that looks similar

8    to this Exhibit 29 other than what we have here

9    today?

10       A.    Yes.

11       Q.    Is that correct?

12       A.    Yes.

13       Q.    Getting back to Paragraph No. 3, who told

14   you from African Ambassadors that you could not be

15   paid more than $195.75 per week, and that if you

16   accepted any additional wages, you would lose your

17   visa?

18       A.    Natalie James.

19       Q.    Of Au Pair In America?

20       A.    Of Au Pair In America, African Ambassadors.

21       Q.    Of African Ambassadors.  I stand corrected.

22             When did she tell you this?

23       A.    I don't remember correctly, but it was

24   during one of our conversations that we had.

25       Q.    Did you document the conversation?

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0004948

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 63

1       A.      No.

2       Q.      When did this conversation take place?

3       A.      I don't remember exactly.  But it was in the

4    year 2012, all conversations that I've had with

5    Ms. Natalie.

6       Q.      What did you understand her statement as

7    reflected in your declaration, Paragraph 3, to mean

8    for you?

9       A.      That if I accepted any amount paid by my

10   host family that was more than the stipulated

11   amount, I would be sent off the program and then

12   sent home.

13      Q.      Did you confirm the truth or veracity of

14   that statement during the time that this statement

15   was allegedly made by Ms. James to you?

16      A.      Can you explain your question, please?

17      Q.      Yes.

18              Did you actually do any research, outside or

19   independent of what Ms. James allegedly told you as

20   reflected in Paragraph 3, to confirm whether it was

21   true or not?

22      A.      No, not that I remember.

23      Q.      Did you understand that to be the rule?

24      A.      Yes.  That's what I understood.

25      Q.      And you understood the rule to be that you

PLAINTIFFS' RESP. APP.0004949

Case No. 1:14-cv-03074-CMA-KMT   Document 1059-26   filed 03/17/18   USDC Colorado   pg 122
Case 1:14-cv-03074-CMA-KMT   Document 1059-26   filed 03/17/18   USDC Colorado   Page 122
123 of 701
of 701

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 64

1   were not to accept any additional wages outside of

2   what you would be earning from the host family,

3   $195.75 per week; is that correct?

4       A.   Yes.  That is what I understood.

5       Q.   And if you did, you potentially could lose

6   your visa; is that right?

7       A.   Yes.

8       Q.   And the visa is a temporary visa for

9   purposes of you being in the United States so you

10  could be part of the Au Pair Program; is that your

11  understanding?

12      A.   Yes.

13           MR. HOOD:  Larry, could I clarify one more

14  thing just on the record?

15           It occurs to me that the last page of her

16  interrogatories are actually entitled a declaration.

17  So there are two declarations, but the last -- she's

18  thinking -- I think -- that the last page of her

19  interrogatory is the second declaration.

20           So to clarify, there are two declarations,

21  but this is the only declaration that was signed for

22  the motion to certify, and the other declaration was

23  for the interrogatory responses.

24           MR. LEE:  Okay.  I can only take you for

25  your word for now.  I'll double-check at lunch.

PLAINTIFFS' RESP. APP.0004950

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 65

1          MR. HOOD:  Sure.

2          MR. LEE:  But thank you for letting me know.

3     Q.   (BY MR. LEE)  Did you ever ask Ms. James or

4  anyone else in 2012 the impact of you accepting any

5  additional wages outside of that $195.75 per week?

6     A.   No, not that I remember.

7     Q.   Did Ms. James also include the statement in

8  her training with you and other au pairs, to the

9  best of your knowledge?

10    A.   Ms. James, no.

11    Q.   Who did?

12    A.   Ms. Jody.

13    Q.   What was Jody's last name?

14    A.   I don't recall her last name, but Au Pair In

15  America has that information.

16    Q.   Did the Ambassadors or Ms. James indicate to

17  you who would be your employer?

18    A.   Yes.

19    Q.   Who told you it would be your employer?

20    A.   I was told, in my understanding, from

21  Ms. James, that Au Pair In America is my employer.

22    Q.   What did she say exactly, to the best of

23  your knowledge?

24    A.   To the best of my knowledge is that Au Pair

25  In America is my employer, is responsible for all of

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0004951

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 66

1    my administrative work, and then places me with a

2    host family which will then pay me a specified

3    amount that Au Pair In America will -- will decide

4    on.

5        Q.   What do you mean by "administrative work"?

6        A.   That is filling in all the paperwork

7    required to facilitate me coming into the United

8    States.

9        Q.   In 2012, how would you define "employer"?

10       A.   I don't remember what in 2012 I would define

11   as employer.

12       Q.   How would you define it today?

13       A.   Someone who is responsible for your

14   employment and providing a job.

15       Q.   Does that person hire you?

16       A.   Yes.

17       Q.   Is your employer also someone who sponsors

18   and supports your ability to be in this country

19   while being in the U.S. Au Pair Program?

20       A.   Can you repeat your question and be more

21   specific, please?

22            MR. LEE:  Could you please repeat the

23   question.

24            (Last question read.)

25       A.   I don't know.

PLAINTIFFS' RESP. APP.0004952

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 67

1    Q.    (BY MR. LEE)  Is part of your definition of
2    employer also the organization that directly pays
3    you money for the work that you have conducted or
4    committed?

5    A.    Can you please repeat your question?

6    Q.    Is the employer definition, in your own
7    mind, also the organization that pays you directly
8    for your work?

9    A.    In my understanding, no, I don't think so.

10   Q.    Why not?

11   A.    In my understanding, I was told that my
12   employer is Au Pair In America, and my sponsor is my
13   host family.

14   Q.    Do you believe that today?

15   A.    Yes, I do.

16   Q.    Did you do any independent research to
17   verify whether that was true or not?

18   A.    Not that I remember, no.

19   Q.    Is that a "no," or --

20   A.    Not that I remember.

21   Q.    As a former child care employee while doing
22   your babysitting in South Africa, who paid you your
23   salary?

24   A.    The parents.

25   Q.    Was the parent your employer?

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0004953

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 68

1       A.    Yes.

2       Q.    And the parent was the person or persons

3   that you actually did the work for in terms of

4   caretaking of the child or children; is that

5   correct?

6       A.    Yes.

7       Q.    Sitting here today, is that the same

8   relationship that you had with your host family in

9   the United States?

10      A.    And which relationship is that?

11      Q.    Weren't they your employer, the host family?

12      A.    They are two different situations.  Whereas

13  the family in South Africa was responsible for

14  hiring me, and so the understanding was they

15  employed me and I also worked for them and they paid

16  me.  But with my host family, the understanding was

17  different, that even though they paid me, they were

18  not my employer.

19      Q.    Do you have any written documentation in

20  your possession or anything you've reviewed today in

21  the deposition that shows that Au Pair In America

22  was your employer?

23      A.    I'll ask you to please repeat the question

24  so I can understand it.

25      Q.    Do you have any written evidence that shows

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0004954

Case 1:14-cv-03074-CMA-KMT Document 430-25 filed 07/13/18 USDC Colorado pg 128 of 701

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 69

1    that Au Pair In America was your employer?

2        A.    Not that I remember.

3              Outside of all the contracts that I've

4    signed?  I don't know.

5        Q.    You don't recall or you don't know?

6        A.    I don't know.

7        Q.    When you were caretaking in South Africa,

8    did you ever pay your former employers any

9    application or administrative fees?

10       A.    No.

11       Q.    Do you have any paycheck that you received

12   for work performed by Au Pair In America?

13       A.    Can you explain the question, please?

14       Q.    Did Au Pair In America ever issue some sort

15   of paycheck or stipend --

16       A.    No.

17       Q.    -- for any work?

18       A.    No.

19       Q.    Who gave you those stipend checks for work

20   performed?

21       A.    My host family.

22             MR. LEE:  Let me show you what will be

23   marked as Exhibit 30.

24             (Exhibit 30 marked.)

25       Q.    (BY MR. LEE)  So you understood in -- please

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0004955

Case 1:14-cv-03074-CMA-KMT Document 859-25 Filed 08/17/18 USDC Colorado Page 128 of 701

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 70

1    look up, and I'll let you look at the document in a
2    second.
3         A.    Okay.
4         Q.    So you understood in 2012 that you were
5    applying for the Au Pair Program in the United
6    States; is that correct?
7         A.    Yes.
8         Q.    Do you recognize this two-page document
9    titled "Au Pair:  Your Application"?
10        A.    Can I have a look at the document?
11        Q.    Yeah.  All I need to know for now is do you
12   recognize the document?
13             MR. HOOD:  I would like to note on the
14   record that the document -- is this Exhibit 30? --
15   marked as Exhibit 30 is extremely difficult to read,
16   at least the copies that were distributed.
17        Q.    (BY MR. LEE)  Are you able to read it, other
18   than what your attorney has noted?
19             MR. LEE:  And I would ask that you limit
20   your objections to form or foundation to keep this
21   proper so we don't get into a discussion about
22   speaking objections, Mr. Hood.
23        A.    I can't read it properly, but --
24        Q.    (BY MR. LEE)  You can or cannot?
25        A.    I cannot read it properly.

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0004956

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 71

1       Q.    Okay.  Do you recognize this document?

2             MR. HOOD:  Larry, do you have any clearer --

3    I can't read the exhibit, and I'm trying to follow

4    what is happening.

5             MR. LEE:  Alex, do you have an objection?

6             MR. HOOD:  I would just like to be able to

7    have an exhibit that I can read so that I can know

8    what is going on with my client.

9             MR. LEE:  You're disrupting.  You're

10   disrupting.  There's a pending question.

11            You've already stated what your --

12            MR. HOOD:  But do I have just a fuzzy copy,

13   or does everyone have the same --

14            MR. LEE:  Everyone has the same.  You're the

15   only one who has spoken out about this.  Please

16   refrain from making a speaking objection again.

17       Q.    (BY MR. LEE)  Go ahead.  There's a pending

18   question.

19       A.    Can I -- can I ask a question?

20       Q.    Do you recognize this document?  Yes or no.

21       A.    Yes.

22       Q.    And if I was to represent to you, whether

23   you can read this copy or not, that nowhere does it

24   say Au Pair In America or American Institute for

25   Foreign Study is your employer, would that be your

Wilson & Associates, LLC
(303) 588-0079

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 72

1    recollection after seeing this application when you

2    first received it?

3        A.   I'm not sure if I really understand your

4    question.

5        Q.   When did you first see a copy of this, Your

6    Application?

7             MR. HOOD:  I'm going to object as to form.

8        Q.   (BY MR. LEE)  You can answer the question.

9        A.   I don't remember exactly when, but I would

10   say in the year 2012.

11       Q.   And do you ever recall after you received

12   and reviewed this application that it stated that

13   Au Pair In America, which is also referred to as

14   AIFS, was your employer?  Do you recall ever when

15   you read it that it said that?

16            MR. HOOD:  Object as to form.

17            MR. LEE:  You can answer the question.

18            MR. HOOD:  Form and foundation.  Excuse me.

19       A.   So it's been a long time since I last read

20   the -- the -- this particular document that you

21   presented to me.  And right now, I wouldn't recall

22   what at that time I thought or known to be.

23       Q.   (BY MR. LEE)  I didn't hear that last part.

24       A.   At this moment I wouldn't recall what I

25   thought at that time, but I was under the impression

PLAINTIFFS' RESP. APP.0004958

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 73

1    that Au Pair In America is my employer.

2         Q.   Through this application at that time?

3              MR. HOOD:  Object as to form and foundation.

4         Q.   (BY MR. LEE)  You can answer the question.

5         A.   Can I read through the document and try?

6         Q.   So you can read it?

7         A.   No.  I want to try and read the document,

8    because there's a document in front of me that I'm

9    supposed to answer on and recall information that I

10   haven't thought about.

11        Q.   I guess my question is:  How can you read it

12   if you -- it's not legible, as your attorney has

13   stated in his own words?

14             Is it legible to you, for you to read, or

15   not?

16        A.   I would like another copy.

17        Q.   Okay.  We don't have another copy.  This is

18   all we have.

19        A.   Okay.

20        Q.   Is this legible for you or not?

21        A.   Huh-uh.

22        Q.   Is that a "yes" or "no"?

23        A.   No.  It's a no.

24        Q.   Okay.  Do you know what a sponsor is in the

25   au pair industry in the United States?  Have you

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0004959

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 74

1   ever heard that term?

2       A.   Yes.

3       Q.   **What is a sponsor?**

4       A.   Someone who sponsors you to come to the

5   United States and pays for a trip.

6       Q.   **Who paid for your trip and who sponsored you**

7   **during the time that you were here as part of the**

8   **U.S. Au Pair Program?**

9       A.   From what I recall, which is not exact, I

10  was with -- in a conversation with Ms. Natalie

11  James, partly the host families paid for a portion

12  of the trip as much as I also paid a portion of the

13  trip.

14      Q.   **Is that your thorough and final**

15  **recollection?**

16      A.   Yes.  And the only thing to add to that was

17  that Au Pair In America facilitates everything.

18      Q.   **How do you define "everything"?**

19      A.   Au Pair In America is the one who

20  administers all payments needed for my trip to the

21  United States.

22      Q.   **What is your definition of "administers"?**

23      A.   My understanding would be to provide the

24  payment, the paperwork, do the paperwork required to

25  get me to the United States.

PLAINTIFFS' RESP. APP.0004960

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 75

1      Q.    And that's coming from you or from Au Pair
2  In America or both you and Au Pair In America?
3      A.    That's my understanding based on Au Pair In
4  America, conversations that I had with Ms. Natalie
5  James and my understanding at that time.
6      Q.    Who is doing the administering?
7      A.    I was told that Au Pair In America, it's an
8  Au Pair In America program that will do -- they've
9  got staff in Connecticut, and they have the African
10 Ambassadors that works on behalf of Au Pair In
11 America, and they're responsible for everything.  So
12 my payments that were paid, the host family's
13 payments, supporting documents, travel documents,
14 that Au Pair In America is the one who does all of
15 that.
16     Q.    When you say "the host family's payments,"
17 are you referring to your stipend?
18     A.    No, I'm not referring to my stipend.
19     Q.    What are you referring to?
20     A.    I'm referring to funds that in my
21 understanding I was told that the host families paid
22 to Au Pair In America to facilitate getting au pairs
23 to America.
24     Q.    So from your knowledge, does a sponsor
25 screen and select both the host family and the

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0004961

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 76

1   au pair applicant and participant according to

2   certain selection criteria under the federal

3   government regulations?

4       A.   Can you please repeat the question and

5   explain?

6            (Last question read.)

7       A.   I don't know.

8       Q.   (BY MR. LEE)  From your knowledge, does an

9   au pair sponsor provide au pairs with training in

10  child development and child safety prior to the

11  au pair and host family getting together?

12      A.   I don't know.

13      Q.   From your understanding, does a sponsor

14  provide an orientation upon your arrival in the

15  United States which includes comprehensive

16  information on life here in this country?

17      A.   Can you clarify "sponsor" in the way that

18  you are asking the question?

19      Q.   You defined what a sponsor is.

20      A.   Yes.

21      Q.   I'm relying on your definition of a sponsor.

22  Do you understand that?

23      A.   Okay.

24      Q.   So as part of your definition of a sponsor

25  over the au pair programs here in this country, I'm

PLAINTIFFS' RESP. APP.0004962

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 77

1    asking you what your understanding is.

2          And my question was:  From your knowledge,

3    does a sponsor provide orientation upon your arrival

4    in the United States that includes information on

5    life here in this country?

6          Did you receive that in orientation or

7    training with Au Pair In America?

8    A.    I did receive training from Au Pair In

9    America.

10   Q.    Doesn't the sponsor or Au Pair In America

11   also give you some form of transparency about the

12   fees that you have to pay, the housing that you'll

13   receive, and other costs that you may incur while in

14   this country under the Au Pair Program?

15   A.    Can you please repeat that?

16         (Last question read.)

17         MR. HOOD:  Objection to form.

18   Q.    (BY MR. LEE)  You can answer the question.

19   A.    Can you please repeat the question, ma'am?

20         (Last question read.)

21         MR. HOOD:  Objection as to form.

22   A.    And can I get clarification on

23   "transparencies"?

24         MR. LEE:  Yes.

25   Q.    (BY MR. LEE)  Did they communicate to you

PLAINTIFFS' RESP. APP.0004963

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 78

1  about the fees that you had to pay as part of the

2  Au Pair Program here in the United States?

3      A.   Yes.

4      Q.   Were they transparent in communicating with

5  you as to what type of housing that you're

6  basically -- your room would be taken care of?

7           MR. HOOD:  Objection as to form.

8      Q.   (BY MR. LEE)  Do you understand the

9  question?

10     A.   Yes.

11     Q.   What is the answer?

12     A.   We were told we would get a room.

13     Q.   You were told you would get a room?

14     A.   A room.

15     Q.   What was your understanding of who would be

16  paying for that room or whether you had to pay?

17     A.   No.  We were told that the host families

18  would provide the rooms for us.

19     Q.   From your knowledge, does an au pair sponsor

20  in this country monitor your participation through

21  the program?

22     A.   Yes.

23     Q.   From your knowledge, does the au pair

24  sponsor have to comply with federal laws,

25  specifically, state department regulations as

PLAINTIFFS' RESP. APP.0004964

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 79

1    applies to au pairs?

2            MR. HOOD:  I'm going to object just to the

3    extent that your knowledge in responding to that

4    question comes from communications with attorneys,

5    that I'd ask that you don't share those

6    communications with counsel.  But you can otherwise

7    respond.

8            That is an objection on privilege grounds.

9       Q.   (BY MR. LEE)  I'm not asking you to divulge

10   what communications you've had with your

11   attorney.  I'm asking you a question as to your

12   knowledge outside of your conversations with your

13   attorney, if au pair sponsors are to comply with

14   Department of State regulations and federal laws

15   that applies to au pairs.

16      A.   Yes.

17           MR. HOOD:  Objection as to form.

18      Q.   (BY MR. LEE)  From your knowledge, do

19   au pair sponsors hire you as an au pair, or does the

20   host family do that?

21      A.   From my knowledge, it's the sponsors,

22   because they don't take you on as an au pair if you

23   don't meet the requirement.

24      Q.   What if the host family sees you as a good

25   match?  Are you obligated to stay with that host

PLAINTIFFS' RESP. APP.0004965

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 80

1    family or can you look for others?

2        A.   I don't think I understand your question.

3        Q.   Who ultimately hires you, the host family or

4    the au pair sponsor?

5        A.   So after -- after the au pair agency has

6    deemed me employable or not?

7        Q.   Correct.

8        A.   It's the host family.

9        Q.   Do au pair sponsors pay the $195.75, or do

10   the host families pay it, from your knowledge?

11       A.   The host families paid the $195.75.

12       Q.   Do you have any knowledge, outside of any

13   conversations you had with your attorney, whether

14   it's the U.S. Government or the au pair sponsor that

15   sets the stipend amount?

16       A.   From my understanding, it's that it's the

17   au pair agency that sets the stipend.

18       Q.   And that knowledge is based upon an alleged

19   conversation you had with someone with African

20   Ambassadors; is that correct?

21       A.   It's based on many conversations.

22       Q.   With?

23       A.   Outside of that one conversation with the

24   African Ambassadors employer.

25       Q.   When you say "many conversations," are you

PLAINTIFFS' RESP. APP.0004966

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 81

1    referring to other people that you have spoken to,

2    to confirm your statement made today?

3        A.    Yes.

4        Q.    Who were those people?

5        A.    Well, outside of African Ambassadors, Jody

6    at training told us that Au Pair In America sets the

7    stipend that we're supposed to get paid, and the

8    families must adhere to what they're told that they

9    should pay us.  And the amount is $195.75, so

10   nothing less and nothing more than that.

11            So that was the first conversation.  And

12   this was in training with other au pairs present.

13       Q.    Do you recall who the other au pairs were

14   that were present in that training?

15       A.    I do not recall because there was over 100

16   au pairs in that training.

17       Q.    Who else told you that it was the au pair

18   sponsor here at Au Pair In America and not the

19   federal government that set the sponsor rate or

20   wage?

21       A.    With -- when I arrived at my first host

22   family, they told me that they were told by Au Pair

23   In America that they have to pay the au pair

24   $195.75.

25       Q.    Who is "they"?

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0004967

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 82

1    A.   Dollars.

2         The host families have to pay.

3    Q.   **Who told you this?**

4    A.   My host father.

5    ███   ████████████████████████

███   ███   ███████████████████

7    Q.   **When did he tell you this?**

8    A.   I don't recall, but it was around the time

9    that I had arrived at their residence.

10   Q.   **Just so I understand what you just**

11   **stated --**

12   A.   Yes.

13   Q.   **-- Mr. █████ told you that he pays you**

14   **$195.75 and that he is then paid by Au Pair In**

15   **America?**

16   A.   No.

17   Q.   **What was -- what was exactly your**

18   **understanding of what he said?**

19   A.   My understanding is that Au Pair In America

20   told him that they, as the host parents, have to pay

21   the au pair $195.75.

22   Q.   **Was that all he told you?**

23   A.   He told me that he was also told that he

24   would get in trouble if they didn't -- if they

25   didn't pay me that amount or anything over.

PLAINTIFFS' RESP. APP.0004968

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 83

1    Q.   Just so I understand, Mr. ███████ told you

2    that Au Pair In America told him that he should not

3    pay you over the $195.75?

4    A.   Yes.

5    Q.   Now, Au Pair In America as a sponsor then

6    accepted you into the Au Pair Program; is that

7    correct?

8    A.   That's correct.

9    Q.   And this was during or after you read and

10   understand the terms and conditions of being

11   accepted into that program; is that right?

12       MR. HOOD:  Objection as to foundation.

13   Q.   (BY MR. LEE)  You indicated earlier that you

14   actually reviewed the terms and conditions of the

15   prior exhibit.

16       Do you recall that?

17       MR. HOOD:  Objection.  Foundation.

18   Q.   (BY MR. LEE)  You can answer the question

19   yes or no.

20   A.   Yes.

21   Q.   And you went ahead and proceeded into the

22   Au Pair Program after reading the terms and

23   conditions of Au Pair In America's program; is that

24   correct?

25       MR. HOOD:  Objection.  Foundation.

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0004969

Case 1:14-cv-03074-CMA-KMT   Document 1059-25   Filed 03/17/18   USDC Colorado   Page 142 of 701

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 84

1       Q.   (BY MR. LEE)  Yes or no.

2       A.   Can you repeat the question?

3       Q.   Sure.

4            Did you read the terms and conditions of

5  being accepted into the Au Pair In America program?

6       A.   Yes.

7       Q.   When did you read them?

8       A.   I don't remember when, but it was in the

9  year of 2012.

10      Q.   Was it before, during, or after you were

11  accepted into Au Pair In America's program?

12      A.   I don't remember.

13      Q.   But you did read it at some point --

14      A.   At some point.

15      Q.   -- in 2012?

16           How did you first learn about Au Pair In

17  America?

18      ███   ███  ███   ███  ███  ███  ███   ███  ███

███   ██████████

███   ███   ████████████

███   ███   ████

███   ███   ██████████████

███   ███   █████

███   ███   ████████████

███   ███   ███  ████  ████  ████  ████  ██  ███  ███

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0004970

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 85

1

11    Q.    So after you and ████. talked about Au Pair

12  In America -- strike that.

13           What did you talk about with ████ about

14  Au Pair In America?

15    A.    I don't remember the conversations exactly,

16  but she had told me that she was an au pair before,

17  with Au Pair In America.

18    Q.    When did this conversation take place?

19    A.    I don't remember.  It was probably around

20  the time I was considering becoming an au pair.

21    Q.    What did she tell you about her experience

22  with Au Pair In America?

23    A.    She told me about where she lived, how her

24  host family was, and all of those other things.

25    Q.    Did she say anything positive or negative

PLAINTIFFS' RESP. APP.0004971

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 86

1   **during those conversations about Au Pair In America**

2   **with you?**

3       A.   It was -- she both had positive and negative

4   things to say.

5       **Q.   What were the positive?**

6       A.   That she preferred Au Pair In America over

7   other agencies.

8       **Q.   Did she say why?**

9       A.   I don't remember her words exactly, but it

10  was around that she had met other au pairs from

11  other agencies and they weren't necessarily having

12  the best experiences.

13      **Q.   What else did she say that was positive?**

14      A.   She went to the United States, worked as an

15  au pair with Au Pair In America, and came back

16  and -- yeah, it lived up to what she thought the

17  experience would be.

18      **Q.   What was her communications about negatives**

19  **with her au pair experience?**

20          MR. HOOD:   Objection as to form.

21      A.   I can't remember.  Like she had a few --

22  quite a few things.

23          What I do remember is that the counselors

24  aren't always nice, don't always pay attention to

25  the au pairs.  And it varies per counselor.

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0004972

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 87

1    Q.   I didn't understand that last part.

2    A.   It varies per counselor.

3    Q.   Per counselor?

4    A.   Yes.

5    Q.   Sitting here today, did you ever believe

6    that the counselors at Au Pair In America, during

7    your experience here through the U.S. Au Pair

8    Program, did not care about you?

9    A.   Can you repeat the question?

10        (Last question read.)

11   A.   Yes.

12   Q.   (BY MR. LEE)  Who did not care about you?

13   A.   When I arrived in the residence of my first

14   au pair family, I did not see a counselor in the

15   time that I was told that the counselor would

16   arrive.  So the counselor actually came much later

17   than the specified time, which was two weeks.

18   Q.   Do you remember who that counselor was?

19   A.   I don't remember her name, but there are

20   documents.

21   Q.   Was her name Agnes Barton?

22   A.   No.  She came later.

23   Q.   Agnes Barton was not your community

24   counselor with the ███████--

25   A.   She --

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0004973

Case No. 1:14-cv-03074-CMA-KMT   Document 859-25   filed 03/17/18   USDC Colorado   pg 147 of 701

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 88

1    Q.    Let me finish -- ▇▇▇▇▇▇▇▇

2    A.    She was.

3    Q.    And wasn't the ▇▇▇▇ family located as the

4    first host -- as the first host family here in the

5    United States on the East Coast?

6    A.    Yes.

7    Q.    So she was or was not your first community

8    counselor?

9    A.    She was not my first community counselor.

10   There was a community counselor before her.

11   Q.    And sitting here today, you don't remember

12   who that was?

13   A.    Her name started with an F.  It's a German

14   name, so I don't remember in that sense, and I only

15   saw her two times.

16   Q.    Did you ever complain about that experience

17   to anyone at Au Pair In America?

18   A.    Yes.

19   Q.    Who?

20   A.    Agnes Barton.

21   Q.    What did you tell Agnes?

22   A.    I told her when she arrived as my counselor

23   that the only thing I was unhappy with was the fact

24   that I didn't meet my counselor in the specified

25   time.

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0004974

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 89

1      Q.    What was Ms. Barton's response?

2      A.    She apologized for that, but she was not my

3  counselor at the time.

4      Q.    Did she eventually become your counselor?

5      A.    Yes.

6      Q.    When?

7      A.    I don't remember exactly, but it was after I

8  had been with the ████ family for the first month,

9  I think.

10          MR. LEE:  So I'm going to hand you what's

11  been marked as Exhibit 31.

12          (Exhibit 31 marked.)

13      Q.    (BY MR. LEE)  And this is an e-mail

14  communication between you and Alli Kruk, who was a

15  placement assistant for Au Pair In America in 2012.

16          Do you remember Ms. Kruk?

17      A.    Yes.

18      Q.    And was your e-mail address

19  ████████████████

20      A.    Yes.

21      Q.    Does it remain -- does that remain your

22  e-mail address today?

23      A.    Yes.

24      Q.    Is it one of other e-mail addresses?

25      A.    Yes.

PLAINTIFFS' RESP. APP.0004975

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 90

1     Q.   How many other e-mail addresses do you have?

2     A.   Quite a few.

3     Q.   So read over this document and look up when

4 you're finished.

5     A.   Okay.  Thank you.

6     Q.   You're welcome.

7     Do you recall having this e-mail

8 communication with Ms. Kruk in 2012?

9     A.   Yes.

10    Q.   Fair and accurate to say this has to do with

11 your matching up in the Au Pair Program with a host

12 family?

13    A.   Yes.

14    Q.   Is there anything in here where Au Pair In

15 America indicates that it's your employer?

16    A.   No.

17    Q.   Is there anything in here that indicates

18 that Au Pair In America would be telling you what

19 your work schedule would be with the prospective

20 host family?

21    A.   No.

22    Q.   Is there anything in this e-mail

23 communication in which Au Pair In America is telling

24 you what your duties are with that host family?

25    A.   No.

PLAINTIFFS' RESP. APP.0004976

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 91

1     Q.    Isn't it also true you had the authority to
2   approve or deny a proposed match with a host family?
3     A.    It's true.
4     Q.    And that is as a result of you searching for
5   families in the Au Pair In America database,
6   correct?
7     A.    Yes.
8     Q.    Who did you contact to set up those meetings
9   with host families?
10          Did you initiate that conversation or did
11   the host families contact you?
12     A.    The host families contacted me.  The
13   website, Au Pair In America website, would indicate
14   that there's a family interested in you, and the
15   agent would then call me to tell me that there's a
16   family interested, and then to have a look and then
17   arrange with the host family.
18     Q.    And when you say "agent," are you referring
19   to a placement assistant?
20     A.    Yes.
21     Q.    And that would have been Alli or Allison
22   Kruk, as indicated in this e-mail communication?
23     A.    Yes.
24     Q.    And did she do that?
25     A.    Yes.

Wilson & Associates, LLC
(303) 588-0079

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 92

1      Q.    And what was her involvement after that?

2      A.    I don't -- I don't remember.

3      Q.    Once you got confirmation that the host

4    family would be contacting you, then what happened?

5      A.    The -- Natalie James contacted me to find

6    out if I had seen that there was a family interested

7    in me.  And she found out when -- if we set up a

8    time to have the interview, and then to -- she told

9    me to prepare for the interview.

10     Q.    Did the host family contact you before

11   Ms. James did?

12     A.    I don't remember.

13     Q.    Did the host family contact you during or

14   after the time Ms. James did?

15     A.    I don't remember.

16     Q.    Wouldn't you have had to arrange a

17   conver- -- a meeting time and date with the host

18   family through some form of communication?

19     A.    Yes.

20     Q.    Did you do so via telephone, in person, or

21   e-mail with the host family?

22     A.    I don't remember exactly, but I think it was

23   e-mail.

24     Q.    And then you met with the host family; is

25   that correct?

PLAINTIFFS' RESP. APP.0004978

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 93

1      A.   I had a Skype.

2      **Q.   A Skype interview?**

3      A.   A Skype interview with the family.

4      **Q.   And then the host family interviewed you and**

5   **asked you questions?**

6      A.   Yes.

7      **Q.   How long did the interview take place**

8   **between the host family and you as their prospective**

9   **au pair?**

10     A.   I don't recall in terms of configuration of

11   the interview, but we had two different interviews.

12     **Q.   How many host families did you interview**

13   **with in 2012?**

14     A.   I had conversations with about three

15   families.

16   ■■      ■■■■■■■■■■■■■■■■■■■■■■■■

■■     ■■     ■■■■■

■■     ■■     ■■■■■■■■■■■■■■■■■■

■■     ■■     ■■■■■■

20     **Q.   Do you remember the name of the other**

21   **family?**

22     A.   I don't remember the name of the other

23   family.

24     **Q.   If the prospective host family wanted you to**

25   **become their au pair, did you have the power or**

PLAINTIFFS' RESP. APP.0004979

Case No. 1:14-cv-03074-CMA-KMT Document 959-25 filed 03/17/18 USDC Colorado pg 153 of 701

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 94

1    authority to reject that proposal?

2        A.   Yes.

3        Q.   If you wanted to match up with a host

4    family, but the host family was not interested in

5    hiring you, did they have the power or authority not

6    to complete the match?

7        A.   Yes.

8        Q.   I just want to read you something out of

9    your declaration in Paragraph No. 6.

10       A.   Yes.

11       Q.   You stated:  "Upon arrival in New York,

12   Au Pair In America made arrangements for me to stay

13   in a hotel with a number of other au pairs for one

14   week to attend mandatory child care training

15   provided by Au Pair In America."

16            Does that statement so far sound true and

17   accurate?

18       A.   Yes.

19       Q.   And then you stated:  "I attended four days

20   of training for approximately 32 hours in total.  I

21   was not paid during this week of training."

22            Was that true?

23       A.   Yes.

24       Q.   So what kind of training did Au Pair In

25   America provide you in terms of child care?

PLAINTIFFS' RESP. APP.0004980

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 95

1       A.   They provided us with written materials, and

2   they had a whole workshop presentation on working

3   with children and how to treat children, and also

4   provided a CPR and first-aid kit as training.

5       Q.   I'm sorry.  I accidentally cut in.

6       A.   I was going to say and first aid, yes.

7       Q.   Did you receive any other type of training

8   from Au Pair In America?

9       A.   No, not that I remember.

10       Q.   You testified earlier that the host family

11   and you funded the cost and expenses for this

12   training.

13           Am I correct in understanding your previous

14   testimony?

15       A.   No.  For the training, no.  I was just told.

16       Q.   Told by whom?

17       A.   By Natalie James that the -- that the amount

18   of money that I was paying was going towards my

19   flight and towards my health insurance.

20       Q.   What was --

21       A.   She --

22       Q.   Go ahead.

23       A.   She didn't say anything about training.

24       Q.   What was the amount you paid?

25       A.   As previously stated, 7450.

PLAINTIFFS' RESP. APP.0004981

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 96

1      Q.   So it's true or not true that Au Pair In

2   America paid for your airfare from South Africa to

3   New York for your training?

4      A.   I don't know.

5      Q.   When you say you don't know, why don't you

6   know?

7      A.   I don't know, because I was told that the

8   host families also pay a portion towards my flights.

9   So I don't know what exactly amount Au Pair In

10   America paid or what the host family paid.

11      Q.   Did you ask?

12      A.   No.

13      Q.   Isn't it true that Au Pair In America paid

14   for your hotel stay during the time that you trained

15   in New York during that time period?

16      A.   I don't know.

17      Q.   Did you ask?

18      A.   No.  I didn't ask.

19      Q.   Who paid for your food during that training?

20      A.   I don't know who paid for my food.

21      Q.   How was it taken care of?

22      A.   Au Pair In America provided the training.

23      Q.   Okay.  Did they provide you food?

24      A.   Yes.

25      Q.   Did you ever complain that the training that

PLAINTIFFS' RESP. APP.0004982

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 97

1    you received from Au Pair In America was out of your

2    pocket in addition to the host family's?

3         A.    No.

4         Q.    Did you ever report that situation as unfair

5    to anyone at Au Pair In America?

6         A.    No.

7         Q.    Did you ever report that training as unfair

8    to the U.S. Government?

9         A.    No.

10        Q.    We talked about matching.  You've also

11   testified on your authority and the host family's

12   authority not to progress into a match.

13             Do you remember that testimony?

14        A.    Yes.

15        Q.    From your knowledge, who has the authority

16   to terminate the au pair relationship with the host

17   family?  You, the host family, or both?

18        A.    Both.

19        Q.    During your experience with the Au Pair

20   Program here in the United States, did Au Pair In

21   America ever terminate your host family in au pair

22   experience?

23        A.    No.

24        Q.    Did the host families ever terminate your

25   assignments?

PLAINTIFFS' RESP. APP.0004983

Deposition of Lusapho Hlatshaneni
September 7, 2016



Page 98

1      A.    No.

5      Q.    Was the relevant time period generally
6   February 2013 to approximately December 2013?
7      A.    No, approximately until the next year, 12 --
8   for a 12-month period.
9      Q.    So it's actually February 2013 to February
10   of 2014?
11     A.    Yes.

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0004984

Deposition of Lusapho Hlatshaneni
September 7, 2016



Page 99

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0004985

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 100

1

6      Q.    Was Au Pair In America involved with those

7  interviews between you and the

8      A.    No.

9      Q.    Were they present or not?

10     A.    They were not present.

11     Q.    When did Agnes Barton become your community

12  counselor from Au Pair In America?

13     A.    I don't remember exactly, but it was around

14  the period in 2013 sometime.

15     Q.    Would it have been early in 2013?

16     A.    Yes.

17     Q.    February 2013?  Does that sound familiar or

18  seem familiar to you?

19     A.    I don't remember, but it wasn't February.

20     Q.    When did it start?  March?

21     A.    I don't remember, but it was definitely

22  after February.

23     Q.    Did you have a community counselor in

24  February from Au Pair In America?

25     A.    I was assigned a counselor.  I was told I

PLAINTIFFS' RESP. APP.0004986

Case 1:14-cv-03074-CMA-KMT   Document 1050-25   Filed 03/17/18   USDC Colorado   Page 159

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 101

1    had a counselor.

2         Q.    Did you contact that counselor after you

3    were told who it was?

4         A.    No.

5         Q.    Why not?

6         A.    I had no means of contacting a counselor,

7    so -- yeah.

8         Q.    Did you ask the host family to use their

9    phone or their e-mail system or even their

10   transportation so you could meet with a community

11   counselor from Au Pair In America?

12        A.    Yes.

13        Q.    And what was their response?

14        A.    They contacted the counselor.

15        Q.    And was this in February 2014 -- strike

16   that -- 2013?

17        A.    Yes.

18        Q.    Who was your counselor?

19        A.    I don't remember her name exactly, so --

20        Q.    It starts with an F, German name?

21        A.    German name, yes.

22        Q.    Now, you testified that your host family

23   contacted the community counselor around February

24   2013.  Did you attempt to contact her?

25        A.    I don't remember.

PLAINTIFFS' RESP. APP.0004987

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 102

1    Q.   After Agnes Barton and you first met, and

2  you testified you don't remember, you just know it

3  was early in 2013, what did you communicate about?

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PLAINTIFFS' RESP. APP.0004988

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 103

1      A.   Can I ask a question?  Is that the year of

2   2013 or -- your question?  I don't know.

3      Q.   **When you first met --**

4      A.   Yes.

5      Q.   **-- Ms. Barton, what was the communication**

6   **about?  What did you guys talk about when you first**

7   **met each other?**

8      A.   She introduced herself.

9      Q.   **In person?**

10     A.   The first time I met her, yes.

11     Q.   **And was that over at the** ███ **family's**

12  **house?**

13     A.   Yes.

14  ██  ████████████████████████████████████

██  ██  ██████

██  ██  ████████████████████████████

17          MR. HOOD:  Can we go off the record for a

18  second, Larry?

19          MR. LEE:  For what purpose?

20          MR. HOOD:  I'm concerned about the kids'

21  names being on the record.

22          MR. LEE:  We have a protective order.  I'm

23  fine with keeping it confidential.

24          MR. HOOD:  Sure.  Let's mark the kids' names

25  as confidential, if Ms. Hlatshaneni feels.

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0004989

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 104

1    comfortable answering the question.

2    ▆▆  ▆▆▆▆▆  ▆▆▆▆▆▆▆

▆  ▆▆  ▆▆▆

▆  ▆▆  ▆▆▆▆▆▆▆

▆  ▆▆  ▆▆▆▆▆▆

▆  ▆▆  ▆▆▆▆▆▆▆▆▆

▆  ▆▆▆▆▆▆

▆  ▆▆  ▆▆▆▆▆

▆  ▆▆  ▆▆▆▆▆

▆  ▆▆  ▆▆▆

11       Q.   You were aware that you were to attend

12   monthly cluster meetings with Agnes Barton of

13   Au Pair In America?

14       A.   Yes.

15       Q.   And you testified earlier you didn't always

16   attend?

17       A.   Yes.

18       Q.   Do you believe that you suffered any

19   consequences from not attending those meetings on a

20   monthly basis?

21            Can you explain by what you mean by

22   "consequences"?

23       Q.   Sure.  Did you believe that you -- you did

24   not benefit or you were harmed in any way by not

25   attending those cluster meetings?

PLAINTIFFS' RESP. APP.0004990

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 105

1     A.    No.

2     Q.    Did you ever complain to Ms. Barton, as your

3 community counselor from Au Pair In America, that

4 you had a problem with the stipend amount?

5     A.    No.

6     Q.    Did you ever complain to Ms. Barton, as your

7 community counselor from Au Pair In America, that

8 you were working too many hours with the Prime

9 family?

10    A.    No.

11    Q.    You testified earlier that the host families

12 paid your stipend?

13    A.    Yes.

14    Q.    And that remains true?

15    A.    Yes.

16    Q.    You also testified that Au Pair In America

17 never paid your stipend.

18          Does that remain true, to the best of your

19 recollection?

20    A.    Yes.

21          MR. LEE:  Let me hand you what will be

22 marked as Exhibit 33.

23          Strike that.  It's 32.

24          (Exhibit 32 marked.)

25

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0004991

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 106

 1          THE DEPONENT:  Excuse me.  Can I take a

 2   short break?

 3          MR. LEE:  I'm sorry?

 4          THE DEPONENT:  Can I please take a restroom

 5   break?

 6          MR. LEE:  Sure.

 7          THE VIDEOGRAPHER:  This is the end of Media

 8   No. 2.  Going off the record.  The time is 11:56.

 9          (Lunch recess from 11:56 a.m. to 1:07 p.m.)

10          THE VIDEOGRAPHER:  We're back on the record.

11   This is the beginning of Media No. 3 in the

12   deposition of Lusapho Hlatshaneni.  The time is

13   1:07.

14      Q.   (BY MR. LEE)  Ms. Hlatshaneni, I remind you

15   that you remain under oath to tell the truth and

16   nothing but the truth.  Do you understand?

17      A.   Yes.

18      Q.   Did the -- you testified earlier the ███████

19   family did pay your stipend on a regular basis; is

20   that correct?

21      A.   Yes.

22      Q.   Were they ever late with their payments to

23   you for your work?

24      A.   Sometimes.

25      Q.   Did you work that out with them to a

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0004992

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 107

1    satisfactory resolution?

2        A.   Yes.

3        Q.   I'm going to hand you what is marked as

4    Exhibit 32.  And that's before you now.

5            Do you recognize this particular paycheck

6    from ████████████████████ that is addressed

7    to your name as an accurate and true example of

8    payment or a stipend for the work that you did with

9    them under the U.S. Au Pair Program?

10       A.   Yes.

11       Q.   Do you have possession of any other examples

12   or copies of such payments during the time that you

13   were with the ████████

14       A.   Of this one, no, but I have other forms of

15   payment.

16       Q.   When you say "other forms of payment," you

17   also kept copies of forms of stipend payment from

18   the other family?

19       A.   No.

20       Q.   ████████████████████████████████

     ████    ████    ████████████████████

22       Q.   Approximately how many other copies or

23   examples do you have of the ██████ family paying you

24   your stipend directly to your name as exhibited as

25   an example in 32?

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0004993

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 108



1     A.    I don't actually know how many I have.

2     Q.    I would ask that you please keep that secure

3   and not toss it, modify it, or do anything other

4   than give it to your attorney.

5         Does that sound good?

6     A.    Yes.

24    Q.    -- that's relevant to this lawsuit?

25         So there are times you had three days off

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0004994

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 109

1   per week with the ▮▮▮ family?

2        A.   Yes.

3        Q.   How many -- approximately how many hours per

4   week did you typically work with them?

5        A.   I worked between eight and ten hours a day,

6   sometimes more.

7        Q.   How many times did you work more than eight

8   to ten hours per week?

9        A.   I don't remember, but -- I don't remember.

10       Q.   Was it pretty rare?

11       A.   I worked within my 45 hours.

12       Q.   And the ▮▮▮ family was fine with you

13  working within your 45 hours per week?

14       A.   Yes.

15       Q.   Was your work schedule with the ▮▮▮ family

16  agreed upon between you and the ▮▮▮?

17       A.   Yes.

18       Q.   Was it a written or verbal work schedule?

19       A.   Both.

20       Q.   Did you keep any records of that written

21  work schedule?

22       A.   Yes.

23       Q.   Do you have it in your possession?

24       A.   I have an e-mail.

25       Q.   Is that e-mail still on your server --

PLAINTIFFS' RESP. APP.0004995

Case 1:14-cv-03074-CMA-KMT Document 859-25 Filed 03/17/18 USDC Colorado Page 168 of 701

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 110

1    A.    Yes.

2    Q.    -- or your computer?

3    A.    Yes.

4    Q.    Have you provided that to your attorney?

5    A.    I don't remember, but I'm not sure.

6    Q.    I'd ask that you preserve it.  Do not

7    destroy it or modify it.  And if you have not

8    provided to your attorney, please do so immediately.

9    And then depending on what the document contains, he

10   will alert us as to whether it's something he will

11   disclose or not.

12         Do you understand?

13   A.    Yes.

14   Q.    Other than not working Thursdays, were you

15   allowed any other deviations from the normal work

16   schedule that the ████ family and you agreed upon?

17   A.    What do you mean by "allowed"?

18   Q.    Were you -- did you work out with the ████

19   family that you would occasionally take a day off

20   other than Thursdays?

21   A.    It was set by the ████ family.

22   Q.    Did you work out with the ████ family as to

23   your work schedule that you would take a vacation?

24   A.    Yes.

25   Q.    How many times did you take a vacation while

PLAINTIFFS' RESP. APP.0004996

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 111

1    with the ███ family?

2        A.    I don't remember how many times, but I

3    worked within that two-week vacation period that I

4    was told.

5        Q.    Did you take more than one vacation?

6        A.    Yes.

7        Q.    And you took a total of two weeks of

8    vacation between February 2013 and '14?

9        A.    Yes.

10        Q.    During the time that you were with the ███

11    family, did they ever communicate to you or provide

12    any input on the number of hours you would be

13    working or would -- were working?

14        A.    Please repeat the question.

15        Q.    Did Au Pair In America ever tell you the

16    number of hours that you would be working during the

17    time that you were the au pair for the ███ family?

18        A.    Yes.

19        Q.    Who told you, or who had that input?

20        A.    At training?

21        Q.    How about during the time after training,

22    that you were with the ███ family, until the time

23    that you ended being their au pair?

24        A.    With the counselors.

25        Q.    Did the community counselors at Au Pair In

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0004997

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 112

1    America, from the time you started with the ████

2    family until the end of your tenure as their

3    au pair, did Au Pair In America ever have any input

4    as to the hours that you were working for the ████

5    family?

6        A.   Yes.

7        Q.   What was that input?

8        A.   They said that I was supposed to work 45

9    hours a week.

10       Q.   Did they say you ever had to work more?

11       A.   No.

12       Q.   Who told you this?

13       A.   This came from my counselors.

14       Q.   When you say "counselors," did that include

15   Agnes Barton?

16       A.   Yes.

17       Q.   Did it also include the lady community

18   counselor whose name began with an F and had a

19   German-sounding name?

20       A.   Yes.

21       Q.   Who else?

22       A.   Kena Anderson.

23       Q.   ████████████████████████████████████████

████  ██████████████████████

████   ████  ████████████████████████████████████

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0004998

Case No. 1:14-cv-03074-CMA-KMT   Document 959-25   filed 03/17/18   USDC Colorado   Page 172 of 701

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 113

1    Q.   Okay.  So let's stay with the █████
2    family.

3    A.   Okay.

4    Q.   Other than the two community counselors that
5    you have testified to for the █████ family, is there
6    anyone else at Au Pair In America that you believe
7    had input into the number of hours that you worked
8    for the █████ family?

9    A.   Including the training, yes.

10   Q.   Okay.  From your knowledge, did Au Pair In
11   America ever tell your host family, the █████ how
12   many hours you should be working?

13   A.   Yes.

14   Q.   And you've testified to that event earlier;
15   is that correct?

16   A.   Pardon?

17   Q.   Did you testify to that fact earlier?

18   A.   That --

19   Q.   Or have you not told us about that?

20   A.   That Au Pair In America gave --

21   Q.   Did you have knowledge that Au Pair In
22   America told the █████ family how many hours you
23   would be working as an au pair?

24        MR. HOOD:  Objection to form.

25   A.   Yes.

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0004999

Case 1:14-cv-03074-CMA-KMT Document 959-25 filed 03/17/18 USDC Colorado Page 172
of 701



```
 1      Q.   (BY MR. LEE)  How did you know that?

 2      A.   ███████████████████

 3      Q.   When did they tell you?

 4      A.   Once I commenced my duties as an au pair

 5   with the ██████ family.

 6      Q.   Was that the only time they told you?

 7      A.   Yes.
```

PLAINTIFFS' RESP. APP.0005000

Case No. 1:14-cv-03074-CMA-KMT   Document 959-25   filed 03/17/18   USDC Colorado   pg 174 of 701

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 115



1

2          MR. LEE:  It sounds like someone joined us.

3   Could you please make your appearance?

4          MR. QUINN:  Yes, Tom Quinn again.  Sorry.  I

5   keep getting bumped out.

6          MR. LEE:  No worries.  Thanks.

7          MR. QUINN:  Yep.

8

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0005001

Case No. 1:14-cv-03074-CMA-KMT   Document 959-25   filed 03/30/18   USDC Colorado   pg
175 of 701

Deposition of Lusapho Hlatshaneni
September 7, 2016



Page 116

PLAINTIFFS' RESP. APP.0005002

Case No. 1:14-cv-03074-CMA-KMT   Document 945-25   filed 03/17/18   USDC Colorado   pg 176 of 701

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 117

17          MR. HOOD:  I'm going to stop this line of
18    questioning and object.
19          Larry, can you articulate a reason -- other
20    than to harass and intimidate my client -- why
21    you're asking questions about ▮▮▮▮▮▮▮▮▮▮▮
22          MR. LEE:  Is that a form or foundation
23    question -- objection?
24          MR. HOOD:  I'm trying to decide whether I
25    should seek a protective order and stop you from

PLAINTIFFS' RESP. APP.0005003

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 118

1    asking these questions or whether there's a real

2    reason to ask these questions.

3            MR. LEE:  I think the real reason, which I

4    just found out just now, was how serious she took

5    safety, which is not only part of her training but

6    also part of her execution with the kids.

7            Is that relevant enough for you or do you

8    need more than that?

9            MR. HOOD:  I don't see how that's relevant

10   to the case.

11           MR. LEE:  It's very relevant to the case.  I

12   would like to know what she did while she was an

13   au pair with both families.

14           MR. HOOD:  What she did with what?

15           MR. LEE:  What she did as an au pair.  This

16   is an open discovery process.

17           MR. HOOD:  Right.  But --

18           MR. LEE:  It's not designed to harass or

19   intimidate.

20           MR. HOOD:  It appears to be designed to

21   harass or intimidate her.

22           MR. LEE:  In your opinion.

23           So do you have an objection?

24           MR. HOOD:  Lusapho, do you feel comfortable

25   answering the question?

PLAINTIFFS' RESP. APP.0005004

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 119



1          THE DEPONENT:  At this point, it's okay.

2    And if I don't, I'll let you know.

3          MR. HOOD:  All right.  You may answer the

4    question.

PLAINTIFFS' RESP. APP.0005005

Deposition of Lusapho Hlatshaneni
September 7, 2016



PLAINTIFFS' RESP. APP.0005006

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 121

1   ▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬    ▬▬    ▬▬

3        Q.   Did you report your number of worked hours

4   to Au Pair In America during the time that you were

5   working for the ▬▬ family?

6        A.   No.

7        Q.   Did Ms. Barton or any other community

8   coordinator for Au Pair In America tell you which

9   duties you should be performing outside of what you

10  were working out with the ▬▬family on?

11             MR. HOOD:  Objection as to form.

12             MR. LEE:  I can rephrase that question.

13       Q.   (BY MR. LEE)  Did Ms. Barton or any other

14  Au Pair In America community counselor tell you any

15  additional duties that you had to perform outside of

16  what you were doing for the ▬▬ family?

17       A.   No, they didn't.

18       Q.   Did you engage in any other duties that you

19  believe were not part of your job description or the

20  duties under the U.S. Au Pair Program that you did

21  perform?

22       A.   For the ▬▬ family, no.

23             MR. LEE:  Let me hand you what will be

24  marked Exhibit 33.

25             (Exhibit 33 marked.)

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0005007

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 122

1      Q.   (BY MR. LEE)  Do you recognize your name in

2    the e-mail address that's accompanying this

3    particular exhibit at the top?

4      A.   Yes.

12     Q.   Feel free to take a look at this exhibit and

13    then look up when you're finished.

18     Q.   And was that, from your understanding, the

19    educational component that was provided as a benefit

20    under the U.S. Au Pair Program?

21     A.   As per my understanding, yes, it was the

22    required education component.

23     Q.   Did you do early registration, on time, or

24    late registration for Psychology and the American

25    Government?

PLAINTIFFS' RESP. APP.0005008

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 123

1    A.   It was on time.

2    Q.   Who paid for that registration?

3    A.   The ████ family.

4    Q.   Do you have any knowledge that Au Pair In

5  America had anything to do with reimbursing or

6  paying for this particular course?

7    A.   No, not that I know of.

8    Q.   Were your classes online or in person with a

9  actual live instructor?

10   A.   They were in person.

11   Q.   How many people were in that class?

12   A.   I don't know the number of people there in

13 that.

14   Q.   Did you successfully complete that class?

15   A.   Yes.

16   Q.   Did you receive credit for that class?

17   A.   Yes.

18   Q.   Did you take any other classes while with

19 the ████ family?

20   A.   Yes.

21   Q.   Which ones?

22   A.   It was a satellite course on culinary

23 cooking for au pairs with Stratford University.

24   Q.   Do you have a copy of a written document

25 that signifies your taking or registering for that

PLAINTIFFS' RESP. APP.0005009

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 124

1   class?

2       A.   I have a certificate saying I completed the

3   class.

4       Q.   Have you provided that to your attorney?

5       A.   No.

6       Q.   I would ask that you provide that to your

7   attorney.

8            Did you take any other classes?

9       A.   With the ████████family, no.

10      Q.   Who paid for the cooking class?

11      A.   The ████████ family, a part thereof.

12      Q.   Did Au Pair In America have any contribution

13  in paying for the cooking class?

14      A.   No.

15      Q.   Getting back to the first class that you

16  mentioned, the Psychology and the American

17  Government, which days did you attend those classes?

18      A.   Over a weekend.

19      Q.   Was it the entire weekend or one day out of

20  the weekend?

21      A.   I don't remember exactly, but two days, I

22  believe.

23      Q.   And I would point you to the bottom of the

24  e-mail that said "Duration:  1 weekend" --

25      A.   Yes.

PLAINTIFFS' RESP. APP.0005010

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 125

1      Q.   -- "Start date" and "End date"; is that
2  accurate?

3      A.   That is accurate.

4      Q.   Regarding the cooking class, when did you
5  attend?

6      A.   I don't remember the dates, but it was
7  spread over a few weeks.

8      Q.   Did you have to meet one day or more than
9  one day per week?

10     A.   It would be one day per week.

11     Q.   Do you recall how many hours that you had to
12  meet for the cooking class?

13     A.   I don't recall, but I do remember most of
14  the classes were four hours.

15          MR. LEE:  Okay.  I'm going to hand you
16  what's been -- or will be marked as Exhibit 34.

17          (Exhibit 34 marked.)

18     Q.   (BY MR. LEE)  This is an e-mail on
19  January 27, 2014, from ███████████████████████████
   ██  ███████████████████████████

21          Do you see that at the top?

22     A.   Yes.

23     Q.   Please review this e-mail and then look up
24  when you're finished.

25     A.   Okay.

PLAINTIFFS' RESP. APP.0005011

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 126

1   **Q.   According to the first paragraph of**
2   **Exhibit 34, it appears that you were in a car**
3   **accident using one of** ████████████

4         MR. HOOD:  I'm going to object again and ask
5   what -- what the purpose of this line of questioning
6   into the car accident is --

7         MR. LEE:  I don't have --

8         MR. HOOD: -- and decide whether or not I
9   should instruct my client not to answer --

10        MR. LEE:  Based on what?

11        MR. HOOD:  -- and ask for protective
12   order.

13        I think you're trying to intimidate my
14   client.

15        MR. LEE:  I'm not trying to intimidate your
16   client at all.  That's your opinion.

17        And once again, this is a speaking
18   objection.  There's --

19        MR. HOOD:  I'm not --

20        MR. LEE:  Let me finish.  Let me make the
21   record.  I've listened to you.

22        That's an inappropriate speaking objection.
23   I can ask her any question of any document -- which,
24   by the way, you provided, Alex, to us.  So if you're
25   not -- if you have a problem with the documents that

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0005012

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 127

1    you provide us, I would look more carefully at

2    documents before you actually disclose them.

3            I can certainly ask about -- any questions

4    about her experience with the -- with the ████

5    family as it applies to safety, as it applies to her

6    experiences, and I take offense by the fact that you

7    believe that I'm trying to intimidate her.

8            MR. HOOD:  It's what it appears, because I

9    don't see any real purpose of this question other

10   than intimidating her.  That's why I'm asking you to

11   provide a rationale.

12           MR. LEE:  Is that a form or a foundation

13   objection?

14           MR. HOOD:  You asked me a question, Larry.

15           MR. LEE:  I'm asking you, is that a form or

16   foundation objection?

17           MR. HOOD:  Lusapho, are you okay with

18   answering the question?  Are you okay with answering

19   questions regarding the car accident?

20           If you're comfortable, you can proceed.

21           THE DEPONENT:  I don't feel comfortable

22   answering the question.

23       **Q.   (BY MR. LEE)  May I ask why you don't feel**

24   **comfortable answering a question about a car**

25   **accident you had in the ████family's car?**

PLAINTIFFS' RESP. APP.0005013

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 128

1         MR. HOOD:  My client doesn't need to respond

2  to that question.

3         MR. LEE:  No, you do need to respond,

4  because you asked her a question out of turn, and

5  you can't do that as well.  You're breaking all the

6  rules.

7     **Q.  (BY MR. LEE)  Why do you feel uncomfortable?**

8         MR. HOOD:  We're going to seek a protective

9  order regarding this issue.  She does not have to

10  answer the question.  If she would like to answer

11  the question, she can.

12         MR. LEE:  Is it based on privilege?

13         MR. HOOD:  The protective order is based on

14  trying to scare and intimidate the witness.

15         MR. LEE:  Tell me how I'm trying to scare

16  and intimidate this witness by asking about a

17  document that you, Alex Hood, from your law firm,

18  provided to us.  Tell me how that's intimidating and

19  harassing.

20         MR. HOOD:  I don't see what the relevance is

21  other than trying to intimidate.

22         MR. LEE:  You're not the judge.  I can ask

23  about anything regarding this document that you

24  provided.

25         MR. HOOD:  Rule 26(c) bars intimidating and

PLAINTIFFS' RESP. APP.0005014

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 129

1    harassing witnesses.

2           MR. LEE:  I know --

3           MR. HOOD:  And you can seek a protective

4    order for that.  If my client feels comfortable

5    responding, she may, but if she says she doesn't

6    want to respond because she doesn't feel

7    comfortable, that is a sufficient response, and we

8    can move for protective order.  It's up to her.

9           MR. LEE:  Because you asked her that

10   question, what else is she supposed to say other

11   than "yes"?  You made a speaking objection, which is

12   completely inappropriate.  You've done it this

13   entire deposition.  You will have the chance to ask

14   questions after my questions.

15          MR. HOOD:  I made very few objections in

16   this deposition, other than where I think my client

17   is being intimidated.  If she is in fact not feeling

18   intimidated, she may respond to the question and we

19   will not seek a protective order.

20   ██████    ████████       ████████████

██████   ████████████

██████    ██    ████████████████████████

██████   ████████████████████████████

██████    ████████████████

██████    ██    ████████████████████

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0005015

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 130

1 ████████████████████████████████████

██  ████████████████████████  ██████████

██  ███████████████████████████████████

██  ██████████████████████

██    ████  ██████

██    ████  █████████████████████████████

██  █████████████████████████████████████

██  ██████████████████  ████████████████

██  ██████████████████████████████████

██  █████████████████████████████████

██  ████████████

12        MR. HOOD:  I'm going to again instruct my

13  witness that she does not need to respond if she's

14  feeling that the purpose of this line of questioning

15  is to harass and intimidate her.  I don't see any

16  relevance to this line of questioning.

17        MR. LEE:  I would ask that you keep your

18  objections to form or foundation and not --

19        MR. HOOD:  I can certainly --

20        MR. LEE:  Let me finish.

21        MR. HOOD:  Okay.

22        MR. LEE:  I'm letting you make your

23  objections, but they're not true objections.  It's

24  either form or foundation, not speaking objections.

25  And you are leading this witness, clearly.  You have

PLAINTIFFS' RESP. APP.0005016

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 131

1    done it for the last two hours.



7            MR. HOOD:  Again, instruct my witness that

8    she does not have to respond to the question.  We'll

9    seek a protective order if she feels that the

10   purpose of the question is to intimidate or harass

11   her.

12       **Q.   (BY MR. LEE)  I'm not trying to intimidate**

13   **or harass you.**

14           **Yes or no.**

23           MR. HOOD:  Again, instruct my witness, if

24   she's feeling intimidated or harassed by the

25   question, that she does not need to respond to the

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0005017

Deposition of Lusapho Hlatshaneni
September 7, 2016



Page 132

1    question and we'll seek a protective order.

2              Larry, if we could go off the record after

3    this?

4              MR. LEE:  I'm not going off the record until

5    I get an answer to this question because it's

6    perfectly legal.  And you should know better, Alex,

7    quite frankly.

PLAINTIFFS' RESP. APP.0005018

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 133



PLAINTIFFS' RESP. APP.0005019

Deposition of Lusapho Hlatshaneni
September 7, 2016



Page 134

1      A.    But, no.  I was going to California.

2

PLAINTIFFS' RESP. APP.0005020

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 135

6     **Q.    How did you first come across meeting the**

7    **family?  Take us through that process.**

8    A.    Agnes Barton, she had -- she was

9  facilitating finding me a family for my second

10  year.

11     **Q.    You may have testified to this before, but**

12  **from your recollection, where was Agnes Barton**

13  **located?**

14    A.    In Virginia.

15     **Q.    And how many different host families did she**

16  **put you in touch with?**

17    A.    I don't remember exactly, but there were

18  quite a few.

19     **Q.    More than two?**

20    A.    Yes.

21     **Q.    Approximately five or more?**

22    A.    I don't remember exactly how many.

23

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0005021

Case No. 1:14-cv-03074-CMA-KMT Document 959-25 filed 03/30/18 USDC Colorado pg 195 of 701

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 136



1     Q.    Did you ask them questions?

2     A.    Yes.

3     Q.    In a sense, you were interviewing them as

4  well; is that fair and accurate?

5     A.    Yes.

25    Q.    Who was your community counselor from

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0005022

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 137

1     Au Pair In America during the time that you worked

2     for the ████████ family?

3          A.   Kena Anderson.

4          Q.   How often did you and Ms. Anderson

5     communicate from February 2014 to February 2015?

6          A.   I don't remember.

7          Q.   Did she ever reach out to you during that

8     time period?

9          A.   Yes.

10         Q.   How often?

11         A.   I don't remember exactly, but it wasn't

12    often.

13         Q.   Did she hold monthly cluster meetings?

14         A.   Yes.

15         Q.   How often did you attend during that year?

16         A.   I don't remember, because most of them were

17    canceled.

18         Q.   When you say most of them were canceled,

19    tell us how many.

20         A.   I don't know.  The -- I don't know.  The

21    cluster had few meetings, and then some of them were

22    canceled, but I don't remember how many exactly.

23         Q.   Okay.  And I just want to make sure that I'm

24    clear.

25         A.   Yes.

PLAINTIFFS' RESP. APP.0005023

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 138

1        Q.    You've said "a few," and then you've said

2    "most" and then you said "some."

3        A.    Yes.

4        Q.    Out of 12 cluster meetings from 2014 to

5    2015, to the best of your recollection, how many

6    cluster meetings were canceled?

7        A.    I don't remember how many were canceled.

8        Q.    And isn't it true that they rescheduled

9    these cluster meetings once they were canceled?

10       A.    Yes.

11       Q.    Did you have Kena Anderson's contact

12   information?

13       A.    Yes.

14       Q.    At the time that you were with the ██████

15   family?

16       A.    Yes.

17       Q.    You could always contact her if you missed a

18   meeting; is that correct?

19       A.    Yes.

20       Q.    When a cluster meeting was scheduled, did

21   you ever not show up for an already-scheduled

22   cluster meeting?

23       A.    Yes.

24       Q.    How many times?

25       A.    I don't remember.

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0005024

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 139

```
 1        Q.    More than once?

 2        A.    Yes.

 3              And --

 4        Q.    I'm sorry.  Go ahead.

 5        A.    Clarity?

 6        Q.    Please.

 7        A.    The cluster meetings would be too far for me

 8   to travel, and so I did not make most of the cluster

 9   meetings.

10        Q.    Where were the cluster meetings located?

11        A.    At least more than a 45-minute drive away

12   from my house.

13   ████  ███████████████

     ███  ███  ██████████████████████████████████

     ███  ██████████████████████████████████████

     ███  ████████████████

17        Q.    Did you ever tell Ms. Anderson that the

18   cluster meetings' location was too far away?

19        A.    Yes.

20        Q.    What was her response?

21        A.    She had responded that she knows that the

22   cluster meetings are far, but I'm one of few

23   au pairs that live on my side.  I'm actually the

24   furthest.  So I either have to travel there or I can

25   miss the cluster meetings.
```

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0005025

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 140

1     **Q.  Didn't she ever offer to have a meeting with**

2  **you one-on-one if you couldn't make the cluster**

3  **meetings?**

4     A.  I don't remember.

5     **Q.  You don't remember a conversation or two or**

6  **more in which she told you that she could -- you**

7  **could contact her at any time if you couldn't make a**

8  **cluster meeting?**

9     A.  I could contact her, yes.  To schedule a

10  cluster meeting, I don't remember.

11     **Q.  Did you ever complain to Ms. Anderson about**

12  **your stipend?**

13     A.  No.

14     **Q.  Did you ever complain to her about any hours**

15  **that you had to work while with the  ███████  family?**

16     A.  Yes.

17     **Q.  When did you first complain about the hours?**

18     A.  When I had a conversation with her, telling

19  her I was working more than the stipulated hours.

20     **Q.  When was that?**

21     A.  I don't recall when, but it was during that

22  year I was with the  ███████  family.

23     **Q.  Well, you testified that you were with them**

24  **from February 2014 to February 2015; is that**

25  **correct?**

PLAINTIFFS' RESP. APP.0005026

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 141

1      A.    That is correct.

2      Q.    **When did you first complain about your hours**

3  **to Ms. Anderson while being an au pair or working as**

4  **an au pair for the** ████████

5      A.    It was during the time when I was working

6  long hours.

7      Q.    **How many times did you complain?**

8      A.    Once.

9      Q.    **What was her response?**

10     A.    She had said that I wasn't supposed to work

11  those long hours, and she'll have a conversation

12  with Mr. ████████ but she will do it in her own time

13  and in her own way.

14     Q.    **How many hours a week did you average**

15  **working as an au pair for the** ████████ **family?**

16     A.    Over 45 hours a week.

17     Q.    **How many times did you work over 45 hours a**

18  **week?**

19     A.    I don't remember exactly how many times, but

20  it was more frequent.

21     Q.    **Did you have any documents to support you**

22  **working over 45 hours per week for the** ████████

23     A.    No, not -- no.

24     Q.    **Did Mr.** ████████ **have any documents of the**

25  **number of hours that you worked for him?**

PLAINTIFFS' RESP. APP.0005027

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 142

1      A.    No.

2      Q.    During that entire year, did you work over

3   45 hours per week more than half the time?

4      A.    I don't know.

5      Q.    Is it entirely possible that you didn't work

6   more than 45 hours a week half the time?

7      A.    Yes.

8      Q.    Is it entirely possible that you worked more

9   than 45 hours per week less than 20 times?

10     A.    I don't know.  I can't say.  I don't

11  remember exactly.

12     Q.    Did you complain to Mr. ████████ that you were

13  working more than 45 hours per week?

14     A.    Yes.

15     Q.    How many times?

16     A.    I don't remember how many times.

17     ██    ████████████████

██    ██    ███████████████████████████████

██  ███████████

██    ██    ████████████████████████████████

██  ██████

██    ██    ████████

██    ██    █████████████████████████████████

██  ████████████

██    ██    ████████

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0005028

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 143



15    Q.    How many times did he not pay you on time?

16    A.    I don't remember, but it was a few times.

17    Q.    Do you have any copies of the documented

18    paychecks that Mr. ████████ gave to you for your work

19    as an au pair for the ████████ family?

20    A.    No.

21    Q.    How were you paid your stipend by

22    Mr. ████████

23    A.    Cash.

24    Q.    Did you actually record or keep receipts of

25    the cash that he paid you on a weekly basis?

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0005029

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 144

```
 1      A.    No.

 2      Q.    Why not?

 3      A.    Because he would pay me eventually.

 4      Q.    When you say he would pay you eventually,

 5   what does that mean?

 6      A.    I would get paid.

 7      Q.    You would get paid the full amount?

 8      A.    Yes.

 9      Q.    Did he ever provide you any extra money

10   outside of what he owed you?

11      A.    Yes.

12      Q.    How much?

13      A.    Well, he paid me $200.

14      Q.    Per week?

15      A.    Per week.

16      Q.    How often did he do that?

17      A.    All the time.

18      Q.    Was his paying you $200 a week in compliance

19   with the Au Pair Program that you were trained on

20   and learned about?

21      A.    No.

22      Q.    Why was it not in compliance?

23      A.    Because we were told by Au Pair In America

24   that we're supposed to get paid a stipend of $195.75

25   a week.
```

PLAINTIFFS' RESP. APP.0005030

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 145

1    Q.   Did you ever report to Au Pair In America

2    from February 2014 to February 2015 that Mr. ████

3    paid you over $195.75 per week?

4    A.   No.

5    ████    ████████████████████████████████

████   █████████████████████████████

████   ████   ████

████   ████   ███████████████

████   ████   ████  ███  ███  ███  ████████

████   ████   ████████

████   ████   ████  ███  ████  ███  ███  █████

████   ████   █████████████████

████   ████   ████  ███  ████  ████

████   ████   ████████████████████

████   ████   ██████

████   ████   ████████████████████████

████   ████████████

████   ████   ███  ███  ███  ███  ███  ████

19   Q.   How much time did you actually take off

20   during that year, vacation or otherwise?

21   A.   I had my weekends off.

22   Q.   So you worked Monday through Friday?

23   A.   Yes.

24   Q.   What were your typical hours?

25   A.   From 6:00, 6:30 in the mornings, sometimes

PLAINTIFFS' RESP. APP.0005031

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 146

1   earlier, up until 6:00 to 7:00, sometimes later in

2   the evening, Mondays through Fridays.

3       Q.   Did you ever request any vacation time from

4   Mr. ████████

5       A.   Yes.

6       Q.   Did you take that vacation time?

7       A.   Yes.

8       Q.   Did you take under, at, or more than two

9   weeks?

10      A.   Under two weeks.

11      Q.   How many days did you take total?

12      A.   I don't remember how many days, but what I

13  do remember, it was around a week, but I'm not sure

14  exactly how many days.

15      Q.   Did you ever ask for more time or more

16  vacation time from Mr. ████████ beyond that one week?

17      A.   Yes.

18      Q.   What did you ask, or what did you say to

19  him?

20      A.   I had said to him that I still had another

21  week of vacation time.

22      ██     ████████████████

        ██     ██  █████████████████████

        ██     ██████████████████████████

        ██     ██████████████████████████

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0005032

Case No. 1:14-cv-03074-CMA-KMT   Document 959-25   filed 03/17/18   USDC Colorado   pg 206 of 701

Deposition of Lusapho Hlatshaneni
September 7, 2016



PLAINTIFFS' RESP. APP.0005033

Case No. 1:14-cv-03074-CMA-KMT   Document 959-25   filed 03/30/18   USDC Colorado   pg 207 of 701

Deposition of Lusapho Hlatshaneni
September 7, 2016



Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0005034

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 149



PLAINTIFFS' RESP. APP.0005035

Deposition of Lusapho Hlatshaneni
September 7, 2016



Page 150

PLAINTIFFS' RESP. APP.0005036

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 151

1  ████████████████████████████████████████

   ██  ██████████████████████████████████

   ██     ██    █████████████████████████████

   ██     ████████████████████████

   ██     ██    ████████████

   ██     ██    ██████████████████████████

   ██     ██    ██████████████████

   ██     ██    ██████████████████████████

   ██     ██████████████████████

   ██    ██    ████████

   ██    ██    ████████████████████

   ██    ██    ██████

13          MR. LEE:  Let me hand you what will be

14  marked as Exhibit 35.

15          (Exhibit 35 marked.)

16      Q.   (BY MR. LEE)  I'm handing you a copy of the

17  responses by you to our first request for

18  production.

19          Did you ever have a chance to review this

20  document before today?

21      A.   Yes.

22      Q.   How many times?

23      A.   I don't remember how many times exactly, but

24  I did spend some time.

25      Q.   Did you review it anytime last month?

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0005037

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 152

1      A.   Yes.

2      Q.   And I asked last month because one of your

3  attorneys, Lauren Louis, dated this response on your

4  behalf for the 9th day of August, 2016.

5           Do you see that on Page 22?

6      A.   Yes.

7      Q.   So I just want to be clear.  Did you have a

8  chance to review this document, this particular

9  exhibit, in its entirety for accuracy, thoroughness,

10  and truthfulness?

11      A.   Yes.

12      Q.   And to the best of your knowledge, are the

13  answers contained in this response, or these

14  responses, truthful and accurate?

15      A.   Yes.

16           MR. LEE:  I'm going to hand you what will be

17  marked as Exhibit 36.

18           (Exhibit 36 marked.)

19      Q.   (BY MR. LEE)  Do you recognize your answers

20  to our first set of interrogatories?

21           Do you recognize this as the document that

22  you would have reviewed sometime in August 2016?

23           MR. HOOD:  Objection as to form and

24  foundation.

25           MR. LEE:  Let me reask that.

PLAINTIFFS' RESP. APP.0005038

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 153

1      Q.    (BY MR. LEE)  Do you recognize this
2  document?
3      A.    Yes.
4      Q.    Did you have a chance to review this
5  document in its entirety prior to August 9, 2016?
6      A.    Yes.
7      Q.    Did you review it anytime after that?
8      A.    Yes.
9      Q.    When?
10     A.    I don't remember exactly, but it was after.
11     Q.    Did you review it in preparation for this
12  deposition?
13     A.    Yes.
14     Q.    Turn to Page 8.  Is that your signature at
15  the bottom of the -- titled "Declaration"?
16     A.    Yes.
17     Q.    Just so I'm clear, you had a chance to
18  review this document for truth, accuracy, and
19  thoroughness; is that correct?
20     A.    As far as I can remember, yes.
21     Q.    As far as you remember, the answers were
22  complete and truthful to the best of your knowledge,
23  right?
24     A.    Yes.
25     Q.    Did you file taxes with the U.S. Government

PLAINTIFFS' RESP. APP.0005039

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 154

1    **in 2013?**

2           MR. HOOD:  I'm going to object.  I think the

3    purpose of this line of questioning is to harass or

4    intimidate my client, and I'm going to instruct my

5    client if she feels that she is being harassed or

6    intimidated by this question that she does not need

7    to answer.

8    ▆▆  ▆▆▆▆▆  ▆▆▆▆▆▆▆▆

▆ ▆▆▆▆▆▆▆▆▆▆▆▆

▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆

▆ ▆▆▆▆▆▆▆▆▆▆▆▆

▆ ▆▆▆▆▆▆

13   A.   I just don't understand why it's being

14   asked.

15   **Q.   That wasn't what I asked.**

16   A.   What did you ask?

17   ▆▆  ▆▆▆▆▆▆▆▆▆▆▆

▆ ▆▆▆▆▆▆▆▆▆▆▆

▆ ▆▆▆▆▆▆

20          MR. HOOD:  Objection as to form.

21   A.   Intimidating, yes.  Harassment, it's

22   borderline.

23   **Q.   (BY MR. LEE)  Tell me why it's intimidating.**

24   A.   As I said, I don't understand why it's being

25   asked, so. . .

PLAINTIFFS' RESP. APP.0005040

Case No. 1:14-cv-03074-CMA-KMT Document 959-25 filed 03/30/18 USDC Colorado pg
214 of 701

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 155

1    Q.   I'm just asking you if you ever filed.   I'm

2    not asking what is in the content of those tax forms

3    if you did file.

4         Do you understand that?

5    A.   Yes.

6    ███ ████████████████████████████████████████████

██ ████████████████ ████████████████████████████

██ ████████████████████████

██ ███ ██████████████████

██ ███ ███████████████████████

██ ███ ████████

██ ███ █████████████████████

13        MR. HOOD:   Again, the purpose of this

14   question is to harass and intimidate my client.   If

15   my client feels that she is being harassed or

16   intimidated by this question, then she does not need

17   to respond, and I'll file a protective order.

18   Q.   (BY MR. LEE)   You can answer the question.

19        ██████████████████████████████████████

██ ████████████████████████

21        MR. HOOD:   You do not have to respond.   I

22   will file a protective order if you do not feel

23   comfortable.

24        And I'll mark this segment, the questions

25   regarding ████████ as confidential if she does --

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0005041

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 156

1    under the protective order, if she does choose to

2    respond.

3        A.   No.

4        Q.   ███████████████     ████████████████████

5            MR. HOOD:   If my client --

6            MR. LEE:   I recognize your standing

7    objection.

8            MR. HOOD:   And if my client chooses to

9    respond, I would mark this confidential under the

10   protective order.

11       A.   No.

12           MR. LEE:   Would you like to take a break, or

13   would you like to keep testifying?

14           THE DEPONENT:   I would like to take a break,

15   please.

16           MR. LEE:   Sure.

17           THE VIDEOGRAPHER:   Going off the record.

18   This is the end of Media No. 4.  The time is 2:15.

19           (Recess taken from 2:15 to 2:39 p.m.)

20           THE VIDEOGRAPHER:   We're back on the

21   record.  This is the beginning of Media No. 4.  The

22   time is 2:39.

23       Q.   (BY MR. LEE)  Ms. Hlatshaneni, you earlier

24   alluded to four friends of yours that you had

25   reported your complaints about the wage and hour

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0005042

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 157

1    issues.  Do you remember that testimony this
2    morning, generally?
3        A.    Yes.
4        Q.    And your reference was to the following
5    people and make sure that I had the spelling
6    correct, okay?
7        A.    Yes.
8    ████   ██████████████████   █████████████████
█  █████████████
10       A.    Which page is that again?
11       Q.    I'm just spelling the names --
12       A.    Oh, yes.
13       Q.    -- to make sure that we have the correct
14   spelling.
15       A.    Okay.  I just needed to find where you were
16   reading from in the document.
17       Q.    I'm reading off of your response to
18   Interrogatory No. 5.
19       A.    Number 5.
20       Q.    On Page 4, at the bottom.
21       A.    Yes.
22       Q.    Are those the correct spellings of three of
23   the folks that you referred to as friends that you
24   reported your issues of pay and hours were?
25       A.    Yes.

PLAINTIFFS' RESP. APP.0005043

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 158

1    Q.    So let me just finish.

2

3

4

5         MR. HOOD:    Larry, which interrogatory are

6    you reading from?

7         MR. LEE:    I'm on Page 4.

8         MR. HOOD:    Oh, Page 4.  I apologize.

9

10

11

12

13

14

15

16

17

18

19

20    Q.    Thank you.

21         I also wanted to let you know that our staff

22    did their best to print out a better copy that is

23    legible, in our opinion, of Exhibit 30, of the terms

24    and conditions.  And I'm going to hand that to you

25    as a new exhibit.  So that would be 37.  So this



PLAINTIFFS' RESP. APP.0005044

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 159

1    replaces Exhibit 30, for the record.

2          (Exhibit 37 marked.)

3      Q.   (BY MR. LEE)  Are you able to read that?

4      A.   It's really like pixilated.  I can read some

5    parts of it.

6      Q.   Can you point me to where it says the word

7    "Employer" in either of these two pages?

8          MR. HOOD:  Object to foundation.

9      Q.   (BY MR. LEE)  You can answer the question.

10     A.   Can I read?

11     Q.   Please do so.

12     A.   And do I have to answer this question?

13     Q.   Yes.

14     A.   Okay.

15     Q.   You're under oath.

16     A.   Okay.  It's going to take some time for me

17   to read through.

18     Q.   I'm giving you time to do it.

19          Do you remember the question?

20     A.   You asked me to point to where it says

21   employee -- "Employer."

22     Q.   Correct.  Employer.

23          So anywhere on that first page does it

24   mention that Au Pair In America is your employer?

25     A.   No, not on this document.

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0005045

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 160

1    Q.   Okay.  Did you have a chance to read the
2  second page?
3    A.   Oh, no.  I only read the first one.
4    Q.   Did you have a chance to review that second
5  page of Exhibit 37?
6    A.   Yes.
7    Q.   Please point me to where it indicates that
8  Au Pair In America or AIFS was your employer.
9    A.   There's no place in the document that it
10 says it is.
11   Q.   I'm going to hand you now what is previously
12 marked as Exhibit 16, and it's the amended -- First
13 Amended Complaint.
14        Prior to today, Ms. Hlatshaneni, did you
15 have a chance to review this First Amended
16 Complaint?
17   A.   Yes.
18   Q.   And does this look like a true and accurate
19 copy of that First Amended Complaint?  You don't
20 have to read it word for word.
21   A.   Yes.
22   Q.   Just generally, does it look like it is?
23   A.   Yes.
24   Q.   And the following questions concern any of
25 your outside knowledge without any regard of

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0005046

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 161

1   communications with your attorney.  In other words,

2   just answer whether you knew this on your own, and

3   if you did, I'll ask you some follow-up questions.

4           Any questions that may invoke your

5   communications with your attorney, as him giving you

6   advice or you engaging in the attorney/client legal

7   relationship, then please state that you talked to

8   your attorney and you had no independent knowledge.

9           Do you understand those terms?  This is

10  based solely on your own knowledge.

11      A.   Okay.

12           MR. HOOD:  Do you understand?

13      Q.   (BY MR. LEE)  You just indicated you

14  understood.  Did you understood -- understand?

15      A.   So conversations with my --

16      Q.   This is just any of your own knowledge, not

17  including any communications with your attorney, if

18  you possess such knowledge.

19           Do you understand?

20      A.   Yes.

21      Q.   Okay.  When did you find out when this

22  lawsuit was being filed?

23      A.   I cannot answer that question.

24      Q.   How did you find out?

25      A.   Conversations with my attorney.

PLAINTIFFS' RESP. APP.0005047

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 162

1       Q.    Who initiated the conversation about this

2    lawsuit?

3       A.    I did.

4       Q.    Why did you file this lawsuit against

5    Au Pair In America?

6       A.    Because of my experiences.

7       Q.    With?

8       A.    As an au pair in the Au Pair In America

9    program.

10      Q.    With both families that you have testified

11   to?

12      A.    With -- with my experiences as an au pair

13   with Au Pair In America, the two years I've been

14   here.

15      Q.    But it happened during the time that you

16   were an au pair for both the ████████████████████

17   families; is that correct?

18      A.    What happened exactly?

19      Q.    During that time period.  It was the

20   relevant time period was based upon your experiences

21   with Au Pair In America during that time period with

22   both families?

23      A.    Yes.

24      Q.    Is that correct?

25            What is your general understanding of what

PLAINTIFFS' RESP. APP.0005048

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 163

1    this lawsuit is about?

2      A.   This lawsuit is with regards with me and

3    some of my complaints, and on behalf of other

4    au pairs, against Au Pair In America and other

5    agencies.

6      Q.   Anything else?

7      A.   The amount of money that we're paid.

8      Q.   Well, that brings me up to my next

9    question.  Have you formed a belief as to whether

10   you've been hurt or harmed by Au Pair In America?

11      A.   Can you clarify by "belief"?

12      Q.   Yes.

13          Have you formed your own opinion of whether

14   you've been hurt or harmed by Au Pair In America

15   during the relevant time period?

16      A.   Yes.

17      Q.   What is that belief or opinion?

18      A.   My belief and opinion is that Au Pair In

19   America and its -- some of its representatives that

20   I've come across in this time have told me of one

21   thing of what the program is, and its different

22   expectations, and it hasn't been a true

23   representative of the actual experience that -- that

24   I then had as an au pair.

25      Q.   What was untrue?

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0005049

Case No. 1:14-cv-03074-CMA-KMT   Document 859-25   filed 03/17/18   USDC Colorado   pg 222 of 701

Page 164

1      A.   That from things that I remember, many other

2   things, that I would have someone who would be there

3   for me as an au pair whenever I needed them, and

4   upon my arrival, and that hasn't always been the

5   case.

6           During recruitment, we were told that if for

7   any reason we were unhappy with the host families,

8   we would be protected, and we would have counselors

9   there for us.

10      Q.   Who told you that?

11      A.   Natalie James.

12      Q.   Anyone else?

13      A.   At orientation as well.  And the truth that

14   I later found out was that our counselors are not

15   always there for us.  They're not the people that

16   support us.

17      Q.   What other aspects of your experience

18   through the United States au pair experience made

19   you form a belief that you should be part of this

20   lawsuit?

21           MR. HOOD:  Object as to form.

22      Q.   (BY MR. LEE)  Anything else?

23           MR. HOOD:  Same objection.

24      A.   Please repeat the question.

25           MR. LEE:  Please repeat the question.

PLAINTIFFS' RESP. APP.0005050

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 165

1          (Last question read.)

2          MR. HOOD:  Object as to form.

3      A.   There are many other beliefs that I can't

4  really record at this time.

5      Q.   **(BY MR. LEE)  Anything else you think this**

6  **lawsuit is about other than what you've testified to**

7  **today?**

8      A.   Yes.

9      Q.   **What is that?**

10     A.   It's about the other experiences that other

11  au pairs had in the program as an au pair in

12  America.

13     Q.   **You have testified to the four friends and**

14  **the family that you've reported your experiences to.**

15  **Have you had conversations with any of the other**

16  **au pairs that you have not named in this deposition?**

17     A.   Conversations?

18     Q.   **About your issues with the Au Pair Program**

19  **here in the United States.**

20     A.   Yes.

21     Q.   **Who else?**

22     A.   I can't remember.  There are a whole lot of

23  other au pairs that I've met in my period of two

24  years that I was an au pair.

25     Q.   **Approximately how many?**

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0005051

Case No. 1:14-cv-03074-CMA-KMT Document 959-25 filed 03/17/18 USDC Colorado pg 225 of 701

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 166

 1      A.    More than ten.

 2      Q.    And I accidentally cut you off.  You said

 3  that your experiences with that -- and then I think

 4  you were going to say something else.

 5      A.    No, just my experiences with that.

 6      Q.    Do you have the names of those other people

 7  that you've spoken with over the past two years?

 8      A.    Not all of them.

 9      Q.    Any names come to mind other than who you've

10  testified about?

11      A.    Names of?

12      Q.    Any other au pairs that you've discussed

13  your problems with the Au Pair Program here in the

14  United States?

15      A.    Yes.

16  ███  ████   ████████████████

    ███  ███  █████████████

    ███  ███  ████████████████████████

    ███  ███  ███████████████████████████████████████

    ███  ███  █████████████████

    ███  ███  ████████████████████████

    ███  ███  ████████

    ███  ███  ██████████████

24      Q.    Who else?

25      A.    There are many other names that I believe --

PLAINTIFFS' RESP. APP.0005052

Deposition of Lusapho Hlatshaneni
September 7, 2016



Page 167

 1    there are a lot of au pairs, a lot of names, and

 2    right now at the moment, there is no -- none of them

 3    come to mind.

 4         Q.   Other than any discussions you've had with

 5    your attorney, have you formed a belief or opinion

 6    of how much money is owed to you in this lawsuit or

 7    through this lawsuit?

 8         A.   No.

 9

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0005053

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 168

1   ███

██      ███    ███

3       Q.    Before you hired your attorneys, were you

4   aware of any facts to support the notion that all

5   the U.S. au pair sponsors got together to keep the

6   wages at $195.75 per week?

7       A.    Yes.

8       Q.    Please tell us what you're aware of.

9       A.    All au pairs that I came across from other

10  agencies as well were getting paid the same amount

11  that I was.

12      Q.    Well, the question is, are you aware of any

13  facts or have any knowledge, other than your

14  conversations with your attorneys, that all the

15  different U.S. au pair sponsors, like Au Pair In

16  America, like Cultural Care, all got together --

17  there's a large number of them that have been sued

18  in this lawsuit, as you're aware of -- they all got

19  together to keep the stipend at $195.75 per week?

20            MR. HOOD:  Objection to form.

21      Q.    (BY MR. LEE)  Do you have any facts that

22  support the notion they all got together to keep the

23  stipend at that amount?

24      A.    All au pairs that I know get paid that

25  amount.

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0005054

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 169

1      Q.   I understand.  But do you have any

2  information, any facts or knowledge, that the

3  au pair sponsors got together to keep the stipend at

4  that amount?

5           MR. HOOD:  Objection to form.

6      A.   Oh, I'm supposed to give an answer.  Sorry.

7      Q.   (BY MR. LEE)  Let's repeat the question.

8      A.   So what other facts, maybe?

9           (Last question read.)

10          MR. HOOD:  Objection to form.

11     Q.   (BY MR. LEE)  Yes or no.

12     A.   Outside of my -- no, not that I remember.

13     Q.   When I talk about employees or staff members

14  of AIFS, I'm including community counselors, their

15  management, and I'm not including au pairs.

16          That was your understanding in answering

17  those questions previously about AIFS; is that

18  correct?

19     A.   Yes.

20     Q.   So are you familiar with the sponsor for

21  au pairs, 20/20 Care Exchange, doing business as the

22  International Au Pair Exchange?  Yes or no.

23     A.   Yes.

24     Q.   Do you know any employees or staff who work

25  for that sponsor?

PLAINTIFFS' RESP. APP.0005055

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 170

 1      A.   No.
 2      Q.   Are you familiar with Apex American
 3  Professional Exchange, LLC, doing business as
 4  Pro Au Pair?  Yes or no.
 5      A.   Pro Au Pairs, or is that the name?
 6      Q.   That's the name.
 7      A.   Yes.
 8      Q.   I'm listing the names --
 9      A.   Oh, the names, oh, yes.
10      Q.   -- of these sponsors that are listed in this
11  lawsuit.
12      A.   Yes.
13      Q.   So you are familiar with that sponsor?
14      A.   From the documents, yes.
15      Q.   Do you know any employees or staff, not
16  au pairs, just employees or staff, who are with
17  Apex Professional Exchange doing business as
18  Pro Au Pair?
19      A.   No.
20      Q.   Are you familiar with the sponsor Agent
21  Au Pair?
22      A.   Yes.
23      Q.   Is that from the caption in this lawsuit
24  that's in front of you?
25      A.   Yes.

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0005056

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 171

1        Q.    Do you know any employees or staff from
2   Agent Au Pair?
3        A.    No.
4        Q.    Are you familiar with the sponsor American
5   Cultural Exchange, LLC, doing business as Go Au
6   Pair?
7        A.    Yes.
8        Q.    Do you know of any staff or employees who
9   work for American Cultural Exchange, doing business
10  as Go Au Pair?
11       A.    No.
12       Q.    Let's just assume you're familiar with the
13  rest of these names of the au pair sponsors.  But
14  I'm going to ask you a specific question as to who
15  you may know through those sponsors.
16             Do you understand?  That will save some
17  time.
18       A.    Yes.
19       Q.    Do you know any employees or staff who work
20  for Associates in Cultural Exchange, doing business
21  as Go Au Pair?  Any employees or staff who work for
22  that sponsor?
23       A.    And which one is that?
24       Q.    Associates in Cultural Exchange, doing
25  business as Go Au Pair.

PLAINTIFFS' RESP. APP.0005057

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 172

1              It's the fifth one from the bottom in the

2     caption.

3         A.   No.

4         Q.   Do you know any employees or staff who work

5     for APF Global Exchange, NFP, doing business as

6     Au Pair Foundation?

7              Seventh from the bottom of the caption.

8         A.   From the bottom.

9         Q.   Do you see where it says "APF Global

10    Exchange NFP d/b/a Au Pair Foundation"?

11        A.   Yes.

12        Q.   Do you know any employees or staff who work

13    for APF?  Yes or no.

14        A.   Not that I know.

15        Q.   Do you see where it says "Au Pair

16    International, Inc."?

17             I'm just going up the caption.

18        A.   Yes.

19        Q.   Do you know any employees or staff who work

20    for Au Pair International, Inc.?

21        A.   Not that I recall.

22        Q.   Not that you recall or no?

23        A.   Not that I recall.

24        Q.   Is it possible that you know employees or

25    staff who work for Au Pair International, Inc.?

PLAINTIFFS' RESP. APP.0005058

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 173

```
 1        A.   The name sounds very familiar.
 2        Q.   But no names come to mind of any workers,
 3   employees, or management for that sponsor?
 4        A.   No.
 5        Q.   Do you know any employees or staff who work
 6   for Au Pair Care, Inc.?
 7        A.   No.
 8        Q.   Do you know any employees or staff who work
 9   for Cultural Care, Inc., doing business as Cultural
10   Care Au Pair?
11        A.   No.
12        Q.   Do you know any employees or staff who work
13   for Cultural Homestay International?
14        A.   No.
15        Q.   Do you know any employees or staff who work
16   for EurAupair Intercultural Child Care Programs?
17        A.   No.
18        Q.   Do you know any employees or staff who work
19   for Expert Group International, Inc., doing business
20   as Expert AuPair?
21        A.   No.
22        Q.   Do you know of any employees or staff who
23   have worked for GreatAuPair, LLC?
24        A.   No.
25        Q.   Do you know any employees or staff who have
```

PLAINTIFFS' RESP. APP.0005059

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 174

1    worked for U.S. Au Pair?

2        A.    No, not that I know of.

3        Q.    Do you know any employee or staff who worked

4    for Interexchange, Inc.?

5        A.    I don't remember exactly, but I have been

6    contacted by an employee of Interexchange, Inc.

7        Q.    Who contacted you from that sponsor?

8        A.    I don't know the person.  But they asked me

9    if I was interested in joining their agency.

10       Q.    When did that person contact you?

11       A.    This was, I don't know -- I don't remember,

12   but when I was searching.

13       Q.    2012?

14       A.    Around that time.

15       Q.    Do you recall if it was a male or female?

16       A.    A female.

17   ████  ██████████████████████████████████

     ██   ████   █████

19       Q.    Other than Interexchange, Inc., have you

20   ever spoken with anyone other than au pairs from any

21   of the sponsors that I read out to you just now?

22       A.    The sponsors that I worked for, for the

23   employees --

24       Q.    Other than AIFS or Au Pair In America, have

25   you spoken with anyone other than Interexchange --

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0005060

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 175

1    A.    No.

2    Q.    -- off of the list that I just read to you

3    in this deposition?

4    A.    No.

5    Q.    Are you aware of any communications between

6    any of these au pair sponsors that I've listed to

7    you that have to do with wages or hours?

8    A.    Please repeat the question.

9          (Last question read.)

10   A.    Yes.

11   Q.    (BY MR. LEE)  Please tell us your knowledge.

12   A.    My knowledge is based on the conversations

13   that I had with au pairs about the conversations

14   that they've had with their sponsors.

15   Q.    Not including your conversations with

16   au pairs, do you have any direct knowledge that

17   there were any communications between any of the

18   au pair sponsors in between 2012, 2015, as it

19   relates to wages and hours?

20   A.    I don't know.

21   Q.    When you say you don't know, you don't

22   remember?

23   A.    I don't know.  I don't remember.  I don't

24   know.

25   Q.    Is it possible that you are directly aware

PLAINTIFFS' RESP. APP.0005061

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 176

1   of communications that took place between all the

2   au pair sponsors on the topic of wages and hours?

3       A.   Yes.

4       Q.   How would you be aware?

5       A.   Just on things that I might have seen on the

6   Internet based on how much au pairs generally work.

7       Q.   What websites are you referring to on the

8   Internet?

9       A.   I don't remember or recall at this moment,

10  because there are a whole lot of websites that are

11  available on the Internet that belong to some of

12  these sponsors.

13      Q.   When is the most recent time you saw that

14  information on the webpage, or on the worldwide

15  web?

16      A.   I don't remember.

17      Q.   Was it in preparation for this deposition?

18      A.   No.

19      Q.   Would it have been in 2012?

20      A.   Yes.

21      Q.   2013?

22      A.   Yes.

23      Q.   2014?

24      A.   I don't remember or recall, but possibly.

25      Q.   2015?

PLAINTIFFS' RESP. APP.0005062

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 177

1      A.    I don't remember.

2      Q.    2016?

3      A.    Not 2016.

4      Q.    You testified earlier that in talking with

5  other au pairs that they had knowledge that they

6  passed on to you that the au pair sponsors in the

7  United States were having communications about wage

8  and hour issues.

9            Was that your previous testimony?

10     A.    My testimony was that I had conversations

11 with au pairs about how much they were paid, and

12 they had had conversations with their sponsors.

13     Q.    Did any of those conversations with those

14 other au pairs have to do with communications that

15 existed between the au pair sponsors in the United

16 States as it applied to wage and hour?

17     A.    Not that I know of.

18     Q.    Are you aware of any types of agreements

19 between any of the au pair sponsors to keep the

20 sponsor -- strike that -- to keep the wage at

21 $195.75 per week?

22           MR. HOOD:  Objection as to form.

23     Q.    (BY MR. LEE)  I can ask you if you're aware

24 of it.  Either yes or no.

25           Would you like the question repeated?

PLAINTIFFS' RESP. APP.0005063

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 178

1    A.    Please.

2    Q.    Are you aware of any agreements between any

3  of the U.S. sponsors that the stipend should be kept

4  at $195.75 per week?

5          MR. HOOD:  Objection as to form.

6    Q.    (BY MR. LEE)  You can answer the question.

7    A.    It's a conversation that I've had with my

8  attorney.

9    Q.    Any other independent conversations you had?

10   A.    No, not that I can recall, no.

11   Q.    I can ask you this.

12   A.    Yes.

13   Q.    Was this based upon any disclosures of

14  firsthand knowledge that you had, or did this have

15  to do with just general conversations about that

16  topic?

17         MR. HOOD:  Objection as to form.

18   Q.    (BY MR. LEE)  Do you have firsthand

19  knowledge that the U.S. au pair industry and all the

20  sponsors have agreements to keep the stipend at a

21  certain rate?  Yes or no.

22   A.    Yes.

23   Q.    What is that knowledge based on?

24   A.    It's based on the fact that au pairs all get

25  paid the same amount of money, and in my

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0005064

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 179

1    understanding, it's that it's the agencies that

2    decide how much au pairs get paid.

3        Q.   Any other information?

4        A.   No.

5        Q.   Could your information be incorrect or

6    false?

7        A.   I don't know.

8        Q.   **Have you actually checked how the stipend**

9    **was determined, outside of what you've been told,**

10   **during the time that you were an au pair in the**

11   **United States?**

12       A.   Please repeat the question.

13            (Last question read.)

14            THE DEPONENT:  Repeat the question one more

15   time.

16            (Last question read.)

17            MR. HOOD:  Objection as to form.

18       Q.   **(BY MR. LEE)  You can answer the question.**

19       A.   I'm trying to understand the question.  And

20   I'm really not understanding your question.

21       Q.   **Tell me what you don't understand, and then**

22   **I'll try and help you.**

23       A.   So the question is, have I checked --

24       Q.   **Have you independently checked who set the**

25   **stipend at $195.75 per week?**

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0005065

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 180

1        You've testified --

2    A.    Yes.

3    Q.    -- earlier that it was the au pair sponsors.

4    A.    Yes.

5    Q.    What did you check independently to

6    determine that the $195.75 stipend per week was

7    determined by the au pair industry?

8    A.    Based on documents that I don't remember --

9    those documents that I've come across when looking

10   into regulations of au pairs being paid and -- so

11   I've had a look and seen some documents, but I don't

12   actually remember which documents and websites I

13   might have seen them.

14   Q.    Were these documents and websites viewed on

15   your part in preparation for this deposition?

16   A.    No.  It was out of curiosity.

17   Q.    When was the last time you were curious on

18   the stipend and who set the stipend?

19        MR. HOOD:  Objection as to form.

20   Q.    (BY MR. LEE)  You can answer the question.

21   A.    I don't remember.

22   Q.    Was it this year?

23   A.    I don't recall or recall.

24   Q.    Turn to your First Amended Complaint.

25        Were you able to review the First Amended

PLAINTIFFS' RESP. APP.0005066

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 181

1    Complaint on your own for determining the basis of

2    this lawsuit prior to today?

3             MR. HOOD:   Objection as to form.

4        A.   Please repeat the question.

5             (Last question read.)

6             MR. HOOD:   Same objection.

7        A.   Yes.

8        Q.   (BY MR. LEE)  Did you review it for

9    truthfulness, accuracy, and thoroughness?

10       A.   I've reviewed it.

11       Q.   In whole?

12       A.   In whole, yes.

13       Q.   Go to Page 32 of the First Amended Complaint

14   and read Paragraph 137.

15       A.   Page?

16       Q.   Page 32.

17       A.   Okay.

18       Q.   Paragraph 137 at the bottom of the page,

19   starting with "Sponsors in addition."

20            Do you see that?

21       A.   Yes.

22       Q.   Please read it and look up when you're

23   finished.

24       A.   Sponsors in addition?

25       Q.   You can read it to yourself.

PLAINTIFFS' RESP. APP.0005067

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 182

1          Do you agree with that statement?

2     A.    Yes.

3     Q.    And do you possess any evidence or firsthand

4  knowledge that sponsors control or dictate wages to

5  au pair family employers and families agree to pay

6  the fixed wages to au pairs?

7          MR. HOOD:  I'm going to object as to

8  privilege to the extent any -- to the extent your

9  response would require you to reveal any

10 conversations with counsel, I instruct you not to

11 respond.  To the extent you can respond without

12 revealing any conversations with counsel, you may

13 respond.

14    Q.    (BY MR. LEE)  Let me correct Mr. Hood on the

15 law.  You can disclose any facts of your knowledge

16 of any of these allegations, and this is under

17 Upjohn -- this is under the U.S. District Court of

18 Colorado, who has interpreted Upjohn -- any facts

19 that you have firsthand or any evidence you possess

20 that support these allegations, whether you've

21 talked to him about it or not.  What you cannot

22 disclose is any communications in which he's advised

23 you on how to approach this allegation substantively

24 or in form.

25          So I'm going to ask you the following

PLAINTIFFS' RESP. APP.0005068

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 183

1    questions just to make this simpler.  And it's based

2    upon your independent knowledge away from any

3    communications with your attorney about some

4    paragraphs in the First Amended Complaint that you

5    reviewed for truthfulness, accuracy, and

6    thoroughness.  I'm going to repeat my question,

7    starting with Paragraph No. 137.

8          Do you possess any evidence or knowledge

9    that sponsors control or dictate wages to au pair

10   family employers and families agree to pay the fixed

11   wages to au pairs?  Yes or no.

12        A.   And you said up to where?

13        Q.   Would you like the question repeated?

14        A.   Yes, please.

15        Q.   Okay.  I would ask that you actually look at

16   me when I ask the questions --

17        A.   Oh, yes.

18        Q.   -- and not look at your document, because it

19   will be easier to figure out what the question is.

20        A.    Okay.

21          MR. LEE:  Renee, can you please repeat the

22   question.

23          (Last question read.)

24        A.   Yes.

25        Q.   (BY MR. LEE)  What knowledge or evidence do

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0005069

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 184

1    you have that directly support this allegation?

2        A.   My knowledge based on the conversations that

3    I've had with the African Ambassadors representative

4    Natalie James, which said that Au Pair In America

5    decides how much I get paid; upon being told at

6    orientation that Au Pair In America set the amount

7    of money that I got paid, that au pairs would get

8    paid in Au Pair In America, which was the $195.75;

9    also in conversations with my host families, who

10   then further confirmed that they were told by

11   Au Pair In America how much to pay us.

12       Q.   Was there anything incorrect about that

13   information that you just testified to?

14       A.   Not that I -- I know of.

15       Q.   Turn to Page 33, starting with the title of

16   "The Sponsors Have Used Deception as One Means of

17   Maintaining Fixed Standard Au Pair Wages."

18            Do you see that in the middle of the page?

19       A.   Yes.

20       Q.   Please read Paragraphs No. 140, 141, 142,

21   and 143 to yourself and look up when you're

22   finished.  And just stop at the end of 143.

23       A.   Yes.

24       Q.   Have you reviewed Paragraphs 140 through 143

25   of the First Amended Complaint, Ms. Hlatshaneni?

PLAINTIFFS' RESP. APP.0005070

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 185

1    A.   Yes.

2    Q.   Do you possess any evidence or firsthand

3    knowledge that the au pair sponsors in the United

4    States have used deception as a means of maintaining

5    fixed standard au pair wages?  Yes or no.

6    A.   Yes.

7    Q.   What is that answer based on?

8    A.   It's based on information given to us at

9    orientation that the U.S. Department of State tells

10   sponsors that there's a minimum wage that we must

11   get paid, but yet they keep it at $195.75.

12   Q.   Well, you understand, I'm sure, from your

13   knowledge and based upon your conversations with

14   others, that that's the standard rate for regular

15   au pairs, $195.75 per week; is that your

16   understanding?

17   A.   Au pairs in the -- in the au pair programs,

18   yes.

19   Q.   Do you also understand that there are other

20   classifications of au pairs, for example,

21   extraordinaires and educare au pairs?

22   A.   Yes.

23   Q.   How much do they make?  How much does an

24   extraordinaire get as far as a weekly stipend?

25   A.   I don't remember -- I don't remember right

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0005071

Case No. 1:14-cv-03074-CMA-KMT Document 859-25 filed 03/07/18 USDC Colorado pg 244
of 701

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 186

1   now, but I do know that some get paid less and some

2   get paid more, depending on how many hours that they

3   work.

4        Q.    Who sets the standard for the

5   extraordinaire's stipend or wage?

6        A.    Sponsors, according to my knowledge.

7        Q.    According to your knowledge, would you be

8   surprised to hear it was the U.S. Government?

9             MR. HOOD:  Objection as to form.

10       Q.    (BY MR. LEE)  Would you be surprised to hear

11   that the sponsors were not the one who set it; it

12   was the U.S. Government?

13       A.    I wouldn't be surprised.

14       Q.    Why wouldn't you be surprised?

15       A.    According to my knowledge, it's the au pair

16   agencies and sponsors that set the stipends.

17       Q.    And if I was to tell you today it's the

18   U.S. Government who did it and not the au pair

19   sponsors, what would be your response?

20             MR. HOOD:  Objection as to form and

21   foundation.

22       Q.    (BY MR. LEE)  You can answer the question.

23       A.    As I was saying, the sponsors -- Au Pair In

24   America had said that the U.S. Government gives them

25   a minimum wage and they have to follow it.  We can't

PLAINTIFFS' RESP. APP.0005072

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 187

1    get anything less.  But ultimately they decide on

2    how much within the regulations.

3         Q.   Who told you that from Au Pair In America?

4         A.   At training, we were told by Jody that they

5    have to stick to certain rules.  They can't pay us

6    less, but they never mentioned anything about paying

7    us more than the minimum required, so I would not be

8    surprised.

9         Q.   Did you ever ask -- ever ask Jody or anyone

10   else in Au Pair In America to elaborate why that

11   was?

12        A.   No, I did not.

13        Q.   Did you ask any questions about the stipend,

14   whether it's for a regular or extraordinare or

15   eurocare -- I'm sorry, educare au pair --

16        A.   No.

17        Q.   -- of why certain stipends were being set?

18        A.   No.  I never asked.

19        Q.   Turn to Page 46 of the First Amended

20   Complaint.  Look at Paragraph No. 218, review it,

21   and then look up when you're finished with that

22   sentence.

23             Do you possess any evidence or direct

24   knowledge that any au pair sponsor in the United

25   States lied to any au pairs and prospective au pairs

PLAINTIFFS' RESP. APP.0005073

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 188

1    in order to sponsor them?

2        A.   Please just explain the question.

3        Q.   **Explain the question or reread the question?**

4        A.   Reread, explain the context.

5        Q.   **Do you possess any evidence or firsthand**

6    **knowledge that any au pair sponsor in the United**

7    **States lied to any au pairs and prospective au pairs**

8    **in order to sponsor them?**

9        A.   No, not that I can recall.

10       Q.   **Turn to Page 47 of the First Amended**

11   **Complaint, please, Ms. Hlatshaneni.  Scroll down to**

12   **Paragraph 224.  Please read and review, and look up**

13   **when you're finished.**

14           **Do you have any evidence or firsthand**

15   **knowledge that any sponsor purported to be in a**

16   **position to protect the legal rights of the**

17   **au pairs?**

18       A.   Yes.

19       Q.   **What is that knowledge or evidence to**

20   **support your previous answer?**

21       A.   The knowledge that I have as far as Au Pair

22   In America telling us that as au pairs that work 45

23   hours a week, we are not supposed to work more than

24   45 hours a week and within the specified range, and

25   if we are, then they would address that with the

PLAINTIFFS' RESP. APP.0005074

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 189

1    host families.  And upon us, if we worked longer

2    hours and receive payment from those, they would

3    then take us out of the program or we leave the

4    country.

5        Q.   Were you ever taken out of the program by

6    Au Pair In America?

7        A.   No.

8        Q.   Do you have any evidence or direct knowledge

9    that the au pair sponsors acted as arbitrators of

10   wages, disputes, and hours?

11       A.   And context of "arbitrators"?

12       Q.   I'm sorry, I didn't understand your answer.

13       A.   I'm saying that the meaning -- just to make

14   sure my understanding of it.

15       Q.   What is your understanding of it?  This is

16   your lawsuit that --

17       A.   Is that is --

18       Q.   Let me finish -- that you've reviewed for

19   truthful, accuracy, and thoroughness.

20            What is your definition of "arbitrators"?

21       A.   Is people who stand for -- who represent you

22   on wage disputes about hours.

23       Q.   That's your definition of arbitrators?

24       A.   Yes, and presenters.

25       Q.   So let me throw out a different definition,

PLAINTIFFS' RESP. APP.0005075

Case No. 1:14-cv-03074-CMA-KMT Document 1059-35 filed 03/7/16 USDC Colorado pg 249 of 701

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 190

1    and you tell me if you have any direct evidence or

2    firsthand knowledge.

3              Arbitrators, in my opinion, means deciders,

4    decision-makers of any disputes, like a judge or

5    someone who has final decision-making authority.

6              Do you understand that definition of

7    arbitrators?

8        A.    Yes.

9        Q.    Based on that definition that I just gave

10   you of what arbitrators are within the context of

11   Paragraph 224 of the First Amended Complaint, do you

12   possess any evidence or firsthand knowledge that any

13   au pair sponsor acted as an arbitrator of wage

14   disputes and hours?

15       A.    Yes.

16       Q.    Who?

17       A.    This is based upon that they --

18       Q.    No.  Let me -- I asked you who, not what

19   it's based on.

20       A.    Who?

21       Q.    The call of the question is who acted as an

22   arbitrator in wage disputes and hours.

23             MR. HOOD:  Objection as to form and

24   foundation.

25       Q.    (BY MR. LEE)  You can answer the question.

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0005076

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 191

1    It's the exact same question I asked you before.

2        A.   The sponsors.

3        Q.   Who as a sponsor?  Which sponsor acted as an

4    arbitrator?

5        A.   Au Pair In America.

6        Q.   Who else?

7        A.   All the other sponsors that decided on how

8    much the au pairs would get paid.

9        Q.   What did --

10       A.   And how many hours they would work.

11       Q.   What did Au Pair In America and all the

12   other sponsors do for you to testify while under

13   oath that they acted as arbitrators of wage disputes

14   and hours?

15           MR. HOOD:  Objection as to form.

16       Q.   (BY MR. LEE)  You can answer the question.

17       A.   By providing au pairs with instructions and

18   rules as well as host families about how many hours

19   they should work and what they should get paid.

20       Q.   Any other information other than what you

21   just testified to?

22           Would you like the question repeated to you,

23   Ms. Hlatshaneni?

24       A.   Yes.

25           (Last question read.)

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0005077

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 192

```
 1        A.    As far as my understanding, that's the

 2   answer that I have for you.

 3             MR. HOOD:  I'm --

 4             MR. LEE:  I'm going to hand you what's been

 5   marked as Exhibit 38.

 6             Yes, Mr. Hood?

 7             MR. HOOD:  When you're at a good stopping

 8   point, could I just have a quick five-minute break?

 9             MR. LEE:  Sure.  Let me get this Exhibit 38

10   in.

11             (Exhibit 38 marked.)

12        Q.    (BY MR. LEE)  Ms. Hlatshaneni, I'm handing

13   you a document that has two pages or two sides.  It

14   starts with forwarded message from ███████████

15   ███████████  dated Thursday, March 5, 2015, at 10:48

16   a.m.

17
```

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0005078

Case 1:14-cv-03074-CMA-KMT   Document 943-25   Filed 03/17/18   USDC Colorado   Page 251
8 of 700

Deposition of Lusapho Hlatshaneni
September 7, 2016



Page 193

11    Q.   I'm going to represent to you, we just

12   received this yesterday from your counsel and had a

13   chance to look at it.  And I have another issue I

14   would like to address after that, but first, when

15   did you -- strike that.

16         Did you receive this report on March 5,

17   2015?

18    A.   Yes.

19

22    Q.   What did you tell her about the lawsuit?

23    A.   That there was a lawsuit that could

24   represent her as an au pair and the -- and her

25   experience as an au pair, and she would consult with

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0005079

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 194

1    legal counsel if she was interested in joining the

2    suit.



24          MR. LEE:  Mr. Hood, you requested a break.

25    I think this is a good breaking time.  And then I

PLAINTIFFS' RESP. APP.0005080

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 195

1   just have one more thing to do after that and then

2   we're good.

3          MR. HOOD:  Okay.  Real quick.

4          THE VIDEOGRAPHER:  Going off the record.

5   The time is 3:51.

6          (Recess taken from 3:51 to 4:12 p.m.)

7          (Ms. Reilly left the room and was not

8           present for the remainder of the

9           deposition.)

10          THE VIDEOGRAPHER:  We're back on the

11   record.  The time is 4:12.

12      Q.   (BY MR. LEE)  Ms. Hlatshaneni, you testified

13   earlier about your host families assigning your

14   duties and setting your schedule, and I just wanted

15   to be absolutely clear.

16          Both host families that you worked with from

17   2013 through 2015 through the Au Pair Program here

18   in this country, they were the ones who assigned

19   your duties; is that correct?

20      A.   Yes.  That is correct.

21      Q.   And both host families during that time

22   period also allowed you to work a certain schedule

23   as well as take time off; is that right?

24      A.   Yes.  That is correct.

25      Q.   Au Pair In America had nothing to do or no

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0005081

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 196

1   input with either setting your duties or scheduling
2   your time off or even scheduling your work, correct?
3        A.   Au Pair In America said which duties I'm not
4   allowed to do.  They said how many hours I'm not
5   supposed to work.  And so in the end, we finalized
6   within those -- those guidelines provided by Au Pair
7   In America.
8        Q.   Let me be clear.  And I --
9        A.   Yes.
10       Q.   That's not what I was referring to.
11       A.   Okay.  So clarify.
12       Q.   From February 2013 through March of 2015 --
13       A.   Yes.
14       Q.   -- did Au Pair In America tell you what
15   duties you should be performing for either host
16   family that you worked for?
17       A.   No.
18       Q.   From February 2013 through March 2015, did
19   Au Pair In America tell you what your exact
20   schedule -- work schedule would be per week?
21       A.   No.
22       Q.   Did Au Pair In America during that time
23   period ever tell you what time you should take off
24   in terms of vacations or other types of days off?
25       A.   So when I should take off?  They told me

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0005082

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 197

1    that I had two weeks.  But, no.

2        Q.   So let me repeat the question so we have a

3    clear record.

4        A.   Yes, please.

5        Q.   From February of 2013 through March 2015,

6    did Au Pair In America ever tell you what time you

7    should take off, including vacations or any other

8    similar time off?

9        A.   No.

10       Q.   And just also so I'm clear, based on your

11   prior testimony, did you ever send an e-mail

12   communication to anyone at Au Pair In America from

13   February 2013 to March 2015 of any complaint that

14   you had that was not responded to?

15       A.   No.

16       Q.   Did you ever leave a voicemail for anyone at

17   Au Pair In America of any complaint that you had

18   during this same time period that was not responded

19   to?

20       A.   No.

21            MR. LEE:  Okay.  I so far believe that I am

22   finished for now.

23            Alex and Counsel, I would like to make a

24   record.  And, Alex, I'm going to permit you to

25   respond at the end of that record, so I would ask

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0005083

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 198

1    for the benefit for purposes of the court reporter
2    being able to establish a clean record --
3            MR. HOOD:  Sure.
4            MR. LEE:  -- and then I will afford you the
5    same courtesy.
6            I think the record should reflect that we
7    filed a motion to compel plaintiff to produce
8    documents.  The Court denied that motion without
9    prejudice for failure to meet and confer, which we
10   actually did meet and confer.  The Court did not
11   take it into consideration, apparently, or it was
12   not enough, and we respect that.
13           Now, in connection with today's deposition,
14   your co-counsel, Mr. Hood, has produced a large
15   number of volume of documents ranging from whatever.
16   I wish I knew what it was, because our office has
17   made four attempts to find out what those 500-plus
18   documents that we received early this morning were.
19   It was a classic dumping of documents on the day of
20   a deposition.
21           Now, for you to oppose our motion to compel
22   if we file a supplemental or an amended, and you
23   resist production, and then you sandbag me -- not
24   you specifically, but counsel who sent it to me --
25   on the day of a deposition for these documents, and

PLAINTIFFS' RESP. APP.0005084

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 199

1   these are very important documents, obviously,

2   otherwise why would you send it to me on the day of

3   the deposition?  It's highly prejudicial for my

4   client and for us.

5          And this tactic did exactly what I perceived

6   was designed by plaintiffs to do, and that's hinder

7   my ability to ask well-informed question and to

8   prepare adequately for this plaintiff's deposition.

9   It likely prevented me from making a complete

10  record.  Until I have more time to absorb these

11  documents, I cannot be sure, and that's the point.

12  We've done our best to try and look at the documents

13  that were provided by co-plaintiffs' counsel this

14  morning at breaks and at lunch, including before

15  this deposition took place.

16          We're going to file a supplemental motion to

17  compel, and we're going to leave this deposition

18  open in light of this late production by your

19  co-plaintiffs' counsel.

20          Had this witness traveled or not traveled

21  such a long way to get here, which we are very

22  sensitive to, as you know, we would have called off

23  the deposition today.  Instead, we did our best to

24  proceed under the circumstances and to mitigate our

25  own prejudice.

PLAINTIFFS' RESP. APP.0005085

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 200

1          At some point we hope that the level of

2    professionalism on plaintiffs' counsel's part rises

3    to the point of cooperation.  I don't care to

4    involve the court in these types of disputes,

5    because everything I hear from our federal bench

6    here hates hearing about these types of conflicts.

7          But I have to defend, my firm has to defend,

8    and every defendant and defense counsel has to

9    defend against this complaint, the allegations, and

10   the numerous -- numerous claims.  And, quite

11   frankly, I'm not going to permit tactics like this

12   to ever continue again.  It's just not fair to us.

13         So more than likely we're going to file a

14   supplemental motion to compel.  We're leaving this

15   deposition open, and we hope in the future that

16   you're going to show my office and other defense

17   counsel more professionalism than you afforded me

18   today.

19         I am finished, and you may respond.

20         MR. HOOD:  Because she has more -- because

21   she's more familiar with the subject matter of what

22   you just discussed, I'm going to allow Lauren Louis,

23   who is on the conference call, to respond.

24         MR. LEE:  We can't open the documents.

25   There's nothing -- we open the documents, and it

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0005086

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 201

1    shows us nothing.  There's nothing.  Period.

2            MS. LOUIS:  What is "nothing," Larry?

3            MR. LEE:  There's no documents Bates labeled

4    000503 to 001066 on the FTP portal or site.

5            MS. LOUIS:  So my question would be -- this

6    is Lauren Louis for the court reporter.

7            At one point today you identified that there

8    was a technical glitch, but with respect to your

9    representation that you did meet and confer, since

10   that won't be able to be rectified in the records

11   since the motion was denied, in fact, there was no

12   meet and confer.  There was a letter and a phone

13   call from my desk and no other attempt to reach me,

14   which I responded with an e-mail, and Sue responded

15   two days later after filing the motion to compel to

16   my e-mail.

17           So to correct that record, Larry, there was,

18   in fact, a response by plaintiffs' counsel to meet

19   and confer in advance of this deposition.

20           Now, with respect to a document dump, there

21   are not 500 documents in this morning's e-mail.  And

22   you elected to set her deposition down within

23   30 days per initial discovery responses, because you

24   felt that it was so critical for you to have her

25   testimony prior to the FLSA opposition.

PLAINTIFFS' RESP. APP.0005087

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 202

1        So she has done everything to comply with

2   her discovery requirements, and plaintiffs have made

3   more than valiant efforts to get all of the

4   documents to you in advance of your deposition, but

5   you elected to set this depo this early in discovery

6   period.

7        There were not 500 documents.  There were

8   295.

9        MR. LEE:  Okay.  Doing my math, it has Bates

10  No. 1066 down to 503.  This is the letter that you

11  sent on September 7th, which is today.

12       The other thing -- and I take exception to

13  the fact that my colleague did attempt to contact

14  you and left a voicemail.  And my understanding is

15  you're representing that you did not receive that

16  voicemail.

17       I would like to --

18       MS. LOUIS:  That is not my representation,

19  Larry.  I received the voicemail, and I responded to

20  Sue with an e-mail, because she just called my

21  direct line with no e-mail.  I wasn't in the office

22  that day.  It was the date of the Beltran

23  deposition.  But I responded to her by e-mail, and

24  she did not then acknowledge my response until after

25  the filing of the motion to compel, which claims

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0005088

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 203

1   falsely that I did not respond to her attempt to

2   reach me that day.

3           MR. LEE:  She is out of the country.  I will

4   have a conversation with her, but I'm conferring

5   with you right now.

6           When are you going to send over the

7   documents that you represented you sent over this

8   morning, and what is your resolution?  Because we're

9   all here, and we would like to see those documents,

10  but we have nothing.

11          And I'm entering this exhibit in as

12  Exhibit 39, which is a letter from you, Lauren, on

13  September 7th, 2016, which says:

14          "Dear Counsel:  Pursuant to the protective

15  order in this case, Plaintiff Hlatshaneni provides a

16  supplemental production via FTP link.  The documents

17  which are Bates numbered Hlatshaneni 000503 through

18  Hlatshaneni 001066 have been marked Confidential

19  under the terms of the protection order.  Plaintiff

20  Hlatshaneni may supplement her production under

21  separate cover."

22          When and how are you going to resolve this?

23          (Exhibit 39 marked.)

24          MS. LOUIS:  Resolve what, Larry?

25          MR. LEE:  We have no documents from you that

PLAINTIFFS' RESP. APP.0005089

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 204

1   you claim you have sent us this morning, and I'm not

2   the only defense counsel who's experienced that you

3   have not sent us anything.  When you going to

4   resolve the alleged documents that you sent over

5   that don't exist?  We cannot access them.

6          MS. LOUIS:  Larry, we opened it.  We are

7   sitting here.  We just opened the FTP link that we

8   sent you.  It is not blank because we are looking at

9   it.

10          So if there is a technical issue and you

11   need help with your technical support, we will be

12   happy to provide it.  The documents were provided.

13   They are there on the link.

14          MR. LEE:  I'm going to --

15          MS. LOUIS:  I'll also further clarify for

16   the record, this is the third production that this

17   plaintiff has provided you, and she has made heroic

18   efforts to make sure that you had the documents as

19   early as possible and to complete her discovery

20   production obligations way in advance of any that

21   have been performed by defense counsel in this case.

22          MR. LEE:  Your responses were due on

23   August the 4th, and we received your second

24   supplemental yesterday, and we received, allegedly,

25   what was supposed to be documents this morning, and

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0005090

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 205

1    we didn't.

2            I'm going to show your co-counsel, Alex, the

3    screenshots of what we have here.  This is the only

4    thing that shows up, and after that, when you click

5    into it, this is all you get.

6            MR. HOOD:  Are you asking for technical help

7    opening the documents?

8            MR. LEE:  Alex, I'm just telling you what it

9    shows based on the screenshot.  I'm not asking you

10   for technical help; otherwise I would have formed

11   that question.

12           Do you understand?  I'm showing you an

13   example of a hard-copy screenshot --

14           MR. HOOD:  Okay.

15           MR. LEE:  -- of nothing showing up.

16           MR. HOOD:  And Ms. Louis is representing

17   that the FTP link is working just fine.  So I think

18   there's a technical glitch, and we would be happy to

19   help.

20           MR. LEE:  Okay.  I've made my record.

21           No further questions for now.

22           MR. HOOD:  Are any other defense counsel

23   going to ask questions?

24           DEFENSE COUNSEL:  (No audible response.)

25           MR. HOOD:  If not, I don't think we have any

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0005091

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 206

1    questions, but if I could just have a few minutes.

2            MR. LEE:  Well, anyone on the phone would

3    like to ask any questions?

4            For the record, those present here at this

5    table have shaken their head no as far as other

6    defense counsel.

7            You would like five minutes, Alex?

8            MR. HOOD:  Yes, just give me five minutes.

9    I don't believe we're going to ask any questions,

10   but I just want to go through my notes.

11           MR. LEE:  Okay.

12           THE VIDEOGRAPHER:  Going off the record.

13   The time is 4:27.

14           (The deponent left the room and was not

15           present for the remainder of the

16           deposition.)

17           THE VIDEOGRAPHER:  We're back on the record.

18   The time is 4:44.

19           MR. HOOD:  Plaintiffs have no questions, but

20   note the defendants have left the deposition open

21   and reserve the right to ask questions if defendants

22   do as well in the future.

23           THE VIDEOGRAPHER:  This is the end of

24   Media No. 4 of 4 in the deposition of Lusapho

25   Hlatshaneni.  Going off the record.  The time is

PLAINTIFFS' RESP. APP.0005092

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 207

1    4:35.

2          (WHEREUPON, the proceedings were concluded at

3    4:35 p.m., on the 7th day of September, 2016.)

4                    *       *       *       *       *

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PLAINTIFFS' RESP. APP.0005093

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 208

1         I, LUSAPHO HLATSHANENI, hereby certify
that I have read the foregoing transcript and that
2  the same and accompanying correction sheets, if any,
constitute a true and complete record of my
3  testimony.

4  (  )  I have made corrections
(  )  I have not made corrections
5
PAGE    LINE        NOW READS              SHOULD READ
6  ____   ____   _____   _____

7  ____   ____   _____   _____

8  ____   ____   _____   _____

9  ____   ____   _____   _____

10 ____   ____   _____   _____

11 ____   ____   _____   _____

12 ____   ____   _____   _____

13 ____   ____   _____   _____

14 ____   ____   _____   _____

15 ____   ____   _____   _____

16 ____   ____   _____   _____

17 ____   ____   _____   _____

18 ____   ____   _____   _____

19              _____
                LUSAPHO HLATSHANENI
20
       Subscribed and sworn to before me this_____
21 day of _____ , 20___.

22     My Commission expires: _____

23              _____
                Notary Public
24              Address: _____

25              _____

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0005094

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 209

1                    REPORTER'S CERTIFICATE

2

   STATE OF COLORADO          )
3                             )ss
   CITY AND COUNTY OF DENVER)

4

5          I, RENEE S. WILSON, Certified Shorthand

6    Reporter and Notary Public, State of Colorado, do

7    hereby certify that previous to the commencement of

8    the examination, the deponent was duly sworn by me

9    to testify to the truth in relation to the matters

10   in controversy between the parties hereto; that the

11   said deposition was taken in machine shorthand by me

12   at the time and place aforesaid and was thereafter

13   reduced to typewritten form; that the foregoing is a

14   true transcript of the questions asked, testimony

15   given, and proceedings had.  I further certify that

16   I am not employed by, related to, nor of counsel for

17   any of the parties herein, nor otherwise interested

18   in the outcome of this litigation.

19          IN WITNESS WHEREOF, I have affixed my

20   signature and seal this _____ day of September,

21   2016.

22          My commission expires December 2, 2018.

23

     _____
24                Renee S. Wilson
             Certified Shorthand Reporter
25

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0005095

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 210

1               Wilson & Associates, LLC
                  P.O. Box 101885
2               Denver, Colorado  80250
                  (303) 588-0079
3
4   September 15, 2016
5   ALEXANDER NEVILLE HOOD, ESQ.
    Towards Justice
6   1535 High Street, Suite 300
    Denver, Colorado 80218
7
    Deposition of:  LUSAPHO HLATSHANENI
8                   Taken:  September 7, 2016
9   In Re:  JOHANA PAOLA BELTRAN; et al., V.
              INTEREXCHANGE, INC.; et al.
10          Civil Action No. 1:14-cv-03074-CMA-KMT
11
    Dear Mr. Hood:
12
    Enclosed please find the original signature page(s)
13  of the above deposition(s). It was agreed that you
    would arrange for signature of LUSAPHO HLATSHANENI'S
14  deposition by means of your copy transcript.
15  Also enclosed is (are) an amendment sheet(s) for
    changes if necessary. Please return the signature
16  page(s) and amendment sheet(s) . . .
17  __xxx___   to our office for filing within 35 days to
               comply with the rule.
18
    _____   to our office before _____, in
19             order that the deposition may be filed in
               time for trial.
20
    _____   to THE COURT prior to trial, furnishing
21             copies of amendments to opposing counsel.
22
    Thank you for your attention to this matter.
23  Sincerely,
24  Renee S. Wilson, CSR
    Certified Shorthand Reporter
25  cc: Lawrence Lee, Esq./original transcript

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0005096

Deposition of Lusapho Hlatshaneni
September 7, 2016

Page 211

1              Wilson & Associates, LLC
                  P.O. Box 101885
2            Denver, Colorado  80250
                  (303) 588-0079
3

4   LAWRENCE LEE, ESQ.
    Fisher Phillips, LLP
5   1801 California Street
    Suite 2700
6   Denver, Colorado 80202

7

    In Re:  JOHANA PAOLA BELTRAN; et al., V.
8            INTEREXCHANGE, INC.; et al.
             Civil Action No. 1:14-cv-03074-CMA-KMT
9

10  Dear Mr. Lee:

11  Enclosed is the deposition of:  LUSAPHO HLATSHANENI

12  _____  Signature waived.

13  _____  Signed, no changes.

14  _____  Signed, with changes, copy of which is
            enclosed.
15
    _____  Unsigned, pursuant to stipulation of counsel
16          that the deponent may sign at the time of
            trial.
17
    _____  Unsigned, notice duly given_____,
18          pursuant to the Rules of Civil Procedure.

19  _____  Unsigned, notice duly given _____,
            since trial is set for _____.
20
    _____  Unsigned, due to settlement of case.
21

22

23  WILSON & ASSOCIATES, LLC
    cc:  counsel of record
24

25

Wilson & Associates, LLC
(303) 588-0079

PLAINTIFFS' RESP. APP.0005097

Case 1:14-cv-03074-CMA-KMT   Document 943-45   Filed 05/17/18   USDC Colorado   Page 270 of 700

# Exhibit 440

                    IN THE UNITED STATES DISTRICT COURT

                    FOR THE DISTRICT OF COLORADO


     JOHANA PAOLA BELTRAN, et al.,


                    Plaintiffs,


     vs.                              No. 14-cv-03074-CMA-KMT


     INTEREXCHANGE, INC., et al.,


                    Defendants.


          Deposition of CARRIE CROMPTON, taken on behalf
     of the Plaintiffs, at the offices of GorePerry
     Reporting & Video, 515 Olive Street, Suite 300, in
     the City of St. Louis, State of Missouri, on the
     22nd day of September, 2016, before Kristine A.
     Toennies, RMR, CRR, CBC, MO-CCR #769, CSR (IL
     #084-004388 & IA), and Notary Public.

PLAINTIFFS' RESP. APP.0005099

MAGNA ▶
LEGAL SERVICES

Case No. 1:14-cv-03074-CMA-KMT   Document 859-25   filed 03/13/18   USDC Colorado   pg 1 of 701
Case 1:14-cv-03074-CMA-KMT   Document 263-5   Filed 08/17/18   USDC Colorado   Page 273 of 701
273

| Page 2 | |
|---|---|
| 1 | APPEARANCES OF COUNSEL: |
| 2 | |
| 3 | FOR THE PLAINTIFFS: |
| 4 | Ms. Sabria A. McElroy |
| 5 | Boies, Schiller & Flexner LLP |
| 6 | 401 East Las Olas Boulevard, Suite 1200 |
| 7 | Fort Lauderdale, FL 33301-2211 |
| 8 | (954) 356-0011 |
| 9 | smcelroy@bsfllp.com |
| 10 | |
| 11 | FOR THE DEFENDANT AU PAIR FOUNDATION: |
| 12 | Ms. Susan M. Schaecher |
| 13 | Fisher & Phillips LLP |
| 14 | 1801 California Street, Suite 2700 |
| 15 | Denver, CO 80202 |
| 16 | (303) 218-3650 |
| 17 | sschaecher@fisherphillips.com |
| 18 | |
| 19 | FOR THE DEFENDANT CULTURAL HOMESTAY INTERNATIONAL: |
| 20 | Mr. Jonathan S. Bender |
| 21 | Holland & Hart LLP |
| 22 | 555 17th Street, Suite 3200 |
| 23 | Denver, CO 80202 |
| 24 | (303) 295-8456 |
| 25 | jsbender@hollandhart.com |

Page 3

1  APPEARANCES CONTINUED:
2  FOR THE DEFENDANT CULTURAL CARE:
3  Ms. Lyndsey M. Kruzer (By telephone)
4  Choate, Hall & Stewart
5  Two International Place
6  Boston, MA 02110
7  (617) 248-5000
8  lkruzer@choate.com
9
10  FOR THE DEFENDANT AUPAIRCARE:
11  Ms. Peggy E. Kozal (By telephone)
12  Gordon & Rees
13  555 17th Street, Suite 3400
14  Denver, CO 80202
15  (303) 534-5160
16  pkozal@gordonrees.com
17
18  FOR THE DEFENDANTS PROAUPAIR AND
19  INTERNATIONAL AUPAIR EXCHANGE:
20  Mr. Lawrence D. Stone (By telephone)
21  Nixon Shefrin Hensen Ogburn P.C.
22  5619 DTC Parkway, Suite 1200
23  Greenwood Village, CO 80111
24  (303) 773-3500
25  lstone@nixonshefrin.com

Page 4

1  APPEARANCES CONTINUED:
2
3  FOR THE DEFENDANT INTEREXCHANGE:
4  Ms. Brooke A. Colaizzi (By telephone)
5  Sherman & Howard LLC
6  633 17th Street, Suite 3000
7  Denver, CO 80202
8  (303) 297-2900
9  bcolaizzi@shermanhoward.com
10
11  FOR THE DEFENDANT EXPERT AUPAIR:
12  Mr. Bogdan Enica (By telephone)
13  Expert AuPair
14  100 2nd Avenue S., Suite 3025
15  St. Petersburg, FL 33701
16  (727) 225-2649
17  bogdan@expertaupair.com
18
19
20
21
22
23
24
25

Page 5

1                    INDEX
2                     PAGE
3  Examination by Ms. McElroy            6
4  Examination by Ms. Schaecher        111
5  Examination by Mr. Bender           113
6  Examination by Mr. Stone            116
7  Examination cont'd by Mr. Stone     120
8  Examination cont'd by Ms. McElroy   122
9  Examination cont'd by Mr. Stone     127
10
11                 EXHIBITS
12
13  Exhibit 79                  44
14  Exhibit 80                  49
15  Exhibit 81                  55
16  Exhibit 82                  67
17  Exhibit 83                  75
18  Exhibit 84                  77
19  Exhibit 85                  83
20  Exhibit 86                  85
21  Exhibit 87                  91
22  Exhibit 88                  93
23  Exhibit 89                  96
24  Exhibit 90                  98
25

PLAINTIFFS' RESP. APP.0005100

MAGNA ▶
LEGAL SERVICES

Page 6

```
 1            CARRIE CROMPTON,
 2  of lawful age, having been first duly sworn to
 3  testify the truth, the whole truth, and
 4  nothing but the truth in the case aforesaid,
 5  deposes and says in reply to oral
 6  interrogatories, propounded as follows, to-wit:
 7            EXAMINATION
 8  QUESTIONS BY MS. McELROY:
 9     Q   Good morning.
10     A   Good morning.
11     Q   Could you please state and spell your name
12  for the record.
13     A   Yeah, it's Carrie Crompton, C-A-R-R-I-E.
14  Last name is Crompton, C-R-O-M-P-T-O-N.
15     Q   Have you ever been deposed before?
16     A   I have not.
17     Q   Have you ever testified in court?
18     A   No.
19     Q   So before we begin I'm just going to go over
20  a couple of procedural rules which you may or may
21  not know already.  First, your counsel may object to
22  some of my questions.  Unless he or she instructs
23  otherwise, you should still answer the question.
24     A   Okay.
25     Q   Please ask me to clarify anything you don't
```

Page 7

```
 1  understand.  If you answer my question, I will
 2  assume that you understood it.  Is that fair?
 3     A   That's fair.
 4     Q   If you need a break, that's fine.  I just
 5  ask that you don't ask for a break while a question
 6  is pending.  Your answers need to be audible so the
 7  court reporter and those on the phone can hear.
 8     A   Okay.
 9     Q   You're testifying here under oath.  Your
10  answers carry the same penalties of perjury as if
11  you were testifying in court.  Do you understand?
12     A   Yes.
13     Q   Is there anything, any medications that
14  you're taking that would prevent you from providing
15  accurate testimony today?
16     A   No.
17     Q   Do you have any physical or mental
18  conditions that would --
19     A   No.
20     Q   Is there anything that would prevent you
21  from testifying truthfully here today?
22     A   No.
23     Q   Can you give me your current address,
24  please.
25     A   My home address?
```

Page 8

```
 1     Q   Yeah, home address.
 2     A   Sure.  It's 1722 Nicholson Place.  It's
 3  N-I-C-H-O-L-S-O-N, St. Louis, Missouri 63104.
 4     Q   How long have you lived there?
 5     A   Gosh, almost seven years.
 6     Q   Who's your current employer?
 7     A   Cultural Homestay International.
 8     Q   Do you have a work address?
 9     A   Yes, I do.
10     Q   Could you please state your work address.
11     A   The main office?  I work at home.
12     Q   You work from home, okay.  Where are they
13  headquartered?
14     A   San Anselmo, California.
15     Q   Before coming here today, did you review any
16  documents in preparation for your deposition?
17     A   Yes.
18     Q   Which documents did you review?
19         MS. SCHAECHER:  You can answer.
20     A   I reviewed for Au Pair Foundation the host
21  family-au pair agreement, the au pair pledge.
22         For CHI I reviewed printouts of the website,
23  the public website.  I think that was it.
24     Q   (By Ms. McElroy) I'm going to move to a bit
25  of background information.  Did you attend college?
```

Page 9

```
 1     A   I did.
 2     Q   Where did you attend college?
 3     A   St. Mary's College in California.
 4     Q   What year did you graduate?
 5     A   1999.  You made me think there for a minute.
 6     Q   What was your degree in?
 7     A   Business administration.
 8     Q   Do you have any graduate education?
 9     A   I do.
10     Q   Where -- what type of degree?
11     A   I have a law degree.
12     Q   You graduated from law school?
13     A   Uh-huh.
14     Q   Where did you attend law school?
15     A   California Western in San Diego.
16     Q   What year did you graduate from law school?
17     A   2004.
18     Q   Did you work between -- the two years
19  between college and law school?
20     A   I did.
21     Q   Where did you work?
22     A   Nordstrom.
23     Q   Did you attend any other post or graduate
24  schools?
25     A   No.
```

PLAINTIFFS' RESP. APP.0005101

MAGNA
LEGAL SERVICES

---

Page 10

1    Q   You said your current employer is Cultural
2  Homestay International?
3    A   Yes.
4    Q   If I use CHI, will you understand what I
5  mean?
6    A   Perfect.
7    Q   How long have you been employed with CHI?
8    A   Since November 2015.
9    Q   Do you know about how many employees CHI
10  has?
11    A   Well, they have several different programs,
12  so as a company I don't know, but au pair, I think
13  there's five or six.
14    Q   So when you say they have several different
15  programs, what do you mean by that?
16    A   Well, in addition to the au pair program,
17  they have work and travel, they have academic year
18  program, which is kind of like a high school
19  exchange program.
20    Q   So those other programs are unrelated to the
21  au pair program?
22    A   They are.
23    Q   So you said there's only five to six
24  employees for the -- or around five to six for the
25  au pair?

---

Page 11

1    A   Yeah, full-time staff.
2        MR. BENDER:  Carrie, just make sure she gets
3  her question out before you answer so we have a
4  clean record.
5        THE WITNESS:  Okay.
6    Q   (By Ms. McElroy) Does Cultural Homestay use
7  independent contractors as part of their au pair
8  program?
9    A   They do.
10    Q   And you said -- are there also part-time
11  employees, or are all part-time workers independent
12  contractors, if you know?
13        MR. BENDER:  Object to the form.
14    A   CHI has, like I said, five to six full-time
15  staff.  The field staff are all independent
16  contractors.
17    Q   (By Ms. McElroy) Do they have any part-time
18  employees?
19    A   I do believe that CHI does use interns.  I
20  am not aware of their employment status.
21    Q   What is your current position with CHI?
22    A   I am the regional administrator for the
23  western U.S.
24    Q   What are your duties as regional
25  administrator?

---

Page 12

1    A   I manage my field staff, so the independent
2  contractors in the region.  I am responsible for
3  customer service in the region.  I am responsible
4  for sales and growth in the region, and I work
5  closely with the field staff in the main office on
6  Department of State required forms and paperwork.
7    Q   When you say that you manage field staff,
8  what are the positions of the people that you
9  manage?
10    A   They are what's called a community
11  administrator.
12    Q   Are they the ones that interact directly
13  with au pairs?
14    A   Yes.
15    Q   Do they also interact directly with the host
16  families?
17    A   Yes.
18    Q   Do you have direct interactions in your
19  position with au pairs?
20    A   Phone and e-mail only.
21    Q   So no in-person contact with au pairs --
22    A   No.
23    Q   -- in this position?  Do you have direct
24  contact with host families?
25    A   Phone and e-mail.

---

Page 13

1    Q   So no in-person contact with phone -- I'm
2  sorry -- with host families?
3    A   No in-person.
4    Q   When you say customer service, could you
5  explain what you mean by that, what your role is
6  with customer service?
7    A   Sure.  Being an added layer of support for
8  both the host families and the au pairs, also for
9  the community administrators.  If any questions come
10  up, you know, helping them find the answers,
11  providing the answers if there's any issues that
12  come up.  We are a business trying to make people
13  happy.
14    Q   So you provide customer service for both
15  host families as well as for au pairs; is that fair
16  to say?
17    A   Yes.
18    Q   Do you ever speak to host families about the
19  stipend that au pairs receive for their work?
20    A   Yes.
21    Q   Do you ever speak to au pairs about the
22  stipend that they receive for their work?
23    A   Yes.
24    Q   You said you're also responsible for the
25  Department of State forms.  Could you explain what

---

MAGNA
LEGAL SERVICES

Page 14

1  your role in that regard is?
2      A   Sure.  I help coordinate the completion of
3  the monthly reports that the community
4  administrators work on and complete and submit to
5  the main office.  I do not complete them myself --
6  as well as the 48-hour check-in, the pre-arrival
7  orientation paperwork as well as the two-week
8  post-arrival supervision paperwork.  Again, I don't
9  do any of that, but I help coordinators -- excuse
10 me -- CAs do that.  Sorry.  I'll say community
11 administrators.  We call them CAs.  Sorry.  I help
12 them do that and then work with the main office if
13 we're missing anything or something didn't get
14 submitted properly.
15     Q   So these monthly reports that you mention,
16 these are monthly reports that you submit to the
17 State Department?
18     A   They are -- I do not submit them.  The
19 coordinators submit them through the online system.
20 They are then used by the main office.  I'm not sure
21 what the main office -- I'm assuming they probably
22 print them and have files.  I know that we have to
23 have, per the Department of State, have to have
24 physical files of every host family and au pair, and
25 those reports are used in the annual audit.

Page 15

1      Q   So you submit them or your office submits
2  them -- or your coordinators, rather, submit them to
3  your main office?
4      A   Correct.
5      Q   What types of information is in the monthly
6  report?
7      A   The monthly report has general questions
8  about, you know -- and this is asked to both the
9  au pair and the host family on separate occasions,
10 but questions like, Is everybody happy?  Are there
11 any issues?  Very kind of like rate the
12 relationship, if you will, on a scale of one to
13 three, so that's kind of the top questions.
14         And then there's specific questions of, Are
15 you receiving the weekly stipend, yes/no?  If no,
16 explain the situation.
17         There's a question about the hours worked.
18 Are you working over 45 hours in a week?  Are you
19 working over ten hours in any given day?  There's a
20 section about the education component, kind of what
21 the status is, have you started looking, are you
22 enrolled, are you done, things like that.
23         And then there's free comment boxes at the
24 bottom so if there's any other issues that they need
25 to report or they want to mention or questions they

Page 16

1  may have.
2      Q   Do the on-site community coordinators -- did
3  I get that correct?
4      A   Yes.
5      Q   Do they interview host families, each host
6  family, each au pair monthly for these reports?
7      A   They do.
8      Q   Who do you report to at CHI?
9      A   I report to Christina Reilly.
10     Q   What is her position?
11     A   She's the director of the au pair program.
12     Q   Do you know if she reports to anyone?
13     A   She reports to Tom Areton, who is the owner
14 of the company.
15     Q   Could you spell his last name?
16     A   A-R-E-T-O-N.
17     Q   How many community coordinators do you
18 personally supervise?
19     A   I believe it's about 15.
20     Q   It's your understanding that those community
21 coordinators are all independent contractors?
22     A   Correct.
23     Q   Is there anyone else who holds your position
24 at Cultural -- at CHI?
25     A   Yes.  There is a regional administrator for

Page 17

1  the eastern half.
2      Q   Do you know the name of that person?
3      A   Yes.  It's Chris, C-H-R-I-S, Burbach,
4  B-U-R-B-A-C-H.
5      Q   Anybody else?
6      A   No.
7      Q   Do you have any responsibility preparing
8  marketing materials for CHI?  By marketing
9  materials, I mean the Internet website, social
10 media?
11     A   I do have input.
12     Q   What is your input?
13     A   The main office does a lot with the IT
14 department, if necessary, and the marketing
15 department that's in-house in preparing the
16 materials, and I get the opportunity to look at it
17 and review it and add comments or edits and maybe
18 the layout, things like that.
19     Q   Do you know approximately how many au pairs
20 CHI has placed for 2016?
21     A   So far?
22     Q   So far.
23     A   We are at about 110.
24     Q   Do you know the approximate number for 2015?
25 You were here.  I guess you were only here for the

**MAGNA**
LEGAL SERVICES

Page 18

```
 1   second -- the last couple months of 2015.
 2       A   Right.
 3           MR. BENDER:  Hold on.  Is there a question?
 4       Q   (By Ms. McElroy) Do you know the number of
 5   au pairs placed for 2015 at CHI?
 6       A   I do not.
 7       Q   And do you know approximately how many
 8   au pairs each of your community coordinators
 9   supports?
10       A   It varies.  Most of them have one or two
11   placements that they supervise.  A few of my
12   coordinators in the bay area have upwards to 10 or
13   12.
14       Q   Do you have any responsibilities for
15   recruitment at CHI, recruitment of au pairs?
16       A   No.
17       Q   Do you know from which geographic areas CHI
18   recruits au pairs?
19       A   I do.
20       Q   What are those areas?
21       A   Generally speaking or would you like
22   countries?
23       Q   Specific countries if you know them.
24       A   Sure.  Argentina, Brazil, Columbia,
25   Venezuela, Bolivia, Thailand, China, Spain, Italy,
```

Page 19

```
 1   Uzbekistan, Ukraine.  I believe that's it.
 2       Q   Do you know whether CHI has a corporate
 3   presence in any of those countries?
 4       A   I'm not aware.
 5       Q   Do you know if they rely on international
 6   partners to help with recruiting?
 7       A   Yes, they do.
 8       Q   Do you know the names of those
 9   organizations?
10       A   I do not.
11       Q   Have you held any other positions with
12   Cultural -- CHI?
13       A   No, I haven't.
14       Q   Prior to working for CHI, where were you
15   employed?
16       A   I was -- prior to that I was at AuPairCare.
17       Q   And how long were you employed at
18   AuPairCare?
19       A   About a month.
20       Q   And what was your position?
21       A   Matching expert.
22       Q   Were you based here in St. Louis?
23       A   I was.
24       Q   What were your responsibilities as a
25   matching expert at AuPairCare?
```

Page 20

```
 1       A   I would receive -- when a host family would
 2   apply to the program to host an au pair and they
 3   were in my region, my two states that I had, I would
 4   do outreach to them and help them interview and
 5   place with an au pair.
 6       Q   What two states were you responsible for?
 7       A   Texas and New Jersey.
 8       Q   So in that role you interacted directly with
 9   host families; correct?
10       A   Correct.
11       Q   Did you meet with them in person?
12       A   No.
13       Q   So everything was by phone or over e-mail?
14       A   Correct.
15       Q   Did you interact directly with au pairs?
16       A   No.
17       Q   In that position did you speak with host
18   families about the weekly stipend that au pairs are
19   required to receive?
20       A   I did not.
21       Q   Do you know approximately how many au pairs
22   AuPairCare placed in 2015?
23       A   I do not.
24       Q   Who did you report to when you worked for
25   AuPairCare?
```

Page 21

```
 1       A   Trudy Mar.
 2       Q   Can you spell her last name?
 3       A   M-A-R.
 4       Q   Do you know her position, her title?
 5       A   I don't.
 6       Q   You said you were there for a month.  What
 7   were the exact dates that you worked for AuPairCare?
 8       A   It was about half of August into half of
 9   September, 2015.
10       Q   Do you know from which specific countries
11   AuPairCare recruits au pairs?
12       A   I could list a few.  You know, France,
13   Germany, Sweden, Brazil, China, Thailand, Mexico.
14       Q   And there may be others that you're not
15   aware of?
16       A   Yes.
17       Q   For the countries that you listed, do you
18   know if they have a corporate -- if AuPairCare has a
19   corporate presence in those --
20       A   I don't know.
21       Q   And why did you leave AuPairCare?
22       A   It's kind of a complicated story.  I was
23   recruited by another agency that it didn't end up
24   panning out.  That's why I have a gap there in
25   employment.  So --
```

MAGNA ▶

LEGAL SERVICES

Page 22

1    Q  When you say you were recruited by another
2  agency, are you referring to a sponsor agency --
3    A  I am.
4    Q  -- that places au pairs?
5    A  Uh-huh.
6    Q  And when I use the term sponsor agency, can
7  you tell me what you understand that term to mean?
8    A  A sponsor agency would be any U.S.-based
9  au pair agency that is designated by the Department
10  of State.
11    Q  Am I correct in saying they're designated by
12  the Department of State to sponsor au pairs to
13  receive J-1 visas?  Is that consistent with your
14  understanding?
15    A  My understanding of that would be that they
16  are authorized to run a U.S.-based au pair program
17  and to issue J-1 visas as the sponsor agency.
18    Q  And which sponsor agency recruited you?
19    A  It was GreatAuPair.
20    Q  Have you ever worked for GreatAuPair?
21    A  They ended up hiring me as an independent
22  contractor because I think they felt bad of the
23  situation.  It was like literally two weeks.  It was
24  a joke.
25    Q  Was that directly -- when did you work for

Page 23

1  them as an independent contractor?
2    A  The last week of September probably until
3  the second week of October.
4    Q  What was your role when you worked with
5  them?
6    A  I think it was program adviser.
7    Q  What were your responsibilities in that
8  role?
9    A  Answering in-bound phone calls of
10  prospective host families of which there were not
11  many.
12    Q  Do you know approximately how many employees
13  GreatAuPair has?
14    A  I have no idea.
15    Q  When you answered phone calls from
16  prospective host families for GreatAuPair, did you
17  ever speak to them about the weekly stipend?
18    A  No.
19    Q  Did you ever receive any sort of training
20  for your job with GreatAuPair?
21    A  I did.
22    Q  What topics were you trained in?
23    A  A lot of how to talk on the phone to people.
24  You know, they were very big on providing customer
25  service to host families.  There was a lot of

Page 24

1  training on that.  Not as much programmatic training
2  as opposed to things you should say and shouldn't
3  say.  It was very script-oriented.
4    Q  Did they provide any training on how to
5  speak to families about the weekly stipend?
6    A  No.
7    Q  Did they provide you with a script for how
8  to speak to families about the weekly stipend?
9    A  No.
10    Q  Prior to that -- where were you employed
11  prior to GreatAuPair?
12    A  AuPairCare.
13    Q  And where were you employed prior to
14  AuPairCare?
15    A  APF -- or excuse me, Au Pair Foundation.
16  Sorry.
17    Q  What was your most recent position with APF?
18    A  I was the national director of field
19  operations.
20    Q  What were your responsibilities as national
21  director of field operations?
22    A  Responsibilities were I would say first and
23  foremost was sales and growth of the program,
24  management of a regional director team that I built.
25  When I say "built," I mean I hired.  Again, customer

Page 25

1  service.
2    Q  When you say that you were responsible for
3  sales and growth, what did you do in that role?
4    A  I worked closely with my superiors on
5  marketing plans for the year, growth numbers, target
6  goals for the recruitment of new host families and
7  placements, and then implementing that.
8    Q  Did you have any role with recruitment of
9  au pairs?
10    A  I did not.
11    Q  Did you have any role with recruitment of
12  host families?
13    A  I did.
14    Q  What was your role in recruiting host
15  families?
16    A  I received all inbound phone calls through
17  the 800 number.  I received all website inquiries in
18  the various forms that they would come.  I would
19  receive the new host family application.  I would
20  speak to host families about the program, answer
21  their questions, help them learn more.
22    Q  When you spoke to host families, was it
23  always by phone or e-mail?
24    A  It was.
25    Q  So you never met with host families in

Page 26

1   person?
2       A   While at APF -- while at APF there were a
3   few local families here to St. Louis, one of which
4   was actually my friend, a family friend, so I did
5   meet with them and in an au pair capacity.  And I
6   don't believe that I met in person with any of the
7   other St. Louis families.
8       Q   Who did you report to in this role?
9       A   I reported to Ellen Hoggard.
10      Q   Do you know what her title is?
11      A   She's the president.
12      Q   Does she report to anybody?
13      A   She does.  She reports to someone in Sweden.
14      Q   I'm assuming you don't know that person's
15  name?
16      A   I don't know who that person is, no.
17      Q   And you said you were responsible for
18  managing a regional team?
19      A   Uh-huh.
20      Q   Approximately how many employees did you
21  manage?
22      A   Well, first of all, they weren't employees.
23  They were independent contractors, and I had a
24  regional team of five.  Five.
25      Q   What was the role of these regional team

Page 27

1   members?
2       A   So their role was to manage their team of
3   what APF called local childcare -- no, local
4   community representatives, excuse me.  We use a lot
5   of acronyms in this industry.  They managed -- so
6   their team in their given region, they were
7   responsible for regional growth, so stemming from
8   our national growth program or what we were doing,
9   they had a regional, regional goals to meet, and I
10  worked with them on developing those goals of what
11  was obtainable, what had been done last year and to
12  try to meet those goals.
13          They managed their team, their field staff,
14  and also they were responsible for hiring those
15  local community representatives.  They were
16  responsible in working with the field staff.  They
17  helped them with the paperwork, the monthly reports
18  and the things that we talked about before.
19      Q   Did you have any telephone communications
20  with au pairs in your role with APF?
21      A   Yes.
22      Q   About how often would you say?
23      A   It was fairly infrequent.  Generally it was
24  a situation either where an issue had arisen and the
25  issue had kind of floated up to my desk and I would

Page 28

1   reach out, but it was pretty infrequent.
2       Q   Were the LCCs the people responsible for
3   interacting directly with the au pairs?
4       A   They were.
5       Q   And were they responsible for interviewing
6   the au pairs for the monthly reports?
7       A   They were.
8       Q   And when they did those interviews, did they
9   typically conduct those by phone?
10      A   It was generally in person with the au pair.
11      Q   When they interviewed the host families, did
12  they conduct those interviews in person as well?
13      A   Typically not.  A host family generally is
14  done by phone or e-mail.
15      Q   Do you know approximately how many au pairs
16  APF placed for the year 2015?
17      A   I don't know what that final number would
18  have been, no.
19      Q   Do you know approximately how many they
20  placed for 2014?
21      A   It was approximately -- it was approximately
22  60.
23      Q   Do you know approximately how many au pairs
24  they placed for 2013?
25      A   I don't remember.  I'm sorry.

Page 29

1       Q   Do you know which geographic areas APF
2   recruited from?
3       A   Sure.  China, Thailand, Mexico, Argentina,
4   Columbia, Brazil, France, Germany, Sweden, Russia
5   actually, Ukraine, South Africa too.
6       Q   Could there be others that you don't
7   remember?
8       A   Yes.
9       Q   Do you know whether APF had a corporate
10  presence in the countries that they recruited from?
11      A   I'm not aware.
12      Q   Do you know whether they relied on
13  international partners to recruit?
14      A   They did.
15      Q   Do you know the names of those international
16  partners?
17      A   I don't.
18      Q   You said that you were also responsible for
19  customer service at APF.  What did that role entail?
20      A   It entailed, you know -- sorry.  It
21  entailed -- part of it was the customer service for
22  the whole organization, so it was working with my
23  regional team and then they working with the field
24  staff to make sure that we were doing best practices
25  and we were, you know, answering phone calls,

MAGNA
LEGAL SERVICES

---

**Page 30**

```
 1   answering e-mails, returning phone calls and e-mails
 2   to host families in a very timely fashion. If any
 3   issues arose, you know, just being very supportive
 4   of the participants, and myself and the regional
 5   team, it was also being supportive of the local
 6   coordinator because sometimes situations would arise
 7   and they would feel overwhelmed, and we can step in
 8   kind of with the neutral -- a neutral set of eyes
 9   and help assess the situation. But just making sure
10   everybody is happy and is having a good program
11   experience.
12       Q   Is it fair to say that customer service was
13   focused primarily on the host family?
14       A   No, it was focused on the au pair as well.
15   At APF we were very focused on au pair happiness.
16       Q   In your role at APF, did you ever speak with
17   host families about the stipend?
18       A   I did.
19       Q   About how often would you say those
20   conversations arose?
21       A   It was very often. I took a lot of inbound
22   phone calls and/or e-mails.
23       Q   Did you have any role preparing marketing
24   materials or providing input for marketing materials
25   at APF?
```

**Page 31**

```
 1       A   I did.
 2       Q   What was your role?
 3       A   I had a bit more input here at APF. I
 4   worked closely when we redid the website as far as
 5   layout, content. I went so far as to show the
 6   mockup of it to some of our veteran host families to
 7   see that their opinion was because we wanted the
 8   host families to be attracted to the website. As
 9   well as our flyers and brochures, I had a lot of
10   input in that.
11       Q   What year did APF redo its website?
12       A   That would have been the summer -- I'm
13   sorry. Gosh, I don't know that I can say completely
14   accurately. I'm sorry.
15       Q   Do you remember it being near the beginning
16   of your time with them or towards the end?
17       A   It was towards the end. I want to say it
18   was like the fall of 2013.
19       Q   When you say you were responsible for some
20   of the content or provided input to some of the
21   content in the website, what input did you provide?
22       A   Layout, pictures. You know, I wanted -- I
23   was really trying to look at the website through the
24   eyes of a prospective host family and what would be
25   attractive to them and keep them engaged with the
```

**Page 32**

```
 1   website. Our website had a lot of information, so
 2   making the content flow.
 3       I also had input on the job positions we had
 4   available as far as for the -- if we were ever
 5   hiring regionals or if we were hiring the local
 6   field staff, making that attractive to a prospective
 7   job applicant.
 8       I really focused a lot on the sections that
 9   talked about the program, you know, what it can do
10   for a family and what -- even on a basic level what
11   the program is.
12       Q   What were the dates that you held the
13   position of national director of field operations?
14       A   So it would have been November -- sorry.
15   I'm doing this by my children's years of birth. So
16   it would have been November 2012 until sometime in
17   August 2015.
18       Q   Did you hold any other positions at APF?
19       A   I did.
20       Q   What other positions did you hold at APF?
21       MS. SCHAECHER: Objection. What do you mean
22   by APF?
23       MS. McELROY: Au Pair Foundation.
24       MS. SCHAECHER: The nonprofit?
25       MS. McELROY: I'm sorry, I might be saying
```

**Page 33**

```
 1   it wrong.
 2       MS. SCHAECHER: No, I think you're --
 3       MS. McELROY: Au Pair Foundation, yes. Yes,
 4   Au Pair Foundation.
 5       A   I was -- I was a regional manager.
 6       Q   (By Ms. McElroy) And did you hold this
 7   position prior to becoming national director of
 8   field operations?
 9       A   I did.
10       Q   And if I use the term APF going forward, do
11   you understand that to mean Au Pair Foundation?
12       A   Yes.
13       Q   What was your role as regional manager?
14       A   I was -- I had, again, kind of the western
15   half of the U.S., and I was responsible for growth
16   and customer service in the region and hiring field
17   staff. I will say that as the regional manager, I
18   was an independent contractor.
19       Q   Did you interact with host families in that
20   role?
21       A   I did.
22       Q   When you interacted with them, was it by
23   phone?
24       A   Phone or e-mail.
25       Q   Did you ever meet with them in person?
```

MAGNA
LEGAL SERVICES

Page 34

1  A  No.
2  Q  Did you interact with au pairs in that role?
3  A  Yes.
4  Q  When you interacted with them, was it by
5  phone or e-mail?
6  A  Yes.
7  Q  Did you ever interact with au pairs in
8  person?
9  A  No.
10  Q  Can you give me the dates for when you held
11  the position of regional manager?
12  A  Yes.  It was February -- February 2012 until
13  I guess November.  I was on maternity leave for two
14  months, so I came back in November of 2012.
15  Q  When you returned, were you promoted to
16  the --
17  A  I was.
18  Q  Do you know approximately how many other
19  people held the position of regional manager when
20  you held this position?
21  A  There was one other.
22  Q  Who did you report to in this position?
23  A  When I first started, I reported to both
24  Christina Reilly and to Mary Cass.
25  Q  Did you supervise anybody in that position?

Page 35

1  A  I supervised the field staff, the local
2  community reps.
3  Q  Approximately how many local community reps
4  did you supervise?
5  A  It was probably about 12.
6  Q  And those local community reps interacted
7  directly with the au pairs?
8  A  They did.
9  Q  Did you hold any other positions at Au Pair
10  Foundation?
11  A  I did not.
12  Q  Where were you employed prior to working for
13  Au Pair Foundation?
14  A  Prior to that I was with Cultural Care
15  Au Pair.
16  Q  What was your most recent position with
17  Cultural Care Au Pair?
18  A  I was a business development director.
19  Q  What were your responsibilities as business
20  development director?
21  A  I was part of the business development team
22  who we wanted to promote the au pair program at
23  Cultural Care to organizations and businesses to
24  offer it as an employee benefit to their employees.
25  Q  Who did you report to in this role?

Page 36

1  A  Her name was Melisa, M-E-L-I-S-A, and her
2  last name was Barlow, B-A-R-L-O-W.
3  Q  Do you know approximately how many employees
4  Cultural Care Au Pair had at the time you were the
5  business director?
6  A  I don't.
7  Q  And what dates did you hold this position as
8  business director?
9  A  I really should have written all these dates
10  down.  It was September, September 2010 until
11  September 2011.
12  Q  In this role did you ever interact with host
13  families?
14  A  I did not.
15  Q  Did you interact with au pairs in this role?
16  A  I did not.
17  Q  Did you hold any other positions at Cultural
18  Care?
19  A  I did.
20  Q  What was your position prior to being
21  business director?
22  A  I was a development director.
23  Q  What were your responsibilities as the
24  development director?
25  A  I had a region of 13 states here in the

Page 37

1  Midwest, and my job was the hiring of what Cultural
2  Care calls local childcare coordinators, LCCs, and I
3  also was responsible for growth in the region,
4  meeting goals for sales and for placements.
5  Q  In that role did you speak directly to host
6  families?
7  A  Very infrequently.
8  Q  Did you ever speak to host families about
9  the weekly stipend?
10  A  Not that I can recall.
11  Q  So you may have but you don't recall?
12  A  I don't recall.
13  Q  Did you ever speak to au pairs in that
14  position?
15  A  No.
16  Q  Can you give me the dates you held the
17  position of regional director?
18  A  Development director?
19  Q  I'm sorry, development director, the dates
20  that you held the development director position?
21  A  Yes.  It would have been I want to say
22  September 2009 until approximately late June of 2010
23  because I went on maternity leave, so I guess I held
24  it until September when I came back.  I'm not sure
25  how you look at that.

PLAINTIFFS' RESP. APP.0005108

MAGNA
LEGAL SERVICES

Page 38

1  Q  Prior to holding the position of development
2  director, did you hold any other positions with
3  Cultural Care?
4  A  I was an independent contractor as an LCC.
5  Q  What was your role as an LCC?
6  A  I worked here in the St. Louis area managing
7  au pair and host family placements.
8  Q  Approximately how many au pairs were you
9  responsible for supporting in that role?
10  A  I had about ten.  It fluctuated but covered
11  around ten.
12  Q  In that role did you ever speak with host
13  families about the weekly stipend?
14  A  I did.
15  Q  Do you recall approximately how often you
16  spoke with host families about the weekly stipend?
17  A  Not specifically, no.
18  Q  Do you recall the dates that you held the
19  role of LCC?
20  A  It was April 2008 until September 2009 when
21  I got hired on full time.
22  Q  Do you recall an increase in the weekly
23  stipend while you were working as an LCC?
24  A  I do.
25  Q  Do you recall what that increase was?

Page 39

1  A  There was a three-year stair-step stipend
2  increase.  I believe it went from 175 and some
3  change to the 195.75 that it currently is.
4  Q  Did you hold any other positions with
5  Cultural Care prior to being an LCC?
6  A  I did not.
7  Q  Why did you leave Cultural Care to work for
8  APF, Au Pair Foundation?
9  A  I was laid off.
10  Q  Where did you work prior to working for
11  Cultural Care?
12  A  I was with the human development
13  corporation.
14  Q  What was your role there?
15  A  I was the budget and compliance officer.
16  Q  And how long did you hold that position?
17  A  I held that position for about six months.
18  Q  Prior to the human development corporation
19  where were you employed?
20  A  I was at Lashly & Baer.
21  Q  What type of corporation or what type of
22  company is Lashly & Baer?
23  A  It's Baer, B-A-E-R.  They're a law firm.
24  Q  How long did you work there?
25  A  For about a year.

Page 40

1  Q  Have you ever worked for any sponsor
2  agencies besides the ones that we've discussed
3  already here today?
4  A  I have not.
5  Q  Is it your understanding that the sponsor
6  agencies are required to ensure that au pairs are
7  paid a weekly stipend?
8  A  Could you repeat the question?
9  Q  Sure.  Is it your understanding that the
10  sponsor agencies are required to ensure that
11  au pairs are paid a weekly stipend?
12  A  The Department of State rules and
13  regulations stipulate the weekly stipend amount and
14  the payment of that by the host families to the
15  au pair on a weekly basis.
16  Q  Is it your understanding that the sponsor
17  agencies must make sure that host families pay that
18  stipend?
19  A  Yes.
20  Q  And while you worked at APF or Au Pair
21  Foundation, were you trained to know the amount of
22  that stipend?
23  A  Yes.
24  Q  And what is the amount of that stipend?
25  A  Currently today?

Page 41

1  Q  Currently.
2  A  $195.75.
3  Q  Was that the same amount while you worked at
4  APF?
5  A  It was.
6  Q  Do you have an understanding of what that
7  number is based on?
8  A  I do.
9  Q  Could you please tell me what your
10  understanding is of what that number is based on?
11  A  My understanding is the Department of State
12  sets that stipend based on federal minimum wage
13  minus a 40 percent allowance for room and board.
14  MS. SCHAECHER:  Would this be a good time
15  for a break?
16  MS. McELROY:  Yes.
17  (Recess)
18  A  So when we were speaking earlier about my
19  time at APF, Au Pair Foundation, when I was a
20  regional manager, the name of the organization was
21  actually Au Pair Foundation, Inc.  So the time from
22  about February, February 2012 until I was promoted
23  to national director of field operations in
24  November, it was Au Pair Foundation, Inc.
25  Q  (By Ms. McElroy) And did that name change

---

Page 42

1 indicate a change in corporate structure?
2    A  It indicated a change in ownership.
3    Q  Au Pair Foundation today is a nonprofit; is
4 that correct?
5    A  Correct.
6    Q  Were they a nonprofit when they were called
7 APF, Inc.?
8    A  I'm not aware.
9       MS. SCHAECHER:  The answer to your question
10 is they were not a nonprofit when they were APF,
11 Inc.
12    Q  (By Ms. McElroy) And Au Pair Foundation, is
13 that the same organization as APF Global Exchange
14 NFP?
15       MS. SCHAECHER:  I'm sorry, could you say
16 that again?
17    Q  (By Ms. McElroy) Sure.  Is Au Pair
18 Foundation the same organization as APF Global
19 Exchange NFP?
20    A  I'm not sure.
21    Q  Before the break we were discussing the
22 stipend, and you testified that it was your
23 understanding that the stipend is set by the
24 Department of State.  Is that a fair summary of your
25 testimony?

---

Page 43

1    A  That is correct.
2    Q  Because the stipend is set by the Department
3 of State, are all sponsors required to abide by it?
4    A  The Department of State rules and
5 regulations are put forth by the Department of
6 State, and all Department of State designated
7 sponsors must abide by those rules.
8    Q  So does that mean that all sponsor agencies
9 are required to abide by the rules that they set for
10 the stipend?
11    A  Yes.
12    Q  So is it your understanding based on your
13 experience working for sponsor agencies that
14 families are restricted by law or by federal
15 regulations in the amount that they can pay to
16 au pairs?
17       MR. BENDER:  Objection.  Lack of foundation.
18    A  They are not restricted in the amount that
19 they pay.
20    Q  (By Ms. McElroy) Could they pay less than
21 $195.75 per week?
22    A  No.
23       MR. BENDER:  I'm sorry, are you asking about
24 all sponsor agencies?
25       MS. McELROY:  I'm asking whether it is her

---

Page 44

1 understanding that families, all families, host
2 families, are restricted in the amount that they can
3 pay au pairs.
4       MR. BENDER:  Across sponsors or --
5       MS. McELROY:  Yes.
6       MR. BENDER:  Objection.  Lack of foundation.
7    A  Do you want me to answer?
8    Q  (By Ms. McElroy) I think you already
9 answered the question, but let me rephrase it to be
10 clear.  Is it your understanding based on your
11 experience that families are -- host families are
12 restricted by law in the amount that they can pay
13 au pairs?
14       MR. BENDER:  Objection.  Lack of foundation.
15    A  No, they are not restricted.
16    Q  (By Ms. McElroy) But it is your
17 understanding that they cannot pay less than $195.75
18 per week?
19       MR. BENDER:  Objection.  Lack of foundation.
20    A  Yes, that is my understanding.
21       (Deposition Exhibit Number
22       79 marked for identification.)
23       MR. BENDER:  Do you have any extra copies?
24       MS. McELROY:  I just have the three.
25    Q  (By Ms. McElroy) I'm showing you a document.

---

Page 45

1 Do you recognize this document?  Please take a
2 moment to review, if needed.
3    A  Yes, I recognize it.
4    Q  On the third page of the document, is that
5 your signature on the bottom right-hand corner?
6    A  It is.
7    Q  If you could look at paragraph six of this
8 document, it describes a telephone call that you may
9 have received in November 2014.  Sitting here today,
10 do you have any memory of the call described in this
11 declaration?
12    A  I do not.
13    Q  I'm going to ask you a couple more questions
14 about this document.  My questions are not intended
15 to ask you to reveal communications with your
16 counsel, so to the extent you can answer my question
17 without revealing those communications, please do
18 so.  Was this document sent to you?
19    A  By whom?
20    Q  How did you receive this document?
21    A  When I signed it?
22    Q  Let me back up.  Did you draft this
23 document?
24    A  No.
25    Q  Did someone send a draft of this document to

---

MAGNA
LEGAL SERVICES

Page 46

1  you and ask you to sign it?
2      MS. SCHAECHER:  Objection.  Attorney-client
3  privilege and instruct you not to answer.
4      MS. McELROY:  Did someone -- I'm not asking
5  about the content or the back and forth in creating
6  the document.  I'm asking merely if someone sent the
7  document to her to establish how she first received
8  it.
9      MS. SCHAECHER:  You may answer that
10  question.
11    A  Yes, I did receive a draft.
12    Q  (By Ms. McElroy) And did you receive it by
13  e-mail?
14    A  Yes.
15    Q  Did you read this document before signing
16  it?
17    A  Yes.
18    Q  And again, I'm not asking about any back and
19  forth, just a yes or no question.  Did you make any
20  changes to this document after you first received
21  it?
22    A  Actually, I do think I had some edits.  I
23  don't remember what.
24    Q  Do you recall whether you discussed this
25  document with any other employees at APF outside the

Page 47

1  presence of your counsel?
2      A  I don't believe so.
3      Q  In paragraph six this document indicates
4  that you have been provided admissions or statements
5  purportedly made by a representative of APF Global
6  Foundation NFP.
7      And then you state, Without context, I
8  cannot be certain whether I might have made any of
9  those statements.  However, I can state -- actually,
10  let me stop there.  Sitting -- was that a true
11  statement when you made it in 2014?
12    A  Which one?
13    Q  The first two sentences that I just read:  I
14  have been provided the admissions or statements
15  purportedly made by a representative of APF Global
16  Foundation NFP.  Without context, I cannot be
17  certain whether I have made any of those statements.
18    A  Yes, that's true.
19    Q  Sitting here today, are you now aware of
20  whether or not you are the person who plaintiff's
21  investigator says he spoke with at APF?
22    A  I apologize.  Could you repeat that?
23    Q  Yes.  As we sit here today, are you now
24  aware of whether or not you are the person that
25  plaintiff's investigator states that he spoke with

Page 48

1  at APF?
2      MR. BENDER:  Objection to the form.
3      A  I am not aware that I was that person.
4      Q  (By Ms. McElroy) Around the time that you
5  drafted this declaration -- I'm sorry.  Let me
6  rephrase that.
7      Around the time that you signed this
8  declaration, did you search APF's call notes or logs
9  for a record of the call described in the
10  declaration?
11    A  No.
12    Q  Is it fair to say sitting here today you
13  have no independent memory of the call described in
14  this declaration?
15    A  I do not.
16    Q  In your role as national director of field
17  operations at APF, you testified earlier that you
18  were responsible for answering the telephones;
19  correct?
20    A  At APF, the not-for-profit, yes.
21    Q  Were there any policies to help -- let me
22  rephrase that.  Were there any policies in place
23  that you relied on to help you respond to phone
24  inquiries?
25    A  No.

Page 49

1      Q  Were you instructed to respond to phone
2  inquiries regarding the weekly stipend in a certain
3  way?
4      A  No.
5      (Deposition Exhibit Number
6      80 marked for identification.)
7      MS. McELROY:  I'd like to mark this as
8  Exhibit 80.
9      Q  (By Ms. McElroy) Do you recognize the --
10     MS. McELROY:  For counsel on the phone, I've
11  just shown her the document Bates labeled APF
12  000274.
13     Q  (By Ms. McElroy) Do you recognize this
14  document?
15    A  Give me just a minute.
16    Q  Sure.
17    A  Yes, I do.
18    Q  Did you write this e-mail?
19    A  I did.
20    Q  Did you write this e-mail in your
21  professional capacity as an employee at APF?
22    A  Yes.
23    Q  What was your role at APF at the time that
24  you wrote this e-mail?
25    A  I was the national director of field

MAGNA
LEGAL SERVICES

Page 50

operations.
Q Do you see the sentence approximately halfway down the page that says, quote, "The weekly stipend is $195.75 as with all agencies"?
A I see it.
Q Was this a true statement at the time that you made it in this e-mail?
A Yes.
MR. STONE: Objection. Form; foundation.
Q (By Ms. McElroy) Is this statement consistent with what you were trained to communicate about the stipend while an APF employee?
MS. SCHAECHER: Objection to form and foundation.
A The weekly stipend at that time was $195.75.
Q (By Ms. McElroy) And you state the weekly stipend is 195.75 as with all agencies. Is this statement consistent with what you were trained to communicate about the stipend while an APF employee?
MS. SCHAECHER: Same objection.
MR. STONE: Objection. Foundation.
A I wasn't trained on that.
Q (By Ms. McElroy) Is this statement consistent with what you told other host families while working at APF?

Page 51

MR. STONE: Objection. Foundation.
A Yes.
Q (By Ms. McElroy) Are you familiar with the acronym IAPA?
A I am.
Q Can you tell us what that stands for?
A It is the International Au Pair Association.
Q And what is your understanding of the purpose of that organization?
A It is a nonprofit organization based out of Europe to promote the au pair program worldwide.
Q Is CHI a member of the IAPA?
A Yes, they are.
Q Is APF a member of the IAPA?
A APF NFP is a member of IAPA.
Q When you say APF NFP, is that different than APF?
A Than APF, Inc., yes.
Q Okay. Do you know whether APF, Inc. was a member of IAPA?
A They were not.
Q Are you aware of whether Cultural Care was a member of the IAPA while you worked there?
A I'm not aware.
Q Are you aware of whether or not GreatAuPair

Page 52

was a member while you worked there?
A I'm not aware.
Q And are you aware of whether or not AuPairCare was a member while you worked there?
A I am not.
Q Have you ever attended an IAPA event in your capacity as an employee for any sponsor agency?
A I have not.
Q Does CHI send any employees to IAPA events?
A Yes.
Q Do you know the names of those employees?
A Christina Reilly.
Q Do they send any other employees?
A Not that I'm aware of.
Q Did APF send any employees -- Au Pair Foundation send any employees to IAPA events?
A While I worked there?
Q Yes, while you worked there.
A Not that I'm aware of.
Q Did you ever receive regular e-mails from the IAPA in your professional capacity while working for any sponsor agency?
A I believe that while I worked for APF NFP I did subscribe to their e-mail distribution list or newsletters and whatnot.

Page 53

Q So you received them because you signed up for a LISTSERV of some sort?
A Yes.
Q Do you recall how regularly you received these newsletters?
A I don't.
Q Are you familiar with the organization Alliance for International Exchange?
A I am.
Q Is CHI a member of the Alliance for International Exchange?
A They are.
Q What do you understand to be the purpose of that organization?
A My understanding is the Alliance is an organization out of Washington, D.C. that works with au pair programs and exchange programs to help improve those programs both here in the U.S. and for au pairs that come here from overseas.
Q Have you ever attended an Alliance event in your capacity as an employee for any sponsor agency?
A I have not. Oh, excuse me. I apologize. No, I did. I'm sorry. While I was working for APF NFP I attended an anti-human trafficking seminar up in Chicago that was put on by the Alliance.

PLAINTIFFS' RESP. APP.0005112
MAGNA LEGAL SERVICES

Case 1:14-cv-03074-CMA-KMT   Document 1059-25   Filed 03/17/18   USDC Colorado   Page 285 of 700

**Page 54**

1    Q   Do you recall approximately the date of --
2  the approximate date of that event?
3    A   Yes.  It was April 2015, early April.
4    Q   Did you receive -- have you ever received
5  regular e-mails from the Alliance for International
6  Exchange in your capacity as an employee for any
7  sponsor agency?
8    A   I haven't.
9    Q   Do you know whether Cultural -- CHI has sent
10  other employees -- I'm sorry, let me rephrase.
11       Do you know whether CHI sends employees to
12  Alliance for International Exchange events?
13    A   Yes, they do.
14    Q   But you've never attended an Alliance for
15  International Exchange event while working at CHI;
16  correct?
17    A   No.
18    Q   What employees has CHI sent to Alliance for
19  International Exchange events?
20    A   Christina Reilly.
21    Q   Anybody else?
22    A   Not that I'm aware of.
23    Q   Is APF a member of the Alliance for
24  International Exchange?
25    A   The not-for-profit APF is.

**Page 55**

1    Q   Are you aware of whether or not Cultural
2  Care is a member of the Alliance for International
3  Exchange?
4    A   I don't know.
5    Q   Are you aware of whether GreatAuPair is a
6  member of the Alliance for International Exchange?
7    A   I don't know.
8    Q   Are you aware of whether AuPairCare is a
9  member of the Alliance for International Exchange?
10    A   I don't know.
11       (Deposition Exhibit Number
12       81 marked for identification.)
13    Q   Do you recognize this document?
14       MS. SCHAECHER:  Do you want to identify the
15  Bates number?
16       MS. McELROY:  Yes.  For counsel on the
17  phone, we're looking at a document Bates stamped
18  APF 000361.
19    Q   (By Ms. McElroy) Do you recognize this
20  document?
21    A   I do.
22    Q   I believe earlier you referred to a human
23  trafficking workshop that you attended --
24    A   Uh-huh.
25    Q   -- put on by the Alliance.  Is this the same

**Page 56**

1  workshop referred to in this confirmation?
2    A   It is.
3    Q   And when you attended this workshop in
4  Chicago, did you see any of your colleagues from
5  other agencies, sponsor agencies that you had worked
6  for in the past?
7    A   I did not.
8    Q   Do you currently stay in contact with any
9  employees from APF?
10    A   I don't.
11    Q   Do you currently stay in contact with any
12  employees that you worked with at GreatAuPair?
13    A   I don't.
14    Q   Do you stay in contact with any employees
15  that you worked with at AuPairCare?
16    A   I have a few connections on like LinkedIn
17  and Facebook with a few people, but that's honestly
18  the extent of it.
19    Q   So you don't speak to these people regularly
20  by e-mail?
21    A   I do not.
22    Q   And you don't speak to them regularly
23  through any other means?
24    A   I do not.
25    Q   Do you know their names?

**Page 57**

1    A   I think Trudy Mar and I are connected on
2  LinkedIn.  I think that's probably the only one,
3  actually.
4    Q   Do you maintain contact with any employees
5  from Cultural Care?
6    A   It would be the same situation, LinkedIn,
7  Facebook.
8    Q   So you don't speak to anyone from Cultural
9  Care regularly via e-mail?
10    A   I do not.
11    Q   And you don't speak to anyone from Cultural
12  Care regularly through any other means?
13    A   I do not.
14    Q   And do you recall the names of your Cultural
15  Care connections on LinkedIn?
16    A   Sure.  There's probably a lot.  Jen Ward,
17  she doesn't work there anymore.  A lot of people
18  don't work there anymore.  Danny Ward.  There were a
19  lot of local coordinators that I'm connected to on
20  Facebook just stemming from the time when I was an
21  LCC.  I could go through some names if you really
22  want.
23    Q   That's okay.  Returning for a second to your
24  employment history, is it fair to say that your
25  experience with APF NFP and APF, Inc. helped you

PLAINTIFFS' RESP. APP.0005113

MAGNA
LEGAL SERVICES

**Page 58**

1   prepare for your current job at Cultural Homestay
2   International?
3       MS. SCHAECHER:  Objection; form.
4       A  Yes.
5       Q  (By Ms. McElroy) So while working for other
6   sponsor agencies, including APF, is it fair to say
7   that you amassed a lot of information specific to
8   the au pair field?
9       A  Could you say that again?
10      Q  Sure.  While working for the various sponsor
11  agencies where you've been employed, is it fair to
12  say that you've amassed a lot of information that's
13  specific to the field of sponsor agencies?
14      A  Yes, related to au pair sponsor agencies.
15      Q  And you've taken that knowledge with you to
16  each employer that you've transitioned to; correct?
17      A  Correct.
18      Q  Can you give an example of how your
19  experience at APF NFP helped you in your current job
20  at CHI?
21      A  I think my role at APF NFP of building and
22  growing an extensive field network of both regional
23  directors and the local field staff, you know, has
24  helped me in my current role.  I did that a lot.
25      Q  Is it your understanding that the various

**Page 59**

1   sponsor agencies for whom you've worked compete with
2   one another?
3       A  Yes.
4       Q  In what ways do they compete?
5       A  We're all businesses.  We all -- we all want
6   to be successful.
7       Q  So for example, do they compete in terms of
8   the host family fees that they offer?
9       A  As far as the program fees, yes.
10      Q  So some agencies have higher fees than
11  others?
12      A  Yes.
13      Q  Do any of the sponsors that you've worked
14  for offer an incentive for a family to switch to
15  that sponsor?
16      A  Many of them do.
17      Q  Which ones?
18      A  That I've worked for?
19      Q  Yes.
20      A  CHI, APF NFP, APF, Inc., AuPairCare,
21  Cultural Care.  I can't speak to GreatAuPair.
22      Q  Does CHI offer any other benefits to -- I'm
23  sorry.  Let me rephrase that question.
24      Does CHI offer any benefits to au pairs for
25  referring families?

**Page 60**

1       A  I don't know.
2       Q  Do you know whether APF NFP offered any
3   benefits to au pairs for referring families?
4       A  Yes, they did.
5       Q  What benefits did they offer?
6       A  I'm not sure.  It happened really
7   infrequently.  I don't remember.
8       Q  Do you know whether APC, AuPairCare, offered
9   any benefits to au pairs for referring families?
10      A  I don't know.
11      Q  Do you know whether GreatAuPair offered any
12  benefits to au pairs for referring families?
13      A  I don't know.
14      Q  Do you know whether Cultural Care offered
15  any benefits?
16      A  I believe they did.
17      Q  Do you recall what those benefits were?
18      A  I don't.
19      Q  Is it your understanding that APF competes
20  to attract high-quality au pairs?
21      A  I don't know.
22      Q  When you transitioned to your current
23  employer, CHI, did you have to undergo any training?
24      A  Yes.
25      Q  What were some of the areas that you were

**Page 61**

1   trained in?
2       A  I was trained on policies and procedures
3   that CHI uses.  A course was provided with a current
4   copy of the Department of State rules and
5   regulations.  I was trained on the website
6   specifically like the back end, my accounts and how
7   to navigate.
8       Q  Did you receive any training about their
9   host family fees?
10      A  Yes.
11      Q  Did you receive any training about the
12  different types of au pair programs that they
13  offered?
14      A  Yes.
15      Q  Did those au pair programs differ from the
16  types offered by APF?
17      MS. SCHAECHER:  Objection to form.
18      A  No.
19      Q  (By Ms. McElroy) Do you understand what I
20  mean -- what is your understanding what I mean by
21  au pair program types?
22      MR. BENDER:  I'm sorry.  You're asking her
23  to testify about what you mean?
24      MS. McELROY:  Well, she answered my question
25  about -- so she indicated that she understood my

PLAINTIFFS' RESP. APP.0005114

MAGNA
LEGAL SERVICES

Case No. 1:14-cv-03074-CMA-KMT   Document 1059-25   filed 07/30/18   USDC Colorado   pg 288 of 701

| Page 62 | Page 64 |
|---|---|

**Page 62**

1   term, so yes, I want to know what her understanding
2   of the phrase au pair program types is.
3       MS. SCHAECHER:  Would you repeat the
4   question?
5       MS. McELROY:  Sure.
6   Q   (By Ms. McElroy) What is your understanding
7   of the phrase au pair program types?
8   A   Whether it would be the traditional au pair
9   program or the EduCare au pair program.
10  Q   Can you explain the attributes of the
11  traditional au pair program?
12  A   The traditional au pair program is the main
13  au pair program.  It is 45 hours of childcare per
14  week, no more than 10 hours in any given day, one
15  weekend off a month, and one and a half days off per
16  week.  The host family pays a program fee to the
17  agency.  The host family is responsible for paying
18  the weekly stipend to the au pair, and they are also
19  responsible for up to $500 for the education
20  component.
21  Q   And what are the attributes of the EduCare
22  program?
23  A   Basically it's the same.  The differences
24  are that it is up to 30 hours of childcare in any
25  given week.  The weekly stipend is less, and the

**Page 63**

1   education component that the au pair completes is
2   doubled, so it's 12 credits instead of six, and the
3   host family contributes up to $1000 towards the
4   education versus the 500.
5   Q   What is the amount of the weekly stipend for
6   EduCare?
7   A   It's $146 and some change.
8   Q   Does CHI have both an EduCare and a standard
9   au pair program?
10  A   They do.
11  Q   Did APF have both an EduCare and a standard
12  au pair program?
13      MS. SCHAECHER:  Objection to form.
14  A   APF NFP had both the traditional and the
15  EduCare.
16  Q   (By Ms. McElroy) Thank you.  Was the stipend
17  for the EduCare program at APF the same as the
18  stipend for the EduCare program at CHI?
19  A   Yes.
20      MS. SCHAECHER:  Objection to form.
21  A   Yes, they were both 146 and the change.
22  Q   (By Ms. McElroy) When you transitioned from
23  APF to CHI, you didn't have to learn about what CHI
24  offered as the weekly stipend; correct?
25  A   It was mandated by the Department of State

**Page 64**

1   rules and regulations, and it was the same.
2   Q   And you mean it was the same as it was when
3   you were with APF?
4   A   Yes.
5   Q   So you didn't have to learn about a new
6   stipend offered by CHI?
7   A   No.
8   Q   At your current position at CHI, are you
9   aware of any other employees that have experience at
10  other sponsor agencies?
11  A   Christina Reilly.
12  Q   Do you know which sponsor agencies she has
13  worked for prior to working for CHI?
14  A   She worked for Au Pair Foundation, Inc.
15  Q   Did you overlap with her while you worked
16  there?
17  A   I did.
18  Q   Do you know of any other employees at CHI
19  that have experience with other sponsor agencies?
20  A   I am not aware of any other.
21  Q   When you worked at APF, were you aware of
22  any other employees that had experience at other
23  sponsor agencies besides Christina Reilly?
24      MS. SCHAECHER:  Objection to form.
25  A   Could you repeat the question?

**Page 65**

1   Q   (By Ms. McElroy) Sure.  When you worked at
2   APF, were you aware of any other -- let me just step
3   back.
4       When I say APF, I mean your position either
5   at APF, Inc. or APF NFP, so when you worked at APF,
6   whether it was called Inc. or APF NFP, were you
7   aware of any other employees with experiences at
8   other sponsor agencies?
9       MS. SCHAECHER:  Objection to form.
10  A   Just to clarify, those are two different
11  organizations.
12  Q   (By Ms. McElroy) Okay.  Well, I'll ask one
13  by one.  When you worked at APF, Inc., did you know
14  any employees with experience at other sponsor
15  agencies?
16  A   Not that I'm aware of.
17  Q   And when you worked at APF NFP, did you know
18  any employees with experience at other sponsor
19  agencies?
20  A   Yes.  Theresa Nelson worked for APF, Inc.
21  Q   Earlier you testified when the transition
22  from APF, Inc. to APF NFP occurred, that was a
23  change in ownership?
24  A   Correct.
25  Q   So did your responsibilities change at the

PLAINTIFFS' RESP. APP.0005115

**MAGNA** ▶
LEGAL SERVICES

Page 66

1  time of that transition?
2    A  No, they did not.
3    Q  Did your supervisor change at the time of
4  that transition?
5    A  No, it did not.
6    Q  When you worked at Culture Care, did you
7  know any employees with experience at other sponsor
8  agencies?
9    A  I'm sorry, can you repeat that?
10    Q  Yes.  While you were employed at Cultural
11  Care, did you know any other Cultural Care employees
12  that had worked for other sponsor agencies?
13    A  Not that I'm aware of.
14    Q  While you were employed at AuPairCare, did
15  you know any other AuPairCare employees that had
16  experience with other sponsor agencies?
17    A  Yes.
18    Q  What was the name of those employees?
19    A  Trudy Mar.
20    Q  Where did she work other than AuPairCare?
21    A  Cultural Care Au Pair.
22    Q  Did you know any other AuPairCare employees
23  that had experience at other sponsor agencies?
24    A  Not that I'm aware of.
25    Q  While you were employed with GreatAuPair,

Page 67

1  did you know any other GreatAuPair employees that
2  had experience at other sponsor agencies?
3    A  Not that I'm aware of.
4    MS. McELROY:  Do you mind if we take a quick
5  break?
6    MS. SCHAECHER:  Not at all.
7      (Recess)
8    MS. McELROY:  I'd like to mark this as
9  Exhibit 82.
10    (Deposition Exhibit Number
11    82 marked for identification.)
12    Q  (By Ms. McElroy) I'll give you a moment to
13  look over this document.
14    MR. STONE:  Would you please identify the
15  document.
16    MS. McELROY:  Yes.  Well, the document is an
17  article called Ten Reasons to Use an Au Pair from
18  ChoiceMoms.org.
19    MR. STONE:  Thank you.
20    Q  (By Ms. McElroy) Do you recognize the
21  article called Ten Reasons to Use an Au Pair in this
22  document?
23    A  Yes.
24    Q  Did you write this article?
25    A  I did.

Page 68

1    Q  Was this article published in
2  ChoiceMoms.org?
3    A  It was.
4    Q  And did you write this article while you
5  worked for Cultural Care?
6    A  I did.
7    Q  Did you write this article in your capacity
8  as an employee of Cultural Care?
9    A  I did.
10    Q  Reason number three in the article states
11  that -- or reason number three is "Au pairs are
12  affordable," and it states that, "Regardless of
13  whether you have one child or are chasing triplets,
14  your family pays the same price for quality
15  childcare."
16    Did you believe this to be an accurate
17  statement at the time that you wrote it?
18    A  Yes.
19    Q  When you state that the family pays the same
20  price, were you referring to the weekly stipend
21  amount?
22    A  No.
23    Q  What were you referring to?
24    A  Whether you have one child or a hundred.
25    Q  You pay the same price, okay.  Are you aware

Page 69

1  of any region today in the United States in which
2  the cost of an au pair is adjusted to account for
3  the cost of living?
4    A  Could you repeat the question?
5    Q  Yes.  Are you aware of any region in the
6  United States in which the stipend paid to an
7  au pair is adjusted to account for the cost of
8  living?
9    A  No, I'm not aware.
10    Q  So there's no difference in the au pair's
11  stipend for an au pair that works in Manhattan
12  versus an au pair that works in Kansas?
13    MS. SCHAECHER:  Objection.  Foundation.
14    MS. KOZAL:  Objection to foundation.
15    A  No, there's no difference.
16    Q  (By Ms. McElroy) The first reason in this
17  article states that, "Au pairs are flexible.  Modern
18  work schedules vary as do our kids' activities.
19  With an au pair you set the schedule weekly or
20  monthly to allow for coverage where you need it
21  most.  No more running from work early to get the
22  kids to soccer practice or having to choose between
23  being in two places at once."
24    Sitting here today, do you agree that
25  flexibility is a benefit of the au pair program?

PLAINTIFFS' RESP. APP.0005116

MAGNA
LEGAL SERVICES

---

**Page 70**

```
 1      A  I do.
 2         MS. KRUZER:  Objection.
 3      Q  (By Ms. McElroy) Part of that flexibility
 4   involves emergency coverage; correct?
 5         MS. KRUZER:  Objection.
 6      A  I don't know what you mean by emergency
 7   coverage.
 8      Q  (By Ms. McElroy) So, for example, say a
 9   mother goes into labor in the middle of the night.
10   If she has an au pair, she may be able to ask her
11   au pair to provide coverage while she goes to the
12   hospital?
13      A  If there are hours still left in the ten
14   hours per day and there's enough hours in the 45
15   hours per week, she could ask.
16      Q  And if there's an abrupt change in schedule
17   for a host family, an au pair may be able to adjust
18   to the schedule change and provide childcare;
19   correct?
20      A  Correct.
21      Q  Do you consider this an advantage over other
22   forms of childcare?
23      A  I do think having an au pair living in your
24   home does provide some flexibility that would be
25   more so than a daycare that is very restrictive in
```

**Page 71**

```
 1   hours and times you have to drop off and pick up or
 2   a come-and-go nanny, you know, who gets stuck in
 3   traffic, sick, late, any number of -- you know, dog
 4   died.
 5      Q  Do you know approximately how many au pairs
 6   you have interacted with either by phone, e-mail or
 7   in person in a professional capacity?
 8      A  I have no idea.
 9      Q  Would you say it's more than a hundred?
10      A  Probably, yes.
11      Q  Have you ever communicated to an au pair
12   that she could earn more than the $195.75 -- I'm
13   sorry.  Let me restate that.
14         I want to ask you about each time you've
15   communicated to an au pair that she could earn more
16   than $195.75 per week.  Have you ever communicated
17   that to an au pair?
18         MS. KOZAL:  Objection to form.
19      A  Could you repeat the question?
20      Q  (By Ms. McElroy) Sure.  Have you ever
21   communicated to an au pair that she could earn more
22   than $195.75 per week as an au pair?
23      A  I have never directly communicated that to
24   an au pair.
25      Q  Have you ever known an au pair that received
```

**Page 72**

```
 1   more than $195.75 per week?
 2      A  Yes.
 3      Q  Could you please -- how many au pairs have
 4   you known that received more than $195.75 per week?
 5      A  I've never directly worked with any
 6   placements in which an au pair was paid more than
 7   $195.75, but I do know from industry blogs and
 8   forums and mom -- host mom websites that many do.
 9      Q  Just to clarify, I'm not asking you about
10   au pairs you know of.  I'm asking you from your
11   personal experience.  Have you known an au pair that
12   received more than $195.75 per week?
13      A  Do you mean my personal experience in
14   hosting my own au pairs?
15      Q  Yes, that would count.
16      A  Yes.  Frequently when my au pairs first
17   arrive before we set up their bank accounts, I pay
18   them $200 in cash.  I have done that on four
19   different occasions.  We've hosted four au pairs.
20      Q  Do you continue to pay them $200 per week to
21   their bank accounts?
22      A  No.  Once the bank accounts were
23   established, I set up an automatic transfer between
24   my bank account and their bank account, and it
25   deposited $195.75 every Friday.
```

**Page 73**

```
 1      Q  Besides the four au pairs that you've
 2   hosted, have you ever personally known an au pair
 3   that received more than $195.75 per week?
 4      A  No.
 5      Q  Now I want to ask you about each time that
 6   you communicated to a host family that they could
 7   pay an au pair more than $195.75 per week.  Have you
 8   ever personally told a host family that they could
 9   pay more than $195.75 per week?
10      A  Yes.
11      Q  How many host families have you communicated
12   this to?
13      A  I don't know.
14      Q  Can you give an estimate?
15      A  10 or 15.
16      Q  When you had these communications, did the
17   host family ask you if they could pay more?
18      A  Yes.
19      Q  Did you ever volunteer to a host family that
20   they could pay more than $195.75 per week to the
21   au pair?
22      A  No.
23      Q  These approximately 10 to 15 host families,
24   approximately how many of them have you communicated
25   with while employed at CHI?
```

PLAINTIFFS' RESP. APP.0005117

**MAGNA**
LEGAL SERVICES

Page 74

1  A  I don't think any.
2  Q  Approximately how many of these host
3  families did you communicate with while employed at
4  APF?
5     MS. SCHAECHER:  Objection to form.
6  A  I would probably say 10 to 12.
7  Q  (By Ms. McElroy) And approximately how many
8  host families did you communicate that they could
9  pay more than $195.75 per week to au pairs while you
10 were employed at Cultural Care?
11 A  Probably the remaining two or three.
12 Q  Do you know whether any of these families
13 that you communicated that they could pay more than
14 $195.75 per week to au pairs actually paid more than
15 $195.75 per week to their au pair?
16 A  I am not aware.
17 Q  Have you ever seen a host family agreement
18 between an au pair and a host family in which the
19 host family agreed to pay more than $195.75 per
20 week?
21 A  I don't believe so.
22 Q  And have you ever personally known a host
23 family that paid an au pair more than $195.75 per
24 week?
25 A  I did, but I don't know any others

Page 75

1  personally.
2     (Deposition Exhibit Number
3     83 marked for identification.)
4     MS. McELROY:  For counsel on the phone I'm
5  marking a document Bates stamped APF 000271 as
6  Exhibit 83.
7  Q  (By Ms. McElroy) I'll give you a moment to
8  review.  Do you recognize this document?
9  A  I do.
10 Q  Did you write this e-mail?
11 A  I did.
12 Q  In the first line of the e-mail you say,
13 "Hello CRs."  Could you remind us what a CR is?
14 A  Yes.  It is a community representative.
15 This was before we added the term local to it.
16 Q  Did you supervise the community
17 representatives?
18 A  At this time when this e-mail was sent --
19 I'm assuming this April 11 -- I know there's
20 redacted information.  I'm assuming that's April 11,
21 2013, is when it was sent.
22 Q  Yes.
23 A  Yes, then I was supervising.  I was just
24 starting to build a regional team.
25 Q  In April 2013 what was your position at APF?

Page 76

1  A  I really should have all this written down.
2  At that time I was the national director of field
3  operations.  I should have brought my resume.
4  Q  Did you write this e-mail in your capacity
5  as the national director of field operations?
6  A  I did.
7  Q  In the body of the e-mail under "weekly
8  stipend" you say -- you write, "The weekly stipend
9  is currently $195.75.  The Department of State sets
10 the weekly stipend at federal minimum wage minus
11 room and board."
12    Is this statement consistent with what you
13 communicated to the community representatives while
14 you were at APF?
15 A  Yes.
16 Q  Was this statement true at the time that you
17 made it?
18 A  Yes.
19 Q  Is this your current understanding of how
20 the weekly stipend is set?
21 A  Yes.
22 Q  Is this statement consistent with what you
23 told host families about the weekly stipend while
24 you were at APF?
25 A  Yes.

Page 77

1  Q  The next sentence says, "So this is a
2  federally mandated stipend that all au pair agencies
3  must adhere to."
4     Is this your current understanding -- is
5  this statement consistent with your current
6  understanding of the weekly stipend?
7  A  Yes, the weekly stipend is set by the
8  Department of State, and all of the agencies must
9  adhere to this as they do with all rules and
10 regulations set forth.
11 Q  Is this statement consistent with what you
12 told host families about the weekly stipend?
13 A  Yes.
14 Q  You can put that one to the side.
15    MS. McELROY:  For counsel on the phone
16 document APF 000314 has been marked as Exhibit 84.
17    (Deposition Exhibit Number
18    84 marked for identification.)
19 Q  Are you familiar with this document?
20 A  I am.
21 Q  Can you explain what this document is?
22 A  This is a document from APF NFP that we
23 implemented.  It is a copy of a submission from an
24 au pair of the weekly survey.
25 Q  How did the au pairs submit this weekly

MAGNA
LEGAL SERVICES

| Page 78 | Page 80 |
|---|---|

**Page 78**

1 survey?
2    A   Each Monday they were sent a link through
3 SurveyMonkey to their e-mail address.  They received
4 this and they completed it and submitted it, and it
5 was then collected and reviewed.
6    Q   Was this in place -- was the survey in place
7 the entire time that you worked at APF NFP?
8    A   No, it was not.
9    Q   When did it become part of the process at
10 APF NFP?
11    A   It was I think sometime in early 2014.
12    Q   After APF NFP started using this survey, did
13 it require all au pairs to complete this form?
14    A   We did require it.
15    Q   And they completed this form on a weekly
16 basis; correct?
17    A   Yes.
18    Q   Did all of the forms contain these same
19 questions that we see here?
20    A   Yes.
21    Q   Question 8 says, quote, "Did you receive
22 your full weekly stipend of $195.75?"  Did all the
23 forms contain this question?
24    A   Yes.
25    Q   In your current position at CHI, are you

**Page 79**

1 aware of any similar reporting forms for au pairs?
2    A   No, CHI does not do this.
3    Q   When you worked at AuPairCare, were there
4 any similar reporting forms for au pairs?
5    A   I don't know.
6    Q   When you worked at GreatAuPair, were there
7 any similar reporting forms for au pairs?
8    A   I don't know.
9    Q   When you worked at Cultural Care, were there
10 any similar reporting forms for au pairs?
11    A   Not that I'm aware of.
12    Q   You can put that one to the side.  You
13 mentioned earlier that you've personally used
14 au pairs for childcare?
15    A   Uh-huh.
16    Q   And you've used four au pairs?
17    A   We've had four.
18    Q   What countries were they from?
19    A   We had two from Germany, one from Columbia
20 and one from Brazil.
21    Q   What years did you use au pairs?
22    A   We started in 2010, and we just finished up
23 in June of this year.
24    Q   So currently you are not using an au pair?
25    A   No.

**Page 80**

1    Q   So starting in 2010, what was the name of
2 that au pair?
3    A   Her name was Stephanie.
4    Q   Do you recall what sponsor agency she was
5 from?
6    A   She was with Cultural Care.
7    Q   And you worked at Cultural Care at the time;
8 correct?
9    A   I did, yes.
10    Q   And how long did Stephanie work with you?
11    A   She was with us for a year.
12    Q   How much did you pay her?
13    A   I paid her $195.75.
14    Q   And then going -- after Stephanie who was
15 your next au pair?
16    A   We had Lina.
17    Q   And what sponsor agency was she with?
18    A   Cultural Care.
19    Q   What year was that?
20    A   That would have been -- no, wait, excuse me.
21 I'm sorry.  Lina was with APF.  I'm so sorry.  I
22 apologize.  It was like the math wasn't adding up.
23 So that was the fall of 2012.
24    Q   Did you have an au pair in 2011?
25    A   I didn't, no.  When I lost my job, the

**Page 81**

1 timing actually worked out.
2    Q   How much did you pay Lina?
3    A   $195.75.
4    Q   After Lina who was your next au pair?
5    A   We had Marlin, M-A-R-L-I-N, and she was also
6 with APF.
7    Q   What year did Marlin work with you?
8    A   She was with us for two years, so it was
9 August 2013 through August 2015.
10    Q   How much did you pay Marlin?
11    A   I paid her $195.75 a week.
12    Q   And after Marlin did you have another
13 au pair?
14    A   We did.  We had Bia (ph).
15    Q   What year did Bia work for you?
16    A   She was with us August 2015 through June of
17 2016.
18    Q   And how much did you pay Bia?
19    A   $195.75.
20    Q   What sponsor agency?
21    A   She was with AuPairCare.
22    Q   At the time that Stephanie worked for you,
23 how many children did you have?
24    A   One.
25    Q   When did you have your -- how many children

PLAINTIFFS' RESP. APP.0005119

MAGNA
LEGAL SERVICES

Page 82

1  do you have now?
2      A   I have three.
3      Q   When did you have your second child?
4      A   2012.
5      Q   When did you have your third child?
6      A   End of 2014.
7      Q   Have you ever used any other forms of
8  childcare besides au pairs?
9      A   Sure.  I've used Kids Day Out programs.
10  I've used -- we use babysitters.  We use parents.
11  My two older ones are in school now obviously, and
12  the baby is at home.
13      Q   Have you ever hired a professional nanny?
14      A   No.
15      Q   Are you familiar with an organization called
16  Au Pair Clearinghouse?
17      A   I am.
18      Q   Can you explain what the purpose of that
19  organization is?
20      A   It is a website created by a woman named
21  Edina Stone who offers it for -- really for host
22  family resources.  If you're interested in learning
23  about the au pair program, she does profiles of the
24  various sponsor agencies, ratings.  There's a host
25  family satisfaction survey that they conduct, but

Page 83

1  they are in no way a part of, at least to my
2  knowledge, of any of the sponsor agencies.  She is
3  neutral and independent.
4      Q   So it's your understanding the ratings are
5  based on the host family surveys?
6      A   Correct.
7      Q   Does APF supply Au Pair Clearinghouse with
8  any information?
9          MS. SCHAECHER:  Objection.  Form.
10      A   Yes.  She conducts interviews with staff
11  from all the sponsors.  There's interviews up there,
12  and there's also -- you know, she checks in with the
13  profiles to make sure that things are up to date and
14  accurate because things change.
15      Q   (By Ms. Schaecher) When you say she checks
16  in with the profiles, you mean the -- each sponsor
17  agency's profile on Au Pair Clearinghouse?
18      A   Correct.
19          MS. McELROY:  Mark this as Exhibit 85.
20  We're marking the document CHI 000328 as an exhibit.
21          (Deposition Exhibit Number
22          85 marked for identification.)
23      Q   (By Ms. Schaecher) We'll give you a moment
24  to look over this document.
25          MR. STONE:  Did you say you marked that as

Page 84

1  an exhibit?
2          MS. McELROY:  Yes.  It's Exhibit 85.
3          MR. STONE:  Thank you.
4      Q   (By Ms. McElroy) Do you recognize this
5  document?
6      A   I do.
7      Q   Does this appear to be a true and accurate
8  depiction of CHI's website?
9      A   It does.
10      Q   And this particular portion of the website
11  discusses the program costs; correct?
12      A   Correct.
13      Q   Could you please turn to the page number
14  that ends in 332.  At the bottom of the page it
15  lists -- there's a section called Additional costs.
16  Do you see that?
17      A   I do.
18      Q   And this lists additional costs -- costs in
19  addition to the program fees that the family pays to
20  CHI; correct?
21      A   I'm sorry, could you repeat the question?
22      Q   Yes.  This section lists costs that are in
23  addition to the program fees that the host family
24  pays to CHI?
25      A   Correct.

Page 85

1      Q   And the section states, "In addition to the
2  program fee, additional costs required by the
3  U.S. Department of State and CHI Au Pair USA include
4  the au pair's weekly stipend of $195.75."
5          Is this statement consistent with what you
6  tell host families in your capacity as a CHI
7  employee?
8      A   Yes, the weekly stipend of $195.75 is
9  required by the U.S. Department of State.
10      Q   Is this statement consistent with what --
11  strike that.
12          Are you aware of any publicly available
13  information from CHI that explains to a family that
14  they can pay an au pair more than $195.75?
15      A   I'm not aware.
16      Q   You can put that one to the side.
17          (Deposition Exhibit Number
18          86 marked for identification.)
19          MS. McELROY:  We're marking the document
20  Bates stamped APF 1 as Exhibit 86.
21      Q   (By Ms. Schaecher) Do you recognize this
22  document?
23          MS. SCHAECHER:  Objection to the
24  characterization of this as a single document.
25          MS. McELROY:  Let me rephrase that.

22  (Pages 82 to 85)

Page 86

```
 1      Q  (By Ms. Schaecher) Do you recognize pages 1
 2  through 66 of the exhibit that I've handed you?  Let
 3  me rephrase that again.
 4          This is a compilation that's been produced.
 5  Do you recognize pages 1 through 46 of this
 6  document?
 7      A  I recognize some of it, but there's many
 8  things I don't recognize.
 9      Q  Does this appear to be a depiction of APF's
10  website?
11          MS. SCHAECHER:  Objection to form.
12      A  It appears to be a printout of many pages of
13  the current APF website.
14      Q  (By Ms. Schaecher) Could you turn to page --
15  to the page ending in 27.  This page describes APF's
16  different au pair programs; correct?
17      A  It does.
18      Q  And under this description of the standard
19  au pair, it states that the standard au pair can
20  provide up to 45 hours of experienced childcare per
21  week for children over the age of two.  Do you see
22  that?
23      A  I do.
24      Q  And it states that the weekly stipend is
25  $195.75.
```

Page 87

```
 1      A  Yes.
 2      Q  While you worked at APF, was this consistent
 3  with what you communicated to host families?
 4      A  Yes.
 5      Q  If you look below that, there's a
 6  description of the EduCare au pair program, and
 7  there it says the weekly stipend is $146.81.  Is
 8  this consistent with what you communicated to host
 9  families while you worked for APF?
10      A  Yes.
11      Q  Have these numbers changed -- are these
12  numbers different than the numbers in place while
13  you were at APF?
14          MS. SCHAECHER:  Objection to form.
15      A  No, they are the same.
16      Q  (By Ms. McElroy) Why is the stipend for the
17  EduCare au pair less than the stipend for the
18  standard au pair?
19          MS. SCHAECHER:  Objection.  Foundation.
20      A  For the EduCare program the au pair is
21  working 30 hours of childcare versus the 45 hours of
22  childcare per week under the traditional program or
23  the standard program.
24      Q  (By Ms. McElroy) Would you please turn back
25  to page 26.  Here there's a description of the
```

Page 88

```
 1  infant care au pair program.  Could you explain the
 2  difference between the infant care au pair program
 3  and the standard and EduCare au pair programs?
 4      A  The infant care au pair program really is
 5  the same as the standard au pair program in the
 6  sense of the hours and the stipend paid.  The
 7  difference being that an infant care au pair has
 8  specific training, a minimum of 200 hours of
 9  childcare experience with children under the age of
10  two.  Any host family that has children under the
11  age of two must have an infant care au pair.  APF
12  broke it out separately for whatever reason.
13      Q  Okay.  So they have specialized experience
14  with children under two?
15      A  They do, and that is a Department of State
16  requirement.
17      Q  I believe you already stated this.  It's
18  blurry there.  Can you see what the weekly stipend
19  is for the infant care au pair?
20      A  I can.
21      Q  And what is that number?
22      A  $195.75.
23      Q  Is this consistent with what you
24  communicated to host families regarding the weekly
25  stipend for infant care au pairs while you worked at
```

Page 89

```
 1  APF?
 2      A  It is.
 3      Q  Could you please turn to page 30.  This page
 4  lists host family program fees; correct?
 5      A  I'm sorry.  Could you repeat your question?
 6      Q  Yes.  Do you agree that this page lists host
 7  family program fees charged by APF?
 8      A  I'm sorry.  You're going to have to restate
 9  that again.
10      Q  Do you agree that this page lists host
11  family program fees charged by APF to host families?
12      A  Yes.
13      Q  In the first section, which lists the fees,
14  there's a new host family program fee.  Do you see
15  that?
16      A  Uh-huh.
17      Q  Do you agree that the infant care host
18  family program fee is higher than the standard care
19  host family fee?
20      A  I do agree.
21      Q  Do you know who at APF is responsible for
22  setting these fees?
23          MS. SCHAECHER:  Objection; form.
24      A  Currently or while I worked there?
25      Q  (By Ms. McElroy) While you worked there.
```

PLAINTIFFS' RESP. APP.0005121

MAGNA
LEGAL SERVICES

| Page 90 | Page 92 |
|---|---|

**Page 90**

1    MS. SCHAECHER:  Same objection.
2    A  Ellen Hoggard had the final say-so.
3    Q  (By Ms. McElroy) Does Cultural -- Does CHI
4  have an infant care program?
5    A  We do.
6    Q  Are the fees for infant care -- let me
7  rephrase that.
8    Are CHI's program fees for the infant care
9  program different than the APF fees listed here?
10   A  I'm sorry.  I don't understand your
11  question.
12   Q  Does CHI also charge $8,500 as a new host
13  family program fee for the infant care program?
14    MR. BENDER:  Objection.  Lack of foundation.
15   A  I would have to check.  I don't think it's
16  the same price.
17   Q  (By Ms. McElroy) While you worked at APF,
18  was the infant care program fee higher than the
19  standard care program fee?
20   A  I don't believe it was.
21   Q  Do you know who -- what employee of CHI sets
22  their program fees?
23   A  I don't.
24   Q  You can put that one to the side.
25    MS. McELROY:  A document Bates stamped

**Page 92**

1  au pair a weekly stipend of $195.75 ($146.81) in
2  accordance with U.S. State Department and Fair Labor
3  Standards Act guidelines."
4    Is this statement regarding the stipend
5  consistent with what you communicated to host
6  families while employed at APF?
7    MS. SCHAECHER:  Objection; form.
8    A  Yes.
9    Q  (By Ms. McElroy) Am I correct that the
10  $146.81 in parentheses would apply to the EduCare
11  au pairs?
12   A  That is correct.
13   Q  And then the $195.75 would apply to the
14  standard au pairs?
15   A  Yes, whether infant qualified or not.
16   Q  While you were employed at APF, was this
17  number listed in all APF standard form contracts
18  that you saw?
19    MS. SCHAECHER:  Objection; form.
20   A  What do you mean by standard form contracts?
21   Q  (By Ms. McElroy) Was this -- was the weekly
22  stipend 195.75 included in all host family contracts
23  that you saw?
24    MS. SCHAECHER:  Same objection.
25   A  Yes, it was listed in all the host family

| Page 91 | Page 93 |
|---|---|

**Page 91**

1  APF 75 is being marked as Exhibit 87.
2    (Deposition Exhibit Number
3    87 marked for identification.)
4    Q  (By Ms. McElroy) Do you recognize this
5  document?
6    A  It appears to be the host family agreement
7  for APF.
8    Q  Did you review this document before your
9  deposition today?
10   A  No.
11   Q  Do you see in the bottom margin it says,
12  "Revised August 2015"?
13   A  Uh-huh.
14   Q  Were you employed with APF in August of
15  2015?
16   A  For a small part of it.
17   Q  At the top of the document, Section A, it
18  says, Host family obligations.  Do you see that?
19   A  Uh-huh.
20   Q  And then I'll just quote it.  It says, "Host
21  family will pay all program fees associated with
22  hosting an au pair as outlined in a payment
23  authorization form.  Host family will provide room
24  and board, including a private room for the au
25  pair," and then it states, "Host family will pay the

**Page 93**

1  agreements that any participating host families
2  would have signed.
3    Q  (By Ms. McElroy) Did APF have one host
4  family agreement that they used for all host
5  families?
6    MS. SCHAECHER:  Objection; form.
7    A  They did.
8    Q  (By Ms. McElroy) You can put that one to the
9  side.
10    MS. McELROY:  The document Bates stamped 126
11  is being marked as Exhibit 88.
12    (Deposition Exhibit Number
13    88 marked for identification.)
14   Q  (By Ms. Schaecher) Do you recognize this
15  document?
16   A  Yeah.  It is the Au Pair Foundation au pair
17  pledge, but I'm missing a page.  I only have four of
18  five.
19   Q  I think this is how it was produced to us,
20  but I will not ask about the fifth page.
21   A  Okay.
22   Q  Do you see in the bottom margin it says it
23  was revised July 19, 2013?
24   A  I do.
25   Q  Were you employed with APF in July of 2013?

PLAINTIFFS' RESP. APP.0005122

MAGNA
LEGAL SERVICES

---

**Page 94**

1    A  I was.
2    Q  Did you review this document before coming
3  to your deposition today?
4    A  I did.
5    Q  While you were at APF, were all au pairs
6  required to sign a version of this document?
7       MS. SCHAECHER:  Objection; form.
8    A  Yes, I believe they were.
9    Q  (By Ms. McElroy) Halfway down the page,
10  Section B is titled, "Forbidden activities."  Do you
11  see that?
12    A  Yes.
13    Q  And under B, number one, it says that the
14  au pair will not, quote, "accept any form of paid
15  employment other than from my duties as an au pair
16  with my host family from whom I will receive a
17  weekly stipend of $195.75 ($146.81 for EduCare
18  participants) according to current U.S. government
19  regulations."
20       Was this statement consistent with what you
21  communicated to au pairs while you were employed at
22  APF?
23       MS. SCHAECHER:  Objection to form.
24    A  Yes.  If the occasion arose, I would inform
25  au pairs that they were not allowed to have any

**Page 95**

1  other employment outside of the au pair program as
2  they were here on a J-1 visa, not a work visa, and
3  it would put their visa status in jeopardy.
4    Q  (By Ms. McElroy) Is this statement in
5  section B-1 -- let me rephrase.
6       Was the statement in section B-1 that I just
7  read in all versions of the au pair pledge while you
8  were employed at APF?
9       MS. SCHAECHER:  Objection; form.
10    A  I don't know.
11    Q  (By Ms. McElroy) Does CHI have a similar
12  pledge that au pairs are required to sign?
13    A  I don't know.
14    Q  Did Cultural Care have a similar pledge that
15  au pairs were required to sign?
16    A  I don't know.
17    Q  While you worked as an LCC at Cultural Care,
18  did you ever ask au pairs to sign a similar pledge?
19       MS. KRUZER:  Objection.
20    A  I don't believe so.
21    Q  (By Ms. McElroy) Does GreatAuPair have a
22  similar pledge --
23    A  I have no idea.
24    Q  -- that au pairs are required to sign?
25    A  I have no idea.

**Page 96**

1    Q  Does AuPairCare have a similar pledge that
2  au pairs are required to sign?
3    A  I have no idea.
4       MS. McELROY:  Can we go off the record for a
5  minute?
6            (Recess)
7    Q  (By Ms. McElroy) While you were employed at
8  Cultural Care, did you ever speak to families about
9  the amount of the weekly stipend?
10    A  Not that I can specifically recall.
11    Q  While you were employed at GreatAuPair, did
12  you ever speak to families about the amount of the
13  weekly stipend?
14    A  Yes.
15    Q  Did you ever communicate to families while
16  employed at GreatAuPair that the weekly stipend was
17  $195.75 per week?
18    A  Yes.
19    Q  While you were employed at AuPairCare, did
20  you ever communicate with host families about the
21  weekly stipend?
22    A  No.
23       (Deposition Exhibit Number
24       89 marked for identification.)
25       MS. McELROY:  A document entitled, "Taking

**Page 97**

1  the au pair:  The key to happy family travels,"
2  which is an article published on MomAboard.com, is
3  being marked as an exhibit.
4    Q  (By Ms. McElroy) Do you recognize the
5  article that appears on the second page of this
6  document?
7    A  I do.
8    Q  Did you write that article?
9    A  I did.
10    Q  Did you write this article while you worked
11  for Cultural Care?
12    A  I did.
13    Q  And did you write this article in your
14  capacity as an employee of Cultural Care?
15    A  Yes.
16    Q  Do you recall the approximate date when this
17  article was published?
18    A  Well, it was when I was a business
19  development director, so it would have been sometime
20  between September 2010 and September of 2011.
21    Q  Was this article published on the website
22  MomAboard.com?
23    A  It was.
24    Q  That's all for that.
25       MS. McELROY:  An article titled "Au Pair

PLAINTIFFS' RESP. APP.0005123

MAGNA
LEGAL SERVICES

Page 98

```
 1   Foundation Combines Childcare, Cultural Immersion"
 2   by Kathy Deters is being marked as Exhibit 90.
 3          (Deposition Exhibit Number
 4          90 marked for identification.)
 5      Q   (By Ms. McElroy) Do you recognize this
 6   article?
 7      A   I do.
 8      Q   Do you know where this article was
 9   published?
10      A   Yeah, it was published actually on a local
11   website here in St. Louis called -- I think it was
12   STL Sprout or St. Louis Sprout.
13      Q   Were you interviewed for this article?
14      A   Yes, I was interviewed.
15      Q   And when you provided comments for this
16   article, did you do so in your capacity as an
17   employee at APF?
18          MS. SCHAECHER:  Objection to form.
19          MS. McELROY:  Let me rephrase.
20      Q   (By Ms. McElroy) When you provided comments
21   for this article, did you do so in your capacity as
22   an employee at APF NFP?
23      A   Yes.
24      Q   If you look on page 2, at the bottom after
25   the article ends in italics, it says, "In the
```

Page 99

```
 1   Sproutlight is a sponsored opportunity."  Was this
 2   an advertising opportunity that APF paid for?
 3      A   Yes.
 4      Q   Were you responsible for this advertising
 5   opportunity?
 6      A   What do you mean?
 7      Q   Did you reach out to Sproutlight or
 8   St. Louis Sprout regarding this article?
 9      A   I believe so.
10      Q   Did you draft any part of this article?
11      A   I don't recall.
12      Q   Are the comments attributed to you in this
13   article accurate?
14      A   Yes, the statements in quotations are
15   attributable to me.
16      Q   And those statements are accurate?
17      A   They are accurate.
18      Q   Towards the bottom of page 1, the
19   second-to-last paragraph there's a quote from you
20   that says, quote, "Hosting an au pair is a flexible,
21   affordable option for families in the United States
22   that are looking for childcare that is a bit more
23   flexible than a daycare or nanny."
24          When you said that an au pair is a bit more
25   flexible, in what ways did you mean it was more
```

Page 100

```
 1   flexible?
 2      A   Daycares are typically really limited in
 3   hours as far as when you can drop off and pick up.
 4   Many families that have dual-income families they
 5   might need early morning care, they may need after
 6   school into evening care depending on when one of
 7   the parents works.
 8          Nannies, a come-and-go nanny, again, they --
 9   I often say they don't -- aren't late -- or I mean
10   nannies can be late.  They can get stuck in snow or
11   snow days.  There's all kinds of different things
12   that can happen, but I think really as compared with
13   daycare, typically you have to pick your child up by
14   five or six, and if you're late, you get charged
15   more and it's a hassle.
16      Q   So would you agree because the au pair lives
17   with a host family they're less likely to be late
18   than a nanny?
19      A   Yes.  If she has to walk down the stairs,
20   it's a much shorter commute.
21      Q   You can put that one to the side.  So you
22   previously testified today that the Department of
23   State sets the amount of the weekly stipend; is that
24   correct?
25      A   That is correct.
```

Page 101

```
 1      Q   Based on your experience, do the sponsors
 2   that you've worked for charge different host family
 3   fees?
 4      A   Could you clarify what you mean by host
 5   family fees?
 6      Q   Yes.  Do the program fees that the sponsors
 7   you've worked for -- do the program fees that the
 8   sponsors charge to host families to participate in
 9   an au pair program vary across the different
10   sponsors that you've worked for?
11      A   Yes, program fees do vary.
12      Q   Would you agree that the stipend paid to the
13   au pair is a fixed expense?
14      A   Can you say that one more time?
15      Q   Yeah.  Would you agree that the stipend paid
16   to the au pair is a fixed expense for the host
17   families?
18          MR. STONE:  Objection; foundation.
19          MR. BENDER:  I join the objection and form.
20          MS. KRUZER:  I join in the objection.
21      A   I don't see it as a fixed expense.  It's a
22   stipend that is set by the Department of State, and
23   it's part of the rules and regulations in the
24   Federal Code for au pairs that host families are
25   required to pay.
```

PLAINTIFFS' RESP. APP.0005124

MAGNA
LEGAL SERVICES

Page 102

1    Q  (By Ms. McElroy) So unlike the program, the
2  host family program fees which vary across the
3  agencies you've worked for, the stipend is the same
4  across the agencies that you've worked for?
5        MS. KRUZER:  Objection.
6    A  Because it is what the Department of State
7  mandates as the weekly stipend, that is what host
8  families are required to pay.
9    Q  (By Ms. McElroy) So would you agree that
10  unlike the program fees which vary across the
11  sponsors, the weekly stipend is the same across the
12  sponsors?
13        MS. SCHAECHER:  Objection; foundation.
14        MR. BENDER:  I join.
15        MR. STONE:  Objection.  Form and foundation.
16        MS. KRUZER:  I join in the objection.
17        MS. KOZAL:  As do I.
18    A  I'm sorry.  You're going to have to repeat
19  the question.  I'm so sorry.  I'm sorry.
20    Q  (By Ms. McElroy) Do you agree that unlike
21  the program fees charged to host families which you
22  testified vary across the sponsors, the weekly
23  stipend paid to au pairs is the same across the
24  sponsors?
25        MS. SCHAECHER:  Objection.  Form and

Page 103

1  foundation.
2        MR. STONE:  Objection.
3        MS. KRUZER:  Join in the objection.
4    A  The weekly stipend, the minimum baseline of
5  $195.75 that is mandated by the Department of State,
6  yes, is the same minimum for all au pair sponsors.
7    Q  (By Ms. McElroy) When speaking with host
8  families, have you ever characterized the weekly
9  stipend as a, quote, "fixed expense"?
10    A  No.
11    Q  You're sure you've never said that?
12    A  A fixed expense?
13    Q  Yes.
14    A  I wouldn't characterize it as a fixed
15  expense.  It is the weekly stipend.
16    Q  Do you know whether you've ever
17  characterized it as a fixed expense in speaking to a
18  host family?
19    A  I don't recall.  I don't know.
20    Q  So you can't with certainty deny that you've
21  never characterized it as a fixed expense?
22        MR. BENDER:  Object to the form.
23    A  Can you rephrase that?
24    Q  (By Ms. McElroy) Yeah.  Can you with
25  certainty deny that you've characterized the stipend

Page 104

1  as a fixed expense?
2        MR. BENDER:  Object to the form.
3    A  I don't know one way or another if I've ever
4  said fixed expense.  It doesn't sound like something
5  I would say, but I don't know.
6    Q  (By Ms. McElroy) Do you agree with the
7  statement that there is no difference in prices as
8  far as the stipend goes between all of the agencies?
9        MS. SCHAECHER:  Objection.
10        MS. KOZAL:  Objection to form.
11        MS. KRUZER:  Join in the objection.
12        MR. STONE:  Objection; foundation.
13        MR. BENDER:  Same objection.
14    Q  (By Ms. McElroy) Do you need me to repeat
15  the question?
16    A  Please.  I'm sorry.
17    Q  Do you agree with the statement:  There is
18  no difference in prices as far as stipend goes
19  between all of the agencies?
20        MR. STONE:  Same objection.
21        MS. KRUZER:  Form and foundation.
22    A  There's no difference in the minimum weekly
23  stipend of $195.75 that is mandated by the
24  Department of State.  All agencies require the
25  minimum stipend of $195.75.

Page 105

1    Q  (By Ms. McElroy) Do you agree with the
2  statement that I'm saying:  There is no difference
3  in prices as far as the stipend goes between all of
4  the agencies?
5        MR. BENDER:  Object to the form.
6        MS. KOZAL:  Counsel, are you -- this is
7  Peggy.  Counsel, are you reading from something, or
8  are you just asking her a question?
9        MS. McELROY:  I'm just asking her a
10  question.
11        MR. STONE:  Objection; foundation.
12        MS. KRUZER:  Join in the objection.
13        MS. KOZAL:  As do I.
14    A  Could you repeat the question?  I'm very
15  sorry.
16    Q  (By Ms. McElroy) Do you agree with the
17  statement that there is no difference in prices as
18  far as the stipend goes between all of the agencies?
19        MS. SCHAECHER:  Same objection.
20        MR. STONE:  Same objection.
21        MS. KRUZER:  Same objection.
22    A  I don't necessarily agree because that's the
23  minimum threshold, and the family could pay more.
24    Q  (By Ms. McElroy) Have you ever made that
25  statement to a caller while acting in your capacity

PLAINTIFFS' RESP. APP.0005125

MAGNA
LEGAL SERVICES

Page 106

1 as an employee of a sponsor agency?
2      MS. KOZAL: Objection to form.
3      A Have I ever said what?
4      MS. KRUZER: Join in the objection.
5      Q (By Ms. McElroy) Have you ever stated to a
6 caller when you were answering the phones in your
7 capacity as an employee of a sponsor agency that
8 there is no difference in prices as far as the
9 stipend goes between all of the agencies?
10     A I mean I have -- to distinguish between the
11 weekly stipend and the program fee -- which the
12 program fee we've already established is variable --
13 that minimum threshold is standard across all of the
14 sponsors.
15        So yes, I would characterize it as that when
16 differentiating, when going through all the pricing
17 with a potential host family to differentiate that
18 between the stipend and the program fee that a
19 particular agency might charge.
20     Q And within that context, do you agree with
21 the statement: There is no difference in prices as
22 far as the stipend goes between all of the agencies?
23     MR. STONE: Objection; foundation.
24     MS. KRUZER: Join.
25     MS. KOZAL: Join.

Page 107

1      A I'm sorry. I feel like this is the same
2 question. I'm just not understanding.
3      Q (By Ms. McElroy) I asked you earlier if you
4 agreed with that statement; correct?
5      A Yeah.
6      Q And then you provided some additional
7 context where you spoke about distinguishing between
8 the stipend and the program fees.
9      A Correct.
10     Q So I'm asking you with that additional
11 context or within that context would you agree with
12 the statement: There is no difference in prices as
13 far as the stipend goes between all of the agencies?
14     MR. STONE: Objection; foundation.
15     MR. BENDER: Same objection.
16     A No. I --
17     MS. KRUZER: Join.
18     A I agree that there is no difference in the
19 minimum baseline of what the agencies tell host
20 families that they need to pay for the au pair for
21 the weekly stipend.
22     Q (By Ms. McElroy) And I understand that
23 you're saying you agree that the minimum baseline is
24 the same across sponsors.
25     A Yeah.

Page 108

1      Q I'm asking you if you agree with the
2 specific statement that there is no difference in
3 prices as far as the stipend goes between all of the
4 agencies?
5      MS. SCHAECHER: Wait for a question.
6      MS. KRUZER: Objection. Asked and answered.
7      MR. STONE: Objection. Form and foundation.
8      MR. BENDER: Object to the form.
9      MS. KOZAL: I join in both.
10     MS. SCHAECHER: Was there a question?
11     MS. McELROY: Yes.
12     Q (By Ms. McElroy) I'm asking you -- I can
13 rephrase it. Do you agree with the statement: Is
14 there a difference -- Do you agree with the
15 statement: There is no difference in prices as far
16 as the stipend goes between all of the agencies?
17     MS. SCHAECHER: Objection. Form;
18 foundation.
19     MS. KRUZER: Same objection.
20     MR. STONE: Objection. Form and foundation.
21     MR. BENDER: Same.
22     A I'm sorry. I'm just not --
23     THE WITNESS: Can I have a moment?
24     MS. SCHAECHER: Sure.
25     MS. McELROY: Sure, yeah. I'll step out.

Page 109

1          (Recess)
2      Q (By Ms. McElroy) Sitting here today, do you
3 know whether you have ever told a caller in your
4 capacity as an employee of a sponsor agency that
5 there is no difference in prices as far as the
6 stipend goes between all of the agencies?
7      MR. BENDER: Object to the form.
8 Foundation.
9      MR. STONE: Objection. Form and foundation.
10     MS. KOZAL: Objection to form and
11 foundation.
12     A No, I don't agree.
13     Q (By Ms. McElroy) I'm asking you not whether
14 you agree with that statement now. Sitting here
15 today, do you know whether you've ever told a
16 prospective -- or a caller in your capacity as an
17 employee at APF that there is no difference in
18 prices as far as the stipend goes between all of the
19 agencies?
20     MS. SCHAECHER: Objection to form.
21     MS. KRUZER: Join in the objection.
22     MS. KOZAL: Join in the objection.
23     A Yes, probably in the context of explaining
24 all of the fees, again, distinguishing from variable
25 program fees that the agencies charge and the

PLAINTIFFS' RESP. APP.0005126

MAGNA
LEGAL SERVICES

Page 110

1   minimum stipend that they're required, the agencies
2   are required to have the host families pay to the
3   au pair, that minimum is standard.
4       Q   (By Ms. McElroy) Okay, so are you saying
5   yes, you may have made that statement within that
6   context?
7       A   Yeah.
8           MS. SCHAECHER: Objection to form.
9       Q   (By Ms. McElroy) Over the course of your
10  career with the various sponsor agencies, can you
11  estimate approximately how many host families you've
12  communicated with?
13      A   Oh, lots. I don't --
14      Q   Would you say it's more than a hundred?
15      A   Oh, definitely more than a hundred.
16      Q   More than a thousand?
17      A   It's possible.
18      Q   Somewhere between a hundred and -- well,
19  possibly more than a thousand?
20          MR. BENDER: Calls for speculation.
21      Q   (By Ms. McElroy) Would you say it's more
22  than 5000?
23          MR. BENDER: Objection. Foundation and
24  form.
25      A   I don't know. I don't know.

Page 111

1       Q   (By Ms. McElroy) I just would like to return
2   for a couple minutes to Exhibit 80.
3           MS. McELROY: For counsel on the phone
4   Exhibit 80 was APF 274.
5       Q   (By Ms. McElroy) Approximately halfway down
6   the page, the first page there's a statement that
7   says, "The weekly stipend is $195.75 as with all
8   agencies," and earlier you testified that this was a
9   true statement at the time that you made it. Is
10  that correct?
11      A   Yes.
12      Q   Was that a true statement in 2014?
13      A   Yes.
14          MS. McELROY: That's all I have.
15          MS. SCHAECHER: Could we have a few minutes
16  to look at our notes?
17          MS. McELROY: Sure.
18              (Recess)
19          MS. SCHAECHER: Back on the record.
20              EXAMINATION
21  QUESTIONS BY MS. SCHAECHER:
22      Q   Ms. Crompton, just a few questions. At one
23  point in your deposition testimony today you said
24  that you had paid your au pairs $200 a week when
25  they first started with you. Do you recall that

Page 112

1   testimony?
2       A   I do.
3       Q   And then later in your testimony you were
4   asked how much you paid each of the au pairs that
5   you had, and you said you paid them $195.75. Do you
6   recall that testimony?
7       A   I do.
8       Q   Which is it?
9       A   Sure. So for each of my au pairs, all four
10  of them, the first I would say month, so the first
11  four to five weeks of paying the weekly stipend, it
12  started out at the $200 while they were getting
13  their Social Security card, their state ID or their
14  driver's license, and then eventually getting the
15  bank account set up.
16          And then at that point for all four of them
17  once the bank account was established, I set up an
18  automatic transfer from my checking account for
19  deposit only into their checking account for the
20  $195.75.
21      Q   Okay. If you would take a look at Exhibit
22  80, please. And again, directing your attention
23  about midway down the page, there's 3-I where it
24  says, "The weekly stipend is $195.75 as with all
25  agencies." Now, you have not worked for all

Page 113

1   agencies, have you?
2       A   I have not.
3       Q   So what is the basis for your statement, "as
4   with all agencies"? How can you say that?
5       A   Because the Department of State sets the
6   minimum threshold of the weekly stipend at $195.75,
7   and every Department of State authorized sponsor
8   agency has to comply with that minimum amount.
9       Q   And are you aware of any agreement among
10  sponsors to require host families to pay the same
11  amount as the stipend?
12      A   No, I'm not aware.
13          MS. SCHAECHER: That's what I have.
14              EXAMINATION
15  QUESTIONS BY MR. BENDER:
16      Q   Ms. Crompton, I have a few questions about
17  testimony you provided earlier. Do you recall being
18  asked if you've ever known an au pair to receive
19  more than the 195.75?
20      A   I do remember.
21      Q   And do you recall being asked if you've ever
22  personally known an au pair to receive in excess of
23  the 195.75 per week?
24      A   I remember.
25      Q   Ms. Crompton, are you in a position to know

MAGNA
LEGAL SERVICES

| Page 114 | Page 116 |
|---|---|
| 1 what an au pair is paid?<br>2    A In working at APF and with CHI I'm in a<br>3 position to know that -- I'm only in a position to<br>4 know when an au pair is being paid less than $195.75<br>5 or at least that amount. I would have no idea what<br>6 a host family would be paying if they were paying in<br>7 excess of 195.75.<br>8    Q Would the same be true for your time at<br>9 Cultural Care?<br>10    A I believe so. I was in a different capacity<br>11 there. I wasn't monitoring the placements as they<br>12 were on the ground. I was very much so on the<br>13 recruitment side of things, so I really wouldn't be<br>14 privy to that information really at all.<br>15    Q Understood. So at Cultural Care you<br>16 wouldn't have known one way or the other?<br>17    A No, no.<br>18    Q But at APF and at CHI, you would know if an<br>19 au pair had not been paid at all; correct?<br>20    A Correct.<br>21    Q But you would have no way of knowing what a<br>22 host family's arrangement was with an au pair, for<br>23 example, to pay in excess of the 195.75?<br>24    A Right, that's really their business. That<br>25 was a relationship between the host family and the | 1 minimum stipend of 195.75 per week?<br>2    A Correct.<br>3      MR. BENDER: I have nothing further.<br>4      MS. SCHAECHER: Counsel, did you have<br>5 questions?<br>6      MR. STONE: Yes. This is Larry Stone.<br>7         EXAMINATION<br>8 QUESTIONS BY MR. STONE:<br>9    Q Good afternoon, Ms. Crompton. How are you<br>10 today?<br>11    A I'm fine. Thank you.<br>12    Q Ms. Crompton, I represent two sponsors. The<br>13 first sponsor I represent goes by the legal name of<br>14 Apex American Professional Exchange, LLC.<br>15    A Okay.<br>16    Q Are you familiar with that sponsor?<br>17    A I'm not familiar with that name.<br>18    Q Okay. They also -- they do business as<br>19 PROaupair. Are you familiar with that name?<br>20    A I am familiar with that name, yes.<br>21    Q Okay. And then the second sponsor I<br>22 represent is 20/20 Care Exchange, Inc. doing<br>23 business as the International Au Pair Exchange.<br>24 Have you ever heard of that sponsor before?<br>25    A I haven't. |

| Page 115 | Page 117 |
|---|---|
| 1 au pair, so if they agreed that they were going to<br>2 pay her $250 a week, we wouldn't necessarily know<br>3 that because what we're checking for is that they're<br>4 being paid at least the minimum of 195.75.<br>5    Q Would the same be true for the hours worked?<br>6 In other words, as long as an au pair isn't working<br>7 in excess of 45 hours a week, would you be in a<br>8 position to know if she were working less?<br>9    A No.<br>10    Q So it's certainly possible that an au pair<br>11 could be working 25 or 30 hours a week for the<br>12 minimum stipend or in excess of that stipend; isn't<br>13 that right?<br>14    A Correct. Because the stipend, A, cannot be<br>15 withheld for any reason, and it's the full stipend.<br>16 The stipend can never be prorated, so if an au pair<br>17 works for five minutes, she gets $195.75, and I've<br>18 always said that.<br>19      And so the 20 hours a week, for example, I<br>20 would have no way of knowing. I would just know<br>21 that she's not working over 45 hours, and I would<br>22 also know that she's not working over 10 hours in a<br>23 given day. Other than that, I wouldn't know. She<br>24 could be working 15 minutes.<br>25    Q And she's still entitled at least to the | 1    Q Okay. Do you know whether you have ever had<br>2 any communications with either of those two<br>3 sponsors?<br>4    A I don't think so.<br>5    Q Do you have any knowledge whatsoever as to<br>6 what those two sponsors require host families to pay<br>7 au pairs?<br>8      MS. McELROY: Objection. Foundation.<br>9    A As far as a stipend? I would assume --<br>10    Q (By Mr. Stone) Yes.<br>11    A I would assume it's at least the minimum of<br>12 $195.75 for standard and 146.81 for EduCare.<br>13    Q Are you aware that PROaupair -- are you<br>14 aware of the professional au pair program --<br>15    A No.<br>16    Q -- and what that involves?<br>17    A Not specifically.<br>18    Q Okay. And are you aware of what PROaupair<br>19 requires host families to pay for professional<br>20 au pairs that it places?<br>21    A I'm not aware, no.<br>22    Q Let me direct your attention to Exhibit 80,<br>23 please.<br>24    A Okay.<br>25    Q I don't have that document in front of me. |

PLAINTIFFS' RESP. APP.0005128

**MAGNA**
LEGAL SERVICES

Page 118

1    Do you have it in front of you now?
2        A  I do.
3        Q  And is this exhibit dated October 24, 2013?
4        A  It is.
5        Q  There was some language that was quoted to
6    you, including the words, "as with all sponsors."
7    Do you see what I'm referring to?
8        A  I do.
9        Q  Could you read that into the record so that
10   I know exactly what that sentence states, please.
11       A  "The weekly stipend is $195.75 as with all
12   agencies."
13       Q  Do I understand correctly that what was
14   intended there was that the $195.75 stipend pertains
15   to the minimum amount of the stipend?
16       MS. McELROY:  Objection.  Form.
17       A  That is correct.
18       Q  (By Mr. Stone) So you're not aware whether
19   some agencies may pay their au pairs -- strike that.
20       You're not aware whether some agencies
21   require host families to pay more than that amount;
22   correct?
23       A  Yeah, I'm not aware.
24       Q  And in particular you're not aware whether
25   my two clients, PROaupair or 20/20, require host

Page 119

1    families to pay more for their au pairs; correct?
2        A  I am not aware.
3        Q  Do you have any knowledge whatsoever as to
4    what the website for PROaupair says with regard to
5    the stipend?
6        A  I am not.
7        Q  Are you aware of what 20/20's website says
8    with regard to the stipend?
9        A  I am not.
10       Q  And if I understand correctly, you're not
11   aware of any communications that you've ever had
12   with those two sponsors; is that correct?
13       A  No, not that I'm aware of, no.
14       Q  To your knowledge, have you had any
15   interaction with PROaupair regarding the stipend?
16       A  No.
17       Q  To your knowledge, have you had any
18   interaction with 20/20 regarding the stipend?
19       A  No.
20       Q  Do you know anyone that's employed by those
21   two sponsors?
22       A  I do not.
23       MR. STONE:  Thank you very much.  I'll pass
24   the questioning.
25       MR. BENDER:  Anyone else on the phone?

Page 120

1        MS. KOZAL:  Nothing for AuPairCare.  Thank
2    you.
3        MS. KRUZER:  Nothing for Cultural Care.
4    Thank you.
5        MR. STONE:  I do have one more series of
6    questions.
7        EXAMINATION CONTINUED
8    QUESTIONS BY MR. STONE:
9        Q  Mrs. Crompton, when you were being asked
10   questions by one of the defense attorneys, you
11   testified that you would only be in a position to
12   know if an au pair is being paid the minimum of
13   $195.75 or if they were being paid less than that.
14   Do you remember that testimony?
15       A  Yes, or if they were not being paid at all.
16       Q  You also testified you wouldn't know whether
17   they were being paid more than that.  You wouldn't
18   have reason to know that; is that correct?
19       A  That is correct.
20       Q  And why is it that you wouldn't have reason
21   to know that?
22       A  Because --
23       MS. McELROY:  Objection; form.
24       A  Because the minimum threshold that we --
25   that the sponsor agencies I worked for were

Page 121

1    concerned with was that they were being paid at
2    least the $195.75, which is required by the rules
3    and regs of the Department of State.
4        The monthly reporting, the weekly survey
5    that APF NFP did specifically asked if they were
6    being paid the weekly stipend of $195.75.  If they
7    said no, we were to assume that they either weren't
8    being paid at all or they were being paid $150, and
9    then we would follow up, talk to the au pair to
10   clarify, talk to the host family, have -- figure out
11   the solution, fix the problem.
12       We would have -- the question didn't ask,
13   What are you being paid?  We would have no reason to
14   know if she was being paid more.  That's not our
15   business.  That's a relationship between the host
16   family and the au pair, and at that point it's up to
17   the host family to decide to pay in excess of the
18   minimum stipend of $195.75.
19       Q  (By Mr. Stone) And are the sponsors charged
20   by the Department of State's -- Department of State
21   to inquire of the au pairs that they are being paid
22   at least the minimum of $195.75?
23       A  The obligations of the sponsor agencies, my
24   understanding is we are to ensure that the au pairs
25   that are participating on our particular program are

MAGNA
LEGAL SERVICES

Page 122

1   being paid at least $195.75.
2        Q   Because you don't inquire about the specific
3   amount that the au pair is being paid, that's the
4   reason why you wouldn't -- you wouldn't -- by
5   sending out these inquiries to au pairs, you
6   wouldn't know if in fact the au pairs are being paid
7   more than the minimum amount of the stipend?
8        MS. McELROY:  Objection.  Form; foundation.
9        A   That is correct.
10       Q   (By Mr. Stone) So for example, for that
11  reason and because you've had no communications with
12  my two sponsor clients, you would have no knowledge
13  about what they require of host families to pay for
14  their au pairs; correct?
15       MS. McELROY:  Objection; form.
16       A   That is correct.
17       MR. STONE:  Thank you very much,
18  Ms. Crompton.
19       MS. McELROY:  I do have a few additional
20  questions, but I need two or three minutes to
21  collect some exhibits.
22            EXAMINATION CONTINUED
23  QUESTIONS BY MS. McELROY:
24       Q   Ms. Crompton, I would like to return to
25  Exhibit 80.  I'm going to refer your attention back

Page 123

1   to the statement halfway down the page that says,
2   "The weekly stipend is $195.75 as with all
3   agencies."  Earlier you testified --
4        MR. STONE:  What document are you referring
5   to, Counsel?
6        MS. McELROY:  Exhibit 80.  Do you need the
7   Bates number?
8        MR. STONE:  I've got it.
9        Q   (By Ms. McElroy) Earlier you testified with
10  respect to the statement that you meant that the
11  minimum weekly stipend was $195.75; is that correct?
12       A   Yes.
13       Q   Can you point me to where in this e-mail you
14  use the word -- is there anywhere in this e-mail
15  where you use the word "minimum"?
16       A   No.
17       Q   Can you point me to anywhere in this e-mail
18  where you express to the prospective host father
19  that the stipend is a minimum?
20       A   No.
21       Q   Did you have any additional phone
22  conversations with this host father about the
23  stipend?
24       A   This is an e-mail.  I don't know that I ever
25  talked to him.

Page 124

1        Q   Let me rephrase.  Do you recall any phone
2   conversations with this host father after this
3   e-mail about the stipend?
4        A   I don't recall.
5        Q   Do you recall any additional e-mail
6   exchanges with this host father about the stipend?
7        A   I don't recall.
8        Q   So sitting here today, you're not in a
9   position to testify whether or not you ever
10  clarified for this host father that what you meant
11  was that the stipend was a minimum?
12       A   That is true.
13       Q   You also testified earlier that you're not
14  aware of any agreement among the sponsors to set the
15  stipend at $195.75; is that correct?
16       A   That is correct.
17       Q   However, you're not in a position to know
18  whether or not there's an agreement among the
19  sponsors to set the stipend at $195.75; is that
20  correct?
21       A   Can you repeat that?
22       Q   You're not in a position to know whether or
23  not there's an agreement among the sponsors to set
24  the stipend at $195.75; correct?
25       MR. STONE:  Objection.  Form and foundation.

Page 125

1        MS. KRUZER:  Join in the objection.
2        MS. KOZAL:  Join in the objection.
3        A   I don't know whether I have ever been in a
4   position to know or not know.  I don't know.
5        Q   (By Ms. McElroy) Is it fair to say you don't
6   know whether or not you're in a position -- never
7   mind.  Strike that.
8            So you don't know whether or not there's an
9   agreement among the sponsors to set the stipend at
10  $195.75?
11       A   I'm not aware that there's any agreement.
12       Q   If there were such an agreement, can you say
13  with certainty that you would know about it?
14       MS. KOZAL:  Objection to form and
15  foundation.
16       MR. STONE:  Objection to form.
17       MS. KRUZER:  Join.
18       A   I think that in some of my roles if there
19  had been an agreement, I think I would have known.
20       Q   (By Ms. McElroy) And on what basis would you
21  know about that agreement?
22       A   I would have been told by my superiors or --
23  if there was an agreement, yeah, I think I would
24  have known.  I would have been told.
25       Q   Are you certain or you think that you would

PLAINTIFFS' RESP. APP.0005130

MAGNA
LEGAL SERVICES

| Page 126 | Page 128 |
|---|---|

**Page 126**

1  have known?
2      A  I can't be certain of anything.
3          MR. STONE:  Objection; form.
4          MR. BENDER:  Object to the form.
5      Q  (By Ms. McElroy) And when you say -- strike
6  that.
7          Would you be aware of an agreement among
8  some of the sponsors to set the stipend at $195.75?
9          MR. BENDER:  Object to the form.
10         MS. KRUZER:  Objection.
11         MR. STONE:  Objection.
12         MS. KOZAL:  Same objection.
13     A  I don't know.
14     Q  (By Ms. McElroy) While you worked at
15  Cultural Care, do you think you would have been
16  aware of whether or not Cultural Care was part of an
17  agreement with other sponsors to set the stipend at
18  $195.75?
19     A  Given my role and my position there,
20  probably not.
21     Q  Are you aware of any sponsor that advertises
22  a higher weekly stipend for -- let me rephrase.
23         Are you aware of any sponsor that advertises
24  a weekly stipend for au pairs that's higher than
25  $195.75?

**Page 128**

1      A  That is correct.
2      Q  (By Mr. Stone) And if some sponsors do
3  require payment of a greater amount, that's just
4  something you're not aware of; correct?
5      A  That is correct.
6          MR. STONE:  Thank you.
7          MS. SCHAECHER:  Nothing further.
8          MS. McELROY:  Nothing further.
9          MR. BENDER:  Nothing further.
10         MS. SCHAECHER:  Off the record.
11         MR. BENDER:  We'll read and sign.  You can
12  send it to me, actually.
13         (Deposition concluded at 2:17 p.m.)

**Page 127**

1      A  I'm not.
2          MS. McELROY:  That's all that I have.
3          MR. STONE:  This is Larry Stone.  One
4  follow-up question on that last question.
5          EXAMINATION CONTINUED
6  QUESTIONS BY MR. STONE:
7      Q  The fact that you're not aware of other
8  sponsors who may pay more than the minimum amount
9  for the stipend doesn't mean that some sponsors
10  don't pay -- require payment of more; correct?
11         MS. McELROY:  Objection; form.
12     A  Yeah, that's correct.
13     Q  (By Mr. Stone) So you testified that --
14         (Discussion off the record.)
15         MS. McELROY:  Could you repeat your
16  question, please.  We were interrupted by the
17  automated message.
18         MR. STONE:  Yes, give me one second.
19     Q  (By Mr. Stone) What you testified to is
20  you're not aware that others may pay more than --
21  strike that.
22         What you testified to is that you're not
23  aware that some sponsors require host families to
24  pay more than the minimum stipend; correct?
25         MS. McELROY:  Objection; form.

**Page 129**

1  State of Missouri
2                 SS.
3  County of St. Louis
4      I, Kristine A. Toennies, a Notary Public in and
5  for the State of Missouri, duly commissioned,
6  qualified and authorized to administer oaths and to
7  certify to depositions, do hereby certify that
8  pursuant to Notice in the civil cause now pending
9  and undetermined in the United States District Court
10  for the District of Colorado, to be used in the
11  trial of said cause in said court, I was attended at
12  the offices of GorePerry Reporting & Video, 515
13  Olive Street, Suite 300, in the City of St. Louis,
14  State of Missouri, by the aforesaid attorneys; on
15  the 22nd day of September, 2016.
16         The said witness, being of sound mind and being
17  by me first carefully examined and duly cautioned
18  and sworn to testify the truth, the whole truth, and
19  nothing but the truth in the case aforesaid,
20  thereupon testified as is shown in the foregoing
21  transcript, said testimony being by me reported in
22  shorthand and caused to be transcribed into
23  typewriting, and that the foregoing pages correctly
24  set forth the testimony of the aforementioned
25  witness, together with the questions propounded by

PLAINTIFFS' RESP. APP.0005131

33 (Pages 126 to 129)

MAGNA
LEGAL SERVICES

```
                                                      Page 130
 1    counsel and remarks and objections of counsel
 2    thereto, and is in all respects a full, true,
 3    correct and complete transcript of the questions
 4    propounded to and the answers given by said witness;
 5    that signature of the deponent was not waived by
 6    agreement of counsel.
 7         I further certify that I am not of counsel or
 8    attorney for either of the parties to said suit, not
 9    related to nor interested in any of the parties or
10    their attorneys.
11         Witness my hand and notarial seal at St. Louis,
12    Missouri, this 30th day of September, 2016.
13    My Commission expires February 13, 2018.
14
15    _____
16         Notary Public in and for the
17           State of Missouri
18
19
20
21
22
23
24
25
```

```
                                                      Page 131
 1    Comes now the witness, CARRIE CROMPTON,
 2    and having read the foregoing transcript
 3    of the deposition taken on 9/22/2016,
 4    acknowledges by signature hereto that it is a
 5    true and accurate transcript of the testimony given
 6    on the date hereinabove mentioned.
 7
 8
 9    _____
10    CARRIE CROMPTON
11
12    Subscribed and sworn to me before this
13    _____ day of _____,20_____.
14    My Commission expires
15
16
17    _____
18    Notary Public
19
20
21
22
23
24
25
```

PLAINTIFFS' RESP. APP.0005132

MAGNA
LEGAL SERVICES

# Exhibit 441

PLAINTIFFS' RESP. APP.0005133

*Johana Paola Beltran, et al. vs.*

*Interexchange, Inc., et al.*

---

*Video Teleconferenced Deposition of Sarah Carolina Azuela*

*March 03, 2017*

---



700 17th Street, Suite 1750
Denver, CO 80202
303-988-8470 (Office)  303-988-8478 (Fax)
SKReporting.com

PLAINTIFFS' RESP. APP.0005134

Case No. 1:14-cv-03074-CMA-KMT   Document 959-25   filed 03/17/18   USDC Colorado   pg 1 of 7
Case 1:14-cv-03074-CMA-KMT   Document 1039-25   Filed 09/17/18   USDC Colorado   Page 307 of 701
308 of 701

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Video Teleconferenced Deposition of Sarah Carolina Azuela
March 03, 2017

**Page 1**

```
 1    UNITED STATES DISTRICT COURT
      DISTRICT OF COLORADO
 2    -----------------------------------------X
      JOHANA PAOLA BELTRAN, et al.,
 3
                             PLAINTIFFS,
 4
 5        -against-       Case No.:
                          1:14-cv-03074-CMA-KMT
 6
      INTEREXCHANGE, INC., et al.,
 7
                             DEFENDANTS.
 8    -----------------------------------------X
 9
10              DATE: March 3, 2017
11              TIME: 9:04 A.M
12
13
14           VIDEO TELECONFERENCED DEPOSITION of
15    the Plaintiff, SARAH CAROLINA AZUELA, taken by the
16    Defendants, pursuant to a Notice and to the Federal
17    Rules of Civil Procedure, held at the offices of
18    Boies, Schiller & Flexner, LLP, 575 Lexington Avenue,
19    New York, New York 10022, before Suzanne Pastor, a
20    Notary Public of the State of New York.
21
22
23
24
25
```

**Page 2**

```
 1    A P P E A R A N C E S:
 2
 3    BOIES SCHILLER & FLEXNER, LLP
           Attorneys for the Plaintiffs
 4         575 Lexington Avenue
           New York, New York 10022
 5         BY:  JOSHUA LIBLING, ESQ.
           212.446.2381
 6         jlibling@bsfllp.com
 7
      CHOATE HALL & STEWART, LLP
 8         Attorneys for the Defendant
           CULTURAL CARE, INC., d/b/a CULTURAL CARE AU PAIR
 9         Two International Place
           Boston, Massachusetts 02110
10         BY:   JUSTIN J. WOLOSZ, ESQ.
                 617.248.5221
11               jwolosz@choate.com
                    -and-
12               LYNDSEY M. KRUZER, ESQ.
                 617.248.4790
13               lkruzer@choate.com
14
      GORDON & REES
15         Attorneys for the Defendant
           AU PAIR CARE
16         555 Seventeenth Street, Suite 3400
           Denver, Colorado 80202
17         BY: PEGGY E. KOZAL, ESQ.
           303.200.6888
18         pkozal@gordonrees.com
           (Via Teleconference)
19
20    SHERMAN & HOWARD LLC
           Attorneys for the Defendant
21         INTEREXCHANGE, INC.
           633 Seventeenth Street, Suite 3000
22         Denver, Colorado 80202
           BY: BROOKE A. COLAIZZI, ESQ.
23         303.299.8471
           bcolaizzi@shermanhoward.com
24         (Via Teleconference)
25    (Continued on next page.)
```

**Page 3**

```
 1    A P P E A R A N C E S: (Continued)
 2
 3    FISHER & PHILLIPS, LLP
           Attorneys for Defendant
 4         APF GLOBAL NFP
           1801 California Street, Suite 2700
 5         Denver, Colorado 80202
           BY:  SUSAN SCHAECHER, ESQ.
 6         303.218.3676
           sschaecher@fisherphillips.com
 7         (Via Teleconference)
 8
 9    LEWIS ROCA ROTHGERBER CHRISTIE, LLP
           Attorneys for Defendant
10         CULTURAL CARE, INC.
           1200 Seventeenth Street, Suite 3000
11         Denver, Colorado 80202
           BY:  JESSICA L. FULLER, ESQ.
12         303.628.9527
           jfuller@lrrc.com
13         (Via Teleconference)
14
15    BOGDAN ENICA, ESQ.
           Attorney for Defendant
16         EXPERT GROUP INTERNATIONAL, INC., d/b/a
           EXPERT AU PAIR
17         111 Second Avenue, N.E., Suite 204
           St. Petersburg, Florida 33701
18         BY:  BOGDAN ENICA, ESQ.
           727.388.3472
19         bogdane@hotmail.com
           (Via Teleconference)
20
21
           (Continued on next page.)
22
23
24
25
```

**Page 4**

```
 1    A P P E A R A N C E S: (Continued)
 2
 3    NIXON SHEFRIN HENSEN OGBURN, P.C.
           Attorneys for Defendants
 4         20/20 CARE EXCHANGE, INC., d/b/a
           THE INTERNATIONAL AU PAIR EXCHANGE, and APEX
 5         AMERICAN PROFESSIONAL EXCHANGE, LLC d/b/a
           PRO AU PAIR
 6         5619 DTC Parkway, Suite 1200
           Greenwood Village, Colorado 80111
 7         BY:  MICHAEL S. DREW, ESQ.
           303.874.3410
 8         mdrew@nixonshefrin.com
           (Via Teleconference)
 9
10
11
12    ALSO PRESENT:
           ROBERT HORGAN, Videographer
13
14
15
16
17             *      *      *
18
19
20
21
22
23
24
25
```

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Video Teleconferenced Deposition of Sarah Carolina Azuela
March 03, 2017

Page 5

E X H I B I T S

DEFENDANT EXHIBITS

| EXHIBIT NUMBER | EXHIBIT DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 153 | Notice of Deposition | 10 |
| Exhibit 154 | Response to Discovery Requests | 17 |
| Exhibit 155 | Declaration of Sara Carolina Azuela | 19 |
| Exhibit 156 | Excel Spreadsheet | 33 |
| Exhibit 157 | Excel Spreadsheet | 35 |
| Exhibit 158 | CC 5982 through 5999 | 37 |
| Exhibit 159 | CC 6126 | 55 |
| Exhibit 160 | CC 6044 through 6048 | 75 |
| Exhibit 161 | CC 6129 through 6131 | 77 |
| Exhibit 162 | AZUELA 55 through 76 | 103 |
| Exhibit 163 | Excerpts, Second Amended Complaint | 124 |
| Exhibit 164 | Facebook Messages | 127 |
| Exhibit 165 | AZUELA 102 through 125 | 152 |
| Exhibit 166 | AZUELA 86 through 89 | 155 |

Page 7

F E D E R A L   S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and between the counsel for the respective parties herein that the sealing, filing and certification of the within deposition be waived; that the original of the deposition may be signed and sworn to by the witness before anyone authorized to administer an oath, with the same effect as if signed before a Judge of the Court; that an unsigned copy of the deposition may be used with the same force and effect as if signed by the witness, 30 days after service of the original & 1 copy of same upon counsel for the witness.

IT IS FURTHER STIPULATED AND AGREED that all objections except as to form, are reserved to the time of trial.

*     *     *     *

Page 6

I N D E X

| EXAMINATION BY | PAGE |
|---|---|
| MR. WOLOSZ | 9 |
| MR. DREW | 163 |
| MS. COLAIZZI | 167 |
| MS. KOZAL | 176 |
| MR. LIBLING | 181 |
| MR. WOLOSZ | 183 |

INFORMATION AND/OR DOCUMENTS REQUESTED

(None)

QUESTIONS MARKED FOR RULINGS

(None)

Page 8

1    THE VIDEOGRAPHER:  We are now on the
2  record.  The time is 9:04 a.m. on March 3rd,
3  2017.  My name is Robert Horgan, legal
4  videographer with Diamond Reporting and Legal
5  Video based in Brooklyn, New York.
6    This is the deposition of Sarah Carolina
7  Azuela taken on behalf of defendant.  This
8  deposition is being held at the offices of
9  Boies Schiller & Flexner, LLP, 575 Lexington
10  Avenue, New York, New York in the United States
11  District Court for the District of Colorado.
12  The caption of the case is Joanna Paola
13  Beltran, et al., plaintiffs, versus
14  InterExchange, Inc., et al., defendants, Civil
15  Action No. 1:14-CV-03074.
16    Will counsel now please identify
17  themselves, their firms and the parties they
18  represent.
19    MR. WOLOSZ:  This is Justin Wolosz from
20  the law firm of Choate Hall & Stewart with my
21  colleague Lyndsey Kruzer.  We represent
22  defendant Cultural Care.  And also with me is
23  our translator Hugo Bonillo.
24    MR. LIBLING:  Joshua Libling from Boies,
25  Schiller & Flexner representing the plaintiffs

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Video Teleconferenced Deposition of Sarah Carolina Azuela
March 03, 2017

Page 9

1    and the witness.
2         THE VIDEOGRAPHER:  Counsel on the phone?
3         MR. WOLOSZ:  That's fine, we can put
4    them on the paper record to save time.  Is that
5    all right with you?
6         MR. LIBLING:  That's fine.
7         THE VIDEOGRAPHER:  The court reporter is
8    Sue Pastor with Diamond Reporting.  Ms. Pastor,
9    please swear in the witness.
10   S A R A H   C A R O L I N A   A Z U E L A, called as a
11   witness, having been first duly sworn by a Notary
12   Public of the State of New York, was examined and
13   testified as follows:
14   EXAMINATION BY
15   MR. WOLOSZ:
16        MR. WOLOSZ:  Shall we begin?
17        MR. LIBLING:  Absolutely.
18   Q.    Good morning again, Ms. Azuela.
19   A.    Good morning.
20   Q.    As I mentioned to you when we met a few
21   moments ago, my name is Justin Wolosz and I represent
22   defendant Cultural Care.  Do you understand that
23   you're here today for your deposition?
24   A.    Yes.
25   Q.    Have you ever been deposed before?

Page 10

1    A.    No.
2    Q.    Have you ever been to a deposition
3    before?
4    A.    No.
5         (Exhibit 153 marked for identification.)
6    Q.    I'm going to ask the court reporter to
7    hand you what has been marked as Exhibit 153.  Have
8    you seen this document before?
9    A.    No.  This is the first time.
10   Q.    Okay, this is a notice of deposition
11   which is the notice that alerted your counsel and
12   through your counsel to you presumably that your
13   deposition would be taking place here today.  Do you
14   understand that you are appearing here today pursuant
15   to this notice?
16   A.    Yes.
17   Q.    The way the deposition will work is that
18   I'll ask questions, and it's a question and answer
19   format.  So I'll ask questions and you'll need to give
20   answers.  Do you understand?
21   A.    Yes.
22   Q.    And then some of the other lawyers,
23   including your own, may ask some questions as well
24   when I finish.  Because what we say is being recorded
25   both on video and being transcribed, it's important

Page 11

1    that we both answer orally; that is, we say out loud
2    what the answer is.  Sometimes head nods or things
3    like that are very difficult to pick up, both on the
4    video but particularly on the transcript.  So we need
5    to answer questions orally.  Do you understand?
6    A.    Yes.
7    Q.    I'm going to ask you to please listen to
8    each question before answering.  If at any point you
9    don't understand a question, please just tell me and
10   I'll be happy to rephrase or try to state it in a
11   different way that makes it easier to understand,
12   okay?
13   A.    Okay.
14   Q.    Also, let me know if you want to take a
15   break at any point.  We're happy to do that.
16        Aside from -- you said you've never been
17   deposed before, correct?
18   A.    Correct.
19   Q.    Have you ever given sworn testimony for
20   any kind of a court proceeding before, like an
21   affidavit or something in writing?
22   A.    No.
23   Q.    Did you prepare in any way for this
24   deposition today?
25   A.    Yes.

Page 12

1    Q.    How did you prepare?
2    A.    Yesterday I came here and talked with my
3    lawyer.
4    Q.    How long did you meet?
5    A.    Around three hours.
6    Q.    You said you talked with your lawyer.  Who
7    specifically was there?
8    A.    It was him and Don Smalls.
9    Q.    Did you look at documents during that
10   meeting?
11   A.    Yes.
12   Q.    What documents did you look at?
13        MR. LIBLING:  Sorry, I'm going to -- why
14   are you asking that question?  It's starting to
15   become privileged.
16        MR. WOLOSZ:  I don't agree.  I think
17   it's a perfectly legitimate question.
18        MR. LIBLING:  Well, I'm going to
19   instruct the witness not to answer what
20   documents were shown her by her counsel during
21   preparation for the deposition.
22        MR. WOLOSZ:  Okay, will you at least
23   represent to me that all documents she looked
24   at are documents that have been produced in the
25   case?

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Video Teleconferenced Deposition of Sarah Carolina Azuela
March 03, 2017



Page 13

1       MR. LIBLING:  Yes.
2     Q.    Did you have any other conversations in
3  preparation for the deposition besides that meeting
4  yesterday?
5     A.    What do you mean with preparation with
6  the deposition?
7     Q.    Did you have any telephone conversations
8  to prepare for the deposition?
9     A.    To specifically prepare for the
10  deposition?
11    Q.    Yes.
12    A.    No.
13    Q.    Did you talk to anyone else about the
14  deposition beside your attorneys?
15    A.    Yes.
16    Q.    Who did you talk to about the deposition?
17    A.    My husband.
18    Q.    Anyone else?
19    A.    No.
20

Page 14

1

Page 15

9     Q.    Now, I know that we've referred to you as
10  Ms. Azuela.  I spoke to your attorney earlier because
11  I was a little confused about your name.  But your
12  full name is Sarah Carolina Azuela Rascon, is that
13  right?
14    A.    Rascon, yes.
15    Q.    But you go by Ms. Azuela, is that right?
16    A.    It's right.  I go for several names.
17    Q.

Page 16

1

PLAINTIFFS' RESP. APP.0005138

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Video Teleconferenced Deposition of Sarah Carolina Azuela
March 03, 2017



**Page 17**

1 ▮▮▮▮

23      MR. WOLOSZ: Could we mark this as
24   Exhibit 154.
25      (Exhibit 154 marked for identification.)

**Page 18**

1     Q.   Do you recognize Exhibit 154?
2     A.   Yes.
3     Q.   What is this document? It's okay if you
4   don't know the formal title. Do you understand that
5   this is a document that was prepared in connection
6   with this litigation?
7     A.   Yes.
8     Q.   And is this a document you've seen
9   before?
10     A.   Yes.
11     Q.   Were you involved in the preparation of
12   this document?
13     A.   Yes.
14     Q.   If you flip to starting on page 5, you'll
15   see that there are a set of questions called
16   interrogatories, and then there's a response to each
17   question. Do you see that?
18     A.   Yes.
19     Q.   Were you involved in the preparation of
20   these responses?
21     A.   Yes.
22     Q.   And in fact, are these your responses?
23     A.   Yes.
24      MR. WOLOSZ: Can we mark this as Exhibit
25   155, please.

**Page 19**

1      (Exhibit 155 marked for identification.)
2     Q.   Now, do you recognize Exhibit 155?
3     A.   Yes.
4     Q.   Do you understand this is a declaration
5   that has been signed by you?
6     A.   Yes.
7     Q.   And in this declaration you're swearing
8   under penalty of perjury that the answers in Exhibit
9   154 are true and correct to the best of your
10   knowledge, information and belief, is that right?
11     A.   Yes.
12     Q.   Now, if we turn to Exhibit 154, the
13   interrogatories, and if we flip to interrogatory
14   number 9, which is on page 12, it lists your work
15   history. You're welcome to follow along with this if
16   you'd like, if that's helpful, but I want to just ask
17   about each of the jobs that you previously had,
18   starting first with the jobs that you had before you
19   became an au pair. ▮▮▮▮

24     Q.   Sorry, for what?
25     A.   I think I want the interpreter here. ISO

**Page 20**

1 9000.
2 ▮▮▮▮

PLAINTIFFS' RESP. APP.0005139

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Video Teleconferenced Deposition of Sarah Carolina Azuela
March 03, 2017



10    Q.    You were an au pair from January 2014
11  through December 2015, is that right?
12    A.    Yes.
13    Q.    And what about since you were an au pair,
14  can you tell us what jobs you've had, if any?
15    A.    Well, while I was an au pair?
16    Q.    No, after.
17    A.    Oh, after.
18    Q.    Yes.
19    A.

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Video Teleconferenced Deposition of Sarah Carolina Azuela
March 03, 2017



Page 25

Page 26

19    Q.    Were you an au pair anywhere else before
20  you became an au pair in the United States?
21    A.    No.
22    Q.    How did you first learn about the au pair
23  program?
24    A.    I saw an advertisement when I was walking
25  out the school.  It was in the -- in a board, an

Page 27

1   advertisement, pink, that said the best years of your
2   life, you can have the best years of your life.  So
3   that's what I remembered.  It came with a number so I
4   call it.
5     Q.    You said it was at your school?
6     A.    Yes.
7     Q.    And it was like a poster?
8     A.    Yes.
9     Q.    Did you know anyone else at that point
10  who had participated in the au pair program?
11    A.    No.
12    Q.    So describe what happened when you called
13  the number.  Just describe the conversation.
14    A.    Well, I remember that I asked what is it
15  about, they told me basically child care and that we
16  can set up a meeting to tell me more about it.
17    Q.    Okay, so not much detail in that first
18  phone conversation?
19    A.    No, not much detail.
20    Q.    And what did you do next?
21    A.    Set up the appointment.
22    Q.    Where did the appointment take place?
23    A.    In the house of this lady.
24    Q.    Who is the lady?
25    A.    Sandra.

Page 28

1     Q.    Sandra, do you remember her last name?
2     A.    Santos.
3     Q.    And where did Ms. Santos live?
4     A.    In Hermosillo.
5     Q.    Do you know anything about Ms. Santos'
6   background?
7     A.    Before I met her?
8     Q.    Was she an au pair herself?  Do you know?
9     A.    Yes.
10    Q.    Did she tell you about that?
11    A.    Generally speaking.
12    Q.    So just describe to me what happened when
13  you met with her.  You set up an appointment and then
14  you said you went to her house?
15    A.    Yes.
16    Q.    How long did you meet with her about?
17    A.    I don't remember.
18    Q.    Any idea at all?
19    A.    Around an hour, two hours.
20    Q.    And did she describe the au pair program
21  to you?
22    A.    Yes.
23    Q.    What do you recall her saying about the
24  au pair program?
25    A.    I remember that she said that it wasn't

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Video Teleconferenced Deposition of Sarah Carolina Azuela
March 03, 2017



**Page 29**

1   that hard, that it's just taking care of kids.  And if
2   you have done it before, you probably already know how
3   to do it.  That you have to take care of the kids'
4   stuff, and like clean after themself.  Everything
5   related to the children.
6      Q.   Do you recall any discussion of the
7   stipend that you would receive for being an au pair?
8      A.   I don't know what is the stipend.
9      Q.   The money that you would receive for
10  being an au pair.
11     A.   Oh.  Can you repeat the question again,
12  please.
13     Q.   Yes.  Do you recall whether in that
14  conversation with Ms. Santos there was any discussion
15  about how much money you would receive in connection
16  with the au pair program?
17     A.   Yes.
18     Q.   What do you remember about that
19  discussion?
20     A.   I remember that she said I was gonna earn
21  196.
22     Q.   Anything else?
23     A.   She told me the hours that I was
24  working -- that I needed to work.
25     Q.   And what did she say about that?

**Page 30**

1      A.   That I have to work around 40 hours and
2   sometimes less.
3      Q.   The amount which you said was $196, did
4   she say that was the most you could earn or did she
5   say that that was the minimum you could earn?
6         MR. LIBLING:  Objection to form.
7      A.   She just said this number.
8      Q.   But she didn't say that there was no
9   chance of earning more.
10     A.   She said that she sometimes earned more.
11     Q.   That she sometimes was paid more in her
12  own experience?
13     A.   Yes, in her own experience.
14     Q.   Was there discussion with her of the
15  cultural benefits of the program?
16     A.   I don't really understand the question.
17  Like, I need something more.
18     Q.   The phrase "cultural benefits," is that
19  the part that you don't understand?
20     A.   Yeah.
21     Q.   Was there discussion about the new
22  experiences you would have if you took part in the
23  program?
24     A.   She told me that you can meet new
25  friends, new people from all over the world.

**Page 31**

9      Q.   And it says you did not accept the offer
10  because you wanted to travel to and experience life in
11  the United States, is that right?
12     A.   Yes.

**Page 32**

24     Q.   It says here that you did not accept the
25  scholarship because you wanted to travel and practice

PLAINTIFFS' RESP. APP.0005142

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Video Teleconferenced Deposition of Sarah Carolina Azuela
March 03, 2017

Page 33

1 English, is that right?
2     A.    Yes.
3     Q.    If we can just take a moment with these
4 interrogatories, I want to make sure that I understand
5 some other documents that we received.
6           MR. WOLOSZ:  Could we mark this as
7 Exhibit 156.
8           (Exhibit 156 marked for identification.)
9     Q.    Now, Ms. Azuela, let me just explain
10 something.
11    A.    Mm-hmm.
12    Q.    We received from your lawyer some
13 documents that were produced by you, and two of the
14 documents, this is one of them, were Excel
15 spreadsheets.  It's very difficult to look at an Excel
16 spreadsheet in print, so we had to do a couple things
17 to it.  We didn't change the content, but we did was
18 we formatted it so that it would print, we added the
19 title of the file on the top here as like a title.
20    A.    Mm-hmm.
21    Q.    And then on the bottom on the right we
22 added the title of the tab.  You're familiar with tabs
23 in Excel?
24    A.    Kind of.
25    Q.    Because otherwise we wouldn't be able to

Page 34

1 tell which part of it is which.  But we did not change
2 the content.
3           Now, with that explanation, are you
4 familiar with --
5           MR. LIBLING:  Sorry, just before you ask
6      your question, was there content in the Excel
7      that is not in this printout?
8           MR. WOLOSZ:  No.
9           MR. LIBLING:  I was just asking because
10     it looks like some tabs -- like there's no tab
11     1 and there's no tab 5.
12          MR. WOLOSZ:  That's right.
13          MR. LIBLING:  Okay.  And no tab 9.
14          MR. WOLOSZ:  That's exactly how it was
15     produced to us.
16    Q.    So with that explanation, and now that
17 you understand that we added a couple of things, do you
18 recognize the content of this document?
19    A.    Yes.
20    Q.    What is this?
21    A.    I will not know how to say the name of
22 it, but it's the amounts that I was paid.
23    Q.    Well, that's in the beginning.
24    A.    Yes.
25    Q.    Stepping back for a minute, the whole

Page 35

1 file itself, is this something that you put together?
2     A.    Yes.
3     Q.    And is this something that you put
4 together when you were responding to the
5 interrogatories we looked at a moment ago?
6     A.    Yes.
7     Q.    So in the bottom right where it says
8 number 2, payments, again, we added that but we took
9 it from the spreadsheet.  Is that because it refers to
10 interrogatory number 2?  We can flip to it in Exhibit
11 154 if you'd like.  I'll just tell you I believe
12 that's what it is.  I just want to make sure that I'm
13 right.
14    A.    Yes.
15    Q.    So I want to make sure I understand this.
16 After you received the interrogatories, you put
17 together the spreadsheet that provided information to
18 respond to the interrogatories, is that right?
19    A.    Yes.
20          MR. WOLOSZ:  And then if we could mark
21     this as Exhibit 157.
22          (Exhibit 157 marked for identification.)
23    Q.    To save time, I'll just tell you this
24 appears to be the same thing, except there were a few
25 things that are a little bit different.  It's a

Page 36

1 slightly different version.  Is it your recollection
2 that you prepared two different versions of these?
3     A.    It's probably the same thing but if -- I
4 had more time to remember or I just sleep and wake up
5 remembering more stuff so I put it there, basically.
6 It's hard to remember two years before.  Sometimes
7 it's hard to remember what you did yesterday, so it's
8 basically that.
9     Q.    So to the best of your knowledge, it's
10 just a slightly later version, is that right?
11    A.    Yes.
12    Q.    I'll have some questions about this in a
13 minute.  I just wanted to make sure that I understood
14 what the document was.
15          All right, so after you met with
16 Ms. Santos, can you tell us what happened next in your
17 application process to become an au pair?
18    A.    I collect a couple of documents and then
19 I gave them to her.  That's what I remember the most.
20    Q.    When did you actually decide that you
21 wanted to go forward and become an au pair?
22    A.    In 2013.
23    Q.    Was it during that conversation with
24 Ms. Santos or after or before?
25    A.    After.

Case No. 14-cv-03074-CMA-KMT   Document 1059-25   Filed 09/17/18   USDC Colorado   Page 317 of 701

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Video Teleconferenced Deposition of Sarah Carolina Azuela
March 03, 2017

Page 37

1    Q.    So after learning about the program from
2  her, you thought about it and decided that you did
3  want to go forward?
4    A.    Yes.
5    Q.    Did you speak with anyone else on behalf
6  of Cultural Care other than Ms. Santos before you made
7  the decision to go forward?
8    A.    If I speak with someone?
9    Q.    Anyone else on behalf of Cultural Care
10  besides Ms. Santos.
11    A.    No.
12    Q.    Now, at some point you prepared an
13  application, correct?
14    A.    Yes.
15       MR. WOLOSZ:  Could we mark this as 158.
16       (Exhibit 158 marked for identification.)
17    Q.    Is Exhibit 158 the application that you
18  prepared in connection with your participation in the
19  au pair program?
20    A.    Looks like it.  It looks like the
21  application.
22    Q.    Okay.  Let's look at the first page if
23  you would, and specifically the top paragraph where it
24  says "why I want to be an au pair."  Do you see that?
25    A.    Mm-hmm.

Page 38

1    Q.    The response to that question, is that
2  something that you wrote?
3    A.    It looks like something that I wrote.
4    Q.    What do you mean it looks like something
5  that you wrote?
6    A.    Because I cannot remember things clearly.
7    Q.    Do you have any reason to think that you
8  didn't write it?
9    A.    No.
10    Q.    If we look in that paragraph it says
11  here, "I want to be an au pair because I love
12  children."  Do you see that?
13    A.    Yes.
14    Q.    Is that right?  Do you love children?
15    A.    Yes.
16    Q.    And if we follow along, it talks about
17  children for a while.  And then it says, "I also want
18  to practice my English."  Do you see that?  Near the
19  bottom of that paragraph.
20    A.    Yes.
21    Q.    What did you mean by that?
22    A.    I have been studying since kindergarten
23  English.  I don't think I have ever stopped studying
24  it, so I wanted to practice.  It sounded like a good
25  idea having an international trade degree.

Page 39

1    Q.    And you thought that being in the au pair
2  program with an English-speaking family would be a
3  good way to practice English, right?
4       MR. LIBLING:  Objection to form.
5    A.    The easiest way.
6    Q.    To practice.  Yes?
7    A.    Yeah.
8    Q.    And then it also says "and be part of
9  other culture."  What did you mean by that?
10    A.    To know about this culture.
11    Q.    The American culture?
12    A.    Yes.
13    Q.    Now, this paragraph kind of sets forth
14  what you would say are the most important reasons why
15  you wanted to become an au pair, right?
16    A.    Mm-hmm.
17       MR. LIBLING:  Objection to form.
18    Q.    It's kind of a summary of the most
19  important reasons, right?
20       MR. LIBLING:  Objection to form.
21    A.    You can say it's a summary.
22    Q.    Do you agree or disagree that it's a
23  summary of the --
24    A.    Well, it's why I wanted to be an au pair.
25    Q.    The paragraph does not say that you want

Page 40

1  to be an au pair to make money, right?
2    A.    No.
3    Q.    And it does not say you want to be an au
4  pair to save money.
5    A.    No.
6  ███████████████████████████████████████
   ████████████████████████████████
7  ███████████████████████
8  ██████████████████████████████████████████
9  ██████████████
10  █████████████████████████████████
11  ████████████████████████
12  ███████████████████████████████████
13  ████████
14  ███████████████████████████████████████████
15  ██████████████████████
16  █████████████████
17  ████████████████████████████████████
18  █████████████████████
19  ███████████████████████  knew that if you became an au
20  pair you would be living with a host family, correct?
21    A.    Yes.
22    Q.    And you wanted that because it was part
23  of the cultural experience, right?
24       MR. LIBLING:  Objection to form.
25    A.    It was part of the program.

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Video Teleconferenced Deposition of Sarah Carolina Azuela
March 03, 2017

Page 41

1    Q.    It was also consistent with your goal of
2  being part of another culture, right?
3    A.    It sounded like a good idea.
4    Q.    And it was consistent with your goal of
5  being part of another culture, right?
6    A.    Well, you can say that.
7    Q.    So yes?
8        MR. LIBLING:  Objection.
9    A.    Can you tell me this question in a
10  different way so I can totally understand?
11    Q.    One of the things you wanted to do was
12  experience the American culture, correct?
13    A.    Yes.
14    Q.    You'd have more opportunity, it would
15  seem, to experience the American culture if you lived
16  with a American family than if, for example, you lived
17  all alone, right?
18        MR. LIBLING:  Objection to form.
19    A.    It might seem.
20    Q.    If you could just pause for a moment
21  because your attorney is allowed to object, but then
22  you have to answer anyway.  So that way there will be
23  no talking over each other.
24        It also was helpful to have a place to
25  stay right away with a new family when you came to the

Page 42

1  United States, right?
2        MR. LIBLING:  Objection.
3    A.    Yes.
4    Q.    It would have been just more work if you
5  had to find your own apartment and things like that;
6  you were able to arrive and go directly to the host
7  family, which was easier, correct?
8    A.    Yes.
9    Q.    What was your plan for spending money
10  while you were in the United States?
11        MR. LIBLING:  Objection.
12    Q.    Do you want me to re-ask the question?
13    A.    Yes, please.
14    Q.    Where did you plan to get money, spending
15  money, while you were in the United States?
16    A.    I don't really understand the question.
17    Q.    Did you bring money with you when you
18  came to the United States?
19    A.    No.
20    Q.    Did you plan to spend all of the money
21  that you received in connection with the au pair
22  program or save some of it?
23    A.    I didn't plan to spend it all.
24    Q.    Did you consider any other agencies
25  besides Cultural Care?

Page 43

1    A.    No.
2    Q.    So can you describe the match process
3  after you submitted the application form.  How did
4  that work?
5    A.    I got e-mails with a family that choose
6  me.  And then you -- I don't remember if you answer
7  with an e-mail or you go to Cultural Care page.  I
8  don't really remember all that part, but you get in
9  contact with this person that choose you, and then the
10  person decides if you are the one for their family.
11    Q.    Did you receive contact from a family
12  that had chosen you?
13    A.    I received the mail that a person pick me
14  up.
15    Q.    How many different families?  Just in the
16  beginning.
17    A.    Around three.
18    Q.    And did you participate in an interview
19  with each of the three families?
20    A.    No.
21    Q.    Did you end up becoming an au pair for
22  one of those three families?
23    A.    Yes.
24    Q.    All right, let's talk about that one
25  last.  Let's first talk about the other two that you

Page 44

1  did not become an au pair with.
2    A.    Uh-huh.
3    Q.    So you received an e-mail saying that you
4  had been selected as a possible match by these two
5  families, right?
6    A.    Yes.
7
19    Q.    What about the second family?
20    A.    I don't remember anything.
21    Q.    Do you remember if you had another
22  interview?
23    A.    I didn't have any other interview.
24    Q.    And then the third family was the one
25  that you ended up with, right?

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Video Teleconferenced Deposition of Sarah Carolina Azuela
March 03, 2017



**Page 45**

1    A.    Yes.
2    Q.    Tell us about that.  Tell us about the
3  first communication you had with them.
4    A.    I got this e-mail, I sent them an e-mail
5  back and they sent me an hour so we can meet in Skype,
6  and then Skype.
7

**Page 46**

1

**Page 47**

2    Q.    And then about how much time passed after
3  that before you came to the United States?
4    A.    I don't remember.
5    Q.    Who handled the preparation of your visa?
6    A.    I don't remember if -- no, I don't really
7  remember.
8    Q.    Who handled your travel arrangements?
9    A.    I think they were online.
10    Q.    Were there costs associated with your
11  visa, do you remember?
12    A.    The amount?
13    Q.    Were there fees in connection with the
14  visa?
15    A.    Yes.
16    Q.    Do you remember who paid them?
17    A.    Myself.
18        MR. WOLOSZ:  We're about to get into a
19  new topic.  This might be a good time for a
20  very short break if that's okay.
21        MR. LIBLING:  Okay.
22        THE VIDEOGRAPHER:  10:03 a.m.  Going off
23  record.
24        (Recess taken.)
25        THE VIDEOGRAPHER:  Back on record, 10:12

**Page 48**

1  a.m.
2  BY MR. WOLOSZ:
3    Q.    Ms. Azuela, I think before the break I
4  had asked if you recall who arranged your travel to
5  the United States, and I spoke with your counsel over
6  the break.  To clarify, what I meant is do you
7  remember whether it was something that you arranged or
8  whether it was something that Cultural Care arranged?
9    A.    It was Cultural Care.  Several people
10  from them.
11    Q.    Where did you fly to?  What route?
12    A.    To New York.
13    Q.    And that was in -- do you remember when
14  that was?
15    A.    2014.
16    Q.    I think it was January 6, is that right?
17    A.    Yes.
18    Q.    So very early in the year.
19    A.    Yes.
20    Q.    Did you stay in New York for a period of
21  time?
22    A.    Yes.
23    Q.    Where did you stay?
24    A.    In a school.
25    Q.    A school, a Cultural Care school?

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Video Teleconferenced Deposition of Sarah Carolina Azuela
March 03, 2017

Page 49

1      A.   Yes.
2      Q.   Who paid for your lodging while you were
3  at the school?
4      A.   I'm not sure if I did.
5      Q.   You don't remember if you had to pay for
6  your room?
7      A.   Yes, I don't remember if they asked me a
8  certain amount of money for that.
9      Q.   How long were you in New York?
10     A.   I know that it was less than two weeks.
11  Around a week.
12     Q.   Do you remember who paid for your meals
13  while you were there?
14     A.   They were included in the training.
15     Q.   So this was training put on by Cultural
16  Care, is that right?
17     A.   Yes.
18     Q.   And it was, if it refreshes your
19  recollection, I believe it was on Long Island, is that
20  right?
21     A.   I know it was around New York.  I'm not
22  really sure where it was.
23     Q.   What do you remember about the training
24  program?  Let's start with the courses, do you
25  remember what courses there were?

Page 50

1      A.   Not the specific name of the courses.  I
2  remember that they were the CPR, I remember the
3  choking baby, like how you need to help the baby.
4  Those are the biggest things that I remember.
5      Q.   So the CPR and first aid, do you
6  remember, was that something that was taught by the
7  American Red Cross?
8      A.   Yes.
9      Q.   And then the -- there were other courses
10  in child care skills, is that right?
11         MR. LIBLING:  Objection to form.
12     A.   I think so.
13     Q.   Do you remember if there was a course on
14  self-defense?
15     A.   No, there wasn't.
16     Q.   Do you remember if there was a course on
17  driving in the United States?
18     A.   No.
19     Q.   Any other topics that you remember?
20     A.   No.
21     Q.   Okay, but the ones that you remember were
22  about child care and first aid.
23     A.   Yes.
24     Q.   They were not something specific to the
25  au pair program; they were more generally about how to

Page 51

1  take care of kids, right?
2         MR. LIBLING:  Objection to form.
3      A.   That's what I remember.
4      Q.   Now, after you were in New York for a
5  period of time, I know you said you don't recall
6  exactly how long, where did you then go?
7      A.   I went to my first host family.



Page 52

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Video Teleconferenced Deposition of Sarah Carolina Azuela
March 03, 2017



Page 53

11    Q.    But for the most part set with some
12    variations.
13    A.    For the most part.
14    Q.    How many days per week did you work?
15    A.    Sometimes Monday to Friday, sometimes
16    Saturdays, too.
17    Q.    How many hours per day?
18    A.    I don't remember. Because they were
19    fraction so it was not like one eight-hour. Because
20    they were like two hours, two hours. I cannot
21    remember the exact amount.
22    Q.    Is there any document that we could look
23    at that would remind you what your schedule was?
24    A.    My communication with them was by cell
25    phone, so everything was in the cell phone. I don't

Page 54

1    think I have any document.
2    Q.    Was there a schedule that was kept at the
3    time? Like a paper schedule that was posted or
4    anything like that?
5    A.    No. They sometimes write in a board
6    something they forgot about it, so basically it was by
7    the cell phone.
8    Q.    When you say a board, you mean like a dry
9    erase board?
10    A.    Yes.
11    Q.    So then it would eventually be erased?
12    A.    Yes.
13    Q.    How many hours per week total did you
14    work? Well, actually, let's stick with hours per day.
15    What was the highest number of hours per day of child
16    care that you provided?
17    A.    The highest hour?
18    Q.    Yes.
19    A.    With that family?
20    Q.    The most hours in any one day.
21    A.    I will say around 10, 11.
22    Q.    How many hours per week did you provide
23    child care?
24    A.    I don't remember the exact amount. I can
25    say an estimate.

Page 55

1    Q.    Okay, I'll take an estimate.
2    A.    45.
3    Q.    Was it sometimes less than that?
4    A.    No.
5    Q.    It was never less than around 45?
6    A.    No.
7    Q.    Was it ever more than 45?
8    A.    Yes.
9         MR. WOLOSZ: Could we mark this as
10    Exhibit 159.
11         (Exhibit 159 marked for identification.)
12         MR. WOLOSZ: For those on the phone,
13    this is Bates number CC 00006126.
14    Q.    Exhibit 159 which was just handed to you
15    is entitled "Host family and au pair acknowledgment."
16    Do you recognize this document?
17    A.    I don't remember the document.
18    Q.    It says at the bottom, "Sarah Carolina
19    Azuela Rascon electronic signature." Do you see that?
20    A.    Yes.
21    Q.    Do you remember signing this?
22    A.    Honestly I don't remember signing it. I
23    probably did.
24    Q.    So you have no reason to believe that you
25    did not sign it.

Page 56

1    A.    Yeah, I don't have any reason.
2    Q.    Could you read paragraph number 1. Out
3    loud:
4    A.    "We hereby agree that the au pair will
5    not provide more than 45 hours per week and no more
6    than ten hours per day of child care and will receive
7    one and a half consecutive days off per week and one
8    complete weekend off each month."
9    Q.    At the time when you were an au pair at
10    the [redacted] family, did you know that this was the
11    restriction, the total number of hours per week that
12    you could provide child care?
13    A.    Yes.
14    Q.    And I believe you testified that there
15    were some weeks that you provided more than 45 hours a
16    week of child care, is that right?
17    A.    Yes.
18    Q.

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Video Teleconferenced Deposition of Sarah Carolina Azuela
March 03, 2017



17   Q.   Cultural Care didn't set your schedule,
18   right?
19   A.   No, they didn't give me the times and
20   specifically the schedule.
21   Q.

24   Q.   But again, Cultural Care didn't do that
25   either, correct?

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Video Teleconferenced Deposition of Sarah Carolina Azuela
March 03, 2017



**Page 61**

1    A.    No.
2

**Page 62**

1

7    Q.    Okay.  Can I ask you to look at Exhibit
8    156.  That's this one.
9    A.    Yes.
10    Q.    And if you flip to the tab that says on
11    the bottom -- or the page that says on the bottom
12    number 3, benefits.  For those on the phone, this is
13    Azuela 000054.  It's an Excel spreadsheet.
14          It says here car, January 17, 2014 to
15    May 23rd, 2014.  Is that referring to the time that
16    you were with the ▅▅▅▅ family?
17    A.    I believe so, yes.
18    Q.    It says approximate money value, $4,000.
19    Is that a number that you put down in this
20    spreadsheet?
21    A.    ▅▅▅▅▅▅▅▅▅▅▅▅▅▅
22    Q.    So this is an approximate value for your
23    use of the car during the time that you were an au
24    pair for the ▅▅▅▅ family?
25          MR. LIBLING:  Objection to form.

**Page 63**

1

**Page 64**

1

PLAINTIFFS' RESP. APP.0005150

Case No. 1:14-cv-03074-CMA-KMT Document 959-26 filed 03/17/18 USDC Colorado pg 323 of 701
Case 1:14-cv-03074-CMA-KMT Document 959-26 filed 03/17/18 USDC Colorado Page 323 of 701
324 of 701

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Video Teleconferenced Deposition of Sarah Carolina Azuela
March 03, 2017



Page 65

1

Page 66

1

15    Q.    Now, looking back at Exhibit 156, if we
16  can look at the front page, the front page, the first
17  part above where the red starts, do you see that?
18    A.    Mm-hmm.
19    Q.    Does this reflect all of the payments
20  that you received from the ███ family?
21    A.    The red part?
22    Q.    No, above the red part.
23    A.    Oh, above.  Yes.
24    Q.    How did you go about creating this chart?
25  Was it from memory, did you have records?  How did you

Page 67

1  figure out what to type into these fields?
2    A.    By memory.
3    Q.    Did you ever ask the ███ family to
4  pay you more money?
5    A.    No.
6    Q.    Did they ever give you any additional
7  money?  Other than the $20 that's reflected here that
8  we talked about.
9    A.    Not that I remember.
10    Q.    Do you believe that the ███ family
11  paid you everything that you were promised?
12    A.    Yeah.
13    Q.    Did you believe at the time that you were
14  an au pair that you were owed more money by Cultural
15  Care?
16    A.    In all the time that I was an au pair?
17    Q.    Yes.
18    A.    Yes.
19    Q.    What did you believe that you were owed
20  by Cultural Care?
21    A.    I cannot tell any specific amount, but I
22  realized that it wasn't a child care setting.  It was
23  more like a housekeeping/maid setting while I was in
24  the house.  So I was like, wow, this is just not the
25  right amount.  And you start to meet people and start

Page 68

1  to see that a maid made more because of the minimum
2  wages.  And a maid make more than you, a child care
3  provider make more than you and you do more work than
4  all of them together.  It wasn't oh, I'm gonna take
5  care of the kid and that's it.  I'm not gonna be
6  playing with the kid.  Yes, I did that but I also give
7  baths to the kid, I also clean everything that I
8  touched and everything that the kids did.
9        Also I wasn't treated like an au pair.  I
10  look at the concept and you should be treated as a
11  member of the family, as an equal.  I was treated as
12  an employee.  And that's what it make me believe, I
13  was an employee, I needed to be paid more as an
14  employee.
15    Q.    So you think that the stipend should be
16  higher.
17    A.    Yes.
18    Q.    Do you believe that the ███ family
19  owes you money?
20        MR. LIBLING:  Objection to the extent it
21  calls for a legal conclusion.  You can answer.
22    A.    I believe that the company should set
23  really fair amount, and that that amount was what I
24  should get.
25    Q.    Did you take courses while you were with

PLAINTIFFS' RESP. APP.0005151

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Video Teleconferenced Deposition of Sarah Carolina Azuela
March 03, 2017



Page 69

1  the ███ family?
2      A.    No.
3      Q.    Did you ever try to take courses while
4  you were with the ███ family?
5      A.    Yes.
6      Q.    ████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
██████████████████
███████████████████████
████████████████████████████
████████████████████████
████████████████████████████
████████████
23     Q.    Did your time with the ███ -- do
24  you think that you were able to practice your English
25  skills during your time with the ███

Page 70

1      A.    No.
2      ██████████████
████████████████████████████
████████████████████████████
████████████████████████████
████████████
8      Q.    Who was your local child care consultant?
9      A.    At that time -- I don't remember the
10  name.
11     Q.    Was it Marta Pena?
12     A.    First it was a German girl.  But I don't
13  remember the name.
14     Q.    Was Marta Pena ever your local child care
15  consultant?
16     A.    Yes.  My LCC at the beginning was getting
17  a raise from the company so she didn't really have a
18  lot of time to talk with me or anyone else.
19     Q.    Let me stop you there.  I don't
20  understand.  She was getting a raise and that meant
21  she didn't have time?  What do you mean?
22     A.    Well, you're supposed to meet with them
23  and you're supposed to talk with them, especially at
24  the beginning.  So I did meet with her and I did talk
25  with her.  But when you wanted to talk more with her

Page 71

1  she didn't really have much time.  And then I figure
2  that she was getting a raise into another position.
3  That's why she didn't have a lot of time and that's
4  why Marta Pena was the one taking over the helpers.
5      Q.    So she was getting a promotion.
6      A.    Yes.
7      Q.    Approximately how far into your time with
8  the ███ did Marta Pena become your LCC?  Do you
9  remember?
10     A.    At what part?  At the end.
11     Q.    If we can look back at Exhibit 154, the
12  interrogatories, I'm going to ask you to turn to
13  interrogatory number 5 which starts on page 8 and then
14  goes over onto page 9.  In the answer that appears on
15  page 9, if we look at the paragraphs that are
16  single-spaced, it says here, "███████████████
████████████████████████████
██████████████████████████████
████████████████████████████████
████████████████████████████
██████████████████████ I
24  think that's the issue that we just talked about,
25  right?

Page 72

1      A.    Yes.
2      Q.    ████████████████████████
████████████████████████████
████████████████████████████████
████████████████████████████
████████████████████████
██████████████
██████████████████████████
███████████
████████████████████████████
█████████████
15         MR. LIBLING:  Objection to form.
16     A.    ████████████████████
████████████████████████
████████████████████████
████████████████
████████████████████████████

PLAINTIFFS' RESP. APP.0005152

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Video Teleconferenced Deposition of Sarah Carolina Azuela
March 03, 2017



**Page 75**

2    MR. WOLOSZ:  Can we mark this as 160.
3    (Exhibit 160 marked for identification.)
4    MR. WOLOSZ:  This is the document that
5    starts with Bates number CC 00006044 for those
6    on the phone.
7    Q.    Ms. Azuela, I've handed you what has been
8    marked as Exhibit 160.  Have you seen this document
9    before?
10   A.    I don't think so.  No.
11   Q.    Well, I will represent to you that this
12   is a document that came from Cultural Care's files
13   that related to your time in the au pair program and
14   that has been produced to your attorneys.
15        If you'd look at the first page, it talks
16   about your transition.  It appears to be a letter
17   directed to a potential new family that says, "I'm
18   pleased to present ████ to you as your family's
19   in-country match."  Do you see that?
20   A.    Yes.

PLAINTIFFS' RESP. APP.0005153

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Video Teleconferenced Deposition of Sarah Carolina Azuela
March 03, 2017



**Page 77**

1

20      MR. WOLOSZ:  Can we mark this as 161.
21      For counsel on the phone, this is the document
22      that starts CC 00006129.
23          (Exhibit 161 marked for identification.)
24      Q.    I'm going to ask you to take a look at
25   this document, Exhibit 161, and tell me if you've seen

**Page 78**

1   this before.
2      A.    No.
3      Q.    I will represent to you again that this
4   is a document that Cultural Care produced from its
5   files relating to the time that you were an au pair
6   sponsored by Cultural Care.
7          If we flip to the bottom of the first
8   page going over onto the second page, there's a
9   message from Anja Primus.  Do you see that?
10     A.    Yes.
11     Q.    It talks about -- it says, "I wanted to
12   give you a heads up on the situation in one of my
13   families."  Do you see that?
14     A.    Yes.
15     Q.    Do you know Anja Primus?
16     A.    Yes.
17     Q.    Who is that?
18     A.    That was the name that I didn't remember
19   of my first LCC.
20     Q.    That was the German LCC?
21     A.    Yes.
22     Q.    If we flip to the second page, there's a
23   discussion of what appears to be discussion of the
24   meeting that took place between you, the LCC and
25   Mr. Budreau and Ms. Griffith.  Do you see that?

**Page 79**

1      A.    Yes.
2      Q.

**Page 80**

1

PLAINTIFFS' RESP. APP.0005154

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Video Teleconferenced Deposition of Sarah Carolina Azuela
March 03, 2017



Page 81

3  Q.  That a lot of things were not typed?
4  A.  Yes.
5  Q.  Like what?
6  A.  I'm really sure it was more than this.
7  Q.  The whole conversation?
8  A.  The whole conversation.
9  Q.  Okay.
10  A.  Yes.
11

16      MR. LIBLING:  Asked and answered.  You
17  can answer.
18

Page 82

6  Q.  So after that you entered the rematch
7  process, right?
8  A.  Yes.
9  Q.  How long did that take?
10  A.  About a month.
11  Q.  Where did you stay during that time?
12  A.  With Marta.
13  Q.  With the LCC Marta Pena?
14  A.  Yes.
15  Q.  Have you had any contact with
16  ▓▓▓▓▓ since you left your time with them as an
17  au pair?
18  A.  No.
19

Page 83

4      Q.  Do you think -- how did the contact take
5  place?  Did you call or e-mail?
6  A.  No, e-mail.
7      MR. WOLOSZ:  I think we've been about
8  another hour and I'm about to move to another
9  topic.  So should we take another short break?
10      MR. LIBLING:  Sure.
11      THE VIDEOGRAPHER:  11:09 a.m., going off
12  record.
13      (Recess taken.)
14      THE VIDEOGRAPHER:  Back on record, 11:18
15  a.m.
16  BY MR. WOLOSZ:
17      Q.  Ms. Azuela, can you describe the process
18  by which you matched with the second family where you
19  served as an au pair?  The rematch process that is.
20  A.  The rematch process?
21  Q.  Mm-hmm.
22  A.  I don't --
23  Q.  You said that it took a month to
24  transition from the ▓▓▓▓▓▓▓ to the next
25  family, right?

Page 84

1  A.  Yes.
2  Q.

PLAINTIFFS' RESP. APP.0005155

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Video Teleconferenced Deposition of Sarah Carolina Azuela
March 03, 2017



Page 85
Page 87

12    Q.    So approximately how many hours per week
13  did you provide child care?
14    A.    I'm not sure.
15    Q.    Sorry, did I just ask how many hours per
16  day or week?  I lost track.
17          So you're not sure how many hours per
18  week you worked.  Did you work more than 40 hours per
19  week?
20    A.    I don't think so.
21    Q.

Page 86
Page 88

22    Q.    Okay.  Who set your schedule?
23    A.    I haven't finished.
24    Q.    Go on.
25    A.

PLAINTIFFS' RESP. APP.0005156

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Video Teleconferenced Deposition of Sarah Carolina Azuela
March 03, 2017



**Page 89**

11    Q.    And again, just to clarify, not by
12    Cultural Care, correct?
13        A.    Yeah, Cultural Care only tell me you need
14    to work for this much, do this and that's it.  So they
15    give me the specific.

23    Q.    Any of these documents that you've saved?
24    A.    No.
25

**Page 90**

12    Q.    And if we look back at Exhibit 156, this
13    is the document Bates numbered Azuela 000054, and we
14    turn to the page that has a marking on the bottom that
15    says number 3, benefits.  Is that 157?
16    A.    157.
17    Q.    We can use 157.
18        On Exhibit number 157, which is Bates
19    numbered Azuela 000144, the tab that says number 3,
20    benefits.
21    A.    Okay.
22

**Page 91**

**Page 92**

1    a computer?
2

17    Q.    And what stipend amount did they pay?
18    A.    195.75.
19    Q.    Did you ever ask them for more money than
20    that?
21    A.    No.
22    Q.    Do you believe that the ██████ family
23    paid you everything that you were promised?
24    A.    That I was promised?  Yes.
25    Q.    Did you take any courses while you were

PLAINTIFFS' RESP. APP.0005157

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Video Teleconferenced Deposition of Sarah Carolina Azuela
March 03, 2017



Page 93

1   with the ████ family?
2        A.   No.
3        Q.   Who was your LCC, your local child care
4   consultant, while you were with the ████ family?
5        A.   Desiree Tomlinson.
6        Q.   Where did she live?
7        A.   She lived in Waldorf.
8        Q.   So close to where you were?
9        A.   Relatively close.
10       Q.   How often did you speak with her?
11       A.   Not often.
12       Q.   Did you meet with her when you first
13  arrived at the ████ family?
14       A.   I did met with her.
15       Q.   Did you physically meet with her on other
16  occasions as well?
17       A.   Yes.
18       Q.   But you didn't speak with her that often?
19       A.   Not that often as I would like to.
20       Q.   How frequently did you speak with her?
21       A.   The time that I arrived, two hour per
22  meeting.  Two or three hour per meetings and that's
23  it.  Personally.  I sent her a lot of e-mails.
24       Q.   If we could turn to Exhibit 154, the
25  interrogatories, and if we could look back at

Page 94

1   interrogatory number 5 which starts on page 8,
2   although the part that I'm going to be asking you
3   about is on page 9.  This is the third paragraph --
4   the third single space paragraph that appears here.
5   It says here.████████

████████

████████       Can you explain what you
9   mean by that?
10

PLAINTIFFS' RESP. APP.0005158

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Video Teleconferenced Deposition of Sarah Carolina Azuela
March 03, 2017



**Page 97**

17   Q.   All right, and then if we look in the
18   interrogatory at the next paragraph, I won't read it
19   but can you just describe to us in your own words what
20   happened, what you're setting forth here on the last
21   paragraph on that page?
22   A.   The last paragraph.
23   Q.   Yes.
24   A.

PLAINTIFFS' RESP. APP.0005159

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Video Teleconferenced Deposition of Sarah Carolina Azuela
March 03, 2017



**Page 101**

1

**Page 102**

1

**Page 103**

1

2    Q.   So it was months after that you told your
3    current LCC?
4        A.   Yes.  When I start to trust her.
5        MR. WOLOSZ:  Can we mark this as Exhibit
6    162.
7        (Exhibit 162 marked for identification.)
8        MR. WOLOSZ:  This is, for those on the
9    phone, Azuela 55 through 76.
10       Q.   Can I ask you to turn to the page that
11   has in the bottom right corner of this Exhibit 162,
12   turn to the page that is labeled with the last two
13   digits 63.  Actually, first let me step back for a
14   second.
15          This entire exhibit, Exhibit 162, appears
16   to be a back and forth text message.  Can you explain
17   to us what this is?
18       A.   Yes.
19       Q.   Sorry, let me -- I should back up a
20   little bit.  I'll represent to you that this was
21   produced by your attorneys to us.  Do you recognize
22   this document?
23       A.   Yes.
24       Q.   And is this something that you have
25   produced in this litigation?  Is this something that

**Page 104**

1    you've provided to your attorneys in this litigation?
2        A.   Yes.
3        Q.   Now, back to my question.  Can you just
4    explain to us what this is?
5        A.   This is a talk that -- well, she was
6    contacting me because she end up with this family.
7

19       Q.   Can you flip to the page that's labeled
20   63 in the bottom right, and can you just translate
21   this for us?  Just starting with the top.
22       A.   Starting with the top?
23       Q.   The top message which appears to be from
24   you, is that right?
25       A.   I will need to go -- you want me to start

PLAINTIFFS' RESP. APP.0005160

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Video Teleconferenced Deposition of Sarah Carolina Azuela
March 03, 2017



Page 105

1  from 62?  Because if I start from 63 top --
2      Q.    It doesn't make much sense.  That's fine,
3  you can start from 62.
4

7      Q.    Are you now on 63?
8      A.    No, 62.  So that was the conversation.
9  Looking from 62 because 63 by itself, it will be kind
10  of weird.
11

20      Q.    Can I just ask that you translate it
21  literally, like when you're working as a translator,
22  as an interpreter.
23      A.    Okay, I can do that but it will not make
24  sense.
25      Q.    Well --

Page 106

1

3      Q.    I understand.  You can fill in the words,
4  but I just mean instead of saying "I told her," can
5  you just put yourself in the first person and tell us
6  what it says.
7      A.    So --
8      Q.    So the 11:37 e-mail on 10/26, which
9  appears on page Azuela 62.
10          MR. LIBLING:  Objection to form.
11      A.    It says I was positive.  I realized at
12  the month.  Don't be scared, this is my third rematch.
13  The LCC will not support you, ever.
14

18      Q.    That's everything that appears in that?
19      A.    Yes.
20      Q.    Okay.
21      A.    And then --
22      Q.    And then at 11:38 you respond.
23      A.    I was telling her she will do that.  She
24  will never stop doing that.
25      Q.    And then at the bottom, 11:38, Karen says

Page 107

1  what to you?
2      A.    She is not leaving me alone at any
3  second.
4

Page 108

1      Q.    Okay, so it depends on where.
2      A.    Yes.
3      Q.    All right, so if we flip the page to 63.
4

12      Q.    Just so the record is clear, I'll stop in
13  between each one and ask you.  So then you responded
14  at 11:39 p.m.
15      A.    Yes.
16

PLAINTIFFS' RESP. APP.0005161

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Video Teleconferenced Deposition of Sarah Carolina Azuela
March 03, 2017



PLAINTIFFS' RESP. APP.0005162

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Video Teleconferenced Deposition of Sarah Carolina Azuela
March 03, 2017



Page 113

1    Q.

Page 114

1

15    Q.    Let's just stop there for a moment.  So I
16  think you said in that last message that you said you
17  believe that's what's happening.  Is that right?
18    A.    Yes.
19    Q.    And you said that you told Ms. Pena.
20    A.    Yes.
21    Q.    Did you tell Ms.
22    A.

Page 115

1

Page 116

1

3        MR. LIBLING:  Objection to form.  You
4    can answer.
5

                                  often were you communicating with
14  Ms. Pena at this point?
15    A.    Only that occasion.
16    Q.    So --
17    A.    I believe so.
18    Q.    So she was no longer your LCC at this
19  time?
20    A.    No.
21    Q.    But because you knew her from your prior
22  family, you called her and told her about this?
23    A.    Yes.
24    Q.    And then when did you tell -- you said
25  you also told your LCC in Virginia.  When was that?

PLAINTIFFS' RESP. APP.0005163

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Video Teleconferenced Deposition of Sarah Carolina Azuela
March 03, 2017



**Page 117**

1  I'm sorry, in Maryland.
2      A.    Around, like, the next year.  It wasn't
3  even the same year.  It was when I actually trust her.
4      Q.    That's Ms. Tomlinson?
5      A.    No.  My LCC in -- I told my other LCC in
6  Virginia, Diane Taylor.
7      Q.    Your LCC while you were with the ▮▮▮▮▮
8  was Ms. Tomlinson, right?
9      A.    Yes.
10     Q.    And you did not tell her?
11     A.    I didn't trust her.
12     Q.    What do you mean by that, you didn't
13  trust her?
14     A.    I was told that I shouldn't trust her.
15     Q.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮
18         MR. LIBLING:  Objection to form.
19     A.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮

**Page 118**

1  ▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮
9         MR. LIBLING:  Objection to form.  The
10  answer is fine.
11     Q.    So you don't remember if you told Karen
12  that you had reported it and that Ms. Pena told you
13  that you shouldn't do anything about it?  You don't
14  remember if you shared that with Karen?
15     A.    Exactly like that?  No, I don't remember.
16     Q.    But you recommended to Karen that she
17  tell someone, right?
18     A.    Yes.
19  ▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**Page 119**

1  ▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮
▮▮▮▮▮▮▮
9         MR. LIBLING:  Object to the form.
10  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮
17         MR. LIBLING:  Objection.  Asked and
18  answered.  You can answer.
19     A.    ▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮
23         MR. WOLOSZ:  Should we break for lunch?
24         MR. LIBLING:  Sure.  Actually, can we
25  just break for -- let's just go off the record

**Page 120**

1  for a second.
2         THE VIDEOGRAPHER:  12:21 p.m. going off
3  record.
4         (Luncheon Recess:  12:21 p.m.)
5         (AFTERNOON SESSION: 12:48 p.m.)
6         THE VIDEOGRAPHER:  Back on record, 12:48
7  p.m.
8  BY MR. WOLOSZ:
9      Q.    Ms. Azuela, on Exhibit 162, thanks to
10  your counsel I was directed to one additional message
11  that I'd like to ask you to translate.  Could you flip
12  to the page that ends in 66.
13     A.    66?
14     Q.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Video Teleconferenced Deposition of Sarah Carolina Azuela
March 03, 2017



Page 124

1       MR. WOLOSZ:  Could we mark this as 163.

2       (Exhibit 163 marked for identification.)

3    Q.   Exhibit 163, I'll just represent to you,

4  is excerpts from the second amended complaint in this

5  case.  It's a document that was filed in this case.

6       Do you recognize -- well, let me ask

7  this.  You can flip to the second page, the paragraph

8  starting at 470.  Have you seen this before?  You can

9  take as long as you'd like to read it.

10   A.   I don't remember nothing like this.

11   Q.   If you can flip to paragraph number 480,

12 it says, "In May 2014 Ms. Rascon rematched with a

13 family in Maryland.  Her second family similarly paid

14 her $195.75 per week."  Does that refer to the ▮▮▮▮

15 family?

16   A.   Yes.

17   Q.   And you agree with that allegation?  You

18 agree with that sentence?

19   A.   I don't remember the exact months of

20 everything or exact dates of everything.

21   Q.   And then the next paragraph says,

22 "Ms. Rascon was verbally attacked and threatened by

23 her host mother.  Ms. Rascon contacted her

24 representative with Cultural Care but received no help

25 or support."

PLAINTIFFS' RESP. APP.0005165

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Video Teleconferenced Deposition of Sarah Carolina Azuela
March 03, 2017



**Page 125**

1        Is that accurate?
2      A.   Yes.
3      Q.    And then paragraph 482, "She was told by
4  one Cultural Care representative to accept the abusive
5  treatment."  Is that accurate?
6      A.   To accept?  Like accept?  That person
7  didn't say oh, accept the abusive treatment.  Not like
8  that.  But she said just hold on there.
9      Q.   Okay.
10     A.   Hold on there.
11     Q.   So didn't say it in this way.
12     A.   No.
13     Q.   Who does that refer to, the Cultural Care
14  representative?
15     A.   I have no idea.  Someone that I talk in
16  the phone with.
17     Q.   So this is a person at Cultural Care who
18  you reached by telephone?
19     A.   Yes.
20     Q.   And then the next sentence says, "Another
21  representative of Cultural Care acknowledged that such
22  circumstances do exist and recommended that Ms. Rascon
23  deal with the threats by looking herself in the
24  bedroom."  Is that accurate?
25     A.   Yes.

**Page 126**

1      Q.    And who was that Cultural Care
2  representative?
3      A.    While I was talking with Marta Pena, she
4  told me to lock myself.
5      Q.    So the first part of paragraph 482 refers
6  to someone at Cultural Care, but you're not certain.
7  And the second refers to Marta Pena.
8      A.   Yes.
9      Q.   Have you had any contact with Ms. ████
10  since you left her house?
11     A.   No.
12     Q.   Have you had any contact with Mr. ████
13  since you left that house?
14     A.   No.
15     Q.

**Page 127**

20        MR. WOLOSZ:  Could we mark that as 164.
21        (Exhibit 164 marked for identification.)
22     Q.   Ms. Azuela, Exhibit 164 is another
23  document that was produced to us by your counsel, as
24  we understand, being produced by you.
25        Do you recognize the collection of pages

**Page 128**

1  in this exhibit?
2      A.   Yes.
3      Q.   What is this?
4      A.   Conversations in Facebook.  In paper.
5      Q.   Were the conversations that appear in
6  Exhibit 162 also in Facebook?
7      A.   Yes.
8        MR. WOLOSZ:  For those on the phone,
9  this new Exhibit 164 is Azuela 1 through Azuela
10  18.
11     Q.

PLAINTIFFS' RESP. APP.0005166

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Video Teleconferenced Deposition of Sarah Carolina Azuela
March 03, 2017



Page 129

```
1
16      Q.    And so you provided -- well, maybe I'll
17   just point you to it and ask you to translate.  Can
18   you flip to the page that's labeled Azuela 4.  It ends
19   in 4.  This message that's dated 3/16 at 7:04 a.m.
20      A.    Hmm.
21      Q.    It's kind of a long message.  I don't
22   necessarily need you to translate the whole thing, but
23   could you tell me what this is, if you're able?
24      A.    Okay.  I need to read it first.
25      Q.    Take your time.
```

Page 131

```
1   translate a couple of these.  Can you flip to the page
2   that ends in 8.  Now, the first message here is from
3   Aline -- I'm sorry -- yes, it's from ▇▇▇ on March 16
4   at 7:17 a.m.  What does that say?
5      A.
6      Q.    And then at 7:17 a.m. you respond, and
7   what do you say?
8      A.    I need to read it first.
9
```

Page 130

```
1
25      Q.    Can you -- I guess I'll just ask you to
```

Page 132

```
1
```

PLAINTIFFS' RESP. APP.0005167

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Video Teleconferenced Deposition of Sarah Carolina Azuela
March 03, 2017



Page 133

Page 134

**19    Q.    Who set your schedule when you were**
**20  serving as an au pair with the ▮▮▮▮ family?**
21    A.    Again, the LCC tell us the hours and the
22  family gave us the specific time that we need to work.
**23    Q.    What do you mean by the LCC tells you the**
**24  hours?**
25    A.    So every time you go to a new family, the

Page 135

1  LCC tells you, you cannot work more than ten hours,
2  you cannot work more than 45.  If you do, just tell
3  me.  So she gives you a lot of what you need to do,
4  what should you do, stuff like that.  So the family
5  specifically tells you at 9 p.m. you will do that, at
6  9 a.m. you will do this.
**7    Q.    So the LCC tells you the maximum you can**
**8  work, but the family tells you which hours?**
9    MR. LIBLING:  Objection to the form.
10    A.    It gives you what you should be doing,
11  the hours after everything.  The family tells you
12  exactly like 9 a.m., at this hour you will do this.
13  Stuff like that.
**14    Q.**

Page 136

**1    Q.**

**16    Q.    If we can go back, we're looking for**
**17  Exhibit 156.**
18    MR. WOLOSZ:  For folks on the phone,
19    this is the document that -- it's an Excel
20    document, it's entitled Azuela 000054.
**21    Q.    Ms. Azuela, can you confirm I believe**
**22  it's the first, second and third pages, starting at**
**23  the bottom of the first, that lists payments in**
**24  connection with your time serving as an au pair with**
**25  the ▮▮▮▮ family, is that right?**

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Video Teleconferenced Deposition of Sarah Carolina Azuela
March 03, 2017



**Page 137**

1   A.   Yes.

2   Q.   And the amounts written on these pages

3 reflect the amounts that you were paid during those

4 weeks, correct?

5   A.   Yes.

6   Q.   Now, at no time were you paid $195.75

7 exactly by Ms. ▬▬▬▬ correct?

8   A.   Correct.

9   Q.   For some weeks we see here that the

10 lowest was $200 a week, is that right?

11   A.   Yes.

12   Q.   But then there's a range; for example, if

13 you turn to the second page you can see there's one

14 instance where it was $450.  Do you see that?

15   MR. LIBLING:  Objection to the form.

16   A.   Yes.

17   Q.   But that particular one says she missed a

18 payment and pay it next week.  Is that what that $450

19 refers to?

20   A.   Yes.

21   Q.   But then there are a number of weeks

22 where the payment was $225, correct?

23   A.   Yes.

24   Q.   And then there's -- I see one where the

25 payment was $300, is that right?  I'm looking on the

**Page 138**

1 second page.

2   A.   Yes.

3   Q.   And then the last payment was $600, is

4 that right?  The last week.

5   A.   That's right.

6   Q.   So during the time that you were an au

7 pair with the ▬▬▬▬ family, you were paid anywhere

8 from $200 up to, in one instance, $600 per week,

9 right?

10   MR. LIBLING:  Objection to the form.

11   A.   I was paid that amount for the work that

12 I was doing.

13   Q.   I understand.  And the amount that you

14 were paid varied by week.  That is to say some weeks

15 you were paid more and some weeks you were paid less,

16 correct?

17   A.   Yeah.

18   Q.   And the amount that you were paid as we

19 see looking at all of pages 1, 2 and 3 --

20   I don't remember my question so I'll just

21 start over.

22   The amount that you were paid as an au

23 pair also varied from one host family to another,

24 right?

25   MR. LIBLING:  Objection to the form.

**Page 139**

1   A.   Yes.

2   Q.   With respect to the ▬▬▬▬ family, how

3 was the amount that you were paid in a particular week

4 determined?

5   A.   I don't understand the question.

6   Q.   ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

**Page 140**

25   MR. LIBLING:  Objection to the form.

PLAINTIFFS' RESP. APP.0005169

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Video Teleconferenced Deposition of Sarah Carolina Azuela
March 03, 2017



Page 141

16    Q.    Did you tell your LCC that -- well, let
17  me back up.  Did you ask her to pay for others?
18    A.    No.
19    Q.    Who was your LCC when you were an au pair
20  with the ▇▇▇▇ family?
21    A.    Diana Taylor.
22    Q.    Did that change at some point to someone
23  else?
24    A.    No.  That I remember, no.
25    Q.    It was Diana Taylor throughout?

Page 142

1     A.    Yes.
2     Q.    How often did you communicate with
3   Ms. Taylor?
4     A.    Every month.
5     Q.    Did you ever report to her any kind of
6   complaints?
7     A.    Yes.
8     Q.    We can go back to the interrogatory if
9   you want, or you can just tell me.  Do you want to
10  just tell me what complaints you made?  Why don't we
11  pull out the interrogatory.  Let's go to Exhibit 154,
12  page 10.  Can you tell us what this last -- the second
13  paragraph from the top is regarding here?
14    A.

PLAINTIFFS' RESP. APP.0005170

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Video Teleconferenced Deposition of Sarah Carolina Azuela
March 03, 2017

---

Page 145



1    Q.
11          MR. WOLOSZ:  We're at a good breaking
12    point, and although it's a little less than an
13    hour, I think the videographer needs a break.
14          THE VIDEOGRAPHER:  1:36 p.m. going off
15    the record.
16          (Recess taken.)
17          THE VIDEOGRAPHER:  Back on record, 1:43
18    p.m.
19    BY MR. WOLOSZ:
20    Q.    So Ms. Azuela, you obviously had a number
21    of issues with the families that you were matched with
22    where you served as an au pair.  Have you heard of
23    others who had better experiences than you did?
24    A.    If I compare it with mine, I believe most
25    of the cases will be better.

Page 146

1    Q.    And if you had had a host family that
2    didn't require you to do additional things and just
3    stuck to the child care, do you think that you may
4    have enjoyed your time in the au pair program?
5          MR. LIBLING:  Objection to form.
6    A.    I may, but I have never heard of that
7    family.
8    Q.    You've never heard of that family?
9    A.    Never heard.
10    Q.    So every au pair that you've met was
11    required to do additional things that in your mind
12    they shouldn't have been required to do?
13    A.    Everything that I have seen is in social
14    media and in this group.  And all of the people that I
15    see posting and that I have talked with have done
16    something that it's like a job requirement.  Like they
17    were not treated as a part of the family, they were
18    not treated like employees.  Sometimes they are
19    treated as a part of the family but they work more
20    than 15 hours some days.  They are left with kids and
21    the parents go on vacations and they have to stay with
22    them for a week.
23          There are a lot of different experience
24    than mine that are not what it says in the program.
25    Q.    And you've never met anyone who said that

Page 147

1    what they did was limited to what it says in the
2    program?
3          MR. LIBLING:  Objection.
4    A.    Not that I remember, no.
5    Q.    If we can look back at Exhibit 164.
6          MR. WOLOSZ:  For folks on the phone,
7    this is the exhibit that starts with Azuela 1.
8    Q.    And if you can flip to the page that ends
9    in 15, could you translate for us the very top message
10    on this page?
11    A.    By the way, you want to join us -- you
12    must send me an in box answer in the following
13    questions.  It's actually in English.
14          I just copy and paste the requirements to
15    join this group.
16    Q.    What group is this?
17    A.    Mexican Au Pairs.
18    Q.    And is it a Facebook group?
19    A.    Yes.
20    Q.    Do you know who administers or runs the
21    group?
22    A.    No.  I know that you can click on it and
23    see who administer, but I don't really know the person
24    who administer, or remember the name of this person.
25    Q.    It's a Facebook group so you can post

Page 148

1    messages that only folks in that group are allowed to
2    see, is that how that works?
3    A.    Yes.
4    Q.    Does the group still exist now?
5    A.    Yes.
6    Q.    Are you still a member of it?
7    A.    Yes.
8    Q.    So what is its purpose?
9    A.    Help each other because the LCCs usually
10    do not help.
11    Q.    So it's a way for Mexican Au Pairs to
12    talk to each other in order to help each other?
13    A.    Find support.
14    Q.    Have you ever posted on that group page?
15    A.    Yes.
16    Q.    And have you produced in this
17    litigation -- well, let me back up.  Have you provided
18    copies of those postings to your attorney?
19    A.    No.
20    Q.    Have you looked for them?
21    A.    Yes.
22    Q.    And were you unable to find them?
23    A.    Yes.
24    Q.    Why is that?
25    A.    I have no idea.  I go on Facebook and I

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Video Teleconferenced Deposition of Sarah Carolina Azuela
March 03, 2017



**Page 149**

1  click on search and I go to the words, like my name.
2  So you can go to your postings.  And I couldn't find
3  anything.  I couldn't at all.  I went, I went down to
4  see the postings of 2014 and I couldn't find it.
5      Q.    Can we switch to Exhibit 162.  And if you
6  can flip to the page that ends in 75.  So the third
7  message down, the message which appears to be from
8  you -- well, the first one is kind of a partial.  But
9  the third message down which appears to you on
10  December 7 at 7:53 p.m.  Can you tell us what you were
11  saying there in English, please?
12      A.    I need to read it first.
13            I would like to say the one that is
14  before because it will make more sense what I said.
15      Q.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**Page 150**

1  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
5      Q.    And the group that you just referred to
6  in that message, is that the same Facebook group that
7  we talked about a moment ago?
8      A.    Yes.
9      Q.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
18      Q.    So when you think back on your time as an au
19  pair, what other -- what cultural experiences
20  outside of the host family's homes did you take part
21  in?
22            MR. LIBLING:  Objection to the form.
23      A.    I don't know what you will consider
24  cultural experience.
25      Q.    Well, what do you consider cultural

**Page 151**

1  experiences?
2      A.    That's why I don't know how to answer
3  that question.  I don't know what is a cultural
4  experience.
5      Q.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
16      Q.    Did you meet friends during that time?
17      A.    I met another au pairs.
18      Q.    Are you still in touch with any of them?
19      A.    With one or two.
20      Q.    Did you join any organizations?
21      A.    What --
22      Q.    Any clubs, groups?
23      A.    What does that include?
24      Q.    Anything in the United States.
25      A.    I went to the gym.

**Page 152**

1      Q.    Okay.  Did you record your time as an au
2  pair in any way?  Did you keep a diary?
3            MR. LIBLING:  Objection to the form.
4      A.    My Facebook.  That was kind of like my
5  diary.
6      Q.    You didn't have any kind of blog that you
7  wrote into?
8      A.    No.
9      Q.    Did you send letters and e-mails to
10  family and friends?  Strike that.  Did you send
11  e-mails to family back home?
12      A.    No.  I don't think so.
13      Q.    Did you send letters to family back home?
14      A.    Like write a letter?  No.
15            MR. WOLOSZ:  Can we mark this as Exhibit
16      165.
17            (Exhibit 165 marked for identification.)
18      Q.    Exhibit 165 is a document that's been
19  labeled Azuela 000102 through 000125.  Do you
20  recognize this document?
21      A.    Yes.
22      Q.    And is this a document that you produced
23  in this litigation?
24      A.    Yes.
25      Q.    What is this document?

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Video Teleconferenced Deposition of Sarah Carolina Azuela
March 03, 2017

Page 153

1    A.   My bank statements.

2    Q.   And is it your bank statements for the

3 entire time that you were an au pair or for a shorter

4 time than that?

5    A.   A shorter time.

6    Q.   Are these the only bank statements that

7 you had available?  Is that why you didn't produce a

8 full set for the entire time period?

9    A.   Yes.

10    MR. LIBLING:  Objection to form.

11    Q.   Did you use these bank statements when

12 you were preparing the spreadsheet that we were

13 talking about earlier, which is at Exhibit 156?

14    A.   Yes.

15    Q.   Are all of your deposits -- let me start

16 again.  Are all of the payments that you received in

17 connection with the au pair program listed in these

18 statements as deposits?  At least for the time period

19 that's covered?

20    A.   Can you rephrase the question, please?

21    Q.   Is each payment you received during the

22 time period covered by these statements --

23    A.   No.

24    Q.   -- reflected as a deposit?

25    A.   No.

Page 154

1    Q.   Why are some of the payments not

2 reflected as a deposit?

3    A.   I couldn't find them.  This is what I

4 have physically.

5    Q.   I'm asking the question poorly.  At least

6 for the time period that's covered, so if we take the

7 first statement which is January 9th through February

8 8 of 2015, will we find each of the payments you

9 received listed on this statement as a deposit for

10 that time period?

11    A.   I believe so.

12    Q.   In other words, you didn't receive any

13 payments that wouldn't show up on your bank statement

14 for that time period.

15    MR. LIBLING:  Objection to the form.

16    Q.   Correct?

17    A.   I don't --

18    Q.   Let me try it this way.  Did you

19 typically deposit your payments when you received

20 them?

21    A.   Sometimes I just accumulate them and

22 went.

23    Q.   And you'd deposit more than one at one

24 time?

25    A.   Sometimes, yeah.

Page 155

1    Q.   Did you ever cash the check?

2    A.   No.

3    Q.   There's another document we have here.

4 I'm going to ask that we mark this as Exhibit 166.

5    (Exhibit 166 marked for identification.)

6    MR. WOLOSZ:  This document starts with

7 the Bates number Azuela 000086.

8    Q.   Do you recognize this document?

9    A.   Yes.

10    Q.   What is it?

11    A.   It's me trying to answer one of the

12 interrogatories.

13    Q.   I'm going to wait one minute so that

14 we're not competing with that fire engine.

15    So this is a document that you put

16 together after you saw the interrogatories, is that

17 right?

18    A.   Yes.

19    Q.   This is not something that you kept back

20 in, for example, February 2014 when the first event

21 that you have listed here took place, is that right?

22    A.   That's right.

23    Q.   And then to your knowledge, this document

24 was used to help prepare the interrogatory response,

25 is that right?

Page 156

1    MR. LIBLING:  Objection.

2    MR. WOLOSZ:  I'm not asking for any

3 specific communications.

4    MR. LIBLING:  Are you just asking --

5 hang on a second.  Are you just asking whether

6 she provided this to assist with the

7 interrogatories?  I'm not clear on exactly what

8 you're asking.  She told you she created it in

9 response to one of the interrogatories.

10    Q.   Did you provide this document to counsel

11 back at the time that you created it?  Did you provide

12 it to your lawyer back then?

13    A.   Well, I did it -- I think first I put

14 everything just in a Word sheet, and then I was, like

15 --

16    MR. LIBLING:  Just answer his question.

17    A.   Yes, I think so.

18

PLAINTIFFS' RESP. APP.0005173



Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Video Teleconferenced Deposition of Sarah Carolina Azuela
March 03, 2017

**Page 157**

1
2      Q.    I'd like to ask a couple of questions
3   about this lawsuit.  Are you aware that there are
4   what's referred to as antitrust claims in this
5   lawsuit?
6      A.    I don't know what is that, antitrust
7   claim.
8      Q.    Do you have any information suggesting
9   that there was any kind of agreement between the
10  sponsors with respect to the stipend that gets paid to
11  au pairs?
12         MR. LIBLING:  Objection to the form.
13     A.    I don't understand the question.
14     Q.    Are you aware that there's an allegation
15  in the complaint that the sponsors, that is, the
16  defendants in this case, made an agreement with
17  respect to the amount of the stipend that gets paid to
18  au pairs?  Did you know that?
19     A.    Is there a more simple way to put that to
20  me to totally and fully understand?
21     Q.    Are you aware that the complaint says
22  that the sponsors reached an agreement that they would
23  not pay more than 195.75 -- strike that.  Are you
24  aware that there's an allegation in this case that the
25  sponsors reached an agreement to keep the stipend that

**Page 158**

1   gets paid to au pairs at $195.75?
2         MR. LIBLING:  Objection to the form.
3      A.    No.
4      Q.    So is that the first you're hearing that
5   there's an allegation of such an agreement?
6         MR. LIBLING:  Objection to form.
7      A.    I think so.
8      Q.    Who have you discussed the lawsuit with,
9   other than your attorneys?
10     A.    I told other au pairs and members of my
11  family.
12     Q.    Can we look back at the interrogatories,
13  Exhibit 154.  And if you flip to interrogatory number
14  4 which appears on page 8.  Let me know when you're
15  ready.
16     A.    Page 4?
17     Q.    Yes -- no, page 8, interrogatory number
18  4.
19

**Page 159**

1
25         MR. LIBLING:  Objection to the form.

**Page 160**

1      Q.    Do you know who was her sponsor?
2      A.    Cultural Care.
3      Q.

PLAINTIFFS' RESP. APP.0005174

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Video Teleconferenced Deposition of Sarah Carolina Azuela
March 03, 2017



Page 161

1

Page 162

1

24    Q.    So what do you believe -- let me start
25    again.  How much do you believe you're owed in

Page 163

1    connection with this lawsuit?
2        MR. LIBLING:  Objection to the extent it
3    calls for legal conclusion.  You can answer.
4        A.    I believe that I should be paid like an
5    employee, which I felt that I was.
6        MR. WOLOSZ:  Can we take a brief break?
7        MR. LIBLING:  Sure.
8        THE VIDEOGRAPHER:  2:16 p.m., going off
9    record.
10        (Recess taken.)
11        THE VIDEOGRAPHER:  Back on record, 2:23
12    p.m.
13        MR. WOLOSZ:  Okay, this is Justin
14    Wolosz, and I have no more questions at this
15    time.
16    EXAMINATION BY
17    MR. DREW:
18        Q.    Good afternoon, this is Mike Drew.  I
19    have just a few questions for you, ma'am.  Is
20    everything okay?
21        A.    Okay.
22        Q.    I represent APEX, American Professional
23    Exchange, d/b/a Pro Au Pair.  And also 20/20 Care
24    Exchange, d/b/a the International Au Pair Exchange.
25        Have you had any communications of any

Page 164

1    kind with either of those sponsor companies?
2        A.    No.
3        Q.    Have you had any communications of any
4    kind with anyone else who talked to you about either
5    of those companies?
6        A.    Yes.
7        Q.    And who have you spoken to about those
8    companies?
9        A.    I cannot remember.
10        Q.    Do you know how many different people you
11    spoke to about those companies?
12        A.    Can you repeat the names of the
13    companies, please?
14        Q.    Yes.  The first company is called APEX,
15    and that stands for American Professional Exchange, or
16    Pro Au Pair.  And the second company is called 20/20
17    Care Exchange.  And it's also known by the name
18    International Au Pair Exchange.
19        Let me circle back to my last question.
20        A.    I just have a question.
21        Q.    What question do you have?
22        A.    I have heard of InterExchange.  Is that
23    International Exchange Au Pair?
24        Q.    No, that's a different company.
25        A.    Okay.  I wasn't sure.

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Video Teleconferenced Deposition of Sarah Carolina Azuela
March 03, 2017

Page 165

1    Q.   So understanding that, let me ask my
2  question again.  Have you had any communications with
3  anyone about either of the two companies that I
4  represent?
5    A.   I think so.
6    Q.   And do you know who you had
7  communications with about either of those companies?
8    A.   I don't remember the person.
9    Q.   Do you know how many people you had
10 communications with about these companies?
11   A.   I don't know.
12   Q.   Do you know when this communication
13 occurred?
14   A.   I don't know when.
15   Q.   Do you know how this communication
16 occurred?  Was it in person, was it by e-mail, was it
17 by some other mode of communication?
18   A.   Yes, by Facebook.
19   Q.   By Facebook.  And what was the nature of
20 the communication?
21   A.   I don't remember.
22   Q.   Is there anything you remember at all
23 about the communication you had on Facebook about
24 either of your clients?
25   A.   I just remember the first company, the

Page 166

1  name.  I just don't remember anything else.
2    Q.   Okay.  And by "the first company" you're
3  referring to APEX?
4    A.   With what other name it was called?
5    Q.   APEX, which is an acronym for American
6  Professional Exchange.  Or Pro Au Pair.
7    A.   Yes, Pro Au Pair.
8    Q.   So if I'm following you then, just to
9  summarize, you remember having some communication on
10 Facebook about Pro Au Pair, but you just don't
11 remember anything about the substance of the
12 communication, is that fair?
13        MR. LIBLING:  Objection to form.
14   A.   Yes, I don't remember anything.  Just the
15 name of the company.  That's it.
16   Q.   Okay.  Is there anything else that you
17 remember about communications you may have had with
18 anyone about my two clients?
19   A.   No.
20   Q.   Do you have any personal knowledge as to
21 what my two clients' routine is as far as paying
22 their -- or what they require, if anything, that their
23 host families pay their au pairs?
24        MR. LIBLING:  Objection to form.
25   A.   I don't know anything.

Page 167

1    Q.   Okay, those are all my questions for you,
2  thank you,
3        MR. WOLOSZ:  Thank you, anyone else on
4    the phone with questions?
5        MS. COLAIZZI:  Yes, this is Brooke
6    Colaizzi on behalf of InterExchange.
7  EXAMINATION BY
8  MS. COLAIZZI:
9    Q.   Good afternoon, my name is Brooke
10 Colaizzi, I represent InterExchange.  I understood a
11 moment ago you saying that you had heard of
12 InterExchange, is that correct?
13   A.   Yes, that's correct.
14   Q.   How have you heard about InterExchange?
15   A.   I believe it's the -- basically a
16 competition of Cultural Care in my country.
17   Q.   And what specifically did you hear about
18 InterExchange?
19   A.   Sorry, what was the question again?
20   Q.   You said you had heard of InterExchange.
21 What specifically have you heard about InterExchange?
22   A.   Well, what I have heard is that it's an
23 au pair program like Cultural Care, but a little bit
24 cheaper, with less families.
25   Q.   I'm sorry, with less what?

Page 168

1    A.   With less families to pick.
2    Q.   From whom did you hear this information?
3    A.   From another au pair.
4    Q.   Who was that?
5    A.   I don't remember the name right now.
6    Q.   When did you learn this information?
7    A.   Between 2013 to 2015.  I don't
8  remember --
9    Q.   Did you ever -- I'm sorry, go ahead.
10   A.   I don't remember the date or the year
11 exactly.
12   Q.   Were you in this country when you spoke
13 to this individual about InterExchange?
14   A.   No.
15   Q.   You were in Mexico?
16   A.   No, I was in the U.S. when I heard this.
17   Q.   I'm sorry, you were in the U.S.?
18   A.   Yes.
19   Q.   Was the au pair that you spoke with, was
20 she -- he or she sponsored by InterExchange, do you
21 know?
22   A.   Yes.
23   Q.   And how did you meet this individual?
24   A.   I knew her from my hometown.
25   Q.   Were your communications with her about

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Video Teleconferenced Deposition of Sarah Carolina Azuela
March 03, 2017

Page 169

1 InterExchange in person?
2    A.   Yes.
3    Q.   And where were you physically located at
4 the time?
5    A.   I don't remember.
6    Q.   But she is located in the same place that
7 you were?
8    A.   No.
9    Q.   Where was she?
10   A.   She was in New York.
11   Q.   And how were you communicating with her?
12   A.   I saw her once.
13   Q.   Where did you see her?
14   A.   In New York.
15   Q.   So you were in New York at the time that
16 you had these communications with her about
17 InterExchange, is that correct?
18   A.   Yes.
19   Q.   What were you doing in New York?
20   A.   I went to the electric zoo.
21   Q.   And how did you meet up with this au pair
22 from InterExchange while you were in New York?
23   A.   By person.
24   Q.   Had you arranged to meet or did you just
25 happen to run into her?

Page 170

1    A.   Oh, no, she picked me up from the
2 airport.
3    Q.   But you don't remember this individual's
4 name?
5    A.   No.  I will to dig into my things to
6 remember the name.
7    Q.   Other than telling you that InterExchange
8 was a competitor of Cultural Care, cheaper with fewer
9 families, what other information was shared with you
10 about InterExchange?
11   A.   About the program, InterExchange
12 specifically, nothing.
13   Q.   Did this individual describe her personal
14 experience as an au pair with you?
15   A.   Yes.
16   Q.   What did she describe?
17   A.   She was in a really low place.
18   Q.   What do you mean by that?
19   A.   Well, that's what she said.
20   Q.   What else did she say?
21   A.   She didn't say much.  That she thought it
22 was gonna be different, but the family wasn't mean
23 with her so she was fine.  She didn't really got used
24 to the rhythm of the city and that's what I can
25 remember that she told me.

Page 171

1    Q.   Did she describe any other ways in which
2 she thought it would be different?
3    A.   No.
4    Q.   Did she discuss with you anything about
5 the money she was receiving from her host family?
6    A.   No.
7    Q.   Did she describe anything to you about
8 the hours she was working?
9    A.   No.
10   Q.   Did she explain anything to you or
11 describe anything to you about the duties she was
12 performing as an au pair?
13   A.   Yes.
14   Q.   What did she describe?
15   A.   Not much.  She just told me that she
16 needed to take care of the kid, give them showers.  I
17 believe she was happy in the family.
18   Q.   Anything else that you recall this
19 individual telling you about her experience as an au
20 pair?
21   A.   Nothing about her experience -- wait,
22 yes, that she hadn't been able to do a lot of friends.
23   Q.   Did she say why?
24   A.   She thought it was because that's the way
25 the city is.

Page 172

1    Q.   Did this individual complain to you at
2 all about any aspect of her experience with
3 InterExchange?
4    A.   No.
5    Q.   Are you still in touch with this
6 individual?
7    A.   No.
8    Q.   Do you recall when it was the last time
9 you had any communication with her?
10   A.   Yes.
11   Q.   When was that?
12   A.   The day of the electric zoo.
13   Q.   Other than the individual that you have
14 just been discussing, have you ever met any other au
15 pairs that were sponsored by InterExchange, to your
16 knowledge?
17   A.   I have knew some.
18   Q.   Who?
19   A.   I don't remember the names.
20   Q.   Do you remember any part of any of their
21 names?
22   A.   No.
23   Q.   How did you come to know these other au
24 pairs sponsored by InterExchange?
25   A.   Well, I was with her the date that I saw

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Video Teleconferenced Deposition of Sarah Carolina Azuela
March 03, 2017

Page 173

1  this girl when she picked me up. She just basically
2  introduced me to them, and that's the way I met them.
3  And at the morning when the festival ended, I went to
4  one of their houses and so I met a lot of these girls
5  that were with InterExchange.
6      Q.    Did any of these other au pairs describe
7  any of their experiences to you?
8      A.    Yes.
9      Q.    What did they describe to you?
10     A.    Well, basically that they were the maids
11 of really fancy houses.
12     Q.    Did they explain in any more detail what
13 they meant by that?
14     A.    Yes. They said they had to do the
15 laundry, take the dogs out, pick up the poop of the
16 dogs, cook, breakfast, dinners and meals. They say
17 that they needed to clean the whole house and that
18 that's why they felt like the made, not the nanny.
19     Q.    Did any of these other InterExchange au
20 pairs discuss their pay with you?
21     A.    Yes.
22     Q.    What did they share with you?
23     A.    It was a big full table of au pairs that
24 we were complaining about what we were doing for the
25 amount that we were paid. We thought that it was

Page 174

1  really low. We -- no one knew how expensive things
2  were in the U.S., how expensive it is to go places in
3  the metro, that how this amount that you were paid
4  trying to go places, it's really hard to even do stuff
5  because you need to buy clothes for the cold weather,
6  that's expensive. So you need to save money to buy
7  clothes for the cold weather. So we were discussing
8  about how we didn't have much for what we came here
9  for.
10     Q.    Anything else that you recall about your
11 discussion of way with the au pairs?
12     A.    No. We were discussing only that we
13 thought that we were paying really low and that -- I
14 do recall that we even laughed at how illegal people
15 get more payment than us. And that's what I remember.
16     Q.    What do you mean that illegal people got
17 more than you?
18     A.    Yeah, well, girls said that besides her
19 cleaning out the house, there was another person that
20 was coming to her house to clean deeply the house
21 and -- Hispanic people, they speaking Spanish, so she
22 asked her how much you earn, and so the other person
23 that just came up once and cleaned the whole house in
24 two hours was paid 25, $50 in those two hours. So we
25 were laughing at the fact that we do way more for

Page 175

1  totally minimal amount and we tried to think the right
2  way legally. And these people that she talked with
3  didn't even have any papers. It was here illegally.
4  So we kind of laughed about that fact.
5      Q.    Anything else that the group of you
6  discussed regarding au pair pay?
7      A.    No, I don't remember anything else.
8      Q.    Have you been in contact with any of
9  these InterExchange au pairs since the get-together
10 that you've been describing?
11     A.    No.
12     Q.    Do you know anybody who is working or has
13 ever worked for InterExchange?
14     A.    Besides these people?
15     Q.    Other than the au pairs that you've been
16 describing, do you know anybody or have you ever known
17 anybody who has worked for InterExchange?
18     A.    Not in person.
19     Q.    What does that mean?
20     A.    I mean that I know that there is people
21 in Facebook group that works for InterExchange, but I
22 don't personally know them or talk with them.
23     Q.    I'm sorry, I lost audio there for a
24 moment. I heard you say that you know there are
25 people in the Facebook group. Could you complete your

Page 176

1  answer?
2      A.    I know there are some people in the
3  Facebook group that works for InterExchange because of
4  their posts, but I don't have any contact with them.
5      Q.    Do you recall any of the names?
6      A.    No.
7      Q.    At any point in time did you ever look
8  into participating in the au pair program through
9  InterExchange?
10     A.    No.
11     Q.    I don't have any further questions, thank
12 you.
13          MR. LIBLING: Does anyone else on the
14     phone have any further questions?
15          MS. KOZAL: This is Peggy Kozal. I have
16     just a few.
17 EXAMINATION BY
18 MS. KOZAL:
19     Q.    Good afternoon, Ms. Azuela. My name is
20 Peggy Kozal, I represent Au Pair Care. Have you ever
21 heard of Au Pair Care?
22     A.    Yes.
23     Q.    And what exactly have you heard?
24     A.    That it's another program like Cultural
25 Care.

Page 177

1   Q.   Did you ever look at utilizing Au Pair
2   Care as a sponsor for your time as an au pair?
3   A.   No.  I didn't even knew it existed until
4   I got here in the U.S. and I was with Cultural Care.
5   Q.   Have you ever had any communications with
6   anyone that has been an au pair through Au Pair Care?
7   A.   Yes.
8   Q.   Who?
9   A.   I don't remember.
10  Q.   Are there any documents or other
11  electronically maintained materials that would refresh
12  your recollection as to those names?
13  A.   They might be.
14  Q.   Can you elaborate more on that?
15  A.   Yes.  I'm in this group Mexican Au Pairs.
16  And there are posts and documents that, like, you can
17  comment.  So it might be comment of Au Pair Care where
18  Au Pair Care is mentioned and I might answer to that
19  post.  But I don't remember if that even happened or
20  if that -- if there is a document right there where I
21  make a comment in a post.  So I don't remember.
22  Q.   Do you know a woman named Julian H --
23  A.   Julian what?
24  Q.   Harning.
25  A.   Harning?

Page 178

1   Q.   Yes.
2   A.   I don't think so, no.
3   Q.   Do you know a woman named Laura Mejia
4   Jimenez?
5   A.   I mean, it sound more like a name that I
6   will know but I'm not sure.
7   Q.   Have you spoken specifically with anyone
8   about Au Pair Care?
9   A.   A deep conversation, no.
10  Q.   I'm not sure I understood your answer.
11  When you "of this conversation" --
12  A.   Like an in box conversation, no.  If I
13  speak with someone it was through a comment.
14  Q.   And you don't have any specific
15  recollection of any conversations through comments
16  that you had about Au Pair Care, is that correct?
17  A.   That's correct.
18  Q.   Do you have any recollection as to how
19  many au pairs that you may have corresponded with
20  through Facebook that have been sponsored by Au Pair
21  Care?
22  A.   I can give an estimate.
23  Q.   What would your estimate be?
24  A.   Three to five.
25  Q.   And when do you think those

Page 179

1   communications occurred?
2   A.   While I was an au pair.
3   Q.   And can you give me the dates when you
4   were an au pair again?
5   A.   From 2014, January, to December 2015.
6   Q.   Are you still a part of the Facebook
7   group that is comprised of Mexican Au Pairs?
8   A.   Yes.
9   Q.   Since December of 2015, do you think
10  you've corresponded with any other au pairs or former
11  au pairs about Au Pair Care through this Mexican au
12  pair Facebook group?
13  A.   After 2015?  No, I don't think so.
14  Q.   Have you had any other communications via
15  other social media with other current or former au
16  pairs about Au Pair Care?
17  A.   I don't recall.
18  Q.   With reference to the au pairs, the three
19  to five au pairs that you estimated that have had Au
20  Pair Care as their sponsor, did you ever speak with
21  them about what they were paid by their host families?
22  A.   I don't remember.
23  Q.   Do you recall whether or not you
24  communicated with them about what hours those au pairs
25  worked?

Page 180

1   A.   I don't remember.
2   Q.   Do you recall whether or not you had any
3   communications with them about what duties or
4   responsibilities those au pairs had while working for
5   their host -- excuse me, while they were in the homes
6   of the host families?
7   A.   I probably did.  I just don't remember.
8   Q.   Do you recall whether these au pairs that
9   were sponsored by Au Pair Care, whether they had any
10  complaints about any aspect of Au Pair Care?
11  A.   Yes, they have complaints.
12  Q.   What were those complaints?
13  A.   I don't remember.  But no one that put a
14  post has been a nice post.  Usually are really bad
15  post.
16  Q.   My question is whether or not the au
17  pairs that were sponsored by Au Pair Care had any
18  specific complaints about Au Pair Care.  My question
19  is not whether or not they had complaints about their
20  host families.
21       MR. LIBLING:  Objection to the form.
22  A.   I don't understand the question.
23  Q.   Setting aside the complaints that these
24  au pairs may have had about their host families that
25  they worked with, do you recall any specific

PLAINTIFFS' RESP. APP.0005179

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Video Teleconferenced Deposition of Sarah Carolina Azuela
March 03, 2017

Page 181

1 complaints that au pairs who were sponsored by Au Pair
2 Care had about Au Pair Care?
3      MR. LIBLING: Objection to the form.
4   A.   Yes, I remember they complained about the
5 program.
6   Q.   Are you in communication currently with
7 any au pairs or former au pairs that have been
8 sponsored by Au Pair Care?
9   A.   Right now I'm not in communication.
10   Q.   That's all the questions I have, thank
11 you.
12      MR. LIBLING: Does anyone else on the
13 phone have anything they wish to ask?
14      I take silence as a no, somewhat
15 hopefully.
16      I have a couple of questions and that I
17 think will be short.
18 EXAMINATION BY
19 MR. LIBLING:
20   Q.   Do you remember earlier today you were
21 asked about training that you had from Cultural Care
22 in January 2014?
23   A.   Yes.
24   Q.   During that training did anyone from
25 Cultural Care give you information about the au pair

Page 182

1 program?
2   A.   Yes.
3   Q.   Did the information that Cultural Care
4 give you include information about what you would be
5 paid?
6   A.   Yes.
7   Q.   What were you told?
8   A.   I told that it was going to be 195.75.
9   Q.   Were you told that it could vary based on
10 host family?
11   A.   I don't -- no, I don't think they told me
12 anything like that.
13   Q.   And speaking more generally, not just
14 about the training you received in January 2014, but
15 generally your interactions with Cultural Care over
16 the time that you were an au pair, did Cultural Care
17 have any involvement in communicating to you the
18 number of hours that you would work?
19   A.   Yes.
20   Q.   And same question about whether they had
21 involvement in communicating to you what you should be
22 paid?
23      MR. WOLOSZ: Objection to the form.
24   A.   Yes.
25   Q.   And did Cultural Care have any

Page 183

1 involvement in communicating to you what types of
2 duties you should be performing?
3      MR. WOLOSZ: Objection to the form.
4   A.   Yes.
5      MR. LIBLING: I have no further
6 questions.
7 CONTINUED EXAMINATION BY
8 MR. WOLOSZ:
9   Q.   At the training program where the stipend
10 was discussed, what was the context? Was it a class
11 setting?
12      MR. LIBLING: Objection to the form.
13   A.   Yes.
14   Q.   And do you remember whether it was your
15 smaller class or whether it was everyone who was at
16 the training program at the time?
17   A.   It was a relatively small class.
18   Q.   And the subject -- okay. Strike that.
19      MR. WOLOSZ: I have nothing further.
20      MR. LIBLING: Neither do I. Thank you.
21      MR. WOLOSZ: I'd just like to say on the
22 record that we are suspending, we are not
23 concluding the deposition, only because I had a
24 discussion with counsel at the break and I hope
25 that counsel is going to assist the witness in

Page 184

1 attempting to retrieve some additional Facebook
2 documents. So we are suspending in the event
3 that there's no further production.
4      MR. LIBLING: Do we need to designate
5 the transcript as confidential?
6      MR. WOLOSZ: Why don't we -- would you
7 be amenable to designating the entire
8 transcript as highly confidential for the next
9 30 days while we determine which portions need
10 to remain as confidential?
11      MR. LIBLING: With the exception I think
12 Ms. Azuela should be allowed to see them, yes.
13 Highly confidential only means that the parties
14 can't see it, but this is Ms. Azuela's
15 deposition.
16      MR. WOLOSZ: Understood. So yeah, with
17 that clarification.
18      MR. LIBLING: Yes, that's fine.
19      MS. KOZAL: Justin, I'm sorry, I did not
20 quite hear everything you said with respect to
21 the conversation that you and plaintiffs'
22 counsel had during a break. I understand
23 there's some documents that --
24      MR. WOLOSZ: Peggy, I'm sorry, to
25 interrupt. Should we go off the record for

PLAINTIFFS' RESP. APP.0005180

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Video Teleconferenced Deposition of Sarah Carolina Azuela
March 03, 2017

**Page 185**

1  this or do you want to stay on the record?
2     MS. KOZAL: My only question is have the
3  Facebook posts that the witness has referred to
4  in the deposition, have those been produced?
5     MR. LIBLING: Are we on the record or
6  off the record right now?
7     MS. KOZAL: Let's be on the record for
8  this. The discussion that I had with counsel
9  for Cultural Care was that he made some
10  suggestions about ways in which Facebook could
11  be served. And I said that I would talk to the
12  witness and look at whether there are ways of
13  retrieving any responsive Facebook documents
14  that have not already been produced. I believe
15  that was the extent of our conversation.
16     MR. WOLOSZ: Yes.
17     MS. KOZAL: Thank you, and subject to
18  that, we would also want to reserve our right
19  to reopen the deposition to ask questions about
20  Facebook posts that have not yet been produced.
21  That's all I have. And I apologize for
22  interrupting, thank you.
23     MR. LIBLING: Okay.
24     MR. WOLOSZ: Anything else from anyone
25  on the phone? Then I think we can go off the

**Page 186**

1  record.
2     THE VIDEOGRAPHER: The time is 3:01 p.m.
3  This concludes today's deposition of Sarah
4  Carolina Azuela. And we are now off the
5  record.
6     (Whereupon, at 3:01 P.M., the
7  Examination of this Witness was concluded.)
8
9        ○     ○     ○     ○
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 187**

1          D E C L A R A T I O N
2
3     I hereby certify that having been first duly
4  sworn to testify to the truth, I gave the above
5  testimony.
6
7     I FURTHER CERTIFY that the foregoing transcript
8  is a true and correct transcript of the testimony
9  given by me at the time and place specified
10  hereinbefore.
11
12
13
   _____
14        SARAH CAROLINA AZUELA
15
16
17  Subscribed and sworn to before me
18  this _____ day of _____ 20___.
19
20
   _____
21     NOTARY PUBLIC
22
23
24
25

**Page 188**

1          C E R T I F I C A T E
2
   STATE OF NEW YORK      )
3                         : SS.:
   COUNTY OF WESTCHESTER  )
4
5     I, SUZANNE PASTOR, a Notary Public for and within
6  the State of New York, do hereby certify:
7     That the witness whose examination is
8  hereinbefore set forth was duly sworn and that such
9  examination is a true record of the testimony given by
10  that witness.
11     I further certify that I am not related to any of
12  the parties to this action by blood or by marriage and
13  that I am in no way interested in the outcome of this
14  matter.
15     IN WITNESS WHEREOF, I have hereunto set my hand
16  this 16th day of March 2017.
17
18
   _____
19        SUZANNE PASTOR
20
21
22
23
24
25

PLAINTIFFS' RESP. APP.0005181

Case No. 1:14-cv-03074-CMA-KMT Document 959-25 filed 03/30/18 USDC Colorado pg
355 of 701

# Exhibit 442

PLAINTIFFS' RESP. APP.0005182

Page 1

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
----------------------------x

JOHANA PAOLA BELTRAN, et al.,

                    Plaintiffs,

        v.                      Civil Case No.
                                14-cv-03074-CMA-KMT

INTEREXCHANGE, INC., et al.,

                    Defendants.

----------------------------x




        VIDEOTAPED DEPOSITION OF MICHAEL MCHUGH
              NEW YORK, NEW YORK
            Thursday, April 6, 2017




HIGHLY CONFIDENTIAL PAGES: 300-301


Reported by:

JEREMY RICHMAN

JOB NO:  308029


            MAGNA LEGAL SERVICES
        320 West 37th Street, 12th Floor
            New York, New York 10018
                (866) 624-6221

PLAINTIFFS' RESP. APP.0005183

MAGNA
LEGAL SERVICES

| | |
|---|---|
| **Page 2** | **Page 4** |

**Page 2**

```
 1
 2
 3
 4                April 6, 2017
 5                9:04 a.m.
 6
 7        VIDEOTAPED DEPOSITION of MICHAEL MCHUGH,
 8  held at the offices of Boies Schiller &
 9  Flexner, 575 Lexington Avenue, New York, New
10  York, before JEREMY RICHMAN, a Shorthand
11  Reporter and Notary Public of the State of New
12  York
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1
 2  APPEARANCES (Continued):
 3
 4  PUTNEY, TWOMBLY, HALL & HIRSON, LLP
 5  Attorneys for defendant American Institute for
 6  Foreign Study d/b/a Au Pair in America
 7     521 Fifth Avenue
 8     New York, NY 10175
 9  BY:  JOHN B. FULFREE, ESQ., via teleconference
10     (jfulfree@putneylaw.com)
11
12
13  GORDON & REES, LLP
14  Attorneys for Au Pair Care
15     555 17th Street, Suite 3400
16     Denver, CO 80202
17  BY:  NATHAN HUEY, ESQ., via teleconference
18     (nhuey@gordonrees.com)
19
20
21
22
23
24
25
```

**Page 3**

```
 1
 2  APPEARANCES:
 3
 4  BOIES SCHILLER & FLEXNER
 5  Attorneys for plaintiffs
 6     575 Lexington Avenue
 7     New York, NY 10022
 8  BY:  JOSHUA J. LIBLING, ESQ.
 9     DANIEL R. SCHWARTZ, ESQ.
10     (jlibling@bsfllp.com)
11     (dschwartz@bsfllp.com)
12
13  SHERMAN & HOWARD
14  Attorneys for defendant Interexchange
15     633 Seventeenth Street, Suite 3000
16     Denver, CO 80202
17  BY:  HEATHER FOX VICKLES, ESQ.
18     (hvickles@shermanhoward.com)
19
20  NIXON SHEFRIN HENSEN OGBURN, P.C.
21  Attorneys for 20/20, APEX
22     5619 DTC Parkway, Suite 1200
23     Greenwood Village, CO 80111
24  BY:  MIKE DREW, ESQ., via teleconference
25     (mdrew@nixonshefrin.com)
```

**Page 5**

```
 1
 2  APPEARANCES (Continued):
 3
 4  LEWIS ROCA ROTHBERGER CHRISTIE, LLP
 5  Attorneys for Cultural Care
 6     One Tabor Center, Suite 3000
 7     1200 Seventeenth Street
 8     Denver, CO 80202
 9  BY:  JESSICA FULLER, ESQ., via teleconference
10     (jfuller@lrrc.com)
11
12
13  CHOATE HALL & STUART
14  Attorneys for Cultural Care
15     2 International Place
16     Boston, MA 02110
17  BY:  JUSTIN J. WOLOSZ, ESQ., via
18  teleconference
19     (jwolosz@choate.com)
20
21
22
23
24  PRESENT:
25  ROBERT STEINKOPF, Videographer
```

MAGNA ▶
LEGAL SERVICES

2 (Pages 2 to 5)

**Page 6**

1
2     IT IS HEREBY STIPULATED AND AGREED
3   by and between the attorneys for the respective
4   parties herein, that filing and sealing be and
5   the same are hereby waived.
6     IT IS FURTHER STIPULATED AND AGREED
7   that all objections, except as to form of the
8   question, shall be reserved to the time of the
9   trial.
10     IT IS FURTHER STIPULATED AND AGREED
11  that the within deposition may be sworn to and
12  signed before any officer authorized to
13  administer an oath, with the same force and
14  effect as if signed and sworn to before the
15  Court.
16
17
18
19
20     - oOo -
21
22
23
24
25

**Page 7**

1       M. MCHUGH
2     THE VIDEOGRAPHER: We're now
3   on the record. This begins DVD
4   number one in the deposition of
5   Michael McHugh in the matter of
6   Johana Paola Beltran, et al.,
7   versus InterExchange, Inc., et
8   al.
9     Today is April 6, 2017. The
10  time is 9:03 a.m., this
11  deposition is being taken at 575
12  Lexington Avenue, New York, New
13  York at the request of Boies
14  Schiller & Flexner, LLP. The
15  videographer is Robert Steinkopf
16  of Magna Legal Services, and the
17  court reporter is Jeremy Richman
18  of Magna Legal Services. Will
19  counsel and all parties present
20  state their appearances and whom
21  they represent.
22     MR. LIBLING: Joshua
23  Libling, Boies Schiller &
24  Flexner, for the plaintiffs.
25     MR. SCHWARTZ: Daniel

**Page 8**

1       M. MCHUGH
2   Schwartz, Boies Schiller &
3   Flexner, for the plaintiffs.
4     MS. VICKLES: Heather
5   Vickles with Sherman and Howard
6   on behalf of defendant
7   InterExchange.
8     THE VIDEOGRAPHER: Will the
9   court reporter please swear in
10  the witness.
11     MICHAEL MCHUGH, having been
12  called as a witness, having first
13  been duly sworn by a Notary
14  Public (Jeremy Richman) of the
15  State of New York, was examined
16  and testified as follows:
17     EXAMINATION BY
18   MR. LIBLING:
19  Q.   Good morning, Mr. McHugh.
20  A.   Good morning.
21  Q.   Thank you for joining us
22  today. I appreciate your time. So we
23  will get started soon with the first
24  exhibit. Obviously, if you have any
25  clarifications that you need to ask

**Page 9**

1       M. MCHUGH
2   about any of my questions, if you
3   don't understand anything that I'm
4   saying, if you need a break while a
5   question isn't pending, anything like
6   that, please just say so. This will
7   go more easily if we understand each
8   other, and so feel free to ask any
9   questions that you need to ask.
10     MR. LIBLING: Can we mark
11   Exhibit 1 and 2, please.
12  Q.   Okay. Before I put
13  Exhibit 1, which is entitled
14  Plaintiffs' -- well, it's entitled
15  Plaintiffs' agered [sic] notice of
16  30(b)(6) deposition of defendant
17  InterExchange, Inc. It probably meant
18  to say agreed. Do you recognize this
19  document?
20     (McHugh Exhibit 1,
21   Plaintiffs' Agreed Notice of
22   30(B)(6) Deposition of Defendant
23   Interexchange, Inc., was marked
24   for identification.)
25     (McHugh Exhibit 2, email

MAGNA ►
LEGAL SERVICES

Page 10

M. MCHUGH

1
2    dated Monday April 3, 2017, was
3    marked for identification.)
4        A.   I do.
5        Q.   And is this the -- is this
6    the notice of deposition pursuant to
7    which you're appearing here today, as
8    you understand it?
9        A.   Yes, this looks familiar to
10   me.
11       Q.   Thank you.  If you could
12   look at Exhibit 2, it should also be
13   in front of you.  It is an email from
14   your counsel, Heather Vickles, to
15   myself, amongst a number of other
16   people, dated Monday, April 3, 2017,
17   at 4:05 p.m., do you recognize this
18   email?
19       A.   I do, yes.
20       Q.   All right.  And do you
21   understand this email to have been
22   agreements between your counsel and
23   counsel for plaintiffs clarifying some
24   of the issues in the notice?
25       A.   I do.

Page 11

M. MCHUGH

1
2        Q.   Thank you.  All right, you
3    can set both of those aside for now.
4    We may come back to Exhibit 1 later.
5        I'm going to mark as Exhibit
6    3 -- this is a document Bates
7    numbered InterExchange 0004408.  We
8    printed it out in its native form for
9    you because we think it's easier to
10   read that way, but just for the
11   record, it was 4408 through 4449.  Do
12   you recognize this document?
13       (McHugh Exhibit 3, Bates
14       stamped INTEREXCHANGE 0004408
15       through 4449, was marked for
16       identification.)
17       A.   I do.
18       Q.   Can you tell me what it is,
19   please?
20       A.   This is a version of our
21   host family handbook for the Au Pair
22   U.S.A. program.
23       Q.   Do you know whether it is
24   the most up-to-date version?
25       A.   I'll have to take a minute

Page 12

M. MCHUGH

1
2    to review it.  This does not appear to
3    be the most up-to-date version.
4        Q.   How are you making that
5    determination?
6        A.   I'm familiar with the
7    content of the, of this version, and
8    I'm familiar with the content of the
9    newer version, and by reading this, I
10   can tell that this is not the newer
11   version.
12       Q.   Do you know when the newer
13   version -- when the newer version came
14   into effect?
15       A.   Well, this one was in effect
16   in 2012.  I believe the new version
17   came out, I'm estimating here, because
18   I don't have the document in front of
19   me, but I would say maybe 2014 or '15.
20   Probably 2015.  But again, that's an
21   estimation.
22       Q.   Okay.  Were there any
23   versions between this 2012 version and
24   the 2014, 2015 version?
25       A.   I really can't answer that

Page 13

M. MCHUGH

1
2    definitively.  I don't think so, but I
3    can't be sure.
4        Q.   Okay.  How --
5        A.   Excuse me, there may have
6    been slight modifications to a version
7    in between.
8        Q.   Thank you.  Have there been
9    any versions since the 2014, 2015
10   version?
11       A.   I do not believe there have
12   been any modifications to that
13   version.
14       Q.   And do you know when the
15   version before the 2012 version came
16   out?
17       A.   I do not know that.
18       Q.   Okay.  All right.  Well,
19   since we're talking about updates to
20   the host family handbook, can you tell
21   me how the host family handbook is
22   updated?  And be more precise, if that
23   will be easier for you.
24       A.   Well, there are a couple of
25   different ways that the host family

MAGNA
LEGAL SERVICES

---

**Page 14**

```
 1              M. MCHUGH
 2    handbook could be updated.  An issue
 3    may be brought to our attention that
 4    necessitates a minor edit to the
 5    handbook.  We do our best to review
 6    the handbook each year to see whether
 7    there are any issues that we should
 8    address, but the newest version was a
 9    new, fresh rewrite of the handbook,
10    rather than a modification of this
11    current handbook that I'm looking at.
12    So we started with a blank screen and
13    started writing a new handbook.
14       Q.   And when you say brought to
15    our attention, who -- slight
16    modification we're talking about,
17    first.
18       A.   Mm-hmm.
19       Q.   Who is the our?
20       A.   InterExchange.
21       Q.   Who specifically at
22    InterExchange?
23       A.   Well, any number of staff
24    members or -- even a host family or
25    an Au Pair could bring an issue to our
```

**Page 15**

```
 1              M. MCHUGH
 2    attention, potentially, that would
 3    cause us to reevaluate what's written
 4    in the handbook.
 5       Q.   Who would make the decision
 6    as to whether whatever the issue was
 7    should result in a change to the
 8    handbook?
 9       A.   We would discuss it, but the
10    ultimate decision would be myself, my
11    own working in consultation with our
12    communications team and senior
13    leadership.
14       Q.   And who do you consider to
15    be the senior leadership that you just
16    referred to?
17       A.   Our CEO and president.
18       Q.   Anyone else?
19       A.   Our COO.
20       Q.   Anyone else?
21       A.   In the past we've had a
22    marketing director.
23       Q.   Anybody else?
24       A.   I believe we discussed font
25    sizes and font types and font spacing
```

**Page 16**

```
 1              M. MCHUGH
 2    and lines per character with our CTO.
 3       Q.   CTO.  Anybody else?
 4       A.   Well, I also consider our
 5    CFO to be senior leadership, but he
 6    would not have been involved in that
 7    discussion.
 8       Q.   Okay.  Is there anybody else
 9    who would have been involved in this
10    discussion?
11       A.   Program staff, front line
12    staff, perhaps local coordinators.
13       Q.   Okay.  And you also
14    mentioned the communications team.  Is
15    there anyone specific on the
16    communications team who would be
17    involved in a decision to make the
18    kind of slight edit you described?
19       A.   Not really, no.
20       Q.   Does the --
21       A.   Oh, in time, in the past in
22    time -- in the past there has been,
23    but currently, no.
24       Q.   Who in the past?
25       A.   We had a director of
```

**Page 17**

```
 1              M. MCHUGH
 2    marketing.
 3       Q.   And what was that person's
 4    name?
 5       A.   Ron Hernandez.
 6       Q.   Okay.  Is there a current
 7    head of the communications team?
 8            THE WITNESS:  Somebody needs
 9    to mute their.
10            MR. LIBLING:  Someone needs
11    to --
12            THE WITNESS:  Whoever has
13    Bentley needs to mute their
14    phone.
15            MS. FULLER:  Oh, sorry.
16       Q.   Let me reask that question.
17    Is there a current head of the
18    communications team?
19       A.   The communications team
20    currently falls under the technology
21    leader, the head of the technology
22    department, who is the CTO.
23       Q.   And who is the current CTO?
24       A.   His name is Dirk Kelly.
25       Q.   All right.  And you said
```

PLAINTIFFS' RESP. APP.0005187

**MAGNA ▶**
**LEGAL SERVICES**

Page 18

M. MCHUGH

1
2    the -- I believe you described the
3    most recent, or at least the 2014,
4    2015 investigation as a fresh rewrite
5    --
6        A.   Yes.
7        Q.   -- is that accurate?
8        A.   Yes.
9        Q.   And who made the decision
10   that you needed to undergo a fresh
11   rewrite?
12       A.   I made that decision.
13       Q.   Did you make that decision
14   alone or in consultation?
15       A.   I made that decision alone.
16       Q.   What were your reasons?
17       A.   I believe the version I'm
18   looking at here had been edited in
19   minor ways too many times to have a
20   consistent voice and a consistent
21   point of view throughout the entire
22   document, and rather than try to
23   rewrite or rework other people's work,
24   I thought it would be a good
25   opportunity to start fresh and create

Page 19

M. MCHUGH

1
2    a new document.
3        Q.   Were there any other
4    reasons?
5        A.   I can't think of any other
6    reasons.
7        Q.   So there was no specific
8    area of substance where you wanted to
9    change the host family handbook?
10       A.   In endeavoring to write a
11   new document, our goal was not to
12   recreate this current document topic
13   by topic, but rather when I say to
14   start fresh, to start with a list of
15   all topics that should be covered, to
16   our opinion, and then flesh those out
17   into paragraph and page document form.
18   So it's not a one-to-one rewrite, it's
19   a new document.
20       Q.   And who approves the --
21   well, let's start with this version,
22   and then I'll ask about the version
23   you just talked about.  Starting with
24   this version in front of you, who
25   provided the final approval that this

Page 20

M. MCHUGH

1
2    version could go out to host families?
3        A.   This version?
4        Q.   This version in front of
5    you.
6        A.   The final approval is with
7    our CEO.
8        Q.   All right.  And who provided
9    the final approval that the 2014, 2015
10   version could go out to host families?
11       A.   Final approval was with our
12   CEO.
13       Q.   And I take it in both cases
14   the CEO did give that final approval?
15       A.   Yes.
16       Q.   So I have, in the last
17   couple of questions there is an
18   implicit assumption, which I realize I
19   will make explicit now, does this
20   document go out to host families?
21       A.   The new version goes out to
22   host families.
23       Q.   And the version in front of
24   you, did that go out to host families
25   during the period that it was the

Page 21

M. MCHUGH

1
2    operative version?
3        A.   Yes.
4        Q.   And how is it provided to
5    host families?
6        A.   Which one?
7        Q.   The version in front of you.
8        A.   The version in front of us
9    was provided, the older investigation
10   was provided in paper format only.
11       Q.   And --
12       A.   I'm sorry, let me correct
13   that.  It was primarily, in my
14   opinion, provided in paper format,
15   although it may have existed on a
16   resource center in a digital format.
17       Q.   And was it provided to all
18   host families?
19       A.   It was provided to all host
20   families who had decided to match with
21   an Au Pair.
22       Q.   Okay.  Has that process
23   changed for the more recent version?
24       A.   Let me think.  It has not.
25   Except, and I'm sorry that I'm

PLAINTIFFS' RESP. APP.0005188

MAGNA
LEGAL SERVICES

Page 22

```
1              M. MCHUGH
2    confused, I'm thinking about this.  It
3    may go to all host families who apply
4    to the program, rather than I stated
5    earlier that all families who matched
6    with the program.  I believe it's all
7    families who apply to the program.
8       Q.   Is that just for the new
9    version or both the new version and
10   this version?
11      A.   Both versions.  And when I
12   say, apply to the program, I mean that
13   they have been provisionally accepted
14   to the program.  They haven't, they
15   haven't -- they have completed the
16   application in its entirety on a first
17   pass.
18      Q.   What is the distinction
19   between provisionally accepted to the
20   program and applying to the program?
21      A.   For us, we would consider
22   any family who begins the application
23   process.  We have an online host
24   family application process.  If
25   somebody starts the application, they
```

Page 23

```
1              M. MCHUGH
2    are applying.  If somebody has
3    completed the application, including
4    all of the required fields, and then
5    signed the host family agreement and
6    pressed submit, and it came to us and
7    we reviewed that and found there to be
8    at that point nothing that would
9    disqualify them, then they would
10   generally be considered provisionally
11   accepted pending further review.
12      Q.   What is the process for that
13   further review?
14      A.   Well, it would begin with a
15   view of the documents they would
16   submit, the required documents.  It
17   would include the interview with the
18   local coordinator and the report that
19   the local coordinator submits.  It
20   would include the review or
21   description of the bedroom that's
22   available to the Au Pair, including
23   the description by the local
24   coordinator, who has seen that bedroom
25   in person.
```

Page 24

```
1              M. MCHUGH
2       It would include employment
3    verification to non-family references.
4    A check of the family's ID, driver's
5    license and the recording of that.
6    Verification that the family lives
7    within 60 miles -- or I'm sorry,
8    60 minutes' drive of a local
9    coordinator for InterExchange.  I
10   think, I think that's just about it.
11      Q.   Who makes the decision
12   whether the host family has satisfied
13   the necessary criteria?
14      A.   Our compliance coordinator.
15      Q.   Is that one person or a team
16   of people?
17      A.   That is currently one
18   person.
19      Q.   What is his or her name?
20      A.   Her name is Meggie,
21   M-E-G-G-I-E, Davenport.
22      Q.   You mentioned local
23   coordinators, are those InterExchange
24   employees?
25      A.   They are InterExchange
```

Page 25

```
1              M. MCHUGH
2    part-time employees.
3       Q.   You also mentioned an online
4    application process.  Are there
5    offline application processes?
6       A.   Currently, no.
7       Q.   Was there ever an offline
8    application process?
9       A.   Yes.
10      Q.   When was there an offline,
11   for what period?
12      A.   From the inception of
13   InterExchange's Au Pair U.S.A. program
14   until we launched our online
15   application program in 2011.
16      Q.   And when you launched the
17   online application process, did you
18   cease using the offline application
19   process?
20      A.   I don't believe that we
21   ceased using the offline application
22   process immediately.  There were some
23   families who requested paper
24   applications for a period of time, but
25   that has ended.
```

PLAINTIFFS' RESP. APP.0005189

**MAGNA**
LEGAL SERVICES

---

Page 26

```
1            M. MCHUGH
2     Q.   Do you know approximately
3  when it ended?
4     A.   I do not.
5     Q.   Okay.  You also mentioned
6  that the host families have to submit
7  required documents.  To which
8  documents were you referring?
9     A.   So the family -- well, the
10 family has to submit an employment
11 verification.
12    Q.   Are there any other
13 documents?
14    A.   The friends of the host
15 family will submit references about
16 the host family, so technically the
17 host family is not submitting those
18 documents, but they are being
19 submitted towards the host family
20 application.  Similarly, the local
21 coordinator submits an interview
22 report.  The host family does not have
23 access to that interview report, but
24 it is submitted into their
25 application.
```

Page 27

```
1            M. MCHUGH
2     Q.   Thank you for that
3  clarification.  Are there other
4  documents which are submitted by
5  anybody else into the host family
6  application?
7     A.   Well, there could be
8  multiple, more than two references.
9  There's no limit to the number of
10 references.  But besides for that,
11 employment verification, interview
12 report, I can't think of another
13 document.
14    Q.   Okay.
15    A.   At the moment.
16    Q.   You mentioned that if there
17 was nothing that would disqualify
18 them, then they would be, then the
19 host family would be accepted.  What
20 would disqualify a host family?
21    A.   If there was nothing that
22 would disqualify them, they would be
23 provisionally accepted.
24    Q.   Okay.
25    A.   Things that could disqualify
```

Page 28

```
1            M. MCHUGH
2  them are -- well, there's a lot.  If
3  they live beyond one hour's drive from
4  the host family, if they live in an
5  area that we don't cover.  If they are
6  not citizens or legal green card
7  holders, legal permanent residents, we
8  would not accept them.
9         If they could not prove that
10 they had employment or adequate
11 financial resources to host an Au
12 Pair, that would disqualify them.  If
13 after the interview, the local
14 coordinator did not recommend that we
15 work with them, that would disqualify
16 them.  If the bedroom the Au Pair was
17 meant to live in was insufficient as
18 judged by our local coordinator, that
19 would disqualify the family.
20        If the family had a criminal
21 record, that would disqualify the
22 family.  If the family was engaged in
23 a, currently engaged in criminal
24 activity, that would disqualify them.
25        If the family had personal
```

Page 29

```
1            M. MCHUGH
2  situations that we believed could
3  present a problem in the successful
4  operation of a cultural exchange
5  program within their home, or would
6  not allow the exchange visitor to have
7  a successful program within their
8  home, that could disqualify them.
9     Q.   Okay.  So is it accurate to
10 say that InterExchange would ensure
11 that none of the conditions that you
12 just listed applied to a host family
13 before, I think you said provisionally
14 accepting a host family?
15    A.   Yes, it is, it is fair to
16 say that we do our best to determine
17 whether any of these situations exist
18 and would exclude families as such.
19    Q.   All right, thank you.  If
20 you can turn to, it's the third page
21 of the document you have there, but
22 it's not the page that's numbered
23 three, it's actually the third page.
24    A.   Mm-hmm.
25    Q.   It's the one that says on
```

PLAINTIFFS' RESP. APP.0005190

MAGNA
LEGAL SERVICES

Page 30

```
1              M. MCHUGH
2    the bottom, keep in touch.
3        A.   Yes.
4        Q.   And I just have a quick
5    question about on the right, do you
6    see where it says client relations
7    team?
8        A.   Mm-hmm.
9        Q.   Who are the client relations
10   team?
11       A.   There currently is not
12   anyone filling the client relations
13   team position.
14       Q.   When was the last time there
15   was somebody filling that position?
16       A.   Maybe two years ago, but I
17   would -- I can't say for sure.
18       Q.   And since that time is there
19   somebody who fulfills the same role?
20       A.   Yes.
21       Q.   Who is that person?
22       A.   The responsibilities of the
23   previous client relations team are
24   split between the compliance
25   coordinator, Meggie Davenport,
```

Page 31

```
1              M. MCHUGH
2    additional responsibilities are
3    conducted or looked over by one of our
4    program specialists named Charlotte
5    Volpe, V-O-L-P-E.
6        Q.   And what are the
7    responsibilities of what used to be
8    the client relations team?
9        A.   The client relations here
10   fielded calls and inquiries from
11   potential host families.  They fielded
12   calls and queries from current host
13   families, and they resolved disputes
14   in a billing sense.  They worked with
15   the finance team to be the point
16   person on the program team to handle
17   billing problems.
18       Q.   So clients refers solely to
19   host families?
20       A.   Yes, in this case.
21       Q.   Are there cases in which you
22   consider somebody else to be your
23   clients?
24       A.   Within our company we refer
25   to Au Pairs as participants or Au
```

Page 32

```
1              M. MCHUGH
2    Pairs or exchange visitors, but we do
3    not refer to them as clients.
4        Q.   And which of the
5    responsibilities that you listed for
6    the former client relations team have
7    been transferred to Ms. Davenport?
8        A.   So Ms. Davenport handles the
9    inquiries from current host families
10   -- telephone inquiries from current
11   host families, telephone inquiries
12   from potential families, people who
13   have started an application but
14   haven't completed an application, she
15   reaches out to them.  And also the
16   billing disputes.
17       Q.   And which of the
18   responsibilities have been assigned to
19   Ms. Volpe?
20       A.   So Ms. Volpe also handles
21   inquiry telephone calls, and she looks
22   after the Au Pair, Au Pair
23   InterExchange email address.
24       Q.   Who comes into the Au Pair
25   InterExchange email address?
```

Page 33

```
1              M. MCHUGH
2        A.   Many different types of
3    emails.
4        Q.   Can you tell me who would be
5    directed to email that email address?
6        A.   Who would be directed to
7    email that email address?
8        Q.   Well, if it's unclear, let
9    me try to make it a better question.
10   Would host families email the Au Pair
11   InterExchange email address?
12       A.   Yes, they might.
13       Q.   Would the Au Pairs email the
14   Au Pair InterExchange email address?
15       A.   Yes, they might.
16       Q.   Would anyone else email the
17   Au Pair InterExchange email address?
18       A.   Sure, people who aren't host
19   families or Au Pairs.  The public.
20   Spam.
21       Q.   Is it fair --
22       A.   Marketing companies.
23       Q.   Is it fair to describe it as
24   a general inquiries email?
25       A.   It is fair to describe it as
```

PLAINTIFFS' RESP. APP.0005191

MAGNA
LEGAL SERVICES

Case 1:14-cv-03074-CMA-KMT Document 939-59 Filed 05/17/18 USDC Colorado Page 364 of 700

Page 34

1          M. MCHUGH
2    a general inquiries email.
3        Q.   If you can turn to page --
4    and this time I mean the page marked
5    two, rather than the second page.  And
6    in particular, I direct your attention
7    to the penultimate paragraph, which
8    starts, our local coordinators.
9        A.   Mm-hmm.
10       Q.   I'm going to read the last
11   two sentences and ask you about them.
12           Local coordinators are a
13   vital part of the organization's
14   efforts to service Au Pairs and host
15   families throughout their year
16   together.  They interact directly with
17   both parties, serving as an
18   informational resource, monitoring the
19   placement during the 12-month period
20   and occasionally serving as a
21   mediator, if problems arise.
22           My first question is given
23   this is an outdated version of this
24   document, are those statements still
25   true?

Page 35

1          M. MCHUGH
2        A.   I wouldn't word it that way
3    again.
4        Q.   Can --
5        A.   But in general, the
6    sentiment is true.
7        Q.   Is there anything that you
8    consider inaccurate?
9        A.   Nothing is inaccurate.
10       Q.   Okay.  So I want to ask you
11   about the local coordinator's role in
12   interacting directly with both
13   parties.  I take that to mean Au Pairs
14   and host families; is that right?
15       A.   Yes.
16       Q.   How do local coordinators
17   serve as an informational resource for
18   Au Pairs and host families?
19       A.   Do you want to start with
20   one?
21       Q.   Sure, that's a good idea.
22   Can you please tell me how local
23   coordinators serve as an informational
24   resource for host families?
25       A.   Well, it's a very broad

Page 36

1          M. MCHUGH
2    question.  It's a broad set of
3    information.  How could they serve as
4    a resource?  If a family had a
5    question, they could call the local
6    coordinators, and the local
7    coordinators can answer that question,
8    or they may refer the question to us.
9           They may get the answer from
10   us and deliver the answer to the
11   family themselves, or they may direct
12   the host family to call the office
13   directly.
14       Q.   Is there any information
15   that a local coordinator is required
16   to provide a host family, required by
17   InterExchange?
18       A.   Required to provide
19   information by InterExchange?
20       Q.   Yes.
21       A.   I'm thinking who could be
22   required by InterExchange.  When you
23   say information, are you thinking of
24   documents?
25       Q.   I was thinking of documents

Page 37

1          M. MCHUGH
2    or verbal communications.  But I can
3    rephrase the question.  Are there
4    conversations or topics that local
5    coordinators are required to discuss
6    with host families?
7        A.   Yes, yes.
8        Q.   What are those topics?
9        A.   So before the Au Pair
10   arrives, as I mentioned earlier, the
11   host family will be visited by the
12   local coordinator, and the local
13   coordinator will conduct an interview
14   with the host family.  So they follow
15   a template that's been provided by
16   InterExchange, they ask the
17   questions on the template, gather
18   information, provide information.
19   Yeah, so that's one area.
20           After the Au Pair arrives,
21   the host -- or the local coordinator
22   is required by the regulations to
23   contact the Au Pair and host family
24   within 48 hours, so they do that.  The
25   local coordinator is also required by

| | |
|---|---|
| Page 38 | Page 40 |

**Page 38**

M. MCHUGH

1  
2  the regulations to conduct -- to  
3  conduct an in-home visit with the Au  
4  Pair and the local coordinator within  
5  two weeks. And during that, for that  
6  they would also follow a template that  
7  we've provided.  
8      Q.   And are there, are there any  
9  topics that a local coordinator is  
10  required to discuss with the Au Pair?  
11     A.   Well, so they cover the  
12  topics that are in those documents  
13  that I mentioned, and they refer to  
14  program regulations, limits on hours  
15  working, limits on number of days per  
16  week for working. The payment of the  
17  stipend, scheduling, vacation, the  
18  standard regulatory issues.  
19     Q.   Okay. And beyond the  
20  required meetings that you've already  
21  referenced, how do local coordinators  
22  monitor the placement during the  
23  12-month period?  
24     A.   Mm-hmm, so local  
25  coordinators are required to have  

**Page 39**

M. MCHUGH

1  
2  monthly contact with the host family  
3  and the Au Pair.  
4      Q.   Is there any other way in  
5  which they monitor the placement?  
6      A.   Besides for the monthly  
7  contact, if they're contacted, they  
8  will, they'll answer the calls that  
9  come to them, the emails that come to  
10  them, they'll help out as necessary.  
11     Q.   Is it fair to say that local  
12  coordinators are expected to be  
13  generally available to Au Pairs or  
14  host families who have an issue they  
15  want to discuss about the placement?  
16     A.   Yes.  
17     Q.   And the last thing it says  
18  here is, occasionally serving as a  
19  mediator if problems arise. Can you  
20  tell me what local coordinators's role  
21  is as a mediator?  
22     A.   So if the Au Pair or the  
23  host family contacts the local  
24  coordinator with an issue and seeks  
25  advice on that issue, they will do  

**Page 40**

M. MCHUGH

1  
2  their best to provide advice to help  
3  resolve that issue.  
4      Q.   Is anything else meant by  
5  being a mediator, or is it just meant,  
6  helping to solve a problem?  
7      A.   It's mostly helping to solve  
8  a problem.  
9      Q.   Okay. If you can turn to  
10  the next page of that document,  
11  please. So at the top of this page it  
12  says, all host families participating  
13  in the InterExchange Au Pair U.S.A.  
14  program must, and then it lists six  
15  bullets.  
16     A.   Mm-hmm.  
17     Q.   Are all six of those  
18  requirements still in effect?  
19     A.   Yes.  
20     Q.   And the next thing it says  
21  is, each accepted host family must  
22  agree to and adhere to the host family  
23  agreement.  
24         Is that still a true  
25  statement?  

**Page 41**

M. MCHUGH

1  
2      A.   They must agree to and  
3  adhere to the host family agreement,  
4  yes.  
5      Q.   Who are the parties to the  
6  host family agreement?  
7      A.   The parties to the agreement  
8  are InterExchange and the host family.  
9      Q.   And there are a number of  
10  bullets listed under this, under the  
11  heading we just read. If you wouldn't  
12  mind just taking a moment to read  
13  through them and letting me know  
14  whether there are any that are no  
15  longer included in the host family  
16  agreement?  
17     A.   In the current host family  
18  agreement?  
19     Q.   In the current host family  
20  agreement. If you're not going to  
21  know the answer to that question, just  
22  tell me and we won't go through the  
23  exercise.  
24     A.   Yeah, I wouldn't be able to  
25  answer without the host family  

PLAINTIFFS' RESP. APP.0005193

MAGNA ▶  
LEGAL SERVICES

---

Page 42

M. MCHUGH

1 agreement.
2    Q.   That's fine, we'll turn to
3 that later, then.  All right, I'm
4 going to ask some specific questions
5 about this one.  One of the bullets
6 about halfway down mentions
7 participating in a Family Day
8 conference annually.  What is a Family
9 Day conference?
10    A.   Family Day is a requirement
11 of the State Department regulations,
12 it's a requirement that -- well, that
13 host families attend an event with
14 their local coordinator.
15    Q.   What happens at that event?
16    A.   A number of things could
17 happen at that event.  It could be
18 social, it could be educational, it
19 could be informational.  It could be,
20 it could be a number of things.
21    Q.   Does it have a set agenda?
22    A.   It does not have a set
23 agenda.
24    Q.   Okay.  The first bullet says
25

---

Page 43

M. MCHUGH

1 the number of hours the Au Pair
2 provides childcare are limited to a
3 maximum of 45 hours per week, no more
4 than five and one half days per week.
5 The Au Pair will not provide more than
6 ten hours of childcare per day.
7       Does InterExchange still
8 require that host families agree to
9 that requirement in an agreement with
10 InterExchange?
11    A.   Well, InterExchange is
12 charged with upholding the
13 regulations, and those limits on the
14 hours per week and the days per week
15 that the Au Pair can provide childcare
16 are State Department regulatory
17 issues.
18    Q.   Are they also included in an
19 agreement between InterExchange and
20 the host family?
21    A.   The host family agreement, I
22 would have to look at the wording to
23 know for sure.
24    Q.   So would this -- would this
25

---

Page 44

M. MCHUGH

1 document, I'm going to give you this,
2 but I actually don't want to mark this
3 whole thing as an exhibit.
4       MR. LIBLING:  Can we go off
5    the record for a second.
6       THE VIDEOGRAPHER:  Off the
7    record, time is 9:50 a.m.
8       (Time noted:  9:51 a.m.)
9       (Recess.)
10       (Time noted:  9:52 a.m.)
11       THE VIDEOGRAPHER:  Now on
12    the record, the time is 9:51 a.m.
13       (McHugh Exhibit 4, Bates
14    stamped INTEREXCHANGE 0004463
15    through 4464, was marked for
16    identification.)
17    Q.   I have marked as Exhibit 4
18 an excerpt of a document after
19 discussing it with your counsel.  The
20 full document is Bates marked
21 InterExchange 0004450 through 4475,
22 but we have only marked 4463 through
23 4464.  Is this the host family
24 agreement that we've been discussing?
25

---

Page 45

M. MCHUGH

1    A.   This is not our current host
2 family agreement.
3    Q.   Do you know when this host
4 family agreement was in effect?
5    A.   I do not, no.
6    Q.   How do you know it's not the
7 current host family agreement?
8    A.   I was involved in the
9 creation of the most recent host
10 family agreement, and this does not
11 appear to be that agreement.
12    Q.   When was the most recent
13 host family agreement -- when did it
14 come into effect?
15    A.   I believe the most recent
16 version of the host family agreement
17 came into effect on January 1st, 2017.
18    Q.   2017, okay.  Could this be
19 the version that was in effect prior
20 to January 1, 2017?
21    A.   This is not the version that
22 was immediately in effect prior to
23 2017.
24    Q.   For what period was the
25

---

PLAINTIFFS' RESP. APP.0005194

MAGNA
LEGAL SERVICES

Page 46

```
1              M. MCHUGH
2    immediately prior version in effect?
3        A.   The immediately prior
4    version was in effect, I believe from
5    March of 2016 until December 31st of
6    2016, I believe.
7        Q.   Okay.  And was -- could this
8    be the version that was in effect
9    prior to March of 2016?
10       A.   This is not the version that
11   was in effect prior to March of 2016.
12       Q.   And when, for what period
13   was the version that was in effect
14   prior to March 2016 in effect?
15       A.   I believe that was in effect
16   from, this may not be exact, maybe
17   December 1, 2015 until March, 2016.
18       Q.   And could this be the
19   version that was in effect prior to
20   December 1, 2015?
21       A.   I do not believe this to be
22   the version in effect prior to March
23   2015.
24       Q.   Prior to December 2015?
25       A.   This is not the version
```

Page 47

```
1              M. MCHUGH
2    prior to December 2015 either.
3        Q.   And how long was the version
4    prior to December 2015 in effect?
5        A.   I'm not sure.
6        Q.   Okay.  How do you know that
7    this is not the version that was in
8    effect during these various periods?
9        A.   As I mentioned before, I was
10   involved in the creation of the most
11   recent version.  I was also involved
12   in the creation of the versions that
13   we have discussed or referenced.
14       Q.   And is there a particular
15   provision that you're seeing in this
16   agreement that is different?
17       A.   It's entirely different.
18   It's a completely different document.
19       Q.   Okay.  Who made the decision
20   -- well, let me start a different
21   question, actually.  Was the decision
22   to update each successive version made
23   by the same person or group of people?
24       A.   Each time, as a standard
25   practice we review the host family
```

Page 48

```
1              M. MCHUGH
2    agreement each year and make changes.
3        Q.   And when you say we review
4    the host family agreement each year,
5    who is the we?
6        A.   Myself and our counsel.
7        Q.   By your counsel, do you mean
8    your in-house or external counsel?
9        A.   External counsel.
10       Q.   And what's the name of the
11   firm?
12       A.   Davis Wright Tremaine
13   currently.
14       Q.   And who approves each
15   successive version of the host family
16   agreement?
17       A.   Final approval rests with
18   the CEO.
19       Q.   And do you approve it before
20   it goes to the CEO?
21       A.   Yes.
22       Q.   Is there a level of approval
23   between you and the CEO?
24       A.   I may send it to counsel to
25   review before handing it to the CEO.
```

Page 49

```
1              M. MCHUGH
2        Q.   Okay.  I take it you don't
3    know when this version of the
4    agreement was in effect; is that
5    accurate?
6        A.   That is, that is accurate.
7        Q.   To your knowledge, would
8    this agreement need to have been
9    approved by the CEO?
10       A.   To my knowledge, that has
11   been the standard practice.
12       Q.   Since?
13       A.   I'm not sure.
14       Q.   For as long as you are
15   aware?
16       A.   No.  So we also, we had two
17   founders who served as the president
18   and -- sorry, the title escapes me, so
19   they may have been involved as well.
20       Q.   Is it fair to say that host
21   family agreements are approved at the
22   highest levels?
23       A.   Yes.
24       Q.   All right.  So I will ask
25   you some questions about this host
```

**MAGNA**
LEGAL SERVICES

| Page 50 | Page 52 |
|---|---|

**Page 50**

M. MCHUGH

1
2  family agreement that's in front of
3  you, and I would appreciate it, if
4  we're discussing a particular
5  provision and you don't think that
6  provision is in effect anymore, then
7  let me know.  Is that okay, or will
8  that not work?  You don't look like --
9      A.   I'm not particularly
10 familiar with this version.
11     Q.   Okay.
12     A.   So perhaps if I could take
13 the time to read it in its entirety
14 before being asked about questions.
15     Q.   You're certainly willing --
16 welcome to read the whole thing.  I
17 won't ask you about every single
18 paragraph, but if you would like to,
19 you should go ahead.
20         MS. FULLER:  Hello?  Hello?
21         MR. LIBLING:  Yes, the
22 witness is reading the document.
23         MS. VICKLES:  Joshua, just
24 curious, does the full
25 application have the date on it?

**Page 51**

M. MCHUGH

1
2         MR. LIBLING:  Yes.
3         MS. VICKLES:  It might be
4  helpful.
5         MR. LIBLING:  We can -- it
6  does, I can -- we can introduce
7  the full document.  I was trying
8  to avoid it.  Let's mark this.
9         (McHugh Exhibit 5, Bates
10        stamped INTEREXCHANGE 0004450
11        through 4475, was marked for
12        identification.)
13     A.   Okay, sorry, what was your
14 question?
15     Q.   Well, actually, in the
16 meantime we marked Exhibit 5, which is
17 the full document Bates numbered
18 InterExchange 0004450 through 4475,
19 and at the top you'll see it says 2010
20 host family application.  And there's
21 also a date in the line, when would
22 you like your Au Pair to arrive, it
23 says 8/2011.
24         So is it fair to conclude
25 that this host family agreement was

**Page 52**

M. MCHUGH

1
2  active in 2010 and 2011, at least for
3  portions of those years?
4      A.   Sorry, and this is the
5  agreement in this application?
6      Q.   That's correct.
7      A.   There we go.  Yes, I think
8  that would be fair to say.
9      Q.   All right, thank you.  So
10 now I'm going to go back to the
11 agreement.  Actually, before I ask,
12 before I ask specific questions about
13 this agreement, you just read it, is
14 there anything that really jumped out
15 at you and made you think, oh, wow,
16 that's different now?  I'm sure there
17 are differences throughout, but I'm
18 asking if there's anything that struck
19 you.
20     A.   Anything that struck me as
21 being different, yes.  The fees are
22 different.
23     Q.   Anything else?
24     A.   The refund amount jumped out
25 at me as being different.

**Page 53**

M. MCHUGH

1
2      Q.   Anything else?
3      A.   Those are easy to see
4  because they're numbers.
5      Q.   Yes.
6      A.   It would be hard to say
7  something else, it's hard to say
8  something is jumping out at me.
9      Q.   Okay.  If I could direct
10 your attention to paragraph three in
11 this agreement, it says, host agrees
12 to ensure that the Au Pair shall, and
13 then there are a number of bullet
14 points.
15         The first one is, be given
16 board and lodging and shall occupy a
17 separate room which must be approved
18 by InterExchange's local coordinator.
19 I take it from your prior testimony
20 that that is still a requirement?
21     A.   That is.
22     Q.   And be given the appropriate
23 U.S. State Department mandated stipend
24 to be paid weekly on a set day.
25         Is that still a requirement

PLAINTIFFS' RESP. APP.0005196

MAGNA
LEGAL SERVICES

Page 54

```
 1              M. MCHUGH
 2   in the host family agreement?
 3       A.   I'm not sure about the
 4   requirement of a set day.
 5       Q.   Okay.
 6       A.   But up until that phrase,
 7   yes.
 8       Q.   What is the U.S. State
 9   Department mandated stipend?
10       A.   The U.S. State Department
11   mandated stipend is $195.75 at a
12   minimum for 45 hours of childcare per
13   week.
14       Q.   Does the stipend vary based
15   upon the number of hours that an Au
16   Pair works?
17       A.   No.
18       Q.   Do you tell host families
19   what the U.S. State Department
20   mandated stipend is?
21       A.   In this document?
22       Q.   Does InterExchange convey
23   that information to the host families,
24   whether in this document or otherwise?
25       A.   Yes.
```

Page 55

```
 1              M. MCHUGH
 2       Q.   And the next bullet is, not
 3   work more than 45 hours per week, nor
 4   ten hours per day spread over five and
 5   one half days, and receive a written
 6   schedule at least one week in advance.
 7            Is that still a requirement
 8   in the host agreement?
 9       A.   The requirement, let's see,
10   so it's still a State Department
11   requirement that they work no more
12   than 45 hours per week, nor ten hours
13   per day spread over five and a half
14   days.  I can't say whether the new
15   version of the agreement references a
16   written schedule without seeing the
17   document.
18       Q.   But the rest of it would be
19   in the new version of the host
20   agreement?
21       A.   Sure, in the sense that
22   we're repeating the regulations and
23   informing the host family of their
24   regulatory obligations.
25       Q.   Do you consider these to be
```

Page 56

```
 1              M. MCHUGH
 2   obligations that the host family owes
 3   to InterExchange?
 4       A.   These are regulatory
 5   obligations that, when put into
 6   practice, are obligations to the Au
 7   Pair, if I'm -- if I'm understanding
 8   your question correctly.
 9       Q.   If these obligations are
10   breached, who determines that they've
11   been breached?
12       A.   So if the, if the
13   obligations have been breached, the Au
14   Pair may notify InterExchange or her
15   local coordinator.  She may notify the
16   State Department directly, and then we
17   would investigate to see whether the
18   State Department regulations had been
19   breached.
20       Q.   And would you make a
21   determination as to whether they had
22   been breached?
23       A.   Our responsibility is such.
24       Q.   And if you determined, you
25   being InterExchange, if InterExchange
```

Page 57

```
 1              M. MCHUGH
 2   determined that the regulations
 3   reflected in the host family agreement
 4   had been breached, what would
 5   InterExchange do?
 6       A.   Well, if any host family, or
 7   if any program regulations, regardless
 8   of whether they're in the host family
 9   agreement or not, had been breached,
10   it's InterExchange's responsibility to
11   look into that situation, try to
12   resolve the situation or address it.
13       Q.   And --
14       A.   Those are regulatory
15   requirements.
16       Q.   And those regulations that
17   you -- it is your responsibility to
18   ensure of being kept include
19   regulations about salary, or stipend,
20   we'll keep your language, about
21   stipend?
22            MS. VICKLES:  Object to
23   form.  You can answer.
24       A.   Can you repeat the question?
25       Q.   Of course.  You stated that
```

PLAINTIFFS' RESP. APP.0005197

MAGNA
LEGAL SERVICES

Case 1:14-cv-03074-CMA-KMT  Document 843-25  Filed 05/17/18  USDC Colorado  Page 870 of 1001

Page 58

```
1                M. MCHUGH
2    there are regulations that it is
3    InterExchange's responsibility to
4    ensure are being stuck to, is that
5    accurate?
6        A.   Yes.
7        Q.   Do those regulations include
8    regulations related to how much the Au
9    Pair will be paid?
10       A.   Yes.
11       Q.   Do those regulations include
12   regulations about the number of hours
13   that the Au Pair will work?
14       A.   Yes.
15       Q.   Do those regulations include
16   regulations about the working
17   conditions that the Au Pair
18   experiences?
19       A.   More specifically?
20       Q.   Do they include, do those
21   regulations include regulations about
22   the types of duties an Au Pair can be
23   expected to perform?
24       A.   Do those, do the State
25   Department regulations include
```

Page 59

```
1                M. MCHUGH
2    regulations about the types of duties
3    the Au Pair can perform?  I believe
4    so, yes.
5        Q.   I'm actually asking a
6    slightly more specific question.  Do
7    the State Department regulations that
8    InterExchange is responsible for
9    enforcing include regulations about
10   the types of duties that the Au Pair
11   can perform?
12       A.   Well, the State Department
13   regulations are the same regulations
14   that all sponsors are required to
15   enforce.  So in that sense, the State
16   Department regulations do include
17   language about that.
18       Q.   Okay.  I understand that
19   InterExchange is not responsible for
20   the Au Pairs and host families of
21   other sponsor agencies, it's
22   specifically for your Au Pairs, your
23   host families, your placements, is it
24   accurate to say that InterExchange is
25   responsible for enforcing regulations
```

Page 60

```
1                M. MCHUGH
2    about the types of work -- the type of
3    work that an Au Pair can perform?
4        A.   As a sponsor, it's
5    InterExchange's responsibility to
6    uphold the State Department's
7    regulations on the programs.
8        Q.   So yes?
9        A.   I believe I answered the
10   question.
11       Q.   Okay.  The regulations that
12   -- so let me get your language.  The
13   State Department regulations on the
14   programs that it is InterExchange's
15   responsibility to uphold include
16   regulations about the type of work
17   that the Au Pair can perform.  Is that
18   accurate?
19       A.   Can you read it again?
20       Q.   The State Department
21   regulations on the programs that it is
22   InterExchange's responsibility to
23   uphold include regulations about the
24   type of work that the Au Pair can
25   perform.  Is that accurate?
```

Page 61

```
1                M. MCHUGH
2        A.   Yes.
3        Q.   And those regulations also
4    include regulations about vacations
5    for Au Pairs?
6        A.   The State Department
7    regulations do include provisions
8    about vacation time.
9        Q.   Does InterExchange -- does
10   InterExchange reserve to itself the
11   right to make determinations about the
12   suitability of a host family outside
13   of the specific requirements of the
14   regulations?
15       A.   Outside of the regulations,
16   yes.
17       Q.   Can you give me an example
18   of a requirement that InterExchange
19   might impose on a host, on the
20   suitability of a host family outside
21   the requirements of the regulations?
22       MS. VICKLES:  Object to
23   form.  You can answer.
24       A.   Outside of the regulations,
25   let me think.  As I mentioned, if a
```

PLAINTIFFS' RESP. APP.0005198

MAGNA ▶

LEGAL SERVICES

Page 62

M. MCHUGH

1  local coordinator, having done the
2  interview report, interviewed the
3  family, met all of the adult members
4  of the family, felt that the family's
5  understanding of the program did not
6  meet the cultural exchange objectives
7  of the program, then that would be a
8  reason.  But I say that, but that
9  might actually be called out in the
10 regulations as well.
11     Q.   So is there an example that
12 is outside the regulation?
13     A.   I can't think of one.
14     Q.   Are there family
15 arrangements or personal situations of
16 the host families not specifically
17 prescribed by State Department
18 regulations, but that InterExchange
19 would not accept?
20     A.   So at times we have
21 discussed certain sensitive situations
22 with the State Department about a
23 family who may be going through an
24 illness, may be reaching the end of

Page 63

M. MCHUGH

1  their life, and discussed whether that
2  would be a suitable placement for an
3  Au Pair.  That's an example.
4     Q.   You say you discussed it
5  with the State Department; is that
6  right?
7     A.   Yes.
8     Q.   Did the State Department
9  make the ultimate decision about
10 whether it was a suitable placement
11 for an Au Pair, or did InterExchange?
12     A.   It was a discussion.  I
13 can't think, I can't say it was one or
14 the other each time.
15     Q.   Do you frequently have
16 discussions with the State Department?
17     A.   What would you consider
18 frequently?
19     Q.   How frequently do you have
20 discussions with the State Department?
21     A.   Within, within a year,
22 probably at least a dozen times.
23     Q.   What are the, in
24 generalities, what are the topics of

Page 64

M. MCHUGH

1  those discussions?
2     A.   Pressing matters, incidents,
3  complaints, questionable, or families
4  that we have a question about, Au
5  Pairs that we could have a question
6  about.
7     Q.   Is there a specific person
8  who is tasked with having these
9  conversations with the State
10 Department?
11     A.   Well, you have to be
12 designated as an alternate responsible
13 officer to have those conversations.
14 In most cases it's myself or our
15 participant services manager or our
16 international recruitment and
17 placement manager.
18     Q.   Who is your participant
19 services manager?
20     A.   Her name is Kate Ferrin,
21 F-E-R-R-I-N.
22     Q.   And who is your
23 international recruitment and
24 placement manager?

Page 65

M. MCHUGH

1     A.   His name is Michael Gates.
2     Q.   Is there anyone else who is
3  designated as an ultimate responsible
4  officer?
5     A.   Yes, Katie Gray is an
6  ultimate responsible officer.
7     Q.   Anyone else?
8     A.   On the Au Pair, in the Au
9  Pair department, I don't believe so
10 currently.
11     Q.   Does the restriction to the
12 Au Pair department mean that anyone
13 else who is so designated would not be
14 discussing Au Pair related issues?
15     A.   Except for the CEO, who is
16 the RO.
17     Q.   What does RO stand for?
18     A.   Responsible officer.
19     Q.   Alternate, got it.  And what
20 is Ms. Gray's title?
21     A.   Logistics manager.
22     Q.   Okay.  And do you have a
23 consistent contact at the State
24 Department?

PLAINTIFFS' RESP. APP.0005199

MAGNA
LEGAL SERVICES

Page 66

```
 1              M. MCHUGH
 2       A.  Not just one.  Depends on
 3  the issue.
 4       Q.  Are there, does it vary
 5  every time you contact the person, or
 6  are there people who you are regularly
 7  in contact with?
 8       A.  So for more procedural
 9  questions we have -- well, I would go
10  to one person.
11       Q.  Who is that?
12       A.  That is Stacy Gomelsky,
13  G-O-M-E-L-S-K-Y.
14       Q.  Are there any other specific
15  contacts that you would go to, or that
16  any of the ultimate or responsible
17  officers would go to for any issue?
18       A.  As issues arose that were
19  incidents, potential incidents or
20  matters that needed to be brought to
21  the State Department's attention, that
22  would be sent to an email address that
23  seems to then funnel those out to
24  various people in that department.
25       Q.  What is that email address?
```

Page 67

```
 1              M. MCHUGH
 2       A.  I can't say with certainty.
 3       Q.  Okay.  So are there any
 4  other specific people that you would
 5  consider to be InterExchange contacts
 6  at the State Department?
 7       A.  So within that department
 8  of, the supervisor of the people who
 9  would, who may receive that email is,
10  would be a contact that we would go to
11  directly.
12       Q.  And what is his or her name?
13       A.  I want to say Dena -- Darra
14  Klein, sorry.  D-A-R-R-A, K-L-E-I-N.
15  And these are current.
16       Q.  Have these, are there -- how
17  long have Darra Klein, and I'm trying
18  tow find the name of the other person,
19  I'm sorry, I'm blanking, Stacy
20  Gomelsky, how long have they been
21  active contacts?
22       A.  Stacy has been an active
23  contact since at least 2015, late
24  2014, 2015.
25       Q.  And Ms. Klein?
```

Page 68

```
 1              M. MCHUGH
 2       A.  I wouldn't even like to
 3  guess.  I'm not sure.
 4       Q.  Longer than that or shorter?
 5       A.  I believe shorter.  But
 6  again, I'm not sure.
 7       Q.  Was there a person in
 8  Ms. Klein's position before her with
 9  whom you were in contact?
10       A.  Before, prior to Ms. Klein
11  it was, we mostly dealt with the
12  people who received those emails.
13       Q.  Okay.  And prior to
14  Ms. Gomelsky, was there anyone in her
15  position that was a contact of yours?
16       A.  Yes.
17       Q.  What was that person's name?
18       A.  So there was Holly Stevens,
19  there was Diane Culkin, there was
20  Julia Findlay.  There was Ida Abell,
21  there was Maha Ammar.  That's what I
22  can, those are the people I can
23  remember for now.
24       Q.  Did any of those people work
25  at the same time, or were they
```

Page 69

```
 1              M. MCHUGH
 2  subsequent to each other?
 3       A.  So Holly Stevens and Stacy
 4  Gomelsky and Diane Culkin all worked
 5  at the same time.  They may have --
 6  there may have been a hierarchy among
 7  the three of them, but I don't know
 8  exactly the details.
 9       Q.  Do you know what
10  Ms. Gomelsky's title is?
11       A.  I believe it's program
12  analyst.
13       Q.  Do you think that would be
14  the same title for the other people
15  that you mentioned?
16       A.  No, I believe they had
17  higher titles.
18       Q.  Okay.  Do you know what
19  those titles were?
20       A.  I do not.  But one of them
21  was division chief.
22       Q.  Do you know who?
23       A.  I believe that was Diane
24  Culkin.
25       Q.  Going back to the host
```

PLAINTIFFS' RESP. APP.0005200

MAGNA ▶
LEGAL SERVICES

**Page 70**

```
 1              M. MCHUGH
 2   family agreement, paragraph five says
 3   that the host agrees that the Au
 4   Pair's duties will be restricted to
 5   childcare and responsibilities related
 6   to care of the children.  Then the
 7   next sentence, I think, is
 8   explanatory, or elaborates on that
 9   first sentence.
10         Is that a requirement that
11   is still in the host family agreement?
12      A.   I believe so, but in this, I
13   can't say whether the descriptive text
14   following children is in the
15   agreement.
16      Q.   You mean the second
17   sentence?
18      A.   Yes.
19      Q.   Okay.
20      A.   So the concept that they are
21   restricted to childcare
22   responsibilities is in the agreement
23   as one of the regulations.
24      Q.   Okay.  And paragraph eight,
25   a host will facilitate attendance and
```

**Page 71**

```
 1              M. MCHUGH
 2   provide time off and transportation to
 3   the Au Pair's monthly cluster meetings
 4   with InterExchange's local
 5   coordinator, is that still a
 6   requirement?
 7      A.   Yes.
 8      Q.   Why is that included as a
 9   requirement?
10      A.   I believe it's a State
11   Department regulation.
12      Q.   Okay.  Sorry, were you
13   finished?
14      A.   Mm-hmm.
15      Q.   Paragraph nine, host agrees
16   to attend at least one of the two
17   Family Day conferences organized by
18   InterExchange's local coordinator
19   during the program year, and
20   understand that failing to do so is
21   grounds for possible termination of
22   continued or future participation in
23   the program.
24         Is that still a requirement?
25      A.   Yes.
```

**Page 72**

```
 1              M. MCHUGH
 2      Q.   Why is that a requirement?
 3      A.   That is a State Department
 4   requirement.
 5      Q.   Okay.  Paragraph 11 requires
 6   that the host agrees that
 7   InterExchange will have regular
 8   contact with the Au Pair and the host
 9   family to ensure the success of the
10   exchange and to provide orientation,
11   assistance and counsel.  Host agrees
12   to cooperate fully with InterExchange
13   and its representatives in their roles
14   supervising and implementing the Au
15   Pair program.
16         Is that still a requirement?
17      A.   It may be worded
18   differently, but the concept is the
19   same.
20      Q.   And paragraph 15, host
21   agrees that if InterExchange finds
22   that the Au Pair is subject to
23   exploitive or other unreasonable
24   circumstances or conditions in my/our
25   household, e.g., failure to pay the
```

**Page 73**

```
 1              M. MCHUGH
 2   appropriate weekly stipend or to
 3   provide the agreed upon free time or
 4   educational benefits, it may in its
 5   sole judgment withdraw the Au Pair
 6   from its household, and host shall not
 7   be entitled to replacement Au Pair or
 8   any refund.
 9         Is that still a requirement
10   in the host family agreement?
11      A.   Again, without seeing the
12   newest version, I can't say that the
13   wording is similar, but the concept is
14   the same.
15      Q.   Okay.  17, host understands
16   that travel with the Au Pair in excess
17   of 30 days within the U.S. or outside
18   the U.S. must have prior written
19   consent from InterExchange.
20         Is that still a requirement
21   in the host family agreement?
22      A.   I am not sure of how that's
23   phrased in the new agreement.
24      Q.   Okay.  Is there a regulation
25   concerning -- to your knowledge, is
```

PLAINTIFFS' RESP. APP.0005201

**MAGNA**
**LEGAL SERVICES**

| Page 74 | Page 76 |
|---|---|

**Page 74**

M. MCHUGH

1
2 there a regulation concerning how long
3 the Au Pair can spend outside of the
4 United States during the period of the
5 placement?
6      A.   Through the Department of
7 State, I'm not sure.
8      Q.   Any other department?
9      A.   I'm not sure.
10      Q.   Do you still monitor the
11 extent to which Au Pairs spend time
12 outside of the United States during
13 the period of their placement?
14      A.   Do we still -- can you
15 repeat the question?
16      Q.   Yes, does InterExchange
17 monitor the extent to which Au Pairs
18 spend time outside of the United
19 States during their placement?
20      A.   Not do we monitor the Au
21 Pairs while they're outside the U.S.?
22      Q.   Right, I'm not asking
23 whether you track them while they're
24 on vacation in France, I'm asking
25 whether you monitor the fact that they

**Page 76**

M. MCHUGH

1
2      A.   Yes.
3      Q.   How is this third-party
4 insurance arranged?
5      A.   The third-party insurance is
6 arranged by InterExchange.
7      Q.   Who pays for the third-party
8 insurance?
9      A.   Well, the third-party
10 insurance is included in the host
11 family fees.
12      Q.   Do the host families pay
13 money to a third-party insurance
14 company?
15      A.   They may for -- no, they
16 wouldn't.  No.
17      Q.   Does InterExchange have a
18 contract with a third-party insurance
19 company for the provision of -- for
20 the provision of accident and sickness
21 insurance for Au Pairs?
22      A.   Yes.
23      Q.   And I -- actually, sorry,
24 withdraw that.  My question is under
25 that contract, does InterExchange pay

**Page 75**

M. MCHUGH

1
2 are leaving and returning and how long
3 they're gone for.
4      A.   If it's brought to our
5 attention, yes.
6      Q.   Do you ask that it be
7 brought to your attention?
8      A.   If it's more than 30 days, I
9 do believe we ask that it be brought
10 to our attention.
11      Q.   Do you require that it be
12 brought to your attention, or is it
13 voluntary?
14      A.   I'm not sure what the
15 language is.
16      Q.   Okay.  18, host
17 understanding that Au Pair are
18 provided with accident and sickness
19 insurance provided by a third-party
20 insurance company, and that this
21 insurance policy contains limitations
22 and exclusions.  And then there's a
23 second sentence.
24           My question is, is that
25 still accurate?

**Page 77**

M. MCHUGH

1
2 the third-party insurance company for
3 that insurance?
4      A.   Yes.
5      Q.   Who is that third-party
6 insurance company?
7      A.   Currently the third-party
8 insurance provider is Invisage.
9      Q.   How long has Invisage been
10 the provider?
11      A.   I believe we've been the
12 provider for three years.
13      Q.   Do you know who the provider
14 was before then?
15      A.   I think for one year the
16 provider was Aetna.
17      Q.   Do you know who was before
18 Aetna?
19      A.   Before Aetna it was Travel
20 Insurance Services.
21      Q.   Twenty-five, host agrees
22 that any decision regarding an Au
23 Pair's program status, dismissal or
24 replacement will be made at the sole
25 discretion of InterExchange and will

PLAINTIFFS' RESP. APP.0005202

**MAGNA** ▶
**LEGAL SERVICES**

20 (Pages 74 to 77)

Page 78

```
1              M. MCHUGH
2  be considered final.
3         Is that still a requirement?
4      A.   I believe so.
5      Q.   Can the host family fire an
6  Au Pair?
7      A.   Absolutely.
8      Q.   Can they do so without
9  InterExchange's agreement?
10     A.   Absolutely.
11     Q.   So what does it mean that
12 any decision regarding an Au Pair's
13 program status dismissal or
14 replacement will be made at the sole
15 discretion of InterExchange?
16     A.   This, as it's written, is
17 intended to describe the program
18 status, whether the Au Pair is on the
19 program or not.
20     Q.   I see.  If a host family
21 wants to fire an Au Pair, how would it
22 go about doing so?
23     A.   There's, it could happen a
24 variety of different ways.
25     Q.   Would it -- let me put it
```

Page 79

```
1              M. MCHUGH
2  this way -- let me ask a different
3  question then.
4         Can the host family tell the
5  Au Pair, you're fired, get out today?
6      A.   Yes.
7      Q.   And the Au Pair would have
8  to leave their placement immediately?
9      A.   Yes.
10     Q.   Can InterExchange say to the
11 Au Pair, can InterExchange pull an Au
12 Pair out of a placement -- can
13 InterExchange pull an Au Pair out of a
14 placement?
15     A.   Yes, of course InterExchange
16 can remove an Au Pair from a home for
17 a variety of reasons.
18     Q.   And does InterExchange need
19 the host family's permission to do
20 that?
21     A.   Does InterExchange need the
22 host family's permission to remove --
23 do we -- so there's so many different
24 situations that could arise.  It may
25 be that the host family is the
```

Page 80

```
1              M. MCHUGH
2  problem, and therefore we have to
3  remove the Au Pair for her health,
4  safety and welfare, so in that case of
5  course the host family does not have
6  to approve.  We're removing her from
7  the home.
8      Q.   If the host family doesn't
9  pay its fees, would InterExchange
10 remove the Au Pair?
11     A.   On occasion, on occasion
12 InterExchange has threatened to remove
13 the Au Pair from a home for failure to
14 pay fees.  I cannot think of an
15 instance where we actually removed the
16 Au Pair from the home.
17     Q.   Does InterExchange have the
18 right to remove the Au Pair from the
19 home for nonpayment of fees by the
20 host family?
21     A.   I believe we do.
22     Q.   Does InterExchange have the
23 right to remove the Au Pair from the
24 home for any reason that InterExchange
25 deems to be sufficient?
```

Page 81

```
1              M. MCHUGH
2      A.   Any reason that
3  InterExchange deemed sufficient,
4  ultimately as the program sponsor it's
5  our responsibility to make sure that
6  the Au Pair's in a good environment,
7  her health, safety and welfare is
8  protected and that it's an environment
9  where a cultural exchange program can
10 flourish, so if we believe that that
11 is not the case, then we can remove
12 the Au Pair from that situation and
13 look for a rematch or ask her what she
14 wants to do.
15     Q.   Okay.  So I'm happy to go to
16 the next exhibit, but we've been going
17 for a while.  If you would like a
18 break, I'm happy to take a break now,
19 or we can just keep going, it's up to
20 you.
21     A.   I can keep going.
22     Q.   Okay.
23         THE VIDEOGRAPHER:  There's
24 about 20 minutes left on the DVD.
25         THE WITNESS:  That sounds
```

PLAINTIFFS' RESP. APP.0005203

**MAGNA**
LEGAL SERVICES

Page 82

```
1              M. MCHUGH
2    like a good time to stop.
3        MR. LIBLING:  Keep going for
4    about 20 minutes, then.
5        (McHugh Exhibit 6, Bates
6        stamped INTEREXCHANGE 0008641
7        through 8642, was marked for
8        identification.)
9        Q.   So I put before you as
10   Exhibit 6 an email from Anna -- no,
11   from Natalie Ung to Anna Pollard,
12   dated July 23, 2013, it's
13   InterExchange 0008641 through 42.  And
14   do you know who Natalie Ung is?
15       A.   Yes.
16       Q.   Who is she?
17       A.   She worked at
18   InterExchange's office as a transition
19   coordinator.
20       Q.   What does a transition
21   coordinator do?
22       A.   Transition coordinator
23   handles situations that arise that may
24   result in the rematch of an Au Pair or
25   an Au Pair leaving the program.
```

Page 84

```
1              M. MCHUGH
2    before the Au Pair arrives at a
3    placement?
4        A.   It's really difficult to
5    tell without the full extent of the
6    conversation.
7        Q.   Okay.  So I believe you said
8    a transition coordinator handles
9    situations that arise as a result of a
10   rematch or an Au Pair leaving the
11   program.  It doesn't sound to me like
12   this Au Pair is leaving the program,
13   so does that suggest this is a rematch
14   situation of some kind?  Or you just
15   don't know?
16       A.   So a transition coordinator
17   could also be a new family who applied
18   -- sorry, the transition coordinator
19   could also handle a situation where a
20   new family applied to a program, but
21   specifically wanted to match with
22   somebody who was already in country,
23   so in that case the Au Pair may be a
24   transition Au Pair, but the host
25   family is not a transition family.
```

Page 83

```
1              M. MCHUGH
2        Q.   So is this email describing
3    a situation where an Au Pair was
4    leaving a host family?  Don't think it
5    is, just to be clear, because at the
6    bottom it says, we will process the
7    match with Nandi for the August 30th
8    arrival.  We advise you to take our
9    feedback into consideration before
10   Nandi arrives.
11       So it sounds to me, and I
12   can be wrong, but it sounds to me that
13   this is an email sent in advance of an
14   Au Pair arriving at a placement, does
15   that sound right to you?
16       A.   If I could read it first,
17   I'll let you know.
18       Q.   Absolutely.
19       A.   Okay, I've read it.
20       Q.   What situation does this
21   email describe, relate to?
22       A.   I am not aware of this
23   situation.
24       Q.   Is this a situation where
25   some kind of review is occurring
```

Page 85

```
1              M. MCHUGH
2    I'm not sure which, I'm not sure which
3    of those various situations this is.
4        Q.   Okay.  The email starts by
5    saying, we've reviewed your list of Au
6    Pair responsibilities.  Is reviewing a
7    list of Au Pair responsibilities
8    something InterExchange always does?
9        A.   No.
10       Q.   Do you do it frequently?
11       A.   It's hard to say.
12       Q.   Okay.  Do you have any sense
13   of the frequency with which you would
14   review a list of Au Pair
15   responsibilities?
16       A.   I'm not sure exactly what
17   the format of the list of Au Pair
18   responsibilities that Natalie is
19   talking about is.  It's really hard to
20   tell, from this email and the email
21   below it, what's happening.
22       Q.   Okay.  And...
23       A.   It may have been.  It may
24   have been that, or a similar situation
25   that could arise with a back-and-forth
```

PLAINTIFFS' RESP. APP.0005204

**MAGNA**
**LEGAL SERVICES**

| Page 86 | |
|---|---|
| | M. MCHUGH |

M. MCHUGH

1    M. MCHUGH
2  like this.  Could be where a previous
3  Au Pair had complained that she was
4  doing work that seemed to be outside
5  the scope of the Au Pair
6  responsibilities.  InterExchange, in
7  the situation like that, could process
8  the transition and intervene with the
9  family and say, this is the corrective
10  action that we need to see before we
11  process another match, and we need
12  your assurance that that's the case.
13       And of course, if it
14  doesn't, if it doesn't -- if the
15  pattern continues, then we have to
16  take additional steps.
17    Q.   Okay.  Thank you.
18    A.   But I can't say whether
19  that's what is exactly happening with
20  Anna and Nandi.
21    Q.   Let's see, so in this email,
22  Ms. Ung says that there were a few
23  tasks from the list that caught our
24  attention and singled some out, and
25  for example, for the first one she

Page 87

1    M. MCHUGH
2  says, it should not become the Au
3  Pair's responsibility, this particular
4  task.  How would Ms. Ung make that
5  determination?
6    A.   I believe Ms. Ung is making
7  that determination because the
8  children's tasks -- well, if the
9  children don't complete their own
10  tasks, then her point is that it then
11  shouldn't be the Au Pair's
12  responsibility to complete the tasks
13  that the children haven't completed.
14       It's a little gray, because
15  I don't have the specific details of
16  what those tasks were, so let me give
17  you an example.  If the children's
18  chore was to clean the children's room
19  and the children didn't do that chore,
20  it would be acceptable for the Au Pair
21  to be responsible for completing that.
22       If the children's chore was
23  to take out the trash and the children
24  didn't do that task, Natalie is right
25  to say that is not, in and of itself,

Page 88

1    M. MCHUGH
2  childcare, and shouldn't be her
3  responsibility.
4    Q.   How do you -- what guidance
5  would Ms. Ung have to draw those kinds
6  of distinctions?
7    A.   A lot of it is verbal
8  communication and discussion.  The
9  guidance is the Au Pair program.  The
10  Au Pair's responsibilities and the
11  jobs that she is permitted to do are
12  childcare related.  So that is active
13  childcare, passive childcare, things
14  focused around the children, picking
15  up their toys, making their beds,
16  doing their laundry, those items.
17       Over the years we've had
18  many discussions of where that line
19  falls, is this within the regulations
20  or is this outside the scope of the
21  regulations as the -- as an Au Pair.
22    Q.   And so InterExchange would
23  make that determination and convey
24  that decision to the host family?
25    A.   InterExchange would decide,

Page 89

1    M. MCHUGH
2  InterExchange would determine that
3  something like washing the car is
4  clearly outside the scope of an Au
5  Pair's program.  That is not
6  childcare.
7       As it's our responsibility
8  to uphold the regulations, we would
9  convey that to the host family.
10    Q.   Okay.  The email says that
11  the, the paragraph that starts, most
12  of the responsibilities, the last
13  sentence is, the Au Pair program is
14  first and foremost the childcare
15  program, and based on this list it
16  seems as if the tasks for your Au Pair
17  are more housework related.
18       You can't comment on the
19  second part because you haven't seen
20  the list.  Do you agree with you first
21  part?
22    A.   Well, I believe it's a poor
23  choice of words based on the context
24  of the situation.  If I was speaking
25  to you, I would say the Au Pair

PLAINTIFFS' RESP. APP.0005205

MAGNA

LEGAL SERVICES

Page 90

```
 1            M. MCHUGH
 2   program is first and foremost a
 3   cultural exchange program.  The
 4   childcare component is a secondary
 5   aspect of it.
 6           In Natalie's day-to-day
 7   life, what she's trying, and that's,
 8   I'm of course trying to, or Natalie
 9   would make a distinction that's
10   different with the host family, where
11   she's saying the distinction she's
12   trying to draw is not -- let me say it
13   this way.  The distinction that she's
14   trying to draw is that this is a
15   childcare program, not a domestic
16   worker program, not a maid program, so
17   that's her focus with that sentence.
18   In the context of this, where we are
19   sitting now, it's a poor choice of
20   words.
21    Q.   Okay.  But in the context of
22   explaining to a host family the sort
23   of duties that an Au Pair can be
24   expected to provide, is it fair to
25   describe those duties as childcare
```

Page 91

```
 1            M. MCHUGH
 2   related?
 3    A.   Yes.
 4    Q.   Okay.  So in that context,
 5   was this a fair statement, you think?
 6    A.   Yes.
 7    Q.   Okay.  I think we're done
 8   with that.
 9        THE VIDEOGRAPHER:  You have
10   about five minutes left.
11        MR. LIBLING:  Why don't we
12   take a break now, then.
13        THE WITNESS:  Okay.
14        THE VIDEOGRAPHER:  Going off
15   the record, the time is
16   10:58 a.m., this ends DVD number
17   one.
18      (Time noted:  10:58 a.m.)
19      (Recess.)
20      (Time noted:  11:12 a.m.)
21        THE VIDEOGRAPHER:  We're now
22   on the record, the time is
23   11:12 a.m., this begins DVD
24   number two.
25    Q.   Mr. McHugh, I have asked the
```

Page 92

```
 1            M. MCHUGH
 2   reporter to hand you what's been
 3   marked as Exhibit 7.
 4        (McHugh Exhibit 7, 2017 Host
 5   Family Agreement, was marked for
 6   identification.)
 7    Q.   This does not have Bates
 8   numbers because I don't believe it's a
 9   produced document.  We pulled it from
10   the website, InterExchange's website.
11        MR. SCHWARTZ:  Yes.
12    Q.   We pulled this from
13   InterExchange's website.  Does this
14   appear to be the 2017 host family
15   agreement?
16    A.   I'm just going to take a
17   moment to review it.
18        MR. LIBLING:  Just a
19        correction to the record, it was
20        pulled from AuPairinAmerica.com.
21    A.   Was going to say this was
22   not your agreement, it is AISF's
23   agreement.
24        MR. LIBLING:  I'll mark
25   this.
```

Page 93

```
 1            M. MCHUGH
 2        (McHugh Exhibit 8, 2015 Host
 3   Employer Handbook, was marked for
 4   identification.)
 5    Q.   So what's been given to you
 6   as Exhibit 8, I think, is, again, not
 7   a produced document.
 8        MR. LIBLING:  Which website
 9   did we pull this one from?
10        MR. SCHWARTZ:  I think this
11   one is from the InterExchange.
12    Q.   This one is from the
13   InterExchange website, it's called the
14   2015 host employer handbook.  Does
15   this appear to be the updated host
16   employer handbook that you testified
17   about earlier?
18        MS. VICKLES:  I'm going to
19   assert an objection for the
20   record to this document.  It's
21   beyond the scope of the 30(b)(6)
22   notice, which deals with the Au
23   Pair program, not the work and
24   travel program.
25    A.   Right, so my answer is no,
```

MAGNA
LEGAL SERVICES

Page 94

```
 1            M. MCHUGH
 2    this is not the document that we spoke
 3    about earlier.
 4       Q.   Okay.  All right, the
 5    reporter is marking as Exhibit 9, a
 6    document which has Bates numbers
 7    InterExchange 0004389 through 400.
 8    Its title is Host Family Home
 9    Orientation.  Do you recognize this
10    document?
11         (McHugh Exhibit 9, Bates
12         stamped INTEREXCHANGE 0004389
13         through 4400, was marked for
14         identification.)
15       A.   I do.
16       Q.   And is this the current
17    version of the Host Family Home
18    Orientation?
19       A.   No.
20       Q.   Do you know when this
21    version was in effect?
22       A.   This version was in effect
23    in, well, it was put into effect in
24    August of 2009.
25       Q.   Do you know when it ceased
```

Page 95

```
 1            M. MCHUGH
 2    being in effect?
 3       A.   I do not.
 4       Q.   When did the most recent
 5    version come into effect?
 6       A.   I'm not sure.  It's a couple
 7    years ago.
 8       Q.   Were there versions between
 9    the most recent and this one?
10       A.   I'm not sure.
11       Q.   Okay.
12         MS. VICKLES:  Just for the
13         record, I think exhibit nine that
14         was marked does not have Bates
15         numbers.
16         MR. LIBLING:  I think again
17         we thought that the native
18         version would be easier for you
19         to read than the Bates numbered
20         version.
21         MS. VICKLES:  Okay.
22         MR. LIBLING:  Which doesn't,
23         which is in black and white.
24       Q.   How is the host family home
25    orientation document used?
```

Page 96

```
 1            M. MCHUGH
 2       A.   The home orientation
 3    document is a tool families can use to
 4    work through, either prior to or when
 5    the Au Pair arrives at the home, and
 6    it's really to give the host family
 7    some talking points and some ideas to
 8    help the Au Pair adjust to her new
 9    surroundings.
10       Q.   Okay.  So is it given to all
11    host families?
12       A.   It's given to all host
13    families who match with an Au Pair.
14       Q.   Match with an Au Pair.
15         (McHugh Exhibit 10, Bates
16         stamped INTEREXCHANGE 0019109
17         through 9112, was marked for
18         identification.)
19       Q.   This next document is called
20    Host Parent Survival Guide.  It's
21    InterExchange 0019109 through 112.  Do
22    you recognize this document?
23       A.   I do not.
24       Q.   Are you familiar with any
25    kind of document that's called a Host
```

Page 97

```
 1            M. MCHUGH
 2    Parent Survival Guide?
 3       A.   I am not.
 4       Q.   Is there anything in this
 5    document that gives you a, a couple of
 6    pages in there's also an Au Pair
 7    survival guide, but is there, at the
 8    end of the document there's the name
 9    Robin Bailey, do you know who Robin
10    Bailey is?
11       A.   Robin Bailey is one of our
12    local coordinators.
13       Q.   All right.  So do you think
14    this is a document that Robin Bailey
15    was provided, or is it a document you
16    think she put together herself?
17       A.   My guess is that this is a
18    document that Robin put together
19    herself.
20       Q.   Okay.  If the --
21       A.   It's certainly not an
22    InterExchange produced document.
23       Q.   Well, Ms. Bailey works for
24    InterExchange, correct?
25       A.   Yeah, she's a part-time
```

PLAINTIFFS' RESP. APP.0005207

MAGNA ▶
LEGAL SERVICES

| Page 98 |
| --- |

1           M. MCHUGH
2    local coordinator.  This is not a
3    document that came out of the head
4    office.
5       Q.   If this document had been
6    submitted by Ms. Bailey for approval
7    to anyone, who would it have been
8    submitted to?
9           MS. VICKLES:  Object to
10      form.
11      A.   She could have submitted it
12   to the field relations manager, she
13   could have submitted it to me, she
14   could have submitted it to anyone.
15      Q.   Are local coordinators
16   permitted to draft up documents of
17   this kind and distribute them?
18      A.   We are unaware of this
19   document.
20      Q.   Okay.  But are local
21   coordinators permitted to draft
22   guidance documents and provide them to
23   host families and Au Pairs?
24      A.   We would prefer they didn't,
25   to the extent what the local

| Page 99 |
| --- |

1           M. MCHUGH
2    coordinator says is not final, what
3    InterExchange's head office says is
4    final, so there may be opportunities
5    for discrepancies to exist, and for
6    that reason we would prefer that this
7    didn't happen.
8       Q.   I understand when you say
9    it's not final from your perspective,
10   but --
11      A.   This is a part-time local
12   coordinator making a list of tips for
13   her families directly that did not
14   come, that was not brought to our
15   attention and isn't an InterExchange
16   document in that sense.
17      Q.   Would a host family have any
18   way of knowing that a document was
19   being provided, had not been approved
20   by the InterExchange, did you call it
21   head office?
22          MS. VICKLES:  Object to
23      form.
24      A.   Well, the current host
25   family agreement states that what LCs

| Page 100 |
| --- |

1           M. MCHUGH
2    say is subject, is not binding and is
3    subject to the approval of the head
4    office of InterExchange.  Looking at
5    this, I hope that they would see that
6    this is not an InterExchange quality
7    document, there's several typos that
8    jump out, and misspellings, and I
9    think that it would give any family
10   pause to say whether this had gone
11   through a thorough vetting process or
12   whether it's just tips and tricks
13   signed off by Robin Winter Bailey, so
14   I think they would be clear that this
15   wasn't something InterExchange
16   produced.
17          (McHugh Exhibit 11, Bates
18      stamped INTEREXCHANGE 0000010,
19      was marked for identification.)
20      Q.   The next exhibit is a
21   document Bates numbered InterExchange
22   0000010, it's just one page.  And what
23   is this document -- sorry, different
24   question.  Do you recognize this
25   document?

| Page 101 |
| --- |

1           M. MCHUGH
2       A.   I do.
3       Q.   And what is this document?
4       A.   This document is a version
5    of our host family interview report,
6    page one.
7       Q.   And how is the host family
8    interview report used?
9       A.   The local coordinator goes
10   to the host family's home, and they
11   meet with all adults living in the
12   home and they work their way through
13   this template.
14      Q.   Is this the current version?
15      A.   I do not believe this is the
16   current version.
17      Q.   When was the version most
18   recently updated?
19      A.   I believe it was updated
20   probably, I can't be sure, but 2014 or
21   2015.
22      Q.   Okay.  Was this the version
23   that was in effect prior to 2014 or
24   '15?
25      A.   I believe so.

**MAGNA**
LEGAL SERVICES

26 (Pages 98 to 101)

Page 102

M. MCHUGH

1
2    Q.   So I guess just one more
3    question on this document.  The
4    information in this document is
5    provided to host families by local
6    coordinators; is that right, or is the
7    document itself provided to the host
8    families?
9        A.   This document is not
10    provided to the host families, this is
11    a document that our local coordinators
12    work from and then provide to
13    InterExchange.
14        Q.   So this is an instructional
15    document to the local coordinators
16    about what they should cover with the
17    host families, what information they
18    should provide to the host families?
19        A.   That's one of the, one of
20    the reasons for producing this
21    document.
22        Q.   What are the other reasons
23    for producing the document?
24        A.   Well, of course it's a
25    Department of State regulation that

Page 103

M. MCHUGH

1
2    all adults in the home be interviewed
3    personally by the local coordinator,
4    so that's another reason.  To go over
5    details, to give tips and tricks, or
6    tips and advice.
7        Q.   Okay.
8        A.   And also to facilitate
9    discussion points where the host
10    family may have questions about a
11    topic, to mark those up.
12        Q.   Okay, thank you.  Does
13    InterExchange recruit Au Pairs?
14        A.   InterExchange works with a
15    network of international cooperators
16    who are independent agents,
17    independent companies who recruit Au
18    Pair candidates and send the
19    applications for those candidates to
20    InterExchange.
21        Q.   Does InterExchange have
22    contracts with the international
23    cooperators?
24        A.   We do.
25        Q.   And do you know whether

Page 104

M. MCHUGH

1
2    those contracts were collected and
3    produced in this action?  Do you know?
4        A.   I don't know.
5        Q.   Okay.  All right.  So are
6    there methods of Au Pair recruitment
7    other than through international
8    cooperators that InterExchange uses?
9        A.   No.
10        Q.   Okay.  Does InterExchange
11    have a website?
12        A.   It does.
13        Q.   Is the website a tool that's
14    used as part of InterExchange's
15    recruitment of Au Pairs?
16        A.   In that we collect, if
17    somebody submits information, we then
18    push that out to our international
19    cooperators.
20        Q.   So if an Au Pair submitted
21    information through a website --
22        A.   Our website.
23        Q.   -- through your website,
24    thank you, you would then identify
25    which international cooperator covers

Page 105

M. MCHUGH

1
2    the Au Pair's region and forward that
3    to the international cooperator?
4        A.   Among other decision
5    factors.
6        Q.   What other --
7        A.   Not just region, it could be
8    a number of things.
9        Q.   How many international
10    cooperators do you work with?
11        A.   I believe currently there
12    are about 80 international cooperators
13    who have contracts with.
14        Q.   How many countries do those
15    international cooperators cover?
16        A.   I believe they cover 29 or
17    30 countries.
18        Q.   Do they have overlapping
19    regions that they cover?
20        A.   They do.
21        Q.   Does InterExchange have any
22    approval or control over the methods
23    that international cooperators use to
24    recruit Au Pairs?
25        A.   Do we have approval or

PLAINTIFFS' RESP. APP.0005209

MAGNA
LEGAL SERVICES

Page 106

1                 M. MCHUGH
2    control, so I would say we have
3    disapproval, we have right of
4    disapproval.
5        Q.    Are ads for -- ads intended
6    to recruit for Au Pairs ever run by
7    InterExchange or international
8    cooperators?
9            MS. VICKLES:  Object to
10   form.
11       Q.    You can still answer.
12       A.    Yes.
13       Q.    And if an ad is going to be
14   run, who makes the decision to run
15   that ad, is it the cooperator or
16   InterExchange?
17       A.    Both have occurred.
18       Q.    So InterExchange will run
19   some ads independently from its
20   cooperators; is that right?
21       A.    InterExchange made a brief
22   foray into running a few Google ads in
23   a few countries as a pilot test
24   program.  It was quickly abandoned.
25       Q.    When was this program in

Page 107

1                 M. MCHUGH
2    effect?
3        A.    I think it was 20 -- we ran
4    those ads, I hesitate to call it a
5    program, we ran a few ads in a few
6    countries, I think in 2014 and 2015.
7        Q.    Okay.  And who approved the
8    content of those ads?
9        A.    I believe I did.
10       Q.    Do you remember the content
11   of any of them?
12       A.    No.  They were written in
13   the native language, so they were
14   running in Sweden and France, and they
15   were written in Swedish and French.
16       Q.    Do you speak Swedish or
17   French?
18       A.    Not really.  But they did
19   say, become an Au Pair, the gist of
20   the ads was become an Au Pair in the
21   U.S.A.
22       Q.    When an international
23   cooperator runs an ad for the purpose
24   of recruiting Au Pairs, will the ad be
25   provided to InterExchange in advance

Page 108

1                 M. MCHUGH
2    of it being run?
3        A.    Not necessarily.  The
4    international cooperators are running
5    the ad, are running ads to recruit for
6    their company.  It's not clear at that
7    point whether those ads are
8    specifically for the U.S.A. program,
9    they could be sending Au Pairs to the
10   UK, they could be sending Au Pairs to
11   Australia, so they're not -- they're
12   not InterExchange focused ads.
13       Q.    I see.  Are the arrangements
14   with the international cooperators
15   exclusive in the sense that the
16   international cooperators are not
17   permitted to work with other U.S. Au
18   Pair sponsors?
19       A.    The arrangements are not,
20   they do not necessarily have to be
21   exclusive.
22       Q.    So some of them are and some
23   of them aren't?
24       A.    That's correct.
25       Q.    Have there been

Page 109

1                 M. MCHUGH
2    circumstances where an international
3    cooperator ran an ad that was
4    specifically to recruit people for
5    InterExchange's program?
6        A.    I'm not aware of one.
7        Q.    Okay.  Have there been any
8    circumstances in which InterExchange
9    approved or disapproved of an ad that
10   InterExchange -- sorry, that an
11   international cooperator was running?
12       A.    I can't think of one.
13       Q.    Okay.  Once an international
14   cooperator has a potential candidate
15   who might be interested in going to
16   the United States, does InterExchange
17   have any input into the informational
18   materials that are provided to that
19   potential candidate?
20       A.    At various times
21   InterExchange has produced a brief
22   tri-fold brochure and supplied that to
23   international cooperators.  That's for
24   advertisement purposes and promotional
25   purposes.  That's about the extent of

MAGNA
LEGAL SERVICES

Page 110

```
 1              M. MCHUGH
 2   it.
 3      Q.   What about for other
 4   purposes?
 5      A.   Well, currently and for the
 6   last couple of years, any Au Pair who
 7   applies to the program, before they
 8   sign the agreement with InterExchange,
 9   they're given what we call the
10   pre-application information that
11   spells out a number of details about
12   the program, rules, regulations,
13   oversight, fees.
14      Q.   Okay.
15      A.   They sign that, they review
16   and sign that before signing the
17   agreement and submitting their
18   application.
19      Q.   Okay.
20          (McHugh Exhibit 12, Bates
21      stamped INTEREXCHANGE 0004373,
22      was marked for identification.)
23      Q.   Do you recognize -- I put
24   before you another exhibit.  Again, we
25   printed it in color so it's easier to
```

Page 111

```
 1              M. MCHUGH
 2   read, but it's Bates numbered
 3   InterExchange 0004373.  Is this the
 4   tri-fold that you referred to?
 5      A.   It is.
 6      Q.   Do you know the period of
 7   time this tri-fold was used?
 8      A.   It's dated October 2012, so
 9   I imagine that's when it was put into
10   circulation.  I'm not certain when it
11   stopped being used.
12      Q.   Okay.  Has it stopped being
13   used, though?
14      A.   Unfortunately, I'm really
15   not sure.  If it exists, it exists in
16   an electronic form only, but I don't
17   even know if that's correct.
18      Q.   Okay.  Do you know which
19   countries it was used in?
20      A.   I do not.
21      Q.   Do you know if it was all of
22   them, most of them, a small number?
23      A.   I believe they were
24   distributed on request from the
25   international cooperators, so on an
```

Page 112

```
 1              M. MCHUGH
 2   as-needed basis, plus the electronic
 3   version was most likely available in a
 4   resource center.
 5      Q.   To all international
 6   cooperators?
 7      A.   Yes.
 8      Q.   Okay.  How long has
 9   InterExchange been in the Au Pair
10   business?
11      A.   I believe we were designated
12   in July of 1989.
13      Q.   And how many Au Pairs a year
14   do you, is sponsor the right word?
15      A.   Mm-hmm, it's exactly the
16   right word.
17      Q.   How many Au Pairs a year do
18   you sponsor?
19      A.   We have on average 600 to
20   650 Au Pairs in the country at any
21   given time.
22      Q.   And does that number vary
23   significantly year to year?
24      A.   That number fluctuates, but
25   not significantly.
```

Page 113

```
 1              M. MCHUGH
 2      Q.   Okay.  Are there countries
 3   from whom most of your Au Pairs --
 4   that's a bad question, let me
 5   rephrase.
 6          Are there more significant
 7   countries that you consider that your
 8   Au Pairs come from?
 9      A.   More significant?
10      Q.   In terms of numbers of Au
11   Pairs.
12      A.   Sure.
13      Q.   What would you consider to
14   be the most -- which country do most
15   of your Au Pairs come from?
16      A.   I believe currently most of
17   our Au Pair applications are coming
18   from Brazil.
19      Q.   Do all Au Pair candidates
20   ultimately use your website as part of
21   the application process?
22      A.   All Au Pair candidates who
23   have submitted their application would
24   have done so through the website.
25      Q.   Okay.  Who is responsible
```

PLAINTIFFS' RESP. APP.0005211

**MAGNA**
LEGAL SERVICES

Page 114

M. MCHUGH

1  for the content of the website?
2     A.   The communications team and
3  the Au Pair team, working together.
4     Q.   Interesting, and the Au Pair
5  team.  By Au Pair team, are there
6  specific people that you have in mind?
7     A.   Well, we're a small team, so
8  I can have them all in mind at once.
9  There's only ten of us.
10     Q.   Is there -- among the ten of
11  you, is there anyone specifically
12  tasked with website content?
13     A.   Not specifically.
14     Q.   Is there someone who, let's
15  ask about you, do you approve
16  decisions -- do you approve website
17  context?
18     A.   Yes.
19     Q.   Do you have final approval
20  on website content?
21     A.   Yes.
22     Q.   How frequently is the
23  website updated?
24     A.   Changes occur to the website

Page 115

M. MCHUGH

1  relatively frequently.
2     Q.   Okay.
3         (McHugh Exhibit 13, Bates
4        stamped INTEREXCHANGE 0002409
5        through 2412, was marked for
6        identification.)
7     Q.   So this is a document marked
8  InterExchange 0002409 through 412.
9  This is how it was produced to us, I'm
10  pretty sure it's not how it appears on
11  the web.
12     A.   Mm-hmm.
13     Q.   But does this appear to be a
14  version, at least, of your website?
15     A.   Yes.
16     Q.   And is this the relevant
17  part of the website we were just
18  discussing, like a portion of that
19  part we were just discussing?
20     A.   Sorry, what were we
21  discussing?
22     Q.   Fair enough.  Is this the
23  portion of the website that Au Pairs
24  are ultimately directed to during

Page 116

M. MCHUGH

1  their, during the recruitment process?
2     A.   Not, not exactly.  This is
3  the host family focused section of the
4  website.
5     Q.   Okay.  So are host families
6  directed --
7     A.   Yes.
8     Q.   -- to this?
9     A.   Directed or they find it
10  themselves.
11     Q.   Okay.
12         (McHugh Exhibit 14,
13        Interexchange website printout
14        via Wayback Machine, was marked
15        for identification.)
16     Q.   What I'm showing you now is
17  not a produced document, it is, as it
18  says at the top, something we got
19  through the Wayback Machine.  So we
20  understand this to be a prior version
21  of the same page; is that right?  So,
22  yes.  Right, yes, a prior version of
23  the same page; is that right?
24     A.   Yes.

Page 117

M. MCHUGH

1     Q.   Do you know how long this
2  version was in effect?
3     A.   The version from the Wayback
4  Machine?
5     Q.   Yes.
6     A.   I do not.
7     Q.   At the top, in the Wayback
8  Machine part of this document at the
9  top, it says 10 October '11 through 6
10  August '16.
11         Is it possible this page was
12  in effect during that period?
13     A.   Was in effect during that
14  period or for the entirety of that
15  period?
16     Q.   Start with the second one,
17  for the entirety of that period.
18     A.   I do not.
19     Q.   During that period?
20     A.   I do not know, but it
21  appears from what I'm looking at that
22  it was.
23     Q.   Do you know when the change
24  was made from this old version to the

PLAINTIFFS' RESP. APP.0005212

MAGNA
LEGAL SERVICES

Page 118

```
           M. MCHUGH
1
2    current version?
3      A.   So I do.  Our, so we
4    switched from one version of a tool to
5    create a website called Drupal to
6    another one called something with,
7    something that creates static HTML
8    pages.
9      Q.   Okay.
10     A.   I'll remember it.  So that
11   happened, I believe, in 2015 or 2016,
12   so quite recently.
13     Q.   And just so the record is
14   clear, did you approve the content on
15   the old -- sorry, on the current
16   version, which is the produced
17   document?
18     A.   Yes.
19     Q.   And did you approve the
20   content on the old version, the
21   Wayback Machine version?
22     A.   Yes.
23     Q.   Did you have any discussions
24   about changing the description of the
25   Au Pair stipend on this web page?
```

Page 119

```
           M. MCHUGH
1
2      A.   Discussions?
3      Q.   Yes, with anybody.
4      A.   To be honest, I don't
5    remember whether there were
6    discussions about it.
7      Q.   Was it a decision that you
8    made consciously, or did it just
9    happen that the language changed?
10     A.   No, we made it consciously.
11     Q.   Did you make that decision?
12     A.   I did.
13     Q.   Why did you make that
14   decision?
15     A.   I felt what was written on
16   the old website was not as accurate as
17   it could be.
18     Q.   Why did you approve it in
19   the first place if it wasn't accurate?
20     A.   It was an oversight.
21     Q.   Okay.  Did you believe it
22   was accurate at the time you approved
23   it?
24     A.   Can you clarify the
25   question?
```

Page 120

```
           M. MCHUGH
1
2      Q.   Sure.  Did you believe that,
3    did you believe that the description
4    of the Au Pair stipend was accurate at
5    the time that you approved that
6    language?
7      A.   In that the Au Pair stipend
8    amount was 195.75 per week?
9      Q.   That's right.
10     A.   Yes, I believe that was
11   accurate.  However, that's not to say
12   that I believed that was a maximum
13   amount.  I believe that that was the
14   amount that was sent to us from the
15   State Department in their notice where
16   they said the stipend from this day
17   forward will be 195.75 per week.  I'm
18   of the opinion that anything based off
19   of a minimum wage can always be higher
20   than that.
21     Q.   Okay.  Let's go to the next
22   website.
23         (McHugh Exhibit 15, Bates
24        stamped INTEREXCHANGE 0002444
25        through 2445, was marked for
```

Page 121

```
           M. MCHUGH
1
2    identification.)
3      Q.   So this next document is
4    Bates numbered InterExchange 0002444
5    through 445.  And again, I'm sure it's
6    more nicely formatted on the web, but
7    this is how it was produced to us.
8    Does this appear to be part of the
9    website that's aimed at Au Pairs?
10     A.   Yes.  But I can't say what
11   time period this is from.
12         (McHugh Exhibit 16,
13        InterExchange website printout
14        via Wayback Machine, was marked
15        for identification.)
16     Q.   Sticking with the version
17   you have right now, the produced
18   version, did you approve the language
19   that's used in this web page?
20     A.   I believe so.
21     Q.   So the next exhibit is not a
22   produced document, again it is a
23   document we got through the Wayback
24   Machine.  Does this appear to be a
25   prior version of the same web page?
```

PLAINTIFFS' RESP. APP.0005213

MAGNA
LEGAL SERVICES

Page 122

M. MCHUGH
1
2    A.   It does not.
3    Q.   What makes you say that?
4    A.   The first document that you
5 gave me appears to be directed towards
6 potential Au Pair candidates.  The
7 second document that you gave me
8 appears to be directed towards host
9 families.
10    Q.   Okay.  So you think this is
11 the frequently asked questions page
12 directed at host families?
13    A.   The version that says
14 Wayback Machine at the top?
15    Q.   Yes.
16    A.   It sounds as if the
17 questions are written to the host
18 family.
19    Q.   Okay.  Would you have
20 approved the language in this
21 document?
22    A.   Yes.
23    Q.   Do you tell host families
24 that the weekly payment of about
25 195.75 is based on -- sorry, not based

Page 123

M. MCHUGH
1
2 on, I'm going to start again.
3        Does InterExchange tell host
4 families that the weekly payment of
5 195.75 is determined by the U.S.
6 Department of State?
7    A.   Currently InterExchange
8 tells host families that the minimum
9 payment of 195.75 per week is
10 determined by the Department of State.
11    Q.   You used the word currently,
12 when did that start to be the message
13 that was conveyed?
14    A.   Well, it hadn't always been
15 one or the other, the lawsuit brought
16 to our attention that we could do a
17 better job of consistently describing
18 it as a minimum, similar to the way
19 the State Department documents
20 occasionally refer to it as the
21 stipend is 195.75, and occasionally
22 they refer to it as the minimum of
23 195.75.  Unfortunately we followed
24 their -- we could have been more
25 accurate about it.

Page 124

M. MCHUGH
1
2    Q.   So prior to the lawsuit,
3 this lawsuit, did you tell host
4 families that the 195.75 stipend was
5 set by the U.S. Department of State?
6    A.   Prior to the lawsuit there
7 were occasions where documents may
8 have said the stipend is 195.75, and
9 there may have been documents where
10 the stipend said at least 195.75, but
11 that it was set by the Department of
12 State.
13    Q.   Okay.  I want to ask you a
14 couple of questions about the produced
15 version of the website.  And on the
16 second page of the document --
17    A.   This is exhibit, this one,
18 15?
19    Q.   Yes, it should be
20 Exhibit 15.  Under life as an Au Pair,
21 question, how much will I be paid --
22 actually, before I ask you about this,
23 do you know when this version went
24 into effect?
25    A.   I do not.

Page 125

M. MCHUGH
1
2    Q.   Was it after the lawsuit?
3    A.   I am not sure.  There's
4 nothing on here that can tell me that.
5    Q.   Okay.  It says currently Au
6 Pairs must receive a weekly stipend of
7 at least 195.75.  This amount is set
8 by the Department of State and
9 Department of Labor.  The amount is
10 based on the federal minimum wage of
11 7.25 per hour times 45 hours, but also
12 reflects a credit of 40 percent for
13 the room and board provided by the
14 host family.
15        So does the stipend vary by
16 state or local minimum wages?
17    MS. VICKLES:  Object to
18 form.
19    A.   We have never received any
20 information from the Department of
21 State that says the stipend varies by
22 state or local minimum wages.  It's
23 always been based off of the federal
24 minimum wage.
25    Q.   Do you tell host families or

PLAINTIFFS' RESP. APP.0005214

32 (Pages 122 to 125)

**MAGNA**
LEGAL SERVICES

Page 126

M. MCHUGH

1
2  Au Pairs anything at all about state
3  or local minimum wages?
4      A.   We do not.
5      Q.   Okay.  Where -- okay.  And I
6  take -- okay.  And I take it you
7  believe it is accurate that 195.75
8  reflects a credit of 40 percent for
9  the room and board provided by the
10  host family?
11     A.   That's what we've been told.
12     Q.   Okay.  And that's what you
13  tell Au Pairs and host families?
14     A.   Yes.
15     Q.   Are Au Pairs entitled to
16  paid vacation?
17     A.   Au Pairs are entitled to two
18  weeks paid vacation.
19     Q.   What pay are they entitled
20  to receive during that vacation?
21         MS. VICKLES:  Object to
22     form.
23     A.   The Au Pairs are entitled to
24  two weeks paid vacation, so they would
25  be entitled to their weekly stipend

Page 127

M. MCHUGH

1
2  for that time.
3      Q.   And that weekly stipend
4  would be 195.75?
5      A.   At least.
6      Q.   Why is there a 40 percent
7  credit for room and board deducted
8  during the period of the vacation?
9         MS. VICKLES:  Object to
10     form.
11     A.   Well, that would be a
12  question that you would have to ask
13  the State Department.  We've received
14  no information that the stipend would
15  vary during the paid vacation.
16  They've told us how much the Au Pairs
17  should be paid, and they've told us
18  that they have to have paid vacation,
19  so.
20     Q.   But you understand the
21  195.75 figure could be calculated by
22  removing a credit for the room and
23  board that the Au Pair is receiving --
24     A.   Mm-hmm.
25     Q.   -- from a larger number; is

Page 128

M. MCHUGH

1
2  that correct?
3      A.   Yes.
4      Q.   And if the Au Pair is not
5  receiving room and board during the
6  vacation, why would you remove that
7  period?
8         MS. VICKLES:  Object to
9     form.
10     A.   I understand this stipend
11  amount to be set at a consistent rate
12  of at least 195.75 per week, without
13  fluctuations for variances according
14  to whether they're currently occupying
15  that room or the room is being held
16  while they travel and they return to
17  it.
18     Q.   Okay.  Your instructions to
19  host families about how much to pay Au
20  Pairs or to Au Pairs about how much
21  they should be paid would not vary,
22  then, based on whether the week in
23  question was a vacation week?
24     A.   No.
25     Q.   My question was vague, it

Page 129

M. MCHUGH

1
2  was ambiguous, sorry, so I'm just
3  going to clarify.
4         No, it would not vary, is
5  that what you meant?
6      A.   Maybe repeat the whole
7  question again.
8      Q.   Sure.  Would your
9  instructions to host families about
10  how much to pay Au Pairs, or to Au
11  Pairs about how much they should be
12  paid, vary based on whether the week
13  in question was a vacation week?
14     A.   Yes, if a family or Au Pair
15  asked us that, we would say the
16  stipend is a minimum 195.75 per week
17  according to the state regulations.
18     Q.   Okay.
19         (McHugh Exhibit 17, Bates
20     stamped INTEREXCHANGE 0003060
21     through 3062, was marked for
22     identification.)
23     Q.   The court reporter has
24  handed you a document marked
25  InterExchange 0003060 through 3062.

PLAINTIFFS' RESP. APP.0005215

MAGNA

LEGAL SERVICES

Case 1:14-cv-03074-CMA-KMT   Document 1059-25   Filed 05/17/18   USDC Colorado   Page 388
of 700

Page 130

M. MCHUGH

1      M. MCHUGH
2   This is an email from Michael McHugh,
3   is that you?
4      A.   Yes.
5      Q.   To
6   amaralespadas@hotmail.com.  Despite
7   the Hotmail address it's dated from
8   2014.  Is this, do you recognize this
9   document?
10     A.   I do.
11     Q.   Is this an email that you
12  wrote?
13     A.   Yes.
14     Q.   Do you remember the
15  circumstances under which you wrote
16  this email?
17     A.   I do.
18     Q.   Can you please describe
19  those circumstances?
20     A.   I believe Ms. Desiree had
21  written a complaint, letter of
22  complaint to us and a number of other,
23  she also sent it to a number of other
24  sources.  Or a number of other
25  recipients, including the New York

Page 131

M. MCHUGH

1      M. MCHUGH
2   Times, the White House and such.
3      Q.   Okay.  And when you and the
4   New York Times and the White House
5   received this email, what did you do?
6   I won't ask you what the White House
7   did.
8      A.   We responded.
9      Q.   And before you responded,
10  did you have any discussion with
11  anybody else about how you should
12  respond?
13     A.   Yeah, I believe we sent it
14  to the Department of State first of
15  all to alert them to the issue.  We
16  explained that we would respond, and
17  then I discussed with my supervisor,
18  our CEO, Christine La Monica-Lunn,
19  L-A, capital M Monica, hyphen, Lunn,
20  L-U-N-N.  We discussed a suitable
21  response for such an extraordinary
22  letter.
23     Q.   Did Ms. La Monica-Lunn
24  approve the content of this email?
25     A.   She did.

Page 132

M. MCHUGH

1      M. MCHUGH
2      Q.   Did she approve the precise
3   language, or just the substance?
4      A.   I believe she approved the
5   letter in its entirety.
6      Q.   In the bottom paragraph on
7   the first page, it says, your local
8   coordinators are available to help you
9   any time of day, it's in the second
10  non-bolded line.
11        Has that always been an
12  accurate statement about local
13  coordinators?
14     A.   Yes.
15     Q.   Okay.  Were they available
16  just to help the Au Pair, or also the
17  host family at any time of day?
18     A.   They would be available to
19  both.
20     Q.   Okay.  On the next page --
21  my understanding of this email, and
22  please tell me if this is accurate, is
23  that the part in bold perhaps
24  paraphrases, but reflects questions or
25  concerns that you're responding to; is

Page 133

M. MCHUGH

1      M. MCHUGH
2   that correct?
3      A.   Yes, that's correct.
4      Q.   Okay.  Do you know whether
5   they are direct quotes from the letter
6   you received or whether they are your
7   paraphrase?
8      A.   At this point in time I do
9   not.
10     Q.   Okay.  And then the parts
11  under the bold are your response to
12  the concerns or questions?
13     A.   Yes.
14     Q.   So in the first response,
15  but the second paragraph of that
16  response, you wrote, I can tell you
17  that our local coordinators often
18  remove families from the program if
19  they break the rules or do not treat
20  the Au Pair fairly.
21        Is that an accurate
22  statement?
23     A.   Upon reviewing it now, I may
24  word it differently.
25     Q.   How would you word it now?

PLAINTIFFS' RESP. APP.0005216

MAGNA

LEGAL SERVICES

Page 134

M. MCHUGH

1
2    A.   Sorry, where am I?  Second
3  page, top --
4    Q.   The second non-bolded
5  paragraph.
6    A.   Second non-bolded.
7    Q.   I think it's the third
8  sentence.
9    A.   So she, her point is that
10  she felt the local coordinators appear
11  to be taking the side of the family in
12  this, so what I would say now is that
13  our local coordinators often recommend
14  that InterExchange remove families.
15    Q.   When a local coordinator
16  recommends that InterExchange removes
17  families, does InterExchange act upon
18  that recommendation?
19    A.   Yes.
20    Q.   Do you always remove a
21  family that is being recommended by a
22  local coordinator to be removed?
23    A.   It's difficult to say
24  always, but we take their
25  recommendations very seriously.

Page 135

M. MCHUGH

1
2    Q.   So it would be the majority
3  of cases where they recommend?
4    A.   I would believe it's the
5  majority of cases.  There's -- there
6  has to be good communication between
7  the local coordinator and the host
8  family for the local coordinator to be
9  able to do her job, and if that breaks
10  down, then we can't really do our job.
11    Q.   Okay.  About halfway down
12  the page, one of the bolded concerns,
13  headings, however you want to describe
14  it, says families who do not pay the
15  Au Pair/working more than 45 hours,
16  and in your second paragraph of your
17  response to that concern, the second
18  sentence -- no, actually, we'll start
19  with that, you describe having
20  specifically developed the Au Pair
21  U.S.A. schedule and weekly planner.
22        When did you develop the Au
23  Pair U.S.A. schedule and weekly
24  planner?
25    A.   Well, the State Department

Page 136

M. MCHUGH

1
2  brought up the issue that they seem to
3  see an increase in the number of
4  complaints about wages and hours, Au
5  Pairs not receiving their full stipend
6  for the hours that they worked.
7        They asked that we look into
8  developing best practices that could
9  help facilitate, alleviate that
10  problem.  So we looked into it and we
11  came up with a tool, we call, well,
12  this version of it was called the
13  schedule and weekly planner.  And I
14  believe it was implemented in 2000 --
15  I could find out for certain, but
16  maybe 2012, '13 or '14.  I'm sorry, I
17  don't remember exactly.
18    Q.   So would it be fair to
19  describe it as a tool that
20  InterExchange uses to monitor the
21  amount of time that the Au Pair is
22  working and also the fact that the Au
23  Pair is being paid?
24    A.   No, it's a tool that we
25  provide to the Au Pairs --

Page 137

M. MCHUGH

1
2    Q.   Mm-hmm.
3    A.   -- so that they can record
4  for themselves the hours that they
5  work and the hours, the pay that we
6  receive, and then they have it signed
7  off on by the host family.  That's a
8  good tool to keep everybody following
9  the rules.
10    Q.   And what do they do with it
11  after it's been signed off by the host
12  family?
13    A.   They keep it.
14    Q.   They just keep it, they
15  don't provide it to the local
16  coordinator?
17    A.   No.
18    Q.   Okay.  You write here, this
19  documentation is very important when a
20  problem with pay or hours worked comes
21  up.
22        How is the document used
23  when a problem with pay or hours
24  worked comes up?
25    A.   Well, the problem with pay

PLAINTIFFS' RESP. APP.0005217

MAGNA

LEGAL SERVICES

| Page 138 | Page 140 |
|---|---|

**Page 138**

M. MCHUGH

1  
2  or hours that we're really addressing
3  here is the relationship between the
4  Au Pair and the host family is not
5  something that we can see. We can't
6  see who paid who or whether they
7  received it, so we end up with a he
8  said, she said situation. The tool is
9  to try to document all of those
10  situations so that a he said, she said
11  situation won't arise.
12     Q.   So in the event of a
13  dispute, would the signed versions of
14  these weekly planners be provided to
15  the local coordinator to help resolve
16  that dispute?
17     A.   They may ask to see them.
18     Q.   And would the local
19  coordinator determine who's right in
20  the he said, she said situation?
21     A.   It's such a case-by-case
22  basis. But in situations like that,
23  the local coordinator would generally
24  consult with the New York office.
25     Q.   So InterExchange, would

**Page 139**

M. MCHUGH

1  
2  InterExchange then decide who was
3  right in the he said, she said
4  situation?
5     A.   If we could. If we could.
6  If we had to and if we could.
7     Q.   What do you do if you can't,
8  if you don't know?
9     A.   Do you know an example of?
10     Q.   If a situation came up where
11  an Au Pair was saying they weren't
12  paid the right amount and the host
13  family was saying that's not true, we
14  did pay you the right amount and you
15  didn't know who was telling the truth,
16  what would you do?
17     A.   I mean, if we don't know
18  what really happened and the two sides
19  are in disagreement about it, there's
20  not much we can do.
21     Q.   If you determined that the
22  Au Pair was telling the truth, would
23  you require the host family to make up
24  the difference?
25     A.   If we knew that the Au Pair

**Page 140**

M. MCHUGH

1  
2  was owed the money and the host family
3  wasn't paying the money, then we feel
4  that that would be breaking the
5  program regulations, and as the
6  sponsor it's our job to first of all
7  try to get the host family to abide by
8  the program regulations and really try
9  to, that's our preferred outcome.
10     We don't want to see an Au
11  Pair not receive her stipend.
12     Q.   And if the, if the host
13  family just won't provide it, just
14  won't provide the stipend for time
15  that's already been worked, what would
16  InterExchange do?
17     A.   In some situations, if we
18  believe that the Au Pair is
19  legitimately owed the stipend, we will
20  pay the Au Pair the stipend and then
21  deduct that from the host family's
22  refund or bill the host family for it.
23  So we will act as an intermediary.
24     Q.   And might the host family be
25  removed from the program among those

**Page 141**

M. MCHUGH

1  
2  circumstances?
3     A.   Sure.
4     Q.   And then the bottom
5  paragraph, you write, the stipend,
6  which is set by the federal
7  government, is equal to 45 hours of
8  work multiplied by the minimum wage.
9  You provide that calculation. This
10  amount is then reduced 40 percent
11  because the host family is providing
12  housing and not collecting rent or
13  money for food. So the Au Pair is
14  paying $130.50 per week from this pay
15  for housing and food, and then it goes
16  on.
17     Did you believe this was
18  accurate when you wrote it?
19     A.   Again, it wouldn't be the
20  words I would choose, and I knew I was
21  writing to a non-native English
22  speaker, based on the letter she sent
23  I had a sense of what her English
24  level was, so I was trying to convey
25  the concept of how we arrived at the

PLAINTIFFS' RESP. APP.0005218

MAGNA
LEGAL SERVICES

Case 1:14-cv-03074-CMA-KMT   Document 1039-25   Filed 05/17/18   USDC Colorado   Page 391 of 700

Page 142

M. MCHUGH

1
2  195.75 per week in terms she would
3  understand.
4      Q.   But both you and your CEO
5  approved this language?
6      A.   Yes.
7      Q.   There is no reference
8  anywhere here to the stipend being a
9  minimum; is that correct?
10      A.   There is a reference to the
11  stipend being based off of the minimum
12  wage.
13      Q.   And is that the only
14  reference to a stipend being in any
15  way a minimum?
16      A.   Yes.
17      Q.   Okay.  On the next page of
18  the document, at the very top, it says
19  -- your response says, if we learn
20  that a host family is breaking the
21  rules, we address it with them
22  immediately.  If they do not fix the
23  situation, we remove them from the
24  program.  The same is true for Au
25  Pairs.

Page 143

M. MCHUGH

1
2          Was that an accurate
3  statement?
4      A.   Again, it may not be the
5  words that I would choose today.
6      Q.   Is it inaccurate?
7      A.   I would say it's a bit more
8  definitive than I would say, I would
9  perhaps make it sound a bit more
10  conditional or we would investigate
11  the situation.
12      Q.   But again, at the time you
13  wrote this, you and your CEO approved
14  this language?
15      A.   Yes.  And this response was
16  sent to the Department of State as
17  well.
18      Q.   Was it sent to anyone else?
19      A.   I don't think we included
20  the New York Times or the White House.
21      Q.   Well, the Department of
22  State reports to the White House?
23      A.   And they said,
24  congratulations on your thoughtful
25  response.

Page 144

M. MCHUGH

1
2      Q.   Did they actually say that,
3  or was that a joke?
4      A.   No, they did actually say
5  that.
6      Q.   And who said that?
7      A.   I believe it was Maha Ammar.
8      Q.   Did they say that in a
9  document or verbally?
10      A.   They said that in an email.
11          (McHugh Exhibit 18, Bates
12      stamped INTEREXCHANGE 0007009
13      through 7029, was marked for
14      identification.)
15      Q.   So this next document, again
16  we're providing it to you in color so
17  it's easier to read.  For the record,
18  it's InterExchange 0007009 through
19  7029.  Do you recognize this document?
20      A.   I do.
21      Q.   What is it?
22      A.   This was a template that we
23  used for webinars that we had with
24  potential Au Pairs.  I think we did
25  two or three and then called it quits.

Page 145

M. MCHUGH

1
2      Q.   What time period did you do
3  the two or three?
4      A.   I don't know for sure, but
5  based on the design I would say maybe
6  2014 or '15, I'm guessing.
7      Q.   Why would you call it quits?
8      A.   We didn't feel that it
9  benefitted our, our program.
10      Q.   Was it replaced with a, was
11  it replaced with anything or was it
12  just terminated?
13      A.   It was just terminated.
14      Q.   And was the information in
15  this, was it communicated to Au Pairs
16  during those webinars?
17      A.   It was communicated to
18  potential Au Pairs, I don't know
19  whether any of them became Au Pairs.
20          (McHugh Exhibit 19, Bates
21      stamped INTEREXCHANGE 0021335,
22      was marked for identification.)
23      Q.   So this next document is an
24  email chain Bates numbered
25  InterExchange 0021335.  And my first

MAGNA ▶
LEGAL SERVICES

| Page 146 | Page 148 |
|---|---|

**Page 146**

M. MCHUGH

1 question is, do you know who Verona
2 Benjamin is?
3     A.   Yes.
4     Q.   Who is Verona Benjamin?
5     A.   She was also a transition
6 coordinator.
7     Q.   Looking at the bottom email
8 from Svetlana Platanova, it appears
9 that she says, I have a question about
10 my ex host family filing the taxes for
11 2010, the local coordinator is Phil
12 Colucci. I just skipped a sentence.
13 The problem is that I don't keep in
14 touch with this family no more due to
15 some difficult relationship between
16 us. The question is, how can I
17 request the information on the wages
18 they paid me during this period
19 according to their tax forms? I
20 haven't been able to file my taxes due
21 to this delay.
22         Again, I skipped a sentence.
23 Do you see that?
24     A.   Yes.

**Page 147**

M. MCHUGH

1     Q.   And the response from
2 Ms. Benjamin is the Au Pair stipend is
3 195.75 per week for all Au Pairs, so
4 this is the wage paid to you by the
5 family on a weekly basis.
6         Do you believe this was an
7 appropriate email for Ms. Benjamin to
8 send to Ms. Platanova?
9     A.   Well, it's not the email
10 that I would have sent to
11 Ms. Platanova.
12     Q.   That's not the question I
13 asked. I asked whether you believe
14 this is an appropriate email.
15     A.   I believe it's not
16 appropriate in that it doesn't answer
17 her question.
18     Q.   Why doesn't it answer her
19 question?
20     A.   Her question is, how can I
21 request the information on the wages
22 they paid me during this period
23 according to their tax forms. That's
24 a question she should be asking them.

**Page 148**

M. MCHUGH

1     Q.   By them, do you mean the --
2     A.   Host family.
3     Q.   -- host family?
4     A.   So I believe the response
5 should have been, try to contact your
6 host family.
7     Q.   Do you believe that, would
8 Ms. Benjamin have received approval
9 for this email before sending it, or
10 would she have sent it on her own
11 cognizance?
12     A.   She would have sent it on
13 her own.
14     Q.   And it seemed she was
15 conveying in this email that
16 Ms. Platanova could file her taxes
17 based on the Au Pair stipend of 195.75
18 per week, is that how you interpret
19 this email?
20         MS. VICKLES:  Object to
21 form.
22     A.   I can't say, the answer is
23 so removed from the question that it
24 could have been a complete misreading

**Page 149**

M. MCHUGH

1 of what the question was. The two
2 almost don't seem to be related.
3     Q.   Okay.
4         (McHugh Exhibit 20, Bates
5 stamped INTEREXCHANGE 0013829,
6 was marked for identification.)
7     Q.   So this is an email Bates
8 numbered InterExchange 0013829. The
9 top email appears to be from Debbie
10 Daly. Is she another local
11 coordinator?
12     A.   She is.
13     Q.   And in an email about
14 halfway down the page -- I'm skipping
15 the first sentence. The family should
16 be paying you 195.75 per week, they
17 should not be subtracting anything for
18 living and food, is that happening?
19 And in the top email she writes, you
20 don't earn additional money over the
21 195.75, but that is how the money is
22 calculated, and then she gives an
23 explanation of how it was calculated.
24 And at the end she says, so the State

PLAINTIFFS' RESP. APP.0005220

MAGNA
LEGAL SERVICES

| Page 150 |
|---|

1         M. MCHUGH
2  Department, well, part of the United States
3  government, figured that those costs
4  which are paid for by the family are
5  about 40 percent of the total, so
6  60 percent of 326.25 is 195.75, and
7  that is what you get paid.
8     Do you believe that Ms. Daly
9  was accurately conveying information
10  to Ms. Wacker?
11    A.  Which part?
12    Q.  Was any of what I read
13  inaccurate?
14    A.  Inaccurate?
15    Q.  Inaccurate.
16    A.  Well, let's see here. I
17  don't know what Louisa's arrangement
18  was with the -- her host family, so I
19  don't know whether she received 195.75
20  per week. It sounds from this email
21  that that's what was happening. So in
22  that sense, nothing described here
23  sounds particularly inaccurate. But
24  again, I don't know exactly what the
25  agreement Louisa had with her host

| Page 151 |
|---|

1         M. MCHUGH
2  family was.
3    Q.  Okay.
4     (McHugh Exhibit 21, Bates
5    stamped INTEREXCHANGE 0038370,
6    was marked for identification.)
7    Q.  This next document is an
8  email Bates numbered InterExchange
9  0038370. The top email appears to be
10  from Nina Kryzak. Is she also a local
11  coordinator?
12    A.  She is.
13    Q.  How long has Ms. Kryzak been
14  a local coordinator?
15    A.  How long has she been a
16  local coordinator?
17    Q.  Yes.
18    A.  Five years.
19    Q.  At the time of this email
20  had she been a local coordinator for
21  five years?
22    A.  Oh. At least seven years,
23  at least six-and-a-half years.
24    Q.  At least six-and-a-half
25  years from today?

| Page 152 |
|---|

1         M. MCHUGH
2    A.  Yes -- well, the email says
3  -- I think she's been a cooperator or
4  local coordinator between, less than
5  ten years, say it that way.
6    Q.  Okay. And it appears in the
7  bottom email, Ms. Krot is asking,
8  among other things, what her salary
9  would be. And does that seem accurate
10  to you?
11    A.  Let's see.
12    Q.  You can take as much time as
13  you need, my question is simply
14  whether Ms. Krot seems to be asking,
15  among a number of other things, what
16  her salary will be as an Au Pair.
17    A.  Okay, sorry, what was the
18  question?
19    Q.  Do you think it's fair to
20  say that Ms. Krot is asking, among
21  other things, what her salary will be
22  as an Au Pair?
23    A.  Yes, Ms. Krot seems to be
24  concerned that some families promise
25  one salary and deliver another salary.

| Page 153 |
|---|

1         M. MCHUGH
2    Q.  And the response is, your
3  salary will be the mandatory 195.75
4  each week as determined by the U.S.
5  State Department. All the regulations
6  of the program are determined by the
7  State Department of the U.S. Do you
8  believe that was an accurate
9  statement?
10    A.  I don't know if Nina Kryzak
11  had discussed with the family that
12  that is what they agreed that they
13  were going to offer the Au Pair.
14  That's what it sounds like to me. She
15  seems to know that the stipend will be
16  195.75, so it appears correct to me.
17    Q.  Do you think that it is
18  accurate to describe the 195.75 as
19  mandatory?
20    A.  It is certainly mandatory
21  that Au Pairs get at least 195.75 per
22  week. They cannot receive less than
23  that, which appeared to be Ms. Krot's
24  concern.
25    Q.  Do you think there's

PLAINTIFFS' RESP. APP.0005221

MAGNA
LEGAL SERVICES

| Page 154 |
|---|

<pre>
 1            M. MCHUGH
 2  anything in this email that conveys to
 3  Ms. Krot that she might be able to
 4  negotiate for more or seek more from a
 5  different host family?
 6      A.   I don't see that that was
 7  the question asked by Anna.
 8      Q.   Do you, does InterExchange
 9  instruct Au Pairs that they can
10  negotiate for salaries?
11      A.   InterExchange, I can't think
12  of a place where InterExchange tells
13  Au Pairs that they should negotiate
14  for salaries, except to say that the
15  stipend is the minimum of 195.75
16  determined by the Department of State.
17  I think it's clear that by saying it's
18  a minimum, they can negotiate.
19          We also, for example, don't
20  say that the educational requirements,
21  while they say they are six credits,
22  we don't tell them that they can take
23  more classes than that, but they
24  certainly can.  There's no restriction
25  on that.
</pre>

| Page 155 |
|---|

<pre>
 1            M. MCHUGH
 2      (McHugh Exhibit 2, Bates
 3    stamped INTEREXCHANGE 0011105
 4    through 1106, was marked for
 5    identification.)
 6      Q.   The court reporter has put
 7  before you Exhibit 22, which is
 8  InterExchange 0011105 to 06.  The from
 9  in this email is Writeboard, do you
10  know what Writeboard is?
11      A.   Yes.
12      Q.   What is it?
13      A.   Writeboard was a function
14  involved in the web application known
15  as Basecamp.  It allowed for creating
16  of draft versions of documents, and
17  editing.
18      Q.   So is this a document -- by
19  looking at this document, can you tell
20  whether this is a final or draft
21  document?
22      A.   I cannot.
23      Q.   Do you know who Stephanie
24  Willhide is?
25      A.   I do.
</pre>

| Page 156 |
|---|

<pre>
 1            M. MCHUGH
 2      Q.   Who is Stephanie Willhide?
 3      A.   Stephanie Willhide, at the
 4  time of writing this, was a client
 5  relations associate.  She currently
 6  works in the communications
 7  department.
 8      Q.   At the time she wrote this,
 9  how long had Ms. Willhide been
10  employed in the Au Pair area?
11      A.   At the time that she wrote
12  this, probably a year, not much more
13  than a year, if more, maybe less.
14      Q.   Okay.  Do you agree with the
15  sentence, all Au Pairs earn a weekly
16  stipend of 195.75 per week.  This is a
17  number chosen by the United States
18  State Department?
19      A.   I do not.
20      Q.   Are you surprised that
21  somebody who had worked in the Au Pair
22  area for maybe a little less than a
23  year would believe that?
24          MS. VICKLES:  Object to
25    form.
</pre>

| Page 157 |
|---|

<pre>
 1            M. MCHUGH
 2      Q.   You can answer.
 3      A.   I'm disappointed to say it.
 4  I can't say whether I'm surprised or
 5  not.
 6      Q.   Okay.  So is it your
 7  position that Au Pairs are permitted
 8  to negotiate for a higher stipend than
 9  195.75?
10      A.   There's nothing in the
11  regulations or our policies that would
12  forbid an Au Pair from negotiating
13  that.
14      (McHugh Exhibit 23, Bates
15    stamped INTEREXCHANGE 0010706
16    through 0711, was marked for
17    identification.)
18      Q.   You're now being handed
19  another exhibit, this one is
20  InterExchange 0010706 through 711.
21  Who is Michael Gates?
22      A.   Michael Gates is the
23  international recruitment and
24  placement manager.
25      Q.   Does he report directly to
</pre>

MAGNA
LEGAL SERVICES

Page 158

M. MCHUGH

1 you?
2 A. He does.
3 Q. What is his role?
4 A. He works with the
5 international cooperators to recruit
6 Au Pairs.
7 Q. Is he in charge of that
8 area?
9 A. He is.
10 Q. How long has he been in that
11 role?
12 A. He's been in that role for
13 eight years.
14 Q. Do you recognize this
15 document?
16 A. I do not.
17 Q. Do you know what Norland
18 Nannies are?
19 A. I do not.
20 Q. If you need it, feel free to
21 take a moment to familiarize yourself
22 with this document. But I am going to
23 ask you about Mr. Gates' response at
24 the very top. I will represent that
25

Page 159

M. MCHUGH

1 this email chain appears to be a
2 discussion with Norland Nannies about
3 whether it would be appropriate for
4 them to be a part of InterExchange's
5 Au Pair program. And in an email from
6 Olivia Goulden on January 22, 2012,
7 which is the second email in the chain
8 from the top, she writes, however, as
9 I mentioned in my email, the only
10 problem I foresee, and I think it is
11 quite a big one, is the salary paid to
12 the nanny.
13 As you say, this is fixed at
14 195.75 per week, however Norland
15 Nannies would normally expect a much
16 higher salary than this, sometimes
17 four times as much.
18 This obviously reflects
19 their length and quality of training
20 and the fact that many have degrees in
21 childcare. It would be a shame if our
22 nannies were prevented from working in
23 the U.S. because of this.
24 And Mr. Gates' response is,
25

Page 160

M. MCHUGH

1 hi, Olivia, unfortunately I'm not in a
2 position to change this regulation by
3 our federal government, which has
4 actually increased its scrutiny and
5 oversight of the Au Pair program in
6 the United States.
7 The current weekly stipend
8 is dictated by our minimum wage rate
9 with the accompanying room and board
10 taken into account, and the Fair
11 Standards Labor Act of the Department
12 of State. And later on, it does not
13 allow for qualification based pay, and
14 I could not endorse this.
15 Do you believe that
16 Mr. Gates' response is accurate?
17 A. I'm not sure what he means
18 by qualification based pay. So this
19 is not an agency that we work with.
20 Q. Do you believe that Norland
21 Nannies could have worked with your,
22 worked in your program and simply
23 negotiated for a higher pay?
24 A. I don't know enough about
25

Page 161

M. MCHUGH

1 Norland Nannies to know whether that's
2 possible or not. Norland Nannies
3 could be 35 years old and outside the
4 bounds of the program.
5 Q. Ms. Goulden said, as you
6 say, this is fixed at 195.75 per week.
7 Why do you think Mr. Gates said that
8 the stipend is fixed at 195.75 per
9 week?
10 MS. VICKLES: Object to
11 form.
12 A. I couldn't say why Mr. Gates
13 said to a potential cooperator that we
14 declined to work with that that was
15 the case. But we never worked with
16 this agency.
17 Q. But you do not believe it is
18 accurate that the stipend is fixed at
19 195.75 a week?
20 A. Absolutely not.
21 Q. So you would be surprised if
22 Mr. Gates had told Ms. Goulden that?
23 A. I would be surprised, yes.
24 Q. Do you work with any
25

PLAINTIFFS' RESP. APP.0005223

MAGNA
LEGAL SERVICES

```
                                    Page 162

 1              M. MCHUGH
 2    potential -- sorry, do you work with
 3    any international cooperators who
 4    routinely seek to negotiate a higher
 5    stipend?
 6        A.   Not to my knowledge.
 7        Q.   Are you aware of any
 8    international cooperators that has
 9    ever encouraged its Au Pairs to
10    negotiate a higher stipend?
11        A.   I'm not privy to what the
12    international cooperators encourage
13    their Au Pairs to do.
14        Q.   Do you know whether -- are
15    you aware of any Au Pair who has ever
16    sought to negotiate a higher stipend
17    than 195.75?
18        A.   I do not know the
19    negotiations between an Au Pair and
20    host family.  I know that there are Au
21    Pairs -- anecdotally I know that there
22    are Au Pairs who are paid more than
23    195.75 per week.  I don't know how
24    they arrived at that.
25            (McHugh Exhibit 24, Bates
```

```
                                    Page 163

 1              M. MCHUGH
 2        stamped INTEREXCHANGE 00024972
 3        through 4973, was marked for
 4        identification.)
 5        Q.   This next exhibit is
 6    InterExchange 00024972 through 73.
 7    The top email appears to be from
 8    Mr. Gates to somebody with an at Thai
 9    Study Abroad email address.  Do you
10    know what Thai Study Abroad is?
11        A.   Yes.
12        Q.   What is Thai Study Abroad?
13        A.   They are a Thai agency that
14    we had previously worked with.
15        Q.   Do you know whether you were
16    working with them at the time of this
17    email?
18        A.   I do not.
19        Q.   And this appears to be
20    another one of those emails where
21    answers are delineated with questions.
22    So my understanding of this email is
23    that the bold is written by Mr. Gates.
24    Does that appear to be correct?
25        A.   Mm-hmm.
```

```
                                    Page 164

 1              M. MCHUGH
 2        Q.   So under -- so number five,
 3    I think five in the question is not
 4    written by Mr. Gates, but it reads,
 5    will Au Pair get paid more than 195.75
 6    per week if Au Pair graduated with a
 7    degree in nursing, child education.
 8    And the response from Mr. Gates is no,
 9    we only run the standard Au Pair
10    program, and all Au Pairs on our
11    program receive the standard weekly
12    stipend of 195.75.  Au Pairs with
13    qualifications in nursing or education
14    are more likely to match with a
15    family, though.
16            Why is Mr. Gates -- well,
17    first of all, do you believe that
18    Mr. Gates is conveying accurate
19    information to Thai Study Abroad?
20        A.   No, I don't.
21        Q.   So where would Mr. Gates
22    have gotten this information?
23            MS. VICKLES:  Object to
24        form.
25        Q.   Where should Mr. Gates have
```

```
                                    Page 165

 1              M. MCHUGH
 2    gotten information about the stipend?
 3        A.   Where should he have gotten
 4    the information about the stipend?
 5    From the program regulations,
 6    documents issued by the State
 7    Department.
 8        Q.   And those would have told
 9    him that -- what part of this is
10    inaccurate?
11        A.   That all Au Pairs receive
12    the weekly standard stipend.
13        Q.   So Mr. Gates' job is to work
14    with international cooperators,
15    correct?
16        A.   Yes.
17        Q.   So why would Mr. Gates give
18    an international cooperator bad news
19    that is also wrong?
20            MS. VICKLES:  Object to
21        form.
22        A.   In reading this email and
23    reading the email that came before it
24    from the international cooperator and
25    the phrasing that Michael Gates used,
```

MAGNA
LEGAL SERVICES

Case 1:14-cv-03074-CMA-KMT    Document 1059-25    Filed 03/17/18    USDC Colorado    Page 397 of 701

Page 166

M. MCHUGH

1  I believe Michael Gates was answering
2  the question, do you have an Au Pair
3  Extraordinaire program that pays a
4  higher stipend for Au Pairs who are
5  qualified as nurses or professional
6  childcare providers.  Other Au Pair
7  agencies run these sort of programs,
8  and they have a higher stipend, that
9  is my reading of his answer.
10     Q.   So you think that when we
11  wrote, all Au Pairs on our program
12  receive the standard weekly stipend,
13  he didn't really mean it?
14     A.   I think he meant all our Au
15  Pairs are standard Au Pairs, and the
16  stipend is, of course, at least
17  195.75, not the 250 that the Au Pair
18  Extraordinaire programs --
19     Q.   So he meant to say, at
20  least, but he just didn't?
21     A.   I'm speculating, but that's
22  my reading.
23     Q.   This next document is an
24  email exchange InterExchange 0019022

Page 167

M. MCHUGH

1  through 23.
2        (McHugh Exhibit 25, Bates
3        stamped INTEREXCHANGE 0019022
4        through 9023, was marked for
5        identification.)
6     Q.   And the top email appears to
7  be from Portia Haynes, do you know who
8  Ms. Haynes is?
9     A.   Yes.
10     Q.   Who is Ms. Haynes?
11     A.   At the time she worked as a
12  placement coordinator, program
13  specialist.
14     Q.   So would Ms. Haynes have
15  reported at this time to Mr. Gates?
16     A.   Yes.
17     Q.   And she's writing to a woman
18  called Lisa Guggemos, who asked, Nina
19  is a professional caretaker, would she
20  qualify with that to earn 250 a week.
21  And she writes back, please ask Nina
22  to let the family know the set weekly
23  stipend requirement as per the
24  Department of State guidelines, which

Page 168

M. MCHUGH

1  is 195.75 per week.
2        Do you believe that
3  Ms. Haynes' email is accurate?
4     A.   I believe this is similar to
5  the last situation.  We have a
6  question about whether an Au Pair
7  qualifies for a typical Au Pair
8  Extraordinaire situation, which is not
9  a program that we run.  So she's,
10  again, asking whether she qualifies
11  for the 250 a week, which she might
12  undergo Au Pair or Au Pair Care, who
13  run these sort of programs.
14        So while the language isn't
15  ideal, what she's trying to say is we
16  don't offer that program.
17     Q.   Let's look at that.  So in
18  the email from Ms. Guggemos, she
19  writes, Nina called me on Tuesday and
20  was already working on an email for
21  the family.  The host mother asked her
22  what she expects in terms of pay, and
23  Nina was a little bit uncomfortable
24  with that question, and she thought

Page 169

M. MCHUGH

1  the pay was set by InterExchange, and
2  families know about it.
3        I take it you believe that
4  it is not accurate that the pay is set
5  by InterExchange?
6     A.   That's correct.
7     Q.   And you believe that whoever
8  Nina is would have been free to ask
9  for the pay that she expects --
10     A.   Yes.
11     Q.   -- in response to the host
12  mother's question?
13     A.   Yes.
14     Q.   And yet the instruction that
15  comes back is for Nina to tell the
16  family that set weekly stipend is
17  195.75 per week.  Why is that the
18  instruction rather than allowing Nina
19  to negotiate for whatever stipend she
20  prefers?
21     A.   It's hard to answer, but
22  again I think that the 250 per week is
23  triggering -- we get this question a
24  lot, do you run the Au Pair

43 (Pages 166 to 169)

MAGNA
LEGAL SERVICES

| Page 170 | Page 172 |
|---|---|

**Page 170**

M. MCHUGH

1   Extraordinaire program.  No.  So I
2   think that's the question Portia was
3   trying to answer.  Is it worded -- is
4   it answered how I would like to see it
5   answered?  No.
6       Q.   So you believed that your
7   employees -- well, InterExchange's
8   employees should answer questions like
9   this by saying that Au Pairs are
10  entitled to negotiate their stipend;
11  is that how you think these questions
12  should be answered?
13      A.   If the question -- if a
14  question such as the host mother asked
15  the Au Pair what she thought she
16  should be paid, then I would hope that
17  the staff or somebody would answer
18  that with, that's a discussion that
19  you need to have with the host family.
20      Q.   Are there any policy
21  documents or instructional documents
22  at InterExchange that tell
23  InterExchange employees to provide
24  that kind of a response?

**Page 171**

M. MCHUGH

1       A.   Not that I can think of, no.
2   It happened so infrequently that we
3   don't.
4       Q.   Have you ever personally
5   told an InterExchange employee that
6   the Au Pair is entitled to negotiate
7   the stipend?
8       A.   I believe so.
9       Q.   When?
10      A.   I can't remember.
11      Q.   Before the lawsuit was
12  filed?
13      A.   I believe so.
14      Q.   Can you think of a specific
15  instance?
16      A.   No, it really wasn't a major
17  topic of discussion at the time.
18          (McHugh Exhibit 26, Bates
19          stamped INTEREXCHANGE 0018054,
20          was marked for identification.)
21      Q.   The next document is
22  InterExchange 0018054, do you know who
23  Julia Jakkaraju is?
24      A.   Yes.

**Page 172**

M. MCHUGH

1       Q.   Who is she?
2       A.   She's the local coordinator
3   in California.
4       Q.   At the time of this email do
5   you know how long she had been with
6   InterExchange?
7       A.   Maybe a year or two.
8       Q.   And the bottom email says,
9   my friend said that the first year is
10  195.75, and the extension year is 205.
11  Is it incorrect?  And it goes on --
12  the response is no, the stipend is
13  regulated and does not increase.
14          Do you think that that is an
15  accurate statement?
16      A.   The stipend is regulated and
17  does not increase, I think the minimum
18  stipend is regulated and does not
19  increase.
20      Q.   Do you think Ms. Jakkaraju
21  should have told Erina that she could
22  negotiate for a higher stipend for her
23  second year?
24      A.   I think she should have

**Page 173**

M. MCHUGH

1   said, discuss this with your family.
2           (McHugh Exhibit 27, Bates
3           stamped INTEREXCHANGE 0016727
4           through 6728, was marked for
5           identification.)
6       Q.   This next email is
7   InterExchange 0016727 through 28.  Do
8   you know who Jana Kuehler is?
9       A.   Yes.
10      Q.   Who is she?
11      A.   She was a local coordinator
12  in California.
13      Q.   And this appears to be, the
14  email second from the top on the first
15  page says, hi Jana, Yuna is a very
16  nice lady, what is she expecting for a
17  weekly salary?  And the response is,
18  as an Au Pair program, we are
19  regulated by the Department of State
20  on many requirements.  These were
21  discussed with you at your in-home
22  interview with Patty Thomas.  I know
23  it has been a while, so if there are
24  any questions about the program, feel

PLAINTIFFS' RESP. APP.0005226

**MAGNA** ▶
**LEGAL SERVICES**

Page 174

M. MCHUGH
1  M. MCHUGH
2  free to contact me.
3       As a reminder, the basics of
4  the program are as follows; and the
5  first bullet, the weekly stipend
6  regulated by the Department of State
7  is 195.75 per week.
8       Do you think this was an
9  accurate -- do you think the
10 information being conveyed here is
11 accurate?
12      A.   I would prefer it to say, at
13 least.
14      Q.   Do you think Ms. Kuehler
15 should have conveyed that Yuna could
16 negotiate for a higher salary than
17 195.75?
18      A.   Do I think that she should
19 have conveyed that?
20      Q.   Yes.
21      A.   Well, the question is being
22 asked by the host mom, so the answer
23 wouldn't be that the Au Pair should
24 negotiate for a higher salary with the
25 host mom.

Page 175

M. MCHUGH
1  M. MCHUGH
2       Q.   But the question is, what is
3  Yuna expecting for a weekly salary.
4       A.   Right.
5       Q.   So shouldn't the answer be
6  about the fact that it needs to be, I
7  think your phrase was, worked out
8  between the host family and the Au
9  Pair?
10      A.   I think the answer -- I
11 think the answer should have been Yuna
12 is expecting at least $195 per week.
13      Q.   We've looked at a number of
14 communications now from local
15 coordinators to host families, to Au
16 Pairs.  We looked at some
17 communications between your
18 international partners and
19 InterExchange.  And you have had very
20 similar criticisms of a lot of these
21 emails.
22       So my question is, does it
23 concern you that there appears to be a
24 systemic failure in the way
25 InterExchange responds to these emails

Page 176

M. MCHUGH
1  M. MCHUGH
2  and inquiries?
3       MS. VICKLES:  Object to
4  form.
5       A.   It concerns me that we could
6  be more accurate in describing that
7  the weekly stipend is set at a minimum
8  of 195 per week.
9       Q.   Do you think InterExchange
10 has done a good job of conveying that
11 message in the past?
12      A.   I believe so.  I think these
13 are, from what I've seen this is some
14 random examples from our local
15 coordinators who are part-time
16 employees across several years when
17 we're dealing with, you know,
18 thousands, tens of thousands of
19 interactions per year.
20      Q.   Some of the emails from
21 Mr. Graves, you wouldn't describe him
22 as a random employee, would you?
23      A.   I think you mean Mr. Gates.
24      Q.   I'm sorry, I did mean
25 Mr. Gates.

Page 177

M. MCHUGH
1  M. MCHUGH
2       A.   We do have a Mr. Graves, so.
3       Q.   I'm getting them confused.
4  I apologize to both.  Mr. Gates.  Some
5  of the emails from Mr. Gates, and you
6  wouldn't describe him as a random
7  employee, would you?
8       A.   No.
9       Q.   He's a relatively senior
10 member of our Au Pair team --
11      A.   Yes.
12      Q.   -- is that fair to say?
13      A.   Yes.
14      Q.   Does it concern you that he
15 appears to be making the same mistake?
16      A.   Again, I know the question
17 that he's answering when he's
18 answering those emails, and it's
19 unfortunate, the language that he
20 chose, because this wasn't -- again,
21 at the time this wasn't such in the
22 forefront of our minds in terms of
23 always making sure you get at least in
24 there.  But that is our policy.
25      Q.   And one of the e-mails we

MAGNA
LEGAL SERVICES

M. MCHUGH

1    looked at was from you, and had been
2    approved by the CEO, and do you
3    believe that you made the same mistake
4    and your CEO made the same mistake
5    that you've been describing here?
6         A.   I believe that that mistake
7    is visible -- is occasionally visible.
8    I have made it, staff have made it,
9    the Department of State has phrased
10   the same question or the same
11   statement the same way.  They have
12   neglected to put at least in their
13   statements from time to time.  I think
14   it's a simple communication error.
15   Yeah, and unfortunately it happens.
16        THE VIDEOGRAPHER:  You have
17   about five minutes.
18        MR. LIBLING:  Let's take a
19   break, then.  Do you want to take
20   lunch -- go off the record.
21        THE VIDEOGRAPHER:  Going off
22   the record, the time is
23   1:10 p.m., this ends DVD number
24   two.

M. MCHUGH

1    (Time noted:  1:10 p.m.)
2    (Luncheon recess.)

M. MCHUGH

1    AFTERNOON SESSION
2         (Time noted:  2:15 p.m.)
3         THE VIDEOGRAPHER:  We are
4    now on the record, time is
5    2:15 p.m., this begins DVD number
6    three.
7         MICHAEL MCHUGH, RESUMED,
8    having been previously and duly
9    sworn, was examined and testified
10   further, as follows:
11        CONTINUED EXAMINATION
12        BY MR. LIBLING:
13        Q.   Good afternoon, Mr. McHugh.
14   So I want to ask you now about the
15   training of Au Pairs.
16        A.   Mm-hmm.
17        Q.   Is any training of Au Pairs
18   done in the Au Pairs' home country?
19        A.   It is.
20        Q.   And what training is done in
21   -- let me first ask, who trains the Au
22   Pairs in their home country?
23        A.   They train themselves in
24   their home country.

M. MCHUGH

1         Q.   What do they use to train
2    themselves?
3         A.   They use an online module
4    and written manuals -- actually,
5    multiple online manual -- modules.
6         Q.   Are those online modules on
7    InterExchange's website?
8         A.   Yes.
9         Q.   And is there any other
10   training that occurs in an Au Pair's
11   home country?
12        A.   There's an orientation,
13   there's preparation that happens, but
14   not orientation.
15        Q.   Okay.
16        A.   Or training, sorry.
17        Q.   Okay.  Other than these
18   online modules, any other materials
19   provided to the Au Pair prior to their
20   arrival in the United States?
21        A.   Yes.
22        Q.   What other materials are
23   provided?
24        A.   They receive access to a

MAGNA
LEGAL SERVICES

| Page 182 | Page 184 |
|---|---|

**Page 182**

M. MCHUGH

1
2 number of materials. They receive a
3 childcare training handbook, a
4 childcare training workbook. The Au
5 Pair handbook, directions to the
6 orientation and training in New York
7 City, that portion of it. A flow
8 chart of who to call if they have a
9 problem. Instructions on how to apply
10 for their Visa. Yeah, a number of
11 documents.
12    Q.   Okay.
13        (McHugh Exhibit 28, Bates
14    stamped InterExchange 005191
15    through 5220, was marked for
16    identification.)
17    Q.   I put before you an exhibit
18 which is Bates numbered InterExchange
19 005191 through 5220, and it's an email
20 and an attachment. The attachment is
21 called the online tutorial outline.
22        My question is whether you
23 know whether this outline was ever
24 actually put up onto the website.
25    A.   Your question is whether

**Page 183**

M. MCHUGH

1
2 this paper document, or this written
3 document, was put onto the website?
4    Q.   The way you asked that
5 suggests I have a misunderstanding
6 about what this document is. So what
7 is this document?
8    A.   So -- give me a minute.
9 Right, so this is a document that was
10 used in designing and building the
11 online orientation tutorial, which is
12 a website, a module website.
13    Q.   Is it the module website you
14 were discussing a moment ago?
15    A.   It's one of them.
16    Q.   It's one of them. How many
17 are there?
18    A.   Two different systems, this
19 is one system. And then there's a
20 second system that involves four
21 sections, multiple chapters each
22 section.
23    Q.   Okay. Do the two systems
24 serve different purposes?
25    A.   Yes.

**Page 184**

M. MCHUGH

1
2    Q.   What system, what purpose
3 does, let's start with this system,
4 serve?
5    A.   So this is more of a general
6 overview. This is not child
7 development training as much as it is
8 how to prepare for your arrival to the
9 United States. Program regulations,
10 information like that. Cultural
11 information. How to get to the
12 orientation in New York. Be prepared
13 for the weather in your host
14 community, researching climate, and
15 then you can see scripts of cartoon
16 characters that would appear on the --
17 on the system, speaking.
18    Q.   So scripts of cartoon
19 characters?
20    A.   So if you've done an online
21 training before, you know, they'll
22 have animated characters come in from
23 the side and say, hi, I'm Anna, I'm an
24 Au Pair.
25    Q.   Oh, I see. What page are

**Page 185**

M. MCHUGH

1
2 you looking at, just so the record is
3 clear? Or were you not looking at a
4 specific page then?
5    A.   I'm looking at this page,
6 5196.
7    Q.   5196. I see, I see.
8    A.   So that would be Anna
9 saying, when you arrive to the U.S.
10 you'll need to go through Customs.
11 And then there will be an animation of
12 an immigration officer, and then some
13 quiz questions.
14    Q.   Okay.
15    A.   Online training.
16    Q.   All right, so this document
17 would not itself be uploaded anywhere?
18    A.   No.
19    Q.   But this document describes
20 what the -- what those online -- the
21 content of those online modules?
22    A.   Yes. And acts as a script.
23    Q.   And acts as a script, got
24 it. That's helpful, thank you.
25        And you said there was a

PLAINTIFFS' RESP. APP.0005229

**MAGNA**
LEGAL SERVICES

47 (Pages 182 to 185)

| Page 186 | Page 188 |
|---|---|

**Page 186**

M. MCHUGH

1
2   second system?
3       A.   Yes.
4       Q.   What is the purpose of the
5   second system?
6       A.   The second system is
7   specifically focused on child
8   development training.
9       Q.   Anything more specific than
10  that, or --
11      A.   It's, it came after this
12  system.
13      Q.   Okay.  Do all Au Pairs use
14  both systems?
15      A.   Yes.
16      Q.   How do you ensure that all
17  Au Pairs have used both systems?
18      A.   Before the Au Pair arrives,
19  we can see within our system whether
20  the modules have been checked off as
21  complete or incomplete.
22      Q.   Got it.  And so once the Au
23  Pairs have completed these in their
24  home countries, is there anything else
25  they do in their home countries before

**Page 187**

M. MCHUGH

1
2   they come to the U.S.?
3       A.   Well, they apply for their
4   Visa, they go to their Visa interview.
5   They may meet with their local or
6   international cooperator to go through
7   any last-minute details or questions
8   they may have.
9       Q.   Okay.
10      A.   Like I said, they'll have
11  the Au Pair handbook, so they're meant
12  to read through all of the materials
13  that we provide.
14      Q.   And is the next step that
15  they come to the U.S. for a training
16  in New York?
17      A.   Once they've secured their
18  Visa, so they would have a scheduled
19  arrival date that they've agreed on
20  with their family, and then they would
21  arrive to New York for that training.
22      Q.   How regularly are these New
23  York trainings conducted?
24      A.   These days we have it's, you
25  know, two a month, but sometimes

**Page 188**

M. MCHUGH

1
2   they're back to back in busier
3   seasons, but, yeah, 24 to 26 per year.
4       Q.   And are they always in New
5   York?
6       A.   Yes.
7           (McHugh Exhibit 29, Bates
8       stamped INTEREXCHANGE 0028522
9       through 8544, was marked for
10      identification.)
11      Q.   You should now have in front
12  of you a document marked InterExchange
13  0028522 through 544.  Is this a
14  document that's used during that New
15  York City training?
16      A.   This is not the most
17  up-to-date version, but this is one
18  version that we may have used in the
19  past.
20      Q.   Do you know when the most
21  up-to-date version was adopted?
22      A.   I believe it would be at the
23  beginning of 2016.
24      Q.   At the beginning of 2016.
25  So is this, could this be the version

**Page 189**

M. MCHUGH

1
2   that was in use prior to the 2016
3   version?
4       A.   I'm not sure.
5       Q.   Okay.  How frequently are
6   these materials updated?
7       A.   They could be modified
8   slightly each year.
9       Q.   Okay.  On page eight of this
10  document, that's not going by the
11  Bates numbers, but the native numbers.
12      A.   Mm-hmm.
13      Q.   It describes an orientation,
14  one of the orientation workshops is
15  the program rules, regulations, and
16  culture shock.
17      A.   Mm-hmm.
18      Q.   Are there handouts or
19  materials provided for these
20  workshops?
21      A.   To be honest, I don't know.
22  For this, I know there is an
23  orientation workbook that they work
24  through, but as I said, I think this
25  is an older version of that document.

PLAINTIFFS' RESP. APP.0005230

MAGNA
LEGAL SERVICES

Case 1:14-cv-03074-CMA-KMT   Document 1053-25   Filed 03/17/18   USDC Colorado   Page 403
6 of 700

Page 190

1          M. MCHUGH
2       So the classes, the
3   trainings may have changed since then,
4   but I believe there is a --
5   supplementary material that they fill
6   in as they go along.
7       Q.   That the Au Pair fills in?
8       A.   That the Au Pair fills in.
9       Q.   Do all Au Pairs have to go
10  through the New York City training?
11      A.   Yes.  It's a State
12  Department requirement that the Au
13  Pairs go through a certain number of
14  hours before reaching the host family
15  home, so everyone has to go through
16  it.
17      Q.   Is there any information
18  that is required to be conveyed during
19  this training period?
20      A.   Well, the State Department
21  regulations are that they have to have
22  a certain number of hours of child
23  safety training, I believe it's four
24  hours, and they have to have a certain
25  number of child development training

Page 191

1          M. MCHUGH
2   hours, so that's 20 hours.
3       Q.   Is there anything else that
4   has to be covered as part of this
5   training?
6       A.   That must be covered?  Per
7   the regulations, not that I can think
8   of.
9       Q.   Okay.  If we turn to page
10  20, it describes a missed orientation
11  training form.  It seems to be, it
12  says that -- do you know what the
13  missed orientation training form is?
14      A.   I don't.
15      Q.   So this says Au Pairs
16  normally arrive on Monday of
17  orientation week in time for their
18  first class on Tuesday morning.
19  However, occasionally an Au Pair will
20  arrive late to orientation due to
21  flight issues.  Due to strict
22  government regulations, we need to
23  make sure all of our Au Pairs receive
24  the correct information from our
25  agency.  When this occurs, we require

Page 192

1          M. MCHUGH
2   the local coordinator to make up the
3   missed session with the Au Pair.
4       The local coordinators will
5   be sent a missed orientation training
6   form that states everything that needs
7   to be reviewed with the Au Pair.  The
8   form needs to be signed by both the
9   local coordinator and the Au Pair, and
10  then mailed back to InterExchange.
11      Does that sound like a
12  process InterExchange has used, are
13  you familiar this process?
14      A.   It sounds like -- I do not
15  believe InterExchange has ever used
16  that process.  If somebody missed a
17  portion of the orientation, our policy
18  is to cover that outside of the
19  orientation hours or to not have them
20  arrive to the orientation, so to -- to
21  move to the next arrival.
22      No, it, in my memory I
23  cannot remember a time when local
24  coordinators were tasked with training
25  the Au Pairs.

Page 193

1          M. MCHUGH
2       Q.   Okay.  So I take it you
3   don't have any explanation as to why
4   this is here in this document?
5       A.   That sounds like it may have
6   been a process that was thought of and
7   written down, but never implemented.
8       Q.   Okay.
9       A.   Again, I don't know what
10  year this document is from, but that
11  hasn't happened while -- in my memory.
12      Q.   When will an Au Pair first
13  learn what their stipend will be?
14      MS. VICKLES:  Object to
15  form.
16      A.   It could be when they see
17  our website, when they speak to an
18  international cooperator.  But
19  officially, they're all given a
20  document that's called the
21  pre-application information document
22  that spells out clearly what the --
23  what the stipend is, what the fees
24  are, what the refund policies are.
25  And they review and sign that, and

PLAINTIFFS' RESP. APP.0005231

MAGNA
LEGAL SERVICES

---

Page 194

1                M. MCHUGH
2    that's uploaded into our system.
3       Q.   Pre-application information,
4    okay.  All right, and so after -- are
5    there any steps between the training
6    in New York and beginning the
7    placement with the host family?
8       A.   So they travel to the host
9    family after the orientation finishes.
10   They arrive to the host family home.
11   The family is required to stay at home
12   with the Au Pair and have them
13   acclimated to the environment for the
14   first three days.  During that time
15   the local coordinator needs to call
16   them within the first 48 hours and
17   establish contact with them, and the
18   family can choose to work through the
19   home orientation handbook if they
20   want.
21      Q.   One part of this process we
22   have not discussed is the matching.
23   Where in this process does the
24   matching occur?
25      A.   Before the orientation.

Page 195

1                M. MCHUGH
2       Q.   So before even the modules,
3    the online modules?
4       A.   Yes.
5       Q.   So what are the steps then,
6    before -- what are the steps before
7    you get to the matching process for an
8    Au Pair?
9       A.   What are the steps before
10   you get to the matching process?
11   Well, they would meet with the
12   international cooperator, they would
13   have the interview, so they have to be
14   interviewed in person.  They have to
15   perform an English evaluation.  They
16   have to submit two childcare
17   references.  Those need to be verified
18   by the international cooperator.
19          They have to submit one
20   character reference.  Also needs to be
21   verified by the international
22   cooperator.  They have to supply proof
23   that they've graduated from secondary
24   school or its equivalent in their
25   country.  They have to have a police

Page 196

1                M. MCHUGH
2    report that says they have no criminal
3    activity.
4           They have to have a medical
5    report saying that they're fit for the
6    program, physically capable of
7    performing the job duties.  They have
8    to take a personality test, DISC
9    assessment.  They have to have a
10   passport.  So all of this is submitted
11   into our system.
12          We review all the materials,
13   and once the Au Pair is complete, once
14   the file is complete and everything's
15   there, then -- sorry, they also write
16   a letter, a dear host family letter.
17   They can upload a video if they
18   choose, and they can upload photos if
19   they choose.
20          So once all of those are
21   compiled, we review the documents to
22   make sure they meet eligibility for
23   the program.  If they do, then they're
24   put into the pool of matching
25   candidates.

Page 197

1                M. MCHUGH
2       Q.   And I think I read
3    somewhere, I think we'll probably get
4    to the document, but maybe you can
5    tell me anyway.  I think I read that
6    one of the requirements is that the Au
7    Pair never have been married; is that
8    right?
9       A.   That is not our current
10   policy.
11      Q.   Do you know if that was ever
12   the policy?
13      A.   I don't know.
14      Q.   All right, let's just deal
15   with it when we go to the document.
16      A.   Yeah.
17      Q.   So then that brings us to
18   the matching process.  Can you
19   describe the matching process for me?
20      A.   Sure.  So host families have
21   been vetted on their side, Au Pairs
22   have been vetted on their side.
23   Families can use our database to
24   search for candidates who they're
25   interested in.  They can request an

PLAINTIFFS' RESP. APP.0005232

**MAGNA**
LEGAL SERVICES

Page 198

M. MCHUGH

1
2    interview with a candidate, they can
3    have an interview with the candidate
4    and they can release the candidate.
5    The Au Pair can ask to be released.
6    They can have, I think, three
7    candidates on view at any time.
8        Q.   The host family can?
9        A.   The host family, for
10   72 hours.
11       Q.   And for each 72-hour period
12   the Au Pair is exclusively viewable by
13   one host family?
14       A.   That's right.
15       Q.   Does the Au Pair choose
16   which host family they become
17   exclusively viewable to?
18       A.   They choose who they no
19   longer wish to be exclusively viewable
20   to.
21       Q.   They can opt out?
22       A.   Yes.
23       Q.   How is -- how does an Au
24   Pair get chosen to be one of the
25   exclusively viewable Au Pairs for a

Page 199

M. MCHUGH

1
2    specific host family?
3        A.   Well, the family has a
4    number of filters that they can use to
5    narrow down the total pool of
6    candidates, and then they have a
7    button that they can press that says,
8    put this candidate on view.  When they
9    select that, it will say, you have
10   this candidate on view until
11   such-and-such a date.
12       Q.   I see.  So is there anything
13   that the InterExchange requires happen
14   during that view period before the Au
15   Pair and the host family both say,
16   yes, this is the match we want?
17       A.   Well, we ensure that the
18   State Department regulations are met
19   in that the State Department
20   regulations say that an interview has
21   to take place between the Au Pair and
22   the host family.
23       Q.   Can those interviews happen
24   over video?
25       A.   Yes.

Page 200

M. MCHUGH

1
2        Q.   Can they happen over the
3    telephone?
4        A.   They can.
5        Q.   So you ensure that a video
6    -- sorry, strike that.
7            Okay.  I take it there is no
8    way for an Au Pair to be matched with
9    a host family other than through a
10   sponsor such as InterExchange?
11       A.   Outside of the State
12   Department program?  I'm not sure.  I
13   don't know what -- if other Visas are,
14   I know that -- I don't know what other
15   Visas are available to families to
16   hire somebody.
17       Q.   Can host -- can host
18   families and Au Pairs decide amongst
19   themselves outside of the -- outside
20   of your matching process who they want
21   to be matched together?
22       A.   Yes.
23       Q.   How does that happen?
24       A.   Sometimes they'll use
25   third-party sites where a family will

Page 201

M. MCHUGH

1
2    register and an Au Pair will register,
3    and they'll find each other that way.
4        Q.   Are there major third-party
5    sites that get used, or?
6        A.   I'm not sure what the most
7    popular one is.
8        Q.   Are there any that are
9    popular enough that you know their
10   names?
11       A.   Sure, there's Au Pair World,
12   Great Au Pair, AuPair.com.
13       Q.   So if they get together
14   through one of these outside sources,
15   then internally in the InterExchange
16   system, would the host family have to
17   find the Au Pair on the system and
18   check them out still, or is there an
19   alternative system?
20       A.   So they may come to us and
21   say, we have what's called a
22   pre-match, we found an Au Pair we want
23   to match with.  We would direct that
24   candidate towards our partner overseas
25   to begin the process, filling in all

**MAGNA**
**LEGAL SERVICES**

| | |
|---|---|
| Page 202 | Page 204 |

**Page 202**

M. MCHUGH

1 
2 the application materials, and we
3 would begin the process with the host
4 family in a very similar way to any
5 other family. It's just that when
6 they get to the matching part, we know
7 to put them on view with each other,
8 and then they can decide.
9    Q.   Do they still have to do an
10 interview as well?
11    A.   Yes. And they still have to
12 confirm the match, record the date
13 that they've interviewed with each
14 other, select the date that they want
15 their Au Pair to arrive, etcetera.
16    Q.   Is there any -- and so that
17 matching process occurs, are there any
18 steps between that and the online
19 modules that you discussed earlier?
20    A.   Well, it's, you know, it's a
21 multi, multi, multi-step process, so
22 on our side we are adding that
23 exchange visitor to the Student
24 Exchange Visitor Information System,
25 which is known as SEVIS. We're

**Page 203**

M. MCHUGH

1 
2 registering them in the SEVIS
3 database. We're producing what's
4 called the DS2019 form. We're paying
5 what's called the SEVIS fee. We're
6 printing out the receipts of that,
7 sending that, and then we put, so we
8 have to -- we have to sign the DS2019
9 form, and ARO, we talked about that
10 earlier, has to sign that in blue ink,
11 that has to be put into a Fedex or UPS
12 envelope with other materials, and
13 then we ship that overseas to the
14 international cooperator, and then
15 it's delivered to the Au Pair
16 candidate.
17    Q.   You mentioned again AROs.
18 What is the significance of being an
19 ARO?
20    A.   An ARO has an account into
21 SEVIS, and an ARO can report or
22 respond to incidents from the
23 Department of State.
24    Q.   Are there any other -- is
25 there anything else significant about

**Page 204**

M. MCHUGH

1 
2 being an ARO?
3    A.   In what sense?
4    Q.   I was asking you. I don't
5 know, are there any particular duties
6 placed upon AROs?
7    A.   Just what we've described.
8 Oh, sorry, there is -- once the Au
9 Pairs arrive into New York at the
10 orientation and training program, then
11 we will take their DS2019 forms back
12 to the office, make sure all the
13 information is correct, and we have to
14 do what is called validating their
15 records, sign off on them again, take
16 them back to the Au Pairs. So an ARO
17 also validates.
18    Q.   How does an ARO validate
19 their records?
20    A.   It's through the SEVIS
21 system. Just pull out their record,
22 check that their address and name and
23 everything is correct, press the
24 button that says validate, and that's
25 it.

**Page 205**

M. MCHUGH

1 
2    Q.   Okay.
3    A.   Also, if somebody were to
4 end their program early, an ARO is the
5 one who ends their program in SEVIS.
6    Q.   Is there anything else an
7 ARO can do?
8    A.   If an Au Pair has to be,
9 quote, unquote terminated, terminated
10 in the SEVIS system, then an ARO does
11 that as well.
12    Q.   Under what circumstances is
13 an Au Pair terminated in the SEVIS
14 system?
15    A.   An Au Pair could be
16 terminated for, there's a drop-down
17 menu of choices. But breaking the
18 law -- I haven't seen it in a while.
19 They're considered -- they're
20 considered stronger offenses, stronger
21 issues. That may have come from a
22 transition.
23       So for example, working
24 illegally with, using -- working
25 outside of the Au Pair Visa is a

MAGNA
LEGAL SERVICES

Page 206

```
 1              M. MCHUGH
 2   terminatable -- terminatable [sic]
 3   example.
 4       Q.   Does that include agreeing
 5   to do extra work for the host family
 6   for extra pay, is that an example of
 7   working outside the program that would
 8   be a terminatable offense?
 9       A.   I think we would -- in this
10   case, you know, we have a bit of
11   discretion there, and I think we would
12   start with a conversation.  But if it
13   was a repeated offense, then -- then
14   that is possible.
15       Q.   Is there a distinction
16   between InterExchange making the
17   decision to remove an Au Pair from the
18   program and terminating an Au Pair on
19   SEVIS?
20       A.   Yes.  Ending the program or
21   shortening the program, as it's now
22   called, implies that the reason for
23   ending the program is not so negative.
24   Terminating the Au Pair's program,
25   terminating her SEVIS status implies
```

Page 207

```
 1              M. MCHUGH
 2   that it was a stronger offense.
 3       Q.   Can you think of any other
 4   examples of what the drop-down menu of
 5   terminatable offenses are?
 6       A.   I can't.  I can tell you
 7   that for drinking and driving, we've
 8   been advised by the State Department
 9   to terminate participants through
10   SEVIS.
11       Q.   And does it have to be an
12   ARO who makes the decision to
13   terminate an Au Pair --
14       A.   Yes.
15       Q.   -- in SEVIS?  Who in
16   InterExchange would be the one making
17   that decision?
18       A.   Usually someone would bring
19   that to my attention, and we would
20   discuss it.
21       Q.   How does InterExchange
22   decide who they will make an ARO --
23   actually, let me ask a prior question.
24   Does InterExchange decide who to make
25   an ARO, or is there a separate
```

Page 208

```
 1              M. MCHUGH
 2   qualification process?
 3       A.   InterExchange decides.
 4       Q.   Okay.  And how does
 5   InterExchange make that decision?
 6       A.   There's a number of factors.
 7   We have to have a certain number of
 8   AROs to be able to handle absences and
 9   something that happens day-to-day with
10   people on vacation.
11          The person who does
12   logistics has to print the DS2019
13   form, so they have to be an ARO.  In
14   other cases it's somebody who has
15   enough experience to handle reporting
16   to the Department of State.
17       Q.   Are there costs to making
18   someone an ARO?
19       A.   I don't know.  There may be
20   a small SEVIS fee, but I don't know.
21       Q.   But not everybody on your
22   ten-person team, approximately
23   ten-person team --
24       A.   Mm-hmm.
25       Q.   -- is an ARO, correct?
```

Page 209

```
 1              M. MCHUGH
 2       A.   Correct.
 3       Q.   How --
 4       A.   Usually somebody in the
 5   transition department is an ARO,
 6   because they're reporting incidents to
 7   the State Department.
 8       Q.   Are there any training or
 9   educational requirements to be an ARO?
10       A.   Like, there's a training
11   manual that AROs work through, but do
12   you mean do they have to have a
13   college degree or something?
14       Q.   That wasn't what I was
15   thinking of, but if that's a
16   requirement, I would be interested to
17   know that.  I was thinking about
18   whether -- for example, to be a --
19   have certain securities licenses or to
20   be a CPA or be a lawyer, for that
21   matter, you have to do certain
22   continuing education or satisfy
23   certain tests or what have you.
24       A.   Mm-hmm.
25       Q.   I was asking whether any
```

PLAINTIFFS' RESP. APP.0005235

MAGNA
LEGAL SERVICES

Page 210

```
1              M. MCHUGH
2  such requirements exist to be an ARO.
3       A.   There's not a quiz or a test
4  that somebody has to pass.
5       Q.   Okay.
6            (McHugh Exhibit 30, Bates
7       stamped INTEREXCHANGE 0004364
8       through 4372, was marked for
9       identification.)
10      Q.   So this exhibit is Bates
11  marked InterExchange 0004364 through
12  4372. It was produced to us collected
13  in this form, but it seems to me to be
14  a collection of different documents.
15  There is a two-week visit checklist.
16  A few pages in at 4367 there's a
17  48-hour contact checklist.  Then
18  there's Au Pair orientation
19  information and a few other things.
20           Do you know why these
21  documents are collected together like
22  this, do you know whether it's -- do
23  you know why these documents are
24  collected together?
25      A.   I do not.
```

Page 211

```
1              M. MCHUGH
2       Q.   Okay. I think
3  chronologically, from an Au Pair's
4  perspective, we need to start at the
5  back and go forward, if you wouldn't
6  mind turning to the last page.  This
7  page appears to be Au Pair orientation
8  overview.  Is this a document that
9  would be received during the New
10  York -- the New York training?
11      A.   I believe this is a document
12  that we've shared with local
13  coordinators about what happens at
14  orientation.  And the document in
15  front of it is also relevant to local
16  coordinators.  This seems to be, or to
17  go back to your original question,
18  this may have been a packet of
19  materials given to a local coordinator
20  for training purposes, the odd one out
21  being this signature page.
22      Q.   For the record --
23      A.   Beth Cook.
24      Q.   Just for the record, I think
25  you're referring to the page Bates
```

Page 212

```
1              M. MCHUGH
2  numbered 4368 as the odd one out?
3       A.   Yes, that's it.
4       Q.   All right, that makes sense.
5  So the record of hours worked and
6  payment received, this is 4371, is
7  this the document we were discussing
8  earlier where Au Pairs write down
9  their hours and their wages?
10      A.   This, this is a precursor to
11  that.  This is an early version of
12  that.  It grew into a more
13  comprehensive document.
14      Q.   Was its purpose a similar
15  function?
16      A.   Yes.
17      Q.   Okay.  And then the -- still
18  going back toward the front in the
19  document, so 4370, there is what
20  appears to be a letter from, dear Au
21  Pair.  At the bottom it says best
22  regards, InterExchange Au Pair U.S.A.
23           Do you recognize this
24  letter?
25      A.   Yes.
```

Page 213

```
1              M. MCHUGH
2       Q.   What is this letter?
3       A.   This is a letter that
4  accompanied 4371.  Record of hours
5  worked and payment received.
6       Q.   So would all Au Pairs have
7  received this letter?
8       A.   During a brief window where
9  that tool was in use.
10      Q.   Is there now an updated
11  version of this letter?
12      A.   The messaging in this letter
13  is incorporated into the actual
14  hardcopy of the schedule and weekly
15  planner.
16      Q.   Okay.
17      A.   So there's no accompanying
18  letter anymore.
19      Q.   Okay.  Do you know what
20  period this letter and record of hours
21  worked document was in use?
22      A.   Maybe 2013.
23      Q.   Do you think it was just in
24  use in just 2013, or until 2013?
25      A.   I'm looking at the 0213,
```

PLAINTIFFS' RESP. APP.0005236

MAGNA
LEGAL SERVICES

| Page 214 | Page 216 |
|---|---|
| M. MCHUGH<br>1<br>2 which leads me to believe it was put<br>3 into effect in 2013, if that's a<br>4 three.<br>5    Q.   Sorry, where are you seeing<br>6 0213?<br>7    A.   Down here.<br>8    Q.   Oh, I see.  Okay.  So that<br>9 makes you think that this form became<br>10 used in February 2013; is that what<br>11 you think that means?<br>12    A.   Yes.<br>13    Q.   Okay.  And when did the new<br>14 form become used?<br>15    A.   Probably within a year.  It<br>16 was pretty quick.<br>17    Q.   Okay.  So for that year,<br>18 anyway, all Au Pairs were told that<br>19 they must be paid at the weekly rate<br>20 of 195.75; is that correct?<br>21    A.   On this document, yes.<br>22    Q.   Which is a document that<br>23 InterExchange provided to every Au<br>24 Pair during that period?<br>25    A.   Let's see.  Yes. | M. MCHUGH<br>1<br>2 really the key that we're looking for<br>3 there.<br>4    Q.   Okay.  And actually, sorry,<br>5 I do have one more question about the<br>6 letter that we looked at prior to<br>7 2013.  If, indeed, you're right that<br>8 this came into effect in 2013, do you<br>9 know if there was a version of this or<br>10 something similar that was used before<br>11 that date?<br>12    A.   There was not.<br>13    Q.   There was not, okay.  And<br>14 then after the 48-hour check-in, there<br>15 is a two-week check-in; is that right?<br>16    A.   After the 48, yes.<br>17    Q.   And now we can go back to<br>18 the front page of this document.  Is<br>19 this the current two-week visit<br>20 checklist?<br>21    A.   I don't believe so.<br>22    Q.   When was it, when was the<br>23 two-week visit checklist updated?<br>24    A.   I believe it was updated in<br>25 2014 or 2015. |

| Page 215 | Page 217 |
|---|---|
| M. MCHUGH<br>1<br>2    Q.   Okay.  And then continuing<br>3 to go towards the front, but I think<br>4 we can skip 4369, which seems to be a<br>5 duplicate of 4372.  And we can skip<br>6 the random, the page you didn't know<br>7 why it was there.  Let's go to the<br>8 48-hour contact checklist.  Is this<br>9 still the 48-hour contact checklist?<br>10    A.   I don't believe so.  This is<br>11 quite old.<br>12    Q.   Okay.  Is there anything in<br>13 particular that the new one covers<br>14 that this one doesn't cover?<br>15    A.   Without the new one in front<br>16 of me, it's hard to say.<br>17    Q.   Okay.  So what is covered at<br>18 the 48-hour check in?<br>19    A.   Well, really, the most<br>20 important thing is to establish<br>21 contact and let the Au Pair know that<br>22 the local coordinator is a resource<br>23 for them in the community.  So<br>24 establishing that contact and<br>25 exchanging contact information is | M. MCHUGH<br>1<br>2    Q.   Okay.  And who was involved<br>3 in updating it?<br>4    A.   I was, and the field<br>5 relations manager.<br>6    Q.   Who is the field relations<br>7 manager?<br>8    A.   Jodie Laub, L-A-U-B.<br>9    Q.   And what is covered at the<br>10 two-week visit?<br>11    A.   Many similar items.<br>12 Department of State regulations,<br>13 insurance, educational requirements.<br>14 Yeah, similar topics.<br>15    Q.   Is the stipend covered at<br>16 the two-week check-in?<br>17    A.   I believe it is.<br>18    Q.   And is the -- is the number<br>19 of hours the Au Pair can work covered<br>20 at the two-week check-in?<br>21    A.   Yes.<br>22    Q.   And what about the amount of<br>23 time that the Au Pair must have as a<br>24 vacation; is that covered?<br>25    A.   I believe so. |

MAGNA
LEGAL SERVICES

| | |
|---|---|
| Page 218 | Page 220 |

**Page 218**

M. MCHUGH

1
2    Q.   Does vacation -- is there a
3  distinction between me talking about
4  the vacation and talking about the
5  weekends that an Au Pair is entitled
6  to, are those separate concepts?
7    A.   Yes.
8    Q.   Let me not start with
9  vacation.  Let me ask about the
10  weekends, then.  Am I at an
11  understanding that an Au Pair needs
12  one and a half days off a week and a
13  full weekend each month?
14    A.   Yes.
15    Q.   Is that discussed at this
16  check-in?
17    A.   Yes, while discussing the
18  program regulations, that's all
19  covered.
20    Q.   That's all covered, okay.
21  So after the two-week check-in, are
22  there additional check-ins for which
23  there are checklists or similar lists
24  of required topics to cover?
25    A.   Well, there's monthly

**Page 219**

M. MCHUGH

1
2  contact that happens between the Au
3  Pair and the -- the Au Pair and the
4  local coordinator.  The local
5  coordinators are instructed to ask
6  whether they are working towards
7  completing their educational
8  component, whether they're receiving
9  their appropriate time off, and
10  stipend.  And I think -- is there
11  anything else you want to talk about,
12  just sort of a checkbox for that.
13    Q.   And that's for the local
14  coordinator and the Au Pair, correct?
15    A.   Yes.
16    Q.   And is there -- is there
17  regular contact between the local
18  coordinator and host family as well?
19    A.   Yes.
20    Q.   And is there a checkmark,
21  checkboxes or checklist for those
22  communications?
23    A.   No, there isn't.  Their
24  instructions are that they have to
25  establish how the relationship is

**Page 220**

M. MCHUGH

1
2  working, whether there are any
3  problems, and then report back in
4  their monthly contact logs saying,
5  spoke to host mom, she reports that,
6  X, Y, z, so there's a reporting
7  format.
8    Q.   And less formally than the
9  specific sort of check-ins that are
10  every month, I think you said, right?
11    A.   Mm-hmm.
12    Q.   Is there weekly contact
13  between the local coordinator and the
14  Au Pairs?
15    A.   It's not a requirement that
16  there be weekly contact.  Some local
17  coordinators have weekly open hours at
18  a Starbucks or something, but it's not
19  a requirement.
20    Q.   Okay.  When do the local
21  coordinators discuss the Au Pair's
22  schedule with the, by which I mean the
23  schedule of assignments with the host
24  family and Au Pair?
25    A.   Well, the local coordinator

**Page 221**

M. MCHUGH

1
2  doesn't see the schedule unless it's
3  brought to their attention.
4    Q.   Do local coordinators keep a
5  communications log?
6    A.   Not necessarily, no.  It's
7  not required.  Some of them may, but
8  it's not through anything that we've
9  provided.
10    Q.   Okay.  Let's see, this was
11  Exhibit 3, I think.  Take a look back
12  at Exhibit 3, which I think is the
13  host family handbook.  And on page 16,
14  which I mean the native page numbers
15  at the bottom.  Page 16.
16    A.   Mm-hmm.
17    Q.   Are these communication logs
18  and weekly meeting topics, are these
19  for the host families to have with the
20  Au Pairs?
21    A.   The communication log was a
22  tool that we used in the past that we
23  no longer use.  But yeah, it was
24  communication between the Au Pair and
25  the host family.

PLAINTIFFS' RESP. APP.0005238

**MAGNA**
LEGAL SERVICES

Case 1:14-cv-03074-CMA-KMT   Document 1059-25   Filed 05/17/18   USDC Colorado   Page 411
3 of 700

Page 222

1          M. MCHUGH
2     Q.   All right, I understand
3  that.  Let's do this.
4          (McHugh Exhibit 31, Bates
5     stamped InterExchange 0000614
6     through 0625, was marked for
7     identification.)
8     Q.   So I'm now giving you
9  InterExchange 0000614 through 625.  Is
10  this the updated version of the
11  calendar and letter we were looking at
12  before?
13     A.   This is an updated version,
14  but not the most up to date.
15     Q.   When was the most up-to-date
16  version created?
17     A.   I think in 2015.
18     Q.   2015.  Do you know when this
19  version went into effect?
20     A.   Probably 2012 or 2013.
21     Q.   Okay.  And were there
22  versions in between this version and
23  the 2015 version?
24     A.   I don't believe so.
25     Q.   Okay.  And if you could turn

Page 223

1          M. MCHUGH
2  to the page that's Bates numbered 618,
3  I just have a quick question about
4  that page.  Is this -- I take it this
5  is not a real filled out form, right,
6  this is a sample?
7     A.   Yes.
8     Q.   So this is part of the
9  weekly planner that was given to host
10  families -- no, sorry, that was given
11  to Au Pairs?
12     A.   Yes.
13     Q.   Okay.  And is there any part
14  of this which is intended to
15  communicate to the Au Pairs how much
16  they should be paid?
17     A.   No.  No, I don't see that
18  information.
19     Q.   So on Bates numbered page
20  616, when it says Au Pairs must
21  receive the U.S. Department of State
22  mandated weekly stipend each week on a
23  set day for all weeks in which they
24  work, that doesn't convey the amount
25  of the stipend?

Page 224

1          M. MCHUGH
2     A.   Not in the sense that
3  there's an amount expressed.
4     Q.   And then on page 618, when
5  the amount of the stipend paid is
6  listed as 195.75, do you think that
7  conveys the amount that Au Pairs are
8  meant to be paid?
9     A.   Well, this is a sample page,
10  it's a hypothetical.  The schedule
11  doesn't convey the hours that the Au
12  Pair's supposed to work.  So this was
13  a document that we developed at the
14  request of the Department of State,
15  and we received extremely positive
16  feedback on this document.  It was
17  held up to the sponsors at meetings in
18  Sydney, Australia, in Washington, D.C.
19  and New York, and held out as a best
20  practice among the sponsor
21  communities.  So this is something
22  they were very proud of, and we are as
23  well.
24     Q.   Is there --
25     A.   And we have that in writing.

Page 225

1          M. MCHUGH
2     Q.   Is there any sample like
3  this that InterExchange has ever
4  produced that has a larger stipend
5  than 195.75?
6     A.   I believe this is the only
7  sample page that we've ever produced.
8     Q.   Okay.  Does InterExchange
9  have a policy about unused vacation
10  time for Au Pairs?
11     A.   Yes.
12     Q.   What is InterExchange's
13  policy?
14     A.   So if the relationship ends
15  early and there's unused vacation time
16  remaining, the family should reimburse
17  the Au Pair for that time.
18     Q.   How do you ensure that the
19  family does do that?
20     A.   Well, we receive
21  confirmation from the Au Pair that it
22  happened.
23     Q.   And what happens if it
24  doesn't happen?
25     A.   If it doesn't happen, if it

MAGNA
LEGAL SERVICES

Page 226

```
 1              M. MCHUGH
 2  is the stipend, we will try to
 3  convince the family to pay that
 4  amount. We'll reach out to them,
 5  explain that it's a State Department
 6  regulation that they be paid, it's a
 7  requirement. So we'll start there.
 8      Q.   And if that doesn't work?
 9      A.   If that doesn't work, we
10  will tell the family again that the Au
11  Pair has to be paid that amount, and
12  if the family is unwilling to pay it,
13  we'll let them know that InterExchange
14  will pay the Au Pair that amount, and
15  then withhold that amount of money
16  from the family's refund or bill them
17  directly for that amount of money.
18      Q.   Okay. Do Au Pairs and host
19  families frequently ask the local
20  coordinator for assistance in
21  understanding whether a schedule is
22  appropriate?
23      A.   I'm not sure.
24      Q.   Not sure. Are there any --
25  let's see, are there any standardized
```

Page 227

```
 1              M. MCHUGH
 2  responses to commonly occurring
 3  problems that local coordinators are
 4  instructed to use?
 5      A.   Like a stock email?
 6      Q.   Something like that, sure.
 7      A.   Yeah, I don't think the
 8  local coordinators have been given
 9  anything like that.
10      Q.   Have you ever heard the
11  phrase, three-point meeting?
12      A.   Yes.
13      Q.   What does three-point
14  meeting refer to?
15      A.   A three-point meeting refers
16  to a meeting between the Au Pair, the
17  host family and the local coordinator,
18  either prior to a transition or
19  perhaps during or after a transition.
20      Q.   And is there any
21  significance to something being a
22  three-point meeting other than the
23  fact that all three of those parties
24  are represented at the meeting?
25      A.   A three-point meeting could
```

Page 228

```
 1              M. MCHUGH
 2  be used in a number of different ways
 3  depending on the situation, so it
 4  doesn't have a really narrow focus.
 5  It's generally just the name we use
 6  for the opportunity for everyone to
 7  get together and discuss whatever is
 8  occurring.
 9      Q.   Are there restrictions on an
10  Au Pair outside of their working
11  hours?
12      A.   In what sense?
13      Q.   Does InterExchange have
14  policies about what Au Pairs can or
15  cannot do in their off time?
16      A.   It's such a broad question,
17  I think...
18      Q.   Okay.
19      A.   No?
20      Q.   The answer might be no, I
21  don't know, it's a genuine question.
22  Sometimes I know the answers,
23  sometimes I don't.
24      A.   Outside of not breaking the
25  law, upholding the program
```

Page 229

```
 1              M. MCHUGH
 2  regulations, there are those
 3  responsibilities. But those are not
 4  InterExchange specific. They're
 5  legal.
 6      Q.   What happens if an Au Pair
 7  gets pregnant?
 8      A.   Hmm, we have that exact
 9  situation right now.
10      Q.   What happens?
11      A.   She's still working.
12      Q.   Okay. I want to talk about
13  the recruitment of host families. We
14  talked about the recruitment of Au
15  Pairs, but what tools are used to
16  attract prospective host families?
17      A.   We have advisements running
18  on the internet. We have our company
19  name and details listed on various
20  websites, LISTSERVs. Local
21  coordinators do sort of local
22  outreach. We have a big proportion of
23  our families, current families, who
24  are referring InterExchange to their
25  friends because they're happy with the
```

PLAINTIFFS' RESP. APP.0005240

MAGNA
LEGAL SERVICES

Page 230

```
 1            M. MCHUGH
 2   service.  Yeah.  Facebook, social
 3   media.
 4        Q.   Who approves the content of
 5   an ad aimed at host families?
 6        A.   Our marketing department,
 7   but ultimately me.
 8        Q.   Are there advertising
 9   messages that you found to be
10   particularly effective or that you've
11   used repeatedly?
12        A.   To be honest, that level of
13   -- we're more focused on the medium.
14   Within Google ad words structure,
15   there are certainly ads that may run
16   more often and attract more
17   conversions than other ads, but it's
18   not a huge focus for us.  I think the
19   difference is not significant.
20        Q.   Okay.
21            (McHugh Exhibit 32, Bates
22            stamped InterExchange 0021954
23            through 1957, was marked for
24            identification.)
25        Q.   So this next exhibit is
```

Page 231

```
 1            M. MCHUGH
 2   Bates marked InterExchange 0021954
 3   through 21957.  My first question is,
 4   do you know who Jessica Randen Fonseca
 5   is?
 6        A.   Yes.
 7        Q.   Who is she?
 8        A.   She worked for InterExchange
 9   years and years ago.
10        Q.   Okay.  And what was her
11   role?
12        A.   I think she was client
13   relations coordinator.
14        Q.   And if you turn to the, I
15   think it's the second to last page,
16   Bates number ends in 956, the email at
17   the bottom is from
18   HFsupport@InterExchange.org.  What is
19   that email address?
20        A.   That would be, like, a
21   general host family info email address
22   that Jessica was probably receiving.
23        Q.   So is this -- was she
24   receiving or was she sending it?
25        A.   Well, she could do both.
```

Page 232

```
 1            M. MCHUGH
 2        Q.   Okay.  So was this email a
 3   communication to host families, or was
 4   it a communication internal to
 5   InterExchange?
 6        A.   Which one?
 7        Q.   I'm still looking at the
 8   bottom email on page 956.
 9        A.   The one that says, dear
10   Manger family?
11        Q.   Yes.
12        A.   So this is an email that she
13   appears to have sent to a prospective
14   host family.
15        Q.   Is this an email that she
16   just wrote, or is this a standard sort
17   of host family contact email?
18        A.   Well, it's from 2009.  It's
19   hard to say.  It may have been a bit
20   of both.
21        Q.   Okay.  The penultimate
22   paragraph on page -- on this page,
23   956, it says you can have 45 hours of
24   childcare in your home for about $330
25   per week.  That's less than 7.50 per
```

Page 233

```
 1            M. MCHUGH
 2   hour.  Please contact us for
 3   information on further savings.
 4            Is that a particular selling
 5   point for the Au Pair program?
 6        A.   It's not a calculation that
 7   we use currently.  Families often
 8   think of childcare in terms of cost
 9   per week, so naturally they're making
10   that comparison.
11        Q.   So do you no longer convert
12   costs into a cost per week format, or
13   are you just saying that this
14   particular formula is not the one
15   that's in use anymore?
16        A.   We certainly don't convert
17   costs into a per hour formula.  We may
18   have a few legacy documents that use a
19   per week calculation, but we don't
20   currently use that.
21        Q.   When was that change made?
22        A.   Probably December of 2014.
23   The 7.50 an hour, I can't remember,
24   that goes back, that's been debated
25   for a long time.  We didn't -- we
```

MAGNA
LEGAL SERVICES

Page 234

```
1              M. MCHUGH
2    personally don't like that
3    calculation.
4        Q.   When you say it's been
5    debated, amongst whom?
6        A.   The staff.
7        Q.   The staff at InterExchange?
8        A.   Yes.
9        Q.   What were the counter --
10   what were the viewpoints?
11       A.   Well, on one hand, the
12   family would like to hear that
13   childcare is only 7.50 per hour.  On
14   the other hand, we found -- we feel
15   that that's not the -- it's slightly
16   disingenuous in the sense that you
17   can't pay for it on an hour-by-hour
18   basis.  So if the family is reading
19   that and they're thinking, great,
20   seven dollars and cents per hour, I
21   only need 20 hours, that's only, do
22   the math.  So that's why we don't like
23   that.
24       Q.   So before approximately
25   December of 2014, InterExchange would
```

Page 235

```
1              M. MCHUGH
2    have regularly done a per-week
3    calculation?
4        A.   We had documents that had
5    that -- had that calculation on it.
6        Q.   As an advertising strategy
7    to host families?
8        A.   Yes.
9        Q.   Who made the decision to
10   stop doing that?
11       A.   Probably me and the
12   marketing team.
13       Q.   And what was your reason?
14       A.   Well, again, it just seemed
15   to not be the best way to frame the
16   costs of the program.  You can't just
17   sign up for six weeks of childcare.
18       Q.   Okay.  Is it a -- sorry,
19   this is not relating to what we were
20   just talking about, but it is an
21   InterExchange regulation that --
22   that's a confusing way of phrasing
23   things too.  I'm going to start again
24   for the third time.
25            Is it an InterExchange
```

Page 236

```
1              M. MCHUGH
2    requirement that the room the Au Pair
3    is provided with have a window?
4        A.   I believe it is.
5        Q.   Is that an InterExchange
6    rule, or is that a regulation from the
7    Department of State or Labor?
8        A.   I believe that is our rule,
9    in the sense that the State Department
10   says suitable bedroom, so we are left
11   to determine what is suitable.
12       Q.   How did the Department of
13   State or Labor set the stipend, as
14   you've stated a couple of times that
15   it has done?
16       A.   Most recently?
17       Q.   Sure.
18       A.   Most recently they sent out
19   a document that said on July 24th,
20   2007, the federal minimum wage is
21   going up.  From that day forward the
22   stipend will be this amount.
23            Going way back, you know,
24   there's a full discussion in the
25   February 15th regulations from 1995
```

Page 237

```
1              M. MCHUGH
2    talking about how they got to the
3    stipend with the, how they decided on
4    the amount of the room and board
5    deduction, how they found the $36
6    fixed deduction to be outdated and
7    insufficient for the time.  So they
8    were then allowing a more flexible
9    system where the families could use
10   the real value of the room as a
11   deduction, as long as it doesn't go
12   above $65.
13            But they were clear that
14   there was a programatic need for a
15   uniform stipend across the program,
16   and that they looked forward to, and
17   the Department of Labor would finalize
18   their rules and then -- about
19   deductions.  They wanted to get to a
20   fixed deduction above the 36.  So they
21   looked forward to when that would
22   happen, and then they stated they
23   would then apply that deduction.
24   Subsequently they issued a number of
25   documents that clearly laid out what
```

PLAINTIFFS' RESP. APP.0005242

MAGNA
LEGAL SERVICES

Page 238

M. MCHUGH

1    the stipend was, yeah.
2        Q.   In 2007, were you employed
3    by InterExchange?
4        A.   Yes.
5        Q.   What was your role at the
6    time?
7        A.   Probably program manager.
8        Q.   Were you involved in
9    discussions about the response to
10   the -- response or interpretation of
11   the July 24, 2007, document from the
12   State Department?
13       A.   Was I involved -- repeat the
14   question.
15       Q.   Were you involved in -- were
16   you involved in discussions about the
17   response to the July 24, 2007,
18   document from the State Department?
19       A.   What's the response?
20       Q.   I mean in InterExchange's
21   response.
22       A.   Did we send a response?
23       Q.   Oh, sorry, I'm not limiting
24   it to an original response. Did

Page 239

M. MCHUGH

1    InterExchange change its policies as a
2    result of the July 24, 2007, document
3    from the State Department?
4        A.   Absolutely.
5        Q.   So were you involved in any
6    discussions about that response?
7        A.   Sorry, I'm laughing because
8    there's just so little discussion.
9    You're sent -- obviously everyone was
10   aware that the stipend was tied to the
11   federal minimum wage. That has been
12   the case for as long as anyone can
13   remember. The federal minimum wage
14   was increased. We went to a meeting
15   with the deputy assistant secretary of
16   state, who opened the meeting by
17   saying, hey, everyone, the Department
18   -- the federal minimum wage has
19   increased, here is what the new
20   stipends are going to be on these
21   days. He listed them out, we all
22   wrote them down. He said, you will
23   get an email from Ida in the future
24   summarizing this.

Page 240

M. MCHUGH

1        The meeting continued, we
2    went back to our offices. Within a
3    couple weeks we got an email from Ida
4    saying what the stipends would be. We
5    changed the website, we sent an email
6    to the host families, sent an email to
7    the Au Pairs, notified everyone. So
8    yes, I was involved.
9        Q.   The meeting you described
10   with the Department of State, was that
11   just InterExchange at that meeting, or
12   were there other sponsors at that
13   meeting as well?
14       A.   The alliance was there,
15   Michael McCarry from the Alliance.
16   InterExchange was there. There were
17   other sponsors from the Au Pair
18   programs, and there were other
19   sponsors from the J1 programs.
20       Q.   When did you assume your
21   current position?
22       A.   Well, my title changed a
23   year or so ago, maybe more.
24       Q.   And what was your title

Page 241

M. MCHUGH

1    before?
2        A.   Program director.
3        Q.   Were your responsibilities
4    significantly changed as a result of
5    the title change?
6        A.   No.
7        Q.   So for how long have you
8    held the responsibilities you
9    currently hold?
10       A.   I believe since probably
11   2005.
12       Q.   '5. So you held those, you
13   had the same responsibilities you have
14   now back when the 2007 notice came
15   out?
16       A.   Yes. There was a director
17   of the Au Pair program, Paul
18   Christianson, but I was next in line.
19       Q.   I take it other than the
20   CEO, there's not currently somebody
21   above you in the hierarchy in the Au
22   Pair programs; is that correct?
23       A.   Yes.
24       Q.   When did that change occur?

MAGNA
LEGAL SERVICES

Page 242

M. MCHUGH

1
2     A.   Well, Paul began to step
3  back in recent years, maybe 2012.
4     Q.   And prior to 2012, how did
5  you and Mr. Christianson divide
6  responsibilities?
7     A.   He was the ultimate
8  authority, and I was responsible for
9  the day-to-day operation.
10    Q.   So is the primary difference
11 between pre and post 2012, you did
12 much the same things, but pre-2012
13 there was somebody you had to check
14 with, and post 2012 you were making
15 the final decisions?
16    A.   Not exactly.  It's just that
17 the person I check with shifted to be
18 the CEO.
19    Q.   Okay.  In your role, are you
20 tasked with knowing which laws and
21 regulations govern the Au Pair
22 program?
23    A.   Yes.
24    Q.   Does the FLSA govern the, in
25 your understanding, govern the Au Pair

Page 243

M. MCHUGH

1
2  program?
3     MS. VICKLES:  Object to
4  form.  You can answer as to your
5  understanding.
6     A.   My understanding is that the
7  FLSA is involved in the Au Pair
8  program in the sense that the stipend
9  must conform with the FLSA.
10    Q.   Have you ever sought legal
11 advice on -- prior to this litigation,
12 have you ever sought legal advice --
13 sorry, I just want to preface this
14 question.  I'm asking this as a
15 yes-or-no question for now, and
16 depending on your answer I might ask a
17 further question, but let's just keep
18 this one yes or no to avoid any
19 privilege issues.
20       So just answer yes or no,
21 have you ever sought legal advice
22 about whether the 195.75 stipend
23 satisfied the FLSA prior to this
24 litigation?
25    A.   No.

Page 244

M. MCHUGH

1
2     Q.   What other -- are there
3  documents that you're required to
4  submit to the State Department on a
5  regular basis?
6     A.   Yes.
7     Q.   What are those documents?
8     A.   Audit reports.
9     Q.   Anything else?
10    A.   Incident reports.
11    Q.   Anything else?
12    A.   Redesignation requests.
13    Q.   Anything else?
14    A.   No.
15    Q.   What are audit reports?
16    A.   So as part of the program
17 regulations, all Au Pair sponsors have
18 to hire an independent auditing firm
19 to go through a template that the
20 Department of State has provided to
21 us, testing whether we are complying
22 with the regulations or not.
23    Q.   Is that an annual
24 requirement?
25    A.   It is an annual requirement.

Page 245

M. MCHUGH

1
2     Q.   Which independent auditing
3  firm does InterExchange use?
4     A.   For the last three years or
5  so, we've used CohnReznick.
6     Q.   And prior to that?
7     A.   Schall & Ashenfarb.
8     Q.   What is in the template the
9  Department of State provides to you?
10    A.   Well, a lot.
11    Q.   What subject areas are
12 covered?
13    A.   So it provides a framework
14 for the auditors to work through, so
15 for example, it begins by instructing
16 the auditors to take a random sampling
17 of the Au Pairs that were on the
18 program that year, sending out
19 confirmation requests or surveys to
20 those Au Pairs, so a selection of Au
21 Pairs and host families.  As those
22 requests come back, they then review
23 those files, they become the set that
24 they review.  So the template provides
25 a format for the auditors to review

MAGNA
LEGAL SERVICES

Page 246

M. MCHUGH
1
2  those files and to review our
3  procedures and processes.
4      Q.   And do the auditors
5  ultimately come to any kind of
6  conclusion?  Is this a pass/fail
7  situation, or is it more complicated
8  than that?
9      A.   It's not a -- they don't
10 give any conclusion, they just give
11 their results.
12     Q.   And once it's been submitted
13 to the State Department, does the
14 State Department follow up in any way?
15     A.   They may have acknowledged
16 that they received it.
17     Q.   Have there ever been any
18 problems with the audits of
19 InterExchange that you're aware of?
20     A.   That they brought to my
21 attention?
22     Q.   That either the auditors or
23 the State Department has brought to
24 your attention.
25     A.   No.

Page 247

M. MCHUGH
1
2      Q.   What are incident reports?
3      A.   Incident reports are reports
4  that we submit to the Department of
5  State when there's an incident that we
6  feel they should know about.
7      Q.   So --
8      A.   For example, a drunk driving
9  case.
10     Q.   So those are done on an ad
11 hoc -- as-needed basis?
12     A.   Yes.
13     Q.   What's a redesignation
14 request?
15     A.   Every two years we have to
16 submit a request to be redesignated to
17 operate the Au Pair program.  So
18 there's some financial documents we
19 have to get in order, and an
20 application form, and we pay a fee and
21 send it off and wait for the response.
22     Q.   So I want to talk a little
23 more about the audit.  What
24 information do you have to provide to
25 the auditors to allow them to conduct

Page 248

M. MCHUGH
1
2  their audit?
3      A.   Well, it starts with a list
4  of all our Au Pairs and host families
5  from that area.  And then when they
6  come back to us with the found set,
7  the sample set, we then have to set
8  aside those files and allow them to
9  review those files.
10     Q.   And what information do they
11 extract from the files of the found
12 set?
13     A.   Well, so they're looking to
14 make sure that all the Au Pairs have
15 all of the required documents in
16 order.  Whether they have their high
17 school verification, the medical
18 report, the childcare references.  If
19 the family is an under two family,
20 under two qualified family, that the
21 Au Pair meets that qualification.
22 Just everything that's required for
23 the vetting of an Au Pair, they check
24 that that's there.  Same thing on the
25 host family side.

Page 249

M. MCHUGH
1
2      Q.   Do they collect information
3  about what Au Pairs are paid?
4      A.   The survey that they send
5  out to host -- to Au Pairs I believe
6  references the stipend amount.
7      Q.   References the 195.75?
8      A.   Yes.
9      Q.   In what context does it
10 reference the 195.75?
11     A.   I believe it says, were you
12 paid the stipend of at least 195.75
13 per week by your host family.
14     Q.   And this is a document
15 that's provided to us by the
16 Department of State.  So we're just
17 following their template, so that's
18 their question.
19         Does InterExchange still
20 possess -- did InterExchange ever
21 receive the responses that are
22 solicited from these surveys?
23     A.   Not usually, no.  We see the
24 end result.  We see the cumulative
25 responses.  But not the individual.

PLAINTIFFS' RESP. APP.0005245

MAGNA
LEGAL SERVICES

Page 250

```
1              M. MCHUGH
2    At the same time, one of our
3    obligations is to run an Au Pair and
4    host satisfaction survey that it asks
5    many similar questions, but is not
6    only sent to the sample set, it's sent
7    to everybody.
8        Q.   I do want to come back to
9    that, but I want to ask a few more
10   questions about the results of the
11   survey sent out by the auditors.
12       A.   Mm-hmm.
13       Q.   Do the auditors retain the
14   responses in unaggregated form?
15       A.   I'm not sure what the
16   auditors do with the documents.  I
17   believe there was one year where they
18   provided us the responses, but just, I
19   think it was just one year.
20       Q.   Okay.  But you don't require
21   them to obtain the responses for any
22   set period of time?
23       A.   We don't require that, no.
24       Q.   Do you know whether a
25   litigation hold was sent to the
```

Page 251

```
1              M. MCHUGH
2    auditors after this litigation was
3    filed?
4        A.   I do not believe the
5    litigation hold was sent.
6        Q.   If you asked for the raw
7    responses from the auditors, would
8    they provide them to you?
9        A.   I think so.
10       Q.   In the -- I understand --
11   no, I don't think I asked this yet.
12   Do you receive a copy of the audit
13   report that also goes to the State
14   Department?
15       A.   Yes.
16       Q.   And do you maintain a copy
17   for your own records?
18       A.   Yes.
19       Q.   And does that audit report
20   contain the aggregated information
21   from the survey results?
22       A.   Yes.
23       Q.   Is there any other source
24   for the aggregated information, or is
25   that the most complete source?
```

Page 252

```
1              M. MCHUGH
2        A.   That's the most complete
3    source.
4        Q.   Okay.  So now I want to go
5    back to the Au Pair and host
6    satisfaction survey.
7        A.   Do you mind if we take a
8    break for a couple minutes?
9        Q.   Absolutely.
10           THE VIDEOGRAPHER:  We are
11       now off the record, it is
12       3:51 p.m., this ends DVD number
13       three.
14           (Time noted:  3:51 p.m.)
15           (Recess.)
16           (Time noted:  4:04 p.m.)
17           THE VIDEOGRAPHER:  We're now
18       on the record.  The time is
19       4:04 p.m., this begins DVD number
20       four.
21       Q.   All right, so I believe the
22   topic on the table when we took a
23   break was the Au Pair satisfaction
24   surveys.
25       A.   Mm-hmm.
```

Page 253

```
1              M. MCHUGH
2        Q.   So my question is, what
3    information do you elicit on an annual
4    basis from those surveys?
5        A.   So the Department of State
6    has provided us with a number of
7    questions that they would like us to
8    ask, and those are the questions we
9    ask.  Plus a few additional ones.
10       Q.   How are the additional
11   questions chosen?
12       A.   Well, they could vary year
13   to year depending on what information
14   we're trying to gather.  We always try
15   to make the survey not too long, so as
16   to not discourage participation.  So
17   year by year we can focus on different
18   things.  Yeah.
19       Q.   Who decides what the
20   additional questions are going to be?
21       A.   Myself, the communications
22   team, perhaps in discussion with other
23   programs to see if we want to
24   understand how Au Pairs are
25   experiencing the program compared to
```

**MAGNA**
**LEGAL SERVICES**

64 (Pages 250 to 253)

Page 254

```
 1              M. MCHUGH
 2   student work -- summer work and travel
 3   participants or interns and trainees,
 4   so other J1 participants.
 5       Q.   When you say other programs,
 6   are you referring to other programs
 7   inside InterExchange?
 8       A.   Yes.
 9       Q.   And do you have regularly
10   scheduled meetings with the Department
11   of State?
12       A.   We have, there's a meeting,
13   so the Alliance for International
14   Exchange has an annual meeting.  At
15   that meeting the Department of State
16   will attend, and as part of that
17   two-day conference meeting, we will
18   meet with the staff from the
19   Department of State in charge of the
20   Au Pair program.
21       Q.   What topics are discussed at
22   those meetings?
23       A.   Generally, so there's a few
24   topics that come up every year.  It's
25   not the most exciting meeting, because
```

Page 255

```
 1              M. MCHUGH
 2   it is very redundant.  So all of the
 3   Au Pair sponsors are asked to send in
 4   topics that they may want to talk
 5   about to create an agenda, and so the
 6   topics that keep coming up are
 7   education component, we've been told
 8   for a number of years now that the
 9   Department of State is open to the
10   idea of expanding the different types
11   of educational opportunities which
12   would count towards completion of the
13   educational component.  So we're
14   looking for progress in that regard.
15              There's also the issue of
16   whether a host family, for example, if
17   one parent is a U.S. citizen and they
18   marry someone who isn't a U.S. citizen
19   or green card holder, if they had an
20   Au Pair, once they got married they
21   would have to have -- that Au Pair
22   would have to leave the home because
23   they no longer meet the requirements.
24   So that seems like a discrepancy that
25   could be adjusted in the regulations.
```

Page 256

```
 1              M. MCHUGH
 2       So it's a lot of that.  They
 3   provide information on incidents,
 4   number of Au Pairs in the country,
 5   trends that they're seeing, yeah, just
 6   general, general update stuff.
 7       Q.   Is the stipend ever
 8   discussed at these meetings?
 9       A.   The stipend was discussed
10   the last time that it increased, as I
11   mentioned, Stanley Colvin started the
12   meeting by saying that the stipend was
13   increasing, and the rates would be, as
14   such, this amount, minus this
15   allowance for room and board,
16   equalling this weekly stipend.  That
17   was the last time it was mentioned.
18       Q.   Are you the person who
19   attends those meetings?
20       A.   I do attend those meetings.
21       Q.   Do other InterExchange
22   employees attend those meetings?
23       A.   Christine La Monica-Lunn,
24   the CEO, attends those meetings as
25   well.
```

Page 257

```
 1              M. MCHUGH
 2       Q.   Are there other meetings of
 3   the Alliance for Cultural Exchange
 4   other than the ones that you just
 5   described?
 6       A.   I believe they have board of
 7   directors meetings.
 8       Q.   Are you on the board of
 9   directors?
10       A.   No.
11       Q.   Is anyone from InterExchange
12   on the board?
13       A.   No.
14       Q.   Are there other meetings of
15   the Alliance For Cultural Exchange
16   that InterExchange attends?
17       A.   So let me clarify, the
18   meeting, the annual meeting where the
19   Au Pair sponsors get together, at the
20   same time the camp program is having
21   their own meeting in the same, at that
22   same location with the Department of
23   State staff who are in charge of the
24   camp program, Camp U.S.A.  The summer
25   work and travel department or sponsors
```

PLAINTIFFS' RESP. APP.0005247

MAGNA
LEGAL SERVICES

Page 258

| 1 | M. MCHUGH |
| 2 | are having a meeting with the |
| 3 | Department of State staff who are in |
| 4 | charge of the summer work and travel |
| 5 | program, so all of these meetings are |
| 6 | happening sort of simultaneously. |
| 7 | Q.   Okay.  But those other |
| 8 | meetings don't relate to the Au Pair |
| 9 | program, right? |
| 10 | A.   No, but they are, they are |
| 11 | Alliance meetings. |
| 12 | Q.   They are Alliance meetings, |
| 13 | all right.  Are there Alliance |
| 14 | meetings related to the Au Pair |
| 15 | programs that InterExchange attends |
| 16 | other than this annual meeting you |
| 17 | described? |
| 18 | A.   Specifically an Au Pair |
| 19 | meeting, no.  So sometimes the State |
| 20 | Department will call an Au Pair |
| 21 | meeting, but that's not an Alliance |
| 22 | meeting.  The Alliance may or may not |
| 23 | attend that meeting, but no. |
| 24 | Q.   Okay.  Under what |
| 25 | circumstances does the State |

Page 259

| 1 | M. MCHUGH |
| 2 | Department call an Au Pair meeting? |
| 3 | A.   They usually have one here. |
| 4 | Q.   And that's separate from the |
| 5 | Alliance meeting that the Au Pair |
| 6 | attends? |
| 7 | A.   Yes. |
| 8 | Q.   At the annual State |
| 9 | Department meetings, what topics are |
| 10 | discussed? |
| 11 | A.   They most recently did a |
| 12 | category review where they evaluated |
| 13 | the Au Pair program to determine how |
| 14 | it fit into the State Department's |
| 15 | foreign policy objectives.  They gave |
| 16 | us their findings on that.  What else? |
| 17 | Q.   Was the stipend ever |
| 18 | discussed at those annual meetings? |
| 19 | A.   No.  They also had, they had |
| 20 | done a series of workshops around the |
| 21 | country, or meet-and-greets with Au |
| 22 | Pairs where the staff from the |
| 23 | Department of State went and met with |
| 24 | Au Pairs in Denver, Colorado, and |
| 25 | Seattle, Washington, and Atlanta, |

Page 260

| 1 | M. MCHUGH |
| 2 | Georgia.  Those are just examples, I'm |
| 3 | making those locations up.  And |
| 4 | they've also talked about what they |
| 5 | found from those meetings. |
| 6 | Q.   And does InterExchange have |
| 7 | contact with the other Au Pair |
| 8 | sponsors outside of these Alliance and |
| 9 | State Department meetings? |
| 10 | A.   We have contacts, we don't |
| 11 | have meetings. |
| 12 | Q.   What kind of contacts do you |
| 13 | have? |
| 14 | A.   For example, we just came |
| 15 | from a contact in Germany, it's the |
| 16 | IAPA, International Au Pair |
| 17 | Association conference, and you can't |
| 18 | help but run into each other there. |
| 19 | Q.   What topics are discussed at |
| 20 | IAPA meetings? |
| 21 | A.   At the IAPA conference, so |
| 22 | there's the IAPA board of directors, |
| 23 | and that's -- that's different than -- |
| 24 | the IAPA is more of a business |
| 25 | generating conference.  You go to the |

Page 261

| 1 | M. MCHUGH |
| 2 | conference, you have a schedule of |
| 3 | appointments with the international |
| 4 | cooperators, you sit for 20 minutes, |
| 5 | you talk to the international |
| 6 | cooperator about whether it's a good |
| 7 | fit that you guys work together, and |
| 8 | then a bell rings and you move on to |
| 9 | the next international cooperator. |
| 10 | Q.   Is the stipend discussed at |
| 11 | those meetings? |
| 12 | A.   The stipend is not discussed |
| 13 | at those meetings.  It may come up in |
| 14 | terms of if I'm speaking to a |
| 15 | potential international cooperator one |
| 16 | on one at a table by ourselves, they, |
| 17 | if they really don't know how the |
| 18 | program works, we may have to start |
| 19 | from square one and say the Au Pair |
| 20 | program is open to 18 to 26-year-olds, |
| 21 | this is how it works, this is what |
| 22 | they would pay, this is what, the |
| 23 | length of the program. |
| 24 | So in that sense we may have |
| 25 | to go over the basics, and then the |

PLAINTIFFS' RESP. APP.0005248

**MAGNA** ▶

LEGAL SERVICES

Page 262

1        M. MCHUGH
2   stipend may come up. But for the more
3   seasoned international cooperators,
4   it's not a topic.
5        Q.   And when it does come up, is
6   the number that you use the 195.75
7   number?
8        A.   At least.
9        Q.   Are there other contexts in
10  which you have contact with the other
11  sponsor agencies?
12       A.   So in certain situations we
13  will reach out to each other to gather
14  information about a potential host
15  family. If a host family is coming
16  from Au Pair In America or Au Pair
17  Care, as an example, and something
18  causes us to question that this family
19  is the right fit for a program,
20  especially if a family comes from two
21  agencies, one right after another, we
22  may reach out to that agency and
23  simply ask, we have this family
24  applying to the program, would you be
25  willing to welcome them back to the

Page 263

1        M. MCHUGH
2   program. They'll give us, they may
3   answer, they may not, they may not
4   have a record of that family. So in
5   that case we occasionally talk to each
6   other.
7        Q.   Do you ever talk about the
8   stipend with other sponsors?
9        A.   No.
10       Q.   Do you ever talk about the
11  regulations governing room and board
12  with the other sponsors?
13       A.   Room and board, no.
14       Q.   Are there any regulations
15  governing room and board?
16       A.   Well, the stipend, as
17  it's -- as it's regulated by the
18  Department of State, includes a
19  deduction for room and board.
20       Q.   Are you aware of any actual
21  law or regulation related to the --
22  related to room and board?
23       A.   A law or regulation related,
24  well, I'm aware of the regulations
25  that have been passed over the years

Page 264

1        M. MCHUGH
2   that have discussed at length the room
3   and board deduction.
4        Q.   You're referring to the
5   notices you discussed earlier?
6        A.   I'm referring to the notices
7   I discussed earlier, the three of
8   which that came in 2007, 2008 and
9   2009. There were other ones that were
10  issued in 1997. There were other, and
11  then there were the -- a very robust
12  discussion of it in the regulations in
13  1995.
14       Q.   Have you ever sought legal
15  advice -- again, it's a yes-or-no
16  question. Have you ever sought legal
17  advice prior to this litigation as to
18  whether those notices have the force
19  of law?
20       A.   No.
21       Q.   So this is an email Bates
22  numbered InterExchange 0003799 through
23  800.
24       (McHugh Exhibit 33, Bates
25       stamped InterExchange 0003799

Page 265

1        M. MCHUGH
2   through 3800, was marked for
3   identification.)
4        Q.   The email at the top appears
5   to be from Michael McCarry.
6        A.   Mm-hmm.
7        Q.   Do you know who Michael
8   McCarry is?
9        A.   I do.
10       Q.   Who is he?
11       A.   He is the former executive
12  director of the Alliance for
13  International Education and Cultural
14  Exchange.
15       Q.   And in the email, in the
16  second email from the top, which is
17  from you, I believe, you say, would
18  this just be a sponsor meeting, or do
19  we have Stanley attend as well, and my
20  question is, who is Stanley?
21       A.   Stanley is the Deputy
22  Assistant Secretary of State, Stanley
23  Colvin.
24       Q.   Got it. And in the top
25  email from Mr. McCarry, focus on the

PLAINTIFFS' RESP. APP.0005249

MAGNA
LEGAL SERVICES

| Page 266 | Page 268 |
|---|---|

**Page 266**

```
1          M. MCHUGH
2   future of the ed component, does ed
3   mean education?
4       A.   Yes.
5       Q.   Then going down to the
6   email, I believe the email below yours
7   is from your CEO; is that right?
8       A.   Yes.
9       Q.   And she writes, Bill from Go
10  Au Pair was going to put together a
11  draft of survey questions so we have a
12  better understanding of our talking
13  points.
14          Do you know what survey
15  she's referring to?
16      A.   I don't.
17      Q.   Okay.
18          (McHugh Exhibit 34, Bates
19      stamped InterExchange 0007875
20      through 7876, was marked for
21      identification.)
22      Q.   This is an email,
23  InterExchange 0007875 through 76.  And
24  it looks like the bottom email is from
25  Helene Young.  Do you know who
```

**Page 267**

```
1          M. MCHUGH
2   Ms. Young is?
3       A.   Yes.
4       Q.   Who is Helene Young?
5       A.   Helene Young is, she's the
6   owner of U.S. Au Pair, I believe.
7       Q.   Okay.  And what is she
8   reporting to you about in this email?
9       A.   At the same time that we
10  were developing the record of hours
11  worked and stipend received documents,
12  so I mentioned earlier that the State
13  Department was really encouraging us
14  to develop that sort of documentation,
15  and the following schedule and weekly
16  planner.
17          So about the same time, I
18  believe they were -- they were
19  discussing that with all the sponsors,
20  and again they held it up as a best
21  practice.  And I believe this email
22  from Helene is her pointing out that
23  the Department of Labor -- well, she
24  bolded it here, once the regulations
25  are finalized, this approach will
```

**Page 268**

```
1          M. MCHUGH
2   eliminate the need for host families
3   to keep individualized records.
4           So her point was, why would
5   we need a schedule and weekly planner
6   when the Department of Labor is
7   saying, we're trying -- the Department
8   of State is saying that we're trying
9   to eliminate the host family's need to
10  keep those sort of records by having a
11  standardized, or a standard stipend
12  that's uniform.
13      Q.   Did it surprise you that
14  Ms. Young was reaching out to you to
15  discuss the regulations or the
16  requirements of the Department of
17  State?
18      A.   No.
19      Q.   Did it not surprise you
20  because that happens a lot?
21      A.   No, it -- no, it didn't
22  surprise me because I'm not easily
23  surprised.
24      Q.   How frequently do you find
25  yourself discussing State Department
```

**Page 269**

```
1          M. MCHUGH
2   requirements or communications with
3   other sponsors?
4       A.   Very rarely.  Less
5   frequently than we discuss -- than we
6   speak to the State Department.
7       Q.   And in your response you
8   say, looking specifically at the
9   section you highlight, my reading is
10  that the language is related to the
11  agency's efforts to standardize the
12  calculation of the deduction for room
13  and board.
14          What did you mean by
15  standardize the calculation for the
16  deduction for room and board?
17      A.   Let's see here.  Can I see
18  the rest of the regulations?
19      Q.   I think this is the entire
20  document.
21      A.   It would be on that link,
22  the PDF that's sent.
23      Q.   We can try and get that for
24  you at a break, if you need it.  But
25  do you know what you meant by
```

**MAGNA**
LEGAL SERVICES

Page 270

1    M. MCHUGH
2  standardizing the calculation of the
3  deduction for room and board?
4      A.   So let's see if there's a
5  hint of it in here.  So the agency
6  concludes that this approach, which
7  isn't included in here, but I
8  mentioned earlier was they looked at
9  the fixed deduction of $36.  They
10  found that that was outdated.  They
11  did a survey unrelated to Bill
12  Kapler's survey, they did a survey of
13  the real cost to house and provide
14  room and board to an Au Pair.  They
15  came back with a number like 65.  They
16  found that to be more reasonable than
17  the $46, and they went through a
18  discussion, well, we would like to
19  have a fixed amount for the room and
20  board to keep, to -- because of the
21  programatic need for a uniform
22  stipend.  So when I'm saying to
23  standardize the deduction, I'm talking
24  about their need and the discussion
25  they engaged in in this document to

Page 271

1    M. MCHUGH
2  work towards a uniform or programatic
3  need for a uniform stipend, which
4  includes, starts with the federal
5  minimum wage and includes a standard
6  deduction for room and board, which
7  they followed up with, with every
8  single notice that they sent in a
9  similar way.  So that's what we're
10  talking about here.
11      Q.   Okay.  So do you understand
12  there to be a programatic need for a
13  uniform stipend?
14      A.   Yes.
15      Q.   Do you know whether the
16  other sponsors share that
17  understanding?
18         MR. LIBLING:  Object to
19  form.
20      A.   I can't say.  I'm sure
21  they've read the same materials I
22  have.
23      Q.   Have you ever discussed a
24  programatic need for a uniform stipend
25  with the other sponsors?

Page 272

1    M. MCHUGH
2      A.   I don't think so.
3      Q.   Has it ever come up in
4  conversation, even if it wasn't the
5  topic?
6      A.   No.  This is really since
7  the lawsuit came up, we've gone
8  backwards to find out how we arrived
9  where we are, and that has been
10  illuminating.  But the stipend is
11  really one topic that never had to be
12  discussed among the sponsors, because
13  it was so clear what the stipend was
14  and is.
15      Q.   How has this -- when you
16  say, we've gone backwards to find out
17  how we arrived where we are, what have
18  you done to do that?
19      A.   I mean, I'm saying that
20  personally.
21      Q.   What have you done to do
22  that?
23      A.   We reviewed all the
24  regulations, the discussion around the
25  regulation that's spelled out in the

Page 273

1    M. MCHUGH
2  PDF here, the notices sent since then.
3      Q.   And you said it was
4  illuminating, how is it illuminating?
5      A.   Oh, I think especially the
6  1995 regs provide a really thorough
7  explanation and analysis of what the
8  intention of the State Department was,
9  starting with the need for -- starting
10  with their approval of the program,
11  their desire to house the program, the
12  fact that the educational component
13  provided the link to the
14  Fulbright–Hays Act and gave them the
15  ability to operate the program.  The
16  fact that it fits into their foreign
17  policy objectives.
18         They go into a discussion of
19  the challenges to the program and
20  explain why they believe the program
21  is valuable through the stipend and,
22  yeah, it's just a really thorough
23  analysis, and I think provides a great
24  backbone and explanation for the
25  regulations that have followed from

PLAINTIFFS' RESP. APP.0005251

MAGNA ▶
LEGAL SERVICES

69 (Pages 270 to 273)

| Page 274 |
|---|

1  　　　M. MCHUGH
2  there.
3  　　Q.　As part of your backwards
4  look, have you had conversations with
5  anybody else to establish how you
6  arrived where you are?
7  　　　MS. VICKLES:　I'm going to
8  　　object to that question.　To the
9  　　extent it involves conversations
10 　　with legal counsel, don't answer.
11 　　Q.　Right now I'm just asking
12 whether he had conversations.　Have
13 you had conversations?
14 　　A.　I have had conversations
15 with legal counsel.
16 　　Q.　Have you had conversations
17 with anyone else?
18 　　A.　I had conversations with our
19 CEO.
20 　　Q.　What was the content of your
21 conversations with the CEO?
22 　　A.　Just a conversation about
23 reviewing those documents and our
24 understanding of what it says.
25 　　Q.　What did you tell her about

| Page 275 |
|---|

1  　　　M. MCHUGH
2  your understanding?
3  　　A.　That it was clear that there
4  was a thorough analysis of the wage
5  and stipend issue, and that there was
6  a programatic need for a uniform wage,
7  and that they wanted to arrive at a
8  fixed room and board deduction.　And
9  then that followed through in the
10 notices that they issued afterwards.
11 　　Q.　And what was her response?
12 　　A.　I'm not sure.　Something
13 affirmative.　Something to the effect
14 of that makes total sense.
15 　　Q.　And have you had subsequent
16 conversations with her since that
17 conversation about this litigation, or
18 the issues raised in the litigation?
19 　　A.　Yes.
20 　　Q.　What was the content of
21 those conversations?
22 　　　MS. VICKLES:　And I'm going
23 　　to object.　To the extent counsel
24 　　was involved in any of those
25 　　conversations, do not answer.

| Page 276 |
|---|

1  　　　M. MCHUGH
2  　　　MR. LIBLING:　That's --
3  　　　MS. VICKLES:　Or to the
4  　　extent those conversations were
5  　　discussing legal advice or
6  　　passing on legal advice you
7  　　received.
8  　　A.　There's very little to say.
9  　　Q.　Let's take it step by step.
10 Have you had -- since the conversation
11 you described, have you had
12 conversations with your CEO outside
13 the presence of counsel about the
14 issues raised in this litigation?
15 　　　MS. VICKLES:　That would
16 　　just be a yes or no.
17 　　A.　Yes.
18 　　Q.　Okay.　And what was
19 discussed in those meetings outside
20 the presence of counsel?
21 　　　MS. VICKLES:　And I'm going
22 　　to object.　If you can answer
23 　　that question without revealing
24 　　advice from counsel or
25 　　conversations you had with

| Page 277 |
|---|

1  　　　M. MCHUGH
2  counsel, you can answer.　But to
3  the extent those conversations
4  would necessarily involve legal
5  advice obtained or passed along,
6  don't answer.
7  　　A.　Yeah, so there were no
8  formal meetings, as you described.　So
9  we've had conversations.　They
10 usually -- well, I regret to say that
11 they are unflattering to your
12 position.
13 　　Q.　I doubt you regret to say
14 that.
15 　　A.　I hesitate to say that.
16 　　Q.　In an informal context, and
17 keeping the same instruction from your
18 counsel for this question as well,
19 because I think it applies just as
20 equally to this question, is there
21 anything you can tell me about the
22 subject matter of what you discussed
23 with the CEO?
24 　　A.　You know, they're sort of
25 passing conversations, these aren't

**MAGNA** ▶
**LEGAL SERVICES**

| Page 278 |
|---|

```
              M. MCHUGH
 1
 2   formal conversations.  But they
 3   generally are of the tone that it's
 4   clear as day, this is ridiculous, we
 5   completely and 100 percent disagree
 6   with the lawsuit, and that's our
 7   position.  And we are in no doubt
 8   about that.  So that's the general
 9   tone and substance of those
10   conversations.
11      Q.   Okay.  The next exhibit that
12   is being put in front of you is
13   InterExchange 0007187 through 7189.
14          (McHugh Exhibit 35, Bates
15          stamped InterExchange 0007187
16          through 7189, was marked for
17          identification.)
18      Q.   And do you know who Jessica
19   Mueller is?
20      A.   Yes.
21      Q.   Who is she?
22      A.   Jessica Mueller is an alias
23   that has been used by InterExchange to
24   explore other agencies' websites and
25   processes, or to gather intelligence.
```

| Page 279 |
|---|

```
              M. MCHUGH
 1
 2      Q.   And who is the Brandon
 3   that's referenced in the top email,
 4   I'm going to talk to Brandon about all
 5   this after the conference?
 6      A.   Top of the email.
 7      Q.   It's the top sentence in the
 8   last email?
 9      A.   Brandon worked in our
10   marketing department.
11      Q.   Okay.  So the information at
12   the bottom of this -- sorry, what's
13   Brandon's last name?
14      A.   Simes, S-I-M-E-S.
15      Q.   So the information at the
16   bottom of this email, I take it, is
17   information you got from Great Au Pair
18   using this alias?
19      A.   Yes.
20      Q.   Okay.  Does InterExchange
21   have competitors?
22      A.   Yes.
23      Q.   Who are InterExchange's
24   competitors?
25      A.   The 15 other Au Pair
```

| Page 280 |
|---|

```
              M. MCHUGH
 1
 2   sponsors for the Au Pair program, the
 3   dozens of summer work and travel
 4   sponsors for the summer work and
 5   travel program.  Various other
 6   sponsors for other programs.
 7      Q.   Does InterExchange compete
 8   with other childcare providers?
 9      A.   How would you define
10   compete?
11      Q.   How would you define
12   compete?
13      A.   Well, do we track the
14   success or lack thereof of other
15   childcare providers, no.
16      Q.   Do you -- let's see, your
17   clients are host families, correct?
18      A.   Yes.
19      Q.   Do host families sometimes
20   face a choice between an Au Pair and
21   other forms of childcare?
22      A.   I imagine anyone looking for
23   childcare is presented with the same
24   options.
25      Q.   And earlier you testified
```

| Page 281 |
|---|

```
              M. MCHUGH
 1
 2   that host families often naturally
 3   think about childcare on a per week
 4   cost, do you remember that?
 5      A.   Mm-hmm.
 6      Q.   And I think you said that
 7   they, even if you wouldn't make that
 8   comparison, they might themselves make
 9   that comparison; is that accurate?
10      A.   That families might.
11      Q.   And so when you were talking
12   about that kind of a comparison, are
13   you imagining, are you in a situation
14   where the Au Pair programs' costs are
15   stacked up against, for example, the
16   cost of a nanny?
17      A.   I imagine families who are
18   looking for childcare could look at
19   both options and make that comparison.
20      Q.   And the same for daycare?
21      A.   Sure.
22      Q.   And the same for some
23   babysitting arrangement less formal
24   than a nanny?
25      A.   Sure.
```

PLAINTIFFS' RESP. APP.0005253

MAGNA
LEGAL SERVICES

Page 282

```
 1            M. MCHUGH
 2     Q.   Let's do tab 19.
 3         (McHugh Exhibit 36, Bates
 4     stamped InterExchange 0017906
 5     through 7908, was marked for
 6     identification.)
 7     Q.   So the document in front of
 8  you is Bates marked InterExchange
 9  0017906 through 08.  Do you recognize
10  this document?
11     A.   No.
12     Q.   Are you the
13  MMcHugh@InterExchange.org who is in
14  the second email from the top?
15     A.   Yes.
16     Q.   Do you doubt that you
17  received this document?
18     A.   No.
19     Q.   If you could turn to the
20  second page.  Do you know how this
21  chart was compiled?
22     A.   No.
23     Q.   Do you know whether this
24  chart is updated on any kind of
25  regular basis?
```

Page 283

```
 1            M. MCHUGH
 2     A.   This chart does not exist
 3  currently.  This looks like it was,
 4  perhaps, from 2007.
 5     Q.   The email to you is from
 6  2012.  Why do you say it's a 2007
 7  chart?
 8     A.   Oh, I'm sorry, I'm looking
 9  at the Bates number, never mind.
10     Q.   Oh, okay.  So do you think
11  this is a 2012 chart based on the date
12  of the email?
13     A.   Yes.
14     Q.   So you said you competed
15  with the other sponsors --
16     A.   Mm-hmm.
17     Q.   -- is that correct?
18     A.   Yes.
19     Q.   Do you compete on the
20  application fee?
21     A.   Yes.
22     Q.   Do you compete on the
23  program fee?
24     A.   Yes.
25     Q.   Do you compete on the
```

Page 284

```
 1            M. MCHUGH
 2  additional charges?
 3     A.   Additional charges, yes.
 4     Q.   Do you compete on total
 5  fees?
 6     A.   Yes.
 7     Q.   Do you compete on the
 8  stipend?
 9     A.   InterExchange 195, plus five
10  --
11         MS. VICKLES:  Object to
12     form.
13     A.   I'm trying to understand the
14  plus 500.
15     Q.   Oh, the plus 500, if you
16  look at the asterisk under the chart,
17  that might help.
18     A.   Hmm.  Okay, so this chart is
19  a collection of information as
20  advertised by these six Au Pair
21  sponsors.
22     Q.   Right, and my question is,
23  do you compete with other agencies,
24  other sponsors, on stipend?
25         MS. VICKLES:  Object to
```

Page 285

```
 1            M. MCHUGH
 2     form.
 3     A.   There are agencies who have
 4  different stipends than we do, so in
 5  that sense there's a discrepancy among
 6  the sponsors for stipends.  Other
 7  sponsors have different levels of
 8  stipends and different types of
 9  programs, but yeah.
10     Q.   For standard Au Pairs, do
11  you compete on the stipend?
12         MS. VICKLES:  Object to
13     form.
14     A.   I think I disagree that the
15  stipend is something that's ours to
16  compete on.  So the program fees come
17  to us, those are ours.  So we can
18  compete on that.  But the stipend is
19  between the Au Pair and the host
20  family and it's an amount, the minimum
21  amount is determined by the Department
22  of State.  The money doesn't come to
23  us, so whether we received more or
24  less of it does not, is not a
25  competitive aspect.
```

PLAINTIFFS' RESP. APP.0005254

MAGNA
LEGAL SERVICES

Page 286

```
1               M. MCHUGH
2      Q.   But you compete on the total
3   yearly fees?
4      A.   In this case we have
5   tabulated the yearly fees.
6      Q.   And the total yearly fees
7   include the stipend, correct?
8      A.   Yeah.
9      Q.   Okay.  So your position is
10  that the stipend is not a category of
11  competition, or it's outside of the
12  realm of competition?
13     A.   No, my position is this
14  chart shows how the various sponsors
15  have described their total annual
16  fees.  How they've calculated that.
17  For us, we've used 195 plus the $500.
18  For others that haven't, other people
19  have additional fees, we don't.  But
20  where we, InterExchange, the sponsor,
21  compete with other sponsors is on the
22  program fees.
23     Q.   Okay.  Let's do this one.
24         (McHugh Exhibit 37, Bates
25      stamped InterExchange 0007562
```

Page 287

```
1               M. MCHUGH
2       through 7571, was marked for
3       identification.)
4      Q.   This is a document we've
5   provided to you in color because we
6   thought it was easier to read.  It is
7   Bates numbered InterExchange 0007562
8   through 7571.
9          Do you recognize this
10  document?
11     A.   I do not.
12     Q.   Do you know who would have
13  produced it?
14     A.   Perhaps the marketing team.
15     Q.   The top slide says
16  February 2013 marketing department, if
17  that helps.
18     A.   Yeah.
19     Q.   So you may have said this
20  already.  If so, I apologize, but who
21  leads the marketing team?
22     A.   At that time I believe it
23  was Ron Hernandez.
24     Q.   Do you know whether you ever
25  saw this document at the time?
```

Page 288

```
1               M. MCHUGH
2      A.   I imagine I did, but I'm
3   sorry, I can't affirmatively say yes.
4      Q.   Okay.  The page, I'm not
5   sure it has a native page numbers,
6   one, two, three, the fourth page of
7   this document, it says Au Pair U.S.A.
8   prices for 2013 at the top, and it has
9   a chart.
10     A.   Yes.
11     Q.   So the total annual fee in
12  the far right column, does that
13  include the stipend, two columns to
14  the left?
15     A.   It appears so.
16     Q.   And that stipend is uniform
17  amongst all of the sponsors listed
18  here?
19     A.   Listed here, yes.
20     Q.   And the education is also
21  uniform amongst all of the sponsors,
22  correct?
23     A.   Yes.
24     Q.   And is that because those
25  two categories, as distinct from the
```

Page 289

```
1               M. MCHUGH
2   first three categories, are categories
3   you consider to be set by the State
4   Department?
5      A.   Determined by the State
6   Department, yes.
7      Q.   Okay.  And then a number of
8   pages later there's a chart called
9   Points of Differentiation.  It is five
10  pages later.  On the top it says
11  Points of Differentiation, part one.
12     A.   Mm-hmm.
13     Q.   Who are the sponsors
14  differentiating themselves for, which
15  I mean -- was that question clear, or
16  did that make no sense to you at all?
17     A.   Maybe --
18     Q.   Again?
19     A.   -- try again.
20     Q.   Okay.  It's called Points of
21  Differentiation, and I'm asking for
22  which target, what is the target
23  audience for which these points of
24  differentiation are relevant?
25     A.   Let's see.  I believe host
```

MAGNA
LEGAL SERVICES

Page 290

```
1              M. MCHUGH
2    families.
3        Q.  And is the same true for the
4    next page as well, Points of
5    Differentiation part two?
6        A.  Yes.
7        Q.  Okay.  Why doesn't the
8    competitive market environment slide
9    deck include points of differentiation
10   targeted towards Au Pairs?
11       MS. VICKLES:  Object to
12   form.
13       A.  I didn't create the
14   document.
15       Q.  So you don't know?
16       A.  So I don't know.
17       Q.  Have you ever seen a
18   document discussing your competitive
19   differentiation with the target
20   audience being the Au Pairs rather
21   than the host families?
22       A.  Because that's a bit removed
23   from the sponsors, it's harder.  So
24   for example, it's very -- it would be
25   very difficult for us to find
```

Page 291

```
1              M. MCHUGH
2    information about another sponsor's
3    arrangement with their recruiting
4    international cooperators.  But when
5    we speak to or engage in a discussion
6    with a potential international
7    cooperator, we do have points of
8    differentiation towards Au Pairs,
9    being we have the orientation in New
10   York City, you know, we're a
11   nonprofit, we've been involved this
12   long.  So it's just a different
13   market.  That's not this document.
14       Q.  Okay.
15       THE VIDEOGRAPHER:  You have
16   45 minutes left.
17       MR. LIBLING:  Good, I think
18   we're going to be fine.
19       (McHugh Exhibit 38, Bates
20   stamped InterExchange 0004888,
21   was marked for identification.)
22       Q.  Do you recognize this
23   document?
24       A.  Yes.
25       Q.  Is this an accurate
```

Page 292

```
1              M. MCHUGH
2    representation of InterExchange's
3    management structure as of March 2016?
4        A.  Yes.
5        Q.  Has anything changed between
6    March 2016 and now?  And I'm only
7    asking about the portions of this
8    chart that are relevant to the Au Pair
9    program.  So let's start with that,
10   which portions of this chart are
11   relevant to the Au Pair program?
12       A.  So at 4:00, you've got the
13   international recruitment and
14   replacement -- sorry, at 3:00, you
15   have Au Pair U.S.A., me, and then
16   everything below that.
17       Q.  So everything under you,
18   you?
19       A.  Yes.
20       Q.  And then the president and
21   CEO?
22       A.  President and CEO.
23       Q.  The board of directors?
24       A.  The board of directors.  So
25   --
```

Page 293

```
1              M. MCHUGH
2        Q.  Anyone else?
3        A.  Anyone else involved in the
4    Au Pair department or -- so the COO
5    would be, marketing and communications
6    would be.
7        Q.  The CFO, I think you said
8    earlier?
9        A.  Yeah, the finance.
10       Q.  Director of finance,
11   marketing communications.  Any of the
12   other teams listed here?
13       A.  Technology.
14       Q.  Technology, okay.
15       A.  Office services, in a
16   support capacity.
17       Q.  Got it.  And for any of
18   those teams that you mentioned, are
19   these boxes accurate as of today?
20       A.  So underneath the CFO, the
21   director of finance is different.
22       Q.  Who is the new director of
23   finance?
24       A.  There is no director of
25   finance, there's a controller, and his
```

PLAINTIFFS' RESP. APP.0005256

MAGNA
LEGAL SERVICES

Page 294

M. MCHUGH

1
2  name is Jonathan Ocsman.  O-C-S-M-A-N.
3      Q.   Anything else?
4      A.   The marketing and
5  communications director.  So there is
6  a -- there's a communications manager,
7  I believe is the title, and her name
8  is Teresa -- sorry, I'm blanking.
9      Q.   Happens.  Anything else?
10     A.   Annie Kingston no longer
11  works there.
12     Q.   And who has taken over her
13  position?  She's one of the
14  communication associates?
15     A.   Currently no one, yeah.
16     Q.   What about in your Au Pair
17  U.S.A. team?
18     A.   Oh, Summer Shetenhelm is no
19  longer on the team.
20     Q.   Anything else?
21     A.   So that position is filled
22  by Valentina Ward.
23     Q.   Anything else?  Do all of
24  the people in the box under you report
25  directly to you?

Page 295

M. MCHUGH

1
2      A.   Not exactly.  So for
3  example, Valentina Ward, Charlotte
4  Volpe, Megan Rodriguez report to
5  Michael Gates on a day-to-day basis.
6      Q.   And then Mr. Gates reports
7  to you?
8      A.   Yes.  The local coordinators
9  report to Jana Barcavage in the field
10  relations department.
11     Q.   And she reports to you?
12     A.   Yes.
13     Q.   What about Katie Gray?
14     A.   Katie Gray reports to me.
15     Q.   And Ms. Haynes?
16     A.   Portia reports to me.
17     Q.   Ms. Ferrin?
18     A.   Kate reports to me.
19     Q.   And Ms. Davenport?
20     A.   She reports to me.
21     Q.   And you report to Ms. La
22  Monica-Lunn?
23     A.   That's right.
24     Q.   We talked about Mr. Gates.
25  What is Ms. Barcavage's role?

Page 296

M. MCHUGH

1
2      A.   She hires and trains the
3  local coordinators.
4      Q.   Okay.  What is Ms. Gray's
5  role?
6      A.   She processes the logistics
7  with the Au Pair's arrival and
8  departure from the country.
9      Q.   We talked about Ms. Haynes.
10  What is Ms. Ferrin's role?
11     A.   She organizes the insurance,
12  she validates the educational
13  component.  She conducts the
14  orientation and training at the -- in
15  New York, and does outreach to the Au
16  Pairs and mans the -- the
17  InterExchange emergency phone.
18     Q.   What is the InterExchange
19  emergency phone?
20     A.   So we have a 24-hour
21  emergency line.  If anything -- if an
22  Au Pair has an emergency, they can
23  always call and they will wake Kate
24  up.
25     Q.   Is it just Au Pairs who can

Page 297

M. MCHUGH

1
2  call that number, or can other people
3  call it too?
4      A.   Well, Au Pairs are the ones
5  who are given that number, so.
6      Q.   So other than prank calls
7  and mistakes, it's Au Pairs?
8      A.   Right, local coordinators
9  have a different emergency phone that
10  rings my phone, so we have the two of
11  them.
12     Q.   Okay.  What is the purpose
13  of the global coordinators' emergency
14  line?
15     A.   Local coordinators.
16     Q.   Oh, local coordinators.  So
17  if they have a emergency call, they
18  call you?
19     A.   Yes.
20     Q.   Does that happen frequently?
21     A.   Yes.
22     Q.   Really, how often does that
23  happen?
24     A.   You know, there's a
25  seasonality to the business.  So

PLAINTIFFS' RESP. APP.0005257

MAGNA
LEGAL SERVICES

Page 298

```
 1              M. MCHUGH
 2   during the busy arrival time, it could
 3   be once a week, could be twice a week,
 4   could be once a month, so somewhere in
 5   there.  Usually on a Saturday or
 6   Sunday.
 7      Q.   Usually on a Saturday or
 8   Sunday?
 9      A.   Well, because we'd be in the
10   office otherwise.
11      Q.   Oh, I see, okay.  Are there
12   recurring topics, or is it pretty ad
13   hoc?
14      A.   It's pretty ad hoc.  The
15   most recent one was a local
16   coordinator called to say that an Au
17   Pair was not being allowed on her
18   flight because she had two pieces of
19   luggage, whereas the flight would only
20   allow one piece of luggage.
21      Q.   Okay.  I don't think I have
22   any questions about that.  All right.
23         Who in the -- in the box
24   that has your name in it and the box
25   below that, who has policy setting
```

Page 299

```
 1              M. MCHUGH
 2   authority?
 3      A.   Policy setting authority,
 4   you know, we -- ultimately myself, but
 5   in discussion with other people who
 6   may bring an idea up to me, we discuss
 7   it, and we may make a change.
 8      Q.   Okay.  So there's no one
 9   below you who can independently make a
10   policy change?
11      A.   Not really, no.
12         MR. LIBLING:  Okay.  Why
13      don't we take a break, and I will
14      work out what areas of cleanup I
15      have to do.
16         MS. VICKLES:  Okay.
17         THE VIDEOGRAPHER:  We're now
18      off the record, the time is
19      5:03 p.m.
20         (Time noted:  5:03 p.m.)
21         (Recess.)
22         (Time noted:  5:14 p.m.)
23         (Page break for beginning of
24      attorneys' eyes only testimony.)
25
```

Page 300

```
 1              CONFIDENTIAL AEO
 2         THE VIDEOGRAPHER:  We're now
 3   on the record, time is 5:13 p.m.
 4      Q.   Mr. McHugh, what are
 5   InterExchange's main sources of
 6   revenue?
 7      A.   InterExchange's main sources
 8   of revenue are program fees.
 9      Q.   And how does the Au Pair
10   business fit into that, what
11   proportion of those come into the Au
12   Pair business?
13      A.   Well, the Au Pair business
14   is -- proportionally the revenue is
15   similar to work and travel, yet the
16   expenses are so much greater than work
17   and travel, it doesn't -- it doesn't
18   really pay InterExchange's bills, so
19   to speak.
20      Q.   So do you know what portion
21   of InterExchange's revenue comes from
22   the Au Pair business?
23      A.   So revenue wise, it's
24   probably 40 to 45 percent.  But with
25   expenses subtracted from that, if we
```

Page 301

```
 1              CONFIDENTIAL AEO
 2   make 100 or $200,000 we're happy.
 3      Q.   As profit, you mean?
 4      A.   Yes.
 5      Q.   And what are the -- do you
 6   know in gross numbers what the total
 7   revenue is?
 8      A.   For the entire company?
 9      Q.   For the Au Pair program.
10      A.   Total revenue for Au Pair,
11   it's 4.5 million, approximately.
12      Q.   Okay.
13         MS. VICKLES:  Do you want to
14      mark that as confidential on the
15      record?
16         THE WITNESS:  Yes.
17         MS. VICKLES:  Can we mark
18      all of the questions regarding Au
19      Pair's, the Au Pair program's
20      revenue as confidential under the
21      terms of the protective order?
22         (Page break for ending of
23      Attorneys' eyes only testimony.)
24
25
```

PLAINTIFFS' RESP. APP.0005258

**MAGNA**
LEGAL SERVICES

Page 302

```
M. MCHUGH
1
2        (McHugh Exhibit 39, Bates
3    stamped InterExchange 0009311
4    through 9343, was marked for
5    identification.)
6    Q.   The document that's in front
7 of you now, InterExchange 0009311
8 through 9343, do you recognize this
9 document?
10   A.   This looks like an old
11 version of the international
12 cooperator handbook.
13   Q.   How is the international
14 cooperator handbook used?
15   A.   This looks like this is
16 perhaps from 2011, it looks like it
17 was made available to international
18 cooperators.
19   Q.   And how are international
20 cooperators meant to use the handbook?
21   A.   As a resource.
22   Q.   As an informational
23 resource?
24   A.   Yes.
25   Q.   Are they meant to provide
```

Page 303

```
M. MCHUGH
1
2 information to prospective Au Pairs
3 based on the information in this
4 handbook?
5    A.   That's up to them.
6    Q.   But they can, though?
7    A.   Yes.
8    Q.   Okay.  Is this a document
9 that would be overseen by Mr. Gates?
10   A.   Yes.
11   Q.   And can I ask you to turn
12 to, the Bates number at the bottom is
13 9319.  Are you there?
14   A.   Mm-hmm, yeah.
15   Q.   Is it still the case that
16 InterExchange does not accept smokers?
17   A.   It's more of a suggestion
18 rather than an actuality.  Smokers
19 generally do not get matched.
20   Q.   So when it says, not
21 accepted, was that -- is that no
22 longer true, or is that not accurate?
23   A.   I don't believe we ask the
24 question anymore.
25   Q.   When did you stop asking the
```

Page 304

```
M. MCHUGH
1
2 question?
3    A.   I'm not sure.
4    Q.   And when it says that, so
5 the heading here is difficult
6 placements, Au Pairs with the
7 following qualities are difficult to
8 match.  And the first bullet point is
9 males.
10      Do you discourage
11 international cooperators from
12 proposing male Au Pair candidates?
13   A.   We don't discourage them, we
14 try to give them realistic
15 expectations on the number of males
16 who are likely to match.
17   Q.   Why are males less likely to
18 match?
19   A.   Males are less frequently
20 selected by host families to be their
21 Au Pair.
22   Q.   Does InterExchange have any
23 policies designed to reduce
24 discrimination in hiring by host
25 families?
```

Page 305

```
M. MCHUGH
1
2    A.   Can you repeat the question?
3    Q.   Does InterExchange have any
4 policies designed to reduce
5 discrimination in hiring by host
6 families?
7        MS. VICKLES:  Object to the
8 form of that question.
9    A.   Families are free to choose
10 who they would like to match with.  I
11 can't think of how that policy would
12 be phrased.  You should match with a
13 male Au Pair to balance out the
14 numbers.
15   Q.   Are families permitted to
16 discriminate amongst Au Pair
17 candidates based on any criteria they
18 wish?
19      MS. VICKLES:  Object to
20 form.
21   A.   Yeah, I disagree with the
22 premise that they are discriminating
23 against someone by not selecting them.
24 If there's a pool of this many
25 candidates, they can only choose one.
```

PLAINTIFFS' RESP. APP.0005259

MAGNA
LEGAL SERVICES

Page 306

M. MCHUGH
1  M. MCHUGH
2  We can't understand their -- the
3  reason they made that decision in the
4  end.
5      Q.   Does that logic apply when
6  InterExchange is hiring somebody to
7  work at InterExchange's home office,
8  that you can only hire one person, so
9  their characteristics, you can take
10  the characteristics of that person,
11  including race, gender, religion, into
12  account?
13      MS. VICKLES:  Object to
14    form.
15      A.   I'm not sure how to answer
16  your question.  Do you want to
17  rephrase it?
18      Q.   Well, sure.  When you hire
19  somebody, are you involved in hiring
20  people at InterExchange?
21      A.   Yes.
22      Q.   And does InterExchange have
23  a nondiscrimination policy for hiring
24  its employees?
25      A.   Yes.

Page 307

M. MCHUGH
1  M. MCHUGH
2      Q.   Is there any similar policy
3  that applies to the hiring of Au
4  Pairs?
5      A.   No.
6      Q.   Okay.  All right.
7      (McHugh Exhibit 40, Bates
8    stamped InterExchange 0008020
9    through 8028, was marked for
10    identification.)
11      Q.   So I have handed you a
12  document numbered InterExchange
13  0008020 through 8028.  Do you
14  recognize this document?
15      A.   I do not.
16      Q.   Do you have any idea how
17  this document was put together or how
18  it was used?
19      A.   It looks like it is used for
20  training international cooperators.
21      Q.   I don't recall seeing, is
22  Marianna Breytman still employed by
23  InterExchange?
24      A.   No.
25      Q.   Do you know when she left?

Page 308

M. MCHUGH
1  M. MCHUGH
2      A.   Probably three years ago.
3      Q.   All right.  I think the only
4  thing I have left to do is there are a
5  number of documents that I want to
6  just sort of establish what they are,
7  but I don't really have that many
8  substantive questions about them.  So
9  I will try to go through them quickly.
10      THE VIDEOGRAPHER:  We're now
11    off the record, the time is
12    5:24 p.m.
13      (Time noted:  5:24 p.m.)
14      (Recess.)
15      (Time noted:  5:25 p.m.)
16      THE VIDEOGRAPHER:  We're now
17    on the record, the time is
18    5:25 p.m.
19      (McHugh Exhibit 41,
20    InterExchange website printout
21    via Wayback Machine, was marked
22    for identification.)
23      Q.   So this first document is
24  from the Wayback Machine, it's not a
25  produced document.  And is this a

Page 309

M. MCHUGH
1  M. MCHUGH
2  prior version of the frequently asked
3  questions section of your website that
4  is aimed towards Au Pairs?
5      A.   Yes.
6      Q.   And do you know the period
7  during which this document -- this was
8  the version of the website that was
9  active?
10      A.   I do not.
11      Q.   Okay.  I may have asked you
12  this already.  Do you recall when the
13  new version came into effect?
14      A.   The new version of the
15  website?
16      Q.   Yes.
17      A.   I believe it was March of
18  2015.
19      Q.   Okay.
20      A.   But there may have been
21  subsequent versions in between.
22      Q.   Okay.
23      A.   Or previous versions in
24  between.
25      (McHugh Exhibit 42, Bates

PLAINTIFFS' RESP. APP.0005260

MAGNA
LEGAL SERVICES

Page 310

```
 1              M. MCHUGH
 2     stamped InterExchange 00009432
 3     through 9461, was marked for
 4     identification.)
 5        Q.   The next one is Bates
 6     numbered InterExchange 00009432
 7     through 9461, and its heading is 2014
 8     International Cooperator Agreement.
 9     And my only question really about this
10     is, is this the standard form contract
11     that international cooperators signed
12     with you as of 2014?
13        A.   I believe so.
14        Q.   Do you pay a -- any kind of
15     referral fee to international
16     cooperators for Au Pairs?
17        A.   We do.
18        Q.   Is that on a per Au Pair
19     basis?
20        A.   Yes.
21        Q.   Okay.  How much is the fee?
22        A.   It varies by agency that
23     we're working with.
24        Q.   Is there a typical range?
25        A.   Five hundred to a thousand.
```

Page 311

```
 1              M. MCHUGH
 2        Q.   Per Au Pair?
 3        A.   Yes.
 4            (McHugh Exhibit 43, Bates
 5     stamped InterExchange 00010456,
 6     was marked for identification.)
 7        Q.   All right, this is the next
 8     one, and my question is, is this the
 9     standard form international cooperator
10     agreement that was in place as of
11     2012?
12        A.   It appears to be, yes.
13        Q.   All right.
14            (McHugh Exhibit 44, Bates
15     stamped InterExchange 0037596
16     through 7597, was marked for
17     identification.)
18        Q.   Okay.  And then this is
19     InterExchange 0037596 through 597.
20     Was this the host family agreement
21     that was in place as of 2011?
22        A.   Yes.
23        Q.   Okay.
24            (McHugh Exhibit 45, Bates
25     stamped InterExchange 0007546
```

Page 312

```
 1              M. MCHUGH
 2     through 7556, was marked for
 3     identification.)
 4        Q.   This next one is
 5     InterExchange 0007546 through 7556.
 6     Is this the host family agreement that
 7     was in place as of 2012?
 8        A.   Yes.
 9            (McHugh Exhibit 46, Bates
10     stamped InterExchange 0038158
11     through 8159, was marked for
12     identification.)
13        Q.   This one is InterExchange
14     0038158 through 38159.  And my
15     question is, I don't know what to call
16     it, but the little tag thing in the
17     bottom left-hand corner, it's a string
18     of letters and numbers.
19        A.   Mm-hmm.
20        Q.   Do the last four numbers
21     there suggest that this is the host
22     family agreement that was in effect as
23     of, I guess August 2009?
24        A.   I believe so.
25        Q.   Okay.
```

Page 313

```
 1              M. MCHUGH
 2            MR. LIBLING:  Let's go off
 3     the record.
 4            THE VIDEOGRAPHER:  We're now
 5     off the record, the time is
 6     5:31 p.m.
 7            (Time noted:  5:31 p.m.)
 8            (Recess.)
 9            (Time noted:  5:48 p.m.)
10            MR. WOLOSZ:  Justin Wolosz
11     for Cultural Care, I actually
12     emailed, I think, with one of
13     your colleagues earlier today,
14     and I would like a rough draft.
15            MR. HUEY:  Nathan Huey with
16     Gordon & Rees, and we would like
17     a rough transcript.
18            THE VIDEOGRAPHER:  We're now
19     on the record, the time is
20     5:47 p.m.
21            (McHugh Exhibit 47, Bates
22     stamped InterExchange 0018456
23     through 8492, was marked for
24     identification.)
25        Q.   There is InterExchange
```

PLAINTIFFS' RESP. APP.0005261

**MAGNA**
LEGAL SERVICES

| Page 314 | Page 316 |

**Page 314**

M. MCHUGH

1
2  0018456 through 18492.  It's not on
3  the first page, but on the second page
4  on the bottom left-hand corner there's
5  that string, again, of letters and
6  numbers.  And is this the version of
7  the host family handbook that was in
8  effect as of July 2010?
9      A.   Yes.
10     Q.   Okay.
11         (McHugh Exhibit 48, Bates
12      stamped InterExchange 0008023
13      through 0829, was marked for
14      identification.)
15     Q.   This is InterExchange
16  0008023 through 0829.  We don't have a
17  handy little date string this time.
18  Do you know whether this is the host
19  family and Au Pair agreement?
20     A.   It is.
21     Q.   Do you know the time period
22  during which it was enforced?
23     A.   I do not exactly.
24     Q.   Sorry.
25     A.   Perhaps 2013 forward.

**Page 316**

M. MCHUGH

1
2      A.   Yes.
3      Q.   And then the questions on
4  the front, do you have to -- are there
5  any questions on the front you can
6  answer false to and still be eligible?
7      A.   So the first one they could
8  answer false to.  The fifth one they
9  can answer false to.  The sixth one
10  they can answer false to, the seventh
11  they can answer false to, the eighth
12  one they can answer false to.
13         The ninth one they can
14  answer false to, the tenth one they
15  can answer false to.  The 11th one
16  they can answer false to.
17         I do not hold U.S.
18  citizenship, if they answered false,
19  they would own U.S. citizenship.  And
20  the last one they can answer false to.
21     Q.   And were you, just so the
22  record is clear, were you answering
23  that question as of today or as of
24  2010?
25     A.   Both.

| Page 315 | Page 317 |

**Page 315**

M. MCHUGH

1
2      Q.   Okay.  Has there been any
3  changes since 2013-ish?
4      A.   No.
5         (McHugh Exhibit 49, Bates
6      stamped Beltran 000477 through
7      0492, was marked for
8      identification.)
9      Q.   Sorry, one last question on
10  the document we were just looking at,
11  the host family and Au Pair agreement.
12  This is signed by all host families
13  and Au Pairs?
14     A.   It's signed by host families
15  and Au Pairs after they've matched
16  with each other.
17     Q.   Right.  Now, the -- so this
18  one is actually Beltran 000477 through
19  492, but it is a -- do you know what
20  this document is?
21     A.   It appears to be an old Au
22  Pair application.
23     Q.   And is this the application
24  that was in effect as of, looks like
25  May 2010?

**Page 317**

M. MCHUGH

1
2      Q.   Both, okay.  At page six of
3  17, or Beltran 000484, and I think we
4  discussed this, in addition to the
5  agreement that Au Pairs enter into
6  with host families, Au Pairs also
7  enter into an agreement with
8  InterExchange; is that correct?
9      A.   Yes.
10     Q.   And this is the version that
11  was in effect as of -- actually, this
12  says 08/10 at the bottom.
13     A.   Yeah, this is, this looks to
14  me to be a draft version, just looking
15  at the formatting.
16     Q.   This document was produced
17  by an Au Pair, not by InterExchange.
18  So somehow the Au Pair got it.
19     A.   Yeah.  Hmm.
20     Q.   So do you think this was the
21  version that was in effect as of
22  August 2010?
23     A.   I mean it's so, it's so
24  wonky, for lack of a better term, I
25  can't say.  Just look at Au Pair's

Page 318

1            M. MCHUGH
2    signature, the G is lower case, the N,
3    A, T and U are upper case.  And this
4    little box here causes me to question
5    whether this has been modified.  So I
6    can't say more than that.
7      Q.   Okay.  As a general rule, is
8    the Au Pair agreement within the --
9    sorry, let's start, what do you call
10   this packet of documents and
11   information?  Did you call it an
12   application?
13     A.   Yeah, that would be an old
14   paper application.
15     Q.   And nowadays these things
16   are done online; is that right?
17     A.   Yes.
18     Q.   Is there a paper form of the
19   Au Pair agreement anymore, or is it
20   just online?
21     A.   It's just online.
22     Q.   And it's part of the
23   application in the same way that this
24   was part of the paper application --
25     A.   Yes.

Page 319

1            M. MCHUGH
2      Q.   -- but now it's online?
3    Okay.
4         MR. LIBLING:  All right.
5    Thank you very much, really
6    appreciate your time, that's it.
7         THE WITNESS:  Thank you.
8         MR. LIBLING:  No further
9    questions.
10        MS. VICKLES:  I don't have
11   any questions for you.
12        THE VIDEOGRAPHER:  We're now
13   off the record.  The time is
14   5:55 p.m., this ends today's
15   deposition and DVD number four.
16        (Time noted:  5:56 p.m.)
17
18
19
20   _____
21        MICHAEL MCHUGH
22   Signed and subscribed to
     before me, this_____day
23   of _____ 2017.
24   _____
          Notary Public
25

Page 320

1
2         C E R T I F I C A T E
3    STATE OF NEW YORK  )
                        :
4    COUNTY OF NEW YORK)
5
6         I, Jeremy Richman, a Notary Public
7    within and for the State of New York, do hereby
8    certify:
9         THAT MICHAEL MCHUGH, the witness
10   whose deposition is hereinbefore set forth, was
11   duly sworn by me and that such deposition is a
12   true record of the testimony given by such
13   witness.
14        I further certify that I am not
15   related to any of the parties to this action by
16   blood or marriage; and that I am in no way
17   interested in the outcome of this matter.
18        IN WITNESS WHEREOF, I have hereunto
19   set my hand this 11th day of April 2017.
20
21
22   _____
          Jeremy Richman
23
24
25

Page 321

1
2            INDEX
3         EXAMINATION BY
4    MR. LIBLING              8
5    MR. LIBLING            180
6
7         EXHIBITS MARKED
8    (McHugh Exhibit 1, Plaintiffs'      9
9    Agreed Notice of 30(B)(6)
10   Deposition of Defendant
11   Interexchange, Inc., was marked for
12   identification.)
13   (McHugh Exhibit 2, email dated       9
14   Monday April 3, 2017, was marked
15   for identification.)
16   (McHugh Exhibit 3, Bates stamped     11
17   InterExchange 0004408 through 4449,
18   was marked for identification.)
19   (McHugh Exhibit 4, Bates stamped     44
20   InterExchange 0004463 through 4464,
21   was marked for identification.)
22   (McHugh Exhibit 5, Bates stamped     51
23   InterExchange 0004450 through 4475,
24   was marked for identification.)
25   (McHugh Exhibit 6, Bates stamped     82

PLAINTIFFS' RESP. APP.0005263

MAGNA
LEGAL SERVICES

Page 322

1  InterExchange 0008641 through 8642,
2  was marked for identification.)
3  (McHugh Exhibit 7, 2017 Host Family   92
4  Agreement, was marked for
5  identification.)
6  (McHugh Exhibit 8, 2015 Host          93
7  Employer Handbook, was marked for
8  identification.)
9  (McHugh Exhibit 9, Bates stamped      94
10  INTEREXCHANGE 0004389 through 4400,
11  was marked for identification.)
12  (McHugh Exhibit 10, Bates stamped     96
13  INTEREXCHANGE 0019109 through 9112,
14  was marked for identification.)
15  (McHugh Exhibit 11, Bates stamped     100
16  INTEREXCHANGE 0000010, was marked
17  for identification.)
18  (McHugh Exhibit 12, Bates stamped     110
19  INTEREXCHANGE 0004373, was marked
20  for identification.)
21  (McHugh Exhibit 13, Bates stamped     115
22  INTEREXCHANGE 0002409 through 2412,
23  was marked for identification.)
24  (McHugh Exhibit 14, Interexchange     116
25  website printout via Wayback

Page 323

1  Machine, was marked for
2  identification.)
3  (McHugh Exhibit 15, Bates stamped     120
4  INTEREXCHANGE 0002444 through 2445,
5  was marked for identification.)
6  (McHugh Exhibit 16, InterExchange     121
7  website printout via Wayback
8  Machine, was marked for
9  identification.)
10  (McHugh Exhibit 17, Bates stamped     129
11  INTEREXCHANGE 0003060 through 3062,
12  was marked for identification.)
13  (McHugh Exhibit 18, Bates stamped     144
14  INTEREXCHANGE 0007009 through 7029,
15  was marked for identification.)
16  (McHugh Exhibit 19, Bates stamped     145
17  INTEREXCHANGE 0021335, was marked
18  for identification.)
19  (McHugh Exhibit 20, Bates stamped     149
20  INTEREXCHANGE 0013829, was marked
21  for identification.)
22  (McHugh Exhibit 21, Bates stamped     151
23  INTEREXCHANGE 0038370, was marked
24  for identification.)
25  (McHugh Exhibit 2, Bates stamped      155

Page 324

1  INTEREXCHANGE 0011105 through 1106,
2  was marked for identification.)
3  (McHugh Exhibit 23, Bates stamped     157
4  INTEREXCHANGE 0010706 through 0711,
5  was marked for identification.)
6  (McHugh Exhibit 24, Bates stamped     162
7  INTEREXCHANGE 00024972 through
8  4973, was marked for
9  identification.)
10  (McHugh Exhibit 25, Bates stamped     167
11  INTEREXCHANGE 0019022 through 9023,
12  was marked for identification.)
13  (McHugh Exhibit 26, Bates stamped     171
14  INTEREXCHANGE 0018054, was marked
15  for identification.)
16  (McHugh Exhibit 27, Bates stamped     173
17  INTEREXCHANGE 0016727 through 6728,
18  was marked for identification.)
19  (McHugh Exhibit 28, Bates stamped     182
20  InterExchange 005191 through 5220,
21  was marked for identification.)
22  (McHugh Exhibit 29, Bates stamped     188
23  INTEREXCHANGE 0028522 through 8544,
24  was marked for identification.)
25  (McHugh Exhibit 30, Bates stamped     210

Page 325

1  INTEREXCHANGE 0004364 through 4372,
2  was marked for identification.)
3  (McHugh Exhibit 31, Bates stamped     222
4  InterExchange 0000614 through 0625,
5  was marked for identification.)
6  (McHugh Exhibit 32, Bates stamped     230
7  InterExchange 0021954 through 1957,
8  was marked for identification.)
9  (McHugh Exhibit 33, Bates stamped     264
10  InterExchange 0003799 through 3800,
11  was marked for identification.)
12  (McHugh Exhibit 34, Bates stamped     266
13  InterExchange 0007875 through 7876,
14  was marked for identification.)
15  (McHugh Exhibit 35, Bates stamped     278
16  InterExchange 0007187 through 7189,
17  was marked for identification.)
18  (McHugh Exhibit 36, Bates stamped     282
19  InterExchange 0017906 through 7908,
20  was marked for identification.)
21  (McHugh Exhibit 37, Bates stamped     286
22  InterExchange 0007562 through 7571,
23  was marked for identification.)
24  (McHugh Exhibit 38, Bates stamped     291
25  InterExchange 0004888, was marked

PLAINTIFFS' RESP. APP.0005264

MAGNA
LEGAL SERVICES

```
                                    Page 326
 1      for identification.)
 2      (McHugh Exhibit 39, Bates stamped    302
 3      InterExchange 0009311 through 9343,
 4      was marked for identification.)
 5      (McHugh Exhibit 40, Bates stamped    307
 6      InterExchange 0008020 through 8028,
 7      was marked for identification.)
 8      (McHugh Exhibit 41, InterExchange    308
 9      website printout via Wayback
10      Machine, was marked for
11      identification.)
12      (McHugh Exhibit 42, Bates stamped    309
13      InterExchange 00009432 through
14      9461, was marked for
15      identification.)
16      (McHugh Exhibit 43, Bates stamped    311
17      InterExchange 00010456, was marked
18      for identification.)
19      (McHugh Exhibit 44, Bates stamped    311
20      InterExchange 0037596 through 7597,
21      was marked for identification.)
22      (McHugh Exhibit 45, Bates stamped    311
23      InterExchange 0007546 through 7556,
24      was marked for identification.)
25      (McHugh Exhibit 46, Bates stamped    312
```

```
                                    Page 327
 1      InterExchange 0038158 through 8159,
 2      was marked for identification.)
 3      (McHugh Exhibit 47, Bates stamped    313
 4      InterExchange 0018456 through 8492,
 5      was marked for identification.)
 6      (McHugh Exhibit 48, Bates stamped    314
 7      InterExchange 0008023 through 0829,
 8      was marked for identification.)
 9      (McHugh Exhibit 49, Bates stamped    315
10      Beltran 000477 through 0492, was
11      marked for identification.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

PLAINTIFFS' RESP. APP.0005265

**MAGNA**
LEGAL SERVICES

Case No. 1:14-cv-03074-CMA-KMT Document 959-25 filed 03/30/18 USDC Colorado pg 439 of 701

# Exhibit 443

PLAINTIFFS' RESP. APP.0005266

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Case No. 14-cv-03074-CMA-KMT

_____

JOHANA PAOLA BELTRAN, ET AL.,

       Plaintiffs,

vs.

INTEREXCHANGE, INC., ET AL.,

       Defendants.

_____

VIDEOTAPED DEPOSITION OF

HELENE YOUNG

30(b)(6) REPRESENTATIVE FOR USAUPAIR, INC.

MAY 1, 2017

DENVER, COLORADO

11:08 A.M.

Magna Legal Services
866-624-6221
www.magnals.com

PLAINTIFFS' RESP. APP.0005267

MAGNA
LEGAL SERVICES

Page 2

1    The videotaped deposition of
2  HELENE YOUNG, taken before Leeann Keenan, a Registered
3  Merit Reporter, Certified Realtime Reporter, and a
4  Notary Public in and for the County of Summit and the
5  State of Colorado, at 1512 Larimer Street, Suite 200,
6  Denver, Colorado, on Monday, May 1, 2017, at the hour
7  of 11:08 a.m., pursuant to Notice.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1  APPEARANCES CONTINUED:
2
3  GORDON & REES
   BY: NATHAN HUEY, ESQ.
4     555 17th Street
      Suite 3400
      Denver, Colorado  80202
5     (303) 200-6888
      nhuey@gordonrees.com
6     appeared by telephone on behalf of
      AuPairCare, Inc.
7
   SHERMAN & HOWARD, L.L.C.
8  BY: ALYSSA LEVY, ESQ.
      633 17th Street
9     Suite 3000
      Denver, Colorado  80202
10    (303) 299-8194
      alevy@shermanhoward.com
11    appeared by telephone on behalf of
      InterExchange, Inc.
12
   FISHER & PHILLIPS
13 BY: SUSAN SCHAECHER, ESQ.
      1801 California Street
14    Suite 2700
      Denver, Colorado  80202
15    (303) 218-3650
      sschaecher@fisherphillips.com
16    appeared by telephone on behalf of
      AuPair Foundation and Au Pair in
17    America
18 EXPERT AUPAIR
   BY: BOGDAN ENICA, ESQ.
19    100 2nd Avenue S.
      Suite 3025
20    St. Petersburg, Florida  33701
      (727) 225-2649
21    bogdan@expertaupair.com
      appeared by telephone on behalf of
22    Expert AuPair
23
24
25

Page 3

1  APPEARANCES:
2
   BOISE, SCHILLER, FLEXNER, L.L.P.
3  BY: DANIEL SCHWARTZ, ESQ.
      575 Lexington Avenue
4     New York, New York  10022
      (212) 303-3537
5     dschwartz@bsfllp.com
      appeared on behalf of the Plaintiffs
6
   TOWARDS JUSTICE
7  BY: ALEXANDER HOOD, ESQ.
      1535 High Street
8     Suite 300
      Denver, Colorado 80218
9     (720) 441-2236
      alex@towardsjustice.org
10    appeared on behalf of the Plaintiffs
11 KELLY & WALKER, L.L.C.
   BY: WILLIAM J. KELLY, III, ESQ.
12    1512 Larimer Street
      Suite 200
13    Denver, Colorado  80202
      (720) 236-1801
14    wkelly@kellywalkerlaw.com
      appeared on behalf of USAuPair Inc.
15
   CHOATE, HALL & STEWART
16 BY: LYNDSEY KRUZER, ESQ.
      Two International Place
17    Boston, Massachusetts  02110
      (617) 248-5221
18    lkruze@choate.com
      appeared by telephone on behalf of
19    Cultural Care
20 LEWIS, ROCA, ROTHGERBER, CHRISTIE
   BY: JESSICA FULLER, ESQ.
21    1200 17th Street
      Suite 3000
22    Denver, Colorado  80202
      (303) 628-9527
23    appeared by telephone on behalf of
      Cultural Care
24
25

Page 5

1  APPEARANCES CONTINUED:
2
3    NIXON, SHEFRIN, HENSEN, OGBURN
     BY: LAWRENCE STONE, ESQ.
4       5619 DTC Parkway
        Suite 1200
5       Greenwood Village, Colorado  80111
        (303) 773-3500
6       lstone@nixonshefrin.com
        appeared by telephone on behalf of
7       ProAuPair and International Au Pair
        Exchange
8
9  ALSO PRESENT: Davis Baumunk, Videographer
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

PLAINTIFFS' RESP. APP.0005268

MAGNA ▶
LEGAL SERVICES

## Page 6

1
2                 I N D E X
3  DEPOSITION WITNESS:            PAGE
   HELENE YOUNG
4  Examination by Mr. Schwartz        11
5
   PLAINTIFFS' DEPOSITION EXHIBITS MARKED:
6  NO.      DESCRIPTION        PAGE
7  Exhibit 1  Plaintiffs' Revised Notice of    12
             30(b)(6) Deposition of Defendant
8            USAuPair, Inc.
9  Exhibit 2  USAuPair Website           21
             USA00868 - 00870
10
   Exhibit 3  USAuPair Organization Chart     23
11           USA 00867
12 Exhibit 4  USAuPair Au Pair Code of Conduct   38
             USA 00467
13
   Exhibit 5  USAuPair Au Pair Code of Conduct   38
14           USA 00469
15 Exhibit 6  USAuPair, website questionnaire "10  54
             Easy Questions)
16           USA 00877 - 00883
17 Exhibit 7  USAuPair Host Family Agreement    61
             USA 00266 - 00267
18
   Exhibit 8  USAuPair Host Family Orientation   64
19           Check List
             USA 00009 - 00011
20
   Exhibit 9  Aur Pair Regulations        79
21           USA 00180 - 00181
22 Exhibit 10  USAuPair 2009 Program Fees &    81
             Schedules
23           USA 00001
24 Exhibit 11  USAuPair 2010 Program Fees &    86
             Schedules
25           USA 00002

## Page 7

1  DEPOSITION EXHIBITS MARKED:
   NO.      DESCRIPTION        PAGE
2
3  Exhibit 12  USAuPair 2011 Program Fees &    86
             Schedules
4            USA 00003
5  Exhibit 13  USAuPair 2012 Program Fees &    86
             Schedules
6            USA 00004
7  Exhibit 14  USAuPair 2013 Program Fees &    86
             Schedules
8            USA 00005
9  Exhibit 15  USAuPair 2014 Program Fees &    86
             Schedules
10           USA 00006
11 Exhibit 16  USAuPair 2015 Program Fees &    86
             Schedules
12           USA 00007
13 Exhibit 17  USAuPair 2016 Program Fees &    86
             Schedules
14           USA 00008
15 Exhibit 18  E-mail from Helene Young to Linda  91
             Mori, with attachment
16           CHI0001270
17 Exhibit 19  September 22 and November 29, 2011  111
             e-mail chain between Helene Young,
18           Mark Overmann and Michael McCarry
             USA 00089
19 Exhibit 20  September 21 - 22, 2011 e-mail chain 116
             between Helene Young, Mark Overmann,
20           and Michael McCarry
             USA 00091 - 00093
21
   Exhibit 21  October 7 - 27, 2011 e-mail chain  127
22           between Helene Young and Michael
             McHugh
23           InterExchange0028985 - 0028987
24 Exhibit 22  January 12 - 13, 2012 e-mail chain 134
             between Helene Young and Michael
25           McHugh

## Page 8

1  DEPOSITION EXHIBITS MARKED:
   NO.      DESCRIPTION        PAGE
2
3  Exhibit 23  HIGHLY CONFIDENTIAL - ATTORNEY EYES  152
             ONLY
4            April 27, 2009 e-mail between Helene
             Young and Stacey Frank
5            AAP_0000767
6  Exhibit 24  October 12, 2011 e-mail to Helene  159
             Young from Linda Mori
7            CHI0001670
8  Exhibit 25  May 23, 2012 e-mail to Linda Mori  165
             from Helene Young
9            CHI0001945
10 Exhibit 26  June 6 - 11, 2012 e-mail chain   167
             between Helene Young and Linda Mori
11           CHI0001981 - 1982
12 Exhibit 27  May 27, 2013 e-mail chain between  171
             Helene Young and Linda Mori
13           CHI0001338 - 1341
14 Exhibit 28  September 23, 2013 e-mail to Helene  177
             Young from Linda Mori
15           CHI0001310
16 Exhibit 29  2010 Host Family Handbook and Guide 181
             USA 00728 - 759
17 Exhibit 30  2011 Host Family Handbook and Guide 186
             USA 00760 - 776
18
19 Exhibit 31  2012 Host Family Handbook and Guide 187
             USA 00792 - 823
20 Exhibit 32  2013 Au Pair Handbook and Guide   189
             USA 00548 - 607
21
22 Exhibit 33  2016 Au Pair Handbook and Guide   190
             USA 00668 - 727
23
24
25

## Page 9

```
1            P R O C E E D I N G S
2            THE VIDEOGRAPHER:  We are now on the
3   record.  This begins videotape No. 1 in the
4   deposition of Helene Young, 30(b)(6) representative
5   for USAuPair, Inc. in the matter of Johana Paola
6   Beltran, et al. versus InterExchange, Inc., et al.
7   in the United States District Court for the District
8   of Colorado, Case No. 14-cv-03074-CMA-KMT.
9            Today is May 1st, 2017 and time is
10  11:08.  This deposition is being taken at 1512
11  Larimer Street, Denver, Colorado at request of
12  counsel for plaintiffs.
13            The videographer is Davis Baumunk
14  of Magna Legal Services, and the court reporter is
15  Leeann Keenan of Magna Legal Services.  Will counsel
16  and all parties present please state their
17  appearances and who they represent.
18            MR. SCHWARTZ:  So with the
19  plaintiffs, this is Daniel Schwartz.
20            MR. HOOD:  Alexander Hood for the
21  plaintiffs.
22            MR. KELLY:  William Kelly for
23  USAuPair.
24            Let's go on the phone.  We'll do
25  our best to muddle through so that people don't talk
```

MAGNA
LEGAL SERVICES

Page 10

1   all over each other.
2          MS. KRUZER:  Lyndsey Kruzer on behalf
3   of Cultural Care.  And my colleague, Jessica Fuller,
4   is also appearing on behalf of Cultural Care.
5          MS. LEVY:  This is Alyssa Levy from
6   Sherman & Howard on behalf of InterExchange.
7          MR. HUEY:  Nathan Huey --
8          MS. SCHAECHER:  Susan Schaecher --
9          MR. HUEY:  Go ahead.
10         MS. SCHAECHER:  Susan Schaecher of
11  Fisher Phillips on behalf of APF Global.
12         MR. HUEY:  Nathan Huey of Gordon &
13  Reese on behalf of AuPairCare.
14         MR. ENICA:  Bogdan Enica on behalf of
15  Expert Group International doing business as Expert
16  Au Pair.
17         MR. STONE:  Larry Stone appearing on
18  behalf of A.P.E.X. and 20/20.
19         MR. KELLY:  Hearing no further, I
20  think we're ready to proceed.
21         MR. SCHWARTZ:  Wonderful.
22             (Witness duly sworn.)
23
24
25

Page 11

1              HELENE YOUNG,
2   having been first duly sworn, was examined and
3   testified as follows:
4              EXAMINATION
5   BY MR. SCHWARTZ:
6      Q.   So, Ms. Young, good morning.
7      A.   Good morning.
8      Q.   So thank you very much for coming in
9   today.  We understand you've had a bit of a journey,
10  so we very much appreciate you -- you making your
11  way out here.
12     A.   Okay.
13     Q.   So to start, I just want to let you know
14  kind of some of the ground rules for how these work.
15  Have you ever been in a deposition before?
16     A.   Yes.
17     Q.   Okay.  So as you may remember, I'll be
18  asking questions and you'll be answering.  Your
19  counsel may object.  Then after an objection, unless
20  your counsel instructs you not to answer, you should
21  continue and answer the question.
22         At any time that you feel you need
23  a break or -- and we've been going for a little
24  while, please, please do feel free to ask for one,
25  so long as there is no question pending.  We'll do

Page 12

1   our best so that you can answer any questions that
2   are pending before we take -- before we take a
3   break.  That about covers it as far as ground rules
4   are concerned, so --
5          MR. SCHWARTZ:  Unless counsel has
6   anything else that he wants to mention?
7          MR. KELLY:  No.  I don't know if
8   there's a standing stipulation for --
9          MR. SCHWARTZ:  I -- I don't believe
10  that -- that there is.
11         MR. KELLY:  We're going to reserve
12  all objections, save as to form, and privileges --
13         MR. SCHWARTZ:  That's fine.
14         MR. KELLY:  -- until trial.
15         MR. SCHWARTZ:  That's fine.
16         MR. KELLY:  We will read and sign and
17  waive the requirement of a notary.
18         MR. SCHWARTZ:  Sounds good.
19         MR. KELLY:  Thank you.
20         MR. SCHWARTZ:  Thank you.
21     Q.   So, Ms. Young, I'm going to start off
22  just by handing you this.
23             (Exhibit No. 1 was marked.)
24     Q.   Are you familiar with this document?
25  It's marked as Exhibit 1.  This is a Plaintiffs'

Page 13

1   Revised Notice of the 30(b)(6) Deposition of
2   USAuPair, Inc.
3      A.   Yes.
4      Q.   Wonderful.
5          So I just want to go through some
6   of these topics with you, which is the -- kind of
7   the topics that we had talked about asking you about
8   today.
9      A.   Okay.
10     Q.   So the first one is your corporate
11  structure.  Is that something you feel competent to
12  talk about?
13     A.   Yes.
14     Q.   Wonderful.
15         And the finances of your company?
16     A.   Yes.
17     Q.   And your recruitment, training,
18  placement, and supervision of au pairs and host
19  families?
20     A.   Yes.
21     Q.   Is there anyone else at the company who
22  would better be able to talk about those things?
23     A.   I'm it.
24     Q.   You're it.
25     A.   I'm it.

PLAINTIFFS' RESP. APP.0005270

MAGNA
LEGAL SERVICES

Page 14

1      Q.   That's what I wanted to ask.  Okay.
2           MR. KELLY:  Head cook and bottle
3   washer.
4           MR. SCHWARTZ:  Sounds good.
5      Q.   So -- and you're also obviously
6   comfortable talking about your relationship and
7   communications with the State Department?
8      A.   Yes.
9      Q.   And your relationships and communications
10  with other sponsors?
11     A.   Yes.
12     Q.   And your understanding of the market in
13  which you operate?
14     A.   Yes.
15     Q.   And the documents and document policies
16  that you have?
17     A.   Yes.
18     Q.   Fabulous.  Thank you.
19          MR. KELLY:  At this point I will just
20  note that we have served counsel with our responses
21  and objections to the revised notice of 30(b)(6)
22  deposition, and are presenting Ms. Young as the
23  person most knowledgeable at USAuPair, subject to
24  such objections.
25          MR. SCHWARTZ:  Thank you.

Page 15

1      Q.   So, Ms. Young, how long have you been in
2   the au pair business?
3      A.   Approximately, 25 years maybe.
4   Approximate -- approximately, 25 years.
5      Q.   25 years.  So it was -- I'm trying to do
6   the math -- around 1992 when you began working in
7   the au pair business?
8      A.   Oh, no.  I started as a host family.
9      Q.   Oh, you started as a host family.  And
10  what --
11     A.   Yeah.
12     Q.   -- what year was that?
13     A.   1994.
14     Q.   Okay.
15     A.   1994.
16     Q.   So you were a host -- you -- you -- you
17  had an au pair --
18     A.   Uh-huh.
19     Q.   -- in 1994?
20          Have you had more than one?
21     A.   Yes.
22     Q.   Okay.  And when did you enter the
23  sponsorship side of the au pair business?
24     A.   I began as a local representative with
25  another agency.

Page 16

1      Q.   What agency was that?
2      A.   EuRaupair.
3      Q.   So you were a local representative of
4   EuRaupair's?
5      A.   Uh-huh.
6      Q.   Do you remember approximately what years
7   you were a local representative of EuRaupair's?
8      A.   Approximately, 1994 to '99, 2000.  I'm
9   not sure.
10     Q.   So what did you -- what were your primary
11  activities while you were a local representative?
12  Did you have -- I'm sorry, let me back up.
13          Did you have a specific title with
14  EuRaupair?
15     A.   I think it was counselor.
16     Q.   Counselor?
17     A.   Yeah, local counselor.  I'm not sure.  I
18  don't remember.
19     Q.   That's fine.  It was a ways ago.
20          What -- what were your primary
21  actions and activities while you were a local
22  counselor with EuRaupair?
23     A.   Interviewing families.
24     Q.   Uh-huh.
25     A.   Meeting with au pairs.  That's basically

Page 17

1   what I did.  Answering questions.
2      Q.   What -- what kind of interviews were
3   these with the families?  What did you talk about?
4   What would you ask them?  What would they ask you?
5   I just asked a lot of questions, so I'll start
6   broadly.
7           What -- what kind of interviews
8   did you have?
9      A.   Just the normal host family interview,
10  filling out a form.
11     Q.   Okay.  So this was a EuRaupair form that
12  you would fill --
13     A.   Uh-huh.
14     Q.   -- out on EuRaupair's behalf?
15     A.   Yes.
16     Q.   At their behest?
17     A.   Uh-huh.
18     Q.   Okay.  So for how long did you do that
19  with EuRaupair?
20     A.   I already answered that question.
21     Q.   Oh, you did.
22     A.   Yes.
23     Q.   You said until around 2000, you think?
24     A.   I think so.  I'm -- I'm not quite sure.
25     Q.   Okay.  That's fine.  So did you --

**Page 18**

1  what -- what happened after you worked for EuRaupair
2  as a -- a -- what did -- what did we call it, a
3  local counselor?
4      A.  Yes.
5          I made an application to start
6  USAuPair.
7      Q.  With the State, with the Department of
8  State?
9      A.  With the U.S. Department of State.
10     Q.  So what inspired you to start your own
11 company?
12     A.  I really believe in the program, and I
13 believe in cultural exchange, and that's the primary
14 reason.
15     Q.  So you were participating with EuRaupair,
16 and you decided to strike out on your own?
17     A.  Uh-huh.
18     Q.  So what -- do you remember approximately
19 what year it was that you applied for USAuPair to
20 become a sponsor agency?
21     A.  Yes, I can remember, because the
22 application went in right after 9/11.
23     Q.  So when -- when were you approved?
24     A.  In March of 2003.
25     Q.  Okay.  So it's a couple of years' long

**Page 19**

1  process for you to have been approved?
2      A.  Yes.
3      Q.  So when you were starting USAuPair --
4      A.  Uh-huh.
5      Q.  -- how did you know all of the rules of
6  the program?
7      A.  From experience.
8      Q.  Uh-huh.
9      A.  Reading the regulations.  State
10 Department advice.
11     Q.  Did you talk to anyone from your former
12 colleagues at EuRaupair, get advice on how to start
13 your own agency?
14     A.  No.  No.
15     Q.  You didn't?
16     A.  No.
17     Q.  Did talk to anyone from any other
18 agencies on --
19     A.  No.
20     Q.  So you started entirely from scratch?
21     A.  Yes.
22     Q.  And that's the case with all of your own
23 materials?  Everything that you had created, you
24 started from scratch?
25         MR. KELLY:  Object to form.

**Page 20**

1          You can answer.
2      A.  Since I was starting on my own, I
3  obviously reviewed what I could find on -- you know,
4  in materials, and I used that as a guide.
5      Q.  Do -- do you happen to recall what
6  materials you reviewed?
7      A.  No, I don't recall.
8      Q.  So back when you were a host family --
9  oh, I forgot to ask.  How many au pairs have you had
10 in your experience as a host mom -- as a host mom?
11     A.  I don't recall.  I -- I'd have to go back
12 and --
13     Q.  Do you --
14     A.  -- think about that.
15     Q.  Do you know approximately?
16     A.  Four, maybe five.  I -- I really can't
17 recall.
18     Q.  Okay.  Do you recall at that time what --
19 what you paid the au pairs who were working for you?
20     A.  No, I don't recall.
21     Q.  Okay.  Do you recall how you knew what to
22 pay the au pairs who were working for you?
23     A.  Do I recall?  Can you repeat that?
24     Q.  Of course.
25         Do you recall how you knew what to

**Page 21**

1  pay the au pairs who were working for you when you
2  were a host mother?
3      A.  That information was provided by the
4  agency.
5          MR. SCHWARTZ:  Can I get No. 28,
6  please.  Thank you.
7          I'm just handing a couple of
8  documents to the court reporter to mark.  Then we do
9  a little dance where she puts the thing on it, hands
10 it back, and we distribute them to look at.
11         (Exhibit No. 2 was marked.)
12         MR. SCHWARTZ:  Thank you.
13     Q.  So do you recognize this document?
14     A.  Yes.
15     Q.  So what is it?
16     A.  It's --
17     Q.  Oh, actually, I'm sorry.  I'm so sorry to
18 interrupt.
19         MR. SCHWARTZ:  For the benefit of the
20 people on the phone, we are looking at USA 00868.
21     Q.  I apologize.  Please.
22     A.  It's the home page of our website, my
23 website, USAuPair's website.
24     Q.  And this is your current website?
25     A.  Correct.

PLAINTIFFS' RESP. APP.0005272

MAGNA
LEGAL SERVICES

**Page 22**

1    Q.   So you called it your website?
2    A.   Well --
3    Q.   Because you -- you said you're -- you're
4  basically a -- a one-man band?
5    A.   Yes.
6    Q.   You know, I was meaning to ask you, and
7  we will get back to it.  But I -- I want to talk
8  about who else works with you, even in a
9  non-full-time capacity.
10       So you're obviously at the top.
11  Who else is involved in your company?
12    A.   Well, I have legal counsel.
13    Q.   Uh-huh.
14    A.   I have -- I -- I contract with a
15  bookkeeping company.  It's vendors and contractors.
16    Q.   So what -- who are your vendors?
17    A.   Vendors?  Bookkeeping company and the
18  training company that does the training, IT, legal
19  counsel.  I'm trying to think who else I use.  A
20  vendor that we use for exams.
21    Q.   For exams?
22    A.   Yeah.
23    Q.   What kind of exams?
24    A.   English and psychometric.
25    Q.   So I'm handing you what is labeled -- and

**Page 23**

1  I'll ask you to hold on to the previous exhibit
2  now that's --
3    A.   Uh-huh.
4    Q.   -- labeled Exhibit 2.  I'm about to hand
5  you something labeled Exhibit 3.
6       (Exhibit No. 3 was marked.)
7    Q.   Is this an accurate organizational chart
8  of your --
9    A.   Yes.
10    Q.   -- company?
11    A.   Uh-huh.
12    Q.   Okay.  So you have, you said, legal,
13  bookkeeper, exams for your vendors and consultants?
14    A.   Right.
15    Q.   You mentioned a workshop instructor?
16    A.   Yes.
17    Q.   So what's a -- what is a workshop
18  instructor?
19    A.   The required workshop on child safety and
20  development.
21    Q.   Okay.  Required by whom?
22    A.   The State Department.
23    Q.   And so this is for a -- a workshop for
24  au pairs who are coming into the United States?
25    A.   Yes.

**Page 24**

1    Q.   And you arrange for an instructor to
2  instruct them on child safety?
3    A.   And development.
4    Q.   And -- excuse me, and development.
5    A.   Yes.
6    Q.   Do you prepare the materials that the
7  workshop instructor is going to use, or does the
8  work -- or do you hire a workshop instructor,
9  understanding that they will prepare their own
10  materials?
11    A.   They prepare their curriculum.
12    Q.   Okay.  But you know what's in the
13  curriculum; is that correct?
14    A.   Yes.
15    Q.   Because you have to make sure that the
16  curriculum is enough for the State Department
17  guidelines?
18    MR. KELLY:  Object to form.
19       You can answer.
20    A.   The curriculum must meet regulations.
21    Q.   Okay.  You have a last one here which is
22  medical insurance?
23    A.   Yes.
24    Q.   What -- what is that?  Well, I -- I know
25  what medical insurance is, but what does this vendor

**Page 25**

1  do?
2    A.   They're the carrier that provides the
3  medical insurance.
4    Q.   For whom?
5    A.   For the au pairs.
6    Q.   So do you purchase medical insurance on
7  behalf of the au pairs?
8    A.   No.  Yes and no.
9    Q.   What does that -- what does that mean?
10    A.   The premium for the medical insurance
11  comes out of program fees that the host family pays.
12    Q.   Okay.  So the host -- we'll get to host
13  families a little later.
14       So the host family pays you, you
15  called it pre -- a -- what did you call the fee?
16    A.   It's a premium.
17    Q.   The pre -- so the -- the host families
18  pay you a fee to be part of the program, right?
19    A.   Yes.
20    Q.   And out of that fee, some of that fee is
21  used to purchase medical insurance on behalf of the
22  au pairs?
23    A.   As required by regulation.
24    Q.   As required by regulation?
25    A.   Yes.

PLAINTIFFS' RESP. APP.0005273

**MAGNA** ▶
**LEGAL SERVICES**

| Page 26 | Page 28 |
|---|---|

**Page 26**

1    Q.   And you arrange for that purchase?
2    A.   Yes.
3    Q.   You work with the insurance company to
4  get the correct coverage for the au pairs?
5    A.   Yes.
6    Q.   So the money goes from the host families
7  to you, and then you to the insurance company?
8    A.   Yes.
9    Q.   And then coverage from the insurance
10  company to the au pairs, okay.  Yes?
11    A.   Yes.
12    Q.   Okay.  So now you have two -- two parts
13  of this chart, one of which says "Domestic
14  Representatives" and one of which says "Foreign
15  Representatives."  Is that right?
16    A.   Correct.
17    Q.   So let's start domestic.
18    A.   Yes.
19    Q.   Who are your domestic representatives?
20    A.   Those are the community representatives
21  that live within an hour's drive of where the
22  au pair resides with the host family.
23    Q.   So would these people be doing work that
24  is similar to what you did for EuRaupair?
25    A.   Similar, yes.

**Page 27**

1    Q.   How is it different?
2    A.   I wouldn't know.  I don't know what other
3  agencies are doing.
4    Q.   Fair enough.  But -- so this -- these are
5  the people who directly interface with host
6  families?
7    A.   Yes.
8    Q.   And with au pairs?
9    A.   Yes.
10    Q.   And who make sure that the -- everyone is
11  following the regulations?
12    A.   Yes.
13    Q.   They make sure that the au pair's not
14  working too many hours?
15    A.   Yes.
16    Q.   Make sure the au pair is getting paid?
17    A.   Yes.
18    Q.   And you have foreign representatives?
19    A.   Yes.
20    Q.   What are your foreign representatives?
21    A.   Foreign representatives recruit and vet
22  au pair applicants.
23    Q.   Okay.  So how do you -- start all the way
24  back.
25         How do you find foreign

**Page 28**

1  representatives?  Or I -- I should say how did you
2  find the current ones that you have?  How many do
3  you have now?
4    A.   I can't recall.  I -- honestly, I can't
5  recall.
6    Q.   Do you have any approximate knowledge of
7  the number?
8    A.   Maybe 20.
9    Q.   Okay.  And are they located mostly in one
10  country?  In many countries?
11    A.   In several different countries.
12    Q.   Any particular ones that you're focused
13  on?
14         MR. KELLY:  Object to form.
15         You can answer.
16         MR. SCHWARTZ:  I can rephrase.
17         MR. KELLY:  Yeah.
18    Q.   Are there any particular countries where
19  your foreign representatives are more concentrated?
20    A.   No.
21    Q.   No?
22    A.   No.
23    Q.   They're evenly distributed?
24    A.   Yes.
25    Q.   So what -- what countries -- what

**Page 29**

1  countries are they in, even as a for instance?  You
2  don't have to give all of them.
3    A.   Mexico, Bolivia, Argentina, Thailand,
4  Spain, France, Ukraine, Macedonia, UK, Germany.
5    Q.   That's a range.
6    A.   Yeah, it is.
7    Q.   So how do you work with the foreign
8  representatives?  Do you provide them materials that
9  they're distributing in those various countries?
10    A.   They are trained, and there's a contract.
11    Q.   Okay.  So let's start with the first
12  part.  You said they're trained?
13    A.   Uh-huh.
14    Q.   How do you train -- do you do the
15  training?
16    A.   Yes.
17    Q.   How do you train your foreign
18  representatives?
19    A.   In person.
20    Q.   So do you fly to all of these countries
21  to train your foreign representatives, or do they
22  come to you?
23    A.   Both.
24    Q.   Okay.  Do you have materials that you use
25  for the training of your foreign representatives?

PLAINTIFFS' RESP. APP.0005274

**MAGNA**
LEGAL SERVICES

Page 30

```
 1      A.   Yes.
 2      Q.   What are those materials?
 3      A.   A manual.
 4      Q.   Do you --
 5      A.   Training manual.
 6      Q.   For foreign representatives?
 7      A.   Yes.
 8      Q.   Do you happen to know if that's been
 9 produced to us in this case?
10      A.   I don't know.
11      Q.   Okay.  So what -- I -- I believe it has
12 not, so I might just ask you some questions
13 generally about what's in the manual, and then we'll
14 have discussion later about facilitating the
15 production of it.
16           But tell me, what -- what do you
17 primarily try to convey to your foreign
18 representatives?
19      A.   I convey the intent and purpose of the
20 program.
21      Q.   Okay.  Do you tell your foreign
22 representatives the details of how many hours an
23 au pair --
24      A.   Yes.
25      Q.   -- must work?
```

Page 31

```
 1      A.   Yes.
 2      Q.   So you -- you tell them that an au pair
 3 can work only how many hours per week?
 4           MR. KELLY:  Object to form.
 5      A.   I follow the regulations and what the
 6 regulations state.
 7      Q.   Okay.  So do you tell -- do you tell the
 8 foreign representatives what the -- what stipend
 9 au pairs are going to be paid?
10           MR. KELLY:  Object to form.
11      A.   I tell foreign representatives what the
12 State Department provided us.
13      Q.   So do you just provide them with the
14 State Department regulations?
15      A.   Yes.
16      Q.   And you -- you don't provide them with
17 any more detail or gloss on those regulations?
18      A.   The information states what the
19 regulations are.
20      Q.   And no more?
21      A.   I don't know what you're trying to -- I
22 don't -- I don't understand what you're trying to
23 get at.
24      Q.   So you said that you provide them with
25 the State Department regulations?
```

Page 32

```
 1      A.   Yes.
 2      Q.   So the -- as I understand it, the State
 3 Department regulations, there's a -- a statute,
 4 right?
 5      A.   Yes.
 6      Q.   But you just testified you have a manual?
 7      A.   Yes.
 8      Q.   That's going to be thicker than the
 9 statute?
10      A.   Yes.
11      Q.   Okay.
12      A.   Well, maybe.  I don't know.
13      Q.   Fair enough.
14           So you're not -- you're -- you're
15 not merely passing the State Department statute on
16 to them, right?
17      A.   I'm not handing them the federal
18 register, no.
19      Q.   Right.  So when you say you're conveying
20 the State Department regulations, I'm trying to
21 understand what exactly you mean by that.
22      A.   I don't convey.
23      Q.   Uh-huh.
24      A.   I copy and paste the regulations in a --
25 in an easier-to-read format in the training manual.
```

Page 33

```
 1      Q.   Okay.  So are you talking about the State
 2 Department regulations or a State Department
 3 bulletin when you describe what you're passing on to
 4 these people?
 5      A.   It's the guidelines that we receive from
 6 the State Department.
 7      Q.   Uh-huh.
 8      A.   And it's the regulations.
 9      Q.   So when you say "regulations," are you
10 talking about what's in the Code of Federal
11 Regulation 62., I think, 31?
12      A.   Yes, plus the guidelines.
13      Q.   Plus the guidelines?
14      A.   Plus the guidelines.
15      Q.   Okay.  And do you en -- how do you ensure
16 that these foreign representatives are accurately
17 describing the program and the regulations to the
18 au pairs that they are soliciting?
19      A.   By the contract and the -- the documents
20 that the au pairs review with them.
21      Q.   Okay.  Do you know what -- you -- you
22 said there was a contract that the au pairs review
23 with them, and then there are documents that the
24 au pairs review with them?
25      A.   Uh-huh.
```

PLAINTIFFS' RESP. APP.0005275

MAGNA
LEGAL SERVICES

---

Page 34

1    Q.   So let's talk about the second one first.
2  What are the documents that the au pair reviews with
3  these foreign representatives?
4    A.   It's the application and the Code of
5  Conduct.
6    Q.   Okay.  Anything else?
7    A.   It's the pre-departure orientation.
8    Q.   Okay.
9    A.   And they're instructed to take the
10 information from our website as it is and put it on
11 their website.
12   Q.   So when you say they are instructed, I
13 want to make sure we understand who "they" are.
14   A.   The foreign representatives.
15   Q.   So the foreign representatives are
16 instructed by you --
17   A.   Uh-huh.
18   Q.   -- to take the information from your
19 website --
20   A.   Uh-huh.
21   Q.   As it is on your website, and put it on
22 their websites?
23   A.   Uh-huh.
24   Q.   For instance, if it's in Ukraine, their
25 website might be in Ukrainian?

---

Page 35

1    A.   Correct.
2    Q.   And it would have information that you
3  had instructed them to put on their website?
4    A.   (Nodding head.)
5    Q.   Okay.  So turning back to the -- I think,
6  I believe it's Exhibit 2, which I already gave to
7  you.
8    A.   This one (indicating)?
9    Q.   Yes, ma'am.  That's right.
10        So this, you testified, was -- is
11 your -- your website?
12   A.   Yeah.
13   Q.   What was that?
14   A.   It's not mobile friendly.
15   Q.   No?  What about iPads, is it friendly on
16 iPads?
17   A.   I -- I think so.
18   Q.   It looks like it would be friendly on an
19 iPad.
20        So taking you to the second page,
21 this is Bates stamped USA 00869.  Do you see where
22 it says, "Be an Au Pair"?
23   A.   Yes.
24   Q.   Now, there's a -- a set of bullets here.
25   A.   Yes.

---

Page 36

1    Q.   So you -- you -- you testified that you
2  instruct your foreign representatives to take
3  information from your website.  Would it be this
4  sort of information --
5    A.   Yes.
6    Q.   -- that you're instructing them?  Okay.
7    A.   Yes.
8    Q.   And looking at the bullet four from the
9  bottom, it says, "Receive 195.75 USD each week."
10   A.   Correct.
11   Q.   Okay.  So you instruct the foreign
12 representatives to tell people that they will
13 receive $195.75 a week?
14   A.   I tell them to mirror this.
15   Q.   Okay.  And this states that an au pair
16 will receive 195.75 a week, right?
17   A.   Correct.
18   Q.   Okay.  Thank you.
19        So you mentioned also that one of
20 the documents that you share with the foreign
21 representatives and you ask them to go over with the
22 would-be prospective au pairs is something called
23 the Code of Conduct?
24   A.   Correct.
25   Q.   Could you tell me a little bit about what

---

Page 37

1  that Code of Conduct is?
2    A.   It's kind -- it would be like any
3  corporate Code of Conduct and expectations.  It just
4  goes through a series of instances, you know, of
5  facts or statements for the au pair.
6    Q.   Facts or statements?
7    A.   Yeah, for the au pair, that they agree or
8  they understand.
9    Q.   And these are USAuPair's expectations of
10 them in the program?
11        MR. KELLY:  Object to form.
12        You can answer.
13   A.   Part is -- part of it is understanding
14 some of the regulations, and part of it is policy.
15   Q.   Policy?
16   A.   Yeah.
17   Q.   Your policy?
18   A.   USAuPair's policy, yeah.
19   Q.   Thank you.  USAuPair's policy.
20        How did you develop your policy?
21   A.   Experience.
22   Q.   You know what makes for a better -- a
23 better au pair experience and a better host family
24 experience?  I can withdraw that question.
25        You say "experience."  So when --

PLAINTIFFS' RESP. APP.0005276

MAGNA ▶
LEGAL SERVICES

Page 38

1   you draw on your experience as a host mother?
2   A.   Partly, yes.
3   Q.   As an LC?
4   A.   As a community rep, yes.
5   Q.   Thank you.  Community rep.
6       Having run your agency, obviously,
7   now for --
8   A.   Yeah.
9   Q.   -- around 14 -- 14 years?  Did I do that
10  right?
11  A.   Yeah.  2003.  Uh-huh.
12  Q.   And drawing on all of that experience,
13  you've come up with a set of policies that au pairs
14  who are USAuPair au pairs should follow?
15  A.   Yes.
16       (Exhibit No. 4 and 5 were marked.)
17  Q.   So I'm going to hand you two exhibits at
18  once.  I hope that's okay.
19  A.   Okay.
20  Q.   And if we can all keep it --
21  A.   Okay.
22  Q.   Keep it together.
23       The first exhibit is Bates stamped
24  USA 467.
25  A.   Uh-huh.

Page 39

1   Q.   And the second exhibit is Bates stamped
2   USA 469.
3       So are these -- are these examples
4   of your Au Pair Code of Conduct?
5   A.   Yes.
6   Q.   Do you happen to -- I see that there's a
7   date on USA 469, which is the --
8   A.   Yes.
9   Q.   -- second one.
10  A.   Uh-huh.
11  Q.   It says "HFAM Reg 10/13"?
12  A.   Yes.
13  Q.   What does "HFAM Reg" stand for?  I think
14  I can guess, but I'll ask you to tell us.
15  A.   It's how we have to update, and so we
16  identified -- somebody talks to me about a document
17  or form, we put that on there so that they can go
18  down and identify the form without trying to
19  describe what it is.
20  Q.   So if somebody's talking to you about it,
21  who -- who would that somebody be?
22  A.   A foreign representative.
23  Q.   I see.
24  A.   And English is a second language and they
25  may not use terminology, so this was added.

Page 40

1   Q.   They may not use terminology that?
2   A.   They may not use the proper terminology.
3   They may -- and forms can get confusing.
4   Q.   Okay.  So when you're talking to a
5   foreign representative, you may say "HFAM Reg 10/13"
6   as a way to identify --
7   A.   Which one they're looking at.
8   Q.   Okay.  Thank you.
9       So I want to go through a few of
10  these, but the first question I have is where did
11  you get the idea for an Au Pair Code of Conduct?
12  A.   Well, in the corporate world,
13  corporations have a Code of Conduct.
14  Q.   Uh-huh.
15  A.   So I put that in here.  And it's
16  basically for the safety and well-being of the
17  program participants.  That's why it's here.
18  Q.   So for the safety and well-being of an
19  au pair?
20  A.   Yes.
21  Q.   For the safety and well-being of a host
22  family?
23  A.   And the children.
24  Q.   And safety and well-being of the
25  children?

Page 41

1   A.   Correct.
2   Q.   And you got it from the -- you -- you
3   were inspired by what corporations do to instruct
4   how everybody within the corporation should act,
5   right?
6       MR. KELLY:  Object to form.
7   A.   I wouldn't -- I -- I don't know how to
8   answer that.  I -- I don't know how to -- can you
9   rephrase?  I don't know what you're asking.
10  Q.   I'm just trying to understand your --
11  your -- your -- your inspiration for this.  And as
12  you said, you -- you were inspired by the -- the
13  corporate world, right?
14  A.   In the corporate world where I worked,
15  there was an established Code of Conduct.
16  Q.   Uh-huh.
17  A.   That was an expectation of how people
18  were to sort of reflect the values of the company
19  and -- and so forth.  I don't know.  I -- I don't
20  know what -- I don't know how to answer it.
21  Q.   I think that's a -- that's an answer, so
22  thank you.
23       So the first -- the first part --
24  A.   Uh-huh.
25  Q.   -- of the Au Pair Code of Conduct -- and

**MAGNA**
LEGAL SERVICES

Page 42

1    I will note -- and please do correct me if I'm
2    wrong. I believe it's the same on both of -- both
3    469 and 467.
4        A.   Uh-huh.
5        Q.   Is, "You agree to be diligent,
6    responsible, and involved in the care of your host
7    family's children. You have a great responsibility
8    and must keep children safe. Failure to attend to
9    your host family's children results in immediate
10   repatriation at your expense."
11            Did I read that right?
12       A.   Correct. Uh-huh.
13       Q.   How does that immediate repatriation
14   work?
15       A.   It follows the regulatory guidelines that
16   we have from the Department of State.
17       Q.   Uh-huh.
18       A.   Uh-huh.
19       Q.   So just getting kind of down to brass
20   tacks here.
21            Do you -- you -- you monitor how
22   an au pair is looking after a host family's children
23   or child?
24       A.   It's monitored. I don't personally
25   monitor it.

Page 43

1        Q.   Sure.
2        A.   But it's -- it's --
3        Q.   Who's it monitored by?
4        A.   The local representative.
5        Q.   USAuPair's local representative?
6        A.   Yes. Uh-huh.
7        Q.   And should that local representative
8    determine that the host family's children aren't
9    being attended to, what -- what happens then?
10       A.   There's a grievance process. There's an
11   investigation. There's an evaluation. It's a
12   case-by-case basis.
13       Q.   And who does that evaluating?
14       A.   Part of it is done by the local
15   representative and part of it is done by me.
16       Q.   So what are you looking for when you're
17   looking at one of those evaluations?
18       A.   I'm looking at the well-being of the
19   au pair, safety of the au pair. I'm looking at the
20   well-being and the safety of the children in the
21   au pair's care. And I'm looking at, you know,
22   how -- how the au pair can succeed.
23       Q.   And --
24       A.   And it's just an evaluation, an
25   investigation. It's a case-by-case basis.

Page 44

1        Q.   And should you determine that after this
2    evaluation and investigation, is it -- you make --
3    you will make the determination whether the au pair
4    is suitable for the program or not; is that correct?
5            MR. KELLY: Object to form.
6        Q.   You can answer.
7        A.   I don't make the determination always. I
8    don't.
9        Q.   Who --
10       A.   It's the regulations that determine what
11   happens.
12       Q.   So I want to back up just a little.
13            You said that there's an
14   evaluation process, correct?
15       A.   Correct.
16       Q.   And the LC's -- or, I'm sorry, local --
17   did I say that right, LC?
18       A.   Yeah.
19       Q.   The LC's involved, of course. Sometimes
20   you're involved personally?
21       A.   Uh-huh.
22       Q.   If -- you, meaning USAuPair or meaning
23   you Ms. Young --
24       A.   Yeah.
25       Q.   -- make -- if you determine that the

Page 45

1    au pair just isn't right for this program -- well,
2    first, can you make that determination?
3        A.   As the sponsor for the State Department.
4        Q.   Uh-huh.
5        A.   For this program, it is my -- it is a
6    sponsor's obligation to monitor and supervise
7    program participants --
8        Q.   Uh-huh.
9        A.   -- and for their safety and welfare and
10   well-being, and that is what is taken into
11   consideration.
12            We work very hard. I mean, I work
13   very hard to ensure the program participants are
14   successful in this program. It's a cultural
15   exchange program.
16       Q.   But -- but sometimes it must happen,
17   right, that sometimes somebody is not successful?
18       A.   Yes, it does happen.
19       Q.   And -- and sometimes you will determine
20   that somebody is just not the right fit, right?
21       A.   It's not about the right fit.
22       Q.   Okay. Okay. But you may determine that
23   for whatever reason they should not continue in the
24   program, right?
25       A.   It would -- how do I say this? Sometimes

PLAINTIFFS' RESP. APP.0005278

MAGNA
LEGAL SERVICES

Page 46

1    we involve the State Department in that decision.
2        Q.   Uh-huh.  But sometimes you will just make
3    that decision?
4        A.   Based on experience, yes, past
5    experience.
6        Q.   And so that decision would mean that
7    you're deciding whether somebody should go home or
8    stay and continue in the -- in the program, right?
9        A.   Our goal is to have the au -- the program
10   participants understand whether they are suitable
11   for the program.
12       Q.   But if --
13       A.   And -- and if there is a situation and
14   it's grievous enough, then, yes, a decision needs to
15   be made.  I mean, that's our responsibility --
16       Q.   So you --
17       A.   -- as a sponsor of the program.
18       Q.   It's your responsibility to make that
19   decision sometimes?
20       A.   As a sponsor of the program, yes.
21       Q.   Okay.  Thank you.
22            So I want to point you to No. 6,
23   and I believe it is the same No. 6 --
24       A.   Yeah.
25       Q.   -- in both?

Page 47

1        A.   Yes.
2        Q.   And you say, "You agree to be respectful,
3    maintain a positive attitude, and" --
4        A.   Uh-huh.
5        Q.   -- "participate in your host family's
6    life, joining in family meals, holidays, social
7    events, recreational activities, and family
8    outings."
9            And if I can point out -- did I
10   read that right?
11       A.   Yes.  Uh-huh.
12       Q.   If I can point out No. 7.  "You agree to
13   keep your room neat and clean, setting an example
14   for the children in your care."
15       A.   Uh-huh.
16       Q.   I read that correctly?
17       A.   Correct.
18       Q.   So these are not State Department
19   regulations, right?
20       A.   No.
21       Q.   These are your --
22       A.   Those are policies.
23       Q.   Those are your policies?
24       A.   Yes.
25       Q.   They make for a better program for

Page 48

1    everybody --
2        A.   I --
3        Q.   -- if they follow those policies?
4        A.   I believe so.
5        Q.   Okay.  So if I go down to No. 12.
6        A.   Uh-huh.
7        Q.   And I believe this is the same on both.
8        A.   Uh-huh.
9        Q.   No. 12 says, "You agree you will not ask
10   your host family for permission to invite your
11   family and friends to visit or stay with your host
12   family."
13            Did I read that correctly?
14       A.   You did.
15       Q.   Is that a State Department regulation?
16       A.   No.
17       Q.   So that's your --
18       A.   It's a policy.
19       Q.   It's your policy?
20       A.   Uh-huh.
21       Q.   Why'd you develop that policy?
22       A.   From experience.
23       Q.   Can you elaborate a little on that?
24       A.   I don't know how to elaborate.  It's
25   that's it -- it is what it says, just...

Page 49

1        Q.   Okay.  So you said -- what I mean, you
2    know, is it's a --
3        A.   It's a policy --
4        Q.   -- tough question.
5        A.   -- and that's what it means.
6        Q.   Well, what I wanted to ask, and I could
7    have framed it much more clearly for you, was when
8    you said -- you -- you said that -- I -- I asked how
9    you developed that policy, and you said "from
10   experience."
11       A.   Uh-huh.
12       Q.   And so I'm just trying to understand
13   what -- what kind of experience did you have that
14   led you to develop that policy?  Does that make
15   sense?
16       A.   Just past experience when events like
17   this occurred and it did not turn out well.
18       Q.   Uh-huh.  Why wouldn't it turn out well?
19       A.   The -- it puts a host family on the spot.
20   They don't -- it -- it just puts them on the spot.
21   It creates an awkward situation.
22       Q.   And you're trying to prevent awkwardness
23   between the --
24       A.   The objective of the program is that
25   there -- every participant has success in the

**MAGNA** ▶
LEGAL SERVICES

Page 50

1  program, and there are guidelines that help that.
2      Q.  So when that --
3      A.  And those are based on experience.
4      Q.  So is that the same as No. 13, which
5  says, "You agree you will not smoke during your
6  program year"?
7      A.  Correct.
8      Q.  So that's not a State Department
9  guideline, of course?
10     A.  No.
11     Q.  And that's based on your own -- your own
12  policy?
13     A.  Correct.
14     Q.  Okay.  Thank you.
15         So I want to back way up in our
16  conversation, if that's okay with you.
17         MR. KELLY:  No conversation being
18  had.
19         MR. SCHWARTZ:  Excuse me, Counsel.
20     Q.  So it -- it's 2003, and you've set up
21  your company.
22     A.  Uh-huh.
23     Q.  How many host families did you have your
24  first year?
25     A.  Nine.

Page 51

1      Q.  Nine.  How did you go about recruiting
2  those nine host families?
3      A.  It -- they were referred.
4      Q.  Do you remember by whom?
5      A.  I guess some of the host families had
6  known or had worked with me --
7      Q.  Uh-huh.
8      A.  -- when I worked with another agency, and
9  some of them were just referred.
10     Q.  I see.  So how do you go about recruiting
11  host families now?
12     A.  They're either referred to us by current
13  host families, they find us on our website, or
14  through the U.S. Department of State.
15     Q.  So you've got referrals from current host
16  families, and then you've got your website?
17     A.  Uh-huh.
18     Q.  So that's a -- a primary driver of
19  advertising for you.  Could I -- is that correct?
20     A.  Yeah.  I don't -- I don't do advertising.
21  It just sits there.
22     Q.  Fair enough.  Fair enough.
23         And then the third one was, you
24  said, through the State Department?
25     A.  Yes, through the listing of sponsors on

Page 52

1  the State Department website.  And there is a
2  Facebook page.
3      Q.  Okay.  Do you happen to know if you've
4  produced the Facebook page to us, or previous
5  versions of it?
6      A.  I don't recall.
7         MR. KELLY:  I -- I believe not, but I
8  will agree to do so.  It's simply a question of
9  printing.
10        MR. SCHWARTZ:  Fair enough.  Thank
11  you.
12        MR. KELLY:  I will note for you that
13  it is not locked for access.
14        MR. SCHWARTZ:  Okay.
15        MR. KELLY:  So it's available to see,
16  equally available to you and me.  But I am happy to
17  produce and Bates it.
18        MR. SCHWARTZ:  Okay.  Thank you.
19     Q.  So when you are thinking about trying to
20  recruit host families, what's your primary
21  competition for host families?
22     A.  Can you define "competition"?
23     Q.  How do you think "competition" should be
24  defined?
25     A.  The cultural exchange organizations.

Page 53

1      Q.  Okay.  So do you see that the host
2  family -- or excuse me.  Let me back up.
3         Is it a selling point that you're
4  trying to get people who want childcare?
5      A.  It's a component of the program.
6      Q.  Okay.  Is it -- is it a selling point for
7  you that the cost to a host family is the same
8  whether they need infant care or more adolescent
9  care, for instance?
10     A.  Can you ask me that again?  Is it --
11     Q.  Sure.
12         I said is it a selling point for
13  you to host families --
14     A.  Uh-huh.
15     Q.  -- that the cost to a host family is the
16  same whether they require infant care or care for
17  their teen-ager, or some other form of childcare?
18        MR. KELLY:  Object to the form.
19         You can answer.
20     A.  The -- the fees are on the website.
21  That's -- that's the cost.
22     Q.  Uh-huh.
23     A.  It's on the website.
24        THE WITNESS:  I didn't know I had
25  that many documents.

MAGNA
LEGAL SERVICES

Page 54

1        MR. KELLY:  Excuse me?
2        THE WITNESS:  I didn't know I had
3  this much stuff for a little tiny organization like
4  mine.
5        MR. SCHWARTZ:  It's amazing how paper
6  can add up, isn't it?
7        THE WITNESS:  Oh, I like your socks.
8        MR. SCHWARTZ:  Oh, thank you.
9        MR. KELLY:  That's on the record.
10        (Exhibit No. 6 was marked.)
11   Q.   So I'm handing you something that is now
12  marked as Exhibit 6.
13        MR. SCHWARTZ:  Counselor, I can --
14        MR. KELLY:  Thank you.
15        MR. SCHWARTZ:  For the people
16  listening, this is Bates stamped USA 00877.
17   Q.   So I have a few questions about this
18  document.
19   A.   Yeah.
20   Q.   The first is do you recognize it?
21   A.   Yes.
22   Q.   What is it?
23   A.   It's a questionnaire on the USAuPair
24  website.
25   Q.   And what is this "10 Easy Questions"?

Page 55

1   A.   It's 10 easy questions for au pairs to
2  answer whether they qualify for our program.
3   Q.   Okay.  So if an au pair answers that they
4  do not have six months' driving experience, do they
5  qual -- if they say no to that --
6   A.   Then --
7   Q.   -- do they qualify?
8   A.   Not for our program.
9   Q.   Okay.  And is that from the State
10  Department or is that an USAuPair policy?
11   A.   USAuPair policy.
12   Q.   Okay.  The question about smoking.
13  Similarly, if they say that they smoke?
14   A.   USAuPair policy.
15   Q.   What is, that they --
16   A.   That if they -- if they smoke, then we
17  don't accept them.
18   Q.   Okay.  So turning to the part that's
19  Bates stamped 882.
20   A.   Okay.
21   Q.   Now, who -- who would you say this page
22  is meant for?
23        MR. KELLY:  Object to form.
24        You can answer.
25   A.   This could be for the host family and it

Page 56

1  could be for the au pair.
2        THE WITNESS:  I just lost my
3  microphone.
4        Is that good?
5        THE VIDEOGRAPHER:  It's good.
6        THE WITNESS:  Okay.
7   Q.   So underneath the word "Programs."
8   A.   Yes.
9   Q.   Do you see starting with the word
10  "USAuPair"?
11   A.   Yes.
12   Q.   All right.  It says, "USAuPair au pair
13  programs are simple, easy to understand, and
14  affordable."
15   A.   Uh-huh.
16   Q.   Is that a message meant for a prospective
17  host family?
18   A.   It could also be for -- it's for program
19  participants.
20   Q.   Okay.  "Program support, fees, and
21  au pair wages remain the same, even if your family
22  needs an au pair with infant care experience or an
23  au pair who can help with homework."
24        Did I read that right?
25   A.   Yeah.  Yes.  Uh-huh.

Page 57

1   Q.   So is it fair to say that a selling point
2  to host families is the flexibility of this
3  childcare?
4   A.   Yes, but it's a cultural exchange
5  program.
6   Q.   Sure.  But -- can I take you over to the
7  part that says, "In-Home Care With Flexibility," on
8  the right.
9   A.   Correct.
10   Q.   And it says, "The au pair program is a
11  wonderful childcare alternative."
12   A.   Uh-huh.
13   Q.   "Au pairs live in your home and provide
14  personal care in exchange for room, board, and a
15  small weekly wage."
16   A.   Uh-huh.
17   Q.   "They may provide up to 10 hours of
18  childcare daily, not to exceed 45 hours per week."
19   A.   Uh-huh.
20   Q.   "Schedules may be reasonably flexible
21  within these guidelines."
22   A.   Uh-huh.
23   Q.   "Music or dance lessons, martial arts,
24  soccer and other activities are more accessible when
25  au pairs are available to drive children while

PLAINTIFFS' RESP. APP.0005281

MAGNA ▶
LEGAL SERVICES

| Page 58 | Page 60 |
|---|---|

**Page 58**

1 parents work."
2 Did I read all of that correctly?
3 A. You did.
4 Q. So when you described this as a
5 childcare --
6 A. Uh-huh.
7 Q. -- alternative, what are the alternatives
8 that you were thinking of?
9 A. It could be anything.
10 Q. Such as?
11 A. It's -- it -- it -- it could be anything.
12 Q. Such as -- such as having a nanny or a
13 daycare center?
14 A. Or a relative living with you.
15 Q. But any of those --
16 A. Of course.
17 Q. -- could be what you're thinking of,
18 right?
19 A. Yes. Uh-huh.
20 Q. Any other forms of the way people take
21 care of children, right?
22 MR. KELLY: Object to form.
23 A. Any way that a person would live in your
24 home.
25 Q. So you see it as in-home childcare --

**Page 59**

1 MR. KELLY: Object to form.
2 Q. -- as the alternative?
3 MR. KELLY: Object to form.
4 A. I -- I see it as a cultural exchange
5 program, where the participant is living with an
6 American family.
7 Q. So that -- that wasn't -- I guess that
8 wasn't quite my question.
9 So you said -- you described this
10 as the au pair program is a wonderful childcare
11 alternative. And I'm just trying to understand,
12 it's alternative to what?
13 MR. KELLY: Asked and answered.
14 A. I've answered that question.
15 Q. Okay.
16 MR. SCHWARTZ: If I could read the
17 record back, please, starting with "any other
18 forms."
19 (Record read as follows:
20 "Q: Any other forms of the way
21 people take care of children,
22 right?
23 MR. KELLY: Object to form.
24 A: Any way that a person would
25 live in your home.")

**Page 60**

1 MR. SCHWARTZ: Okay. Thank you. And
2 could you, actually --
3 MR. KELLY: Yeah.
4 MR. SCHWARTZ: -- read back a little
5 bit farther up.
6 MR. KELLY: Yeah.
7 MR. SCHWARTZ: I -- I -- I can't
8 scroll up, so...
9 (Record read as follows:
10 "Q: So when you described this
11 as a childcare --
12 A: Uh-huh.
13 Q: -- alternative, what are the
14 alternatives that you were
15 thinking of?
16 A: It could be anything.
17 Q: Such as?
18 A: It's -- it -- it -- it could
19 be anything.
20 Q: Such as -- such as having a
21 nanny or a daycare center?
22 A: Or a relative living with
23 you.")
24 Q. So I asked, "Such as having a nanny or a
25 daycare center," and you said, "Or a relative living

**Page 61**

1 with you." Is that correct?
2 MR. KELLY: And continue. You said,
3 "It can include all those things?"
4 MR. SCHWARTZ: Yeah.
5 MR. KELLY: And she said, "Yes."
6 MR. SCHWARTZ: And she said -- yeah,
7 I said, "It could include all those things," and she
8 said, "Yes."
9 MR. KELLY: So that's why I'm saying
10 asked and answered.
11 MR. SCHWARTZ: All right. Fair
12 enough, Counsel.
13 MR. KELLY: Are you okay? Do you
14 want to take a break? We're an hour and 15 in.
15 THE WITNESS: No, I'm okay. I
16 thought I was going to -- sorry. But I'm okay.
17 MR. KELLY: Okay.
18 (Exhibit No. 7 was marked.)
19 Q. So I'm handing you a document marked
20 Exhibit 7.
21 A. Uh-huh.
22 Q. It is Bates stamped USA 266.
23 MR. KELLY: I got two.
24 MR. SCHWARTZ: Oh. Oh, you got -- do
25 you want both?

16 (Pages 58 to 61)

PLAINTIFFS' RESP. APP.0005282

MAGNA
LEGAL SERVICES

Page 62

1       MR. KELLY:  No.
2       MR. SCHWARTZ:  There you go.
3    Q.   Do you recognize this document?
4    A.   Yes.
5    Q.   What is it?
6    A.   It's the Host Family Agreement.
7    Q.   So at what point in the process do you
8  present this document to a host family?  And by "the
9  process," I mean the recruitment of host families
10  into the au pair program.
11    A.   This is presented and reviewed with them
12  at the time of the host family interview.
13    Q.   Okay.  So let's -- let's back up.
14       What is a host family interview,
15  specifically?
16    A.   It's where the representative visits the
17  host family home.
18    Q.   Okay.  And what does a representative
19  look for in that interview?
20    A.   Program suitability.
21    Q.   What is -- what is program suitability?
22    A.   Program suitability.
23    Q.   How can you --
24    A.   That it --
25    Q.   Please.

Page 63

1    A.   That it meets the regulatory guidelines,
2  the family.
3    Q.   So what specifically are you looking for,
4  or "you" being --
5    A.   Sometimes it's me.
6    A.   Sometimes it's you.
7    A.   Sometimes it's me.
8    Q.   What are you looking for when you're
9  looking for somebody's program suitability?
10    A.   The living environment.
11    Q.   What about the living environment?
12    A.   That the au pair has a private room and
13  that there's a lock on the door.  It's suitably
14  furnished.
15    Q.   Uh-huh.
16    A.   That the household environment is a
17  suitable living environment.
18    Q.   And what -- what does that mean?  What
19  does "a suitable living environment" mean?
20    A.   Possibly where -- where I would feel
21  uncomfortable if my own daughter or son were to go
22  someplace and live.  You know, this is somebody's
23  son or daughter coming to live in in somebody else's
24  home.
25    Q.   And so you -- it is your job to make sure

Page 64

1  that home is suitable, and that's --
2    A.   And --
3    Q.   Sorry.
4    A.   And that -- yes, that the environment is
5  suitable and meets the regulatory guidelines.
6    Q.   Okay.  Now, is the host family interview
7  distinct from the host family orientation?
8    A.   Correct.
9    Q.   Okay.  So we'll talk about the host
10  family -- why don't we talk about it now.
11       What is the host family
12  orientation?
13    A.   That's an orientation that is done with
14  the host family within two weeks of arrival of the
15  au pair to the U.S.
16    Q.   So that's with the host family, with the
17  au pair --
18    A.   No, just the host.
19    Q.   Oh, just the host family?
20    A.   Just the host family.
21    Q.   So it's just --
22    A.   At that point.
23    Q.   -- one on one with the host family?
24    A.   Uh-huh.
25       (Exhibit No. 8 was marked.)

Page 65

1    Q.   So I'm handing over Exhibit No. 8.  It's
2  marked USA 9.
3       So this is the Host -- it -- this
4  is called a Host Family Orientation Checklist?
5    A.   Correct.
6    Q.   And this is what is used during that
7  orientation you just described?
8    A.   Yes.
9    Q.   And so that's two days in?  I'm sorry,
10  two weeks in, you said, at least?  Or let me back
11  up.
12       Two weeks after the au pair's
13  arrival --
14    A.   No.
15    Q.   -- you have this?
16       Oh, when is this done?
17    A.   This is done prior to the au pair's
18  arrival.
19    Q.   Okay.  So the host family orientation is
20  prior to the -- the au pair's arrival?
21    A.   Correct.
22    Q.   Okay.  Thank you.  I -- I must have
23  misunderstood you earlier.
24       So you're -- you're -- this
25  goes -- is it fair to say this goes somewhat into

PLAINTIFFS' RESP. APP.0005283

MAGNA
LEGAL SERVICES

**Page 66**

1   the nitty-gritty of hosting an au pair?
2        MR. KELLY:  Object to form.
3        A.   It's a reminder and review.
4        Q.   Okay.  And reminder and review of what?
5        A.   The regulations and USAuPair policies.
6        Q.   Okay.  So you give advice on using a car
7   in this document?  I'm looking specifically on
8   page 10.  Or it's the second page, but it's Bates
9   marked page 10.
10       A.   Okay.
11       Q.   It says "Driving"?
12       A.   Yes.  Uh-huh.  Okay.
13       Q.   You feel --
14       A.   This is what it says.
15       Q.   Yeah.
16       A.   Uh-huh.
17       Q.   This is it says, "Driving."  Thank you.
18            So it says, "If the au pair is
19   driving your children, it is important to know the
20   rules of the road in your state.  This will reduce
21   the risk of auto accidents."
22            And you also say, "All au pairs
23   must obtain a" -- "a local driver's license."
24            That's a USAuPair policy?
25       A.   Yes.

**Page 67**

1        Q.   Not a State Department policy?
2        A.   It's not a regulation.
3        Q.   Thank you.  It's not a regulation.
4            Similarly, to the section marked
5   "Food."  You go into, "Inform the au pair which
6   foods may be eaten during the day when you are not
7   there."
8        A.   It's just advice.
9        Q.   It's advice.  You give, I -- I believe
10  you give advice on how to avoid culture shock?
11       A.   We try.
12       Q.   You try?
13       A.   Uh-huh.
14       Q.   Can't always be avoided, right?
15       A.   Can't always, but everyone's different.
16       Q.   You give advice on how to spot home
17  sickness?
18       A.   We try.
19       Q.   You give advice on all of this.  You --
20  you also say -- you give advice on paying the
21  au pair, right?
22       A.   Yes.
23       Q.   I'm -- I'm on page 11 at the very bottom.
24       A.   Yes.
25       Q.   "Weekly Pay."

**Page 68**

1        A.   Uh-huh.
2        Q.   "Make sure your au" -- "you" -- "you pay
3   your au pair on time each week.  Do not place your
4   au pair in a position of having to ask you for the
5   weekly wage.  This would be very uncomfortable for
6   anyone, let alone an au pair living in your home."
7        A.   Uh-huh.
8        Q.   "Pay must be weekly, not monthly and not
9   bimonthly."
10       A.   Uh-huh.
11       Q.   "Bank Account - your au pair arrives with
12  an opened bank account.  USAuPair offers this as a
13  courtesy to busy families.  Families are encouraged
14  to set up automatic transfers to their au pair's
15  newly opened bank account."
16            Did I read all that right?
17       A.   Yes.
18       Q.   Why do you open a bank account for the --
19  on -- on behalf of the au pairs?
20       A.   It's a courtesy that we assist both the
21  au pairs and the host families.
22       Q.   Okay.  Have you always done that, since
23  the beginning of the program?
24       A.   No.
25       Q.   When did you start?

**Page 69**

1        A.   I don't -- don't recall.
2        Q.   Do you have an estimate?
3        A.   No.
4        Q.   That's okay if you don't.
5        A.   I don't recall.
6        Q.   So there was some point where you didn't
7   do that, and then some point you started to because?
8        A.   It was just easier for us to help the
9   au pairs through that process.
10       Q.   Uh-huh.
11       A.   And also a service for the host families.
12       Q.   So turning back to the Host Family
13  Agreement.
14       A.   Uh-huh.
15       Q.   This is Bates stamped USA 266 to 267.  So
16  I have a -- a few questions for you.
17       A.   Okay.  Surprise, surprise, surprise.
18       Q.   Surprise, surprise, right?  It's what we
19  do.  Don't worry, I'm not going to ask you to read
20  the entire thing for the record.  That would -- that
21  would take a little while.
22            So if I can point you to No. 6.
23       A.   No. 6.  Okay.
24       Q.   It's the bottom of the page.
25       A.   Yes.

PLAINTIFFS' RESP. APP.0005284

MAGNA
LEGAL SERVICES

| Page 70 | Page 72 |
|---|---|

**Page 70**

1    Q.   It says, "USAuPair has published a code
2  of minimum standards of conduct for au pairs
3  participating in the program."
4    A.   Uh-huh.
5    Q.   "And each au pair is required to sign the
6  Code of Conduct" --
7    A.   Uh-huh.
8    Q.   -- "agreement.  Host family must support
9  its au pair's compliance with the Code of Conduct
10 and with all regulations."
11   A.   Uh-huh.
12   Q.   "The Code of Conduct may be amended from
13 time to time in USAuPair's sole discretion."
14        That's enough, I think, for now.
15   A.   Uh-huh.
16   Q.   So did I read all that correctly?
17   A.   Yes.
18        THE VIDEOGRAPHER:  Real quick, you're
19 kind of --
20        THE WITNESS:  Yes.
21        THE VIDEOGRAPHER:  -- hitting the --
22        THE WITNESS:  Oh, I'm sorry.  Yes.
23        MR. SCHWARTZ:  Are you speaking to me
24 or to the --
25        THE WITNESS:  No.

**Page 71**

1         MR. SCHWARTZ:  -- the witness?
2         THE WITNESS:  Me.  I have my hand
3  over this (indicating).
4         MR. SCHWARTZ:  Oh, okay.
5    Q.   What does it mean for a host family to
6  support compliance with the Code of Conduct?
7    A.   It's -- it's just asking host -- it -- it
8  is -- it is just saying what it says.  It's, you
9  know, we're asking the families to support that and
10 support the au pairs with that.
11   Q.   Have you used a ver -- a version of this
12 Host Family Agreement since the beginning of your
13 time as a -- as a sponsor agency?
14   A.   This Host Family Agreement?
15   Q.   Uh-huh.
16   A.   Sometimes it's amended slightly.
17   Q.   Uh-huh.
18   A.   Things are added.
19   Q.   Sure.
20   A.   Removed.
21   Q.   So if I turn to the second page, and on
22 the bottom left here it says "Rev 10/09."
23   A.   Yes.  Revised October '09.
24   Q.   October '09, okay.
25   A.   Uh-huh.

**Page 72**

1    Q.   So how did you develop this agreement?
2    A.   I gave the regs to an attorney --
3    Q.   Uh-huh.
4    A.   -- and asked them to draft an agreement
5  that would comply with the regulations and USAuPair
6  policies.
7    Q.   Did you ever look at other agreements
8  from other sponsors in developing this one?
9    A.   I -- I may have -- I -- I was, I would
10 say, familiar with the agency that I worked for,
11 with their agreements, because I was having families
12 sign that.
13        But I just gave the regs and our
14 policies to the attorney and asked them to develop
15 an agreement.
16   Q.   Okay.  So turning to the second page.
17   A.   Yes.
18   Q.   Paragraph No. 7.
19   A.   Yes.
20   Q.   It says, "USAuPair has published a fee
21 schedule for the program."
22   A.   Uh-huh.
23   Q.   "And host family must pay to USAuPair all
24 fees described in fee schedule."
25   A.   Uh-huh.

**Page 73**

1    Q.   "The fee schedule may be amended from
2  time to time in USAuPair's sole discretion, and host
3  family agrees that all fees are subject to change."
4    A.   Uh-huh.
5    Q.   "The fees include expenses relating to
6  the au pair's recruiting and screening process,
7  round trip international airfare, orientations,
8  transportation to and from hotel, five-day workshop,
9  lodging and meals during workshop."
10   A.   That's 3.5.
11   Q.   Oh, excuse me.  Thank you.  I -- thank
12 you.  No, that's right, "3.5 day workshop, lodging
13 and meals during workshop, medical insurance,
14 placement and supervision by a local counselor, and
15 administrative costs."
16        Did I read that correctly?
17   A.   You did.
18   Q.   Except for that part?
19   A.   Yes.
20   Q.   Okay.  With the 3 and the 3.5?
21   A.   Yes.
22   Q.   Okay.  What are the other administrative
23 costs?
24   A.   Well, just regular administrative costs
25 running a business.

19 (Pages 70 to 73)

PLAINTIFFS' RESP. APP.0005285

MAGNA
LEGAL SERVICES

Page 74

1    Q.   Such as?
2    A.   Sometimes there's the compensation to
3 local representatives, compensation to foreign
4 representatives.  There's classroom rental.
5    Q.   Uh-huh.
6    A.   Materials sometimes like toilet paper,
7 utilities, IT, telecommunications.  Same thing that
8 you would have in your office.
9    Q.   So in the last sentence of this paragraph
10 it says, "USAuPair cannot guarantee 51 weeks of
11 uninterrupted childcare, and interim alternative
12 care is at host family expense."
13    A.   Uh-huh.
14    Q.   So is that -- are you anticipating that,
15 for instance, for whatever reason an au pair may not
16 be able to continue in the program here?
17    A.   That's a possibility.
18    Q.   And so you're saying that it's up to the
19 host family to find childcare to replace the
20 au pair's work for the host family?
21    A.   That they -- we're just -- I'm just
22 saying that the au pair could get homesick --
23    Q.   Uh-huh.
24    A.   -- and decide to go home.
25    Q.   And that happens?

Page 75

1    A.   And that happens, and we can't guarantee
2 uninterrupted childcare.
3    Q.   And so the host family will have to find
4 childcare elsewhere?
5    A.   And --
6    Q.   Is that correct?
7    A.   Well, they would have to make other
8 arrangements, yes.
9    Q.   Thank you.
10    MR. SCHWARTZ:  So let's take a short
11 break right now.
12    THE VIDEOGRAPHER:  Going off the
13 record at 12:33.  This marks the end of media 1.
14    (Break from 12:33 p.m. to
15    12:56 p.m.)
16    THE VIDEOGRAPHER:  This marks the
17 start of media 2 of the video deposition of Helene
18 Young, 30(b)(6) representative for USAuPair, Inc.
19 We're back on the record.  The time is 12:55.
20 BY MR. SCHWARTZ:
21    Q.   So in the last document I was just
22 showing you.
23    A.   Yes.
24    Q.   This was the Host Family Agreement.
25    A.   Okay.  Yes.

Page 76

1    Q.   You -- I -- I read out the beginning of
2 10.  But just for clarity's sake it says, "This
3 agreement, the orientation guidelines, brochure, the
4 Regulations, the handbook, the Code of Conduct, and
5 the fee schedule contain the complete final" --
6 "final and exclusive integrated agreement between
7 the parties."
8    A.   Uh-huh.
9    Q.   Did I read that correctly?
10    A.   Yes.
11    Q.   It then says, "An amendment to this
12 agreement must be written and signed by USAuPair."
13    A.   Yes.
14    Q.   Okay.  When you say "the Regulations"
15 here.
16    A.   Yes.
17    Q.   What -- what regulations do you mean?
18    A.   The Department of State regulations.
19    Q.   Okay.  And when you describe a fee
20 schedule, what is that?
21    A.   That's the USAuPair program fee schedule.
22    Q.   Okay.  And that fee schedule is part of
23 the exclusive integrated agreement between the
24 parties, along with the orientation, guidelines,
25 brochure, Regulations, and handbook?

Page 77

1    A.   Correct.
2    Q.   And Code of Conduct?
3    A.   Correct.
4    Q.   Okay.  Thank you.
5    So are there any hidden fees for
6 host families?
7    A.   Hidden fees?  What do you mean?
8    Q.   Well, let me -- let me back up.
9    When you're talking about what the
10 cost of the program will be to host families, what
11 do you tell them that the costs will be?
12    A.   I don't know what their costs are.  Our
13 fee is our fee.
14    Q.   Uh-huh.
15    A.   And that's what is -- that's what we
16 disclose to run the program.  I mean, to -- for our
17 purposes.
18    Q.   So when you say you don't know what their
19 costs are, what do you mean?  What other costs would
20 there be, other than those that are listed on the
21 fee schedule?
22    A.   Well, host families have a cost, you
23 know, their own costs, somebody living in their
24 home.
25    Q.   Uh-huh.

PLAINTIFFS' RESP. APP.0005286

MAGNA
LEGAL SERVICES

1    A.    Automobile insurance.
2    Q.    Sure.
3    A.    They might have that as a cost.  I don't
4 know what other costs host families might have.
5    Q.    Do you tell the host families what they
6 should be paying the au pair?
7    A.    The host families are -- are told what
8 the regulations are.
9    Q.    The host family --
10    A.    The guidelines that we were given by the
11 State Department.
12    Q.    So what -- do -- okay.
13         So you -- you don't tell the host
14 families a specific stipend that they should pay to
15 au pairs?
16    A.    We state 195.75, in accordance with the
17 guidelines from the State Department.
18    Q.    Guidelines?  Wait.  So are these -- are
19 you describing anything in the Code of Federal
20 Regulations?
21    A.    I'm describing a document that the State
22 Department sent to me --
23    Q.    Uh-huh.
24    A.    -- that listed what the stipend would be.
25    Q.    Okay.  So do you tell host families that

1 they can pay more to au pairs?
2    A.    No.  I tell them exactly what the State
3 Department provided me.
4    Q.    So you've never told a host family that
5 the stipend is a minimum stipend?
6    A.    I've told the families this is what the
7 State Department provided me as the weekly stipend
8 for the au pair.  This is -- this is it.  This is
9 fact.  This is it.
10    Q.    Could a host family pay more?
11    A.    Obviously.  I guess, yes.  I just know
12 that the 195.75 is what the State Department
13 provided USAuPair.
14    Q.    Are you familiar -- you're familiar with
15 the regulations of the au pair program, correct?
16    A.    Yes.
17    Q.    So I'm marking -- we're going to mark for
18 you Exhibit No. --
19         MR. SCHWARTZ:  What are we up to, 8?
20 9?
21         MR. KELLY:  9.
22         (Exhibit No. 9 was marked.)
23    Q.    So you recognize these regulations?
24    A.    Yes.
25    Q.    Okay.  If I could take you to Section J.

1    A.    Yes.
2         MR. SCHWARTZ:  Oh, and for those
3 listening on the phone, this is Bates stamped
4 USA 181, and it is the Section 62.31, Au Pair
5 Regulations.
6    Q.    So you're -- are you familiar with this
7 section J?
8    A.    Yes.
9    Q.    Wages and Hours?
10    A.    Yes.
11    Q.    It says, "Sponsors shall require that
12 au pair participants (1) are compensated at a weekly
13 rate based upon 45 hours of childcare services per
14 week, and paid in conformance with the requirements
15 of the Fair Labor Standards Act as interpreted and
16 amend" -- "and implemented by the United States
17 Department of Labor."
18         Did I read that correctly?
19    A.    Yes.
20    Q.    Is a specific stipend number given
21 anywhere in these regulations?
22    A.    No.
23    Q.    Do these regulations state that the State
24 Department sets what the stipend number is?
25    A.    The State Department is the regulator for

1 the J-1 visa program, and that's the regulator that
2 I look to to provide the guidelines for the program.
3    Q.    Okay.  And so you state that there was a
4 time that you were notified by the State
5 Department --
6    A.    Correct.
7    Q.    -- that the stipend was 195.75?
8    A.    Yes.
9    Q.    Okay.  Did you send that notice to your
10 attorney and ask whether -- what -- what it meant?
11    A.    No.  I just followed the regs.
12    Q.    Okay.
13    A.    I don't have the money to contact an
14 attorney every time something -- I follow the regs.
15    Q.    You follow the regs?
16    A.    Yeah.
17    Q.    And you see these notices as -- as part
18 of the regs?
19    A.    The State Department sends out
20 guidelines, and I see that as my regulator.
21    Q.    Okay.
22         (Exhibit No. 10 was marked.)
23    Q.    So we've marked for you Exhibit 10.  This
24 is Bates stamped USA 00001.
25         Do you recognize this document?

PLAINTIFFS' RESP. APP.0005287

MAGNA ▶
LEGAL SERVICES

Case 1:14-cv-03074-CMA-KMT   Document 1059-25   Filed 03/17/18   USDC Colorado   Page 460 of 700

Page 82

1    A.   Yes, I do.
2    Q.   What is this document?
3    A.   It's the Program Fees & Schedules for
4  USAuPair.
5    Q.   Okay.
6    A.   From 2009.
7    Q.   Thank you.
8         So in 2009 the application fee was
9  $300?
10   A.   Correct.
11   Q.   The program fee was $5,950?
12   A.   Correct.
13   Q.   And the weekly stipend was $195.75?
14   A.   Correct.
15   Q.   Okay.  So you instructed your families
16  that this was the cost that they would face,
17  correct?
18        MR. KELLY:  Object to form.
19   A.   It's not cost.  These are our program
20  fees.
21   Q.   Well, it's not a cost for the host
22  family?
23        MR. KELLY:  "The cost" versus "a
24  cost."
25   Q.   I'm not sure I understand the

Page 83

1  distinction.  Can you explain the distinction to me?
2    A.   This is USAuPair's program fee.  This is
3  the fee that we charge host families to comply with
4  the regulatory requirements for the program.
5  Families may have additional expenses related.
6    Q.   Okay.
7         THE VIDEOGRAPHER:  Counsel, you've
8  lost your mike.
9         MR. SCHWARTZ:  Oh.
10        THE VIDEOGRAPHER:  It just snaps back
11 on.
12   Q.   So underneath, "Weekly stipend for 51
13 weeks" --
14   A.   Uh-huh.
15   Q.   -- it says, "Average weekly cost, $318."
16        What does that number mean?
17   A.   That's taking the program fees, and
18 that's the av -- that's averaging the program fees
19 plus the weekly stipend across 51 weeks.
20   Q.   Okay.  So the cost -- okay.  Okay.  Now,
21 I see a Footnote 3 --
22   A.   Yes.
23   Q.   -- under, "Weekly stipend for 51 weeks."
24   A.   Yes.
25   Q.   And it says, "Subject to change in

Page 84

1  accordance with federal minimum wage laws."
2    A.   Yes.
3    Q.   How do you know that?
4    A.   The State Department told me.
5    Q.   When?
6    A.   It's on -- it was on a document, and it
7  was probably verbally.
8    Q.   It says, "Federal minimum wage laws,"
9  right?
10   A.   Yes.
11   Q.   So despite saying, "Federal minimum wage
12 laws," are you stating that it's your belief that
13 this was the only amount that an au pair could
14 receive for a stipend?
15   A.   I don't understand the question.
16   Q.   Is it your belief that -- or was it,
17 excuse me.  Was it, at this time, your belief that
18 the weekly stipend for 51 weeks had to be $195.75?
19   A.   It -- it's exactly what it says here.
20   Q.   That -- that wasn't my question.
21        MR. SCHWARTZ:  I'll move to strike.
22        MR. KELLY:  You can move to strike.
23        MR. SCHWARTZ:  Right.
24        MR. KELLY:  It's her answer.  If you
25 want a clarification, get clarification.  But --

Page 85

1         MR. SCHWARTZ:  That's fine.
2         MR. KELLY:  -- I -- I don't wear a
3  robe.  I can't grant or deny your --
4         MR. SCHWARTZ:  Yeah, well --
5         MR. KELLY:  -- motion to strike, but
6  I object to your motion.
7         MR. SCHWARTZ:  That's fine.  I --
8         MR. KELLY:  She's going to do her
9  best to answer under oath, and you can ask as many
10 follow-up questions as you wish.
11        MR. SCHWARTZ:  Thank -- thank you,
12 Counselor.
13   Q.   I'm going to repeat the question.
14   A.   Okay.
15   Q.   Is it your belief, or was it at the time
16 this document was written your belief, that the
17 weekly stipend had to be $195.75?
18   A.   I knew that it was -- I was informed that
19 it was tied to federal minimum wage laws, that the
20 weekly stipend was tied to federal minimum wage
21 laws, based on the document that we received --
22   Q.   Okay.
23   A.   -- from the State Department.
24   Q.   And was this the only stipend that they
25 could receive?

MAGNA
LEGAL SERVICES

22 (Pages 82 to 85)

Page 86

1    A.   I don't know.  I followed what the
2  document said.  I really don't know.  I just
3  followed the regulations and what I was told to do.
4    Q.   Did you ever tell host families that they
5  could not pay more than 195.75?
6    A.   I don't recall telling them they couldn't
7  pay more.  I don't recall telling them they could
8  pay less.  I didn't -- all I said -- everything was
9  documented 195.75.
10   Q.   Okay.  I'm going to hand you a series of
11 documents.
12        MR. SCHWARTZ:  Excuse me, I lost my
13 microphone again.
14        THE WITNESS:  I know, you keep losing
15 it.
16   Q.   I'm going to hand you a series documents.
17   A.   Okay.
18   Q.   So it may take a moment to apply all of
19 the exhibit numbers.
20   A.   Okay.  Okay.
21        (Exhibit Nos. 11 through 16 were
22        marked.)
23        MR. SCHWARTZ:  Thank you.
24   Q.   So starting with a document marked
25 Exhibit 11, this is USA 2.

Page 87

1        Do you recognize this document?
2    A.   Yes.
3    Q.   And these -- this is also your Program
4  Fees & Schedules for the year 2010?
5    A.   Correct.
6    Q.   Okay.  Thank you.  And this document
7  here, which is Bates marked USA 3, and this is your
8  Program Fees & Schedules for what year?
9    A.   2011.
10   Q.   2011.
11        Now -- and this document here,
12 marked Exhibit 13, these are your Program Fees &
13 Schedules for 2012 --
14   A.   Correct.
15   Q.   -- is that correct?
16   A.   Correct.
17   Q.   I'll note that the program fee is $6,100
18 here.
19   A.   Yes.
20   Q.   The previous year, what was the program
21 fee?
22   A.   $5,950.
23   Q.   Okay.  What inspired you to increase the
24 program fee in 2012?
25   A.   Some of our costs went up.

Page 88

1    Q.   Uh-huh.  What kind of costs?
2    A.   Airfare to bring the au pairs.
3    Q.   And I'll note that the stipend, weekly
4  stipend here is still listed at 195.75?
5    A.   Correct.
6    Q.   Do you recall what the stipend was prior
7  to 2009?
8    A.   No.  It's on that schedule.  I don't --
9  I -- I couldn't say specifically.
10   Q.   Okay.  I'm presenting to you Exhibit
11 No. 14.
12   A.   Yes.
13   Q.   Do you recognize this?
14   A.   Yes.  2013 Program Fees & Schedules.
15   Q.   And, again, the fees went up to $6,250;
16 is that right?
17   A.   Correct.
18   Q.   And that led to you stating that the
19 average weekly cost is now $324 for host families?
20   A.   Yes, that's what it says.
21   Q.   Okay.  Now, here is Exhibit 15.  I think
22 you're beginning to notice a pattern?
23   A.   Yes.
24   Q.   And this is the 2014 Program Fees &
25 Schedules?

Page 89

1    A.   Yes.
2    Q.   And, finally, Exhibit 16.  And these are
3  the 2015 Program Fees --
4    A.   Correct.
5    Q.   -- & Schedules?
6    A.   Correct.
7    Q.   Okay.  Have you heard of the ProAuPair
8  program?
9    A.   The ProAuPair, yes.
10   Q.   You've heard of the ProAuPair program?
11   A.   Yes.
12   Q.   What in the -- what, in your
13 understanding, is ProAuPair?
14   A.   It's a cultural exchange organization,
15 just like all the rest of us.
16   Q.   Okay.  Do you -- do you re -- do you know
17 any -- what -- what sort of things do you know about
18 them?  Do you know them being similar to -- to you,
19 that they're just -- just like the rest of you?
20   A.   I -- you know, I wouldn't know.
21   Q.   Okay.
22   A.   I really wouldn't know.  I'm so small, I
23 just keep focused on my own program.
24   Q.   So you don't really talk to people from
25 other programs or focus on these other programs?

PLAINTIFFS' RESP. APP.0005289

MAGNA
LEGAL SERVICES

| Page 90 | Page 92 |
|---|---|
| 1    MR. KELLY:  Object to form. | 1    Q.    So -- |
| 2    Q.    You can answer. | 2    A.    Oh, okay. |
| 3    A.    Sometimes I will reach out when I'm | 3    Q.    -- is this an e-mail that you wrote? |
| 4  confused about something. | 4    A.    Yes. |
| 5    Q.    Okay.  But you -- so are you testifying | 5    Q.    And who is Linda -- I -- I can't -- I -- |
| 6  now that you are not familiar with the details of | 6  I can't pretend to pronounce the name correctly -- |
| 7  other programs? | 7  Mori?  Mori? |
| 8    A.    I'm -- generally, no. | 8    A.    Mori. |
| 9    Q.    Generally, no, as in you are not familiar | 9    Q.    Who is Linda Mori? |
| 10  with the details of other programs? | 10    A.    She works with another agency. |
| 11    A.    Correct. | 11    Q.    What agency is that? |
| 12    Q.    Okay.  So are you aware of the existence | 12    A.    CHI. |
| 13  of programs that might specialize in professional | 13    Q.    Do you know what CHI stands for? |
| 14  au pairs, so-called? | 14    A.    Cultural Homestay International.  Yeah. |
| 15    A.    I've heard that term, yes. | 15    Q.    So here it says, "Professional au pairs, |
| 16    Q.    Okay.  Based on your understanding, what | 16  especially those with degrees in OT, PT, nursing, |
| 17  does that term mean? | 17  et cetera may be viewed as taking professional jobs |
| 18    A.    I have no idea. | 18  away from Americans.  It may be pushing the envelope |
| 19    Q.    You have no idea? | 19  and could hurt the industry if labor rights groups, |
| 20    A.    No. | 20  unions, and media view it the same way.  Helene." |
| 21    Q.    Okay. | 21          Did I read that correctly? |
| 22    A.    I mean, I would be interpreting.  And I'm | 22    A.    You did. |
| 23  not an attorney, I'm not them, I'm not -- I'm | 23    Q.    And you also said, "Hi Linda, Article on |
| 24  just -- | 24  ProAuPair." |
| 25    Q.    What -- | 25    A.    Yes. |

| Page 91 | Page 93 |
|---|---|
| 1    A.    -- USAuPair focused on my own program. | 1    Q.    And "digital journal," et cetera? |
| 2    Q.    Sure.  But -- | 2    A.    Yeah. |
| 3    A.    Really. | 3    Q.    So you are familiar with -- with |
| 4    Q.    But you are in the sponsor mark -- world, | 4  ProAuPair? |
| 5  right? | 5    A.    ProAuPair, yeah.  What I read there, yes. |
| 6    A.    Yes. | 6    Q.    Okay. |
| 7    Q.    And you are aware of the existence of | 7    A.    Yeah.  When was this? |
| 8  other sponsors, of course? | 8          MR. KELLY:  Do you have an idea why |
| 9    A.    Yes. | 9  there's no date on this? |
| 10    Q.    And so you -- you just testified that | 10          MR. SCHWARTZ:  This was how it was |
| 11  you're aware that there is -- that you've heard of | 11  produced to us. |
| 12  the sponsor ProAuPair? | 12          Yes, for people listening, this |
| 13    A.    Yes. | 13  document appears to be undated.  It was produced to |
| 14    Q.    And you're aware that they market | 14  us this way.  So I'm -- I'm not clear how that |
| 15  professional au pairs? | 15  happens, but it's how it was produced to us. |
| 16    A.    Yes. | 16    Q.    So you discussed ProAuPair with Linda |
| 17    Q.    Okay.  Are you aware at all of what | 17  Mori -- |
| 18  professional au pairs earn for a stipend? | 18          MR. KELLY:  Object to form. |
| 19    A.    No, not at all. | 19    Q.    -- at CHI? |
| 20    Q.    Okay.  So I'm handing you a document. | 20    A.    I sent her this. |
| 21          (Exhibit No. 18 was marked.) | 21    Q.    Okay.  You sent her that? |
| 22    Q.    The document is marked Exhibit 18. | 22    A.    That's not a discussion. |
| 23    A.    Okay. | 23    Q.    Okay.  Have you ever discussed ProAuPair |
| 24          MR. SCHWARTZ:  And for those | 24  with Linda Mori? |
| 25  listening, it is CHI0001270. | 25    A.    I don't recall. |

PLAINTIFFS' RESP. APP.0005290

**MAGNA**
LEGAL SERVICES

---

**Page 94**

```
1     Q.   You -- you don't recall whether you
2  talked about this --
3     A.   I --
4     Q.   -- agency that you felt inspired to send
5  this e-mail about?
6     A.   I sent this e-mail, but I don't recall
7  talking about it.  I really don't.  I didn't even
8  remember this.
9          UNIDENTIFIED ATTORNEY:  Counsel,
10 what's the e-mail -- what's the exhibit number on
11 this one?
12         MR. KELLY:  CHI0001270.
13         MR. SCHWARTZ:  That's -- that's the
14 Bates number.
15         UNIDENTIFIED ATTORNEY:  And what's
16 the exhibit number?
17         MR. KELLY:  17.  I apologize.
18         THE WITNESS:  18.
19         MR. SCHWARTZ:  I believe it's 18.
20         THE WITNESS:  18.
21         MR. KELLY:  I'm missing --
22         UNIDENTIFIED ATTORNEY:  Thank you.
23         MR. KELLY:  -- a 17.
24         MR. SCHWARTZ:  You know what?
25         MR. KELLY:  Did we miss a 17?
```

**Page 95**

```
1          MR. SCHWARTZ:  I think -- no.  I
2  think I am holding on to Exhibit 17.
3          MR. KELLY:  Okay.
4     Q.   Just so that we're all clear, I'm going
5  to hand you a document that is marked Exhibit 17.
6     A.   Oh, okay.
7     Q.   And that is the Program & Fee Schedule
8  for 2016; is that correct?
9     A.   Yes.
10    Q.   Okay.
11         MR. KELLY:  May I have a copy,
12 please?
13         MR. SCHWARTZ:  Oh, sure.
14         MR. KELLY:  Thank you.  Thank you,
15 sir.
16    Q.   So could you ask host families to charge
17 more than 195.75?
18    A.   I don't know.  I really don't know.
19    Q.   Excuse me.  I -- I'll -- I'll rephrase.
20         I -- I mean, could you ask host
21 families to pay more than 195.75?
22    A.   I think you've asked me that before, and
23 I keep giving you the same answer.
24    Q.   And you're --
25    A.   I really don't know.
```

**Page 96**

```
1     Q.   Okay.  Even as you sit here today?
2     A.   I just follow those guidelines.  That's
3  all I do.  And that's what I tell families, "Here
4  are the guidelines.  Here are the State Department,
5  what the State Department says."  That's a fact.
6     Q.   On those Program Fees & Schedules, do you
7  state this is -- that the State Department set --
8  sets the stipend at 195.75?
9          MR. KELLY:  Object to form.
10    Q.   You can answer.
11    A.   It doesn't state that on the document.
12         MR. KELLY:  What document are you
13 referring to?
14         MR. SCHWARTZ:  Oh.
15         MR. KELLY:  That's my objection.
16         MR. SCHWARTZ:  Oh, fair enough.
17 Thank you, Counselor.
18    Q.   Let's take the -- the latest exhibit.  I
19 believe that was --
20    A.   17.
21    Q.   -- Exhibit 17.
22         Does it say anywhere on Exhibit 17
23 that the State Department sets the stipend at
24 195.75?
25    A.   It doesn't say it on this document.
```

**Page 97**

```
1          MR. KELLY:  Lunch has arrived.  So
2  whenever you're good for a break is when we will
3  take a break.
4          MR. SCHWARTZ:  Okay.  Sounds good.
5  Thank you.
6     Q.   Turning back to Exhibit No. 7.
7     A.   Yes.
8     Q.   And this is the Host Family Agreement,
9  correct?
10    A.   Correct.
11    Q.   Does it say anywhere in the Host Family
12 Agreement that the State Department sets the stipend
13 at 195.75?
14         MR. KELLY:  Are you referring to
15 these pages in front of her, or are you referring to
16 the Host Family Agreement?
17         MR. SCHWARTZ:  Are these -- well, let
18 me ask.
19    Q.   Are these pages in front of you the Host
20 Family Agreement, that -- that are entitled Host
21 Family Agreement -- Agreement, and two pages?
22    A.   Yes.
23    Q.   Okay.  Thank you.
24         In the Host Family Agreement --
25         MR. KELLY:  Again, in these two pages
```

---

**MAGNA**
**LEGAL SERVICES**

Page 98

```
1    in front of her?
2        MR. SCHWARTZ:  These -- Exhibit 7.
3    In Exhibit 7.
4        MR. KELLY:  There you go.  There's an
5    integration clause, Counsel.  You asked about it.
6        MR. SCHWARTZ:  All right.
7        MR. KELLY:  So --
8        MR. SCHWARTZ:  That's fine.
9        MR. KELLY:  -- don't make a face at
10   me.
11       MR. SCHWARTZ:  It also says "this
12   agreement," but that's fine.
13       MR. KELLY:  It's -- it's integrated
14   with --
15       MR. SCHWARTZ:  Counsel, I have no
16   interest in arguing about this right now.
17       MR. KELLY:  It's a --
18       MR. SCHWARTZ:  Let's keep it to
19   object to form and foundation and we can continue on
20   our way.
21       MR. KELLY:  I want a good record.
22       MR. SCHWARTZ:  You're --
23       MR. KELLY:  You're asking an
24   important question that's fundamental to the case,
25   and it's not properly formed.
```

Page 99

```
1        MR. SCHWARTZ:  Counselor, then please
2    just object to form and --
3        MR. KELLY:  Object to form.
4        MR. SCHWARTZ:  -- we'll keep it to
5    form and foundation.  Thank you.
6    Q.   You may answer.
7    A.   It --
8        MR. STONE:  Ms. Court reporter, would
9    you please read back the question.
10       (Record read as follows:
11       "Q:  Are these pages in front of
12       you the Host Family Agreement,
13       that -- that are entitled Host
14       Family Agreement -- Agreement,
15       and two pages?
16       A:  Yes.")
17       MR. STONE:  Thank you.
18   Q.   Does it say anywhere, in the Host Family
19   Agreement before you --
20   A.   Uh-huh.
21   Q.   -- that the Department of State sets the
22   guidelines?  Or excuse me.  Excuse me.
23       That the Department of State sets
24   the stipend?
25       MR. KELLY:  Object to form.
```

Page 100

```
1    A.   It states in here that, "The regulations
2    are published by the USA Department of State in 22
3    CFR Part 62, as amended from time to time
4    (regulations)."
5    Q.   Okay.  Thank you.
6        Please, where in the regulations,
7    22 CFR Part 62, which is -- I've given to you as
8    Exhibit 9 --
9    A.   Uh-huh.
10   Q.   -- is the stipend set by the State
11   Department?
12   A.   It's determined -- it's in the
13   regulations that we receive from the State
14   Department.
15   Q.   So as -- as counselor reminded me, this
16   agreement here says, "The host family must" -- I'm
17   sorry.  Excuse me.  I'm moving back to the Host
18   Family Agreement exhibit.
19   A.   Uh-huh.
20   Q.   That is entitled Host Family Agreement.
21   I believe it's Exhibit 7.
22       And it said, "As a participant in
23   the program, host family must comply fully and
24   timely with all of (1) the provisions in this
25   agreement, (2) provisions in the program's
```

Page 101

```
1    guidelines published by USAuPair, as amended from
2    time to time in USAuPair's sole discretion
3    (guidelines)."
4    A.   Uh-huh.
5    Q.   "(3) provisions in the program's brochure
6    published by USAuPair, as amended from time to time
7    in USAuPair's sole discretion, and (4) regulations
8    published by the USA Department of State in 22 CFR
9    Part 62 as amended from time to time (regulations)."
10   A.   Uh-huh.
11   Q.   Did I read that correctly?
12   A.   You did.
13   Q.   So the Department -- is it -- the
14   Department of State regulations that are described
15   here are 22 CFR Part 62; is that correct?
16   A.   Correct.
17   Q.   And CFR -- 22 CFR Part 62 are those
18   regulations I've handed you -- well, 62.31 are those
19   regulations I handed you and that are marked
20   currently as Exhibit 9?
21   A.   Correct.
22   Q.   So where in -- in these regulations do
23   you indicate -- or where -- excuse me.  Where in
24   these regulations is it stated that the Department
25   of State sets the stipend?
```

MAGNA
LEGAL SERVICES

Page 102

1      A.   It's in the -- it's -- it's not -- it's
2  not specifically stated in here, but it's in the
3  regulations that we receive from the Department of
4  State, in the guidelines.  And that's part of the
5  regulations.
6      Q.   But it's not --
7      A.   I'm very confused because we -- I
8  received this document from the Department of State.
9  They're my regulatory body.  They tell me what to
10 pay and what I can do.  And I follow that, and I
11 followed it to the tee.
12     Q.   But it -- but is it correct that of the
13 various -- various documents that are described in
14 paragraph 1 of the Host Family Agreement, including
15 the provisions of the Host Family Agreement, the
16 guidelines published by USAuPair, the bro -- US --
17 the brochure, the regulations published by USA
18 Department of State 22 CFR Part 62, that in none of
19 those is there a statement that the Department of
20 State sets the stipend?
21          MR. KELLY:  Object to form.
22     Q.   That's a yes-or-no question, is that --
23 is that correct?
24          MR. KELLY:  It's -- I still object to
25 form.

Page 103

1          MR. SCHWARTZ:  Okay.
2      Q.   You can answer.
3      A.   It may -- it -- I don't know.  It may not
4  be accurate.
5      Q.   Okay.  Thank you.
6          MR. SCHWARTZ:  Let's break for lunch.
7          MR. KELLY:  Okay.
8          THE VIDEOGRAPHER:  Going off the
9  record at 1:33.
10         (Whereupon, a lunch break from
11            1:33 p.m. to 2:08 p.m., after
12            which the proceedings continued
13            as follows.)
14         THE VIDEOGRAPHER:  Back on the record
15 at 2:08.
16         EXAMINATION (CONTINUED)
17 BY MR. SCHWARTZ:
18     Q.   Ms. Young, I asked you earlier whether
19 you could pay -- excuse me.
20         Whether -- whether you could have
21 a host family pay more than $195.75 an hour -- or
22 excuse me, an hour.  Per week.
23     A.   Uh-huh.
24     Q.   And you responded, you know, that you
25 didn't know; is that right?

Page 104

1      A.   Yes.
2      Q.   What would you do if you found out that a
3  host family was paying $200, for instance, a week?
4      A.   Nothing.
5      Q.   What would you --
6      A.   Nothing.
7      Q.   Nothing?
8      A.   Nothing really.
9          I --
10         MR. KELLY:  Go ahead.
11         THE WITNESS:  Okay.
12     A.   I got -- I -- I was reminded that I have
13 surveys, and a couple of those had more than 195.75,
14 but I didn't do anything about it.
15     Q.   Okay.  Is that because you didn't see
16 anything wrong with paying -- well, how -- let me --
17 let me back up.
18         Do you recall what amounts those
19 were that were above 195.75?
20     A.   I -- I recall some being 200.
21     Q.   Okay.
22     A.   Yeah.
23     Q.   If a host family -- well, let me back up.
24         When you say you were reminded --
25     A.   Uh-huh.

Page 105

1      Q.   -- are you telling us you were reminded
2  by counsel that this was the case?
3      A.   Yes.  I was reminded by counsel, but I
4  also remembered the surveys.
5      Q.   Okay.  Fair enough.
6      A.   I also remembered the surveys.
7      Q.   What if you saw that someone had paid
8  $150 per week?
9      A.   150?
10     Q.   150.  What would you do?
11     A.   Well, they can't.  It's 195.75.
12     Q.   Okay.  So you can't pay less than that.
13 You can't pay 150?
14     A.   No, you cannot.
15     Q.   Okay.
16         THE VIDEOGRAPHER:  Can I just get you
17 to move your mike down a tiny bit?  That's good.
18         THE WITNESS:  Is that better?
19         THE VIDEOGRAPHER:  That's good.
20 Thank you.
21         THE WITNESS:  Okay.  Sorry about
22 that.
23         THE VIDEOGRAPHER:  That's fine.
24         MR. SCHWARTZ:  All right.  Thank you
25 for that.

PLAINTIFFS' RESP. APP.0005293

MAGNA
LEGAL SERVICES

| Page 106 | Page 108 |
|---|---|

**Page 106**

1    THE WITNESS:  I don't know how
2  sensitive these are, so I don't want to scream in
3  somebody's ear.
4    THE VIDEOGRAPHER:  That's okay.
5    Q.   Do you recall when you were served with
6  this lawsuit?
7    A.   Yes.  Well, served, not so much.
8    Q.   Okay.  So what -- what -- what do you
9  mean by that?
10    A.   I remember getting a call from a
11  reporter --
12    Q.   Ah.
13    A.   -- stating what I thought about this
14  lawsuit, and I had no knowledge of it.
15    Q.   Okay.  Did you contact -- after finding
16  out about the lawsuit, did you contact any people
17  from other sponsor agencies?
18    A.   Absolutely.
19    Q.   Do you recall who?
20    A.   Everybody.
21    Q.   You contacted everybody?
22    A.   Yeah.  I sent an e-mail out --
23    Q.   To --
24    A.   -- even to the State Department.
25    Q.   So you just -- you told the State

**Page 107**

1  Department?  You told all the other sponsors?
2    A.   I was in shock.
3    Q.   So you -- you knew how to get in contact
4  with all of the -- the sponsors, right?
5    A.   I had to look up their contact
6  information.
7    Q.   So do you recall which sponsors you had
8  to look up contact information for, or was it all of
9  them?
10    A.   It was most of them.
11    Q.   Uh-huh.  How about the Alliance For
12  Cultural Exchange, did you contact them?
13    A.   Probably.
14    Q.   What's your understanding of what the
15  Alliance For Cultural Exchange is?  What is it?
16    A.   I'm thinking it's an advocacy
17  organization for cultural exchange.
18    Q.   It's an -- so when you say "advocacy," do
19  you see it as a lobbying group?
20    A.   Honestly, I don't know because I was
21  never a member until last year.
22    Q.   So you joined the Alliance last year?
23    A.   Yes.
24    Q.   Okay.
25    A.   In the fourth quarter, I think.

**Page 108**

1    Q.   Were you ever in communication with
2  people from the Alliance before you joined the
3  Alliance?
4    A.   Yes.
5    Q.   Okay.  What sort of things would you talk
6  to people of the Alliance For Cultural Exchange
7  about?
8    A.   One was membership.
9    Q.   Uh-huh.  You wanted to become a member?
10    A.   Well, I was finding out information about
11  membership.
12    Q.   Okay.  Anything else?
13    A.   Yes.  I disputed their -- their criteria.
14    Q.   For membership?
15    A.   Yes.
16    Q.   What -- what did you dispute?
17    A.   Just some of the process that they had in
18  place.
19    Q.   Okay.  Anything else that you talked to
20  them about?
21    A.   I may -- may have reached out, I may have
22  voiced a concern in e-mails from time to time.  I
23  don't -- I don't recall.
24    Q.   What kind of concerns would you voice to
25  the Alliance?

**Page 109**

1    A.   Just industry concern, general industry
2  concerns.
3    Q.   Why would you -- why -- why would you
4  e-mail the Alliance with general industry concerns?
5    A.   Because I'm -- I'm all by myself.  I
6  don't have --
7    Q.   Uh-huh.
8    A.   -- any -- any resources or -- and I
9  wasn't a member, and so I just reach out just to get
10  some information.
11    Q.   What --
12    A.   That's the only reason.
13    Q.   In -- information about?
14    A.   Just general industry topics.  I don't
15  know what else to say.
16    Q.   What kind of topics?  I'm -- I'm just
17  trying to understand what "general industry topics"
18  means for you.
19    A.   Like, the current -- current
20  administration and what is being in the general
21  media about immigration policies.
22    Q.   Uh-huh.
23    A.   Visas.
24    Q.   So you --
25    A.   That -- that's general concerns.

Case 1:14-cv-03074-CMA-KMT   Document 1059-25   Filed 05/17/18   USDC Colorado   Page 467 of 700

| Page 110 |
|---|

1    Q.   And you would look to the Alliance to
2  talk about these concerns that affect the entire J-1
3  visa?
4    A.   I wouldn't say that I looked to the
5  Alliance, not at that point in time.  I just had
6  maybe some questions.
7    Q.   Uh-huh.
8    A.   Maybe some concerns.  I don't -- I don't
9  recall specifically, but I may have reached out.
10 Sometimes there was a response maybe, sometimes not.
11 I don't know.  I don't recall.
12   Q.   Would you look to ask the Alliance
13 questions relating to State Department requirements?
14   A.   I might have.
15   Q.   Would you look to ask the Alliance
16 questions relating to how sponsors respond to State
17 Department requirements?
18   A.   I might have.
19   Q.   So --
20   A.   I don't recall.  I'd have to see.
21   Q.   But --
22   A.   And I'd have to see within the context.
23   Q.   Uh-huh.
24   A.   I -- I can't answer without seeing
25 something.

| Page 111 |
|---|

1    Q.   But would those be appropriate things to
2  look to the Alliance for?
3        MR. KELLY:  Object to form.
4          You can answer.
5    A.   It -- it's just another resource that I
6  used.
7    Q.   Are you involved with any other
8  associations?
9    A.   No.
10   Q.   So not the International Au Pair
11 Association?
12   A.   No.
13   Q.   Are you familiar with the International
14 Au Pair Association?
15   A.   Yes.
16   Q.   So I'm handing you a document that is
17 marked Exhibit 19.
18       MR. SCHWARTZ:  And for those
19 listening, it is Bates stamped USA 00089.
20         (Exhibit No. 19 was marked.)
21   Q.   So who is Mark Overmann?
22   A.   He works for the Alliance.
23   Q.   Okay.  And who is Michael McCarry?
24   A.   He was the -- I think the director of the
25 Alliance.

| Page 112 |
|---|

1    Q.   Okay.  So do you recall -- actually,
2  scratch that.  Excuse me.
3        Could you please read the e-mail
4  that's at the very top of the page?
5    A.   Yes.
6    Q.   And what's the subject matter?
7    A.   "Au Pair Time Sheets."
8    Q.   Okay.  So "Au Pair Time Sheets," and this
9  e-mail is dated November 29th, 2011?
10   A.   Uh-huh.
11   Q.   I'll -- I'll go ahead and read it, and
12 you tell me if I've read it right.
13   A.   Okay.
14   Q.   Okay.  "Hello, Michael.  Below is excerpt
15 from a Maha e-mail.  Is there any status change of
16 which I may be" -- "I may unaware regarding time
17 sheets for au pairs?"
18       And then there's an excerpt --
19   A.   Uh-huh.
20   Q.   -- from what you describe as the Maha
21 e-mail?
22   A.   Uh-huh.
23   Q.   And it says, "Please advise whether
24 USAuPair has developed internal control to track and
25 verify wages and hours as per Section 62.31(j) and

| Page 113 |
|---|

1  DOL minimum wage, Section 516 recordkeeping."
2    A.   Uh-huh.
3    Q.   I read that right?
4    A.   Correct.
5    Q.   And then you continued, "Any input would
6  be appreciated.  She told me DOS would," quote,
7  unquote, "win on this one.  We've received no
8  guidance directive other than Maha stating the above
9  over and over again.  Has there been a final ruling
10 of some sort?  If USAuPair does this, is USAuPair
11 now the employer?  There was a threat of designation
12 revocation if agencies do not comply with her
13 direction."
14       Did I read that right?
15   A.   Yes.
16   Q.   So why e-mail this to the Alliance For
17 Cultural Exchange?
18   A.   Because the State Department would
19 communicate sometimes at meetings with the Alliance,
20 but would fail to communicate to nonmembers --
21   Q.   Uh-huh.
22   A.   -- of the Alliance.  So I would reach
23 out, if I heard something, to find out if there was
24 any change in regulation.
25   Q.   And you mentioned this Maha e-mail?

PLAINTIFFS' RESP. APP.0005295

MAGNA
LEGAL SERVICES

Case 1:14-cv-03074-CMA-KMT  Document 1059-25  Filed 05/17/18  USDC Colorado  Page 468
of 700

| Page 114 | Page 116 |
|---|---|

**Page 114**

1    A.   Yes.

2    Q.   That's an e-mail to you, that you're

3  describing?

4    A.   It's an e-mail or a phone call.

5    Q.   Okay.

6    A.   One or -- or both.

7    Q.   All right.  And Maha is?

8    A.   A State Department employee.

9    Q.   So here a State Department employee has

10  e-mailed you, correct?

11    A.   Yes.

12    Q.   Or called you?

13    A.   Yes.

14    Q.   Or both?

15    A.   Yes.

16    Q.   And then after that e-mail, you e-mail

17  Michael McCarry of the Alliance to seek guidance; is

18  that accurate?

19    A.   To see if -- not guidance.  To see if

20  there's any change that I should be aware of.

21    Q.   Did the -- did Mr. McCarry reply to this

22  e-mail?

23    A.   He may have.  I don't remember.

24    Q.   Okay.  Do you know if his reply has been

25  produced in this litigation?

**Page 116**

1  instruct her not to answer that one.

2        MR. SCHWARTZ:  I have...

3    Q.   So is it the case --

4        MR. SCHWARTZ:  And I -- I -- I thank

5  you for your objection.

6    Q.   I have no interest in the specific

7  conversations you have with your attorney.

8        MR. SCHWARTZ:  So --

9        MR. KELLY:  Uh-huh.

10        MR. SCHWARTZ:  -- Counselor, yeah.

11        MR. KELLY:  Uh-huh.

12    Q.   Do you -- as a general matter, do you

13  consult with an attorney, or did you in 2011 consult

14  with an attorney, gen -- as -- as a general matter

15  regarding minimum wage laws?

16    A.   Obviously I did, according to this

17  e-mail.

18    Q.   And at any point did you ever ask about

19  the stipend?

20    A.   I don't recall.

21    Q.   Okay.  So I'm handing you a document that

22  is marked Exhibit No. 20.

23        (Exhibit No. 20 was marked.)

24        MR. SCHWARTZ:  And for those

25  listening elsewhere, it is Bates stamped USA 00091.

| Page 115 | Page 117 |
|---|---|

**Page 115**

1    A.   It -- it might be.  I don't -- I don't

2  remember.

3    Q.   Okay.  So I want to draw your attention

4  to the second e-mail down.

5    A.   Yes.

6    Q.   And it's from you to Mark Overmann?

7    A.   Uh-huh.

8    Q.   And Mark Overmann is just another

9  individual who works at the Alliance?

10    A.   Yes.

11    Q.   It says on the bottom here that he's

12  assistant director and senior policy specialist for

13  the Alliance.

14    A.   Yes.

15    Q.   -- is that accurate?

16    A.   Uh-huh.

17    Q.   And you said, "Our attorney, who

18  specializes in labor law, questioned what labor laws

19  au pairs would fall under since they are nonresident

20  aliens, do not receive a W-2, and do not fall under

21  the purview of many labor laws."

22        Is that right?

23    A.   Correct.

24    Q.   So what did your attorney tell you --

25        MR. KELLY:  Oh, no.  I'm going to

**Page 117**

1        MR. KELLY:  And continuing to 93.

2        MR. SCHWARTZ:  Oh, thank you.

3    A.   Uh-huh.

4    Q.   So let's start at the -- at the page 93,

5  which is the third page of this document.

6    A.   Okay.

7    Q.   The date of the e-mail is September 21st,

8  2011, and it's written to Michael McCarry?

9    A.   Uh-huh.

10    Q.   With the subject "DOS New Issue?"  Is

11  that correct?

12    A.   Yes.  Uh-huh.

13    Q.   Okay.  Now, just to give my voice a

14  little break, would you mind -- actually, you know

15  what, I'll read it.  It's fine.  I'll give yours a

16  break too.

17        MR. KELLY:  I'll -- I'll tell you

18  I -- I will stipulate that the document says what it

19  says.

20        MR. SCHWARTZ:  Okay.

21        MR. KELLY:  I don't know that we need

22  to read them all into the record that way.  But it's

23  your deposition.

24        MR. SCHWARTZ:  All right.  Thank you.

25        MR. KELLY:  I'm -- I'm not objecting

| Page 118 | Page 120 |
|---|---|

**Page 118**

1  to those words, and these are our production, so
2  these are our business records.
3  　　　　MR. SCHWARTZ:  Okay.  I appreciate
4  that.
5  　　　　MR. KELLY:  Sure.
6  　　　　MR. SCHWARTZ:  Thank you.
7  　Q.　So here you've written that you talked to
8  Maha?
9  　A.　Yes.
10  　Q.　So this was the individual that you spoke
11  with directly at the Department of State?
12  　A.　Yes.  Uh-huh.
13  　Q.　And received, quote, "An earful about
14  lack of sponsor oversight on au pair work hours,
15  schedules, and wages."
16  　A.　Uh-huh.
17  　Q.　Do you recall that conversation?
18  　A.　I recall a conversation.
19  　Q.　With Maha?
20  　A.　Yes.
21  　Q.　So what -- you -- you -- it states here
22  that, "She was appalled that the Alliance would not
23  insist sponsors be proactive by asking host families
24  to provide sponsors with weekly au pair time
25  sheets."

**Page 119**

1  　　　　Why do you e-mail the Alliance
2  about this?
3  　A.　Again, I'm reaching out to find out
4  information.  I'm wondering if everybody's being
5  told this, but I'm not because I'm not a member.  So
6  I get something from the State Department, and I
7  want to make sure the information is consistent with
8  what everybody else is being told.
9  　Q.　So you want to make sure everyone's on
10  the same page?
11  　　　　MR. KELLY:  Object to form.
12  　A.　I want to make sure that I'm not being --
13  being treated differently than other sponsors.
14  　Q.　Uh-huh.  And it's your goal -- and you're
15  doing this so that you can act consistently with how
16  other sponsors are acting; is that right?
17  　A.　I'm doing this so that I can be in
18  compliance with regulations.  At this juncture, I
19  didn't know.  I didn't know what was going on.  I
20  reached out.
21  　Q.　Okay.  And you say you didn't know what
22  was going on, but you had spoken directly to Ma --
23  to this Maha at the Department of State?
24  　A.　Correct.
25  　Q.　Okay.  So at the very first page here it

**Page 120**

1  says -- which is Bates stamped USA 00091.  At the
2  top Mr. Overmann says to you, "I touched base with
3  Michael in Barcelona."
4  　　　　Who's Michael?  Do you know who
5  Michael is there?
6  　A.　It could be -- I don't -- I don't know.
7  It could be from -- Michael from the Alliance or --
8  　Q.　Uh-huh.
9  　A.　-- Michael from another sponsor.  I don't
10  know.
11  　Q.　Okay.  And it says, "And" --
12  　A.　I don't remember.
13  　Q.　"And he let me know that he has spoken
14  with number of au pair sponsors who are aware of
15  this and are as concerned as you are.  They will all
16  be discussed" -- "discussing today at an
17  already-scheduled Alliance meeting, and Michael then
18  plans to contact the State Department to discuss."
19  　A.　Uh-huh.
20  　Q.　I read that correctly?
21  　A.　Yes.
22  　Q.　Okay.  Now, turning back to what was tab
23  23.
24  　A.　Tab 23.
25  　Q.　Excuse me, not tab 23.  That's -- what

**Page 121**

1  was Exhibit -- it's not even tab 23.  What was the
2  previous e-mail that I gave you?  Forgive me, I've
3  lost track.
4  　　　　MR. KELLY:  19.
5  　A.　19.
6  　Q.　Exhibit 19.
7  　A.　Yeah.
8  　Q.　Here it is.
9  　　　　You asked the question, "If
10  USAuPair" -- it's at the top.  You're e-mailing
11  about these time sheets.
12  　A.　Right.
13  　Q.　And you asked the question, "Is USAuPair
14  now the employer?"
15  　A.　Yes.
16  　Q.　Why did you ask that question?
17  　A.　Because I had a question.  I -- I wanted
18  to know what -- I just had a question.
19  　Q.　No, what -- what made you believe that
20  this message from Maha would indicate that USAuPair
21  is an employer?
22  　A.　Because it's a cultural exchange
23  organization, and the host family is the employer.
24  So I was confused.
25  　　　　Understand that the conversation

PLAINTIFFS' RESP. APP.0005297

MAGNA
LEGAL SERVICES

Page 122

1    with Maha, I asked for something in writing.
2        Q.   Uh-huh.
3        A.   I asked for a Department of State
4    guideline or regulations pointing to this
5    requirement --
6        Q.   This is the --
7        A.   -- that she was telling me on the phone.
8        Q.   This is the time sheets requirement?
9        A.   Yes.
10       Q.   That you keep time sheets of --
11       A.   Yes.
12       Q.   -- of the time --
13       A.   Right.
14       Q.   -- and amount that -- and -- and --
15       A.   And she could not produce a regulation.
16   She could not produce a State Department regulation,
17   a State Department guideline, or anything that said
18   that we had to do this.
19            I didn't know if it was coming
20   down the pike.  I didn't know if anybody else was
21   aware of it.  Remember, I'm all by myself in Oregon,
22   and I don't have a whole bunch of staff and
23   departments and divisions looking into this.  Sorry.
24            MR. SCHWARTZ:  Can we go off the
25   record for two minutes.

Page 123

1            THE VIDEOGRAPHER:  Going off the
2    record at 2:36.
3            (Break from 2:36 p.m. to
4            2:38 p.m.)
5            THE VIDEOGRAPHER:  Back on the record
6    at 2:38.
7    BY MR. SCHWARTZ:
8        Q.   So did you ever develop a policy to keep
9    these time sheets?
10       A.   I advised families, on the host family
11   orientation, that they should probably keep time
12   sheets.
13       Q.   Okay.  So you were -- I mean, when --
14   when Maha was e-mailing you and -- and phone call --
15   excuse me, calling you and e-mailing you about this,
16   is it fair to say you were somewhat concerned?
17       A.   Yes.
18       Q.   And --
19       A.   I was concerned because there was a
20   threat that I would lose designation.
21       Q.   And so you wanted to make sure that you
22   weren't -- that -- so you contacted the Alliance.
23   Did -- did you contact any other agencies also about
24   this?
25       A.   I might have.

Page 124

1        Q.   And you just wanted to make sure that you
2    didn't lose your designation, that --
3        A.   That I wouldn't lose my designation, or I
4    was out of compliance, or if other sponsors had been
5    told the same thing, or if there was just sort of
6    selective rogue --
7        Q.   Uh-huh.
8        A.   -- stipulations for one sponsor versus
9    another.
10       Q.   So --
11       A.   I just didn't know.
12       Q.   Okay.
13       A.   That's why I was reaching out.
14       Q.   And you wanted to make sure that you were
15   doing what others were doing on it?
16            MR. KELLY:  Object to form.
17       A.   No.
18       Q.   No?
19       A.   No.
20       Q.   You didn't want to make sure that --
21            MR. KELLY:  Object to form.
22       Q.   So you weren't concerned that some
23   sponsors would be in compliance and others wouldn't?
24       A.   You're using the word "compliance."  I
25   didn't know.

Page 125

1        Q.   Okay.  So you weren't curious if other
2    sponsors were using these time sheets --
3        A.   I was only --
4        Q.   -- but you weren't?
5        A.   -- curious and concerned about whether
6    USAuPair was in compliance or noncompliance, if
7    there was a regulation that I was unaware of, if
8    there was an administrative rule that I was unaware
9    of; and if there was, I wanted to be in compliance
10   with that.
11       Q.   And you looked to the Alliance For
12   Cultural Exchange to help you know whether you were
13   in compliance?
14       A.   I looked to the Alliance to see if there
15   was any regulation coming down the pike, any
16   administrative rule that they might be aware of that
17   was going to be -- was going to go into effect.
18       Q.   So on Exhibit --
19       A.   I was afraid of losing designation.
20       Q.   On Exhibit 19 --
21       A.   Yes.
22       Q.   -- you say to Mr. McCarry, "Any input
23   would be appreciated.  She told me DOS would,"
24   quote, unquote, "win on this."
25            What does that mean?

32 (Pages 122 to 125)

MAGNA
LEGAL SERVICES

Page 126

1    A.   Well, she threatened me.  And she
2  basically said, "If you don't do this, we're going
3  to win on this."
4          So I was -- it -- it was an
5  implied threat that if I didn't go along with what
6  she said, then I would lose designation.  So I was
7  very concerned.  It's my livelihood.
8    Q.   Uh-huh.
9          So in addition to e-mailing the
10 Alliance when you have concerns, did you ever e-mail
11 other sponsor agencies when you would have concerns
12 about --
13   A.   Probably, yeah.
14   Q.   -- about the Department of State
15 regulations?
16   A.   Probably.
17   Q.   About the enforcement of the Department
18 of State regulations --
19   A.   Probably.
20   Q.   -- from Maha?
21   A.   It would not be unusual for me to do that
22 because I'm all by myself.
23   Q.   Uh-huh.
24   A.   So I would reach out to the community if
25 there was -- if I had a question or a concern.

Page 127

1  Attorneys are expensive.  I don't have a big agency.
2          (Exhibit No. 21 was marked.)
3    Q.   So I am handing you something called
4  Exhibit 21.  It is Bates stamped
5  InterExchange0028985, and it continues through
6  InterExchange0028987.
7          So who is Michael McHugh?
8    A.   Oh, he's at InterExchange.
9    Q.   Do you know what he does at
10 InterExchange?
11   A.   I think he was a program manager --
12   Q.   Pro--
13   A.   -- at the -- program director, something.
14   Q.   Do you know what that means?
15   A.   At InterExchange?
16   Q.   Yeah.
17   A.   No.
18   Q.   Okay.  Is it fair to say you see him as
19 someone fairly high up the ladder at InterExchange
20 in the au pair program?
21   A.   I have no idea.
22   Q.   You don't know?
23   A.   No, I don't.
24   Q.   So how do you -- how did you come to get
25 his e-mail address?

Page 128

1    A.   From the State Department.
2    Q.   You asked the State Department for his
3  e-mail address?
4    A.   No.  The State Department sometimes
5  sent -- sent out a broadcast, and they would copy
6  everybody.
7    Q.   Okay.  So you're saying you -- have you
8  ever met Mr. McHugh in person?
9    A.   Yes.
10   Q.   But you're saying that you came to get
11 his -- his e-mail address and contact information
12 from State Department blast e-mails?
13   A.   Right.
14   Q.   Have you produced those blast e-mails in
15 this litigation?
16        MR. KELLY:  I can tell you she has
17 not.
18        MR. SCHWARTZ:  Okay.
19   Q.   How often do you e-mail with Mr. McHugh?
20   A.   I couldn't recall.  I don't know.
21   Q.   Have you --
22   A.   Period --
23   Q.   Have you --
24   A.   Periodically, you know.  I don't know.
25   Q.   But you have met him -- you -- you said

Page 129

1  you've met in person?
2    A.   Yes.
3    Q.   In what context would you have met in
4  person?
5    A.   At meetings at the State Department, and
6  one time maybe at a meeting at the Alliance.
7    Q.   Okay.  So first let me back up.
8          You said meetings at the State
9  Department?
10   A.   Yeah.
11   Q.   What are those?
12   A.   Those are meetings where the State
13 Department asks the sponsors to come back and meet
14 with them.
15   Q.   How often do those meetings take place?
16   A.   Not very often.
17   Q.   Do you have an estimate?
18   A.   Maybe once every couple of years, once a
19 year, 18 months.
20   Q.   Okay.  But -- so in your time running
21 USAuPair, which was founded in, I think you said,
22 2003?
23   A.   Uh-huh.
24   Q.   Do you know how many of those kinds of
25 meeting you've been to?  Would it be -- I mean, it's

PLAINTIFFS' RESP. APP.0005299

MAGNA
LEGAL SERVICES

Page 130

1　14 years ago, so around ten; is that right?
2　　A.　Maybe.  With whom?
3　　Q.　Oh, thank you.
4　　　　The -- the meetings with the State
5　Department that you were describing.
6　　A.　Maybe ten meetings at the State
7　Department, maybe more.  I don't -- I couldn't tell
8　you exactly.
9　　Q.　Okay.
10　　A.　I mean, I don't go through my calender.
11　I didn't --
12　　Q.　Okay.
13　　A.　-- count before this.
14　　Q.　When you attend those meetings at the
15　State Department, do you normally take notes?
16　　A.　Sometimes.
17　　Q.　Sometimes.  Okay.
18　　　　Have you produced those notes at
19　this -- in this litigation?
20　　A.　No.
21　　Q.　Okay.  What gets discussed at these
22　meetings at the State Department?
23　　A.　General topics; where they would like us
24　to recruit au pairs from, stats in the program.
25　　Q.　Stats in the program?

Page 131

1　　A.　Yeah.  How many au pairs came every year.
2　　Q.　Have you discussed this litigation with
3　the State Department?
4　　A.　No, not specifically.  Not -- I don't
5　know.
6　　Q.　Not specifically?
7　　A.　No.  There are -- there was a meeting,
8　and it was curtailed in the --
9　　Q.　Curtailed?
10　　A.　Yeah.
11　　Q.　How -- how do you mean?
12　　A.　When any -- when any -- when -- when the
13　subject came up, any subject came up, it was just we
14　didn't talk about it.
15　　Q.　"We" being the sponsors?
16　　A.　The sponsors and the State Department.
17　　Q.　Do you recall how this subject came up at
18　these meetings?
19　　A.　There was one meeting, and -- I can only
20　recall one meeting that it came up really.
21　　Q.　Do you remember when that meeting was?
22　　A.　No, I don't remember when it was.  It was
23　after -- obviously after the complaint was filed.
24　　Q.　So what other -- I'm trying to understand
25　how the -- something like that gets curtailed.  So

Page 132

1　it begins, the -- the meeting begins.  What sort of
2　things were you talking about at that meeting?
3　　A.　It was just curtailed.  There was
4　something on the agenda, and it was seen on the
5　agenda.  And it was inappropriate, shouldn't be on
6　the agenda, so it wasn't...
7　　Q.　Who determined it was inappropriate?
8　　A.　Sponsors and their legal counsel.
9　　Q.　Okay.  So the State Department had an
10　agenda for a meeting with the sponsors.  Well, let
11　me -- let me back up.
12　　　　Are these meetings called by the
13　State Department?
14　　A.　Yes.
15　　Q.　So a meeting called by the State
16　Department had a number of different subject
17　matters --
18　　A.　Yes.
19　　Q.　-- correct?
20　　A.　Uh-huh.
21　　Q.　And one of the subject matters at this
22　meeting --
23　　A.　Yes.
24　　Q.　-- involved the lawsuit?
25　　A.　Indirectly.

Page 133

1　　Q.　How -- how indirectly?
2　　A.　It was a presentation by the Department
3　of Labor.
4　　Q.　Okay.  It was a presentation by the
5　Department of Labor regarding what?
6　　A.　I don't know.  It never got that far.
7　　Q.　But you didn't want to attend a
8　presentation by the Department of Labor because it
9　had some potential impact on this lawsuit?
10　　　　MR. KELLY:  Object to form.
11　　A.　I don't know.  It -- it was just -- it
12　was just on the agenda.
13　　Q.　What is your understanding of what the
14　Department of Labor, of how -- or how the Department
15　of Labor is involved in the au pair -- in -- in
16　the -- in the au pair universe?  You know what, I'll
17　rephrase that.
18　　　　What role, based on your
19　understanding, does the Department of Labor play in
20　the -- in regulating the au pair program?
21　　A.　That the -- the Department of State
22　regulates the au pair program.  The only thing I
23　know is that they are in communication with the
24　Department of Labor.  That's what I know.
25　　Q.　So you said the only thing you know is

PLAINTIFFS' RESP. APP.0005300

MAGNA
LEGAL SERVICES

| Page 134 | Page 136 |
|---|---|

**Page 134**

1  that the Department of State is in communication
2  with the Department of Labor?
3      A.   Yes.
4      Q.   Okay.  So how do you know that the
5  Department of State is in contact with the
6  Department of Labor?
7      A.   Because I read it in the Federal
8  Register.
9      Q.   You read it in the Federal Register?
10     A.   Yeah.
11     Q.   Would this be the au pair regulations?
12     A.   Yes.
13     Q.   The ones that we talked about earlier?
14     A.   Yes.
15     Q.   I -- I believe we have those marked as
16  Exhibit -- I think it's Exhibit 7, but let's --
17     A.   No.
18     Q.   No?  That doesn't sound right.
19     A.   No, it --
20     Q.   Oh, it's Exhibit 9.  Thank you.
21     A.   It's -- it's not in this, but it's in the
22  Federal Register.
23     Q.   Okay.  Okay.  Thank you.
24         (Exhibit No. 22 was marked.)
25     Q.   I'm handing you a document labeled

**Page 135**

1  Exhibit 22.  And this is an e-mail produced by
2  InterExchange, Bates stamped InterExchange0007875
3  and going on to 7876.
4      A.   Uh-huh.
5      Q.   So this is another e-mail to Michael
6  McHugh, correct?
7      A.   Uh-huh.
8      Q.   And what are you talking about in this
9  e-mail?
10     A.   I'm talking about performance bonds and
11  I'm talking about time sheets --
12     Q.   Okay.  And you're talking also -- you
13  say, "When DOL issued regs to eliminate the $500
14  performance bond in 1995, the regs also included a
15  ruling on host family individual recordkeeping."
16     A.   Uh-huh.
17     Q.   Okay.  So you see the bottom of the first
18  page, and it bleeds on just slightly into the
19  second --
20     A.   Yeah.
21     Q.   -- where it says 7875.
22         And starting with the word, "Based
23  on the comments received."
24     A.   Uh-huh.
25     Q.   So it says, "Based on the comments

**Page 136**

1  received in the above discussions, the agency is of
2  the opinion that a weekly stipend or wage of not
3  less than $115 is consistent with Fair Labor
4  Standards Act requirements governing payment of
5  minimum wage and is appropriate for the present
6  time."
7          So you copied -- did I read that
8  right?
9      A.   I copied -- okay.  I must have.
10     Q.   Okay.
11     A.   Okay.
12     Q.   So you -- you copied this language?
13     A.   Uh-huh.
14     Q.   And e-mailed it to Mr. McHugh, correct?
15     A.   Uh-huh.
16     Q.   And you've highlighted, as you say,
17  "Highlighted text stating that the Department of
18  Labor eliminates the need for host families to keep
19  individualized records."
20     A.   Uh-huh.
21     Q.   "Attorney believes this would include
22  time sheets."
23     A.   Uh-huh.
24     Q.   So you testified earlier that it was your
25  understanding that the Department of State set the

**Page 137**

1  stipend at 195.75; is that correct?
2      A.   Uh-huh.
3      Q.   Now, down here on the bottom of the page
4  it says that, "The agency is of the opinion that a
5  weekly stipend or wage of not less than $115 is
6  consistent with the Fair Labor Standards Act."
7      A.   Right.
8      Q.   Okay.  So given that they use -- they use
9  the word "not less than" --
10     A.   Uh-huh.
11     Q.   -- isn't that correct?
12     A.   Yeah.
13     Q.   And the wage being described here as the
14  weekly wage is the au pair wage, correct?
15     A.   Weekly stipend or wage, if not less.
16  Yes.
17     Q.   Okay.  So that language, "not less than,"
18  is that consistent with your earlier testimony that
19  the Department of State sets the stipend at 195.75?
20         MR. KELLY:  Object to form.
21         Do you understand that question?
22         THE WITNESS:  No.
23         MR. KELLY:  I don't either.
24         MR. SCHWARTZ:  All right.
25     A.   I -- I really don't understand what

Case 1:14-cv-03074-CMA-KMT Document 1059-25 Filed 05/17/18 USDC Colorado Page 474 of 700

| Page 138 | Page 140 |
|---|---|

**Page 138**

1  you're trying to --
2  Q.  Okay.
3  A.  -- ask.
4  Q.  Would you say that the words "not less
5  than" have the equivalent meaning to "at a minimum"?
6  A.  I'm not an attorney.  I don't know.
7  Q.  Fair enough.
8      If -- if the agent -- if here the
9  -- the -- the thing that you're quoting says that,
10  "The agency is of the opinion that a weekly stipend
11  or wage of not less than 115 is" -- "is consistent
12  with the Fair Labor Standards Act."
13      So a weekly stipend or wage of not
14  less than 115, is that the same to you, based on
15  your general understanding, as saying that a weekly
16  stipend of a minimum of 115?  Does that -- so I'm
17  trying -- I'm trying to understand how -- okay.  Let
18  me -- let me back up.
19  A.  But I'm tired and I'm really confused.
20  I'm not an attorney.  I just read it for what it
21  says, and I do my best to interpret it.  But it's
22  what it says.
23  Q.  So if -- if -- if I have a document --
24  let's -- let's -- let's state that the State
25  Department had said something that said that the

**Page 139**

1  stipend has to be not less than 195.75, or let --
2  let's -- take the 195.75 out of it.  The stipend
3  says not less than $250.
4      If somebody paid $300, is that in
5  compliance with that statement?
6      MR. KELLY:  Object to form.
7  A.  I think I've answered that question, you
8  know.  Can -- can they pay more than the minimum?
9  The answer is yes, probably.
10  Q.  Okay.  Thank you.
11      So you testified earlier that
12  you've had meetings with the Department of State.
13  A.  Uh-huh.
14  Q.  And you've also testified that you had
15  meetings with the Alliance?
16  A.  I attended a meeting.
17  Q.  Okay.
18  A.  Or two.
19  Q.  A meeting or two?
20  A.  Yeah.
21  Q.  Okay.  What goes on at those meetings?
22  A.  What goes on at those meetings?
23  Q.  Uh-huh.
24      MR. KELLY:  Object to form.
25      You can answer.

**Page 140**

1  Q.  I --
2  A.  It's a review of the agenda for the --
3  the only ones I've attended was the first meeting
4  last year and then a meeting -- a meeting or two
5  prior to that, where there was a State Department
6  meeting that was called.
7  Q.  Okay.  A State -- so these were a meeting
8  or two prior to that meeting, a meeting or two with
9  the Alliance?
10  A.  I attended a meeting.
11  Q.  Uh-huh.
12  A.  I received an invitation.  Normally I
13  wouldn't because I'm not a member.
14  Q.  Uh-huh.
15  A.  But there was a State Department meeting,
16  so I was invited as a nonmember to attend a meeting
17  before the State Department meeting.
18  Q.  Okay.  So these meetings take place prior
19  to the meeting with the State Department?
20  A.  Well, the -- I don't know.  Only the one.
21  Q.  The one that you did?
22  A.  The one that I attended, yes.
23  Q.  Took place prior to.
24      So what was discussed at that
25  Alliance meeting?

**Page 141**

1  A.  Actually, I don't know because I was
2  pulled out of the meeting with an au pair emergency.
3  Q.  Okay.  The entire meeting?
4  A.  Yes.
5  Q.  So you -- where did these meetings take
6  place?
7  A.  Washington, D.C.
8  Q.  So you had flown to Washington, D.C.?
9  A.  Yes.  Uh-huh.
10  Q.  You got the hotel?
11  A.  Yeah.
12  Q.  You go in --
13  A.  Yes.
14  Q.  -- to where?  Is it at a hotel, the
15  Alliance meetings?
16  A.  No, it was at -- in their office
17  building, I think.
18  Q.  In the Alliance office building?
19  A.  Uh-huh.
20  Q.  The other sponsors were there?
21  A.  Yes.
22  Q.  And how long into the meeting before you
23  got pulled out?
24  A.  I think I got one bite of my sandwich.
25  Q.  So you -- you took a bite of your

PLAINTIFFS' RESP. APP.0005302

36 (Pages 138 to 141)

| Page 142 | Page 144 |
|---|---|

**Page 142**

1  sandwich?
2      A.   Yes.
3      Q.   And then you get a phone call?
4      A.   Yes.
5      Q.   And you had to leave?
6      A.   Both phones going.
7      Q.   Both phones go off?
8      A.   Uh-huh.
9      Q.   Do you remember the emergency?
10     A.   Yes, I do.
11     Q.   What happened?
12     A.   It was just an au pair emergency that
13 needed immediate attention.
14     Q.   Do you remember the nature of it?
15     A.   Yes, I do.  It was -- I don't -- I'm --
16 I'm tired, I can't remember the name of the term.
17 It's a legal term.  I -- I can't remember.  But
18 there were five police officers in my office.
19     Q.   Oy.  Okay.  I suppose that would
20 constitute as an emergency, wouldn't it?
21     A.   Yes.
22     Q.   So did -- did they hand out an agenda at
23 these meetings with the Alliance?
24     A.   I don't know.  I didn't get that far.
25     Q.   Oh.  So you didn't even get a --

**Page 143**

1      A.   I don't remember getting...
2      Q.   Okay.  So that was one meeting.
3      A.   Yeah.
4      Q.   I -- I believe you testified that there
5 were two meetings --
6      A.   Well --
7      Q.   -- that had occurred prior to the
8 Department of State?
9      A.   Don't hold me that to that because I
10 can't remember.  I remember that one distinctly
11 because of what happened.
12     Q.   Uh-huh.
13     A.   Yeah.
14     Q.   But you recall attending other Alliance
15 For Cultural Exchange meetings?
16     A.   I attend -- I remember attending one
17 more, and that was, like, in 2004 maybe.
18     Q.   Okay.  So you attended -- you were
19 invited to attend in 2004?
20     A.   Uh-huh.  Yeah, I -- I think so.
21     Q.   That --
22     A.   I don't remember the exact date.  It was
23 shortly after designation.
24     Q.   Okay.
25     A.   It was a meet and greet.

**Page 144**

1      Q.   So you were invited to meet and greet
2 everybody shortly after you were designated?
3      A.   Yeah.  And there was -- well, somebody
4 from the State Department was there, so I -- I don't
5 even recall what the meeting was about.
6      Q.   Okay.  But it was with the State
7 Department, the other sponsors, and you were
8 invited --
9      A.   Uh-huh.
10     Q.   -- as well?
11     A.   Yeah.  I was a newbie.
12     Q.   You were the newbie?
13     A.   Uh-huh.
14     Q.   Okay.
15         MR. SCHWARTZ:  You mentioned being a
16 little tired.  Why don't we take ten minutes right
17 now.
18         MR. KELLY:  That's agreeable.  Thank
19 you.
20         THE VIDEOGRAPHER:  Going off the
21 record at 3:09.  This marks the end of media 2.
22         (Break from 3:09 p.m. to
23          3:28 p.m.)
24         THE VIDEOGRAPHER:  This marks the
25 start of media 3 of the video deposition of Helene

**Page 145**

1 Young, 30(b)(6) representative for USAuPair, Inc.
2 We're back on the record.  The time is 3:28.
3 BY MR. SCHWARTZ:
4      Q.   So, Ms. Young, before we start up again.
5      A.   Uh-huh.
6      Q.   I -- your counsel let us know you were
7 feeling a little wan, a little tired?
8      A.   I'm 36 hours now with no sleep, so...
9      Q.   That -- 36 hours without sleep?
10     A.   Yes.
11     Q.   Do you feel comfortable and capable going
12 forward here?
13     A.   Yeah.
14     Q.   I mean, we -- we are happy to adjourn it
15 until -- adjourn this until tomorrow for you to get
16 a night's rest and --
17     A.   I can't, no.  I have to be back.
18         MR. KELLY:  Juan and I worked very
19 hard to shoehorn --
20         MR. SCHWARTZ:  No, I know.
21         MR. KELLY:  -- this deposition date
22 into the only day where we could make it happen, and
23 so I think we'll stipulate that she's good to go.
24         THE WITNESS:  Yeah.
25         MR. KELLY:  We're not going to play

PLAINTIFFS' RESP. APP.0005303

MAGNA
LEGAL SERVICES

Page 146

```
 1   games with that.
 2           MR. SCHWARTZ: Okay. I appreciate
 3   that. I just want to -- but --
 4           MR. KELLY: Yeah.
 5       Q.  Having -- having said all of that, if we
 6   need to take more frequent breaks --
 7       A.  Okay.
 8       Q.  -- that's fine by us.
 9       A.  Okay.
10       Q.  And please don't hesitate to state, you
11   know, whenever it is that -- that you do need to
12   take one.
13       A.  Okay.
14       Q.  Okay.
15           So you talked to us a little bit
16   earlier about something called a performance bond?
17       A.  Yeah.
18       Q.  What was the performance bond?
19       A.  It was like a -- well, the State
20   Department called it a performance bond. We called
21   it a security deposit.
22       Q.  Okay.
23       A.  And that was something, the au pairs
24   would make a deposit and then if they successfully
25   completed the program then they would get it back.
```

Page 147

```
 1       Q.  Okay. And for -- if they didn't
 2   successfully complete the program?
 3       A.  Then they wouldn't get it back.
 4       Q.  And who -- and you would keep it?
 5       A.  It was -- it was in a trust account for
 6   them, and then --
 7       Q.  Okay.
 8       A.  -- it would go toward offsetting the
 9   expenses to bring a replacement in.
10       Q.  Okay. So what happened with that
11   performance bond? Do -- do you still have a
12   performance bond --
13       A.  No.
14       Q.  -- requirement?
15       A.  Uh-huh.
16       Q.  Why not?
17       A.  In April, I think, of 2011 the State
18   Department called a meeting and informed the
19   sponsors that to cease and desist with the
20   performance bonds for au pairs arriving in the
21   country from that date forward.
22       Q.  Okay. And this was April of -- of 2011?
23       A.  I think so.
24       Q.  And did all of the sponsors have a
25   performance bond?
```

Page 148

```
 1       A.  I don't know.
 2       Q.  You don't know?
 3       A.  I don't know.
 4       Q.  Did you ever discuss the performance bond
 5   with other sponsors?
 6       A.  I may have. I don't -- I don't recall.
 7   I may have.
 8       Q.  When -- when did you find out that the
 9   performance bond could be an issue for you?
10       A.  April 2011.
11       Q.  So it was at that meeting?
12       A.  Yes.
13       Q.  It wasn't before that meeting?
14       A.  No.
15       Q.  And so I understand, this was a meeting
16   between you and all of the other sponsors and the
17   Department of State?
18       A.  Yes.
19       Q.  Okay. So you testified earlier -- let me
20   scratch that.
21           So was this one of the ten or so
22   meetings with the Department of State that you --
23       A.  Probably, yeah.
24       Q.  -- attended over time?
25       A.  Uh-huh.
```

Page 149

```
 1       Q.  Okay. Do you know if there was an
 2   Alliance meeting before this meeting?
 3       A.  There could have been. I don't know. I
 4   don't -- I have no idea. There could have been.
 5       Q.  Okay. Did you attend any Alliance
 6   meeting before this meeting?
 7       A.  I can't recall. I may have. I may not
 8   have. I -- I don't know. I -- I do not recall.
 9       Q.  Okay.
10       A.  If I did, let me know.
11       Q.  Sorry?
12       A.  Nothing.
13       Q.  What's your understanding of why the
14   performance bond requirement -- or -- or why -- why
15   you -- you can't have performance bonds?
16           MR. KELLY: Object to form.
17           You can answer.
18       A.  I don't know exactly why. I just know
19   that the State Department called us together and
20   told us to cease and desist.
21       Q.  Uh-huh.
22       A.  And basically cited some -- the
23   regulations from 1995 --
24       Q.  Okay.
25       A.  -- I think it was, yeah.
```

PLAINTIFFS' RESP. APP.0005304

MAGNA
LEGAL SERVICES

Case No. 1:14-cv-03074-CMA-KMT Document 1059-25 filed 03/04/19 USDC Colorado pg 1 of 701
Case 1:14-cv-03074-CMA-KMT Document 932-25 Filed 03/17/18 USDC Colorado Page 477 of 700
478 of 701

| | |
|---|---|
| **Page 150** | **Page 152** |

**Page 150**

1    Q.  So you sometime -- some -- when -- the
2  time sheets issue that we discussed earlier --
3    A.  Uh-huh.
4    Q.  -- you -- you were concerned, you talked
5  to other sponsors about these time sheets?
6    A.  Right.
7    Q.  You talked to the Alliance about these
8  time sheets.
9        What other kinds of issues would
10  come up that you would find the need to reach out to
11  people on?
12    A.  Unusual circumstances.
13    Q.  Such as?
14    A.  Where I haven't -- I don't know if
15  there's a State Department protocol or if there's a
16  reg that I missed or an administrative rule that I
17  missed, sometimes I would reach out to sponsors who
18  have far more experience than I did and I might have
19  asked, you know, "When this situation occurred, how
20  did you handle it?"
21    Q.  So you might ask them for how to respond
22  to -- to -- 
23    A.  Well --
24    Q.  -- certain situations that come up?
25    A.  Give -- give me ideas, you know.

**Page 151**

1    Q.  Uh-huh.
2    A.  Give me ideas to -- just -- just general
3  with a very specific circumstance.
4    Q.  So -- thank you.
5        So when something would come up
6  that you don't expect or don't know how to respond,
7  you might inquire how do -- how do we deal with this
8  situation?
9    A.  I -- I could, yeah.
10    Q.  Do you recall asking advice on how to
11  deal with issues involving au pair taxes?
12    A.  I may have, yeah.
13    Q.  Do you remember doing that?
14    A.  I -- I could have, yes.  That -- I mean,
15  that -- there was a point in time when there -- when
16  I was confused, when there -- there -- I mean, I
17  didn't know.  Families were calling, and they had
18  different opinions and questions, and I would refer
19  them to their CPAs or their tax --
20    Q.  Sure.
21    A.  -- attorneys because I'm not a tax
22  person.
23    Q.  You're not a tax person?
24    A.  I'm not a -- I can't give you --
25    Q.  You're just a --

**Page 152**

1    A.  I -
2    Q.  -- taxed person?
3    A.  Yeah.
4    Q.  Yeah.
5    A.  I can't give advice.
6    Q.  I see.
7    A.  I'm not authorized to do that.
8        (Exhibit No. 23 was marked.)
9        MR. KELLY:  Before you hand that to
10  the witness, I've noticed that that's a --
11  designated attorney's eyes only.
12        MR. SCHWARTZ:  Oh, thank -- thank you
13  for noticing that.
14        I will point out that as part of
15  the protective order, the protective order allows
16  for the showing of attorneys' eyes only documents to
17  the individual who -- who either is the person who
18  produced the document or is the recipient or
19  composer of the document.  That's my understanding
20  of -- of -- of the --
21        MR. KELLY:  I haven't seen the
22  document --
23        MR. SCHWARTZ:  -- protective order.
24        MR. KELLY:  -- other than it's
25  attorneys' eyes only.  I agree with your

**Page 153**

1  characterization of --
2        MR. SCHWARTZ:  Of the protective
3  order.
4        MR. KELLY:  -- the protective order.
5        MR. SCHWARTZ:  Okay.
6        MR. KELLY:  And I am in agreement
7  that that is what it says.
8        We have a number of people on the
9  phone.  I believe they all to be attorneys in the
10  case.  But I want to make sure that everybody on the
11  phone also realizes that the next exhibit is marked
12  attorneys' eyes only pursuant to the protective
13  order.
14        MR. SCHWARTZ:  And why don't I give
15  them the Bates number --
16        MR. KELLY:  Sure.
17        MR. SCHWARTZ:  -- in case anybody
18  wants to discuss this.  It's AAP0000767.
19        So if anyone on the phone or
20  counsel for AAP would like to say anything on the
21  record, I think now would be an appropriate time.
22        MR. KELLY:  I don't think they're on
23  the phone.  Let's go.
24        MR. SCHWARTZ:  All right.  Thank you.
25  Thank you very much for raising that, Counsel.

**MAGNA**
LEGAL SERVICES

Page 154

```
1       Q.   So my first question for you is who is
2   Stacey Frank?
3       A.   She is, or she was, is with Agent
4   Au Pair.
5       Q.   Uh-huh.
6       A.   Responsible officer.
7       Q.   So what does that mean?  What is a
8   responsible officer?
9       A.   That's a term that the State Department
10  uses when you receive designation.
11      Q.   Okay.  So are you the responsible officer
12  for USAuPair?
13      A.   Yes.  Of course.  I wouldn't be here.
14      Q.   And -- but have -- have you heard of the
15  term "alternate responsible officer"?
16      A.   Yes.
17      Q.   So what's the difference between a
18  responsible officer and an alternate responsible
19  officer?
20      A.   I think the response -- well, I'm not
21  sure.  I think the re -- alternate responsible
22  officers are there to cover for the responsible
23  officer, in the event that they're not available.
24      Q.   So the responsible officer -- is it fair
25  to say the responsible is the person designated by
```

Page 155

```
1   the State Department to interact with the State
2   Department on the au pair program?
3       A.   Yes.
4       Q.   Is that right?
5       A.   Yes.
6       Q.   Okay.  So this woman, Stacey -- Stacey?
7       A.   Yes.
8       Q.   Stacey Frank?
9       A.   Uh-huh.
10      Q.   So Ms. Frank, as you understand it,
11  was -- is or was the responsible officer at Agent
12  Au Pair?
13      A.   Yes.
14      Q.   You're laughing?
15      A.   Yeah.  No, I -- go ahead.
16      Q.   Can I ask what you were -- what -- what
17  did -- what did you find funny?
18      A.   Oh, just some of the terminology in here.
19      Q.   Oh, like what?
20      A.   The -- the comment about another sponsor.
21      Q.   Which comment?
22      A.   "They are such snakes."
23      Q.   Ah, I see.  "Plus I would read the fine
24  print.  They are such snakes."
25           And that was referring to -- to
```

Page 156

```
1   which defendant?  Oh, it doesn't matter.
2       A.   No, it doesn't.
3       Q.   It doesn't matter.  Okay.  So we're
4   getting off track here.  All right.
5           So the -- the first e-mail that
6   you had to Stacey was, you said, "Did a woman with a
7   last name of Powers contact you about an au pair?
8   Location is Dallas.  Let me know.  It may be a
9   scam."
10      A.   Yes.
11      Q.   So what's going on there?  What happened?
12      A.   Oh, well, I don't know specifically on
13  this one.
14      Q.   Uh-huh.
15      A.   But there are a lot of scams in this
16  industry.
17      Q.   Just people trying to steal money from
18  au pairs?
19      A.   Yes.  Uh-huh.
20      Q.   Pretending to be agencies or something
21  and --
22      A.   Yes.
23      Q.   I see.  And you were warning a fellow
24  sponsor about this possibility?
25      A.   Yes.
```

Page 157

```
1       Q.   Okay.  So you -- you also e-mail --
2   you -- you also e-mail Ms. Frank about tax advice?
3       A.   Yeah.  I was wondering.
4       Q.   Is that right?
5       A.   Uh-huh.
6       Q.   Yeah.
7       A.   Yeah.
8       Q.   And so -- so this -- would this fall into
9   the category of things you were describing before,
10  as to figuring out how other people respond to these
11  specific issues?
12      A.   Yes.  I mean, ask the question again.
13  I'm sorry.  I was reading the e-mail when you were
14  asking --
15      Q.   Sure.
16      A.   -- the question.
17      Q.   So I said would this fall into the
18  category of things you described before, where you
19  would ask other sponsors to figure out how to
20  respond to specific issues that might come up?
21      A.   Not to figure out, to -- to get some
22  parameters.
23      Q.   Uh-huh.
24      A.   Again, so that our agency would not be
25  out of compliance.
```

PLAINTIFFS' RESP. APP.0005306

MAGNA
LEGAL SERVICES

Page 158

1    Q.   Got you.  So did you find out what these
2  other agencies were doing to stay in compliance?
3    A.   Well, I looked at their websites.
4    Q.   You looked at the other agencies'
5  websites?
6    A.   Yeah.
7    Q.   And would you ask the other agencies what
8  they were doing?
9    A.   No.
10   Q.   So here it says, "I" -- it -- you wrote,
11 it says that you wrote, "I talked to Ruth at APIA."
12   A.   Yes.
13   Q.   "And she basically said they instruct
14 families they are not authorized to give out any
15 tax" --
16   A.   Right.
17   Q.   -- "advice to families or au pairs."
18   A.   Yes.
19   Q.   So you had asked --
20   A.   But I didn't ask everybody.
21   Q.   Oh, okay.  But you had asked -- you --
22 but you asked Ruth at APIA --
23   A.   I -- uh-huh.
24   Q.   -- what she does in this circumstance?
25   A.   Right.

Page 159

1    Q.   And how -- and -- and this is what she
2  told you?
3    A.   Yes.
4    Q.   Okay.
5    A.   Which is what I was doing.
6    Q.   So I'm marking -- well, our court
7  reporter is marking Exhibit No. 24.  It is Bates
8  stamped CHI0001670.
9            (Exhibit No. 24 was marked.)
10   Q.   I'll give you a chance to read over the
11 e-mail.
12           (Witness peruses document.)
13   Q.   So this is an e-mail from October 12,
14 2011 --
15   A.   Uh-huh.
16   Q.   -- from Linda Mori to you and -- well,
17 the first e-mail is from you to -- to Linda Mori --
18   A.   Uh-huh.
19   Q.   -- is that correct?
20   A.   Yeah.
21   Q.   Okay.  Let me -- let me back up.
22           How do you know Linda Mori?
23   A.   She works with CHI.
24   Q.   Okay.
25   A.   And I met her at a State Department

Page 160

1  meeting.
2    Q.   Do you remember when, when you met her?
3    A.   No, not exactly.
4    Q.   No?  Okay.
5    A.   Not exactly.
6    Q.   Do you know an approximate year or --
7    A.   No, I don't remember the exact year.
8    Q.   Okay.
9    A.   I'd have to go back and look.  Okay.
10   Q.   So why did you e-mail Ms. -- Ms. Mori?
11   A.   I was concerned that -- and not just
12 concerned.  I was confused, and I was asking a
13 question because this came out of the blue.
14   Q.   So when you say "this came out of the
15 blue," you're --
16   A.   This -- this -- this --
17   Q.   You -- you received a note from the
18 Department of State, right?
19   A.   Italicized, yeah.
20   Q.   So this italicized note is from the
21 Department of State?
22   A.   Yeah.  Uh-huh.
23   Q.   Where the Department of State says, "Once
24 again, the actions of third parties, in this case
25 the overseas affiliates, are imputed to the

Page 161

1  designated sponsors."
2    A.   Yeah.
3    Q.   "Hence, it is the designated sponsor's
4  (USAuPair's) responsibility to verify if the total
5  or partial cost of the return ticket was indeed
6  advanced to the overseas affiliate."
7            So which -- so -- so do you know
8  why the Department of State sent you this document,
9  this -- this e-mail?
10   A.   It may have been -- I mean, it's
11 obviously regarding a complaint from an au pair to
12 the State Department for fees paid to an overseas
13 agent.
14   Q.   Okay.  And these would be -- these --
15 these are the foreign agents you described at the
16 very beginning of our --
17   A.   Foreign representatives.
18   Q.   The for --
19   A.   Uh-huh.
20   Q.   Excuse me.  Thank you.  The foreign
21 representatives you described at the beginning?
22   A.   Uh-huh.
23   Q.   Oh, with respect to those foreign
24 representatives.
25   A.   Yeah.

MAGNA
LEGAL SERVICES

Case 1:14-cv-03074-CMA-KMT   Document 1059-25   Filed 05/17/18   USDC Colorado   Page 480 of 700

Page 162

1    Q.  Did they work -- do the foreign
2  representatives you work with work exclusively with
3  your agency?
4    A.  They're supposed to.  It's in the
5  contract.
6    Q.  Okay.  Do you have any knowledge if they
7  didn't?
8    A.  Sometimes it comes out that they didn't.
9    Q.  That they're also working with other
10  agencies?
11    A.  Yeah.  Uh-huh.
12    Q.  Okay.  So you're e-mailing this -- you --
13  you e-mail this to the -- what the Department of
14  State said to you, and you -- you e-mailed to
15  Ms. Mori, "What is your take on this?"
16        What is -- what do you mean by,
17  "What is your take"?
18    A.  Again, I'm just trying to find out if --
19  if I am being, how shall I -- if there's selective
20  enforcement --
21    Q.  Uh-huh.
22    A.  -- or selective interpretation --
23    Q.  Uh-huh.
24    A.  -- of regulations for -- for USAuPair and
25  not with other agencies.

Page 163

1    Q.  Okay.
2    A.  Or sponsors.
3    Q.  So, I mean, Ms. Mori responds, "Well, if
4  they sent a message like this to me, I would tell
5  them if we receive a complaint about an overseas
6  agent we thoroughly investigate the allegation.  And
7  if we found any impropriety, we would immediately
8  stop working with the agent."
9    A.  Uh-huh.
10    Q.  I read that right, right?
11    A.  Yeah.  Uh-huh.
12    Q.  So have you taken that advice?
13    A.  Yes and no.
14    Q.  Yes and no?
15    A.  Yes and no.
16    Q.  Okay.  So yes, I understand?
17    A.  Yes, I understand.
18    Q.  What's the no?
19    A.  The -- well, we did an investigation,
20  and -- and then -- and I don't remember which
21  foreign representative this was, so I can't remember
22  exactly which one.  It -- wait a minute.  Does it
23  say any -- no, it doesn't.  I don't remember which
24  one.
25        Understand that I am always

Page 164

1  concerned about losing designation.
2    Q.  Uh-huh.
3    A.  So I want to do the right thing.  And the
4  right thing is sometimes situations occur and I
5  don't have any guidance.  I don't know what to do.
6        So -- and then I get something
7  that's like this, and I -- I just want to find out
8  what I can do and what I should do or if I'm being
9  targeted, singled out.
10    Q.  So you're -- you're looking to them for,
11  like, a best practice of how to respond?
12        MR. KELLY:  Object to form.
13    A.  Not best practice because I would respond
14  only to what applied in my situation.
15    Q.  Uh-huh.
16    A.  So without knowing who the representative
17  is, I don't -- foreign rep is, I wouldn't know how I
18  handled this.
19    Q.  Do you remember how -- what you said to
20  the State Department in response?
21    A.  No, I don't remember.
22    Q.  When -- the advice you're getting here,
23  it says, "I would tell them if we receive a
24  complaint about an overseas agent we thoroughly
25  investigate the allegation.  If we found any

Page 165

1  impropriety, we would immediately stop working with
2  the agent."
3        Is that the sort of thing you
4  would tell the State Department?
5    A.  Well, for me it's a given.  I would
6  investigate immediately.
7    Q.  Uh-huh.
8    A.  So that won't be anything.
9        And if I found any exploitation
10  going on in any way, shape, or form, then the
11  contract is terminated with that foreign
12  representative.
13    Q.  And that's what you'd tell the State
14  Department?
15    A.  Yeah.  Uh-huh.
16        (Exhibit No. 25 was marked.)
17    Q.  So I'm handing you a document marked
18  Exhibit 46 -- oh excuse me.  Exhibit --
19        MR. KELLY:  25.
20    A.  Uh-huh.
21    Q.  -- 25.  I don't know where I got 46 from.
22        It is an e-mail from you to
23  someone named -- to Linda Mori, and cc'ing an --
24  individual named Timothy Resch?
25    A.  Uh-huh.

PLAINTIFFS' RESP. APP.0005308

MAGNA
LEGAL SERVICES

| | |
|---|---|
| **Page 166** | **Page 168** |

**Page 166**

1  Q.  So who is Timothy Resch?
2  A.  He is the attorney for USAuPair.
3  Q.  Okay.
4  A.  I mean, general.
5  Q.  So the -- the general counsel --
6  A.  Uh-huh.
7  Q.  -- for USAuPair?
8  A.  Yeah.  Local.
9  Q.  Okay.  It says here when you're, I
10 suppose, recommending this attorney to CHI?
11 A.  Yes.
12 Q.  Okay.  It says, "He understands the
13 concern sponsors have with proposed rules and
14 already is familiar with DOS dynamics.  Suggest you
15 or others contact him directly."
16       Do you know what these proposed
17 rules are that you're talking about here?
18 A.  I think this was on the Summer Work
19 Travel Program.
20 Q.  Okay.  So is -- so you say, "Below is
21 contact information for attorney on SWT and other
22 exchange programs."
23 A.  Summer Work and Travel.
24 Q.  Summer Work and Travel?
25 A.  Uh-huh.

**Page 167**

1  Q.  And you're saying the rules referred to
2  here are the rules having to do with the Summer Work
3  and Travel Program?
4  A.  General rules for the exchange program,
5  the J-1 visa.
6  Q.  The J-1 visa program --
7  A.  Yes.
8  Q.  -- generally?
9  A.  Yes.
10 Q.  Okay.  So do you recall why you were
11 e-mailing this to Ms. Mori?
12 A.  No, I don't recall why.
13 Q.  So do you know what the concerns were?
14 You said there are proposed rules.  I'm -- I'm just
15 trying to understand what the concerns sponsors have
16 with proposed rules?
17 A.  It may have been information in the media
18 about the Summer Work Travel Program.
19 Q.  Okay.
20       (Exhibit No. 26 was marked.)
21 Q.  This is Exhibit No. 26.
22 MR. SCHWARTZ:  For those listening,
23 it's Bates stamped CHI0001981.
24 A.  Yeah.
25 Q.  So is this a -- an e-mail.  The bottom

**Page 168**

1  e-mail is from Michael McCarry to Michael McCarry?
2  A.  Uh-huh.
3  Q.  And you received it, and the subject is
4  "A State Department Update"?
5  A.  Yes.
6  Q.  Do you receive e-mails from Michael
7  McCarry very often?
8  A.  This was forwarded to me.
9  Q.  Ah, so this was forward -- you -- you
10 didn't receive this --
11 A.  No.
12 Q.  -- initial e-mail?
13       You're saying that this was
14 forwarded to you from Linda --
15 A.  Yes.
16 Q.  Linda Mori?
17 A.  Uh-huh.
18 Q.  Okay.  It says, Ms. Mori says, "We'll try
19 giving you a call this week to fill you in.  But all
20 I can say is that we are all in for the ride of our
21 lives."
22 A.  Uh-huh.
23 Q.  What is that -- what is that about?
24 A.  That was a change of leadership at the
25 State Department.

**Page 169**

1  Q.  From whom to whom?
2  A.  I don't remember who was there before,
3  but the new person was Robin Lerner.
4  Q.  Okay.
5  A.  Uh-huh.
6  Q.  And what was different about Ms. Lerner?
7  A.  At this point I didn't know because I
8  hadn't met her.
9  Q.  Okay.  So have you been in the ride --
10 for the ride of your life?
11 A.  Yeah.
12 Q.  Yeah?
13 A.  Wouldn't you consider this the ride?
14 Q.  What about from Ms. Lerner?
15 A.  Well, I never had a personal -- it was
16 always a group meeting.
17       THE WITNESS:  Sorry, I touched the
18 mike.
19 Q.  So you've never personally met
20 Ms. Lerner?
21 A.  I met her in meetings.
22 Q.  Okay.  And that --
23 A.  At the State Department, but not
24 personally one on one.
25 Q.  And Linda says, "We'll try giving you a

**MAGNA**
**LEGAL SERVICES**

1  call this week to fill you in, but all I can say is
2  that we are in for the ride of our lives."
3          So did she call you to fill you
4  in?
5      A.   She may have.
6      Q.   Do you remember what she said?
7      A.   No.
8      Q.   Okay.
9      A.   I do not.
10     Q.   So do you know what their -- what -- at
11 the top it says, "What's the cultural component of
12 subpart A?"
13         Do you know what that is referring
14 to?
15     A.   It's a part of the federal regulations
16 that have been in process to change for probably ten
17 years now, and we're still waiting for the changes.
18     Q.   So you're still waiting for the
19 changes --
20     A.   Yes.
21     Q.   -- that are referred to here --
22     A.   Yeah.
23     Q.   -- in these 2012 e-mails?
24     A.   Yes.
25     Q.   Okay.

1          (Exhibit No. 27 was marked.)
2          MR. SCHWARTZ:  Did you mark this?
3  Oh.
4      Q.   So do you remember in 2013 when there was
5  a fight over, I guess, immigration reform?  There
6  was new immigration reform legislation?
7      A.   A fight?  Not -- I don't recall right
8  now.
9      Q.   Okay.  I'm just...
10         Do you remember learning about the
11 Immigration Reform Bill that was coming around in
12 2013?
13     A.   It -- if I -- I may have received
14 something on it.  I don't re -- I don't remember it
15 specifically.
16     Q.   Okay.  I'm presenting you with
17 Exhibit 27.  It's Bates stamped CHI001338.  So --
18         MR. KELLY:  May I trouble you for a
19 copy?
20         MR. SCHWARTZ:  Oh, absolutely.
21         MR. KELLY:  Thank you.
22         MR. SCHWARTZ:  Here you go.
23     A.   Okay.  Again, this is forwarded to me.
24     Q.   Uh-huh.  And this is forwarded by Linda
25 Mori of CHI to you, correct?

1      A.   Yes.
2      Q.   Now, she says here at the 5:39 p.m.
3  e-mail on 5-22-2013, "Nice seeing you last night.
4  Keep in touch."
5          Was -- if you remember, when she
6  saw you, was that at a Alliance meeting?
7      A.   No.  I don't know.
8      Q.   At a DOS meeting?
9      A.   Linda lives in the town next to mine.
10     Q.   Oh.
11     A.   So we do country line dancing, or we did.
12     Q.   So do you remember what -- I'll give you
13 a moment to familiarize yourself with the -- the
14 first e-mail.  It says from Michael McCarry to
15 Michael McCarry.
16         (Witness peruses document.)
17     A.   I vaguely remember this.
18     Q.   So what's going on here?
19     A.   I think this had to do with -- what was
20 the Senator's, the immigration bill that they were
21 putting together?  I -- I vaguely remember this, and
22 that it could affect -- but it went -- I don't think
23 it went anywhere.  I don't know.  I was just adding
24 my two cents.
25     Q.   So your two cents, you said, is, "Michael

1  is on the defensive.  He needs to go on the
2  offensive."
3      A.   Yeah.
4      Q.   "Acknowledge and cite percent, stats,"
5  and then there's the number sign.
6      A.   Uh-huh.
7      Q.   "Stats to gain overall perspective."
8          So what are you talking about
9  here?  What -- what do you mean by "needs to go on
10 the offensive rather than the defensive"?
11     A.   I think there was a groundswell of
12 sentiment about the exchange programs taking jobs
13 away from Americans.
14     Q.   Okay.
15     A.   And/or something about, you know, citing
16 specific incidents.  But that doesn't mean you throw
17 the baby out with the bath water, or the bath water
18 out with the baby.  I don't know.  I -- I
19 honestly -- I vaguely remember this.
20     Q.   Okay.
21     A.   So I can't really respond specifically.
22     Q.   So you're -- but you're here -- you --
23 you -- okay.
24         So you're e-mailing your
25 colleague, Linda, about how you think the Alliance

MAGNA
LEGAL SERVICES

Page 174

1   should behave in response to this, right?
2       A.   I was giving my opinion.
3       Q.   Yeah.
4       A.   Yeah.
5       Q.   Okay.  That's fine.
6            So you e-mailed quite -- you go
7   line dancing with Ms. Mori, you said?
8       A.   I did.
9       Q.   Or you did?
10      A.   A few times.
11      Q.   A few times?
12      A.   Yes.
13      Q.   That's fine.
14           Do you ever discuss more
15  specific -- do you discuss the -- the au pair
16  program a lot with Ms. Mori?
17      A.   We might discuss a couple of things.
18      Q.   Anything in particular that you discuss
19  most?
20      A.   Usually just in a -- an au pair situation
21  or a host family situation.  So that's -- or how
22  stressful it can be.
23      Q.   Do you talk about how to interact with
24  host families with her?
25      A.   I might.

Page 175

1       Q.   And do you talk about how to deal with
2   problems that might come up with a given au pair?
3       A.   It's kind of -- I would frame it in the
4   same way attorneys talk about cases without
5   mentioning names.
6       Q.   Uh-huh.
7       A.   About challenges.
8       Q.   Do you ever ask her about even more
9   specific things, how -- what -- what to put in your
10  forms or what to --
11      A.   Not that I can recall.  Not -- not that I
12  can recall.
13      Q.   Okay.  So do you -- you don't -- do you
14  discuss best practices with her, how -- yeah.
15           MR. KELLY:  Object to form.
16           You can answer.
17      A.   I establish my own best practice from my
18  own experience.
19      Q.   Uh-huh.  And you don't talk about that
20  with Ms. Mori?
21      A.   No, I wouldn't do that.
22      Q.   You wouldn't talk --
23      A.   Not -- well, there's some things I might,
24  but some things I -- I might not because they might
25  be proprietary.

Page 176

1       Q.   So what -- what sort of proprietary
2   things do you not share with anybody?
3       A.   I don't generally, you know, share what
4   I -- compensation to the foreign reps, for instance.
5       Q.   You don't talk about that with anyone
6   else?
7       A.   Not generally, unless it's -- I don't
8   know.  I -- I can't recall ever saying anything
9   about that.
10           Compensation to our domestic, our
11  local representatives, community representatives.
12  Things like that.
13      Q.   Okay.  So internal compensation, you're
14  not -- you're not going to talk to about any -- with
15  anyone else, right?
16      A.   Well, and some of our policies and
17  practices.
18      Q.   And what policies and practices would be
19  withheld from -- from your discussions with others?
20      A.   Well, there's things like -- you asked me
21  why we open a bank account.
22      Q.   Uh-huh.
23      A.   I thought that was proprietary.
24      Q.   Oh, you so you haven't -- so you don't
25  think anyone knows that --

Page 177

1       A.   Well, they might know.
2       Q.   -- until now?
3            MR. KELLY:  They do now.
4            THE WITNESS:  They do now.
5            (Exhibit No. 28 was marked.)
6       Q.   So I'm handing you a document that's
7   marked Exhibit 28.  It's Bates stamped CHI0001310.
8   It's an e-mail from you to Ms. --
9       A.   Uh-huh.
10      Q.   -- Mori.  "Hi Linda, do your host family
11  contracts have a different refund policy for host
12  families who are pre-matched?"
13           And she responded, "No, they
14  don't."
15      A.   Okay.  I can answer that one.
16      Q.   Huh.
17      A.   Families change agencies, and they will
18  tell the new agency what the old agency did.  And
19  sometimes we reach out to confirm whether that's
20  true, because they want a lower program fee.  They
21  want a discount.  They want a waiver.  They want --
22  you know, and that's not our policy.
23      Q.   Okay.
24      A.   So one of the ways we find out -- I find
25  out -- I don't know "we."  I find out is when host

MAGNA
LEGAL SERVICES

1  families change and they come to us, they switch to
2  us, and they tell us something.
3         Or somebody has worked with
4  another agency, and they apply with our agency.
5     Q.   And you'll -- you'll confirm that the
6  other agencies or agency does some -- has some
7  policy?  Such as here --
8     A.   Yes.
9     Q.   -- you're confirming that the other
10 agency does not have a different refund policy for
11 host families who are pre-matched?
12    A.   Yeah.  This is -- a question like this is
13 usually predicated on a host family contacting me
14 and asking me -- asking me that exact question.
15    Q.   Okay.  So a host family could contact
16 you, say, "Do you have a different refund policy for
17 host families who are pre-matched?"  And you'll
18 reach out?
19    A.   Well, it could have been a --
20    Q.   It could have --
21    A.   -- CHI family.
22    Q.   I see.
23         So do you ever talk about the
24 general au pair market with other sponsor agencies?
25         MR. KELLY:  Object to form.

1         You can answer.
2     A.   I talk to other sponsors about the
3  general environment of legislation --
4     Q.   Uh-huh.
5     A.   -- administration, how it would impact
6  our industry.
7     Q.   And do you talk to other sponsors about
8  how allotments of au pairs are distributed within
9  the industry?
10        MR. KELLY:  Object to form.
11        You can answer.
12    A.   I don't know what they get.  I only know
13 what I get.
14    Q.   Oh, you don't -- you don't know what
15 anyone else has or --
16    A.   No.
17    Q.   You've never talked to anyone about those
18 sorts of things?
19    A.   Well, I may have talked, but I don't -- I
20 mean, I may have made statements, but I have no
21 idea.
22         Actually, I -- I do recall one.
23 And that was at a State Department meeting --
24    Q.   Uh-huh.
25    A.   -- when a State Department official

1  passed out a chart that showed -- they didn't put
2  the names, but you could figure out who had what on
3  the chart.
4     Q.   Okay.  So how do you -- how do -- how do
5  you compete with the other sponsors?
6     A.   I don't really.  I mean, I'm so small.  I
7  just do referrals and from the State Department,
8  from host families, and through the website.
9         MR. SCHWARTZ:  Let's take about five
10 minutes.
11        MR. KELLY:  Fine.
12        THE VIDEOGRAPHER:  Going off the
13 record at 4:24.
14        (Break from 4:24 p.m. to
15        4:43 p.m.)
16        THE VIDEOGRAPHER:  Back on the record
17 at 4:43.
18 BY MR. SCHWARTZ:
19    Q.   You testified about receiving a bulletin
20 from the State Department regarding the federal
21 minimum wage increase?
22    A.   Yes.
23    Q.   And that's where you said you got the
24 195.75?
25    A.   Yes.

1     Q.   Why did you keep the 195.75 on your
2  website and on your materials after the State
3  Department withdrew that notice?
4     A.   What do you mean they withdrew the
5  notice?
6     Q.   So it's no longer on the State Department
7  website.
8     A.   I don't know what they did on the
9  website.  I just followed the guidelines that I
10 received.
11        (Exhibit No. 29 was marked.)
12    Q.   Okay.  I am handing you a document that's
13 been marked Exhibit 29.
14    A.   Uh-huh.
15    Q.   And it is Bates stamped USA 728.
16        Do you recognize that document?
17    A.   Yes.
18        MR. KELLY:  Sorry.  For those of you
19 on the phone it's 728 through 759.
20    Q.   So what is this document?
21    A.   This is the Host Family Handbook and
22 Guide.
23    Q.   Okay.  So this is what you hand host
24 families when they -- when?  When do you hand this
25 to host families?

**MAGNA** ▶
**LEGAL SERVICES**

Page 182

1   A.  During the host family interview.
2   Q.  During the host family interview?
3   A.  Yes.
4   Q.  Okay.  So there's a lot -- this is
5  relatively long?
6   A.  Yes.
7   Q.  It's around 60-some odd pages?
8   A.  Yes.
9   Q.  Did you personally write everything
10  that's in here?
11   A.  Yes.
12   Q.  Just you?
13   A.  Yes.  Well, copied and pasted from the
14  State Department website.
15   Q.  But this is most -- this is not mostly
16  copies and paste from the State Department
17  website --
18   A.  No.
19   Q.  -- right?
20   A.  No.
21   Q.  It's a lot of writing?
22   A.  Right.
23   Q.  So did you -- and you -- and you
24  consulted the regulations when you wrote these, when
25  you wrote this?

Page 183

1   A.  I would assume so, yes.
2   Q.  Have you had a host family -- have you
3  had one of these documents since you began the
4  au pair program?
5   A.  Have I had one of these?
6   Q.  Uh-huh.
7   A.  Maybe not in the beginning.
8   Q.  Oh, you didn't have one in 2003, 2004?
9   A.  I -- I --
10   Q.  A handbook?
11   A.  I'd -- I'd have to look.  I don't think
12  so.
13   Q.  Okay.  But how long have you had these
14  handbooks?
15   A.  Well, at least since 2009.
16   Q.  And you've had a -- a -- a host family
17  handbook every year since then?
18   A.  Yes.
19   Q.  You make revisions every single year?
20   A.  No.
21   Q.  Okay.  So every couple years?
22   A.  When I have time and on an as-needed
23  basis.
24   Q.  And did you consult with lawyers when
25  discussing what to put in the Host Family Handbook?

Page 184

1   A.  No, I don't think so.
2   Q.  Did you look at materials that -- other
3  Host Family Handbooks that you were able to find?
4   A.  I didn't have any other host family...
5   Q.  So you didn't review a Host Family
6  Handbook from any other sponsor before you created
7  this Host Family Handbook?
8   A.  I looked -- I may have looked at websites
9  for tips or --
10   Q.  Tips?
11   A.  Yeah.  Tips, you know, like, what are in
12  here.
13   Q.  So you looked at websites?
14   A.  I might have looked at websites, yeah.
15   Q.  These are websites for other sponsor
16  organizations?
17   A.  No.  Blogs.
18   Q.  Oh, you might have looked at websites or
19  blogs to describe tips of what to put in a host
20  fam -- in -- in an au pair Host Family Handbook?
21   A.  You know, advice, general advice.  Just,
22  you know, things to help an au pair adjust.
23   Q.  So you were looking at --
24   A.  Or a host family adjust.
25   Q.  You -- you were looking at blogs that

Page 185

1  described what to -- how to -- how to help host
2  families and au pairs adjust?
3   A.  No.  I was looking at blogs to find out
4  what situations came up with other host families and
5  au pairs.
6   Q.  And so you're saying that you looked --
7  you -- you would look at blogs to find situations,
8  but you didn't look at anything, any -- any
9  documents to figure out what to put into the -- into
10  this document?
11   A.  I'm -- I don't recall.  I mean, I -- I
12  started putting this together.  Some of it's from
13  experience.
14   Q.  Some of it's from experience?
15   A.  Uh-huh.
16   Q.  So you didn't consult Host Family
17  Handbooks from other sponsors when creating this?
18   A.  I don't --
19      MR. KELLY:  Asked and answered now
20  three times.
21   A.  Yeah, I have never -- to my recollection,
22  I have never seen a Host Family Handbook.  I mean,
23  I -- I can't recall ever seeing one.
24   Q.  Have you ever talked to anyone at any
25  other agency about what to put in a Host Family

PLAINTIFFS' RESP. APP.0005313

MAGNA
LEGAL SERVICES

Page 186

1   Handbook?
2       A.   Not that I recall.  I just put this
3   together.
4       Q.   So even after you were just starting out,
5   you sat down and just wrote --
6           MR. KELLY:  Object to form.
7   Mischaracterizes testimony.  She stated quite the
8   opposite of that about two minutes ago.
9           MR. SCHWARTZ:  Well, I'm trying to
10  establish when these sorts came --
11          MR. KELLY:  Asked.
12          MR. SCHWARTZ:  I don't believe I
13  have.
14          MR. KELLY:  Asked.  She said she
15  didn't have them when she started out.  They came to
16  be over time.
17          MR. SCHWARTZ:  I don't think that's
18  the exact testimony, but that's fine.  I'll let it
19  go.
20          (Exhibit No. 30 was marked.)
21      Q.   I'm handing you a document marked
22  Exhibit 30.
23      A.   Okay.
24      Q.   What is Exhibit 30?
25      A.   Host Family Handbook and Guide.

Page 187

1       Q.   Okay.  And that's from a different year?
2       A.   Yes.
3       Q.   Is it from 2011?
4       A.   Yes.
5       Q.   Okay.
6           MR. KELLY:  For those on the phone,
7   that's USA 760 to 791.
8           MR. SCHWARTZ:  And marking for
9   Exhibit 31, it's 792 to 823 Bates stamp.
10          MR. KELLY:  Thank you.
11          (Exhibit No. 31 was marked.)
12      Q.   And is this the 2012 Host Family
13  Handbook?
14      A.   Yes.
15      Q.   Okay.  Have you ever referred to the
16  au pair stipend as pocket money?
17      A.   I may have.
18      Q.   So have you ever called it a wage?
19      A.   Yes.
20      Q.   And you've called it a stipend?
21      A.   Yes.
22      Q.   Okay.  Where did you get the term "pocket
23  money"?
24      A.   I think from the State Department.
25      Q.   You think --

Page 188

1       A.   When I first started out, when I first
2   applied.
3       Q.   Could you have gotten the term from
4   another sponsor?
5       A.   That's possible.  I could have used it or
6   it could have been used when I worked with another
7   agency.
8       Q.   That would be EuRaupair?
9       A.   Uh-huh.
10      Q.   Okay.  How many au pairs a year do you
11  have in your program?
12      A.   It varies.  It goes up and down, but not
13  very many.
14      Q.   How many?
15      A.   Let --
16      Q.   What -- what does it vary between?
17      A.   Between 20 and 30, I would say.
18      Q.   Do you have any recent efforts that
19  you've engaged in to increase your pool of au pairs
20  or increase the number of au pairs you can attract?
21      A.   No, not really.
22      Q.   Any efforts recently to try to increase
23  the number of host families you can attract?
24      A.   No.
25      Q.   Okay.

Page 189

1           (Exhibit No. 32 was marked.)
2       Q.   I'm handing you Exhibit No. 32.  It is
3   Bates stamped 548 to 606.
4           MR. KELLY:  607.
5           MR. SCHWARTZ:  Excuse me.  Thank you.
6       Q.   So what is the -- please take your time
7   familiarizing yourself with it, but do you recognize
8   this document?
9       A.   Yes.
10      Q.   And what is this document?
11      A.   This is the Au Pair Handbook and Guide.
12      Q.   Okay.  So what is an Au Pair Handbook and
13  Guide?
14      A.   This is a handbook that is given to the
15  au pair prior to arrival in the U.S.
16      Q.   Okay.  Can you tell what year that guide
17  is from?
18      A.   On the back here it says "Revised
19  June 2013."
20      Q.   Okay.  And did you, similarly, write the
21  entirety of the Au Pair Handbook and Guide?
22      A.   I believe so.
23      Q.   Have you reviewed the -- any au pair
24  handbooks from any other sponsor agencies?
25      A.   I haven't seen any, that I recall.

Page 190

1    Q.   So how do you know to have an Au Pair
2  Handbook?
3    A.   That was my idea, that it would help
4  them.
5    Q.   And calling it an Au Pair Handbook, that
6  was your idea as well?
7    A.   I think so, yeah.  Pretty sure.
8    Q.   So it was -- it was your idea also to
9  have a Host Family Handbook?
10   A.   Yes.
11   Q.   And to call it a Host Family Handbook?
12   A.   Yes.
13   Q.   You never --
14   A.   Handbook.  Host Family Handbook and
15  Guide.
16   Q.   So you're -- are you aware of whether or
17  not other agencies have Host Family Handbooks?
18   A.   No, I am not.
19        (Exhibit No. 33 was marked.)
20   Q.   I'm handing you Exhibit No. 33.
21   A.   Uh-huh.
22   Q.   Is this the Au Pair Handbook from 2016?
23   A.   Yes.
24   Q.   Did you have any help formatting any
25  parts of this?

Page 191

1    A.   What do you mean "formatting"?
2    Q.   Well, I mean there are bubbles over here
3  on the left.  There's --
4    A.   No, I did that myself.
5    Q.   You did that yourself?
6    A.   Yeah.
7    Q.   What -- what computer programs do you use
8  to -- to make this?
9    A.   On this one, it -- well, this one I think
10  may finally be a publisher, but initially it was in
11  Word Perfect.
12   Q.   Okay.
13        MR. SCHWARTZ:  Let's take five
14  minutes.
15        MR. KELLY:  Okay.
16        THE VIDEOGRAPHER:  Going off the
17  record at 5:01.
18        (Break from 5:01 p.m. to
19        5:05 p.m.)
20        THE VIDEOGRAPHER:  Back on the record
21  at 5:05.
22  BY MR. SCHWARTZ:
23   Q.   So earlier this afternoon we talked about
24  situations in which you might reach out to other
25  sponsors.

Page 192

1    A.   Yes.
2    Q.   And reach out to the Alliance.  Some of
3  those situations included a question on taxes that
4  we discussed, right?
5    A.   Yes.
6    Q.   A question on the bond.  A question on
7  the -- the -- the -- the deposit that au pairs paid,
8  the $500 bond?
9    A.   Uh-huh.  Okay.
10   Q.   We talked about time sheets?
11   A.   Yes.
12   Q.   When you reached out, you reached out to
13  others to talk about time sheets after you -- after
14  you received some information from Maha, you reached
15  out to people to talk about them, talk about time
16  sheets, right?
17   A.   I reached out to people to find out if I
18  was being -- if there was selective interpretation
19  or selective enforcement.
20   Q.   Okay.  With respect to the time sheets?
21   A.   With respect to things that came up.
22   Q.   Okay.  Did there ever come a time that
23  you reached out to sponsors to -- let me back up.
24        You talked about receiving this
25  notice from the Department of State regarding the

Page 193

1  minimum wage, right?
2    A.   Yes.  Uh-huh.
3    Q.   After you received that notice, did you
4  reach out to any other sponsors?
5    A.   I might have, but I just took that as
6  gospel, basically.
7    Q.   Have you -- have you ever reached out to
8  sponsors to talk about that notice or that -- or
9  excuse me.
10        Have you ever reached out to
11  sponsors to talk about the stipends that au pairs
12  should be paid?
13   A.   Not what -- no, not what au pairs should
14  be paid.
15   Q.   Have you ever reached out to sponsors to
16  talk about the stipend generally?
17   A.   Not reaching out to sponsors to talk
18  about the stipend generally, no.
19   Q.   Have you ever talked about the -- have
20  you ever talked to sponsors about the stipend?
21   A.   Maybe, but I don't recall.  I -- you
22  know, not specifically the stipend.
23   Q.   Have -- have you ever talked to other
24  sponsors about what an au pair should be paid?
25        MR. KELLY:  Asked and answered.

49 (Pages 190 to 193)

MAGNA
LEGAL SERVICES

| Page 194 | Page 196 |
|---|---|

**Page 194**

1        Go ahead.
2   A.  Not that I recall, no.
3   Q.  Do you ever recall sponsors reaching out
4 to you to ask about the stipend?
5   A.  Not that I recall.
6   Q.  Have you ever reached out to the
7 Department of State to ask them about the stipend?
8   A.  I may have.
9   Q.  You may have?
10   A.  Uh-huh.
11   Q.  Do you know what you would have asked?
12       MR. KELLY:  I'm going to let the
13 witness testify to what she can recall, not what she
14 may have asked about.
15   A.  Yeah, what I can recall?  I can't recall
16 anything specific, not anything specific.
17   Q.  So what -- so what do you recall?
18       MR. KELLY:  Someone is not on mute,
19 and I think thinks that they are, just on the phone.
20   A.  What I recall is seeing websites that
21 suddenly had a tiered program.
22   Q.  Tiered program?
23   A.  Yes.
24   Q.  What does that mean?
25   A.  With different, you know, step-up

**Page 195**

1 extraordinaire, au pair extraordinaire, or infant
2 qualified with different stipends.
3   Q.  Do you remember when?
4   A.  No, I don't remember when.
5   Q.  Do you remember approximately when?
6   A.  I don't remember approximately when.  I
7 just remember seeing it one time and wondering.
8   Q.  Did you ask any sponsors about those
9 tiered programs?
10   A.  No, I don't think so.  I think the
11 only -- the only avenue I would have gone probably
12 is State Department.
13   Q.  So did you ask the Alliance about those
14 tiered program?
15   A.  Not that I recall.
16   Q.  Okay.  Have you ever dis -- have you ever
17 e-mailed the Alliance regarding the au pair stipend?
18   A.  Not that I recall.
19   Q.  Have you discussed the au pair stipend
20 with Michael McCarry of the Alliance?
21   A.  Not that I recall, if -- I -- I don't
22 recall.
23   Q.  Do you recall whether anyone had ever
24 reached out to you to discuss --
25   A.  I've answered that question.

**Page 196**

1   Q.  Okay.  I -- I didn't know if I -- if I
2 had remembered to ask it.
3   A.  Yeah.
4       MR. SCHWARTZ:  Can I ask you to read
5 back when I asked that question?  I just want to
6 make sure that I did indeed do it, asked that
7 question.
8       MR. KELLY:  Well, why don't you just
9 ask it and answer it and that --
10       MR. SCHWARTZ:  If that's okay with
11 you?
12       MR. KELLY:  -- will move things the
13 faster.
14       It is, yes.
15       MR. SCHWARTZ:  That's okay with you?
16       MR. KELLY:  Yes.
17       MR. SCHWARTZ:  Okay.  Thank you.
18       MR. KELLY:  Yes, I -- I agree, you
19 should make a record.
20       MR. SCHWARTZ:  Okay.
21   Q.  So did -- did -- do you recall whether
22 anyone had ever reached out to you to discuss the
23 stipend?
24   A.  Not that I recall.
25   Q.  Okay.  Thank you.

**Page 197**

1       So you mentioned seeing a website
2 that showed tiered programs?
3   A.  Uh-huh.
4   Q.  Do you happen to remember which agencies
5 those were with?
6   A.  No.
7   Q.  What about the existence of tiered
8 programs surprised you?
9   A.  I didn't think it was allowed.
10   Q.  So why is that?
11   A.  Due to the fact that the regs state that
12 au pairs are young adults with some childcare
13 experience, and not certified in any way.
14   Q.  So these tiers that you saw, they were
15 getting paid different amounts, right?
16   A.  Yes.
17   Q.  So was it the amount that you were
18 looking at or was it the nature of their
19 qualifications --
20       MR. KELLY:  Object to form.
21       You can --
22   Q.  -- that surprised you?
23       MR. KELLY:  I'm sorry.  I thought you
24 were finished.
25       MR. SCHWARTZ:  I --

PLAINTIFFS' RESP. APP.0005316

MAGNA
LEGAL SERVICES

| Page 198 | Page 200 |
|---|---|

**Page 198**

1  MR. KELLY: I apologize.
2  MR. SCHWARTZ: That's fine. I did
3  have a pause, so --
4  Q.  So was it the amount that you were
5  looking at or was it the nature of their
6  qualifications that surprised you?
7  A.  It was the -- the nature of the
8  qualifications and whether they complied with the
9  regs.
10  Q.  So you didn't see anything wrong with
11  people being paid more as an au pair?
12  A.  I -- it was just a surprise. It was just
13  a surprise.
14  Q.  So is there anything wrong an au pair
15  being paid more than $195.75?
16  MR. KELLY: This is going to come as
17  a shock. Object to form.
18  A.  I think I've already answered that.
19  Q.  I --
20  MR. KELLY: It's a different
21  question.
22  MR. SCHWARTZ: Yes.
23  THE WITNESS: It is a different
24  question?
25  MR. KELLY: It's a different

**Page 199**

1  question.
2  MR. SCHWARTZ: Oh, okay.
3  MR. KELLY: And I maintain my
4  objection.
5  A.  Can you repeat the question, please?
6  Q.  Of course.
7  Is there anything wrong with an
8  au pair being paid more than $195.75?
9  MR. KELLY: Object to form.
10  You can answer.
11  A.  I would say evidently not.
12  Q.  So did you testify earlier today that
13  sitting here today, 19 -- the stipend is $195.75?
14  A.  Yes.
15  MR. KELLY: Object.
16  Q.  And did you testify that it does not
17  represent a minimum?
18  A.  It's not -- I don't know how to answer
19  that question.
20  Q.  Okay. Earlier today, when you were asked
21  whether an au pair could be paid much more than
22  $195.75, you said "I don't know." Is that right?
23  A.  Yes.
24  Q.  But you've just stated here that
25  evidently there is not anything wrong with paying an

**Page 200**

1  au pair more than $195.75; is that right?
2  A.  Yes.
3  Q.  Okay. So do you have -- do you have any
4  notion of when you first learned about these tiered
5  programs, as you described them?
6  A.  No.
7  Q.  The extraordinaire program?
8  A.  No.
9  Q.  Okay. Please tell me everything you can,
10  as you understand it, what an extraordinaire program
11  is?
12  A.  I think it's someone who has a
13  certification or some degree or something.
14  Q.  Okay. But you would say that you -- you
15  have imperfect knowledge of these extraordinaire
16  programs, right?
17  A.  Correct.
18  Q.  That you wonder whether they are
19  within -- that you have wondered whether they are
20  within the regulations?
21  A.  I was just surprised when I saw them on
22  the website.
23  Q.  Uh-huh.
24  A.  Saw those programs.
25  Q.  What --

**Page 201**

1  A.  USAuPair does not offer them.
2  Q.  Okay. But at the time that you saw
3  them -- and the question I asked was did -- did you
4  believe they perhaps were not within the State
5  Department regulations?
6  A.  No. What I thought was how can they do
7  that.
8  Q.  How can they do that?
9  A.  Yeah. That -- that was my surprise, how
10  can they do that.
11  Q.  So you talked to other -- you -- you
12  talked to other sponsors when you were confused or
13  surprised about other issues, right?
14  A.  (Nodding head.)
15  Q.  So you're nodding. I just want to have
16  it --
17  A.  Yes.
18  Q.  -- for the record.
19  A.  Uh-huh.
20  Q.  Thank you.
21  So -- but you at no point talked
22  to other sponsors about the extraordinaire program?
23  A.  I guess my assumption was the State
24  Department would -- would take -- would monitor and
25  supervisor and take action if there was a problem

PLAINTIFFS' RESP. APP.0005317

MAGNA
LEGAL SERVICES

Page 202

1   with it.
2       Q.   Was that your assumption about the taxes
3   issues that you were curious about and asking about?
4       A.   Yes and no.  I'm not -- I'm -- I would --
5   I'm not a tax person.  I cannot give tax advice.
6   And families would inquire about it, so I didn't
7   know how to handle it.
8       Q.   So you reached out to -- you - you were
9   concerned and you reached out to someone?
10      A.   Yes.
11      Q.   And with respect to the time sheets, you
12  were concerned about how they were being enforced,
13  and you reached out to someone?
14      A.   My concern about the time sheets and the
15  taxes and anything else was regarding whether
16  USAuPair was out of compliance, and there were some
17  administrative rules that I did not know about
18  because I was not a member of any organization where
19  information was being provided to me.
20      Q.   And so you were looking to these people
21  who were members of that organization in order to
22  provide you with that information, right?
23      A.   I was looking to find out whether there
24  were any administrative rules or regulations that I
25  was unaware of.

Page 203

1       Q.   And how to comply with them?
2       A.   And how to comply with them.
3       Q.   So despite e-mailing about --
4            MR. KELLY:  She wasn't doing an
5   extraordinaire program.
6            MR. SCHWARTZ:  Excuse me, Counselor.
7   That's not approp -- that's not an appropriate
8   objection.
9            MR. KELLY:  You're just drilling down
10  and drilling down.  You've asked this question now
11  20 times.
12           MR. SCHWARTZ:  Counselor, it's not --
13           MR. KELLY:  We're at the end of a
14  day, and you're harassing the witness now.
15           MR. SCHWARTZ:  Counselor, this is not
16  harassing the witness.
17           MR. KELLY:  It is.
18           MR. SCHWARTZ:  This is asking a
19  number of questions --
20           MR. KELLY:  You are dancing on the
21  same point 50 times.  She's told you she didn't
22  reach out.  Now you want to go back and rehash the
23  entire deposition.
24           MR. SCHWARTZ:  Counselor, we're --
25           MR. KELLY:  You've drilled this hole.

Page 204

1   It's dry.  Move on.
2            MR. SCHWARTZ:  Counselor, I'm -- I'm
3   entitled to my time, and I've been nothing but --
4            MR. KELLY:  You're not to harass my
5   witness.
6            MR. SCHWARTZ:  And I have been
7   nothing but polite and kind.
8            MR. KELLY:  Your demeanor has been
9   very polite.
10           MR. SCHWARTZ:  Thank you.  So please
11  don't describe this as harassment.
12           I'm trying to get at important
13  questions that we've been going all day in -- in
14  order to -- to -- to flush out.  And I think
15  Counselor understands that.
16           MR. KELLY:  You are trying to beat up
17  my witness on why she reached out in certain
18  circumstances and not in others.  And she's now
19  explained it to you a few times, but it's not the
20  answer you want so you keep going back.  And it's --
21           MR. SCHWARTZ:  Okay.  I am going to
22  object to the idea you --
23           MR. KELLY:  And at some point it
24  becomes harassment.
25           MR. SCHWARTZ:  -- call this beating

Page 205

1   up on anybody, and I --
2            MR. KELLY:  At some point it becomes
3   harassing.
4            MR. SCHWARTZ:  And -- and -- okay.
5       Q.   Are there any other programs of which you
6   are aware similar to, but not the same as, this
7   extraordinaire program?  Are there any other ones?
8   You've described an extraordinaire program.
9       A.   There's an EduCare program.
10      Q.   An EduCare program?
11      A.   Uh-huh.
12      Q.   Were you aware of that EduCare program at
13  the beginning of your time as an au pair sponsor
14  agent?
15      A.   Yes.
16      Q.   Okay.  So is it your understanding that
17  the extraordinaire program is through the Department
18  of State or that it was sponsor created?
19      A.   The extraordinaire --
20      Q.   Uh-huh.
21      A.   -- program was sponsor created.
22      Q.   And you understood that the EduCare
23  program was through the Department of State?
24      A.   Was regulated.
25      Q.   Okay.

PLAINTIFFS' RESP. APP.0005318

MAGNA
LEGAL SERVICES

Case 1:14-cv-03074-CMA-KMT   Document 859-25   Filed 03/17/18   USDC Colorado   Page 491
8 of 700

## Page 206

1     MR. SCHWARTZ:  Okay.  We're going to
2  take two minutes and make sure -- let's take two,
3  three minutes, and then we'll come back.
4     MR. KELLY:  Okay.  Thank you.
5     THE VIDEOGRAPHER:  Going off the
6  record at 5:26.
7        (Break from 5:26 p.m. to
8          5:30 p.m.)
9     THE VIDEOGRAPHER:  Back on the record
10 at 5:30.
11 BY MR. SCHWARTZ:
12    Q.   Okay.  So we talked about your learning
13 or seeing websites at some point about the
14 extraordinaire program?
15    A.   Uh-huh.
16    Q.   Was it -- I'm -- I'm trying to understand
17 when it was that you saw those.  So was it after --
18 was it after 2004?
19    A.   I honestly can't tell you.  I don't know.
20    Q.   Even a range?
21    A.   No, I can't tell you.  It's -- it was a
22 point in time, and I have no relativity around that
23 at all.
24    Q.   Okay.  So you don't know if it was before
25 2015?

## Page 207

1    A.   No, I don't.
2    Q.   2014?  You just don't know?
3    A.   I don't know.  I'm not in the habit of
4  going and visiting and checking up.  I don't have
5  time.
6     MR. SCHWARTZ:  Okay.  That's --
7  that's it for me.
8        If you want to -- if you have any
9  redirect.
10    MR. KELLY:  No.  We will read and
11 sign.
12        And I appreciate your time,
13 gentlemen.
14    MR. SCHWARTZ:  All right.  Thank you
15 very much.
16    THE VIDEOGRAPHER:  Going off the
17 record at 5:30.  This marks the -- excuse me, 5:31.
18 This marks the end of media 3 of 3.
19        (Whereupon, the deposition concluded at
20          5:31 p.m., May 1, 2017.)
21
22
23
24
25

## Page 208

1           SIGNATURE OF WITNESS
2
3        I, HELENE YOUNG, the witness in the above
4  deposition, have read the within transcript of my
5  testimony.  I have made ____ changes in said testimony
6  and have stated such changes (if any) and the reason
7  for each change on a separate sheet attached to this
8  transcript.  My testimony as given herein is true and
9  correct, to the best of my knowledge and belief.
10
11
12
13    _____
14    HELENE YOUNG
15
16 Subscribed and sworn to before me this _____ day of
17 _____, 2017.
18
19    _____
20    Notary Public
21
22 My commission expires _____.
23
24
25

## Page 209

1  - AMENDMENT SHEET -
   Deposition of HELENE YOUNG
2  taken on May 1, 2017
   The deponent wishes to make the following changes in
3  the testimony as originally given:
4  PAGE/LINE     SHOULD READ        REASON FOR CHANGE
5  _____ _____
6  _____ _____
7  _____ _____
8  _____ _____
9  _____ _____
10 _____ _____
11 _____ _____
12 _____ _____
13 _____ _____
14 _____ _____
15 _____ _____
16 _____ _____
17 _____ _____
18 _____ _____
19 _____ _____
20 _____ _____
21 Subscribed and sworn to before me this _____ day of
   _____, 2017.
22
23    _____
24    Notary Public
25 My commission expires _____.

PLAINTIFFS' RESP. APP.0005319

MAGNA
LEGAL SERVICES

Page 210

```
 1              REPORTER'S CERTIFICATE
 2       I, LEEANN L. KEENAN, Registered Merit
 3  Reporter and Certified Realtime Reporter within
 4  Colorado, appointed to take the videotaped deposition
 5  of HELENE YOUNG, do hereby certify that before the
 6  deposition she was duly sworn by me to testify to the
 7  truth; that the deposition was taken by me at 1512
 8  Larimer Street, Suite 200, Denver, Colorado; then
 9  reduced to typewritten form herein; that the foregoing
10  is a true transcript of the questions asked, testimony
11  given and proceedings had.
12
13       I further certify that I am not related to
14  any party herein or their Counsel, and have no interest
15  in the result of this litigation.
16
17       In witness hereof I have hereunto set my
18  hand this 11th day of May, 2017.
19
20       _____
         Leeann L. Keenan
21       Registered Merit Reporter
         Certified Realtime Reporter
22       and Notary Public
23
24  My commission expires June 8, 2020
25
```

PLAINTIFFS' RESP. APP.0005320

MAGNA
LEGAL SERVICES

# Exhibit 444

Case 1:14-cv-03074-CMA-KMT   Document 943-85   Filed 05/17/18   USDC Colorado   Page 494
of 700

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE STATE OF COLORADO


JOHANA PAOLA BELTRAN, et )
al.,                     )
          Plaintiffs,    )
vs.                      ) Case No.:  14-cv-03074
                         )                CMA-KMT
                         )
INTEREXCHANGE, INC., et  )
al.,                     )
          Defendants.    )
_____)




VIDEOTAPED DEPOSITION of AUPAIRCARE, INC.,

pursuant to Rule 30(b)(6), designee

SARAH MCNAMARA

Thursday, May 4, 2017




MAGNA LEGAL SERVICES

866-624-6221

www.MagnaLS.com



Taken before:
HEIDI BELTON, CSR, RPR, CRR, CCRR, CLR
CSR No. 12885

PLAINTIFFS' RESP. APP.0005322

MAGNA
LEGAL SERVICES

**Page 2**

```
1              Thursday, May 4, 2017
2
3
4       Videotaped deposition of SARAH MCNAMARA,
5       held at the offices of GORDON & REES,
6       275 Battery Street, Suite 2000, San
7       Francisco, California, before Heidi
8       Belton, a Certified Shorthand Reporter,
9       Registered Professional Reporter,
10      Certified Realtime Reporter, California
11      Certified Realtime Reporter, Certified
12      LiveNote Reporter, and NCRA Realtime
13      Systems Administrator.
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
1    APPEARANCES (Continued):
2
     For APF Global Foundation:
3         FISHER & PHILLIPS LLP
          BY: SUSAN M. SCHAECHER, ESQ.  (via phone)
4         1801 California Street, Suite 2700
          Denver, Colorado 80202
5         (303) 218-3650
          sschaecher@fisherphillips.com
6
7    For ProAuPair, APEX Professional Exchange and 20/20
     Care Exchange d/b/a International Aupair Exchange:
8         NIXON SHEFRIN HENSEN OGBURN P.C.
          BY: MICHAEL S. DREW, ESQ.  (via phone)
9         5619 DTC Parkway, Suite 1200
          Greenwood Village, Colorado 80111
10        (303) 773-3500
          mdrew@nixonshefrin.com
11
12   Also Present:  Marcie Schneider; Daniel Stroud,
     videographer
13
14              ---oOo---
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
1    APPEARANCES:
2    For the Plaintiffs:
          BOISE, SCHILLER, FLEXNER, LLP
3         BY: SEAN PHILLIPS RODRIGUEZ, ESQ.
          JUAN P. VALDIVIESO, ESQ.
4         1999 Harrison Street, Suite 900
          Oakland, California 94612
5         (510) 874-1010
          srodriguez@bsfllp.com
6         jvaldivieso@bsfllp.com
7
     For Cultural Care:
8         CHOATE, HALL & STEWART
          BY: LYNDSEY KRUZER, ESQ.  (via phone)
9         Two International Place
          Boston, Massachusetts 02110
10        (617) 248-5221
          lkruzer@choate.com
11   and
          LEWIS, ROCA, ROTHGERBER, CHRISTIE
12        BY: JESSICA FULLER, ESQ.  (via phone)
          1200 17th Street, Suite 3000
13        Denver, Colorado 80202
          (303) 628-9527
14
15   For AuPairCare, Inc.:
          GORDON & REES
16        BY: THOMAS B. QUINN, ESQ.
          555 17th Street, Suite 3400
17        Denver, Colorado 80202
          (303) 200-6888
18        tquinn@gordonrees.com
19
     For InterExchange, Inc.:
20        SHERMAN & HOWARD, LLC
          BY: JOSEPH H. HUNT, ESQ.  (via phone)
21        633 17th Street, Suite 3000
          Denver, Colorado 80202
22        (303) 299-8302
          jhunt@shermanhoward.com
23
24
25
```

**Page 5**

```
1    THURSDAY, MAY 4, 2017              11:47 A.M.
2              P R O C E E D I N G S
3         THE VIDEOGRAPHER:  Good morning, ladies
4    and gentlemen.  We're on video record.
5         The time is 11:47 a.m.  Today's date is
6    May 4, 2017.  This begins video 1, Volume I in the
7    30(b)(6) deposition of Sarah McNamara.  In the case
8    JP Beltran versus InterExchange, Incorporated,
9    et al., appearing before the United States District
10   Court, District of Colorado.  Case number
11   14-CV-03074.
12        We're located today at 275 Battery Street,
13   San Francisco, California.  My name is Daniel
14   Stroud; I'm your video specialist.  Our court
15   reporter is Ms. Heidi Belton.  We're with Magna
16   Legal Services.
17        Would all counsel please identify
18   themselves for the record.
19        MR. RODRIGUEZ:  Sean Rodriguez; Boise,
20   Schiller, Flexner, for the plaintiffs.
21        MR. VALDIVIESO:  Juan Valdivieso; Boise,
22   Schiller, Flexner, for the plaintiffs.
23        MR. QUINN:  Tom Quinn, on behalf of the
24   defendant AuPairCare and Ms. McNamara.
25        MR. RODRIGUEZ:  And if no one on the phone
```

**Page 6**

1  has any objection, let's go ahead and use the same
2  appearance list for the phone participants as we did
3  this morning.
4      THE VIDEOGRAPHER:  Okay.  Swear the
5  witness.
6      MS. KRUZER:  No objection to that.
7      (Whereupon, the witness, SARAH MCNAMARA,
8  having been duly sworn, testified as follows:)
9      EXAMINATION
10 BY MR. RODRIGUEZ:
11     Q.  Good morning, Ms. McNamara.
12     A.  Good morning.
13     Q.  For the record, kindly state and spell
14 your full name.
15     A.  Sure.  Sarah Victoria McNamara.
16 S-A-R-A-H. V-I-C-T-O-R-I-A.  M-C-N-A-M-A-R-A.
17     Q.  Ms. McNamara, who is your employer?
18     A.  AuPairCare.
19     Q.  Do you have any other employers?
20     A.  Intrax is the parent company.
21     Q.  Do you consider Intrax an employer?
22     A.  I consider AuPairCare my employer.
23     Q.  Do you have any roles within the Intrax --
24 let me start again.
25      Do you have any roles as respects Intrax

**Page 7**

1  but not AuPairCare?
2      A.  Yes.
3      Q.  What are those roles?
4      A.  I'm on the senior leadership team.
5      Q.  The senior leadership team of Intrax?
6      A.  Yes.
7      Q.  What does the senior leadership team do?
8      A.  We meet about once a month now, probably
9  less than that, and talk about the cultural exchange
10 industry as a whole, where the business wants to go,
11 any major HR issues that would concern the entire
12 company.
13     Q.  Who else is on the senior leadership team?
14     A.  John Wilhelm, Take Yokota, Marcie
15 Schneider.  Currently I think that's the only people
16 that are remaining with the company.
17     Q.  Ms. McNamara, have you ever been deposed
18 before?
19     A.  Once.
20     Q.  When was that?
21     A.  I'd say it's two to three years ago.
22     Q.  What was the nature of the matter?
23     A.  It was a divorce proceeding.
24     Q.  Let's just quickly go over some of the
25 important rules.

**Page 8**

1      I need you to give me verbal answers.
2  Gestures and facial expressions do not come through
3  on the transcript.  Do you agree?
4      A.  Yes.
5      Q.  Please let me know if I've ever
6  interrupted you.  And my apologies in advance if I
7  do.
8      Is there any reason why you may not be
9  able to give accurate testimony today?
10     A.  No.
11     Q.  Any reason why your memory might be less
12 sharp than usual today?
13     A.  No.
14     Q.  Do you have an understanding concerning
15 the purpose of your testimony today?
16     A.  Yes.
17     Q.  What is that understanding?
18     A.  I'm representing AuPairCare in regard to
19 this deposition.
20     Q.  In front of you is an exhibit earlier
21 today marked as Exhibit 1.  It's entitled
22 "Plaintiffs' Notice of 30(b)(6) Deposition of
23 Defendant AuPairCare, Inc."
24     Ms. McNamara, do you recognize Exhibit 1?
25     A.  Yes.

**Page 9**

1      Q.  What is it?
2      A.  It's the plaintiffs' notice of the
3  deposition.
4      Q.  The deposition --
5      A.  Of AuPairCare.
6      Q.  Today's deposition; right?
7      A.  Correct.
8      Q.  Please turn to page 5.  And under
9  "Topics," there's a topic number 3.  Now I
10 appreciate that there's a long list under topic 3.
11 Would you kindly read the text on the line that says
12 number 3 and no further.
13     A.  "Your recruitment, training, placement,
14 and supervision of AuPairCare's, including."
15     Q.  Now, are you generally prepared today to
16 testify on behalf of AuPairCare concerning
17 AuPairCare's recruitment, training, placement, and
18 supervision of au pairs?
19     A.  Yes.
20     Q.  How did you prepare for today's deposition
21 with respect to that topic?
22     A.  I met with counsel and I've been in the
23 industry for a long period of time.  And I'm
24 familiar with the policies and procedures of the
25 Department of State regulations and AuPairCare's

PLAINTIFFS' RESP. APP.0005324

MAGNA
LEGAL SERVICES

Page 10

1    business operations.
2        Q.   Did you discuss topic 3 with anyone
3    besides counsel?
4        A.   No.
5        Q.   Did you review any documents other than
6    any documents that may have been selected by
7    counsel?
8        A.   No.
9        Q.   When did you meet with counsel concerning
10   topic 3?
11       A.   Yesterday briefly, and I think about a
12   week -- about a week ago.
13       Q.   Please turn to the next page of Exhibit 1.
14   And I'm looking at the text following item 4.  I'll
15   go ahead and read it this time.  "Your relationship
16   and communications with the State Department and the
17   Department of Labor."
18           Did I get that right?
19       A.   Yes.
20       Q.   Are you prepared today to give deposition
21   testimony for AuPairCare with respect to its
22   relationship and communications with the State
23   Department and the Department of Labor?
24       A.   Yes.
25       Q.   What did you do to prepare for your

Page 11

1    deposition today with respect to topic 4?
2        A.   I met with counsel and my knowledge and
3    understanding of history in the business.
4        Q.   Did you speak with anyone else besides
5    counsel about topic 4?
6        A.   No.
7        Q.   Did you review any documents other than
8    those that may have been selected by counsel?
9        A.   No.
10       Q.   And turning one more page to page 7, item
11   6.  It reads, "Your analysis and identification of
12   the markets in which you operate, including any
13   analysis of compensation paid to childcare
14   professionals other than au pairs."
15           Did I get that right?
16       A.   Yes.
17       Q.   Are you prepared to testify today on
18   AuPairCare's behalf concerning topic 6?
19       A.   Yes.
20       Q.   What did you do to prepare for topic 6
21   that's different from your preparation for the other
22   topics, if any?
23       A.   Nothing.
24       Q.   I believe earlier you mentioned that
25   you've been in the industry for a long time; is that

Page 12

1    right?
2        A.   (Witness nods head.)
3        Q.   When did you first -- well, first of all,
4    how would you characterize the industry in which you
5    work?
6        A.   I work in the cultural exchange industry.
7        Q.   And specifically in the au pair aspect of
8    the cultural exchange industry; is that right?
9        A.   Yes.
10       Q.   When did you first become involved with
11   au pair placement?
12       A.   In 2006 I was the director of marketing
13   for Intrax, and AuPairCare was one of several
14   divisions that I did marketing for.
15       Q.   How long prior to 2006 did you work for
16   Intrax?
17       A.   Prior to 2006?
18       Q.   Yes.
19       A.   I didn't work for Intrax.
20       Q.   Ah.  So you began working for Intrax in
21   2006?
22       A.   Correct.
23       Q.   For whom did you work prior to 2006?
24       A.   For Macys.com.
25       Q.   Was that a marketing position?

Page 13

1        A.   Correct.
2        Q.   Since 2006 -- let me start again.
3            For how long did you work continuously for
4    Intrax subsequent to 2006?
5        A.   In 2010, about four years, I moved over to
6    AuPairCare to work in operations.  So 2010 I moved
7    over to AuPairCare.
8        Q.   Is that your role today?
9        A.   I'm the senior vice president of the
10   organization.
11       Q.   Okay.  When you first moved to AuPairCare
12   what was your title?
13       A.   I believe it was senior director of
14   operations and new business, I believe.
15       Q.   Now, senior director of operations and new
16   business, does that include any responsibility for
17   AuPairCare's marketing?
18       A.   There was a marketing team that would
19   confer, yes.  There's a shared services marketing
20   team at the time that would confer with
21   AuPairCare --
22       Q.   And by --
23       A.   -- and I was the point person.
24       Q.   And by shared services, you mean shared
25   services with Intrax; correct?

PLAINTIFFS' RESP. APP.0005325

**MAGNA** ▶
LEGAL SERVICES

| Page 14 |
|---|

1     A.  At the time, yes.
2     Q.  At what time did it change?
3     A.  I believe probably four years ago it
4  changed over that AuPairCare had its own marketing
5  department.
6     Q.  And when did you become -- well,
7  following -- my mistake.
8         Following your position as senior
9  development director, what position did you hold at
10  AuPairCare?
11    A.  I believe my next title was vice
12  president.  And then my current role.
13    Q.  Approximately when did you receive the
14  title of vice president?
15    A.  Three years ago, approximately.
16    Q.  Can you tell me how your responsibilities
17  as vice president changed from your responsibilities
18  as senior development director?
19    A.  Sure.  I became the responsible officer
20  for AuPairCare.  So that is the main change.  And I
21  was responsible for all -- all revenue.
22    Q.  And same question with respect to the
23  transition between vice president and your title
24  today.  How did your responsibilities change after
25  you transitioned from vice president to today's

| Page 15 |
|---|

1  role?
2     A.  They didn't.  Maybe the addition of the
3  senior leadership team.
4     Q.  Since 2006, have you had some
5  responsibility for AuPairCare marketing materials,
6  despite your various titles?
7     A.  Yes.
8     Q.  Can you say anything about the general
9  nature of those responsibilities as they have
10  continued over time?
11    A.  (No response.)
12    Q.  That was a bad question.
13        Is it fair to say that you have always --
14  well, is there a common denominator with respect to
15  your marketing role since you joined Intrax?
16    A.  Yes.  AuPairCare.
17    Q.  So fair to say that since 2006 you have
18  had a hand in AuPairCare's marketing materials?
19    A.  Yes.
20    Q.  Can you explain to me what the title
21  "responsible officer" means.
22    A.  It's a term from the Department of State
23  in that you are the designated responsible officer
24  for the sponsor agency who ultimately is responsible
25  for the management of the program.

| Page 16 |
|---|

1     Q.  Does the responsible officer have any
2  particular duties that are prescribed by the
3  Department of State?
4     A.  To understand the -- the regulations and
5  to implement them as -- as they are -- as they see
6  fit.
7     Q.  So am I correct that you became
8  responsible officer about four years ago?
9     A.  About three years ago --
10    Q.  Three years ago?
11    A.  -- yes, when I moved to the VP role.
12    Q.  In that time has AuPairCare's
13  understanding of the Department of State's
14  requirements with respect to au pair stipends
15  changed?
16    A.  No.
17    Q.  What is AuPairCare's understanding with
18  respect to the Department of State's requirements
19  concerning the stipend?
20    A.  AuPairCare's understanding is that the
21  stipend is based on federal minimum wage to be paid
22  to the au pair by the host family on a weekly basis.
23    Q.  You said, "based on the federal minimum
24  wage."  Does that mean equal to the federal minimum
25  wage?

| Page 17 |
|---|

1     A.  It's a calculation based on the -- that's
2  our understanding is a calculation based on the
3  federal minimum wage.
4     Q.  Okay.  And how is that calculation made?
5     A.  My understanding is it's the federal
6  minimum wage with a 40 percent deduction for room
7  and board.  And that's what the host family is to
8  pay the au pair.
9     Q.  Now, I note the passive voice in the
10  phrase you just used "is to pay."  Do you have an
11  understanding as to whether the host family is
12  required to pay $195.75 and no more?
13    A.  The guidance that we understand from the
14  Department of State is the host family is to pay
15  $195.75.
16    Q.  And no more?
17    A.  Families do pay more but the guidance we
18  have is $195.75.
19    Q.  Those families that do pay more, is it
20  AuPairCare's understanding that they are in
21  violation of the DoS' position?
22    A.  No.
23    Q.  Okay.  Why not?
24    A.  Because our role as designated au pair
25  sponsor is to ensure that the au pair is paid

PLAINTIFFS' RESP. APP.0005326

MAGNA
LEGAL SERVICES

Page 18

1   $195.75 per week.  So our role is to make sure that
2   she's paid that amount.  And if host families feel
3   that they want to pay more, they can, but we need to
4   ensure that at least they were paid the $195.75.
5       Q.  So the phrase "at least" modified your
6   last sentence.  And now I'm very confused.
7           Is it in fact AuPairCare's position that
8   au pairs must be paid at least $195.75?
9       A.  They need to be paid $195.75.
10      Q.  Okay.  So if a host family chooses to pay
11  more than $195.75, is it AuPairCare's position that
12  the host family is violating the Department of
13  State's requirements?
14      A.  No.
15      Q.  Why?
16      A.  Because they're -- they're paying $195.75,
17  and that's what we need to ensure that they're paid.
18      Q.  Is it fair to characterize what you just
19  said as treating $195.75 as a minimum stipend?
20      MR. QUINN:  Object to form.
21  BY MR. RODRIGUEZ:
22      Q.  Is there anything unclear about my
23  question?
24      A.  Can you repeat it?
25      Q.  Yeah.  I believe you testified that

Page 19

1   AuPairCare does not believe a host family is
2   violating the Department of State's requirements if
3   they choose to pay more than $195.75; is that fair?
4       A.  Yes.
5       Q.  Okay.  Now I asked is it fair to
6   characterize that position as treating $195.75 as a
7   minimum stipend?
8       MR. QUINN:  Object to form.  Go ahead.
9           (Telephonic interruption.)
10      THE WITNESS:  Repeat it again?  Sorry.
11  BY MR. RODRIGUEZ:
12      Q.  I'll ask it a different way.
13      MR. QUINN:  Hang on.
14           Whoever just joined, would you please put
15  your mute on?
16           Sorry.
17      MR. RODRIGUEZ:  That's okay.
18      MR. QUINN:  Let's get this cleared up.
19      MR. RODRIGUEZ:  Thank you.
20      Q.  May I call AuPairCare APC?
21      A.  Sure.
22      Q.  True or false:  APC is responsible for
23  ensuring that host families follow Department of
24  State directives?
25      A.  True.

Page 20

1       Q.  True or false:  APC understands DoS has
2   issued a directive stating that the stipend must
3   equal $195.75?
4       A.  APC's understanding of the Department of
5   State guidelines is, yes, the au pair should receive
6   $195.75 weekly stipend.
7       Q.  My question was about a directive stating
8   that the stipend must equal.  And I believe you
9   answered in terms of "should receive."  So I'm going
10  to ask again.
11          Is it APC's understanding that DoS has
12  issued a directive stating that the stipend must
13  equal $195.75?
14      A.  No.
15      Q.  Can you articulate what APC understands
16  DoS to require concerning the stipend?
17      A.  Sure.  I'll repeat what I just said.
18          Our understanding is that per the
19  Department of State, that host families should pay
20  the au pair $195.75 per week.
21      Q.  "Should pay."  That means that DoS does
22  not have a requirement of $195.75 a week; is that
23  right?
24      MR. QUINN:  Object to form.
25      THE WITNESS:  The guidance that we

Page 21

1   received is that the au pair needs to be paid $195.
2   So it needs, should, yeah.
3   BY MR. RODRIGUEZ:
4       Q.  So your testimony is that needs to be paid
5   and should pay are synonymous?
6       A.  If they want to participate in the
7   program, yes.
8       Q.  So -- so your testimony is "should pay"
9   and "needs to be paid" are synonymous; correct?
10      A.  Yes.
11      Q.  However, it is also your testimony that
12  "must be paid" has a different meaning than "needs
13  to be paid"; is that accurate?
14      A.  Sure.
15      Q.  What's the difference?
16      A.  I -- I think we're going back to semantics
17  here.  My -- my -- our main goal as an agency is
18  that the au pair -- 195 is what the host family
19  needs to pay the au pair per week, $195.75.
20      Q.  How would you describe a situation where a
21  host family chooses to pay an au pair more than
22  $195.75?
23      A.  So our role per the Department of State is
24  to monitor placements.  So we monitor placements in
25  that we're talking to both the au pair and the host

MAGNA
LEGAL SERVICES

Page 22

1    family to -- per regulations to see how their
2    placement is going and we would be alerted if an
3    au pair was not receiving the $195.75, but he would
4    not be informed an au pair was receiving more than
5    that. So that's -- that's how we would be --
6        Q. But -- okay. So if I'm understanding your
7    testimony correctly, "needs to be paid $195.75" is
8    the same as "needs to be paid a minimum of $195.75";
9    is that accurate?
10       A. Yes.
11       Q. So it would be contrary to AuPairCare's
12   understanding of the Department of State's position
13   if AuPairCare had ever represented that the stipend
14   must be $195.75, no more, no less; is that right?
15       MR. QUINN: Object to form.
16       THE WITNESS: No.
17   BY MR. RODRIGUEZ:
18       Q. Why?
19       A. Because our understanding -- that's a --
20   we have to put a -- a number out there for host
21   families to -- to -- to base this decision on, to
22   participate in the au pair program. So that's the
23   weekly stipend that the --
24       (Telephonic interruption.)
25       -- department of State gave to us and

Page 23

1    that's what we informed the host family to the best
2    of our -- to the best of our knowledge.
3        Q. Okay. So if AuPairCare required host
4    families to pay $195.75 to au pairs, no more, no
5    less, would that accurately reflect AuPairCare's
6    understanding of the Department of State's position?
7        A. No, because we -- our role is to ensure
8    that the au pair is paid $195.75.
9        Q. No more, no less; right?
10       A. Our role as a designated sponsor is to
11   ensure that she's paid $195.75. And we're not -- if
12   au pairs are paid more than that, there's -- we're
13   not monitoring that. But we need to ensure that
14   she's paid $195.75 a week per -- per the Department
15   of State.
16       Q. Now ensuring someone is paid $195 a week,
17   does that mean that the au pair must be paid at
18   least $195.75 a week but could be paid more?
19       A. Yes.
20       Q. So when you say that APC ensures that
21   au pairs are paid $195.75 a week what you actually
22   mean is ensure that au pairs are paid at least
23   $195.75 a week --
24       MR. QUINN: Object --
25   BY MR. RODRIGUEZ:

Page 24

1        Q. -- fair?
2        MR. QUINN: Object to form.
3        MR. RODRIGUEZ: I take that objection.
4    Let me try it again.
5        Q. Is it accurate to say that ensuring
6    au pairs are paid $195.75 a week is the very same as
7    ensuring au pairs are paid at least $195.75 a week?
8        A. Yes.
9        MR. RODRIGUEZ: I am marking what's going
10   to be Exhibit 8. Bears the Bates number APC 000489.
11       (Exhibit 8 marked.)
12   BY MR. RODRIGUEZ:
13       Q. Ms. McNamara, do you recognize the
14   document marked as Exhibit 8?
15       A. Yes.
16       Q. What is the document marked as Exhibit 8?
17       A. It's an e-mail communication to au pairs.
18       Q. Where have you seen Exhibit 8 before?
19       A. Where have I seen it? Um -- can you -- in
20   what context.
21       Q. Have you seen Exhibit 8 before in any
22   context?
23       A. Yes.
24       Q. Okay. What was the context?
25       A. In my capacity working for AuPairCare.

Page 25

1        Q. And did you have any role in the drafting
2    of Exhibit 8?
3        A. I don't believe I had a role in drafting
4    it, but -- I don't believe I -- I maybe gave
5    feedback on the content.
6        Q. Did you approve the content of Exhibit 8?
7        A. I don't recall.
8        Q. Fair to say that Exhibit 8 reflects APC's
9    position as of the date of Exhibit 8; no?
10       MR. QUINN: Object to form.
11       THE WITNESS: Can you repeat the question,
12   please?
13   BY MR. RODRIGUEZ:
14       Q. I'll phrase it a little differently.
15       Is it fair to say that Exhibit 8 reflects
16   APC's position as of the date of Exhibit 8?
17       MR. QUINN: Object to form.
18       THE WITNESS: Our position of ensuring the
19   health, safety, and welfare of au pairs? Yes.
20   BY MR. RODRIGUEZ:
21       Q. Okay. Now I'd like you to read the
22   sentence following the bullets on Exhibit 8.
23       A. "Legitimate host families will also not
24   offer you a higher stipend than what is listed in
25   the regulations published by the US Department of

7 (Pages 22 to 25)

PLAINTIFFS' RESP. APP.0005328

MAGNA
LEGAL SERVICES

**Page 26**

1  state for the au pair program."
2  Q.  As of the date of Exhibit 8, what was the
3  stipend that was published in the regulations by the
4  US Department of state for the au pair program?
5  A.  I believe at the time it was $195.75.
6  Q.  Is it a true statement that at the time of
7  Exhibit 8, legitimate host families would not offer
8  au pairs a higher stipend than $195.75?
9  A.  Repeat the question?
10  Q.  Is it a true statement that as of the time
11  of Exhibit 8, legitimate host families would not
12  offer au pairs a stipend higher than $195.75?
13  A.  No.
14  Q.  So I believe you testified that Exhibit 8
15  was sent to -- sent by e-mail to au pairs; correct?
16  A.  Yeah.
17  Q.  So in light of your testimony, is it
18  accurate to say that AuPairCare sent a false
19  statement by e-mail to au pairs?
20  MR. QUINN:  Objection.
21  THE WITNESS:  I think the statement of
22  this e-mail was sent in the spirit of protecting
23  au pairs from being taken advantage of and losing
24  money by going with scam artists who were not
25  US-designated au pair agencies.

**Page 27**

1  BY MR. RODRIGUEZ:
2  Q.  I have a few questions about that.
3  A.  Sure.
4  Q.  Number 1, does the spirit of Exhibit 8
5  have anything to do with whether the sentence
6  following the bullets is true or false?
7  A.  Yes.  In that we wanted to paint the
8  picture for au pairs that families typically would
9  be paying $195.75.  And someone that's offering you
10  $300 per week or $400 per week, that's not part
11  of this program.  So that was the spirit of the
12  communication, to provide au pairs context around
13  what was happening in the industry at the time.
14  That these phishing scams came out.
15  Q.  So you just said that -- I believe you
16  said in sum and substance that paying more than
17  $195.75 per week was not part of the program; is
18  that right?
19  A.  What I was conveying is that there were at
20  the time probably 2013 legitimate host families that
21  were paying more than $195.75.  But we were painting
22  the context for these au pairs regarding a scam that
23  was taking advantage of them.
24  Q.  So what about the sentence following the
25  bullets on Exhibit 8 says that there are legitimate

**Page 28**

1  host families paying more than $195.75 at the time
2  of Exhibit 8?
3  A.  Repeat the question, please?
4  Q.  What about the sentence following the
5  bullets on Exhibit 8?
6  A.  The sentence, yes.
7  Q.  -- conveys that there were in fact
8  legitimate host families offering more than $195.75
9  per week at the time of Exhibit 8?
10  A.  Is that a question?
11  Q.  It is.  What about it?  Where from the
12  text following the bullets on Exhibit 8 do you
13  infer -- let me start again.
14  From reading Exhibit 8, how would an
15  au pair come to the conclusion that there were in
16  fact legitimate host families paying more than
17  $195.75 at the time of Exhibit 8?
18  A.  She wouldn't.
19  Q.  She wouldn't.  So fair to say, then, that
20  Exhibit 8 contains a falsehood?
21  MR. QUINN:  Object to form.
22  Argumentative.
23  THE WITNESS:  No.
24  BY MR. RODRIGUEZ:
25  Q.  Okay.  But the statement legitimate host

**Page 29**

1  families will also not offer you a higher stipend
2  than what is listed in the regulations --
3  A.  Right.
4  Q.  -- that is false?
5  A.  So -- majority.  So maybe it was a -- we
6  could have put in "majority."  But for the majority
7  legitimate host families wouldn't be offering the
8  au pair $300 or $400 stipend a week.
9  Q.  Now you said a moment ago that the spirit
10  of Exhibit 8 was to protect au pairs from losing
11  money; is that right?
12  A.  Protect au pairs from people that were
13  taking -- trying to take advantage of them, yes.
14  Q.  Do you believe that an au pair is taken
15  advantage from if host families compete for her by
16  paying her more than $195.75?
17  A.  No.
18  Q.  In fact, an au pair would gain money if
19  host families competed for her by offering higher
20  stipends?
21  A.  Well, it's a cultural exchange program.
22  So what goes into the experience is more than just
23  the weekly stipend.  It's living with a host family,
24  it's being part of that host family.  "On par" means
25  equal to that host family.  So there's a lot more

MAGNA
LEGAL SERVICES

Case 1:14-cv-03074-CMA-KMT   Document 935-25   Filed 05/17/18   USDC Colorado   Page 502 of 700

---

**Page 30**

1  elements that go into this cultural exchange
2  experience than just the stipend.
3  Q.  Okay.  Do you have an understanding of
4  what full-time employment is considered to be in the
5  United States?
6  A.  I do.
7  Q.  Okay.  What is full-time employment?
8  A.  For federal, I believe it is 40 hours a
9  week.
10  Q.  And au pairs can work up to how many hours
11  a week?
12  A.  45.
13  Q.  Okay.  Fair to say, then, that au pairs
14  are full-time employees?
15  A.  No.
16  Q.  Why?
17  A.  Au pairs are part of a cultural exchange
18  program.  So they're coming in on a J-1 visa.
19  Q.  But if au pair -- if au pairs are working
20  full-time as domestic workers up to 45 hours a
21  week -- let me ask that again.
22  Am I correct that au pairs generally work
23  at least 40 hours a week?
24  A.  The maximum that au pairs can work is 45
25  hours a week.

**Page 31**

1  Q.  That was not my question.
2  Am I correct that au pairs generally work
3  at least 40 hours a week?
4  A.  No.
5  Q.  Why am I incorrect?
6  A.  It depends on the family situation.
7  Q.  For the purposes of federal wage and hour
8  law, are au pairs considered full-time employees?
9  MR. QUINN:  Objection to form.
10  Foundation.
11  THE WITNESS:  I don't know.  They're
12  considered, and what they come in on is a J-1 visa.
13  So they're a cultural exchange participant and
14  that's what they're considered in our understanding.
15  BY MR. RODRIGUEZ:
16  Q.  So assume for me that an au pair is in
17  fact working 40 hours a week as a domestic worker.
18  Do you believe it's accurate not to characterize
19  that au pair as a full-time employee?
20  MR. QUINN:  Object to form.
21  THE WITNESS:  Repeat the question, please?
22  BY MR. RODRIGUEZ:
23  Q.  Yeah.  So if an au pair is in fact working
24  over 40 hours a week in a household, do you think
25  it's accurate to characterize that au pair as a

**Page 32**

1  full-time employee?
2  MR. QUINN:  Object to form.
3  THE WITNESS:  No.  An au pair is a
4  cultural exchange visitor, participant.  So she
5  is -- she or she -- the participant is in a
6  completely different category for the time that they
7  are in the US under the J-1 visa for the au pair
8  program.
9  BY MR. RODRIGUEZ:
10  Q.  So it simply does not matter that au pairs
11  are working up to 45 hours a week?  That does not
12  change the nature of their relationship?
13  A.  With who?
14  Q.  With anyone.
15  MR. QUINN:  Object to form.
16  BY MR. RODRIGUEZ:
17  Q.  Let me ask it a different way.
18  A.  Sure, please.
19  Q.  What is the significance of au pairs
20  working over 40 hours a week, if any?
21  A.  Per the Department of State regulations
22  for the J-1 au pair program, au pairs are able to
23  work up to 45 hours per week.  Maximum 10 hours per
24  day.
25  Q.  Now, is it your testimony that by dint of

**Page 33**

1  the type of visa that they're coming in on, that the
2  45 hours a week does not make them full-time
3  employees?
4  MR. QUINN:  Object to form.
5  THE WITNESS:  Based on -- sorry.
6  MR. QUINN:  Go ahead.
7  THE WITNESS:  Our understanding is that
8  they are cultural exchange participants.  And part
9  of the program, some of the components of the
10  program are childcare up to 45 hours a week.  But
11  there's other components of the cultural exchange
12  program also.
13  BY MR. RODRIGUEZ:
14  Q.  But 45 hours a week is the equivalent of
15  full-time employment; correct?
16  A.  Correct.
17  (Exhibit 9 marked.)
18  BY MR. RODRIGUEZ:
19  Q.  I'm marking Exhibit 9, which is a document
20  beginning at Bates APC 000254.
21  Ms. McNamara, do you recognize Exhibit 9?
22  A.  Yes.
23  Q.  What is Exhibit 9?
24  A.  It is AuPairCare's au pair agreement.
25  Q.  Is it the agreement as of a certain date?

PLAINTIFFS' RESP. APP.0005330

**MAGNA**
LEGAL SERVICES

---

Page 34

1    A.   Yes.
2    Q.   What is the date?
3    A.   This rev looks to be November 2009.
4    Q.   What's the purpose of the au pair
5  agreement?
6    A.   It's to ensure the au pair's understanding
7  of the US Department of State regulations.
8    Q.   Does it not also obligate the au pair --
9  strike that.
10      Does it not also provide that the au pair
11  has certain responsibilities vis-a-vis AuPairCare?
12      MR. QUINN:  Object to form.
13      THE WITNESS:  Can you point out for me
14  what you're referring to?
15  BY MR. RODRIGUEZ:
16    Q.   Sure.  Well, let's -- let's just start off
17  on page 2.  It's Bates ending 255.  And specifically
18  I'm looking at the last sentence of paragraph 16.
19  Kindly read that into the record.
20    A.   "If a dispute arises concerning the scope
21  of the au pair's responsibilities, AuPairCare shall
22  resolve said dispute and its decision shall be
23  final."
24    Q.   So now does that mean that if an au pair
25  and their host family dispute the AuPairCare's scope

---

Page 35

1  of work -- let me start again.
2      Does that mean that if the au pair and
3  host family have a dispute about the au pair's work
4  responsibilities, that AuPairCare is the party that
5  makes the determination?
6    A.   No.
7    Q.   Why not?
8    A.   Our process is that the host family and
9  au pair, if there is a dispute or if there is a
10  concern, that we always try to mediate and have both
11  parties come together to try and resolve that.  And
12  in the case that it can't be resolved, then
13  either/or both parties can re-match.
14    Q.   Okay.
15    A.   But if we make a determination that one or
16  both parties is not fit for the program because they
17  are not following the rules and regulations of the
18  program, then this sentence applies.
19    Q.   Does AuPairCare facilitate the mediation
20  you just referenced?
21    A.   Yes.
22    Q.   And you said "we make a determination."
23  Was the "we" in that phrase AuPairCare?
24    A.   Yes.
25    Q.   Now the last sentence of paragraph 16 does

---

Page 36

1  in fact give AuPairCare the right to make the final
2  decision as to a dispute between an au pair and the
3  host family concerning the au pair's working
4  conditions; does it not?
5      MR. QUINN:  Object to form.
6      THE WITNESS:  Can you repeat the question,
7  please?
8      MR. RODRIGUEZ:  Would the court reporter
9  please read back that last question.
10      (Record read.)
11      MR. RODRIGUEZ:  That was a bad question.
12  Let me ask it a different way.
13    Q.   Isn't it the case that the last sentence
14  of paragraph 16 gives AuPairCare the right to make
15  the final decision if a dispute arises between the
16  au pair and the au pair's host family concerning the
17  au pair's working conditions?
18      MR. QUINN:  Object to form.
19      THE WITNESS:  Or a designated au pair
20  sponsor.  And we need to ensure that both host
21  families and au pairs are following the guidelines
22  set forth in the Department of State regulations.
23  So if one or both parties is not doing that as it
24  relates to au pairs' duties and responsibilities,
25  then, yes, that would be a decision that we would

---

Page 37

1  make.
2  BY MR. RODRIGUEZ:
3    Q.   And AuPairCare reserves the right itself
4  to make the final decision as to those issues;
5  correct?
6    A.   As it relates to the abiding by the
7  regulations.
8    Q.   Let's turn to paragraph 21.
9      21 begins, "Au pair agrees to abide by
10  host family rules as they are determined by the host
11  family and will behave as a responsible member of
12  the host family at all times."
13      Now, am I correct that that sentence
14  reflects requirements imposed by the host family but
15  not the Department of State?
16    A.   Correct.
17    Q.   Now, what happens if a dispute arises
18  between the au pair and the host family concerning
19  the rules that the host family imposes on the
20  au pair?
21    A.   So the same process would apply.  So
22  anytime that there's a miscommunication, we
23  encourage both parties to talk together and try to
24  resolve it themselves by communicating and sitting
25  down and talking.  And if -- if that doesn't resolve

---

MAGNA
LEGAL SERVICES

---

**Page 38**

1    the situation, then we will offer to mediate and
2    come in and be a third party to help the host family
3    and au pair work through the concerns.
4        Q.   And that process has been consistent for
5    as long as you're aware of; is that right?
6        A.   Correct.
7        Q.   And that process includes AuPairCare
8    facilitating mediation; correct?
9        A.   Our area director, yes.
10       Q.   An employee of AuPairCare?
11       A.   Yes.
12       Q.   The next sentence of paragraph 21 reads
13   "If a dispute arises concerning the host family
14   rules, AuPairCare shall resolve said dispute and its
15   decision shall be final."
16           Does that not mean that AuPairCare
17   reserves to itself the right to make a final
18   decision as to whether host family rules are proper?
19           MR. QUINN:  Object to form.
20           THE WITNESS:  AuPairCare doesn't make a
21   decision whether host family rules are proper.
22   AuPairCare assesses each and every situation --
23   they're all different; we're dealing with humans and
24   personalities -- and we assess the situation.  And
25   if the au pair who is living in the host family's

---

**Page 39**

1    home and part of the family can't abide by the host
2    family's house rules, then we could step in and work
3    with the family.  The family would most likely break
4    the match with the au pair.  And then we could
5    determine the next steps for that au pair.
6    BY MR. RODRIGUEZ:
7        Q.   So maybe "proper" was too narrow.  I
8    believe the sentence actually reads, "If a dispute
9    arises concerning the host family rules," what does
10   "concerning the host family rules" mean?
11       A.   I take it to mean if a dispute arises that
12   the au pair does not want to follow the family
13   rules --
14       Q.   In that --
15       A.   -- and it can't be resolved.
16       Q.   In that situation AuPairCare shall resolve
17   the dispute; is that right?
18       A.   If it's escalated to us and it gets to --
19   to a point where the host family continues to state
20   that the au pair's not following the family rule,
21   which could be a curfew, which could be turning off
22   the lights or parking the car in certain places, it
23   runs the gamut of what -- what host families' rules
24   are.
25       Q.   And in that situation AuPairCare has the

---

**Page 40**

1    right to make the final decision?
2        A.   If it -- if it escalates to us and we feel
3    that the host family no longer wants the au pair in
4    the house and then we can help enforce that based on
5    that particular circumstance, yes.
6        Q.   I think all your answers so far have
7    assumed that the host family rule was appropriate
8    and could be enforced; is that accurate?
9        A.   I'm sorry.  Repeat the question, please.
10       Q.   Yeah.  I think all your answers so far
11   have assumed that the host family rule that the
12   au pair may not be following is appropriate and
13   should be enforced; is that right?
14       A.   No, I'm not aware of every host family's
15   internal house rules and they would have to abide by
16   the law of the land.  But, no, I couldn't say if
17   their house rules are appropriate or not.
18       Q.   Well, what if an au pair objects that a
19   family's house rules are unreasonable and should not
20   be followed but no one thinks that those rules rise
21   to the level of a legal violation.  What would
22   AuPairCare do in that circumstance?
23       A.   So we would talk to both parties and first
24   step would be to encourage dialogue between the host
25   family and the au pair.  So encourage open

---

**Page 41**

1    communication.  And if they can't resolve it that
2    way, then we would come in to mediate.  We would
3    bring up best practices that in our almost 30 years
4    of being an au pair sponsor, what are some best
5    practices that other host families or au pairs are
6    implementing in their local community that might
7    address the particular issue.  And we -- we highly
8    encourage all families before they match with an
9    au pair to -- to ask the right questions and set the
10   right expectations and share upfront what their --
11   what their host -- their home rules are so there
12   isn't miscommunications and misalignments.
13       Q.   My question is what happens in the
14   situation where an au pair objects that the house
15   family's rules are unreasonable?  Would that
16   situation trigger AuPairCare's rights under
17   paragraph 21 as you understand them?
18       A.   No.
19       Q.   Why not?
20       A.   Because we -- we would sit down and talk
21   with the au pair and the host family and if that
22   particular match between the two parties isn't
23   right, then we will work with the parties and say
24   okay, that's not right for you.  That's what your
25   decision is, host family or au pair, then we -- if

**MAGNA** ▶
LEGAL SERVICES

Page 42

1  the au pair's very unhappy with the host family
2  rules and feels they were switched up on her, then
3  she -- she can request to break the match and she
4  can -- if we feel that she's following, you know,
5  the spirit of the program and she's -- she's offered
6  the opportunity to re-match.
7        (Telephonic interruption.)
8        (Reporter asks for repetition.)
9        She's offered the opportunity to re-match,
10  to find a new placement.
11     Q.  So the situation you were just discussing
12  is in fact a dispute concerning host family rules;
13  correct?
14     A.  Mm-hmm.
15     Q.  And AuPairCare has the right to make the
16  final decision as to that dispute; is that right?
17     A.  Yes.
18     Q.  Please turn your attention down to
19  paragraph 29.  I'll go ahead and save you reading it
20  and read it in myself.
21        29 says, "Au pair will receive a weekly
22  stipend in accordance with the US Department of
23  State Regulations in the amount of $195.75."
24        Did I get that first sentence of paragraph
25  29 right?

Page 43

1     A.  Yes.
2     Q.  Now does -- what does this paragraph mean?
3     A.  It's AuPairCare's understanding of the
4  Department of State regulations for the weekly
5  stipend that the host family would pay to the
6  au pair.
7     Q.  Okay.  The amount of $195.75; correct?
8     A.  Yes.
9     Q.  Does that mean that the host family may
10  pay more?
11     A.  It doesn't preclude them.
12     Q.  Why not?
13     A.  Because it doesn't say that they cannot;
14  it says that they need -- it says "In accordance --
15  in the amount of $195.75."
16     Q.  Okay.  But if I say that someone may do
17  something and in fact they do something slightly
18  different, um -- let me ask the -- strike that.
19        If I say that someone will do something
20  and they do something slightly different than what I
21  say they will do, isn't it the case they violated my
22  direction?
23        MR. QUINN:  Object to form.
24  BY MR. RODRIGUEZ:
25     Q.  Hypothetically?

Page 44

1     A.  Hypothetically if I told you to bake me 12
2  cookies and you baked me 13, I would not feel that
3  you were violating my direction.
4     Q.  Well, because they happened to be cookies;
5  right?
6     A.  (No response.)
7     Q.  I mean --
8     A.  We all love cookies.
9     Q.  Exactly.  If I tell someone that they will
10  go to the store and buy 2 percent milk and they in
11  fact go to a farm and get whole milk, have they
12  violated my direction?
13        MR. QUINN:  Object to form.
14        THE WITNESS:  The last part?  Have they
15  violated?  Can you repeat that?
16  BY MR. RODRIGUEZ:
17     Q.  That's right.  Have they violated my
18  direction?
19     A.  I don't know that they violated the
20  direction.
21     Q.  But they did not do what I told them to
22  do?
23     A.  Yes.  The 1 or 2 percent.
24     Q.  And the reason why they did not do what I
25  told them to do is because I said you will do

Page 45

1  something and yet they did something different than
2  what followed what they will do; correct?
3     A.  Yes.
4     Q.  All right.  Let's turn to the next
5  payment -- actually, let's not.  Let's turn to
6  page -- internal page 6, Bates ending 259.  And this
7  time would you read into the record paragraph 61.
8     A.  "Au pair agrees that any decision
9  regarding an au pair's program's status, dismissal,
10  or replacement will be made at the sole discretion
11  of AuPairCare and said decision shall be considered
12  final."
13     Q.  Now does that not give AuPairCare final
14  say as to whether an au pair will remain in the
15  program?
16     A.  Yes.
17     Q.  And isn't it a necessary consequence of a
18  determination that an au pair will no longer be in
19  the program that an au pair's employment will
20  terminate?
21        MR. QUINN:  Object to form.
22        THE WITNESS:  If the au pair's no longer
23  in the program, then she's no longer a cultural
24  exchange participant on the J-1 visa program.  So
25  her -- her status as a J-1 participant would be

12 (Pages 42 to 45)

PLAINTIFFS' RESP. APP.0005333

MAGNA
LEGAL SERVICES

Page 46

1    "ended" or "terminated" in the Department of
2    State -- database.
3    BY MR. RODRIGUEZ:
4        Q.   And the necessary consequence of that is
5    that she would no longer be employed and seek wages;
6    is that right?
7        A.   She would no longer be an au pair
8    participant and be a member of that host family that
9    she was with and a cultural exchange participant.
10       Q.   Do you deny that au pairs are employed?
11       A.   There is -- there does exist an
12   employer/employee relationship between the host
13   family and the au pair.
14       Q.   Okay.  And since that employee -- strike
15   that.
16            Since that employer/employee relationship
17   exists, isn't it the case that a necessary
18   consequence of AuPairCare's decision to terminate an
19   au pair from the program means that the au pair is
20   no longer an employee?
21       A.   She would no longer be providing childcare
22   for the host family.
23       Q.   What's the difference between no longer
24   providing childcare and no longer being an employee?
25       A.   Well, there's a relationship, an

Page 47

1    employer/employee relationship exists between the
2    host family and the au pair.  However, the cultural
3    exchange program, no host family that I know of
4    calls their au pair an employee.  They're a part of
5    the family.  They're on par as a family member.  So
6    I don't see it that way.
7        Q.   Do family members typically work 45 hours
8    a week for the family doing household labor?
9            MR. QUINN:  Object to form.
10           THE WITNESS:  Well, in -- in some cases,
11   yes, you know, there are grandmothers and cousins
12   that come and can live in a home and have free room
13   and board in exchange for providing services to that
14   family.
15   BY MR. RODRIGUEZ:
16       Q.   But not wages; right?
17           MR. QUINN:  Object to form.
18           THE WITNESS:  Repeat or -- can you
19   clarify.
20   BY MR. RODRIGUEZ:
21       Q.   In the situation you just mentioned, are
22   wages being paid by the family?
23       A.   I don't know.  It's a hypothetical.
24       Q.   Now you understand that the Department of
25   State has expressly stated that au pairs are

Page 48

1    domestic workers and employees of the family; is
2    that right?
3        A.   No.
4            MR. QUINN:  Object to form.
5    BY MR. RODRIGUEZ:
6        Q.   You don't think that that's ever happened?
7        A.   I -- I don't.  From my understanding the
8    Department of State, through their guidance to us as
9    sponsors that these are cultural exchange
10   participants and they're not domestic workers.
11       Q.   And they're not employees?
12       A.   There exists an employer/employee
13   relationship that I -- I definitely have heard that.
14       Q.   Okay.
15       A.   Between the host family and the au pair.
16       Q.   My question is if AuPairCare exercises its
17   right to end the au pair's participation in the
18   program, is it not a necessary consequence of that
19   determination that the employee/employer
20   relationship is terminated?
21       A.   You have to repeat the question again.
22   That was a long question.
23       Q.   Do you agree with me that AuPairCare has a
24   right to terminate the au pair's participation in
25   the program?

Page 49

1        A.   As a last resort, yes.
2        Q.   And if AuPairCare terminates an au pair's
3    participation in the program, is it not the case
4    that the au pair's employee relationship must
5    terminate?
6        A.   Her J-1 visa au pair participation ends.
7    And any -- and what goes along with that is she is
8    providing up to 45 hours of childcare for the host
9    family.  So if she's no longer participating in the
10   program she's no longer providing those services.
11       Q.   And she is also no longer an employee;
12   correct?
13       A.   I don't consider -- I consider her an
14   au pair exchange participant.
15       Q.   You understand and you've testified that
16   there is an employee/employer relationship in --
17       A.   Exists.
18       Q.   -- the --
19       A.   Yes, yes.
20       Q.   Now if AuPairCare terminates an au pair's
21   participation in the program, is it not the case
22   that that employee/employer relationship no longer
23   exists?
24       A.   Between the host family and the au pair?
25   Yes.

PLAINTIFFS' RESP. APP.0005334

MAGNA
LEGAL SERVICES

Page 50

1    Q.  Okay.  So is -- the following statement is
2  true, then:  AuPairCare has the right and ability to
3  terminate the employee/employer relationship with
4  the au pair?
5    A.  It goes against the whole grain of our --
6  our program.  Our program's goal is to -- to try to
7  ensure that we have successful host family and
8  au pair placements.  And after, you know, guidance
9  and mediation, if one or either party decides to
10 end -- and it's -- it's -- their making the
11 determination.  So the host family's deciding that
12 she's no longer -- we no -- we no longer wanted her
13 to be an au pair in our home or the au pair's
14 deciding, you know what?  This host family just
15 isn't right for me.  Or I don't like living in this
16 remote location.  So they're -- they're making the
17 decision.  We're in cases and they're very few and
18 far between where we need to step in, then we will
19 help finalize that and say, you know what?  We're
20 not going to give this host family another
21 opportunity to host in our program and/or we're not
22 going to give this au pair another opportunity to
23 find a new family.
24    Q.  But AuPairCare has the right in its sole
25 discretion to make a decision regarding an au pair's

Page 51

1  program status or dismissal --
2    A.  Yes.
3    Q.  -- isn't that right?  And the necessary
4  result if AuPairCare exercises that right, is that
5  the AuPairCare's employee relationship must
6  terminate?
7    A.  Well, again, the -- we're typically not
8  the people -- the source that's ending that
9  relationship.  It's either the host family or the
10 au pair is ending that relationship.
11    Q.  I'm asking about a right.  And you're
12 talking about a typical circumstance.
13    A.  Mm-hmm.
14    Q.  So focusing only on the right, please.
15    A.  Okay.
16    Q.  Isn't it a necessary result that if
17 AuPairCare exercises its right to terminate an
18 au pair's program participation, that the au pair's
19 employee relationship must terminate?
20    A.  I still go back to she's a cultural
21 exchange participant.  So the -- so her -- her
22 cultural exchange participant ends and the
23 employer/employee relationship between the host
24 family and the au pair ends.
25    Q.  Okay.  I'm -- I think this is a good point

Page 52

1  for a break if the witness agrees?
2    A.  Yes.
3    MR. QUINN:  Sure.
4    MR. RODRIGUEZ:  All right.  Let's go ahead
5  and take a break.
6    THE VIDEOGRAPHER:  We're off the record.
7  The time is 12:55 p.m.
8    (Recess taken from 12:55 p.m. to 1:46 p.m.)
9    THE VIDEOGRAPHER:  We're back on the
10 record.  The time is 1:46 p.m.
11 BY MR. RODRIGUEZ:
12    Q.  Ms. McNamara, I'd like to direct your
13 attention back to the last exhibit we were
14 reviewing, which is Exhibit 9.
15    I believe you testified earlier that this
16 document is the 2009 revision of AuPairCare's form
17 au pair agreement; is that fair?
18    A.  Yes.
19    Q.  Has the form agreement changed, to your
20 knowledge, at any point between 2009 and the present
21 day?
22    A.  Yes.
23    Q.  When did it change?
24    A.  Each year we make updates accordingly.
25    Q.  Do you have any understanding as to

Page 53

1  whether the language in the paragraphs we reviewed
2  earlier today has changed at any point between 2009
3  and today?
4    A.  I don't.  I don't recall.
5    (Exhibit 10 marked.)
6  BY MR. RODRIGUEZ:
7    Q.  I have marked Exhibit 10 which is a
8  document beginning at Bates APC 000262.
9    Ms. McNamara, do you recognize Exhibit 10?
10    A.  Yes.
11    Q.  What is Exhibit 10?
12    A.  It is AuPairCare's au pair agreement.
13    Q.  For which year?
14    A.  The rev was November 2010.
15    Q.  Would it be consistent with APC's practice
16 to have issued any form au pair agreements between
17 the form marked as Exhibit 9 and Exhibit 10?
18    A.  Can you repeat your question, please?
19    Q.  Yeah, how often does AuPairCare in the
20 ordinary course of business revise its au pair
21 agreement?
22    A.  Typically one time a year.
23    (Exhibit 11 marked.)
24 BY MR. RODRIGUEZ:
25    Q.  Placing before the witness Exhibit 11.

PLAINTIFFS' RESP. APP.0005335

MAGNA
LEGAL SERVICES

Page 54

1   Exhibit 11 is a document beginning at Bates APC
2   000269.
3           Ms. McNamara, do you recognize Exhibit 11?
4       A.  Yes.
5       Q.  What is Exhibit 11?
6       A.  It's AuPairCare's 2012 au pair agreement.
7           MR. RODRIGUEZ:  And I'm now marking
8   Exhibit 12, which is a document beginning at Bates
9   APC 000275.
10          (Exhibit 12 marked.)
11  BY MR. RODRIGUEZ:
12      Q.  Ms. McNamara, do you recognize Exhibit 12?
13      A.  Yes.
14      Q.  What is Exhibit 12?
15      A.  It's an au pair agreement rev done on
16  February 2013.
17          MR. RODRIGUEZ:  To no one's surprise I'm
18  marking Exhibit 13, which is a document beginning at
19  Bates APC 000281.
20          (Exhibit 13 marked.)
21  BY MR. RODRIGUEZ:
22      Q.  Ms. McNamara, do you recognize Exhibit 13?
23      A.  Yes.
24      Q.  What is it?
25      A.  It's the 2014 au pair agreement, rev

Page 55

1   December 18, 2013.
2           (Exhibit 14 marked.)
3   BY MR. RODRIGUEZ:
4       Q.  Exhibit 14 is a document beginning at
5   Bates.  APC 287.
6           Ms. McNamara, what is Exhibit 14?
7       A.  It is AuPairCare's 2015 au pair agreement.
8       Q.  Are you aware of any revision to
9   AuPairCare's au pair agreement subsequent to the
10  2015 au pair agreement?
11      A.  Yes.
12      Q.  Do you have an understanding as to how
13  many revisions to the au pair agreement AuPairCare
14  has made subsequent to the 2015 au pair agreement?
15      A.  I'm -- I want to clarify.  We make
16  revisions, but typically what goes into the system
17  that the au pairs sign is the one-time standard --
18  typical one-time change.  So, no, I don't know how
19  many revs went into a finalized agreement.
20      Q.  Do I understand your last response to mean
21  that each au pair generally signs a single version
22  of the au pair agreement?
23      A.  Per -- when they apply to the program,
24  yes, for -- for that year that they apply to the
25  program; correct.

Page 56

1       Q.  Does AuPairCare maintain a system from
2   which AuPairCare can pull scanned copies of actual
3   signed agreements?
4       A.  Yes.
5       Q.  What is that system Called?
6       A.  So currently it's called DocuSign.
7       Q.  When did DocuSign begin to be used?
8       A.  I can't recall the exact date, but I --
9   probably for the past four years we've been
10  discussing DocuSign.
11      Q.  Do you have an understanding as to what
12  was used prior to DocuSign?
13      A.  We had -- it was -- I believe it was an
14  online signature that the au pairs would sign an
15  online signature.  And prior to that I believe it
16  was a hard -- hard copy.
17      Q.  Do you have an understanding as to whether
18  AuPairCare maintains historical copies of signed
19  au pair agreements?
20      A.  Yes.
21      Q.  Does AuPairCare in fact maintain such
22  copies?
23      A.  Yes.
24      Q.  How far back do such copies exist within
25  AuPairCare's organization?

Page 57

1       A.  I don't have the exact date for -- for how
2   far that goes back.
3       Q.  Do you have an understanding generally?
4       A.  Generally, 2008 or 2009.
5       Q.  Do archives of au pair agreements -- let
6   me start again.
7           Do archives of signed au pair agreements
8   prior to 2008/2009 exist in any off-site storage?
9       A.  I do not know.
10          (Exhibit 15 marked.)
11  BY MR. RODRIGUEZ:
12      Q.  Passing out Exhibit 15.  Exhibit 15 is a
13  document beginning at Bates APC 000692.
14          (Telephonic interruption.)
15          Ms. McNamara, do you recognize Exhibit 15?
16      A.  It looks to be from our Casper database, a
17  screenshot of the au pair detail page.
18      Q.  In the bottom right there's a box that
19  says, "Program Completion Processing."  And the last
20  line in the, "Program Completion Processing" box
21  says, "Completion Bonus Due."  Do you see that?
22      A.  Yes.
23      Q.  What is a completion bonus?
24      A.  A completion bonus was a practice that was
25  utilized in the industry where an au pair would pay

Page 58

1  a certain amount of -- or au pair would get a
2  certain amount of money if she successfully
3  completed the program.
4      Q.  What was the source of that money that the
5  au pair would receive if he or she successfully
6  completed the program?
7      A.  So this was before my time.  Since I've
8  been with the program we have not done completion
9  bonuses because it was a guidance directive from the
10  Department of State that that wasn't in the spirit
11  of the program.
12     Q.  So my question was what was the source of
13  the money that the au pair would receive through the
14  completion bonus?
15     A.  I do not know.
16     Q.  Do you have an understanding?
17     A.  It was before my time so I wasn't in
18  charge of doing completion bonuses so --
19     Q.  I understand.  But you've been with the
20  organization for --
21     A.  Yes.
22     Q.  -- several years --
23     A.  Yes.
24     Q.  -- and I believe it's possible that within
25  the scope of your -- the course and scope of your

Page 59

1  employment you may have heard about the completion
2  bonuses --
3      A.  Yes.
4      Q.  -- is that fair?
5      A.  Yes.
6      Q.  So what have you heard about it?
7      A.  That an au pair -- I think I said that --
8  that an au pair can receive a certain amount of
9  money for successfully completing the program.  So
10  maybe she -- yeah.
11     Q.  So let's -- I think the first time you
12  started to answer that question you said the au pair
13  pays.  Is it in fact accurate that the au pair to
14  your understanding paid money in that was then given
15  back to her as the completion bonus?
16     A.  That could have been the practice.
17     Q.  Okay.  Is the completion bonus the same as
18  a performance bond?
19         MR. QUINN:  Object to form.
20  BY MR. RODRIGUEZ:
21     Q.  Do you have an understanding what a
22  performance bond is?
23     A.  Yes.
24     Q.  What is it?
25     A.  To my understanding if you perform such

Page 60

1  task, that you will get X reward or compensation.
2      Q.  1 would get or one would get back?
3      A.  I don't know.
4      Q.  Do you have an understanding of the source
5  of funds that constituted the performance bond?
6      A.  The source of funds for the completion
7  bonus?
8      Q.  I'm actually just asking about the
9  performance bond.  So let me --
10     A.  Oh.
11     Q.  Let me step back.
12     A.  I don't know anything about a performance
13  bond.
14     Q.  So you have no understanding as to whether
15  a completion bonus is the same as a performance
16  bonus?
17     A.  Al I know is there was a completion bonus
18  practice in the au pair industry and that a guidance
19  directive went out and sponsors no longer do that.
20     Q.  Do you have an understanding of what the
21  contents of that guidance directive were?
22     A.  I don't.
23     Q.  Do you have an understanding as to whether
24  the Department of State has taken the position that
25  the practice of completion bonuses violates --

Page 61

1      A.  Yes.
2      Q.  -- the wage and hour laws?
3      A.  Yes.
4      Q.  What is that understanding?
5      A.  No, I have an understanding that the
6  Department of State does not want the practice of
7  completion bonuses being used in the au pair
8  program.
9              (Exhibit 16 marked.)
10  BY MR. RODRIGUEZ:
11     Q.  I'm passing out Exhibit 16 which is a
12  document beginning on Bates APC 000013.
13         Ms. McNamara, do you recognize Exhibit 16?
14     A.  Yes.
15     Q.  What is Exhibit 16?
16     A.  I'll look through the whole thing.
17         So the first three pages look to be --
18  first two pages look to be AuPairCare's trifold, a
19  marketing piece.  And the last three through the
20  last pages look to be a brochure.
21     Q.  Are the two documents contained in
22  Exhibit 16 AuPairCare's primary written marketing
23  material?
24     A.  They are one of several marketing pieces.
25     Q.  Okay.  Well, let's start with printed

MAGNA▶
LEGAL SERVICES

16 (Pages 58 to 61)

**Page 62**

1  marketing pieces.
2      A.  Printed, okay.
3      Q.  What are AuPairCare's printed marketing
4  pieces?
5      A.  So we have the trifold brochure.  We have
6  a handout for our infant specialized program, I'd
7  have to go back to the source for other marketing
8  printed pieces.
9      Q.  What about non-printed marketing
10  materials?
11      A.  Like a host family -- host family handbook
12  is a printed piece.  Au pair printed piece.
13      Q.  But the handbook is for host families that
14  have already signed up earlier.
15      A.  Right.
16      Q.  Okay.  So I'm -- this is my mistake.  I'm
17  here focused on marketing that is used prior to --
18      A.  Okay.
19      Q.  -- signing up with AuPairCare?
20      A.  Okay.
21      Q.  What sort of marketing materials, printed
22  or not, does AuPairCare use?
23      A.  Sure.  We have a website.  We do search
24  engine marketing.  Social media marketing.  A lot of
25  word of mouth host family referrals.

**Page 63**

1      Q.  Are prospective host families provided as
2  a matter of course the trifold brochure?
3      A.  The trifold is utilized typically when the
4  area director is going to local fairs or events.
5  It's something smaller that they can maybe put in
6  their purse when they're talking to someone at a
7  soccer game or picking up the kids from swim
8  practice.
9      Q.  Now, you said the last three pages of
10  Exhibit 16 are what you called a brochure; is that
11  accurate?
12      A.  The -- after page 3.  So page 3 and
13  beyond --
14      Q.  So --
15      A.  -- look like they are the brochure.
16      Q.  So I'm not sure if you're familiar with
17  the Bates number.  Are you?
18         MR. QUINN:  You mind if I point?
19         MR. RODRIGUEZ:  No, not at all.  Actually
20  I'm only --
21         MR. QUINN:  He's pointing to the Bates
22  number.  He's referring to that.
23         THE WITNESS:  Okay.
24  BY MR. RODRIGUEZ:
25      Q.  So when you were talking a moment ago

**Page 64**

1  about the third page, you are referencing the page
2  with -- that begins -- the page with Bates ending
3  15; correct?
4      A.  Yes.
5      Q.  So pages with Bates ending 15 to 23
6  constitute an example of the marketing brochure for
7  AuPairCare; is that accurate?
8      A.  Yes.
9      Q.  What is the purpose of the brochure?
10      A.  It's to educate host families on
11  AuPairCare's au pair cultural exchange program.
12      Q.  And when -- under what circumstances would
13  the brochure be provided to a prospective host
14  family?
15      A.  When a customer requests information from
16  AuPairCare, they can request to have the brochure be
17  sent to them or to download the brochure.  So we
18  send it to them if they requested it in the mail.
19      Q.  Do I understand correctly that one way or
20  the other host families receive the --
21      A.  Yes.
22      Q.  -- brochure?
23      A.  Yes.
24      Q.  Through some medium?
25         How long has that been APC's practice?

**Page 65**

1      A.  As long as I've been there.  That's one
2  marketing tactic to educate customers on the
3  program.
4      Q.  So fair to say that AuPairCare intends
5  every host family will have received the brochure at
6  some point.
7      A.  I wouldn't say that.  Because someone
8  could hear it -- about the program from their
9  next-door neighbor or their sister.  And they --
10  they could bypass the lead process and apply to the
11  program directly.
12      Q.  Let's turn to the trifold.  Oh, before we
13  get there, I believe you were in the room earlier
14  when Ms. Schneider and I agreed to some -- some
15  definitions; is that right?
16      A.  Yes.
17      Q.  Okay.  Do you remember our definition of
18  the phrase "fixed stipend"?
19      A.  I believe it's a set stipend, yes.
20      Q.  That is no higher, no lower than; correct?
21      A.  Okay, yes.
22      Q.  How would you use the phrase "fixed
23  stipend"?  Setting aside my agreement with
24  Ms. Schneider, how would you use the phrase fixed
25  stipend in everyday language?

MAGNA
LEGAL SERVICES

**Page 66**

1      A.   I probably wouldn't use the term "fixed
2  stipend."
3      Q.   If -- and why not?
4      A.   I don't think a customer would understand
5  that.  So I want to make it as simple -- I come from
6  a marketing background.  So I want to make it as
7  simple for the customer to comprehend.
8      Q.   So based -- your marketing background and
9  years of experience, what do you think a customer
10  would understand if they heard that the stipend was
11  fixed at a certain amount?
12      A.   That that was the rate that they should
13  pay.
14      Q.   The rate that they should pay or the rate
15  that they must pay, no higher, no lower?
16      A.   My understanding is that's the rate that
17  they should pay for that service, product.
18      Q.   No higher, no lower; correct?
19      MR. QUINN:  Object to form.
20      THE WITNESS:  Sure.
21  BY MR. RODRIGUEZ:
22      Q.   So -- now let's take a look at the gray
23  column on the left-hand side of the trifold.  And
24  I'm looking at the Bates ending 13.  Under the
25  heading "Affordable childcare" would you kindly read

**Page 67**

1  the first sentence.
2      A.   "At a fixed cost of under $8 an hour for a
3  full-time personalized childcare."  I have to get my
4  glasses on; it's really hard to read this.
5      Q.   Sitting here today do you believe it's
6  accurate to characterize an au pair as having a
7  fixed cost of under $8 an hour for full-time
8  personalized childcare?
9      A.   Sitting here today I probably could --
10      MR. QUINN:  Well, I'm going to object to
11  form.
12      Go ahead.
13      THE WITNESS:  Yeah, sitting here today,
14  that probably -- I wouldn't have -- that's not as
15  clear.
16  BY MR. RODRIGUEZ:
17      Q.   Just to clear up your counsel's concern.
18  When I said "fixed cost," did you have an
19  understanding as to who would pay that fixed cost?
20      A.   The host family.
21      Q.   And who would receive the under $8 an
22  hour?
23      A.   The au pair.
24      Q.   Thank you.
25      Now looking at the top of this column, the

**Page 68**

1  heading is "Your Child's Safety is Our Top
2  Priority."  And the second bullet says -- well,
3  under the words, "All AuPairCare au pairs must,"
4  second bullet says "Have previous documented
5  childcare experience."
6      Why does the trifold represent to
7  prospective host families that au pairs have
8  previous documented childcare experience?
9      A.   It's part of the Department of State
10  regulations that au pairs have previous documented
11  childcare experience.
12      Q.   Now moving two bullets down, it says, "All
13  AuPairCare au pairs must attend our rigorous Safety
14  Care program to receive training in important child
15  driving, and household safety measures."
16      Did I get that right?
17      A.   Yes.
18      Q.   What is the Safety Care program?
19      A.   Sure.  It's a marketing term that we use
20  for the training and orientation that's mandated by
21  the Department of State for an au pair to be on the
22  au pair program.
23      Q.   Does the rigorous Safety Care program go
24  beyond the State Department's requirements?
25      A.   The State Department has very defined

**Page 69**

1  hours for child safety and child development
2  training.  So in our estimation, yes, we do go above
3  and beyond.
4      Q.   Where does the Safety Care program take
5  place?
6      A.   In New Jersey.
7      Q.   How long has that been AuPairCare's
8  practice?
9      A.   AuPairCare's practice has -- since the
10  inception of being a designated sponsor, we've
11  always abided by the regulations and provided
12  training and orientation for the au pair in
13  accordance with the Department of State regulations.
14      Q.   My mistake on that, my question.
15      How long has it been AuPairCare's practice
16  to provide the Safety Care program in New Jersey?
17      A.   Well, we've always provided orientation
18  and training in and around the New Jersey area.  The
19  branding of Safety Care I think lasted for a couple
20  of years, but, yeah, we've been doing it since, I
21  think -- I can't tell you the date that this went
22  into play.  Of that -- branding terminology.
23      Q.   Set aside the branding terminology, for
24  how long has it been AuPairCare's practice to hold
25  au pair training in New Jersey?

**MAGNA**
**LEGAL SERVICES**

Page 70

1    A.   To my understanding -- it was before my
2    time.  It was held in New York and then it moved to
3    New Jersey -- I can't give you a date.  I don't know
4    the exact date that it moved.
5    Q.   And has it always been mandatory for
6    au pairs to receive training in New York or
7    New Jersey?
8    A.   Based on the Department of State
9    regulations, the training and orientation is -- is
10   mandatory for an au pair to be a part of the
11   program.
12   Q.   So every au pair that has been placed by
13   APC will have gone through training in either
14   New York or New Jersey; is that accurate?
15   A.   Yes.  Unless an act of God, that is, you
16   know, there was a hurricane and she had to be, you
17   know, brought somewhere else and then to the host
18   family's home.  But, yes, by and large all of our
19   au pairs do.
20       (Reporter asked for repetition.)
21       By and large all of our au pairs attend
22   training in New Jersey.
23   Q.   How long is APC's training program today?
24   A.   How long is it?  Au pairs arrive on Monday
25   and then they leave on Thursday.  And then our

Page 71

1    infant specialized au pairs, it's a separate track
2    of training, they arrive on Monday and depart on
3    Friday.
4    Q.   To your knowledge, has the length of
5    training always been the same?
6    A.   To my knowledge the length of training has
7    abided by the US Department of State regulations to
8    meet the criteria for training and orientation.
9    Q.   Are the au pairs paid any wage for
10   attending the training and orientation?
11   A.   No.  They do not receive a stipend.
12   Q.   So fair to say then that just about every
13   APC au pair has undergone approximately a week of
14   unpaid training and orientation; is that right?
15   A.   No.
16   Q.   Why not?
17   A.   I think it's part of a process to be a
18   cultural exchange participant per the Department of
19   State that they need to undergo this orientation.
20   There's a lot of, you know, getting assimilated into
21   the US culture, American food, speaking the
22   language.  So it's an assimilation process, along
23   with the training that they receive.
24   Q.   Okay.  The trifold doesn't talk about any
25   of the other cultural things; does it?  It only

Page 72

1    talks about safety care, which is training for their
2    job as a household worker; is it not?
3    A.   The trifold is a very abbreviated
4    marketing piece that highlights a component, yes.
5    Q.   Now I believe moving down and back to the
6    sentence, "At a fixed cost of under $8 an hour for
7    full-time personalized childcare," I believe you
8    said earlier that you would not say "fixed cost" if
9    you were writing this today; is that right?
10   A.   Yes.
11   Q.   What would you say?
12   A.   In relation to what?
13   Q.   If you were rewriting the sentence "at a
14   fixed cost of under $8 an hour for full-time
15   personalized childcare AuPairCare is an economical
16   option for families," if you were rewriting that
17   sentence today, how would you write it?
18       MR. QUINN:  Object to form.
19       Go ahead.
20       THE WITNESS:  "At under $8 an hour."
21   BY MR. RODRIGUEZ:
22   Q.   Instead of "at a fixed cost"?
23   A.   Yeah.
24   Q.   Why is that?
25   A.   I try to simplify things and make it easy

Page 73

1    for the customer to comprehend.
2    Q.   Because customers might be confused about
3    "a fixed cost of under $8 an hour"; isn't that
4    right?
5    A.   Potentially.
6    Q.   And what would the nature of that
7    confusion be based on your experience in marketing
8    and in the au pair industry.
9        MR. QUINN:  Object to form.
10       THE WITNESS:  "Fixed" and "under" in the
11   same sentence.
12   BY MR. RODRIGUEZ:
13   Q.   Let's turn on the next page, still on the
14   trifold.  I'm looking at the Bates ending 14.
15       Under, "Why choose AuPairCare?"
16   Second-to-last bullet says, "Full-time live-in
17   childcare for under $8 an hour, regardless of the
18   number of children in your family."  Did I get that
19   right?
20   A.   Yes.
21   Q.   And do you believe that that is an
22   accurate statement of what au pairs provide?  Today?
23   A.   That's one of many things that they bring
24   to a host family as an exchange participant.
25   Q.   Okay.  So just to be clear, your testimony

PLAINTIFFS' RESP. APP.0005340

MAGNA
LEGAL SERVICES

| Page 74 | Page 76 |
|---|---|

**Page 74**

1  is that the sentence "full-time live-in childcare
2  for under $8 an hour regardless of the number of
3  children in your family" is today an accurate
4  statement of what au pairs do?
5      MR. QUINN:  Object to form.
6      THE WITNESS:  "Accurate statement of what
7  au pairs do."  Yes.
8  BY MR. RODRIGUEZ:
9      Q.  Now the bottom right is a chart.  Can you
10  explain to me what the chart is intended to convey?
11      A.  Sure.  This is an educational marketing
12  piece.  A lot people don't even know about the
13  au pair program.  This cultural exchange program.
14  So it's a way to provide context to prospective
15  customers who are looking at their different
16  childcare options.  And that's what it's there to
17  convey.
18      Q.  So fair to say that a customer might
19  consider AuPairCare interchangeable with daycares or
20  nannies; right?
21      A.  No.
22      Q.  Why not?
23      A.  I think it's fair to say that it's an
24  option that they could look at as they look at the
25  different childcare options available to them in

**Page 75**

1  their community.
2      Q.  Okay.  Fair enough.  So is it fair then to
3  say that au pairs are a substitute for daycares or
4  nannies?
5      A.  No.
6      Q.  Why not?
7      A.  An au pair is a different program.  It's a
8  cultural exchange program.  They are providing
9  childcare services, but the au pair is living in the
10  host family's home.  They -- by nature of the word
11  "au pair," they're on par; they're meant to be a
12  part of the host family's family, eat meals
13  together, go to cultural events, whether that's a
14  baseball game or, you know, go swimming to the beach
15  on the weekends.  They're supposed to be a part of
16  the family.
17      Q.  Is it the case that if someone chooses to
18  employ an au pair, their demand for daycares or
19  nannies decreases?
20      MR. QUINN:  Object to form.
21      THE WITNESS:  If they choose to go with
22  the au pair program, would they then not -- can you
23  repeat the question?
24  BY MR. RODRIGUEZ:
25      Q.  Yeah.

**Page 76**

1      A.  Their appetite decreases for wanting a --
2      Q.  For wanting to employ a daycare or nanny;
3  yes?
4      A.  Yes, because they've -- they've chosen the
5  au pair program and --
6      Q.  As an alternative to daycares or nannies?
7      A.  As an option, yeah.
8      Q.  Now you mentioned that it's a
9  distinguishing features of au pairs, that there's a
10  cultural experience; is that fair?
11      A.  Yes.
12      Q.  Okay.  Let's take a look at the
13  second-to-last line on the bottom of the Bates
14  ending 14.  Would you go ahead and read that line
15  for me.
16      A.  "Cultural experience/second-language
17  learning."
18      Q.  Okay.  And fair to say that the chart then
19  reflects that au pairs provide that?
20      A.  Yes.
21      Q.  Okay.  Does the chart also reflect that
22  nannies can provide that?
23      A.  Yes.
24      Q.  Okay.  So in fact, that is not necessarily
25  a point of distinction between au pairs and nannies;

**Page 77**

1  isn't that right?
2      A.  I think it says it varies.
3      Q.  So it is not necessarily a point of
4  distinction; isn't that right?
5      A.  I think it is a point of distinction with
6  the au pair program.
7      Q.  But one could get a nanny that provides
8  the same cultural experience in second-language
9  learning; could they not?
10      A.  Potentially.
11      Q.  I would like to turn your attention to the
12  brochure.  And specifically I'd like to turn your
13  attention to the brochure and specifically the page
14  ending in Bates 21.  And on the left-hand side of
15  the page with the Bates ending 21 there is -- is it
16  fair to say there is a similar chart to the one we
17  just looked at in the trifold?
18      A.  Visually, yes, it looks -- it looks
19  similar.
20      Q.  Would you please read the words under the
21  line "cost."
22      A.  "Fixed cost regardless of number of
23  children."
24      Q.  Okay.  So there's that word "fixed" again.
25  Do you believe that's accurate sitting here today?

MAGNA
LEGAL SERVICES

| Page 78 | Page 80 |
|---|---|
| 1   A.  Can you -- can you rephrase?  Like do I<br>2 believe it's accurate that this marketing piece is<br>3 accurate?<br>4   Q.  Yes --<br>5   A.  Yes.<br>6   Q.  -- with respect to fixed cost.<br>7      Okay.  Why is that?<br>8   A.  Because the stipend that the US Department<br>9 of State set for the au pair program was $195.75,<br>10 and that weekly stipend doesn't change based on the<br>11 one child that an au pair's caring for or the three<br>12 children that an au pair is caring for.<br>13   Q.  Because that amount is fixed; right?<br>14   A.  It's the amount stipulated by the<br>15 US Department of State.<br>16   Q.  It is fixed; right?<br>17      MR. QUINN:  Object to form.<br>18 Argumentative.<br>19      THE WITNESS:  It -- all I can say is<br>20 that's -- that's the -- that's the stipend amount<br>21 that the US Department of State told us, and that's<br>22 what we've shared with host families.<br>23 BY MR. RODRIGUEZ:<br>24   Q.  What is the distinction between what you<br>25 just said and calling the stipend fixed, if any? | 1   Q.  Can you -- can you tell the date of<br>2 Exhibit 17?<br>3   A.  Yes.  4/28/2016.<br>4   Q.  Is Exhibit 17 an example of the web<br>5 marketing materials that you mentioned earlier?<br>6   A.  Yes.<br>7   Q.  I'd like to focus on -- well, actually if<br>8 you take a look at the paragraph near the middle of<br>9 the first page of Exhibit 17.  There's a dash.  And<br>10 then it says "These are among."  Are you with me?<br>11   A.  Yes.<br>12   Q.  It says, "These are among the factors<br>13 that lead many parents to choose the flexibility and<br>14 affordability of an au pair over other childcare<br>15 options like daycare and nannies."<br>16      Did I get that right?<br>17   A.  Yes.<br>18   Q.  Okay.  So I believe that's consistent with<br>19 what you testified earlier, that au pairs are an<br>20 option along with daycare and nannies; is that<br>21 right?<br>22   A.  Yes.<br>23   Q.  It says -- well, go ahead and read the<br>24 last line of that paragraph.<br>25   A.  "Our transparent, flat pricing structure |

| Page 79 | Page 81 |
|---|---|
| 1   A.  I don't know.<br>2      MR. RODRIGUEZ:  Now I believe we may be<br>3 nearing the end of our video; is that right?<br>4      THE VIDEOGRAPHER:  I was about to give<br>5 you the -- you have seven minutes.  I was -- I can<br>6 go five minutes if you want to.<br>7      MR. RODRIGUEZ:  Let's go ahead and change<br>8 the tape.<br>9      THE VIDEOGRAPHER:  We're off the record.<br>10 The time is 2:28.<br>11   (Recess taken from 2:28 p.m. to 2:35 p.m.)<br>12      THE VIDEOGRAPHER:  We're back on the<br>13 record.  The time is 2:35 p.m.  This marks the<br>14 beginning of video 2, Volume I in the deposition of<br>15 Sarah McNamara.<br>16      (Exhibit 17 marked.)<br>17 BY MR. RODRIGUEZ:<br>18   Q.  Exhibit 17 is before the witness.  The<br>19 exhibit begins on Bates ending -- I'm sorry -- on<br>20 the Bates APC 000134.<br>21      Ms. McNamara, do you recognize Exhibit 17?<br>22   A.  Yes.<br>23   Q.  What is it?<br>24   A.  It looks like a Snagit from our website,<br>25 the costs page. | 1 under $8 an hour enables you to budget your<br>2 childcare for the entire year since the cost remains<br>3 the same even as your family grows."<br>4   Q.  Does that sentence convey to you in any<br>5 manner that the au pair stipend is set at a minimum<br>6 and could go higher?<br>7   A.  No.<br>8   Q.  So fair to say that a prospective host<br>9 family reading this web page would believe that the<br>10 stipend is fixed; is that right?<br>11      MR. QUINN:  Object to form.<br>12      THE WITNESS:  From this sentence, I think<br>13 it conveyed they would be paying under $8 an hour<br>14 for the au pair program.<br>15      MR. RODRIGUEZ:  Okay.<br>16      THE WITNESS:  If they had an au pair.<br>17 BY MR. RODRIGUEZ:<br>18   Q.  Let's go ahead and turn to the next page;<br>19 it's the Bates ending 135.<br>20      Have you seen the chart at the top of<br>21 Bates ending 135 before?<br>22   A.  Yes.<br>23   Q.  Okay.  What is it?<br>24   A.  It's on our website on the cost page.<br>25   Q.  And what is it intended to convey? |

**MAGNA** ▶
LEGAL SERVICES

21 (Pages 78 to 81)

| Page 82 |
|---|
| 1    A.  It's intended to convey the price that |
| 2 host family would pay. |
| 3    Q.  And fair to say that each of the three |
| 4 rows are a component of the price that a host family |
| 5 would pay? |
| 6    A.  The two top ones would be to the agency; |
| 7 and the bottom one would be to the au pair. |
| 8    Q.  And what does -- what does the chart say |
| 9 that the payment to the au pair will be? |
| 10    A.  $195.75 a week. |
| 11    Q.  Does it say minimum? |
| 12    A.  No. |
| 13    Q.  Anything on this page convey that it's a |
| 14 minimum? |
| 15    A.  No. |
| 16    Q.  Now it says -- the last column is when |
| 17 it's due.  And on the "Au Pair" line, it says "Paid |
| 18 weekly to your au pair for 51 weeks." |
| 19       Did I get that right? |
| 20    A.  Yes. |
| 21    Q.  Why would it be paid to the au pair for 51 |
| 22 instead of 52 weeks? |
| 23    A.  So the au pair, based on the US Department |
| 24 of State, the host family and au pair need to come |
| 25 to an agreement on when the au pair should be paid. |

| Page 83 |
|---|
| 1 And then the au pair attends the mandatory training |
| 2 and orientation, which is the first week, and then |
| 3 she travels to the host family's home. |
| 4    Q.  So the au pair is generally in the country |
| 5 for 52 weeks; fair? |
| 6    A.  Yes. |
| 7    Q.  But she's not paid for one of those weeks; |
| 8 correct? |
| 9    A.  Correct. |
| 10    Q.  Okay.  And she's not paid for that week |
| 11 while she is in training; correct? |
| 12    A.  Correct. |
| 13       (Exhibit 18 marked.) |
| 14 BY MR. RODRIGUEZ: |
| 15    Q.  I've placed before the witness the exhibit |
| 16 marked 18. |
| 17       For those of you on the phone, Exhibit 18 |
| 18 was not produced in this litigation.  It -- I will |
| 19 represent to you that I printed it last night from |
| 20 the website |
| 21 aupaircare.com/host-families/program-costs. |
| 22       Ms. McNamara, do you recognize the |
| 23 material contained in Exhibit 18? |
| 24    A.  Yes. |
| 25    Q.  What is it? |

| Page 84 |
|---|
| 1    A.  It looks like it's a screenshot from our |
| 2 cost page on the website. |
| 3    Q.  And, again, I will represent that I |
| 4 printed this last night.  If you take a look at the |
| 5 top left corner, you'll see the date is 4/28/17 -- I |
| 6 guess I didn't print it last night. |
| 7       MR. QUINN:  No. |
| 8       MR. RODRIGUEZ:  Okay.  I guess -- wow.  I |
| 9 will represent that this was printed on 4/28/2017. |
| 10       MR. QUINN:  Way too much fun in the last |
| 11 week. |
| 12       MR. RODRIGUEZ:  That must be it. |
| 13    Q.  So I'm just going to represent to you that |
| 14 this is a copy of the page as it appeared in 2017. |
| 15 And we just looked at the page as it appeared in -- |
| 16 at some point in 2016; right? |
| 17    A.  Yes. |
| 18    Q.  Okay. |
| 19    A.  On the exact same day. |
| 20    Q.  Oh.  That's creepy.  Now I notice in the |
| 21 paragraph under "Au pair agency cost for host |
| 22 families," there is no longer any reference to "$8 |
| 23 an hour."  Is there any reason that you're aware of |
| 24 for this? |
| 25    A.  Can you reference where you're -- where |

| Page 85 |
|---|
| 1 you're -- |
| 2    Q.  Yeah.  So I'm -- let's put Exhibits -- |
| 3       MR. QUINN:  Can I -- |
| 4       MR. RODRIGUEZ:  Well, actually, let me |
| 5 just walk through it for the sake of the record. |
| 6    Q.  Let's put Exhibits 17 and 18 side by side. |
| 7    A.  Okay. |
| 8    Q.  And I'm looking at the paragraph beginning |
| 9 "Paying late fees" -- |
| 10    A.  Okay. |
| 11    Q.  -- okay? |
| 12       It appears from these two exhibits that at |
| 13 some point between 2016 and 2017 the reference to |
| 14 "under $8 an hour" disappeared; is that fair? |
| 15    A.  Yes. |
| 16    Q.  Do you have any understanding as to why |
| 17 that reference disappeared? |
| 18    A.  Yes. |
| 19    Q.  What is your understanding? |
| 20    A.  That we continually look at our website |
| 21 and look at the competitors' websites and we make |
| 22 updates to our website content on a continual basis. |
| 23    Q.  Any other reason? |
| 24    A.  No. |
| 25    Q.  Now let's look at the chart on Exhibit 17. |

22 (Pages 82 to 85)

MAGNA
LEGAL SERVICES

Case 1:14-cv-03074-CMA-KMT    Document 1059-25    Filed 03/17/18    USDC Colorado    Page 516 of 700

Page 86

1    It appears on the second page; that's Bates ending
2    135.  On Exhibit 18 it appears on the first page.
3            Under "Payment Type," the last row on the
4    2016 version of the website just says, "Au Pair
5    Stipend."  But on the 2017 version it says, "Minimum
6    Au Pair Stipend."  Do you see that?
7        A.  Yes.
8        Q.  Do you have any understanding about why
9    the word "minimum" was added?
10       A.  Yes.
11       Q.  What is your understanding?
12       A.  That we look at our competitors' sites and
13   we look at the landscape and we make updates
14   accordingly.
15       Q.  Any other reason?
16       A.  No.
17       Q.  Well, do you think that there is a
18   material difference between "Au Pair Stipend" and
19   "Minimum Au Pair Stipend"?
20       A.  I don't.
21       Q.  Okay.  So then why make the change?
22       A.  Because we look at our competitors'
23   website.  We also look and see what they're doing
24   and taking into consideration that March 2015
25   letter.  Those are some factors that -- that went

Page 87

1    into it.
2        Q.  AuPairCare took into consideration the
3    March 2015 letter at some point between 2016 and
4    2017?
5        A.  Mm-hmm.
6        Q.  Why not earlier?
7        A.  I don't know why.
8        Q.  I believe you just testified that one of
9    the reasons why AuPairCare would change "stipend" to
10   "minimum stipend" is that AuPairCare's competitors
11   changed their language; is that fair?
12       A.  Yes.
13       Q.  Okay.  So on that reasoning it has nothing
14   to do with the Department of State guidance; right?
15           MR. QUINN:  Object to form.
16           MR. RODRIGUEZ:  You know, I'll withdraw
17   that question.
18       Q.  So if AuPairCare competitors had not added
19   the word "minimum," would AuPairCare have added the
20   word "minimum"?
21           MR. QUINN:  Object to form.
22           THE WITNESS:  I don't -- I don't know.
23   BY MR. RODRIGUEZ:
24       Q.  More or less likely that AuPairCare would
25   have added the word "minimum" if its competitors had

Page 88

1    not?
2            MR. QUINN:  Object to form.
3            THE WITNESS:  I don't -- I don't know.
4    BY MR. RODRIGUEZ:
5        Q.  I thought you testified earlier that
6    AuPairCare added the word "minimum" because
7    competitors' websites changed?
8        A.  Mm-hmm.
9        Q.  So doesn't that make it more likely that
10   AuPairCare added the word "minimum" because its
11   competitors did?
12       A.  Yes.
13           MR. QUINN:  Object to form.
14   BY MR. RODRIGUEZ:
15       Q.  In other words, AuPairCare and its
16   competitors are representing the same thing to
17   potential host families; is that fair?
18           MR. QUINN:  Object to form.
19           THE WITNESS:  No.
20   BY MR. RODRIGUEZ:
21       Q.  Why?
22       A.  I think we're representing what the US
23   Department of State has -- our understanding of the
24   US Department of State's guidance for what families
25   should pay au pairs for the weekly stipend.

Page 89

1        Q.  Has APC ever discussed statements on its
2    website -- let me strike that.
3            Has APC ever discussed statements
4    concerning the stipend -- let me strike that too.
5            It must be getting late in the day.
6            Has AuPairCare and its competitors ever
7    discussed how to present the stipend in marketing
8    materials?
9        A.  I have not had that discussion.
10       Q.  Have others at AuPairCare had that
11   discussion?
12       A.  Not to my knowledge.
13           (Exhibit 19 marked.)
14   BY MR. RODRIGUEZ:
15       Q.  I am handing out Exhibit 19.
16           For those of you on the phone, Exhibit 19
17   was produced by Expert AuPair with a confidential,
18   not an AEO, designation.  And, further,
19   Ms. McNamara's aupaircare.com e-mail address appears
20   on the face of the document as someone to whom the
21   document was sent.
22           This Exhibit 19 was produced at the Bates
23   beginning Expert AuPair 028121.
24           Ms. McNamara, do you recognize Exhibit 19?
25       A.  Yes.

MAGNA
LEGAL SERVICES

| Page 90 | Page 92 |
|---|---|

**Page 90**

1  Q. What is Exhibit 19?
2  A. It looks to be an e-mail from Ilir of the
3  Alliance to au pair industry executives.
4  Q. Including you; correct?
5  A. Yes.
6  Q. Do you recall receiving Exhibit 19 in your
7  e-mail?
8  A. Yes.
9  Q. Do you recall the context of Exhibit 19?
10  A. I'll take a moment to read it.
11  Q. Of course.
12  A. (Witness reviews document.)
13  Yes.
14  Q. What was the context of Exhibit 19?
15  A. The context is the Department of State
16  reaching out to seek a meeting to get further
17  clarification on questions that the sponsor
18  community had.
19  Q. Well, is it DoS that wants further
20  clarification?
21  A. No, that they would provide sponsors.
22  Q. Now who is Mr. Zherka?
23  A. He's the director of the Alliance for
24  International Exchange.
25  Q. Mr. Zherka writes in his second paragraph,

**Page 91**

1  "As we have agreed, our collective interest in this
2  meeting is only" -- "only" is in bold italics -- "to
3  talk prospectively with DoS about how the stipend
4  might change going forward."
5  Ms. McNamara, do you recall the agreement
6  that Mr. Zherka references in the phrase "as we have
7  agreed"?
8  A. No.
9  Q. Have the members of the Alliance ever made
10  an agreement concerning wages and hours?
11  A. Not to my knowledge.
12  Q. Have they ever discussed wages and hours?
13  A. As it relates -- hmm. Have they ever
14  discussed wages and hours. Yes.
15  Q. Okay. Have they ever discussed the
16  communications they make to prospective host
17  families about wages and hours for au pairs?
18  A. Not to my knowledge.
19  Q. Have they ever discussed the
20  communications they make to prospective au pairs
21  about wages and hours for au pairs?
22  A. I don't know if I can speak for the entire
23  community so --
24  Q. I'm not asking you to speak for the entire
25  community; I'm only asking you to speak on behalf of

**Page 92**

1  APC and yourself.
2  A. Okay.
3  Q. To your knowledge have members of the
4  Alliance ever discussed the communications they make
5  to prospective au pairs about wages and hours for
6  au pairs?
7  A. I don't believe AuPairCare has, no.
8  Q. You don't believe that AuPairCare has. Do
9  you believe that other members of the Alliance have?
10  MR. QUINN: Objection; form.
11  THE WITNESS: I -- I don't know.
12  BY MR. RODRIGUEZ:
13  Q. Mr. Zherka's second paragraph continues.
14  "Our collective interest in this meeting is only to
15  talk prospectively with DoS."
16  Do you understand why it would be in the
17  Alliance members' collective interest only to talk
18  prospectively with DoS about au pair wages and
19  hours?
20  A. Yes.
21  Q. Why?
22  A. Because there was ongoing litigation, I
23  believe, at this time.
24  Q. So then fair to say that the Alliance has
25  agreed among itself that it is best to remain

**Page 93**

1  willfully ignorant of DoS' position --
2  MR. QUINN: Objection; form.
3  BY MR. RODRIGUEZ:
4  Q. -- concerning wages and hours?
5  MR. QUINN: Object to form; argumentative.
6  THE WITNESS: No.
7  BY MR. RODRIGUEZ:
8  Q. Why not?
9  A. Can you repeat the question?
10  Q. Yeah. Is it fair to say that the Alliance
11  members have agreed among themselves that it is best
12  to remain willfully ignorant of Department of
13  State's position of au pair wages and hours?
14  MR. QUINN: Object to form.
15  THE WITNESS: No.
16  BY MR. RODRIGUEZ:
17  Q. Why not?
18  A. Because the sponsors' understanding of --
19  of the Department of State regulations was the
20  $195.75 weekly stipend for the au pairs.
21  Q. Well, then why would it be in the
22  sponsors' collective interest not to know if
23  Department of State agreed with that interpretation?
24  MR. QUINN: Object to form.
25  THE WITNESS: Well, from my understanding,

PLAINTIFFS' RESP. APP.0005345

**MAGNA**
LEGAL SERVICES

Page 94

1 the whole point of this was to have a discussion
2 with the Department of State.
3 BY MR. RODRIGUEZ:
4   Q.  Yes, but Mr. Zherka says -- and you agreed
5 you understood -- that the sponsors' collective
6 interest is in only talking prospectively with DoS.
7 Does that not mean that the sponsors do not have an
8 interest in talking about DoS' retrospective view of
9 wages and hours?
10      MR. QUINN:  Object to form.
11      THE WITNESS:  No.
12      MR. RODRIGUEZ:  Okay.
13      THE WITNESS:  There's a lawsuit going on.
14 BY MR. RODRIGUEZ:
15   Q.  So in the face of this lawsuit, the
16 sponsors believe that it's best, not the DoS, to
17 tell them what DoS thinks about the issues in this
18 lawsuit?
19      MR. QUINN:  Object to form.
20      THE WITNESS:  No.  It's they wanted to
21 concentrate on moving forward and how to establish a
22 program moving forward.
23 BY MR. RODRIGUEZ:
24   Q.  But -- so is it your position that DoS'
25 retrospective view of the wages and hours issues in

Page 95

1 this litigation is irrelevant?
2      THE WITNESS:  No.
3      MR. QUINN:  Object to form.
4 BY MR. RODRIGUEZ:
5   Q.  So if it's not irrelevant, then why would
6 the sponsors not have a collective interest in
7 understanding DoS' position?
8      MR. QUINN:  From APC's perspective or from
9 some third party's perspective?
10      MR. RODRIGUEZ:  Well, this is APC's
11 deposition.  So from APC's perspective.
12      THE WITNESS:  Okay.  So can you repeat the
13 question, please?
14 BY MR. RODRIGUEZ:
15   Q.  Yeah.  So if it's not -- if DoS'
16 retrospective view of the wages and hours issues in
17 this litigation are not irrelevant, then why would
18 it be in the sponsors' collective interest not to
19 learn about DoS' retrospective position?
20      MR. QUINN:  Object to form.
21      THE WITNESS:  I'm sorry.  I don't
22 understand the question.
23      MR. RODRIGUEZ:  Okay.
24      THE WITNESS:  Maybe you can simplify it.
25      MR. RODRIGUEZ:  Sure.

Page 96

1      THE WITNESS:  Thanks.
2 BY MR. RODRIGUEZ:
3   Q.  All right.  So we're on the same page that
4 the sponsors have a collective interest in only
5 talking prospectively with DoS about the
6 wage-and-hour issues in this case; right?
7   A.  Yes.
8   Q.  Okay.  Why is it not the case that the
9 sponsors have a collective interest in talking
10 retrospectively about how DoS views the sponsors'
11 past conduct?
12      MR. QUINN:  Object to form.
13      THE WITNESS:  I think I answered that.
14 Because there was the lawsuit going on.
15 BY MR. RODRIGUEZ:
16   Q.  What -- what does the lawsuit have to do
17 with wanting to hear DoS' position or not?
18      MR. QUINN:  Well, object to form.
19      THE WITNESS:  Because we took our -- our
20 understanding of what the Department of State had
21 told us up to that date, that was our understanding
22 of the stipend.  And we wanted to talk about how --
23 okay, that's -- that's been our understanding,
24 what's our understanding now moving forward with
25 your -- with your guidance.

Page 97

1 BY MR. RODRIGUEZ:
2   Q.  But is it accurate to say that APC did not
3 want to hear about DoS' guidance in the past?
4   A.  We felt we had a good understanding of
5 what their guidance was in the past.
6   Q.  And you didn't want anything to contradict
7 what you say is your understanding; right?
8      MR. QUINN:  Object to form.
9      THE WITNESS:  No, we felt we had a good
10 understanding of what we had done up to that date.
11 BY MR. RODRIGUEZ:
12   Q.  And you did not want to know if DoS
13 believed that your conduct in fact violated the wage
14 and hour laws?
15      MR. QUINN:  Object to form.
16      THE WITNESS:  Well, we -- we provide
17 audits each year and had not received any feedback
18 up to that point, and they review all of our
19 marketing material, the survey questions that go
20 out.  So we felt that they have a complete
21 understanding of our program and our process and we
22 were in compliance.
23 BY MR. RODRIGUEZ:
24   Q.  Are you saying that DoS reviews the
25 trifold and the brochure?

MAGNA
LEGAL SERVICES

| Page 98 | Page 100 |
|---|---|

**Page 98**

1     A. Yes, they get marketing materials.
2     Q. And they reviewed your website?
3     A. They get our marketing materials. So
4 there might be printout of the websites, but I don't
5 think they have the full website.
6     Q. And you know for a fact that DoS actually
7 looks at them and says that's okay?
8     A. They -- that's what the audit process is
9 for.
10     Q. I believe we saw earlier that the audit
11 has some language that you and I may disagree about,
12 at least the audit report. In addition -- do you
13 recall that audit report?
14     A. Yes.
15     Q. In addition to the audit report, what else
16 is submitted to DoS?
17     A. In addition to the audit from the third
18 party, we submit au pair placement records, we
19 submit match-break concerns, complaints, we
20 submit -- just wracking my brain of all the things.
21 It's very long. We submit our marketing materials.
22 We submit cultural exchange activities that the
23 au pairs participate in. Survey results.
24     Q. If your boss Ms. Schneider asked you to
25 pull a set of all the audit materials that were sent

**Page 99**

1 to DoS in a particular year, could you do that?
2     A. Yes.
3     Q. Okay. And how far back in time would you
4 pull such audit materials for?
5     A. I think for at least the past four years
6 and -- yeah, I think for at least the past four
7 years.
8     Q. Two e-mail addresses at
9 sixkillerconsulting.com appear in the "To" line of
10 Exhibit 19. Do you know what
11 sixkillerconsulting.com is?
12     A. Yes.
13     Q. What is it?
14     A. I think it's a -- I believe it's a
15 communication firm hired by the Alliance.
16     Q. Why would a communication firm be involved
17 in the e-mail reflected at Exhibit 19?
18     MR. QUINN: Object to form.
19     THE WITNESS: I don't -- I don't know. I
20 didn't send out the e-mail.
21 BY MR. RODRIGUEZ:
22     Q. Does it make any sense to you?
23     MR. QUINN: Object to form.
24     THE WITNESS: It wasn't my communications,
25 so I don't know.

**Page 100**

1 BY MR. RODRIGUEZ:
2     Q. Has DoS ever sent APC anything in writing
3 that says any of the marketing materials we reviewed
4 today are okay?
5     A. No, I don't believe so.
6     (Exhibit 20 marked.)
7 BY MR. RODRIGUEZ:
8     Q. Exhibit 20 begins on the page bearing
9 Bates APC 001268.
10     Ms. McNamara, do you recognize Exhibit 20?
11     A. So the question is do I recognize all of
12 these different documents?
13     Q. Do you -- well, we can start with that
14 question, sure.
15     A. Well, they look to be older versions of
16 different communications to either au pairs
17 and/or -- and our host families.
18     Q. Would you please turn to the second page
19 of Exhibit 20. This is the page with Bates ending
20 69. And kindly read the first sentence under
21 "financial issues."
22     A. May I ask a question? Is there a date
23 on -- on this or -- to give a reference point.
24     Q. Technically I can't answer questions
25 today.

**Page 101**

1     A. Oh.
2     Q. I'm not aware of a date on this.
3     A. Okay. It looks -- just seemed to be a
4 very old document. So I'm trying to --
5     Q. Well, actually, maybe -- maybe take a look
6 at the second-to-last page ending Bates 85.
7     A. Because it's -- this also doesn't seem to
8 be -- there are various documents. So this isn't
9 one whole package.
10     Q. Thank you. That's helpful clarification.
11     A. Okay.
12     So --
13     Q. Well, I don't think it's important for the
14 question I'm going to ask you.
15     A. Okay.
16     Q. Would you please read the first sentence
17 under "Financial Issues" on the second page; that is
18 the one ending in Bates 69.
19     A. "The au pair will receive the
20 government-mandated pocket money each week."
21     Q. Have you seen the phrase "pocket money" in
22 other contexts besides this document?
23     A. Perhaps maybe.
24     Q. Have you seen the phrase "pocket money" --
25 let me ask it this way. Have you seen or heard the

**MAGNA**
**LEGAL SERVICES**

| Page 102 | Page 104 |
|---|---|

**Page 102**

1  phrase "pocket money" used in the au pair industry
2  prior to today?
3      A.  I have -- I do believe I've seen a
4  reference of it in very old literature on the
5  program.
6      Q.  Do you think that pocket money is an
7  accurate description of au pairs' stipends?
8      A.  No.
9      Q.  Okay.  Why is that?
10     A.  Well, how I grew up, I'd say pocket money
11 is a small amount of money.
12     Q.  You don't think that $195 a week is a
13 small amount of money?
14     A.  If you don't have living expenses or food
15 expenses, no.
16     Q.  Do you think it is demeaning to call
17 someone's earned wages pocket money?
18         MR. QUINN:  Object to form.
19         THE WITNESS:  No.
20 BY MR. RODRIGUEZ:
21     Q.  Do you think it's accurate to call
22 someone's earned wages pocket money?
23     A.  I think it was used in the context of a
24 cultural exchange program where they were trying to
25 illustrate something.

**Page 104**

1  phone.  Could you please repeat the Bates numbers.
2  Sometimes when you're shuffling papers, we can't
3  hear.
4          MR. RODRIGUEZ:  Oh, my apologies.
5  Exhibit 21 --
6          MS. KRUZER:  Thank you.
7          MR. RODRIGUEZ:  -- begins at Bates APC
8  000496.
9          MS. KRUZER:  Thank you so much.
10         MR. RODRIGUEZ:  Sure.
11         THE WITNESS:  Yes.
12 BY MR. RODRIGUEZ:
13     Q.  What is Exhibit 21?
14     A.  It's AuPairCare's au pair handbook.
15     Q.  And is an AuPairCare handbook provided to
16 each au pair?
17     A.  Yes.
18     Q.  Please turn --
19         (Telephonic interruption.)
20         Please turn to internal page 7.  This is
21 the page beginning at Bates ending 02.  I should say
22 502.
23     A.  Yes.
24     Q.  Under "Program Guidelines," the second
25 paragraph begins, "As an au pair you can trust that

**Page 103**

1      Q.  What could APC have been trying to
2  illustrate with the phrase "pocket money" in this
3  document?
4      A.  I believe they were trying to illustrate
5  that it's money for their good times.  So not having
6  to -- not money being spent on rent, on utilities,
7  on food, but money that they could utilize for the
8  movies, to travel, to go get coffees.  So I think
9  that's what it was meant to illustrate.
10     Q.  So sort of purely discretionary purchases;
11 right?
12     A.  Depends on the -- depends on the au pair.
13     Q.  Do you personally believe that au pairs
14 are well-paid today?
15         MR. QUINN:  Object to form.  Relevance.
16         THE WITNESS:  I believe -- I believe that
17 their -- their total package for the au pair program
18 is very fair.
19             (Exhibit 21 marked.)
20 BY MR. RODRIGUEZ:
21     Q.  So I've marked Exhibit 21.
22     Exhibit 21 is a document beginning at
23 Bates APC 000496.
24     Ms. McNamara, do you recognize Exhibit 21.
25         MS. KRUZER:  This is Lyndsey Kruzer on the

**Page 105**

1  your host family has agreed to follow these
2  guidelines."  And then the fourth to last bullet
3  says, "Pay a weekly stipend of $195.75."
4          Now, does anything in the language I just
5  read convey that $195.75 is a minimum?
6      A.  No.
7      Q.  Please turn to internal page 41, Bates
8  ending 536.  Actually, let's take a look at internal
9  page 40, Bates ending 535 first.  Under "Your
10 Financial Life," it says, "The weekly stipend."  It
11 says, "The weekly stipend your host family has
12 agreed to pay you is determined by the United States
13 Department of State."
14         Ms. McNamara, does anything in that
15 sentence suggest that the stipend is a minimum or
16 could vary from $195.75?
17     A.  No.
18     Q.  The next sentence says, "Your weekly
19 stipend will be $195.75."
20         Did I read that right?
21     A.  Yes.
22     Q.  Do you think an au pair would interpret
23 that to mean that their stipend could be higher than
24 $195.75?
25         MR. QUINN:  Objection; form.

PLAINTIFFS' RESP. APP.0005348

**MAGNA** ▶
**LEGAL SERVICES**

| Page 106 | Page 108 |
|---|---|

**Page 106**

1   THE WITNESS:  I think their understanding
2  is that they will be paid $195.75 per week.
3  BY MR. RODRIGUEZ:
4   Q.  Let's turn to the next page which is page
5  41.  Now is it fair to say that this next page,
6  internal page 41, Bates ending 536, is still
7  logically connected to the stipend?
8   A.  I'm going to spend a moment and read it.
9   Q.  Of course.
10   A.  (Witness reviews document.)
11   Okay.  Can you repeat the question,
12  please?
13   Q.  Is it your understanding that the heading
14  "Spend Wisely" is still related to the -- let me
15  start again.
16   Is it your understanding that the material
17  under the heading "Spend wisely" is related to the
18  stipend?
19   A.  No.
20   Q.  Why not?
21   A.  I think it's related to any 18- to
22  26-year-old who's starting out in life and looking
23  for you, know, ways to save money.
24   Q.  Okay.
25   A.  And to have a --

**Page 107**

1   Q.  So you --
2   A.  -- enjoyable life.
3   Q.  You think that someone who's paid a wage
4  based on a 45-hour per workweek should be buying
5  used instead of new items?
6   MR. QUINN:  Object to form.
7   THE WITNESS:  Repeat the question?
8  BY MR. RODRIGUEZ:
9   Q.  Do you think someone who is paid a wage
10  based on a 45-hour workweek --
11   A.  Absolutely.
12   Q.  Okay.
13   A.  Yes.
14   Q.  Why?
15   A.  Because I buy off of Craigslist and --
16   Q.  Let's go down to the next bullet then.
17   Well, what do you buy off Craigslist?
18   A.  I bought my car -- I bought a car off of
19  Craigslist.  Um --
20   Q.  Do you think au pairs are buying cars off
21  Craigslist?
22   A.  You just asked me what I buy.
23   So we have bought concert tickets.  Um --
24  yeah.
25   Q.  Let's go down to the next bullet.  It

**Page 108**

1  says, "Find the local Dollar Store."  Why would APC
2  be advising au pairs to find the local Dollar Store?
3   A.  Because it's a fun shop to get chotskis at
4  a cheap price.
5   Q.  But this falls under the words, "With a
6  little effort you can stretch your spending money."
7   A.  Yes.
8   Q.  Okay.  What is that spending money?
9   A.  It's money that they brought in and it's
10  also the stipend that they get paid.
11   Q.  Well, so you think it's appropriate that
12  au pairs should shop at The Dollar Store with their
13  stipend?
14   A.  This doesn't say you can only shop at The
15  Dollar Store.  It's giving suggestions of fun things
16  that you can buy for just a dollar.
17   Q.  Let's turn back to page -- internal page
18  39, Bates ending 534.  The last bullet under, "your
19  role as family" -- well, it's not accurate.  The
20  bullet immediately above the paragraph beginning "As
21  a member of the family."
22   A.  Yes.
23   Q.  Would you go ahead and read the first
24  sentence of that bullet.
25   A.  Are you referencing "When you go out to

**Page 109**

1  dinner"?
2   Q.  Yes.
3   A.  "When you go out to dinner with your host
4  parents and you are not working, you should still
5  help."
6   Q.  Why should au pairs help when
7  they're going out to dinner?
8   A.  Au pair means on par; that they're part of
9  the family.  And so as part of the family, you still
10  participate as -- as a family member.
11   Q.  Okay.
12   A.  So if someone -- you know, if Johnny needs
13  his shoe tied while you're at dinner --
14   Q.  That's the au pair's job; right?
15   A.  It's the part of any family member.
16   Q.  The next sentence reads, "You can help the
17  kids when their food comes, help entertain the kids
18  while they're waiting, take turns taking them to the
19  bathroom if they need to go, help them clean up
20  afterwards, and make sure to thank your host parents
21  for taking you out to dinner."  And you believe that
22  that is no different than what any family member
23  would do; right?
24   A.  Yes.
25   Q.  Ms. McNamara, do you have an understanding

**MAGNA** ▶
**LEGAL SERVICES**

## Page 110

1    as to whether au pairs are asked if they'd ever been
2    the victims of sexual, emotional, or physical abuse
3    before being admitted into the au pair program?
4        A.  I'm sorry.  Repeat the question again.
5        Q.  Do you have an understanding as to whether
6    au pairs are asked if they've ever been the victims
7    of sexual abuse -- let me start that again.
8        Do you have an understanding as to whether
9    au pairs are asked if they've ever been victims of
10   sexual, emotional, or physical abuse before they are
11   admitted into the au pair program?
12       A.  I believe so, yes.
13       Q.  Why would APC ask that question?
14       A.  So childcare is inherently a stressful
15   job.  Coming over to America from a foreign country,
16   leaving -- leaving your roots and your culture and
17   everything you know is extremely stressful.  Being
18   placed in a foreign country where you need to speak
19   another language is also stressful.
20       So in our experience of running the
21   program, we know that there could be instances
22   that -- in a stressful situation can trigger
23   special -- some emotions that might come up from
24   past circumstances.
25       Q.  Has APC ever denied au pair placement to a

## Page 111

1    victim of sexual abuse for the reason that they were
2    a victim?
3        MR. QUINN:  Object to form.
4        THE WITNESS:  I would have to go back and
5    research that.
6    BY MR. RODRIGUEZ:
7        Q.  It's possible; right?
8        A.  It's possible.
9        Q.  Same for a victim of physical abuse; they
10   might have been denied an au pair position because
11   they were a victim; isn't that right?
12       MR. QUINN:  Object to form.
13       THE WITNESS:  It's possible.
14   BY MR. RODRIGUEZ:
15       Q.  Do you have any role with HR?
16       A.  I interact with human resources, yes.
17       Q.  Now are you familiar with the medical
18   history form that au pairs are required to submit
19   from their doctor?
20       A.  Yes.
21       Q.  And do you have understanding as to
22   whether that medical history form asks whether the
23   patient has HIV AIDS?
24       A.  I'd need to see the -- I'd need to see the
25   form.

## Page 112

1        (Exhibit 22 marked.)
2    BY MR. RODRIGUEZ:
3        Q.  Exhibit 22 is a document beginning at
4    Bates APC 000484.  And, Ms. McNamara, take your time
5    to familiarize yourself with the document.  But I'm
6    going to focus this line of questioning on the page
7    bearing the Bates number APC 000486.
8        A.  Okay.
9        Q.  To your knowledge, is the document
10   reflected at APC 000486 an accurate representation
11   of the medical form that au pairs are required to
12   submit before being admitted into APC's program?
13       A.  This -- this looks like an older version,
14   so I don't -- I'd need to see the date of when this
15   was pulled.
16       Q.  Well, go ahead and turn to the second
17   page.  I believe there's some information there that
18   will help you.
19       A.  Okay.  So au pair arrived in 2014.
20       Q.  Now I'm looking under question 1 on the
21   first page, third-to-last far-left column.  Are you
22   with me.
23       A.  Third-to-last.  Yes.
24       Q.  And that one asked the physician to check
25   yes or no whether the patient has HIV AIDS; is that

## Page 113

1    correct?
2        A.  Yes.
3        Q.  Why would AuPairCare care if a potential
4    au pair has HIV AIDS?
5        A.  Because the host family that is going to
6    match with the au pair would want to know that
7    information.
8        Q.  The host family that will be, in your
9    view, the employer; correct?
10       A.  The host family that would be the host
11   family.  So they would be hosting the au pair.
12       Q.  And they would also have an
13   employer/employee relationship --
14       A.  Correct.
15       Q.  -- with the au pair; correct?
16       Okay.  Now are you aware that
17   discriminating against someone on the basis of HIV
18   AIDS status violates the American with Disabilities
19   Act?
20       MR. QUINN:  Object to form.
21       THE WITNESS:  No, I wasn't aware.
22   BY MR. RODRIGUEZ:
23       Q.  Now, do you believe that it's possible
24   that based on a questionnaire such as this, a host
25   family may have declined to employ an au pair?

PLAINTIFFS' RESP. APP.0005350

MAGNA
LEGAL SERVICES

Case 1:14-cv-03074-CMA-KMT Document 959-25 Filed 03/17/18 USDC Colorado Page 523 of 701

| | |
|---|---|
| **Page 114** | **Page 116** |

**Page 114**

1      MR. QUINN: Object to form.
2      THE WITNESS: Perhaps.
3   BY MR. RODRIGUEZ:
4      Q.  Let's move over to the far-right column.
5   "Genitourinary Issues."  Why would APC want to know
6   if an au pair has genitourinary issues?
7      A.  I think this is a form to sign off on good
8   health.  And if you have consistent urinary tract
9   infections, you could -- one could not be in good
10  health to consistently take care of children.
11     Q.  The box that's ticked doesn't say "urinary
12  tract issues," it says "genitourinary issues";
13  doesn't it?
14     MR. QUINN: Object to form.
15  BY MR. RODRIGUEZ:
16     Q.  What do genitourinary issues have to do
17  with employment as an au pair?
18     A.  This just has to do with their general
19  health.  So I'd have to consult.  I don't know.
20     Q.  The next one is "mental or nervous
21  disorders."  Did I get that right?
22     A.  Yes.
23     Q.  And APC asks that question and provides
24  the answer to potential employing families; is that
25  right?

**Page 115**

1      A.  Yes.
2      MR. QUINN: Object to form.
3   BY MR. RODRIGUEZ:
4      Q.  The next one, "is the patient pregnant."
5      Did I get that right?
6      A.  Yes.
7      Q.  Why would APC would to know if a potential
8   au pair is pregnant?
9      A.  Because this participant is coming on a
10  cultural exchange program for one year and going to
11  be living with a host family.  And -- and that's
12  why --
13     Q.  And having an employee relationship;
14  correct?
15     MR. QUINN: Object to form.
16     THE WITNESS: And going to be living with
17  a host family.
18  BY MR. RODRIGUEZ:
19     Q.  And having an employee relationship;
20  correct?
21     A.  And there is an employee/employer
22  relationship.
23     Q.  In your business do you make hiring
24  decisions based on whether an employee is pregnant?
25     A.  No.

**Page 116**

1      (Exhibit 23 marked.)
2   BY MR. RODRIGUEZ:
3      Q.  Exhibit 23 is a document beginning at
4   Bates APC 002172.
5      Ms. McNamara, do you recognize Exhibit 23?
6      A.  I'm going to spend a moment and read it.
7      Q.  Certainly.
8      A.  (Witness reviews document.)
9      Okay.
10     Q.  Do you recognize Exhibit 23?
11     A.  It looks like an e-mail exchange between
12  myself and Heidi Woehl.
13     Q.  Who was Heidi Woehl?
14     A.  Heidi Woehl was my vice president during
15  the time of this communication.
16     Q.  Where is Heidi Woehl now?
17     A.  She is at ProAuPair agency.
18     Q.  One of APC's competitors; right?
19     A.  Yes.
20     Q.  Is APC still in contact with Ms. Woehl?
21     A.  AuPairCare, we see her at -- I guess two
22  years ago at an industry event.  Or a year ago.  I
23  don't recollect the date.
24     Q.  So what is a floater, in connection with
25  APC's business?

**Page 117**

1      A.  Sure.  A floater is an in-country au pair
2   who is trying to find another placement in -- yeah.
3      Q.  Ms. Woehl's e-mail, the second from the
4   top of the first page of Exhibit 23, says, "FYI,
5   from a competitor regarding one of our floaters."
6   Do you see that?
7      A.  Yes.
8      Q.  Why would a competitor be providing
9   information about one of APC's floaters to APC?
10     A.  She was trying to be friendly and share
11  some information that she conveyed to the au pair.
12     Q.  And what -- what -- well, let's go down
13  to -- to the first e-mail in the chain -- well,
14  let's go down to the last e-mail that begins at the
15  bottom of page ending in Bates 72 from Ms. Silvana
16  Heinrichs -- I'm sorry -- from USAuPair to
17  Ms. Silvana Heinrichs.
18     Who is Ms. Silvana Heinrichs?
19     A.  I'm inferring from this that she was an
20  au pair with AuPairCare from July 2010 to July 2011.
21     Q.  And does it appear from the e-mail
22  exchange that Ms. Heinrichs was looking to be
23  placed -- looking to work with one of AuPairCare's
24  competitors?
25     A.  Yes.

PLAINTIFFS' RESP. APP.0005351

MAGNA ▶
LEGAL SERVICES

Page 118

1    Q.  And so in being friendly, USAuPair was in
2 fact notifying APC that an au pair under contract
3 with APC was looking to APC's competitors for
4 employment?
5    MR. QUINN:  Object to the form.
6    THE WITNESS:  Repeat that question?
7    MR. RODRIGUEZ:  Yeah.
8    THE WITNESS:  Please.
9 BY MR. RODRIGUEZ:
10    Q.  Is it the case that in what you describe
11 as being friendly, USAuPair was notifying APC that
12 an au pair under contract with APC was looking to
13 APC's competitors for employment?
14    A.  Yes.
15    Q.  Is that a common practice in this
16 industry?
17    A.  No.
18    Q.  Are you surprised -- were you surprised by
19 this e-mail when you got it?
20    A.  I think my surprise was more the tone of
21 Helen's response to the e-mail.
22    Q.  Do you think that au pairs should be able
23 to bid sponsors off one another for a better
24 stipend?
25    A.  That's not my determination.  That's a US

Page 119

1 Department of State-regulated program.  So the US
2 Department of State has that regulation in reference
3 even to this, you know, that the sponsor that the
4 au pair came with is the sponsor that she's -- she's
5 with.  So --
6    Q.  Well, let's talk about a sponsor that
7 isn't yet in the United States.  Do you think that
8 au pairs should have the ability to bid sponsors off
9 one another for a higher stipend?
10    A.  If that's what the US Department of State
11 deems fit for this program, I think that would be a
12 consideration.
13    Q.  When you look for employment do you bid
14 potential employers off one another with respect to
15 the salary they're offing you?
16    MR. QUINN:  Object to form.
17    THE WITNESS:  I look at the whole package.
18 BY MR. RODRIGUEZ:
19    Q.  Including salary; right?
20    A.  Yes.
21    Q.  And you in fact bid employers off of one
22 another with respect to the salary they will pay
23 you; correct?
24    MR. QUINN:  Object to form.
25    THE WITNESS:  I do it -- I would do it

Page 120

1 based on the entire package.
2 BY MR. RODRIGUEZ:
3    Q.  Were you aware of au pairs being able to
4 successfully bid sponsors against one another before
5 becoming part of the program for a higher guaranteed
6 stipend?
7    A.  Not to my knowledge.
8    Q.  Do you think there's anything -- do you
9 think there would be anything wrong with that
10 practice?
11    MR. QUINN:  Object to form.
12    THE WITNESS:  I would defer to the
13 Department of State on that.
14 BY MR. RODRIGUEZ:
15    Q.  That practice would be consistent with,
16 for example, what you were able to do with the terms
17 of your employment; isn't that right?
18    MR. QUINN:  Object to form.
19    THE WITNESS:  Repeat the question, please?
20 BY MR. RODRIGUEZ:
21    Q.  Bidding potential employers -- bidding
22 potential sponsors off one another -- you know what?
23 Never mind.
24         (Exhibit 24 marked.)
25 BY MR. RODRIGUEZ:

Page 121

1    Q.  Let's go to Exhibit 24, please.  24 is an
2 e-mail chain beginning at Bates APC 002878.
3    Ms. McNamara, do you recognize Exhibit 24?
4    A.  Let me spend a moment to read it, please.
5    Q.  Absolutely.
6    A.  (Witness reviews document.)
7    Q.  Ms. McNamara, have you had an opportunity
8 to familiarize yourself with Exhibit 24?
9    A.  Yes.
10    Q.  Do you recognize it?
11    A.  No.
12    Q.  Who is Rachel Adamson?
13    A.  At this -- she's an employee of
14 AuPairCare.
15    Q.  At the time of this e-mail; right?
16    A.  Yes.
17    Q.  March 2011; right?
18    A.  Yes.
19    Q.  At the time of this email, who was
20 Ms. La Monica-Lunn?
21    A.  At the time of this e-mail, it looks like
22 she's the executive director and CEO of
23 InterExchange.
24    Q.  Do you know who Michael McHugh is?
25    A.  Yes.

MAGNA ▶
LEGAL SERVICES

Page 122

1      Q.   Who is Michael McHugh today?
2      A.   He works for InterExchange on their
3   au pair program.
4      Q.   At the time of this e-mail, do you have an
5   understanding as to whom Mr. McHugh worked for?
6      A.   I'm inferring InterExchange.
7         MR. RODRIGUEZ:  Let's go ahead and mark
8   the next exhibit.  This will be Exhibit 25.
9         (Exhibit 25 marked.)
10  BY MR. RODRIGUEZ:
11     Q.   Exhibit 25 is a document beginning at
12  Bates APC 002885.
13        Ms. McNamara, do you recognize Exhibit 25?
14     A.   I'm going to spend a moment and read it.
15     Q.   Okay.
16     A.   (Witness reviews document.)
17        Okay.
18     Q.   Do you recognize Exhibit 25?
19     A.   I do not.
20     Q.   What is Exhibit 25?
21     A.   It looks to be an e-mail exchange between
22  Rachel Adamson and Michael McHugh.
23     Q.   I actually want to make sure I understood
24  your answer a moment ago.  Did you say you do or you
25  do not recognize Exhibit 25?

Page 123

1      A.   No.
2      Q.   Oh.  I missed the "not."
3         Are you familiar with the website called
4   aupairclearinghouse.com?
5      A.   Vaguely familiar.
6      Q.   What's your understanding of Au Pair
7   Clearinghouse?
8      A.   I think it has, I believe, articles about
9   the au pair industry -- I'm inferring from here --
10  maybe an interview with au pair executives.
11     Q.   The last sentence of the first paragraph
12  of Mr. McHugh's e-mail at the top of the page says
13  "Edna's [sic] system is not the most" -- I'm sorry.
14  "Edna's rating system is not the most scientific
15  system in the world."
16        "Edina's."  My mistake.
17        Do you have an understanding as to whether
18  Au Pair Clearinghouse has a rating system?
19     A.   I haven't visited that site in a very long
20  time so I'm not super familiar with it.
21     Q.   Ms. Adamson, at the second e-mail in the
22  chain writes, in the first paragraph, "It
23  seems the site is quickly becoming a necessary evil
24  in our business, like Google spending is for nearly
25  every business."  Did I get that right?

Page 124

1      A.   Yes.
2      Q.   Why would Google spending be a necessary
3   evil?
4      A.   I can't infer, you know, what -- I can't
5   state what Rachel's trying to get across here.  I
6   mean, we do Google spending as part of our marketing
7   practice.
8      Q.   So it's an expense to the business; right?
9      A.   Yes.
10     Q.   And in this e-mail she is complaining
11  about an expense to the business with one of her
12  competitors; is she not?
13     A.   I don't know if it's a complaint.  But
14  it's a statement.
15     Q.   Do you think it's appropriate for
16  competitors to be complaining to one another about
17  business expenses that they have?
18        MR. QUINN:  Object to form.
19        THE WITNESS:  In this context I -- I don't
20  see a -- an issue with this.
21  BY MR. RODRIGUEZ:
22     Q.   If competitors communicate about expenses
23  that help them compete with one another -- well, let
24  me put it this way.  Does Google spending help
25  AuPairCare compete with other sponsors?

Page 125

1      A.   Yes.
2      Q.   So why would competitors communicate about
3   expenses that they have competing with one another?
4      A.   I think she's just saying it's an expense
5   that we have; I don't think she's saying any details
6   about how we utilize our Google spend or what --
7      Q.   If in fact --
8         MR. QUINN:  Were you done?
9         THE WITNESS:  Yeah.
10        MR. QUINN:  I'm sorry.
11  BY MR. RODRIGUEZ:
12     Q.   If in fact APC and its competitors agreed
13  to stop spending money on Google, do you agree with
14  me that would be inappropriate?
15     A.   Yes.
16     Q.   Why is that?
17     A.   It's not common for companies to have
18  those discussions.
19        MR. RODRIGUEZ:  Let's go ahead and take a
20  break.
21        THE VIDEOGRAPHER:  We're off the record.
22  The time is 3:45 p.m.
23        (Recess taken from 3:45 p.m. to 4:02 p.m.)
24        THE VIDEOGRAPHER:  We're back on the
25  record.  The time is 4:02 p.m.

PLAINTIFFS' RESP. APP.0005353

MAGNA
LEGAL SERVICES

Case 1:14-cv-03074-CMA-KMT    Document 859-25    Filed 03/17/18    USDC Colorado    Page 526 of 700

---

Page 126

1      (Exhibit 26 marked.)
2          MR. RODRIGUEZ:  We've marked Exhibit 26,
3   which is a document beginning at Bates APC 000299.
4      Q.  Ms. McNamara, do you recognize Exhibit 26?
5      A.  Yes.
6      Q.  What is Exhibit 26?
7      A.  It's AuPairCare's 2010 host family
8   agreement.
9      Q.  Is it fair to say this is the counterpart
10  to the au pair agreements we looked at earlier?
11     A.  Yes.
12     Q.  All right.  And is this updated on roughly
13  the same timeline, that is once a year?
14     A.  Typically, yes.
15     Q.  Let's go ahead and turn to internal page 3
16  at Bates ending 342.
17     A.  I have 301.
18         MR. QUINN:  We don't go that far.
19  BY MR. RODRIGUEZ:
20     Q.  You know what?  299.  My mistake.  I'm
21  getting far ahead of myself in here.
22         All right.  So this is on -- on page 2,
23  Bates ending 300.  And I'm looking at paragraph 16.
24  The second sentence is, "The Department of State has
25  set the current weekly stipend amount at $195.75 as

---

Page 127

1   of July 23, 2009."
2          Did I read that correctly?
3      A.  Yes.
4      Q.  Okay.  Does anything in that sentence
5   indicate to host families that they can pay an
6   au pair more than $195.75?
7      A.  No.
8      Q.  Have you ever had an au pair?
9      A.  Yes.
10     Q.  Was that before or after you became
11  involved with the industry?
12     A.  During.
13     Q.  Are you aware of anything else in this
14  contract that suggests that host families might pay
15  more than $195.75 in stipend?
16     A.  No, to my knowledge.
17     Q.  Has a host family agreement ever been
18  delivered to a host family by means of US Mail?
19     A.  Historically it could have.
20     Q.  More likely than not; right?
21         MR. QUINN:  Object to form.
22         THE WITNESS:  More likely than not -- I'm
23  sorry.  I don't understand your question.
24  BY MR. RODRIGUEZ:
25     Q.  Is it more likely than not that at some

---

Page 128

1   point a host family agreement -- let me start again.
2          Is it more likely than not that at some
3   point after 2009 at least one host family agreement
4   was sent by US Mail to a host family?
5      A.  Perhaps.
6      Q.  More likely than not that that occurred?
7          MR. QUINN:  Object to form.
8          THE WITNESS:  I think the --
9          (Telephonic interruption.)
10         -- the main method for a host family to
11  sign the host family agreement is electronically.
12  BY MR. RODRIGUEZ:
13     Q.  Electronically over the Internet?
14     A.  Yes.
15         (Exhibit 27 marked.)
16  BY MR. RODRIGUEZ:
17     Q.  Exhibit 27 is a document produced at Bates
18  APC 000306.
19         Ms. McNamara, do you recognize Exhibit 27?
20     A.  Yes.
21     Q.  What is it?
22     A.  Looks to be a revision of the host family
23  agreement for 2011.
24         (Exhibit 28 marked.)
25  BY MR. RODRIGUEZ:

---

Page 129

1      Q.  I've put before you Exhibit 28.
2   Exhibit 28 is a document produced at the Bates
3   beginning APC 000313.
4          Ms. McNamara, do you recognize Exhibit 28?
5      A.  Yes.
6      Q.  What is it?
7      A.  It's a revision of the host family
8   agreement from January 2012 for the 2012 host family
9   agreement.
10         (Exhibit 29 marked.)
11  BY MR. RODRIGUEZ:
12     Q.  Exhibit 29 is a document produced at Bates
13  APC 000322.
14         Ms. McNamara, have you seen Exhibit 29
15  before today?
16     A.  Yes.
17     Q.  What is Exhibit 29?
18     A.  It is a November 12th rev -- November 12,
19  2012 rev of our 2013 host family agreement.
20         (Exhibit 30 marked.)
21  BY MR. RODRIGUEZ:
22     Q.  Exhibit 30 is a document produced at Bates
23  APC 000331.
24         Ms. McNamara, do you recognize
25  Exhibit 29 -- my mistake -- Exhibit 30?

---

PLAINTIFFS' RESP. APP.0005354

MAGNA ▶

LEGAL SERVICES

## Page 130

1     A.  Yes.
2     Q.  What is it?
3     A.  It's the host family agreement for 2014.
4              (Exhibit 31 marked.)
5  BY MR. RODRIGUEZ:
6     Q.  Last exhibit of the day, I think.
7        Exhibit 31 is a document produced at Bates
8  APC 000340.
9        Ms. McNamara, do you recognize Exhibit 31?
10    A.  Yes.
11    Q.  What is it?
12    A.  It's -- the 2015 AuPairCare host family
13  agreement.
14    Q.  Since 2015 are you aware of any changes to
15  the APC host family agreement?
16    A.  Yes.
17    Q.  Are you aware of what those changes are?
18    A.  I don't recall specifics.
19    Q.  Do you recall whether those -- any changes
20  to the host family agreement since 2015 concerned
21  the weekly stipend?
22    A.  Potentially.
23    Q.  You have no understanding one way or the
24  other, though?
25    A.  I'd have to refer back to the 2016 and

## Page 131

1  2017 host family agreement compared to these.
2     Q.  As a responsible officer, are you in
3  regular contact with the DoS?
4     A.  Yes.
5     Q.  How often are you in contact with the DoS?
6     A.  I am copied on communications, incidents
7  that we're mandated to report on that go to the
8  compliance office of the Department of State.  So
9  I'm copied on those.  So I see the communication
10  there.  And then as a responsible officer, I
11  communicate with our program analyst and management
12  of the Department of State probably every couple of
13  months.
14    Q.  Is it fair to conclude that you would be a
15  recipient of any Department of State communication
16  that APC has had since you became --
17         (Telephonic interruption.)
18        Is it fair to conclude that if the
19  Department of State made any e-mail communication to
20  APC since you became responsible officer, that that
21  communication would be in your e-mail?
22    A.  Yes.
23    Q.  And just remind me again, when did you
24  become responsible officer?
25    A.  Three years ago when I became vice

## Page 132

1  president.  A little more than three years ago.
2     Q.  Do you have any non-e-mail communications
3  with DoS in your role as responsible officer?
4     A.  Yes.
5     Q.  What are those non-e-mail communications?
6     A.  Phone.
7     Q.  Okay.
8     A.  And in person.
9     Q.  In any of your in-person communications,
10  since you became a responsible officer, has DoS made
11  a statement one way or the other on whether the
12  stipend is a minimum or a fixed amount?
13    A.  I have not had any in-person
14  communications with the Department of State
15  regarding the stipend.
16    Q.  What about over the phone?
17    A.  I have not had any communications with the
18  Department of State on the stipend.
19    Q.  E-mail?
20    A.  I personally -- I don't believe I've had
21  any communications with the Department of State, my
22  Department of State contacts.
23    Q.  What about the Department of Labor?  Have
24  you ever been in contact with the Department of
25  Labor at any time during your employment with APC?

## Page 133

1     A.  Yes.
2     Q.  Okay.  How many times is that?
3     A.  I believe three.
4     Q.  Do you recall at least something about
5  each of those three incidents?
6     A.  Yes.
7     Q.  Let's start with the first one.
8  Approximately what time was that?
9     A.  October of 2016.
10    Q.  And the next?
11    A.  December of 2016.
12    Q.  And the next?
13    A.  I believe it was two -- about two weeks
14  ago.
15    Q.  So I noticed that all of those
16  communications with the Department of Labor have
17  been in about the past six months; is that right?
18    A.  That sounds about -- about right, yes.
19    Q.  So why did you begin communicating with
20  the Department of Labor in the past six months after
21  not having communicated with them for the rest of
22  your career at APC?
23    A.  We received a letter from the Department
24  of Labor in October of 2016.  And that initiated the
25  conversation.

## Page 134

1    Q.  Okay.  And what were the contents of that
2  letter?
3    A.  It was notifying AuPairCare of an audit of
4  our employees.
5    Q.  "An audit of AuPairCare's employees."
6  Does that include au pairs?
7    A.  No.  Au pairs are not our employees.
8      (Reporter asks for repetition.)
9      Au pairs are not our employees.
10    Q.  Are all three of those communications with
11  the DoL concerning the audit you just mentioned?
12    A.  Yes.
13    Q.  At any time has the DoL ever discussed
14  au pair employment practices with APC in any
15  capacity?
16      MR. QUINN:  Object to form.
17      THE WITNESS:  They have asked for
18  employee -- excuse me.  They've asked for au pair
19  records.
20  BY MR. RODRIGUEZ:
21    Q.  Why would DoL be interested in au pair
22  records if DoL is performing an audit of APC's
23  employees but au pairs are not APC's employees?
24      MR. QUINN:  Object to form.
25      THE WITNESS:  I don't know.

## Page 135

1  BY MR. RODRIGUEZ:
2    Q.  Has anyone asked DoL?
3    A.  No.  I don't know that.  I haven't.
4    Q.  If --
5    A.  I don't know that.
6    Q.  Sorry.  Did I interrupt you?
7    A.  No, no, no.
8    Q.  Is it possible that DoL takes a different
9  view of au pair employee status than APC?
10      MR. QUINN:  Object to form.
11      THE WITNESS:  I don't -- I don't know.
12  BY MR. RODRIGUEZ:
13    Q.  So it could be the case that in fact DoL
14  views the audit of APC as including au pairs and not
15  just what you consider APC's employees; is that
16  right?
17    A.  I -- I can't tell you what they think or
18  not.
19    Q.  In which communication did DoL first
20  indicate any interest in au pair records?
21    A.  I believe the first communication asked
22  for all of our employee records.  I'd have to go
23  back and look at the specifics of the communication.
24  I haven't -- I'd have to go back and look at that
25  communication.

## Page 136

1    Q.  Did there come a time when the DoL
2  specifically clarified that request?
3    A.  Yes.
4    Q.  Okay.  And did that -- was it in the
5  context of that clarification that DoL said they
6  wanted au pair records?
7    A.  Yes.
8    Q.  What about the conversation about two
9  weeks ago?  What was the nature of that conversation
10  with DoL?
11    A.  It was pertaining to au pair records.
12    Q.  What specifically concerning au pair
13  records?
14    A.  Au pair placement information.  So their
15  host family, the dates they were on the program,
16  and -- I'm not certain as to what other data was
17  requested.
18    Q.  Are you aware of whether DoL requested any
19  information that would include stipend information?
20    A.  Perhaps it could have had a payment
21  information request.  I don't -- I don't recollect.
22  I'd need to see it again.
23      MS. KRUZER:  I apologize for interrupting.
24      This is Lyndsey Kruzer.  A bunch of us on
25  the phone can't hear the witness at all.  So if you

## Page 137

1  wouldn't mind speaking up, that would be great.
2      THE WITNESS:  Sure.
3  BY MR. RODRIGUEZ:
4    Q.  In preparation for this deposition did you
5  refresh your recollection concerning AuPairCare's
6  relationship and communications with the DoL?
7    A.  In preparation for this deposition I met
8  with counsel.  I didn't pore through those -- those
9  communications.
10    Q.  You didn't pore through them.  But did you
11  peruse them in some manner?
12    A.  No, not in prep for this.
13    Q.  Could you have?
14    A.  Sure.
15    Q.  Did you think it would be -- never mind.
16      Now at the beginning of our time together
17  today you mentioned social marketing.  Do you recall
18  that?
19    A.  Yes.
20    Q.  What sorts of social marketing has APC
21  engaged in?
22    A.  Social media, we have a Facebook page.  We
23  do blog posts.  I believe we have an Instagram feed.
24    Q.  Anything else you can think of sitting
25  here today?

PLAINTIFFS' RESP. APP.0005356

| Page 138 |
|---|

1    A.   Those are the -- those are the top
2  categories for social media.
3    Q.   What about Pinterest?
4    A.   Pinterest?  Perhaps the marketing team as
5  a small -- something small, but it's not my level of
6  attention.
7    Q.   Do you know approximately when APC began
8  engaging in social media marketing?
9    A.   At least five years ago.
10    Q.   Does APC use Skype for business purposes?
11    A.   Yes.
12    Q.   How long has APC used Skype for business
13  purposes?
14    A.   At least four years.
15    Q.   Is it APC's practice to use Skype for any
16  text-based communications?
17    A.   Can you repeat the question?
18    Q.   That was a bad question.
19       What are the -- the modes in which one
20  might communicate using Skype?
21    A.   I'm sorry.  Via Skype.  So it's a -- you
22  can either telephone conference or videoconference,
23  and there's also a chat capability.
24    Q.   Okay.  So does APC use Skype's chat
25  capability?

| Page 139 |
|---|

1    A.   Individuals at the -- at AuPairCare while
2  they're on a Skype call may -- may utilize that
3  function, but it's not an endorsed form of
4  communication.
5       MR. RODRIGUEZ:  I think we're almost done.
6  Let's just go off the record and make sure.
7       THE VIDEOGRAPHER:  We're off the record.
8  The time is 4:23 p.m.
9       (Recess taken from 4:23 p.m. to 4:33 p.m.)
10       THE VIDEOGRAPHER:  We're back on the
11  record.  The time is 4:33 p.m.
12  BY MR. RODRIGUEZ:
13    Q.   Ms. McNamara, a moment ago you testified
14  that APC has used Facebook marketing; is that
15  accurate?
16    A.   Yes.
17    Q.   Is there a Facebook account where APC
18  communicates directly with potential host families?
19    A.   Yes, we could respond on Facebook to host
20  families and/or au pairs.
21    Q.   Now this morning you were present when I
22  spoke with Ms. Schneider about a meeting at DoS
23  where DoL was invited.  Do you recall that?
24    A.   Yes.
25    Q.   Now, do you have an understanding as to

| Page 140 |
|---|

1  who from APC was at that meeting?
2    A.   Yes.
3    Q.   Who?
4    A.   Courtney Biggs.
5    Q.   Anyone else?
6    A.   From AuPairCare?
7    Q.   Yes.
8    A.   No.
9    Q.   Did Ms. Biggs report to you concerning
10  that meeting?
11    A.   Yes.
12    Q.   What did she report?
13    A.   She did a recap of the meeting.
14    Q.   Can you convey to me what you recall from
15  that recap?
16    A.   It was a Department of State update on the
17  au pair program, industry, kind of statistics,
18  aggregate statistics for the year, maybe
19  year-to-date.  I think they talked through -- and
20  this is typically what happens at these -- incidents
21  and complaints and reporting.  And she -- she did
22  mention that the Department of Labor came in kind
23  of -- wasn't part of the plan and came in to speak
24  with them.
25    Q.   Did she mention anything specifically

| Page 141 |
|---|

1  about other sponsors walking out?
2    A.   I -- yes.
3    Q.   Do you recall what she mentioned about the
4  walk-out?
5    A.   I believe she mentioned that it was -- the
6  sponsors walked out, some sponsors walked out of the
7  meeting.
8    Q.   Did she report to you which sponsors --
9       MS. FULLER:  Excuse me.  I'm sorry.  Could
10  we move the speaker closer to the witness?  This is
11  Jessica Fuller.  We are not able to hear the
12  witness.
13       MR. RODRIGUEZ:  Are you still there,
14  Jessica?
15       MS. FULLER:  Yes, I am here.  We're not
16  able to hear the witness very well at all.  Could
17  you move the speaker closer to her, please?
18       MR. RODRIGUEZ:  Yes.  I've done that.
19       THE WITNESS:  I'll lean in.
20  BY MR. RODRIGUEZ:
21    Q.   So I'll ask the question again.  Did
22  Ms. Biggs mention which of the sponsors remained in
23  the room?
24    A.   I don't recall who remained in the room.
25  I think she -- but she mentioned who left the room.

MAGNA
LEGAL SERVICES

Page 142

1    Q.  Do you recall who left the room?
2    A.  From her I -- I wasn't there, but I
3 believe she mentioned that Cultural Care left the
4 room.
5    Q.  Did she see anyone else leave the room?
6    A.  I don't recall who -- if another party
7 left the room.
8    Q.  Ms. Biggs stayed in the room, though;
9 correct?
10    A.  To my understanding, yes.
11    Q.  And did Ms. Biggs report anything to you
12 about what DoL said after Cultural Care left the
13 room?
14    A.  Yes.
15    Q.  What?
16    A.  They talked about abiding by the FLSA.
17    Q.  Did they also talk about abiding by state
18 and local minimum wage laws and ordinances?
19    A.  If that's grouped under FLSA, I think
20 that's grouped under FLSA, but I don't know.
21    Q.  Did Ms. Biggs convey any of the substance
22 of what DoL said about the FLSA at that meeting?
23    A.  I think that was the substance; the Fair
24 Labor Standards Act, that we abide by it.
25    Q.  And was DoL concerned that sponsors were

Page 143

1 not abiding by the FLSA?
2       MR. QUINN:  Object to form.
3       THE WITNESS:  Potentially.
4 BY MR. RODRIGUEZ:
5    Q.  Did DoL say anything concerning the
6 $195.75 stipend?
7    A.  I wasn't at the meeting.  I -- I can't
8 testify to that.  I don't know.
9    Q.  But you do understand that one of the
10 topics on which you were here today to testify --
11    A.  Yes.
12    Q.  -- communications with DoL?
13    A.  Yes.
14    Q.  Okay.  So is it your testimony that you
15 are not prepared to testify as to what DoL said at
16 that meeting?
17       MR. QUINN:  Object to the form.
18 Argumentative.
19       THE WITNESS:  I -- I wasn't at that
20 particular meeting.  I'm testifying as to the
21 information that was conveyed to me.
22 BY MR. RODRIGUEZ:
23    Q.  And so my question to you is did DoL say
24 anything at the meeting concerning the $195.75
25 stipend?

Page 144

1    A.  Potentially.
2    Q.  Okay.
3    A.  I --
4    Q.  But you did not speak to Ms. Biggs to
5 refresh your recollection on that today, did you?
6    A.  No, I did not.
7    Q.  Is Ms. Biggs still an APC employee?
8    A.  Yes.
9    Q.  Where does Ms. Biggs reside?
10    A.  She's in Washington, DC.
11    Q.  What is Ms. Biggs' title?
12    A.  Vice president.
13    Q.  Vice president of -- anything in
14 particular?
15    A.  Field operations.
16    Q.  At the time of the meeting where DoS
17 invited DoL, what was Ms. Biggs' title?
18    A.  I believe it was director or -- I think it
19 was director of field operations, potentially senior
20 director.
21    Q.  Did Ms. Biggs provide any written notes to
22 you concerning the DoL meeting?
23    A.  The Department of State meeting?  Yes, I
24 believe she did an e-mail recap.
25    Q.  Okay.  And when was that?

Page 145

1    A.  Maybe it was in June.  June or July of
2 2015, I think.
3    Q.  Were any materials distributed by DoS or
4 DoL at that meeting, written materials?
5    A.  Yes.
6    Q.  Do you have an understanding of what those
7 materials were?
8    A.  Every meeting that we have with the
9 Department of State, they always do a recap of the
10 PowerPoint presentation, so I believe it was a recap
11 of that PowerPoint presentation.
12    Q.  Anything specific to the DoL presentation?
13    A.  I believe there might have been a handout
14 on the FLSA.
15    Q.  Do you think you've seen that handout
16 before?
17    A.  Yes.
18    Q.  If you would, in your pile near the bottom
19 there should be an Exhibit 5.
20    A.  Okay.  I see 1.  I see 2.  I see 6, 7.  I
21 don't see 5.
22       MR. QUINN:  Here it is.
23 BY MR. RODRIGUEZ:
24    Q.  Ms. McNamara, do you recognize Exhibit 5?
25    A.  Yes.

Page 146

1    Q.  Where have you seen Exhibit 5 before?
2    A.  I believe this was -- I believe it was
3  sent to sponsors in the March -- a link to it -- in
4  the March '15 -- 2015 communication.
5    Q.  Do you have any understanding as to
6  whether Exhibit 5 was provided by DoL at the --
7  we'll call it the walk-out meeting?
8    A.  Yes.
9    Q.  Was it?
10   A.  I -- I -- I believe it was.  I didn't
11 receive it personally.
12       MR. RODRIGUEZ:  Okay.  Subject to any
13 questions from your counsel, I have nothing further
14 today.
15       MR. QUINN:  I have no questions.
16       THE VIDEOGRAPHER:  We're off the record.
17 The time is 4:43 p.m.
18       (Discussion held off the record.)
19       MR. RODRIGUEZ:  Does anyone on the phone
20 think they have standing to ask questions and want
21 to ask questions?
22       (No response.)
23       MS. KRUZER:  Not at this time, thanks
24 Sean.
25       THE REPORTER:  Anyone on the phone need a

Page 147

1  copy of this transcript?
2        MS. KRUZER:  Cultural Care will take a
3  copy.  This is Lyndsey.
4        MR. QUINN:  We'll take a mini.  And I'd
5  like to have the video synched.  And I've got the
6  exhibits.
7        THE REPORTER:  So you don't need more
8  exhibits attached?
9        MR. QUINN:  (Counsel shakes heads.)
10      (The proceeding adjourned at 4:43 p.m.)
11
12       _____
13       SARAH MCNAMARA
14
15
16
17
18
19
20
21
22
23
24
25

Page 148

1  STATE OF CALIFORNIA    )  ss.
2
3        I hereby certify that the deponent in the
4  foregoing deposition was by me duly sworn to testify
5  to tell the truth, the whole truth and nothing but
6  the truth in the within-entitled cause; that said
7  deposition was taken at the time and place therein
8  stated; that the deposition is a true record of the
9  deponent's testimony as reported to the best of the
10 ability by me, a duly certified shorthand reporter
11 and a disinterested person, and was thereafter
12 transcribed under my direction into typewriting by
13 computer.
14        I further certify that I am not interested
15 in the outcome of the said action, nor connected
16 with, nor related to any of the parties in said
17 action, nor to their respective counsel.
18        IN WITNESS WHEREOF, I have hereunto set my
19 hand this 9th day of May, 2017.
20
21
22       _____
23       HEIDI BELTON, CSR, RPR, CRR, CCRR, CLR
24       CSR No. 12885
25

PLAINTIFFS' RESP. APP.0005359

MAGNA
LEGAL SERVICES

Case No. 1:14-cv-03074-CMA-KMT Document 959-25 filed 03/30/18 USDC Colorado pg 533 of 701

# Exhibit 445

PLAINTIFFS' RESP. APP.0005360

Highly Confidential - Attorney's Eyes Only

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

_____

JOHANA PAOLA BELTRAN, ET AL.,    )

       Plaintiffs,,              ) Case No.

v.                                ) 14-cv-03074-CMA-CBS

                                       )

INTEREXCHANGE, INC., ET AL.,     )

       Defendants.               )

_____  )

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Videotaped oral deposition of MARK JAMES GAULTER, called by the Plaintiffs herein, held before a stenographic court reporter at the offices of Hilman Law Chambers, 197 Spadina Avenue, Suite 402, Toronto, Ontario, on Tuesday, the 9th day of May, 2017, at 9:00 a.m.

PLAINTIFFS' RESP. APP.0005361

MAGNA
LEGAL SERVICES

Highly Confidential – Attorney's Eyes Only

## Page 2

```
 1   A P P E A R A N C E S:
 2   For Plaintiffs:
 3   BOIES SCHILLER FLEXNER LLP
     BY:  Dawn L. Smalls, Esq.
 4        Daniel R. Schwartz, Esq.
          575 Lexington Avenue
 5        New York, NY 10022
          (212) 446-2300
 6        dsmall@bsfllp.com
          dschwartz@bsfllp.com
 7
 8   For Defendant Expert International Group d/b/a
 9   Expert AuPair and witness:
     BY:  BOGDAN ENICA, ESQ.
10        100 2nd Avenue S.
          Suite 302-S
11        St. Petersburg, FL 33701
          (727) 225-2649
12        bogdan@expertaupair.com
13
     For Defendant American Institute For Foreign
14   Study d/b/a Au Pair In America:
15   PUTNEY, TWOMBLY, HALL & HIRSON LLP
     BY: JOHN B. FULFREE, ESQ.     (telephone)
16        521 Fifth Avenue
          New York, NY 10175
17        (212) 682-0020
          jfulfree@putneylaw.com
18
19   For Defendant InterExchange, Inc.:
20   SHERMAN & HOWARD, L.L.C.
     BY: ALYSSA LEVY, ESQ.       (telephone)
21        633 17th Street
          Suite 3000
22        Denver, Colorado 80202
          (303) 299-8194
23        alevy@shermanhoward.com
24
25   For Defendant Au Pair Care:
```

## Page 3

```
 1   BY: NATHAN HUEY, ESQ.        (telephone)
 2        555 17th Street, Suite 3400
          Denver, CO 80202
 3        (303) 600-6842
          nhuey@gordonrees.com
 4
 5   For Defendants USAuPair, Inc., GoAuPair,
     and Au Pair International:
 6   WHEELER, TRIGG, O'DONNELL
     BY: NATALIE WEST, ESQ.       (telephone)
 7        370 17th Street
          Suite 4500
 8        Denver, Colorado 80202
          (303) 244-1918
 9        west@wtotrial.com
10
     For Defendant Cultural Care
11
     CHOATE, HALL & STEWART
12   BY: LYNDSEY KRUZER, ESQ.      (telephone)
          Two International Place
13        Boston, Massachusetts 02110
          (617) 248-5221
14        lkruze@choate.com
15
16
17   ALSO PRESENT:
18   Ronald Eckstein, CIM, CCVS (Certified Legal
19   Videographer and Commissioner for Taking Affidavits)
20
21
22
23
24
25
```

## Page 4

```
 1              INDEX OF PROCEEDINGS
 2
 3   WITNESS:  MARK JAMES GAULTER:  SWORN
 4   EXAMINATION                      PAGE
 5     By Ms. Smalls              10
 6     By Mr. Enica              206
 7
 8
 9   QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER: N/a
10   INFORMATION TO BE SUPPLIED: 42, 205
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 5

```
 1           INDEX OF EXHIBITS
 2   NO./ DESCRIPTION                   PAGE
 3   EXHIBIT 1 marked for identification:   14
 4        Revised notice of 30(b)(6)
 5        deposition of Defendant Expert
 6        Group International d/b/a Expert
 7        AuPair.
 8   EXHIBIT 2 marked for identification:   26
 9        Organization chart, Bates
10        ExpertAuPair000203
11   EXHIBIT 3 marked for identification:   39
12        Organization chart,  Bates
13        ExpertAuPair000202
14   EXHIBIT 4 marked for identification:   49
15        Host Family Application, Bates
16        ExpertAuPair000055-59
17   EXHIBIT 5 marked for identification:   67
18        International Representation and
19        Interviewer Agreement, Bates
20        ExpertAuPair000050-54
21   EXHIBIT 6 marked for identification:   78
22        Expert AuPair flyer, Bates
23        ExpertAuPair000151
24   EXHIBIT 7 marked for identification:   101
25        Depreciation and Amortization,
```

Highly Confidential - Attorney's Eyes Only

| | Page 6 |
|---|---|
| 1 | IRS Form 4562, Bates |
| 2 | ExpertAuPair038114-118 |
| 3 | EXHIBIT 8 marked for identification: 110 |
| 4 | U.S. Corporation Income Tax |
| 5 | Return, IRS Form 1120, Bates |
| 6 | ExpertAuPair038119-126 |
| 7 | EXHIBIT 9 marked for identification: 111 |
| 8 | Defendant Expert AuPair's Answers |
| 9 | to Plaintiffs' Second Set of |
| 10 | Interrogatories with attachments |
| 11 | (8 pp.) |
| 12 | EXHIBIT 10 marked for identification: 124 |
| 13 | Agreement, Bates |
| 14 | ExpertAuPair026398-400 |
| 15 | EXHIBIT 11 marked for identification: 137 |
| 16 | Family Costs, Bates |
| 17 | ExpertAuPair021692 |
| 18 | EXHIBIT 13 marked for identification: 164 |
| 19 | "About the Expert AuPair Program" |
| 20 | flyer, Bates ExpertAuPair025157 |
| 21 | EXHIBIT 12 marked for identification: 174 |
| 22 | Sponsor Organizations Comparison |
| 23 | chart (produced in native |
| 24 | format), Bates |
| 25 | ExpertAuPair0022941 (2 pp.) |

| | Page 8 |
|---|---|
| 1 | --- Upon commencing at 9:15 a.m. |
| 2 | THE VIDEOGRAPHER: We are now on the |
| 3 | record. This is the video-recorded |
| 4 | deposition of Dr. Mark Gaulter in the |
| 5 | matter of Johana Paola Beltran et al. |
| 6 | versus InterExchange, Inc. et al., being |
| 7 | heard before the United States District |
| 8 | Court for the District of Colorado, Case |
| 9 | No. 14-cv-03074-CMA-KMT. |
| 10 | This deposition is being held at the |
| 11 | Hilman Law Chambers, 197 Spadina Avenue, |
| 12 | Suite 402, Toronto, Ontario, Canada, and |
| 13 | today's date is Tuesday, May the 9th, |
| 14 | 2017, at the approximate time of 9:16 a.m. |
| 15 | My name is Ronald Eckstein, CIM, |
| 16 | CCVS, and I am the Certified Legal |
| 17 | Videographer and Commissioner for Taking |
| 18 | Affidavits. The court reporter is Karin |
| 19 | Jenkner, CSR, RPR, CRR. |
| 20 | Counsel, please introduce yourselves, |
| 21 | state whom you represent, after which the |
| 22 | witness will be sworn. |
| 23 | MS. SMALLS: Dawn Smalls from Boise, |
| 24 | Schiller & Flexner for the Plaintiffs. |
| 25 | MR. SCHWARTZ: Daniel Schwartz from Boise, |

| | Page 7 |
|---|---|
| 1 | EXHIBIT 14 marked for identification: 185 |
| 2 | AuPair Agreement, Bates |
| 3 | ExpertAuPair000001-8 |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

| | Page 9 |
|---|---|
| 1 | Schiller, Flexner for the Plaintiffs. |
| 2 | MR. ENICA: Bogdan Enica on behalf of |
| 3 | Expert Group International, doing business |
| 4 | as Expert AuPair, representing the |
| 5 | witness -- representing the witness here |
| 6 | today. |
| 7 | And we do have counsel on the phone. |
| 8 | I would read the names of the people on |
| 9 | the phone. I would like the attorneys on |
| 10 | the phone to identify themselves or to |
| 11 | acknowledge their presence. |
| 12 | So I have John Fulfree, representing |
| 13 | American Institute Foreign Study, Au Pair |
| 14 | in America. |
| 15 | MR. FULFREE: Present. |
| 16 | MR. ENICA: I have Nathan Huey, |
| 17 | representing AuPair Care. |
| 18 | MR. HUEY: Present. |
| 19 | MR. ENICA: I have Alyssa Levy, |
| 20 | representing InterExchange. |
| 21 | MS. LEVY: Present. |
| 22 | MR. ENICA: I have Natalie West, |
| 23 | representing GoAuPair and two other |
| 24 | sponsors. Maybe she can identify the |
| 25 | sponsors for us. |

MAGNA ▶
LEGAL SERVICES

Highly Confidential - Attorney's Eyes Only

<hr>

Page 10

1    MS. WEST:  Yes, Agent Au Pair and Au Pair
2    International.
3    MR. ENICA:  Thank you, Natalie.
4        And I have Lyndsey Kruzer,
5    representing Cultural Care.
6    MS. KRUZER:  Present.
7    MR. ENICA:  As far as I know, there are no
8    other attorneys on the phone.  If any
9    other attorney's on the phone, now is the
10   time to make an appearance.
11   THE VIDEOGRAPHER:  And now for the
12   swearing.
13       MARK JAMES GAULTER,
14       having been duly sworn,
15   was examined and testified as follows:
16   THE VIDEOGRAPHER:  The witness has been
17   sworn, Counsel, you may begin.
18   EXAMINATION BY MS. SMALLS:
19   BY MS. SMALLS:
20   Q.  Good morning, Dr. Gaulter.
21   A.  Good morning.
22   Q.  Thank you for being here today.
23       I just want to go over a couple of ground
24   rules.  I'm going to -- you have now just taken an
25   oath, so all of your answers will be truthful to the

<hr>

Page 11

1    best of your ability.
2    A.  Yes.
3    Q.  I will be asking you questions and,
4    as the court reporter instructed us both, I would
5    ask you to wait until I finish my question, and then
6    you can go ahead and answer.  And I will wait until
7    you finish the answer until I give you another
8    question.  Is that okay?
9    A.  That's fine.  Yes.
10   Q.  Okay.  We discussed beforehand that
11   you may be expecting a text according to just
12   personal issue or emergency that you may have.  We
13   agreed beforehand that if that does occur, that you
14   will finish answering the question that is on --
15   before you, and then we, and then we will take a
16   short break so that you can deal with whatever that
17   issue, whatever that issue is.
18       So the videographer already went over
19   this, but we are holding this deposition in the
20   Hilman Law Chambers in Toronto, Canada.  But this
21   deposition is being held under the Federal --
22   United States Federal Rules of Civil Procedure and
23   the local rules of the District of Colorado.
24       And so with that, I think we can go ahead
25   and get started.

<hr>

Page 12

1    MR. ENICA:  Well, do you want to stipulate
2    on reserving objections?  If you want, we
3    can put a stipulation on the record.  We
4    do reserve all of our objections except
5    objections to form.
6    MS. SMALLS:  Mm-hm.
7    MR. ENICA:  And we do reserve any motions
8    to strike until the time of the trial.
9        We waive the requirement that the
10   witness is going to sign and read in the
11   presence of a notary.  However, he would
12   have to sign and read the deposition; if
13   he doesn't in 30 days, it will be deemed
14   signed.
15   MS. SMALLS:  Okay.  Great.
16   THE WITNESS:  Okay.  And to be clear, I
17   didn't understand all of that but that's
18   why we trust the attorneys.
19   MS. SMALLS:  That's right.
20   THE WITNESS:  Right.
21   MR. ENICA:  Well, just in two words, you
22   will have a chance to read the transcript
23   of this deposition and you would have to
24   sign for the accuracy.  If something is
25   inaccurate, you have a chance to correct.

<hr>

Page 13

1    THE WITNESS:  Okay.
2    MR. ENICA:  Okay?  Normally you would have
3    to read and sign in front of a notary.
4    THE WITNESS:  Mm-hm.
5    MR. ENICA:  We waived that requirement
6    today so you can read and sign --
7    THE WITNESS:  Right.
8    MR. ENICA:  -- without having a notary
9    present.
10   THE WITNESS:  Okay.  Perfect.
11   MS. SMALLS:  Okay.
12   THE WITNESS:  So go ahead.
13   BY MS. SMALLS:
14   Q.  Can you state your name again for the
15   record, as well as your title and place of business?
16   A.  All right.  So my name is Mark James
17   Gaulter.  I'm CEO of Expert AuPair, which is a d/b/a
18   of Expert Group International.  We are based in
19   St. Petersburg, Florida, so the address is 100
20   Second Avenue South, Suite 302S for "south,"
21   St.~Petersburg, Florida, 33701.
22   Q.  Okay.
23   A.  Right.
24   Q.  And how long have you had that
25   position?

<hr>

**MAGNA**
LEGAL SERVICES

Highly Confidential - Attorney's Eyes Only

| Page 14 |
| --- |

1  A.  I have had that position since we
2  were founded in, and let me be clear here, we were
3  founded in 2006 in May, I think tomorrow, so it will
4  be our eleventh birthday.
5  And we were designated by the Department
6  of State in approximately May of 2007, so one year
7  later, but exactly what day or -- I'm not sure.
8  Q.  Okay.  And what were the functions
9  that you undertook in May -- from May of 2006 to May
10 of 2007?
11 A.  Me personally or the business?
12 Q.  The business.
13 A.  The business.  So the business
14 applied for designation, which takes some time, and
15 also participated in some study abroad.  We sent
16 some American students overseas.
17 Q.  Okay.  I'm going to admit...
18 EXHIBIT 1 marked for identification:  Revised
19       notice of 30(b)(6) deposition of
20       Defendant Expert Group International
21       d/b/a Expert AuPair.
22 MR. ENICA:  Can we continue on numbering
23       from the previous deposition or we just
24       start with 1?  Start with 1?
25 MS. SMALLS:  I think we just start with 1.

| Page 15 |
| --- |

1  MR. ENICA:  Okay.
2  MR. SCHWARTZ:  I think there's a
3  simultaneous deposition.
4  (Query by reporter)
5  MR. ENICA:  He said we should start
6  numbering with Exhibit 1.
7  MS. SMALLS:  He said there's another
8  deposition occurring today, and so if we
9  did simultaneous numbering it would be
10 confusing.  But he should speak up so that
11 the court reporter can hear his comments
12 as well.
13 Q.  So if I can ask you to review the
14 document before you?
15 A.  Yes.
16 Q.  And if you can let me know whether
17 you're familiar with that document?
18 (witness perusing document)
19 A.  Yes, I believe I have seen all of
20 this.  Let me just check the last page.
21 Yes.
22 Q.  Okay.  We're just going to briefly go
23 through each of the topics --
24 A.  Okay.
25 Q.  -- to just review the basis, one,

| Page 16 |
| --- |

1  your qualification to testify on each of these
2  topics...
3  A.  Right.
4  Q.  And, two, the basis for your
5  qualification.
6  A.  Right.
7  Q.  So the first topic relates to
8  corporate structure and your legal or beneficial
9  ownership.
10 MR. ENICA:  I don't want to interrupt, but
11       for the people on the phone, maybe we
12       should mention what Exhibit 1 is.
13 MS. SMALLS:  Yes.  This is the 30(b)(6)
14       notice, actually, the revised notice of
15       30(b)(6) deposition of Defendant Expert
16       Group International d/b/a Expert AuPair.
17       And we're just reviewing the topics on
18       page 5.
19 Q.  So with respect to topic number 1
20 regarding your corporate structure...
21 A.  Yeah.
22 Q.  Do you feel qualified to testify on
23 that topic?
24 A.  Yes, I do.
25 Q.  And what is the basis of your

| Page 17 |
| --- |

1  ability, your qualification, in testifying on your
2  corporate structure?
3  A.  I'm the CEO and the founder, so I
4  feel qualified.
5  Q.  Okay.
6  A.  Or one of the founders; let me be
7  precise.
8  Q.  Okay.
9  A.  Yeah.
10 Q.  Number 2 relates to your finances,
11 including but not limited to your financial records,
12 revenue and expense streams.  Is this a topic that
13 you feel comfortable testifying to today?
14 A.  Yes, it is.
15 Q.  And what is the basis of that
16 qualification?
17 A.  I used to enter everything into
18 QuickBooks and I still review QuickBooks regularly,
19 right.  And everything is done through QuickBooks.
20 Q.  Okay.  Number 3 relates to your
21 recruitment, training, placement, and supervision of
22 au pairs and host families.  Is that something
23 that -- is that a topic that you feel qualified to
24 testify to today?
25 A.  Yes, it is.  In a technical sense,

PLAINTIFFS' RESP. APP.0005365

MAGNA ►
LEGAL SERVICES

Highly Confidential - Attorney's Eyes Only

Page 18

1 probably the best answer to your question is I'm the
2 Responsible Officer for the au pair program, for a
3 J-1 exchange program.
4    Q. Mm-hm?
5    A. And therefore I feel that I am
6 qualified to testify.
7    Q. Okay. Thank you.
8    Number 4 relates to your relationship and
9 communications with the State Department and the
10 Department of Labour. It has a number of subparts.
11    A. Mm-hm.
12    Q. If you haven't already, if you can
13 just take a moment to review that.
14     (witness perusing document)
15    A. I think I'm more qualified than
16 anyone else in the organization to speak about this.
17    Q. Mm-hm?
18    A. That's not to say that nobody else
19 has spoken to the State Department, but I think I've
20 had the majority of communications over the ten
21 years.
22    Q. Okay. But you, appearing today on
23 behalf of Expert AuPair, feel that you are well
24 qualified to testify on communications that Expert
25 AuPair has had with the State Department and/or the

Page 19

1 Department of Labour?
2    A. Yes. And sorry to interrupt there,
3 but yes, I feel comfortable testifying.
4    Q. Okay.
5    A. Right.
6    Q. Thank you. Number 5 relates to your
7 relationship and communications with other sponsors,
8 including but not limited to the Alliance for
9 International Education and the International Au
10 Pair Association. Is that a topic that you feel
11 qualified to testify to today?
12    A. Yes, it is. However, I would mention
13 we're not in the International Au Pair Association,
14 so that may not be an appropriate line of
15 questioning, but you're more than welcome to ask.
16    Q. Okay?
17    A. But I'm aware of any memberships like
18 that that we have.
19    Q. Okay. Thank you.
20    And the basis -- and what is the basis for
21 that qualification to testify?
22    A. I would have -- well, I did sign the
23 cheque for the Alliance, which has an annual
24 membership fee. And also, I believe I signed a
25 contract with them to become members. But again,

Page 20

1 that's a belief, that's something that was maybe
2 five years ago.
3    Q. Okay?
4    A. And so I -- you know, I want to be
5 careful about when I'm telling you what I know and
6 when I'm telling you what I believe.
7    Q. Right. Thank you. And that's
8 important.
9    So qualifying what you know and what you
10 believe --
11    A. Mm-hm.
12    Q. -- are important to do today. And if
13 there's any item that you are not sure of or would
14 like to qualify, we can follow up --
15    A. Right.
16    Q. -- with afterwards --
17    A. Yeah.
18    Q. -- in terms of getting the
19 documentation or providing you an opportunity to
20 answer with certainty --
21    A. Right.
22    Q. -- any questions that we ask you
23 today.
24    And then number 6 has to do with the
25 market in which you operate, including any analysis

Page 21

1 of the compensation paid to childcare professionals
2 other than au pairs.
3    Are you qualified to testify on that
4 topic?
5    A. I would say that I'm, again, as
6 qualified as anyone in the company, and I speak, I
7 guess, there as a parent.
8    Q. I'm sorry?
9    A. I speak largely as a parent there,
10 because I'm not sure that, if you asked me about the
11 end (sic) childcare professionals other than au
12 pairs in different markets other than
13 St.~Petersburg, I may -- I may struggle.
14    Q. Okay. You place au pairs beyond the
15 St.~Petersburg area.
16    A. That's correct.
17    Q. Is that correct?
18    A. Yes. Yeah.
19    Q. What are your major markets?
20    A. We have a reasonable number in the
21 D.C. area now. New York, Tampa Bay. I would... my
22 belief is that most of our au pairs are placed in
23 and around those cities.
24    Q. Okay.
25    A. Right. So New York, that doesn't

MAGNA
LEGAL SERVICES

Highly Confidential - Attorney's Eyes Only

Page 22

1  just mean the city, that means New Jersey, that
2  means -- and obviously D.C. doesn't mean the city
3  either.
4      Q.  Okay.  Are you familiar with the
5  market, the childcare markets, in the three primary
6  markets that you just identified, which are D.C.,
7  New York, and Tampa Bay?
8      A.  I would say certainly Tampa Bay.  But
9  the other markets, I would be -- I'd be less
10 inclined to speak with certainty.  But I could, I
11 could hazard a guess.  But it would be a guess and
12 it would be qualified.
13     MR. ENICA:  And I don't want to interrupt.
14     Some of the information provided here we
15     will designate as "attorneys' eyes only."
16     For example going over the main market and
17     so on and so forth.
18       (Query by reporter)
19       Yes.  I think this is okay with...
20 MS. SMALLS:  Yes.
21 MR. ENICA:  With you, opposing counsel.
22 MS. SMALLS:  Yes.
23     Q.  Okay.  And then topic number 7 has
24 to -- touches on your document and your document
25 retention policies.

Page 23

1      A.  Right.
2      Q.  Is this is a topic that you feel
3  qualified to testify to today?
4      A.  Yes, absolutely.
5      Q.  Okay.  What did you do today to
6  prepare for today's deposition?
7      MR. ENICA:  Objection.
8      A.  Today?  I spoke with Bogdan for five
9  minutes.  I spoke to my wife for emotional support,
10 if you like.  And I walked to the office.
11     Yesterday was the other time I prepared.
12     Q.  Okay.  Other than yesterday, did you
13 do any preparation for today's deposition?
14     A.  I did -- I don't recall doing
15 anything.  I've read the legal briefs, some of which
16 I understood, some of which I didn't.  But I don't
17 recall, other than getting on the plane on Sunday --
18 I mean, it depends, what, what, what you mean by the
19 question -- the preparation would be minimal.
20     Q.  Okay and --
21     A.  And it was certainly yesterday.
22     Q.  How much time did you devote
23 yesterday to prep for today's deposition?
24     A.  I spent from about 9:30 yesterday
25 morning, just after, until lunchtime, had an hour

Page 24

1  lunch, and then I was preparing until about 5:15.
2      Q.  Okay.
3      A.  Right.
4      Q.  Were there any documents that you
5  reviewed in preparation for today's deposition?
6      A.  Yes.  I reviewed some of the
7  documents that we submitted.  You know, they had our
8  Bates numbers on them.  And I believe there was one
9  document that InterExchange, or a different sponsor
10 but it was -- I think it was only one that I
11 reviewed that a different sponsor had submitted,
12 which could have been in our discovery or may not
13 have been.  I mean, I didn't go through everything,
14 right.
15     Q.  Do you recall what the specific
16 documents that you reviewed were?
17     A.  I reviewed the contracts we have with
18 host families.  I reviewed the contracts we have
19 with au pairs.  And I reviewed... I'm trying to
20 give you a complete list.  I looked at a few
21 specific employment contracts which were redacted.
22 And I think there was an e-mail from -- there was,
23 there was something about a meeting that happened in
24 2011 with the Department of State.  Those are the
25 ones that come most easily to mind.

Page 25

1      Q.  Okay.  Thank you.
2      We're just lowering the blind in the
3  conference room.  It's a bright sunny day in
4  Toronto.
5      Okay.  So you testified that you're the
6  founder and CEO of Expert AuPair?
7      A.  Yes.
8      Q.  And you also testified that you
9  received official designation from the State
10 Department in May of 2007?
11     A.  A designation, I don't know the
12 technical term of official designation, but
13 designation, yeah.
14     Q.  Okay.  And so once you received
15 official designation, how did you start your
16 business as a sponsor?
17     A.  We published a website and waited and
18 hoped for calls to come in, and, I would say,
19 followed -- followed all leads more than you may
20 otherwise do.  In other words, once you're starting,
21 you need people to come in.
22     Q.  Okay.
23     A.  Right.
24     Q.  Why don't we start with Expert AuPair
25 today and then we'll also kind of look backwards

MAGNA
LEGAL SERVICES

Highly Confidential – Attorney's Eyes Only

Page 26

1 just in terms of the structure.
2       A.  It's up to you.  Yeah.
3       Q.  So the company as of today has how
4 many employees?
5       A.  I believe nine.  It might be ten.
6 Let me... we've got two part-time, right, so I think
7 it's nine.  And so FTE would be probably 7, 7.4,
8 something like that.
9 EXHIBIT 2 marked for identification:  Organization
10       chart, Bates ExpertAuPair000203
11 BY MS. SMALLS:
12       Q.  For people on the phone, we just
13 admitted Exhibit No. 2, Expert AuPair Bates number
14 203.
15       Are you familiar with this document?
16       A.  Yes, I am.
17       Q.  What is it?
18       A.  It is an organizational chart, a
19 historic one from 2015 on its face, but if you asked
20 me again when it was produced, that would be -- that
21 would be probably something I'd have to look up.
22       Q.  Okay.
23       A.  Right.
24       Q.  Is this org chart reflective of
25 Expert AuPair's current structure?

Page 27

1       A.  I would say that it is not.  We've
2 added some staff people who've -- some people have
3 moved on.  And I also delegated a lot more to, to
4 somebody who came in in 20--- I want to say 2015.
5 So after August.
6       Q.  Okay.  And who is that person?
7       A.  Kathleen McCormick is her name.  She
8 goes by "Katie."
9       Q.  Okay.  And what is her role?
10       A.  She supervises the office, so she's
11 looking after everything while I'm here, for
12 example.
13       Q.  Okay.  Does she have a title?
14       A.  She does.  She's Chief -- well, she
15 goes by COO.
16       Q.  We're going to go through this chart,
17 understanding that there have been some changes from
18 2015.
19       A.  Yes, of course.
20       Q.  Prior to August to today.
21       A.  Yes.
22       Q.  But can you walk us through each of
23 these roles?  We can start with Rachel Gaulter.  Who
24 is that, and what is her role within the company.
25       MR. ENICA:  Just one correction.  I think

Page 28

1       you said "prior to August."  I think the
2       witness said after August.  The changes
3       were after August.
4       MS. SMALLS:  Yes.
5       Q.  I was -- the notation on the document
6 says 2015 through August.
7       A.  Yes.
8       Q.  So which --
9       A.  So that would be through to some
10 point in August.  I mean --
11       Q.  Right.
12       A.  -- that would be potentially a
13 language issue.
14       Q.  Right.
15       A.  Right.  So I can, I can happily walk
16 through everyone.
17       Rachel, and just for full declaration, is
18 my wife.  She has -- she helps me occasionally to do
19 things like stuff envelopes, you know, with pay for
20 local representatives or whatever.  But her
21 commitment is now maybe half an hour a month, right.
22 So she does -- she doesn't do much.
23       Morgan has been succeeded by somebody
24 called Faith.  I forget her last name.  But she now
25 does the training.

Page 29

1       Rachel McCarthy is now a full-time
2 position.  When she -- when she was an intern,
3 obviously she was, you know, she was compensated
4 hourly, but now she is full-time.
5       Melissa Brady is now, she does most of the
6 collecting of family paperwork.  She also serves as
7 a regional representative.
8       Ann Newsome still is a part-time trainer.
9 She's a school teacher full-time.  She just comes in
10 to sort of explain the U.S. education system to au
11 pairs who obviously come from, you know, come from
12 different systems.
13       We have somebody called Paige, who does a
14 lot of the administrative work, and somebody called
15 Vina, who is -- she's paid hourly, however, she's
16 now up to like 37 hours a week, so she may become
17 full-time at some point.
18       Just trying to think if there's anyone
19 else.  I think that's all.
20       Q.  And what is your role as CEO?
21       A.  At the moment, largely oversight,
22 making sure that -- making sure that the, if you
23 like, the books are balanced, the annual report goes
24 in, and to attend any deposition that's necessary.
25       Q.  I think you said Katie McCormick --

Highly Confidential - Attorney's Eyes Only

| Page 30 |
|---|
| 1      A.  Yes. |
| 2      Q.  -- was primarily responsible for the |
| 3  office in general and while you were here.  Is that |
| 4  correct? |
| 5      A.  Yes, that's right. |
| 6      Q.  So -- |
| 7      A.  And -- |
| 8      Q.  Go ahead. |
| 9      Q.  Go ahead. |
| 10      Q.  Go ahead, sorry. |
| 11      A.  So, for example, if the State |
| 12  Department called today, they would talk to her. |
| 13      Q.  They would talk to her as a, as a |
| 14  first instance or in every instance they would talk |
| 15  to her? |
| 16      A.  In the instance of today. |
| 17      Q.  Okay. |
| 18      A.  Right. |
| 19      Q.  If the State Department called today |
| 20  and -- strike that. |
| 21          When you said the State Department called |
| 22  today, was that a hypothetical or did the State |
| 23  Department actually call today? |
| 24      A.  That is hypothetical.  To be honest, |
| 25  this started at 9 -- well, 9:15, and there wasn't -- |

| Page 31 |
|---|
| 1  there wouldn't have been time for them to call. |
| 2      Q.  Okay.  Thank you.  I just wanted to |
| 3  clarify. |
| 4      A.  Yeah.  Yeah, yeah. |
| 5      Q.  So if the State Department was to |
| 6  call today, is there anybody they would talk to |
| 7  besides Katie? |
| 8      A.  They could certainly get on the, you |
| 9  know, on the phone and talk to people.  I would |
| 10  doubt that if it was anything other than a marginal |
| 11  thing, I would imagine that they would either wait |
| 12  to talk to Katie or wait to tomorrow to talk to me. |
| 13      Q.  Okay.  When did Katie start with |
| 14  Expert AuPair? |
| 15      A.  She started in 2010 or '11 and then |
| 16  left and came back. |
| 17      Q.  And what was her role in 2010 and |
| 18  '11? |
| 19      A.  She was an intern.  She was at |
| 20  school, at Eckerd College, and... |
| 21          (Query by reporter) |
| 22  Eckerd College, yeah, in St.~Petersburg, |
| 23  and she was looking for a position of some kind to, |
| 24  you know, get some -- she got a degree in |
| 25  International Studies, so -- or equivalent.  The |

| Page 32 |
|---|
| 1  exact title I couldn't tell you.  But that's, that's |
| 2  what provoked her interest, if you like, in the au |
| 3  pair program. |
| 4      Q.  Okay.  And then when did she leave |
| 5  and when did she come back? |
| 6      A.  I am -- I believe it was 2014 she |
| 7  left; 2015 she came back. |
| 8      Q.  Okay. |
| 9      A.  But the, the exact date, you know, |
| 10  this is a belief, this is not a fact. |
| 11      Q.  And so she left in approximately |
| 12  2010-2011? |
| 13      A.  No, that's when she arrived. |
| 14      Q.  Okay. |
| 15      A.  And then she left in about 2014. |
| 16      Q.  Got it. |
| 17      A.  And then came back in about 2015. |
| 18      Q.  Okay.  So she was gone for about a |
| 19  year? |
| 20      A.  Yes. |
| 21      Q.  Okay.  So for the period of 2011 to |
| 22  2014, what was her position? |
| 23      A.  She was an intern, and then she did |
| 24  some, as I recall, she did some matching.  But she |
| 25  became full-time, I believe, about the time she |

| Page 33 |
|---|
| 1  graduated.  But again, the exact years aren't |
| 2  something I've really reviewed, so they're not |
| 3  things that I want to say under oath, if you like. |
| 4      Q.  Okay.  It's okay to say your best |
| 5  estimate. |
| 6      A.  Yes.  No, no.  And the best estimate |
| 7  would be probably 2012 or '13. |
| 8      Q.  Okay.  And then when she came back in |
| 9  2015? |
| 10      A.  Mm-hm. |
| 11      Q.  What role did she come back as? |
| 12      A.  She came back, she came back into a |
| 13  role... I want to say she came back as COO. |
| 14      Q.  Okay. |
| 15      A.  But again, that's a best estimate. |
| 16      Q.  Okay.  But in your recollection, when |
| 17  she came back to the company, she took on, whatever |
| 18  her title was, she took on increased |
| 19  responsibilities in comparison to where she -- the |
| 20  position she had before? |
| 21      A.  She took on more responsibility, and |
| 22  I think progressively has taken on more and more |
| 23  responsibility. |
| 24      Q.  Okay.  Thank you. |
| 25          Other than you and Kate McCormick -- |

MAGNA
LEGAL SERVICES

Highly Confidential - Attorney's Eyes Only

<table>
<tr><td>

Page 34

1       A.   Mm-hm.
2       Q.   -- is there anyone else at Expert
3 AuPair that you would deem part of your senior
4 leadership?
5       A.   Let me, let me again be as precise as
6 I can. The delegation of somebody to be, I forget
7 what the word is, Assistant Responsible Officer --
8 it's ARO is the title -- and the ability to go into
9 SEVIS and make changes on the government database, I
10 believe, is a very large responsibility which we
11 have given to five or six at the moment. Right, so
12 there's an immense level of trust in our staff and I
13 think -- I think five or six Associate or Assistant
14 Responsible Officers.
15       And there's also a level of trust in
16 Rachel McCarthy who puts the -- or McCarty -- I
17 don't really know. A last name. I'm not sure if
18 it's got an "H" or not. That could be an error.
19 There's a degree of responsibility for her in
20 addition in that she prepares the invoices for host
21 families.
22       Q.   Okay?
23       A.   So there's some financial, you know,
24 delegation there, if you like.
25       And, again, Melissa, I would say, has a

</td><td>

Page 36

1       Q.   Okay. And what, what is the purpose
2 and mission of the Canadian company?
3       A.   It's designed to place au pairs in
4 Canada. Yeah.
5       Q.   Okay. And who, who has the
6 leadership of Expert AuPair Limited Canada (sic)?
7       A.   That's -- let me be totally candid if
8 I can. We have not yet placed any au pairs in
9 Canada. So in terms of leadership, I'm -- I think
10 I'm named as the person in charge. I had to sign a
11 form saying that Expert AuPair (Canada) had
12 copyright permission to place -- sorry, to use the
13 name "Expert AuPair."
14       Q.   Mm-hm.
15       A.   But I would say that if we came back
16 in five years' time we may have a, you know, more
17 information there. But in terms of leadership,
18 it's -- it's owned by Expert AuPair.
19       Q.   Okay. When was it incorporated or
20 formed?
21       A.   I believe in about 2015.
22       Q.   Okay. Is Expert AuPair (Canada)
23 Limited the only subsidiary of --
24       A.   That's the only subsidiary; that's
25 the only, if you like, shares that we own in

</td></tr>
<tr><td>

Page 35

1 significant responsibility in dealing with the host
2 families before they arrive. Yeah.
3       Q.   So, in terms of your organizational
4 structure --
5       A.   Mm-hm.
6       Q.   -- I understand that you have a great
7 level of trust that you placed in all of your
8 employees.
9       But in terms of your organizational
10 structure, who would you identify as the senior, the
11 senior leadership team at Expert AuPair?
12       A.   I think in terms of organizational
13 structure you would have to say me, then Katie, then
14 the remainder. But again, I don't want to belittle
15 the contributions of everybody in the team.
16       Q.   Does Expert AuPair have any
17 subsidiaries?
18       A.   Yes. We have a -- there's a company
19 Expert AuPair (Canada) Limited.
20       Q.   And what is the relationship of
21 Expert AuPair (Canada) Limited to Expert AuPair... I
22 just want to make sure I get the... to Expert Group
23 International, Inc.?
24       A.   It's fully owned. So the American
25 company owns the Canadian company.

</td><td>

Page 37

1 anything around the world. I think that's -- I
2 think that's a forthright answer.
3       Q.   Okay.
4       A.   Right.
5       Q.   Does Expert Group International, Inc.
6 have any affiliates?
7       A.   Can you define "affiliate"? Is
8 that -- it's just if you could -- again, I want to
9 be really careful.
10       Q.   Well, for purposes --
11       A.   Sorry, go ahead.
12       Q.   Yeah. No, I was looking to see if --
13 we have in other documents but I was looking to see
14 if we had provided a definition that we could use
15 for purposes of this definition -- this deposition.
16       A.   Mm-hm.
17       Q.   But for purposes of my question --
18       A.   Mm-hm.
19       Q.   -- I would define "affiliates" of --
20 as other companies or entities in which you have a
21 relationship with or contract in your administration
22 of the au pair program.
23       A.   Then I would say yes. We contract
24 with the hotel in which the au pairs stay in
25 training. And that's the Hotel Indigo Downtown

</td></tr>
</table>

MAGNA
LEGAL SERVICES

Highly Confidential - Attorney's Eyes Only

Page 38

1  St.~Pete.  It's quite nice, actually.
2         We contract with Secutive, or Global
3  Secutive, I believe their full name is.  They
4  provide health insurance for au pairs once they've
5  arrived.
6         We contract with STA Travel, who help us
7  to buy flights for them coming in.  We have loose
8  relationships with other travel providers.
9         We have 11 recruiting organizations
10 overseas, and I know this because I checked it
11 yesterday.  However, I would qualify that with
12 saying that some of them aren't active.  So some of
13 the contracts expired in January 2017 because we
14 have a three-year term on, I believe, all of them.
15 And they haven't been worth renewing.
16        So I can give as much information as I can
17 about the 11 without having notes, and -- if you
18 would like me to.
19        Q.  Okay.  Is there any other entity or
20 organization other than the vendors that you
21 outlined in terms of hotels, health insurance, and
22 then the 11 recruiting organizations that you just
23 mentioned?  Is there any other company or entity
24 that would qualify as an affiliate of Expert Group
25 International, Inc.?

Page 39

1         A.  I don't believe there is.
2         Q.  Okay.
3         A.  No, I can't, I can't -- I'm just
4  trying to think but I can't think of anything.
5         Q.  Okay.
6         (Counsel conferring)
7  EXHIBIT 3 marked for identification: Organization
8         chart,  Bates ExpertAuPair000202
9  BY MS. SMALLS:
10        Q.  You've given us org charts... sorry.
11        The prior org chart that we looked at was
12 for 2015.
13        A.  Mm-hm.
14        Q.  This is for 2014.  In the interest of
15 thoroughness, I just want to review year by year.
16        A.  Yes, absolutely.
17        Q.  And ensure that the org chart is
18 either reflective of how you described the
19 organization as it functioned in 2015 or note any
20 differences in personnel or differences in function.
21        MR. ENICA:  Just for the people on the
22        phone, I want to mention this was marked
23        as Exhibit 3.  And we are talking about
24        document Expert AuPair ending in 202.
25        That's the Bate number.

Page 40

1         MS. SMALLS:  Okay.  Thank you.
2         MR. ENICA:  You're welcome.
3         Q.  So in 2014, this chart notes Katie
4  McCormick as Client Services.  It has a number of
5  boxes without names.  And then an Anne Newsome, who
6  I believe was on the other chart as well as a
7  part-time trainer.
8         So can you tell me, one, what the -- when
9  it says "Legacy," what that means in the box?
10        A.  I believe when we produced this,
11 "legacy" meant a previous employee who was no longer
12 there.  However, Katie was included because she was
13 back, right.  So "legacy" would mean somebody who's,
14 who's left, and that would be why.
15        Q.  Okay.  So if I'm reading this chart
16 correctly, in 2014 the only two employees that you
17 had were Katie McCormick and Anne Newsome; is that
18 correct?
19        A.  No.  They would -- the legacy people
20 would have been employed at that time, in 2014.
21 However, they were not still present.  And my
22 understanding was that we could or should mark them
23 "legacy" because they weren't any longer involved at
24 Expert AuPair.
25        Q.  Okay.  So there were individuals

Page 41

1  actually in these roles?
2         A.  Yes.
3         Q.  It's just that the names have not
4  been provided?
5         A.  That is correct.
6         Q.  Okay.  So, under "Matching," who is
7  the employee that fulfilled that role in 2014?
8         A.  I cannot honestly tell you.
9         Q.  Okay?
10        A.  That would be a question that we can
11 tackle after the deposition much more approp--- and
12 similarly with the others, much more effectively
13 than at the moment.
14        Q.  Okay.  So can we agree that we
15 will -- I mean, I can spend the time to ask each
16 question or you can provide a chart that actually
17 has the names included.
18        MR. ENICA:  Okay.  Yeah.  Or we can
19        provide -- if you want to ask any specific
20        question of the client, if the witness
21        remembers, feel free to ask.  If you're
22        okay with us providing a chart that
23        includes the names of the legacy
24        employees, we can do that as well; it's up
25        to you.

MAGNA
LEGAL SERVICES

Highly Confidential - Attorney's Eyes Only

Page 42

1    MS. SMALLS:  Well, what I'm understanding
2    from the witness is, he does not recall.
3    And so the question is whether we spend
4    the time going through each box and he
5    answers:  "I don't recall" or "I don't
6    know."  I'm happy to do that.
7        Or we can just agree that after the
8    deposition you'll provide an updated chart
9    with the names included.
10    MR. ENICA:  Yeah.  That is agreeable, to
11    provide the updated charts after the
12    deposition.
13   --- REPORTER'S NOTE:  Request for production
14    MS. SMALLS:  Okay.
15    THE WITNESS:  Yes, and just to confirm,
16    that's fine with me.  I just don't want to
17    give you false information.
18    BY MS. SMALLS:
19    Q.  No, that's fine.  I'm just trying to
20   find out what the roles are.
21    A.  Right.
22    Q.  And who was working at Expert AuPair
23   and who were the full-time employees.  So if we can
24   do that, I think that serves our purposes.
25    A.  Okay.

Page 43

1    Q.  I will ask, given the fact that these
2    were, these were active roles with active employees,
3    I'm going to ask you about each of the roles and
4    what those roles were responsible for.
5    A.  Mm-hm.
6    Q.  So it says, there's a box for
7    "Matching."  What did the person that was
8    responsible for matching do?
9    A.  They looked at the au pair
10   applications when they came in.  And they looked at
11   the host families.  They spoke to the host families.
12   They saw what sort of candidate the host family was
13   looking for, and to the extent possible, they --
14   they tried to match the au pairs.  However, it's
15   always sort of harder because we have many more au
16   pairs than host families.
17       So that's what that person would do.
18    Q.  Okay.  So that, that position, the
19   matching position, interacts both with au pairs and
20   it interacts with host families seeking au pairs?
21    A.  That would be correct, at that time,
22   yes.
23    Q.  Okay.  At some time did that change?
24    A.  I think it would be more accurate now
25   to say we have two people who are doing some of the

Page 44

1    matching.  And they're looking at au pair
2    applications.  And we have one person and that would
3    be Melissa, who's largely concerned with making sure
4    the family applications are okay.
5    Q.  Okay.  So would it be accurate to say
6    that in 2014 there was one position that looked at
7    au pair applications and interacted with host
8    families seeking au pairs, and now that that
9    position has been split into two?
10    A.  It would be accurate to say that one
11   person was matching people, but they would have had
12   the assistance of the admin assistant and the
13   intern, just looking at the chart, and there's some
14   conjecture there.  But there would be -- the --
15   again, in one year, we have about 3,000 applications
16   for, you know, to be an au pair.  So it takes time
17   to review them and look at them and work out, you
18   know...
19       And that figure is based on, I believe,
20   2015 to '16, right, January to January.  And so
21   there's a lot of people that want to come on this
22   exchange.
23    Q.  I'm sorry that I did not get that
24   right.  So I'm going to ask it more generally.
25    A.  Yes.

Page 45

1    Q.  So how does a, how does a match
2    occur?
3    A.  There are at least two ways.  The
4    first is if somebody is, quote, "pre-matched."  And
5    we use the word "pre-match" when we are given an au
6    pair and family combination.  And that can happen
7    either from the au pair -- well, either.  This is
8    only for two.  It can happen from an au pair.  It
9    can happen from a family that contact us.  Or, in
10   rare situations, it can happen from one of our
11   overseas partners.
12       And I -- I mean, if you've spoken to
13   Christian Au Pairs, you know that they --
14    Q.  Okay, sorry.
15    A.  Yeah.  Yeah, no problem.
16    Q.  Let's close the window.  It's just
17   getting warm in here.
18       (Discussion off the record)
19       (Reporter read back as requested)
20    A.  Okay.  So I'll follow as best I can.
21       So again, to follow that answer as best as
22   I can, there are, I believe there are, two overseas
23   partners who have sent us pre-matches.  One would be
24   Christian Au Pairs, and one would be the partners in
25   Mexico.  It's entirely possible that we've had one

PLAINTIFFS' RESP. APP.0005372

MAGNA
LEGAL SERVICES

Highly Confidential - Attorney's Eyes Only

Page 46

1  from a different country that I don't recall at the
2  moment.
3      Q.  Other than if a match is not a
4  pre-match?
5      A.  Mm-hm.
6      Q.  How does the match occur?
7      A.  Right.  We will send au pairs'
8  profiles to families.  And typically we will send
9  about three at a time.  So that's the standard
10  procedure for the last few years, right.  So, you
11  know, unless the family says:  We want to see, you
12  know, ten, if they demand to see ten applicants,
13  we'll normally send three at a time.
14      Obviously we pick those that we believe
15  are most likely to match and most close to what the
16  family is looking for.
17      At that stage, the family will contact the
18  applicants in which they are interested.  They will
19  have a full discussion about where they live, what
20  it could be -- what sort of environment they're in.
21  And everything is then involved in the employment
22  contract as it's written.  And you have, I believe,
23  a copy of that.
24      And so they, they decide on all of their
25  issues relating to the au pair's visit.  So that may

Page 47

1  be, some au pairs will get, you know, access to
2  ridiculous sports cars.  Others will -- others will
3  live in a more sort of, if you like, mainstream U.S.
4  environment.
5      Q.  So for au pairs in families that are
6  not pre-matched, the process is that a family comes
7  to you with a set of qualities that they would like
8  to see in an au pair or their job requirements?
9      MR. ENICA:  Objection to the form.  And
10      can I instruct my client to listen to the
11      question first and then start answering?
12      I think he's getting over the question.
13      So if you can just listen to the
14      question fully and then start answering.
15      MS. SMALLS:  He's doing fine.
16      THE WITNESS:  That's a fair point.  I'm
17      sorry.  There's a lot going on.
18      Can you ask the question again?
19      Sorry.
20  BY MS. SMALLS:
21      Q.  Sure.  For families that are -- well,
22  actually, can you repeat the question, please.
23      (Reporter read back as requested)
24      MR. ENICA:  And I made my objection.
25      THE REPORTER:  Would you like me to read

Page 48

1      the objection?
2      MR. ENICA:  No.  I just renew my
3      objection.
4      A.  I would say that the family comes
5  with an application.  So they will tell us things
6  like where they are, what they, what they do, maybe
7  they have --
8      (Query by reporter)
9      With their application, which does not
10  contain, as far as I would say, qualifications, it
11  contains information about the family.
12      So I think your characterization is
13  slightly off, but the fact is that we want both au
14  pairs and host families to leave with, you know,
15  this cultural exchange experience which enriches
16  them.
17      And I think that by far the most important
18  thing that this does for the United States is, it
19  leaves people who -- sorry, it causes people who
20  when they leave the country, they say good things
21  about America.  And so we want both parties to be
22  happy.
23      Q.  So, going back to my question...
24      A.  Mm-hm.
25      Q.  Which was just, I'm trying to get to

Page 49

1  the matching process.
2      So the host family starts a Host Family
3  Application. Is that correct?
4      A.  That is correct.
5      Q.  And what's in the Host Family
6  Application?
7      A.  Their name.  Their address.  We ask
8  them lots of things like:  "What book is in your
9  cof -- on your coffee table," I seem to recall.  We
10  ask them about educational office -- options around.
11  We ask them lots of things that we designed to be
12  targeted to make sure that we get the au pairs
13  placed in a happy environment that they were
14  expecting.
15  EXHIBIT 4 marked for identification: Host Family
16      Application, Bates
17      ExpertAuPair000055-59
18      MS. SMALLS:  Okay.  I don't have it, so if
19      you read the Bates number.
20      MR. ENICA:  Okay.  So for the record, the
21      Plaintiffs' counsel introduced Exhibit 4,
22      which is document Bates number Expert
23      AuPair starting at 55 and ending with 59.
24      BY MS. SMALLS:
25      Q.  Okay.  Is this a sample of a Host

MAGNA ▶
LEGAL SERVICES

Highly Confidential - Attorney's Eyes Only

| Page 50 |
| --- |

1 Family Application?
2     A. Yes. I'm somewhat concerned that
3 there's a "P" where there should be a box, but I
4 believe this is an accurate document.
5     Q. I'm sorry; you're concerned about
6 what?
7     A. There's a "P" where there should be a
8 box on lines 4 and 5.
9     Q. Oh. I see.
10     A. Mm-hm.
11     Q. Can you go to, I think it's the
12 fourth page of the Host Family Application. And I'll
13 direct you to the section that says "Desired au pair
14 characteristics."
15     A. Okay.
16     Q. Is that an opportunity for the host
17 family to identify characteristics including where
18 they might be from, whether they can swim or drive,
19 in their Host Family Application?
20     MR. ENICA: Objection.
21     A. I do not see these as requirements.
22 I see these as opportunities for a family to let us
23 know more about what sort of home they live in.
24     BY MS. SMALLS:
25     Q. Well, if you can just read what that

| Page 51 |
| --- |

1 section says, "Desired au pair characteristics." And
2 actually read the heading above "Desired au pair
3 characteristics" and what that says.
4     A. Do you mean "Au pair qualifications".
5     Q. That's correct.
6     A. Yes. So "Au pair qualifications" is
7 there. And then it says: (as read)
8     "Desired au pair
9     characteristics: non-smoking,
10     drives, swims, cooks, cleans,
11     specific gender" -- which is male
12     or female. There's no 'or' in
13     there, just to be clear. "Specific
14     nationality. Specific second
15     language. Our religion.
16     Non-smoking."
17     (Query by reporter)
18     "Our." O-u-r, yes. "Religion." And
19     "Non-smoking."
20     BY MS. SMALLS:
21     Q. So I'll ask you again, is this a
22 space or an opportunity for a host family in its
23 Host Family Application to note desired
24 characteristics from prospective au pairs?
25     A. It's desired characteristics;

| Page 52 |
| --- |

1 however, that does not mean necessary
2 characteristics.
3     Q. Do you use any notations that the
4 host family may make here under "Desired au pair
5 characteristics" to match with prospective au pair
6 candidates?
7     A. I believe that we have two
8 qualifications that we insist on. One is the right
9 to be placed with under-twos. So you need 200 hours
10 of childcare experience to be placed with -- I'm
11 sorry, under-twos, yes. So what they call the --
12     (Query by reporter)
13     Yes, and that is 200 hours with
14 under-twos. So that's essential, and it's part of
15 our regulatory requirement. The other thing we
16 insist on is, if a family needs a driver, we want to
17 see a driver's licence from overseas.
18     The others, I would say that -- let me
19 characterize it this way. Families sometimes want
20 things that they don't really necessarily need. So
21 your -- you can have an employee who is not -- not
22 an employee; you can have, you know, in our role,
23 you know, in any, in any job I've had at
24 universities and so on, you can have an employee who
25 was somehow not quite what you imagined you'd hire,

| Page 53 |
| --- |

1 or who you would imagine you'd hire, who ends up
2 being almost better than anyone you could expect.
3     When it comes to au pairs, you're spending
4 some time, you know, in this cultural exchange, you
5 imagine what sort of au pair you would like. But
6 until you've actually spoken to them, you don't know
7 if you're right.
8     And so a lot of this is, it's desired.
9 But the driving is important because we need the au
10 pairs and families to be safe, we need the children
11 to be safe. If the family has a pool, they may
12 actually insist on a swimmer. That's completely
13 reasonable. But the rest is, we've seen people pick
14 people that we never thought they would, and they've
15 had a great exchange, and the au pairs have got home
16 happy, which is what we care about.
17     Q. So I'm going to ask my question
18 again, which is, is this a space or an opportunity
19 for host families in their Host Family Application
20 to indicate desired characteristics of potential au
21 pair candidates?
22     A. This is what the family is telling us
23 that they desire. It does not mean we can provide
24 it. So many, many years ago, like eight years ago,
25 we had a family who -- I think they were Polish and

PLAINTIFFS' RESP. APP.0005374

MAGNA ▶
LEGAL SERVICES

Highly Confidential – Attorney's Eyes Only

| Page 54 | Page 56 |

**Page 54**

1  French, originally from -- not -- they were
2  second-generation, as I recall.  And so they were
3  looking for a Polish au pair who spoke French.  And
4  I think they -- I think they said something on the
5  phone.
6      We didn't have anyone.  Well, and then you
7  think, well, you're not going to get everything you
8  expect on a "desired characteristics."  You are
9  going to get -- and I think, I think in the end they
10 found someone on a different, you know, on a
11 matching site, as I recall, and they, I think they
12 went elsewhere.
13     But the point is, we have some
14 extraordinary examples of people who want very
15 specific things in their au pairs but don't get it.
16 But again, you know, for us, driving is important,
17 and the under-two qualification.
18     Q.  Okay?
19     A.  And you don't need to be a driver to
20 come, because there are families who don't need a
21 driver, but it's certainly, you know, it's certainly
22 helpful.
23     Q.  So, understanding that families may
24 indicate characteristics that may not be feasible or
25 realistic...

**Page 55**

1      A.  Mm-hm.
2      Q.  Do you use their notations here under
3  "Desired au pair characteristics" as the basis for
4  the matching process?  Strike that.
5      When you start to match an au pair with a
6  family, do you refer to this section of "Desired au
7  pair characteristics" as a reference point?
8      A.  Now let me be slightly obtuse here
9  for a second.  I'm not sure this is our current
10 application document.  The current one, I believe,
11 is online.  So I want to be careful about how I'll
12 answer the question.
13     Q.  Right?
14     A.  I believe that because this is
15 cultural exchange, we'd like au pairs to be happy,
16 we like families to be happy.  And this is a guide
17 book.  This is not a requirement, apart from the
18 driving.
19     Q.  Understanding that it is not a
20 requirement, do you use the information that is
21 provided here as a reference point when sifting
22 through the 3,000 applications that you receive from
23 potential au pairs to determine who might be a match
24 for a particular family?
25     MR. ENICA:  Object to the form.  You may

**Page 56**

1      answer.
2      A.  Okay.  Yeah.  I think the -- it's the
3  body of work in this application that is what we
4  look at.  And I think it's fair to say that if we
5  are looking at a family with a pool, we will look at
6  the swimming costume -- the swimming question, and
7  we -- it's part of the body of work of the
8  application.  So, yes, it will be read.
9      BY MS. SMALLS:
10     Q.  If a family indicated that they
11 wanted a Thai au pair, would you use that piece of
12 information to search and see if you had any au pair
13 candidates from Thailand?
14     A.  I believe that that is correct, and I
15 would add that it's reasonably understandable if
16 you're, let's say -- well, let me use myself as an
17 example.
18     I would have, many years ago, have had a
19 bias towards a British au pair because there's some
20 cultural sharing that I think my children can use.
21 So if somebody comes to us and says, "Well, I'm Thai
22 and I would like a Thai au pair," it's reasonable to
23 try, you know, to at least find a few for them.  But
24 in terms of:  Is it possible they could hire someone
25 else?  Yes, absolutely.  Each candidate is a very

**Page 57**

1  different person.
2      Q.  What if a family is not Thai and
3  wanted a Thai au pair?  You said that if a family
4  was Thai and indicated that they wanted a Thai au
5  pair, and that you were British and therefore there
6  was the basis for a British au pair; but if a family
7  did not have, as you could see, the total package, a
8  strong origin basis for requesting a certain type of
9  au pair, what would be Expert AuPair's response
10 then?
11     MR. ENICA:  Object to the form.  You may
12 answer.
13     A.  Okay.  So the question really... if
14 they were not Thai and had no obvious links to
15 Thailand, of course we would wonder why.  And I
16 think one area where we're extremely strong is
17 supporting au pairs.  And so I'm going to -- I don't
18 want to conjecture where your question is going.
19 But we like our au pairs to be -- I can say this in
20 any event -- we like our au pairs to be able to
21 communicate if there is an issue.
22     Q.  Let's go back to the organizational
23 chart.
24     A.  Okay.
25     Q.  It's, I think, Exhibit No. 3, the

PLAINTIFFS' RESP. APP.0005375

**MAGNA** ▶
LEGAL SERVICES

Highly Confidential - Attorney's Eyes Only

| Page 58 |
| --- |

1  2014 org chart.
2       We talked about matching and a bit about
3  the matching process. In the org chart you have an
4  attorney listed here. I don't believe the attorney
5  is listed in the org chart in the 2015 chart. Is
6  that Exhibit No. 2?
7       So can you tell me what the role, why the
8  attorney is there in 2014 and what the role of that
9  individual was within the organization?
10      A. Can I ask you a question first?
11  Because there's a fact that I need to have to
12  identify the year. When was the Complaint in this
13  case originally filed?
14      Q. I mean, you should answer the
15  question to the best of your knowledge, and if you
16  need to qualify it based on the filing or not filing
17  of the Complaint, you should do that.
18      A. Okay. I believe this was Bogdan,
19  who's representing me today.
20      Q. Okay.
21      A. But we may need to clarify that.
22      Q. Okay. But in 2014 -- well, is this
23  attorney position that's listed on the org chart, is
24  it full-time?
25      A. It was full-time at that stage.

| Page 59 |
| --- |

1       Q. Okay. And why was it a full-time
2  position in 2014 and no longer a full-time -- well,
3  not even on the org chart in 2015?
4       A. Again we go back to the years, and I
5  want to make sure I'm correct, but there was -- the
6  attorney position was intended to make sure that,
7  you know, we revised contracts, had -- and it was
8  only for a few months. But it was intended to make
9  sure we had an employment manual for our staff,
10  intended to make sure the contracts were looked at,
11  so it was unrelated to the present issue.
12      And then there was no need in terms of
13  looking at our procedures after, after Bogdan had
14  been there for a little while. So it was only for a
15  few months. Certainly not a year, for example.
16      Q. So, even though it appears on the org
17  chart...
18      A. Mm-hm.
19      Q. This was a position that was in 2014
20  but only for the span of a few months?
21      A. Only for the span of a few months.
22  It may have continued, and I'm going to be totally
23  up front, it may have continued into 2015. I'm
24  basing this, again, as you say, on the best of my
25  recollection.

| Page 60 |
| --- |

1       Q. Okay. Thank you.
2       And was the attorney position created
3  prior to the filing of this litigation?
4       A. I can tell you for a fact that Bogdan
5  started about two or three weeks before -- it was,
6  it was almost, almost simultaneous but it wasn't.
7  He did start before the lawsuit happened. And I
8  remember because I heard about the lawsuit and took
9  it next door into the office. At the time we were
10  at 111 Second Avenue North East. I took it next
11  door and gave it to Bogdan and said: "Look."
12      Q. Okay. So when you advertised or
13  conceived of a position in which you would bring in
14  an attorney, that was not because of the litigation?
15      A. That's correct; it was not because of
16  the litigation.
17      Q. Okay.
18      A. It was designed to improve our
19  policies and procedures throughout the company.
20      Q. And prior to you bringing on an
21  attorney in 2014 to review your policies and
22  procedures, had you ever had an attorney review your
23  policies and procedures before that?
24      A. Okay, let me... let me, if I can,
25  tackle this sort of in phases.

| Page 61 |
| --- |

1       Initially, our contracts were written by,
2  I guess, by me. We were in litigation in, I
3  believe, 2008. A family sued us. And we spoke to
4  an attorney. He did not, as I recall, revise our
5  contracts. He did say that we should not have an
6  arbitration clause. However, I didn't take any
7  action as a result of that.
8       He also represented us in a case where an
9  au pair was -- she never filed suit but he was
10  concerned with protecting our interests in a case.
11  So I consulted him.
12      And then, I believe that's it until Bogdan
13  came along.
14      Q. Okay. Did you -- it sounds like
15  there was only one prior litigation; is that
16  correct?
17      A. That's correct. Let me get that
18  right. For Expert AuPair, yes, there's been one
19  prior litigation. There are currently three,
20  because we have your case, we have two insurance
21  cases also. So...
22      Q. In the 2008 litigation, did you have
23  to do a deposition?
24      A. I've never done a deposition before.
25      Q. Did you have to appear in court?

PLAINTIFFS' RESP. APP.0005376

MAGNA
LEGAL SERVICES

Highly Confidential - Attorney's Eyes Only

Page 62

1     A.  I have appeared in court.  I've
2  appeared once to sort of watch, if you like.  Like,
3  I was divorced so I appeared once to watch, and I
4  testified once also.
5     Q.  But what was the action in which you
6  testified?
7     A.  I was -- and I want to point out the
8  judge said that this was unfounded, but my ex-wife
9  accused me of domestic violence.
10     Q.  So you appeared in your, in your
11  divorce action?
12     A.  I did appear, yeah.  I appeared.  So
13  let me get this -- let me just be completely clear.
14  2008 was a good year.  I was -- I had another charge
15  of domestic violence.
16     MR. ENICA:  Well, before going there, do
17       you think it's okay if you limit the
18       questions to the Expert AuPair
19       appearances, or you really care about his
20       personal appearances?
21  BY MS. SMALLS:
22     Q.  Well, that's fair.
23     A.  It's my -- sorry.
24     Q.  No, no, no.  Your counsel's right.
25  Today you are appearing as Expert AuPair rather than

Page 63

1  in your personal capacity, so let me limit my
2  question.  And when I ask, when I say "you" today,
3  I'm speaking of you as Expert AuPair.
4     A.  Okay.
5     Q.  And so let me re-ask my question,
6  which is:  Have you as Expert AuPair ever testified
7  in a lawsuit or a trial?
8     A.  I have only testified on paper, if
9  you like.  So our attorney back in 2008 would have
10  probably had an affidavit from me.  I couldn't
11  tell you what it said, but I've never appeared or
12  been asked questions in this capacity.
13     Q.  In your capacity --
14     A.  Yeah.  Yeah.
15     Q.  -- as CEO --
16     A.  Yeah, that's right.
17     Q.  -- and on behalf of Expert AuPair?
18     A.  Yeah.
19     Q.  Okay.  Thank you.
20     All right.  So moving a little bit further
21  down the chart, it says, it says:  "Legacy (2)
22  Regional Representative."  Can you tell me --
23         (Query by reporter)
24     "Legacy" and then "(2)".  And then it
25  notes under that box "Regional Representative."

Page 64

1     Can you tell me what the regional
2  representative does or what their responsibilities
3  are?
4     A.  Yes, of course.  And there are two
5  roles.  I mean, the first one is supervising, if you
6  like.  I don't -- that's not the best word; but
7  making sure the local representatives are doing what
8  they should be doing, and also contacting the au
9  pairs and host families periodically to make sure
10  that everything is as expected.
11     They -- finally, they deal with problems
12  which are reported which are not expected.
13     Q.  And at that time, you had two
14  regional representatives; is that correct?
15     A.  That's -- if that's what it says
16  here, I believe, I believe I researched this before
17  submitting.  So, yes, I would expect that to be
18  true.
19     Q.  Okay.  And do you recall or have a --
20  excuse me.  I'm just referring to the 2015 chart
21  there.  It has a name in one legacy, but it appears
22  that it also has two regional representatives.
23     Do you -- can you explain how the two
24  regional representatives are allocated in terms of
25  their regions?  Or what are -- strike that.

Page 65

1     What are the regions for the two regional
2  representatives?
3     A.  They -- that has changed.  However,
4  at the time I believe it was... I believe we drew a
5  map and the East Coast went somewhere because we had
6  more on states bordering the actual East Coast
7  itself.  And I believe the rest went to the other
8  person.
9     So it was a division by two, effectively.
10  I believe Georgia may have been counted on the West
11  because we had some in Atlanta (inaudible)...
12         (Query by reporter)
13     Some in Atlanta and I think it tipped the
14  balance somewhat.
15     Q.  And you said the regional
16  representatives supervised the local
17  representatives.  Is that correct?
18     A.  Yes.  And by that, first they would
19  be a point of contact.  They would also confirm that
20  contacts were made by the local representative
21  before payment was made to those contractors.
22     Q.  Can you describe your relationship
23  with local representatives?  They don't appear on
24  this chart.
25     A.  That's correct; they do not.  They

PLAINTIFFS' RESP. APP.0005377

MAGNA ▶
LEGAL SERVICES

Highly Confidential – Attorney's Eyes Only

| Page 66 | Page 68 |
|---|---|
| 1  are what I would normally refer to as 1099 | 1  Bates numbers Expert AuPair 00050. |
| 2  contractors, sole traders, depending on language; | 2  Q.  Dr. Gaulter, do you recognize this |
| 3  that they are -- that they're not employees. | 3  document? |
| 4  Q.  Do you have agreements with the local | 4  A.  Yes, it looks familiar. |
| 5  representatives? | 5  Q.  Okay.  What is it? |
| 6  A.  Yes. | 6  A.  It's the -- or it's a new |
| 7  Q.  Do you know if you've produced them? | 7  international representation, an interview |
| 8  A.  I couldn't tell you. | 8  agreement.  It's for our recruiters overseas. |
| 9  Q.  Okay. | 9  Q.  Is this the agreement -- well, you |
| 10  A.  Again, you know, everything here is | 10  previously made reference to 11 overseas recruiters. |
| 11  in good faith, and should you need them, we can | 11  A.  Mm-hm. |
| 12  produce them if you can't find them. | 12  Q.  Is this the agreement that you would |
| 13  Q.  Okay.  Thank you. | 13  have signed with each of those 11 overseas |
| 14  And then for 2014, we have Anne Newsome as | 14  recruiters? |
| 15  a part-time trainer.  Can you tell me what she does? | 15  A.  I believe it -- for those recently, |
| 16  A.  Yes, she comes in on -- it's normally | 16  yes.  For those that expired who I mentioned in 2017 |
| 17  Wednesdays, sometimes it's been Tuesday or Thursday | 17  that we hadn't taken off the list, I couldn't tell |
| 18  in the past.  And she is a schoolteacher at North | 18  you because I believe this was written in 2014 or |
| 19  Shore Elementary in St.~Petersburg. | 19  '15. |
| 20  She comes in and she talks to them for two | 20  Q.  Okay.  So is there a prior agreement |
| 21  or three hours, depending on the size of the group, | 21  that you would have used prior to 2014 for your |
| 22  about the American school system, or her perspective | 22  overseas recruiters? |
| 23  of it, which I think the au pairs find helpful | 23  A.  It's not impossible but it would |
| 24  because she's a PA at an elementary school and | 24  be -- it would have been in the electronic |
| 25  teaches kindergarten. | 25  discovery. |

| Page 67 | Page 69 |
|---|---|
| 1  (Query by reporter) | 1  Q.  Okay.  So if there is a prior |
| 2  She's a schoolteacher.  Yeah. | 2  agreement, it's your understanding that that has |
| 3  BY MS. SMALLS: | 3  been produced? |
| 4  Q.  Okay.  And then this chart also has | 4  A.  It's my understanding, yes. |
| 5  an administrative assistant and an intern, two | 5  Q.  Okay.  Thank you. |
| 6  interns listed.  Can you describe what their | 6  So you said that these agreements have a |
| 7  responsibilities would be? | 7  three-year term; is that correct? |
| 8  A.  It's difficult to be exact because | 8  A.  I believe that's correct.  Yes. |
| 9  obviously this was 2014.  The administrative | 9  Q.  And for -- |
| 10  assistant would have probably collected paperwork. | 10  A.  Although it is, it is fair to say |
| 11  Once there's a match, there's still some paperwork | 11  that what's been produced here says one year.  So |
| 12  to collect. | 12  that could be something that changes from agency to |
| 13  And the interns, I would imagine, were -- | 13  agency.  I believed it was three, but it could be, |
| 14  in a parallel universe they could have been under | 14  you know, it apparently isn't the case. |
| 15  the administrative assistant, in all likelihood, but | 15  Q.  When you say "agency" in that |
| 16  because of the way it was structured, they were | 16  instance, are you referring to the overseas |
| 17  written like that.  So, I think that the interns | 17  recruitment agencies? |
| 18  basically helped around the office.  And they would | 18  A.  I'm referring to the overseas |
| 19  not have been full-time. | 19  recruiters, yes. |
| 20  Q.  Okay.  Thank you. | 20  Q.  Okay.  And so, understanding that |
| 21  EXHIBIT 5 marked for identification:  International | 21  this agreement, that you believe this agreement came |
| 22  Representation and Interviewer | 22  into use in 2014 or 2015, is it your understanding |
| 23  Agreement, Bates ExpertAuPair000050-54 | 23  that each of your current overseas recruiters would |
| 24  MS. SMALLS:  For those on the phone, we | 24  have signed this agreement? |
| 25  are now working from the document that is | 25  A.  I couldn't testify to that. |

MAGNA ▶
LEGAL SERVICES

Case 1:14-cv-03074-CMA-KMT   Document 1059-25   Filed 03/17/18   USDC Colorado   Page 551
of 700

Highly Confidential - Attorney's Eyes Only

Page 70

1     Q.   Okay.  Would each of your 11 overseas
2  recruiters have signed an agreement with you?
3     A.  Yes.
4     Q.   Okay.  Have each of the agreements
5  with each of the 11 overseas recruiters been
6  produced to us?
7     A.  I'm without knowledge at the moment.
8  But again, if it turns out that nothing has been
9  produced in one of them, then of course we can.
10    Q.   Who are the 11 overseas recruiters,
11  and their countries?
12    A.  I'm going to tell you those that I
13  recall.
14       We have recruiters in Argentina.  I
15  believe they're called Argentina Cultural Exchange;
16  they may be Argentine Cultural Exchange.
17       We have -- there is a Chinese company,
18  which I can't name for you at the moment, but it's
19  on my list.  I could probably find it.
20       We have a partner in -- sorry, a recruiter
21  in Colombia; Estonia; Christian Au Pairs is based in
22  the UK, and of course you're familiar with them.
23  And there is a partner in -- there's a recruiter in
24  Mexico.  And beyond that, I think that I'm
25  struggling at the moment.

Page 71

1     Q.   There are -- you've listed six
2  overseas recruiters.
3     A.  Yeah.
4     Q.   Are all of these six active?
5     A.  Argentina, yes.  China, I'm not sure.
6  I'll have to check that.  Colombia, I believe so.
7  However, I don't believe they've sent very many, if
8  any.  Mexico, yes.  Christian Au Pair, yes.  And
9  what was the other one?
10    Q.   Estonia?
11    A.  Estonia, yes.
12    Q.   How were you first introduced to the
13  company in Argentina?
14    A.  I believe it would have been an
15  e-mail from the company in Argentina.  In general,
16  our companies overseas, the recruiters overseas will
17  contact us.  It's very rare if not never, probably
18  not never but certainly it's very rare, for us to
19  contact a partner or a recruiter overseas.  They
20  will normally contact us.
21    Q.   Okay.  So, to the best of your
22  knowledge, the Argentine company reached out to you?
23    A.  I would be surprised if it was any
24  other way.  Yes.
25    Q.   Okay.  Is that the case with the

Page 72

1  Chinese company as well?
2     A.  I believe so.  Yes.
3     Q.   What about the company in Colombia?
4     A.  I do not know if that was a
5  reference -- an e-mail from them or if it was a
6  previous au pair who was interested in coming, or
7  interested in helping, if you like.  But I believe
8  they would have contacted us.
9     Q.   Would that be the case for the other
10  three that you have listed that you've named?
11    A.  Again, I -- sorry.
12    Q.   You've named here today, specifically
13  from Estonia, UK, and Mexico, that they would have
14  reached out to you as well?
15    A.  I can't see any reason why we would
16  have contacted them.
17    Q.   I want to direct you to the third
18  page of this document.  It's Expert AuPair 52.
19    A.  Okay.
20    Q.   Under section 5.2, if you can just
21  read section 5.2.1.  You can read it out loud.
22    A.  Yes.  I can do that:  (as read).
23       "5.2.1 XXX will provide each
24       candidate with detailed information
25       about the program.  XXX will

Page 73

1       emphasize that an Au Pair's tasks -
2       in particular taking care of
3       children - require a high degree of
4       responsibility".
5     Q.   Do you know -- instead of referring
6  to it as "XXX," I'll just refer to it as the
7  "recruiting company."
8     A.  Okay, that's fine.
9     Q.   For purposes of this questioning.
10       But in -- do you have any knowledge or
11  involvement with the information that the recruiting
12  company provides to the au pair candidate?
13    A.  I believe that's covered in section 7
14  below, in "Advertising."  And so there are
15  requirements in this contract and, I mean, one is
16  7.1:  (as read)
17       "In no event shall [the agency]"
18       -- if I might use that term -- "use
19       the Department of State seal
20       without obtaining prior permission
21       from the Department of State."
22       And I think that historically was a
23  problem for some other agencies.
24       In advertising, [the agency] will obey all
25  of the laws in the U.S. and wherever the partner is.

PLAINTIFFS' RESP. APP.0005379

MAGNA ▶
LEGAL SERVICES

Highly Confidential - Attorney's Eyes Only

**Page 74**

1    All advertising must conform -- just to
2 summarize 7.3. 7.4:
3    "Upon request from [Expert
4    AuPair], [the agency] shall cease
5    any non-conforming advertising
6    activities or use of any
7    non-conforming advertising
8    materials."
9 And 7.5:
10    "An EAP officer should approve
11    any reference to EAP in [the
12    agency's] advertising materials.
13    Such approval will not be
14    [unnecessarily] withheld."
15 Then it goes on: (as read)
16    "The agency shall ensure that
17    the au pairs understand that the Au
18    Pair program is a cultural exchange
19    and that [Expert AuPair] is the
20    sponsor as designated by" -- and it
21    says "DOS" but it means Department
22    of State in the preamble.  "Au
23    pairs are to be fully informed of
24    the program rules and guidelines.
25    Any questions referring to

**Page 75**

1    program compliance, including
2    but --"
3 Sorry.
4    (Query by reporter)
5 "DOS," which means Department of State,
6 that's where... I'm trying but I need to know where
7 to come in.
8    "Au pairs are to be fully
9    informed of the program rules and
10    guidelines."
11 And finally:
12    "Any questions referring to
13    program compliance, including but
14    not limited to weekly working
15    hours, the educational component,
16    and immigration issues received by
17    [the agency] shall be referred to
18    EAP."
19 BY MS. SMALLS:
20    Q.  Thank you.  You just read to me the
21 section 7, on Advertising.  My question was about
22 section 5.2, on Recruiting.
23    A.  Mm-hm.
24    Q.  And I asked what -- well, actually,
25 can you read back what my initial question was?

**Page 76**

1    (reporter read back as requested)
2    MS. SMALLS:  I have the question.  Dan
3    pulled it up.
4    MR. ENICA:  Before the witness answers, I
5    think the other parties are disconnected.
6    I received an e-mail that they are not
7    connected anymore.
8    THE VIDEOGRAPHER:  Shall we go off the
9    record?
10    MS. SMALLS:  We can go off the record.
11    THE VIDEOGRAPHER:  This is the
12    videographer on May the 9th, 2017, at
13    approximately 11:01 a.m.  We are now going
14    off the record.
15 --- Upon recessing at 11:01
16 --- Upon resuming at 11:12 a.m.
17    THE VIDEOGRAPHER:  This is the
18    videographer on May the 9th, 2017, at
19    approximately 11:13 a.m.  We are now back
20    on the record.
21    BY MS. SMALLS:
22    Q.  Okay.  So before we went off the
23 record, we were asking -- or I was asking a question
24 about section 5.2, and specifically section 5.2.1,
25 that provides that:

**Page 77**

1    "[The recruiting company] will
2    provide each candidate with
3    detailed information about the
4    program."
5    And my question to you was:  Do you have
6 any knowledge or involvement with the information
7 that the recruiting company provides to the au pair
8 candidate?
9    A.  Again, the advertising is controlled
10 by the contract.  If there is any question, we will
11 ask.  And I did ask Christian Au Pairs to send -- to
12 send something, I can't recall at the moment exactly
13 what, but they did provide some materials just to,
14 you know, just to look at them.
15    Q.  Is advertising the same thing as
16 detailed information about the program?
17    THE VIDEOGRAPHER:  I'm sorry.  Could you
18    place the microphone facing up and closer
19    to your chin?
20    THE WITNESS:  Oh, sorry.  Okay.
21    THE VIDEOGRAPHER:  Thank you.
22    A.  I think it's fair to say that
23 advertising and -- advertising is slightly less than
24 detailed information.  However, the detailed
25 information is...  That would presumably come after

PLAINTIFFS' RESP. APP.0005380

MAGNA
LEGAL SERVICES

Highly Confidential - Attorney's Eyes Only

<table>
<tr><td>

Page 78

1   advertising and that's... that's it.
2   EXHIBIT 6 marked for identification: Expert AuPair
3         flyer, Bates ExpertAuPair000151
4       MS. SMALLS: What number is this?
5       THE REPORTER: 6.
6   BY MS. SMALLS:
7       Q. 6; okay. Do you recognize the
8   document in front of you?
9       A. I believe I've seen it before. It's
10   obviously historic. But, yes.
11       Q. Okay. For those on the phone, it's
12   Expert AuPair 151.
13       Would this be an example of an
14   advertisement?
15       A. Yes.
16       Q. Would this constitute detailed
17   information about the program?
18       A. With respect, this is about -- this
19   is a different issue, because we're looking here at
20   or we were looking at Exhibit 5, which is recruiting
21   of au pairs, and this would be an advertisement, as
22   I understand it, for host families.
23       Q. That's correct.
24       A. So -- yeah, so I presume that's,
25   that's why it was produced. Yeah.

</td><td>

Page 80

1   talk about is what we give, which I think is
2   essential. The first one is that they sign a
3   contract with the family before they come; and they
4   sign a contract with us.
5       Beyond that I would not like to -- there's
6   going to be a cultural difference between what
7   information is given to people according to their --
8   according to the recruiting agency because they're
9   based in different places.
10       Q. But the information provided is about
11   a U.S. program; is that correct?
12       A. That's correct.
13       Q. So why would there be differences in
14   the information provided about a U.S. program,
15   depending on location?
16       A. I think it's fair to say that some
17   countries are more similar to the U.S. and some are
18   very different.
19       Q. Do you know what information the
20   recruiting agencies provide to au pair candidates
21   before they are connected with Expert AuPair?
22       A. I do not know all the details.
23       Q. Do you provide the recruiting
24   agencies with information about the au pair program
25   that they should use in their materials?

</td></tr>
<tr><td>

Page 79

1       Q. Is this an example of a
2   advertisement?
3       A. Yes.
4       Q. Is this also an example of detailed
5   information about the program?
6       A. It's -- it would not be detailed in
7   the sense that there is more information to learn,
8   but there always is when you're housing a cultural
9   exchange visitor.
10       Q. Is it your position that advertising
11   is the same as detailed information about the
12   program?
13       A. No.
14       Q. Okay. So would it be fair to say
15   that the detailed information about the program
16   referred to in section 5.2 is different than the
17   advertising referenced in section 7?
18       A. I would argue that advertising is a
19   subset of what is required in 5.2.1.
20       Q. Okay. What other information beyond
21   advertising is provided to each candidate as
22   indicated in section 5.2.1?
23       A. There are two very important things
24   which are provided to each applicant from us, and so
25   I can't speak to each recruiting agency. What I can

</td><td>

Page 81

1       A. The recruiting agencies have a copy
2   of our contract with the au pair and with the host
3   family. Sorry. Sorry, with -- a copy of the
4   contract that the au pairs are required to sign.
5   They have a copy of the contract which is between
6   the au pair and the host family, which is fillable
7   so they can amend what is, you know, what can be
8   changed.
9       And they know that au pairs come to St.
10   Petersburg for training; they know that then they go
11   off to, you know, their family. So they are aware,
12   and all of these contracts have been negotiated in
13   English, so there should be no confusion about the
14   meaning. Many of the families, indeed, have --
15   sorry, many of the agencies are in some sense quite
16   possibly former au pairs or people with lots of
17   experience in the U.S.
18       Q. Do you have any knowledge about what
19   is being represented to potential au pair candidates
20   by recruiting agencies about the program?
21       A. I do not have full knowledge.
22   However, the -- I am confident that nothing is
23   being -- well, I'm confident that to the extent that
24   anything is being advertised incorrectly, we have
25   every ability to take care of that. And once we

</td></tr>
</table>

MAGNA ▶
LEGAL SERVICES

Highly Confidential - Attorney's Eyes Only

---

Page 82

1  talk to au pairs when they arrive, we do discuss
2  what they expect.  And if there's a discrepancy, of
3  course we will address that with the recruiting
4  agency.
5       But again, we meet all the au pairs.
6       Q.  But that's after they arrive,
7  correct?
8       A.  That's after they arrive.  But it is
9  an opportunity to make sure that, if something was
10  incorrect, that it is dealt with for people in the
11  future.  Not perfect, but actually quite effective.
12       Q.  How often does an au pair arrive with
13  a misunderstanding or a discrepancy between what the
14  program guidelines actually are and what they were
15  told in their home country?
16       MR. ENICA:  Objection to form.
17       A.  I would argue that it almost never
18  happens.  I will give you the only example I can
19  think of, which was that an au pair was told they
20  needed to have an international driver's licence
21  before they came.  That's the only example I can
22  think of in which it was reported in training.
23       BY MS. SMALLS:
24       Q.  Okay.  Do you review the
25  advertisements that are used by the in-country

---

Page 83

1  recruiting agencies?
2       A.  We do not routinely do so but we have
3  done so.
4       Q.  And how do you ensure, how do you
5  ensure that the recruiting agency is meeting the
6  programmatic requirements, including conducting the
7  interview in English and assessing English
8  proficiency?
9       A.  Again, largely we speak to the au
10  pairs when they're at their most candid, which is
11  when they're in training.  It's very hard to call
12  somebody overseas and confirm that everything is
13  going exactly as they expected, when instead you can
14  talk to them in-person when they're sort of ready to
15  speak.
16       So there is a retroactive check, but
17  it's -- and of course we collect all the documents.
18  But it's something that we need to look at rather
19  than, you know, to assume, and the best way to look
20  at it is to talk to the au pairs in person.
21       Q.  Okay.  So your primary means of
22  ensuring that the recruiting agencies are acting in
23  compliance with State Department rules and
24  programmatic guidelines is to speak to au pairs once
25  they have arrived in the United States; is that

---

Page 84

1  correct?
2       A.  That's the most effective approach,
3  so yes.
4       Q.  You had previously read section 7
5  with respect to advertising.  And section 7.3, which
6  you read, says:  (as read)
7            "At all times the recruiting
8            agencies shall ensure that all
9            advertising conforms at all times
10            with the Department of State
11            regulations regarding advertising
12            of exchange programs."
13       How do you ensure that all advertising
14  conforms at all times with the Department of State
15  regulations for recruiting agencies?
16       A.  Some of this is self-enforcing
17  because it is a requirement of the recruiting agency
18  that they do this, by the contract.
19       Once more we speak to the au pairs and
20  make sure that they have not seen anything
21  misleading.  And if necessary, we can certainly ask
22  the recruiting agencies to send us their materials.
23  However, let me just say I have -- it's not been a
24  major problem for us.
25       MR. ENICA:  Dawn, if I may, if these

---

Page 85

1            lights turn from green to nothing, I think
2            the phone disconnected.  Maybe somebody is
3            hitting the cable or something?  Because
4            they e-mailed me about being disconnected
5            but I can see the lights are off, so...
6            and I can see -- a cable that I can see.
7            It's powered on.
8       THE VIDEOGRAPHER:  There's one here
9            plugged in.
10       MS. SMALLS:  Why don't we go off the
11            record first.
12       THE VIDEOGRAPHER:  This is the
13            videographer on May the 9th, 2017, at
14            approximately 11:29 a.m.  We are now going
15            off the record.
16  --- Upon recessing at 11:29 a.m.
17  --- Upon resuming at 11:37 a.m.
18       THE VIDEOGRAPHER:  This is the
19            videographer on May the 9th, 2017, at
20            approximately 11:38 a.m.  We are now back
21            on the record.
22       BY MS. SMALLS:
23       Q.  Okay.  Dr. Gaulter, before we went
24  off the record, we were specifically looking at the
25  section 7.3 that states that:  (as read)

---

PLAINTIFFS' RESP. APP.0005382

MAGNA
LEGAL SERVICES

Highly Confidential - Attorney's Eyes Only

| Page 86 |
| --- |

1        "The recruiting company shall
2        ensure that all advertising
3        conforms at all times with the
4        Department of State regulations
5        regarding advertising of exchange
6        programs."
7        You had testified right before the break
8    that it was not a major problem for you.  Is that
9    correct?
10        A.  It's not a problem we've identified
11    as a major problem.
12        Q.  What is your means of ensuring that
13    all advertising conforms at all times?
14        A.  Again, there were two direct -- there
15    were two contracts the au pair themselves signs, and
16    they are rather detailed.  And so, if there is a
17    problem, they would tell us before coming.  At the
18    same time, we do talk to them in training about
19    their experience.  Yeah.
20        Q.  My question is about the recruiting
21    company, not about the au pair requirements.
22        So what I'm trying to ask you is, how do
23    you ensure that the recruiting company ensures that
24    all advertising conforms at all times with the
25    United States...

| Page 87 |
| --- |

1    --- REPORTER'S NOTE:  Automated telephonic message
2        MR. ENICA:  That's not our equipment here.
3        MS. SMALLS:  I understand.  I understand.
4        Q.  So how do you ensure that "all
5    advertising conforms at all times with the [United
6    States Department of State] regulations regarding
7    advertising of exchange programs"?
8        A.  It is impossible for any company to
9    monitor all advertising worldwide by a different
10    company.  Therefore we rely on two things, we
11    rely -- well, one thing.  We rely on the au pairs
12    letting us know if there is an issue.  At the same
13    time, we can ask the agencies to send all
14    advertising material.  However, that requires --
15    that requires them to send all advertising material.
16        Q.  Do you request that they send all
17    advertising material so that you can review it to
18    ensure compliance?
19        A.  Not in our normal course of business.
20        Q.  Have you ever done it?
21        A.  I have said already on the record
22    that I believe we did that with Christian Au Pairs.
23    I wouldn't -- I don't recall any other example at
24    the moment.  But that may well be something that
25    we've checked in the past.

| Page 88 |
| --- |

1        Q.  And with respect to Christian Au
2    Pair, you requested that they send you all
3    advertisements that they had used to recruit au
4    pairs to ensure that they were in compliance with
5    Department of State regulations regarding
6    advertising of exchange programs?
7        A.  I requested, again, to the best of my
8    recollection, after -- and I accept that this was
9    after the deposition that Boies, Schiller performed
10    in London.  Or did we?  Whoever, whoever requested
11    the deposition of Christian Au Pairs.
12        I thought that some further clarification
13    might be required on the (inaudible)...
14        Q.  I'm sorry, I just didn't hear.
15        A.  Yeah, I thought that some further
16    clarification might be required.
17        Q.  So prior to the noticed deposition of
18    Christian Au Pair, had you ever requested from one
19    of the recruiting companies that they send you a
20    copy of their advertising to au pairs for you to
21    review it to ensure compliance with Department of
22    State regulations?
23        A.  I can give you no firm answer to
24    that.  I don't recall a situation when we did.
25    However, it could -- it could well be that something

| Page 89 |
| --- |

1    was sent, and again, we do talk to our au pairs when
2    they come in.
3        Q.  Do you send the -- a copy of the
4    Department of State regulations to the recruiting
5    agencies?
6        A.  I don't know.  I think it's
7    referenced here and 22 C.F.R. 6231 is referenced
8    here, and it's online.  And all of our recruiters by
9    definition must have Internet access, because that's
10    how we communicate.
11        Q.  But these are foreign entities not
12    bound by the United States Department of State; is
13    that correct?
14        A.  They are foreign entities which are
15    bound by -- not only are they bound by their local
16    law, which almost -- in all cases would include
17    false advertising, but they're also bound by,
18    loosely bound by, U.S. law in that many of their
19    directors, et cetera, would come to the U.S.
20    --- REPORTER'S NOTE:  Automated telephonic message
21        MR. ENICA:  Maybe that's the seventh
22        caller.  I don't think it's us.
23        MS. SMALLS:  No, it's certainly not us.
24        MR. ENICA:  Not us.  I think people are
25        still on.

Highly Confidential - Attorney's Eyes Only

---

Page 90

1    MS. KRUZER: Yes, we are still on.
2    MS. WEST: Yes.
3    MR. ENICA: That was a seventh caller --
4    MS. KRUZER: This is Lyndsey Kruzer. I
5    would like the real-time info from the
6    court reporter, though, at the break if
7    that's possible.
8    MS. SMALLS: Okay. We'll do it at the
9    break.
10   MS. WEST: Yes, I would appreciate that as
11   well.
12       (Query by reporter)
13   MS. SMALLS: We'll do it at the break.
14       (Query by reporter)
15   MS. SMALLS: We'll do it at the break. We
16   just can't stop for the folks on the
17   phone. What was the last...
18       (Reporter read back as requested)
19   Q. So I'm going to ask again: Do you
20   personally, or you as Expert AuPair, provide the
21   companies that sign this agreement with copies of
22   the Department of State regulation?
23   A. I... I would not like to promise or
24   judge either way. It's likely that we have to some,
25   if not all. But principally, it's disclosed in this

---

Page 91

1    agreement that that's the relevant section of U.S.
2    law.
3    BY MS. SMALLS:
4    Q. Since you have been with Expert
5    AuPair from its inception and are its CEO and
6    founder, do you ever recall providing a copy of the
7    Department of State regulations to an in-country
8    recruiting company?
9    MR. ENICA: And I would object to the
10   form.
11   A. I don't recall either way.
12   BY MS. SMALLS:
13   Q. But that means you don't -- there is
14   no specific instance that you can recall where you
15   provided the Department of State regulations to a
16   recruiting company that would have signed this
17   agreement?
18   A. I cannot recall any such instance.
19   Again, our number of recruiting partners is small,
20   and probably over the course of Expert AuPair has
21   been maybe less than 20, which would be once every
22   six months. So the precise, the precise nature, I
23   wouldn't like to, you know, say that I -- I could
24   say on the stand.
25   Q. Okay. In section 7.6, which you also

---

Page 92

1    read into the record, it states that: (as read)
2        "Au pairs are to be fully
3        informed of the program rules and
4        guidelines."
5    How does Expert AuPair ensure that au
6    pairs are fully informed of the program rules and
7    guidelines prior to arriving to the United States?
8    A. There are, again, two mechanisms.
9    The first is that they sign a contract with us, and
10   they sign a contract with their host family. In
11   addition, we do note any issues in training like the
12   international driver's licence issue that I
13   mentioned.
14   Q. This provision relates to the
15   recruiting company, not Expert AuPair. I will read
16   the entire provision.
17   A. Right.
18   Q. Which says: (as read)
19       "The recruiting company shall
20       ensure that the au pairs understand
21       that the au pair program is a
22       cultural exchange and that Expert
23       AuPair is the sponsor as designated
24       by Department of State. Au pairs
25       are to be fully informed of the

---

Page 93

1        program rules and guidelines."
2    So how does Expert AuPair ensure that
3    recruiting companies fully inform au pairs of
4    program rules and guidelines prior to arriving in
5    the United States?
6    A. And I don't see the words "prior to
7    arriving in the United States" there. But once more
8    we, we have this -- well, this is a new point. I
9    mean, we have this in the contract so that we can
10   end the contract if things are not being done
11   properly. We first make sure they've signed two
12   agreements, and then we do talk to them in training.
13   And if there's a problem, we will find out.
14   Q. Section 8.1 states that: (as read)
15       "The recruiting company will
16       inform Expert AuPair of any
17       significant controversy that comes
18       to their attention that arises
19       between a host family and an au
20       pair."
21   How would the recruiting company come to
22   know of a controversy between the au pair and a host
23   family?
24   --- REPORTER'S NOTE: Phone ringing
25       MS. SMALLS: Are you still there on the

---

MAGNA ▶
LEGAL SERVICES

Highly Confidential - Attorney's Eyes Only

| Page 94 | Page 96 |
|---|---|
| 1    phone? | 1    "[Recruiting company] may |
| 2    MS. KRUZER:  Yes, we're still here. | 2    collect fees up to the equivalent |
| 3    MS. WEST:  Yes. | 3    of [X] from placed Au Pairs |
| 4    MR. FULFREE:  Yes. | 4    participating in the program." |
| 5    BY MS. SMALLS: | 5    So I am asking you about the practice of |
| 6    Q.  It's okay. | 6  obtaining monies from au pairs applying to the |
| 7    A.  This is, this is here, it is not | 7  program.  And what is the practice for obtaining, |
| 8  common for us to hear from a recruiting agency that | 8  obtaining fees or monies from au pairs that are |
| 9  was a problem.  But if they find out, we need to | 9  applying to the program as referenced in this |
| 10  know.  That's why that line is there. | 10  agreement? |
| 11    Q.  Does the recruiting company have a | 11    MR. ENICA:  I would object to form, so if |
| 12  role once the au pair arrives in the United States? | 12    you have an understanding you may answer. |
| 13    A.  I do not believe they do.  However, | 13    (Query by reporter) |
| 14  if I may give an example, we had an au pair who was | 14    If you understood the question, you |
| 15  sent to hospital; if you want, she was "Baker | 15    may go ahead and answer. |
| 16  Acted."  I don't know if that's a way... if that's a | 16    A.  I'll answer it as I understood it, if |
| 17  way we can express it.  She was committed to | 17  that's okay. |
| 18  hospital because she was looking -- she was | 18    BY MS. SMALLS: |
| 19  suicidal.  We flew her to Helsinki.  I had the | 19    Q.  Well, if you didn't understand it, |
| 20  Estonian rep cross the Baltic to take her back to | 20  let me rephrase. |
| 21  Tallinn. | 21    A.  Okay.  Let's rephrase. |
| 22    So there is sometimes a role, but it's | 22    Q.  So let me... |
| 23  extreme. | 23  Do recruiting agencies obtain fees from au |
| 24    Q.  If we can go back to section 6 -- | 24  pair applicants? |
| 25    A.  Yeah. | 25    A.  I think this document there is |

| Page 95 | Page 97 |
|---|---|
| 1    Q.  -- of this document.  This section | 1  self-evident, so yes. |
| 2  relates to compensation of four activities.  It | 2    Q.  Okay.  Do you know what the fees paid |
| 3  states that au pair candidates will not pay any fees | 3  to recruiting companies are? |
| 4  to Expert AuPair, but states that the recruiting | 4    A.  Yes.  We have a maximum which varies |
| 5  agency may collect fees up to, and that section is | 5  by country.  So I would say we always ask to know, |
| 6  blank. | 6  because we have heard of agencies trying to charge a |
| 7    Is it common practice for recruiting | 7  lot of money and we don't think that's right. |
| 8  companies to receive or obtain fees from au pairs | 8    Q.  What is the maximum fee collected by |
| 9  applying to participate in the program? | 9  a recruiting company? |
| 10    A.  And when you say "common practice," | 10    A.  I believe it is $1200. |
| 11  you're talking about our common practice rather than | 11    Q.  And is it $1200 for au pairs applying |
| 12  other agencies, because obviously I have no | 12  to the program or only au pairs that receive |
| 13  knowledge of other agencies. | 13  placement in the program? |
| 14    Q.  And let me clarify. | 14    A.  We have said that recruiting agencies |
| 15    A.  Yeah.  Yeah. | 15  can charge something, but not as much as 1200 for a |
| 16    Q.  So in this provision, and I'm | 16  failed application, if you'd like.  When I say |
| 17  specifically talking about in the context of this | 17  "failed application," I mean, you know, again, not |
| 18  agreement... | 18  everybody who applies is going to be placed. |
| 19    A.  Mm-hm. | 19    Q.  Do you dictate that, the amount that |
| 20    Q.  Which is between Expert AuPair and | 20  can be charged by recruiting companies? |
| 21  international representation and interviewer.  So | 21    A.  This is here so that we can make sure |
| 22  "XXX," we've agreed, we'll refer to as "recruiting | 22  it is understood. |
| 23  company." | 23    Q.  So the fees that the recruiting |
| 24    A.  Mm-hm. | 24  companies are allowed to charge is discussed and |
| 25    Q.  And it says:  (as read) | 25  negotiated beforehand? |

PLAINTIFFS' RESP. APP.0005385

MAGNA
LEGAL SERVICES

Highly Confidential - Attorney's Eyes Only

Page 98

1    A.  Yes.
2    Q.  Before this agreement is signed?
3    A.  Yeah.  And just to be clear, that's
4  current practice.  Whether it was the practice six
5  years ago, I couldn't... I couldn't tell you when
6  this -- like, I mean we know this contract is from
7  2014.  I can't tell you what the contract said
8  before, but, yes, it's always been a primary concern
9  of ours, do we want to make sure au pairs are not
10  paying astronomical amounts.
11    Q.  So, irregardless of an agreement,
12  prior to the introduction of this agreement in 2014
13  or 2014, what was the practice prior to that?
14    A.  Whether it was written down, I can't
15  tell you.  But it was always discussed.
16    Q.  And is it correct that none of -- the
17  au pairs do not pay any fees directly to Expert
18  AuPair?
19    A.  Au pairs who apply independently do
20  pay us a fee.
21    Q.  And what is that amount?
22    A.  That depends where they're from.  It
23  is $500.  There is a pre-match discount for those
24  who pre-match, as I was discussing earlier.
25        And we also offer -- we also -- we don't

Page 99

1  offer, we also charge an airfare supplement, which
2  is an international supplement.  And the purpose of
3  that is to make sure that the families pay the same
4  price no matter where their au pair is from.  So if
5  the flight is in general more expensive, the au pair
6  will pay some of that fee.
7    Q.  Are any monies exchanged between the
8  recruiting company and the Expert AuPair?
9    A.  In some cases they have been in the
10  past, and Christian Au Pair is, I believe, one of
11  those that is, probably the only one, that is still
12  charging us fees.
13    Q.  And is that --
14    A.  Sorry, charging us rather than --
15  yeah.
16    Q.  Finish.
17    A.  Yeah.
18    Q.  Okay.  And is that fee arrangement
19  in, provided for in this agreement or is that
20  provided in another agreement?
21    A.  It does not appear to be in this
22  agreement.
23    Q.  Okay.  Did you reach a separate
24  agreement with Christian Au Pair regarding
25  compensation they would receive for au pairs that

Page 100

1  they referred to you?
2    A.  I -- it would be...  It would exist,
3  yes.
4    Q.  Okay.  Do you know if that agreement
5  has been produced?
6    A.  I do not.
7    Q.  Okay.  Do you charge recruiting
8  agencies any monies for, in consideration for this
9  contract?
10    A.  We do not charge any fees to any
11  existing partner.
12    Q.  Did you do so in the past?
13    A.  We've done so once.
14    Q.  And what was that partner?
15    A.  They were called Beloved Thai Au
16  Pair.
17    Q.  Okay.  And what was the financial
18  relationship with Beloved Thai Au Pair?
19    A.  I do not recall all the details.
20  However, they did pay a fee of $2,000 to us.
21    Q.  A one-time fee or an ongoing fee?
22    A.  I recall it was an annual fee.
23  However, the -- it was not renewed.  So they paid
24  once.  Again, the reason why they did so is the
25  oversupply of Thai au pairs.

Page 101

1        THE REPORTER:  Exhibit 7.
2  EXHIBIT 7 marked for identification:  Depreciation
3        and Amortization, IRS Form 4562, Bates
4        ExpertAuPair038114-118
5  BY MS. SMALLS:
6    Q.  I'll give you a moment to review it.
7  For those on the phone, we are looking at Expert
8  AuPair 38114.
9        Dr. Gaulter, do you recognize this
10  document?
11    A.  It looks, it looks familiar.
12    Q.  What is it?
13    A.  It is part of our 2015 tax return.
14    Q.  Okay.  Sorry, somebody knocking on
15  the door.
16        So these -- this document was submitted to
17  Plaintiffs as a statements in support of financial
18  statements --
19    A.  Mm-hm.
20    Q.  -- for Expert AuPair.  At the top it
21  says:  "Depreciation and Amortization."
22        Can you tell me what the information here,
23  specifically in section 19a, represents?
24    A.  My understanding is that this is,
25  this details how much property we, and by that I

PLAINTIFFS' RESP. APP.0005386

MAGNA
LEGAL SERVICES

Highly Confidential - Attorney's Eyes Only

Page 102

1    mean Expert AuPair, actually owns.  So that would
2    include -- I think I'd be speculating a little here
3    but I believe five-year property is things like
4    computers and seven-year would be things like
5    furniture.
6        Q.  Okay.  And then in section -- in
7    Schedule D, I think it's the third page, under
8    Part~I, can you tell me what 1a or what the number
9    here in Part I indicates?
10       A.  Yes, I believe I can.  The company
11   owned -- we had an investment account with Merrill
12   Lynch, who were referred to us by Bank of America; I
13   think they're all the same.  And as I recall, that
14   was the the, the gain in 2015, and it was -- this -- I
15   believe there's something strange about this in that
16   the gains are measured by Merrill Lynch in a
17   different way than one which is intuitive.
18       So if I -- if you have shares, I believe
19   they look at the gain at the end of the year and
20   it's -- and it may not exist because dividends and
21   things.  And it's -- that would have been based on a
22   form that I received from Merrill Lynch.
23       Q.  Okay.
24       A.  Would be my short answer.
25       Q.  Thank you.  And then if we can just

Page 103

1    move to the second-to-last page.
2        A.  Mm-hm.
3        Q.  "Information on Certain Persons
4    Owning the Corporation's Voting Stock"?
5        A.  Yeah.
6        Q.  And what, Part II, what that
7    indicates?
8        A.  Okay.  So that says that I own a
9    hundred percent of the stock.  It identifies me as
10   American because I'm both nationalities.  And
11   that's, I think, the full answer.
12       Q.  Okay.  And then if we can go to the
13   last page, which is titled: "Compensation of
14   officers".  Can you tell me what that indicates?
15       A.  It shows that I'm the only officer.
16   It shows a social security number.  It shows the
17   percentage of time I devoted to the business in
18   2015.  And it shows the percentage of stock, which
19   is a repeat of the previous page.  There's no
20   preferred stock it shows.  And it shows compensation
21   of $276,720.89.
22       Q.  Okay.  Thank you.
23       Just while we're pulling that, do you have
24   an au pair handbook that you give au pairs when they
25   arrive?

Page 104

1        A.  We have a departure packet, which I
2    think is probably the thing you're describing.
3        Q.  Okay.  Do you know if that's been
4    produced?
5        A.  I recall some of it -- I recall
6    actually it was very early in production, and there
7    were some things in the social security letter that
8    we erased by, redacted by, hand.  So, yes.
9        Q.  So what you're calling --
10       A.  The departure packet would have
11   been -- oh, sorry.
12       Q.  Your Expert AuPairs version of an au
13   pair handbook is called the departure packet; is
14   that correct?
15           MR. ENICA:  Object to form.  You can
16           answer.
17       A.  I -- it's the closest I think we
18   could...  To the extent you want to know about a
19   handbook, probably the material would be contained
20   in that departure packet.
21   BY MS. SMALLS:
22       Q.  And when does the au pair receive
23   that handbook?
24       A.  During the training week.
25       Q.  So once they arrive in the United

Page 105

1    States?
2        A.  Yes.
3        Q.  Even though it's called a "departure"
4    handbook?
5        A.  It's called the departure handbook
6    because it's the departure from training.
7        Q.  Okay.  Do you have a host family
8    handbook?
9        A.  Yes.  Although, again, whether it's
10   called "handbook" or "guidelines," I wouldn't like
11   to say.
12       Q.  Okay.  Do you know if that's been
13   produced?
14       A.  I do not.
15           MS. SMALLS:  Okay.  I'm going to ask that
16           we take a short break.
17           THE VIDEOGRAPHER:  This is the
18           videographer on May the 9th, 2017, at
19           approximately 12:12 p.m.  We are now going
20           off the record.
21   --- Upon recessing at 12:12 p.m.
22   --- Upon resuming at 12:25 p.m.
23           THE VIDEOGRAPHER:  This is the
24           videographer on May the 9th, 2017, at
25           approximately 12:26 p.m.  We are now back

PLAINTIFFS' RESP. APP.0005387

MAGNA
LEGAL SERVICES

Highly Confidential - Attorney's Eyes Only

Page 106

```
 1        on the record.
 2        BY MS. SMALLS:
 3        Q.  Okay.  Dr. Gaulter, you indicated
 4   before we went back on the record that you wanted to
 5   supplement one of your prior responses, please.
 6        A.  Yes.  That's right.  We -- I can
 7   confirm that we did, we did disclose, or submit,
 8   whatever the word is, a family handbook.  I'm not
 9   sure precisely what name it was.  However, I do know
10   that it was submitted in discovery.
11        Q.  Okay.  Did you realize that on your
12   own or after discussion with counsel?
13        A.  I'll -- counsel did remind me.
14        Q.  Okay.  Thank you.
15        A.  Yeah.
16        Q.  So we were discussing your -- the
17   2015 Depreciation and Amortization form, in which
18   you indicated that your compensation for 2015 was
19   $276,720.89; is that correct?
20        MR. ENICA:  Objection to form.
21        A.  I -- you're reading it, so let me --
22   yeah.
23        BY MS. SMALLS:
24        Q.  Let's strike that.
25        A.  Yeah.
```

Page 107

```
 1        Q.  Let's turn to the last page of the
 2   2015 form, titled:  "Depreciation and Amortization."
 3        Can you again indicate what is indicated
 4   there under "Amount of compensation"?
 5        A.  Yeah.  So the amount of compensation,
 6   it says, is $276,720.89.
 7        Q.  Can you tell me how you determined
 8   what your compensation is year by year?
 9        A.  I -- there are two aspects.  There's
10   whatever the compensation is, and a bonus at -- I
11   couldn't tell you exactly when that would have been
12   in 2015, but very likely in December.
13        Q.  Okay.  My question was:  How do you
14   determine what you are compensated year by year?
15        A.  I look at other similarly sized
16   entities, and I look at what, what in theory I could
17   get on the open market.
18        Q.  Is it based on how many au pairs you
19   place?
20        A.  I would not characterize it as the
21   number of au pairs.  However, the size of the
22   company clearly is larger than it was in 2006 or
23   2007, and therefore a higher compensation is
24   merited.
25        Q.  So the compensation, your
```

Page 108

```
 1   compensation, is determined by the size of the
 2   company in any given year; is that correct?
 3        A.  As the company has grown, I feel that
 4   it's more appropriate -- when we started, I want to
 5   emphasize I wasn't full-time.  So, as I became
 6   full-time and as the stress of the position
 7   increased, it was, I believe, reasonable to, to see
 8   a higher rate of return than the $1 a year I was
 9   earning in 2006, 2007.
10        Q.  Do you determine your own
11   compensation?
12        A.  In my role as... it's the job of the
13   board of directors to do that.  But obviously, yes,
14   there's a, there's a say in that.
15        Q.  Okay.  Who serves on your board of
16   directors?
17        A.  Me.  And, and -- yes, me.
18        Q.  Do you have any other members of the
19   board of directors?
20        A.  Not in the United States.  The
21   Canadian entity has three.
22        Q.  But for the American entity, are
23   there any other members of the board of directors?
24        A.  No.
25        Q.  Okay.  Is there anyone else that has
```

Page 109

```
 1   a say in what you are compensated year to year other
 2   than yourself?
 3        A.  Not... not that I can... no.
 4        Q.  Okay.  For -- is your compensation
 5   based on the profits of the company in a given year?
 6        A.  Again, it's related in a sense
 7   because the -- there was no way, five, six years
 8   ago, that we could have afforded an external CEO.
 9   And therefore, analogously, I was earning, I was
10   earning less.
11        Q.  If the profits of the company
12   increase, does your compensation also increase?
13        MR. ENICA:  Objection to the form.
14        A.  I -- there's no direct correlation.
15   I would say that if we weren't -- and with respect,
16   spending a lot of money on attorneys at the moment,
17   I would expect the extra money to be reinvested or
18   invested in other ventures, other ventures such as
19   Canada, which we haven't been able to properly fund,
20   or Australia.
21        Q.  Do you know what you were compensated
22   in 2014?
23        A.  I don't know.  I would expect it was
24   a little bit lower than that.
25        Q.  Do you know what you were compensated
```

Highly Confidential - Attorney's Eyes Only

Page 110

1   in 2013?
2        A.  Again I struggle to remember.
3   EXHIBIT 8 marked for identification:  U.S.
4        Corporation Income Tax Return, IRS
5        Form 1120, Bates
6        ExpertAuPair038119-126
7   THE REPORTER:  Exhibit 8.
8   BY MS. SMALLS:
9        Q.  Okay.  If you can turn to the last
10  page.  Well, let me ask you, does this document look
11  familiar to you?
12       A.  It's credible that, again, this is a
13  tax return.  And it appears on its face to be from
14  2013.
15       Q.  Okay.  Can you turn to the last page?
16       A.  Yes.
17       Q.  And under "Compensation of officers",
18  tell us what, what that says?
19       A.  Okay.  Mark J. Gaulter, social
20  security number, a hundred percent of time, a
21  hundred percent of stock owned, again, common.  Zero
22  preferred.  197, so $197,391.75.
23       Q.  So is it correct that in two years,
24  your compensation went up by $80,000, from 2013 to
25  2015?

Page 111

1        A.  It's not quite $80,000 but almost.
2        Q.  Do you want to give me an exact
3   number?
4        A.  No, I think we can, we can say it's
5   between 79- and 80,000.
6        Q.  Okay.  So is it correct that your
7   compensation went up by nearly $80,000 in the two
8   years from 2013 to 2015?
9        A.  Yes, that's fair.
10       Q.  And what was the basis of that
11  increase?
12       A.  Again, it would come down to the size
13  and complexity of the tasks.  I believe our...
14  Well, it's -- you know, it's a much more complex
15  business than it was.
16  THE REPORTER:  Exhibit 9.
17  EXHIBIT 9 marked for identification:  Defendant
18       Expert AuPair's Answers to Plaintiffs'
19       Second Set of Interrogatories with
20       attachments (8 pp.)
21  BY MS. SMALLS:
22       Q.  Are you familiar with this document?
23       A.  I believe I've seen it.
24       Q.  Well, let me give you a moment to
25  review it.

Page 112

1        A.  Yeah.  If I could.
2        (witness perusing document)
3   MS. SMALLS:  For those on the phone, this
4   document doesn't have a Bates number but
5   it's Expert AuPairs' Answers to
6   Plaintiffs' Second Set of Interrogatories
7   that I'm referring to.
8        Q.  If I can, I'm going to refer you to
9   page 3 of this document.
10       A.  Mm-hm.
11       Q.  Can you tell me the number of au
12  pairs that you sponsored in 2013?
13       A.  152.
14       Q.  And can you tell me the number of au
15  pairs that you sponsored in 2015?
16       A.  174.
17       Q.  Is it accurate to say that's a
18  difference of 24 au pairs?
19       A.  Well, 22.
20       Q.  22 au pairs?
21       A.  And it's also essential to note that
22  this is based on the number of DS-2019 forms issued.
23  And because of the ability of au pairs to extend,
24  that, the actual number in-country, may have been
25  different.

Page 113

1        Q.  Would it have been substantially
2   different than these numbers?
3        A.  It would because --
4        (Query by reporter)
5        Q.  Would it be substantially different
6   than these numbers?
7        A.  It would, because one would expect
8   about 30 percent of au pairs to extend, maybe 40.
9        And therefore, if you look at the -- if
10  you multiply 30 percent, even if it's at the low
11  end, by 114, you're going to have a lot fewer au
12  pairs in 2013 than in 2015.
13       Q.  But the 30 percent figure that you
14  just offered would apply to au pairs in 2013 and
15  2015, correct?
16       A.  Yes, it would.  But you have to look
17  at the number who arrived in 2012 and compare that
18  with 2014 to look at the growth.
19       So, on their face, the picture is
20  increased by 22.  In reality, because of that
21  extension issue, there's another, there's probably
22  another 15 to 20 on top of that.
23       Q.  Okay.
24       A.  And measured as a percentage, that's
25  quite high.

Highly Confidential - Attorney's Eyes Only

| Page 114 |
| --- |

1     Q. So would you be comfortable with an
2 estimate of 40 au pairs as an increase between 2013
3 to 2015, including new au pairs and au pairs that
4 were extending a year, based on your rough estimate
5 that 30 percent of au pairs extend a year?
6     A. Just give me a second, if you could.
7     Q. Sure.
8     A. 40 is a number I could be vaguely
9 comfortable with. But obviously this is without
10 having gone back and checked. But 40 is about
11 right.
12     Q. Is the number of extensions a number
13 that you maintain year by year?
14     MR. ENICA: Object to form. You may
15     answer if you understood.
16     A. It's not a number that we maintain in
17 the normal course of business. What we do is, I
18 have in the past looked at my e-mail account. Each
19 time we extend an au pair, we get a notice from the
20 Department of State. So therefore in Gmail I can
21 Google it and find out and just count manually.
22     Now, these numbers are slightly inaccurate
23 because some au pairs decide to extend but then
24 don't, so they've asked us to fill in the form and
25 then decide that they want to go home. Others might

| Page 115 |
| --- |

1 change status.
2     So I would not -- when I say "30 percent,"
3 that's my best, you know, estimate based on, on
4 what's -- that's my best estimate based on what I've
5 seen historically. So I would say that it tends
6 to be slightly cyclic; or it tends to vary, the 30
7 percent sometimes is 35, sometimes it's 25.
8     So I don't think you can project from this
9 the exact numbers in-country in any given year.
10     BY MS. SMALLS:
11     Q. This interrogatory asked for the
12 number of au pairs sponsored each year by Expert.
13 Is that correct?
14     MR. ENICA: I would have to object to the
15     form of the question, but you may answer
16     if you know.
17     BY MS. SMALLS:
18     Q. Well, strike that. Strike that. I'm
19 going to read what it says. (as read)
20         "Based on the number of DS-2019
21         forms issued, the number of au
22         pairs sponsored each year by Expert
23         AuPair is as follows:"
24     So, if I'm understanding you correctly,
25 these numbers are limited to the number of DS-2019

| Page 116 |
| --- |

1 forms issued and that there are other au pairs
2 in-country that would not be encompassed by the
3 DS-2019 forms. Is that correct?
4     A. That is correct. And again, to be
5 clear, this is, this includes all au pairs who enter
6 the United States. It may not include people who
7 left after two weeks.
8     Q. Right?
9     A. Sorry. Oh -- sorry. It does include
10 people who left after two weeks. It's the date of
11 entry into the United States. So if they arrive on
12 January the 1st of, let's say, 2014, they would be
13 in the 163 number. If they extended, they would not
14 be included in this number even though they were
15 present at some point during that year.
16     Q. Is there a better count or accounting
17 that you have or are in possession of, of the number
18 of au pairs sponsored by Expert AuPair other than
19 what is provided here in this interrogatory?
20     A. A better answer does not, does not
21 exist to the best of my knowledge. What we're doing
22 here is we're using SEVIS, right? So this is a
23 government database. We know for a fact that these
24 figures are entirely accurate for what they are --
25 for exactly the reason or exactly the measure I've

| Page 117 |
| --- |

1 given you.
2     Now, SEVIS is, you know, that's been
3 around since 2002. I've used it elsewhere as well
4 as Expert AuPair, and I think it was introduced
5 rapidly as a result of the Patriot Act, but it is,
6 as far as we are concerned, entirely reliable.
7     So an au pair cannot enter without us
8 issuing a form. And once we issue the form and we
9 activate them, they would be on these -- on this
10 list.
11     Q. Okay. So I want to go back to my
12 initial question. So from 2013 to 2015, there is an
13 increase of 22 au pairs that entered the company --
14 country and an additional number, a smaller number,
15 of au pairs, that extended their stay in the United
16 States for an additional year. Is that correct?
17     A. Again, I expect that you'll find 40,
18 about 40 more au pairs, which is an increase of
19 about 20 to 25 percent.
20     Q. An increase of 40?
21     A. Au pairs, which is an increase of
22 approximately, in the number of au pairs, 20 to 25
23 percent.
24     Q. And in your number of 40, you're
25 including new au pairs?

30 (Pages 114 to 117)

PLAINTIFFS' RESP. APP.0005390

MAGNA ▶
LEGAL SERVICES

Highly Confidential - Attorney's Eyes Only

Page 118

1    A.  I'm counting the new and I'm counting
2  the extensions.
3    Q.  Okay.  So for an increase of
4  approximately, understanding all these variables
5  that we've just discussed --
6    A.  Mm-hm.
7    Q.  -- an increase of 40 au pairs, your
8  compensation increased nearly $80,000 from 2013 to
9  2015?
10    MR. ENICA:  Object to the form.
11  BY MS. SMALLS:
12    Q.  Is that correct?
13    A.  It was not related to the actual
14  increase in numbers, it was related to the
15  complexity of the role.
16    Q.  Okay.  What --
17    A.  More travel, more -- sorry.  Go
18  ahead.
19    Q.  Well, I was just going to ask you,
20  what did you mean when you said the increase in
21  compensation was really related to the change in
22  complexity of the role?
23    A.  I think as companies like ours grow,
24  there is -- there are things that you do more of,
25  that consume more of your time.  Travel I've already

Page 119

1  mentioned, meetings, dealing with banks, dealing
2  with insurance companies, all these things take,
3  they take, they take a lot of work.
4    Q.  Okay.  I think we can break for
5  lunch.
6    THE VIDEOGRAPHER:  This is the
7    videographer on May the 9th, 2017, at
8    approximately 12:48 p.m.  We are now going
9    off the record.
10  --- Luncheon taken at 12:48 p.m.
11  --- Upon resuming at 1:27 p.m.
12    THE VIDEOGRAPHER:  This is the
13    videographer on May the 9th, 2017, at
14    approximately 1:28 p.m.  We are now back
15    on the record.
16    MS. SMALLS:  Great, thank you.
17    Q.  I want to ask you whether Expert
18  AuPair has entered into any agreements or
19  partnerships with other sponsor agencies.
20    A.  Other designated United States
21  sponsors.
22    Q.  That's correct.
23    A.  Is that what you mean?  Yes.
24    We have -- we have not, however, I want to
25  make sure my answer is very clear.  Before we were

Page 120

1  desig--- sorry, before Great Au Pair was designated,
2  they had a website which I believe -- well, we paid
3  for certain advertising on that website.  And we
4  paid to a company called InteliMark who are -- in
5  some sense, they were acting using the Web address
6  GreatAuPair.com but they were not designated.  And I
7  wouldn't know the relationship between InteliMark
8  and Great Au Pair.
9    In addition, before, before they were
10  designated, there was -- we had some matches which
11  were introduced as pre-matches from ProAuPair.
12    (Query by reporter)
13    ProAuPair.  And, but again, I think it's
14  important to note that neither of those entities was
15  designated at the time of any, any relationship.
16    Q.  So at the time of the relationship,
17  you were both -- both of the contracting entities
18  were not -- strike that.
19    With respect to the agreement with Great
20  Au Pair, or the arrangement with Great Au Pair,
21  during the time of that arrangement, was Great Au
22  Pair a designated sponsor?
23    A.  I recall that Great Au Pair were
24  designated, and then we had an e-mail either from
25  Great Au Pair or InteliMark, at about the same time,

Page 121

1  saying that the sponsorship program, because, again,
2  we were advertising on our site, so the
3  advertising relationship and that sort of -- that
4  relationship would not continue, I believe, past the
5  end of the month.  But -- it may not have been
6  exactly at the same time, but it was certainly, they
7  ended their program at almost exactly the same time
8  that they were designated.
9    Q.  And the primary substance of that
10  arrangement with Great Au Pair was to advertise for
11  Expert AuPair on their website?
12    A.  Yes.
13    MR. ENICA:  Object to form.  Sorry.
14    That's right.  I object to form, and now
15    you answer.
16    A.  Yes, but with the qualification that
17  I do not know if Great Au Pair are the same
18  organization as InteliMark, because I believe that
19  in their current format they use the address
20  GreatAuPairUSA.com.  And I believe Great Au Pair
21  is -- has a different site, but I could not tell you
22  the legal ownership or anything of that, of that
23  sponsor.
24    BY MS. SMALLS:
25    Q.  Okay.  Thank you.

MAGNA ▶
LEGAL SERVICES

Highly Confidential – Attorney's Eyes Only

Page 122

1    And you also mentioned that you had an
2  agreement or an arrangement with ProAuPair; is that
3  correct?
4       A.  Yes.  I do not believe that we ever
5  had a signed agreement.  And therefore I would be --
6  I don't believe it's in the -- in any disclosure.
7  But again, they applied for designation and that was
8  the end of our relationship.
9       Q.  So your relationship, the period of
10 your relationship was only before ProAuPair was
11 designated a sponsor?
12      A.  Yes.
13      Q.  Is that correct?
14      MR. ENICA:  I object to form.  You may
15      answer.
16      A.  But the date of designation, we don't
17 get e-mails from the Department of State saying:  A
18 new sponsor has been designated.  However, it's my
19 complete belief that that relationship was not --
20 was over before designation.
21      BY MS. SMALLS:
22      Q.  And what in your recollection or
23 understanding, what was ProAuPair prior to its
24 designation as a sponsor from the United States
25 Department of State?

Page 123

1       A.  They were a company.  They were not
2  designated so -- they were a company.  I mean, I
3  don't quite know where you're going.  What you're
4  looking for.
5       Q.  For ProAuPair prior to its
6  designation as an official sponsor designated by the
7  Department of State, would they have been competing
8  with you as -- in your role as a sponsor that was
9  designated by the Department of State?
10      A.  I don't see that they would have
11 done, no.  I'm trying to think, and I -- I don't
12 know believe so, no.
13      Q.  Well, let me ask the question:  How
14 did the arrangement with ProAuPair come about?
15      A.  I recall, and this was 2008 or 2009,
16 I recall one of the -- we placed an au pair in
17 California, and then we started talking to Susan
18 Asay, who was the -- and again, I don't want to
19 mischaracterize her position, but I would imagine
20 you would call her a principal of, of ProAuPair.
21      And so we spoke, and it became... She had
22 an interest in placing au pairs from Germany and, I
23 believe, Hungary at the time and was very focussed
24 on candidates who maybe had more either
25 qualifications or, or, or experience working, I

Page 124

1  believe, with special-needs children.  Actually, I
2  think it was one, one of their major niche markets.
3       Q.  You mentioned that you came into
4  contact with Susan Asay because you placed an au
5  pair in California.  How did that come about?
6       A.  It's hard for me to respond
7  accurately because it was so long ago.  I believe
8  that she contacted us because her au pair wanted --
9  she wanted to hire an au pair.  And I think that is
10 what happened, and then she spoke to me, and that
11 was how it started.
12      Q.  When you say that she wanted to hire
13 an au pair --
14      A.  Right.
15      Q.  -- you mean for herself?
16      A.  For her own family, yes.
17      Q.  Okay.  And at that point, based on
18 your understanding, ProAuPair was not engaged in
19 sponsoring au pairs?
20      A.  ProAuPair was not a designated
21 sponsor organization and may not have existed, even.
22 I cannot tell you when it was founded.
23      THE REPORTER:  Exhibit 10.
24 EXHIBIT 10 marked for identification:  Agreement,
25      Bates ExpertAuPair026398-400

Page 125

1       BY MS. SMALLS:
2       Q.  Can you take a moment to review this
3  document?
4       (witness perusing document)
5  Okay.  Can you tell me what this is?
6       A.  It is my recollection that this was a
7  proposed agreement between ourselves and ProAuPair.
8  I do not believe it was ever signed.
9       Q.  Okay.  Do you know who drafted it?
10      A.  I would imagine it was -- it looks
11 like I did.
12      Q.  Okay.  Can you read item number 13
13 out loud?
14      A.  (as read):
15           "There are situations in which
16      PA" -- so that's ProAuPair -- "and
17      EAP may compete.  PA and EAP
18      recognize they are competitors."
19      Q.  Okay.  Can you explain how -- strike
20 that.
21      You previously mentioned that you are a
22 member of the Alliance?
23      A.  Yes.
24      Q.  When did you become a member of the
25 Alliance?

Highly Confidential - Attorney's Eyes Only

Page 126

1    A.  I believe 2011 or 2012.
2    Q.  And why did you join?
3    A.  I think, I think we were invited to
4  join.  And I saw some benefits to joining.
5    Q.  What sort of benefits?
6    A.  I think... knowing -- I think there's
7  some advantage to having some liaison with people,
8  with au pairs to -- you know, that the natural
9  reaction is to join an industry group.  I mean, just
10  that's, that's a normal thing that business do.
11    Q.  And you mentioned specific benefits
12  that you foresaw by joining the Alliance.  What
13  would be some of those benefits?
14    A.  Conferences.  Things like that.
15    Q.  When you joined the Alliance in
16  2011 --
17    A.  Or '12, yeah.
18    Q.  -- or 2012, did you begin attending
19  Alliance meetings on a regular basis?
20    A.  I wouldn't necessarily use the word
21  "regular basis" but to give you an indication, I
22  believe I've been to less than ten total meetings,
23  and probably only about five or six.
24    Q.  At less than ten but more accurately,
25  you think?

Page 127

1    A.  Probably five or six.
2    Q.  Probably five or six.
3    A.  Right.
4    Q.  Okay.  And how often are the meetings
5  held?
6    A.  There is an annual meeting which I
7  believe is always in October.  I have not been to
8  them all.  There are -- there have in the past been
9  occasional meetings when people are in D.C. to meet
10  the State Department.  So it's a convenient way, you
11  know, for people to gather because they're all in
12  the same city.
13    Q.  And at the Alliance meetings, do you
14  convene with other sponsors?
15    MR. ENICA:  Object to form.  Please
16  answer.
17    A.  Other sponsors not just of the au
18  pair program but other J-1 exchange programs.
19    BY MS. SMALLS:
20    Q.  And you mentioned that there are
21  often State Department meetings that are close in
22  time to the Alliance meetings.
23    Have you attended those State Department
24  meetings as well?
25    A.  Yes.  And I would object slightly to

Page 128

1  the word "often."  I don't believe that there have
2  been that many meetings in the State Department.  I
3  would again characterize it as maybe five, that I've
4  been to.
5    Q.  And at those five or six meetings
6  hosted or in which the State Department gave a
7  presentation, what were the topics?
8    A.  A common topic was the, the
9  educational component.  And I believe the Department
10  was looking at making changes there.
11    Q.  Was the stipend ever discussed?
12    A.  There was, in the State Department,
13  there was a presentation which I left the room for
14  because I thought it was inappropriate.
15    Q.  What was that meeting?
16    A.  That was -- I couldn't tell you the
17  date of that meeting.  But there was a meeting when
18  the -- there was a presentation that was about the
19  stipend as part of that meeting.  And that was not
20  something, out of due respect for the judicial
21  process, that I was willing to stay for.
22    Q.  Who was giving the presentation?
23    A.  I couldn't tell you a name.
24    Q.  Okay.  Do you have a general time
25  frame in terms of year that that --

Page 129

1    A.  I put it as 2015, maybe.
2    Q.  Okay.  Was it before or after the
3  lawsuit was filed?
4    A.  That would have been after.
5    Q.  Okay.
6    A.  And again, that was my reason for
7  leaving.
8    Q.  And so, at the presentation the
9  stipend was discussed, and that was your reason for
10  leaving?
11    MR. ENICA:  Object to form.
12    MS. SMALLS:  Well, strike that.
13    Q.  You said that the stipend was
14  discussed at this meeting.  What was specifically
15  being discussed with respect to the stipend?
16    A.  I was not there.  So I can't tell
17  you.  What I can tell you is that I thought that
18  the -- that the conversation was inappropriate.
19    Q.  Okay.  Well, what did you hear that
20  lead you to believe that the discussion of the
21  stipend was inappropriate?
22    A.  This was based on my, my reading of
23  the Complaint.
24    Q.  Did you attend the meeting and then
25  walk out?

PLAINTIFFS' RESP. APP.0005393

MAGNA
LEGAL SERVICES

Highly Confidential - Attorney's Eyes Only

Page 130

1    A.  Yes, I did.  But -- oh, sorry.
2  Sorry.
3    Q.  Go ahead.  Go ahead.
4    A.  But that's not to say I attended
5  the -- the meeting had different topics.
6    Q.  Okay.  You attended a meeting, and
7  then someone said something that lead you to walk
8  out; is that correct?
9    A.  Yes.  And I, I left for the duration
10  of the conversation about the stipend.
11    Q.  Right.  So what I am asking you is,
12  what was said that lead you to believe that the
13  topic or the presentation was inappropriate and that
14  lead you to walk out?
15    A.  I don't.  I know that was -- that
16  that section of the meeting said, I know it said
17  something like stipend or Department of --
18  something.  Something.  There was something on the
19  agenda.  And I just think that the presence of all
20  the sponsors wasn't appropriate.
21    Q.  Has the stipend ever been discussed
22  before at an Alliance meeting?
23    A.  I want to clarify that this is not
24  the Alliance meeting, this is a Department of State
25  meeting which was open to sponsors whether they were

Page 131

1  members of the Alliance or not.
2    Q.  Okay.  Thank you for that
3  clarification.
4    A.  I will say that I have never seen the
5  stipend discussed at an Alliance meeting.
6    Q.  Has the stipend ever been discussed
7  at a State Department meeting that you have
8  attended?
9    A.  Again, I -- well, as described, it
10  was clear that this was about, about the minimum
11  stipend.  And so I was not there.
12    I don't believe I have attended any
13  meeting, either at the Alliance or at the Department
14  of State, and remained there while the stipend was,
15  the minimum stipend was, under any discussion.
16    Q.  So I just want to make sure I
17  understand your answer.
18    A.  Mm.  Yes.
19    Q.  I'm just going to ask, rather than me
20  trying to rephrase what I understand your answer to
21  be.
22    Prior to 2015, or the filing of this
23  Complaint, have there been any State Department
24  briefings or conversations in which the minimum
25  stipend has been discussed?

Page 132

1    A.  My strong impression is that that was
2  the discussion that I left the room for.  And I
3  recall one occasion.
4    Q.  So --
5    A.  So --
6    Q.  In your recollection, other than the
7  discussion that you walked out on...
8    A.  Mm-hm.
9    Q.  There has not been another meeting
10  with the State Department in which the minimum
11  stipend was discussed, or part of the agenda?
12    A.  There has -- so, so, again, I'm trying to
13  be as faithful as I can.  The answer is, there have
14  been other meetings.  I recall somebody, somebody
15  asked a question about the minimum stipend which an
16  attorney present in the room said was inappropriate.
17  That was as far as that part went.
18    Q.  That's a separate meeting?
19    A.  That's a separate meeting in which
20  somebody on a call-in line was asking a question
21  that the attorney present felt was inappropriate.
22  And had that conversation gone on, I would have
23  again left the room.  But it was not addressed.
24    Q.  And why are these discussions of the
25  minimum stipend inappropriate?

Page 133

1    A.  I think the concern I have is that
2  the -- this is a judicial process.  And there are
3  two major causes for my concern.  The first one is,
4  you are all doing a job and the process will work
5  this out somehow.  That's my first position.  The
6  second thing is that the Complaint addresses an
7  alleged -- and again, I'm summarizing as a layperson
8  would -- it addresses whether there was in some
9  sense an agreement to do something, which I have
10  never been a part of and would not support.
11    So I think being in a room in which there
12  is discussion of the minimum stipend I did not see
13  as being in Expert AuPair's best interest.
14    Q.  Have you ever represented that the
15  minimum stipend was determined by the Department of
16  State?
17    A.  We certainly have circulated the
18  Department of State's minimum stipend document that
19  has their seal at the top.
20    Q.  Have you ever in your documents
21  affirmatively said that the minimum stipend is
22  determined by the Department of State and/or the
23  Department of Labour?
24    A.  I could not tell you that.
25    Q.  Okay.  You mentioned the prior

MAGNA ▶
LEGAL SERVICES

34 (Pages 130 to 133)

Highly Confidential - Attorney's Eyes Only

Page 134

1  meeting with the Department of State where someone
2  was on the phone and a lawyer objected.
3       Do you have a general time frame for when
4  that, that call occurred?
5       A.  I believe it was in 2016.  So that
6  was not a prior meeting.  So just to be clear.  My
7  recollection is that the lawsuit was filed in
8  2016 -- 14.  The first State Department meeting
9  which I left the room for was 2015.  And the one in
10 which a question was asked, I believe, was 2016.
11      Q.  Got it.  Thank you for that
12 clarification.  Who was the attorney?
13      A.  He's right there.
14      Q.  Okay.
15      A.  Bogdan.
16      Q.  So, in this meeting of some time in
17 2015, you said you walked out of the meeting.  Were
18 you the only one that walked out of the meeting?
19      A.  No, I was not.
20      Q.  Did you return to the meeting
21 afterwards at all, or were you fully --
22      A.  Yes, I returned to the room.  The
23 conference room is -- was a bit bigger than this.
24 There's a kitchen behind it.  And there's a room in
25 between there and the kitchen, so it's soundproof.

Page 135

1  I walked out and was joined by two other people.
2       Q.  Okay.  Who were those people?
3       A.  They both were -- and I'm not going
4  to say employed by Cultural Care because I'm not
5  sure, obviously, of the relationship between people,
6  but they were representing Culture Care.  One of
7  them would have been Natalie Jordan, I believe her
8  last name is, and the other one Goran Rannefors.
9       Q.  Was there anybody else that exited
10 the room other than Natalie Jordan and Goran
11 Rannefors from Cultural Care?
12      A.  Other than, other than those and me,
13 no.  I don't recall that there was.  Let me also say
14 for the record that I can't guarantee that all
15 sponsors were at the meeting.
16      Q.  Understood.  But in terms of the area
17 that you went to, that was segregated from --
18      A.  Yes.
19      Q.  -- the conversation, you were
20 standing there with Natalie Jordan and Goran
21 Rannefors from Culture Care.  Is that correct?
22      A.  That would be -- we were segregated.
23 We left the room.  Whether I -- whether they went
24 into the kitchen as well, I don't know.
25      Q.  Okay.  What did you talk about?

Page 136

1       A.  With them?
2       Q.  Yes.
3       A.  I believe we spoke about, I think we
4  spoke about how we were -- how we'd been hoping for
5  a new proposed rule from the State Department.  And
6  of course, given we -- I mean, one can surmise that
7  the -- that we had similar reasons for leaving.  Of
8  course we were not going to talk about how to --
9  anything about the stipend.  It would have been
10 perhaps about -- certainly the proposed rule springs
11 to mind.  And the other thing that springs to mind
12 is a discussion of how silly it was to have that
13 discussion, at the time.
14      Q.  Why would it have been "silly" to
15 have that discussion?
16      A.  For the reasons I've laid out.
17      Q.  Which is?
18      A.  Again, hurting the process and, given
19 count 1 of the Complaint, which, again, has no -- no
20 element of truth to it, actually then having any
21 conversation about the stipend, about the minimum
22 stipend, would be silly for both, both of the
23 agencies there and, I would argue, for some of the
24 others too.
25      Q.  Okay.  Thank you.

Page 137

1       THE REPORTER:  Exhibit 11.
2  EXHIBIT 11 marked for identification:  Family
3       Costs, Bates ExpertAuPair021692
4       BY MS. SMALLS:
5       Q.  For folks on the phone, this is
6  Expert AuPair 21692.
7       Are you familiar with this document?
8       A.  Yes, it appears historic, but yes.
9       Q.  Okay.  What is it?
10      A.  It's a summary of family costs.
11      Q.  Can you tell me what it says under
12 "Salary paid to au pair"?
13      A.  It says "$10,179."
14      Q.  Do you know how you -- well, let me
15 ask you, are there any qualifiers on the $10,179
16 salary that's in this, this document?
17      A.  On this document, no.  However, the
18 web page, I believe, has always said that that is a
19 minimum salary.  A minimum stipend.
20      I would also add that these are expected
21 to be minima by families.  For example, the tuition
22 allowance, it could be that the family decides to
23 pay more.
24      Q.  Can I ask you how you got to that --
25 or how that number was arrived to, the $10,179?

MAGNA
LEGAL SERVICES

Highly Confidential - Attorney's Eyes Only

## Page 138

1    A.  I would imagine it took the minimum
2  stipend and multiplied by the number of weeks.
3    Q.  And what is the minimum stipend?
4    A.  That would be based on the Department
5  of State's -- because obviously they're the people
6  who have the, you know, the personnel to do this.
7  They determined that the amount should be, I
8  believe, $195.75 for the minimum stipend, and it's,
9  again, published with a Department of State seal on
10  the top.
11    Q.  What's published with a Department of
12  State seal on the top?
13    A.  The 195.75 figure is or was published
14  on the Department of State's website.
15    Q.  Okay.  But that's not on this
16  document that we're discussing right now?
17    A.  No, it is not.
18    Q.  Okay.  So the number 10,179 is based
19  on the annual cost of an au pair if the au pair is
20  paid the minimum stipend of 195.75; is that correct?
21    A.  I believe that's how it was
22  calculated.  And I refer you to other publications
23  which do indeed make clear that this is a minimum.
24  And this was, this was our position long before the
25  Complaint was filed.

## Page 139

1    Q.  Okay.  Can you read, in the paragraph
2  below that it starts with:  "The salary figure
3  above"?
4    A.  Yeah:  (as read).
5      "You will be expected to comply
6      with the terms of the au pair
7      program, which means that you will
8      pay room and board for the au pair,
9      provide car insurance for the au
10      pair, and other costs that may be
11      associated with making the au pair
12      feel like a member of your family.
13      The salary figure above is based on
14      a calculation involving the federal
15      minimum wage and may increase or
16      decrease according to decisions
17      made by the Department of State and
18      the Department of Labour.  The
19      educational allowance is subject to
20      change according to the Department
21      of State".
22    Q.  So, based on this statement, is it
23  fair to say that you represented -- strike that.
24      I asked you before whether you had ever
25  represented that the Department of State determined

## Page 140

1  or was determinative of the minimum stipend.  I
2  think you answered that no.  Would you like to
3  revise your answer?
4    A.  I believe I said I did not know, but
5  of course we can look on the record.  But certainly
6  if -- to the extent this document is valid, I would
7  say two things.  Firstly, it does refer to the
8  Department of State.  And secondly, I would view
9  this as an advertisement rather than as, as a policy
10  document inasfar as the website -- this is, this is
11  one page which obviously was sloppily written.  For
12  example, "which means you will pay room and board,"
13  I don't think is a natural way to say it.
14      So I believe that it was sloppily written,
15  and it is certainly a document that if I saw today I
16  would be changing.
17    Q.  Okay.  My question is that -- well,
18  let me ask you this.
19      What was your understanding of who
20  determined the minimum stipend?
21    A.  My understanding was that it was
22  presented, I believe it was sent by Ida Abell, who
23  was in the Department of State, and I believe still
24  is.
25      And my -- my understanding was that it

## Page 141

1  would not have been something she did in isolation
2  but would have been looked at by the relevant
3  attorneys in both the Department of State and in the
4  Department of Labour.
5    Q.  And as a designated sponsor agency,
6  you are required to be in compliance with Department
7  of State regulations; is that correct?
8    A.  We always try not only to obey
9  Department of State regulations but the mission of
10  the Department.
11    Q.  Okay.  To be in compliance, or to be
12  in -- aligned with the spirit of the Department,
13  would you need to receive guidance or updated
14  guidelines from the Department of State?
15    A.  The Department of State -- I'm going
16  to try and answer this in --
17    Q.  Well, let me strike it.  It's a
18  bit --
19    A.  Yeah.  It's too confusing.
20    Q.  How do you ensure compliance with
21  State Department regulations or guidelines?
22    A.  There are several, several things we
23  do.  One of the most important is to read the
24  guidance that comes in from the State Department,
25  and the information that comes in from the

MAGNA
LEGAL SERVICES

Highly Confidential - Attorney's Eyes Only

<table>
<tr><td>

Page 142

1   Department of Homeland Security about the SEVIS
2   database. That undergoes changes every so often,
3   which means we have to enter more or less
4   information just depending on what's been changed.
5       Now, the other thing that's important is,
6   there is an audit every year which is performed by
7   an independent CPA who looks at our -- looks to
8   check we have all the documents we say we collect;
9   looks to see if we have contacted the au pairs at
10  least monthly by local representative; make sure the
11  regional representative is contacting quarterly.
12  He'll look at both the family and the au pair
13  applications, and any concerns that came up, any
14  complaints or incidents, are reported. He calls the
15  Department of State to make sure we're designated.
16      And so that document is an important tool
17  in making sure that we're doing exactly what we
18  should be doing and to the very best of our ability.
19     Q. But updates would be an important --
20  updates from the State Department would be an
21  important part of your ability to stay in compliance
22  with Department of State?
23     A. Updates from the State Department are
24  important. I believe we've had maybe one every
25  other year since, since starting. Maybe a few more

</td><td>

Page 144

1      MR. ENICA: Objection --
2   BY MS. SMALLS:
3     Q. During that, during that meeting?
4     A. I was under the impression that this
5  was going to be, like many of the conversations we
6  will have in the State Department, a communication
7  between people, not only a presentation by somebody.
8     Q. Did you ever receive the information
9  that was communicated in that meeting by any other
10  means?
11     A. I don't recall.
12     Q. Do you know the substance of what was
13  communicated in the meeting that you walked out of?
14     A. I can surmise it was about the
15  stipend, the minimum stipend.
16     Q. Other than Alliance meetings, how do
17  you normally communicate with other sponsors?
18     A. It's rare that we need to communicate
19  with other sponsors, but I will give you some
20  examples.
21     We -- in order for an au pair to transfer
22  programs from one sponsor to another, there's a
23  technique in SEVIS which is, the sponsor releases
24  and lets the other sponsor take that au pair.
25     It's extremely rare for that to happen.

</td></tr>
<tr><td>

Page 143

1   than that but not, not very many.
2     Q. So I want to go back to the meeting
3  in, I guess, 2015 --
4     A. Mm-hm.
5     Q. -- in which the State Department was
6  making a presentation about the minimum stipend, and
7  ask, as a designated sponsor of the State
8  Department --
9     A. Mm-hm.
10     Q. -- for the au pair program, why you
11  would walk out while the State Department was
12  providing guidance for updates regarding the minimum
13  stipend?
14     MR. ENICA: Object to form.
15     A. I would start by saying I'm not sure
16  it was a Department of State presentation. I'm not
17  sure. It was in the Department of State.
18     I did not believe that this was a
19  presentation, I believed it was more a
20  question-and-answer session, which to me, again, for
21  the reasons I've already outlined, I did not want to
22  be in.
23   BY MS. SMALLS:
24     Q. Did you understand the presenter to
25  be providing information to you?

</td><td>

Page 145

1   But we had a case in which the au pair was moving
2  with her host family to a location where the sponsor
3  could not place, and so she wanted to change
4  program. She wanted to change to our program; the
5  family wanted to; the sponsor was happy for her to
6  change program.
7     We also -- let me think. I have -- as you
8  know, I've previously been in touch with ProAuPair
9  and with Great Au Pair before designation. I've
10  also sometimes been in touch with Helene (ph.) at
11  USAuPair about, I think there was something about
12  like payment plans is what I think it was about.
13     (Query by reporter)
14   Like payment plans, yeah. The exact --
15  this sort of thing can happen by e-mail, but it
16  would have been presented in ESI.
17     Q. Other than, you talked about your
18  relationship with the Great Au Pair and then
19  ProAuPair. Who are the sponsors that you most
20  regularly interact with other than Great Au Pair or
21  ProAuPair?
22     MR. ENICA: Object to form.
23     A. I would say USAuPair.
24   BY MS. SMALLS:
25     Q. Are there any other sponsors you deal

</td></tr>
</table>

PLAINTIFFS' RESP. APP.0005397

MAGNA

LEGAL SERVICES

Highly Confidential - Attorney's Eyes Only

Page 146

1  with on a regular basis?
2       MR. ENICA: Object to form.
3       A. I'm concerned about the word
4  "regular." I would expect, other than Alliance
5  meetings, that it would be rare that I would
6  communicate with a different sponsor more than once
7  or twice a year.
8       BY MS. SMALLS:
9       Q. Okay. Let me...
10      Are there any sponsors that you
11  communicate with multiple times a year?
12      A. I think I can say USAuPair. And I'm
13  taking Alliance meetings and State Department
14  meetings out of the equation because they're not
15  relevant for what I understand you to be asking.
16      I don't believe I do. Sometimes there
17  might be a situation where somebody tries to call an
18  organization on our behalf, and the natural things,
19  the natural reason for that, would be, you know, if
20  a family came from a different agency, would you
21  place with that family again?
22      And that may have happened, I don't know.
23  But again, it's rare that we are in touch with
24  sponsors. It's much more common that we're in touch
25  directly with the Department about whatever has --

Page 147

1  the Department of State, in this case, about what,
2  you know, whatever issue to make sure that they know
3  if there's a problem with an au pair or if there's,
4  you know, something that they need to be aware of.
5       Q. And you mentioned that you're in
6  touch with USAuPair multiple times?
7       A. USAuPair, yes.
8       Q. USAuPair?
9       A. Mm-hm. And that could be maybe four
10  times a year.
11      Q. Okay. And on what occasions would
12  you be communicating with USAuPair?
13      A. Normally it's because Helène (ph.)
14  contacts me about something. For example, I
15  don't -- you know, she doesn't serve Florida. Some
16  people would call her and she'll -- whether it's
17  Florida, whatever it is, she's obviously -- and it's
18  one of those things where you cannot serve every
19  area in the United States as an au pair sponsor
20  because of the one-hour rule. So she might say:
21  "I've mentioned, you know, that you serve Florida to
22  these people." That's not -- there's no financial
23  arrangement there. It's just a courtesy to people
24  who call.
25      And so I think that would be, you know,

Page 148

1  maybe that happens twice a year, but I said four
2  just to be on the high side.
3       (Query by reporter)
4       I said four just to be -- you know, I
5  don't want to tell you something less than what it
6  really.
7       Q. And do you know if all of your
8  communications, to the extent that they occur over
9  e-mail, have been produced?
10      A. I would have to, I would have to...
11  To the best of my knowledge, yes.
12      Q. Okay.
13      A. However, clearly the way, the way the
14  information was asked would affect the answer. So,
15  for example, if you wanted designated sponsors, we
16  would not necessarily have produced stuff from
17  before Great Au Pair were designated.
18      Q. Understood.
19      A. Yeah.
20      Q. But my question in that respect was
21  specifically limited to USAuPair and whether your
22  communications with Helène -- I don't know if I'm
23  getting her name right -- were the scope, given
24  that's the agency that you tend to have the most
25  communications with, whether all of those

Page 149

1  communications have been produced.
2       A. My -- sorry. You've finished that?
3       Q. I'm done, thank you.
4       A. Yeah. My understanding is that, yes,
5  they would all have been produced.
6       Q. Okay. And then what would be your
7  occasion or what would be examples of when you would
8  have contact with other sponsor agencies, I think
9  you said once or twice a year.
10      A. Yes. Again, it could be an au pair
11  changing, you know, who wants to change sponsors.
12  As I've said, that happened once. It could be a
13  question, doing it the other way around, it could be
14  a question of, you know, why somebody left our
15  program, and something along those lines. But it's
16  very rare.
17      Q. Okay. And do you know whether those
18  communications, the communications you've had with
19  other designated sponsors, have been produced?
20      A. Again, my expectation is that they
21  have.
22      Q. Okay. Thank you. Let's go back. We
23  talked about State Department meetings.
24      A. Mm-hm.
25      Q. And you very clearly distinguished

PLAINTIFFS' RESP. APP.0005398

MAGNA
LEGAL SERVICES

Highly Confidential - Attorney's Eyes Only

**Page 150**

1 State Department meetings from Alliance meetings,
2 which are distinct?
3 A. Yes.
4 Q. I want to talk about Alliance
5 meetings. And for the Alliance meetings that you
6 have attended, what has been generally the agenda?
7 A. Right. Now let me first clarify that
8 State Department personnel have been known to attend
9 Alliance meetings. And so when I say they're
10 distinct, I mean from location they'll be distinct.
11 Q. Okay.
12 A. So therefore I have them differently
13 in my mind.
14 One issue that was spoken about earlier
15 this year was... earlier this year? Maybe last
16 year. I think there's a general sort of expectation
17 that the Department of State will one day release a
18 rule which I think has been in draft form since
19 2009, 2010. And I don't believe I have a copy of
20 that because I believe they collected all the draft
21 rules back at the end of that. So there's some
22 frustration there.
23 I think it's also important to the
24 Department -- sorry, to the Alliance, that ECA, the
25 division within the Department of State, is funded

**Page 151**

1 appropriately so there is enough, enough staff power
2 to make sure that au pairs are looked after
3 properly.
4 But those are examples of what, what's
5 discussed.
6 Q. Has the minimum stipend ever been the
7 subject of discussion at Alliance meetings?
8 A. I do not recall the minimum stipend
9 being discussed.
10 Q. Has the subject of the minimum
11 stipend being tied to the minimum wage ever been a
12 topic of discussion at Alliance meetings?
13 A. I don't recall that happening.
14 Q. Okay. We've been talking about
15 meetings with the Department of State.
16 A. Mm-hm.
17 Q. I want to turn to your communications
18 with the Department of State and what, what those
19 generally consist of.
20 Can you tell me what your interactions and
21 communications with the Department of State?
22 A. Yes, absolutely. We send them the
23 annual report. We respond to complaints, which can
24 come either from a host family or from an au pair.
25 We inform the Department of State about a

**Page 152**

1 substantive issues. So let me find an example of
2 that. If an au pair has not been paid by their host
3 family, we will inform the Department of State.
4 If an au pair -- I think the Estonian
5 example I gave before lunch would also be something
6 that we would have communicated, and any crime,
7 serious crime, committed by an au pair such as for
8 example let's say DUI, that needs to be reported by
9 new directives from the Department.
10 Q. You gave an example of an au pair not
11 being paid the weekly stipend.
12 A. Mm-hm.
13 Q. If that occurs, would you pay the au
14 pair?
15 A. If that occurs, the family would pay
16 the au pair, because the family is -- if the au pair
17 was withdrawn, the family would get a refund of some
18 kind. However, they would not get as high a refund.
19 So on maybe three occasions we have reduced the
20 family's refund and...
21 Q. I'm sorry. I don't understand the
22 refund part of it.
23 A. Right. A family pays our fees up
24 front. So therefore, if the family leaves the
25 program after six months, they would normally be

**Page 153**

1 entitled to, I believe, $1200.
2 However, we would use some of that money
3 to -- you know, the au pair would get that money and
4 then the family would receive less. So the
5 assumption is the au pair is going to be paid by the
6 family.
7 Q. Okay. But --
8 A. From (indiscernible) --
9 Q. They're not paid by the family
10 directly. In that example they're not being paid by
11 the family directly, they're being paid by Expert
12 AuPair funded by the family's fees; is that correct?
13 A. I would, I would characterize it
14 differently. I think this is an interpretation. I
15 would characterize it as the family is paying the au
16 pair.
17 Q. Well, how does the situation arise
18 where the au pair is not paid the weekly stipend?
19 A. How does it happen.
20 Q. Yeah.
21 A. Well, it could be several things. It
22 could be a case of the family not -- the family not
23 wanting to pay, or it could be a case of the family
24 not being able to pay.
25 Q. Okay. So let's say the family does

PLAINTIFFS' RESP. APP.0005399

MAGNA
LEGAL SERVICES

Highly Confidential - Attorney's Eyes Only

Page 154

1    not want to pay.
2          A.  Mm-hm.
3          Q.  It gets escalated to you if the
4    family as an entity is -- refuses to pay or is
5    unable to pay the au pair; is that correct?
6          A.  It would normally, it would normally
7    be something that I was aware of, yes.
8          Q.  Okay.  And in terms of the
9    disbursement of funds to pay the au pair --
10         A.  Mm-hm.
11         Q.  -- where the au pair has not been
12   paid, where are those funds disbursed from?
13         MR. ENICA:  Object to form.
14         A.  The funds would be normally paid by
15   cheque, and the money would come from the family's
16   refund.
17         BY MS. SMALLS:
18         Q.  Who would issue the cheque?
19         A.  Well, in an ideal world, the family.
20   But, again, most families understand that they must
21   pay.
22         Q.  Right.  But in this scenario, we're
23   talking about the few, you said it's rare, but an
24   instance where the family either refuses to pay the
25   au pair or is unable to pay the au pair.

Page 155

1          So family X that the au pair is working
2    for is not writing a cheque; has not acted in
3    compliance with their obligations under, under the
4    agreement.  But the au pair must be paid.
5          Who pays the au pair when the family
6    cannot or will not pay the au pair?
7          A.  The amount is reimbursed from the
8    family as a reduced refund, and, if it's absolutely
9    necessary, and it's very rare, we will make sure
10   that the au pair is treated appropriately so they go
11   back home having a positive view of the United
12   States.
13         Q.  Whose name is on the cheque to the au
14   pair in the situation where the host family cannot
15   or will not pay and the au pair needs to be made
16   whole?
17         MR. ENICA:  Object to the form of the
18   question.
19         A.  I'm not sure that I understand "to be
20   made whole" as it's --
21         BY MS. SMALLS:
22         Q.  Okay.  Strike that.
23         Does Expert AuPair issue cheques to au
24   pairs that have not received payment from host
25   families?

Page 156

1          A.  We have issued a cheque using the
2    host family's money probably on three occasions.
3          Q.  Okay.  So Expert AuPair, on occasion,
4    has issued cheques directly to au pairs for payment
5    of the weekly stipend; is that correct?
6          MR. ENICA:  Object to form.
7          A.  I would not characterize it as
8    payment by us.
9          BY MS. SMALLS:
10         Q.  I understand that you would not
11   characterize it that way.  I'm just -- what I'm
12   trying to get to is the actual facts of what occurs.
13         A.  Mm-hm.
14         Q.  Rather than get into any
15   characterization.
16         If an au pair is not paid by a host family
17   and is due a stipend payment, you testified that you
18   will step in and make a payment to that au pair.  Is
19   that correct?
20         A.  There would be a cheque with our name
21   on, and it would, however, not be -- we consider to
22   be our money.
23         Q.  Okay.  But that cheque would be from
24   Great Au Pair -- I'm sorry, Expert AuPair to the au
25   pair for the weekly stipend?

Page 157

1          A.  That's --
2          MR. ENICA:  Object to form.
3          BY MS. SMALLS:
4          Q.  Is that correct?
5          MR. ENICA:  I renew my objection.  You may
6    answer.
7          THE WITNESS:  Can you ask -- can I hear
8          that question again?
9          (Reporter read back as requested)
10         A.  It would be from Expert AuPair using
11   the host family's money, and therefore it is the
12   host family's money for the minimum stipend, not our
13   payment.
14         BY MS. SMALLS:
15         Q.  For the three occasions that this has
16   occurred...
17         A.  Mm-hm.
18         Q.  Whose name is on the cheque as where
19   the funds are being -- are being disbursed from?
20         A.  The cheque would be --
21         Q.  Which cheque is it?
22         A.  It would be a corporate cheque that
23   we issue using the host family's money.
24         Q.  Okay.  So it's a Great Au Pair (sic)
25   cheque; is that correct?

PLAINTIFFS' RESP. APP.0005400

MAGNA
LEGAL SERVICES

Page 158

1    MR. ENICA: Objection. We are not at a
2  Great Au Pair deposition.
3    BY MS. SMALLS:
4    Q. I'm sorry. I screwed that up.
5  Sorry.
6    So it's an Expert AuPair cheque?
7    A. Yes.
8    Q. Okay. And on that cheque, on the
9  three occasions that you recall, it has an au pair,
10 an au pair's name on it. Is that correct?
11   A. The cheque would be issued to the au
12 pair using the host family's money.
13   Q. From Expert AuPair; is that correct?
14   MR. ENICA: Objection.
15   A. The money is not from Expert AuPair.
16   BY MS. SMALLS:
17   Q. Okay. But the cheque is from Expert
18 AuPair?
19   A. The cheque appears to be from Expert
20 AuPair; however, it is using the host family's
21 money.
22   Q. Okay. Thank you.
23   THE VIDEOGRAPHER: This is the
24 videographer on May the 9th, 2017, at
25 approximately 2:35 p.m. We are now going

Page 159

1  off the record.
2  --- Upon recessing at 2:35 p.m.
3  --- Upon resuming at 2:50 p.m.
4    THE VIDEOGRAPHER: This is the
5  videographer on May the 9th, 2017, at
6  approximately 2:51 p.m. We are now back
7  on the record.
8    BY MS. SMALLS:
9    Q. Okay. I want to go back to, we were
10 talking about communications with the State
11 Department?
12   A. Yes.
13   Q. And you outlined a number of
14 situations in which there may be problems or an
15 issue with an au pair where you would reach out to
16 the State Department.
17   I want to focus in on interactions with
18 the State Department that may be more of a policy
19 nature, or more specifically outside of the context
20 of a specific au pair complaint or issue, and ask
21 you what are, what are those occasions with which
22 you would interact with the State Department outside
23 of an individual au pair issue or complaint or the
24 reporting of individual au pair issues or
25 complaints?

Page 160

1    A. Okay. It's -- I think the best way
2  to answer your question is to try to give you a list
3  of guidance directives of things that we've received
4  from the Department.
5    Now, before we were designated, there was
6  some clarification of the educational component, and
7  I think that was in 2006. Since then, apart from
8  ignoring the Department of Homeland Security, which
9  is giving us technical advice on SEVIS, there was a
10 guidance directive which -- there was a guidance
11 directive when the minimum stipend was increased.
12 There have been -- there was guidance given on what
13 incidents to report to the Department. There was
14 guidance given about... What was the last one?
15 There was a guidance I referred to about
16 alcohol-related crimes committed by au pairs. And I
17 believe that was coming to all J sponsors, not just
18 the au pair program. I would say that would be
19 universities, for example, as well.
20   And there was -- there have been new
21 versions of the annual report circulated so that we
22 produce an Excel document in the same format as all
23 the other sponsors, because I think in the past it
24 depended when you were designated as to what form
25 you were completing. But they made that all

Page 161

1  consistent.
2    If we're contacting them, it would be to
3  ask them for clarifications but this comes back to
4  individuals, probably. The only, the only question
5  I can think of asking that applied to more than one
6  or two au pairs, let's say, would be about the
7  Western Association of Schools and Colleges because
8  the -- one of the components of that, it has three
9  different accreditation levels, and one of the
10 accreditation levels has -- is now no longer
11 recognized by the Department of Education because
12 it's only for schools and colleges, so -- sorry,
13 it's schools. So it's a secondary accreditation.
14 But the other two, the Junior College and the
15 universities, are still recognized. So we asked for
16 some clarification on that.
17   I can't think of -- I can't think of
18 anything else that applied to more than one at
19 present.
20   Q. Okay. So you're -- outside of
21 discussing individual au pair issues or complaints,
22 your main point of interaction with the State
23 Department would be in meetings that are organized
24 in and around Alliance meetings?
25   A. Yes.

Highly Confidential - Attorney's Eyes Only

Page 162

1    MR. ENICA: Object to form. I object to
2  the form, and you may answer.
3    A.  The main interactions with the State
4  Department would either be in their meetings or in
5  Alliance-held -- you know, if they've rented a
6  hotel, you know, wherever that would be. Whereas
7  obviously the State Department's one place, right.
8  Okay.
9    BY MS. SMALLS:
10    Q.  What about your -- what about any
11  interactions with the Department of Labour?  Have
12  you had any interactions or communications directly
13  with any representative of the Department of Labour?
14    A.  I do not believe so.  And we have to
15  mention the meeting in 2015 again, where I believe
16  it was a Department of Labour person who was, who
17  was, you know, when I walked out.  I can't think of
18  any other time.
19    Q.  Okay.  Thank you.
20    I want to refer you to, I think it's
21  Exhibit No. 6.
22    A.  Okay.
23    Q.  And you testified earlier that this
24  was an advertisement; is that correct?
25    A.  Yes, it looks certainly on its face

Page 163

1  as if it's an advertisement, and a historic one,
2  obviously.
3    Q.  Okay.  And who is it targeted to?
4    A.  Again, on its face it looks like it's
5  targeted to families because it refers to "your
6  family."
7    Q.  Okay.  And can you tell me what the
8  cost as presented in this advertisement is?
9    A.  Yes.  It's approximately $330 per
10  week.
11    Q.  And can you tell me how, what the
12  basis or the -- what the basis for that number is?
13    A.  I can surmise that it would --
14    Q.  Well, I don't want you to surmise.
15    A.  Mm-hm.
16    Q.  I mean, this is an Expert AuPair
17  advertisement.  And so it offers the number of, and
18  it states: (as read)
19        "The program averages out to
20        approximately $330 per week for 52
21        weeks and provides you with 45
22        hours of childcare weekly."
23    What would be the component parts of a
24  cost of $330 per week?
25    A.  That would, that would certainly

Page 164

1  contain our agency fee, probably the minimum
2  educational contribution, and probably the minimum
3  stipend.  And I think this advertisement is
4  reasonable because it is -- there is an oversupply
5  of au pairs and so it is possible to pay that plus
6  any car insurance or any increase that the family
7  may have there.
8    However, as with anything, if the family
9  wants to pay more because that's -- there's more,
10  there's going to be a wider choice of au pairs.  If
11  they want to pay more, they can.
12    Q.  But based on this advertisement, in
13  terms of the approximate cost of an au pair, it's
14  your testimony that this is based on the minimum
15  stipend of 195.75?
16    MR. ENICA: I object to form.
17    A.  I believe it's probably in that, in
18  that region.  I would not know when exactly this was
19  written, so therefore I can't tell you what the
20  agency fees are at that stage.  But it's, it's quite
21  likely to be based on the minimum stipend.  But of
22  course that doesn't mean that you can't pay more.
23    THE REPORTER:  Exhibit 13.
24    EXHIBIT 13 marked for identification:  "About the
25        Expert AuPair Program" flyer, Bates

Page 165

1        ExpertAuPair025157
2    BY MS. SMALLS:
3    Q.  For those on the phone, this is
4  Expert AuPair document 25157.
5    (witness perusing document)
6    Are you familiar with this document?
7    A.  Again it's historic, but yes, I
8  believe I have seen it before.
9    Q.  Okay.  And can you tell me on the
10  left side of the page, under "Why" -- it says, "Why
11  Expert AuPair?" what the chart that is in that
12  section is describing?
13    A.  It is showing the difference between
14  daycare, nannies, and Expert AuPair.
15    Q.  And when you say "differences," do
16  you mean the different, the different options or
17  benefits that are offered under each program or each
18  option?
19    A.  I think it's a comparison between
20  different types of childcare.
21    Q.  Would this be representative of the
22  different options in the childcare market?
23    MR. ENICA: Object to form.
24    A.  These are commonly -- or these are,
25  these are words that have been mentioned, you know,

PLAINTIFFS' RESP. APP.0005402

MAGNA
LEGAL SERVICES

Highly Confidential - Attorney's Eyes Only

Page 166

1  informally as options to me when I had children.
2  Well, I mean, I do have children but they're bigger
3  now.
4      BY MS. SMALLS:
5      Q.  But I'm referring to this chart that
6  Expert AuPair put together.
7      Why was this chart put together and
8  included on this document?  What purpose does it
9  serve?
10     A.  I think we could conclude that this
11 is advertising, and whenever you advertise
12 something, you want it to look good.
13     Q.  My question is, in the scope of this
14 advertising, why would Expert AuPair compare itself
15 with or use as a comparison point daycares and
16 nannies?
17     A.  I think each of these is a form of
18 childcare.  And anybody who's worked and has young
19 children realizes that you can't sort of leave them
20 at home.  So these are three commonly used options
21 in St. Petersburg.
22     Q.  Are there other options, other
23 childcare options, that are not represented here?
24     A.  Some locations such as St.~Petersburg
25 now have pre-K care.  And of course there's always

Page 167

1  schools, which could be state schools or public
2  schools or private schools in the American...
3      It's also, presumably, possible for our
4  families to have a sort of small at-home daycare.  I
5  believe in Florida that's five people can -- five
6  children can be watched by one parent, who then is
7  paid almost as a co-operative system.
8      Q.  Was the decision to use daycare and
9  nannies as the reference point because these are the
10 most commonly used alternatives to au pairs in the
11 childcare market?
12     MR. ENICA:  Objection to form.
13     A.  I believe I know the staff member who
14 wrote this, and I believe it was probably done
15 rather quickly.  I would not like to say that there
16 was a significant amount of thought that went into
17 those options.
18     Q.  When you talk to families, have they
19 always already -- have they always already have
20 decided on using an au pair?
21     A.  No, I would say there are cases where
22 they haven't decided what they want to do.  There
23 are cases in which the children haven't been born
24 yet, and they want to work out what they're going to
25 do.

Page 168

1      Q.  And in those cases where the families
2  have not already decided on an au pair, what are the
3  other alternatives that they are considering?
4      A.  Some have decided to stay at home
5  with their children.  Some will look at paying for
6  either daycare or the small institutional home that
7  I mentioned as a sort of almost co-operative.  Some
8  will want to hire -- or some will be thinking of
9  hiring somebody full-time, who lives in or who lives
10 wherever, you know, whatever the arrangement,
11 depending on the size of their house.  Some are
12 looking at au pairs.  Some are looking at different
13 au pair agencies as well.
14     Q.  Okay.  Are daycare, nanny, and au
15 pairs three of the most common childcare options
16 used by parents?
17     MR. ENICA:  Object to form.
18     BY MS. SMALLS:
19     Q.  That need childcare?
20     MR. ENICA:  I renew my objection.  Ready?
21     THE WITNESS:  Yeah.
22     A.  I cannot really talk to the whole
23 U.S. market.  I would say that since the number of
24 au pairs has probably been produced at some point --
25 there is something like 19,000 au pairs, maybe

Page 169

1  18,000 -- and just a quick bit of math would have
2  you thinking, well, there's going to be -- it's
3  going to be a small part of the market, because
4  19,000 compared with the number of American children
5  is small.
6      BY MS. SMALLS:
7      Q.  Are au pairs employees?
8      A.  Au pairs work for their host
9  families.
10     Q.  Are they employees?
11     MR. ENICA:  I will object to the question.
12 It requires some legal conclusion but I'm
13 moving past to state the objection and...
14     A.  I'm not qualified to state that
15 because it does seem to be a question of law.
16     BY MS. SMALLS:
17     Q.  Do they sign an employment contract?
18     A.  They do sign a document that we
19 entitle "Employment Contract."
20     Q.  Thank you.  I want to refer you back
21 to I guess this is document number 13.  And the
22 first sentence on the right side says:  (as read)
23          "When you become a host family,
24       your program fees cover everything,
25       including the following: health

MAGNA
LEGAL SERVICES

43 (Pages 166 to 169)

Highly Confidential - Attorney's Eyes Only

| Page 170 |
| --- |

1        insurance for the au pair, detailed
2        pre-screening of the au pair, Skype
3        interview with the au pair prior to
4        their arrival, embassy scheduling
5        and visa [terms]" -- I think.
6            I think the sentence stops there.
7        Can you tell me what the "detailed
8    pre-screening of the au pair" is?
9            MR. ENICA:  I would have to object to the
10       fact that you mentioned the sentence stops
11       there, but the sentence continues on the
12       next line.
13           And I also want for the record to
14       make clear we are talking about Exhibit
15       13.  The Bate number of the document is
16       different.
17       MS. SMALLS:  Okay.  Exhibit 13, I think I
18       already said the Bates number.
19       MR. ENICA:  Correct.
20       MS. SMALLS:  Which is zero --
21       MR. ENICA:  You mentioned document number
22       13, so I just want to make sure for the
23       record that it's Exhibit 13.
24       MS. SMALLS:  Okay, but let me just read
25       the whole sentence because I --

| Page 171 |
| --- |

1            (Query by reporter)
2        MR. ENICA:  You referred to Exhibit 13.
3        BY MS. SMALLS:
4        Q.  Exhibit 13:
5            "When you become a host family
6            your program fees cover everything
7            including the following:  Health
8            insurance for the au pair, detailed
9            pre-screening of the au pair, Skype
10           interview with the au pair prior to
11           their arrival, embassy scheduling
12           and visa terms [sic], support
13           network through the local and
14           regional representatives,
15           orientation, airfare, child
16           development training, and CPR and
17           First Aid training."
18       That sentence refers to "detailed
19   pre-screening of the au pair."
20           Can you tell me what is referred to there
21   or what constitutes the "detailed pre-screening of
22   the au pair" referred to in that sentence?
23       A.  I can certainly try.  I would like to
24   correct, I believe it says visa forms, not visa
25   terms.  That's what I'm reading.  But again, the

| Page 172 |
| --- |

1    copy is -- this isn't --
2        Q.  We can change that to "visa forms."
3        A.  Yeah, it's --
4        Q.  I was reading it the best I could.
5        A.  Yes, I'm not sure that must was done
6    with this advertisement.  I don't think it was -- as
7    I say, I don't really like the way it's written, so
8    I -- you know, I'm -- and I would like again to
9    emphasize it's historic.
10           The pre-screening would involve collecting
11   references, the medical check that we're required to
12   do by law, a personality profile, a criminal record
13   check in home country and in any country they've
14   spent more than a year in, because some people will
15   move, become au pairs in the UK and come over, for
16   example.  And it's what's required by law.  A test
17   of English proficiency as well.
18           I may be missing something, but those are
19   the things that I can think of.
20       Q.  But that screening, the elements that
21   you've just or the components that you just outlined
22   are conducted by the in-- the recruiting companies,
23   as we've been referring to them; is that correct?
24       A.  In almost all cases, the
25   pre-screening will be done by us.  Now, sometimes

| Page 173 |
| --- |

1    the -- sometimes people will collect documents and
2    send them.  But we have all of those documents in
3    head office and review them all.  So that -- that
4    isn't -- that is not done by recruiting -- well, to
5    the extent it is done by the recruiting
6    organizations, it is stuff that we also look at.
7            And so, to the extent the -- you know, to
8    all extents, I think, we can say we do that.
9        Q.  Okay.  The sentence also refers to
10   health insurance for the au pair.
11           Who -- how does health insurance for the
12   au pair work?  And how did the fees, the program
13   fees by the host family, pay for them?
14           MR. ENICA:  Object to form.
15       A.  The medical cover we buy from a
16   company I've mentioned before, Global Secutive.  We
17   pay the amount, and we will enroll them before their
18   arrival.  And clearly, I mean, we are -- the family
19   pays a fee.  So that would be where the money
20   comes from.
21           BY MS. SMALLS:
22       Q.  Okay.  And so the health insurance
23   that the au pair has while they are in United
24   States, is arranged and done by Expert AuPair?
25           MR. ENICA:  Object to form.

PLAINTIFFS' RESP. APP.0005404

MAGNA ▶
LEGAL SERVICES

Highly Confidential - Attorney's Eyes Only

1    A.   The health in-- the insurance policy
2  that we enroll them in, again, it's paid for by the
3  host family's fees.  We sign them up because we --
4  obviously, I mean, if you are enrolling, let's say,
5  200 au pairs, the rates are going to be cheaper.
6    Q.   Thank you.
7    THE REPORTER:  Exhibit 12.
8  EXHIBIT 12 marked for identification:  Sponsor
9        Organizations Comparison chart
10       (produced in native format), Bates
11       ExpertAuPair0022941 (2 pp.)
12   THE WITNESS:  Haven't we had Exhibit 13?
13   THE REPORTER:  Yes.  We just skipped.
14   THE WITNESS:  Okay.  We skipped.  Okay,
15  sorry.
16   MS. SMALLS:  Okay.  For those on the
17  phone, we're now looking at Expert AuPair
18  22941.
19   Q.   Are you familiar with this document?
20   A.   I have seen it, yes.
21   Q.   Okay.  What is it?
22   A.   It's -- appears to be a comparison
23  aimed at seeing what other sponsors are charging.
24   Q.   Okay.  And let me just ask you
25  generally.  How do you -- how does Expert AuPair

1  distinguish itself in the market?
2    A.   I think there are a couple of things
3  that immediately spring to mind.  The first one is
4  that we're small.  If you call the switchboard, you
5  will get a person rather than "press 1 for this,
6  press 2 for that." But we're still big enough to
7  have the ability to, to -- we're big enough to be
8  able to provide a, you know, the support that au
9  pairs need.
10   Now, the other thing I think it's fair to
11  say is that we're not the most expensive agency.  I
12  don't believe we're the least expensive but we're
13  not, we're not in the same level as some of the
14  other programs.
15   Q.   Anything else, in terms of how Expert
16  AuPair distinguishes itself from other sponsor
17  agencies?
18   A.   Our training program is in a sunny
19  place with palm trees, not New York.  The -- but I
20  think it's the small personal feel that the au pairs
21  like during training.
22   Q.   Is the weekly stipend a point of
23  differentiation among sponsor agencies?
24   A.   The weekly minimum stipend is
25  something we encourage au pairs to negotiate because

1  it's on the employment contract, as we've called it,
2  for -- that's, I guess, its historic name.  And
3  there is a clear space for the stipend to be
4  changed.
5    So if you have an amount of money that you
6  want to dedicate to paying your au pair if you have
7  more, you're going to have more because our fees
8  are -- and again, this is based upon this comparison
9  and my belief.  I believe that the family is going
10  to have more money, if they can compensate the au
11  pair more, I believe they'll have more by using us
12  than by using some of the other agencies who might
13  charge 9,000.
14   Q.   I'm sorry, can you....
15   I don't -- your answer was:  "I believe
16  that the family is going to have more money if they
17  can compensate the au pair more.  I believe they'll
18  have more by using us than using some of the other
19  agencies who might charge 9,000".
20   I don't understand that statement.
21   A.   Okay.
22   Q.   Or what you're trying to communicate
23  by that.
24   A.   If a family wishes to pay -- if a
25  family is paying less in agency fees, it is more

1  likely that they will be able to pay more as our
2  contract offers them the clear ability to do so.
3    Q.   So you believe that Expert AuPair
4  distinguishes itself from its competitors based on
5  your contract allowing a space for a different
6  stipend amount?
7    A.   I think that's an important thing we
8  do.
9    Q.   Is that a point of differentiation
10  among your competitors, other sponsor agencies?  Is
11  it -- is the weekly stipend a point of
12  differentiation among Expert AuPair and other
13  sponsors?
14   MR. ENICA:  Object to form.
15   A.   I believe that the diversity of
16  stipends that is evident by our production shows
17  quite clearly that people do take advantage of that,
18  of knowing that flexibility.
19   The difference, I looked at quite -- I
20  looked at the, at the numbers.  And some were before
21  the minimum stipend was changed by the Department.
22  Some were Educare.
23       (Query by reporter)
24   Educare, E-d-u-c-a-r-e.
25   Those, excluding those, I calculated the

**MAGNA**
**LEGAL SERVICES**

Highly Confidential - Attorney's Eyes Only

Page 178

1  standard deviation of those contracts, as we're
2  calling them, as $77, which is very high in -- if
3  it's -- I would imagine it's very high compared with
4  other agencies, although I do not have knowledge. I
5  would imagine you'll find that's a reasonably high
6  standard deviation, which implies a large difference
7  in contracts.
8      And should I talk about being qualified to
9  calculate standard deviation?  I --
10     Q.  No.
11     A.  Yeah.
12     Q.  My question, again, is, and I'll
13 rephrase it in a different way...
14     A.  Mm-hm.
15     Q.  You're in a market where you compete
16 for host families seeking au pairs; is that correct?
17     A.  We are in a market where we compete,
18 yes.
19     Q.  Compete for what?
20     A.  We compete for, primarily for, host
21 families because there are more au pairs than
22 families.
23     Q.  Okay.  So in the competition for host
24 families, is the weekly stipend a point of
25 differentiation between you and other sponsors?

Page 179

1      MR. ENICA:  Object to form.
2      A.  I believe if a family wants to pay
3  their au pair more, it is more practical for them to
4  do it with our agency fee.  And we also emphasize
5  and have done since before the lawsuit, since well
6  before the lawsuit was filed, that this is a
7  minimum.
8      I would argue that some families do come
9  to us because they appreciate that.  I'm not saying
10 that all families do.  However, any business wants
11 to compete in various ways to, to provide a product,
12 if you like, that people want.
13     So certainly the fees are useful.  The
14 fact that there is the ability to pay more than the
15 minimum stipend is good.  The size is good.  There
16 are, there are many things that we compete on, to
17 use your language.
18     Q.  Okay.  If we can go back to Exhibit,
19 I think it's 6?
20     A.  Yeah.
21     Q.  Which is the advertisement?
22     A.  Mm-hm.
23     Q.  I've lost my copy but why don't you
24 just walk through.  That's a advertisement.
25     A.  Mm-hm.

Page 180

1      Q.  And we've already established that
2  that's a advertisement to a host family.
3      A.  Right.
4      Q.  Is that correct?
5      A.  Yes.
6      Q.  And you are advertising to try to
7  obtain new host families to participate in the
8  program?
9      A.  Yes.
10     Q.  And by doing that, you also testified
11 that in advertising, you generally try to put your
12 best foot forward; is that correct?
13     A.  Yes.  I believe that comment was
14 actually about Exhibit 13, but I say that... I say
15 that advertisements are designed to make -- designed
16 to try to attract people.
17     Q.  Okay.  Can you tell me what, in this
18 advertisement, what are the points that you
19 highlight that you are trying -- you are using to
20 attract host families to your program?
21     A.  I believe that this is aimed at
22 people who had never heard of an au pair rather than
23 people who already house an au pair, because it
24 seems to talk about the au pair program in general
25 more than it talks about us, other than it has the

Page 181

1  name on it.  And of course there's that reference at
2  the bottom, the MW from Jacksonville.
3      Q.  Okay.  But can you, can you read the
4  three bullets on the, on the advertisement?
5      A.  Yes.
6      Q.  That are the substance of this
7  advertisement?
8      A.  (as read):
9          "Hosting an au pair offers
10         families the chance to experience a
11         new culture and receive affordable
12         childcare services.
13         The program averages out to
14         approximately $330 per week for 52
15         weeks and provides you with 45 hours
16         of childcare weekly.
17         Regional and local
18         representatives ensure monthly
19         contact with your family and your au
20         pair."
21     Q.  Okay.  Now let's go back to Exhibit
22 No. 13.
23     A.  Mm-hm.
24     Q.  And I think this was the document,
25 you testified that this was also an advertisement;

MAGNA ▶
LEGAL SERVICES

Highly Confidential - Attorney's Eyes Only

| Page 182 |
| --- |

1   is that correct?
2        A.  Yes, that's my, that's my reading of
3   it, yes.
4        Q.  Okay.  And under "Fees and costs,"
5   can you read -- well, can you read that whole
6   section under "Fees and costs"?
7        A.  Yes.  (As read)
8             "At Expert AuPair, we have a
9             strict no-hidden-fee policy.
10            Here's what you can expect to pay:
11            Program fee:  6,400.
12            Domestic transfer:  0-350.
13            Tuition allowance" --
14       And my copy is not clear but I believe
15   that would say "500."
16            "Weekly stipend:  195.75."
17            Total is approximately $330 a week for one
18   year.
19       Q.  So understanding that these are,
20   Exhibit 6 and Exhibit 13 are, just two
21   advertisements, based on these two advertisements,
22   can you tell me anything that would attract families
23   that are interested in paying their au pair more
24   than the minimum stipend of 195.75?
25            MR. ENICA:  I object to form.  And may I

| Page 183 |
| --- |

1            request a clarification or you want him to
2            answer?
3            BY MS. SMALLS:
4        Q.  I want him to answer.
5        A.  I believe it accurate to say that
6   both of these advertisements -- and again, I find
7   this one sloppy and I've mentioned that -- I believe
8   that both of these advertisements were aimed at
9   people who had not heard of the au pair program more
10   than more than for people who were currently housing
11  an au pair or had heard of the au pair program.
12       Q.  What percentage of the families that
13  participate in your program have never heard of the
14  au pair program, versus families that already house
15  an au pair or are already versed in the program?
16       A.  It's very hard for me to say that
17  because I don't -- I haven't collected all that
18  data, at least not -- it's not something we've done.
19       The probable answer to your question is,
20  about 50 percent, probably, and again, this is
21  conjecture, about 50 percent have not heard of an au
22  pair or at least thought it was not something that
23  they -- that would be something that they would --
24  an avenue they would pursue.
25       Q.  I only ask that question because you

| Page 184 |
| --- |

1   drew a distinction between families, I guess,
2   advertising that would be geared towards families
3   that had never heard of the au pair program versus
4   families that were already housing an au pair or
5   were already versed in the program?
6        A.  Yeah.
7        Q.  So for families that had never heard
8   of the au pair program, is there anything in either
9   of these advertisements that would attract or
10  indicate to them that they should come to Expert
11  AuPair or that it would be easier to pay their au
12  pair more if they came through Expert AuPair versus
13  another sponsor agency?
14            MR. ENICA:  I object to form.  If you
15            understood, you can answer.
16       A.  I don't think that this, these
17  advertisements were written for that purpose.  And
18  while I understand you asked the question -- I
19  think, I think what I would add to my previous
20  answer is that these are printouts, and we probably
21  have produced this maybe a, maybe a copy of -- maybe
22  a thousand of them and put them on doors in
23  St.~Petersburg, where the au pair program is perhaps
24  not as well known as it may be elsewhere.
25       But once more, the first question that --

| Page 185 |
| --- |

1   the first thing we have to do is let people know
2   about the au pair program.  The second part is once
3   they do know, they can decide, you know, I want to
4   do this, I want to do that for my au pair.
5        Some families will buy a new car for the
6   au pair.  Some will -- lots, lots of things can
7   happen.  But it's certainly, it's certainly fair to
8   say these are for -- these are to tell people about
9   the au pair program rather than really necessarily
10  looking at us.
11       Q.  Are there other advertisements that
12  target families that already have an au pair or are
13  already versed in au pairs that tell them that, as
14  you said it, because your fees are lower, they can
15  pay their au pair more?
16       A.  I believe it says something to that
17  effect on the website or on the historic version of
18  the website, which is available still or archived, I
19  expect, at Expert AuPair.com.
20            MS. SMALLS:  For folks on the phone...
21            THE REPORTER:  This is 14, sorry.
22            MS. SMALLS:  We're now marking as Exhibit
23            14, Expert AuPair number 1.
24  EXHIBIT 14 marked for identification:  AuPair
25            Agreement, Bates ExpertAuPair000001-8

MAGNA
LEGAL SERVICES

Highly Confidential - Attorney's Eyes Only

## Page 186

1    BY MS. SMALLS:
2        Q.  Can you tell me what this is?
3        (witness perusing document)
4        A.  Yes, it's -- it priors to be our au
5    pair agreement.
6        Q.  Is this the current version of the
7    agreement?
8        A.  I believe it is.
9        Q.  If I can turn your attention to the
10   second page?  It says "2 of 8".  On the bottom?
11       A.  Mm-hm.
12       Q.  If you look at section F, it states
13   that: (as read)
14           "The au pair will be required to
15           pay all the fees and costs
16           specified in this agreement."
17       What costs, what fees and costs, are being
18   referenced there?
19       A.  The fees and costs I think we
20   described or we discussed earlier.  It was, it was a
21   $500 program fee and an airfare supplement that
22   varies according to where in the world you're coming
23   from.
24       Q.  Okay.  So would this be the case of
25   an au pair agreement where the au pair has applied

## Page 187

1    directly with Expert AuPair versus through
2    recruiting agency?
3        A.  Yes.
4        Q.  Or recruiting company?
5        A.  Yes.
6        Q.  Is there a separate agreement that an
7    au pair would sign if they came in through a
8    recruiting company versus coming directly to Expert
9    AuPair?
10       A.  I don't believe so.  I think the way
11   this works is that the fee is given in a separate
12   appendix, which is the -- which is normally just the
13   invoice that -- so that they see it.
14       Q.  You testified earlier that the au
15   pair pays fees to the recruiting company if they're
16   recruited through a recruiting company, or a $500
17   fee to Expert AuPair if the au pair comes to Expert
18   AuPair directly.
19       A.  Plus the airfare supplement in the
20   case that they're coming to us.
21       Q.  Okay.  Plus the airfare supplement.
22       A.  Mm-hm.
23       Q.  This agreement, which is entitled the
24   "Au Pair Agreement," provides for a $500 fee, under
25   H.

## Page 188

1        A.  Yes, it does.  Yes.
2        Q.  And what I'm -- what I'm asking you
3    is, does the au pair pay Expert AuPair a $500 fee
4    only when the au pair comes to Expert AuPair
5    directly, or does the au pair pay a $500 fee in
6    addition to the fees that the au pair pays to the
7    recruiting company, if she used or came to you
8    through a recruiting company?
9        A.  The $500 fee referenced here is for
10   au pairs matching -- sorry, coming to us.  I cannot
11   talk to all of the agreements we have because I have
12   not reviewed them.  But my recollection is that, for
13   example, the Argentine recruiting agency, we do not
14   receive money from those au pairs and so this would
15   probably be crossed out.
16       I believe it's also important to say that
17   there can be discounts on this amount, for example,
18   for pre-matches.
19       Q.  So this is your standard au pair
20   agreement, but in certain circumstances, you will
21   cross out certain provisions; is that, is that your
22   testimony?
23       A.  I, I cannot really speak to that.  I
24   would...  I cannot speak to what happens, but again,
25   there is space or there is an invoice or space for

## Page 189

1    an invoice to be sent.  So perhaps this needs to be
2    amended.
3        Q.  Okay.  To be clear, I am asking:  Is
4    this the only agreement in use for au pairs that
5    come to Expert AuPair?  Or is there an alternate
6    agreement for au pairs that may come to Expert
7    AuPair through a recruiting company?
8        A.  I don't know.
9        Q.  This agreement provides that the au
10   pair would pay Expert AuPair $500 in fees; is that
11   correct?
12       A.  This agreement does state that.
13       Q.  Are there exemptions to the $500 fee
14   for au pairs that come to -- come to and apply
15   through Expert AuPair?
16       A.  There are possible discounts, $200
17   for the airfare supplement -- sorry, for the
18   pre-matched discount.  I believe that's just been
19   decreased to $100.  So that this fee can be
20   lessened.  But it is not... and it is not always
21   charged, for example, to the Argentine au pairs,
22   which I can speak to.  I would not like to
23   characterize all of our agreements with overseas
24   recruiters without having reviewed them carefully.
25       Q.  Do most au pairs that apply through

PLAINTIFFS' RESP. APP.0005408

MAGNA
LEGAL SERVICES

Highly Confidential - Attorney's Eyes Only

Page 190

1  and are placed by Expert AuPair pay Expert AuPair a
2  $500 fee?
3      A.  I would not like to characterize our
4  number of pre-matches but 500 would be a common
5  amount to be charged, plus the airfare supplement.
6      Q.  Under "Working conditions," can you
7  read the sentence under number 1?
8      A.  (as read):
9          "Name is an au pair and
10         understands that her primary
11         responsibility is to provide
12         childcare in accordance with her
13         employment contract."
14     Q.  Are au pairs childcare providers?
15     A.  Au pairs look after children.
16     Q.  Are au pairs childcare providers?
17     MR. ENICA:  Objection.
18     A.  I'm not entirely sure I understand
19  the legal definition of "provider".
20     BY MS. SMALLS:
21     Q.  Okay.  Scratch that.
22     A.  Yeah.
23     Q.  I asked this question earlier.
24  Are au pairs employees?
25     MR. ENICA:  Objection.

Page 191

1      A.  Again, I've said that I don't
2  understand the legalities of that question.  So I'm
3  not comfortable answering it.
4      BY MS. SMALLS:
5      Q.  But au pairs do sign employment
6  contracts; is that correct?
7      A.  They sign a document that we call
8  "employment contract."  And it is referred to in the
9  same language here for that, for the reason of
10  cross-referencing.  It should probably be
11  capitalized just because it's a name.
12     Q.  Okay.  Can you read number 10 for me,
13  under "Working conditions"?
14     A.  (as read):
15         "Name will keep her living space
16         clean and will not invite guests
17         into the host family's house
18         without permission from the
19         family".
20     Q.  Is that a requirement as indicated by
21  the State Department regulations or is that an
22  Expert AuPair requirement?
23     A.  I do not recall seeing that in the
24  State Department rules.
25     Q.  Okay.  You can go to section --

Page 192

1  actually, I want to, under the section for "Required
2  Education" on page 3, that section seems to --
3  strike that.
4      We can go to page 4, under "Flight Home."
5  If you can read section 29 and its subparts?
6      A.  (as read):
7          "Expert AuPair will not provide
8          a return flight in the following
9          cases.  (This list is for
10         exemplification purposes and it is
11         not an exhaustive list.)
12         (i) if name strikes a child or,
13         through negligence or deliberate
14         acts" -- "act," sorry, singular --
15         "caused physical harm to a child.
16         If name changes status from J-1
17         au pair while in the United States.
18         If name smokes in a house or car
19         belonging to the family without
20         permission.
21         (iv)  If name present herself for
22         work under the influence of drugs or
23         alcohol or if name consumes alcohol
24         while working.
25         (v)  If name leaves the program

Page 193

1          before the end of her 12 months.
2          (vi) If name does not complete
3          her educational component.
4          (vii) If name does not maintain
5          contact with her local
6          representative" -- "representative
7          each and every month and her
8          regional representative at least
9          once every three months she is in
10         the au pair program."
11     Q.  Are these requirements in the State
12  Department regulations or in Expert AuPair's
13  guidelines and requirements?
14     A.  Some of these are things that were
15  added after conversations with the State Department,
16  the -- number (iv) being the notable one.  And of
17  course number (vii); it's essential that they're
18  contacting their local representative and their
19  regional representative, and clearly our concern
20  there is their safety and wellbeing as well as the
21  safety and well-being of the children.
22     Q.  Okay, let me specifically refer you
23  to 29(iii) that refers to "smoking in a house or car
24  belonging to the family without permission."
25     Is that a requirement outlined in the

Highly Confidential - Attorney's Eyes Only

Page 194

1  State Department regs or is that an Expert AuPair
2  requirement?
3      MR. ENICA: Objection to form.
4      A. I do not recall seeing it in the
5  Department of State guidelines.
6  BY MS. SMALLS:
7      Q. Okay. Let's go to 29(iv), which is:
8          "If name presents herself for
9          work under the influence of drugs
10         or alcohol or if name consumes
11         alcohol while working."
12     Is that a, is that a requirement or a
13 guideline in the State Department regulations or is
14 that a guideline that is specific to Expert AuPair?
15     A. This was added because one of our au
16 pairs had half a bottle of Smirnoff Ice while
17 watching children and the State Department was not
18 happy that we took no action.
19     Q. Sorry, had a half a bottle of what?
20     A. Smirnoff Ice.
21     Q. Okay. Smirnoff Ice.
22     Do you know if other sponsor agencies have
23 a similar guideline or requirement like that?
24     A. I do not.
25     Q. If you can go to the "Immediate

Page 195

1  Removal" section, you can read section 31.
2      A. Yes. (As read)
3          "Withdrawal from the Au Pair
4          program.
5          In accordance with the above
6          mentioned regulations, Expert AuPair
7          may withdraw any participant from
8          the program for failure to comply
9          with this agreement or the Code of
10         Federal Regulations mentioned
11         above."
12     Does Expert AuPair have the ability to
13 pull out an au pair --
14     MR. ENICA: Objection.
15     BY MS. SMALLS:
16     Q. -- if it deems that it is in
17 violation of this agreement?
18     MR. ENICA: Objection to form. You may
19 answer.
20     A. This is not about removal from --
21 removal of an au pair, this is about withdrawal from
22 the program.
23     BY MS. SMALLS:
24     Q. Okay. Can you explain? I mean, the
25 participant is being withdrawn, versus the

Page 196

1  participant withdrawing.
2      So can you explain how you are
3  distinguishing pulling an au pair out of the program
4  versus Expert AuPair proactively withdrawing an au
5  pair from the program?
6      MR. ENICA: I object to form. You may
7      answer, please.
8      A. I would distinguish our reporting of
9  that au pair in SEVIS from whether they continue
10 with the host family. For example, an au pair may
11 change status in the United States.
12     Q. Well let me ask you a question.
13 Outside of this specific provision, can Expert
14 AuPair pull an au pair out of a family's home or the
15 program?
16     MR. ENICA: I object to form.
17     A. They are different. The two concepts
18 are different.
19     BY MS. SMALLS:
20     Q. Okay. Can you tell me -- give me --
21 can you explain the two concepts as you understand
22 them?
23     A. If an au pair changes status to a
24 different status or adjusts status to a different
25 status, and stays with the host family, that would

Page 197

1  be one example. But again, what we do is we
2  withdraw them from the program. There's a
3  difference between withdrawing someone from the
4  computer database and taking somebody out of a
5  house.
6      Q. And what would happen if you, as you
7  explained it, took an au pair out of the computer
8  program?
9      A. Then they would no longer have the
10 status J-1 au pair.
11     Q. So they would need to legally go
12 home?
13     A. No.
14     MR. ENICA: I object to form. Yeah.
15     A. No.
16     BY MS. SMALLS:
17     Q. Okay. Why not? What would be their
18 options? Once you change their status in the
19 computer program and withdrew them from the program,
20 what would be the options for an au pair at that
21 point?
22     MR. ENICA: Objection.
23     A. They would -- that would depend on
24 the au pair. Some of our au pairs have two or three
25 different visas in their passport. So, for example,

MAGNA ▶
LEGAL SERVICES

Case 1:14-cv-03074-CMA-KMT   Document 1059-25   Filed 03/17/18   USDC Colorado   Page 583

Highly Confidential - Attorney's Eyes Only

Page 198

1  as I understand it, and I'm not an immigration
2  lawyer, but as I understand it, they could leave the
3  country and re-enter immediately.  They could come
4  up to Toronto, for example, re-enter immediately on
5  a different visa.  They could apply for a change of
6  status, or an adjustment of status.  There are
7  different options that an au pair could have.
8        Q.  But Expert AuPair in its sole
9  judgment can withdraw an au pair from the program;
10  is that correct?
11        A.  We are asked to maintain accurate
12  records in SEVIS, which we do.
13        Q.  Are you able to unilaterally make a
14  determination about whether the -- an au pair should
15  continue in the program?
16        MR. ENICA:  Objection to form.
17        A.  We can withdraw an au pair in SEVIS.
18  Obviously, we take that responsibility, which is, I
19  believe, part of designation if you wanted to say it
20  as a layperson, to -- we take that responsibility
21  very seriously.
22        BY MS. SMALLS:
23        Q.  I'm just going to re-read my
24  question.
25        A.  Yeah.  Yeah.

Page 199

1        Q.  Are you able to unilaterally make a
2  determination about whether the -- an au pair should
3  continue in the program?
4        MR. ENICA:  And I'm going to maintain my
5  objection.
6        A.  Again, we have a responsibility to
7  maintain the database records and, yes, therefore we
8  can withdraw au pairs from SEVIS.
9        BY MS. SMALLS:
10        Q.  Okay.  Going back to drugs and
11  alcohol, if we can go to number 35 that's part of
12  this agreement.
13        Number 35 states that:  (as read).
14            "Name consents to a reasonable
15            drug [and] alcohol test in the
16            event that a credible complaint is
17            made that she has presented herself
18            for work under the influence of
19            drugs or alcohol."
20        If a drug or alcohol test was called for,
21  who would administer it?
22        A.  I actually can't recall us... Maybe
23  we've done one.  It's very, very unusual.  And I
24  believe that was done by the host family.
25        Q.  The drug test was administered by the

Page 200

1  host family?
2        A.  I believe so, but I can't... I am
3  talking from vague recollection, not from...
4        Q.  Okay.  And then can you read number
5  36?
6        A.  (as read):
7            "Name agrees that if she refuses
8            to give a sample, Expert AuPair
9            will conclude either that she has
10            taken illegal drugs or she
11            presented herself for work under
12            the influence of alcohol."
13        Q.  So the results of the drug tests are
14  submitted to Expert AuPair for review?
15        MR. ENICA:  I object to the form of the
16        question.
17        BY MS. SMALLS:
18        Q.  Pursuant to this agreement?
19        A.  Well, this refers to if there's a
20  refusal to take a -- to give a sample.  I think this
21  also should be read in a, you know, in the way it's
22  intended, to sort of -- to make sure that the
23  children are safe.
24        Q.  And once the au pair is in the United
25  States and placed with a host family, what kind of

Page 201

1  monitoring occurs?
2        A.  So, once they've left training, they
3  will fly, normally on Friday, I believe now, to
4  their host family's local airport.  The host family
5  will pick them up.  Obviously it's different if it's
6  in Tampa or St. Pete.
7        The host family will pick them up.  There
8  is a check-in from the local representative within
9  two days, so within 48 hours.
10        The local rep then performs an
11  orientation, and that goes over the document we're
12  calling the employment contract.  And they interpret
13  various things like what dangers the child may --
14  may face in the home.  You know, things like
15  swimming pools and so on come up.  What the
16  understanding is on phone lines, although that's
17  less important now in the days of Skype.  What
18  opportunities the au pairs has -- the au pair has to
19  go out and sort of meet people?
20        And so that's all performed in two --
21  within two weeks of the date of the, date of
22  arrival, so two weeks after the Friday they've left
23  training.
24        Then there is monthly monitoring from the
25  local rep.  And so the typical questions are, you

MAGNA
LEGAL SERVICES

Highly Confidential – Attorney's Eyes Only

## Page 202

1 know: How are you doing? We'll ask, you know,
2 we'll ask how they're going about their education to
3 make sure that we want them to get out early to meet
4 Americans, because that's the point of the program,
5 the cultural exchange.
6         We will -- we'll ask to make sure that the
7 family is obeying the program rules. We'll make
8 sure they're happy. And we'll also talk to the host
9 family once a month. And then the regional rep
10 calls once every quarter. So typically there will
11 be -- you know, there would normally be four
12 contacts from the regional rep. The regional reps
13 know the au pairs from training, which is a nice,
14 you know, it's a nice sort friendly voice.
15        Q.   And are all of those contacts
16 required by the State Department regulations?
17        A.   Yes, I believe so. The only other
18 contact is -- the only other necessary contact, let
19 me say, is the two contacts that are needed in the
20 case of a rematch. So when an au pair leaves one
21 family and moves to another, we need two contacts
22 per month.
23        (Query by reporter)
24        Rematch, yeah.
25        And then there are various events

## Page 203

1 depending on where they are. So, for example, our
2 D.C. rep, I think, always meets at Starbucks in
3 Chinatown in D.C. And she occasionally does
4 something else as well. We have -- we've started
5 doing events in sort of big, quote, "interesting"
6 cities, so we did an event in D.C. a couple of weeks
7 ago which was attended by, I think, 40, some of whom
8 came down from New York.
9         So there is interaction afterwards with
10 the au pairs.
11        MS. SMALLS:  I'd ask that we take a short
12 break, and we'll just review what we have
13 left. Thank you.
14        MR. ENICA:  So we'll take ten minutes for
15 the people on the phone?
16        MS. SMALLS:  Yes.
17        THE VIDEOGRAPHER:  This is the
18 videographer on May the 9th, 2017, at
19 approximately 4:07 p.m. We are now going
20 off the record.
21 --- Upon recessing at 4:07 p.m.
22 --- Upon resuming at 4:15 p.m.
23        THE VIDEOGRAPHER:  This is the
24 videographer on May the 9th, 2017, at
25 approximately 4:16 p.m. We are now back

## Page 204

1         on the record.
2         BY MS. SMALLS:
3         Q.   Okay. Before we broke, we were
4 talking about orientations for both host families
5 and au pairs.
6         A.   Yes.
7         Q.   Do you provide an orientation form at
8 those orientations?
9         A.   There is an orientation standard
10 form, yes.
11        Q.   Okay. Do you know if those have been
12 produced?
13        A.   I believe they have.
14        Q.   Okay. If they have not been
15 produced, we'll follow up with your counsel.
16        A.   Okay.
17        Q.   Afterwards. So --
18 --- REPORTER'S NOTE:  Automatic telephonic message
19        (Discussion off the record)
20        BY MS. SMALLS:
21        Q.   So with that, I think we're done for
22 today with the reservation of -- that we would have
23 an opportunity to review the 4,000 documents that
24 were produced last week. And there are also a
25 number of documents that we discussed today that it

## Page 205

1 is unclear. We have searched for them, but it is
2 unclear whether they have been produced. So we
3 would like to reserve the balance of our time,
4 understanding that that time would be limited
5 towards the documents that were produced last week
6 or documents that we have specifically referenced in
7 today's deposition if they have not already been
8 produced.
9 --- REPORTER'S NOTE:  Request for production
10        MR. ENICA:  With one -- two
11 clarifications. The documents that were
12 produced within the last production, the
13 4,000 documents you mentioned, as long as
14 they were not produced before.
15        MS. SMALLS:  That's correct. Yeah.
16        MR. ENICA:  And the documents that were
17 referenced today, as long as they were
18 responsive to requests for production that
19 were due before today.
20        MS. SMALLS:  Yes.
21        MR. ENICA:  We do agree with that.
22        MS. SMALLS:  Okay.
23        MR. ENICA:  And if you require a
24 continuation of deposition, it will take
25 place in St. Petersburg, Florida.

**MAGNA** ▶
LEGAL SERVICES

Highly Confidential - Attorney's Eyes Only

| Page 206 | Page 208 |
|---|---|

**Page 206**

1    MS. SMALLS: That's correct.
2    THE WITNESS: And if I might add, if we
3    had two days to pick from, just in case
4    there's an event.
5    MR. ENICA: It's the 18th. I think we
6    agreed on the 18th.
7    THE WITNESS: Which, if there is a date --
8    MR. ENICA: Yes.
9    THE WITNESS: -- then I'm happy, I just
10    need to know.
11    MS. SMALLS: Okay. Yeah. It's the 18th.
12    Okay. Then we're ready to conclude.
13    MR. ENICA: I do have some cross. And
14    then maybe people on the phone have
15    questions.
16    EXAMINATION BY MR. ENICA:
17    BY MR. ENICA:
18    Q. So Dr. Gaulter, I would point you to
19    Exhibit 13.
20    A. Yes.
21    Q. And I would like you to look at the
22    bottom of the page and to read in the record the
23    last sentence -- sorry, the second-to-last and the
24    last sentence. The first three words of the, of the
25    second-to-last sentence are "our staff is."

**Page 207**

1    A. (as read):
2    "Our staff is always happy to
3    help answer questions about the
4    Expert AuPair program, so please
5    feel free to call us at our main
6    office at 727-388-3472 or send us
7    an e-mail at
8    admin@expertaupair.com. You may
9    also check out our website as
10    www.expertaupair.com for more
11    information about the program."
12    Q. And I'm going to ask you a question.
13    When you produced -- when you created this document
14    marked here as Exhibit 13, did you expect families
15    to contact you if they have any questions about the
16    information here?
17    A. Yes.
18    Q. Did you expect families to contact
19    you if they require clarification about the
20    information here?
21    A. Yes.
22    Q. Did you expect families to visit your
23    website if you want to go further in hiring an au
24    pair?
25    A. Yes.

**Page 208**

1    Q. Did you mention on your website that
2    the $195.75 is a minimum?
3    A. Yes, that's, that's on the website.
4    Q. Did you mention on the website that
5    they are -- they can pay more if they want to?
6    A. Yes.
7    MR. ENICA: I would like to mark this
8    document as Exhibit 14. Let's mark it
9    first.
10    MS. SMALLS: Are you -- I mean, I think
11    you're able to rebut things that we've
12    entered in as exhibits. I'm not sure that
13    you're able to enter in new documents that
14    we haven't --
15    MR. ENICA: Okay.
16    MS. SMALLS: -- specifically discussed or
17    referenced. I mean, it's a rebuttal of
18    our examination, not an affirmative
19    examination by you.
20    MR. ENICA: Correct. Do you object to
21    entering the document as Exhibit 14?
22    MS. SMALLS: I do.
23    MR. ENICA: Okay.
24    MS. SMALLS: I think you can rebut
25    anything that we put forward in today's

**Page 209**

1    deposition.
2    MR. ENICA: Mm-hm.
3    MS. SMALLS: But at this stage I object to
4    any new documents being introduced.
5    MR. ENICA: Okay. Then I have no further
6    question.
7    MS. SMALLS: Okay.
8    MR. ENICA: Maybe counsel on the phone, if
9    they have any questions for the witness?
10    MS. WEST: This is Natalie West appearing
11    GoAuPair, Agent Au Pair, and Au Pair
12    International. I do not.
13    MS. KRUZER: This is Lyndsey Kruzer for
14    Cultural Care. I do not.
15    MR. FULFREE: John Fulfree for AIFS. I do
16    not.
17    MS. LEVY: Alyssa Levy for InterExchange.
18    No questions.
19    THE VIDEOGRAPHER: This is the
20    videographer on May the 9th, 2017, at
21    approximately 4:23 p.m. We are now going
22    off the record and that concludes the
23    deposition of Dr. Mark Gaulter.
24    --- Whereupon proceedings concluded at 4:23 p.m.
25

PLAINTIFFS' RESP. APP.0005413

MAGNA
LEGAL SERVICES

Highly Confidential - Attorney's Eyes Only

Page 210

REPORTER'S CERTIFICATE

I, KARIN A. JENKNER, RPR, CRR, CSR (ONT.),
Certified Shorthand Reporter, certify:
     That the foregoing proceedings were taken
before me at the time and place therein set forth,
at which time the deponent was put under oath;
     That the testimony of the deponent and all
objections made at the time of the examination were
recorded stenographically by me and were thereafter
transcribed;
     That the foregoing is a true and correct
transcript of my shorthand notes so taken.
     I further certify that I am not a relative
or employee of any attorney or of any of the
parties, nor financially interested in the action.
     I declare that the foregoing is true and
correct.
     Dated this 18th day of May, 2017.


_____
     Karin A. Jenkner, CRR, RPR, CSR (Ontario)
(My Commissioner of Oaths expires July 19, 2019.)

Page 212

*** ERRATA SHEET ***

CASE:   Beltran v. InterExchange, Inc. et al.
DATE OF DEPOSITION:  May 9, 2017
NAME OF WITNESS: MARK JAMES GAULTER

PAGE  LINE     FROM          TO
____|____|____|_____|_____
____|____|____|_____|_____
____|____|____|_____|_____
____|____|____|_____|_____
____|____|____|_____|_____
____|____|____|_____|_____
____|____|____|_____|_____
____|____|____|_____|_____
____|____|____|_____|_____
____|____|____|_____|_____
____|____|____|_____|_____
____|____|____|_____|_____
____|____|____|_____|_____
____|____|____|_____|_____

                    _____
                    MARK JAMES GAULTER

Page 211

INSTRUCTIONS TO WITNESS

     Read your deposition over carefully.  It is
your right to read your deposition and make changes
in form or substance.  You should assign a reason on
the errata sheet in the appropriate column for any
change made.

     After making any changes in form or substance,
and which have been noted on the following errata
sheet, along with the reason for any change, sign
your name on the errata sheet and date it.

     Then sign your deposition at the end of your
testimony in the space provided.  You are signing it
subject to the changes you have made in the errata
sheet, which will be attached to the deposition
before filing.  You must sign it in front of a
witness.  The witness need not be a notary public.
Any competent adult may witness your signature.

     Return the original errata sheet to the
examining attorney (attorney questioning) promptly.
Court rules require filing within 30 days after you
receive the deposition.

Page 213

SIGNATURE PAGE
OF
MARK JAMES GAULTER

     I, THE UNDERSIGNED, declare:

     That I have read the foregoing transcript,
and I have made any and all corrections, additions
or deletions that I was desirous of making;

     That the foregoing is a true and correct
transcript of my testimony contained therein.

SIGNATURE:  _____

WITNESSED BY:  _____

DATE:       _____

# Exhibit 446

PLAINTIFFS' RESP. APP.0005415

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Case No. 14-cv-03074-CMA-KMT

_____

JOHANA PAOLA BELTRAN, ET AL.,

         Plaintiffs,

vs.

INTEREXCHANGE, INC., ET AL.,

         Defendants.

_____

VIDEOTAPED DEPOSITION OF

THERESA NELSON

30(b)(6) REPRESENTATIVE FOR AU PAIR FOUNDATION

MAY 9, 2017

DENVER, COLORADO

9:06 A.M.

Magna Legal Services
866-624-6221
www.magnals.com

PLAINTIFFS' RESP. APP.0005416

MAGNA
LEGAL SERVICES

## Page 2

1　　　　The videotaped deposition of THERESA
2　NELSON, taken before Leeann Keenan, a Registered Merit
3　Reporter, Certified Realtime Reporter, and a Notary
4　Public in and for the County of Summit and the State of
5　Colorado, at 1801 California Street, Suite 2700,
6　Denver, Colorado, on Tuesday, May 9, 2017, at the hour
7　of 9:06 a.m., pursuant to Notice.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 3

1　APPEARANCES:
2
3　BOISE, SCHILLER, FLEXNER, L.L.P.
　　BY: JUAN P. VALDIVIESO, ESQ.
4　　　1999 Harrison Street
　　　Suite 900
5　　　Oakland, California  94612
　　　(510) 874-1010
　　　appeared on behalf of the Plaintiffs
6
7　TOWARDS JUSTICE
　　BY: ALEXANDER HOOD, ESQ.
8　　　1535 High Street
　　　Suite 300
9　　　Denver, Colorado 80218
　　　(720) 441-2236
10　　alex@towardsjustice.org
　　　appeared on behalf of the Plaintiffs
11　CHOATE, HALL & STEWART
　　BY: JUSTIN WOLOSZ, ESQ.
12　　Two International Place
　　　Boston, Massachusetts  02110
13　　(617) 248-5221
　　　jwolosz@choate.com
14　　appeared by telephone on behalf of
　　　Cultural Care
15
16　LEWIS, ROCA, ROTHGERBER, CHRISTIE
　　BY: JESSICA FULLER, ESQ.
17　　1200 17th Street
　　　Suite 3000
18　　Denver, Colorado  80202
　　　(303) 628-9527
19　　appeared on behalf of Cultural Care
20　FISHER & PHILLIPS
　　BY: SUSAN SCHAECHER, ESQ.
21　　1801 California Street
　　　Suite 2700
22　　Denver, Colorado  80202
　　　(303) 218-3650
23　　sschaecher@fisherphillips.com
　　　appeared on behalf of AuPair
24　　Foundation and Au Pair in America
25

## Page 4

1　APPEARANCES CONTINUED:
2
3　GORDON & REES
　　BY: NATHAN HUEY, ESQ.
4　　　555 17th Street
　　　Suite 3400
5　　　Denver, Colorado  80202
　　　(303) 200-6888
6　　nhuey@gordonrees.com
　　　appeared by telephone on behalf of
7　　AuPairCare, Inc.
8　SHERMAN & HOWARD, L.L.C.
　　BY: JOSEPH HUNT, ESQ.
9　　　633 17th Street
　　　Suite 3000
10　　Denver, Colorado  80202
　　　(303) 299-8194
11　　jhunt@shermanhoward.com
　　　appeared by telephone on behalf of
12　　InterExchange, Inc.
13　NIXON, SHEFRIN, HENSEN, OGBURN
　　BY: MICHAEL DREW, ESQ.
14　　5619 DTC Parkway
　　　Suite 1200
15　　Greenwood Village, Colorado  80111
　　　(303) 773-3500
16　　michaeldrew@nixonshefrin.com
　　　appeared by telephone on behalf of
17　　ProAuPair and International Au Pair
　　　Exchange
18　GORDON & REES
　　BY: PEGGY KOZAL, ESQ.
19　　555 17th Street
　　　Suite 3400
20　　Denver, Colorado  80202
　　　(303) 200-6888
21　　pkozal@gordonrees.com
　　　appeared by telephone on behalf of
22　　AuPairCare, Inc.
23
24
25

## Page 5

1　APPEARANCES CONTINUED:
2
3　BROWNSTEIN, HYATT, FARBER, SCHRECK
　　BY: MARTHA FITZGERALD, ESQ.
4　　　410 17th Street
　　　Suite 2200
5　　　Denver, Colorado  80202
　　　(303) 223-1472
6　　mfitzgerald@bhfs.com.com
　　　appeared by telephone on behalf of
7　　EuRaupair InterCultural Child Care
　　　Programs
8
9　ALSO PRESENT: Jerry DeBoer, Videographer
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

MAGNA ►
LEGAL SERVICES

Page 6

I N D E X

DEPOSITION WITNESS:                          PAGE
THERESA NELSON
Examination by Mr. Valdivieso            10

DEPOSITION EXHIBITS MARKED:
NO.      DESCRIPTION                       PAGE
Exhibit 1   Plaintiffs' Notice of 30(b)(6)    12
            Deposition of APF Global Exchange,
            NFP d/b/a Au Pair Foundation
Exhibit 2   "About Us" from APF website       43
            APF000037

Exhibit 3   APF Global Exchange Organizational  66
            Chart
            APF 000062

Exhibit 4   Au Pair Foundation "Host Family   90
            Program Fees"
            APF 000030

Exhibit 5   Au Pair Foundation "Au Pair Programs" 97
            APF 000026 - 27
Exhibit 6   Au Pair Foundation "International  109
            Minds Begin at Home"
            APF 000159
Exhibit 7   Au Pair Foundation "Bring the World 116
            to Your Children" Brochure
            APF 000152 - 153
Exhibit 8   April 11, 2013 e-mail from Carrie  124
            Crompton to Ellen Hoggard and Theresa
            Nelson
            APF 000271 - 272

            Au Pair Foundation Encouragement   133

Exhibit 9   Letter
            APF 000233

Page 7

DEPOSITION EXHIBITS MARKED:
NO.      DESCRIPTION                       PAGE

Exhibit 10   "A Few Tips for Posting Online and  141
             E-mailing HF Leads"
             APF 000236 - 238

Exhibit 11   "The Au Pair Program - Au Pair 101" 152
             APF 000245 - 267
Exhibit 12   October 24, 2013 e-mail from Carrie  158
             Crompton to Tom Sullivan with
             attachment
             APF 000274 - 288

Exhibit 13   Au Pair Application - Au Pair Pledge, 164
             July 19, 2013
             APF 000126 - 130

Exhibit 14   Au Pair Application - Au Pair Pledge, 175
             August 19, 2013
             APF 000131 - 136

Exhibit 15   Au Pair Foundation Host Family    177
             Application, Host Family Agreement
             APF 000095 - 000100
Exhibit 16   February 3, 2014 e-mail from Holly  199
             Stephens to multiple recipients
             "Guidance on Workers' Compensation
             for Au Pairs, Illinois"
             EAP002942 - 2943
Exhibit 17   Au Pair Foundation Host Family    203
             Application, Host Family Agreement
             APF 000110 -115
Exhibit 18   Host Family Agreement            204
             APF 000075 - 80

Exhibit 19   Host Family Agreement - Au Pair Agreement  207
             APF 000137 - 150
Exhibit 20   Au Pair Handbook                 216
             APF 000160 - 202

Page 8

DEPOSITION EXHIBITS MARKED:
NO.      DESCRIPTION                       PAGE
Exhibit 21   Survey Monkey survey             229
             APF 000312
Exhibit 22   July 16, 2014 e-mail from Theresa  231
             Nelson to DOS with attached 2013
             Annual Report
             APF000368 - 389

Exhibit 23   June 25, 2015 e-mail from Theresa  242
             Nelson to DOS with attached 2014
             Annual Report
             APF 000429 - 449

Exhibit 24   December 31, 2015 AFP Global      243
             Exchange, Report of Independent
             Accountant son Applying Agreed-Upon
             Procedures
             APF 000599 - 614

Exhibit 25   June 8, 2011 e-mail from Michael  246
             McCarry to multiple recipients "June
             21 Board Dinner"
             InterExchange0033912

Exhibit 26   February 19, 2016 e-mail from Ilir  248
             Zherka to multi recipients "DOS
             Meeting"
             ExpertAuPair028121 - 028122
Exhibit 27   March 19 - 21, 2013 e-mail string  254
             between Carrie Crompton, Ellen
             Hoggard and Theresa Nelson
             APF 000268 - 270

Exhibit 28   July 16, 2013 e-mail string between  259
             Theresa Nelson and Deborah Herlocker
             CHI001202 1205

Exhibit 29   "Cost Breakdown Au Pair Program"  261

Page 9

P R O C E E D I N G S

1    THE VIDEOGRAPHER:  We are now on the
record.  This begins video No. 1 in the 30(b)(6)
deposition of Au Pair Foundation through their
designee, Theresa Nelson, in the matter of Johana
Paola Beltran, et al. versus InterExchange, Inc.,
et al. in the United States District Court for the
District of Colorado.

Today's date is May 9th, 2017 and
the time is 9:06 a.m.  This deposition is being
taken at Fisher & Phillips, L.L.P. located at 1801
California Street, Suite 2700, Denver, Colorado at
the request of counsel for plaintiffs.

The videographer is Jerry DeBoer
of Magna Legal Services, and the court reporter is
Leeann Keenan of Magna Legal Services.

All counsel will be noted on the
stenographic record and the reporter will now swear
in the witness.

(Witness duly sworn.)

THERESA NELSON,
having been first duly sworn, was examined and
testified as follows:

MAGNA
LEGAL SERVICES

1         EXAMINATION
2  BY MR. VALDIVIESO:
3      Q.   Good morning.
4      A.   Good morning.
5      Q.   Could you please state your name for the
6  record.
7      A.   Theresa Nelson.
8      Q.   Thank you, Ms. Nelson.
9           Who is your employer?
10     A.   I am self-employed.
11     Q.   And on whose behalf are you here today?
12     A.   I'm on -- here on behalf of APF Global
13  Exchange, non-profit -- not-for-profit.
14          MS. SCHAECHER:  And would I note for
15  the record that defendants submitted or served its
16  responses and objections to the 30(b)(6) notice, and
17  we present Ms. Nelson as the most knowledgeable
18  witness subject to those objections.
19          MR. VALDIVIESO:  Thank you, Counsel.
20     Q.   Ms. Nelson, have you been deposed before?
21     A.   No, I have not.
22     Q.   Have you given testimony in a
23  nondeposition setting in any judicial matter?
24     A.   No, I have not.
25     Q.   So given that this is your first time,

1  let's go over a few ground rules so we're all on the
2  same page.  Is that okay?
3      A.   Yes.
4      Q.   First, we're on video today --
5      A.   Uh-huh.
6      Q.   -- and we're trying to create a record,
7  so it's important that you give verbal answers and
8  not any gestures or nods.  Do you understand?
9      A.   Yes.
10     Q.   And let's try to agree to not speak over
11  each other.  I'll do my best, and is it -- I'll ask
12  you to do your best.  Is that okay?
13     A.   Yes.
14     Q.   And if you don't understand a question,
15  please let me know and I'll try to rephrase it.
16          Is there any reason you may not be
17  able to give accurate testimony today?
18     A.   No.
19     Q.   Any reason that your memory might be less
20  sharp today than usual?
21     A.   No.
22          MS. FULLER:  Excuse me, Counsel.
23  Would you mind moving the mike closer, and let's
24  make sure people on the phone can hear.  I know --
25  no, I'm sorry to the witness.  I know we've had

1  issues with the sound quality when I've been on the
2  phone for some of the other ones.
3          MR. VALDIVIESO:  Counsel on the
4  phone, can you hear us?
5          MR. HUEY:  It's much better now.
6  Thank you.
7          MS. FULLER:  And how about the
8  witness, can you hear when the witness speaks?
9          THE WITNESS:  Hello.
10         MR. HUEY:  Yes.  Also much better.
11  Thank you.
12         (Exhibit No. 1 was marked.)
13     Q.   Ms. Nelson, I'm handing you what we've
14  marked as Nelson Exhibit 1.  I'm going to --
15         MS. SCHAECHER:  Thank you.
16     Q.   Could you take a look at this exhibit,
17  please, Ms. Nelson.
18         Ms. Nelson, do you recognize
19  Exhibit 1?
20     A.   Yes, I do.
21         One moment.
22     Q.   We can -- we can actually limit our
23  discussion to what's coming before the blue page.
24     A.   Okay.
25     Q.   But -- but you're free to look at

1  the second --
2      A.   Okay.
3      Q.   -- set, if you'd like.
4      A.   Yes, the -- what's before the blue page
5  looks familiar.
6      Q.   And do you understand that you are APF
7  Global Exchange's corporate representative on these
8  topics here, subject to the counsel's -- your
9  counsel's objections --
10     A.   Yes.
11     Q.   -- is that correct?
12     A.   Yes, I do.
13     Q.   Now, today I might ask you some questions
14  about your personal experience, and I might ask you
15  some other questions about APF Global Exchange
16  generally.  I'll try to be clear when I'm asking my
17  questions.  But if you have any concerns, you can
18  ask me and I'll clarify whether I'm speaking about
19  you in your personal capacity or you as a
20  representative of APF Global Exchange.  Is that
21  okay?
22     A.   Yes.
23     Q.   Now, I'd like to turn your attention to
24  page 5 of what -- well, page 5 of Exhibit 1.  And
25  I -- I believe your counsel already spoke to this,

**MAGNA**
LEGAL SERVICES

Case 1:14-cv-03074-CMA-KMT    Document 1059-25    Filed 03/17/18    USDC Colorado    Page 592 of 700

Page 14

1  but I will ask you, just so I get your view.
2        Are you the most competent person
3  at APF to testify with respect to the topics listed
4  starting at page 5 of this notice?
5     A.   Yes, I believe so.
6     Q.   How did you prepare for today's
7  deposition, Ms. Nelson?
8     A.   I spoke with my attorney yesterday.
9     Q.   Did you speak with anyone else?
10    A.   Also my other attorney, Lawrence Lee.
11    Q.   Did you speak with anyone else at APF?
12    A.   No, I did not.
13    Q.   Where did you do your preparation?
14    A.   Here at the office.
15    Q.   Was anyone else from APF at your
16  preparation?
17    A.   No.
18    Q.   Did you speak with any other defendants
19  regarding this deposition?
20    A.   No, I did not.
21    Q.   Did you review any documents in
22  preparation for today's deposition?
23        MS. SCHAECHER:  I'm going to object
24  on the basis of attorney/client privilege to
25  documents identified by counsel.

Page 15

1        You can respond otherwise.
2     A.   Only any documents that I reviewed
3  yesterday in preparation for today.
4     Q.   In preparation for today, did you review
5  APF Global Exchange's 990s?
6     A.   No, I didn't.  Not in their entirety, no.
7     Q.   Did you review them in any way?
8     A.   I was asked several -- we had several
9  practice questions.
10        MS. SCHAECHER:  I'm going to object
11  again and instruct the witness not to answer
12  regarding anything that was discussed with counsel,
13  including documents selected by counsel for you to
14  review.  That's on the basis of the attorney/client
15  privilege.
16        MR. VALDIVIESO:  I understand,
17  Counsel.
18    Q.   You said a bit earlier that you are
19  currently self-employed; is that right?
20    A.   Yes, that's correct.
21    Q.   Prior to being self-employed, by whom
22  were you employed?
23    A.   Fireman's Fund and American Express.
24    Q.   Have you ever been an employee of APF
25  Global Exchange?

Page 16

1     A.   No, I have not.
2     Q.   Have you ever been an employee of Au Pair
3  Foundation?
4     A.   No, I have not.
5     Q.   Before Fireman's Fund and American
6  Express, did you have any other employers?
7     A.   I believe I was a secretary or something
8  at some point in my high school career.
9     Q.   Were you a volunteer for APF Global
10  Exchange at any point in your career?
11    A.   No.
12    Q.   What is your affiliation, if any, to APF
13  Global Exchange?
14    A.   I hold the title of vice president in
15  finance and accounting.  Or sorry, let me correct
16  that.  Finance and administration.
17    Q.   Is that an unpaid position?
18    A.   No, that is not.
19        I'm also assigned alternative
20  responsible officer with the Department of State.
21    Q.   And what does alternative responsible
22  officer with the Department of State entail, as far
23  as your duties go?
24    A.   My duties are outlined by the Department
25  of State in an ARO guideline, and my

Page 17

1  responsibilities are to follow those guidelines as
2  set forth.
3     Q.   Are you familiar with the regulations
4  governing the au pair program?
5     A.   Yes, I am.
6     Q.   So you -- you say you receive
7  remuneration for your current title as vice
8  president of finance.  Who -- who pays that salary
9  or -- you said compen -- are you -- is it a
10  compensated position?
11    A.   I am self-employed, so I present an
12  invoice.
13    Q.   You present an invoice to whom?
14    A.   Ellen Hoggard.
15    Q.   Do you present it to -- to Ellen Hoggard
16  in her individual capacity, or do you present it to
17  her in some other capacity?
18    A.   I present it to her as the president of
19  APF Global Exchange.
20    Q.   And how does she pay your invoice?
21    A.   I facilitate that through our accounting
22  system.
23    Q.   Do you know what account the payment that
24  you receive comes from?
25    A.   What do you mean by "account"?  The --

MAGNA
LEGAL SERVICES

1 the name or the bank or...
2    Q.   Do you know -- do you know the financial
3 institution from which the payment that you receive
4 is paid?
5    A.   Yes, I do.
6    Q.   And what financial institution is that?
7    A.   Bank of America.
8    Q.   And do you know in whose name that
9 account is in?
10    A.   Yes, I do.
11    Q.   Whose -- whose name is that account in?
12    A.   APF Global Exchange Non-For-Profit.
13    Q.   Would you describe yourself as an
14 independent contractor?
15    A.   Yes, I would, and I believe I have
16 already stated that.
17    Q.   When did you begin your role as a vice
18 president of finance?
19    A.   With APF Global Exchange?
20    Q.   With APF Global Exchange, yes.
21    A.   The day they -- of inception of the
22 corporation.
23    Q.   What was the date of inception of that
24 corporation?
25    A.   I don't recall the exact date.  I believe

1 that to be somewhere in 2012.
2    Q.   Prior to that did you provide any
3 services to AP -- strike that.
4         Prior to that did you provide any
5 services to any predecessor organizations to APF
6 Global Exchange?
7    A.   What specifically?  Which one?
8    Q.   Are there any predecessor organizations
9 to APF Global Exchange?
10    A.   I'm not sure I understand the term
11 "predecessor."
12    Q.   Okay.  How --
13    A.   There -- APF --
14    Q.   If you understand the question at all,
15 you can answer it, or I can clarify it?
16    A.   If you can clarify, because APF Global
17 Exchange is its own entity.
18    Q.   Okay.  Are you familiar with Au Pair
19 Foundation, Inc.?
20    A.   Yes.
21    Q.   What do you know about Au Pair
22 Foundation, Inc.?
23    A.   I know that that was a company formed
24 with the ownership of Mary Kass.
25    Q.   Who is Ms. Kass?

1    A.   She is the owner and president of that
2 corporation.
3    Q.   Did you provide any services to Au Pair
4 Foundation, Inc.?
5    A.   Yes, I did.
6    Q.   What services did you provide to Au Pair
7 Foundation, Inc.?
8    A.   That was primarily accounting.
9    Q.   Did you provide any other services,
10 besides accounting, to Au Pair Foundation, Inc.?
11    A.   Occasionally I would serve on -- as --
12 participate in management questions and day-to-day
13 functions.
14    Q.   When did you begin providing services to
15 Au Pair Foundation, Inc.?
16    A.   I believe that was -- that that
17 corporation was formed in 2006.
18         And let me also state, I was also
19 ARO for that entity as well.
20    Q.   What was the nature of Au Pair
21 Foundation, Inc.'s business, if you know?
22    A.   A J-1 visa sponsor for the au pair
23 program.
24    Q.   Do you know when Au Pair Foundation, Inc.
25 became a designated sponsor for the J-1 visa program

1 for the au pair program?
2    A.   2 -- I -- I believe it was 2006.
3    Q.   Do you know if Au Pair Foundation --
4 strike that.
5         Do you know if APF Global Exchange
6 existed prior to 2012?
7    A.   I'm -- I don't recall the actual legal
8 date that it was formed.
9    Q.   When -- what -- do you have an
10 understanding of what APF Global Exchange's business
11 is?
12    A.   Yes.  We're a J-1 visa sponsor for the
13 au pair program.
14         MR. VALDIVIESO:  I apologize.  I need
15 to silence my phone.
16    Q.   Where is APF Global Exchange located?
17    A.   The headquarters' office is at 205 Keller
18 Street, Suite 204, Petaluma, California.
19    Q.   Does it have any other offices, that
20 you're aware of?
21    A.   Ellen Hoggard sits in a separate office
22 in Massachusetts, but it is not an official APF
23 office.
24    Q.   Do you have any office space at the 205
25 Keller Street suite?

PLAINTIFFS' RESP. APP.0005421

**MAGNA**
LEGAL SERVICES

Page 22

1      A.   No, I do not.
2      Q.   Where do you work when you are providing
3  services to APF Global Exchange?
4      A.   I work at the office.
5      Q.   Do you have a workstation?
6      A.   Yes, I do.
7      Q.   To whom do you report, if anybody, at APF
8  Global Exchange?
9      A.   I report to Ellen Hoggard.
10     Q.   Do you report to anyone else?
11     A.   No, I do not.
12     Q.   Does anyone report to you?
13     A.   No.  Not -- not formally, no.
14     Q.   Does anyone report to you informally?
15     A.   No.
16     Q.   Did you work in the J-1 visa space prior
17  to providing service to Au Pair Foundation, Inc.?
18     A.   Can you repeat that question?
19        MR. VALDIVIESO:  Can you read the
20  question back to the witness, please.
21        THE WITNESS:  Sorry.
22         (Record read.)
23     A.   The answer would be no.  No, I did not.
24         In that particular space, prior to
25  Au Pair Foundation, Inc. I rented that space, Nelson

Page 23

1  Financial Services.
2      Q.   When you say you rented that space --
3  okay.  I -- I think I see what -- what our confusion
4  is.  I -- I meant in the J-1 visa in -- industry.
5  So we might have misunderstood each other when --
6  when I said "space."
7         Do you -- do you have an
8  understanding as to what my question is now?
9      A.   Do you mean have I worked in the J-1 visa
10  industry --
11     Q.   That's what I mean.
12     A.   -- or programs before?
13     Q.   Yes.
14     A.   Yes, I have.
15     Q.   And -- and please tell me in what
16  capacities you worked in the J-1 visa space before
17  providing services to Au -- Au Pair Foundation, Inc.
18     A.   Providing services to Au Pair Foundation,
19  Inc.?
20     Q.   Before.
21     A.   Before, okay.  Yes.
22         I provided the same, similar
23  services, in terms of accounting, ARO, finance, and
24  participating on management and management decisions
25  and review for Face the World and American Work and

Page 24

1  Travel.
2      Q.   Other than Face the World and American
3  Work and Travel, Au Pair Foundation, Inc., APF
4  Global Exchange, have you provided services to any
5  organization that works in the J-1 visa industry, as
6  you described it?
7      A.   Yes.  I'm also currently providing
8  services to STS Foundation.
9      Q.   What is STS Foundation?
10     A.   STS Foundation is a J-1 visa-sponsored
11  high school program.
12     Q.   Where is STS Foundation located, if you
13  know?
14     A.   It is located at 100 Main Street, Suite
15  420, Concord, Massachusetts.
16     Q.   Did you know if Ms. Hoggard has any
17  affiliation to STS Foundation?
18     A.   Yes, I do.
19     Q.   What is Ms. Hoggard's affiliation with
20  STS Foundation?
21     A.   She's the president.
22     Q.   Let's go back to Face the World for a
23  second.
24         Did Face the World provide any
25  visas for the au pair program?

Page 25

1      A.   No, they did not.
2      Q.   What types of visas did they provide?
3      A.   High school student, secondary -- I
4  believe it's secondary student exchange, or -- or
5  students is the official.
6      Q.   American Work and Travel, did they
7  provide visas for the au pair category?
8      A.   No, they did not.
9      Q.   What types of visas did they provide?
10     A.   They were a work and travel sponsor.
11     Q.   What were the approximate dates during
12  which you provided services to Face the World and
13  American Work Travel?
14     A.   I began with Face the World, I believe,
15  in 1998, somewhere around there, and continued as an
16  independent contractor working off and on until the
17  inception of American Work and Travel.  I don't
18  recall what year that company began, but it would
19  have been somewhere after '98 and before Au Pair
20  Foundation, Inc. was formed.
21     Q.   Did Ms. Hoggard have any affiliation with
22  Face the World or American Work and Travel?
23     A.   No, she did not.
24     Q.   Did you know Ms. Hoggard prior to your
25  work for Au Pair Foundation, Inc.?

PLAINTIFFS' RESP. APP.0005422
MAGNA
LEGAL SERVICES

Page 26

1      A.   No, I did not.
2      Q.   Did Ms. Hoggard have any affiliation with
3   Au Pair Foundation, Inc.?
4      A.   No, she did not.
5           Can I restate or back up on -- and
6   clarify that point?
7      Q.   Sure.
8      A.   She did not while Mary Kass was the
9   president and owner of Au Pair Foundation, Inc.
10     Q.   And when was Mary Kass the owner of
11  Au Pair Foundation, Inc.?
12     A.   From its inception until the ownership
13  transferred in, I believe, 2011 or 2012.
14     Q.   Do you know to whom the ownership
15  transferred in 2011 or 2012?
16     A.   No, I don't recall the names of the --
17  the transfer of ownership.  That was a very short
18  period.
19     Q.   Do you know why the ownership was
20  transferred?
21     A.   No, I do not.
22     Q.   Do you have an understanding as to why
23  the --
24     A.   Yes.
25     Q.   -- ownership was transferred?

Page 27

1      A.   I understand Mary Kass no longer wanted
2   to participate in the au pair program.
3      Q.   For purposes of today's deposition, is it
4   okay if I call APF Global Exchange and AP -- Au Pair
5   Foundation, Inc. APF?  And my question will apply to
6   both entities, and you can answer and specify to
7   which one your answer applies?  Would that be okay?
8           MS. SCHAECHER:  I'm going to object
9   to that.  This deposition is of a APF Global NP --
10  Not-For-Profit witness.  And combining the two in
11  every question I believe is in -- inappropriate,
12  plus confusing for the witness.
13          MR. VALDIVIESO:  Are you instructing
14  your witness not to answer my questions in that
15  form?
16          MS. SCHAECHER:  I'm asking you not to
17  combine those in that way.  Otherwise, I will have a
18  standing objection on the basis of form.
19          I think it would be smoother if
20  you would have the assumption be that the
21  not-for-profit is who you're referring to by "APF,"
22  unless otherwise stated.
23          MR. VALDIVIESO:  I think today's
24  deposition is going to go much longer if I need to
25  ask my questions, each time I ask, twice.  And I

Page 28

1   think it would be more efficient if -- if I could
2   refer to APF Global Exchange in shorthand by "APF."
3           I -- I -- I -- I take your
4   objection, but I -- I think it -- it will be more
5   painful for all of us.  But I -- I -- I will -- I
6   will be clear in my questioning.
7           MS. SCHAECHER:  It's going to be
8   painful if I have to object to every question that
9   gets asked today, and that's also going to extend
10  the deposition.
11          And for the clarity of the witness
12  I, again, ask you to have the references to APF be
13  references to the not-for-profit, which is the party
14  that is designated to testify here today and the
15  party that you requested come to this deposition.
16          MR. VALDIVIESO:  I will indulge
17  counsel.
18     Q.   And when we refer -- when I refer to APF,
19  if we assume -- you can assume that I'm referring to
20  APF Global Exchange Not-For-Profit, unless otherwise
21  stated.  Is that okay?
22     A.   Yes.  And that's much more clear for me
23  because my roles were very different between the two
24  organizations.
25     Q.   Does Au Pair Foundation, Inc. still exist

Page 29

1   as an entity?
2      A.   No, it does not.
3      Q.   So starting with APF -- APF Global
4   Exchange.
5           Does APF Global Exchange belong to
6   any organizations, groups, or associations related
7   to the childcare industry?
8      A.   No.
9      Q.   Does APF belong to any organizations,
10  groups, or associations related to the work travel
11  industry?
12     A.   No.
13     Q.   Does APF belong to any organizations,
14  groups, or associations related to cultural
15  exchange?
16     A.   Yes.
17     Q.   Which groups, organizations, or
18  associations is that?
19     A.   We are a member of Alliance for
20  International Exchange and IAPA, International
21  Au Pair Association, I believe is the name of that
22  one.
23     Q.   Any other organizations related to
24  cultural exchange?
25     A.   Not that I can recall, no.

PLAINTIFFS' RESP. APP.0005423

MAGNA
LEGAL SERVICES

1    Q.   Is APF a member of any other business
2  organizations?
3    A.   We're a member of the Better Business
4  Bureau.
5    Q.   Is it okay if I refer to the first group
6  you mentioned as just the Alliance?
7    A.   Yes.
8    Q.   Do you know when APF Global Exchange
9  joined the Alliance?
10    A.   No, I do not recall.
11    Q.   Do you have an approximate understanding
12  as to when APF Global Exchange joined the Alliance?
13    A.   From memory, I'm assuming 2012, 2013,
14  somewhere in there.
15    Q.   Was Au Pair Foundation, Inc. a member of
16  the Alliance?
17    A.   I do not believe so, but I don't have a
18  clear memory on that.
19    Q.   Have you ever attended any Alliance --
20  strike that.
21        Do you know if the Alliance meets
22  with any regularity?
23    A.   Yes, it's my understanding.
24    Q.   What's your understanding of how regular
25  the Alliance meets?

1    A.   I have an assumption that they meet
2  annually at least, and then sporadically, depending
3  on other events throughout the year, I suppose.
4    Q.   Have you attended any Alliance meetings?
5    A.   Yes, I have.
6    Q.   I'm sorry, when you said you were
7  assuming, what did you mean by assumption?
8    A.   I don't participate directly on Alliance
9  or keep a day-to-day activity interacting with
10  Alliance.
11    Q.   When you attended -- when you attended
12  the Alliance meetings, you mentioned that you had
13  attended, were you attending as a representative of
14  APF?
15    A.   Yes, I was.
16    Q.   Who else at APF, if anyone, are you aware
17  of that has attended Alliance meetings in the past?
18    A.   Ellen Hoggard has attended Alliance
19  meetings. I believe Ainura Ozturk.
20    Q.   And could you spell that for the record,
21  please?
22    A.   O-z-t-u-r-k. Carrie Crompton.
23    Q.   Anybody else who -- that you are aware of
24  who has attended Alliance meetings on behalf of APF?
25    A.   We have an -- that I recall, an

1  independent contractor that was acting as regional
2  director, Julie Moeller, who attended a local event.
3  But that may have been a Department of
4  State-sponsored event. I'm not clear on who
5  actually sponsored that particular event.
6    Q.   Are you aware of anyone who has
7  represented Alliance -- strike that.
8        You mentioned Ms. Hoggard,
9  Ms. Ozturk, Ms. Crompton, and Ms. Moeller as people
10  that you are aware of who attended Alliance
11  meetings. When they attended, were they attending
12  on behalf of APF as well?
13    A.   Yes.
14    Q.   Were they attending on behalf of any
15  other organization?
16    A.   Ellen Hoggard, I assume, would also be
17  have -- have been attending on behalf of STS
18  Foundation.
19    Q.   Other than Ms. Hoggard, would any of the
20  other individuals you named have attended on behalf
21  of STS Foundation, if you know?
22    A.   No.
23    Q.   You also mentioned IAPA. What is IAPA?
24    A.   IAPA is an international organization to
25  sponsor -- or promote cultural exchange in the

1  au pair industry.
2    Q.   Does IAPA have meetings with any
3  regularity?
4    A.   Yes. They have annual meetings, to my
5  knowledge.
6    Q.   Have you ever attended an IAPA meeting?
7    A.   Yes, I have.
8    Q.   How many times have you attended IAPA
9  meetings?
10    A.   One.
11    Q.   When was that?
12    A.   I believe that was last year or the year
13  before.
14    Q.   When you represent -- when you attended
15  the IAPA meeting, were you representing APF?
16    A.   Yes, I was.
17    Q.   Are you aware if anyone else from APF
18  having attended IAPA meetings?
19    A.   Yes. Ellen Hoggard, and I believe Ainura
20  Ozturk has as well.
21    Q.   Do you know if Ms. Hoggard attended IAPA
22  on behalf of APF when she attended the IAPA
23  meetings?
24    A.   Yes.
25    Q.   Would she have attended IAPA representing

PLAINTIFFS' RESP. APP.0005424

MAGNA
LEGAL SERVICES

Case 1:14-cv-03074-CMA-KMT   Document 1059-25   Filed 05/17/18   USDC Colorado   Page 597
of 700

Page 34

1    STS Foundation?
2        A.   No.
3        Q.   Why is that?  How do you know that?
4        A.   IAPA is specifically for the au pair
5    industry or au pair program, the cultural exchange
6    for au pairs.
7        Q.   What is your understanding of the
8    Alliance's purpose?
9        A.   My Alliance -- my understanding for
10   Alliance is to help promote and help spread the word
11   of cultural exchange.
12       Q.   Do you know if -- I'm sorry.
13           The meetings that you described,
14   were they all -- were all those meetings -- for both
15   IAPA and the Alliance, were all those meetings
16   in-person meetings?
17       A.   The particular ones I attended?  Sorry.
18       Q.   Yes.
19       A.   Yes, the ones I attended were in-person
20   meetings.
21       Q.   Do you know if the Alliance conducts any
22   meetings over conference calls?
23       A.   I don't believe they have formal meetings
24   over conference calls.
25       Q.   Are you aware --

Page 35

1        A.   They -- they may invite members to join
2    and listen in, but I don't have any clarity on that.
3        Q.   Is that something that you believe did
4    happen, or is that something that you are assuming?
5        A.   I'm assuming, just due to the logistics
6    of people attending events.
7        Q.   What about IAPA, do you know if they hold
8    conference calls?
9        A.   No, I do not.
10       Q.   Do you receive any e-mails from the
11   Alliance or any representatives of the Alliance?
12       A.   Yes, I do.
13       Q.   Do you receive them with any regularity?
14       A.   Yes, I do.
15       Q.   And with what regularity is that?
16       A.   I don't recall.  I probably receive at
17   least two a month, I'm assuming.
18       Q.   Are you part of a distribution list or
19   e-mail LISTSERV belonging to the Alliance?
20       A.   Yes, I am.
21       Q.   When you receive the e-mail from the
22   Alliance, do you receive it to an address that's to
23   your name?
24       A.   Au Pair Foundation, yes.
25       Q.   What is that e-mail?

Page 36

1        A.   Theresa@AuPairFoundation.org.
2        Q.   Do you receive Alliance e-mails to any
3    other e-mail?
4        A.   No, I do not believe so.
5        Q.   Does APF receive Alliance e-mails to any
6    other e-mail?
7        A.   I am not aware if Ellen -- how Ellen
8    Hoggard receives Alliance communication, to which
9    e-mail it goes to.
10       Q.   And are you on any e-mail distribution
11   list or LISTSERV belonging to IAPA?
12       A.   I believe I am.
13       Q.   Do you receive those e-mails to your
14   Au Pair Foundation e-mail as well?
15       A.   Yes, I do.
16       Q.   Does anyone else at Au Pair Foundation
17   receive e-mails from the IAPA LISTSERV?
18       A.   Ellen Hoggard may.  I'm not clear if she
19   does or does not.  Also Ainura Ozturk may.
20       Q.   You mentioned Ms. Crompton and
21   Ms. Moeller.  Are they still with Au Pair
22   Foundation?
23       A.   No, they are not.
24       Q.   Do you know where they have gone?
25       A.   I believe Carrie is -- Carrie Crompton is

Page 37

1    working for CHI.
2        Q.   Okay.
3        A.   And I do not know what Julie is doing.
4        Q.   And you said she was local.  Where --
5    where was she based?
6        A.   Washington, D.C.
7        Q.   Where was Ms. Crompton based?
8        A.   I believe she's in St. Louis, Missouri.
9        Q.   And she was in St. Louis at the time that
10   she worked for Au Pair Foundation; is that right?
11       A.   Yes.
12       Q.   Is Au Pair Foundation a -- a member of
13   any groups on social media related to childcare,
14   work travel, or -- or cultural exchange?
15       A.   And you mean APF?
16       Q.   APF, yes.
17       A.   Can you repeat the question?
18       Q.   Is APF a member of any groups on social
19   media related to childcare, work travel, or cultural
20   exchange?
21       A.   No, other than the ones I've already
22   mentioned.
23       Q.   The ones that I mentioned would be the
24   Alliance and IAPA; is that right?
25       A.   Yes.

**MAGNA**
LEGAL SERVICES

**Page 38**

1    Q.    Do the Alliance and IAPA, do they have
2 groups on social media?
3    A.    No, not that I'm aware of.
4    Q.    Does APF have a Facebook page?
5    A.    Yes.
6    Q.    How does APF use its Facebook page?
7    A.    APF uses its Face -- Facebook page to
8 promote and communicate to the community.
9    Q.    How do those communications take place on
10 Facebook?
11    A.    Postings.
12    Q.    When you say posting, is that a post to
13 the public?
14    A.    Yes.  That would be a post to the public,
15 yes.
16    Q.    Do you know if the settings on the
17 Facebook page are what's called -- do -- do you know
18 what a private setting is on Facebook?
19    A.    Yes, I believe so.
20    Q.    Do you know if the settings for the APF
21 page are private?
22    A.    No, my assumption would be they're all
23 public.
24    Q.    And who at APF is responsible for
25 creating the content of the Facebook page?

**Page 39**

1    A.    We have an intern that is responsible for
2 that content.
3    Q.    Other than posting publicly, do you know
4 if the Facebook page or Facebook as a medium is used
5 to communicate with host families or au pairs?
6    A.    We have a blog on our website.
7          In terms of Facebook, no, not --
8 not specific communication directed to specific
9 au pairs or specific host families.  It would be the
10 public in general.
11    Q.    Are you familiar with the service
12 Facebook Messenger?
13    A.    Yes.
14    Q.    Do you know if Au Pair Foundation or
15 anyone of -- at Au Pair Foundation uses Facebook
16 Messenger to communicate with host families or
17 au pairs?
18    A.    I would say not on a regular basis.  Only
19 if a message came in to us.
20    Q.    Are you aware of any instance where --
21 where Facebook Messenger has been used by anyone at
22 APF to respond to a message?
23    A.    Not that I recall, but I'm not -- I
24 wouldn't be aware of that sort of detail.
25    Q.    Does APF have a LinkedIn page?

**Page 40**

1    A.    Yes, I believe we do.  I don't believe it
2 to be very active, if at all.
3    Q.    Does APF use -- are you familiar with the
4 service Google Plus?
5    A.    No, I am not.
6    Q.    You mentioned a blog on APF's website; is
7 that right?
8    A.    Correct.
9    Q.    Who at APF is responsible for maintaining
10 the content of that blog?
11    A.    That would be Kim Wunderlich-Cady.
12    Q.    What is --
13    A.    The ultimate responsibility would be
14 Ainura Ozturk, our program manager.
15    Q.    And Ms. Wunderlich-Cady, what is her --
16 her role at APF?
17    A.    She creates the content that's submitted
18 to Ainura.
19    Q.    Does Ms. Ozturk also have ultimate
20 responsibility for the content of the Facebook page?
21    A.    Yes.
22    Q.    Do you, Ms. Nelson, have any
23 responsibility for the content on either the
24 Facebook page or the blog?
25    A.    No, I do not.

**Page 41**

1    Q.    You mentioned you have a website as well;
2 is that right?
3    A.    Yes.
4    Q.    Does anyone other than -- strike that.
5          Who -- who has responsibility for
6 creating the content for the APF website?
7    A.    At this time, that would be Ainura
8 Ozturk.
9    Q.    And prior to this time, and any time
10 since the founding of APF, has anyone else had
11 responsibility for the content of the APF website?
12    A.    I would have participated in that as
13 well, and Ellen -- Ellen Hoggard, so a collaboration
14 between the two of us.  I'm trying to think.  Carrie
15 Crompton would have participated in content for
16 the -- for the website during that period.
17    Q.    Does APF work with any third parties in
18 creating the design or the content of the APF
19 website?
20    A.    We use Word -- WordPress to design.  We
21 also use a vendor called HubSpot that interacts with
22 our website.
23    Q.    What do you mean by interact with the
24 website?
25    A.    I believe that when you go to our website

PLAINTIFFS' RESP. APP.0005426

**Page 42**

1   and complete an application, the application
2   actually goes to HubSpot.
3       Q.   Those are vendors that APF currently
4   uses?
5       A.   Yes.
6       Q.   Has APF used any other vendors in
7   creating its website content or design?
8       A.   I'm trying to think who else we would
9   have used over the years.  That's all that I can
10  recall.
11      Q.   Are you familiar with Ms. Von Rock Ricci?
12      A.   Yes.  I believe that is a former host
13  family.
14      Q.   Do you know if Ms. Von Rock Ricci had any
15  affiliation with Au Pair Foundation, Inc.?
16      A.   Yes.  I believe she was an attorney or
17  represented them in some way.
18      Q.   Is Ms. Von Rock Ricci a current host
19  family?
20      A.   Not to my knowledge, no.
21      Q.   Is APF in the business of childcare
22  provision?
23      A.   No, we are not.
24      Q.   I'm going to be handing you what we are
25  marking as Exhibit 2.

**Page 43**

1            (Exhibit No. 2 was marked.)
2       Q.   Are you familiar with Exhibit 2,
3   Ms. Nelson?
4       A.   Yes.  It looks like a page from our
5   website.
6       Q.   And specifically what part of the website
7   is this a page -- strike that.
8            What -- what part of APF's website
9   is this?
10      A.   It appears to be from the "About Us"
11  section.
12      Q.   And if you read in the first paragraph,
13  the last sentence starting with, "In addition."
14           Do you see that?
15      A.   Yes, I do.
16      MR. VALDIVIESO:  Oh, and I -- I
17  apologize for counsel on the phone.  Exhibit 2 is a
18  document ending in Bates No. -- or with Bates No.
19  APF 000037.
20      Q.   And if you could read that last sentence
21  into the record, please.
22      A.   "In addition, we provide quality
23  childcare to American families and educational
24  opportunities to international young people."
25      Q.   So does APF provide quality childcare?

**Page 44**

1       A.   APF is a J-1 visa sponsor.
2       Q.   Is it your testimony today that the About
3   Us website is inaccurate in stating that APF
4   provides quality childcare?
5       A.   I don't have a comment regarding that.
6   APF is a J-1 visa sponsor, and we provide
7   opportunities to foreign participants to participate
8   in the J-1 visa sponsor program in accordance with
9   the Department of State regulations.
10      Q.   So providing quality childcare is not a
11  part of APF's business?
12      A.   APF sponsors the visa that allows the
13  participant to come into the U.S., and the
14  Department of State defines what that participation
15  is.
16      Q.   You can set Exhibit 2 aside, Ms. Nelson.
17           Other than the au pair program,
18  does APF have any other missions or provide any
19  other services?
20      A.   Other than the au pair program?
21      Q.   Yes.
22      A.   Just to promote cultural exchange.
23      Q.   Does it promote cultural exchange through
24  any other means, other than the au pair program?
25      A.   No, it does not.

**Page 45**

1       Q.   Does APF have any international offices?
2       A.   No, it does not.
3       Q.   Does STS Foundation have any
4   international offices --
5       A.   No.
6       Q.   -- do you know?
7       A.   No, it does not.
8       Q.   Has APF had any other -- strike that.
9            Has APF in the past, have they had
10  any international offices?
11      A.   No.
12      Q.   And has STS Foundation in the past had
13  any international offices?
14      A.   No.
15      Q.   Do you know if APF Foundation, Inc. had
16  any international offices?
17      A.   Yes, I know; and, no, they do not, have
18  not.
19      Q.   Does APF Global Exchange NPF [sic] have
20  any joint ventures with any other entities?
21      A.   No, they do not.
22      Q.   Have they in the past had any joint
23  ventures?
24      A.   No.
25      Q.   Does APF Foundation Global Exchange NPF

| Page 46 | Page 48 |
|---|---|

**Page 46**

1 have any investments in any other entities?
2    A. No.
3    Q. You mentioned that you use a NPF
4 Foundation -- sorry, APF Foundation e-mail address;
5 is that right?
6    A. Yes, that's correct.
7    Q. Do you have an STS Foundation e-mail
8 address?
9    A. Yes, I do.
10    Q. How do you distinguish when you're
11 providing services to STS Foundation versus when you
12 are providing services to APF?
13    A. I distinguish it by the type of work that
14 I'm per -- that I'm making my contribution to.
15    Q. What type of work would indicate to you
16 that you are providing services to Au Pair
17 Foundation?
18    A. Which entity I'm working for at that
19 time, whether it's an APF project, communication,
20 interaction, or STS Foundation.
21    Q. Do you select which e-mail you are using
22 based on the -- strike that.
23       How do you select which -- which
24 of the two e-mails you described to use?
25    A. I tend to segregate my time during the

**Page 47**

1 day. And I will focus for a certain amount of time
2 on a certain company, so I'll be working on that
3 e-mail.
4    Q. When you pro -- when you submit invoices
5 for payment -- let's back up a little bit.
6       Does STS Foundation pay your --
7 pay invoices of yours as well?
8    A. Yes, they do.
9    Q. Do you submit separate invoices to APF
10 and STS Foundation --
11    A. Yes, I do.
12    Q. -- for payment?
13       The "NFP" in APF Global Exchange,
14 does that stand for not-for-profit?
15    A. Yes, it does.
16    Q. Do you have an understanding of what type
17 of corporation APF Global Exchange NFP is?
18    A. A non-for-profit.
19    Q. Do you know if it's a 501(c)(3)?
20    A. Yes, it is.
21    Q. Do you know if Au Pair Foundation, Inc.
22 was a not-for-profit?
23    A. No, it was not.
24    Q. What type of corporation was Au Pair
25 Foundation, Inc.?

**Page 48**

1    A. A corporation.
2    Q. Was it a for-profit corporation?
3    A. Yes, it was. I believe so.
4       There were two different corporate
5 structures during the period that I was doing the
6 accounting there.
7    Q. Could you refresh my memory? During the
8 period that you were providing accounting services
9 at Au Pair Foundation, Inc., was that approximately
10 between 2007 and 2012?
11    A. Yes. I believe -- I believe it was 2006,
12 but it could have been 2007, since the inception.
13 And I believe that began as a subchapter
14 corporation.
15    Q. When you say "subchapter," a subchapter
16 of what?
17    A. It was a -- a subchapter of a company
18 called, I believe, MMK Holdings, Incorporated.
19    Q. Do you know if "MMK" happens to be the
20 initials of Ms. Kass?
21    A. Yes.
22    Q. Do you know what other businesses MMK
23 Holdings participated in, other than the au pair
24 program?
25    A. It -- the American Work and Travel

**Page 49**

1 Corporation was under that entity as well.
2    Q. Were there any other programs under that
3 entity?
4    A. I don't have a clear memory. There may
5 have been another one.
6    Q. Do you have an understanding as to why --
7 strike that.
8       Do you -- do you have an
9 understanding whether there was a merger between APF
10 Global Exchange Not-For-Profit and Au Pair
11 Foundation, Inc.?
12    A. Yes.
13    Q. What is your --
14    A. I -- I -- I don't -- sorry.
15    Q. Go ahead. I apologize for interrupting
16 you.
17    A. Generically, yes. But legally I don't
18 understand the specifics of what transpired.
19    Q. Fair enough. I'm asking as to your
20 understanding, and I'm not asking you to provide any
21 legal conclusions.
22    A. Okay.
23    Q. What is your understanding of --
24    A. My legal --
25    Q. -- what -- what occurred?

PLAINTIFFS' RESP. APP.0005428

**MAGNA** ◗
LEGAL SERVICES

Page 50

1    A.  My nonlegal understanding is that APF,
2  Incorporated was dissolved, and then APF Global
3  Exchange was submitted on its own as a
4  not-for-profit.
5    Q.  Do you have an understanding as to why
6  Au Pair Foundation, Inc. had been a for-profit
7  corporation and the new entity to which -- new
8  entity that was created was created as a
9  not-for-profit?
10       MS. SCHAECHER: Objection. Form.
11  Foundation.
12    A.  No, I don't. I was not part of that
13  decision-making process.
14    Q.  Does APF Global Exchange have a board of
15  directors?
16    A.  Yes, it does.
17    Q.  Do you know how large -- how many people
18  sit on the board of directors?
19    A.  The board fluctuates. From memory, I
20  would say anywhere from four to six members,
21  perhaps.
22    Q.  Are you on -- are you, Ms. Nelson, on the
23  board of APF Global Exchange?
24    A.  I am not officially on the board. My
25  name is listed on the document as an officer.

Page 51

1    Q.  When you say "the document," to which
2  document are you referring?
3    A.  A listing of board of directors.
4       MR. VALDIVIESO: Counsel, to the
5  extent that document has not been produced, we
6  request that it be produced.
7       MS. SCHAECHER: It would be helpful
8  to me if at the end of the deposition you could give
9  me a list to remind me.
10       MR. VALDIVIESO: I'm just noting it
11  for the record.
12       MS. SCHAECHER: Sure.
13    Q.  So you're not officially on the board,
14  but your name is listed on the document as an
15  officer.
16       Have you ever attended any APF
17  board meetings?
18    A.  No, I have not.
19    Q.  Does the board meet with any regularity?
20    A.  Yes, it does.
21    Q.  With what regularity does the board meet?
22    A.  At least annually.
23    Q.  When you say "at least annually," is that
24  because in some years it has met more than once?
25    A.  Yes. I believe so, yes.

Page 52

1    Q.  When was the last board meeting?
2    A.  I believe the last board meeting was
3  sometime last fall.
4    Q.  For -- you testified that they meet with
5  regularity. For -- does that mean that some of
6  them are -- some of the board meetings are regularly
7  scheduled?
8    A.  I don't know what the definition of
9  "regular" -- "regularly scheduled" is.
10    Q.  Well, what did you mean by regularity,
11  when you responded to my question about regularity?
12  What did understand that to mean?
13    A.  The board meetings are held at least
14  annually. There is --
15    Q.  Are they held --
16    A.  -- a minimum of one each year.
17    Q.  Are they held at the same time each --
18  each year, or does it vary?
19    A.  It varies.
20    Q.  So it's -- there's not a -- it's not
21  always in October of this -- or --
22    A.  Correct. That's correct.
23    Q.  Is it in the same season each year, or --
24    A.  I believe so. I believe it's -- it's my
25  understanding they attempt to have it in the fall.

Page 53

1    Q.  Do you know in -- in what years between
2  2013 and today there has been more than one board
3  meeting?
4    A.  No, I do not.
5    Q.  But you do -- you do recall that at least
6  in one of those years, there has been more than one
7  meeting in that year?
8    A.  Yes, I do.
9    Q.  Do you have an idea as to how many years
10  there has been more than one meeting?
11    A.  No, I don't, not from memory.
12    Q.  What is your understanding of the board's
13  role?
14    A.  My understanding of the board's role
15  would be to self-evaluate the program's success,
16  make recommendations, improvements, provide overall
17  guidance for the success, and -- and also oversee
18  procedures, protocols, ensure that -- the longevity
19  of the program.
20    Q.  Is Ms. Hoggard on the board?
21    A.  Ms. Hoggard is the president.
22    Q.  And by -- is -- does that mean that
23  Ms. Hoggard is on the board?
24    A.  Yes, she's a -- a board member.
25    Q.  Please list any other board members'

PLAINTIFFS' RESP. APP.0005429

MAGNA
LEGAL SERVICES

Page 54

1   names that you are aware of, sitting here today.
2       A.   From memory, I don't.  I -- I work with
3   many organizations, and I -- I don't recall.
4       Q.   What organizations, besides Au Pair
5   Foundation, do you currently work with?
6       A.   I've mentioned those to you today.
7   STS Foundation.
8       Q.   You -- you mentioned a few.  So is -- but
9   sitting here today, you can't think of any other
10  board members' names, other than Ms. Hoggard?
11      A.   Not -- not clearly, no, I cannot.
12      Q.   What about not clearly?
13      A.   I manage the -- and maintain and just
14  file the documents.  I don't participate in the
15  board meetings.  So from memory, I don't know who's
16  on the board.  And that's not a -- piece of
17  information that I feel relevant to have memorized,
18  so I'm sorry.
19      Q.   When you say you file the documents, to
20  which documents were you referring?
21      A.   The an -- the record of the annual
22  meeting and the one also mentioned, the list of the
23  board of directors.
24          MR. VALDIVIESO:  And, Counsel, I'll
25  provide you a list of the documents that we are

Page 55

1   requesting, but I'm noting for the record today that
2   we are requesting those documents as well.
3       Q.   So the record of the annual meeting.  Do
4   you know if there are minutes -- minutes that are
5   kept at each board meeting?
6       A.   Yes.
7       Q.   Are you responsible for filing the
8   minutes as well?
9       A.   Yes.
10      Q.   Do you know if --
11      A.   Ult -- the ultimate -- let me back up.
12          The ultimate responsibility would
13  be Ellen Hoggard.
14      Q.   But you have some responsibility for
15  filing them?
16      A.   If sent to me and she's asked me to store
17  them, yes.
18      Q.   And you do recall that at least on some
19  occasions there have been sent APF board meeting --
20  board meeting minutes; is that right?
21      A.   Yes, that's correct.
22      Q.   Do you know if the issue of -- strike
23  that.
24          You just told me that -- some time
25  ago that you are familiar with the State Department

Page 56

1   regulations; is that right?
2       A.   Yes.
3       Q.   What is your understanding as to how
4   those regulations relate to the hours that an
5   au pair works and the amount of money that they are
6   to receive?
7           MS. SCHAECHER:  Objection.  Form.
8       A.   Could you separate that?
9       Q.   What is your understanding as to what --
10  how those regulations -- do those regulations, as
11  far as you understand, have anything to say about
12  the hours that an au pair may work?
13      A.   Yes, that's correct.
14      Q.   What is your understanding?
15      A.   My understanding is an au pair may work
16  45 hours in one week.  She must have no more than
17  ten hours in a day.  And I'm speaking of the
18  standard/infant care program.
19          Her time off is regulated by one
20  and a half hours off a week, with one full weekend a
21  month.
22      Q.   Do you have any understanding as to
23  whether those regulations have anything to say about
24  the amount of money that an au pair receives during
25  the au pair program?

Page 57

1       A.   Yes.
2       Q.   What is your understanding?
3       A.   The Department of State set forth the
4   amount of the minimum weekly stipend.
5       Q.   And what is the stipend that you're
6   referring to?  Is there an amount associated with
7   that?
8       A.   Yes.
9       Q.   What is that amount?
10      A.   That is the minimum of the 195.75.
11      Q.   So you just described your understanding
12  of how those regulations applied to hours worked and
13  the stipend; is that right?
14      A.   Yes.
15      Q.   Do you know if the issue of hours worked
16  or the stipend has come up at any of the APF board
17  meetings?
18          MS. SCHAECHER:  Objection.  Form.
19          You may answer.
20      A.   No, not to my knowledge.
21      Q.   Do you know if APF and STS Foundation
22  share revenue?
23      A.   No, they do not.
24      Q.   Do you know if APF and STS have any
25  employees in common?

PLAINTIFFS' RESP. APP.0005430

MAGNA
LEGAL SERVICES

Page 58

```
 1       A.   No, they do not.
 2       Q.   Were you involved in collecting documents
 3  for the purposes of producing it to us in this
 4  litigation?
 5       A.   Yes, I was.
 6       Q.   What was your role in that collection
 7  process?
 8       A.   If I was asked, I produced the document.
 9       Q.   When you were asked, were you -- were you
10  asked to search any e-mails for this case?
11            MS. SCHAECHER:  I'm going to object
12  on the basis of attorney/client privilege.
13       Q.   Did you search for any e-mails in this
14  case?
15       A.   I don't recall if I made my e-mails
16  available or specifically searched for any.
17       Q.   Do you know if -- so it's your testimony
18  today that you may have -- either searched them
19  yourself or you made -- may have made them available
20  to your counsel; is that correct?
21       A.   My testimony today is that a lot of
22  information has gone through my brain over the last
23  couple years regarding this matter, and I don't
24  specifically recall the steps that I have taken to
25  get here today.  I know for certain that I made all
```

Page 59

```
 1  of my e-mails available.
 2       Q.   When you say you made all of your e-mails
 3  available, does that mean you also made your STS
 4  e-mails available?
 5       A.   I was never requested to, and they're --
 6  they're not relevant to APF business matters.
 7  They're two separate legal entities.
 8       Q.   Does APF receive any gifts, grants,
 9  contributions, or donations from any individuals or
10  entities?
11       A.   We receive contributions through a form
12  of -- we don't -- we don't receive.  We charge for
13  marketing services.
14       Q.   Whom do you charge for these marketing
15  services?
16       A.   We -- in the past when we first started
17  APF Global Exchange, there was a company called
18  Cross Cultural Exchange.
19       Q.   Did Cross Cultural Exchange participate
20  in the au pair program?
21       A.   No, they did not.
22       Q.   During what time frame did APF charge
23  Cultural Exchange -- Cross -- strike that.
24            During what time frame did APF
25  charge Cross Cultural Exchange for marketing
```

Page 60

```
 1  services?
 2       A.   I don't specifically recall when it --
 3  the arrangement began, but we are currently in that
 4  agreement right now.
 5       Q.   What is your understanding, if any, of
 6  APF's role in that relationship with Cross Cultural
 7  Exchange?
 8       A.   Cross Cultural Exchange provides
 9  marketing services to us and assists with the
10  website and -- and other issues related to the
11  website and developing our product, and they also
12  receive a royalty fee from the income generated.
13       Q.   When you say they receive a royalty fee
14  from the income generated, what income are you
15  referring to?
16       A.   Income collected from the host family
17  program fees.
18       Q.   What is the size of the royalty, if you
19  know?
20       A.   I believe it is 2 percent.  Sorry, let
21  me -- let me restate that.
22            I believe it's currently 20
23  percent.
24       Q.   Do you know where Cross Cultural Exchange
25  is located?
```

Page 61

```
 1       A.   Yes.  That's also located at the 205
 2  Keller Street.
 3       Q.   Do you, Ms. Nelson, provide services to
 4  Cross Cultural Exchange?
 5       A.   Yes, I do.
 6       Q.   And when you provide services to them,
 7  you invoice them?
 8       A.   Yes, I do.
 9       Q.   But Cross Cultural Exchange is a separate
10  entity from APF; is that right?
11       A.   Yes, it is.
12       Q.   Is Cross Cultural Exchange also a
13  nonprofit?
14       A.   No, it is not.
15       Q.   Does Ms. Hoggard have any affiliation or
16  association with Cross Cultural Exchange?
17       A.   Yes.  She's also the president.
18       Q.   Cross Cultural Exchange, is that a
19  separate entity from STS Foundation?
20       A.   Yes, it is.
21       Q.   Is Cross Cultural Exchange a J-1 visa
22  sponsor --
23       A.   No.
24       Q.   -- if you know?
25       A.   No, they are not.
```

PLAINTIFFS' RESP. APP.0005431

**MAGNA**
LEGAL SERVICES

---

**Page 62**

1    Q.   I don't think we covered this in the
2 ground rules.  But if at any time you would like a
3 break, please just let me know.
4    A.   Okay.
5    Q.   The only thing I do ask is if there is a
6 question pending, if you can finish answering that
7 question and then we can take a break.
8         MS. SCHAECHER:  Would this be a good
9 time for a break?  Or when we get to a good point,
10 let us know.
11         MR. VALDIVIESO:  Ms. Nelson, if you
12 need a break -- I just have a few more questions I
13 wanted to get to before I was ready for a break.
14 But if you'd like to take one now, we can certainly
15 take one.
16         THE WITNESS:  I'd love to refill my
17 coffee --
18         MR. VALDIVIESO:  Okay.
19         THE WITNESS:  -- very quickly.
20         MR. VALDIVIESO:  Okay.  Then let's go
21 off the record.
22         THE VIDEOGRAPHER:  Going off the
23 record.  The time is 10:24.
24         (Break from 10:24 a.m. to
25         10:33 a.m.)

---

**Page 63**

1         THE VIDEOGRAPHER:  We are back on the
2 record.  The time is 10:33.
3 BY MR. VALDIVIESO:
4    Q.   Welcome back, Ms. Nelson.
5    A.   Thank you.
6         I'd like to go back and correct
7 one thing that I stated.
8    Q.   Sure.
9    A.   When you asked me the question about what
10 other entities I'm working for, I'm currently
11 working for Hunter House Publishers.  And I -- I'm
12 sorry, I keep, out of habit working for them for 20
13 years, call them by their old name.  The new name is
14 Kir -- Kiran Sonhaan, Inc.
15         And I also work for STS Global
16 Studies.  And then I also work for any other clients
17 that approach me indirectly for occasional
18 accounting assistance.
19    Q.   Thank you for that, Ms. Nelson.
20         You mentioned STS Global Studies.
21 Is that a separate entity from STS Foundation?
22    A.   Yes, it is.
23    Q.   Does Ms. Hoggard have any affiliation
24 with STS Global Studies?
25    A.   Yes.  She's president.

---

**Page 64**

1    Q.   Do you know if STS Global Studies is a
2 not-for-profit?
3    A.   It is not.
4    Q.   Are you familiar with the entity named
5 STS Student Travel Schools?
6    A.   Yes, I am.
7    Q.   What is it?
8    A.   I believe that to be an organization
9 overseas.
10    Q.   Does STS Student Travel Schools have any
11 affiliation with STS Foundation?
12    A.   No, they do not.
13    Q.   Does Ms. Hoggard have any affiliation
14 with STS Student Travel Schools?
15    A.   No, she does not.
16    Q.   Is there any relationship between STS
17 Student Travel Schools and STS Foundation?
18    A.   No.  They have -- I believe they may have
19 one or two similar board members.
20    Q.   How are you familiar with STS Student
21 Travel Schools?
22    A.   By name, and I've been there once.
23    Q.   Where is it located?
24    A.   Sweden.  And they're also an overseas
25 partner of APF Global Exchange and STS Foundation.

---

**Page 65**

1    Q.   What is an overseas partner?
2    A.   An overseas partner is someone that we
3 would partner with that would provide the applicant
4 a location to be interviewed, vetted, processed,
5 learn about the program in their home country, and
6 then sent to us as an applicant.
7    Q.   By "us" you mean APF; is that right?
8    A.   I would generalize that as any U.S.
9 sponsor.
10    Q.   When an applicant is sent to APF, does
11 APF pay the overseas partner?
12    A.   It depends on the agreement that we have
13 with our overseas partners.  Some we do have a
14 payment arrangement and some we do not.
15    Q.   For those with which you do not have a
16 payment arrangement, does APF provide anything of
17 value in return?
18    A.   We provide the -- what I would say we
19 provide is the ability for that overseas agent to
20 bring us an application for us to vet, and be able
21 to hopefully eventually participate on our program.
22    Q.   I'm going to take a little pause to
23 address something that I discussed with your counsel
24 off the record.
25         I inadvertently handed you

---

**MAGNA**
LEGAL SERVICES

Page 66

1 Exhibit 1 that included more than one document. I
2 only intended to include the first version -- or,
3 sorry, the first document in that set of documents.
4         MR. VALDIVIESO: Counsel, if there's
5 no objection, I'd like to claw back the second
6 document that was attached.
7         MS. SCHAECHER: No objection.
8         MR. VALDIVIESO: I appreciate that.
9         So -- so, for the record,
10 Exhibit 1 is the notice of deposition.
11        MS. SCHAECHER: That appeared before
12 the blue page. I think we had references to the
13 blue page in the testimony --
14        MR. VALDIVIESO: That's correct.
15        MS. SCHAECHER: -- and the questions.
16        (Exhibit No. 3 was marked.)
17    Q.  I'm handing you what we are marking as
18 Exhibit 3.
19        MR. VALDIVIESO: For those of you on
20 the phone, Exhibit 3 is a document ending in Bates
21 No. 62.
22        And I will generally be referring
23 to Bates numbers as APF Bates numbers, unless I
24 state otherwise.
25    Q.  Ms. Nelson, are you familiar with

Page 67

1 Exhibit 3?
2    A.  Yes, I am.
3    Q.  What is Exhibit 3?
4    A.  It's an APF Global Exchange org chart.
5    Q.  Did you prepare Exhibit 3?
6    A.  No, I do not.
7    Q.  I'm sorry, the question is did you -- did
8 you prepare Exhibit 3?
9    A.  Did I?
10   Q.  Yes.
11   A.  No, I did not.
12   Q.  Is Exhibit 3 an accurate representation
13 of APF's organization?
14   A.  At a fixed point in time, it is.
15   Q.  Do you know at which fixed point in time
16 it is an accurate representation of?
17   A.  Not specifically, since it's not dated.
18 I'd have to look at my records to see. My guess is
19 sometime in 2015 or prior, based on the March 2015
20 date shown.
21   Q.  At the top of this organization chart --
22 organizational chart it lists Ms. Hoggard; is that
23 right?
24   A.  Yes, it does.
25   Q.  Does APF Global Exchange have a CEO?

Page 68

1    A.  No, it does not.
2    Q.  What changes would you make to this
3 organizational chart for it to be accurate today, if
4 any?
5    A.  Can you explain how I should -- should I
6 just say I'd eliminate or --
7    Q.  Sure. If you'd say you would eliminate a
8 certain person or add a certain person --
9    A.  Okay.
10   Q.  -- that would be helpful.
11   A.  Okay. At this moment in time Kristen
12 Wormley is no longer with us, Melissa Inkley is no
13 longer with us, Jana Smolenski, Julie Moeller.
14        Kim Wunderlich-Cady holds a
15 different position.
16   Q.  All right. Just to be clear on that
17 bottom line, Ms. Moeller, Ms. Smolenski, Ms. Inkley,
18 and Ms. Wormley are no longer with AFP Global
19 Exchange; is that right?
20   A.  That's correct.
21   Q.  And you said Ms. Wunderlich had a
22 different position now. What is her current
23 position?
24   A.  Mediation specialist.
25   Q.  What does a mediation specialist do?

Page 69

1    A.  She makes herself available as an
2 independent contractor, and she will assist in any
3 mediation situations that may rise or need further
4 clarification or just a higher level of expertise in
5 problem solving related to matches.
6    Q.  And that bottom line refers to regional
7 directors; is that right?
8    A.  Yes, it does.
9    Q.  Does that role still exist at APF Global
10 Exchange?
11   A.  It does. That role is currently being
12 held by -- excuse me -- Melanie Lorenz.
13   Q.  Is there only one regional director at
14 this time?
15   A.  Yes.
16        Then if I was to continue.
17   Q.  Sure. Moving on to the next line, where
18 Carrie Crompton is.
19   A.  Okay. I would -- I would sort of stay
20 down at the bottom line.
21   Q.  Okay. Sure.
22   A.  We also now have Tomas Beccar Varela, and
23 his title is meeting -- matching specialist.
24   Q.  Okay.
25   A.  So then moving up, Carrie Crompton's

**MAGNA**
LEGAL SERVICES

Page 70

```
1    position's no longer there.
2        Q.   Does that role still exist at APF Global
3    Exchange?
4        A.   No, it does not.
5        Q.   So no one replaced Ms. Crompton?
6        A.   No, not in that role.
7        Q.   Did anyone replace her in any other role?
8        A.   No.
9             We then did proceed and hired a
10   program manager, Ainura Ozturk.
11            And then moving up, Keiko Monraz's
12   position's been eliminated.
13       Q.   And does that role still exist at APF?
14       A.   That role was -- those duties were
15   absorbed into the position that Melanie Lorenz
16   holds.
17       Q.   And I believe you mentioned an intern; is
18   that right?
19       A.   Yes.
20       Q.   How many interns do you have?
21       A.   We have one intern that we share.
22       Q.   When you say "we share," who does "we"
23   refer to?
24       A.   APF Global Exchange has a shared resource
25   agreement the -- with the intern and Melanie Lorenz
```

Page 71

```
1    and the office space from Cross Cultural Exchange.
2        Q.   Would you add anyone else to this
3    organizational chart to make it accurate as of
4    today?
5        A.   No, I would not.
6        Q.   Do you recall when Ms. Crompton left APF
7    Global Exchange?
8        A.   I believe it was in 2015.  It could
9    have -- it could have been '16.  I believe '15,
10   though.
11       Q.   Is it fair to say, at least as of the
12   time of the organizational chart, that the regional
13   directors had responsibility for various regions; is
14   that accurate?
15       A.   Yes, depending on the -- the role.  I --
16   I think I would need further clarification on the
17   responsibilities.
18       Q.   Sure.  Does APF Global Exchange divide up
19   the territory of the United States into various
20   regions?
21       A.   Yes, we did at that time.
22       Q.   Is it fair to say at that time you had
23   five different regions?
24       A.   Yes, that appears so.  Yes, I would say
25   that's fair to say.
```

Page 72

```
1        Q.   And today does APF still carve up the
2    territory of the United States into various regions?
3        A.   No, we do not.
4        Q.   Why is that?
5        A.   I think that using my -- the best of my
6    knowledge as to how we got to this point today, is
7    these persons contributed limited amount of time,
8    and we decided to consolidate them all and have one
9    person focus and provide more continuity.
10       Q.   And that one person now is Melanie
11   Lorenz; is that right?
12       A.   Yes, and the ultimate responsibility is
13   our program manager.  So with -- with the hiring of
14   that position, it enabled us to consolidate these
15   various roles.
16       Q.   At the time of the organizational chart,
17   I think you may have already -- I apologize if
18   you've already answered this.  But were any of these
19   individuals employees of APF Global Exchange?
20       A.   I don't believe I answered that, and that
21   Keiko Monraz was a full-time employee and Carrie
22   Crompton.
23       Q.   So other than Ms. Monraz and Ms. Crompton
24   on this page, is it fair to say that the others were
25   independent contractors?
```

Page 73

```
1        A.   Except for Ellen Hoggard.  She
2    wouldn't -- her role was not as an independent
3    contractor.
4        Q.   Would you --
5        A.   Otherwise, yes.
6        Q.   And to make the sentence I said earlier
7    accurate.  Would you describe Ms. Hoggard as an
8    owner?
9        A.   No, I would not.
10       Q.   How would you describe Ms. Hoggard?
11       A.   I would hold -- I would describe Ellen
12   Hoggard as president of APF.
13       Q.   Does Ms. Hoggard receive any compensation
14   from APF?
15       A.   No, she does not.
16       Q.   Do you have any understanding as to the
17   percentage of her working time -- I'm speaking of
18   Ms. Hoggard now -- that she devotes to APF Global
19   Exchange?
20       A.   No, I -- I don't track her -- her time.
21       Q.   Do you have a rough estimate?
22       A.   No, I don't, since I don't work side by
23   side with Ellen.
24       Q.   Are you familiar with the term "local
25   community representative"?
```

| Page 74 | Page 76 |
|---|---|

**Page 74**

1    A.   Yes, I am.

2    Q.   What is a local community representative?

3    A.   A local community representative is a

4  representative of our program that will live and

5  reside within 60 minutes of an au pair match, and

6  they will facilitate the regular -- relationship

7  between the host family and the au pair to ensure

8  that we are following -- as the sponsor, that we're

9  following the regulations and that the au pair is

10  safe and sound and -- and, you know, safe and sound

11  in accordance with the regulations.

12    Q.   Is there anyone at APF Global Exchange

13  tasked with the responsibility of training the local

14  community representative?

15    A.   Yes.

16    Q.   Who is that?

17    A.   At this time?

18    Q.   At this time.

19    A.   At this time that is Maiya Champa, whom I

20  neglected to mention in the current org chart.

21    Q.   What is Maiya Champa's role?

22    A.   She's training specialist.

23    Q.   At the time of the organizational

24  chart --

25         (Telephone interruption.)

**Page 75**

1         MR. VALDIVIESO:  Sorry, did counsel

2  on the phone, was someone trying to saying

3  something?

4         If you could please put your

5  phones on mute, we would appreciate it over here.

6  Thank you.

7    Q.   At the time of the organizational chart,

8  was there someone at APF Global Exchange with the

9  responsibility of training the LCRs?

10    A.   That would have been Carrie Crompton.

11    Q.   And between the time where Ms. Crompton

12  had the responsibility for training LCRs and the

13  time that Ms. Champa had that responsibility, did

14  anyone else have primary responsibility for training

15  the LCRs?

16    A.   That would be Ainura Ozturk, our program

17  manager.

18    Q.   Did anyone have -- I'm sorry to interrupt

19  you.

20    A.   And there was also a point in time where

21  Kim Wunderlich-Cady and Tomas Beccar were

22  responsible for training local coordinators.

23    Q.   Do you have a time -- do you have an

24  estimate for when that time frame might have been?

25    A.   I would say between the time that Carrie

**Page 76**

1  left and Ainura was hired and trained and -- and --

2  and got up to speed.

3    Q.   Were all of the individuals listed on the

4  bottom line, the regional directors, were they all

5  mothers, do you know?

6    A.   No.  Kristen Wormley was not, is not.  I

7  believe at this time she's now, but at the time, no.

8         And let me clarify also.  Jana, at

9  the time that she worked, actively worked with us,

10  was not a mother.  But she left on maternity leave.

11  Or not maternity leave, but she left to have her

12  baby.

13    Q.   I see.

14         You mentioned overseas partners;

15  is that right?

16    A.   Yes.

17    Q.   Do you have an estimate as to how many

18  overseas partners you have today?

19    A.   Yes.  I would estimate that I have

20  somewhere between 30 to 40.  Not all of them are

21  active.  And by "active" I mean currently submitting

22  applications to us.

23    Q.   But when you say you have, does that mean

24  that there is -- what does -- what does that mean to

25  you?

**Page 77**

1    A.   That means that I have a relationship

2  with them in where they have been vetted and can

3  send us an application.

4    Q.   Is that relationship generally governed

5  by a contract?

6    A.   It is governed by agreement, yes.

7    Q.   When you say governed by an agreement, is

8  that an agreement that's signed by both APF and the

9  overseas partner?

10    A.   Yes, it is.

11    Q.   Does APF keep the agreements --

12    A.   Yes.

13    Q.   -- that it has with its overseas

14  partners?

15    A.   Sorry.

16         Yes, we do.

17    Q.   Where does it keep them?

18    A.   In my office.

19    Q.   Are they kept in hard copy?

20    A.   At one point in time they were both

21  electronical and hard copy, and now it's only

22  electronic.

23    Q.   Do you know the format in which they are

24  kept electronically?

25    A.   If I understand the question correctly, I

PLAINTIFFS' RESP. APP.0005435

MAGNA
LEGAL SERVICES

Page 78

1 believe pdf would be the answer, right.
2    Q.   Are they stored on some sort of database?
3    A.   No. They are stored on a server.
4    Q.   Do you, Ms. Nelson, have responsibility
5 for interacting with the overseas partners?
6    A.   Yes, I do.
7    Q.   Would you say that you have primary
8 responsibility for that function at APF?
9    A.   Yes, I would say that.
10    Q.   And you mentioned vetting. Would you
11 explain to me what APF does in order to vet its
12 overseas partners?
13    A.   Yes. What APF does in order to vet the
14 overseas partners, we receive an application via our
15 online website. From that application, I will
16 review the information to see if it is a country or
17 of any interest for us to pursue that partnership.
18        From there I will ask for a list
19 of vetting documents. Once those are received, I
20 review those. And then if the application is --
21 meets my guidelines that I have, then I'll proceed
22 forward and present them with an agreement. The
23 agreement is then sent and signed by Ellen and
24 stored on our server.
25    Q.   Do your overseas partners share with APF

Page 79

1 its marketing materials in the home country?
2    A.   Can you repeat the question?
3    Q.   Do the overseas partners share their
4 marketing materials with APF?
5    A.   They provide marketing materials, that I
6 request at the time of vetting.
7    Q.   Do you receive marketing materials only
8 at the time of vetting, or do you receive marketing
9 materials periodically?
10    A.   Only at the time of vetting.
11    Q.   Have any of your overseas partners been
12 subject to allegations of fraud during your time at
13 APF?
14    A.   Not that I'm aware of.
15    Q.   During your time at APF, have you
16 terminated any relationships with overseas partners?
17    A.   Yes, I believe I have.
18    Q.   How many times do you believe you have
19 terminated your relationship with overseas partners?
20    A.   At least once, that comes to memory.
21    Q.   That one time, could you tell me who that
22 overseas partners -- partner was?
23    A.   I don't recall the name, but I recall the
24 location.
25    Q.   What was the location?

Page 80

1    A.   China.
2    Q.   What was the reason that you terminated
3 that relationship?
4    A.   I felt they did not provide proper
5 support for the au pair once here on the program.
6    Q.   You said "once here on the program." Is
7 that right?
8    A.   Uh-huh.
9    Q.   Do your overseas partners generally
10 provide support to au pairs while in the United
11 States?
12    A.   I would say not generally, that I'm aware
13 of. They may be providing support to their
14 participant behind the scenes that are -- that I'm
15 not aware of.
16    Q.   But for this particular overseas partner
17 that was terminated, the reason for the termination
18 was that they weren't providing adequate support to
19 the au pair while they were in the United States?
20    A.   It was either support to the au pair or
21 to me. So when I was reaching out to them, I was
22 not getting the response that I was looking for in a
23 timely manner.
24    Q.   Do you recall when the termination
25 occurred?

Page 81

1    A.   Not specifically. I would say within the
2 last year.
3        And then I would like to add also
4 that my memory is a little foggy, whether it was
5 providing support for an applicant or an au pair on
6 the ground. I -- I don't recall which situation it
7 was. I just recall they didn't respond to me in the
8 timely manner that I would be accustomed to.
9    Q.   I appreciate that clarification. And all
10 of my questions here are asking your -- your best
11 recollection, your best understanding --
12    A.   Uh-huh.
13    Q.   -- sitting here today.
14    A.   Uh-huh. Thank you.
15    Q.   I think you said the overseas partners
16 screen the applicants and then send the applicants
17 to you; is that right?
18    A.   That's correct.
19    Q.   Do you have an approximation as to how
20 many au pairs apply to APF's program each year?
21    A.   I would define "apply" as complete
22 application, and I would say less than a hundred.
23    Q.   And, sorry, just to clarify because
24 you've -- we've -- we've discussed a screening
25 process and then having the application sent to

Case 1:14-cv-03074-CMA-KMT    Document 1059-25    Filed 03/17/18    USDC Colorado    Page 609 of 700

Page 82

```
1    Au Pair Foundation.
2       A.   Uh-huh.
3       Q.   The number that you were approximating,
4    was that the number of applications that are sent to
5    Au Pair Foundation?
6       A.   Complete applications.
7       Q.   And do you -- do you know how many visas
8    APF is allotted each year?
9       A.   Yes, I do.
10      Q.   Starting in 2013 until today, what is the
11   approximate range of that number?
12      A.   From 50 to 100.
13      Q.   Let's focus on the host families for a
14   second.
15           Do you have an approximation of
16   how many families -- we can use your term -- submit
17   completed applications to Au Pair Foundation each
18   year?
19      A.   No, I do not have a -- a -- a very clear
20   idea of that.  I would estimate that it would be
21   more around 75.
22      Q.   Do you have an idea as to whether,
23   generally, more families apply than -- sorry.
24   Strike that.
25           Do you have an idea as to whether,
```

Page 83

```
1    generally, more families complete applications than
2    the number of complete applications of au pairs that
3    are sent to APF?
4       A.   APF has more au pair complete
5    applications.  We receive more au pair applications
6    versus host family.
7       Q.   And you would say that that holds for
8    each year between 2013 and 2017?
9       A.   Yes, I would say that's consistent.
10      Q.   Does every family that applies to the --
11   strike that.
12           Does every family that completes
13   an APF application match with an au pair?
14      A.   No.
15      Q.   And do you have an estimate for the
16   number of families that apply, that completed an
17   application, but do not match in each year between
18   2013 and 2017?
19      A.   I do not have a -- that number.  It's not
20   a number that I physically monitor all the time.  If
21   I was to guess, I would guess 50 percent.
22      Q.   What is the top sending country in this
23   most recent batch of au pairs that have been sent to
24   you?
25      A.   If I was to guess, I'm going to guess
```

Page 84

```
1    Argentina.
2       Q.   Has that been consistent over time or has
3    that changed?
4       A.   It has been growing over the last couple
5    of years.
6       Q.   And do you have a top sending location,
7    for this current batch of au pairs, where the host
8    families are located?
9       A.   No, we do not.
10      Q.   And just to clarify that.  There -- there
11   may be a state that receives the most -- that has
12   the most host families, but you, sitting here today,
13   are not aware of that.  Is that an accurate...
14      A.   That is accurate at -- and the state in
15   which we receive au pairs fluctuates consistently.
16      Q.   I understand.
17      A.   So at this exact moment in time, yes, I
18   would assume there is.  But that consistently
19   changes, so I would not go on record to say it is
20   always this location.
21      Q.   I appreciate that.  I'm just trying to
22   get a sense of --
23      A.   Yeah.  No.
24      Q.   -- of your program.
25      A.   Yeah.
```

Page 85

```
1       Q.   Do you have a document that summarizes
2    the number of au pairs in each state?
3       A.   Yes, that information could be gathered.
4       Q.   The information could be gathered, but
5    does it exist on a -- in one document at this time,
6    to your knowledge?
7       A.   Not anything that I produce, that -- that
8    APF produces on a regular basis and distributes.
9       Q.   But if Ms. Hoggard, for example, asked
10   you to get that data, you would know how to do it?
11      A.   Absolutely.
12      Q.   You currently have three categories of
13   au pairs; is that right?
14      A.   What do you mean by "category"?
15      Q.   You're familiar with the term "standard
16   au pair"?
17      A.   Yes.
18      Q.   Other than standard au pair, are there
19   any other categories of au pairs that you are aware
20   of?
21      A.   Yes.  We have infant and EduCare.
22      Q.   So if I refer to infant, standard, and
23   EduCare as categories of au pairs, we would be -- we
24   would be on the same page?
25      A.   Yes, now we would.  Thank you.
```

PLAINTIFFS' RESP. APP.0005437

MAGNA
LEGAL SERVICES

Page 86

1    Q.   Other than infant care, standard care,
2 and EduCare, has APF had any other categories of
3 au pairs during your time?
4    A.   No, we have not.
5    Q.   Do most of your au pairs fall into the
6 standard category?
7    A.   No.  I would say most of our au pairs
8 fall into the infant category.
9    Q.   After the infant category, do the
10 remaining au pairs mostly fall into your standard
11 category?
12    A.   Yes, that would be correct.
13    Q.   So this isn't a trick question.  But
14 would it be fair to say that infant care has most of
15 your au pairs, then standard care has the next
16 largest amount of au pairs, and EduCare is your
17 smallest category of au pairs?
18    A.   I would say their applications are
19 defined by infant and standard, based on their
20 experience.  Does that...
21        THE VIDEOGRAPHER:  Counsel, five
22 minutes until media change.
23    Q.   Then going back.  This will be my last
24 question, and then we can change the tape.
25        You had a rough idea of the number

Page 87

1 of applicants, completed applications that are
2 submitted to APF on a yearly basis.  Do the
3 number -- is -- is -- does one category of au pair
4 have the most number of applications, completed
5 applications, to your knowledge?
6    A.   I think I need you to restate that
7 question.
8    Q.   Happy to do so.
9        Which of the categories that we've
10 discussed has the most submitted applications?
11    A.   Au pair applications?
12    Q.   Au pair applications.
13    A.   Infant.
14    Q.   And which of the completed -- strike
15 that.
16        When host families apply, do they
17 indicate which category they are applying for?
18    A.   Yes, they do.
19    Q.   And out of the host families, which
20 categories -- which category receives the most host
21 family completed applications?
22    A.   It fluctuates greatly, but overall I
23 would say we tend to have more infant families
24 versus standard.
25    Q.   So there are -- you can think of at least

Page 88

1 one year in which there were more applications for
2 standard au pairs from host families -- strike that.
3        You recall at least one year in
4 which host families completed applications for
5 standard au pairs in greater numbers than they did
6 for infant au pairs?
7        MS. SCHAECHER:  Objection.  Form.
8    Q.   Did you understand my question?
9    A.   No.  If you'd like to restate it again.
10    Q.   Was there at least one year in which more
11 host families applied for a standard au pair than
12 for an infant au pair?
13    A.   I don't have a specific memory of that,
14 and --
15    Q.   You said -- I'm sorry.  Sorry.  I cut you
16 off.  Have you finished the answer?
17    A.   Oh.  My impression is that we receive
18 more infant host family applications than standard.
19 I do not know if my impression is accurate based on
20 the data, based on reality.
21    Q.   But as with the location of your host
22 families, is that information that, if asked, you
23 could ascertain?
24    A.   Yes.
25        MR. VALDIVIESO:  I think we can take

Page 89

1 a break.
2        THE VIDEOGRAPHER:  This is the end of
3 media No. 1 in the 30(b)(6) deposition of Au Pair
4 Foundation through their designee, Theresa Nelson.
5 Going off the record.  The time is 11:11.
6        (Break from 11:11 a.m. to
7        11:20 a.m.)
8        THE VIDEOGRAPHER:  We are back on the
9 record.  The time is 11:20.  This is the beginning
10 of media No. 2 in the 30(b)(6) deposition of Au Pair
11 Foundation through their designee, Theresa Nelson.
12 BY MR. VALDIVIESO:
13    Q.   Welcome back, Ms. Nelson.
14    A.   Thank you.
15    Q.   Before the break we were discussing the
16 different au pair categories, and two of those
17 categories that you described were infant au pairs
18 and standard au pairs; is that right?
19    A.   Yes.
20    Q.   Could you explain to me the difference
21 between the infant au pair and the standard au pair
22 category?
23    A.   That is defined in the Department of
24 State regulations.  The infant care category
25 initially has an additional requirement of 200 hours

MAGNA
LEGAL SERVICES

Page 90

1   with experience of children under the age of two.
2           And then on the host family side,
3   we must match up an infant au pair to a family with
4   children under the age of two.
5       Q.  Whereas, the infant au pair category has
6   a requirement of 200 hours caring for children under
7   the age of two, the standard au pair category does
8   not have that requirement; is that right?
9       A.  That's correct.
10      Q.  I'm going to hand you what has been
11  marked as Nelson Exhibit 4.
12          (Exhibit No. 4 was marked.)
13      Q.  Ms. Nelson, are you familiar with
14  Exhibit 4?
15          MR. VALDIVIESO:  And for counsel on
16  the phone, this -- this is a document ending in
17  Bates No. 30.
18      A.  I -- I am not familiar with this exact
19  document.  It appears to be a document from our
20  website.
21      Q.  What part of the APF website does this
22  document appear to be from?
23      A.  It appears to be from a section called
24  "Host Family Program Fees."
25      Q.  If you'll look on the section under the

Page 91

1   "New Host Family Program Fees," what -- do you
2   see -- do -- do you see that part that I'm referring
3   to?
4           MS. SCHAECHER:  Objection.  Form.
5           You may answer.
6       A.  No.  You'll have to repeat that.
7       Q.  Under -- there's a heading that says "New
8   Host Family Fees" -- "New Host Family Program Fees -
9   Infant Care, Standard Care, and EduCare Au Pair
10  (Payment Method, Checking Account)."
11      A.  Yes.
12      Q.  Do you see that?
13      A.  Yes, I do see that.
14      Q.  And I read that correctly?
15      A.  Yes.
16      Q.  Under that section, do you see that it --
17  it indicates "New Host Family Program Fee"?
18      A.  Yes, I do.
19      Q.  What is the new host family program fee
20  indicated for the standard care au pair in that
21  section?
22      A.  In this document, is 8,100.
23      Q.  And what is the new host family program
24  fee for infant care listed in this document?
25      A.  8,500.

Page 92

1       Q.  Is it fair to say that a host -- a new
2   host family under the regime governing this document
3   paid $400 more in new host family program fees than
4   a host family seeking to host a standard care
5   au pair?
6       A.  It would be fair to say that that's how
7   the price is publicized.
8       Q.  Was the price, in practice, different
9   than what it was as publicized?
10      A.  No.
11          MS. SCHAECHER:  Ob -- objection to
12  form.
13          You may answer.
14      Q.  I'll -- I'll repeat the question.
15      A.  Okay.
16      Q.  Was the price, as publicized, different
17  than the price in practice with respect to the --
18  that -- those two categories of au pairs?
19          MS. SCHAECHER:  Objection.  Form.
20      A.  This would be our starting point for
21  discussing prices related to programs.
22      Q.  Are prices related to programs
23  negotiable?
24      A.  Yes.
25      Q.  Going down a few lines further, there's a

Page 93

1   section that -- and I will read.  "New Host Family
2   Program Fees - Infant Care, Standard Care, and
3   EduCare Au Pair (Payment Method, Debit Or Credit
4   Card):"
5           Do you see that?
6       A.  Yes, I do.
7       Q.  Did I read that correctly?
8       A.  Yes, I believe so.
9       Q.  And scrolling two lines down under "New
10  Host Family Program Fee," what is indicated for the
11  new host family program fee under the standard care
12  category under this payment method?
13      A.  8,440.
14      Q.  And moving one column to the right under
15  the "Infant Care," what is the new host family
16  program fee under this payment method indicated on
17  this website?
18      A.  8,850.
19      Q.  Is there currently a difference in new
20  host family -- family program fee between standard
21  and infant au pair categories?
22      A.  At this moment in time, there is not
23  between infant care and standard care.
24      Q.  Do you have an understanding as to why
25  at the point in time in which this screen shot of

MAGNA
LEGAL SERVICES

---

Page 94

1 the -- the website was captured and today there was
2 a change in policy, such that now there is no
3 difference in the published price between the two
4 categories for new host family program fees?
5     A.   That policy decision for this year's
6 pricing was decided between the program manager,
7 Ainura, and Ellen Hoggard.
8     Q.   Sorry, was that Ms. Hoggard and
9 Ms. Ozturk?
10    A.   Sorry.  Correct.  Yes.
11    Q.   I only remember their last names.
12    A.   Yeah.
13    Q.   So that policy was made for 20 -- 2017
14 pricing; is that correct?
15    A.   Correct, 2017.
16    Q.   Between the program's inception, and I
17 believe you said it was 2013, and the change for the
18 2017 pricing, was there always a difference in the
19 new host family program fees' published price
20 between standard and infant care au pairs?
21    A.   Would you repeat that one more time?
22    Q.   That was a mouthful.
23         MR. VALDIVIESO:  Could you read the
24 question back to the witness, please.
25         (Record read.)

---

Page 95

1     A.   Yes, I believe so.
2     Q.   Do you have an understanding as to why,
3 prior to the policy change, APF published a
4 different new host family program fee for the two
5 categories we've been discussing?
6     A.   No, I don't.  It's -- no.
7     Q.   Staying on this page, going down to the
8 next small table, could you read the -- the next
9 line of text, please, starting with "Weekly."
10    A.   "A weekly stipend - standard care and
11 infant care, 195.75 per week."
12    Q.   Is it fair to say that the published
13 weekly stipend for standard care and infant care
14 au pairs is the same for both categories?
15    A.   I'm -- repeat that.
16    Q.   Is it fair to say that the published
17 weekly stipend for standard care and infant care
18 au pairs is the same for both categories?
19    A.   In looking at this document, it is.
20    Q.   Do you know if Au Pair Foundation
21 currently publishes a different weekly stipend for
22 standard care and infant care au pairs on its
23 website?
24    A.   APF Global Exchange?
25    Q.   Yes.

---

Page 96

1     A.   I'm not currently familiar with what's
2 published on the -- exactly published on the website
3 today.
4     Q.   Going back to the screen shot of the
5 website that's before you, sitting here today.
6     A.   Uh-huh.
7     Q.   Is there anything about the quantity of
8 the fees that indicates to you what period of time
9 this website might be from?
10    A.   No, not -- not -- I don't have the fees
11 memorized per time.
12    Q.   Do you have an understanding as to why --
13 strike that.
14         Do you believe -- do you believe
15 that the published fees on this page was an accurate
16 representation of the published fees as of the time
17 of -- that that website screen shot was captured?
18    A.   Yes, unless there was any delay in
19 updating the website for any price changes that we
20 may have had.
21    Q.   And do you know why, as of the time of
22 the screen shot of this web page, there was a
23 difference between standard and infant au pairs with
24 respect to the new host family program fee, but the
25 stipend for the two categories was listed as the

---

Page 97

1 same?
2         MS. SCHAECHER:  Objection.  Form.
3     A.   So I see that as two separate questions.
4     Q.   How are you understanding the question?
5     A.   The difference between the program fees
6 themselves is a business decision that was made
7 within APF, and the weekly stipend shown here is
8 from the Department of State regulations.
9     Q.   Nothing on this website indicates that
10 195.75 is a minimum amount, does it?
11    A.   No, it does not.
12    Q.   Who do you think the intended audience of
13 this section of APF's website is?
14    A.   The intended audience would be the host
15 family.
16    Q.   I am handing you what we are marking as
17 Exhibit 5.
18         (Exhibit No. 5 was marked.)
19    Q.   Do you recognize Exhibit 5, Ms. Nelson?
20    A.   It appears to be a screen shot from our
21 website.
22    Q.   Does the content of the website look
23 familiar to you?
24    A.   Yes, it looks familiar.  I don't have
25 the -- our website memorized, but it looks familiar.

---

PLAINTIFFS' RESP. APP.0005440

MAGNA
LEGAL SERVICES

Page 98

1    Q.   What would you say the intended audience
2 of this section -- well, I apologize.
3         What section of APF's website does
4 this appear to be?
5    A.   It appears to be on the section of
6 au pair programs.
7    Q.   Who's the intended audience of this
8 section of APF's website?
9    A.   I would say host families.
10        MR. VALDIVIESO:   And for counsel on
11 the phone, Exhibit 5 is a document ending in 26.
12   Q.   Turning --
13        THE VIDEOGRAPHER:   Counsel, you're
14 covering your microphone.
15   Q.   On page 27, and -- and I'm referring to
16 the number on the bottom right.
17   A.   Uh-huh.
18   Q.   The last bullet point in this section,
19 could you read that into the record, please.
20   A.   "Pledge against smoking.  Au Pair
21 Foundation does not accept ap" -- "au pairs who
22 smoke."
23   Q.   Is that a current policy of Au Pair
24 Foundation?
25   A.   I would say that that policy has been

Page 99

1 modified.
2    Q.   How has that policy been modified?
3    A.   They must -- the way I read this
4 language, it says "au pairs who smoke."  They must
5 make a pledge that they will not smoke.
6    Q.   Is that a Department of State mandated
7 policy, or is that APF's own policy?
8    A.   I believe -- I'm not sure.
9    Q.   And looking at the bottom of page 26 and
10 at the top of page 27, this website lists a weekly
11 stipend of 195.75 as -- as it did in -- in the other
12 section of the website we just looked at; is that
13 right?
14        MS. SCHAECHER:   Objection.  Form.
15   A.   Yes, it does.
16   Q.   It lists a weekly stipend of 195.75 under
17 the "Infant Care Au Pair Program" and a weekly
18 stipend of 195.75 under the "Standard Au Pair"
19 heading; is that correct?
20   A.   Yes, that's correct.
21        I'd like to take a step back and
22 clarify that I do -- the smoking policy is a -- is
23 an APF policy, not a regulation.
24   Q.   Thank you for that, Ms. Nelson.
25        So you mentioned WordPress and

Page 100

1 HubSpot being vendors associated with the
2 preparation of the -- of the website; am I correct?
3    A.   Correct.
4    Q.   And then you also mentioned Cross
5 Cultural Exchange having some role in -- in the
6 development of APF's website; is that right?
7    A.   No.  They -- they didn't develop the
8 website.  They assisted our staff in providing
9 services related to marketing services, which may
10 have included content.  Not content.  Educational
11 marketing services to help us learn how to develop
12 this information.
13   Q.   So is it -- is it fair to say that the
14 website is one tool that APF uses to market the
15 au pair program?
16   A.   Yes, it's fair to say it's one tool.
17   Q.   Are you aware of any other tools that APF
18 uses to market the au pair program?
19   A.   Yes.
20   Q.   What other tools are you aware of?
21   A.   It would vary from time to time.
22   Q.   Let's start with today.  What time --
23 what does --
24   A.   Word of -- word of mouth.
25   Q.   Okay.  Anything else?

Page 101

1    A.   We may use flyers or brochures.  Our
2 local community representatives, in talking with
3 families, are encouraging to spread the information
4 in regards to -- to cultural exchange.  We -- we
5 often encourage our host families, you know, to --
6 to spread the word of cultural exchange.
7    Q.   And those are tools for marketing the
8 au pair program.  Are those all tools used to market
9 the program to host families?
10   A.   There would also be tools to market local
11 coordinators.
12   Q.   What do you mean by "tools to market
13 local coordinators"?
14   A.   We -- APF is continually looking for
15 local coordinators to participate on our program.
16   Q.   And you use, APF uses word of mouth,
17 flyers and brochures, other LCRs, and the website to
18 market opportunities for local coordinators?
19   A.   Yes.  Those are some of the ways, yes.
20   Q.   Are there any other ways, that you're
21 aware of?
22   A.   I'm sure there are many other ways
23 that -- but I couldn't list them all.
24   Q.   Are those tools that you mentioned --
25 word of mouth, flyers and brochures, LCRs, and the

**MAGNA**
LEGAL SERVICES

| | |
|---|---|
| **Page 102** | **Page 104** |

**Page 102**

1  website -- are those tools used to market the
2  au pair program to au pairs?
3      A.   No.  We don't market to au pairs.
4      Q.   Are you familiar with the name
5  GreatAuPair?
6      A.   Yes, I am.
7      Q.   What is GreatAuPair?
8      A.   I believe it's -- it's my understanding
9  it's another U.S. sponsor.
10      Q.   And, sorry, I want to go back to the --
11  we'll get back to GreatAuPair, but going back to the
12  line of questioning we just on.
13           You said you don't market to
14  au pairs.  Have you ever marketed to au pairs?
15      A.   In terms of having -- asking them to
16  apply with our agency as a sponsor?
17      Q.   What is -- what is your understanding of
18  the word "market"?
19      A.   My understanding of the word "market" is
20  to have you participate and come to us as a customer
21  or a vendor.
22      Q.   Does Au Pair Foundation use any tools to
23  encourage au pairs to come to the au pair program?
24      A.   No, not that I can think of.
25      Q.   Okay.  Turning back to GreatAuPair.  You

**Page 103**

1  understand it to be another U.S. sponsor.  And you
2  mean a J-1 au pair sponsor?
3      A.   Yes.
4      Q.   Do you know if GreatAuPair had any roles
5  related to the au pair program before it became a
6  designated J-1 sponsor?
7      A.   No, I would not.
8      Q.   I'm handing you what we are marking as
9  Exhibit 6.
10           MR. VALDIVIESO:  For counsel on the
11  phone --
12           Let's go off the record.
13           THE VIDEOGRAPHER:  Going off the
14  record.  The time is 11:45.
15           (Break from 11:45 a.m. to
16           11:52 a.m.)
17           THE VIDEOGRAPHER:  We are back on the
18  record.  The time is 11:52.
19  BY MR. VALDIVIESO:
20      Q.   Welcome back, Ms. Nelson.
21           Ms. Nelson, are you aware of
22  anyone at Au Pair Foundation whose name is Olivia?
23      A.   Olivia was a staff member when the
24  organization first began, I believe, or very near
25  its beginning.

**Page 104**

1      Q.   What was Olivia's last name, do you know?
2      A.   Frere.
3      Q.   Is that the only Olivia that you're aware
4  of that has been associated with Au Pair Foundation?
5      A.   To memory, yes.
6      Q.   What was Ms. Frere's role?
7      A.   I don't recall what her role was.  It
8  would have -- or what her title was.  She would have
9  been -- yeah, I -- I don't recall.
10      Q.   And was she a staff member of Au Pair
11  Foundation, Inc.?
12      A.   Yes.
13      Q.   Did she have any role at Au Pair
14  Foundation Global Exchange NPF?
15      A.   No, not to my knowledge.
16      Q.   Do you know if Au Pair Foundation Global
17  Exchange NPF has entered into any agreements with
18  GreatAuPair?
19      A.   Not to my knowledge.
20      Q.   Do you know if GreatAuPair, Inc. had
21  entered into any agreements with GreatAuPair?
22      A.   No, I don't -- I'm not familiar with
23  either of those two entities.
24      Q.   With which entities?
25      A.   Do you want to repeat the question?

**Page 105**

1      Q.   I -- I -- I can ask it again.
2           Are you familiar with Au Pair
3  Foundation, Inc.?
4      A.   Yes.
5      Q.   And you're familiar with GreatAuPair?
6      A.   Yes.
7      Q.   Are you aware of any agreements entered
8  into between Au Pair Foundation, Inc. and
9  GreatAuPair?
10      A.   Not to my memory, no.
11      Q.   And are you aware of any relationship
12  between GreatAuPair and Au Pair Foundation, Inc.?
13      A.   No, not to my memory.
14      Q.   Do you know anyone who works at
15  GreatAuPair?
16      A.   No, not -- no, not that I can recall.
17      Q.   Is -- what -- in your e-mail address,
18  what comes after the "at" sign?
19      A.   AuPairFoundation.org.
20      Q.   Do you know if the e-mails -- do you know
21  if there's a retention policy for the e-mails at
22  Au Pair Foundation?
23      A.   No, we don't have a stated policy
24  written.
25      Q.   Do you know if there's a practice for

PLAINTIFFS' RESP. APP.0005442

MAGNA
LEGAL SERVICES

| Page 106 | Page 108 |
|---|---|
| 1  maintaining -- | 1  "accounting at," and then whatever domain was active |
| 2     A.  Yeah. | 2  at that time. |
| 3     Q.  -- e-mails? | 3     Q.  So did -- |
| 4     A.  The practice is we keep e-mails. | 4     A.  I honestly don't have a memory if it was |
| 5     Q.  Do you know if after the merger between | 5  .org or .com, but I believe it was Au Pair |
| 6  Au Pair Foundation, Inc. and APF Global Exchange | 6  Foundation. |
| 7  NPF, if the AuPairFoundation.org e-mails were kept? | 7     Q.  Do you think it's possible that -- strike |
| 8        MS. SCHAECHER:  Objection to form. | 8  that. |
| 9     A.  Yeah, I don't think I understand the | 9        If there was an e-mail domain |
| 10  question.  If you could restate it. | 10  AuPairFoundation.com, do you know whether -- do you |
| 11     Q.  Which part of the question do you not | 11  know whether Au Pair Foundation Global Exchange |
| 12  understand? | 12  would have used that domain? |
| 13     A.  Which e-mails were kept when. | 13     A.  No, I don't.  I don't recall. |
| 14     Q.  Did the AuPairFoundation.org e-mail | 14     Q.  And if there was a change between the |
| 15  exist -- e-mail domain exist before NP -- strike | 15  domain AuPairFoundation.com and |
| 16  that. | 16  AuPairFoundation.org, do you know whether that |
| 17        Did the AuPairFoundation.org -- do | 17  change would have occurred after APF Global Exchange |
| 18  you know -- strike that. | 18  was created? |
| 19        Do you know whether the | 19     A.  I -- I don't recall. |
| 20  AuPairFoundation.org e-mail domain existed before | 20     Q.  But you testified that Olivia at Au Pair |
| 21  APF Global Exchange NPF was created? | 21  Foundation left before AP Foundation Global Exchange |
| 22     A.  Oh, I -- I don't have a clear memory | 22  was formed; is that right? |
| 23  whether it was .org or .com or -- no.  I wasn't | 23     A.  Yeah, to my memory. |
| 24  involved in the day-to-day operations when Au Pair | 24     Q.  So if she had an AuPairFoundation.org |
| 25  Foundation, Inc. was in existence.  My | 25  e-mail address, would that make it more or less |

| Page 107 | Page 109 |
|---|---|
| 1  representation here today is -- is for APF Global | 1  likely that AuPairFoundation.com existed after APF |
| 2  Exchange. | 2  Global Exchange was created? |
| 3     Q.  I understand that.  But you've testified | 3     A.  Can you repeat that? |
| 4  here today that you provided services to Au Pair, | 4     Q.  If you knew that Olivia had an |
| 5  Inc.; is that right? | 5  AuPairFoundation.org e-mail address. |
| 6     A.  Yes. | 6     A.  Uh-huh. |
| 7     Q.  When you provided services to au pair, | 7     Q.  Would that make it more or less likely |
| 8  Inc., did you have an Au Pair Foundation e-mail | 8  that the domain AuPairFoundation.com existed after |
| 9  address? | 9  APF Global Exchange was created? |
| 10     A.  Yes.  I believe I did, yes. | 10        MS. SCHAECHER:  Objection.  Form. |
| 11     Q.  Did that e-mail address change when you | 11     A.  To -- to my memory, one thing would not |
| 12  changed -- when the organization changed to AP | 12  have anything -- any bearing on the other. |
| 13  Foundation Global Exchange NPF? | 13        (Exhibit No. 6 was marked.) |
| 14        MS. SCHAECHER:  Objection.  Form. | 14     Q.  I'm handing you and counsel what has been |
| 15     A.  I believe at some point in time, and I | 15  marked as Exhibit 6. |
| 16  don't recall when, I went from a generic e-mail, | 16        Are you familiar with Exhibit 6, |
| 17  which was, I believe, "accounting at," to my | 17  Ms. Nelson? |
| 18  personal name. | 18        MS. FULLER:  May I please have a |
| 19     Q.  You don't recall whether that change | 19  copy? |
| 20  occurred prior to or after APF Global Exchange was | 20        MR. VALDIVIESO:  Oh, I'm sorry. |
| 21  created? | 21        MS. FULLER:  Thank you. |
| 22     A.  Not specifically, no. | 22        MR. VALDIVIESO:  For those on the |
| 23     Q.  Do you recall what your generic e-mail | 23  phone, Exhibit 6 is a document ending in Bates No. |
| 24  address was? | 24  159. |
| 25     A.  Yes.  As I stated, I -- I recall it being | 25     A.  No, I'm not personally -- no, I'm not |

MAGNA
LEGAL SERVICES

| Page 110 | Page 112 |
|---|---|
| 1  familiar with this document. | 1  copy of this via e-mail, are you -- do you know |
| 2  Q.  Is that Au Pair Foundation's logo on the | 2  whether you received it to your Au Pair Foundation, |
| 3  top of the document? | 3  Inc. e-mail or your Au Pair Foundation Global |
| 4  A.  This appears to be a document from | 4  Exchange NPF e-mail? |
| 5  Au Pair Foundation, Inc. | 5  A.  No, I don't. |
| 6  Q.  What indicates to you that this appears | 6  Q.  What is Au Pair Foundation Global |
| 7  to be a document from Au Pair Foundation, Inc.? | 7  Exchange NPF's current website address? |
| 8  A.  The address at the bottom. | 8  A.  Www.AuPairFoundation.org. |
| 9  Q.  Do you know if Au Pair Foundation, Inc. | 9  Q.  What is the address listed at the bottom |
| 10  had a website? | 10  of Exhibit 6? |
| 11  A.  Yes. | 11  A.  Www.AuPairFoundation.org. |
| 12  Q.  What was Au Pair Foundation, Inc.'s | 12  Q.  That's the same address; is that right? |
| 13  website -- | 13  A.  Yes, it is. |
| 14  A.  I -- | 14  Q.  What about that phone number listed just |
| 15  Q.  -- address? | 15  above the website on Exhibit 6, what is that phone |
| 16  A.  I believe Au Pair Foundation.  I -- I | 16  number? |
| 17  really, honestly, do not know if it was .com or | 17  A.  866-4AU-PAIR. |
| 18  .org. | 18  Q.  Is that number currently Au Pair |
| 19  Q.  Do you believe that this -- | 19  Foundation Global Exchange NPF's phone number? |
| 20  A.  It was more than ten years ago, so I -- | 20  A.  Yes, it is. |
| 21  and I wasn't involved to that extent. | 21  Q.  The e-mail just above the phone number, |
| 22  Q.  You believe that this, however, is an | 22  do you see that? |
| 23  Au Pair Foundation, Inc. document based on the | 23  A.  Yes, I do. |
| 24  address, the physical address at the bottom; is that | 24  Q.  What e-mail is that? |
| 25  right? | 25  A.  Info@AuPairFoundation.org. |

| Page 111 | Page 113 |
|---|---|
| 1  A.  I'm -- I believe that based solely on the | 1  Q.  Do you know if that e-mail address is |
| 2  address listed at the bottom, having no other | 2  still used by APF Global Exchange NPF? |
| 3  knowledge of this document. | 3  A.  Yes, it is. |
| 4  Q.  When did Au Pair Foundation move from | 4  Q.  So other than the physical address |
| 5  Red -- Redwood Boulevard to its current address? | 5  located at the bottom, is there anything else that |
| 6  MS. SCHAECHER:  Objection.  Form. | 6  indicates to you that this is an AP Foundation, Inc. |
| 7  Foundation. | 7  document and not an AP Foundation Global Exchange |
| 8  A.  I don't have a clear memory of when we | 8  NPF document? |
| 9  moved. | 9  MS. SCHAECHER:  Objection.  Form. |
| 10  Q.  Do you have an idea as to when Au Pair | 10  A.  Not knowing the author, no. |
| 11  Foundation last resided or was located at 7599 | 11  Q.  And do you see the photo of the child? |
| 12  Redwood Boulevard? | 12  A.  Yes, I do. |
| 13  A.  I don't have a memory of when they moved. | 13  Q.  Right under the photo of the child |
| 14  Q.  So as Au Pair Foundation Global Exchange | 14  there's a sentence.  Could you read that sentence |
| 15  NPF's corporate representative, you are disclaiming | 15  into the record, please. |
| 16  that Exhibit 6 is a document created by Au Pair | 16  A.  The very first sentence? |
| 17  Foundation Global Exchange NPF? | 17  Q.  Yes, please. |
| 18  A.  No, I didn't state that. | 18  A.  "Au Pair Foundation is Department of |
| 19  Q.  So you -- you are -- you are not stating | 19  State designated au pair agency that provides |
| 20  that; is that correct? | 20  American host families with affordable live-in |
| 21  A.  I do not know who the author of this | 21  childcare, at just under $8 an hour." |
| 22  document was.  I may have received a copy via | 22  Q.  Sitting here today, and recognizing that |
| 23  e-mail, but I -- I do not know who the author of | 23  you are not sure whether this document was authored |
| 24  this document was. | 24  by someone at Au Pair Foundation Global Exchange |
| 25  Q.  And when you say you may have received a | 25  NPF, is this sentence an accurate description of APF |

PLAINTIFFS' RESP. APP.0005444

**MAGNA**
LEGAL SERVICES

Page 114

1    Global Exchange NPF?
2         MS. SCHAECHER: Objection. Form.
3         A.   I could not answer that because since I
4    don't know who the author of this was, who the
5    audience was intended for.
6         Q.   That's not my question, Ms. Nelson. My
7    question is: Is the sentence that you just read an
8    accurate description, to your understanding, of what
9    APF Global Exchange NPF does or is?
10        A.   No.
11        Q.   Why is that?
12        MS. SCHAECHER: Objection. Form.
13        Q.   Why is it not accurate?
14        A.   I would never have written it this way.
15        Q.   How would you have written it?
16        A.   I don't know because I'm not the author.
17   I don't know what this document was intended for or
18   what the purpose of it was used for. It's just --
19   excuse me -- worded very awkwardly.
20        Q.   But you said it was not accurate; is that
21   right?
22        A.   I'm not the author of this, so --
23        Q.   That wasn't my question. The sentence --
24   you read the sentence into the record; is that
25   right?

Page 115

1         A.   Yes, I did.
2         Q.   And it states what Au Pair Foundation is.
3    Is that an accurate description of what the sentence
4    does?
5         A.   Au Pair Foundation is a J-1 visa sponsor
6    for the au pair program, and we facilitate
7    participants to come into the U.S. and live with
8    American host families and interact in the
9    community.
10        Q.   Does the affordability of the au pair
11   program continue to be an attribute that Au Pair
12   Foundation NPF -- sorry -- that -- strike that.
13        Does the affordability of the
14   au pair program continue to be an attribute that APF
15   Global Exchange NPF continues to market?
16        MS. SCHAECHER: Object to form.
17        Q.   Do you understand what I mean by
18   "affordability"?
19        A.   Yes. I -- I consider that a very
20   relative term.
21        Q.   Sorry, just going back. I want to ask
22   one more question about the sentence.
23        Is affordable live-in childcare no
24   longer something that Au Pair Foundation Global
25   Exchange NPF provides?

Page 116

1         MS. SCHAECHER: Objection. Form.
2         A.   APF Global Exchange does not provide
3    childcare.
4         (Exhibit No. 7 was marked.)
5         Q.   I'm handing you what's been marked
6    Exhibit 7.
7         A.   Thank you.
8         Q.   Are you familiar with Exhibit 7,
9    Ms. Nelson?
10        A.   Yes, I am.
11        Q.   What is Exhibit 7?
12        A.   This is a doc -- an advertising or a tool
13   that we would use in promoting our program. It's
14   what we commonly refer to as the APF brochure.
15        Q.   What is the intended audience of
16   Exhibit 7?
17        A.   The -- the intended audience would be
18   anyone within the U.S. that we would like to spread
19   the word of cultural exchange to. It could be host
20   families. It could just be anyone in the community.
21        Q.   And on --
22        MR. VALDIVIESO: And sorry, Counsel
23   on the phone. This is a document that ends in 152.
24        Q.   On 153, next page, in the left column,
25   can you read the first sentence under "Au Pair

Page 117

1    Foundation's Mission."
2         A.   "By offering personalized one-to-one
3    service, Au Pair Foundation offers American families
4    a flexible and affordable childcare offer by placing
5    highly qualified, loving care providers from other
6    countries in their home for up to two years."
7         Q.   Is a flexible and affordable childcare
8    option something that Au Pair Foundation offers?
9         A.   Au Pair Foundation offers the opportunity
10   for participants to come into the U.S. on a J-1 visa
11   program, and the Department of State specifies the
12   requirements that the au pairs must meet in order to
13   fulfill their visas.
14        Q.   Is that all it offers?
15        A.   I'm not sure I understand the question.
16        Q.   You -- I asked you what Au Pair
17   Foundation offers.
18        A.   Uh-huh.
19        Q.   You gave a response.
20        A.   Uh-huh.
21        Q.   Does it -- does Au Pair Foundation offer
22   anything else?
23        A.   Au Pair Foundation offers the opportunity
24   for participants and host families to expand their
25   cultural understanding of the world.

PLAINTIFFS' RESP. APP.0005445

MAGNA ►
LEGAL SERVICES

Page 118

1    Q.   So affordable -- affordable childcare is
2 not something that Au Pair Foundation offers?
3    A.   No, that is not something that Foundation
4 offers.
5    Q.   Do you believe the first sentence in that
6 brochure that you read is accurate?
7    A.   No. I believe that that is a marketing
8 tool.
9    Q.   I'm sorry, you said you do not believe
10 it's accurate?
11    A.   I believe it is a statement used to
12 market and describe the pro -- describe Au Pair
13 Foundation's mission.
14    Q.   Do you believe the statement to be
15 accurate?
16    A.   Not the way it is worded, no.
17    Q.   In the second column under "Host Family
18 Program Fees," do you see the words, "Weekly stipend
19 to au pair"?
20    A.   Yes, I do.
21    Q.   And what follows the words, "Weekly
22 stipend to au pair"?
23    A.   "195.75 per week."
24    Q.   Does anything on this brochure indicate
25 that 195.75 per week is a minimum amount?

Page 119

1    A.   No, there -- it does not. There's
2 many -- much information that is not on this
3 brochure.
4    Q.   At the bottom of the second column,
5 staying on the same page, 153, there's a sentence
6 that starts, "Once the visa is issued, international
7 flights are purchased and the au pair completes her
8 training."
9         I have a couple of questions
10 relating to that sentence. But, first, did I read
11 that sentence accurately?
12    A.   Yes, you read it accurately.
13    Q.   Who purchases the international flights
14 referred to in that sentence?
15    A.   APF Global Exchange, in coordination with
16 families.
17    Q.   And then it's -- the last part of the
18 sentence says, "The au pair completes her training."
19         Who provides the training
20 referenced in that sentence?
21    A.   Au Pair -- APF Global Exchange.
22    Q.   And where does that training occur,
23 generally?
24    A.   That's an online training.
25    Q.   Does the au pair log onto the online

Page 120

1 training from his or her home country?
2    A.   Yes, that's correct.
3    Q.   And how long does the training program
4 last?
5    A.   It depends on each person. It varies.
6 It's a self-paced course.
7    Q.   And the training occurs prior to travel
8 to the United States?
9    A.   Yes, it does. It also -- our policy is
10 to complete the training prior to issuing the
11 ticket, purchasing the ticket as well.
12    Q.   Once the au pair arrives in the United
13 States, how long do they typically stay? Well,
14 strike that.
15         The J1...you see under "Host
16 Family Program Fees" in the middle of that second
17 column in bold, there's a program fee listed?
18    A.   Yes, I do.
19    Q.   How long does the program last?
20    A.   In relationship to this particular fee?
21    Q.   Yes.
22    A.   The expectation is to be 12 months, in
23 align with the visa that's issued.
24    Q.   How many weeks?
25    A.   52 weeks.

Page 121

1    Q.   And does that 52 weeks include the
2 training, or not?
3    A.   It -- it does not.
4    Q.   So once the au pair arrives here, she
5 stays -- is -- is -- is permitted to stay for 52
6 weeks; is that correct?
7    A.   If -- if she continues to fulfill the
8 obligations of her visa, yes.
9    Q.   As part of the au pair program, does APF
10 purchase insurance for au pairs?
11    A.   Yes, we do, in accordance with the
12 Department of State regulations.
13    Q.   And do you have an understanding as to
14 what that insurance covers?
15    A.   Yes, I do.
16    Q.   What is that?
17    A.   It is primarily what I would consider
18 a -- a -- a medical policy for acute illness,
19 injuries, accidental injuries.
20    Q.   You said earlier that the infant au pairs
21 were required to have 200 hours of documented infant
22 experience, and that the standard au pairs were not
23 required to have that.
24         Do the standard au pairs have any
25 prior experience requirement?

**MAGNA** ▶
**LEGAL SERVICES**

Page 122

```
 1      A.   The Department -- I -- we follow the
 2 Department of State guidelines.  And to my
 3 knowledge, it doesn't specify specific training.
 4 However, APF follows that policy, and they must have
 5 at least a minimum of 200 childcare hours.
 6      Q.   I'm a bit confused.  Does the policy
 7 require 200 childcare hours or not --
 8      A.   The Department of State regulations --
 9      Q.   -- as you understand it?
10      A.   -- specifies infant care must have 200
11 hours of documented care.
12      Q.   But as you understand it, the Department
13 of State does not require 200 hours of childcare
14 experience for standard au pairs?
15      A.   APF follows the policy of having those
16 hours.
17      Q.   So -- so you believe -- I'm just trying
18 to understand what your understanding of the
19 Department of State regulations are.
20           Is it your understanding that the
21 Department of State regulations requires standard
22 au pairs to have had 200 hours of childcare
23 experience?
24      A.   The regulations are quite extensive.  I
25 don't have them memorized verbatim.  I do happen to
```

Page 123

```
 1 have the memorization of the infant qualification.
 2      Q.   Right.  And I -- and now I'm asking about
 3 standard au pairs.
 4      A.   Yes, I understand that.
 5      Q.   Okay.  And is your under -- do you have
 6 an understanding as -- as to whether the Department
 7 of State guidelines require a certain amount of
 8 experience for standard au pairs?
 9      A.   I would have to look at the regulations.
10 As I stated, I don't have them memorized.
11           Can I step back on one point?  You
12 had asked how long the training takes, and I'd like
13 to put on record that the training that APF provides
14 is in the length, minimum length as required by the
15 Department of State to provide to au pairs.
16      Q.   Thank you.
17           And just to clarify, since we're
18 going back to that anyways.  During -- from the
19 entire period that you've been at APF Global
20 Exchange NPF, that training has always been
21 conducted online; is that right?
22      A.   Yes.  There is a -- we have also done
23 what we call a test pilot to do that training in
24 person, in addition to a smaller coursework online.
25      Q.   When did that test pilot begin?
```

Page 124

```
 1      A.   I believe last year or the year before.
 2 I believe last year.
 3      Q.   And did all of the au pair participants
 4 in the program that year also participate in the
 5 pilot program?
 6      A.   No.
 7      Q.   So it's fair to say it was a subset of
 8 the au pairs --
 9      A.   Yes.
10      Q.   Do you have an understanding of the
11 proportion of the au pairs who participated, or
12 the -- the exact numbers, if you know them?
13      A.   No, I don't have the exact numbers.
14           (Exhibit No. 8 was marked.)
15      Q.   I'm handing you what's been marked
16 Exhibit 8.
17           MR. VALDIVIESO:  And for those on the
18 phone, it's a document ending in Bates No. 271.
19      Q.   Do you recognize this document,
20 Ms. Nelson?
21      A.   Yes.  It appears to be a document sent
22 from Carrie Crompton.
23      Q.   And to whom was the document sent?
24      A.   It appears to be addressed to the --
25 the -- what she's referring to as CRs, which would
```

Page 125

```
 1 be local coordinators.
 2      Q.   And you were subsequently copied on an
 3 e-mail that attached this document; is that correct?
 4           MS. SCHAECHER:  Object to form.
 5      A.   I don't see an attachment.  I am copied.
 6 It does appear I'm copied on this document, yes.
 7      Q.   And the document that you were copied on
 8 contains an e-mail with the subject "Au Pair
 9 Foundation - Thursday Tip."  Is that right?
10      A.   Yes, that's how it's labeled.
11      Q.   And I will just represent to you that the
12 blacked-out section of this document was not
13 something that I did, and this is how I received the
14 document from your counsel.
15      A.   Uh-huh.
16      Q.   But how do you know that Ms. Crompton
17 sent -- or did -- do you know who sent the
18 Thursday -- the -- the e-mail that appears to follow
19 a top e-mail on this document?
20      A.   I -- I only see one e-mail here.
21      Q.   But you believe that Ms. Crompton sent
22 it; is that right?
23      A.   Yeah, it appears so.  It does say "From
24 Carrie."
25      Q.   Is the "Thursday Tip" an e-mail that was
```

MAGNA
LEGAL SERVICES

Page 126

regularly sent to LCRs?
A. I don't have a memory back to -- to that date.
Q. Do you recall having ever received any other Thursday Tips?
A. I am sure that in the course of my working there, I've received lots of weekly tips.
Q. Do you see in bold, it says, "Onto Today's Thursday's Tip"?
A. Yes, I do.
Q. Could you please read what follows after Today's Thursday Tip?
A. "The weekly stipend and weekly hours adherence. These are two items that are very important to our program."
Q. And could you continue until the end, please.
A. "We rely heavily on our CRs to help us verify that these two items are being fulfilled."
Q. Is the first sentence that you read accurate? I'm sorry, I think you read three sentences.
The sentence that -- that stated, "These are two items that are very important to our program," referring to the weekly stipend and the

Page 127

weekly hours adherence, is that an accurate sentence?
A. I would say they are in terms of they are one of the Department of State -- one of the many Department of State regulations as specified for the J-1 visa program, and our -- as our role as a sponsor is to ensure those programs are -- excuse me, those guidelines are being met.
Q. And is the second sentence that starts with, "We rely," is that sentence accurate?
A. I -- I don't know how to answer that question. That's not terminology that I would use.
Q. Are you familiar with what the word "accurate" means?
A. Yes. I'm -- I'm saying "rely heavily." I -- I don't know how to specify that or quantify that. These two regulations are two of many regulations.
Q. Does APF rely at all, whether heavily or not, be on LCRs to help verify that the two items are being fulfilled?
A. Yes, we do.
Q. And going a little bit further down to the "Weekly Stipend" underlined and in bold. Do you see that?

Page 128

A. Yes, I do.
Q. Could you read the paragraph starting with, "The weekly stipend," and ending on, "Weekly basis." I think it's about three, four lines.
A. Uh-huh. "The weekly stipend is currently 195.75."
Do you want me to, I'm sorry, continue on?
Q. Yes, please, until you've reach "weekly basis."
A. "The Department of State sets the weekly stipend at federal minimum wage, minus room and board. So this is a fed" -- "federally mandated stipend that all au pair agencies must adhere to."
Q. One more sentence, please.
A. "The weekly stipend is paid directly from the host families to the au pair on a weekly basis."
Q. Is there anything in the sentences that you just read that indicates that 195.75 is a minimum stipend?
A. No, nor does it state it's a maximum.
Q. Do you think it's accurate to -- accurate to describe the stipend as federally mandated?
A. I don't see where she -- oh, federally mandated.

Page 129

No, the -- the -- the Depart -- the Department of State set the weekly stipend.
Q. Do you think it's accurate that all au pair agencies must adhere to the federally mandated stipend?
A. I believe it accurate that all sponsors must adhere to the Department of State regulations.
Q. You said the Department of State sets the weekly stipend. Does the Department of State set the weekly stipend in its regulations?
A. Can you repeat that question? I think I'm getting hungry.
Q. You testified that the Department of State sets the weekly stipend; is that right?
A. Yes, I did.
Q. Does the Department of State set the weekly stipend in its regulations, as far as you know?
A. Yes, it's my understanding.
Q. So you said that you rely on LCRs to help verify that the weekly stipend and weekly hours are adhered to; is that right?
A. Yes, it's one of our tools.
Q. How -- how does APF Global Exchange NPF rely on LCRs?

Page 130

1      A.   LCRs --
2           MS. SCHAECHER: Objection. Form.
3           Go ahead.
4           THE WITNESS: Okay.
5      A.   Would you repeat this question?
6      Q.   How does APF Global Exchange rely on its
7  LCRs as one of its tools in verifying that the
8  weekly stipend and weekly hours are being adhered
9  to?
10     A.   LCRs would be working with the au pair
11 and the host family. And when I say "working with,"
12 I'm saying communicating with either in person often
13 or -- or e-mail, other various communications. And
14 they would have dialogue regarding this regulation
15 and many other regulations.
16     Q.   In the last paragraph in -- on page 271,
17 do you see where it says, "Additionally, ask your
18 au pair about her weekly hours."
19     A.   Yes, I do.
20     Q.   Could you read that sentence, please.
21     A.   "Additionally, ask your au pair about her
22 weekly hours and weekly stipend every once in a
23 while so we can ensure that all is well."
24     Q.   Do you know if LCRs, in fact, asked
25 au pairs about her weekly hours and weekly stipend

Page 131

1  to ensure that all is well?
2      A.   Can you repeat that?
3      Q.   Do you know if, in fact, LCRs would ask
4  au pairs about their weekly hours or stipends to
5  ensure that all is well?
6      A.   No, I could not say, in fact, every
7  single one.
8      Q.   Would APF Global Exchange ask its LCRs to
9  ask the au pairs about their weekly hours and weekly
10 stipend to ensure that all is well?
11          MS. SCHAECHER: Objection. Form.
12     A.   APF would all -- would rely upon the
13 au pair to provide communication to LCRs in
14 addition.
15     Q.   In addition to what?
16     A.   If the -- if the question was asked by a
17 local coordinator.
18     Q.   Does APF have a practice of asking
19 au pairs about their weekly hours and weekly stipend
20 with any regularity?
21     A.   Yes.
22     Q.   With what regularity does APF ask its
23 au pairs about their weekly hours and weekly
24 stipend?
25     A.   We ask weekly.

Page 132

1      Q.   How does APF ask weekly?
2      A.   APF sends a survey.
3      Q.   In what format is that survey sent?
4      A.   Survey Monkey e-mail, I would assume.
5      Q.   Has that been the practice since APF
6  Global Exchange NPF was created?
7      A.   No.
8      Q.   When did that practice begin?
9      A.   That best practice developed somewhere
10 along the line. I don't recall exactly what date.
11     Q.   I understand that you don't have an exact
12 date in mind, but do you have an approximate time
13 period during which that practice commenced?
14     A.   No, not specifically.
15     Q.   Do you think it was in the last year?
16     A.   No.
17     Q.   Do you think it was prior to the last
18 year?
19     A.   I know it's been longer than one year.
20     Q.   Before using Survey Monkey, did APF
21 Global Exchange NPF use any other means of
22 conducting a sur -- a weekly survey of its au pairs?
23     A.   No, not to my knowledge.
24          MS. SCHAECHER: Would this be a good
25 time for a break?

Page 133

1          MR. VALDIVIESO: Would you like to
2  break for lunch, Counsel, or do you want to --
3          MS. SCHAECHER: That's what I'm
4  thinking.
5          MR. VALDIVIESO: I apologize. At one
6  point the computer screen that I was looking at was
7  an hour ahead.
8          MS. SCHAECHER: Oh.
9          MR. VALDIVIESO: So I thought it was
10 only 11:45. I'm very sorry. I would not have gone
11 on this long, had I known.
12          Yes, now would be a great time to
13 break for lunch. Thank you.
14          THE VIDEOGRAPHER: Going off the
15 record. The time is 11:4 -- excuse me, 12:42.
16          (Whereupon, a lunch break was had
17          from 12:42 p.m. to 1:27 p.m.)
18          THE VIDEOGRAPHER: We are back on the
19 record. The time is 1:27.
20          EXAMINATION (CONTINUED)
21 BY MR. VALDIVIESO:
22     Q.   Welcome back, Ms. Nelson.
23     A.   Thank you.
24          (Exhibit No. 9 was marked.)
25     Q.   I'm handing you what has been marked as

PLAINTIFFS' RESP. APP.0005449

MAGNA
LEGAL SERVICES

## Page 134

1  Exhibit 9.
2       MR. VALDIVIESO:  For those of you on
3  the phone, this is a document Bates stamped 233.
4       Q.   Do you recognize this document,
5  Ms. Nelson?
6       A.   Yes, I do.
7       Q.   What is this document?
8       A.   This document is an Encouragement Letter
9  written to a host family.
10      Q.   And what is an Encouragement Letter?
11      A.   An Encouragement Letter may be used for a
12 different variety of things.  In this particular
13 case it was to highlight a behavior and bring to the
14 host family's attention and remind them.
15      Q.   What in particular is this Encouragement
16 Letter bringing to the host family's attention?
17      A.   In this particular situation it was in
18 regards to the hours worked, from my memory.
19      Q.   Do you have an estimate for the time
20 period in which this letter was sent?
21      A.   I believe this letter was sent -- no,
22 I -- I don't have a clear memory of when it was
23 sent.
24      Q.   But the signature on the bottom of this
25 page is set for your signature; is that correct?

## Page 135

1       A.   Yes, it is.
2       Q.   Do you know if you would have sent this
3  document to the host family via e-mail?
4       A.   Yes, I believe I did.
5       Q.   On the third-to-last paragraph, it starts
6  with, "These regulations must be followed
7  regardless."
8            Do you see that?
9       A.   Yes, I do.
10      Q.   Could you read that paragraph into the
11 record, please.
12      A.   "These regulations must be followed
13 regardless of school holidays, illnesses, traffic,
14 and/or any other scheduling issue (emergency or
15 otherwise).  This regulatory item is determined in
16 accordance with the Fair Labor Standards Act.  Any
17 violation of this regulation actually violates the
18 FLSA."
19      Q.   Thank you.
20           And you put your name to this
21 document, including this paragraph; is that right?
22      A.   Yes.
23      Q.   What is your basis for the un --
24 understanding in the last sentence that a violation
25 of this regulation actually violates the FLSA?

## Page 136

1       A.   My understanding is -- refers up to
2  paragraph (j)(1), under Wages and Hours shown on
3  this document, under the Department of State
4  regulations.
5       Q.   So is it your understanding that if an
6  au pair exceeds more than 10 hours of childcare per
7  day, that that would violate the regulation that's
8  cited in this letter, as well as the FLSA?
9       A.   Yes, that would be my understanding.
10      Q.   You testified earlier that the stipend is
11 also set by the Department of State regulations; is
12 that correct?
13      A.   Yes, I did.
14      Q.   Is it your understanding that a violation
15 of the stipend set by the regulations is also a
16 violation of the FLSA?
17      A.   Can you repeat that?
18      Q.   Sure.
19           Is it your understanding that a
20 violation of the stipend set by the Department of
21 State regulations is also a violation of the FLSA?
22           MS. SCHAECHER:  Objection.  Form.
23 Foundation.
24      A.   I -- I'm not an attorney, so I -- I can't
25 say.

## Page 137

1       Q.   In this letter you reached a conclusion
2  that a violation of -- of the wage and hours portion
3  of the Department of State regulations cited in the
4  letter is a violation of the Fair Labor Standards
5  Act; is that right?
6            MS. SCHAECHER:  Objection.  Form.
7       A.   Can you repeat the question?
8       Q.   In this letter you reached a conclusion
9  that a violation of the wage -- wage and hours
10 portion of the Department of State regulations,
11 which is cited in -- in the letter, is a violation
12 of the Fair Labor Standards Act; is that right?
13           MS. SCHAECHER:  Objection.  Form.
14      A.   I was referring to each of the items
15 listed above, not any one individual.
16      Q.   The next paragraph, do you see the
17 sentence that starts, "We are here as your partner"?
18      A.   Yes.
19      Q.   Do you want to read that sentence into
20 the record, please.
21      A.   "We are here as your partner.  If you
22 feel there is a misunderstanding in the number of
23 hours worked, as reported by your au pair, I welcome
24 you to please contact me directly so that I may help
25 identify the misunderstanding."

MAGNA
LEGAL SERVICES

Page 138

1      Q.   Do you believe that you have a
2   partnership with the host families?
3           MS. SCHAECHER:  Object to form.
4      A.   I believe that as the J-1 visa sponsor
5   and the au pair living in their home, host families,
6   all -- all of the entities need to work together in
7   a cooperative effort to ensure the safety and
8   success of the au pair.
9      Q.   Do they work in partnership?
10          MS. SCHAECHER:  Same objection.
11     A.   I would have to ask you what is your
12   definition of "partnership"?
13     Q.   Well, you used the word "partner" in this
14   sentence, did you not?
15     A.   Yes, I did.
16     Q.   What do you mean by "partner"?
17     A.   Someone -- in this sentence, I meant as
18   someone that needs to work together in a cooperative
19   effort to reach a common goal.
20     Q.   Do you believe that host families and
21   Au Pair Foundation work together in a cooperative
22   effort to reach a common goal?
23          MS. SCHAECHER:  Object to form.
24     A.   I believe -- no.  At times.
25     Q.   With respect to number of hours worked?

Page 139

1           MS. SCHAECHER:  Object to form.
2      A.   APF has no control over the hours worked.
3   We rely on the host family.  It's their
4   responsibility to ensure those -- those hours are
5   set forth.
6      Q.   Was it your responsibility to sign
7   Encouragement Letters on behalf of Au Pair
8   Foundation?
9      A.   At times, yes.
10     Q.   At other times who has had the
11   responsibility for signing --
12     A.   I --
13     Q.   -- Encouragement Letters on behalf of
14   Au Pair Foundation?
15     A.   It would have changed depending on which
16   staff member was working at the time and who was
17   available to address or had -- who had the best
18   expertise knowledge or who -- who knew the family
19   better, or the situation.  It could be a variety of
20   people.
21     Q.   Do you recall having ever sent an
22   Encouragement Letter regarding the stipend?
23     A.   No, I do not.
24     Q.   And do you recall AuPairCare -- sorry.
25   Strike that.

Page 140

1           Do you recall Au Pair Foundation
2   having sent an Encouragement Letter to a host family
3   with respect to the stipend?
4      A.   I would not possess that knowledge.  I
5   didn't work in that role at that time.
6      Q.   And I may have confused the record, but I
7   will ask the question with more specificity.
8           Do you recall Au Pair Foundation
9   Global Exchange NFP having sent an Encouragement
10   Letter to a host family with respect to the stipend?
11     A.   No, I do not.
12     Q.   The section of the regulations cited in
13   this letter, you -- you refer to it as regulatory
14   wording regarding "wages and hours."  Is that right?
15     A.   Can you repeat the question?
16     Q.   You refer to the language that's in
17   italics as regulatory wording regarding "wages and
18   hours."  That's how you referred to it in this
19   letter; is that right?
20     A.   I indicated these as regulations.
21     Q.   If you see above the section (j), Wages
22   and Hours, there's a sentence.
23     A.   Oh, yes, I do see that.
24     Q.   Could you read that into the record,
25   please.

Page 141

1      A.   "Following is the regulatory wording
2   regarding wages and hours."
3      Q.   Is there any mention of 195.75 in this
4   section that you've cited?
5      A.   No, there is not.
6           (Exhibit No. 10 was marked.)
7      Q.   I'm handing you what's been tabbed --
8   what's been marked as Exhibit 10.
9           MR. VALDIVIESO:  For counsel on the
10   phone, this is a document ending in 236.
11     Q.   Are you familiar with this document,
12   Ms. Nelson?
13     A.   No, I am not.
14     Q.   Is that Au Pair Foundation's logo on the
15   top of this document?
16     A.   Yes, it does appear to be.
17     Q.   Did Au Pair Foundation, Inc. have a
18   different logo than Au Pair Foundation Global
19   Exchange NPF, if you know?
20     A.   Yes, we did.
21     Q.   And you're familiar with both logos?
22     A.   Yes.
23     Q.   And the logo up on the top of Exhibit 10
24   is Au Pair Foundation Global Exchange NPF's logo?
25     A.   That's Au Pair Foundation, Inc.'s logo.

PLAINTIFFS' RESP. APP.0005451

MAGNA
LEGAL SERVICES

Page 142

1    Q.   Understood.
2         So in your work for providing
3    services to Au Pair Foundation, Inc., you do not
4    recall having seen this document?
5    A.   No, I don't recall seeing this document.
6    Q.   Are you familiar with the content of this
7    document?
8    A.   No, since I have not seen it before.
9    Q.   I understand that you haven't seen this
10   particular document before.  But the words and the
11   content appearing therein, does the content appear
12   familiar to you?
13        MS. SCHAECHER:  You may take your
14   time to read the document, since you haven't seen it
15   before, before answering questions.
16        THE WITNESS:  Sure, I can read
17   through it.
18        But before I read through it, may
19   I ask a question?
20        MS. SCHAECHER:  Generally, no.
21        THE WITNESS:  Okay.  Okay.
22   Q.   Is there something you would like for me
23   to clarify, Ms. Nelson?
24   A.   No, that's fine.
25        (Witness peruses document.)

Page 143

1    Q.   What question were you going to ask,
2    Ms. Nelson?
3    A.   It's not important.
4         MS. SCHAECHER:  I object.
5         MR. VALDIVIESO:  I was just asking a
6    question, which is my role in the objection.
7         MS. SCHAECHER:  That's fine.  But I
8    object to the question, which is my role in the
9    deposition.
10        MR. VALDIVIESO:  Are you instructing
11   your witness not to answer my question?
12        MS. SCHAECHER:  No, I'm not.
13   Q.   Would you like to answer the question,
14   Ms. Nelson?
15   A.   No, it's not important.
16   Q.   You don't recall what you were going to
17   ask?
18   A.   I've been able to answer my own question,
19   so I don't need to ask a question.
20   Q.   You realize you're under oath?
21   A.   Yes, I do.
22   Q.   You realize that your role here is to
23   answer my questions, to the extent you can?
24   A.   Yes, I do.
25   Q.   Well, what were you going to ask?

Page 144

1    A.   What was I going to ask you?
2    Q.   Yes.
3         MS. SCHAECHER:  I'm going to object
4    again.  This is bordering on harassment.  The
5    witness has said that she does not have a question.
6         MR. VALDIVIESO:  She had a question
7    at one point.
8    Q.   And my question is what was --
9         MS. SCHAECHER:  It's not her role to
10   ask questions in this deposition.
11        MR. VALDIVIESO:  Are you instructing
12   your witness not to answer the question?
13        MS. SCHAECHER:  No, I'm not.
14   A.   I'm going to go ahead and answer my
15   question.  I'm going to take a few minutes to read
16   through this.  I've never seen it before, and I
17   believe your original question was do I recognize
18   it.
19   Q.   That was my first question.  I believe
20   you answered "No."
21        My second question following that
22   was, "Are you familiar with the content of the
23   document?"
24   A.   So I can easily answer that without
25   reading it, since I've never seen it.

Page 145

1    Q.   I think there's a distinction between
2    having seen the document and being familiar with the
3    content of it.  Do you understand the difference
4    between those two things?
5    A.   No, I'm sorry, I do not.
6    Q.   Okay.  So let's think of an example.
7         You might be familiar with my
8    name, title, and law firm; is that right?
9    A.   Correct.
10   Q.   Have you seen my business card before?
11   A.   No.
12   Q.   If I asked you if you had seen my
13   business card and you recognized the content of the
14   business card, would you be able to say that you
15   know the content of the business card without having
16   seen the business card before?
17        MS. SCHAECHER:  And I would object to
18   that hypothetical question.
19   A.   I -- I would say no, with not -- without
20   seeing the business card.  I would assume your
21   name's on it, and I would recognize your name.
22   Q.   Have you had a chance to look over the
23   content of this document?
24   A.   No, I have not.
25        (Witness peruses document.)

Case 1:14-cv-03074-CMA-KMT   Document 959-25   Filed 03/17/18   USDC Colorado   Page 625 of 700

Page 146

1    A.   Okay.  I've completed it.
2    Q.   Were you familiar with any of the content
3  that you read on the pages that you just reviewed?
4    A.   No, I'm not familiar with this content.
5    Q.   Having provided services to Au Pair
6  Foundation, Inc., do you have any idea as to what
7  the intended audience of this document may have
8  been?
9    A.   No, I do not.  My role was accounting
10  with them.
11    Q.   Has anyone, other than yourself, been
12  involved with collecting documents for purposes of
13  producing it to us in this litigation?  Let me
14  rephrase that.
15         Has anyone else from APF Global
16  Exchange NPF been involved in the collection of
17  documents for production in this litigation?
18    A.   To my recollection, I've been the one
19  producing the documents.  I can't recall any
20  instance where Sue has asked someone else to produce
21  it.
22         MS. SCHAECHER:  Again --
23         THE WITNESS:  Sorry.
24         MS. SCHAECHER:  -- please don't
25  testify to any --

Page 147

1         THE WITNESS:  Yes.
2         MS. SCHAECHER:  -- communications
3  with me --
4         THE WITNESS:  Okay.
5         MS. SCHAECHER:  -- or with Larry.
6    Q.   Do you have an explanation for why an
7  Au Pair Foundation, Inc. document would have been
8  collected and -- during your collection of documents
9  for this litigation?
10    A.   All of the -- not all of the documents.
11  There were documents which transferred over on my
12  computer, that were backed up on my computer, and
13  that came with the legal transfer of Au Pair
14  Foundation, Inc. to APF Global Exchange.
15    Q.   Do you currently use a computer provided
16  by APF Global Exchange NPF?
17         MS. SCHAECHER:  Object to form.
18    Q.   Did you understand the question?
19    A.   Yes, I do.
20         No, that is my personal computer.
21  The server is the property of APF.
22    Q.   You testified, "There were documents
23  which transferred over on my computer, that were
24  backed up on my computer, and that came with the
25  legal transfer of Au Pair Foundation, Inc. to APF

Page 148

1  Global Exchange."
2         Is that testimony accurate?
3    A.   Do you want to repeat it again, please?
4    Q.   "There were documents which transferred
5  over on my computer" --
6    A.   Uh-huh.
7    Q.   -- "that were backed up on my
8  computer" --
9    A.   Uh-huh.
10    Q.   -- "and that came with the legal transfer
11  of Au Pair Foundation, Inc. to APF Global Exchange."
12    A.   Yes, that's correct.
13    Q.   Is that accurate?
14    A.   Yes, it is.
15    Q.   And in that sentence you refer to "my
16  computer."  Is that right?
17    A.   Yes, I did.
18    Q.   And that computer, you just testified a
19  second ago, that you use your personal computer.  In
20  the sentence that I read to you, does "my computer"
21  refer to your personal computer?
22    A.   Yes, it does.
23    Q.   Your personal computer contains files
24  that were transferred over, that came with the legal
25  transfer of Au Pair Foundation, Inc. to APF Global

Page 149

1  Exchange?
2    A.   Yes, that's correct.
3    Q.   And you were search -- do -- do you
4  recall searching your personal computer for
5  responsive documents as part of this litigation?
6    A.   Yes.
7    Q.   So it's possible that this document may
8  have come from those files that you referred to?
9    A.   Yes, it is.
10    Q.   And you said -- you referred to a server
11  that is property of APF; is that right?
12    A.   Correct.
13    Q.   How do you know about the server?
14    A.   I worked with an IT person to have the
15  server installed.
16    Q.   When was the server installed?
17    A.   It would have been after we moved to --
18  excuse me.  After APF moved to the Petaluma
19  location.
20    Q.   Do you know if the server, that is the
21  property of APF, contains files that pre -- predated
22  APF Global Exchange?
23    A.   Yes.
24    Q.   Do you know if the server, that is
25  property of APF, contains documents that belong to

PLAINTIFFS' RESP. APP.0005453

MAGNA
LEGAL SERVICES

Page 150

1 Au Pair Foundation, Inc.?
2    A.   Yes.
3    Q.   And to be clear on the record, that
4 server does, in fact, contain documents that belong
5 to Au Pair Foundation, Inc.?
6         MS. SCHAECHER:  Objection. Form.
7    A.   Au Pair Foundation, Inc. dissolved, so
8 there's no ownership.
9    Q.   And my question was that at one point
10 belonged to Au Pair Foundation, Inc.?
11    A.   Yes, there would be documents on that
12 server that at one point belonged to Au Pair
13 Foundation, Inc.
14    Q.   And, again, I'm not asking you for a
15 legal conclusion, but I am asking as to your best
16 understanding.
17    A.   Uh-huh.
18    Q.   In your understanding, did APF -- Au Pair
19 Foundation, Inc. dissolve or did it merge?
20         MS. SCHAECHER:  Objection to form and
21 foundation.
22    Q.   Because I believe you used -- used both
23 of those words today.
24         MS. SCHAECHER:  Same objection.
25    A.   Yeah, I -- I legally do not know the

Page 151

1 difference.  I mean, there is a difference legally.
2 I do not have that knowledge as to which one.  I
3 don't recall.
4    Q.   You said you were able to identify the
5 logo on this Exhibit 10, I believe we're on.  What's
6 the difference between this logo and the Au Pair
7 Foundation Global Exchange NPF?
8    A.   If you look at Exhibit 9, this is our
9 current logo.
10    Q.   And if you could describe it in words,
11 how would you describe the difference?
12    A.   I would describe it as a straight font
13 of -- with the words, in large text, "Au Pair," a
14 small globe on top of the "I," and the word
15 "Foundation" underneath the word -- the letters
16 "Pair."
17    Q.   What you were just describing, that's the
18 current logo?
19    A.   That's their current logo, yes.
20    Q.   And the prior logo, how would you
21 describe that with words?
22    A.   For APF?
23    Q.   Yes.
24    A.   There -- there was --
25    Q.   The -- the logo on the top of page --

Page 152

1 Exhibit 10.
2    A.   Of APF Inc.?  I would describe that as
3 the word "Au Pair" with a globe, the word
4 "Foundation," a swoosh, a star, another underline,
5 and it looks like maybe a trademark seal.
6         (Exhibit No. 11 was marked.)
7    Q.   I'm handing you what's been marked
8 Exhibit 11.
9         (Witness peruses document.)
10    Q.   Are you familiar with Exhibit 11,
11 Ms. Nelson?
12    A.   No, I'm not.
13    Q.   On the first page of Exhibit 11, do you
14 see a logo at the top of the page?
15    A.   Yes, I do.
16    Q.   That logo that you see at the top of the
17 page, is that APF Global Exchange NPF's current
18 logo?
19    A.   Yes, it is.
20    Q.   Do you have any reason to believe that
21 this document is not an APF Global Exchange NPF
22 document?
23    A.   No.  I have no reason to not believe
24 that, no.
25    Q.   Do you believe that this is an APF Global

Page 153

1 Exchange NPF document?
2    A.   Yes, I would.  I do.
3    Q.   You don't think you've seen this document
4 before today, do you?
5    A.   No, I don't have any specific memory of
6 this document.
7    Q.   Before seeing this document today, had
8 you heard of a document titled "Au Pair 101"?
9    A.   Yes, I have.
10    Q.   What is Au Pair 101?
11    A.   Au Pair 101 was a marketing tool that one
12 of our coordinators was creating to be able to
13 promote cultural exchange in her community.
14    Q.   Do you know the name of the coordinator?
15    A.   I don't recall if it was -- two names
16 come to mind.
17    Q.   What are those two names?
18    A.   Kristen Wormley or perhaps Carrie
19 Crompton.
20    Q.   Did you have any role in the development
21 of the Au Pair 101 program?
22    A.   No, I did not.
23    Q.   Do you know what the intended audience of
24 the Au Pair 101 program was?
25    A.   No.  Not specifically, no.

MAGNA ▶
LEGAL SERVICES

Page 154

1 Q. Would anyone at Au Pair Foundation Global
2 Exchange NPF have approved the content contained in
3 Exhibit 11?
4 A. Not to my knowledge. It's not a document
5 that we use on a regular basis. I see it as a
6 marketing -- as a tool for maybe a PowerPoint or
7 some other presentation.
8 Q. Do you recall having seen any other
9 version of the Au Pair 101 PowerPoint?
10 A. Not specifically, no.
11 Q. Do you know if the Au Pair 101 program
12 was, in fact, ever presented to an audience?
13 A. No, I don't, in fact, know that.
14 Q. Did you receive any reports that it had
15 ever been presented?
16 A. Not that I recall.
17 Q. Who, if anyone, at APF Foundation Global
18 Exchange NPF would have more information regarding
19 the Au Pair 101 program?
20 A. I would say whoever was the author of
21 this document.
22 Q. Other than the author of this document,
23 do you know if anyone at APF Global Exchange NPF has
24 familiarity with the Au Pair 101 program?
25 A. I couldn't speculate on someone else's

Page 155

1 behalf.
2 Q. I'm not asking you in your personal
3 capacity. I'm asking you as the corporate
4 representative of --
5 A. No, not to my knowledge.
6 Q. -- Au Pair Foundation.
7 Let's turn to page 253, please.
8 Under "Cost," do you see a sentence that starts,
9 "Weekly stipend"?
10 A. Yes, I do.
11 Q. Could you read that into the record,
12 please.
13 A. "Weekly stipend is standard per week," it
14 then goes on to read, "(determined by the Department
15 of State and is calculated using a formula that
16 accounts for room, board, and a stipend that equal
17 minimum wage in value, but not in expense to the
18 family)."
19 Q. Sitting here today, do you believe the
20 words that you just read are an accurate description
21 of what the weekly stipend is?
22 A. I'm not sure I understand the question.
23 Q. Do you know what the word "accurate"
24 means?
25 A. Yes, I do.

Page 156

1 Q. Do you know what the word "description"
2 means?
3 A. Yes.
4 Q. And do you have any confusion as to what
5 weekly stipend is being referred to in this
6 sentence?
7 A. No.
8 Q. So what -- what about the question was
9 not clear?
10 A. What a weekly stipend is, if that this
11 describes the weekly stipend.
12 Q. Does the sentence state what the weekly
13 stipend is?
14 A. It says, "Weekly stipend is standard per
15 week."
16 Q. And is what follows the word "is," is
17 that an accurate description of what the weekly
18 stipend is?
19 A. Yes, I would assume so. The Department
20 of State set that, and I assume they came up with a
21 formula from somewhere.
22 Q. Sitting here today, what -- what does the
23 word "standard," in the context of this sentence,
24 mean to you?
25 A. You mean what do I think the author was

Page 157

1 intending to say?
2 Q. What meaning does it convey to you when
3 you read it?
4 A. Minimum.
5 THE VIDEOGRAPHER: Counsel, five
6 minutes until media change.
7 Q. And do you think the word "standard"
8 typically means minimum?
9 A. I couldn't say. It would depend on the
10 context of the sentence and how it was presented.
11 Q. What about the way in which this sentence
12 is presented causes you to understand the word
13 "standard" to mean minimum?
14 A. Because the Department of State set the
15 weekly stipend as a minimum.
16 Q. When did you say that Ms. Crompton left
17 Au Pair Foundation?
18 A. I don't believe I said. I -- I don't
19 know when she left.
20 We were looking at an org. chart
21 earlier that had her name on it.
22 Q. Do you recall if she left before or after
23 2015?
24 A. I believe she left in 2015.
25 Q. On page 266 -- do you know the

**MAGNA**
**LEGAL SERVICES**

Page 158

1  circumstances under which Ms. Crompton left Au Pair
2  Foundation?
3      A.  Yes, I do.  I think I'm fairly familiar
4  with them, yes.
5      Q.  What were the circumstances?
6      A.  Carrie had told us that she wished to no
7  longer be working because she was going to be having
8  her third child.
9      Q.  Looking at page 267, is there anything
10  here that indicates to you the date of the document?
11      A.  Yes.  I would guess that it would have
12  been published sometime around October -- it does
13  indicate a date of October 15th, 2015.
14      Q.  You can set that exhibit aside,
15  Ms. Nelson.
16          MR. VALDIVIESO:  And we're going to
17  go off the record briefly.
18          THE VIDEOGRAPHER:  This is the end of
19  media No. 2 in the 30(b)(6) deposition of Au Pair
20  Foundation through their designee, Theresa Nelson.
21  Going off the record.  The time is 2:09.
22          (Break from 2:09 p.m. to
23          2:18 p.m.)
24          (Exhibit No. 12 was marked.)
25          THE VIDEOGRAPHER:  We are back on the

Page 159

1  record.  The time is 2:18.  This is the beginning of
2  media No. 3 in the 30(b)(6) deposition of Au Pair
3  Foundation through their designee, Theresa Nelson.
4  BY MR. VALDIVIESO:
5      Q.  Ms. Nelson, I'm handing what's been
6  marked as Exhibit 12.
7          THE VIDEOGRAPHER:  Counsel, I believe
8  we're still on mute for the phone.
9          MR. VALDIVIESO:  I apologize for
10  those on the phone.  I -- we forgot to take the
11  phone off of mute.
12          To catch you up on what's
13  occurred, I've handed Ms. Nelson what's been marked
14  Exhibit 12.  It's a document ending in 274, and the
15  witness has perused the documents.
16      Q.  Ms. Nelson, do you recognize Exhibit 12?
17      A.  There are a few pages out of the exhibit
18  that I recognize.
19      Q.  Which pages are those?
20      A.  I recognize pages 276, 277.  And pages
21  279 through 288 look familiar, as though they
22  perhaps were copies of -- from our website.
23      Q.  And as --
24      A.  But I have not seen them before in this
25  format.

Page 160

1      Q.  Thank you.
2          And as AFP Global Exchange NFP's
3  corporate representative sitting here today, what
4  does the document at pages 274 to 275 appear to be
5  to you?
6      A.  This appears to be an e-mail between a
7  Tom Sullivan and Carrie Crompton.
8      Q.  Do you know who Tom Sullivan is?
9      A.  No, I do not.
10      Q.  Does it appear to you, reading this
11  e-mail, that Tom Sullivan was a prospective host
12  family?
13      A.  Yes.
14      Q.  And at the time that this e-mail was
15  sent, was Ms. Crompton authorized to communicate
16  with host families on behalf of APF Global Exchange
17  NFP?
18      A.  Yes.
19      Q.  Towards the middle of the page -- let me
20  start again.
21          Towards the middle of the page
22  there's a Roman numeral, a small Roman numeral (i)
23  following a letter (a).  Do you see that section?  I
24  can just read it for you, and you can tell me if
25  I've read it correctly.

Page 161

1          After romanette (i) it says, "The
2  weekly stipend is 195.75, as with all agencies."
3          Do you see that?
4      A.  Yes, I do.
5      Q.  Do you believe that sentence is accurate?
6      A.  I think -- I don't -- I don't know how to
7  answer that, since I was not the author.  I am not
8  sure how she intended this.
9      Q.  You, sitting here today reading those
10  words, do they convey an accurate meaning to you as
11  you read them?
12      A.  They convey a meaning to me that the
13  weekly stipend is a minimum of 195.75 that was set
14  forth by the Department of State.
15      Q.  Does the word "minimum" appear in that
16  sentence?
17      A.  No, it does not.
18      Q.  Is it your understanding that all
19  agencies have a weekly stipend of 195.75?
20      A.  I can't speak on behalf of other
21  agencies.
22      Q.  It appears that Ms. Crompton spoke with
23  respect to other agencies in this sentence; is that
24  right?
25      A.  Yes, it does.

MAGNA ▶
LEGAL SERVICES

Page 162

1     Q.   Was she authorized to speak as to other
2   agencies?
3     A.   No, she was not.
4        MS. KOZAL:  Objection to foundation.
5     A.   It's my understanding she would not have
6   been.
7     Q.   Do you understand what the basis for the
8   part of the sentence that says, "As with all
9   agencies," is?
10        MS. SCHAECHER:  Objection.  Form and
11   foundation.
12     A.   Can you restate the question, please?
13     Q.   Do you understand what the basis for
14   Ms. Crompton's statement that, "The weekly stipend
15   is 195.75, as with all agencies," is?
16        MS. SCHAECHER:  Same objection.
17     A.   Can I restate the question?
18     Q.   If you understand the question as I
19   phrased it, I would like for you to answer the
20   question as I phrased it.
21     A.   What I understood you to ask me is do I
22   know what Carrie intended to say in this sentence?
23     Q.   What is your basis for knowing what
24   Carrie intended with the sentence?
25     A.   That she would have -- that her knowledge

Page 163

1   was based on the Department of State regulations.
2     Q.   Is Ms. Crompton a lawyer?
3     A.   I'm not sure.  Not in this capacity,
4   certainly not.
5     Q.   Has Ms. Crompton attended law school?
6     A.   I believe she has some law -- attended
7   law school or has some law experience in her
8   background, yes.
9     Q.   During her time at APF Global Exchange
10   NFP, did Ms. Crompton ever serve in a legal
11   capacity?
12     A.   No, she did not.
13     Q.   Does APF Global Exchange NFP have a
14   general counsel?
15     A.   Do we have a general counsel?
16        MS. SCHAECHER:  I'm going to object
17   to the form.
18     Q.   Do you know if APF Global Exchange NFP
19   has a general counsel?
20        MS. SCHAECHER:  Same objection.
21     A.   Do we have an ongoing contract?  I don't
22   understand the question.  I'm sorry.
23     Q.   Is there a person --
24     A.   Do we have one on retainer?
25     Q.   Is there someone at APF Global Exchange

Page 164

1   NFP that has the title "general counsel"?
2     A.   No.
3     Q.   Going down three lines, it's -- I'm going
4   to read to you and ask you if I've read it
5   correctly.  "The weekly stipend and education remain
6   the same for the extension year."
7        Did I read that correctly?
8     A.   Yes, you did.
9     Q.   What is meant by "extension year"?
10     A.   Extension year would be the time period
11   after the first 12 months.
12     Q.   Is it the case that the weekly stipend
13   remains the same for an extension year?
14     A.   That would be up to the host family to
15   make that determination.
16     Q.   Is it your testimony that the sentence,
17   as read, is inaccurate?
18     A.   I believe it is a recommendation.
19     Q.   What word in that sentence to you
20   indicates that it's a recommendation?
21     A.   It's my interpretation in reading the
22   sentence.
23        (Exhibit No. 13 was marked.)
24     Q.   Ms. Nelson, I'm handing you what's been
25   marked Exhibit 13.

Page 165

1     A.   Thank you.
2     Q.   Are you familiar with Exhibit 13?
3     A.   Yes, I am familiar with this exhibit.
4     Q.   What is Exhibit 13?
5     A.   Exhibit 13 is our Au Pair Pledge, which
6   is a document within our au pair application.
7     Q.   Are you able to determine the date of
8   this document by looking at it, Ms. Nelson?
9     A.   I'm able to determine it was created, or
10   rather revised, 7-19-2013.
11     Q.   Has an au pair --
12        MR. HUEY:  Excuse me, I'm sorry for
13   interrupting.  But, Juan, do you have a Bates number
14   for this document?
15        MR. VALDIVIESO:  I'm sorry.  This
16   ends in 126.
17        MR. HUEY:  Thank you.
18     Q.   Ms. Nelson, has an Au Pair Pledge been
19   part of the au pair application since the inception
20   of APF Global Exchange NFP?
21     A.   Yes, it has.
22     Q.   Was the Au Pair Pledge part of the
23   au pair program of Au Pair Foundation, Inc., if you
24   know?
25     A.   I believe so, but I'm not sure as to what

PLAINTIFFS' RESP. APP.0005457

MAGNA
LEGAL SERVICES

| Page 166 | Page 168 |
|---|---|

**Page 166**

1  extent or when it was put in place.
2      Q.  Was this document intended to be signed
3  prior to departing the home country or after?
4      A.  Prior to.
5      Q.  And is an Au Pair Pledge still part of
6  the au pair application?
7      A.  Yes.
8      Q.  Does Au Pair Foundation Global Exchange
9  NFP collect signed copies of the agreements?
10      A.  Yes.
11      Q.  Sorry.  Strike that.
12         Does Au Pair Global -- Au Pair
13  Foundation Global Exchange NFP collect signed copies
14  of the Au Pair Pledge?
15      A.  Yes.
16      Q.  And does it store copies of the signed
17  Au Pair Pledge?
18      A.  Yes.
19      Q.  Where does it store them?
20      A.  On the server.
21      Q.  Do you know if the server also contains
22  signed copies of the Au Pair Pledge that were signed
23  as part of the Au Pair Foundation, Inc. au pair
24  program?
25         MS. SCHAECHER: Objection.  Form and

**Page 167**

1  foundation.
2      A.  No, I don't.
3      Q.  The signed copies of the Au Pair Pledge
4  that you do maintain, are those maintained in pdf
5  form?
6      A.  Yes, they are.
7      Q.  And you said they're kept on the server.
8  Are they also kept on your personal computer?
9      A.  Yes.  I would believe, yes.
10      Q.  Do you know if your personal computer
11  contains copies of the signed Au Pair Pledge that
12  were signed as part of the Au Pair Foundation, Inc.
13  au pair program?
14         MS. SCHAECHER: Objection.  Form and
15  foundation.
16      A.  No.
17      Q.  No, you do not know?
18      A.  No, I don't know from memory if there are
19  or are not.
20      Q.  On page 126 there's a section called, "B.
21  Forbidden Activities."
22         Do you see that?
23      A.  Yes, I do.
24      Q.  Could you please read the first paragraph
25  and No. 1 and the text following No. 1?

**Page 168**

1      A.  "Accept any form of employment offer" --
2  excuse me.
3         "Accept any form of paid
4  employment, other than for my duties as an au pair
5  with my host family, from whom I will receive a
6  weekly stipend of 195.75 (146.81 for EduCare
7  participants) according to U.S. Government
8  regulations."
9         I -- I believe it reads,
10  "According to current U.S. Government regulations."
11  I'm sorry if I --
12      Q.  Thank you, Ms. Nelson.
13      A.  -- can't recall if I said "current."
14      Q.  And accepting any form of paid
15  employment, other than for her duties as an au pair
16  with her host family from whom she will receive a
17  weekly stipend of 195.75, would be a forbidden
18  activity; is that correct?
19      A.  According to the -- the policy on this
20  pledge, yes.
21      Q.  Do you believe that's also a forbidden
22  activity according to current U.S. Government
23  regulations?
24      A.  I believe that the Department of State
25  indicates that au pairs cannot have any other form

**Page 169**

1  of employment.
2      Q.  So the only permitted form of employment
3  is as an au pair?
4      A.  Yes, on this J-1 visa that they have
5  entered the country into.
6      Q.  Turning to page 127, please.  And, sorry,
7  I guess I should let you read, that the next section
8  after "Forbidden Activities" is "Basic Duties."
9         Do you see that?
10      A.  Yes.
11      Q.  And we're going to turn the page to 127,
12  No. 3 under "Duties."  Could you read that into the
13  record, please.
14      A.  "Remaining in the home with the
15  child/children should the parents be away during the
16  evening hours or overnight."
17      Q.  And is it fair to say that that is one of
18  the duties, one of the basic duties of an au pair?
19      A.  No, I would not say that that is fair to
20  say.
21      Q.  Why not?
22      A.  Given the context of this sentence.
23      Q.  What about the context of the sentence
24  makes that an unfair statement?
25      MS. SCHAECHER: Object to form.

MAGNA
LEGAL SERVICES

Page 170

1    A.   Well, let me -- let me step it back to
2  the previous page under "Basic Duty."
3          So if that was understanding -- an
4  understanding of the basic duty, then, yes, it would
5  be a correct statement.
6    Q.   And you testified earlier that an au pair
7  was permitted to work a maximum of 45 hours per week
8  under the Department of State regulations; is that
9  right?
10   A.   Yes, for the -- for this standard infant
11 program.
12   Q.   Is it APF's position today that remaining
13 in the home with the children, when the parents are
14 away during evening hours or overnight, counts
15 towards the 45 hours maximum?
16   A.   Can you repeat the sentence, please?
17   Q.   Is it APF's position today that remaining
18 in the home with the children, when the parents are
19 away during evening hours or -- or overnight, counts
20 towards the 45 hours maximum?
21   A.   Yes, it is.
22   Q.   And that was APF's position in July of
23 2013?
24   A.   Yes.
25   Q.   So APF's position with respect to that

Page 171

1  issue has not changed during the intervening time,
2  has it?
3    A.   No, it has not.
4    Q.   Turning now to page 128, in a section
5  titled, "F.  Pledge of Commitment and Cooperation."
6          Do you see that?
7    A.   Yes.
8    Q.   Do you see a No. 7 under F?
9    A.   Yes.
10   Q.   Could you read No. 7 to us, please, on
11 the record.
12   A.   "Forfeit a portion of my program fee and
13 application fee for a total of $300 if I cancel the
14 program after I have accepted a host family
15 placement, or a total of $500 plus the cost of the
16 international flight if I cancel after APF has
17 purchased my international flight."
18   Q.   Is that sentence an accurate description
19 of Au Pair Foundation's policy with respect to the
20 forfeiture of program fees and application fees
21 today?
22   A.   Yes, that's an inaccurate statement.
23   Q.   It's an inaccurate statement?
24   A.   It is.
25   Q.   How is it inaccurate?

Page 172

1    A.   The -- APF does not collect or receive
2  any program fees or application fees from the
3  au pair.
4    Q.   But that is an accurate -- the sentence
5  is an accurate description of APF's policy as of
6  July 2013?
7    A.   No.  I -- no, it is not an accurate.
8    Q.   What is inaccurate about it?
9    A.   It should have been stricken from this
10 document.
11   Q.   Why do you think it should have been
12 stricken from this document?
13   A.   Because APF Global Exchange does not
14 collect any program fees or application fees from
15 the au pair directly.
16   Q.   And it never has?
17   A.   APF has not.
18   Q.   Do you have an understanding as to
19 whether APF -- strike that.
20          Do you have an understanding as to
21 whether Au Pair Foundation, Inc. had a policy of
22 collecting program fees and application fees from
23 au pair applicants?
24   A.   Yes, I have a vague recollection.  Before
25 there was a directive issued from the Department of

Page 173

1  State to discontinue that practice.
2    Q.   So is it fair to say that up until the
3  Department of State issued the directive that you
4  mentioned, Au Pair Foundation, Inc. had a practice
5  of collecting program fees and application fees from
6  au pair applicants?
7    A.   No.
8    Q.   What was unfair about the statement I
9  said?
10   A.   We would have collected it from the
11 overseas partner.
12   Q.   Do you know whether the overseas partner,
13 in turn, collected it from the au pair?
14   A.   No.
15   Q.   No, you do not -- not know?
16   A.   No, I do not know.
17   Q.   I'm asking for your best recollection and
18 knowledge or understanding now.
19          But do you know if the language
20 has, in fact, been stricken from the current version
21 of the Au Pair Pledge?
22   A.   I do not.
23   Q.   On page 129 -- and just so you know what
24 this section refers to, it's part of a section
25 called, "G.  Miscellaneous Obligations."  On

PLAINTIFFS' RESP. APP.0005459

MAGNA ▶
LEGAL SERVICES

| Page 174 |
| --- |

1 page 129 there's a No. 5. I'll just read it for
2 you, and you can tell me if I've messed something
3 up.
4    A.   Uh-huh.
5    Q.   "I understand that I am responsible for
6 paying $65 for AVI medical insurance coverage for
7 the 13th month if I choose to remain in the United
8 States for the 30-day grace period. STS
9 participants are excluded."
10         Did I read that correctly?
11    A.   Yes, I believe so.
12    Q.   What does it mean, the second sentence in
13 that section, that, "STS participants are excluded"?
14    A.   STS was a particular overseas partner,
15 and they provided insurance for their participants
16 through the 13th month.
17    Q.   Turning to the last page, page 130.
18 Under, "J. Program Termination." Could you read
19 what follows Section No. 2, starting with, "APF
20 reserves the right."
21    A.   APF reserves the right to terminate my
22 participation in this program if I should violate
23 any program rules and/or if my mental and/or
24 physical health, as determined solely by Au Pair
25 Foundation, is in jeopardy."

| Page 175 |
| --- |

1    Q.   Do you believe that sentence to be an
2 accurate representation of APF Global Exchange NFP's
3 policy as of 2013?
4    A.   I believe as they're the sponsor of the
5 J-1 visa that the student has entered in the
6 country, we have the obligation and -- to end their
7 visa if they violate any of the program rules.
8    Q.   That is a current obligation; is that
9 right?
10    A.   Yes.
11    Q.   And was that the obligation as of
12 July 2013?
13    A.   Yes.
14    Q.   Do you know whether Exhibit 13 is --
15 strike that.
16         Do you know if there was a prior
17 version between the time that A -- APF Global
18 Exchange NFP, since its inception and since July 19,
19 2013, was there a prior version of this document
20 that you're aware of?
21    A.   No, I don't know. I don't have any
22 memory.
23         (Exhibit No. 14 was marked.)
24    Q.   I'm handing you what has been marked
25 Exhibit 14.

| Page 176 |
| --- |

1       MR. VALDIVIESO: On the phone, this
2 is APF 131.
3         Oh, sorry. Thanks.
4    Q.   Are you familiar with this document,
5 Ms. Nelson?
6    A.   Yes, I am.
7    Q.   What is it?
8    A.   This is the Au Pair Pledge from the
9 au pair application, and this -- this version is
10 dated 8-19-2013.
11    Q.   Do you know if this document has been
12 revised since?
13    A.   No, not from memory.
14    Q.   You've referred to a server and you've
15 referred to your personal computer. Do you know if
16 on either of those locations the blank versions of
17 the Au Pair Pledge are stored?
18    A.   Can you repeat the question?
19    Q.   Yes. You've referred to a server and
20 you've referred to your personal computer. Do you
21 know if on either of those locations the blank
22 versions of the Au Pair Pledge are stored?
23    A.   Yes.
24    Q.   On which one?
25    A.   Could be either.

| Page 177 |
| --- |

1       MR. VALDIVIESO: Counsel, I don't
2 think I've seen any version after the August 19th,
3 2013 Au Pair Pledge. So to the extent that there
4 are any subsequent versions that have not been
5 produced, I'm just noting for the record that we're
6 requesting these.
7         (Exhibit No. 15 was marked.)
8    Q.   I'm handing you what we're -- we have
9 marked as Exhibit 15.
10       MR. VALDIVIESO: For those of you on
11 the phone, it's an APF document ending in 95.
12    Q.   Do you recognize this document,
13 Ms. Nelson?
14    A.   Yes, I do.
15    Q.   What is it?
16    A.   This is the Host Family Agreement. At
17 this particular time it was part of, a piece of the
18 Host Family Application.
19    Q.   And are you able to tell, by looking at
20 Exhibit 15, what the date of this document is?
21    A.   It indicates a revised date of 4-24-2013.
22    Q.   What is the address listed on the bottom
23 of this document?
24    A.   205 Keller Street, Suite 204, Petaluma,
25 California.

PLAINTIFFS' RESP. APP.0005460

MAGNA
LEGAL SERVICES

| Page 178 | Page 180 |
|---|---|

**Page 178**

1  Q. And Au Pair Foundation, Inc. has not been
2  housed at that address, to your knowledge, has it?
3  A. I think I've explained that before, but I
4  can restate it.
5  Q. Sure.
6  A. So define "housed."
7  Q. Was Au Pair Foundation, Inc. ever located
8  at 20 -- 20 -- 205 Keller Street?
9  A. Yes, they -- yes, they would have been.
10  They would have been located there, as I was an
11  independent contractor working for them.
12  Q. And the logo on the top of this document,
13  I believe you had earlier described this logo
14  bearing -- showing a globe in between the words
15  "Au Pair" and "Foundation" with a swoosh and a
16  star --
17  A. Uh-huh.
18  Q. -- as being Au Pair Foundation, Inc.'s
19  logo; is that right?
20  A. Yes. Correct.
21  Q. Is this an Au Pair Foundation, Inc.
22  document or is it an Au Pair Foundation Global
23  Exchange NPF -- NFP document?
24  A. I -- I couldn't say which -- whose
25  document this was.

**Page 179**

1  Q. Why is that?
2  A. Because the documents from Au Pair
3  Foundation, Inc. were adopted or merged into APF
4  Global Exchange.
5  Q. Does APF Global Exchange NFP currently
6  use a Host Family Agreement?
7  A. Yes, we do.
8  Q. Does APF Global Exchange NFP collect the
9  executed copies of the Host Family Agreement?
10  A. Yes.
11  Q. And has it been a practice since APF
12  Global Exchange NFP's inception?
13  A. Yes.
14  Q. Do you know whether Au Pair Foundation,
15  Inc. collected executed copies of the Host Family
16  Agreement?
17  A. No.
18  Q. No, you do not know?
19  A. No, I do not have that direct knowledge
20  as of my role working with APF, Inc. Sorry.
21  Au Pair Foundation, Inc.
22  Q. I was just about to suggest something,
23  but -- I was about to suggest that we --
24  A. Even --
25  Q. -- refer to --

**Page 180**

1  A. -- I am getting --
2  Q. I was going to suggest that we refer to
3  Inc. as Au Pair Foundation, Inc. --
4  A. Inc., uh-huh.
5  Q. -- and N -- NPF as AFP --
6  A. Yes.
7  Q. -- Global. Because I -- it's a bit of a
8  mouthful every time. Would that be okay with you
9  and your counsel?
10  MS. SCHAECHER: I'm not sure I heard
11  all of that.
12  MR. VALDIVIESO: If I refer to Inc.
13  as Au Pair Foundation, Inc.
14  MR. SCHAECHER: Uh-huh.
15  MR. VALDIVIESO: And I refer to NFP
16  as Au Pair Foundation Global Exchange NFP.
17  MS. SCHAECHER: Do you mean the
18  reverse of that? Are you looking for a shorthand
19  method?
20  MR. VALDIVIESO: I -- I -- I was
21  suggesting that we refer to Inc. as Au Pair
22  Foundation, Inc.
23  MS. SCHAECHER: That's fine.
24  MR. VALDIVIESO: And NFP as the
25  shorthand for Au Pair Foundation Global Exchange --

**Page 181**

1  MS. SCHAECHER: That's fine.
2  MR. VALDIVIESO: -- NFP.
3  So we're all on the same page?
4  MS. SCHAECHER: Yes.
5  MR. VALDIVIESO: I will try to be
6  consistent. I apologize if I've already adopted a
7  habit.
8  Q. So starting on page 95, it's on the third
9  line down, the first full sentence starting -- oh, I
10  apologize. Under Section A, "Host Family
11  Obligations," the third line down. It's the
12  sentence that starts with, "Host family."
13  Do you see that?
14  A. Yes, I do.
15  Q. Could you please read that sentence into
16  the record.
17  A. "Host family agrees to attend at least
18  one family day conference" --
19  Q. I apologize. I don't think we're on the
20  same page.
21  A. Oh, sorry.
22  Q. What -- I'm on page 95.
23  A. Yes.
24  Q. Under "Host Family Obligations."
25  A. Yes.

Page 182

1    Q.   The third line down.
2    A.   Oh, I'm sorry.  I went from the bottom.
3    Q.   It's the sentence that starts with, "Host
4  family will."
5    A.   "Host family will pay the au pair a
6  weekly stipend of 195.75 (146.81) in accordance with
7  U.S. Department of State Fair Labor Standards Act
8  guidelines."
9    Q.   Thank you.
10        The 146.81 here, that refers to
11  the EduCare category; is that right?
12    A.   Yes, that's correct.
13    Q.   And 195.75 refers to infant and standard?
14    A.   Yes.
15    Q.   Does the word "minimum" appear in the
16  sentence that you just read?
17    A.   No, it does not.  It is implied as a
18  starting point.
19    Q.   Turning to the next page ending in 96.
20  In the first paragraph, the last sentence, do you
21  see where it starts, "APF may immediately"?
22    A.   Yes.
23    Q.   Could you read that sentence into the
24  record, please.
25    A.   "APF may immediately terminate host

Page 183

1  family's participation in the program and remove the
2  au pair from the host family's home."
3    Q.   Is it fair to say that as of April 24th,
4  2013 APF had the authority to immediately terminate
5  the host family's participation in the program and
6  remove the au pair from the host family's home?
7    A.   As a J-1 visa sponsor, that particular
8  language is also indicated in the Department of
9  State regulations.
10    Q.   Is that still -- is the ability to -- to
11  immediately terminate a host family's participation
12  and remove the au pair from the host family's home,
13  is -- is that something that APF is authorized to
14  do?
15    A.   Only if there is a violation of the
16  regulations or the policies that the Department of
17  State has ensured -- has tasked us with.
18    Q.   On page 98, and the section that I'd like
19  you -- for you to focus on actually continues on to
20  page 99.  The very last full sentence of 98,
21  starting with, "We understand and agree that to the
22  extent."
23        Do you see that?
24    A.   No, I'm sorry, I don't.  Oh, yes.  Sorry.
25    Q.   Could you read that sentence into the

Page 184

1  record, please.
2    A.   Beginning with, "We understand"?
3    Q.   Yes.
4    A.   "We understand and agree to the extent
5  any of our home state labor laws (for example,
6  minimum wage and overtime rules) or federal, state,
7  and income tax laws may apply to the performance of
8  services by an au pair in our home.  We are solely
9  responsible for complying with such laws."
10    Q.   Had you seen this language before today?
11    A.   Yes.
12    Q.   Do you recall any discussion -- and here
13  we're focusing on the time of April 2013 -- well,
14  strike that.
15        Focusing on the time period
16  between NFP's inception and the time of this
17  document, April 24th, 2013, do you recall any
18  discussion between anyone at NFP regarding the
19  extent to which home state labor laws applied to the
20  performance of services by an au pair?
21    A.   No, I do not.
22    Q.   Do you recall any discussions between
23  NFP's inception and the date of this document,
24  April 24th, 2013, regarding the extent to which
25  federal income tax laws apply to the performance of

Page 185

1  services by an au pair?
2    A.   Only in the context of this litigation.
3    Q.   And I'm not asking you to disclose any
4  attorney/client privileged materials.
5    A.   Uh-huh.
6    Q.   But to the extent that you recall any of
7  those discussions with anyone who is not a lawyer,
8  and to the extent you are not relaying information
9  that you had received from your lawyer --
10    A.   Uh-huh.
11    Q.   -- do you recall any discussions on that
12  topic?
13    A.   No.
14    Q.   Do you know why this sentence was
15  included in this agreement?
16    A.   No, I do not.
17    Q.   Do you know whether this sentence was
18  included in Inc.'s Host Family Agreements?
19    A.   No, not from memory.
20    Q.   Right after "General Provisions" in
21  Section K, could you read the first sentence there.
22    A.   "It is agreed that the U.S. labor law
23  shall apply to this agreement, and I agree to submit
24  to the jurisdiction of the state of California
25  courts."

PLAINTIFFS' RESP. APP.0005462

**MAGNA**
LEGAL SERVICES

Page 186

1    Q.  Is it NFP's position today that U.S.
2  labor law applies to this agreement?
3    A.  I don't know if I have the legal
4  understanding to answer that question.
5    Q.  Do you have a layperson's understanding
6  whether that is NFP's position today?
7       MS. SCHAECHER:  I'll object to the
8  form of the question and foundation.
9    A.  I follow the Department of State
10  regulations and guidelines as set forth, as a
11  sponsor.
12    Q.  Prior to this litigation, did you have
13  any understanding as to the possible application of
14  state labor laws to the performance of services by
15  an au pair?
16       MS. SCHAECHER:  Object to the form
17  and foundation.
18    A.  Can you repeat the question, please?
19    Q.  Prior to this litigation, did you have
20  any understanding as to the possible application of
21  state labor laws to the performance of services by
22  an au pair?
23       And here I'm speaking -- my use of
24  the word "you" refers to NFP.
25       MS. SCHAECHER:  Same objection.

Page 187

1    A.  Can you repeat it one more time?  I --
2    Q.  Prior to --
3    A.  With my --
4    Q.  Yes, it is a mouthful.
5    A.  Yes.
6    Q.  Prior to this litigation, did NFP have
7  any understanding as to the possible application of
8  state labor laws to the performance of services by
9  an au pair?
10       MS. SCHAECHER:  Same objections.
11    A.  I don't -- one more time.  I'm sorry.  I
12  must be getting tired.
13    Q.  Prior to this litigation, did NFP have
14  any understanding as to the possible application of
15  state labor laws to the performance of services by
16  an au pair?
17       MS. SCHAECHER:  Same objection.
18    A.  I -- I think that I'm confused by the
19  "performance of services."
20    Q.  Sure.  That language appears in the
21  sentence that you read.
22    A.  Okay.
23    Q.  Do you have an understanding as to the
24  word of -- what the word "performance of services"
25  means in the context of the sentence that you read,

Page 188

1  which is part of the Host Family Application?
2    A.  And which sentence?
3    Q.  You read the sentence that began -- I'll
4  read it again.
5       The sentence that goes, "We
6  understand and agree that to the extent any of our
7  home state labor laws (for example, minimum wage and
8  overtime rules) or federal state and income tax laws
9  may apply to the performance of services by an
10  au pair in our home, we are solely responsible for
11  complying with such laws."
12       Do you understand what the word
13  "performance of services by an au pair" means in the
14  context of that sentence?
15    A.  Yes, I do.
16    Q.  What does it mean?
17    A.  Whatever relationship the -- whatever
18  duties the au pair is performing for the host
19  family.
20    Q.  Okay.  So now that we're on the same page
21  as to what the word "performance of services" mean.
22  Prior to this litigation, did NFP have any
23  understanding as to the possible application of
24  state labor laws to the performance of services by
25  an au pair?

Page 189

1       MS. SCHAECHER:  Same objections.
2    A.  It's my understanding APF did not possess
3  any legal understanding, and we relied upon the
4  wording and the -- the regulation as set forth by
5  the Department of State.
6    Q.  Who is the in -- intended signatory of
7  the Host Family Application?  Sorry.  Strike that.
8       Who is the intended sig --
9  signatory of the Host Family Agreement?
10    A.  The host family.
11    Q.  Is it fair to say that the words in this
12  agreement are drafted such that a host family -- a
13  reasonable host family reading them would understand
14  them?
15       MS. SCHAECHER:  Objection to form and
16  foundation.
17    A.  I -- I can't make that speculation.
18    Q.  Let's turn back to Exhibit 1, page 5 of
19  the topics you were prepared to testify on today.
20       MS. SCHAECHER:  It's over here.
21    Q.  Do you see on page 5, under the topics,
22  Topic No. 3?
23    A.  Yes, I do.
24    Q.  And there is a letter G there; is that
25  right?

MAGNA
LEGAL SERVICES

Page 190

1    A.   Yes, there is.
2    Q.   Oh, I'm sorry, letter I.  What does it
3  say under letter I or after letter I?
4    A.   "Contracts you enter into with au pairs
5  or host families."
6    Q.   Are you prepared to discuss contracts
7  that NFP enters into with au pairs and host families
8  today?
9    A.   I'm not sure that I understand the legal
10 definition of -- of "contracts."  I'm willing to
11 discuss the documents that are set forth in front of
12 us, yes.
13   Q.   The intended audience, you said of the
14 Host Family Agreement, is a host family, right?
15   A.   Yes.
16   Q.   And as NFP's corporate representative
17 prepared to discuss contracts that you enter into
18 with host families, as a general matter are your
19 contracts drafted with the intention that the host
20 family will understand the words written in them?
21        MS. SCHAECHER:  Objection to form and
22 foundation.
23        You may answer.
24   A.   I see this as an agreement.  I'm not --
25 I'm not a lawyer.  I don't know what the legal

Page 191

1  definition of a "contract" is.
2        I would anticipate that a host
3  family would understand this.  If they do not, it
4  would be their obligation, as the person saying that
5  they understand it, that they either ask questions,
6  seek counsel on their own, or whatever method they
7  need to understand the document.
8    Q.   As a general matter, going back to some
9  things that we were discussing before, such as the
10 website where the intended audience was the host
11 family, does NFP tailor the words that it uses such
12 that a reasonable host family will understand what
13 is meant by the words on the page?
14        MS. SCHAECHER:  Objection to form.
15   A.   Yes.
16   Q.   So you have some understanding as to what
17 a reasonable -- strike that.
18        Were you going to say something?
19 I'm sorry.
20   A.   (Shaking head.)
21   Q.   Do you think a reasonable host family
22 reading the sentence that you read might interpret
23 that sentence to mean that it's possible that home
24 state labor laws may apply; but that they are
25 responsible for complying with such laws, and it's

Page 192

1  on them to go figure it out?
2        MS. SCHAECHER:  Objection to form and
3  foundation.
4    A.   It was a little -- a little bit long.
5  Can you repeat it, please?
6    Q.   Well, the next sentence says, "APF does
7  not provide legal advice regarding any such laws."
8        Do you see that?
9    A.   What page, please?
10   Q.   Page 99 on the top, after the
11 following -- the sentence following the sentence we
12 had just been focused on.
13   A.   Yes, I see that.
14   Q.   What does the word "any such laws" mean
15 to you in the context of these two sentences?
16   A.   Which two sentences?  The one that you
17 just read?
18   Q.   Yes, the two sentences that follow each
19 other.  The one that starts with, "We understand,"
20 until the end of that paragraph.
21   A.   "Any such labor laws."  I think that's
22 clear.  I don't understand where it's --
23   Q.   Sorry.  "Any such laws," what --
24   A.   "Any such."
25   Q.   -- what -- which laws do those refer to?

Page 193

1    A.   It says, "Any such labor laws."
2    Q.   Sorry.  When it says, "APF does not
3  provide legal advice regarding any such laws."
4        Do you see that?
5    A.   Yes.
6    Q.   What does, "Any such laws," refer to?
7    A.   It would refer to the previous sentence.
8    Q.   And what laws are referred to in the
9  previous sentence?
10        MS. SCHAECHER:  Objection to form.
11   A.   I mean, I'm not an attorney, so I
12 don't -- I don't know what it was specifically
13 returning -- referring to, and I didn't create the
14 document.
15   Q.   I'm not asking you for your legal
16 interpretation.
17   A.   Okay.
18   Q.   I'm -- I'm asking for your understanding
19 as you read those words written on the page, sitting
20 here today?
21   A.   I would interpret to -- to mean any of
22 the laws mentioned in the previous sentence.
23   Q.   Which laws were mentioned in the previous
24 sentence?
25   A.   It says, "State labor laws, for example,

MAGNA
LEGAL SERVICES

Page 194

1  minimum wage and overtime rules, or federal, state,
2  and income tax laws."
3      Q.   Do you think that the first sentence, to
4  a reasonable host family reading it, raises the
5  possibility that state labor laws or federal, state,
6  and income tax laws might apply to the performance
7  of services by an au pair?
8          MS. SCHAECHER:  Objection to form and
9  foundation.
10     A.   I can't guess -- I can't surmise the
11 definition of a reasonable host family and what
12 their education, their background, their content,
13 and signing this document at the time or reading it.
14     Q.   I thought you testified a little bit
15 earlier that you tailor the content of your website
16 to be intelligible to a reasonable host family
17 reading it.  Was that not correct?
18     A.   Yes, I did state that.
19     Q.   So you have some understanding of what a
20 reasonable host family is capable of understanding;
21 is that right?
22         MS. SCHAECHER:  Objection to the
23 form.
24     A.   I stated that in regards to the website,
25 not to this document.

Page 195

1      Q.   To your -- to you, Ms. Nelson, sitting
2  here today reading the sentence that begins, "We
3  understand and agree," do you believe that that
4  sentence raises the possibility that home state
5  labor laws might apply to the performance of
6  services by an au pair?
7          MS. SCHAECHER:  Objection to form and
8  foundation.
9      A.   Me personally?
10     Q.   Yes.
11     A.   Using my education and background?
12     Q.   Reading those words as they appear on the
13 page, sitting here today.
14     A.   No, I would not infer that.  But I would
15 infer that I need do my own research and homework.
16     Q.   Why would you need to do your own
17 research and your homework?
18     A.   Because it indicates that they're not
19 providing legal advice in regards to that.
20     Q.   But the sentence -- strike that.
21         Is the Host Family Agreement
22 available online to prospective host families?
23     A.   No, it is not.
24     Q.   Other than in this Host Family Agreement,
25 are you aware of any of NFP's marketing materials

Page 196

1  discussing the possible application of home state
2  labor laws to the performance of services by an
3  au pair?
4      A.   I think that question is too broad for me
5  to answer.  Can you narrow down your question or
6  rephrase -- re -- restate it?
7      Q.   I believe you earlier listed some of
8  NFP's marketing materials; is that right?
9      A.   Specifically docket -- document names?
10     Q.   You mentioned categories of names.  I
11 believe you mentioned a brochure.
12     A.   Yes.
13     Q.   The website.  You mentioned various tools
14 that NFP uses to market the au pair program.
15     A.   Yes.
16     Q.   Is that fair?
17     A.   That is correct, yes.
18     Q.   Okay.  Keeping those categories in mind,
19 are you aware of any of those categories of
20 documents discussing the possible application of
21 home state labor laws to the performance of services
22 by an au pair?
23     A.   No.  I wouldn't have all the documents
24 memorized.
25     Q.   That wasn't my question.

Page 197

1      A.   No, I don't recall any one specific
2  document or any of the documents.  It's not to say
3  the language is not there, or is there, or is not
4  there.  I do not recall.
5      Q.   Sitting here today, there's not an
6  example that comes to mind?
7      A.   No, there is not.
8          MS. FULLER:  Counsel, it's been about
9  two hours, I think, since -- if I'm not mistaken,
10 since we've been on.  I could use a break.  I don't
11 know how anyone else here is feeling.
12         THE WITNESS:  I could as well.
13         MR. VALDIVIESO:  Okay.  Let's go off
14 the record.
15         MS. FULLER:  Thank you.
16         THE VIDEOGRAPHER:  Going off the
17 record.  The time is 3:25.
18         (Break from 3:25 p.m. to
19          3:34 p.m.)
20         THE VIDEOGRAPHER:  We are back on the
21 record.  The time is 3:34.
22 BY MR. VALDIVIESO:
23     Q.   Ms. Nelson, do you know whether APF --
24 strike that.
25         Ms. Nelson, do you know whether

PLAINTIFFS' RESP. APP.0005465

MAGNA
LEGAL SERVICES

| Page 198 | Page 200 |
|---|---|
| 1  N -- N -- NPF -- NFP has a position as to whether<br>2  home state labor laws apply to the performance of<br>3  services by an au pair?<br>4    A.   Only to the extent as it relates to the<br>5  Department of State regulation.<br>6    Q.   What is your --<br>7    A.   And -- and --<br>8    Q.   I apologize.<br>9    A.   And that section within the federal labor<br>10  laws.<br>11    Q.   What is your understanding of APF's<br>12  position with respect to the application of state<br>13  labor laws to the performance of services by an<br>14  au pair?<br>15    A.   We follow the -- the regulations that --<br>16  in the Department of State, where it references the<br>17  federal labor laws.<br>18    Q.   Is it APF's -- NFP's position that state<br>19  laws do not apply to the performance of services by<br>20  an au pair?<br>21    A.   I don't believe that we make that<br>22  determination, since we're not the employer.<br>23    Q.   Is NFP aware of any state government that<br>24  takes the position that its state minimum wage law<br>25  -- | 1      Counsel.<br>2      (Witness peruses document.)<br>3    Q.   Please let me know when you've had a<br>4  chance to review this document.<br>5    A.   Okay.<br>6    Q.   Ms. Nelson, do you recognize Exhibit 16?<br>7    A.   I want to clarify.  I feel like you said<br>8  this document was from -- can you restate where this<br>9  document was from, for the record.<br>10    Q.   Sure.<br>11      I -- I stated on the record that<br>12  this document is -- bears a Bates stamp EAP0002942,<br>13  which is a Bates number that's been used by an<br>14  organization named EuRaupair.<br>15    A.   Oh, okay.  Okay.<br>16      Yeah, this document looks<br>17  familiar.<br>18    Q.   What is this document?<br>19    A.   It appears to be a communication from<br>20  Holly Stephens at the Department of State.<br>21    Q.   Are you familiar with Ms. Stephens?<br>22    A.   I recognize the name.  I may have met her<br>23  through my course of work.<br>24    Q.   And what is the subject of this e-mail<br>25  communication from Ms. Stephens? |

| Page 199 | Page 201 |
|---|---|
| 1      MS. COURT REPORTER:  Can you repeat<br>2  that?  I lost that, I'm sorry.<br>3    Q.   Is NFP aware of any state government that<br>4  takes the position that its state minimum wage law<br>5  applies to the performance of services by an<br>6  au pair?<br>7    A.   One more time.<br>8    Q.   And I'm going to rephrase it.<br>9      Is NFP aware of any state<br>10  government that takes the position that its labor<br>11  law applies to the performance of services by an<br>12  au pair?<br>13    A.   As it applies to the J-1 visa sponsor<br>14  program, no.<br>15      (Exhibit No. 16 was marked.)<br>16    Q.   I'm handing you what's been marked as<br>17  Exhibit 16.<br>18      MR. VALDIVIESO:  Counsel on the<br>19  phone, this is an -- a EuRaupair document.  It's<br>20  Bates No. EAP0002942.  There is no confidentiality<br>21  designation on this document.<br>22      And I will further state for the<br>23  record that Ms. Hoggard, Ellen Hoggard of<br>24  AuPairFoundation.org, appears as a recipient of this<br>25  e-mail. | 1    A.   "Guidance on Workers' Compensation For<br>2  Au Pairs, Illinois."<br>3    Q.   And the recipient -- did you receive this<br>4  e-mail, Ms. Nelson?<br>5    A.   Yes, I believe I received a copy of this<br>6  e-mail.<br>7    Q.   And your colleague, Ms. Hoggard, received<br>8  this e-mail as well; is that right?<br>9    A.   Yes, it appears so.  It's addressed to<br>10  her.<br>11    Q.   Do you recall discussing the contents of<br>12  this e-mail with Ms. Hoggard after you received it?<br>13    A.   No, not specifically.<br>14    Q.   Do you recall generally discussing the<br>15  topic of workers' compensation insurance in the<br>16  state of Illinois?<br>17    A.   No.<br>18    Q.   Do you recall what your reaction was when<br>19  you received this e-mail?<br>20    A.   No, I don't.<br>21    Q.   And what do you understand this e-mail to<br>22  be?<br>23    A.   I understand this e-mail to be a -- a<br>24  guidance on workers' compensation for the state of<br>25  Illinois. |

1   Q.   And it's guidance from the Department of
2   State --
3   A.   Yes.
4   Q.   -- is that right?
5        Having read this e-mail, does this
6   e-mail indicate to you whether the Department -- the
7   state of Illinois takes a position on whether
8   workers' compensation insurance in the state of
9   Illinois applies to au pairs?
10        MS. SCHAECHER:  Objection to form.
11   Foundation.
12   A.   Yes, I would infer that the -- based on
13   having no legal knowledge, that that's what this is
14   intended to -- to communicate from the -- from the
15   state of Illinois.
16   Q.   And the -- the last sentence on page 9,
17   2942, starting with "However."  Could you read that
18   into the record, please.
19   A.   "However, the Department of State
20   expects" -- "expects sponsors, host families, and
21   exchange visitors alike to comply with all
22   applicable state and local laws during the exchange
23   visitors program."
24   Q.   I just want to be clear on one thing that
25   I think -- I don't want to mischaracterize your

1   testimony, so please correct me if I'm wrong.
2   A.   Uh-huh.
3   Q.   But I believe you -- you had testified
4   that you don't recall ever discussing state minimum
5   wage laws' application to services provided by
6   au pairs.  Is that an accurate representation?
7   A.   Yes, I don't recall that.
8   Q.   You don't recall having discussed that
9   with any of your colleagues at NFP?
10   A.   Not -- not -- I don't recall a specific
11   conversation, no.
12   Q.   Do you recall generally discussing the
13   issue?
14   A.   As to whether -- would you restate it?  I
15   mean, to me it was a broad question.  I'm so sorry.
16   Q.   Do you ever --
17   A.   I don't --
18   Q.   Do -- do you recall ever having discussed
19   generally the topic of the application of state
20   minimum wage laws to services provided by an
21   au pair?
22   A.   No, I -- I don't.
23        MR. VALDIVIESO:  We're marking what's
24   APF 000110 as Exhibit 17.
25        (Exhibit No. 17 was marked.)

1   Q.   You can take as much time as you need.
2   But my question, I think you probably know what it
3   is by now, is do you recognize Exhibit 17,
4   Ms. Nelson?
5   A.   Yes, I do recognize this exhibit.
6   Q.   What is Exhibit 17?
7   A.   It is the Host Family Agreement with a
8   revision date of 5-28-2013.
9   Q.   Thank you, Ms. Nelson.  You can set that
10   agreement, that exhibit aside.
11        MR. VALDIVIESO:  We are marking
12   APF 000075 as Exhibit 18.
13        (Exhibit No. 18 was marked.)
14   Q.   I'm sorry, just one -- one detail from --
15   I hate to do this to you, but could you pull
16   Exhibit 17 back out.
17   A.   Yes.
18   Q.   Just for the record, on the top of the
19   first page of that document, is that Inc.'s logo on
20   the top?
21   A.   Yes, it is.
22   Q.   Now going back to Exhibit 18.  What is
23   Exhibit 18, Ms. Nelson?
24   A.   Exhibit 18 is the Host Family Agreement,
25   and it has a revised date of 8-2-2015.

1   Q.   Are you aware of any revisions between
2   the time of Exhibit 17's publication and August of
3   2015?
4   A.   Not from memory.
5   Q.   Do you know if the Host Family Agreement
6   has been revised subsequent to August 2015?
7   A.   Not in looking at this, no.
8   Q.   Who at NFP would have an idea as to the
9   revision history of Host Family Agreements?
10   A.   I would.
11   Q.   You can't think of anyone better suited
12   than yourself for knowing the revision history of --
13   A.   No, I don't --
14   Q.   -- Host Family --
15   A.   I don't have the revision dates of all
16   the documents memorized, no.
17   Q.   Sorry, that wasn't my question.
18        My question was:  You -- you can't
19   think of anyone, other than yourself, who would have
20   a better knowledge as to the revision history of the
21   Host Family Agreement?
22   A.   No.  I would be.
23   Q.   Looking at the third line after
24   Section A, "Host Family Obligations," could you just
25   read the sentence that begins, "Host family will

MAGNA
LEGAL SERVICES

Case 1:14-cv-03074-CMA-KMT Document 1059-25 Filed 03/17/18 USDC Colorado Page 640 of 700

Page 206

1  pay," into the record, please.
2      MS. FULLER:  Counsel, which exhibit
3  are you on now, 17 or 18?
4      MR. VALDIVIESO:  18.
5      MS. FULLER:  Thank you.
6      A.   "Host family" -- let's see.  I'm sorry.
7  I've lost my place.
8          "Host family will pay the au pair
9  a weekly stipend of 195.75 (146.81) in accordance
10 with U.S. State Department and Fair Labor Standards
11 Act guidelines."
12     Q.   In comparing that sentence to the
13 sentence that you read for me, which appears almost
14 in exactly the same space, is it fair to say that
15 those are identical?
16     A.   Yes, that -- yes, that sentence appears
17 identical.
18     Q.   And neither sentence includes the word
19 "minimum," modifying the number 195.75; is that
20 correct?
21     A.   I'm sorry, include -- repeat the
22 sentence.
23     Q.   Neither sentence uses the word "minimum"
24 to modify the number 195.75; is that correct?
25     A.   I'm not sure what you mean to modify, but

Page 207

1  the word "minimum" is not shown.
2      Q.   Other than as a pdf, are those signed
3  Host Family Agreements stored in any other format?
4      A.   There may be copies of particular host
5  family files in hard copy as well.
6      Q.   And in electronic copy, are any of them
7  kept on a database?
8      A.   No.
9          (Exhibit No. 19 was marked.)
10     Q.   I'm handing --
11     A.   And you were referring specifically to
12 the agreement?
13     Q.   To the Host Fam -- to the signed Host
14 Family Agreements.
15     A.   Okay.
16     Q.   Which I believe you testified, you said,
17 NFP does collect --
18     A.   Yes.
19     Q.   -- and store?
20     A.   Yes.
21     Q.   I'm handing you what's been marked
22 Exhibit 19.
23     A.   Uh-huh.
24     Q.   Whenever you're ready, my question is do
25 you recognize --

Page 208

1      A.   Yes.
2      Q.   What is Exhibit 19?
3      A.   Exhibit 19 is the Host Family - Au Pair
4  Agreement.
5      Q.   What is the purpose of the Host Family -
6  Au Pair Agreement?
7      A.   The purpose of this agreement is to
8  identify responsibilities and guidelines,
9  expectations between the host family and the
10 au pair.
11     Q.   By looking at this document, sitting here
12 today, are you able to identify the date of the
13 document?
14     A.   Yes.  It has a date of July 2013.
15     Q.   Has NFP used Host Family - Au Pair
16 Agreements since the inception of the au pair --
17 since the inception of NFP?
18     A.   Yes, we have.
19     Q.   Are you aware if Inc. also had a practice
20 of using Host Family - Au Pair Agreements?
21     A.   Yes, I believe they have, some version.
22     Q.   Does NFP collect and maintain signed
23 copies of the Host Family - Au Pair Agreement?
24     A.   Yes.
25     Q.   Where are such agreements kept?

Page 209

1      A.   On the server.
2      Q.   Are they also kept on your personal
3  computer?
4      A.   Perhaps.
5      Q.   Do you know if Inc.'s signed Host Family
6  and Au Pair Agreements are kept on either NFP's
7  server or your personal computer?
8      A.   I'm sorry, I got distracted by the light
9  flashing and --
10     Q.   I can repeat the question.
11     A.   -- and dozed off.
12         Repeat it, please.
13     Q.   Do you know if Inc.'s signed Host Family
14 - Au Pair Agreements are kept on either NFP's server
15 or your personal computer?
16     A.   No, I do not.
17     Q.   Do you think it's more likely than not
18 that they are?
19     A.   I think it's less likely.
20     Q.   Why is that?
21     A.   We weren't tasked with maintaining those
22 documents.
23     Q.   But you did testify earlier that you
24 believed that the Au Pair Pledge, dating back to the
25 period of Au Pair, Inc. -- APF, Inc., were, in fact,

PLAINTIFFS' RESP. APP.0005468

MAGNA
LEGAL SERVICES

| Page 210 | Page 212 |
|---|---|

**Page 210**

1  maintained to this date?
2          MS. SCHAECHER:  Objection to form.
3          You may answer.
4      A.   I believe -- if I'm incorrect, please let
5  me know -- that I was indicating at that time they
6  were blank versions.  And I got the assumption from
7  this question that you're asking me if we have
8  completed versions.
9      Q.   Fair enough.
10          Does the server or your personal
11  computer contain blank versions of the versions of
12  the Host Family - Au Pair Agreement used by Inc.?
13      A.   Perhaps.
14      Q.   And going back to the -- the Host Family
15  Agreement, which was the category that we were
16  looking at just before.  On the blank versions of
17  those documents, are those kept on NFP's server or
18  your personal computer?
19          MS. SCHAECHER:  Objection.  Form.
20      A.   Perhaps.
21      Q.   Does NFP still use a Host Family -
22  Au Pair Agreement?
23      A.   Yes, we do.
24      Q.   Could you turn to 139, please.  On the
25  top of the page there's a section titled "Financial

**Page 211**

1  Issues," and then "Host Family."
2          Do you see that?
3      A.   Yes, I do.
4      Q.   Could you read the sentence that starts
5  with, "We, as the host parents."
6      A.   "We, as the host parents, understand that
7  within the guidelines of this au pair exchange
8  visitor program, our au pair is entitled to receive
9  a weekly stipend" -- "stipend, according to the Fair
10  Labor Standards Act, of 195.75 (146.81 for EduCare
11  participants)."
12      Q.   Thank you.
13          Does the word "minimum" appear in
14  that sentence?
15      A.   No, it does not.
16      Q.   And just below that do you see the
17  sentence that says, "We agree to make payment of the
18  stipend on (day of week)," and then there's a blank
19  followed by, "of each week."
20      A.   Yes.
21      Q.   What was the purpose of that blank?
22      A.   That was -- the purpose of that was that
23  the host family and the au pair would agree upon a
24  fixed -- a -- a day of the week to be paid.
25      Q.   Turning to page 146, at the bottom of the

**Page 212**

1  page there's a section in bold that starts with,
2  "We, the host parents."
3          Do you see that?
4      A.   Yes, I do.
5      Q.   Could you read that sentence into the
6  record, please.
7      A.   "We, the host parents, au pair, and local
8  community representative, have thoroughly discussed
9  all items listed in this document.  And by signing
10  below, we acknowledge accept" -- "acceptance of the
11  agreements detailed here within."
12      Q.   Thank you.
13          Below that there are some blanks
14  for various parties to sign; is that accurate?
15      A.   Yes.
16      Q.   Which parties are expected to sign this
17  agreement?
18      A.   We expect all parties to sign.
19      Q.   And by "all parties," who does that
20  include?
21      A.   The au pair, the host mother, the host
22  father, and the local community representative.
23      Q.   Why do you require the local community
24  representative to sign?
25      A.   This document is discussed during the

**Page 213**

1  two-week visit, and we believe that it's a good
2  opportunity for the local coordinator to review the
3  duties and have a dialogue between the host family
4  and the au pair as to what they each expect of each
5  other, to make sure that those expectations are
6  inline.
7      Q.   You had mentioned a few different
8  players, I think, in discussing -- in discussing
9  this agreement.  You called them parties to this
10  agreement.  You mentioned the au pair, members of
11  the host family, and the LCR, the local community
12  representative.
13          Does NFP have any publications,
14  such as handbooks, policies, or manuals, that are
15  meant to serve as a resource for any of these
16  parties?
17      A.   Yes.
18      Q.   Which ones?
19      A.   Can you repeat the question?
20      Q.   You answered "Yes" to my question, "Does
21  NFP -- NFP have any publications -- have any
22  publications such as handbooks, pol -- policies or
23  manuals that are meant to serve as a resource for
24  any of these parties?"
25          You answered, "Yes."

Page 214

1      My question following that was,
2  "Which ones?"
3      A.   All three mentioned.
4      Q.   And what publications?
5      A.   The -- all of them are provided a copy of
6  the Department of State regulations, as well as a
7  document whose name has fluidly changed.  I will
8  refer to it as "The Program Guide."  And we also
9  have a handbook, and that title has also fluidly
10 changed over the years.
11     Q.   Who was the intended audience of what you
12 have described as The Program Guide?
13     A.   Initially, The Program Guide, I believe,
14 was entitled "Handbook."  And I -- from memory, I
15 believe there was a Host Family Handbook, an Au Pair
16 Handbook, and a Local Coordinator Handbook and/or
17 Guide.  We'll use that term loosely.
18          That then evolved into a document
19 where it is now, I believe, called The Program
20 Guide, intended for all three audiences.  Then
21 there's an additional section intended specifically
22 for host families.  And when I say "section," I mean
23 a separate document for host families, local
24 coordinators, and au pairs.
25     Q.   Do you know if NFP has kept the various

Page 215

1  versions of each of the documents that you just
2  described?
3      A.   Yes.  To the best of my ability, yes.
4      Q.   Where have those documents been kept?
5      A.   At the office there on the server and/or
6  my personal computer.
7          THE VIDEOGRAPHER:  Counsel, your
8  microphone is in contact with your documents.
9          MR. VALDIVIESO:  Thank you.
10         THE VIDEOGRAPHER:  Thanks.
11     Q.   Who at NFP had the responsibility for
12 drafting these various documents?
13         MS. SCHAECHER:  Object to the form.
14     A.   I would need to know which specific
15 document.
16     Q.   We can go one --
17     A.   And then it would also depend on the time
18 that the document was written and/or revised.
19     Q.   Did you play a role in drafting or
20 revising any of these documents at any time?
21     A.   Yes.
22     Q.   Which documents and for which time period
23 did you play a role in revising the document?
24     A.   I -- I don't recall.
25     Q.   Did you play a role in drafting or

Page 216

1  revising any of those documents at the time of NFP's
2  inception?
3          MS. SCHAECHER:  Object to form.
4      A.   The documents that are in use for the
5  program, I would say some.  Again, I'd have to see
6  the document to be able to identify if I
7  participated on it.
8      Q.   Do you know if NFP used any publications
9  or materials from Inc. in creating the first version
10 of any of the documents that you described?
11     A.   Yes.
12         MR. VALDIVIESO:  I'm marking what's
13 Bates stamped APF 000160 as Exhibit 20.
14         (Exhibit No. 20 was marked.)
15     Q.   Are you familiar with Exhibit 20,
16 Ms. Nelson?
17     A.   Yes, I am.
18     Q.   What is Exhibit 20?
19     A.   Exhibit 20 is the Au Pair Handbook, and
20 this particular document is dated revised 1-12-2013.
21     Q.   Is this an NFP document or an Inc.
22 document?
23     A.   Let's see.  I would base that off of
24 our -- the date of our designation if -- and I'm
25 going blank on that.  I believe that was in 2012,

Page 217

1  2013.  I'm sorry, I'm going blank on the date that
2  APF became a designated sponsor.  That would
3  determine whose document this is.
4      Q.   The address on the bottom of page 161
5  doesn't help you, does it?
6      A.   Oh, yes.  I'm sorry.  That would be
7  Peta -- the Petaluma one.  That would be an APF
8  document.
9      Q.   And by an A -- APF you mean --
10     A.   N -- NFP.
11     Q.   Understood.
12          But the logo on this document is
13 the logo that you told us belonged to Inc.; is that
14 right?
15     A.   Correct.  The non-for-profit had -- had
16 the legal right to use this logo.
17     Q.   I see.
18          Does it still have the legal right
19 to use that logo?
20     A.   Yes, I would say so.
21     Q.   How do you know that NFP has a legal
22 right -- and I'm not asking for you to disclose any
23 attorney/client communications here.
24          But what is the basis for your
25 understanding that NFP has a legal right to use

MAGNA
LEGAL SERVICES

| Page 218 | Page 220 |
|---|---|
| 1 Inc.'s logo? | 1 top, could you please read that bullet into the |
| 2 MS. SCHAECHER: Objection to form and | 2 record starting with, "Commit to." |
| 3 foundation. | 3 A. "Commit to exclusively working with your |
| 4 A. So I don't understand the legal aspects | 4 host family for a minimum of 12 months. No |
| 5 or reasonings behind -- the mechanics behind how we | 5 additional employment allowed." |
| 6 use it. But through the, I will use the word | 6 Q. You testified earlier something about NFP |
| 7 "transfer," for lack of better definition, not using | 7 not being an employer of the au pair; is that right? |
| 8 that as a definition. When the documents -- we | 8 A. That's correct. |
| 9 had -- we had -- APF Global Exchange had the right | 9 Q. Is the host -- |
| 10 to use their name, their logo, and their documents. | 10 A. Wait. Wait. Can you re -- repeat the |
| 11 Q. Does NFP today still use a document | 11 question? I think I really got tired on that one. |
| 12 titled Au Pair Handbook? | 12 Q. You testified earlier -- earlier |
| 13 A. I believe we've changed it to Au Pair | 13 something about NFP not being an employer of the |
| 14 Program Guide, my best rec -- recollection. | 14 au pair? |
| 15 Q. Would anyone at NFP have had the | 15 A. Correct. |
| 16 responsibility for approving the content of the | 16 Q. Is that right? |
| 17 Au Pair Handbook? | 17 A. Yes. |
| 18 A. I would say that would be my | 18 Q. Do you have a position on whether the |
| 19 responsibility. | 19 host family is the employer of the au pair? |
| 20 Q. Did you share that responsibility with | 20 A. Yes. |
| 21 anyone else? | 21 Q. What is your position? |
| 22 A. No. | 22 A. My -- |
| 23 Q. I think you referred to something called | 23 Q. N -- NFP's position? |
| 24 a Program Guide; is that right? | 24 A. NFP's position is the host family is the |
| 25 A. Yes, I believe so. | 25 employer of the au pair. |

| Page 219 | Page 221 |
|---|---|
| 1 Q. Is it your responsibility to approve the | 1 Q. So an employer/employee relationship |
| 2 content of the Program Guide? | 2 exists between the host family and the au pair; is |
| 3 A. Yes. | 3 that fair? |
| 4 Q. Do you share that responsibility with | 4 A. I don't know that I have the legal |
| 5 anyone else? | 5 back -- background to make that distinction. I use |
| 6 A. No. | 6 that term loosely in accordance with the Department |
| 7 Q. On page 163, where the heading "Standard | 7 of State guidelines. |
| 8 Care Au Pair." | 8 Q. Looking at the last bullet in that family |
| 9 Do you see that? | 9 of bullets that contained the language you just |
| 10 A. Yes. | 10 read, do you see the bullet starting with, "Submit |
| 11 Q. And under the bullet that states, "Up to | 11 required paperwork," just above, "Additional APF |
| 12 45 hours per week of childcare for children over two | 12 Rules"? |
| 13 years of age," what follows? | 13 A. Yes. |
| 14 A. The next bullet reads, "Weekly stipend of | 14 Q. It says, "Submit required paperwork, |
| 15 195.75." | 15 including a weekly report of working hours and time |
| 16 Q. Does the word "minimum" appear in that | 16 off and monthly check-ins to your CR and APF." |
| 17 bullet? | 17 Did I read that correctly? |
| 18 A. No, it does not. | 18 A. Yes. |
| 19 Q. Under the heading "Infant Care Au Pair" | 19 Q. What does "required paperwork" refer to? |
| 20 in the third bullet, what does it say? | 20 A. That would refer to any paperwork that we |
| 21 A. "Weekly stipend of 195.75." | 21 require of the au pair. |
| 22 Q. Does the word "minimum" appear in that | 22 Q. Did you require a weekly report of the |
| 23 sentence? | 23 au pair? |
| 24 A. No. | 24 A. To my knowledge, the weekly survey was |
| 25 Q. On page 166, on the second bullet at the | 25 not in existence in 2013, but I don't recall. I'd |

PLAINTIFFS' RESP. APP.0005471

MAGNA
LEGAL SERVICES

Page 222

1  have to look at my records.
2      Q.   Does this document, dated January 2013,
3  state a weekly report among the required paperwork
4  required of an au pair?
5           MS. SCHAECHER: Objection.  Form.
6      A.   It states, "Submit required paperwork."
7      Q.   And the very next part of that states,
8  "Including."  Is that right?
9      A.   Yes.
10     Q.   So is a weekly report included among the
11  required paperwork?
12     A.   Not always.  Only if required.  The
13  language was intended to be if we asked for it, you
14  submit it.  If we require it, you submit it.
15     Q.   Turning to page 167, under "Host Family
16  Responsibilities."
17          Do you see that?
18     A.   Yes, I do.
19     Q.   And then it says, "Host families who host
20  an APF au pair participant are expected to,"
21  followed by a colon.
22          Do you see that?
23     A.   Yes.
24     Q.   Could you please read the second bullet?
25     A.   "Limit your working" --

Page 223

1           (Telephone interruption.)
2      A.   The second bullet --
3      Q.   Yes.
4      A.   -- is that correct?
5           "Limit your working hours to a
6  maximum of 45 hours per week, 30 hours per week for
7  EduCare participants, and 10 hours per day."
8      Q.   Thank you.
9           And the word "maximum" is
10  underlined; is that right?
11     A.   Yes, it is.
12     Q.   Why is that second bullet included in
13  this document, if you know?
14     A.   It is to indicate the Department of State
15  regulations regarding the number of hours that an
16  au pair can work in a week and a day.
17     Q.   Thank you.
18          And the bullet immediately
19  following that bullet, what does it state, please?
20     A.   "Pay a weekly stipend of 195.75 (146.81
21  for EduCare participants)."
22     Q.   Thank you.
23          The word "minimum" doesn't appear
24  in that sentence; is that right?
25     A.   Correct, nor does "maximum."

Page 224

1      Q.   But the word "maximum" appeared in the
2  bullet above and it was underlined, that's right?
3      A.   Yes.
4      Q.   Why does APF include the word "maximum"
5  underlined in the second bullet, but doesn't include
6  the word "minimum" in the third bullet?
7      A.   It's not necessary.
8      Q.   Why is it not necessary?
9      A.   A starting point of 195 means you begin
10  here.  Maximum means that's the ceiling, that's the
11  maximum.
12          You'll notice there's also not a
13  starting point of zero hours or one hour.
14     Q.   What word in the third bullet conveys
15  that 195.75 is a minimum?
16     A.   "Pay a weekly stipend of 195.75."
17     Q.   Which of those words conveys that 195.75
18  is a minimum?
19          MS. SCHAECHER: Objection.  Form.
20     A.   This is a starting point, so families
21  must pay a minimum of 195.75.
22     Q.   Which of those words indicate that 195.75
23  is a starting point?
24          MS. SCHAECHER: Objection.  Form.
25     A.   We, Au Pair Foundation, does not in --

Page 225

1  dictate the pay that the host families provide to
2  the au pair, other than the starting point of
3  195.75.
4           THE VIDEOGRAPHER:  Counsel, five
5  minutes until media change.
6           MR. VALDIVIESO:  Okay.
7      Q.   Does NFP dictate the number of hours per
8  week?
9      A.   No, NFP does not.  The Department of
10  State does.  They also dictate the minimum starting
11  wage of 195.75.
12     Q.   Does the Department of State dictate that
13  45 hours per week is a maximum?
14     A.   Yes, that is a regulation within the
15  Department of State regulations for this program.
16     Q.   And the word "maximum" does appear in the
17  second bullet; is that right?
18          MS. SCHAECHER:  Objection to form.
19     A.   I -- I believe I've answered that.  Yes,
20  it does.
21     Q.   You mentioned weekly surveys.  And if you
22  want to use a different word to describe what you
23  were describing, please correct me.
24     A.   That's fine.
25     Q.   But -- and I believe you said they were

MAGNA
LEGAL SERVICES

Page 226

1  conducted on Survey Monkey; is that right?
2      A.   Yes, that's correct.
3      Q.   So does NFP conduct any other regular
4  surveys?
5          MS. SCHAECHER:  Object to form.
6      A.   We do have a survey that the Department
7  of State requires, and we conduct that annually.
8      Q.   Does NFP conduct it directly, or do you
9  hire someone to conduct it?
10     A.   It -- it's been both.
11     Q.   During which periods of time has NFP
12  conducted the survey itself?
13     A.   NFP sends out the survey through Survey
14  Monkey.  The auditor reviews the results of the
15  survey, this particular survey.
16     Q.   And that's on an annual basis?
17     A.   Yes.
18     Q.   The weekly survey that you referred to,
19  is that a survey of the au pair?
20     A.   Yes, it's sent to the au pair.
21     Q.   Do you conduct any surveys of host
22  families?
23     A.   Not on a regular basis.
24     Q.   And the annual survey that you referred
25  to, that's also conducted of the au pair?

Page 227

1      A.   The annual survey that I'm speaking of
2  with -- in regards to the Department of State
3  report, that the Department of State requires, is
4  sent to the au pairs and the host families
5  individually annually.
6      Q.   I see.  Do you keep records of the annual
7  surveys?
8      A.   No, I do not.  The auditor would have
9  those records, I would assume.  The results are in
10  our reports.
11     Q.   But you do keep the weekly survey
12  results; is that right?
13     A.   Yes, we do.
14     Q.   And the Au Pair Handbook referred to
15  monthly check-ins.  Do you recall that?
16     A.   On page?
17     Q.   On page 166.
18     A.   And what area are you speaking
19  specifically to?
20     Q.   It's the bullet that you read, which is
21  right above "Additional APF Rules."
22     A.   Okay.  I don't even recall --
23     Q.   Right -- right above "Additional APF
24  Rules."
25     A.   Okay.  Yes.

Page 228

1      Q.   It refers to a monthly check-in?
2      A.   Yes.
3      Q.   Is that a practice that has, in fact,
4  occurred in the NFP au pair program, monthly
5  check-ins?
6      A.   Yes, monthly check-ins do occur.
7      Q.   Have they occurred since the program's
8  inception until today?
9      A.   Yes.
10     Q.   Does APF keep any records reflecting
11  information gathered in the monthly check-in?
12     A.   Yes.
13     Q.   Does it keep records from the inception
14  of NFP to the present?
15     A.   Yes, I -- I -- yes, I would say so.
16         THE VIDEOGRAPHER:  Less than a
17  minute.
18         MR. VALDIVIESO:  Okay.  Let's change
19  the tape.
20         THE VIDEOGRAPHER:  This is the end of
21  media No. 3 in the 30(b)(6) deposition of Au Pair
22  Foundation through their designee, Theresa Nelson.
23  Going off the record.  The time is 4:26.
24         (Break from 4:26 p.m. to
25             4:33 p.m.)

Page 229

1          (Exhibit No. 21 was marked.)
2          THE VIDEOGRAPHER:  We are back on the
3  record.  The time is 4:33.  This is the beginning of
4  media No. 4 in the 30(b)(6) deposition of Au Pair
5  Foundation through their designee, Theresa Nelson.
6  BY MR. VALDIVIESO:
7      Q.   Ms. Nelson, I'm handing you what's been
8  marked Exhibit 21.  This is a document ending in
9  312.
10         Do you recognize Exhibit 21?
11     A.   Yes, I do.
12     Q.   Is this an example of the weekly survey
13  that you were describing before, conducted on Survey
14  Monkey?
15     A.   Yes, this is an example.
16     Q.   Do you see Question No. 8 on this survey?
17     A.   Yes, I do.
18     Q.   Could you read the text that follows
19  "Q8:"
20     A.   It says, "Yes" -- or, sorry.
21         After Q8, "Did you receive your
22  full weekly stipend of 195.75 this week?"
23     Q.   And what is the answer that this example
24  notes?
25     A.   It is, "Yes, I received 195.75 for the

PLAINTIFFS' RESP. APP.0005473

MAGNA
LEGAL SERVICES

---

**Page 230**

```
 1   week."
 2            It's a yes-or-no question.
 3       Q.   A yes-or-no question.  Does that mean the
 4   au pair taking the survey has an option of selecting
 5   either yes or no?
 6       A.   Yes, it's -- from my memory, it's a
 7   yes-or-no question.
 8       Q.   What is the date of this document, as far
 9   as you can tell?
10       A.   The date of this document is -- appears
11   to be April 19th, 2014.
12       Q.   And you said that NFP continues to
13   conduct weekly surveys of its au pairs?
14       A.   Yes.  We find that a best practice.
15       Q.   Does the current version of the survey
16   contain Question No. 8?
17       A.   Yes, I believe it does.
18       Q.   Do you believe that it contains it in
19   substantially the same form?
20       A.   I do not have a recollection.
21       Q.   Do you know whether the current version
22   of the survey provides for a yes-or-no answer as
23   well?
24       A.   I believe the format of the answer has
25   not changed.  So if my memory is correct, that it's
```

**Page 231**

```
 1   yes or no, then it has remained yes or no.
 2       Q.   On the top of the page we are looking at,
 3   312, do you see where it says "Collector"?
 4       A.   Yes.
 5       Q.   And then it says "Web Link."  Is that
 6   right?
 7       A.   Yes.
 8       Q.   Do you have any understanding as to what
 9   "Web Link" means?
10       A.   Web Link, I believe that to be a link;
11   that at that time we would e-mail the au pair the
12   link to Survey Monkey, and she would click on that
13   link and complete the survey.
14            So this would be a terminology
15   that Survey Monkey has.
16       Q.   That's useful.  Thank you.
17            You mentioned the annual survey
18   was part of the audit reports submitted to the
19   Department of State on an annual basis; is that
20   correct?
21       A.   Correct.
22       Q.   I'm handing you what's been marked
23   Exhibit 22.
24            (Exhibit No. 22 was marked.)
25            MR. VALDIVIESO:  For those on the
```

**Page 232**

```
 1   phone, it's a document ending in 368.  It's a cover
 2   e-mail containing several attachments, and I believe
 3   we have included all of the attachments to the cover
 4   e-mail.
 5       Q.   Are you familiar with this document,
 6   Ms. Nelson?
 7       A.   Yes, I am.
 8       Q.   What is it?
 9       A.   It is the annual report that is submitted
10   to the Department of State, per regulations.
11       Q.   And this document came from your e-mail
12   address; is that correct?
13       A.   Yes, it did.
14       Q.   And the e-mail contains several
15   attachments; is that right?
16       A.   Yes, it does.
17       Q.   Could you state for the record what the
18   various attachments are?
19       A.   It appears the first attachment is the
20   DS-3097 Department of State Annual Report.
21            There is an additional document,
22   and that is referred to as the Annual Report
23   Addendum, which answers some questions as required
24   by the Department of State.
25            And the third is the Au Pair
```

**Page 233**

```
 1   Program Audit, as required by the Department of
 2   State.
 3       Q.   Did you review the attachments before
 4   submitting them to the Department of State in the
 5   attachment to your e-mail?
 6       A.   Yes.
 7       Q.   Looking at the second attachment, which
 8   begins on page 371, the second paragraph in the
 9   body, it states that, "We are pleased to announce."
10       A.   Yes.
11       Q.   The last sentence of that paragraph
12   states, "We received this award due to the extensive
13   evaluation of the program's effectiveness starting
14   in January 2013 and the change in management in
15   2013."
16            Do you see that?
17       A.   Yes, I do.
18       Q.   Did I read that accurately?
19       A.   Yes.
20       Q.   What does the change in management in
21   2013 refer to?
22       A.   Ellen Hoggard taking the position as
23   president.
24       Q.   And prior to Ms. Hoggard, who had the
25   position as president?
```

PLAINTIFFS' RESP. APP.0005474

MAGNA
LEGAL SERVICES

Page 234

1    A.   I don't know that that was held by anyone
2    in particular.
3         We also had staffing changes,
4    where I became more involved in 2013.  And prior to
5    that I was not involved as much.
6    Q.   In the second bullet it says, "Holding a
7    Skype interview with au pair candidates prior to
8    acceptance of their application to ensure adequate
9    English skills and presentation."
10        Do you see that?
11   A.   Yes, I do.
12   Q.   Did I read that accurately?
13   A.   I -- I believe so.  I really wasn't
14   paying attention to every word.
15   Q.   That's okay.  My question is just
16   focusing on one word in that sentence.
17   A.   Uh-huh.
18   Q.   The word "Skype."
19        Does NFP use Skype for business
20   purposes?
21   A.   NFP uses Skype to interview the au pair
22   candidates, yes.
23   Q.   Does it use Skype for any other purpose?
24   A.   We, over the past years, have had
25   meetings via Skype, or perhaps discussions with

Page 235

1    partners.
2    Q.   Are you familiar -- familiar with Skype's
3    text messages capabilities?
4    A.   Yes.
5    Q.   Are you aware of anyone at NFP using
6    Skype's text messaging capabilities to communicate
7    internally?
8    A.   Yes.
9    Q.   Have you used Skype's messaging
10   capabilities to communicate internally?
11   A.   Yes.  I -- I use it only in -- two main
12   purposes are the reasons that I use it:  To answer
13   an inquiry if something comes -- if someone Skypes
14   me; and/or if I'm trying to reach an overseas
15   partner in an urgent matter or cannot reach them via
16   e-mail, I will also try Skype.
17   Q.   Do you have an account for Skype that's
18   specific to your work for NFP?
19   A.   Yes.  It's now being used for other
20   purposes, but it originally started just for
21   Au Pair -- or NFP.  And then as my use of Skype
22   expanded, I now use it.
23   Q.   What is your Skype user name?
24   A.   I believe it's Theresa.Nelson.APF.
25   Q.   And other persons at NFP also use Skype

Page 236

1    for business purposes.  For their user name, do they
2    follow the same naming -- naming convention used for
3    your user name; that is, first name, dot last name,
4    dot APF?
5    A.   No, not to my knowledge.
6    Q.   Are you aware of anyone else using that
7    naming convention?
8    A.   No, I don't.  I don't have anyone else's
9    Skype address memorized.  But to my knowledge, no.
10   Q.   Going down to the fourth bullet on 371,
11   it states, "Weekly surveys for au pairs:  In January
12   2014 APF began conducting a weekly survey of all
13   current au pairs to ensure that au pairs were
14   working within program regulations and/or receiving
15   their weekly stipend on time and in full."
16        Did I read that correctly?
17   A.   Yes.
18   Q.   Does that sentence help refresh your
19   recollection as to when NFP began using Survey
20   Monkey to conduct weekly surveys?
21   A.   Yes, greatly.
22   Q.   When -- now that your recollection has
23   been refreshed, when do you believe APF began using
24   Survey Monkey to conduct its weekly surveys?
25   A.   January 2014, based on reading this.

Page 237

1    Q.   Turning to the next attachment, which
2    begins at 374.
3         On page 376 there is a block of
4    text at the top that states, "Robert R. Naugler."
5    Is that right?
6    A.   Yes, that's correct.
7    Q.   Are you familiar with Mr. Naugler?
8    A.   Yes, I am.
9    Q.   Who is Mr. Naugler?
10   A.   Mr. Naugler is -- I'm not sure what his
11   role is in relationship.  I assume the owner, but
12   I -- I don't know.  A certified public accountant.
13   Q.   And did he conduct the audit required by
14   the Department of State regulations in the year
15   20 -- for the program year 2013?
16   A.   He, or a representative from his CPA
17   firm.
18   Q.   Does NFP have a contract with
19   Mr. Naugler?
20   A.   We have, I believe it's called, an
21   engagement agreement or -- or something to that
22   effect.
23   Q.   As part of that engagement agreement,
24   does NFP pay Mr. Naugler or his company any
25   consideration?

PLAINTIFFS' RESP. APP.0005475

MAGNA
LEGAL SERVICES

Page 238

```
1      A.   Yes.
2      Q.   Were you involved in selecting
3  Mr. Naugler as the auditor for the program year
4  2013?
5      A.   Yes, I participated in that decision.
6      Q.   What was the extent of your
7  participation?
8      A.   I believe that I suggested his name, as
9  he's done previous work with Au Pair Foundation,
10 Inc.
11     Q.   Did you work with Mr. Naugler in your
12 capacity of providing services to Au Pair, Inc.
13 prior to NFP's?
14     A.   Yes, I believe so.  Not him personally.
15 I may or may not have worked with him personally,
16 also a member of his staff.
17     Q.   And can you describe what the audit
18 Mr. Naugler conducted for program year 2013 entails?
19     A.   It entails whatever is necessary to meet
20 the Department of State requirements for that audit,
21 as set forth by the Department of State.
22     Q.   Does NFP convey to Mr. Naugler or his
23 firm what those requirements are?
24     A.   Yes, we do.
25     Q.   How do you do that?
```

Page 239

```
1      A.   From the Department of State.
2      Q.   I'm -- I'm a bit confused.  I -- I asked
3  how you convey to Mr. Naugler and his firm what --
4  what the requirements of the Department of State.
5  Your answer was "from" -- "from the Department of
6  State."
7          Could you clarify your answer to
8  that question, please, as I'm having trouble
9  understanding it?
10     A.   Yeah, I'm sorry.
11          The Department of State sets
12 forth -- forth what those requirements of the audit
13 should be and what the audit points or what the
14 auditor will be doing within the scope of his work,
15 in layman's -- I don't know, in layman's.
16     Q.   Does NFP modify the language, or is the
17 language set by the Department of State?
18     A.   The language is set by the Department of
19 State.
20     Q.   Turning to page 8 of the internal
21 pagination, which is page 383 on the numbers on the
22 bottom right-hand corner.  There's a numeral 23.
23     A.   I'm --
24     Q.   Can you --
25     A.   I'm sorry, what page?
```

Page 240

```
1      Q.   It ends in 8 -- yeah, 383 on the bottom
2  right.
3      A.   383, okay.
4      Q.   There's a number 23.  Could you read that
5  into the record, please.
6      A.   No. 23?
7      Q.   Yes, and only going all the way down to
8  the end of what follows letter A.
9      A.   Sure.  "We read the signed Host Family -
10 Au Pair Agreements to determine that the host family
11 has agreed that the au" -- "au pair participant
12 will," A reads, "be compensated at a weekly rate
13 based on 45 hours per week and paid in conformance
14 with the requirements of the Fair Labor Standards
15 Act.  Compensation must be no less than 195.75 per
16 week."
17     Q.   Thank you.
18          Could you go back to your pile of
19 exhibits, please, and locate for me the one that is
20 designated Host Family - Au Pair Agreement, please.
21          MS. SCHAECHER:  Do you have the
22 number, exhibit number?
23          MR. VALDIVIESO:  It's Exhibit No. 19,
24 I believe.
25     Q.   I'm sorry, what -- do you see a date on
```

Page 241

```
1  the bottom of that one?
2      A.   "APF July 2013."
3      Q.   So this is the Host Family - Au Pair
4  Agreement that was in effect at the time of the
5  program year that this audit relates to; is that
6  right?
7      A.   Yes, I would say that would be accurate.
8  I cannot say if there was another version ahead of
9  or behind, but certainly at that time it appears to
10 be so.
11     Q.   On page APF 139 --
12     A.   Uh-huh.
13     Q.   -- under "Host Family," the sentence that
14 you read that starts with, "We, as the host
15 parents."
16     A.   Yes.
17     Q.   The words, quote, "No less than," end
18 quote, do not appear in that sentence, do they?
19     A.   No, they do not.
20     Q.   Sitting here today, reading the sentence
21 that's on page 383 that you read out loud that
22 states, as you read it, "We read the signed Host
23 Family - Au Pair Agreements to determine that the
24 host family has agreed that the au pair participants
25 will be compensated at a weekly rate based on 45
```

**MAGNA**
LEGAL SERVICES

| Page 242 | Page 244 |
|---|---|
| 1   hours per week and paid in conformance with the | 1   A.   Okay. |
| 2   requirements of the Fair Labor Standards Act. | 2   Q.   No tough questions on that one. |
| 3   Compensation must be no less than 195.75 per week." | 3      This has been marked Exhibit 24. |
| 4      Does anything in that sentence | 4      MR. VALDIVIESO: Counsel, this is a |
| 5   indicate to you that 195.75 is a minimum? | 5   document ending in 599. |
| 6   A.   It indicates "no less than," which I | 6   Q.   Do you recognize this document, |
| 7   would equate -- equate to a minimum. | 7   Ms. Nelson, |
| 8   Q.   And, in fact, it says, "Must be no less | 8   A.   Yes, I do. |
| 9   than." Is that right? | 9   Q.   What is it? |
| 10   A.   "Must be no less than." | 10   A.   This is a piece of the annual report. |
| 11   Q.   And those words, to you, indicate that | 11   It's specifically the audit for program year 2015. |
| 12   195.75 is a minimum? | 12   Q.   And do you recall having reviewed the -- |
| 13   A.   Yes. | 13   A.   Yes. |
| 14   Q.   Thank you. | 14   Q.   -- audit for program year 2015? |
| 15      I'm handing you what has been -- | 15   A.   Yes, I do. |
| 16   and you can put those other exhibits to the side -- | 16   Q.   And this document was, in fact, submitted |
| 17   what's been marked Exhibit 23. | 17   to the Department of State as part of the annual |
| 18      (Exhibit No. 23 was marked.) | 18   report? |
| 19      MR. VALDIVIESO: Counsel. | 19   A.   Yes, I'm going to assume so. Yes. I |
| 20   Q.   And my question should come as no | 20   don't see the attached e-mail, but...yes, it's not |
| 21   surprise by this point. Do you recognize this | 21   marked "draft" or anything. |
| 22   Exhibit -- | 22   Q.   And I -- I'm losing my memory at this |
| 23   A.   Yes. | 23   point, but is -- did you say that you were the |
| 24   Q.   -- 23 -- | 24   responsible officer or the alternative -- |
| 25   A.   I do. | 25   alternate -- |

| Page 243 | Page 245 |
|---|---|
| 1   Q.   -- Ms. Nelson? | 1   A.   I'm -- |
| 2      What is it? | 2   Q.   -- responsible officer? |
| 3   A.   This is the Annual Report for 2014. | 3   A.   -- alternate. |
| 4   Q.   And that's program year 2014, correct? | 4   Q.   And what are the duties of the -- do the |
| 5   A.   Yes. | 5   duties -- I think you already told me what some of |
| 6   Q.   That was actually submitted in 2015; is | 6   the duties were. |
| 7   that right? | 7      Do the duties of the |
| 8   A.   Yes, that's correct. | 8   responsible -- or alternate responsible officer |
| 9   Q.   And if you could just please take a quick | 9   include communicating with the Department of State? |
| 10   look at the attachments. | 10   A.   Yes, that would be one of the |
| 11      MR. VALDIVIESO: And, Counsel, did I | 11   responsibilities. |
| 12   say for you on the phone, this ends in Bates 249, | 12   Q.   Do you have a main point of contact at |
| 13   and it contains the same number of attachments as | 13   the Department of State? |
| 14   the prior exhibit. | 14   A.   No. It would fluctuate, depending on the |
| 15   Q.   Thank you, Ms. Nelson. What are the | 15   staff member at the time and the department. |
| 16   attachments to Exhibit 23? | 16   Q.   Does anyone also at NFP maintain regular |
| 17   A.   We have a DS-3097, the Program | 17   contact with people at the Department of State? |
| 18   Evaluation, and the 2014 Audit Report. | 18   A.   I wouldn't define "regular." But the |
| 19   Q.   You reviewed those documents before | 19   other persons that have contact would be the other |
| 20   sending them over to the Department of State? | 20   alternative responsible officer, which would be |
| 21   A.   Yes, I did. | 21   Ainura Ozturk, and the responsible officer, Ellen |
| 22   Q.   Thank you. | 22   Hoggard. |
| 23      (Exhibit No. 24 was marked.) | 23   Q.   During your time at NFP, have you had any |
| 24   Q.   I'm handing you what has been marked -- | 24   contact with anyone at the Department of Labor? |
| 25   you can put that one aside. | 25   A.   No. |

**MAGNA**
LEGAL SERVICES

| Page 246 | Page 248 |
|---|---|
| 1    Q.  Have you received any communications from<br>2 anybody at the Department of Labor during your time<br>3 at the NFP?<br>4    A.  No.  Not I recall, no.<br>5    Q.  And you stated very early on in today's<br>6 deposition that NFP is a member of the Alliance; is<br>7 that right?<br>8    A.  Yes.<br>9    Q.  Do you know when NFP joined the Alliance?<br>10    A.  No, I don't recall the date we joined.<br>11       MR. VALDIVIESO:  I am marking a<br>12 document Bates stamped InterExchange0033912.  The<br>13 document does not bear any confidentiality<br>14 designation.  Furthermore, I represent that<br>15 Ms. Hoggard is a recipient of the e-mail.<br>16       (Exhibit No. 25 was marked.)<br>17    Q.  I'm handing you what's been stamped<br>18 Exhibit 25.<br>19       Are you familiar with this<br>20 document, Ms. Nelson?<br>21    A.  No, I'm not.<br>22    Q.  Above, to recap.  On the first page, two<br>23 sentences before the end of that paragraph, it says<br>24 in brackets, "In the case of Ellen and STS, they are<br>25 prospective member.  Their application is now being | 1 foundation.<br>2    A.  No, I do not.<br>3    Q.  Okay.<br>4    A.  I don't have a recollection.<br>5    Q.  And you have no knowledge?<br>6    A.  I would not have a recollection.<br>7       MR. VALDIVIESO:  Tab 48, please.<br>8    Q.  I'm sorry, I think you testified earlier<br>9 that you attended at least once Alliance meeting?<br>10    A.  Yes, I did.<br>11    Q.  Do you recall when that meeting was?<br>12    A.  Not specifically.  It would have been the<br>13 last few years.<br>14    Q.  Do you have a more specific recollection<br>15 than just the last few years?<br>16    A.  No.<br>17    Q.  Do you recall where the meeting was?<br>18    A.  I -- I don't have a recollection.<br>19       (Exhibit No. 26 was marked.)<br>20    Q.  I'm handing you what's been marked<br>21 Exhibit 26.<br>22       MR. VALDIVIESO:  This is a document<br>23 that is Bates stamped ExpertAuPair028121.  It does<br>24 not bear -- it -- it bears a Confidential<br>25 designation, but it does not bear an Attorneys' Eyes |

| Page 247 | Page 249 |
|---|---|
| 1 processed."<br>2       Do you see that?<br>3    A.  Yes, I do.<br>4    Q.  Does that sentence help refresh your<br>5 recollection as to when NFP became a member of the<br>6 Alliance?<br>7       MS. SCHAECHER:  Objection to the<br>8 form.<br>9    A.  No, it still doesn't.  I don't know how<br>10 long --<br>11    Q.  Did --<br>12    A.  -- it then took from this application<br>13 being processed to accepted.<br>14    Q.  Do you have an understanding as to<br>15 whether STS and NFP applied for membership in the<br>16 Alliance at the same time?<br>17    A.  No, I do not.<br>18    Q.  Do you know if Inc. was a member of the<br>19 Alliance?<br>20    A.  No, I do not.<br>21    Q.  So sitting here today, you don't know one<br>22 way or another whether as of June 2011 Au Pair<br>23 Foundation, Inc. or Au Pair Foundation NFP had a<br>24 pending application with the Alliance?<br>25       MS. SCHAECHER:  Objection.  Form and | 1 Only designation.<br>2       Furthermore, I represent that<br>3 there is a recipient in the "To" line from<br>4 AuPairFoundation.org with the e-mail address of<br>5 Ellen@AuPairFoundation.org.<br>6    Q.  Ms. Nelson, are you familiar with this<br>7 document?<br>8    A.  Yes.  This document looks familiar.<br>9    Q.  Do you recall discussing this document<br>10 with -- well, do you know who<br>11 Ellen@AuPairFoundation.org is?<br>12    A.  Yes.<br>13    Q.  Who is Ellen@AuPairFoundation.org?<br>14    A.  That's Ellen Hoggard.<br>15    Q.  Do you recall discussing this document<br>16 with Ms. Hoggard?<br>17    A.  Other than acknowledging receipt of it.<br>18    Q.  Is your testimony you don't -- you don't<br>19 recall anything other than acknowledging receipt of<br>20 it?  Is that what you said?<br>21    A.  Yeah.  There was nothing to discuss.<br>22    Q.  Turning to the second page of this<br>23 document, the very last paragraph before<br>24 "Sincerely," it states, "Please let Ethan<br>25 Bursofsky," and then "(BursofskyEJ@state.gov) know |

Page 250

```
1    if a representative of your organization will be
2    attending the May 2 meeting."
3              Do you see that?
4         A.   Yes, I do.
5         Q.   Do you know if a May 2 meeting of the
6    Alliance occurred?
7         A.   I don't have a memory.
8         Q.   And, I'm sorry, do you know if a May 2
9    meeting with the State -- Department of State
10   occurred?
11        A.   I -- I don't know, from memory.
12        Q.   The -- turning back to the first page of
13   this document, the third paragraph states, "We will
14   be reaching out early next week to DOS to get some
15   clarification about the meeting and to explore a
16   possible agenda."
17             And, sorry, now jumping all the
18   way to the bottom, it states, "The department
19   learned recently that a number of sponsors
20   designated in the au pair category of the exchange
21   visitor program are seeking further clarification on
22   the requirements for calculating wages paid to
23   au pairs by host families reflected in the governing
24   regulations at 22 CFR Section 62.31(j)(1)."
25             Do you see that?
```

Page 251

```
1         A.   Yes.
2         Q.   Sitting here today, do you have any
3    understanding as to whether Au Pair Foundation NFP
4    was seeking further clarification on the
5    requirements for calculating wages paid to au pairs?
6         A.   No.
7         Q.   And then the second paragraph on the
8    first page, it states, "As we have agreed, our
9    collective interest in this meeting is" -- and in
10   bold and italics -- "only to talk prospectively with
11   the DOS about how the stipend might change going
12   forward."
13             Do you see that?
14        A.   Yes.
15        Q.   Do you have any understanding, sitting
16   here today reading that sentence, what "as we have
17   agreed," means?
18        A.   No.  I was not a part of that decision or
19   discussion.
20        Q.   Do you know if Ellen Hoggard was a part
21   of that discussion?
22        A.   No.  I'm not even specifically sure what
23   discussion he's referring to, since there's no date
24   or time.
25        Q.   Is it possible that "our collective
```

Page 252

```
1    interest in this meeting" refers to the May 2
2    meeting referred to in the first e-mail?
3         A.   I'm sorry, can you ask that question
4    again?
5         Q.   Is it possible that the words, quote,
6    "this meeting," end quote, refer to the May 2
7    meeting discussed on page 2 of this e-mail?
8         A.   Yes, I would make that assumption, that
9    "this meeting" refers to the May 2nd meeting.
10        Q.   And the Alliance meeting that you
11   attended personally, do you recall taking any notes
12   of that meeting?
13        A.   I have taken notes at the meetings.
14        Q.   And "the meetings" refer to Alliance
15   meetings?
16        A.   If I attended a meeting, yes.
17        Q.   And did you attend any meetings with the
18   Department of State?
19        A.   Yes.
20        Q.   And did you take notes at the meetings
21   with the Department of State?
22        A.   Yes.
23        Q.   Have you kept those notes?
24        A.   No.
25        Q.   What have -- what have you done with
```

Page 253

```
1    those notes?
2         A.   Those notes would have either been
3    report -- reported to Ellen Hoggard in a recap of
4    the meeting, or just not kept.
5         Q.   And do those recaps that you have from
6    time to time provided to Ms. Hoggard, do you provide
7    that recap in an e-mail form?
8         A.   I have.  I have also done that verbally.
9         Q.   Focusing still on that last sentence on
10   the bottom of page 1 that says -- where there --
11   where it states, "The department learned recently
12   that a number of sponsors are seeking further
13   clarification."
14             Do you know of any other sponsors
15   who were seeking clarification?
16        A.   No, I do not.
17        Q.   Do you recall hearing or participating in
18   any meeting where the Department of Labor was
19   present at the same time as the Department of State
20   was present?
21        A.   Not specifically.  I have attended many
22   meetings over the...
23        Q.   Did you receive reports regarding what
24   happened at the meetings in which NFP attended, but
25   you did not attend personally?
```

64 (Pages 250 to 253)

MAGNA
LEGAL SERVICES

Page 254

1      A.   I may or may not have.
2      Q.   Do you recall any instance in which you
3  have?
4      A.   I recall Ainura Ozturk, I believe,
5  attended.  I -- I don't know if she -- I don't have
6  any memory if she submitted a report after or not.
7      Q.   And I didn't mean just submit a report,
8  but also provide a report to you orally as well?
9      A.   Yes.
10     Q.   Yes, you have received oral reports of
11 other representatives of NFP at either Alliance or
12 State Department meetings?
13     A.   Yes.
14     Q.   But you're not sure if you've received a
15 written report?
16     A.   Correct.
17          (Exhibit No. 27 was marked.)
18     Q.   I'm handing you what's been marked
19 Exhibit 27.  Actually, before we start discussing
20 Exhibit 27.
21          Just with respect to the
22 Department of State and Alliance meetings.  As a
23 general practice, do you know whether the Alliance
24 meets around the same time that the Department of
25 State meetings occur?

Page 255

1      A.   I would not say that I know that for
2  certain.  My observation has been for logistics that
3  they have in the past.
4      Q.   And the Department of State and the
5  Alliance meeting that you recall attending, do you
6  recall whether that particular meeting, whether
7  those particular meetings occurred at approximately
8  around the same time?
9      A.   Yes, the meeting I attended.
10     Q.   And did the Alliance meeting occur before
11 or after the Department of State meeting?
12     A.   I -- I don't have a clear recollection of
13 which occurred first.
14     Q.   Okay.  Turning back to Exhibit 27.
15          Are you familiar with this
16 document, Ms. Nelson?
17     A.   No, I'm not.  I mean, it was sent to me,
18 but I don't recall this document specifically.
19     Q.   Do you have any reason to doubt that
20 this -- strike that.
21          Is it your testimony that you
22 believe that you did, in fact, receive this document
23 in your e-mail?
24     A.   Yes.
25     Q.   And what is Exhibit 27?

Page 256

1      A.   It's an e-mail from Carrie Crompton
2  regarding the IAPA conference.
3      Q.   And Ms. Crompton's e-mail is -- is in
4  response to an e-mail from Ms. Hedin; is that right?
5      A.   Correct.  Appears to be so, yes.
6      Q.   Do you know who Ms. Hedin is?
7      A.   Eva Hedin was a member of STS or an
8  employee of STS, Student Travel Schools.
9      Q.   Does -- did you testify that STS screens
10 and sends au pairs to NFP?
11     A.   Yes.  We're one of their partners, or
12 overseas partners.
13     Q.   At the bottom of --
14          MR. VALDIVIESO:  And I apologize to
15 counsel.  This is a document ending in 268.
16     Q.   At the bottom of page 268 it states, "All
17 sponsors in USA (Cultural Care, InterExchange,
18 AuPairCare, GoAuPair) that I met was very positive
19 that APF is now a part of the STS global family
20 since they know we represent quality and have a good
21 organization structure and long experience within
22 cultural exchange.  They all said," quote, "it will
23 be good for the au pair program," end quote.
24          Do you see that?
25     A.   Yes, I do.

Page 257

1      Q.   Did I read that correctly?
2      A.   Yes, appears to be so.
3      Q.   Do you have any understanding as to what
4  Ms. Hedin meant or -- or what did it mean to you
5  when you read "STS" -- or, "APF is now a part of the
6  STS global family"?
7      A.   That STS Student Travel Schools would be
8  sending us applications from Sweden and France and
9  perhaps a few other countries.
10     Q.   And is that arrangement something that
11 commenced around the time that this e-mail was sent?
12          MS. FULLER:  Objection to form and
13 foundation.
14     A.   With APF.
15     Q.   Why -- do you have an understanding as to
16 why Cultural Care, InterExchange, AuPairCare
17 GoAuPair might view it as a positive thing?
18          MS. SCHAECHER:  Objection.  Form and
19 foundation.
20          MS. FULLER:  Join.
21     A.   No, absolutely none.
22     Q.   Do you know if Ms. Hedin was representing
23 NFP at the IAPA conference?
24     A.   No, she was not.
25     Q.   Do you know if anyone from NFP

PLAINTIFFS' RESP. APP.0005480

MAGNA
LEGAL SERVICES

| Page 258 | Page 260 |
|---|---|

**Page 258**

1 represented -- well -- well, do you know if anyone
2 was representing NFP at the IAPA conference referred
3 to in this e-mail?
4     A.   I do not have a recollection if Ellen
5 Hoggard attended the conference in Rome. It's my
6 memory that she did not. If Ellen did not attend,
7 then no one would have represented APF.
8     Q.   And Ms. Crompton wrote on the third
9 sentence in the first e-mail, this is in relation to
10 an emergency protocol, and it says "Theresa can look
11 on the server and see if we do. We will hold on to
12 the STS version in case we have to create
13 something."
14         Do you see the text that I was
15 just reading?
16     A.   Yes, I do.
17     Q.   Do you know if NFP referred to STS
18 documents in creating its own documents?
19     A.   No. STS, as an overseas partner, would
20 occasionally ask for us to use their documents.
21     Q.   And would NFP in those situations, in
22 fact, use STS' document?
23     A.   If they were in compliance with
24 Department of State regulations and APF policies and
25 guidelines. We're not in conflict with any of our

**Page 259**

1 policies.
2         (Exhibit No. 28 was marked.)
3     Q.   I'm handing you what's been marked as
4 Exhibit 28. This is a document Bates stamped
5 CHI1202.
6         MR. VALDIVIESO: It is designated
7 Confidential, but it is not designated Attorneys'
8 Eyes Only.
9         Furthermore,
10 Theresa@AuPairFoundation.org is a recipient of this
11 document.
12     Q.   Do you recognize Exhibit 28, Ms. Nelson?
13     A.   Yes, this looks familiar.
14     Q.   What is Exhibit 28?
15     A.   Exhibit 28 is an e-mail between myself
16 and Deborah Herlocker, or Herlocker.
17     Q.   Do you know who Ms. Herlocker is?
18     A.   Not personally. It's indicated here
19 she's operations manager at CHI at that time.
20     Q.   What is CHI?
21     A.   I -- CHI, I believe, stands for Cultural
22 Homestay, one of the other sponsors.
23     Q.   And does the first e-mail, the top of
24 page 1202, does that refresh your recollection as to
25 the Alliance meeting that you attended?

**Page 260**

1     A.   Not specifically.
2     Q.   Does it generally?
3     A.   I did attend one -- one Alliance meeting
4 in San Francisco on anti-trafficking, that I
5 specifically do recall meeting Tom.
6     Q.   And who is Tom?
7     A.   I believe Tom to be the owner of CHI, or
8 founder.
9     Q.   Do you recall what you discussed with Tom
10 at the meeting?
11     A.   I believe I discussed my relationship
12 with another colleague that had recently passed
13 away, that used to work for Face the World.
14     Q.   Sorry to hear that.
15         What is your understanding -- what
16 is your understanding of the subject of the e-mail
17 exchange with Ms. Herlocker?
18     A.   Ms. Herlocker is coming to me as
19 another -- excuse me -- U.S. sponsor and asking me
20 for a reference or information regarding this agency
21 and Mr. Kark -- Karki. And she's got a list of
22 specific questions.
23     Q.   Is it unusual for you to receive --
24 receive requests for references from other sponsors?
25     A.   I would say in the au pair industry, it

**Page 261**

1 does not occur as often. In the high school
2 exchange program, it -- it occurs on a highly
3 regular basis.
4     Q.   At the bottom -- I'm sorry, who -- who
5 was requesting the information, the reference?
6     A.   It appears to be Deborah from CHI.
7     Q.   In response -- did you, in fact, respond
8 to the request for reference?
9     A.   Yes, I did.
10     Q.   And -- and was it your understanding that
11 the information you were providing to her was
12 confidential?
13     A.   No, it was not.
14         MR. VALDIVIESO: Can we take a brief
15 break, please.
16         THE VIDEOGRAPHER: Going off the
17 record. The time is 5:27.
18         (Break from 5:27 p.m. to
19          5:31 p.m.)
20         THE VIDEOGRAPHER: We're back on the
21 record. The time is 5:31.
22 BY MR. VALDIVIESO:
23     Q.   Thank you, Ms. Nelson. Thank you for
24 your patience.
25         (Exhibit No. 29 was marked.)

**MAGNA**
LEGAL SERVICES

Page 262

1    Q.  I'm handing you what's been marked as
2  Exhibit 29?
3      MR. VALDIVIESO:  For counsel on the
4  phone, I represent that this document has not been
5  produced.  However, I represent that this is a
6  printout of the AuPairFoundation.org website located
7  at https://www.aupairfoundation.org/costs/, and it
8  was printed on today's date, May 9th, 2017.
9    Q.  Ms. Nelson, do you recognize this
10  document?
11    A.  Yes.  It appears to be printed from our
12  website.
13    Q.  And specifically, what section of the
14  website is it?
15    A.  Costs.
16    Q.  And on the -- on the first page, do you
17  see a row that says, "Paid To Your Au Pair"?
18    A.  In this example, yes.
19    Q.  And what does it state directly under,
20  "Paid To Your Au Pair"?
21    A.  In this example it states, "Weekly
22  Stipend of 195.75," and the next -- do you want me
23  to continue?
24    Q.  Yes.  Sure.
25    A.  Next column, "10,179."

Page 263

1    Q.  And what does the 10,179 represent?
2    A.  I'm going to make an assumption that it's
3  195.75 times 52.
4    Q.  Does the word "minimum" appear in the row
5  that you just read?
6    A.  No.
7    Q.  And this website is current as of today?
8    A.  I don't maintain the website.  I'm not
9  familiar if I -- if there's been any changes.  I
10  assume it's current.
11    Q.  And I believe very early on in today's
12  deposition you referred to the new host family
13  program fee as a published rate that's subject to
14  negotiation; is that right?
15    A.  Yes, I think that's a fair statement.
16    Q.  Does NFP ever offer any discounts to that
17  new host family program fee?
18    A.  Yes, we do.
19    Q.  Why do you provide discounts?
20    A.  We provide discounts for a variety of
21  reasons.  We may provide a discount if we are trying
22  to fulfill or use up certain visa -- certain
23  allotted number of visas within the time of the
24  year.  We may offer a discount to promote an event,
25  such as Mother's Day or Fourth of July.

Page 264

1    Q.  Do you ever provide a discount to compete
2  with any of the other sponsors?
3    A.  I -- no, not directly.  We are providing
4  the discount in order to negotiate and move forward
5  on an agreement with the host family.
6    Q.  Do you know if you provide a discount for
7  people who are switching from one agency to another?
8    A.  We do this year.
9    Q.  That's something that you just started
10  this year and hadn't done before?
11    A.  No, we had not done it very often, as --
12  especially particular as a published discount, no.
13    Q.  And do you recall any instance in which
14  NFP has matched a discount being offered by another
15  sponsor?
16    A.  Yes.
17    Q.  And why does NFP match a discount
18  provided by another sponsor?
19    A.  I would say in order to move forward in
20  that relationship with the host family.
21    Q.  Does matching a -- another sponsor's
22  discount help encourage the host family to choose
23  your agency over another?
24      MS. SCHAECHER: Objection.  Form.
25  Foundation.

Page 265

1    A.  No.  I would say there would be many
2  factors.  That may be one particular factor of one
3  particular family.
4    Q.  But you acknowledge that it's at least
5  one of many factors?
6      MS. SCHAECHER: Same objection.
7    A.  Do you want to restate the question?
8    Q.  I believe you stated that it is one of
9  many factors.  I was just confirming that you
10  were -- well, I'll read back your testimony.
11    A.  Thank you.  It's getting late.
12    Q.  I understand.
13      I asked, "Does matching another
14  sponsor's discount help encourage a host family to
15  choose your agency over another?"
16      You replied, "No.  I would say
17  there would be many factors.  That may be one
18  particular factor of one particular family."
19      So for some families, do you
20  believe that a matching discount would help choose
21  your agency over another agency?
22      MS. SCHAECHER: Objection.  Form and
23  foundation.
24    A.  I don't know that I could say that that
25  is their decision, their one residing decision that

MAGNA
LEGAL SERVICES

Page 266

1 made them switch --
2    Q.   Well, is that one of the factors --
3    A.   -- or choose us.
4    Q.   I apologize.
5    A.   Sorry.
6    Q.   Did -- did you finish?
7    A.   Yes.
8    Q.   Is that one of the factors that you
9 consider -- and I'm speaking of NFP -- in matching?
10    A.   No, I -- I actually -- no, I do not.
11    Q.   Is it your testimony today that NFP does
12 not compete with other au pair program sponsors on
13 the program fee?
14    A.   No.  Our pricing is set individually,
15 based upon our business needs, not the needs of
16 others.
17    Q.   And you don't consider the pricing of
18 other agencies in setting your own prices?
19    A.   It's a consideration, but not the
20 consideration.
21    Q.   Does NFP compete with other sponsors on
22 the weekly stipend?
23    A.   I don't understand the question.
24    Q.   Well, you understood when I used the word
25 "compete" with respect to the program fee; is that

Page 267

1 right?
2         MS. SCHAECHER:  Objection.
3    A.   Yes.
4         APF does not pay the weekly
5 stipend.
6    Q.   So is it your testimony that NFP does not
7 compete with other sponsors with respect to the
8 weekly stipend?
9    A.   My testimony is that APF is not a party
10 of paying out the weekly stipend.
11         THE VIDEOGRAPHER:  Five minutes,
12 Counsel.
13    Q.   But NFP does publish the weekly stipend
14 on its website; is that right?
15    A.   Yes.  This is an example, yes.
16         MR. VALDIVIESO:  Counsel, do you have
17 any questions for your witness?
18         MS. SCHAECHER:  I have none.
19         Jessica?
20         MS. FULLER:  No questions.  Thank
21 you.
22         THE WITNESS:  Thank you.
23         MS. SCHAECHER:  Counsel on the phone?
24         THE WITNESS:  They've all gone to
25 sleep.

Page 268

1         MS. SCHAECHER:  Okay.
2         MR. VALDIVIESO:  So I have no further
3 questions.  Thank you very much for your time.  I
4 believe we can go off the record now.
5         MS. SCHAECHER:  Wait.  We do request
6 reading and signing.
7         THE VIDEOGRAPHER:  This is the end of
8 media 4 of 4 in the 30(b)(6) deposition of Au Pair
9 Foundation through their designee, Theresa Nelson.
10 Going off the record.  The time is 5:41.
11         (Whereupon, the deposition concluded at
12         5:41 p.m., May 9, 2017.)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 269

1         SIGNATURE OF WITNESS
2
3         I, THERESA NELSON, the witness in the above
4 deposition, have read the within transcript of my
5 testimony.  I have made ____ changes in said testimony
6 and have stated such changes (if any) and the reason
7 for each change on a separate sheet attached to this
8 transcript.  My testimony as given herein is true and
9 correct, to the best of my knowledge and belief.
10
11
12
13         _____
14         THERESA NELSON
15
16 Subscribed and sworn to before me this _____ day of
17 _____, 2017.
18
19         _____
20         Notary Public
21
22 My commission expires _____.
23
24
25

PLAINTIFFS' RESP. APP.0005483

MAGNA
LEGAL SERVICES

Page 270

```
 1      - AMENDMENT SHEET -
        Deposition of THERESA NELSON
 2      taken on May 9, 2017
        The deponent wishes to make the following changes in
 3      the testimony as originally given:
 4      PAGE/LINE    SHOULD READ          REASON FOR CHANGE
 5      _____ _____
 6      _____ _____
 7      _____ _____
 8      _____ _____
 9      _____ _____
10      _____ _____
11      _____ _____
12      _____ _____
13      _____ _____
14      _____ _____
15      _____ _____
16      _____ _____
17      _____ _____
18      _____ _____
19      _____ _____
20      _____ _____
21      Subscribed and sworn to before me this _____ day of
        _____, 2017.
22
23      _____
24              Notary Public
25      My commission expires _____.
```

Page 271

```
 1             REPORTER'S CERTIFICATE
 2             I, LEEANN L. KEENAN, Registered Merit
 3      Reporter and Certified Realtime Reporter within
 4      Colorado, appointed to take the videotaped deposition
 5      of THERESA NELSON, do hereby certify that before the
 6      deposition she was duly sworn by me to testify to the
 7      truth; that the deposition was taken by me at 1801
 8      California Street, Suite 2700, Denver, Colorado; then
 9      reduced to typewritten form herein; that the foregoing
10      is a true transcript of the questions asked, testimony
11      given and proceedings had.
12
13             I further certify that I am not related to
14      any party herein or their Counsel, and have no interest
15      in the result of this litigation.
16
17             In witness hereof I have hereunto set my
18      hand this 19th day of May, 2017.
19
20      _____
                Leeann L. Keenan
21              Registered Merit Reporter
                Certified Realtime Reporter
22              and Notary Public
23
24      My commission expires June 8, 2020
25
```

PLAINTIFFS' RESP. APP.0005484

**MAGNA** ▶
LEGAL SERVICES

Case No. 1:14-cv-03074-CMA-KMT   Document 959-25   filed 03/30/18   USDC Colorado   pg
658 of 700

# Exhibit 447

Page 1

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
-----------------------------x

JOHANA PAOLA BELTRAN, ET AL,

                    Plaintiffs,

        v.                          Civil Case No.
                                    14-cv-03074-CMA-KMT

INTEREXCHANGE, INC., ET AL.,

                    Defendants.

-----------------------------x

             CONFIDENTIAL VIDEOTAPED DEPOSITION
                      OF RUTH FERRY
                   NEW YORK, NEW YORK
                 Thursday, May 11, 2017

Reported by:

JEREMY RICHMAN

JOB NO:   314334

                 MAGNA LEGAL SERVICES

        320 West 37th Street, 12th Floor

             New York, New York 10018

                 (866) 624-6221

PLAINTIFFS' RESP. APP.0005486

MAGNA
LEGAL SERVICES

## Page 2

```
 1
 2
 3
 4                    May 11, 2017
 5                    9:11 a.m.
 6
 7          CONFIDENTIAL VIDEOTAPED DEPOSITION
 8   of RUTH FERRY, held at the offices of Boies
 9   Schiller & Flexner, 575 Lexington Avenue, New
10   York, New York, before JEREMY RICHMAN, a
11   Shorthand Reporter and Notary Public of the
12   State of New York
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1
 2   APPEARANCES:
 3
 4   BOIES SCHILLER & FLEXNER
 5   Attorneys for plaintiffs
 6        575 Lexington Avenue
 7        New York, NY 10022
 8   BY:  RANDALL JACKSON, ESQ.
 9        BYRON D.M. PACHECO, ESQ.
10        (rjackson@bsfllp.com)
11        (bpacheco@bsfllp.com)
12
13   PUTNEY, TWOMBLY, HALL & HIRSON, LLP
14   Attorneys for American Institute For Foreign
15   Study, Inc., d/b/a  Au Pair in America
16        521 Fifth Avenue
17        New York, NY 10175
18   BY:  STEPHEN J. MACRI, ESQ.
19        (smacri@putneylaw.com)
20
21
22
23
24
25
```

## Page 4

```
 1
 2   APPEARANCES (Continued):
 3
 4   GIBSON DUNN
 5   Attorneys for American Institute For Foreign
 6   Study, Inc., d/b/a  Au Pair in America
 7        200 Park Avenue
 8        New York, NY 10166-0193
 9   BY:  ERIC J. STOCK, ESQ.
10        (estock@gibsondunn.com)
11
12   SHERMAN & HOWARD
13   Attorneys for defendant InterExchange
14        633 Seventeenth Street, Suite 3000
15        Denver, CO 80202
16   BY:  JOSEPH H. HUNT, ESQ., via teleconference
17        ALYSSA LEVY, ESQ., via teleconference
18        (jhunt@shermanhoward.com)
19        (alevy@shermanhoward.com)
20
21
22
23
24
25
```

## Page 5

```
 1
 2   APPEARANCES (Continued):
 3
 4   NIXON SHEFRIN HENSEN OGBURN, P.C.
 5   Attorneys for 20/20, A.P.E.X.
 6        5619 DTC Parkway, Suite 1200
 7        Greenwood Village, CO 80111
 8   BY:  KATHLEEN E. CRAIGMILE, via teleconference
 9        (kcraigmile@nixonshefrin.com)
10
11   BOGDAN ENICA, ESQ.
12   Attorneys for defendant Expert Group
13   International dba Expert AuPair
14        111 Second Avenue NE, Suite 204
15        St Petersburg, FL 33701
16   BY:  BOGDAN ENICA, ESQ.
17        (bogdane@hotmail.com)
18
19
20
21
22
23
24
25
```

PLAINTIFFS' RESP. APP.0005487

MAGNA ►
LEGAL SERVICES

Page 6

```
1
2    APPEARANCES (Continued):
3
4
5    GORDON & REES, LLP
6    Attorneys for Au Pair Care
7        555 Seventeenth Street, Suite 3400
8        Denver, CO 80202
9    BY:  PEGGY E. KOZAL, ESQ., via teleconference
10       (pkozal@gordonrees.com)
11
12
13   CHOATE HALL & STUART
14   Attorneys for Cultural Care
15       2 International Place
16       Boston, MA 02110
17   BY:  JUSTIN J. WOLOSZ, ESQ., via
18   teleconference
19       (jwolosz@choate.com)
20
21
22
23
24
25
```

Page 7

```
1
2    APPEARANCES (Continued):
3
4
5    WHEELER TRIGG O'DONNELL, LLP
6    Attorneys for defendant Go Au Pair, Au Pair
7    International, and Agent Au Pair
8        370 17th Street, Suite 4500
9        Denver, CO 80202
10   BY:  NATALIE WEST, ESQ.
11       (West@wtotrial.com)
12
13   PRESENT:
14   ROBERT STEINKOPF, Videographer
15
16
17
18
19
20
21
22
23
24
25
```

Page 8

```
1
2            IT IS HEREBY STIPULATED AND AGREED
3    by and between the attorneys for the respective
4    parties herein, that filing and sealing be and
5    the same are hereby waived.
6            IT IS FURTHER STIPULATED AND AGREED
7    that all objections, except as to form of the
8    question, shall be reserved to the time of the
9    trial.
10           IT IS FURTHER STIPULATED AND AGREED
11   that the within deposition may be sworn to and
12   signed before any officer authorized to
13   administer an oath, with the same force and
14   effect as if signed and sworn to before the
15   Court.
16
17
18
19
20       - oOo -
21
22
23
24
25
```

Page 9

```
1
2            THE VIDEOGRAPHER:  We are
3    now on the record.  This begins
4    DVD number one in the deposition
5    of Ruth Ferry in the matter of
6    Johana Beltran, et al. V.
7    InterExchange, Inc., et al.
8        Today is Thursday, May 11,
9    2017, and the time is 9:11 a.m.
10   This deposition is being taken at
11   575 Lexington Avenue, New York,
12   New York, at the request of Boies
13   Schiller & Flexner, LLP.
14       The videographer is Robert
15   Steinkopf of Magna Legal
16   Services, and the court reporter
17   is Jeremy Richman of Magna Legal
18   Services.
19       Will counsel and all parties
20   present state their appearances
21   and whom they represent.
22       MR. JACKSON:  Good morning.
23   Randall Jackson of Boies Schiller
24   & Flexner on behalf of the
25   plaintiffs.
```

**MAGNA** ▶
**LEGAL SERVICES**

Page 10

```
 1
 2        MR. PACHECO:  Byron Pacheco
 3   of Boies Schiller & Flexner also
 4   on behalf of the plaintiffs.
 5        MR. MACRI:  Stephen Macri of
 6   Putney Twombly Hall & Hirson on
 7   behalf of American Institute for
 8   Foreign Study.
 9        MR. STOCK:  Eric Stock from
10   Gibson Dunn & Crutcher,
11   representing AIFS as well.
12        THE VIDEOGRAPHER:  Will the
13   court reporter please swear in
14   the witness.
15        RUTH FERRY, having been
16   called as a witness, having first
17   been duly sworn by a Notary
18   Public (Jeremy Richman) of the
19   State of New York, was examined
20   and testified as follows:
21        EXAMINATION BY
22        MR. JACKSON:
23   Q.   Thank you.  Good morning.
24   A.   Good morning.
25   Q.   Could you please, for the
```

Page 11

```
 1
 2   record, state your full name?
 3   A.   My full name is Ruth Frizell
 4   Ferry.
 5   Q.   And what do you do for work,
 6   Ms. Ferry?
 7   A.   I work for a cultural
 8   exchange company called the American
 9   Institute for Foreign Study.
10   Q.   Can you tell us what your
11   title is?
12   A.   Yes.  I'm senior vice
13   president for AIFS and director for
14   the Au Pair in America program.  And I
15   also serve as responsible officer to
16   the Department of State.
17   Q.   And just for the record, can
18   you give us your business address?
19   A.   Yes.  One High Ridge Road,
20   Stamford, Connecticut.
21   Q.   Now, Ms. Ferry, have you
22   ever participated in a deposition
23   before?
24   A.   I have.
25   Q.   Okay.  Can I ask, generally,
```

Page 12

```
 1
 2   in what context?
 3   A.   Only in context between
 4   suits that have come up between
 5   customers with Au Pair in America.
 6   Q.   Okay.  Before we go any
 7   further, let me just remind you of a
 8   couple of things that you're probably
 9   somewhat familiar with.
10        The court reporter is
11   transcribing everything in this
12   deposition.
13   A.   Yes.
14   Q.   So I'd ask that you allow me
15   or whomever is asking you a question
16   to fully ask the question before you
17   start to answer.
18        It's important that you
19   provide verbal responses to all of our
20   questions, because even though this is
21   being videotaped, it's being
22   transcribed.  So it's important we
23   have verbal responses.
24        If there's any question that
25   I ask that you don't understand as I
```

Page 13

```
 1
 2   phrased it, please feel free to let me
 3   know that you don't understand it or
 4   ask me if I can ask it in a different
 5   way, and I will do my best to phrase
 6   it in a way that's comprehensible.
 7        If at any point you need a
 8   break or you want to talk to your
 9   attorney, please feel free.  We have
10   spaces outside of this room where you
11   can take a break.
12        The only -- the only request
13   I'd make on that score is that if I'm
14   in the middle of a question, I'd ask
15   that any question be answered before
16   you take the break, if that makes
17   sense.
18        Your counsel, your attorney
19   is also going to potentially make
20   objections today.  And all of those
21   objections will be preserved for the
22   record, but unless your counsel
23   instructs you not to answer the
24   question after an objection is made,
25   you should answer the question.
```

MAGNA
LEGAL SERVICES

Case 1:14-cv-03074-CMA-KMT   Document 935-25   Filed 05/17/18   USDC Colorado   Page 662 of 700

Page 14

1
2      So do you understand that
3  based on the oath that you've taken,
4  you're sworn to tell the truth today?
5      A.   Yes, I do.
6      Q.   Is there any reason that you
7  think you might have difficulty today
8  testifying fully and completely?
9      A.   No reason why I can't do so.
10     Q.   Have you taken any
11  medication or any substance that could
12  impact you today, in terms of your
13  deposition?
14     A.   No, there is not.
15     MR. MACRI:  Mr. Jackson, if
16  I may, just one qualification.
17  I'll be posing objections as to
18  form, in accordance with the
19  local rule.  All other objections
20  will be held until trial, in
21  accordance with the federal
22  rules.
23     MR. JACKSON:  Great.  Thank
24  you.
25     Q.   Now, Ms. Ferry, can you tell

Page 15

1
2  us, how long have you been in your
3  current position?
4      A.   I've been in my current
5  position as director of Au Pair in
6  America program since about 1998 -- I
7  don't know -- 26 years.
8      Q.   How is it you came to get
9  that job?
10     A.   Well, I've always been with
11  AIFS in cultural exchange programs in
12  my professional career.  I worked with
13  them on outbound study programs for
14  youth.
15     And then in 1991, I returned
16  to AIFS as the deputy director for the
17  Au Pair in America program and then,
18  in the late '90s, became the director.
19     Q.   Now, you said that you've
20  always been with AIFS.  When was it
21  that you first came to AIFS?
22     A.   About 1972.
23     Q.   What brought you there?
24     A.   I was looking for a job
25  involved in cultural exchange

Page 16

1
2  programs.
3      Q.   And --
4      A.   That and an ad in the paper
5  was the trick.
6      Q.   Do you remember which paper
7  it was?
8      A.   No.
9      Q.   And in your current work as
10  the director, do you report to anyone?
11     A.   Yes.
12     Q.   Okay.
13     A.   Yes.  I report to the
14  president of AIFS.
15     Q.   Who is that?
16     A.   That's William Gertz.
17     Q.   And does anyone report
18  directly to you?
19     A.   Yes.
20     Q.   How many people?
21     A.   I have three direct reports.
22     Q.   Who are those people?
23     A.   That is the deputy director,
24  the services manager, and my personal
25  assistant.

Page 17

1
2      Q.   Now, did you do anything to
3  prepare for this deposition today?
4      A.   Yes.
5      Q.   Without discussing -- well,
6  let me just ask you.  In general, can
7  you describe what you did to prepare
8  for the deposition?
9      A.   I met with my legal counsel.
10     Q.   And did you look at any
11  documents?
12     A.   Many documents.
13     Q.   Have you discussed this
14  deposition with anyone?
15     A.   Yes.  With -- I have.
16     Q.   And apart from your
17  attorney, who have you discussed this
18  deposition with?
19     A.   Individuals within the
20  company that -- so that I could be
21  fully informed to be prepared for a
22  30(b)(6) deposition.  So chief
23  financial officer, the president, my
24  deputy director.
25     Q.   Have you discussed the

PLAINTIFFS' RESP. APP.0005490

MAGNA
LEGAL SERVICES

Page 18

1
2  deposition with any individuals who
3  don't work at AIFS, apart from your
4  attorney?
5      A.   No.
6      Q.   I know you've had a long
7  career with AIFS, but have you ever
8  worked at any other sponsor agencies?
9      A.   No, I have not.
10     Q.   Now, I want to show you what
11 has been marked -- we have -- we're
12 going to identify -- what we're going
13 to mark as Exhibit 1 for this
14 deposition, which is the deposition
15 notice today.
16     (Exhibit 1, marked for
17     identification, Plaintiffs'
18     Agreed Notice of 30(B)(6)
19     Deposition of Defendant American
20     Institute for Foreign Study d/b/a
21     Au Pair in America.)
22     Q.   Have you seen this
23 deposition notice?
24     A.   Yes, I have.
25     Q.   And, in general, can you --

Page 19

1
2  what's your understanding of what your
3  expectations are in connection with
4  this deposition notice?
5      A.   That I need to come prepared
6  to discuss all of the topics that are
7  listed here and respond to any
8  questions to the best of my ability.
9      Q.   Now, if you can turn to page
10 5 of this.  Are those the topics that
11 you're talking about?
12     A.   That's correct.
13     Q.   And do you feel prepared
14 today to discuss all the topics that
15 are identified in this deposition
16 notice?
17     A.   Yes, I do.
18     Q.   And the discussions that you
19 had with other people at AIFS and your
20 attorney, did they include discussion
21 of all these topics, your preparation
22 for all -- discussion of all these
23 topics?
24     A.   Well, the topics that would
25 be relevant to the individual I was

Page 20

1
2  speaking to, who would have the
3  information.  Yes, to that extent.
4      Q.   That's great.  Thank you.
5      All right.  Let's talk just
6  a little bit through each one of these
7  topics.  The first one on page 5 is
8  corporate structure, your corporate
9  structure, including your legal and/or
10 beneficial ownership.
11     Can you just describe to me
12 a little bit about what sort of --
13 what is the basis for your knowledge
14 on that topic?
15     A.   The American Institute for
16 Foreign Study is owned by the Sir
17 Cyril Taylor, who is chairman and
18 founder of AIFS.  He founded AIFS in
19 1964.
20     It's a privately held
21 company, a Delaware corporation, and
22 its headquarters is in Stamford,
23 Connecticut.
24     Q.   And can you -- can you
25 describe to me how it is that you know

Page 21

1
2  that?
3      A.   I think I've known that
4  since 1972.
5      Q.   The second topic listed here
6  are finances, including financial
7  records, revenue and expense streams,
8  major sources of revenue or funding,
9  profits and losses, and overall
10 financial position.
11     What I'm -- what I'm asking
12 here is, can you just describe
13 generally what kinds of things you did
14 to prepare to be able to talk about
15 that topic?
16     A.   I reviewed with the -- my
17 legal counsel and with the chief
18 information officer, the documents
19 that were provided to Boies Schiller
20 on the revenue and expenses that were
21 requested and submitted to make sure
22 that I understood what was presented.
23     Q.   What about topic three,
24 which includes recruitment, training,
25 placement, and supervision of au pairs

Page 22

1
2   in a number of areas that are
3   described here?
4       A.   I did have -- I'm quite
5   familiar with the process, very
6   involved in the structure of setting
7   up recruitment, training, placement,
8   and supervision of au pairs.
9           Specifically, the placement
10  and supervision of au pairs falls
11  directly under my watch as the
12  director here in the U.S.
13          MR. MACRI:  Some of the
14      folks on the phone are asking for
15      the dial-in number to be sent by
16      email, please.
17          (An off-the-record
18      discussion was held.)
19      Q.   And topic four is your
20  relationship and communications with
21  the State Department and the
22  Department of Labor, including a
23  number of subcategories there.
24          Can you describe for us what
25  you did to prepare for your testimony

Page 23

1
2   on that topic?
3       A.   Well, as responsible
4   officer, I have a pretty thorough
5   relationship and communications with
6   the Department of State.  I'm their
7   primary point of contact, that, along
8   with any alternate responsible
9   officers within our division, I relate
10  to the Department of State directly,
11  not the Department of Labor.
12      Q.   Is it fair to say that
13  you're the most competent person at
14  your organization to talk about this
15  topic?
16      A.   Oh, absolutely.
17      Q.   All right.  What about topic
18  five, which is your relationship and
19  communications with other sponsors,
20  including your membership and
21  associations with other sponsors,
22  including, but not limited to, the
23  Alliance for International Education
24  and the International Au Pair
25  Association?

Page 24

1
2       A.   AIFS has been a longstanding
3   member of the Alliance for
4   International Education.  And I attend
5   their annual meetings and have
6   certainly met with program sponsors
7   there and met with program sponsors at
8   the Department of State.
9           Periodic meetings will occur
10  between the Department of State and
11  all program sponsors.  So I'm
12  certainly familiar with the sponsors.
13      I'm less familiar with the
14  International Au Pair Association.
15  While we're members, it is an
16  international group based outside the
17  company, and my colleague in London
18  would relate more closely to the
19  International Au Pair Association.
20      Q.   So with regard to, I guess,
21  the first part of this topic, would
22  you say that you're the most competent
23  person at your organization to talk
24  about this subject?
25      A.   Yes.

Page 25

1
2       Q.   But your colleague in London
3   would probably be the most competent
4   person with regard, just specifically,
5   to the International Au Pair
6   Association issue?
7       A.   Yeah.  I think I'm pretty
8   familiar, but yes, that's correct.  I
9   just don't have a direct relationship.
10      Q.   Right.  But based on your
11  work and your preparation, do you feel
12  competent to talk about that today?
13      A.   Yes, I do.
14      Q.   Okay.  So topic six would be
15  your analysis and identification of
16  the market in which you operate,
17  including any analysis of the
18  compensation paid to childcare
19  professionals, other than au pairs.
20  And that also includes several -- oh,
21  no.  It's independent.  Excuse me.
22          Can you just describe to us
23  what is sort of the basis of your
24  preparedness to talk about that today?
25      A.   Analysis of the compensation

PLAINTIFFS' RESP. APP.0005492

MAGNA
LEGAL SERVICES

---

**Page 26**

2 paid to childcare professionals, other
3 than au pairs.
4       To be honest with you, I'm
5 not sure what the second part of that
6 statement means, but maybe you could
7 clarify for me what you're asking in
8 the second part of that statement.
9    Q.   Well, I think the first part
10 is really the key here, which is the
11 company's analysis and understanding
12 of the market that you operate in.
13       And the second part is
14 talking about analysis of the
15 compensation paid to childcare
16 professionals who are not au pairs.
17       MR. MACRI:  We have an
18    objection as to foundation on the
19    second part of the inquiry.
20       MR. JACKSON:  Sure.
21       MR. MACRI:  Thank you.
22    A.   Okay.  You know, I have some
23 general knowledge of other -- you
24 know, where families might seek out
25 childcare options across the United

---

**Page 27**

2 States.
3    Q.   Okay.  Do you feel like
4 there's anyone at your organization
5 who would be more competent to talk
6 about that subject, generally, than
7 you?
8    A.   No.  I don't think so.
9    Q.   Okay.  And then the last
10 topic is your documents and document
11 policies, including documents that
12 relate to the topics we've already
13 described above --
14    A.   Mm-hmm.
15    Q.   -- the identity and location
16 of your ESI and ESI systems, your
17 document retention, destruction, and
18 disposition policies, practices, and
19 procedures, and your efforts to
20 preserve documents, data, and ESI
21 relevant to this case since
22 November 13, 2014.
23       Can you just describe to us
24 a little bit about the basis for your
25 competence to talk about that topic?

---

**Page 28**

2    A.   I have met with the chief
3 information officer.  And he and I
4 coordinated right after this
5 November 13, 2014 request to preserve
6 documents and every couple of months
7 remind our staff that we're still
8 under this order to preserve all
9 documents and retention.
10       I have a general knowledge
11 of our retention and destruction
12 policy, although it goes on for pages,
13 but, generally, we retain -- the
14 length of time we retain documents.
15       And I'm not fully aware of
16 all of the ESI systems, but have -- I
17 believe we provided a list or range
18 of, you know, databases and systems
19 that we use.
20    Q.   Okay.  Now, with regard to
21 any of the topics that we just went
22 over, when you had the conversations
23 with other people at your organization
24 about them, did you take any notes?
25    A.   No.

---

**Page 29**

2    Q.   Okay.  Now, just a flashback
3 to your role as director, can you tell
4 us a little bit about what you do,
5 what you do at the organization, very
6 generally, in a little bit more detail
7 than you previously described?
8    A.   Well, it might be best to
9 explain what -- what is under my
10 purview, if you will, my
11 responsibilities.  And that is,
12 generally, to oversee the circulation
13 and placement of -- circulation of au
14 pair applications to prospective
15 families for their selection, the
16 screening and vetting of the host
17 families, including their homes and
18 home environment, the logistics of
19 then arranging for the au pair to come
20 to the U.S., and the monitoring of the
21 placement, according to Department of
22 State regulations.
23       And so through that, I --
24 and then the safe transport home of
25 the international visitor, including

---

MAGNA
LEGAL SERVICES

Case 1:14-cv-03074-CMA-KMT   Document 933-25   Filed 05/17/18   USDC Colorado   Page 666
of 700

| Page 30 |
|---|

```
1
2     any support services during the year
3     from medical, medical evac, to
4     questions that come up about traveling
5     outside of the country during their
6     visit to the U.S. and what the
7     implications are for Visas, but
8     depending on where they might be
9     traveling to or from.
10         And that operation is then
11    managed with a staff, not only in the
12    office, but a field employee network,
13    because we only place au pairs in
14    communities across the United States
15    where we have an employee locally in
16    the community to support the au pair
17    and the hosting family and monitor
18    according to Department of State
19    regulations and to ensure that we have
20    met the goals of this exchange
21    program, which is to provide an
22    exchange -- an educational and
23    emersion exchange that enable people
24    of two different countries to become
25    fully emersed together in the hopes
```

| Page 31 |
|---|

```
1
2     that we might be -- this is soft
3     power -- that we might be having au
4     pairs go home to their home country at
5     the end of the year feeling that they
6     have had an improved relationship with
7     Americans.
8       Q.   When you say soft power,
9     what do you mean by that?
10      A.   Well, the U.S. government
11    looks at how are we going to engage in
12    people -- with people in other
13    countries in peaceful relations.
14          This is an ideal way to do
15    that.  It's bringing people together
16    from different cultures in a very
17    intimate setting and allowing people
18    to get to know one another, share
19    their ideas, share their -- you know,
20    their knowledge of one another's
21    country, and, through that, become
22    friends and feel better about, you
23    know -- instead of the slogans when
24    you're, you know, marching down -- I
25    don't know -- the Champs-Elysees, you
```

| Page 32 |
|---|

```
1
2     know, blasting the Americans for some
3     reason.
4           This is a way to kind of
5     instill positive relations between
6     people of the U.S. and other
7     countries.  I think it's been very
8     successful.
9       Q.   I'm going to use the
10    acronyms for the organizations we've
11    talked about.  Would that be okay for
12    you if I use APIA and AIFS?
13      A.   That's certainly acceptable.
14      Q.   Thank you.
15          Can you describe in general
16    what the relationship is of APIA to
17    AIFS?
18      A.   APIA is one program of the
19    American Institute for Foreign Study.
20      Q.   How many programs are there?
21      A.   I have to give you a count.
22    I think it's six.
23      Q.   Can you describe for us a
24    little bit about what those other
25    programs are?
```

| Page 33 |
|---|

```
1
2       A.   Academic Year in America,
3     which is a high school inbound
4     program.
5           Thank you.  This is much
6     easier.
7           Camp America, which is an
8     inbound summer program where students
9     are coming in to serve as camp
10    counselors in camps across the United
11    States.
12          The College Study Abroad
13    Program, which is Americans studying
14    abroad, usually, a semester or a year
15    abroad programs that include
16    partnerships with American
17    universities to provide their study
18    abroad activities.
19          And Summer Institute for the
20    Gifted, which is youth -- both
21    elementary day programs and summer
22    camp programs on university campuses
23    in the summertime for gifted children,
24    both Americans and international.
25          And then we have Cultural
```

PLAINTIFFS' RESP. APP.0005494

**MAGNA**
**LEGAL SERVICES**

Page 34

```
 1
 2      Services International, which is our
 3   insurance services program.
 4      Q.   Now, in terms of APIA's
 5   work, is it just the au pair program,
 6   or are there other components to the
 7   business?
 8      A.   I'm sorry.  In APIA's --
 9   could you repeat that?
10      Q.   Sure.  APIA focuses on the
11   au pair programs you've been
12   describing?
13      A.   That's correct.
14      Q.   Are there other things that
15   APIA does?
16      A.   Just the au pair program.
17      Q.   And would you say -- in
18   terms of the percentage of AIFS's
19   work, what rough percentage would you
20   say is APIA?
21      A.   Of its work?
22      Q.   Mm-hmm.
23      A.   It's a lot of work.  I don't
24   know how to measure the percentage of
25   work, except to look at the staffing
```

Page 36

```
 1
 2   employees in the field, and I have
 3   another eight employees involved in
 4   the orientation program, six, eight.
 5   That's right.
 6      Q.   As a general matter, what
 7   are those employees in the field
 8   doing?
 9      A.   They're -- well, they're the
10   ones that are fulfilling the
11   requirements of the Department of
12   State, in terms of interviewing the
13   hosting families, vetting the room for
14   the au pair -- prospective au pair,
15   contacting the au pair and the host
16   family at 48 hours, going out and
17   conducting an assessment of the
18   placement at two weeks, staying in
19   monthly contact with the host family
20   and the au pair, stepping back into
21   the placement if they are asked to
22   mediate a problem.
23          They are to fulfill the
24   cultural component of the program,
25   ensure that the cultural emersion for
```

Page 35

```
 1
 2   schedule and say, Well, there's more
 3   staff here than there are down the
 4   street.
 5      Q.   Right.
 6      A.   It's very complex.  There's
 7   a lot of complex wheels.
 8      Q.   No.  I understand.  I
 9   totally understand.
10          Would you say that APIA is
11   the biggest program of AIFS?
12      A.   Well, it depends on how you
13   want to measure it.  If you're
14   measuring it in terms of, you know,
15   staff and staff support, it's probably
16   the biggest.
17      Q.   What about -- what are the
18   other ways that you might measure it?
19      A.   I suppose you could measure
20   it in revenues.  Then it's about -- I
21   don't know -- 20 percent.
22      Q.   And how big is the staff of
23   APIA?
24      A.   I have 33 full-time staff in
25   the Stamford office.  I have 192
```

Page 37

```
 1
 2   the au pair is going well, that she is
 3   being exposed to activities within her
 4   community.
 5          She's learning about her
 6   community, that she's registering for
 7   classes, that she's participating in
 8   those classes, that she's experiencing
 9   America as a whole.
10          Go to a baseball game, you
11   know.  We're all going to a hockey
12   game on Friday night.  Let's do it.
13   So it's those activities.
14      Q.   At any given time,
15   approximately how many au pairs are
16   those 192 people in the field
17   responsible for?
18      A.   Well, it can range from two
19   or three, or it can be -- but on
20   average, it's about 24, 25.
21      Q.   So how many au pairs does
22   your organization typically have
23   placed with a host family at any given
24   time?
25      A.   Repeat that.
```

PLAINTIFFS' RESP. APP.0005495

MAGNA ►
LEGAL SERVICES

1
2      Q.   Sure.  At any given time,
3  approximately how many au pairs are
4  placed with host families in America?
5      A.   Oh, in America.  Okay.  I'd
6  say on any given day of the week, we
7  probably have about 5400 au pairs in
8  country.
9      Q.   Now, I notice that as you're
10 describing what the field personnel do
11 with regard to the au pairs, you're
12 using the pronoun she.
13     Just curious.  What is the
14 sort of breakdown among those 5400 au
15 pairs, generally, between men and
16 women?
17     A.   They're predominantly women.
18 I have a few male au pairs.
19     Q.   When you say predominantly,
20 can you give sort of a range of the
21 rough typical percentage?
22     A.   About 99.8 percent.
23     Q.   Is there any particular
24 reason for that?
25     A.   We don't actively recruit

1
2  male      au pairs.
3      Q.   Why is that?
4      A.   Because our experience in
5  the past was that if a placement --
6  well, first of all, it was very
7  difficult to -- you can always recruit
8  more au pairs than you can families.
9  And there is a tendency for American
10 families not to select male au pairs.
11     So even while we try to
12 restrict and restrict the volume of
13 male au pairs into the program, even
14 of those, if they were selected, if
15 the placement did not work out, the --
16 statistically, it was very difficult
17 for the male au pair to get a second
18 placement.
19     And I feel very strongly
20 that for success of this program,
21 these au pairs need a pretty good
22 sense that they are coming and making
23 a full year commitment, usually, to
24 leave their studies.
25     And if that doesn't work

1
2  out, they're bailing and going home.
3  They can't -- they can't stay on the
4  Visa if they don't have a fully vetted
5  placement within the program.
6      Q.   Right.
7      A.   They can't transfer their
8  Visa to another program sponsor.  So
9  it's very limited, what their
10 possibilities are.
11     Q.   I'm curious, because I
12 remember earlier when you were talking
13 about sort of the soft power.
14     It's one of the goals of
15 your organization, in terms of helping
16 the United States with this
17 overarching mission, in terms of
18 diplomacy and this cultural exchange.
19     A.   Mm-hmm.
20     Q.   In light of that, has there
21 ever been any discussion in your
22 organization about that sort of
23 imbalance between male and female au
24 pairs?
25     A.   I think we've struggled with

1
2  it.  I mean, I think we've struggled
3  with, you know, are there ways to have
4  male au pairs be more accepted?
5      You know, at the end of the
6  day, the decision is on the family.
7  Who do they want in their home?  They
8  choose the individual, and it's their
9  choice.  I'm not in a position to -- I
10 don't place people into homes and say,
11 This is yours --
12     Q.   Right, right.
13     A.   -- to have.
14     Q.   In terms of -- I know you
15 said that your organization struggled
16 with it.  What kinds of things have
17 you thought about doing to sort of
18 address this issue, potentially?  What
19 kinds of things have you discussed to
20 potentially --
21     A.   We've chosen to step away
22 from it.  We've chosen not to actively
23 recruit male      au pairs.  That was
24 our final decision.
25     Q.   Completely understood.  I

MAGNA
LEGAL SERVICES

Page 42

```
 1
 2      guess what I meant is, before you came
 3   to that decision, during the period
 4   when you were struggling with it, were
 5   there steps that were taken within the
 6   organization or discussions that were
 7   had about how you might be able to get
 8   host families to accept more male au
 9   pairs?
10          MR. MACRI:  Objection as to
11      form.
12      A.   To be honest with you, this
13   was so long ago.  We cut off our
14   recruitment of male au pairs --
15   actively recruiting male au pairs in
16   the late '90s.
17          And to this day, the
18   Department of State reports a very low
19   volume of male      au pairs entering
20   the U.S. each year, contrary to some
21   other cultural exchange programs, like
22   the camp program.
23          That's predominantly -- you
24   know, that has a high proportion of
25   males.  So it's -- different programs
```

Page 43

```
 1
 2   are reaching different audiences.
 3          The Au Pair in America
 4   program is only one of many J
 5   programs, and it only accounts for
 6   about 8 percent of the JVs of
 7   participants coming into the United
 8   States each year.
 9      Q.   Are there any other programs
10   that AIFS runs, where there are
11   placements in the home?  Does the camp
12   program involve placements in the
13   home?
14      A.   No.
15      Q.   Do any of the other programs
16   involve placement in the home?
17      A.   Yes.  Academic Year in
18   America.  It's a high school program.
19      Q.   Does Academic Year in
20   America have a similar male/female
21   breakdown, in terms of the -- in terms
22   of the people who are placed?  I'm not
23   sure what you would call them, the
24   high school students.
25      A.   Right.  I -- I'm not
```

Page 44

```
 1
 2   familiar with the breakdown of
 3   percentage of female and male, but
 4   there's probably more of a balance, if
 5   you will.
 6          Like it's probably, you
 7   know -- what is it?  You know, I have
 8   no idea, but it's probably closer to
 9   50/50 than, you know, the alternative.
10      Q.   Why is that?
11          MR. MACRI:  Object as to
12      foundation.
13      A.   I'm not sure I could -- I
14   could begin to guess, but the, you
15   know, high school exchange program is
16   a high school student who is being
17   selected by a family to join them and
18   then attend high school for a semester
19   or a year.
20          And I would -- I'm not going
21   to presume.  I'm not going to presume.
22      Q.   Have there ever been any
23   discussions about that disparity, why
24   that disparity exists?
25      A.   Certainly, no recent
```

Page 45

```
 1
 2   discussions in my memory.
 3      Q.   What about old discussions?
 4      A.   Not in my memory.
 5      Q.   So there's -- you have no
 6   recollection of any discussion about
 7   the disparity between those two
 8   organizations --
 9      A.   No.
10      Q.   -- in terms of the
11   male/female representation?
12          Now, if we could look at --
13   I'd like to show you what we're going
14   to mark as Exhibit 2.
15          MR. JACKSON:  If you could
16      mark this as Exhibit 2.
17          (Exhibit 2, marked for
18      identification, Bates stamped
19      AIFS 0000559.)
20      Q.   Have you seen this document
21   before?
22      A.   I'm not sure that I have.
23      Q.   Let me just give you a
24   moment to take a look through it, if
25   that's okay.  There's no need for you
```

MAGNA ▶
LEGAL SERVICES

---

Page 46

```
1
2     -- well, if you'd like to look at it a
3     little bit more, that's fine, but I
4     think for my questions, there's no
5     need for you to read it exhaustively,
6     but my only question -- my first
7     question really is just, do you think
8     that you've seen this?  Sort of glance
9     through it.
10        A.   I don't believe I've ever
11    seen this before.
12        Q.   Have you seen presentations
13    like this that Au Pair in America has
14    put together?
15        A.   Yes.  In that we prepare
16    presentations within the U.S.  This
17    particular presentation has been
18    prepared by our London office.
19        Q.   What is -- I'm sorry.  I
20    didn't mean to cut you off.  Sorry.
21        A.   Okay.  It would appear to me
22    to be prepared for an informational
23    meeting.  I don't know what Lecco is,
24    but it took place on the 23rd of
25    February 2013.
```

Page 47

```
1
2            And I would -- I would
3     presume -- I don't know.  I would
4     assume the audience is interviewers.
5        Q.   If you could turn to the
6     second page of this, where it says
7     who's who.
8        A.   Yes.
9        Q.   Are you familiar with the --
10       MR. MACRI:  I'm sorry,
11    Randall.  Bates 0561?
12       MR. JACKSON:  Yes.
13       MR. MACRI:  Is that the page
14    we're looking at?
15       MR. JACKSON:  Yes.
16       MR. MACRI:  Thank you.
17       MR. JACKSON:  Thank you.
18    Yes.  Bates 561.
19       MR. MACRI:  Okay.
20       MR. JACKSON:  It's the page
21    that says who's who.
22       Q.   Are you familiar with the
23    individuals who are depicted here?
24       A.   Yes.  I'm familiar with many
25    of them.
```

Page 48

```
1
2        Q.   Is this chart current, this
3     sort of --
4        A.   No, it is not current.
5        Q.   Can you tell me who on this
6     chart is no longer an Au Pair in
7     America employee or is no longer in
8     that role?
9        A.   Nicolien Mostert is no
10    longer    Au Pair in America.
11    Sandra Piksch is no longer with AIFS.
12    Ulrike Pelz is no longer with AIFS.
13    Eleonora Pennini is no longer, Chiara,
14    last name spelled G-A-L-L-I, and
15    Melisha John.
16           Take the bottom row.  They
17    should have put them on the top.
18           Melisha John, M-E-L-I-S-H-A,
19    last name J-O-H-N.
20           All others are still with Au
21    Pair in America, based in our London
22    office.  I can't say that their titles
23    may not have changed.
24       Q.   Okay.  As a general matter,
25    what does Linda James do?
```

Page 49

```
1
2        A.   Linda James --
3           MR. MACRI:  For a point of
4     clarification, this is beyond the
5     scope of the 30(b)(6) notice.
6     This is a separate corporation.
7     This is a UK corporation.
8           MR. JACKSON:  Okay.  Thank
9     you.  Thanks very much.
10          MR. MACRI:  That is not
11    AIFS, Inc.
12          MR. JACKSON:  Thank you very
13    much.  I appreciate it.
14       Q.   I'll just ask a couple of
15    questions about this.  What does Linda
16    James do?
17       A.   Linda James is the senior
18    vice president/director of Au Pair in
19    America, based in the UK office.
20          And her responsibility is
21    for the relationships with -- both
22    building and maintaining relationships
23    with partners in over 50 countries
24    that -- and then provide training and
25    support to those individuals within
```

**MAGNA**
LEGAL SERVICES

Page 50

1
2    those partnerships that recruit and
3    vet and screen applicants for Au Pair
4    in America.
5         She also -- her team is the
6    third layer of the vetting of the
7    applicants for Au Pair in America
8    before they are then sent through to
9    our offices in Connecticut.
10    Q.    And can you help me
11    understand, just generally, what the
12    relationship is between your Stamford
13    office and the -- and the UK office?
14    A.    Well, the Stamford -- the UK
15    office is a separate entity.
16    Q.    Mm-hmm.
17    A.    And the -- there are two
18    primary offices that I would relate
19    to, in that Linda's team is one of the
20    teams that is directly responsible for
21    recruitment, vetting, screening of the
22    au pair applications and preparing
23    them for release to our office
24    under -- and following under the terms
25    of whatever the Department of State

Page 51

1
2    regulations are.
3    Q.    When you say Linda's team,
4    that includes the other people who are
5    identified on this page, apart from
6    the people who have left?
7    A.    Right.  And they've been
8    replaced, by the way.  That was the
9    good news.
10    Q.    For sure.
11         And you said that they are
12    responsible for recruitment, vetting,
13    screening of au pair applications and
14    preparing them for release to your
15    office.
16         Who else is responsible for
17    that, or is it just -- or is it just
18    Linda's team?
19    A.    Also separate from that
20    would be our subsidiary office in
21    Bonn, Germany, which is AIFS Germany.
22         They're responsible for the
23    training of the German interviewers,
24    which would be German speaking -- so
25    it would be Germany, Austria, and

Page 52

1
2    Switzerland -- and the vetting and
3    screening of those applications before
4    they come forward to our office.
5    Q.    Is there anyone else
6    responsible for that, besides the
7    Germany and London office?
8    A.    No.  It all boils up into
9    those two offices.
10    Q.    Who is in charge at the
11    Germany office?
12    A.    That's Thomas Kiechle.
13    Q.    How long has he been in that
14    role?
15    A.    Probably 15 years.
16    Q.    Can you -- I'm sorry for the
17    challenge, but can you spell that last
18    name?
19    A.    K-I-E-C-H-L-E-R, Kiechle.
20    No R on the end.
21    Q.    How frequently do you
22    communicate with Mr. Kiechle?
23    A.    At least four or five times
24    a year, more.
25    Q.    What kinds of things do you

Page 53

1
2    guys talk about?
3    A.    We talk about recruitment
4    and placements.  He's always
5    complaining that we're not placing his
6    au pairs fast enough.  I'm always
7    complaining that he's not sending them
8    to me fast enough.  That's basically
9    it.
10         Certainly, anytime there's a
11    situation involving a German au pair,
12    we would relate back directly to their
13    office.
14         We may ask for their
15    assistance if we have an au pair -- a
16    German au pair or, you know, likewise,
17    London, to get in touch with natural
18    parents or whatever is needed in order
19    to help support a situation or an
20    incident that maybe occurred.
21    Q.    Now, the Germany and the
22    London office are responsible for
23    recruitment of au pairs from different
24    areas.
25         Am I correct about that?

PLAINTIFFS' RESP. APP.0005499

MAGNA
LEGAL SERVICES

Page 54

```
1
2        A.   Repeat the question.
3        Q.   Sure.  Let me ask a
4   different question.
5             What are the geographic
6   areas that the London office is
7   responsible for recruiting au pairs
8   from?
9        A.   Well, we're recruiting on
10  five continents.  So if it is not
11  Germany, Switzerland, and Austria,
12  then all of the other countries are
13  under the umbrella of the London
14  office.
15            Our partnership -- we have
16  an agreement partnership with the
17  companies in those other countries.
18       Q.   So sort of the sun never
19  sets on the responsibilities of the
20  London office?
21       A.   You got it.
22       Q.   And is there a reason that
23  you sort of centralize all of the
24  world recruitment, apart from the
25  Germany, Austria, and --
```

Page 55

```
1
2        A.   Switzerland.
3        Q.   -- Switzerland recruitment,
4   in London and then had a separate
5   operation for those three countries?
6        A.   It's just always been that
7   way.
8        Q.   Are there any countries that
9   the London office recruits the
10  polarity or majority of the au pairs
11  from?
12       A.   Well, there's certainly --
13  you'll find shifts and waves in
14  countries.  About -- over 50 percent
15  of our au pairs are coming from
16  Western Europe.
17            And I'm not sure I can take
18  out of that what percentage then are
19  German, Swiss, or Austrian, but the
20  most popular countries outside of that
21  would be South Africa, with fewer
22  applicants coming from Namibia or
23  Malawi.
24            In South America, the
25  largest recruiting country -- the
```

Page 56

```
1
2   largest country is Brazil, but we're
3   also recruiting in Colombia and Chile
4   and Central America, you know, Panama,
5   and Costa Rica and El Salvador and --
6   I don't know.  Where else?
7             We also have a subsidiary
8   office in Australia, but the
9   Australian applicants are going
10  through our London office for a final
11  vetting.
12            And New Zealand, China,
13  Thailand, South Korea, Canada.  Let's
14  not forget Canada and Mexico.  Let's
15  not forget Mexico.
16       Q.   Have you ever been in any
17  discussions about the reason that
18  50 percent of the      au pairs come
19  from Western Europe?
20            MR. MACRI:  Objection,
21  foundation.
22       A.   I think the primary reason
23  is that when the program started, you
24  could only bring      au pairs from
25  Western Europe.
```

Page 57

```
1
2             Prior to full federal
3   regulations as a test pilot program,
4   it was only open to recruitment in
5   Western Europe.
6             The concept of being an au
7   pair, living with a family, is very
8   Western European centric.  So I think
9   that the ramp-up, if you will, of
10  recruitment across other countries is
11  slower.
12            It also gets somewhat fed by
13  what's the interest of the family.
14  And when families are looking for an
15  exchange participant, they tend -- you
16  know, certainly, a segment of them
17  will look for a specific language.
18            So, you know, the Spanish
19  speaking countries in South and
20  Central America become very popular,
21  because they're Spanish speaking.  And
22  you can never seemingly get enough
23  applicants out of Spain.
24            And you'll see recruitment
25  levels in some countries grow and
```

PLAINTIFFS' RESP. APP.0005500

MAGNA ▶
LEGAL SERVICES

1
2  expand, shift over -- over the years.
3      The French is French. You
4  can't go to too many places to find
5  French speaking. And, you know,
6  Scandinavia is the same way.
7      And then the challenge is
8  getting applicants who may have
9  particular dialects, you know. I
10  don't want Spanish. I want Catalan.
11  You know, I don't want Stockholm
12  Swedish. I want Northwest Island
13  Swedish.
14      So it's -- you know, that's
15  -- that's part of the driver is
16  where -- what are families looking
17  for?
18  Q. Sure. In terms of South
19  Africa, has the organization looked at
20  why South Africa sort of leads among
21  the African countries, in terms of the
22  au pair placement?
23      MR. MACRI: Objection as to
24  foundation.
25  A. We -- yeah. Easy. Because

1
2  we started a subsidiary office there
3  and based it in Cape Town. And so we
4  intentionally started to build from
5  there.
6      It is no longer a subsidiary
7  office, as it was not -- but that's
8  where we began.
9      MR. JACKSON: Counsel,
10  just -- if we could take a moment
11  just for my understanding.
12      Could you tell me what you
13  mean when you say objection to
14  foundation in this context?
15      MR. MACRI: Okay. As I
16  understand it from being
17  instructed by my local counsel,
18  there are requirements in the
19  local rules in addition to
20  Colorado that an objection has to
21  be specified with respect to form
22  or foundation.
23      MR. JACKSON: Oh, okay. I
24  just -- I just meant -- I don't
25  want to -- I don't want to ask an

1
2  improper question if I can avoid
3  it, but I just wondered if you
4  could give me insight on what you
5  mean by foundation in that
6  context.
7      MR. MACRI: There was no
8  basis in the witness's testimony
9  previously for you to ask that
10  question.
11      MR. JACKSON: Okay. Okay.
12  Q. Now, can we -- can we take a
13  look at Exhibit 3 -- what we're going
14  to mark as Exhibit 3, which is a
15  document entitled Stamford Staff and
16  Organizational Chart?
17      (Exhibit 3, marked for
18  identification, Bates stamped
19  AIFS0003887.)
20      MR. HUNT: Counsel, for
21  those of us on the phone, could
22  we have a Bates number, please?
23      MR. JACKSON: Yes. This is
24  Bates number AIFS0003887.
25      MR. HUNT: Thank you.

1
2      MR. JACKSON: No problem.
3  Q. Have you had a chance to
4  take a glance at this?
5  A. Yes.
6  Q. Are you familiar with this
7  document?
8  A. Yes, I am.
9  Q. Can you just tell us what
10  we're looking at here?
11      MR. MACRI: Are we on the
12  second page of the document,
13  3888, or are we anywhere in
14  particular --
15      MR. JACKSON: I'm not
16  anywhere in particular.
17      MR. MACRI: Okay.
18      MR. JACKSON: I just -- I
19  just meant generally, but
20  we'll -- we'll walk just briefly
21  through it.
22  A. Okay. Well, 3888 is our
23  organizational chart of the team that
24  I'm responsible for in Stamford, along
25  with the appointed lines to the field

PLAINTIFFS' RESP. APP.0005501

MAGNA
LEGAL SERVICES

Page 62

```
1
2   staff as well.  So the -- that's what
3   it is.
4       Q.   Okay.  Is this chart still
5   accurate?
6       A.   Actually, it's -- yeah.  I
7   guess it's sort of accurate.  I
8   realize there's, you know -- yeah.
9   It's accurate.
10      Q.   Where it says director on
11  this chart, is that your current
12  position?
13      A.   That's me.
14      Q.   Okay.  And there are --
15  there are a few different components
16  here.  First, who is currently the
17  deputy director?
18      A.   Jean Quinn.
19      Q.   How long has she been in
20  that role?
21      A.   Probably more than 15.  I
22  want to say 18 years.
23      Q.   There's a point here where
24  it branches off, and it says
25  orientation trainers.
```

Page 63

```
1
2       A.   Correct.
3       Q.   What do those orientation
4   trainers do?
5       A.   Well, it should be
6   orientation team, because the
7   orientation team are the lead
8   orientation, those that provide the
9   program, deliver the program, the
10  orientation program to the au pairs,
11  plus the logistic staff that's present
12  at the orientation to handle any
13  logistics and sort out any details,
14  take care of sick au pairs, whatever.
15      Q.   What about the program
16  services manager?  What does the
17  program services manager do?
18      A.   So the program services
19  manager would oversee the regional
20  program managers.  The community
21  counselors report up to the regional
22  program managers.
23           And she also -- so she would
24  provide training and support,
25  communication with community
```

Page 64

```
1
2   counselors.
3           She also has the education
4   administrator, who fulfills -- makes
5   sure that we are fulfilling the
6   education component for the program
7   and tracking the education details of
8   au pairs for the completion of their
9   education component.
10          And then there's a program
11  administrative assistant.
12      Q.   What does the insurance
13  division do?
14      A.   Where's insurance?  Oh, at
15  the bottom, support divisions.
16          The insurance division -- it
17  would be Cultural Services Insurance
18  International that handles both the
19  medical and liability insurance for au
20  pairs.
21      Q.   Who is in charge of the
22  accounting team right now?
23      A.   The accounting team would be
24  James Mahoney.
25      Q.   Where is Mr. Mahoney's
```

Page 65

```
1
2   office?
3       A.   In the Stamford,
4   Connecticut, office.
5       Q.   How often do you talk to
6   Mr. Mahoney?
7       A.   Every day at lunch, some
8   frequency.
9       Q.   Is he a person who's under
10  your supervision?
11      A.   No, he's not.
12      Q.   And then there's a community
13  relations manager.  Can you tell us
14  what that person does?
15      A.   Her job is to relate to the
16  community counselors to look at how to
17  provide outward facing community wide
18  events at the local community level.
19          She also trains community
20  counselors on how to effectively
21  follow up with prospective families
22  who may have expressed interest in the
23  program.
24          And she will coordinate
25  those efforts in line with our
```

PLAINTIFFS' RESP. APP.0005502

MAGNA
LEGAL SERVICES

Page 66

```
 1
 2      marketing and -- our marketing team,
 3      our AIFS based marketing team, who
 4      handles sort of the national marketing
 5      campaigns.
 6          Q.   Who is the current community
 7      relations manager?
 8          A.   That's Blair Steinberg.
 9          Q.   Underneath the regional
10      program manager, there is a box for
11      the community counselors?
12          A.   Correct.
13          Q.   Can you explain what those
14      people do?
15          A.   The community counselors
16      reside in the community where we place
17      au pairs.  And their job is to
18      interview prospective families in the
19      community, follow up and answer their
20      questions, then, if they plan to join
21      the program, interview them within the
22      home, all the adult members, confirm
23      that the room would be appropriate for
24      placement of an au pair and that the
25      intent -- that the family has an
```

Page 67

```
 1
 2      intent of including a cultural
 3      component for the program.
 4              Then they monitor the
 5      placements when the au pair arrives in
 6      the community, according to the
 7      Department of State regulations, works
 8      to fulfill the cultural emersion
 9      components that are unrelated to the
10      aspects of the home life, but how to
11      help the au pair acclimate within the
12      community, register for classes, and,
13      if necessary, help problem solve, if
14      the family and the au pair are looking
15      for a mediator, if they're having
16      challenges, problem solving, and
17      supporting the au pair.
18          Q.   Who is it that is in charge
19      of the community counselors?
20          A.   They -- well, ultimately,
21      me, but the community counselors
22      relate up to the regional program
23      managers, and the regional program
24      managers relate up to the program
25      services manager.  And that relates up
```

Page 68

```
 1
 2      to me.
 3          Q.   How many community
 4      counselors are there?
 5          A.   About 192.
 6          Q.   Are they all based out of
 7      Stamford?
 8          A.   No.  They live in the
 9      communities where we're placing au
10      pairs.
11          Q.   And what are some of those
12      communities?
13          A.   Well, we're in about 40
14      states.  So I don't know where to
15      begin.  Do you want me to list them?
16          Q.   No, no.
17          A.   Okay.  Good.
18          Q.   Let me just ask you.  Are
19      there any cities that represent an
20      outsize, you know, representation, in
21      terms of the placement of au pairs
22      from the organization?
23              MR. MACRI:  Objection, form.
24          A.   Well, typically, au pairs
25      are placed in suburban communities,
```

Page 69

```
 1
 2      not in cities.  The condition -- the
 3      first condition of the placement is
 4      that the family needs to have a spare
 5      bedroom, a private room that they can
 6      dedicate only to the au pair.
 7              And so that just forces that
 8      into, but -- so we're predominantly,
 9      certainly, in suburban areas outside
10      major cities across the U.S.
11              So you could start with
12      Boston, you know, New York, the
13      Tri-State area, the Greater
14      Washington, D.C., area, Atlanta, and
15      then, you know, Miami and Orlando and
16      Austin and Houston and Dallas and Fort
17      Worth and Colorado and Indianapolis
18      and Chicago and --
19          Q.   That's great.
20          A.   And then just go west.  Keep
21      going.
22          Q.   That's great.  That's great.
23              And I guess once the au
24      pairs -- in each one of these cities,
25      once the au pairs have been placed,
```

PLAINTIFFS' RESP. APP.0005503

MAGNA

LEGAL SERVICES

Page 70

```
 1
 2      are the community counselors the
 3      people who are the primary point of
 4      contact for them?
 5          A.   Yes.  The caveat being that
 6      any community -- any au pair and/or
 7      host family can also be in contact
 8      with our office directly, but yes, the
 9      community counselor serves as the
10      primary point of contact.
11          Q.   How do you -- what are sort
12      of the qualifications for somebody to
13      be a community counselor?
14          A.   We're looking for somebody
15      that can do just about everything.  I
16      mean, we're looking for
17      somebody that -- it might be easier
18      for me to describe the type of
19      candidate that makes for a good
20      community counselor.
21          So someone who is -- either
22      themselves has studied and/or lived
23      abroad, has an understanding of
24      emersion in their own -- in another
25      culture themselves.
```

Page 71

```
 1
 2          Teachers are very often --
 3      will apply for this type of program.
 4      Social workers who have experience in
 5      mediation and problem solving and/or
 6      working with young adults, that 18 to
 7      26 category.
 8          If they -- it's always nice
 9      if they have -- more than one language
10      can be helpful, but we're looking for
11      someone that has, you know, experience
12      in this.
13          We have some that started
14      out as hosting families themselves and
15      decided to -- it was something they
16      enjoyed, but they wanted to serve in
17      the community counselor role.
18          Q.   Are any of the community
19      counselors involved in recruiting host
20      families?
21          A.   Well, recruiting in that
22      this is a big referral business.  So
23      yes.  Once a community counselor is
24      established in the community as a
25      community counselor, I would like them
```

Page 72

```
 1
 2      to be known as the go-to person in the
 3      community if you want to know about an
 4      au pair program.  And that is only
 5      if -- that follows the reputation.
 6          Q.   Do they ever have any role
 7      in trying to make sure the host
 8      families pay the weekly stipend to au
 9      pairs?
10          MR. MACRI:  Objection, form
11      and foundation.
12          A.   No, they do not.
13          Q.   Are they ever involved if
14      there's a dispute about payment with
15      host families?
16          MR. MACRI:  Same objections.
17          A.   No, they do not.
18          Q.   Are they ever involved in
19      any of -- sort of money or monetary
20      aspects of the host families's
21      relationship with au pairs?
22          A.   No, they do not.
23          Q.   Is the compensation of the
24      community counselors, is it flat, or
25      does it have any relationship to the
```

Page 73

```
 1
 2      number of au pairs that they are
 3      working with?
 4          MR. MACRI:  Objection as to
 5      form.
 6          A.   The compensation is based on
 7      services rendered.  So there is a
 8      payment that they would receive for
 9      conducting an interview, for example.
10      There's a separate payment if they're
11      conducting an assessment.
12          There is an annualized
13      payment that is paid, but broken down
14      into payments, based on -- for each au
15      pair and host family that  is in --
16      so for a specific host family and
17      au pair that is in their community,
18      each month they would receive a
19      portion of this annualized fee for the
20      ongoing monitoring of the placement.
21          They receive a separate
22      expense they can put towards the
23      expenses to conduct cluster meetings.
24          Q.   Okay.  So in part of that,
25      you were saying that they get a
```

PLAINTIFFS' RESP. APP.0005504

MAGNA
LEGAL SERVICES

Page 74

1
2  separate fee, that they have a -- so
3  they have a base payment that is their
4  base salary.
5        Am I correct about that?
6    A.   Well, the base salary, if
7  you will, the annualized fee, is per
8  host family or au pair.  So if you're
9  asking, well, you know, do they make
10  more money if they have more au pairs
11  or host families?  Yes.  Because it's
12  per host family and au pair placement.
13        And then the additional
14  fees, if they're conducting an
15  interview with a family, they would
16  receive a payment for that, whether
17  the family continues with the program
18  or not.
19        If they're -- and they're
20  required to conduct a two-week
21  assessment, and they're required to --
22  with new families, to conduct an
23  orientation.  There are separate
24  payments for those.
25    Q.   And what are those payments?

Page 76

1
2  performance -- if the performance of
3  the community counselor handling 30
4  families is poor, then I would not be.
5        However, when that community
6  counselor was able to handle 20, did
7  an excellent job, then we would make
8  some changes.  We would bring in a
9  second community counselor.
10        The only -- the Department
11  of State requirement is that a
12  community counselor cannot have
13  responsibility for more than 15  au
14  pairs in a cluster and hold another
15  full-time job.
16    Q.   Okay.  For most of your
17  community counselors, is it a
18  full-time job?
19    A.   No.
20    Q.   So for what percentage of
21  them is it a full-time job?
22    A.   Maybe 35 or 40 percent.
23    Q.   And for the -- for the
24  community counselors for whom it's a
25  full-time job, what is the maximum

Page 75

1
2    A.   They would range around --
3  for an interview and assessment, they
4  would range around 70 to $80.
5    Q.   Okay.  70 or $80 per
6  interview and assessment?
7    A.   Yes.
8    Q.   What about for placements?
9    A.   So the annualized fee can
10  range, based on years of service,
11  from -- I don't know what the low
12  is -- about 800 to 1100, 1200, 1100,
13  maybe more, 1200.
14    Q.   So each community counselor
15  gets somewhere between 800 and $1200
16  as an annualized fee per host family
17  that they're dealing with?
18    A.   Right.
19    Q.   Is there a limit to the
20  number of host families that a
21  particular community counselor can be
22  responsible for?
23    A.   It depends on the individual
24  community counselor.  It's determined
25  by her performance.  If her

Page 77

1
2  number of host families that you've
3  seen a community counselor dealing
4  with?
5    A.   The highest that I think
6  I've seen is maybe 68.
7    Q.   What's the average?
8    A.   The average number is 24, 25
9  in a cluster.
10    Q.   Just to be clear, when you
11  say in a cluster, the cluster refers
12  to --
13    A.   The cluster is the --
14    Q.   I'm sorry.  I appreciate you
15  trying to -- let me try to finish
16  that.
17        The cluster refers to the
18  specific number of host families that
19  a particular community counselor is
20  dealing with?
21    A.   That's correct.
22    Q.   Okay.  Now, apart from
23  the -- apart from the 70 to $80 per
24  assessment and the 800 to $1200 per
25  host family annualized fee, are there

PLAINTIFFS' RESP. APP.0005505

MAGNA
LEGAL SERVICES

Page 78

1
2  any other sort of incentive payments
3  that can go to a -- that can go to a
4  community counselor?
5       A.   Well, community counselors
6  are employees.  So they have the full
7  benefits of -- that any AIFS employee
8  might be entitled to.  So, certainly,
9  a portion of them have insurance
10 benefits.
11      And then we have a myriad of
12 benefit offers from covering gym
13 membership costs to educational costs.
14 We encourage our employees to take
15 educational courses, especially those
16 that will enhance their skill set in
17 the roles that they're -- that they're
18 in.  So a myriad of other benefits.
19      There may be one special
20 incentive program during the time
21 that -- to generate new leads or
22 referrals that the au pair -- that the
23 community counselor may be able to
24 take advantage of.
25      She's offered incentives if

Page 79

1
2  she is able to get a story in the
3  local paper, for example, about her
4  hosting family and one of the hosting
5  families and au pairs in the
6  community.
7       Q.   What is the incentive for --
8  what is the incentive payment for a
9  media placement like that?
10      A.   Somewhere around a hundred
11 or --
12      Q.   Besides the media placement
13 incentive, what other incentives are
14 there?
15      A.   There are other incentives
16 for social media placement that's less
17 than a hundred, you know.  That would
18 be different from a print -- full on
19 print article.  So it would be less
20 money.
21      Q.   How much is the social media
22 placement incentive?
23      A.   I want to say it's around 35
24 or -- not more than 50, I don't think.
25      Q.   Is there an incentive

Page 80

1
2  payment if an  au pair leaves a host
3  family and the community counselor is
4  able to place them with another host
5  family?
6            MR. MACRI:  Objection as to
7       form and foundation.
8       A.   No.  There's not an
9  incentive.  We will make a payment to
10 a community counselor who may have
11 worked with the au pair to find --
12 placement breaks.
13      The host family leaves the
14 program.  The au pair is looking for a
15 new placement.  The counselor does not benefit
16 not -- the counselor does not benefit
17 from the placement, because the
18 placement goes -- the au pair is
19 placed with a family in another
20 cluster community.
21      Then we will make a payment
22 to that community counselor who helped
23 ensure that the placement carried on,
24 but she's not going to get the
25 ongoing -- she would not get an

Page 81

1
2  ongoing fee as a result of that au
3  pair, but she did provide the services
4  to help the    au pair get placed
5  into a new location.
6       Q.   What is the average total
7  compensation for the non full-time
8  employee community counselors?
9            MR. MACRI:  Objection as to
10      form, foundation.
11      A.   That's going to -- that's
12 going to have a big range.
13      Q.   What is the range?
14      A.   From -- I don't know how to
15 determine that.  So if you only have
16 two or three families, then you've got
17 an annualized fee of, you know -- so
18 now you've got -- it's going to be
19 less than $8,000 a year.
20      Q.   And what about at the top
21 end of that range?
22      A.   Probably $70,000 a year.
23      Q.   Okay.  What about for the
24 full-time employees?
25      A.   Well, that would be

PLAINTIFFS' RESP. APP.0005506

MAGNA
LEGAL SERVICES

Page 82

```
 1
 2    full-time.  I'm sorry.
 3      Q.   Don't be.
 4      A.   That would not be -- 70,000
 5    would not be a part-time employee.
 6      Q.   Part-time.
 7          Okay.  So for the -- let me
 8    just back it up to the part-time
 9    employees.  I'm just asking first,
10    what is the range -- sort of average
11    or the range for the -- in terms of
12    total compensation for the part-time
13    employees?
14      A.   Then I think the range would
15    be, certainly, less than 8,000 to --
16    up to about 24,000, 25,000.
17      Q.   And what about for the
18    full-time employees?
19      A.   So then you're over 25,000
20    to about 70,000, with a very small
21    number at the top.
22      Q.   Is there anyone else, other
23    than community counselors, who get
24    incentive payments at your
25    organization in connection with the
```

Page 83

```
 1
 2    placement of au pairs with host
 3    families?
 4      A.   Our placement services
 5    coordinators --
 6      Q.   Okay.
 7      A.   -- are certainly
 8    incentivized to meet placement goals.
 9      Q.   And how are they
10    incentivized?
11      A.   They could be incentivized
12    with, you know, stay late and let's
13    see if we can meet this goal this
14    week, and we all get lunch next week
15    to, we'll give you, you know, a
16    hundred dollar gift card if you're the
17    top matcher of the week.
18          Generally, small incentives
19    like that.  They are aware that a
20    portion of their salary is -- can be
21    earned in meeting monthly -- monthly
22    goals, monthly placement goals.
23      Q.   Can you explain just a
24    little bit more about that, that a
25    portion of the salary is connected to
```

Page 84

```
 1
 2    meeting monthly goals?
 3      A.   I shouldn't say it's
 4    connected, because they receive a
 5    salary.  They receive a salary.  And
 6    there is a bonus structure in place.
 7    And that bonus structure -- there is a
 8    goal set each month, and they need to
 9    exceed the goal to receive the bonus.
10          And the bonus is -- it's
11    based on placements that go over the
12    base, and the goal -- and the bonus
13    amount is like $15 a placement.
14      Q.   Okay.  One of the things
15    that you mentioned earlier was the
16    extent to which the community
17    counselors -- the extent to which you
18    will regulate the number of host
19    families which they can deal, based on
20    performance.
21          Can you explain how
22    performance is evaluated for community
23    counselors?
24      A.   Primarily, through the
25    surveys from hosting families and au
```

Page 85

```
 1
 2    pairs.  So the surveys that -- we have
 3    host families and au pairs complete
 4    surveys at the end of their term.
 5          We then produce, at the end
 6    of each year, a report of those survey
 7    results to the community counselor,
 8    along with any comments.  And we set
 9    up a phone discussion with them to
10    review the surveys.
11          We also provide them with a
12    statistical data report on the
13    activity that's occurred within their
14    cluster in the last year.
15          So the number of leads that
16    they've -- that have occurred within
17    that cluster community, the number
18    of -- the lead conversion, the
19    cluster, the number of repeat
20    customers that have remained in the
21    program, the number of families that
22    have dropped from the program, the
23    number of new families that have
24    joined the program.
25          We also give them -- provide
```

PLAINTIFFS' RESP. APP.0005507

MAGNA ◆
LEGAL SERVICES

Page 86

```
1
2     them with some market data -- market
3     share data on the volume of au pair
4     placements that are in that state,
5     according to the Department of State.
6        Q.   Okay.  Now --
7        A.   Before we go on, could we
8     take a break?
9        Q.   Yeah.  Absolutely.
10       A.   Good.
11          MR. MACRI:  Perfect spot.
12          THE VIDEOGRAPHER:  We're now
13    off the record.  The time is
14    10:41 a.m.
15          (Time noted:  10:41 a.m.)
16          (Recess.)
17          (Time noted:  10:50 a.m.)
18          THE VIDEOGRAPHER:  We're now
19    on the record.  The time is
20    10:50 a.m.  This begins DVD
21    number two.
22       Q.   Okay.  So I want to show you
23    a document that we're marking as
24    Exhibit 4, which is a -- which is
25    Bates stamped AIFS0058232.
```

Page 87

```
1
2          And this is a letter that
3     says Community Counselor Letter of
4     Agreement 2009.
5          (Exhibit 4, marked for
6           identification, Bates stamped
7           AIFS0058232.)
8        Q.   Now, do you recognize this
9     document?
10       A.   I do.
11       Q.   And what are we looking at
12    here?
13       A.   This is an independent
14    contractor agreement between Au Pair
15    in America and community counselor,
16    which was in effect in 2009.
17       Q.   Are you still using this
18    agreement?
19       A.   No, we are not.
20       Q.   When did you stop using it?
21       A.   In -- what year is it?
22    2017.  We stopped using it in 2015.
23       Q.   Are you using a similar
24    document now?
25       A.   It's an employment
```

Page 88

```
1
2     agreement.  There are some aspects of
3     this that are similar.
4        Q.   So did you make the
5     transition from the individuals
6     affected by this being independent
7     contractors to being employees?
8        A.   Ask the question again.
9          MR. MACRI:  Yes.  Objection
10    as to form.  Would you try that
11    again?
12       Q.   What was the reason that you
13    stopped using this agreement?
14       A.   Because we made the decision
15    that we would move all of our field
16    staff into employment positions.
17       Q.   And they were previously
18    independent contractors?
19       A.   That's correct.
20       Q.   Now, let me just ask you.
21    If you could turn to page three of
22    this document.
23       A.   Is that 58234?
24       Q.   Yes.  At paragraph eight,
25    one of the things it says here is,
```

Page 89

```
1
2     "Community counselors are required at
3     a minimum to contact au pairs and host
4     families on a monthly basis and
5     maintain a record of all contacts"?
6        A.   That's correct.
7        Q.   Is that an obligation that
8     was one that was actually practiced
9     during the time period that this
10    agreement was in place?
11       A.   Yes.
12       Q.   Has your organization
13    maintained the written records of
14    contacts, community counselors with
15    their host families?
16       A.   Yes, we have.
17       Q.   Do you still require
18    community counselors to maintain a
19    written record of all contacts with
20    host families?
21       A.   Yes.
22       Q.   And is that -- are those
23    records maintained by your
24    organization?
25       A.   Yes.  They're held in our
```

PLAINTIFFS' RESP. APP.0005508

MAGNA
LEGAL SERVICES

Page 90

1
2  data system.
3     Q.   Okay.  Now, one of the other
4  items here at paragraph three on the
5  page that ends in Bates 58233 is,
6  under the description of duties, it
7  instructs the community counselors to
8  coach the host family during the
9  placement process and communicate the
10  host family's priorities to the
11  placement service coordinator?
12     MR. MACRI:  Objection, form.
13  We have no objection to what the
14  document says.
15     MR. JACKSON:  Okay.
16     Q.   What is meant by coach the
17  host family?
18     A.   What we were looking for is
19  to encourage the community counselor
20  to speak to the host family about the
21  type of au pair that they might be
22  looking for and communicate that to
23  our placement services coordinator,
24  who can in turn help try to identify
25  candidates that might meet that

Page 91

1
2  criteria.
3     There are two -- there are
4  actually multiple different ways that
5  -- a family can self-search, or a
6  family will say, I don't have time.  I
7  want to -- you know, I'm looking for
8  something that's got green hair and
9  can jump through round hoops.  I'd
10  like you to try and find it.
11     Q.   Now, in the second part of
12  this paragraph, it says that the
13  effort may require resetting the host
14  family's expectations in consideration
15  of the supply of available au pair
16  applicants?
17     A.   In that -- and here we kind
18  of come back to our discussion earlier
19  today about an au pair -- family's
20  expectation that they want someone to
21  speak a particular dialect of a
22  language.
23     And we may not be able to
24  have that, but are they open to maybe
25  opening up and considering something

Page 92

1
2  different?
3     Some families will approach
4  it, and they'll make a decision in
5  their own mind that anybody that is in
6  a particular -- the applicant must be
7  over a certain age.  Otherwise,
8  they're immature.  And maturity or
9  immaturity is not measured by age.
10     Q.   Okay.  Is there anything in
11  the responsibilities that are -- that
12  were laid out for these community
13  counselors about communicating to
14  those families how much they were
15  expected to pay au pairs?
16     MR. MACRI:  Objection, form
17  and foundation.
18     A.   Ask me the question again,
19  please.
20     Q.   Sure.  Is there anything in
21  this document, in terms of their
22  duties, the duties that you
23  communicated to the community
24  counselors, about what community
25  counselors were expected to

Page 93

1
2  communicate to host families regarding
3  how much they were expected to pay?
4     MR. MACRI:  Objection as to
5  form.
6     A.   I don't believe so.
7     Q.   Is talking to the host
8  family about payment one of the
9  responsibilities of the community
10  counselors?
11     A.   No.  Only if the question is
12  raised by the hosting family.
13     Q.   Okay.  If it is raised by
14  the hosting family, though, the
15  community counselor is expected to be
16  able to talk with them about payment
17  issues, right?
18     A.   The community counselor is
19  expected to understand how the minimum
20  wage is established by the Department
21  of State and -- and that it is a
22  minimum.  A family can't set their own
23  base minimum below that.  So they need
24  to understand how that amount was
25  derived.

PLAINTIFFS' RESP. APP.0005509

MAGNA
LEGAL SERVICES

Page 94

1
2      Q.   Okay.  So you're saying that
3   at the time that this document was in
4   place, the training of community
5   counselors was that they were
6   instructed to inform the families that
7   it was -- that there was a minimum
8   payment?
9          MR. MACRI:  Objection as to
10     form and foundation.
11     A.   No.  Only if they're
12  prepared to answer -- only in that
13  they need to be prepared to answer a
14  question directly from a host family
15  about that, but, generally, by the
16  time a community counselor is engaged
17  in, say, an interview with a hosting
18  family, the hosting family has already
19  received that information in their
20  agreement.
21     Q.   And when you say -- I think
22  what you said earlier is that the
23  community counselor is expected to
24  understand how the minimum wage is
25  established by the Department of State

Page 95

1
2   and that it is a minimum.
3          Is that something that you
4   specifically train the community
5   counselors on?
6      A.   Yes.
7      Q.   Okay.  And in the record --
8   in the records of communications, the
9   written records of communications of
10  contacts between the community
11  counselors and the host families, is
12  that ever a topic of discussion that
13  you saw recorded?
14         MR. MACRI:  Objection to
15     form.
16     A.   No.  I'm not familiar enough
17  with that.
18     Q.   Aren't the community
19  counselors also --
20         MR. MACRI:  I'm sorry.
21     You're inverting us on the
22     transcript.
23     Q.   A moment ago, when we were
24  talking about the -- their preparation
25  to answer that question, that it's

Page 96

1
2   only a minimum, has it always been the
3   understanding of -- has it always been
4   the understanding of your organization
5   that it's only a minimum?
6      A.   Yes.
7      Q.   Okay.  And has there ever
8   been a point, to your knowledge, where
9   the organization instructed any
10  community counselors that that stipend
11  could be the appropriate full payment?
12     A.   As long as it's not less
13  than that.
14     Q.   And isn't it the case that
15  the community counselors have a
16  recruitment role in connection with
17  host families?
18         MR. MACRI:  Objection, form,
19     foundation.
20     A.   Yes.
21     Q.   In connection with
22  recruitment, wouldn't the community
23  counselors need to be able to talk to
24  host families about the potential cost
25  of bringing an au pair into the home?

Page 97

1
2          MR. MACRI:  Objection, form.
3      A.   Yes.
4      Q.   So their training, in terms
5   of the recruitment function, would
6   necessarily involve a discussion of
7   those costs, apart from just answering
8   a question a host family had about
9   cost, correct?
10         MR. MACRI:  Objection, form.
11     A.   Repeat the question.
12     Q.   Sure.  One of the things you
13  said earlier is that the only -- the
14  only extent to which you would expect
15  community counselors to be talking
16  about payments is in response to a
17  host family's question.
18         My question is, in
19  connection with recruitment, wouldn't
20  that be a necessary affirmative part
21  of the recruitment process?
22     A.   Well, yes.  I mean, if
23  you're following up on a lead and
24  the -- you know, what questions do you
25  have, I mean, even a lead has received

MAGNA
LEGAL SERVICES

Page 98

```
 1
 2   a certain amount of information about
 3   the program, usually, prior to the
 4   community counselor having an engaged
 5   discussion.
 6           Either the lead has
 7   reviewed, you know, web materials.  We
 8   send program brochures out to every
 9   lead.  We send a set of federal
10   regulations and an au pair exchange
11   booklet out to every prospective
12   family with that brochure.
13           So they already have quite a
14   bit of information about the program
15   in front of them.  I don't know the
16   extent to which -- I don't have a pat
17   paragraph and say, You must read this
18   to every new host family.
19       Q.   Right.
20       A.   Generally, it's going to be,
21   you know -- the questions that
22   typically come up are, There's a
23   program fee.  When does the program
24   fee have to be paid?
25           Oh, you have a payment plan.
```

Page 99

```
 1
 2   How does that work?  What does the
 3   program fee include?  And I pay the
 4   stipend.  Yes, you would pay the
 5   weekly stipend.  And what is the
 6   stipend amount?
 7           Well, the minimum is.  And
 8   depending on -- we offer three program
 9   types.  So we have an educator
10   program, and then we have the 195.75.
11   And then we have the -- an
12   extraordinaire program.  So they have
13   to be able to meet those levels.
14       Q.   Now, are host families
15   instructed by the community counselors
16   as to what the average payment is to
17   au pairs?
18           MR. MACRI:  Objection as to
19   form and foundation.
20       A.   The average payment, no.
21       Q.   No.  I guess one of the
22   things that you mentioned a moment ago
23   is that host families are instructed
24   as to what the minimum is when they
25   ask the question, What is the stipend
```

Page 100

```
 1
 2   amount?
 3           Is there any other
 4   information that's provided about what
 5   they should expect to pay, other than
 6   the minimum?
 7       A.   No.
 8       Q.   Have you ever encountered
 9   the issue, within the organization, of
10   host families understanding that this
11   is -- that the minimum that you've
12   described is something other than the
13   minimum?
14           MR. MACRI:  Objection, form.
15       A.   I'm not sure I understand
16   the question.
17       Q.   Sure.  I guess have you ever
18   confronted, within your organization,
19   the question of confusion amongst host
20   families about what they are actually
21   expected to pay?
22       A.   I'm not sure I understand
23   there to be confusion about what
24   they're expected to pay.
25       Q.   Okay.  So the answer is no,
```

Page 101

```
 1
 2   you have not, within the organization,
 3   confronted the question of whether or
 4   not there's any confusion with the
 5   host family --
 6           MR. MACRI:  I'm going to
 7      object.  The witness's answer is
 8      the witness's answer.  It's in
 9      the record.  If you have a
10      question, you can ask her another
11      question.
12           MR. JACKSON:  I'm going to
13      repeat my question.
14       Q.   The answer is no, you have
15   not, within the organization,
16   confronted the question of whether or
17   not there's any confusion with the
18   host families about the amount that
19   they're supposed to pay?
20           MR. MACRI:  Same objection.
21      The witness answered the
22      question.
23           MR. JACKSON:  Are you
24      instructing the witness not to
25      answer the question?
```

PLAINTIFFS' RESP. APP.0005511

MAGNA
LEGAL SERVICES

Page 102

1
2      MR. MACRI:  No.  But the
3  same objection stands.
4      MR. JACKSON:  Your objection
5  is noted.
6      Q.   You should answer the
7  question.
8      A.   I am not aware that families
9  are confused by the amount that they
10  are to pay.
11      Q.   Right.  And that's -- I
12  understand that.  The question I'm
13  asking you is, has your organization,
14  within the organization, ever
15  confronted the question of whether or
16  not there was confusion amongst host
17  families?
18      A.   Since there -- the
19  organization is not aware that there
20  is confusion, we have not raised the
21  question of confusion.
22      Q.   Okay.  So at no point are
23  you aware of host families contacting
24  the organization, seeking clarity as
25  to what the appropriate amount of

Page 103

1
2  money is that they're supposed to pay
3  the au pairs?
4      A.   If a customer contacts the
5  office, then we will review the
6  minimum payment levels, and that
7  typically answers the question.
8      Q.   Besides the minimum payment
9  levels, is any guidance given as to
10  what the expected payment levels are
11  for au pairs?
12      A.   Yes.  We give the guidance
13  that the Department of State has
14  provided on what the minimum weekly
15  stipends are to be set at.
16      Q.   Right.  What I'm asking is,
17  apart from the guidance of what the
18  minimum levels are, does your
19  organization give any guidance as to
20  what -- as to what the payments might
21  be, apart from the minimum?
22      A.   The only differential we
23  have is with our extraordinaire
24  program, where we set the minimum at
25  $250 pocket money per week.

Page 104

1
2      Q.   Why is the minimum higher
3  for the extraordinaire program?
4      A.   Because the qualifications
5  of the applicants in the
6  extraordinaire program have a
7  different skill set, in that they have
8  either two years full-time, full
9  charge care experience and/or they
10  have a childcare degree, educational
11  degree, which is what most of them
12  have.
13      And that sets them
14  significant -- that sets them apart
15  from the -- the requirement for an au
16  pair to qualify for the program is to
17  have a minimum of 200 hours of prior
18  child -- recent childcare experience.
19      So it is -- the organization
20  determined that applicants with this
21  different skill set should receive a
22  different level of stipend, and we set
23  the minimum at a higher amount.
24      Q.   How did you determine what
25  the amount would be?

Page 105

1
2      A.   I don't remember how we
3  initially determined it, but it just
4  seemed to be, you know, a fair amount.
5      Q.   So the amount is $250?
6      A.   Yes.
7      Q.   Okay.  And what is the
8  minimum for   au pairs that are not
9  in the extraordinaire program?
10      A.   You have the 195.75.
11      Q.   Now, the 195.75 is an amount
12  that's set by the State Department,
13  correct?
14      A.   Yes.  And then the EduCare
15  program is 146.81, I think, also set
16  by the State Department.
17      Q.   The $250 is not an amount
18  that's set by the State Department?
19      A.   That's correct.
20      Q.   And in determining that the
21  $250 minimum would apply to the
22  extraordinaire program, did you do any
23  sort of market research, in terms of
24  the market for childcare?
25      A.   I don't think we did, no.

PLAINTIFFS' RESP. APP.0005512

MAGNA
LEGAL SERVICES

Page 106

1
2      Q.   Is there anyone else at your
3   organization that would know whether
4   or not you did any market research?
5      A.   I don't think so.
6      Q.   You said that it just seemed
7   like it would be a fair amount.
8      A.   That's correct.
9      Q.   What was the basis for
10  concluding that that seemed like it
11  would be a fair amount?
12     A.   It was probably
13  communicating with applicants,
14  prospective applicants that have that
15  skill set, and are they interested in
16  joining a program, but that recognizes
17  their skills that they have prior to
18  joining the program by setting their
19  pocket money at a higher level.  And
20  it seemed to be well received.
21     Q.   One of the things that
22  you've talked about in a couple of --
23  in the context of a couple of these
24  questions is the availability of au
25  pair applicants.

Page 107

1
2          Is that an issue that you've
3   been involved in as director, working
4   to figure out what the -- what the
5   organization could do to address the
6   availability of au pair applicants?
7      A.   Certainly.
8      Q.   And are you -- in terms of
9   your attempt to ensure that the supply
10  of available au pair applicants
11  continues to flow, are you in
12  competition with any other
13  organizations?
14         MR. MACRI:  Objection as to
15     form and foundation.
16     A.   Yes, we are.
17     Q.   What other organizations?
18     A.   There are 16 other program
19  sponsors.  I consider them all
20  competition.  And there are other au
21  pair program options in other
22  countries.  So to some extent, I
23  consider them a competitor.
24     Q.   Now, your organization was
25  free to raise the minimum for the

Page 108

1
2   extraordinaire program from the State
3   Department set 195 to $250, right?
4      A.   Yes.
5      Q.   There's no State Department
6   regulation that prevented you from
7   raising the minimum?
8      A.   No.
9      Q.   Did you ever discuss raising
10  the minimum for all of your au pairs
11  in an attempt to recruit more au
12  pairs?
13     A.   No.
14     Q.   Why not?
15     A.   Because it was -- the amount
16  was set by the Department of State.
17  And just like I wouldn't make a
18  decision that I wouldn't interview a
19  prospective family face-to-face in
20  their home, I wouldn't make a decision
21  to do it differently, cheaper, slyer,
22  via Skype, because I would not be
23  adhering to the Department of State
24  regulations.
25     Q.   I guess what I'm -- when you

Page 109

1
2   say you wouldn't be adhering to
3   Department of State regulations,
4   you've already raised the minimum of
5   one of your programs, right?
6      A.   That's correct.
7      Q.   And we're clear that you
8   were not running afoul of any
9   Department of State regulations by
10  raising the minimum from 195 to 250,
11  correct?
12     A.   Mm-hmm.
13     Q.   Is that right?
14     A.   Mm-hmm.
15     Q.   I'm sorry.  I have to have a
16  verbal answer on that.
17     A.   Yes.
18     Q.   And if that didn't run
19  afoul, why would raising the minimum
20  for all of your   au pairs potentially
21  run afoul of Department of State
22  regulations?
23         MR. MACRI:  Objection to
24     form.
25     A.   There's no -- here's another

MAGNA
LEGAL SERVICES

| Page 110 | Page 112 |
|---|---|
| 1 | 1 |
| 2 way to put it. There's no value in | 2 unknown, you know. I think the |
| 3 raising the -- raising the weekly | 3 limitation is on the volume of |
| 4 stipend for an au pair if I have more | 4 families that are willing and wanting |
| 5 au pairs anytime than are possibly | 5 and able to participate in this |
| 6 going to be placed. | 6 program in the U.S. That is the |
| 7 Q. What do you mean -- | 7 limitation. |
| 8 A. We're only able to place | 8 Q. What is the average amount |
| 9 somewhere between 72 and 80 percent of | 9 of money that host families associated |
| 10 the au pair applicants that we receive | 10 with your organization are paying the |
| 11 that are cleared to be accepted into | 11 au pairs? |
| 12 the program. | 12 MR. MACRI: Objection, form |
| 13 So you lose many in the | 13 and foundation. |
| 14 process, but at the end of the day, I | 14 A. I can't tell you that, |
| 15 want a relatively high placement rate. | 15 because that's between the au pair and |
| 16 Q. What do you mean when you | 16 the hosting family. |
| 17 say there's no value? | 17 Q. At no point -- |
| 18 A. If the -- if you suggest | 18 A. I don't know what their |
| 19 that we're going to pay the au pair | 19 compensation package makes up. |
| 20 more, then I'm going to have more of a | 20 Q. Is that something that you |
| 21 challenge -- more than the state | 21 could survey the au pairs about? |
| 22 minimum, then I will have more of a | 22 MR. MACRI: Objection to |
| 23 challenge to compete against | 23 form. |
| 24 competitors who are -- why would a | 24 A. I believe you already did |
| 25 hosting family go with Au Pair in | 25 that. |

| Page 111 | Page 113 |
|---|---|
| 1 | 1 |
| 2 America when I tell them that the | 2 Q. Right. I'm just asking, is |
| 3 minimum stipend for the au pairs in | 3 that something that your organization |
| 4 our program are going to be greater? | 4 could ask the au pairs about? |
| 5 The -- there's no -- when I | 5 A. Certainly, we could ask the |
| 6 also want to have -- ensure that the | 6 au pairs that. |
| 7 high volume of applicants that are | 7 Q. Okay. Is there a reason |
| 8 coming into the program will be pretty | 8 that you haven't? |
| 9 secure to have a placement. | 9 A. I've seen no reason to do |
| 10 Otherwise, I'm going to be | 10 so. |
| 11 the known entity on the block. Don't | 11 Q. So in terms of trying to |
| 12 apply to them. Don't apply to this | 12 understand the market for host |
| 13 organization, because they're not able | 13 families, at no point did the |
| 14 to secure a placement for you. | 14 organization want to try to get a |
| 15 Q. Isn't it the case, though, | 15 handle on how much the host families |
| 16 that there are -- if you were able to | 16 were actually paying the au pairs? |
| 17 recruit a higher percentage of the | 17 MR. MACRI: Objection, form. |
| 18 available au pairs, that you would | 18 A. No. |
| 19 have the potential to edge out some of | 19 Q. Why? |
| 20 your competitors, in terms of the | 20 A. Because it's not just a |
| 21 ability to actually place au pairs | 21 question of a weekly payment. It's an |
| 22 with host families? | 22 entire -- what is the compensation -- |
| 23 MR. MACRI: Objection, form | 23 you know, what is the difference |
| 24 and foundation. | 24 between the family that's -- you know, |
| 25 A. I think that is very | 25 the au pair that's going to have a |

**MAGNA** ⟩
**LEGAL SERVICES**

Page 114

```
 1
 2   suite of rooms to live in versus the
 3   au pair that's going to have a small,
 4   you know, 10 by 12 bedroom, that one
 5   is going to be furnished with a
 6   television and a CD player and another
 7   is not, that one family is going to
 8   provide their au pair with an iPhone
 9   and free Wi-Fi and access through the
10   year and another is not, that one
11   family is going to provide, you know,
12   all of their transportation costs for
13   their both personal use and have
14   unlimited, you know, distance that
15   they can travel in  the car and not
16   the type of vehicle that one au pair
17   will be driving versus another?
18        There's just a range of, you
19   know, compensation.  I don't ask an au
20   pair, you know, what were your -- what
21   additional, you know, payments did you
22   receive?  Did you get a bonus, you
23   know?  Did you get cash for Christmas?
24   Did you -- no.  We've never -- we've
25   never asked them.  That is between --
```

Page 115

```
 1
 2   the relationship between the hosting
 3   family and the au pair.
 4        Q.   But let me just ask you
 5   this.  Putting aside your reasons for
 6   not wanting to ask them, you would
 7   agree that would be valuable
 8   information to you to know how much
 9   the families were actually paying the
10   au pairs?
11        MR. MACRI:  Objection as to
12     form and foundation.
13        A.   When a fam -- when an au
14   pair comes in, you do not want to
15   mislead an au pair to think that she
16   might receive something more or
17   different from the structure of the
18   program.
19        Q.   I understand that.
20        A.   And it's a little like if an
21   au pair says to -- and this has come
22   up in the orientation program, where
23   an au pair says, well, what if the
24   family is going to pay me more?
25        And the orientation
```

Page 116

```
 1
 2   coordinator will usually say, You're
 3   very fortunate.  Say thank you very
 4   much and leave the room.
 5        Q.   Right.  I guess what I'm
 6   saying is, you would agree, correct,
 7   that it would be valuable information
 8   if you could know how much the host
 9   families were actually paying the au
10   pairs?
11        MR. MACRI:  Objection as to
12     form and foundation.
13        A.   I don't know that it would
14   be helpful to me.
15        Q.   You can't conceive of any
16   way in which it would be helpful to
17   your organization to know how much the
18   families were actually paying the au
19   pairs?
20        A.   No.
21        MR. MACRI:  Objection.
22        Q.   Sorry.  Your answer is no?
23        A.   No.
24        Q.   Okay.  And in terms of the
25   ability to recruit au pairs, it's your
```

Page 117

```
 1
 2   testimony that you don't think there
 3   would be any value to being able to
 4   communicate to au pairs what they
 5   could actually expect to be paid?
 6        MR. MACRI:  Objection as to
 7     form.
 8        A.   I do communicate to them
 9   exactly what they can expect to be
10   paid at a minimum.
11        Q.   You communicate the minimum,
12   right?
13        A.   That's right.
14        Q.   But it's your understanding
15   that that's only a minimum, correct?
16        A.   That's right.
17        Q.   And so you have no knowledge
18   of what the delta is between the
19   minimum and what the actual payment is
20   on average for your      au pairs?
21        MR. MACRI:  Objection to
22     form.
23        A.   That's correct.
24        Q.   You agree with me, if it
25   were knowable, that would be valuable
```

PLAINTIFFS' RESP. APP.0005515

MAGNA
LEGAL SERVICES

Page 118

```
1
2    information, in terms of your ability
3    to recruit au pairs, right?
4         MR. MACRI:  Objection, form.
5         A.   No.  Because it could put me
6    in -- put the organization in a
7    position of misleading au pairs to
8    thinking that -- it's about the full
9    compensation package.
10        I would instead instruct an
11   au pair to speak to the hosting family
12   about what their living situation is
13   and what are -- is the full
14   compensation that the au pair can be
15   expected to have.
16        Is she going to have use of
17   the family car?  Is that going to be
18   for her personal use?  All of these
19   other pieces are more important.  It's
20   part of the full emersion.
21        Q.   I understand that, but what
22   I'm saying is, you're saying that
23   there would be no value to actually
24   knowing what the host families are
25   being paid.
```

Page 119

```
1
2         MR. MACRI:  Objection.  Is
3    there a question?
4         MR. JACKSON:  That's my
5    question.
6         THE WITNESS:  And I answered
7    no.
8         MR. JACKSON:  If you're not
9    instructing the witness to not
10   answer the question, you should
11   just note your objection for the
12   record, and she should answer the
13   question.
14        MR. MACRI:  I'm objecting as
15   to form of the question.
16        MR. JACKSON:  Your
17   objection, sir, is noted.  And
18   I'm just going to ask if the
19   witness can complete the answer
20   to the question.
21        A.   My answer is no.
22        Q.   Okay.  Thank you.
23        Now, I would like to ask
24   you.  Is it possible that the amount
25   of money that host families are paying
```

Page 120

```
1
2    to the au pairs on average
3    substantially exceeds the minimum?
4         MR. MACRI:  Objection, form.
5         A.   I don't know.
6         Q.   You have no idea?
7         A.   I do not know.
8         Q.   Okay.  Does your
9    organization believe that it is
10   possible that host families are paying
11   more than the minimum?
12        MR. MACRI:  Objection, form.
13        A.   The possibility is there.
14        Q.   Okay.  If the host families
15   are paying substantially more than the
16   minimum, that would be valuable
17   information, in terms of what the
18   actual minimum could be, potentially,
19   for the entire set of au pairs, right?
20        MR. MACRI:  Objection, form
21   and foundation.
22        A.   I kind of want to ask a
23   question.
24        Q.   Please.  Ask a question.
25   Anything I can help to clarify.
```

Page 121

```
1
2         A.   What is the value for a
3    hosting family to pay substantially
4    more to the au pair in pocket money?
5         Q.   Well --
6         A.   When there are gifts in
7    kind -- this is to treat this au pair
8    as a family member.  Include this au
9    pair in your family events.  You take
10   your family out to dinner.  You take
11   your au pair out to dinner.  You don't
12   ask her to pay for the bill.
13        You take your family on
14   vacation.  You take your au pair on
15   vacation.  You don't ask your
16   family -- your au pair to pay for her
17   own hotel room.
18        You take your -- you want
19   your au pair to be engaged in the
20   community, and you want her to have
21   access to that community.  You give
22   her the use of the car.  You give her
23   a credit card for the gas.
24        That is a better way to --
25   and those dollars will add up faster.
```

**MAGNA**
LEGAL SERVICES

Page 122

1
2    Then the pocket money is to give some
3    extra spending money.  It was never
4    intended as a living wage.
5        Q.   Well --
6        A.   This is a -- pocket money so
7    that she can go to the movies.  You
8    have families that will buy a winter
9    coat for the au pair.  She just came
10   from South Africa.
11       I'll send a winter coat to
12   the orientation program so she's got
13   something to wear on the train when
14   she comes down to meet with us.
15       Q.   Right.
16       A.   We'll buy -- we'll buy her
17   summer shorts, because she just came
18   from Norway, and we are -- we are in
19   Miami.  And it never gets cold.
20       Q.   Certainly, you're aware that
21   there are a number of different
22   markets where people regularly pay
23   more than face value for goods and
24   services, right?
25       MR. MACRI:  Objection, form,

Page 123

1
2    foundation.
3        A.   And the danger is --
4        Q.   I'm just asking if you're
5    aware of that.
6        A.   Yes.  I am aware of that.
7        Q.   For example, you're aware
8    that in the Broadway ticket market,
9    for example, people often will pay
10   more than the face value for those
11   goods or services than Broadway
12   tickets, right?
13       MR. MACRI:  Objection, form.
14       A.   I know it's possible.  I
15   wouldn't, but...
16       Q.   Understood.  And so I guess
17   what I'm saying is, the market for
18   childcare, you also understand, is
19   quite competitive in some parts of the
20   country, right?
21       MR. MACRI:  Objection, form.
22       A.   The market for childcare is
23   quite competitive.  I would suggest
24   that the need for childcare is far
25   greater than the ability of America to

Page 124

1
2    supply appropriate childcare options.
3        Q.   Right, right.  And not to be
4    -- and so the demand for childcare in
5    many parts of the country outpaces the
6    supply of available childcare,
7    correct?
8        A.   That's correct.
9        Q.   And so to the extent that
10   the demand for childcare,
11   particularly, high quality childcare,
12   outpaces the supply of available
13   childcare, it's conceivable that
14   people might pay a premium for what
15   they believe to be high quality
16   childcare?
17       MR. MACRI:  Objection to
18   form.
19       A.   Yes.  I guess that's
20   possible in other forms, you know.
21       Q.   Sure.
22       A.   Yeah.
23       Q.   And so for a host family
24   that believes that its au pair is
25   providing the highest quality

Page 125

1
2    childcare that they could imagine,
3    it's conceivable that they might be
4    willing to pay a premium above and
5    beyond the minimum in order to keep
6    that au pair, right?
7        MR. MACRI:  Objection to
8    form.
9        A.   Maybe there's a mis -- most
10   au pairs are students.  They are not
11   professional childcare providers.
12       Q.   Right.
13       A.   So if -- to line up the au
14   pair program and compare it direct on
15   with other childcare options, where
16   nannies are professional childcare
17   workers or day care programs that have
18   professional childcare workers, this
19   is very different.
20       These are not care providers
21   who -- and they have a very narrow
22   responsibility to -- they cannot take
23   full charge, full care of the
24   household.
25       They have -- there are

PLAINTIFFS' RESP. APP.0005517

MAGNA
LEGAL SERVICES

Page 126

```
 1
 2      limits on what duties they can perform
 3      in childcare within the home.  They
 4      are restricted on the number of hours.
 5           And the challenges that you
 6      have are if the -- the suspect would
 7      be if the au pair -- if the family is
 8      paying significantly higher weekly
 9      stipend than would be required, is
10      there an abuse on the hours that they
11      are requiring the au pair to work?
12      Q.   Okay.
13      A.   And so there's a limitation
14      on hours.  It's a very restrictive
15      program.
16      Q.   I want to unpack all that,
17      but just to go back to my core
18      question, it is conceivable that a
19      family that believed its au pair was
20      providing excellent childcare in a
21      competitive market would be willing to
22      pay a premium for that, correct?
23      A.   And -- yes.  And I would
24      suggest that those very often come in
25      gifts in kind.
```

Page 127

```
 1
 2      Q.   But the answer is yes, it is
 3      conceivable that they would be willing
 4      to pay a premium for that?
 5      A.   Yes.
 6      Q.   And the potential premium
 7      that is being paid by host families is
 8      not a subject that your organization
 9      has endeavored to explore?
10      A.   That's correct.
11      Q.   Okay.  How long has Au Pair
12      in America been in business?
13      A.   Au Pair in America was the
14      first authorized sponsor for the au
15      pair program.  So 1986.
16      Q.   And do you know how they got
17      started as the first -- as the first
18      organization?
19      A.   The AIFS, along with another
20      organization -- and I'm sorry.  I
21      don't recall the name.  It's not a
22      company that is in existence
23      anymore -- is -- looked at the
24      opportunity of opening a cultural
25      exchange program that would be like
```

Page 128

```
 1
 2      this.
 3           In the 1980s, there was a
 4      high influx of -- '70s and '80s, there
 5      was a large influx of foreigners into
 6      the country, coming in on tourist
 7      Visas, overstaying their stays, living
 8      with families, and providing
 9      unregulated, not only childcare, but
10      household duties care.
11           And AIFS, as one of the lead
12      programs, felt that this was -- there
13      was an environment here to plan a
14      program that had a set of federal
15      regulations underneath it to protect
16      all parties, including, most
17      importantly, the children in the home.
18      Q.   How many -- how many
19      potential       au pairs apply each
20      year to your organization?
21      A.   Just over 5,000.
22      Q.   And how many are accepted?
23      A.   Oh, those are -- I'm sorry.
24      Those are the ones that are accepted
25      into the program.  Sorry.
```

Page 129

```
 1
 2      Q.   Just to -- just to back up,
 3      how many -- what's your understanding
 4      of how many potential au pairs apply
 5      each year?
 6      A.   A little difficult for me to
 7      give you a number, because there is an
 8      initial tick off list of, you know, if
 9      you're not 18 to 26, if you don't have
10      200 hours in childcare experience, if
11      you can't produce a criminal
12      background check, if you can't -- you
13      don't speak English to an acceptable
14      standard.
15           There's a whole checklist of
16      things.  So if you can't meet this,
17      you've just taken yourself out of the
18      program.
19           So there are probably
20      thousands that inquire about the
21      program, but can't meet those minimum
22      standards.  We won't even start an
23      application process with them.
24           Once they start the
25      application process, you'll find
```

**MAGNA**
**LEGAL SERVICES**

Case 1:14-cv-03074-CMA-KMT   Document 1059-25   Filed 03/17/18   USDC Colorado   Page 691 of 700

Page 130

1
2    probably several hundred, a thousand,
3    more, that will cancel themselves out,
4    because they decide in the process
5    that maybe something else is -- they
6    would rather spend their time
7    elsewhere.
8           This is a big commitment
9    when you're talking about taking a
10   year out to come to the U.S.  And you
11   are making a commitment to fulfill the
12   full term of the Visa.
13          There are many other program
14   options out there for young people
15   who, even if they want to --
16   primarily, they want to improve their
17   English language.
18          That's going to make the
19   difference to them when they are
20   either in the job market or they're
21   looking to get into a better
22   university when they return back to
23   their home country.
24       Q.   Okay.
25       A.   So it makes a huge

Page 131

1
2    difference to them, but we're also
3    competing with, you know, short-term
4    language programs in the UK or
5    Australia.
6           And so those come into play.
7    So you're going to lose a thousand or
8    more just in the process.
9        Q.   Right.
10       A.   And then you're going to
11   have a relatively small percentage
12   that don't clear the criminal
13   background check, that they're last
14   minute fails, if you will.  It doesn't
15   come up until the end.
16       Q.   Now, the Department of State
17   sets an annual allotment, correct, of
18   the number of J1 Visas your
19   organization can get?
20       A.   Yes.  We have an annual
21   allotment.  We do not use our full
22   allotment.
23       Q.   What is the allotment right
24   now?
25       A.   I don't know.  It's some

Page 132

1
2    really odd number like -- I don't
3    know.  It's somewhere in the
4    neighborhood of, you know, 5,000, but
5    I don't know the specific number.
6        Q.   All right.  Do you know
7    what -- how much of the allotment you
8    don't use?
9        A.   We're probably inching up
10   there.  So I would say there's about
11   10, 12 percent that we're not using
12   right now.
13       Q.   And can you describe the
14   process by which the State -- by
15   which, you know, the State Department
16   determines what your allotment is
17   going to be?
18       A.   No.  I am aware that each
19   program has a different allotment
20   level and that our allotment was
21   established many years ago, whereas
22   some of the other program sponsors who
23   joined -- who applied for sponsorship
24   in -- you know, after 2011, you
25   know -- or 2001 probably used a

Page 133

1
2    different formula at Department of
3    State, but there's no restriction on
4    the limit of J1 Visas that any sponsor
5    organization that has reached their
6    cap, if you will, in issuance of Visas
7    can apply for an extension.
8           There are a number of tests
9    that you have to meet in order to be
10   granted an extension of Visas -- or
11   additional Visas, but it is possible
12   to apply.
13       Q.   What's the total size of the
14   au pair population in America?
15       A.   Department of State reported
16   just over 17,000 Visas issued for the
17   au pair program in 2015 -- or '16.
18   I'm sorry.
19       Q.   So your company amounted to
20   close to -- close to a third of the
21   allotted Visas?
22       A.   Yeah.  I think it's actually
23   a little less.  It's about 24 percent.
24       Q.   And have you ever -- have
25   you ever made an attempt to increase

PLAINTIFFS' RESP. APP.0005519

MAGNA
LEGAL SERVICES

| Page 134 | Page 136 |
|---|---|

**Page 134**

1
2 the allotment?
3    A. We've never had to.
4    Q. Never had to. Have you ever
5 discussed whether you wanted to try to
6 expand the program?
7    A. I wouldn't ask to expand the
8 program until -- believe me. I would
9 love to expand the program. That
10 would be good business, wouldn't it?
11      If we reach our allotment,
12 then I will apply for an extension. I
13 would presume that we would receive
14 the additional Visas.
15    Q. During the time that you've
16 been working with APIA, has the number
17 -- has the allotment grown?
18    A. I think our allotment was
19 established back in the kind of mid to
20 late '90s and hasn't shifted is my
21 recollection.
22    Q. And since that time, the
23 number of host families that you've
24 been dealing with has remained,
25 roughly, stagnant?

**Page 135**

1
2      MR. MACRI: Objection as to
3 form.
4    A. No. We've seen some ups and
5 downs, very much driven by the
6 economy. The downturn in the economy
7 in 2009 dropped our business by almost
8 24 percent. And it took several years
9 to bring that back up.
10    Q. Let me show you what's been
11 marked as -- what we're about to mark
12 as Exhibit 11.
13      MR. MACRI: We're up to
14 number 5.
15      MR. JACKSON: Sorry.
16 Exhibit 5. Sorry.
17      MR. MACRI: It's okay.
18      THE WITNESS: We can jump
19 over the others. It okay.
20      MR. MACRI: It makes it
21 confusing when you try and look
22 back and figure out where they
23 went to.
24      MR. JACKSON: Actually, I'm
25 going to hold off on that for a

**Page 136**

1
2 moment.
3      MR. MACRI: Okay.
4      MR. JACKSON: Let's take a
5 look at -- I'm handing you --
6      (Exhibit 5, marked for
7 identification, Bates stamped
8 AIFS0058316.)
9    Q. Do you recognize this
10 document?
11      MR. JACKSON: I'm sorry.
12 We're looking at AIFS0058316,
13 which is a document entitled
14 American Institute for Foreign
15 Study Internal Memoranda.
16    A. Yeah.
17    Q. Do you recognize this
18 document?
19    A. I do recognize it.
20    Q. What are we looking at here?
21    A. Well, let me just quickly
22 review it, because I've -- okay.
23 Well, first, it was a failing idea,
24 but the notion was that -- our
25 structure is an internal marketing

**Page 137**

1
2 team and that a community counselor
3 network, whose primary duties were to
4 service customers and, as a secondary
5 tangential, to, yes, try to develop
6 new business.
7      One of our other competitors
8 seemed to have more sales force in --
9 community based. We were not
10 interested in -- and I was
11 particularly not interested in
12 bringing onboard community counselors
13 whose first skill set was sales, if
14 they couldn't provide the servicing
15 end.
16      So the notion was to
17 possibly have a different layer of an
18 individual. We hired this marketing
19 representative, who had been working
20 with Cultural Care, to work with us in
21 Fairfield County.
22      And the idea was that the
23 Cultural Care -- what would be our
24 sales representative or marketing
25 representative would be focused on

PLAINTIFFS' RESP. APP.0005520

MAGNA
LEGAL SERVICES

1
2    trying to find local activities and
3    social networking activities and areas
4    that Au Pair in America could have a
5    presence, childcare fairs, kidfests,
6    that type of thing, and be there to
7    kind of generate that buzz of the
8    program and be, actually, the sales
9    marketing person.
10        At the same time, they would
11   also have a role in becoming a local
12   coordinator for the academic Year in
13   America program.
14   Q.   Now, you mentioned Cultural
15   Care.  Cultural Care is one of your
16   competitors, correct?
17   A.   That's correct.
18   Q.   And --
19       THE WITNESS:  Could the
20   person on the phone --
21       MR. STOCK:  On the phone,
22   please mute.
23   Q.   One of the -- one of the
24   statements in this document -- in this
25   internal memoranda is, "The primary

1
2    focus would be to promote  Au Pair in
3    America through local activities and
4    social networking designed to reach
5    fluid families with children."
6        Why was the organization
7    engaging in this particular endeavor?
8    A.   One of the challenges that
9    Au Pair in America has is two-fold.
10   One, you want to educate the average
11   family, especially new families, what
12   is an au pair?
13       It's still not a really
14   well-known term within America.  What
15   is an au pair?
16       And then, secondly, are you
17   aware that it might be an option for
18   you to consider if you're going to be
19   engaged in -- you're going to be
20   looking for childcare.
21       So it was sort of someone
22   that would sort of be able to reach
23   into the community to new prospective
24   parents.
25       And then, secondarily, once

1
2    you get them, make sure they stay with
3    Au Pair in America and not choose the
4    competition.
5    Q.   Who is Mike Dimauro?
6    A.   Mike Dimauro was the
7    marketing executive for AIFS at that
8    time.
9    Q.   Is he still with the
10   organization?
11   A.   No, he is not.
12   Q.   When did he leave?
13   A.   We're in 2017.  I want to
14   say at least five years ago.
15   Q.   Who was the representative
16   from Cultural Care who was hired, the
17   marketing representative?
18   A.   I don't remember her name.
19   Q.   Is she still with your
20   organization?
21   A.   No, she is not.
22   Q.   Now, you --
23   A.   It was a very short lived
24   pilot.
25   Q.   Right.  I think you referred

1
2    to it as sort of a failed endeavor?
3    A.   A really failed endeavor.
4    Q.   Why do you say it was a
5    failed endeavor?
6    A.   It never really got off the
7    ground.
8    Q.   But why?
9    A.   I think because it's -- the
10   expectation is, it's the person in the
11   community -- it's the person that we
12   hired that sort of needed to figure
13   out a way to do this.  And it just
14   never took off.
15       MR. JACKSON:  Can we take --
16   Q.   Can we look at the document
17   with Bates number AIFS0067116?  And
18   this is a document entitled Au Pair in
19   America Media Kit 2001.
20       MR. JACKSON:  And we're
21   going to mark this as Exhibit --
22   I'm sorry.  2011.
23       We're going to mark this as
24   Exhibit 6.
25       (Exhibit 6, marked for

MAGNA
LEGAL SERVICES

Page 142

1
2       identification, Bates stamped
3       AIFS0067116.)
4       Q.   Do you recognize this
5    document?
6       A.   Yes, I do.
7       Q.   Okay.  What is this
8    document?
9       A.   It is a information document
10   that would be provided to any media
11   that may be inquiring or interested in
12   doing a story.
13      Q.   And why was this put
14   together?
15      A.   It's just background
16   information for a reporter or, you
17   know, writer.
18      MR. STOCK:  Again, on the
19   phone, can you please mute?
20      Q.   Now, if we look at the page
21   that ends 7119, the fourth page, I
22   believe, of this --
23      A.   Yes.
24      Q.   -- the first sentence on
25   that page says, "All au pairs are

Page 143

1
2    between the age of 18 and 26 and have
3    at least 200 hours of recent practical
4    childcare experience," correct?
5       A.   Correct.
6       Q.   Why is the 200 hours of
7    recent practical childcare experience
8    so key to the au pair qualifications?
9       A.   Federal requirements require
10   that the au pair -- any au pair being
11   placed with an infant under the age of
12   two have a minimum or at least
13   200 hours of recent practical
14   childcare experience.
15      Au Pair in America felt that
16   it was important that no applicant
17   coming into the states -- that every
18   applicant coming into the states has a
19   minimum of 200 hours of recent
20   childcare experience.
21      Q.   Why is that?
22      A.   Because I think as a bare
23   minimum, if you're going to be then
24   caring for children in a home, up to
25   45 hours a week.

Page 144

1
2       Q.   If we look at the page that
3    ends in 7123.  It's a few pages ahead.
4       A.   Yes.  That's me.
5       Q.   Okay.  Where did this
6    description come from?
7       A.   It's my bio.
8       Q.   I know.  I guess did you
9    write this?
10      A.   Yeah.  Well, I sort of
11   crafted the start of it.  The
12   marketing department probably polished
13   it up, took out the typos.
14      Q.   Okay.  Now, on the
15   subsequent pages, on 7125 and 7126,
16   there are a number of family quotes
17   from different host families?
18      A.   That's correct.
19      Q.   Can you tell us how you
20   accumulated these family quotes?
21      A.   Most of these family quotes
22   would come from yearend surveys, or
23   they could be unsolicited.  I receive,
24   you know, emails all the time -- our
25   staff do -- about that.

Page 145

1
2       Q.   In those yearend surveys,
3    was there ever any surveying of
4    amounts of money that were paid to au
5    pairs?
6       A.   No.
7       Q.   Why is that?
8       A.   We've just never done that.
9    We've never needed to do that.
10      Q.   And how far back have you
11   been doing yearend surveys like this
12   with the host families?
13      A.   Probably since almost the
14   beginning of time.
15      Q.   One of the phrases -- one of
16   the terms you used a little bit
17   earlier when you were describing the
18   structure of payment to the   au
19   pairs was the term pocket money?
20      A.   Yes.
21      Q.   Can you explain a little bit
22   more about what you mean when you
23   refer to pocket money?
24      A.   I think of the weekly
25   stipend or the pocket money.  I use

PLAINTIFFS' RESP. APP.0005522

37 (Pages 142 to 145)

**MAGNA**
LEGAL SERVICES

1
2    those terms sort of interchangeably.
3    They were intended to be part of the
4    compensation package that an     au
5    pair would receive while she is in the
6    United States.
7         So her medical insurance is
8    provided. Her transportation will be
9    provided. Her room and board will be
10   provided. Her, you know, support
11   services will be provided. She is not
12   paying excess fees for those things --
13   for those things.
14        So this is intended as money
15   that she can put towards her own
16   social activity for the week, set
17   aside for a trip that she might plan
18   to do, you know, halfway through the
19   year or a few times during the year.
20        So I use that somewhat
21   interchangeably. I think it's very
22   possible the Department of State used
23   it in preambles in various regulatory
24   documents as well.
25   Q.   Now, you mentioned -- you

1
2    mentioned, for example, the health
3    insurance that's paid for for the au
4    pairs?
5    A.   That's correct.
6    Q.   Who pays for their health
7    insurance?
8    A.   It's included in the host
9    family fees, the basic health
10   insurance required. The     au pair
11   does have the option to purchase an
12   upgrade policy and/or additional, like
13   a sports policy or a travel policy.
14        If the au pair is -- chooses
15   to -- the au pair has the right, if
16   she completes her first 12 months in
17   the program, to take an additional
18   four weeks to travel within the U.S.
19   prior to exiting the country, at which
20   point her Visa then becomes invalid.
21        In that 30-day period, she
22   would be required to have insurance
23   coverage. That is not covered by the
24   basic insurance that the family has
25   paid for for the first 12 months.

1
2    Q.   What is the host family fee
3    for an     au pair?
4    A.   It depends on the program
5    type, but it ranges from -- what is
6    it -- about 78, $7900 to -- the kind
7    of basic program is -- what are we up
8    to -- about 8500, $8600.
9    Q.   How did you come up with
10   those numbers?
11   A.   I look at the -- I look at
12   program expenses for the program. So
13   cost of insurance, estimated cost of
14   airlines, estimated cost of our
15   general liability insurance, our
16   staffing structure for our community
17   counselors, their training cost.
18        That's all indirect costs.
19   So I look at all the direct costs.
20   And we sort of measure it off of then
21   prior year.
22        Typically, your costs,
23   particularly, in the airline sector
24   and insurance sector -- well,
25   insurance has just been out of sight,

1
2    but, you know, those can go up as much
3    as, you know, anywhere from 4 percent
4    to 10 percent.
5         And then orientation costs.
6    Those are kind of the big bucket
7    items.
8         SEVIS expenses, that type of
9    thing, credit card expenses.
10        And determine, you know, to
11   what extent that then the fees need to
12   be raised year on year.
13   Q.   How much on average have the
14   fees gone up per year since you've
15   been director?
16   A.   It's usually -- well, since
17   I've been director, I couldn't -- I'd
18   have to look at something, you know,
19   back in charge years ago, but for
20   several years now, it's either been
21   flat, like during the downturn in the
22   economy, or about two and a half to
23   three and a half percent is more
24   typical.
25        MR. JACKSON: Let's just

MAGNA
LEGAL SERVICES

| Page 150 | Page 152 |
|---|---|
| 1 | 1 |
| 2   mark Exhibit 7, 8, and 9. | 2   Q.   Just above that, it says, |
| 3       (Exhibit 7, marked for | 3   "Provides up to 45 hours childcare per |
| 4   identification, Bates stamped | 4   week." And that refers to the |
| 5   AIFS0063180.) | 5   expectation that the au pair will |
| 6       (Exhibit 8, marked for | 6   provide up to 45 hours of childcare |
| 7   identification, Bates stamped | 7   per week, correct? |
| 8   AIFS0000063.) | 8       MR. MACRI:  Objection as to |
| 9       (Exhibit 9, marked for | 9   form and foundation. |
| 10   identification, Bates stamped | 10   A.   They will provide up to |
| 11   AIFS0062581.) | 11   45 hours of childcare per week for the |
| 12   Q.   Can you take a look at | 12   children in the home -- that is in |
| 13   Exhibit 8, the Africa ambassadors | 13   their host family's home. Let's make |
| 14   document, which is AIFS0000063? | 14   that clear. |
| 15       Do you recognize this | 15   Q.   Sure. |
| 16   document, Ms. Ferry? | 16   A.   Okay. |
| 17   A.   I don't. I recognize | 17   Q.   Now, the fifth -- I'm sorry. |
| 18   pictures in it. | 18   The sixth bullet here says, "Earn |
| 19   Q.   Are you familiar with the | 19   $195.75/$250 weekly pocket money"? |
| 20   African ambassadors program? | 20   A.   That's correct. It does. |
| 21   A.   It is the partner | 21   Q.   And when you were -- this is |
| 22   organization based in Cape Town, South | 22   the same pocket money that you were |
| 23   Africa, that recruits and screens | 23   referring to earlier sort of |
| 24   Africans from South Africa, Namibia, | 24   interchangeably with the stipend? |
| 25   and Malawi. | 25   A.   That's correct. |

| Page 151 | Page 153 |
|---|---|
| 1 | 1 |
| 2   Q.   Can we go to page -- about | 2   Q.   Nowhere in this document, am |
| 3   the fifth page, I belive, the one that | 3   I correct, does it indicate that that |
| 4   ends in Bates number 0000068? | 4   amount is a minimum, right? |
| 5   A.   68? | 5   A.   That's correct. |
| 6   Q.   Yes, ma'am. It says, What | 6   Q.   Can we go to the page that |
| 7   is an      au pair? And do you see on | 7   ends in 0071? And you see in the |
| 8   that document where it says study up | 8   third bullet there, it says, "Earn |
| 9   to three hours per week? | 9   195.75 weekly pocket money." And then |
| 10   A.   Yes. | 10   it has in parentheses, "$250 per week |
| 11   Q.   Okay. What does that refer | 11   for Au Pair Extraordinaire"? |
| 12   to? | 12   A.   Correct. |
| 13   A.   The educational component to | 13   Q.   That's referring to the |
| 14   the program. Each au pair is expected | 14   expected payment that the au pair will |
| 15   to register and participate in | 15   receive, right? |
| 16   educational courses during their year. | 16       MR. MACRI:  Objection as to |
| 17   Q.   And the understanding is, it | 17   form. |
| 18   shouldn't exceed more than three hours | 18   A.   Yes. |
| 19   per week? | 19   Q.   And it doesn't indicate here |
| 20   A.   Well, that's the implication | 20   that that's referring to a minimum, |
| 21   here. I think it's to give sort of a | 21   right? |
| 22   concept of, you know, so you can | 22   A.   No, it does not. |
| 23   expect to study up to about three | 23   Q.   Can we go to the next page, |
| 24   hours per week. I think that was the | 24   which is ending in 0000072? |
| 25   intent. | 25   A.   Yes. |

**MAGNA** ▶
LEGAL SERVICES

Page 154

1
2      Q.   This one refers to EduCare
3   in America.  And EduCare in America is
4   another program, right?
5      A.   It's under the same Visa as
6   the Au Pair in America program.  So
7   it's -- the au pair program and the
8   EduCare program is just the -- the
9   regulations for the EduCare component
10  are written differently in the federal
11  regulations.
12     Q.   And the primary difference
13  between those two programs is what you
14  spell out in the first bullet point,
15  right, where it says, "This program is
16  for someone who prefers to spend more
17  time studying and less time caring for
18  the host family's children"?
19     A.   That's correct.
20     Q.   The second bullet point
21  says, "With EduCare, you will work up
22  to 30 hours a week instead of
23  45 hours.  You will earn slightly less
24  pocket money.  However, your U.S.
25  1,000 study allowance allows you to

Page 155

1
2   take courses for six hours a week,"
3   correct?
4      A.   Yes.
5      Q.   The reason that you're able
6   to say you will earn slightly less
7   pocket money is because your
8   organization understands exactly how
9   much the au pair is expected to earn
10  in each of these programs, correct?
11        MR. MACRI:  Objection as to
12     form and foundation.
13     A.   Well, they need to
14  understand that the minimum pocket
15  money that they earn will be less than
16  the 195.75.
17     Q.   Right.  But you just said
18  the minimum.
19     A.   Yes.
20     Q.   It doesn't say minimum in
21  the document, right?
22     A.   Well, this is a marketing
23  and sales document.
24     Q.   Right.  But my question is
25  just, it doesn't say minimum in the

Page 156

1
2   document, right?
3      A.   No.  It does not say minimum
4   in the document.
5      Q.   It says, "You will earn
6   slightly less pocket money," correct?
7      A.   It does state that, yes.
8      Q.   And the reason that your
9   organization is able to say that is
10  because you have an understanding of
11  how much pocket money a person is
12  going to get in EduCare and in the au
13  pair program, right?
14     A.   Yes.
15     Q.   And that's reflected in the
16  documents, the amount that you expect
17  them to earn, right?
18     A.   Yes.
19     Q.   Now, let's take a look at
20  what we're going to mark as
21  Exhibit 10.
22        (Exhibit 10, marked for
23     identification, Bates stamped
24     AIFS0058479.)
25     Q.   Do you recognize this

Page 157

1
2   document, Ms. Ferry?
3        MR. JACKSON:  And just for
4     the record, this is a document
5     that was produced in native
6     format.  The Bates number that
7     corresponds with this document is
8     AIFS0058479.
9      Q.   Ms. Ferry, what is this
10  document?
11     A.   I believe this document is a
12  PowerPoint presentation that can be
13  used by a community counselor to use
14  in doing a presentation in front of, I
15  would presume, a group of interested
16  families to give an overview of the
17  program and as a way to educate them
18  about the possibility of joining the
19  Au Pair in America program.
20     Q.   Right.  Can we go to the
21  fourth page of this document, the one
22  that starts with, "Added benefits of
23  live-in childcare with   Au Pair in
24  America"?
25     A.   Mm-hmm.

PLAINTIFFS' RESP. APP.0005525

MAGNA
LEGAL SERVICES

Case 1:14-cv-03074-CMA-KMT  Document 935-29  Filed 05/17/18  USDC Colorado  Page 698 of 700

Page 158

```
1
2      Q.   The second bullet point on
3   that page is, "Only $347 per week.
4   That's per family, not per child,"
5   with an exclamation point, correct?
6      A.   That's correct.
7      Q.   How was that $347
8   calculated?
9      A.   I would presume that would
10  have been calculated based on the --
11  what year this is -- the program fee
12  prorated, plus the weekly pocket money
13  prorated, to establish a per week
14  average rate.
15     Q.   Right.  And the
16  reasonable -- what your organization
17  is attempting to communicate in this
18  particular bullet point is that the
19  host family can expect to only pay
20  $347 per week when you add the stipend
21  that they'd be expected to pay and the
22  prorated amount?
23        MR. MACRI:  Objection as to
24  form.
25     A.   Well, that's the hook.
```

Page 159

```
1
2      Q.   What do you mean when you
3   say that's the hook?
4      A.   Well, you're trying to get
5   the lead in the door.  You're trying
6   to get the customer interested.
7      Q.   Okay.
8      A.   Once you have the lead in
9   the door, then you have to start
10  educating them about the program, you
11  know, the room and board, the private
12  room, the transportation, the
13  educational benefit, the limitation on
14  hours, the -- whatever it is, the
15  support services.  There's a whole
16  litany of stuff.
17     Q.   But you would agree --
18     A.   And then you would -- then
19  you would give them the program fee.
20  We would -- we would hand out
21  brochures.
22        Every brochure would have a
23  program fee insert that would describe
24  the program fees, the minimum stipend
25  amounts, how they're described and
```

Page 160

```
1
2   established by the Department of
3   State.
4        This is not giving them all
5   those details.  These are a few
6   highlights.
7      Q.   Okay.  But you would agree
8   that that's a -- that's a pretty
9   important detail, the amount of money
10  that they can expect to pay?
11        MR. MACRI:  Objection as to
12  form.
13     A.   Repeat the question.
14     Q.   You would agree with me that
15  one of the most important details to
16  be communicated to the host families
17  is the amount of money that they can
18  expect to pay, right?
19     A.   I think there are many other
20  details that need to be communicated
21  as well, but I would agree with you
22  that before a family -- and this is
23  not -- this is an introductory piece.
24        Before a family is even
25  thinking about applying to the
```

Page 161

```
1
2   program, they're going to know -- need
3   to know many more details about the
4   fees and the full investment of their
5   financial investment in the program.
6      Q.   Right.  But you'd agree with
7   me, correct, that one of the most
8   important details is the amount of
9   money they can expect to pay?
10     A.   That will be one of the most
11  important details.
12     Q.   And the implication from
13  this part of the slide is that they
14  can expect to pay only $347 per week,
15  right?
16        MR. MACRI:  Objection as to
17  form.  Counsel is stating
18  argument, not posing questions.
19        You need to ask questions.
20  That's how I understand a
21  deposition to work.
22        MR. JACKSON:  Your objection
23  is fully noted.
24     Q.   Now, could you please answer
25  the question, ma'am?
```

Page 162

1
2      A.   I don't know what question
3  I'm answering.
4      Q.   The question is, the
5  implication from this part of the
6  slide is that the host families can
7  expect to pay only $347 per week,
8  correct?
9      A.   That is an implication
10  stated here.
11      Q.   Okay.
12      A.   Long before they join the
13  program, they're going to learn
14  differently.
15      Q.   Okay.  But that's the
16  implication from this part of this
17  slide, correct?
18      A.   Yes.
19          MR. JACKSON:  Now, can we go
20  to -- let's mark Exhibit 11,
21  which is a document with Bates
22  number AIFS0059062.
23          (Exhibit 11, marked for
24  identification, Bates stamped
25  AIFS0059062.)

Page 163

1
2      Q.   Do you recognize this
3  document?
4      A.   I do.  I haven't seen a CQ
5  in a long time.
6      Q.   What is a CQ?
7      A.   It's a communication
8  newsletter that we used to prepare and
9  distribute to community counselors.
10  It was a form of communicating
11  information out.  It was a monthly
12  newsletter.
13      Q.   And this particular CQ has
14  the heading, Germany, Our Number One
15  Recruiting Country?
16      A.   Yes, it does.
17      Q.   What is that a reference to?
18      A.   Germany is our number one
19  country that we recruit au pairs from,
20  meaning we recruit more au pairs from
21  Germany.
22      Q.   Is that still the case?
23      A.   It is still the case, but
24  not for much longer.  Birth rate is
25  going down.

Page 164

1
2      Q.   Let me ask you about that.
3  So, first, why is it the number one
4  country that you recruit from?
5      A.   Oh, Germans -- Germans --
6  born and bred in their culture is gap
7  year.  Finish high school.  Go away.
8  Do something for a year.  Come back
9  and start university.  That's what
10  they do.
11      Q.   And you said that it's not
12  going to be the number one country for
13  long.  Why is that?
14      A.   Birth rate is declining.
15      Q.   Does the organization do
16  advertising in Germany?
17      A.   Yes.  We have a subsidiary
18  office in Germany.
19      Q.   What kind of advertising do
20  you do for potential au pairs there?
21  And by that, just to be a little bit
22  more clear, I mean, are you utilizing
23  newspapers, internet, word of mouth?
24  What are the forms of --
25      A.   Well, most of it is now

Page 165

1
2  internet rather than print or paper
3  advertising.  So most of it is
4  internet advertising, referral,
5  information sessions.
6          So going out to -- in
7  Germany, it's not uncommon to go into
8  schools to -- a year or two before
9  students are graduating to educate
10  them about.
11          Like schools will hold fairs
12  so that students can find out what
13  they could possibly consider doing in
14  their gap year.
15      Q.   You said most of it is
16  internet now.  Does that include your
17  website?
18      A.   I'm not sure what you mean.
19  Does that include my website?
20      Q.   Well, I mean, is the website
21  one of the internet tools that you
22  utilize, I guess, as part of your
23  marketing efforts or your recruitment
24  efforts?
25      A.   Yes.

PLAINTIFFS' RESP. APP.0005527

MAGNA
LEGAL SERVICES

|  | Page 166 |
|---|---|

1
2      Q.   Why is it -- why is more of
3  it internet now as opposed to print?
4      A.   Why is Google so big?
5  Sorry.
6      Q.   I'm not in the marketing
7  space.  I just mean in terms of -- for
8  the transition that you guys made.
9      A.   I mean, that's my response.
10     Q.   Right.
11     A.   It's Google, Yahoo.  I mean,
12  that's where people go.  Where do you
13  go when you want to find out some
14  information?  I either go to Google or
15  I go to Wikipedia.  It's one or the
16  other.
17     Q.   Right, yeah.  No.  I'm the
18  same.
19     A.   So...
20     Q.   In terms of your website,
21  who is responsible for maintaining the
22  website?
23     A.   The head of our marketing
24  division --
25     Q.   Who is that?

|  | Page 167 |
|---|---|

1
2      A.   -- for AIFS.  That's Kim
3  Balkun.
4      Q.   Do you use an outside
5  service for any aspects of formatting
6  of the website or anything like that?
7      A.   There might be some
8  technical services that we use for
9  optimization.  And we'll have
10  consultants come in and how do we
11  optimize, you know, our web presence.
12     Q.   Have you done any website
13  redesign, substantial website redesign
14  in recent years?
15     A.   Constantly.
16     Q.   What's the --
17     A.   It's the one thing that you
18  have to stay ahead of.
19     Q.   Why is that?
20     A.   Because web design moves so
21  rapidly, I mean, the responsive
22  design, the -- I don't know all the
23  lingo, but you have to stay ahead of
24  it.
25         You know, we'll take --

|  | Page 168 |
|---|---|

1
2  offload and decide we're going to
3  build an app over here.  And before we
4  know it, the app is outdated, because
5  you can do so much more right within
6  the web frameworks itself.  So yeah.
7  It's constantly changing.
8      Q.   That's great.
9          MR. JACKSON:  Let's take a
10  moment off the record.
11         THE VIDEOGRAPHER:  We're now
12  off the record.  The time is
13  12:26 p.m.
14         (Time noted:  12:27 p.m.)
15         (Luncheon recess.)
16
17
18
19
20
21
22
23
24
25

|  | Page 169 |
|---|---|

1
2      A F T E R N O O N   S E S S I O N
3          (Time noted:  1:35 p.m.)
4          THE VIDEOGRAPHER:  We're now
5  on the record.  The time is
6  1:35 p.m.  This begins DVD number
7  three.
8          MR. MACRI:  With thanks to
9  Mr. Jackson, this is Steve Macri
10  speaking.
11         Just a friendly reminder
12  that a lot of the testimony being
13  heard today is proprietary, and
14  everything in this proceeding
15  remains subject to the AEO
16  designation, which, for the
17  purposes of today, I guess, would
18  mean attorney's ears only, in
19  addition to attorney's eyes only.
20         And I thank you very kindly
21  for your participation and
22  cooperation with that assurance.
23         MR. JACKSON:  Great.  Thank
24  you.
25         RUTH FERRY, RESUMED, having

PLAINTIFFS' RESP. APP.0005528

**MAGNA**
LEGAL SERVICES