IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:14-cv-03074-CMA-KMT

JOHANA PAOLA BELTRAN; et al.

Plaintiffs,

v.

INTEREXCHANGE, INC.; et al.

Defendants.

_____

## DEFENDANTS APEX AND 20/20'S REPLY IN SUPPORT OF CORRECTED MOTION FOR SUMMARY JUDGMENT [DOC. 890]

_____

### ARGUMENT

"At trial, a § 1 plaintiff will be required to make a 'factual showing that *each* defendant conspired in violation of the antitrust laws.'" *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2015), quoting *AD/SAT v. A.P.* 181 F.3d 216, 234 (2nd Cir. 1999) (emphasis added).

"[A] litigant may not proceed by first assuming a conspiracy and then explaining the evidence accordingly." *Valspar Corp. v. E.I. DuPont de Nemours & Co.,* 873 F.3d 185, 198 (3rd Cir. 2017), quoting *Blomkest Fertilizer, Inc. v. Potash Corp.,* 203 F.3d 1028, 1033 (8th Cir. 2000). Yet that is the sum and substance of Plaintiffs' argument against APEX and 20/20. Plaintiffs *assume* a price-fixing conspiracy, *assume* APEX and 20/20 joined it, and then attempt to explain how some of APEX and 20/20's conduct "fits" this conspiracy theory. Plaintiffs' argument suffers from the "loaded question" fallacy (*Id.*, at 198) and is insufficient to meet their summary judgment burden to dispute

APEX and 20/20's evidence that they did not discuss the amount of the standard au pair stipend with other sponsors, much less agree to fix the stipend at the $195.75 minimum.

Plaintiffs' scanty "evidence" against APEX and 20/20 appears a mere afterthought – a mish-mash of misleading deposition quotations, vague and ambiguous statements, meaningless statistics, speculation, and broad conclusions. This cannot hide the fact that Plaintiffs have failed to come up with any evidence "'that tends to exclude the possibility' that [APEX and 20/20] acted independently." *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.,* 475 U.S. 574, 588 (1986).

## A.     Plaintiffs Have No Direct Evidence of Conspiracy

Plaintiffs do not seriously claim that they have direct evidence linking APEX and 20/20 to any alleged agreement to fix stipends.

Contrary to Plaintiffs' argument (*Oppos. 9*), APEX and 20/20 have never admitted or "acknowledge[d] that wages are uniform across Defendants"—which wouldn't be direct evidence of conspiracy even if true.  *See Mitchael v. Intracorp, Inc.,* 179 F.3d 847, 859 (10th Cir. 1999) (holding that even "consciously parallel" behavior "is insufficient, standing alone, to prove conspiracy." ). But Plaintiffs' "uniform wage" argument does not apply to APEX and 20/20. Plaintiffs cite no evidence implicating APEX or 20/20 in any admission of "uniform" wages, no evidence that APEX or 20/20 agreed to fix stipends at the $195.75 minimum, nor any evidence countering APEX and 20/20's undisputed showing that the stipends paid to their standard au pairs were not, in fact, "uniform."  As established by APEX and 20/20's spreadsheet summary—which Plaintiffs do not dispute—at least eight of the 30 standard au pairs they placed were paid *more* than $195.75 and up to $250 or more, at least six were "pre-matches," whose

stipends were pre-negotiated between au pair and host family before APEX/2020 became involved, and several of the remaining au pairs were paid the minimum stipend because that is what the host family could afford. *See Corrected Motion, 12-14; APEX Appx. (ECF 878) 65.* Plaintiffs do not even address this evidence, much less rebut it.

As for Plaintiffs' contention that the Alliance trade association "enabled and facilitated" the conspiracy and had a core principle of "uniformity re: stipend,"[1] *(Oppos. 10-11),* Plaintiffs have not produced any direct evidence that the Alliance facilitated any agreement among sponsors—particularly, APEX and 20/20—to fix the stipend for standard au pairs at $195.75. In fact, 20/20 has never been a member of the Alliance. *Declaration of Susan Asay (attached), ¶3.* APEX joined for the first time on April 8, 2015 (*Id. ¶2),* after which it matched and placed only four standard au pairs before discontinuing standard au pair placements entirely in late 2015. *APEX Appx. 65.* APEX and 20/20 have produced evidence establishing that they never had discussions with the Alliance or other sponsors about the amount of the stipend, much less any agreement to place standard au pairs at a fixed stipend of $195.75. *See, e.g., Corrected Motion, 10; APEX Appx. 37 (196:7-22); see also 38, 40-42 (208:1-6; 217:20-218:12; 223:17-23).* Plaintiffs have produced nothing to rebut this showing.

Finally, nothing in the memoranda or testimony of Plaintiffs' investigator Mr. Keil addresses APEX or 20/20, much less implicates them in any alleged conspiracy.

---

[1]   Based on Plaintiffs' cited reference, the Alliance's statements regarding "uniformity" refer to nationwide uniformity, which the Alliance felt was important to ensure au pairs received cultural experiences in different regions across the U.S. and that the program was available to a wide range of host families. *PRA 4812 (Zherka trans., 38:17-39:20).* Moreover, to the extent Plaintiffs argue that stipends paid to au pairs did not comply with state minimum wage laws, no such claims have been alleged against APEX and 20/20, who are "antitrust-only" defendants.

**B.      Plaintiffs' Circumstantial Evidence Falls Far Short**

Plaintiffs' "circumstantial evidence" arguments (*Oppos. 19-23*) mention APEX or 20/20 only sporadically. These Defendants will address only those arguments.

**"Actions Rationally Explicable by Conspiracy."**

First, Plaintiffs broadly claim that "Defendants have admitted that they do not compete with regard to the stipend," citing Plaintiffs' Annex 2.  The only testimony in Annex 2 pertaining to APEX or 20/20 is a selective—and highly misleading—quote from the testimony of their Rule 30(b)(6) designee, Heidi Mispagel:  "we don't view ourselves as competitors with other au pair agencies."  *Annex 2, p. 1 (PRA 4627 at 4633).*  As the full context of that testimony shows, her statement had absolutely nothing to do with the stipend or the amount of the stipend. Rather, it concerned APEX and 20/20's unique business model as a provider of *professional* au pair placements for families with special needs –96% of their business—which differentiates these Defendants from standard au pair sponsors and domestic nanny agencies:

> A.   … [B]ased on my conversations with Susan [Asay, owner of APEX and 20/20], is that she's never wanted the program to be considered as an au pair program. She believes that we are competing in the nanny space, and so this is why she's making a comparison between a domestic nanny and a professional au pair, is my understanding.
>
> Q. Are you also competing with the other sponsor agencies?
>
> A. *I would say we're a sponsor along with other au pair agencies, but we don't view ourselves as competitors with other au pair agencies because we are the only agency specializing in professional live-in childcare and catering to that special needs market. And so, you know, I don't view that as competition.* I view that as us filling a need within the childcare space for families that have kids with special needs to have access to a cultural exchange program and live-in childcare.

*APEX Appx. 34-35 (105:7-106:1)* (emphasis added). Plaintiffs' attempt to re-characterize her testimony as an admission that APEX and 20/20 "do not compete with regard to the stipend" speaks volumes about the credibility of their arguments.

Plaintiffs again undercut their own arguments by citing Ms. Mispagel's testimony about "glean[ing] …best practices" to support their claim that Defendants "promote homogeneity and stability by sharing business methods and otherwise helping one another." *Oppos, 20, n. 31*. Again, her testimony has nothing to do with stipends, but rather, concerned "best practices" for routine operational functions, such as processes for collecting documents, insurance, compliance with various State Department regulations, and the like. *APEX Appx. 37-38 (196:14-198:1)*. Ms. Mispagel testified unequivocally that she *never* had discussions with other sponsors or the Alliance about the amount of the standard au pair stipend, because, as a provider of *professional* au pairs, "APEX has a different stipend." *Id., 37 (196:7-22); see also 38, 40-42*.

**"Nearly Identical Behavior Regarding Pricing"**

As discussed above and in the evidence cited in APEX and 20/20's Motion, Plaintiffs' "uniform pricing" argument has no application to APEX and 20/20, whose relatively few standard au pairs received varying stipends, some up to $250/week and more. And for those au pairs who were paid in the range of $195.75, APEX and 20/20 have shown that a number of those were pre-matches whose stipends were predetermined by the host family, or au pairs who were placed with a family that could not afford more than $195.75. *Corrected Motion, 12-14; APEX Appx. (ECF 878) 65.* Plaintiffs have not countered this showing with any evidence "that tends to exclude the possibility'" that APEX and  20/20 acted independently with respect to stipends for the

standard au pairs they placed. *Matsushita,* 475 U.S. at 588. Nor have they produced any trace of evidence implicating APEX and 20/20 in any alleged efforts to "use fear to defraud" families and au pairs into adhering to a stipend of $195.75. (*Oppos. 22*)

In fact, APEX and 20/20's business, with their focus on placement of professional au pairs with advanced training and qualifications for special-needs families (with commensurately higher stipends and host family fees), demonstrates exactly the kind of "differentiation … on price [and] quality" that "are hallmarks of a competitive, well-functioning market." *Oppos. 21.* For this very reason, Plaintiffs' argument that Defendants "create and commoditize the 'standard' au pair" (*Id., 22-23*) has no application to APEX and 20/20. For example, the host family fees APEX and 20/20 charged for professional au pair placements were nearly twice the fees charged for standard placements—for essentially the same amount of effort. *Corrected Motion, p. 18; APEX Appx. 94-95.* This is a clear example of price differentiation reflecting a competitive market for which APEX and 20/20 did not have the economic incentive to place standard au pairs. Thus, APEX and 20/20 did not commoditize standard au pair stipends, as claimed by Plaintiffs, as 96% of their placements were for professional au pairs commanding a stipend of $250 per week or more, reflecting both price and quality differentiation.

## C.   Plaintiffs' Defendant-Specific Evidence Fails to Meet their Summary Judgment Burden

Despite their claim that they have "evidence that each and every Defendant joined the conspiracy" to fix au pair wages (*Oppos. 29*), Plaintiffs' evidence regarding APEX and 20/20 (*id., 49-51*) falls flat, and is insufficient to meet their summary judgment burden as to these Defendants:

- ▪ "The evidence shows that [APEX and 20/20 placed standard au pairs] at the wage fixed by Defendants' conspiracy."

This argument merely *assumes* APEX and 20/20 joined in a conspiracy, without citing any supporting evidence. *Oppos. 50, n. 144.* To the contrary, APEX and 20/20 have established that the standard au pairs they placed were paid varying stipends, some more than $200/week and up to $277/week, some pre-negotiated by host families, and some determined based on what the families could afford, all of which are reasons independent of any alleged wage-fixing conspiracy. *Corrected Motion, 12-14; APEX Appx. (ECF 878) 65.* Plaintiffs do not address this evidence, much less rebut it.

- ▪ Through their membership in the Alliance, APEX and 20/20 had the "opportunity" to collude by meeting with other sponsors and discussing business practices, and "joined in the common understanding" that there is a stipend that does not "vary state by state."

As discussed, 20/20 was never an Alliance member. APEX did not join until April 8, 2015, after which APEX placed only *four* standard au pairs. *Decl. of S. Asay; APEX Appx. (ECF 878) 65.* In any event, an "opportunity to collude" or a discussion of "business practices" (which did not include the stipend, *Id., 37-41*) are not equivalent to an agreement to fix wages, and do not meet Plaintiffs' summary judgment burden. *Williamson Oil Co., Inc. v. Philip Morris USA*, 346 F.3d 1287, 1319 (11th Cir. 2003) ("[T]he mere opportunity to conspire among antitrust defendants does not, standing alone, permit the inference of conspiracy."); *Valspar,* 873 F.3d at 198-199 (information-sharing at association meetings does not support inference of conspiracy where "[t]here is no evidence [of] any discussion of prices during these meetings and certainly no evidence of an agreement.")(cits. omitted). Plaintiffs have no evidence APEX and 20/20 actually "joined" in any "understanding" or agreement with other sponsors to fix the

standard au pair stipend at $195.75, and offer nothing to rebut APEX and 20/20's Rule 30(b)(6) evidence that the standard au pair stipend was never discussed with other sponsors or the Alliance. *Corrected Motion, 10; APEX Appx. 37-42.*

The single comment Plaintiffs attribute to Ms. Mispagel during a conference call on February 8, 2016 (which was *after* APEX and 20/20 discontinued standard au pair placements, and *after* APEX's last standard au pair matched with his host family[2]) shows nothing about the existence of any conspiracy. The comment–"we need clarity re: how to pay au pairs/what to tell HF" –is ambiguous at best, indicating only that APEX was interested in obtaining prospective clarification from the State Department, which is hardly illegal or indicative of a conspiracy. And once again, Plaintiffs take the statement out of context, as the remainder of the comment indicates that APEX's question concerned au pair working hours, not stipends: "we need clarity re: how to pay au pairs/what to tell HF → **can they only work 45 hours?"** (emphasis added). This isolated comment falls short of raising any genuine issue of material fact with respect to APEX's alleged agreement in a stipend-fixing conspiracy.

   ▪   According to Dr. Kerr's survey, "90% of APEX and 20/20 au pairs who responded to the survey received a stipend within +/- 2.5% of $195.75."

After Plaintiffs were unable to rebut APEX and 20/20's evidence that a significant number of the 30 standard au pairs placed by APEX and 20/20 were paid *more* than $195.75, and up to $277 per week, Plaintiffs turn to statistics, claiming that "at least

---

[2]  Lukas S. matched with his host family on January 12, 2016, the date he agreed to the amount of his stipend, and was the last standard au pair placed by APEX. *Decl. of S. Asay, ¶4; APEX Appx. (ECF 878) 65.* The February 8, 2016 comment, which Plaintiffs attribute to Ms. Mispagel, seeks clarification about how to pay au pairs and was made *after* the match date and stipend was determined for APEX's last standard pair. Thus, the comment is not evidence that APEX and 20/20 were parties to a stipend-fixing conspiracy, as these sponsors were no longer placing standard au pairs at that time.

90% of APEX and 2020 au pairs who responded to Dr. Kerr's survey received a stipend within +/- 2.5% of the $195.75 [allegedly fixed stipend]." *Oppos. 50.* But according to the summary table Plaintiffs rely on ("Stipend Response Summary by Sponsor," *PRA 388*), only **two** APEX standard au pair families responded to the survey, and **none** of 20/20's families responded, which cannot support any global conclusion about the stipends APEX and 20/20's standard au pairs actually received, much less an inference that APEX and 20/20 conspired with other sponsors to fix the stipend at $195.75.

Furthermore, Plaintiffs' statistical analysis is incorrect and their 90% figure is inexplicable. Only one of the two APEX respondents (a self-selected group, with a very large nonresponse rate[3]) reported paying within +/- 2.5% of $195.75, which even Dr. Kerr calculates as 50%, not 90%. *See PRA 388.* The other reported stipend of $180 cannot be correct as no APEX or 20/20 standard au pairs were paid less than $195.75.

- ▪ APEX and 20/20 extended a "courtesy" to other sponsors, against their own business interests, hence they conspired.

Finally, Plaintiffs contend that APEX and 20/20 extended a "courtesy" to other sponsors—against their own business interests—by placing standard au pairs at the minimum stipend of $195.75, which "shows that they joined Defendants' wage fixing conspiracy, albeit for a 'tiny fraction' of their business." Plaintiffs do not explain how this leap of logic supports an inference of conspiracy, nor cite any evidence to support it.

APEX and 20/20 have established that they never discussed or communicated with other sponsors about the standard au pair stipend; that a significant number of the

---

[3]  The Fed. Jud. Center, Ref. Man. on Sci. Evid. 290 (3d ed. 2011) defines "nonresponse bias" as "[s]ystematic error created by differences between respondents and nonrespondents. If the nonresponse rate is high, this bias may be severe." *See also id.* at 226 ("A large nonresponse rate warns of bias.")

30 standard au pairs they placed were paid *more* than $195.75; and that placing *some* standard au pairs (including pre-matches) with families who paid the minimum stipend of $195.75 was "as consistent with [APEX and 20/20's] permissible independent interests as with an illegal conspiracy." *Gibson v. Greater Park City Co.,* 818 F.2d 722, 724 (10th Cir.1987). This is so because, as specialists in professional au pair placements,[4] which commanded much higher host family fees than standard placements, APEX and 20/20's economic interests lay in promoting *professional* placements, not in depressing standard au pair wages to attract more standard host families. It would make no economic sense for APEX and 20/20 to illegally conspire to fix stipends for a "tiny fraction" of their business, in which they had little interest and which they discontinued entirely by late 2015.

Rather than addressing and attempting to rebut this evidence, Plaintiffs simply ignore it, instead offering ambiguous and out-of-context statements, faulty "statistics," frank speculation, and sweeping conclusions. In short, Plaintiffs have nothing to link APEX and 20/20 to any agreement to fix standard au pair wages, and certainly no evidence 'that tends to exclude the possibility' that APEX and 20/20 acted independently." *Matsushita*, 475 U.S. at 588.

## CONCLUSION

For the reasons discussed herein, APEX and 20/20 are entitled to summary judgment on Plaintiffs' antitrust claim.

---

[4]   As discussed above, 96% of APEX and 20/20's total au pair placements were for professional au pairs at stipends of $250/week or more.  Moreover, APEX and 20/20 did not have the economic incentive to place standard au pairs as the host family fees they received were nearly twice as much for professional au pairs.

Dated this 30th day of March, 2018.

NIXON SHEFRIN HENSEN OGBURN, P.C.

*s/ Lawrence D. Stone*
Lawrence D. Stone
5619 DTC Parkway, Suite 1200
Greenwood Village, CO 80111
(303) 773-3500
lstone@nixonshefrin.com

Attorneys for Defendants A.P.EX. American
Professional Exchange, LLC dba ProAuPair; and
20/20 Care Exchange, Inc. dba The International
Au Pair Exchange

## CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of March, 2018, I have electronically filed the foregoing **DEFENDANTS APEX AND 20/20'S REPLY IN SUPPORT OF CORRECTED MOTION FOR SUMMARY JUDGMENT [DOC. 890]** with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record below:

Lauren F. Louis
Sigrid S. McCawley
Matthew L. Schwartz
Peter M. Skinner
Randall W. Jackson
Sabrina A. McElroy
Dawn L. Smalls
Joshua J. Libling
Sean P. Rodriguez
Daniel R. Schwartz
Juan P. Valdivieso
BOIES SCHILLER & FLEXNER, LLP
llouis@bsfllp.com
smccawley@bsfllp.com
mlschwartz@bsfllp.com
pskinner@bsfllp.com
rjackson@bsfllp.com
smcelroy@bsfllp.com
dsmalls@bsfllp.com
jlibling@bsfllp.com
srodriguez@bsfllp.com
dschwartz@bsfllp.com
jvaldivieso@bsfllp.com

Alexander N. Hood
TOWARDS JUSTICE – DENVER
alex@towardsjustice.org
*Attorneys for Plaintiffs*

Bogdan Enica, Esq.
111 Second Avenue NE, Suite 204
St Petersburg, FL 33701
Phone: 727-388-3472
bogdane@hotmail.com
*Attorney for Defendant Expert Group International Inc. d/b/a Expert AuPair*

Joan A. Lukey
Robert M. Buchanan, Jr.
Michael T. Gass
Justin J. Wolosz
Lyndsey M. Kruzer
CHOATE, HALL & STEWART, LLP
joan.lukey@choate.com
rbuchanan@choate.com
mgass@choate.com
jwolosz@choate.com
lkruzer@choate.com
*kokeefe@choate.com*
*Attorneys for Defendant Cultural Care, Inc. d/b/a Cultural Care Au Pair*

Thomas B. Quinn
Peggy E. Kozal
Jennifer W. Vedra
Nathan A. Huey
Heather K. Kelly
GORDON & REES LLP
tquinn@gordonrees.com
pkozal@gordonrees.com
nhuey@gordonrees.com
jvedra@gordonrees.com
hkelly@gordonrees.com
*Attorneys for Defendant AuPairCare, Inc.*

Diane R. Hazel
James M. Lyons
Jessica L. Fuller
Jonelle Martinez
LEWIS ROCA ROTHGERBER
CHRISTIE LLP
dhazel@lrrc.com
 jlyons@lrrc.com
jfuller@lrrc.com
jmartinez@lrrc.com
**Attorneys for Defendant Cultural
Care, Inc. d/b/a Cultural Care Au Pair**

Brooke A. Colaizzi
Raymond M. Deeny
Heather F. Vickles
Erica L. Herrera Joseph H. Hunt
SHERMAN & HOWARD, LLC
bcolaizzi@shermanhoward.com
rdeeny@shermanhoward.com
hvickles@shermanhoward.com
eherrera@shermanhoward.com
jhunt@shermanhoward.com
**Attorneys for Defendant
InterExchange, Inc.**

Kathryn A. Reilly
Grace A. Fox
WHEELER TRIGG O'DONNELL, LLP
reilly@wtotrial.com fox@wtotrial.com
**Attorneys for Defendants Au Pair
International, Inc., American Cultural
Exchange, LLC d/b/a GoAuPair and
Agent Au Pair**

William J. Kelly, III
Chanda M. Feldkamp
KELLY & WALKER, LLC
wkelly@kellywalkerlaw.com
cfeldkamp@kellywalkerlaw.com
**Attorneys for Defendant USAuPair,
Inc.**

Meshach Y. Rhoades
Martin J. Estevao
ARMSTRONG TEASDALE, LLP
mrhoades@armstrongteasdale.com
mestevao@armstrongteasdale.com
**Attorneys for Defendant GreatAuPair,
LLC**

David B. Meschke
Martha L. Fitzgerald
BROWNSTEIN HYATT FARBER
SCHRECK, LLP dmeschke@bhfs.com
mfitzgerald@bhfs.com
**Attorneys for Defendant EurAupair
InterCultural Child Care Programs**

James E. Hartley
Adam A. Hubbard
Jonathan S. Bender
HOLLAND & HART, LLP
jhartley@hollandhart.com
aahubbard@hollandhart.com
jsbender@hollandhart.com
**Attorneys for Defendant Cultural
Homestay International**

Lawrence L. Lee
Susan M. Schaecher
FISHER & PHILLIPS, LLP
llee@laborlawyers.com
sschaecher@laborlawyers.com
**Attorneys for Defendants APF
Global Exchange, NFP d/b/a
Aupair Foundation; American
Institute for Foreign Study d/b/a
Au Pair in America**

John B. Fulfree
PUTNEY,TWOMBLY, HALL & HIRSON
LLP
jfulfree@putneylaw.com

*Joseph B. Cartafalsa*
*Stephen J. Macri*
*Robert M. Tucker*
*Ogletree, Deakins, Nash, Smoak &*
*Stewart, P.C.*
*1745 Broadway, 22nd Floor*
*New York, NY 10019*
joseph.cartafalsa@ogletree.com
stephen.macri@ogletree.com
robert.tucker@ogletree.com

Eric J. Stock
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166-0193
estock@gibsondunn.com
**Attorneys for Defendants American
Institute for Foreign Study d/b/a Au
Pair in America**

*s/ Carol A. Larsen Cook*
Carol A. Larsen Cook