IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:14-cv-03074-CMA-KMT

JOHANA PAOLA BELTRAN; et al.

      Plaintiffs,

v.

INTEREXCHANGE, INC.; et al.

      Defendants.

_____

**CERTAIN DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Summary judgment briefing has demonstrated that a handful of key structural facts are undisputed and suffice to resolve this case. The Department of State ("DOS") routinely advises sponsor agencies (the "Sponsors") on issues of regulatory compliance through interpretive notices and other official communications. For decades, that official guidance has included notices sent directly to all Sponsors concerning the amount of the required stipend. Since 2009, those notices have stated that the au pair stipend is $195.75 (the "Notices"). Consistent with that directive, each Sponsor's marketing materials have, since 2009, advertised a required stipend of (or at least) $195.75. During that time, DOS has annually audited and reviewed each Sponsor's business practices—including marketing materials—and reauthorized each to continue participating in the au pair program.

All of that is undisputed. Yet Plaintiffs say this Court must preside over a lengthy trial so that a jury can determine (among other things) whether DOS annually reauthorized a criminal antitrust conspiracy that was implemented by a RICO enterprise, which may or may not have included thousands of American families and allegedly has been operating in plain view of the federal government for decades. If that sounds implausible, it should. There is no evidence that such a conspiracy existed, or that the Sponsors' conduct was otherwise unlawful. The Sponsors' motion for summary judgment therefore should be granted.

## I.   DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' ANTITRUST CLAIM

When the Court authorized discovery in this case, it warned Plaintiffs that they must "shore up" their conspiracy allegations. And for good reason: the existence of an

agreement is an essential element of Plaintiffs' claim. *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 763 (1984). After years of discovery, however, Plaintiffs cannot identify any evidence of an alleged agreement. Plaintiffs had access to the files of each Sponsor—including materials ranging from e-mails to handwritten notes of Sponsors' candid conversations at trade-association meetings. Yet Plaintiffs came up empty. There are no witnesses to the alleged agreement, no e-mails that refer to the alleged agreement, and no other record of any kind suggesting the alleged agreement exists.

Nor is there any economic evidence from which a jury could infer the existence of the alleged agreement. What Plaintiffs call "circumstantial evidence" amounts to basic market facts, which are clearly explained by the Sponsors' unilateral interests and conduct in response to the DOS stipend. Faced with this total failure of proof, Plaintiffs resort to misleading labels and caricature. But lawyers' arguments cannot change the text of the documents; and no evidence points to the alleged price-fixing agreement.

### A.   Plaintiffs Cannot Obscure the Impact of the DOS Notices.

Plaintiffs do their best—but ultimately fail—to obscure the key fact in this case: DOS told the Sponsors that $195.75 was the amount of the stipend. For years, DOS published Notices explaining that "the weekly stipend" was $195.75. Certain Defendants' Motion for Summary Judgment ("Mot."), ECF 860 at 8. Those Notices were a common stimuli (each Sponsor received them), they predictably triggered a common response (each Sponsor's advertisements published the $195.75 figure in some way), and Plaintiffs' expert conceded that the prominence of $195.75 in the market was attributable to those Notices (and not to anything else). Mot. 7–9.

Plaintiffs' attempts to explain away the natural import of the Notices simply do not withstand scrutiny. First, Plaintiffs simply misstate the Sponsors' responses to the Notices. Because "Defendants were free to interpret the amount calculated by the Department of State as a minimum," Plaintiffs insist that there is no non-conspiratorial explanation for the Sponsors' "identical independent responses setting *au pair* wages at $195.75." Plaintiffs' Opposition to Defendants' Motions for Summary Judgment ("Opp."), ECF 942 at 24, 28. But it is undisputed that the Sponsors' reactions to the Notices were not "identical": Sponsors interpreted the guidance in different ways, at different times, and advertised different messages regarding the stipend. Mot. 14-15. Some called it a minimum, others did not, and others passed along precisely what DOS said. *Id.* Plaintiffs' expert agreed that the Sponsors' responses varied in these ways, and Plaintiffs nowhere cite specifically to the record disputing this portion of the Sponsors' motion. CMA Rule 7.1E(b)(2)(B); Reply App. 2 - Kerr Merits Dep. 43:8–12.[1] Any argument that depends on an imaginary set of "identical" responses therefore fails.

Plaintiffs' second argument hangs on a similarly misguided reading of the regulatory background. According to Plaintiffs, the Sponsors' advertising must have resulted from a deliberate conspiracy to ignore the law, because "the government" had

---

[1] Citations in the format "Defs. S.J. App. _" and "Defs. S.J. R. App. _" refer to Defendants' unrestricted and restricted appendices, respectively, in support of summary judgment, ECF 861 and 862. Citations in the format "Pl. S.J. App. _" refer to Plaintiffs' Appendix, ECF 886-1-62. Citations in the format of "PRA" refer to Plaintiffs' Opposition to Defendants' Motion for Summary Judgment, ECF 943. Citations in the form of "CCI Opp. App." refer to Defendant Cultural Care's appendix in opposition to Plaintiffs' motion for summary judgment, ECF 937-1. Citations in the format "Reply App." refer to the Appendix filed herewith.

"repeatedly clarified" that "state minimum wage laws" applied to au pairs since before 2009. Opp. 25. Plaintiffs fail to identify any government publication that actually supports that assertion, relying instead upon the Wilberforce Pamphlet, a single pre-2009 document that addresses multiple programs.[2] The pamphlet is designed for *all* "aliens applying for employment- or education-based nonimmigrant visas," 8 U.S.C. §1375b(a)(1), including those in J-1 visa programs that specifically incorporate state and local labor laws, e.g., summer work travel (22 C.F.R. §62.32(i)(1)). The language of the pamphlet does not state that au pairs are entitled to the higher minimum wages, but that some among the broad swath of visa holders "**may** be entitled to earn more than the federal minimum wage **if**" certain conditions are satisfied. Defs. S.J. App. 1160 - Wilberforce Pamphlet (emphasis added). Even if Plaintiffs were correct that DOS had published an illegal stipend amount for years—a dubious proposition that the Sponsors vigorously dispute—Plaintiffs themselves contend that this lawsuit, filed in late 2014, is what caused DOS to consider for the first time whether it had been calculating the stipend incorrectly for almost two decades.[3] According to Plaintiffs, "the State Department pulled down the June 2007 notice because they realized it was erroneous

---

[2] Plaintiffs do not and cannot claim that the other pre-2009 publications they cite actually address whether state law applies. *E.g.*, Opp. 25–26 (quoting documents referring to "minimum wage law" and the "Fair Labor Standards Act"). Plaintiffs also cite various post-2009 publications that likewise do not say whether state law applies to au pairs. *E.g.*, Opp. 27 n.47 (citing a 2015 e-mail, which provides that Sponsors must comply with "applicable" laws).

[3] To be clear, DOS has never withdrawn the Notices. When an agency withdraws regulatory guidance, it does not merely remove something from its website; it informs the public and the regulated community. *See, e.g.*, Reply App. 3 - DOL News Release Withdrawing Joint Employment Guidance (June 7, 2017).

**once Towards Justice filed this suit**." Reply App. 8 - "Can Au Pairs Legally Be Paid Less Than $5 An Hour?" (quoting Plaintiffs' counsel) (emphasis added). Merely observing that a regulated industry echoed the views of its regulator up to and through the filing of a lawsuit does not prove a conspiracy.

Finally, Plaintiffs obscure what really matters about the Notices. Plaintiffs observe that "Defendants disagreed amongst themselves about" the proper interpretation of the Notices at the "outset of the litigation," and even took different positions in this litigation. Opp. 2. If anything, the Sponsors' differing initial reactions to the lawsuit tend to rebut—rather than confirm—the notion that they had arrived at some prior collusive interpretation of the Notices. At bottom, it does not matter how the Sponsors interpreted the Notices **unless** their interpretation was part of a conscious, joint commitment to fix the stipend paid by host families to au pairs. Plaintiffs have identified no evidence that such an agreement exists.

### B. There Is No Direct Evidence of an Agreement.

Plaintiffs claim to have uncovered "direct evidence" of the alleged conspiracy— i.e., an admission "that officials of the defendants had met and agreed explicitly on the terms of a conspiracy to [fix] price[s]." *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010). In truth, there is no such evidence in this case.

While Plaintiffs purport to offer "direct evidence" in their lead argument, their labelling cannot change the nature of the evidence. The so-called "party admission" of an agreement to which Plaintiffs refer is nothing of the sort. Opp. 10. For that "admission," Plaintiffs cite testimony from an au pair about her own understanding of

whether Cultural Care "set the stipend for other agencies." *See id.* Her speculation about the existence of an agreement is not direct evidence that one actually existed. And Plaintiffs' remaining "direct evidence" is nothing more than observations by two employees of two Sponsors that stipends cluster around $195.75. *See, e.g.*, Opp. 9 ("The weekly stipend is $195.75, as with all agencies."), 10 ("the minimum stipend amount . . . is the same regardless which au pair program sponsor" a host family chooses). To be clear: none of the e-mails or Sponsor testimony Plaintiffs cite in this section of their brief refers to an agreement at all. *See id.* at 8-10.

The clustering of stipends constitutes neither direct nor circumstantial evidence of a conspiracy. Even in the absence of a government-issued "price," competitors often charge similar prices, and courts routinely grant summary judgment absent some reason to think the clustering results from a conspiracy.[4] Areeda & Hovenkamp, Antitrust Law ¶ 1434a ("[M]ere parallelism . . . cannot support a conspiracy finding unless there are additional or 'plus' factors."); *Valspar Corp. v. E.I. du Pont de Nemours & Co.*, 873 F.3d 185, 194–96 (3d Cir. 2017) (affirming summary judgment where defendants issued "31 parallel price increase announcements"). Plaintiffs' burden is even greater where, as here, clustered pricing is explained by the DOS stipend and the Sponsors' unilateral incentives. As Defendants' economist explained, one would expect wages to cluster in any industry where a regulatory minimum sets the price of labor

---

[4] The logic of these authorities applies with particular force here, where third parties not part of the alleged conspiracy—host families—make the payment that allegedly has been fixed. *See* Mot. 15-16.

above the price required to attract an adequate number of applicants. Mot. 15–16.

Plaintiffs therefore cannot discharge their burden at summary judgment by pointing to

clustered stipends (or the parties' recognition of that phenomenon). Instead, they must

identify evidence that tends to exclude the possibility that the clustering resulted from

unilateral conduct. *See Monsanto*, 465 U.S. at 764. This alleged evidence—regardless

of how Plaintiffs label it—does not tend to prove the existence of the alleged agreement.

### 1.    Coordinated Lobbying Efforts Are Not Antitrust Violations.

Because there is no real evidence of a conspiracy, Plaintiffs' main argument is

that the Court should infer an illegal agreement from Defendants' constitutionally

protected petitioning activity and their participation in a trade association. Opp. 10–16.

Courts routinely reject arguments of this kind: trade associations are legitimate vehicles

for coordinating lobbying efforts, and, as described below, the Sponsors' legal

petitioning activity is not evidence of an illegal conspiracy. *In re Musical Instruments &*

*Equip. Antitrust Litig.*, 798 F.3d 1186, 1196 (9th Cir. 2015) ("[M]ere participation in trade

organization meetings where information is exchanged and strategies are advocated

does not suggest an illegal agreement."); *ADA v. Cigna Corp.*, 605 F.3d 1283, 1295–96

(11th Cir. 2010) (similar); *Ross v. Am. Express Co.*, 35 F. Supp. 3d 407, 452 (S.D.N.Y.

2014) (explaining that the court was "especially hesitant to infer an illicit agreement"

from communications that "resembled those of trade associations" and were "akin to

legitimate activities protected under the *Noerr-Pennington* doctrine").

Plaintiffs acknowledge, as they must, that Defendants' lobbying activity is

constitutionally immune from antitrust challenge. Opp. 14. That is so because "joint

efforts to influence public officials do not violate the antitrust laws." *United Mine Workers v. Pennington*, 381 U.S. 657, 670 (1965). Plaintiffs nevertheless proceed to treat communications that fall within the heartland of the First Amendment's protections as antitrust violations. In doing so, Plaintiffs blatantly mischaracterize the documents they rely upon in an effort to persuade the Court that they fall outside of these constitutional protections. For example, Plaintiffs say that "the AIFS CEO went so far as to invite his competitors at Cultural Care and AuPairCare . . . to fix their recruitment fees at a standard rate." Opp. 15. In reality, the AIFS CEO was discussing potential trade-offs in proposed legislation, which he would accept "only as a last resort" and "only if the rest of the bill was dropped." PRA 570, at 571. Collaborating on a response to proposed legislation does not violate the antitrust laws. *Pennington*, 381 U.S. at 670.

Plaintiffs' misleading description of the AIFS CEO's e-mail is not an isolated mistake. Much of their brief depends upon similar sleights of hand. For example, Plaintiffs offer as "direct evidence" that the Alliance "explicitly works to keep wages uniform across Sponsors" and that one of its "core principles" is "uniformity re stipend." Opp. 11. In the context of a case about a price-fixing conspiracy, one might expect documents so characterized to show that the Sponsors used the Alliance to implement their illegal agreement. The documents show nothing of the kind. What they do show is that the Alliance lobbied DOS, legislators, and other public officials to affirm the stipend regime described in the Notices. *See* Mot. 7–8. Many documents reflect the Sponsors' legal lobbying efforts, but not a single one—nor any of the notes from the Alliance's meetings—refers to or memorializes any alleged agreement to fix the stipend.

One would not know that from Plaintiffs' brief, which contains several misleading suggestions of a reference to an illegal agreement where none exists.[5]

| Citation | Plaintiff's Description of the Document | The Document |
|---|---|---|
| PRA 449, at 450 | "After the call, the Alliance members memorialized their agreement that they should ensure *au pair* wages be 'uniform[] across the country.'" (Opp. 12) | Plaintiffs misleadingly quote this document to suggest an active agreement rather than a common historical understanding of the regulatory framework and its perceived benefits. The full text of the quoted language is under the heading "Current Regulatory Regime" and states:<br><br>"In the 1995 rule, **USIA asserted 'the programmatic need for a uniform wage' across the program** . . . . This uniform approach has enable[d] sponsor organizations to provide **au pair opportunity** uniformly across the country...." (emphasis added).<br><br>The document clearly reflects lobbying efforts: "The goal of this document is to ensure that all parties—au pair sponsors, Alliance staff, and consultants—are making the same points regarding the benefits of the current regulatory regime, the proposed State Department changes, and what we are asking of whom." |
| PRA 784, at 785 & PRA 1469, at 1470 | "(April 19, 2011 meeting with representatives from [various Sponsors] where 'minimum wage violation' was discussed)" (Opp. 11 n.7) | The "minimum wage violation" to which Plaintiffs refer has nothing to do with their allegations—or even the stipend. Instead, it concerns the use of "performance bonds":<br><br>"The ***bond requirement*** is a minimum wage violation and sponsors can expect to receive an email from Maha advising that the withholding of a security deposit is not within keeping of regulatory violations." (emphasis added). |
| PRA 631 | "For example, one document describes the | This email describes a potential letter for the Alliance to send to DOS as part of lobbying |

---

[5] Due to space constraints, Defendants cannot address each lobbying document Plaintiffs cite. Every document Plaintiffs cite in this section of their brief (their "second" category of "direct evidence," Opp. 10–16), however, is attached in Annex 1.

| | | |
|---|---|---|
| | 'national stipend' as a 'well established practice' of '20 years.'" (Opp. 12) | efforts. The letter would explain how (i) the current regulations resulted from an "interagency process to set stipend based on federal minimum wage," and (ii) modifying the program "without any consultation" or "rule making" would go "against 20 years of well established practice." The letter also would explain that the Alliance "would like to work with [the DOS] to develop a new method of calculating a national stipend." |
| PRA 625 | "For example, AuPairCare, AIFS, and Cultural Care worked together on a document that stated 'Au pairs receive a weekly stipend from host families of $195.75, as mandated by [DOS], in consultation with [DOL] and the IRS." (Opp. 20) | This is a "position paper" for "J-1 Advocacy Day," as the e-mail itself explains:<br><br>"Attached is our au pair position paper for J-1 Advocacy Day from last year. We'd like to use it again this year, with the below tweaks to the back page language. Please let me know ASAP . . . if this paper/these changes look good to you, or if you have any additional suggested changes." |
| PRA 434 | "On a January 12, 2016 conference call, AIFS's CEO stated how '50 different wages won't work . . . we cannot deviate from this.'" (Opp. 12) | These notes concern the Sponsors' plan for an upcoming "meeting" with DOS. The AIFS CEO explained that the Sponsors should not "deviate from" their collective lobbying position, and that they should "talk about how the au pair program is different from other J-1s like SWT [summer work travel]." |

All of these communications reflect legal petitioning activity. They are not evidence of any illegal agreement, nor do they suggest that such an agreement exists.

### 2. Legal Petitioning Is Not Evidence of an Illegal Agreement.

Plaintiffs maintain that communications reflecting joint petitioning activity—if not antitrust violations themselves—are at least "direct evidence" of the alleged illegal agreement.[6] Opp. 9, 15-16. The leading antitrust treatise explains that their argument

---

[6] As discussed below, these communications are not evidence at all. If they were, they would be only circumstantial evidence. No discussion of legal petitioning activity can

suffers from a crucial "logical infirmity." Areeda ¶ 212. Competitors' desire to take an action "has no antitrust significance apart from the means by which the intention is implemented." *Id.* So, an intention to oppose legislation "does not imply or even tend to imply that the defendant took other steps with an improper motive." *Id.* As a result, Areeda and courts around the country hold that evidence of protected activity "presumably" should be excluded. *Id.*; *U.S. Football League v. NFL*, 634 F. Supp. 1155, 1181 (S.D.N.Y. 1986) ("[T]he exclusion of 'purpose and character' evidence consisting of conduct clearly embraced by *Noerr-Pennington* should be the rule rather than the exception in an antitrust case."), *aff'd* 842 F.2d 1335 (2d Cir. 1988); *Colorado Interstate Gas Co. v. Natural Gas Pipeline Co. of Am.*, 885 F.2d 683, 692 n.13 (10th Cir. 1989) (affirming the exclusion of evidence of petitioning conduct in the regulatory context).[7]

The probative value of the protected activity is particularly weak here. Plaintiffs admit that much of this "evidence" post-dates the lawsuit, which explains why so many of the communications reflect litigation and lobbying strategies. *See* Opp. 12. Moreover, the communications show only that Sponsors opposed raising the minimum stipend that must be paid to au pairs. *See supra* § I.B.1. That jointly held political position does not suggest—as a matter of law, logic, or economics—that Sponsors had a similar joint

---

qualify as an admission "that officials of the defendants had met and agreed explicitly on the terms of a conspiracy to [fix] price[s]." *In re Text Messaging*, 630 F.3d at 628.

[7] Petitioning activity is admissible only if it reveals the "purpose and character" of the alleged antitrust violation. *See Telecor Commc'ns v. Sw. Bell Tel. Co.*, 305 F.3d 1124, 1138–39 (10th Cir. 2002). So, where a defendant presents a defense at trial that is inconsistent with its representations to the government, its representations may be admitted to show that the defense is pretextual. *Id.* As discussed below, there is no analogous basis for admitting the petitioning activity here.

interest in fixing the stipends host families actually paid to au pairs. Areeda ¶ 212. Although each Defendant had a unilateral incentive to advertise the lowest stipend possible, no Defendant had an interest in **other Defendants** advertising lower stipends. Ferry Decl. ¶ 8, ECF 605-4. Nor did any Defendant have an incentive to fix—or even monitor—the amount actually paid by host families in the program. Defs. S.J. R. App. 957 - Stiroh Merits Rpt. ¶¶ 32-35. That is why it is undisputed that the Sponsors did not monitor the amounts paid by host families to au pairs. Mot. 38-40.

Plaintiffs' only remaining purported "direct evidence" is the statements gathered by their investigator, David Keil. For the reasons explained in Defendants' opening motion—and by the Court in its order on Defendants' motion to dismiss—that evidence alone does not create a genuine dispute of material fact. Mot. 9-13. Low-level employees' ambiguous answers to a professional investigator's leading questions cannot form the basis for an antitrust trial, particularly where the alleged agreement to which they supposedly referred is not reflected in a single document in the files of any defendant. *See Kleen Prods. LLC v. Int'l Paper*, 276 F. Supp. 3d 811, 842 (N.D. Ill. 2017) (considering the evidence "which is missing"); *see* Mot. 12.

## C. There Is No Circumstantial Evidence of a Conspiracy.

Plaintiffs point to five "plus factors" that allegedly support their antitrust claims. Their so-called "plus factors" either fail as a matter of law or have no basis in the record:

1. "Actions Rationally Explicable by Conspiracy" (Opp. 19-20). Plaintiffs cite no case that examined whether a particular action was "rationally explicable by conspiracy." That is because courts uniformly ask a different question in determining

whether a triable issue exists: whether the evidence excludes the possibility that the alleged conspirators were "acting independently." *See Monsanto*, 465 U.S. at 764. Indeed, actions that are "merely consistent with" an alleged agreement do not plausibly suggest that an agreement exists. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007). Courts therefore look for evidence that defendants acted against their self-interest, or otherwise took steps that would have been economically irrational had they been acting alone. *See, e.g.*, Areeda ¶ 1434 (listing "plus factors," including actions against self-interest). Plaintiffs do not explain why advertising a stipend of $195.75 would be inconsistent with the Sponsors' self-interest. *See* Opp. 19–23.[8]

2. "Means of Monitoring Agreement and Punishing Cheaters" (Opp. 21). To enforce the alleged agreement, Defendants would need to monitor the amount paid by host families to au pairs, as well as the full universe of Sponsors' communications with host families and au pairs regarding the stipend. Defs. S.J. R. App. 957 - Stiroh Merits Rpt. ¶¶ 23(iv), 24 n.46, 35. It is undisputed that the Sponsors do not monitor the amount paid by their own host families to au pairs—let alone the amount paid by other Sponsors' host families—and Plaintiffs do not contend otherwise. *See* Mot. 17–18.

3. "Nearly Identical Behavior Regarding Pricing" (Opp. 21-22). "Nearly identical behavior regarding pricing" is not a "plus factor." Similar payments made by host

---

[8] Plaintiffs fault the Sponsors for collectively discussing "best practices" at Alliance meetings, Opp. 19–20 & n.29, but courts have squarely held that is a legitimate function of trade associations, *Cigna*, 605 F.3d at 1296 ("The establishment and monitoring of trade standards is a legitimate and beneficial function of trade associations.") (internal quotations omitted).

families to au pairs is not the Sponsors' conduct at all. Even if it were, it would not support an inference of conspiracy: "mere parallelism . . . cannot support a conspiracy finding unless there are additional or 'plus' factors." Areeda ¶ 1434. Plaintiffs had the burden to come forward with evidence tending to show that the allegedly clustered stipends resulted from a conspiracy, and they failed to do so. *See supra* § I.B.

4. "Defendants' Decision to Create and Commoditize the 'Standard' *Au Pair*" (Opp. 22-23). Plaintiffs claim that Defendants "create[d] and commoditize[d] the 'standard' *au pair*." Once again, Plaintiffs cite no case identifying this as a relevant "plus factor," nor do Plaintiffs identify any evidence that Defendants in fact "created" or "commoditized" standard au pairs. Plaintiffs were obliged to make "specific references to supportive evidence in the record appendix," and they failed to do so. CMA Rule 7.1E(b)(2)(B).[9] This "plus factor" therefore cannot create a fact dispute.

5. "Regulatory Barriers to Entry" (Opp. 23). Plaintiffs contend that the DOS approval process for new sponsors "promotes stable price fixing," but they ignore the significant market entry that took place during the damages period. Opp. 23; *see* Mot. 18–19. In fact, they cite no evidence that any competitor was deterred or prevented from entering the market at all, and their expert even admitted that he was unsure whether the alleged barriers to entry had any meaningful effect. Mot. 19.

**D. Plaintiffs Suffered No Antitrust Injury.**

---

[9] The only record citation in this portion of Plaintiffs' brief discusses how the Sponsors compete to attract au pairs. Opp. 22 (citing PRA 161 (Kerr Merits Rpt. ¶ 73)). The cited paragraph makes no mention of any decision by the Sponsors to "create and commoditize" any class of au pair. *Id.*

In attempting to establish antitrust injury, Plaintiffs conflate two distinct concepts: injury-in-fact and antitrust injury. *See, e.g.*, *Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 106 (2d Cir. 2007) (distinguishing "injury-in-fact" from "whether any such injury is injury of the type the antitrust laws were intended to prevent") (internal quotations omitted). Plaintiffs argue that Defendants' conduct injured them, so they must be entitled to recover under the antitrust laws. *See* Opp. 55–56. But it has been clear for more than 40 years that a plaintiff must prove more than just injury-in-fact—he must <u>also</u> prove that his injury flows from a diminution in competition that was caused by the defendants' conduct. *Brunswick v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); *see Cordes*, 502 F.3d at 105 (in *Brunswick*, "Plaintiffs doubtless suffered real harm . . . but this was insufficient to meet the antitrust injury requirement").

Plaintiffs must identify evidence that competitive forces would have pushed the stipend higher but-for the challenged conduct. *Sharp v. United Airlines, Inc.*, 967 F.2d 404, 408 (10th Cir. 1992). They cannot carry that burden. The undisputed economic evidence shows that there are more au pairs willing to join the program for $195.75 than there are host families willing to hire them. Mot. 21. Accordingly, au pair stipend amounts would decrease in the but-for world. *Id.* at 21–22.

Plaintiffs try to avoid the import of these undisputed facts by imagining a different state of affairs that has no basis in the record. According to Plaintiffs, although there is an oversupply of qualified au pairs, "there are indications that there may be a shortage of candidates who have qualities viewed as acceptable to potential host families." Opp. 60. In fact, some Sponsors offer more experienced au pairs for higher prices, and they

frequently fail to place them. Mot. 15; *see also* Reply App. 18 - Stiroh Dep. 283:16-23.[10]

Unable to grapple with these market facts, Plaintiffs resort to arguing that they were automatically injured because they allege a *per se* antitrust violation. *See* Opp. 57–58. Even if this were a *per se* case—and it is not, *see* Mot. 4 n.2—that would not relieve Plaintiffs of their burden to show antitrust injury. *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 341–42 (1990) ("[t]he per se rule . . . does not indicate whether a private plaintiff has suffered an antitrust injury"). Plaintiffs had to identify evidence that competition would have increased stipends, and they have failed to do so.

## II.   PLAINTIFFS' STATE WAGE-AND-HOURS CLAIMS ARE PREEMPTED

### A.   The "Law of the Case" Does Not Prevent This Court from Revisiting Its Ruling that the Federal Au Pair Regulations Preempt State Law.

Defendants recognize the Court's statement in its recent Order on Depositions of FLSA Opt-In Class Members, ECF 969 at 3, that it had conclusively ruled at the motion to dismiss phase that there was no federal preemption (ECF 258 at 29). Defendants respectfully urge the Court to reconsider the appropriateness of a conclusive ruling on preemption in the absence of any factual evidence and without fully developed arguments. To avoid an inadvertent waiver of rights on this key legal doctrine, Defendants set forth abbreviated versions of their arguments below and refer the Court to their previously-filed summary judgment briefing.

#### 1.   The Court's Preliminary Findings at the Motion to Dismiss Stage Are Not the Law of the Case.

---

[10] Even if there were more host families than au pairs (and J-1 visas), the Sponsors still would not have an incentive to decrease the stipend; instead, they would have an incentive to increase fees for host families. *See* Reply App. 17 - Stiroh Dep. 117:4–11.

The Court's earlier ruling is not binding. *See Atkinson v. Ortiz*, No. 06-cv-01725-PAB-MJW, 2009 WL 3161960, at *5 (D. Colo. Sept. 29, 2009) (motion to dismiss decision was not law of the case because it was "tailored to the particular state of the facts at that stage of the case."). Law of the case is "discretionary rather than mandatory" and "district courts generally remain free to reconsider their earlier interlocutory orders." *Been v. O.K. Indus.*, 495 F.3d 1217, 1225 (10th Cir. 2007) (internal citations omitted). Denial of a motion to dismiss does not preclude an argument at summary judgment "because a motion to dismiss and a motion for summary judgment do not raise the 'same issues.' . . . reliance on law of the case in dismissing Defendants' motion for summary judgment . . . would be erroneous." *Robbins v. Wilkie*, 433 F.3d 755, 765 (10th Cir. 2006), *rev'd on other grounds*, 551 U.S. 537 (2007).

**B.   Even If the Earlier Ruling Is Deemed the Law of the Case, the Court Should Revisit Its Earlier Findings.**

A court should revisit its prior rulings where evidence has substantially changed or the first decision was "clearly erroneous." Opp. 4 (citing *Rimbert v. Eli Lilly & Co.*, 647 F.3d 1247, 1251 (10th Cir. 2011)). Both of these factors mandate review here.

**1.   New Facts Uncovered During Discovery Require this Court to Revisit Its Earlier Comments.**

Though Plaintiffs attempt to characterize preemption as a pure question of law, Opp. 127, they acknowledge in another filing that what they term "legislative facts" *are* relevant to the question of preemption. Plaintiffs' Opposition to Cultural Care's Motion for Clarification, ECF No. 951 at 5. There are at least three sources of legislative facts that are before the Court now that were not available at summary judgment.

First, Stanley Colvin, a former USIA and DOS employee with over two decades of experience administering the Program, submitted a factual declaration which provides context critical in understanding the Program's complex history. Defs. S.J. App. 59 - Colvin Decl. This declaration is dated June 15, 2017, well after the preliminary ruling on preemption that the Court has now deemed conclusive. Colvin's declaration confirms that the Notices reflect the considered views of DOS (in consultation with the Department of Labor ("DOL")) and have never been withdrawn.

Second, DOS has re-authorized at least two Sponsors within the past month. Reply App. 11-14. These re-authorization letters, authored during the pendency of the suit and after the Court's ruling on the motion to dismiss, confirm DOS's view that the Program primarily concerns cultural exchange. The letters emphasize that the aim of the Program is to improve "relations between the United States and other nations." *Id.* The DOS presumably issued these letters with full knowledge that Sponsors continue to advertise—and host families continue to pay—a minimum stipend of $195.75 in all states. The letters thus confirm that the Program pursues uniquely federal objectives.

Third, fact discovery has uncovered an email from DOS that confirmed as recently as September 18, 2014, that: "$195.75 a week meets the FLSA minimum wage standards and accounts for 40% au pair room and board credit." CCI Opp. App. 4. The email is an explicit statement by the administering agency that the stipend amount reflected in the Notices is lawful and complies fully with the FLSA. The letter also reflects DOS's view that compliance with the FLSA does not require compliance with state and local laws, which strongly supports the argument that state law is preempted.

2.    **The Enforcement History of the Program Shows Congress, and Federal Agencies It Charged with Administering the Program, Intended the Regulations to Preempt State Law.**

The enforcement history of the Program was not fully before the Court at the motion to dismiss stage. Fact discovery has uncovered no instance of DOL or DOS taking action against any Sponsor for participation in the Program. Colvin's declaration refutes Plaintiffs' assertion, Opp. 141-42, that DOL was somehow unaware of the stipend amount or other Program regulations. Defs. S.J. App. 59 - Colvin Decl. ¶ 14. This uncontroverted fact is material because, as the Supreme Court noted, where an industry engages in a "decades-long practice" in plain view of an agency, courts consider whether the agency ever took enforcement action or "otherwise suggested that it thought the industry was acting unlawfully." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 157 (2012). Here, DOS has affirmatively stated host families *were* acting lawfully by paying au pairs $195.75 per week. *See* CCI Opp. App. 4. DOL, aware of the Program because it was consulted by DOS, *see* 60 Fed. Reg. 8547 at 8550, has similarly not taken enforcement actions against the industry. *See* Mot. 30-32.

3.    **The Stipend Notices Are Entitled to *Auer* Deference.**

In its prior ruling, the Court dismissed the Notices and suggested that they were inconsistent with the Program regulations. ECF 258 at 24. The Sponsors respectfully submit that *Auer v. Robbins* requires deference to DOS's interpretation of its own regulations, as expressed in the Notices. 519 U.S. 452 (1997). Agency interpretations of its own regulations are controlling "unless plainly erroneous or inconsistent with the regulation." *Id.* at 461 (citations omitted). Despite the Court's earlier view that the

19

regulations "trump" the Notices, it is clear that the Notices are consistent with, and express DOS's view of, the regulations: that "$195.75 a week meets the FLSA minimum wage standards and accounts for 40% au pair room and board credit." CCI Opp. App. 4. DOS's explicit, reasoned interpretation of its own regulation qualifies for deference because it "reflects the agency's fair and considered judgment on the matter in question." *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 171 (2007).

## III.   PLAINTIFFS' CANNOT AVOID SUMMARY JUDGMENT ON THEIR RICO CLAIMS BY DEFERRING TO AMBIGUITY

Sponsors' joint motion pointed out, correctly, that Plaintiffs sought class certification on a different RICO theory than the one alleged in the complaint. Mot. 23 n.20. Both theories are legally deficient, and the RICO claim must be dismissed.

### A.   Plaintiffs' Hub-and-Spoke Enterprise Theory Is Deficient.

The RICO enterprise theory pleaded in the complaint—alleging four separate associations-in-fact, each comprising a RICO defendant, their respective host families, and recruiters—requires Plaintiffs to concede that, if host families have a lawful purpose, *all* association members, including the Sponsors, had a *common lawful* purpose. Opp. 78 (citing "innocent bystander[]" families); *United States v. Turkette*, 452 U.S. 576, 580, 583 (1981) (defining an association-in-fact as "a group of persons associated together for a common purpose of engaging in a course of conduct"). The common purpose is lawful participation in a cultural exchange program, and the allegation that each of the four RICO defendants purportedly committed unlawful acts "do[es] not render the entire [lawful enterprise] a RICO enterprise absent a common purpose among the other [enterprise] participants to violate RICO." *Moss v. BMO Harris*

*Bank, N.A.*, 258 F. Supp. 3d 289, 300 (E.D.N.Y. 2017); *see also Baker v. IBP, Inc.*, 357 F.3d 685, 691 (7th Cir. 2004) ("[The defendant] wants to pay lower wages; the recruiters want to be paid more. . . [t]hese are divergent goals."); *United States v. Int'l Longshoremen's Ass'n*, 518 F. Supp. 2d 422, 475-77 (E.D.N.Y. 2007) (dismissing RICO claims where enterprise was an "interconnected in a web of personal and commercial relationships that evolves organically as each entity pursues its own interests").[11] Plaintiffs have not posited any structure for these enterprises, as host families often switch sponsors or enter and leave the program, and different recruiters contracted with multiple Sponsors over time. Entities with divergent motivations and no continuity of membership do not satisfy the basic structural requirements of a RICO enterprise.

Plaintiffs' enterprise theory merely recites the Defendants' business: recruiters locate au pair applicants, and host families pay sponsors for au pair placement. RICO does not reach such run-of-the-mill business operations, as RICO would then apply to every entity that interacts with customers and third parties. *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 374-75 (3d Cir. 2010) (parallel conduct cannot establish an enterprise because "[w]ere the rule otherwise, competitors who independently engaged in similar types of transactions with the same firm could be considered associates in a common enterprise."); *Stachon v. United Consumers Club, Inc.*, 229 F.3d 673, 676 (7th

---

[11] Plaintiffs argue that the enterprise may be lawful, which is true if the enterprise is an actual entity. However, Plaintiffs' enterprises are associations-in-fact, and Plaintiffs have cited *no authority* that a lawful association-in-fact falls within RICO. *Fitzgerald v. Chrysler Corp.*, 116 F.3d 225, 226 (7th Cir. 1997) (dismissing RICO founded on associations-in-fact consisting of defendant, subsidiaries, dealerships, and affiliates).

Cir. 2000) (Defendant's "21 years [of] business dealings with a wide assortment of unnamed manufacturers, wholesalers, and members in no way establishes that they function with [Defendant] as a continuing unit or as an ongoing structured organization."); *Fitzgerald*, 116 F.3d at 228; *Moss*, 258 F. Supp. 3d at 300-01.

Plaintiffs' enterprise theory fares no better by omitting the host families; there would be no RICO "enterprise" distinct from the RICO "person." *See* Mot. 23-24 (citing *Bd. of Cty. Comm'rs v. Liberty Grp.*, 965 F.2d 879, 885 (10th Cir. 1992)); *see also Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1357 (11th Cir. 2016) ("[P]laintiffs may not plead the existence of a RICO enterprise between a corporate defendant and its agents or employees acting within the scope of their roles for the corporation . . ."); *Brannon v. Boatmen's First Nat'l Bank*, 153 F.3d 1144, 1148-49 (10th Cir. 1998) (no enterprise where corporation conducted its regular business affairs via delegation to a subsidiary).

## B.    Plaintiffs' Revised Horizontal RICO Theory Is Deficient.

At class certification, Plaintiffs transitioned to a new RICO theory, where the four RICO Defendants, and only those Defendants, became an association-in-fact. ECF 559 at 9. Plaintiffs do not explain why or how these four Defendants conspired, excluding the other eleven Defendants. Plaintiffs' alleged antitrust conspiracy is bereft of factual support, *see supra* § I, and this alleged sub-conspiracy fails as well.

Because they have no proof of an independent enterprise, Plaintiffs observe that corporations joining together may be an enterprise. Opp. 84. Plaintiffs, however, have proffered no association apart from the purportedly unlawful acts (*see id.*), but "[s]imilar acts by unrelated . . . entities do not create an enterprise." *Shell v. Henderson*, No. 09-

cv-00309-MSK-KMT, 2011 WL 1085784, at *6 (D. Colo. Mar. 24, 2011).[12]

Moreover, Plaintiffs' backup RICO enterprise theory is indistinguishable from the pattern of—unproven—racketeering activity. "In assessing whether an alleged enterprise has an ascertainable structure distinct from that inherent in a pattern of racketeering, it is our normal practice to determine if the enterprise would still exist were the predicate acts removed from the equation." *Handeen v. Lemaire*, 112 F.3d 1339, 1352 (8th Cir. 1997). RICO fails where, absent the unlawful conduct, the association merely engages in regular communications and transactions. *United Food & Commer. Workers Unions v. Walgreen Co.*, 719 F.3d 849, 854-55 (7th Cir. 2013); *Switzer v. Coan*, 261 F.3d 985, 992 (10th Cir. 2001) (rejecting an enterprise that was "simply the group of individual defendants accused of engaging in [] racketeering.").

### C. Plaintiffs' Failure to Prove Predicate Acts Is Not "Laughable."

Instead of correcting their failure to prove predicate acts, Plaintiffs sidestep this issue by labeling as "laughable" Defendants' assertion that statements regarding the DOS-calculated stipend were accurate. Plaintiffs' resort to insult in lieu of substantive response underscores a consistent deficiency in Plaintiffs' claims: Plaintiffs assiduously avoided undertaking proof of scienter in all of their common law claims, for the obvious reason that they cannot satisfy that burden. Defendants' position is, and has been, that their statements regarding the minimum legal stipends are (1) accurate, and (2)

---

[12] "[U]nless a plaintiff must allege something more than the fact that individuals were all engaged in the same type of illicit conduct during the same time period," RICO "becomes an open gateway to the imposition of potentially massive costs . . . , regardless of whether there is even a hint of the collaboration." *In re Ins. Brokerage*, 618 F.3d at 370 (citation and internal quotation omitted).

representative of an honestly held belief of legality. Honestly held, even if mistaken, beliefs in law are not grounds for scienter, and Plaintiffs are unable to prove the predicate fraud acts. *United States v. Moran*, 493 F.3d 1002, 1013 (9th Cir. 2007). Plaintiffs have offered no meaningful evidence to satisfy these scienter requirements.

## IV.   THE SPONSORS ARE ENTITLED TO SUMMARY JUDGMENT REGARDING THE ROOM AND BOARD CREDIT

By defining "wage" to include "the reasonable cost" of "board [and] lodging" when customarily furnished, 29 U.S.C § 203(m), the FLSA creates a "presumption" that the cost of such facilities may be included in the minimum wage. *Soler v. G. & U., Inc.*, 833 F.2d 1104, 1109 (2d Cir. 1987). Plaintiffs do not rebut this presumption. They argue only that a credit is improper because host families must provide a "suitable private bedroom," 22 C.F.R. § 62.31(e)(6), and an employer may not credit the cost of facilities it is legally required to provide. Plaintiffs' Motion for Partial Summary Judgment ("Pls. Mot."), ECF 886 at 4-5; Opp. 115. This conclusion misinterprets agency guidance.

Plaintiffs' "required by law" premise is absent from the FLSA and its regulations. They are mistaken that such a rule exists "pursuant to 29 C.F.R. § 531.30" (Pls. Mot. 4-5), which states only that the employee's acceptance of customarily furnished facilities must be "voluntary and uncoerced." 29 C.F.R. § 531.30. Assuming that requirement is valid, the acceptance of room and board satisfies § 531.30 as a matter of law when, as here, the employee voluntarily enters an employment arrangement that requires living on the premises as a condition of employment. *Lopez v. Rodriguez*, 668 F.2d 1376, 1380 (D.C. Cir. 1981) ("Since 'living-in' was a lawful condition of employment and an integral part of the job … board and lodging was 'voluntary and uncoerced' under 29

C.F.R. § 531.30."); *Roces v. Reno Hous. Auth.*, No. 3:15-cv-00408-RCJ-WGC, 2018 WL 1512598, at *9-10 (D. Nev. Mar. 27, 2018) (similar).[13] *See also* Mot. 43-45. It makes no logical difference whether the "living in" condition is imposed by the employer or the government, and no court has found otherwise.[14]

Here, living with a host family is undisputedly a condition of participating in the Program, and Plaintiffs do not show that their decision to participate in the Program was somehow coerced or involuntary. Defs. S.J. App. 703 - Gonzalez Dep. 70:3-12; Defs. R. S.J. App. 818 - Kapler Decl. ¶ 20. Accordingly, crediting the cost of the au pair's room and board against minimum wage is allowed under 29 C.F.R. § 531.30.

## CONCLUSION

For the foregoing reasons, the Court should grant the Sponsors' Motion.

---

[13] Three courts of appeals have rejected the voluntary-and-uncoerced requirement of § 531.30 as inconsistent with the FLSA. *See Herman v. Collis Foods, Inc.*, 176 F.3d 912, 916-17 (6th Cir. 1999); *Donovan v. Miller Properties, Inc.*, 711 F.2d 49, 50 (5th Cir. 1983); *Davis Bros., Inc. v. Donovan*, 700 F.2d 1368, 1370-72 (11th Cir. 1983).

[14] *Ramos-Barrientos v. Bland*, 661 F.3d 587 (11th Cir. 2011), is not to the contrary. The court held that the cost of housing provided to workers under the H-2A visa program could not be credited against minimum wage when a regulation expressly imposed the <u>cost</u> of such housing on the employer. *Id.* at 597; *see also id.* at 592 (H-2A program regulations state that "'employer must provide housing <u>at no cost</u> to the H-2A workers'" (quoting 8 U.S.C. § 1188(c)(4) and 20 C.F.R. § 655.122(d)(1)) (emphasis added)). That reasoning is consistent with DOL's determination that educational expenses may not be deducted from the au pair's stipend, as the host family must "<u>pay the cost</u> of the [au pair's] academic course work." 22 C.F.R. § 62.31(k)(1) (emphasis added). *See* DOL Opinion Ltr., 1997 WL 998029 (Aug. 19, 1997). By contrast, no cost-shifting concern is presented as to au pairs' room and board. Unlike the H-2A program regulations at issue in *Bland*, DOS regulations do <u>not</u> mandate that the <u>cost</u> of such housing be borne by the host family. Thus, DOS regulations align with the statutory presumption that of a room and board credit toward minimum wage. *See Soler*, 833 F.2d at 1109.

Dated: April 13, 2018

Respectfully submitted,

s/ Diane R. Hazel
Joan A. Lukey (joan.lukey@choate.com)
Robert M. Buchanan, Jr.
(rbuchanan@choate.com)
Michael T. Gass (mgass@choate.com)
Justin J. Wolosz (jwolosz@choate.com
Lyndsey M. Kruzer (lkruzer@choate.com)
CHOATE HALL & STEWART LLP
Two International Place
Boston, Massachusetts 02110
Telephone: (617) 248-4790

James M. Lyons (jlyons@lrrc.com)
Jessica L. Fuller (jfuller@lrrc.com)
Diane R. Hazel (dhazel@lrrc.com)
LEWIS ROCA ROTHGERBER CHRISTIE LLP
One Tabor Center, Suite 3000
1200 Seventeenth Street
Denver, CO 80202
Tel: (303) 623-9000
Fax: (303) 623-9222

**Attorneys for Defendant Cultural Care,
Inc. d/b/a Cultural Care Au Pair**

s/ Kathryn A. Reilly
Kathryn A. Reilly
(reilly@wtotrial.com)
Brett M. Mull (mull@wtotrial.com)
Natalie E. West
(west@wtotrial.com)
Wheeler Trigg O'Donnell LLP
370 Seventeenth Street, Suite 4500
Denver, CO 80202-5647

**Attorneys for Defendants Agent
Au Pair, Go Au Pair Operations,
and American Cultural
Exchange, LLC d/b/a Go Au Pair**

_s/ James E. Hartley_
James E. Hartley
(jhartley@hollandhart.com)
Jonathan S. Bender
(jsbender@hollandhart.com)
Holland & Hart LLP
555 Seventeenth Street, Suite 3200
Denver, CO 80202

Adam A. Hubbard
(aahubbard@hollandhart.com)
Holland & Hart LLP
1800 Broadway, Suite 300
Boulder, CO 80302

**_Attorneys for Defendant Cultural Homestay International_**

_s/ Susan M. Schaecher_
Susan M. Schaecher, Esq.
(sschaecher@laborlawyers.com)
FISHER & PHILLIPS, LLP
1801 California Street, Suite 2700
Denver, CO 80202
Tel: 303-218-3650
Fax: 303-218-3651

**_Attorneys for Defendants APF Global Exchange, NFP_**

_s/ Stephen J. Macri_
Stephen J. Macri
(Stephen.macri@ogletree.com)
Joseph B. Cartafalsa
(joseph.cartafalsa@ogletree.com)
Robert M. Tucker
(robert.tucker@ogletree.com)
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
1745 Broadway, 22nd Floor
New York, NY 10019
(212) 492-2071

s/ Eric J. Stock
Eric J. Stock
(estock@gibsondunn.com)
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166
(212) 351-2301

**Attorneys for Defendant**
**American Institute for Foreign**
**Study d/b/a Au Pair in America**

s/ Bogdan Enica
Bogdan Enica
(Bogdan@expertaupair.com)
Expert AuPair
111 Second Ave NE, Ste. 213
St. Petersburg, FL 33701

**Attorney for Defendant Expert**
**Group International, Inc. d/b/a**
**Expert Au Pair**

s/ Peggy E. Kozal
Peggy E. Kozal
(pkozal@gordonrees.com)
Thomas Baker Quinn
(tquinn@gordonrees.com)
Nathan A. Huey
(nhuey@gordonrees.com)
Heather K. Kelly
(hkelly@gordonrees.com)
Gordon & Rees LLP
555 17th Street, Suite 3400
Denver, CO 80202

**Attorneys for Defendant**
**AuPairCare, Inc.**

_s/ Martha L. Fitzgerald_
Martha L. Fitzgerald
(mfitzgerald@bhfs.com)
David B. Meschke
(dmeschke@bhfs.com)
Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street, Suite 2200
Denver, CO 80202-4432

**_Attorneys for Defendant_**
**_EurAuPair Intercultural Child Care_**
**_Programs_**


_s/ Brooke A. Colaizzi_
Brooke A. Colaizzi
(bcolaizzi@shermanhoward.com)
Heather F. Vickles
(hvickles@shermanhoward.com)
Raymond M. Deeny
(rdeeny@shermanhoward.com)
Joseph Hunt
(jhunt@shermanhoward.com)
Alyssa L. Levy
(alevy@shermanhoward.com)
SHERMAN & HOWARD L.L.C.
633 Seventeenth Street, Suite 3000
Denver, CO 80202

**_Attorneys for Defendant_**
**_InterExchange, Inc._**

_s/ William J. Kelly III_
William J. Kelly III
(wkelly@kellywalkerlaw.com)
Chandra Marie Feldkamp
(cfeldkamp@kellywalkerlaw.com)
KELLY & WALKER LLC
1512 Larimer Street, Suite 200
Denver, CO 80202

**Attorneys for Defendant
USAuPair, Inc.**


_s/ Meshach Y. Rhoades_
Meshach Y. Rhoades
(mrhoades@armstrongteasdale.com)
Martin J. Estevao
(mestevao@armstrongteasdale.com)
1700 Broadway, Suite 2100
Denver, CO 80290-2101
(720) 722-7195

**Attorneys for Defendant
GreatAuPair, LLC**

## CERTIFICATE OF SERVICE (CM/ECF)

I hereby certify that on April 13, 2018, I have caused to be electronically filed the foregoing **CERTAIN DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following counsel of record:

Matthew L. Schwartz (mlschwartz@bsfllp.com)
Peter M. Skinner (pskinner@bsfllp.com)
Randall W. Jackson (rjackson@bsfllp.com)
Dawn L. Smalls (dsmalls@bsfllp.com)
Joshua J. Libling (jlibling@bsfllp.com)
Sigrid S. McCawley (smccawley@bsfllp.com)
Sabria A. McElroy (smcelroy@bsfllp.com)
Sean P. Rodriguez (srodriguez@bsfllp.com)
Juan P. Valdivieso (jvaldivieso@bsfllp.com)
Boies Schiller & Flexner, LLP

Alexander N. Hood (alex@towardsjustice.org)
Towards Justice-Denver

*Counsel for Plaintiffs*

*s/ Diane R. Hazel*