IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:14-cv-03074-CMA-KMT

JOHANA PAOLA BELTRAN; et al.

        Plaintiffs,

v.

INTEREXCHANGE, INC.; et al.

        Defendants.

---

**APPENDIX IN SUPPORT OF CERTAIN DEFENDANTS'
REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

---

**TABLE OF CONTENTS FOR CERTAIN DEFENDANTS' APPENDIX**

I.     Excerpts of William O. Kerr Deposition, December 21, 2017……………..………1

II.    Department of Labor News Release, "US Secretary of Labor Withdraws Joint Employment, Independent Contractor Informal Guidance" (June 7, 2017) ……………………………………………………………………3

III.   Bryce Covert, Can Au Pairs Legally Be Paid Less Than $5 An Hour? (July 25, 2015) (available at goo.gl/cyhYuS)…………………………………..4

IV.    Department of State Re-Designation Letter to Cultural Care, Inc. (March 19, 2018) (redacted)………….…………………………………………..11

V.     Department of State Re-Designation Letter to Cultural Homestay International (March 23, 2018) (redacted) ………….…………………………13

VI.    Excerpts of Lauren J. Stiroh Deposition, March 14, 2018…………………………15

VII.   Excerpts of Beaudette Deetlefs Deposition, September 21, 2016 ……………....19

1

```
 1
 2    UNITED STATES DISTRICT COURT
      DISTRICT OF NEW YORK COLORADO
 3    ----------------------------------------X
      JOHANA PAOLA BELTRAN, et al.,
 4
              PLAINTIFFS,
 5
 6    -against-      Case No.:
                1:14-CV-03074-CMA-KMT
 7
 8    INTEREXCHANGE, INC., et al.,
 9              DEFENDANTS.
      ----------------------------------------X
10
11           DATE: December 21, 2017
12           TIME: 9:03 A.M.
13
14           VIDEOTAPED and TELECONFERENCED
15    DEPOSITION of a Non-Party Witness, WILLIAM
16    O. KERR, Ph.D., taken by the Defendants,
17    pursuant to a Notice and to the Federal
18    Rules of Civil Procedure, held at the
19    offices of Putney Twombly Hall & Hirson,
20    LLP, 521 Fifth Avenue, New York, New York
21    10175, before Suzanne Pastor, an RPR and
22    Notary Public of the State of New York.
23
24
25
```

2

```
 1
 2    A P P E A R A N C E S:
 3
 4    BOIES SCHILLER & FLEXNER, LLP
         Attorneys for the Plaintiffs
 5       1999 Harrison Street, Suite 900
         Oakland, California 94612
 6       BY: SEAN RODRIGUEZ, ESQ.
         510.874.1101
 7       srodriguez@bsfllp.com
 8    CHOATE HALL & STEWART, LLP
 9       Attorneys for the Defendants
         CULTURAL CARE, INC., d/b/a CULTURAL
10       CARE AU PAIR
         Two International Place
11       Boston, Massachusetts 02110
         BY: MICHAEL T. GASS, ESQ.
12       617.248.4750
         mgass@choate.com
13       AND: SAMUEL M. RUDMAN, ESQ.
         srudman@choate.com
14
15    PUTNEY, TWOMBLY, HALL & HIRSON, LLP
         Attorneys for the Defendant
16       AMERICAN INSTITUTE FOR FOREIGN STUDY,
         d/b/a AU PAIR IN AMERICA
17       521 Fifth Avenue
         New York, New York 10175
18       BY: JOHN B. FULFREE, ESQ.
         212.682.0020
19       jfulfree@putneylaw.com
         -and-
20    GIBSON DUNN & CRUTCHER
         200 Park Avenue
21       New York, New York 10166
22       BY: ERIC J. STOCK, ESQ.
         212.351.2301
23       estock@gibsondunn.com
24
25    (Continued on the following page.)
```

3

```
 1
 2    A P P E A R A N C E S:  (Continued)
 3
 4    LEWIS ROCA ROTHGERBER CHRISTIE, LLP
         Attorneys for Defendant
 5       CULTURAL CARE, INC., d/b/a CULTURAL CARE
         AU PAIR
 6       1200 17th Street, Suite 3000
         Denver, Colorado 80202
 7       BY: DIANE R. HAZEL, ESQ.
         303.628.9545
 8       dhazel@lrrc.com
         (Via teleconference)
 9
10    SHERMAN & HOWARD, LLP
         Attorneys for Defendant
11       INTEREXCHANGE, INC.
         633 Seventeenth Street, Suite 3000
12       Denver, Colorado 80202
         BY: BROOKE A. COLAIZZI, ESQ.
13       303.299.8471
         bcolaizzi@shermanhoward.com
14       (Via teleconference)
15
16    NIXON SHEFRIN HENSEN & OGBURN, P.C.
         Attorneys for Defendant
17       APEX and 20/20
         5619 DTC Parkway, Suite 1200
18       Greenwood Village, Colorado 80111
         BY: LAWRENCE D. STONE, ESQ.
19       303.874.3408
         lstone@nixonshefrin.com
20       (Via teleconference)
21
22
23
24
25
```

4

```
 1
 2    A P P E A R A N C E S:  (Continued)
 3
 4    WHEELER TRIG O'DONNELL
         Attorneys for Defendants
 5       GO AU PAIR, AGENT AU PAIR and AU PAIR
         INTERNATIONAL
 6       370 Seventeenth Street, Suite 4500
         Denver, Colorado 80202
 7       BY: KATHRYN A. REILLY, ESQ.
         303.244.1983
 8       reilly@wtotrial.com
         (Via teleconference)
 9
10
      BOGDAN ENICA, ESQ.
11       Attorney for Defendant
         EXPERT GROUP INTERNATIONAL, INC., d/b/a
12       EXPERT AU PAIR
         111 Second Avenue, N.E., Suite 204
13       St. Petersburg, Florida
         727.388.3472
14       bogdane@hotmail.com
         (Via teleconference)
15
16    GORDON & REES
         Attorneys for Defendant
17       Au Pair Care
         555 Seventeenth Street, Suite 3400
18       Denver, Colorado 80202
         BY: THOMAS B. QUINN, ESQ.
19       303.534.5154
         tquinn@gordonrees.com
20       (Via teleconference)
21
22    ALSO PRESENT:
23
         HOWARD SEIDEL, Videographer
24
25          *    *    *
```

1 (Pages 1 to 4)

41

W. KERR

1
2    Q.   Do you have any information to
3    suggest that the defendants came up with
4    the stipend amount of 195.75 from any
5    source other than the DOS notice?
6    A.   No.
7    Q.   And I take it you don't have
8    any reason to believe that the DOS notice
9    is the result of collusion by the
10   defendants.
11   A.   No.
12   Q.   Is it your understanding that
13   all 15 defendant sponsors are party to the
14   conspiracy -- to the collusion?
15   A.   I don't know.
16   Q.   Well, don't you need to know
17   who are the members of the alleged illegal
18   conduct to perform your work?
19   A.   I assume they are.  I've been
20   asked to assume they are.  I don't have any
21   knowledge of the 15 defendants all being
22   part of a collusive group.
23   Q.   Have you done any analysis to
24   determine whether some of the defendants
25   are not part of the alleged collusion?

42

W. KERR

1
2    A.   Have I done analysis -- I'm
3    sorry, done analysis to determine if anyone
4    is not part of the collusive group?
5    Q.   Yes.
6    A.   No.
7    Q.   So you just assumed that.
8    A.   Largely I've assumed it.  I've
9    also looked for documents to reflect -- for
10   what might be evidence of that collusion.
11   I found some.  I can't tell you that I
12   found information on every one of the 15,
13   but -- and that's really not -- again, not
14   my job to go through the -- to present the
15   facts of the collusion, which really,
16   again, is a legal side rather than -- or a
17   factual side rather than an economic
18   analysis side.
19   Q.   You acknowledge in your report
20   that not all of the defendants
21   characterized the stipend as an absolute
22   requirement, correct?
23       MR. RODRIGUEZ:  Object to the
24   form.
25   A.   I'm not sure about that.  I

43

W. KERR

1
2    haven't gone through and evaluated each of
3    them.  Some of them some of the time did
4    not.  I'll say that.  And some of them some
5    of the time did.  I didn't go back and
6    check whether all of them did it all of the
7    time or whatever the permutation is.
8    Q.   Well, some of the defendants on
9    a number of occasions characterized it as a
10   minimum, correct?
11   A.   Yes, I think I just said that,
12   yes.
13   Q.   And that would be inconsistent
14   with the alleged collusion, wouldn't it be?
15   A.   It would be accurate for them
16   to do it.
17   Q.   Well, and the alleged collusion
18   is to provide inaccurate information to the
19   prospective host families and the au pairs,
20   correct?
21   A.   Yes.  Yes.
22   Q.   So you would agree with me that
23   characterizing it as a minimum would be
24   inconsistent with the alleged collusion.
25   A.   Yeah, well, at times they had

44

W. KERR

1
2    to give -- at times some of them felt that
3    they had to give accurate information and
4    to correctly characterize what they were
5    claiming as a standard rate was in fact a
6    minimum.  Because it is.
7        Now, that doesn't mean that
8    they weren't colluding to keep the rate
9    down and that they were willing at other
10   times to do it.  Some of them some of the
11   time referred to it as a minimum.
12   Others -- some of them at some of the time
13   referred to it explicitly as a set rate or
14   as a required rate.  And there are some
15   that are ambiguous.
16       I didn't go back and evaluate
17   each and every instance I found of them
18   referring -- characterizing the rate to
19   determine whether any one of them every
20   time they referred to it called it a
21   required rate or whether they -- any of
22   them every time I could find that they
23   referred to it characterized it as a
24   minimum.
25       My impression is that some of

11 (Pages 41 to 44)

Defs.' Reply Appx. 00003

## US SECRETARY OF LABOR WITHDRAWS JOINT EMPLOYMENT, INDEPENDENT CONTRACTOR INFORMAL GUIDANCE

**WASHINGTON** – U.S. Secretary of Labor Alexander Acosta today announced the withdrawal of the U.S. Department of Labor's 2015 and 2016 informal guidance on joint employment and independent contractors. Removal of the administrator interpretations does not change the legal responsibilities of employers under the Fair Labor Standards Act and the Migrant and Seasonal Agricultural Worker Protection Act, as reflected in the department's long-standing regulations and case law. The department will continue to fully and fairly enforce all laws within its jurisdiction, including the Fair Labor Standards Act and the Migrant and Seasonal Agricultural Worker Protection Act.

**OPA News Release:** 06/07/2017

**Contact Name:** Jennifer Hazelton
**Email:** hazelton.jennifer@dol.gov
**Phone Number:** (202) 693-4676

**Release Number:** 17-0807-NAT

**Share This**

# Can Au Pairs Legally Be Paid Less Than $5 An Hour?

**BRYCE COVERT**

JUL 25, 2015, 1:00 PM



CREDIT: SHUTTERSTOCK

Beaudette Deetlefs, who goes by Bella, thought being an au pair in the United States would be a great opportunity. The agency she applied to told her she'd travel with her host family on vacation, earn enough to put money into savings, and be treated like a member of the family.

But the when she arrived in Salt Lake City from her home country of South Africa, the reality turned out to be completely different. "What the company told us before we came here, and what actually happened when we got to America, was two different things," she said. She says her host family wasn't comfortable her living in

the house, which made things tense, and wouldn't take her on vacation. Sometimes she would be left behind with no food, and the pay was meager.



"The way [the agency] presented it is you can save money," she said. "It's not possible with a family that wants you to pay for everything … The pay we get is not enough to save and do stuff with."

Federal regulations say the J-1 Visa Program, which governs au pairs, must comply with American minimum wage laws. A State Department pamphlet says as much. But a lawsuit Deetlefs and other au pairs have filed alleges that the 15 agencies in the U.S. illegally paid less than minimum wage. Agencies require host families to pay a minimum stipend of $195.75 a week, and because au pairs put in 45-hour weeks, the hourly wage comes to just $4.35. The agencies say that these wages comply with the guidelines set by the Department of Labor and the State Department.

"The State Department has regulations that are specific to au pairs, not even just the J-1 program," said Matthew L. Schwartz, a lawyer from Boies, Schiller & Flexner working on the case. "They say explicitly that the sponsors are in charge of ensuring that au pairs are paid in accordance with the Fair Labor Standards Act

[FLSA]," the law that requires all American workers to be paid minimum wage and overtime.

Go Au Pair President Bill Kapler, one of the agencies named in the lawsuit, said his company simply complies with guidelines sent to it by the government when it tells families that the minimum weekly payment is $195.75. "We truly believe it's what we've been told to do," he said. "If the Department of Labor comes back and says, 'We've changed some rules,' we'll follow whatever the rules are." He pointed out the program "is not meant to be a labor thing at all," but is run by the State Department to further foreign relations goals. Many other agencies named in the lawsuit declined to comment.



At the heart of the issue may be whether or not the host families can deduct the cost of room and board from what they pay. The complaint filed on behalf of the au pairs claims that families can't deduct the costs of food and lodging against the minimum wage given that the program requires them to provide those things. But a 2007 letter from the State Department sent to the agencies and shared with ThinkProgress, indicates they may deduct 40 percent of an au pair's compensation as the room and board credit, thus bringing their weekly stipend for 45 hours a week to $195.75 under the federal $7.25 an hour minimum wage.

Schwartz said that State Department has since withdrawn that notice and instead clarified that au pairs have to be paid in accordance with minimum wage laws. "We believe that the State Department pulled down the June 2007 notice because they realized it was erroneous once Towards Justice filed this suit," he said. "We're very confident in our view of the law."

Either way, the deductions still wouldn't account for higher state minimum wages, which the lawyers for the au pairs argue agencies would have to comply with. Twenty-nine states and Washington, D.C. have higher wage floors than the federal government does.

The lawsuit also argues that the agencies engaged in anti-trust behavior by conspiring to keep wages so low and in false advertising by making promises to the au pairs that didn't turn out to be true for many of them. Kapler of Go Au Pair denied that the agencies coordinated on wages or that it made any promises in its advertising beyond "the facts and the rules."

The complaint brought by Boies, Schiller & Flexner, the nonprofit Towards Justice, and the au pairs argues that the program has been plagued by low wages from the beginning. Started in 1986, sponsors paid just $100 a week for 45 hours of work. This caught the attention of the General Accounting Office in 1990, which issued a report saying that the au pair program was a "full-time child care work" program and the au pairs had to be treated as full-time employees. Later clarifications made it clear they had to be paid according to American wage and hour laws.

Defs.' Reply Appx. 00009

The low wages fit into the larger child care picture in the United States, in which care is expensive but also doesn't pay workers very much. "It's one more signal that the child care system is broken," said Helen Blank, director of child care and early learning at the National Women's Law Center.

The current situation doesn't work for anyone. "It's broken on both sides," Blank pointed out. "Parents are really struggling to pay for child care … then the people who are paid for child care don't get paid enough, don't get benefits, and don't get treated well."

Median pay for U.S. residents who provide child care is just $9.38 an hour, more than what au pairs can expect but on par with fast food employees, bar tenders, and parking lot attendants and less than people who care for animals in zoos or homes. Their pay increased just 1 percent between 1997 and 2013—barely keeping up with the rising cost of living. At the same time, however, the cost of care for an infant can reach as much as $16,500 a year, on average, and eats up a bigger portion of families' budgets than food, rent, or, in many states, public college tuition.

Defs.' Reply Appx. 000010

So au pairs can be "a solution for families," Blank noted. The complaint itself notes that "the sponsors extract premiums from families seeking affordable childcare with the sales pitch that even with significant sponsor fees, au pairs are significantly cheaper than other childcare options available in the United States." In many cases, this is likely true.

Even if the au pairs prevail in their lawsuit against the agencies, it won't fix this broken system. But Deetlefs hopes it changes things for people brought over to care for American children. She herself was fired from her position when she got involved in the lawsuit and is currently back home in South Africa. But she says it's not about her. "The whole purpose for me is to make it better for the au pairs that come after us," she said. "We already had a bad experience and I wish to spare them that."

Defs.' Reply Appx. 000011



**United States Department of State**

*Bureau of Educational and Cultural Affairs*
*Washington, D.C. 20547*

*www.state.gov*

March 19, 2018

Mr. Goran Rannefors
CEO
Cultural Care, Inc. d/b/a/ Cultural Care Au Pair
One Education St
Cambridge, MA 02141

Dear Mr. Rannefors:

The U.S. Department of State is pleased to inform you that **Cultural Care, Inc. d/b/a/ Cultural Care Au Pair** is re-designated as a sponsor of an exchange visitor program in accordance with the administrative regulations issued under the Mutual Educational and Cultural Exchange Act of 1961 (Public Law 87-256, also known as the Fulbright-Hays Act).  The program is identified as Exchange Visitor Program No. REDACTED. This number is to be used in all communications to identify the program to the Department of State and the Department of Homeland Security.  The following information is provided to assist you in the administration of your program:

**Approved Category on Form DS-2019:** Au Pair
**Annual Report Due Date:** Calendar year – June 30

The sponsor of an exchange visitor program is contributing to educational and cultural exchange as authorized by the Fulbright-Hays Act, the objective of which is to increase mutual understanding between the people of the United States and the people of other countries and to assist in the development of friendly, sympathetic, and peaceful relations between the United States and other nations.  This objective is best met by ensuring that participants in the exchange visitor program return abroad to exercise the skills and knowledge acquired in the United States thereby strengthening the ties and communications that unite us with the other nations of the world.

In addition, reciprocity is an integral component of the exchange visitor program and sponsors are required to make every effort to achieve the fullest possible reciprocity [22 CFR 62.8(c)].  Given this objective, many participants in any exchange visitor program may be subject to the provisions of Section 212(e) of the Immigration and Nationality Act, as amended.  For further details, see Section 22 CFR 41.63.

You are listed in the Department's records as the Responsible Officer (RO).  **Ms. Abigail Cooper, Ms. Mary Donald, Ms. Kayla Fox, Ms. Piecora Jamie, Ms. Natalie Jordan, Ms. Lauren Kostoulakos, Ms. Morgan McClure, Ms. Gisela Nilsson, Ms. Anny Juliet Rodriguez Guevara, and Ms. Rikki Tracy** are listed as the Alternate Responsible Officers (AROs) for this program.  The RO and AROs are the only officials authorized to sign the issued Form DS-2019.  These individuals are also the only officials with whom this office conducts business regarding this program. All communications originating from this program must be submitted and signed by the RO or the AROs.

Defs.' Reply Appx. 000012

2

Form DS-2019. These individuals are also the only officials with whom this office conducts business regarding this program. All communications originating from this program must be submitted and signed by the RO or the AROs.

22 CFR Part 62.11 of the Department's administrative regulations outlines the duties of the Responsible Officer. These regulations also apply to the Alternate Responsible Officers, who assist the RO in the administration of the Program. The RO is ultimately responsible for ensuring that the Program is administered according to the Department's regulations and the Student and Exchange Visitor Information System (SEVIS). Some of the duties are:

a) training and supervision of the Alternate Responsible Officer(s);
b) ensuring that Forms DS-2019 are issued responsibly;
c) ensuring that Forms DS-2019 are signed in blue ink;
d) ensuring that the SEVIS Sponsor Profile is updated to reflect any changes in address, telephone number, fax number, and email addresses of RO and ARO(s);
e) validating the arrival and participation of each exchange visitor in your program;
f) requiring that all exchange visitors have health/accident insurance for themselves and any dependents;
g) ensuring that an exchange visitor's stay in the U.S. does not exceed the set time limit for his/her category; and
h) meeting all requirements set forth in the Exchange Visitor Program regulations, such as submitting an annual report.

Please read and acquaint yourself with the regulations governing the Exchange Visitor Program and your facilitation of exchange activities. The Exchange Visitor Program Code of Federal Regulations, SEVIS User Manuals (two volumes), and Department Guidance Directives are available from our website at http://j1visa.state.gov. It is important that you take the time to read these documents. If you have any questions, please call the Office of Designation, Private Sector Programs Division, at DesignationAuPair@state.gov.

Your designation has been extended for a period of **two years** from the most recent date of re-designation noted in SEVIS. You are responsible for applying for re-designation no more than six months and no fewer than three months before the designation expiration date [22 CFR §62.7(a)]. Designation as a sponsor does not imply approval, sponsorship or promotion of your organization by the U.S. Government and should not be so implied in advertisements, business cards, websites, etc.

Thank you for your interest in and support of international educational and cultural exchange.

Sincerely,

Jennifer Zimdahl Galt
Acting Assistant Secretary

Defs.' Reply Appx. 000013



**United States Department of State**

*Bureau of Educational and Cultural Affairs*
*Washington, D.C. 20547*

*www.state.gov*

March 23, 2018

Mr. Thomas Areton
Executive Director
Cultural Homestay International
255 West End Avenue
San Rafael, CA  94901

Dear Mr. Areton:

The U.S. Department of State is pleased to inform you that **Cultural Homestay International** is re-designated as a sponsor of an exchange visitor program in accordance with the administrative regulations issued under the Mutual Educational and Cultural Exchange Act of 1961 (Public Law 87-256, also known as the Fulbright-Hays Act).  The program is identified as Exchange Visitor Program No. REDACTED.  This number is to be used in all communications to identify the program to the Department of State and the Department of Homeland Security.  The following information is provided to assist you in the administration of your program:

**Approved Category on Form DS-2019:** Au Pair
**Annual Report Due Date:** Calendar year – June 30

The sponsor of an exchange visitor program is contributing to educational and cultural exchange as authorized by the Fulbright-Hays Act, the objective of which is to increase mutual understanding between the people of the United States and the people of other countries and to assist in the development of friendly, sympathetic, and peaceful relations between the United States and other nations.  This objective is best met by ensuring that participants in the exchange visitor program return abroad to exercise the skills and knowledge acquired in the United States thereby strengthening the ties and communications that unite us with the other nations of the world.

In addition, reciprocity is an integral component of the exchange visitor program and sponsors are required to make every effort to achieve the fullest possible reciprocity [22 CFR 62.8(c)].  Given this objective, many participants in any exchange visitor program may be subject to the provisions of Section 212(e) of the Immigration and Nationality Act, as amended.  For further details, see Section 22 CFR 41.63.

You are listed in the Department's records as the Responsible Officer (RO). **Ms. Elisaveta Milholland, Ms. Linda Mori, and Ms. Christina Reilly** are listed as the Alternate Responsible Officers (AROs) for this program.  The RO and AROs are the only officials authorized to sign the issued Form DS-2019.  These individuals are also the only officials with whom this office conducts business regarding this program. All communications originating from this program must be submitted and signed by the RO or the AROs.

Defs.' Reply Appx. 000014

2

22 CFR Part 62.11 of the Department's administrative regulations outlines the duties of the Responsible Officer.  These regulations also apply to the Alternate Responsible Officers, who assist the RO in the administration of the Program.  The RO is ultimately responsible for ensuring that the Program is administered according to the Department's regulations and the Student and Exchange Visitor Information System (SEVIS).  Some of the duties are:

    a) training and supervision of the Alternate Responsible Officer(s);
    b) ensuring that Forms DS-2019 are issued responsibly;
    c) ensuring that Forms DS-2019 are signed in blue ink;
    d) ensuring that the SEVIS Sponsor Profile is updated to reflect any changes in address, telephone number, fax number, and email addresses of RO and ARO(s);
    e) validating the arrival and participation of each exchange visitor in your program;
    f) requiring that all exchange visitors have health/accident insurance for themselves and any dependents;
    g) ensuring that an exchange visitor's stay in the U.S. does not exceed the set time limit for his/her category; and
    h) meeting all requirements set forth in the Exchange Visitor Program regulations, such as submitting an annual report.

Please read and acquaint yourself with the regulations governing the Exchange Visitor Program and your facilitation of exchange activities.  The Exchange Visitor Program Code of Federal Regulations, SEVIS User Manuals (two volumes), and Department Guidance Directives are available from our website at http://j1visa.state.gov.  It is important that you take the time to read these documents.  If you have any questions, please contact the Office of Designation, Private Sector Programs Division, at DesignationAuPair@state.gov.

Your designation has been extended for a period of **two years** from the most recent date of re-designation noted in SEVIS.  You are responsible for applying for re-designation no more than six months and no fewer than three months before the designation expiration date [22 CFR §62.7(a)].  Designation as a sponsor does not imply approval, sponsorship or promotion of your organization by the U.S. Government and should not be so implied in advertisements, business cards, websites, etc.

Thank you for your interest in and support of international educational and cultural exchange.

Sincerely,

Jennifer Zimdahl Galt
Acting Assistant Secretary

Defs.' Reply Appx. 000015

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

- - - - - - - - - - - - - - - - - - - - -x

JOHANA PAOLA BELTRAN; LUSAPHO
HLATSHANI; BEAUDETTE DEETLEFS;
DAYANNA PAOLA CARDENAS CAICEDO;
ALEXANDRA IVETTE GONZALES; SARAH
CAROLINA AZUELA RASCON; LAURA
MEIJA JIMENEZ; JULIANE HARNING;
NICOLE MAPLEDORAM; and those
Similarly situated,

   Plaintiffs,

       Civil Case No.
 -against-    14-cv-03074-CMA-CBS

INTEREXCHANGE, INC.; USAUPAIR, INC.;
GREATAUPAIR, LLC; EXPERT GROUP
INTERNATIONAL, INC.; DBA EXPERT
AUPAIR; EURAUPAIR INTERCULTURAL
CHILD CARE PROGRAMS; CULTURAL
HOMESTAY INTERNATIONAL; CULTURAL
CARE, INC. D/B/A CULTURAL CARE AU
PAIR; AUPAIRCARE INC.; APF GLOBAL
EXCHANGE, NFP, DBA AU PAIR IN
AMERICA; ASSOCIATES IN CULTURAL
EXCHANGE DBA GOAUPAIR; AMERICAN
CULTURAL EXCHANGE, LLC, DBA GOAUPAIR;
AGENT AU PAIR; A.P.E.X. AMERICAN
PROFESSIONAL EXCHANGE, LLC DBA
PROAUPAIR; AND 20/20 CARE EXCHANGE,
INC. DBA THE INTERNATIONAL AU PAIR
EXCHANGE,

   Defendants.

- - - - - - - - - - - - - - - - - - - - -x
(Caption continued on the following page.)



Defs.' Reply Appx. 000016

Page 2

```
 1
 2          Videotaped oral deposition of
 3   LAUREN J. STIROH, Ph.D., taken pursuant
     to notice, was held at the law offices
     of BOIES SCHILLER & FLEXNER LLP, 575
 4   Lexington Avenue, New York, New York,
     commencing March 14, 2018, 9:16 a.m., on
 5   the above date, before Leslie Fagin, a
     Court Reporter and Notary Public in the
 6   State of New York.
 7            - - -
 8
 9
10
11
12
13
14
15
16
17
18          MAGNA LEGAL SERVICES
            320 West 37th Street, 12th Floor
19          New York, New York 10018
            (866) 624-6221
20
21
22
23
24
25
```

Page 4

```
 1
 2   APPEARANCES:
 3
 4   GIBSON DUNN & CRUTCHER
       Attorneys for Defendant AIFS and The Witness
 5       200 Park Avenue
         New York, New York
 6   BY:   ROYCE ZEISLER, ESQUIRE
           ERIC STOCK, ESQUIRE
 7       (Appearing via telephone.)
 8
 9
10   NIXON SHEFRIN HENSEN OGBURN
       Attorneys for ProAuPair and International Au
     Pair Exchange
11       5619 DTC Parkway #1200
         Greenwood Village, Colorado 80111
12   BY:   LAWRENCE STONE, ESQ.
           (Appearing via telephone.)
13
14
15   ALSO PRESENT:
16     BOGDAN ENICA,
         Expert AuPair
         (Appearing via telephone)
17
18     ROBERT STEINKOPF, Videographer
         Magna Legal Services
19
20
21
22
23
24
25
```

Page 3

```
 1
 2   APPEARANCES:
 3
 4   BOIES SCHILLER & FLEXNER LLP
       Attorneys for Plaintiffs
 5       575 Lexington Avenue
         New York, New York 10022
 6   BY:   BYRON PACHECO, ESQUIRE
           PETER SKINNER, ESQUIRE
 7
 8   SHERMAN & HOWARD LLC
       Attorneys for InterExchange, Inc.
 9       633 17th Street, Suite 3000
         Denver, Colorado 80202
10   BY:   BROOK COLAIZZI, ESQUIRE
           (Appearing via telephone.)
11
12   CHOATE HALL & STEWART LLP
13     Attorneys for Defendant Cultural
       Care, Inc. and the Witness
14       Two International Place
         Boston, Massachusetts 02110
15   BY:   MICHAEL T. GASS, ESQUIRE
           SAM RUDMAN, ESQUIRE
16         VIRGINIA I. SELDEN, ESQUIRE
17
18   GORDON & REES LLP
       Attorneys for Defendant AuPairCare
19       555 Seventeenth Street
         Suite 3400
20       Denver, Colorado 80202
     BY:   THOMAS B. QUINN, ESQUIRE
21
22
23
24
25
```

Page 5

```
 1
 2          (Stiroh Exhibit 11, Lauren J.
 3   Stiroh, Ph.D.'s merit report dated July
 4   31, 2017, marked for identification.)
 5          (Stiroh Exhibit 12, Lauren J.
 6   Stiroh, Ph.D.'s rebuttal report dated
 7   October 30, 2017, marked for
 8   identification.)
 9          THE VIDEOGRAPHER:  We are now on
10   the record.
11          This begins DVD No. 1 in the
12   deposition of Lauren Stiroh in the
13   matter of Joan pale Beltran, et al., v.
14   InterExchange, Inc., et al., in the
15   United States District Court for the
16   District of Colorado.
17          Today is Wednesday, March 14, 2018.
18   The time is 9:16 a.m.
19          This deposition is being taken at
20   575 Lexington Avenue, New York, New York
21   at the request of Boies Schiller &
22   Flexner LLP.
23          The videographer is Robert
24   Steinkopf of Magna Legal Services and
25   the court reporter is Leslie Fagin of
```



Page 114

L. Stiroh

2 make -- whether there would be an incentive
3 to raise the advertised stipend, that is part
4 of my analysis, yes, I do not agree, there is
5 an incentive to do so.
6    Q.  The reason you believe there is no
7 incentive to do so is that some of the
8 sponsor agencies have said where there is a
9 higher stipend, it's harder for us to find
10 host families?
11    A.  That is part of the information
12 that I have considered.
13        In addition to reviewing data that
14 indicate that there are more au pairs than
15 there are visas and reviewing data that there
16 is a limit on the number of visas at any
17 moment of time that can be offered and my
18 understanding that, for the most part,
19 sponsor agencies are generally able to use
20 the visas that they have.
21        Under all of those considerations,
22 it would not be economically rational to
23 offer a higher stipend in the advertised
24 material and a lower host family fee if you
25 are able to place sufficient au pairs at all

Page 115

L. Stiroh

2 of your allocated J-1 visas at the higher
3 fee.
4    Q.  So the three factors you identified
5 that formed your conclusion that this is not
6 an incentive is information from the sponsors
7 as to the difficulty in attracting host
8 families, the fact there are more au pairs
9 than there are visas, and the limit on the
10 number of agencies that are in the
11 marketplace, is that right?
12    A.  I don't know the third one.  The
13 third one is a fact that the sponsor agencies
14 are able to generally use their visas.  I
15 think there are some situations where they
16 give some back or don't use them all, but I
17 think, generally, they are able to use them.
18    Q.  The three factors are the
19 information from the sponsors, the fact that
20 there are more au pairs than visas, and the
21 fact that the sponsor agency generally use
22 all their visas?
23    A.  Those three facts tell me it is the
24 economically rational not to advertise a
25 higher -- individually, economically

Page 116

L. Stiroh

2 rational, not to advertise a higher stipend
3 for au pairs of similar qualifications when
4 you are able to find sufficient to place all
5 of the host families for which you have
6 visas.
7    Q.  A part of your conclusion is
8 relying upon what the sponsors have said,
9 right, with respect to their ability to
10 attract au pairs at a higher stipend?
11    A.  I think that's true, whether it is
12 specific to the way that you worded it, I may
13 word it as my opinion is based on what I
14 observe as the economic outcomes and it is
15 consistent and explained by the declarations
16 of sponsor agencies.
17    Q.  So if the sponsor agencies were
18 wrong, if, in fact, it's no harder to attract
19 host families at a higher stipend than it is
20 at a lower stipend, then your analysis would
21 change, correct?
22    A.  No, because my analysis is also
23 dependent on the economic outcomes, so there
24 are a number of visas and I think that is a
25 market fact that cannot be extracted from in

Page 117

L. Stiroh

2 this market.
3        When host families are able to use
4 all of their visas, even if they thought
5 there were more host families they could
6 potentially get, the economic incentives are
7 not to lower the host family fee and, in
8 fact, if they thought there were more host
9 families and they had more visas, then they
10 thought there would be an economic incentive
11 to increase it.
12    Q.  So in your analysis, it doesn't
13 matter what the sponsors say with respect to
14 their ability to attract host families at a
15 higher stipend?
16        MR. GASS:  Objection.
17        MR. QUINN:  Objection.
18    A.  I don't think that is true.  I
19 think the work that I do and other economists
20 that function as expert witnesses, we look at
21 what the economic data is, we look at what an
22 economic model would say and we look for
23 information in the record to see if the
24 market participants behave in a way that is
25 consistent with the economic models predict.



Defs.' Reply Appx. 000018

Page 282

L. Stiroh

2  I also have information that,
3  generally, the au pair sponsors are able to
4  use their allotment of J-1 visas, so that
5  tells me that all of the visas that they
6  have, not all the time, but, generally, would
7  get used.
8      I also have the pieces of
9  information from the sponsors that indicate
10  that it is easier to find more qualified au
11  pairs than host families.  All of that
12  together tells me that this is a meaningful
13  oversupply of au pairs that but for the
14  regulation in the market, market forces would
15  cause stipends to fall as the 26,000 au pairs
16  competing for 20,000 placements would
17  undercut each other to get a position.
18      Q.   But all of that then, to a certain
19  extent, boils down to that information you
20  get from the sponsors that it's easier to get
21  a qualified au pair.  What do you they mean
22  by, a qualified au pair?
23      A.   By that, I understand it to mean
24  meets the qualifications that I think are set
25  forth by the Department of State, but I may

Page 283

L. Stiroh

2  be misremembering that and they are, I
3  believe, listed somewhere in my report and I
4  don't call them specifically to mind right
5  now.
6      Q.   What I'm wondering is, the State
7  Department qualifications, a bare minimum to
8  qualify for a J-1 visa, but the au pair
9  market might require a higher qualifications
10  for the host family to hire that au pair, and
11  if qualified au pair is satisfying the
12  minimum State Department, how do you know
13  there is not actually an undersupply of au
14  pairs that the host families are actually
15  willing to buy?
16      A.   From a couple of sources.
17  Information from the sponsor agencies that
18  specialize in pro au pairs, that have a
19  higher level of qualifications.  Some of
20  those au pairs, notwithstanding their higher
21  qualifications, still accept positions at
22  195.75 because they would prefer that to not
23  getting a position at all.
24      In addition to the information that
25  I understand generally, the visas get used so

Page 284

L. Stiroh

2  that means that there is some clearing on
3  average on the household side and the excess
4  supply of au pairs is persistent,
5  notwithstanding that.
6      Q.   Anything else, other than that,
7  supporting this part of your opinion?
8      A.   I think if I can just gather all my
9  thoughts.  I think the other piece of
10  information is that the conspiracy, as
11  alleged, does not bind that type of activity,
12  so far as I am aware, and so if there was an
13  unmet need for higher qualified au pairs,
14  there is nothing binding the market on the
15  upward side where a household could say, I
16  want somebody with a college degree and be
17  able to screen for that type of information,
18  I think is something that could be -- it's
19  not hidden, it's not a quality that you don't
20  find out until six months into the tenure of
21  the au pair.  You can screen for that and you
22  could pay more for it if that is something
23  the household values.
24      Q.   Any other factors informing your
25  conclusion that what we have here is not a

Page 285

L. Stiroh

2  situation where there is an undersupply of
3  qualified au pairs, aside from the pro au
4  pair information and the fact that the visas
5  are typically used and the fact that the host
6  families can make higher requirements if they
7  want to?
8      A.   I think all of those are consistent
9  with there not being an undersupply of
10  qualified au pairs.
11      Q.   The sponsors basically -- I don't
12  know if this comes across all sponsors, tell
13  me if you agree with me or not, most of the
14  sponsors engage either themselves or in
15  coordination with others to recruit au pairs
16  to then post them on their websites, trying
17  to match them with sponsors, is that right,
18  more or less?
19      A.   I don't think I remember clearly
20  enough all of the information about how the
21  au pairs are recruited.  As I recall, some of
22  the au pairs have relationships with
23  recruiting companies in other countries that
24  advertise for au pairs that then make their
25  way on to the au pair websites, but I am not



Defs.' Reply Appx. 000019

<u>D E P O S I T I O N</u>

HELD AT CAPE TOWN, SOUTH AFRICA

<u>DATE</u>:                                        21 SEPTEMBER 2016

In:

<u>JOHANA PAOLA BELTRAN</u>

and

<u>INTEREXCHANGE</u>

<u>BEFORE</u>:

                 (TRANSPERFECT DEPOSITION SERVICES)

<u>COMMISSIONER OF OATHS</u>:

<u>ON BEHALF OF PLAINTIFF</u>:          MR DANIEL SCHWARTZ

<u>ON BEHALF OF DEFENDANT</u>:          MR JUSTIN WOLOSZ

VERITAS A DIVISION OF EOH LEGAL SERVICES (PTY) LIMITED

Defs.' Reply Appx. 000020

MR WOLOSZ                        87                        B DEETLEFS

stayed?

MS DEETLEFS:  I think it was in Long Island – Long Beach something like that.  It was like a hostel.  From my understanding it was ~~called~~ <u>Cultural Care's</u>~~... (indistinct)~~

5  Buildings.

MR WOLOSZ:  And who paid for your stay there?

MS DEETLEFS:  I don't know.

MR WOLOSZ:  But you didn't pay for – did you have to pay for your room?

10  MS DEETLEFS:  No.

MR WOLOSZ:  It was provided for you?

MS DEETLEFS:  Yes.

MR WOLOSZ:  Who paid for your meals?

MS DEETLEFS:  It was provided for.

15  MR WOLOSZ:  Did you receive training while you were there in New York?

MS DEETLEFS:  Yes.

MR WOLOSZ:  Where did the training take place?

MS DEETLEFS:  Where we lived.

20  MR WOLOSZ:  ~~Oh~~ <u>So</u> at the – in the same complex?

MS DEETLEFS:  Yes.

MR WOLOSZ:  How long was the training?

MS DEETLEFS:  I think it was three days.

MR WOLOSZ:  And approximately how many hours per day?

25  MS DEETLEFS:  A lot.  I can't remember the exact times it was

21.09.16                                                    /...