# Exhibit 61

Annex 1

---

Message

---

| | |
|---|---|
| **From:** | Ilir Zherka [/O=FIRST ORGANIZATION/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=ILIR ZHERKA0B3] |
| **Sent:** | 2/25/2016 8:22:39 PM |
| **To:** | 'Thomas Areton' [chitom@chinet.org]; 'Jim Hartley' [JHartley@hollandhart.com]; 'tom harriman' [tomharrimanattorney@hotmail.com]; 'CHI Directors' [directors@chinet.org] |
| **CC:** | 'Christina Reilly' [chichristina@chinet.org]; Lisa Heyn [/O=FIRST ORGANIZATION/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Lisa Heyn]; Mark Overmann [/O=FIRST ORGANIZATION/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Mark Overmann6626bf2f] |
| **Subject:** | RE: From Tom - re Au Pair... |

Tom:

I haven't read the decision, but intend to do so soon. I will schedule a call with you to discuss our strategy once I do that and we hear back from Robin regarding the May meeting.

Best,

Ilir Zherka
Executive Director
Alliance for International Exchange
1828 L Street, NW, Suite 1150
Washington, DC 20036
www.alliance-exchange.org
202-293-6141

---

**From:** Thomas Areton [mailto:chitom@chinet.org]
**Sent:** Tuesday, February 23, 2016 5:52 PM
**To:** Jim Hartley <JHartley@hollandhart.com>; tom harriman <tomharrimanattorney@hotmail.com>; Ilir Zherka <IZherka@Alliance-Exchange.org>; CHI Directors <directors@chinet.org>
**Subject:** From Tom - re Au Pair...
**Importance:** High

Good afternoon, Gentlemen…

I have been analyzing the judge's decision. It became apparent that the judge had incorrect idea as what the AP organizations do and what their function is in the Au Pair program. There are two salient points I wish the attorneys made to the District Judge.

1)      Even the weekly AP pay of $195.75, as low as it is, is very difficult for many Au Pair families to meet. This is not a program for the 1% of wealthy "millionaires and billionaires"… It is a program for the middle class working women. Taking an Au Pair is already a big financial burden, but it is doable. Most Au Pair tend 2 or 3 children.   Under the proposed new régime, $10 per hour wage would amount to $475 per week (O/T and no deduction for room and board) – more than a double. $12 per hour would translate into $570 per week. (SEA and SFO families would have to pay $750 per week!) This would make the AP program completely unaffordable to 99% of AP families. These working women would stop working and perhaps go on welfare. Is this what the judge intended?
2)      Every demand will find its supply. Shady characters will start trafficking in Au Pairs almost immediately. Hapless South American and East European young women will come to the U.S. on visitor visas, they will overstay. These women will not be screened, trained nor vetted in their home countries. AP families will no longer get screened through the Criminal Background Check or interviewed. The program will become rife for exploitation, sexual and otherwise. The Au Pairs will have no one to go to, to check on their welfare nor help them when they become victims of abuse. The young

CONFIDENTIAL
ALLI-035950

American toddlers will become the unintended victims of this short-sighted decision. The US DoS J-1 AP program will close down as it will become economically unfeasible for organizations to continue.

This is an impending disaster and it is an emergency! DAS Learner should be interested, as she was a member of Sen. Kerry's anti-trafficking task force before she became our Deputy Assistant Secretary for J-1 programs. What illegal abortion did to women in back alleys, this decision will do to young overseas Au Pairs who will be smuggled to the U.S. on tourist visas. I can already see the oncoming disaster.

The time is now to contact Secretary Clinton or our legislators.

Tom

**Tom Areton**
**Executive Director**
**Phone: 415-459-5397, ext 0**
**Fax: 415-453-9445**

**Cultural Homestay International (CHI)**
**Toll Free: 1-800-432-4643**
Website: chinet.org
CHI Blog | Facebook | YouTube | Twitter

PLAINTIFFS' RESP. APP.0000648

CONFIDENTIAL

ALLI-035951

# Exhibit 434

PLAINTIFFS' RESP. APP.0004786

Confidential

Page 66

1    A.    The Alliance position was and I believe
2  still is, but somebody else can speak to that -- the
3  Alliance position was that maintaining the national
4  stipend was the most desirable outcome for the Au
5  Pair Program.
6    Q.    And that was part of the common agenda of
7  the Alliance?
8    A.    Yes.
9    Q.    I think you said earlier that if there had
10  been state and local wages applied to the Au Pair
11  Program that would make the program hard to
12  administer?
13    A.    Yes.
14    Q.    Why would it make it hard to administer?
15    A.    We would have a different set of rules for
16  every state potentially.
17    Q.    And are you aware of how au pairs are
18  compensated?
19    A.    In broad general terms, yeah.
20    Q.    What is your general broad understanding
21  of how they are compensated?
22    A.    They receive a weekly stipend.

Page 67

1    Q.    And from whom do they receive --
2    A.    The host family.
3    Q.    So why would having state and local wages
4  be hard to administer if it's the host families that
5  pay?
6    A.    Well, you'd have potentially more than 50
7  different jurisdictions and different -- and
8  different stipends. I mean, if you have one national
9  stipend, then everybody knows.
10        But if you have 50 plus, because some
11  cities, I believe, have minimum wages, then that
12  becomes pretty complex. You have -- let's make up a
13  number -- 56 sets of rules.
14    Q.    And was that understanding about the
15  difficulty of administering more than 50 different
16  sets of rules, was that based in part on input from
17  au pair sponsors?
18    A.    Yes, but also just my impression that it
19  would be. I mean, the other things are you have
20  other rules. If the state allows a domestic worker
21  to work overtime, that would diminish the cultural
22  exchange opportunities for an au pair.

Page 68

1        They have a 45-hour per week cap, as I'm
2  sure you're aware, that would be superseded by the
3  law in Massachusetts if it were applied to au pairs.
4        They could find other jobs in families
5  that are not vetted, which would pose a risk just --
6  you know, to their participant safety and, again,
7  diminish the cultural exchange aspects.
8        We wanted to preserve this as a cultural
9  exchange program. This approach would turn it more
10  toward a work program.
11    Q.    And when you say, "we," are you referring
12  to the Alliance and the au pair sponsors?
13    A.    I am.
14    Q.    And does having a fixed national stipend
15  help promote cultural exchange?
16    A.    In the sense that it provides -- in the
17  sense that it provides an affordable predictable
18  environment, it allows, I believe, for a larger
19  program and more broad participation both of families
20  and exchange participants.
21        So in that sense, yes. It's part of the
22  infrastructure that makes the program successful.

Page 69

1    Q.    And do you have an understanding as to why
2  an affordable predictable environment was beneficial
3  for au pair sponsors?
4        MR. QUINN: Objection to the form.
5    A.    Again, it's a much easier program to
6  administer if you have -- it's a challenging program
7  to administer in any event. But it's simpler with
8  one set of rules than 56 sets of rules.
9        BY MR. VALDIVIESO:
10    Q.    And you mentioned a work program earlier.
11  What do you mean by, "work program"?
12    A.    The United States has a variety of --
13  there are a variety of ways to come to the United
14  States, varied categories of these, as I'm sure
15  you're all aware.
16        And there are Visas, H, L, Q, examples,
17  where people come particular -- the purpose of their
18  coming to the United States is to work. The exchange
19  visitor visa, the J visa, the purpose is cultural
20  exchange.
21        And the work -- the work element was
22  injected by Congress in 1961, the Mutual Educational

# Exhibit 435

Annex 1

Highly Confidential - Attorneys' Eyes Only

Page 38

1       BY MS. SMALLS:
2       Q.   Was one of the common strategies of the au
3   pair sponsor group to keep a uniform national
4   stipend?
5           MS. LUKEY:  Objection.  Form.
6       A.   Our strategy at the Alliance is to support
7   a national federal exchange policy.  And in that
8   respect, we support uniformity across regulations for
9   the Au Pair Program, as is the case for other
10  programs as well that are exchange programs.
11          BY MS. SMALLS:
12      Q.   Has the Alliance ever taken a position
13  with respect to the au pair stipend?
14          MS. REYES:  Objection as to form.
15      A.   You have to be more specific than that.
16          BY MS. SMALLS:
17      Q.   Has the Alliance ever taken a position on
18  the au pair stipend?
19          MS. REYES:  Objection as to form.
20      A.   Our -- since I've been at the Alliance
21  since 2016, our view regarding the stipend has been
22  that the stipend should be uniform to reflect the

Page 39

1   exchange nature of the Au Pair Program and to ensure
2   that as much as possible that au pair opportunities
3   are available for host families throughout the United
4   States, which I believe is a view reflected in the
5   1996 regulation regarding uniformity.
6           BY MS. SMALLS:
7       Q.   And you said "our" view --
8       A.   Meaning the Alliance.
9       Q.   -- meaning the Alliance.  Okay.
10          Was it the collective view of au pair
11  sponsors that the stipend should be uniform to
12  reflect the exchange nature of the program?
13          MS. LUKEY:  Objection to form.
14      A.   I don't know if you're asking me a
15  specific question.  The policy of the Alliance since
16  I've been at the Alliance is to support uniformity
17  across all the regulations to ensure that the program
18  is an exchange program and that it's available to
19  host families and communities throughout the United
20  States.
21          BY MS. SMALLS:
22      Q.   You're making a distinction between

Page 40

1   speaking on behalf of the Alliance and au pair
2   sponsors; is that correct?
3       A.   I'm speaking about the Alliance and what
4   our views are, yes.  When I used the word, "our,"
5   it's in reference to the Alliance.
6       Q.   But you've testified that you have -- in
7   your role at the Alliance, you advance the collective
8   view of au pair sponsors; is that correct?
9           MS. LUKEY:  Objection to form.
10          MS. REYES:  Object to the form.
11      A.   That is not correct.
12          BY MS. SMALLS:
13      Q.   Okay.
14      A.   That is not correct.  We advance our --
15  the Alliance's views on public policy.  In advancing
16  the Alliance's views on public policy, we do talk to
17  members of the Alliance.
18      Q.   Do you ever organize au pair sponsors
19  towards collective action?
20          MS. LUKEY:  Objection to form.
21      A.   We do ask Alliance sponsors to do certain
22  things that we ask of all of them.

Page 41

1       BY MS. SMALLS:
2       Q.   Do you ever tell au pair sponsors to take
3   one position over another?
4       A.   We -- in interacting with our members, we
5   do share with them what our positions are.
6       Q.   Was a common goal of the Alliance to
7   maintain a uniform national stipend?
8           MS. LUKEY:  Objection to form.
9       A.   The goal of the Alliance, since I've been
10  at the Alliance, is to have uniformity in the au pair
11  programming, including the stipend.
12          MS. SMALLS:  Could you mark this as 4,
13  please?
14          (Exhibit Number 4 was marked for
15  identification and was attached to the deposition.)
16          MS. LUKEY:  And for those on the phone,
17  Exhibit 4 is ExpertAuPair 028121.
18          MS. REYES:  And before you start asking
19  questions on this regard, I see that this is produced
20  by ExpertAuPair.
21          I know in our production we've redacted
22  the first part of this pursuant to the privilege and

MAGNA
LEGAL SERVICES

# Exhibit 12

Case 1:14-cv-03074-CMA-KMT   Document 943-1   Filed 03/17/18   USDC Colorado   Page 427 of 471

8/8/16

Call w/ the lobbyists
re: our pair

Carl:
- different options.
- stand-alone bill amending PBSA
  corresponding letter to DoS

• come up with a 3-5 point plan
  up usage w/ each other but
  are essentially different

Alex:
- what pressure can you bring
  to bear on DoS?
  top #s, LLCs, sponsors,
  lobbyists etc. weighing
  in

Kate:
- what does the Alliance want
  to stand for? - grooming
  principle?

~ this: core principles:
  - keeping this as an exchange

- our pair = member of HF
            ≠ employer
- bipartisanship
- uniformity no stipend

(Lisa)

• set up our pair lobbyists meeting
• Alliance can work on options
  before-hand

Alex:
• we can't just attack DoS
  we have to nudge them in the
  right direction but not confront
  them

afternoon Feb.18
Friday after 11:00   Feb.19

PLAINTIFFS' RESP. APP.0000423

ALLI-000006

# Exhibit 21

Case No. 1:14-cv-03074-CMA-KMT    Document 989-1    filed 04/13/18    USDC Colorado    pg 11 of 56
Annex 1
Case 1:14-cv-03074-CMA-KMT    Document 909-20    Filed 09/27/17    USDC Colorado    Page 275 of 392



**Alliance Membership Meeting 2009**

**Au Pair Task Force Meeting Report**
**October 21, 2009**
*Chair*: Ruth Ferry, AIFS – Au Pair in America

In Attendance:  Uta Christianson, InterExchange; Goran Rannefors and Natalie Jordan, EF – Cultural Care;  Bill Kapler, goAuPair; Ruth Ferry, AIFS – Au Pair in America

Au pair sponsors are comfortable with task force approach – accustomed to collaborating over the years on regulatory matters.

Goran Rannefors provided a brief history and current update on a bill before the Massachusetts legislature to govern au pair/nanny programs.  For over 10 years, EF and AIFS have met with legislators and submitted testimony supporting federal regulations and opposing state regulations which, if passed, would set a precedent for other states to regulate at the state level and make it cumbersome if not impossible to administer the program.  During recent meetings, we learned the chairs of the committees with oversight are not in favor of the bill and in all likelihood the bill will move to study and therefore no additional action required by sponsors. Sponsors who have questions are welcome to contact Goran Rannefors or Ruth Ferry.

Subpart A of J Program 22CFR Part 62

We appreciate the importance for each organization to file a response to the proposed rule before the November 23 deadline—that our voice in numbers was critical to facilitating change.

The overriding concerns we discussed with respect to the rule:

1.  62.5(c)(6) and 62.7(2) business information report from Dunn and Bradstreet:  Those who have checked D&B reports for their own organizations do not find the information accurate and so question the validity of such report.  Attaining a D&B report for all 3rd parties foreign and domestic with whom a sponsor has a written agreement raises concern for those of us who have networks of local representatives who are independent contractors.  While ECA has indicated the intent of the language is to require D&B reports on all foreign partners and on all host organizations, we want the language of the bill to be more specific to that intent.

2.  62.14 insurance:  We noted the increase in minimum coverage levels.  Aside from cost, we expressed concern with the proviso that levels may be adjusted by the Department through guidance documents.

ALLIANCE FOR INTERNATIONAL EDUCATIONAL AND CULTURAL EXCHANGE          1

**InterExchange0031005**

PLAINTIFFS' RESP. APP.0001720

3. Actions by sponsors related to SEVIS: we noted that several requirements including those related to control of forms DS-2019 (62.12) would require a rule change with SEVIS II.

Educational requirement
We view a change to the current educational component a strategic focus for au pair programs in 2010.

ECA is open to change the regulatory requirement and Stanley has requested the Alliance submit a paper proposing a change to the requirement that all sponsors sign. The requirement must remain 'educational' for statutory reasons. He is prepared to allow on-line courses, with the proviso that volunteer experience be added to provide a community immersion component. He apparently will not accept volunteering as a substitute for classroom education, however.

Sponsors present felt the requirement for classroom education and the opportunity for au pairs to take an on-line coupled with a volunteer component was viable. Working from this premise, Ruth Ferry offered to work with Michael McCarry to draft a proposal to change the education rule. We agreed that a draft paper would be distributed by the Alliance to member au pair sponsors and when there was agreement from the group, sent to non-Alliance members for consensus.

Age cap
Some sponsors felt they did not view a change to the age cap, currently age 27, was critical, but would support a request to change to age 30 or 32. A change would enable more au pairs who would like to return to the program after a 2-year home residency to do so.

The age cap change will be requested with the change of education.

Beyond immediate issues:

We are concerned that several newer au pair sponsors are not members of the Alliance and do not benefit from sharing best practices and gaining insight in to the regulatory aspects of the program. We view it an important mission to encourage their membership in 2010.

The filing of extension requests for the sponsor and the Department of State is cumbersome. Sponsors would be pleased to work with the Department in an effort to streamline the process.

Sponsors would like to know more about the future focus of the Department with the expansion of the compliance unit.

ALLIANCE FOR INTERNATIONAL EDUCATIONAL AND CULTURAL EXCHANGE                2

**InterExchange0031006**

PLAINTIFFS' RESP. APP.0001721

# Exhibit 248

IV. **THERE IS NO EVIDENCE THAT THE CONSPIRACY, AS ALLEGED, IS ECONOMICALLY RATIONAL**

A. **The Conspiracy as Alleged Would Not Be Profitable Because There Is No Market Mechanism that Would Drive Au Pair Stipends Higher in the But-For World**

31.   For Plaintiffs' theory of antitrust harm to be correct, at a fundamental level it must be the case that Defendants have successfully conspired to decrease weekly stipends below the level that would prevail under competitive conditions and profited from doing so. This would mean that but for the alleged conspiracy, weekly stipends paid to au pairs by host families would have been driven higher by market forces. If but-for stipends would be higher, there should be evidence that market forces would push au pair stipends higher but are prevented from doing so by the alleged conduct.

32.   I have not yet seen how Plaintiffs and Plaintiffs' expert will demonstrate that current stipends are below stipends that would prevail in a competitive but-for world. This is critical because at the current stipend levels, I understand that there are already enough au pairs willing to participate in the program to satisfy host family demand. In fact, all of the evidence that I have seen indicates that there are already more qualified au pairs willing to participate in the program at the current DOS minimum stipend than there are families willing to host them.[66] This suggests that the current DOS minimum stipend is a binding price floor and that market forces would push stipends downwards rather than upwards if that floor were removed, irrespective of any alleged conspiracy. Therefore, Defendants do not have an economic incentive to agree on a weekly stipend amount because they can achieve the same outcomes observed in the alleged market through independent, competitive action.

33.   In addition, if at the current DOS minimum stipend level, sponsors can attract enough au pairs to the program to satisfy host family demand, then it is not clear what market forces would push stipends to be any higher in a but-for world. There is no incentive for any individual au pair sponsor to join a buyers' cartel. Nor is there an incentive for a sponsor to unilaterally deviate from the alleged agreement. In a typical cartel, while members can collectively earn higher profits from cooperating, individual cartel members would find it profitable to unilaterally deviate from the agreement.[67] But in this case, individual sponsors would not find it profitable to unilaterally raise stipends because it is possible to attract sufficient au pairs to meet host family demand at current stipend levels. I have not seen how Plaintiffs' expert will attempt to show that an individual sponsor can profit by unilaterally raising stipends. If there is no reason for individual sponsor agencies to

---

[66]   I discuss the evidence for an excess supply of au pairs at the stipends that were received in **Section V.A**.

[67]   This is the reason why functioning cartels typically need both an agreement mechanism and an enforcement mechanism. In a typical functioning cartel, members are better off collectively under the agreement, but would individually be better off by cheating on the agreement.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

PLAINTIFFS' RESP. APP.0002005

# Exhibit 15

1/12/16

Au Pair number

Conference call

- Specific questions/comments?

- Natalie: there confident re: Friday meeting?
  (b/ she is scheduled to be out of the country)

- Marcie: What is the expectation for the meeting?

- Shannon: Has ECA's agenda changed?

- Stacey: CCA has a disconnect w/ re: sponsors being businesses

- Natalie: we have to be really careful about what we distribute!
  b/ it can get tied into lawsuit
  b/ have a subcommittee to discuss are this
  b/ potentially meeting Thursday afternoon to prep for Friday

- Ellen: keep as much out of writing as possible
  b/ not available on Friday

- Shannon: program's PD value
  b/ define au pair program as part of PD policy
  → Bill: DoS is well aware

- Marcie: go into what this may mean for the families
  → Bill: yes, be clear about this:
  so different loops won't work
  → we cannot divide from this

- Bill: talk about how the au pair program is different from other J-1s like S&T

  prep meetings could also be Friday morning depending on Gwen meeting time

ALLI-000018

PLAINTIFFS' RESP. APP.0000434

Case 1:14-cv-03074-CMA-KMT   Document 943-1   Filed 03/17/18   USDC Colorado   Page 435 of 471

Susan Goldsmith session continued

\* other sponsors feel like IENA + co don't hold 3d parties compliant

→ EGA has picked up on it

• ACA will be open re: who gets the invitation

• Susan truly believes EGA wants to know what camps want and need

↳ doesn't feel like there is some kind of underlying problem

• ACA will provide table group facilitate

→ will share the notes

• EGA has never reached out to ACA
  • like this before → good sign?

• Susan will be sharing questions

Role:

– then then in on:
  How would a minimum wage
  change the nature of the
  program?

– the trade-off w/ higher minimum
  wage is not worth it

– reassure them that we are
  speaking on behalf of the Alliance
  → we are a step removed

ALLI-000019

PLAINTIFFS' RESP. APP. 0000435

# Exhibit 434

PLAINTIFFS' RESP. APP.0004786

Confidential

Page 38

1  don't really quite understand why you're going on the
2  record.
3          MR. VALDIVIESO:  If we could leave the
4  objections to form, we'd appreciate it.
5          MS. REYES:  Well, that's fine, but, you
6  know, ask a question that's not a trick.
7          MS. SMALLS:  Okay.  I'm speaking, I've
8  appeared, and I'm saying you just gave like a
9  three-minute objection.  I'm sure it felt good to get
10  all of that out, but if we can limit objections to
11  form, that would help move this along.
12          MS. REYES:  If we ask questions ethically,
13  that would be fine.
14          MR. VALDIVIESO:  Okay.
15          BY MR. VALDIVIESO:
16  Q.    You testified that you believed that
17  having a balkanized stipend would be damaging to the
18  Au Pair Program; is that right?
19  A.    Yes.  That's right.
20  Q.    Okay.  And what is the basis for your
21  belief?
22  A.    The basis for my belief is what I said

Page 39

1  before, about it needs to be a national program so
2  there's equal opportunities for young people to go to
3  different places and for all families to be
4  participating.
5  Q.    And you testified earlier about how you
6  received input from au pair sponsor members in
7  setting the agenda?
8  A.    Right.
9  Q.    Was that belief based at all in part on
10  having received input from the au pair sponsor
11  agencies?
12  A.    Yes.
13  Q.    And what input in particular did you
14  receive with respect to a need for a national stipend
15  from au pair sponsor agencies?
16  A.    I had phone conversations with a number of
17  sponsors, all of whom shared my view.
18  Q.    And did they sometimes share that view in
19  phone conversations when there was more than one
20  sponsor on the line?
21  A.    I don't recall that.
22          MR. VALDIVIESO:  I'm going to hand you

Page 40

1  what the court reporter will please mark as Exhibit
2  No. 2.  It's an Alliance document ending in 26611 and
3  it's marked confidential.
4          (Exhibit Number 2 was marked for
5  identification and was attached to the deposition.)
6          BY MR. VALDIVIESO:
7  Q.    Are you ready?
8  A.    Yes.
9  Q.    Okay.  Mr. McCarry, what is Exhibit 2?
10  A.    It's a series of emails mostly from -- an
11  email chain in which I'm included mostly -- and the
12  other participants are various lobbyists who are
13  working on exchange issues.
14  Q.    What is the context of Exhibit 2?
15  A.    The context is -- again, this is towards
16  the end of my tenure.  This is -- we have Kate
17  Eltrich's report about the Senate approps (sic)
18  amendment.  And that's what it's primarily about.
19  Q.    Okay.  And is the Senate approps (sic)
20  amendment -- was that the amendment that you were
21  thinking about earlier?
22  A.    Yes.  It's the same one.

Page 41

1  Q.    Okay.  And you believe that you did
2  receive this email --
3  A.    Yes.
4  Q.    -- and you participated in this email
5  chain?
6  A.    Yes.
7  Q.    If we look on page 26613, there's an email
8  from you to Bob Dotchin, Susan Glucksman, Alec
9  French, Carl Thorsen, copying Kate Eltrich and Mark
10  Overmann.
11          Do you see that?
12  A.    Yes, I do.
13  Q.    It's dated July 10th, 2015.  And it says:
14  "Here is how it came out."
15          Do you see that??
16  A.    I do.
17  Q.    Okay.  What is the language that follows
18  after that?
19  A.    That's the language.  It's the Senate
20  report -- Senate approps (sic) report.
21  Q.    Okay.  And did you have an -- did you have
22  a belief as to how that language would affect the Au

MAGNA
LEGAL SERVICES

Annex 1

Confidential

| Page 158 | Page 160 |
|---|---|

**Page 158**

1   to me to be proprietary.

2   Q.   So given that it was not -- that you

3   didn't consider it to be proprietary information, was

4   it then appropriate for sponsors to discuss the au

5   pair stipend, in your view?

6   MS. REYES:  Objection as to form and

7   foundation.

8   MS. KRUZER:  Same objection.

9   A.   No.  I don't have a view about that.

10   BY MR. VALDIVIESO:

11   Q.   Do you recall being on any discussions in

12   which sponsors discussed the au pair stipends with

13   each other?

14   A.   The only time there was ever any

15   discussion of the stipend in my time at the Alliance

16   was we were in that -- when we were in that process

17   when there was the three-step bump, 050-709, of the

18   minimum wage.

19   As we approached the date for that,

20   someone would ask me, "Michael, have you heard yet

21   from Stanley when he's going to announce the new

22   stipend."  That was the only discussion, the timing

**Page 159**

1   of the announcement of the new stipend; no

2   substantive discussion at all.

3   Q.   And you don't recall any discussion about

4   the au pair stipend around the time that we were

5   discussing at the very beginning of today when the

6   appropriations subcommittee had issued language about

7   the au pair stipend?

8   A.   No.

9   MR. VALDIVIESO:  Faith, could you please

10   give Mr. McCarry the December 4th, 2015 letter to Ms.

11   Ryan?

12   MS. REYES:  It's Exhibit 3, the attachment

13   to Exhibit 3.

14   MR. VALDIVIESO:  Thank you.

15   BY MR. VALDIVIESO:

16   Q.   In that third paragraph when we looked at

17   this earlier today --

18   A.   Right.

19   Q.   -- in formulating that paragraph, did you

20   have any discussions with au pair sponsors regarding

21   the au pair stipend?

22   A.   Yes, I did.

**Page 160**

1   Q.   And were those discussions with the au

2   pair sponsors as a group or one-on-one?

3   A.   One-on-one, I believe.  Can I just clarify

4   something?

5   Q.   Sure.

6   A.   When you asked me about discussions of the

7   stipend, I understood you to mean the amount of the

8   stipend.  I don't know if that's what you meant.

9   MR. OGLETREE:  Is that what you meant?

10   MR. VALDIVIESO:  I was discussing any

11   discussion about the au pair stipend at all, both --

12   I understand that that's -- so let's leave a clear

13   record of what your testimony is.

14   A.   Yes, I agree.  That's why I raised it.

15   BY MR. VALDIVIESO:

16   Q.   Okay.  So do you recall any conversations

17   among the sponsors that you were present in or privy

18   to in which the au pair stipend was discussed?

19   A.   The question of the national stipend

20   versus state and local minimum wages, yes.  There

21   were such discussions.

22   Q.   And with respect to the amount of the

**Page 161**

1   stipend, are there any conversations among sponsors

2   or including sponsors that you recall?

3   A.   No.

4   MR. VALDIVIESO:  Okay.  Now I'll admit on

5   the record that I'm confused because I thought that

6   you understood my original question to refer to the

7   amount.

8   And I believe that you testified in

9   response to that question, as you understood it, that

10   there had been conversations with regard -- in 2005,

11   2007, and in 2009?

12   A.   Correct.  And the conversation was, when

13   will Stanley tell us what the new stipend is.  That

14   was all.  I'm sorry.

15   Q.   Okay.  So let's try one more time to leave

16   a clear record.

17   So my first question is:  Do you recall

18   any conversations among sponsors that you know about

19   in which the au pair stipend was discussed?

20   A.   The amount or policy issues surrounding

21   it?

22   Q.   Let's start with the first one.



# Exhibit 16

1/8/16

- Our wants Diana + Caucus chairs
  to clarify their intention
  "each Caucus to 90-day plan
    └ develop support plan
       to materials, briefings, emails etc.
       to exchange pax visits

Kate Ehrich
Susan Hays
Christine laMonica-Lunn + Michael Matthys
Natalie Jordan
Ellen Hubgard
Vir Mar, Aaron, Lisa (in person)
Bill Garte + Ruth Ferry

① SFoPS

July: Senate SFoPS when working
on approps bill, included an
fair language
  to issue of minimum wage
    → language initially seemed to
      suggest that state + local
      wage's should apply
        └ DoS to report how senators
          are complying w/ minimum
          wage
  - this was Republican language,
    Democrats didn't feel strongly
  - Dems helped rewrite the language
  - Dem staff may have an interest
    in redefining the au pair
    program (re: wage's)

ALLI-000020

PLAINTIFFS' RESP. APP. 0000437

① lobbyist conversations

- Dem staff asserted that there was confusion about what applies
- a congressional report is not law
  └> we want to prevent confusing around idea
  └> you need to use the legal process to regulate
  └> there is a litigation
  └> we don't need a reinterpretation
- people in the administration don't seem to know that Robin & co. are doing this

- Aaron:
  - we are not unclear about the regs
    └> federal minimum wage sets the stipend
    └> legal counsel confirmed this

- Bill:
  - it's muddied - it's a grey area
    └> there's subpart A re: FLSA
  └> we can't dismiss out of hand

Sean:
- by raising this dust storm, we may be raising the issue - fear

Bill:
- should we just wait for a rule / report
  └> if we do nothing, DOL will say state + local apply
- might be smarter now to at least kill the report
  └> potential legal issues if we keep kicking the can
  - this is not going away
  - NA bill: there will be minimum wage for au pairs in NA in 2017

Ellen:
- history w/ DOS: if we do nothing it usually doesn't work well for us
- who's pushing this agenda?
  └> Kate: Sen. Leahy staff (Tim Rieser) has had concerns re au pair for disables
  - it seems to be coming from RJH
- BPBS felt like they needed to stay abreast on J-1
  (report congress every year)

PLAINTIFFS' RESP. APP. 0000438

ALLI-000021

- 5 -

Natalie:
- we for the first time received a summary from State re:
  audit
    └ no mention of wages / stipend

Bacari:
- no mention at recent DoS-sponsor meetings

Jhir:
- waiting to hear back from CCA re: Elan Ryan - Alliance - sponsor meeting

\# FSLA does not define stipend - it is a reference for DoL to determine appropriate stipend

Jhir:
- if we disagree + Robin is successful that locks people in, becomes policy
- there's a possibility - we could turn Elan + others around
  └ is an Alliance + sponsor meeting w/ Elan will likely not be enough

Natalie:
- Our position cannot be that there is confusion about the current regs \#
- we became unilateral if we suggest we need clarification
  └ Jhir: this has to be our collective position
- when we communicate w/ families we have to be really careful re: what we put in writing (check w/ legal counsel)
  └ keep it as high-level as possible

Bacari:
- CCA has not punished any sponsor absent for what we're doing

ALLI-000022

PLAINTIFFS' RESP. APP. 0000439

-7-

3. Review of options memo
- DoS engagement +
- Tier 1 Hill engagement
  (plus Tier 2)
- Grassroots engagement

Hill engagement
- Dave: who has the power + willingness
  to influence DoS.
→ Graham + Carter: could influence Tony
→ Kaine: constituents; very responsive
    SFRC
→ Granger + Lowey: BFDRS
→ Royce + Engel: HFAC
(double-edged sword:
  minimum wage issue is gaining
  traction as primary Democratic
  agenda item
- Feran: → met w/ CCAP + APHA
  - Feran is pro federal exemption,
    hates class-action)
- DHs:
  - program allows a wide range
    of American families to do this

→ this argument could fly →)
  Dems → make it about families
Natalie:
- we are not cherry-picking a wage
- it's not just about the amount
  of $ they are paid; it's also
  about tracking hours, another
  doing on premises etc.
- we need to strategically determine
  which arguments are most
  compelling
- this doesn't just create a
  hurdle, this ends the program
Ellen:
- ECK seems to appreciate sponsor
  proactiveness
  → should we propose a new
    spend amount?
  → Julie Nolar(?) - AFF mid-
    Atlantic Regional Director (in LA)
    = Ferma Hill Staffer
    = very articulate
  (→ w/... at this moment, offering up
    to DoS is premature
    → that may change.

ALLI-000023

PLAINTIFFS' RESP. APP. 0000440

-7-

3. Review of options memo
- DoS engagement +
- Tier 1 Hill engagement
  (plus Tier 2)
- Grassroots engagement

Hill engagement
- Gale: who has the power + willingness
  to influence DoS?
  ↳ Graham + Corker: could influence
    Kerry
  ↳ Kaine: constituents; very responsive
    SFRC
  ↳ Granger + Lowey: SFOPS
  ↳ Royce + Engel: HFAC
  (double-edged sword:
  minimum wage issue is gaining
  traction as primary Democratic
  agenda item
- Secan: 9 mot w/ CCAP + APHA
  - Royce is pro federal exemption,
    holds class-action)
- our
  · program allows a wide range
    of American families to do this

↳ this argument could fly - w/
  Dems ⇒ make it about families

Natalie:
- we are not charging picking a wage
- it's not just about the amount
  of $ they are paid...it's also
  about tracking hours, D wither
  Dining on premises etc.
- we need to strategically determine
  which arguments are most
  compelling
- this doesn't just create a
  hassle, this ends the program

Allen:
- Eck seems to appreciate sponsor
  proactiveness
  ↳ Should we propose a new
    stipend amount?
  ↳ Julie Polar(?) - ARE mid-
    Atlantic Regional Director (in)
    = former Hill staffer
    = very articulate
  ↳ Wir: at this moment, opening up
    to DoS is premature
    → that may change

ALLI-000024

PLAINTIFFS' RESP. APP. 0000441

— 8 —

↳ to get their ideas first as we don't want to negotiate against ourselves

- Beth has an agenda as she always do

- because of the minimum wage, we need to have sth. we can offer

- Vir: Grassroots
- numbers matter (but sometimes an constant/can seem heavy-heavy)
- sponsors to identify whatever? of families they find appropriate
  ↳ do more targeted outreach

- Gavin: what is our ask?
↳ Vir: there is an effort to make program into a jobs program
↳ Gavin: by whom? I need to know for sure!
↳ Bill: we can only go to the families so many times
  ↳ we need a clear ask
↳ Natalie: the speculation and threat is enough to stoke it to families
  ↳ DoS may come back and say

— 9 —

- Beth: we need to all be on the same page
  ↳ we can't create a dust storm if we're not all behind this
  ↳ we have to put our cards on the table
  ↳ our host families believe they are working w/ a legal program
  ↳ strong distrust of families esp. in the DC area

- Ellen: they could do domestic work or illegal childcare
  ↳ they want the cultural exchange
- Michael: messaging before or after meeting w/ Ryan.
  ↳ Vir: before
  ↳ we will share talking points + ask
  • what's the tone of the messaging?
    ↳ say is failing - could end program almost

- Bill: you don't want to scare families from program

CONFIDENTIAL PLAINTIFFS' RESP. APP. 000442

ALLI-000025
REPLACEMENT PAGE

ATTORNEY'S EYES ONLY 00013"

add to talking points:
- socioeconomic group
- young women

- Michael: there's an advantage to not knowing the exact details
  - ...this could do ABC
- Christine: we need to run everything by lawyers re: lawsuit
- Susan: we need to be clear + consistent

Group to work on talking points and ask: Natalie, Ruth, Michael

TO DO:
- Jur to call Kit 1/8
- Alliance to circulate talking points and ask 1/8 → share in pm 1/11
- Alliance to work on action plan 1/8
- next call: 1/12 @ 3:30 pm
- Alliance to reach out to all sponsors 1/8

ALLI-000026

PLAINTIFFS' RESP. APP. 0000443

# Exhibit 18

## Potential Report and Changes to Au Pair Program:
## Messages and Requests
### January 2016

The goal of this document is to ensure that all parties – au pair sponsors, Alliance staff, and consultants – are making the same points regarding the benefits of the current regulatory regime, the proposed State Department changes, and what we are asking of whom.

### Current Regulatory Regime

1. This program provides an immersive cultural exchange for both au pairs and host families; au pairs develop valuable skills and strong ties to the United States; and children of host families receive quality care and develop travel aspirations and enhanced interest in international engagement.

2. The program meets three of the Department of State's stated key foreign policy priorities: Women's empowerment; Youth engagement; and American English language acquisition

3. Au pairs receive a weekly stipend of $195.75 from their host families, and amount set by State Department after an extensive interagency process with the Department of Labor; au pairs also receive room, board, transportation, and other benefits from their host families.

4. In the 1995 rule, USIA asserted "the programmatic need for a uniform wage" across the program, and intended its rules in this case to preempt local laws, as au pair is a federal program authorized by Congress.

5. This uniform approach has enable sponsor organizations to provide au pair opportunity uniformly across the country and empower families at a range of income levels to afford to participate.

### Problems with Potential State Department Changes

1. Generally, moving the program from a federal exchange program that is fully regulated by the Department of State, to one in which certain state and local requirements take precedence would. . .?

2. Specifically, changing the required au pair weekly stipend from a federally-mandated amount to one in which the higher of state and local minimum wages apply would. . .?

3. Ever-increasing regulation and the Bureau's stated interest in lowering program fees (this relates not to just to au pair but also all J-1 programs). More and more regulation means that the cost of implementing the programs is continually rising—yet the Department continues to insist on lower programs fees for participants

Confidential - Internal Document Only

ALLI-000055

4. Regarding program fees, one of the principal issues in the 2013 Senate immigration bill was attempting to placement responsibility for program fee payment on host employers/families, not participants. Implementation of such a requirement would bind participants more closely to their host employers, and thus may affect participant safety and program satisfaction. This practice would move au pair and all J-1 programs closer to labor programs rather than cultural exchange. While the Department has not specifically said they want to make this change for au pair, it is an on-going concern for all J-1 programs with a work component, and has taken new life with its inclusion in the Senate SFOPS funding bill regarding SWT fishery placements.

**Requests**

1. Families:

2. Congress:

3. State Department/Obama Administration:

Confidential - Internal Document Only

ALLI-000056

# Exhibit 57

Annex 1

Case 1:14-cv-03074-CMA-KMT   Document 943-4   Filed 03/17/18   USDC Colorado   Page 20 of 166

---

Message

---

| | |
|---|---|
| **From**: | Michael McCarry [/O=FIRST ORGANIZATION/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=MICHAEL MCCARRY989DD960] |
| **Sent**: | 10/23/2015 11:13:02 AM |
| **To**: | Goran Rannefors [Goran.Rannefors@culturalcare.com] |
| **Subject**: | my idea re au pair |

---

Goran – sorry we kept missing each other yesterday. Thought getting this into an email might be the most efficient procedure.

As we approach a rule making on au pair, I'm concerned the RJL is seen as the only authoritative voice in the Department (who would/could challenge her?), and that Evan (to the extent she pays attention to this) would have no real basis to question anything RJL says about the program.

So here's what I'm thinking:  what if I write to Evan, copies to RJL and Rick Ruth, a letter that basically lays out the argument I made to RJL in Cape Town, I.e., FLSA is in the rule, but the rule also includes 'programmatic need for national stipend,' details of interagency process to set stipend based on federal minimum wage, and a clear statement that the mandated stipend is compliant with FLSA.

I could note in passing that ECA has, till now, never challenged this since the publication of the rule and over 20 years of audits.

Could express concern that the Dept has now all but taken a public position reversing this without consultation, said the same thing to MA AG (might not be fully specific there), and we are concerned about the future of the program, especially since this decision has been reached without any consultation w sponsors, rule making, etc., and goes against 20 years of well established practice that has built a successful program.

I think I would have to say that with the political impasse around federal minimum wage, we would like to work with ECA to develop a new method of calculating a national stipend that is compliant with FLSA and is regularly revisited to ensure that au pairs are treated fairly.  I could even throw in a reference to the CT case if we think it helpful.

What I'm trying to do is let leaders at ECA know, respectfully, that RJL is wrong about this and has backed them into a political corner.  As needed, we would tell them this again in our comment letter, but know there are reasonable people who will understand and possibly support our perspective.  This may be an easier fight if we can weigh in on the front end.

Welcome your thoughts – I'm in and out today with a morning meeting and CSIET presentation in the pm.  Best, M

CONFIDENTIAL

# Exhibit 331

*Alliance*
*for International Exchange*

December 4, 2015

The Honorable Evan Ryan
Assistant Secretary for Educational and Cultural Affairs
U.S. Department of State

Dear Evan:

Thanks for a great discussion Tuesday.  As you said, the partnership between ECA and the Alliance is critical for our field, and I'm sure the strong ties will continue and deepen under Ilir and Bill's leadership.

I want to follow up on our brief conversation about the au pair rulemaking, and hope we can set a time soon for a meeting to discuss the sponsor community's concerns. I'll be happy to work with Kit on setting a date and other details.

Recent comments from the Bureau appear to suggest that a new rule may mandate that au pair weekly stipends be set in accordance with state and local laws, rather than the national stipend that has served the program well for over 25 years. We strongly believe that a change like this would be very damaging to the au pair program, and, realistically, could bring it to an end.

Should local stipends become the rule, prospective au pairs will aspire to those locations with high stipends, and will be reluctant to accept placements with lower compensation. Sponsors will not be able to meet the demand from applicants for families in the more economically desirable locations, which means a sharp reduction in program participation. If sponsors were to continue to operate under these potential conditions, the result would be a boutique activity that serves only a few locations, rather than a national program that makes a cultural exchange opportunity available to every American family.

We are also concerned about participant safety and welfare. State legislatures and city councils that legislate to protect domestic *workers* are serving a population that already resides in the U.S. and relies on domestic work for its livelihood. They are not concerned about cultural exchange participants. Recent Massachusetts law, for example, would allow au pairs to work overtime and for multiple (un-vetted) families, undermining both cultural exchange and participant safety.

We believe strongly in the power and impact of the au pair program, and feel just as strongly that it must remain a national program, fully regulated by the Department of State. Sharing your authority with state and local governments – that have no mandate or authority to foster cultural exchange – would damage the program, perhaps irreparably. Further, we believe that such a change would fundamentally shift the nature of what survives from a cultural exchange to a labor program.

1828 L STREET, NW, SUITE 1150 | WASHINGTON, DC 20036 | TEL 202-293-6141 | www.alliance-exchange.org

PLAINTIFFS' RESP. APP.0003158

CONFIDENTIAL                                                                      ALLI-021378

Annex 1

We believe that the Department can maintain its full authority and continue au pair as a truly national program, while addressing any and all issues facing the program. We look forward to meeting with you, and to working with you and your team to ensure that outcome.

Sincerely,

Michael McCarry
Executive Director

PLAINTIFFS' RESP. APP.0003159

CONFIDENTIAL

ALLI-021379

Annex 1

# Exhibit 215

PLAINTIFFS' RESP. APP.0001810

**Subject:** Re: Update - Good News and Next Steps
**From:** Ellen Hoggard <ellen@aupairfoundation.org>
**To:** Ilir Zherka <IZherka@Alliance-Exchange.org>,"'wgertz@aifs.com'" <wgertz@aifs.com>,"'rferry@aifs.com'" <rferry@aifs.com>,"'bill@asse.com'" <bill@asse.com>,"'smcnamara@aupaircare.com'" <smcnamara@aupaircare.com>,"chitom@chinet.org'" <chitom@chinet.org>,"chilinda@chinet.org'" <chilinda@chinet.org>,"'goran.rannefors@ef.com'" <goran.rannefors@ef.com>,"'dan.sodervall@ef.com'" <dan.sodervall@ef.com>,"natalie.jordan@ef.com'" <natalie.jordan@ef.com>,"shayes@eurapair.com'" <shayes@eurapair.com>,"mark@expertaupair.com'" <mark@expertaupair.com>,"'bkapler@goaupair.com'" <bkapler@goaupair.com>,"'twilson@goaupair.com'" <twilson@goaupair.com>,"shannon@greataupair.com'" <shannon@greataupair.com>,"jennifer@greataupair.com'" <jennifer@greataupair.com>,"clamonica-lunn@interexchange.org'" <clamonica-lunn@interexchange.org>,"mmchugh@interexchange.org'" <mmchugh@interexchange.org>,"jwilhelm@intraxinc.com'" <jwilhelm@intraxinc.com>,"mschneider@intraxinc.com'" <mschneider@intraxinc.com>,"heidi@proaupair.com'" <heidi@proaupair.com>,"susan@proaupair.com'" <susan@proaupair.com>,"stacey@agentaupair.com'" <stacey@agentaupair.com>,'Christina Reilly' <chichristinar@chinet.org>
**Time:** Friday, January 29, 2016 1:15:37 PM GMT-07:00

Dear Ilir:

Thank you for sharing this great news on a Friday afternoon! Well done!  Looking forward to hearing next steps.

All boats always rise with the tide when we as programs work together under the umbrella of the Alliance. This shows how we truly are The Voice of International Education!

Warm regards,

Ellen



Ellen B. Hoggard
President RO

Au Pair Foundation
100 Main Street, Suite 420
Concord, MA, 01742
Phone: 866-428-7247 x201
Fax: 707-658-2393
www.aupairfoundation.org

EXHIBIT 15
Hoggard
R. Grogan 8-10-17

**From:** Ilir Zherka <IZherka@Alliance-Exchange.org>
**Sent:** Friday, January 29, 2016 2:39 PM
**To:** 'wgertz@aifs.com'; 'rferry@aifs.com'; 'bill@asse.com'; Ellen Hoggard; 'smcnamara@aupaircare.com'; 'chitom@chinet.org'; 'chilinda@chinet.org'; 'goran.rannefors@ef.com'; 'dan.sodervall@ef.com'; 'natalie.jordan@ef.com'; 'shayes@eurapair.com'; 'mark@expertaupair.com'; 'bkapler@goaupair.com';

PLAINTIFFS' RESP. APP.0001811

'twilson@goaupair.com'; 'shannon@greataupair.com'; 'jennifer@greataupair.com'; 'clamonica-lunn@interexchange.org'; 'mmchugh@interexchange.org'; 'jwilhelm@intraxinc.com'; 'mschneider@intraxinc.com'; 'heidi@proaupair.com'; 'susan@proaupair.com'; 'stacey@agentaupair.com'; 'Christina Reilly'
**Cc:** Mark Overmann; Lisa Heyn; 'Kate Eltrich'
**Subject:** Update - Good News and Next Steps

Greetings:

We have some very good news to share. The appropriations subcommittee staff jointly asked ECA for a verbal briefing on the stipend question, rather than a written report. Additionally, the majority staff communicated to ECA that they believe it would be inappropriate to make new policy through a report to their committee. Those are both things we wanted and got. So, two big wins thus far, with the caveat that unexpected things can still happen. We'll remain vigilant.

The briefing hasn't been scheduled yet. We will be providing information and support to both set of staffers, and will try to thoroughly brief the majority staff beforehand. We'll let you all know how their meeting went once we hear back.

Additionally, we will keep pushing forward on the larger congressional engagement strategy because we know that Robin hopes to change the stipend calculation at some point. So, next Thursday, we are meeting with most of the offices we identified last week. EF and AIFS have helped set those meetings up and will be attending them with us. That is great news. We're putting our heads together with the other lobbyists next week to decide on messages and requests for each office.

We'll set up a conference call on either Feb. 5 or 8 to share reports from the various meetings and to discuss next steps. Stay tuned for details.

Best,

Ilir Zherka
Executive Director
Alliance for International Exchange
1828 L Street, NW, Suite 1150
Washington, DC 20036
www.alliance-exchange.org
202-293-6141

PLAINTIFFS' RESP. APP.0001812

APEX-20/20 10085

AP Pan

DIANE CULKIN (TAVIS BACK UP)
MARY GRANT (CPA)
JOY PROCTOR (CPA)
KELLY STEVENS (PROG ANALYST)
DAVID GLASNER? DOS

PARTNERSHIP
COMMITTED TO EXAMINING
CHANGING WORLD
HSW

REGS - FRAMEWORK / MINIMUM

SPONSORS - LYNCH PIN FOR SUCCESS
(BAND TOGETHER / CREATE COP
OF CONDUCT)
DISTANCING W/ OFF TERMS

1BY- Schedule + Weekly Planner

AP RULE -
BEGINNING 704
PUBLIC COMMENT
REGS

AUDIT - SPONSOR DATA
PROPRIETARY INFO

INCIDENTS + COMPLAINTS + FRIENDS

CAR ACCIDENTS
INTERNATIONAL DRIVER'S LIC.
CHECK BY STATE
DEFENSIVE DRIVING SKILL
DUI - GERMANS

DRINKS - SPIKED
PEOPLE WHEN -
POLICE - DISREPUTE H/SW
IF IN DOUBT → SEND IT
WILL CALL HOTLINE OF SPONSOR
IN MIDDLE OF NIGHT

AP Vacation + SICK DAYS
TREATED AS FAMILY MEMBERS
SPONSORS SHOULD HAVE
PROTOCOLS IN EXTENDED
ILLNESS

NOT LABOR PROGRAM

FOLLOW INTENT OF FULBRIGHT/AU
SEND RECORDS
REGS

WALK TO GET RECORDS STRAIGHT

ALLI-034847

# Exhibit 72

HIGHLY CONFIDENTIAL – ATTORNEY EYES ONLY

| | |
|---|---|
| **From:** | Michael McCarry <MMcCarry@alliance-exchange.org> |
| **Sent:** | Thursday, April 02, 2009 1:43 PM |
| **To:** | stacey@agentaupair.com |
| **Cc:** | Ruth Ferry |
| **Subject:** | The Alliance |
| **Attachments:** | MEMBERSHIP APPLICATION CHECKLIST with logo.doc; 2009 MEMBERSHIP INFORMATION sheet with logo.doc; ALLIANCE mission.doc; 2009 Dues Worksheet.doc; Members List 2009 with logo.doc |

Hi, Stacey – Ruth Ferry said she had been in touch with you recently, and she encouraged me to contact you about the possibility of Alliance membership for Agent Au Pair.  I think you are generally familiar with the work we do – within the Alliance, the au pair group has been especially effective in working with ECA (and as needed, Congress) to support the program.  While the sponsors maintain their own relationships with State, I think it's fair to say that they all see value in a collective approach on policy and advocacy.  I'm sure our members agree that our efforts would be stronger and the program better served if all the au pair sponsors were at the table.

We've recommended to Stanley that he convene a meeting soon to discuss the educational component, and I will strongly suggest that all sponsors, not just Alliance members, have an opportunity to participate.  Should that happen, I hope it will give us an opportunity to discuss this.

I'm attaching some basic information on Alliance membership, including the all-important question of dues levels.  There is a scale based on organizational size, and a worksheet to figure out dues is attached.   There is a process involved in accepting a member, which according to our by-laws is accomplished by a vote of the current membership.  It's relatively straightforward and painless, and I'd be happy to answer any questions should this be of interest.

Best wishes,

Michael

Michael McCarry
Executive Director
Alliance for International Educational & Cultural Exchange
1776 Massachusetts Avenue, N.W.
Suite 620
Washington, D.C. 20036
(202)293-6141
(202)293-6144(fax)
www.alliance-exchange.org

1



PLAINTIFFS' RESP. APP.0000691

AAP_0000848

Annex 1

PLAINTIFFS' RESP. APP.0000692

Case No. 1:14-cv-03074-CMA-KMT    Document 989-1    filed 04/13/18    USDC Colorado    pg 44 of 56
Annex 1
Case 1:14-cv-03074-CMA-KMT    Document 943-4    Filed 03/17/18    USDC Colorado    Page 81 of 166

HIGHLY CONFIDENTIAL – ATTORNEY EYES ONLY



## MEMBERSHIP APPLICATION CHECKLIST

The Alliance welcomes applications for membership. Organizations wishing to be considered for membership should submit a cover sheet containing the following information and accompanying material:

**Items to include in cover letter:**

   1.    Contact information, including names, addresses, telephone and fax numbers

   2.    Name of CEO and individual who would serve as primary Alliance representative (if not CEO)

   3.    Year founded

   4.    Organizational mission statement and description of international activities

   5.    Description of your interest in and ability to contribute to the mission of the Alliance

   6.    Description of any pertinent corporate parent or subsidiary relationships

   7.    Confirmation of J-1 Exchange Visitor Visa designation (if applicable)

   8.    Description of primary source(s) of funding

   9.    Estimation of Alliance dues level (see 2008 Dues Level Worksheet)

**Items to accompany cover letter:**

   1.    Printed materials describing your organization and its activities, including most recent annual report

   2.    Articles of Incorporation

   3.    By-laws

   4.    IRS certification of non-profit status, if applicable

   5.    Most recent IRS form 990, 1065, or 1120, as appropriate

   6.    Most recent Audited Financial Statement

   7.    List of Governing Board

   8.    Two letters of reference, including one from a current Alliance member

If you are not able to provide an item, please explain in the cover letter. Your application should be submitted to the attention of Michael McCarry, Executive Director.

HIGHLY CONFIDENTIAL – ATTORNEY EYES ONLY

*Alliance*
*for International Educational and*
*Cultural Exchange*

## MEMBERSHIP INFORMATION

*The Alliance for International Educational and Cultural Exchange* is a membership association located in Washington, DC, whose mission is to formulate and promote public policies that support the growth and well-being of international exchange linkage between the people of the United States and other nations. The association is a 501 (c) (3) organization incorporated in the District of Columbia. Its membership is composed of leading organizations in the United States dedicated to international educational and cultural exchange activities. The Alliance welcomes inquiries from organizations interested in joining the Alliance who meet its membership criteria.

**Benefits and Privileges:** Alliance membership provides opportunities for organizations in the U.S. exchange community to contribute to a community-wide effort to advance and strengthen educational and cultural exchanges. Every organization admitted to membership is entitled to a position on the Alliance Board of Directors, ensuring each member's ability to participate in the governance of the association. Individuals from each member organization are eligible to serve as Alliance officers or members of the Executive Committee. Additional individuals are eligible to serve on Alliance Task Forces or other working groups on specific issues of concern to the organization, as well as advocacy meetings with the executive and legislative branches. All of these activities serve to set and execute the policy agenda of the exchange community.

Membership in the Alliance provides access to an unsurpassed network of CEOs and senior executives engaged in international activities. Member organizations are entitled to receive the Alliance's comprehensive information services and to fully utilize the extensive government-relations expertise of the Alliance staff.

**Eligibility:** To be considered for membership organizations must: 1) be legally established in the United States; 2) have clearly defined programs and activities directly concerned with conducting, facilitating, or supporting international exchange and which are national or regional in scope; 3) comply with generally accepted ethical standards for the conduct of international exchange activities; and 4) agree with the purposes of the Alliance. For some larger organizations, separate divisions dedicated to international exchange-related activities are also eligible for Alliance membership.

**Other Forms of Affiliation:** Organizations and individuals who are involved with international exchanges but cannot consider full membership may be interested in the Alliance's affiliates and subscribers programs. For information about these programs, contact the Alliance office.

**Consideration and Approval:** Membership in the Alliance is granted on approval by majority vote of the Alliance Board of Directors upon recommendation of the Alliance's Membership and Executive Committees. The Board is composed of one representative from each organization.

**Dues:** Membership dues are the Alliance's primary source of support. Member organizations pay dues annually based on total salaries, benefits, and other compensation paid for personnel devoted to international exchange-related activities. Dues are assessed according to the table on the 2009

Annex 1

HIGHLY CONFIDENTIAL – ATTORNEY EYES ONLY

Membership Dues Worksheet. Annual dues amounts are for the 2009 membership period and are subject to possible change in the future by a vote of the Board. For organizations joining the Alliance mid-year, dues are prorated by quarters, i.e., an organization joining in July would pay for two quarters, or one-half of the annual dues for that year.

**Applications:** Organizations wishing to become members of the Alliance should submit a cover letter and accompanying materials detailed on the attached checklist.

The application should be submitted to:

*Michael McCarry*
*Executive Director*
*Alliance for International Educational and Cultural Exchange*
*1776 Massachusetts Avenue, NW*
*Suite 620*
*Washington, DC 20036*

**Additional Information:** For additional information please contact Michael McCarry, Executive Director at tel: (202) 293-6141; e-mail: mmccarry@alliance-exchange.org.

PLAINTIFFS' RESP. APP.0000695

AAP_0000851

Annex 1

PLAINTIFFS' RESP. APP.0000696

HIGHLY CONFIDENTIAL – ATTORNEY EYES ONLY

---

### *ALLIANCE for International Educational and Cultural Exchange*

1776 Massachusetts Avenue, NW, Suite 620  Washington, DC  20036
tel: (202) 293-6141    fax: (202) 293-6144    e-mail: info@alliance-exchange.org
website:  www.alliance-exchange.org

**Mission**   The Alliance is an association of non-governmental organizations comprising the international educational and cultural exchange community in the United States. Its mission is to formulate and promote public policies that support the growth and well-being of international exchanges between the people of the United States and other nations.

**Activities**   In fulfilling this mission, the Alliance undertakes activities set forth by the membership and leadership focusing on the following areas:

**Common Agenda**   Formulating a set of public policy concerns and recommendations that supports the broad common interests of the organizations making up the international exchange community in the United States.

**Advocacy**   Organizing an effective program of government relations activities, including both direct representation with policy makers and the marshaling of grassroots constituencies in pursuit of this common agenda.

**Forum**   Providing a meeting ground for the leadership of the international exchange community to discuss issues of mutual concern and develop cooperative approaches to them.

**Coalition Building**   Developing constituencies to support international exchange both within the exchange community and in other sectors of American society.

**Information Services**   Furnishing comprehensive information about policy issues affecting the future of international exchanges and other matters of broad interest to the international exchange community.

**Public Awareness**   Building awareness about the critical role of international exchange in meeting global, national, and individual needs for international knowledge and relationships.

The *Alliance* staff:
Michael McCarry, Executive Director
Sherri Powar, Assistant Director/Senior Policy Specialist

PLAINTIFFS' RESP. APP.0000697

AAP_0000852

PLAINTIFFS' RESP. APP.0000698

Annex 1

HIGHLY CONFIDENTIAL – ATTORNEY EYES ONLY

Name of Organization _____   Date _____

*Alliance for International Educational and Cultural Exchange*

## 2009 Dues Work Sheet

**Definitions: Salaries and Benefits** should include all personnel salaries, wages, and benefits, including consultants' fees, part-time and temporary employees, of all affiliated exchange organizations. For separately identifiable divisions or subunits of organizations whose primary purpose is not exchange, dues should be assessed only on the exchange division. **International Exchange-Related Activities** should include all activities related to individuals coming to or going from the United States for educational and cultural purposes, including academic programs, participant training, workplace-based training, cultural and artistic activities, and supporting activities related to such exchanges. It should also include a proportionate share of overhead personnel salaries and benefits attributable to exchange activities.

| 1 | Salaries and Benefits: Enter salaries and benefits for the last completed fiscal year.<br>Source ☐ IRS Form 990<br>☐ Completed Audit<br>☐ Other:<br><br>Inclusive Dates of fiscal period: | $ |
|---|---|---|
| 2 | Subtractions: Enter the amount of salaries and benefits to be excluded in calculating the dues base because they are not exchange-related as defined above.<br><br>Brief description: | $ |
| 3 | Additions: Enter additions such as the proportionate share of overhead salaries and benefits expenses attributable to exchange-related activities and consultant fees, etc., not included in Line 1.<br><br>Brief description: | $ |
| 4 | Adjusted Salaries and Benefits total: (Line 1 less line 2 plus line 3) | $ |
| 5 | Dues: Enter amount from column III below based on Adjusted Salaries and Benefits Total in Line 4. | $ |

| | | |
|---|---|---|
| 11 | $99,999 or less | $1,800.00 |
| 10 | $100,000-$249,999 | $2,700.00 |
| 9 | $250,000-$499,999 | $3,700.00 |
| 8 | $500,000-$749,999 | $7,000.00 |
| 7 | $750,000-$999,999 | $8,100.00 |
| 6 | $1,000,000-$1,499,999 | $10,250.00 |
| 5 | $1,500,000-$1,999,999 | $12,500.00 |
| 4 | $2,000,000-$2,999,999 | $14,700.00 |
| 3 | $3,000,000-$4,499,999 | $17,600.00 |
| 2 | $4,500,000-$6,999,999 | $20,600.00 |
| 1 | $7,000,000 or more | $22,000.00 |

AAP_0000853

Annex 1

PLAINTIFFS' RESP. APP.0000700

Case No. 1:14-cv-03074-CMA-KMT   Document 989-1   filed 04/13/18   USDC Colorado   pg 52 of 56
Annex 1
Case 1:14-cv-03074-CMA-KMT   Document 943-4   Filed 03/17/18   USDC Colorado   Page 89 of 166

HIGHLY CONFIDENTIAL – ATTORNEY EYES ONLY



*Alliance*
*for International Educational and Cultural Exchange*

The Alliance for International Educational and Cultural Exchange is an association of 75 organizations comprising the international educational and cultural exchange community in the United States. Its mission is to formulate and promote public policies that support the growth and well-being of international exchanges between the people of the United States and other nations. Alliance member organizations administer or facilitate exchange programs that put a human face on American foreign policy, transmit America's democratic values, foster economic ties with overseas markets, engage millions of Americans in our foreign affairs, and develop foreign language, cross-cultural, and area studies expertise of American citizens.

## MEMBER ORGANIZATIONS

Academic Year in America
Academy for Educational Development
AFS Intercultural Programs-USA
AIESEC United States
Alliance Abroad Group
American Association of Community Colleges
American Association of Intensive English Programs
American Council for International Studies
American Council on Education
American Council on International Personnel
American Councils for International Education: ACTR/ACCELS
American Immigration Law Foundation
American Institute for Foreign Study Foundation
American Institute for Foreign Study, Inc.
American-Scandinavian Foundation
American Secondary Schools for International Students and Teachers
AMIDEAST
ASSE International Student Exchange Programs
ASSE Work Experience Programs
Association for International Practical Training
Association of International Education Administrators
AuPairCare
Au Pair in America
AYUSA Global Youth Exchange
BUNAC
Camp America
CCUSA
CDS International
Center for Cultural Interchange
Children's International Summer Villages, Inc.
The College Board
Communicating for Agriculture
Concordia Language Villages
Cordell Hull Foundation for International Education
Council of Graduate Schools
Council of International Programs USA
Council on International Educational Exchange

Council on Standards for International Educational Travel
Cultural Care Au Pair
Cultural Exchange Network
Cultural Homestay International
Educational and Cultural Interactions, Inc.
Educational Testing Service
EF Foundation for Foreign Study
EurAupair
French – American Chamber of Commerce
Fulbright Association
GeoVisions
German American Chamber of Commerce
goAUPAIR
iEARN-USA
Institute of International Education
InterExchange
International Cultural Exchange Organization
International Cultural Exchange Services
International Exchange of North America
Intrax Cultural Exchange
IREX: International Research & Exchanges Board
LASPAU: Academic and Professional Programs for the Americas
MAST International
Meridian International Center
NAFSA: Association of International Educators
National Association of State Universities and Land-Grant Colleges
National Council for Eurasian and East European Research
National Council for International Visitors
Ohio Agricultural Intern Program
Pacific Intercultural Exchange
PAX – Program of Academic Exchange
People to People International
Sister Cities International
Summer Institute for the Gifted
University and College Intensive English Programs
World Education Services

AAP_0000854

Annex 1

HIGHLY CONFIDENTIAL – ATTORNEY EYES ONLY

World Heritage
YMCA International
Youth For Understanding USA

PLAINTIFFS' RESP. APP.0000702

AAP_0000855

# Exhibit 29

PLAINTIFFS' RESP. APP.0000480

Annex 1

---

Message

| | |
|---|---|
| **From**: | Michael McCarry [/O=ALLIANCE-EXCHAN/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=MMCCARRY] |
| **Sent**: | 10/19/2009 7:54:16 PM |
| **To**: | 'Mark Gaulter' [mark@expertaupair.com] |
| **Subject**: | RE: Alliance membership |

Hi, Mark – thanks for your reply, and don't worry about the delay.

When we receive an application, we have a review process and a board vote for acceptance, which usually takes about 4-6 weeks. We assess dues on a calendar year basis, but pro-rate by quarters. So if your membership were activated today, you would pay 25% of your total annual dues, and then be invoiced for a full year 2010 in December.

We don't run a conference per se, but a membership meeting, which is always in the fall and always in Washington, and is happening this week. There occasionally are additional, ad hoc meetings of the Alliance au pair sponsors. Usually the group comes to Washington once a year to compare notes and meet with ECA. Earlier this year, we had a meeting in New York to discuss alternatives to the education component. It's not a fixed schedule, but a reasonable budgetary guess would be two trips a year – one to DC, and another either to DC or NY, although the second doesn't always happen. And I know there is sentiment to have such a meeting in California one of these times.

In terms of timing, if you are prepared to apply soon, I'd suggest you do so and we could plan to activate the membership at the start of the calendar year, if you like.

I'll be pretty much flat out the rest of this week, but if you want to discuss next week, please give me a call.

Thanks for your interest, and all best, Michael


Michael McCarry
Executive Director
Alliance for International Educational & Cultural Exchange
1776 Massachusetts Avenue, N.W.
Suite 620
Washington, D.C. 20036
(202)293-6141
(202)293-6144(fax)
www.alliance-exchange.org

**From:** Mark Gaulter [mailto:mark@expertaupair.com]
**Sent:** Monday, October 19, 2009 1:59 PM
**To:** Michael McCarry
**Subject:** Re: Alliance membership

Michael,

Thanks for your email, and sorry for the delay in my response.

We're certainly interested in joining the Alliance, and I think the main questions at the moment are more about timing than anything else.

Since it's coming to the end of the year, it would be helpful to know when our membership would expire if we joined now (i.e. will it last a full year or would it make more sense to us to apply in January 2009). Also, from a budgeting point-of-view, it would be nice to know the dates and location of this year's conference, and the cost of attending the conference for members of the Alliance.

CONFIDENTIAL

Thanks,
Mark

On Thu, Oct 8, 2009 at 9:53 AM, Michael McCarry <MMcCarry@alliance-exchange.org> wrote:

Hi, Mark – Ruth Ferry gave me your contact info and suggested I send along some material about Alliance membership.

The attachments should explain everything, but you'll surely have questions so feel free to call or e-mail me.  I'll welcome the opportunity to get acquainted, and we'd certainly be glad to have an application if it looks a good fit to you.

Best, Michael

Michael McCarry

Executive Director

Alliance for International Educational & Cultural Exchange

1776 Massachusetts Avenue, N.W.

Suite 620

Washington, D.C. 20036

(202)293-6141

(202)293-6144(fax)

www.alliance-exchange.org

--
Mark Gaulter
CEO, Expert AuPair
111 Second Avenue NE, Suite 303
St Petersburg, FL 33701
Phone: (727) 388-3472
Fax: (727) 231-8256

Email: mark@expertaupair.com
Web: http://www.expertaupair.com

CONFIDENTIAL

ALLI-010017