# Exhibit 182

# Exhibit 21

PLAINTIFFS' RESP. APP.0001719



**Alliance Membership Meeting 2009**

**Au Pair Task Force Meeting Report**
**October 21, 2009**
*Chair*: Ruth Ferry, AIFS – Au Pair in America

In Attendance: Uta Christianson, InterExchange; Goran Rannefors and Natalie Jordan, EF – Cultural Care; Bill Kapler, goAuPair; Ruth Ferry, AIFS – Au Pair in America

Au pair sponsors are comfortable with task force approach – accustomed to collaborating over the years on regulatory matters.

Goran Rannefors provided a brief history and current update on a bill before the Massachusetts legislature to govern au pair/nanny programs. For over 10 years, EF and AIFS have met with legislators and submitted testimony supporting federal regulations and opposing state regulations which, if passed, would set a precedent for other states to regulate at the state level and make it cumbersome if not impossible to administer the program. During recent meetings, we learned the chairs of the committees with oversight are not in favor of the bill and in all likelihood the bill will move to study and therefore no additional action required by sponsors. Sponsors who have questions are welcome to contact Goran Rannefors or Ruth Ferry.

Subpart A of J Program 22CFR Part 62

We appreciate the importance for each organization to file a response to the proposed rule before the November 23 deadline—that our voice in numbers was critical to facilitating change.

The overriding concerns we discussed with respect to the rule:

1. 62.5(c)(6) and 62.7(2) business information report from Dunn and Bradstreet: Those who have checked D&B reports for their own organizations do not find the information accurate and so question the validity of such report. Attaining a D&B report for all 3rd parties foreign and domestic with whom a sponsor has a written agreement raises concern for those of us who have networks of local representatives who are independent contractors. While ECA has indicated the intent of the language is to require D&B reports on all foreign partners and on all host organizations, we want the language of the bill to be more specific to that intent.

2. 62.14 insurance: We noted the increase in minimum coverage levels. Aside from cost, we expressed concern with the proviso that levels may be adjusted by the Department through guidance documents.

ALLIANCE FOR INTERNATIONAL EDUCATIONAL AND CULTURAL EXCHANGE     1

PLAINTIFFS' RESP. APP.0001720

**InterExchange0031005**

3. Actions by sponsors related to SEVIS: we noted that several requirements including those related to control of forms DS-2019 (62.12) would require a rule change with SEVIS II.

Educational requirement

We view a change to the current educational component a strategic focus for au pair programs in 2010.

ECA is open to change the regulatory requirement and Stanley has requested the Alliance submit a paper proposing a change to the requirement that all sponsors sign. The requirement must remain 'educational' for statutory reasons. He is prepared to allow on-line courses, with the proviso that volunteer experience be added to provide a community immersion component. He apparently will not accept volunteering as a substitute for classroom education, however.

Sponsors present felt the requirement for classroom education and the opportunity for au pairs to take an on-line coupled with a volunteer component was viable. Working from this premise, Ruth Ferry offered to work with Michael McCarry to draft a proposal to change the education rule. We agreed that a draft paper would be distributed by the Alliance to member au pair sponsors and when there was agreement from the group, sent to non-Alliance members for consensus.

Age cap

Some sponsors felt they did not view a change to the age cap, currently age 27, was critical, but would support a request to change to age 30 or 32. A change would enable more au pairs who would like to return to the program after a 2-year home residency to do so.

The age cap change will be requested with the change of education.

Beyond immediate issues:

We are concerned that several newer au pair sponsors are not members of the Alliance and do not benefit from sharing best practices and gaining insight in to the regulatory aspects of the program. We view it an important mission to encourage their membership in 2010.

The filing of extension requests for the sponsor and the Department of State is cumbersome. Sponsors would be pleased to work with the Department in an effort to streamline the process.

Sponsors would like to know more about the future focus of the Department with the expansion of the compliance unit.

ALLIANCE FOR INTERNATIONAL EDUCATIONAL AND CULTURAL EXCHANGE          2

PLAINTIFFS' RESP. APP.0001721

**InterExchange0031006**

# Exhibit 212

**From:**      Michael McCarry(MMcCarry@alliance-exchange.org)
**To:**        Ruth Ferry
**CC:**        Goran.Rannefors@culturalcare.com
**BCC:**
**Subject:**   Re: Meeting
**Sent:**      3/19/2011 04:28:49 PM 0000 (GMT)
**Attachments:**

---

Thanks, Ruth. I'll proceed along the lines you suggest M

Sent from my iPhone

On Mar 19, 2011, at 3:22 PM, "Ruth Ferry" <rferry@aifs.com> wrote:

> Hi Mike and Goran,
>
> I think we invite them to our pre-meeting. Might be an opportunity for them to see how we work together and promote their involvement in Alliance.
>
> Some of the issues may be stemming from how some of the smaller organizations are operating. Sally had called me recently for input on issues she was working out with one organization and issue of bonds.
>
> Mike, I will call you next week.
>
> Ruth
>
> ----- Original Message -----
> From: Michael McCarry <MMcCarry@alliance-exchange.org>
> To: Ruth Ferry
> Cc: Goran Rannefors <Goran.Rannefors@culturalcare.com>
> Sent: Sat Mar 19 06:12:46 2011
> Subject: Meeting
>
> Since ECA has turned this into all sponsor meeting, should we consider inviting outliers to our pre-meeting?
>
> I'm with Goran at Wetm and he doesn't have strong feeling either way.
>
> Tks M
>
> Ps back at my desk Wednesday
>
>
> Sent from my iPhone



**HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY**                    AIFS0003685

Page 142

```
1    sandwich?
2        A.   Yes.
3        Q.   And then you get a phone call?
4        A.   Yes.
5        Q.   And you had to leave?
6        A.   Both phones going.
7        Q.   Both phones go off?
8        A.   Uh-huh.
9        Q.   Do you remember the emergency?
10       A.   Yes, I do.
11       Q.   What happened?
12       A.   It was just an au pair emergency that
13   needed immediate attention.
14       Q.   Do you remember the nature of it?
15       A.   Yes, I do.  It was -- I don't -- I'm --
16   I'm tired, I can't remember the name of the term.
17   It's a legal term.  I -- I can't remember.  But
18   there were five police officers in my office.
19       Q.   Oy.  Okay.  I suppose that would
20   constitute an emergency, wouldn't it?
21       A.   Yes.
22       Q.   So did -- did they hand out an agenda at
23   these meetings with the Alliance?
24       A.   I don't know.  I didn't get that far.
25       Q.   Oh.  So you didn't even get a --
```

Page 143

```
1        A.   I don't remember getting...
2        Q.   Okay.  So that was one meeting.
3        A.   Yeah.
4        Q.   I -- I believe you testified that there
5    were two meetings --
6        A.   Well --
7        Q.   -- that had occurred prior to the
8    Department of State?
9        A.   Don't hold me that to that because I
10   can't remember.  I remember that one distinctly
11   because of what happened.
12       Q.   Uh-huh.
13       A.   Yeah.
14       Q.   But you recall attending other Alliance
15   For Cultural Exchange meetings?
16       A.   I attend -- I remember attending one
17   more, and that was, like, in 2004 maybe.
18       Q.   Okay.  So you attended -- you were
19   invited to attend in 2004?
20       A.   Uh-huh.  Yeah.  I -- I think so.
21       Q.   That --
22       A.   I don't remember the exact date.  It was
23   shortly after designation.
24       Q.   Okay.
25       A.   It was a meet and greet.
```

Page 144

```
1        Q.   So you were invited to meet and greet
2    everybody shortly after you were designated?
3        A.   Yeah.  And there was -- well, somebody
4    from the State Department was there, so I -- I don't
5    even recall what the meeting was about.
6        Q.   Okay.  But it was with the State
7    Department, the other sponsors, and you were
8    invited --
9        A.   Uh-huh.
10       Q.   -- as well?
11       A.   Yeah.  I was a newbie.
12       Q.   You were the newbie?
13       A.   Uh-huh.
14       Q.   Okay.
15            MR. SCHWARTZ:  You mentioned being a
16   little tired.  Why don't we take ten minutes right
17   now.
18            MR. KELLY:  That's agreeable.  Thank
19   you.
20            THE VIDEOGRAPHER:  Going off the
21   record at 3:09.  This marks the end of media 2.
22            (Break from 3:09 p.m. to
23             3:28 p.m.)
24            THE VIDEOGRAPHER:  This marks the
25   start of media 3 of the video deposition of Helene
```

Page 145

```
1    Young, 30(b)(6) representative for USAuPair, Inc.
2    We're back on the record.  The time is 3:28.
3    BY MR. SCHWARTZ:
4        Q.   So, Ms. Young, before we start up again.
5        A.   Uh-huh.
6        Q.   I -- your counsel let us know you were
7    feeling a little wan, a little tired?
8        A.   I'm 36 hours now with no sleep, so...
9        Q.   That -- 36 hours without sleep?
10       A.   Yes.
11       Q.   Do you feel comfortable and capable going
12   forward here?
13       A.   Yeah.
14       Q.   I mean, we -- we are happy to adjourn it
15   until -- adjourn this until tomorrow for you to get
16   a night's rest and --
17       A.   I can't, no.  I have to be back.
18            MR. KELLY:  Juan and I worked very
19   hard to shoehorn --
20            MR. SCHWARTZ:  No, I know.
21            MR. KELLY:  -- this deposition date
22   into the only day where we could make it happen, and
23   so I think we'll stipulate that she's good to go.
24            THE WITNESS:  Yeah.
25            MR. KELLY:  We're not going to play
```



# Exhibit 434

Annex 1

Confidential

Page 42

1    Pair Program?
2        A.   Let me just reread the language.
3        Q.   Can you read the language out loud,
4    please?
5        A.   Sure.  "Au Pair Program - the committee
6    is" -- hang on.
7            MS. REYES:  I want to remind you to speak
8    a little bit slowly because the court reporter is
9    jotting things down.
10       A.   "Au Pair Program:  The committee is aware
11   of reports that participants in the Au Pair Program
12   have been compensated at the federal minimum wage
13   level, which in some instances is below state and
14   local minimum wage levels.
15           "The committee directs the Secretary of
16   State to report to the committee not later than 45
17   days after enactment of the act on whether state and
18   local minimum wage levels apply to the Au Pair
19   Program, and, if so, the Department of State
20   guidelines for applying such wage levels."
21       BY MR. VALDIVIESO:
22       Q.   And that language that you just read, do

Page 43

1    you believe that you had an understanding as to what
2    those words meant when you were transmitting them to
3    email recipients?
4        A.   Yes.
5        Q.   And what did you understand that language
6    to mean?
7        A.   I understand that language to mean that
8    the Senate appropriations committee is asking the
9    state department how it views this issue and is
10   asking for specific information on how -- if it's
11   going to implement a change how it would do it.
12           It's a request for clarification, I
13   believe.
14       Q.   And why were you sending that language to
15   these particular individuals?
16       A.   Because it was in a Senate appropriations
17   committee report and they had an interest in knowing
18   about it.
19       Q.   And did you know what their interest in
20   knowing about it was?
21       A.   Yes.
22       Q.   What was their interest in knowing about

Page 44

1    it?
2        A.   They -- they were lobbyists working for --
3    in this case, Cultural Care and Au Pair in America.
4        Q.   I see.  And could you identify which of
5    the lobbyists are for Cultural Care and which ones
6    are for Au Pair in America?
7        A.   Alec French and Carl Thorsen are Cultural
8    Care.  Bob Dotchin and Suzy Glucksman are Au Pair in
9    America.
10       Q.   Okay.  And there's a person named Kate
11   Eltrich.  Who is that?
12       A.   Kate Eltrich at the time was working as a
13   lobbyist and consultant for the Alliance.
14       Q.   And why did the Alliance have a lobbyist?
15       A.   To expand our capacity.
16       Q.   Do you know when you hired a lobbyist?
17       A.   Do I remember when?  2013.
18       Q.   Was there something that happened in 2013
19   that required additional capacity?
20       A.   Immigration reform.
21       Q.   Okay.  And was there still immigration
22   reform efforts -- strike that.

Page 45

1            And was the purpose of their engagement in
2    2015 still immigration reform?
3        A.   No.  They helped us on a variety of
4    issues, appropriations and Exchange Visitor Program
5    related.
6        Q.   Okay.  Was there anything more specific
7    about what the purpose of their engagement was?
8        A.   Overall, it was simply to expand our
9    capacity.  You have to remember, the Alliance had a
10   staff of me plus three others -- myself and three
11   others and a very big agenda.
12           Once we worked with them, we found we
13   liked the extra capacity.
14       Q.   And did the Alliance take a position on --
15   strike that.
16           Did the Alliance react to this language in
17   a positive or negative way?
18       A.   Neither.  We didn't react.
19       Q.   So you said that the recipients of this
20   email had an interest in the language?
21       A.   Right.
22       Q.   Right.  Was that interest -- did you have

MAGNA◆
LEGAL SERVICES

Confidential

Page 66

1      A.    The Alliance position was and I believe
2  still is, but somebody else can speak to that -- the
3  Alliance position was that maintaining the national
4  stipend was the most desirable outcome for the Au
5  Pair Program.
6      Q.    And that was part of the common agenda of
7  the Alliance?
8      A.    Yes.
9      Q.    I think you said earlier that if there had
10 been state and local wages applied to the Au Pair
11 Program that would make the program hard to
12 administer?
13     A.    Yes.
14     Q.    Why would it make it hard to administer?
15     A.    We would have a different set of rules for
16 every state potentially.
17     Q.    And are you aware of how au pairs are
18 compensated?
19     A.    In broad general terms, yeah.
20     Q.    What is your general broad understanding
21 of how they are compensated?
22     A.    They receive a weekly stipend.

Page 67

1      Q.    And from whom do they receive --
2      A.    The host family.
3      Q.    So why would having state and local wages
4  be hard to administer if it's the host families that
5  pay?
6      A.    Well, you'd have potentially more than 50
7  different jurisdictions and different -- and
8  different stipends. I mean, if you have one national
9  stipend, then everybody knows.
10        But if you have 50 plus, because some
11 cities, I believe, have minimum wages, then that
12 becomes pretty complex. You have -- let's make up a
13 number -- 56 sets of rules.
14     Q.    And was that understanding about the
15 difficulty of administering more than 50 different
16 sets of rules, was that based in part on input from
17 au pair sponsors?
18     A.    Yes, but also just my impression that it
19 would be. I mean, the other things are you have
20 other rules. If the state allows a domestic worker
21 to work overtime, that would diminish the cultural
22 exchange opportunities for an au pair.

Page 68

1      They have a 45-hour per week cap, as I'm
2  sure you're aware, that would be superseded by the
3  law in Massachusetts if it were applied to au pairs.
4      They could find other jobs in families
5  that are not vetted, which would pose a risk just --
6  you know, to their participant safety and, again,
7  diminish the cultural exchange aspects.
8      We wanted to preserve this as a cultural
9  exchange program. This approach would turn it more
10 toward a work program.
11     Q.    And when you say, "we," are you referring
12 to the Alliance and the au pair sponsors?
13     A.    I am.
14     Q.    And does having a fixed national stipend
15 help promote cultural exchange?
16     A.    In the sense that it provides -- in the
17 sense that it provides an affordable predictable
18 environment, it allows, I believe, for a larger
19 program and more broad participation both of families
20 and exchange participants.
21       So in that sense, yes. It's part of the
22 infrastructure that makes the program successful.

Page 69

1      Q.    And do you have an understanding as to why
2  an affordable predictable environment was beneficial
3  for au pair sponsors?
4      MR. QUINN:  Objection to the form.
5      A.    Again, it's a much easier program to
6  administer if you have -- it's a challenging program
7  to administer in any event. But it's simpler with
8  one set of rules than 56 sets of rules.
9      BY MR. VALDIVIESO:
10     Q.    And you mentioned a work program earlier.
11 What do you mean by, "work program"?
12     A.    The United States has a variety of --
13 there are a variety of ways to come to the United
14 States, varied categories of these, as I'm sure
15 you're all aware.
16       And there are Visas, H, L, Q, examples,
17 where people come particular -- the purpose of their
18 coming to the United States is to work. The exchange
19 visitor visa, the J visa, the purpose is cultural
20 exchange.
21       And the work -- the work element was
22 injected by Congress in 1961, the Mutual Educational

# Exhibit 208

PLAINTIFFS' RESP. APP.0001789

Message
_____

| | |
|---|---|
| **From:** | Michael McCarry [/O=FIRST ORGANIZATION/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=MICHAEL MCCARRY989DD960] |
| **Sent:** | 10/30/2015 3:44:56 PM |
| **To:** | Kate Eltrich [kate@sixkillerconsulting.com]; Bob Dotchin [robert@advocacy.com]; Alec French [Alec@Thorsen-french.com]; Suzy Glucksman [sglucksman@advocacy.com]; Carl Thorsen [Carl@Thorsen-french.com]; Natalie Jordan [natalie.jordan@ef.com] |
| **CC:** | Mark Overmann [/O=FIRST ORGANIZATION/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Mark Overmann6626b f2f] |
| **Subject:** | Re: Au pair report language |

Would it be easier/quicker for this to be a call?  We could host.

Times that work for us at the start of next week:

Monday:  9-10, noon till 2, 3-4

Tuesday:  11:30

Thanks, M

Michael McCarry
Executive Director
Alliance for International Exchange
1828 L St NW, Suite 1150
Washington, DC  20036
202-293-6141
www.alliance-exchange.org

_____

**From:** Kate Eltrich <kate@sixkillerconsulting.com>
**Date:** Friday, October 30, 2015 11:40 AM
**To:** Bob Dotchin <robert@advocacy.com>, Alec French <Alec@Thorsen-french.com>, Suzy Glucksman <sglucksman@advocacy.com>, Carl Thorsen <Carl@Thorsen-french.com>
**Cc:** Alliance/Mark <movermann@alliance-exchange.org>, Michael <MMcCarry@alliance-exchange.org>
**Subject:** Re: Au pair report language

What times are best? I'm happy to host at 440 First St. NW (behind the Hall of States), if convenient. thanks, Kate

_____

**From:** Alec French <alec@thorsen-french.com>
**Date:** Thursday, October 29, 2015 at 9:22 PM
**To:** Kate Eltrich <kate@sixkillerconsulting.com>

CONFIDENTIAL

ALLI-026611



Annex 1

Cc: Carl Thorsen <carl@thorsen-french.com>, Robert Dotchin <robert@advocacy.com>, Suzy Glucksman <sglucksman@advocacy.com>, Mark Overmann <MOvermann@Alliance-Exchange.org>, Michael McCarry <MMccarry@alliance-exchange.org>
Subject: Re: Au pair report language

Sounds like a good idea.

Alec French
Thorsen French Advocacy
405 First Street SE
Washington DC 20003
Office - (202) 506-5673
Mobile - (202) 997-4453

On Oct 29, 2015, at 3:04 PM, Kate Eltrich <kate@sixkillerconsulting.com> wrote:

Hi all, as an FY16 appropriations bill looks certain now, we wanted to circle back on the au pair reporting requirement included in the Senate report. Can we get together to discuss early next week, in person or call-in if you can't make it. If we want to weigh in with the conference next week would be the time. I understand they're trying to wrap up by Thanksgiving in order to have a package on the floor the beginning of December.
I'd like us to collectively mull the merits of asking for something in conference and our liabilities.
thanks, Kate

From: Kate Eltrich <kate@sixkillerconsulting.com>
Date: Friday, July 10, 2015 at 10:35 AM
To: Carl Thorsen <carl@thorsen-french.com>, Michael McCarry <MMccarry@alliance-exchange.org>, Robert Dotchin <robert@advocacy.com>, Suzy Glucksman <sglucksman@advocacy.com>, Alec French <alec@thorsen-french.com>
Cc: Mark Overmann <MOvermann@Alliance-Exchange.org>
Subject: Re: Au pair report language

Hi all, this is a good outcome considering the political situation - Leahy staff was convinced that the state minimum wage was already the rule. Graham staff was very helpful to giving Leahy staff what they wanted – a statement examining au pair – but not taking a positive position endorsing state minimum wages. Granted, folks can read what they want out this. Asking "whether state minimum wage applies" is a better place to be there where this started.

Process-wise, this report stands on its own and doesn't get much greater or lesser emphasis going forward. If a conference happened on appropriations they typically do not repeat the report language from both the separate House and Senate reports. A conference report says at the front that both House and Senate reports stand unless contravened in the conference report language. It would be a big lift to get the conference report to say "we don't want this report". Generally the staff doesn't view reporting requirements as negative.

All that said, as Carl suggested, it's unlikely a traditional conference will happen this year. The biggest reason is that the President has a blanket veto threat on all approps bills because Congress is increasing defense spending while freezing non-defense. At this point there is no clear path forward to resolving this top-line issue. There certainly will be a CR on October 1. The question is whether a deal can be made, however small, to get approps to an omnibus in November-December. If not, they will be in a full year CR where this language is somewhat ignored by State Dept (in the past they've said, hey that bill wasn't enacted!). Then it will matter most whether the committee asks for an update on this issue. I do not think State will formally respond to the committee unless required to. The only way there's a public report is if an omnibus passes and this reporting requirement stands.

I think it's worth catching up in person on this after I get some more intel /after action from the committee staff.
thanks, Kate

From: Carl Thorsen <carl@thorsen-french.com>
Date: Friday, July 10, 2015 at 9:40 AM
To: Michael McCarry <MMccarry@alliance-exchange.org>, Bob Dotchin <robert@advocacy.com>, Suzy Glucksman <sglucksman@advocacy.com>, Alec French <alec@thorsen-french.com>

CONFIDENTIAL

ALLI-026612

**Cc:** Kate Eltrich <kate@sixkillerconsulting.com>, Mark Overmann <MOvermann@Alliance-Exchange.org>
**Subject:** RE: Au pair report language

Not being an expert on the kubuki dance of Approps report language, what is our collective judgement?  Does it give State any wiggle room other than to give a clear yes or no?  Not good, right?

In the wake of the Confederate Flag debacle and other Senate issues the prospect of stand alone approps bills is basically gone right?  If there is an Omni end of year as opposed to a CR, what does that mean for this language?  Is it conferencable?  We want this stripped right?

I fully admit to being out of depth here and if I'm asking the wrong questions or have the wrong read just tell me.

---

**From:** Michael McCarry [mailto:MMcCarry@Alliance-Exchange.org]
**Sent:** Friday, July 10, 2015 9:31 AM
**To:** Bob Dotchin; Suzy Glucksman; Alec French; Carl Thorsen
**Cc:** Kate Eltrich; Mark Overmann
**Subject:** Au pair report language

Here's how it came out:

*Au Pair Program.*-The Committee is aware of reports that participants in the Au Pair program have been compensated at the Federal minimum wage level which in some instances is below State and local minimum wage levels. The Committee directs the Secretary of State to report to the Committee not later than 45 days after enactment of the act on whether State and local minimum wage levels apply to the Au Pair program, and, if so, the Department of State guidelines for applying such wage levels.

CONFIDENTIAL

ALLI-026613

# Exhibit 41

Annex 1

Message
_____

| | |
|---|---|
| **From:** | Ruth Ferry [rferry@aifs.com] |
| **Sent:** | 6/10/2013 7:46:49 PM |
| **To:** | William Gertz [wgertz@aifs.com]; Michael McCarry [/O=FIRST ORGANIZATION/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Michael McCarry989dd960]; Natalie Jordan [Natalie.Jordan@EF.com]; Goran Rannefors [Goran.Rannefors@EF.com]; Heidi Woehl [hwoehl@aupaircare.com] |
| **CC:** | Mark Overmann [/O=FIRST ORGANIZATION/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Mark Overmann6626bf2f] |
| **Subject:** | RE: Au pair issues |

I would agree with Bill.

I think much of this could be achieved with a periodic, i.e. quarterly signed agreement between host family/au pair, collected by the sponsor, that both parties have complied with the hours, nature of care, stipend.  Enforcement here is at issue.

If there were civil penalties for families this would need to be public information so sponsors were not taking on a family who had been inappropriate with a different sponsor. A 'black list' would help!

Sponsor required to make the au pair 'whole' in cases of proven exploitation.


I don't think we should go down the road of 'timesheet' collection/review by sponsor – it is too invasive, and frankly will not catch the FEW exploited cases.


Ruth Frizell Ferry | Sr Vice President and Director
9 West Broad St., Stamford, CT 06902
203.399.5025
aupairinamerica.com

Au Pair
IN AMERICA
Trust the world's most experienced
live-in child care program
(800) 928-7247
a division of the American Institute For Foreign Study® (AIFS)

..................................................................................................................

**From:** William Gertz
**Sent:** Monday, June 10, 2013 3:08 PM
**To:** 'Michael McCarry'; Natalie Jordan; Ruth Ferry; Goran Rannefors; Heidi Woehl
**Cc:** Mark Overmann
**Subject:** RE: Au pair issues

There are some things I would put on the table  but only as a last resort.  They might be

--Standard country recruitment fees or maximums.  $5000 as in case 3 is crazy and should not be tolerated.

--Better enforcement of 45 hour rule including monthly review of hours (I hate this but...)

--More education that working more than 45 hours is illegal for family and au pair.  No side deals as in case 4 which is a violation of rules.  Civil penalties for families and agencies breaking the rules.

Again,  speaking for myself only I would make this deal but only if the rest of the bill was dropped including all the foreign labor contracting stuff.

Bill

CONFIDENTIAL

ALLI-024342

Annex 1

---

**William L. Gertz**
President & Chief Executive Officer

**American Institute For Foreign Study (AIFS)**
River Plaza
9 West Broad Street
Stamford, CT 06902

"we bring the world together"

203-399-5007
wgertz@aifs.com
www.aifs.com

This email communication is privileged, confidential or otherwise protected by disclosure and is intended only for the individuals or entities named above and any others who have been specifically authorized to receive it. Any unauthorized dissemination, copying or use of the contents of this email is strictly prohibited and may be in violation of law. If you are not the intended recipient, please reply to this email and do not read, copy, use or disclose to others the contents of this communication.

---

**From:** Michael McCarry [mailto:MMcCarry@Alliance-Exchange.org]
**Sent:** Monday, June 10, 2013 2:51 PM
**To:** Natalie Jordan; William Gertz; Ruth Ferry; Goran Rannefors; Heidi Woehl
**Cc:** Mark Overmann
**Subject:** Re: Au pair issues

Natalie – I take your points, of course, but I think this will need a different sort of response. This link was sent to me, I believe, to give a flavor of concerns they have about the J-1 program.  Working successfully with this group to hear and address their concerns will be important to resolving our issues in the way we would like, as they have the ear of many in high places.  I suspect those who have a professional and personal commitment to anti-trafficking won't respond well to an 'isolated cases' argument, but instead will want to know what might have gone wrong in these cases and how that could be addressed in the future.

Better enforcement/oversight, to me, is the start of a response, but they will want to know specifics of what we would propose.  M

---

**From:** Natalie Jordan <natalie.jordan@ef.com>
**Date:** Monday, June 10, 2013 2:38 PM
**To:** Michael <MMcCarry@Alliance-Exchange.org>, Bill Gertz <wgertz@aifs.com>, Ruth Ferry <rferry@aifs.com>, "Goran. Com" <goran.rannefors@ef.com>, Heidi Woehl <hwoehl@aupaircare.com>
**Cc:** Alliance/Mark <movermann@alliance-exchange.org>
**Subject:** RE: Au pair issues

Hi Michael,

Could you provide a bit more context on the way they brought this link to your attention?  At first glance I would say that they represent one side of the story but I'm not sure if there's more information which would be relevant and helpful in understanding each of these 4 cases more completely.  How was this information verified?  What years did they take place in?  Let's say every single allegation in these overviews is accurate, I would argue that they are isolated and with respect to the overall numbers represent the vast minority (to an extreme degree) of what happens on this

CONFIDENTIAL

program. I think it's important to express that each of these represent extremely concerning situations that are absolutely unacceptable.  However, do these limited and very isolated examples justify the kind of sweeping changes to the program that the bill would cause?  I would argue that it points to the need for better oversight on the part of DOS but this is where timing is important, i.e. this new DOS admin is much more focused on anti-trafficking issues.

Natalie

---

**From:** Michael McCarry [mailto:MMcCarry@Alliance-Exchange.org]
**Sent:** Monday, June 10, 2013 2:27 PM
**To:** Bill Gertz; Ruth Ferry; Goran Rannefors; Natalie Jordan; Heidi Woehl
**Cc:** Mark Overmann
**Subject:** Au pair issues

At the suggestion of Sen. Leahy's staff, we've opened a conversation with anti-trafficking groups to try to find some common ground on the immigration bill.

That conversation got off to a good start, but today the group sent me the following link:

http://fairlaborrecruitment.files.wordpress.com/2013/06/ilrwg-au-pair-case-studies1.pdf

I'd welcome your reactions to this asap, as we are in a fast-moving environment here.  Thanks, Michael

This e-mail and any attachments may contain confidential and privileged information. If you are not the intended recipient, please notify the sender immediately by return e-mail, delete this e-mail and destroy any copies. Any dissemination or use of this information by a person other than the intended recipient is unauthorized and may be illegal.

PLAINTIFFS' RESP. APP.0000573
CONFIDENTIAL

ALLI-024344