**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:14-cv-03074-CMA-KMT

JOHANA PAOLA BELTRAN; et al.,

     Plaintiffs,

v.

INTEREXCHANGE, INC.; et al.,

     Defendants.

---

**APIA'S SUPPLEMENTAL BRIEF IN FURTHER SUPPORT OF
DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT**

     American Institute for Foreign Study, d/b/a Au Pair in America ("APIA"), submits

this brief in further support of Defendants' Joint Motion for Summary Judgment (ECF

Dkt. # 860) ("Joint MSJ Brief").[1]

**I.    PLAINTIFFS FAILED TO REBUT—OR EVEN ADDRESS—APIA'S EVIDENCE
PROVING THAT APIA ACTED UNILATERALLY**

    A.    <u>Plaintiffs Fail to Rebut APIA's Evidence That It Acted Inconsistently with
the Alleged Conspiracy</u>

     Plaintiffs allege a conspiracy pursuant to which the Defendant sponsors

"consistently misrepresented to au pairs and the host families in whose homes they

work that $195.75 per week was a nonnegotiable, mandatory rate."  (Opp. at p. 1.)  But

in the APIA MSJ Brief, APIA demonstrated that its conduct was flatly inconsistent with

---

[1] APIA adopts and incorporates, as if fully set forth herein, the Joint MSJ Brief, APIA's Supplemental Brief in Support of Defendants' Joint MSJ (Dkt. # 883) ("APIA MSJ Brief"), APIA's Brief in Opposition to Plaintiffs' Partial MSJ (Dkt. # 932), and Defendants' Joint Reply in Support of MSJ (Dkt. # 988) ("Joint MSJ Reply Brief").

such a conspiracy.  (Dkt. # 883.)  Specifically, APIA demonstrated that its contracts, customer communications, and promotional materials regularly communicated that $195.75 was the ***minimum*** stipend, and that the host families and au pairs were permitted to—and at times did—agree to higher stipend levels.  As an example of these documents, below is the clause that each host family and au pair signed as a prerequisite for participation in the program, thereby demonstrating that they understood that the $195.75 stipend was merely a minimum:[2]



Similarly, APIA's webpage has expressly stated that the stipend is a minimum:[3]



In their opposition, Plaintiffs do not address these facts, nor do they attempt to explain how they are consistent with the putative conspiracy.  Instead, Plaintiffs simply

---

[2] Dkt. # 605-6 at p. 2 (emphasis added); *accord id.* at pp. 3-4 (different versions); *see also* Dkt. # 605-4 at ¶¶ 15-17 (authenticating agreements; explaining agreements permit host families and au pairs to "independently determine. . . actual [stipend] amount").

[3] Dkt. # 605-5 (screenshots of APIA's website, 2009 through 2017) (emphasis added); Dkt. # 605-4 at ¶ 17 (authenticating screenshots).  Similar statements are in APIA's other promotional materials.  *See generally* Dkt. # 605-6.

lump APIA in with the other Defendants.  But that is not sufficient to defeat summary judgment.  Conspiracy must be proven separately for *each* Defendant.  APIA's conduct was inconsistent with the conspiracy alleged, requiring summary judgment for APIA.[4]

B.    Plaintiffs Provide No Direct Evidence of Conspiracy

Plaintiffs assert that there are three classes of direct evidence that prove conspiracy, but not one piece of Plaintiffs' "direct evidence" supports the conclusion that APIA was part of the alleged conspiracy.

1.    Alliance Documents

First, Plaintiffs contend that there are "documents from the Alliance showing agreement between the members to fix prices."  (Opp. at p. 9.)  This is false—every cited document is evidence only of APIA exercising its constitutional right to lobby the government regarding proposed regulations of its business, as permitted under the *Noerr-Pennington* doctrine.[5]  None indicate a conspiracy to fix au pair stipends.

For example, Plaintiffs contend that a January 12, 2016, call provides direct evidence of "Defendants' agreement to keep au pair wages fixed at $195.75."  (Opp. at p. 12.)  According to Plaintiffs, "the Alliance members memorialized [the January 12,

---

[4] *See Dahl v. Bain Capital Partners, LLC*, 963 F. Supp. 2d 38, 48-49 (D. Mass. 2013) (granting summary judgment to alleged antitrust co-conspirator when evidence showed that its actions were "inconsistent with the overarching conspiracy"); *cf. Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (actions that are "merely consistent with" an alleged agreement do not even plausibly suggest that an agreement exists).

[5] As previously explained, because APIA had excess au pairs relative to host families, it was in its unilateral interest to maintain the minimum stipend levels, so as to maximize the number of host families willing to match with an au pair.  *See also* Joint MSJ Reply Brief (Dkt. # 988) (Alliance's lobbying acts protected under the *Noerr-Pennington* doctrine).

2016,] agreement that they should ensure au pair wages be 'uniform[] across the country,'" in a memo circulated after the call.  (*Id.* (*citing* PRA 449, at 450).)  But no reasonable fact finder could find that the cited memo evidences more than an agreement on how to lobby government regulators—here, to prevent the au pair program from being subjected to 50 different regulations.  Indeed, the memo makes this completely clear in its first sentence, stating that it is being submitted in connection with "proposed State Department changes" to regulatory rules.  PRA 449, at 450.

Plaintiffs make a similar mischaracterization when they state that "The [APIA] CEO went so far as to invite his competitors at Cultural Care and AuPairCare, on an email copying then-Alliance Executive Director Michael McCarry, to fix their recruitment fees at a standard rate as well."  (Opp. at p. 15.)  To support this contention, Plaintiffs cite only to PRA 571, which is part of an email chain, that no reasonable fact finder could conclude was anything other than a discussion regarding proposed legislation.  It begins by stating that it is part of a conversation begun "[a]t the suggestion of Sen. Leahy's staff" (PRA 573), and then unambiguously discusses legislative provisions to be included in proposed legislation aimed at protecting au pairs:



**From:** William Gertz
**Sent:** Monday, June 10, 2013 3:08 PM
**To:** 'Michael McCarry'; Natalie Jordan; Ruth Ferry; Goran Rannefors; Heidi Woehl
**Cc:** Mark Overmann
**Subject:** RE: Au pair issues

There are some things I would put on the table  but only as a last resort.  They might be

--Standard country recruitment fees or maximums.  $5000 as in case 3 is crazy and should not be tolerated.

--Better enforcement of 45 hour rule including monthly review of hours (I hate this but...)

--More education that working more than 45 hours is illegal for family and au pair.  No side deals as in case 4 which is a violation of rules.  Civil penalties for families and agencies breaking the rules.

Again,  speaking for myself only I would make this deal but only if the rest of the bill was dropped including all the foreign labor contracting stuff.

Bill

Indeed, the fee cap that plaintiffs misleadingly describe as an invitation to price-fix was instead, by total contrast, an idea for a legislative provision to prevent au pair exploitation—the idea being that capping "recruitment fees" imposed on au pairs by foreign recruiters would reduce their vulnerability and thus the likelihood of exploitation.

The above examples are not unique—quite simply, every Alliance document that Plaintiffs cite is **explicitly** tied to APIA's attempts to influence government bodies in enacting or enforcing laws that could impact APIA's program,[6] which cannot, as a matter of fact and under applicable law, be construed as direct evidence of conspiracy.[7]

2.    Sponsors' Describing the Stipend as a Fixed Amount

Second, Plaintiffs' claim that there is direct evidence that "sponsors have been openly representing that wages are set across sponsors," and as proof cite various sponsors stating that $195.75 is an industry standard.  (Opp. at p. 9.)  But Plaintiffs **cite no APIA statements for this contention**.  *Id.* at pp. 9–10.  Nor could they, as the

---

[6] As further examples, Plaintiffs state: "For example, AuPairCare, AIFS, and Cultural Care worked together on a document that stated 'Au pairs receive a weekly stipend from host families of $195.75, as mandated by the Department of State, in consultation with the Department of Labor and the IRS.'"  (Opp. at p. 20).  In support, Plaintiffs cite only to PRA 625, at 626 (ALLI-03537), but that document was drafted for lobbying during the Alliance's J-1 Advocacy day program, as shown in the document's first paragraph.

[7] *See, e.g.*, *U.S. Football League v. NFL*, 634 F. Supp. 1155, 1181 (S.D.N.Y. 1986) ("[T]he exclusion of 'purpose and character' evidence consisting of conduct clearly embraced by *Noerr-Pennington* should be the rule rather than the exception in an antitrust case. . . . [E]vidence which by its very nature chills the exercise of First Amendment rights, is properly viewed as presumptively prejudicial.") (citation omitted); *Colorado Interstate Gas Co. v. Natural Gas Pipeline Co. of Am.*, 885 F.2d 683, 692 n.13 (10th Cir. 1989) (affirming exclusion of evidence of petitioning conduct).

unrebutted evidence shows APIA consistently made clear that $195.75 was a *minimum*.

### 3.    Plaintiffs' Investigator

Plaintiffs next cite the supposed "party admissions to Plaintiffs' investigator." (Opp. at p. 9.)  But this evidence also fails with respect to APIA as Plaintiffs present **no statements from any employee** affiliated with APIA; nor do Plaintiffs present statements referencing APIA.  (*See* Opp. at pp. 16–19.)

### C.    No Circumstantial Evidence of APIA's Participation in a Conspiracy

Plaintiffs' circumstantial evidence also does nothing to show that APIA was part of any alleged conspiracy.  The most important circumstantial evidence is whether the sponsors acted in a manner that was contrary to their economic interests absent a conspiracy.[8]  (Opp. at p. 19.)  But that is not true with respect to APIA.  Under Plaintiffs' theory, it is suspicious that APIA did not seek to both increase au pair's stipends and reduce its own host family fees, thus reducing its own profits.  (Opp. at p. 62.)  But how can it possibly be suspicious that a firm did not seek to impose greater costs upon itself and its customers?  The unrebutted facts are that APIA already had more au pairs than it could possibly place with host families, thus, it had *no* unilateral incentive to seek to raise au pair stipends.  *See* Dkt. #605-4 ¶ 5 (year-after-year approximately 20% of

---

[8] Plaintiffs tacitly acknowledge that they have failed this test by reframing the inquiry as whether APIA's "actions [are] rationally explicable by conspiracy."  (Opp. at p. 19.)  But, as explained in the Joint MSJ Reply Brief at Dkt. # 988, the legal test is whether a defendant "acted in a manner that would have been contrary to [its] own interests absent a conspiracy."  *In re Utherane*, 913 F. Supp. 2d 1145, 1154 (D. Kan. 2012); *see also Monsanto Co. v. Spray Rite Serv. Corp.*, 465 U.S. 752, 764 (1984) (requiring an antitrust plaintiff "to *exclude* the possibility that the [Defendants] were acting independently") (emphasis added).

APIA's au pairs were not placed with a family).  Accordingly, it is Plaintiffs' proposed course of conduct that would be counter to APIA's unilateral economic incentives.

Plaintiffs' interpretation of the remaining circumstantial evidence is similarly flawed.  For example, Plaintiffs repeatedly claim that APIA had a "policy" of "discourag[ing] families from paying more than the minimum stipend."  (Opp. at pp. 4 & 33 n.72.)  But contrary to Plaintiffs' implication that APIA's policy is aimed at depressing au pair compensation, the policy is merely one of advising host families that they should carefully manage their relationship with their au pair.  Indeed, the sole document that Plaintiffs cite in support of this allegedly improper policy disproves Plaintiffs' price-fixing claim, as the document makes clear that APIA **did not** determine au pair stipends, but **did** have a policy of freely permitting au pair compensation to increase beyond the minimum stipend (via bonuses and/or increased stipends).[9]  Similarly, Plaintiffs contend that APIA had the "means of monitoring agreement and punishing" but do not cite any instance of any other sponsor complaining to APIA that APIA's website and other materials expressly stated that the $195.75 stipend level was a "minimum."

In a similar vein, Plaintiffs state that as the chair of the Alliance Task Force, APIA

---

[9] Plaintiffs also cite deposition testimony.  (Opp. pp. 4, 33 n.72 (*citing* AIFS 30(b)(6) Dep. Tr. 252:24-254:13).)  But the testimony is clear that APIA's policy was merely concerned with recommending a process for increasing compensation for host families who want to pay au pairs more than the minimum stipend.  *See, e.g.*, AIFS 30(b)(6) Dep. Tr. 251:4-18 ("And I always suggest . . .pay the minimum first and see how things are going before you then be so generous . . . . You have to have your framework first. And then once you know and trust this individual and you want to be more generous, you can do that in many different ways, in many different compensatory ways, **including increasing the weekly stipend**.") (emphasis added).

could keep "other sponsors in line and did so," but as support they cite only two sources of evidence (Opp. at pp. 32 n.70 & 85 n.2), both of which relate solely to lobbying.[10]

## II.   AU PAIRS AND HOST FAMILIES UNDERSTOOD THAT THE WEEKLY STIPEND COMMUNICATED BY APIA WAS A MINIMUM AMOUNT

Plaintiffs allege that au pairs and host families who participated in the APIA program understood that the "weekly wage would be $195.75" and that "they could not vary from that amount." (Opp. at p. 119).  Although this allegation is indispensable (but not sufficient) to Plaintiffs' fraud claims and assertions of joint-employer status, Plaintiffs have failed to adequately support it.  Instead, Plaintiffs' rely solely on unsupported and contradictory evidence from one former au pair (nominal Plaintiff Lusapho Hlatshaneni) and one former host parent (Eileen Boehne) who participated in the APIA program.

Ms. Hlatshaneni's unsubstantiated assertion that she understood that she "could not be paid more than $195.75 per week" is undermined by her weekly receipt of a stipend in an amount greater than $195.75.  Hlatshaneni Dep. Tr. 144:12-144:17 (Movant's App. p. 13).  It is also undermined by her execution of the APIA Host Family and Au Pair / Companion Agreement, wherein Ms. Hlatshaneni and her host family agreed and understood that she was to receive "at a minimum" the stipend amount

---

[10] First, Plaintiffs cite Hoggard's deposition testimony, in which she recalls a disagreement with Ruth Ferry of APIA.  But the transcript makes clear the disagreement (1) concerned whether to lobby the government on the correct background-check regulation (nothing to do with price-fixing), and (2) did not **result in any "change" in "behavior."**  PRA 4703 (Hoggard Dep. Tr. 127:7-128:18).  Second, Plaintiffs cite handwriting stating "we need to all be on the same page," but this note was made with respect to the Alliance's lobbying positions (a fact Plaintiffs do not attempt to dispute).  PRA 442 (ALLI-000025) (Plaintiffs cite document as "PRA 425 (ALLI-000025)" but the ALLI-000025 stamp makes clear that Plaintiffs intended to cite PRA 442).

communicated by APIA.  Dkt. #861-1, Ex. B.  As discussed above, all au pairs and host families execute the Agreement as a prerequisite for participation in the APIA program, thereby demonstrating that they understood that the $195.75 stipend was merely a *minimum*.[11]

Plaintiffs cite to the Declaration of Eileen Boehne in support of their contention that host families understood that $195.75 was a fixed amount. (Opp. at p. 119.)  During Ms. Boehne's deposition, however, she testified that she was "not sure" if an APIA representative told her that she "could not pay more than [$195.75]" when she was provided an opportunity to review and verify the Declaration.  Boehne Dep. Tr., 129:9-129:20 (Movant's App. p. 18.)  Moreover, just as Ms. Hlatshaneni executed the Agreement and received a weekly stipend in an amount greater than $195.75, Ms. Boehne also executed the Agreement and paid some of the au pairs placed in her home a stipend in an amount greater than $195.75.  Boehne Dep. Tr., 132:14 – 133:1. (*Id.* pp. 19-20.)

## III.  MEMBERS OF THE CALIFORNIA SUBCLASS ARE INELIGIBLE FOR OR NOT ENTITLED TO OVERTIME UNDER THE CLL

Plaintiffs argue that the "personal attendant" overtime exemption is inapplicable to au pairs because au pairs are not "in the healthcare industry" and because au pairs perform a significant amount of non-childcare work.  (Opp. pp. 150-51).  First, the exemption does not require healthcare industry employment.  *Young v. Simon*, 2011

---

[11] *See also*, Barrera Dep. Tr. 18:2 – 19:4; 40:3 – 41:2 (Movant's App. pp. 15-16); Fusete Dep. Tr. 12:14 – 13:15 (Agreement is "pretty accurate with everything, with all the – all the rules for the au pair program") (*Id.*, pp. 5-8); Lemus Dep. Tr. 25:22 – 28:6 (*Id.*, pp. 5-8); Arias Dep. Tr. 16:12 – 17:11 (*Id.*, pp. 10-11).

WL 9119259 (Cal. Super. 2011) (applying exemption to a nanny).  Second, au pairs do not perform at least 20% of their time engaged in non-childcare duties. *Cardenas v. Mission Indus.*, 226 Cal. App. 3d 952, 958, 277 Cal. Rptr. 247, 249 (Ct. App. 1991) ("[T]he status of 'personal attendant' does not apply if…more than 20 percent of the time respondent was…performing general housekeeping tasks unrelated to the care of the children.").  With the exception of grocery and clothes shopping, Ms. Hlatshaneni testified that all of her duties were limited to childcare.  Hlatshaneni Dep. Tr. 149:13 – 150:9.  It is not even <u>plausible</u> that such shopping duties would exceed 20 percent of the time (more than 9 hours each week) that Ms. Hlatshaneni alleges she spent engaged in her duties.  Therefore, she qualified for the personal attendant exemption. *See Young*, 2011 WL 9119259 at *25.  Plaintiffs have failed to supply any evidence of a "significant amount" of non-childcare duties performed by any APIA au pairs who were placed with a California host family.  Recognizing this deficiency, Plaintiffs cite to evidence from au pairs who participated in other sponsors' programs.  However, evidence from au pairs who were not placed in California and did not participate in the APIA program is woefully insufficient to rebut application of the exemption.

## <u>CONCLUSION</u>

For all the foregoing reasons, APIA respectfully requests that the Court grant Defendants' Motion in its entirety, together and with such other and further relief as the Court deems just and proper.

Respectfully submitted this 13th day of April, 2018.

*s/ Robert M. Tucker*
Stephen J. Macri
Robert M. Tucker
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
1745 Broadway, 22nd Floor
New York, NY 10019
(212) 492-2071
Email:   stephen.macri@ogletree.com
            robert.tucker@ogletree.com

*s/ Eric J. Stock*
Eric J. Stock
Royce Zeisler
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166
(212) 351-2301
Email:    estock@gibsondunn.com

**Attorneys for American Institute for Foreign Study d/b/a Au Pair in America**

## CERTIFICATE OF SERVICE (CM/ECF)

I hereby certify that on April 13, 2018, I have caused to be electronically filed the foregoing APIA'S SUPPLEMENTAL BRIEF IN FURTHER SUPPORT OF DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following counsel of record:

Matthew L. Schwartz (mlschwartz@bsfllp.com)
Peter M. Skinner (pskinner@bsfllp.com)
Randall W. Jackson (rjackson@bsfllp.com)
Dawn L. Smalls (dsmalls@bsfllp.com)
Joshua J. Libling (jlibling@bsfllp.com)
Lauren F. Louis (llouis@bsfllp.com)
Sigrid S. McCawley (smccawley@bsfllp.com)
Sabria A. McElroy (smcelroy@bsfllp.com)
Sean P. Rodriguez (srodriguez@bsfllp.com)
Juan P. Valdivieso (jvaldivieso@bsfllp.com)
Boies Schiller & Flexner, LLP

Alexander N. Hood (alex@towardsjustice.org)

*Counsel for Plaintiffs*

*s/ Robert M. Tucker*